UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

IN RE

MASTER FILE NO. 1:05-md-1720-JG-JO

PAYMENT CARD INTERCHANGE FEE
AND MERCHANT-DISCOUNT
ANTITRUST LITIGATION

This Document Relates To:  All Class Actions

| | | |
|---|---|---|
| 1:05-cv-03800 | 1:05-cv-05081 | **FIRST CONSOLIDATED AMENDED** |
| 1:05-cv-03924 | 1:05-cv-05082 | **CLASS ACTION COMPLAINT** |
| 1:05-cv-04194 | 1:05-cv-05083 | |
| 1:05-cv-04520 | 1:05-cv-05153 | **JURY TRIAL DEMANDED** |
| 1:05-cv-04521 | 1:05-cv-05207 | |
| 1:05-cv-04728 | 1:05-cv-05319 | |
| 1:05-cv-04974 | 1:05-cv-05866 | |
| 1:05-cv-04974 | 1:05-cv-05868 | |
| 1:05-cv-05069 | 1:05-cv-05869 | |
| 1:05-cv-05070 | 1:05-cv-05870 | |
| 1:05-cv-05071 | 1:05-cv-05871 | |
| 1:05-cv-05072 | 1:05-cv-05878 | |
| 1:05-cv-05073 | 1:05-cv-05879 | |
| 1:05-cv-05074 | 1:05-cv-05880 | |
| 1:05-cv-05075 | 1:05-cv-05881 | |
| 1:05-cv-05076 | 1:05-cv-05882 | |
| 1:05-cv-05077 | 1:05-cv-05883 | |
| 1:05-cv-05080 | 1:05-cv-05885 | |

America's largest banks unlawfully fix the fees charged to merchants for transactions over the Visa and MasterCard Networks and enact restrictions that prevent merchants from protecting themselves against those fees.   In this Complaint, two nationwide classes of merchants seek monetary damages to compensate them for the overcharges caused by this illegal conspiracy and equitable relief to protect themselves against continuing and future harm.

Plaintiffs Affiliated Foods Midwest Cooperative, Inc.; Capital Audio Electronics, Inc.; CHS Inc.; Coborn's Incorporated; Crystal Rock LLC; D'Agostino Supermarkets; Discount

Optics, Inc.; Jetro Holdings, Inc. and Jetro Cash & Carry Enterprises, Inc.; Leon's Transmission Service, Inc.; Parkway Corp.; Payless ShoeSource, Inc.; Photos Etc. Corporation; and Traditions, LTD. (collectively the "Merchant Plaintiffs"), American Booksellers Association; National Association of Convenience Stores; NATSO, Inc.; National Community Pharmacists Association; National Cooperative Grocers Association; National Grocers Association; and National Restaurant Association (collectively the "Trade-Association Plaintiffs") on behalf of themselves and two classes of merchants, by their undersigned attorneys herein, allege for their Complaint against Visa U.S.A., Inc. ("Visa"), MasterCard International Incorporated ("MasterCard"), and the other Defendants named in this Complaint ("Bank Defendants") (collectively referred to as "Defendants").

This Complaint is set forth in three parts. Part One relates to all claims that the Plaintiffs assert. Part Two relates to the First through Twelfth Claims that challenge the collective fixing of uniform Credit Card Interchange Fees by Visa and MasterCard member banks and the imposition of various Anti-Steering Restraints and tying, bundling, and exclusive dealing arrangements on merchants by Defendants. Part Three relates to the Thirteenth through Sixteenth Claims that challenge the collective fixing of uniform Offline-Debit-Card Interchange Fees. The Plaintiffs' allegations are upon knowledge with respect to their own acts and upon information and belief with respect to all other matters, as follows:

## PART ONE: ALLEGATIONS COMMON TO ALL CLAIMS

### I.

### INTRODUCTION

1.     The Merchant Plaintiffs operate commercial businesses throughout the United States that have accepted Visa and MasterCard Credit Cards and Debit Cards as forms of

payment along with cash, checks, travelers checks, and other plastic Credit, Debit, and Charge Cards.

2.      The Trade-Association Plaintiffs are comprised of members that operate commercial establishments in the United States and accept Visa and MasterCard Credit Cards and Offline-Debit Cards as forms of payment along with cash, checks, travelers checks, and other plastic Credit, Debit, and Charge Cards.

3.      Together, the Plaintiffs represent two classes of millions of merchants that accept Visa and MasterCard Credit and Debit Cards as forms of payment along with cash, checks, travelers checks, and other plastic Credit, Debit, and Charge Cards and challenge the collusive and anticompetitive practices of the Defendants under the antitrust laws of the United States and the State of California.  The contracts, combinations, conspiracies, and understandings entered into by the Defendants harm competition and cause Plaintiffs and members of the Classes to pay supracompetitive, exorbitant, and fixed prices in the market for General Purpose Card Network Services and Debit Card Network Services and raise the prices paid by all of their retail customers.

4.      The contracts, combinations, and conspiracies in restraint of trade, are illegal under § 1 of the Sherman Act and the California Cartwright Act.  Further, the Anti-Steering Restraints and other exclusionary practices constitute illegal monopolization under § 2 of the Sherman Act.

## II.

## JURISDICTION AND VENUE

5.      This Complaint is filed under § 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain violations of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2, and for

damages under § 4 of the Clayton Act, 15 U.S.C. § 15. This Court has jurisdiction over Plaintiffs' federal antitrust claims under 28 U.S.C. §§ 1331, 1337, 2201, and 2202.

6.      This Court has original jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1332. The aggregate amount in controversy for this class action exceeds $5,000,000 and less than one-third of all class members reside in New York. This Court has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367.

7.      Venue in the Eastern District of New York is proper under 28 U.S.C. § 1391 and 15 U.S.C. §§ 15, 22, and 26. Several of the Merchant Plaintiffs operate retail outlets in the District. The Trade-Association Plaintiffs' members include merchants that transact business in the Eastern District of New York. Defendants transact business and are found in the Eastern District of New York. Thousands of merchants located in the Eastern District of New York accept Visa and/or MasterCard Credit Cards and Debit Cards issued by one or more Defendants and, thus, are members of the Classes. Hundreds of member banks of Visa and/or MasterCard, including many of the banks named as Defendants, issue Visa and MasterCard Credit Cards and Debit Cards and/or acquire retail merchant transactions for Visa and/or MasterCard in the Eastern District of New York. A substantial part of the interstate trade and commerce involved and affected by the alleged violations of the antitrust laws was and is carried on in part within the Eastern District of New York. The acts complained of have had, and will have, substantial anticompetitive effects in the Eastern District of New York.

## III.

## DEFINITIONS

8.     As used in this Complaint, the following terms are defined as:

a.     "Acquiring Bank" means a member of Visa and/or MasterCard that acquires payment transactions from merchants and acts as a liaison between the merchant, the Issuing Bank, and the Payment-Card Network to assist in processing the payment transaction. Visa and MasterCard rules require that an Acquiring Bank be a party to every merchant contract. In a typical payment transaction, when a customer presents a Visa or MasterCard card for payment, the merchant relays the transaction information to the Acquiring Bank. The Acquiring Bank then contacts the Issuing Bank via the network for authorization based on available credit or funds. Acquiring Banks compete with each other for the right to acquire payment transactions from merchants.

b.     "All-Outlets Rule" is a rule of the Visa and MasterCard Networks that requires a merchant with multiple outlets to accept Visa or MasterCard, respectively, in all of its outlets, even if those outlets are owned by a separate corporate entity, operated under a different brand name, or employ a different business model.

c.     "Anti-Steering Restraints" are the rules of the Visa and MasterCard Networks that forbid merchants from incenting consumers to use less expensive payment forms, including: the No-Surcharge Rule; the policies against seeking to "steer" consumers to cheaper payment media; the No-Minimum-Purchase Rule; and the Networks' so-called "anti-discrimination rules," which prohibit merchants from treating any other Payment Card or medium more advantageously than the Defendants' cards. The Defendants' standard-form-merchant agreements proscribe steering by preventing merchants from establishing procedures that favor, discourage, or discriminate against the use of any particular Card.

d.     "Assessment" refers to an amount computed and charged by the Networks on each transaction amount to the Acquiring and Issuing Banks.

e.     "Authorization" is the process by which a merchant determines whether a cardholder is authorized by his or her Issuing Bank to make a particular transaction. The merchant sends the cardholder's information to its Acquiring Bank or a Third-Party Processor, which sends it to Visa or MasterCard, which then sends it to the issuer or the issuer's processor, to obtain authorization. If authorization is given, the process is repeated in reverse.

f.      "Charge Card" or "Travel & Entertainment Card" is an access device, usually a Payment Card, enabling the holder to purchase goods and services on credit to be paid on behalf of the holder by the issuer of such device. Typically, the contractual terms of such cards require that payment from the holder to the issuer be made in full each month, for all payments made on behalf of the cardholder by the issuer during the preceding month. The issuer does not extend credit to the holder beyond the date of the monthly statement, nor does it impose interest charges on the balance due except as a penalty for late payment. Examples of Charge Cards are the American Express Green, Gold, Platinum, and Centurion cards as well as the Diners Club and Carte Blanche cards issued by Citibank.

g.      "Credit Card" is an access device, usually a Payment Card, enabling the holder to (i) effect transactions on credit for goods and services purchased, which are paid on behalf of the holder by the issuer of such devices; or (ii) obtain cash with credit extended by the issuer.  Credit Cards permit consumers to borrow the money for a retail purchase from the card issuer and to repay the debt over time, according to the provisions of a revolving-credit agreement between the cardholder and the issuer.  Examples of Credit Cards are the Visa and MasterCard Credit Cards issued by members of the Defendant Bank card networks, as well as the Discover and Private Issue cards issued by Morgan Stanley, Dean Witter & Co., and the Optima and Blue-type cards issued by American Express.  Proprietary cards of individual merchants for use only at particular merchants' outlets are not included in this definition.

h.      "Debit Card" is an access device, usually a Payment Card, enabling the holder, among other things, to effect a cash withdrawal from the holder's depository bank account, either at an Automated Teller Machine ("ATM") or a point of sale.

i.      "Float" refers to the expense the Issuing Bank incurs by extending interest-free credit to the consumer for the grace period between the date of purchase and the date of payment.

j.      "General Purpose Cards" collectively refers to Credit Cards and Charge Cards.

k.      "Grace Period" refers to the time between a consumer's purchase and the date on which the consumer's payment is due to the Issuing Bank, during which time the consumer pays no interest.

l.      "Interchange Fee" in the United States General Purpose Card Network Services and Debit Card Network Services markets means a fee that merchants pay to the Issuing Bank through the Network and the

Acquiring Bank for each retail transaction in which the Issuer's card is used as a payment device at one of the Acquirer's merchant accounts. The Interchange Fee is paid to the Issuing Bank through the Network and the Acquiring Bank by Class members, and constitutes a component of and a floor for the Merchant-Discount Fee.  The following example illustrates how the Visa and MasterCard Interchange Fees work.  A customer presents a Visa or MasterCard card to a merchant as a payment method.  The merchant contacts the Acquiring Bank, either directly or through a Third-Party Processor, to authorize the transaction.  The Acquiring Bank submits the transaction to the Network.  The Network relays the transaction information to the Issuing Bank or the Issuing Bank's Third-Party Processor, which approves the transaction if the customer has a sufficient line of credit or available funds.  If the transaction is authorized through the Network, the Issuing Bank pays the Acquiring Bank the payment amount minus the "Interchange Fee," which is fixed by the member banks of Visa and MasterCard.  The Acquiring Bank then pays the merchant the payment amount minus the Interchange Fee and other charges for processing the transaction.  The total fee charged the merchant is often referred to as the "Merchant-Discount Fee."  The Interchange Fee is the largest component of the Merchant-Discount Fee.  Visa Interchange Fees are fixed periodically by Visa member banks, acting through the Visa Board of Directors.  MasterCard Interchange Fees are fixed periodically by the MasterCard member banks, acting through the MasterCard Board of Directors. "Merchant-Discount Fee" means the total amount that the merchant, such as one of the Class members, pays to its Acquiring Bank for each transaction involving a Visa or MasterCard credit or Offline-Debit Card.

m.   "Intra-Processed Transactions" are transactions in which the Issuing Bank and Acquiring Bank or merchant processes transactions through the same Third-Party Processor.

n.   "Issuing Bank" means a member of Visa and/or MasterCard that issues Visa and/or MasterCard branded Payment Cards to consumers for their use as payment systems and access devices.  Issuing Banks compete with each other to issue Visa and MasterCard cards to consumers.  Visa and MasterCard rules require that all member banks issue, respectively, Visa and MasterCard Payment Cards.

o.   "Merchant-Discount Fee" is the fee paid by the merchant to the Acquiring Bank, which typically consists of the Interchange Fees, service fees, and processing fees and an additional processing fee charged by the Acquiring Bank.

p.   "Miscellaneous Exclusionary Restraints" refer collectively to the All-Outlets Rule, the No-Bypass Rule, and the No-Multi-Issuer Rule.

q.  "Network Services" means the services and infrastructure that Visa and MasterCard and their members provide to merchants through which payment transactions are conducted, including authorization, clearance, and settlement of transactions, and those similar services offered by American Express and Discover. As they currently are offered by Visa and MasterCard and their member banks, Network Services include Network-Processing Services and the Visa and MasterCard Payment-Card Systems that guarantee universal acceptance of Visa and MasterCard Payment Cards.

r.  "Network-Processing Services" are the services that are or may be used for authorizing, clearing, and settling Visa and MasterCard Credit and Debit Card transactions.

s.  "No-Minimum-Purchase Rule" is a rule of the Visa and MasterCard Networks that prohibits merchants from imposing minimum-purchase amounts for Visa and MasterCard Credit-Card purchases.

t.  "No-Bypass Rule" is a rule of the Visa and MasterCard Networks that prohibits merchants and member banks from bypassing the Visa or MasterCard system (thereby avoiding the supracompetitive Interchange Fees) in order to clear, authorize, or settle Credit Card transactions even if the Issuing and Acquiring Banks are the same, or even if an independent processor has agreements with both the Issuing and Acquiring Banks on any given transaction.

u.  "No-Multi-Issuer Rule" is a rule of the Visa and MasterCard Networks respectively, that prohibits Visa and MasterCard transactions from also being able to be processed over other Networks.

v.  "No-Surcharge Rule" is a rule of the Visa and MasterCard Networks that forbids merchants from charging cardholders a surcharge on their Payment-Card transactions to reflect cost differences among various payment methods. For example, merchants are prohibited from surcharging cardholders who use a Visa Credit Card rather than a Discover-branded Credit Card, or use a Premium Credit Card rather than a standard Credit Card, or use a Credit Card rather than another form of payment.

w.  "Offline Signature Debit Card" or "Offline Debit Card" is a Debit Card with which the cardholder authorizes a withdrawal from his or her bank account usually by presenting the card at the POS and signing a receipt. Offline Signature Debit Card transactions are processed as Credit Card transactions. Examples of Offline Signature Debit Cards include Visa's "Visa Check" product and MasterCard's "Debit MasterCard" product.

x.   "Online PIN-Debit Card" is a Debit Card with which the cardholder authorizes a withdrawal from his or her bank account by swiping her card at the POS and entering a Personal Identification Number ("PIN"). Online PIN-Debit-Card networks grew out of regional ATM networks and are therefore processed differently than Offline transactions. Examples of Online PIN-Debit-Card networks include Interlink, Maestro, NYCE, and Pulse.

y.   "On-Us Transactions" are transactions in which the Acquiring Bank and the Issuing Bank are the same. Even when the Issuing and Acquiring Banks are identical, Visa and MasterCard require that the Bank charge an Interchange Fee to the merchant.

z.   "Payment Card" refers to a plastic card that enables consumers to make purchases from merchants that accept the consumer's Payment Card. The term "Payment Card" refers to several different types of cards, including, General-Purpose Cards, Debit Cards, Travel & Entertainment Cards, stored-value cards, and merchant-proprietary cards.

aa.  "Payment-Card-System Services" means the standard-setting functions performed by Payment-Card Networks. Payment-Card-System Services encompasses the brand of the particular card program, the rules and protocols for providing merchant acceptance of and conducting Payment-Card transactions under that brand, and the rules and protocols for conducting transactions under that brand. The four leading providers of Payment-Card-System Services are Visa, MasterCard, Discover, and American Express.

bb.  "Payment-Guarantee Services" refers to a service that a merchant might purchase to insure the merchant against Credit- or Debit-Card fraud, check fraud, and other forms of payment fraud, and/or assists the merchant in minimizing the costs of such fraud.

cc.  "Settlement" is the process by which the merchant is reimbursed for the Credit Card transaction. While Visa and MasterCard rules require that an Acquiring Bank be a party to all merchant card-acceptance agreements, merchants often use Third-Party Processors to process these transactions. The Acquiring Bank or its processor credits the merchant's bank account with the amount paid by the cardholder less the Merchant-Discount, and then transmits the transaction data to Visa or MasterCard, which sends it to the Issuing Bank or its Third-Party Processor. The Issuing Bank then sends payment to the Acquiring Bank through Visa or MasterCard (and possibly the Acquirer's processor).

dd.   "Third-Party Processor" is a firm, other than Visa, MasterCard, a member bank, or an entity affiliated with a member bank, that performs the authorization, clearing, and settlement functions of a Visa or MasterCard Payment-Card transaction on behalf of a merchant or a member bank. Examples of Third-Party Processors include First Data and Transfirst.

## IV.

## THE PARTIES

9.    Plaintiff Affiliated Foods Midwest Cooperative, Inc. ("AFMW") is a Nebraska corporation with principal business operations in Norfolk, Nebraska. AFMW is a cooperative owned by or serving over 850 independent supermarkets in 12 Midwestern states. AFMW's primary business is a supply warehouse and service provider for its retail-grocer members.

10.   Most of the retailer-owners and retailer-members of AFMW accept payment by Visa and/or MasterCard Credit Cards and Debit Cards and, as such, are forced to pay the supracompetitive Interchange- and Merchant-Discount Fees associated with these transactions and are forced to abide by Anti-Steering Restraints and tying and bundling arrangements imposed by Defendants. AFMW's retail members and owners that accept Visa and/or MasterCard Credit Cards and Debit Cards have been injured in their business or property and many have agreed or will agree to assign their claims for monetary damages to AFMW.

11.   Plaintiff American Booksellers Association ("ABA") is a non-profit association, organized under the laws of New York with its principal place of business in Tarrytown, New York. ABA represents and serves, through advocacy, education, research, and information dissemination, more than 1800 independently owned bookstore-members, which operate over 2000 retail-storefront locations. Some of ABA's members are located in the Eastern District of New York.

