UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

IN RE                                                      MASTER FILE NO. 1:05-md-1720-JG-JO

PAYMENT CARD INTERCHANGE FEE
AND MERCHANT-DISCOUNT
ANTITRUST LITIGATION

This Document Relates To: All Class Actions

| | | |
|---|---|---|
| 1:05-cv-03800 | 1:05-cv-05081 | **CLASS PLAINTIFFS' FIRST** |
| 1:05-cv-03924 | 1:05-cv-05082 | **SUPPLEMENTAL CLASS ACTION** |
| 1:05-cv-04194 | 1:05-cv-05083 | **COMPLAINT** |
| 1:05-cv-04520 | 1:05-cv-05153 | |
| 1:05-cv-04521 | 1:05-cv-05207 | **JURY TRIAL DEMANDED** |
| 1:05-cv-04728 | 1:05-cv-05866 | |
| 1:05-cv-04974 | 1:05-cv-05868 | |
| 1:05-cv-05069 | 1:05-cv-05869 | |
| 1:05-cv-05070 | 1:05-cv-05870 | |
| 1:05-cv-05071 | 1:05-cv-05871 | |
| 1:05-cv-05072 | 1:05-cv-05878 | |
| 1:05-cv-05073 | 1:05-cv-05879 | |
| 1:05-cv-05074 | 1:05-cv-05880 | |
| 1:05-cv-05075 | 1:05-cv-05881 | |
| 1:05-cv-05076 | 1:05-cv-05882 | |
| 1:05-cv-05077 | 1:05-cv-05883 | |
| 1:05-cv-05080 | 1:05-cv-05885 | |

Plaintiffs, on behalf of themselves and Class II in the above-captioned Action, as well as all other merchants that begin to accept Visa or MasterCard Payment Cards during the pendency of this Action, submit this Supplemental Complaint pursuant to Fed. R. Civ. P. 15(d) to challenge MasterCard's acquisition of its Member Banks' card-issuing and merchant-acquiring functions as a violation of federal antitrust law. Plaintiffs seek monetary damages and declaratory and injunctive relief to remedy the antitrust violations alleged herein. Plaintiffs repeat and re-allege each and every allegation and definition in the First Consolidated Amended Class Action Complaint as if fully set forth herein.

MP3 20185800.1

# I.

## __INTRODUCTION__

1.      For many years, MasterCard and its Member Banks have engaged in various and repeated violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 ("Section One"), which prohibits contracts, combinations and conspiracies in unreasonable restraint of trade or commerce. MasterCard and its Member Banks have now entered into Agreements (as defined herein) by which they purport to transform MasterCard from a consortium, or "joint venture," of competing Member Banks whose conduct is limited by the proscriptions of Section One, into a purported "single entity" not subject to those proscriptions.

2.      MasterCard and its Member Banks purport to accomplish this transformation by the public issuance of stock for a partial interest in the New MasterCard. Specifically, the Agreements involved the purchase by MasterCard of certain of the Member Banks' ownership and control rights in MasterCard through the redemption and reclassification of approximately 100 million shares of MasterCard common stock currently owned by the Member Banks into new Class B non-voting shares, and issuing new Class M shares to the Member Banks. In exchange for acquiring part of their interests in MasterCard, MasterCard paid the Member Banks approximately $2.2 billion. MasterCard raised the money by selling to the public through an initial public offering ("IPO") approximately 61,520,912 shares of Class A common stock, which raised approximately $2.83 billion. The IPO was consummated on May 24, 2006.

3.      Although stock in MasterCard is being offered to the public, the Agreements place restrictions on the ability of an independent entity to acquire the New MasterCard, and limitations on the exercise of the business judgment of the Board of Directors of New MasterCard (collectively the "Ownership and Control Restrictions").

MP3 20185800.1

4.      MasterCard's public statements suggest that it believes that the New MasterCard is a "single entity," untouched by the proscriptions of Section One. But the IPO and the Agreements do not remove Defendants' anticompetitive conduct from the reach of Section One. And even if MasterCard were correct that the IPO and Agreements turned it into a single entity, the formation of that entity would violate Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section One of the Sherman Act, 15 U.S.C. § 1.

5.      This action is therefore brought to challenge the Agreements between and among MasterCard and its Member Banks. Insofar as the IPO and the Agreements created a legitimate single entity, the consummation of the IPO and those Agreements violated Section 7 of the Clayton Act, 15 U.S.C. § 18, in that their effect may be substantially to lessen competition in the Relevant Market. The Agreements also violated Section One in that they constituted an unlawful combination in restraint of trade, and unreasonably restrained competition in the Relevant Market. Both violations will harm competition and consumers by fixing, raising or maintaining prices charged to merchants in the market for General Purpose Card Network Services.

6.      The substantial lessening of, and unreasonable restraint on, competition resulting from the Agreements among MasterCard and its Member Banks may take a variety of forms, including at least the following:

a)      It purports to create a single firm with market power in the market for General Purpose Card Network Services. Unlike the former MasterCard, which was at least prevented from exercising its market power by Section One, Defendants may argue that the New MasterCard can unilaterally impose supra-competitive fees on merchants in the relevant market.

- 3 -

b)     Its effect may be substantially to lessen competition among Member Banks in the setting of fees charged to merchants for the acceptance and processing of transactions between merchants and MasterCard card-holders.

c)     It may permit MasterCard and its Member Banks to evade the restrictions on its anticompetitive conduct that are currently embodied in orders issued by the United States District Court for the Southern District of New York in *United States v. Visa U.S.A., Visa International, Inc. and MasterCard, Incorporated*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001), *aff'd,* 344 F. 3d 229 (2nd Cir. 2003), *cert. denied* 543 U.S. 811 (2004). If the New MasterCard believes itself to be a "single entity" unbound by the proscriptions of Section One, as MasterCard has publicly stated, it would feel free to re-impose the anti-competitive restraints which were the subject of that case, or to impose other restraints with similar anticompetitive effects.

d)     The Ownership and Control Restrictions embodied in the Agreements between and among the Member Banks of MasterCard substantially inhibit the possibility that a new entrant into the General Purpose Card Network Services Market could acquire ownership and control of MasterCard with a business plan by which it could compete more vigorously with Visa and other Networks for the business of merchants by eliminating or reducing prices charged to merchants for the acceptance of and payment for transactions between the merchant and the MasterCard cardholders.

- 4 -

7.     This action is also brought to enjoin as a fraudulent conveyance the Member Banks' attempt to convey without adequate consideration MasterCard's right to assess the Member Banks for its litigation liabilities and to unwind that conveyance.

## II.

## DEFINITIONS

8.     "Agreements" means the contracts, agreements, and mutual understandings by, between and among MasterCard, the members of its Board of Directors, and its Member Banks, relating in any way to the proposed Initial Public Offering described in the Forms S-1, prospectus, and other filings made by MasterCard with the United States Securities and Exchanges Commission.

9.     "New MasterCard" means the corporate entity that will emerge when the Agreements and the Initial Public Offering are were fully consummated.

10.    "Ownership and Control Restrictions" means those portions of the Agreements disclosed in the Forms S-1 and other filings made by MasterCard with the United States Securities and Exchanges Commission, and such other contracts, agreements, and mutual understandings by, between and among MasterCard, the members of its Board of Directors, and its Member Banks, which purport to limit the percentage of shares in the New MasterCard that any shareholder may own or control, and the limitations upon the free exercise of the business judgment of the Board of Directors of the New MasterCard, including the limitations imposed by the grant of certain veto powers to the holders of the Class M shares in the New MasterCard.

