**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------X

IN RE PAYMENT CARD
INTERCHANGE FEE AND
MERCHANT DISCOUNT
ANTITRUST LITIGATION

This document refers to: ALL ACTIONS

---------------------------------------------------------X

**SEALED**
**MEMORANDUM**
**AND ORDER**

MDL 05-1720 (JG) (JO)

**JAMES ORENSTEIN, Magistrate Judge:**

By notice dated December 21, 2005, defendants MasterCard Incorporated and

MasterCard International Incorporated (collectively "MasterCard") moved to disqualify attorney

K. Craig Wildfang ("Wildfang") and the law firm Robins, Kaplan, Miller & Ciresi ("RKMC")

from representing plaintiffs in this litigation on the basis of Wildfang's involvement in an

antitrust investigation of the defendant credit card networks during his tenure as a Special

Counsel in the Antitrust Division of the Department of Justice (the "Antitrust Division" or

"Division") from January 1994 to August 1995.  Docket Entry ("DE") 180.[1]  On December 13,

2005, the Honorable John Gleeson, United States District Judge, referred that nondispositive

motion to me for decision, pursuant to 28 U.S.C. § 636(b)(1)(A).  On January 27, 2006, I heard

oral argument from the parties  At the conclusion of the argument, I denied the motion from the

bench with a brief explanation of my reasoning and a commitment to provide a more complete

statement of my analysis in a subsequent written memorandum.  DE 189.  I now provide that

statement.

---

[1]  Unless otherwise noted, all docket numbers cited herein refer to the Master File of this
multidistrict litigation, 05-MD-1720 (JG).  *See generally* DE 160 at 1-2.

I.    Background

    A.    The Interchange Claims

On June 22, 2005, RKMC, acting on behalf of its client Photos, Etc. and a putative class

of similarly situated merchants, filed the first of what are now fifty pending lawsuits against the

defendant credit card networks and certain of their member banks alleging that the defendants

have fixed transaction costs known as "interchange fees" at supra-competitive levels in violation

of Section One of the Sherman Act, 15 U.S.C. § 1.  *See* Carney Dec. Ex. 1 (Complaint in *Photos*

*Etc. Corp., et al., v. Visa U.S.A. Inc., et al.*, CV 05-1007 (D. Conn. June 22, 2005) (the "*Photos*

Complaint")).  Many of those actions were brought on behalf of a putative class, while several

others were brought by individual merchants acting alone.  By order of the Judicial Panel on

Multidistrict Litigation dated October 19, 2005, fourteen such lawsuits that had been

commenced in four separate districts were consolidated in the current litigation for pretrial

purposes.  DE 2.  Since then, more thirty-six additional cases have been transferred to this MDL

action.  *See* DE 57; DE 94; DE 144; DE 314.  The following factual background, drawn from the

*Photos* complaint, explains the transaction fees at issue and the plaintiffs' allegations.[2]

Defendants MasterCard and Visa are payment card networks that are owned,

respectively, by their thousands of member banks.[3]  Since 1976, the card networks' rules have

---

[2]  The following decisions provide a more exhaustive description of the credit card industry,
including the role of networks and their member banks:  *United States v. Visa U.S.A., Inc.*, 344
F.3d 229, 234-236 (2d Cir. 2003); *In re Visa Check/MasterMoney Antitrust Litigation*, 192
F.R.D. 68, 72 (E.D.N.Y. 2000).

[3]    More precisely, although Visa was and still is owned by its member banks, MasterCard
recently made an initial public offering by which members of the public purchased shares of the
company.  Member banks continue to play an important role in the network's management and
operation, but no longer have exclusive ownership.  *See* DE 332-1.  The class plaintiffs filed
their First Amended Consolidated Class Complaint ("FACCC") on April 24, 2006.  DE 317.
The FACCC was filed by a group of three law firms, including RKMC as well as two other firms

allowed a single bank to be a member of both networks and to issue both brands of payment cards, a phenomenon known as "duality." In the thirty years since the networks changed their rules to permit duality, it has become commonplace: today, every major bank in the United States is a member of both networks. *See Photos* Complaint ¶ 103.

The plaintiffs in these actions, as well as the members of the putative class that several of them purport to represent, are all merchants who accepted for payment the use of cards issued by such member banks (or, in some instances, associations of such merchants). In essence, the use of a credit card for payment is a four-party transaction in which one member bank functions as an "issuer" and another bank (or possibly, by happenstance, the same one) functions as an "acquirer."

These functions are less easy to define than to illustrate by means of a step-by-step description of a credit card transaction. When a consumer presents a credit card to a merchant for payment, the merchant sends an electronic transmission to its acquiring bank, which contacts the consumer's issuing bank for authorization through the network. Once the transaction is authorized, the consumer's issuing bank pays the merchant's acquiring bank the payment amount, minus a processing fee that it retains for itself. The acquiring bank in turn pays the merchant the amount relayed by the issuer, minus its own additional processing fee. The fee retained by the consumer's issuing bank is known as the "interchange;" the aggregate of both fees – representing

---

the propriety of whose participation in this litigation has never been challenged, all of whom I appointed to serve as co-lead class counsel following my ruling on the instant disqualification motion. *See* DE 278. The legal theories that the challenged attorneys asserted in their original pleadings remain in the jointly-drafted FACCC. The class plaintiffs thereafter raised additional claims related to the recent change in MasterCard's ownership. *See* DE 332-2 (Class Plaintiffs' First Supplemental Class Action Complaint). These recent developments may or may not affect the prejudice arising from my ruling on disqualification of counsel; however, the analysis herein is based entirely on the state of the record as of the time of that ruling on January 27, 2006.

the difference between what the consumer pays and what the merchant receives – is called the "merchant discount." Both fees reflect a set percentage of the total amount of the underlying transaction. *Id*. ¶ 61.

Merchants who wish to accept MasterCard- or Visa-branded payment cards enter into a contract with an acquiring bank that specifies the merchant discount that will be assessed on each transaction. The plaintiffs allege that the largest component of the merchant discount is the interchange fee, which they assert is periodically fixed at the network level by each network's board of directors, and that the interchange fee thus sets a lower limit for the merchant discount that merchants must agree to pay in order to be able to accept payment cards. *Id*

At the heart of the class complaints is the plaintiffs' claim that Visa, MasterCard, and their respective member banks take advantage of the networks' alleged market power to fix uniform interchange fees at supra-competitive levels. *See id*. ¶¶ 83-84. They thus assert price-fixing claims against each individual network. *Id*. ¶¶ 113-130. They also cite the phenomenon of duality to raise a conspiracy claim against all of the defendants collectively: they claim that the virtual identity of the networks' membership leads to direct communication and tacit collusion that restrains competition among member banks and results in supra-competitive transaction fees. *Id*. ¶¶ 131-138. The plaintiffs also challenge two other network practices associated with interchange fees: the "tying" and "bundling" of what they claim are distinct services into the single "interchange fee," and the agreements among defendants not to sell one such component of the interchange fee – specifically, payment guarantee services – "untied" from the other components. *Id*. ¶¶ 111-112, 139-176. Based on all their various claims of antitrust violations, the plaintiffs seek treble damages, injunctive relief, and attorney's fees. *Id*. at 47 (Prayer For Relief).

B.    Wildfang's Prior Involvement In Credit Card Antitrust Litigation

Before he filed the *Photos* complaint in the current litigation, Wildfang had some level of involvement in prior litigation involving allegations of antitrust violations by MasterCard and others in the credit card industry, first as an attorney for the government and later, after his return to private practice, on behalf of private litigants.  MasterCard cites the former in support of its instant motion for disqualification, notwithstanding the fact that it did not make a similar application with regard to the latter.

1.    Wildfang's Work As A Government Attorney

From January 1994 to August 1995 Wildfang left private practice to serve in the Antitrust Division as a Special Counsel to Assistant Attorney General Anne K. Bingaman ("Bingaman").  *See* Declaration of K. Craig Wildfang dated January 5, 2006 ("Wildfang Dec. I") ¶¶ 17-18.  Wildfang describes two primary duties in that role:  working with other senior Division lawyers to advise Bingaman on civil enforcement priorities, and assisting Department of Justice ("DOJ" or "Department") attorneys in the prosecution of certain high-profile matters to which Bingaman assigned him.  *Id.* ¶ 19.  In the latter capacity, Wildfang worked on several specific matters, including the Division's suit accusing Pilkington, plc of monopolization of the flat glass industry; the development of guidelines for the application of antitrust laws to joint ventures; and an investigation of price-fixing by NASDAQ market-makers.  *Id.* ¶¶ 18, 23, 28.[4]

Wildfang's work for the Division also included involvement in two matters relating to credit cards.  The first, which Mastercard does not cite in support of the instant motion,

---

[4]    In connection with the latter assignment, Wildfang's tenure with DOJ was in fact slightly longer than his eighteen months of formal employment.  Wildfang acted as an unpaid consultant to Bingaman for a few months at the end of 1993 before his government employment officially began and he remained a consultant to the Division until it filed its complaint against NASDAQ market-makers in July 1996.  *Id.* ¶¶ 17-18.

concerned Discover's petition for a writ of *certiorari* in its lawsuit challenging Visa's exclusivity rule: Wildfang advised Bingaman about whether the Department should take a formal position in the Supreme Court as to whether the writ should be granted. In exploring the Department's options in that case, Wildfang and Bingaman together attended meetings about the litigation with, respectively, Visa and Discover. *Id*. ¶¶ 20-21. In the end, the Department did not make any formal recommendation, and the Supreme Court denied the writ. *See id*. ¶ 21; *see Mountain West Fin. Corp. v. Visa U.S.A., Inc*., 515 U.S. 1152 (1995) (denying writ of *certiorari* to review *SCFS ILC, Inc. v. Visa U.S.A., Inc.*, 36 F.3d 958 (10th Cir. 1994), which had reversed the district court's judgment in favor of Discover).

It was the second credit card matter that occasions the instant motion. In December 1993, six months before Wildfang arrived at DOJ, the Division opened a preliminary investigation to examine whether the overlapping membership of Visa and MasterCard inhibited competition in cards and services. Wildfang Dec. I ¶ 25, Exhibit ("Ex.") 14 (Declaration of Mary Jean Moltenbrey in *United States v. Visa U.S.A.,* et al. ("Moltenbrey Dec.")) ¶ 5. There is no dispute that Wildfang played some role in the investigation, but the parties differ as to the significance of that role under applicable law and rules.

Wildfang reports that he does not remember actively participating in the investigation. *See id*. ¶¶ 28, 30-31. He does not dispute, however, that he did in fact have some such participation. Contemporaneous documents suggest that Wildfang played a rather significant role in the Division's efforts to obtain information from credit card companies by issuing a Civil Investigatory Demand ("CID") to MasterCard, as well as by issuing substantially similar CIDs to Visa and American Express. *See* Declaration of Gary R. Carney dated December 20, 2005 ("Carney Dec. I") Ex. 6 (CID # 11066 issued to MasterCard on June 29, 1994 ("MasterCard

CID")); Reply Declaration of Gary R. Carney dated January 18, 2006 ("Carney Dec. II") Exs. 36 (CID # 11065 issued to Visa USA Inc on June 29, 1994 (("Visa CID")), 39 (CID # 11238 issued to American Express on July 26, 1994 ("American Express CID")). The Department is authorized pursuant to the Antitrust Civil Process Act, 15 U.S.C. §§ 1311-1314, to issue a CID to any person who "may be in possession, custody, or control of any documentary material, or may have any information, relevant to a civil antitrust investigation." 15 U.S.C. § 1312 (a). The demand must set forth the "conduct constituting the alleged antitrust violation." 15 U.S.C. § 1312 (b)(1)(A). Accordingly, the August 1994 CID described the underlying investigation as an effort "to determine whether there is, has been, or may be a violation of § 1 of the Sherman Act ... by ... agreements restraining competition between card associations." MasterCard CID (cover page).

