September 5, 2006

The Honorable James Orenstein
United States District Court for the Eastern District of New York
225 Cadman Plaza East, Room 456 North
Brooklyn, NY 11201

**Re:**   *In Re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*

Dear Magistrate Judge Orenstein:

We write on behalf of MasterCard International Incorporated, MasterCard Incorporated (together, "MasterCard"), Visa USA Inc. ("VUSA"), and Visa International ("VI") (collectively, "Network Defendants") in response to Plaintiffs' August 30, 2006 letter regarding (1) the temporal scope of the Network Defendants' document search and (2) Plaintiffs' request for documents related to actual or contemplated corporate reorganizations. As set forth below, Plaintiffs' motion should be denied.

***Temporal Scope of Search:*** The Network Defendants' position has never been that they will not produce documents generated prior to January 1, 2000; rather, the Network Defendants have done so already, and the production of additional, duplicative discovery from that remote timeframe would be unduly burdensome.

In the *Wal-Mart* litigation, the merchant class served extremely broad discovery requests, concerning, among other topics, the alleged interchange-related practices that are the focus of Plaintiffs' discovery requests here and which Judge Gleeson held were a "centerpiece" of that case. *See In re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d 503, 513 (E.D.N.Y. 2003), *aff'd, Wal-Mart Stores, Inc. v. Visa, U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005). Separately, the Department of Justice served broad pre-complaint discovery and then civil discovery demands in the *DOJ* action. In response, the Network Defendants conducted costly and time-consuming document collections and, along with over 150 third parties, produced more than 8 million pages, covering a period from as early as the 1970s through 2000. Plaintiffs now have those documents along with over 500 fact and expert deposition transcripts. Moreover, Plaintiffs have the tools they need to parse through these materials (most of which they have had for months now) to investigate their claims here. The Network Defendants have provided all available OCR data from the prior actions, which make the *Wal-Mart* and *DOJ* materials largely full-text searchable, as well as expert reports and the exhibits to all depositions, which provide a shortcut to the documents deemed most significant in those cases. The Network Defendants also have agreed to produce all exhibits identified in the Joint Pre-Trial Order in *Wal-Mart*. And, Plaintiffs have received, or soon will receive, objective coding prepared by class counsel in *Wal-Mart*.

Notwithstanding the voluminous discovery and various search tools the Network Defendants already produced from the pre-2000 timeframe, Plaintiffs now demand (1) objective coding from *Wal-Mart* free of charge; (2) all pre-2000 documents found in the files of custodians searched in this action; and (3) responsive data back to January 1, 1995. *See* App. A to Motion, [Proposed] Pretrial Order. Plaintiffs also request that the Network Defendants collect and produce documents generated through "the present," not December 31, 2005. *Id.* Each of these is an unreasonable request, and would impose obligations on the Network Defendants beyond those set forth in the Federal Rules.

The Honorable James Orenstein
September 5, 2006
Page 2

First, the Court should not order the Network Defendants generally to search for and produce pre-2000 documents from the files of hundreds of custodians, nor should it require further production of pre-2000 data.   In light of the broad discovery in *Wal-Mart* and *DOJ*, any additional pre-2000 discovery will largely be duplicative of the efforts made in connection with those legacy productions.  Moreover, given the extraordinary breadth of Plaintiffs' discovery demands here (even as narrowed through negotiation), Plaintiffs' request that the Network Defendants collect pre-2000 documents from hundreds of custodians will significantly expand the volume of documents to be reviewed for production.  Imposing on the Network Defendants the enormous expense and burden of this re-collection effort is unwarranted.  *See* Fed. R. Civ. P. 26(b)(2) (courts may limit discovery that is "unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive"); *Manual For Complex Litig., Third* § 21.421 ("a balance must be struck between the burden and expense of discovery sought and its potential benefit"); *see also, e.g., Jones v. Goord*, 2002 WL 1007614, at *14-15 (S.D.N.Y. May 16, 2002) (motion to compel denied where discovery likely to be duplicative: "the expense of additional production has to be weighed in the context of the extraordinarily burdensome and expensive discovery process already undertaken in this case").[1]

Second, the Court should deny Plaintiffs' oft-repeated request for free objective coding from *Wal-Mart*.  Plaintiffs have never made a counter-proposal on cost-sharing, despite the Court's direction that they do so.[2]  Moreover, Plaintiffs have obtained (or soon will obtain) objective coding of the same population of documents generated by *Wal-Mart* class counsel.  Plaintiffs do not even address why they also need duplicative coding of those same documents from the Network Defendants.  Under these circumstances, there is no reason to require the Network Defendants to provide this objective coding at no charge to Plaintiffs.

Moreover, given Defendants' position that the claims in this action have been released to the extent based on conduct prior to January 1, 2004, such discovery will be of little or no benefit to this litigation.  *See* Defs. Motion to Dismiss (June 9, 2006).  While the Network Defendants do not contend that the *Wal-Mart* releases will obviate the need for any pre-2004 discovery (and, indeed, have committed to producing certain pre-2004 discovery), the fact that those releases render pre-2004 conduct non-actionable further weighs against the duplicative pre-2000 discovery Plaintiffs request here.

---

[1]      In support of their contention that more discovery from outside that period is required here, Plaintiffs rely on cases where defendants refused to search for or produce *any* documents from outside the alleged period or sought to exclude all such evidence, which is not the case here. *See Empire Volkswagen, Inc. v. World-Wide Volkswagen Corp.* 95 F.R.D. 398, 399 (S.D.N.Y. 1982) (refusing all discovery outside of the statute of limitations period); *In re Shopping Carts Antitrust Litig.*, 1982 WL 1817, at *1-2 (S.D.N.Y. Mar. 11, 1982) (attempting to preclude all evidence prior to the acts in the complaint). Plaintiffs also rely on these cases for the faulty proposition that simply because this matter is an antitrust case, the time period must extend back to, or even before, the beginning of the alleged conspiracy.  Neither case stands for this, and neither supports Plaintiffs' request for duplicative discovery already provided in this case.

[2]      Plaintiffs claim that Defendants "have not agreed to Plaintiffs' proposal to share costs in the amount of $50,000." Despite repeated reminders that the Court had directed Plaintiffs to make a counter-proposal, see Ex. A hereto, Trans. of June 20, 2006 Status Conf. at 11-13 and Ex. B hereto Parties' Case Status Report For Conf. No. 5 at 3, no counsel for Defendants has heard of such a proposal from Plaintiffs, and, tellingly, Plaintiffs cite no correspondence reflecting such a proposal. In any event, given Plaintiffs' access to objective coding of the same documents from *Wal-Mart* class counsel, there is no longer a need for Defendants to produce their coding data; however, if Defendants must do so, Plaintiffs should be required to pay the full $88,934 Defendants originally proposed.

The Honorable James Orenstein
September 5, 2006
Page 3

Finally, Plaintiffs' broad request for production of post-December 31, 2005 documents should be denied. The Network Defendants have not refused to produce *any* documents generated after that date and have specifically agreed to produce certain categories of documents created after that date.[3] Defendants have proposed December 31, 2005 as a general end date for the parties' production of responsive documents. The Plaintiffs filed the original complaints well before December 31, 2005, and all cases were transferred to this Court on October 19, 2005. Thus, all conduct alleged in the MDL 1720 complaints would have occurred prior to December 31, 2005. A December 31, 2005 end date would permit full discovery of the period alleged in Plaintiffs' complaints while limiting the parties' burden of collecting documents, on a rolling basis, through the present.

***Discovery of Corporate Reorganization:*** Plaintiffs' motion to compel discovery of actual or contemplated corporate reorganizations should be denied for the reasons set forth below.

**MasterCard:** Plaintiffs' motion to compel directed at MasterCard is perplexing. Citing a July 24, 2006 letter, Plaintiffs incorrectly claim that MasterCard has agreed only to produce documents concerning its recent IPO to the extent they concern the setting of interchange, the composition of MasterCard's board, and the IPO's impact on competition. Motion at 3. Although MasterCard offered this as one compromise on this topic, Plaintiffs know that this is not MasterCard's current position. Rather, by letter dated August 15, 2006 (Ex. C hereto), MasterCard agreed to expand its prior proposal and produce all responsive, non-privileged documents on the IPO located in the files of the custodians MasterCard agrees to search, subject to a proposed limitation on MasterCard's obligation to log privileged documents concerning the IPO. MasterCard and Plaintiffs continue to negotiate the scope of MasterCard's custodian list, as well as MasterCard's proposal on logging privileged documents.

