UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE PAYMENT CARD INTERCHANGE
FEE and MERCHANT-DISCOUNT ANTI-
TRUST LITIGATION

This Document Relates to:

| | |
|---|---|
| 1:05-CV-3800 | 1:05-CV-5083 |
| 1:05-CV-3924 | 1:05-CV-5153 |
| 1:05-CV-4194 | 1:05-CV-5207 |
| 1:05-CV-4520 | 1:05-CV-5866 |
| 1:05-CV-4521 | 1:05-CV-5868 |
| 1:05-CV-4728 | 1:05-CV-5869 |
| 1:05-CV-4974 | 1:05-CV-5870 |
| 1:05-CV-5069 | 1:05-CV-5871 |
| 1:05-CV-5070 | 1:05-CV-5878 |
| 1:05-CV-5071 | 1:05-CV-5879 |
| 1:05-CV-5072 | 1:05-CV-5880 |
| 1:05-CV-5073 | 1:05-CV-5881 |
| 1:05-CV-5074 | 1:05-CV-5882 |
| 1:05-CV-5075 | 1:05-CV-5883 |
| 1:05-CV-5076 | 1:05-CV-5885 |
| 1:05-CV-5077 | 1:06-CV-1829 |
| 1:05-CV-5080 | 1:06-CV-1830 |
| 1:05-CV-5081 | 1:06-CV-1831 |
| 1:05-CV-5082 | 1:06-CV-1832 |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MASTER FILE NO. 1:05-md-1720-JG-JO

:

:

:

:

:

:

:

:

:

:

:

:

:

MEMORANDUM IN SUPPORT OF BANK
DEFENDANTS' MOTION TO DISMISS
CLASS PLAINTIFFS' FIRST SUPPLE-
MENTAL CLASS ACTION COMPLAINT

## Table of Contents

Page

Table of Authorities ................................................................................................ ii

Preliminary Statement ............................................................................................ 1

Background ............................................................................................................. 4

     A.    Pleading Standards ................................................................................ 4

     B.    The Supplemental Complaint Alleges That MasterCard Members
           Controlled MasterCard Before the IPO. .............................................. 5

     C.    As a Result of the IPO, the Members of MasterCard Relinquished
           Their Previously Held Voting Power Such That They No Longer
           Have Voting Control. ............................................................................ 6

     D.    The Supplemental Complaint Alleges That the IPO Threatens
           Competition, *Inter Alia*, Because of the Possibility That
           MasterCard May be Recognized as a Single Entity. .............................. 8

Argument ................................................................................................................. 10

I.     The Changes In Mastercard's Corporate Ownership Structure Do Not
     Violate Federal Antitrust Laws. ..................................................................... 10

     A.    The Banks Are Not "Acquirers" Within the Meaning of Section 7. ...... 11

     B.    The Allegations of Claim Seventeen Foreclose Application of
           Section 7 to the Bank Defendants. ....................................................... 12

     C.    The Allegations of the Supplemental Complaint Provide No Basis
           to Conclude That the IPO Threatens to Substantially Lessen
           Competition. .......................................................................................... 13

           1.    MasterCard's Alleged Attempt to Structure Itself as a Single Entity
                 Does Not Threaten to Lessen Competition. ................................ 14

           2.    Allegations That Post-IPO MasterCard will be a Vehicle for
                 Collusion Are Irrelevant to the IPO. ......................................... 17

           3.    The Ownership and Control Restrictions Do Not Lessen
                 Competition. ................................................................................ 18

Conclusion ............................................................................................................... 20

i

## **Table of Authorities**

Cases                                                                                               Page

*In re American Express Co. Shareholder Litigation*, 39 F.3d 395 (2d Cir. 1994) ..........................5

*Arbitron Co. v. Tropicana Prod. Sales, Inc.*, No. 91 Civ. 3697 (PKL), 1993 WL
    138965 (S.D.N.Y. Apr. 28, 1993)....................................................................................11

*Associated Gen. Contractors, Inc. v. California State Council of Carpenters*, 459
    U.S. 519 (1983) ........................................................................................................3, 14

*Bayou Bottling, Inc. v. Dr. Pepper Co.*, 725 F.2d 300 (5th Cir. 1984)..........................................19

*Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979).....................................15

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) .................................................................12

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) .........................................19

*Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104 (1986) .......................................................13

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002) .......................................................5

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984) ........................................15

*Correa-Martinez v. Arrillaga-Belendez*, 903 F.2d 49 (1st Cir. 1990) ...........................................5

*De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65 (2d Cir. 1996) .......................................................4

*DM Research, Inc. v. College of Am. Pathologists*, 170 F.3d 53 (1st Cir. 1999) ...........................4

*Electronics Communications Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129
    F.3d 240 (2d Cir. 1997)..................................................................................................4

*Federal Trade Comm'n v. Consolidated Foods Corp.*, 380 U.S. 592 (1965) ...............................16

*Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 201 F. Supp. 2d 236 (S.D.N.Y.
    2002), *aff'd in part, rev'd in part on other grounds*, 386 F.3d 485 (2d Cir.
    2004) ............................................................................................................................11

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485 (2d Cir. 2004).....................13, 17

*Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085 (2d Cir. 1995) .....................................................5

*Kramer v. Time Warner Inc.*, 937 F.2d 767 (2d Cir. 1991).............................................................5

*Northeastern Tel. Co. v. American Tel. & Tel. Co.*, 651 F.2d 76 (2d Cir. 1981) .........................15

*Papasan v. Allain*, 478 U.S. 265 (1986) ..........................................................................4

*Texaco Inc. v. Dagher*, 126 S. Ct. 1276 (2006) ...............................................................15

*Twombly v. Bell Atl. Corp.*, 425 F.3d 99 (2d Cir. 2005), *cert. granted*, 126 S. Ct. 2965 (2006).................................................................................................4

*United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586 (1957) ..............................11

