UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE PAYMENT CARD INTERCHANGE
FEE and MERCHANT-DISCOUNT ANTI-
TRUST LITIGATION

This Document Relates to:

| | |
|---|---|
| 1:05-CV-3800 | 1:05-CV-5083 |
| 1:05-CV-3924 | 1:05-CV-5153 |
| 1:05-CV-4194 | 1:05-CV-5207 |
| 1:05-CV-4520 | 1:05-CV-5866 |
| 1:05-CV-4521 | 1:05-CV-5868 |
| 1:05-CV-4728 | 1:05-CV-5869 |
| 1:05-CV-4974 | 1:05-CV-5870 |
| 1:05-CV-5069 | 1:05-CV-5871 |
| 1:05-CV-5070 | 1:05-CV-5878 |
| 1:05-CV-5071 | 1:05-CV-5879 |
| 1:05-CV-5072 | 1:05-CV-5880 |
| 1:05-CV-5073 | 1:05-CV-5881 |
| 1:05-CV-5074 | 1:05-CV-5882 |
| 1:05-CV-5075 | 1:05-CV-5883 |
| 1:05-CV-5076 | 1:05-CV-5885 |
| 1:05-CV-5077 | 1:06-CV-1829 |
| 1:05-CV-5080 | 1:06-CV-1830 |
| 1:05-CV-5081 | 1:06-CV-1831 |
| 1:05-CV-5082 | 1:06-CV-1832 |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MASTER FILE NO. 1:05-md-1720-JG-JO

:

:

:

: REPLY MEMORANDUM IN SUPPORT
OF BANK DEFENDANTS' MOTION TO
: DISMISS CLASS PLAINTIFFS' FIRST
SUPPLEMENTAL CLASS ACTION COM-
: PLAINT

:

:

:

:

:

:

:

:

## Table of Contents

*Page*

Table of Authorities ......................................................................................................... ii

Preliminary Statement......................................................................................................1

Argument ..........................................................................................................................3

I.      PLAINTIFFS HAVE NOT DEMONSTRATED THAT THE BANKS
        ARE "ACQUIRERS" WITHIN THE MEANING OF SECTION 7. .................................3

II.     PLAINTIFFS HAVE OFFERED NO FACTUAL BASIS TO SUPPORT
        THEIR CONCLUSION THAT THE IPO THREATENS SUBSTAN-
        TIALLY TO LESSEN COMPETITION. ........................................................................5

        A.      Plaintiffs Have Offered No Basis To Conclude That The Banks'
                Divestiture Of Their Voting Rights And Equity Interest In Master-
                Card Threatens Substantially To Lessen Competition. ...........................5

        B.      Plaintiffs Have Offered No Basis To Conclude That The 15%
                Limitation On A Single Shareholder's Ownership Of MasterCard
                Threatens Substantially To Lessen Competition. ...................................9

Conclusion .....................................................................................................................10

## Table of Authorities

***Cases***                                                                                                          ***Page***

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002) .........................................................1

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984) ...........................................3

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485 (2d Cir. 2004).............................7

*In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568 (E.D.N.Y. Apr.
    1, 2003) .....................................................................................................................................6

*Kramer v. Time Warner Inc.*, 937 F.2d 767 (2d Cir. 1991) .............................................................1

*North American Soccer League v. National Football League*, 670 F.2d 1249 (2d
    Cir. 1982) ...........................................................................................................................9, 10

*Sullivan v. National Football League*, 34 F.3d 1091 (1st Cir. 1994) ........................................9, 10

*Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co.*, 370 U.S. 19
    (1962) ........................................................................................................................................4

*Texaco Inc. v. Dagher*, 126 S. Ct. 1276 (2006) ...........................................................................4

*United States v. Columbia Pictures Indus., Inc.*, 507 F. Supp. 412 (S.D.N.Y.
    1980) .........................................................................................................................................8

*United States v. Visa USA, Inc.*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001), *aff'd*, 344
    F.2d 596 (2d Cir. 2003) .........................................................................................................6

## *Preliminary Statement*

As defendants Bank of America, Capital One, JPMorgan Chase, Citigroup and HSBC (collectively the "Banks") demonstrated in their moving papers, plaintiffs' effort to force MasterCard's initial public offering transaction (the "IPO") into some anticompetitive pigeon-hole under Section 7 of the Clayton Act ("Section 7") or Section 1 of the Sherman Act ("Section 1") simply does not work. The indisputable purpose of Section 7 is to prevent potential diminution of competition by reason of an acquisition of stock or assets. The logic of the statute thus has compelled inquiry into one overriding question: whether the particular transaction at issue has increased economic concentration.

