1

```
 1                UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF NEW YORK
 2
      - - - - - - - - - - - - - X
 3                              :
 4
      IN RE: PAYMENT CARD
 5    INTERCHANGE FEE and
      MERCHANT DISCOUNT ANTITRUST
 6    LITIGATION,
                                      O5 MDL 1720 (JG)
 7
 8                              :
 9                                    United States Courthouse
                                      Brooklyn, New York
10                              :
11                                    December 18, 2006
      - - - - - - - - - - - - X      9:30 o'clock a.m.
12
                  TRANSCRIPT OF STATUS CONFERENCE
13         BEFORE THE HONORABLE JAMES ORENSTEIN
           UNITED STATES DISTRICT MAGISTRATE-JUDGE
14
      APPEARANCES:
15
      For the Plaintiff:        ROBINS KAPLAN MILLER & CIRESI, LLP
16                              800 LaSalle Avenue
                                Mineapolis, MN 55402
17                              BY:  K. CRAIG WILDFANG, ESQ., and
                                     BONNIE SWEENEY, ESQ.
18
                                POMERANTZ HAUDEK BLOCK GROSSMAN
19                                   GROSS, LLP
                                100 Park Avenue
20                              New York, N. Y. 10017
                                BY: JASON S. COWART, ESQ.
21
                                KENNY NACHWALTER
22                              201 South Biscayne Boulevard
                                Miami, Florida 33131
23                              BY: WILLIAM J. BLECHMAN, ESQ.
24
25
```

RECEIVED
HON. JAMES ORENSTEIN
AUG 22 2007

HENRY SHAPIRO        OFFICIAL COURT REPORTER

```
 1                          BERGER & MONTAGUE, P.C.
                            1622 Locust Street
 2                          Philadelphia, Pa 19103
                            BY: MERRILL G. DAVIDOFF, ESQ.
 3
                            BERGER & MONTAGUE, P.C.
 4                          1622 Locust Street
                            Philadelphia, Pa 19103.
 5                          BY: H. LADDIE MONTAGUE, JR., ESQ., and
                                BART D. COHEN, ESQ.
 6

 7

 8
    For the Defendant:      ARNOLD & PORTER
 9                          90 New Montgomery Street
                            San Francisco, CA 94105
10                          BY:  ROBERT VIZAS, ESQ.,
                                 JULIE ROTTENBERG, ESQ, and.
11                               MARK R. MERLEY, ESQ.

12                          PAUL WEISS RIFKIND WHARTON &
                                GARRISON, LLP.
13                          Attorneys for Mastercard
                            1285 Avenue of the Americas
14                          New York, N. Y. 10019
                            BY: GARY CARNEY, ESQ., and
15                          KENNETH A. GALLO, ESQ.

16                          SKADDEN ARPS SLATE MEAGHER & FLOM, LLP
                            Attorneys for JP Morgan Chase
17                          Four Times Square
                            New York, N. Y. 10038
18                          BY: PETER E. GREENE, ESQ.

19                          HUNTON & WILLIAMS, LLP
                            200 Park Avenue
20                          New York, N. Y. 10166
                            BY: WESLEY R. POWELL, ESQ., and
21                          KEILA D. RAVELO, ESQ.

22                          LORD BISSELL BROOK, LLP
                            Attorneys for VISA International
23                          111 South Wacker Drive
                            Chicago, Illinois 60606
24                          BY: MICHAEL J. GAERTNER, ESQ.

25
```

```
 1                            SIDLEY AUSTIN, LLP
                              One South Dearborn
 2                            Chicago, Illinois 60603
                              BY: DAVID GRAHAM, ESQ.
 3
                              MORRISON FOERSTER
 4                            Attorneys for Bank American
                              1290 Avenue of the Americas
 5                            New York, N. Y. 10104
                              BY: MARK P. LADNER, ESQ.
 6
     Present:
 7                            DEBEVOISE & PLIMPTON, LLP
                              919 Third Avenue
 8                            New York, N. Y. 10022
                              BY:  JEFFREY S. JACOBSON, ESQ.
 9
                              WILMER HALE, LLP
10                            399 Park Avenue
                              New York, N. Y.10022
11                            BY: CHRISTOPHER R. LIPSETT, ESQ.

12                            LATHAM & WATKINS, LLP
                              555  Eleventh Street N.W.
13                            Washington, D.C. 20004
                              BY: ERIC J. MCCARTHY, ESQ.
14
                              ZELDES NEEDLE & COOPER
15                            1000 Lafayette Blvc
                              Bridgeport, CT 06601
16                            BY: JONATHAN B. ORLEANS, ESQ.

17                            EDWARDS ANGELL PALMER & DODGE, LLP.
                              2800 Financial Plaza.
18                            Providence, RI 02903
                              BY: PATRICIA A. SULLIVAN, ESQ.
19

20
     Court Reporter:         Henry R. Shapiro
21                            225 Cadman Plaza East
                              Brooklyn, New York
22                            718-260-2509

23

24

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer.
```

4

1

2      THE CLERK:  Civil cause for status conference MDL

3  05-720, in Re: Payment Card Interchange Fee and Merchant

4  Discount Antitrust Litigation.

5      THE COURT:  Good morning, all.  As usual we will

6  skip appearances on the record, but please identify yourselves

7  when you begin speaking for the convenience of the court

8  reporter.

9      I received your status report.  It's very helpful.

10  Let's start marshaling through it.  There was an issue about

11  some deposition transcript in the Walmart litigation.

12      Has this been resolved?

13      MS. ROTTENBERG:  We were raised the question of any

14  deposition transcripts that were missing in earlier

15  production. We worked in the process of finishing all of the

16  transcripts that were produced and we produced any that we

17  have.

18      THE COURT:  Sounds like you are on track for that.

19      MR. WILDFANG:  We have gotten through two or three

20  and are hoping to get through whatever remains that are

21  missing.

22      THE COURT:  Looks like there is nothing that I have

23  to take up about the coding of documents.

24      Now, we have issue about the document production

25  protocol between the defendants and the individual

HENRY SHAPIRO          OFFICIAL COURT REPORTER

5

1  plaintiffs.

2           Regarding Metadata.  Mr. Blechman, you are speaking

3  for the individual defendants?

4           MR. BLECHMAN: Yes, your Honor.

5           THE COURT:  Do you agree under current Rule 34, the

6  current version of it, what is at issue is covered?

7           MR. BLECHMAN:  As amended what is at issue would be

8  covered going forward.

9           THE COURT:  I guess, that's why I asked the

10  question.  Then it comes down to if it's covered, then it's

11  really whether the production that you don't want to provide,

12  providing it is just and practicable.  I am not sure that I

13  understand the nature of your objection.  It's not just or not

14  practical or both?

15           MR. BLECHMAN:  Both and intrusive and seeking

16  information that was not requested by the defendants in their

17  written discovery.  I can elaborate.

18           THE COURT:  Walk me through each.  One, is it not

19  just and practicable and go on, its a Rule 26 application

20  beyond that.

