**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------X
IN RE PAYMENT CARD INTERCHANGE FEE AND
MERCHANT DISCOUNT ANTITRUST LITIGATION                    **REPORT AND**
                                                          **RECOMMENDATION**
This Document Relates To:                                 MD 05-1720 (JG) (JO)

| | | | |
|---|---|---|---|
| CV 05-3800 | CV 05-4728 | CV 05-5072 | CV 05-5077 |
| CV 05-5803 | CV 05-5869 | CV 05-5880 | CV 06-1829 |
| CV 05-3924 | CV 05-4974 | CV 05-5073 | CV 05-5080 |
| CV 05-5153 | CV 05-5870 | CV 05-5881 | CV 06-1830 |
| CV 05-4194 | CV 05-5069 | CV 05-5074 | CV 05-5081 |
| CV 05-5207 | CV 05-5871 | CV 05-5882 | CV 06-1831 |
| CV 05-4520 | CV 05-5070 | CV 05-5075 | CV 05-5082 |
| CV 05-5866 | CV 05-5878 | CV 05-5883 | CV 06-1832 |
| CV 05-4521 | CV 05-5071 | CV 05-5076 | |
| CV 05-5868 | CV 05-5879 | CV 05-5885 | |

------------------------------------------------------------------------X
**JAMES ORENSTEIN, Magistrate Judge:**

A putative class including millions of retailers across the country has sued the Visa and

MasterCard payment card networks, as well as many of the banks that are members of those

networks and issue their cards, alleging a variety of violations of the antitrust laws.  Their claims

have certain things in common with claims settled in an earlier case known as *In re Visa Check/*

*MasterMoney Antitrust Litigation*, docket no. CV 96-5238 (E.D.N.Y.)  (the "*Visa Check*"

litigation).  It is the relationship between that earlier case and this one that is now before the

court:  specifically, along with the bank defendants, the payment card network defendants in this

case who previously settled the *Visa Check* litigation seek an order that either dismisses or strikes

from the relevant pleadings all of the class plaintiffs' claims for damages incurred prior to

January 1, 2004.  Docket Entry ("DE") 387.  Upon a referral from the Honorable John Gleeson,

United States District Judge, I now make my report and, for the reasons that follow, respectfully

recommend that the court grant the motion.

I.      Background

The first complaint in this consolidated litigation was filed by plaintiff Photos, Etc. Corp.

in June 2005; several others followed over the next months and on October 20, 2005, the Judicial

Panel on Multidistrict Litigation consolidated those actions for pretrial purposes and transferred

them to this district.  DE 1.  In the almost two years since that time, cases have continued to be

transferred for consolidation and there are currently over fifty cases associated with this action.

Several of the consolidated cases were pleaded as putative class actions; the remaining plaintiffs

(the "Individual Plaintiffs") eschewed collective action and sued only on their own behalf.  The

plaintiffs in the putative class actions (the "Class Plaintiffs"), who have coordinated their actions

under the leadership of a group of attorneys serving as co-lead counsel,[1] filed their First

Consolidated Amended Class Complaint ("Complaint") on April 24, 2006.  DE 317.  The motion

I address here concerns only the claims contained in the latter pleading; it has no bearing on the

Individual Plaintiffs' several complaints.

The Complaint defines two putative classes, both of which seek relief for harms allegedly

arising out of the defendants' purported collaboration to inflate "interchange" fees.  The latter

term refers to the fee charged to merchants by the banks that issue payment cards; it is the largest

component of the total fee that banks charge for processing transactions using those cards.

Complaint ¶ 8.  The two classes differ in only two respects:  one class seeks monetary damages

and is defined as "[a]ll persons, business, and other entities that have accepted Visa and/or

MasterCard Credit and/or Debit Cards in the United States at any time from and after January 1,

---

[1] *See In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 2006 WL
2038650 (E.D.N.Y. Feb. 24, 2006) (appointing co-lead counsel).

2004[;]" the second seeks equitable relief and is defined exactly the same as the first class, only without the temporal restriction.  Complaint ¶ 97a.  The Complaint acknowledges that a class "virtually identical to" the aggregate of the two putative classes was previously certified in the *Visa Check* litigation.  Complaint ¶ 106 (citing *In re Visa Check/MasterMoney Antitrust Litig.* ("*Visa Check I*"), 192 F.R.D. 68 (E.D.N.Y. 2000), *aff'd*, 280 F.3d 124 (2d Cir. 2001)).  A brief discussion of that earlier litigation will help place the instant dispute in context.

> A.   The *Visa Check* Litigation

> > 1.   The Claims

On February 22, 2000, this court certified a class consisting of "all persons and business entities who have accepted Visa and/or MasterCard credit cards and therefore have been required to accept Visa Check and/or MasterMoney debit cards under the challenged tying arrangements during the fullest period permitted by the statute of limitations."  *Visa Check I*, 192 F.R.D. at 90.  The *Visa Check* class alleged, among other things, that unlawful collusion between Visa and MasterCard resulted in artificially inflated interchange fees, which in turn caused harm to the class and for which it sought damages and equitable relief.  The class asserted that Visa and MasterCard were effectively controlled and operated by their member banks by virtue of the banks' positions on the boards of directors of Visa and MasterCard; it further alleged that the simultaneous membership of certain banks on the boards of both Visa and MasterCard facilitated collusion between the two networks.  *See* DE 387-6 ("*Visa Check* Complaint") ¶¶ 43-46.  The *Visa Check* class further contended that Visa and MasterCard shared overwhelming dominance in the credit card market and implemented anticompetitive rules to preserve that dominance.  *See, e.g.*, *Visa Check* Complaint ¶¶ 50, 66.  For example, the class alleged, when a competitor entered

3

the credit card market, Visa required its members to boycott the competitor's credit cards by refusing to issue cards or process transactions using them. *Visa Check* Complaint ¶ 54.

### 2. The Notice Of Pendency

In June 2002, the court ordered the leaders of the plaintiff class in *Visa Check* to notify class members that the action was pending. The plan of notification required the class to mail a seven-page Notice of Pendency ("Notice") directly to absent class members and to publish a summary version in a variety of media over a month-long period. DE 455-7 (*Visa Check* Consent Order For Providing Notice To Members Of The Certified Class dated June 21, 2002) ("*Visa Check* Notice Order") ¶¶ 12-16. The order provided the parties with full opportunities to object both to the execution of the notice plan and to the sufficiency of the Notice itself, on due process grounds or otherwise. *See id.* ¶¶ 11, 19.

