**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
IN RE PAYMENT CARD
INTERCHANGE FEE AND
MERCHANT DISCOUNT                           **REPORT AND**
ANTITRUST LITIGATION                        **RECOMMENDATION**
                                            MD 05-1720 (JG) (JO)
This Document Relates To:
CV 05-3925    CV 05-4677    CV 06-0039
CV 05-4650    CV 05-4799    CV 06-0078
--------------------------------------------------------X

**JAMES ORENSTEIN, Magistrate Judge:**

Defendants MasterCard International Incorporated and MasterCard Incorporated

(together, "MasterCard") seek an order dismissing the monopolization and attempted

monopolization claims that a number of plaintiffs in this consolidated multidistrict litigation have

brought against them under Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.[1]  Docket

Entry ("DE") 376.[2]  Upon a referral from the Honorable John Gleeson, United States District

Judge, I now report my analysis of that motion and, for the reasons that follow, respectfully

recommend that the court deny it.

---

[1]  The complaints at issue in this motion are:  *Hy-Vee Inc., v. Visa U.S.A.*, *et al.*, CV 05-3925,
DE 81; *Supervalu Inc. v. Visa U.S.A., et al.*, CV 05-4650, DE 1; *Raley's v. Visa U.S.A., et al.*, CV
05-4799, DE 1; *Publix Super Markets, Inc. v. Visa U.S.A., et al.*, CV 05-4677, DE 1; *The Kroger
Co., et al. v. MasterCard Incorporated et al.*, CV 06-0039, DE 6; *Rite Aid Corp., et al. v.
MasterCard Incorporated et al.*, CV 06-0078, DE 1.  In addition to the plaintiffs named in the
cited captions, MasterCard seeks to dismiss the claims of plaintiffs Ahold U.S.A., Inc.;
Albertson's, Inc.; Delhaize America, Inc.; Eckerd Corp.; Maxi Drug, Inc.; Pathmark Stores, Inc.;
Safeway, Inc.; and Walgreen Co.  Adhering to the parties' usage in this litigation, I refer
collectively to the plaintiffs whose claims are challenged in this motion as the "Individual
Plaintiffs" (notwithstanding the fact that each is a corporate entity) to distinguish them from the
"Class Plaintiffs" – *i.e.*, the named plaintiffs in the several putative class actions that have been
consolidated in this multidistrict litigation.  Each such Individual Plaintiff seeks recovery only for
itself, and not on behalf of any putative class.

[2]  Unless explicitly associated with a different docket number, "DE" refers to entries in the docket
of the master file, MD 05-1720.

I.      Background

        The Class Plaintiffs have set forth their claims in a Consolidated Amended Class Action

Complaint, and the various Individual Plaintiffs have pleaded their respective claims in

complaints that they have filed singly or in small groups.  The various complaints allege a

number of similar claims against MasterCard and its member banks, as well as against the

various corporate entities associated with the Visa payment card network (collectively, "Visa")

and its member banks.  Those common claims include claims against both sets of defendants of

restraint of trade, price fixing, and illegal tying and bundling in violation of Section 1 of the

Sherman Antitrust Act, 15 U.S.C. § 1.  Also common to all plaintiffs are claims that Visa has

engaged in unlawful monopolization and attempted monopolization in violation of Section 2 of

the Sherman Antitrust Act, 15 U.S.C. § 2.  But unlike the Class Plaintiffs, the Individual

Plaintiffs also raise similar monopolization claims against MasterCard.  It is those claims that

MasterCard now challenges.

        A.      The Individual Plaintiffs' Section 2 Allegations Against MasterCard

        Many, if not all, of the allegations central to the current dispute are contested; I assume

them to be true for purposes of this motion to dismiss and summarize them below, using as a

representative example the claims asserted in the Amended Complaint in the *Kroger* action.

*See The Kroger Co., et al. v. MasterCard Incorporated et al.*, docket no. CV 06-0039

(E.D.N.Y.), DE 6 ("*Kroger* Complaint").

        In the early 1980s, approximately one consumer in six used payment cards to purchase

goods and services.  The costs associated with processing such transactions were substantial:

each such payment involved significant paperwork and required authorization by means of a

2

person-to-person telephone communication.  MasterCard instituted "interchange fees" to pay for the costs associated with processing these card transactions.  Those fees also helped allocate the network costs among the various banks involved in processing card payments.[3]

Twenty years later, as the use of payment cards pervaded the economy, circumstances had changed considerably.  By 2004, over 75 percent of consumers had payment cards, and they used them to pay for roughly $1.7 trillion worth of goods and services.  Virtually all of those transactions were processed electronically, and therefore at less cost per transaction than in prior years.  Nevertheless, the fees that the networks and their member banks charged merchants to process such transactions have increased.  *Kroger* Complaint ¶¶ 23, 38, 41.

