**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------X
IN RE PAYMENT CARD INTERCHANGE FEE AND
MERCHANT DISCOUNT ANTITRUST LITIGATION

This Document Relates To:

**REPORT AND**
**RECOMMENDATION**
MD 05-1720 (JG) (JO)

| | | | |
|---|---|---|---|
| 05-CV-3800 | 05-CV-5072 | 05-CV-5153 | 05-CV-5880 |
| 05-CV-3924 | 05-CV-5073 | 05-CV-5207 | 05-CV-5881 |
| 05-CV-4194 | 05-CV-5074 | 05-CV-5319 | 05-CV-5882 |
| 05-CV-4520 | 05-CV-5075 | 05-CV-5866 | 05-CV-5883 |
| 05-CV-4521 | 05-CV-5076 | 05-CV-5868 | 05-CV-5885 |
| 05-CV-4728 | 05-CV-5077 | 05-CV-5869 | 06-CV-1829 |
| 05-CV-4974 | 05-CV-5080 | 05-CV-5870 | 06-CV-1830 |
| 05-CV-5069 | 05-CV-5081 | 05-CV-5871 | 06-CV-1831 |
| 05-CV-5070 | 05-CV-5082 | 05-CV-5878 | 06-CV-1832 |
| 05-CV-5071 | 05-CV-5083 | 05-CV-5879 | |

------------------------------------------------------------------------X

**JAMES ORENSTEIN, Magistrate Judge:**

On May 22, 2006, plaintiffs in the above captioned putative class actions ("Class

Plaintiffs") jointly supplemented their consolidated complaint to challenge certain aspects of the

initial public offering of MasterCard stock scheduled to occur that week.  Defendants

MasterCard International Incorporated and MasterCard Incorporated (collectively, "MasterCard")

and Bank of America, Capital One, JPMorgan Chase, Citigroup, and HSBC (collectively, the

"Banks") filed separate motions with a unified purpose:  to dismiss in its entirety the Class

Plaintiffs' supplemental complaint.  On December 1, 2006, the Honorable John Gleeson, United

States District Judge, referred the motions to me for a report and recommendation.  I now make

my report and, as explained below, respectfully recommend that the court partially grant and

partially deny each motion.  Specifically, I recommend that the court dismiss the claim against

the Banks under the Clayton Act, dismiss the fraudulent conveyance claim against all defendants,

grant the Class Plaintiffs leave to amend, and deny the motions in all other respects.

I.      Background

        In their First Consolidated Amended Class Action Complaint, filed on April 24, 2006, the

merchants and trade associations that comprise the Class Plaintiffs alleged sixteen antitrust

claims against a variety of networks and banks arising from those defendants' use of fees and

rules that enable the merchants to accept credit and debit cards as forms of payments for the

goods and services their customers purchase.  *See generally* Docket Entry ("DE") 317.[1]  A month

later, pursuant to an agreement among MasterCard and the Banks, MasterCard made an initial

public offering of its stock for sale to the public, subject to certain restrictions (the "IPO").  The

agreement by which MasterCard transformed itself from a membership organization run by a

consortium of constituent banks to a public company is the subject of additional claims that the

Class Plaintiffs asserted in a supplemental pleading filed on May 22, 2006.  *See* DE 332-2 (First

Supplemental Class Action Complaint); *see also* DE 350 (Pretrial Order 10 dated June 5, 2006,

accepting the latter pleading for filing with the defendants' consent).[2]  In short, the plaintiffs

allege that the IPO fundamentally altered MasterCard's structure and operations, as well as the

relationships between and among itself and the Banks, in ways that offend federal antitrust laws

as well as New York State's prohibition against fraudulent conveyances.

        MasterCard thereafter filed a motion to dismiss the Complaint in its entirety, and the

Banks, acting as a group, separately did the same.  DE 507-1 (MasterCard's Notice of Motion);

DE 588 (Banks' Notice of Motion).  In seeking such relief, they make several arguments.  First,

---

[1]  I will use "DE" exclusively to refer to entries in the docket of the master file, MD 05-1720.

[2]  As convenient short-hand terminology, I will hereafter refer to the Class Plaintiffs and their
First Supplemental Class Action Complaint, DE 332-2, as, respectively, the "plaintiffs" and the
"Complaint."

they contend that the plaintiffs fail to state a plausible claim under Section 7 of the Clayton Act because neither MasterCard nor the Banks "acquired" stock or assets during the course of the IPO within the meaning of that statute as a matter of law.  Second, they attack the Complaint's claims under Section 1 of the Sherman Antitrust Act on the ground that those claims do not sufficiently allege that the IPO will cause an increase in concentration or other lessening of competition. Third, the defendants challenge as insufficiently pleaded the plaintiffs' claim that a provision of the IPO agreement – extinguishing certain rights that MasterCard previously enjoyed to make certain assessments against its member banks – is barred as a fraudulent conveyance under the pertinent provision of New York law.[3]  To place those disputes in context, I describe below the Complaint's relevant allegations, which I accept as true for purposes of analyzing the instant motions.

Before the IPO, the banks that made up the membership of the MasterCard consortium completely controlled the network:  they owned all of its shares and populated its Board of Directors and other governance committees.  Complaint ¶¶ 42, 44-45.  MasterCard's role in payment card transactions was largely a matter of setting standards, and it financed its activities by means of levies on its member banks.  *Id*. ¶¶ 42, 66.  The banks derived revenue from their participation in transactions involving MasterCard-branded cards (at least in part) by charging processing fees that were ultimately paid by the merchants who accepted the cards as payment for their customers' purchases of goods and services.  *Id*. ¶¶ 42, 57, 66; *see In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 2008 WL 115104, at *5 (E.D.N.Y. Jan.

---

[3]  Because each set of movants made separate arguments but also incorporated by reference those made by the other, *see* DE 507-2 ("MC Memo.") at 1; DE 559 ("Bank Memo.") at 4 n.2, I describe their arguments without regard to the specific party that articulated them.

8, 2008) (describing typical payment card transaction and the associated processing fees).

MasterCard, as an entity, did not set the levels of such fees; instead, its member banks acted

collectively to do so, allegedly at supra-competitive levels.  Complaint ¶¶ 48, 53, 58-63.

In *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001), *aff'd*, 344

F.3d 229 (2d Cir. 2003), *cert. denied*, 543 U.S. 811 (2004), the district court reached the

conclusion, affirmed on appeal, that the collective actions of MasterCard's member banks (as

with those of the member banks of the similarly constituted Visa network) constituted an

unreasonable horizontal restraint of commerce in violation of Section 1 of the Sherman Act.  Of

relevance to the instant dispute, the courts rejected the argument made by MasterCard and Visa

that they should be treated as single entities, and thereby not liable under Section 1.  *See*

Complaint ¶¶ 71-73.  The plaintiffs assert that it was to avoid such liability that MasterCard's

banks determined to transform the consortium into a public company that would qualify as a

single entity; however, in doing so, the plaintiffs contend that the banks sought only to divest

themselves of enough participation in MasterCard to avoid antitrust liability, without losing their

ability to engage in anti-competitive conduct.  *Id.* ¶¶ 74-75.  In making that allegation, they note

that MasterCard publicly described one expected advantage of the IPO as being insulated against

"legal and regulatory challenges involving our ownership and governance."  *Id.* ¶ 78 (citing

Amendment 4 to Form S-1, filed with the SEC on April 14, 2006, at 67).

To effect the IPO, MasterCard reclassified all of its outstanding shares – all of which

were until then held exclusively by its member banks – into three different classes of stock in the

new entity:  Class A, Class B, and Class M.  To oversimplify the allegations about these different

types of stock, the plaintiffs contend that they allow outsiders to invest in, but not control, the

4

new MasterCard company.  Public investors can purchase minority stakes in Class A and thereby obtain both economic and governance rights in the new MasterCard company, but the applicable rules prevent such outside investors, even if they all band together, from overcoming the unified votes of member banks and the newly-created MasterCard Foundation.  Class B shares, which are available exclusively to member banks, carry economic benefits without voting rights, but are subject to transactional rules that preserve the member banks' collective control of the company. Class M shares, also available only to member banks, guarantee their owners representation on the Board of Directors and a veto over fundamental business decisions such as mergers or abandonment of the company's core business.  *See id*. ¶¶ 80-84.

