UNITED STATES DISTRICT COURT      <u>FOR ONLINE PUBLICATION ONLY</u>
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x

IN RE PAYMENT CARD INTERCHANGE
FEE AND MERCHANT DISCOUNT
ANTITRUST LITIGATION                    MEMORANDUM
                                             <u>AND ORDER</u>
                                             05-MD-1720 (JG) (JO)

------------------------------------------------------------x
A P P E A R A N C E S :

      ROBINS, KAPLAN, MILLER & CIRESI LLP
            2800 LaSalle Plaza
            800 LaSalle Avenue South
            Minneapolis, MN 55402
      By:   K. Craig Wildfang
            Attorneys for Class Plaintiffs

      COUGHLIN STOIA GELLER RUDMAN
      & ROBBINS LLP
            655 West Broadway
            Suite 1900
            San Diego, CA 92101
      By:   Bonny E. Sweeney
            Attorneys for Class Plaintiffs

      BERGER & MONTAGUE, PC
            1622 Locust Street
            Philadelphia, PA 19103
      By:   H. Laddie Montague
            Merrill G. Davidoff
            Bart Cohen
            Attorneys for Class Plaintiffs

      PAUL, WEISS, RIFKIND, WHARTON
      & GARRISON LLP
            1615 L Street, N.W., Suite 1300
            Washington, DC 20036
      By:   Kenneth A. Gallo
            Danielle M. Aguirre
            Bruce Birenboim
            Andrew C. Finch
            Attorneys for Defendants MasterCard

1

Inc. and MasterCard Int'l Inc.


HUNTON & WILLIAMS LLP
    200 Park Avenue
    New York, NY 10166
By:   Keila D. Ravelo
    Wesley R. Powell
    Attorneys for Defendants MasterCard
    Inc. and MasterCard Int'l Inc.

MORRISON & FOERSTER, LLP
    1290 Avenue of the Americas
    New York, NY 10104
By:   Mark P. Ladner
    Michael B. Miller
    Attorneys for Defendants Bank of America, N.A.,
     BA Merchant Services LLC (f/k/a National
     Processing, Inc.), Bank of America Corp.,
     and MBNA America Bank, N.A.

O'MELVENY & MYERS LLP
    7 Times Square
    New York, NY 10036
By:   Andrew J. Frackman
    Edward D. Hassi
    Richard G. Parker
    Attorneys for Defendants Capital One Bank,
    Capital One F.S.B., and Capital One
    Financial Corp.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
    4 Times Square
    New York, NY 10036
By:   Peter E. Greene
    Cyrus Amir-Mokri
    Peter S. Julian
    Boris Bershteyn
    Attorneys for Defendants JPMorgan
    Chase & Co. and Chase Bank USA, N.A.

SIDLEY AUSTIN LLP
    787 Seventh Avenue
    New York, NY 10019

2

By:     Benjamin R. Nagin
        David F. Graham
        Eric H. Grush
        Attorneys for Defendants Citigroup Inc.,
        Citicorp, and Citibank, N.A.

WILMERHALE
        399 Park Avenue
        New York, NY 10022
By:     Christopher R. Lipsett
        David S. Lesser
        William J. Kolasky
        A. Douglas Melamed
        Ali M. Stoeppelwerth
        Attorneys for Defendants HSBC Finance
        Corp. and HSBC North American Holdings Inc.

JOHN GLEESON, United States District Judge:

In May 2006, the plaintiffs in the above-captioned putative class actions filed a supplemental complaint alleging that the then-pending initial public offering ("IPO") of MasterCard stock violated both federal antitrust law and state fraudulent conveyance law. Defendants MasterCard International Incorporated and MasterCard Incorporated (collectively, "MasterCard") and Bank of America, Capital One, JPMorgan Chase, Citigroup, and HSBC (collectively, the "Banks") filed various motions to dismiss the supplemental complaint. I referred these motions to Magistrate Judge James Orenstein. On February 12, 2008, he issued a Report and Recommendation ("R&R") recommending that I dismiss the state law claim, dismiss the Clayton Act claim against the Banks with leave to amend, and deny the motions as to the remaining federal antitrust claims. For the reasons stated below, I grant the motions to dismiss plaintiffs' amended complaint in their entirety with leave to amend.

## BACKGROUND

A.      *The First Amended Complaint*

3

As most people know, merchants may accept a "payment card," such as a credit card or a debit card, as payment for goods and services. The resolution of this motion requires a detailed understanding of how these payment card transactions work.

MasterCard runs a payment card network. It provides the infrastructure through which a customer's payment makes its way to a merchant. The Banks participate in payment card transactions as an acquiring bank, an issuing bank, or both. An issuing bank issues MasterCard-branded payment cards to customers. An acquiring bank "acquires payment transactions from merchants and acts as a liaison" between the merchant and the issuing bank. First Consolidated Amended Class Action Compl. ("AC") ¶ 8(a). The Banks compete with each other to issue payment cards and "acquire" merchant transactions. AC ¶ 8(a), (n). The Banks also take part in the management of MasterCard, which, prior to May 2006, was organized as a joint venture among more than 23,000 member banks. AC ¶ 54.

In a standard credit card transaction, the customer/cardholder presents her MasterCard to a merchant who has contracted to accept such cards. The merchant sends the transaction data to an acquiring bank, which forwards it to the cardholder's issuing bank. The issuing bank then authorizes or denies the transaction. Following authorization, the merchant submits a payment request to the acquiring bank, which again forwards it to the issuing bank. The issuing bank pays the acquiring bank the purchase price minus a fee (the "interchange fee"). The acquiring bank then pays the merchant but also deducts a fee (the "merchant-discount fee"). MasterCard relays the communications between the acquiring and issuing banks, and its board of directors sets the amount of interchange fees charged on MasterCard's network. AC ¶ 8(l). Visa's network processes transactions and sets fees in an analogous manner. AC ¶ 8(l).

