UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE PAYMENT CARD INTERCHANGE
FEE and MERCHANT-DISCOUNT ANTI-
TRUST LITIGATION

This Document Relates to All Class Actions

:     MASTER FILE NO. 1:05-md-1720-JG-JO

:     ORAL ARGUMENT REQUESTED

:

:

:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

## *Table Of Contents*

Table of Authorities ....................................................................................................... iii

Preliminary Statement ..................................................................................................... 1

ARGUMENT ...................................................................................................................... 3

I.  THE *VISA CHECK* RELEASE BARS PLAINTIFFS FROM PURSUING THEIR
    CLAIMS ................................................................................................................... 4

    A.  The *Visa Check* Release ................................................................................ 4

    B.  Defendants' Prior Motion Relating To The Release ........................................ 5

    C.  The Challenged Conduct Occurred Before January 1, 2004 ........................... 5

    D.  The Release Bars Plaintiffs From Seeking Damages Incurred Prior To ..............
        January 1, 2004 ............................................................................................... 6

    E.  The Release Bars Plaintiffs From Seeking To Establish Defendants' Liability
        After January 1, 2004 Based, In Whole Or In Part, On Defendants' Continued
        Adherence To Network Rules That Were Established Before January 1, 2004 ..... 7

II.  NETWORK DEFAULT INTERCHANGE RULES DO NOT CONSTITUTE
     "RESTRAINTS" BECAUSE MEMBER BANKS  RETAIN UNIMPAIRED
     INDEPENDENCE TO OFFER CARD PRODUCTS AND SERVICES ...................... 11

    A.  The Challenged Conduct Does Not Restrict The Bank Defendants'
        Independent Freedom To Compete ................................................................ 11

    B.  The Default Interchange Rules Of A Non-Exclusive Joint Venture That
        Does Not Limit the Freedom Of Its Members To Offer Their Individual
        Products or Services, To Participate In Rival Joint Ventures, Or To Do
        Anything They Could Have Done Had They Not Joined The Joint Venture
        Do Not Constitue A "Restraint" Under Section 1 ........................................... 13

    C.  Under *Buffalo Broadcasting*, The Complaint Fails Adequately To Plead
        The Existence Of A "Restraint" ...................................................................... 16

III.  PLAINTIFFS' INTER-NETWORK CONSPIRACY CLAIM FAILS TO MEET
      THE *TWOMBLY* STANDARD FOR ALLEGING AN AGREEMENT .................. 17

    A.  Pleading Standards For A Section 1 Conspiracy Under *Twombly* ................ 18

    B.  Plaintiffs Have Not Pleaded An Inter-Network Agreement ........................... 19

1.   Plaintiffs Make No Factual Allegations Pointing To An Express Agreement ...................................................................................... 19

2.   Plaintiffs' Alleged "Plus Factors" Do Not Add Up To An Agreement ................ 19

   a.   Plus Factors (i) & (ii):  Duality, Transparency And Opportunity To Conspire ...................................................................................... 20

   b.   Plus Factor (iii):  Visa and MasterCard Network Services Are Indistinguishable .............................................................................. 23

   c.   Plus Factor (v):  Profit Motive to Conspire ...................................... 24

   d.   Plus Factors (iv), (vi) and (ix):  Parallel Pricing .............................. 25

   e.   Plus Factor (vii):  Networks Have Substantial Market Power ......................... 28

   f.   Plus Factor (viii):  Adoption of Anti-Steering and Miscellaneous Exclusionary Restraints Disincentivizes Lower Interchange Fees .................... 29

3.   The Alleged Conduct Can Be Explained As Natural, Unilateral Behavior ........... 29

IV.   PLAINTIFFS' POST-IPO CONSPIRACY CLAIMS SHOULD BE DISMISSED ........ 30

   A.   Plaintiffs Allege No Facts Establishing An Agreement Among The Banks ......... 31

   B.   Plaintiffs Allege A "Rimless" Hub-and-Spoke Arrangement That Is Insufficient To State A Horizontal Conspiracy Claim ............................ 32

   C.   Plaintiffs Cannot Rely On Parallel Conduct Where, As Here, That Conduct Is Equally Explained By The Independent Economic Interest Of Each Bank ............................................................................. 35

V.   AMENDMENT WOULD BE FUTILE ..................................................... 36

Conclusion ............................................................................ 36

### Table Of Authorities

### Cases

*American Airlines v. Christensen,*
   967 F.2d 410 (10th Cir. 1992) .................................................................34

*In re Baby Food Antitrust Litigation,*
   166 F.3d 112 (3d Cir. 1999) ........................................................18, 24, 25

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007) ..............................................................................*passim*

*Beutler Sheetmetal Works v. McMorgan & Co.,*
   616 F. Supp. 453 (N.D. Cal. 1985) .........................................................34

*Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan, Inc.,*
   203 F.3d 1028 (8th Cir. 2000) ................................................................27

*Broadcast Music, Inc. v. CBS,*
   441 U.S. 1 (1979) ...............................................................................15, 16

*Buffalo Broadcasting Co. v. ASCAP,*
   744 F.2d 917 (2d Cir. 1984) ..................................................2, 11, 14, 15, 17

*CBS v. ASCAP,*
   620 F.2d 930 (2d Cir. 1980) ....................................................................11

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.,*
   996 F.2d 537 (2d Cir. 1993) ....................................................................22

*Discover Fin. Serv., LLC v. Visa U.S.A. Inc.,*
   04-CV-7844 (BSJ)(DFE), 2008 U.S. Dist. LEXIS 63566 (S.D.N.Y. Aug. 20, 2008) ..........22

*Dickson v. Microsoft Corp.,*
   309 F.3d 193 (4th Cir. 2002) ...................................................................32

*In re Digital Music Antitrust Litigation,* 06 MDL No. 1780,
   2008 U.S. Dist. LEXIS 79764 (S.D.N.Y. Oct. 9, 2008) ..............19, 24, 26, 27, 30

*E.I. Du Pont de Nemours & Co. v. FTC,*
   729 F.2d 128 (2d Cir. 1984) ...........................................................26, 27, 29

*In re Elevator Antitrust Litig.,*
   502 F.3d 47 (2d Cir. 2007) ...........................................................18, 26, 36

*In re Elevator Antitrust Litigation*, No. 04 CV 1178, 2006 U.S. Dist.
LEXIS 34517 (S.D.N.Y. May 30, 2006), *aff'd*, 502 F.3d 47 (2d Cir. 2007) ........................29

*Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*,
602 F.2d 1025 (2d Cir. 1979) ..................................................................................34

*Hassan v. Spicer*, No. 05-CV- 1526, 2006 U.S. Dist.
LEXIS 3571 (E.D.N.Y. Jan. 31, 2006), *aff'd*, 216 Fed. App'x 123 (2d Cir. 2007) ..............36

*Hirsch v. Arthur Andersen & Co.*,
72 F.3d 1085 (2d Cir. 1995) ........................................................................4, 12, 18

*Hunter Douglas, Inc. v. Comfortex Corp.*, No. 98-CV-0479 (LEK/DNH),
1999 U.S. Dist. LEXIS 10906 (N.D.N.Y. Mar. 11, 1999) ....................................................10

*Interstate Circuit, Inc. v. United States*,
306 U.S. 208 (1939) ..................................................................................................32

*Kendall v. Visa U.S.A. Inc.*,
518 F.3d 1042 (9th Cir. 2008) ................................................................................3, 33

*In re LTL Shipping Servs. Antitrust Litig.*,
No. 1:08-MD-01895, 2009 U.S. Dist. LEXIS 14276 (N.D. Ga. Jan. 29, 2009) ....................23

*In re Late Fee & Over-Limit Fee Litig.*,
528 F. Supp. 2d 953 (N.D. Cal. 2007) ......................................................................23, 24

*MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*,
161 F.3d 443 (7th Cir. 1998) ....................................................................................10

*Madison Square Garden, L.P. v. National Hockey League*,
No. 07 CV 8455 (LAP), 2008 WL 4547518 (S.D.N.Y. Oct. 10, 2008)..............................8, 9

*Mailand v. Burckle*,
572 P.2d 1142 (Cal. 1978).......................................................................................30

*Marin County Board of Realtors v. Palsson*,
549 P.2d 833 (Cal. 1976)........................................................................................30

*Market Force Inc. v. Wauwatosa Realty Co.*,
906 F.2d 1167 (7th Cir. 1990)................................................................................26

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
465 U.S. 752 (1984) ........................................................................................18, 31

iv

*NCAA v. Board of Regents of the Univ. of Oklahoma*,
    468 U.S. 85 (1984) ........................................................................... 15

*Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*,
    467 F.3d 283 (2d Cir. 2006) ............................................................ 28

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*,
    No. 05-MD-1720 (JG), 2008 WL. 115104 (E.D.N.Y. Jan. 8, 2008) .................. 2, 4, 5, 6, 7, 8

*PepsiCo v. Coca-Cola Co.*,
    315 F.3d 101 (2d Cir. 2002) ............................................................ 31

*Record Club of Am., Inc. v. United Artists Records, Inc.*,
    611 F. Supp. 211 (S.D.N.Y. 1985) ................................................... 7

*Ryan v. Hunton & Williams*,
    No. 99-CV-5938 (JG), 2000 WL 1375265 (E.D.N.Y. Sept. 20, 2000) ............... 36

*Spectators' Comm. Network, Inc. v. Colonial Country Club*,
    253 F.3d 215 (5th Cir. 2001) ........................................................... 32

*Toscano v. Professional Golfers' Ass'n*,
    258 F.3d 978 (9th Cir. 2001) ........................................................... 33

*Toys "R" Us, Inc. v. F.T.C.*,
    221 F.3d 928 (7th Cir. 2000) ........................................................... 33

*United States v. Visa U.S.A., Inc.*,
    344 F.3d 229 (2d Cir. 2003) ............................................................ 12

*United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322 (S.D.N.Y.),
    *Modified on other grounds*, 181 F. Supp. 2d 613 (S.D.N.Y. 2001),
    *aff'd*, 344 F.3d 229 (2d Cir. 2003) ................................................. 22, 27

*VKK Corp. v. National Football League*,
    244 F.3d 114 (2d Cir. 2001) ............................................................ 9, 10

*In re Visa Check/MasterMoney Antitrust Litig.*,
    297 F. Supp. 2d 503 (E.D.N.Y. 2003), *aff'd sub nom.*
    *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96 (2d Cir. 2005) ............... 2, 4

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
    396 F.3d 96 (2d Cir. 2005) .............................................................. 6

*Williamson Oil Co., Inc. v. Philip Morris USA*,
    346 F.3d 1287 (11th Cir. 2003) ........................................................ 23

*Willsea v. Theis*,
     No. 98 Civ. 6773 (BSJ), 1999 WL 595629 (S.D.N.Y. Aug. 6, 1999)......................................9

### *Statutes*

15 U.S.C. § 1 .............................................................................................................................4

### *Miscellaneous*

1 ABA Section of Antitrust Law, Antitrust Law Developments (6th ed. 2007)..........................32

6 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1412(a) (2d ed. 2003)...................24

6 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1425 (2d ed. 2003) ......................18

6 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1433(a) (2d ed. 2003)...................25

11 Herbert Hovenkamp, *Antitrust Law* ¶ 1913(c) (2d ed. 2005)..................................................17

## ***Preliminary Statement***

Defendants respectfully submit this memorandum of law in support of their motion, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the Second Consolidated Amended Class Action Complaint (the "Complaint") in its entirety.

