**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION**<br><br>**This Document Relates to:**<br><br>**All Class Actions** | **MASTER FILE 05-MD-1720 (JG) (JO)**<br><br>**ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS THE
SECOND SUPPLEMENTAL CLASS ACTION COMPLAINT**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND ...........................................................................................................................3

      A.    Visa's Restructuring and IPO ...............................................................................3

          1.  Plaintiffs Allege That Before the IPO, Visa's Board of
              Directors Adopted the Alleged Restraints ...........................................3

          2.  As a Result of the IPO, a Majority of Visa's Directors Are
              Independent of, and Were Not Selected by, the Banks.....................3

      B.    The Court's November 25, 2008 Decision .............................................................6

      C.    The Supplemental Complaint ...............................................................................6

PLEADING STANDARD...............................................................................................................8

ARGUMENT .................................................................................................................................9

I.     The Supplemental Complaint and the Dismissed Complaint Make the
      Same Key Allegations, and the Supplemental Complaint Should Be
      Dismissed Based on the Court's November 25, 2008 Decision .........................................9

      A.    Plaintiffs Fail To State a Claim Because They Cannot Allege Facts
          Establishing That the Independent, Post-IPO Visa Would Act in
          the Banks' Interests, at Visa's Expense ...............................................................10

      B.    The Court Has Already Rejected Plaintiffs' Post-IPO "Ownership
          and Control" Allegations as Insufficient to State a Claim .....................................12

II.    The Supplemental Complaint Does Not Allege Additional Facts Sufficient
      to Overcome the Court's November 25, 2008 Decision....................................................14

      A.    Plaintiffs' Conclusory Allegations that the Post-IPO Visa Will Be
          a Vehicle for Collusion Cannot State a Claim ......................................................14

      B.    Plaintiffs' Allegations of Additional Purported Anticompetitive
          Effects Arising Out of Visa's Becoming a Single Entity Are
          Irrelevant ...............................................................................................................18

III.   Additional, Independent Grounds for Dismissal .............................................................19

i

IV.     Amendment Would Be Futile ............................................................................................20

CONCLUSION.......................................................................................................................20

**TABLE OF AUTHORITIES**

**Cases**                                                                                          **Page(s)**

*Acquaire v. Canada Dry Bottling Co. of New York, Inc.*,
  24 F.3d 401 (2d Cir. 1994)..............................................................................................16

*Barkan v. Amsted Indus., Inc.*,
  567 A.2d 1279 (Del. 1989) .............................................................................................13

*Bayou Bottling, Inc. v. Dr. Pepper Co.*,
  725 F.2d 300 (5th Cir. 1984) ..........................................................................................20

*Bell Atlantic v. Twombly*,
  550 U.S. 554, 127 S. Ct. 1955 (2007)...............................................................................9

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977).........................................................................................................20

*Cuoco v. Morintsugu*,
  222 F.3d 99 (2d Cir. 2000)...............................................................................................20

*De Jesus v. Sears, Roebuck & Co.*,
  87 F.3d 65 (2d Cir. 1996)...................................................................................................8

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*,
  386 F.3d 485 (2d Cir. 2004).............................................................................................19

*Hirsch v. Arthur Anderson & Co.*,
  72 F.3d 1085 (2d Cir. 1995)...............................................................................................8

*Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*,
  159 F.3d 723 (2d Cir. 1998).............................................................................................20

*In re Elevator Antitrust Litig.*,
  502 F.3d 47 (2d Cir. 2007).................................................................................................9

*In re Payment Card Interchange Fee and Merchant Disc. Antitrust Litig.*,
  No. 05-MD-1720, 2008 WL 5082872 (E.D.N.Y. Nov. 25, 2008)................................. *passim*

*Kendall v. Visa U.S.A. Inc.*,
  518 F.3d 1042 (9th Cir. 2008) ...........................................................................................9

*Klonis v. Nat'l Bank of Greece, S.A.*,
  492 F. Supp. 2d 293 (S.D.N.Y. 2007)..............................................................................15

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984) ................................................................................16

*Podiatrist Ass'n Inc. v. La Cruz Azul de Puerto Rico, Inc.*,
    332 F.3d 6 (1st Cir. 2003) .......................................................................15

*RSA Media Inc. v. AK Media Group, Inc.*,
    260 F.3d 10 (1st Cir. 2001) .....................................................................20

*Ryan v. Hunton & Williams*,
    No. 99-CV-5938, 2000 WL 1375265 (E.D.N.Y. Sept. 20, 2000) ...........20

*Subaru Distribs. Corp. v. Subaru of Am., Inc.*,
    425 F.3d 119 (2d Cir. 2005)......................................................................9

*U.S. Football League v. Nat'l Football League*,
    842 F.2d 1335 (2d Cir. 1988)..................................................................16

*White Consol. Indus. Inc. v. Whirlpool Corp.*,
    781 F.2d 1224 (6th Cir. 1986) ..................................................................9

**Statutes**

8 Del. Code Ann. § 203 .................................................................................13

15 U.S.C. § 1 ....................................................................................... *passim*

15 U.S.C. § 18........................................................................................ *passim*

**Other Authorities**

Fed. R. Civ. P. 12(b)(6)....................................................................................8

William M. Fletcher, *Fletcher Cyclopedia Corporations* § 1041.70 (2008)................................13

iv

Defendants in the Second Supplemental Class Action Complaint (the "Supplemental Complaint" or "SSC") respectfully move for an order dismissing that Complaint, for the reasons stated below.[1]

## PRELIMINARY STATEMENT

On November 25, 2008, the Court held that Class Plaintiffs ("Plaintiffs") had failed adequately to plead that MasterCard's initial public offering ("IPO") was likely to substantially lessen competition, and accordingly dismissed Plaintiffs' First Supplemental Class Action Complaint (the "dismissed complaint"). *In re Payment Card Interchange Fee and Merchant Disc. Antitrust Litig.*, No. 05-MD-1720, 2008 WL 5082872 (E.D.N.Y. Nov. 25, 2008) ("Nov. 25, 2008 Op."). Plaintiffs had theorized in the dismissed complaint against MasterCard that, even though a majority of MasterCard's directors were independent of MasterCard's member banks and selected by common stock shareholders, MasterCard's restructuring nonetheless left the banks in control of MasterCard, which purportedly enabled the banks to continue to impose allegedly uniform interchange fees and the so-called "merchant restraints," thereby maximizing bank profits at the expense of MasterCard itself. *Id.* at *3, *9. The Court rejected Plaintiffs' claim. The Court ruled that -- because Plaintiffs failed to assert *how* the banks could exercise sufficient control over the post-IPO MasterCard to cause its independent directors to engage in anticompetitive behavior -- Plaintiffs did not adequately allege that the MasterCard IPO either

