**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION<br><br>This Document Relates to:<br><br>All Class Actions | MASTER FILE 05-MD-1720 (JG) (JO)<br><br>ORAL ARGUMENT REQUESTED |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS THE**
**FIRST AMENDED SUPPLEMENTAL CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ................................................................. 1

BACKGROUND ...................................................................................... 3

I.      Dismissal of the First Supplemental Complaint ........................ 3

II.     Allegations in the Amended Supplemental Complaint ............. 4

      A.    MasterCard's Review of Its Governance Structure and Business Model ................................................................. 5

      B.    The MasterCard IPO ................................................... 7

ARGUMENT ............................................................................................ 8

I.      Plaintiffs Fail to State a Claim Under Section 7 of the Clayton Act or Section 1 of the Sherman Act ................................... 9

      A.    Plaintiffs Do Not Adequately Allege That the Banks Continue to Control MasterCard After the IPO and Set Interchange to Maximize Bank Profits .................................................. 9

           1.    Plaintiffs' Allegation That the Banks Control the Post-IPO MasterCard Board of Directors Is Not Plausible ............... 9

           2.    Plaintiffs Cannot Plausibly Allege That the Class M Veto Powers Give Banks Control of MasterCard ..................... 11

           3.    Plaintiffs Do Not Plausibly Allege That the Stock Ownership Restrictions Allow the Banks to Control Interchange ................................................................. 13

      B.    Plaintiffs' Own Allegations Establish the Absence of Any Anticompetitive Effect, Injury, or Damage to Merchants. ........... 14

II.     Plaintiffs Fail to State a Fraudulent Conveyance Claim ........................ 16

      A.    Plaintiffs Have Not Alleged the Requisite Actual Fraud Necessary to State a Claim Under Section 276 ............................................. 17

      B.    Plaintiffs Have Not Alleged an Adequate Basis for a Constructive Fraud Claim Under Section 275 .................................................. 22

III.    Plaintiffs Should Not Be Permitted To Replead ....................................... 24

CONCLUSION ........................................................................................ 25

i

## <u>TABLE OF AUTHORITIES</u>

**Table of Authorities**

<u>Page(s)</u>

**CASES**

*Abrams v. Ohio Cas. Ins. Co.*,
    731 A.2d 48 (N.J. Super 1999) ................................................................ 12

*Amron v. Morgan Stanley Inv. Advisors, Inc.*,
    464 F.3d 338 (2d Cir. 2006) .................................................................. 22

*Barkan v. Amsted Indus., Inc.*,
    567 A.2d 1279 (Del. 1989) .................................................................... 12

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) .................................................................... 2, 8

*Blue Tree Hotels Inv. (Canada) Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*,
    F.3d 212 (2d Cir. 2004) .................................................................... 7

*Centaur Partners, IV v. Nat'l Intergroup, Inc.*,
    582 A.2d 923 (Del. 1990) .................................................................... 12

*Citizens & S. Nat'l Bank v. Auer*,
    640 F.2d 837 (6th Cir. 1981) ................................................................ 17

*Eberhard v. Marcu*,
    530 F.3d 122 (2d Cir. 2008) ................................................................. 17

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007) .................................................................... 8

*Gentile v. Singlepoint Fin., Inc.*,
    788 A.2d 111 (Del. 2001) .................................................................... 11

*Hibbert v. Hollywood Park, Inc.*,
    457 A.2d 339 (Del. 1983) .................................................................... 11

*In re Integrated Res. Real Estate Ltd. P'ships Sec. Litig.*,
    850 F. Supp. 1105 (S.D.N.Y. 1993) .................................................... 19

*Iqbal v. Hasty*,
    490 F.3d 143 (2d Cir. 2007) .................................................................. 1, 8

*Klang v. Smith's Food & Drug Ctrs.*,
    702 A.2d 150 (Del. 1997) .................................................................... 22

*Kleban v. S.Y.S. Rest. Mgmt., Inc.*,
    929 F. Supp. 294 (N.D. Il. 1996)....................................................................... 12

*Klonis v. Nat'l Bank of Greece, S.A.*,
    492 F. Supp. 2d 293 (S.D.N.Y. 2007) ............................................................. 10

*Lippe v. Bairnco Corp.*,
    249 F. Supp. 2d 357 (S.D.N.Y. 2003) ............................................. 17, 18, 19, 20

*Lockwood v. Gen. Abrasive Co.*,
    210 A.D. 141 (Sup. Ct. NY 1924).................................................................... 11

*MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*,
    910 F.Supp. 913 (S.D.N.Y. 1995).................................................................... 23

*Morris v. Standard Gas & Electric Co.*,
    63 A.2d 577 (Del. Ch. 1949)............................................................................ 22

*In re Murphy*,
    331 B.R. 107 (Bankr. S.D.N.Y. 2005).............................................................. 16

*Ostashko v. Ostashko*,
    No. 00-CV-7162, 2002 WL 32068357 (E.D.N.Y. Dec. 12, 2002) .................. 23

*In re Park S. Sec., LLC*,
    326 B.R. 505 (Bankr. S.D.N.Y. 2005)..........................................................20, 24

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*,
    No. 05-MD-1720, 2008 WL 5082872 (E.D.N.Y. Nov. 25, 2008).............passim

*Podiatrist Assoc. Inc. v. La Cruz Azul de Puerto Rico, Inc.*,
    332 F.3d 6 (1st Cir. 2003)................................................................................ 10

*Roth v. Jennings*,
    489 F.3d 499 (2d Cir. 2007)............................................................................... 7

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000)................................................................................. 7

*Ryan v. Hunton & Williams*,
    No. 99-CV-5938, 2000 WL 1375265 (E.D.N.Y. Sept 20, 2000)..................... 24

*In re Sharp Int'l Corp.*,
    403 F.3d 43 (2d Cir. 2005).............................................................................. 19

*Sharp Int'l Corp. v. State St. Bank & Trust Co.*,
    403 F.3d 43 (2d Cir. 2005).........................................................................17, 19

*Shelly v. Doe*,
   173 Misc. 2d 200 (N.Y. Co. 1997) .................................................................. 24

*Sullivan v. Kodsi*,
   373 F. Supp. 2d 302 (S.D.N.Y. 2005) ............................................................. 18

*Weber v. Weber*,
   624 A.D.2d 1021 (S. Ct. NY 1995) ................................................................. 12

*In re Western Nat'l Corp.*,
   No. 15927, 2000 WL 710192 (Del. Ch. May 22, 2000) ................................... 12

## STATUTES

15 U.S.C. § 1 ...................................................................................................... 3

15 U.S.C. § 18 .................................................................................................... 3

N.Y. Debt. & Cred. Law § 275 ...................................................................passim

N.Y. Debt. & Cred. Law § 276 ...................................................................passim

## OTHER AUTHORITIES

Fed. R. Civ. P. 9(b) .....................................................................................17, 18

Fed. R. Civ. P. 12(b)(6) .................................................................................... 1

Defendants in the First Amended Supplemental Class Action Complaint (the "ASC") respectfully submit this memorandum of law in support of their motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[1]

## PRELIMINARY STATEMENT

In its November 25, 2008 Memorandum and Order dismissing class plaintiffs' First Supplemental Complaint, the Court held that "plaintiffs have failed to adequately plead fraud, or to plausibly allege that the Banks will retain control of the post-IPO MasterCard in ways that may have an anticompetitive effect." *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, No. 05-MD-1720, 2008 WL 5082872, at *11 (E.D.N.Y. Nov. 25, 2008) ("Nov. 25, 2008 Op."). As the Court recognized, a plaintiff must "amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Id.* at *4 (quoting *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) (emphasis omitted)). The ASC fails to meet that standard: It contains all the same defects that led to the dismissal of its predecessor, as well as additional allegations that reveal fundamental flaws in plaintiffs' claims that provide independent grounds for dismissal. Moreover, the ASC should be dismissed with prejudice because extensive discovery has now been completed and—notwithstanding the conclusory allegations and unsupported inferences in the ASC—plaintiffs are still unable to state a cognizable claim for relief.

