# Exhibit A

Table of Contents

As filed with the Securities and Exchange Commission on May 23, 2006.

Registration No. 333-128337

# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## AMENDMENT NO. 8 TO
## FORM S-1
## REGISTRATION STATEMENT
### UNDER
### THE SECURITIES ACT OF 1933

# MASTERCARD INCORPORATED
(Exact name of Registrant as specified in its charter)

| **Delaware** | **7389** | **13-4172551** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification No.) |

**2000 Purchase Street**
**Purchase, New York 10577**
**Telephone: (914) 249-2000**
(Address, including zip code, and telephone number,
including area code, of Registrant's principal executive offices)

**Noah J. Hanft, Esq.**
**General Counsel**
**MasterCard Incorporated**
**2000 Purchase Street**
**Purchase, New York 10577**
**Telephone: (914) 249-2000**
(Name, address, including zip code, and telephone number,
including area code, of agent for service)

*Copies to:*

| | |
|---|---|
| **Vincent Pagano, Jr., Esq.** | **David Lopez, Esq.** |
| **Joshua Ford Bonnie, Esq.** | **Cleary Gottlieb Steen & Hamilton LLP** |
| **Simpson Thacher & Bartlett LLP** | **One Liberty Plaza** |
| **425 Lexington Avenue** | **New York, NY 10006-1470** |
| **New York, NY 10017-3954** | **Telephone: (212) 225-2000** |
| **Telephone: (212) 455-2000** | **Facsimile: (212) 225-3999** |
| **Facsimile: (212) 455-2502** | |

**Approximate date of commencement of the proposed sale of the securities to the public:**   As soon as practicable after the Registration Statement becomes effective.

If any of the securities being registered on this form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, check the following box.  ☐

If this form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

If this form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

If this form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

## CALCULATION OF REGISTRATION FEE

| Title of Each Class of Securities To Be Registered | Amount to be Registered(1) | Proposed Maximum Offering Price Per Share | Proposed Maximum Aggregate Offering Price(2) | Amount of Registration Fee(3) |
|---|---|---|---|---|
| Class A common stock, par value $.0001 per share | 66,134,989 shares | $43.00 | $2,843,804,527 | $330,502.08 |

(1)   Includes 4,614,077 shares subject to the underwriters' option to purchase additional shares.
(2)   Estimated solely for the purpose of determining the amount of the registration fee in accordance with Rule 457(a) under the Securities Act of 1933.
(3)   Previously paid.

**The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until the Registration Statement shall become effective on such date as the Commission, acting pursuant to said Section 8(a), may determine.**

Source: MASTERCARD INC, S-1/A, May 23, 2006

**Table of Contents**

The information in this preliminary prospectus is not complete and may be changed. These securities may not be sold until the registration statement filed with the Securities and Exchange Commission is effective. This preliminary prospectus is not an offer to sell nor does it seek an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.

Subject to Completion. Dated May 23, 2006.

*MasterCard International*



61,520,912 Shares

# MasterCard Incorporated

## Class A Common Stock

This is an initial public offering of shares of Class A common stock of MasterCard Incorporated. MasterCard is offering all of the 61,520,912 shares of Class A common stock to be sold in this offering.

Prior to this offering, there has been no public market for the Class A common stock. It is currently estimated that the initial public offering price per share will be between $40.00 and $43.00. The Class A common stock has been approved for listing on the New York Stock Exchange under the symbol "MA."

Subject to limited exceptions, our certificate of incorporation will prohibit any person from beneficially owning more than 15% of the Class A common stock.

We intend to use all but $650 million of our net proceeds from this offering to redeem shares of Class B common stock from our existing stockholders.

See "*Risk Factors*" on page 13 to read about factors you should consider before buying shares of Class A common stock.

**Neither the Securities and Exchange Commission nor any other regulatory body has approved or disapproved of these securities or passed upon the accuracy or adequacy of this prospectus. Any representation to the contrary is a criminal offense.**

|  | Per Share | Total |
|---|---|---|
| Initial public offering price | $ | $ |
| Underwriting discount | $ | $ |
| Proceeds, before expenses, to MasterCard | $ | $ |

To the extent that the underwriters sell more than 61,520,912 shares of Class A common stock, the underwriters have the option to purchase up to an additional 4,614,077 shares of Class A common stock from MasterCard at the initial public offering price less the underwriting discount.

The underwriters expect to deliver the shares against payment in New York, New York on _____, 2006.

## Goldman, Sachs & Co.

| Citigroup | Goldman, Sachs & Co. | HSBC | JPMorgan |
|---|---|---|---|

| Bear, Stearns & Co. Inc. | Cowen and Company | Deutsche Bank Securities |
|---|---|---|
| Harris Nesbitt | KeyBanc Capital Markets | Santander Investment |

Prospectus dated _____, 2006.

Source: MASTERCARD INC, S-1/A, May 23, 2006

Table of Contents

## SUMMARY

*This summary does not contain all the information you should consider before investing in our Class A common stock. You should read this entire prospectus carefully, including the section entitled "Risk Factors" and our consolidated financial statements and the notes to those statements, before you decide to invest in our Class A common stock.*

*In this prospectus, references to the "Company," "MasterCard," "we," "us" or "our" refer to the MasterCard brand generally, and to the business conducted by MasterCard Incorporated and its consolidated subsidiaries, including our principal operating subsidiary, MasterCard International Incorporated. We use the term "card" to refer to the plastic cards carrying our brands or those of our competitors, together with the underlying credit, charge, deposit or other account.*

### MasterCard

MasterCard is a leading global payment solutions company that provides a variety of services in support of the credit, debit and related payment programs of nearly 25,000 financial institutions. We manage a family of well-known, widely accepted payment card brands, including MasterCard®, MasterCard Electronic™, Maestro® and Cirrus®, which we license to these financial institutions. As part of managing these brands, we also provide our financial institution customers with a sophisticated set of information and transaction processing services and establish and enforce rules and standards surrounding the use of our payment card system. We generate revenues from the fees that we charge our customers for providing these transaction processing and other payment-related services (operations fees) and by assessing our customers based on the dollar volume of activity on the cards that carry our brands (assessments).

A typical transaction processed over our system involves four parties in addition to ourselves: the cardholder, the merchant, the issuer (the cardholder's bank) and the acquirer (the merchant's bank). Our customers are the financial institutions that act as issuers and acquirers. Using our transaction processing services, issuers and acquirers facilitate payment transactions between cardholders and merchants throughout the world, providing merchants with an efficient and secure means of receiving payment, and consumers and businesses with a convenient payment method accepted worldwide. We guarantee the settlement of many of these transactions among our customer financial institutions to ensure the integrity of our payment system. In addition, we undertake a variety of marketing activities designed to maintain and enhance the value of our brands. However, cardholder and merchant relationships are managed principally by our customers. Accordingly, we do not issue cards, extend credit to cardholders, determine the interest rates (if applicable) or other fees charged to cardholders by issuers, or establish the merchant discount charged by acquirers in connection with the acceptance of cards that carry our brands.

Our business has a global reach and has experienced significant growth. Gross dollar volume on cards carrying the MasterCard brand as reported by our customers (GDV) was $1.7 trillion in 2005, a 13% increase in U.S. dollar terms over the GDV reported in 2004. For the first three months of 2006, GDV was $426 billion, a 12% increase in U.S. dollar terms over the GDV reported in the first three months of 2005. In 2005, we processed 13.7 billion transactions (including 2.6 billion PIN-based online debit transactions), a 13% increase over the transactions processed in 2004.

1

Source: MASTERCARD INC, S-1/A, May 23, 2006

Table of Contents

We believe there is a trend within the global payments industry from paper-based forms of payment such as cash and checks toward electronic forms of payment such as cards, which creates significant opportunities for continued growth in our business. We believe this trend is driven by the following elements:

- *Increasing Usage of Electronic Forms of Payment.*   Credit and debit card usage has grown at significant rates and is displacing cash and checks, the traditional forms of payment. Consumers are migrating to card-based forms of payment, motivated in part by the convenience, enhanced services and reward programs that cards offer. Corporations, small businesses and governments have also increased their usage of card-based forms of payment for travel, purchasing and fleet management in order to gain better transaction information, more efficiently manage their supply chains and reduce administrative costs. Other forms of electronic payments, including pre-paid cards, chip-based cards and mobile commerce, offer opportunities for further usage and growth.

- *Increasing Acceptance of Electronic Forms of Payment.*   Merchants of all sizes have increased their acceptance of electronic payments as a way to augment their sales and increase consumer convenience. Electronic forms of payment are gaining wider acceptance in corporate payment applications and in important merchant categories such as supermarkets, gas stations, convenience stores, utilities and fast-food restaurants. In addition, governments have begun accepting electronic payments in order to reduce their administrative costs. Payment cards and other electronic forms of payment continue to be the preferred method of payment in certain higher growth channels of commerce, such as the Internet.

- *Innovation in the Payments Industry.*   Innovation at the point of sale, including the incorporation of new technologies such as smart cards and contactless cards, continues to reduce transaction times and otherwise enhance the attractiveness of payment cards to both consumers and merchants. In addition, issuers are making payment cards more attractive to cardholders through value-adding initiatives such as rewards and co-branding programs.

- *Favorable Trends in Global Commerce.*   A wide range of factors has increased global commerce, particularly cross-border business and leisure travel. This trend benefits card-based forms of payment, which afford cardholders increased convenience and efficiency when making international transactions compared with cash and checks. In addition, in many emerging markets, increased consumer card usage is being driven by the growth of middle-class consumer populations and the development of modern payment systems to serve them. Globalization is also encouraging the replacement of domestic payment solutions with payment solutions that have a worldwide reach.

**Competitive Strengths**

We believe the following key strengths enhance our ability to compete successfully in the global payments industry:

- *Leading Worldwide Payments System.*   We believe that the strong worldwide recognition of our brands, our long-standing relationships with our issuers and acquirers and the extensive global reach of our payment card system are valuable corporate assets that provide us with a strong platform from which we can deliver value to our customers, merchants and cardholders.

  - *Global Brand.*   Through our global brand-building initiatives, we have established strong worldwide recognition for MasterCard and our other brands. We believe that our brands are valuable strategic assets that drive card acceptance and usage and facilitate our ability to successfully introduce new service offerings and access new markets.

2

Source: MASTERCARD INC, S-1/A, May 23, 2006

Table of Contents

- *Long-Standing Customer Relationships.*   Our business originated in 1966 when a number of banks in the United States formed the Interbank Card Association and, over time, we have grown into a global organization that serves nearly 25,000 financial institutions in 210 countries and territories. We believe that the breadth and depth of our relationships with our issuers and acquirers provide us with valuable insights into their businesses. These insights, in turn, facilitate our ability to pursue additional opportunities with these customers in connection with both our core transaction processing business and the related value-added services we provide, such as the consulting services provided by MasterCard Advisors.

- *Worldwide Acceptance.*   Based on information from our customers, as of March 31, 2006, cards carrying the MasterCard brand were accepted at over 24 million locations around the world, including merchant locations, ATMs and other locations where cash may be obtained. We believe that the extensive global acceptance of cards carrying our brands is unsurpassed by any of our competitors, which is a significant competitive strength that facilitates the use of our cards and contributes to the growth of our business globally.

- *Global, Branded Processing Platform.*   We operate a proprietary, worldwide computer and telecommunications system that links issuers and acquirers around the globe for transaction processing services and permits cardholders to use their cards at millions of merchants worldwide. This system, in which we have made significant recent investments, is a highly reliable, scalable asset that we believe provides us with the flexibility to provide additional transaction processing services to both new and existing customers with relatively low incremental costs. We also believe that the strength of our global brands and our processing experience enhance our ability to compete for new processing business.

- *Global Reach of Business.*   We have offices in 40 countries worldwide and a senior management team with extensive international experience. Through these resources, we have developed substantial knowledge of local customer practices and cardholder behavior in the key markets in which we operate. In addition, we believe that our integrated corporate structure and worldwide presence enables us to provide globally coordinated payment solutions to multinational customers more effectively than our competitors whose businesses are limited in geographic scope or organized principally as separate regional operating companies. As customers continue to consolidate, we believe our structure will enhance our ability to support their differing needs. We also believe that our global operations and worldwide customer base moderate our exposure to the varying economic conditions of different regions.

**Business Strategy**

Our strategy is to drive growth by further penetrating our existing customer base and by expanding our role in targeted areas of the global payments industry. Primary elements in implementing our strategy include:

- *Focus on Key Customers.*   We are committed to providing our key customers with coordinated services through integrated, dedicated account teams in a manner that allows us to leverage our expertise in payment programs, brand marketing, product development, technology, processing and consulting services for these customers. We have historically applied this customer-focused model to our largest global customers and are now expanding this approach to include customers around the world representing a substantial majority of our revenue. Through MasterCard Advisors, we seek to leverage our deep functional expertise in many important areas of the payments industry for our customers. By further investing in strong

3

Source: MASTERCARD INC, S-1/A, May 23, 2006

Table of Contents

relationships over the long term with our key customers, we believe that we can increase our volume of business with them over time.

- *Continued Expansion in Targeted Geographies and Higher-Growth Programs.*   We believe that there are significant opportunities to expand our role in targeted geographies and higher-growth programs. For example, while we process a large majority of the domestic MasterCard- branded card transactions in the United States, Canada, the United Kingdom and Australia, the proportion of domestic MasterCard-branded card transactions that we process outside these markets is significantly lower. Accordingly, we believe that there are substantial opportunities for us to capture additional operations fees through transaction processing arrangements in selected markets. We are also focused on expanding the role of MasterCard in higher-growth segments of the global payments industry, such as commercial, premium, debit and pre-paid cards. Among other initiatives, we intend to expand our business in these segments by continuing to invest in developing new payment solutions and customized services applicable to them. For example, MasterCard PayPass , a "contactless" payment solution that enables consumers simply to tap or wave their payment card on a specially equipped terminal, is designed to help our customers further grow their businesses by enhancing the functionality of MasterCard cards in fast throughput environments.

- *Enhance Merchant Relationships and Maintain Unsurpassed Acceptance.*   We recognize that merchants are important stakeholders for the growth of our business, and we are focused on strengthening our merchant relationships by providing merchants with direct input into our business via merchant advisory boards and other initiatives. We intend to maintain the unsurpassed acceptance of MasterCard-branded programs by focusing on three core initiatives. First, we seek to increase the number of categories of merchants that accept cards carrying our brands. We are presently focused on expanding acceptance in electronic commerce environments, in fast food restaurants and convenience stores, and in public sector payments, such as those involving taxes, fees, fines and tolls, among other categories. Second, we seek to increase the number of payment channels where MasterCard programs are accepted, such as by expanding MasterCard acceptance in connection with recurring payment applications. Third, we seek to increase usage of our programs at selected merchants through a range of business development programs on a global basis.

- *Continued Investment in our Brands.*   We are committed to maintaining and enhancing our brands and image through advertising and marketing efforts on a global scale. Our approach to marketing activities combines advertising, sponsorships, promotions, interactive media and public relations as part of an integrated package designed to increase MasterCard brand awareness and preference and usage of MasterCard cards. Among numerous other initiatives, we intend to continue our award-winning "Priceless®" advertising campaign, which has run in 106 countries and 50 languages.

## Risks Related to our Business and Industry

The operation of our business involves a number of risks. For example:

- *Increased Legal and Regulatory Scrutiny of Interchange Fees.*   Interchange fees, which represent a sharing of payment system costs among acquirers and issuers, have been the subject of increased regulatory scrutiny and litigation as they have increased in recent years and as card-based forms of payment have become relatively more important to local economies. Although we establish interchange fees and collect and remit them on behalf of those of our customers entitled to receive them, we do not generally earn revenues in

4

Table of Contents

connection with interchange fees. However, if issuers cannot collect or are forced to reduce interchange fees, this could reduce the number of financial institutions willing to participate in a four-party payment card system such as ours, lower overall transaction volumes, and/or make proprietary end-to-end networks or other forms of payment more attractive. Issuers could also charge higher fees to consumers, thereby making our card programs less desirable and reducing our transaction volumes and profitability, or attempt to decrease the expense of their card programs by seeking a reduction in the fees that we charge.

- *Litigation.*   We are exposed to a variety of significant lawsuits in addition to those relating to interchange fees, including federal antitrust claims, claims under state unfair competition statutes and claims relating to our currency conversion practices. If we are found liable in any of these lawsuits, we may, among other things, be forced to pay damages and/or change our business practices and pricing structure, which could have a material adverse effect on our revenue and profitability, or, in certain circumstances, even cause us to become insolvent, and result in a significant reduction in the value, or the complete loss, of your investment. Except with respect to currency conversion litigations, we have not established reserves for any of the significant legal proceedings in which we are currently involved.

- *Heightened Competition.*   Competition and pricing pressure within the global payments industry is increasing, due in part to consolidation within the banking sector. These risks and pressures are heightened by the growing power of merchants within the payments industry.

