

LEXSEE 2009 U.S. DIST. LEXIS 83199

IN RE ATM FEE ANTITRUST LITIGATION

No. C 04-02676 CRB

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

*2009 U.S. Dist. LEXIS 83199*

September 4, 2009, Decided
September 4, 2009, Filed

**COUNSEL:** [*1] For Pamela Brennan, Plaintiff: Daniel O. Myers, LEAD ATTORNEY, Richardson, Patrick, Westbrook and Brickman, LLC, Mt. Pleasant, SC; Joseph Richard Saveri, LEAD ATTORNEY, Lieff, Cabraser, Heiman & Bernstein, LLP, San Francisco, CA; Andrew W. Hutton, Hutton & Hutton, LLC, Wichita, KA; Anthony J. Bolognese, Bolognese & Associates LLC, Philadelphia, PA; Bart D. Cohen, Merrill G. Davidoff, Michael J. Kane, Berger & Montague, P.C., Philadelphia, PA; Brendan Patrick Glackin, Lieff, Cabraser, Heimann & Bernstein LLP, San Francisco, CA; Daniel Bruce Allanoff, Meredith Cohen Greenfogel & Skirnick, P.C., Philadelphia, PA; Daniel E. Gustafson, Karla M. Gluek, Gustafson Gluek PLLC, Minneapolis, MN; David Felderman, Spector, Roseman & Kodroff & Willis, P.C., Philadelphia, PA; Deborah Brown McIlhenny, Hutton & Hutton, LLC, Wichita, KS; Eugene A. Spector, Jeffrey J. Corrigan, Spector Roseman Kodroff & Willis, PC, Philadelphia, PA; George A. Shohet, Attorney at Law, Venice, CA; Gretchen M. Nelson, Kreindler & Kreindler LLP, Los Angeles, CA; Hector Daniel Geribon, Lieff Cabraser Heimann & Bernstein, LLP, San Francisco, CA; Jahan C. Sagafi, Leiff Cabraser Heimann & Bernstein LLP, San Francisco, CA; Joel [*2] Cary Meredith, Meredith Cohen Greenfogel & Skirnick PC, Philadelphia, PA; Joseph C. Kohn, Kohn Swift & Graf P.C., Philadelphia, PA; Joshua P. Davis, University of San Francisco School of Law, San Francisco, CA; Kim Keevers, Richardson Patrick Westbrook & Brickman, Charleston, SC; Marc Howard Edelson, Edelson & Associates, LLC, Doylestown, PA; Marc S. Moller, Kreindler & Kreindler LLP, New York, NY; Mark G. Ayesh, Ayesh Law Offices, Wichita, KS; Michael Joseph Brickman, Richardson, Patrick, Westbrook & Brickman, LLC, Charleston, SC; William G. Caldes, Spector, Roseman, Kodroff & Willis, P.C., Philadelphia, PA; William E. Hoese, Kohn Swift & Graf PC, Philadelphia, PA.

For Terry Crayton, Darla Martinez, on behalf of themselves & all others similarly situated, Plaintiffs: Daniel O. Myers, LEAD ATTORNEY, Richardson, Patrick, Westbrook and Brickman, LLC, Mt. Pleasant, SC; Joseph Richard Saveri, LEAD ATTORNEY, Lieff, Cabraser, Heiman & Bernstein, LLP, San Francisco, CA; Andrew W. Hutton, Hutton & Hutton, LLC, Wichita, KA; Anthony J. Bolognese, Bolognese & Associates LLC, Philadelphia, PA; Bart D. Cohen, Merrill G. Davidoff, Michael J. Kane, Berger & Montague, P.C., Philadelphia, PA; Brendan [*3] Patrick Glackin, Lieff, Cabraser, Heimann & Bernstein LLP, San Francisco, CA; Daniel Bruce Allanoff, Meredith Cohen Greenfogel & Skirnick, P.C., Philadelphia, PA; Daniel E. Gustafson, Karla M. Gluek, Gustafson Gluek PLLC, Minneapolis, MN; David Felderman, Spector, Roseman & Kodroff & Willis, P.C., Philadelphia, PA; Deborah Brown McIlhenny, Hutton & Hutton, LLC, Wichita, KS; Eugene A. Spector, Jeffrey J. Corrigan, Spector Roseman Kodroff & Willis, PC, Philadelphia, PA; George A. Shohet, Attorney at Law, Venice, CA; Gretchen M. Nelson, Kreindler & Kreindler LLP, Los Angeles, CA; Hector Daniel Geribon, Lieff Cabraser Heimann &

2009 U.S. Dist. LEXIS 83199, *3

Bernstein, LLP, San Francisco, CA; Jahan C. Sagafi, Leiff Cabraser Heimann & Bernstein LLP, San Francisco, CA; Joel Cary Meredith, Meredith Cohen Greenfogel & Skirnick PC, Philadelphia, PA; Joseph C. Kohn, Kohn Swift & Graf P.C., Philadelphia, PA; Joshua P. Davis, University of San Francisco School of Law, San Francisco, CA; Kim Keevers, Richardson Patrick Westbrook & Brickman, Charleston, SC; Marc Howard Edelson, Edelson & Associates, LLC, Doylestown, PA; Marc S. Moller, Kreindler & Kreindler LLP, New York, NY; Mark G. Ayesh, Ayesh Law Offices, Wichita, KS; Michael [*4] Joseph Brickman, Richardson, Patrick, Westbrook & Brickman, LLC, Charleston, SC; W. Joseph Bruckner, Lockridge Grindal Nauen P.L.L.P, Minneapolis, MN; William G. Caldes, Spector, Roseman, Kodroff & Willis, P.C., Philadelphia, PA; William E. Hoese, Kohn Swift & Graf PC, Philadelphia, PA.

For Cecilia Salvador, Plaintiff: Bart D. Cohen, Merrill G. Davidoff, Michael J. Kane, Berger & Montague, P.C., Philadelphia, PA; Brendan Patrick Glackin, Lieff, Cabraser, Heimann & Bernstein LLP, San Francisco, CA; David Felderman, Spector, Roseman & Kodroff & Willis, P.C., Philadelphia, PA; Eugene A. Spector, Jeffrey J. Corrigan, Spector Roseman Kodroff & Willis, PC, Philadelphia, PA; Hector Daniel Geribon, Lieff Cabraser Heimann & Bernstein, LLP, San Francisco, CA; Jayne Arnold Goldstein, Shepherd, Finkelman, Miller & Shah, LLP, Weston, FL; Joseph Richard Saveri, Lieff, Cabraser, Heiman & Bernstein, LLP, San Francisco, CA; William G. Caldes, Spector, Roseman, Kodroff & Willis, P.C., Philadelphia, PA.

For Peter Sanchez, Plaintiff: David B. Krauss, LEAD ATTORNEY, Law Office of David B. Krauss, New York, NY; Bart D. Cohen, Merrill G. Davidoff, Berger & Montague, P.C., Philadelphia, PA; Brendan Patrick [*5] Glackin, Lieff, Cabraser, Heimann & Bernstein LLP, San Francisco, CA; Eugene A. Spector, Spector Roseman Kodroff & Willis, PC, Philadelphia, PA; Hector Daniel Geribon, Lieff Cabraser Heimann & Bernstein, LLP, San Francisco, CA; Joseph Richard Saveri, Lieff, Cabraser, Heiman & Bernstein, LLP, San Francisco, CA.

For Deborah Fennern, Plaintiff: David B. Krauss, LEAD ATTORNEY, Law Office of David B. Krauss, New York, NY; Bart D. Cohen, Merrill G. Davidoff, Berger & Montague, P.C., Philadelphia, PA; Brendan Patrick Glackin, Lieff, Cabraser, Heimann & Bernstein LLP, San Francisco, CA; Garrett D. Blanchfield, Jr., Reinhardt Wendorf & Blanchfield, St. Paul, MN; Hector Daniel Geribon, Lieff Cabraser Heimann & Bernstein, LLP, San Francisco, CA; Joseph Richard Saveri, Lieff, Cabraser, Heiman & Bernstein, LLP, San Francisco, CA.

For Darecia Miller, Lynette Williams, Plaintiffs: Reginald Von Terrell, LEAD ATTORNEY, The Terrell Law Group, Oakland, CA; Bart D. Cohen, Merrill G. Davidoff, Berger & Montague, P.C., Philadelphia, PA; Brendan Patrick Glackin, Lieff, Cabraser, Heimann & Bernstein LLP, San Francisco, CA; Donald Chidi Amamgbo, Esq., Amamgbo & Associates, Oakland, CA; Hector Daniel Geribon, [*6] Lieff Cabraser Heimann & Bernstein, LLP, San Francisco, CA; Joseph Richard Saveri, Lieff, Cabraser, Heiman & Bernstein, LLP, San Francisco, CA.

