

HUNTON & WILLIAMS LLP
200 PARK AVENUE
NEW YORK, NY 10166-0005

TEL   212 • 309 • 1000
FAX   212 • 309 • 1100


WESLEY R. POWELL
DIRECT DIAL: 212 • 309 • 1013
EMAIL: wpowell@hunton.com

January 8, 2010

FILE NO: 66831.50

**BY ECF**


The Honorable James Orenstein
United States District Court
Eastern District of New York
225 Cadman Plaza East, Room 456 North
Brooklyn, New York 11201

Re:   *In re Payment Card Interchange Fee and
Merchant Discount Antitrust Litigation*, **MDL 1720**

Dear Magistrate Judge Orenstein:

We write in response to class plaintiffs' January 5, 2010 motion to compel MasterCard (the "Motion") to produce a copy of the oral recording of the November 14-15, 2006 hearing in the European Commission investigation into the intra-European interchange fees set by MasterCard Incorporated, MasterCard International Incorporated, and MasterCard Europe SPRL ("Oral Recording").

**Background.**   Notwithstanding MasterCard's objections on relevance and other grounds, MasterCard has already produced a significant volume of materials from a number of foreign interchange-related regulatory proceedings, covering the timeframe from approximately 2000 through the Court-ordered October 15, 2008 close of discovery.  These productions have included a complete record of MasterCard's substantive submissions to the European Commission in connection with its investigation concerning interchange fees on cross-border MasterCard/Maestro transactions in the European Economic Area (EEA) and the Commission's decisions, orders, requests for information, and other releases concerning this investigation.  In this context, MasterCard specifically agreed to produce the Oral Recording subject to the Commission's consent.

Class plaintiffs acknowledge that MasterCard has undertaken appropriate efforts to seek the Commission's consent. (*See* Motion at 2, Exs. 4-5, 7.)  And it is undisputed that, to date, the Commission has declined to consent to MasterCard's production of the Oral Recording; in fact, the assigned Hearing Officer expressly directed MasterCard *not* to produce it: "I remind you that MasterCard should abstain from disclosing the tapes of the Hearing in the discovery



The Honorable James Orenstein
January 8, 2010
Page 2

procedure in the U.S." (Motion at Ex. 4, December 9, 2008 Letter from Hearing Officer Karen Williams.) Accordingly, MasterCard has declined to produce the Oral Recording.

In response to the Court's January 6, 2010 Minute Order, MasterCard (through its European counsel) immediately wrote to the Commission on January 7, 2010 to inform it of the Court's invitation to make a submission in response to the Motion and appear at the January 13 conference. (*See* Ex. A hereto.) MasterCard will promptly apprise the Court of any response from the Commission.

**Analysis.** The question presented here is whether class plaintiffs' purported need for information contained in the Oral Recording outweighs the European Commission's stated interest in preserving the confidentiality of its competition enforcement hearings. It is well-established that, based on principles of comity, courts "should not take such action as may cause a violation of the laws of a friendly neighbor, or at the least, an unnecessary circumvention of its procedures." *Ings v. Ferguson*, 282 F.2d 149, 152 (2d Cir. 1960). Here, MasterCard has been expressly directed not to produce the Oral Recording, based on the Commission's long-held view that protecting the confidentiality of its hearings preserves the integrity and effectiveness of its enforcement procedures.[1] In the Commission's view, ordering MasterCard to produce the Oral Recording risks interfering with the Commission's investigative procedures.

