EXHIBIT 3



COMMISSION OF THE EUROPEAN COMMUNITIES

Brussels, 29.4.2009
SEC(2009) 574 final

**COMMISSION STAFF WORKING PAPER
accompanying the
COMMUNICATION FROM THE COMMISSION TO THE EUROPEAN
PARLIAMENT AND COUNCIL**

Report on the functioning of Regulation 1/2003

**{COM(2009)206 final}**

EN       EN

efficient and effective way of providing access to national court judgments should be contemplated.

*6.2.4. Training of judges*

292. There is a perception among some that national judges may have limited knowledge of Community law and/or have difficulties in accessing up-to-date information.[331] Stakeholders have also called for national judges to be more proactive in raising potential EC competition law issues.[332] Continuous training and education of national judges in EC competition law is therefore crucial in order to ensure the effective and coherent application of those rules and to raise awareness of the mechanisms for cooperation with the Commission which are available. Since 2002, the Commission has co-financed 35 training projects, which have provided for the training of approximately 3,500 judges by the end of 2007. In 2008, 15 grant agreements were concluded for new projects for the training of judges. A call for new proposals was also launched in October 2008.

**7. INTERFACE WITH THIRD COUNTRY ENFORCEMENT**

293. The Commission attaches great importance to fostering constructive cooperation with third country authorities, in particular as concerns infringements with an international dimension. The effectiveness of international cooperation is interdependent on the effectiveness of Commission's own investigations for the enforcement of Articles 81 and 82 EC. During the reported period, issues of disclosure of information from the Commission's file in third jurisdictions arose. Such issues were encountered in the context of private litigation in third jurisdictions and, to a lesser extent, with respect to third country public authorities.

**7.1. Private litigation in third jurisdictions**

294. The Commission is a strong proponent of effective damages actions so that victims of infringements of EC competition law can be fully compensated for the harm they have suffered.[333] However, in certain circumstances there is a balance to be struck between public enforcement interests in the EU and the interests of private litigants in third country jurisdictions. Disclosure of information from the Commission's file in the context of private litigation in third jurisdictions, in particular of leniency statements submitted during the investigation, may seriously undermine the effectiveness of public antitrust enforcement. The Commission has a particular interest to ensure that its investigations and the effectiveness of its enforcement programmes[334] are not undermined by disclosure.

---

[331] See the European Parliament resolution of 9 July 2008 on the role of the national judge in the European judicial system, P6_TA(2008)0382.

[332] Joined cases C-430/93 and C-431/93 van Schijndel [1995] ECR I-4705, paras 13-15, 19 and 22 sets out the extent of the duty of national courts to raise binding EC rules, such as the EC competition rules, of their own motion.

[333] See Commission White Paper on Damages Actions for Breach of the EC Antitrust Rules (COM (2008) 165, 2.4.2008).

[334] See the Commission Notice on immunity from fines and reduction of fines in cartel cases, OJ C 298, 08.12.2006, p. 17 ("2006 Leniency Notice"), points 6-7 and 32-35; see also the Commission Notice on the conduct of settlement procedures in view of the adoption of Decisions pursuant to Article 7 and

295. Article 15(4) of Regulation 773/2004 provides that documents obtained through access to the file shall only be used for the purposes of judicial or administrative proceedings for the application of Articles 81 and 82 EC.[335] Accordingly, they shall not be disclosed for any other purpose.

296. The Commission's statement of objections and the full confidential version of the decision are documents prepared specifically for the antitrust proceedings and contain confidential information received through investigative measures.[336] Therefore, they and the information contained therein shall also be used only for the purpose of proceedings concerning the application of Articles 81 and 82 EC.[337]

297. The Commission has taken further initiatives to safeguard its administrative file. Specific protection has been given to voluntary statements made in the context of its Leniency Policy[338], in particular, the oral procedure was formally introduced for leniency applications. Equivalent safeguards are foreseen for settlement submissions.[339] Access to such statements is granted only to the addressees of the statement of objections provided they commit not to make any copies by mechanical or electronic means of any information contained therein and to use information obtained from such statements only for the purpose stated in the Commission Notice on the rules for access to the Commission file.

