# ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015
TEL: 612-349-8500 FAX: 612-339-4181
www.rkmc.com

ATTORNEYS AT LAW

K. Craig Wildfang
612-349-8554

May 25, 2010

**VIA ECF**

The Honorable Magistrate Judge James Orenstein
225 Cadman Plaza East
Room 456 North
Brooklyn, NY 11201

Re:     In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation,
Case No. 1:05-MD-1720-(JG)(JO)

Dear Magistrate Judge Orenstein:

As the Court may be aware, the Supreme Court yesterday issued its decision in *American Needle, Inc. v. NFL*, No. 08-661. I am attaching a copy of the Court's slip opinion for the Court's reference in connection with Defendants' pending motions to dismiss Class Plaintiffs' amended complaints [DE 1171, 1176, 1179]. The Supreme Court's unanimous decision is relevant to many of the issues that Defendants raise in their motions to dismiss, including whether Class Plaintiffs state a claim for post-IPO "agreements" among competitors, whether Plaintiffs can plausibly allege that the Bank Defendants "control" the post-IPO Networks, and whether the default interchange rules constitute "restraints on trade". Both the Trade Association Plaintiffs and the Network Defendants submitted *amici curiae* briefs to the Supreme Court, which we would be happy to provide to the Court if the Court so desires.

In light of the significance of the issues raised in *American Needle* to this case, if the Court feels that such arguments from the parties would be helpful the Court might consider hearing argument at the status conference now scheduled for June 17, 2010 regarding how the *American Needle* opinion affects Defendants' motions.

Sincerely,

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

K. Craig Wildfang

KCW/sml
Attachment
cc:     All Counsel of Record via ECF

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.*, 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## AMERICAN NEEDLE, INC. *v.* NATIONAL FOOTBALL LEAGUE ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

No. 08–661.  Argued January 13, 2010—Decided May 24, 2010

Respondent National Football League (NFL) is an unincorporated association of 32 separately owned professional football teams, also respondents here.  The teams, each of which owns its own name, colors, logo, trademarks, and related intellectual property, formed respondent National Football League Properties (NFLP) to develop, license, and market that property.  At first, NFLP granted nonexclusive licenses to petitioner and other vendors to manufacture and sell team-labeled apparel.  In December 2000, however, the teams authorized NFLP to grant exclusive licenses.  NFLP granted an exclusive license to respondent Reebok International Ltd. to produce and sell trade-marked headwear for all 32 teams.  When petitioner's license was not renewed, it filed this action alleging that the agreements between respondents violated the Sherman Act, §1 of which makes "[e]very contract, combination . . . or, conspiracy, in restraint of trade" illegal.  Respondents answered that they were incapable of conspiring within §1's meaning because the NFL and its teams are, in antitrust law jargon, a single entity with respect to the conduct challenged.  The District Court granted respondents summary judgment, and the Seventh Circuit affirmed.

*Held:* The alleged conduct related to licensing of intellectual property constitutes concerted action that is not categorically beyond §1's coverage.  Pp. 4–20.

(a) The meaning of "contract, combination . . . , or, conspiracy" in §1 of the Sherman Act is informed by the Act's "'basic distinction between concerted and independent action.'"  *Copperweld Corp.* v. *Independence Tube Corp.*, 467 U. S. 752, 767.  Section 1 "treat[s] concerted behavior more strictly than unilateral behavior," *id.*, at 768,

because, unlike independent action, "[c]oncerted activity inherently is fraught with anticompetitive risk" insofar as it "deprives the marketplace of independent centers of decisionmaking that competition assumes and demands," *id.*, at 768–769. And because concerted action is discrete and distinct, a limit on such activity leaves untouched a vast amount of business conduct. That creates less risk of deterring a firm's necessary conduct and leaves courts to examine only discrete agreements. An arrangement must therefore embody concerted action in order to be a "contract, combination . . . or, conspiracy" under §1. Pp. 4–6.

(b) In determining whether there is concerted action under §1, the Court has eschewed formalistic distinctions, such as whether the alleged conspirators are legally distinct entities, in favor of a functional consideration of how they actually operate. The Court has repeatedly found instances in which members of a legally single entity violated §1 when the entity was controlled by a group of competitors and served, in essence, as a vehicle for ongoing concerted activity. See, *e.g., United States* v. *Sealy, Inc.*, 388 U. S. 350, 352–356. Conversely, the Court has found that although the entities may be "separate" for purposes of incorporation or formal title, if they are controlled by a single center of decisionmaking and they control a single aggregation of economic power, an agreement between them does not constitute a "contract, combination . . . or, conspiracy." *Copperweld,* 467 U. S., at 769. Pp. 6–10.

(c) The relevant inquiry is therefore one of substance, not form, which does not turn on whether the alleged parties to contract, combination, or conspiracy are part of a legally single entity or seem like one firm or multiple firms in any metaphysical sense. The inquiry is whether the agreement in question joins together "separate economic actors pursuing separate economic interests," *Copperweld,* 467 U. S., at 768, such that it "deprives the marketplace of independent centers of decisionmaking," *id.*, at 769, and therefore of diversity of entrepreneurial interests and thus of actual or potential competition. If it does, then there is concerted action covered by §1, and the court must decide whether the restraint of trade is unreasonable and therefore illegal. Pp. 10–11.

