UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ONLINE PUBLICATION ONLY

----------------------------------------------------------------x
                                         :

IN RE PAYMENT CARD INTERCHANGE    :    MEMORANDUM
FEE AND MERCHANT DISCOUNT        :    AND ORDER
ANTITRUST LITIGATION             :
                                           :    05-MD-1720 (JG) (JO)

----------------------------------------------------------------x

A P P E A R A N C E S :

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
        800 LaSalle Avenue, Suite 2800
        Minneapolis, MN 55402
By:   K. Craig Wildfang
        Thomas J. Undlin
        Ryan J. Marth
        Jesse M. Calm

        --and--

ROBBINS GELLER RUDMAN & DOWD LLP
        655 West Broadway, Suite 1900
        San Diego, CA 92101
By:   Bonny Sweeney

        --and--

BERGER & MONTAGUE, P.C.
        1622 Locust Street
        Philadelphia, PA 19103
By:   H. Laddie Montague
        Merill G. Davidoff
        Bart Cohen
        *Attorneys for Class Plaintiffs*

ARNOLD & PORTER LLP
        275 Battery Street, 27th Floor
        San Francisco, CA 94111
By:   Robert. J. Vizas
        Robert C. Mason
        Mark R. Merley
        Matthew A. Eisenstein
        *Attorneys for Defendants Visa Inc., Visa U.S.A. Inc., and Visa International*
                *Service Association*

HUNTON & WILLIAMS LLP
    200 Park Avenue
    New York, NY 10166
By:   Keila D. Ravelo
    Wesley R. Powell

       --and--

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
    1285 Avenue of the Americas
    New York, NY 10019
By:   Gary R. Carney
    Andrew C. Finch
    Kenneth A. Gallo
    *Attorneys for Defendants MasterCard Incorporated and MasterCard*
       *International Incorporated*

CLEARY GOTTLIEB STEEN & HAMILTON LLP
    One Liberty Plaza
    New York, NY 10006
By:   Howard Zelbo
    Boaz Morag
    Scott B. Reents
    Emily Picone
    *Attorneys for* Amicus Curiae *the European Commission*

JOHN GLEESON, United States District Judge:

This opinion resolves a discovery dispute over two documents created in connection with the European Commission's investigations into the defendants' conduct. The Commission, appearing as *amicus curiae*, asserts that the documents are confidential under European law and that this Court should deny the plaintiffs access to them pursuant to the doctrine of international comity. Magistrate Judge James Orenstein granted the plaintiffs' motion to compel discovery of the documents. Defendants Visa and MasterCard, supported by the Commission, object to that ruling. For the reasons stated below, I conclude that the order appealed from is contrary to the law of international comity, which mandates an exception in this

instance to the usual rule that all relevant information is discoverable. Accordingly, the motion to compel is denied.

BACKGROUND

A.    *This Litigation*

Prior decisions provide more detail on the background to this case[1]; a brief introduction suffices for present purposes. The plaintiffs are merchants in the United States who accept Visa and MasterCard payment cards.[2] They charge that the defendants – Visa, MasterCard, and various American banks – have violated and continue to violate the United States antitrust laws by unlawfully inflating the fees merchants pay on Visa and MasterCard transactions.

Visa and MasterCard are membership corporations comprised of thousands of banks. In any given consumer payment-card transaction, a bank assumes the role of "Issuing Bank" or "Acquiring Bank." The Issuing Bank issues a payment card bearing the Visa or MasterCard name; a consumer then uses the card to pay a merchant for goods or services. The merchant holds an account with the Acquiring Bank. The amount debited from the consumer's account with the Issuing Bank is reduced by various fees before it arrives in the merchant's

---

[1]    *See, e.g., In re Payment Interchange Fee and Merchant Discount Antitrust Litig.*, No. 05-MD-1720 (JG) (JO), 2008 WL 5082872 (E.D.N.Y. Nov. 25, 2008); *In re Payment Interchange Fee and Merchant Discount Antitrust Litig.*, 562 F. Supp. 2d 392 (E.D.N.Y. May 14, 2008); *In re Payment Interchange Fee and Merchant Discount Antitrust Litig.*, No. 05-MD-1720 (JG) (JO), 2008 WL 115104 (E.D.N.Y. Jan. 18, 2008). This litigation is a sequel of sorts to *In re Visa Check/Mastermoney Antitrust Litig.,* 297 F. Supp. 2d 503 (E.D.N.Y. 2003), *aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96 (2d. Cir. 2005), a class action that ended in a settlement agreement involving injunctive relief and payment of more than $3 billion to merchants.

