

LEXISNEXIS® FILE & SERVE
35916829
E-SERVICE
Feb 12 2011
12:25AM

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In Re Payment Card Interchange Fee And Merchant Discount Antitrust Litigation<br><br>This Document Relates to All Class Actions | Case No. 1:05-MD-1720 (JG)(JO) |

## Class Plaintiffs' Memorandum of Law In Support of Their Motion for Summary Judgment

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
K. Craig Wildfang
Thomas J. Undlin
Ryan W. Marth
800 LaSalle Avenue, Suite 2800
Minneapolis, MN  55402
Tel: 612-349-8500
Fax: 612-339-4181

BERGER & MONTAGUE, P.C.
H. Laddie Montague
Merrill Davidoff
Bart Cohen
Michael Kane
1622 Locust Street
Philadelphia, PA 19103
Tel: 215-875-3000
Fax: 215-875-4604

ROBBINS GELLER RUDMAN & DOWD LLP
Bonny Sweeney
655 West Broadway, Suite 1900
San Diego, CA  92101
Tel: 619-231-1058
Fax: 619-231-7423

### Co-Lead Counsel for Class Plaintiffs

81561318.14

INTRODUCTION ................................................................................................ 1

PART ONE PRELIMINARY STATEMENT ..................................................... 2

I.      Overview of Class Plaintiffs' claims ................................................. 2

II.     The Visa and MasterCard rules restrict the competitive conduct of
        all of the players in a payment-card transaction. .......................... 5

III.    The history of the payment-card industry and default interchange
        fees ...................................................................................................... 9

        A.      Visa and MasterCard grew out of banking associations that
                formed to offer regional and national credit-card programs
                in an era of localized banking. ............................................. 9

        B.      Visa and MasterCard enter the debit-card market and
                transform debit cards from electronic checks to profit centers
                for large issuing banks. ...................................................... 12

        C.      Visa, MasterCard and their member banks are now
                dominant credit and debit-card networks............................ 15

        D.      Visa and MasterCard are adjudged to be structural
                conspiracies in the United States and abroad .................... 16

        E.      MasterCard and Visa restructure to avoid application of
                Section 1 of the Sherman Act and similar laws outside of the
                United States ........................................................................ 19

        F.      Despite MasterCard's restructuring, the European
                Commission finds that MasterCard's default interchange
                fees are agreements among competitors and harm
                competition, before and after the IPO ................................ 21

IV.     In a Visa or MasterCard transaction, the issuing and acquiring
        banks transfer electronic information about the transaction and
        withhold portions of the transaction amount from the merchant ............ 22

PART TWO SUMMARY JUDGMENT STANDARD
24

PART THREE DEFENDANTS' DEFAULT CREDIT-CARD INTERCHANGE
FEES VIOLATED § 1 OF THE SHERMAN ACT BEFORE THE NETWORKS'
IPOS [2D CONSOL. AM. COMPL., CLAIMS 1, 2 & 5]....................................... 26

I.      Visa and MasterCard's pre-restructuring rules and credit-card
        default interchange fees constitute agreements among competitors
        because they were established and enforced by competing banks
        [Claims 1, 2 & 5]. .............................................................................. 27

81561318.14

II.     The networks' rules and interchange fees restrain trade because they restrict the manner in which banks can compete with one another ................................................................................. 33

III.    Credit-card network services is a proper relevant product market for analyzing Defendants' conduct ........................................... 37

        A.     As prices for credit-card network services have increased, merchants have not been able to substitute debit-card network services or other forms of payment. ................... 39

        B.     Defendants' anti-steering restraints prevent merchants from steering consumers from credit cards to less costly forms of payment. ...................................................................... 40

        C.     Consumers do not view debit cards and other forms of payment as acceptable substitutes for credit cards ........................ 41

        D.     Defendants consider credit-card network services to be distinct from debit-card network services and other forms of payment ..................................................................... 42

IV.     The relevant geographic market is in the United States ............................. 44

V.      Defendants have market power in the market for credit-card network services ................................................................ 45

        A.     Defendants have raised credit-card interchange fees without losing merchant acceptance. ............................................ 47

        B.     Merchants did not discontinue accepting Visa- and MasterCard-branded payment cards even after the networks created higher-cost "premium" credit cards and issuers shifted their portfolios to those cards ................................. 48

        C.     Defendants price discriminate in their setting of interchange fees to merchants and set interchange fees at merchants' reserve prices ...................................................... 50

        D.     Defendants' interchange fees are unrelated to issuers' or networks' costs of providing network services to merchants in the relevant markets ...................................... 52

        E.     Defendants' rules are a source of market power in each of the relevant markets because they prevent merchants from reducing their acceptance of payment cards as prices increase ..................................................................... 53

        F.     Defendants possess market power in each of the relevant markets because they possess high market shares in concentrated markets ...................................................... 55

81561318.14

VI.   Defendants' rules and default interchange fees harm competition ........... 57

    A.   Defendants' rules and default interchange fees inflate the price of network services to merchants ............................................... 59

    B.   Defendants' arguments regarding costs to cardholders should not be considered when evaluating harm to competition ............................................................................................... 61

        1.   Antitrust violations are not excused because they may benefit consumers outside of the affected relevant market. ............................................................................... 61

        2.   Defendants' "total price" argument is unsupported in the record. ........................................................................ 63

    C.   Defendants' high interchange fees and the other challenged rules result in consumers paying higher prices for the goods and services they buy from merchants than they would in the absence of Defendants' conduct .................................................. 67

    D.   Defendants' high interchange fees and the other challenged rules have created and enhanced barriers to entry and expansion into the relevant markets ..................................................... 67

    E.   Defendants' interchange fees and other rules reduce merchant acceptance ........................................................................ 68

        1.   In combination with the anti-steering restraints, interchange fees set at current levels reduce merchant acceptance in the United States .............................................. 68

        2.   The fact that merchant acceptance, cardholder accounts, and volume in Australia increased when the RBA capped interchange fees demonstrates that supracompetitive interchange fees suppress output ........... 71

VII.   The Defendants' interchange fees and rules are more restrictive than necessary to attain any procompetitive benefits ................................. 72

    A.   Defendants' default interchange fees and other rules are not necessary to overcome a "chicken-and-egg" problem or to prevent a "death spiral" of declining issuance and acceptance. ................................................................................... 74

    B.   Interchange fees are not necessary, or are more restrictive than necessary, to "balance the system." ........................................... 76

        1.   Defendants' "system-balancing" argument is not supported in the record ........................................................... 76

81561318.14

2.    Defendants' arguments that interchange fees and the anti-steering restraints increase output fail because they ignore the effect of Defendants' anti-steering restraints and undisputed evidence ...................................... 77

3.    The "system-balancing" justification is not legally cognizable.................................................................. 82

C.    Defendants' claim that interchange fees provide incremental sales to merchants cannot justify conduct that harms competition and is unsupported by the evidence............................ 83

D.    Defendants cannot justify default interchange fees to solve the "hold-up" problem because the hold-up problem is a problem of their own creation............................................. 85

PART FOUR SUMMARY JUDGMENT SHOULD BE GRANTED ON CLASS PLAINTIFFS' CLAIMS RELATING TO DEFENDANTS' PRE-RESTRUCTURING FIXING OF DEBIT-CARD INTERCHANGE FEES ON DEBIT CARDS [CLAIMS 10, 11, 13 & 14] ....................................................................................... 86

I.    Signature and PIN-debit-card network services are proper relevant markets in which to evaluate Defendants' conduct................................... 87

A.    The cross-elasticity of demand between signature-debit-card network services and PIN-debit-card network services is low because merchants accepted signature-debit cards when they were significantly more expensive than PIN-debit cards ...... 87

B.    The anti-steering restraints limit merchant substitution between Signature and PIN debit-card network services.............. 89

C.    Defendants' internal documents show that Defendants treat signature-debit cards and PIN-debit cards as separate products................................................................... 90

D.    PIN-debit-card network services and signature-debit-card network services are not reasonable substitutes for each other because many merchants lack the equipment necessary to process PIN-debit transactions ....................................... 90

II.    Defendants have market power in the relevant product markets for signature-debit-card network services and PIN-debit-card network services................................................................... 91

A.    Defendants have market power in the market for signature-debit-card network services ............................................. 92

1.      Defendants have the power to control the prices of signature-debit-card network services because they can increase interchange fees and price discriminate in the levels of those fees without losing significant merchant acceptance ................................................................. 92

2.      Indirect evidence establishes that Defendants have market power in the market for signature-debit-card network services ........................................................................ 93

B.      Visa and its member banks have market power in the market for PIN-debit-card network services ................................. 94

1.      Visa and its member banks are able to increase PIN-debit-card interchange fees and discriminate in the level of those fees without losing significant merchant acceptance ................................................................... 94

2.      The ability of Visa and its member banks to lead a market "convergence" in the interchange fees for signature-debit-card network services and PIN-debit-card network services directly demonstrates Visa's market power ................................................................... 95

3.      Defendants' conduct enhances their market power in PIN-debit-card network services ............................................ 97

4.      Indirect evidence establishes that Visa and its member banks have market power in the market for PIN-debit-card network services ..................................................... 98

III.     Defendants' rules and default interchange fees harm competition in the signature-debit-card-network-services market and the PIN-debit-card-network-services market ............................................................. 98

A.      Defendants and their experts do not refute the central conclusion of Dr. Frankel, that debit-card interchange fees increase merchants' costs of debit-card acceptance ......................... 98

B.      Defendants' rules and interchange fees reduce the number of merchants that accept debit cards. ..................................................... 99

IV.      Defendants do not show procompetitive justifications to offset the obvious anticompetitive effects of their conduct ...................................... 100

PART FIVE DEFENDANTS' RULES AND DEFAULT INTERCHANGE FEES CONTINUE TO VIOLATE SECTION 1 OF THE SHERMAN ACT AFTER THEIR RESTRUCTURINGS. [CLAIMS 17, 18 & 20] ................................................................... 102

- v -

I.     A broad range of agreements can constitute "contracts, combinations, or conspiracies" under Section 1 ........................................ 103

II.    The conduct that Class Plaintiffs challenge is governed by a series of agreements among each network and its member banks ................... 105

    A.    The Visa and MasterCard rules continue to dictate the conduct that Class Plaintiffs challenge ........................................... 105

    B.    Agreements among the banks and networks were intended to—and did—coordinate the competitive conduct of the banks after the restructurings .......................................................... 106

    C.    The restructurings at most converted the networks from horizontal conspiracies to hub-and-spoke conspiracies............... 107

III.   No bank has made any affirmative statement to withdraw from the previously adjudicated structural conspiracies.......................................... 108

CONCLUSION ..................................................................................................... 111

81561318.14

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Am. Needle, Inc. v. NFL,*
130 S. Ct. 2201 (2010) .................................................................... passim

*Bd. of Trade of Chicago v. United States,*
246 U.S. 231 (1918) ........................................................................ 33

*Capital Imaging Assocs. v. Mohawk Valley Med. Assocs.,*
996 F.2d 537 (2d Cir. 1993) ........................................................ 25, 27, 74

*Catalano, Inc. v. Target Sales, Inc.,*
446 U.S. 643 (1980) ..................................................................... 62, 106

*Citizen Publ'g Co. v. United States,*
394 U.S. 131 (1969) ...................................................................... 32

*Clarett v. NFL,*
306 F. Supp. 2d 379 (S.D.N.Y. 2004), *rev'd on other, non-antitrust grounds,*
369 F.3d 124 (2d Cir. 2004) ......................................................... passim

*Copperweld v. Indep. Tube Corp.,*
467 U.S. 752 (1984) ...................................................................... 28, 104

*Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.,*
502 F.3d 91 (2d Cir. 2007) ........................................................... 78

*Drug Mart Pharmacy Corp. v. Am. Home Prods. Corp.,*
288 F. Supp. 2d 325 (E.D.N.Y. 2003) .......................................... 109

*F.T.C. v. Indiana Fed'n of Dentists,*
476 U.S. 447 (1986) ...................................................................... 61

*Fraser v. Major League Soccer, L.L.C.,*
284 F.3d 47 (1st Cir. 2002) .......................................................... 18, 30, 104

*Freeman v. San Diego Assn. of Realtors,*
322 F.3d 1133 (9th Cir. 2003) ...................................................... passim

81561318.14

*FTC v. Ind. Fed'n of Dentists*,
    476 U.S., 447 (1996) ................................................................................ 73

*Geneva Pharm. Techn. Corp. v. Barr Lab. Inc.*,
    386 F.3d 485 (2d Cir. 2004) ...............................................................passim

*Hertz Corp. v. City of New York*,
    212 F. Supp. 2d 275 (S.D.N.Y. 2002) .............................................. 25

*In re "Agent Orange" Prod. Liab. Litig.*,
    611 F.Supp. 1223 (E.D.N.Y. 1985) .................................................. 102

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
    256 F.R.D. 82 (D. Conn. 2009) ........................................................ 78

*In re Parmalat Sec. Litig.*,
    477 F. Supp. 2d 637 (S.D.N.Y. 2007) .............................................. 82

*In re Visa Check/MasterMoney Antitrust Litig.*,
    No. 96-CV-5238 (JG), 2003 WL 1712568  E.D.N.Y. Apr. 1, 2003) ................passim

*Interstate Circuit, Inc. v. United States*,
    306 U.S. 208 (1939) .............................................................. 104, 108

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984) ............................................................... 87

*Khaimi v. Schonberger*,
    664 F. Supp. 54 (E.D.N.Y. 1987) ...................................................... 26

*Kramer v. Time Warner Inc.*,
    937 F.2d 767 (2d Cir. 1991) ........................................................... 82

*Law v. NCAA*,
    134 F.3d 1010 (10th Cir. 1998) .................................................passim

*Leegin v. PSKS, Inc.*,
    551 U.S. 877 (2007) ........................................................... 104, 106

*Major League Baseball Prop., Inc. v. Salvino*,
    542 F.3d 290 (2d Cir. 2008) .......................................................... 26, 32

*Marquette Nat'l Bank v. First of Omaha Serv. Corp.*,
    439 U.S. 299 (1978) .................................................................... 10

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ......................................................................................... 25

*MCM Partners v. Andrews-Bartlett & Assocs.*,
    62 F.3d 967 (7th Cir. 1995) .......................................................................... 91

*Mercedes-Benz USA, Inc. v. Coast Auto. Group, Ltd.*,
    362 F. Appx. 332 (3d Cir. 2010) ................................................................ 102

*Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*,
    198 F.3d 823 (11th Cir. 1999) .................................................................... 109

*Nat'l Soc'y of Prof. Eng. v. United States*,
    435 U.S. 679 (1978) ................................................................................. 58, 73

*New York ex rel Abrams v. Anheuser-Busch, Inc.*,
    811 F. Supp. 848 (E.D.N.Y. 1993) ............................................................ 103

*New York ex rel Spitzer v. St. Francis Hosp.*,
    94 F. Supp. 2d 399 (S.D.N.Y. 2000) ........................................................... 32

*Northwestern Fruit Co. v. A. Levy & J. Zentner Co.*,
    665 F. Supp. 869 (E.D. Cal. 1986) .............................................................. 62

*Pepsico, Inc. v. The Coca-Cola Co.*,
    315 F.3d 101 (2d Cir. 2002) ...................................................................... 103

*Premier Elec. Construction Co. v. Nat'l Elec. Contractors Assn, Inc.*,
    814 F.2d 358 (7th Cir. 1987) .................................................... 58, 62, 63, 83

*R.B. Ventures, Ltd. v. Shane*,
    112 F.3d 54 (2d Cir. 1997) .......................................................................... 25

*Rexall Sundown, Inc. v. Versus Perrigo, Co.*,
    651 F. Supp. 2d 9 (E.D.N.Y. 2009) ............................................................ 63

*Robinson v. Transworld Sys., Inc.*,
    876 F. Supp. 385 (N.D.N.Y. 1995) ............................................................ 26

*Ross v. Bank of America, N.A.*,
    524 F.3d 217 (2d Cir. 2008) .......................................................... 61, 67, 93

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
    792 F.2d 210 (D.C. Cir. 1986) .................................................................. 104

*S.E.C. v. Thrasher,*
    152 F. Supp. 2d 291 (S.D.N.Y. 2001) ............................................................... 26

*State of New York v. Kraft Gen. Foods, Inc.,*
    926 F. Supp. 321 (S.D.N.Y. 2001) ................................................................. 38

*Texaco Inc. v. Dagher,*
    126 S. Ct. 1276 (2006) ............................................................................... 28

*Timken Roller Bearing Co. v. United States,*
    341 U.S. 593 (1951) ................................................................................. 32

*Toys "R" Us v. F.T.C.,*
    221 F.3d 928 (7th Cir. 2000) ............................................................... passim

*United States v. Addyston Pipe,*
    175 U.S. 211 (1899) ................................................................................. 26

*United States v. American Express Co.,*
    No. CV-10-4496 (E.D.N.Y. Oct. 4, 2010) ................................................. 8, 36, 49

*United States* v. *Archer-Daniels-Midland Co.,*
    866 F.2d 242 (8th Cir. 1988) ......................................................................... 88

*United States v. Dentsply Int'l, Inc.,*
    399 F.3d 181 (3d Cir. 2005) ......................................................................... 55

*United States v. E.I. duPont de Nemours & Co.,*
    351 U.S. 377 (1956) ............................................................................... passim

*United States v. Greenfield,*
    44 F.3d 1141 (2d Cir. 1995) ............................................................... 109, 110

*United States v. Lothian,*
    976 F.2d 1257 (9th Cir. 1992) ..................................................................... 109

*United States v. Microsoft Corp.,*
    253 F.3d 34 (D.C. Cir. 2001) ................................................................... passim

*United States v. Socony-Vacuum Oil Co.,*
    310 U.S. 150 (1940) ................................................................................. 33

*United States v. Topco Associates, Inc.,*
    405 U.S. 596 (1972) ............................................................................... passim

*United States v. Visa U.S.A., Inc.,*

- x -

344 F.3d 229 (2d Cir. 2003) ....................................................................................................passim

*Visa U.S.A., Inc. v. First Data Corp.*,
    No. 3:02-cv-01786 ("*First Data*") (N.D. Cal. Aug. 16, 2005) ................................ 18, 98

*Wal-Mart Stores Inc. v. Visa U.S.A. Inc.*,
    396 F.3d 96 (2d Cir. 2005) ...................................................................................... 15, 40, 48

**Statutes**

15 U.S.C. § 1 ............................................................................................................................ 28

F. R. Evid. 201 ........................................................................................................................ 81

Fed. R. Civ. P. 56(c) .............................................................................................................. 24

Fed. R. Civ. P. 56(d) .............................................................................................................. 26

Fed. R. Evid. 702 .................................................................................................................... 63

Local Rule 56.1 ........................................................................................................................ 4

**Other Authorities**

Alan S. Frankel,
    *Towards a Competitive Card Payments Marketplace*,
    Reserve Bank of Australia, Payments System Review Conference (2007) ............ 66

Benjamin Klein, Kevin Murphy, *et al.*,
    *Competition In Two-Sided Markets: The Antitrust Economics of
    Payment Card Interchange Fees*, 73 Antitrust L.J. 571 (2006) ..................................... 54

Carlton & Perloff,
    Modern Industrial Organization 88 .......................................................................... 93

David L. Stearns,
    Think of it as Money: A History of the VISA Payment System, 1970-1984 .......... 10

David S. Evans & Richard Schmanensee,
    Paying With Plastic 117 (2d ed. 2005) .................................................................. 11, 75

Dennis Carlton & Jeffrey Perloff,
    Modern Industrial Organization (4th ed. 2005) ........................................................ 50

81561318.14

Fumiko Hayashi,
*A Puzzle of Card Payment Pricing:*
*Why Are Merchants Still Accepting Card Payments?*, 5 Rev. Network Econ. 144
(2006) ................................................................................................................... 88

H. Hovenkamp & C. Leslie,
*The Firm as Cartel Manager*, 64 Vand. L. Rev. ___ (forthcoming spring 2011) ........ 28

H. Hovenkamp,
Federal Antitrust Policy: the Law of Competition and its Practice (3d ed. 2005) 26, 72

L. Costantine, et al.,
*Repairing the Failed Debit Card Market: Lessons from a Historically*
*Interventionalist Federal Reserve and the Recent Visa Check / MasterMoney Antitrust*
*Litigation,* 2 NYU J. of Law and Business 147 (2006) ................................................. 95

*MasterCard to Trim Fees in Europe Under a Settlement,*
American Banker, Apr. 2, 2009 .................................................................................. 22

Materials Prepared for Meeting Between Federal Reserve Staff and Merchants Payment
Coalition
¶ 28 (Nov. 2, 2010) ..................................................................................................... 16

Michael Quint,
*MasterCard and Visa Sued over Debit Cards,* N.Y. Times July 27, 1989.) ................... 13

Press Release, Visa Inc.,
*Visa Inc. Statement on Charges to U.S. Operating Regulations on Non-Visa*
*Debit Transactions on Visa-Branded Cards* (July 1, 2008) ............................................. 69

Reserve Bank of Australia,
Designation of Credit Card Schemes in Australia (Apr. 12, 2001) ........................... 19

Robert Stillman, Wm. Bishop, Kyla Malcolm, Nicole Hildebrandt,
Regulatory Intervention in the Payment Card Industry by the Reserve Bank
of Australia, Analysis of the Evidence  CRA Int'l (Apr. 28, 2008) ......................... 72

*Tentative Deal in Lawsuit by Discover,*
(Oct. 15, 2008) .......................................................................................................... 17

U.S. Dep't of Justice & F.T.C.,
*Horizontal Merger Guidelines*  (2010) ................................................................. 38, 56, 76

## Introduction

For decades, the Visa and MasterCard networks were controlled by the largest banks in the United States. Although these banks were competitors in nearly every aspect of their payment-card businesses, they collectively set and enforced uniform schedules of default interchange fees, which established minimum prices for merchants' acceptance of Visa and MasterCard cards. Competition authorities and central banks across the globe concluded that Defendants' agreements harmed competition and raised prices to merchants and consumers. After these regulatory actions and their defeat in *United States v. Visa*, the banks that controlled both Visa and MasterCard knew that the networks were "structural conspiracies." Only recently and only in response to litigation did those banks restructure Visa and MasterCard in hopes of evading continuing antitrust liability while continuing their anticompetitive conduct. Even after the restructurings, Visa and MasterCard's default interchange fees and other anticompetitive rules continue in effect and continue to be enforced by the competing banks to this day. Extensive discovery in this litigation[1] has removed any material dispute of fact that default interchange fees and Defendants' other rules raise prices to merchants and harm competition without any offsetting benefit to competition. Therefore, for the reasons stated below, Class Plaintiffs respectfully move this Court for summary judgment on ten of their claims that challenge the setting of default

---

[1]     Hereinafter the term "networks" will refer collectively to Visa, MasterCard and the banks that control Visa and MasterCard. Also, "Visa" refers to the Visa network and its member banks, and "MasterCard" refers to MasterCard and its member banks. All other capitalized words or phrases have the meaning contained in the definition in the Second Consolidated Amended Class Action Complaint.

81561318.14

interchange fees.  Summary judgment for Class Plaintiffs on these claims will materially advance the resolution of this case and provide substantial benefits to American merchants and consumers.

### Part One
### Preliminary Statement

Class Plaintiffs ("Class Plaintiffs"),[2] on behalf of themselves and others similarly situated, respectfully move this Court for summary judgment on liability on Counts 1, 2, 5, 10, 11, 13, 14, 17, 18 and 20 as pleaded in the Second Consolidated Amended Class Action Complaint, which challenges agreements between and among Visa and the Visa member banks[3] and between and among MasterCard and the MasterCard member banks to adopt, impose, and enforce a system of rules (the "rules") that require the payment of an interchange fee on every transaction conducted through the networks and to adopt, impose and enforce the use of default levels of those fees (the "intranetwork conspiracy claims").

## I.     Overview of Class Plaintiffs' claims.

---

[2]     "Class Plaintiffs" collectively refers to "Class I" and "Class II" in the Second Consolidated Amended Class  Action Complaint. Paragraph 108 of the complaint defines Class I as "[a]ll persons, businesses, and other entities, that have accepted Visa and/or MasterCard Credit and/or Debit Cards in the United States at any time from and after January 1, 2004." Class II consists of "all persons businesses, and other entities" that currently accept Defendants' cards.