- 10 -

12.    Most of the merchants represented by ABA accept payment by Visa and MasterCard Credit Cards and Debit Cards and, as such, are forced to pay the supracompetitive Interchange- and Merchant-Discount Fees associated with these transactions and are forced to abide by Anti-Steering Restraints and tying and bundling arrangements imposed by Defendants.

13.    ABA seeks declaratory and injunctive relief on behalf of its members to remedy the violations of federal and state antitrust laws described in this Complaint.

14.    Plaintiff Capital Audio Electronics Inc. ("Capital Audio") is a wholesale and retail consumer electronics company, with its principal place of business in New York, New York.  Capital Audio accepts payment by Visa and MasterCard Credit- and Debit Cards and, as such, is forced to pay the supracompetitive Interchange- and Merchant-Discount Fees associated with these Visa and MasterCard transactions and is forced to abide by the Anti-Steering Restraints and tying and bundling arrangements imposed by the Defendants.  Capital Audio has been injured in its business or property as a result of the unlawful conduct alleged herein.

15.    Plaintiff CHS Inc. ("CHS") is a Minnesota cooperative corporation with its principal place of business in Inver Grove Heights, Minnesota.  CHS is an agricultural cooperative that, among its many activities, does the following:  (i) owns farm stores, gas stations and convenience stores (the "Owned Stores") and (ii) provides products, supplies and services to other persons and entities that own gas stations and convenience stores (the "Non-Owned Stores").  CHS accepts Visa and MasterCard Credit- and Debit Cards on behalf of both the Owned Stores and the Non-Owned Stores, and as such pays the supracompetitive Interchange- and Merchant-Discount Fees associated with Visa and MasterCard transactions

at those stores and is forced to abide by the Anti-Steering Restraints and tying and bundling arrangements imposed by the Defendants.  CHS has been injured in its business or property as a result of the unlawful conduct alleged herein.

16.     Plaintiff Coborn's, Incorporated ("Coborn's") is a Minnesota corporation with its principal place of business in St. Cloud, Minnesota.  Coborn's accepts payment by Visa and MasterCard Credit- and Debit Cards and, as such, is forced to pay the supracompetitive Interchange- and Merchant-Discount Fees associated with these Visa and MasterCard transactions, and is forced to abide by the Anti-Steering Restraints and tying and bundling arrangements imposed by the Defendants.  Coborn's has been injured in its business or property as a result of the unlawful conduct alleged herein.

17.     Plaintiff Crystal Rock, LLC ("Crystal Rock") is a Delaware limited-liability company with its principal place of business in Watertown, Connecticut.  Crystal Rock markets and distributes natural spring water as well as coffee and other ancillary products to homes and offices throughout New England, New York, and New Jersey.  Crystal Rock is the fourth-largest home- and office water-distribution company in the United States.  Crystal Rock accepts payment by Visa and MasterCard Credit- and Debit Cards and, as such, is forced to pay the supracompetitive Interchange- and Merchant-Discount Fees associated with these Visa and MasterCard transactions, and is forced to abide by the Anti-Steering Restraints and tying and bundling arrangements imposed by the Defendants.  Crystal Rock has been injured in its business or property as a result of the unlawful conduct alleged herein.

18.     Plaintiff D'Agostino Supermarkets, Inc. ("D'Agostino") is a family-owned retail grocery chain operating under the laws of New York with its principal place of business is Larchmont, New York.  D'Agostino has 34 locations in and around New York City.

D'Agostino accepts payment by Visa and MasterCard Credit- and Debit Cards and, as such, is forced to pay the supracompetitive Interchange- and Merchant-Discount Fees associated with these Visa and MasterCard transactions, and is forced to abide by the Anti-Steering Restraints and tying and bundling arrangements imposed by the Defendants. D'Agostino has been injured in its business or property as a result of the unlawful conduct alleged herein.

19.     Plaintiff Discount Optics, Inc. ("Discount Optics") is a Florida corporation with its principal place of business in Boca Raton, Florida. Discount Optics is in the business of wholesale optical supplies for the optical industry. Discount Optics accepts payment by Visa and MasterCard Credit- and Debit Cards and, as such, is forced to pay the supracompetitive Interchange- and Merchant-Discount Fees associated with these Visa and MasterCard transactions, and is forced to abide by the Anti-Steering Restraints and tying and bundling arrangements imposed by the Defendants. Discount Optics has been injured in its business or property as a result of the unlawful conduct alleged herein.

20.     Plaintiff Jetro Cash & Carry Enterprises, Inc., a Delaware corporation with its principal place of business in College Point, New York, is a subsidiary of Jetro Holdings, Inc., a New York corporation with its principal place of business in College Point, New York. Jetro Cash & Carry Enterprises, Inc. and Jetro Holdings, Inc. are collectively referred to herein as "Jetro."

21.     Jetro engages in interstate commerce. It operates 45 warehouse-style stores under the names "Jetro Cash & Carry" and "Restaurant Depot." Through these wholesale outlets, Jetro is the nation's largest cash-and-carry supplier of food and equipment to independent grocery stores and restaurants. Jetro accepts payment by Visa and MasterCard Credit- and Debit Cards and, as such, is forced to pay the supracompetitive Interchange- and

Merchant-Discount Fees associated with these Visa and MasterCard transactions, and is forced to abide by the Anti-Steering Restraints and tying and bundling arrangements imposed by the Defendants. Jetro has been injured in its business or property as a result of the unlawful conduct alleged herein.

22.     Plaintiff Leon's Transmission Service, Inc. ("Leon's Transmission") is a California corporation with its principal place of business in Reseda, California. Leon's Transmission is an automotive transmission service serving Southern California. Leon's Transmission accepts payment by Visa and MasterCard Credit- and Debit Cards and, as such, is forced to pay the supracompetitive Interchange- and Merchant-Discount Fees associated with these Visa and MasterCard transactions, and is forced to abide by the Anti-Steering Restraints and tying and bundling arrangements imposed by the Defendants. Leon's Transmission has been injured in its business or property as a result of the unlawful conduct alleged herein.

23.     Plaintiff National Association of Convenience Stores ("NACS") is a non-profit international trade association organized under the laws of Virginia, with its principal place of business in Alexandria, Virginia.

24.     NACS represents over 2200 convenience store companies, operating over 140,000 storefronts in the United States and over 250,000 storefronts worldwide. NACS members have combined revenues of over $474 billion annually. Some of NACS's members are located in the Eastern District of New York.

25.     Most of the convenience stores represented by NACS accept payment by Visa and/or MasterCard Credit Cards and Debit Cards and, as such, are forced to pay the supracompetitive Interchange- and Merchant-Discount Fees associated with these transactions

- 14 -

and are forced to abide by the Anti-Steering Restraints and tying and bundling arrangements imposed by the Defendants.

26. NACS funds its operations partly with dues and payments from its members. NACS accepts payment by Visa and MasterCard Credit- and Debit Cards and, as such, is forced to pay the supracompetitive Interchange- and Merchant-Discount Fees associated with these Visa and MasterCard transactions, and is forced to abide by the Anti-Steering Restraints and tying and bundling arrangements imposed by the Defendants. NACS and its members have been injured in their business or property as a result of the unlawful conduct alleged herein.

27. NACS seeks declaratory and injunctive relief on behalf of itself and its members and damages on behalf of itself as a remedy and compensation for the violations of federal and state antitrust laws described in this Complaint.

28. Plaintiff NATSO, Inc. ("NATSO") is a non-profit trade association, organized under the laws of Virginia, with its principal place of business in Alexandria, Virginia. NATSO represents travel plaza and truck stop owners and operators. NATSO represents over 900 travel plazas and truck stops nationwide, owned by more than 260 corporate entities. NATSO's mission is to advance this diverse industry by serving as the official source of information on travel plazas, acting as the voice of the industry with government, and conducting the industry's only national convention and exposition.

29. NATSO, and most of the truck stops and travel plazas it represents, accept payment by Visa and MasterCard Credit- and Debit Cards and, as such, are forced to pay the supracompetitive Interchange- and Merchant-Discount Fees associated with these Visa and MasterCard transactions, and are forced to abide by the Anti-Steering Restraints and tying and

bundling arrangements imposed by the Defendants. NATSO and its members have been injured in their business or property as a result of the unlawful conduct alleged herein.

30.     NATSO seeks declaratory and injunctive relief on behalf of itself and its members and damages on behalf of itself as a remedy and compensation for the violations of federal and state antitrust laws described in this Complaint.

31.     Plaintiff National Community Pharmacists Association ("NCPA") is a non-profit trade association operating under the laws of Virginia with its principal place of business in Alexandria, Virginia.

32.     NCPA represents the pharmacist owners, managers, and employees of nearly 25,000 independent community pharmacies across the United States. Some of NCPA's members are located in the Eastern District of New York.

33.     Most of the pharmacies and pharmacists represented by NCPA accept payment by Visa and/or MasterCard Credit Cards and Debit Cards and, as such, are forced to pay the supracompetitive Interchange- and Merchant-Discount Fees associated with these transactions and are forced to abide by the Anti-Steering Restraints and tying and bundling arrangements imposed by the Defendants. NCPA and its members have been injured in their business or property as a result of the unlawful conduct alleged herein.

34.     NCPA funds its operations partly with dues from its members. It allows its members to pay dues with Visa and MasterCard Credit Cards and Debit Cards, for which NCPA pays the supracompetitive Interchange and Merchant-Discount Fees associated with those Credit Card dues payments.

35. NCPA seeks declaratory and injunctive relief on behalf of itself and its members and damages on behalf of itself as a remedy and compensation for the violations of federal and state antitrust laws described in this Complaint.

36. Plaintiff National Cooperative Grocers Association ("NCGA") is a Minnesota cooperative with its principal place of business in Iowa City, Iowa and acts as a trade association and national purchasing cooperative for consumer-owned grocery stores.

37. NCGA represents the interests of 107 member-owned cooperatives, which operate 133 storefronts in 32 states across the nation, with combined annual sales of over $800 million. NCGA's mission is to provide the vision, leadership, and systems necessary to support a nationwide network of cooperatives.

38. Most of the cooperative retailers represented by NCGA accept payment by Visa and/or MasterCard Credit Cards and Debit Cards and, as such, are forced to pay the supracompetitive Interchange- and Merchant-Discount Fees associated with these transactions and abide by the Anti-Steering Restraints and tying and bundling arrangements imposed by the Defendants. NCGA and its members have been injured in its business or property as a result of the unlawful conduct alleged herein.

39. NCGA seeks declaratory and injunctive relief on behalf of itself and its members as a remedy and compensation for the violations of federal and state antitrust laws described in this Complaint.

40. Plaintiff National Grocers Association ("N.G.A.") is a non-profit international trade association, organized under the laws of the District of Columbia with its principal place of business in Arlington, Virginia.

- 17 -

41.     N.G.A. represents and serves the retail grocery/food companies and wholesale distributors that comprise the independent sector of the food-distribution industry. N.G.A. members include retail-grocery/food companies and wholesale distributors, affiliated associations, as well as manufacturers, service suppliers, and other entrepreneurial companies that support N.G.A.'s Philosophy and Mission. Some of N.G.A.'s members are located in the Eastern District of New York.

42.     N.G.A. and most of the retailers and wholesalers represented directly or indirectly by it accept payment by Visa and/or MasterCard Credit Cards and Debit Cards and, as such, are forced to pay the supracompetitive Interchange- and Merchant-Discount Fees associated with these transactions and abide by the Anti-Steering Restraints and tying and bundling arrangements imposed by the Defendants. N.G.A. and its members have been injured in their business or property as a result of the unlawful conduct alleged herein.

43.     N.G.A. seeks declaratory and injunctive relief on behalf of itself and its members and damages on behalf of itself as a remedy and compensation for the violations of federal and state antitrust laws described in this Complaint.

44.     Plaintiff National Restaurant Association ("NRA") is a non-profit trade association, organized under the laws of the State of Illinois, with its principal place of business in Washington, D.C. Founded in 1919, NRA is the leading business trade association for the restaurant industry. The Association's mission is to represent, educate, and promote a rapidly growing industry that is comprised of 925,000 restaurant and foodservice outlets employing 12.5 million people.

45.     NRA, and many of its members, accept payment by Visa and/or MasterCard Credit and Debit Cards and, as such, are forced to pay the supracompetitive Interchange Fees

- 18 -

and Merchant-Discount Fees associated with those transactions and abide by the Anti-Steering Restraints and tying and bundling arrangements imposed by the Defendants. NRA and its members have been injured in their business or property as a result of the unlawful conduct alleged herein.

46.    NRA seeks declaratory and injunctive relief on behalf of itself and its members and damages on behalf of itself as a remedy and compensation for the violations of federal and state antitrust laws described in this Complaint.

47.    Plaintiff Parkway Corporation ("Parkway") is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania. Parkway is engaged in the automobile-parking business. Parkway accepts payment by Visa and MasterCard Credit- and Debit Cards and, as such, is forced to pay the supracompetitive Interchange- and Merchant-Discount Fees associated with these Visa and MasterCard transactions, and is forced to abide by the Anti-Steering Restraints and tying and bundling arrangements imposed by the Defendants. Parkway has been injured in its business or property as a result of the unlawful conduct alleged herein.

48.    Plaintiff Payless ShoeSource, Inc., ("Payless") is a Delaware Corporation with its principal place of business in Topeka, Kansas. Payless accepts payment by Visa and MasterCard Credit- and Debit Cards and, as such, is forced to pay the supracompetitive Interchange- and Merchant-Discount Fees associated with these Visa and MasterCard transactions, and is forced to abide by the Anti-Steering Restraints and tying and bundling arrangements imposed by the Defendants. Payless has been injured in its business or property as a result of the unlawful conduct alleged herein.

49.     Plaintiff Photos Etc. Corporation ("Photos Etc.") is a California corporation doing business as "30 Minute Photos Etc." with its principal place of business in Irvine, California. Photos Etc. is engaged in the business of photography finishing, which includes the operation of a national internet-based photography business. Photos Etc. accepts payment by Visa and MasterCard Credit- and Debit Cards and, as such, is forced to pay the supracompetitive Interchange- and Merchant-Discount Fees associated with these Visa and MasterCard transactions, and is forced to abide by the Anti-Steering Restraints and tying and bundling arrangements imposed by the Defendants. Photos Etc. has been injured in its business or property as a result of the unlawful conduct alleged herein.

50.     Plaintiff Traditions Ltd. is a Minnesota corporation which owns and operates retail furniture stores in St. Paul and Minneapolis, Minnesota and Naples, Florida. Traditions Ltd. accepts payment by Visa and MasterCard Credit- and Debit Cards and, as such, is forced to pay the supracompetitive Interchange- and Merchant-Discount Fees associated with these Visa and MasterCard transactions, and is forced to abide by the Anti-Steering Restraints and tying and bundling arrangements imposed by the Defendants. Traditions Ltd. has been injured in its business or property as a result of the unlawful conduct alleged herein.

51.     The anticompetitive behavior by the Visa and MasterCard Networks and their member banks described above has caused antitrust injury common to the Plaintiffs and members of the Classes.

52.     Defendant Visa International (f/k/a Visa International Service Association) is a non-stock, non-assessable Delaware membership corporation with its principal place of business in Foster City, California. Its members include approximately 21,000 banks.

- 20 -

53.     Defendant Visa U.S.A., Inc. is a group-member of Visa International Service Association and is also a non-stock, non-assessable Delaware membership corporation with its principal place of business in San Francisco, California.   It is a national bank-card association whose members include approximately 14,000 banks.   Defendants Visa International Service Association and Visa U.S.A., Inc. are collectively referred to herein as "Visa."   During the relevant time period, Visa has been and is governed by a board of directors comprised of bank executives selected from its member banks, including some of the Bank Defendants.  Visa transacts business in this judicial district.

54.     Defendant MasterCard Incorporated is a private, SEC-registered share company, organized under the laws of Delaware with its principal place of business in Purchase, New York.   Defendant MasterCard International Incorporated is a Delaware membership corporation that consists of more than 23,000 member banks worldwide and is the principal operating subsidiary of MasterCard Incorporated.  MasterCard Incorporated and MasterCard International Incorporated are collectively referred to herein as "MasterCard."

55.     Defendant Bank of America, N.A. is a national banking association with its principal place of business in Charlotte, North Carolina.  Defendant BA Merchant Services LLC (f/k/a Defendant National Processing, Inc.) is an Ohio corporation with its principal place of business in Louisville, Kentucky, and is a wholly owned subsidiary of Defendant Bank of America, N.A., which in turn is a wholly owned subsidiary of NB Holdings, which in turn is wholly owned by Defendant Bank of America Corporation, a Delaware corporation with its principal place of business in Charlotte, North Carolina.  Defendant Bank of America, N.A., Defendant BA Merchant Services LLC (f/k/a Defendant National Processing, Inc.), and NB Holdings are collectively referred to as "Bank of America."

56.     Bank of America is a member of both Visa and MasterCard.  It engages in interstate commerce.  It is an Issuing Bank that, throughout this judicial district, issues General Purpose Payment Cards to individuals and businesses.  It is an Acquiring Bank which, throughout this judicial district, acquires Visa and MasterCard credit receipts or the electronic equivalent for members of the Classes, for deposit in their commercial-demand-deposit bank account at the face amount less a fee.  It is currently and/or has been represented on the Visa Board of Directors.  It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

57.     Defendant MBNA America Bank, N.A. ("MBNA") is a Delaware corporation with its principal place of business in Wilmington, Delaware and a wholly-owned subsidiary of MBNA Corporation, a Delaware corporation with its principal place of business in Wilmington, Delaware.

58.     MBNA is a member of both Visa and MasterCard.  It engages in interstate commerce.  It is an Issuing Bank that, throughout this judicial district, issues General Purpose Payment Cards to individuals and businesses.  It is currently and/or has been represented on the Board of Directors of MasterCard.  It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

59.     On January 1, 2006, Defendant Bank of America acquired 100 percent of the stock of MBNA.  For all actions from and after that date, Defendants MBNA and Bank of America are referred to collectively as "Bank of America."

60.     Defendant Barclays Bank Limited, a bank operating under the laws of the United Kingdom with its principal place of business in London, England, and Defendant Juniper Financial Corporation, a Delaware corporation with its principal place of business in

Wilmington, Delaware, are subsidiaries of Defendant Barclays Group Holdings Limited, a corporation operating under the laws of the United Kingdom, with its principal place of business in London, England.   Defendants Barclays Bank Limited, Juniper Financial Corporation, and Barclays Group Holdings Limited are collectively referred to herein as "Barclays."

61.     Barclays is a member of both Visa and MasterCard through Juniper Financial Corporation and issues credit cards through its Barclay card division. It engages in interstate commerce.   It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

62.     Defendant Capital One Bank, a Virginia bank with its principal place of business in Glen Allen, Virginia, and Capital One F.S.B., a national bank with its principal place of business in McLean, Virginia, are wholly-owned subsidiaries of Defendant Capital One Financial Corporation, a Delaware corporation with its principal place of business in McLean, Virginia.   Defendants Capital One Bank, Capital One F.S.B., and Capital One Financial Corporation are collectively referred to as "Capital One."