11.    "Relevant Market" means the market relevant to plaintiffs' claims herein, which is no broader than the market for General Purpose Card Network Services in the United States.

- 5 -

**III.**

**BACKGROUND**

12.      Before the IPO and the Agreements, MasterCard was indisputably a consortium of Member Banks that were direct, horizontal competitors of each other. Then and now, MasterCard acts as a standard-setting organization to create a Network for the issuance and acceptance of Payment Cards. This standard-setting function enables consumers across the nation to use any Payment Card issued by any MasterCard Member Bank at any participating merchant. This limited coordination is pro-competitive and permissible under the antitrust laws.

13.      The purported "single entity" New MasterCard Corporation allegedly created has the appearance of a single entity, but operates to mask price setting by controlling Member Banks. Although the corporate structure contemplated by the IPO is complicated and ambiguous, the MasterCard Member Banks that issue MasterCard Payment Cards will retain effective control of the New MasterCard. Not only do the Member Banks retain substantial representation of the New MasterCard's Board of Directors, other provisions in the new corporate structure also operate to assure the continuance of the Member Banks' effective control of the New MasterCard. For example, through the issuance of a new class of stock (Class M stock) to MasterCard Member Banks only, and by giving the holders of Class M stock the ability to veto major business decisions, the Member Banks have the ability to exercise effective control over the business of the New MasterCard. These provisions and others—together with the fact that the New MasterCard will be highly dependent upon the current Member Banks' continued willingness to issue MasterCard Payment Cards—mean that the current MasterCard Member Banks retain effective control over the New MasterCard. Thus the purported single entity will operate in the same way as the Member Banks' cartel did: the Member Banks will control the

- 6 -

setting of Interchange Fees collectively and will maintain artificially high fees by refusing to compete on price, while preventing new entry into the Relevant Market.

14.     Even if the IPO and Agreements did create a single-entity MasterCard, the formation of that entity may have the effect of substantially lessening competition in the Relevant Market because, when the IPO was consummated, it removed the anticompetitive conduct of MasterCard and its Member Banks from the proscriptions of Section 1 of the Sherman Act. Under MasterCard's theory, this allows the New MasterCard to engage in the same activity that is challenged in MDL 1720—and because it will have market power in the market for General Purpose Card Network Services—it will be able profitably to raise the fees charged to merchants in this market.

15.     In addition to structuring the IPO to ensure that the Member Banks do not lose collective control over the level of Interchange Fees charged to merchants, the Member Banks also structured the IPO so that no single purchaser can purchase more than 15% of the voting shares in the New MasterCard. This restriction has the effect of limiting the incentives of any firm that might have the ability to acquire control of MasterCard, which could disrupt the collusive arrangements among the MasterCard Member Banks. Absent the Ownership and Control Restrictions, MasterCard Member Banks—which are virtually all members of the competing Visa Network—could not ensure that a party that might acquire control of MasterCard would maintain the prices at the supra-competitive level set by the colluding Member Banks. Such a restriction on ownership is a violation of Section 1 of the Sherman Act as an unreasonable restraint on trade.

MP3 20185800.1

16.     Absent the Ownership and Control Restrictions, an interested party could acquire MasterCard and attempt to increase its market share by lowering the Interchange Fees it charges to merchants.

17.     The Ownership and Control Restrictions constitute an unreasonable restraint on trade that serves both to protect the MasterCard Member Banks' stream of supra-competitive Interchange-Fee revenues and insulate the Member Banks' interest in Visa from price competition by the New MasterCard.

18.     In addition, there are a wide variety of rules and strategies that either are—or more importantly for this suit, could be—put into place that restrict the extent to which there is coordination versus competition among the MasterCard Member Banks. Section 1 of the Sherman Act ensures that when restraints on competition among horizontal competitors are necessary to permit the efficient production or distribution of goods or services, these restraints be appropriately tailored to ensure that competition is not unreasonably lessened. However, the protections afforded by Section One to competition in the Relevant Market, under MasterCard's theory, disappear to the extent that the MasterCard IPO creates a single entity unfettered by Section One. According to MasterCard, as a "single entity" it can now "unilaterally" fix prices and adopt operating rules and restrictions that restrain activities that were and are the natural subject of competition between the Member Banks, whether or not such restraints are reasonably necessary to the efficiency of the Network.

19.     Under the purported single-entity scheme, MasterCard could adopt rules to overturn the results in the *United States v. Visa* case noted above that found the conduct of MasterCard and its Member Banks anticompetitive. MasterCard's public statements suggest that it believes that the New MasterCard could adopt a rule that it will deal only with banks that deal

- 8 -

exclusively with it and Visa (effectively overturning the decision in *United States v. Visa*, 163 F. Supp. 2d 322 (S.D.N.Y 2001)). According to MasterCard, this action would be beyond the reach of Section 1 of the Sherman Act. However, this action's impact would be no less anticompetitive than when MasterCard adopted the same rule as a consortium of competing banks.

### IV.

### JURISDICTION AND VENUE

20.    The claims set forth in the Seventeenth Claim for Relief are brought under Section 7 of the Clayton Act, 15 U.S.C. § 18.

21.    The claims set forth in the Eighteenth and Nineteenth Claims for Relief are brought under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

22.    The claims set forth in the Twentieth Claim for Relief are brought under N.Y. Debt. & Cred. Law § 270 *et seq.* (2006) and the common law of the State of New York.

23.    This Court has jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331, 1337, 1367, and 2201(a) and 15 U.S.C. § 15.

24.    Venue in this action is proper pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 22. Each of the defendants can be found, reside, has an agent, or transacts business in this district and the causes of action alleged in this supplemental Complaint arose in part and were carried on in part by one or more of the defendants within this district. The interstate trade and commerce described in this Complaint is and has been carried out in part within this district.

### V.

### CLASS ACTION ALLEGATIONS

25.    Plaintiffs represent Class II ("the Class"), as set forth in the First Consolidated Amended Class Action Complaint in MDL 1720 and bring the claims set forth herein as part of

MP3 20185800.1

that Class Action under Rule 23(a), (b)(1), (2), and (3), Fed. R. Civ. P., for violations of 15 U.S.C. §§ 1 & 18, and N.Y. Debt. & Cred. Law § 270 *et seq.* (2006).

26.     The anticompetitive conduct of Defendants alleged herein has or will impose a common antitrust injury on the members of the Class. The members of the Class are so numerous that joinder of all members is impracticable.

27.     Defendants' relationships with the members of the Class and Defendants' anticompetitive conduct have been substantially uniform. Common questions of law and fact will predominate over any individual questions of law and fact.

28.     Defendants have acted, continue to act, refused to act, and continue to refuse to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

29.     There will be no extraordinary difficulty in the management of this Class Action. Common questions of law and fact exist with respect to all members of the Class and predominate over any questions solely affecting individual members. Among the questions of law and fact common to the Class, many of which cannot be seriously disputed, are the following:

a)      Whether the effect of the IPO and the Agreements may be to substantially lessen competition in the Relevant Market;

b)      Whether the IPO and the Agreements constitute a combination in unreasonable restraint of trade;

c)      Whether the Ownership and Control Restrictions contained in the Agreements constitute an unreasonable restraint on trade;

- 10 -

MP3 20185800.1

d)   Whether the abandonment by MasterCard of its right to levy special assessments on its Member Banks constitutes a fraudulent conveyance;

e)   The proper measure of damages sustained by the Class as a result of the conduct described herein;

f)   The proper injunctive relief to remedy the threatened substantial lessening of competition.