The MasterCard CID spanned twenty pages. It contained twenty-four interrogatories and twenty-five document requests concerning virtually every aspect of MasterCard's structure and operations. For example, the interrogatories sought information on such diverse matters as the composition and functions of MasterCard's Board of Directors, MasterCard's involvement with member financial institutions, its methods for establishing interchange fees, its product market and market share, its rules restricting merchants from preferring non-MasterCard payment methods, and its document retention programs. *Id* at 10-17. The document requests were similarly comprehensive. Many concerned "Visa/Mastercard duality," which the CID defined as "the fact that many financial institutions are members of both the VISA [sic] and the MasterCard systems." MasterCard CID at 6; *see id*, Document Requests 2-3, 5-6, 22. The CID also sought all documents concerning contracts or agreements between MasterCard and its member banks restricting merchants from expressing a preference with regard to non-MasterCard payment

methods, all of MasterCard's business plans, all documents showing revenues, costs and profits, all minutes and agendas from each meeting of the Board of Directors or a committee thereof since January 1, 1985, and all market analyses and market research. *Id.*, Document Requests 16-22. In August and September 1994, MasterCard responded to this CID by producing more than 180,000 pages of documents to DOJ. *See* Carney Dec. I Ex. 9.

Wildfang's involvement in issuing the MasterCard CID and negotiating with MasterCard about the company's response is revealed by several documents. He signed the cover letter by which the CID was sent to MasterCard, he was designated as the Division's deputy custodian of documents produced in response to it, and he signed or was the recipient of several letters in the correspondence between the Division and MasterCard concerning the scope of the company's production and matters of confidentiality. *See* Carney Dec. I Exs. 6-9; Carney Dec. II Exs. 33-35. In addition, a privilege log from the litigation arising out of the Division's investigation, *United States v. Visa U.S.A., Inc., et al.* ("*United States v. Visa*"), identified Wildfang as a recipient of one memorandum prepared by Division economists concerning credit card matters; that same log also indicates that six other memoranda relating to the Division's investigation of the credit card industry (the specific subjects of which are not revealed in the record before me) were prepared during the time period that Wildfang was at DOJ. *See* Carney Dec. I, Ex. 21, Schedule of Documents to the Declaration of Joel I. Klein ¶ 55 (privilege log from *United States v. Visa*).

After Wildfang left his position at DOJ, the Division expanded its investigation of Visa and MasterCard into the networks' "exclusivity" rules that permitted member banks to issue both MasterCard and Visa-branded cards but prevented them from issuing other brands of payment

cards.[5]  *See id.*  In 1998, the investigation culminated in the filing of the complaint in *United*

*States v. Visa.*  The complaint challenged two sets of network rules:  governance duality rules

that allowed member-owners to be directors of both networks, and exclusivity rules that

permitted members to issue both MasterCard- and Visa-branded cards but prohibited them from

issuing those of other card networks.  The court ultimately found that governance duality did not

violate the Sherman Act but that the exclusivity rules at issue did.  On that basis, the court

ordered the exclusivity rules permanently revoked.  *See United States v. Visa,* 163 F. Supp.2d

322, *aff'd*, 344 F.3d 229 (2d Cir. 2003), *cert. denied* 543 U.S. 811 (2004).  The parties to this

litigation agree that Wildfang was not involved in the 1998 litigation and that he had no further

involvement with the Division's credit card investigation after his return to private practice in

August 1995.

2.     Wildfang's Work In Private Practice

In October 1996, Wal-Mart Stores, Inc. filed the first of over thirty class action suits in

which merchants challenged a variety of rules governing the use of Visa and MasterCard debit

cards.  The merchants claimed that the networks' rules resulted in supra-competitive interchange

fees for debit and credit transactions.  These class actions were eventually consolidated as a

multidistrict litigation under the caption *Wal-Mart Stores, Inc. v. Visa USA, Inc.,* CV 96-5238

(E.D.N.Y.) ("*In re VisaCheck*").  At issue in that suit were the networks' "Honor All Cards"

policies, which required merchants to accept each network's debit and credit cards.  The

plaintiffs alleged that the rule was an illegal "tying arrangement" that violated Section One of the

Sherman Act.  The merchants also claimed that the networks used their "Honor All Cards"

---

[5]   The investigation did not focus on the networks' exclusivity rules until after January 1996
when MasterCard first adopted such a rule.  *See* Moltenbrey Dec. ¶ 5.

policies and other anticompetitive practices to monopolize the debit card market in violation of Section Two of the Sherman Act. In January 2004, both networks entered into an agreement with the class plaintiffs that has been described as "the largest antitrust settlement ever." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d. 96, 117 (2d. Cir. 2005) (citation and internal quotation omitted). The settlement agreement, which was approved by the Second Circuit in January 2005, included compensatory relief of nearly $3.4 billion and injunctive relief valued at more than $25 billion.[6] *See id.* at 104.

Some members of the plaintiff class opted out of the consolidated class action pursuant to Federal Rule of Civil Procedure 23(c)(2)(B). Among those parties were Best Buy Co., Inc. and GMRI, Inc. In mid-2003, those companies, represented by Wildfang and RKMC, commenced actions against MasterCard that included allegations concerning interchange fees. Wildfang Dec. I ¶ 6. As part of discovery in the opt-out cases, MasterCard produced nearly all of the documents that it had produced to the class plaintiffs, including the materials it had produced to DOJ in response to the 1994 CID. *Id.* ¶ 11. The only documents that MasterCard ultimately produced to the plaintiff class in *Wal-Mart* but never produced to Wildfang's opt-out clients were a series of papers that MasterCard initially withheld on grounds of privilege. *Id.* ¶ 11, Ex. 7. Both of Wildfang's opt-out actions ultimately settled. Carney Dec. II ¶ 14.

MasterCard never challenged Wildfang's representation of the opt-out plaintiffs on the basis of his involvement in the DOJ investigation. It contends that it did not do so because it did not know of Wildfang's role in the DOJ investigation at that time. MasterCard claims that it first

---

[6] My description in this memorandum of the claims at issue in the earlier multidistrict litigation and the settlement therein is in no way intended to convey an opinion as to the merits of the various motions for dismissal now before me in the instant litigation, which motions implicate the scope of that settlement.

learned of Wildfang's role in the DOJ investigation after the *Photos* complaint was filed in 2005

and MasterCard, prompted by its concern over the possible impropriety arising from the

participation in that litigation of one of Wildfang's partners who had previously worked at the

Federal Trade Commission, began an investigation of the propriety of the plaintiffs'

representation in that suit.  *See* Memorandum of Law in Support of Motion of Defendants

MasterCard Incorporated and MasterCard International Incorporated for Disqualification of

Counsel Robins, Kaplan, Miller & Ciresi L.L.P. ("MC Memo.") at 9-10.

II.     Discussion

     A.     Preliminary Matters

          1.     The General Legal Standard Governing Disqualification Motions

A court's authority to disqualify a civil litigant's counsel stems from its "inherent power

to preserve the integrity of the adversary process."  *Hempstead Video, Inc. v. Incorporated Vill.*

*of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005) (citations and internal quotation omitted).

The exercise of such authority is discretionary, and requires a "painstaking analysis of the facts

and precise application of precedent."  *United States v. Standard Oil Co.*, 136 F. Supp. 345, 367

(E.D.N.Y. 1955).  A court considering such relief must balance important competing policy

concerns, including an individual's right to the counsel of her choice and "the need to maintain

the highest standards of the profession."  *Gov't of India v. Cook Indus., Inc.*, 569 F.2d 737, 739

(2d Cir. 1978) (citations omitted).[7]  A district court's resolution of such competing interests is

---

[7]  The analysis of a court's authority to disqualify counsel for a civil litigant differs in important
respects from the corresponding issue in the context of a criminal case.  The latter implicates two
rights under the Sixth Amendment that are occasionally in tension with one another:  the right to
effective, conflict-free counsel, and the right to counsel of choice.  *Compare United States v.
Schwarz*, 283 F.3d 76 (2d Cir. 2002) (vacating conviction where trial court erroneously accepted
defendant's waiver and permitted conflicted counsel to represent the defendant at trial) *with
United States v. Gonzalez-Lopez*, 126 S.Ct. 2557 (2006) (vacating conviction, without requiring

entitled to deference and normally will be overturned only upon a showing of abuse of discretion. *Spinner v. City of New York,* 2002 U.S. Dist. LEXIS 26390, *24 (S.D.N.Y. June 3, 2002) (citing *Bobal v. Rensselaer Polytechnic Inst.,* 916 F.2d 759, 764 (2d Cir. 1990)).

Federal appellate courts have become increasingly skeptical of motions to disqualify in civil cases. *See Board of Education of the City of New York v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1978) (noting that disqualification motions have an "immediate adverse effect" on clients and are "often interposed for tactical advantage."). In this Circuit, "disqualification ... is only appropriate where there has been a clear violation of the Code of Professional Responsibility that leads to a 'significant risk of trial taint.'" *Spinner,* 2002 U.S. Dist. LEXIS 26390 at *28 (quoting *Glueck v. Jonathan Logan, Inc.*, 653 F.2d 746, 748 (2d Cir. 1981)). This exacting standard is both equitable and pragmatic. A motion to disqualify counsel will often result in delay, which in some cases can prove substantial. *See Nyquist*, 590 F.2d at 1246 (noting that disqualification motion had delayed the proceedings by nearly a year).[8] Such disruption is often unwarranted, as courts are neither the sole forum for adjudicating alleged ethical lapses nor even the best forum

---

a showing of prejudice, where trial court erroneously declined to accept waiver of conflict and disqualified defendant's counsel of choice).

[8] I have attempted to avoid such delay in this case by announcing my decision before being in a position to reduce to writing a careful explanation of my reasoning. That approach solved one problem but not without creating another, as MasterCard has aptly observed. *See* DE 438 (letter from MasterCard dated July 10, 2006, regarding delay). While waiting for this memorandum, MasterCard has reasonably chosen, with my authorization, to delay its request to Judge Gleeson to review my decision pursuant to Federal Rule of Civil Procedure 72(a). If MasterCard later succeeds in persuading Judge Gleeson that the instant decision is "clearly erroneous or contrary to law," *id.*, the parties may be forced to duplicate some of the intervening litigation with new counsel representing the current clients of RKMC. In addition, if MasterCard later finds itself seeking appellate relief on the ground that my refusal to order disqualification was an abuse of discretion, it may be in a position to demonstrate that it suffered some prejudice resulting from the delay between my order denying disqualification and a later order by Judge Gleeson granting it.

for doing so.  At both the federal and state level, there exists "comprehensive disciplinary machinery" – namely, bar authorities – that have a specific mandate to enforce the disciplinary rules of their respective jurisdictions and to sanction the attorneys who violate those rules rather than punish the clients who may innocently have sought such attorneys' counsel.  *See Nyquist,* 590 F.2d at 1246.[9]

Another policy concern arises where, as here, a motion to disqualify is predicated on the challenged attorney's former government service.  Such a motion compels the court to consider whether disqualification will create an unwarranted disincentive to government service.  *See Spinner* at 2002 U.S. Dist. LEXIS 26390 at *29; *United States v. Standard Oil*, 136 F. Supp. 345, 363 (S.D.N.Y. 1955).  Creating such a disincentive can plainly occasion harm to both the legal profession and to society:

> If service with the government will tend to sterilize an attorney in too large an area of law for too long a time, or will prevent him from engaging in practice of the very specialty for which the government sought his service – and if that sterilization will spread to the firm with which he becomes associated – the sacrifices of entering government service will be too great for most … to make. As for those … willing to make these sacrifices, not only will they and their firms suffer a restricted practice thereafter, but clients will find it difficult to obtain counsel, particularly in those specialties and suits dealing with the government.