Under these circumstances, it appears that Plaintiffs' motion directed at MasterCard on this issue is moot. However, to the extent Plaintiffs seek broader discovery of the IPO (*e.g.,* by requiring a search beyond the list of more than 100 custodians MasterCard already has agreed to search), Plaintiffs' request should be denied as unduly burdensome. Moreover, if Plaintiffs seek discovery of contemplated corporate reorganization measures, their request should be denied for the reasons set forth below on behalf of VUSA and VI.

**VUSA:**[4] Plaintiffs seek perhaps the most sensitive and confidential documents of any business, documents relating to any *contemplated* proposal to reorganize VUSA, now or in the future, for any reason. If VUSA is forced to disclose these sorts of documents to retailers and MasterCard, even under a protective order, its ability to consider or execute any potential plans for reorganization may be undermined. VUSA should not have to conduct its most sensitive business analyses while being monitored by key players in its marketplace.

Nor do Plaintiffs have a legitimate need for these documents. Because they relate to steps that VUSA has yet to take, and may never take, such documents can not be relevant to the merits of plaintiffs' case. Instead, their request smacks of an effort to gain a tactical advantage in settlement discussions, or in connection with any reorganization efforts themselves. Despite VUSA's agreement to produce documents related to announced or implemented changes, Plaintiffs nonetheless insist on seeking documents that relate to plans that may or may not come

---

[3]      For example, MasterCard has agreed to produce responsive documents concerning its IPO, and has not limited that commitment to documents generated prior to December 31, 2005, since MasterCard's IPO took place in 2006.

[4]      VI joins in the positions expressed by VUSA.

The Honorable James Orenstein
September 5, 2006
Page 4

to fruition. What VUSA considers doing, however, does not affect Plaintiffs and does not bear on their claims.

Courts routinely recognize companies' need to protect sensitive business documents such as those at issue here. Indeed, some courts have even recognized a privilege against disclosure of ongoing strategic business planning. *See, e.g., BNS Inc. v. Koppers Co.*, 683 F.Supp. 454 (D. Del. 1988) (recognizing privilege for analysis of business strategies); *see also, Parsons v. Jefferson-Pilot Corp.*, 141 F.R.D. 408 (M.D.N.C. 1992) (same). Thus, plaintiffs may seek these documents only if they show that their need for the discovery outweighs the "countervailing protectible interests" of VUSA. *See Mitchell v. Fishbein*, 227 F.R.D. 239, 245 (S.D.N.Y. 2005) (party seeking discovery must show that "its need for the information, and the harm that it would suffer from the denial of such information, outweigh the injury that disclosure would cause either the other party or the interest cited by it") (citation omitted). Here, Plaintiffs cannot make this showing. They offer no explanation why VUSA's consideration of *potential* restructuring in the future is relevant to this action.

There is a clear line between announced or implemented restructuring — which may properly be a subject of discovery to the extent that it relates to plaintiffs' claims — and internal contemplation of potential organizational changes — which is not. This line is easy to draw, appropriate to draw, effectively balances the parties' interests, and has already been drawn in this case. For example, VUSA has recently added independent directors to its board. VUSA and VI have agreed to produce documents and information that relates to the authority or practice of VUSA's independent directors in approving interchange rates or the rules and regulations governing interchange. *See* App. C to Motion at 2. Likewise, MasterCard has agreed to produce responsive documents relating to its IPO, which has actually occurred.

Plaintiffs, in contrast, seek broad discovery of *any* consideration by VUSA of *any* change in its business structure, now or in the future, for whatever reason. Plaintiffs request "all documents and information related to the analysis, discussion, examination and implementation of any proposal (whether contemplated or implemented) to reorganize the business structure." Unlike VUSA, which merely asks the Court to draw a reasonable line that accommodates the interests of all parties, Plaintiffs insist on far-flung requests that seek highly sensitive information unrelated to their claims.[5] For the reasons stated above, discovery relating to contemplated changes in business structure should be denied. *See Manual For Complex Litig., Third* § 21.41 ("Application of this underlying principle of proportionality [in Rule 26(b)(2)] means that even in complex litigation, conducting discovery does not call for leaving no stone unturned").

********
For all of these reasons, Plaintiffs' motion to compel should be denied.

Respectfully submitted,

Keila D. Ravelo
Counsel for MasterCard

Robert C. Mason
Counsel for Visa USA

Michael Gaertner
Counsel for Visa International

cc:  All Counsel of Record (via ECF)

---

[5]   If VUSA announces or implements further organizational changes, plaintiffs may seek discovery concerning those changes to the extent that discovery relates to the issues in this litigation.

# EXHIBIT A

06-20-06 Hearing Transcript before Magistrate Orenstein re status of discovery.txt
0001
```
 1                         UNITED STATES DISTRICT COURT
                          EASTERN DISTRICT OF NEW YORK
 2
     - - - - - - - - - - - - - -  X
 3
     IN RE:
 4                                       :
 5   PAYMENT CARD INTERCHANGE FEE
     and MERCHANT DISCOUNT
 6   ANTITRUST LITIGATION            :     05-MDL-1720 (JG)(JO)
 7                                   :     U.S. Courthouse
                                           Brooklyn, N.Y.
 8                                   :
                                          TRANSCRIPT OF PROCEEDINGS
 9                                        June 20, 2006
                                          2:00 p.m.
10   - - - - - - - - - - - - - -  X
11
12
     BEFORE:
13
               HONORABLE JAMES ORENSTEIN, U.S.M.J.
14
15
     APPEARANCES:
16
     For the Plaintiffs:
17
                              ROBINS, KAPLAN, MILLER & CIRESI
18                            Attys. for American Booksellers
                              Association, et al
19                            2800 LaSalle Plaza
                              800 LaSalle Avenue
20                            Minneapolis, MN 55402
                              By:  K. CRAIG WILDFANG, ESQ.
21
22
                              LERACH, COUGHLIN, STOIA, GELLER,
23                            RUDMAN & ROBBINS, LLP
                              Attys. for LDC, Inc., et al
24                            655 West Broadway, Suite 1900
                              San Diego, California 92101
25                            By:  BONNEY E. SWEENEY, ESQ.
                                   CHRISTOPHER BURKE, ESQ.
0002
 1                            POMERANTZ, HAUDEK, BLOCK,
                              GROSSMAN & GROSS, LLP
 2                            Attys. for NuCity Publications, et al
                              100 Park Avenue
 3                            New York, New York  10017
                              By:  JASON S. COWART, ESQ.
 4
 5                            BERGER & MONTAGUE
                              Attys. for Tabu Salon & Spa, et al
 6                            1622 Locust Street
                              Philadelphia, PA  19103
 7                            By:  MERRILL G. DAVIDOFF, ESQ.
                                   BART COHEN, ESQ.
 8
 9                            KENNY NACHWALTER
                              Attys. for Kroger, et al
10                            1100 Miami Center
                                        Page 1
```

06-20-06 Hearing Transcript before Magistrate Orenstein re status of discovery.txt
12   for it or do you think it is just something they bear the cost
13   of producing?
14           MR. WILDFANG:  I think, in the interests of avoiding
15   a dispute, we would be willing to pay something.  We think
16   half of the original cost is not the right number and, you
17   know, if it was something that was maybe not nominal but
18   somewhere between nominal and $150,000, we probably, in the
19   interests of avoiding a dispute, we would probably pay that
20   but even though we do think that the case law supports our
21   requesting for getting it without payment.
22           THE COURT:  Right.  Well, let me ask you this, who
23   is Mr. Wildfang's counterpart on this issue; Mr. Vizas, have
24   you folks actually had discussions about what an appropriate
25   number would be and it's broken down or have you broken down
0011
1    on the yes or no issue?
2            MR. VIZAS:  I think the issue is they're pretty
3    embryonic, we've had some discussion, I wouldn't say it has
4    been a Herculean effort so far.
5            THE COURT:  Let me suggest this, especially given
6    the nature of the claims you're asserting, the benefits to
7    society of market forces, I'm going to see if market forces
8    will resolve this particular dispute.  If by the next
9    conference you haven't worked out this issue on your own, I'll
10   be happy to discuss it further.
11           MR. VIZAS:  Right.  There's one further, I think a
12   newer wrinkle on this which is that plaintiff's counsel in the
13   Wal-Mart case, who obviously represented many of the same
14   members of the putative class that's alleged here, they
15   obviously had many, the same universe of documents and
16   apparently --
17           THE COURT:  Is that the Constantine?
18           MR. VIZAS:  Yes, Constantine.  One of the topics
19   for discussion is why the plaintiffs -- and I don't know why
20   Mr. Constantine doesn't want to turn it over but he
21   represented the same merchants, I would think it would be easy
22   and efficient and he did it from the plaintiff's perspective.
23           THE COURT:  Well, you know, I'll confess this is an
24   area -- I recognize there's a bit of an edge to that comment,
25   it is not as ingenuous as you very successfully made it sound.
0012
1    I recognize the issue, I will confess I have not quite figured
2    out the overlap or lack of overlap among the plaintiffs in
3    this case and the plaintiffs there.  I recognize that
4    Mr. Constantine's firm isn't here which I think that's right.
5            MR. WILDFANG:  They were invited to be here.
6            THE COURT:  Not here as representing a party.  I am
7    sensitive to the argument to the extent there's overlap of
8    parties -- documents of the parties' information, if they
9    can't pry it out of their lawyer's hands, that's not an issue
10   necessarily for me in the first instance.  I do think they
11   should be part of this conversation.  I don't want to argue on
12   this because my guess is you folks can work it out either
13   between the two of you or with Constantine at the table but
14   let's give it a try and we'll come back to this next time.
15           MR. VIZAS:  Very well.
16           MR. WILDFANG:  Your Honor, Mr. Davidoff wanted to
17   address that.
18           MR. DAVIDOFF:  Your Honor, we did write to
19   Mr. Constantine who -- Mr. Visas is correct, there is
20   substantial overlap between the class represented here and
21   the class there.  We wrote him on June 6th and we gave him
22   the citations that I'd like to at least put on the record for
                                Page 6