*United States v. Marine Bancorporation, Inc.*, 418 U.S. 602 (1974) .............................16

*United States v. Philadelphia Nat'l Bank*, 374 U.S. 321 (1963) ....................................13

*United States v. Visa U.S.A., Inc.*, 344 F.3d 229 (2d Cir. 2003)......................................8

*White Consol. Indus., Inc. v. Whirlpool Corp.*, 781 F.2d 1224 (6th Cir. 1986) ..............10

## Statutes and Rules

15 U.S.C. § 1................................................................................................*passim*

15 U.S.C. § 18 .............................................................................................*passim*

Fed. R. Civ. P. 12(b)(6)...........................................................................................4

N.Y. Debt. & Cred. Law § 270 (McKinney 2001) .......................................................4

N.Y. Debt. & Cred. Law § 273-a (McKinney 2001) ....................................................4

## Other Authorities

1 ABA Section of Antitrust Law, *Antitrust Law Developments* (5th ed. 2002) ...........................11

**Preliminary Statement**

Class Plaintiffs' First Supplemental Class Action Complaint (the "Supplemental Complaint" or "Supp. Compl.") alleges that, on May 24, 2006, MasterCard made an initial public offering ("IPO") through which it issued approximately 61.5 million shares of voting common stock to the general public.  As MasterCard's registration statement filed with the Securities and Exchange Commission (the "SEC") explains, this public offering of voting securities was accompanied by a simultaneous divestiture of voting control by MasterCard's member banks. According to the Supplemental Complaint, as a result of the IPO, MasterCard's member banks collectively now are entitled to elect only a minority of the board of directors and to veto certain actions, all of which concern extraordinary corporate events such as a sale or merger of the company or abandonment of its core businesses.  The upshot of the restructuring is that member banks have divested approximately 60% of their economic interest in MasterCard, have surrendered their voting shares, and have divested themselves of all voting rights save certain limited rights to board representation and influence with respect to extraordinary events.

On May 22, 2006, two days before the effective date of the registration statement for the IPO – and eight months after the IPO had been disclosed in MasterCard's initial registration statement – plaintiffs filed their Supplemental Complaint, seeking, *inter alia*, to enjoin MasterCard's IPO on the theory that the IPO, together with its attendant agreements, violates Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiffs sued not only MasterCard, but also a few of its bank members, specifically Bank of America, Capital One, JPMorgan Chase, Citigroup and HSBC (collectively the "Banks").

Plaintiffs' theory of competitive harm – an essential element of both their Clayton and Sherman Act claims – appears to involve the following three hypotheses.  The first hypothesis plaintiffs assert is that the restructuring occasioned by the IPO is unlawful because it will

cause MasterCard to become a "single entity" (as that term is understood in antitrust doctrine) and that this single entity status would immunize the restructured MasterCard from liability for activity that, while subject to Section 1 of the Sherman Act had it been undertaken by two or more actors, would be beyond the reach of Section 1 if carried out unilaterally by a single entity. The second of plaintiffs' hypotheses is that the restructured MasterCard is a restructuring in name only, and that alleged collusion will continue between MasterCard and its member banks with respect to matters such as interchange fees.  The third hypothesis of antitrust restraint asserted by plaintiffs is that the agreements surrounding the IPO preclude non-members from gaining a majority stake in MasterCard, which plaintiffs assume harms competition in some unexplained way.

Plaintiffs' novel and strained antitrust hypotheses contradict the plain terms of the documents to which they refer, defy logic and common sense, and find no support in the antitrust statutes and case law.  Section 7 of the Clayton Act is at issue when an acquisition of assets or stock *increases* economic concentration in an industry, because the increased concentration levels, under some circumstances, could indicate a probability that competition will substantially be reduced.  But the Supplemental Complaint fails to allege facts indicative of such an increase in concentration.  On the contrary, plaintiffs allege that the IPO has *decreased* the level of the Banks' ownership and control in MasterCard.  Because an increase in control or ownership is the touchstone of Section 7 analysis, the allegations of the Supplemental Complaint afford no basis for a Section 7 claim.

Plaintiffs' objection to the IPO is that MasterCard may now be deemed a single entity under antitrust analysis, and that its unilateral actions are therefore not subject to scrutiny under Section 1.  But this objection cannot form the basis for a challenge to the IPO under either

2

Section 7 or Section 1.  The IPO and its concomitant restructuring cannot be condemned as anti-competitive simply because, in plaintiffs' view, they transform MasterCard into a "single entity" that, under the antitrust laws, may legally perform certain actions that might otherwise require scrutiny if collectively carried out by competitors.[1]

To allege a link between the IPO and any plausible theory of antitrust harm, the Supplemental Complaint offers speculative allegations of two sorts:  (i) the reorganized Master-Card may itself engage in new anticompetitive conduct and (ii) the reorganized MasterCard is a sham through which the Banks may collude.  Plaintiffs' theory of harm thus reduces to conjectures of what might happen, not as a direct and foreseeable consequence of the IPO – which is the test for challenging an acquisition under the Clayton Act and the Sherman Act – but as speculative possibilities hinging on the independent decisions of independent actors.  *See Associated Gen. Contractors, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 532-33 (1983) ("Congress simply assumed that antitrust damages litigation would be subject to constraints comparable to well-accepted common-law rules applied in comparable litigation," including "doctrines such as foreseeability and proximate cause, directness of injury, certainty of damages, and privity of contract.").  Speculation of this kind is inadequate to sustain plaintiffs' burden of alleging a reasonable likelihood that competition will be substantially lessened (the standard under Section 7 of the Clayton Act) or that the transaction at issue has in fact caused harm to competition (the standard under Section 1 of the Sherman Act).  In any event, were plaintiffs' unlikely speculation to occur someday in the future, the antitrust laws would provide

---

[1]   Although the issue is not presented on this motion, the Banks disagree with any suggestion from plaintiffs' allegations in the Supplemental Complaint that MasterCard would not be considered a single entity for conduct of its operations before the IPO.

sufficient remedy, and plaintiffs could file an antitrust claim challenging such conduct at that time.