MasterCard's IPO can in no way be conceived as a transaction that increases economic concentration. It achieves precisely the opposite result, as member/owner Banks have divested their voting control and the majority of their equity interest in favor of ownership by the investing public. Notwithstanding these facts – which plaintiffs cannot and do not dispute[1] – plaintiffs advance the counter-intuitive proposition that the IPO, in and of itself, harms competition. The conclusory allegation offends not only common sense, but, if credited, would undermine the essential purpose of the statute.

---

[1]  Plaintiffs' assertions that they have not incorporated MasterCard's Form S-1 by reference in their Supplemental Complaint, that the Banks' submission of excerpts from the Form S-1 converts this motion to dismiss into a motion for summary judgment, and that plaintiffs are thus entitled to discovery (Opp. Br. at 9) are nonsense. In their Supplemental Complaint, plaintiffs expressly define the challenged "Agreements" and "Ownership and Control Restrictions" as those agreements or portions thereof that are "described in the Form S-1, prospectus, and other filings made by MasterCard with the United States Securities and Exchange Commission." (Supp. Compl. ¶¶ 8, 10.) Such explicit incorporation by reference makes the claims in the Supplemental Complaint unintelligible without reference to MasterCard's Form S-1. Accordingly, this Court may consider MasterCard's Form S-1 so as to understand the basis for plaintiffs' claims without converting the motion to dismiss into one for summary judgment. *See, e.g., Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir. 2002); *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773-74 (2d Cir. 1991).

As they established in their moving brief, the Banks are not "acquirers" within the meaning of the statute.  Moreover, because there is no increase in concentration as a result of the IPO, that transaction by itself cannot be deemed to substantially lessen competition.  If plaintiffs cannot adequately allege potential harm to competition under Section 7, it follows that they cannot make a case under Section 1.

Plaintiffs' basic riposte is that, sometime after the IPO, MasterCard may increase interchange rates.  Plaintiffs further complain that such a hypothetical increase would occur with impunity because Section 1 would no longer operate as a check on MasterCard's conduct.  These conclusory allegations constitute rank speculation and are logically unconnected to the structural changes occasioned by the IPO.  For example, an increase in interchange is not a necessary consequence of MasterCard's new structure (nor is it alleged to be a part of any agreement relating to the IPO).  Thus, plaintiffs' allegations of harm turn on manifold speculation about the occurrence of post-IPO behavior that, if it were to occur, would be separate and distinct from the IPO.  In a similar vein, plaintiffs conjecture that the 15% limitation on a single shareholder's ownership in MasterCard threatens to prevent a single firm from purchasing all of MasterCard and thereby forestalls reductions in interchange.

Complaints may not survive on the strength of speculation of this nature.  Because plaintiffs offer no factual basis to support a claim that the IPO itself threatens to lessen or restrain competition, their Supplemental Complaint should be dismissed with prejudice.[2]

---

[2]   In addition to the arguments set forth in this reply brief, the Banks adopt the arguments set forth in MasterCard's reply brief and incorporate those arguments by reference here.