21           MR. BLECHMAN:  If I might?

22           THE COURT:  Go ahead.

23           MR. BLECHMAN:  The first I think is just to make sure

24  we're talking about the same thing.  The issue here, however,

25  is that Metadata is a term new on the legal lexicon and talks

HENRY SHAPIRO          OFFICIAL COURT REPORTER

1   about what information, how electronic documents are tracked,

2   names, dates, file types, applications, restrictions and

3   alike.

4         The scope of the issue is framed to some extent by

5   what has been discussed between the class and the defendants

6   thus far in terms of their stipulation.

7         On page 2, Section 1C the stipulation that is sought

8   of focusing this issue --

9         THE COURT:  Give me a moment to find it.

10         MR. BLECHMAN:  Yes, your Honor.

11         THE COURT:  Go ahead.

12         MR. BLECHMAN:  That provides the stipulation does not

13   apply to documents that have been collected and processed or

14   produced up to the effective date of the stipulation, which

15   the defendants and the class simply selected November 22nd.

16   We haven't agreed to that.

17         The point is, what we're talking about what we

18   produced going forward, what we collect and haven't processed

19   going forward, we don't think that information should be

20   produced:

21         First, because it was not requested in the

22   defendants' written discovery to us.

23         That discovery was served back in May or June.  We

24   objected.  We said that -- we objected to producing

25   information that sort for us to provide information that was

7

1 | not required by the rules.

2 |       THE COURT:  I get the argument about it wasn't

3 | requested or we raised an objection earlier to doing this.

4 | What I want to know, to the extent the rule has changed and

5 | the applicability turns on whether it's just or practicable,

6 | why is it neither of those two things?

7 |       MR. BLECHMAN:  It's not relevant.  In the words of

8 | Wyatt and Williams cases, that we cited in the papers, the

9 | district court said that Metadata is of little evidentiary

10 | value and a waste of resources.

11 |       The information that they are talking about here is

12 | information that is not -- doesn't have relevance in

13 | determining the file application nor file name and things of

14 | that sort.

15 |       THE COURT:  Foregive me for interrupting. I think

16 | we're passing each other. To the extent you are arguing

17 | relevance, it seems to me what you are really arguing about is

18 | whether you are entitled to a protective order from the

19 | application of Rule 34 as it has been amended.

20 |       An earlier point in the discussion, unless you are

21 | willing to stipulate to it, is that we're under the current

22 | regime.

23 |       MR. BLECHMAN:  Let me try to be specific.  We don't

24 | think it's just or practicable for the following reasons:

25 |       First, we have started a search protocol in this case

8

1   in looking for and processing and producing information going

2   back six months ago.  What the defendants are asking us to do

3   now, going forward with additional people, who they are asking

4   us to search for, and we're talking about whether we'll do

5   that or not, what they are asking us to do is to change the

6   protocol we're using for selecting documents and processing

7   them internally.

8          We're a depository that is setup in Tallahassee,

9   Florida, that we have down to a science, how this information,

10  once collected gets processed all the way to the end process

11  where it's put on a disk and provided to the defendants in

12  electronic format, which is searchable, such as the author,

13  the recipient, the date, information which I can understand

14  that they might need or want to have.

15         We're giving that information to them.  What they're

16  asking us to do is change that process which involves a lot of

17  people, Judge.  It's sort of akin to trying to move an

18  aircraft carrier.  It's not something that happens easily for

19  us in having to institute a whole new number of protocols that

20  we're not using.

21         THE COURT:  Part of the problem you've been sending

22  the aircraft carrier in the wrong direction.

23         MR. BLECHMAN:  We don't think so.

24         THE COURT:  To the extent there is a burden issue

25  associated with changing it, I want to make sure that I

1  understand it. A lot of the burden-- seems to me -- at least

2  from what I have seen in the status report-- arises from

3  taking data in its native format and then changing it into

4  something else and then OCRing it and providing it in that

5  format.  At least some of those steps, I take it, would be

6  gone if you did as the defendants want?

7       MR. BLECHMAN:  I'm not sure about that, your Honor.

8  What is more the defendants raised this issue with us at a

9  meeting in New York on December 4th.  After that meeting, and

10  I was there and I heard what they were saying, I went back and

11  I asked some people to find out from our clients how easy or

12  difficult it is to try to retrieve the information. The

13  reports that I received back to date are-- not all of these

14  clients have Metadata-- for more of the point, one report that

15  I received, and I was told it could take several months to

16  give the defendants what they are asking for.

17       That is the report that I have at this point.

18       THE COURT:  You're going to walk me through in some

19  more specific detail.  I don't understand.  Maybe I

20  mispreceive it.  I don't understand it to be separate Metadata

21  and give that separately in as much as you have a document in

22  an electronic format that includes Metadata, provide it along

23  with the document.

24       MR. BLECHMAN:  As I understand the process -- I don't

25  hold myself out --

1      THE COURT:  Forget the process for a moment.  I'm

2   trying to understand the request that is in dispute here.

3      MR. BLECHMAN:  The request in dispute, as we

4   understand it, the defendants want us presumably to go forward

5   to make a copy -- essentially -- I think what is largely at

6   issue are e-mails.  In conversation with defense counsel I

7   think they acknowledged what we're talking about.  What they

8   want is, as I understand, for our clients' to go and to

9   literally copy the entire contents, the entire contents of

10  their e-mail files along with, to the extent that they have

11  them and can find them, going to places where they maybe

12  archived, raises a whole other slew of issues and trying to

13  restore those and copy those as well.

14      From that point, the next step as I understand it

15  would be the information is then provided to, I suppose to us,

16  the lawyers, and then we'd have to cull through it to find

17  what information is discoverable and what is not.

18      Realizing the path that this takes us. I know the

19  Court remembers well the multiple status conferences that were

20  had here where plaintiffs' counsel were discussing with the

21  defendants' counsel the issue of search terms.  That wasn't a

22  process that happened overnight.

23      For us to then have to go -- where this is heading I

24  believe-- they are then going to say, we want you to use

25  search terms to search this enormous universe of materials,

1 | most of which we believe is probably not relevant to this

2 | case. That's the reason this becomes such a big problem for

3 | us, your Honor.

4 | THE COURT:  I guess, there is something that I am

5 | missing.  That may be a step down the road and we can talk

6 | about that.

7 | In terms of what the defendants want you to do now,

8 | in terms of what it is you produced differs from which you

9 | want to produce, I'm still not seeing where you are not saving

10 | a step or two in producing the native format, rather than

11 | turning it into a different format.

12 | MR. BLECHMAN:  The reason for that, through

13 | interviewing the clients and finding out who are the people

14 | that we think have the documents or where are they located

15 | reasonably, we then take a hands on approach. We go in and can

16 | search for information at the clients or the clients who know

17 | their documents, they can do searches as to instructions that

18 | we provided to them.