The Notice sent pursuant to the order was addressed to "all persons and business entities in the United States who, at any time since October 25, 1992, have accepted Visa and/or MasterCard credit cards for payment and have therefore been required to accept Visa and/or MasterCard-branded debit cards (also known as *Visa Check, MasterMoney* or *MasterDebit* cards)." *Visa Check* Notice Order Ex. G (Notice of Pendency of Class Action) (boldface highlighting and capitalization removed). It contained information about the history of the litigation, provided notice of the class members' right to opt out of the action and consequences of remaining in it, and directed class members to sources of further information. *Id.* The Notice described the claims at issue as follows:

> The allegations against Visa and MasterCard are set forth in the Second Amended Consolidated Class Action Complaint filed with the Court on May 26, 1999. Plaintiffs claim that Visa and MasterCard, individually, and in conspiracy with

4

each other and with their member banks, have violated the federal antitrust laws by forcing merchants who accept Visa and/or MasterCard-branded credit cards for payment also to accept Visa and/or MasterCard-branded debit cards for payment, and by conspiring and attempting to monopolize a market for general purpose point of sale debit cards.  Plaintiffs claim that Defendants' actions have caused merchants to pay excessive fees on Visa and MasterCard credit and debit transactions, have caused merchants to pay excessive fees on on-line PIN based debit transactions (which allegedly have been inflated as part of Defendants' alleged conduct), and have injured competition, merchants and consumers. Plaintiffs seek:  (1) an injunction prohibiting the Defendants from engaging in the alleged violations of the federal antitrust laws (including the elimination of the alleged forced acceptance of the Visa and/or MasterCard-branded debit cards for payment by merchants who accept Visa and/or MasterCard-branded credit cards for payment), and (2) the recovery of damages for the alleged excess portion of fees paid on Visa and MasterCard credit and debit transactions, and on online PIN-based debit transactions, as well as costs and attorneys' fees.

*Visa Check* Notice of Pendency ¶ 3.[2]

### 3.    The Settlement

After seven years of hard-fought litigation and on the cusp of trial, the parties to the *Visa Check* litigation agreed in principle to settle the case.  As part of that settlement, the plaintiff class gave Visa and MasterCard a broad release of claims, the precise contours of which are at the heart of the dispute now before the court.  Part of that release, the meaning of which is now in dispute, referred to "conduct prior to January 1, 2004" – a date that was still several months in the future both at the time the agreement was signed and when the court approved it.  In full, the release provided as follows:

---

[2]   The summary version – which was published in eight separate publications, over the PR Newswire twice, in relevant trade association publications, and on the Internet from September 9, 2002 through October 14, 2002 – included the following warning:  "If you or your company have accepted MasterCard and/or Visa cards for payment at any time since October 1992, this Notice may affect your rights."  *Visa Check* Notice Order Ex. H (boldface highlighting and capitalization removed).

[MasterCard and Visa] shall be released and forever discharged from all manner of claims, demands, actions, suits, causes of action against the Released Parties [MasterCard and Visa], whether class, individual, or otherwise in nature, damages whenever incurred, liabilities of any nature whatsoever, including costs, expenses, penalties and attorneys' fees, known or unknown, suspected or unsuspected, in law or equity, that any Releasing Party [Class Member] ever had, now has, or hereafter can, shall or may have, relating in any way to any conduct prior to January 1, 2004 concerning any claims alleged in the Complaint or any of the complaints consolidated therein, including, without limitation, claims which have been asserted or could have been asserted in this litigation which arise under or relate to any federal or state antitrust, unfair competition, unfair practices, or other law or regulation, or common law, including, without limitation, the Sherman Act, 15 U.S.C. § 1 *et seq.* Each Class Member hereby covenants and agrees that it shall not, hereafter, seek to establish liability against any of the Released Parties based, in whole or in part, upon any of the Released Claims.

DE 387-4 ("Settlement") ¶ 28.[3]  The injunctive relief included modifications to the defendants' marketing and labelling of their debit products, alterations to the defendants' membership rules, and the reduction of interchange fees for transactions involving debit cards between August 1, 2003 and December 31, 2003.  Settlement ¶¶ 4-8.  The defendants agreed to make regular instalment payments that will ultimately exceed $3.05 billion, $350 million of which was to be paid by December 22, 2003.  Settlement ¶ 3.

Of particular relevance to the dispute now before the court is the fact that the Settlement did not become binding on the parties when executed, or even when approved by the court. Instead, the parties agreed that the Settlement would take effect only when three events had occurred:  (1) court approval of the Settlement; (2) dismissal of the action with prejudice; and (3) expiration of the time to appeal from the court's approval of the Settlement, or if appealed, affirmance of the court's approval with no possibility of further review.  Settlement ¶ 25.

---

[3]  The *Visa Check* class entered into substantially identical settlement agreements with each network.  *See* DE 387 (reprinting each).  For ease of reference, I refer to them collectively as the "Settlement" and cite exclusively to the agreement executed by Visa.

6

The Settlement was negotiated in the Spring of 2003, and the final agreement documents were signed in June of that year.  Over the next two months, the parties notified the roughly five million class members about the terms of the proposed settlement and solicited any objections they might have to its fairness.  The notice included "the releases, verbatim, as set forth in the proposed Settlement" as well as instructions about how to get additional information, contact the claims administrator or the plaintiffs' lead counsel, and lodge an objection.  *In re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d 503, 509 n.5 (E.D.N.Y. 2003) ("*Visa Check II*").  Only 18 class members lodged any objection to the proposal.  *Id.* at 509 & n.6.

The district court held a fairness hearing on September 25, 2003, at which it heard argument on all objections to the Settlement.  *Id.* at 508.  The court found the Settlement to be procedurally and substantively fair, and approved its terms as reasonable under all of the circumstances.  *Id.* at 509-11.  The United States Court of Appeals for the Second Circuit affirmed that ruling, and the Settlement accordingly took effect in early 2005.  *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir.), *cert. denied*, 544 U.S. 1044 (2005).