MasterCard does not charge the same interchange fees to all merchants; rather, it charges different levels of fees to different classes of merchants.  Moreover, it has deliberately implemented a series of rules described as "Merchant Restraints" that artificially inflate interchange fees and simultaneously keep merchants from bargaining for lower fees.  For example, the "Honor All Cards Rule" obliges a merchant who accepts one MasterCard credit card to accept all other MasterCard credit cards, whether or not the merchant wishes to pay the different levels of interchange fees associated with different types and classes of credit cards.  In addition, as a practical matter, merchants are also economically coerced into accepting different

---

[3]  There are usually at least two such banks involved in every payment card transaction:  the Issuing Bank, which issues to consumers payment cards bearing the imprimatur of a card association like MasterCard; and the Acquiring Bank, which receives payment transactions from such merchants and coordinates between and among the relevant Issuing Bank, the merchant, and the network to facilitate payment.  The total amount that a merchant receives as payment for a transaction in which a consumer uses a payment card is less than the amount that the merchant charges to the consumer; the merchant must pay interchange fees and other fees for the network services required to process the card transaction.

classes of payment cards, such as debit and credit cards, by MasterCard's practice of withholding better rates of fees from merchants who refuse one class.[4]  Similarly, the "No Surcharge Rule" prevents merchants from passing the increased cost associated with some types of cards to holders of those cards which, in turn, protects MasterCard against pressure to lower interchange fees.[5]  The Individual Plaintiffs contend that in the absence of economically feasible alternatives, they are constrained to abide by these rules and pay fees far above the competitive level.  *Kroger* Complaint ¶¶ 23, 39-40.

In making their Section 2 claims, the Individual Plaintiffs allege the existence of "at least two" relevant product markets (the geographical area of each of which is the United States):  a market for "Network services for General Purpose Payment Cards" (the "General Purpose Market"),and a narrower market for "Network services for MasterCard Credit Cards" (the

---

[4]  To clarify my understanding of a somewhat opaque matter:  the plaintiffs are asserting that they are prohibited from declining subsets of MasterCard's *credit* cards by force of the "Honor All Cards" rule, but their claim about being coerced also to accept MasterCard *debit* cards is based on the alleged use of economic pressure rather than an explicit rule.  Prior to 2004, the "Honor All Cards" rule applied to all of MasterCard's payment cards, credit and debit alike.  As part of the settlement of earlier litigation, MasterCard limited the rule so as to apply only to credit cards. *See In re Visa Check/Mastermoney Antitrust Litigation*, 297 F. Supp. 2d 503, 508 (E.D.N.Y. 2003).  In this litigation, the plaintiffs contend in essence that the relaxation of the old rule has been a matter of form rather than substance:  they allege that merchants who try to take advantage of the rule change by declining to accept debit cards or other products are charged higher fees for the cards they do accept.  *See Kroger* Complaint ¶ 25(H).

[5]  Such rules do not forbid the merchants from passing the costs associated with accepting payments cards along to *all* consumers – both those who use the cards and those who pay with cash – by raising the price of their merchandise.  Whether such merchant conduct might violate antitrust law was an issue raised in *Temple v. Circuit City Stores, Inc.*, docket no. CV 06-5303 (JG) (E.D.N.Y.), and *Bennett, et al. v. Wal-Mart Stores, Inc.*, docket no. CV 06-5304 (JG) (E.D.N.Y.).  This court dismissed the antitrust claims in those cases due to the plaintiffs' lack of standing, and transferred the remaining claims to Tennessee.  *See Temple*, DE 75.  Just as the court in *Temple* and *Bennett* did not opine on the merits of the plaintiff's substantive antitrust theory, I likewise express no view on the issue here.

"Single-Brand Market"). *Kroger* Complaint ¶ 29(A).  In each such product market, MasterCard

is alleged to be a supplier of network services, banks are described as the sellers, and the retail

merchants (who allow their customers to use payment cards to purchase goods and services from

them) are characterized as buyers.  *Kroger* Complaint ¶ 30.  The commodity in each product

market is "Network Services" – namely, "the collection of services that MasterCard and other

card associations provide retail merchants ... includ[ing] authorization, clearance, and settlement

of retail transactions." *Kroger* Complaint ¶ 23(D).