The Class Plaintiffs contend that the net effect of these changes is to create the appearance but not the reality of a single entity, and thereby improperly to insulate MasterCard from Section 1 liability for what amounts to a continuation of its member banks' continued unreasonable horizontal restraints of commerce.  Complaint ¶¶ 91, 94-99, 100-106.  They further allege that the structure of the market – into which no company has successfully entered for decades, and in which the only meaningful participants are Visa (with, they say, 43 percent of the market share), MasterCard (30 percent), American Express (22 percent), and Discover (five percent) – will facilitate such continued anti-competitive conduct.  *Id*. ¶¶ 35, 38-39.

In addition to making claims under federal antitrust laws, the plaintiffs also describe the IPO as the result of agreements that effected a fraudulent conveyance under New York law.  That is, the plaintiffs do not challenge the IPO itself as unlawful; instead, they assert that it is the product of agreements that have only partially been disclosed in MasterCard's public filings, some of which are unlawful.  *Id*. ¶¶ 8, 96.  In particular, the plaintiffs assert that MasterCard

5

agreed to release its right to assess the banks for any liabilities arising out of litigation judgments. *Id.* ¶ 107. This right "protect[ed] the solvency and stability of MasterCard" and the plaintiffs allege that MasterCard released it "without adequate consideration," to its detriment. *Id.* ¶¶ 108-09. As a result, the plaintiffs allege that MasterCard will likely be unable to satisfy any judgment against it in this or any other litigation, and that the agreement is therefore an unlawful fraudulent conveyance. *Id.* ¶¶ 111, 148.

II.   Discussion

    A.   Motions to Dismiss

A complaint must set forth "a short and plain statement of the claim showing that the pleader is entitled to relief. " Fed. R. Civ. P. 8(a). That rule is not always simple to satisfy; it can oblige a plaintiff "to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*." *Iqbal v. Hasty*, 490 F.3d 143, 148-49 (2d Cir. 2007) (emphasis in original) (quotation marks omitted). A claimed violation of the antitrust laws is a paradigmatic example of the need for such amplification because discovery of such claims often proves expensive, laborious and time-consuming (as this case has amply demonstrated already); that reality can unfairly pressure "cost-conscious defendants to settle even anemic cases" as the least prohibitive alternative. *Bell Atl. v. Twombly*, 127 S. Ct. 1955, 1967 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 & nn.3-4 (2d Cir. 2007) (noting that despite uncertainty about the application of the flexible plausibility standard in other kinds of cases, it plainly applies in antitrust cases in part due to discovery burdens). The "plausibility standard" does not heighten the pleading requirements of Rule 8(a), but rather clarifies that a plaintiff has given fair notice of the nature of the claims and the grounds on which they rest only

6

if the complaint specifies enough factual detail to show that the plaintiff is entitled to relief.  *Id.* at 1965 n.3.  Accordingly, the Complaint must include "enough fact to raise a reasonable expectation that discovery will reveal evidence" of the claim at hand.  *Twombly*, 127 S.Ct. at 1965.  The court must accept the Complaint's allegations as true and draw all reasonable inferences in the plaintiffs' favor.  *Cleveland v. Caplaw Enter.*, 448 F.3d 518, 521 (2d Cir. 2006).[4]

In evaluating a motion to dismiss, the court may consider the complaint, any documents incorporated into the complaint by reference, and public records.  *Blue Tree Hotels Inv. (Canada) Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004).  Further, if plaintiffs have actually relied on the terms and effect of a relevant document in drafting their complaint, and if the authenticity and accuracy of the document is undisputed, the document is "integral to the complaint," although outside the pleadings, and the court may consider it in deciding a motion to dismiss.  *Faulkner v. Beer*, 463 F.2d 130, 134 & n.1 (2d Cir. 2006); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (plaintiff's actual notice of information contained in defendant's motion papers dissipates necessity of converting motion to dismiss into motion for summary judgment).  To the extent that the Class Plaintiffs urge the court to treat these motions as summary judgment motions, I respectfully recommend that the court decline.  *See* DE 740.  Other than the pleadings, the only other relevant materials – MasterCard's Form S-1 and related filings – are matters of public record.

---

[4]   The instant motion was briefed and argued before *Twombly* was decided.  No party has suggested that either the latter decision or the cases in this Circuit interpreting it, such as *Iqbal* and *In re Elevator Antitrust Litigation*, alter the analysis or the outcome that should obtain here.

B.      The Antitrust Claims

        1.      Applicable Law

The plaintiffs assert antitrust claims under two statutes:  in the "Seventeenth Claim For

Relief,"[5] they contend that MasterCard and the Banks violated Section 7 of the Clayton Act by

virtue of their participation in the IPO and its attendant agreements.  Specifically, in the

paragraph that sets forth their legal claim, they assert that the "acquisition of assets by the New

MasterCard and its Member Banks will" harm competition and thereby injure them.  Complaint

¶ 125.  In their Eighteenth and Nineteenth claims for relief, the plaintiffs assert violations of

Section 1 of the Sherman Act.  *Id*. ¶¶ 129-43.  To place the dispute in its legal context, I briefly

describe the two statutes and their interrelationship.

        Section 1 of the Sherman Act, prohibits "[e]very contract, combination ... or conspiracy,

in restraint of trade or commerce ...."  15 U.S.C. § 1 ("Section 1").  Section 7 of the Clayton Act,

provides:

> No person engaged in commerce or in any activity affecting commerce shall acquire,
> directly or indirectly, the whole or any part of the stock or other share capital and no
> person subject to the jurisdiction of the Federal Trade Commission [(the "FTC")] shall
> acquire the whole or any part of the assets of another person engaged also in commerce or
> in any activity affecting commerce, where in any line of commerce or in any activity
> affecting commerce in any section of the country, the effect of such acquisition may be
> substantially to lessen competition, or to tend to create a monopoly.

15 U.S.C. § 18 ("Section 7").

        Section 7 of the Clayton Act "is not co-extensive with the Sherman Act" – the former

supplements the latter without supplanting it.  *Geneva v. Barr*, 386 F.3d 485, 510-11 (2d Cir.

---

[5]  This "Seventeenth" claim is actually the first one set forth in the supplemental pleading now at
issue.  As noted above, the plaintiffs asserted their first sixteen claims for relief in the First
Consolidated Amended Class Complaint, filed on April 24, 2006.  DE 317.

2004).  Both statutes target harms to competition in the guise of restraints of trade and monopolization, but Section 7 has a pre-emptive focus; accordingly, it targets in their incipiency transactions that will demonstrably "substantially ... lessen competition." 15 U.S.C. § 18; *Brown Shoe Co. v. United States*, 370 U.S. 294, 317 (1962); IV Areeda, Hovenkamp & Solow, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ("Areeda") ¶ 906 (2d ed. 2002). Section 1 of the Sherman Act applies a more rigorous standard, proscribing combinations, conspiracies and contracts functioning as unreasonable restraints of trade. 15 U.S.C. § 1; *see State Oil Co. v. Khan*, 522 U.S. 3 (1997).  Conduct may be deemed unreasonable under Section 1 according to a *per se* analysis, or a rule of reason analysis; the court's inquiry considers the actual effects of the conduct at issue.  *See, e.g.*, *Paycom Billing Servs., Inc. v. MasterCard Int'l*, 467 F.3d 283, 289-90 (2d Cir. 2006).