4

In April 2006 the plaintiffs, merchants who accept Visa and MasterCard payment cards, filed their first amended complaint in this action.  They alleged that the Banks, by virtue of their control over the boards of directors of MasterCard and Visa, dictate the amount charged as interchange fees for each network.  Further, because so many banks are members of both boards, they "ensure that the Interchange Fees of Visa and MasterCard increase in parallel and stair-step fashion, rather than decreasing in response to competition from each other."  AC ¶ 135.  The plaintiffs also challenged the networks' "Anti-Steering Restraints," AC ¶8(c), a group of rules promulgated by both Visa and MasterCard which allegedly prevent merchants from encouraging customers to use less expensive forms of payment.  AC ¶¶ 234-247.  They further allege that Visa has engaged in monopolization in violation of Section 2 of the Sherman Act, *id.* at ¶¶ 248-54, and that both MasterCard and Visa have engaged in prohibited tying and exclusive dealing arrangements.  *Id.* at ¶¶ 255-71, 272-88, 288-93, and 294-99.  Only the allegations regarding interchanges fees are relevant to the disposition of the instant motions to dismiss.

B.     *The Supplemental Complaint*

In May 2006, one month after plaintiffs filed their first amended complaint, MasterCard announced its IPO, in which it proposed to sell approximately 60 million shares of MasterCard Class A common stock to the public.  To effectuate this offering, MasterCard first redeemed and reclassified all of its outstanding common stock, approximately 100 million shares, then held by its member banks.  Each former shareholder received 1.35 shares of MasterCard Class B common stock for each share of old stock it held.  All former shareholders

also received a single share of Class M stock.  MasterCard Incorporated, Amendment No. 8 to Form S-1 Registration, filed May 23, 2006.[1]

The three new classes of MasterCard stock convey different control rights.  Class A shares have standard voting rights.  These shares may not be held by MasterCard's member banks, and no individual entity may own more than 15% of the outstanding Class A stock.  Class B shares have no voting rights.  They may be transferred among member banks and sold to outside investors, in which case they convert to Class A shares.  However, Class B shareholders have a right of first refusal over the sale of Class B shares to outside investors.  Class Pls.' First Supplemental Class Action Complaint ("SC") ¶ 82.  Class M shareholders may vote to elect up to three members of MasterCard's board of directors, but no more than one quarter of all directors.  Class M shareholders, collectively, also have the power to veto "1) any sale of all, or substantially all, of the company's assets; 2) any merger or consolidation of the company; 3) any waiver of beneficial ownership limitations in the certificate of incorporation; and 4) any discontinuation of the core payments business."  *Id.* at ¶ 83.

On May 22, 2006, the plaintiffs filed the supplemental complaint at issue here.  It alleges four causes of action arising from the agreements and transactions underpinning MasterCard's IPO.  They assert that the IPO is a pretext, and that the various "Ownership and Control Restrictions" it entails, specifically the 15% limit on ownership of Class A stock and the voting rights of the Class M stock, operate to preserve the Banks' control of MasterCard.  SC ¶¶ 10, 100.  MasterCard's purported transformation from a joint venture to a "single entity," plaintiffs allege, will insulate its internal actions from the prohibitions of Section 1 of the

---

[1]     A copy of the relevant filing is attached as Exhibit A to the Memorandum of Law of Defendants MasterCard International Incorporated and MasterCard Incorporated in Support of Their Motion to Dismiss Class Plaintiffs' First Supplemental Class Action Complaint.

Sherman Act, which regulates agreements between joint venturers but does not reach the unilateral actions of individual corporations. With effective control of the post-IPO MasterCard enterprise, the Banks will be free to impose or continue the operation of allegedly anticompetitive restraints. Specifically, plaintiffs allege that MasterCard will continue to impose and increase the uniform interchange fees challenged in plaintiffs' first amended complaint and will reinstate the exclusivity arrangements found unlawful in *United States v. Visa U.S.A.*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001), *aff'd* 344 F.3d 229 (2d Cir. 2003), whereby merchants who wish to accept MasterCard-branded cards must agree to accept only MasterCard and Visa cards and decline to accept American Express or Discover cards. SC ¶ 114. Because these restraints will decrease competition in the relevant market, plaintiffs allege that the agreements leading to the IPO constitute a conspiracy in restraint of trade in violation of Section 1 of the Sherman Act, and that the stock transfers by which the IPO is effected violate Section 7 of the Clayton Act. The plaintiffs also argue that MasterCard did not receive adequate consideration for its release of "its right to assess its Member Banks for liability expenses," (its "assessment right") and that the release was therefore a fraudulent conveyance under New York law. SC ¶¶ 145, 147.

C.    *Judge Orenstein's Report and Recommendation*

In the report and recommendation, Judge Orenstein recommended that I grant the motion in part and deny it in part. As to the antitrust claims, he rejected defendants' contentions that they did not "acquire" stocks or "assets" under Section 7 of the Clayton Act. R&R 14-23. And he concluded, based on the barriers to entry in the relevant market and the ownership restrictions that would prevent an outsider from acquiring control of MasterCard, that the supplemental complaint sufficiently pleaded "that the agreements leading to the IPO will