Class plaintiffs ("plaintiffs") allege that defendant Visa and its member banks conspired in violation of the antitrust laws to establish and enforce Visa network rules pertaining to Visa card transactions that (i) require the payment of a default interchange fee in the absence of a superseding bilateral agreement (the "default interchange rule"), and (ii) prevent merchants from steering consumers at the point of sale away from all or some Visa-branded cards to the merchants' more preferred method of payment (the "anti-steering rules").[1]  Plaintiffs further allege that defendant MasterCard and its member banks likewise conspired in violation of the antitrust laws to establish and enforce MasterCard default interchange and anti-steering rules.[2]  (The alleged conspiracies between Visa and its members and MasterCard and its members are referred to as alleged "intra-network conspiracies.")  Plaintiffs also allege that Visa and MasterCard, together with their member banks have conspired with each other to fix default interchange rates

---

[1]   The alleged Visa "intra-network conspiracy" is the subject of the First, Fourth, Sixth, Tenth, Twelfth, Fourteenth, Fifteenth, Sixteenth, Seventeenth and Nineteenth Claims for Relief.  Each of those claims for relief other than the Sixth Claim for Relief relates to the alleged Visa intra-network conspiracy to fix default interchange rates, while the Sixth Claim for Relief relates to the alleged Visa intra-network conspiracy to impose and enforce the alleged anti-steering rules.  The Fifth, Thirteenth and Twentieth Claims for Relief seek injunctive relief with respect to both the alleged Visa and MasterCard intra-network conspiracies, as well as the alleged inter-network conspiracy.

[2]   The alleged MasterCard "intra-network conspiracy" is the subject of the Second, Seventh, Eleventh and Eighteenth Claims for Relief.  Each of those claims for relief except the Seventh Claim for Relief relates to the alleged MasterCard intra-network conspiracy to fix default interchange rates, while the Seventh Claim for Relief relates to the alleged MasterCard intra-network conspiracy to impose and enforce the alleged anti-steering rules.  As previously noted, the Fifth, Thirteenth and Twentieth Claims for Relief seek injunctive relief with respect to both alleged intra-network and the alleged inter-network conspiracies.

1

(referred to as an alleged "inter-network conspiracy").[3]  Finally, plaintiffs allege that, after the

MasterCard and Visa initial public offerings ("IPOs"), MasterCard and its member banks and

Visa and its member banks have engaged in "hub-and-spoke" conspiracies relating to the default

interchange and anti-steering rules.[4]

 Defendants base their motion to dismiss the Complaint on four separate grounds.

First, the release in *In re Visa Check/MasterMoney Antitrust Litigation*, 297 F. Supp. 2d 503

(E.D.N.Y. 2003), *aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96 (2d Cir.

2005) ("*Visa Check*") (the "Release") bars plaintiffs from pursuing their claims.  If the Com-

plaint were dismissed on this ground, then the Court need not reach the other grounds for dis-

missal advanced on this motion.  This Court has already held that plaintiffs' claims fall within

the scope of the Release and that the Release therefore bars plaintiffs in this case from recovering

damages incurred prior to January 1, 2004.  *In re Payment Card Interchange Fee & Merchant*

*Discount Antitrust Litig.*, No. 05-MD-1720 (JG)(JO), 2008 WL 115104, at *10-16 (E.D.N.Y. Jan.

8, 2008) ("*Interchange Fee*").  By the same reasoning, the Release also bars plaintiffs from as-

serting defendants' liability for (i) conduct (including network rules) that occurred or were in

place before January 1, 2004, and (ii) for continued enforcement of, or adherence to, such con-

duct after January 1, 2004.

 Second, plaintiffs' "intra-network conspiracy" claims to fix default interchange

rates fail adequately to plead a restraint of trade.  Under the principles established in *Buffalo*

---

[3] The alleged "inter-network conspiracy" is the subject of the Third Claim for Relief.  Plaintiffs also allege that defendants have monopolized the general purpose payment card market.  The alleged monopolization claims are the subject of the Eighth and Ninth Claims for Relief.

[4] The post-IPO claims are the subject of the Seventeenth, Eighteenth, Nineteenth and Twentieth Claims for Relief. The challenged rules include the so-called no-surcharge, anti-discrimination, no-minimum purchase, all-outlets, no-multi-issuer, and no-bypass rules.

*Broadcasting Co. v. ASCAP*, 744 F.2d 917 (2d Cir. 1984), and related cases, the rules and prac-
tices of a joint venture, like Visa and MasterCard, do not constitute a restraint of trade if they al-
low members of the venture the freedom to do anything they could have done if they had not
joined the venture.

Third, plaintiffs' "inter-network conspiracy" claim does not adequately plead the
existence of an agreement within the meaning of Section 1.  Under the pleading principles of
*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), plaintiffs must allege conduct that "in-
vests" the networks' alleged parallel behavior "with a plausible suggestion of conspiracy," *id.* at
566; *i.e.*, conduct that "indicates the sort of restricted freedom of action and sense of obligation
that one generally associates with agreement" and that tends to exclude the possibility of inde-
pendent action. *Id.* at 554, 557 n.4 (citation omitted).  Plaintiffs' inter-network conspiracy claim
does not do so.

Fourth, plaintiffs' allegations of post-IPO intra-network horizontal conspiracies
similarly fail to state a claim.  In antitrust law, geometry matters.  Although plaintiffs try to al-
lege a horizontal conspiracy among the bank defendants, their post-IPO conspiracy claims are
based on nothing more than a series of *vertical* agreements – each between a network and an in-
dividual bank – under which the participating banks allegedly agree to "abide by" the rules of the
networks.  As a result, plaintiffs plead nothing more than a "rimless" hub-and-spoke arrangement
that is insufficient to state a horizontal conspiracy claim.  Nor can they rely on allegations of
"parallel" conduct where – as here – the alleged conduct is equally explained by the independent
economic interest of each bank.

## **ARGUMENT**

An antitrust plaintiff must make sufficient factual allegations "to render . . . plau-
sible" its entitlement to relief. *Twombly*, 550 U.S. at 556; *see also Kendall v. Visa U.S.A. Inc.*,

3

518 F.3d 1042, 1044-45 (9th Cir. 2008). Conclusory allegations do not suffice to survive a motion to dismiss, and generalized allegations "need not be credited . . . when they are belied by more specific allegations in the complaint." *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995).

## I. THE *VISA CHECK* RELEASE BARS PLAINTIFFS FROM PURSUING THEIR CLAIMS

### A.    *The* Visa Check *Release*

The *Visa Check* Release provides:

> [T]he Released Parties [MasterCard and Visa and their member banks[5]] shall be released and forever discharged from all manner of claims, demands, actions, suits, causes of action against the Released Parties, whether class, individual, or otherwise in nature, damages whenever incurred, liabilities of any nature whatsoever, including costs, expenses, penalties and attorneys' fees, known or unknown, suspected or unsuspected, in law or equity, that any Releasing Party [merchant class member] ever had, now has, or hereafter can, shall or may have, ***relating in any way to any conduct prior to January 1, 2004*** concerning any claims alleged in the Complaint or any of the complaints consolidated therein, including, without limitation, claims which have been asserted or could have been asserted in this litigation which arise under or relate to any federal or state antitrust, unfair competition, unfair practices, or other law or regulation, or common law, including, without limitation, the Sherman Act, 15 U.S.C. § 1 *et seq.* ***Each Class Member hereby covenants and agrees that it shall not, hereafter, seek to establish liability against any of the Released Parties based, in whole or in part, upon any of the Released Claims.***

*Interchange Fee*, 2008 WL 115104, at *3 (emphasis added). As Judge Gleeson observed, "in exchange for an unprecedented amount of compensatory damages, plaintiffs here have released all claims based on the mix of facts that produced anticompetitive interchange rates." *Visa Check*, 297 F. Supp. 2d at 514.

---

[5]    The "Released Parties" are defined in the settlement agreements to include Visa, MasterCard and their "member financial institutions." *See Visa Check*, 297 F. Supp. 2d at 512.

4

### B.      *Defendants' Prior Motion Relating To The Release*

In June 2006, defendants moved this Court for an order limited to dismissing or striking plaintiffs' claims for damages incurred *before* January 1, 2004. At that time, defendants noted that, depending on how the case progressed and plaintiffs' further elucidation of the factual basis for their claims, the Release may lend itself to other potential motions against some or all of plaintiffs' claims. (Docket Entry 387, at 11 n.7.) Defendants thus reserved the right to argue that the Release precluded plaintiffs' claims to the extent those claims seek to establish defendants' liability *after* January 1, 2004. *See Interchange Fee*, 2008 WL 115104, at *3.

It is now apparent from their most recent Complaint that plaintiffs base their claims on network rules that pre-date the Release and which relate to claims "which have been asserted or could have been asserted in [the *Visa Check*] litigation." For that reason, defendants now move to dismiss the Complaint in its entirety as barred by the Release.

### C.      *The Challenged Conduct Occurred Before January 1, 2004*

Plaintiffs allege on behalf of a putative class of merchants that is "virtually identical" to the *Visa Check* class (Compl. ¶ 119) that "[f]or more than 40 years," Visa, MasterCard and their member banks have violated the antitrust laws by collectively adopting, and agreeing to adhere to, the networks' default interchange and anti-steering rules. (Compl. Preamble ¶ 1.) In their prayer for relief, plaintiffs ask the Court to award monetary damages "for the fullest time period permitted by the applicable statutes of limitations and the purported settlement and release in [*Visa Check*]." (Compl. Prayer for Relief at 120.)

Consistent with the allegations that defendants have been engaging in the challenged conduct for more than forty years, the Complaint does not challenge any rule, policy or practice not in existence as of January 1, 2004, and does not allege that defendants collectively established or materially altered the challenged default interchange and alleged anti-steering

rules after January 1, 2004. To the extent that the bank defendants have allegedly agreed to adhere to the networks' rules as a condition of their membership in Visa and MasterCard, that agreement has been in place since well before 2004, and plaintiffs do not allege otherwise. Other than allegations that defendants have continued to adhere to those network rules, and a handful of (for purposes of this motion, irrelevant) allegations about each network's recent corporate restructuring, the Complaint contains no allegations whatsoever about new conduct occurring after January 1, 2004.