---

[1]    Defendants are Visa Inc., Visa U.S.A. Inc., and Visa International Service Association (collectively "Visa"), and Bank of America, N.A., BA Merchant Services LLC, Bank of America Corporation, MBNA America Bank, N.A., Chase Bank USA, N.A., Chase Manhattan Bank USA, N.A., Chase Paymentech Solutions, LLC, JPMorgan Chase Bank, N.A., JPMorgan Chase & Co., Bank One Corporation, Bank One Delaware, National City Corporation, National City Bank of Kentucky, Texas Independent Bancshares, Inc., and Wells Fargo & Company (collectively, the "Bank Defendants").

threatened to substantially lessen competition as required under Clayton Act, Section 7, or caused any actual anticompetitive effects under Sherman Act, Section 1. *Id.* at *10.

Plaintiffs now challenge Visa's restructuring and IPO on the same grounds. The Supplemental Complaint asserts that Visa's IPO and related agreements violate Section 7 of the Clayton Act and Section 1 of the Sherman Act because Visa's member banks "kept effective control" of Visa after the IPO and, under the guise of an "'independent' entity," may impose the alleged restraints with impunity. (SSC ¶ 8.) Thus, as in the dismissed complaint, Plaintiffs make the novel argument that Visa's change of corporate structure, purportedly undertaken to minimize Section 1 risks, instead somehow violated both Section 7 and Section 1 itself.

Again, however, Plaintiffs' own allegations defeat their claim. Plaintiffs admit that, both before and after the IPO, Visa's board of directors retained "ultimate authority" over the conduct challenged in the Second Consolidated Amended Class Action Complaint ("SCACC"). (SCACC ¶¶ 94, 431.[2]) Plaintiffs further acknowledge, as they must, that as a result of the IPO, Visa's member financial institutions surrendered their majority representation on Visa's board, and that a majority of Visa directors are now independent of the banks and selected by non-bank common stock shareholders. (*Id.* ¶ 431; SSC ¶ 141.) Therefore, under the allegations of the Supplemental Complaint, there is no question that, post-IPO, banks do not "control" Visa.

As was true in the dismissed complaint, Plaintiffs do not -- and cannot -- allege facts that make it *plausible* that an independent Visa, controlled by independent directors with fiduciary duties to act in Visa's best interests, would adopt measures contrary to Visa's own best interests in order to benefit the banks at Visa's expense. The various assertions Plaintiffs otherwise make

---

[2]   The Supplemental Complaint incorporates "each and every factual allegation and definition of the Second Consolidated Amended Class Action Complaint as if fully set forth [t]herein." (SSC ¶ 10.)

to suggest that the banks somehow retain control either have been rejected by the Court's

November 25, 2008 decision (*e.g.*, restrictions on share ownership) or are defective as a matter

of law.  Accordingly, the Supplemental Complaint should be dismissed.

## BACKGROUND

### A.    Visa's Restructuring and IPO

#### 1.    Plaintiffs Allege That Before the IPO, Visa's Board of Directors Adopted the Alleged Restraints

According to the Supplemental Complaint, before the challenged IPO, Visa was a private

membership corporation that consisted of more than 14,000 financial institution members in the

United States and more than 22,000 worldwide.  (SSC ¶ 33.)  Until the restructuring, "[t]he

Member Banks were holders of shares in Old Visa, which entitled them to certain rights within

the Visa association.  Importantly for purposes of [the] Supplemental Complaint, Old Visa's

Member Banks elected a Board of Directors . . . ."  (*Id.* ¶ 38.)  Plaintiffs allege that, pre-IPO, the

banks "delegated" to Visa's board of directors the authority to "fix[ ] uniform Interchange Fees

and impose[ ] the anticompetitive Anti-Steering Restraints and Miscellaneous Exclusionary

Restraints, tying and bundling arrangements, and exclusive-dealing."  (SCACC ¶ 94.)

#### 2.    As a Result of the IPO, a Majority of Visa's Directors Are Independent of, and Were Not Selected by, the Banks

In March 2008, Visa completed an IPO through which it sold more than 400 million

shares of voting class A common stock to the general public.  (SSC ¶ 114; Amend. 4 to Form S-

1,[3] at 7.)  To effectuate this offering, Visa converted all of its outstanding common stock, which

---

[3]    Visa Inc., Amendment No. 4 to Form S-1 Registration Statement (Form S-1/A) (Feb. 25, 2008) ("Amend. 4 to Form S-1").  A copy of Amend. No. 4 to Form S-1 is attached to the accompanying Declaration of Michael Hartman as Ex. A.  As discussed below, the Court properly may consider Visa's SEC filings because the Supplemental Complaint refers to and relies on those documents.  *See, e.g.*, Nov. 25, 2008 Op. at *2 n.1 (relying on MasterCard's

Footnote continued on next page

was then held by member banks of Visa's subsidiaries -- *i.e.*, Visa U.S.A., Visa Canada, and

three unincorporated geographic regions of Visa International (Visa Asia Pacific, Latin

America/Caribbean, and Central Europe/Middle East/Africa) -- as well as by Visa Europe and

VESI (a subsidiary of Visa Europe).  (SSC ¶¶ 113-14; Form S-4,[4] at 1.)  Post-IPO, those banks

received shares of Visa based on geographic region:  members of Visa U.S.A. acquired class B

common stock; banks associated with Visa Canada and the three unincorporated geographic

regions of Visa International acquired class C (series I) common stock; and Visa Europe

acquired class C (series II, III, and IV) common stock.  (SSC ¶ 115; Form S-1,[5] at 7.)