---

[1] Defendants are MasterCard International Inc., MasterCard Inc. (collectively, "MasterCard"), Bank of America, N.A., BA Merchant Services LLC (f/k/a Defendant National Processing, Inc.), Bank of America Corporation, MBNA America Bank, N.A., Capital One Bank (USA), N.A., Capital One F.S.B., Capital One Financial Corporation, Chase Bank USA, N.A., Chase Manhattan Bank USA, N.A., Chase Paymentech Solutions, LLC, JPMorgan Chase Bank, N.A., JPMorgan Chase & Co., Bank One Corporation, Bank One Delaware, Citibank (South Dakota), N.A., Citibank, N.A., Citigroup, Inc., Citicorp, HSBC Finance Corporation, and HSBC North America Holdings, Inc. (collectively, the "Banks"). Defendants hereby include by reference all arguments put forth in their memoranda in support of their motions to dismiss plaintiffs' First Supplemental Complaint.

*First*, plaintiffs have again failed to provide a factual basis for their allegation that MasterCard's initial public offering continued the banks' control over MasterCard, thereby prolonging the purported "structural" conspiracy among the banks and causing MasterCard to maximize bank profits rather than its own.  Despite including pages of new allegations concerning the process leading up to MasterCard's IPO, plaintiffs again fail to plead any factual basis that could establish the banks' continued control over MasterCard after the IPO.  Nowhere, for example, do plaintiffs plead any factual basis for their suggestion that the post-IPO, independent MasterCard Board of Directors would seek to maximize the profits of banks rather than MasterCard.  Nor do plaintiffs allege how the banks' limited veto rights over a handful of extraordinary business decisions could have any effect on MasterCard's day-to-day decisions regarding interchange or the company's entry into new lines of business.  Plaintiffs' antitrust claims should therefore be dismissed because—despite their conclusory allegations of a post-IPO conspiracy—plaintiffs have not alleged "enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

*Second*, the allegations in the Amended Supplemental Complaint reveal an independent ground for dismissing plaintiffs' antitrust claims:  Plaintiffs have not alleged facts that plausibly support their conclusion that, in the absence of the purported conspiracy, fees to merchants would decline.  Indeed, the ASC on its face concedes that eliminating collectively set interchange would not result in lower fees to the merchants.  Specifically, plaintiffs allege that post-IPO MasterCard—if it were not "controlled" by the banks and interchange were not collectively set—would still impose *non-collectively* set fees on merchants at current levels or higher, but would keep that revenue for itself rather than passing it on to the banks.  Therefore, plaintiffs' own factual allegations establish that the IPO did not cause merchants any injury,

damage plaintiffs by causing higher fees, or have any other anticompetitive effect on merchants. For this reason alone, plaintiffs' antitrust claims should be dismissed with prejudice.

*Finally*, the ASC fails to correct the pleading defects that properly led to the dismissal of plaintiffs' fraudulent conveyance claims. Despite the additional factual clutter now provided, plaintiffs still fail to state a sufficient factual basis supporting their core allegations on this score—that MasterCard had either actual fraudulent intent in conducting its IPO or that MasterCard believed, when it eliminated its right to impose a special assessment on bank members, that it would incur debts that it could not pay. If anything, the allegations in the ASC reflect that MasterCard undertook a reasonable, deliberate, thorough, and public process in structuring and effecting the IPO, which squarely eliminates any inference of fraud, and fully disclosed publicly its conclusion that the possibility and extent of liability in this action could not be considered either likely or estimable. Just as in the prior pleading, these allegations are wholly inconsistent with factual allegations that could establish a viable fraudulent conveyance claim. *See* Nov. 25, 2008 Op. at *14.

## BACKGROUND

### I.   Dismissal of the First Supplemental Complaint

On July 5, 2006, plaintiffs filed the First Supplemental Complaint, seeking declaratory and injunctive relief against MasterCard and five banks for purported violations of Section 7 of the Clayton Act, Section 1 of the Sherman Act, and for fraudulent conveyance under New York law.[2]  Plaintiffs claimed that, through the various agreements comprising MasterCard's IPO, defendants sought to insulate MasterCard from antitrust liability while

---

[2]   Section 1 of the Sherman Act prohibits contracts, combinations and conspiracies in restraint of trade or commerce.  15 U.S.C. § 1.  Section 7 of the Clayton Act prohibits acquisitions of capital or stock, the effect of which may be substantially to lessen competition, or to tend to create a monopoly.  15 U.S.C. § 18.

preserving the banks' ability to impose supracompetitive interchange rates and network rules to maximize the banks' profits.

MasterCard and the banks moved to dismiss these claims and, on November 25, 2008, the Court dismissed them in their entirety.  Finding that plaintiffs failed to demonstrate *how* the banks could exercise sufficient control over the post-IPO MasterCard to cause its independent directors to engage in anticompetitive behavior, the Court held that plaintiffs did not adequately allege that the IPO either threatened to substantially lessen competition as required under Section 7, or caused any actual anticompetitive effects under Section 1.  Nov. 25, 2008 Op. at *10.  The Court also dismissed the fraudulent conveyance claim because plaintiffs insufficiently alleged the existence of actual fraudulent intent and failed to make any allegation regarding MasterCard's intent or belief regarding its ability to pay its debts.  *Id.* at *11.

## II.    Allegations in the Amended Supplemental Complaint

On January 29, 2009, plaintiffs filed a First Amended Supplemental Class Action Complaint, seeking declaratory and injunctive relief and monetary damages for injury allegedly suffered as a result of the MasterCard IPO.[3]  Plaintiffs' antitrust claims under Section 7 of the Clayton Act and Section 1 of the Sherman Act are once again based on allegations that the IPO and restructuring of MasterCard will substantially lessen competition by perpetuating the banks' control over MasterCard and interchange.  Plaintiffs also charge that the IPO is a fraudulent conveyance under New York law because it was performed with an intent to defraud MasterCard's creditors and included an elimination of a special right of assessment that MasterCard purportedly knew would leave it unable to pay a judgment in this case.

---

[3]   Plaintiffs filed a corrected First Amended Supplemental Class Action Complaint under seal on March 27, 2009.