- *Expected Credit Ratings Downgrade.*   Due to the loss of MasterCard International's right to impose special assessments upon its members in connection with this offering, Standard & Poor's Rating Services expects to lower our credit ratings.

- *Expected Net Loss for the Second Quarter and Full Year of 2006.*   At the time of this offering, we intend to donate 13,496,933 newly-issued shares of our Class A common stock and cash to The MasterCard Foundation, a private charitable foundation incorporated in Canada. In connection with this donation we expect to record an expense that is equal to the aggregate value of the cash and shares we are donating, which expense will generally not be deductible for tax purposes. As a result of this expense, we expect to record a significant net loss in the second quarter of 2006 and a net loss for the 2006 fiscal year.

- *Substantial Portion of Offering Proceeds Unavailable.*   We intend to use all but $650 million of our net proceeds from this offering (including any proceeds received pursuant to the underwriters' option to purchase additional shares) to redeem shares from our existing stockholders, who include affiliates of the underwriters. Accordingly, we will not have those proceeds available to us to invest in and grow our business.

- *Additional Offering of Class A Common Stock.*   In the event that the underwriters do not exercise in full their option to purchase additional shares of Class A common stock from us in connection with this offering, our certificate of incorporation will require us, prior to the time of our 2007 annual meeting of stockholders, to issue additional shares of Class A common stock in a public offering and to use the proceeds from such offering to redeem additional shares from our existing stockholders so that, immediately following such subsequent offering and redemption, our existing stockholders own approximately 41% of our equity. This additional issuance may depress the market price of our Class A common stock.

- *Adverse Effect of New Ownership and Governance Structure on our Customer Relationships.*   Our existing stockholders are also principal members of MasterCard International, who we refer to as our members and who are also our customers. In connection with this offering, our certificate of incorporation will be amended to provide that our members

5

Source: MASTERCARD INC, S-1/A, May 23, 2006

Table of Contents

may own only Class B common stock, which has no voting power, and Class M common stock, which is generally non-voting except that it provides the right to elect up to three directors (but not more than one-quarter of all directors) and approve specified significant corporate actions. In addition, with the exception of directors elected by the Class M common stockholders, persons affiliated with our customers will not be permitted to serve as directors of MasterCard. If our members are dissatisfied with these changes to our corporate governance structure, it could have a material adverse effect on our business relationships with them and they may elect to instead do business with a competitor with a different governance structure. In addition, our members' ownership in our company will be reduced substantially in connection with this offering, which may reduce their interest in the continued success of our business.

See "Risk Factors" for a discussion of factors you should carefully consider before deciding to invest in shares of our Class A common stock.

## The Offering Transactions

Prior to this offering of shares of our newly-authorized Class A common stock, we will reclassify all of our approximately 100 million outstanding shares of common stock, causing each of our existing stockholders to receive 1.35 shares of our Class B common stock for each share of common stock that they held prior to the reclassification and a single share of our Class M common stock. In addition, at the time of this offering, we will issue 13,496,933 shares of our Class A common stock as a donation to The MasterCard Foundation, a private charitable foundation incorporated in Canada that will be controlled by directors who are independent of us and our members. The Class A common stock and the Class B common stock will have the same economic rights, although the Class B common stock will be non-voting (except as may be required by Delaware law). The Class M common stock will have no economic rights. The holders of the Class M common stock will, however, have the right to elect up to three of our directors (but no more than one-quarter of all directors) and approve specified significant corporate transactions. See "Description of Capital Stock."

We intend to use all but $650 million of our net proceeds from this offering (including any proceeds received pursuant to the underwriters' option to purchase additional shares) to redeem a number of shares of Class B common stock from our existing stockholders that is equal to the aggregate number of shares of Class A common stock that we issue to investors in this offering (including any shares sold pursuant to the underwriters' option to purchase additional shares) and to The MasterCard Foundation. Our board of directors has approved this redemption. We intend to use the remaining proceeds to increase our capital, defend ourselves against legal and regulatory challenges, expand our role in targeted geographies and higher growth segments of the global payment industry and for other general corporate purposes. See "Use of Proceeds."

Following the reclassification, the issuance of shares of our Class A common stock as a donation to The MasterCard Foundation and in this offering and the subsequent redemption of shares of our Class B common stock from our existing stockholders, which we refer to collectively as the "offering transactions," investors in this offering will own 61,520,912 shares of Class A common stock representing 46% of our equity and 82% of our general voting power (or 66,134,989 shares representing 49% of our equity and 83% of our general voting power if the underwriters exercise their option to purchase additional shares in full). The MasterCard Foundation will own 13,496,933 shares of Class A common stock representing 10% of our equity and 18% of our general voting power (or 17% of our general voting power if the underwriters exercise their option to purchase additional shares in full)

6

Source: MASTERCARD INC, S-1/A, May 23, 2006

Table of Contents

and our existing stockholders will own 59,951,485 shares of Class B common stock representing 44% of our equity (or 55,337,408 shares representing 41% of our equity if the underwriters exercise their option to purchase additional shares in full) and shares of Class M common stock that entitle them to elect up to three of our directors and approve specified significant corporate actions but are otherwise non-voting. Commencing on the fourth anniversary of the consummation of this offering, each of the shares of Class B common stock will be convertible for shares of Class A common stock on a one-for-one basis, subject to certain rights of first refusal by the other holders of Class B common stock. In the event that the underwriters do not exercise in full their option to purchase up to an additional 4,614,077 shares of Class A common stock from us in connection with this offering, our certificate of incorporation will require us, subject to applicable law and to the board of directors' fiduciary duties, prior to the time of our 2007 annual meeting of stockholders, to issue additional shares of Class A common stock in a public offering and to use the proceeds from such offering to redeem additional shares of Class B common stock so that, immediately following such subsequent offering and redemption, our existing stockholders will own approximately 41% of the aggregate number of shares of Class A common stock and Class B common stock outstanding at that time.

We believe that the new ownership and governance structure that we will achieve through the offering transactions will enhance our business over the long term in various ways. In particular, we believe that perceived conflicts of interest in our business will be addressed by transitioning to a board of directors that includes a majority of directors who are independent of us and of our customers and through the broader diversity of our share ownership. As a result, we believe that we will be competitively advantaged as compared with other four-party payment card systems as customers will view our new structure as a more stable base upon which to build, manage and grow their payments businesses. We also believe that the new structure will benefit our business by providing us with publicly traded equity that we may use as a tool to better align the incentives of our management with those of our stockholders and to attract, retain and motivate our employees and as a currency with which to effect acquisitions, as well as by providing us with enhanced access to the public markets to raise capital. See "Business—Reasons for Transition to New Ownership and Governance Structure."

---

Our principal executive offices are located at 2000 Purchase Street, Purchase, New York 10577 and our telephone number is (914) 249-2000.

7

Source: MASTERCARD INC, S-1/A, May 23, 2006

Table of Contents

## The Offering

| | |
|---|---|
| Class A common stock offered | 61,520,912 shares |
| Class A common stock and Class B common stock outstanding after the offering transactions: | |
| Class A common stock | 75,017,845 shares |
| Class B common stock | 59,951,485 shares |
| | 134,969,330 shares |

| | |
|---|---|
| Common stock | Following this offering, we will have three classes of common stock outstanding: Class A common stock, all of the outstanding shares of which will have been issued in this offering or to The MasterCard Foundation; and Class B common stock and Class M common stock, all of the outstanding shares of which will be held by our existing stockholders. |
| Voting rights | Each share of Class A common stock will entitle its holder to one vote per share. Except as may be required by Delaware law, holders of Class B common stock will not be entitled to vote and will have no voting power. Although the Class M common stock is generally non-voting, the holders of the Class M common stock will have the right to elect up to three of our directors (but not more than one-quarter of all directors) and approve specified significant corporate actions. |
| Dividend rights | The Class A common stock and Class B common stock will share equally in any dividends declared by our board of directors, subject to any preferential or other rights of any outstanding preferred stock. Holders of Class M common stock will not be entitled to receive dividends. |
| Liquidation rights | Upon liquidation, dissolution or winding up, holders of Class A common stock and Class B common stock will be entitled to receive ratably the assets available for distribution to the stockholders after payment of our liabilities and the preferential or other amounts, if any, payable on any outstanding preferred stock. Holders of Class M common stock will not be entitled to receive any assets upon a liquidation, dissolution or winding up. |
| Conversion rights | Subject to the provisions of our amended and restated certificate of incorporation that prohibit our members, former members and certain other persons from beneficially owning Class A common stock and other conditions, any holder of Class B common stock may at any time and from time to time commencing on the fourth anniversary of the consummation of this offering, at such holder's option, convert all or any portion of such holder's shares of Class B common stock into an equal number of shares of Class A common stock in connection with a transfer of these shares to a permitted owner. |

8

Source: MASTERCARD INC, S-1/A, May 23, 2006

Table of Contents

In addition, in the event that the number of shares of Class B common stock outstanding is less than 41% of the aggregate number of shares of Class A common stock and Class B common stock outstanding, our members will in certain circumstances be permitted to acquire shares of Class A common stock in the open market or otherwise, which acquired shares would thereupon convert into an equal number of shares of Class B common stock.

Shares of Class M common stock are not convertible into any other class of our capital stock.

See "Description of Capital Stock."

| | |
|---|---|
| Use of proceeds | We intend to use all but $650 million of our net proceeds from this offering (including any proceeds received pursuant to the underwriters' option to purchase additional shares) to redeem a number of shares of Class B common stock from our existing stockholders that is equal to the aggregate number of shares of Class A common stock that we issue to investors in this offering (including any shares sold pursuant to the underwriters' option to purchase additional shares) and to The MasterCard Foundation. We intend to use the remaining proceeds to increase our capital, defend ourselves against legal and regulatory challenges, expand our role in targeted geographies and higher growth segments of the global payments industry and for other general corporate purposes. Approximately 30% of the aggregate redemption price in connection with the redemption of the shares of Class B common stock will be received by affiliates of the underwriters. See "Use of Proceeds." |
| Risk factors | See "Risk Factors" beginning on page 13 of this prospectus for a discussion of risks you should carefully consider before deciding to invest in shares of our Class A common stock. |
| New York Stock Exchange symbol | MA |
| Dividend policy | Following this offering and subject to legally available funds, we currently intend to pay a quarterly cash dividend at an annual rate initially equal to $0.36 per share (or a quarterly rate initially equal to $0.09 per share) of Class A common stock and Class B common stock, commencing in the fourth quarter of 2006. The declaration and payment of any future dividends will be at the sole discretion of our board of directors after taking into account various factors, including our financial condition, settlement guarantees, operating results, available cash and current and anticipated cash needs. See "Dividend Policy." |

9

Source: MASTERCARD INC, S-1/A, May 23, 2006

Table of Contents

---

Unless indicated otherwise, the information included in this prospectus gives effect to the reclassification of our outstanding shares of common stock and assumes no exercise by the underwriters of their option to purchase up to an additional 4,614,077 shares from us and that the shares to be sold in this offering are sold at $41.50 per share, which is the mid-point of the price range indicated on the front cover of this prospectus.

In addition, shares outstanding and other information based thereon do not reflect 5,300,000 shares of Class A common stock reserved for issuance under our long term equity based incentive plan, including (1) the shares of Class A common stock underlying the unvested restricted stock units (RSUs) we intend to grant to our non-executive management employees at the time of this offering, (2) the shares of Class A common stock underlying the RSUs to be issued upon the conversion of certain outstanding awards under our existing cash based long term incentive plans to our long term equity based incentive plan, and (3) the shares of Class A common stock underlying the 2006 awards under our long term equity based incentive plan. See "Management—IPO Date RSU Award to Non-Executive Management Employees" and "—MasterCard Long Term Incentive Plan—Incentive Plan Benefits."

10

Source: MASTERCARD INC, S-1/A, May 23, 2006

Table of Contents

# RISK FACTORS

*An investment in our Class A common stock involves a number of risks. You should carefully consider the following information about these risks, together with the other information contained in this prospectus, before investing in our Class A common stock. The following risks could materially adversely affect our business, financial condition or operating results. In that case, the trading price of our Class A common stock could decline and you could lose all or part of your investment.*

## Risks Related to Our Business

### Legal and Regulatory Risks

**Interchange fees are subject to increasingly intense legal and regulatory scrutiny worldwide, which may have a material adverse impact on our revenue, our prospects for future growth and our overall business.**

Interchange fees, which represent a sharing of payment system costs among the financial institutions participating in a four-party payment card system such as ours, are generally the largest component of the costs that acquirers charge merchants in connection with the acceptance of payment cards. Typically, interchange fees are paid by the merchant bank (the acquirer) to the cardholder bank (the issuer) in connection with transactions initiated with our payment system's cards. Interchange fees, including MasterCard's default interchange fees (MIFs), are subject to increasingly intense regulatory scrutiny worldwide as they have increased in recent years and as card-based forms of payment have become relatively more important to local economies. Regulators are seeking to reduce these costs through regulatory action. For example:

- In the European Union, the European Commission has issued a Statement of Objections challenging MasterCard's cross-border MIF under European Union competition rules and has recently stated that it intends to issue a supplemental statement of objections in the near future. If we do not obtain a favorable ruling, the European Commission could order us to change the manner in which MasterCard calculates its cross-border MIF.

- In the United Kingdom the Office of Fair Trading (OFT) issued a decision on September 6, 2005 concluding that MasterCard's U.K. MIFs contravene U.K. and European Union competition law. If this decision is upheld on appeal, it could have a significant adverse impact on the revenues of MasterCard's U.K. members and on MasterCard's competitive position and overall business in the U.K. In addition, the OFT has stated that it will commence a new investigation of MasterCard's current U.K. MIFs and, if it determines that they contravene U.K. and European Union competition law, it will issue a new decision and possibly levy fines accruing from the date of its first decision. This new investigation will examine whether the new methodology for setting U.K. MIFs adopted by MasterCard in November 2004—in connection with which MasterCard withdrew the authority of the U.K. members to set domestic MIFs and related fees and conferred such authority exclusively on MasterCard's President and Chief Executive Officer—contravenes applicable law.

- In Australia, the Reserve Bank of Australia has enacted regulations controlling the costs that can be considered in setting interchange fees for four-party payment card systems such as ours, but do not regulate the merchant discount charged by proprietary end-to-end networks (such as those offered by American Express or Discover), which have already benefited from these regulations.

Interchange fees are also being reviewed in a number of other jurisdictions, including Colombia, Mexico, New Zealand, Poland, Portugal, Norway, Sweden, Brazil, Hungary and Spain. We believe that regulators are increasingly adopting a coordinated approach to interchange matters and, as a result, developments in any one jurisdiction may influence regulators' approach to interchange in other jurisdictions. In the United States, interchange fees have also been the topic of increased congressional and regulatory interest. In particular, the U.S. House of Representatives has passed a

13

Source: MASTERCARD INC, S-1/A, May 23, 2006

Table of Contents

bill that would commission a study by the Federal Trade Commission of the role of interchange in alleged price gouging at gas stations. In February 2006, the Energy and Commerce Committee of the U.S. House of Representatives held a hearing on interchange fees. Also, the general topic of interchange fees has been raised in hearings and other forums, including conferences held by various Federal Reserve banks. Individual state legislatures in the United States are also reviewing interchange fees. For instance, legislators in the states of Washington, Tennessee and Kentucky have proposed bills that would limit or cap interchange fees. Finally, the Merchants Payment Coalition, a coalition of trade associations representing businesses that accept credit and debit cards, is mounting a challenge to interchange fees in the United States by seeking legislative and regulatory intervention.

In addition, merchants are seeking to reduce interchange fees through litigation. In the United States, merchants have filed over forty class-action suits alleging that our interchange fees violate federal antitrust laws. These suits allege, among other things, that MasterCard's purported setting of interchange fees constitutes horizontal price-fixing between and among MasterCard, Visa and their member banks in violation of Section 1 of the Sherman Act, which prohibits contracts, combinations or conspiracies that unreasonably restrain trade. The suits seek treble damages in an unspecified amount, attorney's fees and injunctive relief. See "Business—Legal and Regulatory Proceedings—Global Interchange Proceedings." We are devoting substantial management and financial resources to the defense of MIFs and to the other legal and regulatory challenges we face.

If issuers cannot collect or are forced to reduce interchange fees, they may be unable to recoup a portion of the costs incurred for their services. This could reduce the number of financial institutions willing to participate in a four-party payment card system, lower overall transaction volumes, and/or make proprietary end-to-end networks or other forms of payment more attractive. Issuers could also charge higher fees to consumers, thereby making our card programs less desirable and reducing our transaction volumes and profitability, or attempt to decrease the expense of their card programs by seeking a reduction in the fees that we charge. If we are less successful than Visa in defending interchange fees, we could also be competitively disadvantaged against Visa. If we are ultimately unsuccessful in our defense of interchange fees, such regulation may have a material adverse impact on our revenue, our prospects for future growth, and our overall business.