For Melissa Griffin, Dorothy Stam, Plaintiffs: Laurence D. King, LEAD ATTORNEY, Kaplan Fox & Kilsheimer LLP, San Francisco, CA; Bart D. Cohen, Merrill G. Davidoff, Berger & Montague, P.C., Philadelphia, PA; Brendan Patrick Glackin, Lieff, Cabraser, Heimann & Bernstein LLP, San Francisco, CA; Hector Daniel Geribon, Lieff Cabraser Heimann & Bernstein, LLP, San Francisco, CA; Joseph Richard Saveri, Lieff, Cabraser, Heiman & Bernstein, LLP, San Francisco, CA; Linda Phyllis Nussbaum, Kaplan Fox & Kilsheimer, LLP, New York, NY; Lori Sambol Brody, Kaplan Fox & Kilsheimer LLP, Los Angeles, CA.

For Steve Murray, Plaintiff: Beth E. Terrell, LEAD ATTORNEY, Terrell Marshall & Daudt PLLC, Seattle, WA; Bart D. Cohen, Merrill G. Davidoff, Berger & Montague, P.C., Philadelphia, PA; Brendan Patrick Glackin, Lieff, Cabraser, Heimann & Bernstein LLP, San Francisco, CA; Hector Daniel Geribon, Lieff Cabraser Heimann & Bernstein, LLP, San Francisco, CA; Joseph Richard Saveri, Lieff, Cabraser, Heiman & Bernstein, LLP, San Francisco, CA.

For Grace P. Spohnholz, Plaintiff: [*7] George T. Freeman, LEAD ATTORNEY, Anchorage, AK; Bart D. Cohen, Merrill G. Davidoff, Berger & Montague, P.C., Philadelphia, PA; Brendan Patrick Glackin, Lieff, Cabraser, Heimann & Bernstein LLP, San Francisco, CA; Hector Daniel Geribon, Lieff Cabraser Heimann & Bernstein, LLP, San Francisco, CA; Joseph Richard Saveri, Lieff, Cabraser, Heiman & Bernstein, LLP, San Francisco, CA.

For Concord EFS, Inc., First Data Corp., Defendants:

Benjamin Kneeland Riley, Howrey LLP, San Francisco, CA; Brian Douglas Wallach, Peter Edward Moll, Esq., Howrey Simon Arnold & White, LLP, Washington, DC; Stephen R. Cook, Howrey LLP, Irvine, CA; Buckmaster DeWolf, Howrey Simon Arnold & White, LLP, Menlo Park, CA.

For Bank of America Corporation, Defendant: Anita Fern Stork, Esq., LEAD ATTORNEY, Kelly Patrice Finley, Sonya Diane Winner, Covington & Burling LLP, San Francisco, CA; Erin C Smith, Tara M. Steeley, Covington & Burling, San Francisco, CA.

For Bank One, N.A., Defendant: Benjamin Jonathan Fox, Sylvia Rivera, Morrison & Foerster LLP, Los Angeles, CA.

For J.P. Morgan Chase & Co., Defendant: Sylvia Rivera, Morrison & Foerster LLP, Los Angeles, CA; W. Stephen Smith, Morrison & Foerster LLP, Washington, DC.

For **[*8]** Citibank (West), F.S.B., CitiGroup, Inc., Citibank, N.A., Defendants: David F. Graham, PRO HAC VICE, Eric Henry Grush, PRO HAC VICE, Sidley Austin LLP, Chicago, IL; Menesh S. Patel, Sidley Austin LLP, San Francisco, CA.

For Suntrust Banks, Inc., Defendant: Deborah Kay Croyle, Stephen V. Bomse, Orrick Herrington & Sutcliffe, San Francisco, CA; M. Laurence Popofsky, Orrick, Herrington & Sutcliffe LLP, San Francisco, CA.

For Wachovia Corporation, Defendant: Jack R. Nelson, LEAD ATTORNEY, Michele D. Floyd, Reed Smith LLP, San Francisco, CA; Kirsten Joy Daru, Reed Smith LLP, Two Embarcadero Center, San Francisco, CA.

For Wachovia Bank NA, Defendant: Kirsten Joy Daru, Reed Smith LLP, San Francisco, CA; Michele D. Floyd, Reed Smith LLP, San Francisco, CA.

For Wells Fargo & Co., Wells Fargo Bank, N.A., Defendants: Brett Davis Collins, Daniel Murray Wall, Erica T. Grossman, Latham & Watkins LLP, San Francisco, CA; Donald I Baker, Baker & Miller PLLC, Washington, DC; Katie Ya-yee Chang, Joshua N. Holian, Latham & Watkins, San Francisco, CA.

For Servus Financial Corp., Defendant: Brett Davis Collins, Daniel Murray Wall, Erica T. Grossman, Latham & Watkins LLP, San Francisco, CA; Katie Ya-yee Chang, **[*9]** Joshua N. Holian, Latham & Watkins, San Francisco, CA.

For Bank of America, N.A., Defendant: Anita Fern Stork, Esq., Kelly Patrice Finley, Sonya Diane Winner, Covington & Burling LLP, San Francisco, CA; Erin C Smith, Covington & Burling, San Francisco, CA.

For JP Morgan Chase Bank, N.A., Defendant: Sylvia Rivera, Morrison & Foerster LLP, Los Angeles, CA.

Gilberto Felix, Movant, Pro se, Salters, SC.

Gino Romano, Movant, Pro se, Endicott, NY.

**JUDGES:** CHARLES R. BREYER, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** CHARLES R. BREYER

**OPINION**

**ORDER**

With this antitrust action, filed over five years ago, Plaintiffs challenge the legitimacy of the fixed interchange fees in the Star ATM network. This case has slowly wound its way through several Judges and multiple rounds of dispositive motions. In the Court's most recent order addressing Defendants' motion for summary judgment, the Court held that the per se rule is inapplicable to Plaintiffs' claim. Plaintiffs then filed their Second Amended Complaint ("SAC") which purports to allege an antitrust violation that may be sustained under the rule of reason analysis.

Before the Court are four motions to dismiss through which Defendants challenge the sufficiency of Plaintiffs' pleading. **[*10]** Having held oral argument on August 28, 2009 and carefully considering the submissions of the parties, the Court hereby GRANTS dismissal with leave to amend because Plaintiffs have failed to allege a legally adequate "relevant market." The Court also GRANTS dismissal of Bank of America, N.A. ("BANA") because claims against BANA are barred by the statute of limitations. Further, the Court GRANTS with prejudice dismissal of the bank holding companies for failure to state a claim.

**BACKGROUND**

1

1   As the background information underlying this case has not changed over the last year and a half, the following recitation of the facts is largely taken from the Court's March 24, 2008 Order. See *In re ATM Fee Antitrust Litig., 554 F. Supp. 2d 1003, 1007-09 (N.D. Cal. 2008)*.

I. The Star Network

This case challenges the right of a non-proprietary network to set network-wide "interchange" fees that govern the amount of money paid by an ATM card issuer - generally a bank - to a foreign ATM owner when the ATM is used by the issuer's customer. Customers at most commercial banks receive ATM cards that allow them to make withdrawals from their accounts electronically. Typically, these ATM cards permit withdrawals [*11] not only from ATM machines at the bank where they hold their accounts, but also from ATM machines elsewhere. Such "foreign ATM transactions" involve four parties: (1) the "cardholder," i.e. the customer who retrieves money from the ATM machine; (2) the "card-issuer bank," i.e. that bank at which the customer holds an account and from which the customer has received an ATM card; (3) the "ATM owner," i.e. the entity that owns the ATM machine from which the customer withdraws money on his account; and (4) the "ATM network," i.e. the entity that administers the agreements between various card-issuer banks and ATM owners and thereby ensures that customers can withdraw money from one network member's ATM as readily as from another's.

Foreign ATM transactions involves multiple fees. Generally, a customer must pay two fees - one to the ATM owner for the use of that entity's ATM machine (known as a "surcharge"), and one to the bank at which he has an account (known as a "foreign ATM fee"). But that is not all. Out of the money that a customer pays directly to his own bank, the bank then also pays two fees. The first of the bank's fees is known as a "switch fee" and is paid directly to the ATM [*12] network. The second of the bank's fees - and the one at issue in this lawsuit - is known as an "interchange fee" and is paid directly to the owner of the foreign ATM. Since 2003, the interchange fee has been set at $ 0.46 for on-premise transactions (i.e., transactions at ATMs deployed on a bank's premises), and $ 0.54 for off-premise transactions.

In this case, Plaintiffs contest the legality of only the interchange fee. They contend that the manner in which this fee is set and administered violates antitrust laws. In their SAC, Plaintiffs allege that certain members of the Star ATM network had "fixed the interchange fee." SAC P 1.