A number of courts have analyzed the appropriate balancing of these substantial comity interests against the moving party's purported need for the discovery material at issue; the case most directly on-point is *In re Rubber Chems. Antitrust Litig.*, 486 F. Supp. 2d 1078 (N.D. Cal. 2007). There, the court denied a motion to compel production of materials relating to a Commission antitrust investigation on the grounds that comity interests outweighed plaintiff's need for defendants' communications with the Commission. The *Rubber Chemicals* court based its decision on a balancing of the five comity factors identified by the Supreme Court in *Société Nationale Industrielle Aérospatiale v. U.S. Dist. Court for the S. Dist. of Iowa*, 482 U.S. 522, 546 (1987): "1) the importance to the . . . litigation of the documents or other information requested; (2) the degree of specificity of the request; (3) whether the information originated in the United States; (4) the availability of alternative

---

[1] *See* Ltrs. from K. Williams to V. Brophy and B. Amory, dated Dec. 9, 2008 and Sept. 25, 2009 (Motion at Exs. 4 and 7) and Ltr. from I. Schwimann to B. Amory and V. Brophy, dated July 7, 2009 (Motion at Ex. 5). *See also* Communication from the Commission to the European Parliament and the Council – Report on the functioning of Regulation 1/2003, April 29, 2009 (Exhibit B).



The Honorable James Orenstein
January 8, 2010
Page 3

means of securing the information; and (5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located." *Id.* at 1082 (quoting). Based on its weighing of these factors, the Court declined to order the disputed materials produced over the Commission's objections, finding that "any marginal benefit that the plaintiff would gain from disclosure is outweighed by the impact that disclosure will have on the Commission's interests in the effective enforcement of its competition laws." *Rubber Chems.*, 486 F. Supp. 2d at 1084.

Applying these factors here similarly supports denying the motion to compel. Class plaintiffs expressly acknowledge the Oral Recording did not originate in the United States. (*See* Motion at 3.) Moreover, class plaintiffs have not established that any material contained in the Oral Recording is important to this litigation or that the information they seek through this motion is unavailable elsewhere. Indeed, plaintiffs do not dispute that they already have a voluminous, comprehensive record of both MasterCard's and the Commission's positions on the legality of MasterCard's cross-border interchange structure in the EEA and other business practices at issue in the Commission's investigation. Any "marginal benefit" plaintiffs purportedly would obtain from access to the Oral Recording cannot possibly outweigh the Commission's stated interests in preserving the confidentiality of its competition enforcement efforts. *Rubber Chems.*, 486 F. Supp. 2d at 1084. Finally, in light of the marginal value of the Oral Recording to these proceedings, class plaintiffs cannot show that respecting the Commission's interest in the confidentiality of its proceedings would undermine an important interest of the United States.

\* \* \*

For all of these reasons, class plaintiffs' motion should be denied.

Respectfully submitted,

*[signature]*
Wesley R. Powell

cc. All Counsel of Record via ECF

# EXHIBIT A

**REDACTED**

---

**Subject:** Cases COMP/34.579, COMP/36.518 and COMP/38/580 - MasterCard e.a - Recording of the Oral Hearing

**Attachments:** Order of Judge Orenstein 6 January 2010.pdf; pic14140.gif; ATTK9JGV.pdf

 

Order of Judge    pic14140.gif (3 KB) ATTK9JGV.pdf (938
Orenstein 6 Jan...                                    KB)

**REDACTED**

```
----- Original Message -----
From: Vincent Brophy
Sent: 01/07/2010 02:28 PM CET
To: hearing.officer@ec.europa.eu; karen.williams@ec.europa.eu
Cc: Irmfried.Schwimann@ec.europa.eu; Rita.WEZENBEEK@ec.europa.eu; Bernard Amory; Scott McInnes; Marcus Pollard
Subject: Cases COMP/34.579, COMP/36.518 and COMP/38/580 - MasterCard e.a - Recording of the Oral Hearing Dear Ms. Williams,
```

Further to my email of 22 December 2009 updating you on the ongoing proceedings against MasterCard (and others) in the US District Court, Eastern District of New York, plaintiffs counsel in those proceedings filed on 5 January 2010 a motion for an order to compel production of the Oral Hearing on 14/15 November 2006 (see attached).

US counsel to MasterCard had previously informed plaintiffs of your position – that, in essence, disclosure of the contents of an oral hearing should not be used for purposes other than the application of Articles 101 and 102 TFEU.