298. Undertakings which fail to comply with the obligations set out in the preceding paragraphs may face negative consequences. A breach of the obligation not to use information obtained through access to file for any other purpose during the proceeding by leniency applicants may be regarded as lack of cooperation under the Leniency Notice. Pursuant to the Guidelines on the method of setting fines[340], refusal to cooperate with or obstruction of the Commission in carrying out its investigations may be considered as an aggravating circumstance in any Commission prohibition decision. If any such use is made after the Commission has already adopted a prohibition decision in the proceeding, the Commission may, in any legal proceedings before the Community Courts, ask the Court to increase the fine in respect of the responsible undertaking. The Access to the Commission file Notice (paragraph 48), the 2006 Leniency Notice (point 34) and the Settlement Procedure

---

Article 23 of Council Regulation (EC) No 1/2003 in cartel cases, OJ C 167, 2.7.2008, p. 1 ("Settlement Procedure Notice"), points 35-40.

[335] See para 48 of the Commission Notice on the rules for access to the Commission file in cases pursuant to Articles 81 and 82 of the EC Treaty, Articles 53, 54 and 57 of the EEA Agreement and Council Regulation (EC) No 139/2004, OJ C 325, 22.12.2005, p. 7 ("Access to the Commission file Notice"); see also Article 8 (2) of Regulation 773/2004 concerning complainants.

[336] The same considerations apply to the disclosure of replies to statements of objections, requests for information and other documents depending on the individual procedure.

[337] See Case T-353/94 Postbank v. Commission [1996] ECR II-921, para 89 concerning provisions on professional secrecy which were provided in Regulation 17 and, in particular, statements of objections: "[t]hese provisions, *even if they prevent undertakings from transmitting such documents to third parties*, do not in any way prevent their disclosure to the national courts [of Member States for the purpose of application of Articles 81 and 82 of the Treaty]" (emphasis added).

[338] See the 2006 Leniency Notice, points 33-34 and 37. Leniency applicants are also expected to comply with the obligation not to use information obtained through access to file for any other purpose (see point 34).

[339] See the 2006 Leniency Notice, points 32-35 and 6-7 and the Settlement Procedure Notice points 35-40.

[340] Guidelines on the method of setting fines imposed pursuant to Article 23(2)(a) of Regulation No 1/2003, OJ C 210, 1.09.2006, p. 2, para 28.

Notice (point 36) explicitly provide that should the information be used for a different purpose, at any point in time, with the involvement of an outside counsel, the Commission may report the incident to the bar of that counsel, with a view to disciplinary action.

299. The Commission has intervened through *amicus curiae* briefs before courts of the US, where US legislation and its application by US courts allows discovery that is exceptionally broad and relatively uncertain as to its outcome[341], to highlight the threat of discovery to its investigative processes. Such briefs were submitted in the *Vitamins* case[342], and the *Methionine* litigation.[343] The Directorate General for Competition has also submitted letters to litigants in a number of proceedings in the US against the discoverability of information that has been prepared solely for the purpose of its investigation, either by the parties or by the Commission itself, including the recent *Rubber Chemicals* litigation.[344]

300. On 4 April 2006, the Directorate General for Competition made a submission to the US Antitrust Modernisation Commission concerning the impact of discovery rules in antitrust civil damages actions in the United States on the Commission's antitrust enforcement. It explained why it believes that the disclosure of statements and submissions, especially corporate statements, which are specifically prepared by undertakings within the context of the Commission's antitrust proceedings should not be deemed discoverable to third parties. The disclosure of such information submitted on a voluntary basis during the Commission's investigation could seriously undermine the effectiveness of the Commission's and other authorities' antitrust enforcement actions. In particular, undertakings which voluntarily cooperate with the Commission in revealing cartels cannot be put in a worse position in respect of civil claims than other cartel members which refuse cooperation. The ordered production, or uncertainty in this regard, of submissions that a company has prepared and produced exclusively for the European Commission's antitrust proceedings in civil proceedings for damages could seriously undermine the effectiveness of the Leniency Programme and jeopardise the Commission's investigation of cartels. In contrast, the Commission does not have an interest in generally protecting pre-existing documents from discovery.[345] Nevertheless, when the investigation is

---

[341] Rule 26 of the Federal Rules of Civil Procedure. Although the Rules of Civil Procedure allow for a range of exemptions, information prepared for the benefit of foreign enforcement agencies is not covered by those exemptions.