(d) The NFL teams do not possess either the unitary decisionmaking quality or the single aggregation of economic power characteristic of independent action. Each of them is a substantial, independently owned, independently managed business, whose "general corporate actions are guided or determined" by "separate corporate consciousnesses," and whose "objectives are" not "common." *Copperweld*, 467 U. S., at 771. They compete with one another, not only on the playing field, but to attract fans, for gate receipts, and for contracts with

Case 1:05-md-01720-JG -JO Document 1392-1 Filed 05/25/10 Page 3 of 23

managerial and playing personnel. See, *e.g., Brown* v. *Pro Football, Inc.*, 518 U. S. 231, 249. Directly relevant here, the teams are potentially competing suppliers in the market for intellectual property. When teams license such property, they are not pursuing the "common interests of the whole" league, but, instead, the interests of each "corporation itself." *Copperweld*, 467 U. S., at 770. It is not dispositive, as respondents argue, that, by forming NFLP, they have formed a single entity, akin to a merger, and market their NFL brands through a single outlet. Although the NFL respondents may be similar in some sense to a single enterprise, they are not similar in the relevant functional sense. While teams have common interests such as promoting the NFL brand, they are still separate, profit-maximizing entities, and their interests in licensing team trademarks are not necessarily aligned. Nor does it matter that the teams may find the alleged cooperation necessary to compete against other forms of entertainment. Although decisions made by NFLP are not as easily classified as concerted activity, the NFLP's decisions about licensing the teams' separately owned intellectual property are concerted activity and thus covered by §1 for the same reason that decisions made directly by the 32 teams are covered by §1. In making the relevant licensing decisions, NFLP is "an instrumentality" of the teams. *Sealy,* 388 U. S., at 352–354. Pp. 11–17.

(e) Football teams that need to cooperate are not trapped by antitrust law. The fact that the NFL teams share an interest in making the entire league successful and profitable, and that they must cooperate to produce games, provides a perfectly sensible justification for making a host of collective decisions. Because some of these restraints on competition are necessary to produce the NFL's product, the Rule of Reason generally should apply, and teams' cooperation is likely to be permissible. And depending upon the activity in question, the Rule of Reason can at times be applied without detailed analysis. But the activity at issue in this case is still concerted activity covered for §1 purposes. Pp. 18–19.

538 F. 3d 736, reversed and remanded.

STEVENS, J., delivered the opinion for a unanimous Court.

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 08–661

_____

## AMERICAN NEEDLE, INC., PETITIONER *v.* NATIONAL FOOTBALL LEAGUE ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

[May 24, 2010]

JUSTICE STEVENS delivered the opinion of the Court.

"Every contract, combination in the form of a trust or otherwise, or, conspiracy, in restraint of trade" is made illegal by §1 of the Sherman Act, ch. 647, 26 Stat. 209, as amended, 15 U. S. C. §1. The question whether an arrangement is a contract, combination, or conspiracy is different from and antecedent to the question whether it unreasonably restrains trade. This case raises that antecedent question about the business of the 32 teams in the National Football League (NFL) and a corporate entity that they formed to manage their intellectual property. We conclude that the NFL's licensing activities constitute concerted action that is not categorically beyond the coverage of §1. The legality of that concerted action must be judged under the Rule of Reason.

## I

Originally organized in 1920, the NFL is an unincorporated association that now includes 32 separately owned professional football teams.[1] Each team has its own name,

_____

[1] The NFL was founded in Canton, Ohio as the "American Profes-

colors, and logo, and owns related intellectual property.
Like each of the other teams in the league, the New Or-
leans Saints and the Indianapolis Colts, for example, have
their own distinctive names, colors, and marks that are
well known to millions of sports fans.

Prior to 1963, the teams made their own arrangements
for licensing their intellectual property and marketing
trademarked items such as caps and jerseys.  In 1963, the
teams formed National Football League Properties (NFLP)
to develop, license, and market their intellectual property.
Most, but not all, of the substantial revenues generated by
NFLP have either been given to charity or shared equally
among the teams.  However, the teams are able to and
have at times sought to withdraw from this arrangement.

Between 1963 and 2000, NFLP granted nonexclusive
licenses to a number of vendors, permitting them to manu-
facture and sell apparel bearing team insignias.  Peti-
tioner, American Needle, Inc., was one of those licensees.
In December 2000, the teams voted to authorize NFLP to
grant exclusive licenses, and NFLP granted Reebok Inter-
national Ltd. an exclusive 10-year license to manufacture
and sell trademarked headwear for all 32 teams.  It there-
after declined to renew American Needle's nonexclusive
license.