[2]    The plaintiffs are sub-divided into Class Plaintiffs, who are represented by Lead Counsel, and Individual Plaintiffs, who are separately represented.

account with the Acquiring Bank. Chief among these fees is the interchange fee, which the Issuing Bank keeps for itself as compensation for its role in the transaction.

The interchange fee is calculated using rules set by the Visa and MasterCard Boards of Directors. Several banks are represented on one Board or the other, and some are represented on both. According to the plaintiffs, the defendants are violating section 1 of the Sherman Act of 1890, 15 U.S.C. § 1, by conspiring to fix the interchange rate, by adopting and enforcing anticompetitive restraints of trade, and by engaging in illegal tying and bundling. In addition, the plaintiffs allege that Visa and MasterCard have monopolized the market for payment card transactions, thereby violating section 2 of the Sherman Act, 15 U.S.C. § 2. The plaintiffs, who seek damages and injunctive relief, filed various complaints in several district courts in 2005. Those actions were consolidated and transferred to me by the Judicial Panel on Multidistrict Litigation. *In re Payment Interchange Fee and Merchant Discount Antitrust Litig.*, 398 F. Supp. 2d 1356 (J.P.M.L. 2005).

B.      *The European Investigation and the Contested Documents*

Visa and MasterCard are worldwide networks, and their practices have come under scrutiny from regulatory agencies outside the United States.[3] Since 1999, Visa and MasterCard's activities in the member states of the European Union ("EU") have been the subject of an investigation by the European Commission. As explained below, the documents whose production plaintiffs seek to compel arise from the European investigation.

---

[3]      For example, in addition to the United States and the European Union, Visa and MasterCard's business practices have been investigated by government agencies in the United Kingdom, Australia, Colombia, Mexico, New Zealand, Poland, Portugal, Norway, Sweden, Brazil, Hungary, and Spain.

1.      *The European Commission's Antitrust-Enforcement Procedures*

The European Commission is the EU's executive and administrative branch. Through its antitrust enforcement agency, the Directorate-General for Competition, the Commission investigates possible breaches of European competition law.  The Commission has the power to search business premises and the homes of executives, and it can seize documents and other evidence.  In addition, the Commission can compel investigated parties to provide information, and may also collect information from third parties.

The Commission has the power to impose fines and remedial measures where it finds that European antitrust law has been violated.[4]  But before making a final decision, the Commission gives the targets of its investigation notice and an opportunity to be heard.  The Commission provides the targets with a Statement of Objections, which outlines the Commission's preliminary views and informs the targets of its intended findings.  The Statement of Objections is not made public.  A party served with a Statement of Objections is given time to submit a written reply.  Like the Statement of Objections, a party's reply is confidential; even the other parties to the investigation are generally precluded from seeing it.

A target served with a Statement of Objections may also elect to be heard by the Commission at an Oral Hearing.  An Oral Hearing takes place before a Hearing Officer, and is attended by the parties, representatives of the Commission, representatives of competition authorities of member states, and third parties who have established a sufficient interest in the

---

[4]      The Commission's decisions are subject to review by the European Union's judicial branch. Judicial review proceedings are commenced in the General Court (known until the Lisbon Treaty as the Court of First Instance), and appeals on points of law are heard by the European Court of Justice.

proceedings. The Oral Hearing is confidential. The Hearing is recorded, and the Commission

provides a copy of the recording to any party who requests one.

2. *The European Commission's Investigations of Visa and MasterCard*

The European investigation of Visa and MasterCard concerns, among other

things, the networks' rules and practices for setting interchange fees in the EU's member states.

Visa reached a settlement with the Commission in the early stages of the investigation. As part

of the settlement agreement reached in 2002, Visa received a five-year exemption from antitrust

scrutiny in exchange for a promise to cap its cross-border interchange fees at agreed levels.

MasterCard, however, decided to contest the allegations.

a. *The MasterCard Oral Hearing*

The Commission served Statements of Objections on MasterCard in 1999, 2003

and 2006. After receiving the third Statement of Objections, MasterCard exercised its right to an

Oral Hearing, which took place on November 14 and 15, 2006. The Oral Hearing was attended

by ten interested third parties. MasterCard requested and received a recording of the Hearing.