[3]     Like regulatory and judicial bodies in other countries, the Second Circuit held that Visa and MasterCard are not "single entities; they are consortiums of competitors. They are owned and effectively operated by some 20,000 banks, which compete with one another in the issuance of payment cards and the acquiring of merchants' transactions. These 20,000 banks set the policies of Visa U.S.A. and MasterCard." *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 242 (2d Cir. 2003). Thus, the actions of Visa and MasterCard were effectively the actions of thousands of competing banks. As explained in Part Five below, even after the banks restructured the two networks, agreements among the banks and networks continue to restrict the competitive activities of these competing banks. For ease of reference, however, this memorandum often simply refers to "Visa" or "MasterCard" when describing collective actions of the networks and their member banks.

- 2 -

Plaintiffs challenge the rules adopted, imposed and enforced by the member banks of Visa and MasterCard via those networks, which artificially inflate the prices that merchants pay to accept Visa and MasterCard-branded payment cards, and which prevent price competition in those markets.

This memorandum addresses the intra-network claims in the following manner. Part Two contains an overview of the history of the payment-card industry and the rules and other conduct that the plaintiffs are challenging. The intra-network claims relating to the credit-card-network-services market [Counts 1, 2 & 5] before the networks' IPOs are addressed in Part Three. This section applies the framework utilized in Sherman Act "rule of reason" cases by the Second Circuit by addressing the "agreement" and "restraint" elements of a Section 1 claim, market definition, market power, harm to competition, and potential procompetitive justifications. Part Four addresses the intra-network claims relating to the pre-IPO rules and conduct in the markets for signature- and PIN-debit-card network services [Counts 10, 11, 13 & 14]. Because the proof required to establish the agreement and restraint elements of a Section 1 claim are identical for the credit-card and debit-card markets, the debit-card section of this memorandum refers back to the credit-card section. Because some of the facts relating to market definition, market power, harm to competition, and procompetitive justifications are specific to debit markets, those elements are addressed independently in the debit section. Finally, Part Five addresses Class Plaintiffs' challenges to the networks' post-IPO rules and conduct [Counts 17, 18 & 20.] Because the only facts that have arguably changed with the networks' IPOs are those relating to

- 3 -

the "agreement" element of a Section 1 claim, this section incorporates the discussion of the other elements in the credit-card and debit-card sections.

As detailed in the accompanying Statement of Undisputed Facts, no material factual disputes exist with respect to the core conduct and facts at issue in this case. No reasonable and properly instructed jury could fail to find as true the following facts:

- The challenged network rules were enacted by votes of the MasterCard and Visa boards of directors, which consisted of representatives of their competing member banks, elected by the banks;  (SUF ¶¶ 9-10; 15-20; 23.)[4]

- Before and after the networks' restructurings, each of the Visa and MasterCard member banks agrees to abide by and enforce the same rules that the member banks put in place before the restructurings; (SUF ¶¶ 3-4; 21-22; 24-25; 49; 59.)

- The rules requiring the payment of default interchange fees on every transaction[5] and the anti-steering restraints increase the costs to merchants of accepting payment cards; (SUF ¶¶ 66-67; 75-76.)

- The default-interchange-fee rules and the anti-steering restraints reduce the number of merchants that would accept those cards in the absence of those rules and restraints; (SUF ¶¶ 71-72.)

- The Defendants have been able to increase interchange fees in the markets for credit-card network services, signature-debit-card network services, and PIN-debit-card network services without losing acceptance volume or the number of merchants who accept those card products in any of these markets; (SUF ¶ 93.)

- No firm has been able to successfully enter these markets since Discover in 1985. Other four-party payment systems operate efficiently without an interchange fee or with a significantly less restrictive fee; (SUF ¶¶ 112-113; 117-122.)

- Bank representatives that were elected by all of the member banks and sat on each network's board of directors caused the networks to re-structure

---

[4]      "SUF" refers to Class Plaintiffs' Statement of Undisputed Facts Pursuant to Local Rule 56.1.

[5]      Hereinafter in this memorandum the term "interchange fee rules" refers to the Visa and MasterCard rules requiring the payment of interchange fees specified in the schedule.

their business organizations and consummate those organizations with the primary purpose of continuing the banks' conduct and agreements while hoping to evade scrutiny under Section 1 of the Sherman Act. (SUF ¶¶ 3-4; 8-9; 16; 33-34; 37-38.)

## II. The Visa and MasterCard rules restrict the competitive conduct of all of the players in a payment-card transaction.

The anticompetitive conduct that Class Plaintiffs challenge centers around three sets of rules: (i) the honor-all-cards rules; (ii) the default-interchange rules; and (iii) a group of rules referred to as the "anti-steering restraints."[6]

- The networks' **honor-all-cards rules**[7] require that any merchant that accepts Visa or MasterCard credit or signature-debit cards accepts all credit or signature-debit cards bearing that brand, regardless of the issuer, type of card (standard credit, premium credit, or commercial, for example), and regardless of the interchange rate associated with that card.

- The **default-interchange rules**[8] require the payment of an interchange fee specified in the networks' published schedules of default interchange fees on every transaction in which the issuing and acquiring banks have not executed a bilateral interchange-fee agreement. While both networks allow for bilateral interchange arrangements in theory, in practice such agreements are virtually non-existent. (SUF ¶ 74.)

- The **anti-steering restraints** refer to a number of rules that limit merchants' ability to influence consumers' payment-method choice at the point of sale by making the costs of various payment methods invisible to the consumer. Among those rules are the following:

  o The **no-surcharge rules**[9] prohibit merchants from adding a surcharge to a transaction conducted with a Visa or MasterCard-branded

---

[6] The term "anti-steering restraints" has the meaning given to it in the Second Consolidated Amended Class Action Complaint. The following terms used in this memorandum are also defined in ¶ 8 of the complaint: acquirer, acquiring bank, authorization, credit card, debit card, honor-all-cards rule(s), interchange fee, issuer, issuing bank, member bank, merchant, network(s), network services, no-bypass rule, no-minimum purchase rule(s), no-multi-issuer rule(s), no-surcharge rule(s), payment card, PIN-debit card, premium card, settlement, signature-debit card.

[7] Visa Op. Regs, Core Principle 6.2; MasterCard Rules 5.11.2.

[8] Visa Op. Regs. Core Principle 10.2; MasterCard Rule 9.4 (SUF ¶¶ 31ii; 32ii.)

[9] Visa Int'l Op. Regs. 5.1C; MasterCard Rule 9.12.2 (SUF ¶¶ 31iii; 32iii.)

- 5 -

payment card, unless that surcharge is applied equally to all forms of payment. Thus, an airline could add a fuel surcharge to all passengers' ticket prices, but it could not apply a surcharge only to those passengers' tickets that were purchased with credit cards.

o The **no-minimum-purchase rules** and **no-maximum-purchase rules**[10] prevented merchants that accept Visa or MasterCard-branded cards from refusing to accept those cards for transactions over or under a certain amount.

o The **no-discrimination rules**[11] prohibited merchants from (in the case of MasterCard) "discriminat[ing] against or discourag[ing] the use of a Card in favor of any other acceptance brand." Visa's rule similarly prohibited discounts that were "[n]on-discriminatory, as between a Cardholder who pays with a Visa Card and a Cardholder who pays with a comparable card." Both networks interpreted their rules to prohibit point-of-sale discounts that were given for purchases made with card products other than their own products. (SUF ¶¶ 31vii; 32viiB.)

o The **no-multi-issuer rules**[12] prevent issuers from issuing payment devices that can process credit-card or signature-debit-card transactions on more than one network. Visa also has a **no-bypass rule**[13] which prevents the merchant and acquiring bank from routing transactions over a network other than VisaNet. (SUF ¶¶ 31viii; 32viii.)

The combination of the rules mentioned above harms merchants by increasing the prices that they pay to accept payment cards. The honor-all-cards and the default-interchange rules together require that a merchant accept all of a network's cards and pay the issuing bank an interchange fee on each transaction. These two rules allow the issuer to demand an exorbitant sum from the merchant. (Frankel Rep. ¶¶ 118-203;

---

[10]   Visa Int'l Op. Regs. 5.2.F; MasterCard Rule 5.1 (SUF ¶¶ 31vi; 32vi.)

[11]   Visa Int'l Op. Regs. 5.2.D.2.; MasterCard 5.11.1 (SUF ¶ 31vii.)

[12]   Visa Int'l Op. Regs. Core Principle 4.3; MasterCard Rules 4.2.12.

[13]   Visa Int'l Op. Regs. Core Principle 7.4.

- 6 -

Murphy Rep. ¶ 209.)[14] The anti-steering restraints compound this problem by preventing merchants from charging their customers prices that reflect the cost of the payment method they choose. Together, these rules endow the issuing bank with substantial market power over the merchant. In fact, both Visa and MasterCard referred to this as the "hold up" problem, *i.e.*, each bank is a monopolist in the redemption of transactions on cards issued to its cardholders. Thus, when the networks set interchange fees that apply to all issuing banks' cards, they have been able to take advantage of this collective market power to increase interchange fees without merchants dropping acceptance of their cards.

Recent developments will force the defendants to alter some of their rules to some extent. The Durbin Amendment to the Dodd-Frank Wall Street Reform and Consumer Protection Act[15] forces the defendants to alter their no-discrimination rules and their no-minimum- and no-maximum purchase rules to allow merchants to provide discounts to consumers who use cards that compete with Visa and MasterCard's. It also requires the Defendants to repeal their no-multi-issuer rules to the extent that they

---

[14]    Several expert reports and deposition transcripts are cited directly in this memorandum. These reports and depositions are attached as exhibits to the Affidavit of Ryan W. Marth as follows: Expert Report of Alan. S. Frankel (SUFEX 240); Expert Report of Christopher A. Velltaro (SUFEX 582); Expert Report of Joseph Stieglitz (SUFEX 583); Expert Report of Dan Ariely (SUFEX 584); Expert Report of Michael McCormack (SUFEX 001); Expert Report of Kevin M. Murphy (SUFEX 338); Expert Report of Benjamin Klein (SUFEX 212); Expert Report of Barbara Kahn (SUFEX 585); Expert Report of Kenneth G. Elzinga (SUFEX 250); Expert Report of Christopher M. James (SUFEX 254); Expert Report of Robert H. Topel (SUFEX 304); Expert Report of William Wecker (SUFEX 586); Murphy Deposition Transcript (SUFEX 317 and SUFEX 588); Elzinga Deposition Transcript (SUFEX 305); Kahn Deposition Transcript (SUFEX 587); Klein Deposition Transcript (SUFEX 188); Topel Deposition Transcript (SUFEX 589).

[15]    Pub. L. 111-203, 124 Stat. 1376 (2010) §§ 1075 *et seq.*

- 7 -

81561318.14

prevent issuers from placing multiple debit-network bugs on one payment device.[16] A recent proposed consent decree with the Department of Justice's Antitrust Division will require the Defendants to make the same modifications to their no-discrimination rules, and will also give merchants the option of providing differential discounts to customers who use debit cards or standard credit cards instead of the networks' premium cards. *See* Competitive Impact Stmt., *United States v. American Express Co.*, No. CV-10-4496, 10-11 (E.D.N.Y. Oct. 4, 2010), *available at http://www.justice.gov/atr/cases/f262800/262873.htm*. Even though these developments will improve merchants' ability to influence consumers' payment-method choices, they cannot immediately reverse the anticompetitive effects of interchange fees being set at supracompetitive levels, in part because merchants lacked these tools for so many years. And even the Durbin Amendment and the DOJ consent decree leave intact the networks' prohibitions on surcharging, which experts on both sides of this case acknowledge to be the most effective tool for merchants to influence consumers' payment choices. (Frankel Rep. § 5.2.3, Ariely Rep. at 12-14, Kahn Rep. ¶¶ 97-108.)

Both before and after the corporate restructurings, the rules of Visa and MasterCard guarantee that the member banks are involved in every step of a payment-card transaction. In the networks' standard agreements with their member banks, which also remained unchanged after the IPOs (SUF ¶ 4.), the banks agree to abide by each of the networks' rules, including the honor-all-cards rule, the default-interchange rule, and the anti-steering restraints. (SUF ¶¶ 19-25.) Moreover, for those member banks

---

[16]     *Id.*

that act as acquirers, the member banks further agree to enforce each of the networks'
rules against the merchants whose payment-card transactions they acquire.  (SUF ¶¶ 21;
25; 49; 59.) Even if the merchant uses a third-party processer or an independent sales
organization (ISO), the rules of Visa and MasterCard require that an acquiring-member
bank be a party to the merchant contract (SUF ¶¶ 31iv; 32iv.) Thus, on every single Visa
or MasterCard transaction, member banks are responsible for ensuring that the
transaction complies with the Visa or MasterCard rules, transferring funds from the
cardholder to the merchant, deducting an interchange equal to the networks' schedules
of default fees applicable to the particular transaction and enforcing the rules that
prevent merchants from steering customers to other payment systems. (SUF ¶¶ 19-25;
31iv; 32iv; 49.)

III.    **The history of the payment-card industry and default interchange fees.**

  A.    **Visa and MasterCard grew out of banking associations that formed to
         offer regional and national credit-card programs in an era of localized
         banking.**

Both Visa and MasterCard arose from regional associations of banks that formed
joint ventures to operate regional credit-card networks in the 1950s and 1960s. In 1958,
Bank of America introduced a general-purpose credit-card program known as
BankAmericard. Although banking regulations in effect at the time prohibited it from
operating outside of California, Bank of America provided its card program with a
national scope by licensing banks in other regions of the country to issue cards and sign
up merchants. In 1970, Bank of America divested its control over the BankAmericard
program to National BankAmericard Inc. (NBI) a bank-owned joint venture, which was

- 9 -

renamed "Visa" in 1976. MasterCard also began as a joint venture of banks, the Interbank Card Association, in 1969, before changing its name to Master Charge and finally MasterCard.

Until at least the early 1980s, the banking industry, and by extension the payment-card industry, looked dramatically different than those industries do today.[17] Federal and state regulations prevented interstate branch banking and some intrastate branch banking, and state usury laws capped the interest rates that lenders (including credit-card issuers) could charge. In the early 1980s, interest rates spiked to prime interest rates in excess of 20%, which made credit-card lending particularly unprofitable in light of the usury laws. The legal and marketplace restrictions on credit-card issuers persisted until the Supreme Court's 1978 decision in *Marquette Nat'l Bank v. First of Omaha*,[18] which allowed nationally-chartered banks to circumvent state usury laws by issuing cards from a different state, and set in motion a trend of states repealing or relaxing their usury laws. The *Marquette* decision and the repeal of state usury laws paved the way for banks to issue credit cards on a national basis. (D. Evans & R. Schmalansee p. 69 (2d ed.)

In the early days of the networks, payment-card transactions were processed largely without the benefit of computer technology. (McCormack Rep. ¶ C-2.) In the late 1960s and early 1970s, sales clerks conducted card authorizations either by telephone or

---

[17]    The early history of the payment-card industry is set forth in detail in Appendix A to the Expert Report of Alan S. Frankel. An informative, albeit biased, history of Visa is found in a document heavily relied on by Defendant's expert Kevin M. Murphy. (Murphy Rep. § 52 n.37 (citing David L. Stearns, Think of it as Money: A History of the VISA Payment System, 1970-1984.)

[18]    *Marquette Nat'l Bank v. First of Omaha Serv. Corp.*, 439 U.S. 299 (1978).

by checking the consumer's card number against large books of card numbers that were known to be invalid. (*Id.* ¶ C-3.) Once transactions were authorized, the merchant sent paper "drafts" from the transaction to its acquiring bank, which then sent the drafts to the appropriate network, where the drafts were sorted according to issuing bank, bundled, and then sent to the appropriate bank so that it could debit the consumer's account. (*Id.* ¶ C-2.)

Consumers' and merchants' acceptance of credit cards was also slow in the early years. In 1970 only 16% of U.S. families had at least one credit card, and only 43% had a card as late as 1983. (Frankel Rep. ¶¶ 407, 411 & Fig. A.2.)[19] At this time, credit-card usage was concentrated among affluent individuals, and even their use was tilted toward stores' own credit cards, rather than the general-purpose credit cards issued by American Express, or Visa or MasterCard issuing banks. (*Id.* ¶ 407.) As of 1971, only 820,000 U.S. merchants accepted payment cards, which was no more than 20% of U.S. merchants. (*Id.* ¶ 423); David S. Evans & Richard Schmanensee, *Paying With Plastic* 117 (2d ed. 2005).

Visa and MasterCard operated virtually since their inception with some sort of fee paid from the merchant to the issuing bank. During the era of regulation and before payment cards had become ubiquitous, Visa and MasterCard justified their interchange fees as a method of reimbursing issuers for their costs of serving the "convenience user," who did not revolve a credit balance from month to month and therefore did not

---

[19]     For this proposition, Dr. Frankel relied upon the Federal Reserve Board's "Survey of Consumer Finance" data, which is available on the Fed's homepage at http://www.federalreserve.gov/pubs/oss/oss2/2007/scf2007data.html (last visited February 6, 2011).

provide the issuer with any interest revenue. The interchange fee was also meant to

provide an incentive for banks to issue cards in an era when interest rates were capped

and cardholder annual fees limited by the states. (SUF ¶ 57.) Both networks set their

level of interchange fees based on cost studies performed by "independent" entities –

Arthur Anderson for Visa and Edgar Dunn for MasterCard – that purportedly

measured issuing banks' transaction costs. (SUF ¶¶ 44; 54.)

> **B.** **Visa and MasterCard enter the debit-card market and transform debit cards from electronic checks to profit centers for large issuing banks.**

Two forms of debit cards emerged in the late 1970s. The first was PIN-debit cards

(also known as online-debit cards), which grew out of regional ATM networks, such as

Star, NYCE, and Pulse. The second form of debit was signature-debit cards (also known

as offline-debit cards), which were created by Visa and MasterCard and which relied on

the existing Visa and MasterCard credit-card networks for transaction processing. PIN-

debit networks generally operated without an interchange fee or with a small

interchange fee paid by the issuer to the merchant. (SUF ¶ 120.)

Banks and merchants were slow to adopt Signature Debit, which was more

costly and less efficient than PIN-debit, and by the late 1980's both Visa and MasterCard

were worried that if PIN-debit were "uncontained" it could be the "demise" of

Signature Debit and eventually threaten their growing market power in the market for

credit-cards. (SUF ¶ 115a.) Visa and MasterCard first attempted to enter the debit

market jointly by creating a joint interchange-fee-based PIN-debit card to rival existing

regional PIN-debit networks. This joint venture, known as "Entree" was abandoned it

- 12 -

after state attorneys general sued Visa and MasterCard on antitrust grounds. (Frankel Rep. ¶ 441) (citing Michael Quint, *MasterCard and Visa Sued over Debit Cards*, N.Y. Times July 27, 1989.) The attorneys general alleged that the joint venture was intended to prevent the debit-card market from evolving in a way that could threaten credit-card profits. *Id.* After its attempt to enter the debit market collectively with MasterCard was rebuffed, Visa entered the PIN-debit market by acquiring the then-largest PIN-debit network, California-based Interlink. (SUF ¶¶ 114; 120d.) Until it was acquired by Visa, Interlink did not have an interchange fee; its transactions cleared "at par" just like paper checks. (*Id.* Rep. ¶ 441.) Almost immediately upon acquiring Interlink, Visa introduced an interchange fee charged to the merchant – 45 basis points - and also imposed a No-Surcharge Rule on the merchant so that the fee would not be apparent to the cardholder. *Id.*



- 13 -

████████████████████████████████████████████ Visa's successful execution of a decade-long convergence strategy fits the classic definition of market power as "the power to control prices or exclude competition."[20] *United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 391 (1956); *Infra* at Part Four II.B.2..

While Visa was transforming the PIN-debit market into an issuer-centric business model, Visa and MasterCard took steps to make their signature-debit products the dominant forms of debit cards. (SUF ¶¶ 104-05.) In the mid-1990s, both Visa and MasterCard began persuading Issuing banks to issue signature-debit cards that bore their "bugs"—card logos that identify the transaction-processing network—instead of or in addition to the bugs of regional PIN-debit networks. (SUF ¶ 105.) Visa and MasterCard also incented issuers to issue their debit cards by promising much higher interchange revenues than the banks received on transactions processed through the regional PIN-debit networks. (SUF ¶¶ 105; 115.) Although merchants paid significantly higher fees for Signature than PIN-debit-card transactions, merchants could not refuse to accept signature-debit cards if they accepted Visa or MasterCard credit cards because of the networks' honor-all-cards rules to accept signature-debit cards. *In re Visa Check/MasterMoney Antitrust Litig.*, No. 96-CV-5238 (JG), 2003 WL 1712568 at *1-2 (E.D.N.Y. Apr. 1, 2003). (SUF ¶¶ 31i; 32i.; 90; 96.)  The combination of the higher interchange bounty of signature-debit, combined with the inability of merchants to refuse acceptance of those cards, produced the dominance in debit cards that Visa and

---

[20]     Visa's conduct in the debit market meets the classic definition of market power as "the power to control prices or exclude competition."

- 14 -

MasterCard had sought to achieve. *See id.* at *3-4. (SUF ¶ 90.)

The 2003 *Visa Check* settlement required the networks to eliminate that portion of their honor-all-cards rules that required credit-card-accepting merchants to also accept signature-debit cards. *Wal-Mart Stores Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 104 (2d Cir. 2005). It also resulted in a $3 billion payment to merchants and a temporary reduction in signature-debit-card interchange fees. Despite the settlement, the networks' market power in debit cards was so entrenched that only a handful of merchants – and no major merchants – were able successfully to discontinue the acceptance of Visa or MasterCard signature-debit products. (SUF ¶ 90.) Visa and MasterCard's market power in the credit-card network services market was also re-affirmed by the fact that both networks were able to *simultaneously* increase their interchange fees on credit cards on August 1, 2003 by precisely the same amount. (SUF ¶¶ 93l-m.)  Only the increased credit-card interchange fees were *permanent*, not *temporary*. (SUF ¶ 63.) The overwhelming market power of Visa and MasterCard was also demonstrated by the fact that, despite having lost the trial in *U.S. v. Visa*, and having settled the *VisaCheck* case by agreeing to uncouple the honor-all-cards rule for credit- and debit-card acceptance, and agreeing to temporary reductions in signature-debit interchange fees, from January 1, 2004 to the present average effective interchange fees on both credit and debit cards have continued to increase inexorably. (SUF ¶ 63.)

### C. Visa, MasterCard and their member banks are now dominant credit and debit-card networks.

The payment-card industry today is significantly different than the industry of

the late 1970s. Visa, MasterCard, and their payment-card offerings reached ubiquity many years ago. (SUF ¶¶ 1; 79-84; 116.) In 1971, fewer than 1 million merchants accepted payment cards while today over 7 million do. (*Id*. Rep. ¶ 423.) And transaction volume on general purpose, bank-issued credit cards has grown from $52.9 billion in 1980 to over $2 trillion in 2007. (Frankel Rep. ¶ 423) (citing Nilson Rep. Nos. 712, 738, 760, 784, 805, 828, 851, 874.) (SUF ¶¶ 1; 79-80.) Of this amount, Visa and MasterCard collectively accounted for approximately 75 % of credit-card purchase volume in the United States in 2008. (SUF ¶ 107.) Similarly, Visa and MasterCard collectively accounted for 100% of signature-debit purchases in 2009 and Visa's Interlink had 39.3 % of PIN-debit purchase volume in 2006. (SUF ¶¶ 108-109.) A 2006 report published by the Federal Reserve Bank of Kansas City showed that as of 2005, nearly six million merchants accepted signature-debit cards, while less than 2 million accepted PIN-debit cards. (SUF ¶ 115m.) Interlink's market share is at least that high today.[21] The dominance of the Visa and MasterCard networks has allowed them to increase interchange fees dramatically over the past decade despite decreasing costs for the processing of transactions. (SUF ¶¶ 45g-h; 63; 90; 93-96; *see also* SUF ¶ 55e.)