63.     Capital One is a member of both Visa and MasterCard. It engages in interstate commerce. It is currently and/or has been represented on the MasterCard Board of Directors. It is an Issuing Bank that, throughout this judicial district, issues General Purpose Payment Cards to individuals and businesses. It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

64.     Defendant Chase Bank USA, N.A., a New York bank with its principal place of business in New York, New York, is the successor to Defendant Chase Manhattan Bank USA, N.A., and a wholly-owned subsidiary of Defendant JPMorgan Chase & Co., a Delaware

- 23 -

corporation with its principal place of business in New York, New York. Defendants Chase Manhattan Bank USA, N.A. and JPMorgan Chase & Co. are referred to collectively herein as "Chase."

65. Chase is a member of both Visa and MasterCard. It engages in interstate commerce. It is an Issuing Bank that issues General-Purpose Payment Cards to individuals and businesses throughout this judicial district. It is also an Acquiring Bank. It is the majority parent of Chase Paymentech Solutions, LLC, which, throughout this judicial district, acquires Visa and MasterCard credit receipts or the electronic equivalent for members of the Classes, for deposit in their commercial-demand-deposit bank account at the face amount less a fee. In 2004, Chase completed its acquisition of Bank One Corporation and Bank One, Delaware, N.A., which also had acted as an Issuing Bank and an Acquiring Bank. It is currently and/or has been represented on the Visa Board of Directors. It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

66. Defendant Citibank N.A., a bank with its principal place of business in New York, New York, is a subsidiary of Defendant Citigroup, Inc., a Delaware corporation with its principal place of business in New York, New York. Defendant Citicorp merged into Defendant Citigroup, Inc., on August 1, 2005. Defendants Citibank N.A., Citicorp, and Citigroup, Inc. are collectively referred to herein as "Citigroup."

67. Citigroup is a member of both Visa and MasterCard. It engages in interstate commerce. It is an Issuing Bank that, throughout this judicial district, issues General Purpose Payment Cards to individuals and businesses. It is an Acquiring Bank that, throughout this judicial district, acquires Visa and MasterCard credit receipts or the electronic equivalent for members of the Classes, for deposit in their commercial-demand-deposit bank account at the

- 24 -

face amount less a fee.  It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

68.    Defendant Fifth Third Bancorp ("Fifth Third") is an Ohio corporation with its principal place of business in Cincinnati, Ohio.

69.    Fifth Third is a member of both Visa and MasterCard.  It engages in interstate commerce.  It is an Issuing Bank that, throughout this judicial district, issues General Purpose Payment Cards to individuals and businesses.  It is an Acquiring Bank, which acquires Visa and MasterCard credit receipts or the electronic equivalent for members of the Classes, for deposit in their commercial-demand-deposit bank account at the face amount less a fee.  It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

70.    Defendant First National Bank of Omaha is a Nebraska corporation with its principal place of business in Omaha, Nebraska.

71.    First National Bank of Omaha is a member of both Visa and MasterCard.  It engages in interstate commerce.  First National Bank of Omaha is and/or has been represented on the Visa Board of Directors.  It is an Acquiring Bank, which acquires Visa and MasterCard credit receipts or the electronic equivalent for members of the Classes, for deposit in their commercial-demand-deposit bank account at the face amount less a fee.  It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

72.    Defendant HSBC Finance Corporation is a Delaware corporation with its principal place of business in Prospect Heights, Illinois.  It is a subsidiary of Defendant HSBC Bank USA, N.A., a Delaware corporation with its principal place of business in Wilmington,

Delaware.  Defendant HSBC Bank USA, N.A. is a subsidiary of HSBC Overseas Holdings (UK) Limited, which is wholly owned by HSBC North America Holdings, Inc., which is a subsidiary of HSBC Holdings, plc, a corporation organized under the laws of the United Kingdom with its principal place of business in London, England.  Defendants HSBC Finance Corporation, HSBC Bank USA, N.A., HSBC North America Holdings, Inc., and HSBC Holdings, plc are collectively referred to herein as "HSBC."

73.     HSBC is a member of both Visa and MasterCard.  HSBC engages in interstate commerce.  Through its subsidiary, HSBC Bank USA, N.A., HSBC is an Acquiring Bank which acquires Visa and MasterCard credit receipts or the electronic equivalent for members of the Classes, for deposit in their commercial-demand-deposit bank account at the face amount less a fee.  It is currently and/or has been represented on the MasterCard Board of Directors.  It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

74.     Defendant National City Corporation is a Delaware Corporation with its principal place of business in Cleveland, Ohio.  Defendant National City Bank of Kentucky is a wholly-owned subsidiary of Defendant National City Corporation.  Defendants National City Corporation and National City Bank of Kentucky are collectively referred to herein as "National City."

75.     National City is a member of both Visa and MasterCard.  It engages in interstate commerce.  It is an Issuing Bank.  National City was an Acquiring Bank through its former subsidiary, Defendant National Processing, Inc. (n/k/a BA Merchant Services LLC), until National Processing, Inc. (n/k/a BA Merchant Services LLC) was purchased by Bank of America in October 2004.  Until then, National City was an Acquiring Bank that acquired

Visa and MasterCard credit receipts or the electronic equivalent for members of the Classes, for deposit in their commercial-demand-deposit bank account at the face amount less a fee. It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

76.     Defendant SunTrust Banks, Inc. ("SunTrust") is a Georgia corporation with its principal place of business in Atlanta, Georgia.

77.     SunTrust is a member of both Visa and MasterCard. It engages in interstate commerce. Through its subsidiary, SunTrust BankCard, N.A., it is an Issuing Bank that, throughout this judicial district, issues General Purpose Payment Cards to individuals and businesses. It is also an Acquiring Bank, which acquires Visa and MasterCard credit receipts or the electronic equivalent for members of the Classes, for deposit in their commercial-demand-deposit bank account at the face amount less a fee. It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

78.     Defendant Texas Independent Bancshares, Inc. is a Texas corporation with its principal place of business in Texas City, Texas.

79.     Texas Independent Bancshares, Inc. is a member of Visa and MasterCard. It engages in interstate commerce. It is currently and/or has been represented on the Visa Board of Directors. It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

80.     Defendant Wachovia Bank, N.A., a North Carolina corporation with its principal place of business in Charlotte, North Carolina, is a subsidiary of Defendant Wachovia Corporation, a North Carolina corporation with its principal place of business in

Charlotte, North Carolina. Defendants Wachovia Bank, N.A. and Wachovia Corporation are collectively referred to herein as "Wachovia."

81.     Wachovia is a member of both Visa and MasterCard. It engages in interstate commerce. It is an Acquiring Bank that, throughout this judicial district, acquires Visa and MasterCard credit receipts or the electronic equivalent for members of the Classes, for deposit in their commercial-demand-deposit bank account at the face amount less a fee. It is currently and/or has been represented on the Visa Board of Directors. It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

82.     Defendant Washington Mutual, Inc., is a Washington corporation with its principal place of business in Seattle, Washington. Washington Mutual engages in interstate commerce. On October 3, 2005, Washington Mutual completed its acquisition of Defendant Providian. From that date forward, Defendants Washington Mutual, Inc. and Providian are collectively referred to as "Washington Mutual."

83.     Through its acquisition of Providian, Washington Mutual is an Issuing Bank that, throughout this judicial district, issues General Purpose Payment Cards to individuals and businesses. It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

84.     Defendant Providian National Bank, a national banking association with its principal place of business in Tilton, New Hampshire, is a wholly-owned subsidiary of Defendant Providian Financial Corporation, a Delaware corporation with its principal place of business in San Francisco, California. Defendants Providian National Bank and Providian Financial Corporation are referred to collectively herein as "Providian."

85.     Providian is a member of both Visa and MasterCard.  It engages in interstate commerce.  It is an Issuing Bank that, throughout this judicial district, issues General Purpose Payment Cards to individuals and businesses.  It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

86.     Defendant Wells Fargo & Company ("Wells Fargo") is a Delaware corporation with its principal place of business in San Francisco, California.

87.     Wells Fargo is a member of both Visa and MasterCard.  It engages in interstate commerce.  It is an Issuing Bank that, throughout this judicial district, issues General Purpose Payment Cards to individuals and businesses.  Through its "Wells Fargo Merchant Services" division, it is an Acquiring Bank, which acquires Visa and MasterCard credit receipts or the electronic equivalent for members of the Classes, for deposit in their commercial-demand-deposit bank account at the face amount less a fee.  It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

88.     Defendants Bank of America, N.A., BA Merchant Services LLC (f/k/a Defendant National Processing, Inc.), Bank of America Corporation, MBNA America Bank, N.A., Barclays Bank Limited, Juniper Financial Corporation, Barclays Group Holdings Limited, Capital One Bank, Capital One F.S.B., Capital One Financial Corporation, Chase Bank USA, N.A., Chase Manhattan Bank USA, N.A., JPMorgan Chase & Co., Citibank N.A., Citigroup, Inc., Citicorp, Fifth Third Bancorp, First National Bank of Omaha, HSBC Finance Corporation, HSBC Bank USA, N.A., HSBC North American Holdings, Inc., HSBC Holdings, plc, National City Corporation, National City Bank of Kentucky,, SunTrust Banks, Inc., Texas Independent Bancshares, Inc., Wachovia Bank, N.A., Wachovia Corporation, Washington Mutual, Inc., Providian National Bank, Providian Financial Corporation, and

- 29 -

Wells Fargo & Company, (collectively "Bank Defendants"), are member banks of the Visa and MasterCard networks. The Bank Defendants are actual or potential competitors for the issuance of Credit Cards and acquisition of merchants. All of the Bank Defendants belong to both networks and have conspired with each other and with the Visa and MasterCard Associations to fix the level of Interchange Fees that they charge to merchants. Many of the Bank Defendants are, or were during the relevant period, represented on the Visa and/or MasterCard Boards of Directors at the times when those Boards collectively fixed uniform Interchange Fees and imposed the anticompetitive Anti-Steering Restraints and Merchant Restraints, tying and bundling arrangements, and exclusive-dealing. The Bank Defendants delegated to the Visa and MasterCard Boards of Directors the authority to take those actions. Each of the Bank Defendants had actual knowledge of, participated in, and consciously committed itself to the conspiracies alleged herein.

89.     Bank Defendants are therefore directly responsible for fixing Interchange Fees within each Network and between the two Networks. Bank Defendants, acting by and through the Boards of Directors of Visa and MasterCard, are also directly responsible for the tying and bundling of separate and distinct services together in those Interchange Fees, the imposition of the Anti-Steering Restraints and engaging in the other anticompetitive conduct alleged herein. Collectively, the Bank Defendants, through their operation of Visa and MasterCard, adopted and approved the above-mentioned policies and have significantly profited from those policies.

## V.

## CO-CONSPIRATORS

90.     Visa and MasterCard "are not single entities; they are consortiums of competitors. They are owned and effectively operated by over 22,000 banks, which compete

with one another in the issuance of Payment Cards and the acquiring of merchants'
transactions." *United States v. Visa*, 344 F.3d 229, 242 (2d Cir. 2003).

91.     Various persons, firms, corporations, organizations, and other business entities,
some unknown and others known, have participated as co-conspirators in the violations
alleged and have performed acts in furtherance of the conspiracies.  Co-conspirators include,
but are not limited to, the following: (a) Issuing Banks that have issued Visa and/or
MasterCard Credit and Debit Cards and have agreed to charge uniform, collectively fixed
Visa and MasterCard Interchange Fees for various merchants and transactions; (b) certain
banks that are or were members of the Boards of Directors of Visa or MasterCard and adopted
and agreed to fix Interchange Fees for various merchants and transactions and to impose the
anticompetitive Anti-Steering Restraints and Miscellaneous Exclusionary Restraints, and
tying, bundling, and exclusive-dealing arrangements alleged herein; and (c) Acquiring Banks
that acquire Visa and MasterCard transactions from members of the Classes, and that have
participated in the conspiracy to collectively fix Interchange Fees.

92.     Members of the Classes pay Interchange Fees and Merchant-Discount Fees to
the Visa and MasterCard member banks through the Acquiring-Bank members of Visa and
MasterCard, including, but not limited to, certain of the Bank Defendants.

93.     The member banks of Visa and MasterCard, acting through the Networks'
Boards of Directors, have set uniform Interchange Fees for transactions conducted over Visa
and MasterCard Networks.  The Bank Defendants have had actual knowledge of, and have
knowingly participated in, the conspiracy to collectively fix uniform Credit and Debit Card
Interchange Fees, impose upon members of the Classes the anticompetitive Anti-Steering

Restraints and Miscellaneous Exclusionary Restraints, and the tying, bundling and exclusive-dealing arrangements alleged herein.

## VI.

## TRADE AND INTERSTATE COMMERCE

94.     The trade and interstate commerce relevant to this action is General Purpose Card Network Services and Debit Card Network Services.

95.     During all or part of the Class Period, each of the Defendants, directly or through their affiliates or subsidiaries, participated in the market for General Purpose Card Network Services and Debit Card Network Services in a continuous and uninterrupted flow of interstate commerce.

96.     The activities of Defendants and their co-conspirators, as described herein, were within the flow of and had a substantial effect on interstate commerce.

## VII.

## CLASS ACTION ALLEGATIONS

97.     Plaintiffs represent two classes that bring this action as a Class Action under Rule 23(b)(1), (2) and (3), Fed. R. Civ. P., for violations of 15 U.S.C. §§ 1 & 2, and Cal. Bus. & Prof. Code § 16700 *et seq.*

a.      The first class, "Class I," seeks damages only for violations of 15 U.S.C. §§ 1 & 2, and Cal. Bus. & Prof. Code § 16700 *et seq.* and is defined as:

All persons, business, and other entities that have accepted Visa and/or MasterCard Credit and/or Debit Cards in the United States at any time from and after January 1, 2004. This Class does not include the named Defendants, their directors, officers, or members of their families, or their co-conspirators.

b.      The second class, "Class II," seeks declaratory and injunctive relief only for violations of 15 U.S.C. §§ 1 & 2, and Cal. Bus. & Prof. Code § 16700 *et seq.* and is defined as:

All persons, business and other entities, and entities that currently accept Visa and/or MasterCard Credit and/or Debit Cards in the United States. This Class does not include the named Defendants, their directors, officers, or members of their families, or their co-conspirators.

98.    Plaintiffs AFMW, Capital Audio, CHS, Coborn's, Crystal Rock, D'Agostino, Discount Optics, Jetro, Leon's Transmission, NACS, NATSO, NCPA, N.G.A., NRA, Parkway, Payless, Photos Etc., and Traditions bring this action under Federal Rules of Civil Procedure 23(a), and (b)(3), on behalf of themselves and Class I. These Plaintiffs are members of Class I, their claims are typical of the claims of the other Class I members, and Plaintiffs will fairly and adequately protect the interests of Class I. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of class-action antitrust litigation. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other member of Class I.

99.    Plaintiffs Capital Audio, CHS, Coborn's, Crystal Rock, D'Agostino, Discount Optics, Jetro, Leon's Transmission, Parkway, Payless, Photos Etc., and Traditions, bring this action under F.R.C.P. 23(a) and (b)(2), on behalf of themselves and Class II. These Plaintiffs are members of Class II, their claims are typical of the claims of the other Class II members, and Plaintiffs will fairly and adequately protect the interests of Class II. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of class-action antitrust litigation. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of Class II.

100.    Plaintiffs ABA, AMFW, NACS, NATSO, NCGA, NCPA, N.G.A., and NRA bring this action under F.R.C.P. 23(a) and (b)(2), on behalf of their members and Class II. These Plaintiffs' members are members of Class II, their members' claims are typical of the claims of the other Class II members, and these Plaintiffs will fairly and adequately protect

the interests of Class II. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of class-action antitrust litigation. Plaintiffs' members' interests are coincident with, and not antagonistic to, those of the other members of Class II.

101. The anticompetitive conduct of Defendants alleged herein has imposed a common antitrust injury on the members of the Classes. The members of the Classes are so numerous that joinder of all members is impracticable.

102. Defendants' relationships with the members of the Classes and Defendants' anticompetitive conduct have been substantially uniform. Common questions of law and fact will predominate over any individual questions of law and fact.

103. Defendants have acted, continue to act, refused to act, and continue to refuse to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief with respect to the Classes as a whole.

104. There will be no extraordinary difficulty in the management of this Class Action. Common questions of law and fact exist with respect to all members of the Classes and predominate over any questions solely affecting individual members. Among the questions of law and fact common to the Classes, many of which cannot be seriously disputed, are the following:

      a.     Whether Defendants and their co-conspirators illegally fixed and continue to fix uniform Credit-Card Interchange Fees charged to merchants in the market for General Purpose Card Network Services, thereby causing the Classes to pay supracompetitive Interchange Fees and Merchant-Discount Fees;

      b.     Whether Defendants and their co-conspirators illegally fixed uniform Offline-Debit-Card Interchange Fees charged to merchants in the market for Debit Card Network Services, and, thereby caused the Classes to pay supracompetitive Offline-Debit-Card Interchange Fees and Merchant-Discount Fees;

c.   Whether Visa, MasterCard, and their members possess and exercise market power or monopoly power in the markets alleged in this Complaint;

d.   Whether Visa, MasterCard, and their dual member banks conspired with each other to fix the price of Credit-Card Interchange Fees;

e.   Whether Visa, MasterCard, and their member banks conspired with each other to fix the price of Offline-Debit-Card Interchange Fees;

f.   Whether Defendants' price-fixing arrangements are illegal under § 1 of the Sherman Act;

g.   Whether the Anti-Steering Restraints imposed by Defendants violated §§ 1 or 2 of the Sherman Act;

h.   Whether Defendants' tying and bundling practices are illegal under § 1 of the Sherman Act;

i.   Whether Defendants' exclusive-dealing practices are illegal under § 1 of the Sherman Act; and

j.   The proper measure of damages sustained by Class I as a result of the conduct described herein.

105.   This Class Action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all members is not only impracticable, but impossible. The damages suffered by many members of the Classes are small in relation to the expense and burden of individual litigation, and therefore, it is highly impractical for such members of the Classes to individually attempt to redress the wrongful anticompetitive conduct alleged herein.

106.   A class virtually identical to the Classes alleged herein above was certified, and affirmed on appeal, in *In re Visa Check/MasterMoney Antitrust Litig.*, 192 F.R.D. 68 (E.D.N.Y. 2000), *aff'd*, 280 F.3d 124 (2d Cir. 2001).