30.   This Class Action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all members is not only impracticable, but impossible. The damages suffered by many members of the Class are small in relation to the expense and burden of individual litigation, and therefore, it is highly impractical for such members of the Class to individually attempt to redress the wrongful anticompetitive conduct alleged herein.

31.   A class virtually identical to the Class alleged herein above was certified, and affirmed on appeal, in *In re VisaCheck/MasterMoney Antitrust Litig.*, 192 F.R.D. 68 (E.D.N.Y. 2000), *aff'd*, 280 F.3d 124 (2d Cir. 2001).

## VI.

## RELEVANT MARKET

32.   There exists a relevant market, the product dimension of which is no broader than General Purpose Cards. *In re VisaCheck/MasterMoney Antitrust Litig.,* 2003 WL 1712568, at *3 (E.D.N.Y. Apr. 1, 2003); *United States v. Visa*, 163 F. Supp. 2d 322, 335 (S.D.N.Y. 2001). The geographic dimension of this market is the United States ("General Purpose Card Market"). *United States v. Visa*, 163 F. Supp. 2d at 339-40 (S.D.N.Y. 2001), *aff'd.*, 344 F.3d at 239 (2d Cir. 2003).

- 11 -

33.     There exists a relevant market, the product dimension of which is no broader than General Purpose Card Network Services. *In re VisaCheck/MasterMoney Antitrust Litig.,* 2003 WL 1712568, at "3 (E.D.N.Y. Apr. 1, 2003); United States v. Visa, 163 F. Supp. 2d at 338, *aff'd,* 344 F.3d at 239. The geographic dimension of this market is the United States ("General Purpose Card Network Services Market").

34.     MasterCard and the Member Banks of MasterCard, acting through the MasterCard Network, have market power in the Relevant Market above. To the extent that the New MasterCard is a legitimate single entity, that the New MasterCard will have market power in the Relevant Market.

35.     In 2005, MasterCard transactions conducted by MasterCard Member Banks accounted for 30% of all General Purpose Card-transaction volume in the United States. This figure would be even higher if Charge Cards are excluded from the market. Only Visa transactions conducted by Visa Member Banks constitute a larger share of the relevant market, with 43% of General Purpose Card transaction volume. The only other General Purpose Card Networks, American Express and Discover, have smaller market shares, 22% and 5%, respectively. American Express's share of the market would be significantly lower if Charge Cards are not included in the market.

36.     The conduct of MasterCard and its Member Banks confirms the presumption that the New MasterCard has market power. MasterCard's market power has allowed it and its Member Banks to increase Interchange Fees significantly without any merchants refusing to accept MasterCard-branded Payment Cards. The collusive behavior among MasterCard Member Banks allows them to sustain these frequent Interchange-Fee increases. Only the threat of an antitrust challenge under Section 1 of the Sherman Act prevents further increases in Interchange

- 12 -

Fees. There is reason to believe that the commencement and pendency of the actions now consolidated in MDL 1720 have caused MasterCard and its Member Banks to restrain Interchange-Fee increases that otherwise would have adopted.

37.    Concerted activity between Visa and MasterCard enhances MasterCard's market power by allowing the Networks to collectively assert market power. *See In re VisaCheck/MasterMoney Antitrust Litig.*, 2003 WL 1712568, at *3 (E.D.N.Y. Apr. 1, 2003) (noting evidence of collusion between Visa and MasterCard with respect to their Debit-Card strategies). Because MasterCard's Member Banks are still members of Visa after the IPO, the Visa and MasterCard Networks will still be able to collectively assert market power after the IPO.

38.    There are significant barriers to entry in the General Purpose Card Network Services Market. Because of these barriers, the only successful market entrant since the 1960's was Discover, which was introduced by Sears in the mid-1980's and benefited from its extensive network of stores, the then-existing Sears proprietary card network, and its relationship with Dean Witter.

39.    Because of those unique conditions, Discover was able to enter the market by offering attractive fees to merchants. Even so, Discover has not been able to constrain MasterCard and Visa's Market Power. New entry into the General Purpose Card Network Services Market would cost over $1 billion and would involve a "chicken-and-egg problem of developing a merchant acceptance network without an initial network of cardholders who, in turn, are needed to induce merchants to accept the system's cards in the first place." *United States v. Visa*, 163 F. Supp. 2d at 342.

40.     This "chicken-and-egg" problem remains a substantial barrier to entry, even after the Department of Justice successfully eliminated Visa and MasterCard's "No Competing Cards" rules, which prevented Visa and MasterCard Member Banks from issuing American Express or Discover cards. Even if an entrant could issue Payment Cards, either individually or through banks, it would still need to assemble a network of merchants to accept its cards, so that it could attract cardholders to use its card.

41.     Since the final judgment in *United States v. Visa*, there has been no successful entry into the General Purpose Card Network Services Market.

## VII.

## MASTERCARD'S PRE-IPO ANTICOMPETITIVE STRUCTURE AND CONDUCT

### A.     BEFORE THE IPO MASTERCARD WAS EFFECTIVELY CONTROLLED BY ITS MEMBER BANKS

42.     Before the IPO, MasterCard was indisputably a consortium of Member Banks that were direct, horizontal competitors of each other. MasterCard acted as a standard-setting organization in the market for General Purpose Card Network Services that facilitates the exchange of transaction data and funds among Merchants, Acquiring Banks, and Issuing Banks. This limited coordination is pro-competitive and permissible under the antitrust laws.

43.     Before the IPO, the Member Banks competed with each other to issue MasterCard-branded Payment Cards and acquired merchants for the MasterCard Network. The Member Banks of MasterCard earned revenues through their card-issuing and merchant-acquiring activities and did not share those revenues with other Member Banks or with MasterCard.

- 14 -

44.     Control of MasterCard rested with the Member Banks, and larger banks (especially Issuing Banks) tended to have greater control as evidenced by their positions on the Board of Directors and other important committees of MasterCard.

45.     Most Member Banks, including all of the Issuing Banks, also were owners of the shares in MasterCard and received a bundle of rights including those as shareholders in MasterCard. These rights included the opportunity to vote for a Board of Directors, participate in the governance of MasterCard, and receive dividends.

46.     Regardless of this relationship, MasterCard did not operate as a single entity with respect to the setting of Interchange Fees, but rather as a consortium of competing banks.

47.     Individual Member Banks could have varying degrees of authority within the Network, as some rights are apportioned by volume of transactions.

48.     The Member Banks of MasterCard—direct, horizontal competitors of each other—collectively fixed uniform Interchange Fees that were charged to merchants in the market for General Purpose Card Network Services. As such, they restrained the competition that would otherwise exist among themselves in a free and competitive market.

49.     When the Member Banks collectively set Interchange Fees, they attempted to maximize their own profits rather than those of MasterCard. Thus the Member Banks had an incentive to—and actually did—set Interchange Fees in a way that maximized their own profits, but not necessarily MasterCard's profits.

50.     The only thing that stood in the way of the anticompetitive agreements among MasterCard and its Member Banks to fix uniform Interchange Fees was Section 1 of the Sherman Act, which prohibits contracts, combinations, and conspiracies in unreasonable restraint of trade. These anticompetitive output-reducing agreements among MasterCard and its Member

- 15 -

Banks are the subject of pending antitrust actions before this Court in *In re: Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, MDL 1720.

51.     Virtually all MasterCard Member Banks were members of both the Visa and MasterCard Networks. This relationship ensured that the dual Member Banks had an interest in maximizing their revenues through their Visa and MasterCard activities.