*Standard Oil*, 136 F. Supp. at 363.

---

[9]   In addition, some specific areas of attorney conduct are regulated by statute and subject to enforcement by litigation directly against the offending lawyer.  Thus, a federal statutory regime regulates former federal officials – both attorneys and others – in their subsequent employment in the private sector.  *See* 18 U.S.C. § 207.  That statute, the violation of which is a criminal offense, is narrowly tailored to prohibit those actions that are "detrimental to public confidence in the government" without discouraging the "revolving-door" movement of skilled professionals between government and the private sector.  *See* 5 C.F.R. § 2637.101(c)(5) (2005). The statute imposes criminal liability only in circumstances where the United States is a party or otherwise has a direct and substantial interest in the matter.  *Id*  Accordingly, that particular brake on attorney misconduct is not implicated in the instant litigation, and MasterCard has never argued to the contrary.  *See* 18 U.S.C. § 207.

Those responsible for creating and implementing the "comprehensive disciplinary machinery" of the legal profession have not been insensitive to such concerns. To the contrary, they have drafted rules regulating the conduct of former government attorneys specifically to avoid disincentives that harm society. Thus, whereas private attorneys may not appear against a former client in the same or a substantially related matter in which the attorney played *any* role, the rule concerning former government attorneys only precludes subsequent representation in a matter that is the same as one in which the attorney participated "personally and substantially" while in the government's employ. *Compare* DR 5-108 (rule governing private attorneys with respect to representation adverse to a former client) *with* DR 9-101(B) (rule governing private representation by former government lawyers); *see* Declaration of Prof. Bruce A. Green dated December 26, 2005 ("Green Dec.") ¶ 9.

On the other hand, a court considering a motion for disqualification must remain cognizant of those specific harms that the rules were designed to prevent. Among those harms is the possibility that a government lawyer will conduct his official actions with an eye towards later enjoying "lucrative returns" in the private sector. *See Twin Laboratories v. Weider Health & Fitness,* 1989 WL 49368, at *3 (S.D.N.Y. May 4, 1989) (quoting *General Motors,* 501 F.2d at 650). More specifically, as an example, the disciplinary rule seeks to guard against the government attorney who might conduct litigation in a manner to facilitate subsequently "uphold[ing] or upset[ting]" the result of that litigation in private practice, and to prevent such an attorney from exploiting resources such as confidential government information. *General Motors*, 501 F.2d at 649; *Laker Airways Ltd. v. Pan Am. World Airways,* 103 F.R.D. 22, 29 (D.D.C. 1984). Given the harm that the unethical former government attorney can cause, once a party has met the heavy burden of demonstrating that disqualification is warranted, "any doubt

should be resolved in favor of disqualification." *Twin Laboratories*, 1989 WL 49368, at *4

(citing *Cheng v. GAF Corp.,* 631 F.2d 1052, 1059 (2d Cir. 1980), *judgment vacated on other*

*grounds*, 450 U.S. 903 (1981)).

      2.     The Timing Of MasterCard's Motion Does Not
              Obviate The Need For Resolution On The Merits

Wildfang and RKMC argue that the instant motion is untimely because current

MasterCard officials including its internal counsel dealt with Wildfang during the course of the

DOJ investigation and have or should have known of his adverse representation since Wildfang

filed the *In re VisaCheck* opt-out actions in June 2003. *See* Memorandum of Law in Opposition

to MasterCard's Motion to Disqualify ("RKMC Response") at 21-22; Wildfang Dec. I ¶ 47. In

essence, they argue that MasterCard is estopped from seeking their disqualification in this

litigation – which seeks wide-ranging relief on the basis of an attack on a core practice of

MasterCard's business – because the company did not seek similar relief when the same

attorneys represented two merchants who had opted out of an agreement to settle previous

litigation.

MasterCard disagrees. In particular, it denies that the officials named in the attorneys'

responses knew of Wildfang's involvement in the DOJ investigation, and it maintains that it

promptly brought the instant motion after learning of his involvement and then unsuccessfully

attempting to resolve the issue directly with RKMC. MC Memo. at 24-25.

Whatever the merits of the assumptions implicit in the attorneys' argument, and

regardless of who actually knew what when – issues as to which neither side has been entirely

persuasive – I conclude that I can and should resolve MasterCard's motion on its merits. Delay

alone is an insufficient basis on which to deny a disqualification motion. It is only in those

exceptional cases where delay has prejudiced a party that laches can serve as the basis to deny a disqualification motion. *See Brown & Williamson Tobacco Corp. v. Pataki,*152 F. Supp.2d 276, 289-290 (S.D.N.Y. 2001) (court had already issued a TRO and parties were engaged in expedited discovery when the disqualification motion was filed); *United States v. Newman,* 534 F. Supp. 1113, 1127 (S.D.N.Y.1982) (two-year delay in bringing disqualification motion); *see also Emle Indus., Inc. v. Patentex, Inc.*, 478 F.2d 562, 574 (2d Cir. 1973) (three-year delay in bringing disqualification motion not prejudicial because case was dormant in the interim). RKMC has not asserted that it was actually prejudiced as a result of MasterCard's alleged delay. Moreover, at the time of my decision, the current litigation was still in a nascent phase: discovery had not yet begun and lead counsel had not yet been assigned.[10]  Accordingly, whether MasterCard moved as soon as reasonably possible to disqualify Wildfang and RKMC from representing its adversaries in antitrust litigation is not a matter I need decide, as even a decision in the attorneys' favor in that regard would not render the instant motion so untimely as to require its denial on procedural grounds alone.

B.     <u>MasterCard's Motion Implicates Two Distinct Rules</u>

In considering motions for attorney disqualification, the courts of this Circuit look for guidance to the Canons and Disciplinary Rules of the American Bar Association's Model Code of Professional Responsibility ("Model Code").  *See Hempstead Video*, 409 F.3d at 132. MasterCard's motion to disqualify Wildfang and RKMC implicates two distinct subsections of one such Disciplinary Rule:

---

[10]  Even now, some six months after my oral ruling on the motion, the litigation still has far to go.  The parties are still briefing the defendants' motions to dismiss, and although discovery is well under way in the sense that the defendants have made great strides in providing legacy discovery (*i.e.,* copies of the extensive productions from prior cases), they have far to go in exchanging discovery relevant to the claims in the current complaints.

(1) A lawyer shall not represent a private client in connection with a matter in which the lawyer participated personally and substantially as a public officer or employee, and no lawyer in a firm with which the lawyer is associated may knowingly undertake or continue representation in such a matter unless ... the disqualified lawyer is effectively screened ....

(2) A lawyer having information that the lawyer knows is confidential government information about a person, acquired when the lawyer was a public officer or employee, may not represent a private client whose interests are adverse to that person in a matter in which the information could be used to the material disadvantage of that person. A firm with which that lawyer is associated may knowingly undertake or continue representation in the matter only if the disqualified lawyer is effectively screened ....

Model Code Disciplinary Rule ("DR") 9-101(B).

These rules are promulgated pursuant to Canon 9 of the Model Code, which provides that "a lawyer should avoid even the appearance of impropriety." The Canon itself, however, is not itself a sufficient basis on which to predicate the relief that MasterCard seeks: "the possible appearance of impropriety is simply too slender a reed on which to rest a disqualification order." *Armstrong v. McAlpin*, 625 F.2d 433, 445 (2d Cir. 1974) (quoting *Nyquist*, 590 F.2d at 1246). Instead, as discussed below, disqualification should be ordered only if the appearance of impropriety is demonstrated by the challenged attorney's violation of the plain meaning of one or both of the specific disciplinary rules at issue. I therefore turn to each rule that MasterCard claims is violated by Wildfang's continued participation in this litigation.[11]

C.    Wildfang's Participation Does Not Violate DR 9-101(B)(1)

A claim that an attorney must be disqualified pursuant to DR 9-101(B)(1) raises two separate questions: whether the instant litigation is the same as the prior "matter" in which the

---

[11]  The following discussion focuses on MasterCard's application to disqualify Wildfang individually. All of MasterCard's arguments in support of disqualifying RKMC necessarily presuppose a valid basis for first disqualifying Wildfang. As a result, my conclusion that Wildfang may continue as plaintiffs' counsel compels a like conclusion as to his law firm.

challenged attorney was involved, and whether the attorney had the requisite level of participation in that matter. As explained below, I conclude that while there can be no question that Wildfang's participation in the government's investigation of MasterCard was personal and substantial, the "matter" in which he played a role as a government attorney was not the same "matter" as is now before this court. Accordingly, his continued participation as counsel for the class plaintiffs does not violate DR 9-101(B)(1).

> 1. This Litigation Is Not The Same Matter As The One
> In Which Wildfang Previously Represented The
> Government

> a. The Applicable Legal Standards

Determining whether one matter is sufficiently related to another so as to be considered the "same" for purposes of the rule requires a court to decide whether "the facts necessary to support the two claims are sufficiently similar." *General Motors Corp. v. City of New York,* 501 F.2d 639, 651 n.22 (2d Cir. 1974). The party seeking disqualification must demonstrate that the issues in the two cases are "identical" or "essentially the same," *Gov't of India,* 569 F.2d at 739, and that the relationship between them is "patently clear." *Twin Laboratories*, 1989 WL 49368, at *5.

When the matters being compared are a civil lawsuit among private litigants and an earlier matter involving a governmental actor, there are two primary ways in which such similarity can occur. First, in cases of "ongoing litigation" a former government attorney may seek to represent in a private capacity a party to a lawsuit in which she previously participated as a government attorney. Second, there can be "parallel case proceedings" in which a subsequent civil suit raises claims against a defendant that are virtually identical to those made against the

same defendant in a prior suit brought by the government.  *Laker Airways Ltd. v. Pan Am. World Airways*, 103 F.R.D. at 29; *Spinner,* 2002 U.S. Dist. LEXIS 26390 at *39.

The level of similarity that renders two matters the same for purposes of the rule is perhaps more easily illustrated than defined.  At one extreme are cases in which the latter suit is a simulacrum of the former.  *See General Motors*, 501 F.2d at 650 (complaint in subsequent private suit lifted "in haec verba" from complaint in prior government action); *United States v. Uzzi,* 549 F. Supp. 979 (S.D.N.Y. 1982) (both matters concerned the same ongoing criminal proceeding).  Toward the other end of the spectrum are cases where material factual differences between lawsuits that in other ways appear similar render them distinct matters for purposes of the disciplinary rules.  *See Spinner*, 2002 U.S. Dist. LEXIS 26390, at *58 (lawsuit concerning strip searches of pretrial detainees at a Brooklyn facility not the same matter as prior suits involving strip searches at facilities in Manhattan and Queens because of the different agencies and different policies involved in each); *accord McBean v. City of New York*, 2003 WL 21277115, at *3 (S.D.N.Y. 2003) (class action challenging strip searches of misdemeanor arrestees different matter than prior suit challenging strip search of a single felony arrestee).