06-20-06 Hearing Transcript before Magistrate Orenstein re status of discovery.txt
23   Your Honor and Mr. Wildfang wrote to him again on June 16th
24   after he had twice declined inviting him to this hearing and
25   advising him that we were going to raise it before Your Honor
0013
1    at this hearing and I don't know whether he sent anyone or has
2    come himself.  He did reply finally yesterday to Mr. Montague,
3    my partner, and basically said, well, this is our work product
4    and some of the merchants are not the same and, therefore, we
5    decline to give it to you and we think he's dead wrong.  I
6    mean there is a little more law on this than there is on the
7    issue that Mr. Wildfang was talking about.
8             THE COURT:  Mr. Davidoff, before you get into giving
9    me cites which I don't want to, you know, slow us down while I
10   copy them down, I am going to suggest that we defer this
11   discussion until you've had a chance and, look, I'm the
12   magistrate assigned in the Wal-Mart case as well so I can
13   certainly ask, you know, Mr. Constantine or somebody from his
14   firm to be part of the discussion when we take this up again.
15   I will just ask you to get everybody around the table to do
16   this further.  I can understand the argument that a lack of
17   complete overlap presents an obstacle for saying it belongs
18   to, you know, the clients collectively represented here but
19   there may be a way that you can all work this out without
20   further litigation.
21            MR. DAVIDOFF:  I think he's been pretty categorical,
22   Your Honor.
23            THE COURT:  Perhaps after reporting back to him our
24   conversation today and he reads the transcript for himself he
25   may believe that it makes sense for him to be not quite as
0014
1    categorical.
2             MR. DAVIDOFF:  We'll take another pass at it, Your
3    Honor.
4             THE COURT:  All right.  I don't want to put you off,
5    you know, and avoid the issue, I just think that there's a
6    shot with further discussion you'll resolve it.  All right.  I
7    think that's everything that was addressed in your collective
8    report on legacy discovery, right.  Let's move on to new
9    discovery.  And I've got a taste of what's coming on the
10   network defendants' responses to the plaintiffs' requests but
11   I don't have any specifics really.  Is it ripe yet for
12   discussion, are you going to -- you, sir, what's your name?
13            MR. BURKE:  Chris Burke, Your Honor, good afternoon.
14            THE COURT:  Good afternoon.
15            MR. BURKE:  We had I think a productive meet and
16   confer with the networks last week and we have another
17   scheduled tomorrow.  We also have a meet and confer scheduled
18   with the banks tomorrow.  In the case that they haven't
19   started searching for documents yet, that's a concern for us.
20   There are some issues that are coming up, I think at this
21   point they're not yet ripe to bring them to the Court's
22   attention.
23            THE COURT:  To the extent you're having difficulties
24   working them out and you want to start teeing them up for me,
25   that's fine, you know, give some thought to the order in which
0015
1    we tee things up because if there's something where getting
2    guidance on a broad category will help you resolve issues on
3    more specific things, let's address the broader ones first,
4    all right.
5             MR. WILDFANG:  Your Honor, that raised the issue of
6    procedural -- the method by which we should raise these.  The
7    local rule contemplates a letter exchange, we're fine with
                                   Page 7

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

IN RE PAYMENT CARD INTERCHANGE
FEE AND MERCHANT DISCOUNT          MASTER FILE 05-MD-1720(JG)(JO)
ANTITRUST LITIGATION

This Document Relates To:                **ELECTRONICALLY FILED**

ALL ACTIONS                              PARTIES' CASE STATUS REPORT AND
                                         PROPOSED   AGENDA    FOR   CASE
                                         MANAGEMENT CONFERENCE NO. 5


                                         August 4, 2006

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

        Pursuant to the Court's instructions, counsel for the Class and Non-Class Plaintiffs

(collectively, "Plaintiffs") and Defendants have met and conferred on this Status Report and

Proposed Agenda for Case Management Conference Number 5 to be held on August 8, 2006.

Where the parties' positions differ, Plaintiffs' and Defendants' positions are shown separately.

1.      **Status of Consents From Third Parties In The First Data Litigation.**

        Visa has informed Plaintiffs' counsel that all necessary third-party consents have been

obtained and, as a result, Visa has produced to Plaintiffs the full text of the expert reports and

expert depositions transcripts, including exhibits.

2.      **Status of Production of Documents From the DOJ and Wal-Mart Litigations.**

        *Plaintiffs' Position*:  Most, but still not all, of these documents have been produced, and

some, but not all, of the applicable privilege logs have been produced.

        *Defendants' Position*:  Following Judge Barbara Jones' entry of an order addressing

third-party notice issues in *DOJ*, the time for *DOJ* third parties to object to production of their

materials in this action expired on July 21, 2006.  As a result, with the exception of

approximately 40 documents produced by the Department of Justice in *DOJ* (which will be produced in advance of the August 8 conference) and a small number of *DOJ* deposition transcripts (and exhibits thereto), Defendants have produced the agreed-upon discovery materials from *DOJ* and *Wal-Mart*, including third-party productions. Defendants expect the last few *DOJ* transcripts will be produced within the next few days. Defendants are also processing the *DOJ* summary judgment record for production to Plaintiffs. Finally, Defendants believe that all applicable privilege logs from these legacy cases have been produced.

**3.    Status of Production of Objective Coding Information Relating to the Legacy Documents.**

***Plaintiffs' Position***: Defendants have pre-existing objective coding information for these documents but have refused to provide it to Plaintiffs unless Plaintiffs pay Defendants $150,000 representing one-half of Defendants' costs to obtain the objective coding. Plaintiffs believe that pre-existing objective coding information is freely discoverable in subsequent litigation. After the discussion at the June 20, 2006, Status conference on this issue, Plaintiffs considered proposing to Defendants that Plaintiffs make a small payment to Defendants in order to try to et their agreement to produce the objective coding information they have relating to the legacy productions. However, Plaintiffs concluded that a better alternative for all parties would be to use the objective coding information to relieve Defendants of the burden of identifying specific documents from the legacy productions which are responsive to Plaintiffs' interrogatories, which is required by applicable rules. Therefore, Plaintiffs have proposed, as part of a larger resolution of discovery disputes, that Defendants produce their objective coding information from the legacy productions, in return for Plaintiffs' agreement to not require Defendants to identify with specificity (i.e., by Bates number) legacy documents responsive to particular interrogatories or document requests. Defendants have not agreed, but discussions are continuing. Plaintiffs'

- 2 -

discussions with Defendants have been intertwined with issues related to similar discussions with Class Counsel in Wal-Mart.

Following up on the Court's suggestion at the last Status Conference, the Class Plaintiffs in MDL 1720 have had further discussions with Class Counsel in Wal-Mart regarding making available to Class Plaintiffs the document coding information on the Wal-Mart documents that is in their possession. These discussions have led to an agreement, in principle, that such materials will be produced to MDL 1720 Class Counsel by the Wal-Mart Class Counsel, subject to certain conditions. Wal-Mart Class Counsel has under review a proposed stipulation and proposed order. Class Counsel in MDL 1720 expect to submit that stipulation and proposed order on this subject in the near future. A draft of that stipulation and order is Attachment 10 hereto.