The final predicate for plaintiffs' theories of antitrust harm, namely the allegations concerning certain "Ownership and Control Restrictions" contained in MasterCard's post-IPO certificate of incorporation and bylaws, likewise cannot form the basis for their antitrust claims. The "Ownership and Control Restrictions" that plaintiffs criticize preclude a consolidation of economic power and control, and thus are fully consonant with the purposes of the Clayton and Sherman Acts. Moreover, the provisions plaintiffs challenge are common governance provisions that appear frequently in corporate charters; they do not violate federal antitrust law.[2]

## Background

### A.    Pleading Standards

On a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, well-pled allegations are taken as true. *See De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 69 (2d Cir. 1996). However, conclusory allegations and assertions that rehearse legal conclusions are not credited. *See, e.g., Papasan v. Allain*, 478 U.S. 265, 299 (1986); *Twombly v. Bell Atl. Corp.*, 425 F.3d 99, 109 (2d Cir. 2005) (observing that "a bare bones statement of conspiracy or of injury under the antitrust laws without any supporting facts permits dismissal") (citations omitted), *cert. granted*, 126 S. Ct. 2965 (2006); *Electronics Communications Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 243 (2d Cir. 1997); *DM Research, Inc. v. College of*

---

[2]    In addition to their antitrust theories, plaintiffs challenge MasterCard's release of certain assessment rights under New York's fraudulent conveyance statute, N.Y. Debt. & Cred. Law §§ 270, 273-a (McKinney 2001). (Supp. Compl. ¶¶ 144-49.) In its Memorandum in Support of its Motion to Dismiss the Supplemental Complaint, MasterCard addresses the inadequacy of this claim. The Banks adopt MasterCard's arguments for the dismissal of this claim, and incorporate them by reference here.

*Am. Pathologists*, 170 F.3d 53, 55 (1st Cir. 1999). Also, generalized allegations "need not be credited . . . when they are belied by more specific allegations of the complaint." *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995); *see also In re American Express Co. Shareholder Litig.*, 39 F.3d 395, 400 & n.3 (2d Cir. 1994) (same).

Finally, only reasonable inferences may be construed in favor of the plaintiff. *See Correa-Martinez v. Arrillaga-Belendez*, 903 F.2d 49, 53 (1st Cir. 1990) ("[i]t is only when . . . conclusions are logically compelled, or at least supported, by the stated facts, that is, when the suggested inference rises to what experience indicates is an acceptable level of probability, that 'conclusions' become 'facts' for pleading purposes") (citation omitted). Thus, for example, allegations that contravene materials attached to or incorporated by reference in a complaint need not be accepted. In this regard, the Supplemental Complaint refers to and relies on MasterCard's filings with the SEC. (Supp. Compl. ¶¶ 8, 10.) These materials are therefore incorporated by reference and may be relied on by this Court on this motion to dismiss. *See, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773-74 (2d Cir. 1991).

### B.   The Supplemental Complaint Alleges That MasterCard Members Controlled MasterCard Before the IPO.

Plaintiffs allege that, prior to the consummation of the challenged IPO, MasterCard was a private membership corporation that consisted of more than 23,000 member banks and financial institutions worldwide. (Compl.[3] ¶ 54; Supp. Compl. ¶ 52.) They further allege that MasterCard's voting securities were owned by member banks that directly compete with one another to issue MasterCard-branded payment cards and to acquire merchants that would accept

---

[3]   First Consolidated Amended Class Action Complaint, filed April 24, 2006 ("Compl.").

such cards.  (Compl. ¶ 90; Supp. Compl. ¶¶ 12, 43.)  The Supplemental Complaint also avers that

MasterCard's members, as owners of MasterCard, received "a bundle of rights" as shareholders,

including "the opportunity to vote for a Board of Directors, participate in the governance of

MasterCard, and receive dividends."  (Supp. Compl. ¶ 45.)  Plaintiffs allege that, pursuant to

these rights, many of MasterCard's member banks were represented on the MasterCard board of

directors, with responsibility for overseeing the competitive operations of MasterCard.  (Compl.

¶ 88.)  In sum, the Supplemental Complaint asserts that, before the IPO, "[c]ontrol of Master-

Card rested with the Member Banks."  (Supp. Compl. ¶ 44.)

> **C.**     **As a Result of the IPO, the Members of MasterCard Relinquished**
>            **Their Previously Held Voting Power Such That They No Longer Have**
>            **Voting Control.**

As the Supplemental Complaint acknowledges, one overall significant feature of

the IPO is that it has divested MasterCard's members of their previously held voting control.

This divestiture was effected as follows:  immediately prior to the IPO, MasterCard reclassified

all 100 million outstanding shares of voting common stock previously held by its member banks

by converting each existing share of common stock to 1.35 shares of newly authorized non-

voting Class B common stock and issuing each member bank a single share of newly authorized

Class M common stock.  (Form S-1/A,[4] at 6.)  At the time of the IPO, MasterCard then issued

approximately 13.5 million shares of its newly authorized Class A voting common stock as a do-

_____

[4]   MasterCard filed its initial registration statement on Form S-1 with the SEC on September 15,
2005.  Several amendments were filed with the SEC during the subsequent eight months until,
on May 23, 2006, MasterCard filed Amendment 8 to its Form S-1 ("Form S-1/A"), which
amended registration statement fully describes the IPO.  Citations to the Form S-1/A are to
the May 23, 2006 filing, relevant excepts of which are submitted with the Declaration of
Avad Noti in support of MasterCard's motion to dismiss the Supplemental Complaint.  The
entire May 23, 2006 amended registration statement on Form S-1/A may be found at
www.investorrelations.mastercardintl.com.

nation to The MasterCard Foundation, a private charitable foundation and dedicated to charitable giving in the communities served by MasterCard.  (*Id.*)  In addition, as the Supplemental Complaint alleges, through the IPO, MasterCard sold approximately 61.5 million shares of Class A voting common stock to the public.  (Supp. Compl. ¶ 2.)  At the time of the IPO, it was MasterCard's intention to use all but $650 million of the net proceeds from that sale to redeem a number of shares of non-voting Class B stock from the member bank shareholders equal to the number of shares of Class A voting shares MasterCard had issued to public investors and The MasterCard Foundation.  (Form S-1/A, at 6.)