## ***Argument***

**I.     PLAINTIFFS HAVE NOT DEMONSTRATED THAT THE BANKS ARE "AC-QUIRERS" WITHIN THE MEANING OF SECTION 7.**

As the Banks explained in their moving papers, to consider the Banks "acquirers" under circumstances in which they have divested 60% of their equity interest and their right to elect at least 75% of the board of directors to the investing public would not just be contrary to the natural meaning of the statute, but would also upset its purpose, leading to absurd results. Plaintiffs offer nothing in opposition except the rote assertion that, despite the Banks' divestiture of their voting rights and the majority of their economic interest in MasterCard, each Bank's conversion of its voting stock for non-voting Class B stock and one share of Class M stock constitutes an acquisition of "the whole or any part of the stock or other share capital" of MasterCard sufficient to fall within the statutory language of Section 7.  (Opp. Br. at 15-16.)[3]  Plaintiffs' construction of Section 7 in the context of the challenged IPO turns Section 7 on its head.

Indeed, plaintiffs themselves acknowledge that the "concern in modern antitrust cases is the same as in the early days of enforcement – when an acquisition is likely to increase concentration or creates a firm with market power, prices will increase and output will decrease." (Opp. Br. at 19.)  To suggest that the Banks are acquirers when, as a result of the IPO, each converted its pre-IPO common stock into non-voting Class B stock and one share of Class M stock, so that their voting control was divested and their economic interest substantially diluted, exalts form over substance in a way that imposes grave legal consequences on a distinction that has *de minimis* meaning and effect.  *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 772-73 & n.21 (1984) (rejecting the intra-enterprise conspiracy doctrine, which "looks to the

---

[3]   Plaintiffs concede, as they must, that the Banks' alleged "acquisition of assets is not subject to Section 7."  (Opp. Br. at 16 n.17.)

form of an enterprise's structure and ignores the reality," because "substance, not form, should determine whether" the challenged conduct threatens to harm competition in violation of federal antitrust laws); *Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co.*, 370 U.S. 19, 29 (1962) (holding that 12,000 citrus growers were "in practical effect and in the contemplation of the statutes one 'organization' or 'association' even though they have formally organized themselves into three separate legal entities" because "[t]o hold otherwise would be to impose grave legal consequences upon organizational distinctions that are of *de minimis* meaning and effect . . . within the purview of the Clayton and Capper-Volstead Acts"). There is no plausible argument that the IPO involves an acquisition that increases either economic concentration or Master-Card's market power in any relevant market.[4]

Recognizing the illogic of their claim, plaintiffs assert that, "even if this Court accepted the banks' technical defense to Section 7 that they were not acquirers, the Court nonetheless should maintain the Section 7 cause of action against them in order to remedy a violation of Section 7" and that "to effectuate the equitable remedy the Plaintiffs seek, the Court must be able to unwind the IPO." (Opp. Br. at 17.) Under Section 7, a party to a transaction is either an acquirer or a seller, and, as the Banks previously demonstrated, the statute only applies to acquirers. To be sure, courts may exercise jurisdiction over sellers in Section 7 cases in which the purchasers are also defendants, so as to have all parties to the challenged transaction before the court in the event the court were to order the extraordinary remedy of "unwinding" a transaction. But courts do not exercise jurisdiction over the sellers where, as here, the purchasers are not before

---

[4]    While not presented on this motion, the Supreme Court's holding in *Texaco Inc. v. Dagher*, 126 S. Ct. 1276 (2006), that the pricing decisions of a legitimate joint venture are to be treated as the conduct of a single firm, and not as joint conduct of the entity's venturers, is consistent with the proposition that the antitrust laws are concerned with substance and not form.

the court because, without the purchasers (who now own MasterCard's Class A voting shares), jurisdiction over the Banks is ineffective to unwind the transaction. There is therefore no basis for this Court to exercise "equity jurisdiction" over the Banks as certain of the sellers, since no "unwinding" of the transaction may be ordered against them in the absence of the members of the public who purchased the more than 61 million shares of MasterCard Class A voting stock.

In sum, plaintiffs have offered no rationale consistent with the language, logic or purposes of Section 7 to consider the Banks to be "acquirers" within the meaning of the statute or to exercise "equity jurisdiction" over the Banks as sellers of MasterCard shares. Accordingly, plaintiffs' Section 7 claim should be dismissed.