19 | Using protocols well recognized in the law, briefing

20 | a client as to what a defendant has requested in discovery,

21 | and having them execute on that sort of protocol and the

22 | information then comes to us, and for us this has been a

23 | process that has proven efficient and workable and produces

24 | information in a format that the defendants can use.

25 | This is not the first time that we've done this, your

1   Honor.

2        THE COURT:  I think I get what you are saying. To me,

3   one thing that is not clear, and maybe it's just me.  This

4   sounds like argument that you might make if the case started

5   today and we can clearly understand the new Rule 34 regime.

6        This strikes me purely as argument that you would

7   make for a protective under Rule 26.  I'm happy to consider it

8   in that light.

9        What I don't get yet is why it's unjust or

10   impracticable to apply the Rule 34 standard because that is

11   what the Supreme Court requires.

12        MR. BLECHMAN:  Doing so expands the scope of what the

13   defendants have asked for.  Doing so is going to multiply the

14   amount of time it's going to take us to complete the discovery

15   process, because doing so is requiring us to use a certain

16   protocol that we've not used before and which we're less

17   familiar with and --

18        THE COURT:  You are reading my face, I think. I

19   didn't mean to interrupt.  Since I have in affect, where I

20   think we keep missing each other, I don't understand if there

21   is daylight between the standard for relief under Rule 26, if

22   the case were starting today, and the standard for saying Rule

23   34 doesn't apply because it's unjust and impracticable. Is

24   there a difference or just the same inquiry?

25        MR. BLECHMAN:  It's different because what I

13

1  understand the rule, the just and practicable standard is

2  talking about is a retroactive application of the rule.  What

3  this Court is not faced with -- and I think this goes to the

4  question that your Honor is asking me -- suppose for the sake

5  of discussion this case began today, and you had these

6  requests and these issues, what would you do?

7          But, your Honor, those are not these facts --

8          THE COURT:  It's not that far removed.  We knew what

9  was coming as of December 1st for quite sometime?

10         MR. BLECHMAN:  But the -- what defines our world--

11 maybe I'm missing the Court.  What defines our world, not what

12 might be coming out there, but the written discovery that the

13 defendants sent to us that we then responded to and we tell

14 them here's what we're doing, how we're doing it and we begin

15 to do it. That defines our world.

16         The touch stop for this in our judgment has got to be

17 the written discovery request under Rule 34 that was sent to

18 us back in May or June, that we responded and lodged timely

19 objection to and executed a protocol thereafter.

20         THE COURT:  It sounds like what you are hanging your

21 hat on, in terms of what you told me, is in the nature of an

22 estoppel argument.

23         MR. BLECHMAN: It's more than estoppel.  That

24 certainly is an ingredient in it, yes.

25         THE COURT:  Because you have gone this far down a

HENRY SHAPIRO          OFFICIAL COURT REPORTER

14

1   path and they had an opportunity to object before, you can't

2   be asked to change, as opposed to starting today, I don't

3   think we'd be saying we wouldn't have to do it now.

4        MR. BLECHMAN:  Provided the defendants asked us for

5   Metadata.  To put an afterthought, we've spent time and a lot

6   of people worked real hard to the point we got a million plus

7   documents that are being processed and ready to go out and we

8   produced about 320,000 documents.

9        What we're focusing on here is the process and I

10   understand that, but at some point it seems to us, as the

11   Court recognized in the Militar case from the Southern

12   District of New York, there got to be a recognition.

13        I think that counsel for a party can excise his or

14   her judgement to determine what is the protocol that is used

15   for the client's searches.

16        What is happening here, we submit respectfully, is

17   that the larger issue really is whether adversary counsel can

18   dictate the protocol that is used by the other parties.

19        THE COURT:  Framed that way, the answer is clearly,

20   no.  Just as clear to me, counsel for the producing party

21   can't willfully adopt a protocol and say, we might miss

22   something, but to bad, we're making a responsible choice.

23        If there is something that is lacking in the

24   protocol, I think, that is fair game.  I'm not saying that is

25   what you've done, in terms of the two standards compared to

1  each other.

2      MR. BLECHMAN:  I have no interest in arguing with the

3  Court. The Court should have a clear idea the information that

4  we're producing to the defendants gives them the kind of

5  information that they really need here. This is not the parol

6  evidence rule and a file application for a file size is

7  somehow going to be irrelevant here. That is why you have

8  courts that characterize this kind of information as wasteful

9  resources.

10      The information that we're giving them can be

11  searched with 99 percent accuracy. We feel comfortable and

12  confident in the reliability of the information we're giving

13  them and I wouldn't want the Court to have a different

14  impression of that.

15      THE COURT:  I was overstating it to make a point

16  rather than to make an accusation of it.  It's certainly not

17  my intention.

18      Unless there is something more you wanted to tell me

19  on this issue, I have one other question for you.

20      What's the difference -- what's driving the

21  difference between your approach and the class plaintiffs, who

22  seem willing to sign onto the stipulation?

23      MR. BLECHMAN:  I suspect the answer-- and I hesitate

24  to speak for the class-- for them largely they're representing

25  much smaller companies and for them getting information, the

16

1    Metadata is very beneficial for them.  For us we have much

2    larger companies that have issues that may not necessarily be

3    the same as the class in terms of the intrusiveness of the

4    kinds of requests and I want to make that point before the

5    Court movers to the other side.

6         In addition, the procedures that we're using are

7    tried and tested and work and we've used them in a number of

8    cases.  That is why from the start, when this issue raised

9    itself, when we became aware of it in the end of September

10   early October, we told the class and the class defendants this

11   is not something that the individual plaintiffs will agree

12   on.

13        THE COURT:  Talk to me about intrusiveness.

14        MR. BLECHMAN:  It's fair to say from the collective

15   experience from all of the people in the courtroom, a given

16   person's e-mails, prepared in a business setting, are likely

17   to contain information that is, one, not intended at the time

18   to be for consumption by other people, and

19        Second, unquestionably contain information, at least

20   for our clients, that has no reasonable relation -- that is

21   not -- not relevant to issues in this case.

22        In other words, just a subset of the information in

23   there.  We've been told by our clients, and I need to make

24   this point to the Court, the clients have been quite adamant

25   to us, this is viewed as an unreasonably intrusive invasion of

17

1   the privacy interests of the people who are working in the

2   company --

3          THE COURT:  Is it similarly intrusive for the

4   defendants?

5          MR. BLECHMAN:  It might be. This is what they want to

6   do, my client and the other individual plaintiffs, and we

7   haven't said to them we want you to give us your Metadata. If

8   they wanted to give us their production in the format that

9   we're giving it to them, that would be fine-- that would be

10  fine. The request that comes in the plaintiffs' written

11  discovery --

12         THE COURT:  Let me interrupt.  Is that fine with you,

13  if they don't provide the Metadata?

14         MR. WILDFANG:  It's not fine.

15         THE COURT:  I take it you don't want me to have two

16  flavors of discovery in the case.  Is that practicable?