B.       The Instant Litigation:  The Class Plaintiffs' Claims

 The instant Complaint, the allegations of which I deem to be true for present purposes, names as defendants Visa U.S.A., Inc. and Visa International Service Association (collectively, "Visa"); MasterCard International Incorporated and MasterCard Incorporated (collectively, "MasterCard"); and several banks.  The Complaint alleges that all defendants engaged in a course of concerted activity to inflate interchange fees in violation of various antitrust laws.

Visa and MasterCard are membership corporations comprised of thousands of banks worldwide; the banks named as defendants in this action are members of both MasterCard and

Visa.  Complaint ¶¶ 52-54.  Several banks are represented on the Board of Directors of each network, and some are represented on both boards.  Complaint ¶¶ 88, 177-92.  In addition to their governance roles, the banks, as network members, participate in consumer payment card transactions involving the Visa or MasterCard transaction processing system, assuming the role in any given transaction of an "Issuing Bank" or an "Acquiring Bank."  An Issuing Bank issues payment cards bearing the Visa or MasterCard imprimatur to consumers who wish to use them as forms of payment in transactions with merchants in the putative plaintiff class.  An Acquiring Bank receives payment transactions from such merchants, and coordinates between and among the relevant Issuing Bank, the merchant, and the Visa or MasterCard network, as appropriate, to facilitate the transaction's processing.  Issuing Banks assess interchange fees, purportedly as compensation for their role in the payment card transaction.  Those fees are a subset of the overall fee a merchant must pay every time it accepts a Visa or MasterCard payment card as payment for a sale.  Complaint ¶ 8.

To illustrate, when a consumer uses a Visa card to make a purchase from a merchant, the latter contacts an Acquiring Bank to seek authorization, and the Acquiring Bank then submits the transaction to the Visa network for transmission to the Issuing Bank.  If the Issuing Bank determines that the consumer has sufficient credit or funds to make the proposed purchase, it approves the transaction.  Upon such approval, the Issuing Bank transfers the payment price to the Acquiring Bank, minus the interchange fee, which the Issuing Bank keeps for itself.  The Acquiring Bank then transfers the purchase price to the merchant, minus the interchange fee (which the Issuing Bank kept) as well as other deductions, including the Acquiring Bank's fee,

and other service and processing fees.[4]  The total difference between the purchase price paid by the consumer and the smaller amount that the merchant eventually receives is known as the "merchant discount fee." Complaint ¶ 8.

Each network promulgates membership rules, which govern the terms of the banks' participation in transactions using either network's card, and sets the level of the interchange fee charged to merchants.  By virtue of their positions on the Boards of Directors of MasterCard and Visa, the banks control the amount charged as interchange fees for each network.  Further, because so many banks are members of both Boards, they jointly establish the level of interchange fees for Visa and MasterCard and ensure that each network's interchange fees increase regularly in coordination with each other, rather than decreasing as they would in response to competition.  Complaint ¶¶ 131-35.

The membership rules insulate Visa and MasterCard from competition in other ways, and the rules imposed on merchants forbid them to encourage customers to use payment cards with a lower interchange fee or to pass the cost of the interchange fee along to customers using Visa or MasterCard payment cards.  The Class Plaintiffs contend that all of this conduct, by itself, violates federal and state antitrust laws.  Additionally, among other anticompetitive effects that they say show violations of the antitrust laws, the Class Plaintiffs claim that they have been coerced into paying interchange fees that are far higher than unrestrained competition would produce.  Complaint ¶¶ 153-60, 227-33.

---

[4]  In some circumstances, a single bank can act as both the Issuing Bank and the Acquiring Bank for the same transaction; the interchange fee is nevertheless charged in such transactions.

9

Throughout the Complaint, the Class Plaintiffs refer to the *Visa Check* litigation.  *See* Complaint ¶¶ 106, 121, 141, 198-99, 204, 312-13, 318.  They also define the amount of damages at issue with reference to the Settlement:  specifically, they seek monetary damages "for the fullest time period permitted by the applicable statutes of limitations and the purported settlement and release in [*Visa Check*], in an amount to be proved at trial ...."  Complaint Prayer for Relief ¶ D.  Accordingly, the Complaint's terms mandate clear definition of the temporal scope of the Settlement as a precondition for establishing the amount of damages at issue.

C.    The Defendants' Motion to Dismiss

On June 9, 2006, the defendants moved to dismiss the Class Plaintiffs' claims for damages to the extent such damages were incurred before January 1, 2004.  DE 387.  The defendants argued that the Settlement's release provision excused Visa and MasterCard from liability of the type the Class Plaintiffs seek to impose until January 1, 2004, and that the latter date therefore marks the start of the time period for which the Class Plaintiffs may seek monetary damages.  The Class Plaintiffs disagree and, to put the dispute in clear relief, they point to an increase in the networks' interchange fees for credit card transactions[5] that took effect in August 2003 (the "2003 fee increase") – after the Settlement was signed, but before this court approved it in December 2003 and before it took effect in 2005.  The Class Plaintiffs contend that that fee increase caused billions of dollars in damages in 2003 alone, and effectively wiped out the monetary value of the Settlement.  *See* DE 738 (Transcript of Oral Argument, Nov. 21, 2006)

---

[5]  The Settlement provided for a five-month decrease in the interchange fee for debit transactions using Visa and MasterCard products, but said nothing about interchange fees for credit transactions.  Thus the dispute here centers on whether the latter fact was contemplated by all parties, or was an oversight by the class plaintiffs' erstwhile counsel that left room for the defendants to take an action that was arguably entirely inconsistent with the Settlement's spirit.

("Tr.") 51-52, 56, 61.  They therefore assert that it can appropriately form part of the basis of their instant claims against the defendants.  The defendants argue that they have been released from any liability for such damages because the 2003 fee increase was conduct included within the Settlement's release provision.

Notwithstanding the Class Plaintiffs' assertion that the amount at stake in this motion is potentially billions of dollars, the relief that the defendants now seek is in one sense quite limited:  as they made clear at the oral argument before me, they do *not* now seek to bar the Class Plaintiffs from seeking the much greater amount of damages – an amount that the Class Plaintiffs' counsel characterized as "a lot more than" five to eight billion dollars, Tr. 61-62 – that was incurred in or after 2004 as a result of the 2003 fee increase or any other pre-2004 conduct. Although they have not disavowed seeking such relief later, they have explicitly limited the instant motion to seeking the dismissal of claims for damages that assert harms both caused and suffered prior to January 1, 2004.  *See* Tr. 26, 32-37.