B.     <u>MasterCard's Motion to Dismiss</u>

      MasterCard seeks dismissal of the Section 2 claims against it for two basic reasons.  First,

relying heavily on a recent decision by another court, it argues that its roughly 30 percent share of

the General Purpose Market forecloses the claims as a matter of law.  *See* DE 376-2 ("Memo.")

at 10 (citing *Discover Financial Services, Inc. v. Visa U.S.A., Inc.*, docket no. CV 04-7844 (BSJ)

(S.D.N.Y. Oct. 24, 2005) ("*Discover*")).  Second, it argues that the law strongly disfavors

recognition of a single-brand product market.  *See* Memo. at 11.  As discussed below, I conclude

that neither argument suffices to require dismissal at this relatively early stage of the proceedings.

Simply put, both of the plaintiffs' theories of liability – the one predicated on the existence of a

General Purpose Market in which MasterCard holds a share of approximately 30 percent, as well

as the one that asserts the existence of a doctrinally more exotic Single-Brand Market – are

viable, provided the plaintiffs can demonstrate the existence of the facts alleged in their

pleadings.  In such circumstances, although MasterCard may later be able to demonstrate that it

is entitled to dispositive relief under Rules 56 or 50 of the Federal Rules of Civil Procedure, it

cannot now prevail on a motion to dismiss.

II.    Discussion

    A.    Applicable Legal Standards

        1.    Motions to Dismiss

A complaint must set forth "a short and plain statement of the claim showing that the pleader is entitled to relief. " Fed. R. Civ. P. 8(a).   Certain characteristics of antitrust cases – in particular, the discovery process – make it necessary for plaintiffs to "amplify" their claims with factual allegations in order to make them plausible; claims that do not meet this standard cannot survive a motion to dismiss.  *See Bell Atl. v. Twombly*, 127 S. Ct. 1955, 1967 (2007); *Iqbal v. Hasty*, 490 F.3d 143, 148-49 (2d Cir. 2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 & nn. 3-4 (2d Cir. 2007) (noting that despite uncertainty about the application of the flexible plausibility standard in other kinds of cases, it plainly applies in antitrust cases in part due to discovery burdens).  Certain aspects of claims under Section 2 have traditionally been subject to this plausibility standard for purposes of motions to dismiss.  *Todd v. Exxon*, 275 F.3d 191, 199-200 (2d Cir. 2001) (citing cases).[6]

---

[6]  The instant motion was briefed and argued before *Twombly* was decided.  No party has suggested in its briefing that either the latter decision or the cases in this Circuit interpreting it such as *Iqbal* and *In re Elevator Antitrust Litigation* alter the analysis or the outcome that should obtain here.  I note that in their oral arguments, the parties did make reference to a plausibility standard drawn from pre-existing case law in this circuit.  *See* DE 738 (Transcript of Proceedings dated November 21, 2006) ("Tr.") 82 (MasterCard's argument that the Individual Plaintiffs "have to make more than a conclusory allegation about [monopoly power]"); Tr. 87 ("They have no factual allegations to support the plausibility that MasterCard credit cards [or] network services are not interchangeable or deemed interchangeable with Visa or American Express or other[s.]"); Tr. 101 (Individual Plaintiffs' argument that they "have plausibly pled that it is because of the narrow market and ... the extraordinary circumstances that cause that market to have its boundaries and its definition and ... that they have been charged in the declining cost structure.").  In light of the record and the state of the law prior to *Twombley*, I have not solicited additional argument addressing recent case law developments.

Discovery of antitrust claims is frequently a daunting endeavor; the time and resources required can constrain "cost-conscious defendants to settle even anemic cases" as the least prohibitive alternative. *Twombly*, 127 S. Ct. at 1967. If a complaint's allegations, taken as true, cannot sustain a claim of entitlement to relief, then they should be disposed of before the parties – and the court – invest substantial resources in massive discovery. *Id.* at 1966. Accordingly, the complaint must include enough factual detail to raise "a reasonable expectation that discovery will reveal evidence" supporting the plaintiff's claims. *Id.* at 1965.