When Congress amended Section 7 in 1950 to proscribe certain "asset" acquisitions in addition to certain "stock" acquisitions, it deliberately crafted a broad remedy designed to increase the reach of the Clayton Act's protection of competition.  As the Supreme Court has observed, Congress explicitly sought "to prevent accretions of power which are individually so minute as to make it difficult to use the Sherman Act test against them."  *United States v. Aluminum Co. of America*, 377 U.S. 271, 280 (1964) (quoting S. Rep. No. 81-1775, at 5 (1950), *reprinted in* 1950 U.S. Code Cong. Serv. 4293, 4297) (internal quotation marks omitted)).  In particular, Congress intended to close a perceived gap in Section 7 that allowed parties to structure anti-competitive transactions in ways that would escape scrutiny under federal antitrust laws by extending the act's coverage to everything "from pure stock acquisitions to pure assets acquisitions."  *United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 342 (1963); *see also id.* at

9

341-47 (discussing legislative history of 1950 amendment); *Brown Shoe*, 370 U.S. 315-323; Areeda ¶ 903.  Moreover, Congress enacted the amendment to reach "every corporation engaged in commerce" and quite obviously did not intend to "create a large loophole in a statute designed to close a  loophole." *Id.* at 343; *see also id.* at 346 (noting the use of statutory language intended "to prevent evasion of the central purpose") (quoting H.R. Rep. No. 1191, at 8-9 (1949) (internal quotation marks omitted)); *Brown Shoe*, 370 U.S. at 317 ("[Congress] hoped to make plain that [Section] 7 applied not only to mergers between actual competitors, but also to vertical and conglomerate mergers whose effect may tend to lessen competition in any line of commerce in any section of the country.").

    A claim under either statute must be predicated on allegations about a defendant's current conduct, but each requires a different kind of analysis of the likely effects of that conduct.  Under Section 1, the court looks to "the immediate and short-term effects;" but under Section 7, it asks "whether today's acquisition will bring tomorrow's loss of competition." *Cine 42nd Street Theater Corp. v. Nederlander Organization, Inc.*, 790 F.2d 1032, 1039-40 (2d Cir. 1986).  In part because of these analytic differences, "the tests for measuring the legality of any particular economic arrangement under the Clayton Act are to be less stringent than those used in applying the Sherman Act." *Brown Shoe*, 370 U.S. at 328-29.

    Where Section 1 is concerned with agreements that unreasonably restrain trade, Section 7 addresses acquisitions in which the effect "may be substantially to lessen competition." *See Brown Shoe*, 370 U.S. at 323 (use of the words "may be" reflects Congressional concern with "probabilities, not certainties").  Both inquiries are fact-intensive and heavily dependent on context; a court undertaking either kind of analysis with respect to a challenged transaction must

consider, among other things, the structure of the relevant market, its concentration, its history, and the ease with which a competitor can enter the market. *See id.* at 321-22; *United States v. Visa*, 344 F.2d 229 (2d Cir. 2003). Past behavior is highly relevant; mergers and acquisitions that occur in concentrated markets characterized by a history of substantial collusion among participants should be viewed with a skeptical eye. An acquisition that facilitates coordinated behavior among competitors runs afoul of Section 7 and Section 1 to the extent that its effect is to stifle competition by diminishing threats to coordination. Similarly, an acquisition that allows one competitor to raise prices unilaterally with impunity may be viewed as artificially depressing competition in violation of both statutes.

Given the more speculative nature of the harm that Section 7 is designed to prevent (in comparison with the prohibition in Section 1), it is not surprising that where the allegations in a complaint fail to state a claim under Section 7, they will generally also fail to support a cause of action under Section 1. That practical reality has produced some support among scholars and in other courts for the proposition that there no longer is (or should be) any effective distinction between the two prohibitions. *See U.S. v. Rockford Mem'l Corp.*, 898 F.2d 1278, 1281-83 (7th Cir. 1990); *White Consol. Indus., Inc. v. Whirlpool Corp.*, 781 F.2d 1224, 1228 (6th Cir. 1986); *Vantico Holdings, S.A.*, 247 F. Supp. 2d 437, 458 (S.D.N.Y. 2003); Areeda ¶ 906 (noting that the amendment to the Clayton Act rendered the Sherman Act "largely superfluous"). In this circuit, however, courts continue to recognize a distinction between the two standards. *See Geneva*, 386 F.3d at 510-11 ("Although § 7 of the Clayton Act targets restraint of trade and monopolization, it is not co-extensive with the Sherman Act."); *Cine 42nd Street Theater Corp.*, 790 F.2d at 1039

(distinguishing between the Sherman Act's focus on immediate or short-term effects and the Clayton Act's focus on future effects on competition).

The defendants contend that they should prevail under the Section 7 standard, and that the necessary result of such success would be a similar result for their challenge to the plaintiffs' Section 1 claims.  Consistent with that view, their attack on the Section 1 claims rests on the same arguments about the perceived shortcomings in the Complaint as does their challenge to the Section 7 claims – namely, that the Complaint fails plausibly to identify any anti-competitive effects that the IPO may produce.  *See* Bank Memo. at 10; MC Memo. at 7 (incorporating Bank Memo. by reference); DE 591 (Transcript of Proceedings held on February 2, 2007) ("Tr.") 73. The defendants reason that if the Complaint fails plausibly to raise the specter of future harm to competition in violation of Section 7, it must necessarily fail to state a claim of conduct that has any immediate or short-term effect of impairing competition in violation of Section 1.  Bank Memo. at 10 (citing *White Consol. Indus., Inc.*, 781 F.2d at 1228).  Although they disagree about the height of the statutory bar, the plaintiffs agree that for purposes of the instant motions, the court should analyze the defendants' challenge to their Section 1 claims under the Section 7 standard.  *See* DE 539 (plaintiffs' opposition memorandum) ("Opp.") at 18.  As far as the parties go on the matter, I agree, but I also acknowledge that if I conclude that the Complaint alleges a form of competitive harm that states a claim under Section 7, it may nevertheless fail under the law of this circuit to state a claim under Section 1.  Accordingly, because I do conclude that the plaintiffs have identified viable Section 7 claims against both MasterCard and the Banks, as set forth below, I also analyze the allegations about competitive harm under the standard applicable to Section 1.

Consequently, in the following discussion I analyze the issues that are relevant, in the context of this case, to the viability of the plaintiffs' Section 7 claims.  Specifically, I first discuss whether the transactions in which MasterCard and the Banks, respectively, have allegedly engaged are the kinds of acquisitions that are governed by Section 7.  To the extent that they are, I next examine whether the plaintiffs have sufficiently alleged, for purposes of Section 7, that the transactions may substantially lessen competition or lead to a monopoly.  To the extent that they do, I end by considering whether those same allegations suffice to plead that the IPO has an actual adverse effect on competition for purposes of Section 1.

### 2.      The Nature Of The Acquisitions

As explained below, I conclude that the IPO resulted in both MasterCard and the Banks making an acquisition that is properly subject to scrutiny under Section 7.  First, the Banks acquired stock in the new MasterCard entity, and that acquisition is not shielded from liability simply because it was paid for with arguably more valuable shares of the old entity.  Second, MasterCard acquired assets from the Banks – namely, their shares of the old MasterCard entity and certain associated rights – and that acquisition is not shielded from liability simply because the assets can *also* accurately be described as MasterCard's own stock rather than "the stock ... of another person[.]"  Both sets of defendants oppose such an interpretation based on crabbed readings of the 1950 amendment to the Clayton Act that are inconsistent not only with the statute's plain text, but also with the manifestly broad remedial goal described above.

### a.      Claims Against The Banks

As set forth above, Section 7 now prohibits two different kinds of acquisitions that may substantially lessen competition or promote a monopoly:  acquisitions of "stock or other share

13

capital" and acquisitions of "the assets of another[.]" 15 U.S.C. § 18.  But while the first

prohibition governs the broadest range of persons subject to the legislature's power under the

Commerce Clause, the second explicitly applies only to the much narrower class of persons

"subject to the jurisdiction of the [FTC.]"  *Id*.  That narrower class does not include banks, as

such entities are not within the FTC's jurisdiction.  15 U.S.C. § 45(a)(2).  Accordingly, the

plaintiffs cannot seek relief from the Banks under Section 7 based on any acquisition of assets;

they must instead rely exclusively on a theory that the Banks have acquired the stock of another –

namely, shares in the new MasterCard entity.  The latter theory does not require the defendants to

be subject to the FTC's jurisdiction, as the Clayton Act's regulation of stock acquisitions is not

limited to those in which the acquirer is within the FTC's jurisdiction.  15 U.S.C. § 18;

*Philadelphia Nat'l Bank*, 374 U.S. at 335-36.

        Thus, to the extent that the Banks have challenged the plaintiffs' Seventeenth Claim for

Relief on the ground that it asserts a cause of action only under the Clayton Act's "assets" prong,

*see* Bank Memo. at 12-13, they are correct:  the relevant part of the pleading refers only to an

"acquisition of *assets* by the ... Banks" and makes no mention of any acquisition of stock.