7

probably result in a substantial lessening of competition," and therefore stated a claim under the Clayton Act. R&R 28. As to the Sherman Act claims, Judge Orenstein noted that the parties had argued the motion "exclusively by reference to the standard relevant under Section 7" of the Clayton Act. *Id.* at 29. Taking this conduct as an indication that the parties agreed "that the Sherman Act claims stand or fall together with those under the Clayton Act," he also concluded that plaintiffs had properly pleaded their Sherman Act claims. *Id.* However, Judge Orenstein concluded that the plaintiffs had failed to plead with particularity that MasterCard acted with fraudulent intent or received inadequate consideration in exchange for relinquishing its assessment right, and therefore recommended that I dismiss plaintiffs' fraudulent conveyance claim. *Id.* at 36. MasterCard and the Banks filed objections to the report and recommendation, alleging that Judge Orenstein erred in determining that the Clayton Act applied to the challenged transactions and that plaintiffs had adequately pleaded their anticompetitive effect. *See* MasterCard's Objections to the February 12, 2008 Report and Recommendation Denying in Part Its Motion to Dismiss Class Pls.' Supplemental Compl. Directed to the MasterCard IPO ("MC's Obj."); Bank Defs.' Objections to the Report and Recommendation Regarding Bank Defs.' Mot. to Dismiss Class Pls.' First Supplemental Class Action Compl. ("Banks' Obj."). Plaintiffs responded to these arguments but filed no objections of their own. *See* Class Pls.' Reply to the Apr. 4, 2008 Objections of MasterCard, Bank of America, Capital One, JPMorgan Chase, Citigroup and HSBC to the Court's Feb. 12, 2008 Report and Recommendation ("Pls.' Reply").

DISCUSSION

A.      *Standard of Decision*

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). However, a plaintiff must also "amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*." *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007). Second Circuit precedent applying the Supreme Court's decision in *Bell Atlantic v. Twombly*, 127 S. Ct. 1955 (2007), makes clear that antitrust claims generally require such amplification. *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 & nn.3-4 (2d Cir. 2007).

B.    *The Antitrust Claims*

Section 1 of the Sherman Act ("Section 1") bars "[e]very contract, combination . . . . or conspiracy, in restraint of trade or commerce . . . ." 15 U.S.C. § 1. Section 7 of the Clayton Act ("Section 7") provides, in relevant part, that

> [n]o person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission [("FTC")] shall acquire the whole or any part of the assets of another person engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

15 U.S.C. § 18. Thus, while Section 1 regulates agreements and Section 7 regulates acquisitions, both focus on the potentially anticompetitive effects of the challenged conduct. However, Section 1 requires actual "restraint," while Section 7 requires only the possibility of an anticompetitive effect. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 328-29 (1962). It is therefore generally assumed that if a plaintiff's Section 7 claim cannot survive a motion to dismiss, its Section 1 claim will fail as well. Accordingly, the parties in this case have focused

their arguments on whether the plaintiffs have stated a claim under the less demanding standard of Section 7.

To effect MasterCard's IPO, the Banks transferred their old MasterCard stock to MasterCard, and MasterCard then transferred new Class B and M shares to the Banks. The plaintiffs allege that MasterCard thereby "acquir[ed] from the Member Banks the right to set Interchange Fees charged to merchants" in the IPO. SC ¶ 95. Plaintiffs allege that these transactions create the appearance, but not the reality, of an independent MasterCard, and therefore enable MasterCard and the Banks to continue and reimpose various anticompetitive practices.

The defendants first argue that Section 7 does not reach the transactions challenged in the supplemental complaint. MasterCard contends that it merely redeemed its own stock, rather than acquiring the stock or assets of another person. The Banks claim that they did not acquire any stock or assets because the net effect of the IPO was, for them, a divestment of their controlling stake in MasterCard. Thus, for different reasons, both MasterCard and the Banks argue that they did not "acquire . . .any part of the stock or other share capital . . . [or] any part of the assets of another person" in the course of the MasterCard IPO. 15 U.S.C. § 18. They also contend that, even if Section 7 does govern the challenged transactions, the plaintiffs have failed to adequately plead that the effect of these acquisitions "may be substantially to lessen competition." *Id.* I address each argument in turn.

1.   *The Banks' Acquisition of Stock*

In addressing whether the Banks' role in the IPO implicated Section 7, Judge Orenstein first addressed a technical defect in the supplemental complaint. R&R 14. He noted

that while the operative portion of plaintiffs' Section 7 claim alleged that both the Banks and

MasterCard had acquired "the assets of another person," the clause of Section 7 governing the

acquisition of assets covers only entities "subject to the jurisdiction of the [FTC]."  15 U.S.C. §

18.  Because banks are not subject to the FTC's jurisdiction, 15 U.S.C. § 45(a)(2), he concluded

that plaintiffs could not "seek relief from the Banks under Section 7 based on any acquisition of

assets."  R&R 14.[2]  However, because he concluded that the complaint could allege a viable

theory of liability based on the Banks' acquisition of "stock or other share capital" of the post-

IPO MasterCard, he recommended that I grant the plaintiffs leave to amend to allege such a

theory.  R&R 15.

The Banks dispute Judge Orenstein's conclusion that they acquired stock as a

result of the MasterCard IPO.  The issue is whether a party "acquire[s] . . . the stock or share

capital . . . of another person" under Section 7 when it exchanges existing shares of a

reorganizing corporation for the shares of the restructured corporation, and the question appears

to be one of first impression.  Judge Orenstein concluded that under the "plain and unambiguous

text of Section 7," an acquisition had occurred.  R&R 15 ("By virtue of the IPO (and the

agreements pursuant to which it was effected), the Banks have acquired shares in a company that

did not previously exist, and that they therefore did not previously possess.").

While there is reason to doubt the description of the post-IPO MasterCard as a

company "that did not previously exist," the Class B and M shares the banks received did not

themselves exist prior to the IPO, and this fact renders the Banks' receipt of these shares an

acquisition.  As the Banks point out, the dictionary meaning of "acquire" is "gain," Banks' Obj.

---

[2]      The plaintiffs do not object to this conclusion, and I agree with Judge Orenstein's reasoning on
this point.

21, and the Banks indisputably gained shares of Class B and Class M stock in MasterCard as a result of the IPO.