### D.   *The Release Bars Plaintiffs From Seeking Damages Incurred Prior To January 1, 2004*

On January 8, 2008, the Court adopted the September 7, 2007 report and recommendation of Magistrate Judge Orenstein, granting defendants' motion to dismiss the class plaintiffs' claims for damages to the extent those damages were incurred prior to January 1, 2004, on the ground that such claims were barred by the Release. *Interchange Fee*, 2008 WL 115104, at *1. The report and recommendation states that, "[t]aken as a whole, the [*Visa Check*] Settlement reflects a bargain that is both carefully calibrated in its details and intentionally broad in scope: in return for relief that marked the Settlement as 'the largest in the history of antitrust law,' *Wal-Mart Stores, Inc.*, 396 F.3d [96, 101 (2d Cir. 2005)], the *Visa Check* plaintiff class released Visa and MasterCard from liability for all conduct up through the end of the year in which the agreement was reached." *Interchange Fee*, 2008 WL 115104, at *10. Judge Orenstein held that the "plain language" of the Release "extinguishes any claim that could be asserted by a *Visa Check* class member against Visa and MasterCard if that claim related to the *Visa Check* claims, regardless of whether such claims were actually asserted in the complaint – and also regardless of whether such claims *could* have been so asserted under applicable pleading rules and case law." *Id.* The claims the Court was addressing arose out of conduct occurring before January 1, 2004:

6

> *Every court to consider the scope of the Settlement has similarly con-*
> *cluded that it released all claims arising out of conduct occurring before Janu-*
> *ary 1, 2004 related to the claims at issue in the* **Visa Check** *litigation.* . . .  In so
> ruling, those courts have construed the Settlement's release provision as extin-
> guishing a universe of potential claims that is necessarily larger than those sup-
> ported by the factual allegations in the complaint filed in the *Visa Check* litigation.

*Id.* at *11 (emphasis added) (citations omitted).

Judge Orenstein then described the class plaintiffs' complaint in the instant case

as challenging under the federal antitrust laws "agreements into which the defendants entered,

the exclusionary rules they implemented and the supracompetitive interchange fees they

charged." *Id.*  Judge Orenstein noted that "under any fair reading of the relevant pleadings and

the Settlement, the claims at issue here fall within the scope of the Settlement's release of claims

'relating in any way to any conduct prior to January 1, 2004 concerning any claims alleged in the

[*Visa Check*] Complaint." *Id.*

E.  **The Release Bars Plaintiffs From Seeking To Establish**
    **Defendants' Liability After January 1, 2004 Based, In Whole**
    **Or In Part, On Defendants' Continued Adherence To**
    **Network Rules That Were Established Before January 1, 2004**

Application of the principles articulated in that earlier decision compels the con-

clusion that the Release bars plaintiffs from seeking to impose any liability on defendants based

on conduct occurring before January 1, 2004, that plaintiffs claim have caused merchants to pay

supracompetitive interchange fees since January 1, 2004.  *See, e.g., Record Club of Am., Inc. v.*

*United Artists Records, Inc.*, 611 F. Supp. 211, 217 n.8 (S.D.N.Y. 1985) (release barred antitrust

claim where, "all of the harm alleged flows from and is related to the terms and conditions under

which [the plaintiff] settled the original antitrust lawsuit.  In other words, there may have been a

continuing effect, but plaintiff's cause of action arose before the release was signed.").

The scope of this Release extends not only to the post-January 1, 2004 effects of

pre-January 1, 2004 conduct, but to post-January 1, 2004 conduct that amounted to a continua-

tion of pre-January 1, 2004 conduct as well.  This construction of the Release is consistent with the Release's broad language, *i.e.*, "***relating in any way*** to any conduct prior to January 1, 2004," *Interchange Fee*, 2008 WL 115104, at \*3 (emphasis added), and, as a matter of law, is the only interpretation consistent with the manifested intent of the Release to resolve a set of actual and potential disputes.  For plaintiffs now to seek to impose liability on defendants merely for their continued adherence to the very same rules and practices in existence as of January 1, 2004 would violate the language of the Release and frustrate its purpose.

In a case raising this precise issue, the court in *Madison Square Garden, L.P. v. National Hockey League*, No. 07 CV 8455 (LAP), 2008 WL 4547518 (S.D.N.Y. Oct. 10, 2008) ("*NHL*"), held that a broad release barred a subsequent antitrust challenge to the NHL's continued enforcement of League rules and policies that existed at the time the release was executed. The plaintiff Madison Square Garden ("MSG"), the owner of the New York Rangers, claimed that certain policies of the NHL relating to merchandising and licensing, broadcasting rights, and advertising and sponsorship rules violated the federal antitrust laws. *Id.* at \*1-2.  MSG had previously signed a consent agreement and release which provided that, as partial consideration for the NHL's consent to MSG's purchase of the team, MSG released the NHL and its member teams from all liability arising out of "any act, omission, transaction, or occurrence taken or occurring at any time up to and including the date of the execution of this Consent Agreement, relating to, or arising from, any hockey operations or any NHL activity, including without limitation, the performance, presentation or exploitation of any hockey game or hockey exhibition." *Id.* at \*5.

MSG argued that (i) the release did not apply to its claims because those claims were based on "current conduct, not historical conduct," and (ii) the release was unenforceable as

against public policy because it operated as a prospective waiver of the right to sue for subsequent antitrust violations. *Id.* at *6. Judge Preska rejected both arguments.

Judge Preska rejected MSG's first argument on the ground that MSG had alleged only that the NHL had continued to enforce, or had acted pursuant to or reaffirmed, rules and policies that were in existence at the time of the execution of the release. *Id.* "Because this very antitrust 'claim' 'exist[ed]' at the time of the release, and because the only allegations in the Complaint demonstrate that the League *continued* its enforcement of pre-existing policies, the Court has little trouble concluding that the Release evidences that the 'parties had in mind a general settlement of all accounts up to that time.'" *Id.* (quoting *Willsea v. Theis*, No. 98 Civ. 6773 (BSJ), 1999 WL 595629, at *12 (S.D.N.Y. Aug. 6, 1999) (Jones, J.).

Judge Preska also rejected MSG's argument that the release violated public policy and was therefore unenforceable. Several considerations supported the court's conclusion. First, MSG was challenging not the legitimacy of the NHL itself as a joint venture, but only of certain rules and policies of the venture that had existed at the time MSG executed the release. "[T]he venture's undisputed legitimacy diminishes the public policy concerns compared to those in the case of a Section 1 conspiracy whose very existence is unlawful." *Id.* at *7. Second, MSG's argument was at odds with well-settled public policy favoring settlement of disputes. The court observed that a defendant could never meaningfully settle an antitrust claim predicated on a rule or policy if the settlement's release did not bar the releasing party from thereafter asserting claims based on the defendant's continued adherence to the rule or policy. *Id.* at *8. The court relied on the Second Circuit opinion in *VKK Corp. v. National Football League*, 244 F.3d 114 (2d Cir. 2001), in which the court wrote:

> It is not uncommon, we assume, for a release to prevent the releasor from bringing suit against the releasee for engaging in a conspiracy that is later alleged to

have continued after the release's execution.  Such a release would seem always to protect the ongoing conspiracy because it always prevents the releasor from beginning litigation that would establish the scheme's illegality.  We do not think that the part and parcel doctrine can be read so broadly as thus to render void all releases relating to conspiracies alleged to continue post-release.

*Id.* at 126; *see also MCM Partners, Inc. v. Andrews-Bartlett & Assocs. Inc.*, 161 F.3d 443, 448 (7th Cir. 1998) (where the defendants' post-release refusal to deal with the plaintiff was based on "continued adherence" to a pre-release agreement, "the claim is clearly based on pre-[release] conduct and, as such, is expressly barred by the Release"); *Hunter Douglas, Inc. v. Comfortex Corp.*, No. 98-CV-0479 (LEK/DNH), 1999 U.S. Dist. LEXIS 10906, at *21 (N.D.N.Y. Mar. 11, 1999) (release barred a claim challenging ongoing practices that had "not been altered *materially* since the parties executed" a release (emphasis added)).

The instant case is indistinguishable from the *NHL* case.  Plaintiffs are challenging not the legitimacy of Visa and MasterCard as joint ventures, but only of certain joint venture rules and practices that plainly fall within the scope of the Release in the *Visa Check* litigation and that existed before January 1, 2004.  Plaintiffs do not allege any truly new and distinctive conduct occurring after January 1, 2004; they merely challenge defendants' continued adherence to the networks' default interchange and anti-steering rules.  Enforcement of the Release to bar plaintiffs' claims thus does not violate public policy.  Indeed, to refuse to enforce the Release request would violate the clear public policy favoring settlement of disputes, since no antitrust case predicated on a rule or policy, including this one, could be settled if the same plaintiffs could challenge defendants' continued adherence to their existing network rules again and again *ad infinitum*, notwithstanding the terms of the Release.

The Release thus bars plaintiffs from seeking to establish defendants' liability based on conduct that occurred before January 1, 2004, including the alleged collective estab-lishment of the network default interchange and anti-steering rules at issue in this case, as well as

10

on continued enforcement of, and adherence to, those network rules after January 1, 2004.  Accordingly, Plaintiffs' Complaint should be dismissed in its entirety.

## II.   NETWORK DEFAULT INTERCHANGE RULES DO NOT CONSTITUTE "RESTRAINTS" BECAUSE MEMBER BANKS RETAIN UNIMPAIRED INDEPENDENCE TO OFFER CARD PRODUCTS AND SERVICES

The elements of a Section 1 claim – restraint, unreasonableness, and agreement – are analytically distinct.[6] As it relates to the alleged intra-network conspiracy claims, this ground of the motion to dismiss concerns only the *threshold* inquiry whether plaintiffs have adequately pleaded that the challenged default interchange rules constitute a "restraint" within the meaning of Section 1.[7] They have not.

### A.   *The Challenged Conduct Does Not Restrict The Bank Defendants' Independent Freedom To Compete*

The Complaint alleges that Visa and MasterCard operate as joint venture networks of financial institutions established by their members to develop, promote, and operate national payment card networks.  (Compl. ¶¶ 51, 53, 120.)  The bank defendants are members of both Visa and MasterCard.  (*Id.* ¶ 93.)  Visa and MasterCard each has established by-laws and operating rules that govern its members.  (*Id.* ¶¶ 50-53, 150-51, 156, 185.)  Each network's default interchange rule requires the payment of a default interchange fee in the absence of a super-

---

[6]   The question of a restraint's reasonableness – which involves the balancing of pro- and anti-competitive effects of conduct – need not be reached if there is no restraint at all within the meaning of the Sherman Act.  *See, e.g., Buffalo Broadcasting*, 744 F.2d at 924 ("We think the initial and, as it turns out, dispositive issue on the merits is whether the blanket licensing of performing rights to the local television stations has been proven to be a restraint of trade."); *CBS v. ASCAP*, 620 F.2d 930, 934-35 (2d Cir. 1980) (identifying as a "threshold contention" the question whether "the balancing of pro- and anti-competitive effects need not be undertaken" where the challenged conduct is not a "restraint at all").