      The terms of the public offering imposed ownership restrictions on each class of common

stock.  Significantly, Visa's member financial institutions were not permitted to hold voting class

A common stock.  (Amend. 4 to Form S-1, at ii:  "All shares of class A common stock acquired

by a Visa member . . . will be converted automatically into class C common stock."[6])

Conversely, Visa's member financial institutions may hold only class B and C common stock.

(SSC ¶ 115.)  In addition, absent approval of Visa's board of directors, no individual entity may

own more than 15% of the aggregate shares of the outstanding class A stock.  (SSC ¶ 116;

Amend. 4 to Form S-1, at 229.)

---

Footnote continued from previous page

securities filings referenced in the dismissed complaint and attached to MasterCard's Memorandum of Law in support of dismissal).

[4]    Visa Inc., Form S-4 Registration Statement (Form S-4) (June 22, 2007) ("Form S-4").  A copy of Form S-4 is attached to the accompanying Declaration of Michael R. Hartman as Ex. B.

[5]    Visa Inc., Form S-1 Registration Statement (Form S-1) (Nov. 9, 2007) ("Form S-1").  A copy of Form S-1 is attached to the accompanying Declaration of Michael R. Hartman as Ex. C.

[6]    The automatic conversion referenced above does not apply in limited circumstances not alleged here -- namely, if a Visa member acquires shares of Class A common stock (i) for "its own account as a principal investor or for the account of an affiliate of such Visa member that is acting as a principal investor," or (ii) "in connection with [the member's] brokerage, market making, custody, investment management or similar operations or acquired by any investment fund managed by a Visa member . . . ."  (Amend. 4 to Form S-1, at 223.)

The terms of the public offering also conveyed different voting and control rights to the three classes of Visa stock.  One share of class A stock entitles its holder to one vote.  (Amend. 4 to Form S-1, at 11.)  Class B and C common stock, held by the banks, have no voting rights, except in the case of certain "extraordinary transactions" such as "a proposed consolidation or merger, a decision to exit our core payments business or any other vote required by law."  (*Id.* at 11, 38.)  A decision to exit the core payments business requires an 80% approval of voting shares.  (Form S-1, at 187-88; SSC ¶ 117.)

For three years after the date of the IPO, class A shareholders are entitled to elect 10 of the 17 directors on Visa's board of directors.  (Amend. 4 to Form S-1, at 32, 177.)  Visa's CEO holds one board seat.  (*Id.*)  The banks that hold the Class B and C shares have the right to minority board representation:  two directors from the U.S.A. region, and one director each from the Canada, Asia Pacific, Latin America/Caribbean, and Central Europe/Middle East/Africa regions of the world.  (SSC ¶ 116; Amend. 4 to Form S-1, at 177.)  The banks that hold the class B and C stock "are not otherwise entitled to vote in the election of directors."[7]  (Amend. 4 to Form S-1, at 32.)  In addition, at all times, Visa's board of directors must "be comprised of at least 58% independent directors" that may not be elected by the banks.  (*Id.* at 177.)

According to Plaintiffs' allegations, "even after [Visa's] restructuring attempt[ ] and IPO [ ]," Visa's board of directors has the "ultimate authority to establish [Visa's] uniform schedules of default Interchange Fees."[8]  (SCACC ¶ 431.)  But the board is not controlled by financial

---

[7]   Although not material to resolve this motion, since the IPO, only Visa's public shareholders may vote for directors (including directors employed by banks).  (Visa Inc., Amendment No. 5 to Form S-4 Registration Statement (Form S-4/A) (Sept. 13, 2007), at 343, 361.)  A copy of Amend. No. 5 to Form S-4 is attached to the accompanying Declaration of Michael Hartman as Ex. D.

[8]   In fact, the responsibility for setting of interchange lies with Visa's Interchange Management Committee, which is composed of members of Visa management.

institutions.  Visa's public filings with the SEC confirm that Visa's multi-class stock structure "allow[s] stockholder decisions generally to be made by, and a majority of [Visa's] board of directors to consist of independent directors elected by, [Visa's] class A stockholders and not by our financial institution customers that hold [Visa's] class B and class C common stock." (Amend. 4 to Form S-1, at 7.)

**B.      The Court's November 25, 2008 Decision**

In its November 25, 2008 decision dismissing Plaintiffs' challenge to MasterCard's IPO, the Court held that Plaintiffs had failed adequately to allege that MasterCard's IPO was likely to substantially lessen competition.  The Court focused on the issue of control.  The Court noted Plaintiffs' allegations that MasterCard could function efficiently without default interchange fees, finding that Plaintiffs' "complaint suggests that a uniform interchange fee is not a profit-maximizing measure for MasterCard itself; rather, it only allows the Banks to charge monopolistic fees."  Nov. 25, 2008 Op. at *10.  The Court then inferred that, if this were so, "an independent corporate director, one who seeks to maximize MasterCard's revenues, would therefore oppose such fees . . . ."  *Id.*  Given the undisputed fact that "MasterCard's directors will be independent of the Banks and selected by the Class A shareholders," the Court held that "plaintiffs cannot plausibly allege that MasterCard will continue to impose supracompetitive interchange fees following its IPO, because its board would not be controlled by the Banks. Rather, a majority of the board would consist of independent directors who would theoretically oppose any efforts to enrich the Banks at MasterCard's expense."  *Id.*

**C.      The Supplemental Complaint**

The Supplemental Complaint alleges four claims for relief:  the Twenty-Seventh and Twenty-Eighth Claims for relief are brought under Section 7 of the Clayton Act, and the Twenty-Ninth and Thirtieth Claims are brought under Section 1 of the Sherman Act.  Each claim for

relief challenges "the conduct of Visa and its Member Banks in the events leading up to and culminating" with Visa's IPO.  (SSC ¶ 1.)