A.      **MasterCard's Review of Its Governance Structure and Business Model**

Plaintiffs allege that, prior to the IPO, MasterCard was a "member-owned and member-governed association of banks that issued MasterCard-branded Payment Cards and acquired MasterCard-branded transactions." (ASC ¶ 31.) According to plaintiffs, the association was controlled by its Member Banks, horizontal competitors who, through their membership on MasterCard's Board, determined uniform schedules of default interchange rates for MasterCard transactions. (*Id.* ¶ 4.)[4]

According to the ASC, in July 2003, following legal and regulatory challenges to MasterCard's business model, "MasterCard formed a task force to review its governance and business practices" to mitigate against certain perceived risks. (*Id.* ¶ 79.) Ultimately, on November 18, 2004, approximately 18 months following the formation of a task force to examine MasterCard's future, the Board of Directors resolved that "the company could not maintain the status quo ownership and governance model" and directed management to work "towards the development of a new governance and ownership structure." (*Id.* ¶ 113.)[5]

The Board's determination to transform MasterCard into a publicly held corporation was followed by more than a year of planning by MasterCard's management and careful deliberation by the Board. (*Id.* ¶¶ 115, 118, 119, 121, 122, 124, 183, 185, 188.) In January 2005, MasterCard's Nominating and Corporate Governance Committee began work on the company's restructuring plan (*Id.* ¶ 115), and throughout the spring and summer of 2005,

---

[4]   Plaintiffs admit that in July 2004 the Board delegated its authority to set interchange fees in the United States to MasterCard's management, at which point no bank representative had a vote on interchange rates. (ASC ¶¶ 46, 107.)

[5]   According to plaintiffs, "[t]he primary factor driving the decision to pursue governance and ownership changes . . . was the belief, based on the advice of counsel, that governance and ownership changes had a greater likelihood of shielding MasterCard and its Member Banks from antitrust liability." (ASC ¶ 104; *see also* ASC ¶¶ 113, 131, 134.)

along with MasterCard's Board and management, considered several proposed IPO structures (*Id*. ¶ 122). On July 14, 2005 the MasterCard Board voted to approve the IPO. (*Id*. ¶ 124.)

In structuring the IPO, MasterCard determined that it would eliminate its right to impose a special assessment on bank members to assist it in satisfying any large litigation judgment or settlement. Throughout this period, and no later than March 2005, MasterCard's Nominating and Corporate Governance Committee focused considerable attention on the "post-IPO elimination of special assessment rights and management's views on handling risk without assessment rights." (*Id*. ¶ 118.) In order to fulfill its fiduciary obligations to fully understand and consider all material information relating to the elimination of the special assessment rights, the Board engaged "special antitrust counsel" (*id*.), and retained two well-respected, independent firms, Goldman Sachs, underwriters of the IPO (*id*. ¶ 179), and Houlihan Lokey, the investment bank (*Id*. ¶¶ 184-85). Specifically, Houlihan Lokey was retained in connection with MasterCard's redemption of the shares of its member banks to advise the Committee and the Board with respect to the fair value of the assets and liabilities other than certain contingent liabilities of the company. (*See id*.)

The ASC expressly concedes that in MasterCard's securities filings it disclosed its conclusion that contingent liabilities arising from this lawsuit were not probable or quantifiable. (*Id*. ¶¶ 184-89.) The Nominating and Corporate Governance Committee "twice expressed support for the redemption vote and the full Board approved it in April 2006." (*Id*. ¶ 188.) It was not necessary to quantify contingent liabilities in order for MasterCard to redeem the banks' shares in the IPO. (*Id*. ¶ 186.)

B.     **The MasterCard IPO**

The IPO was launched on May 25, 2006.  (ASC ¶ 1.)[6]  According to plaintiffs, as part of its IPO, MasterCard converted all of its outstanding shares of voting common stock held by its member banks to shares of newly authorized non-voting Class B common stock and issued each member bank a single share of newly authorized Class M common stock.  (*Id*. ¶ 125; S-1 at 6.)  Class M stockholders held the right to elect up to three of MasterCard's directors, but not more than one-quarter of all directors.  (S-1 at 6.)  Furthermore, in their pleading plaintiffs characterize Class M shareholders as holding a limited "veto" power over "(i) any sale of all, or substantially all, of the company's assets; (ii) any merger or consolidation of the company; (iii) any waiver of beneficial ownership limitations in the certificate of incorporation; and (iv) any discontinuation of the core payments business."  (*Id*. ¶ 129.)

---

[6]   The structure of the IPO is set forth in a Form S-1 registration statement filing made by MasterCard with the Securities Exchange Commission ("SEC"), which plaintiffs extensively rely upon in their pleading.  (*See* MasterCard Incorporated, Amendment No. 8 to Form S-1 Registration Statement (Form S-1/A), at 1-10 (May 23, 2006) (hereinafter "S-1"), a true and correct copy of which is attached to the accompanying Declaration of Andrew C. Finch as Exhibit A.)  MasterCard filed its initial Form S-1 registration statement with the SEC on September 15, 2005.  On May 23, 2006, MasterCard filed Amendment 8 to its Form S-1, which fully describes the IPO.  Citations to the Form S-1 are to the May 23, 2006 filing. This Court previously recognized that it may consider this public filing without converting MasterCard's motion to dismiss into a motion for summary judgment.  (*See* Report & Recommendation at 7 (Feb. 12, 2008) (citing *Blue Tree Hotels Inv. (Canada) Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004)); s*ee also Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (documents that are incorporated into the complaint by reference or are otherwise integral to the complaint may be considered in ruling on a motion under Rule 12(b)(6)); *Rothman v. Gregor*, 220 F.3d 81, 88-89 (2d Cir. 2000) ("For purposes of a motion to dismiss, we have deemed a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit.") (internal citations omitted).)

MasterCard offered the investing public a series of Class A shares which held general voting rights; the proceeds from this sale, with the exception of $650 million, were used to redeem 61,520,912 shares of non-voting Class B stock from member banks.  (*Id*. ¶ 125; S-1 at 29.)  MasterCard disclosed that it intended to use the $650 million to "increase our capital, defend ourselves against legal and regulatory challenges, expand our role in targeted geographies and higher growth segments of the global payment industry and for other general corporate purposes."  (S-1 at 6.)  The end result of the transaction was that the banks' ownership of MasterCard's equity had been reduced to 41% and the banks' equity interest (Class B shares and M shares) held no general voting rights.  (S-1 at 6-7.)  Additionally, certain ownership limitations on voting securities were put into effect that prohibit any single entity from acquiring more than 15% of any class of voting stock or 15% of the total voting power.  (S-1 at 140.)

## ARGUMENT

To survive a motion to dismiss, a plaintiff must allege sufficient facts to demonstrate its entitlement to relief.  *See Twombly*, 550 U.S. 544, 570.  Supreme Court and Second Circuit precedent make clear that a plaintiff making antitrust claims has an "obligation to provide . . . more than labels and conclusions, and a formulaic recitation of the elements of a cause of action."  *Id.* at 555; *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007).  As the Court previously recognized in dismissing plaintiffs' First Supplemental Complaint, a plaintiff must "amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible."  Nov. 25, 2008 Op. at *4 (quoting *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007)).  Although plaintiffs have offered additional so-called "factual" allegations in their ASC that primarily detail the process leading up

to MasterCard's IPO, they have failed to cure the pleading deficiencies that caused the Court to dismiss the First Supplemental Complaint in its entirety.