**If we are found liable in any of the cases brought by American Express or Discover, we may be forced to pay substantial damages.**

In 1998, the U.S. Department of Justice filed suit against MasterCard International, Visa U.S.A., Inc. and Visa International Corp. in the U.S. District Court for the Southern District of New York alleging that certain aspects of the governance of MasterCard and Visa were unlawful, and that MasterCard's Competitive Programs Policy (CPP) and a similar Visa bylaw provision that prohibited financial institutions participating in the respective systems from issuing competing proprietary payment cards (such as American Express or Discover) acted to restrain competition. Although we were successful in defending the relevant aspects of our governance structure at trial, the Second Circuit Court of Appeals affirmed the trial court judge's ruling that our CPP and Visa's bylaw constituted unlawful restraints of trade under the U.S. federal antitrust laws. Based on the final judgment in this matter, our CPP became unenforceable in October 2004 and was subsequently repealed. Thereafter, Discover and American Express each filed suit against us, Visa U.S.A., Inc. and Visa International Services Association alleging that the CPP and Visa's bylaw provision caused each injury by unlawfully restraining trade under the U.S. federal antitrust laws. Discover also alleges that it suffered injury by reason of our rules, which required merchants in the United States to accept our debit cards if they accepted other MasterCard-branded cards, before these rules were modified as part of the U.S. merchant lawsuit described below. The American Express complaint names a number of member banks as co-defendants. In connection with their respective claims, American Express and Discover each requested that the district court give collateral estoppel effect to its findings in its judgment in the Department of Justice litigation. Although the district court has denied that request at this stage in the

14

Source: MASTERCARD INC, S-1/A, May 23, 2006

Table of Contents

litigation, the court indicated that American Express and Discover may refile a motion for collateral estoppel after further proceedings. If the court were to give effect to collateral estoppel on one or more issues in the future, then significant elements of plaintiffs' claims would be established, thereby making it more likely that we would be found liable and making the possibility of an award of damages that much more likely. In the event all issues are subsequently decided against MasterCard in dispositive motions during the course of the litigation then there is the possibility that the sole issue remaining will be whether a damage award is appropriate and, if so, what the amount of damages should be.

Neither American Express nor Discover has specified the amount of damages sought and, due to the considerable uncertainty associated with these proceedings, it is currently not reasonably possible to estimate the amount or range of any potential liability. Each of American Express and Discover has conveyed their belief that these damages are substantial. Moreover, because these actions have been brought under the U.S. federal antitrust laws, any actual damages will be trebled and we may be subject to joint and several liability among the defendants if liability is established, which could significantly magnify the adverse effect upon us of any adverse judgment. If we are unsuccessful in defending against either or both of these lawsuits, the ultimate liability for MasterCard could have a material adverse effect on our results of operations, financial position and cash flows in the quarterly and annual period when such losses are recognized, could have a material adverse effect on our overall financial position, or, in certain circumstances, even cause us to become insolvent, and result in the significant reduction in the value, or the complete loss, of your investment. Similarly, if we decide to settle either or both lawsuits or if we establish provisions in connection with them (which will depend on our continuing reconsideration of the progress of the litigation), such a settlement or the establishment of such provisions could also have such a material adverse effect or result. See "Risk Factors—Risks Related to Our Business—Legal and Regulatory Risks—If we determine in the future that we are required to establish reserves or we incur liabilities for any litigation that has been or may be brought against us, our results of operations, cash flow and financial condition could be materially and adversely affected and you could lose your investment" and "Business—Legal and Regulatory Proceedings."

**If we are ultimately unsuccessful in any of our various lawsuits relating to our currency conversion practices, our business may be materially and adversely affected.**

We generate significant revenue from processing cross-border currency transactions for members. However, we are defendants in several state and federal lawsuits alleging that our currency conversion practices are deceptive, anti-competitive or otherwise unlawful. In particular, a trial judge in California found that our currency conversion practice is deceptive under California state law, and ordered us to mandate that members disclose the currency conversion process to cardholders in cardholder agreements, applications, solicitations and monthly billing statements. The judge also ordered unspecified restitution to California cardholders. The final judgment and restitution process have been stayed pending MasterCard's appeal. In addition, we have been served with similar complaints in several state courts seeking to, in effect, extend the judge's decision to our cardholders outside of California. We have succeeded in having several of these cases dismissed or transferred to the U.S. District Court for the Southern District of New York and combined with putative federal class actions. The class actions allege that our currency conversion practices violate federal antitrust laws. See "Business—Legal and Regulatory Proceedings." If we are unsuccessful in defending against these lawsuits, we may have to pay restitution to cardholders who make claims that they used their cards in another country, or may be required to modify our currency conversion practices.

Based upon litigation developments, certain of which were favorable to MasterCard, and progress in ongoing settlement discussions in these currency conversion cases and pursuant to Statement of Financial Accounting Standards No. 5, "Accounting for Contingencies," MasterCard recorded an additional $75 million of legal reserves in 2005. As a result of this additional reserve, we have now established total legal reserves of $89 million in connection with these currency conversion cases. Based on future developments, this estimate may be revised. The amount of damages sought has not been specified in any of these cases.

15

Source: MASTERCARD INC, S-1/A, May 23, 2006

Table of Contents

**If we are found liable in any of the other litigations that have been brought against us or in any other litigation to which we may be subject in the future, we may be forced to pay damages and/or change our business practices or pricing structure, any of which could have a material adverse effect on our revenue and profitability.**

There are currently actions against MasterCard International in a number of state courts and the District of Columbia. In a number of these state courts, there are multiple complaints against MasterCard International brought under state unfair competition statutes on behalf of putative classes of consumers. The claims in these actions mirror the allegations made in the U.S. merchant lawsuit, which was brought on behalf of a class of U.S. merchants against MasterCard International and Visa and alleged, among other things, that our "Honor All Cards" rule (and a similar Visa rule), which required merchants who accept MasterCard cards to accept for payment every validly presented MasterCard card, constituted an illegal tying arrangement in violation of Section 1 of the Sherman Act. The plaintiffs also asserted that we and Visa conspired to monopolize what they characterized as the point-of-sale debit card market. In June 2003, MasterCard International entered into a settlement agreement that resolved the U.S. merchant lawsuit and contract disputes with certain customers. The settlement agreement required, among other things, that we pay $125 million in 2003 and $100 million annually each December from 2004 through 2012. See "Business—Legal and Regulatory Proceedings—U.S. Merchant Opt Out and Consumer Litigations" for a description of the settlement agreement. The putative consumer class actions are not covered by the terms of the June 2003 settlement agreement. These actions assert that merchants, faced with excessive merchant discount fees, have passed these overcharges to consumers in the form of higher prices on goods and services sold. In addition to these litigations, we are also being sued in several other state and federal courts under both federal antitrust laws and state common and statutory law in connection with certain of our rules, including those related to chargeback transactions.

Chargebacks refer to the situation where a transaction is returned, or charged back, to an acquirer by an issuer at the request of the cardholder or for some other reason. The claims directed at our chargeback rules allege that MasterCard's chargeback policies and related rules violate Section 1 and Section 2 of the Sherman Act, which prohibits contracts, combinations or conspiracies that unreasonably restrain trade, and monopolization or attempted monopolization, respectively. The claims allege that such rules constitute unlawful agreements and/or monopolization in restraint of trade. In addition, the complaints contain claims under state common law, including breach of contract, tortious interference with contract and breach of covenant of good faith and fair dealing. None of the putative consumer class actions specifies the amount of damages sought and, except for one lawsuit in which the plaintiff seeks $60 million in compensatory damages as well as $180 million in punitive damages, none of the lawsuits relating to chargeback transactions specifies the amount of damages sought. See "Business—Legal and Regulatory Proceedings." We may also be sued in the future in the United States or in other jurisdictions by our customers, merchants or consumers for substantial damages or injunctive relief in connection with our business practices. If we are unsuccessful in our defense against the consumer class actions, the merchant chargeback litigations, or any other litigation, we may be forced to pay damages and/or change our business practices and pricing structure, any of which could have a material adverse effect on our revenue and profitability.

**If we determine in the future that we are required to establish reserves or we incur liabilities for any litigation that has been or may be brought against us, our results of operations, cash flow and financial condition could be materially and adversely affected and you could lose your investment.**

Except with respect to currency conversion litigations and $0.5 million of legal reserves recorded in connection with one of the chargeback litigations, we have not established reserves for any of the legal proceedings in which we are currently involved and we are unable to estimate at this time the amount of charges, if any, that may be required to provide reserves for these matters in the future. We may determine in the future that a charge for all or a portion of any of our legal proceedings is required, including charges related to legal fees. In addition, we may be required to record an additional charge if

Source: MASTERCARD INC, S-1/A, May 23, 2006

Table of Contents

we incur liabilities in excess of reserves that we have previously recorded. Such charges, particularly in the event we may be found liable in a large class-action lawsuit or on the basis of an antitrust claim entitling the plaintiff to treble damages or under which we were jointly and severally liable, could be significant and could materially and adversely affect our results of operations, cash flow and financial condition, or, in certain circumstances, even cause us to become insolvent, and result in a significant reduction in the value, or the complete loss, of your investment. A plaintiff in one of our antitrust litigations has asserted in a written communication that the damages it believes it is likely to recover in its lawsuit will exceed our capital and ability to pay and that the damages in such lawsuit and in our other pending litigations are likely to be in the billions of dollars before trebling. See "Business—Legal and Regulatory Proceedings."

**Limitations on our business and other penalties resulting from litigation or litigation settlements may materially and adversely affect our revenue and profitability.**

As a result of antitrust litigation that was brought against us by the U.S. Department of Justice, until October 15, 2006, we are required to permit issuers with which we have entered into business agreements in the United States before October 15, 2004 to terminate those agreements without penalty in order to enter into agreements with American Express or Discover. See "Business—Legal and Regulatory Proceedings—Department of Justice Antitrust Litigation and Related Private Litigation." In addition, as a result of the settlement agreement in connection with the U.S. merchant lawsuit, merchants have the right to reject our debit cards in the United States while still accepting other MasterCard-branded cards, and vice versa. See "Business—Legal and Regulatory Proceedings—U.S. Merchant Opt Out and Consumer Litigations." These limitations and any future limitations on our business resulting from litigation or litigation settlements could reduce the volume of business that we do with our customers, which may materially and adversely affect our revenue and profitability.

**The payments industry is generally the subject of increasing global regulatory focus, which may impose costly new compliance burdens on us and our customers and lead to decreased transaction volumes through our systems.**

We are subject to regulations that affect the payment industry in the many countries in which our cards are used. In particular, our customers are subject to numerous regulations applicable to banks and other financial institutions in the United States and abroad, and, consequently, MasterCard is at times affected by such regulations. Regulation of the payments industry, including regulation applicable to us and our customers, has increased significantly in recent years. For example, in 2002 MasterCard became subject to the regulatory requirements of Section 352(a) of the USA PATRIOT Act, which has required our customers and us to create and implement comprehensive anti-money laundering programs. Increased regulatory focus in this area could result in additional obligations or restrictions with respect to the types of products that we may offer to consumers, the countries in which our cards may be used, and the types of cardholders and merchants who can obtain or accept our cards.

We are also subject to regulations imposed by the U.S. Treasury Office of Foreign Assets Control (OFAC). While MasterCard has no business operations, subsidiaries or affiliated entities in Syria, Iran, Sudan, North Korea, Cuba or Libya, a limited number of financial institutions are licensed by MasterCard to issue cards or acquire merchant transactions in certain of these countries, which have each been identified by the U.S. State Department as terrorist-sponsoring states and are subject to OFAC restrictions. Our reputation may suffer due to our association with these countries, which in turn could have a material adverse effect on the valuation of our stock. Further, certain U.S. states have recently enacted legislation regarding investments by pension funds and other retirement systems in companies that have business activities or contacts with countries that have been identified as terrorist-sponsoring states and similar legislation may be pending in other states. As a result, pension funds and other retirement systems may be subject to reporting requirements with respect to investments in companies such as ours or may be subject to limits or prohibitions with respect to those investments that may materially and adversely affect our stock price.

17

Source: MASTERCARD INC, S-1/A, May 23, 2006

Table of Contents

In addition, in 2005 and 2004, a number of regulations were issued implementing the Fair and Accurate Credit Transactions Act which, among other things, makes permanent the preemptive effect of several key provisions of the Fair Credit Reporting Act that could have a material impact on our customers' businesses. Additional implementing regulations are anticipated later this year. One such regulation pertaining to "risk-based pricing" could have a significant impact on the application process for credit cards, resulting in increased costs of issuance and/or a decrease in the flexibility of card issuers to set the price of credit. Regulators and the U.S. Congress have also increased their scrutiny of our customers' pricing of credit and their underwriting standards. Any legislative or regulatory restrictions on our customers' ability to price credit freely could result in reduced amounts of credit available to consumers, which could materially and adversely affect our transaction volume and revenues.

The U.S. Congress is also presently considering regulatory initiatives in the areas of Internet gambling, Internet prescription drug purchases, copyright and trademark infringement and interchange fees, among others, that could impose additional compliance burdens on us and/or our customers. Most U.S. states are considering a variety of similar legislation. If implemented, these initiatives could require us or our customers to monitor, filter, restrict, or otherwise oversee various categories of payment card transactions, thereby increasing our costs or decreasing our transaction volumes. Various regulatory agencies are also considering regulations covering identity theft, account management guidelines, privacy, disclosure rules, security, and marketing that would impact our customers directly, in part due to increased scrutiny of our customers' underwriting standards. The implementation of recently enacted bankruptcy reform legislation in the United States may also directly affect our customers' business models for their payment cards business. The U.S. Congress has also examined the practices of credit card issuers in general, which could lead to significant legislative restrictions. These new requirements and developments may affect our customers' ability to extend credit through the use of payment cards, which could decrease our transaction volumes. In some circumstances, new regulations could have the effect of limiting our customers' ability to offer new types of payment programs or restricting their ability to offer existing programs such as stored value cards, which could materially and adversely reduce our revenues and revenue growth.

Increased regulatory focus on us, such as in connection with the matters discussed above, may increase our costs, which could materially and adversely impact our financial performance. Similarly, increased regulatory focus on our customers may cause them to reduce the volume of transactions processed through our systems, which would reduce our revenues materially and adversely impact our financial performance.

**Existing and proposed regulation in the areas of consumer privacy and data use and security could decrease the number of payment cards issued and could increase our costs.**

We and our customers are also subject to regulations related to privacy and data use and security in the jurisdictions in which we do business, and we and our customers could be negatively impacted by these regulations. For example, in the United States, we and our customers are respectively subject to the Federal Trade Commission's and the banking regulators' information safeguard rules under the Gramm-Leach-Bliley Act. The rules require that each financial institution (including us) develop, implement and maintain a written, comprehensive information security program containing safeguards that are appropriate to the financial institution's size and complexity, the nature and scope of the financial institution's activities, and the sensitivity of any customer information at issue. In 2005, there has been a heightened legislative and regulatory focus on data security, including requiring consumer notification in the event of a data breach. In the United States, there are a number of bills pending in Congress and there have been several congressional hearings to address these issues. Congress will likely consider data security/data breach legislation in 2006 which, if implemented, could affect us and our customers. In addition, a number of states have enacted security breach legislation, requiring varying levels of consumer notification in the event of a security breach, and several other states are considering similar legislation.

18

Source: MASTERCARD INC, S-1/A, May 23, 2006

Table of Contents

In Europe, the European Parliament and Council have passed the European Directive 95/46/EC (the "Directive") on the protection of individuals with regard to the processing of personal data and on the free movement of such data, which obligates the controller of an individual's personal data to take the necessary technical and organizational measures to protect personal data. The Directive has been implemented through local laws regulating data protection in European Union member states to which we and our customers are subject.

Regulation of privacy and data use and security in these and other jurisdictions may increase the costs of our customers to issue payment cards, which may decrease the number of our cards that they issue. Any additional regulations in these areas may also increase our costs to comply with such regulations, which could materially and adversely affect our profitability. Finally, failure to comply with the privacy and data use and security laws and regulations to which we are subject could result in fines, sanctions or other penalties, which could materially and adversely affect our results of operations and overall business.

### Business Risks

**We face increasingly intense competitive pressure on the prices we charge our customers, which may materially and adversely affect our revenue and profitability.**

We generate revenue from the fees that we charge our customers for providing transaction processing and other payment-related services and from assessments on the dollar volume of activity on cards carrying our brands. In order to increase transaction volumes, we seek to enter into business agreements with customers through which we offer incentives, pricing discounts and other support to issue and promote our cards. In order to stay competitive, we may have to increase the amount of these incentives and pricing discounts. Over the past several years, we experienced continued pricing reductions. The demand from our customers for better pricing arrangements and greater rebates and incentives moderates our growth. We may not be able to continue our expansion strategy, to process additional transaction volumes or to provide additional services to our customers at levels sufficient to compensate for such lower fees or increased costs in the future, which could materially and adversely affect our revenue and profitability. In addition, increased pressure on prices enhances the importance of cost containment and productivity initiatives in areas other than those relating to customer incentives. We may not succeed in these efforts.