The Star Systems, Inc. ("Star") network of ATM services was founded by a number of banks over twenty years ago. SAC P 76. On February 1, 2001, Concord acquired Star by purchasing all of the member Banks' ownership interest. SAC P 79. Star has over 5,400 members nationwide. SAC P 80. It is one of approximately twenty-five ATM networks in the country. SAC P 75.

Until 1996, interchange fees and foreign ATM fees were the sole sources of revenue on foreign ATM transactions for bank issuers and ATM owners. SAC P 87. In 1996, Star and other ATM networks dropped their [*13] bans against customer surcharges. SAC P 88. As a result, ATM owners began imposing surcharges, with banks now charging users of foreign ATMs around one to three dollars per foreign transaction. SAC P 89. Plaintiffs allege that those surcharges are artificially inflated because the Star network continues to impose an arbitrary interchange fee, which gets passed on to customers through the surcharges. SAC P 99. Plaintiffs further allege that the interchange fee was set through an illegal agreement of the Defendants, who controlled Star's Board of Directors. SAC PP 100-15. Plaintiffs contend that the banks enforced their illegal agreement by requiring all Star members - both banks and non-banks that own ATMs in the network - to abide by the fixed interchange fee. Id. P 62.

II. Procedural History

On a previous motion to dismiss, this Court ruled that the Plaintiffs' allegations, if true, would establish that the Defendants had engaged in illegal price-fixing. See *Brennan v. Concord EFS, Inc., 369 F. Supp. 2d 1127 (N.D. Cal. 2005)* (Walker, J.). In its ruling, the Court first noted that the Plaintiffs' objection is not to the existence of an interchange fee, but rather to its fixed nature. [*14] *Id. at 1132*. In other words, Plaintiffs did not contend that it would be impermissible for a card-issuing bank to compensate foreign ATM owners, but only that they may not decide collectively what compensation to render. Further, the court noted that the Complaint had described a "naked" attempt to fix prices, as opposed to an attempt to fix price that the Star network members determined was "ancillary" to a legitimate, procompetitive venture.

*Id. at 1133*. In other words, Plaintiffs alleged that Defendants fixed the interchange fee because they could, not because a fixed fee was necessary to sustain the ATM network. Because the Defendants could not defend against such allegations of "naked price fixing" without invoking evidence that was beyond the scope of the Complaint, the Court denied the motion to dismiss. *Id. at 1138*.

Shortly after the ruling on the motion to dismiss, Defendants filed a motion for partial summary judgment on the ground that, as of February 2001, the Star network ceased to be owned by a group of banks but instead was operated by Concord as a proprietary network. Taking a different tack, the Court issued a Memorandum and Order on November 30, 2006, terminating Concord's **[*15]** motion and directing the parties to address the fundamental question of whether a per se analysis applies to this case. The Court observed that "if Defendants can set forth evidence to support plausible, procompetitive justifications for their agreement to fix the interchange fee," then the per se rule would not apply. Mem. & Order at 5 (Docket No. 360).

Defendants moved for summary judgment on August 3, 2007, having adduced evidence bearing on the applicability of the per se rule. In an order issued on March 24, 2008, the Court granted Defendants' motion and held that rule of reason analysis applies to this case, thereby determining that the price-fixing challenged by Plaintiffs is not the kind of naked horizontal restraint that lacks any redeeming virtue. *In re ATM Fee Antitrust Litig., 554 F. Supp. 2d 1003, 1016-17 (N.D. Cal. 2008)*.

Given substantial uncertainty in the law regarding which mode of analysis to apply, the Court subsequently certified for appeal the issue of whether the per se or rule of reason rubric should be employed in this case. The Ninth Circuit declined to take the matter up, which led to Plaintiffs' SAC.

Presently before the Court are four motions to dismiss. The **[*16]** first is a Joint Motion to Dismiss filed by all Defendants. Three other parties have filed separate motions to dismiss: (1) SunTrust Banks, Inc.; (2) Bank of American Corporation and Bank of America, N.A.; and (3) CitiGroup, Inc.

## STANDARD OF REVIEW

A motion to dismiss under *Rule 12(b)(6) of the Federal Rules of Civil Procedure* tests the legal sufficiency of the pleadings. *De La Cruz v. Tormey, 582 F.2d 45, 48 (9th Cir. 1978)*. A complaint may be dismissed for failure to state a claim where the factual allegations do not raise the right to relief above the speculative level. *Bell Atlantic v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. Conversely, a complaint may not be dismissed for failure to state a claim where the allegations plausibly demonstrate that the pleader may be entitled to relief. Id. In ruling on a *Rule 12(b)(6)* motion, a court must construe the pleadings in the light most favorable to the plaintiff, and must accept as true all material allegations in the complaint, as well as any reasonable inferences to be drawn from them. *Broam v. Bogan, 320 F.3d 1023, 1028 (9th Cir. 2003)*.

The allegations in the complaint may not evade antitrust requirements by merely alleging a bare legal conclusion. **[*17]** *Rutman Wine Co. v. E. & J. Gallo Winery, 829 F.2d 729, 736 (9th Cir. 1987)*. "[A] district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed," particularly in light of the fact that "antitrust discovery can be expensive." *Twombly, 550 U.S. at 558* (internal citation and quotation omitted). Plaintiffs alleging antitrust claims must set forth enough "factual matter" to "nudge[] their claims across the line from conceivable to plausible." *Id. at 570*.

## DISCUSSION

*Section 1* of the Sherman Act provides in pertinent part:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

*15 U.S.C. § 1*. In order to establish a claim under *Section 1*, a plaintiff must demonstrate: (1) there was a contract, combination, or conspiracy; (2) that the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis; and (3) that the restraint affected interstate commerce. *Tanaka v. Univ. of S. Cal., 252 F.3d 1059, 1062 (9th Cir. 2001)*. Pursuant to the **[*18]** Court's Order of March 24, 2008, the Court

shall apply the rule of reason analysis to this suit. "A restraint violates the rule of reason if the restraint's harm to competition outweighs its procompetitive efffects." *Id. at 1063*.

I. Defendants' Joint Motion to Dismiss

All sixteen defendants have joined a single motion to dismiss, which makes two main arguments: (1) Plaintiffs lack standing to allege an antitrust violation because they are indirect purchasers; and (2) Plaintiffs have failed to allege a relevant product market that is cognizable under the antitrust laws.

A. Plaintiffs' Standing under *Illinois Brick*

Defendants contend that Plaintiffs lack standing to bring an antitrust claim for damages [2] because they are indirect purchasers of foreign ATM transactions routed over the Star network. In *Illinois Brick Co. v. Illinois, 431 U.S. 720, 97 S. Ct. 2061, 52 L. Ed. 2d 707 (1977)*, the Supreme Court narrowed the class of plaintiffs that have statutory standing to enforce antitrust laws. There, the Supreme Court held that indirect purchasers may not bring an antitrust claim where an overcharge was passed on to the plaintiff through the distribution chain; only direct purchasers have standing to sue. *Id. at 728*. The Supreme [*19] Court reasoned that a direct purchaser rule serves to eliminate the "evidentiary complexities and uncertainties" of apportioning overcharges between direct and indirect purchasers. *Id. at 731-33, 740-43*. "[A]ntitrust laws will be more effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers rather than by allowing every plaintiff potentially affected by the overcharge to sue . . . ." *Id. at 735*.

> 2   The direct purchaser rule does not apply to equitable relief, see *Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc., 140 F.3d 1228, 1235 (9th Cir. 1988)*, which is also sought by Plaintiffs.

The direct purchaser rule was reaffirmed in *Kansas v. UtiliCorp United, Inc., 497 U.S. 199, 110 S. Ct. 2807, 111 L. Ed. 2d 169 (1990)*. There, the states of Kansas and Missouri, on behalf of individual energy consumers, initiated suits against a pipeline company and five gas production companies, alleging that the defendants conspired to inflate the price of gas. *Id. at 204*. The Court determined that the states lacked standing because the consumers they represented were indirect purchasers. *Id. at 207*. The consumers bought gas directly from the utilities, so "any antitrust claim against the defendants [*20] is . . . for the utilities to assert." Id.

Case law has loosely recognized three "exceptions" to the direct purchaser rule: (1) if there was a pre-existing cost-plus contract, see *UtiliCorp, 497 U.S. at 217-18*; (2) the direct purchaser is owned or controlled by the indirect purchaser, *Royal Printing Co. v. Kimberly-Clark Corp., 621 F.2d 323, 326 (9th Cir. 1980)*; or (3) where there is a price-fixing conspiracy between the manufacturer and the middleman, *Arizona v. Shamrock Foods Co., 729 F.2d 1208, 1211 (9th Cir. 1984)*.