As you can see from the attached motion, plaintiffs refer to the series of correspondence between the Commission and us. However, they argue that production of the oral hearing would not undermine the effectiveness of EC antitrust enforcement, and that the Commission's decision not to intervene indicated that the Commission is not concerned with the ramifications of the disclosure of oral hearings.

Following that motion, the Judge in the US proceedings (Judge Orenstein) yesterday (6 January 2010) issued an Order (attached) by which he formally invites the European Commission to submit a letter as amicus curiae. The Order invites (but does not order) the Commission to provide its views on the motion to compel discovery of the oral hearing through counsel at the next status conference on 13 January 2010.

We would be grateful if you could confirm receipt of the Order and an indication of the Commission's response to Judge Orenstein. For that purpose, we remain at your disposal should you or the Commission's services require further information.

Regards,
Vincent.


(See attached file: Order of Judge Orenstein 6 January 2010.pdf)



(Embedded    Vincent Brophy

1

(Using :)

```
image moved
to file:        Brussels
pic14140.gif)   165 Boulevard Brand Whitlock, 1200 Brussels
                Direct: +32 (0) 2 645 15 35 • Fax: +32 (0) 2 645 14 45 •
                Mobile: +32 (0) 477 61 81 33

                London
                21 Tudor Street, London EC4Y 0DJ
                Direct: +44 (0) 20 7039 5192 • Fax: +44 (0) 20 7039 5999 •
                Mobile: +32 (0) 477 61 81 33
```

==========
This e-mail (including any attachments) may contain information that is private,
confidential, or protected by attorney-client or other privilege.
If you received this e-mail in error, please delete it from your system without copying it
and notify sender by reply e-mail, so that our records can be corrected.
==========

# EXHIBIT B

 COMMISSION OF THE EUROPEAN COMMUNITIES

Brussels, 29.4.2009
COM(2009) 206 final

**COMMUNICATION FROM THE COMMISSION TO THE EUROPEAN PARLIAMENT AND THE COUNCIL**

**Report on the functioning of Regulation 1/2003**

{SEC(2009)574}

**EN**                                                                                                                                   **EN**

COMMUNICATION FROM THE COMMISSION TO THE EUROPEAN
PARLIAMENT AND THE COUNCIL

**Report on the functioning of Regulation 1/2003**

1. **INTRODUCTION**

1. Regulation 1/2003[1], the keystone of the modernisation of the European Union's antitrust enforcement rules and procedures, entered into application on 1 May 2004. Article 44 of Regulation 1/2003 provides that the Commission shall by 1 May 2009, i.e. after five years of application, report to the European Parliament and the Council on its functioning.

2. Regulation 1/2003 was the result of the most comprehensive reform of procedures for the enforcement of Articles 81 and 82 EC since 1962. Its main features are:

   – The abolition of the practice of notifying business agreements to the Commission, enabling the Commission to focus its resources on the important fight against cartels and other serious violations of the antitrust rules.

   – The empowerment of national competition authorities and courts to apply EC antitrust rules in their entirety, so that there are multiple enforcers and therefore wider application of the EC antitrust rules.

   – More level playing field for businesses operating cross-border as all competition enforcers, including the national competition authorities and national courts, are obliged to apply EC antitrust rules to cases that affect trade between Member States.

   – Close cooperation between the Commission and national competition authorities in the European Competition Network (the "ECN").

   – Enhanced enforcement tools for the Commission so that it is better equipped to detect and address breaches of the antitrust rules.

---

[1] Council Regulation (EC) No 1/2003 of 16 December 2002 on the implementation of the rules on competition laid down in Articles 81 and 82 of the Treaty (OJ 2003 L1, 4.1.2003, p.1), as amended by Council Regulation (EC) No 411/2004 of 26 February 2004 repealing Regulation (EEC) No 3975/87 and amending Regulations (EEC) No 3976/87 and (EC) No 1/2003, in connection with air transport between the Community and third countries (OJ L 68, 6.3.2004, p.1) and Council Regulation (EC) No 1419/2006 of 25 September 2006 repealing Regulation (EEC) No 4056/86 laying down detailed rules for the application of Articles 85 and 86 of the Treaty to maritime transport, and amending Regulation (EC) No 1/2003 as regards the extension of its scope to include cabotage and international tramp services (OJ L 269, 28.9.2006, p. 1).