[342] United States District Court of the District of Columbia, in Re. Vitamins Antitrust Litigation – Misc. No. 99-197. This case concerned disclosure of corporate statements, where the investigation which was still on-going. The defendant, however, did not contest production of its corporate statements and the court ordered the production of these documents.

[343] United States District Court of Northern District of California, In Re: Methionine Antitrust Litigation, case No. C-99-3491 CRB MDL no. 1311. The Commission expressed opposition to the production of corporate statements. The plaintiff's motion to compel the production of these documents was denied.

[344] In Re: Rubber Chemicals Antitrust Litigation, Case No. C04-1648 MJJ (BZ).The plaintiff requested discovery of the documents provided by the defendant to the Commission in the context of the Leniency Programme. The defendant submitted to the US Court a letter from the Directorate General for Competition, which expressed opposition to discovery of those documents. The court denied discovery of the documents requested.

[345] Documents that were in the possession of leniency applicants before and independently of any submission to the Commission. The leniency programme and other forms of voluntary cooperation should not act as a shield for companies seeking to conceal information that would otherwise be subject to disclosure/discoverable.

ongoing, pre-existing documents should be shielded from discovery, insofar as it could reveal the Commission's investigative strategy.

301. In conclusion, the Commission attaches particular importance to the protection of information and documents against disclosure in private litigation in third countries insofar as this would operate to the detriment of its enforcement tools. It should be examined how the legal framework can be clarified and reinforced to further enhance existing levels of protection.

## 7.2. Third country public authorities

### 7.2.1. *Enforcement cooperation*

302. The Commission enhances effective enforcement of competition rules through international cooperation with third country authorities. Such cooperation may include sharing experience, coordination of enforcement actions and exchange of information to facilitate enforcement activities.

303. Cooperation with third country enforcement authorities is agreed by bi-lateral or multi-lateral agreements or is arranged through regular contacts. The European Union has agreements concerning competition matters with a number of countries and regions.[346] Cooperation between the European Commission and the EFTA Surveillance Authority in antitrust matters is governed by the terms of Protocol 23 concerning the cooperation between surveillance authorities.[347]

304. So-called dedicated cooperation agreements on competition policy were signed with the United States, Canada and Japan.[348] Under these agreements, competition authorities exchange non-confidential information and co-ordinate their enforcement activities. Furthermore, each side may ask the other to take enforcement action (positive comity); and each side must take account of the other's significant interests when enforcing competition rules (traditional comity).

305. Cooperation with competition authorities of other OECD member countries is based on the 1995 OECD recommendation.[349]

306. Regulation 1/2003 does not specifically regulate exchange of information with third country enforcement authorities. Article 12 of the Regulation is applicable only to the exchange of information between the Commission and the Member States for the purpose of application of Article 81 and 82 EC. Under the agreements with the United States, Canada and Japan, the European Commission and each respective competition authority exchange information. However, the existing cooperation agreements expressly exclude the exchange of protected or confidential information.

---

[346] A list of countries and regions with which the European Union has signed a bilateral or multilateral agreement concerning competition matters is available at http://ec.europa.eu/competition/international/bilateral/.

[347] See at http://www.efta.int/content/legal-texts/eea/protocols/protocol23.pdf/view.

[348] 1991 EU/US Competition Cooperation Agreement, OJ 95, 27.4.1995, p. 47; Agreement between the European Communities and the Government of Canada regarding the application of their competition laws OJ L 175, 10.7.1999, p. 50; Agreement between the European Community and the Government of Japan concerning cooperation on anti-competitive activities, OJ L183, 22.7.2003, p. 12.