American Needle filed this action in the Northern Dis-
trict of Illinois, alleging that the agreements between the
NFL, its teams, NFLP, and Reebok violated §§1 and 2 of
the Sherman Act.  In their answer to the complaint, the
defendants averred that the teams, NFL, and NFLP were
incapable of conspiring within the meaning of §1 "because
they are a single economic enterprise, at least with respect

---

sional Football Association." *United States Football League* v. *National
Football League*, 842 F. 2d 1335, 1343 (CA2 1988).  It took its current
name in 1922.  *Ibid.*  Forty-one franchises failed in the first forty-one
years of the League's existence.  *Ibid.*

Opinion of the Court

to the conduct challenged." App. 99.  After limited discovery, the District Court granted summary judgment on the question "whether, with regard to the facet of their operations respecting exploitation of intellectual property rights, the NFL and its 32 teams are, in the jargon of antitrust law, acting as a single entity." *American Needle, Inc.* v. *New Orleans La. Saints*, 496 F. Supp. 2d 941, 943 (2007).  The court concluded "that in that facet of their operations they have so integrated their operations that they should be deemed a single entity rather than joint ventures cooperating for a common purpose." *Ibid.*

The Court of Appeals for the Seventh Circuit affirmed. The panel observed that "in some contexts, a league seems more aptly described as a single entity immune from antitrust scrutiny, while in others a league appears to be a joint venture between independently owned teams that is subject to review under §1."  538 F. 3d, 736, 741 (2008). Relying on Circuit precedent, the court limited its inquiry to the particular conduct at issue, licensing of teams' intellectual property.  The panel agreed with petitioner that "when making a single-entity determination, courts must examine whether the conduct in question deprives the marketplace of the independent sources of economic control that competition assumes." *Id.*, at 742.  The court, however, discounted the significance of potential competition among the teams regarding the use of their intellectual property because the teams "can function only as one source of economic power when collectively producing NFL football."  *Id.*, at 743.  The court noted that football itself can only be carried out jointly.  See *ibid.*  ("Asserting that a single football team could produce a football game . . . is a Zen riddle: Who wins when a football team plays itself"). Moreover, "NFL teams share a vital economic interest in collectively promoting NFL football . . . [to] compet[e] with other forms of entertainment." *Ibid.*  "It thus follows," the court found, "that only one source of economic power con-

trols the promotion of NFL football," and "it makes little sense to assert that each individual team has the authority, if not the responsibility, to promote the jointly produced NFL football." *Ibid.* Recognizing that NFL teams have "license[d] their intellectual property collectively" since 1963, the court held that §1 did not apply. *Id.*, at 744.

We granted certiorari. 557 U. S. __ (2009).

## II

As the case comes to us, we have only a narrow issue to decide: whether the NFL respondents are capable of engaging in a "contract, combination . . . , or conspiracy" as defined by §1 of the Sherman Act, 15 U. S. C. §1, or, as we have sometimes phrased it, whether the alleged activity by the NFL respondents "must be viewed as that of a single enterprise for purposes of §1." *Copperweld Corp.* v. *Independence Tube Corp.*, 467 U. S. 752, 771 (1984).

Taken literally, the applicability of §1 to "every contract, combination . . . or conspiracy" could be understood to cover every conceivable agreement, whether it be a group of competing firms fixing prices or a single firm's chief executive telling her subordinate how to price their company's product. But even though, "read literally," §1 would address "the entire body of private contract," that is not what the statute means. *National Soc. of Professional Engineers* v. *United States*, 435 U. S. 679, 688 (1978); see also *Texaco Inc.* v. *Dagher*, 547 U. S. 1, 5 (2006) ("This Court has not taken a literal approach to this language"); cf. *Board of Trade of Chicago* v. *United States*, 246 U. S. 231, 238 (1918) (reasoning that the term "restraint of trade" in §1 cannot possibly refer to any restraint on competition because "[e]very agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence"). Not every instance of co-operation between two people is a potential "contract,

combination . . . , or conspiracy, in restraint of trade." 15 U. S. C. §1.

The meaning of the term "contract, combination . . . or conspiracy" is informed by the "'basic distinction'" in the Sherman Act "'between concerted and independent action'" that distinguishes §1 of the Sherman Act from §2. *Copperweld*, 467 U. S., at 767 (quoting *Monsanto Co.* v. *Spray-Rite Service Corp.*, 465 U. S. 752, 761 (1984)). Section 1 applies only to concerted action that restrains trade.  Section 2, by contrast, covers both concerted and independent action, but only if that action "monopolize[s]," 15 U. S. C. §2, or "threatens actual monopolization," *Copperweld,* 467 U. S., at 767, a category that is narrower than restraint of trade.  Monopoly power may be equally harmful whether it is the product of joint action or individual action.

Congress used this distinction between concerted and independent action to deter anticompetitive conduct and compensate its victims, without chilling vigorous competition through ordinary business operations.  The distinction also avoids judicial scrutiny of routine, internal business decisions.

Thus, in §1 Congress "treated concerted behavior more strictly than unilateral behavior."  *Id.*, at 768.  This is so because unlike independent action, "[c]oncerted activity inherently is fraught with anticompetitive risk" insofar as it "deprives the marketplace of independent centers of decisionmaking that competition assumes and demands." *Id.*, at 768–769.  And because concerted action is discrete and distinct, a limit on such activity leaves untouched a vast amount of business conduct.  As a result, there is less risk of deterring a firm's necessary conduct; courts need only examine discrete agreements; and such conduct may be remedied simply through prohibition.[2]  See Areeda &

────────

[2] If Congress prohibited independent action that merely restrains

Hovenkamp ¶1464c, at 206. Concerted activity is thus
"judged more sternly than unilateral activity under §2,"
*Copperweld*, 467 U. S., at 768. For these reasons, §1
prohibits any concerted action "in restraint of trade or
commerce," even if the action does not "threate[n] monopo-
lization," *Ibid.* And therefore, an arrangement must
embody concerted action in order to be a "contract, combi-
nation . . . or conspiracy" under §1.