On December 19, 2007, the Commission issued a 241-page decision concluding

that MasterCard had violated European competition law. A partially redacted version of this

decision is publicly available. *See* Non-Confidential Version, Commission Decision of Dec. 19,

2007, COMP/34.579 MasterCard, COMP/36.518 EuroCommerce, COMP/38.38.580

Commercial Cards. The Commission found that MasterCard's multilateral interchange fee

"restrict[ed] competition between acquiring banks by inflating the base on which acquiring banks

set charges to merchants and thereby setting a floor under the merchant fee." *Id.* ¶ 2. Moreover,

the Commission rejected MasterCard's attempts to justify these restrictions on competition.

*Id.* ¶¶ 5-12. In light of these findings, the Commission determined that MasterCard had violated

6

Article 81[5] of the European Community Treaty (Europe's analog to section 1 of the Sherman Act), and ordered remedial action. *Id.* ¶¶ 13-14.

      b.    *The Statement of Objections Addressed to Visa*

After Visa's agreed exemption from antitrust scrutiny expired in 2007, the Commission again began to investigate Visa's European practices. On April 3, 2009, Visa Europe, Ltd. received a Statement of Objections. On May 26, 2009 the Commission sent Visa Inc. a redacted version of that Statement of Objections, altered to remove information deemed confidential by Visa Europe. The Commission told Visa Inc. that even the redacted version could only be used for the purposes of the Commission's proceedings and "should not therefore be disclosed to any person, body or agency . . . unless you have the prior explicit authorisation of the Commission." Letter from Philip Lowe to Visa Inc. dated May 26, 2009.

The Commission held an Oral Hearing in the Visa investigation on November 30, 2009 and December 1, 2009.[6] As in the case of MasterCard, the European investigation of Visa is aimed at practices analogous to those at issue in the litigation before this Court. The Commission alleges that Visa's actions in setting interchange fees "harm competition between acquiring banks, inflate the cost of payment card acceptance for merchants and ultimately for merchants and ultimately increase consumer prices." Press Release, European Commission, Antitrust: Commission Sends Statement of Objections to Visa (Apr. 6, 2009). According to the Commission, the Visa Statement of Objections "contains a competition assessment of

---

       [5]      After the Lisbon Treaty's consolidation of various European treaties, Article 81 of the European Community Treaty is now Article 101 of the Treaty on the Functioning of the European Union.

       [6]      The plaintiffs have not moved to compel production of the recording of that hearing, recognizing that the Court's ruling on the instant motion to compel will govern its discoverability.

[multilateral interchange fees] in mature payment card systems that is similar to the assessment in the MasterCard prohibition decision of December 2007." *Id.*

C.  *The Plaintiffs' Requests for the Contested Documents*

During discovery in this case, MasterCard agreed to disclose the written submissions it made to the Commission in advance of the November 14-15, 2006 Oral Hearing. The plaintiffs also asked MasterCard to produce a transcript of the hearing itself.  MasterCard replied that it had no transcript of the hearing, but that MasterCard would provide the recording if the Commission gave its consent.  The Commission, however, refused its consent.  The Hearing Officer stated that "the recordings of the Oral Hearings are not public and in principle the recordings cannot be used" in the American proceedings, and instructed that "MasterCard should abstain from disclosing the tapes of the Hearing in the discovery procedure in the US." Letter from Karen Williams to Vincent Brophy dated Dec. 9, 2008.  After further communications from MasterCard's European counsel, the Commission reiterated that "disclosure of information from the Commission file in the context of private litigation in third country jurisdictions, in particular of information voluntarily submitted during the investigation, may seriously undermine the effectiveness of public antitrust enforcement."  Letter from Irmfried Schwimann to Bernard Amory & Vincent Brophy dated July 7, 2009.

The plaintiffs also sought discovery of the Statement of Objections addressed to Visa Inc.  After receiving the request, Visa asked for the Commission's position.  The Commission declined to authorize production of the Statement of Objections to the plaintiffs, relying on "the European Commission's general policy that the Statement of Objections and the information contained therein should be used only for the purpose of proceedings concerning the

application of [European competition law]." Letter from Irmfried Schwimann to Visa Inc. dated August 11, 2009.