### D.   Visa and MasterCard are adjudged to be structural conspiracies in the United States and abroad.

By the late 1990s, the networks' joint-venture structures, in combination with

---

[21]      In a submission to the Federal Reserve Board, the Merchants Payment Coalition noted that Interlink transactions accounted for 42% of its members' PIN-debit transaction volume, despite members' efforts to steer transactions away from Interlink to other PIN-debit networks. Materials Prepared for Meeting Between Federal Reserve Staff and Merchants Payment Coalition ¶ 28 (Nov. 2, 2010), *available at* http://www.federalreserve.gov/newsevents/files/merchants_payment_coalition_meeting_20101102.pdf

81561318.14

their high market shares, high fees, and exclusionary practices mired the networks in antitrust law suits and investigations in dozens of jurisdictions across the globe.[22] In 1996, a class of merchants sued the networks claiming that the networks' requirement that credit-card accepting merchants also accept signature-debit cards was an illegal tying arrangement. This Court ruled as a matter of law that the general-purpose-card and debit-card network services markets were separate and that Visa possessed market power in the general-purpose-card network services market. *In re Visa Check*, 2003 WL 1712568 at 4. In 2003, the case settled resulting in the networks' honor-all-cards rules being partially eliminated, a temporary reduction in signature-debit interchange fees, and a monetary payment of $3 billion.

Later, the Department of Justice sued the networks over their exclusionary rules that prevented Visa or MasterCard member banks from also issuing American Express or Discover cards. This resulted in an injunction, affirmed on appeal, that required the repeal of that rule, and led to multi-billion dollar settlements in follow-on private litigation. *See Tentative Deal in Lawsuit by Discover*, (Oct. 15, 2008). On appeal, the Second Circuit held Visa and MasterCard were not "single entities" but "consortiums of competitors," which were "owned and effectively operated by some 20,000 [competing] banks." *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 242 (2d Cir. 2003). The court also held that each network possessed market power in the general-purpose-card network services market. *Id.* at 239.

---

[22]     In the United States Visa and MasterCard have been almost continuously in antitrust litigation since the 1970's. *See* K. Craig Wildfang & Ryan W. Marth, 73 Antitrust L.J. at 676-89, 703-04 (2006).

Similarly, in *Visa v. First Data*, a third-party processor countersued Visa on antitrust grounds, claiming that its rules that required all transactions to be processed and settled over Visa's VisaNet system unreasonably restrained trade. The court found that the pre-IPO promulgation and administration of the rules for authorization, clearing, and settlement ("ACS") of transactions by the competing member banks that sat on the Board of Directors of Visa constituted "agreements among competitors." *See Visa U.S.A., Inc. v. First Data Corp.*, No. 3:02-cv-01786 ("*First Data*"), at 1-3, 7 (N.D. Cal. Aug. 16, 2005) (Order denying Mot. Partial Summ. J. that Visa is Single Entity). In finding ACS to be concerted activity, the Court concluded that Visa possessed three characteristics that defined it as a collaboration of competitors instead of a single entity: lack of economic unity; actual and potential competition among members; and control by the member banks by virtue of the banks' representation on Visa's Board of Directors. *First Data*, No. 3:02-cv-01786, at 3-4, 10 (N.D. Cal. Mar. 2, 2006) (Order Granting Mot. Partial Summ. J. on Single Entity Def.) (relying on *Freeman & Fraser*).

While the U.S. cases were pending, the European Commission ("EC"), the United Kingdom's Office of Fair Trading ("UK OFT"), and the Australian Competition and Consumer Commission ("ACCC") and many other competition or central bank authorities around the world investigated the networks' member banks' collective setting of uniform schedules of default interchange fees. (Frankel Rep. ¶ 447 & n. 578) (citing Visa and MasterCard SEC filings). In the case of Europe, MasterCard eventually conceded that its structure, in which bank-appointed directors made its most important business decisions, rendered it an "association of undertakings" under EU law – the

- 18 -

equivalent of an agreement among competitors under Section 1.[23] (Commission

Decision (E.C.) relating to a proceeding under Article 81 of the E.C. Treaty and Article

53 of the EEA Agreement, COMP/34.579 (MasterCard), COMP/36.518

(EuroCommerce), COMP/38.580 (Commercial Cards) ¶¶ 348-49 (Dec. 17, 2007) ("E.C.

Decision".) The ACCC reached similar conclusions on the networks' structures and the

competitive effects of default interchange fees, which led to interchange fees being

regulated by the Reserve Bank of Australia at levels that were approximately half of the

pre-investigation levels and one-quarter the U.S. level.[24]

> E.   **MasterCard and Visa restructure to avoid application of Section 1 of the Sherman Act and similar laws outside of the United States.**

Because of the ongoing challenges to the networks' practices and the Second

Circuit's holding that the networks were consortia of competitors, the banks that

controlled the networks sought to avoid future antitrust liability while continuing their

interchange-based business model for their payment-card-issuing businesses. (SUF ¶¶

7; 13; 33-40; 61.) To do so, the banks—acting through the networks' boards—conducted

a series of transactions in which the networks acquired the banks' ownership shares,

and issued new classes of preferred stock to the banks. (SUF ¶¶ 7; 14; 33; 37.) The new

stock entitled the banks to elect a minority of each network's board and to veto certain

extraordinary transactions. (SUF ¶¶ 34b; 38a; 39d; 40a-b.)  The member banks caused

---

[23]     Visa chose to settle the OFT and EC investigations into its interchange fees. The MasterCard OFT decision was overturned on appeal on nonsubstantive grounds, and the OFT is currently pursuing a new investigation into MasterCard's practices.

[24]     Press Release, Reserve Bank of Australia, Designation of Credit Card Schemes in Australia (Apr. 12, 2001), *available at http://www.rba.gov.au/media-releases/2001/mr-01-09.html.*

each network also to set aside a "majority" of shares to be sold to the public, but put in place restrictions that prevented any single public shareholder or group of shareholders from acquiring more than 15% of the equity in the restructured networks.[25] (SUF ¶¶ 36e; 40b.) These restrictions were intended to prevent any entity that might have had an incentive to decrease interchange fees from gaining a significant ownership stake in the networks. (SUF ¶¶ 36e; 39d; 40b.) The networks financed their acquisition of the shares previously held by the banks with proceeds from their IPOs (held on May 26, 2006 for MasterCard and March 18, 2008 for Visa.) (SUF ¶¶ 7; 14; 33; 37.) Contemporaneous documents demonstrate that the avoidance of antitrust liability was the primary motivation behind the member banks' adoption of the networks' restructurings. (SUF ¶¶ 34; 38.) The banks that sat on the networks' boards of directors designed the restructurings such that, even after the IPOs, the interchange-based business model would remain unchanged, *i.e.*, the networks would continue to set uniform schedules of default interchange fees in the same way as they had done before the IPOs, and would continue to enforce the same merchant restraints that existed before the IPOs. (SUF ¶¶ 35-36; 38-39; 50-51; 62.)

In fact, key Visa and MasterCard executives testified that nothing changed in the manner in which the networks set interchange fees after the IPOs. (SUF ¶¶ 50-51; 62.) And MasterCard's counsel admitted that the networks' IPOs did not change any of the

_____

[25]      In the MasterCard IPO, new Class A shares, representing 49% of MasterCard's equity and 83% of MasterCard's voting rights were sold to the public. MasterCard Inc. FY06 Form 10-K, at 5. On March 18, 2008, Visa, Inc. conducted an IPO, in which the banks' "Class A" shares in Visa, Inc. were redeemed, reclassified, and sold to the public. Visa, Inc. FY 2009 Form 10-K at 101-02.

dynamics in the payment-card industry. (Tr. of argument on Mot. to Dismiss, 16, Nov. 18, 2009. Moreover, interchange fees continued to escalate after the IPOs, without the networks losing any significant merchant acceptance. (SUF ¶ 93a-b, d, h, j.) Because the banks designed and approved the networks' rules and the networks' restructurings, the networks' conduct was essentially unchanged by the restructurings and the IPOs – those transactions had the effect of appointing a third party – the restructured networks – to continue the fee-setting conduct on behalf of the banks that the banks recognized that they could not themselves continue. (SUF ¶ 34a; 50-51; 60-61.) The European Commission found precisely that. (SUF ¶ 34a; 60-61.)

F.     **Despite MasterCard's restructuring, the European Commission finds that MasterCard's default interchange fees are agreements among competitors and harm competition, before and after the IPO.**

After a long and in-depth investigation, in a 245-page opinion, the European Commission issued detailed findings describing how MasterCard's default interchange fees harmed competition and how the MasterCard Restructuring that the banks orchestrated merely outsourced the setting of fees to a third party. It found that, "rather than modifying the business model to bring it in line with EU competition law, the banks . . . effectively 'outsourced' this decision making to a new a management body." (E.C. Decision ¶ 378.) (emphasis in original.) Even after the IPO, "the decisions of [MasterCard's] management bodies are still binding upon [its] members and no bank can participate in [MasterCard] without complying in all respects with [MasterCard's rules.]" (E.C. Decision ¶ 352.) The E.C. also found that the New MasterCard entity "co-ordinat[es] the market behavior of the organisation's member banks," by enforcing

- 21 -

uniform schedules of default interchange fees. (E.C. Decision ¶ 355.) Moreover, the E.C. found that the IPO did not change the effect of MasterCard's default interchange fees, which both before and after the IPO "allow[] [the member banks] to exploit [their] collective market power by effectively putting a floor under the MSC [merchant service charge] charged to all merchants." (E.C. Decision ¶ 522.) After the EC's decision, MasterCard entered into a "conditional settlement" with the Commission that required it to lower its cross-border interchange fees to 0.3% for credit and 0.2% for debit, while MasterCard pursues its appeal. *See, MasterCard to Trim Fees in Europe Under a Settlement*, American Banker, Apr. 2, 2009. Plaintiffs are not aware of any evidence that MasterCard or its banks have not been operating efficiently at this new, lower interchange rate.

IV.     **In a Visa or MasterCard transaction, the issuing and acquiring banks transfer electronic information about the transaction and withhold portions of the transaction amount from the merchant.**

A payment-card transaction on both the Visa and MasterCard networks involve four parties other than the networks to complete a transaction: a merchant, an acquiring bank, an issuing bank, and a cardholder. In a four-party network, the network acts as a switch between the four parties. (SUF ¶ 2a.)

Credit-card transactions and signature-debit-card transactions are processed in essentially the same manner, involving three steps: authorization, clearance, and settlement. (SUF ¶ 2a.) After the cardholder initiates the transaction, the "authorization" process begins when an electronic message is sent from the point of sale to the merchant's bank, and then through the appropriate network to the bank that issued the card. (SUF ¶ 2d, f, i.) The issuer then determines whether the cardholder has sufficient

credit for a credit transaction (or account funds for a debit transaction). (SUF ¶ 2f.) The issuer then sends its decision to authorize or decline the transaction back through the network to the merchant. (SUF ¶ 2f.)

After a transaction is "authorized," it is cleared. Under the "clearance" process, the merchant sends transaction information to the acquirer, which sends it through the network to the issuer, which then debits the cardholder's account for the amount of the transaction. (SUF ¶ 2b-c, e-f.)

Finally, funds are transferred among the parties in a process known as "settlement." (SUF ¶ 2c, f, h, j.) Under the "settlement" process, the networks maintain records of the credits and debits due each issuer and acquirer, and each day determine each bank's settlement position based on the clearance records that were run through the network on that day. (SUF ¶ 2c, f, h.) After the network determines the banks' settlement position, it deducts the interchange fee from the amount due to the acquirer. Before the acquirer credits the merchant's account it further deducts any processing fees that the acquirer may be owed from the merchant. (SUF ¶¶ 2c, f; 67a-b.) In a credit or signature-debit transaction, this process takes one to three days. (SUF ¶ 2j.) Because authorization, clearance, and settlement occurs in two separate messages, credit-card and signature-debit-card transactions are said to be processed in "dual-message" formats. (SUF ¶ 2f.)

The following graphic provides a visual illustration of the transaction (SUF ¶



81561318.14

676):[26]

PIN-debit-card transactions, on the other hand, are typically processed in a "single-message" format. (*See* SUF ¶ 2.) The majority of PIN-debit transactions are authorized by the cardholder entering his or her personal identification number, or PIN, at the point of sale. (SUF ¶ 2i) If the consumer enters the correct PIN, his or her account information is sent to the issuing bank. (SUF ¶ 2f.) The issuing bank then sends an electronic message back to the merchant that both authorizes payment and electronically settles funds with the merchant. (SUF ¶ 2f.) When a PIN-debit transaction is settled, funds are transferred to the merchant only *after* deducting the default interchange fees and other network fees, just as they are in the credit or signature-debit environment. (SUF ¶¶ 2f; 67a-b.) The merchant typically receives the funds it is due in a PIN-debit transaction within one-to-two days, versus one-to-three days in a signature-debit transaction. (SUF ¶ 2j.)

### Part Two
### Summary judgment standard

Summary judgment shall be granted to the moving party when there is "no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). "[A]lthough the court must

---

[26]     The image reproduced below was generated from a native version of a document produced at VUSAMDL1-02603213-18 at VUSAMDL1-02603216. (SUF ¶ 67b.)

draw the inferences in favor of the nonmoving party, the permissible inferences are ultimately limited by the relevant substantive law." *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 58 (2d Cir. 1997) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-88 (1986)). Summary judgment in an antitrust case is therefore appropriate when a party fails to raise a material issue of fact on an element for which that party bears a burden of production. *Capital Imaging Assocs. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537, 542 (2d Cir. 1993); *see also In re Visa Check/MasterMoney Antitrust Litig.*, No. 96-CV-5238 (JG), 2003 WL 1712568, at *1 (E.D.N.Y. Apr. 1, 2003).

Antitrust cases often employ burden-shifting analyses, and therefore when a defendant fails to satisfy its burden of proof on any issue as to which it has the burden, summary judgment for the plaintiff is appropriate, even if the court utilizes some form of Rule of Reason analysis. *Hertz Corp. v. City of New York*, 212 F. Supp. 2d 275, 280 (S.D.N.Y. 2002). For example, summary judgment is appropriate when the defendant fails to present sufficient evidence to create a jury question on its burden of demonstrating a procompetitive justification for a practice that increases price or decreases output. *Law v. NCAA*, 134 F.3d 1010, 1020 (10th Cir. 1998); *Clarett v. NFL*, 306 F. Supp. 2d 379, 408-10 (S.D.N.Y. 2004), *rev'd on other, non-antitrust grounds*, 369 F.3d 124 (2d Cir. 2004). Or when a defendant's proffered justification for a practice is contradicted by real-world evidence from the market when the restraint was not present, summary judgment for the plaintiff is appropriate. *Hertz*, 212 F. Supp. 2d at 280. Even if this Court concludes that some factual issues preclude complete summary judgment for Plaintiffs on liability, it may grant partial summary judgment on

- 25 -

particular elements of Plaintiffs' case under Fed. R. Civ. P. 56(d). *See, e.g., In re Visa Check/MasterMoney Antitrust Litig.*, No. 96-CV-5238 (JG), 2003 WL 1712568, at 6-8 (concluding as a matter of law that Visa possessed market power in the market for general purpose credit and charge card services, and that credit-card and debit-card services were separate products).[27]

**Part Three**

**Defendants' default credit-card interchange fees violated § 1 of the Sherman Act before the networks' IPOs [2D Consol. Am. Compl., Claims 1, 2 & 5]**

Plaintiffs seek summary judgment on the intra-network claims under the Rule of Reason.[28] Under the Rule of Reason, the plaintiff bears the initial burden of demonstrating that the defendants have market power in a relevant market and that

---

[27]     *See, e.g., S.E.C. v. Thrasher*, 152 F. Supp. 2d 291, 295-97 (S.D.N.Y. 2001); *Robinson v. Transworld Sys., Inc.*, 876 F. Supp. 385, 389 (N.D.N.Y. 1995); *Khaimi v. Schonberger*, 664 F. Supp. 54, 59 (E.D.N.Y. 1987).

[28]     Related analytical frameworks, known as the Ancillary-Restraints doctrine and Quick Look or "truncated" Rule of Reason, may also be appropriate in this case, even though Plaintiffs organize this memorandum to correspond with a full Rule of Reason analysis. While these frameworks have been characterized as separate by some courts and commentators, they pursue the same goal—determining whether defendants' practices promote or inhibit competition. *See* H. Hovenkamp, Federal Antitrust Policy: the Law of Competition and its Practice at 255-259 (3d ed. 2005) (discussing the "exaggerated distinction" between rule of reason and per se treatment). Under the Ancillary-Restraints doctrine, the court evaluates whether the restraints in question are reasonably necessary to an efficiency-enhancing aspect of a joint venture. *Major League Baseball Prop., Inc. v. Salvino*, 542 F.3d 290, 339 & n.6 (2d Cir. 2008) (Sotomayor, J. concurring) (citing *United States v. Addyston Pipe*, 175 U.S. 211 (1899)). If the answer is "no," the restraints are declared illegal *per se*. If the restraints are reasonably related to efficiencies of the joint venture, the analysis proceeds under the Rule of Reason. *See Am. Needle, Inc. v. NFL*, 130 S. Ct. 2201 (2010) (noting that rule of reason was appropriate only because "restraints on competition are essential if the product is to be available at all.") Under the Quick Look Rule of Reason, once the plaintiff demonstrates harm to competition, the defendant bears the "heavy burden" to prove that its conduct has an offsetting, procompetitive benefit, which the plaintiff then may rebut. *NCAA*, 468 U.S. at 104-113. Because extensive discovery has been conducted in this matter, which confirms the extent of Defendants' market power and the anticompetitive effects of their rules, however, Plaintiffs address Defendants' conduct under the full Rule of Reason. *See United States v. Visa*, 163 F. Supp. 2d at 322, 344 (declining to decide whether Quick Look Rule of Reason analysis was appropriate because, as a practical matter, court presided over an extensive bench trial and was presented with sufficient evidence to decide case under full Rule of Reason).

defendants' conduct harms competition in that market. *Visa*, 344 F.3d at 238. The plaintiff's burden may also be satisfied "without detailed market analysis by offering proof" that defendants' conduct had "actual detrimental effects" on competition. *Capital Imaging*, 996 F.2d at 546; *see also NCAA*, 468 U.S. at 106. Once the plaintiff meets its initial burden, the burden shifts to the defendants to produce evidence of procompetitive justifications for, and procompetitive effects of, the conduct, sufficient to raise a question of fact. *Visa*, 344 F.3d at 238. But if the defendants' justification is merely pretextual or unsupported in the record, summary judgment for the plaintiff is appropriate. *See Freeman v. San Diego Assn. of Realtors*, 322 F.3d 1133-49 (9th Cir. 2003) (granting summary judgment for plaintiffs after assessing and rejecting defendants' arguments that fixed support fee was necessary for survival of joint venture); *Clarett*, 306 F. Supp. 2d at 407-10 (concluding that no reasonable justifications for defendants' rules existed and finding less restrictive alternatives to those rules as a matter of law). Even if the defendant meets its burden of production regarding procompetitive effects, the plaintiff may prevail if it proves that the justification is not reasonably necessary – or more restrictive than necessary – to bring about the purported efficiency. *Visa*, 344 F.3d at 238.

I.     **Visa and MasterCard's pre-restructuring rules and credit-card default interchange fees constitute agreements among competitors because they were established and enforced by competing banks [Claims 1, 2 & 5].**

Before the networks' restructurings, the setting of default interchange fees was

- 27 -

81561318.14

undoubtedly a horizontal agreement among competitors.[29] Section 1 of the Sherman Act applies to concerted conduct, which is present when actions "deprives the marketplace of independent centers of decisionmaking." *Am. Needle, Inc. v. NFL*, 130 S. Ct. 2201, 2213 (2010) (quoting *Copperweld v. Indep. Tube Corp.*, 467 U.S. 752, 768-69 (1984)). Collective decision-making by joint-venture members, or by their appointed third party, is concerted activity when those decisions could be made independently in a competitive market. *See id*. In *American Needle*, concerted action existed because the NFL teams -- potential competitors in the licensing of merchandise -- outsourced their competitive decisions to a third party, NFLP. *Id*. NFLP then had the exclusive right to sell the collective intellectual property of the teams—a function that the Court reasoned should naturally be subject to competition among the teams. By holding that the activities of NFLP were subject to Section 1, the Court directed the focus of Section 1 to a "functional analysis" of the restrictions that a venture places on the activities of its members. *Id*. at 2209-10. Thus, the focus of Section 1 is "not on *who controls*, but rather *who is controlled*," because, when competitors outsource their decisionmaking to third parties, they are able to achieve the same competitive result as if they had collectively agreed on price or output. (Marth Aff. Ex. SUF Ex. 579 at 1, 5, 15, H. Hovenkamp & C. Leslie, *The Firm as Cartel Manager*, 64 Vand. L. Rev. ___ (forthcoming spring 2011) ("Hovenkamp &

---

[29]     In prior motion practice, Defendants intimated that they might argue that even the pre-IPO setting of default interchange fees by horizontal competitors sitting on the Visa and MasterCard boards was unilateral conduct outside the scope of 15 U.S.C. § 1. (*See* Bank Defs' Mem. Law Supp. Mot. Dismiss. Cl. Pls' 1st Supp. Cl. Action Compl. at 15 (citing *Texaco Inc. v. Dagher*, 126 S. Ct. 1276, 1279-80 (2006)). Even if the Defendants were correct in this argument, the member banks "agreed" for purposes of Section 1 to abide by and enforce the networks' uniform schedules of default interchange fees. *See infra* Part Five.

Leslie")).[30] An assessment of *who is controlled* is in line with sound antitrust policy. *Id.* at 7, 15.

Several undisputed facts establish that the Defendants "agreed" on the rules and uniform schedules of default interchange fees before the networks' restructurings:

- The networks were owned by competing banks, and were governed by boards of directors whose membership was limited to representatives of those banks; (SUF ¶¶ 3; 6-10; 12-16.)

- The bank-controlled boards of directors set the rules that the plaintiffs challenge and, before their IPOs, directly required the payment of interchange fees and set uniform schedules of default interchange fees; (SUF ¶¶ 19; 20; 23; 41-42; 52.)

- For a period of time before the IPOs, the banks that governed the networks agreed to outsourced the setting of default interchange fees to management (MasterCard) or nonbank directors (Visa); (SUF ¶¶ 11; 43; 53.)

- The networks' default interchange fees were set to maximize member banks' profits rather than to maximize the profits of the networks; (SUF ¶¶ 45a-c; 55h-i.)

- Each of the member banks of Visa and MasterCard agreed to abide by and enforce the rules and default interchange fees that the boards of directors established. (SUF ¶¶ 21-22; 24-25; 49; 59.)

In *United States v. Visa*, both the district court and Second Circuit found that Visa and MasterCard were also consortia of competitors – not single entities -- with respect to the rules challenged in this case. The member banks of Visa and MasterCard compete for the issuance of payment cards and the provision of payment-card network services to merchants. (SUF ¶ 77.) These competing banks owned virtually all of the stock of the

---

[30]     This article is currently available online through the Social Science Research network ("SSRN"), at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1628175. Exhibit 579 was downloaded from SSRN on February 3, 2011.

- 29 -

—

prerestructuring networks, which entitled them to elect representatives to the boards of directors of both networks. (SUF ¶¶ 7; 13.) Membership on the boards was limited to current or former bank executives—and the networks regularly referred to board members as representatives of banks. (SUF ¶¶ 8; 10; 14-15.) The bank representatives that sat on the networks' boards often circulated their "confidential" board materials to their colleagues at the banks, to solicit input on how to vote. (SUF ¶¶ 28-29.) These bank representatives were elected by vote of all of the member banks of Visa and MasterCard (SUF ¶¶ 7; 9; 13; 16.) The boards of Visa and MasterCard in turn adopted the rules and policies – such as the default interchange rule, the anti-steering restraints, and the honor-all-cards rules – that restricted the ways in which the banks competed with one another. *See Visa,* 344 F.3d at 242 (citing *Fraser v. Major League Soccer, L.L.C.,* 284 F.3d 47, 57 (1st Cir. 2002)). (SUF ¶¶ 19; 20; 23.) The bank-controlled boards then established each network's schedules of default interchange fees and revised those schedules from time to time. (SUF ¶¶ 41-42; 52.) The banks also sent representatives to serve on various committees of the networks that were responsible for everything from product development to merchant acquiring. (SUF ¶¶ 17-18; 28e-f; 29c.)