## VIII.

## FACTUAL ALLEGATIONS

107.    Visa and MasterCard (collectively the "Networks") are international bank-card Networks whose members include banks, regional-banking associations, and other financial institutions. Visa and MasterCard were established by their members to develop, promote, and operate national Credit-Card Networks.

108.    Visa and MasterCard evolved from regional and local Credit-Card systems formed during the 1960's.

109.    Visa's predecessor, Bank Americard, was the local Credit-Card program of Bank of America, then based in California. In 1970, the program was introduced throughout the United States under the name National Bank Americard, Inc. ("NBI"). In 1977, NBI changed its name to Visa.

110.    MasterCard is the successor to Mastercharge, which was created in 1967 when the Interbank Card Association of New York banks merged with the Western States Bankcard Association.

111.    During the early years of the Visa and MasterCard Networks, merchants that accepted Credit Cards used paper forms called "drafts" to conduct transactions, which were then passed to the merchant's Acquiring Bank and transmitted through the Network to the consumer's card-issuing bank.

112.    In the mid 1980's, technology evolved such that many transactions were processed electronically and paper drafts were not needed for most Payment-Card transactions. Since that time, the costs to Visa and MasterCard of the various components of Credit-Card-transaction processing (for example, computer hardware, telephone service, network service, and data-processing services) have decreased significantly. These changes

led to significant reductions in the costs for Visa and MasterCard of processing Payment-Card transactions.

113.    Since Visa and MasterCard began operating on a national scale, use of their cards has increased dramatically.  The percentage of U.S. households with Credit Cards increased from 16% in 1970 to 76% in 2004.

114.    Since 1970, the number of Visa member banks has increased from approximately 1400 to nearly 14,000 in the United States and over 22,000 worldwide.  U.S. consumers now carry more than 429 million Visa-branded Credit-, Debit-, commercial-, and prepaid cards.

115.    MasterCard has experienced similar growth and now includes more than 23,000 member banks worldwide.  During MasterCard's 2004 fiscal year, there were 337 million MasterCard-branded cards in the United States.

116.    In 2005, the top five Visa Card-Issuing Banks accounted for 75% of all Visa Credit Card transaction volume in the United States.

117.    In 2005, the top five MasterCard Card-Issuing Banks accounted for 89% of all MasterCard Credit Card transaction volume in the United States.

118.    In 2004, 71% of Visa and MasterCard transaction volume was acquired by seven member banks.

119.    Visa and MasterCard utilized their dominance in Credit Cards to become the dominant Debit-Card networks.  Visa and MasterCard initiated their Visa Check and MasterMoney (the predecessor to MasterCard Debit) programs in 1979.  At that time, Offline-Debit-Card transactions represented only a small portion of all Payment-Card transactions.

120. By tying their Offline-Debit Cards to their dominant Credit Cards, Visa and MasterCard increased the volume of Visa Check and MasterMoney cards to over 47 million by 1996. By 2004, the number of Visa and MasterCard Offline-Debit Cards in circulation had grown to 228 million.

121. The tying practices described above led to a lawsuit by a class of merchants, in which this Court granted partial summary judgment for the class and denied summary judgment for the defendants. *In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568 (E.D.N.Y. Apr. 1, 2003).

122. The Visa and MasterCard Networks have also experienced substantial consolidation among their member banks.

123. Unlike Payment-Card transactions in other jurisdictions, the fees imposed by banks on merchants for Payment-Card transactions in the United States are almost completely unregulated. Thus, the General Purpose Card Network Services Market can reach an equilibrium between supply and merchants' demand for those services, only if market forces are effective.

### A. Interchange Fees In The Context Of A Payment-Card Transaction

124. The Visa and MasterCard networks are standard-setting organizations in the markets for General Purpose Card Network services and Debit Card Network Services that facilitate the exchange of transaction data and funds among merchants, Acquiring Banks, Issuing Banks, and consumers.

125. When a consumer makes a payment with a Credit- or Offline-Debit Card, the merchant sends an electronic transmission to its Acquiring Bank or Third-Party Processor. The Acquiring Bank or processor then sends an electronic transmission to the Networks. The

Network relays the transaction to the cardholder's Issuing Bank or its Third-Party Processor, which makes a payment to the Acquiring Bank, through the Network for the purchase amount minus the Interchange Fee. The Acquiring Bank then credits the merchant's account for the transaction amount minus the Merchant-Discount Fee. Finally, the Issuing Bank charges the cardholder's credit account for the full amount of the purchase. During the Grace Period between the purchase and the date payment is due from the consumer, the Issuing Bank extends free credit to the consumer. Under this system, the Issuing Bank earns revenue from annual fees and interest charged to cardholders, as well as the amount of the Interchange Fee, while the Acquiring Bank earns revenue from the difference between the Merchant-Discount Fee and the Interchange Fee.

126.    The Bylaws of Defendant Visa U.S.A. require that all "Principal Member [Banks]," which include the Bank-Defendant members of Visa U.S.A. and the vast majority of all member banks, "[s]hall issue Cards bearing the Visa service mark." Visa U.S.A., Bylaws § 2.04(a) (May 15, 2004).

127.    Similarly, MasterCard's Bylaw 2.9 (2005) requires that member banks "must have issued and outstanding a reasonable number of MasterCard cards." If a member bank fails to issue the requisite number of cards, it will be assessed a penalty by the MasterCard Network.

128.    Visa and MasterCard rules also require that a member bank be a party to every merchant contract for the acceptance of Visa and MasterCard Payment Cards. This rule applies even to merchants and banks that use Third-Party Processors.

129.    Visa and MasterCard do not use the Interchange Fee to fund their operations. The majority of Visa and MasterCard revenues are derived from operation fees that the

Networks charge member banks. These fees include fees for authorization and clearing of transactions, network-access fees, and currency-conversion fees. The other substantial source of Visa and MasterCard revenues are assessments that the Networks levy on member banks.

130. The Visa and MasterCard Networks can and do perform their functions of authorizing and clearing Credit-Card transactions, acting as standard-setting entities for Credit- and Debit-Card transactions, promoting their respective Networks, and paying other operating expenses through the operations fees and assessments that their member banks pay.

131. Visa and MasterCard do not act as single entities when their member banks collectively fix Interchange Fees. Visa and MasterCard member banks — direct, horizontal competitors of each other — effectively control the decisions of both Networks. These banks do not share a unity of interest. Nor do they owe a fiduciary duty to each other or the Visa and MasterCard Networks with respect to the setting of Interchange Fees.

132. The member banks of Visa and MasterCard charge an Interchange Fee to merchants even for On-Us Transactions in which the Issuing and Acquiring Banks are the same.

133. The Bank Defendants, acting as members of Visa by and through the Visa Board of Directors, fixed and continue to fix uniform Interchange Fees for various merchants and transactions for all Visa General Purpose Card and Debit Card transactions that they agreed to impose upon merchants.

134. Those same Bank Defendants, acting by and through the Board of Directors of MasterCard, set similar uniform Interchange Fees for various merchants and transactions for all MasterCard General Purpose Card transactions that they agreed to impose upon merchants.

- 40 -

135.     The Bank Defendants, by jointly setting Interchange Fees that they charge to merchants in the competing Visa and MasterCard Networks, ensure that the Interchange Fees of Visa and MasterCard increase in parallel and stair-step fashion, rather than decreasing in response to competition from each other.

136.     Interchange Fees were devised in the early days of the Visa and MasterCard Networks.   Interchange Fees purportedly helped pay for the costs of initial card issuance, marketing, transferring transactional paper between Acquiring- and Issuing Banks, and purportedly balanced Network costs between Issuers and Acquirers.   These early Interchange Fees were cost-based, set with the help of independent auditing firms.

137.     Credit-Card Interchange Fees were purportedly necessary in the early days of the Visa and MasterCard Networks to induce banks to issue cards to cardholders and "acquire" merchants for the Networks.

138.     Those initially proffered justifications for collectively set, uniform Credit-Card Interchange Fees are no longer valid.   The Networks no longer must transfer large numbers of paper receipts between member banks, and Interchange Fees are no longer cost-based.

139.     The collective setting of Interchange Fees neither performs the standard setting function of Visa and MasterCard, nor enables the Networks to perform that function.

140.     Unlike in the early days of the Networks, Visa and MasterCard now, jointly and separately, have market power in the market for General Purpose Card Network Services. Even in the face of frequent and significant increases in Interchange Fees, merchants have no choice but to continue to accept Visa's and MasterCard's dominant Credit Cards.   *United States v. Visa*, 163 F. Supp. 2d at 340, *aff'd*, 344 F.3d at 240.

141.    Visa and MasterCard also have market power in the market for Debit Card Network Services. *See In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568, (E.D.N.Y. Apr. 1, 2003) (finding that Visa has market power as a matter of law and that fact issues remained with respect to MasterCard).

142.    Therefore, given the ubiquity of Visa and MasterCard Payment Cards, banks now would find it in their best interest to issue Visa and MasterCard Payment Cards and acquire merchants for the Networks, even without the promise of large Interchange Fee revenues.

143.    Acquiring Banks, each of which is a participant in the conspiracies to collectively fix Interchange Fees, charge retailers a Merchant-Discount Fee for each Credit- and Debit-Card transaction completed on the Defendants' Networks. Interchange Fees, fixed by the Visa and MasterCard member banks, are the major component of these Merchant-Discount Fees. It would, therefore, not be feasible for Acquiring Banks to set a Merchant-Discount Fee below the Interchange Fee set by Visa and MasterCard. For this reason, the Interchange Fee acts as a minimum Merchant-Discount Fee paid by the Plaintiffs and members of the Classes.

144.    The Visa and MasterCard Networks could function efficiently without uniform, collectively fixed Interchange Fees. Even if the member banks of Visa and MasterCard did not fix uniform Interchange Fees, the Visa and MasterCard Networks could continue in their roles as standard-setting organizations for Payment-Card transactions. There are many examples of similar networks that function efficiently without collectively set uniform Interchange Fees and many more examples of networks that operate efficiently with dramatically lower Interchange Fees.

145. The collective fixing of uniform Interchange Fees is not a core function of the Visa and MasterCard Credit- and Offline-Debit Networks. It is not reasonably necessary to the operation of the Visa and MasterCard Networks. Even if some Interchange Fees were reasonably necessary, the collectively fixed Interchange Fee is more restrictive than is necessary to effectuate the business of Visa and MasterCard. Other four-party, two-sided markets function efficiently without Interchange Fees, or with Interchange Fees that are dramatically less restrictive than Visa and MasterCard Credit-Card Interchange Fees.

**B.  Acquiring Banks Of Visa And MasterCard Have No Ability Or Incentive To Seek Redress For The Collective-Fixing Of Interchange Fees.**

146. Visa U.S.A.'s Operating Regulation 1.15 specifies that "Visa has no liability of any nature to any Member arising from any cause or circumstance." Regulation 1.15A clarifies that the liability limitation "appl[ies] to all products, programs, services, specifications, standards or other matters or items provided by [Visa and its member banks]." Thus, if a Visa member bank determined that it was harmed by the collectively fixed Interchange Fee, Regulation 1.15A prevents it from suing Visa.

147. MasterCard's Bylaw 1.1 states that "[e]ach member shall...hold harmless [MasterCard]...from any actual or threatened claim, demand, [or] obligation,...resulting from and/or arising in connection with...the compliance or non-compliance with the standards by the member." Thus, if a MasterCard member bank determined that it was harmed by the collectively fixed Interchange Fee, Bylaw 1.1 prevents it from suing MasterCard.

148. In a technical manual issued to its member banks, MasterCard states that "MasterCard shall have no liability to any member, member processor, or other person acting on behalf of the member for any loss, cost, or other damage arising out of or in connection

with MasterCard's administration of or any member's participation in any interchange rate program." MasterCard Int'l, GCMS Reference Manual.

149.   Even if Visa and MasterCard member banks were not explicitly prevented from suing Visa and MasterCard over the collectively fixed Interchange Fees, they have no practical incentive to do so.

150.   Because all member banks are required to issue Visa or MasterCard Payment Cards, all member banks benefit from the supracompetitive level of Interchange Fees that they collectively set.

151.   The member banks appoint the Networks' Boards of Directors and approve of and agree to abide by the Networks' rules and bylaws.  These member banks have conspired with each other and with Visa and MasterCard to collectively fix uniform Interchange Fees.

152.   There is therefore no realistic possibility that any member bank will sue Visa or MasterCard over any of the practices described in this Complaint.  *See Freeman v. San Diego Ass'n of Realtors*, 332 F.3d 1133, 1145-46 (9th Cir. 2003).

### C. The Anti-Steering Restraints Insulate Visa and MasterCard From Inter-Network Competition In The General Purpose and Debit Card Network Services Markets, Among Other Anticompetitive Effects.

153.   Because consumers do not know the actual costs of the Interchange Fees and Merchant-Discount Fees paid by merchants, merchants are unable to assist them in choosing lower-cost payment methods.

154.   Visa and MasterCard impose the No-Surcharge Rule and other Anti-Steering Restraints to prevent merchants from incenting consumers to use less-expensive payment methods.  By implementing and enforcing these rules, Visa and MasterCard have fully insulated themselves from any cost-based competitive threat.  It is the consumer who selects which card (and hence which Network) to use in making a purchase.  The No-Surcharge Rule

and other Anti-Steering Restraints guarantee that the consumer will make this selection without regard to cost; the consumer neither knows nor cares how expensive his or her chosen card is to the merchant, because the Anti-Steering Restraints ensure that the costs of the transaction will be borne indirectly by him or her, but without his or her knowledge.

155.    The No-Surcharge Rule is reflected in the rules and merchant agreements of Visa, MasterCard, and their member banks. Under the Defendants' standard-form merchant agreements, merchants "shall not impose any surcharge or fee for accepting a [Visa-branded or MasterCard-branded] Card." The MasterCard Member Service Provider Rules Manual, published April 2005, likewise admonishes merchants that they "must not directly or indirectly require any MasterCard cardholder to pay a surcharge" (§ 9.12.2), and the Card Acceptance and Chargeback Management Guide for Visa merchants, published October 2004, provides "you may not impose any surcharge on a Visa transaction."

156.    Accordingly, a Credit- or Debit-Card Network that charges lower Merchant-Discount Fees than the Defendant Associations will not be able to make inroads on the monopoly positions of Visa and MasterCard. While potential new market entrants and competitors such as Discover stand ready, willing, and able to compete with the Defendants on Interchange Fees, the Defendants' rules prevent any such competition by ensuring that increased efficiency and lower prices will not lead to increased market share for competitors in the Network-Services Markets.

157.    Likewise, the Anti-Steering Restraints have a profound inflationary effect on retail goods and services. The Defendants' rules ensure that merchants seeking to pass along these costs must raise prices to all consumers, including cash-payers, PIN-Debit-Card users, and those who would otherwise seek to avoid the high cost of Defendants' Interchange Fees.

But for these rules, consumer prices would be lower.  The prices of goods and services would fall because those prices would no longer be marked up to reflect the supracompetitive costs of Credit-Card acceptance.  Instead, those supracompetitive prices would be borne by the consumer choosing to use the Defendants' expensive payment products.

158.    In addition to insulating Defendants from competition and raising prices for all consumers, the No-Surcharge Rule compels inequitable and anticompetitive subsidies, running from the least-affluent U.S. consumers to the most-affluent.  Because merchants must mark up the prices of all goods to cover the costs of accepting Visa and MasterCard products, rather than impose a discrete surcharge on users of those products, the No-Surcharge Rule effectively compels cash payers and users of other low-cost payment forms to subsidize all of the costly perquisites given by Issuing Banks to consumers using more expensive payment forms such as Visa and MasterCard Payment Cards, including frequent-flier miles, rental-car insurance, free gifts, and even cash-back rewards.

159.    The other Anti-Steering Restraints also serve to protect the Defendants' elevated Interchange Fees.  In the face of merchant prompting — and particularly faced with the prospect of incurring surcharges — consumers would migrate towards less-expensive payment products, causing Defendants to drop their Interchange Fees in order to maintain market share.   In the absence of the Anti-Steering Restraints, therefore, Defendants' Interchange Fees, even if they were collusively established, would be lower.

160.    Finally, there is simply no procompetitive justification for the Anti-Steering Restraints.  These rules are naked restraints on trade, are not ancillary to the legitimate and competitive purposes of the Defendant Networks, and have profound anticompetitive effects.

**D.** **Defendants Tie And Bundle Several Distinct Services In Their Interchange Fees And Enter Into Agreements With Merchants For The Exclusive Provision Of Those Services.**

161.    The Defendants illegally tie and bundle together separate and distinct services in the Interchange Fee.

162.    Interchange Fees purportedly pay for the costs of many separate and distinct services, including the Payment-Card-System Services, "Float" of funds from the Issuing Bank to the consumer during the Grace Period, the promotional costs of the Issuing Banks, Network-Processing Services, and Payment-Guarantee Services.

163.    Both Visa and MasterCard, jointly and separately, have market power in the market for Payment-Card-System Services.

164.    Visa requires that all merchants that accept Visa Payment-Card-System Services also purchase Payment-Guarantee Services and Network-Processing Services from Visa.

165.    Visa, MasterCard, and their member banks bundle together the prices for the separate and distinct services in their Interchange Fees, such that merchants are required to pay the full Interchange Fee, even if they were able to purchase Network-Processing Services or Payment-Guarantee Services from a competitor of Visa and MasterCard.

166.    Because the prices for these separate and distinct services are bundled together, merchants have no practical ability to purchase Network-Processing Services or Payment-Guarantee Services from competitors of Visa and MasterCard. Because the costs of Payment-Guarantee Services and Network-Processing Services are bundled together in the Interchange Fees that Defendants charge members of the Classes, Interchange Fees and, thereby,

Merchant-Discount Fees, are higher than they would be absent these collectively-established tying and bundling practices.

167. In the card-acceptance agreements between merchants and their Visa and/or MasterCard Acquiring Banks, merchants implicitly agree that Visa and MasterCard will be the exclusive providers of Payment-Guarantee Services and Network-Processing Services.

168. These exclusive-dealing arrangements foreclose a significant share of the market from competitors to Visa and MasterCard in the market for Payment-Guarantee Services and Network-Processing Services.

169. There exists a demand among merchants for each of the services described above that is separate and distinct from the demand for the other services.

170. If Visa, MasterCard, and the Bank Defendants did not tie and bundle together these separate and distinct services, many merchants could, and would, choose to purchase the Payment-Guarantee Services from other vendors or would choose to self-insure against fraud. Even those merchants that choose to purchase Payment-Guarantee Services from Visa and MasterCard would benefit from Visa and MasterCard lowering their prices for those services in response to competition from other providers of these services.

171. If Visa and MasterCard did not require merchants to use Visa and MasterCard Network-Processing Services on all Visa and MasterCard Credit-Card and Debit-Card transactions, many merchants would choose to process those transactions through a Third-Party Processor of Payment-Card transactions. All merchants would benefit from the untying of Network-Processing Services from General Purpose Card Network Services, because Visa and MasterCard would then have to compete with Third-Party Processors to offer cheaper and more-efficient Network-Processing Services.