## B.     BEFORE THE IPO MASTERCARD MEMBER BANKS COMPETED WITH EACH OTHER IN THE RELEVANT MARKET

52.     MasterCard authorizes the issuance of branded Payment Cards by its Member Banks. MasterCard includes over 23,000 Member Banks worldwide that issued over 337 million MasterCard-branded cards in the United States in the 2004 fiscal year.

53.     MasterCard acts as a standard-setting organization among these banks by adopting trademarks, implementing systems and technologies to authorize, clear, and settle General Purpose Card transactions. This standard-setting function enables consumers to use any MasterCard-branded General Purpose Card for payment at any merchant that accepts MasterCard-branded General Purpose Cards.

54.     Despite the standard-setting cooperation among MasterCard Member Banks, as horizontal competitors the antitrust laws expect those banks to compete vigorously with each other to issue General Purpose Cards to consumers and to acquire merchants for the MasterCard Network.

55.     As described in Section VIII, Subp. D, MasterCard Member Banks have recently been found to have restrained this competition among themselves and have been enjoined from engaging in similar restraints in the future.

MP3 20185800.1

**C.   BEFORE THE IPO MASTERCARD MEMBER BANKS COLLECTIVELY FIXED UNIFORM LEVELS OF INTERCHANGE FEES IN VIOLATION OF SECTION ONE OF THE SHERMAN ACT**

56.   General-Purpose-Card transactions can involve four parties: the Cardholder, the Merchant, the Issuing Bank, and the Acquiring Bank.

57.   Typically a merchant, such as one of the Plaintiffs or one of their members accepts a MasterCard from a customer for the provision of goods and/or services. The merchant then presents the card-transaction data to an Acquiring Bank for verification and processing. The Acquiring Bank presents the transaction data to MasterCard which, in turn, contacts the Issuing Bank to authorize the transaction. The Issuing Bank then indicates to MasterCard that it authorizes or denies the transaction. MasterCard relays the message to the Acquiring Bank, who then relays the message to the merchant. If the transaction is authorized, the merchant will submit a request for payment to the Acquiring Bank, which relays the request, via MasterCard, to the Issuing Bank. The Issuing Bank pays the Acquiring Bank, keeping a percentage of the price as the Interchange Fee. The Acquirer pays the merchant, also retaining a fee for its services. Sometimes, during the grace period between the purchase and the date payment is due from the Cardholder, the Issuing Bank extends free credit to the Cardholder. Under this system, the Issuing Bank earns revenue from annual fees and interest charged to Cardholders, as well as the amount of the Interchange Fee, while the Acquiring Bank earns revenue from the difference between the Merchant-Discount Fee and the Interchange Fee.

58.   While MasterCard Member Banks compete with each other for the issuance of General Purpose Cards and the acquisition of merchants for the MasterCard Network, they collectively set uniform Interchange Fees among each of several classes of merchants that they impose on merchants for General Purpose Card purchases.

59.     The Member Banks, by setting Interchange Fees that they would charge to merchants in the MasterCard Network, guarantee that MasterCard Interchange Fees increase at the same rate as competitors, even though, in a competitive unrestrained market, a fee decrease would attract merchants to accept more MasterCard credit card transactions over the individual networks.

60.     Interchange Fees were devised in the early days of the Visa and MasterCard Networks, purportedly to pay for the costs of transferring transactional paper between Acquiring and Issuing Banks and to balance network costs between Issuers and Acquirers. These early Interchange Fees were cost-based, set with the help of independent auditing firms.

61.     At that time Visa and MasterCard lacked market power and therefore had to offer competitive fees to merchants in order to grow their Networks.

62.     Credit-Card Interchange Fees were purportedly necessary in the early days of the Visa and MasterCard Networks to induce banks to issue cards to Cardholders and to "acquire" merchants for the Networks.

63.     Those initial proffered justifications for collectively-set uniform Credit Card Interchange Fees are no longer valid, if they ever were. The Networks no longer must to transfer large numbers of paper receipts between Member Banks, and Interchange Fees are no longer cost-based.

64.     MasterCard has market power in the market for General Purpose Card Network Services. Even in the face of frequent and significant increases in Interchange Fees, merchants have no choice but to continue to accept MasterCard credit cards. *Visa*, 163 F. Supp.2d at 340, *aff'd.*, 344 F.3d at 240.

65.     Therefore, given the ubiquity of MasterCard Payment Cards, banks would find it in their interest to issue MasterCard Payment Cards and acquire merchants for the Networks, even without the promise of supra-competitive Interchange Fee revenues.

66.     Before the IPO, MasterCard's activities were financed by levies on the members. The Interchange Fees charged to merchants was not revenue to MasterCard, but was revenue to the Issuing Banks.

67.     The MasterCard Network could function efficiently without collectively-fixed Interchange Fees. Even if the members of MasterCard did not fix uniform Interchange Fees, the MasterCard Network could continue in its role as a clearinghouse between Issuing and Acquiring Banks. There are many examples of similar networks that function very efficiently without collectively-set uniform Interchange Fees, and many more examples of networks which operate efficiently with dramatically lower Interchange Fees.

68.     The collective fixing of uniform Interchange Fees for various merchants and transactions is not reasonably necessary to the functioning of MasterCard as a Payment Card Network or as a standard-setting organization. Even if some Interchange Fee were reasonably necessary, the collectively fixed Interchange Fee is more restrictive than is necessary to effectuate the business of MasterCard. Other four-party, two-sided markets function efficiently without Interchange Fees, or with Interchange Fees dramatically lower than MasterCard credit card Interchange Fees.

69.     Before the IPO and Agreements, Section 1 of the Sherman Act was the only protection to competition that prevented MasterCard's Member Banks from collusively setting the Interchange Fees that were changed to merchants and increasing those fees to supra-competitive levels.

**D.   MASTERCARD AND ITS MEMBER BANKS HAVE ABUSED THEIR COLLABORATIVE STRUCTURE IN VIOLATION OF SECTION ONE OF THE SHERMAN ACT**

70.      In 1998, the Antitrust Division of the Department of Justice sued Visa and MasterCard alleging that the joint governance of the two Networks and certain rules that prevented banks from issuing cards on competitive networks violated Section 1 of the Sherman Act. After a 34-day trial the court found the exclusivity rules violated the antitrust laws and that decision was affirmed by the Second Circuit. *United States v. Visa USA, et al.,* 163 F.Supp.2d 322 (S.D.N.Y. 2001), *aff'd,* 344 F.3d 229 (2d Cir. 2003), *cert. denied,* 125 S.Ct. 45 (2004). The Court found that the Visa and MasterCard Networks, together with their Member Banks, implemented and enforced illegal exclusionary agreements requiring any U.S. bank that issued Visa or MasterCard General Purpose Cards to refuse to issue American Express and Discover cards. 163 F. Supp. 2d at 405-06.

71.      The court held that the "exclusionary rules undeniably reduce output and harm consumer welfare," that Visa and MasterCard had "offered no persuasive procompetitive justification for them," that "the Member Banks agreed not to compete by means of offering American Express and Discover branded cards," that "[s]uch an agreement constitutes an unreasonable horizontal restraint [that] cannot be permitted," and that "these rules constitute agreements that unreasonably restrain interstate commerce in violation of Section 1 of the Sherman Act." *Id.* At 405-06.