The parties do not differ in any material respect in defining the applicable rule, but they do disagree on its import – largely because they cannot agree on the precise contours of the "matter" on which Wildfang worked during his tenure as a government attorney.  Both sides agree, at least to some extent, that the earlier "matter" was the DOJ investigation of MasterCard that began in December 1993.  MasterCard's Reply Memorandum of Law in Further Support of Motion ("MC Reply") at 8; RKMC Response at 17; Sur-Reply Memorandum of Law in

Opposition to Motion ("RKMC Sur-Reply") at 9.[12]  Beyond that, however, they have little common ground:  MasterCard argues that the earlier matter and the current one "involve the same parties and largely the same facts and conduct," MC Memo. at 18 (quoting *Monument Builders of Pennsylvania v. The Catholic Cemeteries Ass'n, Inc.,* 190 F.R.D. 164, 166-167 (E.D. Pa. 1999), while the challenged attorneys counter that the two matters involve substantively and temporally unique antitrust problems.  RKMC Response at 12; RKMC Sur-Reply at 9.  Their disagreement begs the question of what constitutes a "matter" in this context.

For the purposes of DR 9-101(B)(1), a matter is a "'discrete and isolatable transaction or set of transactions between identifiable parties.'"  *McBean*, 2003 WL 21277115, at *2 (quoting *Int'l Union. United Auto. Aerospace and Agric. Implement Workers of Am. v. Nat'l Caucus of Labor Committees*, 466 F. Supp. 564, 568 (S.D.N.Y. 1979)).  An investigation by the government can constitute a "matter" under this definition, and that "matter" can be considered the same for purposes of the disciplinary rule as the litigation that arises from it.  *See In re Sofaer*, 728 A.2d 625, 649 (D.D.C. 1999) (investigation of bombing of Pan Am Flight 103 same matter as subsequent criminal and civil litigation against Libya concerning same); *United States v. Uzzi*, 549 F. Supp. at 982 (criminal investigation same matter as resulting prosecution); *see also* Model Rules of Prof'l Conduct R. 1.11(e)(1) (defining "matter" in model rule identical to 9-101(B) to include investigations); 18 U.S.C. § 207(i)(3) (criminal statutory analog to 9-101(B) defining "particular matter" to include "any investigation ... controversy, claim, charge, accusation ... or judicial or other proceeding").

---

[12]  While RKMC's initial opposition appeared to define the matter as the DOJ investigation of credit card networks, its sur-reply appeared to contemplate a broader definition that included both the investigation and the resulting lawsuit.  *Compare* RKMC Response at 13 (arguing that the DOJ investigation and the current litigation are not the same matter for purposes of DR 9-101(B), *with* RKMC Sur-Reply at 9.

b.    The Competing Definitions Of The DOJ "Matter"

Defining the precise contours of the "matter" on which Wildfang worked as a government attorney is important to achieve the balance of interests that DR 9-101(B)(1) seeks to strike between forestalling misconduct by government attorneys and avoiding the creation of disincentives to government service.  *See Spinner* 2002 U.S. Dist. LEXIS 26390 at *36 (citing *Laker Airways*, 103 F.R.D. at 29).  Compared to other cases arising under the same rule, such an inquiry in this case is not a simple task.  In each of those other cases, the earlier government investigation in which an attorney had participated had an easily discernible and sharply defined subject matter.  *See Laker Airways,* 103 F.R.D. at 30 (grand jury investigation of a single meeting of North Atlantic air carriers); *In re Sofaer*, 728 A.2d 625, 627 (investigation of the "why and how Pan Am 103 blew up over Lockerbie").  Here, Wildfang participated in the beginning stage of what was, by all accounts, a very long investigation of what can be broadly defined as "agreements restraining competition between card associations."  MasterCard CID (cover page).  Not surprisingly, the parties have vastly different theories as to how I should define the investigation here at issue.

MasterCard argues that the "central focus" of the DOJ investigation was MasterCard's practices concerning the setting of interchange fees and the anticompetitive impact of Visa and MasterCard duality on the same.  MC Memo. at 19; MC Reply at 6-8.  In advocating this definition, MasterCard relies on the fact that the CID it received from DOJ sought information and documents concerning interchange fees.  MC Reply at 5.  Specifically, four of twenty-four interrogatories and six of twenty-five document requests mention interchange fees and MasterCard subsequently produced a number of memoranda and other materials responsive to

these requests.[13]  MC Memo. at 5-8; *see* Carney Dec. I Exs. 10-20 (documents produced to DOJ having interchange fees as a subject).

Wildfang and his firm understandably define the investigation more broadly.  They assert that in 1994 and 1995, the Division was investigating broad structural issues in the credit card industry such as whether the overlapping governance that resulted from member banks serving on both networks' respective Board of Directors diminished competition between them.  RKMC Response at 13; RKMC Sur-Reply at 7; Wildfang Dec. I ¶¶ 35, 41.  They reject MasterCard's contention that the investigation was ever focused on interchange fee price setting and argue that the CID, which they liken to a request for discovery, sought information about interchange fees solely by way of background to inform the Division's understanding of competitive conditions in the industry.  *See* RKMC Response at 15-16; Wildfang Dec. I ¶ 34. Wildfang elaborates on this point in his declaration, noting that the CID sought interchange fee information for market definition purposes and not because the Division was investigating price-fixing or any other wrongdoing related to interchange fees.  *See* Wildfang Dec. I ¶41; Wildfang Dec. II ¶¶ 3, 6.

For reasons amplified below, I find that the documentary evidence better supports Wildfang's version.  In addition to being better supported by the evidence, his definition compels

---

[13]  The interrogatories in questions sought the following: a detailed description of each factor considered in setting interchange fees and all individuals involved; each interchange fee since 1980 including revisions; data on international interchange fees since 1980; identification of each communication concerning interchange fees between MasterCard and a member or other entity since 1980.  *See* MasterCard CID, Interrogatories 8, 9, 13, 20.  The document requests sought: all documents at all related to the effect of duality on competition in setting interchange fees; documents referring to duality and how it affects the merchant discount charged to merchants; documents concerning the blending of interchange fees or discounts a merchant receives; documents analyzing interchange fees, including those recommending a change to same; documents describing, discussing or analyzing other entities' interchange fees or merchant discounts; documents concerning any communication between MasterCard and a member or other entity concerning interchange fees.  *See id.*, Document Requests 3, 6, 7, 11-13.

a result that does less violence to the pertinent case law and better reflects the disciplinary rule's balancing of the competing interests at stake.

c.      The DOJ "Matter" Was Narrower
Than MasterCard Claims

The documents proffered by both sides support the proposition that during Wildfang's tenure at the DOJ, the government's investigation was focused on the overlapping structure of the Visa and MasterCard networks. The very broad scope of the CIDs served on MasterCard and its competitors American Express and Visa support Wildfang's assertion that the Division was gathering general background information about the industry. Further, I find it instructive, though not dispositive, that the attorney who served as Chief of the Division's Civil Task Force at the time of the investigation at issue and the resulting lawsuit submitted a declaration in another case that described the investigation as an inquiry into "the overlapping structure of Visa and MasterCard." *See* Moltenbrey Dec. ¶ 5. That declaration was based on the attorney's first-hand knowledge and was made at a time when the nature of the investigation would have been relatively fresh in her mind and in a context in which she would have had no discernible motive to mislead as to the nature of the investigation or the materials the Division staff had generated.[14]

---

[14]  At oral argument, MasterCard attempted to minimize the import of the declaration by noting that the attorney's purpose in submitting her declaration was to resist a discovery request that concerned duality, and that she therefore would have had no reason to acknowledge the investigation's focus on other matters such as interchange fees. *See* transcript of January 27, 2006 oral argument on this motion ("Transcript") at 9-12. The argument carries little weight, as the declaration is merely one of several pieces of evidence indicating that the focus of the investigation was on matters other than interchange fees. Moreover, in context, it is apparent that the declarant's description of the investigation is no more than that: her short-hand description of what the investigation was about. I am thus less concerned with what the declarant omitted (and the reason she may have omitted it) than I am with what she affirmatively chose to say.

Other contemporaneous evidence supports that characterization of the investigation.  In a letter to Visa's counsel concerning Visa's production of its member banks' credit card price and cost information, Wildfang wrote:  "We recognize that this seeks quite a bit of information, but we believe it is all within the scope of the CID, *and necessary for us to fully understand the industry*"  Carney Dec. II Ex. 38 (emphasis added).  While a statement by Wildfang to the same effect made in the course of the instant litigation could be discounted as self-serving (although I note that he has not, in fact, made such a self-serving assertion, but has instead disclaimed any recollection, *see* Wildfang Dec. I ¶ 13), the fact that he so explained the requests for information about interchange fees and a wide array of other topics long before he left government service and commenced his representation of the plaintiffs is very persuasive.

Finally, the allegations in the complaint that the government filed following Wildfang's departure are less easily reconciled with Mastercard's theory as to the role that interchange fees played in the investigation than with the view advanced by its adversaries  The government's complaint mentioned interchange fees once, under the heading "Product Market," as one of many examples of card network functions used to demonstrate that the products and services provided by networks constitute a "relevant product market" for antitrust purposes.  Carney Dec. I Ex. 25 at 6-7 ("[a]ll general purpose card networks ...  set fees ...  for use of the network's products and services, including the interchange fee").  Although that complaint does not conclusively define the contours of the lengthy investigation that preceded its filing, the pleading's limited allegations about interchange fees is plainly relevant.

MasterCard would have me ignore much of this documentary evidence and rely instead on the uncontested fact that the CID sought information about interchange fees.  *See* MC Reply at 6-7, 10.  MasterCard discerns some significance in the Antitrust Division's internal policy

requiring that a CID should be narrow in scope and issued only "'after the theory of the violation ... has been carefully formulated.'" MC Reply at 7 (quoting Division Manual Ch. 3, Section (E)(1)(D) (submitted as Carney Dec. II Ex. 32)). Implicitly assuming that Wildfang and his erstwhile colleagues applied that policy meticulously, MasterCard infers from the presence in the CID of a request for such information about interchange fees as price, methodology and rationale that those fees must inevitably have been a focus of the Division's investigation. Undaunted by the non-existence of any supporting evidence, MasterCard goes on to explain away the absence of any allegations about interchange fees in the lawsuit resulting from the government's investigation by arguing that the DOJ "decided not to challenge as anticompetitive MasterCard's setting of interchange fees." MC Memo. at 8 (citing nothing).

MasterCard thus accomplishes the neat trick of bootstrapping an argument that not only would favor Wildfang's disqualification, but would also enlist in the defendants' support an implicit Justice Department finding that the plaintiffs' substantive theory in the instant litigation is wrong. The stuff of which the theory is spun is too friable to withstand much scrutiny.