***Defendants' Position***: Plaintiffs have repeatedly asked all defendants to produce any objective coding they prepared for their document productions in *Wal-Mart* and *DOJ*. Plaintiffs are now well aware that MasterCard and Visa U.S.A. have agreed to produce objective coding only for their *Wal-Mart* productions, Bank of America has agreed to produce its limited objective coding for its *DOJ* production, and no other Defendant has objective coding data from these legacy productions. MasterCard, Visa U.S.A., and Bank of America each has agreed to produce its objective coding to Plaintiffs if Plaintiffs agree to reimburse them for a reasonable portion of their substantial costs of obtaining this data in the prior cases.

At the June 20 conference, the Court took up this precise issue and suggested that Plaintiffs (1) make a counterproposal to MasterCard, Visa U.S.A., and Bank of America for sharing the cost of this legacy coding data and (2) continue in their efforts to obtain objective coding data for *Wal-Mart* from lead class counsel in that case, the Constantine Cannon firm. (*See* Tr. of Status Conference, June 20, 2006, at 11-13). Plaintiffs now indicate that they have

- 3 -

made progress in obtaining objective coding data for the *Wal-Mart* productions from Constantine

Cannon. However, to this day, Plaintiffs have never presented MasterCard, Visa U.S.A, or Bank

of America with a counterproposal to their cost-sharing proposal. Nor have Plaintiffs explained

why, if they expect to get objective coding of *Wal-Mart* documents from Constantine Cannon,

they also need MasterCard and Visa U.S.A.'s coding of the same documents.

Instead, notwithstanding the Court's request that the parties work out a reasonable cost-

sharing agreement, Plaintiffs now take yet another run at getting this coding for free. This time,

Plaintiffs suggest that these Defendants should turn over their coding as an alternative to

Defendants' identifying by Bates number certain documents that are responsive to certain of

Plaintiffs' interrogatories. However, with no reference to this objective coding issue, the parties

already have been negotiating the scope of Defendants' responses to Plaintiffs' 106

interrogatories, including the extent to which Defendants must identify documents responsive to

those interrogatories by Bates number. This has been an issue because a significant number of

plaintiffs' dozens of "interrogatories" are little more than disguised document production

requests.    In fact, more than twenty of plaintiffs' "interrogatories" merely demand that

Defendants "identify" broad swaths of documents, virtually all of which have been separately

requested in plaintiffs' document requests.    In essence, this amounts to an enormously

burdensome attempt to circumvent Fed. R. Civ. P. Rule 34(b), which does not require that a

party identify documents produced in response to particular requests if the documents are

produced as maintained in the regular course of business.  Thus, while Defendants have not

objected to identifying by Bates number discrete documents referenced in their interrogatory

responses, they have objected to doing so on a broad scale in response to document requests

- 4 -

posing as interrogatories.   In any event, as plaintiffs admit, "discussions are continuing" regarding these matters.

**4.      Status of Defendants' Responses to Plaintiffs' Discovery Requests.**

*Plaintiffs' Position*:  Although the parties have been actively meeting and conferring on Plaintiffs' discovery requests for several weeks, Defendants have yet to produce any responsive documents (other than organizational charts), and Plaintiffs do not know when Defendants will start producing materials to Plaintiffs because, although the Defendants say they are gathering records, they still have not said when they will actually commence producing those materials to Plaintiffs. Plaintiffs anticipated some issues would need to be addressed regarding this discovery, and in the letter serving this discovery, dated May 1, 2006, (Attachment 1), Plaintiffs sought to have early discussions with Defendants in order to expedite the resolution of these issues, and thus to expedite the production of responsive materials.  Defendants declined to have such early discussions.  Thus, beginning in June, Plaintiffs and the Defendants have had a series of lengthy, and thus far largely unproductive, discussions with both the Network Defendants and the Bank Defendants to resolve the myriad disputes and objections asserted by Defendants in their responses to Plaintiffs' discovery requests that were served on May 1, 2006, as well as issues that have arisen in the taking of the Rule 30(b)(6) depositions contemplated by the Court's Scheduling Order of March 23, 2006.  (Plaintiffs have now taken limited 30(b)(6) depositions of virtually all of the Defendants.)  There has been an exchange of correspondence attempting to summarize those discussions.   *See* Attachment 2 (correspondence regarding the Network Defendants) and Attachment 3 (correspondence regarding the Bank Defendants).  Plaintiffs list below some of the disputes that remain.  If there is no substantial progress on these and other issues in the very near future, Plaintiffs will seek relief from the Court.

- 5 -

*Defendants' Position*:  As Plaintiffs concede, all the discovery issues they purport to raise remain under discussion, with no relief currently being sought.  Yet plaintiffs have nonetheless offered a series of tendentious statements about various of these matters, matters in which the details are important but have often been omitted.  Defendants do not believe that such premature exchanges are fair or particularly useful.  Instead, they are, by their nature, incomplete and far more burdensome than helpful.  Because Defendants cannot simply remain silent in the face of Plaintiffs' statements on these matters, however, they are responding on what should be understood to be a limited and understated basis.

Plaintiffs' initial discovery demands consist of 96 interrogatories and 133 document requests (not including sub-parts) to the Network Defendants, and 78 interrogatories and 126 document requests (not including sub-parts) to the Bank Defendants.  The documents in which these requests are compiled are collectively over a hundred pages in length.  The length and scope of these requests has necessitated multiple meet and confer sessions—on separate tracks, one track each for the Network Defendants and the Bank Defendants.  Specifically, during the past month and a half, Plaintiffs and the Network Defendants have held three separate meet and confer sessions (in Chicago and New York), and Plaintiffs and the Bank Defendants have also had three separate sessions (in New York, Chicago, and Minneapolis).  There has also been an additional session in which both Network and Bank Defendants participated together (in New York).  In addition, certain Defendants also have participated in additional telephonic meet and confers to discuss issues concerning the production of their electronic data and proposed lists of custodians.  As a result of these meetings, Plaintiffs have agreed to review and narrow many of their demands. The parties have exchanged correspondence confirming their positions and continuing dialogue on others.  Indeed, the Bank Defendants are currently still awaiting further

- 6 -

correspondence that Plaintiffs had committed to provide to the Banks on or around July 18 to clarify and narrow many of their demands.   At all times, Plaintiffs have stated during the meetings that the parties' negotiation efforts have been productive.   In light of the length and scope of Plaintiffs' demands, the frequency of the meetings, and the spirit in which the negotiations have been conducted, Plaintiffs' recent characterization of the discussions as "largely unproductive" is both surprising and troubling.

Nevertheless, Defendants respond to each of the topics below, but believe that, if and when the time arises for resolution of discovery disputes, the parties should follow this Court's established procedures governing such matters.

(a)     Timing and Scope of Search for Materials Responsive to Plaintiffs' First Sets of Omnibus Discovery Requests to the Network and Bank Defendants.

*__Plaintiffs' Position__*:   The Defendants have uniformly taken the position that they will not begin searching for *any* responsive materials until a comprehensive agreement is reached on all issues related to this discovery.   No such comprehensive agreement has yet been reached and, therefore, with very few exceptions related to organizational charts and the like, Defendants have not yet begun searching for responsive materials.   Unfortunately, this means that document production has not yet begun.

Plaintiffs have agreed to consider Defendants' proposal that the scope of search be generally governed by the identification of custodians whose files would be searched.   Under such an agreement, Defendants would identify employees whose files would be searched without prejudicing Plaintiffs' need, if any, from others in the future.   (*See* Letter from William J. Blechman to Julie Rottenburg dated August 3. 2006, found in Attachment 2.)   Plaintiffs contemplated that Defendants would provide comprehensive lists of custodians, in accordance with their obligations under the applicable rules to make a good faith effort to produce all

- 7 -

responsive materials. Plaintiffs were disappointed when the initial lists of custodians provided by several of the Defendants were plainly under-inclusive. For example, MasterCard's initial list of proposed custodians for search identified only 69 MasterCard employees whose files would be searched for materials responsive to Plaintiffs' First Set (See Attachment 4, letter from Matthew Freimuth to Plaintiffs' Counsel, dated July 7, 2006.) Class counsel responded with a list of 60 additional custodians, based upon the 30(b)(6) depositions that had been taken of MasterCard. (Attachment 5, letter from Christopher Burke to Matthew Freimuth dated July 10, 2006.) Subsequently, however, after the 30(b)(6) deposition JP Morgan Chase, it was discovered that MasterCard had failed to include in its list of proposed custodians MasterCard employees who are responsible for the management of the relationship between MasterCard and Chase. For example, MasterCard's employee David King who is responsible for the management of the MasterCard debit relationship with Chase was not listed by MasterCard. Similarly, the list of custodians provided by Visa (see Attachment 6, letter dated July 7, 2006, from Julie Rottenberg to William Blechman) consisted of only 61 employees of Visa, and did not include the names of David Misavich and Valerie Federice who, according to Chase's 30(b)(6) witness, are "dedicated persons" whose sole jobs are to serve as liaison between Visa and Chase with respect to credit cards. Visa also did not list in its proposed list of custodians Summer Phillips and Susan Painter, who, according to Chase's 30(b)(6) witness, are responsible for managing the relationship between Visa and Chase with respect to debit cards. Plaintiffs believe that Defendants have an affirmative obligation, consistent with the Rules of Civil Procedure, to make a full disclosure of all employees who are likely to have responsive materials in their files. Even after deposing Defendants' corporate designees on their organizational structure, Plaintiffs are not as well-positioned as Defendants to determine which custodians might have responsive materials, and

- 8 -

should not be put in the position of risking that responsive materials will not be produced simply because Plaintiffs are not in a position to know who all of the appropriate custodians are. If Defendants want to proceed under the custodial approach for defining the scope of search, then the lists of custodians must be fairly complete. Discussions on the issue of identifying appropriate custodians continue between Plaintiffs and Defendants.