As a result of the IPO, members of the investing public and the MasterCard Foundation own all the newly authorized Class A voting shares, representing approximately 60% of the equity capitalization and 100% of the voting rights.  Accordingly, "[v]oting rights after the IPO are limited to Class A shares." (Supp. Compl. ¶ 81.)  The former MasterCard member institutions, including the Banks, hold all the newly authorized Class B non-voting shares, which represent approximately 40% of the equity capitalization and no voting rights, and all the newly authorized Class M shares, which represent no equity capitalization but which, according to the Supplemental Complaint, entitle the Banks to limited board representation and limited veto power over four, specifically enumerated particular extraordinary events:  "1) any sale of all, or substantially all, of the company's assets; 2) any merger or consolidation of the company; 3) any waiver of beneficial ownership limitations in the certificate of incorporation [the 15% limitation]; and 4) any discontinuance of the core payments business." (Supp. Compl. ¶ 83.)  No banks may hold Class A voting shares; if a bank acquires Class A shares, they immediately convert to Class B non-voting shares.  (Form S-1/A, at 8-9.)  Moreover, no director, officer, employee or representative of any MasterCard member bank may occupy a board seat elected by Class A shares.

(*Id.* at 113.)  However, the Class M shares as a class have the right to elect the lesser of three directors or one-quarter of the full board; each Class M director to come from a different region of the world.  (*Id.* at 113-14.)

> **D.**    **The Supplemental Complaint Alleges That the IPO Threatens Competition, *Inter Alia*, Because of the Possibility That MasterCard May Be Recognized as a Single Entity.**

The Supplemental Complaint asserts that the IPO may transform MasterCard from a joint venture of competing banks into a single entity incapable of conspiring with itself and thus not subject to potential Section 1 liability for its unilateral behavior.  Plaintiffs aver that this will potentially harm competition:  "[i]nsofar as the IPO and the Agreements created a legitimate single entity, the consummation of the IPO and those Agreements violated Section 7 of the Clayton Act, 15 U.S.C. § 18, in that their effect may be substantially to lessen competition in the Relevant Market."  (Supp. Compl. ¶ 5.  *See also id.* ¶ 13 (asserting that "the creation of a single entity would be an antitrust violation").)

The Supplemental Complaint presents a number of hypothetical examples of anti-competitive effects, which generally fall into three categories.  First, there are those effects that will flow from MasterCard's unilateral actions as a single entity.  Plaintiffs assert that the absence of Section 1 as a constraint on the unilateral activities of MasterCard as a single entity might, for instance, embolden MasterCard to increase interchange rates (Supp. Compl. ¶ 114(b)), or to adopt rules and regulations it might not adopt as a joint venture of competing banks.  (Supp. Compl. ¶¶ 18, 114(d).)  Alternatively, plaintiffs speculate, MasterCard might attempt to implement a No-Bypass rule, which to date it has not done (Supp. Compl. ¶ 98), or reimpose exclusivity rules of the kind invalidated in *United States v. Visa U.S.A., Inc.*, 344 F.3d 229 (2d Cir. 2003).  (Supp. Compl. ¶¶ 6(c), 19, 70-74, 114(c).)  Plaintiffs further complain that, unconstrained by Section 1 scrutiny, MasterCard may be able to earn supra-competitive profits, which allegedly

8

would allow MasterCard to increase entry barriers by funding incentives, such as airline miles and other rewards, for consumers to sign up and use MasterCard payment cards instead of Visa or American Express or Discover payment cards. (Supp. Compl. ¶ 97.)

Second, the Supplemental Complaint alleges that, notwithstanding the corporate restructuring attendant to the IPO, the member banks will continue to use MasterCard as a vehicle for collusion. (Supp. Compl. ¶93.) Plaintiffs contend, for instance, that the new single entity structure allegedly "operates to mask price setting by controlling Member Banks," who "retain substantial representation on the New MasterCard Board of Directors" and, through the ability to "veto major business decisions," "have the ability to exercise effective control over the business of the New MasterCard." (Supp. Compl. ¶ 13.) According to the Supplemental Complaint, the IPO "did not change the capacity or incentives of MasterCard or its Member Banks to behave anticompetitively, in violation of Section One." (Supp. Compl. ¶ 85.) Plaintiffs speculate that "[t]he organization will do exactly what the Member Banks did before: set Interchange Fees that are higher than they would have been in a world where Member Banks compete to offer merchants competitive pricing and services." (Supp. Compl. ¶ 91.) Furthermore, the Supplemental Complaint alleges, "[b]ecause the Member Banks retain a significant role in governing the New MasterCard and those same Member Banks are nearly all members of Visa, the Agreements facilitate express and tacit collusion between Visa and MasterCard over the level of fees charged to merchants in the market for General Purpose Card Network Services." (Supp. Compl. ¶ 96.) Plaintiffs' theory that the IPO is a sham and that the MasterCard and the Banks might continue to collude under the guise of a restructured MasterCard is nothing more than a preemptive attack on a possible defense that MasterCard may assert to a potential Section 1 challenge to some unspecified future conduct.