## II.   PLAINTIFFS HAVE OFFERED NO FACTUAL BASIS TO SUPPORT THEIR CONCLUSION THAT THE IPO THREATENS SUBSTANTIALLY TO LESSEN COMPETITION.

### A.   Plaintiffs Have Offered No Basis To Conclude That The Banks' Divestiture Of Their Voting Rights And Equity Interest In MasterCard Threatens Substantially To Lessen Competition.

In their moving brief, the Banks explained that, even accepting the factual allegations in the Supplemental Complaint as true, plaintiffs have not alleged that the IPO has increased either economic concentration in, or MasterCard's share of, any alleged relevant market. Only the identity of MasterCard's owners has changed as a result of the IPO, and, in this regard, the IPO dispersed -- rather than aggregated -- ownership of MasterCard among members of the public. Plaintiffs allege that this dispersion of ownership among members of the public is anti-competitive because MasterCard, as a public company, may now act as a single entity under the antitrust laws. Under plaintiffs' unprecedented antitrust theory, any sale of MasterCard to any single-entity party, including a sale to a private equity investment fund, would result in the same

"harm" as the alleged harm of which plaintiffs complain.  The alleged "harm" thus is not the result of the IPO.

Plaintiffs concede that, "unlike other areas of the law, merger enforcement is focused on market structure rather than conduct," and that the "concern in modern antitrust cases" is to arrest acquisitions that are "likely to increase concentration or create[] a firm with market power."  (Opp. Br. at 19.)  Plaintiffs further contend that this Court in *In re Visa Check/Master Money Antitrust Litig.*, 2003 WL 1712568 (E.D.N.Y. Apr. 1, 2003), and the district court in *United States v. Visa USA, Inc.*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001), *aff'd*, 344 U.S. 596 (2d Cir. 2003), determined that MasterCard already possessed market power before the IPO.  (Opp. Br. at 19-20.)  In view of these two concessions and the absence of any allegation that the IPO itself has increased MasterCard's market share in any relevant market, there is no foundation for plaintiffs' conclusory assertion of competitive harm.[5]

Plaintiffs attempt to cure the defect in their Supplemental Complaint by asserting that MasterCard's exercise of (alleged) market power after the IPO may differ from its exercise of that same power before the IPO.  After the IPO, plaintiffs allege, MasterCard's "fee-setting" decisions will be the decisions of a "single entity" and thus an exercise of market power that is no longer subject to Section 1.  (Opp. Br. at 20.)  Plaintiffs speculate that, contrary to its current practice, MasterCard may set mandatory (as opposed to default) interchange rates.  (*Id.* at 6, 20.)  Plaintiffs further speculate that "[i]f New MasterCard sets mandatory as opposed to default In-

---

[5]  Plaintiffs' citation to this Court's decision in *In re Visa Check/MasterMoney Antitrust Litigation* in this regard is wholly disingenuous.  Though plaintiffs assert that this Court "determined that MasterCard has market power" and describe the case with the parenthetical "denying summary judgment for MasterCard" (Opp. Br. at 19-20), in fact, this Court held that it "cannot conclude as a matter of law that MasterCard has 'sufficient economic power' to warrant application of the per se rule" and therefore denied *the merchants'* motion for summary judgment as it pertained to MasterCard.  2003 WL 1712568, at *4.

terchange Fees," the Banks may not undercut the interchange rates on MasterCard transactions, and Visa members may thereafter be encouraged to maintain interchange rates on Visa transactions at some supracompetitive level. (*Id.* at 20.)

Plaintiffs themselves concede that, "in order to state a claim under Section 7, a Plaintiff must allege a 'reasonable probability' of anticompetitive effects materializing from a transaction." (*Id.* at 18.) But the speculative chain of possible events plaintiffs hypothesize is both unrelated to the IPO insofar as it depends on intermediate decisions by independent actors, and is so speculative as to be insufficient to sustain an antitrust claim. *See, e.g., Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 511-12 (2d Cir. 2004).