17         MR. BLECHMAN:  I don't see why not.  We're giving

18  them the information. If they need help to figure out how to

19  search it, we'll help them.  We told them that.  That is a

20  good faith offer, it gets them the information that they want.

21         THE COURT:  I guess, what I don't understand in terms

22  of intrusiveness, they are willing to do it even if you are

23  not requesting it.

24         What I don't understand, I spoke to someone that had

25  my e-mails in a business setting in front of someone else, and

HENRY SHAPIRO         OFFICIAL COURT REPORTER

18

1    I don't get why are your clients' are viewing it as intrusive

2    so much more adversely than your opponents do.  What is it

3    about the data that is the issue that is so sensitive?

4         MR. BLECHMAN:  I'm going to speculate in answering

5    the Court's question, because I can't -- I don't purport to

6    speak for defense counsel on in.

7         It's my opinion, that for the networks and a number

8    of the banks, this is not the first antitrust case that they

9    have been in.

10        There is the American Express and Discovery case,

11   which the Court is familiar with. We found out only after the

12   fact that for Visa 116 custodians that they produced, 89 of

13   them are custodians in the American Express case.

14        Why?  The point is before this process began I

15   believe the defendants realized they had to produce

16   documents -- first of all the written request from plaintiffs

17   in these kinds of cases cover everybody and their companies

18   and cover almost every piece of paper in the company.  They

19   made a judgment they need some protocol to manage that.

20        Second, I believe, that they realized they were going

21   to have to go through a process of searching and producing

22   documents for the same people in two or more other cases, and

23   again this is my opinion, your Honor, but I believe what they

24   made a decision way back, in order for them to do this most

25   efficiently for themselves-- and I represent to the Court this

HENRY SHAPIRO          OFFICIAL COURT REPORTER

19

1   is an efficient mechanism for them, the way to do it

2   efficiently is for them to use the protocols that they are

3   using.

4           It's not that way for us.  There is a real symmetry

5   in the nature of the businesses why we're able to tackle --

6   while we're able to tackle the issue of getting materials from

7   our clients', in an hands on approach, which is different from

8   the way they are doing it.

9           THE COURT:  You are getting far afield from the

10  question.  Why your clients would be more sensitive to the

11  intrusiveness of it than individuals on the other side,

12  whether there is multiple litigation or not?  At some point

13  they're saying, we're exposed to this as well.

14          MR. BLECHMAN:  In candor, I don't know that I could

15  say somebody at Walgreen's is more sensitive about it than

16  somebody at Visa.  I don't know.

17          Just as a general proposition, I think most people

18  probably are sensitive about the invasion of their e-mails.

19  But I do know that that invasion is a price that the

20  defendants were willing to pay in order to be able to use a

21  search protocol that for them was most efficient in managing a

22  number of antitrust cases in which they were being called upon

23  to produce a great many documents for a number of people who

24  were going to be witnesses in two or more of those cases. It's

25  not the same for us.

---

HENRY SHAPIRO        OFFICIAL COURT REPORTER

20

1          THE COURT:  I take it we wouldn't have this issue and

2    your clients would not have to worry about potential

3    intrusiveness, and you were members of the class, and decided

4    to pursue a separate action, right?

5          MR. BLECHMAN:  If our clients were members of the

6    glass they would not be called upon to produce documents at

7    this point, correct.

8          THE COURT:  Anything else that I need to know about

9    this issue from your prospective?

10          MR. BLECHMAN:  Not right now.

11          THE COURT:  Who is going to speak for the defendants?

12          MR. VIZAS:  I will be brief.

13          First, let's go back to where this begins.  The

14    plaintiffs, not the class plaintiffs, the individual

15    plaintiffs, and plaintiffs both requested Metadata from the

16    defendants back in May at their initial document request.

17    They didn't say it was intrusive or improper.

18          Mr. Blechman requested that information from us. We

19    didn't volunteer it. We agreed to it because we believed it

20    appropriate, not because our people are less disturbed about

21    the e-mails.

22          When we filed our document request, back in May, the

23    idea this was a surprise to Mr. Blechman that we wanted this,

24    we asked for documents to be provided in the same form in

25    which they are kept in the ordinary course of business and

HENRY SHAPIRO          OFFICIAL COURT REPORTER

1  that electronic data should be produced in an electronic

2  form.

3          We then went on to define electronic data as all

4  information of all kinds maintained by a electronic data

5  processing systems. There was a request made by us in May and

6  them in May.  This didn't arise the end of November or

7  December. It was not a complete to surprise that was an offer

8  on their own protocol.  There is no estoppel here.

9          The first  week of September the plaintiffs again,

10  not the class plaintiffs, but the individual plaintiffs and

11  the plaintiffs presented us with a protocol completely

12  appropriate, which has been negotiated now for several months,

13  which included from the first week in September, the

14  requirement that the parties produce their electronic

15  documents in electronic form and that they produce the

16  Metadata.

17          There was never any dispute, no one raised a concern,

18  it was not a word at a meeting, not a word in an e-mail.  This

19  estoppel notion of surprise is just flatly wrong.

20          The first this arose was late in the day, end of

21  November early December, when at a deposition in Texas one of

22  our co-counsel asked Mr. Blechman a question, and he said, I

23  might have some problems with that.  I sit here and a little

24  bit like through the looking glass that this was a shock.  Was

25  a new wrinkle is wrong and I'm shocked.

22

1      But leaving that aside the OCR process is not as good

2 as getting the electronic data --

3      THE COURT:  Tell me what you didn't get that you

4 need?

5      MR. VIZAS:  You don't get two things.  There is a

6 searchability problem, which others can tell you more about

7 than I.

8      Basically, when you scan something you get a scan

9 copy, you don't get an electronic copy. In a case with

10 millions of documents, we produced three and a half million

11 document already, that is a huge task to tell your searches to

12 go back and look at the database.  We use a different

13 protocol --

14      THE COURT:  I can certainly understand that problem

15 being more of an issue if you got a variety of formats that

16 are being scanned in OCR.  Maybe I'm wrong about this.  If

17 what is happening they are printing out e-mails, which tend to

18 be in the same font and doing it essentially in printed form,

19 isn't the risk of OCR missing something or misinterpreting

20 something minimal.

21      MR. VIZAS:  I think it's a real problem. Our people

22 tell us it's a real problem.

23      THE COURT:  You had said there was something else.

24      MR. VIZAS:  When you get the documents in electronic

25 form by OCR you are taking away information that exists in a

HENRY SHAPIRO      OFFICIAL COURT REPORTER

1  document as to creation-- who created it, who revised it, when

2  it was revised.  There is a whole string of information that

3  is transferred--

4          THE COURT:  What of that is useful to you?

5          MR. VIZAS:  All.

6          THE COURT:  How?  Give me some examples what you

7  won't you been able to find out if you get it this way that

8  you will get from what the class plaintiffs are producing?