The Class Plaintiffs oppose the defendants' motion on two grounds.  First, they advance a construction of the Settlement's release provision that would cover only the defendants' allegedly anticompetitive conduct through May 26, 1999 (the date of the last amended complaint in *Visa Check*), leaving them free in this litigation to seek damages for later conduct, including the 2003 fee increase.  Second, they assert that even if the Settlement did purport to release the portion of their claim for damages that is predicated on the effects prior to January 1, 2004 of the 2003 fee increase, that part of the release is ineffective because the notice sent to *Visa Check* class members was constitutionally inadequate to protect their rights to opt out of the Settlement.  *See* DE 453 ("Opp'n Memo.").

11

I heard oral argument on the motion on November 21, 2006.  In light of the fact that the

Class Plaintiffs had challenged the adequacy of the notice provided to the *Visa Check* plaintiff

class, I asked their counsel to explain if he was seeking rescission of the Settlement or some

other remedy.  He was unable to provide an answer at the time, and I therefore permitted him an

opportunity to submit supplemental briefing on the Class Plaintiffs' position in the event that the

court agreed that the notice was inadequate.  In that later submission, the Class Plaintiffs

explained that they believe that any constitutional inadequacy of the Notice of Pendency would

not void the Settlement but would restrict the enforceable scope of its release provision.  DE 562.

II.   Discussion

A.   Applicable Legal Standard

A complaint must set forth "a short and plain statement of the claim showing that the

pleader is entitled to relief. "  Fed. R. Civ. P. 8(a).  That rule is not always simple to satisfy; it can

oblige a plaintiff "to amplify a claim with some factual allegations in those contexts where such

amplification is needed to render the claim *plausible*."  *Iqbal v. Hasty*, 490 F.3d 143, 148-49 (2d

Cir. 2007) (emphasis in original) (quotation marks omitted).  A claimed violation of the antitrust

laws is a paradigmatic example of the need for such amplification because – as this case has

demonstrated – discovery of such claims often proves expensive, laborious and time-consuming;

and that reality can unfairly pressure "cost-conscious defendants to settle even anemic cases" as

the least prohibitive alternative.  *Bell Atl. v. Twombly*, 127 S.Ct. 1955, 1967 (2007); *see also In*

*re Elevator Antitrust Litig.*, 2007 WL 2471805, *2 & nn.3-4 (2d Cir. Sept. 4, 2007) (noting that

despite uncertainty about the application of the flexible plausibility standard in other kinds of

cases, it plainly applies in antitrust cases in part due to discovery burdens).  The "plausibility

standard" does not heighten the pleading requirements of Rule 8(a), but rather clarifies that a plaintiff has given fair notice of the nature of the claims and the grounds on which they rest only if it specifies enough factual detail to show that the plaintiff is entitled to relief. *Id.* at 1965 n.3.[6] Accordingly, to survive a motion to dismiss, the Complaint must include "enough fact to raise a reasonable expectation that discovery will reveal evidence" of the claim at hand. *Id.* at 1965. Of course, the court must accept the allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor. *Cleveland v. Caplaw Enter.*, 448 F.3d 518, 521 (2d Cir. 2006).

Although the defendants seek relief under Rule 12, the Class Plaintiffs urge the court to decide it instead pursuant to Rule 56 for two reasons. First, they argue that the defendants have presented materials external to the pleadings and have thus forced the conversion of their motion to one for summary judgment. Second, they argue that the defendants' reliance on the Settlement's release provision is an affirmative defense that the Complaint merely anticipates, and is therefore an inappropriate basis for relief under Rule 12, even if substantially similar relief might be available under Rule 56. Opp'n at 8-9 & n.8. Neither proffered reason justifies treating the defendants' motion to dismiss as a motion for summary judgment.

In evaluating a motion to dismiss, the court may consider the complaint, any documents incorporated into the complaint by reference, and public records. *Blue Tree Hotels Inv. (Canada) Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004). Further, if plaintiffs have actually relied on the terms and effect of a relevant document in drafting their complaint, and if the authenticity and accuracy of the document is undisputed, the document is

---

[6]  The instant motion was briefed and argued before *Twombly* was decided.  No party has suggested that either the latter decision or the cases in this Circuit interpreting it, such as *Iqbal* and *In re Elevator Antitrust Litigation*, alter the analysis or the outcome that should obtain here.

"integral to the complaint," although outside the pleadings, and the court may consider it in deciding a motion to dismiss. *Faulkner v. Beer*, 463 F.2d 130, 134 & n.1 (2d Cir. 2006); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (plaintiff's actual notice of information contained in defendant's motion papers dissipates necessity of converting motion to dismiss into motion for summary judgment).   Indeed, the court may consider such a document even if the plaintiff's complaint does not include or incorporate it. *Holowecki v. Fed. Express Corp.*, 440 F.3d 558, 565-66 (2d Cir. 2006).  In addition, the court may, without converting a dismissal motion into a motion for summary judgment, consider materials of which judicial notice may be taken, such as a settlement agreement. *See In re Drexel Burnham Lambert Group*, 960 F.2d 285, 289 (2d Cir. 1992); *Kramer v. Time Warner*, 937 F.2d 767, 773 (2d Cir. 1991). Finally, it is not a party's presentation of extrinsic materials that triggers the conversion; rather, it is the court's consideration of them in determining the motion that is critical. *Fonte v. Bd. of Managers of Continental Towers Condominium*, 848 F.2d 24, 25 (2d Cir. 1988).

The defendants' submission consists of two declarations from counsel, a copy of each of the *Visa Check* Settlement Agreements, and a copy of the *Visa Check* Second Amended Consolidated Class Action Complaint.  DE 387.  The latter three fall well within the range of materials that a court may consider on a motion to dismiss.  Each was filed on the public docket of the *Visa Check* litigation, and each is therefore cognizable information on a motion to dismiss.[7]  Further, as set out below, the Class Plaintiffs relied on all of those documents in

---

[7]  The relevant items in the docket of that litigation, CV 96-5238, were the following:  DE 1 (Complaint); DE 24 (First Amended Consolidated Class Action Complaint); DE 25 (Second Amended Consolidated Class Action Complaint); DE 164 (Third Amended Consolidated Class Action Complaint); DE 811 (Settlement Agreement as to MasterCard); DE 812 (Settlement Agreement as to Visa).