This "flexible plausibility standard" is emphatically not a heightened pleading standard. *Iqbal*, 490 F.3d at 148. Even in the antitrust context, the court's analysis of a motion to dismiss centers on the legal feasibility of the complaint, rather than the relative merits of the claims it contains. *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006). The court must accept the allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor. *Cleveland v. Caplaw Enterprises*, 448 F.3d 518, 521 (2d Cir. 2006). Moreover, to evaluate a motion to dismiss, the court may consider the complaint, any documents incorporated into the complaint by reference, and public records. *Blue Tree Hotels Inv. (Canada) Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004). A well-pleaded complaint – which must include allegations that cross "the line between the factually neutral and the factually suggestive" – "may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 127 S. Ct. at 1965-66 & n.5 (internal quotation marks and citation omitted); *see also Todd*, 275 F.3d at 204-05 (reversing dismissal of single industry claim while recognizing that plaintiff might fail to prove the existence of the narrowly-defined marked).

2.     Monopolization Under the Sherman Act

Section 2 of the Sherman Act prohibits, among other things, monopolization and attempted monopolization.  15 U.S.C. § 2 ("[e]very person who shall monopolize, or attempt to monopolize ... any part of the trade or commerce among the several States, or with foreign nations" has committed a cognizable offense).  To state a claim for monopolization, a plaintiff must plausibly allege:  "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  *United States v. Grinnell*, 384 U.S. 563, 570-71 (1966).   A viable claim for attempted monopolization must include factual allegations that:  "(1) ... the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power" in the relevant market.  *Spectrum Sports v. McQuillan*, 506 U.S.447, 456 (1993).

Monopoly power, or "the power to control prices or exclude competition," is the central element of both offenses.  *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956) ("*Du Pont*").  It requires "something more" than the "market power" standard that is relevant to claims brought under Section 1 of the Sherman Act, 15 U.S.C. § 1.  *Eastman Kodak*, 504 U.S. at 481.  A company has monopoly power if it can sell a product or service for a supra-competitive price untroubled by market forces; in other words, if it is able to exert power to insulate its prices from competition.  *Du Pont*, 351 U.S. at 392 ("Monopoly power is the power to control prices or exclude competition.");  IIA Areeda, Hovenkamp & Solow, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ("Areeda") ¶ 501 (2d ed. 2002).

8

To survive a motion to dismiss claims for monopolization and attempted monopolization, a plaintiff must allege that the defendant has monopoly power in the relevant market or the dangerous probability of acquiring it, either directly "by evidence of the control of prices or exclusion of competition" or indirectly, by showing that "the defendant has a large percentage share of the relevant market." *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 227 (2d Cir. 2006) (quoting *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 98 (2d Cir. 1998)); *see PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 108 (2d Cir. 2002). Courts frequently rely on indirect evidence – because direct evidence is "often difficult or impossible to prove" – but a plaintiff may elect to meet its burden through either form of proof. *Heerwagen*, 435 F.3d at 227.

It follows logically that a plaintiff must properly plead a relevant market to plausibly allege that a defendant has monopoly power. *See Heerwagen*, 435 F.3d at 229 (a "plaintiff cannot escape proving her claims with reference to a particular market even if she intends to proffer direct evidence of controlling prices or excluding competition"); IIA Areeda ¶ 515 at 114. Definition of the relevant market depends on the "the commercial realities faced by consumers." *Eastman Kodak Co. v. Image Technical Servs.*, 504 U.S. 451, 482 (1992) (citation and quotation marks omitted). The contours of the relevant market track the cross-elasticity of demand: the extent to which products or services are perceived by consumers to be reasonably interchangeable for the same purposes. *Eastman Kodak Co.*, 504 U.S. at 481-82; *Du Pont*, 351 U.S. at 394. The inquiry is one of degree; the more that consumers perceive two products to be fungible, the more likely they will be to respond to an increase in one by purchasing the other – and the less likely each supplier is to be able to raise its prices without decreasing its output. *See* IIA Areeda ¶¶ 506, 507. Companies should be treated as competitors in a market if – considering

9

price, use, and qualities – consumers treat their products as acceptable substitutes for the

purposes for which the products were intended.  *PepsiCo, Inc.*, 315 F.3d at 105.  The cross-

elasticity of demand analysis depends on information about consumer behavior and perceptions

and is accordingly "a deeply fact-intensive inquiry[.]"  *Todd*, 275 F.3d at 199.  As a result,

"courts hesitate to grant motions to dismiss for failure to plead a relevant product market" and a

plaintiff seeking to survive such a motion must do no more than allege a product market that is

"plausible" and that bears a "rational relation" to the analytical framework described above.  *Id.*

at 199-200 (citing cases).