Complaint ¶ 125 (emphasis added).  In opposing the motion, the plaintiffs make no effort to

counter that argument, but instead argue that they have also alleged that the Banks acquired stock

in a transaction that threatens competitive harm, and that their Clayton Act claim is therefore

viable.  Opp. at 15-16 (citing Complaint ¶¶ 13, 18, 100-106).

        The plaintiffs are certainly correct in pointing out that they have included in their

complaint allegations that the Banks acquired the stock of another in the IPO.  It is also plainly

true that those allegations are incorporated by reference into the Seventeenth Claim for Relief.

Complaint ¶ 123.  But what the plaintiffs fail to acknowledge is that the operative part of that claim explicitly describes the Section 7 claim as being predicated on the Banks' "acquisition of assets" and does not make any allegation that describes the simultaneous acquisition of stock as a basis for invoking the statute's protection.  As a result, the Clayton Act claim against the Banks is technically deficient and should be dismissed.  However, to the extent that the plaintiffs' substantive legal theory about the Banks' alleged acquisition of stock is viable – and the parties have now had a full and fair debate on that point – they should be allowed to amend their Clayton Act claim.  As explained below, I believe that theory is viable, and therefore respectfully recommend that the court dismiss the claim against the Banks with leave to amend.

In arguing against a theory of liability predicated on their acquisition of stock, the Banks point out that they have merely exchanged some of their shares in the former MasterCard private consortium for shares in the new MasterCard public company, and that the transaction has divested them of rights and diluted their economic interest in the company.  DE 560 (Banks' Reply Memorandum) at 3-4.  As a result, the Banks contend that they are not "acquirers" for purposes of Section 7.  I disagree:  the fact that the IPO effectively added nothing substantively new to their stock portfolios – which I assume to be true for purposes of this discussion – is of no moment.  By virtue of the IPO (and the agreements pursuant to which it was effected), the Banks have acquired shares in a company that did not previously exist, and that they therefore did not previously possess.  That is all that is required under the first prong of Section 7, which applies equally to both stock exchanges and stock purchases.  The plain and unambiguous text of Section 7 provides for no exception simply because the Banks bought their shares in the new MasterCard with similar shares of the old company rather than with cash.  *See Philadelphia Nat'l Bank*, 374

15

U.S. at 339 n.16 ("In the case of an acquisition ... in which shares in the acquired corporation are to be exchanged for shares in the resulting corporation, *a fortiori* we discern no difficulty in conceptualizing the transaction as a 'stock acquisition.'").

Even assuming the truth of the Banks' contention that the overall value of the economic and governance interests in the new MasterCard entity that they own as a result of the IPO is less than the value of the comparable stake they held in the old consortium, it remains the case that they have acquired shares that they did not previously own.  At oral argument, the Banks's counsel responded to that observation by informing me that no court had applied Section 7 to impose liability on an acquirer who ended up with a less valuable stake in a company as the result of a corporate transaction.  To ensure a complete record, I granted the Banks leave to submit supplemental briefing on the issue.  *See* Tr. 65.  Their submission discussed only one comparable series of transactions – in which the National Association of Securities Dealers divested itself of its interests in the Nasdaq Stock Market, Inc. – and those transactions did not, as far as I can discern from the submission, result in any litigation or ruling concerning the applicability of the Clayton Act.  *See* DE 589.  While I credit the Banks' contention that no court has affirmatively ruled that a diminution of overall economic value in a transaction may remove it from the scope of Section 7, I note that they have cited no authority to the contrary.  More to the point, the fact that the IPO diminished the Banks' economic stake in MasterCard – if it is a fact – does not suffice to overcome the statute's plain text, which provides for no such exception.

Finally, while it may be true that the Banks' new holdings have less value than their original ownership interest in the MasterCard consortium, the plaintiffs have neither alleged that fact in their complaint nor conceded it in connection with this motion.  It is therefore an

16

insufficient basis for granting relief at the pleading stage.  Accordingly, I conclude that the Banks are potentially liable under Section 7 and should therefore be given an opportunity to plead, and thereafter to prove, that the Banks' acquisition of stock in the new MasterCard entity may lead to a substantial lessening of competition.

b.    <u>Claims Against MasterCard</u>

As part of the IPO, MasterCard acknowledges that it spent billions of dollars to "redeem" millions of shares of Class B stock "from its existing shareholders" – namely, the banks who formerly formed its consortium membership.  MC Memo. at 4.  As a result, MasterCard argues, it has not acquired the stock "of another person[,]" 15 U.S.C. § 18, and therefore cannot be held to account under the Clayton Act's "stock" prong.  MasterCard further argues that it is also immune from liability under the statute's second prong because the redemption of its own stock cannot be considered the acquisition of the "assets ... of another person."  *See* MC Memo. at 5-7.  I disagree with the latter argument for the reasons explained below.

i.    <u>Acquisition Of Stock</u>

MasterCard argues that the Clayton Act's "stock" prong applies only to the acquisition of the stock of an entity other that the acquirer itself, and that the plaintiffs may therefore not predicate their claim on its redemption of its own shares pursuant to the IPO.  MC Memo. at 4-5.[6]

---

[6] As will become evident, it is in MasterCard's interest to characterize the plaintiffs' Clayton Act theory as one that rests on an assertion that the defendants acquired "stock" rather than "assets." It is therefore understandable that MasterCard has elided, as the Banks have not, the fact that the Complaint asserts no more than that the "acquisition of assets" constitutes a violation of Section 7.  Because all parties have submitted arguments under both prongs of the statute, and also because I have already recommended that the court grant the plaintiffs leave to amend the claim against the Banks by asserting a Section 7 claim based on the acquisition of "stock," I address both theories here, despite the fact that the "stock" theory is arguably moot.

17

The plaintiffs counter that such a stock redemption must be held to fall within the scope of the "stock" prong because to do otherwise would amount to an impermissible alteration of the statutory text.  Specifically, the plaintiffs argue that MasterCard's reading of the statute is a semantic "sleight of hand" that transforms the phrase "stock ... *of* another person" into "stock ... *in* another person."  Opp. at 12-14.  I disagree, and instead conclude that it is the plaintiffs' reading of the statute that improperly amends the text.

The statute reaches all acquisitions "of the stock or other share capital ... of another person engaged also in commerce or in any activity affecting commerce" – with "person" being elsewhere defined "to include corporations and associations" that exist under the laws of most jurisdictions.  15 U.S.C. §§ 18, 7.  The term "share capital ... of another person" plainly and unambiguously refers to a possessory interest in that other corporate "person" rather than to something the latter possesses.  And by virtue of the fact that the statute places the words "or other share capital" immediately after the word stock, it is evident that Congress intended "stock" to denote a subset of the category of items that can properly be described as "share capital" – meaning that to fall within the scope of the Clayton Act's first prohibition, a corporate defendant must acquire a possessory interest in "another person" rather than merely a possessory interest in itself that the other person happens to own.  *See United States v. Du Pont*, 353 U.S. 586, 592 (1957).