The Banks' contention that they also *surrendered* stock in the transaction does not alter this conclusion. They ask me to hold that they did not "acquire" stock because they "gained no greater voting control or economic interest during MasterCard's IPO than they previously possessed." Banks' Obj. 21. But this "purposive and pragmatic" interpretation of "acquire," Banks' Obj. 24, makes no semantic sense. Suppose I sell 100 shares of X Corp. on Monday and then buy 100 shares of X Corp. on Tuesday. Although I have the same equity stake and voting rights on Tuesday evening that I had on Monday morning, it seems odd to argue that I did not "acquire" stock on Tuesday based on this fact, just as it would be odd to say that I therefore did not "sell" stock on Monday. At the very least, the substantive similarity between my starting and ending positions certainly wouldn't convince a broker to waive his commission on these transactions.

Furthermore, this "substantive" interpretation of "acquire," Banks' Obj. 24, appears unworkable and threatens to render other language in Section 7 superfluous. The Banks suggest that, before I find that a party has acquired stock, I first determine whether the transacting party previously held a stake in the target company (or a predecessor company), and, if so, whether the transaction results in a net increase or decrease of their stake in that company. But how far back must I look, and how do I determine whether a party has increased or decreased its stake when, as here, the party initially holds one class of stock in a company and subsequently holds different classes of stock in a restructured (and possibly "new") incarnation of that company? Even if this interpretive framework could be applied coherently, it would

12

inappropriately import into the "acquire[] . . . stock" element of a Section 7 claim the considerations that relate to whether the challenged transaction may have the effect of lessening competition.  Using the (admittedly formal) dictionary definition of "acquire" to interpret Section 7 preserves the independent significance of its language regarding anticompetitive "effect," and is therefore consistent with the Supreme Court's admonition to read Section 7 "in the light of the overriding congressional purpose to control corporate concentrations tending to monopoly."  *United States v. Phila. Nat. Bank*, 374 U.S. 321, 338 (1963).

The fact that the Banks' argument conflates the separate elements of a Section 7 claim is underscored by their reliance on *Record Club of Am., Inc. v. Capitol Records, Inc.*, 70-CV-3315 (HRT), 1971 WL 558 (S.D.N.Y. Sept. 8, 1971).  In that case, defendants Capitol Records and Longines operated a number of different businesses, and were competitors in the record club market.  In the challenged transaction, Capitol sold its record club assets to Longines in exchange for five percent of the stock of the "Longines Symphonette Corporation," which it subsequently exchanged for a smaller stake in the "Longines-Wittnauer Watch Company."  *Id.* at *5.  The plaintiff, the operator of a rival record club, claimed that this transaction substantially lessened competition in the record club market in violation of the Clayton Act.  The district court granted summary judgment as to Capitol, holding that it was "convinced by the plain language of section 7 of the Clayton Act that a seller in a challenged transaction is not meant to be included in the statutory proscription."  *Id.* at *6.

The Banks interpret *Record Club* as holding that Capitol did not "acquire" Longines stock, as that term is used in Section 7.  Banks' Obj. 22 ("The district court dismissed the Section 7 claim against the seller because the seller did not 'acquire' anything.").  If this is an

accurate description of the holding of *Record Club*, I cannot fathom its rationale. The district court was clearly correct to award summary judgment to Capitol, because its acquisition of Longines stock had no anticompetitive effect: "plaintiff has understandably failed to produce any factual support for its theory that Capitol's receipt of a 2.6 percent stock interest in Longines in some way restrained competition in the record club market." *Record Club*, 1971 WL 558, at *6. However, this is the result of Section 7's "effect" language, not its use of the term "acquires." Although Capitol's receipt of stock in a watch company would not affect competition in the record club market (only Longines's acquisition of record club assets would do so), I cannot see how this fact proves that Capitol did not "acquire" any stock. To the extent that *Record Club* implicitly holds that a defendant only "acquires" stock under Section 7 when its acquisition has an anticompetitive effect, I decline to follow it because it renders the "effect" language of that section superfluous.

The Banks also rely, to no avail, on the Clayton Act's legislative history. Observing that Congress originally intended Section 7 to govern stock acquisitions by holding companies, they argue that if Congress intended to govern "holding companies' *reductions* of their economic stakes in other business," it would have said so unambiguously. Banks' Obj. at 23. As a threshold matter, because the "literal terms" of Section 7, specifically the term "acquires," resolve this issue, consulting the statute's legislative history is unnecessary. *See Phila. Nat. Bank*, 374 U.S. at 337. In addition, the Supreme Court's Clayton Act jurisprudence emphatically demonstrates that Section 7, particularly after its 1950 amendment, can and should cover transactions not expressly contemplated by the drafters of the 1914 Act. *See id.* at 337-38. More fundamentally, however, the Banks' appeal to the legislative history misrepresents

14

plaintiffs' theory of liability -- plaintiffs do not argue that the Banks violated Section 7 by disposing of their old MasterCard shares, but by acquiring the new Class B and M shares. In sum, I agree with Judge Orenstein's conclusion that the Banks "acquire[d]" stock as that term is used in Section 7.

> 2.   *MasterCard's Acquisition of Stock or Assets*
>
> a.   *Acquisition of MasterCard Stock*

Section 7 provides that no party "shall acquire" the "stock or other share capital . . . of another person" if that acquisition may have an anticompetitive effect. 15 U.S.C. § 18. Judge Orenstein concluded that the language "of another person," in this context, refers to stock *in* a separate entity; it does not include the acquirer's own corporate stock, even if that stock is *held* by a separate entity. Therefore, because MasterCard acquired only its own stock from the Banks, it did not acquire the stock "of another person." R&R 18.

The problem with this interpretation is that it arguably requires the phrase "of another person," which appears only once in Section 7 and it is used to modify both "stock or other share capital" and "assets," 15 U.S.C. § 18, to simultaneously convey two different meanings. The phrase "of another person" is capable of at least two meanings when it modifies "stock or share capital": it could refer to the stock *in* another person, or to stock *held by* that person. Used to modify "assets," only the second meaning makes sense. Thus, under MasterCard's proposed reading of Section 7, "of another person" would have one meaning with regard to "stock or other share capital," and a second, distinct meaning with regard to "assets." I need not endorse or reject this reading, however, because I conclude that MasterCard's redemption of its shares constitutes an acquisition of the "assets of another person."