[7]   As noted above, plaintiffs' alleged intra-network interchange conspiracy claims are the subject of all of the claims for relief except the Third, Sixth, Seventh, Eighth and Ninth Claims for Relief.  *See* notes 1 and 2, *supra*.

11

seding bilateral agreement between the payment card issuing bank and either the acquiring bank or the merchant.  (*Id.* ¶¶ 150-51, 155.)

Neither Visa nor MasterCard prohibits its member banks from providing any payment card service that the member could have provided if it had not joined the network or if the network did not exist.  The member banks are free, for example, to issue payment cards as members of other networks.  (*Id.* ¶¶ 211-12.)  Indeed, each bank defendant is alleged to be a member of both Visa and MasterCard, and thus has the right to issue payment cards and acquire merchant transactions on both the Visa and MasterCard networks.  (*Id.* ¶ 211.)  Similarly, since before the post-2004 period relevant to this case, members of Visa and MasterCard have been free to issue American Express and Discover cards.  *See United States v. Visa U.S.A., Inc.*, 344 F.3d 229 (2d Cir. 2003).[8]  The Complaint does not allege that Visa or MasterCard forbids its member banks from issuing private label, or "proprietary," cards to individual merchants for use only at the particular merchant's outlets, and alleges that the bank defendants in fact do issue such cards.  (Compl. ¶¶ 8(dd), 55, 62, 63, 68, 70, 72, 74, 78, 80, 84, 92.)

In addition, nothing in the Complaint alleges that the Visa and MasterCard rules restrain the freedom of member banks to compete in providing Visa and MasterCard branded products they issue by, for example, altering the network-established default interchange rates through bilateral agreements with either other member banks or merchants.  The Complaint alleges that such bilateral agreements among issuing banks, acquiring banks and merchants are feasible.  (*Id.* ¶¶ 169, 170.)  Moreover, despite plaintiffs' passing, conclusory reference to the "Networks' policies to discourage bilateral agreements between Issuers and Merchants" (*id.* ¶

---

[8]   The Complaint relies on the decision in *United States v. Visa* (Compl. ¶ 101), and thus incorporates the decision by reference therein.  The decision is also a public record of which judicial notice may be taken.  *See Hirsch*, 72 F.3d at 1092, 1095 (courts may take judicial notice of prior judicial proceedings).

236), nothing in the Visa or MasterCard rules or by-laws is alleged to prohibit member banks from entering into such agreements.

In sum, nothing in the Complaint alleges that the Visa or MasterCard rules preclude any member bank from doing anything it could have done had it not joined Visa or MasterCard, or that the network default interchange rules restrain anyone – member banks, Visa, MasterCard or merchants – from bargaining over the purchase and sale of payment card services.

**B.**      ***The Default Interchange Rules Of A Non-Exclusive Joint Venture That Does Not Limit The Freedom Of Its Members To Offer Their Individual Products Or Services, To Participate In Rival Joint Ventures, Or To Do Anything They Could Have Done Had They Not Joined The*** <u>***Joint Venture Do Not Constitute A "Restraint" Under Section 1***</u>

*Buffalo Broadcasting* addressed the question posed here – whether the rules and practices of a non-exclusive joint venture "restrain" trade. In that case, local television stations challenged the blanket licensing practices of the American Society of Composers, Authors and Publishers ("ASCAP"), an unincorporated membership association of music composers, authors and publishers that had obtained from its members the non-exclusive right to license music performing rights to others for the music on which its members held the copyright. ASCAP offered television and radio broadcasters a blanket license to broadcast all the compositions of its members in the repertoire. ASCAP did not permit a broadcaster to alter the venture product in any way, for example, by reducing the scope of the blanket license by selecting fewer than all of ASCAP's repertoire. But, because ASCAP possessed only non-exclusive licensing authority, nothing prevented a broadcaster from negotiating different license agreements with any individual ASCAP member or group of members. Nor did ASCAP prevent its members from licensing their music in any other way, including by forming a competing joint venture to offer alternative licensing arrangements. Notwithstanding the availability of these alternatives, virtually all radio

13

and television broadcasters bought ASCAP's blanket license. *See Buffalo Broadcasting*, 744 F.3d at 919-23.

The Second Circuit held that ASCAP's blanket license did not constitute a "restraint" under Section 1 because it did not impede the independence of individual songwriters to negotiate separate licenses for the use of their own compositions with broadcasters outside ASCAP. Writing for the court, Judge Newman explained that, although it might be "difficult" for plaintiff local broadcasters to license compositions outside ASCAP, it remained "possible." *Id.* at 929. As Judge Newman explained, the local broadcasters had not alleged that ASCAP's blanket license was "functioning to restrain willing buyers and sellers from negotiating for the licensing of performing rights to individual compositions." *Id.* at 932. Judge Newman concluded that "[t]he blanket license is not even amenable to scrutiny under section 1 unless it is a restraint of trade. . . . Since the blanket license restrains no one from bargaining over the purchase and sale of music performance rights, it is not a restraint unless it were proven that there are no realistically available alternatives. . . . Not having been proven to be a restraint, it cannot be a violation of section 1." *Id.* at 933.

In a concurring opinion, Judge Winter agreed that a nonexclusive joint venture that does not inhibit the freedom of its members to compete with products and services of their own does not violate Section 1: "[S]o long as composers or producers have no horizontal agreement among themselves to refrain from source or direct licensing and there is no other artificial barrier, such as a statute, to their use, a non-exclusive blanket license cannot restrain competition." *Id.* at 933-34 (Winter, J., concurring). "In those circumstances," Judge Winter explained, the nonexclusive joint venture "is simply one alternative competing on the basis of price and services with others." *Id.* at 934 (Winter, J., concurring). Contrasting the competitive effect

of the non-exclusive character of the blanket licenses with the arrangement that was struck down

in *NCAA v. Board of Regents of the Univ. of Oklahoma*, 468 U.S. 85 (1984), Judge Winter wrote:

> I think all would agree that, if the NCAA merely offered a *non-exclusive* license
> to all football games between member schools and the member schools were free
> to negotiate television rights on their own, the action would have been dismissed
> on the pleadings.

744 F.3d at 934 (Winter, J., concurring).

In *Buffalo Broadcasting*, it was unimportant that no one ASCAP member could

duplicate the ASCAP blanket license that ASCAP offered.  In earlier litigation involving the

same ASCAP blanket licensing practices, the Supreme Court had observed that ASCAP's blan-

ket license was comprised of the individual compositions of its members plus certain additional

services such that "the whole is truly greater than the sum of its parts; it is, to some extent, a dif-

ferent product."  *Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 21-22 (1979)("*BMI*").  "[T]o the ex-

tent the blanket license is a different product, ASCAP is not really a joint sales agency offering

the individual goods of many sellers, but is a separate seller offering its blanket license, of which

the individual compositions are raw material.  ASCAP, in short, made a market in which indi-

vidual composers are inherently unable to compete fully effectively."  *Id.* at 22-23 (footnotes

omitted).  In other words, ASCAP did not interfere with competition that could otherwise take

place; instead, it added a new option to the marketplace – the blanket license.  The members

were permitted to set the price of that new product because doing so did not interfere with com-

petition that could otherwise have occurred.  The *BMI* Court explained:

> Here, the blanket license fee is not set by competition among individual
> copyright owners, and it is a fee for the use of any of the compositions covered by
> the license.  But the blanket license cannot be wholly equated with a simple hori-
> zontal arrangement among competitors.  ASCAP does set the price for its blanket
> license, but that license is quite different from anything any individual owner
> could issue.  The individual composers and authors have neither agreed not to sell
> individually in any other market nor use the blanket license to mask price fixing
> in such other markets.

15

*Id.* at 23-24.

### C.   Under **Buffalo Broadcasting**, *The Complaint Fails Adequately To Plead The Existence Of A "Restraint"*

Like the individual composers in *Buffalo Broadcasting*, each bank defendant's arrangement with each network is non-exclusive.  Nothing in the Complaint alleges that either network's default interchange rule impairs the independence of member banks to do anything they could have done if they had not joined the network, including joining rival card networks or issuing proprietary "private-label" cards to individual merchants.

If anything, the non-exclusive, non-restraining nature of the Visa and MasterCard ventures, and the unrestricted freedom of their members to compete, are more apparent on the face of the Complaint in this case than were the comparable freedoms in the record in *Buffalo Broadcasting*.  In *Buffalo Broadcasting*, the unimpaired independence of songwriters to negotiate licenses outside ASCAP was theoretical; local television stations had never tried to negotiate an independent license agreement with an individual songwriter.  By contrast, the unimpaired independence of Visa's or MasterCard's member banks is expressly alleged in the Complaint. (*See* Compl. ¶ 211 (every bank defendant in this action is a member of both Visa and MasterCard, and "thus has the right to issue Payment Cards and acquire Merchants for both the Visa and MasterCard networks").)  In addition, the Complaint acknowledges that some merchants accept non-network payment cards that can be used "only at particular Merchants' outlets." (*Id.* ¶ 8(h).) The Complaint alleges that all or nearly all bank defendants issue proprietary payment cards. (*See, e.g., id.* ¶¶ 62, 63.)  Moreover, the Complaint acknowledges that each network's default interchange rule applies only in the absence of a superseding bilateral agreement (*id.* ¶¶ 150-51, 155), which bilateral agreements plaintiffs plead are feasible.  (*Id.* ¶ 170.)  And plaintiffs do not allege that merchants have been restricted from accessing these other options.

To be sure, alternatives, including competing network products and proprietary cards, would not have the same attributes of the Visa or MasterCard network products; no single issuing bank can offer a merchant an arrangement that incorporates the entire host of attributes provided by the Visa or MasterCard network. In this respect, however, the case is identical to *BMI* and *Buffalo Broadcasting*. In those cases, only the association could issue the blanket license. The individual licenses that the members were free to provide were very different. Nevertheless, as the Second Circuit reasoned, the key is that the challenged conduct of the venture – here the network default interchange rules – does not restrict other, individual conduct of any member of the venture. *Buffalo Broadcasting*, 744 F.2d at 934 (Winter, J., concurring) ("so long as [venture members] have no horizontal agreement among themselves to refrain from [individual conduct] . . . a non-exclusive blanket license cannot restrain competition").[9]

Because the individual members of Visa and MasterCard retain the freedom to do anything they could have done if they had not joined the networks, including offering other payment card products, under the principles established in *Buffalo Broadcasting*, the bank defendants' participation in Visa and MasterCard and the challenged default interchange rules do not constitute a "restraint" within the meaning of Section 1. Accordingly, plaintiffs' intra-network interchange conspiracy claims should be dismissed.