The salient allegations on which the Court relied in its November 25, 2008 decision dismissing the complaint that challenged MasterCard's IPO are, in substance, the same as those in the Supplemental Complaint (or the Second Consolidated Amended Class Action Complaint, which the Supplemental Complaint incorporates by reference).  In particular:

| Court's November 25, 2008 Opinion on MasterCard's IPO | Supplemental Complaint |
|---|---|
| "[T]he Banks, by virtue of their control over the boards of directors of MasterCard and Visa, dictate the amount charged as interchange fees for each network" and promulgated rules "which allegedly prevent merchants from encouraging customers to use less expensive forms of payment" (Nov. 25, 2008 Op. at *2) | Before its IPO and prior reorganization, Visa's board of directors was controlled by competing member banks, which set interchange rates and maintained so-called "merchant restraints" (SCACC ¶¶ 94-95, 97, 294) |
| "[T]he Banks profit from these restraints and will impose or continue them if they are able to do so" (Nov. 25, 2008 Op. at *9) | Member banks of Visa "have significantly profited" from interchange fees and other restraints, and have sought to "guarantee the continued flow of funds from Merchants to Issuers" (SCACC ¶ 97; SSC ¶ 43, 126) |
| "'The MasterCard Network could function efficiently without collectively-fixed Interchange Fees'" (Nov. 25, 2008 Op. at *10) | Visa does "not use the Interchange Fee to fund [its own] operations," and interchange fees "are not reasonably necessary" for Visa to function efficiently (SCACC ¶¶ 157, 175-76; SSC ¶¶ 35, 42) |
| "MasterCard's purported transformation from a joint venture to a 'single entity,' plaintiffs allege, will insulate its internal actions from the prohibitions of Section 1 of the Sherman Act" (Nov. 25, 2008 Op. at *3) | Visa and its member banks "elected to restructure themselves" into a new entity that "they hoped would allow them to continue their alleged anticompetitive conduct while eliminating their antitrust risk" (SSC ¶¶ 4, 135) |
| "Plaintiffs suggest that the IPO shifted the right to elect the board from the Banks to MasterCard's | By virtue of the restructuring and IPO, a majority of Visa's board of directors is "elected by public |

| Court's November 25, 2008 Opinion on MasterCard's IPO | Supplemental Complaint |
|---|---|
| shareholders" (Nov. 25, 2008 Op. at *9) | shareholders rather than by the Member Banks" (SCACC ¶ 431) |
| "[I]nterchange fees, both before and after the IPO, are set by MasterCard's board of directors" (Nov. 25, 2008 Op. at *9) | Post-IPO, Visa's board of directors retained "ultimate authority to establish [Visa's] uniform schedules of default Interchange Fees" (SCACC ¶ 431) |
| "[T]he various 'Ownership and Control Restrictions' [the MasterCard IPO] entails, specifically the 15% limit on ownership of Class A stock and the voting rights of the Class M stock, operate to preserve the Banks' control of MasterCard" (Nov. 25, 2008 Op. at *3) | After the restructuring and IPO, the banks retained "effective control" over Visa, for example, based on "Ownership and Control" restrictions, including a limit on ownership of common stock, and "the supermajority voting requirement and the right of bank-controlled Class B and C shares to vote" for certain "extraordinary events" (SSC ¶¶ 8, 18(c), 116-17, 128) |

Like the dismissed complaint, the Supplemental Complaint concludes that, if the post-IPO Visa is recognized as a single entity that can impose the challenged restraints without violating the antitrust laws, the effect of the IPO is to substantially lessen competition.  (SSC ¶ 238; *see* Nov. 25, 2008 Op. at *9.)  And this assertion is, in turn, premised on the notion that even after the IPO, the member banks somehow still control Visa.

## PLEADING STANDARD

Under Fed. R. Civ. P. 12(b)(6), well-pled allegations in a complaint must be taken as true.  *See De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 69 (2d Cir. 1996).  However, conclusory allegations are insufficient to survive a motion to dismiss, and generalized allegations "need not be credited . . . when they are belied by more specific allegations in the complaint." *Hirsch v. Arthur Anderson & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995).  Likewise, allegations that contravene materials attached to or incorporated by reference in a complaint need not be accepted.  Here, because the Supplemental Complaint refers to and relies on Visa's filings with

the SEC, *e.g.*, SSC ¶ 18(a), the Court may rely on those materials to resolve this motion.  *See, e.g.*, *Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005); Nov. 25, 2008 Op. at *2 n.1 (relying on MasterCard's securities filings).

In addition, under *Bell Atlantic v. Twombly*, an antitrust plaintiff must make sufficient factual allegations "to render [a claim] plausible."  550 U.S. 554, 127 S. Ct. 1955, 1964-65 (2007).  Thus, "[t]o survive a motion to dismiss under *Twombly*, it is not enough to make allegations of an antitrust conspiracy that are consistent with an unlawful agreement; to be viable, a complaint must contain 'enough factual matter (taken as true) to suggest that an agreement [to engage in anticompetitive conduct] was made.'"  *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 127 S. Ct. at 1974); *see also Kendall v. Visa U.S.A. Inc.*, 518 F.3d 1042 (9th Cir. 2008) (affirming dismissal, under *Twombly*, of complaint that alleged a conspiracy among credit card networks and member banks to fix interchange fees).

## ARGUMENT

**I.     The Supplemental Complaint and the Dismissed Complaint Make the Same Key Allegations, and the Supplemental Complaint Should Be Dismissed Based on the Court's November 25, 2008 Decision**

The operative question under the Court's November 25, 2008 decision is whether the Supplemental Complaint adequately pleads that Visa's IPO is likely to substantially lessen competition.[9]  Nov. 25, 2008 Op. at *4.  As noted, in an attempt to satisfy this standard, the

---

[9]     As the Court noted, because Section 1 of the Sherman Act requires an actual "restraint," while Section 7 requires only the possibility of an anticompetitive effect, it is "generally assumed that if a plaintiff's Section 7 claim cannot survive a motion to dismiss, its Section 1 claim will fail as well."  Nov. 25, 2008 Op. at *4; *see also, e.g.*, *White Consol. Indus. Inc. v. Whirlpool Corp.*, 781 F.2d 1224, 1228 (6th Cir. 1986) ("[T]he plaintiffs' failure to sustain proof of potential anticompetitive effects under Section 7 of the Clayton Act precludes them from successfully establishing proof of conspiracy in restraint of trade under the more vigorous standard for Section 1 of the Sherman Act.").  As a result, the dismissal of Plaintiffs' Section 7 claims on the basis of the Court's November 25, 2008 decision would require dismissal of Plaintiffs' Section 1 claims as well.