## I.      Plaintiffs Fail to State a Claim Under Section 7 of the Clayton Act or Section 1 of the Sherman Act

Plaintiffs again fail to allege facts that would provide a plausible basis to find any continuation of the banks' control of MasterCard after the IPO and a prolonging of the alleged structural conspiracy.  Indeed, certain allegations showing that a non-bank-controlled MasterCard would impose the same or higher fees on merchants actually concede plaintiffs' inability to plead facts supporting harm to competition, injury or damages with respect to the merchants, as Section 7 of the Clayton Act and Section 1 of the Sherman Act require.

### A.      Plaintiffs Do Not Adequately Allege That the Banks Continue to Control MasterCard After the IPO and Set Interchange to Maximize Bank Profits

Despite including countless additional allegations about the process leading up to the MasterCard IPO, plaintiffs have not remedied the fundamental deficiency the Court previously identified in the First Supplemental Complaint: plaintiffs' allegations, and the reasonable inferences they create, actually demonstrate that post-IPO the banks do not retain sufficient control "to allow any efforts to enrich the Banks at MasterCard's expense."  Nov. 25, 2008 Op. at *10.

#### 1.      Plaintiffs' Allegation That the Banks Control the Post-IPO MasterCard Board of Directors Is Not Plausible

Once again, plaintiffs premise their antitrust claim on the assertion that the post-IPO "MasterCard remains under the effective control of its Member Banks . . . [b]ecause the largest Member Banks have representatives on the Board of [post-IPO] MasterCard."  (ASC ¶¶ 149, 149(c).)  As the Court previously recognized, however, MasterCard's public filings relating to the IPO demonstrate that bank-appointed directors can and do comprise only a small minority

9

fraction of the MasterCard Board.  Nov. 25, 2008 Op. at *10.  Indeed, Class M shareholders may elect only the lesser of three directors or one-quarter of the full board.  (S-1 at 135.)

Plaintiffs' allegations are thus insufficient to support any inference of control. Where a maximum of one-quarter of a board of directors is comprised of representatives of member banks and the remaining three-quarters are independent directors elected by public shareholders, it is well-settled that the minority block cannot establish control.  *See, e.g.*, *Podiatrist Assoc. Inc. v. La Cruz Azul de Puerto Rico, Inc.*, 332 F.3d 6, 19 (1st Cir. 2003) (holding that it was "plainly not enough to show [doctors'] control" where doctors held 8 of 19 seats on board); *see also Klonis v. Nat'l Bank of Greece, S.A.*, 492 F. Supp. 2d 293, 301 (S.D.N.Y. 2007) (subsidiary was not controlled by parent company where only 3 of 10 directors on subsidiary's board were affiliated with parent).

The Court previously recognized the fact that "three-quarters of MasterCard's directors will be independent of the Banks and selected by the Class A shareholders" and thus MasterCard's board "would not be controlled by the Banks."  Nov. 25, 2008 Op. at *10.  To the contrary, "a majority of the board would consist of independent directors who would theoretically oppose any efforts to enrich the Banks at MasterCard's expense."  *Id.*  Plaintiffs therefore cannot rely on allegations about the banks' presence on the MasterCard Board to establish any antitrust claim.[7]

---

[7]  Plaintiffs themselves concede this point in the ASC, acknowledging that the IPO restructuring gives the Board the unilateral power to determine fees and the services offered for such fees, actions that plaintiffs contend previously would have been done collusively by banks acting through the "old" MasterCard Board.  (ASC ¶ 159.)

2.     **Plaintiffs Cannot Plausibly Allege That the Class M Veto Powers Give Banks Control of MasterCard**

Recognizing the Court's correct conclusion that the banks cannot control MasterCard through their minority representation on the Board, plaintiffs concoct an alternative theory—that the banks exercise "de facto" control of MasterCard by virtue of their Class M veto powers. Specifically, plaintiffs allege that, as Class M shareholders, the banks could use their Class M rights to (i) "attempt to block any decision to eliminate or greatly reduce Interchange Fees" or (ii) "prevent MasterCard from issuing Payment Cards or acquiring Merchant transactions, as doing so would constitute 'entering a new line of business.'" (ASC ¶¶ 139, 172.) But here, too, plaintiffs' alternative theory of "control" is not grounded on any factual allegations, but instead rests upon a pure mischaracterization of the Class M veto rights.

The plain language of MasterCard's publicly filed S-1 Registration Statement and accompanying Certificate of Incorporation squarely rebuts plaintiffs' allegations by revealing the limited nature of the Class M veto.[8] Specifically, the S-1 and Certificate of Incorporation state that a majority of Class M shareholders must approve any decision by MasterCard "to *cease to engage in the business* of providing core network authorization, clearing and settlement services for branded payment card transactions." (S-1 at 134; *see also* S-1 Ex. 3.1(a) at § 4.3(A)(3)(a)(4)

---

[8]    This court may consider MasterCard's S-1 public filing without converting this motion to dismiss into a motion for summary judgment. *See supra* note 6. Furthermore, "[i]t is a fundamental principle that the rules used to interpret statutes, contracts and other written instruments are applicable when construing corporate charters and bylaws . . . . [As such, they are] construed as [ ] written, and the language, if simple and unambiguous, is given the force and effect required." *Gentile v. Singlepoint Fin., Inc.*, 788 A.2d 111, 113 (Del. 2001); *see also Hibbert v. Hollywood Park, Inc.*, 457 A.2d 339, 342-43 (Del. 1983). Indeed, "[t]he words of the certificate [of incorporation] must be given their usual and ordinary meaning." *Lockwood v. Gen. Abrasive Co.*, 210 A.D. 141, 143 (S. Ct. NY 1924).

(emphasis added).)[9]   Because this recitation of Class M rights makes no reference to interchange whatsoever, there is no factual basis in the ASC for plaintiffs' conclusory assertion that this veto right includes the power to "block any decision to eliminate or greatly reduce Interchange Fees." (ASC ¶ 139.)  Indeed, it is inconsistent with plaintiffs' own allegation that the "uniform schedules of Interchange Fees and rules requiring the payment thereof *are not a core function* of the Visa and MasterCard Credit and Offline Debit Networks." (*See* Second Consolidated Am. Class Action Compl. ¶ 176.) (emphasis added).

Moreover, even under the most tortured construction, reducing or eliminating interchange fees would not constitute "ceas[ing] to engage in the business of providing core network authorization, clearing and settlement services."  (S-1 at 134.)  Numerous courts have recognized that shareholder veto rights pertaining to certain specific corporate decisions do not as a matter of law give the shareholders control over other corporate decisions.[10]  Plaintiffs' suggestion to the contrary is pure invention.