Our strategy is to grow our business by, among other things, focusing on our key customers and entering into customized business agreements with key customers around the globe. We may in the future not be able to enter into such agreements on terms that we consider favorable, and we may be required to modify existing agreements in order to maintain relationships and to compete with others in the industry. Some of our competitors are larger or have greater financial resources than we do. In addition, to the extent that we offer discounts or incentives under such agreements, we will need to further increase transaction volumes or the amount of services provided thereunder in order to benefit incrementally from such agreements and to increase revenue and profit. Furthermore, a number of customers from which we earn substantial revenue are principally aligned with one of our competitors. A significant loss of revenue or transaction volumes from these customers could have a material adverse impact on our business.

**Consolidation or other changes affecting the banking industry could result in a loss of business for MasterCard and may create pressure on the prices we charge our customers, which may materially and adversely affect our revenue and profitability.**

Over the last several years, the banking industry has undergone rapid consolidation, and we expect this trend to continue in the future. Consolidation represents a competitive threat to us because our strategy contemplates entering into business agreements with our largest customers in exchange

19

Source: MASTERCARD INC, S-1/A, May 23, 2006

Table of Contents

for significant business commitments. Significant ongoing consolidation in the banking industry may result in a financial institution with a substantial MasterCard portfolio being acquired by an institution that has a strong relationship with a competitor, resulting in the loss of business for MasterCard. For example, in January 2006, Bank of America acquired MBNA Corporation. MBNA Corporation is an issuer with a larger proportion of its card portfolio devoted to MasterCard than Bank of America. In addition, one or more of our customers could seek to merge with, or acquire, one of our competitors, and any such transaction could have a material adverse impact on our business and prospects.

The continued consolidation in the banking industry also produces a smaller number of larger customers, which generally have a greater ability to negotiate pricing discounts with MasterCard. In addition, consolidations could prompt our customers to renegotiate our business agreements to obtain more favorable terms. This pressure on the prices we charge our customers could materially and adversely affect our revenue and profitability.

In addition, changing regulatory environments in certain regions may lead us to change our pricing arrangements and could reduce our overall revenues.

**Our revenue would decline significantly if we lose one or more of our most significant customers, which could have a material adverse impact on our business.**

Most of our customer relationships are not exclusive and in certain circumstances may be terminated by our customers. Our customers can reassess their commitments to us at any time in the future and/or develop their own competitive services. Until October 15, 2006, we are required to permit issuers with which we have entered into business agreements in the United States before October 15, 2004 to terminate those agreements without penalty in order to enter into agreements with American Express or Discover as a result of the antitrust litigation that was brought against us by the U.S. Department of Justice. See "Business—Legal and Regulatory Proceedings—Department of Justice Antitrust Litigation and Related Private Litigation." Accordingly, our business agreements with customers may not reduce the risk inherent in our business that customers may terminate their relationships with us in favor of our competitors, or for other reasons, or might not meet their contractual obligations to us.

In addition, a significant portion of our revenue is concentrated among our five largest customers. In 2005, the net revenues from these customers represented an aggregate of approximately $981 million, or 33%, of total revenue. For the first three months of 2006, the net revenues from these customers represented an aggregate of approximately $252 million, or 34%, of total revenue. One of our large customers, JPMorgan Chase Bank and its affiliates, generated 11% of our consolidated revenue in each of 2005 and the first three months of 2006. JPMorgan Chase Bank also acts as our U.S. settlement bank and has a significant commitment under our revolving credit facility. Loss of business from JPMorgan Chase Bank or any of our other large customers could have a material adverse impact on our business.

**Merchants are increasingly focused on the costs of accepting card-based forms of payment, which may lead to additional litigation and regulatory proceedings and may increase the costs of our incentive programs, which could materially and adversely affect our profitability.**

We rely on merchants and their relationships with our customers to expand the acceptance of our cards. We believe that consolidation in the retail industry is producing a set of larger merchants with increasingly global scope. These merchants are having a significant impact on all participants in the global payments industry, including MasterCard. For instance, as a result of the settlement agreement in connection with the U.S. merchant lawsuit, merchants have the right to reject our debit cards in the United States while still accepting other MasterCard-branded cards, and vice versa. See "Business—Legal and Regulatory Proceedings—U.S. Merchant Opt Out and Consumer Litigations." In addition, some large merchants are supporting many of the legal and regulatory threats to interchange fees that

20

Table of Contents

MasterCard is now defending, since interchange fees represent a significant component of the costs that merchants pay to accept payment cards. See "—Interchange fees are subject to increasingly intense legal and regulatory scrutiny worldwide, which may have a material adverse impact on our revenue, our prospects for future growth and our overall business." The increasing focus of merchants on the costs of accepting cash-based forms of payment may lead to additional litigation and regulatory proceedings. Large merchants are also able to negotiate pricing discounts and other incentives from us and our customers in order to accept our payment cards. As merchants consolidate and become even larger, we may have to increase the amount of incentives that we provide to certain merchants, which could materially and adversely affect our revenues and profitability.

**Our operating results may suffer because of substantial and increasingly intense competition worldwide in the global payments industry.**

The global payments industry is highly competitive. Our payment programs compete against all forms of payment, including paper-based transactions (principally cash and checks), electronic transactions such as wire transfers and Automated Clearing House payments and other electronic forms of payment, including card-based payment systems. See "Business—Competition." Some of our competitors have developed, or may develop, substantially greater financial and other resources than we have, may offer a wider range of programs and services than we offer or may use more effective advertising and marketing strategies to achieve broader brand recognition or merchant acceptance than we have. We may not continue to be able to compete effectively against these threats. In addition, our competitors may be more efficient in introducing innovative programs and services than we are. As a result, our revenue or profitability may decline.

**We have repealed our Competitive Programs Policy as a result of a final judgment in our litigation with the U.S. Department of Justice, and our business may suffer as a result.**

Based on a final judgment of our litigation with the U.S. Department of Justice, in October 2004, our CPP, which prohibited financial institutions participating in our system from issuing competing proprietary payment cards, became unenforceable and was subsequently repealed. See "Business—Legal and Regulatory Proceedings—Department of Justice Antitrust Litigation and Related Private Litigation." As a result, our issuers are now permitted to issue general purpose credit or debit cards in the United States on any other general purpose card network (such as American Express or Discover). This may cause our members to issue fewer cards with our brand and to enter into arrangements with our competitors to issue cards, thereby reducing the volume of transactions that we process, decreasing our revenues. A number of our large customers, including Bank of America, Citibank, HSBC, USAA and GE Finance, have begun to issue or have announced that they will issue American Express or Discover-branded cards. Accordingly, the repeal of the CPP may have a material adverse effect on our business, revenue and profitability.

**We depend significantly on our relationships with our customers to manage our payment system. If we are unable to maintain those relationships, or if our customers are unable to maintain their relationships with cardholders or merchants that accept our cards for payment, our business may be materially and adversely affected.**

We are, and will continue to be, significantly dependent on our relationships with our issuers and acquirers and their further relationships with cardholders and merchants to support our programs and services. We do not issue cards, extend credit to cardholders or determine the interest rates (if applicable) or other fees charged to cardholders using cards that carry our brands. Each issuer determines these and most other competitive card features. In addition, we do not solicit merchants to process transactions or establish the discount rate that merchants are charged for card acceptance, which are responsibilities of our acquirers. As a result, our business significantly depends on the continued success and competitiveness of our issuer and acquirer customers. In turn, our customers'

21

Source: MASTERCARD INC, S-1/A, May 23, 2006

Table of Contents

success depends on a variety of factors over which we have little or no influence. If our customers become financially unstable, we may lose revenue or we may be exposed to settlement risk as described below.

With the exception of the United States and a select number of other jurisdictions, most in-country (as opposed to cross-border) transactions conducted using MasterCard, Maestro and Cirrus cards are authorized, cleared and settled by our customers or other processors without involving our central processing systems. Because we do not provide domestic processing services in these countries and do not, as described above, have direct relationships with cardholders or merchants, we depend on our close working relationships with our customers to effectively manage our brands, together with the perception of our payment system, among regulators, merchants and consumers in these countries. From time to time, our customers may take actions that we do not believe to be in the best interests of our payment system overall, which may materially and adversely impact our business. In addition, our competitors may process a greater percentage of domestic transactions in jurisdictions outside the United States than we do. As a result, our inability to control the end-to-end processing on cards carrying our brands in many markets may put us at a competitive disadvantage by limiting our ability to introduce value-added programs and services that are dependent upon us processing the underlying transactions.

We rely on the continuing expansion of merchant acceptance of our brands and programs. Although our business strategy is to invest in strengthening our brands and expanding our acceptance network, there can be no guarantee that our efforts in these areas will continue to be successful. If the rate of merchant acceptance growth slows or reverses itself, our business could suffer.

**If we are unable to grow our debit business, particularly in the United States, we may fail to maintain and increase our revenue growth.**

In recent years, we believe that industry-wide offline and online debit transactions have grown more rapidly than credit or charge transactions. However, in the United States, we believe that transactions involving our brands account for a smaller share of all offline, signature-based debit transactions than they do credit or charge transactions. In addition, many of our competitors process a greater number of online, PIN-based debit transactions at the point of sale than we do, since our Maestro brand has relatively low market penetration in the United States. We may not be able to increase our market penetration for debit transactions in the United States since many of our competitors have long-standing and strong market positions. We may also be impacted adversely by any tendency among U.S. consumers or financial institutions to migrate from offline, signature-based debit transactions to online, PIN-based transactions, because the latter types of transactions are more likely to be processed by other ATM/debit point-of-sale networks. In addition, we generally earn higher revenues on point-of-sale purchase transactions than on cash access transactions, and on domestic credit and offline debit transactions than on comparable online debit transactions.

Furthermore, in June 2003, following the settlement of the U.S. merchant lawsuit, Visa enacted a bylaw requiring its 100 largest issuers of debit cards in the United States to pay a so-called "settlement service fee" if these issuers reduce their debit Visa volume by more than 10%. This bylaw was later modified to clarify that the settlement service fee would only be imposed if an issuer shifted its portfolio of debit cards to MasterCard. See "Business—Legal and Regulatory Proceedings—Department of Justice Antitrust Litigation and Related Private Litigation" for a description of our response to this bylaw provision. If Visa is permitted to impose this settlement service fee on issuers of debit cards according to this bylaw, it would penalize Visa members seeking to do debit business with MasterCard and would effectively prohibit them from converting their debit card programs to our programs.

Any of these factors may inhibit the growth of our debit business, which could materially and adversely affect our revenues and overall prospects for future growth.

22

Source: MASTERCARD INC, S-1/A, May 23, 2006

Table of Contents

**The changes to our governance structure in connection with this offering could have a material adverse effect on our business relationship with our members.**

A number of our key customers are currently represented on our board of directors. Upon the consummation of this offering, the organization and composition of our board of directors will be substantially restructured. In particular, our certificate of incorporation will be amended to provide that, with the exception of the directors to be elected by the holders of our Class M common stock, any person who is or has been during the prior three years a director, officer, employee, agent or representative of, or otherwise has any business relationship that is material to such person with, a member or former member of MasterCard International, or of an operator, member, or licensee of any competing general purpose payment card system, or any affiliate of such person, may not serve as a director of MasterCard. In addition, our members will be able to own only Class B common stock, which has no voting power, and Class M common stock, which is generally non-voting except that it provides the right to elect up to three directors (but not more than one-quarter of all directors) and approve specified significant corporate actions. If certain of our members are dissatisfied with these changes to our corporate governance structure, this could have a material adverse effect on our business relationship with them and they may elect to instead do business with a competitor with a different governance structure. In addition, our members' ownership in our company will be reduced substantially in connection with this offering. The reduced ownership may reduce their interest in the continued success of our business. A significant loss of revenue or transaction volumes from our members could have a material adverse effect on our business.

**Global economic, political and other conditions may adversely affect trends in consumer spending and in cross-border travel, which may materially and adversely impact our revenue and profitability.**

The global payments industry depends heavily upon the overall level of consumer, business and government spending. A sustained deterioration in general economic conditions, particularly in the United States or Europe, or increases in interest rates in key countries in which we operate, may adversely affect our financial performance by reducing the number or average purchase amount of transactions involving payment cards carrying our brands. In addition, a significant portion of the volume generated on cards carrying our brands (and a significant portion of the revenue we earn outside the United States) are associated with cross-border business and leisure travel, which may be adversely affected by world geopolitical, economic and other conditions, including the threat of terrorism and outbreak of diseases such as SARS and avian flu. In particular, revenue from processing foreign currency transactions for our customers fluctuates with cross border travel and our customers' need for transactions to be converted into their base currency.

**As a guarantor of certain obligations of principal members and affiliate debit licensees, we are exposed to risk of loss or illiquidity if any of our members default on their MasterCard, Cirrus or Maestro settlement obligations.**

We may incur liability in connection with transaction settlements if an issuer or acquirer fails to fund its daily settlement obligations due to technical problems, liquidity shortfall, insolvency or other reasons. If a principal member or affiliate debit licensee is unable to fulfill its settlement obligations to other members, we may bear the loss even if we do not process the transaction. In addition, although we are not contractually obligated to do so, we may elect to keep merchants whole if an acquirer defaults on its merchant payment obligations, in order to maintain the integrity and acceptance of our brands. Our estimated gross legal settlement exposure, which is calculated using (and the average daily card charges made during the quarter multiplied by the estimated number of days to settle, was approximately $15.0 billion as of March 31, 2006. We have a revolving credit facility in the amount of $2.5 billion to provide liquidity in the event of one or more settlement failures by our members. While we believe that we have sufficient liquidity to cover a settlement failure by any of our largest customers

23

Source: MASTERCARD INC, S-1/A, May 23, 2006

Table of Contents

on their peak day, concurrent settlement failures of more than one of our largest customers or of several of our smaller customers may exceed our available resources and could materially and adversely affect our business and financial condition. In addition, even if we have sufficient liquidity to cover a settlement failure, we may not be able to recover the cost of such a payment and may therefore be exposed to significant losses, which could materially and adversely affect our results of operations, cash flow and financial condition. For more information on our settlement exposure as of March 31, 2006, see Note 10 to our interim consolidated financial statements included in this prospectus.

**Following the offering transactions, we will no longer have the right to impose special assessments upon the members of MasterCard International, which could leave us exposed to significant losses that could materially and adversely affect our results of operations, cash flow and financial condition, or, in certain circumstances, even cause us to become insolvent, and result in a significant reduction in the value, or the complete loss, of your investment.**

In connection with this offering, the certificate of incorporation and the bylaws of MasterCard International will be amended to eliminate the right of MasterCard International to impose special assessments upon its members. This special assessment right currently allows MasterCard International to recover from its members all or a portion of its expenses and liabilities arising out of extraordinary events, such as settlements or judgments in major litigations and catastrophic occurrences that may cause significant risk or damage to MasterCard. Therefore, following the offering transactions, we will bear the expenses and liabilities associated with extraordinary events without recourse to our members through a right of assessment. Accordingly, the loss of this special assessment right leaves us exposed to significant risks and losses from these types of extraordinary events, which could materially and adversely affect our results of operations, cash flow and financial condition, or, in certain circumstances, even cause us to become insolvent, and result in a significant reduction in the value, or the complete loss, of your investment.

**Standard and Poor's Rating Services has announced that they will downgrade our credit rating upon completion of this offering, which will result in an increase of our interest expense for borrowings under our credit facility. Further downgradings of our credit ratings could materially and adversely affect our future ability to obtain funding or materially increase the cost of any additional funding.**

Due to the loss of MasterCard International's right to impose special assessments upon its members in connection with this offering, Standard & Poor's Rating Services expects to lower our counterparty credit ratings from A-/A-2 with negative outlook to BBB+/A-2 with stable outlook and our subordinated debt rating from BBB+ with negative outlook to BBB with stable outlook. Until the completion of this offering, our existing ratings will remain on credit watch with negative outlook. The expected downgrading will result in an increase of our interest expense if borrowings were necessary under our credit facility. In addition, further downgrading of our credit ratings by Standard & Poor's Rating Services or by any other rating agency could materially and adversely affect our future ability to obtain funding or materially increase the cost of any additional funding.

**If our transaction processing systems are disrupted or we are unable to process transactions efficiently or at all, our revenue or profitability would be materially reduced.**

Our transaction authorization, clearing and settlement systems may experience service interruptions as a result of fire, natural disasters, power loss, disruptions in long distance or local telecommunications access, fraud, terrorism or accident. Most of our transaction processing systems are controlled by a single facility, supported by a separate smaller co-processing facility. A natural disaster or other problem at our primary and/or back-up facilities or our other owned or leased facilities could interrupt our services. Additionally, we rely on third-party service providers, such as AT&T, for

24

Source: MASTERCARD INC, S-1/A, May 23, 2006

Table of Contents

the timely transmission of information across our global data transportation network. If a service provider fails to provide the communications capacity or services we require, as a result of natural disaster, operational disruption, terrorism or any other reason, the failure could interrupt our services, adversely affect the perception of our brands' reliability and materially reduce our revenue or profitability.