1. The *Royal Printing* "No Reasonable Possibility" Exception

In Royal Printing, the Ninth Circuit applied the direct purchaser rule. A printing company and other small businesses brought suit against ten manufacturers of paper products. *621 F.2d at 324*. The plaintiffs had never bought paper products directly from any of the defendants, instead purchasing through wholesale firms. Id. The Ninth Circuit permitted the suit to proceed insofar as plaintiffs could demonstrate that the wholesaler was a subsidiary of a defendant. *Id. at 326*. However, those plaintiffs who bought through independent wholesalers that were not owned or controlled by any defendant were only indirect purchasers. [*21] *Id. at 327-28*. Therefore, the Illinois Brick rule barred them from sustaining a suit.

Nonetheless, the Ninth Circuit held that "Illinois Brick does not bar an indirect purchaser's suit where the direct purchaser is a division or subsidiary of a co-conspirator." *Id. at 326*. The court first observed that, in such a case, there was little fear of multiple liability because of the unlikelihood that a subsidiary would sue its parent's co-conspirators. Id. "Because, . . . as a practical matter the direct purchasers here will never sue, barring [plaintiff's] suit would close off every avenue for private enforcement of the antitrust laws in such cases. This would be intolerable." *Id. at 327*.

In this Court's order on summary judgment, it stated that "[w]ithout deciding the issue, the Court notes that an exception to Illinois Brick would apply if there is no realistic possibility that the Star network's members - who both pay and receive the interchange fee - would sue the network for antitrust violations." Order Mar. 24, 2008 (citing *Royal Printing, 621 F.2d at 326*). Plaintiffs pursue that argument here, and the Court agrees: there is no

realistic possibility that Defendants would sue to recover **[*22]** cartel overcharges or terminate an interchange fee scheme that allegedly allows them to reap inflated profits through foreign ATM fees.

Defendants complain that the language cited in Royal Printing is mere dicta because the plaintiffs in that case had not actually purchased paper from the manufacturer's subsidiaries or divisions. However, "most courts considering the [similar] question correctly allow the indirect purchaser to recover" in these circumstances. Areeda et al., Antitrust Law, P 346f (3d ed. 2007) (collecting cases).

Defendants' argument that Royal Printing was abrogated by *UtiliCorp, 497 U.S. 199, 110 S. Ct. 2807, 111 L. Ed. 2d 169*, is similarly unavailing. There, the Court held that residential customers were indirect purchasers of gas because the good was distributed through utility companies. *Id. at 214*. In denying the exception sought by the plaintiffs, the Court noted that utilities themselves have incentives to sue overcharging suppliers. Id. ("Utilities, moreover, have an established record of diligent antitrust enforcement, having brought highly successful [antitrust] actions in many instances.") Such is not the case here, where Plaintiffs have alleged that Defendants both participate in and profit **[*23]** from the price-fixing.

In *Freeman v. San Diego Association of Realtors, 322 F.3d 1133, 1145-46 (9th Cir. 2003)*, the Ninth Circuit applied the exception described in Royal Printing. There, the plaintiffs paid a fee set by an entity known as "Sandicor" for access to a real estate listing service. *Id. at 1140-41*. Plaintiffs sued the real estate associations that owned and controlled Sandicor, alleging the fee was inflated by collusively set "support fees" that Sandicor paid to the real estate associations that owned and controlled it. *Id. at 1142*. The Freeman court stated:

> [I]ndirect purchasers can sue for damages if there is no realistic possibility that the direct purchaser will sue its supplier over the antitrust violation. The associations [defendants] own Sandicor [direct purchaser]. They appoint its board of directors, and they are accused of conspiring with it. There's no realistic possibility Sandicor will sue them.

*322 F.3d 1133, 1145-46 (9th Cir. 2003)*. Because there was "no realistic possibility that the direct purchaser [would] sue its supplier over the antitrust violation," the Freeman court permitted the indirect purchaser to sustain its claim. Id.

Similarly, here there is "no **[*24]** realistic possibility" that the Bank Defendants would sue Star or the co-defendants. Plaintiffs allege that the banks themselves controlled the Star network and colluded to set the interchange fee. The banks created Star and agreed upon its operating rules. In so doing, Plaintiffs allege Defendants conspired to fix interchange fees. SAC P 141. Plaintiffs further allege that Defendants continue to profit from charging inflated foreign ATM fees based on the fixed interchange fee. SAC P 117. Thus, as a practical matter, Plaintiffs are the only parties positioned to allege an antitrust claim.

2. The Co-Conspirator Exception

Plaintiffs also contend that the Illinois Brick direct purchaser rule does not apply because here, Plaintiffs are the first innocent purchasers in the chain of distribution. See *Shamrock Foods, 729 F.2d at 1211*. In Shamrock Foods, the plaintiffs alleged that retail grocery stores were co-conspirators with dairy producers to fix the price of dairy products at the retail level. Id. The Ninth Circuit held that Illinois Brick did not apply because the retail price was the one fixed, and the theory of recovery did not depend on pass-on of damages. Id. The plaintiffs were not **[*25]** alleging a conspiracy at the wholesale level, rather they presented a conspiracy among horizontal competitors at the retail level to fix retail prices. Id. "Illinois Brick does not prevent this garden variety price-fixing claim." Id.

In dicta, the Ninth Circuit went on to observe that "[e]ven if the plaintiffs were claiming a two-tier conspiracy, we would hold that Illinois Brick is no bar to the suit." Id. The court noted the many other opinions that found the direct purchaser rule inapplicable in claims against "remote sellers when the plaintiffs allege that the sellers conspired with intermediates in the distribution chain to fix the price at which the plaintiffs purchased." *Id. at 1212*. The court determined that the two main policies at play in Illinois Brick, (1) the risk of duplicative recovery if indirect and direct purchasers could bring suit and (2) the problem of a complex damage computation, were not at issue because the plaintiffs alleged a conspiracy that fixed prices at the

retail level. *Id. at 1214*. "There is no need to apportion that overcharge because it was not passed on to the consumers through any other level in the distribution chain." Id.

Here, Plaintiffs allege [*26] that they paid foreign ATM fees to one or more of the Bank Defendants. SAC PP 7-9, 57-58. Plaintiffs further allege that the banks participating in Star agreed collectively to fix the price of ATM interchange fees, SAC PP 98-113, and that the banks "mark up" the interchange fees to set their foreign ATM fees which they pay to the Bank Defendants and their co-conspirators. SAC PP 1, 7-9, 99. Accordingly, the direct purchaser rule is inapplicable because Plaintiffs have alleged that they purchased directly from parties to the unlawful agreement. See *Shamrock Foods, 729 F.2d at 1211*. Defendants contend that Shamrock Foods is distinguishable, because here the allegedly unlawful agreement set the interchange fee, and not the foreign ATM fees that the Bank Defendants directly charge Plaintiffs. However, Plaintiffs do allege that the artificially high interchange fee is the basis for the inflated foreign ATM fees. By alleging that Plaintiffs are purchasing directly from the price-fixing conspirators, Plaintiffs may sustain a claim for damages under the Sherman Act. The fee paid by the consumers to the Defendants includes the fee that was allegedly unlawfully set by Defendants. Accordingly, [*27] the Court also holds that the co-conspirator exception applies to preclude the Illinois Brick bar.

3. Recent Ninth Circuit Case Law

The Ninth Circuit recently revisited the direct purchaser rule in *Kendall v. Visa U.S.A., Inc., 518 F.3d 1042, 1049-50 (9th Cir. 2008)*. There, merchants brought an antitrust action against both credit card companies and banks, alleging that the defendants conspired to set fees on credit card purchases. *Id. at 1044-45*. The court found that, because the fee at issue was set by the credit card companies and not by the banks, the banks were the "middlemen." *Id. at 1048-49*. As a result, plaintiffs could not maintain an antitrust suit against the credit card companies as direct purchasers because they ran "squarely into the Illinois Brick wall." *Id. at 1049*.

At first blush, Kendall appears to offer strong support to Defendants' position. Yet in Kendall, the court specifically rejected Plaintiffs' attempt to rely on the co-conspirator exception because they failed to allege any facts showing that the banks were either controlled by or in a conspiracy with the credit card companies. *Id. at 1050*. The court also rejected plaintiffs "attempt to rely upon Freeman" because [*28] "they failed to allege any facts establishing that there is no realistic possibility that the Banks will not sue the Consortiums." Id.