3.  In the context of Regulation 1/2003, the Commission further adopted the Commission implementing Regulation 773/2004[2] as well as six new Commission Notices and Guidelines.[3]

4.  The Report is a stock-taking exercise, the aim of which is to understand and assess how modernisation of the EC antitrust enforcement rules has worked during the first five years. It is to be read in conjunction with the accompanying Commission Staff Working Paper which contains a more detailed review.

2.  **SYSTEM CHANGE: FROM THE NOTIFICATION SYSTEM TO DIRECT APPLICATION OF ARTICLE 81(3) EC**

5.  Regulation 1/2003 introduced a fundamental change in the framework for applying Articles 81 and 82 EC. It replaced the centralised notification and authorisation system which was created by Regulation 17 by an enforcement system based on the direct application of Articles 81 and 82 EC in their entirety.

6.  Under Regulation 1/2003, the Commission, national competition authorities and courts have the power to apply Articles 81 and 82 EC in full. In particular, agreements which are caught by Article 81(1) EC but which satisfy the conditions of Article 81(3) EC are now directly valid and enforceable, no prior decision to that effect being required. In the context of public enforcement, the conditions of Article 81(3) EC are principally being assessed where the provision is invoked as a defence in enforcement cases.

7.  The change from a system of notification and administrative authorisation to one of direct application has been remarkably smooth in practice. Overall, neither the case practice of the Commission and the national enforcers, nor the experience reported by the business and legal community, indicate major difficulties with the direct application of Article 81(3) EC which has been widely welcomed by stakeholders.

8.  The system change has supported a shift in priorities of the Commission, enabling it to focus its resources on areas where it can make a significant contribution to the enforcement of Articles 81 and 82 EC. This proactive approach is clearly illustrated by the launch of large scale inquiries in key sectors of the EU economy which directly impact consumers. The Commission has further implemented a more effects-based approach in all areas of antitrust case work and policy, outside the field of cartels. The more pro-active stance of the Commission is further illustrated by an

---

[2] Commission Regulation (EC) No 773/2004 of 7 April 2004 relating to the conduct of proceedings by the Commission pursuant to Articles 81 and 82 of the EC Treaty (OJ L 123, 27.4.2004, p.18), as amended by Commission Regulation (EC) No 622/2008 of 30 June 2008 amending Regulation (EC) No 773/2004, as regards the conduct of settlement procedures in cartel cases (OJ L 171, 1.7.2008, p. 3).

[3] The Modernisation Package, cf. Commission Notice on Cooperation within the Network of Competition Authorities (OJ C 101, 27.4.2004, p.43), Commission Notice on Cooperation between the Commission and the Courts of the EU Member States in the application of Articles 81 and 82 EC (OJ C 101, 27.4.2004, p.54), Commission Notice on Informal Guidance relating to Novel Questions concerning Articles 81 and 82 of the EC Treaty that arise in Individual Cases (Guidance Letters) (OJ C 101, 27.4.2004, p.78), Commission Notice on the Handling of Complaints by the Commission under Articles 81 and 82 of the EC Treaty, (OJ C 101, 27.4.2004, p.65), Guidelines on the effect on trade concept contained in Articles 81 and 82 of the Treaty (OJ C 101, 27.4.2004, p.81) and Guidelines on the application of Article 81(3) of the Treaty (OJ C 101, 27.4.2004, p.97).

increase in the number of enforcement decisions adopted, compared with earlier periods.