[349] See at http://ec.europa.eu/competition/international/bilateral/oecd_recommendation_1995.pdf.

This means in practice that no information obtained through the formal investigative tools can be shared with the other authority without the specific consent ("waivers") of the companies involved.[350]

307. International cooperation with third country enforcers may involve cooperating with third countries which have a criminal enforcement system for cartels, in which both undertakings and individuals can be prosecuted. The possibility of exchanging evidence between competition authorities is an essential element of efficient cooperation in the enforcement of the competition rules in an ever increasing globalised world. The Report on Cooperation between Competition Agencies in Cartel Investigations for the ICN Annual conference in Moscow states that the limitations to exchange of information are a major problem for efficient cooperation in the fight against international cartels: "Insufficient cooperation between agencies may allow some cartels to escape detection completely, if the evidence required for their conviction is scattered in different jurisdictions which cannot share it for legal reasons." [351]

308. However, the conclusion of an international cooperation agreement which allows for the exchange of evidence with enforcers in selected third countries with a criminal enforcement system comes up against the obstacle that inside the EU, Article 12(3), last sentence of Regulation 1/2003 prohibits the use of information collected by one authority by the receiving authority to impose custodial sanctions, insofar as the law of the transmitting authority does not provide for sanctions of a similar kind for the infringement of Articles 81 or 82 EC. This raises the difficulty that it would be awkward for the EU to go further in terms of information exchange with third country enforcers than is currently the case for enforcers inside the Union. As noted above[352], it may be appropriate to reflect upon the limitation on authorities using information they received to impose custodial sanctions set out in Article 12(3), last sentence of Regulation 1/2003 and to examine if other options are available, while fully preserving parties' rights of defence.

*7.2.2. Disclosure to third country public authorities*

309. The Commission attaches great importance to fostering constructive cooperation with third country public authorities. The effectiveness of international cooperation is, however, interdependent on the effectiveness of Commission's own investigations and its Leniency Programme, in particular as concerns infringements with an international dimension. Disclosure of documents from the Commission's file to third country public authorities is therefore subject to certain limitations.

310. In this context, the legal requirements set out in section 7.1 above are equally applicable. These considerations do not, in general, preclude the submission to third country public authorities of documents that exist independently of the Commission's investigation and which are in possession of undertakings independently of their access to the Commission file or of other information received from the Commission

---

[350] See the Opinion of Advocate General Mengozzi in case C-511/06 P Archer Daniels Midland Co. v. Commission (pending case; the Opinion not yet reported), para. 105.
[351] Cooperation between Competition Agencies in Cartel Investigations, Report to the ICN Annual conference, Moscow, May 2007, p. 5.
[352] See part 5.4.1.

in the course of proceedings. Nevertheless, when the Commission investigation is still on-going, protection from disclosure may be needed in order to safeguard the investigation.

311.  The issue of disclosure to third country public authorities merits further consideration, in particular in light of deepening and enhancing cooperation with third country authorities. It should be further examined in the context of the reflection suggested above.[353]

**8.  CONCLUSION**

312.  Regulation 1/2003 has brought about a landmark change in the way the European competition law is enforced. The Regulation has significantly improved the Commission's enforcement of Articles 81 and 82 EC. The Commission has been able to become more proactive, tackling weaknesses in the competiveness of key sectors of the economy in a focussed way. Moreover the Regulation has entrusted the Member States' competition authorities and courts with the role of ensuring that the EU competition rules are applied efficiently and effectively, in conjunction with the Commission.

313.  The EC competition rules have to a large extent become the "*law of the land*" for the whole of the EU. Cooperation in the ECN has contributed towards ensuring their coherent application. The network is an innovative model of governance for the implementation of Community law by the Commission and Member State authorities.

314.  In a limited number of areas, the Report which is accompanied by the present Staff Working Paper highlights aspects which merit further evaluation, but leaves open the question of whether any amendment to the existing rules or practice is required. It will serve as a basis for the Commission to assess, in a further stage, whether it is appropriate to take further policy initiatives.

---

[353]  See part 7.1.