## III

We have long held that concerted action under §1 does
not turn simply on whether the parties involved are le-
gally distinct entities. Instead, we have eschewed such
formalistic distinctions in favor of a functional considera-
tion of how the parties involved in the alleged anticom-
petitive conduct actually operate.

As a result, we have repeatedly found instances in
which members of a legally single entity violated §1 when
the entity was controlled by a group of competitors and
served, in essence, as a vehicle for ongoing concerted
activity. In *United States* v. *Sealy, Inc.*, 388 U. S. 350
(1967), for example, a group of mattress manufacturers
operated and controlled Sealy, Inc., a company that li-
censed the Sealy trademark to the manufacturers, and

---

trade (even if it does not threaten monopolization), that prohibition
could deter perfectly competitive conduct by firms that are fearful of
litigation costs and judicial error. See *Copperweld*, 467 U. S., at 768
("Judging unilateral conduct in this manner reduces the risk that the
antitrust laws will dampen the competitive zeal of a single aggressive
competitor"); cf. *United States* v. *United States Gypsum Co.*, 438 U. S.
422, 441 (1978) ("[S]alutary and procompetitive conduct . . . might be
shunned by businessmen who chose to be excessively cautious in the
face of uncertainty"). Moreover, if every unilateral action that re-
strained trade were subject to antitrust scrutiny, then courts would be
forced to judge almost every internal business decision. See 7 P.
Areeda & H. Hovenkamp, Antitrust Law ¶1464c, at 206 (2d ed. 2003)
(hereinafter Areeda & Hovenkamp) (unilateral behavior is "often
difficult to evaluate or remedy").

Opinion of the Court

dictated that each operate within a specific geographic area. *Id.*, at 352–353. The Government alleged that the licensees and Sealy were conspiring in violation of §1, and we agreed. *Id.*, at 352–354. We explained that "[w]e seek the central substance of the situation" and therefore "we are moved by the identity of the persons who act, rather than the label of their hats." *Id.*, at 353. We thus held that Sealy was not a "separate entity, but . . . an instrumentality of the individual manufacturers." *Id.*, at 356. In similar circumstances, we have found other formally distinct business organizations covered by §1. See, *e.g., Northwest Wholesale Stationers, Inc.* v. *Pacific Stationery & Printing Co.*, 472 U. S. 284 (1985); *National Collegiate Athletic Assn.* v. *Board of Regents of Univ. of Okla.*, 468 U. S. 85 (1984) *(NCAA); United States* v. *Topco Associates, Inc.*, 405 U. S. 596, 609 (1972); *Associated Press* v. *United States*, 326 U. S. 1 (1945); *id.*, at 26 (Frankfurter, J., concurring); *United States* v. *Terminal Railroad Assn. of St. Louis*, 224 U. S. 383 (1912); see also Rock, Corporate Law Through an Antitrust Lens, 92 Colum. L. Rev. 497, 506–510 (1992) (discussing cases). We have similarly looked past the form of a legally "single entity" when competitors were part of professional organizations[3] or trade groups.[4]

Conversely, there is not necessarily concerted action simply because more than one legally distinct entity is involved. Although, under a now-defunct doctrine known as the "intraenterprise conspiracy doctrine," we once treated cooperation between legally separate entities as

––––––––

[3] See, *e.g., FTC* v. *Indiana Federation of Dentists*, 476 U. S. 447 (1986); *Arizona* v. *Maricopa County Medical Soc.*, 457 U. S. 332 (1982); *National Soc. of Professional Engineers* v. *United States*, 435 U. S. 679 (1978); *Goldfarb* v. *Virginia State Bar*, 421 U. S. 773 (1975).

[4] See, *e.g., Allied Tube & Conduit Corp.* v. *Indian Head, Inc.*, 486 U. S. 492 (1988); *Radiant Burners, Inc.* v. *Peoples Gas Light & Coke Co.*, 364 U. S. 656 (1961) *(per curiam); Fashion Originators' Guild of America, Inc.* v. *FTC*, 312 U. S. 457 (1941).

necessarily covered by §1, we now embark on a more
functional analysis.

The roots of this functional analysis can be found in the
very decision that established the intraenterprise conspiracy doctrine. In *United States* v. *Yellow Cab Co.*, 332 U. S.
218 (1947), we observed that "corporate interrelationships
. . . are not determinitive of the applicability of the
Sherman Act" because the Act "is aimed at substance
rather than form." *Id.*, at 227. We nonetheless held that
cooperation between legally separate entities was necessarily covered by §1 because an unreasonable restraint of
trade "may result as readily from a conspiracy among
those who are affiliated or integrated under common
ownership as from a conspiracy among those who are
otherwise independent." *Ibid.;* see also *Kiefer-Stewart Co.*
v. *Joseph E. Seagram & Sons, Inc.*, 340 U. S. 211, 215
(1951).