D.    *The Motion to Compel*

On January 5, 2010 plaintiffs moved before Judge Orenstein for an order compelling the defendants to produce the MasterCard Oral Hearing recording and the Visa Statement of Objections. The defendants noted the European Commission's opposition to production, and Judge Orenstein invited the Commission to submit its views to the Court. The Commission responded on January 20, 2010 with a submission by Philip Lowe, who at that time served as the Commission's Director-General for Competition. Lowe opposed disclosure of the documents on the ground that they are confidential under European law.[7]

Judge Orenstein ruled on the motions to compel as follows:

After reviewing the submissions by the parties and by the European Commission ("EC") on the pending motions to compel discovery . . . and weighing the EC's concerns against the plaintiffs' legitimate discovery interests, I conclude that international comity does not require the plaintiffs to forego information to which they would otherwise be entitled. I therefore order defendant MasterCard to produce the transcript of the oral hearing held before the EC on November 14 and 15, 2006, and I further order defendant Visa to produce a copy of the EC's Statement of Objections issued against Visa on April 3, 2009.

Visa and MasterCard have objected to the order. The Commission, by a vote of the College of Commissioners,[8] authorized the filing of an *amicus* brief in support of the objections to safeguard the EU's asserted interest in the confidentiality of its enforcement proceedings.

---

[7]    Lowe has since been replaced as Director-General for Competition by Dr. Alexander Italianer.

[8]    The College of Commissioners is the Commission's ruling body. It consists of the twenty-seven Commissioners, one from each of the EU's member states.

DISCUSSION

The issue on this motion is whether, in these circumstances, the need for deference to a foreign sovereign entity trumps the Federal Rules' usual liberal approach to discovery. The general practice of requiring a party to turn over documents in its possession, however damaging those documents may be to the disclosing party, serves the important goals of increasing fairness and accuracy in adjudication. Parties to a civil case in federal court are thus generally entitled to "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." *See* Fed. R. Civ. P. 26(b)(1). To be subject to discovery, relevant information need not be admissible at trial; it suffices that the information "appears reasonably calculated to lead to the discovery of admissible evidence." *Id.*

Though the European investigation has a different geographic scope, the European documents are plainly relevant to this litigation, and hence are presumptively subject to disclosure by the defendants in this action. Visa and MasterCard operate across international borders, and their transaction-fee practices in the EU are at least similar to those in the United States. The MasterCard Oral Hearing recording may contain admissions by MasterCard that would constitute admissible evidence in this action. Similarly, the Visa Statement of Objections may include admissions by Visa, by MasterCard or by member banks collected by the Commission in the course of its investigation.[9] And each document may alert plaintiffs to further relevant lines of inquiry.

---

[9] The Federal Rules of Evidence exclude a party's out-of-court statement from the definition of hearsay if the statement is offered against that party. Fed. R. Evid. 801(d)(2)(A). Similarly excluded from the definition of hearsay is any statement by a party's agent during the agency and concerning a matter within its scope, *id.* 801(d)(2)(C), and any statement by a co-conspirator during the course and in furtherance of the conspiracy. *Id.* 801(d)(2)(E).

Visa and MasterCard accept that they would be obligated to turn over the Oral Hearing tape and Statement of Objections in the absence of a countervailing concern for international comity.[10] International comity is "the recognition [that] one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws." *Hilton v. Guyot*, 159 U.S. 113, 174 (1895). "Comity refers to the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states." *Société Nationale Industrielle Aérospatiale v. U.S. Dist. Court for the S. Dist. of Iowa*, 382 U.S. 522, 544 n.27 (1987) ("*Aérospatiale*"). In that spirit, the Second Circuit has cautioned that United States courts "should not take such action as may cause a violation of the laws of a friendly neighbor or, at the least, an *unnecessary circumvention of its procedures.*" *Ings. v. Ferguson*, 282 F.3d 149, 152 (2d Cir. 1960) (emphasis added).

Courts afford respect to the laws and procedures of other nations partly out of a sense of fairness, but also in the hope of securing reciprocal respect and cooperation from the institutions of foreign nations. *See Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937-38 (D.C. Cir. 1984). A principle rather than a rule, international comity manifests itself in various ways. It supports the courts' general practice of recognizing and enforcing

---

[10]     Aside from international comity, the Commission relies on the act of state doctrine, which requires American courts to "refrain from examining the validity of an act of a foreign state by which that state has exercised its jurisdiction to give effect to its public interests." *See W.S. Kirkpatrick & Co. v. Environmental Tec-Tonics Corp., Int'l*, 493 U.S. 400, 496 (1990). The act of state doctrine is inapposite because the plaintiffs do not ask the court to pass on the validity of any of the EU's acts. Rather, they ask the court to resolve a conflict between a valid European law and United States law. Moreover, in this context, the argument proves too much, as it would displace the balancing test the Supreme Court has prescribed for discovery requests that conflict with a foreign sovereign's asserted interests. *See Société Nationale Industrielle Aérospatiale v. U.S. Dist. Court for the S. Dist. of Iowa*, 382 U.S. 522 (1987).