Member banks of Visa and MasterCard were also active in the development of the Visa Signature and MasterCard World premium credit-card products, which carried much higher interchange rates and which raised the networks' average effective interchange rates. (SUF ¶ 30.) For example, ███████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

81561318.14



Similarly, ████████████████████████████████████

████████████████████████████████████████████

██████████████ The record contains evidence of Visa and MasterCard employees

working with employees from ████████████████ on the specifications of

the Visa and MasterCard premium cards. (SUF ¶ 30.)

There is no material dispute of fact that the pre-IPO networks were not "single

entities" when they set interchange fees.[32] The banks that sat on the board received

interchange fees based on their transaction volume rather than on their ownership stake

in the networks. (SUF ¶ 64.); *See Freeman*, 322 F.3d at 1149. This is significant because

competition for transaction volume is one of the principal areas of competition among

the member banks. (SUF ¶¶ 77-78.); *See Freeman*, 322 F.3d at 1149. These fees were set to

maximize the member banks' profits rather than to benefit the networks. (SUF ¶¶ 45a;

55i.) Internal network documents confirm that interchange fees were set to maximize

the banks' profits. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

---

[31] ████████████████████████████████████████

████████████████████████████████████████████

██████

[32]      The networks continue to employ the same methodologies to set interchange fees after their IPOs. (SUF ¶¶ 46, 51, 56, 62.)

████████████████████████████████

The networks changed their methods for adopting interchange fees only after they realized that their practice of setting interchange fees by a vote of competing member banks rendered them "structural conspiracies." (SUF ¶¶ 34; 38.) In July 2004 the MasterCard Board of Directors outsourced interchange-fee-setting authority to management. (SUF ¶¶ 34a; 53.) ████████████████████████████

███████████████████████████████████████████████

████████████████████████ But even though the identities of the natural persons who set the fees changed after the delegation of interchange-fee-setting authority, the delegation decisions themselves was the product of an "agreement" among competitors. (SUF ¶ 34a; 38g; 40a, d; 43; 60-61.) And the networks' internal documents noted that delegation did not change anything about the way that interchange fees were set other than the identity of the people who approved them. The Visa and MasterCard boards retained ultimate control of the Visa and MasterCard businesses. (SUF ¶¶ 36; 40.) The competing banks then agreed to abide by the schedule of fees that were set for them. (SUF ¶¶ 5; 50-51; 60; 62) *See Am. Needle*, 130 S. Ct. at 1215-16; *see also Salvino*, 542 F.3d at 336 (Sotomayor, J. concurring) (citing *Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 598 (1951)). Thus, the delegation of fee-setting authority by the Visa and MasterCard member banks is similar to the delegation of price-setting authority to a joint-sales agent, which courts have consistently recognized as illegal. *Citizen Publ'g Co. v. United States*, 394 U.S. 131, 134-46 (1969); *New York ex rel Spitzer v. St. Francis Hosp.*, 94 F. Supp. 2d 399, 412-14 (S.D.N.Y. 2000).

- 32 -

II.     **The networks' rules and interchange fees restrain trade because they restrict the manner in which banks can compete with one another.**

"[E]very agreement concerning trade . . . restrains," because "[t]o bind, to restrain, is of their very essence." *Am. Needle*, 130 S. Ct. at 2208 (Slip. Op. at 4) (quoting *Bd. of Trade of Chicago v. United States*, 246 U.S. 231, 238 (1918)). A horizontal restraint exists when competitors agree "on the way in which they will compete with one another." *NCAA*, 468 U.S. at 99. Even if an agreement only partially eliminates competition, a restraint of trade exists for purposes of Section 1. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 220 (1940). Agreements that have the effect of fixing or stabilizing prices are the "paradigm of an unreasonable restraint on trade." *NCAA*, 468 U.S. at 100. This is so even for agreements within a joint venture. For example, in *NCAA*, the Supreme Court held that an NCAA rule that limited member-schools' ability to have their football games broadcast on national television restrained trade "in the sense that they limit[ed] members' freedom to enter into their own television contracts." 468 U.S. at 98-99. Similarly, in *United States v. Topco Associates, Inc.*, which the Supreme Court cited favorably in *American Needle*, the Court held that a restraint of trade existed because territorial restrictions among joint-venture members restricted intra-brand competition among members for the sale of the venture's products. 405 U.S. 596, 608-11 (1972).

In their motion to dismiss Plaintiffs' amended complaints, Defendants attempted to distinguish the cases above by arguing that none of them restricted joint-venture members' activities outside of the venture itself. (Defs.' Reply Mem. Sup. Mot. Dismiss

- 33 -

2d Consol. Am. Cl. Action Compl. at 8-9, July 2, 2009.) *American Needle* put to rest any

argument that Defendants' attempted distinction has merit. In that case, the Supreme

Court held that an agreement existed, which limited competition among NFL teams on

the licensing of the teams' trademarks and other intellectual property. 130 S. Ct. at 2213.

But before the challenged exclusivity agreement, the teams completely pooled their

intellectual property into the NFL Properties joint venture, such that licensing

restrictions placed on NFL Properties by definition occurred within the venture itself

and affected only the intraventure activities of the teams. *Id*. at 2207.

The undisputed facts in the record support the conclusion that Defendants' rules

restrain trade as a matter of law. (*See* Cl. Pls' Mem. Opp. Mot. Dismiss 2d Consol. Am.

Cl. Action Compl. at 13-14, Jun. 2, 2009.) The Visa and MasterCard member banks

elected representatives of member banks – including the Bank Defendants – to serve on

the Board of Directors of Visa and MasterCard. (SUF ¶¶ 6-16.) The Bank Defendants,

acting through the networks' boards of directors, collectively adopted and enforced the

networks' default interchange rules, the honor-all-cards rule, and the merchant

restraints (SUF ¶¶ 20-21; 23.) These rules continue in effect after the networks' IPOs and

the banks continue to abide by and enforce them. (SUF ¶¶ 4-5.) The default interchange

rules restrict competition among acquiring banks by setting a floor under which no

acquirer's merchant discount can fall. (SUF ¶¶ 66a; 67c-g; 68; 69f.) The restriction on

competition among acquiring banks raises the prices that all merchants pay to accept

Visa and MasterCard-branded cards. (SUF ¶ 66.) Frankel Rep. ¶ 144; Topel Rep. at 9;

Elzinga Rep. at 32; James Rep. at 9, 13; Klein Rep. ¶¶ 27-29; K. Murphy Dep. 172:24-

- 34 -

173:24; Elzinga Dep. 320:13-322:21.)

The Defendants' rules also restrict competition among issuers because they greatly reduce the incentive that an issuer might have to negotiate a "bilateral" interchange fee with a merchant that is below the default level. (SUF ¶ 75); Frankel ¶ 146.) ███████████████████████████████████

███████████████████████████████████████████████

Because default interchange fees provide a guaranteed source of revenue for issuing banks on every transaction, the issuer does not have an incentive to accept any lesser amount from the merchant. (SUF ¶¶ 31ii; 32ii; 64.) And because the honor-all-cards rule and the anti-steering restraints prohibit merchants from favoring one issuer's card over another's, merchants have little ability to convince issuers to provide them with a lower interchange fee by, for example, steering customers toward their cards. (SUF ¶¶ 31i; 32i; 76.) Defendants' documents and deposition testimony acknowledge this basic fact. (SUF ¶ 106.) "Bilateral" interchange agreements between merchants and issuers are therefore extremely rare, indeed virtually non-existent, in the Visa and MasterCard systems. (SUF ¶ 74.) By limiting bilateral agreements – and thereby limiting the extent of price competition for merchants' business – Defendants' rules "fix or stabilize" prices, which "is" the paradigm of an unreasonable restraint on trade." *NCAA*, 468 U.S. at 100; *see also Topco*, 405 U.S. at 608-11.

The anti-steering restraints compound the competitive restraint that default interchange fee rules and the honor-all-cards rule create. These rules prevent merchants from surcharging Visa and MasterCard transactions to encourage consumers to use

- 35 -

other forms of payment and to recover the cost of accepting cards specifically from the customers who use them, rather than also from customers who choose to use less costly means of payment. (SUF ¶¶ 31iii; 32iii; 76; 106.) The networks' rules also prevented merchants from steering consumers by discounting purchases made on competing networks' cards until Congressional legislation and the DOJ Consent Judgment forced the Defendants to modify some of their rules.[33] (SUF ¶¶ 31vii; 32vii; 76.) In public statements, the Defendants acknowledge that surcharging allows merchants to put competitive pressure on price and Defendants therefore implicitly admit that their anti-steering restraints restrain trade. (SUF ¶ 76c-d, f.)

The European Commission found that the MasterCard interchange fee "forms part of a network of inter-related or similar arrangements that, taken together, have a cumulative restrictive effect on competition." (E.C. Decision ¶ 653; Kahn Rep. ¶ 96; Kahn Dep. 214:8-215:1 (describing how network rules "work together").) Many of the findings that supported the E.C.'s conclusion that MasterCard's interchange fees violated the European equivalent of Section 1 of the Sherman Act, are not specific to Europe, and further support the conclusion that Defendants' rules "restrain trade" within the meaning of Section 1 of the Sherman Act. For example, the Commission found that the MasterCard interchange fee and other rules have "the effect of appreciably restricting and distorting competition to the detriment of merchants." E.C.

---

[33]     Visa and MasterCard entered into a preliminary settlement with the Department of Justice which, when finalized, will require Visa and MasterCard to repeal or modify many of their rules that restrict merchants from providing preferential discounts to consumers who use non-Visa or MasterCard cards. Competitive Impact Stmt., *United States v. Am. Express Co.*, No. CV-10-4496 (S.D.N.Y. Oct. 4, 2010)., *available at http://www.justice.gov/atr/cases/f262800/262873.pdf.*

- 36 -

Decision  ¶ 407. The Commission reached the inescapable conclusion that this restriction has the effect of fixing and increasing the fees that merchants pay to accept payment cards. *Id.* ¶¶ 2, 405.

### III.   Credit-card network services is a proper relevant product market for analyzing Defendants' conduct.

Direct evidence that defendants' practices harm competition—such as by increasing prices or limiting output—renders a relevant-market analysis unnecessary. *See NCAA*, 468 U.S. at 109; *see also* F.T.C. & U.S. Dep't of Justice, *Antitrust Guidelines for Collaboration Among Competitors*, § 3.3.  (2000). In this case, the undisputed, direct evidence that Defendants' rules harm competition set forth in Part III below obviates the need for Plaintiffs to define the relevant markets and demonstrate large market shares to support an inference that Visa and MasterCard have market power. The direct evidence establishes beyond dispute that Visa and MasterCard, each collectively with its member banks, have market power that harm competition.

In cases where there is no direct evidence of harm to competition, the first step in evaluating the market power of the defendant is to define a relevant product market and a relevant geographic market. *Geneva Pharm. Techn. Corp. v. Barr Lab. Inc.*, 386 F.3d 485, 496-500 (2d Cir. 2004). The relevant product market consists of all products that are "reasonably interchangeable by consumers for the same purposes." *Id.* at 496. The object of the reasonable-interchangeability assessment is to "identify the range of substitutes relevant to determining the degree, if any, of the defendants' market power." *Visa*, 163 F. Supp. 2d at 335. Courts may determine reasonable interchangeability by employing

- 37 -

the "hypothetical monopolist test" as set forth in the FTC and DOJ Horizontal Merger Guidelines. *Visa*, 163 F. Supp. 2d at 335-36; U.S. Dep't of Justice & F.T.C., *Horizontal Merger Guidelines*, § 4.1.1 (2010); *see also State of New York v. Kraft Gen. Foods, Inc.*, 926 F. Supp. 321, 361 (S.D.N.Y. 2001). Under that test, a relevant product market exists when a hypothetical monopolist could profitably impose a "small but significant and non-transitory" increase in price of approximately five percent. Antitrust Division, Dep't of Justice & FTC, *Horizontal Merger Guidelines* § 4.1.2 (2010). In addition to the hypothetical-monopolist test, courts consider product function, price, and quality when defining a relevant market. *Visa*, 163 F. Supp. 2d at 335 (citing *duPont*, 351 U.S. at 404). A relevant market may be further narrowed if the defendants' challenged practices limit purchasers' substitution options. *See United States v. Microsoft Corp.*, 253 F.3d 34, 54 (D.C. Cir. 2001) (affirming exclusion of "middleware" from the relevant market, even though Microsoft's challenged conduct was aimed at excluding middleware).

The evidence adduced since this Court's summary-judgment decision in *Visa Check* affirms its conclusion that credit-card network services is a proper relevant product market in which to analyze Defendants' conduct.[34] *Visa Check*, 2003 WL 1712568 at *3.

- Since the *Visa Check* decision, Visa and MasterCard have continued to raise credit-card interchange fees without merchants substituting to other forms of payment. (SUF ¶¶ 90; 93-95.);

- Defendants' rules prevent merchants from substituting between credit cards, debit cards, and other forms of payment. (SUF ¶¶ 76; 88-90; 106.);

---

[34]     In addition, the record also supports relevant markets that are limited to the acceptance of Visa or MasterCard-branded cards. (*See* Frankel Rep. § 3.5.)

- 38 -

- The networks' and banks' public filings and internal documents treat credit-card network services and debit-card network services as distinct products (SUF ¶ 86.);

- Consumers use credit cards, debit cards, cash, checks, and other forms of payment for different types of transactions. (SUF ¶ 85.)

**A.      As prices for credit-card network services have increased, merchants have not been able to substitute debit-card network services or other forms of payment.**

In the period from 2003 to 2009, Visa's effective interchange rate for credit-card transactions in the United States increased from ███████████ an increase of ████[35] (SUF ¶ 63.) During the same time period, MasterCard's effective rate increased from ██████████████████ (*Id.*) Despite these increasing costs to merchants, Visa and MasterCard credit-card-transaction volume increased during this time period. (SUF ¶ 107.) Moreover, no major merchant discontinued its acceptance of Visa or MasterCard credit cards while fees were increasing. (SUF ¶¶ 93-96.) The fact that Defendants could impose such significant increases in credit-card interchange fees without losing merchant acceptance or transaction volume establishes a relevant market no broader than credit-card network services to merchants. *See Visa*, 163 F. Supp. 2d at 340.

The events following the settlement of the *Visa Check* litigation illustrate that even Defendants' own signature-debit cards are not in the same relevant markets as their credit cards. As part of the settlement agreement, the networks modified their honor-all-cards rules to the extent that they prohibited merchants from accepting credit

---

[35]      This figure actually understates the increased prices paid by merchants for card acceptance services, since it fails to account for increasing transaction volume on credit cards, which adds to the price increase. (*See* Frankel Rep. Table 9.1 at 149.)

cards but not debit cards or *vice versa*, and agreed to temporarily decrease their signature-debit card interchange fees. *Wal-Mart*, 396 F.3d at 103. After the settlement agreement was signed but before the debit-card interchange-fee reduction went into effect, MasterCard and then Visa implemented credit-card interchange-fee increases, which increased the gap between credit and debit rates. (SUF ¶¶ 93*l*-m.) In the case of MasterCard, the percentage-fee gap between credit and signature debit increased from 4 basis points to 73 basis points.  (SUF ¶ 68.) Despite these significant price increases, credit-card purchase volume continued to rise after the *Visa Check* settlement. (SUF ¶¶ 80; 83.)  At the same time, no major merchant stopped accepting Visa or MasterCard credit cards. (SUF ¶ 90.) An internal Visa document noted that ███████████████

███████████████████████████████████████

███████████████████████████████████

████████████████████████████████ The fact that merchants could not substitute acceptance of signature-debit cards for credit cards even after the price difference between the two products increased substantially demonstrates that credit-card network services and debit-card network services are not reasonable substitutes for each other. *See Visa Check*, 2003 WL 1712568, at *2-3.

**B.**   **Defendants' anti-steering restraints prevent merchants from steering consumers from credit cards to less costly forms of payment.**

While Defendants attempt to justify their anti-steering rules, they do not deny that several of their rules prevent merchants from steering their customers from credit cards to debit cards. Visa and MasterCard have "no-surcharge" rules that prohibit

- 40 -

merchants from imposing a surcharge on a consumer for using a Visa or MasterCard credit card. (SUF ¶¶ 31iii; 32iii.) Until recent legislation and antitrust enforcement forced their repeal, Visa and MasterCard's rules also prohibited merchants from offering a discount at the point of sale to a consumer who uses another brand of credit card instead of a Visa or MasterCard credit card, respectively. (SUF ¶¶ 31vii; 32vii.) The networks' rules also prevented merchants from providing point-of-sale discounts to consumers for using a debit cards instead of credit cards.[36] (SUF ¶¶ 31vii; 32vii.) Thus, in addition to inflating merchant prices, the anti-steering restraints have the effect of restricting the ability of merchants to substitute lower-cost forms of payment for credit cards, and therefore are a substantial cause of the narrowing of the relevant market. *See Microsoft*, 253 F.3d at 54.

C.     **Consumers do not view debit cards and other forms of payment as acceptable substitutes for credit cards.**

Certain characteristics of credit cards make them unique from the cardholder's perspective, which in turn creates merchant demand for acceptance of credit cards that is unique from the demand for the acceptance of other forms of payment. (SUF ¶¶ 85-86.) A credit card, by definition, offers the consumer an interest-free period (or "float") after a purchase and is tied to an unsecured line of credit with the issuing bank. (SUF ¶ 98c); Frankel Rep. ¶ 39 (quoting Visa Europe, Response to the Consultation on the European Commission's Interim Report I, payment cards at 9-10, Jun. 21, 2006).) While

---

[36]     In depositions, MasterCard took the position that its rules allowed discounting for other forms of payment, so long as that discount was not given in the form of a reduced price at the point of sale. (SUF ¶ 32viiB.)

a consumer could theoretically emulate this credit function by piecing together debit card or check purchases with a line of credit at a depository institution, the credit card is the only electronic payment device that integrates the credit function with the payment function. *See* SUF ¶ 86f.) Because of the unique characteristics of credit cards, consumers have preferences for particular payment methods based on the amount of a given purchase. ((SUF ¶ 85); Frankel Rep. Fig. 3.2;

Because consumers have well-established preferences to use credit cards for some (generally higher-priced) transactions, merchants must accept credit cards to accommodate their customers' choices to use those cards on particular transactions. (SUF ¶¶ 31i; 32i ; 85.) Merchants testified in this litigation that they would lose a significant number of sales if they did not accept credit cards. (SUF ¶ 89.) As this Court previously recognized, merchants' distinct demand for credit-card acceptance suffices to establish that credit-card-network-services and debit-card-network-services markets are distinct as a matter of law. *Visa Check*, 2003 WL 171268, at *2-3.

### D. Defendants consider credit-card network services to be distinct from debit-card network services and other forms of payment.

The networks' public filings and internal documents treat credit cards and debit cards as distinct products. (SUF ¶¶ 86; 98-101.) MasterCard, for example, classifies its card-product offerings into "pay later" cards such as credit cards, "pay now" cards such as debit cards, and "pay before" cards such as prepaid cards. (SUF ¶¶ 86c, f, h; 98c.) Likewise, Visa's SEC filings separately describe its "consumer credit" and consumer debit" cards as distinct products. (SUF ¶ 101.) Documents and testimony from the

- 42 -

banks also separately describe these products. (SUF ¶ 86e, g, j, l-m.)  The networks'

internal documents follow this distinction as well. (SUF ¶¶ 86a; 99-100.)  For example,

the networks perform separate cost studies for credit-card and debit-card products.

(SUF ¶ 86d, k.) Similarly, an April 2006 Visa Independent Director Orientation

presentation███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████MasterCard also evaluates its consumer credit-card interchange rates only

against other credit-card products, and not against debit-card products. (SUF ¶ 99.) In

the words of Visa's William Sheedy, the credit-card business is "just different" from the

debit-card business. (SUF ¶ 86a.)

When Visa and MasterCard developed their respective "Signature" and "World"

MasterCard premium-credit-card products, they ignored debit cards and other forms of

payment and designed the features and interchange-fee  rates to be comparable to those

of American Express credit and charge cards. (SUF ¶¶ 99b; 100e.)  As Defendants'

expert Kenneth Elzinga observed, Visa's "broad strategy in issuing Visa Signature cards

was an effort to draw affluent consumers away from American Express." (SUF ¶ 100e.)

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████Similarly, MasterCard designed its premium

"World" credit card to be competitive with American Express and the Visa Signature

- 43 -

credit card. (SUF ¶ 99b.)

Likewise, when the banks make credit-card-issuing decisions, they compare Visa and MasterCard's credit-card offerings to each other and to those of American Express, but they do not compare them to debit-card products. For example, a ▆▆▆ vice president admitted that ▆▆▆ does not market its debit-card products as substitutes for credit cards. (SUF ¶ 86j.) ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

## IV.    The relevant geographic market is in the United States.

Defendants do not dispute that the relevant geographic market in which to analyze Defendants' conduct is the United States. In any case, Visa and MasterCard restrictions on cross-border acquiring guarantee that a broader relevant geographic market cannot exist. With few exceptions, both Visa and MasterCard require U.S. merchants to have a relationship with an acquirer located in the United States. (SUF ¶¶ 31iv, viii; 32iv, ix.) (Frankel Rep. ¶ 80 n. 97.) The networks also prohibit an acquirer from signing up merchants located outside of its home region unless the acquirer first obtains a license from the network to do so and agrees to impose interchange fees that correspond to the merchant's location. (SUF ¶¶ 31viii; 32ix.) Because merchants are prohibited from looking outside of the United States for acquiring banks, competition in the network services market occurs at the country level and thus the geographic market must be limited to the United States as a matter of law. *Visa*, 163 F. Supp. 2d at 339-40;

- 44 -

*see also Microsoft*, 253 F.3d at 54.

## V.      Defendants have market power in the market for credit-card network services.

In *United States v. Visa*, Judge Jones found that the networks had market power because they "raised interchange rates charged to merchants a number of times, without losing a single merchant customer as a result." *Visa*, 163 F. Supp. 2d at 340. The record in this case confirms that Judge Jones's conclusion is equally true today:

- Merchants have not discontinued the acceptance of Visa and MasterCard payment cards despite increases in the prices of those cards (SUF ¶¶ 93; 95-96.);

- Defendants price discriminate in interchange fees among classes of merchants (SUF ¶¶ 46-47; 56; 58.);

- Defendants' interchange fees are unrelated to issuers', acquirers', or the networks' costs of operating a payment-card system (SUF ¶¶ 45-46; 55; 57.);

- Defendants' rules prevent merchant substitution to cheaper forms of payment (SUF ¶¶ 31i, iii, vi-vii; 32i, iii, vi-vii; 76; 106.).

Once a relevant market is defined, the court determines whether the defendant possesses market power in that market. Market power is the "power to control prices or exclude competition." *DuPont*, 351 U.S. at 391. Market power may be established directly, "through evidence of specific conduct undertaken by the defendant that indicates that [it] has the power to affect price or exclude competition." *Visa*, 344 F.3d at 239. A firm's ability to increase its prices without losing significant amounts of sales is direct evidence of market power. *See Visa*, 163 F. Supp. 2d at 340. Testimony of the defendants' customers that they have no practical ability to substitute away from the defendant's product is also persuasive. *See id.* The defendants' ability to price above cost

- 45 -

or price discriminate among its customers also demonstrates control over price, and therefore is evidence of market power. *See id.*

A plaintiff may also demonstrate indirectly that a defendant has market power. For example, market power may be presumed if the defendant controls a large enough share of the relevant market. *Visa*, 344 F.3d at 239. While market shares are persuasive, indirect evidence of market power, low market shares do not preclude a finding of market power when the record shows that defendant was able to harm competition. *Toys "R" Us v. F.T.C.*, 221 F.3d 928, 937 (7th Cir. 2000) (holding that 20% market share did not preclude finding of market power when the defendant's boycott was successful in excluding rivals); *Visa*, 344 F.3d at 239 (MasterCard's 26% market share could support a finding of market power against a firm that demonstrated the ability to increase prices without losing customers). Finally, the presence of barriers to entry and the lack of successful entry in the past also support a conclusion that the defendant possesses market power. *Visa*, 163 F. Supp. 2d at 341.