172.   Third-Party Processors have the technical capability to bypass the Visa and MasterCard Network-Processing Services mechanism on intra-processor transactions and On-Us Transactions in which the member bank uses a Third-Party Processor.

173.   The member banks of Visa and MasterCard are also potential competitors in the market for Network-Processing Services.  But for the tying arrangement described herein, member banks or their Third-Party Processors could process On-Us Transactions and avoid paying that part of the Interchange Fee that purportedly covers the cost of Network-Processing Services.

174.   Defendants' tying and bundling of the fees for these separate and distinct services prevents other firms from competing on the merits to offer those services independently and at lower prices to merchants.

175.   The Classes suffer harm from the Defendants' bundling of these services in the form of Interchange Fees, for the tied and bundled services that are set at a higher rate than if those services were offered separately.  This harm outweighs any efficiency benefit that the Defendants may argue arises from the tying and bundling of the separate and distinct services.

176.   These restraints on competition are not reasonably related to the operations of Visa and MasterCard, and even if they were reasonably necessary, they are more restrictive than necessary to effectuate the business of Visa and MasterCard.

## E.   **Duality Facilitates Interchange-Fee Fixing, Tying And Bundling, Exclusive Dealing, And Anticompetitive Restraints.**

177.   Since 1976, Visa's and MasterCard's rules have permitted banks to be members of both Visa and MasterCard and issue both brands of Payment Cards.  This is referred to as "Issuance Duality."  Banks could also "acquire" retail stores for both Visa and MasterCard.  This is referred to as "Acquiring Duality."  Every major bank in the United

States is a member of both Visa and MasterCard, and thus has the right to both issue Payment Cards and acquire merchants for both the Visa and MasterCard Networks. The U.S. Memberships of Visa and MasterCard are virtually identical. Furthermore, virtually every merchant that accepts Visa Payment Cards as a form of payment also accepts MasterCard Payment Cards.

178. There are very few exceptions to Duality among the thousands of financial institutions that issue Visa and/or MasterCard Credit Cards and the financial institutions that acquire retail stores for Visa and/or MasterCard. Each of the Bank Defendants is a member of both Networks.

179. Although Visa and MasterCard rules prohibit banks from issuing both Visa and MasterCard Debit Cards, virtually all Visa Check Card-Issuing Banks are members of MasterCard and virtually all MasterCard Debit-Issuing Banks are members of Visa. Therefore, many of the Debit-Card operations of the Networks are transparent to the competing Network, and the Debit-Card-Issuing Banks of both Networks have a profit motive to restrain inter-Network competition.

180. Visa and MasterCard member banks exert control over the operations of the competing Visa and MasterCard Networks by simultaneously participating on the Board of Directors and other important committees of both Networks. For example, MasterCard's Business Committee and Visa's Marketing Advisors Committee advise their respective Network's professional staff and management on key strategic and competitive issues. In 1996, 12 of the 21 banks represented on Visa's Board of Directors were also represented on MasterCard's Business Committee, and 17 of the 27 banks on MasterCard's Business Committee had representatives on Visa's Marketing Advisors Committee. Seven of the 22

banks represented on MasterCard's Board of Directors also were represented on Visa's Marketing Advisors Committee.

181.    As of year-end 1996, approximately 19 banks had a representative on the Board of Directors of one Network and at least one important committee of the other Network.

182.    In 1992, MasterCard International's Executive Vice President and General Counsel wrote in a letter to the Department of Justice that "when one board acts with respect to a matter, the results of those actions are disseminated to the members who are members in both organizations. As a result, each of the Associations is a fishbowl and officers and board members are aware of what the other is doing, much more so than in the normal corporate environment."

183.    Both Networks are essentially controlled by a small number of member banks — those with the largest shares of card issuance and with the highest sales-transaction volumes — including many of the Bank Defendants. These banks establish their control by simultaneously serving on the Boards of Directors and/or important committees of either or, in many cases, both Networks. This relationship among member banks and the Networks has lessened competition between Visa and MasterCard because it makes the member banks less willing to implement policies that would increase competition between Visa and MasterCard for the business of merchants.

184.    Because their memberships are virtually identical, the Networks and their member banks communicate frequently, exchange data, and coordinate much of their activity through joint programs and parallel activity. Duality has also facilitated a high degree of uniformity in the services offered by the competing Networks and the Merchant-Discount

Fees charged by the Acquiring Banks to merchants accepting Visa and MasterCard Credit Cards.

185. The member banks of both Networks can and do easily pass information among themselves, and with and between the two Networks, in part through participation on the boards and committees of the two Networks.

186. The trend towards uniformity in pricing among dual Visa/MasterCard member banks has also been facilitated and exacerbated because Visa member banks collectively fix the Visa Interchange Fees and contemporaneously, acting as MasterCard members, collectively fix the MasterCard Interchange Fees.

187. Because the member banks represented on the Visa Board of Directors are all members of MasterCard, and issue MasterCard Payment Cards, they have a profit motive to ensure that MasterCard Interchange Fees increase in step with Visa Interchange Fees.

188. Because the member banks represented on the MasterCard Board of Directors are virtually all members of Visa, they have a profit motive to ensure that Visa Interchange Fees increase in step with MasterCard Interchange Fees.

189. Therefore, virtually without exception, an Interchange Fee increase by one Network is followed by a similar Interchange Fee increase by the other Network. These price-fixed Interchange Fees are the largest component of the "Merchant-Discount Fees" charged to retailers who accept Visa and MasterCard cards. These collective acts are all manifestations of Duality.

190. But for the conspiracy among Visa, MasterCard, and their member banks, Visa and MasterCard would have had an incentive to decrease Interchange – and Merchant-

Discount Fees to merchants in order to increase or promote merchant acceptance of their respective Payment Cards.

191.    Duality has also facilitated a high degree of uniformity in the Anti-Steering Restraints and Miscellaneous Exclusionary Restraints that the Visa and MasterCard Networks impose on merchants.  This lack of significant non-price competition is evidence of collusion among the Defendants and maintains their monopoly power.

192.    A Visa transaction is indistinguishable from a MasterCard transaction.  The transactions utilize the same relationships among the same member banks to provide the same method of payment to merchants.  Because of this identity between products, Visa and MasterCard and their member banks should principally compete on price, including the price of Credit Card Interchange Fees.

> **F.      The Practices Described Above Harm Competition.**

193.    The collective setting of uniform Interchange Fees restrains competition between Visa and MasterCard member banks in the markets for General Purpose Card Network Services and Debit Card Network Services.  This harms competition by imposing large and ever-increasing Interchange Fees, and thereby elevates Merchant-Discount Fees to supracompetitive levels.

194.    The Anti-Steering Restraints harm competition by allowing Defendants to insulate themselves from competition from lower-priced General Purpose Card and Debit Card Network Service providers, by inflating prices for all consumers, by compelling inequitable subsidies that affect the least-affluent U.S. consumers, and by allowing Defendants to continue their practices of collectively fixing supracompetitive, uniform Interchange Fees.

- 53 -

195.    The tying of Payment-Guarantee Services and Network-Processing Services to Payment-Card-System Services harms competition by foreclosing competitors from a significant share of those markets.    Under Defendants' tying and bundling practices, a merchant that purchases General Purpose Card Network Services from the Defendants must also purchase Payment-Guarantee Services and Network-Processing Services from the Defendants.    Having foreclosed competition, these tying and bundling practices allow Defendants to raise the price of Payment-Guarantee Services and Network-Processing Services to supracompetitive levels.

196.    Similarly, Defendants' exclusive-dealing arrangements with merchants for the provision of Payment-Guarantee Services and Network-Processing Services harms competition by foreclosing competitors of the Defendants from providing Payment-Guarantee Services to merchants that accept Visa and MasterCard General-Purpose and Debit Cards.

197.    The damages suffered by the members of the Classes cumulate and increase with each passing day that Defendants' anticompetitive practices are allowed to continue. These damages will continue to increase during the pendency of this suit until halted by Court Order, or by abandonment of the conspiracy, or both.

## PART TWO: ALLEGATIONS RELATING TO CREDIT-CARD CLAIMS

### IX.

### RELEVANT MARKETS

198.    There exists a relevant market, the product dimension of which is no broader than General Purpose Cards.    *In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568, at *3 (E.D.N.Y. Apr. 1, 2003); *United States v. Visa*, 163 F. Supp. 2d 322, 335 (S.D.N.Y. 2001).    The geographic dimension of this market is the United States ("General

Purpose Card Market"). *United States v. Visa*, 163 F. Supp. 2d at 339-40 (S.D.N.Y. 2001), *aff'd*, 344 F.3d at 239 (2d Cir. 2003).

199.    There exists a relevant market, the product dimension of which is no broader than General Purpose Card Network Services. *In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568, at *3 (E.D.N.Y. Apr. 1, 2003); *United States v. Visa*, 163 F. Supp. 2d at 338, *aff'd*, 344 F.3d at 239.   The geographic dimension of this market is the United States ("General Purpose Card Network Services Market").

200.    Both Visa and MasterCard, jointly and separately, have market power in the market for General Purpose Cards and General Purpose Card Network Services. *United States v. Visa*, 163 F. Supp. 2d at 340, *aff'd*, 344 F.3d at 239.

201.    The market shares of Visa and MasterCard indicate that each has market power in the General Purpose Card Network Services market. In 1999, Visa had a 47% share of the General Purpose Card transactions by dollar volume in the United States, while MasterCard's share was 26%. Visa and MasterCard had a combined market share of 73%. *United States v. Visa*, 163 F. Supp. 2d at 341. At that time, Visa and MasterCard collectively issued 85% of the General Purpose Cards in the United States. *Id.*

202.    In 2004, Visa transactions accounted for 43% of U.S. General-Purpose-Card-transaction volume, which included American Express and Diners Club Charge Cards. Visa's market share is significantly higher if Charge Cards are excluded from the market.

203.    In 2004, MasterCard transactions accounted for 30% of all General-Purpose-Card-transaction volume in the United States. Again, this figure would be even higher if Charge Cards were excluded from the market.

204.   Concerted activity between Visa and MasterCard allows the Networks to collectively assert market power.  *See In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568, at *3 (E.D.N.Y. Apr. 1, 2003) (noting evidence of collusion between Visa and MasterCard with respect to their Debit-Card strategies).

205.   Visa and MasterCard have exercised their market power in the General Purpose Card Network Services market.  Visa and MasterCard have recently raised Credit-Card Interchange Fees charged to merchants a number of times, *United States v. Visa*, 163 F. Supp. 2d at 340, without losing merchants.

206.   Visa and MasterCard have also demonstrated their market power by "price discriminating" in the level of Interchange Fees charged to various merchants and various transactions. *United States v. Visa*, 163 F. Supp. 2d at 340.

207.   Visa and MasterCard have also forced premium Credit Cards, often known as "signature cards," upon merchants that accept Visa and MasterCard Credit Cards.  These signature cards carry higher Interchange Fees than non-premium cards and many merchants would refuse to accept them if they had the power to do so.  Visa and MasterCard rules require merchants that accept Visa and MasterCard Credit Cards to also accept these "signature cards."  The inability of merchants to resist the imposition of higher Interchange Fee cards further demonstrates Visa and MasterCard's market power.

208.   There are significant barriers to entry in the General Purpose Card Network Services Market.  Because of these barriers, the only successful market entrant since the 1960's was Discover, which was introduced by Sears and benefited from its extensive network of stores and its relationship with Dean Witter.  New entry into the General Purpose Card Network Services Market would cost over $1 billion and would involve a "chicken-and-

egg problem of developing a merchant acceptance network without an initial network of cardholders who, in turn, are needed to induce merchants to accept the system's cards in the first place." *United States v. Visa*, 163 F. Supp. 2d at 342.

209.    Visa and MasterCard's substantial (individual and collective) market power in the General Purpose Card and Debit Card Network Services Markets has been reinforced by their implementation and enforcement of the Anti-Steering Restraints and Miscellaneous Exclusionary Restraints, which insulate them from competition that would exist in a free market.

210.    Payment-Card-System Services is the product dimension of a relevant market. The geographic dimension of this market is the United States.

211.    Network-Processing Services is the product dimension of a relevant market. The geographic dimensions of this market is the United States.  Network-Processing Services are unique in that they are required to transfer data and funds among the consumer, merchant, and the Issuing- and Acquiring Banks.  Network-Processing Services are therefore not reasonably interchangeable with other products or services.

212.    Payment-Guarantee Services is the product dimension of a relevant market. The geographic dimension of this market is the United States.  Payment-Guarantee Services constitute a unique bundle of services that are not reasonably interchangeable with other services.  A hypothetical monopolist in the market for Payment-Guarantee Services could impose a significant increase in price without those merchants switching to other services.

**FIRST CLAIM FOR RELIEF:**
**CLASS I VS. VISA AND BANK DEFENDANTS FOR DAMAGES UNDER § 4 OF THE CLAYTON ACT, 15 U.S.C. § 15, FOR VIOLATIONS OF SHERMAN ACT, § 1, 15 U.S.C. § 1 UNLAWFUL PRICE FIXING OF CREDIT CARD INTERCHANGE FEES BY VISA AND ITS MEMBER BANKS**

213. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

214. Visa and its member banks, including the Bank Defendants — direct, horizontal competitors of each other — engaged in unlawful contracts, combinations, and conspiracies in an unreasonable restraint of interstate trade or commerce in violation of § 1 of the Sherman Act, 15 U.S.C. § 1.

215. The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings, and concerts of action between and among Visa's issuing and acquiring members including the Bank Defendants and Visa, the substantial terms of which were to illegally fix, raise, maintain, or stabilize the Credit Card Interchange Fees charged to merchants for the market for General Purpose Card Network Services.

216. The Visa Board of Directors, which includes representatives from several Bank Defendants, acted on behalf of the member banks to fix, raise, maintain, or stabilize the Interchange Fees for Visa transactions, in violation of § 1 of the Sherman Act, 15 U.S.C. § 1.

217. All of the member banks of Visa, including the Bank Defendants, have actual knowledge of, and have knowingly participated in, the conspiracy alleged herein.

218. The contract, combination, conspiracy, and agreement alleged in this First Claim has, had, and/or is likely to have, among others, the following effects which are common to Plaintiffs and members of the Classes:

        a. Actual and potential competition in the General Purpose Card Network Services market was substantially excluded, suppressed, and effectively foreclosed;

        b. Defendants acquired and maintained market power in the relevant markets;

c. Defendants controlled, maintained, and elevated above competitive levels the Interchange Fees charged to members of the Classes in the market for General Purpose Card Network Services;

d. All Class members were required to pay supracompetitive Credit Card Interchange Fees for Visa transactions in the market for General Purpose Card Network Services;

e. Defendants derived direct and substantial economic benefits from the supracompetitive Credit Card Interchange Fees for Visa transactions in the market for General Purpose Card Network Services;

f. But for the anticompetitive conduct of Visa and its member banks, competition among banks would have eliminated or greatly reduced the Interchange Fees for Visa transactions in the market for General Purpose Card Network Services; and

g. The specific amount of damages suffered by Class I have not yet been determined, as such determination will require additional discovery and expert analysis, but the Class estimates damages will range in the tens of billions of dollars.

219. The collectively fixed Interchange Fees are illegal. They are not necessary to accomplish any procompetitive benefits of the Visa Network. Even if some horizontal agreement were necessary to promote the efficiencies of the Visa Network, the collectively-set Interchange Fee is significantly more restrictive than necessary to bring about those efficiencies. Visa and its member banks' price fixing achieves few — if any — procompetitive benefits to counterbalance the price-fixing's demonstrated anticompetitive effects in the General Purpose Card Network Services market.

**SECOND CLAIM FOR RELIEF:**
**CLASS I VS. MASTERCARD AND BANK DEFENDANTS FOR DAMAGES UNDER § 4 OF THE CLAYTON ACT, 15 U.S.C. § 15, FOR VIOLATIONS OF SHERMAN ACT, § 1, 15 U.S.C. § 1, UNLAWFUL PRICE FIXING OF CREDIT CARD INTERCHANGE FEES BY MASTERCARD AND ITS MEMBER BANKS**

220. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

221.    MasterCard and its member banks, including Bank Defendants — direct, horizontal competitors of each other — engaged in unlawful contracts, combinations, and conspiracies in an unreasonable restraint of interstate trade or commerce in violation of § 1 of the Sherman Act, 15 U.S.C. § 1.

222.    The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings, and concerts of action between and among MasterCard's issuing and acquiring members, including Bank Defendants and MasterCard, the substantial terms of which were to illegally fix, raise, maintain, or stabilize the Credit-Card Interchange Fees charged to merchants in the market for General Purpose Card Network Services.

223.    The MasterCard Board of Directors, which includes representatives from several Bank Defendants, acted on behalf of the member banks to fix, raise, maintain, or stabilize the Interchange Fees for MasterCard transactions, in violation of § 1 of the Sherman Act, 15 U.S.C. § 1.

224.    All of the member banks of MasterCard, including the Bank Defendants, have actual knowledge of, and have knowingly participated in, the conspiracy alleged herein.

225.    The contract, combination, conspiracy, and agreement alleged in this Second Claim has, had, and/or is likely to have, among others, the following effects which are common to Plaintiffs and members of the Classes:

a.     Actual and potential competition in the General Purpose Card Network Services market was substantially excluded, suppressed, and effectively foreclosed;

b.     Defendants acquired and maintained market power in the relevant markets;

- 60 -

c.    Defendants controlled, maintained, and elevated above competitive levels the Interchange Fees charged to members of the Classes in the market for General Purpose Card Network Services;

d.    All Class members were required to pay supracompetitive Credit Card Interchange Fees for MasterCard transactions in the market for General Purpose Card Network Services;

e.    Defendants derived direct and substantial economic benefits from the supracompetitive Credit Card Interchange Fees for MasterCard transactions in the market for General Purpose Card Network Services;

f.    But for the anticompetitive conduct of MasterCard and its member banks, competition among MasterCard's member banks would have eliminated or greatly reduced the Interchange Fees for MasterCard transactions in the market for General Purpose Card Network Services; and

g.    The specific amount of damages suffered by Class I have not yet been determined, as such determination will require additional discovery and expert analysis, but the Class estimates damages will range in the tens of billions of dollars.

226.    The collectively fixed Interchange Fees are illegal.    It is not necessary to accomplish any procompetitive benefits of the MasterCard Network.    Even if some horizontal agreement were necessary to promote the efficiencies of the MasterCard network, the collectively-set Interchange Fee is significantly more restrictive than necessary to bring about those efficiencies.    MasterCard and its member banks' price fixing achieves few — if any — procompetitive benefits to counterbalance the price-fixing's demonstrated anticompetitive effects in the General Purpose Card Network Services market.