72.      In affirming the court's "comprehensive and careful opinion," 344 F.3d at 234, the Second Circuit underscored the crucial role played by the Member Banks in agreeing to, and abiding by, the Visa and MasterCard versions of the exclusionary rules: "Visa U.S.A. and MasterCard, however, are not single entities; they are consortiums of competitors. They are owned and effectively operated by some 20,000 banks, which compete with one another in the

issuance of payment cards and the acquiring of merchants' transactions. These 20,000 banks set the policies of Visa U.S.A. and MasterCard. These competitors have agreed to abide by a restrictive exclusivity provision to the effect that in order to share the benefits of their association by having the right to issue Visa or MasterCard cards, they must agree not to compete by issuing cards of Amex or Discover. The restrictive provision is a horizontal restraint adopted by 20,000 competitors." *Id.* At 242 (emphasis added). Thus, "the restraint imposed by the consortium members [the Member Banks] is on themselves. Each has agreed not to compete with the others in a manner which the consortium considers harmful to its combined interests." *Id.* (emphasis added).

73.     On appeal, MasterCard and Visa claimed that the antitrust rules applicable to single entities should apply to the action to exclude banks that sought to issue rival cards. The court of appeals rejected that argument. 344 F.3d at 242.

74.     By adopting the purported single entity structure, MasterCard and the Bank Defendants may attempt to evade the restrictions imposed in *United States v. Visa*. Through this structure, MasterCard intends to resurrect the single-entity defense properly rejected by the district court and Second Circuit in *United States v. Visa*. This guise will give MasterCard the opportunity to resurrect the restrictions properly condemned in these cases.

## VIII.

## THE IPO AND THE AGREEMENTS

**A.     BY ENTERING INTO THE AGREEMENTS, MASTERCARD AND ITS MEMBER BANKS SEEK TO INSULATE THEMSELVES FROM LIABILITY UNDER SECTION ONE OF THE SHERMAN ACT**

75.     Faced with antitrust challenges in MDL 1720 to the collective setting of Interchange Fees by MasterCard Member Banks, MasterCard and its Member Banks now seek to

MP3 20185800.1

continue their anticompetitive conduct while purportedly removing themselves from the scope of Section 1 of the Sherman Act.

76.     The Member Banks seek to accomplish this goal by combining certain of their important card-issuing and merchant-acquiring functions in the New MasterCard.

77.     Section 7 of the Clayton Act, like its predecessor, Section 1 of the Sherman Act, was designed precisely to prevent mergers or combinations of firms for the purpose of engaging in conduct that "if engaged in by competitors, would 'constitute a menace to, and a restraint upon, that freedom of commerce which Congress intended to recognize and protect, and which the public is entitled to have protected.'" *Northern Security Co. v. United States*, 193 U.S. 197, 227 (1902).

78.     MasterCard has publicly stated that the purpose of the IPO was to reduce its exposure to antitrust claims. MasterCard's intentions can be found in the Form S-1 filed by MasterCard with the United States Securities and Exchanges Commission. A recent amendment to that document includes language explaining that "[m]any of the legal and regulatory challenges we face are in part directed at our current ownership and governance structure in which our customers—our member financial institutions—own all of our common stock and are involved in our governance…" Amendment No. 4 to Form S-1, filed with the SEC on April 14, 2006, at 67. After discussing the changes in ownership structure, MasterCard states "[w]e believe our new structure will place our business in a stronger position as we will be better able to defend ourselves against legal and regulatory challenges involving our ownership and governance. As a result, we believe that we will be competitively advantaged[.]"*Id.* As discussed above, New MasterCard's purported "single entity" structure does not eliminate the Member

- 22 -

MP3 20185800.1

Banks' control over New MasterCard Agreements. The structure of the IPO ensures that the banks will maintain control of the purported "single entity."

79.     The Agreements purport to broaden ownership of MasterCard stock, but in fact impose significant restrictions on ownership and control that reveal the true purpose of the IPO.

80.     The IPO imposed the Ownership and Control Restrictions to prevent the MasterCard Network from being effectively controlled by anyone other than the Member Banks. The initial offering limited sales to public investors as a group to 49% of the equity shares, while the Member Banks and the MasterCard Foundation maintained 41% and 10% respectively. The Member Banks have executed or will execute a stock buyback following the IPO to bring membership back up to 51%.

81.     The IPO creates three classes of shares: Class A shares, Class B shares, and Class M shares. Voting rights after the IPO are limited to Class A shares, but Class M shares held by the Member Banks have certain veto powers. No shareholder is allowed to acquire more than 15% of outstanding Class A or B shares.

82.     Class B shares may be transferred among Member Banks. After four years, the Class B shares may be sold to outside investors, but the Member Banks have a right of first refusal. If allowed to be sold, these shares convert to Class A shares. If this occurs, Member Banks will be able to purchase Class A shares, which would immediately convert to Class B shares, in order to maintain their level of ownership.

83.     Under the IPO, Class M shares were acquired by Member Banks. These shares gave the Member Banks rights to elect 3 board members, and to veto: 1) any sale of all, or substantially all, of the company's assets; 2) any merger or consolidation of the company; 3) any

- 23 -

waiver of beneficial ownership limitations in the certificate of incorporation; and 4) any discontinuation of the core payments business.

84.     The MasterCard IPO provided the promised broadening of stock ownership, but imposed clear restrictions that make it impossible for the Member Banks collectively to lose control of the business. By imposing limits on stock purchases and retaining certain veto powers for the Member Banks over major business decisions, the current MasterCard Member Banks have ensured that they will maintain effective collective control even now that the IPO is completed.

85.     This IPO purported to change MasterCard. But from the perspective of the antitrust laws and the consumers that suffer from MasterCard's anticompetitive behaviors, the IPO did not change the capacity or incentives of MasterCard or its Member Banks to behave anticompetitively, in violation of Section One. In fact the IPO produced an entity that will have the ability to increase prices in the Relevant Market, while, according to MasterCard, being freed from some of the restrictions that constrained MasterCard's anti-competitive conduct before the IPO.

86.     The IPO is a form by which the Member Banks sought to combine certain of their important card-issuing and merchant-acquiring assets in order to continue to operate a conspiracy to restrain trade in the Relevant Market of General Purpose Card Network Services operating in interstate commerce. Setting aside the deceptive restrictions designed to mask the true nature of the IPO and the fact that by design it cannot result in the Member Banks losing control of the price-setting role they covet, it is nothing more than a combination designed ultimately to limit competition and restrain trade in a vital sector of interstate commerce.

- 24 -

**B.      THE PURPORTED "SINGLE ENTITY" IS A PRETEXT**

87.      MasterCard constitutes one of only four General-Purpose-Card Networks in the United States. MasterCard is the second largest Payment-Card Network, and its strength in the marketplace makes it very difficult, if not impossible, for merchants to decline to accept the MasterCard-branded cards. Competition between Payment-Card Networks is limited by the price-setting behavior of the Member Banks, which are also Member Banks of other Payment-Card Networks, including Visa.

88.      The Member Banks compete against each other to issue MasterCard-branded Payment Cards and to "acquire" merchants by providing them with access to the funds of MasterCard cardholders. This competition is restrained, however, by the Banks' collective decision to set the Interchange Fee that is charged to merchants at supra-competitive levels. But for this restraint, competition among Member Banks would drive Interchange Fees down to competitive levels.

89.      The Member Banks decision to not compete on price is a classic antitrust violation: by collectively setting prices, the cartel has increased price (and harmed consumers) beyond the level that would occur in a competitive market. The antitrust laws exist to protect competition, and thus to protect consumer welfare. Horizontal price fixing harms competition, harms merchants, and harms consumers—who ultimately absorb the higher fees reflected in higher costs for goods and services.

90.      Despite possessing market power as a cartel, the Member Banks are constrained by the possibility of public and private antitrust enforcement. MasterCard has faced significant and successful claims brought by the government and by private parties under the antitrust laws. Additionally, under the pre-IPO MasterCard structure the Member Banks could bear liability for

- 25 -

any judgments obtained against MasterCard for antitrust violations. The Agreements purported to effect the repeal of this provision.