Among other shortcomings, MasterCard's theory proves too much. One of its necessary components is that the inclusion in the CID of a request for information about a given subject – specifically, interchange fees – renders that subject part of the definition of the prior "matter" for purposes of DR 9-101(B). But there is no principled reason to stop with interchange fees: by the same logic, the "matter" on which Wildfang worked also included advertising campaigns and market research. *See* MasterCard CID, Interrogatory 11 (asking about MasterCard's assistance to member banks on advertising and promotional campaigns), Document Request 17 (seeking "all documents constituting or containing market research, whether or not generated by or on behalf of your company, relating to credit cards or charge cards").

That the government was in no meaningful sense "investigating" such matters is patent. The point highlights the important distinction between the particular antitrust problem the government was investigating and the background information about the credit card industry and the relevant market that it understandably sought to inform its investigation. *See* Wildfang Dec. I ¶ 34, Wildfang Dec. II ¶ 6 (antitrust analysis begins with market definition, which requires a full understanding of the industry at issue). Requests for information that fall in the latter category are analogous to discovery demands, which, for good reason, should not define the scope of an investigation. *See Laker Airways*, 103 F.R.D. 22, 31 (D.D.C. 1984) ("A court would not be justified in finding that matters are related, much less essentially the same ... on the basis of demand for discovery."). Thus, the mere fact that the CID that Wildfang sent to MasterCard sought information about interchange fees does not support the inference that the "matter" then being investigated was the same as is now before this court.

Discounting MasterCard's reliance on the CID does not suffice to end the inquiry, however. MasterCard further argues that the two matters being compared may be considered identical, even if the focus of the government's investigation was membership duality in the credit card industry, because, "the industry's dual organizational structure is *the basis for* the conspiracy allegations supporting plaintiffs' claims under Section 1 of Sherman Act." MC Reply at 6 (emphasis added). One might just as plausibly argue that any two matters are identical so long as they share a common fact that is the subject of inquiry or proof. The disciplinary rule on which MasterCard relies, however, is not so broad. The dual organizational structure of credit card networks may help to explain the plaintiffs' theory of an illegal price-fixing conspiracy, but that does not mean that the instant matter is about the same "transaction or set of transactions" as those that were the focus of the government's investigation. *McBean*, 2003 WL 21277115, at *2.

Not all lawsuits alleging injuries traceable in any way to the same policy or practice are the same matter. *See id* at *3 ("the very fact that multiple individual and class action lawsuits have been filed and litigated, all attacking [a] 'policy' in different circumstances ... indicates that not all injuries traceable to that policy are the same 'matter'").

The Division's investigation was focused on the anticompetitive effects of the networks' overlapping governance structure in 1994 and 1995. The complaints here concern something quite distinct: alleged ongoing price fixing of interchange fees.[15] Where such material factual differences exist, the similarity of allegations, subject matter, defendants, or legal theory is an insufficient basis on which to conclude that two matters are the same. *See McBean*, 2003 WL 21277115, at *4; *Twin Laboratories*, 1989 WL 49368, at *5. To decide otherwise would require me to ignore the bulk of the 48-page *Photos* complaint, which plainly conveys to any fair reader that its authors seek redress for readily identifiable "transactions" including the fixing of interchange fees that simply were not the focus of the government's prior investigation.

Notwithstanding the preceding analysis, MasterCard argues that the appellate court's decision in *General Motors* is precedent that compels me to conclude that the government's investigation and the instant suit are the same matter for purposes of the disciplinary rule. MC Memo. at 20-21; MC Reply at 5-10. MasterCard and its expert in the field of legal ethics tell

---

[15] That the class plaintiffs accuse the defendants of ongoing antitrust violations suggests that much, if not all, of the conduct at issue post-dates the government investigation that ended more than ten years ago. *See generally Photos* Complaint Moreover, I note that at a preliminary case management conference before me, Visa's counsel opined that the method by which interchange fees are set has evolved substantially over the years. *See* transcript of January 12, 2006 initial case management conference at 48. However, I hesitate to place much emphasis on that statement since it was made outside of the context of this motion. In addition, while MasterCard did not contradict the assertion at the time it was made, its counsel later claimed that Visa did not speak for his clients, who take a different view as to the underlying factual assertion Visa made. *See* Transcript at 82-83.

me that the dispute now before me presents "essentially the same" situation as arose in that case. MC Memo. at 9. As they see it, both cases involve a private antitrust action filed by a former government attorney based on alleged conduct that substantially overlapped with conduct the attorney had investigated and litigated ten years earlier while employed by DOJ. MC Reply at 9-10; Declaration of Geoffrey C. Hazard, Jr. in Support of Motion dated December 16, 2005 ("Hazard Dec. I") ¶ 9 (citing *General Motors,* 501 F.2d at 650). That facile comparison understandably, if not fairly, omits material differences between the two cases that substantially limits the precedential value of *General Motors* to the current litigation.

In *General Motors*, the former DOJ attorney filed a complaint on behalf of his private practice client that was essentially identical to the complaint he had previously filed on behalf of the government against the same defendant. *Id*. at 650 ("virtually every overt act of attempted monopolization alleged in the City's complaint is lifted in haec verba from the Justice Department complaint"). The court noted that the passage of time between the two complaints and the presence in the later one of an additional claim "hardly alters the nuclear identity of these two suits." *Id*. at 651. No such identity of issues exists between the DOJ investigation in which Wildfang participated and the current lawsuit. The former, unlike the latter, simply was not focused on interchange fees as the source of claimed violations of antitrust laws.

This difference in circumstance plainly renders *General Motors* inapposite. The conclusion should hardly be surprising as I am not the first to conclude that the level of similarity between the two complaints at issue in *General Motors* compels caution in applying it as precedent. Other courts have likewise interpreted its requisite similarity test strictly, concluding that it compels a finding that two matters are the same only if the issues are

"identical ... or essentially the same." *Twin Laboratories*, 1989 WL 49368, at *5. Some factual overlap is insufficient. *See id.*

Narrowly construing the precedential effect of *General Motors* preserves the goal of the disciplinary rule the court enforced in that case because it guards against the specific impropriety that rule was designed to avert. The attorney in *General Motors*, in filing suit on behalf of his private client and by virtue of his prominent role in the earlier case on behalf of the government, had at least the opportunity to "'uphold ... what he had done' as a government lawyer." *General Motors,* 501 F.2d at 649 (quoting ABA Formal Op. 37 (May 4, 1931)). No similar evil is apparent, or even suggested, here. When Wildfang worked for DOJ, he did not investigate the anticompetitive effects of interchange fees or bring an enforcement action against MasterCard based on the way it set those fees. His ultimate success or failure in proving the claims of his current private practice clients in the instant litigation will thus do nothing to uphold (or undermine) his work as an attorney in public service. As a result, MasterCard's success in establishing the proposition that there is some factual and legal overlap between the current suit and the prior investigation falls well short of the demonstration necessary to secure Wildfang's disqualification; namely, that this litigation and the earlier investigation are the same matter.

MasterCard's final argument under DR 9-101(B)(1) is perhaps its weakest, conflating as it does the "same matter" inquiry relevant to the latter rule with a distinct inquiry – concerning Wildfang's past access to information – that is relevant only to DR 9-101(B)(2). MasterCard begins this part of its argument by noting that the plaintiffs' antitrust theory depends in part on the contention that technological advances and the defendants' market power have rendered the original justifications for interchange fees obsolete. From that predicate, MasterCard argues that the plaintiffs' rely on historical information about those original justifications that was available

to Wildfang while he was at DOJ. MC Memo. at 19-21. Here again, MasterCard proposes an analogy to *General Motors*, noting that there the court in that case found that historical evidence concerning the defendant company's operations would be imperative to proving the claims in the later suit that the attorney brought on behalf of his private clients. MC Memo. at 20-21; MC Reply at 5-10 (citing *General Motors,* 502 F.2d at 650). As before, MasterCard's reliance on *General Motors* is misplaced.

In contrast to the circumstances in *General Motors*, the plaintiffs in the instant litigation do not rely on "proof of alleged predatory practices amassed by the United States" on Wildfang's watch. *General Motors,* 502 F.2d at 650. As discussed more fully below in Part D of this discussion, not only is the factual overlap between this case and the government investigation minimal in extent, but most of the information upon which the plaintiffs here may seek to rely concerning MasterCard's interchange fee pricing and methodology has previously been disclosed or is otherwise publicly available. *See Twin Laboratories*, 1989 WL 49368, at *13 (relevance of publicly available information to two suits does not render them the same matter). Moreover, while access to confidential information – and, more specifically, the potential to exploit that information – is a core concern of DR 9-101(B)(2), as discussed below, it is not a basis on which to conclude that matters are the same. *See McBean* 2003 WL 21277115 at *4; *Laker Airways,* 103 F.R.D. at 31-32 (noting that the limiting language of 9-101 could be avoided altogether if an attorney could be disqualified solely on the basis of access to information about a corporation that was subsequently an adversary in private litigation).

In effect, MasterCard advocates an interpretation of DR 9-101(B)(1) that would disqualify a former government attorney from participating in any litigation that had any factual overlap with a matter on which the attorney had worked while in government service. That

approach is inconsistent with both settled law and the sound policy of avoiding undue disincentives to public service. It is hard to imagine how, consistent with MasterCard's theory, Wildfang could represent a private client in any case involving credit card networks or, for that matter, any other industry that he investigated while at DOJ. Applying DR 9-101(B)(1) so broadly would impose a needless and intolerable cost on government service that would harm not only the attorneys constrained by such a rule, but also their clients, the legal profession, and the public. *See McBean*, 2003 WL 21277115, *4 ("If *General Motors* required disqualification here, then any [Assistant Corporate Counsel] who personally handled any of the large variety of civil rights issues that come up in the City's Law Department would effectively be ... 'prevent[ed] ... from engaging in practice of the very specialty for which the government sought his service.'") (quoting *Standard Oil*, 136 F. Supp. at 363). My decision to deny the motion for disqualification under DR 9-101(B)(1) is not based on such policy preferences, but the fact that the contrary result would imply that the rule's authors had made such an unsound policy choice does give me some comfort that I am on the right track.

    2. <u>Wildfang Did Personally And Substantially</u>
        <u>Participate In The DOJ Investigation</u>

    The distinction between the matter on which Wildfang worked as a government attorney and the matter now being litigated suffices to defeat the portion of MasterCard's motion that relies on DR 9-101(B)(1). Were the two matters the same, however, MasterCard would further need to demonstrate that Wildfang personally and substantially participated in the earlier matter in order to secure his disqualification from this one. For purposes of any later review of this decision, I explain my analysis of the latter element. As discussed below, I find that MasterCard

has met its burden of showing the requisite level of Wildfang's involvement in the earlier government investigation.

Where the matter from which a party seeks an attorney's disqualification is the same as a matter on which that attorney previously worked as a government employee, the relevant inquiry becomes whether, in the earlier matter, the challenged attorney was "personally involved to an important, material degree, in the investigative or deliberative processes regarding the transactions or facts in question." *Twin Laboratories*, 1989 WL 49368, at *17 (quoting *National Caucus of Labor Comms.,* 466 F. Supp. 564, 570-571 (S.D.N.Y. 1979), *aff'd* 607 F.2d 996 (2d Cir. 1979), *cert. denied*, 444 U.S. 839 (1979)).  As part of that inquiry, a court should consider whether the attorney was "'heavily involved in the facts of a particular matter'" or instead only briefly involved "'for a limited and specific purpose related solely to legal questions.'" *Id.* (quoting *Silver Plymouth, Inc., v. Chrysler Motors Corp.*, 518 F.2d 751, 756) (2d Cir. 1979); *see also* ABA Formal Op. 342 (Nov. 24, 1975) (noting that the "substantial responsibility" test was intended to narrow the "investigated or passed upon" test in predecessor rule).