With respect to the temporal scope of the search for responsive materials, Defendants had proposed limiting the scope of their search to the period January 1, 2000, to the present for the Network Defendants, and to December 31, 2005, for the Bank Defendants. Plaintiffs agree to a temporal scope of January 1, 2000, to the present regarding documents (except as specifically identified below), provided Plaintiffs obtain from Defendants and the Class objective coding of the *Wal-Mart* and *DOJ* productions. Further, to the extent that Defendants discover documents predating January 1, 2000, in files within the scope of search, then Defendants should produce those documents. Plaintiffs' proposed scope of search demonstrably eliminates the burden, if any, to a Defendant to seek out archived files that contain records prior to January 1, 2000. Regarding data, Plaintiffs proposed that if reasonably available prior to January 1, 2000, and not already produced in Defendants' legacy productions, then Defendants should produce responsive data for the period January 1, 1995, to the present. Such historic data is typically meaningful for economic analysis in antitrust cases of this sort.

With respect to obtaining objective coding information from Defendants, Plaintiffs believe that, pursuant to applicable rules, Defendants have an affirmative obligation to identify with particularity materials responsive to particular requests. Thus, for example, it would not be appropriate for Defendants to respond to an interrogatory with a Rule 33(d) response, without providing Bates numbers for the materials that are allegedly responsive to the interrogatory.

- 9 -

Indeed, Local Rule 33.1 requires such specificity. In order to relieve Defendants of this claimed burden, Plaintiffs are willing to accept the objective coding information on the legacy materials, so that Plaintiffs would perform their own search within the legacy productions for materials responsive to requests made by Plaintiffs. Thus far, Defendants have rejected this proposal.

*Defendants' Position*: As noted above, Plaintiffs' first set of discovery demands are voluminous, overbroad and unduly burdensome. Nonetheless, Defendants have been working on multiple fronts to respond to Plaintiffs' discovery requests and to produce documents as promptly as feasible.

*First*, by the time of this hearing, most of the defendants will have sent Plaintiffs proposed lists of current and former employees whose files the Defendant in question is willing to search for responsive documents. The remaining defendants will do so shortly. The purpose of the custodial approach is to strike the proper balance between ensuring that Plaintiffs receive the documents to which they are entitled, and ensuring that Defendants do not sustain undue burden by collecting and reviewing files of custodians who are not reasonably likely to have responsive materials, or whose documents would be duplicative of those in the files of other listed custodians. Many of the Plaintiffs have proposed to follow the same approach to collect materials responsive to Defendants' discovery requests (discussed further below). Defendants also have produced their current and historical organizational charts, which together with information culled from depositions of Defendants' 30(b)(6) witnesses on organizational issues, place Plaintiffs in a position to make an informed analysis of the proposed lists and to propose additional custodians. Indeed, in a limited number of cases, Plaintiffs have now proposed additional custodians to be searched, and those Defendants affected either have or will soon respond to Plaintiffs' counterproposal.

- 10 -

*Second*, contrary to Plaintiffs' statements, although the custodian lists are not finalized, many Defendants already have begun gathering and processing documents (both electronic and hard-copy) from the files of custodians whom Defendants know will have materials pertinent to this case. Moreover, Plaintiffs themselves have proposed (and Defendants have agreed) that searches of hard-copy custodian files will proceed prior to electronic searches, because, as discussed next, the latter require an agreed list of electronic search terms.

*Third*, by the time of the status conference, Defendants will have forwarded a proposed list of electronic search terms to Plaintiffs. The use of search terms will streamline the review process. Again, Plaintiffs have agreed conceptually with this approach in their correspondence to Defendants (with the understanding that hard-copy searches and productions will take place first).

*Fourth*, consistent with Defendants' agreement to produce documents on a rolling basis, Defendants have begun collecting, reviewing, and processing responsive documents and data that are not part of the custodial approach for production in the near future. For example, Visa U.S.A. and MasterCard are preparing to produce, or have already produced, their published interchange rates, Operating Regulations and By-laws.

*Fifth*, it is simply not the case that "Defendants have uniformly taken the position that they will not begin searching for any responsive materials until a comprehensive agreement is reached on all issues related to" the new discovery. Putting aside for the moment the millions of pages of material already produced from *Wal-Mart* and *DOJ*, at one of the meet-and-confer sessions involving the Plaintiffs and the Banks, the Plaintiffs said that they would be sending the Banks a list of specific document requests that the Plaintiffs viewed as calling for "discrete" sets of documents and which the Plaintiffs view as being of higher priority for searches and

- 11 -

production.  The Banks agreed to consider that list when it was received.  However, Plaintiffs still have not provided the Banks with the promised list of specific document requests. Moreover, as was noted above, the Banks are still awaiting Plaintiffs' positions on numerous discovery requests and cannot move forward with respect to these specific requests until the parties have made agreements relating thereto.

As to the temporal scope of search, Plaintiffs say that they have agreed to limit their document requests to documents from January 1, 2000, for most requests, but only on the condition that Defendants produce their objective coding of the *Wal-Mart* and *DOJ* productions. MasterCard and Visa U.S.A. already have produced OCR data (which generally makes documents full-text searchable) that satisfies Plaintiffs' stated need to perform their own searches within the legacy productions.  For example, Visa U.S.A. and MasterCard provided Plaintiffs with OCR text for the *Wal-Mart* and *DOJ* productions to allow full text searching; Visa U.S.A. also already has provided certain additional objective coding from the *Wal-Mart* litigation. Moreover, as discussed above, Visa U.S.A. and MasterCard have agreed to provide Plaintiffs with the remainder of their existing objective coding from the *Wal-Mart* productions subject to an appropriate cost-sharing arrangement, a proposal Plaintiffs continue to resist in their effort to obtain this for free.

Furthermore, the Plaintiffs have misinterpreted Local Rule 33.1.  Defendants have no "affirmative obligation to identify with particularity materials responsive to particular requests," as Plaintiffs claim.  What Local Rule 33.1 in fact requires is that if any party intends to respond to an interrogatory by referring to documents in its production, that party must identify with specificity the documents on which it is relying.  But that well-established rule would not, as

- 12 -

Plaintiffs appear to argue, require Defendants to organize the legacy productions "with particularity" and according to "particular requests."

In any event, objective coding from the *Wal-Mart* and *DOJ* productions is irrelevant to the temporal scope of search issue. Collectively, Defendants already have produced over eight million pages of documents from the *Wal-Mart* and *DOJ* productions that pre-date January 1, 2000. In order not to duplicate their prior productions of materials that pre-date January 1, 2000, Defendants would need to search through the same files that underlie the *Wal-Mart* and *DOJ* productions, with the goal of identifying documents responsive to Plaintiffs' discovery requests that somehow were excluded from those legacy productions. Such a task would be unduly burdensome, particularly given that Judge Gleeson and the Court of Appeals have found that any interchange-overcharge claims based on Defendants' conduct prior to January 1, 2004, have been released. As noted, however, Defendants have agreed to provide certain information that pre-dates January 1, 2000, and the parties' discussions on this topic are on-going.

Finally, it is worth noting that Plaintiffs have made clear that their proposal regarding the temporal scope of search is largely illusory. Plaintiffs have stated that they are not seeking to impose a temporal limitation on the search being conducted by the Defendants, but instead are merely offering to allow Defendants to exclude from their search "archived documents." (*See above*, at 9 ("to the extent that Defendants discover documents predating January 1, 2000, in files within the scope of search, then Defendants should produce those documents. Plaintiffs' proposed scope of search demonstrably eliminates the burden, if any, to a Defendant to seek out archived files that contain records prior to January 1, 2000"). The issue of any obligation to search "archived" materials is separate from the appropriate temporal scope of search – Plaintiffs are offering agreement on the former and calling it an agreement on the latter.