Third, the Supplemental Complaint asserts that the IPO and its implementing agreements are anticompetitive because they prevent others from obtaining a majority voting position in MasterCard.  (Supp. Compl. ¶¶ 100-06.)  According to Plaintiffs, these "Ownership and Control Restrictions" are designed to entrench the member banks and to prevent other investors (or groups of investors, including merchants) from being able to influence MasterCard's operations.  (*Id.*)

## Argument

### I.   The Changes In MasterCard's Corporate Ownership Structure Do Not Violate Federal Antitrust Laws.

The Seventeenth, Eighteenth and Nineteenth Claims for Relief challenge the IPO and its attendant agreements.  Claim Seventeen is brought under Section 7 of the Clayton Act, while Claims Eighteen and Nineteen are set forth under Section 1 of the Sherman Act.  The analysis here will review the allegations of all of plaintiffs' claims under Section 7's more forgiving standard of potential anticompetitive effects, because if plaintiffs fail to state a claim under Section 7 of the Clayton Act, it follows that they have not stated a claim under Section 1 of the Sherman Act, which requires allegations of actual competitive harm.   *See*, *e.g.*, *White Consol. Indus., Inc. v. Whirlpool Corp.*, 781 F.2d 1224, 1228 (6th Cir. 1986) ("the plaintiffs' failure to sustain proof of potential anticompetitive effects under Section 7 of the Clayton Act precludes them from successfully establishing proof of a conspiracy in restraint of trade under the more vigorous standard for Section 1 of the Sherman Act.")(citations omitted).  With respect to Claim Seventeen (which is brought solely under Section 7), however, the Banks submit that there are two additional reasons for dismissal:  (i) the Banks are not "acquirers" within the meaning of the Section 7, and (ii) the statute does not apply because the Banks are not within the FTC's jurisdiction.

10

### A.   The Banks Are Not "Acquirers" Within the Meaning of Section 7.

Section 7 is "designed to arrest in its incipiency . . . the substantial lessening of competition from the acquisition by one corporation of the whole or any part of the stock" of a competing corporation. *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 589 (1957). The focus on arresting acquisitions is stated plainly in the statute, which provides that "[n]o person . . . shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another person . . . , where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. Because Section 7 claims do not exist against the person or entity selling the stock or assets, "[c]ourts have consistently dismissed section 7 claims against the seller of stock or assets." *Arbitron Co. v. Tropicana Prod. Sales, Inc.*, No. 91 Civ. 3697 (PKL), 1993 WL 138965, at *4 (S.D.N.Y. Apr. 28, 1993); *accord Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 201 F. Supp. 2d 236, 278-79 (S.D.N.Y. 2002), *aff'd in part, rev'd in part on other grounds,* 386 F.3d 485 (2d Cir. 2004); *see also* 1 ABA Section of Antitrust Law, *Antitrust Law Developments* 321 (5th ed. 2002) ("By its express terms, Section 7 is directed only against acquiring persons. Courts have consistently dismissed Section 7 claims brought solely against the seller of stock or assets.").

The allegations of the Supplemental Complaint establish that the Banks are not acquirers within the meaning of Section 7. As the IPO documents establish, and as the Supplemental Complaint acknowledges, the impact of the IPO was to cause the Banks to divest their voting rights in MasterCard to members of the investing public. This divestiture of voting power is part and parcel of an overall dilution of member institutions' economic interest in MasterCard compared to their exclusive ownership before the IPO. Thus, even though the Banks still retain a

11

limited right to elect board members and to prevent the occurrence of certain enumerated extraordinary events, that retention of rights occurs against a background of an overall loss of economic privileges.  In this vein, the fact that, as part of the reorganization occurring in connection with the IPO, the Banks exchanged their shares in the old MasterCard for shares in the reorganized entity does not transform them into "acquirers."  Such a claim overlooks the fact that the Banks' ownership interest was significantly diluted.

To consider the Banks "acquirers" under these circumstances would be contrary not just to the natural meaning of the statute, but would also upset its purpose, leading to absurd results.  Section 7 was designed to check economic concentration.  *See Brown Shoe Co. v. United States*, 370 U.S. 294, 314-16 (1962).  There is no plausible argument that the IPO involves an acquisition that increases concentration, and it would exalt form over substance to suggest that the Banks were acquirers when, as a consequence of the IPO, their voting control and economic interests were diluted.  Accordingly, there is no basis consistent with the language, logic or purposes of Section 7 to consider the Banks to be "acquirers" within the meaning of the statute.  Therefore, Claim Seventeen should be dismissed.

## B.   The Allegations of Claim Seventeen Foreclose Application of Section 7 to the Banks.

Plaintiffs allege that the Banks have acquired certain unidentified assets in the IPO.  (Supp. Compl. ¶ 125 (asserting that "[t]his acquisition of assets by the New MasterCard and its Member Banks will injure Plaintiffs").)  These assets are nowhere described or detailed in the Supplemental Complaint (nor do any of the transaction documents incorporated by reference in the Supplemental Complaint identify any such acquisition).  But, for the purposes here, that pleading defect is beside the point because, even if plaintiffs could identify these assets, the fact that they allege an *asset* acquisition makes the statute inapplicable to the Bank defendants.  Sec-

12

tion 7 does not apply to asset acquisitions by persons not "subject to the jurisdiction of the Federal Trade Commission." 15 U.S.C. ¶ 18. Banks are not subject to that jurisdiction. *See United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 335-36 (1963). To the extent that Claim Seventeen is based on an allegation that the transaction is an asset acquisition, it merits dismissal on this basis as well.

### C.    The Allegations of the Supplemental Complaint Provide No Basis to Conclude That the IPO Threatens to Substantially Lessen Competition.

"The Clayton Act is concerned with whether an acquisition or merger *itself* may cause antitrust injury." *Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 511 (2d Cir. 2004) (citing *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 115-17 (1986)). Consequently, for the Supplemental Complaint to pass muster, it must allege facts establishing that the IPO and its agreements *themselves* will cause the purported antitrust injury. It is not enough for an antitrust complaint to allege an injury that is caused by some event or conduct other than the alleged violation.