Plaintiffs offer absolutely no factual allegations to support their conjecture that MasterCard might set mandatory (as opposed to default) interchange rates following the IPO. Indeed, given that at least 75% of the MasterCard board of directors is now elected by members of the investing public, there is every reason to believe that MasterCard will maintain an interchange policy that is in MasterCard's independent best interest, regardless of whether that policy corresponds to the perceived best interests of MasterCard's former shareholders, including the Banks. More fundamentally, the effects of any decision to set mandatory rates would flow entirely from this hypothetical change in conduct – a change which could also hypothetically occur in the absence of any IPO – not from any change in market structure. Relatedly, were there any unlawful collusion by the Banks on interchange rates or any other aspect of their payment card businesses, it would not arise from the IPO itself but from some other, independently actionable agreement. Accordingly, even if, following the IPO, the Banks were to conspire to engage in anticompetitive behavior, plaintiffs could challenge that conspiracy at that time in a separate action.

Plaintiffs also argue in their opposition brief – heedless of the inconsistency with their allegation that the Banks retain control over the level of interchange rates following the IPO (Supp. Compl. ¶ 86) – that the Banks have somehow delegated the pricing of interchange rates to MasterCard as their joint agent. (Opp. Br. at 21-22.) Plaintiffs' reliance on *United States v. Columbia Pictures Indus., Inc.*, 507 F. Supp. 412 (S.D.N.Y. 1980), to support this allegation is inapposite. In *Columbia Pictures*, four competing motion picture distributors, along with Getty Oil Company, formed a joint venture for the purpose of distributing the motion pictures each defendant would otherwise have distributed independently. The formation of the venture brought together five previously separate and independent entities (four of which were competitors) that, following the formation, intended to own and control 100% of the venture. The court determined, on a motion for preliminary injunction, that the transfer of each competitor's motion pictures to the joint venture for pricing and distribution by the joint venture might constitute price fixing under Section 1 of the Sherman Act, and preliminarily enjoined the defendants from making their films available to the joint venture. By contrast, the Banks have entirely relinquished any such control to the investing public who now elects the majority of MasterCard's board of directors. As a matter of law, whatever interchange decisions MasterCard makes – including whether or not to maintain default interchange rates at all – will not be the decisions of the Banks, but of MasterCard acting on behalf of its new public shareholders and in accordance with the direction and authorization of its board of directors, at least 75% of which will be elected by shareholders other than the former member banks.[6]

---

[6]   Plaintiffs' contention that acquisitions in "collusion-prone" industries are even more closely scrutinized under Section 7 (Opp. Br. at 19) is misplaced. Even if plaintiffs were correct in characterizing the payment cards industry as "collusion-prone," the IPO has served to dis-

*(cont'd)*

**B.**   **Plaintiffs Have Offered No Basis To Conclude That The 15% Limitation On A Single Shareholder's Ownership Of MasterCard Threatens Substantially To Lessen Competition.**

Plaintiffs' challenge to the so-called Ownership and Control Restrictions amounts to this:  the 15% limitation on a single shareholder's ownership in MasterCard has the effect of barring a single firm that hypothetically might operate MasterCard as a "more-effective, low-fee competitor" from acquiring more than 15% of the Class A voting shares.  (Opp. Br. at 23.) Plaintiffs offer no factual allegations to support the assertion that a single purchaser of more than 15% of the voting control of MasterCard would operate MasterCard any differently – and more importantly, any more competitively – than the widely dispersed members of the public that currently hold all of the voting shares of MasterCard.  There is simply no factual basis from which to conclude that the 15% limitation on a single shareholder's ownership in MasterCard has any predictable impact whatsoever on the likely competitive behavior of MasterCard in the market for payment card network services, and plaintiffs' assertion to the contrary is no more than sheer speculation insufficient to sustain their antitrust complaint.