9          MR. VIZAS:  Why don't I let Ms. Rottenberg handle it.

10   I can explain it, but she is more familiar with it.

11          MS. ROTTENBERG:  To go back to your question, if we

12  receive all of the documents from Mr. Blechman's clients, for

13  example, we just get a CD of the documents, all OCRd, on that

14  may be original paper which have been scanned, electronic

15  documents perhaps, word documents that come from someone else,

16  and there may be e-mails, many different kinds of documents.

17  Then we take that and load it into our system. The way that we

18  work, we then have to review those documents. There are

19  millions of pages, very difficult to review them page by

20  page.  We maybe forced to do that when we try to avoid it to

21  save on efficiency.

22          For example, people, if we need in a set of

23  documents, everything is produced in tip images-- I think your

24  Honor is familiar with that-- if we get tip images that we

25  know from the Metadata was originally e-mails our search is

1  more reliable, we're searching electronic for electronic.

2        If we get images because they are all mixed in with

3  paper scans, because they don't have the Metadata, then I know

4  when I instruct the people that need to review the documents,

5  searching is less reliable, and we may need in fact to go page

6  by page.

7        If I get a CD of a million pages and everything has

8  been scanned in OCRd, that forces me to go through those

9  documents in a very different way, with much more effort, with

10  lesser liability to the searching, and probably more time that

11  needs to be spent on each document that would otherwise be

12  done--

13        THE COURT:  What about you don't get in terms of lost

14  data?

15        MS. ROTTENBERG: Even at the simplest level one of the

16  things that we don't get is the type of document it is.  Once

17  everything is scanned and OCRd you lose at its base level what

18  was this document, was it an Excel spread sheet, an e-mail--

19        THE COURT:  You can't tell by looking it?

20        MS. ROTTENBERG:  You can, but you have to open every

21  document.  If I wanted to sort the documents and do e-mail

22  first, I would not be able to do that.

23        THE COURT:  I understand there are a hoist of

24  efficiencies that are attained if you get it in the format you

25  want.

25

1          What information you won't get?

2          MS. ROTTENBERG:  The Metadata that we don't get in

3     e-mails, what we've asked-- and we're not asking the plaintiff

4     to do anything that we're not doing-- every piece of Metadata

5     known to man, but what is readily available.

6          In some circumstances that would be many fields of

7     Metadata and in other circumstances some less.  It depends on

8     the size of the system used. Metadata will reveal in the

9     Metadata field the the CC, and sometimes the CCBs, who edited

10    the document, what other custodians may have searched the

11    documents that is not clear on the face of the document.  It

12    varies from the Metadata field on what system they used. If a

13    document what production I might be able to tell from Metadata

14    from the actual document three other custodians edited that

15    document.

16         THE COURT:  Let's pursue that.  What does that lead

17    to in determining information relevant to this case?

18         MS. ROTTENBERG:  In a depositions, if a witness

19    denied that they had seen that document or made changes to the

20    document, I would be a position of saying, but according to

21    your computer system you in fact made x-changes, could you

22    explain that.

23         That actually could be very material, if we're

24    talking about an  agreement that was negotiated over an

25    interchange or something -- their merchant discount rate were

                HENRY SHAPIRO          OFFICIAL COURT REPORTER

26

1   the bank-- and we'll know who is involved from the Metadata if

2   someone doesn't recall it.

3           THE COURT:  To be hypertechnical. You are telling me

4   how you might -- how this might lead to the discovery of

5   impeachment information, which is not independently

6   admissible.

7           How are you going to get admissible evidence,

8   substantive admissible evidence? Maybe I am being

9   hypertechnical.

10          MS. ROTTENBERG:  I don't want to evade your question.

11  It's very hard to say, standing here right now, there will be

12  something in the Metadata that is itself admissible about the

13  document --

14          THE COURT:  Forgive me for interrupting.  Not about

15  the Metadata by itself.  I can understand how Metadata may

16  help you answer a question that may impeach a witness that

17  says, I didn't see a document. What is that going to produce

18  affirmatively?

19          MS. ROTTENBERG:  Asking witnesses about information

20  that would lead to affirmative evidence. What negotiations

21  have you had and with whom.  We might learn who was involved

22  in the process and learn more about information that we

23  wouldn't know to ask custodians about the information. You

24  could not tell from just a paper document that they were

25  involved in the process.

27

1      If we were concerned if someone was negotiating a

2 particular deal to reduce their cost of payment, we won't be

3 able to know who the parties were absent Metadata and someone

4 if doesn't recall that we may not have access to the

5 information.

6      THE COURT:  Playing it out, and perhaps this is being

7 overly hypothetical, I don't mean to put you on the spot.  Try

8 to give me an illustration of a situation, looking at the

9 contents of an e-mail itself, which I assume, and you can

10 interrupt me if I am wrong, I assume printed out in an OCR are

11 going to show two CC lines, will it show BCC?

12      MR. BLECHMAN:  Yes.

13      THE COURT:  Let's assume for purposes of discussion

14 that you have that information and data.  You won't have

15 revision dates and who else touched it as you say.

16      Give me a scenario as to what that is going to cost

17 you.

18      MS. ROTTENBERG:  The example is not on the e-mail.

19 Contrary to what Mr. Blechman said earlier, and I think

20 equally important as e-mail, Metadata is a electronic

21 document, whether an Excel spread sheet, a draft of an

22 agreement on someone's hard drive or on their system, those

23 documents also have information about them, frankly, just as

24 an OCR process would never capture, and these are something

25 that you cannot see from the face of the document.

---

1        I concede on e-mails you are right, we'd see to,

2  from, CC, assuming their system, and I don't know their

3  system.

4        Some systems truncate e-mail addresses after a

5  certain point.  In our system, I can speak from experience, if

6  you have X number of e-mails that you no longer see them when

7  you print them out, Metadata would prevent that problem.  I

8  don't know if it's an issue for them.

9        THE COURT:  From your prospective, your

10 practicability to pursue what you need to do in terms of

11 discovery, if we require the individual plaintiffs to provide

12 the Metadata with respect to non-e-mail files, but not with

13 e-mails, what does that do from you prospective?

14        MS. ROTTENBERG:  We'll have fundamental problems.

15 With e-mail , as Mr. Vizas pointed out, and maybe is slightly

16 away from Metadata, taking an e-mail and transforming a tip

17 and edge, without screening it with OCR we loose a search

18 ability that we won't have and that plaintiffs are asking us

19 to provide.

20        We're providing for them in all of our electronic

21 documents, because we're translating them directly from

22 electronic to images, in a way that is 100 percent searchable,

23 including because we're giving Metadata that we are allowing

24 them to segregate.

25        As they are using the example of Sheedy, our person

1   in charge of intervening groups that they invoke, they are

2   able to do a search and pull up all of his e-mails, CCs, very,

3   very easily. It will be a fast thing-- takes ten minutes and

4   they have those documents to review. They are denying us the

5   same ability.

6          Maybe we can search the OCR, and that is not always

7   reliable. With Metadata we not only can make sure that Sheedy

8   e-mailed it-- and we are prohibited from doing that-- that

9   allows them with every document whether it was Sheedy's, one

10  hundred percent reliability.