14

detailing their claims for relief and they are accordingly cognizable as "integral to the complaint." Finally, the court could take judicial notice of the Settlement Agreements under Rule 201 of the Federal Rules of Evidence. *In re Drexel Burnham Lambert Group*, 960 F.2d at 289. Under any of these rationales, the Settlement Agreements and the *Visa Check* complaint are properly considered on this motion.

The remaining two documents on which the Class Plaintiffs rely in urging a conversion to a Rule 56 motion – the declarations of counsel – do unquestionably contain facts outside the pleadings, but the mere fact of their presentation does not require the court to convert this motion to a motion for summary judgment. If "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment." Fed. R. Civ. P. 12(b). Under the circumstances, I need not and do not consider the declarations at issue, and I recommend that the court do likewise: one declaration merely lists the exhibits annexed to it and the other sets forth allegations regarding communication between the Class Plaintiffs' counsel and the declarant. *See* DE 387. Neither is helpful to my analysis of the defendants' motion and accordingly I do not consider them. As a result, there is no basis for converting the defendants' motion into one for summary judgment. Further, to the extent that the Class Plaintiffs have submitted factual evidence outside the pleadings, I do not consider it, and it would not affect my analysis in any event.[8]

---

[8] The Class Plaintiffs have submitted a declaration that sets forth allegations and discusses the exhibits annexed to it, which include: discovery materials from this litigation, an article published on the "American Banker Online" web site, and assorted documents previously publicly filed on the *Visa Check* docket. DE 454.

15

The Class Plaintiffs' second argument in favor of conversion fares no better. A defendant may raise an affirmative defense on a motion filed pursuant to Rule 12(b)(6), and need not employ the procedure available under Rule 56, "if the facts supporting the defense appear on the face of the complaint." *United States v. Space Hunters, Inc.*, 429 F.3d 416, 426 (2d Cir. 2005) (citing *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004)). The Complaint is rife with references to the *Visa Check* litigation. It defines the class as "virtually identical" to the class certified in the *Visa Check* litigation,[9] Complaint ¶ 106, refers to the market definition and market power findings in the *Visa Check* litigation, Complaint ¶¶ 141, 198-99, 204, 312-13, and relies on findings of fact in that litigation. Complaint ¶¶ 121, 318. More significantly for present purposes, the Complaint explicitly defines its prayer for relief by reference to the release provision on which the defendants rely for their affirmative defense: specifically, the Class Plaintiffs seek "monetary damages ... for the fullest time period permitted by ... the purported settlement and release in [*Visa Check*.]" Complaint Prayer for Relief ¶ D. In other words, the Class Plaintiffs acknowledge that the amount of their recovery is limited by the scope of the claims released by the Settlement.

The parties plainly disagree about the scope of damages that might be available in light of the Settlement, and that disagreement may or may not raise an obstacle to disposition at this stage of the proceedings – a matter I discuss below. But there can be no dispute that the Class Plaintiffs themselves have pleaded that the scope of the release in the Settlement is dispositive of the limits of the damages they may seek if they prove the claims asserted in the Complaint.

---

[9]  The exception, of course, is those members of the plaintiff class here who opted out of the *Visa Check* litigation and thus are not bound by the Settlement; their claims for damages incurred prior to 2004 are not affected by this motion.

Accordingly, the defendants may properly raise their affirmative defense of release as a basis for seeking dismissal under Rule 12. *See Steinmetz v. Toyota Motor Credit Corp.*, 963 F. Supp. 1294 (E.D.N.Y. 1997) (determining preclusive effect of class action settlement under Rule 12(b)(6)).

      B.    <u>Analysis</u>

The Class Plaintiffs make several arguments in support of the viability of the claims at issue, but all of them fall into two broad categories. First, they argue that, for a variety of reasons, the claims in the current Complaint seeking damages for conduct that occurred in late 2003 are viable because they do not fall within the scope of the *Visa Check* Settlement's release provision. Second, they contend that even if the claims at issue here are properly considered to be within the scope of the Settlement, the release provision is unenforceable either because it is the result of a fraud or due to insufficient notice to the class members whose rights were at stake. I consider – and reject – each category of arguments in turn below.

      1.    <u>The Claims Are Within The Scope Of The Release</u>

The Class Plaintiffs argue that the Settlement did not effect a release of the current Complaint's claims related to conduct occurring after the time of settlement, such as the 2003 fee increase, because that conduct could not be considered as "concerning any claims alleged in the [*Visa Check*] Complaint." *Id.* In other words, the Class Plaintiffs urge the court to first examine the current Complaint to identify the conduct out of which its claims arise, compare that conduct with the conduct at issue in the *Visa Check* complaint, and only bar claims in the current Complaint to the extent the conduct at issue in the two cases is identical.

The defendants construe the language of the release provisions differently:  they argue that the Settlement released any claim "relating in any way to any conduct prior to January 1, 2004 as long as that conduct related to claims alleged in the [*Visa Check*] Complaint."  DE 490-1 ("Reply") at 5 (quotation marks omitted).  Using their approach, the court would first assess whether the current Complaint's claims relate to conduct prior to January 1, 2004, then evaluate whether that conduct has a connection with claims asserted in *Visa Check* and if so, bar any such claims.

a.      <u>The Release Is Not Ambiguous</u>

The parties' disagreement must be considered against the backdrop of substantive New York law, which the parties to the *Visa Check* Settlement agreed would govern.  Settlement ¶ 38. That law defines ambiguity, as applicable here, as language that is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the integrated agreement."  *Collins v. Harrison-Bode*, 303 F.3d 429, 433 (2d Cir. 2002) (citing *Kass v. Kass*, 91 N.Y.2d 554, 566 (1998)).  Absent any disagreement as to whether the Settlement is a fully integrated contract, *see* Settlement ¶ 35, the question thus becomes whether the disputed release provision is objectively susceptible to multiple meanings.  Even if it is, if the overall intent of the parties is clear from the face of a contract, the court should "choose that construction which will carry out the plain purpose and object of the [agreement]."  *Kass*, 91 N.Y.2d at 567 (internal citation and quotation marks omitted) (alteration in original).  The applicable substantive law thus contemplates consideration of the precise clause in dispute and the overall context of the agreement in which that clause appears.