      B.    <u>Analysis</u>

As noted above, the Individual Plaintiffs argue that MasterCard is liable on the Section 2

claims under either of two theories about the relevant product market.  Under the General

Purpose Market theory, MasterCard is one of several suppliers of network services for payment

cards; under the Single-Brand Market theory, the Individual Plaintiffs posit the existence of a

narrower market for network services specifically for MasterCard credit cards – a market in

which MasterCard is by definition the sole supplier.  The parties' respective arguments on these

theories for purposes of the instant dismissal motion are essentially mirror images of one another:

in debating the General Purpose Market theory, MasterCard does not take serious issue with the

proposition that the market exists, but argues that the Individual Plaintiffs' have not adequately

pleaded facts that can support a finding that it has monopoly power; in debating the Single-Brand

Market theory, MasterCard essentially concedes that the Complaint sufficiently alleges monopoly

power, but argues that the law forecloses the alleged market's existence.  I address each theory in

turn.

1.     The General Purpose Market Theory

There is no serious dispute, for purposes of this motion, that the General Purpose Market exists.  *See United States v. Visa*, 344 F.3d 229, 239 (2d Cir. 2003) (affirming the district court's finding that "there are no products reasonably interchangeable ... with the network services provided by" Visa, MasterCard, Discover, and American Express); *Kroger* Complaint ¶¶ 29(A), 43.  MasterCard's focus in attacking this aspect of the Individual Plaintiffs' claim is that its share of that market is less than 30 percent, and that such a share is simply too small to support a finding of liability under Section 2.  The argument succeeds only in knocking down a straw man.

In arguing about the significance of its market share, MasterCard does not point to any defective allegations in the relevant complaints, and for good reason:  the Individual Plaintiffs have not made any such allegations.  Instead, MasterCard predicates its arguments on two prior judicial decisions.  *See United States v. Visa*, 344 F.3d 229 (2d Cir. 2003) (in 1999, MasterCard had a 26 percent market share); *Discover*, slip op. at 3 (operative complaint alleged MasterCard's market share was 29 percent).  Neither decision provides a reliable basis for resolving the instant motion (even assuming that they are binding on all of the Individual Plaintiffs in this litigation). The finding of 26 percent market share described the market as it existed nine years ago, and at least five years before the filing of the first of the Individual Plaintiffs' complaints; even MasterCard does not contend that it remains an accurate description of the market, as demonstrated by its reliance on the 29 percent share alleged in *Discover*.  And the latter decision merely accepted as true allegations in a complaint that have not been made in this litigation.[7]

---

[7]  Moreover, the *Discover* decision does not specify whether the plaintiffs' allegations in that case failed because they rested only on MasterCard's market share in lieu of any direct evidence or for some other reason.  Without a clearer statement on that score, its persuasive weight is limited.

More fundamentally, a finding that MasterCard's market share is less than 30 percent would not, in any event, foreclose the possibility that the Individual Plaintiffs may succeed on their Section 2 claims.  That is because market share and monopoly power are not the same thing; the former is merely evidence of the latter.

A plaintiff may attempt to prove that a defendant has monopoly power through direct evidence that the defendant controls prices or excludes competition; when direct evidence is "unavailable or inconclusive ... monopoly power may be inferred from high market share." *Geneva v. Barr*, 386 F.3d at 500; *see Tops Mkts.*, 142 F.3d at 98.  The existence of monopoly power, or the dangerous probability of acquiring it, is heavily fact-dependent.  *See Virgin Atl. Airways Ltd. v. British Airways, PLC.*, 872 F. Supp. 52, 63-64 (S.D.N.Y. 1994) (collecting cases).  Accordingly, courts rarely grant dismissal of Section 2 claims on the basis of insufficient market share, unless the plaintiff rests its claims on market share allegations to the exclusion of other evidence.  *See Flash Elecs, Inc. v. Universal Music & Video Distrib. Corp.*, 312 F. Supp. 2d 379, 395-96 (E.D.N.Y. 2004) (dismissing claims and noting that individual defendants' market shares of 50 and 25 percent, respectively, could not raise an inference of monopoly power unless combined); *Natsource, LLC v. GFI Group, Inc.*, 332 F. Supp. 2d 626 (S.D.N.Y. 2004) (denying motion to dismiss where allegations of conduct supported attempted monopolization claim); *Orthopedic Studio, Inc. v. Health Insurance Plan of Greater New York, Inc.*, 1996 WL 84503 (E.D.N.Y. Feb. 9, 1996) (dismissing claims where defendant with 10 percent of geographic market did not compete in the alleged product market).  That rationale plainly does not apply here.