Such a reading of the statute respects not only its unambiguous text, but also common sense:  in most circumstances, a corporation's redemption of its own stock will not create the kind of economic concentration with which Section 7 is concerned.  *See Philadelphia Nat'l Bank*, 374 U.S. at 362-63.  But while the appeal to usual experience is helpful, it is not sufficient:  an

acknowledgment that a corporation's redemption of its own stock will generally fail to implicate the statutory bar's second element ("the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly"), says nothing about whether Congress intended to cover such transactions within the "stock" clause of the first element. That question is conclusively answered by the statute's unambiguous text. Accordingly, to the extent that the plaintiffs characterize MasterCard's redemption of MasterCard stock as the acquisition of the "stock ... of another person" within the meaning of Section 7, they fail to state a cognizable claim.

ii.     Acquisition Of Assets

While the Complaint's factual narrative does not explicitly allege that MasterCard acquired "assets" from the Banks by virtue of the IPO, it does allege the "acquisition by the New MasterCard of portions of the card-issuing and merchant-acquiring functions of each Member Bank[.]" Complaint ¶ 113. Moreover, as discussed above, the operative allegation in the Seventeenth Claim For Relief explicitly mentions MasterCard's acquisition of "assets" as a basis for relief – indeed, that is the *only* statutory predicate the relevant paragraph recites. Complaint ¶ 125. At any rate, in responding to the instant motion, the plaintiffs are more explicit in specifying MasterCard's acquisition of cognizable "assets ... of another person[.]" First, they allege that MasterCard obtained from the Banks a bundle of three valuable rights that previously belonged exclusively to the Banks: the right to issue MasterCard-branded payment cards (*i.e.*, the right to act as the "Issuing Bank"); the right to acquire merchants (*i.e.*, the right to act as the "Acquiring Bank"); and the right to set the level of interchange fees for transactions involving MasterCard-branded cards. *See* Opp. at 14-15. Second, they argue that the Class B shares of

19

MasterCard that the Banks sold back to MasterCard as part of the IPO were, when in the Banks' possession, "assets" belonging to the Banks and therefore properly subject to Clayton Act scrutiny upon their sale to MasterCard.  *See* DE 592 (Class Plaintiffs' Response to MasterCard's Supplemental Brief) ("CP Supp. Letter") at 3.  Without speculating as to the likelihood that the plaintiffs can support those theories with evidence sufficient to survive a motion for summary judgment or to prevail at trial, I conclude that each is sufficient to survive a motion to dismiss.

Consistent with the legislature's intent in 1950 to expand Section 7 to include all corporate amalgamations that might lessen competition, I understand the law's use of the word "assets" to refer broadly to any tangible or intangible thing of value.  *See United States v. Columbia Pictures Corp.*, 189 F. Supp. 153, 182 & n.4 (S.D.N.Y. 1960).  Congress amended the statute in 1950 to expand its reach by sweeping away restrictions based on the form of a particular transaction and focusing instead on "the end result of a transfer of a sufficient part of the bundle of legal rights and privileges from the transferring person to the acquiring person[;]" the inquiry is whether that end result "gives the transfer economic significance and the proscribed adverse 'effect.'"  *McTamney v. Stolt Tankers & Terminals (Holdings), S.A.*, 678 F. Supp. 118, 120 (citing *United States v. Columbia Pictures Corp.*, 189 F. Supp. at 182).

In that respect, the plaintiffs' first argument – that the bundle of rights transferred to MasterCard as a result of the IPO are assets – is plainly correct.  The plaintiffs have plausibly alleged that the right to set the level of interchange fees for transactions involving MasterCard-branded cards is an asset that the banks have previously used to maximize their profits.  Complaint ¶¶ 48-49.  MasterCard, having allegedly acquired that right pursuant to the IPO, Complaint ¶ 95, can now presumably do the same and thereby derive value from its acquisition.

20

Likewise, the plaintiffs plausibly allege that in effecting the IPO, MasterCard acquired the ability to issue MasterCard-branded cards and acquire merchants – an ability that previously allowed banks to receive revenue from credit card transaction fees while expending few if any resources. Complaint ¶¶ 57, 63-66.  Moreover, the plaintiffs plausibly allege that the banks that previously exercised such rights did so in a manner that allowed them to collect fees at supra-competitive levels.  *See* Complaint ¶¶ 88, 122, 125.  They thus conclude that the same rights, now in MasterCard's possession, will allow MasterCard to dominate the market unrestrained by competition or by antitrust laws.  Complaint ¶¶ 76, 86, 91-93.  Such allegations plainly suffice to satisfy the asset-acquisition requirement of a Section 7 claim.

So too does the simple fact that, as the plaintiffs have alleged and as MasterCard acknowledges, MasterCard purchased Class B MasterCard shares from the banks.  MasterCard is undoubtedly correct, as explained above, that such a redemption of its outstanding stock was not the acquisition of "the whole or any part of the stock or other share capital ... of another person[.]"  But that does not mean those shares were not *also* "the assets of another person[.]"  Indeed MasterCard necessarily acknowledges that point when it writes that it "acquired no assets *other than* MasterCard stock from the member banks."  MC Memo. at 6 n.3 (emphasis added).  MasterCard's argument is thus based not on a denial that it acquired the assets of another, but rather on an assumption that the particular kind of assets it acquired from another – shares of stock in the acquiring company – is categorically exempt from the reach of Section 7.  That assumption – which, as far as I can determine, has never been endorsed by any court – is at odds with the statute's plain text as well as its unmistakable remedial goal.

As a matter of statutory construction, the matter is simple:  Congress made *any* acquisition of the assets of another subject to scrutiny (so long as the acquirer is also within the FTC's regulatory mandate) and provided for potential liability in the event any such acquisition threatened substantial competitive harm.  15 U.S.C. § 18.  Including within that broad statutory prohibition assets that might also accurately be described as the stock of the acquirer does nothing to nullify any part of the text of the "stock" clause or to undermine its validity or scope. Moreover if it is true that the vast majority of instances in which a company redeems its own stock from shareholders will cause no lessening of competition, then it is also necessarily true that such transactions will escape liability under Section 7 – but only because of the lack of anti-competitive effect, not because the transaction itself is exempt.

Such a literal reading of the statute's unambiguous text is entirely consistent with the legislative intent that informed the 1950 amendment to Section 7.  Prior to 1950, the statute only reached acquisitions of the stock of another person.  Clayton Act, ch. 323, § 7, 38 Stat. 730, 730 (1914) (current version at 15 U.S.C. § 18).  As discussed above, when Congress expanded the statute's reach to include acquisitions of assets by those within the jurisdiction of the FTC, it expressly sought to close perceived loopholes rather than to create new ones.  *See Philadelphia Nat'l Bank*, 374 U.S. at 342-43; *Brown Shoe,* 370 U.S. at 317.

I also find support for my literal reading of the "assets" provision in the overall structure of the statute.  In particular, its third paragraph bolsters the conclusion that Congress intended to define an essentially unlimited universe of transactions involving an acquirer subject to FTC regulation that would be unlawful to the extent they endangered competition:

22

> This section shall not apply to persons purchasing such stock solely for
> investment *and not ... attempting to bring about, the substantial lessening of
> competition*. Nor shall anything contained in this section prevent a corporation
> engaged in commerce or in any activity affecting commerce from causing the
> formation of subsidiary corporations for the actual carrying on of their immediate
> lawful business, or the natural and legitimate branches or extensions thereof, or
> from owning and holding all or a part of the stock of such subsidiary corporations,
> *when the effect of such formation is not to substantially lessen competition*.

15 U.S.C. § 18 (emphasis added).  In this third paragraph of Section 7, Congress addressed

activities that normally do not carry the threat of competitive harm.  But rather than categorically

exempt such activities from the statute's reach, Congress instead provided a conditional

exemption that turns on whether the transaction at issue is one of the rare examples that *does*

threaten competition.  So too here:  if Congress had wanted categorically to exempt a

corporation's acquisition of its own shares from private owners, it could easily have done so.  But

that would have been inconsistent with the broad remedial goal of prohibiting transactions that

threaten competitive harm.

That last proviso – the threat to competition – is of course critical to the analysis of the

defendants' motions to dismiss.  Thus far I have determined nothing more than that, contrary to

the defendants' several arguments, the *form* of the transactions associated with the IPO do not

preclude liability under Section 7.  That determination begs the question whether the plaintiffs

have met the arguably more challenging requirement of plausibly pleading an unlawful *effect* –

namely, a threat of competitive harm.  It is to that question that I now turn.

3.      The IPO's Effect On Competition

a.      The Potential For A Substantial Lessening Of Competition

The relevant inquiry under Section 7 is whether "the effect" of the challenged acquisition
– if of a kind within the statute's scope, as discussed above – "may be substantially to lessen
competition[.]"  15 U.S.C. § 18.[7]  The focus of that inquiry is on "competition" as such – not
competitors.  Thus, although the participants in a challenged acquisition will often be actual
competitors, they need not be, so long as they engage in or affect interstate commerce.  For
example, an acquisition involving an entity that has not yet entered the relevant market – and
which therefore does not involve actual competitors – may have an effect on commerce that the
statute forbids.  *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 533-35 (1973).