15

MasterCard argues that the language of the statute, which was amended in 1950 to add the prohibition of certain asset acquisitions, draws a sharp distinction between stock acquisitions and asset acquisitions, making it erroneous to interpret the former as a subset of the latter.  The first problem with MasterCard's argument is that an acquisition of stock is also an acquisition of assets, under the plain meaning of that term.  Judge Orenstein correctly concluded that the term "assets" refers "broadly to any tangible or intangible thing of value."  R&R 20. Accordingly, when the Banks possess Class B shares of MasterCard, those shares are simultaneously the stock of MasterCard and the assets of the Banks.  MasterCard notes that it has "found no case that has read the term so expansively as to include stock," MC's Obj. 17, but they have similarly found no case endorsing a contrary reading.  "Assets" is a capacious term, and the proposition that it is typically read to include stock is sufficiently uncontroversial that the apparent lack of litigation on the point is unsurprising.[3]

Furthermore, MasterCard's contention that Congress intended asset acquisitions and stock acquisitions to be mutually exclusive categories was rejected by the Supreme Court in *Philadelphia National Bank*.  In that case, the Supreme Court noted that mergers and consolidations could not be readily classified as either "pure stock acquisition[s]" or "pure assets acquisition[s]"; they "fit neither category neatly."  *Phila. Nat. Bank*, 374 U.S. at 336-37.  After canvassing the legislative history of Section 7, the Court concluded that Congress intended to "bring the entire range of corporate amalgamations, from pure stock acquisitions to pure assets

---

[3]     MasterCard correctly observes that regulations implementing the Hart-Scott-Rodino amendments to the Clayton Act provide that securities are not considered assets of another person when valuing an asset acquisition to determine whether it triggers certain notification requirements.  MC's Obj. 11 n.8 (citing 16 C.F.R. § 801.21(b)).  But this regulation also underscores the proposition that stock would normally constitute an asset -- the regulation merely serves to identify a specific situation in which the conventional meaning of the "assets" should not control.

acquisitions, within the scope of s 7," and that the two provisions, when "read together," covered mergers and consolidations.  *Id.* at 342.  This conclusion cannot be reconciled with MasterCard's contention that the 1950 amendment of Section 7 is intended to draw a sharp distinction between stock acquisitions and assets acquisitions.

MasterCard also argues that characterizing a stock acquisition as an asset acquisition renders Section 7's stock acquisition language superfluous.  If a stock acquisition is also an asset acquisition, it contends, the portion of the Section 7 prohibiting stock acquisitions is superfluous.  This argument fails, as it overlooks the fact that the prohibition on stock acquisitions applies to "any person," while the broader prohibition on asset acquisitions applies only to persons "subject to the jurisdiction of the Federal Trade Commission."  15 U.S.C. § 18.  Accordingly, the interpretation recommended by Judge Orenstein does not result in the asset acquisition provision swallowing the stock acquisition provision.

In essence, MasterCard urges a "purposive" definition of "assets," just as the Banks urge a purposive definition of "acquire."  They contend that Congress could not have intended Section 7's asset acquisition language to apply to a company's purchase of its own stock because such purchase "could not in any event result in the type of concentration that Congress intended Section 7 to address."  MC's Obj. 16.  Thus, although *Philadelphia National Bank* teaches that the Clayton Act reaches all corporate amalgamations, regardless of the form they take, MasterCard argues that the transaction here is no amalgamation at all.  If this contention is correct, MasterCard will be able to demonstrate that the "effect" of its transaction is not "substantially to lessen competition, or to tend to create a monopoly," and there is no need to introduce formal exceptions to the term "assets" on a case-by-case basis.

17

     b.    *Acquisition of Rights*

Judge Orenstein also determined that the plaintiffs have plausibly alleged an acquisition of assets by alleging that "MasterCard obtained from the Banks a bundle of three valuable rights that previously belonged exclusively to the Banks: the right to issue MasterCard-branded payment cards . . .; the right to acquire merchants . . . ; and the right to set the level of interchange fees for transactions involving MasterCard-branded cards."  R&R 19.  I respectfully disagree.

Although plaintiffs allege that MasterCard "acquir[ed] from the Member Banks the right to set Interchange Fees charged to merchants," SC ¶ 95, I find this allegation implausible.  It is contradicted by plaintiffs' assertion (in which the defendants concur) that interchange fees, both before and after the IPO, are set by MasterCard's board of directors.  AC ¶ 8(1).  Thus, at all relevant times, the right to set interchange fees rested with MasterCard; it did not acquire this right by virtue of the IPO.  Plaintiffs suggest that the IPO shifted the right to elect the board from the Banks to MasterCard's shareholders, and by doing so it also shifted the right to set interchange fees.  Pls.' Reply 23.  This argument is unpersuasive.  The right to vote for a board of directors is different from the right to exercise its powers, and the plaintiffs' own allegations establish that MasterCard at all times possessed the power to set interchange fees.

As to the rights to acquire merchants and issue cards, the complaint does suggest that these rights are transferred from the Banks to MasterCard when it states that "[t]o the extent that this IPO is a fundamental change in the MasterCard network, it operates as an acquisition by the New MasterCard of portions of the card-issuing and merchant-acquiring functions of each member bank."  SC ¶ 113.  But there is neither an allegation nor a basis to infer that MasterCard

did not have the right to issue cards or acquire merchants before the IPO.  Nor do the plaintiffs allege that the IPO somehow diminishes the Banks' independent ability to issue cards or acquire merchants.  Instead, the complaint suggests that, after the IPO, the Banks will continue to issue cards as before.  SC ¶ 13 (arguing that the post-IPO MasterCard "will be highly dependent upon the current Member Banks' continued willingness to issue" MasterCard-branded cards).