## III. PLAINTIFFS' INTER-NETWORK CONSPIRACY CLAIM FAILS TO MEET THE *TWOMBLY* STANDARD FOR ALLEGING AN AGREEMENT

Plaintiffs' alleged inter-network conspiracy claim fails adequately to allege an agreement between Visa and MasterCard and their respective members, as required by *Twombly*.

---

[9] Nor can the plaintiffs' claims be saved by resort to the assertion that there is some less restrictive alternative to default interchange rules. The concept of less restrictive alternatives becomes relevant, if at all, only after the threshold element of a restraint is satisfied. 11 Herbert Hovenkamp, *Antitrust Law* ¶ 1913(c) (2d ed. 2005).

Under *Twombly*, plaintiffs must allege conduct that "invests" the networks' alleged parallel behavior "with a plausible suggestion of conspiracy," 550 U.S. at 566; they must plead conduct that "indicates the sort of restricted freedom of action and sense of obligation that one generally associates with agreement," *id.* at 557 n.4, and that "tend[s] to exclude the possibility of independent action." *Id.* at 554 (citing *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984)); *see also In re Baby Food Antitrust Litig.*, 166 F.3d 112, 122 (3d Cir. 1999) ("no conspiracy should be inferred from ambiguous evidence or from mere parallelism when defendants' conduct can be explained by independent business reasons"). Plaintiffs have not done so.

### A.   *Pleading Standards For A Section 1 Conspiracy Under* Twombly

Stating a claim under Section 1 "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556; *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (same). "'[T]he crucial question' is whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement.'" *Twombly*, 550 U.S. at 553 (citation omitted). Conclusory allegations of agreement are insufficient. *In re Elevator*, 502 F.3d at 50-51; *Hirsch*, 72 F.3d at 1092.

Absent well-pleaded facts of an express agreement, a plaintiff must plead facts showing "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *Twombly*, 550 U.S. at 557 n.4 (quoting 6 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1425 (2d ed. 2003)). Indeed, "[a] statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim," *id.* at 557, since parallel conduct is "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the

market." *Id.* at 554.  Thus, "without some further factual enhancement [an allegation of parallel conduct] stops short of the line between possibility and plausibility of 'entitle[ment] to re-lief.'" *Id.* (citation omitted) (alteration in original).

**B.   *Plaintiffs Have Not Pleaded An Inter-Network Agreement***

**1.   *Plaintiffs Make No Factual Allegations
Pointing To An Express Agreement***

Notwithstanding their conclusory allegations that Visa and MasterCard "have agreed not to reduce . . . Interchange Fees," and that there is a "meeting of the minds" between the networks and the banks that the networks "will match each others' effective Interchange Fees," (*see* Compl. ¶¶ 229, 307), plaintiffs have not pleaded an express inter-network agreement. *Twombly*, 550 U.S. at 565 n.10 (noting that plaintiffs had not pleaded the "specific time, place, or person" involved in any express agreement).  Indeed, plaintiffs state that it is Visa's and Master-Card's consciously parallel conduct and "other conduct" that "supports the inference of . . . agreement." (Compl. ¶ 308.)  Thus, the question presented on this aspect of the motion is whether plaintiffs have alleged conduct that "invests" the networks' alleged parallel behavior "with a plausible suggestion of conspiracy."  550 U.S. at 566.  Put another way, do plaintiffs al-lege conduct that "indicates the sort of restricted freedom of action and sense of obligation that one generally associates with agreement"? *Id.* at 557 n.4 (citation omitted).  Plaintiffs do not meet this standard.

**2.   *Plaintiffs' Alleged "Plus Factors" Do Not Add Up To An Agreement***

Recognizing that "'parallel conduct, even conduct consciously undertaken,' does not itself state an antitrust conspiracy," *In re Digital Music Antitrust Litig.*, 06 MDL No. 1780, 2008 U.S. Dist. LEXIS 79764, at *37 (S.D.N.Y. Oct. 9, 2008) (citation omitted), plaintiffs plead the following additional "plus factors" to support the inference of an agreement between the

networks: (i) duality (Compl. ¶ 308(a)) and a high level of inter-network communications "both directly and through the Bank Defendants and other dual Member Banks" (*id.* ¶ 308(a)); (ii) the transparency of interchange-fee setting activities of each network (*id.* ¶ 308(b)); (iii) the indistinguishable nature of the network services provided by Visa, MasterCard and their member banks (*id.* ¶ 308(c)); (iv) the "parallel and stair-step fashion" moves in each network's credit card interchange fees (*id.* ¶ 308(d)); (v) the "profit motive" of the bank defendants and other network member banks to ensure the parallel increases in network interchange fees (*id.* ¶ 308(e)); (vi) the lack of incentive for each network to match the price increases of the other in the absence of a conspiracy (*id.* ¶ 308(f)); (vii) the "substantial market power" of each network as well as the networks' incentive and ability to maintain interchange fees at supracompetitive levels (*id.* ¶ 308(g)); (viii) the adoption of Anti-Steering Restraints and Miscellaneous Exclusionary Restraints by each network and their member banks, which has structured the market such that there is no incentive for issuers to offer lower interchange fees (*id.* ¶ 308(h)); and (ix) the policies of both networks that they will not be "competitively disadvantaged" with respect to interchange fees, which provides the mutual assurances to continue the spiral of higher prices (*id.* ¶ 308(i)).

These "plus factors" do not provide the requisite "circumstance pointing toward a meeting of the minds." *Twombly*, 550 U.S. at 557. Indeed, the factual allegations that purport to support these "plus factors" actually suggest that the alleged inter-network agreement is not plausible.

### a. *Plus Factors (i) And (ii): Duality, Transparency And Opportunity To Conspire*

Plaintiffs allege that, since 1976, the Visa and MasterCard rules have permitted member banks to issue both Visa- and MasterCard-branded credit cards ("issuance duality") and acquire both Visa and MasterCard transactions from merchants ("acquiring duality"). (Compl. ¶

20

211.)  As a result, the United States memberships of Visa and MasterCard "are virtually identi-

cal."  (*Id.*)  Indeed, "[v]ery few exceptions to Duality exist."  (*Id.* ¶ 212.)  While lacking off-line

debit duality, the debit operations of each network are alleged to be transparent to the other be-

cause virtually all banks that issue Visa debit cards are members of MasterCard and virtually all

banks that issue MasterCard debit cards are Visa members.  (*Id.* ¶ 213.)

      Plaintiffs further allege that, through "governance duality," the banks have "his-

torically exerted control" over the competing networks' operations through simultaneous partici-

pation on the Board and other "important" network committees.  (*Id.* ¶ 214; *see also id.* ¶¶ 215-

16.)  According to plaintiffs, this dual governance by the banks in both networks has continued

into the relevant time period of this lawsuit.  (*Id.* ¶ 218.)  This duality, plaintiffs contend, allows

the networks and their member banks to pass information (*id.* ¶¶ 217, 223) and "communicate

frequently, exchange data and coordinate much of their activity through joint programs and par-

allel activity," (*id.* ¶ 222), even after the networks' corporate restructurings.  (*Id.* ¶ 223.)  Plain-

tiffs allege that, as a consequence, competition between the networks "has lessened . . . because

[duality] makes the Member Banks less willing to implement policies that would increase com-

petition between Visa and MasterCard for the business of merchants."  (*Id.* ¶ 221.)[10]

      Plaintiffs' duality allegations are not new.  The Department of Justice made simi-

lar claims when it brought suit against Visa and MasterCard in 1998 to challenge, among other

things, the legality of dual governance of the networks by the member banks.  *See* Complaint for

Equitable Relief for Violations of 15 U.S.C. § 1 ("DOJ Complaint") at ¶¶ 40-65, *United States v.

Visa U.S.A. Inc.*, No. 98 Civ. 7076, 1998 WL 34279897 (S.D.N.Y. Oct. 7, 1998).  In fact, para-

---

[10]  While plaintiffs have alleged "transparency" as a separate "plus factor" (Compl. ¶ 308(b)), transparency, at its
core, is a manifestation of duality.

graph 214 of this Complaint mirrors paragraph 49 of the DOJ Complaint, and paragraph 220 of this Complaint essentially repeats the allegations in paragraphs 52, 60 and 61 of the DOJ Complaint.  After trial, Judge Jones found that governance duality was not shown to be anticompetitive, *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 345 (S.D.N.Y.) (Jones, J.), *modified on other grounds*, 183 F. Supp. 2d 613 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003), and found that duality and the structure of the associations had pro-competitive effects, including "rapid innovation in systems, product offerings, and services" and numerous other efficiencies. 163 F. Supp. 2d. at 334.

Plaintiffs' own arguments reveal the inadequacy of their duality allegations.  If, for instance, duality has existed since 1976, as plaintiffs allege in paragraph 211 of the Complaint, what is it about duality that gives plausibility to plaintiffs' allegations that an agreement can be inferred because the networks have engaged in "parallel and stair-step" pricing increases since 2002 (Compl. ¶ 308(d))?  Plaintiffs' failure to differentiate the effects of duality on defendants' pre-conspiracy and allegedly conspiratorial conduct demonstrates that no particular inference should reasonably be drawn from plaintiffs' duality allegations.

At most, plaintiffs' duality allegations amount to an "opportunity to conspire" – a "plus factor" that repeatedly has been held to be an insufficient ground from which to infer an agreement.  *See Twombly*, 550 U.S. at 544 n.12 (refusing to infer conspiracy from defendants' participation in an industry trade association); *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 545 (2d Cir. 1993) ("The mere opportunity to conspire does not by itself support the inference that . . . an illegal combination actually occurred."); *see also Discover Fin. Serv., LLC v. Visa U.S.A. Inc.*, 04-CV-7844 (BSJ)(DFE), 2008 U.S. Dist. LEXIS 63566, at *49-50 (S.D.N.Y. Aug. 20, 2008) ("Discover's argument hinges in large part upon the

imputation of conspiratorial motives merely by dint of the overlapping membership of several banks in both the Visa and MasterCard associations, and the assumption that any pressure placed by those banks was done so to further Visa's, rather than MasterCard's interests.  The fact of duality alone does not permit such a series of speculative inferences."); *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 963-64 (N.D. Cal. 2007) (rejecting inference of conspiracy from dual membership in Visa and MasterCard, which the plaintiffs argued provided opportunities to conspire); *cf. Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1319 (11th Cir. 2003) ("Indeed, the opportunity to fix prices without any showing that appellees *actually* conspired does not tend to exclude the possibility that they did not avail themselves of such opportunity or, conversely, that they actually did conspire.  Appellants may not rely on this proposition to support their allegations in this case.").