Supplemental Complaint alleges the same theory of anticompetitive effects alleged in the dismissed complaint:  Visa's restructuring left the banks in "effective control" of Visa, which purportedly enables the banks to continue to impose the alleged restraints in order to benefit the banks at Visa's expense.  (*E.g.*, SSC ¶¶ 8, 137.)  On that fundamental issue, the dismissed complaint and the Supplemental Complaint make the same key allegations.  Thus, the conclusions in the Court's November 25, 2008 decision apply to the Supplemental Complaint as well and compel its dismissal.

**A.      Plaintiffs Fail To State a Claim Because They Cannot Allege Facts Establishing That the Independent, Post-IPO Visa Would Act in the Banks' Interests, at Visa's Expense**

In the dismissed complaint, Plaintiffs alleged that "[t]he MasterCard Network could function efficiently without collective fixed Interchange Fees," and that "[w]hen the Member Banks collectively set Interchange Fees, they attempt to maximize their own profits rather than those of MasterCard."  Nov. 25, 2008 Op. at *10 (internal quotation marks and citation omitted). From those allegations, the Court concluded that "the complaint suggests that a uniform interchange fee is not a profit-maximizing measure for MasterCard itself; rather, it only allows the Banks to charge monopolistic fees."  *Id.*

Nearly identical allegations appear in the Supplemental Complaint against Visa:

- "The uniform schedules of Interchange Fees and rules requiring the payment thereof . . . are not reasonably necessary to the operation of the Visa and MasterCard networks."  (SCACC ¶ 176; *accord id.* ¶ 175; SSC ¶¶ 35, 42.)

- "Old Visa's Issuing Banks used their collective market power to extract supracompetitive Interchange fees from Merchants . . . ."  (SSC ¶ 56.)

- "Visa and MasterCard do not use the Interchange Fee to fund their operations. Rather, the Interchange Fee is retained by the Issuing Bank on every transaction." (SCACC ¶ 157; *accord id.* ¶ 158.)

10

The Court held that such allegations could not state a claim because the dismissed complaint also "compel[led] the inference, supported by MasterCard's public filings relating to the IPO, that three-quarters of MasterCard's directors will be independent of the Banks and selected by the Class A Shareholders." Nov. 25, 2008 Op. at *10. Here, too, the Supplemental Complaint and public filings for Visa's IPO likewise show that a majority of Visa's directors are independent of the banks and selected by class A common stock shareholders:

- Class A shareholders are entitled to elect 10 of the 17 directors on Visa's board of directors over three years following the IPO. (Amend. 4 to Form S-1, at 32, 177.) These 10 directors "must be independent directors in accordance with New York Stock Exchange and SEC rules." (*Id.* at 177.)

- The "holders of B and C shares (Visa's Member Banks) will be able to elect 6 of the 17 directors over three years following the IPO." (SSC ¶ 116.) However, "[t]he holders of [Visa's] class B and class C common stock are not otherwise entitled to vote in the election of directors." (Amend. 4 to Form S-1, at 32.)

- "All shares of class A common stock acquired by a Visa member . . . will be converted automatically into class C common stock." (*Id.* at ii, 35, 222.)

- Visa's board of directors "must at all times be comprised of at least 58% independent directors" that may not be elected by banks. (*Id.* at 177.)

In fact, with respect to the independent directors' control over default interchange rates, the Supplemental Complaint asserts that "[t]here is no factual or legal distinction between the delegation decisions that Visa and MasterCard made." (SSC ¶ 99.)

Given these similarities, the conclusions reached in the Court's November 25, 2008 decision apply equally to require dismissal of the Supplemental Complaint. The allegations in the Supplemental Complaint "compel[ ] the inference" that a majority of Visa's directors will be selected by class A shareholders and independent of the banks. Nov. 25, 2008 Op. at *10. And, as with the dismissed complaint, because Visa's board of directors is not controlled by the banks, Plaintiffs cannot plausibly allege that a post-IPO and independent Visa will seek to benefit the

banks at Visa's expense.  *Id.*  As such, the Supplemental Complaint fails to plead that the

"effect" of the IPO may be substantially to lessen competition.

### B.  The Court Has Already Rejected Plaintiffs' Post-IPO "Ownership and Control" Allegations as Insufficient to State a Claim

The Supplemental Complaint's "Ownership and Control" allegations do not alter this

conclusion.  Like the dismissed complaint, the Supplemental Complaint alleges that the 15%

limit on ownership of class A Visa stock operates "to protect the bank-focused business model

that Visa and its Member Banks constructed."  (SSC ¶ 128; *see also id.* ¶¶ 18(c), 116-17.)  In

addition, Plaintiffs allege that class B and C stockholders (*i.e.*, the banks) have "veto powers,"

resulting from their right to vote on certain "extraordinary events" and the 80% voting approval

required for such events.  Plaintiffs claim that this "supermajority provision, gives the banks veto

powers that allow them to prevent the sale of Visa or prevent a change in the core business of

Visa, just as the Member Banks of MasterCard retained certain veto rights through their Class M

shares in the MasterCard Restructuring."  (*Id.* ¶ 117.)

Insofar as Plaintiffs allege that Visa has a 15% limit on the ownership of its class A stock,

the Court has already considered -- and rejected -- such an allegation as insufficient to show an

effect on interchange fees.  The Court held that, given the existence of an "independent

MasterCard, . . . by plaintiffs' own allegations, a takeover by some trust-busting white knight

(which plaintiffs allege is impossible due to the 15% limit on ownership of [MasterCard's] Class

A shares) is not required to prevent the imposition or continuation of MasterCard's allegedly

anticompetitive practices."  Nov. 25, 2008 Op. at *10.  Thus, despite Plaintiffs' similar stock

ownership allegations against MasterCard, the Court found that the "Banks do not retain

sufficient control to allow them" to impose the alleged restraints.  *Id.*  The Court should reach

same result here.