---

[9]   In addition to the veto power described above, Class M shareholders have veto power over certain major changes to the nature of the corporation such as a decision to sell substantially all of MasterCard's assets, a merger or consolidation, or certain amendments to the Certificate of Incorporation.  (*See* S-1 at 134.)  Such measures are commonplace.  *See, e.g.*, *Centaur Partners, IV v. Nat'l Intergroup, Inc.*, 582 A.2d 923 (Del. 1990); *Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1287 (Del. 1989).  They cannot serve as a basis for an antitrust violation.

[10]   *See In re Western Nat'l Corp.*, No. 15927, 2000 WL 710192, at *6 (Del. Ch. May 22, 2000) (minority shareholder's power to veto business combination did not indicate control over later merger); *see also Kleban v. S.Y.S. Rest. Mgmt., Inc.*, 929 F. Supp. 294, 301 (N.D. Ill. 1996) (power to veto proposed real estate sites for restaurant development did not give defendant power to control representations made regarding future restaurant developments, investments in the developments, or in financial statements); *Abrams v. Ohio Cas. Ins. Co.*, 731 A.2d 48, 52 (N.J. Super. 1999) (power to veto sale of real estate or rent reduction did not give control over statements made in real estate offering memorandum); *Weber v. Weber*, 624 A.D.2d 1021, 1021 (S. Ct. NY 1995) (holding that where certificate of incorporation enumerated specific items requiring unanimous consent of directors, it was inappropriate to read certificate to require unanimous consent for any other items).

### 3. Plaintiffs Do Not Plausibly Allege That the Stock Ownership Restrictions Allow the Banks to Control Interchange

Finally, plaintiffs fail in their effort to resurrect their discredited theory that certain ownership restrictions effectively enable the banks to retain control of MasterCard after the IPO. In dismissing the First Supplemental Complaint, the Court squarely rejected plaintiffs' allegations that restrictions that prevent a third party from acquiring more than 15 percent of MasterCard's class A shares effectively foreclosed the possibility of a takeover by a third-party intent on eliminating "anticompetitive" interchange. The Court concluded that these allegations were insufficient to establish that the IPO has resulted in anything other than an "independent MasterCard, run by directors and managers with a fiduciary duty to act in MasterCard's best interests, rather than in the interests of its customers or competitors." Nov. 25, 2008 at *10.

Plaintiffs essentially have alleged nothing new to support the proposition that the stock ownership restrictions effectively keep MasterCard under the control of the banks. Indeed, the allegations in the Amended Supplemental Complaint with respect to these stock ownership restrictions are virtually identical to the allegations in plaintiffs' prior pleading. (*Compare* Supp. Compl. ¶¶ 101-106 and ASC ¶¶ 163-173.)

The only arguably new allegations regarding the stock ownership restrictions consist of a handful of statements made by bank and MasterCard representatives *before* the IPO, which (according to plaintiffs' conclusory characterizations) suggest that the intended purpose of the stock ownership restrictions was to allow the banks to retain control over MasterCard after the IPO. (ASC ¶¶ 141-146.) These allegations, even if true, have no legal significance whatsoever in the face of plaintiffs' failure to plead facts showing that the stock ownership restrictions *actually do* enable the banks to control MasterCard *after* the IPO. To the contrary, as

13

the Court previously recognized, MasterCard's public filings demonstrate that the banks have no control over MasterCard's interchange rates post-IPO.

In the end, plaintiffs allege nothing but speculation challenging the reality that a post-IPO MasterCard would act in MasterCard's independent interest—rather than in the interests of the banks. They have not and cannot plausibly allege that the IPO has perpetuated any alleged bank-controlled conspiracy that threatens or results in any anticompetitive effects.

**B.    Plaintiffs' Own Allegations Establish the Absence of Any Anticompetitive Effect, Injury, or Damage to Merchants**

In addition to their failure to adequately allege that the banks control the setting of interchange after the IPO, plaintiffs' allegations suffer from another fundamental flaw: their assertion that fees paid by merchants would be lower in the absence of the purported post-IPO conspiracy is wholly conclusory and lacks any factual basis. Indeed, to the extent the ASC contains any factual allegations on this score, those allegations actually establish the opposite and support the fact that merchants did not suffer any injury or damages by paying higher fees as a result of the alleged post-IPO conspiracy. For this separate and independent reason, plaintiffs' antitrust claims should be dismissed with prejudice.

Although plaintiffs assert in certain paragraphs of the ASC that merchant fees would be lower absent the purported post-IPO conspiracy, they do so in wholly conclusory form. (*See, e.g.*, ASC ¶ 153; *see also* ASC ¶ 60.) Plaintiffs simply do not allege any facts establishing that, without the purported conspiracy, MasterCard would reduce or eliminate interchange or its economic equivalent.

Plaintiffs do, however, allege that, absent the alleged post-IPO conspiracy, MasterCard could keep interchange revenue for itself rather than distribute it to the issuing banks. (ASC ¶¶ 8, 149, 149(e).) But this allegation suggests only that, absent the purported

14

conspiracy, MasterCard could keep the interchange revenue for itself, not that it would reduce

the fees charged to the merchant class.  (*Id*.¶ 149(e) (alleging that MasterCard "could, in theory,

collect Interchange Fees from Merchants and keep that substantial revenue").)  Nowhere do

plaintiffs allege any facts establishing that an independent post-IPO MasterCard would pass on

to merchants in the form of lower fees any alleged savings resulting from reduced issuer

payments.

        To the contrary, the factual allegations of the Amended Supplemental Complaint

actually acknowledge that merchant fees would *not* be reduced by MasterCard absent the alleged

post-IPO conspiracy: *First*, as noted, plaintiffs allege that even in the absence of a conspiracy

among the banks to control the setting of interchange, an independent post-IPO MasterCard

could continue to collect interchange fees from merchants, but keep interchange revenue for

itself.  (*Id*. ¶¶ 149, 149(e).)

        *Second*, plaintiffs allege that MasterCard's current fees are set at a level that seeks

to balance both merchant prices and merchant acceptance of MasterCard payment cards, and that

MasterCard has been able to increase its fees to current levels without losing any merchants.

(*See, e.g.*, ASC ¶ 220 ("MasterCard has increased Interchange Fees by large amounts without

losing any Merchants as a result"); ASC ¶ 222 ("MasterCard continues its practice of increasing

Interchange fees, again without losing significant Merchant acceptance.").)  Thus, as MasterCard

purportedly has not lost any merchants at the current fee levels, absent the alleged post-IPO

conspiracy MasterCard similarly would have no economic incentive to lower fees to merchants.

        Taken together, these factual allegations mean only one thing:  under

plaintiffs' allegations, in the absence of a conspiracy among the banks to control the setting of

interchange post-IPO, an independent MasterCard—acting in its unilateral self-interest to

maximize its profits— would continue setting merchant fees at current or *higher* levels. Plaintiffs thus cannot allege that the purported post-IPO conspiracy has any anticompetitive effect on merchants, or causes any merchant to suffer any injury or damages.  Plaintiffs' antitrust claims should therefore be dismissed for this reason as well.

## II.      Plaintiffs Fail to State a Fraudulent Conveyance Claim

Plaintiffs once again attempt to plead that MasterCard's elimination of its right to assess member banks to satisfy a litigation judgment constitutes a fraudulent conveyance in violation of N.Y. Debtor & Creditor Law §§ 275 and 276.  (*See* ASC Twenty-Fifth and Twenty-Sixth Claims for Relief.)  The Court has dismissed these claims once before.