**Account data breaches involving card data stored by us or third parties could adversely affect our reputation and revenue.**

We, our customers, and other third parties store cardholder account information in connection with our payment cards. In addition, our customers may sponsor third-party processors to process transactions generated by cards carrying our brands. Breach of the systems on which sensitive cardholder data and account information are stored could lead to fraudulent activity involving our cards, damage the reputation of our brands and lead to claims against us. For example, in 2005, a third-party processor that held account information for merchants and acquirers was subject to a security breach in connection with card and account information for approximately 40 million cards, approximately 10.1 million of which were MasterCard cards. As a result, we have been named in a lawsuit claiming unspecified damages and may be subject to additional lawsuits in connection with data security breaches involving payment cards carrying our brands. If we are unsuccessful in defending lawsuits involving such data security breaches, we may be forced to pay damages, which could materially and adversely affect our profitability. In addition, any damage to our reputation or that of our brands resulting from an account data breach could decrease the use and acceptance of our cards, which could have a material adverse impact on our transaction volumes, revenue and future growth prospects, or increase our costs by leading to additional regulatory burdens being imposed upon us.

**An increase in fraudulent activity using our cards could lead to reputational damage to our brands and could reduce the use and acceptance of our cards.**

Criminals are using increasingly sophisticated methods to capture cardholder account information to engage in illegal activities such as fraud and identity theft. As outsourcing and specialization become a more acceptable way of doing business in the payments industry, there are more third parties involved in processing transactions using our cards. If fraud levels involving our cards were to rise, it could lead to regulatory intervention (such as mandatory card reissuance) and reputational and financial damage to our brands, which could reduce the use and acceptance of our cards or increase our compliance costs, and thereby have a material adverse impact on our business.

**If we are not able to keep pace with the rapid technological developments in our industry to provide customers, merchants and cardholders with new and innovative payment programs and services, the use of our cards could decline, which would reduce our revenue and income.**

The payment card industry is subject to rapid and significant technological changes, including continuing developments of technologies in the areas of smart cards, radio frequency and proximity payment devices (such as contactless cards), electronic commerce and mobile commerce, among others. We cannot predict the effect of technological changes on our business. We rely in part on third parties, including some of our competitors and potential competitors, for the development of and access to new technologies. We expect that new services and technologies applicable to the payments industry will continue to emerge, and these new services and technologies may be superior to, or render obsolete, the technologies we currently use in our card programs and services. In addition, our ability to adopt new services and technologies that we develop may be inhibited by a need for industry-wide standards or by resistance from customers or merchants to such changes. Our future success will depend, in part, on our ability to develop or adapt to technological changes and evolving industry standards.

25

Source: MASTERCARD INC, S-1/A, May 23, 2006

Table of Contents

**Adverse currency fluctuations and foreign exchange controls could decrease revenue we receive from our international operations.**

During 2005 and the first three months of 2006, approximately 45% and 47% of our revenue, respectively, was generated from activities outside the United States. Some of the revenue we generate outside the United States is subject to unpredictable and indeterminate fluctuations if the values of other currencies change relative to the U.S. dollar. Resulting exchange gains and losses are included in our net income. Our risk management activities provide protection with respect to adverse changes in the value of only a limited number of currencies. Furthermore, we may become subject to exchange control regulations that might restrict or prohibit the conversion of our other revenue currencies into U.S. dollars. The occurrence of any of these factors could decrease revenues we receive from our international operations and have a material adverse impact on our business.

**Competing dynamic currency conversion services could reduce the volume of foreign currency transactions we process or force us to change our pricing or practices, which may materially and adversely affect our business.**

Some of our members and competitors provide currency conversion services at the point of sale, known as dynamic currency conversion. Dynamic currency conversion services could, if significant numbers of cardholders choose to use them, replace our own currency conversion processing services or could force us to change our pricing or practices for these services. If we process fewer transactions or are forced to change our pricing or practices for our currency conversion processing because of competing dynamic currency conversion services or otherwise, our revenue may be materially and adversely affected.

**Our assessment revenues that are based on quarterly GDV are recorded utilizing an estimate of our customers' performance. Material changes in our customers' performance compared to estimates could have a material adverse impact on our results of operations and stock price.**

Our assessment revenues that are based on quarterly GDV are recorded utilizing an estimate of our customers' performance. Such estimates are subsequently validated against actual performance as reported by our customers, and differences are ordinarily adjusted in the period in which the customer reports actual results. Rebates and incentives, which are recorded as contra-revenue, are also estimated based on customer performance. Material changes in our customers' performance compared to estimates, or revisions to performance information subsequently reported by our customers in accordance with the MasterCard rules could have a material adverse impact on our results of operations and on the price of our Class A common stock.

**Any acquisitions that we make could disrupt our business and harm our financial condition.**

We may evaluate or make strategic acquisitions of complementary businesses, products or technologies. If so, we may not be able to successfully finance or integrate any such businesses, products or technologies. Furthermore, the integration of any acquisition may divert management's time and resources from our core business and disrupt our operations. We may spend time and money on projects that do not increase our revenue. To the extent we pay the purchase price of any acquisition in cash, it would reduce our cash reserves, including the proceeds from this offering available to us for other uses, and to the extent the purchase price is paid with our stock, it could be dilutive to our stockholders. While we from time to time evaluate potential acquisitions of businesses, products and technologies, and anticipate continuing to make these evaluations, we have no present understandings, commitments or agreements with respect to any material acquisitions.

26

Source: MASTERCARD INC, S-1/A, May 23, 2006

Table of Contents

**We expect to record a significant net loss for the second quarter and full year of 2006 as a result of the donation of shares of our Class A common stock and cash to The MasterCard Foundation, and we may make additional cash donations to The MasterCard Foundation to allow it to make charitable disbursements during the first four years of its operations.**

At the time of this offering, we intend to donate 13,496,933 newly-issued shares of the new Class A common stock, representing approximately 10% of our equity, to The MasterCard Foundation, a private charitable foundation incorporated in Canada. We also expect to donate an estimated $40 million in cash to the Foundation in support of its operating expenses and charitable disbursements for the first four years of its operations, and we may make additional cash contributions to the Foundation during and after this period. Because the Foundation's operations are currently being established, the overall size and timing of our expected initial cash donation have not been finally determined.

In connection with the donation of the shares of the Class A common stock, we expect to record an expense that is equal to the value of the shares we are donating. The value of the shares of Class A common stock we donate will be determined based on the initial public offering price per share of Class A common stock in this offering less a marketability discount of 25%. This marketability discount and the methodology used to quantify it were determined by management in consultation with independent valuation consultants retained by MasterCard. This discount was calculated based on analyses of prices paid in transactions of restricted stock of publicly held companies and income based analyses. Based on an initial public offering price per share of $41.50 (the mid-point of the price range set forth on the cover page of this prospectus), we expect to record an expense of $420 million in connection with the donation of the Class A common stock. If the initial public offering price per share is higher than $41.50, the expense we record will be greater. For example, if the initial public offering price per share is $43.00 (the high-point of the price range set forth on the cover page of this prospectus), we would record an expense of $435 million in connection with the donation of the Class A common stock. Conversely, if the initial public offering price per share is $40.00 (the low-point of the price range set forth on the cover page of this prospectus), we would record an expense of $405 million in connection with the donation of the Class A common stock. As a result of this expense, we expect to record a significant net loss for the three and six months ended June 30, 2006 and a net loss for the 2006 fiscal year. We also expect to record an expense equal to the value of any cash we donate in the period or periods in which such donation or donations are made. The expense of these donations will generally not be deductible to MasterCard for tax purposes. As a result of this difference between financial statement and tax treatments of the donations, we expect there to be a significant increase to our effective tax rate in the periods in which the contributions are made. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Impact of Offering Transactions."

**Changes in the regulatory environment may adversely affect our benefit plans.**

We provide certain retirement benefits to our U.S. employees through the MasterCard Accumulation Plan (MAP), a cash qualified balance benefit plan. In 2003, a U.S. federal district court ruled that International Business Machines Corporation's cash balance pension plan violated the age discrimination provisions of ERISA. If this decision is upheld on appeal and applied to cash balance plans generally, we may be required to amend the MAP and, like other U.S. companies with cash balance plans, may be exposed to claims from plan participants. These developments could have a material adverse impact on our results of operations.

**Risks Related to Our Class A Common Stock and This Offering**

**There may not be an active trading market for shares of our Class A common stock, which may cause our Class A common stock to trade at a discount from its initial offering price and make it difficult to sell the shares you purchase.**

Prior to this offering, there has been no public trading market for shares of our Class A common stock. Although our Class A common stock has been approved for listing on the NYSE, it is possible that,

27

Source: MASTERCARD INC, S-1/A, May 23, 2006

Table of Contents

after this offering, an active trading market will not develop or continue. The initial public offering price per share of our Class A common stock will be determined by agreement among us and the representative of the underwriters, and may not be indicative of the price at which the shares of our Class A common stock will trade in the public market after this offering.

**Future sales of our shares of Class A common stock could depress the market price of our Class A common stock.**

The market price of our Class A common stock could decline as a result of sales of a large number of shares in the market after the offering or the perception that such sales could occur. These sales, or the possibility that these sales may occur, also might make it more difficult for us or you to sell equity securities in the future. Upon completion of this offering, we will have 75,017,845 outstanding shares of Class A common stock (or 79,631,922 shares if the underwriters exercise their option to purchase additional shares in full), of which 61,520,912 shares (or 66,134,989 shares if the underwriters exercise their option to purchase additional shares in full) will have been sold in this offering and may be resold immediately in the public market.

In addition, 13,496,933 shares of our Class A common stock will have been issued as a donation to The MasterCard Foundation and, under the terms of the donation, may be resold by The MasterCard Foundation commencing on the fourth anniversary of the consummation of this offering to the extent necessary to comply with charitable disbursement requirements. Under Canadian tax law, The MasterCard Foundation is generally required each year to disburse at least 3.5% of its assets not used in administration of the Foundation in qualified charitable disbursements. However, we have obtained permission from the Canadian tax authorities for The MasterCard Foundation to defer its annual disbursement requirement for up to ten years and meet its total deferred disbursement obligations at the end of the ten-year period. Despite this permission to defer annual disbursements, The MasterCard Foundation may decide to meet its disbursement obligations on an annual basis or to settle previously accumulated obligations during any given year. In addition, The MasterCard Foundation will be permitted to sell all of the remaining shares held by it starting twenty years and eleven months after the consummation of this offering.

Also, in the event that the underwriters do not exercise in full their option to purchase up to an additional 4,614,077 shares of Class A common stock from us in connection with this offering, our certificate of incorporation will require us, prior to the time of our 2007 annual meeting of stockholders, to issue additional shares of Class A common stock in a public offering and to use the proceeds from such offering to redeem additional shares of Class B common stock so that, immediately following such subsequent offering and redemption, our existing stockholders will own approximately 41% of the aggregate number of shares of Class A common stock and Class B common stock at that time. Accordingly, if the underwriters do not exercise their option to purchase additional shares from us and we neither issue nor repurchase any shares following the offering transactions, we would be required to issue an additional 4,614,077 shares of Class A common stock (and to redeem an equivalent number of shares of Class B common stock) in connection with such subsequent offering.

In addition, immediately following the offering transactions, our existing stockholders will hold 59,951,485 shares of our Class B common stock (or 55,337,408 shares if the underwriters exercise their option to purchase additional shares in full), each of which will, commencing on the fourth anniversary of the consummation of this offering, be convertible for shares of our Class A common stock on a one-for-one basis, subject to certain rights of first refusal by the other holders of Class B common stock. All of the shares of Class A common stock issuable upon conversion of such shares will be freely tradable without restriction or registration under the Securities Act by persons other than our affiliates. These future sales, or the perception that such sales may occur, could depress the market price of our Class A common stock.

28

Source: MASTERCARD INC, S-1/A, May 23, 2006

Table of Contents

We and our directors and executive officers have agreed with the underwriters not to dispose of or hedge any of our Class A common stock or securities convertible into or exchangeable for shares of our Class A common stock, subject to specified exceptions, during the period from the date of this prospectus continuing through the date 180 days after the date of this prospectus, except with the prior written consent of Goldman, Sachs & Co. Subject to these agreements, we may issue and sell in the future additional shares of Class A common stock.

**Because a substantial portion of the proceeds from this offering will be used to redeem shares of Class B common stock, we will not have any of those proceeds available to invest in our business.**

We estimate that our proceeds from this offering (based on an initial public offering price of $41.50 per share), after deducting underwriting discounts and estimated offering expenses, will be approximately $2.4 billion, or $2.6 billion if the underwriters exercise their option to purchase additional shares in full. We intend to use all but $650 million of our net proceeds from this offering (including any proceeds received pursuant to the underwriters' option to purchase additional shares) to redeem a number of shares of Class B common stock from our existing stockholders that is equal to the aggregate number of shares of Class A common stock that we issue to investors in this offering (including any shares sold pursuant to the underwriters' option to purchase additional shares) and to The MasterCard Foundation. We intend to use the remaining proceeds to increase our capital. We will not have any of the proceeds from this offering that we use to redeem shares of our Class B common stock available to us to invest in and grow our business. See "Use of Proceeds."

**A potential conflict of interest may exist with respect to some of the underwriters for this offering.**

Several of the underwriters for this offering are members or affiliates of members of MasterCard International and, based on an initial public offering price per share of $41.50 and assuming no exercise of the underwriters' option to purchase additional shares, collectively will receive approximately 30% of the proceeds used for the redemption of the Class B common stock, as described under "Underwriting." Those underwriters include J.P. Morgan Securities Inc., Citigroup Global Markets Inc., HSBC Securities (USA) Inc., Harris Nesbitt Corp., Santander Investment, S.A., KeyBanc Capital Markets, a division of McDonald Investments Inc., Deutsche Bank Securities Inc., Cowen and Company, LLC, ABN AMRO Rothschild LLC, Barclays Capital Inc., Calyon Securities (USA) Inc., Credit Suisse Securities (USA) LLC, ING Bank N.V., London Branch, Mitsubishi UFJ Securities International plc, Mizuho International plc and Wells Fargo Securities, LLC. Moreover, under the formula that determines the redemption price per share of Class B common stock that we will pay to our existing stockholders, the proportion of the aggregate redemption price that will be paid to our existing stockholders in the United States (and, accordingly, the proportion of the proceeds used for the redemption of the Class B common stock that will be paid to the underwriters or their affiliates) increases as aggregate cash proceeds that we receive in this offering increases. Accordingly, those underwriters may have interests beyond receiving customary underwriting discounts and commissions. In particular, there may be a conflict of interest between their interests as recipients of the proceeds from the redemption (i.e., maximizing the value of their investment) and their interests as underwriters (i.e., in negotiating the initial public offering price). Several of the underwriters or their affiliates also perform other services for us. Pursuant to NASD Conduct Rule 2720, the shares of Class A common stock will be offered at a price no higher than that recommended by Goldman, Sachs & Co., which is acting as a qualified independent underwriter. Although the qualified independent underwriter has performed due diligence investigations and reviewed and participated in the preparation of the registration statement of which this prospectus forms a part, conflicts may arise with respect to the offering, and, if conflicts do arise, they may be resolved in a manner adverse to investors. An affiliate of Goldman, Sachs & Co. is a lender under our credit facility.

Source: MASTERCARD INC, S-1/A, May 23, 2006

Table of Contents

**The trading market for our Class A common stock could be adversely affected because provisions of our certificate of incorporation will make it in many cases difficult for broker-dealers that are members or affiliates of members of MasterCard International to make a market in our Class A common stock.**

Following this offering, our amended and restated certificate of incorporation will provide that no person who is a member or affiliated with a member of MasterCard International, including J.P. Morgan Securities Inc., Citigroup Global Markets Inc., HSBC Securities (USA) Inc., Harris Nesbitt Corp., Santander Investment, S.A., KeyBanc Capital Markets, a division of McDonald Investments Inc., Deutsche Bank Securities Inc., Cowen and Company, LLC, ABN AMRO Rothschild LLC, Barclays Capital Inc., Calyon Securities (USA) Inc., Credit Suisse Securities (USA) LLC, ING Bank N.V., London Branch, Mitsubishi UFJ Securities International plc, Mizuho International plc and Wells Fargo Securities, LLC, which we refer to collectively as "member affiliates," as well as the broker-dealer affiliates of such members, will be permitted to beneficially own any shares of Class A common stock or certain other voting stock (or securities convertible or exchangeable into such stock) at any time, subject to a limited number of exceptions. Those exceptions include (1) an underwriter participating in an offering of such securities may beneficially own such securities, but only to the extent necessary to facilitate that offering and (2) such a person may beneficially own such securities if those securities are held for the benefit of third parties or in customer or fiduciary accounts in the ordinary course of such person's business and are held by such person without the purpose or effect of changing or influencing control of MasterCard. Accordingly, once the offering has been completed, no member affiliate will be able to trade as a principal in our Class A common stock and will be restricted in its ability to act as a market-maker in our Class A common stock, although member affiliates will be able to execute trades as agents for third parties. Other members of the underwriting syndicate that are not member affiliates may continue to engage in market-making activities. However, they are under no obligation to do so, and may cease those activities at any time. These restrictions on the ability of the member affiliates to engage in market-making may adversely affect the trading market for the Class A common stock.