Here, Plaintiffs have alleged with some specificity that the Bank Defendants exerted actual control over the Star network and the setting of the interchange fee. See SAC PP 99-115. For example, Plaintiffs allege that the "Bank Defendants, acting through Star's Board of Directors, collectively adopted and enforced Star's Operating Rules mandating payment of Interchange Fees." SAC P 100. Moreover, "Star and its Board of Directors conspired to fix, through a concert of action, Star's Interchange Fees. Pursuant to this illegal agreement, each member bank agreed to pay the fixed Interchange fees." SAC P 101. "At all relevant times, the Defendants continued to participate in the conspiracy and reap the benefits of supracompetitive Interchange Fees. At no time did any of the Defendants take the steps necessary to withdraw publicly from the conspiracy or otherwise abandon it." SAC P 112. Finally, Plaintiffs specifically allege:

> There is no realistic possibility that any member Bank that both issues ATM cards and owns ATMs, which is the vast majority of members [*29] including all Bank Defendants, would sue Star over fixed Interchange Fees, because they both pay and receive Interchange Fees. The Bank Defendants also mark-up the Interchange Fees to compute Foreign ATM Fees, which are a significant source of their revenue. Accordingly they benefit from fixed Interchange Fees. They are also co-conspirators.

SAC P 141.

In *Delaware Valley Surgical Supply Inc. v. Johnson & Johnson, 523 F.3d 1116, 1122 (9th Cir. 2008)*, the Ninth Circuit applied the direct purchaser rule to bar a suit brought by a hospital against a medical supplies manufacturer. In a straightforward application of the Illinois Brick rule, the court held that the hospital lacked standing because it purchased its supplies from an independent third-party distributor. Id. In so doing, the court rejected the plaintiff's attempt to craft a new

formulation of the direct purchaser rule in circumstances where the indirect purchaser was itself involved in contractual negotiations with the manufacturer that had an impact on the final retail price. *Id. at 1122-23*. The court was not persuaded. *Id. at 1123*. Despite those negotiations, the plaintiff had purchased its supplies entirely from an independent [*30] distributor who was itself positioned to allege an antitrust claim. Id. In declining to recognize a new exception to Illinois Brick, the Delaware Valley court recognized the existing exceptions and did not purport to abrogate their application. *Id. at 1123 n.1*.

In sum, Plaintiffs' claim withstands the Illinois Brick direct purchaser rule. Plaintiffs have properly alleged that they are involved in direct transactions with Defendants which are inflated by Defendants' unlawful price-fixing conspiracy. Furthermore, Plaintiffs are afforded standing to vindicate the antitrust laws because there is no realistic possibility that the Bank Defendants would bring a similar suit against the Star network or their co-defendants.

B. Plaintiffs Have Not Pled a Legally Cognizable Market

Although the Court holds that Plaintiffs have standing to assert an antitrust violation, it is not persuaded that their claim can persist as currently pled. The SAC alleges that the relevant product market is "the provision of Foreign ATM Transactions routed over Star." SAC P 119. Plaintiffs further allege that the "relevant product market is wholly derivative from and dependent on the market for deposit accounts." SAC [*31] P 121.

Under rule of reason analysis, "the plaintiff bears the initial burden of showing that the restraint produces significant anticompetitive effects within a relevant market." *Tanaka v. Univ. of S. Cal., 252 F.3d 1059, 1063 (9th Cir. 2001)*. "The term 'relevant market' encompasses notions of geography as well as product use, quality, and description. The geographic market extends to the area of effective competition where buyers can turn for alternate sources of supply." *Oltz v. St. Peter's Cmty. Hosp., 861 F.2d 1440, 1446 (9th Cir. 1988)* (internal citation and quotations omitted).

"There is no requirement that [the market definition] elements of the antitrust claim be pled with specificity." *Newcal Indus., Inc. v. Ikon Office Solution, 513 F.3d 1038, 1045 (9th Cir. 2008)*. "An antitrust complaint therefore survives a *Rule 12(b)(6)* motion unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect." Id. The existence of a "relevant market" is typically a factual inquiry for the jury. Id. However, a complaint may be dismissed if the market definition is "facially unsustainable." Id.; see, e.g., *Tanaka, 252 F.3d at 1063* (affirming dismissal [*32] where plaintiffs failed to identify an appropriate product market); *Big Bear Lodging Ass'n v. Snow Summit, Inc., 182 F.3d 1096, 1104 (9th Cir. 1999)* (affirming dismissal of monopolization claim where plaintiffs did not "sufficiently identify the markets affected by Defendants' alleged antitrust violations"); *Apple, Inc. v. Psystar Corp., 586 F. Supp. 2d 1190, 1203 (N.D. Cal. 2008)* (dismissing claim because plaintiff's assertion of a relevant market "contravenes the pertinent legal standards").

"For antitrust purposes, a 'market is composed of products that have reasonable interchangeability for the purposes for which they are produced - price, use and qualities considered.'" *Paladin Assocs., Inc. v. Montana Power Co., 328 F.3d 1145, 1163 (9th Cir. 2003)* (citation omitted). "[T]he relevant market must include the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business." *Newcal, 513 F.3d at 1045* (citation omitted). Plaintiffs must plead facts showing that their product market "bear[s] a rational relation to the methodology courts prescribe to define a market for antitrust purposes - analysis of the interchangeability [*33] of use or the cross-elasticity of demand, and it must be plausible." *Chapman v. New York State Div. for Youth, 546 F.3d 230, 237 (2d Cir. 2008)* (citation omitted). The fact that multiple products may do the same thing does not mean they are "reasonably interchangeable" to the consumer. See *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc., 7 F.3d 986, 995-96 (11th Cir. 1993)* (recognizing relevant market was more narrow where multiple factors showed inelastic demand for anchors). An essential consideration is whether there is cross-elasticity of demand for the similar products. See *FTC v. Swedish Match, 131 F. Supp. 2d 151, 158-59 (D.D.C. 2000)* ("Finding two products to be functionally interchangeable, however, does not end the analysis.")

1. Plaintiffs' Derivative Aftermarket Is Insufficiently Pled

In the two previous complaints, Plaintiffs defined the relevant market as the "provision of ATM network

services to consumers." See, e.g., AC P 71. In the current complaint, Plaintiffs have modified the market definition, now alleging a market of "the provision of Foreign ATM Transactions routed over Star" that is "wholly derivative from and dependent on the market for deposit accounts." SAC PP **[*34]** 119, 121. The parties dispute whether Plaintiffs may rely on a derivative aftermarket comprised of a single brand of a product - a market consisting only of transactions routed over Star, but excluding other ATM networks.

"[T]he law permits an antitrust claimant to restrict the relevant market to a single brand of the product at issue." *Newcal, 513 F.3d at 1048* (citing *Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 112 S. Ct. 2072, 119 L. Ed. 2d 265 (1992))*. However, "[s]ingle brand markets are, at a minimum, extremely rare." *Psystar, 586 F. Supp. 2d at 1198*. "[C]ourts have usually rejected the claim that one brand is its own market when there are competing brands." *Glen Holly Entm't, Inc. v. Tektronix, Inc., 100 F. Supp. 2d 1073, 1078 n.6 (C.D. Cal. 1999)*.

In Kodak, the case that gave rise to a potential single brand market claim, the plaintiffs were a group of independent service organizations that worked on photocopiers manufactured by Kodak. *Kodak, 504 U.S. at 455*. The plaintiffs alleged that Kodak exerted monopoly power over the market for Kodak-compatible parts. Id. Kodak adopted policies that limited the availability of its parts, which made it more difficult for the plaintiffs to compete with Kodak **[*35]** in servicing Kodak equipment. Id. The Court explained that in certain circumstances, a single brand of a product can constitute a separate market. *Id. at 482*. "Because service and parts for Kodak equipment are not interchangeable with other manufacturers' service and parts, the relevant market from the Kodak equipment owner's perspective is composed of only those companies that service Kodak machines." Id. The Court labeled this as a single-brand "derivative aftermarket." *Id. at 455*. The single-brand aftermarket for parts and service for Kodak equipment arose once customers had purchased and were "locked in" to Kodak equipment. *Id. at 476*.

Recently in Newcal, the Ninth Circuit held that plaintiffs could state a claim where they alleged the "relevant market" was for parts and service for IKON photocopiers for customers who had service contracts with *IKON. 513 F.3d at 1045-50*. This was similar to the situation addressed in Kodak: a single brand derivative aftermarket for products that was related to or dependent on a specific company's products. The Newcal plaintiffs plead:

> the existence of two separate but related markets in intraband copier equipment and service. The first market [was] **[*36]** an initial market for copier leases and copier service, which (as the district court correctly found) is a competitive market in which IKON has no significant market power. The second market [was] a derivative aftermarket for replacement equipment, which include[d] markets for lease "buy outs" and for "lease-end services." As in all three of the cited cases, the relevant market here [was] not the indisputably competitive market in which the consumers first shop for the primary product. It [was] an aftermarket in which the consumers claim that they should be able to shop for a secondary product.

*Id. at 1049*.