9. The reform of the antitrust rules entailed a shift from giving comfort to individual agreements to a system in which the emphasis is on general guidance that can be helpful to numerous undertakings and other enforcers. This was a process which the Commission had already started prior to 2004 for vertical restraints[4] and horizontal cooperation agreements.[5] The 2004 Modernisation package included general guidelines on the application of Article 81(3) EC[6] and the Transfer of Technology Block Exemption and guidelines were adopted in the same year.[7] On 9 February 2009, the Commission published guidance on its enforcement priorities in applying Article 82 EC to abusive exclusionary conduct by dominant undertakings, in response to a strong demand from many stakeholders.[8] With regard to individual guidance, the Commission remains firmly committed to providing guidance to companies which encounter novel or unresolved questions, in accordance with the Notice on informal guidance.[9] Very few approaches have, however, been made to the Commission during the reporting period.

3. **COMMISSION PROCEDURES UNDER REGULATION 1/2003**

10. Regulation 1/2003 equipped the Commission with a renewed set of enforcement powers which are geared towards its principal objectives of effective and coherent enforcement. The Commission has used its new or revised powers actively, and overall successfully, for effective enforcement.

11. Regulation 1/2003 clarified and reinforced the Commission's investigation powers (Articles 17 to 22). Sector inquiries have become one of its key investigative tools and have enabled it to identify shortcomings in the competitive process of the gas and electricity, retail banking, business insurance and pharmaceutical sectors. They have provided a wealth of factual material that has supported the Commission's enforcement of Articles 81 and 82 EC in individual cases.

12. The new or revised powers have been used to the extent necessary in the cases investigated. The power to seal, as well as the power to ask questions about facts or documents during inspections in business premises, have been regularly employed. Inspections in non-business premises have been carried out on two occasions.[10] Regulation 1/2003 also introduced the power to interview legal and natural persons

---

[4] Commission Regulation No 2790/1999 of 22 December 1999 on the application of Article 81(3) of the Treaty to categories of vertical agreements and concerted practices (OJ L 336, 29.12.1999, p. 21-25) and Commission Notice on Guidelines on Vertical Restraints (OJ C 291, 13.10.2000, p.1).

[5] Commission Regulation No 2658/2000 of 29 November 2000 on the application of Article 81(3) of the Treaty to categories of specialisation agreements (OJ L304, 5.12.2000, p.3), Commission Regulation No 2659/2000 of 29 November 2000 on the application of Articles 81(3) to categories of research and development agreements (OJ L 304, 5.12.2000. p.7) and the Guidelines on the applicability of Article 81 of the EC Treaty to horizontal cooperation agreements (OJ C 3, 6.1.2001, p.2).

[6] Guidelines on the application of Article 81(3) of the Treaty (OJ C 101, 27.4.2004, p.97.).

[7] Commission Regulation No 772/2004 of 27 April 2004 on the application of Article 81(3) of the Treaty to categories of technology transfer agreements (OJ L 123, 27.04.2004, p.11-17).

[8] OJ C 45, 24.02.2009, p.7.

[9] Commission Notice on informal guidance, see footnote 3.

[10] See Commission Press Release IP/09/137 for the recently decided *Marine Hoses* cartel case.

with their consent. While the Commission has used this instrument regularly, experience has shown that the absence of penalties for misleading or false replies may be a disincentive to provide correct and complete statements. Moreover, the Commission has rarely used the power to request national competition authorities to carry out inspections on its behalf, as provided for in Article 22(2). Further reflection on these two preceding matters may be appropriate.

13. Regulation 1/2003 introduced a renewed set of decisions. The main innovation is Article 9 which empowered the Commission to make commitments offered by undertakings binding and enforceable upon them. The Commission has used it in the adoption of 13 decisions. Article 9 pursues the objective of enhancing administrative efficiency and effectiveness in dealing with competition concerns identified by the Commission where the undertaking(s) concerned voluntarily offer commitments with a view to address these concerns. It ensures rapid change in the marketplace and has added considerable value in comparison to Regulation 17, under which no enforcement possibility was available for cases concluded by informal commitments.

14. The Commission has adopted numerous prohibition decisions in accordance with Article 7 of the Regulation. That provision explicitly foresees the power to impose structural remedies. So far the Commission has not used this power. It has, however, accepted structural changes as commitments.[11]

15. During the reported period, the Commission has not adopted decisions in accordance with Article 10 of the Regulation. This instrument was principally created to ensure consistency. The extensive efforts of the ECN in promoting the coherent application of the EC antitrust rules have made its use unnecessary to date.