The decline of the intraenterprise conspiracy doctrine
began in *Sunkist Growers, Inc.* v. *Winckler & Smith Citrus
Products Co.*, 370 U. S. 19 (1962). In that case, several
agricultural cooperatives that were owned by the same
farmers were sued for violations of §1 of the Sherman Act.
*Id.*, at 24–25. Applying a specific immunity provision for
agricultural cooperatives, we held that the three cooperatives were "in practical effect" one "organization," even
though the controlling farmers "have formally organized
themselves into three separate legal entities." *Id.*, at 29.
"To hold otherwise," we explained, "would be to impose
grave legal consequences upon organizational distinctions
that are of *de minimis* meaning and effect" insofar as "use
of separate corporations had [no] economic significance."
*Ibid.*

Next, in *United States* v. *Citizens & Southern Nat.
Bank*, 422 U. S. 86 (1975), a large bank, Citizens and
Southern (C&S), formed a holding company that operated
*de facto* suburban branch banks in the Atlanta area

Case 1:05-md-01720-JG -JO   Document 1392-1   Filed 05/25/10   Page 12 of 23

through ownership of the maximum amount of stock in each local branch that was allowed by law, "ownership of much of the remaining stock by parties friendly to C&S, use by the suburban banks of the C&S logogram and all of C&S's banking services, and close C&S oversight of the operation and governance of the suburban banks." *Id.*, at 89 (footnote omitted). The Government challenged the cooperation between the banks. In our analysis, we observed that "'corporate interrelationships . . . are not determinative,'" *id.*, at 116, "looked to economic substance," and observed that "because the sponsored banks were not set up to be competitors, §1 did not compel them to compete." Areeda & Hovenkamp ¶1463, at 200–201; see also *Citizens & Southern*, 422 U. S., at 119–120; Areeda, Intraenterprise Conspiracy in Decline, 97 Harv. L. Rev. 451, 461 (1983).

We finally reexamined the intraenterprise conspiracy doctrine in *Copperweld Corp.* v. *Independence Tube Corp.*, 467 U. S. 752 (1984), and concluded that it was inconsistent with the "'basic distinction between concerted and independent action.'" *Id.*, at 767. Considering it "perfectly plain that an internal agreement to implement a single, unitary firm's policies does not raise the antitrust dangers that §1 was designed to police," *id.,* at 769, we held that a parent corporation and its wholly owned subsidiary "are incapable of conspiring with each other for purposes of §1 of the Sherman Act," *id.,* at 777. We explained that although a parent corporation and its wholly owned subsidiary are "separate" for the purposes of incorporation or formal title, they are controlled by a single center of decisionmaking and they control a single aggregation of economic power. Joint conduct by two such entities does not "depriv[e] the marketplace of independent centers of decisionmaking," *id.,* at 769, and as a result, an agreement between them does not constitute a "contract, combination . . . or conspiracy" for the purposes

of §1.[5]

## IV

As *Copperweld* exemplifies, "substance, not form, should determine whether a[n] . . . entity is capable of conspiring under §1." 467 U. S., at 773, n. 21.  This inquiry is sometimes described as asking whether the alleged conspirators are a single entity.  That is perhaps a misdescription, however, because the question is not whether the defendant is a legally single entity or has a single name; nor is the question whether the parties involved "seem" like one firm or multiple firms in any metaphysical sense.  The key is whether the alleged "contract, combination . . . , or conspiracy" is concerted action—that is, whether it joins together separate decisionmakers.  The relevant inquiry, therefore, is whether there is a "contract, combination . . . or conspiracy" amongst "separate economic actors pursuing separate economic interests," *id.,* at 769, such that the agreement "deprives the marketplace of independent centers of decisionmaking," *ibid.,* and therefore of "diversity of entrepreneurial interests," *Fraser* v. *Major League Soccer, L. L. C.,* 284 F. 3d 47, 57 (CA1 2002) (Boudin, C. J.), and thus of actual or potential competition, see *Freeman* v. *San Diego Assn. of Realtors,* 322 F. 3d 1133, 1148–1149 (CA9 2003) (Kozinski, J.); *Rothery Storage & Van Co.* v. *Atlas Van Line, Inc.,* 792 F. 2d 210, 214–215 (CADC 1986) (Bork, J.); see also Areeda & Hovenkamp ¶1462b, at 193–194 (noting that the "central evil ad-

---

[5]This focus on "substance, not, form," *Copperweld,* 467 U. S., at 773, n. 21, can also be seen in our cases about whether a company and its agent are capable of conspiring under §1.  See, *e.g., Simpson* v. *Union Oil Co. of Cal.,* 377 U. S. 13, 20–21 (1964); see also E. Elhauge & D. Geradin, Global Antitrust Law and Economics 787–788, and n. 7 (2007) (hereinafter Elhauge & Geradin) (explaining the functional difference between *Simpson* and *United States* v. *General Elec. Co.,* 272 U. S. 476 (1926), in which we treated a similar agreement as beyond the reach of §1).

Opinion of the Court

dressed by Sherman Act §1" is the "elimin[ation of] competition that would otherwise exist").