foreign-court judgments. *See Hilton*, 159 U.S. at 202-03. It also provides part of the reason that district courts have discretion under the doctrine of *forum non conveniens* to dismiss a civil action more appropriately brought in another nation's courts. *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 260-261 (1981). Moreover, international comity animates the canon of statutory construction that, unless a contrary intent appears, acts of Congress do not apply extraterritorially. *See Morrison v. Nat'l Australia Bank Ltd.*, 130 S. Ct. 2869, 2877 (2010).

Though traditional formulations of the doctrine typically refer to the interests of other *nations*, the policies underlying international comity apply with equal force to a supranational body like the EU. *See In re Rubber Chems.*, 486 F. Supp. 2d 1078, 1082 (N.D. Cal. 2007). Though it lacks sufficient powers to be called a nation, the EU involves a significant pooling of sovereignty by the EU's member states within certain defined areas. And in recent years, the member states have increasingly sought to speak with one voice in the area of foreign relations. As a result of the Lisbon Treaty, the EU has its own legal personality as a matter of international law, and can hence enter into treaties with nations. In these circumstances, the plaintiffs rightly concede that the interests and procedures of the European Commission, as the EU's executive branch, are entitled to some degree of deference under the rubric of international comity.

Discovery disputes have been a particular source of strife between American and European legal systems. The American system of expansive, party-driven discovery is something of an outlier, and it often causes consternation abroad. *See, e.g.,* Geoffrey C. Hazard, Jr., *Discovery and the Role of the Judge in Civil Law Jurisdictions*, 73 Notre Dame L. Rev. 1017 (1998). As a result of American courts' willingness to impose broad unilateral extraterritorial

discovery orders, some countries have adopted legislative measures as a means of resisting the disclosure of documents to foreign courts. The French "blocking statute," for example, criminalizes the disclosure of documents located in France for use in foreign proceedings, other than pursuant to treaties such as the Hague Convention on Evidence. The Hague Convention process is relatively cumbersome, and the French law is "apparently intended to protect French businesses from excessive discovery in hostile foreign litigation." *United States v. Gonzales*, 748 F.2d 74, 78 (2d Cir. 1984). Many American courts have refused to defer to the French blocking statute, finding that it was "never expected nor intended to be enforced against French subjects but was intended rather to provide them with tactical weapons and bargaining chips in foreign courts." *Adidas (Canada) Ltd. v. SS Seatrain Bennington*, No. 80 Civ. 1911 (PNL), 1984 WL 423, at *3 (S.D.N.Y. May 30, 1984).

In this case, the European Commission asserts a narrower, more powerful interest. It contends that the investigation, notice, and hearing portions of its own enforcement proceedings are confidential under European law, and that this court should respect that confidentiality by denying the motion to compel. American courts must demonstrate due respect for any sovereign interest, but they need not defer blindly in every case to any interest expressed by a foreign state. *See Laker Airways*, 731 F.2d at 937 ("No nation is under an unremitting obligation to enforce foreign interests which are fundamentally prejudicial to those of the domestic forum."). When they conflict in the discovery context, foreign and domestic interests are adjudicated using a balancing test. The United States Supreme Court, drawing on the Restatement (Third) of Foreign Relations Law, has noted that five factors are relevant to any

comity analysis of a discovery request.[11]  *See Aérospatiale*, 382 U.S. at 544 n.28 (citing

Restatement (Third) of Foreign Relations Law, § 442(1)(c) (1987)).  These five factors yield the

following five questions:

> (1) How important is the requested information to the litigation?
>
> (2) How specific is the request?
>
> (3) Did the information originate in the United States?
>
> (4) Are there alternative means of securing the information?
>
> (5) How much would refusing the request undermine important United States interests, and how much would complying with the request undermine important foreign-sovereign interests?