Courts that have considered the practices of Visa and MasterCard in recent years have found both networks to possess market power. For example, in *United States v. Visa*, Judge Jones concluded that "even a cursory examination of the…network market reveals that whether considered jointly or separately, [Visa and MasterCard] have market power." *Visa*, 163 F. Supp. 2d at 341. For example, the networks raised interchange fees repeatedly "without losing a single merchant customer as a result." *Id.* at 340. In addition, Visa and MasterCard collectively accounted for 73% of transaction volume on general purpose cards in the United States – a market which the court found

- 46 -

to contain significant barriers to entry. *Id.* at 341. Similarly, in *Visa Check*, this Court granted partial summary judgment for the plaintiffs, concluding that Visa possessed market power in the credit-card network services market. *Visa Check*, 2003 WL 1712568 at 11-12.

> ### A.     Defendants have raised credit-card interchange fees without losing merchant acceptance.

The networks' interchange rates have continued to escalate since that decision, confirming that their market power is at least as great as it was then. Between 2003 and 2008, Visa raised its effective credit-card interchange fee from ███████████ (SUF ¶ 63.) MasterCard raised its rates from █████████% between 2003 and 2009. (SUF ¶ 63.) Despite these fee increases, no major merchant has stopped accepting Visa or MasterCard credit cards. (SUF ¶¶ 93; 95.)

Several network executives—including the heads of Visa's and MasterCard's interchange-fee groups—testified that, despite these interchange-fee increases across all Visa and MasterCard product types, they were not aware of any major merchants that had stopped accepting their cards. (SUF ¶¶ 93c-d, h-k; 95.) Even two of Defendants' experts, Dr. Benjamin Klein and Prof. Kenneth Elzinga, acknowledged that few merchants have stopped accepting Visa and MasterCard payment cards despite increases in interchange fees. (SUF ¶ 93a-b.)

Merchant testimony in this litigation also confirms that merchants "cannot refuse to accept Visa and MasterCard even in the face of significant price increases" out of competitive necessity. (SUF ¶¶ 89a-c; 90f; 96e-f; h-k.) For example, Michael Schumann,

- 47 -

the co-owner of a three-location retail-furniture business, testified that while he would like to stop accepting payment cards, "that's not a viable option for me, because if I didn't accept Visa and MasterCard, I'd be out of business." (SUF ¶ 96b.) Similarly, Susan De Vries, the director of financial services of Walgreens, one of the nation's largest retailers, testified that in the "business we're in today, we cannot not [*sic*] accept credit cards or debit cards as a form of payment." (SUF ¶ 89j.) The Defendants realize that merchants are powerless to stop accepting their cards. According to a senior MasterCard executive, even Wal-Mart, the world's largest retailer, could not discontinue accepting MasterCard (let alone Visa) because "there are too many Wal-Mart consumers carrying the card" such that "it would have been very detrimental to their customer service." (SUF ¶ 96j.) The Defendants' ability to increase prices to merchants without merchants switching to other products directly establishes that they have the "power to control prices." *DuPont*, 351 U.S. at 391; *Visa*, 163 F. Supp. 2d at 340.

### B. Merchants did not discontinue accepting Visa- and MasterCard-branded payment cards even after the networks created higher-cost "premium" credit cards and issuers shifted their portfolios to those cards.

At the urging of their largest issuers, both networks created "premium" credit-card products that had higher interchange fees than traditional credit-card products. The networks also adopted initiatives to enable issuers to convert card accounts *en masse* from traditional Visa and MasterCard credit cards to Visa Signature and MasterCard World accounts. (SUF ¶ 70b-e.) Issuers responded by converting large portions of their outstanding cards to Signature and World cards, with corresponding

- 48 -

higher interchange-fee rates. (SUF ¶ 70f-i.) In many instances, issuers simply converted cardholders' cards to premium cards—and earned the correspondingly higher interchange—without even reissuing new cards to those cardholders. (SUF ¶ 70f-i.) Issuers' significantly increased their revenues by converting traditional credit cards to premium cards. (SUF ¶¶ 70f-h; 95) ████████████████████████████ ████████████████████████████████████████ ████████████████████ Merchants were the source of the enhanced revenue to issuers. Visa's effective credit-card interchange-fee rate increased from ████ to ████ between 2004 and 2006, while MasterCard's increased from ████ to ████ during the same period. (SUF ¶ 63.)

Despite the increases in interchange fees associated with issuers flipping their portfolios to premium cards, merchants had no alternative but to continue accepting those cards. (SUF ¶¶ 95-96.) The Defendants' honor-all-cards rules prohibit merchants that accept Visa or MasterCard credit cards from refusing *any* Visa or MasterCard credit cards, including the new premium cards which cost the merchants much higher interchange fees. (SUF ¶¶ 31i; 32i; 95.) And the networks' anti-steering restraints prevent merchants from discouraging consumers from using premium credit cards by surcharging those cards or providing discounts to consumers who use other cards.[37] (SUF ¶¶ 31i, iii, vi-vii; 32i, iii, vi-vii; 76; 106.) The creation of new tiers of premium cards

---

[37]     A proposed settlement with the Department of Justice Antitrust Division would require the networks to allow merchants to provide point-of-sale discounts to consumers who used traditional credit cards as opposed to premium cards. Competitive Impact Stmt., *United States v. American Express Co.*, No. CV-10-4496 (E.D.N.Y. Oct. 4, 2010)., *available at http://www.justice.gov/atr/cases/f262800/262873.htm.*

- 49 -

without losing merchant acceptance demonstrates Defendants have the "power to control prices," and therefore have market power as a matter of law. *DuPont*, 351 U.S. at 391.

### C. Defendants price discriminate in their setting of interchange fees to merchants and set interchange fees at merchants' reserve prices.

In *United States v. Visa*, the court found that Visa and MasterCard had market power in part because they engaged in rampant price discrimination in the interchange fees that they charged merchants.[38] *Visa*, 163 F. Supp. 2d at 340. Since that decision, the Defendants' price-discrimination practices have only expanded. The networks' recent interchange fee announcements reveal that Visa had 104 separate interchange categories, while MasterCard had 275. (SUF ¶¶ 47d; 58d.) By way of contrast, at the time of Judge Jones's decision, Visa had 21 separate categories while MasterCard had 19. (SUF ¶¶ 47d; 58d.) Both Visa and MasterCard establish separate interchange fees for each merchant category, for each of the networks' card products (credit, signature-debit, PIN-debit, and commercial), and for an individual merchant's acceptance volume. (SUF ¶¶ 47a-f; 58a-e.) Thus, two transactions conducted with the same Visa or MasterCard payment card could have vastly different interchange-fee rates based upon the size or type of merchant that accepted the card. (SUF ¶¶ 47a-f; 58a-e.) Executives from both networks admitted that the various categories of interchange fees have no relationship to the networks' or banks' costs. (SUF ¶¶ 45f; 55b-e; 57.) The lack of any relationship between the price charged to different merchants for any particular credit card

---

[38] Economists recognize that market power is one of the prerequisites for price discrimination. Dennis Carlton & Jeffrey Perloff, Modern Industrial Organization 294 (4th ed. 2005).

transaction (which varies widely on both the Visa and MasterCard schedules of default interchange fees) and the marginal costs of the transaction to card issuers and the networks (which are tiny and identical across all merchants) is strong evidence of the market power of the card issuers and the networks. *See Visa*, 163 F. Supp. 2d at 340.

The networks set interchange fees for each merchant segment based upon that segment's elasticity of demand –*i.e.,* the degree to which merchants in that segment "must take" their cards. (SUF ¶¶ 46; 56.) MasterCard's (U.S.-based) Associate General Counsel testified before the European Commission that MasterCard performs cost studies "to answer the question: 'How high could interchange fees go before we would start having either serious acceptance problems...[or] surcharging or discounting for cash." (SUF ¶ 56c.) Based on this testimony, the E.C. found that any argument that interchange fees were cost-based was "erroneous," noting that instead "interchange fees would be a *'proxy for merchants' elasticity of demand.'*" (SUF ¶ 56b.) (emphasis in original)▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮)



**D.    Defendants' interchange fees are unrelated to issuers' or networks' costs of providing network services to merchants in the relevant markets.**

In contrast to the networks' early histories, in which they justified interchange fees as a method of reimbursing issuing banks for their costs of issuing payment cards, Visa's and MasterCard's interchange fees have for many years borne no relationship to costs. At least as early as 2003, MasterCard documents implied ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ By 2002, Visa ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ A 2004 Visa presentation ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

- 52 -



E.    **Defendants' rules are a source of market power in each of the relevant markets because they prevent merchants from reducing their acceptance of payment cards as prices increase.**

In addition to creating separate relevant markets for credit-card network services, signature-debit-card network services, and PIN-debit-card network services, Defendants' rules give them the "power to control prices." *See DuPont*, 351 U.S. at 391. The honor-all-cards rules require that any merchant that accepts Visa or MasterCard must accept all cards of that brand, regardless of the issuer or level of interchange fee. (SUF ¶¶ 31iii; 32iii.) With the honor-all-cards rules in place, Plaintiffs' and Defendants' experts agree that the networks' requirement that an interchange fee be paid on every transaction confers the issuer with extensive market power over the merchant on any given transaction (*See* Frankel Reb. Rep. ¶ 63; Murphy Rep. ¶ 209.) The issuer has

- 53 -

81561318.14

market power because it can demand any price it desires (or "hold up" the merchant), knowing that the merchant must both accept its card *and* pay it a fee (*Id.*) Thus, although Plaintiffs' and Defendants' experts disagree on the implications of this "hold-up" problem, there is no disagreement that it exists. Benjamin Klein, Kevin Murphy, *et al., Competition In Two-Sided Markets: The Antitrust Economics of Payment Card Interchange Fees*, 73 Antitrust L.J. 571, 574 (2006).

Defendants' no-surcharge rules and other forms of anti-steering rules prevent any erosion of Defendants' market power. The rules limit steering by prohibiting surcharging, preventing merchants from processing Visa or MasterCard transactions over alternative networks, and preventing issuers from issuing cards that can process transactions over alternative general-purpose-card networks. (SUF ¶¶ 31ix; 32x.) Defendants and their experts admit that steering is an effective means of influencing consumer choice. (Klein Rep. ¶¶ 51-52; Murphy Rep. ¶¶130, 211.) In submissions to the European Commission, for example, MasterCard admitted that in Europe (where it permits surcharging) it sets interchange fees as high as it can without merchants dropping its cards *or "trying to discourage the use of the card either by surcharging or discounting for cash."* (E.C. Decision ¶ 175 (emphasis added).) And internal documents from both networks acknowledge that merchant surcharging would have the effect of increasing merchants' ability to influence the choice of payment-card network at the point of sale. (SUF ¶¶ 76; 106.) In denying MasterCard's motion to dismiss the Individual Plaintiffs' Section 2 claims, the Court concluded that the rules give merchants a "strong incentive to accept all cards" and "a strong disincentive to

- 54 -

purchase networks services only from, for example, Visa." (Rep. & Recom. at 19, Jan. 11, 2008, *aff'd* May 14, 2008).

By preventing merchants from influencing consumer choice, Defendants' anti-steering restraints prevent merchants from reducing the amount of Defendants' network services they purchase based on the price. If merchants were able to freely surcharge consumers and provide other price signals, to respond to high interchange fees they could reduce the volume of network services that they purchase from a given network (fewer consumers would use a surcharged card) while still accepting that network's card. (Klein Rep. ¶¶ 51-52.; Murphy Rep. 130-31, 210-11; Frankel Rep. ¶ 124.) But by taking away the ability to steer, the Defendants force an "all-or-nothing" choice on merchants. (*See* Frankel Rep. ¶ 185; Murphy Rep. 210-11.) Because merchants risk losing sales if they do not accept Defendants' cards at all (SUF ¶¶ 89, 96), "nothing" is not a viable option. Courts routinely recognize that, when a defendant has a "must take" product for its customers, it enhances its market power by disincentivizing those customers from purchasing competitors' products for the remainder of their needs. *See United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 196 (3d Cir. 2005); *United States v. Microsoft Corp.*, 253 F.3d 34, 55 (D.C. Cir. 2001).

### F.    Defendants possess **market power in each of the relevant markets because they possess high market shares in concentrated markets.**

There is no material dispute of fact that the market for credit-card network

services is highly concentrated.[39] Applying the Herfindahl Hirshman Index ("HHI")[40] –

a common measure of market concentration– to 2009 market shares based on

transaction volume, the credit-card market scores 3217 (counting each network as a

"firm"). The antitrust-enforcement agencies and courts recognize that these figures

reflect highly concentrated industries. Horizontal Merger Guidelines § 5.3;[41] *see also*

*Visa*, 163 F. Supp. 2d at 341 (finding payment-card industry to be "highly concentrated"

based on market-share figures that resemble current figures).

　　　Just as Judge Jones found in 2001, each of the relevant markets have significant

barriers to entry. *Visa*, 163 F. Supp. 2d at 341-42. While several firms have attempted to

enter the market, the only significant successful entrant was Discover in the mid-1980s.

Despite the advantage of initially being owned by a major retailer (Sears), even

Discover has consistently had market shares of only 5%. (SUF ¶¶ 112i, 113.)  Horizontal

Merger Guidelines § 9 (stating that the agencies give "substantial weight" to "the actual

history of entry" when evaluating barriers to entry). Firms that have attempted to enter

have either not attained significant transaction volume or, in the case of Tempo—which

attempted to create its own network based on the ACH system—abandoned its attempt

---

[39]　　As noted above, at pp. 4-5, the relevant markets in this case are properly defined from the perspective of the merchants because *inter alia* the Visa and MasterCard "honor-all-cards" rules require merchants to accept *e.g.,* all Visa credit cards.

[40]　　The HHI is computed by summing the squares of the market shares of the industry participants. Thus, for a 10-firm industry in which each firm has a 10% market share, the HHI would be 1000 ($10^2 = 100$ x 10). For a four-firm industry in which each firm has a 25% share, the HHI would be 2500 ($25^2 = 625$ x 4). Horizontal Merger Guidelines § 5.3.

[41]　　The 2010 Horizontal Merger Guidelines increase the threshold for "highly concentrated" to 2500, but even under these more stringent standards of concentration, each of the three relevant markets are highly concentrated.  Horizontal Merger Guidelines ¶ 5.3.

81561318.14

to start a stand-alone network. (SUF ¶ 112h.) Revolution Money, touted by Professor Elzinga as "one of the most interesting" attempted entrants, was launched in 2005, failed to make significant inroads, and was acquired by American Express in January 2010. (SUF ¶ 112h, Elzinga Rep. at 122-23.) Defendants' executives ████████ confirmed in depositions that it would take billions of dollars and many years for a *de novo* entrant to break into the payment-card industry on any viable scale and there would be no guarantee of long-term success. (SUF ¶ 112f-h.)

The Defendants have large market shares in these concentrated markets. Based upon 2009 data, Visa had a 43.4% share of the credit-card market, while MasterCard had a smaller-yet-significant 27.1%. (SUF ¶ 107.) Judge Jones found that "even a cursory examination" of nearly-identical numbers revealed that both networks had market power. *Visa*, 163 F. Supp. 2d at 341 (citing 47% market share for Visa and 26% market share for MasterCard in market that included credit cards and charge cards). And even if the market shares, standing alone, might not be sufficient to support a conclusion that the networks possess market power as a matter of law, those numbers combined with the direct evidence of power over price eliminate any material dispute of fact as to Defendants' market power. *See Toys "R" Us*, 221 F.3d at 937 (citing direct evidence of market power to reject defendants' argument that lower market shares precluded a finding of market power).

## VI.    Defendants' rules and default interchange fees harm competition.

In a rule of reason case, a plaintiff may demonstrate a harm to competition without an elaborate market inquiry by proving that the challenged restraint has the

effect of increasing price or limiting output. *NCAA*, 468 U.S. at 107-08. In *NCAA*, for example, the plaintiff was able to meet this burden by demonstrating that the NCAA's restrictions on the number of times that any member school could appear on television "commandeered the rights of its members and sold those rights for a sum certain," such that prices were "responsive neither to the relative quality of the teams playing the game nor to viewer preference." *Id.* at 106 & n.30. Similarly, in *Professional Engineers,* the Court concluded without an elaborate market inquiry that a professional association's ban on competitive bidding harmed competition because it "impede[d] the ordinary give and take of the market place." *Nat'l Soc'y of Prof. Eng. v. United States*, 435 U.S. 679, 692 (1978). And the Tenth Circuit held that the plaintiff did not need an elaborate market inquiry to prove that an NCAA rule that restricted the salaries of certain assistant coaches harmed competition because it "fixe[d] the cost of one of the component items used by NCAA members to produce the product of Division I basketball." *Law*, at 1017. Finally, the Seventh Circuit held that a union's agreement with a contractors' association to impose a 1% fee on nonunion contractors was illegal because "no one involved in establishing and collecting the [fee] had consumers' interests at heart." *Premier Elec. Construction Co. v. Nat'l Elec. Contractors Assn, Inc.*, 814 F.2d 358, 369 (7th Cir. 1987).

The record in this case obviates any need for an elaborate market inquiry to determine that the Defendants' rules and interchange fees harm competition in the following ways:

- Inflating the prices that merchants pay to accept payment cards (SUF ¶

- 58 -

66.) ;

- Inflating the prices merchants must charge consumers for the goods and services they sell (SUF ¶¶ 72f.);

- Diminished and delayed development and deployment of improved payment card products;(SUF ¶ 73.)

- The creation and enhancement of barriers to entry and expansion into the relevant markets (SUF ¶ 112.);

- Limiting the number of very price sensitive merchants who accept Visa and MasterCard when interchange rates are high. (SUF ¶¶ 71-72.)

### A.   Defendants' rules and default interchange fees inflate the price of network services to merchants.

The most important and obvious harmful effect on competition is high prices for payment card network services to merchants. In the absence of the rules that Class Plaintiffs challenge, merchants would have paid significantly lower fees to accept payment cards. Class Plaintiffs' expert, Dr. Alan Frankel, concludes that, without a rule requiring the payment of an interchange fee, merchants "would not have had an economic incentive to agree to pay any interchange fee" because merchants do not receive services from the issuer in exchange for paying the interchange fee. (Frankel Rep. ¶¶ 296-97.) Defendants' experts do not dispute Dr. Frankel's conclusion that without the default-interchange rules, merchant fees would have been nonexistent or at least drastically lower than they are today. (Klein Rep. ¶¶ 27, 119; James Rep. at 9, 13; Topel Rep. at 9; Murphy Rep. ¶ 240; Murphy Dep. ¶ 173:20-24; James Dep. 65:9-11.) Even the Defendants acknowledge that, in the words of Visa executive Vic Dahir, increases in interchange fees "tak[e] [merchants'] money and hand[] it to [the] card

issuer." (SUF ¶ 66b.) Not surprisingly, merchants also testified that increases in interchange fees increased their costs of accepting cards. (SUF ¶ 66g-k.) The availability of interchange-fee revenue for the banks has related effects, such as delaying the migration from magnetic-stripe-based cards to new payment devices such as mobile phones and contactless devices because adopting these technologies would—in the words of MasterCard documents—kill the banks' "cash cow" of magnetic-stripe cards. (SUF ¶ 73.)

By any measure, Visa and MasterCard interchange fees transfer an extraordinary amount of money from merchants to issuers. Based on Defendants' data, Plaintiffs' experts estimate that Visa and MasterCard issuers collected over █████████in interchange fees in 2008, which represents an increase of over ███████per year since 2004. (Frankel Rep. ¶ 322 Table 9.1.) In 2008, the "effective interchange rate"[42] was ████████for Visa and ███████for MasterCard. (SUF ¶ 63.) Witnesses from the networks, acquiring banks, and merchants agree that the interchange fee is borne by merchants and constitutes a floor below which the merchant Discount cannot fall. (SUF ¶¶ 66-67;) *See also Law,* 134 F.3d at 1017 (noting that cap on coaches' salaries restricts competition by fixing the cost of a component of college basketball); E.C. Decision ¶ 410. Defendants' experts do not dispute that interchange fees increase merchants' costs of accepting payment cards. (SUF ¶ 66c-f.) By inflating merchant-acceptance costs, Defendants' default-interchange fees and rules "impair[] the ability of the market to

---

[42]     The "effective interchange rate" is a term that both networks use to denote the total amount of interchange fees collected as a percentage of total transaction volume.(e.g., SUF ¶¶ 63; 99b; 123e; 124j.)

advance social welfare by ensuring the provision of desired goods and services to consumers at a price approximating the marginal cost of providing them." *Ross v. Bank of America, N.A.*, 524 F.3d 217, 223 (2d Cir. 2008)(quoting *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 459 (1986)).

**B.     Defendants' arguments regarding costs to cardholders should not be considered when evaluating harm to competition.**

Defendants' experts claim that the interchange fees that merchants pay are not the correct prices to analyze, however, and that the Court should instead analyze the "total price" paid by merchants and cardholders. Defendants' "total price" argument is legally improper, however, and is unsupported in the factual record. But even taking Defendants' experts' assertions at face value, certain facts are undisputed:

- Interchange fees are not completely passed through to cardholders (SUF ¶ 124.); and

- After interchange fees were reduced in Australia, the "total price" to cardholders and merchants decreased (SUF ¶ 122c.)

**1.     Antitrust violations are not excused because they may benefit consumers outside of the affected relevant market.**

An antitrust defendant cannot "offset" competitive harms in one market -- in this case the network-services market -- with purported benefits in another market -- the payment-card-issuance market. *United States v. Topco Assocs., Inc.*, at 610; *Law v. NCAA*, 902 F. Supp. 1394, 1406 (D. Kan. 1995) (concluding that anticompetitive effects in the market for coaching services are not offset by procompetitive effects in market for intercollegiate sports). The "freedom to compete . . ." cannot be foreclosed with respect to one sector of the economy because certain private citizens or groups believe that such

- 61 -

foreclosure might promote greater competition in a more important sector of the economy." *Clarett*, 306 F. Supp. 2d at 409 & n.183 (citing *Topco*, 405 U.S. at 610). For example, the teams of the NFL could not justify a collective restriction on a labor market—in the form of a limitation on the age of incoming players—by arguing that it promoted competition in a separate "entertainment" market. *Clarett, 306 F. Supp. 2d,* at 408-09. Nor could the member schools of the NCAA justify a collective restriction on the salaries of certain basketball coaches by arguing that the labor-market restriction created some benefit in the larger market for intercollegiate athletics. *Law*, 902 F. Supp. 2d, at 406; *see also Northwestern Fruit Co. v. A. Levy & J. Zentner Co.*, 665 F. Supp. 869, 872 (E.D. Cal. 1986). And even if the Defendants were correct that cardholders and merchants participated in one unitary network services market, the Defendants cannot collectively pick the "winners" and "losers" within that market but must instead allow market forces to determine how prices and quantities are allocated. *Premier Electrical*, 814 F.2d at 368. Thus, the Seventh Circuit rejected a trade association's attempt to justify a one-percent surcharge on nonunion contractors by arguing that it benefitted employers. *See Premier Elec.*, 814 F.2d at 368 (applying *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643 (1980)).

In fact, Prof. Murphy's analysis makes clear that the alleged competitive benefits (which Defendants contend outweigh the direct anticompetitive harm to merchants) do not arise in any card market at all, but rather in each merchant's own retail market for the sale of the merchant's goods and services. But competitive harm to merchants in the relevant credit-card network services market in the United States cannot be justified by

- 62 -

assertions that, for example, there are offsetting benefits to consumers in the local grocery store market in San Francisco, and in a multitude of other retail markets. *See Premier Electrical*, 814 F.2d at 368.