**THIRD CLAIM FOR RELIEF:**
**CLASS I VS. VISA AND MASTERCARD AND BANK DEFENDANTS FOR DAMAGES UNDER § 4 OF THE CLAYTON ACT, 15 U.S.C. § 15, FOR VIOLATION OF THE SHERMAN ACT, § 1, UNLAWFUL PRICE FIXING OF CREDIT CARD INTERCHANGE FEES BETWEEN AND AMONG DEFENDANTS VISA AND MASTERCARD AND THEIR MEMBER BANKS**

227.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

- 61 -

228.   Visa and MasterCard, together with Bank Defendants and other member banks, have agreed to fix, raise, maintain, or stabilize Credit-Card Interchange Fees in the market for General Purpose Card Network Services at similar supracompetitive levels, and have agreed not to reduce such Interchange Fees.

229.   Defendants consciously engaged in parallel conduct with respect to Interchange Fees and other conduct that supports the inference of the above-described agreement. In addition to consciously-parallel conduct, the Defendants' conduct exhibits the following "plus factors," among others, which support an inference of the existence of the above-described agreement:

a.   Many of the same member banks issue both Visa and MasterCard Payment Cards, which provides fertile ground for collusion between the two Networks. A high level of communication regarding Interchange Fees, other fees, and promotions exists between and among Visa and MasterCard, both directly and through the Bank Defendants and other dual member banks;

b.   The Interchange-Fee-setting activities of Visa are transparent to MasterCard and its member banks and vice versa;

c.   The Network Services that Visa, MasterCard, and their member banks provide to merchants are indistinguishable from each other;

d.   Credit-Card Interchange Fees for both Visa and MasterCard move in parallel and stair-step fashion. Virtually without exception, an increase in Interchange Fees by one Association was met with an increase by the other;

e.   The Bank Defendants and other member banks of Visa and MasterCard have a profit motive to ensure that the Interchange Fees of both Networks increase in parallel and stair-step fashion;

f.   But for the conspiracy between Visa and MasterCard, neither Network would have had an incentive to match a price increase by the other Network; and

g.   Both Visa and MasterCard each have substantial market power and have the incentive and ability to maintain Interchange Fees at

supracompetitive levels to protect their profits from competition from each other.

230.    Visa, MasterCard, the Bank Defendants, and their Co-Conspirators achieved their anticompetitive objectives, in part, by agreeing, separately and together, to establish, implement, and maintain a price-fixing scheme whereby they fixed supracompetitive Credit-Card-Interchange Fees in the market for General Purpose Card Network Services.

231.    The conspiracy by Visa and MasterCard to fix the price of Credit-Card Interchange Fees to be charged to merchants in the market for General Purpose Card Network Services has, and/or is likely to have, among others, the following intended and actual effects, which are common to the entire Class of Plaintiffs:

  a.    Actual and potential competition in the General Purpose Card Network Services markets was substantially excluded, suppressed, and effectively foreclosed;

  b.    Defendants acquired and maintained market power in the relevant markets;

  c.    Defendants controlled, maintained, and elevated above competitive levels the Credit-Card Interchange Fees charged to Plaintiffs and Class members for General Purpose Card Network Services;

  d.    All Class members were required to pay supracompetitive Credit-Card Interchange Fees to Issuing Banks in the market for General Purpose Card Network Services;

  e.    Defendants derived direct and substantial economic benefits from the supracompetitive Credit-Card Interchange Fees charged to merchants; and

  f.    The specific amount of damages suffered by Class I have not yet been determined, as such determination will require additional discovery and expert analysis, but the Class estimates damages will range in the tens of billions of dollars.

232.    As a consequence of the Defendants' illegal conspiracies, Plaintiffs and members of the Classes suffered a common injury to their business and property, in part,

because they were forced to pay higher Credit-Card Interchange Fees and Merchant-Discount Fees in the market for General Purpose Card Network Services than they would have paid in the absence of the Defendants' anticompetitive conduct.

233.    These restraints on competition alleged in this Third Claim for Relief are illegal *per se*. They are not reasonably related to the operations of the Visa and MasterCard Networks, and even if they were reasonably necessary, they are broader than necessary to effectuate the business of Visa and MasterCard.

### FOURTH CLAIM FOR RELIEF:
### CLASS I VS. VISA AND BANK DEFENDANTS FOR DAMAGES UNDER § 4 OF THE CLAYTON ACT, 15 U.S.C. § 15, FOR VIOLATION OF SHERMAN ACT § 1 UNREASONABLE RESTRAINT OF TRADE BY VISA AND ITS MEMBER BANKS IN IMPOSING AND ENFORCING ANTI-STEERING RESTRAINTS

234.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

235.    Visa has and exercises market power in the relevant markets identified above.

236.    The No-Surcharge Rule and the other Anti-Steering Restraints, imposed upon merchant plaintiffs by Visa and its member banks, represent an unlawful contract in restraint of trade in violation of Sherman Act § 1.

237.    In addition, the collective adoption and enforcement of the No-Surcharge Rule and the other Anti-Steering Restraints by Visa and its member banks constitute a contract, combination, or conspiracy in unreasonable restraint of trade.

238.    The Anti-Steering Restraints (and particularly the No-Surcharge Rule) are anticompetitive vertical restraints. Among their anticompetitive effects are the inflationary pressure they exert on consumer goods and services, the compulsion of subsidies running from users of low-cost payment media to users of Defendants' high-cost payment media, the

entrenchment of Defendants' market positions, and the insulation of Defendants from any competitive threat from a rival offering cheaper or more efficient Payment Card services.

239.   No procompetitive justifications exist for the Anti-Steering Restraints.

240.   As a direct and foreseeable result of Defendants' willful imposition of the Anti-Steering Restraints, the Classes have suffered damages to their business and property.

## FIFTH CLAIM FOR RELIEF:
**CLASS I VS. MASTERCARD AND BANK DEFENDANTS FOR DAMAGES UNDER § 4 OF THE CLAYTON ACT, 15 U.S.C. § 15, FOR VIOLATION OF SHERMAN ACT § 1 UNREASONABLE RESTRAINT OF TRADE BY MASTERCARD AND ITS MEMBER BANKS IN IMPOSING AND ENFORCING ANTI-STEERING RESTRAINTS**

241.   Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

242.   MasterCard has and exercises market power in the relevant markets identified above.

243.   The No-Surcharge Rule and other Anti-Steering Restraints, imposed upon merchant plaintiffs by MasterCard and its member banks, represent an unlawful contract in restraint of trade in violation of Sherman Act § 1.

244.   In addition, the collective adoption and enforcement of the No-Surcharge Rule and other Anti-Steering Restraints by MasterCard and its member banks constitute a contract, combination, or conspiracy in unreasonable restraint of trade.

245.   The Anti-Steering Restraints (and particularly the No-Surcharge Rule) are anticompetitive vertical restraints.  Among their anticompetitive effects are the inflationary pressure they exert on consumer goods and services, the compulsion of subsidies running from users of low cost payment media to users of Defendants' high cost payment media, the

entrenchment of Defendants' market positions and the insulation of Defendants from any competitive threat from a rival offering cheaper or more efficient Payment Card services.

246.   No procompetitive justifications exist for the Anti-Steering Restraints.

247.   As a direct and foreseeable result of Defendants' willful imposition of the Anti-Steering Restraints, the Classes have suffered damages to their business and property.

**SIXTH CLAIM FOR RELIEF:**
**CLASS I VS. VISA AND BANK DEFENDANTS FOR DAMAGES UNDER § 4 OF THE CLAYTON ACT, 15 U.S.C. § 15, FOR VIOLATION OF SHERMAN ACT § 2 MONOPOLIZATION BY VISA AND ITS MEMBER BANKS**

248.   Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

249.   Visa has monopoly power in the relevant markets identified above.

250.   The Anti-Steering Restraints further and protect Visa's monopoly power by ensuring that no competitor can make inroads on its market position by offering cheaper or more efficient Credit-Card services to merchants.  The adoption, imposition, and enforcement of the Anti-Steering Restraints constitute willful maintenance of monopoly power, which harms the competitive process and consumers, in violation of § 2 of the Sherman Act.

251.   No procompetitive justification exists for the No-Surcharge Rule in particular or the Anti-Steering Restraints in general.

252.   As a direct and foreseeable result of Visa's willful maintenance of its monopoly power in the markets identified above by the anticompetitive device of the Anti-Steering Restraints, Plaintiffs and members of the Classes have suffered and continue to suffer irreparable injury for which there is no adequate remedy at law.

253.   As a direct and foreseeable result of Visa's willful maintenance of its monopoly power in the markets identified above by the anticompetitive device of the Anti-

Steering Restraints, Plaintiffs and members of the Class have suffered damages in an amount to be determined at trial.

254.   Visa's monopolization occurred in and affected interstate commerce.

### SEVENTH CLAIM FOR RELIEF:
**CLASS I VS. VISA AND BANK DEFENDANTS FOR DAMAGES UNDER § 4 OF THE CLAYTON ACT, 15 U.S.C. § 15, FOR VIOLATION OF THE SHERMAN ACT, § 1 UNLAWFUL TYING AND BUNDLING OF NETWORK-PROCESSING SERVICES AND PAYMENT-GUARANTEE SERVICES TO PAYMENT-CARD-SYSTEM SERVICES BY DEFENDANT VISA AND ITS MEMBER BANKS**

255.   Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

256.   Throughout the relevant period, Visa and its member banks — direct, horizontal competitors of each other — engaged in unlawful contracts, combinations, and conspiracies in an unreasonable restraint of interstate trade or commerce in violation of § 1 of the Sherman Act, 15 U.S.C. § 1.

257.   The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings, and concerts of action between and among the Bank Defendants and Visa, the substantial terms of which were to illegally tie and bundle together the separate and distinct services identified in ¶ 162 above.

258.   The agreements between Visa Acquiring Banks and merchants to tie and bundle the Payment-Guarantee Services and Network-Processing Services to Visa's Payment-Card-System Services also constitute unlawful contracts and continuing agreements.

259.   Visa and its member banks, including Bank Defendants, achieved their anticompetitive objectives, in part, by agreeing, separately and together, to establish, implement, and maintain this tying and bundling arrangement, in which Visa and its members

offer Payment-Card-System Services only to those merchants that also accepted the other separate and distinct services.

260.    Throughout the relevant time period, Visa acquired and maintained market power in the market for Payment-Card-System Services.

261.    Throughout the relevant time period, Visa acquired and maintained market power in the market for General Purpose Card Network Services.

262.    Throughout the relevant time period, Visa acquired and maintained market power in the market for Debit Card Network Services.

263.    Throughout the relevant time period, Visa had an economic interest in the markets for Payment-Guarantee Services and Network-Processing Services.

264.    Throughout the relevant time period, Visa forced all merchants that accepted transactions using Visa Payment-Card-System Services to also purchase Payment-Guarantee Services and Network-Processing Services from Visa.  These merchants thus lost the ability to purchase Payment-Guarantee Services and Network-Processing Services, among other services, from independent vendors or, in the case of Payment-Guarantee Services, to self-insure against loss to fraud.

265.    Various forms of Payment-Guarantee Services and Network-Processing Services are often sold and purchased independently of Payment-Card-System Services.

266.    Absent this tying and bundling arrangement, many merchants would have purchased Payment-Guarantee Services and/or Network-Processing Services from those other sources.

267.    These tying and bundling arrangements harmed competition in the market for Payment-Guarantee Services and Network-Processing Services.  All Class Members were

harmed by this tying and bundling arrangement by paying higher prices for Payment-Guarantee Services and Network-Processing Services than they would have paid in a competitive environment.

268.   Throughout the relevant time period, the tying and bundling arrangements perpetrated by Visa, Bank Defendants, and other member banks affected a substantial amount of commerce in the market for Payment-Guarantee Services and Network-Processing Services.

269.   Defendants' contracts, combinations, and conspiracies to tie and bundle together these separate and distinct services had, among others, the following intended and actual effects that are common to Plaintiffs and all Class Members:

a.   The entire Classes of merchants are forced to purchase all of these separate and distinct services from Visa and pay Visa's supracompetitive Interchange Fees as a condition of accepting transactions over Visa's dominant and ubiquitous Payment-Card-System Services;

b.   The entire Classes of merchants pay fees for these separate and distinct services that exceed the untied and competitive prices for those services;

c.   A substantial amount of commerce in the market for Payment-Guarantee Services is affected by the contracts, combinations, and conspiracies between Visa and its members to tie and bundle Payment-Guarantee Services to its dominant Payment-Card-System Services;

d.   A substantial amount of commerce in the market for Network-Processing Services is affected by the contracts, combinations, and conspiracies between Visa and its members to tie and bundle to its dominant Payment-Card-System Services; and

e.   The competitive harm caused by the bundling and tying arrangements between Visa and its member banks exceeds any efficiency benefit that Defendants may argue arises from these practices.

270.   These tying and bundling arrangements are illegal under § 1 of the Sherman Act.

271.   As a consequence of the Defendants' illegal combinations and conspiracies, Plaintiffs and members of the Classes suffered a common injury to their business and property, in part because they were forced to pay higher fees for these separate and distinct services than they would have paid in the absence of the Defendants' tying and bundling arrangements.

**EIGHTH CLAIM FOR RELIEF:**
**CLASS I VS. MASTERCARD AND BANK DEFENDANTS FOR DAMAGES UNDER**
**§ 4 OF THE CLAYTON ACT, 15 U.S.C. § 15, FOR VIOLATION OF THE SHERMAN**
**ACT, § 1 UNLAWFUL TYING AND BUNDLING OF NETWORK-PROCESSING**
**SERVICES AND PAYMENT-GUARANTEE SERVICES TO PAYMENT-CARD-**
**SYSTEM SERVICES BY DEFENDANT MASTERCARD AND ITS MEMBER BANKS**

272.   Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

273.   MasterCard and its member banks — direct, horizontal competitors of each other — engaged in unlawful contracts, combinations, and conspiracies in an unreasonable restraint of interstate trade or commerce in violation of § 1 of the Sherman Act, 15 U.S.C. § 1.

274.   The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings, and concerts of action between and among the Bank Defendants and MasterCard, the substantial terms of which were to illegally tie and bundle together the separate and distinct services identified in ¶ 162 above.

275.   The agreements between MasterCard Acquiring Banks and merchants to tie and bundle the Payment-Guarantee Services and Network-Processing Services to the MasterCard Payment-Card-System Services also constitute unlawful contracts and continuing agreements.

276.   MasterCard and its member banks, including Bank Defendants, achieved their anticompetitive objectives, in part, by agreeing, separately and together, to establish,

implement, and maintain this tying and bundling arrangement, in which MasterCard and its members offer the MasterCard Payment-Card-System Services only to those merchants that also accepted the other separate and distinct services.

277.    Throughout the relevant time period, MasterCard acquired and maintained market power in the market for Debit Card Network Services.

278.    Throughout the relevant time period, MasterCard acquired and maintained market power in the market for General Purpose Card Network Services.

279.    Throughout the relevant time period, MasterCard had an economic interest in the markets for Payment-Guarantee Services and Network-Processing Services.

280.    Throughout the relevant time period, MasterCard deprived all merchants of the practical ability to purchase Payment-Guarantee Services and Network-Processing Services from independent vendors or, in the case of Payment-Guarantee Services, to self-insure against loss to fraud.

281.    Various forms of Payment-Guarantee Services and Network-Processing Services are often sold and purchased independently of Payment-Card-System Services.

282.    Absent this tying and bundling arrangement, many merchants would have purchased Payment-Guarantee Services and/or Network-Processing Services from those other sources.

283.    These tying and bundling arrangements harmed competition in the market for Payment-Guarantee Services and Network-Processing Services.  All Class Members were harmed by this tying and bundling arrangement by paying higher prices for Payment-Guarantee Services and Network-Processing Services than they would have paid in a competitive environment.

284.   Throughout the relevant time period, the tying and bundling arrangements perpetrated by MasterCard, Bank Defendants, and other member banks affected a substantial amount of commerce in the market for Payment-Guarantee Services and Network-Processing Services.

285.   Defendants' contracts, combinations, and conspiracies to tie and bundle together these separate and distinct services had, among others, the following intended and actual effects that are common to all Plaintiffs and Class Members:

a.   The entire Classes of merchants are forced to purchase all of these separate and distinct services from MasterCard and pay MasterCard's supracompetitive Interchange Fees as a condition of accepting transactions over MasterCard's dominant and ubiquitous Payment-Card-System Services;

b.   The entire Classes of merchants pay fees for these separate and distinct services that exceed the untied and competitive prices for those services;

c.   A substantial amount of commerce in the market for Payment-Guarantee Services is affected by the contracts, combinations, and conspiracies between MasterCard and its members to tie and bundle Payment-Guarantee Services to its dominant Payment-Card-System Services;

d.   A substantial amount of commerce in the market for Network-Processing Services is affected by contracts, combinations, and conspiracies between MasterCard and its members to tie and bundle Network-Processing Services to its dominant Payment-Card-System Services; and

e.   The competitive harm caused by the bundling and tying arrangement between MasterCard and its member banks exceeds any efficiency benefit that Defendants may argue arises from these practices.

286.   These tying and bundling arrangement are illegal under § 1 of the Sherman Act.

287.   As a consequence of the Defendants' illegal combinations and conspiracies, Class members suffered a common injury to their business and property, in part because they

were forced to pay higher fees for these separate and distinct services than they would have paid in the absence of the Defendants' bundling arrangements.

**NINTH CLAIM FOR RELIEF:**
**CLASS I VS. VISA AND BANK DEFENDANTS FOR DAMAGES UNDER § 4 OF THE CLAYTON ACT, 15 U.S.C. § 15, FOR VIOLATION OF THE SHERMAN ACT, § 1, 15 U.S.C. § 1, UNLAWFUL EXCLUSIVE DEALING BY VISA AND ITS MEMBER BANKS**

288.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

289.    The agreements between Visa and its member banks, including several Bank Defendants, and between Acquiring Banks and the Class not to sell Payment-Guarantee Services or Network-Processing Services untied from the Visa Payment-Card-System Services unreasonably restrict competition and, therefore, violate § 1 of the Sherman Act, 15 U.S.C. § 1.

290.    By acting as the exclusive provider of Payment-Guarantee Services and Network-Processing-Services to merchants that accept Visa, Visa unreasonably forecloses a significant share of the market from its competitors in the Payment-Guarantee Services and Network-Processing Services markets.

291.    Because competitors of Visa are foreclosed from selling Payment-Guarantee Services and Network-Processing Services to merchants accepting  transactions using Visa Payment-Card-System Services, those merchants pay higher prices for those services than they would have paid in a competitive market.