91.     In an attempt to evade liability for antitrust violations, the Member Banks have entered into the Agreements, which purported to create the New MasterCard as a "single entity." The MasterCard IPO purportedly created a unified organization with public ownership that could, if it did not itself result from an antitrust violation, set prices for Interchange Fees without conspiring anticompetitively. This organization will do exactly what the Member Banks did before: set Interchange Fees that are higher than they would have been in a world where Member Banks compete to offer merchants competitive pricing and services.

92.     The purported "single entity" form adopted by the IPO attempts to avoid scrutiny under Section 1 of the Sherman Act. Rather than the Member Banks agreeing to charge the same price, the purported "single entity" will set the price. However, a true "single entity" would respond to the needs of its shareholders, would be driven by its own interests, could be purchased and controlled by an independent buyer, and could make major business decisions without being vetoed by MasterCard's Member Banks. The MasterCard purported "single entity" has none of these characteristics, and is little more than an elaborate pretext to ensure that the competition between banks on Interchange Fees that was eliminated by the collusion of the Member Banks cannot emerge.

93.     Under the New MasterCard, the Member Banks will effectively set Interchange Fees using the same cartel-like structure that they used before the IPO. This structure will allow the Member Banks to continue setting Interchange Fees according their own interests, rather than according to any independent interest of the New MasterCard.

- 26 -

## C.    THE EFFECT OF THE AGREEMENTS MAY BE SUBSTANTIALLY TO LESSEN COMPETITION IN THE RELEVANT MARKET

94.      Even if the IPO created a legitimate "single entity" in the New MasterCard, the effect of the formation of that entity may be substantially to lessen competition.

95.      By acquiring from the Member Banks the right to set Interchange Fees charged to merchants, and to grant or deny Member Banks the right to issue MasterCard Payment cards, the New MasterCard has effectively become the largest Issuer in the market for General Purpose Card Network Services, which gives it the market power to unilaterally set supra-competitive prices for the acceptance of MasterCard General-Purpose-Card transactions. MasterCard controls such a large percentage of General Purpose Card issuing volume that merchants would be unable to refuse MasterCard cards, even in the face of substantial increases in fees for accepting those cards.

96.      Because the Member Banks retain a significant role in governing the New MasterCard and those same Member Banks are nearly all members of Visa, the Agreements facilitate express and tacit collusion between Visa and MasterCard over the level of fees charged to merchants in the market for General Purpose Card Network Services.

97.      The supra-competitive profits that the New MasterCard would earn would allow it to increase barriers to entry by funding incentives, such as airline miles and other rewards, for consumers to sign up for and use MasterCard Payment Cards. Such incentives would make it difficult for an entrant to secure an adequate base of cardholders to be able to attract merchants to accept its card.

98.      MasterCard's pre-IPO public statements also indicate that it believes that it will be able to implement a wide variety of anticompetitive restraints now that the IPO is consummated. For example, it may attempt to implement a No-Bypass Rule, such as Visa has

- 27 -

implemented, which would require that all MasterCard transactions be processed over the MasterCard network. Visa's rule has been challenged as an unreasonable restraint among Member Banks. *See*, *Visa v. First Data*, No. 3:02-cv-01786-JSW (N.D.Cal. May 12, 2006) (denying summary judgment for Visa).

99.     The harm to competition that the Agreements cause will outweigh any benefits to competition that MasterCard may argue arises from the transaction.

**D.     THE OWNERSHIP AND CONTROL RESTRICTIONS IN THE AGREEMENTS HARM COMPETITION**

100.     The Ownership and Control Restrictions in the MasterCard IPO are designed to preserve control in the hands of the Member Banks by preventing any single entity from gaining a controlling share of MasterCard.

101.     The Ownership and Control Restrictions prevent a single investor or group of investors from acquiring New MasterCard and operating it as a single entity, free from the constraints of Member Banks.

102.     For example, in the absence of such Restrictions, a single large merchant, or perhaps a joint venture of merchants, could acquire control of MasterCard by purchasing 50 percent or more of the Class A stock. If merchants could acquire control of the New MasterCard, their interests would stand in stark contrast to those of the MasterCard Member Banks.

103.     A merchant or merchant joint venture which acquired MasterCard would have every incentive to reduce Interchange Fees and eliminate the other anticompetitive rules and arrangements that MasterCard imposed before the IPO and will continue to impose.

104.     The pricing of the shares issued through the IPO makes this point. According to published reports, MasterCard intended to raise approximately $2.8 billion by selling shares representing over 80 percent of voting shares. Estimates of the magnitude of Interchange Fees

- 28 -

paid annually by merchants to MasterCard Member Banks exceed $6 billion. If merchants collectively could acquire control of MasterCard with the prospect of saving more on Interchange Fees than it would cost to acquire control of MasterCard, merchants might very well do so.

105.    Without the Ownership and Control Restrictions MasterCard's Member Banks could not retain control of a publicly traded MasterCard. And if the New MasterCard were to significantly reduce its Interchange Fees, then Visa and American Express would have to do so as well. Therefore in the Agreements the Member Banks imposed restrictions on the purchase and ownership of stock following the IPO. These restrictions, in addition to revealing the true nature of the IPO-as-pretext, are an anticompetitive restriction on ownership.

106.    The Ownership and Control Restrictions also enable the Member Banks of MasterCard to protect the supra-competitive profits they earn as Visa Member Banks. If those restrictions did not exist and a single firm could acquire MasterCard, that acquiring firm would lower Interchange Fees to attract merchant transaction volume, thereby forcing the Visa Member Banks to respond by lowering their fees.

## E.    THE RELEASE OF MASTERCARD'S RIGHT OF ASSESSMENT IS A FRAUDULENT CONVEYANCE

107.    Fearing the prospect of additional antitrust liability in MDL 1720 and antitrust cases filed by American Express and Discover, the Member Banks of MasterCard, acting through the MasterCard Board of Directors, have agreed to extinguish MasterCard's right to assess the Member Banks for "liabilities arising out of...judgments in major litigation." MasterCard, Incorporated, Registration Statement (Form S-1) at 20 (Sept. 15, 2005).

108.    This right of assessment—contained in the bylaws of the current MasterCard—is a valuable asset to MasterCard, as it would be to any business entity. It protects the solvency and

stability of MasterCard against losses to litigation, natural disaster, or other events by enabling MasterCard to collect assessments from the Member Banks that own and control MasterCard.

109.    The Member Banks have essentially decided that MasterCard will release this right—and the Member Banks' corresponding duty—without adequate consideration from the Member Banks. This agreement among the Member Banks to release this right has already disadvantaged MasterCard. As MasterCard admits in its S-1, "the loss of this special assessment right accordingly leaves [it] exposed to significant risks and losses from these types of extraordinary events, which could materially and adversely affect [its] results of operations, cash flow and financial condition or, in certain circumstances, even cause [it] to become insolvent." MasterCard Incorporated, Registration Statement (Form S-1) at 24 (May 23, 2006). In fact the loss of this right has led Standard & Poor's Rating Services to place MasterCard on credit watch with negative implications, which could increase the cost to MasterCard of obtaining additional funding. *Id.*

110.    This agreement to release MasterCard's valuable assessment right would not have been made by a "single entity." It is essentially an attempt by the Member Banks to ensure that, even if their plan to remove MasterCard from Section One fails, they will face no liability for the price-fixing conduct of either the current MasterCard or the "New MasterCard." This agreement further demonstrates how the New MasterCard, far from behaving like a "single entity," has been and will continue to be, controlled by its Member Banks.