MasterCard argues that the evidence conclusively establishes that Wildfang was an active manager of the DOJ investigation.  In MasterCard's view, record demonstrates that Wildfang was the specific government attorney from whom MasterCard received the CID, with whom its officials negotiated about the scope of the investigative request, and to whom the company produced its documents.  MC Memo. at 18-19; MC Reply at 11-14.

I agree.  The documentary evidence establishes that Wildfang "ha[d] a much closer and more direct relationship than that of mere perfunctory approval or disapproval of the matter in question." *Twin Laboratories*, 1989 WL 49368, at *17 (citations and internal quotation omitted).  Wildfang's correspondence with MasterCard officials shows that he was personally involved to

a significant extent in the DOJ's investigation of credit card networks. For example, a letter dated August 12, 1994, from Wildfang to Robert E. Norton, Jr. ("Norton") (a Senior Vice President, General Counsel, and Secretary of MasterCard International Inc.) documents in considerable detail the terms of an agreement reached between DOJ and MasterCard about the scope of the latter's initial production of documents. *See* Carney Dec. I Ex. 7. The letter evinces the author's familiarity with the CID and his clear understanding of the scope of the investigation as well as of key aspects of MasterCard's operations. *See id.* Other correspondence establishes that Wildfang was involved in subsequent negotiations over the scope of MasterCard's production. *See id.* Ex. 8 (letter from Norton to Wildfang dated August 24, 1994 concerning MasterCard's production); Carney Dec. II Exs. 33-35 (correspondence between Wildfang and MasterCard officers). Wildfang was similarly involved in negotiations with Visa and American Express regarding the CIDs issued to them. *See* Visa CID (cover page signed by Wildfang); Carney Dec. II Exs. 37-38 (letters from Wildfang to Visa's counsel concerning same); American Express CID; Carney Dec. II Ex. 40 (letter from Wildfang to American Express' counsel concerning same). Wildfang's own declaration and the biographical information about him that his former law firm published on its Internet web site likewise demonstrate his substantial participation in the government's investigation. *See* Wildfang Dec. I ¶ 32 (noting that his role was to ensure that the investigation was being diligently pursued); Carney Dec. II Ex. 41 (biography of Wildfang noting that he "supervised the Justice Department's investigation into the activities of Visa and MasterCard").

Wildfang and his law firm do not dispute the preceding facts on which MasterCard relies, but seek instead to negate the import of that proof in two ways. First, they argue that Wildfang was far removed from the day-to-day conduct of the government's investigation. RKMC

33

Response at 17-19. They assert that Wildfang did not personally draft the CID and did not review the documents that MasterCard produced in response, and argue that Wildfang merely lent his name to the government's investigative efforts so as to give them "weight and credibility." *Id.* at 18.

Such argument presents several difficulties. Assuming the truth of its factual predicate, it can hardly be a unique occurrence for a senior official (in any branch of government, including the judiciary) to subscribe his name to a letter or other document that was substantially written by a subordinate. Such a practice hardly renders the signing official any less responsible for the contents of the documents he signs. Moreover, accepting Wildfang's argument in this regard would create a standard for disqualification that would be extremely difficult for courts or disciplinary authorities to administer, in large part because of the satellite litigation it could entail – possibly including discovery and evidentiary hearings – on who did exactly what in the course of a government investigation.[16] Such litigation, if allowed, would inevitably produce additional epicycles of litigation over governmental assertions of privilege. In short, a disciplinary rule that would require the party seeking to disqualify a former government lawyer to prove the precise contours of that lawyer's work in a previous government investigation, as distinct from the work of his colleagues, would quickly become a dead letter.

But my rejection of Wildfang's argument in this regard is born not of a policy disagreement, nor of a reluctance to make such inquiry as might be required to give effect to the

---

[16] The concern is hardly fanciful. MasterCard not only urges me to disregard Wildfang's description of his role in the investigation, *see* MC Reply at 14-16, it also argues that before I can credit that description I must allow it an opportunity for rebuttal after taking discovery from Wildfang as well as from his former DOJ colleagues. MC Reply at 15 n.9. Having rejected Wildfang's legal argument in this regard, I have no occasion either to express a view on the veracity of Wildfang's subjective description of his role in the investigation or to predict what amount of discovery and evidentiary inquiry, if any, might otherwise be appropriate.

ethical rules of attorney conduct.  Instead, I reject Wildfang's argument because it distorts the concept of significant responsibility in the context of supervisory officials, whose function is more often to oversee and approve than to execute.  *See Int'l Union, United Auto. Aerospace and Agric. Implement Workers of Am. (UAW) v. Nat'l Caucus of Labor Committees*, 466 F. Supp. 564, 570-571 (S.D.N.Y. 1979).  It may well be true that Wildfang did not actually do anything other than blindly sign his name to correspondence prepared by subordinates in a government investigation.  But even if that is true, given the nature of the documents he signed and their number, the simple act of lending his name to the effort amounted to the assertion and exercise of significant responsibility with respect to the DOJ investigation.  In such circumstances, I conclude that Wildfang was personally and substantially involved in that investigation.  *See id.* (citing ABA Formal Op. 342 (Nov. 24, 1975)).[17]

Wildfang's second argument on this score is equally unpersuasive.  He and his law firm urge me to read into the disciplinary rule what might be described as a proportional duration requirement.  That is, they point to the fact that the government's investigation lasted well beyond Wildfang's tenure at the Division, and argue that viewed against the duration and scope of the entire investigation, Wildfang's participation cannot be considered sufficiently substantial to require his disqualification under DR 9-101(B)(1).  *See* RKMC Sur-Reply at 9-10; Transcript

---

[17]  That conclusion is fully consistent with the policy goal of encouraging public service by ensuring that a former government attorney can practice law in his chosen field of specialization without undue restriction.  Even as to matters in which a former government attorney had personal and substantial participation, DR 9-101(B)(1) does not require disqualification unless two additional circumstances exist:  the matter on which the attorney later seeks to work must be the same as the prior matter *and* there must be a specific threat of trial taint.  That formidable barrier to disqualification is protection enough; safeguarding society's legitimate interest in avoiding disincentives to public service requires no more.  In particular, it does not compel me to embrace a tortured interpretation of "personal and substantial participation" that would vitiate the rule for former high-level government officials while leaving it fully intact for the subordinates who get their hands dirty carrying out directives from above.

at 60. They also cite Wildfang's lack of involvement in the resulting lawsuit as further support of their claim of mere transitory and peripheral involvement. *Id.* at 18-19.

This argument misses the mark. If, by the time of his departure from the Justice Department, Wildfang had had sufficiently personal and substantial participation in the investigation to warrant his disqualification from a similar private action filed the next day, I cannot believe that the ethical constraint on his private practice would diminish over time simply because the government continued its investigation in his absence. Such a rule could create truly perverse incentives for a government attorney, who – anticipating the possibility of related litigation after entering private practice – might find it expedient to leave his investigative work unfinished so as to dissolve the disqualifying taint of his own governmental work in the subsequent efforts of his successor. In the absence of any authority that Wildfang can cite supporting this novel theory, I am reluctant to create from whole cloth an exception to the disciplinary rule that would reward the government attorney who performs his duty with an eye on the potential for later reward in the private sector while punishing his more assiduous and selfless counterpart.

Finally, Wildfang and RKMC argue that in determining whether Wildfang's involvement in the government investigation was sufficient for purposes of DR 9-101(B)(1), I should consider the degree of actual trial taint that would arise in this litigation from his earlier work. While this last argument, unlike its predecessor, does at least rely on the authority of some case law, the authority it cites – *Board of Education v. Nyquist*, 590 F.2d 1241 (2d Cir. 1979) (cited in RKMC Response at 18) – is entirely inapposite. *Nyquist* did not involve DR 9-101 and did not address the "personal and substantial" test relevant to that rule. *See id.* at 1248 n.1. The admonition in *Nyqyist* that "courts should be quite hesitant to disqualify an attorney" whose

participation in a trial is not tainted by either compromised loyalty or unfair advantage is relevant only to the issue of whether Wildfang should be disqualified *if* MasterCard can demonstrate that he has committed a disciplinary violation. *Id.* at 1246. That admonition, however, does nothing to help me determine whether Wildfang's role in the DOJ investigation was sufficient to trigger the constraints of DR 9-101(B)(1).[18] For the reasons explained above, I find that it was.

### D. Wildfang's Participation Does Not Violate DR 9-101(B)(2)

The second prong of MasterCard's disqualification motion, independent of its invocation of DR 9-101(B)(1), is its argument that Wildfang must withdraw because he is "[a] lawyer having information that the lawyer knows is confidential government information about a person [*i.e.*, MasterCard], acquired when the lawyer was a public officer or employee[.]" DR 9-101(B)(2). The purpose of DR 9-101(B)(2) is to prevent misuse of confidential information acquired during and as a result of government employment The salient inquiry is whether the attorney has present knowledge of information that is both confidential and materially prejudicial to an opposing party. *See* Model Rules of Prof'l Conduct R. 1.11(b). The rule guards against the risk that confidential information acquired during government service will be used to the unfair advantage of an adversary and rule helps to promote and secure the trust of witnesses whom the government relies on to voluntarily cooperate with the myriad investigations

---

[18]  RKMC also improvidently cites *Ah Ju Steel Co., Ltd. v. Amoco, Inc.*, 680 F.2d 751, 752 (C.C.P.A. 1982), for the proposition that mere access to confidential government information is insufficient to warrant disqualification. RKMC Response at 18. The attorney in that case had almost no involvement in the prior government matter and was found to have been effectively screened from any participation in the latter private suit. On that basis, the Court of Customs and Patent Appeals (the functions of which were later transferred to the Court of Appeals for the Federal Circuit) concluded that the attorney's access to confidential information was an insufficient basis for finding a violation of 9-101(B)(1). 680 F.2d at 752.

undertaken by government agencies.  *See* Hazard Dec.  ¶ 10; *see Kessenich v. Commodity Futures Trading Comm'n*, 684 F.2d 88, 98 (D.C. Cir. 1982) (per curiam).  Notwithstanding Wildfang's assertion that he remembers no such information (if he ever knew it) and has not used it in representing his private clients in this litigation, MasterCard argues that Wildfang's former *access* to confidential information, which he enjoyed during his tenure as a Special Counsel in the Division, suffices to require his disqualification no matter how much or little he now recalls.  As MasterCard would have it, such access, without more, conclusively establishes prejudice and compels disqualification.  *See* MC Memo. at 22; MC Reply at 16-19.  For the reasons explained below, I disagree.

       1.       <u>MasterCard Is Not Entitled To A Presumption Of Taint</u>

       a.       <u>MasterCard Relies On The Wrong Rule</u>

At the heart of this part of MasterCard's motion is its theory that DR 9-101(B)(2) is concerned with information to which an attorney has *access* rather than information that an attorney actually has the ability to <u>use</u> to the detriment of an adverse party.  MC Memo. at 23-24; MC Reply at 16-19; Transcript at 34-36, 41-42.  The company's argument seems to be – or, at a minimum, seems as a matter of logic to compel the conclusion – that once an attorney working for the government gains access to confidential information about an entity, she is forever after presumed to be tainted by such information and therefore subject to disqualification should she ever seek to represent a private client in litigation against that same entity.  In so arguing, MasterCard improvidently relies on authority interpreting a different disciplinary rule that implements, instead of the canon against the appearance of impropriety, the distinct canon that enjoins an attorney to "Preserve the Confidences and Secrets of a *Client*."  Model Code Canon 4 (emphasis added).