(b)    Search for and Production of Materials Relating to Foreign Jurisdiction Investigations.

*Plaintiffs' Position*:    In their First Set, Plaintiffs have sought materials related to investigations by foreign jurisdictions into various practices, including Interchange Fee setting, by Visa and MasterCard. For example, the Reserve Bank of Australia, the United Kingdom Office of Fair Trading, the European Union Directorate for Competition and other jurisdictions have made specific findings regarding the anticompetitive nature of the setting of Interchange Fees and other rules, including rules similar to those challenged in these cases, of Visa and MasterCard. The relevance of these materials relating to foreign investigations cannot be seriously disputed, as experts for both Visa and MasterCard have published articles analyzing these foreign jurisdictions and comparing them to the United States. Nonetheless, Defendants have resisted producing these materials in any comprehensive way, and have not agreed with Plaintiffs regarding the scope of this search. Plaintiffs have made a proposal to limit the burden on the Networks of searching for such materials. (*See* Attachment 7, letter from K. Craig Wildfang to Visa U.S.A. and Visa International, dated July 7, 2006.)[1] Although discussions are continuing on this topic, Plaintiffs believe that this may be a subject which will require the Court's intervention.

*Defendants' Position*:    Plaintiffs' have propounded numerous discovery requests that seek documents and information concerning foreign interchange proceedings and defendants' business practices abroad. Defendants have objected to this collection of requests as overbroad and unduly burdensome. Nonetheless, during the parties' recent meet-and-confer sessions, Defendants invited Plaintiffs to re-formulate these requests (principally, by narrowing them) and Plaintiffs agreed to do so. Plaintiffs made a proposal to Visa U.S.A. and Visa International,

---

[1] Plaintiffs' proposal would require a full search of the U.S. offices of Visa U.S.A. and Visa International, and limit searches of foreign offices to those located in the European Union, Australia, Mexico, Canada, and Japan.

- 14 -

which, although it purports to narrow the requests, remains incredibly broad in scope. Plaintiffs still request, for example, that Visa International search all of its offices (and the offices of its outside counsel) in the United States, all European Union member states, Australia, Mexico, Canada, and Japan. Visa U.S.A. and Visa International have responded to this proposal.

Plaintiffs did not direct their proposal to MasterCard. However, to move this process along, MasterCard recently made a proposal to Plaintiffs for a more narrow (yet still substantial) collection and production of its filings in a number of foreign interchange-related proceedings and documents reflecting certain of MasterCard's business practices abroad. MasterCard assumes Plaintiffs will respond to this proposal shortly, and the parties will continue their negotiations on this issue.

(c)   Documents Related to the Re-Organizations of Visa and MasterCard.

*Plaintiffs' Position*: In the last 12 months both Visa and MasterCard have undertaken corporate re-organizations for the publicly stated purpose of limiting their antitrust exposure. Plaintiffs have requested documents related to these re-organizations, and Defendants have resisted. Again, this is a topic which may require the Court's intervention.

*Defendants' Position*: Plaintiffs' discovery requests concerning the recent reorganizations of MasterCard and Visa are incredibly broad. In fact, Plaintiffs have literally requested "*all* documents regarding actual or contemplated so-called reorganizations." (*See* , Letter from William Blechman to Network Defendants, dated July 7, 2006, at 2 found in Attachment 2). Plaintiffs' requests, as phrased, call for the production of an enormous volume of material (resulting in an enormous burden on defendants), yet Plaintiffs have made no showing as to why literally all such documents are discoverable in this case. Nonetheless, contrary to Plaintiffs' assertion that the Network Defendants "have resisted" producing documents

- 15 -

concerning their corporate reorganizations, both Visa and MasterCard have made proposals to the Plaintiffs suggesting reasonable limitations on the scope of these requests. (*See* , Letter from Julie Rottenberg to William Blechman, dated July 25, 2006, at 2 found in Attachment 2; Letter from Keila Ravelo to William Blechman, dated July 24, 2006, at 2 found in Attachment 2). Plaintiffs' response to these proposals have just been received and Defendants will review them and respond in the near future.

(d)    Identification of Former Employees.

*Plaintiffs' Position*:    Plaintiffs have requested that, when answering Plaintiffs' interrogatories, Defendants identify any former employees, including the last title or position the person held for the company and the person's last known residential address and telephone number. Defendants have refused to so agree.

*Defendants' Position*:    Defendants have produced both current and historical organizational charts, from which Plaintiffs can identify former employees, their titles, and positions, and Plaintiffs have now deposed Defendants' 30(b)(6) designees concerning relevant former employees, among other topics. With the benefit of this information already in their possession, Plaintiffs can make more targeted requests for additional information concerning relevant former employees. Under these circumstances, Defendants contend that Plaintiffs' broad requests for the identification of all former employees (including home addresses) with knowledge of the issues in this case is unnecessary and unduly burdensome.

Nonetheless, Defendants remain open to further discussion of this issue with Plaintiffs. However, there are multiple concerns with identifying the telephone numbers and addresses of former employees. Some of these involve privacy concerns relating to the former employees information. There are other significant concerns as well, though. If the information is desired

- 16 -

to enable plaintiffs to contact and speak with the identified former employees, many of whom will have occupied managerial positions, such contacts are forbidden in various jurisdictions and, in addition, many of these former employees possess privileged information, making such contacts potentially inappropriate. In addition, many will be represented with respect to matters related to their former employment. If, on the other hand, this information is desired merely to arrange for depositions and/or serve subpoenas, there are other ways that this can be accomplished. Again, Defendants remain open to further discussion of this issue, which may also vary on a case by case basis.

(e)     Contention Interrogatories.

*Plaintiffs' Position*: In their First Sets, Plaintiffs propounded a small number of what might be characterized as "contention interrogatories." The most important of these interrogatories seeks from Defendants an identification of the relevant market or markets which they contend are at issue in this case. The purpose of this set of interrogatories is plain, since the definition of the relevant market is the starting point for virtually all analyses and investigation that might be done in connection with this case, including issues relating to the certification of the Plaintiff Class. Plaintiffs' position is that Defendants should be required to answer these interrogatories at this time. Defendants contend that any contention interrogatories are premature.

*Defendants' Position*: While identification of relevant markets may be a central issue in this case, it will require discovery and input from experts, and it is an issue with respect to which Plaintiffs – not Defendants – must sustain the burden of proof. Moreover, Plaintiffs have had ample opportunity to investigate the factual bases for the extensive allegations in their Complaints (and presumably have done so). Being in a position to have to respond to those

- 17 -

allegations, Defendants cannot fairly be required to articulate their defenses or class certification theories at this stage, without having completed their own investigation, which depends in part on the benefit of discovery.

(f)     <u>Date for Completion of Document Production in Response to Plaintiffs' First Sets.</u>

*__Plaintiffs' Position__*: On July 7, 2006 Plaintiffs proposed that Defendants commit to a date certain for the completion of production of documents responsive to Plaintiffs' First Set, but Defendants have refused. Thus, not only have Defendants refused to commit to a date to begin production, they have also refused to commit to a date for its completion. While Defendants have agreed to produce documents on a rolling basis, Plaintiffs believe they are entitled to some certainty on beginning and completion dates.

*__Defendants' Position__*: Plaintiffs recently proposed that Network Defendants commit to substantially complete their productions by August 30, 2006, and that the Bank Defendants commit to do so by September 30, 2006. However, as noted, Plaintiffs' propounded 133 document requests and 96 interrogatories (not including sub-parts) in the first set of discovery to the Network Defendants, and 126 document requests and 78 interrogatories (not including sub-parts) in the first set to the Bank Defendants. Furthermore, as noted above, Plaintiffs have failed to provide the Bank Defendants with proposals and information that Plaintiffs agreed to provide during the parties' meet and confer sessions and that are essential to the Bank Defendants' ability to estimate the date by which they anticipate completing their productions. In light of the massive amount of material that the Defendants need to collect, review, and prepare for production in response to these requests, and the on-going negotiations over some of the requests, Defendants believe it is premature to fix any deadline for the completion of document production.

(g)    Admissibility of Copies.

*Plaintiffs' Position*:  Defendants have indicated that they intend to only produce copies of original documents, not the actual original documents.  Therefore, Plaintiffs proposed that the parties stipulate to the admissibility of copies, in order to avoid complications at trial. Defendants have declined.  Plaintiffs may need to seek relief from the Court on this issue.