In this case, plaintiffs do not allege that the IPO and the Agreements have increased concentration in any relevant market that they allege. MasterCard's share of the alleged relevant markets – the alleged United States markets for general purpose cards and general purpose card network services (Supp. Compl. ¶¶ 32, 33) – has remained the same after the IPO as it had been before the IPO, and the same is true for its members. Only the identity of MasterCard's owners changed as a result of the IPO, and, in this regard, the IPO dispersed – rather than aggregated – ownership of MasterCard among members of the public. Even if, as the Supplemental Complaint avers, the Banks continue to hold some portion of the equity capitalization and limited veto rights, concentration in the alleged relevant markets has not been increased. Accord-

ingly, the evidentiary hallmark of competitive injury arising from an acquisition transaction –
whether tested under Section 7 or Section 1 – is absent in this case.[5]

       Having no basis on which to allege an increase in concentration, plaintiffs resort
to asserting various non-standard theories of potential competitive harm.  As detailed above,
these allegations of harm may roughly be divided into three groups:  (i) purported effects arising
out of MasterCard becoming a single entity for antitrust purposes; (ii) effects due to allegations
of alleged collusion between MasterCard members through and with MasterCard; and (iii) pur-
ported effects of the so-called "Ownership and Control Restrictions."  None of the three catego-
ries of purported competitive effects suffices to properly allege a potential lessening of competi-
tion.  The first two fail to establish any link between the IPO and the alleged antitrust harm (if it
even can be considered such harm).  *See Associated Gen. Contractors,* 459 U.S. at 532-33.
Rather, any harm would arise from separate acts that would be subject to independent antitrust
scrutiny.  The third alleged effect is baseless because the challenged governance provisions are
consistent with the purposes of the antitrust laws.

### 1. MasterCard's Alleged Attempt to Structure Itself as a Single Entity Does Not Threaten to Lessen Competition.

       Plaintiffs set forth a novel theory of antitrust harm, claiming that MasterCard may
not restructure itself because the resulting "single entity" would be immune from antitrust scru-
tiny.  But insofar as the IPO results in a structural separation between MasterCard and the Banks

---

[5]    The allegation that the MasterCard reorganization should be seen as an acquisition by
MasterCard of some unspecified portion of the issuing and merchant acquiring functions of
the member banks (Supp. Compl. ¶ 113) does not cure this defect.  While that allegation
should be disregarded as being both conclusory and inconsistent with the description of the
reorganization in MasterCard's Form S-1/A (which plaintiffs have incorporated into their al-
legations), more fundamentally it fails to allege that the reorganization increased concentra-
tion in either card issuance or card acquisition, much less any relevant market alleged in the
Supplemental Complaint.

such that MasterCard will be able lawfully to operate as a single entity when it unilaterally conducts business, such a result can hardly be considered anticompetitive. Under plaintiffs' unprecedented theory, any sale by MasterCard to any single-entity party – including, for example, a sale to a private equity investment fund – would result in precisely the same "harm." Plaintiffs' complaint that the conduct of a single firm is scrutinized less closely than joint conduct of multiple firms overlooks the fact that, under the antitrust laws, the conduct of an economically rational single firm (other than conduct intended to acquire or maintain a monopoly) is assumed to be either competitively neutral or procompetitive, and so single firms, including even dominant single firms, are permitted "to engage in the rough and tumble of competition." *Northeastern Tel. Co. v. American Tel. & Tel. Co.*, 651 F.2d 76, 79 (2d Cir. 1981) (citing *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979)). By contrast, the joint conduct of rational economic competitors may be competitively neutral, procompetitive or anticompetitive, and, for that reason, it is scrutinized more closely under the antitrust laws to determine its reasonableness.

While defendants believe that MasterCard's and Visa's prior conduct in operating the core functions of their respective businesses should properly be treated as the conduct of a single economic entity, *see Texaco Inc. v. Dagher*, 126 S. Ct. 1276, 1279-80 (2006), Master-Card's reorganization removes the technical issue of organizational structure (i.e., the putative joint venture of competitors) on which so much of plaintiffs' theory of antitrust conspiracy is based. To the extent that the reorganized MasterCard may enjoy certain increased freedom of legal action under the antitrust laws, that is precisely because the antitrust laws recognize that, far from being anticompetitive, allowing a liberal sphere for single entity action is the very essence of competition – and the antithesis of cognizable antitrust injury. *See, e.g., Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767-68 (1984). In all events, plaintiffs' asser-

15

tion that MasterCard's conduct will be immune from antitrust scrutiny (Supp. Compl. ¶¶ 1, 4, 6(c), 14,18) is wrong.  Even as a single entity, MasterCard would continue to be subject to the antitrust laws, including Sections 1 and 2 of the Sherman Act.  So MasterCard would not be immune from antitrust scrutiny; the scrutiny would simply take a different form.

There is another fundamental flaw with plaintiffs' theory of harm.  There is no causal link between the parade of horribles that plaintiffs speculate might be committed by a "single entity" MasterCard – an alleged potential imposition of new rules, for example – and the IPO, which the Supplemental Complaint identifies as the relevant wrongful agreement giving rise to alleged liability.  All of the harms alleged to occur as a result of conduct by a single entity MasterCard would be due to independent action by a new MasterCard; and it is that new action, not the IPO itself, which would be the ground for complaint.  The causation chain, then, would be intermediated by separate and independent unilateral conduct or, if the new MasterCard is acting in concert with others, by separate and independent agreements or conspiracies.

This remoteness and separation of the alleged effects from the allegedly violative agreements (i.e., the IPO and its attendants agreements) compels disregarding plaintiffs' allegations of harm.  While Section 7 requires plaintiffs to show that the effect of an acquisition "may be substantially to lessen competition," 15 U.S.C. § 18, the "'mere possibility' of the prohibited restraint is not enough."  *Federal Trade Comm'n v. Consolidated Foods Corp.*, 380 U.S. 592, 598 (1965) (citation omitted).  "Probability of the proscribed evil is required."  *Id.*  And "ephemeral possibilities" will not satisfy the statute's requirement of a reasonable probability.  *See United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 623 (1974).  In their Supplemental Complaint, plaintiffs hypothecate only the most remote and speculative possibilities of conduct in which MasterCard and the Banks might some day engage; they do not allege that such pur-

16

portedly anticompetitive outcomes are probable.  Equally significant, none of those purported effects is causally linked to the IPO or any of its attendant agreements.