Plaintiffs' reliance on *Sullivan v. National Football League*, 34 F.3d 1091 (1st Cir. 1994), and *North American Soccer League v. National Football League*, 670 F.2d 1249 (2d Cir. 1982), is misplaced.  In each of those cases, the challenged restriction on ownership allegedly had an adverse impact in the market for team ownership or financing, not on the competitive behavior of the team itself.  In *Sullivan*, for example, an NFL franchise owner alleged that the NFL's ban on selling shares of his franchise to the public depressed the value of his ownership interest in the New England Patriots and had an adverse impact on competition in the "nation-

---

*(cont'd from previous page)*

perse MasterCard's decisionmaking, not concentrate it in the hands of the putative colluders, as in the cases on which plaintiffs rely.

9

wide market for the sale and purchase of ownership interests in the National Football League

member clubs, in general, and in the New England Patriots, in particular." 34 F.3d at 1097.

Similarly, in *North American Soccer League*, the NASL alleged that the NFL's ban on cross-

ownership between owners of NFL franchises and franchises of other major sports, including

soccer, substantially reduced the sources of capital for soccer franchises and had an adverse im-

pact on competition in the market for "sports capital and skill." 670 F.2d at 1260-61. In neither

case did the court attempt to predict the competitive behavior of possible future team owners if

the challenged ownership restrictions were eliminated. Such an attempt would have been en-

tirely conjectural.

        Plaintiffs in the instant case are not complaining that the 15% limitation on own-

ership of MasterCard voting shares depresses the value of MasterCard stock, makes financing for

MasterCard more expensive or less available, or otherwise somehow structurally decreases

MasterCard's ability to compete (compared to its pre-IPO structure). Instead, plaintiffs complain

that the limitation could theoretically preclude certain merely hypothetical owners who hypo-

thetically might cause MasterCard to alter its own conduct and adopt a different competitive tack.

That complaint is wholly speculative; it is also entirely unrelated to market structure. As a mat-

ter of law, the limitation on stock ownership in MasterCard has no market structural impact

whatsoever, much less any predictive value as to MasterCard's likely competitive behavior under

public ownership or otherwise, and plaintiffs' complaint in this regard should therefore be dis-

missed.

### *Conclusion*

        For all of the foregoing reasons, as well as for the reasons set forth in the Banks'

moving memorandum, plaintiffs' Supplemental Complaint should be dismissed in its entirety.

Dated:  November 29, 2006                    Respectfully submitted,


*Mark P. Ladner /psg*

Mark P. Ladner (ML-8404)
MORRISON & FOERSTER, LLP
1290 Avenue of the Americas
New York, New York  10104
(212) 468-8000
(212) 468-7900 (facsimile)


Attorneys for Defendants Bank of America,
N.A., BA Merchant Services LLC (f/k/a De-
fendant National Processing, Inc.), Bank of
America Corporation, MBNA America
Bank, N.A.


*Andrew J. Frackman /psg*

Andrew J. Frackman (AF-4276)
Edward D. Hassi (EH-5339)
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, New York  10036
(212) 326-2000
(212) 326-2061 (facsimile)


Richard G. Parker
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
(202) 383-5300
(202) 383-5414 (facsimile)


Attorneys for Defendants Capital One Bank,
Capital One F.S.B., and Capital One Finan-
cial Corp.

_Peter E. Greene_

Peter E. Greene (PG-8125)
Cyrus Amir-Mokri (CA-6865)
Peter S. Julian (PJ-3443)
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
Four Times Square
New York, New York  10036
(212) 735-3000
(212) 735-2000 (facsimile)

Attorneys for Defendants JPMorgan
Chase & Co. and Chase Bank USA, N.A.

_Benjamin R. Nagin /pjs_

Benjamin R. Nagin (BN-05294)
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York  10019
(212) 839-5300
(212) 839-5599 (facsimile)

David F. Graham
Eric H. Grush
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois  60603
(312) 853-7000
(312) 853-7036 (facsimile)

Attorneys for Defendants Citigroup Inc.,
Citicorp, and Citibank, N.A.

_Christopher R Lipsett /pjs_

Christopher R. Lipsett (CL-4818)
David S. Lesser (DL-2928)
WILMERHALE
399 Park Avenue
New York, New York  10022
(212) 230-8800
(212) 230-8888 (facsimile)

12

William J. Kolasky
A. Douglas Melamed
Ali M. Stoeppelwerth
WILMERHALE
1875 Pennsylvania Ave., N.W.
Washington, D.C.  20006
(202) 663-6000
(202) 663-6363 (facsimile)

Attorneys for Defendants HSBC Finance
Corporation, HSBC North American Hold-
ings Inc.