11         We're not going to have that same ability and it

12  doesn't seem fair considering they are the plaintiffs, they

13  have sued us, they asked us for Metadata, we asked them for

14  electronic data.

15         They served us with a protocol that we have the same

16  functionability that they have.  We're not asking for anything

17  that doesn't exist.

18         THE COURT:  A couple of follow-up questions.

19         MR. BLECHMAN:  If I can clarify a few points?

20         THE COURT:  I do want to move on to some other

21  topics.

22         MR. BLECHMAN:  I do have one thing and it's

23  important.

24         THE COURT:  In terms of intrusiveness, the privacy

25  concern here, you're going through all of e-mails yourself or

1  are you and your attorneys doing it?

2          MR. BLECHMAN:  The clients provide us with the

3  e-mails that are responsive to the defendants' discovery, in

4  accordance with direction that we have provided the clients --

5          THE COURT:  The basic idea, no matter what we do here

6  on this issue, every persons' e-mail is being searched by some

7  stranger, who is looking through their private e-mails.

8          MR. BLECHMAN:  Not necessarily.  We're educating the

9  people who are being asked to search for materials as to what

10  is needed. We have in house counsel that is working with us

11  and with the clients in obtaining the information, but I don't

12  know that I can represent to you that in every instance what

13  you said --

14          THE COURT:  Some individual employees in these

15  companies are responsible for going through their in and out

16  boxes and providing responsive e-mails?

17          MR. BLECHMAN:  Yes.

18          THE COURT:  What about deleted e-mails.

19          MR. BLECHMAN:  To the extent they are in the system,

20  your Honor, they are directed to retrieve them.

21          THE COURT:  Just as a practical matter, are they

22  getting them?

23          MR. BLECHMAN:  If somebody else, if I had to go

24  retrieve an e-mail, I would-- their are some functions that I

25  would go to the computer to go to trash and find a deleted

31

1   e-mail.

2          THE COURT:  If I were to do this in situations where

3   I had to produce my e-mails, I wouldn't get everything.

4          MR. BLECHMAN:  We feel we're getting what we're

5   responsible for.

6          THE COURT:  Just in terms of where there is a dispute

7   on this, Ms. Rottenberg, was telling me because of what they

8   provide you, you have some search capability that they don't

9   have.

10         Do you disagree with that?

11         MR. BLECHMAN:  I do.

12         THE COURT:  Tell me.

13         MR. BLECHMAN:  If I heard what defense counsel said

14  the information that they actually are looking for, the very

15  sorts of information your Honor mentioned, that information is

16  specifically provided in the materials that we're turning over

17  to them. They want to see Excel spread sheets --

18         THE COURT:  You are missing my question.  Ms.

19  Rottenberg was saying, the name was Sheedy, you want to get

20  all of Sheedy's e-mails, to CC, BCC, you could get that very

21  quickly.

22         MR. BLECHMAN:  I don't know if we can or can't.

23         THE COURT:  You have a electronic search function --

24         MR. BLECHMAN:  I take what Ms. Rottenberg said at

25  face value.  They can run an inquiry on the materials that we

1   send to them, in which they can do the same thing, if they

2   don't know how we'll show them.

3          THE COURT:  If I misread Sheedy's name, the OCR--

4          MR. BLECHMAN:  Just as if it was misspelled when we

5   put it into the system, we wouldn't get it --

6          THE COURT:  Just to pursue this.  If Sheedy's name is

7   misspelled, neither side will get it from a electronic search

8   that just looks for Sheedy?

9          MR. BLECHMAN:  You wouldn't necessarily just do it

10  that way.

11         THE COURT:  It maybe fanciful, let's construct a

12  scenario here where both sides want to find the name Sheedy,

13  spelled just one way.  There are some situations, because the

14  originator of the document misspelled the name, neither side

15  is going to get it if they look for Sheedy.

16         Are there some that you're going to find that they

17  are not going to find because of the way OCR does it?

18         MR. BLECHMAN:  I don't believe so. I say that based

19  on having talked to the information technical people with whom

20  we're working who have run tests on the accuracy and

21  reliability of the information that we turned over asking just

22  the kind of questions that you are posing to me now and they

23  have assured me they will get that same information.

24         If I might, there were a view points that were

25  raised, and I think it's important that the Court have a full

HENRY SHAPIRO        OFFICIAL COURT REPORTER

1  picture.

2        First, it's true that plaintiffs' consolidated

3  written Rule 34 requests, the defendants seek Metadata, and

4  the Court needs to understand that that reflects the class

5  plaintiffs desire to get Metadata.

6        The fact that we don't want something and somebody

7  else does, doesn't mean we can impose our will on the class

8  plaintiffs to ask for it. That's why it's there--

9        THE COURT:  Excuse me.  Why don't you at least raise

10  the issue in a more transparent way to the defendants, the

11  class plaintiffs want it, but we don't want to start down this

12  road.

13        MR. BLECHMAN:  When the issue was raised -- we did

14  when the issue became ripe-- the issue became ripe in

15  September when we saw for the first time --

16        THE COURT:  I understand.

17        MR. BLECHMAN:  -- the proposed stipulation the

18  defendants--

19        THE COURT:  I understand the point.

20        Go ahead.

21        MR. BLECHMAN:  On October 9th we informed the class

22  that we'd not agreeing to provide Metadata.  On October 11th

23  the class told the defendants.

24        One other point, if I might. I know I'm taking up

25  lots of the Court's time.

1      I don't know if the defendants have actually run

2  searches, if they can gets the information they are looking

3  for from the information given to them.  There has been

4  discussion, it's hard to say, they don't know our system, and

5  maybe they can read the OCR, but what I suggest to this Court,

6  what would make sense here, because what is at issue what is

7  going forward, to allow us to work with the defendants to

8  allow them to determine and confirm what we know to be the

9  case, which is they can get the information that they say they

10  need using our system, because it sound to me what we're

11  talking about here, a little about how many angels can dance

12  on the head of an pin.

13      I'm representing what I'm told is accurate and I'm

14  not sure that the defendants actually know, as opposed to

15  speculating, as to the concerns of the information they are

16  getting from us--

17      THE COURT:  What determines how would they know how

18  accurate it was?

19      MR. BLECHMAN:  Take Mr. Sheedy -- that is a bad

20  example.  It's information coming from us.  Take some names,

21  run inquiries on the information on them on file, that we've

22  turned over, we're telling them the people whose files are

23  going to be produced, and

24      The answer to the second part of the Court's

25  question, I don't know the technical answer, but apparently

1  you can run individual inquiries, because I have gotten

2  reports that were run, you put in the words and tells you--

3  gives you percentage of the number of hits that you get and it

4  tells you how accurate it is.

5         I apologize, I can't be more clear about what this

6  mechanism is because in candor I don't fully understand it to

7  be able to explain it you to you. The information technology

8  people say those kinds of tests can be run.