18

Taken as a whole, the Settlement reflects a bargain that is both carefully calibrated in its details and intentionally broad in scope: in return for relief that marked the Settlement as "the largest in the history of antitrust law," *Wal-Mart Stores, Inc.*, 396 F.3d at 101, the *Visa Check* plaintiff class released Visa and MasterCard from liability for all conduct up through the end of the year in which the agreement was reached. The breadth of that release was underscored by the comprehensive and open-ended wording upon which the parties agreed. For example, the Agreements refer to "claims, demands, actions, suits, causes of action ... whether class, individual, or otherwise in nature" and to "liabilities of any nature whatsoever, including costs, expenses, penalties and attorneys' fees, known or unknown, suspected or unsuspected, in law or in equity ...." Settlement ¶ 28. Moreover, in delineating the claims released, the Settlement uses the clause "*relating in any way* to any conduct prior to January 1, 2004 concerning any claims alleged in the Complaint[.]" *Id.* (emphasis added). The Settlement made explicit that the plaintiffs were releasing all "claims which have been asserted or could have been asserted in this litigation[,]" but it was equally explicit in stating that the release included such claims but was not limited to them. *Id.* ("including without limitation" the claims that were or could have been raised in the *Visa Check* complaint). The plain language of the release provision thus extinguishes any claim that could be asserted by a *Visa Check* class member against Visa and MasterCard if that claim related to the *Visa Check* claims, regardless of whether such claims were actually asserted in the complaint – and also regardless of whether such claims *could* have been so asserted under applicable pleading rules and case law.

Every court to consider the scope of the Settlement has similarly concluded that it released all claims arising out of conduct occurring before January 1, 2004 related to the claims

at issue in the *Visa Check* litigation.  *See Visa Check*, 297 F. Supp. 2d at 514 (the Settlement released "all claims based on the mix of facts that produced anticompetitive interchange rates"); *Wal-Mart*, 396 F.3d at 104 (the Settlement "precludes actions for conduct occurring prior to January 1, 2004 that was or could have been alleged in the complaint"); *Reyn's Pasta Bella LLC v. Visa U.S.A., Inc.*,  442 F.3d 741, 745 (9th Cir. 2006) (the Settlement released "all antitrust liability arising out of conduct, prior to January 1, 2004, that is related to the claims asserted in the [*Visa Check*] class action").  In so ruling, those courts have construed the Settlement's release provision as extinguishing a universe of potential claims that is necessarily larger than those supported by the factual allegations in the complaint filed in the *Visa Check* litigation.

For example, this court held in *Visa Check II* that the Settlement released claims asserted in a separate action pending in the Southern District of New York.  The claims in that case, *In re Visa/MasterCard Membership Rules Antitrust Litig.*, docket no. CV 01-10027 (S.D.N.Y.), arose out of allegedly inflated interchange fees for credit card transactions supported by exclusionary rules pertaining to the Visa and MasterCard credit card networks.  Notwithstanding the different legal theory underlying the claims at issue in that action, and the different facts that might be relevant, the exclusionary rules were "an integral part of the factual predicate" in *Visa Check* and thus, claims arising out of them were also extinguished.  *Visa Check II*, 297 F. Supp. 2d at 515; *aff'd Wal-Mart*, 396 F.3d at 108.  Likewise, this court held that the release provisions were broad enough to extinguish claims against banks who are members of the Visa and MasterCard networks even though the banks were not parties to *Visa Check* and claims accordingly could not have been asserted against them in that litigation.  *Visa Check II*, 297 F. Supp. 2d at 513-15; *see*

*Reyn's Pasta Bella LLC v. Visa U.S.A., Inc.*, 259 F. Supp. 2d 992 (N.D. Cal. 2003) (adopting

reasoning), *aff'd* 442 F.3d 741 (9th Cir. 2006).

The Class Plaintiffs seek damages for harms they allegedly suffered due to concerted

activity among the defendants that violated federal antitrust law.  They complain about the

agreements into which the defendants entered, the exclusionary rules they implemented, and the

supracompetitive interchange fees they charged.  Complaint ¶¶ 228, 273, 289.  The factual

allegations on which those complaints are predicated plainly relate to the factual predicate of the

*Visa Check* litigation, which included the nature and extent of defendants' collaboration, the

effect of any such collaboration on competition and interchange fees, and the resulting harm to

merchants in the plaintiff class.  *Visa Check II*, 297 F. Supp. 2d at 513-14.  To the extent they

seek to prove that the defendants are liable as a result of the implementation of the 2003 fee

increase, the Class Plaintiffs will have to establish, among other things, that the fee increase was

an artificial result of the defendants' illegal concerted activity and that the fee increase had

anticompetitive effects – elements that are "virtual clone[s] of the centerpiece" of *Visa Check*.

*Visa Check II*, 297 F. Supp. 2d at 513.  Accordingly, I conclude that under any fair reading of the

relevant pleadings and the Settlement, the claims at issue here fall within the scope of the

Settlement's release of claims "relating in any way to any conduct prior to January 1, 2004

concerning any claims alleged in the [*Visa Check*] Complaint."  Settlement ¶ 28.

b.    The Claims At Issue "Could Have Been Asserted"

The broad scope of the language of the release makes inapposite the Class Plaintiffs'

attempt to show that the claims now at issue in this motion – claims for damages incurred in the

last five months of 2003 as a result of the 2003 fee increase – could not have been asserted in the

*Visa Check* litigation.  Even if that were the relevant inquiry, however, I would not find the plaintiffs' argument convincing because I do not agree that the allegations in the final version of the class complaint filed in *Visa Check* prior to the Settlement sets the boundary of the claims that "could have been asserted" in that litigation.

As a general matter, when a plaintiff attacks a defendant's continuous anticompetitive course of conduct, the plaintiff may not recover damages incurred after the date the complaint is filed.  *Borger v. Yamaha Int'l Corp.*, 625 F.2d 390, 398 (2d Cir. 1980).  In some circumstances, however, the court may allow the plaintiff to supplement the complaint "to allow for recovery of damages up to the time of trial."  *Id.*  The scope of a plaintiff's recovery is therefore dependent on the contents of the complaint, but those contents are subject to amendment at the discretion of the trial court.  As a result, I disagree with the Class Plaintiffs that the universe of claims that "could have been asserted" in the *Visa Check* case – and that were accordingly released pursuant to the Settlement – is limited to the claims actually pleaded in any of the various iterations of the complaint filed by the plaintiff class in the earlier litigation.