12

The Individual Plaintiffs' complaints include sufficient plausible factual allegations to support the proposition that MasterCard has (or is dangerously likely to acquire) monopoly power in the General Purpose Market.  Specifically, they claim that MasterCard has controlled prices by setting "pricing tiers" for different groups of merchants, increasing the level of its interchange fees, and establishing different rates for general and premium cards, all without losing business.  *Kroger* Complaint ¶¶ 30, 32, 43, 47.  They further contend that MasterCard has forced merchants to accept a series of rules that effectively insulate its interchange fees from competition – such as a prohibition against passing the cost of interchange fees to their customers or another against refusing to accept MasterCard-branded cards that carry higher fees.  *Kroger* Complaint ¶¶ 23(G)-(H), 96, 102.   They also allege that despite an increase in consumers' use of MasterCard products to make purchases, the cost to merchants of accepting the card has increased – in other words, increased demand leads to higher prices, even though they contend that a properly functioning market would see higher prices correlating with lower demand. *Kroger* Complaint ¶¶ 39-40.  Finally, they allege that the level of MasterCard's interchange fees has no relationship to the burdens that MasterCard or its member banks incur when processing payment card transactions – in other words, that MasterCard is a supplier that can set the price of its product without regard to its costs – and that the overwhelming majority of interchange fees is profit. *Kroger* Complaint ¶¶ 23, 38; *see* DE 451-1 (Individual Plaintiffs' Memorandum in Opposition) at 8-9. If the Individual Plaintiffs can prove these allegations, they will succeed in demonstrating that MasterCard has the ability to control prices and exclude competition – that is, they will establish MasterCard's monopoly power.

Success in proving the allegations described above could suffice even in the face of evidence showing that MasterCard's share of the market is less than 30 percent.  Just as a defendant's large market share, without more, cannot support a finding of monopoly power, a low market share by itself cannot necessarily defeat such a finding.  *See* IIA Areeda ¶¶ 532b-c (discussing special circumstances that might not preclude a defendant with a low market share from being a monopolist).  Market share is not the only factor in a court's analysis of whether the evidence supports an inference of the defendant's monopoly power; rather, courts consider it in the context of all of the evidence of the relevant market's dynamics.  *See Tops Mkts.*, 142 F.3d at 98.  In addition to information about market share, information about entry barriers, the strength of competition, the nature of the challenged conduct and the probable development of the industry, among other factors, can shed light on whether a defendant has acquired "the kind of competitive advantage about which the antitrust laws should be concerned."  *Geneva*, 386 F.3d at 500-01; *Twin Labs., Inc. v. Weider Health & Fitness*, 900 F.2d 566, 570 (2d Cir. 1990) (market share evidence is "the primary indicator of the existence of a dangerous probability" of successfully achieving monopoly power, "but not the sole one"); *see also* IIA Areeda ¶ 564 (noting, in the context of market definition, that the ability to price processing fees well above costs indicates monopoly power).

Generally, a defendant with a low degree of power in the relevant market cannot successfully wield monopoly power; customers dissatisfied with the defendant's prices can and do simply turn to other suppliers.  III Areeda ¶ 651e at 81-82.  Evidence of a defendant's high market share indirectly suggests that the defendant has the power to control prices if only because it demonstrates that there are few competitors and that customers' alternatives are limited in the

event they decide the defendant's prices are too high.  Where the structure of the market as a whole prevents a customer's ability to purchase lower-priced alternatives to the defendant's product, however, a defendant's market share may be less probative of its monopoly power.  For example, a market with high entry barriers would to some extent suppress competition:  whereas a seller in a market with low entry barriers could not raise its prices without the risk that a new seller would enter the market and offer the same product for a lower price, a competitor in a market with high entry barriers could raise its prices unfettered by the prospect of a new entrant into the market who would undercut prices.  *See Tops Mkts.*, 142 F.3d at 99.