Such an inquiry is of course fact-intensive and necessarily speculative to some degree:
the court must consider whether the outcome of the challenged transaction will facilitate
collusion between competitors or otherwise allow the acquiring entity to increase prices above
their competitive level without challenge.  *United States v. Long Island Jewish Medical Center*,
983 F. Supp. 121, 135-36 (E.D.N.Y. 1997); *State of New York v. Kraft General Foods, Inc.*, 926
F. Supp. 321, 359 (S.D.N.Y. 1995).  An assessment of the barriers to entry in the relevant market
is particularly important in such analysis; low entry barriers in a given market can vitiate the
impact of an acquisition that would lessen competition in another market with higher barriers.
*See United States v. Waste Management, Inc.*, 743 F.2d 976 (2d Cir. 1984).  The level of market
concentration prior to the challenged acquisition is another important consideration; "the

---

[7]  Because the parties focus their arguments exclusively on whether the effect of the IPO "may be
substantially to lessen competition," for ease of reference I will ignore the final clause of the
quoted provision, which reads, "or to tend to create a monopoly."  *Id*.

24

importance of preventing even slight increases in concentration" is pronounced where an already-high level of concentration renders a market unusually vulnerable to competitive threats. *Stanley Works v. Federal Trade Commission*, 469 F.2d 498, 504 (2d Cir. 1972) (quoting *United States v. Continental Can*, 378 U.S. 441, 461-62 (1964)).

The defendants contend that the Complaint falls short of this standard for two basic reasons. First, they claim that the Class Plaintiffs cannot state a viable theory of harm under Section 7 because the effects of the IPO, including a reduction in the banks' ownership and control of MasterCard and MasterCard's status as a single entity, are not anti-competitive – or at least no more so than would be the sale of MasterCard as a whole to any outside single entity. In that regard they emphasize that the resulting single entity – whether MasterCard or some assumed independent purchaser – is itself bound by Sections 1 and 2 of the Sherman Act. Second, they argue that the Complaint fails to allege a sufficient causal link between the IPO itself and the "parade of horribles" the Class Plaintiffs ascribe to the post-IPO single-entity MasterCard. *See* Bank Memo. at 14-19. I disagree with both arguments, in part because the distinction between them artificially, and unfairly, severs a critical link in the plaintiffs' theory.

The Class Plaintiffs seek relief for harm flowing from the agreements and transactions underlying the IPO, not the IPO itself. *See* Complaint ¶¶ 123-28. Specifically, they claim that those agreements reveal the IPO to be a pretextual transformation of MasterCard from a joint venture to an entity that will only appear for purposes of federal antitrust laws to be a single economic actor – the internal workings of which by definition cannot constitute a horizontal restraint of trade – but which in actuality will continue to reflect the collective action of the several member banks who should be competitors. *See* Complaint ¶¶ 4-5; 91-92; Opp. at 1.

25

Thus, even if the transformation of the old MasterCard consortium into a single entity by means of a sale to an independent third party might normally raise no concerns about competition – because in such circumstances the member banks would plainly be unable to continue to exercise the kind of anti-competitive collective control the plaintiffs ascribe to them – such a transformation by means of a transfer of ownership and governance rights among the existing members of the consortium offers no such assurance.  Moreover, if the "parade of horribles" that the plaintiffs fear is made possible by the latter sort of transformation, then the plaintiffs plainly satisfy their pleading burden by explaining how the agreement to transform MasterCard in a particular way makes probable the kind of anti-competitive conduct in which an independent acquirer of MasterCard would presumably have no reason to engage.

It is precisely such a link – between the nature of the agreements by which MasterCard assumes the form of a single entity and its resulting ability to act on its members alleged desire to engage in anti-competitive conduct – that the plaintiffs allege, and that the defendants elide with their arguments.  The plaintiffs allege that link by starting with a description of a market that they contend has historically seen high concentration and anti-competitive behavior.  *See* Complaint ¶¶ 32-41, 64, 87-93.  The Class Plaintiffs theorize that MasterCard's power in that market would increase if, by virtue of being considered a single entity that is free to take actions forbidden to a consortium of competitors – it could implement anti-competitive restraints comparable to those challenged in prior litigation.  Indeed, the plaintiffs claim that the exposure to antitrust liability is all that prevents MasterCard from re-instating such restraints on competition that have already been found to be unlawful.  *Id.* ¶¶ 69-74.

26

It is of course true, as the defendants argue, that the single-entity MasterCard that resulted from the IPO is inherently no more *able* to engage in such conduct than the single entity that would result from a sale to an outside buyer, or from an unrestricted sale of MasterCard's shares to the public.  But that is why the nature of the agreements leading to the IPO, rather than the fact of the IPO itself, is critical to the viability of the plaintiffs' claims:  they contend that the particular circumstances that produced the new single-entity MasterCard were deliberately designed to ensure that those who *want* to engage in anti-competitive conduct and have a history of doing so are the ones who end up controlling the single entity that is now better able to try.

Specifically, the plaintiffs assert that the rules governing transfers and ownership of the new classes of MasterCard shares will concentrate effective control of the new entity in the defendants' hands.  Those rules ensure that the banks that were members of the old MasterCard consortium will retain a substantial economic interest – 41 percent ownership – in the new entity.  Combined with ten percent ownership share guaranteed to the new MasterCard Foundation, it is impossible for outsiders to obtain a majority stake in the company.  In addition, the restrictions on governance rights – including the ownership qualifications and veto powers associated with Class M shares and the limitations on voting rights available to public investors –  further ensure that no outsider can gain enough power to operate MasterCard in a way that might be more competitive but less profitable for the banks.  *Id.* ¶¶ 79-84.

Given such allegations, the fact that the member banks have *less* ownership and control of MasterCard than they did before the IPO does not preclude a finding that the company's transformation may substantially lessen competition.  The plaintiffs do not contend that the threat to competition arises from the precise degree of ownership and control, but rather from the fact

27

that the banks retain *enough* ownership and control to allow them – effectively unmediated by outside influence – to take unfair advantage of the greater freedom to act that MasterCard's new status as a single entity creates.  *See*, *e.g.*, *Du Pont*, 366 U.S. at 331-32 (shareholders' incentives aligned with heavily economically invested corporation so divestment of that corporation's voting control in favor of public ownership did not protect against lessened competition).

Such a reading of the Complaint suffices to overcome the defendants' arguments that there is nothing inherently anti-competitive in the creation of a single-entity MasterCard and that the plaintiffs fail to link the IPO to their "parade of horribles."[8]  Moreover, the plaintiffs have bolstered their allegations about the effect of the transaction with claims about the characteristics of the relevant market.  In particular, they allege that new competitors are dissuaded from entering that market by the astronomical cost of entry, and that competitive forces are therefore unlikely to restrain any anti-competitive behavior in which the new single-entity MasterCard may engage.  *See* Complaint ¶¶ 39-40.  Given the plaintiffs' plausible allegations about the characteristics of the relevant market and the effects of the acquisitions at issue, I conclude that the Complaint sufficiently pleads that the agreements leading to the IPO will probably result in a substantial lessening of competition.  Combined with my earlier conclusion about the form of the acquisition, I further conclude that – with respect to both MasterCard's alleged acquisition of assets from its member banks and the Banks' acquisition of stock in MasterCard – the plaintiffs have identified, if not yet sufficiently pleaded, a viable claim under Section 7 of the Clayton Act.

_____

[8]  With respect to the latter argument, I note that in assailing the purported lack of a causal link, the defendants do not explicitly take issue with the proposition that the "parade of horribles" would in fact constitute a substantial lessening of competition for purposes of Section 7, but instead appear to treat the latter issue as premature.  *See* Bank Memo. at 16-17.

b.   <u>Actual Adverse Effects On Competition</u>

As noted at the outset, the parties have argued the instant motion exclusively by reference to the standard relevant under Section 7.  Having concluded that the Complaint states a cause of action under the latter standard, I must consider the possibility that it nevertheless fails to include a sufficient allegation of short-term competitive harm that would support a finding of liability under Section 1 of the Sherman Act.  Because the parties have not addressed that issue, I assume they agree that the Sherman Act claims stand or fall together with those under the Clayton Act.  I am content to do likewise, and merely add two brief observations.  First, the Complaint does explicitly allege immediate effects, as opposed to those that are merely probable to occur in the future, in a section entitled "The Ownership and Control Restrictions in the Agreements Harm Competition."  *See* Complaint ¶¶ 100-106.  Second, to the extent that the theory I find sufficient under the Clayton Act rests on the proposition that the transformation of MasterCard is designed to create only the appearance of a single entity so as to allow the defendants to reinstate unreasonable restraints of competition, the Complaint alleges a harm to competition that by its nature exists immediately upon the consummation of the IPO.  Thus, regardless of whether the competitive harm elements of Section 1 and Section 7 are distinct as a matter of abstract legal interpretation, under the circumstances of this case it makes sense to conclude that allegations in the Complaint that suffice to satisfy the element in one statute also suffice to satisfy the corresponding element in the other.  Accordingly, I conclude that the court should deny the motions to dismiss the plaintiffs' claims under Section 1 of the Sherman Act.