Even if the complaint could be read as plausibly alleging that MasterCard has somehow acquired the right to issue cards and acquire merchants in the IPO, I can discern no plausible connection between possession of these rights and the competitive harms plaintiffs allege.  These harms stem only from the imposition of interchange fees and other allegedly anticompetitive restrictions on access to the MasterCard network.  I see nothing in the complaint to suggest that MasterCard's ability to impose these restraints, or the Banks' ability to control MasterCard's imposition of these restraints, somehow depends on MasterCard having the right to issue cards or acquire merchants.

3.    *Allegations of Anticompetitive Effect*

Plaintiffs' theory of anticompetitive effect proceeds as follows.  The imposition of uniform interchange fees and other merchant restraints (such as the exclusivity rules that were found to violate the Sherman Act in the *Visa U.S.A.* case) is anti-competitive.  The Banks profit from these restraints and will impose or continue them if they are able to do so.  MasterCard's pre-IPO structure prevented it from imposing these restraints, but its post-IPO structure will allow it to impose such restraints without violating the antitrust laws.  Post-IPO, MasterCard will impose or continue these restraints because it is still effectively controlled by the Banks.

19

Because the challenged restraints will be imposed with impunity in a post-IPO regime but would be struck down in a pre-IPO regime, the effect of the IPO is to substantially lessen competition.

The defendants allege that plaintiffs have failed to adequately plead that the Banks will "retain effective control" over the post-IPO MasterCard.  SC ¶ 13.  The Banks contend that "control" over MasterCard means "the power to elect a majority of the board of directors," Banks' Obj. 13, a power the Banks surrendered in the IPO.  Neither the plaintiffs nor Judge Orenstein's report and recommendation offer a contrary definition of control, nor do they suggest *how* the Banks will nevertheless be able to control the board of directors, and thereby assure the continued imposition of the allegedly supracompetitive interchange fees.

Judge Orenstein concluded that the plaintiffs successfully pleaded that the "banks retain *enough* ownership and control to allow them -- effectively unmediated by outside influence -- to take unfair advantage of the greater freedom to act that MasterCard's new status as a single entity creates."  R&R 28.  I respectfully disagree, and conclude that the plaintiffs' allegations, and the reasonable inferences they create, actually demonstrate that the Banks do not retain sufficient control to allow them, for example, to continue to impose supracompetitive interchange fees.

Plaintiffs allege that "[t]he MasterCard Network could function efficiently without collectively-fixed Interchange Fees."  SC ¶ 67.  They also contend that "[w]hen the Member Banks collectively set Interchange Fees, they attempt to maximize their own profits rather than those of MasterCard."  *Id.* at ¶ 49.  Thus, the complaint suggests that a uniform interchange fee is not a profit-maximizing measure for MasterCard itself; rather, it only allows the Banks to charge monopolistic fees.  Taking these allegations as true, I can only infer that an

20

independent corporate director, one who seeks to maximize MasterCard's revenues, would therefore oppose such fees, while a corporate director controlled by the Banks would support them.  Furthermore, plaintiffs' complaint compels the inference, supported by MasterCard's public filings relating to the IPO, that three-quarters of MasterCard's directors will be independent of the Banks and selected by the Class A shareholders.  Given this state of affairs, plaintiffs cannot plausibly allege that MasterCard will continue to impose supracompetitive interchange fees following its IPO, because its board would not be controlled by the Banks.  Rather, a majority of the board would consist of independent directors who would theoretically oppose any efforts to enrich the Banks at MasterCard's expense.

In sum, the plaintiffs' arguments overlook a middle ground between effective control of MasterCard by the Banks and effective control of MasterCard by some hypothetical outsider -- an independent MasterCard, run by directors and managers with a fiduciary duty to act in MasterCard's best interests, rather than in the interests of its customers or competitors.  Plaintiffs have put forth no reason to believe that the takeover will not result in such an entity, or that this entity will continue or impose the restraints plaintiffs fear.  Thus, by plaintiffs' own allegations, a takeover by some trust-busting white knight (which plaintiffs allege is impossible due to the 15% limit on ownership of Class A shares) is not required to prevent the imposition or continuation of MasterCard's allegedly anticompetitive practices.   Accordingly, they have failed to plead that the "effect" of the IPO may be substantially to lessen competition, or to tend to create a monopoly."  15 U.S.C. § 18.  *A fortiori*, they have also failed to plead the actual anticompetitive effects necessary to sustain a claim under Section 1 of the Sherman Act.  *See, e.g., Paycom Billing Servs., Inc. v. MasterCard Int'l*, 467 F.3d 283, 289-90.

C.    *The Fraudulent Conveyance Claim*

The plaintiffs allege that MasterCard's release of its right to assess its member banks for liabilities arising from litigation constitutes a fraudulent conveyance under New York Debtor and Creditor Law §§ 275 and 276.  Section 276 prohibits actual fraud; it deems fraudulent "[e]very conveyance made . . . with actual intent . . . to hinder, delay, or defraud present or future creditors."  N.Y. Debt. & Cred. Law § 276.  Section 275 prohibits constructive fraud; *i.e.*, any "conveyance made . . . without fair consideration when the person making the conveyance . . . intends or believes that he will incur debts beyond his ability to pay as they mature . . . ."  *Id.* § 275.  Judge Orenstein rejected both theories of fraud, finding that the plaintiffs had insufficiently alleged the existence of actual fraudulent intent and had failed to make any allegation whatsoever regarding MasterCard's intent or belief regarding its ability to pay its debts.  In light of the plaintiffs' failure to object to this portion of Judge Orenstein's report and recommendation, *see Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) ("[A] party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point."), I grant the motion to dismiss with respect to the fraudulent conveyance claim.