Plaintiffs' duality allegations accordingly do not plausibly exclude independent action or provide the "factual enhancement" required to move plaintiffs' inter-network conspiracy claim across "the line between possibility and plausibility of 'entitle[ment] to relief." *Twombly*, 550 U.S. at 557.

### b.  *Plus Factor (iii):  Visa And MasterCard Network Services Are Indistinguishable*

Because of the "identity between products," plaintiffs assert that Visa, MasterCard and their member banks should be principally competing on price "but they do not." (Compl. ¶ 235.)  Taking as true plaintiffs' allegation that Visa and MasterCard transactions are "identical" and "indistinguishable," one would expect pricing between the networks to be naturally similar, with or without an inter-network agreement.  *See, e.g., In re LTL Shipping Servs. Antitrust Litig.*, No. 1:08-MD-01895, 2009 U.S. Dist. LEXIS 14276, at *69-70 (N.D. Ga. Jan. 29, 2009) ("In a homogeneous industry each major player has the same incentive to charge the same

surcharge and realize the same improved profit margin.  These circumstances do not indicate anticompetitiveness, they indicate a close and competitive industry."); *In re Late Fee*, 528 F. Supp. 2d at 964 ("Similar cost structures would explain why the defendants' prices would naturally be similar without the need for any agreement.").

The alleged "parity" of Visa's and MasterCard's pricing is thus as likely to indicate competitiveness as it is conspiracy, and therefore, no inference of unlawful conspiracy may be drawn.

### c.   *Plus Factor (v):  Profit Motive To Conspire*

Plaintiffs allege that defendants have "a profit motive to restrain inter-Network competition that might result in lower interchange fees."  (Compl. ¶¶ 213, 225-26.)  A "profit motive to restrain . . . competition" does not support the inference of a conspiracy.  *See In re Baby Food*, 166 F.3d at 134-35 ("profit is always a motivating factor in the conduct of a business. Profit is a legitimate motive in pricing decisions, and something more is required before a court can conclude that competitors conspired to fix pricing in violation of the Sherman Act"); *In re Late Fee*, 528 F. Supp. 2d at 964 ("As one court put it, if 'a motive to achieve higher prices' were sufficient, every company in every industry could be accused of conspiracy because they all 'would have such a 'motive.'"); 6 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1412(a) (2d ed. 2003) ("The presence of a motivation to conspire does not mean that a conspiracy has occurred. . . . [And] is an insufficient ground for finding a conspiracy.").  An allegation of a "motive to conspire" is "nothing more than an assertion of interdependence."  *In re Digital Music*, 2008 U.S. Dist. LEXIS 79764, at *36; *see also In re Baby Food*, 166 F.3d at 135 ("if a firm's motivation is merely to meet rival prices, it would constitute only interdependence").  And interdependence does not establish a conspiracy.  *See Twombly*, 550 U.S. at 554; *see also* 6

Areeda & Hovenkamp, *supra*, ¶ 1433(a) ("The courts are nearly unanimous in saying that mere interdependent parallelism does not establish the contract, combination, or conspiracy required by Sherman Act § 1."). As with the "opportunity to conspire," a "profit motive" fails to provide the necessary factual predicate to infer an agreement.

### d. *Plus Factors (iv), (vi) And (ix): Parallel Pricing*

Plaintiffs allege that a "trend towards uniformity in pricing," facilitated and exacerbated by duality, started prior to the networks' IPOs and has continued even after the IPOs. (*See* Compl. ¶ 224.) Plaintiffs further allege that, in 2002, the Visa member banks "exacerbated the effects of duality" by causing Visa to "enact, publicize and adhere to a policy that Visa 'will not be disadvantaged' on interchange fees vis-à-vis MasterCard *and American Express*." (*Id.* ¶ 227 (emphasis added).) According to plaintiffs, these Visa member banks, also members of MasterCard, subsequently caused MasterCard to "adopt a policy of engaging in 'competitive response'" to Visa's increases in interchange fees. (*Id.*; *see also id.* ¶¶ 230-31.) Since the adoption of these "twin policies," plaintiffs allege that "the average effective interchange rates of Visa and MasterCard have been virtually identical." (*Id.*) Visa and MasterCard are aware of each other's policies "through communications with their dual Member Banks." (*Id.* ¶ 228.) Because each network knows of the other's policy, neither network has an incentive to compete for merchant acceptance on interchange fee levels. (*Id.* ¶ 229.) Industry-wide knowledge of these twin policies has "led the Banks and the Networks to a meeting of the minds that Visa and MasterCard will match each other's effective Interchange Fees." (*Id.*) The combination of all this means that "virtually without exception, an Interchange Fee increase by either Visa or MasterCard is followed by a similar Interchange Fee increase by the other network." (*Id.* ¶ 232.)

25

The adoption and announcement of policies by the networks not to be competitively disadvantaged vis-à-vis one another is nothing more than conscious parallelism. *See Market Force Inc. v. Wauwatosa Realty Co.*, 906 F.2d 1167, 1172 (7th Cir. 1990) ("evidence that brokers were aware of other brokers' policies regarding buyers' brokers before enacting their own policy is nothing more than a restatement of conscious parallelism"). Similarly, allegations that the networks' effective interchange fees move in "parallel and stair step fashion," is just another way of restating conscious or "sequential" parallelism, which "by itself is not enough to support an antitrust conspiracy case." *Id.*; *see also In re Digital Music*, 2008 U.S. Dist. LEXIS 79764, at *40 ("Plaintiffs' ambiguous allegation of price increases does not support an inference of agreement because that conduct, as alleged, is consistent with sequential parallelism."). Parallel behavior "represents a condition, not a 'method;' indeed, it could be consistent with intense competition." *E.I. du Pont de Nemours & Co. v. FTC*, 729 F.2d 128, 139 (2d Cir. 1984); *see also In re Elevator*, 502 F.3d at 51 (concluding that "similar pricing can suggest competition at least as plausibly as it can suggest anticompetitive conspiracy").

In fact, paragraph 227 of the Complaint tends to make an inference of conspiracy implausible because it sets forth a legitimate business explanation for "parallel and stair-step" interchange fee increases following Visa's adoption of its "will not be disadvantaged" policy and MasterCard's subsequent "competitive response": competition with American Express for issuers' portfolios. Likewise, plaintiffs' Second Supplemental Class Action Complaint, which is incorporated in paragraph 261 of the Complaint, supports that same legitimate business explanation for the networks' interchange increases: the networks "*compete . . .* by incenting banks to issue Visa-branded Payment Cards through consistent escalation of Interchange Fees." (Supp. Compl. ¶ 76 (emphasis added); *see also id.* ¶ 40 (alleging that Visa and MasterCard have created

a "market in which the only way that the Networks could compete with each other was through consistently increasing the level of Interchange Fees that they promised to Issuers").)

These allegations undermine plaintiffs' effort to use allegedly parallel rate increases to raise an inference of unlawful conspiracy. Interchange rates have increased because the networks are competing with each other and with American Express to convince banks to issue their branded payment cards. *United States v. Visa*, 163 F. Supp. 2d at 367 (Visa and MasterCard compete for issuers through the use of "cash incentives" that they offer to their members). Not only have plaintiffs failed to plead facts that would "tend[] to exclude the possibility of independent action," *Twombly*, 550 U.S. at 554, they have alleged facts totally consistent with competitive behavior.

Plaintiffs' allegation in paragraph 229 that Visa's and MasterCard's price increases are a result of a "meeting of the minds" adds nothing. The essence of paragraph 229 is that (i) both MasterCard and Visa have an expectation as to the other's "competitive response" following an interchange fee increase; (ii) neither Visa nor MasterCard has an "incentive" to compete on interchange fee levels; and (iii) knowledge of this has led to a "meeting of the minds." But "'price uniformity is normal in a market with few sellers and homogeneous products.' This is because all producers in an oligopoly must charge roughly the same price or risk losing market share." *Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan, Inc.*, 203 F.3d 1028, 1031 (8th Cir. 2000) (quoting *E.I. du Pont*, 729 F.2d at 139). And as one district court has recognized, "[t]here is no agreement . . . merely because an oligopolist charges an inflated price knowing (or even hoping) that other oligopolists will match his high price." *In re Digital Music*, 2008 US Dist. Lexis 79764, at *37.

27

Similarly, plaintiffs' allegation in paragraph 233 that there must be a conspiracy because, if there were not, then Visa and MasterCard would not have had the economic incentive to match each other's price increases does not make plaintiffs' inter-network conspiracy any more plausible. In *Twombly*, plaintiffs' had similarly alleged that a conspiracy could be inferred from the fact that the defendant ILECs passed up "especially attractive business opportunit[ies]" by declining to compete against each other. 550 U.S. at 568. The Court held this allegation did not make conspiracy plausible because, while the complaint made reference to "especially attractive business opportunit[ies]," it did not allege that competition "was potentially any more lucrative than other opportunities being pursued . . . during the same period." *Id.; see also Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*, 467 F.3d 283, 293 (2d Cir. 2006) (claim that, but for a MasterCard rule, "increased competition from Discover and American Express would have forced MasterCard to adopt policies more favorable to Paycom" was "highly speculative"). Because plaintiffs here have failed to allege any facts that would establish that either network would have engaged in a strategy to lower interchange rates, or that it would have been more lucrative for each network to adopt such a strategy, conspiracy is not any more plausible than independent action.

Because defendants' allegedly parallel pricing may be equally well explained by non-anti-competitive reasons, plaintiffs' parallel pricing allegations do not give rise to an inference of conspiracy

### e.    *Plus Factor (vii): Networks Have Substantial Market Power*

Plaintiffs allege that Visa and MasterCard each have "substantial market power" and the "incentive and ability" to maintain interchange fees at supracompetitive levels. (Compl. ¶ 308(g).) An allegation of "market power," however, is insufficient to state a Section 1 claim. *See Twombly*, 550 U.S. at 550 n.1 (concluding that plaintiffs failed to state a Section 1 claim

even when defendants were alleged to have a 90% market share).  Courts also have stated that "allegations of oligopoly are insufficient to state a claim under the antitrust laws." *In re Elevator Antitrust Litig.*, No. 04 CV 1178, 2006 U.S. Dist. LEXIS 34517, at *30 (S.D.N.Y. May 30, 2006), *aff'd*, 502 F.3d 47 (2d Cir. 2007); *see also E.I. du Pont*, 729 F.2d at 139 ("The mere existence of an oligopolistic market structure in which a small group of manufacturers engage in consciously parallel pricing of an identical product does not violate the antitrust laws.").