Plaintiffs also now allege, on "information and belief," that the "vetoing rights on attempts by new Visa to exit the core payments business . . . would allow the Member Banks to block an attempt by New Visa to eliminate Interchange Fees."  (SSC ¶ 133; *accord id.* ¶ 158.) But the Supplemental Complaint is devoid of factual allegations supporting this assertion. Moreover, there is no logical reason why Visa member banks could block an effort to eliminate interchange fees by vetoing an attempt by Visa to exit its core payments business.  If appropriate, the post-IPO and independent Visa board could vote to eliminate interchange fees without any vote on whether Visa should exit its core payments business.  Visa's Amended and Restated Certificate of Incorporation defines "exit . . . core payments business" as "to no longer operate a consumer debit/credit payments business."  (Visa Inc., Amendment No. 6 to Form S-1 Registration Statement (Form S-1/A), Exhibit 3.1 (Mar. 13, 2008),[10] at 7.)

In addition, corporate ownership and change-in-control limitations like those Plaintiffs challenge are commonplace.  *See*, *e.g.*, 3A William M. Fletcher, *Fletcher Cyclopedia Corporations* § 1041.70 (2008) ("It is a common tactic for a board of directors to adopt defensive measures against a hostile takeover."); Del. Code Ann. tit. 8 § 203 (anti-takeover statute, limiting ability of "interested shareholder" with 15% or more of a corporation's outstanding voting stock from entering a "business combination" with corporation).  They take the form of poison pills, percentage limitations, staggered board memberships, and similar tools, all designed to assure the continuity and stability of a company and the rights of its shareholders. *See*, *e.g.*, *Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1287 (Del. 1989).  Plaintiffs cannot plausibly allege that routine corporate control provisions violate the antitrust laws.

---

[10]    A copy of this exhibit is attached to the accompanying Declaration of Michael R. Hartman as Ex. E.

II.     **The Supplemental Complaint Does Not Allege Additional Facts Sufficient to Overcome the Court's November 25, 2008 Decision**

To try to overcome the Court's prior decision, Plaintiffs include allegations that attempt to show that banks still influence post-IPO Visa's default interchange rates, and that post-IPO Visa is a single entity with "market power" that can "further increase Interchange Fees imposed on merchants." (*See, e.g.*, SSC ¶ 238(a), (c), (e), (f).) But none of these allegations overcomes Plaintiffs' core pleading hurdle -- *i.e.*, the need to allege adequately and plausibly that the banks control Visa and that an independent Visa board of directors would act in the best interests of the banks, to Visa's detriment.

A.      **Plaintiffs' Conclusory Allegations that the Post-IPO Visa Will Be a Vehicle for Collusion Cannot State a Claim**

The Supplemental Complaint alleges that, despite Visa's "nominally 'independent' form," the IPO and its implementing agreements left the banks' influence in Visa intact, and established "a new forum for collusion" among Visa's banks. (SSC ¶ 135; *accord id.* ¶¶ 137, 238(f).) But the Court previously found such conclusory allegations inadequate to state a claim in considering the dismissed complaint, in which Plaintiffs likewise asserted that the banks "will effectively set Interchange Fees using the same cartel-like structure that they currently use." (First Supplemental Class Action Complaint, May 22, 2006 (DE 332), ¶ 93.) The Court concluded that allegation was insufficient because Plaintiffs did not "suggest *how* the Banks will nevertheless be able to control the board of directors, and thereby assure the continued imposition of the allegedly supracompetitive interchange fees." Nov. 25, 2008 Op. at *10 (emphasis in original); *see id.* at *3. The same deficiency exists in the Supplement Complaint.

Plaintiffs have tried to plead around the Court's ruling in three ways, all of which fail. *First*, Plaintiffs have added citations to the discovery record, which focus on the banks' purported pre-IPO concern about losing control of Visa through restructuring, and their intent to

14

"guarantee[ ] that the New Visa continues to pursue its bank-focused strategy." (SSC ¶ 104; *see also, e.g.*, *id.* ¶ 122.) But whatever individual bank employees might have *said* or *intended* with respect to their concerns about proposed restructuring options being considered by Visa *before* the IPO cannot establish that the banks now control Visa or its default interchange rates *after* the IPO. The operative issue is what Visa actually did in the IPO. In the post-IPO Visa, the banks lack ownership and voting control. (Amend. 4 to Form S-1, at 177.) Plaintiffs' allegations reflecting pre-IPO bank sentiments or concerns are irrelevant.

*Second*, Plaintiffs allege that, post-IPO, the banks retain influence because they have representation on Visa's board (while merchants do not) and Visa must continue to "address the needs of its customers (*i.e.*, banks)" in order to "protect its value." (SSC ¶ 125; *accord id.* ¶ 137(c).) As a result, Plaintiffs claim, "[n]either Visa nor MasterCard can pursue any business strategy that does not involve ever-higher Interchange Fees." (*Id.* ¶ 137(b).) However, none of these allegations is a plausible claim that the banks, in fact, control the decisions of the publicly held post-IPO Visa or its board of directors. It is well-settled that a minority representation on a board of directors cannot establish control. *See, e.g.*, *Podiatrist Ass'n Inc. v. La Cruz Azul de Puerto Rico, Inc*., 332 F.3d 6, 14-15 (1st Cir. 2003) (holding that it was "plainly not enough to show [doctors'] control" where doctors held 8 of 19 seats on board); *see also Klonis v. Nat'l Bank of Greece, S.A*., 492 F. Supp. 2d 293, 301 (S.D.N.Y. 2007) (subsidiary not controlled by parent where 3 of 10 directors on subsidiary's board were affiliated with parent). The Court previously recognized this principle, holding that MasterCard's board "would not be controlled by the Banks" where "three-quarters of MasterCard's directors will be independent of the banks and selected by the Class A shareholders." Nov. 25, 2008 Op. at *10. Plaintiffs cannot rely on allegations about bank representation on Visa's board to overcome the Court's prior opinion.

As to Plaintiffs' claims that Visa will "address the needs of its customers," there is nothing suspect or illegal about a supplier making independent business decisions to satisfy its customers.  *See*, *e.g.*, *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 762-63 (1984) ("The manufacturer often will want to ensure that its distributors earn sufficient profit to pay for programs [supporting the product]."); *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1361 (2d Cir. 1988) ("Under the antitrust laws, a monopolist is encouraged to compete vigorously with its competitors and to remain responsive to the needs and demands of its customers.").  Nor is there anything suspect or illegal about customers trying to obtain the best deal they can from their suppliers.  *See*, *e.g.*, *Acquaire v. Canada Dry Bottling Co. of New York, Inc.*, 24 F.3d 401, 411 (2d Cir. 1994) (customer resistance to supplier actions that would disadvantage them "simply 'reflect[s] the working of a free market'").