As with their antitrust claims, plaintiffs present no new allegations that should alter the Court's previous order.  First, plaintiffs offer no particularized factual allegations to support a claim that MasterCard, having pursued a thorough and deliberate process in connection with a publicly-disclosed IPO, intentionally sought to defraud plaintiffs in violation of N.Y. Debt. & Cred. Law § 276.  Nor do plaintiffs' allegations provide a basis for concluding, as required by § 275, that the MasterCard Board or senior management believed that when MasterCard moved to a public structure and retained $650 million in IPO proceeds, it would incur debts that the company would be unable to pay.  In both instances, the admissions in plaintiffs' own pleading compel dismissal of these claims with prejudice.

At bottom, fraudulent conveyance law concerns itself with transfers by a debtor that remove the subject property from the reach of a creditor.[11]  Here, the funds plaintiffs seek to

---

[11]    The purpose of fraudulent conveyance statutes is to "prevent harm to creditors by a transfer of property from the debtor."  *In re Murphy*, 331 B.R. 107, 124 (Bankr. S.D.N.Y. 2005) (internal citations omitted).  Courts have recognized that "fraudulent conveyance laws were not intended to protect individuals who were not legally harmed by the transfer and have refused to upset the transfer to the extent it was legal as between the transferor and the

recover are held by MasterCard or the banks—the largest of whom are directly before this Court as defendants.  Plaintiffs cannot complain they are prejudiced by their purported inability to recover *indirectly* from these banks through MasterCard's former special assessment procedure when they can recover directly.

### A.   Plaintiffs Have Not Alleged the Requisite Actual Fraud Necessary to State a Claim Under Section 276

Section 276 governs "only those conveyances 'made . . . with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors[.]'" (Orenstein Report & Recommendation at 33 (Feb. 12, 2008) (citing N.Y. Debt. & Cred. Law § 276 (2006).)  The Court ruled that plaintiffs had previously failed to plead a claim of actual fraud under Section 276 with the particularity required under Fed. R. Civ. P. 9(b).

Plaintiffs now again have failed to allege sufficient facts to establish the actual fraud element of a § 276 claim with the particularity required by Fed. R. Civ. P. 9(b).[12]  (*See* Report & Recommendation at 33; *Sharp Int'l Corp. v. State St. Bank & Trust Co.*, 403 F.3d 43, 56 (2d Cir. 2005) ("As an actual intent to hinder, delay, or defraud [under NYDCL § 276]

---

recipient." *Id.* at 125.  A fraudulent conveyance requires "prejudice to [the creditor's] rights," and the creditor must show that "the transfer under attack deprived him of the right to subject the property transferred to the payment of this debt." *Citizens & S. Nat'l Bank v. Auer*, 640 F.2d 837, 838 (6th Cir. 1981) (internal citation omitted) (interpreting Tennessee Uniform Fraudulent Conveyance Act); *see also Eberhard v. Marcu*, 530 F.3d 122, 129-30 (2d Cir. 2008) ("It is well settled that in order to set aside a fraudulent conveyance, one must be a creditor of the transferor; those who are not injured by the transfer lack standing to challenge it."); *Lippe v. Bairnco Corp.*, 99 Fed. Appx. 274, 281 (2d Cir. 2004) ("In New York, fraudulent-conveyance liability may not attach absent some prejudice to a creditor of the transferor.").

[12]   Fed. R. Civ. P. 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."

constitutes fraud, it must be pled with specificity, as required by Fed. R. Civ. P. 9(b).") (internal quotations and citation omitted).)[13]

      None of the factual allegations in the amended pleading demonstrates actual fraud.  Other than making a conclusory assertion that "MasterCard's release of its right of special assessment against the banks was made with actual intent to hinder and defraud Class Plaintiffs, which have potential claims of tens of millions of dollars against MasterCard" (ASC ¶ 319), plaintiffs do not and cannot allege any *facts* suggesting that MasterCard *intended* to defraud them.

      Instead, as in their first pleading, plaintiffs attempt to plead various "badges of fraud" in an indirect effort to construct a "strong inference" of fraudulent intent.  Badges of fraud are "circumstances that so commonly accompany fraudulent transfers that their presence gives rise to an inference of intent to defraud."  (Report & Recommendation at 34.)  Courts have identified badges of fraud that concern "whether the transfers were conducted in secrecy" and "the circumstances of the transfers" (*see Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 382 (S.D.N.Y. 2003)), as well as "the financial condition of the party sought to be charged both before and after the transaction in question[,] the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors[,] and the general chronology of the events and transactions under inquiry."  *Sullivan v. Kodsi*, 373 F. Supp. 2d 302, 307 (S.D.N.Y. 2005).  Other indicia include "'a close relationship between the parties to the alleged fraudulent transaction; a questionable transfer not in the usual course of business; inadequacy of the

---

[13]   Plaintiffs' allegations of actual intent and fraud are conclusory and inadequate as to MasterCard, but the ASC is *silent* as to the bank defendants named in the fraudulent conveyance counts.  As a result, plaintiffs cannot dispute that these claims should be dismissed as to the bank defendants.

consideration; . . . [and] retention of control of the property by the transferor after the conveyance.'"  (Report & Recommendation at 34 (quoting *In re Sharp Int'l Corp.*, 403 F.3d at 56) (add'l citations omitted).)

   But rather than identify badges of fraud, plaintiffs allege facts that reveal only legitimate conduct.  *First*, plaintiffs have no answer for the undisputed reality that these transactions were fully reported and disclosed to the public in MasterCard's filings with the SEC.  *See, e.g.*, *Lippe*, 249 F. Supp. 2d at 384 (finding that transactions "reported in [defendants'] publicly-filed reporting statements . . . weighs heavily against a finding of fraud");  *In re Integrated Res. Real Estate Ltd. P'ships Sec. Litig.*, 850 F. Supp. 1105, 1130 (S.D.N.Y. 1993) ("allegations of alleged fraud which [were] available for public and investor consumption, are futile").  The elimination of the special assessment right, the effect of that on MasterCard and prospective investors, and MasterCard's retention of $650 million in the IPO were plainly disclosed in public filings.  (*See, e.g.*, S-1 at 5, 24.)

   *Second*, the ASC demonstrates that MasterCard's IPO and the related transactions were conducted in the usual course of business and had a legitimate business purpose.  MasterCard's SEC filings clearly state that the IPO's purpose was to "increase [MasterCard's] capital," "defend . . . against legal and regulatory challenges," "expand . . . in targeted geographies and higher growth segments," and "enhance [MasterCard's] business over the long term" in part by "transitioning to a board of directors that includes a majority of [independent] directors."  (*See* S-1 at 6-7.)  Further, plaintiffs allege that in consideration for MasterCard's elimination of the special assessment right, the banks would fund a pool of $1 billion ($650 million in after-tax dollars) in connection with MasterCard's redemption of the banks' Class B shares.  (ASC ¶¶ 125-26, 182-83.)  MasterCard reported in its public filings that it intended to

use this $650 million in proceeds "to increase our capital, defend ourselves against legal and regulatory challenges, expand our role in targeted geographies and higher growth segments of the global payment industry and for other general corporate purposes."  (S-1 at 6.)