**Anti-takeover provisions in our charter documents and Delaware law could delay or prevent entirely a takeover attempt or a change in control.**

Provisions contained in our amended and restated certificate of incorporation and bylaws and Delaware law could delay or prevent entirely a merger or acquisition that our stockholders consider favorable. These provisions may also discourage acquisition proposals or have the effect of delaying or preventing entirely a change in control, which could harm our stock price. For example, subject to limited exceptions, our amended and restated certificate of incorporation will prohibit any person from beneficially owning more than 15% of any of the Class A common stock, the Class B common stock or any other class or series of our stock with general voting power, or more than 15% of our total voting power. Further, no member or former member of MasterCard International, or any operator, member or licensee of any competing general purpose payment card system, or any affiliate of any such person, may beneficially own any share of Class A common stock or any other class or series of our stock entitled to vote generally in the election of directors. In addition,

- our board of directors will be divided into three classes, with approximately one-third of our directors elected each year;

- up to three of our directors (but no more than one-quarter of all directors) will be elected by the holders of our Class M common stock;

- any representative of a competitor of MasterCard or of The MasterCard Foundation will be disqualified from service on our board of directors;

- our directors, other than the directors elected by the holders of our Class M common stock (who may be removed without cause by the holders of the Class M common stock), may be

30

Table of Contents

removed only for cause and only upon the affirmative vote of at least 80% in voting power of all the shares of stock then entitled to vote at an election of directors, voting together as a single class;

- our stockholders are not entitled to the right to cumulate votes in the election of directors;

- holders of our Class A common stock are not entitled to act by written consent;

- our stockholders must provide timely notice for any stockholders proposals and director nominations;

- we have adopted limited liability provisions that eliminate the personal liability of directors and the members of our European Board for monetary damages for actions taken as a director or member, with certain exceptions; and

- a vote of 80% or more of all of the outstanding shares of our stock then entitled to vote is required to amend certain sections of our amended and restated certificate of incorporation and for stockholders to amend any provision of our bylaws.

See "Description of Capital Stock—Anti-Takeover Effects of Certain Provisions of Our Amended and Restated Certificate of Incorporation and Bylaws" and "—Delaware Law Anti-Takeover Statute."

**A substantial portion of our voting power will be held by The MasterCard Foundation, which will be restricted from selling shares for an extended period of time and may therefore not have the same incentive to approve a corporate action that may be favorable to the other public stockholders. In addition, the ownership of Class A common stock by The MasterCard Foundation and the restrictions on transfer could discourage or make more difficult acquisition proposals favored by the other holders of the Class A common stock.**

Following completion of this offering, The MasterCard Foundation is expected to own 13,496,933 shares of Class A common stock, representing approximately 10% of our equity and 18% of our general voting power (or 17% of our general voting power if the underwriters exercise their option to purchase additional shares in full). Under the terms of the donation, The MasterCard Foundation may not sell or otherwise transfer its shares of Class A common stock prior to the date which is twenty years and eleven months following the consummation of this offering, except to the extent necessary to satisfy its charitable disbursement requirements starting on the fourth anniversary of the consummation of this offering. The five initial directors of The MasterCard Foundation were selected by a three-member "blue ribbon" panel subject to certain limited veto rights of the Nominating and Corporate Governance Committee of our new board of directors. The blue ribbon panel was selected by Messrs. Boudreau and Falcones, two of our current directors, and Mr. Selander, our Chief Executive Officer, and was comprised of individuals who satisfy the independence requirements for service on our board of directors. The continuing directors of the Foundation will, in consultation with, but not under the control of, the Nominating and Corporate Governance Committee, select successors to become directors of the Foundation at the end of any director's term of office or to fill any vacancy. The directors of the Foundation will be required to be independent of us and our members.

The ownership of Class A common stock by The MasterCard Foundation, together with the restrictions on transfer, could discourage or make more difficult acquisition proposals favored by the other holders of the Class A common stock. In addition, because The MasterCard Foundation will be restricted from selling its shares for an extended period of time, it may not have the same interest in short or medium-term movements in our stock price as, or incentive to approve a corporate action that may be favorable to, our other stockholders.

31

Source: MASTERCARD INC, S-1/A, May 23, 2006

Table of Contents

**The holders of our Class M common stock have the right to elect up to three of our directors and to approve significant corporate transactions, and their interests in our business may be different than yours.**

Our amended and restated certificate of incorporation will require us to obtain the approval of the holders of our Class M common stock, voting separately as a class, for a variety of enumerated items. For example, the approval of the holders of our Class M common stock will be required to make certain amendments to our certificate of incorporation, to approve the sale, lease or exchange of all or substantially all of our assets, to approve the consummation of mergers or consolidations of MasterCard or for us to cease to engage in the business of providing core network authorization, clearing and settlement services for branded payment card transactions. In addition, the holders of our Class M common stock will have the right to elect up to three of our directors. Because shares of the Class M common stock do not have any economic rights, the holders of the Class M common stock may not have the same incentive to approve a corporate action that may be favorable for the holders of Class A common stock, or their interests may otherwise conflict with yours. See "Description of Capital Stock—Common Stock—Voting Rights."

**Certain aspects of our European operations will be managed by a European Board that will be elected by the European holders of Class M common stock and which may reach different decisions than our Global Board of Directors.**

Certain aspects of our European operations, including review of membership applications, levying of fines and certain assessments and fees applicable to European members, establishment of intraregional operating rules, approval of the European annual expense budget, surplus funds, and implementation of certain intraregional product and enhancement developments and affinity and co-branding rules will be managed by or under the direction of our European Board. The European Board will be elected by holders of our Class M common stock who have their principal operations in Europe, and is expected to consist of representatives of our European members. Although our board of directors may, through a majority or a two-thirds vote depending on the circumstances, override decisions or temporarily assume any authority granted to the European Board, the European Board may reach different decisions than our board of directors would have reached on the same matter.

**Our ability to pay regular dividends to our holders of Class A common stock is subject to the discretion of our board of directors and will be limited by our ability to generate sufficient earnings and cash flows.**

After consummation of this offering, we intend to pay cash dividends on a quarterly basis on our shares of Class A common stock and Class B common stock. Our board of directors may, in its discretion, decrease the level of dividends or discontinue the payment of dividends entirely. The payment of dividends will be dependent upon our ability to generate earnings and cash flows so that we may pay our obligations and expenses and pay dividends to our stockholders. However, sufficient cash may not be available to pay such dividends. Payment of future dividends, if any, would be at the discretion of our board of directors after taking into account various factors, including our financial condition, settlement guarantees, operating results, available cash and current and anticipated cash needs. If, as a consequence of these various factors, we are unable to generate sufficient earnings and cash flows from our business, we may not be able to make or may have to reduce or eliminate the payment of dividends on our shares of Class A common stock and Class B common stock.

32

Source: MASTERCARD INC, S-1/A, May 23, 2006

Table of Contents

## FORWARD-LOOKING STATEMENTS

This prospectus contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. Such forward-looking statements include, in particular, statements about our plans, strategies and prospects under the headings "Summary," "Risk Factors," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Business." You can identify these forward-looking statements by the use of words such as "outlook," "believes," "anticipates," "expects," "potential," "continues," "may," "will," "should," "seeks," "approximately," "predicts," "intends," "plans," "estimates," "anticipates," or the negative version of these words or variations on these words and similar expressions. Such forward-looking statements are subject to various risks and uncertainties and are not guarantees of future performance. Accordingly, there are or will be important factors that could cause actual outcomes or results to differ materially from those indicated in these statements. We believe that these factors include, but are not limited to, those described under "Risk Factors." We undertake no obligation to publicly update or revise any forward-looking statement, whether as a result of new information, future developments or otherwise.

33

Source: MASTERCARD INC, S-1/A, May 23, 2006

Table of Contents

## USE OF PROCEEDS

We estimate that our net proceeds from this offering of shares of Class A common stock (based on an assumed initial public offering price of $41.50 per share), after deducting underwriting discounts and estimated offering expenses, will be approximately $2.43 billion (or $2.61 billion if the underwriters exercise their option to purchase additional shares in full). We intend to use all but $650 million of our net proceeds from this offering (including any proceeds received pursuant to the underwriters' option to purchase additional shares) to redeem a number of shares of Class B common stock from our existing stockholders that is equal to the aggregate number of shares of Class A common stock that we issue to investors in this offering (including any shares sold pursuant to the underwriters' option to purchase additional shares) and to The MasterCard Foundation. We intend to use the remaining proceeds to increase our capital, defend ourselves against legal and regulatory challenges, expand our role in targeted geographies and higher growth segments of the global payments industry and for other general corporate purposes. However, we have not determined the amounts of such remaining proceeds that are to be allocated to these purposes. We will determine these amounts in our sole discretion and may also eliminate uses or include additional uses without stockholder approval.

Certain of the underwriters, including J.P. Morgan Securities Inc., Citigroup Global Markets Inc., HSBC Securities (USA) Inc., Harris Nesbitt Corp., Santander Investment, S.A., KeyBanc Capital Markets, a division of McDonald Investments Inc., Deutsche Bank Securities Inc., Cowen and Company, LLC, ABN AMRO Rothschild LLC, Barclays Capital Inc., Calyon Securities (USA) Inc., Credit Suisse Securities (USA) LLC, ING Bank N.V., London Branch, Mitsubishi UFJ Securities International plc, Mizuho International plc and Wells Fargo Securities, LLC, are members or affiliates of members of MasterCard International and, based on an initial public offering price per share of $41.50 and assuming no exercise of the underwriters' option to purchase additional shares, collectively will receive approximately 30% of the proceeds used for the redemption of Class B common stock described above. In addition, several of the underwriters or their affiliates also perform other services for us. See "Underwriting."

## DIVIDEND POLICY

Following this offering and subject to legally available funds, we currently intend to pay a quarterly cash dividend at an annual rate initially equal to $0.36 per share (or a quarterly rate initially equal to $0.09 per share) of Class A common stock and Class B common stock, commencing in the fourth quarter of 2006. Based on the approximately 135 million shares of Class A common stock and Class B common stock to be outstanding after the offering transactions, this dividend policy implies a quarterly cash requirement of approximately $12 million. Our cash flows provided by (used in) operating activities, which were $273 million for the year ended December 31, 2005 ($(14 million), $211 million, $151 million and $(75 million) for the quarterly periods ended March 31, June 30, September 30 and December 31, 2005, respectively) and $41 million for the three months ended March 31, 2006, indicate a level of cash flows from operating activities which we believe provides us with a reasonable basis for our assessment that we can support our intended dividend policy. In addition, we had $1.3 billion of cash, cash equivalents and available-for-sale securities as of March 31, 2006. The declaration and payment of any future dividends will be at the sole discretion of our board of directors after taking into account various factors, including our financial condition, settlement guarantees, operating results, available cash and current and anticipated cash needs.

34

Source: MASTERCARD INC, S-1/A, May 23, 2006

Table of Contents

## DESCRIPTION OF CAPITAL STOCK

The following description of our capital stock as it will be in effect upon the consummation of this offering is a summary and is qualified in its entirety by reference to our Amended and Restated Certificate of Incorporation and Amended and Restated Bylaws, the forms of which have been filed with the SEC as exhibits to the registration statement of which this prospectus forms a part, and by applicable law.

### Authorized Capitalization

Upon consummation of this offering, our authorized capital stock will consist of 3,000,000,000 shares of Class A common stock, par value $.0001 per share, 1,200,000,000 shares of Class B common stock, par value $.0001 per share, 1,000,000,000 shares of Class M common stock, par value $.0001 per share, and 300,000,000 shares of preferred stock, par value $.0001 per share.

### Common Stock

*Voting Rights*.   Each share of Class A common stock will entitle its holder to one vote per share.

Except as may be required by Delaware law, holders of Class B and Class M common stock will not be entitled to vote and will have no voting power. Notwithstanding the foregoing, in addition to any other vote required by law, the following items will require the affirmative vote of a majority of the votes cast thereon by the holders of the Class M common stock, voting separately as a class:

- the sale, lease or exchange of all or substantially all of the assets of MasterCard or any of its subsidiaries which, in each case, requires stockholder approval under the General Corporation Law of the State of Delaware or any sale, lease or exchange of all or substantially all of the assets of MasterCard International;

- the consummation of any merger or consolidation of MasterCard (a) with any other corporation or entity prior to the date which is twenty years and eleven months following the date of the consummation of this offering or (b) with (i) any competitor of MasterCard, (ii) any of our members or (iii) any financial institution that is eligible to become a member;

- any amendment or modification of the amended and restated certificate of incorporation to authorize the issuance of capital stock other than Class A common stock, Class B common stock, Class M common stock or preferred stock prior to the date which is twenty years and eleven months following the date of the consummation of this offering;

- for us to cease to engage in the business of providing core network authorization, clearing and settlement services for branded payment card transactions;

- any alteration, amendment or repeal of any provision of the amended and restated certificate of incorporation that would have the effect of permitting (1) any person to beneficially own (a) shares of Class A common stock representing more than 15% of the aggregate outstanding shares or voting power of Class A common stock, (b) shares of any other class or series of our stock entitled to vote generally in the election of directors (which, for the avoidance of doubt, shall not include Class M common stock) ("other voting stock") representing more than 15% of the aggregate outstanding shares or voting power of such class or series, or (c) shares of Class A common stock and/or other voting stock representing more than 15% of the aggregate voting power of all our then outstanding shares of stock entitled to vote at an election of directors, voting as a single class, or (2) or any member, former member or person that is an operator, member or licensee of any competing general purpose payment card system, or any

134

Source: MASTERCARD INC, S-1/A, May 23, 2006

Table of Contents

affiliate of any such person, to beneficially own any shares of Class A common stock or any other class or series of other voting stock in violation of the limitations on beneficial ownership described below under "—Beneficial Ownership Limitations";

- any alteration, amendment, or repeal of the requirement in our amended and restated certificate of incorporation that our board be comprised of three to twelve directors, of which up to three directors (but not more than one-quarter of all directors) shall be elected by the holders of Class M common stock or of the director qualifications discussed above in "Management—Our Board of Directors After the Offering" or the voting requirement for removal of Class M directors without cause or of any provision in the bylaws that is to the same effect;

- any alteration, amendment, or repeal of the provisions of our certificate of incorporation governing the director qualifications and geographic diversity of our directors described in "Management—Our Board of Directors After the Offering" or of any provision in the bylaws that is to the same effect; and

- any alteration, amendment, or repeal of any of the above listed approval rights of the Class M common stock or of the global proxy calculation used to determine the number of votes to which each holder of Class M common stock is entitled, or of any provision in the bylaws that is to the same effect.

In addition, the holders of the Class M common stock will also have the right to elect up to three of our directors, provided that the total number of Class M directors shall not exceed one-quarter of the total number of directors that will be in office immediately following such election. The holders of Class M common stock, collectively, will have the right to cast 1,000 votes in any vote of the holders of that class. Each holder of Class M common stock will be entitled to the number of votes that is equal to the product of 1,000 multiplied by the holder's global proxy calculation, which is a fraction that is determined annually by a formula based on the relative level of revenues and transaction volume we generate from such holder. The sum of the global proxy calculations for all the holders of Class M common stock is one.

*Dividend Rights.*   Our Class A common stock and Class B common stock will share equally (on a per share basis) in any dividend declared by our board of directors, subject to any preferential or other rights of any outstanding preferred stock and to the distinction that any stock dividends will be paid in shares of Class A common stock to the holders of our Class A common stock and in shares of Class B common stock to the holders of our Class B common stock.

Holders of Class M common stock will not be entitled to receive dividends.

*Liquidation Rights.*   Upon liquidation, dissolution or winding up, our Class A common stock and Class B common stock will be entitled to receive ratably the assets available for distribution to the stockholders after payment of liabilities and payment of preferential and other amounts, if any, payable on any outstanding preferred stock.

Holders of Class M common stock will not be entitled to receive any assets upon a liquidation, dissolution or winding up.

*Conversion Right of Class B Common Stock.*   Subject to the provisions of our amended and restated certificate of incorporation that prohibit our members and former members, and any person that is an operator, member or licensee of any competing general purpose payment card system, and any affiliate of any such person, from beneficially owning any share of Class A common stock or of any other class of our stock with general voting power and to such holder's compliance with the right of first refusal procedures described below, any holder of Class B common stock may at any time and from time to time commencing on the fourth anniversary of the consummation of this offering, at such

135

Source: MASTERCARD INC, S-1/A, May 23, 2006

Table of Contents

holder's option, convert all or any portion of such holder's shares of Class B common stock into an equal number of shares of Class A common stock in connection with a transfer of these converted shares of Class A common stock to a person permitted to hold our Class A common stock. For so long as our outstanding shares of Class B common stock represent 15% or more of the aggregate outstanding shares of our Class A and Class B common stock, before converting shares to Class A common stock, a holder of shares of Class B common stock must first offer to sell any shares of Class B common stock that such holder wishes to convert to the member financial institutions of MasterCard International. The shares can only be converted if they are not being purchased by another member. Our board of directors will establish procedures for the exercise of these conversion rights and the right of first refusal by the members of MasterCard International.