The court analogized the market definition in Newcal to the market sustained in Kodak, where the manufacturer "held a natural monopoly in the submarket . . . which gave it a unique position in the wholly derivative aftermarket for service contracts." Id. In both cases, the defendant was "exploiting its unique position - its unique contractual relationship - to gain monopoly power in a derivative aftermarket in which its power is not contractually mandated." *Id. at 1050*.

Two courts in this district have also recently addressed the relevant market inquiry. See *In re Apple & AT&TM Antitrust Litigation, 596 F. Supp. 2d 1288 (N.D. Cal. 2008)*; **[*37]** *Apple, Inc. v. Psystar Corp., 586 F. Supp. 2d 1190 (N.D. Cal. 2008)*. In re Apple involved an arrangement between Apple and AT&T, whereby consumers of iPhones were required to sign a two-year service agreement with AT&T Mobility. *Id. at 1294*. Unbeknownst to customers, the companies also had agreed to restrict service for an additional period after the expiration of the initial contract. Id. The plaintiffs alleged the relevant market was the aftermarket for iPhone voice and data services. *Id. at 1303*. Citing to Newcal, the district court sustained the complaint, finding that the

plaintiffs had sufficiently "alleged an aftermarket for iPhone services that would not exist without the primary market for iPhones, and is those wholly derivative from and dependant on the primary market." Id. By buying an iPhone and contracting for service, "Defendants involuntarily impose on consumers a contract exclusivity restriction which restricts their freedom from that point forward for at least the next five years and conceivably for the life of the iPhone." *Id. at 1304*. The court noted that the consumers "own the iPhone," and that they were tied by financial commitments to the phone service. Id.

In Apple, **[*38]** Inc. v. Psystar Corp., the court dismissed Psystar's claim for failure to allege a relevant market. *586 F. Supp. 2d at 1203*. Psystar filed a counterclaim against Apple under the Sherman Act. *Id. at 1192*. Psystar alleged two relevant markets, one being the single brand derivative aftermarket for computers that could run the Mac OS operating system. *Id. at 1193*. Psystar alleged that Apple sought to dominate the aftermarket for Mac OS-compatible computer hardware systems through its exclusionary behavior. *Id. at 1200*. In a thorough opinion, Judge Alsup distinguished both Kodak and Newcal. *Id. at 1200-01*. The court noted that in Kodak, customers "did not knowingly bind themselves to a single brand of the aftermarket and market imperfections (information costs and switching costs) prohibited customers from imposing market discipline in the aftermarket by switching among competitors in the primary market." *Id. at 1201*. Apple, on the other hand, "ask[ed] its customers to purchase Mac OS knowing that it is to be used only with Apple computers." Id. The court found Newcal was inapplicable because Newcal disavowed the very type of claim asserted by Apple, holding that a claimant may not rely **[*39]** on market power "that arises solely from contractual rights that customers knowingly and voluntarily gave to the defendant." Id. (quoting *Newcal, 513 F.3d at 1048*). Purchasers of the Mac OS did so knowing that it could only be used with Apple computers. Id. Judge Alsup also distinguished In re Apple because the plaintiff had not alleged any undisclosed exclusivity agreement - the aftermarket restriction was fully disclosed. *Id. at 1202*.

The Court finds Plaintiffs have failed to plead a legally sufficient relevant market. Plaintiffs correctly point out that, in general, whether a relevant market exists as alleged is a question of fact. Courts may, however, grant dismissal when the alleged relevant market "contravenes the pertinent legal standards." See *id. at 1203*. "[C]ourts have been extremely reluctant to embrace" Kodak's single-brand market theory, "much less to extend it to other types of goods." *Streamcast Networks, Inc. v. Skype Techs., S.A., 547 F. Supp. 2d 1086, 1094-95* (citing Kintner, 2-10 Federal Antitrust Law § 10.8).

The prior single brand derivative aftermarket cases have focused on the provision of expensive, durable goods. Once a consumer buys such a good, like a photocopier, **[*40]** he is "locked in" to purchasing compatible parts and service for a considerable length of time, given the expense and difficulty of buying a new photocopier. In those circumstances, market imperfections prevent customers from imposing market discipline in the derivative market because of the difficulty of switching among competitors in the primary market. See *Psystar, 586 F. Supp. 2d at 1201*.

It is unclear to the Court that a holder of a bank account, on the other hand, faces such hurdles in simply moving his business elsewhere. Plaintiffs' "relevant market" is a derivative aftermarket of the "primary market for deposit accounts." SAC P 121. Plaintiffs argue that once customers open accounts with Star member banks, they become "locked-in" to the Star network. Thus, Plaintiffs contend they have no choice among ATM networks at the time of each foreign ATM transaction. Where Plaintiffs fall short, however, is in their failure to plead a viable theory suggesting that once a customer signs up for a bank account, he is "locked in" to that bank's services. There are numerous banks that offer deposit accounts and ATM services, and customers may presumably switch to a new bank if they are unhappy **[*41]** with the services offered by their current institution. Because Plaintiffs have failed to allege that they are effectively limited to the Star network as a result of their present banking relationships, they have failed to plead that they are "locked in" to the derivative aftermarket. When this issue was discussed at the hearing, Plaintiffs represented that there are significant hurdles to switching banks that are not obvious to the Court. Accordingly, the Court hereby GRANTS Defendants' motion to dismiss, but Plaintiffs are granted leave to amend the complaint so as to allege an adequate relevant market. As the validity of the relevant market is typically a factual element, an adequately pled relevant market can then be factually tested through summary judgment or trial. See *Newcal, 513 F.3d at 1045*.

2. Whether a Separate Market Exists

Defendants argue that Plaintiffs' "relevant market" theory is further flawed because it is not clear that the provision of ATM services is separate from the provision of general banking services. An aftermarket exists when a customer buys two separate products. See *Kentmaster Mfg. Co. v. Jarvis Prods. Corp., 146 F.3d 691, 695 (9th Cir. 1998)*. There is [*42] presumably no aftermarket if the customers "purchase the alleged primary- and aftermarket-products at the same time, as a package." *Psystar, 586 F. Supp. 2d at 1201*.

Defendants contend that there is no aftermarket here because, as stated in the complaint, "consumers cannot obtain ATM Cards without first opening deposit accounts." See SAC P 121. Thus, ATM services are part of the "package" of services consumers acquire when they open a deposit account. On the other hand, Newcal, Kodak, and In re Apple involved clearly distinct products in the primary and aftermarkets: the initial good and then the derivative goods and services necessary to maintain the initial good. A different transaction was involved in procuring each.

Defendants' argument on this issue will not be the basis for granting the motion to dismiss. Although the bank issues an ATM card at the time the account is opened, a consumer is arguably involved in a separate transaction each time he visits a foreign ATM for a withdrawal. See SAC PP 122-24. On the current record, the Court is not persuaded that Plaintiffs' relevant market insufficiently alleges a separate and distinct product. As this case proceeds, Defendants may attempt [*43] to prove otherwise, but it would be premature to dismiss on this ground.

3. Whether ATM Networks are "Reasonably Interchangeable"

Defendants further contend that Plaintiffs' complaint must fail because ATM networks are "reasonably interchangeable" with each other. Whether there are functionally similar products is not the end of the inquiry, however; the Court must also look to whether there is cross elasticity of demand. See *FTC v. Swedish Match, 131 F. Supp. 2d 151, 158-59 (D.D.C. 2000)*. Here, Plaintiffs specifically allege that "ATM Networks other than Star are not substitutes for Foreign ATM Transactions routed over Star. When withdrawing cash at Foreign ATMs, consumers have no choice regarding the ATM Networks over which the transactions are routed." SAC P 125. Plaintiffs concede that Star is one of many ATM networks, see SAC P 75, but they also allege that a consumer is not presented with any alternative options because his bank account locks him into the Star network, SAC P 125. As discussed above, the Court takes issue with the premise of this allegation - that the consumer has no options because he is "locked into" his bank account - and dismisses with leave to amend on that [*44] ground. Yet, if the Plaintiffs get past that hurdle, they have satisfied the requirement of pleading that there is not a "reasonably interchangeable" option available to consumers. "The cross-elasticity of demand analysis depends on information about consumer behavior and perceptions and is accordingly a deeply fact intensive inquiry." *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig., 562 F. Supp. 2d 392, 399 (E.D.N.Y. 2008)*. It is too early to say whether Plaintiffs can meet their burden in this regard.

II. SunTrust Bank's Motion to Dismiss

SunTrust's motion, which is joined by all Defendants, argues in essence that Plaintiffs fail to state an antitrust offense at all. The motion is based on four propositions:

> 1. ATM networks require the process of interchange conducted pursuant to contract or rules.
>
> 2. Bilateral negotiations are not feasible in a network such as Star; the interchange process thus required network-level interchange rules, including a "price rule."
>
> 3. If interchange requires a network fee rule, then having such a rule by definition does not eliminate competition over fees that otherwise would exist.
>
> 4. Since interchange fees cannot be set through [*45] competition, Plaintiffs' claim can only be about preferring one network-level fee over another - a claim that lies outside the domain of antitrust.