16. Regulation 1/2003 has taken over from Regulation 17 the possibility for persons that are able to show a legitimate interest to be (formal) complainants that enjoy certain procedural rights. The Commission welcomes complaints that trigger priority cases and encourages complainants to provide substantiated input. At the same time, it should be further examined how to streamline the handling of complaints that do not give rise to priority cases in accordance with the case law of the Community Courts.

17. Fines with sufficient deterrent effect, coupled with an effective leniency program, constitute the most efficient weapon in the Commission's armoury to fight cartels, in particular. The legal basis for the Commission's power to impose fines for breaches of substantive competition law under Regulation 1/2003 was essentially taken over from Regulation 17. The Commission may impose fines on infringing undertakings and associations of undertakings that do not exceed 10% of its total turnover in the preceding business year. The Commission has further refined and elaborated its fining policy in its 2006 Fining Guidelines. The Community Courts have reviewed a great number of fines imposed by the Commission and have largely endorsed the Commission's approach.

18. Regulation 1/2003 introduced more effective sanctions for non-compliance with obligations incumbent on undertakings in the context of investigations. The Commission made use of this provision for the first time and imposed a fine of €38

---

[11] E.ON German electricity market, OJ C 36, 13.02.2009, p.8 and the RWE Gas Foreclosure case, see Commission Press Release IP/09/410 of 18.03.2009.

million for breach of a seal.[12] Another important improvement introduced by Regulation 1/2003 was the substantial increase in the ceilings for penalty payments that can be imposed for failure to comply with a Commission decision. Experience with this provision has shown that the procedure foreseen in Article 24 can prove relatively lengthy and cumbersome[13] and the potential for improvement could be examined.

4. **APPLICATION OF EC COMPETITION LAW IN ACCORDANCE WITH ARTICLE 3 OF REGULATION 1/2003**

19. Article 3 of Regulation 1/2003 regulated for the first time the relationship between national competition law and the EC competition rules. Stakeholders from the legal and business communities have largely confirmed that Regulation 1/2003 has positively contributed to the creation of a level playing field, in line with the Lisbon objectives.[14]

20. Article 3(1) obliges national competition authorities and courts to apply Articles 81 EC and 82 EC to agreements or conduct capable of affecting trade between Member States. This rule is intended to ensure that the EC competition rules are applied to all cases within their scope. Compliance also entails that the cooperation mechanisms set forth in Articles 11 to 13 and 15 of Regulation 1/2003 are fully applicable in such cases. The obligation to apply the EC competition rules in Article 3(1) has led to a very significant increase in the application of Articles 81 and 82 EC, making a single legal standard a reality on a very large scale.

21. The convergence rule contained in paragraph 2 of Article 3 seeks to create a level playing field by providing for a single standard of assessment for agreements, concerted practices and decisions by associations of undertakings. Conversely, Member States remain free to enact and maintain stricter national competition laws than Article 82 EC to prohibit or sanction unilateral conduct. Provisions of these types exist in a number of Member States and include notably: national provisions which regulate the abuse of economic dependence, 'superior bargaining power' or 'significant influence'[15]; legal provisions concerning resale below cost or at loss[16]; national laws that foresee different standards for assessing dominance[17] and stricter national provisions governing the conduct of dominant undertakings.

22. The divergence of standards regarding unilateral conduct was commented on critically by the business and legal communities which consider that the diverging standards fragment business strategies that are typically formulated on a pan-European or global basis. This is a matter which should be further examined, both in

---

[12] E.ON, OJ C 240, 19.09.2008, p.6.
[13] A complete set of the documents relating to the Microsoft procedure can be found at: http://ec.europa.eu/competition/antitrust/cases/microsoft/index.html.
[14] The so-called Lisbon strategy was agreed by the European Council in Lisbon in March 2000 and aims to promote sustainable economic growth in the EU.
[15] Rules of this type exist in France, Germany, Greece, Portugal, Latvia, Hungary and Ireland.
[16] The Member States currently prohibiting resale below cost or at loss include notably France and Germany.
[17] An example is found in Austrian law, according to which an undertaking is deemed to be dominant if it has a superior position in the marketing relation to its customers or suppliers.

terms of evaluating the extent of the problems caused and assessing the need for action at European level.