Thus, while the president and a vice president of a firm could (and regularly do) act in combination, their joint action generally is not the sort of "combination" that §1 is intended to cover. Such agreements might be described as "really unilateral behavior flowing from decisions of a single enterprise." *Copperweld*, 467 U. S., at 767. Nor, for this reason, does §1 cover "internally coordinated conduct of a corporation and one of its unincorporated divisions," *id.*, at 770, because "[a] division within a corporate structure pursues the common interests of the whole," *ibid.*, and therefore "coordination between a corporation and its division does not represent a sudden joining of two independent sources of economic power previously pursuing separate interests," *id.*, at 770–771. Nor, for the same reasons, is "the coordinated activity of a parent and its wholly owned subsidiary" covered. See *id.*, at 771. They "have a complete unity of interest" and thus "[w]ith or without a formal 'agreement,' the subsidiary acts for the benefit of the parent, its sole shareholder." *Ibid.*

Because the inquiry is one of competitive reality, it is not determinative that two parties to an alleged §1 violation are legally distinct entities. Nor, however, is it determinative that two legally distinct entities have organized themselves under a single umbrella or into a structured joint venture. The question is whether the agreement joins together "independent centers of decisionmaking." *Id.*, at 769. If it does, the entities are capable of conspiring under §1, and the court must decide whether the restraint of trade is an unreasonable and therefore illegal one.

## V

The NFL teams do not possess either the unitary decisionmaking quality or the single aggregation of economic

power characteristic of independent action. Each of the
teams is a substantial, independently owned, and inde-
pendently managed business. "[T]heir general corporate
actions are guided or determined" by "separate corporate
consciousnesses," and "[t]heir objectives are" not "com-
mon." *Copperweld*, 467 U. S., at 771; see also *North
American Soccer League* v. *NFL*, 670 F. 2d 1249, 1252
(CA2 1982) (discussing ways that "the financial perform-
ance of each team, while related to that of the others, does
not . . . necessarily rise and fall with that of the others").
The teams compete with one another, not only on the
playing field, but to attract fans, for gate receipts and for
contracts with managerial and playing personnel. See
*Brown* v. *Pro Football, Inc.*, 518 U. S. 231, 249 (1996);
*Sullivan* v. *NFL*, 34 F. 3d 1091, 1098 (CA1 1994); *Mid-
South Grizzlies* v. *NFL*, 720 F. 2d 772, 787 (CA3 1983); cf.
*NCAA*, 468 U. S., at 99.

Directly relevant to this case, the teams compete in the
market for intellectual property. To a firm making hats,
the Saints and the Colts are two potentially competing
suppliers of valuable trademarks. When each NFL team
licenses its intellectual property, it is not pursuing the
"common interests of the whole" league but is instead
pursuing interests of each "corporation itself," *Copperweld*,
467 U. S., at 770; teams are acting as "separate economic
actors pursuing separate economic interests," and each
team therefore is a potential "independent cente[r] of
decisionmaking," *id.*, at 769. Decisions by NFL teams to
license their separately owned trademarks collectively and
to only one vendor are decisions that "depriv[e] the mar-
ketplace of independent centers of decisionmaking," *ibid.*,
and therefore of actual or potential competition. See
*NCAA*, 468 U. S., at 109, n. 39 (observing a possible §1
violation if two separately owned companies sold their
separate products through a "single selling agent"); cf.
Areeda & Hovenkamp ¶1478a, at 318 ("Obviously, the

Opinion of the Court

most significant competitive threats arise when joint venture participants are actual or potential competitors").

In defense, respondents argue that by forming NFLP, they have formed a single entity, akin to a merger, and market their NFL brands through a single outlet. But it is not dispositive that the teams have organized and own a legally separate entity that centralizes the management of their intellectual property. An ongoing §1 violation cannot evade §1 scrutiny simply by giving the ongoing violation a name and label. "Perhaps every agreement and combination in restraint of trade could be so labeled." *Timken Roller Bearing Co.* v. *United States*, 341 U. S. 593, 598 (1951).

The NFL respondents may be similar in some sense to a single enterprise that owns several pieces of intellectual property and licenses them jointly, but they are not similar in the relevant functional sense. Although NFL teams have common interests such as promoting the NFL brand, they are still separate, profit-maximizing entities, and their interests in licensing team trademarks are not necessarily aligned. See generally Hovenkamp, Exclusive Joint Ventures and Antitrust Policy, 1995 Colum. Bus. L. Rev. 1, 52–61 (1995); Shishido, Conflicts of Interest and Fiduciary Duties in the Operation of a Joint Venture, 39 Hastings L. J. 63, 69–81 (1987). Common interests in the NFL brand "*partially* unit[e] the economic interests of the parent firms," Broadley, Joint Ventures and Antitrust Policy, 95 Harv. L. Rev. 1521, 1526 (1982) (emphasis added), but the teams still have distinct, potentially competing interests.

It may be, as respondents argue, that NFLP "has served as the 'single driver'" of the teams' "promotional vehicle," "'pursu[ing] the common interests of the whole.'" Brief for NFL Respondents 28 (quoting *Copperweld*, 467 U. S., at 770–771; brackets in original). But illegal restraints often are in the common interests of the parties to the restraint,

at the expense of those who are not parties.  It is true, as
respondents describe, that they have for some time mar-
keted their trademarks jointly.  But a history of concerted
activity does not immunize conduct from §1 scrutiny.
"Absence of actual competition may simply be a manifes-
tation of the anticompetitive agreement itself."  *Freeman*,
322 F. 3d, at 1149.