*See id.*  The fifth factor – which requires a comparison of the national interests at stake – is

rightly regarded as the most important.  *See, e.g. Richmark Corp. v. Timber Falling Consultants*,

959 F.2d 1468, 1476 (9th Cir. 1992).

The Supreme Court has declined to "articulate specific rules to guide this delicate

task of adjudication."  *Aérospatiale*, 482 U.S. at 546 & n.30.  The Commission asks me to adopt

a specific rule that would require the proponent of discovery over a foreign government's

objection to establish that the documents are "crucial" to the litigation.[12]  Such a rule would be

---

[11]     Courts in the Second Circuit have also considered two additional factors, neither of which plays a significant role in this case: "the hardship of compliance on the party or witness from whom discovery is sought [and] the good faith of the party resisting discovery."  *See Strauss v. Credit Lyonnais, S.A.*, 249 F.R.D. 429, 439 (E.D.N.Y. 2008).

[12]     The authority the Commission cites in support of a "cruciality" test is weak.  It quotes a post-*Aérospatiale* case for the proposition that "the normal discovery standard of whether a document is relevant or is calculated to lead to the discovery of admissible evidence . . . should be replaced by the higher standard of whether the requested documents are crucial to the resolution of a key issue in the litigation."  *Minpeco, S.A. v. Conticommodity Services, Inc.*, 116 F.R.D. 517, 522 (S.D.N.Y. 1987).  The quotation, however, comes in a parenthetical citation to a pre-*Aérospatiale* case, *In re Uranium Antitrust Litigation*, 480 F.Supp. 1138, 1146, 1154-55 (N.D.Ill. 1979), and the *Minpeco* court does not appear actually to have applied the heightened standard.  *See* 116 F.R.D. at 528.

14

easier to administer than an all-things-considered discretion,[13] but it would run contrary to the spirit of *Aérospatiale*. The balancing test adopted by the Supreme Court in that case allows for the possibility that the requested material may be less than crucial, but still sufficiently important to outweigh a relatively weak foreign interest. The "exact line between reasonableness and unreasonableness in each case must be drawn by the trial court" after comparing the competing interests. *Id.*

In the absence of a rule to govern the decision, each side to the dispute cites the district court cases it believes provide the best analogy to this one.[14] Supporting disclosure, the plaintiffs point to a decision from this courthouse in the *Air Cargo* antitrust litigation. *In re Air Cargo Shipping Servs. Antitrust Litig.,* No. 06-MD-1775 (JG) (VVP), 2010 WL 1189341, at *4 (E.D.N.Y. Mar. 29, 2010). There, the plaintiffs sought disclosure of five boxes of documents belonging to Air France, a defendant in the action, that the United States Department of Justice had obtained in the course of a criminal antitrust investigation into the same conduct that forms the basis of the private suit. Air France objected that disclosure of the documents would violate the French blocking statute, and would expose Air France to criminal penalties.[15] Judge Pohorelsky found a "substantial likelihood that the documents will prove to be important to the

---

[13]     One critic of the balancing test has said that it "calls on the district judge to throw a heap of factors on a table and then slice and dice to taste." *Reinsurance Co. of America, Inc. v. Administratia Asigurarilor de Stat,* 902 F.2d 1275, 1285 (7th Cir. 1990) (Easterbrook, J., concurring).

[14]     Because discovery orders are generally not appealable at the interlocutory stage, these questions only rarely reach an appellate court. (The *Aérospatiale* case made it beyond the district-court level on a writ of mandamus.) The relative dearth of appellate decisions makes it more difficult to identify a coherent body of doctrine.

[15]     As Judge Pohorelsky noted, Air France's risk of prosecution under the blocking statute was more theoretical than real. *See Air Cargo,* 2010 WL 1189341, at *3. Nevertheless, for the first time since it was passed, the French authorities have recently shown some willingness to enforce the blocking statute. Marc J. Gottridge and Thomas Rouhette, *"Blocking" Statutes Bring Discovery Woes,* New York Law Journal, Apr. 30, 2008.

prosecution of the plaintiffs' claims." *Id.* at *2.  Reviewing the arguments against discovery,

Judge Pohorelsky concluded that "the only French interest is a sovereign interest in controlling

access to information within its own borders, fueled at least in part by a desire to afford its

citizens protections against discovery in foreign litigation." *Id.*  Moreover, the French

government had already consented to the disclosure of the material to the Department of Justice,

further weakening the argument that there was a strong French national interest in prohibiting

disclosure.  In light of these considerations, Judge Pohorelsky granted the motion to compel.

The sort of blanket prohibition imposed by the French blocking statute is different

in kind from the interest asserted by the European Commission in this case.  The Commission

seeks to restrict access to its own investigative and adjudicative procedures.  In recent years, the

Commission has filed briefs in several district courts seeking to vindicate that interest.  The

reasoning of courts considering the Commission's arguments is more germane to this motion

than the *Air Cargo* decision or others concerning the French blocking statute.