### 2.   Defendants' "total price" argument is unsupported in the record.

As noted above, the parties' experts agree that default interchange fees increase the aggregate "total price" in a two-sided market. Defendants respond with three "empirical analyses" by Prof. Murphy that attempt to show that interchange fees are completely passed through to consumers *at the margin*. (Murphy Rep. ¶ 20)[43] Each of these three empirical analyses, however, are fundamentally flawed and unreliable and therefore do not provide any basis for supporting even Prof. Murphy's limited and irrelevant claim about changes in interchange fees at the margin. Because far less than all of the interchange fees collected from merchants are transferred to cardholders, even if Defendants' "two-sided market" and "total price" arguments were legally relevant, their own expert's data shows that the "total price" is increased significantly by interchange fees.[44]

Prof. Murphy's first "empirical analysis" compares the incremental level of network-mandated reward levels on various card products to corresponding increases in interchange fees on those same card products. This analysis is facially flawed because

---

[43]   In a contemporaneous motion, Plaintiffs move to preclude Prof. Murphy from testifying because his opinions are unreliable and do not meet the standards for admissibility under Rule 702, Fed. R. Evid. If the Court grants the motion, the three flawed "empirical analyses" do not constitute "admissible evidence" and therefore may not be considered at summary judgment. *Rexall Sundown, Inc. v. Versus Perrigo, Co.*, 651 F. Supp. 2d 9, 25 (E.D.N.Y. 2009).

[44]   Other defense experts rely on Prof. Murphy's analyses. (Topel Rep. ¶¶ 87 & n. 108, 115, 140; Elzinga Dep. 357:2-24, 674:18-676:12, 683:18-686:23; James Dep. 44:3-24, 169:22-171:15.)

it does not prove that interchange fees lower the price in the purported "two-sided market." His yardstick for rewards -- the network-required levels -- is misleading because the network requirements center around the value of a single reward among those offered in a bank's program meets a stated threshold value to cardholders rather than the actual value of the rewards that consumers actually redeem. (Frankel Rep. ¶ 222 (SUF ¶ 124j.) Moreover, by measuring only *incremental* changes in interchange and rewards, Prof. Murphy's analysis misses the *overall* effect of interchange fees on prices in the "two-sided" market that he claims exists. This omission is critical because the data that Prof. Murphy cites confirm that, even for the networks' most "premium" cards -- MasterCard Elite Rewards and Visa Signature Preferred Rewards -- the interchange rate far exceeds the mandated rewards level. (Murphy Rep. Ex. 5.1A) (citing Visa and MasterCard interchange-fee reports and internal documents describing reward levels).

Prof. Murphy's second "empirical analysis" is equally insufficient to overturn the plain fact that interchange fees increase the "total price" to merchants and consumers. In this analysis he examines data from ██████████ to conclude that, ██████████ ██████████ the ratio of rewards and "revenue sharing" to overall interchange revenue increased ██████████████████████ as interchange fees increased. ██████████████████ But Prof. Murphy's claim provides no basis for drawing an industry-wide conclusion because he conceded that ██████████████ ████████████████████████████████ ████████████████████████████████



Prof. Murphy's third "empirical analysis" — his attempt to show that the "two-sided price" decreased between 2004 and 2008 — also fails to show that interchange lowers the "two-sided price." Prof. Murphy arrives at the "two-sided price" by subtracting rewards earned by cardholders, and revenue-sharing payments that ██████ ██████ made to merchants, from the sum of interchange fees and cardholder annual fees that these two banks collected. ████████████████████ Again, two nonrepresentative banks provide no basis for drawing conclusions for all card-issuing banks. ██████████████████████████ His attempt to calculate the "two-sided price" is further flawed because the "price to consumers" in his model considers only annual fees and ignores other fees such as late fees, over-limit fees, and interest charges on balances. (*See* Murphy Rep. ¶ 245.) Finally, even setting aside the holes in Prof. Murphy's data and methods, his "empirical analyses" demonstrate at most that the gap between issuers' interchange-fee income and rewards paid out has shrunk in recent years.

Defendants' experts' total-price claim is also inconsistent with Visa's own data. (SUF ¶ 124b-c, e.) As Dr. Frankel explains, if the Defendants' experts were correct that

- 65 -

interchange fees are simply a frictionless transfer from merchants to cardholders, then an increase in interchange fees would be entirely offset by decreases to cardholder fees and increases to "rewards" and other payments made from issuers to cardholders. But Dr. Frankel found that Visa's data demonstrate that the "total price" increased during the period that interchange fees increased between 1996 and 2008.[45] Defendants' experts did not dispute the accuracy of the Visa data cited by Dr. Frankel.

The reduction of interchange fees in Australia further illustrates how interchange fees inflate prices, even in a so-called "two-sided" market. In 2003, the Reserve Bank of Australia ("RBA") capped Visa and MasterCard credit-card interchange fees at 0.55%, which represented an immediate 40 basis-point reduction from their then-prevailing level of .95%. (SUF ¶ 122a.)The RBA mandated an additional .05% reduction in 2006. (SUF ¶ 122a.) The average merchant-discount fee fell by a greater amount than the mandated interchange-fee reductions. (SUF ¶ 122c.) On the cardholder side, even if one credits Defendants' experts that annual fees and other "cardholder fees" did increase as a result of the interchange-fee reductions in Australia, the net-price change to merchants and cardholders is still negative by a significant amount which contradicts Defendants' claim that interchange fees do not affect, or reduce, the "total price." [46]

---

[45]     In addition to examining the value of rewards and cardholder payments, Dr. Frankel also included the value of co-brand and affinity payments to merchants, which Defendants have argued are reductions in interchange fees.  If one takes the sum of total interchange fees plus annual fees and cardholder fees, and subtracts the amount of rewards and affinity payments made to consumers and the banks' co-branding and affinity partners, one observes approximately a 50 basis-point increase in this total "two-sided" price from 1996 to 2008. (Frankel Reb. Ex. 5.3).

[46]     *See also* Alan S. Frankel, *Towards a Competitive Card Payments Marketplace*, Reserve Bank of Australia, Payments System Review Conference at 29 (2007), available at http://www.rba.gov.au/payments-system/reforms/review-card-reforms/pdf/pymts-sys-review-conf-

(Murphy Rep. Ex. 5.4.)

> **C.    Defendants' high interchange fees and the other challenged rules result in consumers paying higher prices for the goods and services they buy from merchants than they would in the absence of Defendants' conduct.**

The Defendants' experts do not contest the fact that retail markets in the United States are highly competitive. (*See* Murphy Rep. at ¶ 100; Klein Rep. ¶ 71.) As noted above, in competitive markets prices approximate sellers' marginal cost. (James Rep. at 49); *see Ross*, 524 F.3d at 223. There is no dispute that per transaction interchange fees imposed on merchants increase merchants' marginal costs. (SUF ¶ 66c-f.) There is therefore no dispute that Defendants' anticompetitive elevation of interchange fees result in *all* consumers paying inflated prices for goods and services they buy from merchants. (Frankel Rep. ¶ 205.) But even though all consumers pay higher prices, only some get the supposed benefits of cards. Customers who pay with cash or checks get none of the convenience, security, or rewards benefits that many cardholders get. (*See* Murphy Rep. ¶¶ 76-77; *see also* E.C. Decision ¶ 411.) Therefore, as many studies have found, high interchange fees have the effect of having relatively less affluent consumers subsidize relatively more affluent cardholders. (*See* Frankel Rep. ¶¶ 205-06.)

> **D.    Defendants' high interchange fees and the other challenged rules have created and enhanced barriers to entry and expansion into the relevant markets.**

---

2007/competitive-card-mkt.pdf (computing the increase in cardholder fees posited by Chang, Evans, Garcia Swartz, three economists whose work has been subsidized by Visa and MasterCard, and comparing that increase to the decrease in merchant fees as a result of the RBA reforms to conclude that the "total price" in Australia declined on a nearly 1:1 basis with the RBA's mandated reduction in interchange fees, whereas Defendants' claim in this case is that there should be no reduction, or even an increase in the total price when interchange fees are reduced).

- 67 -

81561318.14

In competitive markets, the forces of competition inexorably drive prices down and quality up. (*See, e.g.*, Frankel Rep. ¶ 172.) If prices of incumbent firms are much higher than their marginal costs, and the prices are transparent to buyers, then the opportunity to earn profits will attract new entrants, or encourage small incumbent firms to expand, who can charge slightly lower prices and gain market share. (*See* Frankel Rep. ¶ 132.) But when the forces of competition are restrained artificially, as in this case by the anti-steering restraints, firms are prevented from entering or expanding even if they offer much lower prices. (Frankel Rep. ¶¶ 135, 172, 200, Vellturo Rep. ¶¶ 152, 164.) The fact that very high interchange fees have persisted in the U.S. for a very long time, prices that are many multiples of marginal costs, is indisputable evidence that the anti-steering restraints have made entry and expansion impossible. (SUF ¶¶ 63; 112.) The best evidence of this is the fact, alluded to above, that Discover has been stuck at a market share of only about 5% for 25 years, despite generally lower fees to both cardholders and to merchants and despite its innovation of offering "cash back" to cardholders. (SUF ¶¶ 112i, 113.)

### E. Defendants' interchange fees and other rules reduce merchant acceptance.

#### 1. In combination with the anti-steering restraints, interchange fees set at current levels reduce merchant acceptance in the United States.

As discussed above, for most categories of merchants the option of not accepting Visa or MasterCard payment cards is not a practicable business alternative. (SUF ¶ 89.) That is because a sufficiently large portion of their customers prefer to pay with Visa or

- 68 -

MasterCard payment cards *and* a sufficiently large portion of their competitors accept Visa and MasterCard payment cards such that they would lose substantial sales to those competitors if they chose not to accept Visa or MasterCard payment cards. (SUF ¶ 89.) However, historically there have been a few merchant segments for which the above two conditions did not apply.

███████████████████████████████████████████████

████████████████████████████████████In the early 1990s a similar graph would have had grocery stores in the upper left quadrant. But Visa and MasterCard overcame the lack of acceptance among grocery stores by offering much lower interchange fees to incent acceptance among grocery stores. (Elzinga Rep. at 91.)

███████████████████████████████████████████████

███████████████████████████████████████By the late 2000s Visa and MasterCard had targeted quick service restaurants with special low interchange-fee rates and dispensed with the signature authorization requirement for credit and signature-debt transactions; of less than $25.[47] (SUF ¶ 71b; *see also* Elzinga Rep. at 91; Frankel Reb. Rep. ¶ 128, n.288.)

So the conclusion is indisputable that interchange fees set at current levels, in combination with Defendants' other rules, have a negative impact on the merchant

---

[47]       As part of its strategy to incentivize the use of signature debit (with its higher interchange fees) Visa initially refused to dispense with requiring the entry of a PIN for PIN debit transactions on Visa's Interlink PIN debit network.  After the Department of Justice began an investigation of this practice, Visa yielded and agreed to dispense with PIN authorization for transactions under $25 as well. (Press Release, Visa Inc., *Visa Inc. Statement on Charges to U.S. Operating Regulations on Non-Visa Debit Transactions on Visa-Branded Cards* (July 1, 2008), available at http://corporate.visa.com/media-center/press-releases/press791.jsp.)

acceptance of payment cards in several categories. At least two of Defendants' experts agree that, all things equal, a reduction in the cost of payment-card acceptance will induce more merchants to accept payment cards. (*See* Murphy Rep. ¶ 111; Elzinga Rep. at 91.) In the United States, several categories of merchants have low payment-card-acceptance rates because of the costs of accepting cards or began accepting cards only after the networks offered significantly discounted interchange fees. (*See* Elzinga Rep. at 91

The networks' experience with colleges and universities and utilities demonstrates how interchange fees and the anti-steering restraints suppress merchant acceptance. The college and university and utility segments traditionally lagged behind other segments in payment-card acceptance. (*See* SUF ¶ 72d; *see also* Frankel Rep. ¶ 162.)

(*See* Frankel

Reb. Rep. ¶ 130.)[48]

MasterCard's public statements concede that the No-Surcharge Rule has the effect of inflating merchants' payment-card acceptance costs and discouraging additional merchants from accepting payment cards. In a submission to the Reserve Bank of Australia, it stated that merchants' ability to surcharge "place[s] an effective constraint on the setting of interchange fees. (SUF ¶ 76d.) Similarly, when it repealed its No-Surcharge Rule in Europe in 2004, it shared its expectations for the change with its member banks:



(SUF ¶ 72a.)

> **2.** **The fact that merchant acceptance, cardholder accounts, and volume in Australia increased when the RBA capped interchange fees demonstrates that supracompetitive interchange fees suppress output.**

The experience in Australia further demonstrates that supracompetitive interchange fees and the anti-steering restraints negatively impact merchant acceptance.

---

[48] Dr. Frankel quotes the website of the University of Virginia (where Prof. Elzinga teaches), which states that it accepts tuition payments by MasterCard, American Express, and Discover with a 2.75% fee charged by a third-party vendor. The website continues that the university does not accept Visa because "VISA's association rules will not permit [it] to charge a percentage service fee and would require UVA to charge the same fee for ALL transactions, including e-check and paper check."

- 71 -

MasterCard's 30(b)(6) witness on the Australian reforms testified that the number of

Australian merchants that accept MasterCard payment cards increased since the 2003

RBA reforms and Dr. Frankel notes that Visa experienced a similar uptick. (SUF ¶ 122d;

Frankel Rep. at n. 611.)[49] Moreover, the post-reform increase in merchant acceptance

was not accompanied by a decrease in cardholders. To the contrary, the number of

credit-card accounts in Australia increased from approximately 10.8 million at the time

of the reforms to over 14.8 million seven years later. (SUF ¶ 122e.) Transaction volume

on credit cards also increased by 75.5% during this time period from $104.4 billion in

2003 to $183.3 billion in 2010. (SUF ¶ 122f.) Thus, regardless of how output is measured,

output in the market for payment card transactions in Australia *increased* when the price

to merchants *decreased*.

## VII.  The Defendants' interchange fees and rules are more restrictive than necessary to attain any procompetitive benefits.

Once the plaintiff makes a threshold showing that the defendants' practices harm

competition, the burden shifts to the defendants to present evidence—sufficient to raise

a question of material fact—that their conduct had a procompetitive justification. *Visa*,

344 F.3d at 238. Professor Hovenkamp explains that once a plaintiff presents "structural

evidence that makes a practice look suspicious," the defendant must "show why it

should be exonerated." Herbert Hovenkamp, Federal Antitrust Policy: The Law of

Competition and its Practice, 267 (3d ed. 2005). The fact that "procompetitive

---

[49]      Other evidence shows that the number of merchant locations accepting MasterCard increased from 500,000 to 700,000 in the first four years of the reforms. (Frankel Rep. ¶ 460 (citing Robert Stillman, Wm. Bishop, Kyla Malcolm, Nicole Hildebrandt, Regulatory Intervention in the Payment Card Industry by the Reserve Bank of Australia, Analysis of the Evidence at 25-26, CRA Int'l (Apr. 28, 2008).)

justifications" are considered, however, does not "open up the field of antitrust inquiry to any argument in favor of a challenged restraint that may fall within the realm of reason." *Nat'l Society of Prof'l Engineers v. United States*, 435 U.S. 679, 688 (1979).

Certain justifications can be rejected as a matter of law. F.T.C. & U.S. Dep't of Justice, Antitrust Guidelines for Collaborations Among Competitors, § 3.2 (2000) (citing *FTC v. Ind. Fed'n of Dentists*, 476 U.S., 447, 463-64 (1996); *NCAA v. Bd. of Regents of the Univ. of Okla.,*, 468 U.S. 85, 116-17 (1984)). For example, as a matter of antitrust policy, proposed justifications that "depend on power over price for their efficacy," are impermissible. *Freeman*, 322 F.3d at 1152 (quoting 7 Areeda & Hovenkamp, *Antitrust Law* ¶ 1504c, at 361 (2d ed. 2003)); *accord* F.T.C. & U.S. Dep't of Justice, Antitrust Guidelines for Collaborations Among Competitors, § 3.36 (2000)  (Efficiencies are not "cognizable" if they "*arise from anticompetitive reductions in output or service.*") (emphasis added.)  And the profitability of joint-venture members is likewise an uncognizable justification. *See Law*, 134 F.3d at 1022-23. Nor may antitrust defendants "justify the anticompetitive effects of a policy by arguing that it has procompetitive effects *in a different market*," because competition, not competitors should "determine the respective values of competition in various sectors of the economy." *Clarett*, 306 F. Supp. 2d at 408-09 (citing *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610-11 (1972)).

If the defendants proffer sufficient evidence of cognizable, procompetitive effects, the plaintiff may nonetheless prevail by demonstrating that the proffered justification is unsupported in the record, or that the alleged procompetitive benefit could be attained by less restrictive means. The Second Circuit defines "less restrictive

- 73 -

means" as competitive alternatives "that would be less prejudicial to competition as a whole." *Capital Imaging*, 996 F.2d at 543. Even on summary judgment, the court must carefully scrutinize a defendant's proposed justification to test whether it is both legally cognizable *and* supported by the facts in the record. *See Freeman*, 322 F.3d at 1152-53; *Law*, 134 F.3d at 1021-24; *Clarett*, 306 F. Supp. 2d at 410; *see also Am. Needle*, 130 S. Ct. at 2214 n. 7 (questioning connection between licensing restrictions and offering product of "NFL football").

In this litigation, and in prior cases and regulatory proceedings, the Defendants have generally made four arguments that default interchange fees and the other rules are necessary for the operation of a payment-card network: (i) overcoming the "chicken-and-egg" problem of establishing a network or avoiding a "death spiral" of declining issuance or acceptance; (ii) "balancing the system" or maximizing purchase volume by making sure that the cardholder and merchant sides of the market pay efficiency-maximizing price; (iii) providing incremental sales to merchants; and (iv) preventing the "hold-up" problem. As detailed below, each of these proffered justifications is either legally non-cognizable, unsupported in the record, or both. (*See* Frankel Rep. ¶¶ 209-10, 217; Murphy Rep. 263-72.) And each of these proffered justifications has been repeatedly rejected in jurisdictions around the world.

### A. Defendants' default interchange fees and other rules are not necessary to overcome a "chicken-and-egg" problem or to prevent a "death spiral" of declining issuance and acceptance.

Interchange fees are not necessary for the networks to assemble enough merchants and cardholders to make their systems ubiquitous. Visa and MasterCard

networks have been unquestionably "mature" for years. More than 20,000 banks issue Visa or MasterCard payment cards in the United States, the cards are carried by approximately 70% of U.S. households and accepted at more than 7 million U.S. merchant outlets representing over 95% of all retail sales, and the networks had over $2 trillion in purchase volume in 2008. (McCormack Rep. Figs. 1A & 1B; Frankel Rep. ¶ 423;) *see also Visa*, 344 F.3d at 242. Because the networks are mature, consultants who have traditionally worked for the networks agree that the effect of adding additional members to a payment system is nonexistent or minimal as the network reaches maturity. (Frankel Rep. ¶ 219 (quoting D. Evans & R. Schmalensee, *Paying with Plastic*, at 68, 153 (1st ed. 1999)).) The antitrust agencies' competitor collaboration guidelines also recognize that "[a]n agreement that may be justified by the needs of a new entrant, for example, may not be reasonably necessary to achieve cognizable efficiencies in different market circumstances." F.T.C. & U.S. Dep't of Justice, Antitrust Guidelines for Collaborations Among Competitors, § 3.36(b) (2000).

Now that the networks are ubiquitous, the Defendants have repackaged their "chicken-and-egg" argument as an argument that reduction of interchange fees will lead to a "death spiral" of declining cardholder usage and merchant acceptance. (SUF ¶¶ 116; 122b.) This "death spiral" argument was dispelled by real-world experience after the RBA drastically and immediately reduced interchange fees and allowed merchant surcharging. As noted in Section VI.E.2, in the six years following the RBA reforms, the number of card-accepting merchant locations in Australia increased from 500,000 to 700,000, and the number of cardholder accounts increased from 10.8 million

to 14.8 million.  Defendants' experts do not dispute these numbers, but offer alternative explanations, which as explained above are not supported in the record. Once Defendants' arguments are dispelled, the undisputed evidence from Australia shows that the networks could have grown their networks with significantly lower interchange fees.

**B.    Interchange fees are not necessary, or are more restrictive than necessary, to "balance the system."**

**1.    Defendants' "system-balancing" argument is not supported in the record.**

Contrary to Defendants' claim, the evidence also establishes that interchange fees set at current levels are unnecessary to "balance" the prices to the "two sides" of the market by incenting card usage and merchant acceptance. *See Visa*, 163 F. Supp. 2d at 401 (relying on contemporaneous evidence to rebut Defendants' justification for their conduct); *see also* U.S. Dep't of Justice & the F.T.C., Horizontal Merger Guidelines § 2.2.1 (Apr. 19, 2010) ("Documents created in the normal course are more probative than documents created as advocacy materials in merger review."). ▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆And despite the fact that MasterCard justifies its interchange fees by arguing that they are "a mechanism by which the operators of four-party payment systems redress the imbalance between issuers' and acquirers' costs and revenues," Steve Jonas of MasterCard conceded that "MasterCard does not know what issuers' and acquirers' costs and revenues are." (SUF

- 76 -

¶ 57.)

But while Defendants' executives struggle to pinpoint how their interchange fees attain balance, the internal documents of both networks unambiguously state that, rather than "balancing the system," interchange fees are intended to (in the case of Visa) "maximize member [bank] profits" (SUF ¶ 45a.) or (in the case of MasterCard) "maximize business growth, customer profitability, and stickiness to our customers."[50] (SUF ¶ 55i.)

The "balancing the system" justification is also fatally flawed because it is premised on the false assumption that interchange fees are completely passed through to consumers. (*See* James Rep. ¶ 9; Klein Rep. ¶¶ 107-119; *see also* Elzinga Rep. at 31.) As Plaintiffs discuss in Section VI.B.2, above, interchange fees increase the "two-sided" price of network services, which indicates that merchants pay more in interchange fees than consumers receive.

> **2.    Defendants' arguments that interchange fees and the anti-steering restraints increase output fail because they ignore the effect of Defendants' anti-steering restraints and undisputed evidence.**

While recognizing that current levels of interchange fees discourage merchant acceptance, Defendants argue that interchange fees *increase* output because Visa and MasterCard transaction volumes and number of transactions have been increasing despite interchange-fee increases in recent years. (Elzinga Rep. at 40-49; James Rep. at 50-51.) While the volume numbers that Defendants' experts cite are undisputed, the

---

[50]    The networks frequently refer to the member banks as "customers." (*See*  SUF ¶ 35b.)

81561318.14

conclusion that they draw is legally impermissible in an antitrust case and therefore should be rejected as a matter of law.[51] *See Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 108 (2d Cir. 2007)).

According to Prof. Elzinga and Dr. Klein, the number and volume of payment-card transactions are proper indicators of output because they measure the "quantity" of network services that Visa and MasterCard "produce." Pricing their products in ways that increase volume, they argue, is inconsistent with a firm that exercises market power or monopoly power, which would normally restrict the volume produced. (Elzinga Rep. at 40-43; Klein Rep. ¶ 192.) Defendants' experts' conclusions on this point are fundamentally flawed because they fail to ask the correct question. The correct question is: In the "but-for" world in which the Defendants' challenged conduct did not exist, *i.e.*, a world without mandatory default interchange fees and the anti-steering restraints, would output in the relevant market(s) have been greater? *Cordes & Co.* , 502 F.3d at 108; *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 88 (D. Conn. 2009); *see also generally Visa Check*, 192 F.R.D. 68, 82-83 (E.D.N.Y. 2000) (finding that class plaintiffs' expert's "but-for" world in which Visa and MasterCard never implemented a credit-debit tying arrangement could be proven by class-wide evidence). As already discussed, based on all of the available evidence the inescapable conclusion is "yes."