292.    Because these merchants pay higher prices for Payment-Guarantee Services and Network-Processing Services than they would have paid in a competitive market, competition in the markets for Payment-Guarantee Services and Network-Processing Services was harmed.

- 73 -

293.    There exists no countervailing benefit to competition to offset the harm that Visa's exclusive dealing has imposed on the Classes. Even if such a benefit did exist, it would not outweigh the harm to competition that Visa and its member banks impose.

**TENTH CLAIM FOR RELIEF:**
**CLASS I VS. MASTERCARD AND BANK DEFENDANTS FOR DAMAGES UNDER § 4 OF THE CLAYTON ACT, 15 U.S.C. § 15, FOR VIOLATION OF THE SHERMAN ACT, § 1, 15 U.S.C. § 1, UNLAWFUL EXCLUSIVE DEALING BY MASTERCARD AND ITS MEMBER BANKS**

294.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

295.    The agreements between MasterCard and its member banks, including several Bank Defendants, and between Acquiring Banks and the Class not to sell the Payment-Guarantee Services or Network-Processing Services untied from the MasterCard Payment-Card-System Services unreasonably restrict competition and, therefore, violate § 1 of the Sherman Act, 15 U.S.C. § 1.

296.    By acting as the exclusive provider of Payment-Guarantee Services and Network-Processing Services to merchants that accept MasterCard, MasterCard unreasonably forecloses a significant share of the market from its competitors in the Payment-Guarantee Services and Network-Processing-Services markets.

297.    Because competitors of MasterCard are foreclosed from selling Payment-Guarantee Services and transaction processing services to merchants accepting transactions using MasterCard Payment-Card–System Services, those merchants pay higher prices for those services than they would have paid in a competitive market.

298.    Because these merchants pay higher prices for Payment-Guarantee Services and Network-Processing Services than they would have paid in a competitive market,

competition in the markets for Payment-Guarantee Services and Network-Processing Services was harmed.

299.    There exists no countervailing benefit to competition to offset the harm that MasterCard's exclusive dealing has imposed on the Classes. Even if such a benefit did exist, it would not outweigh the harm to competition that MasterCard and its member banks impose.

**ELEVENTH CLAIM FOR RELIEF:**
**CLASS I V. VISA AND BANK DEFENDANTS FOR VIOLATION OF THE CARTWRIGHT ACT, § 16700 *ET SEQ.* OF THE CALIFORNIA BUSINESS AND PROFESSIONAL CODE, UNLAWFUL PRICE FIXING OF INTERCHANGE FEES**

300.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

301.    Throughout the relevant period, Visa and its member banks, including the Bank Defendants — direct, horizontal competitors of each other — engaged in unlawful contracts, combinations, and conspiracies in an unreasonable restraint of interstate trade or commerce in violation of § 16700 *et seq.* of the Cartwright Act (Cal. Bus. & Prof. Code, § 16700 *et seq.*). These unlawful contracts, combinations, and conspiracies were entered into and effectuated within the State of California.

302.    The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings, and concerts of action between and among Visa's issuing and acquiring members, including the Bank Defendants and Visa, the substantial terms of which were to illegally fix, raise, maintain, or stabilize the Credit-Card Interchange Fees charged to merchants by Issuing Banks in the market for General Purpose Card Network Services and to enact the Anti-Steering Restraints and Miscellaneous Exclusionary Restraints to protect their ability to fix supracompetitive prices for those services.

303.   The Visa Board of Directors, which includes representatives from several Bank Defendants, voted to fix, raise, maintain, or stabilize the Credit Card Interchange Fees for Visa transactions, in violation of § 16700 *et seq.* of the Cartwright Act.

304.   All of the member banks of Visa, including the Bank Defendants, have had actual knowledge of, and have knowingly participated in, the conspiracy alleged herein.

305.   The contract, combination, conspiracy, and agreement has, had, and/or is likely to have, among other things, the following effects which are common to the entire Class of Plaintiffs:

      a.   Actual and potential competition in the General Purpose Card Network Services market was substantially excluded, suppressed, and effectively foreclosed;

      b.   Visa acquired and maintained market power in the relevant markets;

      c.   Defendants controlled, maintained, and elevated above competitive levels the Credit-Card Interchange Fees charged to Class members in the market for General Purpose Card Network Services;

      d.   Class members were required to pay supracompetitive Interchange Fees;

      e.   Defendants derived direct and substantial economic benefits from the supracompetitive Credit-Card Interchange Fees in the market for General Purpose Card Network Services;

      f.   But for the anticompetitive conduct of Visa and its member banks, competition among banks would have eliminated or greatly reduced the Credit-Card Interchange Fees in order to gain business from merchants; and

      g.   But for the anticompetitive conduct of Defendants, Class members would have saved tens of billions of dollars by avoiding to pay collectively fixed Interchange Fees.

306.   The collectively fixed Interchange Fee is illegal.   It is not necessary to accomplish any procompetitive benefit of the Visa Network.   Even if some horizontal agreement were necessary to promote the efficiencies of the Visa Network, the collectively-

set Interchange Fee is significantly more restrictive than necessary to bring about those efficiencies. Visa and its member banks' price fixing achieved few procompetitive benefits to counterbalance its demonstrated anticompetitive effects in the General Purpose Card Network Services market.

307.     As a consequence of the Defendants' illegal combinations and conspiracies, all Class members suffered a common injury to their business and property, in part, because they were charged higher Credit Card Interchange Fees by Issuing Banks in the market for General Purpose Card Network Services than they would have paid in the absence of the Defendants' conduct. The specific amount of damages suffered by the Classes have not yet been determined, as such determination will require additional discovery and expert analysis.

**TWELFTH CLAIM FOR RELIEF:**
**CLASS II VS. ALL DEFENDANTS FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER § 16 OF THE CLAYTON ACT FOR VIOLATIONS OF THE SHERMAN ACT, §§ 1 AND 2, AND THE CARTWRIGHT ACT, BY DEFENDANTS VISA AND MASTERCARD AND THEIR MEMBER BANKS**

308.     Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

309.     Plaintiffs have been injured and will continue to be injured in their business and property as a result of Defendants' continuing conduct in violation of §§ 1 and 2 of Sherman Act and the Cartwright Act, as described in this Complaint, including the First through Twelfth Claims.

310.     Plaintiffs request a declaratory judgment, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a), that Defendants' aforementioned conduct constitutes unlawful price fixing of Interchange Fees, unlawful tying and bundling of transaction processing fees and other separate and distinct services, unlawful exclusive dealing, unreasonable restraints of trade,

and monopolization as detailed in the First through Twelfth Claims and in violation of §§ 1 and 2 of the Sherman Act and the Cartwright Act.

311.   Plaintiffs further request that the Court enjoin and restrain Defendants' wrongful conduct, alleged herein, pursuant to § 16 of the Clayton Act, 15 U.S.C. § 26.

## PART THREE: ALLEGATIONS RELATING TO DEBIT-CARD CLAIMS

## X.

### DEBIT-CARD RELEVANT MARKETS

312.   There exists a relevant market, the product definition of which is no broader than Debit Cards.  *See In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568, at *2 (E.D.N.Y. Apr. 1, 2003).  The geographic dimension of this market is the United States.

313.   There exists a relevant market, the product definition of which is no broader than Debit Card Network Services.  *See In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568, at *7 (E.D.N.Y. Apr. 1, 2003).  The geographic dimension of this market is the United States.

314.   Debit Cards and Debit Card Network Services are a unique bundle of services. Consumers who use Debit Cards either want to or have to make contemporaneous payment for their purchases with funds in their depository accounts.  These consumers either cannot borrow money for those purchases (because they may not be deemed credit-worthy by Credit Card Issuing Banks) or choose not to.

315.   Because Debit Cards uniquely enable consumers to make certain types of purchases, the acceptance of Debit Cards is also unique from a merchant's perspective. There are therefore no other services that are reasonably substitutable for Debit Card Network Services.

316. Visa and MasterCard have market power in the market for Debit Card Network Services. In 2004, Visa had a 79% share of the transaction volume in the Offline-Debit-Card market and a 59% share of the Debit Card market. MasterCard's share of the Offline market was 21% and its share of the Debit Card market was 13%.

317. The market shares of Visa and MasterCard understate their market power.

318. Visa and MasterCard's market power in the Debit Card and Debit Card Network Services markets is reinforced by the fact that the major Visa-Check-Issuing Banks are members of MasterCard and major MasterCard-Debit-Issuing Banks are members of Visa. This makes the Interchange Fee structures between the two Networks transparent and minimizes the incentives of the Networks to undercut each other's fees. *See In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568, at *3, *6 (E.D.N.Y. Apr. 1, 2003) (citing incidents of concerted activity between Visa and MasterCard).

319. Few, if any, merchants would stop accepting Visa or MasterCard Debit Cards even in the face of a substantial increase in Merchant-Discount Fees.

320. Barriers to entry in the Debit Card market and the Debit Card Network Services market are high. No major competitors have emerged to challenge Defendants' dominance of those markets since Defendants began attempting to grow their Offline-Debit-Card volume in the early 1990s. New entrance into these markets would be costly and would involve the "chicken-and-egg" problem of signing up both Card-Issuing banks and merchants for the network.

321. Visa and MasterCard's substantial (individual and collective) market power in the General Purpose Card Network Services and Debit Card Network Services markets has been reinforced by their implementation and enforcement of the Anti-Steering Restraints and

Miscellaneous Exclusionary Restraints, which insulate them from the competition that would exist in a free market.

**THIRTEENTH CLAIM FOR RELIEF:**
**CLASS I VS. VISA AND BANK DEFENDANTS FOR DAMAGES UNDER § 4 OF THE CLAYTON ACT, 15 U.S.C. § 15, FOR VIOLATIONS OF SHERMAN ACT, § 1, 15 U.S.C. § 1, UNLAWFUL PRICE FIXING OF OFFLINE DEBIT CARD INTERCHANGE FEES BY VISA AND ITS MEMBER BANKS**

322.   Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

323.   Throughout the relevant period, Visa and its member banks, including the Bank Defendants — direct horizontal competitors of each other — engaged in unlawful contracts, combinations, and conspiracies in an unreasonable restraint of interstate trade or commerce in violation of § 1 of the Sherman Act, 15 U.S.C. § 1.

324.   The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings, and concerts of action between and among Visa's issuing and acquiring members, including the Bank Defendants and Visa, the substantial terms of which were to illegally fix, raise, maintain, or stabilize the Offline-Debit-Card Interchange Fees charged to merchants for the market for Debit Card Network Services.

325.   The Visa Board of Directors, which includes representatives from several Bank Defendants, acted on behalf of the member banks to fix, raise, maintain, or stabilize the Interchange Fees for Visa Offline-Debit-Card transactions, in violation of § 1 of the Sherman Act, 15 U.S.C. § 1.

326.   All of the member banks of Visa, including the Bank Defendants, have actual knowledge of, and have knowingly participated in, the conspiracy alleged herein.

327. The contract, combination, conspiracy, and agreement alleged in this Claim has, had, and/or is likely to have, among others, the following effects which are common to Plaintiffs and members of the Class:

    a.    Actual and potential competition in the Debit Card Network Services market was substantially excluded, suppressed, and effectively foreclosed;

    b.    Defendants acquired and maintained market power in the relevant markets;

    c.    Defendants controlled, maintained, and elevated above competitive levels the Interchange Fees charged to members of the Classes in the market for Debit Card Network Services;

    d.    All Class members were required to pay supracompetitive Offline-Debit-Card Interchange Fees for Visa transactions in the market for Debit Card Network Services;

    e.    Defendants derived direct and substantial economic benefits from the supracompetitive Offline-Debit-Card Interchange Fees for Visa transactions in the market for General Purpose Card Network Services;

    f.    But for the anticompetitive conduct of Visa and its member banks, competition among banks would have eliminated or greatly reduced the Interchange Fees for Visa transactions in the market for Debit Card Network Services; and

    g.    The specific amount of damages suffered by the Classes has not yet been determined, as such determination will require additional discovery and expert analysis, but the Classes estimates damages will range in the tens of billions of dollars.

328. The collectively fixed Interchange Fee is illegal. It is not necessary to accomplish any procompetitive benefit of the Visa Network. Even if some horizontal agreement were necessary to promote the efficiencies of the Visa Network, the collectively-set Interchange Fee is significantly more restrictive than necessary to bring about those efficiencies. Visa and its member banks' price fixing achieves few — if any —

procompetitive benefits to counterbalance the price-fixing's demonstrated anticompetitive effects in the Debit Card Network Services market.

**FOURTEENTH CLAIM FOR RELIEF:**
**CLASS I VS. MASTERCARD AND BANK DEFENDANTS FOR DAMAGES UNDER § 4 OF THE CLAYTON ACT, 15 U.S.C. § 15, FOR VIOLATIONS OF SHERMAN ACT, § 1, 15 U.S.C. § 1, UNLAWFUL PRICE FIXING OF OFFLINE-DEBIT-CARD INTERCHANGE FEES BY MASTERCARD AND ITS MEMBER BANKS**

329.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

330.    Throughout the relevant period, MasterCard and its member banks, including the Bank Defendants — direct horizontal competitors of each other — engaged in unlawful contracts, combinations, and conspiracies in an unreasonable restraint of interstate trade or commerce in violation of § 1 of the Sherman Act, 15 U.S.C. § 1.

331.    The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings, and concerts of action between and among MasterCard's issuing and acquiring members, including the Bank Defendants and MasterCard, the substantial terms of which were to illegally fix, raise, maintain, or stabilize the Offline-Debit-Card Interchange Fees charged to merchants for the market for Debit Card Network Services.

332.    The MasterCard Board of Directors, which includes representatives from several Bank Defendants, acted on behalf of the member banks to fix, raise, maintain, or stabilize the Interchange Fees for MasterCard Offline-Debit-Card transactions, in violation of § 1 of the Sherman Act, 15 U.S.C. § 1.

333.    All of the member banks of MasterCard, including the Bank Defendants, have actual knowledge of, and have knowingly participated in, the conspiracy alleged herein.

334.   The contract, combination, conspiracy, and agreement alleged in this Claim has, had, and/or is likely to have, among others, the following effects which are common to Plaintiffs and members of the Class:

a.   Actual and potential competition in the Debit Card Network Services market was substantially excluded, suppressed, and effectively foreclosed;

b.   Defendants acquired and maintained market power in the relevant markets;

c.   Defendants controlled, maintained, and elevated above competitive levels the Interchange Fees charged to Class members in the market for Debit Card Network Services;

d.   All Class members were required to pay supracompetitive Offline-Debit-Card Interchange Fees for MasterCard transactions in the market for Debit Card Network Services;

e.   Defendants derived direct and substantial economic benefits from the supracompetitive Offline-Debit-Card Interchange Fees for MasterCard transactions in the market for General Purpose Card Network Services;

f.   But for the anticompetitive conduct of MasterCard and its member banks, competition among banks would have eliminated or greatly reduced the Interchange Fees for MasterCard transactions in the market for Debit Card Network Services; and

g.   The specific amount of damages suffered by the Classes has not yet been determined, as such determination will require additional discovery and expert analysis, but the Classes estimates damages will range in the tens of billions of dollars.

335.   The collectively fixed Interchange Fee is illegal.   It is not necessary to accomplish any procompetitive benefit of the MasterCard Network.   Even if some horizontal agreement were necessary to promote the efficiencies of the MasterCard network, the collectively-set Interchange Fee is significantly more restrictive than necessary to bring about those efficiencies.   MasterCard and its member banks' price fixing achieves few — if any —

procompetitive benefits to counterbalance the price-fixing's demonstrated anticompetitive effects in the Debit Card Network Services market.

**FIFTEENTH CLAIM FOR RELIEF:**
**CLASS I VS. VISA AND ITS MEMBER BANKS FOR VIOLATION OF THE CARTWRIGHT ACT, § 16700 *ET SEQ.* OF THE CALIFORNIA BUSINESS AND PROFESSIONAL CODE, UNLAWFUL PRICE FIXING OF OFFLINE-DEBIT-CARD INTERCHANGE FEES BY VISA AND ITS MEMBER BANKS**

336.   Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

337.   Throughout the relevant period, Visa and its member banks, including the Bank Defendants — direct, horizontal competitors of each other — engaged in unlawful contracts, combinations, and conspiracies in an unreasonable restraint of interstate trade or commerce in violation of § 16700 *et seq.* of the Cartwright Act (Bus. & Prof. Code, § 16700 *et seq.*).   These unlawful contracts, combinations, and conspiracies were entered into and effectuated within the State of California.

338.   The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings, and concerts of action between and among Visa's issuing and acquiring members, including the Bank Defendants, and Visa, the substantial terms of which were to illegally fix, raise, maintain, or stabilize the Offline-Debit-Card Interchange Fees charged to merchants in the market for Debit Card Network Services.

339.   The Visa Board of Directors, which includes representatives from several Bank Defendants, voted to fix, raise, maintain, or stabilize the Offline-Debit-Card Interchange Fees for Visa transactions, in violation of § 16700 *et seq.* of the Cartwright Act.

340.   All of the member banks of Visa, including the Bank Defendants, have had actual knowledge of, and have knowingly participated in, the conspiracy alleged herein.

341.   The contract, combination, conspiracy, and agreement has, had, and/or is likely

to have, among other things, the following effects which are common to the entire Class of

Plaintiffs:

    a.   Actual and potential competition in the Debit Card Network Services market was substantially excluded, suppressed, and effectively foreclosed;

    b.   Visa acquired and maintained market power in the relevant markets;

    c.   Visa controlled, maintained, and elevated above competitive levels the Offline-Debit-Card Interchange Fees charged to Class members in the market for Debit Card Network Services;

    d.   Class members were required to pay supracompetitive Interchange Fees;

    e.   Defendants derived direct and substantial economic benefits from the supracompetitive Offline-Debit-Card Interchange Fees in the market for Debit Card Network Services;

    f.   But for the anticompetitive conduct of Visa and its member banks, competition among banks would have eliminated or greatly reduced the Offline-Debit-Card Interchange Fees in order to gain business from merchants; and

    g.   But for the anticompetitive conduct of Defendants, Class members would have saved tens of billions of dollars by avoiding to pay collectively fixed Interchange Fee.

342.   The collectively fixed Interchange Fee is illegal.   It is not necessary to

accomplish any procompetitive benefit of the Visa Network.   Even if some horizontal

agreement were necessary to promote the efficiencies of the Visa Network, the collectively-

set Interchange Fee is significantly more restrictive than necessary to bring about those

efficiencies. Visa and its member banks' price fixing achieved few procompetitive benefits to

counterbalance its demonstrated anticompetitive effects in the Debit Card Network Services

market.

343.    As a consequence of the Defendants' illegal combinations and conspiracies, all members of the Classes suffered a common injury to their business and property, in part, because they were charged higher Offline-Debit-Card Interchange Fees in the market for Debit Card Network Services than they would have paid in the absence of the Defendants' conduct.    The specific amount of damages suffered by the Classes has not yet been determined, as such determination will require additional discovery and expert analysis.