111.    If MasterCard were allowed to release its right to assess its Member Banks as a result of the litigation pending against it, it would likely be unable to satisfy any judgment against it in MDL 1720 or in cases filed by American Express and Discover. On the basis of MasterCard's S-1 and its public statements, it values itself at approximately $5 billion.

Independent analysts estimate that MasterCard's antitrust damages exposure may reach $25 billion, and that the present value of MasterCard's likely damages is approximately $6 billion, either of which could easily surpass the value of the New MasterCard. Bernstein Research, AXP | Quantifying the Legal Risk to MasterCard (May 17, 2006).

112.   As a result of the Agreements' release of MasterCard's assessment right, the New MasterCard may be unable to satisfy its continuing obligation to pay the agreed settlement amounts in *In re VisaCheck/MasterMoney Antitrust Litigation*, 96-cv-5238 (JG) (E.D.N.Y.), if it is found to be liable in any of the litigation pending against it.

**F.   THE AGREEMENTS INCLUDE AN ACQUISITION WITHIN THE MEANING OF SECTION 7 OF THE CLAYTON ACT, AND THE EFFECT OF ITS CONSUMMATION MAY BE SUBSTANTIALLY TO LESSEN COMPETITION IN A RELEVANT LINE OF COMMERCE**

113.   The MasterCard Agreements and IPO are complex. They are, within the context of the General Purpose Card networks, an elaborate pretext to ensure anticompetitive price-fixing can persist free from the threat of antitrust enforcement. As discussed above, the formalities of the IPO cannot mask the true nature of the IPO. But even without the restrictions that betray the true nature of the IPO, the creation of a single entity with substantial market power would be an antitrust violation. To the extent that this IPO is a fundamental change in the MasterCard network, it operates as an acquisition by the New MasterCard of portions of the card-issuing and merchant-acquiring functions of each Member Bank. Analyzed as a merger or a combination, the MasterCard IPO violates Section 7 of the Clayton Act and Section 1 of the Sherman Act.

114.   Now that the Agreements and the IPO have been consummated, the following anticompetitive effects are likely to result:

a)   Competition in the Relevant Market will be substantially lessened;

- 31 -

b)     Prices charged to merchants by MasterCard Member Banks for the Member Banks' acceptance of and payment for transactions between the merchant and the Member Banks' cardholders will be fixed, raised and maintained at supra-competitive levels. Post-IPO there will be the complete absence of competition in the setting of prices charged to merchants for this important card-issuing function in the MasterCard Network;

c)     MasterCard could re-impose the exclusivity rules, or the equivalent thereof, found unlawful in *United States v. Visa U.S.A. and MasterCard International*, which prohibited MasterCard Issuing Banks from issuing General Purpose Cards on competing Networks.

d)     MasterCard could institute other anti-competitive restraints.

115.   Even if the Court accepts MasterCard's claim that the IPO was a legitimate attempt to create a single entity, the merger of important aspects of the Card-Issuing and Merchant-Acquiring functions of the Member Banks into a purported single entity raises serious concerns due to the adverse competitive effects that will result.

116.   If MasterCard changed from a joint venture to a purported "single entity," MasterCard will argue that the antitrust laws will no longer prevent some of its behaviors that were illegal before the IPO, and certainly anticompetitive.

117.   The merger of portions of the Member Banks' MasterCard Card-Issuing businesses into a purported single entity will have negative unilateral effects. MasterCard has market power in the Relevant Market, and could profitably make a small but sustained price increase in the fees charged to merchants. The MasterCard products are marketed to

- 32 -

Cardholders, and are so widespread that merchants cannot decline to accept MasterCard Payment Cards for fear of alienating or losing customers.

118.    The Relevant Market will become less competitive and consumers and competition will suffer.

119.    One obvious force restraining the profit-maximizing behavior of the pre-IPO cartel was the Sherman Act. But for Section 1 of the Sherman Act, MasterCard could raise prices even higher than the anticompetitive level where they were set before the IPO. Fear of private antitrust suits and public enforcement actions (and the court costs, fines, and settlements that would result) gave MasterCard and its Member Banks strong incentives to curtail their anti-competitive behavior. Indeed, there has been reports in the trade press that the pending MDL actions by merchants has caused Visa and MasterCard to moderate the increases of Interchange Fees.

120.    Action such as the Agreements—which increase the profitability of cartel-set, supra-competitive prices by decreasing the potential costs imposed by litigation—will lead to unilateral increases in the price that MasterCard charges to merchants and thereby harm competition and consumers.

121.    But for this IPO, MasterCard would remain a joint venture of price-setting Member Banks subject to antitrust enforcement under Section One. The very existence of the antitrust laws creates disincentives to raise prices even where a profit-maximizing cartel has the market power to do so. By avoiding these laws, the merged combination will no longer make pricing decisions subject to these disincentives, and prices will increase at the expense of consumers.

- 33 -

122.   But for the IPO, the Member Banks represent separate, distinct entities. Before the IPO, their decision to set-prices collectively was temporary, legally actionable, and subject to defections—at any time an individual Member Bank could have chosen to compete on price for Interchange Fees or defect from the set price, driving down the fees charged and mitigating the anticompetitive effect of the cartel's price-setting. After the IPO, however, New MasterCard is purported to be a single entity. Pricing decisions will not be actionable, and individual Member Banks will not be able to defect or to set their own prices, and merchants and their consumers will suffer.

## IX.

### SEVENTEENTH CLAIM FOR RELIEF

### CLASS II VS. DEFENDANT MASTERCARD AND DEFENDANTS BANK OF AMERICA, CAPITAL ONE, CHASE, CITIGROUP, AND HSBC VIOLATION OF SECTION 7 OF THE CLAYTON ACT, 15 U.S.C. § 18, THE EFFECTS OF THE AGREEMENTS AND THE CONSUMMATION OF THE IPO MAY BE SUBSTANTIALLY TO LESSEN COMPETITION IN THE RELEVANT MARKET

123.   The Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

124.   The Agreements and the IPO are designed to, and likely will, have the effect of substantially lessening competition in the Relevant Market in violation of Section 7 of the Clayton Act.

125.   The Plaintiffs, their members, and members of the Class will suffer common antitrust injury to their business or property by reason of the violation of Section 7 of the Clayton Act. This acquisition of assets by the New MasterCard and its Member Banks has injured and will continue to injure Plaintiffs, their members, and members of the Class by eliminating any

competition that could lead to a competitive price, and by making antitrust enforcement more difficult or impossible for plaintiffs.

126.    This harm that Plaintiffs, their members, and the Class will suffer outweighs any efficiencies that Defendants may argue arises from the Agreements and the IPO.

127.    Plaintiffs will suffer irreparable loss or damage to their business or property by reason of the violation of Section 7 of the Clayton Act.

128.    Harm to plaintiffs from the Agreements and the IPO far outweighs any harm that defendants may claim arises from enjoining the Agreements and reversing the IPO.

## X.

## EIGHTEENTH CLAIM FOR RELIEF

## CLASS II VS. DEFENDANT MASTERCARD AND DEFENDANTS BANK OF AMERICA, CAPITAL ONE, CHASE, CITIGROUP, AND HSBC VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1, UNREASONABLE RESTRAINT OF TRADE IN THE RELEVANT MARKET

129.    The plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

130.    The Agreements and the IPO are designed to, and likely will, have the effect of unreasonably restraining competition in the Relevant Market.

131.    The Plaintiffs, their members, and members of the Class will continue to suffer common antitrust injury to their business or property by reason of the violation of Section 1 of the Sherman Act.