None of the cases MasterCard cites in support of the presumption it advocates holds that an attorney's prior access to relevant confidential information is sufficient to require disqualification under DR 9-101(B). The cases from this Circuit that support any such kind of presumption arise in the context of "side-switching" – that is, cases in which an attorney seeks to represent one client in a manner adverse to a former client. In such cases, the attorney is presumed to be tainted by having had access to the former client's confidences. The disciplinary rule at issue in such cases is not the one that MasterCard invokes here, but rather DR 4-101(A), which is promulgated under Canon 4. *See Cheng v. GAF Corp.*, 631 F.2d 1052, 1055-1056 (2d Cir. 1980), *vacated on other grounds and remanded*, 450 U.S. 903 (1981).

The presumption under DR 4-101 arises as follows: Once a party seeking to disqualify its former attorney from representing an adverse party has shown that the former attorney represented it in a "substantially related" matter, a presumption arises that during the prior representation the client disclosed confidential matters to its attorney that are related to the later case in which it seeks disqualification. *See*, *e.g.*, *Cheng*, 631 F.2d at 1055; *Spinner,* 2002 U.S. Dist. LEXIS 26390 at *42 (citing cases).[19] The presumption is eminently sensible in the context of an attorney who switched sides; without it, a client seeking to disqualify its former attorney would unfairly be forced to choose between disclosing the very confidences the rule of secrecy is

---

[19] There is at least a semantic difference between the standard relevant to a disqualification motion under Canon 9 (*i.e.*, whether two matters on which the challenged attorney worked are the "same") and the standard applied under DR 4-101 (whether two such matters are "substantially related"). In both contexts, of course, the factual similarity between the two matters is the focus of the inquiry. *See Spinner*, 2002 U.S. Dist. LEXIS at *28-*30. Although the plain language of the two rules suggests that a stronger factual nexus is required in the Canon 9 context, in this Circuit the two tests are interchangeable. *See Spinner*, 2002 U.S. Dist. LEXIS at *28-*30; *Twin Labs*, 1989 WL 49368 at *4; *Int'l Union, United Auto. Aerospace and Agr. Implement Workers of Am. (UAW) v. Nat'l Caucus of Labor Committees*, 466 F. Supp. 564, 570-572 (S.D.N.Y. 1979).

designed to protect and refraining from trying to disqualify the attorney whose conduct threatens to reveal those confidences. *Cheng*, 631 F.2d at 1055. The presumption that MasterCard proposes thus spares a former client this "Hobson's choice" created by the disloyal attorney who switches side. *Gov't of India v. Cook Industries, Inc.*, 569 F.2d 737, 740 (2d Cir. 1978). But MasterCard is quite obviously not in that position, and therefore needs no such presumption: Wildfang never represented MasterCard.

The evil that MasterCard fears is not that Wildfang will betray its confidences, but rather that he will misuse the advantage he gained by compulsion while working for the government. The policy considerations are vastly different, and are understandably protected in different ways by different disciplinary rules. That the rule at issue here – which regulates the conduct of former government attorneys as such – is less restrictive than the protection of client confidences under Canon 4, and therefore less amenable to the presumption MasterCard seeks, is evident from its wording. DR 9-101(B)(2) uses the present tense to refer to an attorney "having" information that she knows "is" confidential. There is nothing about the fact that the attorney at issue may once have had access to information that supports a presumption that she actually has such information now; likewise, logic does not compel the presumption that information that was once confidential necessarily retains that status today.[20] The plain language of the rule MasterCard seeks to invoke is thus at odds with the presumption it would have me apply.

_____

[20] Of course, there might well be a good policy-based reason to presume that confidential information retains its character absent an affirmative reason to think otherwise. But such a presumption would still be rebuttable and, as explained below, the record sufficiently rebuts any presumption of confidentiality that I might otherwise be inclined to indulge. As a result, the view that DR 9-101(B)(1) does not contemplate the presumption that MasterCard advocates is not critical to my decision.

As explained above, the presumption of taint that MasterCard advocates is designed to

guard against an evil uniquely associated with side-switching, and therefore is not available in

the context of a motion for disqualification under DR 9-101(B)(2).  Nevertheless, even if the

presumption were available in this case, the result would be the same because MasterCard has

failed to demonstrate that the circumstances necessary to the presumption exist.  Specifically,

MasterCard has not established that the instant litigation is substantially the same matter as the

investigation on which Wildfang previously worked.  "Where there has been no showing of a

substantial relationship between the matters at issue, disqualification is not automatically

required simply because a government attorney had access to possible confidential materials

during the period of public service."  *Spinner* 2002 U.S. Dist. LEXIS 26390, at *45 (citing *Laker*

*Airways Ltd. v. Pan Am. World Airways,* 103 F.R.D. at 31).

c.    MasterCard Relies On Inapposite Case Law

To the extent that MasterCard relies on case law from the District of Columbia ("DC")

that differs from the comparable authority in this jurisdiction, *see* MC Memo. at 23-24; MC

Reply at 16-19,  I must follow the latter.[21]   But MasterCard's reliance on such case law is not

misplaced simply because it invokes the law of a different jurisdiction, but because that law

---

[21]  All of the submissions on the instant motion have assumed (implicitly or otherwise) that the
law of this Circuit applies.  *See*, *e.g.*, MC Memo. at 2, 12; RKMC Response at 10.  Because the
power of federal courts to disqualify attorneys derives from their power to "preserve the integrity
of the adversary process in actions before them," *Nyquist,* 590 F.2d 1241 at 1246, it seems
axiomatic that courts considering such relief should apply the law of the jurisdiction in which the
action is taking place.  Moreover, while other approaches to the choice of law might also be
reasonable, the fact that none of the cases in this consolidated proceeding originated in the
District of Columbia means that there is no reason to treat the law of that Circuit as dispositive in
this proceeding.

interprets a rule that is simply not comparable to DR 9-101(B)(2).  The disciplinary rule at issue

in those cases is one that precludes representation by a former government attorney in a private

suit that is "the same as, or substantially related to," a matter the attorney worked on as a "public

official or employee."  DC Code of Prof'l Responsibility Rule ("DC Rule") 1.11(a).[22]  That rule,

like DR 9-101(B), exists to police the revolving door between government service and private

practice.  *See Brown v. D.C. Bd. of Zoning Adjustment*, 486 A.2d 37, 49 (D.C. 1984).  As

discussed below, however, its true analog in this Circuit is DR 9-101(B)(1) and thus it does not

advance MasterCard's argument with respect to disqualification under DR 9-101(B)(2).

    In *Brown,* the DC Court of Appeals explained the burden-shifting framework for a

disqualification motion predicated on a violation of DC Rule 1.11(a):

> [I]n cases where the complainant's evidence shows that the factual contexts of the
> two (or more) transactions overlap in such a way that a reasonable person could
> infer that the former government attorney may have had access to information
> legally relevant to, or otherwise useful in, the subsequent representation, we
> conclude that the complainant will have established a prima facie showing that
> the transactions are substantially related. The burden of producing evidence that
> no ethical impropriety has occurred will then shift to the former government
> attorney, who must rebut complainant's showing by demonstrating that he or she
> could not have gained access to information during the first representation that
> might be useful in the later representation. Absent sufficient rebuttal, the
> complainant will have carried the burden of persuasion as the moving party.

486 A.2d at 49-50.  Federal courts in DC interpret the rule similarly.  *See United States v. Philip*

*Morris*, 312 F. Supp.2d 27, 39 (D.D.C. 2004) (quoting *Brown*).

---

[22]  DC Rule 1.11(a) provides:

> A lawyer shall not accept other employment in connection with a matter which is the
> same as, or substantially related to, a matter in which the lawyer participated personally
> and substantially as a public officer or employee. Such participation includes acting on
> the merits of a matter in a judicial or other adjudicative capacity.

*Id.*

In other words, DC courts look at a former government attorney's prior access to information that is useful in the later suit as a *proxy* for determining whether two matters are "the same ... or substantially related" for purposes of DC Rule 1.11(a). That determination is comparable to the one I must make under DR 9-101(B)(1). The cases on which MasterCard relies do not, however, address the attorney's prior access to government information as a free-standing element of the showing needed to secure the attorney's disqualification. In that regard, the cases from DC provide no useful guidance to the inquiry I must make under DR 9-101(B)(2).

Viewing the DC cases that MasterCard cites against that interpretive framework, it is apparent that the cases do nothing to advance MasterCard's cause. I have already determined that the DOJ investigation and the instant suit are not the "same matter" for purposes of DR 9-101(B)(1). The access-to-information argument that MasterCard raises in reliance on the DC cases would serve only to help me make that same determination by indirection. To the extent that using the proxy analysis of the DC Circuit might arguably lead to a different result than direct analysis under the law of this Circuit, I must of course adhere to the latter. But it is hardly obvious that the two methods of legal analysis would produce different results. Even under the case law from DC, Wildfang's prior access to information during the DOJ investigation would do no more than create a rebuttable presumption. *See Brown*, 486 A.2d at 50 n.18 (former government attorney can rebut presumption of relatedness with evidence that the issues in the two suits are in fact unrelated). To the extent any such presumption might arise in this case, the actual circumstances of the DOJ investigation and of the instant litigation amply serve to rebut it: for the reasons explained above in section C.1 of this discussion, the two matters are not the same (nor even, should my view of the question be relevant, substantially related).

2. MasterCard Has Failed To Establish That Wildfang Has Knowledge About It That He Gained While In Government Service And That Remains Confidential

Under the circumstances of this case, the preceding legal discussion about the availability of a presumption is largely beside the point. Whether because it has failed to meet its burden or because Wildfang and RKMC have pointed to undisputed evidence that rebuts any presumption of taint, my conclusion is that none of the information to which Wildfang had access while working for DOJ is of a kind that requires his disqualification under DR 9-101(B)(2). MasterCard cites three distinct categories of information to which Wildfang had access while at DOJ that it characterizes as confidential government information within the meaning of DR 9-101(B)(2): the proprietary information that it produced to DOJ pursuant to the CID; the information about MasterCard that the government obtained pursuant to CIDs issued to its competitors Visa and American Express pursuant to the similar CIDs issued upon them; and internal DOJ analyses of information in the first two categories, including legal and economic memoranda prepared by Division staff during Wildfang's government service. MC Reply at 17.

Wildfang and RKMC argue that none of the three categories of information triggers disqualification under DR 9-101(B)(2) because none of it can today be considered confidential or particularly relevant to the instant litigation. RKMC Sur-Reply at 3-6. They also argue that Wildfang has no present knowledge of any of the information (or, perhaps more precisely, that he had no such knowledge when the instant litigation began). RKMC Response at 19-21.

The litigants' disagreement on this score requires an interpretation of the phrase "confidential government information" as used in the pertinent rule. Although DR 9-101(B)(2) does not define the phrase, the rule on which it is based does:

44

Confidential government information means information that has been obtained under governmental authority and which, at the time this Rule is applied, the government is prohibited by law from disclosing to the public or has a legal privilege not to disclose and which is not otherwise available to the public.