*Defendants' Position*:  Plaintiffs' proposal on admissibility of copies is unnecessary given that Rules 1003 and 1004 of the Federal Rules of Evidence adequately address issues related to the admissibility of copies or reproductions at trial.  Discussion of stipulations with respect to the handling of exhibits at trial is premature at this stage.  Instead, if and when the relevant copies to be designated as trial exhibits are identified, Defendants then will be able to identify whether there is some unusual circumstance in which a legitimate question exists about a copy.  (And, of course, if a question does exist and the original is available, the original would then be provided.)  But it is unnecessary and unfeasible to stipulate to admissibility of all copies now – in advance even of production – and the production of million of pages of originals is simply not a viable option.

(h)    Plaintiffs' 30(b)(6) depositions of Defendants.

*Plaintiffs' Position*:  Plaintiffs have wanted to begin merits discovery from the earliest stages of the case.  During the negotiations over the pretrial schedule, Defendants desired that no depositions occur for a 3 month period after fact discovery would start.  In order to reach accord with Defendants on a pretrial timetable for the case, Plaintiffs agreed that any depositions during the first 3 months after fact discovery commenced would be limited to depositions regarding specific subjects, notably corporate organization and structure.  (Other topics specifically mentioned in the pretrial order were, by agreement of the parties, deferred or handled through

- 19 -

other means.)  Thus, at the start of fact discovery, Plaintiffs not only served written discovery to Defendants, but they also noticed 30(b)(6) depositions of each Defendant on its corporate organization and structure.  The first of those depositions began on June 15th, and others ensued through August 4th.  Although Plaintiffs encountered sporadic problems described below  at some of the depositions when a witness was instructed not to answer some questions or the witness did not appear to be properly educated to testify, Plaintiffs by and large succeeded in completing these depositions and are now planning to notice other depositions in the case.

In particular, some of the 30(b)(6) deponents were inadequately prepared on the topics noticed.  In some cases, the defendant bank 30(b)(6) designees were unprepared or unable to testify as to the corporate organization and responsibilities of all of the defendant bank's card issuing entities.   In addition, some bank defendants did not provide sufficient or current organizational charts, or provided them only after Plaintiffs' counsel expressed concerns about their insufficiency, on the eve of the deposition, despite an agreement to produce organizational charts well in advance.  Unless this problem can be remedied in other ways, this may require Plaintiffs to seek another deposition on these topics.

Second, counsel for some Defendants have improperly instructed their witnesses not to answer questions which Defendants' counsel claim are beyond the scope of the noticed topics, but which are conceivably within the personal knowledge of the witness.  The majority of courts hold that such instructions are improper.  *See e.g. King v. Pratt & Whitney*, 161 F.R.D. 475, 476 (S.D. Fla. 1995).  *Aff'd*, 213 F3d 647 (11th Cir. 2000); *Detoy v. City & County of San Francisco*, 196 F.R.D. 362, 367 (N.D. Cal. 2000); *Cabot Corp. v. Yamalla Enters., Inc.*, 194 F.R.D. 499, 500 (M.D.Pa. 2000); *Starlight Int'l, Inc. v. Herlihy*, 186 F.R.D. 626, 639 (D. Kan. 1999); *Overseas Private Investment Corp. v. Mandellbaum*, 185 F.R.D. 67-69 (D.D.C. 1999); *Stone v.*

- 20 -

*Morton Int'l*, 170 F.R.D. 498, 500 (D. Utah 1997).  *But see Paparelli v. Prudential Ins. Co. of Am.*, 108 F.R.D. 727, 731 (D. Mass 1985).

Defendants' counsel's position is that, because the 30(b)(6) topics were limited by the Court's March 23, 2006, Scheduling Order, that Plaintiffs could not inquire into the witness' personal knowledge.  However, nothing in the language of the Scheduling Order suggests that the Court intended that Order to trump applicable case law and impose restraints on Plaintiffs' that lead to significant inefficiencies.[2]

For the moment, Plaintiffs' have decided not to bring a motion on this issue, but reserve their right to do so.  Because this problem threatens to recur at future depositions, Plaintiffs request that the Court provide its guidance on the propriety of instructions by counsel to witnesses not to answer questions.  In particular, Plaintiffs are concerned that such a practice is inconsistent with Local Rule 30.6, which prohibits an attorney from initiating a private conference with a deponent during the actual taking of a deposition, except for the purpose of determining whether a privilege should be asserted.

***Defendants' Position***:  Plaintiffs have now largely completed their 30(b)(6) depositions of Defendants. As they state, they have for now "decided not to bring a motion" on the issues they purport to raise concerning these deposition – which have no applicability at all to many of Defendants or have not even been discussed with them.

Unfortunately, in a number of instances, Plaintiffs' counsel intentionally disregarded the express limitations on the subject matter of those depositions, which limitations were defined by this Court's scheduling order and the documented agreement between the parties. On certain occasions, when faced with plainly improper questions, Rule 30(b)(6) witnesses were instructed

- 21 -

not to answer the question.   By way of example, in one of Chase's 30(b)(6) depositions,

Plaintiffs' counsel asked, among many others, the following improper questions:

> Can you tell us what the business rationale is for having a
> Visa United debit rewards program, as well as a
> Continental MasterCard debit program?
>
> Are you aware of any consideration by any other large
> banks about establishing their own networks?

(*See* Attachment 8, Chase 30(b)(6) Dep. <u>101</u>:5-8, 105:20-22, July 20, 2006).   These (and other

similar) questions plainly had nothing to do with corporate organization issues, which was, by

agreement and order, the sole topic for the depositions.   Under these circumstances, as the case

law makes plain, an instruction not to answer was appropriate in light of Plaintiffs' clear breach

of the subject matter limitation on these depositions.

In this instance, Defendants respectfully submit that the case law clearly supports the

propriety of instructions to a Rule 30(b)(6) witness not to answer questions beyond the scope of

the discovery authorized by the Court or agreed to by the parties.    The cases Plaintiffs cite for

the proposition that instructions not to answer were improper are wholly inapposite.   In none of

these cases was there an agreement of the parties or a court order limiting the subject matter of

the deposition at issue.   Accordingly, there was no basis for counsel to instruct the witness not to

answer.   Here, by contrast, the Court-ordered and agreed subject matter of these depositions was

quite narrow, and Plaintiffs sought to evade that limitation through improper questions

concerning the merits of this case.   Where counsel for a Defendant instructed a witness not to

answer, the direction was necessary to enforce the subject matter limitation on the deposition.

---

[2] At the deposition of JP Morgan Chase's corporate designee on debit card issues, Chase's counsel told Plaintiffs'
counsel that a second trip to Columbus, Ohio would be necessary in order to ask the witness questions on which the
witness conceded he had personal knowledge.   Plaintiffs' hope to avoid such inefficiencies.

Plaintiffs claim that these instructions not to answer, and the supposed lack of knowledge of certain designees, has led to inefficiency in Plaintiffs' discovery efforts.  The purported inefficiency argument has no merit.  The purpose of the agreement on limited deposition discovery of Defendants was to aid Plaintiffs' effort to conduct substantive documentary and deposition discovery going forward, by enabling them to identify key business employees of, and documents maintained by, Defendants.  It is no surprise that many of the Rule 30(b)(6) designees on these topics would have substantive knowledge and, thus, Plaintiffs would undoubtedly seek to depose them again once document discovery is complete and substantive deposition discovery is permitted.

To the extent Plaintiffs have complained about the knowledge level of a handful of 30(b)(6) deponents in certain instances, those Defendants are discussing the issue with Plaintiffs and likely will resolve the issue with no need for the Court's resolution.  Under these circumstances, Plaintiffs' complaints about the now-substantially completed 30(b)(6) depositions of Defendants are unfounded.

(i)      Materials Provided to Experts.

Plaintiffs have proposed that the parties agree that any documents, data, or information which they do not produce in discovery to the other side, but which they share with their experts, will be immediately produced to the other side.  Defendants have invited Plaintiffs to submit a stipulation on this point and Defendants have stated that they will respond to this point after they inspect the stipulation.  Plaintiffs have also agreed to make a proposal on production of drafts of expert reports and other common expert discovery issues, and Defendants will respond to that proposal.

- 23 -

MP3 20189677.1

5.     **Status of Defendants' Discovery Requests to Plaintiffs**

*Defendants' Position*:  Defendants have served deposition notices pursuant to Fed. R. Civ. P. 30(b)(6) on all named putative class Plaintiffs and individual Plaintiffs requiring testimony from corporate representatives on each Plaintiff's organizational structure and document management/retention practices.  The parties have agreed that Defendants will defer the depositions on document issues in exchange for letters from each of the Plaintiffs describing their respective document management practices.  Defendants have further agreed that they will defer depositions regarding organizational structure of certain of the smaller Plaintiff merchants in exchange for letter descriptions of their structure and the production of organization charts, if any.  For the remainder of the Plaintiff merchants, Defendants will take the 30(b)(6) depositions regarding organization and structure; the parties currently are scheduling those depositions.