**2.    Allegations That Post-IPO MasterCard will be a Vehicle for Collusion Are Irrelevant to the IPO.**

Second, plaintiffs allege that the IPO is a façade.  They allege that MasterCard and the Banks will likely conspire under the new ownership structure.  (Supp. Compl. ¶¶ 13, 85, 91.)  But this contention does not allege a substantial lessening of competition *as a result* of the transaction because plaintiffs do not allege that the transaction *itself* makes it any more likely that the Banks would engage in anticompetitive behavior after the IPO than before the IPO.  *See Geneva Pharmaceuticals*, 386 F.3d at 511.  Nor is any such allegation possible, given the dilution of the Banks' ownership and voting control of MasterCard, which has reduced, not increased, their opportunities for collusive action – reflected, for instance, by the fact that at least 75% of the new MasterCard board of directors will not be elected by the banks.  At worst, the Supplemental Complaint simply alleges that there may be some attempt by the Banks to recreate the *status quo* by undertaking some collusive action among themselves; but, in that event, the alleged anticompetitive effect would arise not from the IPO itself, but from this other purported agreement, which would be independently actionable.  In short, the claim that the IPO might give rise to some other unlawful collusion suffers the shortcomings of being both causally unrelated to the conduct challenged and being speculative.  As the Second Circuit observed in *Geneva Pharmaceuticals*,

> All we really have before us is plaintiffs' sneaking suspicion that something illegal occurred from the [challenged] acquisition. . . .  But plaintiffs have the burden to present evidence that the purchase violated the Clayton Act.  They cannot on the basis of surmise and suspicion transform their Sherman Act allegations into a Clayton Act violation.

386 F.3d at 511-12.

17

### 3. The Ownership and Control Restrictions Do Not Lessen Competition.

Plaintiffs define the "Ownership and Control Restrictions" they challenge as:

> those portions of the Agreements disclosed in the Form S-1 and other filings
> made by MasterCard with the United States Securities and Exchange Commission,
> and such other contracts, agreements, and mutual understandings by, between and
> among MasterCard, the members of its Board of Directors, and its Member Banks,
> which purport to limit the percentage of shares in the New MasterCard that any
> shareholder may own or control, and the limitations upon the free exercise of the
> business judgment of the Board of Directors of the New MasterCard, including
> the limitations imposed by the grant of certain veto powers to the holders of the
> Class M shares in the New MasterCard.

(Supp. Compl. ¶ 10.) Specifically, the Supplemental Complaint challenges two so-called "Ownership and Control Restrictions": (i) the 15% ownership restriction set forth in the MasterCard certificate of incorporation; and (ii) the Class M "veto" rights over four particular extraordinary events, to wit "1) any sale of all, or substantially all, of the company's assets; 2) any merger or consolidation of the company; 3) any waiver of beneficial ownership limitations in the certificate of incorporation [the 15% limitation]; and 4) any discontinuance of the core payments business." (Supp. Compl. ¶ 83.)

Plaintiffs claim that the Ownership and Control Restrictions constitute an unreasonable restraint of trade because they prevent a single investor or group of investors from acquiring control of MasterCard. In the absence of the Ownership and Control Restrictions, plaintiffs contend, a merchant or a group of merchants might acquire 50% or more of the Class A voting common stock and might operate MasterCard differently than it is operated today. (Supp. Compl. ¶¶ 15-17, 100-06.) Plaintiffs' antitrust challenge to the Ownership and Control Restrictions fails.

First, plaintiffs' claim of injury contravenes basic antitrust principles. The antitrust laws seek to discourage the amalgamation and concentration of economic power. But here, plaintiffs' claimed antitrust injury allegedly flows from provisions that preclude such concentra-

18

tion of economic power.  In this vein, the Banks' retention of the right to veto four specific extraordinary events following their divestiture of 100% of the MasterCard voting stock is a *reduction* in the Banks' control over MasterCard.

Second, such arguments are foreclosed by cases such as *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977).  Essentially, plaintiffs complain that the transaction, while benefiting certain economic actors, does not allow a consortium of merchants to enjoy the same benefit.  Such contentions do not amount to antitrust harm because plaintiffs simply seek for themselves the benefit of a transaction engaged in by others.  *See, e.g., Bayou Bottling, Inc. v. Dr. Pepper Co.*, 725 F.2d 300, 304 (5th Cir. 1984) (citing *Brunswick Corp.*, 429 U.S. at 487).  Moreover, this predicate for antitrust harm is ironic.  Plaintiff merchants, many of which are competitors, are complaining that they are wrongfully prevented from conduct that, elsewhere, they have alleged to be unlawful:  control of MasterCard by a consortium of competitors.

Finally, it bears noting that corporate ownership and change-in-control limitations are common.  They take the form of percentage limitations and poison pills, as well as staggered board membership, all designed to assure the continuity and stability of the company.  These provisions are not anticompetitive and do not constitute a violation of the federal antitrust laws.  And, unsurprisingly, no court has so held.

**Conclusion**

For all of the foregoing reasons, plaintiffs' Supplemental Complaint should be dismissed in its entirety.

Dated:  September 15, 2006

Respectfully submitted,

Mark P. Ladner (ML-8404)
MORRISON & FOERSTER, LLP
1290 Avenue of the Americas
New York, New York  10104
(212) 468-8000
(212) 468-7900 (facsimile)

Attorneys for Defendants Bank of America, N.A., BA Merchant Services LLC (f/k/a Defendant National Processing, Inc.), Bank of America Corporation, MBNA America Bank, N.A.