13

## CERTIFICATE OF SERVICE

I, Peter S. Julian, hereby certify that, on November 29, 2006, I caused a true copy of the foregoing REPLY MEMORANDUM IN SUPPORT OF BANK DEFENDANTS' MOTION TO DISMISS CLASS PLAINTIFFS' FIRST SUPPLEMENTAL CLASS ACTION COMPLAINT to be served via ECF Notification System, on this date to:

K. Craig Wildfang, Esq.
ROBINS KAPLAN MILLER & CIRESI LLP
2800 LaSalle Plaza
800 LaSalle Avenue South
Minneapolis, MN 55402

Bonny E. Sweeney, Esq.
Christopher M. Burke, Esq.
LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
655 West Broadway
Suite 1900
San Diego, CA 92101

William J. Blechman, Esq.
KENNY NACHWALTER, P.A.
Miami Center
201 South Biscayne Boulevard
Suite 1100
Miami, FL 33131

H. Laddie Montague, Esq.
Bart D. Cohen, Esq.
Merrill G. Davidoff, Esq.
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103

Jason S. Cowart, Esq.
POMERANTZ HAUDECK BLOCK &
GROSS
100 Park Avenue
26th Floor
New York, NY 10017

Mark P. Ladner, Esq.
MORRISON & FOERSTER, LLP
1290 Avenue of the Americas
New York, NY 10104

Andrew Frackman, Esq.
Edward Hassi, Esq.
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, NY 10036

Richard P. Jeffries, Esq.
KUTAK ROCK LLP
The Omaha Building
1650 Farnam Street
Omaha, NE 68102

David F. Graham, Esq.
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603

Patrick F. Fischer, Esq.
KEATING MUETHING & KLEKAMP
1 East 4th Street, Suite 1400
Cincinnati, OH 45202

Christopher R. Lipsett, Esq.
Ali Stoeppelwerth, Esq.
WILMER CUTLER PICKERING HALE &
DORR LLP
399 Park Avenue
New York, NY 10022

Lisl J. Dunlop, Esq.
SHEARMAN & STERLING
599 Lexington Avenue
New York, NY 10022

Kenneth A. Gallo, Esq.
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON, LLP
1615 L Street, N.W., Suite 1300
Washington, DC 20036

Wesley R. Powell, Esq.
Keila D. Ravelo, Esq.
HUNTON & WILLIAMS
200 Park Avenue
52nd Floor
New York, NY 10166

John M. Majoras, Esq.
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001

Patricia A. Sullivan, Esq.
EDWARDS ANGELL PALMER & DODGE
LLP
2800 Financial Plaza
Providence, RI 02903

Brian Herman, Esq.
MORGAN LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington DC 20004

Jonathan B. Orleans, Esq.
ZELDES, NEEDLE & COOPER, P.C.
1000 Lafayette Boulevard
PO Box 1740
Bridgeport, CT 06601

Alicia Batts, Esq.
Richard J. Leveridge, Esq.
DICKSTEIN SHAPIRO MORIN &
OSHINSKY
2101 L Street, N.W.
Washington, DC 20037

H. Stephen Harris, Jr., Esq.
Teresa T. Bonder, Esq.
Michael P. Kenny, Esq.
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309

Randall Hack, Esq.
Edward Fitzpatrick, Esq.
LORD, BISSELL & BROOK LLP
111 South Wacker Drive
Chicago, IL 60606

David Gersch, Esq.
Mark Merley, Esq.
Julie Rottenberg, Esq.
ARNOLD & PORTER
555 Twelfth Street, N.W.
Washington, DC 20004

Eric J. McCarthy, Esq.
LATHAM & WATKINS, LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004

Dated:  New York, NY
       November 29, 2006

Peter S. Julian

3