9         THE COURT:  In terms of burden, your concerned about

10  intrusiveness, but the burden of shifting course, do you have

11  a dollar figure of what it would cost you to do what the

12  defendants asked?

13         MR. BLECHMAN:  Going forward?

14         THE COURT:  Yes.

15         MR. BLECHMAN:  A million dollars, I don't know.

16         THE COURT:  Do you have a sense, Ms. Rottenberg, in

17  terms of efficiency you achieve between the two types of

18  production, any kind of ball mark estimation of a dollar

19  figure?

20         MS. ROTTENBERG:  I don't have that estimation.  I

21  would not like to just -- we've not run the numbers as to how

22  many we'd need.

23         If I could just respond to one point, to run tests

24  and to run searches. Before I came into court today I did

25  actually look at what the plaintiffs produced and I wanted to

1   come to court prepared in case you had questions about
2   production.

3         Here is the number of documents we produced and
4   here's how many were electronic documents, how much paper, how
5   much were e-mail, because we have not received that
6   information from plaintiff, I could not run the search.

7         There was no way for me to go through the 100,000
8   documents and say how many were electronic versus how many
9   were on paper. That's a huge detriment to us. I can't quantify
10  it standing here today.

11        If I had to quantify it, I would need to figure out
12  the number of extra attorney hours and contract attorney hours
13  that we'd need to search the production that would allow us--
14  if we wanted to look at only e-mails-- to do that and the only
15  way right now because of the way they produced it is to
16  basically look at it page by page, because OCR will not reveal
17  e-mail as opposed to other types of documents.

18        THE COURT:  I will not give you a ruling from the
19  bench today.

20        What I would like, to the extent there is
21  disagreement, to what I'm overly simplistically calling the
22  estoppel part of the argument, put in a short letter the
23  documents that I need to look at your understand your
24  position.

25        I don't want argument.  I want to know that I'm

1  looking at the right documents on each side.

2         Can you get me that within a week?

3         MS. ROTTENBERG:  Yes.

4         MR. BLECHMAN:  Yes.

5         MS. ROTTENBERG:  A week from today is Christmas,

6  could it be Tuesday?

7         THE COURT:  Of course.  Make it the end of next

8  week.

9         MR. BLECHMAN:  A week from Friday?

10        MS. ROTTENBERG:  That is fine.

11        THE COURT:  Let's move on.

12        There is an issue about substantial completion date

13 for defendants' responses to plaintiffs' requests.  I had one

14 question.  I'm happy to hear from both sides. It is more a

15 matter of you folks all working and wanting to get done as

16 soon as possible, I'm sure.  Who is speaking for the bank

17 defendants?

18        Here's my question, and I shouldn't group them

19 because there are several different bank defendants.

20        I'm looking at page 13 of the status report. Capital

21 One expects to produce its first wave of document in late

22 December, early January.  Bank of America is engaged in

23 collecting the documents for production. JP Morgan Chase has

24 searched and gathered the documents maintained by the bank.

25 Those three jumped out at me.

HENRY SHAPIRO       OFFICIAL COURT REPORTER

1          As I understood from our discussion last time, the

2     bank defendants had committed to start production by early

3     November.  Is that incorrect?

4          MR. GREENE:  I represent JP Morgan Chase.  Peter

5     Greene.  I think when we were here last time and we committed

6     to start production as soon as we could, we thought we'd be

7     able to do that in November.

8          I know with respect to Chase, since we were here, we

9     made three productions, the most resent last Friday, and we

10    made one before the last pre-hearing and one between today and

11    last Friday.

12         I can't speak for the other bank defendants.  We're

13    giving rolling production and processing the documents and

14    getting them out the door as quickly as we can as the report

15    indicates.

16         THE COURT:  I am sure I do underestimate how

17    burdensome it is to get the stuff reviewed. I want to make

18    sure that we're staying close to prediction.

19         Anything else counsel for Capital One or Bank of

20    America can tell me?

21         MR. LADNER:  Mark Ladner for Bank of America. We

22    produced documents since our last conference. We have been

23    working diligently to review documents and certainly the date

24    of November 15th looms large in our mind and have committed an

25    awful lot of resources to get it done by that date.

---

1          THE COURT:  Anybody who thinks, speak now please, if

2     it's the case, anybody who thinks that we're not on track to

3     complete it on schedule?

4          MR. VIZES:  Your Honor, I guess, I will speak since

5     we're the producer of documents in the range of three and half

6     million. Could I promise you today by the end of February?  Is

7     there anything that I know that we're not going to make it?

8          THE COURT:  That's what I'm looking for.

9          MR. VIZES:  I think we're in the same position.

10    There are lots and lots of people doing this.  Absent any

11    glitches we're hopeful.

12         MR. GREENE:  Your Honor, we agree with what Mr. Vizes

13    said, we are hopeful we'll make the February 15. We're

14    certainly trying. We have committed an awful lot of resources

15    to doing that.

16         The way production is going, we produced a lot of

17    documents.  I could not promise we'll make the 15th. We're

18    certainly trying and I have no reason to believe at this point

19    that we'll not.  I'll be in a lot better position as we get

20    into the first and second week in January as to whether any

21    glitches or difficulties pop up.

22         It would be our intention to let the Court and

23    opposing counsel know immediately if there is a problem.

24         THE COURT:  Okay.  Anyone on behalf of the plaintiffs

25    who want to address this issue.  I just wanted a status

1  update.

2          MR. WILDFANG:  We take defense counsel at their word.

3  I would note one of the advantages of having Metadata, we can

4  search by custodian.  We've done some of that and it appears

5  that for some of the defendants, I will pick on Visa USA, no

6  documents from Mr. Sheedy's files have been produced.

7          For Chase out of 6,000 documents produced, we have

8  eight from the guy who is the representative on the Visa

9  board.  I'm not accusing them of any of this, it appears a

10 lot of this stuff that we're waiting for, we're still waiting

11 for.

12         THE COURT:  We will address issues as they arise.  I

13 wanted to get further input on that.

14         On the custodian list there was one person in dispute

15 and that has been resolved.

16         You folks were going to update me on the status of

17 discovery with respect to the defendants reorganization.

18         MR. VIZAS:  At your directions, after the last

19 conference, a small group of people on behalf of plaintiffs

20 and the defense side have met several sometimes and exchanged

21 information. I think we narrowed it down to a couple of

22 issues.

23         MR. WILDFANG:  We made progress. There are a couple

24 of sticking points that hopefully when we can get over.