I also disagree with the Class Plaintiffs for a more practical reason.  Even if the *Visa Check* plaintiffs did not and could not foresee the 2003 fee increase when they first agreed to the Settlement, that increase had already occurred by the time the fairness of the proposed agreement was before the court for approval.  At that time – when nobody was in the dark about the defendants' intention to raise the interchange fee for credit transactions – the Settlement was still executory, and it remained so for over a year after that, until the affirmance of this court's approval of the Settlement finally made the agreement binding on all parties.  As counsel on both sides appeared to agree during the oral argument on the instant motion, if the *Visa Check*

22

plaintiffs believed that the 2003 fee increase was unlawful and deprived them of the anticipated

benefit of their bargain, they could have simply withdrawn from the Settlement before or after

the fairness hearing and sought leave to add new claims based on the defendants' conduct in

August 2003.  *See* Tr. 21, 28, 50-51.  Thus, even if I agreed that the "could have been asserted"

language served to limit the scope of the Settlement's release provision, I would not agree that

such a reading would advance the Class Plaintiffs' cause here.

2.     The Release Is Enforceable

The Class Plaintiffs contend that even if their current claims based on the 2003 fee

increase can properly be considered within the scope of the Settlement's release provision, they

should nonetheless be free to pursue such claims here both because the release was fraudulently

induced and because the class was given insufficient notice to support such a broad release of its

claims.  I find neither argument persuasive.

a.     There Was No Fraud In The Inducement

Pursuant to the parties' explicit agreement, Visa and MasterCard lowered interchange fees

for debit transactions on August 1, 2003.  *See* Settlement ¶ 8.  The Class Plaintiffs now complain,

however, that what the defendants gave the merchants with one hand, they took away with the

other:  on the same day, both networks increased the interchange fees they charged for credit

transactions.  The Class Plaintiffs theorize that Visa and MasterCard secretly agreed to fix the

level of those fees in violation of antitrust laws.  Opp'n at 5.  They also contend that such a secret

plan to make the Settlement worth less to the merchants than they anticipated would amount to

23

fraudulent inducement and render the resulting Settlement – and in particular, its release

provision – unenforceable.  Opp'n at 16.[10]

A release, like any other contract, may be avoided if it has been fraudulently induced,

even if the release was produced after extensive negotiations by represented parties.  *Lobel v.*

*Maimonides Med. Ctr.*, 835 N.Y.S.2d 28, 29 (N.Y. App. Div. 2007) (citing *Blue Chip Emerald v.*

*Allied Partners*, 750 N.Y.S.2d 291 (N.Y. App. Div. 2002)); *City of Amsterdam v. Daniel*

*Goldreyer, Ltd.*, 882 F. Supp. 1273, 1280 (E.D.N.Y. 1995) (citations omitted).  Further, an

omission of material fact constitutes fraud if it violates a duty of disclosure; such a duty exists,

among other things, when one party has "superior knowledge, not readily available to the other,

and knows that other is acting on the basis of mistaken knowledge."  *Frontier-Kemper*

*Constructors, Inc. v. Am. Rock Salt Co.*, 224 F. Supp. 2d 520, 529 (W.D.N.Y. 2002) (citations

omitted).

In essence, the Class Plaintiffs' fraudulent inducement theory requires an assumption that

the *Visa Check* defendants had superior information about, and therefore a duty to disclose, their

plans to institute the 2003 fee increase before the parties entered into the Settlement in June

2003.  Such an assumption is untenable for several reasons.  First, the defendants may have had

---

[10]  As a technical matter, the court could simply disregard this aspect of the Class Plaintiffs'
argument because it relies on factual assertions outside the Complaint.  I nevertheless urge the
court to dispose of the argument on the merits to avoid the piecemeal litigation that might
otherwise result.  Under the liberal amendment regime of Fed. R. Civ. P. 15(a), the only reason
the Class Plaintiffs would be denied leave to amend their Complaint to add allegations
supporting a theory of fraudulent inducement would be a finding that the amendment would be
futile (I offer no view as to whether such allegations would be likely to satisfy the flexible
plausibility standard required under *Twombly*).  Such a futility inquiry would merely replicate the
analysis I present here.  I therefore conclude that the interest of judicial economy is served by
addressing the issue now.

superior advance knowledge of the 2003 fee increase, but the *Visa Check* class plaintiffs had good reason to anticipate the possibility of that increase even if they did not know for a certainty to expect it. *See Visa Check I*, 192 F.R.D. at 75 (discussing, in February 2000, the defendants' prediction that that credit card interchange fees would increase in response to a decrease in debit card interchange fees).

Second, even if the class was unaware of the 2003 fee increase until after they entered into the Settlement, they had ample opportunity to act on their presumed dismay over the increase before being bound by the release to which they had agreed. The fee increase had taken effect almost two months before the fairness hearing on September 25, 2003, and over five months before this court approved the agreement. Any of the 18 objectors to the Settlement could have cited the fee increase as a new development that rendered the agreement unfair, but none did so. More fundamentally, the class itself could have simply withdrawn from the Settlement, without the need to persuade the court that it was unfair, if it believed that the fee increase deprived it of the anticipated benefit of its bargain – but it did not do so.

It would hardly have been unreasonable for the *Visa Check* class plaintiffs to decide that the concrete benefits of the Settlement – including a fund of billions of dollars, and a guaranteed (albeit temporary) decrease in interchange fees for debit transactions – made the risks attendant to the agreement worthwhile. Assuming they viewed an increase in credit card interchange fees as possible, or even likely, they also had to know that, like the anticipated decrease of debit card fees for which they had bargained, the change need not be permanent. A card network's decision to charge a higher (or lower) interchange fee must to some extent be ratified with each new transaction – it is always, at least in theory, subject to renegotiation absent an exercise of

bargaining power, licit or otherwise, that artificially keeps the subject off the table. Accordingly, it is entirely plausible that the attorneys representing the *Visa Check* class plaintiffs (who do not represent the current putative classes) concluded after a cost-benefit analysis that the worst-case scenario – a rise in credit transaction interchange fees that would wipe out much of the benefit to the class but would presumably be subject to renewed litigation starting in 2004 if continued in effect – was sufficiently unlikely to persuade them not to give up the certain benefits of the proposed Settlement.