The Individual Plaintiffs allege that the entry barriers to the General Purpose Market are so high that there have not been new competitors in over 20 years.  *Kroger* Complaint ¶ 33.  Moreover, they claim that MasterCard's conduct has neutralized the ability of market forces to correct supra-competitive pricing and that the rules it imposes on merchants force them to purchase network services at prices they would not pay if they had economically feasible alternatives.  *Kroger* Complaint ¶¶ 23(H), 40.  In the context of such allegations, MasterCard's assertion that its market share is less than 30 percent market, while relevant, cannot be dispositive; if the Individual Plaintiffs prove their allegations they may succeed in demonstrating that MasterCard wields monopoly power (or is dangerously likely to acquire it) notwithstanding its limited share of the market.  *See Tops Mkts.*, 142 F.3d at 100 ("a lesser degree of market power may establish an attempted monopolization claim than that necessary to establish a completed monopolization claim."); *Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co., Inc.*, 812 F.2d 786, 792 (2d Cir. 1987).

For much the same reason that I reject MasterCard's reliance on market share alone, I also reject its argument that Section 2 liability is foreclosed by the presence in the General Purpose Market of competitors with, alternately, a larger market share (Visa) or a higher interchange fee (American Express). *See* Tr. at 104. As with market share, evidence about the strength and conduct of a defendant's competitors is unquestionably relevant, but only in the context of all evidence of the relevant market's characteristics. At this relatively early stage of the litigation, the court is unable to weigh that evidence and determine its significance. Accordingly, because neither the respective market shares nor the conduct of the various participants in the General Purpose Market necessarily precludes the possibility that the Individual Plaintiffs will prove that MasterCard has or is dangerously likely to acquire monopoly power, I recommend that the court reject this prong of the motion to dismiss.

2.    The Single Brand Market Theory

A court normally cannot resolve a Section 2 claim without defining the relevant product; the contours of that market definition provide the context necessary to assess a plaintiff's allegations about price control or exclusion of competition. *See* IIA Areeda ¶ 563. Arriving at such a definition is inevitably a fact-intensive inquiry; the court must consider the "commercial realities" faced by consumers, and evaluate the extent to which consumers can substitute products for the same purposes in light of price, use, and qualities of each potential alternative. *See Eastman Kodak Co.*, 504 U.S. at 481-82; *Du Pont*, 351 U.S. at 395-96. It is undoubtedly true that in most cases, the relevant product market will encompass products or services provided by multiple suppliers, but that observation merely describes usual practical experience rather than a rule of law. Products that cannot be substituted for each other generally should not be lumped

together in a relevant market.  *See Eastman Kodak Co.*, 504 U.S. at 481-82 (rejecting the

argument that "as a matter of law, a single brand of a product or service can never be a relevant

market under the Sherman Act.").

Of course, the mere fact of consumer unwillingness to substitute one product for another

does not make the products different or preclude them from being considered reasonably

interchangeable.  *See Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 481-83 (S.D.N.Y. 2001)

(finding that the New York *Times*, the New York *Post*, and *The Wall Street Journal* competed

with the *Daily News* in the market for newspaper readers).  A plaintiff may choose Pepsi over

Coke because "the manufacturer has spent time and energy differentiating his or her creation

from the panoply of products in the market, but at base, Pepsi is one of many sodas" and does not

belong in its own market.  *Global Discount Travel Svcs., LLC v. Trans World Airlines, Inc.*, 960

F. Supp. 701, 705 (S.D.N.Y. 1997) (Sotomayor, J.).

On the other hand, where a product's characteristics make it unique or circumstances

prevent consumers from substituting alternatives for the same purposes, it may be alone in the

relevant product market.  IIA Areeda ¶ 563d (noting "presumption" of multibrand markets that

can be overcome by circumstances); *see id.* ¶ 534.  The paradigm for circumstances preventing

consumers from substituting one product for another is where consumers are "locked in" to a

brand – as where a product is so expensive that replacements are not affordable, and where the

product is designed so that it can be repaired only with parts manufactured by the product's

manufacturer.  *Eastman Kodak Co.*, 504 U.S. at 481-82.  In the latter example, the manufacturer's

parts belong in a market of their own:  they are not interchangeable with parts manufactured by

other sources, and customers have no economically feasible alternative to purchasing them if the

product breaks.  *Id.*  In that case, the term "single-brand market" is more of a convenient shorthand than a full description:  products are included in the market not because they originate from a single brand, but because consumers have no meaningful alternatives to a specific product if they wish to purchase any good to serve a particular purpose.  *See Trugman-Nash, Inc. v. New Zealand Dairy Board*, 942 F. Supp. 905, 921 (S.D.N.Y. 1996) ("For the quota-licensed New Zealand cheese importer, desirous of deriving maximum profit from its license, New Zealand cheese" is not interchangeable with cheese from any other source).