C.    The Fraudulent Conveyance Claims

In pleading their supplemental Complaint, the plaintiffs challenge one aspect of the IPO not because of its effect on competition, but rather because it renders considerably more shallow the pockets from which they hope to secure a recovery for the other conduct that they think does violate antitrust laws.  That is, the plaintiffs assert that as part of its transformation into a single entity, MasterCard divested itself of the right to levy an assessment on its member banks in the event of a litigation-related loss (as well as in the event of a number of other contingencies). Complaint ¶¶ 107-08 (quoting MasterCard S-1 at 20).  They claim that MasterCard gave up that right for little if any consideration, and that an autonomous MasterCard – an entity acting in its own interests rather than the collective interests of the banks – would not have made the same decision.  The plaintiffs describe that decision as a deliberate attempt by the defendants to place their assets beyond the reach of any judgment in this litigation.  *See* Complaint ¶¶ 109-12.  As such, the plaintiffs assert that the transaction is barred by New York's prohibition against fraudulent conveyances.  Complaint ¶¶ 144-149 (Twentieth Claim For Relief).

The plaintiffs predicate this part of their Complaint on New York's Uniform Fraudulent Conveyance Act, N.Y. Debt. & Cred. Law § 270 *et seq.* (2006).  *See* Opp. 38.  When MasterCard challenged the viability of such claims under Sections 273-a and 276 of that statute, the plaintiffs subsequently disavowed any claim under the former but defended the validity of their claims under Sections 275 and 276.  The parties have not discussed the viability of the fraudulent conveyance claims under any other provision, and I therefore restrict the following analysis to those parts of the law.

30

1.     <u>Threshold Issues</u>

New York's fraudulent conveyance statute is designed to "aid specific creditors who have

been defrauded by the transfer of a debtor's property." *HBE Leasing Corp. v. Frank*, 48 F.3d

623, 634 (2d Cir. 1995).   Two necessary – but not sufficient – elements of a cognizable claim

under the statute are a transaction that constitutes a "conveyance" under New York law and a

plaintiff whom that same law defines as the transferor's "creditor." *Ostashko v. Ostashko*, 2002

WL 32068357, at *17  (E.D.N.Y. Dec. 12, 2002).  In considering those and other elements of the

cause of action, courts have the authority to construe the statute liberally to advance its remedial

goal; stated more elegantly, "the path is to be cleared of harassing impediments to the swift

pursuit of justice." *American Surety Co. v. Conner*, 251 N.Y. 1, 7 (1929) (Cardozo, J.).  As

explained below, I conclude that the Complaint sufficiently alleges that the plaintiffs are creditors

and that the IPO was a conveyance within the meaning of the statute.

Under New York's Uniform Fraudulent Conveyance Act, a conveyance is broadly defined

as any "payment of money, assignment, release, transfer, lease, mortgage or pledge of tangible or

intangible property, and also the creation of any lien or incumbrance." N.Y. Debt. & Cred. Law

§ 270.  In keeping with the statute's purpose, courts have interpreted this definition to encompass

a wide array of transfers, provided that the transaction involving the release of an asset with at

least some value. *See Hoyt v. Godfrey*, 88 N.Y. 69 (1882) (cancellation of "worthless" debt was

not a conveyance).  For example, an extension of time on a debt qualifies as a conveyance,

because it is tantamount to the release of a valuable right "to demand immediate or timely

payment of a demand debt or a note when due[.]" *Clarkson Co. Ltd. v. Shaheen*, 533 F. Supp.

905, 930 (S.D.N.Y. 1982).  Similarly, a debtor's "waiver of or failure to collect" a specific

penalty to which it is entitled under an agreement can also support a fraudulent conveyance claim. *In re Unified Commercial Capital, Inc.*, 260 B.R. 343, 349 n.6 (Bankr. W.D.N.Y. 2001). Even a law firm's transfer of its cases – and the associated expectation of fees – is a cognizable conveyance under the statute. *Parsons & Whittemore, Inc. v. Abady Luttati Kaiser Saurborn & Mair, P.C.*, 765 N.Y.S.2d 861, 865 (N.Y. App. Div. 2003).

Viewed against the backdrop of such law, it is clear that the Complaint sufficiently alleges a conveyance. The plaintiffs contend both that MasterCard's right to levy assessments on its member banks was "a valuable asset" that "protect[ed] the solvency and stability of MasterCard against losses" and that MasterCard's Board of Directors agreed to extinguish that right in connection with the IPO. Complaint ¶¶ 107-08. The release of that right was unquestionably the "conveyance" of a valuable property interest within the meaning of the law.

The plaintiffs have likewise satisfied, for purposes of a motion to dismiss, the requirement that they establish their status as MasterCard's "creditors" within the meaning of the statute. As with "conveyance," the statute's definition of "creditor" is quite broad: it includes any person with "any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent." N.Y. Debt. & Cred. L. § 270. A claim that "has not yet accrued and which is dependent on some future event that may never happen" is necessarily contingent; accordingly, the person to whom such a claim accrues constitutes a creditor. *Trafalgar Power, Inc. v. Aetna Life Ins. Co.*, 131 F. Supp. 2d 341, 347 (N.D.N.Y. 2001) (citing *Shelly v. Doe*, 173 Misc.2d 200 (N.Y. Co. Ct. 1997), *aff'd as modified*, 249 A.D.2d 756, 671 N.Y.S.2d 803 (N.Y. App. Div. 1998)); *see Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 428 (S.D.N.Y. 2006).

32

Having satisfied the pleading requirements with respect to the "conveyance" and "creditor" elements, the plaintiffs must also allege that the conveyance at issue was a fraud, either actual or constructive, designed to frustrate the creditors' claims. I analyze each kind of fraud theory below and conclude that the plaintiffs have failed to make sufficient allegations under both.

2.   Actual Fraud

To the extent the plaintiffs seek to rely on a theory of actual fraud pursuant to Section 276, their Complaint must include sufficient allegations about MasterCard's intent. By its terms, the statute governs only those conveyances "made ... with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors[.]" N.Y. Debt. & Cred. Law § 276 (2006). Because the substantive law on which the plaintiffs rely make such actual fraudulent intent an element of the cause of action, their Complaint "must state with particularity the circumstances constituting [such] fraud." Fed. R. Civ. P. 9(b); see In re Sharp Int'l Corp., 403 F.3d 43, 56 (2d Cir. 2005) (citing Atlanta Shipping Corp., Inc. v. Chemical Bank, 818 F.2d 240, 251 (2d Cir. 1987)).

Nevertheless, because direct proof of intent is notoriously hard to come by, conclusory allegations can suffice if they are bolstered by factual allegations giving rise to a "strong inference" that the challenged conveyance was undertaken with the requisite intent. Lippe v. Bairnco, 225 B.R. 846, 856 (S.D.N.Y. 1998) (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1176 (2d Cir. 1993)). Accordingly, a pleading may substitute particularized allegations of fraudulent intent with so-called "badges" of fraud – that is, "circumstances that so commonly accompany fraudulent transfers that their presence gives rise to an inference of intent to defraud."