D.    *Leave to Amend*

"Leave to replead is to be liberally granted."  *Slayton v. Am. Express Co.*, 460 F.3d 215, 230 (2d Cir. 2006).  While plaintiffs have failed to adequately plead fraud, or to plausibly allege that the Banks will retain control of the post-IPO MasterCard in ways that may have an anticompetitive effect, it does not appear that they would be categorically unable to do so, and Judge Orenstein recommended granting leave to amend the supplemental complaint.

22

Defendants' papers suggest three reasons why leave to replead should not be granted.  Each lacks merit.

        1.     *The Antitrust Claims and Antitrust Standing*

As to the antitrust claims, the Banks argue that plaintiffs should be denied leave to replead because they cannot demonstrate that the Banks "acquired" stock as Section 7 defines that term, Banks' Obj. 20, an argument I have already rejected.  The Banks also argue that plaintiffs cannot establish antitrust standing as a matter of law.  This contention requires a more in-depth discussion.

The Second Circuit has recently advised that to demonstrate antitrust standing, a plaintiff must first

> show that he suffered an antitrust injury, which is an injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.  A court must also consider other factors relevant to standing (sometimes called the "efficient enforcer" factors), including: (1) the directness or indirectness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries.

*Ross v. Bank of Am.*, *N.A.*, 524 F.3d 217, 222 n.1 (2d Cir. 2008) (internal citations and quotation marks omitted).

The Banks advance two arguments that plaintiffs have failed to plead antitrust standing.  First, in the memorandum supporting their motion to dismiss, they argue that the plaintiffs have not demonstrated antitrust injury because they "simply seek for themselves the benefit of a transaction engaged in by others."  Mem. in Support of Bank Defs.' Mot. to Dismiss Class Pls.' First Supplemental Class Action Compl. ("Banks' Mem. in Support") 19.  This argument misapprehends plaintiffs' theory of injury.  The plaintiffs' theory, according to the

23

Banks, is that the agreements structuring the IPO violate antitrust law because they prevent a hypothetical "consortium of merchants," *id.* at 19, "from acquiring control of MasterCard." *Id.* at 18.  However, as discussed above, plaintiffs complain that the agreements ensure that the Banks retain control of MasterCard, not just that they prevent the plaintiffs from obtaining control of it.  Thus, the injury pleaded by the banks is the harm they suffer from the anticompetitive restraints that only a Bank-controlled MasterCard would seek to continue or impose.

Viewed in this way, the plaintiffs' injury is readily distinguishable from the injuries deemed insufficient in *Brunswick Corp. v. Pueblo Bowl-O-Mat*, 429 U.S. 477 (1977) and *Bayou Bottling, Inc. v. Dr. Pepper Co.*, 725 F.2d 300, 304 (5th Cir. 1984).[4]  According to plaintiffs, if the Banks continued to operate MasterCard as a joint venture, plaintiffs would suffer no injury because MasterCard's challenged practices would be struck down under Section 1 of the Sherman Act as the product of an agreement in restraint of trade.  And if the Banks actually surrendered control of MasterCard to any other entity, the restraints would be lifted because they only serve to benefit the Banks.  In *Brunswick* and *Bayou Bottling*, the plaintiffs would have

---

[4]     In *Brunswick Corp.*, the operators of several bowling centers alleged antitrust injury based on the acquisition of rival, financially distressed bowling centers by a leading manufacturer of bowling equipment.  429 U.S. at 479-80.  Their alleged injury was the "loss of income that would have accrued had the acquired centers gone bankrupt" and ceased operations.  *Id.* at 487.  The Supreme Court observed that plaintiffs "would have suffered the identical 'loss' but no compensable injury had the acquired centers instead obtained refinancing or been purchased by 'shallow pocket' parents . . . ."  *Id.*  Because this loss bore "no relationship to the size of either the acquiring company or its competitors," the Court held that plaintiffs' injury "was not of the type that the statute was intended to forestall."  *Id.* at 487-88 (internal quotation marks omitted).

In *Bayou Bottling*, plaintiff Bayou Bottling, which sold Pepsi-Cola products, sought to acquire the franchise rights to distribute Dr. Pepper products from Wilcox, a franchisee who was retiring.  725 F.2d at 302.  Defendant Dr. Pepper, for unexplained "business reasons," urged Wilcox to sell his franchise to a bottler of Coca-Cola products, and he did so.  *Id.*  Plaintiff claimed that it suffered antitrust injury as a result of Dr. Pepper's conduct "because it was prevented from acquiring Wilcox's franchise, an acquisition which would have improved its business position and increased its profits."  *Id.* at 304.  Because plaintiff "would have suffered the identical loss of sales, and economies of scale if Wilcox had retained his operation or if he had sold to a third party," the Fifth Circuit held that this theory of antitrust injury was "foreclosed by the holding in *Brunswick*."  *Id.*

suffered the injuries they alleged even if the businesses in question had continued under their current management or been transferred to a stranger to the litigation. By contrast, the injury pleaded here will only occur if the agreements, which allegedly violate the Sherman and Clayton Acts, are not set aside. Accordingly, this *is* an injury "of the type the antitrust laws were intended to prevent." *Brunswick*, 429 U.S. at 489.

The Banks also contend, in their objections to the report and recommendation, that "where an antitrust plaintiff's alleged injury is caused by operation of applicable law," that plaintiff cannot establish antitrust standing. Banks' Obj. 18. They base this argument on *RDA Media, Inc. v. AK Media Group, Inc.*, 260 F.3d 10 (1st Cir. 2001), a First Circuit case exploring the requisite causal connection between the alleged injury and the challenged conduct. Because this argument challenges whether plaintiff's injury "flows from" defendant's conduct, *Brunswick*, 429 U.S. at 489, and not whether the injury is "of the type the antitrust laws were intended to prevent," *id.*, it is distinct from the standing argument raised in the Banks' initial memorandum. As a result, the plaintiffs argue that the Banks have waived this argument by failing to present it to the magistrate judge.