> ### f.    Plus Factor (viii):  Adoption Of Anti-Steering And Miscellaneous Exclusionary Restraints Disincentivizes Lower Interchange Fees

Plaintiffs allege that the member banks of Visa and MasterCard have caused each of the networks to adopt certain rules that affect the ability of merchants to offer lower prices to generate more sales.  Aside from the conclusory assertions in paragraph 234 of the Complaint that "[d]uality has . . . facilitated a high degree of uniformity in the Anti-Steering Restraints and Miscellaneous Exclusionary Restraints" and the "lack of significant non-price competition is evidence of collusion," plaintiffs have alleged no corroborating facts.  Moreover, as with pricing uniformity, the "high degree of uniformity" in both networks' rules is consistent with competitive behavior.  Plaintiffs have not pleaded otherwise.

> ### 3.    The Alleged Conduct Can Be Explained As Natural Unilateral Behavior

Just as in *Twombly*, the combination of one or more plus factors does not alter the fact that defendants' conduct can be explained by "natural" market conditions facing the defendants and is completely consistent with unilateral behavior and lawful, independent business goals.  And because plaintiffs have not pleaded any facts that tend to exclude the possibility of independent action or that would indicate the "restricted freedom" or "sense of obligation" ordinarily associated with an agreement, they have failed to measure up to the *Twombly* standard for

pleading a Section 1 conspiracy. *See In re Digital Music*, 2008 U.S. Dist. LEXIS 79764, at *41 (finding that facts "just as consistent with independent action are insufficient as a matter of law").

## IV.   PLAINTIFFS' POST-IPO CONSPIRACY CLAIMS SHOULD BE DISMISSED

Because the Visa and MasterCard IPOs cut off potential antitrust liability from the dates of those IPOs onward, plaintiffs try to keep antitrust claims for post-IPO conduct alive by asserting four new claims for relief. These claims are premised on the theory that each bank that participates in the Visa or MasterCard network allegedly entered into a horizontal agreement with every other participating bank to "abide by" the respective network's bylaws and rules.[11] The allegations in the Complaint, however – which allege nothing more than a series of *vertical* agreements, each between a network and an individual bank – are insufficient to state a horizontal conspiracy claim. Moreover, merely accepting and following rules established by an association or other organization is not sufficient to establish a horizontal agreement in violation of the antitrust laws.

### A.   *Plaintiffs Allege No Facts Establishing An Agreement Among The Banks*

Plaintiffs have failed to allege any factual basis for the purported horizontal "agreement" among the thousands of banks that participate in each network. A complaint must contain "[f]actual allegations" that are "enough to raise a right to relief above a speculative level" – mere "labels and conclusions . . . will not do." *Twombly*, 550 U.S. at 555. Here, plaintiffs have failed to allege even the most rudimentary factual basis for the purported horizontal

---

[11]   These claims are the Seventeenth, Eighteenth, Nineteenth and Twentieth claims in the Complaint. The Nineteenth claim for relief, which asserts a claim against Visa under California's Cartwright Act, should be dismissed for the same reasons that the Sherman Act claims should be dismissed. *See Marin County Bd. of Realtors v. Palsson*, 549 P.2d 833, 835 (Cal. 1976) (Cartwright Act is patterned after the Sherman Act and "federal cases interpreting the Sherman Act are applicable to problems arising under the Cartwright Act."); *see also Mailand v. Burckle*, 572 P.2d 1142, 1147-48 (Cal. 1978) (same).

agreements.  They do not come close to alleging the "conscious commitment to a common scheme" that is the hallmark of any conspiracy.  *Monsanto*, 465 U.S. at 764.

The inadequacy of plaintiffs' conspiracy allegations is apparent from what plaintiffs *do* – and what they *do not* – allege.  For example, plaintiffs allege in conclusory terms that "after the Networks' restructuring attempts and IPOs, each Member Bank that participates in the Visa or MasterCard network agrees to abide by the respective Network's bylaws and rules." (Compl. ¶ 433.)  It is those bylaws and rules, according to plaintiffs, that "require that [the Networks'] default uniform schedules of Interchange Fees apply to all transactions." (*Id.* ¶ 437.) Plaintiffs further allege that each member bank "understands that all other banks that participate in that network agree to abide by the same bylaws and rules, including those rules that apply the network's uniform schedule of default Interchange Fee[s] to every transaction on the network." (*Id.* ¶ 440.)

Notwithstanding these labels and conclusions, there is not a single allegation in the Complaint that the banks ever communicated with each other regarding the terms of their respective agreements with either of the networks.  There is not a single allegation that the banks ever discussed whether they would "abide by" network rules and regulations purportedly required under their respective licensing agreements (such as the a rule establishing "default" interchange rate).  Nor is there a single allegation that the banks ever acknowledged to each other that they would do so.  *See, e.g., PepsiCo v. Coca-Cola Co.*, 315 F.3d 101, 110 (2d Cir. 2002) (affirming summary judgment where plaintiffs failed to proffer evidence of direct communications between the spokes of the alleged hub-and-spoke conspiracy).

**B.**     ***Plaintiffs Allege A "Rimless" Hub-and-Spoke Arrangement***
           ***That Is Insufficient To State A Horizontal Conspiracy Claim***

The few facts plaintiffs have alleged – that each bank has an agreement with a network that requires, inter alia, the banks to follow certain network rules and regulations – establish nothing more than a series of independent vertical agreements, each between an individual bank and an individual network.  Because, as noted above, plaintiffs do not allege any facts to establish that any banks entered into any agreements with each other, plaintiffs ultimately allege nothing more than two "rimless" hub-and-spoke conspiracies, each with a single network – Visa or MasterCard – purportedly serving as the center or "hub" of each conspiracy.  Such rimless hub-and-spoke arrangements are insufficient to allege a horizontal conspiracy because "[w]hat makes [a] series of agreements an actionable conspiracy . . . is some set of facts that shows a connecting agreement among the horizontal competitors that form the spokes; this is the 'rim' of the wheel."  1 ABA Section of Antitrust Law, Antitrust Law Developments 25 (6th ed. 2007)[12]

Although courts have recognized factual circumstances in which a horizontal agreement or "rim" may be inferred, those circumstances are not present here.  In *Interstate Circuit, Inc. v. United States*, 306 U.S. 208 (1939), for example, a movie exhibitor sent a letter to eight movie distributors – naming all as addressees – asking each of them to establish a minimum price for first-run theaters and adopt a policy against playing double features at night.  *See id.* at 215-17, 225-27.  The fact that the distributors' actions would have reduced output and thus

---

[12]  *See also Dickson v. Microsoft Corp.*, 309 F.3d 193, 203-04 (4th Cir. 2002) ("A rimless wheel conspiracy is one in which various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other than the common defendant's involvement in each transaction . . .. [But] a wheel without a rim is not a single conspiracy." (citations omitted)); *Spectators' Comm. Network, Inc. v. Colonial Country Club*, 253 F.3d 215, 224 (5th Cir. 2001) (plaintiffs failed to establish a hub-and-spoke conspiracy because "there must be an agreement between more than one competitor at the same level to make a horizontal restraint").

would have been contrary to their own economic self-interests if they had been acting independently – which was crucial to the Supreme Court's decision in finding a hub-and-spoke conspiracy – is absent here.  Similarly, in *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000), individual toy manufacturers entered into vertical arrangements with Toys "R" Us that they would not sell certain popular toys to discount warehouse clubs expressly "on the condition that their competitors would do the same." *Id.* at 932.  That express condition, plus the fact that the agreements explicitly required the manufacturers to act contrary to their independent economic interest by refraining from selling toys and thereby sacrificing sales, as well as evidence of communications between the toy manufacturers regarding the alleged conspiracy, was deemed sufficient to establish a horizontal agreement among the toy manufacturers.  *Id.*

Here, there are no factual allegations that any banks communicated with each other regarding their individual agreements with the networks, and there are no allegations that banks entered agreements that would be contrary to their independent economic self-interest.  Although plaintiffs attempt to allege such a horizontal agreement between the banks by virtue of each bank's vertical agreement with a network to comply with default interchange rules (*see* Compl. ¶ 439), they fail to allege either why such individual commitments are against a bank's individual self-interest or reflect an express "conditional" agreement by the bank that it is only participating if other banks agree to the same terms.

Plaintiffs otherwise attempt to rely on a series of vertical agreements – each between an individual bank and an individual network – to adhere to a network's rules and regulations.  But as the Ninth Circuit recently held, "merely charging, adopting or following the fees set by a Consortium is insufficient as a matter of law to constitute a violation of Section 1 of the Sherman Act." *Kendall*, 518 F.3d at 1048; *see also Toscano v. Professional Golfers' Ass'n*, 258

F.3d 978, 983 (9th Cir. 2001) (finding "no direct or circumstantial evidence of an agreement in restraint of trade because defendants merely accepted the . . . rules and regulations and played no role in creating or enforcing them); *American Airlines v. Christensen*, 967 F.2d 410, 413-14 (10th Cir. 1992) (mere acceptance by members of terms under an agreement set by the airlines does not result in concerted action sufficient to support a Section 1 violation).

Moreover, taken to its logical conclusion, the theory underlying plaintiffs' post-IPO claims would lead to the incorrect result of imposing antitrust liability on any distributor who adhered to a manufacturer's pro-competitive territorial or customer restrictions if the distributor believed that the same restrictions were being imposed on other distributors. *See Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*, 602 F.2d 1025, 1030 (2d Cir. 1979) (Sherman Act "does not condemn every business decision as a § 1 conspiracy merely because it is the product of an agreement between two persons or entities legally capable of conspiring. A manufacturer may announce the terms under which he will market his product and deal only with those customers who agree to abide by the terms." (citation omitted)); *see also Beutler Sheetmetal Works v. McMorgan & Co.*, 616 F. Supp. 453, 456 (N.D. Cal. 1985) (acquiescence by contractors in trust fund's demands that contractors use union-only subcontractors was not an actionable conspiracy under Section 1). The fact that individual banks each agree separately *with a network* to abide by certain rules – even if they anticipate or expect that other banks may be following the same rules – is insufficient to establish an unlawful agreement *among the banks* in violation of Section 1.

Plaintiffs cannot cure these fatal pleading defects by alleging in a wholly conclusory fashion that the banks together "designated a common agent" – *i.e.*, Visa and MasterCard – to "fix" interchange fees. (Compl. ¶¶ 444, 451.) Of course, in every "rimless" hub-and-spokes conspiracy it is always possible to conclusorily assert that the "hub" (here, Visa or MasterCard)

is merely a designated "agent" for the spokes (here, the banks), so that what looks like a vertical agreement is in reality a conspiracy controlled by horizontal competitors. Plaintiffs here, however, simply allege no *facts*, as they must under *Twombly*, suggesting that after the IPOs the banks agreed among themselves to control the networks and designate them as their agents, instead of the networks making decisions independently from the banks. Moreover, they simply have alleged no facts that would suggest it was against the banks' independent self-interest to follow network rules, separate and apart from any conspiracy, requiring rejection of their "agency" theory under *Twombly*.