*Third*, Plaintiffs complain about Visa's "Retrospective Responsibility Plan" and the "Litigation Committee composed of representatives of . . . Member Banks" appointed as part of that Plan, and assert that the Plan and Committee "provide[ ] these Member Banks another mechanism by which they can control Visa."  (SSC ¶ 121; *accord id.* ¶¶ 120, 137(e).)  But Plaintiffs do not allege any connection between the Plan or Committee and the banks' purported control over Visa's board in a manner that "assure[s] the continued imposition of the allegedly supracompetitive interchange fees."  Nov. 25, 2008 Op. at *10.  Nor could Plaintiffs allege such a connection, given the terms and operation of the Plan and Committee.

The Retrospective Responsibility Plan delegates three responsibilities to the Litigation Committee:  (i) to determine the amount of the proceeds of Visa's IPO to be deposited in an escrow account, from which settlements of, or judgments in, the "covered litigation" will be

payable;[11] (ii) to request the sale of "loss shares" to fund the escrow account;[12] and (iii) to "recommend or refer the cash payment portion of a proposed settlement of any covered litigation to the Visa U.S.A. board of directors." (Amend. 4 to Form S-1, at 86, 151-52.) Moreover, to authorize any settlement that "would or might require payments out of the escrow account, the sale of loss shares, or the payment of cash by principal, acquirer, administrative, cheque issuer, administrative, group, or associate members of Visa U.S.A.," the Retrospective Responsibility Plan requires a two-thirds vote of certain financial institutions. (*Id.* at 152.)

These provisions -- which relate to the funding and payment of a *cash* component of a potential settlement -- say nothing about prospective decisions regarding interchange fees or the alleged restraints challenged in this case. In addition, Visa retains the "sole right to approve . . . any terms of any settlement of any Covered Litigation that are applicable to Visa USA and/or Visa Inc. or any of their Subsidiaries (including, for the avoidance of doubt, any terms of a settlement that relate to the setting of Interchange Reimbursement Fees) . . . ." (Loss Sharing Agreement, Ex. 10.14 to Amend. 1 to Form S-4.[13]) Nothing in the Retrospective Responsibility Plan suggests that an independent Visa board of directors would act in the best interests of the banks, at Visa's expense, on those issues.

---

[11]   The "covered litigation" includes several matters involving Visa U.S.A. and Visa International, including this litigation. (Amend. 4 to Form S-1, at 151.)

[12]   "Loss shares" refer to "follow-on offerings" of Visa's class A common stock, made to increase the funds in the escrow account. The issuance of class A stock for this purpose concurrently dilutes the conversion rate of class A to class B shares (held by Visa U.S.A. member financial institutions). (Amend. 4 to Form S-1, at 152.) This clause recently was amended in ways not relevant here -- *i.e.*, to allow Visa to deposit "loss funds" to fund the escrow, in addition to the issuance of loss shares. Visa. Inc., Form 8-K (Dec. 12, 2008).

[13]   Visa Inc., Amendment No. 1 to Form S-1 Registration Statement (Form S-1/A), Exhibit 10.15 (Dec. 21, 2007). A copy of this exhibit is attached to the accompanying Declaration of Michael R. Hartman as Ex. F.

**B.      Plaintiffs' Allegations of Additional Purported Anticompetitive Effects Arising Out of Visa's Becoming a Single Entity Are Irrelevant**

In addition to the points discussed above, the Supplemental Complaint faults the restructuring and IPO for converting Visa's joint venture structure into "a New Visa that is akin to a 'three-party system' [which] will allow New Visa to further increase Interchange Fees that are imposed on Merchants."  (SSC ¶ 238(c).)  According to the Supplemental Complaint, pre-IPO, Visa and the banks created a "market structure" that purportedly is anti-competitive because "the principal mode of competition is through ever-increasing Interchange Fees."  (*Id.* ¶¶ 40, 137(a); *accord id.* ¶¶ 137(d), 238(e).)  Plaintiffs complain that the IPO did not alter this market structure, but instead created a new Visa "single entity" with "market power" that will allow Visa to raise interchange fees to "supra-competitive levels" and "continue[ ] to enforce its restrictive rules without losing significant Merchant acceptance."  (*Id.* ¶¶ 138-39, 238(a).)  None of these conclusory allegations can overcome Plaintiffs' failure to satisfy the standards set forth in the Court's November 25, 2008 decision.

*First*, and most fundamentally, none of these allegations relates to the core issue on this motion -- the lack of bank control over Visa post-IPO.  The allegations therefore do nothing to overcome "the fundamental defect in [Plaintiffs'] complaint" -- namely, "their failure to plausibly allege that [anticompetitive effects] will in fact result from defendants' challenged actions."  Nov. 25, 2008 Op. at *14.

*Second*, none of the purported effects that Plaintiffs allege is causally linked to the IPO or any of its attendant agreements.  The harms alleged to occur as a result of conduct by a single entity would be due to action taken by the post-IPO Visa; and that new action, not the IPO itself, would be grounds for complaint.  Consequently, nothing about the restructuring *itself* challenged in the Supplemental Complaint has caused the purported injury.  *See Geneva Pharms. Tech.*

*Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 511 (2d Cir. 2004) ("The Clayton Act is concerned with whether an acquisition or merger *itself* may cause antitrust injury." (emphasis in original)).

### III.   Additional, Independent Grounds for Dismissal

In addition to the grounds for dismissal set forth above, Plaintiffs' own allegations effectively concede that the IPO will not lead to higher interchange fees or otherwise injure Plaintiffs.  The Supplemental Complaint alleges that, even without the alleged bank "control," the post-IPO Visa "could, in theory, collect Interchange Fees from Merchants and keep that substantial revenue" for itself.  (SSC ¶ 137(d).)  (As further support for this argument, which provides an independent ground for dismissal, this memorandum incorporates by reference Argument I.B of the Mem. of Law in Support of MasterCard's Mot. to Dismiss First Am. Suppl. Class Action Compl., Mar. 31, 2009.)