In light of their own allegations showing the legitimate business rationale underlying this IPO structure, plaintiffs are unable to classify the IPO as an extraordinary transaction raising the specter of fraud.  Speculative allegations that the IPO structure also affects MasterCard's litigation exposure similarly are unavailing.  *See Lippe*, 249 F. Supp. 2d at 383 ("Even assuming management's concern over the asbestos cases was a motivating factor [behind the transfers,] there was nothing inappropriate about a company's management looking for lawful ways to reduce the adverse impact of asbestos litigation."); *see also In re Park S. Sec., LLC*, 326 B.R. 505, 518 (Bankr. S.D.N.Y. 2005) (suggesting that "evidence of a legitimate supervening purpose" can obviate inference of actual intent to defraud).

Third, any allegation of continuing control cannot be considered a badge of fraud.  For all the reasons discussed above in Point I, plaintiffs have not established that the banks retain control over MasterCard after the IPO.  MasterCard's restructuring as a public company with a majority of independent directors effectively severed any alleged control by the banks.  Furthermore, plaintiffs have not alleged facts showing that the funds they seek to recover have been shifted to controlling entities of MasterCard that are outside the jurisdiction of the Court.

Finally, plaintiffs assert that MasterCard eliminated a right of special assessment in consideration of $650 million in IPO proceeds with full knowledge that it would be facing far greater monetary exposure as a result of the instant lawsuit.  (ASC ¶¶ 177, 192, 197-98.)  But there is no factual basis present within the four corners of the ASC supporting the contention that this was *MasterCard's* belief.  To the contrary, the pleading alleges that after lengthy

consideration, aided by independent legal and financial advisors, MasterCard was of the view, which it publicly disclosed, that the possibility of liability in this case was not likely nor estimable.  (*Id*. ¶¶ 179-86.)

Plaintiffs nonetheless contend that this entire process was a sham, and that MasterCard undertook the IPO even though it secretly believed that it would be liable for billions of dollars in damages in this case.  But plaintiffs ultimately allege only that two Board members and one MasterCard executive voiced concerns about litigation exposure generally, and that certain third-parties such as the Boston Consulting Group (not MasterCard's attorneys) made some widely-varying estimates of potential lost interchange revenues.

Yet, these allegations are not supportive of plaintiffs' claims.  For example, the Boston Consulting Group is alleged only to have provided MasterCard with estimates of forward-looking, lost interchange revenues by the banks, not estimates of damages paid by MasterCard from past wrongful conduct.  Significantly, all of the estimates simply *assumed* liability; none included any estimate based on the actual likelihood of an adverse judgment.  And allegations that MasterCard considered and addressed a director's questions regarding general litigation risks—which the director himself suggested "[could] not be quantified" (ASC ¶ 187)— cannot be considered evidence of fraud.  In the end, the actual *facts* plaintiffs have alleged suggest that MasterCard believed not only that the litigation risks were in fact inestimable, but that the IPO would actually *reduce* any such risks (*e.g.*, ASC ¶¶ 113-14), so that its decision to accept $650 million as a "business compromise" (ASC ¶ 126) is consistent with sound business judgment rather than fraud.

The bottom line is that even the plaintiffs' allegations concede that MasterCard concluded and publicly disclosed that the contingent liabilities arising from this lawsuit were not

quantifiable or probable.  (ASC ¶¶ 184-89).[14]  Plaintiffs have come forward with no factual

allegations that can credibly support an inference of fraud warranting the Court's re-examination

of the business judgment of MasterCard and its Board.  *See Klang v. Smith's Food & Drug Ctrs.*,

702 A.2d 150, 156 (Del. 1997) ("[i]n the absence of bad faith or fraud on the part of the board,

courts will not 'substitute [our] concepts of wisdom for that of the directors'" in valuing a

company (quoting *Morris v. Standard Gas &Electric Co.*, 63 A.2d 577 (Del. Ch. 1949))).  In

short, plaintiffs are left with their own self-serving contentions regarding the "likely" success of

their lawsuit, which is no more than speculation already rejected by the Court as a foundation of

a fraud claim.  (*See* Report & Recommendation at 36; *see also* Point II.B, *infra*.)

### B.  Plaintiffs Have Not Alleged an Adequate Basis for a Constructive Fraud Claim Under Section 275

Plaintiffs also cannot rely on § 275 to salvage their fraudulent conveyance claim.

Section 275 defines as fraudulent any "'conveyance made . . . without fair consideration when

the person making the conveyance . . . intends or believes that he will incur debts beyond his

ability to pay as they mature[.]'" (Report & Recommendation at 35 (quoting N.Y. Debt. & Cred.

Law § 275).)  Section 275 additionally imposes upon plaintiffs "the obligation to allege 'those

facts *necessary* to a finding of liability.'"  (*Id.* (quoting *Amron v. Morgan Stanley Inv. Advisors,*

*Inc.* 464 F.3d 338, 343 (2d Cir. 2006) (emphasis in original)).)

In recommending the dismissal of the prior pleading, this Court found that

plaintiffs alleged no facts to show that MasterCard itself believed at the time of the elimination

---

[14]  Plaintiffs allege that Houlihan Lokey did not make an assessment of contingent liabilities in
its valuation opinion.  (ASC ¶ 185.)  But nowhere do they allege why this is indicative of
fraud.  Nor do they allege (i) that assessing contingent litigation liabilities is an appropriate
function of a valuation firm such as Houlihan Lokey, (ii) that Houlihan Lokey regularly does
such litigation analyses, (iii) the methodology Houlihan was to utilize, or (iv) why
MasterCard's alleged instruction to Houlihan not to attempt to estimate damages in light of
the current litigation was improper in any way.

of the special assessment that it would incur debts beyond its ability to pay.  (*See* Report &
Recommendation at 36 ("Neither the plaintiffs' prediction of the 'likely' results of a victory on
their antitrust claims nor the corresponding estimate of third parties says anything about what
*MasterCard* intended or believed in releasing its right of assessment.") (emphasis in original)
(quoting *Ostashko v. Ostashko*, No. 00-CV-7162, 2002 WL 32068357, at \*26 (E.D.N.Y. Dec.
12, 2002); *see also MFS/Sun Life Trust – High Yield Series v. Van Dusen Airport Servs. Co.*, 910
F. Supp. 913, 943 (S.D.N.Y. 1995) (dismissing § 275 claim where plaintiffs "adduced no
evidence of an actual belief by the defendants that [the company] would be unable to pay its
debts").)