Shares of Class M common stock and, except as described below in "—Beneficial Ownership Limitations," shares of Class A common stock are not convertible into any other class of our capital stock.

**Redemption of Class B Common Stock.**   Our board of directors has approved the redemption, following this offering of Class A common stock, of that number of shares of Class B common stock that is equal to the aggregate number of shares of Class A common stock issued in this offering (including any shares sold pursuant to the underwriters' option to purchase additional shares) and to The MasterCard Foundation. The number of shares to be redeemed from each of our existing stockholders will be ratable to their respective ownerships. The redemption price per share to be received by our existing stockholders outside the United States (the "Non-U.S. Holders") will equal the quotient of (A) the product of (x) the aggregate cash proceeds that we received in this offering (including any shares sold pursuant to the underwriters' option to purchase additional shares), net of underwriting discounts and commissions and other offering-related expenses (the "Net Cash Proceeds"), multiplied by (y) the fraction obtained by dividing the aggregate number of shares of Class B common stock then held by the Non-U.S. Holders by the total number of shares of Class B common stock then outstanding, divided by (B) the aggregate number of shares of Class B common stock that is being redeemed from the Non-U.S. Holders. The redemption price per share to be received by our existing stockholders in the United States (the "U.S. Holders") will be lower than the price to be received by the Non-U.S. Holders and will equal the quotient of (A) the remainder of (x) the Net Cash Proceeds minus (y) the aggregate redemption price to be received by the Non-U.S. Holders minus (z) $650 million, divided by (B) the aggregate number of shares of Class B common stock that is being redeemed from the U.S. Holders; provided, however, that if such calculation results in a negative number, the redemption price per share to be received by the U.S. Holders will equal zero.

If the underwriters do not exercise in full their option to purchase additional shares in connection with this offering, our certificate of incorporation will require us, subject to applicable law and our board of directors' fiduciary duties, to conduct a subsequent public offering of shares of Class A common stock prior to the 2007 annual meeting and to redeem that number of shares of Class B common stock that is equal to the aggregate number of shares of Class A common stock that we have issued in the subsequent public offering. The number of shares of Class B common stock to be redeemed will be reduced to the extent that the redemption would otherwise result in a number of shares of Class B common stock outstanding immediately following the redemption being less than 41% of the aggregate number of shares of Class A common stock and Class B common stock outstanding at the date of the redemption. The redemption price will be payable in cash in an amount equal to the price per share of Class A common stock that we receive in the subsequent public offering, net of underwriting discounts and commissions and other offering related expenses.

Shares of Class M common stock and, except as described below in "—Beneficial Ownership Limitations," shares of Class A common stock are not redeemable. Shares of Class M common stock are subject to retirement under certain circumstances as described below in "—Issuance and Retirement of Class M Common Stock."

136

Source: MASTERCARD INC, S-1/A, May 23, 2006

Table of Contents

**Beneficial Ownership Limitations.**

*Class A Common Stock and Other Voting Stock.*   Subject to limited exceptions, our amended and restated certificate of incorporation will prohibit any person from beneficially owning (a) shares of Class A common stock representing more than 15% of the aggregate outstanding shares or voting power of Class A common stock, (b) shares of any other class or series of our stock entitled to vote generally in the election of directors (which, for the avoidance of doubt, shall not include Class M common stock) ("other voting stock") representing more than 15% of the aggregate outstanding shares or voting power of such class or series, or (c) shares of Class A common stock and/or other voting stock representing more than 15% of the aggregate voting power of all our then outstanding shares of stock entitled to vote at an election of directors, voting as a single class. In addition, no member or former member of MasterCard International or person that is an operator, member or licensee of any competing general purpose payment card system, or any affiliate of any such person, may beneficially own any share of Class A common stock or of other voting stock.

Any attempted transfer of Class A common stock or other voting stock which, if effective, would result in violation of the ownership limits discussed above, will cause the number of shares causing the violation (rounded to the next highest whole share) to be automatically transferred to a trust for the exclusive benefit of one or more charitable beneficiaries. The automatic transfer will be deemed to be effective as of the close of business on the business day prior to the date of the transfer. Shares of Class A common stock or other voting stock held in the trust will be issued and outstanding shares. The proposed transferee will not benefit economically from ownership of any shares of Class A common stock or other voting stock held in the trust, will have no rights to dividends or other distributions and no rights to vote or other rights attributable to the shares of Class A common stock or other voting stock held in the trust. The trustee of the trust will have all voting rights and rights to dividends or other distributions with respect to shares of Class A common stock or other voting stock held in the trust. These rights will be exercised for the exclusive benefit of the charitable beneficiary. Any dividend or other distribution paid prior to MasterCard's discovery that shares of Class A common stock or other voting stock have been transferred to the trust has to be paid by the recipient to the trustee upon demand. Any dividend or other distribution authorized but unpaid will be paid when due to the trustee. Any dividend or distribution paid to the trustee will be held in trust for the charitable beneficiary. Subject to applicable law, the trustee will have the authority (1) to rescind as void any vote cast by the proposed transferee prior to MasterCard's discovery that the shares have been transferred to the trust and (2) to recast the vote in accordance with the desires of the trustee acting for the benefit of the charitable beneficiary. However, if MasterCard has already taken corporate action, then the trustee will not have the authority to rescind and recast the vote.

Within 20 days of receiving notice from MasterCard that shares of its stock have been transferred to the trust, the trustee must sell the shares to a person designated by the trustee, whose ownership of the shares will not violate the above ownership limitations. Upon the sale, the interest of the charitable beneficiary in the shares sold will terminate, and the trustee will distribute the net proceeds of the sale to the proposed transferee and to the charitable beneficiary as follows. The proposed transferee will receive the lesser of (1) the price paid by the proposed transferee for the shares or, if the proposed transferee did not give value for the shares in connection with the event causing the shares to be held in the trust (e.g., a gift, devise or other similar transaction), the Market Price (as defined in MasterCard's certificate of incorporation) of the shares on the day of the event causing the shares to be held in the trust and (2) the price received by the trustee from the sale or other disposition of the shares. Any net sale proceeds in excess of the amount payable to the proposed transferee will be paid immediately to the charitable beneficiary. If, prior to MasterCard's discovery that shares of its stock have been transferred to the trust, the shares are sold by the proposed transferee, then (1) the shares shall be deemed to have been sold on behalf of the trust and (2) to the extent that the proposed transferee received an amount for the shares that exceeds the amount he was entitled to receive, the excess shall be paid to the trustee upon demand.

137

Source: MASTERCARD INC, S-1/A, May 23, 2006

Table of Contents

In addition, shares of Class A common stock or other voting stock held in the trust transferred to the trustee may be redeemed by MasterCard, or its designee, at a price per share equal to the lesser of (1) the price per share in the transaction that resulted in such transfer to the trust (or, in the case of a devise, gift or other such transaction, the Market Price at the time of such devise or gift or other such transaction) and (2) the Market Price on the date MasterCard, or its designee, elects to redeem such shares. MasterCard may reduce the amount payable to the Prohibited Owner (as defined in the certificate of incorporation) by the amount of dividends and distributions which has been paid to the Prohibited Owner and are owed by the Prohibited Owner to the trustee. MasterCard may pay the amount of such reduction to the trustee for the benefit of the charitable beneficiary. MasterCard shall have the right to redeem such shares until the trustee has sold the shares held in the trust. Upon such a redemption, the interest of the charitable beneficiary in the shares shall terminate and the trustee shall distribute the net proceeds of the redemption to the Prohibited Owner.

*Class B Common Stock.*   Shares of Class B common stock may be held only by a member of MasterCard, by MasterCard or by MasterCard's directors, officers or employees. Any transfer that would result in a violation of this ownership limitation will be void. MasterCard may redeem any shares of Class B common stock held by a person prohibited from holding such shares. In addition, subject to limited exceptions, our amended and restated certificate of incorporation will also prohibit any person from beneficially owning more than 15% of the aggregate outstanding shares of Class B common stock otherwise than as a direct result of a decrease in the number of shares of Class B common stock outstanding. If any attempted transfer of Class B common stock would, if effective, result in a violation of the ownership limitation discussed above, then the proposed transferee will not acquire any rights with respect to such shares, including any voting rights or dividend rights. We may redeem shares of Class B common stock owned in violation of this limitation.

Notwithstanding the foregoing, if at any time when shares of Class M common stock remain outstanding the number of shares of Class B common stock outstanding is less than 41% of the aggregate number of shares of Class A common stock and Class B common stock outstanding, our members will be permitted to acquire that number of additional shares of Class A common stock that would result in the holders of Class B common stock, collectively, holding 41% of the total outstanding shares of Class A common stock and Class B common stock. Any shares of Class A common stock that are acquired by a member pursuant to this exception will automatically convert into an equal number of shares of Class B common stock upon the acquisition thereof by the member. Our amended and restated certificate of incorporation provides that our board of directors may establish binding procedures for the exercise of these acquisition rights by members, including, without limitation, procedures relating to the periodicity of such acquisitions and the allocation among the members of the permission to acquire additional shares. While our board of directors has not yet established procedures for the exercise of these member acquisition rights, we expect to determine the number of shares of Class A common stock that members will be permitted to acquire on a quarterly basis based on our published financial statements and that any such acquisitions would be executed by members through open market or privately negotiated transactions with other stockholders rather than through any primary issuances by us.

*Issuance and Retirement of Class M Common Stock.*   Following the offering, we will issue a share of Class M common stock to each new principal member of MasterCard International. If any outstanding share of Class M common stock ceases to be held by a principal member of MasterCard International, such share shall automatically be transferred to us and then retired. In addition, all outstanding shares of Class M common stock shall automatically be transferred to us and retired and unavailable for issue or reissue, and we shall not have the authority to issue additional shares of Class M common stock, upon the earliest to occur of:

- the approval of the retirement by the affirmative vote of at least a majority of the votes cast by the holders of Class M common stock, voting as a class; and

138

Source: MASTERCARD INC, S-1/A, May 23, 2006

Table of Contents

- the day on which the outstanding shares of Class B common stock represent less than 15% of the total outstanding shares of Class A common stock and Class B common stock.

*Other Matters.*   Holders of our common stock do not have preemptive or subscription rights. All shares of our common stock that will be outstanding at the time of the completion of the offering will be fully paid and non-assessable, and the shares of our Class A common stock offered in this offering, upon payment and delivery in accordance with the underwriting agreement, will be fully paid and non-assessable. The opinion of Simpson Thacher & Bartlett LLP with respect to the validity of the Class A common stock is filed as Exhibit 5.1 to the registration statement of which this prospectus forms a part. We will issue all shares of our capital stock in uncertificated form unless our board of directors determines that any particular series will be issued in certificated form.

**Preferred Stock**

Our amended and restated certificate of incorporation authorizes our board of directors to establish one or more series of preferred stock (including convertible preferred stock). Unless required by law or by any stock exchange, the authorized shares of preferred stock will be available for issuance without further action by you. Our board of directors is able to determine, with respect to any series of preferred stock, the terms and rights of that series, including:

- the designation of the series;

- the number of shares of the series, which our board may, except where otherwise provided in the preferred stock designation, increase or decrease, but not below the number of shares then outstanding;

- whether dividends, if any, will be cumulative or non-cumulative and the dividend rate of the series;

- the dates at which dividends, if any, will be payable;

- the redemption rights and price or prices, if any, for shares of the series;

- the terms and amounts of any sinking fund provided for the purchase or redemption of shares of the series;

- the amounts payable on shares of the series in the event of any voluntary or involuntary liquidation, dissolution or winding-up of the affairs of our company;

- whether the shares of the series will be convertible into shares of any other class or series, or any other security, of our company or any other corporation, and, if so, the specification of the other class or series or other security, the conversion price or prices or rate or rates, any rate adjustments, the date or dates as of which the shares will be convertible and all other terms and conditions upon which the conversion may be made;

- restrictions on the issuance of shares of the same series or of any other class or series; and

- the voting rights, if any, of the holders of the series.

Accordingly, we could issue a series of preferred stock that could, depending on the terms of the series, impede or discourage an acquisition attempt or other transaction that some, or a majority, of you might believe to be in your best interests or in which you might receive a premium for your Class A common stock over the market price of the Class A common stock.

**Authorized but Unissued Capital Stock**

Delaware law does not require stockholder approval for any issuance of authorized shares. However, the listing requirements of the New York Stock Exchange, which would apply so long as the

139

Source: MASTERCARD INC, S-1/A, May 23, 2006

Table of Contents

Class A common stock remains listed on the New York Stock Exchange, require stockholder approval of certain issuances equal to or exceeding 20% of the then outstanding voting power or then outstanding number of shares of Class A common stock. These additional shares may be used for a variety of corporate purposes, including future public offerings, to raise additional capital or to facilitate acquisitions.

One of the effects of the existence of unissued and unreserved Class A common stock or preferred stock may be to enable our board of directors to issue shares to persons friendly to current management, which issuance could render more difficult or discourage an attempt to obtain control of our company by means of a merger, tender offer, proxy contest or otherwise, and thereby protect the continuity of our management and possibly deprive the stockholders of opportunities to sell their shares of Class A common stock at prices higher than prevailing market prices.

## Anti-Takeover Effects of Certain Provisions of our Amended and Restated Certification of Incorporation and Bylaws

### Beneficial Ownership Limitations

As described above, subject to limited exceptions, our amended and restated certificate of incorporation will prohibit any person from beneficially owning more than 15% of any of the Class A common stock, the Class B common stock or any other class or series of our stock entitled to vote, or more than 15% of our total voting power. In addition, no member or former member of MasterCard International, or any operator, member or licensee of any competing general purpose payment card system, or any affiliate of any such person, may beneficially own any share of Class A common stock or any other class or series of our stock entitled to vote generally in the election of directors (which, for the avoidance of doubt shall not include Class M common stock).

These ownership limitations could delay, defer or prevent a transaction or a change in control that might involve a premium price for the holders of Class A common stock and/or Class B common stock or otherwise be in their best interest.

### Classified Board

Our amended and restated certificate of incorporation provides that, commencing with the first annual meeting of stockholders after our amended and restated certificate of incorporation becomes effective, our board of directors will be divided into three classes of directors, with the classes to be as nearly equal in number as possible. As a result, approximately one-third of our board of directors will be elected each year. The classification of directors will have the effect of making it more difficult for stockholders to change the composition of our board. In addition, the holders of our Class M common stock, voting separately as a class are entitled to elect a number of our directors that is equal to the lesser of (x) three and (y) $1/4$ of the total number of directors that will be in office immediately following such election (rounded down to the nearest whole number). No more than one of the directors elected by the holders of our Class M common stock will be allocated to any one of the three classes of our board of directors. Our amended and restated certificate of incorporation provides that the number of directors will be fixed from time to time exclusively pursuant to a resolution adopted by the board, but must consist of not less than three or more than twelve directors.

### Removal of Directors; Vacancies

Under the General Corporation Law of the State of Delaware, unless otherwise provided in our amended and restated certificate of incorporation, directors serving on a classified board may be removed by the stockholders only for cause. Our amended and restated certificate of incorporation and bylaws provide that, except for the directors elected by the holders of Class M common stock, directors

140

Source: MASTERCARD INC, S-1/A, May 23, 2006

Table of Contents

may be removed only for cause, and only upon the affirmative vote of holders of at least 80% in voting power of all the shares of stock then entitled to vote at an election of directors, voting together as a single class. The directors elected by the holders of Class M common stock may be removed, without cause, by the holders of Class M common stock. In addition, our certificate of incorporation and bylaws also provide that any vacancies on our board of directors will be filled only by the affirmative vote of a majority of the remaining directors who are not Class M directors, although less than a quorum. If our board of directors consists solely of Class M directors or a vacancy relates to a Class M directorship, the affirmative vote of the entire board of directors, including Class M directors, although less than a quorum, is required to fill any vacancy. If any applicable provision of the General Corporation Law of the State of Delaware expressly confers power on stockholders to fill such a directorship (other than a Class M directorship) at a special meeting of stockholders, such a directorship may be filled at such meeting only by the affirmative vote of at least 80% of the votes cast thereon by the outstanding shares of the Company then entitled to vote at an election of directors (which, for the avoidance of doubt, shall not include shares of Class M common stock), voting together as a single class. If any applicable provision of the General Corporation Law of the State of Delaware expressly confers power on stockholders to fill such a Class M directorship at a special meeting of stockholders, such a directorship may be filled at such meeting only by the affirmative vote of at least 80% of the votes cast thereon by the outstanding shares of Class M common stock, voting separately as a class.