See SunTrust's Reply.

The Court declines to subscribe to this argument

because it does not agree with its premise: it is not altogether clear that a set network-level interchange fee is necessary to the operation of the Star network. In the recent order on summary judgment, the Court held only that fixing of the interchange fee did not per se violate the Sherman Act. The Court noted that there must be some rules to govern the apportionment of costs in a payment system such as the Star network. *In re ATM Fee Antitrust Litig., 554 F. Supp. 2d 1003, 1016 (N.D. Cal. 2008)*. The Court held that the apportionment of costs is a legitimate purpose, ancillary to the operation of the Star network, and that such apportionment may be fixed in some manner. Id. Defendants succeeded in avoiding application of per se analysis because they showed that the fee has procompetitive justifications. Id.

The Court's order should not be read to say that the interchange fee set by the network is necessarily permissible under the rule of reason analysis. The Court's **[*46]** holding was simply that, because there are procompetitive reasons in favor of setting an interchange fee, per se analysis is inapplicable. See id. Yet by opining that it is perhaps necessary to apportion costs among members of an ATM network, the Court did not consider the interchange fee itself under the rule of reason analysis. Aside from any purported procompetitive justifications, Plaintiffs' claim under the rule of reason asserts that the fixed interchange serves to inflate prices charged to consumers. Thus, Plaintiffs assert that the rate's anticompetitive effects outweigh the procompetitive justifications identified by the Court. An inquiry into whether the evidence supports Plaintiffs' claim has yet to be conducted. In the prior motion, the parties and the Court all agreed that the only issue before the Court was whether per se analysis should apply. Accordingly, the Court will not read its prior order to have made a factual determination that forecloses Plaintiffs' rule of reason claim.

III. Bank of America's Motion to Dismiss

A. Rule 15 "Relation Back" Doctrine

Plaintiffs' previous complaints named the Bank of America Corporation ("BAC") as a defendant. The current complaint **[*47]** still names BAC, but Plaintiffs have added Bank of America, N.A. ("BANA") as a defendant. BAC is a bank holding company, not a bank. The entity that participates in the Star network is BANA, a subsidiary of BAC. BANA, the newly named defendant, moves to dismiss on the ground that the statute of limitations bars Plaintiffs' suit against it.

The statute of limitations for claims under the Sherman Act is four years. *15 U.S.C. § 15(b)*. Plaintiffs' SAC was filed on February 2, 2009, so BANA contends it is untimely with respect to all claims arising before February 2, 2005. Plaintiffs contend that the "relation back" doctrine of *Federal Rule of Civil Procedure 15* should apply. Under *Rule 15*, a new defendant may be made party to an existing complaint if (1) the claim arose out of the same conduct, transaction, or occurrence; (2) the new defendants received sufficient notice of the original action within 120 days so as not to be prejudiced in defending on the merits; and (3) the new defendants knew or should have known that "but for a mistake concerning the proper party's identity" the complaint would have included them. *Fed. R. Civ. P. 15(c)(1)(C)*; *Percy v. San Francisco Gen. Hosp., 841 F.2d 975, 978 (9th Cir. 1988)*. **[*48]** The main objective is avoiding prejudice to the party to be added. Id. Plaintiffs argue that as BANA was certainly on notice of this suit and shares counsel with BAC, it would not suffer prejudice if forced to defend.

The parties do not dispute that the first and second prongs of *Rule 15(c)* are met, but BANA presents persuasive reasons as to why Plaintiffs have not satisfied the "mistake" prong. "The mistake under *Rule 15(c)* has to be as to identity." *Louisiana-Pacific Corp. v. ASARCO, Inc., 5 F.3d 431, 434 (9th Cir. 1993)*. If this Defendant were omitted because they were unknown to the plaintiff at the time the complaint was filed, then amendment may be proper. See *Kilkenny v. Arco Marine Inc., 800 F.2d 853, 856-58 (9th Cir. 1986)*. "However, if a plaintiff is aware of the potential defendant's identity at the time the original complaint is filed, but is uncertain whether the potential defendant may be found liable, amendment is not allowed to defeat the statute of limitations." *In re Brocade Commc'ns Sys., Inc. Derivative Litig., 615 F. Supp. 2d 1018, 1041 (N.D. Cal. 2009)*. "Similarly, if the plaintiff learns of the defendant within the limitations period, but seeks to add the defendant **[*49]** only after the period has expired, amendment is not allowed." Id. "In these two situations, the plaintiff's failure to add the defendant(s) before the expiration of the statute of limitations cannot be characterized as a 'mistake concerning . . . identity' because the plaintiff was aware of the new party's identity before the statute of limitations had run." *Brink v. First Credit Res., 57 F. Supp. 2d 848, 856 (D. Ariz. 1999)*. "The defendant deserves the

Case 1:05-md-01720-JG-JO   Document 1304-2   Filed 09/22/09   Page 14 of 17

Page 14
2009 U.S. Dist. LEXIS 83199, *49

protection of the statute of limitations because he or she may believe the plaintiff made a conscious decision not to include him or her." Id.; see also *Kilkenny, 800 F.2d at 857-58* ("*Rule 15(c)* was never intended to assist a plaintiff who ignores or fails to respond in a reasonable fashion to notice of a potential party").

Plaintiffs cannot defeat the statute of limitations by arguing that relation back applies because Plaintiffs were on notice of BANA's participation with the Star network for over three years before naming it as a party. The original complaint was filed on July 2, 2004, and the amended complaint was filed on May 25, 2005. Plaintiffs correctly identified and named the banking entities of Wachovia, Wells Fargo, and Bank **[*50]** One, but failed to identify the correct Bank of America entity. In its July 5, 2005 initial disclosures, BAC informed Plaintiffs that BANA was the corporate entity likely to have information pertaining to this suit. See Smith Decl. Ex. 10 at 4-7. To follow-up, BAC's counsel called Plaintiffs' counsel to explain that BANA, and not BAC, is a member of the Star network. See id. at 8. BAC explicitly suggested that Plaintiffs may wish to amend the pleadings to name BANA. See id. Ex. 9 at 2. On August 5, 2005, BAC sent Plaintiffs a letter reiterating that "the complaint in this case names as a defendant in this case [BAC] rather than [BANA], which is the corporate entity that runs the retail bank and participates in the Star ATM network." See id. Ex. 10 at 8. The letter further stated that "it does not appear that [BAC] is the entity that Plaintiffs truly intended to sue in this case." Id.

In response, Plaintiffs sent an email stating:

> We appreciate your willingness to cooperate with regard to making BANA a party, and to respond to any discovery served on BANA within 15 days. But we are very concerned about whether BANA can be added promptly and without complications, even if you cooperate **[*51]** and the other defendants don't interfere. We have not yet decided how we are going to proceed in that regard, but our overriding goal will continue to be getting discovery from BANA as soon as possible.

Id. at 10.

On September 15, 2005, BAC again reiterated that Plaintiffs should be demanding discovery from BANA rather than BAC. BAC noted that it was "willing to cooperate if you should decide to . . . move to amend the complaint to add BANA as a defendant." Id. Ex. 8 at 9. Plaintiffs did not add BANA, and the parties litigated a discovery dispute regarding whether BAC had sufficient "control" over BANA's documents to require it to obtain those documents from its subsidiary. Plaintiffs won that fight. See *In re ATM Fee Antitrust Litig., 233 F.R.D. 542 (N.D. Cal. 2005)*. BAC complied with the Court's order, but continued to take the position that BANA was the entity that could most appropriately defend the suit. See, e.g., id. Ex. 1 at 2 n.1; Ex. 2 at 2 n.1. Plaintiffs, on the other hand, made it clear that they "did not name BAC as a defendant by virtue of any 'error' or 'mistake.'" Id. Ex. 6 at 1. In a discovery order, even Judge Walker stated that he was "somewhat puzzled" as to why **[*52]** BANA is "not a party in this case." Id. Ex. 7 at 2.

In a letter dated November 6, 2005, BAC again noted:

> Plaintiffs have made clear that their decision not to name BANA as a party was not a 'mistake' but rather a deliberate choice. We accept that plaintiffs are entitled to decide whom they wish to sue, and that they have chosen not to sue BANA in this action.

Id. Ex. 9 at 5 n.5 (citation omitted). Litigation proceeded over the next three years with various discovery and motions practice. On February 2, 2009, Plaintiffs filed the SAC, which names BANA as a defendant for the first time.