5. **THE EUROPEAN COMPETITION NETWORK**

23. Regulation 1/2003 entrusted the national competition authorities with a key role in ensuring that the EC competition rules are applied effectively and consistently, in conjunction with the Commission. After five years, it is apparent that the challenge of boosting enforcement of the EC competition rules, while ensuring their consistent and coherent application, has been largely achieved.

24. Enforcement of the EC competition rules has vastly increased since the entry into application of Regulation 1/2003. By the end of March 2009, more than 1000 cases have been pursued on the basis of the EC competition rules in a wide variety of sectors.

25. Work sharing between the enforcers in the network has generally been unproblematic. Five years of experience have confirmed that the flexible and pragmatic arrangements introduced by Regulation 1/2003 and the Network Notice work well. Discussions on case-allocation have come up in very few cases and have been resolved swiftly.

26. Cooperation mechanisms for fact-finding purposes within the ECN have worked well overall. The possibility to exchange and use information gathered by another competition authority enhances the overall efficiency within the network and is a pre-condition for a flexible case-allocation system. Moreover, the power of national competition authorities to carry out inspections or other fact-finding measures on behalf of another national competition authority, while encountering some limitations as a result of the diversity of national procedures, has been used actively in appropriate cases and has contributed to effective enforcement.

27. A discussion has arisen on whether the ban on the use of information by a national competition authority for the imposition of custodial sanctions which has received the information from a jurisdiction which does not have such sanctions, as provided for by Article 12(3), is too far-reaching and is an obstacle to efficient enforcement. It may be appropriate to examine whether other options are available, while fully preserving parties' rights of defence. These considerations could also be relevant for future discussions concerning international cooperation agreements with selected jurisdictions with criminal enforcement systems.

28. By the end of the reporting period, the Commission had been informed of more than 300 envisaged decisions by the national competition authorities on the basis of Article 11(4). None of these cases resulted in the Commission initiating proceedings pursuant to Article 11(6) to relieve a national competition authority of its competence for reasons of coherent application. Experience indicates that national competition authorities are generally highly committed to ensuring consistency and efforts undertaken in the ECN have successfully contributed to this aim. Pursuant to Article 11(4), a practice of informally discussing the national authority's proposed course of action at services' level and within the confines of confidentiality in the network has been developed. Stakeholders are largely satisfied with the results of application of the EC competition rules within the ECN.

29. The ECN has proven to be a successful forum to discuss general policy issues. Constant dialogue between the network members on all levels over the last years has significantly contributed to coherent application of the EC competition rules.

30. While Regulation 1/2003 does not compel Member States to adopt a specific institutional framework for the implementation of EC competition rules, many Member States have reinforced or reviewed their enforcement structures to optimise their effectiveness.

31. Regulation 1/2003 does not formally regulate or harmonise the procedures of national competition authorities, meaning that they apply the same substantive rules according to divergent procedures and they may impose a variety of sanctions. Regulation 1/2003 accommodates this diversity.[18] It has also given rise to a significant degree of voluntary convergence of Member States' laws that has been supported by policy work in the ECN.

32. The ECN Model Leniency Programme[19] illustrates how the ECN is able to combine its forces and jointly develop a new vision to address real and perceived deficits in the existing system. The work within the ECN has been a major catalyst in encouraging Member States and/or national competition authorities to introduce and develop their own leniency policies and in promoting convergence between them. Today, only two Member States do not have any kind of leniency policy in place. The Model Programme foresees that the ECN will evaluate the state of convergence of the leniency programmes by the end of 2008. The assessment will form the basis for a reflection on whether further action is needed in this field.