Respondents argue that nonetheless, as the Court of
Appeals held, they constitute a single entity because
without their cooperation, there would be no NFL football.
It is true that "the clubs that make up a professional
sports league are not completely independent economic
competitors, as they depend upon a degree of cooperation
for economic survival."  *Brown*, 518 U. S., at 248.  But the
Court of Appeals' reasoning is unpersuasive.

The justification for cooperation is not relevant to
whether that cooperation is concerted or independent
action.[6]  A "contract, combination . . . or conspiracy," §1,
that is necessary or useful to a joint venture is still a
"contract, combination . . . or conspiracy" if it "deprives the
marketplace of independent centers of decisionmaking,"
*Copperweld*, 467 U. S., at 769.  See *NCAA,* 468 U. S., at
113 ("[J]oint ventures have no immunity from antitrust
laws").  Any joint venture involves multiple sources of
economic power cooperating to produce a product.  And for
many such ventures, the participation of others is neces-
sary.  But that does not mean that necessity of cooperation
transforms concerted action into independent action; a nut
and a bolt can only operate together, but an agreement
between nut and bolt manufacturers is still subject to §1

---

[6]As discussed *infra*, necessity of cooperation is a factor relevant to
whether the agreement is subject to the Rule of Reason.  See *NCAA*,
468 U. S., at 101 (holding that NCAA restrictions on televising college
football games are subject to Rule of Reason analysis for the "critical"
reason that "horizontal restraints on competition are essential if the
product is to be available at all").

Opinion of the Court

analysis.  Nor does it mean that once a group of firms agree to produce a joint product, cooperation amongst those firms must be treated as independent conduct.  The mere fact that the teams operate jointly in some sense does not mean that they are immune.[7]

The question whether NFLP decisions can constitute concerted activity covered by §1 is closer than whether decisions made directly by the 32 teams are covered by §1.  This is so both because NFLP is a separate corporation with its own management and because the record indicates that most of the revenues generated by NFLP are shared by the teams on an equal basis.  Nevertheless we think it clear that for the same reasons the 32 teams' conduct is covered by §1, NFLP's actions also are subject to §1, at least with regards to its marketing of property owned by the separate teams.  NFLP's licensing decisions are made by the 32 potential competitors, and each of them actually owns its share of the jointly managed assets.  Cf. *Sealy*, 388 U. S., at 352–354.  Apart from their agreement to cooperate in exploiting those assets, including their decisions as the NFLP, there would be nothing to prevent each of the teams from making its own market

_____

[7] In any event, it simply is not apparent that the alleged conduct was necessary at all.  Although two teams are needed to play a football game, not all aspects of elaborate interleague cooperation are necessary to produce a game.  Moreover, even if leaguewide agreements are necessary to produce football, it does not follow that concerted activity in marketing intellectual property is necessary to produce football.

The Court of Appeals carved out a zone of antitrust immunity for conduct arguably related to league operations by reasoning that coordinated team trademark sales are necessary to produce "NFL football," a single NFL brand that competes against other forms of entertainment.  But defining the product as "NFL football" puts the cart before the horse: Of course the NFL produces NFL football; but that does not mean that cooperation amongst NFL teams is immune from §1 scrutiny.  Members of any cartel could insist that their cooperation is necessary to produce the "cartel product" and compete with other products.

decisions relating to purchases of apparel and headwear, to the sale of such items, and to the granting of licenses to use its trademarks.

We generally treat agreements within a single firm as independent action on the presumption that the components of the firm will act to maximize the firm's profits. But in rare cases, that presumption does not hold. Agreements made within a firm can constitute concerted action covered by §1 when the parties to the agreement act on interests separate from those of the firm itself,[8] and the intrafirm agreements may simply be a formalistic shell for ongoing concerted action. See, *e.g.*, *Topco Associates, Inc.*, 405 U. S., at 609; *Sealy,* 388 U. S., at 352–354.

For that reason, decisions by the NFLP regarding the teams' separately owned intellectual property constitute concerted action. Thirty-two teams operating independently through the vehicle of the NFLP are not like the components of a single firm that act to maximize the firm's profits. The teams remain separately controlled, potential competitors with economic interests that are distinct from NFLP's financial well-being. See generally Hovenkamp, 1995 Colum. Bus. L. Rev., at 52–61. Unlike typical decisions by corporate shareholders, NFLP licensing decisions effectively require the assent of more than a mere majority of shareholders. And each team's decision reflects not only an interest in NFLP's profits but also an interest in the team's individual profits. See generally Shusido, 39 Hastings L. J., at 69–71. The 32 teams capture individual

---

[8] See Areeda & Hovenkamp ¶1471; Elhauge & Geradin 786–787, and n. 6; see also *Capital Imaging Assoc.* v. *Mohawk Valley Medical Assoc., Inc.*, 996 F. 2d 537, 544 (CA2 1993); *Bolt* v. *Halifax Hospital Medical Center*, 891 F. 2d 810, 819 (CA11 1990); *Oksanen* v. *Page Memorial Hospital*, 945 F. 2d 696, 706 (CA4 1991); *Motive Parts Warehouse* v. *Facet Enterprises,* 774 F. 2d 380, 387–388 (CA10 1985); *Victorian House, Inc.* v. *Fisher Camuto Corp.*, 769 F. 2d 466, 469 (CA8 1985); *Weiss* v. *York Hospital*, 745 F. 2d 786, 828 (CA3 1984).