Not all of the Commission's efforts to protect the confidentiality of litigation

documents have been successful.  In multidistrict litigation concerning vitamins price-fixing, the

district court adopted a special master's report recommending that documents be produced in

spite of the Commission's confidentiality policy.[16]  *See In re Vitamins Antitrust Litig.*, Misc. No.

99-197 (TFH), 2002 U.S. Dist. LEXIS 26490 (D.D.C. Jan. 23, 2002) (Special Master's Report).

In that case, the defendants had "assiduously avoided keeping records of their activities or

destroyed what records existed and went to great lengths to hide their activities and meetings

---

[16]     The district court affirmed the Special Master's report without a published opinion, and later
rejected the Commission's attempt to relitigate the issue.  *See In re Vitamins Antitrust Litig.*, Misc. No. 99-197
(TFH),  2002 WL 34499542 (D.D.C. Dec. 18, 2002) (Hogan, J.).

from others." *Id.* at *127. The plaintiffs successfully sought production of the defendants' own submissions to the Commission. The Special Master doubted whether disclosure would significantly undermine the Commission's interests. In any event, the Special Master concluded that the Commission's interests were "not more important than the interests of the United States in open discovery and enforcement of the antitrust laws." *Id.*

The case most helpful to the defendants is probably *In re Rubber Chemicals*, 486 F. Supp. 2d 1078 (N.D. Cal. 2007).[17] In that case, a company called Flexsys met with European Commission officials pursuant to the Commission's Leniency Program and confessed to its participation in anti-competitive practices in the worldwide rubber chemicals industry. The Leniency Program "allows cartel participants to confess their wrongdoing in return for prosecutorial leniency." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 266 n.18 (2004). Partly on the basis of Flexsys's cooperation, the Commission issued a detailed – and publicly available – set of factual findings. An aggrieved Korean corporation, Kumho, filed suit against Flexsys for keeping Kumho out of the American rubber chemicals industry. During discovery, Kumho moved to compel disclosure of Flexsys's communications with the Commission.

The *Rubber Chemicals* court performed the five-factor balancing exercise and determined that the Commission's interest in confidentiality should prevail. As for the first factor, the contested documents concerned a conspiracy to restrain trade in Europe, and were not

---

[17] The Commission also succeeded in resisting disclosure of unredacted versions of European litigation documents in another chemicals antitrust action. *See In re Methionine Antitrust Litig.*, MDL No. 00-1311 CRB (N.D. Cal. June 17, 2002) (Order on Pls.' Mot. to Compel Production of Docs. Submitted to Government Authorities). The Special Master concluded that the "principle [of international comity] should be given effect here, particularly in light of the strong statements of the European Commission." *Id.* at 13.

particularly relevant to the plaintiff's claim that it was kept out of the American market. While the document requests were fairly specific (factor two), the third factor favored the defendant because "[t]he documents were created, transmitted, and used only in Europe and in conjunction with the European enforcement proceedings." 486 F. Supp. 2d at 1083. The fourth factor also supported the defendant, because the relevant information could be sought by alternative means, including by reading the Commission's published findings concerning competition in the European rubber chemicals market. As for the fifth factor, this also favored the defendant. The court accepted the Commission's argument that disclosure of the documents "would undermine [the Commission's] ability to initiate and prosecute future investigations by creating disincentives to cooperate with the Commission and would prejudice future investigations." *Id.* at 1084. The court noted that "a foreign entity has taken a clear position and articulated reasons why it believes production of the requested documents would harm its interests." *Id.* Balancing the factors, the court found that "the principles of comity outweigh[ed] the policies underlying discovery," and denied Kumho's motion to compel. *Id.*

For similar reasons, I find that the Commission's interest in confidentiality outweighs the plaintiffs' interest in discovery of the European litigation documents. That interest is not limited to this case. Rather, the Commission has strong and legitimate reasons to protect the confidentiality of Statements of Objections and Oral Hearings as a general matter. The Commission has established that confidentiality plays a significant role in assisting the effective enforcement of European antitrust law. Most importantly, confidentiality encourages third parties to cooperate with the Commission's investigations. The Commission relies on

information provided by complainants and other third parties, including business secrets and other information that the third parties often want to keep confidential.