Defendants' arguments are also flawed because, if demand in the market is

---

[51]     It is also incorrect as a matter of economics, as Prof. Elzinga conceded in his deposition. (Elzinga Dep. 419:22-420:13.)

increasing, output might increase even in the presence of anticompetitive conduct such as price fixing. No one would suggest, for example, that, if the major cell phone networks had agreed 10 years ago to fix the price of cell phone service, the number of cell phones, the number of minutes of air time, or the number of persons owning cell phones would not still have increased. Of course not, because even at fixed, supra-competitive prices many people would still buy and use cell phones. However, at *competitive* prices, unaffected by collusion, *i.e.*, in a "but-for" world without anti-competitive conduct, it is highly likely that more people would have cell phones, and use them more, than in a world of collusively set prices. (*See* Elzinga Dep. 436:2-437:522 (conceding that growth in output over time could be consistent with the exercise of monopoly power or the existence of a cartel).)

Even aside from this fundamental error, Defendants' argument still fails. Their argument might apply to a market in which prices are transparent and consumers will reduce the amount they purchase if prices creep too high. In such a market, a firm with market power would maximize its profits by increasing price and reducing volume sold. (Frankel Reb. Rep. ¶ 304; Elzinga Rep. at 40.) But such is not the market in this case. In these markets, the party who decides which method of payment will be used (the consumer) does not see the total price of her payment choice, and the party that does foot the bill (the merchant) cannot increase or decrease the volume of transactions it accepts in response to the price. (SUF ¶¶ 31i, iii, vi-vii; 32i, iii, vi-vii; Frankel Rep. ¶ 237; Vellturo Rep. ¶ 170; Murphy Rep. ¶ 211; Stieglitz ¶¶ 39-41.) In the payment-card industry, the cost to the merchant is hidden from the consumer, but is certainly

- 79 -

reflected in the price of the underlying product or service. (Stiglitz ¶ 23; Frankel Rep. ¶ 170; Kahn Rep. ¶¶ 97-101.) In this type of market, the producer can increase its prices without suffering the effects of decreased sales.  (SUF ¶¶ 72f; 76c-d.) Because Defendants' argument ignores the effect of the anti-steering restraints on choices of payment method, it may be rejected as a matter of law. *See Microsoft*, 253 F.3d at 54 (holding that effect of defendant's conduct should be considered when evaluating defendant's market power).

Possibly recognizing the flaws of relying on transaction volume as the only surrogate for output, Prof. Elzinga points to the fact that the number of merchant outlets also increased in recent years as effective interchange fees increased. (Elzinga Rep. at 44.) This argument fails, however, because it omits the key fact that explains *why* the number of merchant outlets increased – the networks decreased interchange fees to attract merchant acceptance in the segments that lagged behind. (SUF ¶ 76a-b, e, i.) Top-level executives from both networks confirmed that they *decreased* interchange fees in merchant sectors for which acceptance lagged behind, which in turn led to acceptance increases for those segments. (SUF ¶ 76b, e, i.)

Defendants' experts' answers to Class Plaintiffs' evidence from Australia does not create a material dispute of fact. Regarding Australia, Defendants do not address the fact that the number of merchant locations and cardholder accounts increased after the reforms. (*See* Murphy Rep. ¶¶ 310-16.) Through Prof. Murphy, they argue that the RBA reforms nonetheless reduced output because the market shares of payment systems that were unaffected by the RBA regulation—namely American Express and

- 80 -

Diners Club—initially increased after the reforms. (*Id.* ¶¶ 314-16.) Prof. Murphy reasons that the market-share increase for the "unregulated" systems (and the corresponding decrease for Visa and MasterCard) indicates that the reduced-fee Visa and MasterCard operated less efficiently than before the reforms. (Murphy Rep. ¶¶ 310-16.) But this reasoning suffers from the undisputed fact – which Prof. Murphy himself acknowledges – that the uptick in "unregulated" market share was small (1.3% by his estimate) and temporary (lasting no more than three years). (Murphy Rep. ¶ 313.)

After November 2006, the "unregulated" market shares began to fall and the "unregulated" networks also reduced their merchant discount rates to reduce the differential with Visa and MasterCard. (Murphy Rep. ¶ 315.) Prof. Murphy attempts to explain away these facts by pointing ███████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████ However, that testimony is contradicted by American Express's filings with the SEC and the RBA, in which it states that its merchant fees declined "in response to competition from the lower merchant fees of our competitors and pressure from merchants," which can surcharge American Express as well as Visa and MasterCard as a result of the RBA reforms.[52]  F. R. Evid. 201; *Kramer v. Time Warner*

---

[52]     American Express Australia Ltd., Review of Payment System Reforms: A Submission to the Reserve Bank of Australia 10-11 (2007); American Express Company, 2004 Form 10-K, at 13 ("As a result of changes in the marketplace, we have reduced our own merchant discount rates in Australia.") Moreover, Dr. Frankel had telephone and email conversations with officials at the RBA who were involved in the entire process of the payment-system reforms, who answered an "emphatic no" to the question of whether the RBA ever threatened American Express with regulation. (Frankel Rebuttal Rep. ¶ 178-79.)

*Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (noting that a district court may take judicial notice of the contents of SEC filings); *In re Parmalat Sec. Litig.*, 477 F. Supp. 2d 637, 640 (S.D.N.Y. 2007) (noting that submissions to foreign governments are admissible).

### 3.    The "system-balancing" justification is not legally cognizable.

Finally, Defendants' "balancing the system" justification is legally insufficient to justify uniform schedules of default interchange fees. Defendants claim that interchange fees are set at such high levels because the cardholder side of the market is more price sensitive than the merchant side. (Elzinga Rep. at 89-91; Klein Rep. ¶ 31; *see also* James Rep. at 48-49.) But the fact that Defendants charge relatively higher prices to the least price-sensitive participants in the system—merchants—is another way of saying that they price discriminate, which is an indication of market power. *See Visa*, 163 F. Supp. 2d at 340. Moreover, as described in Part Three, V.E. above, any imbalance in the cost sensitivity between merchants and cardholders is a result of Defendants' own rules that require merchants to accept all of a particular network's cards and pay an interchange fee on every transaction. (Murphy Rep. ¶ 209.) Thus, even Defendants' experts agree that the purported benefit of Defendants' conduct—inducing consumer usage by passing benefits to cardholders—exists only because Defendants' rules allow them to extract interchange fees from merchants. A proffered justification that "depend[s] on power over price for [its] efficacy" or can attain its purpose only by restricting competition is not legally cognizable. *NCAA*, 468 U.S. at 117; *Freeman*, 322 F.3d at 1152 (quoting Areeda & Hovenkamp, *Antitrust Law* ¶ 1504c, at 361 (2d ed. 2003). And even if it were true that cardholders respond more favorably to interbank competition than do

- 82 -

merchants, antitrust defendants "cannot fix prices as a mere *quid pro quo* for providing consumers with better products." *Freeman*, 322 F.3d at 1152 (emphasis added); *Premier Elec.*, 814 F.2d at 368.

### C.   Defendants' claim that interchange fees provide incremental sales to merchants cannot justify conduct that harms competition and is unsupported by the evidence.

Defendants' expert, Kevin Murphy, attempts to characterize merchants as free riders who receive all the benefits of payment cards—which he characterizes as incremental sales and increased consumer spending—but do not want to pay the costs.[53] (*See* Murphy Rep. ¶ 236; *see also* Klein Rep. ¶¶ 51-52.) This characterization does not as a matter of law justify a practice that has demonstrated anticompetitive effects, and in any case is not supported in the record.

The "incremental sales" justification is not legally cognizable because the purported "incremental sales" that merchants receive arise only as a consequence of rewards and other benefits provided to cardholders. An antitrust defendant cannot "offset" competitive harms in one market with purported benefits in another market. *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972). (*See supra* Part Three, VI.B.)

Professor Murphy's "incremental sales" model is also factually flawed because it assumes 100% pass through of the merchant Discount from merchant to consumer—a proposition that is contradicted by the record. (*See supra* Part Three, VI.B.2.) Secondly, contrary to the real world, his model examines only the effect of a single merchant beginning to accept payment cards when none of its competitors do. (K. Murphy Dep.

---

[53]     Other defense experts rely on Prof. Murphy's analysis. *Supra* n. 44.

- 83 -

Tr. 140:14-141:16, Apr. 13, 2010; *see also*, Jt. Mot. Cl. Pls & Indiv. Pls. Exclude K. Murphy at 28-32 ("Murphy *Daubert* Mot.") The model is therefore inapplicable to the real-world situation in which payment cards are ubiquitous and accepted by nearly every merchant in the United States. Finally, Prof. Murphy's claim that Sam's Club's acceptance of MasterCard ███████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████ Wal-Mart's SEC filings attribute the growth-rate differential to other factors and do not even mention the acceptance of MasterCard as a reason for the sales growth at Sam's during this period. Wal-Mart Stores, Inc., Annual Report (Form 10-K) at 9-10 (Mar. 31, 2008).[54]

Professor Murphy's attempt to prove that higher interchange fees lead to increased consumer spending also fails. ████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████ This analysis is also critically flawed, in ways that are fully explained in Plaintiffs' *Daubert* motion. (Murphy *Daubert* Mot. at 44-56.) To summarize, however, the first flaw is that Prof. Murphy's analysis is limited to credit cards, and therefore cannot serve to justify debit-card interchange fees (Plaintiffs' Tenth, Eleventh, and Fourteenth Claims for relief.) (Murphy Rep. ¶ 277.) Secondly, even

---

[54]   Specifically, Wal-Mart attributes the increase in Sam's sales to relatively low fuel sales in the year prior to accepting MasterCard and relatively higher fuel sales in the following year. The slower growth rate at Wal-Mart-branded stores is attributed to cannibalization resulting from the opening of new stores. Wal-Mart Stores, Inc., Annual Report (Form 10-K), at 9-10 (Mar. 31, 2008).

Prof. Murphy admits that his analysis cannot prove that credit-card holding (or premium-credit-card holding) *causes* increased spending, only that there is a correlation between the two variables. Thirdly, he ignores the effect of income restraints on spending, thereby assuming that premium-card-holding individuals will spend more into perpetuity and will not have to reduce their spending in later periods to pay off the debt they accumulated. (Murphy Rep. ¶ 282; K. Murphy Dep. 542:6-543:9, Apr. 13, 2010 (speculating without empirical support that people with many credit cards may have an incentive to earn greater income.)) Finally, Defendants' internal documents contradict Prof. Murphy's theory. For example, ████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████

**D.      Defendants cannot justify default interchange fees to solve the "hold-up" problem because the hold-up problem is a problem of their own creation.**

Finally, Defendants have argued in their expert reports in this litigation that default interchange fees are necessary to solve the "hold-up" problem that results from their honor-all-cards rule, the anti-steering restraints, and the default-interchange rule. (*See* Murphy Rep. ¶ 209.) This justification fails as a matter of law because Defendant's conduct has created the "hold-up" problem. As Defendants' experts admit, the "hold-up" problem arises from the networks' rules, which create a situation in which the issuer has "a great deal of bargaining power" over the merchant at the point of sale.

- 85 -

Without the self-created hold-up problem, no so-called "solution" would be necessary. And because the justification of this restriction depends upon the issuer and the network being able to exercise market power, it fails as a matter of law. *Freeman*, 322 F.3d at 1152.

**Part Four**
**Summary judgment should be granted on Class Plaintiffs' claims relating to Defendants' pre-restructuring fixing of debit-card interchange fees on debit cards [Claims 10, 11, 13 & 14]**

Class Plaintiffs' claims against Visa and MasterCard and their member banks for pre-IPO fixing of signature-debit-card interchange fees [Claims 10 & 11] and against Visa and its member banks for the pre-IPO fixing of PIN-debit-card interchange fees [Claim 14] rest on the same legal standards and evidence on the agreement,[55] restraint-of-trade,[56] and relevant geographic market[57] elements of a Sherman Act violation as the pre-IPO credit-card claims [Claims 1, 2 & 5]. The evidence necessary to establish the relevant product market, injury and damages for the debit-card claims differs somewhat from that for the credit-card claims, however, and therefore these elements are discussed separately in this section. Similar to Class Plaintiffs' credit-card claims, no genuine issue of material fact exists that (i) Defendants have market power in the separate markets for signature- and PIN-debit-card network services, (ii) merchants have been overcharged for signature- and PIN-debit-card network services; and (iii) Defendants have failed to show any procompetitive justification for their conduct.

---

[55]   *Supra* Part Three, I.

[56]   The contract, combination or conspiracy to set and enforce default interchange fee schedules for Visa's signature and PIN-debit cards and MasterCard's signature-debit cards is likewise a restraint of trade for the same reasons as it is for credit cards. (*Supra* Part Three, II.)

- 86 -

I.      **Signature and PIN-debit-card network services are proper relevant markets in which to evaluate Defendants' conduct.**

The undisputed facts in the record indicate that PIN-debit-cards and signature-debit-cards are not reasonable substitutes for each other and therefore fall in separate relevant markets. *See Geneva Pharms.*, 386 F.3d at 496.

- Merchants accepted both signature-debit-cards and PIN-debit-cards despite traditionally large gaps in acceptance costs. (SUF ¶¶ 63; 88.);

- Defendants' rules prevent merchants from providing customers with monetary incentives to process debit-card transactions as PIN transactions instead of signature. (SUF ¶¶ 31iii, vii; 32iii, vii.);

A.      **The cross-elasticity of demand between signature-debit-card network services and PIN-debit-card network services is low because merchants accepted signature-debit cards when they were significantly more expensive than PIN-debit cards.**

Even products that are functionally equivalent reside in separate product markets they have a low cross-elasticity of demand—*i.e.,* customers do not substitute between them despite differences in price. *Visa Check,* 2003 WL 1712568 at *2 (quoting *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 19 (1984)). For example, in *Visa Check,* this Court ruled that credit-card network services and debit-card network services were in separate product markets as a matter of law because the character of merchant demand was different for the two products. *Id.* at *3. This Court's ruling in *Visa Check* is consistent with the view of federal appellate courts and the antitrust agencies that market definition should focus on "customers' ability and willingness to substitute away from one product to another in response to a price increase." Horizontal Merger Guidelines § 4; *see also Geneva Pharms.*, 386 F.3d at 496; *United States* v. *Archer-Daniels-*

---

[57]      *Supra* Part Three, IV.

*Midland Co.*, 866 F.2d 242, 248 & n.1 (8th Cir. 1988) (holding that high-fructose corn syrup and sugar are in separate markets because "a small change in the price of HFCS would have little or no effect on the demand for sugar.")

The cross-elasticity of demand between signature- and PIN-debit-card network services is low. In particular, merchants have not refused to accept signature-debit cards despite interchange fees on those cards being traditionally much higher than the fees on PIN-debit cards. ████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████[58] While the gap for supermarket purchases was smaller, the cheapest signature-debit card (Visa) was nonetheless twice as expensive as the most expensive PIN-debit card (Interlink) for ██████ purchase. (Frankel Rep. Fig. 3.6 (citing Hayashi.)) These price gaps in and of themselves help establish separate relevant markets for PIN-debit card and signature-debit-card network services. *See Geneva Pharms.*, 386 F.3d at 496-97. And the fact that signature-debit volume continued to grow even while these cost differences persisted confirms the presences of separate relevant markets. *See id.*

The experience after the *Visa Check* settlement illustrates why signature-debit-card network services and PIN-debit-card network services are in separate relevant

---

[58]     Figures 3.5 and 3.6 are based upon data that Dr. Frankel received from Kansas City Federal Reserve economist, Fumiko Hayaski. Ms. Hayaski's data were later included in a published article. Fumiko Hayashi, *A Puzzle of Card Payment Pricing: Why Are Merchants Still Accepting Card Payments?*, 5 Rev. Network Econ. 144, 146 (2006).

81561318.14

markets. As part of the settlement, signature-debit-card rates are temporarily reduced, but remained significantly higher than the rates for PIN-debit cards. (SUF ¶¶ 63; 88, 93*l*-m.) But even after merchants were no longer required to accept Visa and MasterCard signature-debit cards if they accepted Visa and MasterCard credit cards, the proportion of PIN-debit purchases to signature-debit purchases remained constant, and only a handful of merchants dropped signature-debit acceptance. (Frankel Rep. Fig. 3.11; SUF ¶ 90.) ███████████████████████████████████

████████████████████████████████████████████

████████████████████████ The lack of substitution between signature-debit and PIN-debit, even after merchants became free to drop signature-debit confirms that the products are in separate relevant markets. *See Geneva Pharms.*, 386 F.3d at 496-97; In re *Visa Check*, 2003 WL 1712568 at *2-3.

> **B.** **The anti-steering restraints limit merchant substitution between Signature and PIN debit-card network services.**

The anti-steering restraints, described in Section IV.D.2.b. above, play a significant role in establishing separate relevant markets for the acceptance of signature-debit cards and PIN-debit cards. Notwithstanding the increase in PIN-pad deployment after the *Visa Check* settlement, merchants did not have the ability to engage in a number of strategies that might improve substitutability: they could not surcharge signature-debit cards; they could not impose minimum-transaction amounts on signature-debit purchases; and they could not provide a cash discount for consumers who use PIN-debit cards instead of signature-debit cards. (SUF ¶¶ 31iii, vii; 32iii, vii.)

Thus, while a merchant can prompt a consumer to use a PIN-debit card instead of an signature-debit card, it cannot design a monetary incentive for the cardholder to follow its prompt. The success of these anti-steering strategies – and their effectiveness at keeping the PIN-debit and signature-debit markets separate – is demonstrated by the fact, noted above, that even after PIN prompting increased, the proportion of PIN-debit purchases to signature-debit purchases remained constant. (Frankel Rep. Fig 3.11.)

**C.    Defendants' internal documents show that Defendants treat signature-debit cards and PIN-debit cards as separate products.**

Defendants' internal documents reflect that Defendants recognize PIN- and signature-debit-card network services are separate products. For example, a February 2006 MasterCard ███████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███ Similarly, ███████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

██████████████████████████████

**D.    PIN-debit-card network services and signature-debit-card network services are not reasonable substitutes for each other because many**

- 90 -

**merchants lack the equipment necessary to process PIN-debit transactions.**

The differences in the technology necessary to process PIN and Signature debit transactions reduce their substitutability from a merchant's perspective. PIN-debit transactions are typically initiated by the cardholder entering his or her personal identification number ("PIN") into a PIN pad at the point of sale. (SUF ¶ 2i.)The large number of merchants without PIN pads cannot process PIN-debit transactions and thus, for them, there is no substitutability between Signature and PIN-debit-card network services. (SUF ¶¶ 102-103.)As Defendants' expert Professor Klein recognizes, this lack of substitutability is particularly acute for merchants that have a significant percentage of internet or telephone sales. (Klein Rep. ¶ 235.) Evidence that a particular group of customers cannot substitute between two products indicates that those products are in separate markets. *See Geneva*, 386 F.3d at 497-98. *See also MCM Partners v. Andrews-Bartlett & Assocs.*, 62 F.3d 967, 976-77 (7th Cir. 1995) (holding that market for "rental of forklifts, material handling and personnel moving equipment" could be limited to convention-and-trade-show exhibitioners).

II.    **Defendants have market power in the relevant product markets for signature-debit-card network services and PIN-debit-card network services.**

As stated above, market power is the "power to control prices or exclude competition." *Du Pont*, 351 U.S. at 391. The record in this case removes any material dispute of fact that Visa and MasterCard have the power to control prices—and have used that power—in both the network-services markets for signature- and PIN-debit cards:

- Defendants successfully increased interchange fees for signature-debit cards and PIN-debit cards without losing significant merchant acceptance (SUF ¶¶ 63; 90; 93a-f, k.);

- Defendants set interchange fees for signature-debit cards and PIN-debit cards based on merchants' elasticity of demand (SUF ¶¶ 46-47, 56, 58.);

- Visa and its member banks successfully "converged" PIN-debit and signature-debit interchange fees (SUF ¶ 115.); and

- Defendants have large market shares in concentrated markets for signature-debit-card network services and PIN-debit-card network services (SUF ¶¶ 108-109.)

## A.   Defendants have market power in the market for signature-debit-card network services.

### 1.   Defendants have the power to control the prices of signature-debit-card network services because they can increase interchange fees and price discriminate in the levels of those fees without losing significant merchant acceptance.

Defendants' practices for setting signature-debit-card interchange fees—and merchants' reactions to those practices—demonstrate that the Defendants have the same power to influence the price of debit-card network services that they do for credit-card network services. Defendants price discriminate in the level of signature-debit-card interchange fees, just as they do for credit-card interchange fees. (SUF ¶¶ 46-47, 56, 58.) In recent interchange-fee announcements, Visa listed 30 separate signature-debit-card interchange-fee categories, while MasterCard listed 32. (SUF ¶¶ 47c; 58d.) Just as in the credit-card market, Visa and MasterCard base their signature-debit-card interchange fees on merchants' willingness to pay rather than the banks' costs or their

own costs. (SUF ¶¶ 46-47, 56, 58.)[59] And immediately upon the expiration of the mandatory fee decrease required under the *Visa Check* settlement, Visa and MasterCard increased signature-debit-card interchange fees. (SUF ¶ 94.) Despite these practices, no significant merchant has dropped acceptance of Visa's and MasterCard's signature-debit cards. (SUF ¶¶ 63; 90; 93a-f, k.) Indeed, merchants have confirmed that they cannot, as a practical matter, drop acceptance of Visa and MasterCard signature-debit cards. (*See* SUF ¶¶ 89b-c, j-k; 96b-e, g-i; 115m.) Merchants' inability to fend off the Defendants' signature-debit-card-interchange-fee increases and discriminatory pricing practices directly establishes that the defendants possess market power. *See Visa*, 344 F.3d at 239; *Visa Check*, 2003 WL 1712568 at, at 2-3.

> ## 2.   Indirect evidence establishes that Defendants have market power in the market for signature-debit-card network services.

The structure of the signature-debit-card market also establishes that both Visa and MasterCard, each with its respective member banks, have market power. Based upon 2009 data, Visa had a 73.0% share of the signature-debit market and MasterCard

---

[59]    The factual record compiled by the Federal Reserve Board ("FRB") in connection with its rule-making required by the Durbin Amendment for debit interchange fees is enlightening on the issue of debit-card issuers' costs. The Durbin Amendment limits debit-card interchange fees to a level that is "reasonable and proportional" to a debit-card issuer's marginal costs. Prices in competitive markets are usually close to sellers' marginal costs. *See Ross*, 524 F. 3d at 223; Carlton & Perloff, Modern Industrial Organization 88. The FRB designed a survey that it sent to banks, seeking data on issuing banks' marginal costs for debit-card transactions. When the FRB issued its Notice of Proposed Rule-Making on December 16, 2010 it disclosed the results of its survey. Issuers' total median per-transaction processing costs were 13.7 cents for signature debit and 7.9 cents for PIN debit. The median variable costs were 4.5 cents for PIN-debit-card transactions and 6.7 cents for signature-debit-card transactions. Debit Card Interchange Fees and Routing, 75 Fed. Reg. 81722, 81725 & n.25, 26 (to be codified at 12 C.F.R. pt. 235). Based on that issuer-cost data, the FRB proposed an interchange-fee cap of 12 cents per transaction. 75 Fed. Reg. at 81756 (to be codified at 12 C.F.R. § 235.3) ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████

81561318.14

had a 27.0% share. (SUF ¶¶ 108, 115m.) Thus, the market is essentially a duopoly with

an HHI of 6058. *Id.* These market shares and concentrations are well over the level that

Judge Jones found to establish market power after "a cursory examination." *Visa*, 163 F.

Supp. 2d at 341. Significant barriers to entry also exist. ███████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████No

evidence exists that any other firm has attempted to enter this market in the last thirty

years. Visa and MasterCard's ability to maintain such dominating market shares

without other firms entering provides indirect support for the direct evidence of their

signature-debit market power. *See Visa*, 344 F.3d at 239-40.