<b>SIXTEENTH CLAIM FOR RELIEF:</b>

**CLASS II VS. ALL DEFENDANTS FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER § 16 OF THE CLAYTON ACT AND 28 U.S.C. § 201 FOR VIOLATIONS OF THE SHERMAN ACT, § 1, BY DEFENDANTS VISA AND MASTERCARD AND THEIR MEMBER BANKS**

344.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

345.    Plaintiffs have been injured and will continue to be injured in their business and property as a result of Defendants' continuing conduct in violation of § 1 of Sherman Act, as described in this Complaint, including Claims Fourteen and Fifteen.

346.    Plaintiffs request a declaratory judgment, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a), that Defendants' aforementioned conduct constitutes unlawful price fixing of Offline-Debit-Card Interchange Fees as detailed in Claims Thirteen through Fifteen and in violation of § 1 of the Sherman Act and the Cartwright Act.

347.    Plaintiffs further request that the Court enjoin and restrain Defendants' wrongful conduct, alleged herein, pursuant to § 16 of the Clayton Act, 15 U.S.C. § 26.

## XI.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

A.   Declare, adjudge, and decree that Defendants have committed the violations of the federal and state antitrust laws as alleged herein;

B.   Order that Defendants, their directors, officers, employees, agents, successors, and members be enjoined and restrained from, in any manner, directly or indirectly, committing the violations of the Cartwright and Sherman Acts, in which they and co-conspirators have been engaged;

C.   Order that Defendants, their directors, officers, employees, agents, successors, and members be enjoined and restrained from, in any manner, directly or indirectly, committing any other violations of statutes having a similar purpose or effect; and

D.   Pursuant to applicable law, award monetary damages sustained by the Representative Plaintiffs and the Classes for the fullest time period permitted by the applicable statutes of limitations and the purported settlement and release in *In re Visa Check/MasterMoney Antitrust Litigation,* in an amount to be proved at trial, attorneys' fees, and costs of suit; and award all other and further relief as this Court may deem just and proper.

## XII.

### JURY DEMAND

Plaintiffs hereby demand trial by jury of all issues properly triable thereby.

Dated: Minneapolis, Minnesota
       April 24, 2006

By: _____
    K. Craig Wildfang
    Co-Lead Counsel for Plaintiffs

MP3 20177181.2

- 87 -

**Robins, Kaplan, Miller & Ciresi L.L.P.**
David Balto (dbalto@rkmc.com)
Bethany D. Krueger (bdkrueger@rkmc.com)
Anne M. Lockner (amlockner@rkmc.com)
Christopher W. Madel (cwmadel@rkmc.com)
Kevin M. Magnuson (kmmagnuson@rkmc.com)
Ryan W. Marth (rwmarth@rkmc.com)
Bradley M. Orschel (bmorschel@rkmc.com)
Thomas J. Undlin (tjundlin@rkmc.com)
K. Craig Wildfang (kcwildfang@rkmc.com)
2800 LaSalle Plaza
800 LaSalle Avenue South
Minneapolis, MN  55402
Tel. (612) 349-8500
Fax (612) 349-4181

**Berger & Montague, P.C.**
Bart Cohen (bcohen@bm.net)
Merrill G. Davidoff (mdavidoff@bm.net)
Michael J. Kane (mkane@bm.net)
H. Laddie Montague (hlmontague@bm.net)
1622 Locust Street
Philadelphia, PA  19103
Tel. (215) 875-3000
Fax (215) 875-4604

**Lerach Coughlin Stoia Geller Rudman & Robbins LLP**
Christopher M. Burke (chrisb@lerachlaw.com)
Bonny E. Sweeney (bonnys@lerachlaw.com)
655 West Broadway
Suite 1900
San Diego, CA  92101
Tel. (619) 231-1058
Fax (619) 231-7423

Samuel H. Rudman (srudman@lerachlaw.com)
200 Broadhollow Road
Suite 405
Melville, NY  11747
Tel. (619) 231-1058
Fax (619) 231-7423

**Freedman, Boyd, Daniels, Hollander & Goldberg, P.A.**
Joseph Goldberg (jg@fbdlaw.com)
20 First Plaza
Suite 700
Albuquerque, NM  87102
Tel. (505) 842-9960
Fax (505) 842-0761

**Hulett, Harper, Stewart, LLP**
Dennis J. Stewart (dennis@hulettharper.com)
550 West C Street
Suite 1600
San Diego, CA  92101
Tel. (619) 338-1133
Fax (619) 338-1139

**Abraham, Fruchter & Twersky, LLP**
Mitchell M. Z. Twerksy (mtwerksy@aftlaw.com)
One Penn Plaza, Suite 2805
New York, NY  10019
Tel. (212) 279-5050
Fax (212) 279-3655

**Ann White Law Offices, P.C.**
Ann White (awhite@awhitelaw.com)
One Pitcairn Place
Suite 2400
165 Township Line Road
Jenkintown, PA  19046
Tel.  (215) 481-0274
Fax . (215) 481-0271

**Barrack, Rodos & Bacine**
William Ban (wban@barrack.com)
Jeffrey Gittleman (jgittleman@barrack.com)
Gerald Rodos (grodos@barrack.com)
Mark Rosen (mrosen@barrack.com)
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA  19103
Tel. (215) 963-0600
Fax (215) 963-0838

**Bernard M. Gross, P.C.**
Warren Rubin (warren@bernardmgross.com)
Suite 450, John Wanamaker Building
Juniper and Market Street
Philadelphia, PA  19107
Tel. (215) 561-3600
Fax (215) 561-3000

**Bonnett, Fairbourn, Friedman & Balint**
Francis J. Balint, Jr. (fbalint@bffb.com)
Andrew S. Friedman (afriedman@bffb.com)
2901 North Central Avenue
Suite 1000
Phoenix, AZ 85012
Tel. (602) 274-1100
Fax (602) 274-1199

**Chestnut & Cambronne, P.A.**
Karl L. Cambronne (kcambronne@chestnutcambronne.com)
Jeffrey Bores (jbores@chestnutcambronne.com)
Becky Erickson (berickson@chestnutcambronne.com)
Stewart C. Loper (sloper@chestnutcambronne.com)
Brian N. Toder (btoder@chestnutcambronne.com)
3700 Mithun Tower
222 South Ninth Street
Minneapolis, MN 55402
Tel. (612) 339-7300
Fax (612) 336-2940

**Chitwood, Harley Harnes LLP**
Craig Harley (charley@chitwoodlaw.com)
Leslie G. Toran (ltoran@chitwoodlaw.com)
James M. Wilson (jwilson@chitwoodlaw.com)
2300 Promenade Two
1230 Peachtree Street NE
Atlanta, GA 30309
Tel. (404) 873-3900 or (888) 873-3999
Fax (404) 876-4476

**Drubner, Hartley & O'Connor, LLC**
Charles S. Hellman (chellman@dholaw.com)
1 Penn Plaza
Suite 4507
New York, NY 10119
Tel. (212) 736-2121
Fax (212) 736-2122

James Hartley (jhart@dholaw.com)
500 Chase Parkway
Waterbury, CT 06708
Tel. (203) 597-6314
Fax (203) 753-6373

**Finkelstein Thompson & Loughran**
Hilary Ratway (hr@ftllaw.com)
Douglas G. Thompson (dgt@ftllaw.com)
Richard M. Volin (rmv@ftllaw.com)
1050 – 30th Street NW
Washington, DC  20007
Tel. (202) 337-8000
Fax (202) 337-8090

**Friedman & Shube**
Gary B. Friedman (garybfriedman@att.net)
Noah Shube (nshube@yahoo.com)
155 Spring Street
5th Floor
New York, NY  10012
Tel. (212) 680-5150
Fax (212) 219-6446

**Giskan & Solotaroff**
Catherine Anderson (canderson@gslawny.com)
Oren Giskan (ogiskan@gslawny.com)
Jason Solotaroff (jsolotaroff@gslawny.com)
207 W. 25th Street
New York, NY  10001
Tel. (212) 847-8315
Fax (212) 473-8096

**Goldman, Scarlato & Karon, P.C.**
Daniel Karon (karon@gsk-law.com)
55 Public Square, Suite 1500
Cleveland, OH  44113
Tel. (216) 622-1851
Fax (216) 622-1852

**Gray & White**
Mark K. Gray (mkgrayatty@aol.com)
Doris Kim
James Puszczewicz
Matt White
1200 PNC Plaza
500 West Jefferson Street
Louisville, KY  40202
Tel. (502) 585-2060
Fax (502) 581-1933

**Gustafson Gluek PLLC**
Daniel E. Gustafson (dgustafson@gustafsongluek.com)
Dan Hedlund (dhedlund@gustafsongluek.com)
Jason Kilene (jkilene@gustafsongluek.com)
650 Northstar East
608 Second Avenue South
Minneapolis, MN 55402
Tel. (612) 333-8844
Fax (612) 339-6622

**Jaffe + Martin**
Arthur L. Martin (amartin@lawjm.com)
Howard M. Jaffe (hjaffe@lawjm.com)
2029 Century Park East, Suite 2100
Los Angeles, CA 90067-3007
310-226-7770

**Kohn, Swift & Graf, P.C.**
Michael J. Boni (mboni@kohnswift.com)
Robert J. LaRocca (rlarocca@kohnswift.com)
Joshua Snyder (jsnyder@kohnswift.com)
Kate Reznick (kreznick@kohnswift.com)
One South Broad Street
Suite 2100
Philadelphia, PA 19107-3389
Tel. (215) 238-1700
Fax (215) 238-1968

**Koskoff Koskoff & Bieder PC**
Richard Bieder (rbieder@koskoff.com)
William Bloss (bbloss@koskoff.com)
Cynthia Bott (cbott@koskoff.com)
Neal A. DeYoung (ndeyoung@koskoff.com)
Lillian C. Gustilo (lgustilo@koskoff.com)
Michael Koskoff (mkoskoff@koskoff.com)
Anthony Ponvert (aponvert@koskoff.com)
Craig Smith (csmith@koskoff.com)
350 Fairfield Avenue
Bridgeport, CT 06604
Tel. (203) 336-4421
Fax (203) 368-3244

**Kreindler and Kreindler**
Gretchen M. Nelson (gnelson@kreindler.com)
707 Wilshire Boulevard, Suite 5070
Los Angeles, CA 90017
213-622-6469

**Labaton Sucharow & Rudoff LLP**
Craig L. Briskin (cbriskin@labaton.com)
Bernard Persky (bpersky@labaton.com)
Hollis L. Salzman (hsalzman@labaton.com)
100 Park Avenue
New York, NY 10017
Tel. (212) 907-0700
Fax (212) 818-0477

**Law Offices of George A. Shohet**
George Shoehet (gshohet@aol.com)
245 Main Street, Suite 310
Venice, CA 90291
Tel. (310) 452-3176
Fax (310) 452-2270

**Law Office of Jerald M. Stein**
Jerald M. Stein (jmslaw@nyc.rr.com)
Scott Klein (sklein@mintandgold.com)
470 Park Avenue South
Floor 10 North
New York, NY 10016-6819
Tel. (212) 481-4848
Fax (212) 481-6803

**Law Offices of Joshua P. Davis**
Joshua Davis (davisj@usfca.edu)
437 Valley Street
San Francisco, CA 94131
Tel. (415) 422-6223
Fax (415) 422-6433

**Law Offices of Scott A. Bursor**
Scott A. Bursor (scott@bursor.com)
500 Seventh Avenue, 10th Floor
New York, NY 10018
Tel. (212) 989-9113
Fax (212) 989-9163

**Law Offices of Tracey Kitzman**
Tracey Kitzman (traceykitzman@yahoo.com)
7 East 8th Street
Suite 206
New York, NY 10003-5901
Tel. (917) 270-1023
Fax (212) 219-6446

**Lieff, Cabraser, Heiman & Bernstein, LLP**
Joseph R. Saveri (jsaveri@lchb.com)
275 Battery Street, 30th Floor
San Francisco, CA  90411-3339
Tel. (415) 956-1000
Fax (415) 956-1008

Hector D. Geribon (hgeribon@lchb.com)
David P. Gold (dgold@lchb.com)
780 Third Avenue, 48th Floor
New York, NY  10017-2024
Tel. (212) 355-9500
Fax (212) 355-9592

**Lockridge, Grindal & Nauen, P.L.L.P.**

Darla Jo Boggs (djboggs@locklaw.com)
W. Joseph Bruckner (wjbruckner@locklaw.com)
Carmen B. Copher (cbcopher@locklaw.com)
William A. Gengler (wagengler@locklaw.com)
Richard A. Lockridge (ralockridge@locklaw.com)
Charles N. Nauen (cnnauen@locklaw.com)
100 Washington Avenue South
Suite 2200
Minneapolis, MN  55401-2179
Tel. (612) 339-6900
Fax (612) 339-0981

**Mager & Goldstein**
Jayne Goldstein (jgoldstein@magergoldstein.com)
2825 University Drive
Coral Springs, FL  33065
Tel. (954) 341-0844
Fax (954) 341-0855

Lee Albert (lalbert@magergoldstein.com)
Carol Mager (cmager@magergoldstein.com)
One Liberty Place 21st Floor
1650 Market Street
Philadelphia, PA  19103
Fax (215) 640-8281

**Markun, Zusman & Compton, LLP**
Kevin K. Eng (keng@mzclaw.com)
465 California Street
Suite 500
San Francisco, CA  94101
Tel. (415) 438-4515
Fax (415) 434-4505

**Milberg, Weiss, Bershad & Schulman**
David Bershad (dbershad@milbergweiss.com)
Michael Buchman (mbuchman@milbergweiss.com)
Edith M. Kallas (ekallas@milbergweiss.com)
Ryan G. Kriger (rkriger@milbergweiss.com)
J. Douglas Richards (drichards@milbergweiss.com)
Melvyn Weiss (mweiss@milbergweiss.com)
One Pennsylvania Plaza
49th Floor
New York, NY 10119
Tel. (212) 594-5300
Fax (212) 868-1229

**Murray, Frank & Sailer**
Eric J. Belfi (ebelfi@murrayfrank.com)
Brian Brooks (bbrooks@murrayfrank.com)
275 Madison Avenue
8th Floor
New York, NY 10016
Tel. (212) 682-1818
Fax (212) 682-1892

**Pomerantz, Haudeck, Block & Gross**
Jason Cowart (jscowart@pomlaw.com)
Stanley Grossman (smgrossman@pomlaw.com)
100 Park Avenue, 26th Floor
New York, NY 10017
Tel. (212) 661-1100
Fax (212) 661-8665

**Reinhardt Wendorf & Blanchfield**
Garrett D. Blanchfield, Jr.
Mark Reinhardt (mreinhardt@comcast.net)
Mark Wendorf
332 Minnesota Street
E1250 First National Bank Building
St. Paul, MN 55101
Tel. (651) 287-2100
Fax (651) 287-2103

**Richard L. Jasperson, P.A.**
Richard L. Jasperson (jaspersonr@cs.com)
E1000 First National Bank Building
332 Minnesota Street
St. Paul, MN 55101
Tel. (651) 223-5039
Fax (651) 223-5802

**Robert D. Greenbaum & Associates, LLC**
Robert D. Greenbaum (rgreenba@voicenet.com)
123 South Broad Street, 28th Floor
Avenue of the Arts
Philadelphia, PA 19109
Tel. (215) 772-5060
Fax (215) 772-5058

**Roda Nast P.C.**
Dianne M. Nast (dnast@rodanast.com)
801 Estelle Drive
Lancester, PA 17601
Tel. (717) 892-3000
Fax (717) 892-1200

**Ross, Dixon & Bell, LLP**
Jason Hartley (jhartley@rdblaw.com)
550 West "B" Street, Suite 400
San Diego, CA 92101-3599
Tel. (619) 235-4040
Fax (619) 231-8796

Charles Hadden (chadden@rdblaw.com)
2001 K Street NW
Washington, DC 20006
Tel. (202) 662-2000
Fax (202) 662-2190

**Sheller, Ludwig & Badey**
Jonathan Shub (jshub@sheller.com)
1528 Walnut Street, Third Floor
Philadelphia, PA 19102
Tel. (215) 790-7300
Fax (215) 546-0942

**Shepherd, Finkelman, Miller & Shah, LLC**
Patrick Klingman (pklingman@sfmslaw.com)
James E. Miller (jmiller@classactioncounsel.com)
Laurie Rubinow (lrubinow@sfmslaw.com)
65 Main Street
Chester, CT  06412
Tel. (860) 526-1100
Fax (860) 526-1120

Natalie Finkelman Bennett (nfinkelman@classactioncounsel.com)
Paul Rettinger (prettinger@classactioncounsel.com)
Nathan Zipperian (nzipperian@classactioncounsel.com)
30 East State St.
Media, PA 19063
Tel.  (610) 891-9880
Fax  (610) 891-9883

**Spector, Roseman & Kodroff**
William Caldes (wcaldes@srk-law.com)
Jay S. Cohen (jcohen@srk-law.com)
Jeff Corrigan (jcorrigan@srk-law.com)
David Felderman (dfelderman@srk-law.com)
Gene Spector (espector@srk-law.com)
1818 Market Street
Suite 2500
Philadelphia, PA  19103
Tel. (215) 496-0300
Fax (215) 496-6611

**Starr, Gern, Davison & Rubin, P.C.**
Jonathan J. Lerner (jlerner@starrgern.com)
Nicholas Stevens (nstevens@starrgern.com)
103 Eisenhower Parkway
Roseland, NJ  07068-1050
Tel. (973) 403-9200
Fax (973) 226-0031

**Wechsler Harwood**
Jeffrey M. Norton (jmn@whesq.com)
488 Madison Avenue, 8th Floor
New York, NY  10022
Tel. (212) 935-7400
Fax  (212) 753-3630

**Weinstein, Kitchenoff & Asher, LLC**
Steven A. Asher (asher@wka-law.com)
Robert S. Kitchenoff (kitchenoff@wka-law.com)
1845 Walnut Street
Suite 1100
Philadelphia, PA 19103
Tel. (215) 545-7200
Fax (215) 545-6535

**Whatley Drake LLC**
Richard Rouco (rrouco@whatleydrake.com)
Joe R. Whatley (jwhatley@whatleydrake.com)
P.O. Box 10647
Birmingham, AL 35202-0647
Tel. (205) 328-9576
Fax. (205) 328-9669

**Wolf Popper, LLP**
Marian P. Rosner (mrosner@wolfpopper.com)
Patricia I. Avery (pavery@wolfpopper.com)
845 Third Avenue
New York, NY 10022-6601
Tel. (212) 759-4600
Fax (212) 486-2093