132.    The harm that Plaintiffs, their members, and the Class will suffer far outweighs any efficiencies that Defendants may argue arises from the Agreements and the IPO.

133.    Plaintiffs, their members, and members of the Class will suffer irreparable loss or damage to their business or property by reason of the violation of Section 1 of the Sherman Act.

- 35 -

134.    Harm to Plaintiffs, their members, and members of the Class from allowing these Agreements and the IPO to proceed far outweighs any harm that defendants may argue arises from enjoining Agreements and reversing the IPO.

## XI.

## NINETEENTH CLAIM FOR RELIEF

### CLASS II VS. DEFENDANT MASTERCARD AND DEFENDANTS BANK OF AMERICA, CAPITAL ONE, CHASE, CITIGROUP, AND HSBC VIOLATION OF SECTION ONE OF THE SHERMAN ACT, 15 U.S.C. § 1 UNREASONABLE COMBINATION IN RESTRAINT OF TRADE

135.    The Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as it fully set forth here.

136.    MasterCard and its Member Banks, including the Bank Defendants engaged in unlawful contracts, combinations, and conspiracies in an unreasonable restraint of interstate trade or commerce in violation of § 1 of the Sherman Act, 15 U.S.C. § 1.

137.    As part of the IPO and the Agreements, the Member Banks of MasterCard combined their Payment-Card-issuing and merchant-acquiring assets into the New MasterCard.

138.    This aspect of the IPO and the Agreements constituted a combination within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1.

139.    This combination purported to allow Defendants to engage in the same collusive setting of uniform Interchange Fees, while purportedly removing themselves from the purview of Section One. The combination was and is therefore illegal. *Northern Security Co. v. United States*, 193 U.S. 197, 227 (1902).

140.    This combination by the Defendants injured and will injure Plaintiffs, their members, and members of the Class by eliminating any competition that could lead to a

- 36 -

competitive price, and making antitrust enforcement against Defendants more difficult or impossible.

141.    As a result of the combination discussed herein, Plaintiffs, their members, and members of the Class suffered and will suffer common antitrust injury by paying supra-competitive prices for the acceptance of MasterCard Payment-Card transactions.

142.    The harm that Plaintiffs, their members, and members of the Class suffered and will suffer will outweigh any efficiency benefit that Defendants may argue arises from this combination.

143.    Plaintiffs, their members, and members of the Class suffered and will suffer irreparable loss or damage to their business or property by reason of the violation of Section 1 of the Sherman Act.

## XII.

## TWENTIETH CLAIM FOR RELIEF

## CLASS II VS. DEFENDANT MASTERCARD AND DEFENDANTS BANK OF AMERICA, CAPITAL ONE, CHASE, CITIGROUP, AND HSBC VIOLATION OF N.Y. DEBT. & CRED. LAW § 270 *ET SEQ.* (2006) UNLAWFUL FRAUDULENT CONVEYANCE

144.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth herein.

145.    Before the IPO, Defendant MasterCard had a valuable property interest in its right to assess its Member Banks for liability expenses.

146.    The release of the right to assess Member Banks was a "conveyance" within the meaning of N.Y. Debt. & Cred. Law §§ 270 & 273-a (2006).

147.    The Agreements released this interest without adequate consideration from the Member Banks, the potential assessee.

- 37 -

148.    The release of the right to assess Member Banks had the effect of making MasterCard unable to satisfy the liabilities it may incur in MDL 1720 and other antitrust litigation pending against it. The release was therefore a fraudulent conveyance with respect to the Plaintiffs and the Class in that case.

149.    The Agreements were undertaken by MasterCard and its Member Banks, including Bank Defendants, with the intent to defraud potential judgment creditors, such as Plaintiffs, their members, and the Class. The effect of these Agreements caused harm that is common to Plaintiffs, their members, and members of the Class.

## XIII.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray for judgment with respect to their Complaint as follows:

A.    Declare, adjudge, and decree that Defendants have committed the violations of the federal antitrust laws as alleged herein;

B.    Order that Defendants be enjoined from, in any manner, directly or indirectly, committing the violations of Section 1 of the Sherman Act and Section 7 of the Clayton Act in which they have been engaged;

C.    Order the reversal and unwinding of the IPO;

D.    Order that Defendants be enjoined and restrained from committing any other violations of statutes having a similar purpose or effect;

E.    Declare adjudge and decree that the release of MasterCard's right to assess its Member Banks was a fraudulent conveyance in violation of N.Y. Debt. & Cred. Law § 270 *et seq.* (2006);

F.    Order that Defendants be enjoined and restrained from consummating the fraudulent release of MasterCard's right to assess the Member Banks;

- 38 -

MP3 20185800.1

G.     Set aside MasterCard's release of its right to assess Member Banks as fraudulent as to Plaintiffs, their members, and Class II in MDL 1720; and

H.     Pursuant to applicable law, award monetary damages sustained by the Plaintiffs and the Class for the fullest time permitted by the applicable statutes of limitations in an amount to be proved at trial, attorneys' fees, and costs of suit, and award all other further relief as this Court may deem just and proper.

XIV.

**JURY DEMAND**

Plaintiffs hereby demand trial by jury of all issues properly triable thereby.

Dated: Minneapolis, Minnesota
       July 5, 2006

By: _____
    K. Craig Wildfang
    Co-Lead Counsel for Plaintiffs

**Robins, Kaplan, Miller & Ciresi L.L.P.**
David Balto (dbalto@rkmc.com)
Bethany D. Krueger (bdkrueger@rkmc.com)
Anne M. Lockner (amlockner@rkmc.com)
Christopher W. Madel (cwmadel@rkmc.com)
Kevin M. Magnuson (kmmagnuson@rkmc.com)
Ryan W. Marth (rwmarth@rkmc.com)
Bradley M. Orschel (bmorschel@rkmc.com)
Thomas J. Undlin (tjundlin@rkmc.com)
K. Craig Wildfang (kcwildfang@rkmc.com)
2800 LaSalle Plaza
800 LaSalle Avenue South
Minneapolis, MN  55402
Tel. (612) 349-8500
Fax (612) 349-4181

MP3 20185800.1

**Berger & Montague, P.C.**
Bart Cohen (bcohen@bm.net)
Merrill G. Davidoff (mdavidoff@bm.net)
Michael J. Kane (mkane@bm.net)
H. Laddie Montague (hlmontague@bm.net)
1622 Locust Street
Philadelphia, PA  19103
Tel. (215) 875-3000
Fax (215) 875-4604

**Lerach Coughlin Stoia Geller Rudman & Robbins LLP**
Christopher M. Burke (chrisb@lerachlaw.com)
Bonny E. Sweeney (bonnys@lerachlaw.com)
655 West Broadway
Suite 1900
San Diego, CA  92101
Tel. (619) 231-1058
Fax (619) 231-7423

Samuel H. Rudman (srudman@lerachlaw.com)
200 Broadhollow Road
Suite 405
Melville, NY  11747
Tel. (619) 231-1058
Fax (619) 231-7423

**Freedman, Boyd, Daniels, Hollander & Goldberg, P.A.**
Joseph Goldberg (jg@fbdlaw.com)
20 First Plaza
Suite 700
Albuquerque, NM  87102
Tel. (505) 842-9960
Fax (505) 842-0761

**Hulett, Harper, Stewart, LLP**
Dennis Stewart (dstewart@hulettharper.com)
550 West C Street
Suite 1600
San Diego, CA  92101
Tel. (619) 338-1133
Fax (619) 338-1139

- 40 -