Model Rules of Prof'l Conduct R. 1.11(c).

The inclusion in the preceding definition of the words "at the time this Rule is applied" is entirely consistent with the disciplinary rule's present-tense phrasing. It would of course make no sense to disqualify an attorney for having once had access to information that, by the time of the disqualification motion, has become available to the public. Thus, if the material at issue has been made public, even if it was confidential government information at the time the attorney obtained it, the inquiry need proceed no further and the motion for disqualification should be denied.

At first blush, that would seem to end the matter before me, at least with respect to the first two categories of information at issue: the record makes clear that the information obtained from and about MasterCard via the Justice Department's CIDs was previously disclosed in litigation and, as MasterCard conceded at oral argument, will again be disclosed in this case. *See* Wildfang Dec. ¶ 13; Tr. at 28.[23] However, to the extent the information has been produced in litigation, it has been produced subject to protective orders that are still in effect. As a result, I cannot conclude that the bulk of the information at issue is "public" within the precise meaning of the definition quoted above.

But just as the fact of prior disclosures does not end the inquiry, neither does my conclusion that the information is not "public" necessarily mean that Wildfang's access to it

_____

[23] As of the date of the hearing on this motion very little of this information had yet been disclosed in this case. Since then, most of the information at issue has been produced to the class plaintiffs. *See* DE 320.

warrants his disqualification. Rather, I must consider whether, in light of the subsequent

disclosures, Wildfang's prior access to confidential information by virtue of his government

service puts him in a position "in which the information could be used to the material

disadvantage of" MasterCard. DR 9-101(B)(2). Under the circumstances, and using any fair

interpretation of the term "material disadvantage," the answer must be no.

First, with regard to the information that MasterCard and its rivals produced in response

to the government's investigative demands, there is virtually nothing that can possibly put

MasterCard at a material disadvantage given the information available to every other attorney in

this case. Most of the documents about interchange fees that MasterCard introduced as

examples of the "highly confidential and proprietary" information to which Wildfang had access

are very similar to documents that Wildfang was able to review by virtue of his representation of

the opt-out plaintiffs in the *In re Visa:Check* litigation. *Compare* Carney Dec. I Exs. 12-19 *with*

Wildfang Dec. I Exs. 9-11. There is moreover a considerable degree of overlap between the

information about MasterCard's interchange fee rate and methodology in the public domain – for

example, on MasterCard's Internet web site – and the information about interchange fees that

MasterCard and its rivals produced to DOJ. *See* Declaration of Alan S. Frankel dated December

23, 2005 ¶ 7. It is therefore difficult to comprehend how Wildfang's access to this information a

decade ago could possibly put MasterCard at any material disadvantage compared to the position

it would occupy if the plaintiffs had different counsel.

Second, with respect to the internal governmental memoranda to which Wildfang

presumably had access, there is simply nothing in the record from which I can conclude that

those memoranda contain any information that is even relevant to issues raised in this litigation,

let alone that they put Wildfang in a position that might materially disadvantage MasterCard,

assuming he even remembers them. The privilege log from *United States v. Visa, Inc.* identifies Wildfang as the recipient of only one memorandum. *See* Carney Dec. I Ex. 21 (Declaration of Joel Klein, Schedule of Documents). The log describes that document as follows: "A two-page memorandum dated October 17, 1994 from Ian Gale to K. Craig Wildfang, commenting on a legal analysis drafted by Antitrust Division attorneys."[24] *Id.* ¶ 55. MasterCard's argument thus reduces to the proposition that Wildfang must be disqualified because, more than ten years ago, he received a two-page memo that may have contained information relevant to the instant litigation based on an analysis of information that has previously been disclosed to him by MasterCard in prior private litigation and would be available to any counsel representing plaintiffs in the present action. But there is nothing in the record to suggest that that memorandum did, or even could have, set forth any information that could not only be used to MasterCard's material disadvantage in the instant litigation, but that also would not be available in the underlying documents themselves.[25] The concatenation of assumptions required to turn

---

[24] In fact, none of the document descriptions in the privilege log contains the word "interchange" or in any way refers to price-fixing. *See id.*

[25] Given the timing of the memorandum in light of the document production, I find credible Wildfang's claim that this memo likely concerned the unrelated *Mountain West* litigation on which Wildfang also worked while at DOJ. Furthermore, I note, based on Wildfang's recollection of Division priorities and staffing shortages, that it is entirely possible that no Division staff began to review the documents until after Wildfang's departure. *See* Wildfang Dec. I ¶ 42. Finally, it is also important to note that Wildfang was not the first lawyer to raise a price-fixing claim claim against MasterCard regarding interchange fees. The first action to raise such a claim was *Reyn's Pasta Bella, LLC v. Visa U.S.A., Inc.*, 259 F. Supp.2d 992 (N.D. Cal. 2003). Wildfang first raised an interchange price fixing claim against the defendants more than a year after that case was filed in connection with his representation of opt out merchants in the *In re VisaCheck* litigation. Wildfang Dec. I ¶ 9.

Wildfang's long-past access to that memorandum into a basis for disqualification is both too attenuated and too speculative to succeed.[26]

The essential flaw in the portion of MasterCard's motion under DR 9-101(B)(2) is that, regardless of who he worked for or what he learned in the past, or how much of it he still remembers, Wildfang today enjoys no unfair advantage over MasterCard in representing clients who claim that MasterCard has violated various antitrust laws. As MasterCard necessarily acknowledges, virtually all of the information potentially relevant to this litigation to which Wildfang may once have had unique access is now available to any private attorney who might replace him. If, contrary to applicable precedent, I were to rule that Wildfang's prior access created a barrier to his current work, I would establish a rule that would do nothing to protect companies like MasterCard but would harm the legal profession and the public by limiting the subsequent career options of public servants. I decline to so misread the law.

---

[26] In light of the foregoing analysis, I need not rely on Wildfang's declaration that he lacks any memory of reviewing the documents to which he once had access. I note, however, that I disagree with the rationale underlying MasterCard's protestation that the declaration has no relevance to this motion. *See* MC Memo. at 23. The declaration becomes irrelevant for purposes of my analysis because neither the law nor the facts warrant the presumption of taint that MasterCard proposes. But had I concluded otherwise, I would certainly have to consider the declaration as evidence that might suffice to rebut the presumption MasterCard sought. In this Circuit, even the Canon 4 presumption of access to confidential information is amenable to rebuttal. *See, e.g.*, *Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp*, 518 F.2d 751, 754 (2d Cir. 1975) (citations omitted). Drawing an irrebuttable presumption would be inconsistent with the case law in this Circuit that approaches with caution any motion to disqualify counsel and that demands a showing of actual taint in addition to the demonstration of a technical violation of a disciplinary rule. *See Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1978). Finally, MasterCard should not be heard to object to reliance on Wildfang's declaration in this context when it has itself relied on that declaration in another context. *See* MC Reply at 15 (arguing that "even a cursory examination of [Wildfang's] declaration demonstrates that he, in fact, has no actual current knowledge, rendering his declaration unreliable"). If MasterCard would use Wildfang's declaration as a sword, it cannot in fairness deny its adversary the right to use the same evidence as a shield.

E.   Wildfang's Participation Does Not Threaten To Taint The
     Proceedings

In the preceding discussion I have explained my conclusion that MasterCard has failed to

demonstrate that Wildfang's participation in these proceedings violates any disciplinary rule.

But even if I were to conclude otherwise, I would not, without more, be in a position to order

Wildfang's disqualification or that of his firm.   A court is not a disciplinary committee; its power

to disqualify an attorney in a civil case is grounded not in some abstract interest in policing

disciplinary violations but rather in its independent institutional interest in preserving the

integrity of actual judicial proceedings.   Accordingly, absent a specific threat that an attorney's

unethical conduct could affect the outcome of a case, a court "should be quite hesitant to

disqualify an attorney."   *Nyquist,* 590 F.2d 1241, 1246 (2d Cir. 1978).   There is no such threat

here.

The Second Circuit has identified two specific forms of trial taint that warrant

disqualification: a conflict of interest that "undermines the court's confidence in the vigor of the

attorney's representation of his client" and access to confidential information that gives the

attorney's current client an unfair advantage.   *Id*. (citing cases).   Wildfang's representation of

plaintiffs in this litigation does not threaten the current proceedings in either of these ways.

MasterCard has never suggested that Wildfang labors under a conflict of interest and, as

discussed above, Wildfang's former government service does not give his current clients any

unfair advantage in this litigation.

That I can discern no threat of actual taint in this case arising from Wildfang's

participation is not attributable to a failure to inquire.   I expressly asked MasterCard to identify

*any* specific undue prejudice that will arise as a result Wildfang's participation in this litigation.[27]

In its final substantive submission on the motion, and again at oral argument, MasterCard argued that the mere threat that Wildfang *might* use confidential information produced to and by DOJ concerning interchange fees and duality "patently prejudices" it. MC Reply at 18-19; *see* Transcript at 23-31. Such speculation cannot suffice to require disqualification. MasterCard's argument in this regard reduces to nothing more than an ephemeral appeal to a perceived "appearance of impropriety" – a standard that MasterCard's own expert has argued (albeit only before a different tribunal) is an "obsolete ... engine of mischief," *see* Anthony Lin, *Firm's Disqualification Over Interview Upheld,* New York Law Journal (Jan. 23, 2006), and that a rather more authoritative source has called "too slender a reed on which to rest a disqualification order." *Armstrong v. McAlpin*, 625 F.2d 433, 445 (2d Cir. 1980), *vacated on other grounds,* 449 U.S. 1106 (1981) (citations and internal quotations omitted).

IV.    Conclusion

For the reasons set forth above, as well as those orally stated on the record on January 27, 2006, I denied the motion of defendants MasterCard Incorporated and MasterCard International Incorporated to disqualify attorney K. Craig Wildfang and the law firm of Robins, Kaplan, Miller & Ciresi from further representation of the plaintiffs in this litigation. On the same date, pursuant to Rule 6(b)(1) of the Federal Rules of Civil Procedure, I enlarged those defendants' time to seek review of my decision pursuant to Rule 72(a) of the Federal Rules of Civil Procedure. Consistent with that ruling, I now order that the movants may seek Judge Gleeson's

---

[27] I made no corresponding inquiry of codefendant Visa because that company did not join in MasterCard's motion. The fact that a defendant in this case with, as far as I can tell, precisely the same reason to be concerned (or not) about Wildfang's participation did not likewise seek his disqualification is interesting, but of no relevance to my legal analysis. Any attempt on my part to explain the two networks' difference in approach would be pure conjecture.

review of the denial of its disqualification motion no later than August 21, 2006. I will entertain an application for a further enlargement of the time to seek such review on a showing of good cause filed before that deadline. Finally, I note that most of the parties' submissions with respect to this motion, including their memoranda of law, were submitted under seal pursuant to the protective order that governs this case. Accordingly, I have temporarily issued this Memorandum and Order under seal. No later than August 21, 2006, the parties shall identify the portions of this document, if any, that they wish to redact and maintain under seal, and explain the need for such continued secrecy; I will thereupon unseal the portions of this document as to which there is no such showing of need.

**SO ORDERED.**

Dated: Brooklyn, New York
      August 7, 2006

/s/ James Orenstein   
JAMES ORENSTEIN
U.S. Magistrate Judge