Defendants had asked that all of Plaintiffs produce their letters, organizational charts, and proposed deposition dates by July 31, 2006.  Defendants have not yet received organization charts from plaintiff Ahold.  Plaintiff Payless Shoesource will be producing its document management letter on August 10.

With respect to Defendants' written discovery requests, the parties have engaged in two substantial meet and confer sessions to discuss the Plaintiffs' objections and responses to Defendants' first set of interrogatories and document requests.  While some of these matters eventually may require the Court's attention, the parties will continue to work through any issues and solicit the Court's assistance if it becomes necessary.

There is one request for information that would greatly expedite Defendants' ability to gather information from their own files regarding Plaintiffs—each merchant has a merchant identification number associated with its payment card acceptance.  Defendants have now on several occasions specifically requested that those numbers be provided quickly, but Plaintiffs

thus far have not provided this information.  If Plaintiffs do not provide this information by the August 8 conference, Defendants will ask the Court to impose a deadline for production of those merchant identification numbers.

Defendants have not yet commenced third-party discovery, but plan to do so soon.  One of the areas of particular importance for Defendants, particularly with respect to class certification issues, will be discovery from absent class member merchants.  Defendants do not seek to raise any specific disputes with the Court at the conference, but thought it appropriate to apprise the Court of this issue and will be prepared to discuss this in more detail should the Court wish. Depending upon when Plaintiffs elect to file their motion for class certification, this is an issue that may require the Court's attention prior to the next scheduled conference.

***Plaintiffs' Position***:   Class Plaintiffs have been working diligently since Defendants served their discovery requests to begin searching and gathering documents—both electronic and hard-copy documents.  Plaintiffs have already retrieved documents from most of their clients—at least six of the Class Plaintiffs have completed the gathering of all their documents.  All gathered documents are currently being processed (converted to electronic format, reviewed for responsiveness and privilege, and labeled).  Class Plaintiffs currently have over 300,000 pages of documents converted to TIFF images and are converting hundreds of thousands of additional pages from native electronic format to TIFF.   Plaintiffs anticipate being able to begin the production of some documents by the time of the status conference or shortly thereafter.  Before production begins, however, Plaintiffs seek guidance from Defendants as to whom to send disks or other electronic productions.  Class Plaintiffs assume that they need not produce separately to each of the Defendants.

- 25 -

The Individual Plaintiffs have likewise been working diligently since Defendants served their written discovery to search, identify and gather responsive documents. In fact, on June 20, 2006 (before the last status conference), the Kroger Plaintiffs produced responsive documents to Defendants, and they made a second production on August 2nd. The Individual Plaintiffs anticipate the production of an additional several hundred thousand documents in the coming weeks. All of the documents produced to date, and which the Individual Plaintiffs anticipate producing in the future, have been converted to electronic format and then produced to Defendants.

With respect to Defendants' request for their merchant discount number, Plaintiffs are diligently working on that request and anticipate providing htat information in the near future. Plaintiffs did not understand Defendants to have requested a frim deadline for this information, but Plainitffs will consider any reasonable request.

**6.    Status of Parties' Discussion Regarding An Electronic Document Service**

The parties have agreed to use the Lexis/Nexis electronic service for the service of all letters and other papers not filed with the Court.

**7.    Scheduling Issues**

*Plaintiffs' Position:*  MasterCard has requested that Class Plaintiffs agree to an extension of 10 days to answer or respond the Class Plaintiffs Supplemental Complaint, now due on September 5, 2006. Plaintiffs are agreeable to a slight extension. The parties will submit a stipulation and proposed order at or before the August 8 Status Conference.

*Defendants' Position:*  MasterCard made the request on behalf of all defendants named in the counts set forth in the Supplemental Complaint. MasterCard and those other defendants all understand Plaintiffs' position to consist of agreement to the requested extension.

- 26 -

MP3 20189677.1

**8.      Protective Order**

*Defendants' Position:*  The governing Protective Order permits the parties to share both Confidential and Highly Confidential materials with expert witnesses and other litigation consultants, unless those experts and consultants are employed by certain of Defendants' competitors (e.g., American Express and Discover) listed in Appendix A to the Order.  *See* Protective Order ¶13(c).  After the Court resolved several issues with the Protective Order, including ¶13(c), the parties agreed on the list of competitors in Appendix A.  In the course of negotiating the list, defendants agreed not to include four debit network competitors (STAR, NYCE, Fiserv, and Debitman), based on Plaintiffs' representation that their case does not concern "debit interchange."  (*See* Attachment 9, Letter from Wesley R. Powell to Plaintiffs, dated March 7, 2006).  However, defendants expressly reserved all rights to seek to include those debit networks in the event plaintiffs expanded their claims to challenge interchange applicable to debit transactions.  *Id.*  Plaintiffs' Consolidated Amended Class Action Complaint now squarely challenges debit interchange. (*See, e.g.,*  First Consolidated Am. Class Action Compl. ¶¶ 312-347.   Accordingly, Defendants have asked Plaintiffs to stipulate to amending the Protective Order to include these debit networks in Appendix A.  Defendants have raised this issue now to ensure that it is resolved before defendants begin to produce Confidential and Highly Confidential documents.  Defendants are hopeful that the parties can resolve this issue without the Court's intervention, but, if not, defendants likely will seek relief from the Court.

*Plaintiffs' Position:*   Plaintiffs expect this issue to be resolved before the Status Conference.

Dated: August 4, 2006                              By: _____

K. Craig Wildfang
*Co-Lead Counsel for Plaintiffs*
*On behalf of all Parties for purposes*
*of this Status Report*

- 27 -

MP3 20189677.1

EXHIBIT C



HUNTON & WILLIAMS LLP
200 PARK AVENUE
NEW YORK, NEW YORK 10166-0005

TEL      212 • 309 • 1000
FAX      212 • 309 • 1100

KEILA D. RAVELO
DIRECT DIAL: 212-309-1049
EMAIL:  kravelo@hunton.com

FILE NO: 66831.50

August 15, 2006

**Via E-Mail and First Class Mail**

Thomas J. Undlin, Esq.
Robins, Kaplan, Miller & Ciresi LLP
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN  55402

*Re:*    ***In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation***

Dear Tom:

We write in response to your letter of August 9, 2006, seeking our "final positions" on the so-called "overarching issues" that plaintiffs have raised.  To reiterate, MasterCard's positions on these issues have been previously stated in our letters of July 24, 2006 and August 2, 2006, as well as the August 4, 2006 status report to the Court.  We are also in agreement with the positions advanced by Visa U.S.A. in its letter today regarding these issues.

That said, with regard to plaintiffs' request for documents concerning MasterCard's recent IPO, we are prepared to expand the scope of our prior proposal and agree to produce responsive, non-privileged documents located in the files of the custodians whose files we agree to search, subject to certain limitations on our obligation to log privileged documents.  Specifically, MasterCard, like Visa U.S.A., maintains its objection, on undue burden grounds, to logging certain categories of privileged documents with substantial in-house and outside counsel involvement, such as IPO-related documents.   As such, consistent with our prior position regarding privilege logs, MasterCard will not agree to log documents generated by its outside counsel or reflecting communications between its employees and outside counsel.  In addition, MasterCard will not agree to log privileged drafts of SEC filings, given the substantial volume of such privileged documents we expect to find during MasterCard's collection.  In light of the enormous burdens involved, we believe MasterCard's position to be quite reasonable.



Thomas Undlin, Esq.
August 15, 2006
Page 2


With respect to foreign discovery, MasterCard submitted a comprehensive proposal to plaintiffs by letter dated August 2, 2006 (a copy of which we attach for your convenience), to which we have received no response. We would anticipate a specific response from plaintiffs to that proposal before the issue could become ripe for court intervention.

Finally, while we are not in a position today to propose a target date for completion of our document production, we expect to make such a proposal well in advance of our next status conference with the Court. In addition, we plan to continue rolling out additional responsive materials to plaintiffs over the next few weeks, to the extent permitted by the parties' ongoing negotiations regarding, among other things, search terms and custodian lists.


Very truly yours,

Keila D. Ravelo


Attachment


cc:     Defense Counsel (via e-mail)
        William Blechman, Esq. (via e-mail)
        Jason Cowart, Esq. (via e-mail)