Andrew J. Frackman (AF-4276)
Edward D. Hassi (EH-5339)
O'MELVENY & MYERS LLP
Times Square Tower
7 times Square
New York, New York  10036
(212) 326-2000
(212) 326-2061 (facsimile)

Richard G. Parker
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
(202) 383-5300
(202) 383-5414 (facsimile)

Attorneys for Defendants Capital One Bank, Capital One F.S.B., and Capital One Financial Corp.

_Peter E. Greene_

Peter E. Greene (PG-8125)
Cyrus Amir-Mokri (CA-6865)
Peter S. Julian (PJ-3443)
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
Four Times Square
New York, New York  10036
(212) 735-3000
(212) 735-2000 (facsimile)

Attorneys for Defendants JPMorgan
Chase & Co. and Chase Bank USA, N.A.

_Benjamin R. Nagin / psj_

Benjamin R. Nagin (BN-05394)
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York  10019
(212) 839-5300
(212) 839-5599 (facsimile)

David F. Graham
Eric H. Grush
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois  60603
(312) 853-7000
(312) 853-7036 (facsimile)

Attorneys for Defendants Citigroup Inc.,
Citicorp, and Citibank, N.A.

21

*Christopher R. Lipsett/psj*

Christopher R. Lipsett (CL-4818)
David S. Lesser (DL-2928)
WILMERHALE
399 Park Avenue
New York, New York  10022
(212) 230-8800
(212) 230-8888 (facsimile)

William J. Kolasky
A. Douglas Melamed
Ali M. Stoeppelwerth
WILMERHALE
1875 Pennsylvania Ave., N.W.
Washington, D.C.  20006
(202) 663-6000
(202) 663-6363 (facsimile)

Attorneys for Defendants HSBC Finance
Corporation, HSBC North American Hold-
ings Inc.

22

## CERTIFICATE OF SERVICE

I, Peter S. Julian, hereby certify that, on September 15, 2006, I caused a true copy of the foregoing MEMORANDUM IN SUPPORT OF BANK DEFENDANTS' MOTION TO DISMISS CLASS PLAINTIFFS' FIRST SUPPLEMENTAL CLASS ACTION COMPLAINT to be served via electronic mail and Federal Express, on this date to:

K. Craig Wildfang, Esq.
ROBINS KAPLAN MILLER & CIRESI LLP
2800 LaSalle Plaza
800 LaSalle Avenue South
Minneapolis, MN 55402

Bonny E. Sweeney, Esq.
Christopher M. Burke, Esq.
LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
655 West Broadway
Suite 1900
San Diego, CA 92101

William J. Blechman, Esq.
KENNY NACHWALTER, P.A.
Miami Center
201 South Biscayne Boulevard
Suite 1100
Miami, FL 33131

H. Laddie Montague, Esq.
Bart D. Cohen, Esq.
Merrill G. Davidoff, Esq.
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103

Jason S. Cowart, Esq.
POMERANTZ HAUDECK BLOCK &
GROSS
100 Park Avenue
26th Floor
New York, NY 10017

Mark P. Ladner, Esq.
William Wade-Gery, Esq.
MORRISON & FOERSTER, LLP
1290 Avenue of the Americas
New York, NY 10104

John F. Conway, Esq.
LOUGHLIN FITZGERALD
150 South Main Street
Wallingford, CT 06492

Andrew Frackman, Esq.
Edward Hassi, Esq.
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, NY 10036

David F. Graham, Esq.
Theodore R. Scarborough, Esq.
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603

Patrick F. Fischer, Esq.
KEATING MUETHING & KLEKAMP
1 East 4th Street, Suite 1400
Cincinnati, OH 45202

Richard P. Jeffries, Esq.
KUTAK ROCK LLP
The Omaha Building
1650 Farnam Street
Omaha, NE 68102

Christopher R. Lipsett, Esq.
Ali Stoeppelwerth, Esq.
Daniel Squire, Esq.
WILMER CUTLER PICKERING HALE &
DORR LLP
399 Park Avenue
New York, NY 10022

Patricia Farren, Esq.
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, NY 10005

Wayne D. Collins, Esq.
Lisl J. Dunlop, Esq.
SHEARMAN & STERLING
599 Lexington Avenue
New York, NY 10022

Kenneth A. Gallo, Esq.
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON, LLP
1615 L Street, N.W., Suite 1300
Washington, DC 20036

Wesley R. Powell, Esq.
Keila D. Ravelo, Esq.
HUNTON & WILLIAMS
200 Park Avenue
52nd Floor
New York, NY 10166

John M. Majoras, Esq.
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001

Patricia A. Sullivan, Esq.
EDWARDS ANGELL PALMER & DODGE
LLP
2800 Financial Plaza
Providence, RI 02903

Jonathan M. Rich, Esq.
MORGAN LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington DC 20004

Jonathan B. Orleans, Esq.
ZELDES, NEEDLE & COOPER, P.C.
1000 Lafayette Boulevard
PO Box 1740
Bridgeport, CT 06601

Randall Hack, Esq.
Edward Fitzpatrick, Esq.
LORD, BISSELL & BROOK LLP
111 South Wacker Drive
Chicago, IL 60606

Alicia Batts, Esq.
Richard J. Leveridge, Esq.
DICKSTEIN SHAPIRO MORIN &
OSHINSKY
2101 L Street, N.W.
Washington, DC 20037

David Gersch, Esq.
Mark Merley, Esq.
Julie Rottenberg, Esq.
ARNOLD & PORTER
555 Twelfth Street, N.W.
Washington, DC 20004

H. Stephen Harris, Jr., Esq.
Teresa T. Bonder, Esq.
Michael P. Kenny, Esq.
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309

Daniel Wall, Esq.
LATHAM & WATKINS, LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111

Dated:  New York, NY
        September 15, 2006

Peter S. Julian

3