25         THE COURT:  The same thing with data discovery.

---

HENRY SHAPIRO          OFFICIAL COURT REPORTER

41

 1          MS. ROTTENBERG:  Yes, your Honor. We are in similar
 2   position.
 3          THE COURT:  The next thing I have on my agenda is
 4   this opt out from the earlier MDL case.  I'm not sure that I
 5   understand whether there is something currently before me.
 6          MR. VIZAS:  No.  We thought we'd include it.  It's
 7   the one opt out case.
 8          MR. WILDFANG:  The only issue, we have served
 9   discovery, it has been resisted, that prompted some additional
10   discussion of trying to settle the matter, if it doesn't
11   settle, Visa's position it should be coordinated with this
12   discovery.
13          THE COURT:  We'll get there when we get there.
14   Westpac, the Australian bank, have you folks narrowed your
15   dispute on that?
16          Do we have counsel for Westpac?
17          MR. JACOBSON:  Mr. Wildfank can address that.
18          MR. WILDFANK:  There is nothing to be decided today.
19   We have made progress.  I'm sure at the end of the day there
20   won't be something that comes back.
21          THE COURT:  Still working on it?
22          MR. WILDFANG:  Yes.
23          THE COURT:  Make sure you give the court reporter
24   your information.
25          Plaintiffs' responses to the defendants' request.

1  Let's go through that.

2          First of all, there is issue about the custodial

3  search approach.  As I understand it, Mr. Blechman, this is

4  your issue.

5          MR. BLECHMAN:  Yes, your Honor.

6          THE COURT:  There is sort of basic level, which I

7  don't understand the dispute here. What's the difference

8  between a custodial approach and what you are doing?

9          MR. BLECHMAN:  The custodial approach here, here are

10  the names of 134 people, we want you to search all of their

11  files.

12          The approach that we have been using says where the

13  documents are reasonably likely to exists that are responsive

14  and not cumulative, not duplicative, that are in the hands of

15  decision makers and people who are dealing directly with the

16  banks or the networks and where are documents that are

17  responsive to defendants' request that are located in common

18  areas such as a file drawer where all the contracts might be

19  kept that no individual might have.

20          Therefore, the difference is what we're doing is

21  going and finding the materials that are responsive from the

22  people who we, based on talking to the client, are expected to

23  have this material that is responsive to their discovery.

24          What they're doing is far more of a dragnet approach,

25  that in the end is calling for the production of materials

1   that are duplicative of what other people higher-up in the

2   food chain have that are cumulative and Rule 26 says that we

3   are allowed to protect ourselves from doing that kind of

4   search.

5        THE COURT:  The difference it seem to me you are

6   starting with a smaller list of people.

7        MR. BLECHMAN:  It's a small peer group of people.

8        THE COURT:  That is an interesting move.  This isn't

9   a pointed question.  You are starting with a list of people

10  and going from there to identify what is responsive.

11       MR. BLECHMAN:  We're starting by going to people that

12  we think are decision makers who have knowledge and from there

13  we go and find the other people where we think the document

14  might lie.

15       The approach that we're doing allows us to get the

16  information without producing lots of cumulative information.

17  We're talking to them, to defendants.

18       THE COURT:  You are saying it's not ripe yet.

19       MR. BLECHMAN:  I think it's not ripe.

20       THE COURT:  Mr. Vizas.

21       MR. CARNEY:  Gary Carney.

22       There are two issues, I think, with respect to

23  plaintiffs' responses.  One, the custodian list issue I will go

24  along with Mr. Blechman.  It's probably not ripe in the sense

25  that we are talking with them about what the scope of that

1  should look like.

2      We're concerned it has taken this long.  We wanted to

3  pursue it in a logical manner so we serve our request, took

4  30(b)(6) depositions, got a sense of their organization, we've

5  gone back to them in every case, with respect to Mr.

6  Blechman's clients, and have asked for custodians that we

7  think, based on the 30(b)(6) depositions are relevant and

8  important.

9      In the December 4th conference plaintiff told us that

10  they will come back to us in the next couple of weeks, which

11  is today, and we've gotten some responses.

12      If Mr. Blechman's informs us many responses are in

13  the back and we're expecting updated custodians and we would

14  be happy to talk to them and hear the condition on that.

15      The second issue though is one that sort of dovetails

16  what we were talking about before, the approach that the

17  individual plaintiffs are taking with respect to electronic

18  discovery.

19      As Mr. Blechman said there is fairly well settled law

20  out there what you should do in terms of going about searching

21  hard copy documents.  We don't know what they're doing with

22  respect to electronic documents.

23      It appears from what Mr. Blechman told us they are

24  essentially doing it the same way, they are asking their

25  people to what pull down the e-mails-- to search pursuant to

1 instructions, but it seems clear to us there is no systematic

2 effort the defendants identify to pull all e-mails in the in

3 box, out box, what is on the electronic --

4     THE COURT: To some expect we're doing this in a

5 vacuum. Do you have search protocols? Are you willing to

6 give it to them?

7     MR. BLECHMAN: We're willing to supply them with what

8 we're doing.

9     THE COURT: The instructions that you are sending

10 out?

11     MR. BLECHMAN: Allow me to confer with other lawyers

12 from other firms who represent other individuals, and subject

13 to doing so -- subject to their agreement--

14     THE COURT: I'm with you, that the responsibility to

15 discharge is yours and you have to figure out how to do it.

16 They get to argue if it's not producing what they are entitled

17 to and I think there are two ways that we can discuss it. We

18 agree in advance how you are going to do the search or we find

19 out after you made the production how you went about doing

20 it.

21     I wouldn't say this in a smaller case, where we've so

22 many moving parts, the only way to resolve these kinds of

23 disputes if they see -- if you are not willing to commit to

24 specific search protocols by agreement, at least tell them

25 what it is you have done.

46

1          I understand you have to make a decision whether you
2     are going to do it.  You will have to educate me passed that
3     if you don't go along with that.
4          MR. CARNEY:  Thank you.
5          THE COURT:  I think is essentially the issues that
6     are in the status report that we needed to cover today. Is
7     there anything else?
8          MR. WILDFANG:  Talking to some of my colleagues, it
9     might be helpful to the Court to look beyond March for some
10    status conference dates.
11         THE COURT:  Why don't I do it as last time, schedule
12    some down the road past March.  In the order that comes out
13    today, to the extent dates there are problems, you confer and
14    get back to me.
15         MR. VIZES:  Could we do a day other Monday?
16         THE COURT:  Because of Sunday travel.  Is Friday
17    problematic?
18         I'm happy to change the remaining conferences through
19    March.  Are those Mondays?.  I will reschedule, if there are
20    any problems, I can change them. The one think that I don't
21    want to move, we have you coming in on January 29th.  If we
22    move that off the top of my head to the 31st, which is a
23    Wednesday--
24         MR. VIZES:  That would be great.
25         MR. WILDFANG:  We have a prior engagement on the

HENRY SHAPIRO          OFFICIAL COURT REPORTER

1   31st.

2          MR. VIZAS:  We can move that.

3          MR. WILDFANG:  I don't know if we can.

4          THE COURT:  I'm happy to move it.  I want you folks

5   to talk among yourselves. In the next couple of days get back

6   to me with an alternative date.  I will leave that open.  I

7   didn't want to just give you a date.  Anything else, folks?

8   Then I will see you January 29th or sometime shortly

9   thereafter.  Have a good day.

10                          ********

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25