The class plaintiffs and their counsel may or may not actually have engaged in such reasoning before deciding to press forward with the Settlement after the 2003 fee increase took effect. They may have come up with other reasons, or they may simply have failed to realize that they had a claim for damages that they were unintentionally waiving (though the latter possibility seems rather implausible). The matter is of course entirely speculative. What is not susceptible to any such speculation is the proposition that the defendants in *Visa Check* knew that their adversaries, in going forward with the Settlement even after the 2003 fee increase was announced, were "acting on the basis of mistaken knowledge." Whatever the defendants' motives in waiting until after the Settlement was signed to announce the fee increase, they simply could not unilaterally foist that increase on the plaintiffs without taking a risk that they would thereby jeopardize settlement and incur the continued burdens of litigation.

### b.   The Notice Was Sufficient

In seeking to preserve their ability to pursue damages incurred in 2003 as a result of the 2003 increase, the Class Plaintiffs step gingerly around some potential legal land mines. Most obvious in that context is their disavowal of any intention to seek rescission of the Settlement

based on their argument that the notice to the *Visa Check* class plaintiffs was unconstitutionally deficient. Instead, they would seek only to limit the scope of the Settlement's release provision so as to negate its coverage of "the claims as to which the [*Visa Check*] notice of pendency was constitutionally inadequate." DE 562 at 1. The proposal is, not surprisingly, quite convenient for the Class Plaintiffs: it would recast the bargain they struck in 2003 in a way that, in their view, would allow them to keep the billions of dollars paid under the Settlement as well as the benefit of the five-month decrease in debit card interchange fees, and would also give them the opportunity to seek billions of dollars more in damages associated with the increase in credit card interchange fees incurred in late 2003. Whether the *defendants* would have entered into such a bargain is not something the Class Plaintiffs address. But that question is inescapable because the court would only reach this prong of the Class Plaintiffs' argument if it concludes that the Settlement's release does otherwise bar the claims at issue in this motion. Viewed in that light, the question answers itself: the defendants having bought a very expensive peace for their conduct through the end of 2003, the remedy the Class Plaintiffs propose as an alternative to rescission would unfairly deprive them of a significant part of the benefit of their bargain. Thus even if I agreed that the notice in *Visa Check* was defective, I would disagree that the claim they wish to pursue as a result could be resuscitated through any means other than a complete rescission of the Settlement – a result that even the Class Plaintiffs affirmatively seek to avoid.

The Class Plaintiffs are similarly careful in identifying the notice that they say was insufficient. Given the fact that it is the Settlement, and in particular its release provision, that is the obstacle they now face, they might naturally be expected to challenge the sufficiency of the notice to the *Visa Check* class about the proposed Settlement itself. That course, however, is

plainly foreclosed by two facts.  First, although several class members lodged objections to the Settlement at the fairness hearing on September 25, 2003, and continued to press them on appeal, no participant in the *Visa Check* litigation objected at that stage that the notice of that Settlement was itself inadequate.  Second, in reviewing this court's approval of the Settlement, the appellate court explicitly held that the latter notice, coupled with the *Visa Check* complaint and the Notice of Pendency, sufficiently advised class members that their potential claims against banks – and not only their potential claims against named defendants Visa and MasterCard – were at issue in the litigation.  *Wal-Mart*, 396 F.3d at 114-15.

Accordingly, the Class Plaintiffs restrict their argument to an attack on the Notice of Pendency disseminated to absent *Visa Check* class members long before the parties agreed to the Settlement.  In essence, the Class Plaintiffs contend that because there was insufficient notice of the claims being litigated, any Settlement that purported to release not only those claims but others that *could* have been litigated as well would result in a denial of due process if enforced against absent class members.

Due process requires that absent class members receive the best practicable notice "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314-15 (1950).  It also requires that such parties be afforded the opportunity to remove themselves from the class.  *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985); *see* Fed. R. Civ. P. 23.  Thus, to be constitutionally adequate, notice to absent class members must:

(1) describe succinctly and simply the substance of the action and the positions of the parties; (2) identify the opposing parties, class representatives, and counsel; (3) indicate the relief sought; (4) explain any special risks of being a class member, such as being bound by the judgment; (5) describe clearly the procedures and deadlines for opting out; and (6) note the right of any class member to appear in the action through counsel.

*Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 167 n.11 (2001).

The Notice of Pendency plainly warned absent *Visa Check* class members that their potential claims for damages arising out of artificially inflated interchange fees were at issue in that action. The third sentence in its description of the litigation said that the *Visa Check* class claimed "that Defendants' actions have caused merchants to pay excessive fees on Visa and MasterCard credit and debit transactions ..." *Visa Check* Notice ¶ 3. That warning plainly sufficed to put absent class members on notice of the possibility that their rights with respect to the defendants' practices in setting and collecting interchange fees might be determined in the class action.[11] As a result there is nothing about enforcement of the Settlement's release provision in this case that offends due process.

III. <u>Recommendation</u>

For the reasons set forth above, I respectfully recommend that the court grant in full the defendants' motion to dismiss the Class Plaintiffs' claims for damages to the extent that those damages were incurred prior to January 1, 2004.

---

[11] In attacking the Notice as under-inclusive, the Class Plaintiffs take issue with the sentence that immediately precedes the one just quoted (a sentence that describes the *Visa Check* complaint's allegation of an unlawful tying arrangement) but elides any reference to the allegations about excessive fees. Opp'n at 21; *Visa Check* Notice ¶ 3. The omission is troubling, but has no bearing on my analysis, which takes into account the record rather than merely the parties' selections from it.

IV.   <u>Objections</u>

This Report and Recommendation has been electronically filed on the court's ECF system and is therefore deemed served on all parties as of today's date.  Any objection must be filed with the Clerk of the Court must be filed by September 24, 2007.  Failure to file objections within this period, absent the entry of an order extending that deadline pursuant to Federal Rule of Civil Procedure 6(b)(1), waives the right to appeal the district court's order.  *See* 28 U.S.C. § 636 (b)(1); Fed. R. Civ. P. 72; *Beverly v. Walker*, 118 F.3d 900, (2d Cir. 1997); *Savoie v. Merchs. Bank*, 84 F.2d 52, 60 (2d Cir. 1996).

**SO ORDERED.**
Dated: Brooklyn, New York
September 7, 2007

/s/ James Orenstein
JAMES ORENSTEIN
U.S. Magistrate Judge

30