The Individual Plaintiffs have alleged facts that, if established, could suffice to prove that network services for MasterCard-branded credit cards are not interchangeable with such services for other forms of payment, and that the Single-Brand Market they propose does exist for purposes of their Section 2 claims.  For example, they allege that MasterCard's rules require merchants to use MasterCard's network services to process all transactions involving a MasterCard-branded credit card.  Even if a single bank plays the roles of Issuing Bank and Acquiring Bank with respect to a particular MasterCard credit card, merchants cannot receive payment unless the transaction is processed through MasterCard network services.  *Kroger* Complaint ¶ 23(J) (the "No-Bypass Rule").  They further allege that MasterCard prohibits its Issuing Banks from issuing payment cards that process transactions through any other network's system in addition to transactions using MasterCard's network services; they claim that this enforces the requirement that merchants use MasterCard's network services to process payment for all MasterCard-branded credit cards by removing the possibility that a single card could be compatible with multiple network services.  *Id.* ¶ 23(K) (the "No-Multi-issuer Rule").  Further, they assert that MasterCard's network services cannot be disaggregated:  merchants must use, and

pay MasterCard's prices for, several distinct services each time they accept payment using a MasterCard-branded credit card. *Id.* ¶¶ 48-52.

Also relevant to the viability of the Single-Brand Market theory are the Individual Plaintiffs' allegations about the "No-Surcharge Rule" and the "Honor All Cards Rule." *Id.* ¶¶ 23(G), 23(H). They contend that the first of these rules prevents merchants from imposing a surcharge on their customers who use MasterCard credit cards to pay for goods and services, to reflect the higher fees associated with premium cards, while the second prevents them from rejecting the cards that carry the highest costs. *Id.* As their counsel argued in opposing the instant motion, if merchants could pass along such higher fees to their customers, the differing surcharges associated with different types of cards would presumably produce consumer preferences among them, and would also promote certain preferences between such cards and cash as a form of payment. Tr. at 101. Where merchants lack the ability to pass along such costs, their customers understandably have no reason to select payment cards on the basis of price, thereby giving merchants a strong incentive to accept all cards – and therefore a strong disincentive to purchase network services only from, for example, Visa. *Id.* at 101-02. The Individual Plaintiffs therefore assert that consumers who use MasterCard-branded credit cards rather than the Visa analogs do so for reasons other than preferences arising from price competition between the brands in a market for network services; to the contrary, the Individual Plaintiffs contend that their customers are insulated from such cost considerations. *Kroger* Complaint ¶ 23(G); Tr. 98-101.

The Individual Plaintiffs' allegations about MasterCard's rules and their effects on merchant and consumer behavior may or may not be correct, but I conclude that they plausibly

support the existence of a cognizable market that is confined to MasterCard's network services. As a result, I recommend that the court reject this prong of MasterCard's motion to dismiss.[8]

III.   Recommendation

For the reasons set forth above, I respectfully recommend that the court deny MasterCard's motion to dismiss the Individual Plaintiffs' claims under Section 2 of the Sherman Act.

IV.   Objections

This Report and Recommendation will be filed electronically on the court's ECF docketing system and is deemed served on all parties as of the date of such filing.  Any objection to this Report and Recommendation must be filed with the Clerk of Court no later than January 31, 2008.  Failure to file objections within this period waives the right to appeal the district court's order.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; *Beverly v. Walker*, 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchs. Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

**SO ORDERED.**

Dated: Brooklyn, New York
       January 11, 2008

/s/ James Orenstein
JAMES ORENSTEIN
U.S. Magistrate Judge

---

[8]  To the extent that MasterCard relies on the fact that it has previously been found to compete in a market that includes not only other brands of credit cards, but also charge cards, *see* Memo. at 9 (citing *United States v. Visa*, 344 F.3d 229, 238-39 (2d Cir. 2003)), its reliance is misplaced.  The court in *Visa* so defined the market only on the basis of "substantial expert testimony" and other evidence produced in discovery; it did not reject a single-brand market theory at the pleading stage.  It may be that MasterCard will succeed in defeating the Single-Market Brand theory by means of a motion for summary judgment for the same reason that the court defined an all-payment-card market in *Visa*, but that possibility provides no basis for dismissing that part of the Individual Plaintiffs' claims now.

20