33

*In re Manhattan Investment Fund Ltd.*, 310 B.R. 500, 505 (Bankr. S.D.N.Y. 2002) (citation omitted); *see Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582-83 (2d Cir. 1983).  Among these circumstances are "'a close relationship between the parties to the alleged fraudulent transaction; a questionable transfer not in the usual course of business; inadequacy of the consideration; ... [and] retention of control of the property by the transferor after the conveyance.'"  *In re Sharp Int'l Corp.*, 403 F.3d at 56 (quoting *Wall St. Assocs. v. Brodsky*, 257 A.D.2d 526, 529 (N.Y. App. Div. 1999) (alterations in original); and citing *HBE Leasing*, 48 F.3d at 639)).  Moreover, in assessing the sufficiency of the accusation of fraudulent intent, it is appropriate for the court not only to consider the allegations concerning the allegedly fraudulent portion of a challenged conveyance, but to consider such allegations in the context of all of the assertions about the transaction at issue.  *See In re Monahan Ford Corp.*, 340 B.R. 1, 38 (Bankr. E.D.N.Y. 2006).

        Even with the aid of that generous standard, the plaintiffs cannot sustain their burden, at least not with the Complaint in its current form.  Their pleading provides virtually no information about the factual grounding for its claims about MasterCard's fraudulent intent.  In other words, there is no basis from which to conclude that the plaintiffs' assertions of fraud are predicated on a "belief rather than irresponsible speculation."  *Cargo Partner AG v. Albatrans, Inc.*, 207 F. Supp. 2d 86, 116 (S.D.N.Y. 2004) (quoting *Morgan v. Prudential Group, Inc.*, 81 F.R.D. 418, 423 (S.D.N.Y. 1978)).  Their sole allegation regarding fraudulent intent is that the agreements occasioning the IPO "were undertaken by MasterCard and its Member Banks, including Bank Defendants, with the intent to defraud potential judgment creditors...." Complaint ¶ 149.  This conclusory allegation requires bolstering to survive – if not with particularized allegations of

actual fraudulent intent, then at least with a description of the badges of fraud that would permit the requisite inference. *See Lippe*, 225 B.R. at 856. Without such support, the Complaint fails to state a claim under Section 276 that passes muster under Rule 9(b), and that claim should accordingly be dismissed.

### 3.   Constructive Fraud

The plaintiffs' alternate statutory basis for a fraudulent conveyance claim is a provision that defines as fraudulent, and therefore unlawful, any "conveyance made ... without fair consideration when the person making the conveyance ... intends or believes that he will incur debts beyond his ability to pay as they mature[.]" N.Y. Debt. & Cred. Law § 275. Although the latter statute explicitly includes an element of intent, the intent of which it speaks is not the intent to defraud. As a result, a claim under this provision, unlike a claim under Section 276, does not trigger the heightened pleading requirement of Rule 9(b). *Drenis v. Haligiannis*, 452 F. Supp. 2d at 428-29. Instead, the plaintiffs need only provide a "short and plain statement of the claim showing that [they are] entitled to relief." Fed. R. Civ. P. 8(a)(2). Even without the need to make particularized allegations of intent, however, the plaintiffs do have the obligation to allege "those facts *necessary* to a finding of liability" and cannot rely on "bald assertions and conclusions of law." *Amron v. Morgan Stanley Investment Advisors, Inc.*, 464 F.3d 338, 343 (2d Cir. 2005) (emphasis in original).

Here again, the Complaint falls short as currently pleaded. In asserting the lack of fair consideration for the conveyance, the plaintiffs provide no more detail than that MasterCard released its right of assessment "without adequate consideration." Complaint ¶¶ 109, 147. Such conclusory pleading cannot suffice, as the test of fair consideration is more nuanced: "(1) the

35

recipient ... must either (a) convey property in exchange or (b) discharge an antecedent debt in exchange; and (2) such exchange must be a 'fair equivalent' of the property received; and (3) such exchange must be 'in good faith.'" *In re Sharp Int'l Corp.*, 403 F.3d at 53 (citations omitted); *see* N.Y. Debt. and Cred. Law § 272.  The plaintiffs give no hint in their complaint about just how the release of MasterCard's right of assessment failed to constitute adequate consideration.

The Complaint likewise fails sufficiently to allege that MasterCard intended or believed that it would incur debts beyond its ability to pay.  The Complaint alleges that, without the assessment right, MasterCard "would *likely* be unable to satisfy any judgment against it" in currently pending actions, and that "*[i]ndependent* analysts" have estimated that the value of such judgments would drastically exceed MasterCard's value.  Complaint ¶ 111 (emphasis added).  Neither the plaintiffs' prediction of the "likely" results of a victory on their antitrust claims nor the corresponding estimate of third parties says anything about what *MasterCard* intended or believed in releasing its right of assessment.  Absent any allegation on that score, the Complaint is manifestly insufficient.  *Ostashko*, 2002 WL 32068357, at *26 ("Courts have interpreted 'intends or believes' as 'awareness by the transferor that, as result of the conveyance, he will not be able to pay present and future debts.'") (quoting *The Cadle Co. v. Lieberman*, 1998 WL1674549 (E.D.N.Y. Sept. 11, 1998)).  I therefore conclude that the court should dismiss the plaintiffs' fraudulent conveyance claim under Section 275.

    D.    <u>Leave To Amend Insufficiently Pleaded Claims</u>

Having concluded that the court should dismiss at least some of the plaintiffs' claims, the question arises as to whether it should do so with prejudice, or should instead grant the plaintiffs leave to amend their Complaint in an effort to cure its defects.  As a general matter, "[l]eave to

replead is to be liberally granted." *Slayton v. American Express Co.*, 460 F.3d 215, 230 (2d Cir. 2006); *see* Fed. R. Civ. P. 15(a).  Where an amendment of the operative pleading would be meritless, however, the court should refuse to allow it.  *SCS Communications, Inc. v. Herrick Co.*, 360 F.3d 329, 345 (2d Cir. 2004) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  For example, if a claim could not withstand a motion to dismiss under Rule 12(b)(6) even after such revision, the court should deny leave to amend on the basis of its futility.  *Ricciuti v. New York City Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991); *see Luce v. Edelstein*, 802 F.2d 49, 57 (2d Cir. 1986).

Some of the defects I have identified in the plaintiffs' theories of liability can be cured and others cannot.  First, with respect to Clayton Act claim against the Banks, I have concluded that the plaintiffs *can* plead a viable Section 7 claim based on the Banks' acquisition of stock, but that they have not yet actually done so – they have instead pleaded a non-viable claim based on the Banks' acquisition of assets.  I therefore recommend that the court dismiss the Seventeenth Claim For Relief against the Banks without prejudice and with leave to amend.  Second, with respect to the Clayton Act claim against MasterCard, I have concluded that the plaintiffs *cannot* plead a viable Section 7 claim based on MasterCard's acquisition of the stock of another, but that they have not in any event actually filed such a pleading – they have instead pleaded only a claim based on MasterCard's acquisition of assets, which claim I find to be viable.  The issue of leave to amend therefore does not arise with respect to the Seventeenth Claim For Relief against MasterCard.  Finally, as explained above, the plaintiffs' defective fraudulent conveyance claim may be viable if the plaintiffs are in a position to make good-faith allegations that fill in the gaps in their current pleading.  They should be given the opportunity to do so if they wish.

37

III.    <u>Recommendation</u>

For the reasons set forth above, I respectfully recommend that the court grant in part and deny in part each pending motion to dismiss the Class Plaintiffs' First Supplemental Class Action Complaint.  Specifically, I recommend that the court (a) dismiss, with leave to amend, the Class Plaintiffs' Seventeenth Claim For Relief as against the Bank defendants only; (b) dismiss, with leave to amend, the Class Plaintiffs' Twentieth Claim For Relief as against all defendants; and (c) deny the defendants' motions in all other respects.

IV.    <u>Objections</u>

This Report and Recommendation will today be filed electronically on the court's ECF system and is therefore deemed served on the parties as of today's date.  Any objections to this Report and Recommendation must be filed with the Clerk no later than March 3, 2008.  *See* Fed. R. Civ. P. 72(b)(2); Fed. R. Civ. P. 6(a), (d).  Failure to file objections within that period, absent the entry of an order extending that deadline pursuant to Federal Rule of Civil Procedure 6(b)(1), will waive the right to appeal the district court's order.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; *Beverly v. Walker*, 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchs. Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

**SO ORDERED.**

Dated: Brooklyn, New York
       February 12, 2008

/s/ James Orenstein___
JAMES ORENSTEIN
U.S. Magistrate Judge