I agree. As I have observed elsewhere, the interests of justice are ill served by allowing a party to subsequently press an argument it failed to raise before the magistrate judge. Order at *2, *Meehan v. Gristede's Supermarkets, Inc,* No. 95-CV-2104 (JG), 1997 WL 1097751 (Sept. 25, 1997) (noting that failure to present an argument to the magistrate judge "handicap[s]" the deliberations of both the district judge and the magistrate judge). Indeed, several circuits have squarely held that the failure to raise an argument before the magistrate judge results in its waiver. *Marshall v. Chater*, 75 F.3d 1421, 1426-27 (10th Cir. 1996); *Greenhow v. Sec'y of*

*Health & Human Servs.*, 863 F.2d 633, 638 (9th Cir. 1988), *overruled on other grounds by United States v. Hardesty*, 977 F.2d 1347 (9th Cir. 1992) (en banc); *Borden v. Sec'y of Health and Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987) (per curiam).[5]

In any event, the argument lacks merit. The plaintiffs' claimed injury does result, in part, from the operation of the antitrust laws, because they allege that MasterCard's new status as a single entity will allow it to impose or continue anticompetitive practices that a joint venture could not legally utilize. But the Banks have failed to demonstrate that this fact renders the nexus between the challenged transactions and the plaintiffs' injury too remote to furnish antitrust standing.

As mentioned, the Banks rely primarily on *RSA Media*, in which AK Media controlled 92% of the billboards in the Greater Boston market. 260 F.3d at 12. In addition, a stringent state regulatory scheme "ma[de] it impossible, or at least nearly impossible" to obtain a permit to build a new billboard. *Id.* Plaintiff RSA wished to enter this market, but could not persuade landlords who owned the land on which AK Media's billboards were located to lease that land to RSA instead. It claimed that AK Media caused the landlords' reluctance by "drilling" them -- telling them that if they decided to lease to RSA, AK Media would tear down its billboard on the leased land, and RSA would be unable to receive a license to build a replacement. *Id.* at 13. On a motion for summary judgment, the district court found that RSA failed to raise a genuine issue of material fact as to whether its injury -- its inability to enter the

---

[5] However, the issue appears to be an open question in the Second Circuit, and there is dicta from that court, in a case decided after my order in *Meehan*, suggesting that an argument may not be waived for appellate review unless a party fails to raise it before both the magistrate and the district judge. *See Grace v. Rosenstock*, 228 F.3d 40, 54 (2d Cir. 2000) (finding waiver only after noting that plaintiffs failed to raise issue *both* before the magistrate judge *and* in their objections to his report and recommendation).

billboard market -- was caused by AK Media's allegedly anticompetitive conduct.  The First

Circuit affirmed, agreeing that

> RSA was not excluded from the market for outdoor billboards because of AK's threats; it was excluded because of the Massachusetts regulatory scheme that prevents new billboards from being built. In short, AK's representations to landlords did not prevent those landlords from leasing their land to RSA. Even if the landlords had, foolishly perhaps, leased their land to RSA, RSA would not have been able to erect new billboards on those properties. Any injury suffered by RSA is therefore unrelated to AK's allegedly exclusionary conduct, and RSA lacks antitrust standing.

*Id.* at 15.

As this language makes clear, the fatal defect in RSA's complaint was its failure to demonstrate

that AK Media's conduct was a "cause-in-fact" of its alleged antitrust injury -- the court

concluded that, had AK Media simply remained passive, RSA's injury would still occur, either

because the landlords would rationally refuse to negotiate a lease, or because RSA would be

unable to obtain the licensure to operate billboards on the leased land.  In this case, by contrast,

the defendants' conduct and the applicable law are *both* "but for" causes of the alleged injury --

if the Banks were not inclined to impose anticompetitive restraints, or if Section 1 of the

Sherman Act reached the internal conduct of single entities, the injury plaintiffs allege would not

come to pass.  The fact that the structure of the antitrust laws contributes to plaintiffs' alleged

injury does not, by itself, deprive them of antitrust standing -- indeed, one purpose of Section 7

of the Clayton Act is to prevent combinations that "will make it easier for leading members of

the industry to collude on price and output without committing a detectable violation of Section

1 of the Sherman Act."  *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 905 (7th Cir. 1989).

Accordingly, plaintiffs have sufficiently pleaded that their injury "flows from that which makes

defendants' acts unlawful."  *Brunswick*, 429 U.S. at 489.  The fundamental defect in their

complaint is their failure to plausibly allege that this injury will in fact result from defendants'

challenged actions, a defect they may attempt to address in an amended complaint.

　　　　2.　　*The Fraudulent Conveyance Claim*

　　　　　　As to the fraudulent conveyance claim, MasterCard argues that "Class Plaintiffs

cannot allege any manner in which termination of MasterCard's special assessment right might

plausibly hinder or delay Class Plaintiffs, as five large Bank Defendants as to whom this

assessment right was allegedly held are Defendants in this action, and Class Plaintiffs would be

able to satisfy any judgment against these Defendants directly."  Reply Mem. of Law in Further

Support of MasterCard's Mot. to Dismiss Class Pls.' First Supplemental Class Action Compl. 2.

In effect, MasterCard argues that because the alleged fraud is legally impossible (because the

Banks are directly liable for the antitrust violations asserted by plaintiffs), plaintiffs cannot

demonstrate fraudulent intent.  This argument distorts the language of Section 276.  It is not

necessary for the plaintiffs to plead that the challenged transaction will actually hinder or delay

them, they must only plead that the transaction was undertaken with the intent to do so.

CONCLUSION

　　　　　　For the reasons stated above, the motion to dismiss plaintiffs' supplemental

complaint is granted in its entirety.  Plaintiffs, however, may amend their complaint to address

the defects noted in this opinion.

　　　　　　　　　　　　　　　　　So ordered.


　　　　　　　　　　　　　　　　　JOHN GLEESON, U.S.D.J.

28

Dated: Brooklyn, New York
       November 25, 2008