### C. *Plaintiffs Cannot Rely On Parallel Conduct Where, As Here, That Conduct Is Equally Explained By The Independent Economic Interest of Each Bank*

In the absence of any allegations that show a horizontal agreement among the banks, plaintiffs are left with allegations of allegedly "parallel" conduct by the banks – *i.e.*, that each bank agreed with a network to abide by the network's "rules," including the default interchange rate. But "a complaint seeking to plead an agreement based on parallel conduct must allege facts to show some "further circumstance pointing to a meeting of the minds" and not "merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557. These alleged facts must establish a "plausible grounds to infer an agreement." *Id.* at 556.

The conduct plaintiffs allege here – the series of individual licensing agreements between individual banks and an individual network – is at best purely parallel conduct. As noted above, plaintiffs allege nothing suggesting that the banks had a "meeting of the minds" under which each of them would continue to abide by each network's rules. Nor do plaintiffs allege anything suggesting that each bank's decision to enter an agreement with a network – and to abide by the network's rules – was prompted by anything other than a rational and competitive independent business strategy. Indeed, to the extent that each network imposed certain rules –

35

and demanded that each bank agree to abide by those rules – it is perfectly rational that each bank, desiring to issue cards accepted by that network, would find it in its own independent economic self-interest to abide by those rules. *See In re Elevator*, 502 F.3d at 50-52 (rejecting allegations of parallel conduct that were as consistent with rational competition as with conspiracy).

In light of the foregoing, plaintiffs' post-IPO conspiracy claims should be dismissed.

## V.      AMENDMENT WOULD BE FUTILE

Giving plaintiffs the opportunity to amend the Complaint would be futile.  Plaintiffs have already been granted one opportunity to amend, and their failure to allege sufficient facts to support their claims the second time around should not be excused.  This is particularly so here since plaintiffs' most recent amendment was made with the benefit of massive discovery. Accordingly, if the Court grants defendants' motion, it should deny plaintiffs leave to amend the Complaint.  *See, e.g., Hassan v. Spicer*, No. 05-CV-1526 (FB)(LB), 2006 U.S. Dist. LEXIS 3571, at *16-17 (E.D.N.Y. Jan. 31, 2006) (holding that leave to amend would be futile since the defects in plaintiff's complaint were "not merely the result of inartful pleading; rather, they indicate substantive obstacles to stating claims against the defendants"), *aff'd*, 216 Fed App'x 123 (2d Cir. 2007); *Ryan v. Hunton & Williams*, No. 99-CV-5938 (JG), 2000 WL 1375265, at *11 (E.D.N.Y. Sept. 20, 2000) (Gleeson, J.) (denying plaintiffs leave to amend their complaint because an opportunity to amend would be futile given that plaintiffs "drafted [the] complaint well after discovery had been taken in a related case" and plaintiffs had access to that discovery).

## *Conclusion*

For all of the foregoing reasons, the Second Consolidated Amended Class Action Complaint should be dismissed in its entirety.

Dated: New York, New York
      March 31, 2009

Respectfully submitted,

**ARNOLD & PORTER LLP**

By: /s/ Robert C. Mason
    Robert C. Mason
    399 Park Avenue
    New York, NY  10022-4690
    Tel:  (212) 715-1000
    Fax:  (212) 715-1399
    robert.mason@aporter.com

    Robert J. Vizas
    275 Battery Street, Suite 2700
    San Francisco, CA  94111
    Tel:  (415) 356-3000
    Fax:  (415) 356-3099

    Mark R. Merley
    Matthew A. Eisenstein
    555 12th Street, N.W.
    Washington, DC  20004
    Tel:  (202) 942-5000
    Fax:  (202) 942-5999
    *Attorneys for Defendants Visa Inc., Visa U.S.A.*
    *Inc., and Visa International Service Association*

**PAUL, WEISS, RIFKIND, WHARTON &**
    **GARRISON LLP**

By: /s/ Kenneth A. Gallo
    Kenneth A. Gallo
    Joseph J. Simons
    2001 K Street, N.W.
    Washington, DC  20006-1047
    Tel:  (202) 223-7300
    Fax:  (202) 223-7420
    KGallo@paulweiss.com
    JSimons@paulweiss.com

    Bruce Birenboim
    Andrew C. Finch
    Gary R. Carney
    1285 Avenue of the Americas

New York, NY  10019-6064
Tel:  (212) 373-3000
Fax:  (212) 757-3990
BBarenboim@paulweiss.com
AFinch@paulweiss.com
GCarney@paulweiss.com

**HUNTON & WILLIAMS LLP**
Keila D. Ravelo
Wesley R. Powell
200 Park Avenue
New York, NY  10166-0005
Tel:  (212) 309-1000
Fax:  (212) 309-1100
*Attorneys for Defendants MasterCard*
*Incorporated and MasterCard International*
*Incorporated*

**MORRISON & FOERSTER, LLP**

By: */s/ Mark P. Ladner*
    Mark P. Ladner
    Michael B. Miller
    1290 Avenue of the Americas
    New York, NY  10104-0050
    Tel:  (212) 468-8000
    Fax:  (212) 468-7900
    mladner@mofo.com
    *Attorneys for Defendants Bank of America, NA.,*
    *BA Merchant Services LLC (f/k/a Defendant*
    *National Processing, Inc.), Bank of America*
    *Corporation, and MBNA America Bank, N.A.*

**SHEARMAN & STERLING LLP**

By: */s/ James P. Tallon*
    James P. Tallon
    Wayne D. Collins
    Lisl J. Dunlop
    599 Lexington Avenue
    New York, NY 10022-6069
    Tel:  (212) 848-4000
    Fax:  (212) 848-7179
    jtallon@shearman.com
    *Attorneys for Defendants Barclays Financial*
    *Corp. and Barclays Bank plc*

**O'MELVENY & MYERS LLP**

By: /s/ Andrew J. Frackman

Andrew J. Frackman
Edward D. Hassi
Peter C. Herrick
Times Square Tower
7 Times Square
New York, NY 10036
Tel: (212) 326-2000
Fax: (212) 326-2061
afrackman@omm.com
*Attorneys for Defendants Capital One Bank
(USA), N.A., Capital One, N.A., Capital One
Bank, Capital One F.S.B., and Capital One Fi-
nancial Corp.*

**SKADDEN, ARPS, SLATE, MEAGHER
& FLOM, LLP**

By: /s/ Peter E. Greene

Peter E. Greene
Cyrus Amir-Mokri
Peter S. Julian
Linda W. Cenedella
Boris Bershteyn
Four Times Square
New York, NY 10036
Tel: (212) 735-3000
Fax: (212) 735-2000
peter.greene@skadden.com
*Attorneys for Defendants JPMorgan Chase &
Co., Chase Bank USA, N.A., Chase Paymen-
tech Solutions, LLC and JPMorgan Chase
Bank, N.A. as acquirer of certain assets and li-
abilities of Washington Mutual Bank*

**SIDLEY AUSTIN LLP**

By: /s/ Benjamin R. Nagin

Benjamin R. Nagin
787 Seventh Ave
New York, NY 10019
Tel: (212) 839-5300
Fax: (212) 839-5599

bnagin@sidley.com

David F. Graham
Eric H. Grush
One South Dearborn Street
Chicago, IL 60603
Tel: (312) 853-7000
Fax: (312) 853-7036
*Attorneys for Defendants Citigroup Inc.,*
*Citicorp, and Citibank, N.A.*

**KUTAK ROCK LLP**

By: */s/ John P. Passarelli* _____
    John P. Passarelli
    James M. Sulentic
    The Omaha Building
    1650 Farnam Street
    Omaha, NE 68102-2186
    Tel: (402) 346-6000
    Fax: (402) 346-1148
    john.passarelli@kutakrock.com
    *Attorneys for Defendant First National Bank*
    *of Omaha*

**WILMER CUTLER PICKERING HALE AND
DORR LLP**

By: */s/ Christopher R. Lipsett* _____
    Christopher R. Lipsett
    David S. Lesser
    399 Park Avenue
    New York, NY 10022
    Tel: (212) 230-8800
    Fax: (212) 230-8888
    chris.lipsett@wilmerhale.com

    A. Douglas Melamed
    Ali M. Stoeppelwerth
    Perry A. Lange
    1875 Pennsylvania Ave., N.W.
    Washington, DC 20006
    Tel: (202) 663-6000
    Fax: (202) 663-6363
    *Attorneys for HSBC Finance Corporation and*
    *HSBC North America Holdings, Inc.*

**JONES DAY**

By: /s/ John M. Majoras

John M. Majoras
Joseph W. Clark
51 Louisiana Avenue, N.W.
Washington, DC  20001
Tel:  (202) 879-3939
Fax:  (202) 626-1700
jmmajoras@jonesday.com
jwclark@jonesday.com
*Attorneys for Defendants National City*
*Corporation, National City Bank of Kentucky*

**PULLMAN & COMLEY, LLC**

By: /s/ Jonathan B. Orleans

Jonathan B. Orleans
850 Main Street
P.O. Box 7006
Bridgeport, CT  06601-7006
Tel:  203-330-2000
Fax:  203-576-8888
jborleans@pullcom.com
*Attorney for Defendant Texas Independent*
*Bancshares, Inc.*

**ALSTON & BIRD LLP**

By: /s/ Teresa T. Bonder

Teresa T. Bonder
Valerie C. Williams
1201 W. Peachtree Street, N.W.
Atlanta, GA  30309
Tel:  (404) 881-7000
Fax:  (404) 881-7777
teresa.bonder@alston.com

Naeemah Clark
90 Park Avenue
New York, NY  10016
Tel.: (212) 210-9400
Fax.: (212) 210-9444
*Attorneys for Defendants Wachovia*
*Bank, NA., Wachovia Corporation, and*

41

*Suntrust Banks, Inc.*

**PATTERSON BELKNAP WEBB & TYLER LLP**

By: */s/* William F. Cavanaugh

William F. Cavanaugh
Cecilia B. Loving
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
Tel.: 212-336-2793
Fax: 212-336-2222
wfcavanaugh@pbwt.com
*Attorneys for Defendant Wells Fargo & Company*

**WASHINGTON MUTUAL, INC.** [13]

---

[13] The defendants understand that, on September 26, 2008, defendant Washington Mutual, Inc. filed a voluntary petition under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware and, therefore, that the automatic bankruptcy stay, 11 U.S.C. § 362, applies to plaintiffs' claims against Washington Mutual, Inc. The matter is currently pending in that court as Bankruptcy Case No. 08-12229-MFW.