Finally, in its November 25, 2008 decision, the Court considered and rejected several additional, independent arguments directed at the dismissed complaint.  Visa briefly reasserts those arguments here solely to preserve them in the event of an appeal.

*First*, Plaintiffs' claims against Visa under Section 7 of the Clayton Act should be dismissed because Plaintiffs have failed to allege that Visa acquired the stocks or assets "of another person," within the meaning of Section 7, 15 U.S.C. § 18.  (As further support, this memorandum incorporates by reference Argument I of Mem. of Law in Support of MasterCard's Mot. to Dismiss First Suppl. Class Action Compl., Sept. 15, 2006 (DE 507).)

*Second*, Plaintiffs' claims against the Bank Defendants under Section 7 of the Clayton Act should be dismissed because the Bank Defendants, whose ownership share in Visa was diluted as a result of the IPO, did not "acquire" stock in Visa under Section 7.  (As further support, this memorandum incorporates by reference Argument I.A of Mem. of Law in Support of Bank Defs. Mot. to Dismiss First Suppl. Class Action Compl., Sept. 15, 2006 (DE 558).)

*Third*, the Supplemental Complaint should be dismissed in its entirety on the grounds that: (1) Plaintiffs have not demonstrated antitrust injury, because they seek for themselves the benefit of a transaction engaged in by others, and thus are foreclosed by cases such as *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977), and *Bayou Bottling, Inc. v. Dr. Pepper Co.*, 725 F.2d 300 (5th Cir. 1984); and (2) Plaintiffs cannot establish antitrust standing, because their alleged injury is caused by operation of applicable law, and is barred by cases such as *RSA Media Inc. v. AK Media Group, Inc.*, 260 F.3d 10 (1st Cir. 2001).  (As further support, this memorandum incorporates by reference Argument I.A of Mem. of Law in Support of Bank Defs. Mot. to Dismiss Class Plaintiffs' First Supp. Compl., Sept. 15, 2006 (DE 558), and Argument II.B of Bank Defs. Objections to Report and Recommendation, Apr. 4, 2008 (DE 938).)

## IV.   Amendment Would Be Futile

"[I]t is proper to deny leave to replead where there is no merit in the proposed amendments or amendment would be futile."  *Hunt v. Alliance N. Am. Gov't Inc. Trust, Inc.*, 159 F.3d 723, 728 (2d Cir. 1998).  Amendment would be futile, for example, where plaintiffs drafted a deficient complaint "after discovery had been taken."  *Ryan v. Hunton & Williams*, No. 99-CV-5938, 2000 WL 1375265, at *11 (E.D.N.Y. Sept. 20, 2000) (Gleeson, J.); *see also Cuoco v. Morintsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (amendment futile where problem "is substantive; better pleading will not cure it").  Here, after Plaintiffs have had two chances to plead their "IPO claims" as well as a complete discovery record, dismissal with prejudice is warranted.

### CONCLUSION

For the foregoing reasons, the Second Supplemental Class Action Complaint should be dismissed with prejudice.

Dated:  March 31, 2009.

**ARNOLD & PORTER LLP**

By: /s/ Robert C. Mason
    Robert C. Mason
    399 Park Avenue
    New York, NY  10022-4690
    Telephone:  (212) 715-1000
    Facsimile:  (212) 715-1399
    robert.mason@aporter.com

    Robert J. Vizas
    275 Battery Street, Suite 2700
    San Francisco, CA   94111-3823
    Telephone:  (415) 356-3000
    Facsimile:  (415) 356-3099

    Mark R. Merley
    Matthew A. Eisenstein
    555 12th Street, N.W.
    Washington, DC   20004-1206
    Telephone:  (202) 942-5000
    Facsimile:  (202) 942-5999

Attorneys for Defendants Visa Inc., Visa U.S.A. Inc., and Visa International Service Association

**MORRISON & FOERSTER**

By: /s/ Mark P. Ladner
    Mark P. Ladner
    Michael B. Miller
    1290 Avenue of the Americas
    New York, NY   10104-0050
    Telephone:  (212) 468-8000
    Facsimile:  (212) 468-7900
    mladner@mofo.com

Attorneys for Defendants Bank of America, N.A., BA Merchant Services LLC (f/k/a Defendant National Processing, Inc.), Bank of America Corporation, and MBNA America Bank, N.A.

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM, LLP

By:  /s/ Peter E. Greene
     Peter E. Greene
     Cyrus Amir-Mokri
     Peter S. Julian
     Linda W. Cenedella
     Boris Bershteyn
     Four Times Square
     New York, NY   10036
     Telephone.:  (212) 735-3000
     Facsimile:  (212) 735-2000

Attorneys for Defendants JPMorgan Chase & Co.,
Chase Bank USA, N.A., Chase Manhattan Bank
USA, N.A., Chase Paymentech Solutions, LLC,
JPMorgan Chase Bank, N.A., Bank One
Corporation, and Bank One Delaware

JONES DAY

By:  /s/ John M. Majoras
     John M. Majoras
     Joseph W. Clark
     51 Louisiana Avenue, NW
     Washington, DC   20001
     Telephone:  (202) 879-3939
     Facsimile:  (202) 626-1700
     jmmajoras@jonesday.com

Attorneys for Defendants National City
Corporation, National City Bank of Kentucky

**PULLMAN & COMLEY, LLC**

By: /s/ Jonathan B. Orleans
    Jonathan B. Orleans
    Pullman & Comley
    850 Main Street
    Bridgeport, CT   06601-7006
    Telephone:  (203) 330-2000
    Facsimile:  (203) 576-8888
    jborleans@pullcom.com

Attorneys for Defendant Texas Independent
Bancshares, Inc.

**PATTERSON BELKNAP**

By: /s/ William F. Cavanaugh
    William F. Cavanaugh
    Cecilia B. Loving
    Patterson, Belknap, Webb & Tyler LLP
    1133 Avenue of the Americas
    New York, NY   10036
    Telephone:  (212) 336-2793
    Facsimile:  (212) 336-2222
    wfcavanaugh@pbwt.com

Attorneys for Defendant Wells Fargo & Company