   Instead of curing this deficiency, plaintiffs only point to anecdotal concerns of
several individuals and "estimates" of revenue loss — not of a liability or damages estimate.
(*See, e.g.,* ASC ¶¶ 95, 177.)  Additionally, the pleading acknowledges that Mr. Selander reported
management's view that the contingent liability arising from this lawsuit was not quantifiable, a
conclusion with which the Board of Directors allegedly agreed.  (ASC ¶ 186.)  MasterCard thus
reported to the public that the contingent liability associated with this litigation could not be
accurately estimated, not that it would render MasterCard insolvent.  (*See, e.g.*, ASC ¶ 189.)
Indeed, MasterCard's public disclosures concerning the IPO are replete with statements that the
IPO would *increase* MasterCard's capital base, thereby enhancing its ability to meet future
obligations from potential creditors such as plaintiffs.  (*See, e.g.*, S-1 at 34 (discussing use of IPO
proceeds to "increase our capital," and "defend ourselves against legal and regulatory
challenges"), 73 (IPO "will place our business in a stronger position").)

   Thus, there are no new facts alleged by plaintiffs to demonstrate that MasterCard
eliminated the special assessment rights at a time when it believed that it would incur debts

beyond its ability to pay.  Nov. 25, 2008 Op. at *11.  Merely taking appropriate actions in

furtherance of valid business objectives is fundamentally inconsistent with fraud.  *See, e.g.*, *In re*

*Park S. Sec., LLC*, 326 B.R. at 518 (suggesting that "evidence of a legitimate supervening

purpose" can obviate inference of actual intent to defraud).

        Plaintiffs also assert again that "[b]y eliminating MasterCard's assessment rights

against its member banks . . . MasterCard is eliminating the only mechanism to satisfy large

judgments against it."  (ASC ¶ 203.)  But the mere pendency of litigation against an alleged

tortfeasor who transferred assets prior to trial is not sufficient to establish a § 275 claim because

it "is inherently speculative, in view of the possibility of different outcomes to the trial."  *Shelly*

*v. Doe*, 173 Misc. 2d 200, 211-12 (N.Y. Co. 1997).[15]  Absent specific factual allegations

demonstrating that MasterCard itself believed that it would incur debts resulting from this

litigation beyond its ability to pay, plaintiffs have not stated a claim under N.Y. Debt. & Cred.

Law § 275.

## III.    Plaintiffs Should Not Be Permitted To Replead

        Plaintiffs now have had months of discovery, taken hundreds of depositions and

obtained millions of pages of documents from defendants.  Their failure to plead legally

cognizable claims after this ample fact-finding fully justifies dismissal of the Amended

Supplemental Complaint with prejudice.  *See, e.g.*, *Ryan v. Hunton & Williams*, No. 99-CV-

---

[15]  Plaintiffs' claim is further attenuated here because the fraudulent conveyance claims rest on
the twin assumptions that plaintiffs will be awarded billions of dollars at the conclusion of
this case, *and* that MasterCard would choose to invoke its right of assessment to satisfy any
judgment.  Yet, as plaintiffs acknowledge, MasterCard did not even use the right of
assessment to fund the settlement in *In re Visa Check/MasterMoney Antitrust Litigation*
when it was able to do so.  (ASC ¶ 193.)  Plaintiffs have not offered any reason for the Court
to conclude that MasterCard would have done so at the end of this case either.

5938, 2000 WL 1375265, at *11 (E.D.N.Y. Sept 20, 2000) (Gleeson, J.) (amendment would be futile where plaintiffs prepared complaint "after discovery had been taken").

## CONCLUSION

For the forgoing reasons, defendants  respectfully requests that this Court enter an order dismissing the First Amended Supplemental Class Action Complaint in its entirety with prejudice.

Dated:  New York, New York
        March 31, 2009

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

By: /s/ Kenneth A. Gallo_____
    Kenneth A. Gallo
    Joseph J. Simons
    2001 K Street, N.W.
    Washington, D.C. 20006-1047
    Tel:  (202) 223-7300
    Fax:  (202) 223-7420
    KGallo@paulweiss.com
    JSimons@paulweiss.com

    Bruce Birenboim
    Gary R. Carney
    Andrew C. Finch
    1285 Avenue of the Americas
    New York, N.Y. 10019-6064
    Tel:  (212) 373-3000
    Fax:  (212) 757-3990
    BBirenboim @paulweiss.com
    GCarney@paulweiss.com
    AFinch@paulweiss.com

**HUNTON & WILLIAMS LLP**
Keila D. Ravelo
Wesley R. Powell
200 Park Avenue
New York, N.Y. 10166-0005
Tel: (212) 309-1000
Fax: (212) 309-1100

Attorneys for Defendants MasterCard
Incorporated and MasterCard
International Incorporated.


**SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM, LLP**

By: /s/ Peter E. Greene
    Peter E. Greene
    Cyrus Amir-Mokri
    Peter S. Julian
    Linda W. Cenedella
    Boris Bershteyn
    Four Times Square
    New York, N.Y.  10036
    Telephone:  (212) 735-3000
    Facsimile:  (212) 735-2000
    peter.greene@skadden.com


Attorneys for Defendants JPMorgan Chase & Co.,
Chase Bank USA, N.A., Chase Paymentech
Solutions, LLC, JPMorgan Chase Bank, N.A. as
acquirer of certain assets and liabilities of
Washington Mutual Bank, Bank One Corporation,
Bank One Delaware.

**MORRISON & FOERSTER, LLP**

By: /s/ Mark P. Ladner
  Mark P. Ladner
  Michael B. Miller
  1290 Avenue of the Americas
  New York, N.Y.  10104-0050
  Tel: (212) 468-8000
  Fax: (212) 468-7900
  mladner@mofo.com

Attorneys for Defendants Bank of America, NA., BA
Merchant Services LLC (f/k/a Defendant National
Processing, Inc.), Bank of America Corporation, and
MBNA America Bank, N.A.

**SIDLEY AUSTIN LLP**

By: /s/ David F. Graham
  David F. Graham
  Eric H. Grush
  One South Dearborn Street
  Chicago, IL 60603
  Tel: (312) 853-7000
  Fax: (212) 853-7036
  dgraham@sidley.com

  Benjamin R. Nagin
  787 Seventh Ave
  New York, N.Y.  10019
  Tel: (212) 839-5300
  Fax: (212) 839-5599
  bnagin@sidley.com

Attorneys for Defendants Citibank (South Dakota),
N.A., Citibank, N.A., Citigroup, Inc., Citicorp.

27

**O'MELVENY & MYERS LLP**

By: /s/ Andrew J. Frackman
     Andrew J. Frackman
     Edward D. Hassi
     Peter C. Herrick
     Times Square Tower
     7 Times Square
     New York, N.Y. 10036
     Tel: (212) 326-2000
     Fax: (212) 326-2061
     afrackman@omm.com

Attorneys for Defendants Capital One Bank (USA), N.A., Capital One F.S.B., and Capital One Financial Corp.

**WILMER CUTLER PICKERING HALE AND DORR LLP**

By: /s/ Christopher R. Lipsett
     Christopher R. Lipsett
     David S. Lesser
     399 Park Avenue
     New York, N.Y.  10022
     Tel: (212) 230-8800
     Fax: (212) 230-8888
     chris.lipsett@wilmerhale.com

     A. Douglas Melamed
     Ali M. Stoeppelwerth
     Perry A. Lange
     1875 Pennsylvania Ave., N.W.
     Washington, D.C.  20006
     Tel: (202) 663-6000
     Fax: (202) 663-6363

Attorneys for HSBC Finance Corporation and HSBC North America Holdings, Inc.