### No Cumulative Voting

The General Corporation Law of the State of Delaware provides that stockholders are not entitled to the right to cumulate votes in the election of directors unless our amended and restated certificate of incorporation provides otherwise. Our amended and restated certificate of incorporation does not provide for cumulative voting.

### No Stockholder Action by Written Consent; Calling of Special Meetings of Stockholders

Our amended and restated certificate of incorporation prohibits stockholder action by written consent by the holders of Class A common stock. It also provides that special meetings of our stockholders may be called only by or at the direction of the board of directors, our chief executive officer or the chairman of our board.

### Advance Notice Requirements for Stockholder Proposals and Director Nominations

Our bylaws provide that stockholders seeking to nominate candidates for election as directors or to bring business before an annual meeting of stockholders must provide timely notice of their proposal in writing to the corporate secretary.

Generally, to be timely, a stockholder's notice must be received at our principal executive offices not less than 90 nor more than 120 days prior to the first anniversary of the previous year's annual meeting. Our bylaws also specify requirements as to the form and content of a stockholder's notice. These provisions may impede stockholders' ability to bring matters before an annual meeting of stockholders or make nominations for directors at an annual meeting of stockholders.

### Limitations on Liability and Indemnification of Officers and Directors

The General Corporation Law of the State of Delaware authorizes corporations to limit or eliminate the personal liability of directors to corporations and their stockholders for monetary damages for breaches of directors' fiduciary duties. Our amended and restated certificate of incorporation includes a provision that eliminates the personal liability of directors and members of the European Board for monetary damages for any breach of fiduciary duty in such capacity, except to the extent such exemption from liability or limitation thereof is not permitted under the General Corporation Law of the State of Delaware.

141

Source: MASTERCARD INC, S-1/A, May 23, 2006

Table of Contents

Our amended and restated certificate of incorporation provides that we must indemnify our directors, any non-voting advisor to our board of directors, our officers and the members of our European Board to the fullest extent authorized by the General Corporation Law of the State of Delaware. We are also expressly authorized to carry directors' and officers' insurance for the benefit of our directors, officers and certain employees. We believe that these indemnification provisions and insurance are useful to attract and retain qualified directors and executive officers.

The limitation of liability and indemnification provisions in our amended and restated certificate of incorporation and bylaws may discourage stockholders from bringing a lawsuit against directors for breach of their fiduciary duty. These provisions may also have the effect of reducing the likelihood of litigation against directors and officers, even though such an action, if successful, might otherwise benefit us and our stockholders. In addition, your investment may be adversely affected to the extent we pay the costs of settlement and damage awards against directors and officers pursuant to these indemnification provisions.

There is currently no pending material litigation or proceeding involving any of our directors, officers or employees for which indemnification is sought.

### Supermajority Provisions

The General Corporation Law of the State of Delaware provides generally that the affirmative vote of a majority of the outstanding shares then entitled to vote, voting together as a single class, is required to amend our amended and restated certificate of incorporation, unless the amended and restated certificate of incorporation requires a greater percentage. Our amended and restated certificate of incorporation provides that, in addition to any vote required by law or the amended and restated certificate of incorporation, the provisions in the amended and restated certificate of incorporation addressing the following matters may be amended only by a vote of 80% or more of all of the outstanding shares of our capital stock then entitled to vote (not including shares of Class M common stock):

- the amendment, alteration or repeal by our stockholders of any provisions of the bylaws;

- the election and term of our directors, the composition of our board of directors, the director qualifications and the European Board;

- the removal of directors;

- the prohibition on Class A stockholder action by written consent;

- the ability to call a special meeting of stockholders being vested solely in our board of directors, the chairman of our board or our Chief Executive Officer; and

- the amendment provisions requiring that the above provisions be amended only with a 80% supermajority vote.

In addition, our amended and restated certificate of incorporation grants our board of directors the authority to amend and repeal our bylaws without a stockholder vote in any manner not inconsistent with the laws of the State of Delaware or our amended and restated certificate of incorporation. Notwithstanding the foregoing, our amended and restated certificate of incorporation also provides that our bylaws may be amended by the stockholders only by a vote of 80% or more of all of the outstanding shares then entitled to vote at an election of directors. In addition, the affirmative vote of at least 75% of our board of directors is required to amend the provision in our bylaws that requires that the appointment or election of one of our officers as Chairman of our board of directors be approved by at least 75% of our board of directors.

Source: MASTERCARD INC, S-1/A, May 23, 2006

Table of Contents

### Voting Rights of Holders of Class M Common Stock

As described above, certain provisions contained in our amended and restated certificate of incorporation will require us to obtain the approval of the holders of our Class M common stock, voting separately as a class, for a variety of corporate actions. For example, the approval of the holders of our Class M common stock is required for certain amendments to or modifications of the amended and restated certificate of incorporation, including amendments or modifications that would have the effect or permitting any person to own more than 15% or more of our voting stock, or to approve the sale, lease or exchange of all or substantially all of the assets of MasterCard or the consummation of mergers or consolidations of MasterCard. Because shares of our Class M common stock do not have any economic rights, the holders of the Class M common stock may not have the same incentive to approve a corporate action that may be favorable for the holders of Class A common stock. In addition, the holders of the Class M common shares have the right to elect up to three of our directors (but no more than one-quarter of all directors). See "—Common Stock—Voting Rights."

### Stock Ownership of The MasterCard Foundation

Following completion of this offering, The MasterCard Foundation is expected to own 13,496,933 shares of Class A common stock, representing approximately 10% of our equity and 18% of our general voting power (or 17% of our general voting power if the underwriters exercise their option to purchase additional shares in full). Under the terms of the donation, The MasterCard Foundation may not sell or otherwise transfer its shares of Class A common stock prior to the date which is twenty years and eleven months following the date of the consummation of this offering, except to the extent necessary to comply with charitable disbursement requirements under Canadian law starting on the fourth anniversary of the consummation of this offering. The five initial directors of The MasterCard Foundation were selected by a three-member "blue ribbon" panel subject to certain limited veto rights of the Nominating and Corporate Governance Committee of our new board of directors. The blue ribbon panel was selected by Messrs. Boudreau and Falcones, two of our current directors, and Mr. Selander, our CEO, and was comprised of individuals who satisfy the independence requirements for service on our board of directors. The continuing directors of the Foundation will, in consultation with, but not under the control of, the Nominating and Corporate Governance Committee, select successors to become directors of the Foundation at the end of any director's term of office or to fill any vacancy. The directors of the Foundation will be required to be independent of us and our members. The ownership of Class A common stock by The MasterCard Foundation, together with the restrictions on transfer, could discourage or make more difficult acquisition proposals favored by the other holders of the Class A common stock. In addition, because The MasterCard Foundation will be restricted from selling its shares for an extended period of time, it may not have the same interest in short or medium-term movements in our stock price as, or incentive to approve a corporate action that may be favorable to, our other stockholders.

## Delaware Law Anti-Takeover Statute

We are a Delaware corporation and will, upon the consummation of this offering, be subject to Section 203 of the General Corporation Law of the State of Delaware. Section 203 provides that, subject to certain exceptions specified in the law, a Delaware corporation shall not engage in certain "business combinations" with any "interested stockholder" for a three-year period following the time that the stockholder became an interested stockholder unless:

- prior to such time, our board of directors approved either the business combination or the transaction that resulted in the stockholder becoming an interested stockholder;

- upon consummation of the transaction that resulted in the stockholder becoming an interested stockholder, the interested stockholder owned at least 85% of our voting stock outstanding at the time the transaction commenced, excluding certain shares; or

143

Source: MASTERCARD INC, S-1/A, May 23, 2006

Exhibit 3.1(a)

## SECOND AMENDED AND RESTATED CERTIFICATE OF INCORPORATION
### OF
### MASTERCARD INCORPORATED

MasterCard Incorporated (the "*Corporation*"), a corporation organized and existing under the laws of the State of Delaware, hereby certifies as follows:

A. The name of the Corporation is MasterCard Incorporated. The Corporation was originally incorporated under the name MasterCard Incorporated. The Corporation's original Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on May 9, 2001. The Corporation's Amended and Restated Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on June 28, 2002.

B. This Second Amended and Restated Certificate of Incorporation, which amends and restates the Corporation's Amended and Restated Certificate of Incorporation in its entirety, was duly adopted in accordance with Sections 242 and 245 of the General Corporation Law of the State of Delaware (the "*DGCL*").

C. The Second Amended and Restated Certificate of Incorporation of the Corporation shall read in its entirety as follows:

### ARTICLE I

Section 1.1. *Name*. The name of the Corporation is MasterCard Incorporated (the "*Corporation*").

### ARTICLE II

Section 2.1. *Address*. The registered office of the Corporation in the State of Delaware is 1209 Orange Street, Wilmington, New Castle County, Delaware 19801; and the name of the Corporation's registered agent at such address is The Corporation Trust Company.

### ARTICLE III

Section 3.1. *Purpose*. The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware (the "*DGCL*").

### ARTICLE IV

Section 4.1. *Capitalization*.

(A) The total number of shares of all classes of stock that the Corporation is authorized to issue is 4,501,000,000 shares, consisting of (i) 300,000,000 shares of Preferred Stock, par value $.0001 per share ("*Preferred Stock*"), (ii) 3,000,000,000 shares of Class A Common Stock, par value $.0001 per share ("*Class A Common Stock*"), (iii) 1,200,000,000 shares of Class B Common Stock, par value $.0001 per share ("*Class B Common Stock*") and (iv) 1,000,000 shares of Class M Common Stock, par value $.0001 per share ("*Class M Common Stock*" and, together with the Class A Common Stock and the Class B Common Stock, the "*Common Stock*"). The number of authorized shares of any of the Class A Common Stock, Class B Common Stock, Class M Common Stock or Preferred Stock may be increased or decreased (but not below the number of shares thereof then outstanding) by the affirmative vote of the holders of a majority in voting power of the stock of the Corporation entitled to vote thereon irrespective of the provisions of Section 242(b)(2) of the DGCL (or any successor provision thereto), and no vote of the holders of any of the Class A Common Stock, Class B Common Stock, Class M Common Stock or Preferred Stock voting separately as a class shall be required therefor.

Source: MASTERCARD INC, S-1, September 15, 2005

(B) Upon the filing of this Second Amended and Restated Certificate of Incorporation with the Secretary of State of the State of Delaware (the "*Filing Time*"), each share of common stock of the Corporation, however designated, issued and outstanding immediately prior thereto ("*Old Common Stock*"), shall automatically, without further action on the part of the Corporation or any holder of such Old Common Stock, be reclassified as and shall become: (i) 1.35 new validly issued, fully paid and nonassessable shares of Class B Common Stock; and (ii) that fraction of a new validly issued, fully paid and nonassessable share of Class M Common Stock that will result in each holder of Old Common Stock receiving one share of Class M Common Stock. Fractional shares of Class B Common Stock will be issued to the extent necessary, but only if fractional shares of Old Common Stock exist as of the Filing Time. The reclassification of the Old Common Stock into Class B Common Stock and Class M Common Stock will be deemed to occur at the Filing Time, regardless of when any certificates previously representing such shares of Old Common Stock (if such shares are held in certificated form) are physically surrendered to the Corporation in exchange for certificates representing such new Class B Common Stock or Class M Common Stock.

Section 4.2. *Preferred Stock*.

(A) The Board of Directors of the Corporation (the "*Board*") is hereby expressly authorized, by resolution or resolutions, to provide, out of the unissued shares of Preferred Stock, for series of Preferred Stock and, with respect to each such series, to fix the number of shares constituting such series and the designation of such series, the voting powers (if any) of the shares of such series, and the powers, preferences and relative, participating, optional or other special rights, if any, and any qualifications, limitations or restrictions thereof, of the shares of such series. The powers, preferences and relative, participating, optional and other special rights of each series of Preferred Stock, and the qualifications, limitations or restrictions thereof, if any, may differ from those of any and all other series at any time outstanding.

(B) Except as otherwise required by law, holders of a series of Preferred Stock, as such, shall be entitled only to such voting rights, if any, as shall expressly be granted thereto by this Second Amended and Restated Certificate of Incorporation (including any certificate of designations relating to such series).

Section 4.3. *Common Stock*.

(A) *Voting Rights*.

(1) Each holder of Class A Common Stock, as such, shall be entitled to one vote for each share of Class A Common Stock held of record by such holder on all matters on which stockholders generally are entitled to vote (which, for the avoidance of doubt, shall not include the election of Class M Directors (as defined below)); *provided, however*, that to the fullest extent permitted by law, holders of Class A Common Stock, as such, shall have no voting power with respect to, and shall not be entitled to vote on (a) any amendment to this Second Amended and Restated Certificate of Incorporation (including any certificate of designations relating to any series of Preferred Stock) that relates solely to the terms of one or more outstanding series of Preferred Stock if the holders of such affected series are entitled, either separately or together with the holders of one or more other such series, to vote thereon pursuant to this Second Amended and Restated Certificate of Incorporation (including any certificate of designations relating to any series of Preferred Stock) or pursuant to the DGCL, or (b) any amendment to Section 4.3(A)(3)(c).

(2) To the fullest extent permitted by law, holders of Class B Common Stock, as such, shall have no voting power and shall not be entitled to vote on any matter.

(3) (a) Except as expressly set forth in Article IV, Section 4.3(A)(3)(b) and Article V, Section 5.1, to the fullest extent permitted by law, holders of Class M Common Stock, as such, shall have no voting power and shall not be entitled to vote on any matter; *provided, however,* that, in addition to any other vote required by law, for so long as any shares of Class M Common Stock remain issued and

2

Source: MASTERCARD INC, S-1, September 15, 2005

outstanding, the affirmative vote of at least a majority of the votes cast thereon by the holders of the Class M Common Stock, voting separately as a class, shall be required for:

1) any sale, lease or exchange of all or substantially all of the Corporation's assets or of any subsidiary of the Corporation, in each case which requires the approval of the stockholders of the Corporation under the DGCL, or approval of any sale, lease or exchange of all or substantially all of the assets of MasterCard International Incorporated ("*MasterCard International*");

2) the consummation of any merger or consolidation of the Corporation or any approval of the consummation of any merger or consolidation of MasterCard International, in either case, (a) with any other corporation or entity prior to the date that is 20 years and 11 months following the date of the consummation of the Corporation's initial public offering of the Class A Common Stock (the "*Initial Public Offering*"), or (b) with (i) any competitor of the Corporation, as determined by the Board in its sole discretion, (ii) any Member (as defined below) or (iii) any financial institution that is eligible to become a Member, as determined by the Board in its sole discretion;

3) any amendment or modification of this Second Amended and Restated Certificate of Incorporation to authorize the issuance of capital stock other than Class A Common Stock, Class B Common Stock, Class M Common Stock or Preferred Stock prior to the date that is 20 years and 11 months following the date of the consummation of the Initial Public Offering;

4) the Corporation to cease to engage (directly or through its subsidiaries) in the business of providing core network authorization, clearing and settlement services for branded payment card transactions;

5) any alteration, amendment or repeal of any provision of this Second Amended and Restated Certificate of Incorporation if such alteration, amendment or repeal would have the effect of permitting (i) any Person (as defined below) to Beneficially Own (as defined below) (a) shares of Class A Common Stock representing more than 15% of the aggregate outstanding shares or voting power of Class A Common Stock; (b) shares of any other class or series of stock of the Corporation entitled to vote generally in the election of directors (which, for the avoidance of doubt, shall not include Class M Common Stock) ("*Other Voting Stock*") representing more than 15% of the aggregate outstanding shares or voting power of such class or series of Other Voting Stock; or (c) shares of Class A Common Stock and/or Other Voting Stock representing more than 15% of the aggregate voting power of all the then outstanding shares of stock of the Corporation entitled to vote at an election of directors, voting as a single class, or (ii) any Member or Similar Person (as defined below) to Beneficially Own any share of Class A Common Stock or Other Voting Stock; and

6) any alteration, amendment or repeal of any provision of this Article IV, Section 4.3(A)(3), the last sentence of Article V, Section 5.1, Article VI, Section 6.1(A), Article VI, Section 6.4 or Article VI, Section 6.5 of this Second Amended and Restated Certificate of Incorporation or the adoption of any provision inconsistent therewith.

(b) For so long as any shares of Class M Common Stock are outstanding, holders of outstanding Class M Common Stock, voting separately as a class, shall be entitled to elect a number of directors of the Corporation (each, a "*Class M Director*") that is equal to the lesser of (x) three and (y) the product of $^1/_4$ *multiplied by* the total number of directors that will be in office immediately following such election (rounded down to the nearest whole number). For so long as any shares of Class M Common Stock are outstanding, any Class M Director may be removed without cause by the affirmative vote of at least a majority in voting power of all the then outstanding shares of Class M Common Stock, voting separately as a class.

(c) The aggregate number of votes that may be cast by all holders of the Class M Common Stock shall on all matters equal 1000 and each holder of Class M Common Stock, without regard to the number of shares of Class M Common Stock held by such holder, shall be entitled to that

3

Source: MASTERCARD INC, S-1, September 15, 2005