Given this history, Plaintiffs cannot now claim that their failure to add BANA at an earlier time was a "mistake" within the context of *Rule 15*. Plaintiffs claim that BANA will suffer no prejudice because BANA knew about the litigation and probably expected to be sued. Yet even where a defendant "will not suffer significant prejudice," *Rule 15* applies if a plaintiff fails to add the defendant in a timely fashion. See *In re Brocade, 615 F. Supp. 2d at 1041*. Plaintiffs have failed to demonstrate either that they did not know of BANA's existence when it filed its first two complaints or that it did not learn **[*53]** of BANA's potential participation in the suit shortly thereafter. This is simply not a case of mistaken identity.

See id.; *Louisiana-Pacific Corp., 5 F.3d at 434* (holding *Rule 15* did not apply were the plaintiffs "knew who those parties were and made a mistake in who it ought to sue under the circumstances").

Plaintiffs suggest that the "unusual procedural history" of this case should weigh in favor of their amendment. Throughout 2005, the parties were dealing with discovery motions and Defendants' first motion for partial summary judgment. On the day set for hearing that motion, Judge Walker recused himself. The case was reassigned to Judge Armstrong, who recused herself in February 2006. In November 2006, this Court terminated the first summary judgment and directed the parties to focus on whether to apply the per se or rule of reason analysis. The second summary judgment motion was filed in August 2007 and decided in March 2008. The Ninth Circuit declined to hear the interlocutory appeal in August 2008, and Plaintiffs filed the SAC in February 2009. Through all this, however, the Court is not persuaded that Plaintiffs could not, within a reasonable time, have added BANA as a named **[*54]** party. They were plainly aware that BANA was an appropriate defendant, yet took no action toward including BANA in the suit. BAC represented that it would not oppose such an amendment, and in fact actively encouraged Plaintiffs to add BANA. In light of the overwhelming evidence [3] suggesting that Plaintiffs knew that BANA was a proper party to defend as early as May 25, 2005, they cannot justify applying the relation back doctrine where they failed to add BANA until February 2009. Accordingly, BANA can only be held liable for a claim arising within four years of the filing of the SAC.

> 3   Plaintiffs argue that the Court should not consider the Smith Declaration filed with BANA's motion because it constitutes extrinsic evidence. Extrinsic evidence cannot be considered on a *Rule 12(b)(6)* motion to dismiss. *Fed. R. Civ. P. 12(d)*. However, Defendants' motion is also a challenge to the amendment under *Rule 15*. At a case management conference on December 5, 2008, the Court stated it would allow Plaintiffs leave to amend without requiring them to file a motion. However, the Court also stated that Defendants would be entitled to raise any arguments in their challenge to the new complaint that could **[*55]** have been raised in opposing the amendment under *Rule 15*. Accordingly, the Court may consider the extrinsic evidence in regard to the challenge to the amendment.

B. Allegations of Agreement

The Bank of America Defendants also move to dismiss on the ground that the SAC fails to allege adequate facts showing that they participated in an unlawful agreement to fix the interchange fee. The other Bank Defendants have joined in this portion of Bank of America's motion.

1. The SAC Fails to Distinguish Between the Banks and Holding Entities

Defendants rightly point out that Plaintiffs' pleading does not distinguish between operating banks and their holding companies. Rather, Plaintiffs merely lump together allegations against the holding company and its subsidiary. For example, BAC and BANA are collectively referred to as "Bank of America." Judge Walker rejected this exact kind of consolidation of parties when he ruled on the initial motions to dismiss. See *Brennan v. Concord EFS, Inc., 369 F. Supp. 2d 1127, 1136-37 (N.D. Cal. 2005)* (holding that Plaintiffs' allegation was conclusory and insufficient to state a claim where it stated that "Bank One [Corp] exercised such dominion and control over **[*56]** Bank One, NA and Bank One Arizona that it is liable according to the law for the acts of Bank One, NA and Bank One Arizona"). There are no allegations in the complaint that tie the holding companies to the alleged conspiracy to set the interchange fee. Accordingly, dismissal of the SAC is GRANTED as to the corporate parent Defendants: Bank of America Corporation, JPMorgan Chase & Co., CitiGroup, Inc., and Wells Fargo & Co. As this very defect was identified by Judge Walker in 2005, and Plaintiffs failed to remedy this problem upon amendment, dismissal is with prejudice.

2. The SAC Adequately Pleads Agreement

Much attention has been paid to the pleading standards for Sherman Act claims, given the Supreme Court's recent decision in *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. There, the Court clarified that:

> [A] plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements

of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level. . . . In applying these general standards to a § 1 claim, we hold that stating such [*57] a claim requires a complaint with enough factual matter (taken as true) to suggest an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.

*Id. at 555-56* (internal citations omitted). In Ashcroft v. Iqbal, the Court explained that courts must consider whether a complaint's factual allegations as to each defendant "plausibly suggest an entitlement to relief." *129 S. Ct. 1937, 1951, 173 L. Ed. 2d 868 (2009)*.

Despite Defendants' arguments to the contrary, Plaintiffs' allegations of an unlawful agreement have met the standard set forth in Twombly. Twombly itself was a case where the plaintiffs' theory of an unlawful agreement stemmed from parallel conduct. There, the plaintiffs alleged that defendant telephone companies had "entered into a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets and have agreed not to compete with one another and otherwise allocated customers and markets to one another." *Twombly, 550 U.S. at 551*. [*58] The plaintiffs had not made any specific allegations providing direct evidence of an illicit agreement. Rather, the plaintiffs relied on circumstantial evidence of parallel action. The Supreme Court found those allegations stated only ultimate facts, and failed to plead the necessary evidentiary facts to support those conclusions. *Id. at 570*.

In contrast, here Plaintiffs have made more specific allegations of a definite agreement. Plaintiffs allege that "Bank Defendants, acting through Star's Board of Directors, collectively adopted and enforced Star's Operating Rules mandating payment of Interchange Fees." SAC P 100. Plaintiffs contend that the Bank Defendants acted through Star's Board of Directors on specific occasions with the aim of setting Star's Interchange Fee. SAC PP 100-07. Plaintiffs further allege that each Bank Defendant agreed to abide by Star's fixed interchange, with the expectation that other Bank Defendants would do so as well. SAC PP 110-11. Unlike the circumstantial evidence at play in Twombly, Plaintiffs have made definite allegations about Defendants' role in making a specific agreement. Whether or not Plaintiffs will be able to prevail on their theory, they have [*59] presented a claim that is plausible on its face.

Plaintiffs allegations are also more specific than those in the other case relied upon by Defendants, *Kendall v. Visa U.S.A., Inc., 518 F.3d 1042 (9th Cir. 2008)*. In Kendall, the plaintiffs alleged that bank defendants conspired to fix a credit card fee by "merely charging, adopting or following the fees set by a Consortium." *Id. at 1048*. The Ninth Circuit found that allegation was "insufficient as a matter of law to constitute a violation of *Section 1* of the Sherman Act." Id. The court noted that "membership in an association does not render an association's members automatically liable for antitrust violations committed by the association. Even participation on the association's board of directors is not enough." Id. (internal citation omitted).

Again, here, Plaintiffs have alleged more than parallel conduct or membership in an association as the basis for their claim. Plaintiffs specifically allege that the Defendants who participated in the Star network struck an agreement to set the interchange fee. Plaintiffs detail certain meetings where decisions were made on fees. Defendants are certainly on notice of Plaintiffs' claims as to [*60] how they were involved with the alleged unlawful scheme. As the Supreme Court noted in Twombly, "we do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *550 U.S. at 570*. Plaintiffs' allegations provide the Court with a plausible basis for sustaining the SAC.

IV. Citigroup, Inc.'s Motion to Dismiss

Citigroup, Inc. is a parent company to Citibank, N.A. and Citibank (West), FSB. The SAC lumps all three entities together, defining them collectively as "Citibank." SAC P 29. As described above, this tactic has been expressly rejected by Judge Walker in this case. The SAC makes no allegations that are specific to the holding entity, Citigroup, Inc. Accordingly, Citigroup's motion to dismiss is GRANTED with prejudice.

**CONCLUSION**

Based on the foregoing, the Court hereby:

(1) DENIES the joint motion to dismiss insofar as it alleges Plaintiffs lack standing to assert a claim for damages under the Sherman Act;

(2) GRANTS the joint motion to dismiss with leave to amend because Plaintiffs fail to identify a proper relevant market;

(3) DENIES SunTrust's motion to dismiss;

(4) GRANTS Bank of America N.A.'s motion to dismiss [*61] insofar as Plaintiffs' claim is barred by the statute of limitations; and

(5) GRANTS dismissal of the bank holding entities with prejudice.

**IT IS SO ORDERED**.

Dated: September 4, 2009

/s/ Charles R. Breyer

CHARLES R. BREYER

UNITED STATES DISTRICT JUDGE