33. Notwithstanding, divergences of Member States' enforcement systems remain on important aspects such as fines, criminal sanctions, liability in groups of undertakings, liability of associations of undertakings, succession of undertakings, prescription periods and the standard of proof, the power to impose structural remedies, as well as the ability of Member States' competition authorities to formally set enforcement priorities. This aspect may merit further examination and reflection.

6. **INTERACTION WITH NATIONAL COURTS**

34. Since the entry into application of Regulation 1/2003, national courts have the power to apply both Articles 81 and 82 EC in full. National courts have applied Articles 81 and 82 EC in a variety of sectors and have tackled a range of issues. However, stakeholders have pointed to what they perceive as uneven enforcement of the EC competition rules by national courts.

35. Regulation 1/2003 provides for a number of devices to promote coherent application of the competition rules by national courts. Since 1 May 2004, the Commission has issued opinions on 18 occasions to national courts on questions concerning the application of Articles 81 and 82 EC. Both the Commission and the national competition authorities have the power to make observations as *amicus curiae* under Article 15(3). This is a tool which is well used by several national competition

---

[18] See the conditions for the use in evidence of exchanged information in Article 12(2) and (3).
[19] Available at http://ec.europa.eu/competition/ecn/model_leniency_en.pdf.

authorities. The Commission has decided to submit amicus observations on two occasions during the reporting period where it considered that there was an imminent threat to the coherent application of the EC competition rules. Stakeholders have called on the Commission to have greater recourse to this instrument and it should be reflected upon how this practice should further develop.

36. Regulation 1/2003 requires Member States to forward to the Commission a copy of any written judgment of national courts deciding on the application of Articles 81 or 82 EC. However, this has not functioned optimally and options for ensuring efficient and effective access to national court judgments should be reflected upon.

7. **INTERFACE WITH THIRD COUNTRY ENFORCEMENT**

37. The Commission attaches great importance to fostering constructive cooperation with third country authorities, in particular as concerns infringements with an international dimension. The effectiveness of international cooperation is, however, interdependent on the effectiveness of Commission's own investigations for the enforcement of Articles 81 and 82 EC.

38. During the reported period issues of disclosure of information from the Commission's file in third jurisdictions arose. Such issues were encountered in the context of private litigation in third country jurisdictions and, on a more limited scale, with respect to the exchange of information with third country public authorities.

39. The Commission is a strong proponent of effective civil proceedings for damages, in particular, against cartel participants. However, disclosure of information from the Commission file in the context of private litigation in third country jurisdictions, in particular of information voluntarily submitted during the investigation, may seriously undermine the effectiveness of public antitrust enforcement. The Commission has intervened through *amicus curiae* briefs before courts of the US against the discoverability of information that has been prepared solely for the purpose of its investigation. The Commission's Directorate-General for Competition also made a submission to the US Antitrust Modernisation Commission to this effect.

40. Overall, there is a perception that the legal framework could be clarified and reinforced to further enhance existing levels of protection against disclosure, vis-à-vis both private litigation in third jurisdictions and the exchange of information with third country public authorities.

8. **CONCLUSION**

41. Regulation 1/2003 has brought about a landmark change in the way the European competition law is enforced. The Regulation has significantly improved the Commission's enforcement of Articles 81 and 82 EC. The Commission has been able to become more proactive, tackling weaknesses in the competiveness of key sectors of the economy in a focused way.

42. The EC competition rules have to a large extent become the "*law of the land*" for the whole of the EU. Cooperation in the ECN has contributed towards ensuring their

coherent application. The network is an innovative model of governance for the implementation of Community law by the Commission and Member State authorities.

43. In a limited number of areas[20], this Report highlights aspects which merit further evaluation, but leaves open the question of whether any amendment to the existing rules or practice is required. It will serve as a basis for the Commission to assess, in a further stage, whether it is appropriate to take further policy initiatives.

---

[20] See paragraphs 12, 16, 18, 22, 27, 32, 33, 35, 36 and 40.