Opinion of the Court

economic benefits separate and apart from NFLP profits as a result of the decisions they make for the NFLP. NFLP's decisions thus affect each team's profits from licensing its own intellectual property. "Although the business interests of" the teams "will *often* coincide with those of the" NFLP "as an entity in itself, that commonality of interest exists in every cartel." *Los Angeles Memorial Coliseum Comm'n* v. *NFL*, 726 F. 2d 1381, 1389 (CA9 1984) (emphasis added). In making the relevant licensing decisions, NFLP is therefore "an instrumentality" of the teams. *Sealy,* 388 U. S., at 352–354; see also *Topco Associates, Inc.*, 405 U. S., at 609.

If the fact that potential competitors shared in profits or losses from a venture meant that the venture was immune from §1, then any cartel "could evade the antitrust law simply by creating a 'joint venture' to serve as the exclusive seller of their competing products." *Major League Baseball Properties, Inc.* v. *Salvino, Inc.*, 542 F. 3d 290, 335 (CA2 2008) (Sotomayor, J., concurring in judgment). "So long as no agreement," other than one made by the cartelists sitting on the board of the joint venture, "explicitly listed the prices to be charged, the companies could act as monopolies through the 'joint venture.'" *Ibid.* (Indeed, a joint venture with a single management structure is generally a better way to operate a cartel because it decreases the risks of a party to an illegal agreement defecting from that agreement). However, competitors "cannot simply get around" antitrust liability by acting "through a third-party intermediary or 'joint venture'." *Id.*, at 336.[9]

────────

[9] For the purposes of resolving this case, there is no need to pass upon the Government's position that entities are incapable of conspiring under §1 if they "have effectively merged the relevant aspect of their operations, thereby eliminating actual and potential competition . . . in that operational sphere" and "the challenged restraint [does] not significantly affect actual or potential competition . . . outside their merged operations." Brief for United States as *Amicus Curiae* 17. The

## VI

Football teams that need to cooperate are not trapped by antitrust law. "[T]he special characteristics of this industry may provide a justification" for many kinds of agreements. *Brown*, 518 U. S., at 252 (STEVENS, J., dissenting). The fact that NFL teams share an interest in making the entire league successful and profitable, and that they must cooperate in the production and scheduling of games, provides a perfectly sensible justification for making a host of collective decisions. But the conduct at issue in this case is still concerted activity under the Sherman Act that is subject to §1 analysis.

When "restraints on competition are essential if the product is to be available at all," *per se* rules of illegality are inapplicable, and instead the restraint must be judged according to the flexible Rule of Reason.[10]   *NCAA*, 468

––––––––––

Government urges that the choices "to offer only a blanket license" and "to have only a single headwear licensee" might not constitute concerted action under its test. *Id.*, at 32. However, because the teams still own their own trademarks and are free to market those trademarks as they see fit, even those two choices were agreements amongst potential competitors and would constitute concerted action under the Government's own standard. At any point, the teams could decide to license their own trademarks. It is significant, moreover, that the teams here control NFLP. The two choices that the Government might treat as independent action, although nominally made by NFLP, are for all functional purposes choices made by the 32 entities with potentially competing interests.

[10]Justice Brandeis provided the classic formulation of the Rule of Reason in *Board of Trade of Chicago* v. *United States*, 246 U. S. 231, 238 (1918):

"The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint is imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end

Opinion of the Court

U. S., at 101; see *id.*, at 117 ("Our decision not to apply a *per se* rule to this case rests in large part on our recognition that a certain degree of cooperation is necessary if the type of competition that petitioner and its member institutions seek to market is to be preserved"); see also *Dagher*, 547 U. S., at 6. In such instances, the agreement is likely to survive the Rule of Reason. See *Broadcast Music, Inc.* v. *Columbia Broadcasting System, Inc.*, 441 U. S. 1, 23 (1979) ("Joint ventures and other cooperative arrangements are also not usually unlawful . . . where the agreement . . . is necessary to market the product at all"). And depending upon the concerted activity in question, the Rule of Reason may not require a detailed analysis; it "can sometimes be applied in the twinkling of an eye." *NCAA*, 468 U. S., at 109, n. 39.

Other features of the NFL may also save agreements amongst the teams. We have recognized, for example, "that the interest in maintaining a competitive balance" among "athletic teams is legitimate and important," *NCAA*, 468 U. S., at 117. While that same interest applies to the teams in the NFL, it does not justify treating them as a single entity for §1 purposes when it comes to the marketing of the teams' individually owned intellectual property. It is, however, unquestionably an interest that may well justify a variety of collective decisions made by the teams. What role it properly plays in applying the Rule of Reason to the allegations in this case is a matter to be considered on remand.

---

sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences." See also *Leegin Creative Leather Products, Inc.* v. *PSKS, Inc.*, 551 U. S. 877, 885–887 (2007); *National Soc. of Professional Engineers,* 435 U. S., at 688–691.

20      AMERICAN NEEDLE, INC. *v.* NATIONAL
FOOTBALL LEAGUE

Opinion of the Court

\*    \*    \*

Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*