The confidentiality the Commission promises is particularly important in encouraging voluntary cooperation by third parties. But even when the Commission compels third parties' participation, the assurance of confidentiality tends to make their participation fuller and more open. Moreover, the confidentiality of the investigative and adjudicative process is also important to encourage candor by the targets of the investigation. That the proceedings are secret encourages free and open participation by the parties under investigation, which in turn serves the Commission's interest in detecting and punishing violations of its laws. The Commission's interests would be significantly undermined if its confidentiality rules were disregarded by American courts in this case and others like it.

The geographic origin of the documents – the third *Aérospatiale* factor – also favors denying the motion to compel. The contested documents originated in Europe. One of the documents, the Statement of Objections, was created in Brussels by Commission officials, and the other is a recording of a Hearing conducted by the Commission in conjunction with European enforcement proceedings. Granting the motion to compel would amount to requiring the European Commission to turn over the fruits of its own labors in the service of the plaintiffs' American case.

As the plaintiffs point out, the European rules exhibit a greater solicitude for confidentiality than the equivalent United States procedures. But a foreign sovereign need not demonstrate precise congruity with American law and procedure to invoke international comity. By its very nature, international comity sometimes requires American courts to accommodate

foreign interests even where the foreign system strikes a different balance between opposing policy concerns.

Pitted against the Commission's concern for confidentiality is the interest that the United States always has in preventing anticompetitive behavior by enforcing its own antitrust laws. In the circumstances of this case, the strength of the national interest in disclosure depends largely on the analysis of the first *Aérospatiale* factor: the importance of the contested documents to this litigation.[18] As the plaintiffs point out, the Statement of Objections and Oral Hearing are likely to contain information that is of some relevance to this litigation. Visa and Mastercard are global networks, and their American practices are broadly similar to their European practices. At trial, the plaintiffs may even be entitled to present evidence of the defendants' European activities as part of their proof of the defendants' American activities, and the contested documents may assist the plaintiffs in that endeavor.

Nevertheless, I conclude that the Commission's interest in confidentiality is entitled to prevail.[19] As is relevant to the analysis the fourth *Aérospatiale* factor, the plaintiffs have other avenues for obtaining information about the defendants' European activities. The plaintiffs have access to MasterCard's submissions to the Commission and to an unredacted copy of the extensive opinion published by the Commission in the MasterCard case. *See Rubber Chemicals*, 486 F. Supp. 2d at 1083 (declining to order production where the plaintiff had access to a decision by the Commission). Moreover, it is the defendants' European business practices,

---

[18] Because the plaintiffs' document request is highly specific, the second *Aérospatiale* factor also counsels in favor of production.

[19] I have considered whether I should review the contested documents *in camera* and have decided that such a review is unnecessary. Given the strength of the Commission's interest in confidentiality, I find that there is no reasonable possibility that inspecting the documents themselves would make a dispositive difference to the comity analysis.

rather than the Commission's investigation itself, that may be directly relevant to this litigation. The Statement of Objections and Oral Hearing, though they might be helpful to the plaintiffs, are secondary to any unlawful conduct alleged to give rise to a cause of action. And the plaintiffs are entitled to discovery of the defendants' existing business documents, including those that were disclosed to the European Commission.

As a final argument in favor of disclosure, the plaintiffs contend that the Commission was slow to assert its interest in confidentiality. I reject that contention. When the disputes over the documents' discoverability first arose, Commission officials responded promptly to Visa and MasterCard's queries and declined to authorize production. True, the Commission took some time to express a "final" or "official" position, but it would be wrong to characterize the Commission's position as equivocal. From the beginning, the Commission invoked the confidentiality rules, and those rules indisputably apply to the Statement of Objections and the Oral Hearing recording. And when Judge Orenstein asked the Commission for its views, the Director-General for Competition responded with a lengthy submission – consistent with the Commission's prior statements in other similar cases – explaining the reasons for the confidentiality policy. Nothing more was required of the Commission to put the plaintiffs on notice of its position or to convince the court that its concern for confidentiality is genuine.

In reaching the decision that the motion to compel should be denied, I have considered a less restrictive alternative proposed by the plaintiffs: granting the motion but imposing a protective order prohibiting public dissemination of the contested documents. In my view, a protective order would not sufficiently protect the EU's interest in keeping the investigation, notice, and hearing phases of its antitrust enforcement proceedings confidential.

Preventing the European litigation documents' use in foreign private litigation is among the

legitimate reasons for keeping their contents secret.

CONCLUSION

For the reasons set forth above, the motion to compel is denied.

So ordered.

John Gleeson, U.S.D.J.

Dated:  August 27, 2010
        Brooklyn, New York