    **B.**    **Visa and its member banks have market power in the market for PIN-debit-card network services.**

        **1.**    **Visa and its member banks are able to increase PIN-debit-card interchange fees and discriminate in the level of those fees without losing significant merchant acceptance.**

The record demonstrates that Visa and its member banks have the power to

control price on PIN-debit transactions and have been using that power for two

decades. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[60]    PIN-debit-card interchange fees are often calculated as a percentage of the transaction amount plus a flat fee, subject to a fixed cap. ████████████████████████

81561318.14



**2.      The ability of Visa and its member banks to lead a market "convergence" in the interchange fees for signature-debit-card network services and PIN-debit-card network services directly demonstrates Visa's market power.**

As this Court is aware from the evidentiary record compiled in *In re Visa Check*, by the late 1980s the member banks of Visa and MasterCard had concluded that the growth of strong regional ATM networks into merchant-friendly PIN-debit networks threatened the dominance of the Visa and MasterCard credit card networks. (SUF 114; 115a; *See* Pls.' Stmt. Undis. Facts at 52-54, *Visa Check*, Jun. 7, 2000 (Dkt. 365).) To counter that threat Visa and MasterCard and the large credit-issuing banks that controlled both networks, embarked on a campaign designed to maintain the dominance of those two networks, and to destroy – or at least marginalize – the regional PIN-debit networks. (SUF ¶¶ 114-15.) *See* L. Constantine, et al., *Repairing the Failed Debit Card Market: Lessons from a Historically Interventionalist Federal Reserve and the Recent Visa Check / MasterMoney Antitrust Litigation*, 2 NYU J. of Law and Business 147, 162-175 (2006).

In furtherance of this strategy, ███████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

81561318.14

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████ And just as Visa had planned,

American Banker – a leading trade publication – reported on April 30, 2010 that "Visa

this month changed its debit interchange rates by raising PIN-based transaction costs

and lowering signature transactions; both are now 0.95% plus 20 cents." (SUF ¶ 115n.)

That Visa could successfully execute a decade-long strategy to converge PIN-

debit and signature-debit interchange fees directly demonstrates that it has the power

"to control price." *See DuPont*, 351 U.S. at 454. ███████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

81561318.14

███████████████████ *See also Visa Check,* 2003 WL 1712568 at *4. ████████

████████████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

3.      **Defendants' conduct enhances their market power in PIN-debit-card network services.**

Agreements between Visa and the banks further enhanced their market power in

PIN-debit-card network services. ███████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

The effect of this strategy was to eliminate merchants' ability to route transactions over

the cheapest network on some PIN-debit cards. Competitive Impact Stmt. 9; *United*

*States v. First Data Corp.*, 1:03CV02169 (RMC) (D.D.C. Jan. 23, 2004).[61] Without

competition from regional networks, merchants lost a check on Defendants' ability to

execute a strategy of "converging" debit rates by raising PIN-debit rates.

> **4.    Indirect evidence establishes that Visa and its member banks have market power in the market for PIN-debit-card network services.**

Just as in the credit-card and signature-debit-card markets, indirect evidence

eliminates any material dispute of fact that Visa's Interlink has market power in the

PIN-debit-card network services market. Interlink's market share of 39.3% in a market

with an HHI of 2750 is consistent with the levels that Judge Jones found to constitute

market power in *United States v. Visa*. (SUF ¶ 109.); *see* 163 F. Supp. 2d at 341. Barriers to

entry are also high, as shown by the recent, failed attempt by Tempo to enter the

market. (SUF ¶ 112h.)

**III.    Defendants' rules and default interchange fees harm competition in the signature-debit-card-network-services market and the PIN-debit-card-network-services market.**

> **A.    Defendants and their experts do not refute the central conclusion of Dr. Frankel, that debit-card interchange fees increase merchants' costs of debit-card acceptance.**

Defendants and their experts have not refuted Class Plaintiffs' evidence that

fixed interchange fees on signature- and PIN-debit-card network services harm

merchants by inflating their costs of debit-card acceptance. Dr. Frankel's conclusion

that, absent Defendants' rules, merchants would not have paid interchange fees, is

undisputed for the debit-card markets. For the debit-card markets, Dr. Frankel

---

[61]    Merchants' ability to choose networks was subject to some networks' and banks' priority-routing rules. Competitive Impact Stmt., at 6.

supported his conclusions with real-world evidence, including, among other things that (i) in the early 1990s, 15 out of the top-20 PIN-debit-card networks in the United States operated efficiently without interchange fees, and (ii) several debit-card networks around the world operate efficiently without interchange fees. (Frankel Rep. ¶¶ 345-46; *see also* SUF ¶ 120.) Dr. Frankel therefore concluded that merchants were injured by, and paid overcharges in, the entire amount of interchange fees on Visa's signature and PIN-debit transactions and MasterCard's signature-debit transactions. (*Id.* ¶¶ 324-25.)

Defendants have not refuted Dr. Frankel's conclusions, or his real-world empirical support, with respect to debit cards. Defendants' primary expert, Robert Topel, for responding to Class Plaintiffs' injury and damages evidence conceded that he "did not write down a literal but-for world that said this is how the but-for world for signature-debit would differ from the but for world for credit." (Topel Tr. 145:15-146:4, Apr. 20, 2010.) He also admitted that he did not offer an opinion on the PIN-debit market. (*Id.* 148:23-49:11.) And although Professor Topel contended that several of the foreign debit-card networks without interchange fees are not appropriate benchmarks, he did not dispute that debit-card networks in Canada, Norway, and New Zealand operate successfully without interchange fees. (Topel Report, ¶ 29; Frankel Rebuttal, ¶ 337.) Another of Defendants' experts, Dr. William Wecker, added that debit-card networks in Switzerland and Belgium functioned efficiently without interchange fees. (Wecker Rep. ¶¶ 31, 34-35.) Prof. Topel did not dispute Dr. Wecker's examples.

### B. Defendants' rules and interchange fees reduce the number of merchants that accept debit cards.

In Part Three, Class Plaintiffs presented undisputed evidence from the United States and abroad that interchange fees—and especially interchange fees set at current levels—cause certain categories of merchants not to accept payment cards. Defendants' experts do not dispute this proposition. These facts equally support the proposition that debit-card interchange fees reduce output by reducing the number of merchants that accept debit cards. Class Plaintiffs also present undisputed evidence that seven of the top eight countries in debit-card use per capita have networks that operate without interchange fees. (SUF ¶¶ 117-119; 121.)

But because of the interchange-fee disparity between the two products, several issuers encouraged their cardholders to process transactions on cards that contained PIN and signature functionality as signature transactions instead of PIN-debit transactions. Issuers accomplished this by providing rewards to consumers for only those transactions for which the consumer signed as opposed to entering a PIN. (SUF ¶ 104.)

## IV. Defendants do not show procompetitive justifications to offset the obvious anticompetitive effects of their conduct.

Defendants and their experts do not dispute that mandatory interchange fees have a price-fixing effect by increasing the fees that merchants pay for signature- and PIN-debit-card network services. *See supra* Part Three, VI.A. In particular, Defendants have not provided any statistical or empirical evidence to support their claimed justification as to signature- and PIN-debit-card network services.

Defendants' primary justification for their rules and interchange fees—that they

- 100 -

provide an "effective discount" to cardholders which increases merchants' sales—does not apply to debit-card networks. Professor Murphy conceded in his report that his "analysis" "focused on credit cards and credit-card networks." (Murphy Report, ¶ 332.) Professor Murphy's neglect of debit-card markets permeates each of his empirical models: (i) his "numerical model," which claims to show that the introduction of an interchange-fee results in efficiency gains for both merchants and cardholders; (ii) his claim that interchange fees are passed through to cardholders; and (iii) his claim that there is a correlation between higher credit card use and lower retail prices. (Murphy Rep. ¶¶ 242, 244, 254-62, 273 & Exs. 4.8, 5.1A, 5.1B, 5.2.) Professor Murphy spent hundreds of paragraphs explaining his theoretical justification for credit-card interchange fees, including his purportedly supporting statistical analysis and empirical evidence. (Murphy Rep. ¶ 332 ("The analysis I presented so far has focused on credit cards and credit card networks.").) In contrast, he devotes only five paragraphs to any attempted justification of debit-card fees. (*Id.* at ¶¶ 333.36 (discussing debit.)) Rather than analyzing the debit-card fees and their impact in the debit-card markets, Professor Murphy simply speculates that his claimed justifications for credit-card interchange fees apply equally to signature- and PIN-debit-card interchange fees because "the same economic framework" is applicable to credit-card and debit-card networks. (Murphy Rep. ¶ 332.)

Defendants' expert Robert Topel implicitly conceded that any claimed justifications for the challenged conduct as to credit cards do not apply to debit cards. In particular, he concluded that "debit and credit cards [are] economically different

- 101 -

because credit cards drive more incremental sales" and "credit cards provide advantages – and require issuers to undertake costs – that debit-cards do not provide or require." (Topel Report, ¶¶ 29, 54.)

Several of Defendants' experts rely on Professor Murphy's empirical work to support their own conclusions. *(See supra* n. 44.*)* Because these experts' proffered justifications for fixed interchange fees are based solely on Professor Murphy's, they should not be considered on Class Plaintiffs' Claims 10, 11, and 14, which challenge the fixing of debit-card interchange fees. *Mercedes-Benz USA, Inc. v. Coast Auto. Group, Ltd.*, 362 F. Appx. 332, 335 (3d Cir. 2010) (citing *In re "Agent Orange" Prod. Liab. Litig.*, 611 F.Supp. 1223, 1245 (E.D.N.Y. 1985)).

**Part Five**
**Defendants' rules and default interchange fees continue to violate Section 1 of the Sherman Act after their restructurings. [Claims 17, 18 & 20].**

MasterCard's counsel admitted at oral argument on Defendants' previous motions to dismiss that "the IPO did not change any competitive circumstances in the market whatsoever." (Hr'g Tr. at 16:2-3, Nov. 18, 2009.) The following undisputed facts prove that counsel was correct in his statement, and that the Defendants' conduct constitutes "agreements" even after the networks' IPOs:

- The pre-IPO agreements between the networks and the banks, which required the banks to abide by the networks' rules, remained in effect after the networks' IPOs (SUF ¶¶ 3-4.);

- The rules that Plaintiffs challenge—including the default-interchange rule and the rules against merchant steering—remain essentially unchanged after the IPOs (SUF ¶¶ 31-32.);

- The bank representatives that sat on the Visa and MasterCard boards of directors designed and executed the networks' restructurings (SUF ¶¶ 3-4;

- 102 -

8-9; 16; 33; 37.)

I.     **A broad range of agreements can constitute "contracts, combinations, or conspiracies" under Section 1.**

Courts interpret the "contract, combination, or conspiracy" requirement of § 1 broadly to include agreements that are purely horizontal in nature, purely vertical, and hybrids of the two. *New York ex rel Abrams v. Anheuser-Busch, Inc.*, 811 F. Supp. 848, 869 (E.D.N.Y. 1993), *Toys "R" Us Inc. v. F.T.C.*, 221 F.3d 928, 936 (7th Cir. 2000). Horizontal agreements to fix prices or allocate territories are "classic examples" of an antitrust violation and obviously subject to § 1. *See United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972). At the other end of the spectrum, this Court has stated that it is "axiomatic" that a vertical agreement between a manufacturer and its wholesalers meets the "agreement" threshold of § 1. *Anheuser-Busch*, 811 F. Supp. at 869. Other courts have held that a series of vertical agreements between an upstream supplier and manufacturers are subject to § 1 scrutiny, even without evidence of a "rim" of agreements among the manufacturers. *Dickson v. Microsoft Corp.*, 309 F.3d 193, 204-205 (4th Cir. 2002) (analyzing "rimless" agreements between Microsoft and various PC manufacturers under the rule of reason); *Pepsico, Inc. v. The Coca-Cola Co.*, 315 F.3d 101, 110 (2d Cir. 2002) (analyzing agreements between Coca Cola and its wholesalers under the rule of reason after holding that they did not constitute a *per se* illegal horizontal agreement). In its most recent pronouncement on the antitrust treatment of resale-price-maintenance agreements, the Supreme Court stated that even purely vertical agreements can "facilitate a retailer cartel" if the retailers (or any downstream parties)

- 103 -

"were the impetus for the vertical price restraint." *Leegin v. PSKS, Inc.*, 551 U.S. 877, 897-98 (2007).

The Supreme Court recently held that a horizontal agreement subject to § 1 may be directly proven when an agreement or a series of agreements coordinates the conduct of "separate economic actors pursuing separate economic interests." *Am. Needle*, 130 S. Ct. at 2212 (citing *Copperweld Corp. v. Independence Tube, Corp.*, 467 U.S. 752, 769 (1984)). As fully explained on p. 22 above, when a group of competitors allows a third party to control their competitive activities, the decisions of the third party are subject to § 1. *Id.* Accordingly, the D.C. Circuit held that a group of moving companies entered into a horizontal agreement by adhering to the prices and territorial restraints of a national network of movers. *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 214 (D.C. Cir. 1986). The court characterized the arrangement as a horizontal agreement because it restricted the way in which horizontal competitors could compete with one another. *Id.* at 214-215; *see also Fraser*, 284 F.3d at 57 (dicta describing how setting of soccer players' salaries by separately incorporated league resembles horizontal agreement rather than unilateral action).

Even if there is no direct evidence of a horizontal agreement, a court may use circumstantial evidence to infer a "hub-and-spoke" horizontal agreement from a series of vertical agreements. To prove a hub-and-spoke agreement, a plaintiff need not demonstrate direct communications among the horizontal competitors. *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 227 (1939); *Toys "R" Us*, 221 F.3d at 936. Rather, it is sufficient to demonstrate that the horizontal competitors agreed to participate in a

- 104 -

scheme with a common "hub," with the knowledge that the other competitors would also participate, and the knowledge that the competitors' participation was necessary to effectuate the conspiracy. *Id.* For example, in *Toys "R" Us* each major toy manufacturer independently agreed with Toys "R" Us to boycott "warehouse stores" such as Sam's Club and Costco, but in order to keep from losing sales to competing manufacturers, conditioned the agreement on Toys "R" Us also securing agreements from the other major manufacturers. A horizontal agreement existed because the agreements prevented one form of competition among manufacturers – competition for sales at multiple retail outlets. *Id.* at 936.

## II.    The conduct that Class Plaintiffs challenge is governed by a series of agreements among each network and its member banks.

### A.    The Visa and MasterCard rules continue to dictate the conduct that Class Plaintiffs challenge.

No matter how one characterizes the agreements, there is no dispute that the Defendants' post-restructuring activities are controlled by thousands of agreements. (*See* Mem. Law Supp. Mot. Dismiss 2d Consol. Cl. Action Compl. at 30, Mar. 31, 2009.) Through agreements with their member banks, the networks maintain and continue to enforce the rules that combine to create the "hold-up problem," namely the honor-all-cards rule, the default-interchange rule, and the anti-steering restraints. (SUF ¶¶ 31i-iii, vi-vii; 32i-iii, vi-viii.) And just as before the IPOs, the banks continue to agree to enforce the networks' rules that require the payment of interchange fees and prevent merchant surcharging. (SUF ¶¶ 21-22; 24-25; 49; 59.) The networks and the banks do in fact enforce the rules after the IPOs.  And even if — as Defendants contend — these

- 105 -

agreements are purely vertical, there is no dispute that they increase card-acceptance

prices to merchants. (SUF ¶ 66.) *Leegin*, 551 U.S. at 897-98.[62]

**B.      Agreements among the banks and networks were intended to—and did—coordinate the competitive conduct of the banks after the restructurings.**

In addition to the post-restructuring vertical agreements that Defendants appear

to concede, there is undisputed direct evidence that horizontal agreements among the

banks continue to harm competition after the restructurings. First, there is no dispute

that the post-restructuring networks were created by votes of the competing banks that

sat on the pre-IPO Visa and MasterCard boards. (SUF ¶¶ 3-4; 8-9; 16; 33; 37; 77-78.)

There is no dispute that votes to restructure the networks were motivated primarily by

the threat of antitrust litigation under the networks' old ownership and governance

structures. (SUF ¶¶ 34; 38.) Similar to the networks' earlier appointment of non-bank

parties to approve interchange fees, these votes to create "new" networks had the effect

of appointing a new third party to set the interchange fees that were previously set by

the banks themselves. (SUF ¶¶ 34a; 35; 39; *see supra* p. 27; *St. Francis Hosp.*, 94 F. Supp.

2d at 412-414.) By setting common interchange fees that all banks agree to abide by, the

Defendants continue to deprive the marketplace of "independent centers of

decisionmaking" by fixing a common component of the price that all merchants pay to

accept payment cards. *Am. Needle*, 130 S. Ct. at 2212; *Catalano, Inc.*, 446 U.S. at 648.

The fact that the parties that now set interchange fees are nominally independent

---

[62]      For the purposes of its complaint against Visa, MasterCard, and American Express, the Justice Department treats the agreements among the networks, banks, and merchants as purely vertical, but nonetheless alleges that they restrict competition and increase prices in violation of § 1.

81561318.14

of the banks is not relevant to deciding whether the Defendants' post-restructuring conduct is subject to § 1. Even if—as Defendants argued in their motions to dismiss— the post-restructuring-network boards had fiduciary duties only to the networks' shareholders, American Needle recognizes that "illegal restraints often are in the common interests of the parties to the restraint." *Am. Needle*, 130 S. Ct. at 2213. Thus even the alleged alignment of bank and network interests does not alter the fact that the Defendants' rules continue to restrict competition among the banks and therefore create a horizontal agreement among them. *Id.*

### C.   The restructurings at most converted the networks from horizontal conspiracies to hub-and-spoke conspiracies.

The record also contains undisputed, circumstantial evidence that the post-restructuring networks coordinate a "hub-and-spoke" conspiracy among the member banks. In fact the conclusion that the networks constitute hub-and-spoke conspiracies after their restructurings is stronger in this case than in *Toys "R" Us* because the member banks—the "spokes"—not only agreed to abide by the mandate of the "hub" but they also created the "hub" through horizontal agreements. (SUF ¶¶ 3-4.) The 30(b)(6) witnesses from both networks testified that the bank-representative directors that orchestrated the IPOs did so to perpetuate interchange fees and network rules by protecting them from antitrust challenges. (SUF ¶¶ 34h-i; 36e; 38f; 39c; 40b.) This testimony is consistent with the European Commission's findings that MasterCard's "member banks shaped and eventually approved the IPO in order to perpetuate [default interchange fees] as part of the business model." (SUF ¶ 61.) The fact that the

- 107 -

conspiracy's "hub" is a creation of its "spokes" presents an additional element of conspiracy that was not present in *Toys "R" Us* or *Interstate Circuit*, and which eliminates any dispute of fact that the interchange fees constituted agreements post-IPO.

In addition to creating the "new" networks, the banks received assurances that the networks would continue to operate in a "bank/issuer centric" business model. (SUF ¶¶ 35-36; 39-40.) In the case of MasterCard, ██████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ██████████████████████████████ Consistently with the evidence in this case, the E.C. found that the banks that designed the MasterCard IPO "legitimately expected and therefore agreed that [the Global Board] would henceforth set [interchange fees] in a manner that is in their common interest." (SUF ¶ 35a.) (E.C. Decision ¶ 379;) *see Toys "R" Us*, 221 F.3d at 932, 936 (citing assurances of parallel agreements that *Toys "R" Us* provided to the manufacturers to secure their adherence to its policies). Similarly, a Visa notice to member banks ████████████████████ ███████████████████████████████████████████ █████████

III.    **No bank has made any affirmative statement to withdraw from the previously adjudicated structural conspiracies.**

- 108 -

81561318.14

Once a defendant is found to be a party to an unlawful conspiracy, its

involvement is rebuttably presumed to continue until it does some unequivocal act to

"disavow or defeat the purpose of the conspiracy." *Drug Mart Pharmacy Corp. v. Am.*

*Home Prods. Corp.*, 288 F. Supp. 2d 325, 329 (E.D.N.Y. 2003) (citations omitted); *see also*

*United States v. Greenfield*, 44 F.3d 1141, 1150 (2d Cir. 1995). The defendant bears the

burden to demonstrate that it has effectively withdrawn. *United States v. Berger*, 224 F.3d

107, 118 (2d Cir. 2000). Withdrawal may be shown by disavowal of the goal of the

conspiracy, affirmative steps to defeat the goal of the conspiracy, or taking "decisive

[ ]and positive steps" to disassociate from the conspiracy. *United States v. Lothian*, 976

F.2d 1257, 1261 (9th Cir. 1992) (internal quotation and citation omitted). The Second

Circuit's "case law strongly suggests" that the "defendant must not take any

subsequent acts to promote the conspiracy." *Berger*, 224 F.3d at 118. Withdrawal is not

effective, however, if the defendant continues to receive any additional benefits from

the conspiracy. *See id*. at 118-19. For example, in *United States v. Eisen*, the Second Circuit

held that a law partner who resigned from his firm continued to be liable for the firm's

illegal conduct after he resigned because he continued to receive a percentage of the

firm's recoveries. 974 F.2d 246, 269 (2d Cir. 1992); *cf. Morton's Mkt., Inc. v. Gustafson's*

*Dairy, Inc.*, 198 F.3d 823, 829 (11th Cir. 1999) (holding that defendant effectively

withdrew because it sold the business that had fixed prices and stopped selling the

price-fixed product).

No Defendant—bank or network—made any affirmative statement to the effect

that the pre-IPO agreements between banks and networks ceased to apply after the

81561318.14

IPOs, and they did not take any other action that would have ended the effect of the previous forty years of agreements among the banks and the networks. *See Greenfield*, 44 F.3d at 1150. At oral argument on Defendants' motions to dismiss, MasterCard's counsel argued that simply restructuring and conducting an IPO was "a pretty loud statement" to signal that the banks were no longer part of a price-fixing conspiracy. (Hr'g Tr. 145:9-17, Nov. 18, 2009.) But the undisputed facts indicate that the rules and the fee-setting methodology that were the products of agreements among banks remained unchanged after the networks' IPOs. (SUF ¶¶ 4-5; 23; 31-32; 51; 62.) And it was not merely a coincidence that Defendants' conduct did not change with the IPOs – the banks' primary motivation in designing and executing the restructurings was to enable their rules and fee setting to continue free from antitrust exposure. (SUF ¶¶ 34; 36e; 38; 39c; 40b; 61.) Moreover, just as the law partner in *Eisen* continued to receive the fruits of his work for his corrupt firm, the banks continue to receive interchange fees pursuant to the rules that they established as a consortium of competitors. (SUF ¶¶ 4; 31ii; 32ii.) *Eisen*, 974 F.2d at 269. The lack of affirmative withdrawal by any bank provides an additional reason for this Court to conclude that the Defendants' activity was illegal under Section 1, even after their restructurings.

Legal and economic labels aside, the record is clear that the Defendants' IPOs were nothing more than window dressing for their continuing anticompetitive conduct. When the Defendants designed the IPOs, they fully expected that the entities that emerged would continue to set interchange fees in their interest. (SUF ¶¶ 35, 39.) Class Plaintiffs are not aware of any evidence that any defendant expected to networks' IPOs

- 110 -

to change how the networks served the banks. For the Defendants to argue that these transactions changed the antitrust analysis of their rules and interchange fees would truly be to exalt form over substance. Such a surface view of Defendants' conduct is contrary to both precedent and sound antitrust policy and should not be adopted by this court

### Conclusion

Since our nation's founding, one of the core public functions has been the issuance and regulation of currency to further the public interest. Now, as electronic transactions play an even larger role in the economy, this traditional public function is at risk of being co-opted by a small number of America's largest banks and the payment-card networks working on their behalf. While the defendants and their experts attempt to justify this conduct, there is no dispute around the core facts of this case that agreements among the defendants restrict banks' competitive behavior and raise prices for all merchants. The undisputed effects of this conduct are as pronounced after the networks' IPOs as before. Class Plaintiffs therefore respectfully request that this Court grant summary judgment on liability for Class Plaintiffs on Counts 1, 2, 5, 10, 13, 14, 17, 18, and 20 of the Second Consolidated Amended Class Action Complaint.

February 11, 2011                    **Robins, Kaplan, Miller & Ciresi L.L.P.**


                                     By:    _s/ K. Craig Wildfang_____
                                            K. Craig Wildfang
                                            Thomas J. Undlin
                                            Ryan W. Marth

                                            800 LaSalle Avenue, Suite 2800
                                            Minneapolis, MN  55402
                                            Tel: 612-349-8500
                                            Fax: 612-339-4181

                                            *Co-Lead Counsel Class Plaintiffs for MDL 1720*