

37447803

May 6 2011
3:11PM

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

IN RE PAYMENT CARD INTERCHANGE FEE
AND MERCHANT DISCOUNT ANTITRUST
LITIGATION

This Document Relates To:  ALL ACTIONS

Case No. 1:05-md-1720-JG-JO

ORAL ARGUMENT REQUESTED

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
## CLASS PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

### *Table of Contents*

Table Of Authorities ...................................................................................................... v

Preliminary Statement ................................................................................................... 1

Summary Of Argument .................................................................................................. 2

The Establishment Of Default Interchange Rules ........................................................ 5

    A.    Early History Of United States Payment Card Systems ......................... 6

    B.    The Development Of Interchange And Default Interchange Rules ....................... 9

    C.    The *NaBanco* Antitrust Challenge To The Establishment Of Interchange Rules ............................................................................................ 11

    D.    The *Visa Check* Release And Its Effect On Default Interchange Rates ............... 13

    E.    The *United States v. Visa* Decision And Its Effect On Interchange Rates ........... 15

    F.    The Development Of Payment Card Rewards Programs ..................................... 17

    G.    The Effect Of Interchange Revenue On Payment Card Transaction Volume ...................................................................................................... 19

    H.    Regulation Overseas Has Not Outlawed The Network Establishment Of Default Interchange Rates, But Has Simply Regulated A Cap On Those Rates ................................................................................................... 21

Argument ..................................................................................................................... 22

I.    SUBSTANTIAL EVIDENCE REFUTES CLASS PLAINTIFFS' CLAIM THAT THE ESTABLISHMENT OF DEFAULT INTERCHANGE RULES CONSTI-TUTES AN UNREASONABLE RESTRAINT OF TRADE ......................................... 23

    A.    Substantial Evidence Establishes That Default Interchange Rules Have Not Unreasonably Restrained Competition ......................................................... 24

        1.    Default Interchange Rules Are Reasonably Necessary For The Op-eration Of The Visa And MasterCard Payment Card Networks .............. 25

        2.    The Challenged Default Interchange Rules Have Increased Trans-action Volume – And Thus Market Output – In The Payment Card Industry ...................................................................................... 28

3.     Class Plaintiffs Incorrectly Assert That The Effect Of The Challenged Default Interchange Rules On Cardholders Should Not Be Considered When Analyzing The Competitive Effects Of Those Rules ........................................................................................... 30

4.     Substantial Evidence Contradicts Class Plaintiffs' Argument That Default Interchange Rates Result In Higher Prices Or Barriers To Entry Or Lower Merchant Acceptance ..................................................... 34

     a.     Positive Interchange Rates Do Not Necessarily Result In Higher Merchant Discount Rates .................................................. 35

     b.     Positive Interchange Rates Do Not Necessarily Result In Higher Retail Prices ...................................................................... 37

     c.     Positive Interchange Rates Do Not Result In Higher Barriers To Entry Or Expansion .......................................................... 40

     d.     Positive Interchange Rates Do Not Result In Reduced Merchant Acceptance Of Payment Cards .......................................... 40

5.     Class Plaintiffs' Argument That Merely Lowering Interchange rates Constitutes A Less Restrictive Alternative To Current Interchange Rates Misapplies The Law .......................................................... 42

B.     Substantial Evidence Contradicts Class Plaintiffs' Argument That Each Network's Establishment Of Default Interchange Rules Constitutes Concerted Activity ......................................................................................... 46

1.     Each Network's Internal Establishment Of Default Interchange Rules Constitutes The Unilateral Act Of A Single Entity ......................... 48

2.     Substantial Evidence Refutes Class Plaintiffs' Claim That Each Defendant Consciously Committed Itself To A Common Scheme To Achieve An Unlawful Purpose With Respect To Each Network's Internal Establishment Of Its Default Interchange Rules .............. 51

C.     Substantial Evidence Contradicts Class Plaintiffs' Proffered Relevant Market Definitions, As Well As Their Claim That Visa And MasterCard Possess Market Power In Those Markets ............................................................ 57

1.     Substantial Evidence Contradicts Class Plaintiffs' Claim That The Relevant Markets Are The Three Narrow Markets Class Plaintiffs Assert ................................................................................................... 58

     a.     Increases In Visa And MasterCard Default Interchange Rates Are Not Evidence Of Separate Narrow Relevant Product Markets .......................................................................... 62

b.      Different Default Interchange Rates Do Not Establish Different Relevant Markets ................................................................ 62

c.      Merchants Can And Do Steer Cardholders Between Credit, Signature Debit, And PIN Debit Payment Cards .......................... 64

d.      Consumers Readily Substitute Among Credit Cards, Debit Cards, And Other Forms Of Payment .......................................... 65

e.      Visa And MasterCard Recognize The Substitutability Of Credit Cards, Signature Debit Cards, And PIN Debit Cards ......... 67

f.      Merchants Without PIN Debit Card Terminals Can Easily Obtain Them And Begin Accepting PIN Debit Cards ................. 68

2.    Whether Either Network Has Market Power In A Properly Defined Relevant Market Is A Triable Issue For The Jury .................................... 68

a.      Increases In Visa And MasterCard Default Interchange rates Are Not The Result Of Market Power But Intense Competition For Issuer Business .................................................. 69

b.      Price Differentiation Among Merchant Categories Is Not Price Discrimination ................................................................... 72

c.      Default Interchange Rates Are Related To The Costs That Issuers And Acquirers Incur To Provide Services To Merchants .......................................................................................... 73

d.      Merchant Acceptance Rules Do Not Convey Market Power ........ 74

e.      Class Plaintiffs' Market Share Data Does Not Prove Substantial Market Power ................................................................. 75

f.      Visa's Convergence Of Default Interchange Rates For Signature And PIN Debit Card Transactions Does Not Establish Visa's Market Power In Any Relevant Market ..................... 79

g.      Visa's Preferred Or Exclusive Issuance Agreements With Debit Issuers Does Not Establish Visa's Market Power In Any Relevant Market ................................................................ 80

II.    CLASS PLAINTIFFS' ANTITRUST CHALLENGE TO THE NETWORKS' ESTABLISHMENT OF DEFAULT INTERCHANGE RATES IS BARRED BY THE *VISA CHECK* RELEASE, THE PRINCIPLES OF *BUFFALO BROADCASTING* AND *PAYCOM*, AND THE *ILLINOIS BRICK* DOCTRINE ......................... 81

A.   The *Visa Check* Release Precludes Class Plaintiffs' Challenge To Each Network's Default Interchange Rules ................................................................ 81

B.   The Networks' Default Interchange Rules Do Not Constitute Restraints ............ 82

C.   The *Illinois Brick* Doctrine Bars Class Plaintiffs' Damages Claims Based On Each Network's Default Interchange Rules .................................................... 82

Conclusion .................................................................................................................... 83

## *Table Of Authorities*

### *Cases*

*AD/SAT v. Associated Press*, 181 F.3d 216 (2d Cir. 1999) .................................. 46, 47, 51, 52, 53

*Ajir v. Exxon Corp.*, No. C 93-20830-RMW, 1995 WL 429234 (N.D. Cal. July 7, 1995), *aff'd*, 185 F.3d 865 (9th Cir. 1999) ............................................................................... 64

*American Airlines v. Christensen*, 967 F.2d 410 (10th Cir. 1992) ............................................. 55

*American Express Travel Related Servs. Co. v. Visa U.S.A.*, No. 04 Civ. 8967 (BSJ), 2005 WL 1515399 (S.D.N.Y. June 23, 2005) .................................................................. 52

*American Needle, Inc. v. National Football League*, 130 S. Ct. 2201 (2010) ........... 48, 49, 54, 56

*Andrea Theatres Inc. v. Theatre Confections, Inc.*, No. 87 CV 4833, 1987 WL 17457 (E.D.N.Y. Sept. 11, 1987) .................................................................................................. 68

*Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) ............................................................................................................. 61

*In re ATM Fee Antitrust Litig.*, 554 F. Supp. 2d 1003 (N.D. Cal. 2008) .................................... 26

*Ball Mem. Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325 (7th Cir. 1986) ....................... 27

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................... 56

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406 (7th Cir. 1995) ................................................................................................................................ 71

*Bogan v. Hodgkins*, 166 F.3d 509 (2d Cir. 1999) ..................................................................... 25

*In re Brand Name Prescription Drugs Antitrust Litig.*, 288 F.3d 1028 (7th Cir. 2002) ............... 72

*Brennan v. Concord EFS, Inc.*, 369 F. Supp. 2d 1127 (N.D. Cal. 2005) .............................. 27, 45

*Broadcast Music Inc. v. Columbia Broadcasting Sys.*, 441 U.S. 1 (1979) ............................ 26, 35

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993) ................ 28, 35

*Buffalo Broadcasting Co. v. ASCAP*, 744 F.2d 917 (2d Cir. 1984) .......................................... 5, 82

*California Dental Ass'n v. Federal Trade Comm'n*, 526 U.S. 756 (1999) .................................... 25

*Capital Imaging Assocs. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537 (2d Cir.
1993) ........................................................................................................................ 52, 57, 59

*Chicago Bd. of Trade v. United States*, 246 U.S. 231 (1918) .................................................. 1, 24

*Chicago Prof'l Sports Ltd. Partnership v. National Basketball Ass'n*, 961 F.2d 667 (7th
Cir. 1992) ................................................................................................................................ 28

*Chicago Prof'l Sports Ltd. Partnership v. National Basketball Ass'n*, 95 F.3d 593 (7th
Cir. 1996) ............................................................................................................ 27, 28, 35, 58, 75

*Columbia Broadcasting Sys. v. ASCAP*, 620 F.2d 930 (2d Cir. 1980) ........................................ 82

*Commercial Data Servers, Inc. v. International Bus. Machs. Corp.*, 262 F. Supp. 2d 50
(S.D.N.Y. 2003) .................................................................................................................. 77, 78

*Continental T.V. Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36 (1977)................................................ 12

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984).................................... 49, 57

*Eastman Kodak Co. v. Image Technical Servs.*, 504 U.S. 451 (1992)........................................ 58

*Flying J Inc. v. TA Operating Corp.*, No. 1:06-CV-30-TC, 2008 WL 4923041 (D. Utah
Nov. 14, 2008).......................................................................................................................... 31

*Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485 (2d Cir. 2004)................ 57, 63, 71

*Guth v. Loft, Inc.*, 5 A.2d 503 (Del. 1939) ................................................................................. 53

*HDC Med., Inc. v. Minntech Corp.*, 474 F.3d 543 (8th Cir. 2007)............................................. 63

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977)................................................................... 5, 83

*Illinois Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28 (2006) ........................................ 72

*Interstate Circuit, Inc. v. United States*, 306 U.S. 208 (1939) .................................................... 55

*Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008).................................................. 47, 55

*Klickads, Inc. v. Real Estate Bd. of N.Y., Inc.*, No. 04 Civ. 8042, 2007 WL 2254721
(S.D.N.Y. Aug. 6, 2007).......................................................................................................... 61

*Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422 (9th Cir. 1993).................................... 76

*Madison Square Garden, L.P. v. National Hockey League*, No. 07 CV 8455 (LAP), 2007
WL 3254421 (S.D.N.Y. Nov. 2, 2007), *aff'd*, 270 F. App'x 56 (2d Cir. 2008) ............... 25

*Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ...................................... 46

vi

*Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984)....................................................46

*National Bancard Corp. (NaBanco) v. Visa U.S.A., Inc.*, 596 F. Supp. 1231 (S.D. Fla. 1984), *aff'd*, 779 F.2d 592 (11th Cir. 1986).............................................................*passim*

*Paddock Publications, Inc. v. Chicago Tribune Co.*, 103 F.3d 42 (7th Cir. 1996) .....................80

*Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*, 467 F.3d 283 (2d Cir. 2006)...............5, 82

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 562 F. Supp. 2d 392 (E.D.N.Y. 2008).......................................................................... 58, 59, 71

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, No. 05-md-1720 (JG)(JO), 2008 WL 115104 (E.D.N.Y. Jan. 8, 2008).............................................15

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, No. 05-md-1720 (JG)(JO), 2008 WL 5082872 (E.D.N.Y. Nov. 25, 2008)........................................36

*PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101 (2d Cir. 2002).....................................................58

*Phillips v. Insituform of N. Am., Inc.*, No. Civ. A. 9173, 1987 WL 16285 (Del. Ch. Aug. 27, 1987) ...............................................................................................................53

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997) ...........................64

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210 (D.C. Cir. 1986).................56

*State of New York v. Anheuser-Busch, Inc.*, 811 F. Supp. 848 (E.D.N.Y. 1993) ........................78

*Town of Concord v. Boston Edison Co.*, 915 F.2d 17 (1st Cir. 1990) ..........................................27

*Toys "R" Us v. Federal Trade Comm'n*, 221 F.3d 928 (7th Cir. 2000).......................................55

*Union Carbide Corp. v. Montell N.V.*, 27 F. Supp. 2d 414 (S.D.N.Y. 1998) ..............................78

*United States v. Continental Can Co.*, 378 U.S. 441 (1964).......................................................63

*United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377 (1956) .................................59, 66

*United States v. Trenton Potteries Co.*, 273 U.S. 392 (1927) .....................................................27

*United States v. Visa U.S.A. Inc.*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003) ....................................................................................... 15, 18

*United States v. Visa U.S.A., Inc.*, 344 F.3d 229 (2d Cir. 2003)..................... 15, 16, 31, 50, 57, 59

*United States Football League v. National Football League*, No. 84 Civ. 7484, 1986 WL 10620 (S.D.N.Y. July 31, 1986)..................................................................................66

*In re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003), *aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96 (2d Cir. 2005) ............................................................................................... 5, 13, 14, 68

*In re Visa Check/MasterMoney Antitrust Litig.*, No. 96-cv-5238 (JG), 2003 WL 1712568 (E.D.N.Y. Apr. 1, 2003) ........................................................................ 31, 78

*Visa U.S.A. Inc.. v. First Data Corp.*, No. C 02-01786, 2006 WL 516662 (N.D. Cal. Mar. 2, 2006) ................................................................................................. 50

*Wellnx Life Sciences, Inc. v. Iovate Health Sciences Research, Inc.*, 516 F. Supp. 2d 270 (S.D.N.Y. 2007) ............................................................................... 56

*Winter Hill Frozen Foods & Servs., Inc. v. Haagen-Daz Co.*, 691 F. Supp. 539 (D. Mass. 1988) ................................................................................................. 78

*In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d 403 (S.D.N.Y. 2005) ...................... 71

*Xerox Corp. v. Media Sciences, Inc.*, 660 F. Supp. 2d 535 (S.D.N.Y. 2009) .............................. 71

*Yankees Entertainment & Sports Network, LLC v. Cablevision Sys. Corp.*, 224 F. Supp. 2d 657 (S.D.N.Y. 2002) ...................................................................... 27

### *Statutes*

15 U.S.C. § 1 .......................................................................................................... 1

### *Other Authorities*

IIB Areeda & Hovenkamp, *Antitrust Law* (3d ed. 2007) ................................................ 63, 73, 78

IIIB Areeda & Hovenkamp, *Antitrust Law* (3d ed. 2008) ........................................................ 28

VII Areeda & Hovenkamp, *Antitrust Law* (3d ed. 2010) ...................................................... 48, 49

William J. Baumol & Daniel G. Swanson, *The New Economy and Ubiquitous Competitive Price Discrimination: Identifying Defensible Criteria of Market Power*, 70 Antitrust L.J. 661 (2003) ............................................................................... 73

Gary Becker & Kevin M. Murphy, *A Simple Theory of Advertising as a Good or Bad*, 108 Q. J. Econ. 941 (1993) .............................................................................. 39

Lee Benham, *The Effect of Advertising on the Price of Eyeglasses*, 15 J. L. & Econ. 337 (1972) ........................................................................................................ 39

Delegation of the United States to the Competition Committee, *Roundtable on Two-Sided Markets*, Organisation for Economic Co-operation and Development (June 4, 2009) .................................................................................................................. 17, 32

Margaret E. Guerin-Calvert & Janusz A. Ordover, *Merchant Benefits & Public Policy Towards Interchange: An Economic Assessment*, 4 R. Network Econ. 384 (2005) ........ 38

Letter from Department of Justice, Office of Legislative Affairs, to Hon. Lamar Smith, Committee on the Judiciary (June 23, 2008) ................................................................. 31

Geoffrey A. Manne & Joshua D. Wright, *Google and the Limits of Antitrust: The Case Against The Case Against Google*, 34 Harv. J.L. & Pub. Policy 171 (2011) ................... 32

Nocera, A Piece of the Action: How the Middle Class Joined the Money Class (1994) ............... 9

Steven Semeraro, *The Reverse-Robin-Hood-Cross-Subsidy Hypothesis: Do Credit Card Systems Tax The Poor And Reward The Rich?*, 40 Rutgers L.J. 419 (2009) ................... 38

United States Government Accountability Office, Report to Congressional Addressees, *CREDIT CARDS, Rising Interchange Fees Have Increased Costs for Merchants, but Options for Reducing Fees Pose Challenges* (GAO-10-45) (Nov. 2009) ................. 31

### ***Preliminary Statement***

Defendants respectfully submit this memorandum in opposition to class plaintiffs' motion for summary judgment. For each of the reasons set forth below, class plaintiffs' motion for summary judgment should be denied.

For more than forty years, Visa and MasterCard, or their predecessors, have established internal default interchange rules to be applied, in the absence of superseding bilateral arrangements, to the interchange between member financial institutions of consumer purchase transactions using Visa- or MasterCard-branded credit and debit cards (collectively, "payment cards"). In their motion for summary judgment, class plaintiffs ask this Court to rule that the establishment of these internal default interchange rules constitutes an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 ("Section 1"). Class plaintiffs do not ask this Court to condemn each network's default interchange rules as *per se* illegal, but move this Court to grant them summary judgment on their claim that the default interchange rules are unreasonable when judged under the rule of reason.

Class plaintiffs' motion should be denied. Rule of reason analysis of challenged conduct under Section 1 is an intensely fact-driven inquiry. That inquiry includes an examination of "the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts." *Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918). For that reason, while summary judgment is frequently granted in a defendant's favor because some element of the plaintiff's claim is lacking, summary judgment is

1

rarely granted in a plaintiff's favor because courts are loathe to find a business practice unlawful under the rule of reason without having conducted the necessary rigorous factual inquiry.

This case is no exception. As demonstrated below, the facts relating to the transformation of the payment card industry, the importance of the joint venture structure in making payment cards broadly available to consumers and merchants nationwide, the reasonable necessity of rules applicable for the interchange of payment card transaction data and funds where the card issuing bank and the merchant acquiring bank on any particular transaction are not the same bank, the procompetitive benefits of the default interchange rules that increase network efficiency and output in the marketplace, and the history of the challenged default interchange rules in the courts – including their having been upheld as reasonable in the face of a previous antitrust challenge in *National Bancard Corp. (NaBanco) v. Visa U.S.A., Inc.*, 596 F. Supp. 1231 (S.D. Fla. 1984), *aff'd*, 779 F.2d 592 (11th Cir. 1986) – all preclude summary judgment condemning those rules as unreasonable under Section 1.

### *Summary Of Argument*

Class plaintiffs have limited their motion to those claims challenging the intra-network establishment of default interchange rates, *i.e.*, the establishment within Visa and the establishment within MasterCard of default interchange rules applicable to payment card transactions using Visa- or MasterCard-branded payment cards. (Class Pl. Br.[1] at 2.)[2] They have not

---

[1]   Class Plaintiffs' Memorandum of Law In Support of Their Motion for Summary Judgment, dated Feb. 11, 2011 ("Class Pl. Br.").

[2]   Specifically, class plaintiffs limit their motion to seek summary judgment with respect only to the First, Second, Fifth, Tenth, Eleventh, Thirteenth, Fourteenth, Seventeenth, Eighteenth, and Twentieth Claims for Relief in the Second Consolidated Amended Class Action Complaint ("Complaint" or "Compl.").

moved for summary judgment with respect to their claim that Visa and MasterCard conspired with each other to establish default interchange rates (class plaintiffs' inter-network conspiracy claim),[3] their claims challenging the merchant acceptance rules, including, for example, the no-surcharge rules and the honor-all-cards rules,[4] their monopolization claims,[5] or their claims under California's Cartwright Act.[6]  Accordingly, the only conduct at issue on class plaintiffs' motion is each network's separate decision to establish rules governing the financial obligations of member banks when acquiring banks, through each network's clearance and settlement interchange process, present issuing banks with payment card transactions that their cardholders have made at participating merchants.

       To prevail on their motion, class plaintiffs must prove that, as a matter of law and undisputed fact, the intra-network establishment of default interchange rules at Visa and Master-Card has had an adverse effect on competition and, furthermore, that any such anticompetitive effects indisputably outweigh the demonstrated procompetitive benefits of those rules.  They cannot satisfy this burden.  Regardless of how they define the relevant markets or how they measure each network's market power within those markets, substantial evidence — including

---

[3]   Class plaintiffs make their inter-network conspiracy claim in their Third Claim for Relief. As defendants demonstrated in their motion for summary judgment on the claims in the Second Consolidated Amended Class Action Complaint, class plaintiffs have abandoned their inter-network conspiracy claim. (*See* Defendants' Memorandum of Law in Support of the Motion for Summary Judgment as to the Claims in the Second Consolidated Amended Class Action Complaint, dated Feb. 11, 2011 ("Def. SJ Br. (Class)"), at 42-44.)

[4]   Class plaintiffs challenge the merchant acceptance rules in their Sixth and Seventh Claims for Relief.

[5]   Class plaintiffs' monopolization claims are contained in their Eighth and Ninth Claims for Relief.

[6]   Class plaintiffs assert claims against Visa under California's Cartwright Act in their Fourth, Twelfth, Fifteenth, and Nineteenth Claims for Relief.

class plaintiffs' own concessions – demonstrates that each network's establishment of default interchange rules is procompetitive and has intensified, rather than injured, the vigorous competition that exists in the payment card industry. (Part I.A., below.) As defendants show below, default interchange rules are vital to the day-to-day operation of the Visa and MasterCard payment card networks, and, on this basis alone, are not unreasonable. (Part I.A.1., below.) Moreover, as plaintiffs' admissions confirm, the challenged default interchange rules have increased payment card transaction volume – and thus market output – in the payment card industry. (Part I.A.2., below.) Class plaintiffs incorrectly assert that the impact of the challenged default interchange rules on cardholders should be ignored when analyzing the competitive effects of those rules (Part I.A.3., below), and substantial evidence contradicts class plaintiffs' arguments that default interchange rates result in higher prices, higher barriers to entry, and lower merchant acceptance of payment cards. (Part I.A.4., below.) Class plaintiffs' argument that merely lowering interchange rates constitutes a less restrictive alternative to current interchange rates misapplies the law. (Part I.A.5., below.)

   In addition to the substantial evidence refuting class plaintiffs' contention that default interchange rules have unreasonably restrained competition, substantial evidence also contradicts class plaintiffs' threshold argument that each network's establishment of default interchange rules constitutes concerted activity of the type to which Section 1 applies. (Part I.B., below.) Substantial evidence supports defendants' position that each network's internal establishment of default interchange rules constitutes the unilateral act of a single entity (Part I.B.1., below), and refutes class plaintiffs' claim that each defendant consciously committed itself to a common scheme to achieve an unlawful purpose with respect to each network's internal establishment of default interchange rules. (Part I.B.2., below.)

4

Substantial evidence also contradicts class plaintiffs' proffered relevant market definitions, as well as their claim that Visa and MasterCard possess market power in those markets. (Part I.C., below.)  The undisputed facts do not establish the existence of the three separate and discrete "relevant" markets that class plaintiffs assert: (i) the credit card network services market, (ii) the signature debit card network services market, and (iii) the PIN debit card network services relevant market. (Part I.C.1., below.)  In addition, substantial evidence refutes class plaintiffs' claim that Visa and MasterCard possess meaningful market power in any of the three markets that class plaintiffs define. (Part I.C.2., below.)

Finally, class plaintiffs' antitrust challenge to the networks' establishment of default interchange rates is barred by several of the arguments that defendants advanced in their motion for summary judgment, including the release in *In re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003), *aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96 (2d Cir. 2005), the principles of *Buffalo Broadcasting Co. v. ASCAP*, 744 F.2d 917 (2d Cir. 1984), and *Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*, 467 F.3d 283 (2d Cir. 2006), and the indirect purchaser ban established in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). (Part II., below.)

### *The Establishment Of Default Interchange Rules*

The current Visa and MasterCard four-party networks account for the majority of credit and debit payment card transactions today.  With Visa- and MasterCard-branded payment cards, consumers may execute transactions ranging from purchasing a soda from a vending machine at the local mall to paying for a hotel room in a country on the other side of the globe, confident that the transaction will be executed safely and securely, regardless of the type of card they use, the identity of the bank that issued the card or the identity of the merchant's acquiring

5

bank. Likewise, merchants may accept Visa- or MasterCard-branded payment cards from local regular customers and foreign travelers, confident that they will be guaranteed payment regardless of the identity of their acquiring bank or the cardholder's issuing bank, even if the cardholder fails to pay his bill to his issuing bank. The efficiency and consumer attractiveness of Visa and MasterCard have largely obviated the need for individual merchants to extend credit to their customers. Visa and MasterCard have replaced earlier single-bank payment card systems, and their four-party structure has now been adopted by the two large three-party systems, American Express and Discover.

The default interchange rules that plaintiffs challenge as unreasonable are a fundamental foundation of these four-party payment card networks. The history of the development of four-party payment card systems, and the concomitant need for the establishment of rules governing the relationship among participants in that system, demonstrate the reasonableness – and the reasonable necessity – of the internal default interchange rules that competing merchants, acting collectively as class plaintiffs, attack on this motion for summary judgment. At a minimum, the reasonableness of the challenged rules must be determined by a jury.

A.    *Early History Of United States Payment Card Systems*

Purchasing goods and services on credit has long been an integral part of the United States retail environment. Individual merchants provided credit, often without fees or interest, to entice and enable certain customers to "buy now, pay later." (Def. Counterstatement[7] ¶ 125.) Merchants issued proprietary charge cards to develop loyal customers who would buy more of the merchants' products. (*Id.*) Charge cards provided consumers with convenience

---

[7]    Defendants' Counterstatement in Opposition to Class Plaintiffs' Statement of Undisputed Facts, Pursuant to Local Rule 56.1(b), dated May 6, 2011 ("Def. Counterstatement").

benefits that simplified their payments by permitting them to pay for an entire month's purchases at one time, as well as providing them with an open account to purchase goods at all the merchant's locations. Offering charge cards was one of the important ways in which a retailer could attempt to obtain a competitive advantage over other retailers.

In the 1950s, Diners Club, American Express, and Carte Blanche introduced competing payment card systems. (*Id.* ¶ 126.) Unlike the individual merchants that had theretofore offered credit to their own customers, these companies were independent third-party suppliers of payment card services, responsible for recruiting merchants from multiple retail categories, recruiting cardholders, collecting cardholder receivables, and making disbursements to merchants. (*Id.*) These companies also operated for profit and, for the card services they provided, they charged participating merchants a fee, referred to as a merchant discount, often as much as six or seven percent of each transaction. (*Id.*) These companies also charged cardholders a fee, typically on an annual basis. Initially, the payment cards offered by Diners Club, Carte Blanche, and American Express could be used only within the travel and entertainment sector, which limited merchant acceptance to merchants in the travel and entertainment industry and potential cardholders generally to higher-income travelers. (*Id.*)

In 1958, Bank of America introduced BankAmericard – which later became Visa – to compete with Diners Club, American Express, Carte Blanche, and other forms of payment. (*Id.* ¶ 127.) Like its competitors, Bank of America functioned as both a payment card issuer and a merchant acquirer, issuing cards to cardholders and servicing participating merchants, and helped fund its network's operations by charging participating merchants a merchant discount fee. (*Id.*) Unlike its competitors, however, Bank of America offered a "general purpose" card targeting a much broader group of consumers and merchants outside the travel and entertainment

7

industry. It charged cardholders no annual fee, offered cardholders revolving unsecured credit lines, and settled transactions more expeditiously. (*Id.*)

Merchants received substantial benefits from participating in the BankAmericard network. Bank of America promised merchants that it would recruit and deliver enough card-holders to provide increased sales and profits that would more than offset the merchant's six per-cent discount and $25 monthly card imprinter rental fee. In addition, Bank of America acceler-ated the transfer of payment risk from the merchant to the issuing bank after a transaction, and offered merchants transactional benefits, such as improved cash flow, by paying merchants im-mediately upon receipt of sales drafts. (*Id.* ¶¶ 127, 129.)

By 1966, Bank of America had recognized the benefits of widespread acceptance. Given the interstate banking restrictions then in place, Bank of America attempted to expand na-tionwide by licensing its BankAmericard program to banks in other states to process Bank-Americard transactions in their regions. (*Id.* ¶ 128.) Accordingly, Bank of America created a "mark" to be printed on all payment cards and hung in the windows of participating merchants, so that cardholders easily could identify locations where they could use their cards. (*Id.*) Mer-chants displaying this mark agreed to accept all cards carrying the mark. (*Id.*) The introduction of a uniform mark, combined with a network of regional banks required to honor all transactions under the mark, helped the BankAmericard network spread across the United States during the 1960s.

In 1966, a consortium of banks introduced a second general-purpose card network – Interbank Card Association, which later became MasterCard – to compete with Diners Club, Carte Blanche, American Express, BankAmericard and other existing forms of payment. (*Id.* ¶ 135.) Like Bank of America, Interbank saw nationwide acceptance as essential to network suc-

8

cess with cardholders.  (*Id.*)  However, unlike Bank of America, the Interbank network did not

maintain a single identifiable network image across the United States, which slowed merchant

acceptance, confused cardholders, and retarded the achievement of a nationwide network.  (*Id.* ¶

136.)  In 1969, after struggling to increase nationwide merchant acceptance, Interbank purchased

the Master Charge name and logo (overlapping yellow and orange balls) and eventually placed

the mark on all cards issued by Interbank members.  (*Id.*)

### B.      *The Development Of Interchange And Default Interchange Rules*

After Bank of America allowed other banks to enter the BankAmericard system

as franchisees, cardholders from one bank could use their card to make purchases at merchants

represented by a different bank.  (*Id.* ¶ 130.)  This meant that, with respect to any given transac-

tion, it became possible for one bank to be the cardholder's issuing bank and a different bank to

be the merchant's acquiring bank.  Rules had to be established to govern the interchange of the

transaction information and funds between the issuing and acquiring banks on each transaction

where the two functions were performed by different banks.  "Interchange" provided the means

for the two banks to clear and settle those transactions, and to allocate the merchant discount

when the issuing and merchant servicing functions on a given transaction were performed by dif-

ferent banks.  (*Id.*)  As one commentator has written:

> It is impossible to overstate the importance of a workable interchange sys-
> tem; without it, nationwide bank credit cards simply cannot exist. . . .  A merchant
> will accept a credit card because he knows, absolutely, that his bank will reim-
> burse him, no matter what.  A bank will pay the merchant, knowing absolutely
> that it will get its money from other banks.  A customer will take his credit card
> out of his wallet knowing absolutely that it is as acceptable to the merchant as
> cash.  Interchange is the structure that supports our faith that a credit card will do
> what we expect it to.

Nocera, A Piece of the Action: How the Middle Class Joined the Money Class 67 (1994).

Under the BankAmericard system, individual acquiring banks set their own merchant discount fees. (Def. Counterstatement ¶ 131.) Initially, the BankAmericard franchise agreements provided that when the card issuing and merchant servicing functions were performed by different banks, the merchant-acquiring bank had to remit to the card-issuing bank either the actual merchant discount fee earned on the particular transaction, or an amount equal to the merchant bank's "average" merchant discount fee. (*Id.*) The allocation of the entire merchant discount fee to issuers reduced acquiring banks' incentives to compete for and sign up merchants and caused acquiring banks to look for ways to evade the requirement, such as by underreporting the amount of the merchant discount. (*Id.*) Issuing banks retaliated by refusing to accept transactions from acquiring banks that they thought had failed to remit the appropriate merchant discount amount, and by holding sales drafts from such merchant banks for weeks to accrue interest they otherwise would not have earned. (*Id.*) These issues threatened to undo the competitive benefits that Bank of America had sought to achieve by expanding BankAmericard nationwide and including a large number of financial institutions as issuers and acquirers in the network.

In 1970, Bank of America spun BankAmericard off to create National Bank-Americard Inc. ("NBI"). (*Id.* ¶ 132.) NBI recognized that "[e]stablishing a fixed and fair fee was crucial to the viability of the system, as issuers needed a high-enough fee to make a profit, yet acquirers needed a low-enough fee to be able to offer competitive merchant discounts." (*Id.*) In 1971, NBI adopted a formal, system-wide interchange fee "to deal with transactions in which issuing and acquiring banks were different." (*Id.*) The fee was uniform across all members and was to be paid by acquiring banks to issuing banks. Acquiring banks were free to set their own

merchant discount, but they paid the same interchange rate independent of the level of the merchant discount they set. (*Id.*)

In 1976, NBI changed its name to Visa. (*Id.* ¶ 133.) In 1979, Interbank became MasterCard. (*Id.* ¶ 137.)

### C.   *The* **NaBanco** *Antitrust Challenge To The Establishment of Interchange Rules*

By 1979, Visa's interchange rules required any acquiring bank that submitted a transaction for clearance and settlement through the Visa network – known as the Visa Base II computer system – to pay the cardholder's issuing bank the established interchange rate for that transaction. (*Id.* ¶ 134.) In 1979, National Bancard Corporation ("NaBanco"), a processing agent for various Visa acquiring banks, challenged the establishment of interchange rates as a violation of Section 1. Claiming that Visa's interchange rule violated Section 1 of the Sherman Act, NaBanco requested the court to "enjoin VISA from setting [the interchange rate] at any level other than 'par' (zero)." *National Bancard Corp. (NaBanco) v. Visa U.S.A., Inc.*, 596 F. Supp. 1231, 1241 (S.D. Fla. 1984), *aff'd*, 779 F.2d 592 (11th Cir. 1986). As the district court explained: "Essentially, NaBanco has asked the court to 'fix' its own price for [the interchange rate] but in accordance with terms NaBanco considers fair. Alternatively, NaBanco has asked the court to enjoin VISA from setting any particular [interchange rate], thus permitting each merchant bank (or NaBanco) to establish individually-negotiated [interchange rates] with issuer banks." *Id.*

After trial, the district court rejected NaBanco's antitrust challenge and held that Visa's establishment of interchange rules did not violate Section 1. The court concluded that the establishment of interchange rates "should be analyzed under the rule of reason because it is an agreement on the terms of interchange necessary for VISA to market its product and be an effec-

11

tive competitor." *Id.* at 1253. The court further held that the "fact that VISA members have integrated to the extent of agreeing on the terms of interchange, but have not fully integrated and still compete for cardholders and merchants, is typical of pro-competitive joint ventures and serves to maximize VISA's competitive potential." *Id.* The court explained:

> Assuming that VISA cardholders want unplanned and rapid access to merchants anywhere, regardless of whether their own bank signed a particular merchant, and that VISA merchants want unplanned and rapid access to each cardholder who enters their shop, regardless of whether the merchant's bank signed the cardholder, then some before-the-fact agreements must be made. The principal purpose of these agreements with member banks does not appear to be to improperly fix prices as NaBanco asserts but rather to provide a service which each member bank could not alone provide, namely, universal payments service which ensures that a VISA card will be honored by any merchant regardless of which bank issued it so long as that merchant displays the VISA logo on its door. Given past and current interstate banking regulations which once flatly proscribed and continues to inhibit the growth of single bank entities which cross state lines, it is hard to conclude otherwise. Even assuming that each VISA member could afford to issue its own card, there would be no assurances of universality since issuer banks and merchant banks might still differ as to exchange rates. Cardholders would either have to carry a suitcase full of cards representing the different banks which have contracts with particular merchants or suffer the disappointment of being unable to transact certain purchases with merchants whose merchant banks refused for some reason to contract with the cardholders' bank; to say nothing of the inconvenience and dissatisfaction of the merchant who must check each card out with its merchant bank even if it may mean that he will lose a sale. Prohibiting [network-established interchange rates] would thus undermine "interbrand" competition, "which is the primary concern of the antitrust law."

*Id.* at 1254 (quoting *Continental T.V. Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 52 n.19 (1977)).

In applying the rule of reason to the challenged establishment of interchange rates, the court held that Visa was not required to prove that the challenged practice was the most competitive device imaginable or that it was the least restrictive alternative, but rather that it was "reasonable; *i.e.*, not 'unduly' restrictive of competition." *Id.* at 1257. "So long as a practice is 'fairly necessary' to achieve a legitimate purpose, it is not unlawful under the rule of reason." *Id.* (citation omitted). The court determined that the establishment of network interchange rates was "vital" to the day-to-day functioning of the network, insofar as it eliminated "the costly uncer-

tainty and prohibitive time and expense of 'price negotiations at the time of the exchange' between the thousands of VISA members. In doing so, it guarantees the universal acceptability that is at the heart of the competitive success of the product." *Id.* at 1259-60 (citation omitted).

Moreover, the court explained, Visa's interchange rule balances – "equillibrates" – the supply and demand for Visa network services between network members. *Id.* at 1261. The court acknowledged that this balance might be achieved by other means, but concluded that the establishment of interchange rules requiring acquiring banks to pay issuing banks an interchange fee was "the most, if not the only, realistic alternative." *Id.* Indeed, the court concluded – and the Eleventh Circuit affirmed – that the establishment of network interchange rules was procompetitive because it eliminated substantial transaction costs on transactions in which two different network members combined to offer a single service – network payment card services – to a merchant and a cardholder. *Id.* at 1264.[8]

**D.    _The Visa Check Release And Its Effect On Default Interchange Rates_**

A decade after the Eleventh Circuit affirmed the trial court's judgment that Visa's establishment of default interchange rates did not violate federal antitrust laws, a group of merchants, representing a class of merchants that class plaintiffs claim is virtually identical to the class of merchants that they seek to represent in this action, sued Visa and MasterCard. *In re Visa Check/ MasterMoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003), *aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96 (2d Cir. 2005) ("*Visa Check*"). In their complaint, the *Visa Check* plaintiffs alleged that the networks and their member banks had col-

---

[8]    Following the *NaBanco* decision, Visa modified its interchange rules to require all transactions to be processed over the Visa network, but permitted member banks to enter into alternative bilateral financial arrangements that would supersede what became the network-established default interchange rates. (Def. Counterstatement ¶ 50.)

lectively fixed interchange fees,[9] which the merchants defined as fees "that the bankcard acquiring institution pays to the card issuing institution for each retail transaction where the issuer's card is used as a payment device at one of the acquirer's retail store accounts,"[10] and which the merchants claimed were maintained at artificially elevated levels because the networks required merchants to accept all Visa- or MasterCard-branded debit cards as a condition of their ability to accept Visa- or MasterCard-branded credit cards.

In December 2003, this Court approved the merchant plaintiffs' settlement of their antitrust claims against Visa and MasterCard in *Visa Check*, finding that settlement to be fair, reasonable, adequate, and not the product of collusion. 297 F. Supp. 2d at 509. The *Visa Check* settlement: (i) required the payment of more than $3 billion in cash; (ii) required a delinking of debit card acceptance from credit card acceptance and, as part of that delinking, for the period August 1, 2003 through December 31, 2003, established independent debit interchange rates that were roughly a third lower than the previously linked rates, relief valued by plaintiffs at tens of billions of dollars; (iii) required changes to certain network rules, including the honor-all-cards rules and other merchant acceptance rules; and (iv) left in place the default interchange rules, the no-surcharge rules, the non-discrimination rules and a host of other rules allegedly affecting merchant acceptance of Visa and MasterCard payment cards. *Visa Check*, 297 F. Supp. 2d at 508-12. In addition, the *Visa Check* plaintiffs released Visa, MasterCard, and their member banks from all antitrust claims that each plaintiff "ever had, now has, or hereafter can, shall or may have, relating in any way to any conduct prior to January 1, 2004 concerning any claims

---

[9]  Second Amended Consolidated Class Action Complaint and Jury Demand, *In re Visa Check/MasterMoney Antitrust Litig.*, 1999 WL 34848247, ¶¶ 45, 58, 93-97 (E.D.N.Y. May 26, 1999).

[10]  *Id.* ¶ 8(o).

alleged in the Complaint or any of the complaints consolidated therein, including, without limitation, claims which have been asserted or could have been asserted in this litigation." *Id.* at 512. Furthermore, each plaintiff "covenant[ed] and agree[d] that it shall not, hereafter, seek to establish liability against any of the Released Parties based, in whole or in part, upon any of the Released Claims." *See In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, No. 05-md-1720 (JG)(JO), 2008 WL 115104, at *3 (E.D.N.Y. Jan. 8, 2008).

### E. *The* United States v. Visa *Decision And Its Effect On Interchange Rates*

In 1998, the United States Department of Justice sued Visa and MasterCard, alleging that so-called "governance duality" – the "situation in which a bank has formal decision-making authority in one system while issuing a significant percentage of its credit and charge cards on a rival system" – and each network's exclusivity rule prohibiting member banks from issuing American Express or Discover payment cards constituted agreements in restraint of trade in violation of Section 1. *United States v. Visa U.S.A. Inc.*, 163 F. Supp. 2d 322, 345 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003). After a two-month trial, the district court found that governance duality did not violate Section 1, and declined to order any changes to the network's respective governance structures. By contrast, the court found that the networks' exclusivity rules did violate Section 1 by restraining competition in the United States market for general purpose card network services. The district court held that the abolition of the networks' exclusivity rules would increase competition among the four network services providers – Visa, MasterCard, American Express, and Discover – as they competed for the business of issuing banks. *Id.* at 396.

The Second Circuit affirmed the district court's decision, stating that "[w]hile competition among (and within) these networks is robust at the issuing level (where 20,000 sepa-

15

rate issuers compete to provide products to consumers), at the network level (where four major networks seek to sell their technical, infrastructure, and financial services to issuer banks) competition has been seriously damaged by the defendants' exclusionary rules." *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 240 (2d Cir. 2003). The appellate court explained that, as a result of the challenged exclusivity rules:

> only two rival networks are effectively able to compete for the business of issuer banks. Testimony at trial revealed that Visa U.S.A. and MasterCard "pay millions of dollars in incentive payments in the form of discounts from the price for network services to selected issuing banks to compete for their business and [that] the banks play Visa and MasterCard against [each] other to obtain lower net prices and higher value for card network services." [163 F. Supp. 2d] at 382. With only two viable competitors, however, such price and product competition is necessarily limited. *Trial testimony strongly indicated that price competition and innovation in services would be enhanced if four competitors, rather than only two, were able to compete in this manner for issuing banks. Id.* Indeed, the district court found, based on testimony from Visa U.S.A. and MasterCard executives, that both defendants would "respond to . . . greater network competition by offering new and better products and services." *Id.* at 396. *MasterCard's former CEO, for example, testified that MasterCard would be forced to "speed up" development of a premium card product were Amex cards issued through Master-Card member banks. Id.*

*Id.* at 240-41 (emphasis added).

The district and appellate courts in *United States v. Visa* thus foresaw that the elimination of the networks' exclusivity rules would lead to increased competition among the four payment card network services providers for the business of issuers, and that that competition would in turn lead, among other things, to an increase in the development and issuance of premium cards offering increased rewards and benefits to cardholders. The courts viewed this likely result as a positive, procompetitive consequence of eliminating the exclusivity rules.

Likewise, the government too expected that the elimination of the networks' exclusivity rules would increase network competition for issuers, as well as the interchange rates necessary to fund that competition. In 2009, the government explained:

16

> In *United States v. Visa U.S.A., Inc.*, the DOJ had to consider [the possibility that competition would drive interchange rates higher] when it challenged exclusionary rules that restricted the ability of American Express and Discover to compete for issuing banks.  Because American Express sets the highest prices to merchants of all of the credit card networks, it seemed possible that a ban on the exclusionary rules would drive Visa and MasterCard to raise their interchange fees to be closer to the merchant fees of American Express.  This would, however, have occurred as part of an increase in competition.  Since the banning of the exclusionary rules in 2004, Visa and MasterCard have introduced premium cards with higher interchange rates targeted at the same high-end consumers that American Express targets.  This may have happened for a variety of reasons, but it is consistent with a conclusion that increased competition with American Express led to an increase in interchange fees.

Delegation of the United States to the Competition Committee, *Roundtable on Two-Sided Markets*, Organisation for Economic Co-operation and Development, at 68, ¶ 12 (June 4, 2009), *available at* http://www.ftc.gov/bc/international/docs/roundtabletwosided.pdf.

It was no surprise, therefore, that, following the court's decision in *United States v. Visa*, competition led to the intensified development and issuance of premium cards offering more rewards and benefits to cardholders, as well as a concomitant increase in interchange rates associated with those premium payment cards.

F.    ***The Development Of Payment Card Rewards Programs***

Although premium card programs increased after the decision in *United States v. Visa*, the development of payment card rewards programs for consumers began much earlier as a competitive response by three-party networks like Discover and American Express.  Rewards programs were designed as a way to respond to issuers' needs to compete for cardholder loyalty, to lower cardholder costs and to encourage card usage.  For example, in 1986, Discover introduced a program that offered cash rewards with no annual fee. (Def. Counterstatement ¶ 156.) In 1993, American Express introduced rewards programs that gave cardholders the opportunity to earn one point for every dollar spent on the American Express Optima card, with points re-

17

deemable for restaurant meals, flowers, books, concert tickets and vacation packages. (*Id.*) In three-party systems like American Express and Discover, these cardholder rewards programs were funded primarily by merchant discount fees that the network charged to merchants that accepted the network's card. (*Id.* ¶ 157.) In four-party systems like Visa and MasterCard, these cardholder rewards programs were funded primarily by interchange revenues that flowed from acquiring banks, who collected merchant discount fees from participating merchants, to issuing banks, who provided the rewards to their cardholders. (*Id.* ¶ 158.)

As expected, competition among the payment card networks to offer more expensive rewards and benefits to cardholders increased dramatically after the *United States v. Visa* decision as a result of competition among American Express, Discover, Visa and MasterCard for the business of issuing banks and the preference of cardholders. (*Id.* ¶¶ 99a, 100e, 140-45, 159-60.) As the district court in *United States v. Visa* recognized, Visa and MasterCard already competed with one another for issuer loyalty by paying "millions of dollars in incentive payments in the form of discounts from the price for network services to selected issuing banks to compete for their business," with the banks playing Visa and MasterCard against each other "to obtain lower net prices and higher value for card network services." 163 F. Supp. 2d at 382. Increased competition with American Express and Discover required Visa and MasterCard to increase the amount they paid in incentive payments – including through interchange rates associated with premium cards – to issuing banks, which in turn, given the robust competition among issuers for cardholders, enabled issuing banks to offer expanded rewards and benefits to cardholders. (Def. Counterstatement ¶¶ 99a, 100e, 140-45, 159-60.) As predicted, the increased competition with American Express caused Visa and MasterCard to hasten the launch of their premium credit

18

cards – Visa's "Signature" card and MasterCard's "World" card – to compete with American Express's premium card offerings. (*Id.*)

Class plaintiffs acknowledge that increased competition with American Express and Discover following the *United States v. Visa* decision caused Visa and MasterCard to introduce their respective premium credit cards and to raise associated default interchange rates to provide an incentive for issuers to issue the cards of one network rather than those of its competitors.



G.    <u>*The Effect Of Interchange Revenue On Payment Card Transaction Volume*</u>

From their inception, payment card networks have competed with one another and with other payment methods to increase output by increasing transaction volume. (Def. Counterstatement ¶¶ 35, 45, 46, 48, 54, 71, 139-52.) To increase transaction volume, payment card networks have competed to increase cardholder usage by providing cardholders with valuable benefits, such as increased convenience, payment security, easier dispute resolution, and record-

---

11  

keeping mechanisms, while lowering the cost to cardholders of using payment cards. (*Id.* ¶¶ 138-45.) Indeed, as a result of the dramatic growth of rewards programs, millions of cardholders receive cash back or other rewards when they use their payment cards. These benefits effectively provide cardholders with a discount on the goods and services they buy from merchants that accept the cards. (*Id.* ¶ 158.) Interchange revenues to issuing banks in four-party systems like Visa and MasterCard serve to increase the level of benefits and rewards offered to cardholders, increasing the effective discount those cardholders receive when they use their cards. (*Id.* ¶¶ 158-60; *see also id.* ¶¶ 140-45.)

As defendants' economic expert, Professor Kevin Murphy, has demonstrated, the value of payment card usage to cardholders economically encourages cardholders to increase their purchases at merchants that accept payment cards. (*Id.* ¶ 161.) Just like promotional sales, manufacturers' and store coupons, loyalty programs, preferred provider networks, and volume discounts, the effective discount that a cardholder receives when using her payment card encourages her to increase her spending. (*Id.*) The profits on the incremental sales that merchants realize because they accept payment cards exceeds the costs that merchants pay to accept payment cards. (*Id.* ¶ 123.) If it were otherwise, then merchants would not accept payment cards. Moreover, as Professor Murphy has shown, higher interchange helps generate additional incremental sales for merchants that accept payment cards. (*Id.* ¶ 161.)

The dramatic growth in payment card transaction volume – and thus in output in any relevant market associated with payment card transactions – demonstrates the success that payment card networks have had in providing cardholders with payment card products and services they desire. According to class plaintiffs, transaction volume on Visa- and MasterCard-branded credit and signature debit cards increased from $222 billion in 1990 to $2.217 trillion in

2008. (McCormack Rep. ¶ 8.) Class plaintiffs assert that transaction volume on Visa- and

MasterCard-branded credit cards increased from $214 billion in 1990 to $1.371 trillion in 2008,

while transaction volume on Visa- and MasterCard-branded signature debit cards increased from

$8 billion in 1990 to $846 billion in 2008. (*Id.* ¶¶ 9, 10.) Likewise, since at least the mid-1990s,

PIN debit transaction volume has increased substantially. (Def. Counterstatement ¶¶ 81, 84, 85.)

### H.   *Regulation Overseas Has Not Outlawed The Network Establishment Of Default Interchange Rates, But Has Simply Regulated A Cap On Those Rates*

Despite the gains from incremental sales that merchants realize as a result of

payment card acceptance, and the fact that those gains increase as cardholder costs decline and

cardholder benefits and rewards increase, merchants have complained to governmental authori-

ties in the United States and elsewhere about the level of Visa and MasterCard default inter-

change fees that acquiring banks face and which allegedly increase the merchant discount fees

that merchants pay their acquirers for merchant services. In response to those complaints, bank

regulators and competition authorities in several countries outside the United States have exam-

ined default interchange rates, and none has concluded that the internal establishment of default

interchange rates by Visa and MasterCard violates its competition laws or other Section 1 analog.

Perhaps the most notable investigations – and the ones to which class plaintiffs

and their experts refer – are the investigations conducted in Australia, the United Kingdom, the

European Union, and New Zealand. Each of these investigations resulted in regulation that in

some measure capped the level of default interchange rates in those jurisdictions. But two sig-

nificant aspects of those investigations bear on class plaintiffs' motion for summary judgment

and demonstrate that that motion should be denied. First, as defendants' economic expert, Pro-

fessor Murphy, has shown, the regulatory reduction in Visa and MasterCard interchange rates in

Australia led to an increase in cardholder fees, a reduction in cardholder rewards and benefits,

and a reduction in each network's output. (Def. Counterstatement ¶ 122.) On that basis, the re-
ductions in interchange rates in Australia reduced output and were not procompetitive, but rather
served to advance a policy decision to benefit merchants at cardholders' expense. Second, al-
though each investigation resulted in a regulatory reduction in interchange rates, no regulatory
agency precluded the networks from establishing interchange rules and thus each must have con-
cluded that the establishment of rules governing the financial payment card transaction settle-
ment obligations of issuing and acquiring banks in four-party payment card networks is reasona-
bly necessary for those four-party networks to offer their services. Thus, none of the foreign in-
vestigations resulted in or provide support for the kind of decision that class plaintiffs seek here –
a ruling that it is unlawful for Visa and MasterCard to establish rules concerning the financial
obligations of issuing and acquiring banks in connection with the clearance and settlement of
payment card transactions between them. Such a ruling would be unprecedented, and wholly
unwarranted.

### *Argument*

Against this historical backdrop, class plaintiffs move this Court for summary
judgment holding that, as a matter of law and based on purportedly undisputed facts, each net-
work's internal establishment of default interchange rules constitutes an unreasonable restraint of
trade in violation of Section 1. Class plaintiffs' motion should be denied for two primary reasons.
First, contrary to class plaintiffs' assertion and their purportedly undisputed facts, the history and
nature of the payment card business, the reasons for the establishment of default interchange
rules, the nature of those rules and their effect on the payment card industry, and the history of
challenges to the challenged default interchange rules – including their having been upheld as
reasonable in the face of a previous antitrust challenge – demonstrate that the internal establish-

22

ment of default interchange rules does not constitute an unreasonable restraint of trade in violation of Section 1. Second, judgment for class plaintiffs is barred by many of the arguments advanced in defendants' motion for summary judgment, including specifically the arguments predicated on (i) the *Visa Check* release, (ii) the principles of *Buffalo Broadcasting* and *Paycom*, and (iii), as to class plaintiffs' damages claims, the *Illinois Brick* doctrine.

I.

### SUBSTANTIAL EVIDENCE REFUTES CLASS PLAINTIFFS' CLAIM THAT THE ESTABLISHMENT OF DEFAULT INTERCHANGE RULES CONSTITUTES AN UNREASONABLE RESTRAINT OF TRADE

A Section 1 claim requires a private plaintiff to prove by a preponderance of evidence the existence of an agreement that creates an unreasonable restraint on competition in a properly defined relevant market. As demonstrated below, substantial evidence refutes class plaintiffs' assertion that each network's default interchange rules have created an unreasonable restraint on competition; indeed, substantial evidence establishes that some form of interchange rules are reasonably necessary for four-party networks like Visa and MasterCard to offer their services at all. Furthermore, substantial evidence contradicts class plaintiffs' argument that each network's establishment of default interchange rules constitutes concerted activity of the kind to which Section 1's prohibitions were intended to apply. Moreover, substantial evidence contradicts class plaintiffs' proffered relevant market definitions, as well as their claim that defendants possess market power in those markets. In short, undisputed facts admissible in evidence fail to establish, and substantial evidence undermines class plaintiffs' ability to prove, each of the requirements of a Section 1 claim. Class plaintiffs' motion for summary judgment should therefore be denied.

**A.**   *Substantial Evidence Establishes That Default Interchange*
    <u>*Rules Have Not Unreasonably Restrained Competition*</u>

To prevail on their motion, class plaintiffs must prove that, as a matter of law and undisputed fact, the challenged conduct has had an adverse effect on competition.  "The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition."  *Chicago Bd. of Trade v. United States*, 246 U.S. at 238.  As demonstrated below, regardless of the relevant market definition or each network's market power within that relevant market, substantial evidence – including class plaintiffs' own concessions – demonstrates that each network's establishment of default interchange rules is procompetitive and has intensified, rather than injured, the vigorous competition that exists in the payment card industry.  First, default interchange rules are reasonably necessary for the Visa and MasterCard payment card networks to function, and, on this basis alone, are not unreasonable.  Second, as a matter of law, a challenged rule does not restrain competition if it increases market output; here, as plaintiffs' admissions confirm, the challenged default interchange rules have increased payment card transaction volume – and thus market output – in the payment card industry.  Third, class plaintiffs incorrectly assert that the impact of the challenged default interchange rules on cardholders should be ignored when analyzing the competitive effects of those rules.  Fourth, substantial evidence contradicts class plaintiffs' arguments that default interchange rates result in higher prices, higher barriers to entry, and lower merchant acceptance of payment cards.  And finally, class plaintiffs' argument that merely lowering interchange rates constitutes a less restrictive alternative to current interchange rates misapplies the law.[12]

---

[12]   Plaintiffs' assertion that each network's default interchange rules harmed competition and so obviates the need for an elaborate market inquiry under a "quick look" approach (Class Pl. Br.
        *(cont'd)*

24

*1.   Default Interchange Rules Are Reasonably Necessary For The
     Operation Of The Visa And MasterCard Payment Card Networks*

The court in *NaBanco* has already held that default interchange rules do not con-

stitute unreasonable restraints of trade. As that court recognized, in four-party networks like

Visa and MasterCard, some before-the-fact rules must be established concerning the financial

rights and obligations of issuing banks and acquiring banks with respect to the transaction data

and funds that they must interchange between them. *NaBanco*, 596 F. Supp. at 1254. Otherwise,

a cardholder could not be assured of universal acceptance by merchants everywhere, regardless

of whether her own bank had signed an acquiring agreement with a particular merchant, and a

merchant could not be assured of access to each cardholder who entered its shop, regardless of

whether the merchant's bank had issued the cardholder's card. (Def. Counterstatement ¶ 138.)

Without predefined interchange rules, including rules concerning the financial rights and obliga-

tions of issuers and acquirers, network participants would potentially have to negotiate thousands

of bilateral agreements. (*Id.* ¶ 181.) The court in *NaBanco* acknowledged this alternative, but

concluded that the prospective establishment of network interchange rules was "the most, if not

the only, realistic alternative." *Id.* at 1261. Pre-determined network interchange rules were "vi-

tal" to the day-to-day functioning of the four-party network, insofar as they eliminated "the

---

*(cont'd from previous page)*

at 26 n.8, 57-58) is therefore wrong. The Supreme Court has held that a "quick look" ap-
proach should not be applied unless "the likelihood of anticompetitive effects is . . . obvious"
and there is no evidence that "might plausibly be thought to have a net procompetitive ef-
fect." *California Dental Ass'n v. Federal Trade Comm'n*, 526 U.S. 756, 771 (1999). Thus,
courts do not apply a "quick look" approach where, as here, "the defendant has shown a pro-
competitive justification for the conduct." *Bogan v. Hodgkins*, 166 F.3d 509, 514 n.6 (2d Cir.
1999); *see also Madison Square Garden, L.P. v. National Hockey League*, No. 07 CV 8455
(LAP), 2007 WL 3254421, at *8 (S.D.N.Y. Nov. 2, 2007) (where the challenged conduct
"has procompetitive virtues, the quick look doctrine is inapplicable"), *aff'd*, 270 F. App'x 56
(2d Cir. 2008).

costly uncertainty and prohibitive time and expense of 'price negotiations at the time of the exchange' between thousands of [network] members.  In so doing, [they] guarantee[ ] the universal acceptability that is at the heart of the competitive success of the product."  *Id.* at 1259-60 (citation omitted).

   The Eleventh Circuit affirmed the district court's decision, holding that "[f]or a payment system like VISA to function, rules must govern the interchange of a cardholder's receivable.  The [interchange fee rule] represents one such rule establishing a 'necessary' term, without which the system would not function."  *NaBanco*, 779 F.2d at 602.  The appeals court explained that "universality of acceptance – the key element to a national payment system – could not be guaranteed absent prearranged interchange rules.  Consequently, the restraint is 'a necessary consequence of the integration necessary to achieve these efficiencies.'"  *Id.* (quoting *Broadcast Music Inc. v. Columbia Broadcasting Sys.*, 441 U.S. 1, 21 (1979) ("*BMI*")); *accord In re ATM Fee Antitrust Litig.*, 554 F. Supp. 2d 1003, 1016 (N.D. Cal. 2008) ("there are too many potential entities involved in the transaction that all efficiencies would be lost if the cardholder's bank and the ATM owner were required to engage in bi-lateral negotiation every time a cardholder attempted to get money from a foreign ATM").

   There can be no legitimate dispute – and substantial evidence demonstrates – that Visa and MasterCard must establish some pre-arranged rules setting forth the respective financial rights and obligations of the issuing and acquiring banks for credit, signature debit and PIN debit cardholder transactions they interchange between themselves.  (Def. Counterstatement ¶ 69.)

███████████████████████████████████████████

███████████████████████████████████

     Class plaintiffs deceptively claim that they would have this Court eliminate all interchange rules. But they do not seek to dismantle the four-party network system, and they do not advocate bilateral negotiations between issuers and acquirers within the four-party networks. So class plaintiffs do not really seek the elimination of all interchange rules. Like the plaintiff in *NaBanco*, class plaintiffs here simply would like those rules to specify that acquiring banks must pay issuing banks something less than they currently do, preferably nothing. Like the plaintiff in *NaBanco*, class plaintiffs are simply requesting the court to fix a price for the interchange rate that class plaintiffs would prefer. *See NaBanco*, 596 F. Supp. at 1241.

     As a matter of law, courts are not permitted to regulate price under the guise of the antitrust laws. *See, e.g.*, *United States v. Trenton Potteries Co.*, 273 U.S. 392, 397-98 (1927) (explaining that the lawfulness of a price setting agreement must be judged "in the light of its effect on competition" and not by judicial assessments of the reasonableness of price levels); *see also Brennan v. Concord EFS, Inc.*, 369 F. Supp. 2d 1127, 1131-32 (N.D. Cal. 2005) (holding that an argument that network interchange fees should be "abolished" is "the same thing as 'set at zero,'" and is "not an antitrust argument at all, for it amounts to a dispute over prices and competition law is not concerned with the setting of a proper price"); *Chicago Prof'l Sports Ltd. Partnership v. National Basketball Ass'n*, 95 F.3d 593, 597 (7th Cir. 1996) ("the antitrust laws do not deputize district judges as one-man regulatory agencies"); *Town of Concord v. Boston Edison Co.*, 915 F.2d 17, 24-25 (1st Cir. 1990) (noting that "courts normally avoid direct price administration"); *Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1340 (7th Cir. 1986) (courts should not become "little versions of the Office of Price Administration"); *Yankees*

*Entertainment & Sports Network, LLC v. Cablevision Sys. Corp.*, 224 F. Supp. 2d 657, 674-75 (S.D.N.Y. 2002) (asking a court to determine whether a price is "reasonable" amounts to "nothing less than price regulation of the kind undertaken by regulatory agencies – something for which both the federal courts and the antitrust litigation process are extremely ill-suited and which is, in any event, inconsistent with antitrust's fundamental 'market' orientation" (quoting IIIB Areeda & Hovenkamp, *Antitrust Law* ¶ 771b, at 195 (3d ed. 2008))).

Accordingly, because some pre-arranged, before-the-fact rules establishing the financial rights and obligations of issuing and acquiring banks when they clear and settle payment card transactions are reasonably necessary to permit the Visa and MasterCard networks to function and to offer the payment card network services they do, such rules are not unreasonable. They do not unreasonably restrain trade – plainly not as a matter of undisputed fact – and class plaintiffs' motion for summary judgment should thus be denied.

**2.      *The Challenged Default Interchange Rules Have Increased Transaction Volume – And Thus Market Output – In The Payment Card Industry***

As a matter of law, an alleged restraint has no anticompetitive effect – and thus is not unlawful – unless it can be shown to have reduced output in the relevant market. "Supracompetitive pricing" necessarily "entails a restriction in output." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 233 (1993). "The core question in antitrust is output. Unless a contract reduces output in some market, to the detriment of consumers, there is no antitrust problem." *Chicago Prof'l Sports*, 95 F.3d at 597. By contrast, an alleged restraint that "in the end expands output serves the interests of consumers and should be applauded rather than condemned." *Chicago Prof'l Sports Ltd. Partnership v. National Basketball Ass'n*, 961 F.2d 667, 673 (7th Cir. 1992).

28

In the instant case, while the *level* of interchange rates is not a matter within the authority of an antitrust court once the *fact* of interchange rules has been determined to be reasonably necessary for the functioning of the business itself, substantial evidence demonstrates that the current levels of interchange rates in the United States benefit both consumers and merchants by increasing output, and are therefore procompetitive. ███████████

███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

The use of non-uniform default interchange rates allows Visa and MasterCard to adjust default interchange rates for each of their payment card products to compete more effectively with other payment networks and forms of payment. ███████████

███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████



The procompetitive effects of each network's default interchange rules have re-
sulted in substantial increases in cardholder usage of payment cards and payment card transac-
tion volume.  For example, class plaintiffs assert that transaction volume on Visa- and Master-
Card-branded credit and signature debit cards has increased from $222 billion in 1990 to $2.217
trillion in 2008.  (McCormack Rep. ¶ 8.)  According to class plaintiffs, transaction volume on
Visa- and MasterCard-branded credit cards increased from $214 billion in 1990 to $1.371 trillion
in 2008, while transaction volume on Visa- and MasterCard-branded signature debit cards in-
creased from $8 billion in 1990 to $846 billion in 2008.  (*Id.* ¶¶ 9, 10.)  Likewise, since the mid-
1990s, PIN debit transaction volume has increased substantially.  (Def. Counterstatement ¶¶ 81,
84, 85.)  In their moving papers, class plaintiffs acknowledge that increases in transaction vol-
ume have accompanied increases in default interchange rates.  (Class Pl. Br. at 39, 40.)  Such
increases in output are manifestly procompetitive, requiring denial of class plaintiffs' motion for
summary judgment.

> **3.**     ***Class Plaintiffs Incorrectly Assert That The Effect Of The
> Challenged Interchange Rules On Cardholders Should Not Be
> <u>Considered When Analyzing The Competitive Effects Of Those Rules</u>***

Payment card networks serve two groups of interrelated end-use customers:
cardholders and merchants.  Moreover, these two groups of customers purchase services in direct

proportion to one another; every payment card transaction requires one cardholder and one merchant. Because of the interrelationship between the two groups of customers, substantial economic literature and empirical evidence, as well as judicial decisions and regulatory reports, support the defendants' position that the market for payment card services is a two-sided market. *See*, *e.g.*, *United States v. Visa U.S.A., Inc.*, 344 F.3d at 239, 243 (holding that relevant market was a "market for general purpose card network services," and in that market the "buyers" were both "issuers of cards and merchants"); *Flying J Inc. v. TA Operating Corp.*, No. 1:06-CV-30-TC, 2008 WL 4923041, at *8-10 (D. Utah Nov. 14, 2008) (noting that "Trucker Fuel Card Market" is a two-sided market, with truck stops on one side and truck fleets (who used the cards) on the other); *In re Visa Check/MasterMoney Antitrust Litig.*, No. 96-cv-5238 (JG), 2003 WL 1712568, *5 (E.D.N.Y. Apr. 1, 2003) (holding that the effects on the consumer side of the payment card business were relevant for purposes of analyzing the competitive effects of the alleged tie on the merchant side of the business, noting that "the ultimate effects of [the challenged] arrangements on consumers" would benefit from further development at trial); United States Government Accountability Office, Report to Congressional Addressees, *CREDIT CARDS, Rising Interchange Fees Have Increased Costs for Merchants, but Options for Reducing Fees Pose Challenges* (GAO-10-45), at 18 (Nov. 2009) ("Economists and other researchers note that credit card networks function differently from most markets because the card market can be considered a 'two-sided' market, in which two different groups – merchants and consumers – pay prices for goods and services offered by a producer"); Letter from Department of Justice, Office of Legislative Affairs, to Hon. Lamar Smith, Committee on the Judiciary, at 1 (June 23, 2008), *available at* www.vantagecard.com/images/DOJResponsetoSmithLetter6-23-08 ("The credit and debit markets are complex, so-called 'two-sided' markets in that each network needs to attract both

31

cardholders and merchants"); Geoffrey A. Manne & Joshua D. Wright, *Google and the Limits of Antitrust: The Case Against The Case Against Google*, 34 Harv. J.L. & Pub. Policy 171, 221-22 (2011). As the delegation of the United States to the OECD Competition Committee explained in its report:

> A feature of many two-sided markets is a highly skewed pricing structure. That is, one group of customers pays a high price to use the platform, while the other group pays a very low or even negative price. . . . In credit card systems, the transactional services (those services associated with the physical process of making a payment, as distinct from the supply of credit) are sometimes provided to cardholders for free. For credit cards that carry reward programs, the cost of the transactional services is subsidized by the rewards so that the effective price to a cardholder for using the card is negative. Merchants, on the other side of the market, however, often pay substantial fees for credit card transactions.

Delegation of the United States to the Competition Committee, *Roundtable on Two-Sided Markets*, Organisation for Economic Co-operation and Development, at 68 ¶ 5 (June 4, 2009), *available at* http://www.ftc.gov/bc/international/docs/roundtabletwosided.pdf.

　　　　While the direct customers of a three-party payment network like American Express are cardholders and merchants, in a four-party network like Visa and MasterCard, the networks compete to provide network services to two slightly different groups of customers: (i) issuing banks that bundle some of those network services with their own products and services to issue payment cards to cardholders and (ii) acquiring banks that bundle other of those network services with their own products and services to sell merchant services to card-accepting merchants. (Def. Counterstatement ¶¶ 139-52.) Like cardholders and merchants in the three-party networks, these two groups of customers of the four-party networks purchase network services in direct proportion to one another. In other words, an issuer and an acquirer must participate in every cardholder transaction, and they each purchase network services in order to complete the transaction.

There is no serious dispute that payment card usage benefits merchants. These benefits include more satisfied customers, reduced bad checks and cash thefts, reduced costs of processing checks and transporting cash, improved record keeping, faster transaction times, reduced labor costs at automated transaction terminals like gas pumps and automated checkout lines, guaranteed payment, increased security, and an increased ability to conduct business over the Internet. (*Id.* ¶¶ 161-67, 182-187.) Class plaintiffs' expert, Dr. Frankel, agreed: "Generally, one can infer from the fact that a merchant accepts a card that the merchant expects to be more profitable by accepting it than by refusing to accept it." (Frankel Rep. ¶ 56.) Moreover, in addition to the operational efficiencies and cost savings that merchants realize on each payment card transaction, plaintiffs acknowledge that merchants sell more when they accept payment cards. (Frankel Dep. at 134-35.) The transactional benefits that a cardholder realizes from the use of a payment card operate as an effective price discount – much like the use of coupons, volume discounts, holiday sales, and loyalty programs – which encourages consumers to make additional purchases. (Def. Counterstatement ¶¶ 123, 185-86.)[13]

In their motion, class plaintiffs assert that it would be improper for this Court to consider costs and benefits to cardholders when determining whether each network's default in-

---

[13]  Class plaintiffs' suggestion that defendants and their experts do not identify procompetitive benefits of debit interchange is incorrect. For instance, class plaintiffs assert that defendants' expert Professor Kevin Murphy neglected debit card markets (Class Pl. Br. at 101), but Professor Murphy made clear that his analysis of the justification for credit interchange rates would apply equally to signature and PIN debit interchange rates. (Def. Counterstatement ¶ 189.) Class plaintiffs simply ignore the opinions of defendants' experts Professor Kenneth Elzinga and Dr. Benjamin Klein on the procompetitive role interchange plays with respect to signature and PIN debit. (*Id.* ¶¶ 190-91.) Class plaintiffs also ignore the explanation of defendants' damages expert Professor Robert Topel that his analysis with respect to credit cards would also apply to signature debit cards, and that his analysis about the importance of default interchange rules with respect to a "transfer of value across the platforms" applies to PIN debit cards as well. (*Id.* ¶ 192.)

terchange rules unreasonably restrain trade. (Class Pl. Br. at 61-66.) But plaintiffs' contention that cardholder costs and benefits should be ignored is belied by the industry dynamics that plaintiffs themselves describe. Plaintiffs complain that the challenged rules increase payment card usage – and thus increase transaction volume and output in the markets plaintiffs allege for payment card network services – by encouraging cardholders through the proliferation of enhanced rewards programs to use their payment cards more often.

Plaintiffs agree that increased cardholder use of payment cards increases merchants' sales and that merchants expect to be more profitable by accepting payment cards than by refusing to accept payment cards precisely because cardholders increasingly use their payment cards to make purchases. It is therefore impossible to assess accurately the impact of each network's default interchange rules on merchants – even in the narrow markets that class plaintiffs define – without considering the impact that those rules have on cardholders and cardholder behavior. The impact of the default interchange rules on cardholders and cardholder behavior is integral to forming any judgment about the effects of the challenged rules on output of payment card network services, and thus the reasonableness of those challenged rules. Class plaintiffs' assertion that that impact should be ignored is mistaken both as a matter of law and as a matter of fact, and should be rejected.

### 4. *Substantial Evidence Contradicts Class Plaintiffs' Arguments That Default Interchange Rates Result In Higher Prices Or Barriers To Entry Or Lower Merchant Acceptance*

Despite the substantial evidence demonstrating the procompetitive effects of default interchange rules and the acknowledged increase in output as a result of those rules, class plaintiffs make four arguments in their effort to suggest some harm to competition: They claim that higher interchange rates – by which they appear to mean any positive, non-par interchange

34

rates – result in (i) higher merchant discount rates; (ii) higher retail prices; (iii) higher barriers to entry or expansion in the provision of network services; and (iv) reduced merchant acceptance of payment cards. But the Supreme Court has clearly held that higher prices and price increases, even by alleged oligopolists, are not anticompetitive in the absence of a restriction in output. *Brooke Group*, 509 U.S. at 232, 237; *see also Chicago Prof'l Sports*, 95 F.3d at 597 ("A high price is not itself a violation of the Sherman Act." (citing *BMI*, 441 U.S. at 9-10, 19-20, 22 n.40)). Moreover, as demonstrated below, substantial evidence refutes each of these arguments, rendering them unavailing as a basis for summary judgment in class plaintiffs' favor.

### a.    *Positive Interchange Rates Do Not Necessarily Result In Higher Merchant Discount Rates*

Class plaintiffs contend that each network's default interchange rates have resulted in excessively high merchant discount rates and that, absent default interchange rates, merchants' cost of accepting Visa and MasterCard payment cards would be lower. But class plaintiffs have proffered no evidence that their acceptance costs would be different in the absence of the networks' default interchange rules. To the contrary, because there is substantial evidence that merchant acceptance costs would not change in any material way were current default interchange rules eliminated, there is at a minimum a material issue of fact as to whether each network's establishment of default interchange rules has resulted in higher merchant discount rates.

Substantial evidence shows that, in the absence of the current interchange rules, each network would either restructure itself to eliminate the so-called "structural conspiracy" on which class plaintiffs base their antitrust challenge to the default interchange rules and then establish default interchange rules that would not be dissimilar to the current rules, or replace default interchange rules with other fees, such as higher fees to merchant acquirers or direct fees to

merchants, to provide an incentive for increased payment card issuance and merchant acceptance.



In lieu of an IPO – and in place of its current default interchange rules – each network might have implemented a variety of different acquirer membership or participation fees. Indeed, following the interchange rate reductions by regulatory fiat in Australia, MasterCard explored business alternatives to the then-current interchange structure in Australia and elsewhere, which included, among other things, "increased acquirer fees to provide a pool for issuer incentive payments or a merchant acceptance fee to capture some of the value merchants obtain from the acceptance of MasterCard, and an issuer distribution fee to incentivize card issuance by using some or all of the proceeds of the merchant fee." (*Id.* ¶ 194.) Class plaintiffs have not shown that, under any of these alternative possibilities, the costs to merchants would be lower than current merchant discount fees.

Moreover, class plaintiffs have made no showing that such alternatives would be unlawful. Indeed, this Court has already rejected class plaintiffs' challenge to the MasterCard IPO once, *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, No. 05-

md-1720 (JG)(JO), 2008 WL 5082872, at *10 (E.D.N.Y. Nov. 25, 2008).  And given class plain-

tiffs' own suggestion that non-bank third-parties be allowed to purchase each network (Compl. ¶

163) -- as they did in each network's IPO -- class plaintiffs have proffered no basis for this Court

to alter its earlier holding.  Furthermore, if each network were to replace its current interchange

rules with increased membership or participation fees for acquirers, acquiring banks could inde-

pendently decide whether to pass on all or some portion of such increased membership or par-

ticipation fees to their merchant customers, just as they now do with respect to current inter-

change fees.  There is simply no evidentiary basis from which this Court may conclude as a mat-

ter of undisputed fact that merchant discount rates are higher as a result of each network's default

interchange rules than they otherwise would be under any of the alternative financial arrange-

ments that each network might adopt.  The consequences of any such alternative financial ar-

rangements on merchant discount rates therefore raise genuine issues of material fact that pre-

clude the granting of summary judgment for class plaintiffs.

### b.   *Positive Interchange Rates Do Not Necessarily Result In Higher Retail Prices*

Class plaintiffs' argument that positive interchange rates have led to higher retail

prices for consumers is predicated entirely on class plaintiffs' *assumption* that all retailer mer-

chants sell at their marginal costs, and therefore must raise their retail prices to recover their

merchant discount fee costs.  (Class Pl. Br. at 67.)  But class plaintiffs proffer no evidence what-

soever to support their assumption about the way in which merchants price the goods and ser-

vices they sell.  And they have not demonstrated that payment card acceptance actually increases

merchants' marginal costs.  The relevant evidence that defendants have proffered rebuts class

plaintiffs' unsupported assumption and nullifies their argument that positive interchange rates

lead to higher retail prices.

First, payment card acceptance often lowers merchants' costs by reducing labor costs, lowering the costs of handling checks, including bad check expenses and faster access to funds, reducing the costs of handling cash, including the cost of security and theft, streamlining bookkeeping and otherwise improving operational efficiencies. (Def. Counterstatement ¶¶ 162-67.) These transactional benefits may reduce marginal (as well as average variable) costs, thus encouraging lower, rather than higher, retail prices to customers.[14] Class plaintiffs offer no evidence even to suggest that the amount of merchants' discount fees exceeds the reduction in merchants' other costs. Indeed, given their expert's acknowledgement that "[g]enerally, one can infer from the fact that a merchant accepts a card that the merchant expects to be more profitable by accepting it than by refusing to accept it" (Frankel Rep. ¶ 56), the more probable likelihood is that the cost savings realized by merchants that accept payment cards are greater than the merchant discount fees those merchants pay.

Second, payment card usage provides more purchasing options for cardholders, thereby rendering retail markets more competitive and likely lowering retail prices for all consumers. Payment cards permit cardholders to shop at distant locations, including the Internet,

---

[14] *See, e.g.*, Steven Semeraro, *The Reverse-Robin-Hood-Cross-Subsidy Hypothesis: Do Credit Card Systems Tax The Poor And Reward The Rich?*, 40 Rutgers L.J. 419, 421 (2009) ("Credit cards provide significant benefits to merchants that could outweigh the incrementally higher out-of-pocket costs and thus lead to lower retail prices"); Margaret E. Guerin-Calvert & Janusz A. Ordover, *Merchant Benefits & Public Policy Towards Interchange: An Economic Assessment*, 4 R. Network Econ. 384, 406 & n.64 (2005) ("The substantial benefits [merchants receive by accepting credit cards] include the reduced overall cost of fraud, the more efficient allocation of financial risks as between the merchant and issuers, improved channels of liquidity (prompt payment) of the merchants, as well as opening new retail channels. These services facilitate many aspects of merchants' sales, reduce costs to merchants, and can be provided by credit card networks at a cost substantially below that likely to be achievable by merchants, particularly small merchants, on their own or from other sources." For this reason, recent studies "suggest that non-card users benefit from the use of cards by other customers because card acceptance [reduces merchants' costs], which in turn should lower prices at the checkout line.").

and to purchase more at any one time to take advantage of sales, volume discounts and the like. In economic terms, payment cards increase cardholders' demand elasticity, which generally results in increased competition among merchants and lower – not higher – retail prices. *See, e.g.,* Lee Benham, *The Effect of Advertising on the Price of Eyeglasses*, 15 J. L. & Econ. 337 (1972) (concluding that the removal of prohibitions on advertising of eyeglasses and eye examinations resulted in lower prices for eyeglasses and eye examinations, even though eyeglass sellers incurred the additional cost of the advertising); Gary Becker & Kevin M. Murphy, *A Simple Theory of Advertising as a Good or Bad*, 108 Q. J. Econ. 941, 950 (1993) (finding that advertising, the cost of which is borne by merchants, increases consumers' demand elasticity and may lead to lower retail prices).

Finally, contrary to class plaintiffs' predicate assumption, merchants routinely set their prices above their marginal costs. (Def. Counterstatement ¶ 188.) Class plaintiffs have proffered no evidence whatsoever to refute the common sense observation that, within the difference between their marginal costs and their regular prices, merchants often lower their prices to customers who, for example, use coupons, purchase large quantities or shop during certain hours, in an effort to increase sales and thereby to increase profits. And class plaintiffs have not offered any evidence at all to establish that merchants raise their prices when they honor manufacturers' coupons or promote a holiday sale or, as in the instant case, when they accept payment cards.

Unlike class plaintiffs' economist, defendants' economic expert, Professor Murphy, has demonstrated that available empirical evidence does not support class plaintiffs' hypothesis that higher payment card usage (with its concomitant merchant discount fees) is associated with higher retail prices. Indeed, Professor Murphy found that, if anything, the evidence suggests that prices tend to be lower in areas where customers have more credit cards or greater

39

availability of credit.  (Murphy Supp. Rep ¶ 6.)  This is entirely consistent with economic theory.  Accordingly, contrary to class plaintiffs' unsubstantiated assertions, it is not undisputed that positive interchange rates "result in *all* consumers paying inflated prices for the goods and services they buy from merchants."  (Class Pl. Br. at 67 (emphasis in the original).)  Rather, the relevant evidence in this record suggests precisely the opposite conclusion – that positive interchange rates lead to higher credit card usage, which in turn causes merchants to lower retail prices.

### c.      *Positive Interchange Rates Do Not Result In Higher Barriers To Entry Or Expansion*

Class plaintiffs attempt to support their claim that positive interchange rates increase barriers to entry or expansion with a single fact;  "Discover has been stuck at a market share of only about 5% for 25 years, despite generally lower fees to both cardholders and to merchants and despite its innovation of offering 'cash back' to cardholders."  (Class Pl. Br. at 68.)  Defendants certainly dispute that Discover offers lower fees to its cardholders than Visa or MasterCard issuers offer to their cardholders, but Discover's real problem is simple:  it fails to offer cardholders better competitive rewards and other benefits than Visa- and MasterCard-branded payment cards provide, so fewer cardholders carry and use a Discover card.  Barriers to entry or expansion have nothing to do with Discover's market share among cardholders, and class plaintiffs' unsupported – and unsupportable – assertion to the contrary should be rejected.

### d.      *Positive Interchange Rates Do Not Result In Reduced Merchant Acceptance Of Payment Cards*

Class plaintiffs themselves contend that Visa and MasterCard payment cards are accepted by more than seven million merchant outlets representing more than 95% of all retail sales in the United States.  (Class Pl. Br. at 75.)  Despite increases in interchange rates, class

plaintiffs claim that "no major merchant discontinued its acceptance of Visa or MasterCard credit cards" and "no major merchant stopped accepting Visa or MasterCard credit cards." (*Id.* at 39, 40.) Plaintiffs further claim that, despite interchange increases, merchants cannot refuse to accept Visa and MasterCard payment cards "out of competitive necessity." (*Id.* at 47.) Indeed, according to class plaintiffs, "for most categories of merchants the option of not accepting Visa or MasterCard payment cards is not a practical business alternative" because "a sufficiently large portion of their customers prefer to pay with Visa or MasterCard payment cards and a sufficiently large portion of their competitors accept Visa and MasterCard payment cards such that they would lose substantial sales to those competitors if they chose not to accept Visa or Master-Card payment cards." (*Id.* at 68-69.) These contentions belie class plaintiffs' unsupported claim that positive interchange rates have led to a reduction in the number of merchants that accept payment cards.

Moreover, class plaintiffs acknowledge that Visa and MasterCard recently have targeted certain categories of merchants, such as quick service restaurants "with special low interchange-fee rates and dispensed with the signature authorization requirement for credit and signature-debit transactions of less that $25." (*Id.* at 69.) Class plaintiffs then assert that "the conclusion is indisputable that interchange fees set at current levels, in combination with Defendants' other rules, have a negative impact on the merchant acceptance of payment cards in several categories." (*Id.*) Such a conclusion is manifestly *not* "indisputable"; indeed, it is not even logical. The undisputed conclusion is that Visa and MasterCard have established default interchange rates at levels that optimize merchant acceptance, even offering acquiring banks lower default interchange rates for certain categories of merchants so that acquiring banks may encourage payment card acceptance within those merchant categories.

41

In the end, of course, output in this case must be measured by transaction volume and not the number of merchants willing to accept payment cards. All relevant evidence shows that Visa and MasterCard have established their internal default interchange rates in such a manner as to try to optimize the number of cardholders and the number of participating merchants, all in an effort to maximize transaction volume. (Def. Counterstatement ¶¶ 35, 45, 46, 48, 54, 71, 139-52.) In light of the substantial increase in transaction volume output resulting from each network's establishment of default interchange rules, the only indisputable conclusion is that default interchange rules have expanded output and are therefore procompetitive. Class plaintiffs' motion for summary judgment declaring default interchange rules unlawful should be denied.

5.  *Class Plaintiffs' Argument That Merely Lowering Interchange Rates Constitutes A Less Restrictive Alternative To Current Interchange Rates Misapplies The Law*

Class plaintiffs offer no evidentiary support whatsoever for their conclusory assertion that each network's default interchange rules "are more restrictive than necessary to attain any procompetitive benefits." (Class Pl. Br. at 72.) Class plaintiffs do not explain, for example, how four-party networks like Visa and MasterCard would operate without pre-established rules defining the financial rights and obligations of issuing and acquiring banks when they must cooperate with each other to clear and settle, *i.e.*, interchange, a payment card transaction between them. Class plaintiffs do not advocate thousands of bilaterally negotiated agreements as an alternative to network-established, pre-determined default interchange rules. They simply posit that "[o]ther four-party systems operate efficiently without an interchange fee or with a significantly less restrictive fee." (*Id.* at 4.)

Whether other four-party systems operate as efficiently as Visa and MasterCard operate is clearly open to factual dispute, and class plaintiffs offer no evidence on this issue. But,

42

as importantly, it is clear that when class plaintiffs refer to a "less restrictive fee," they simply mean a lower fee. Like the plaintiff's argument in *NaBanco*, class plaintiffs' efforts here to dispute defendants' procompetitive rationale for the current interchange rules, and their claim that those procompetitive goals might be achieved by a "less restrictive fee," merely challenge the level of interchange rates, not the actual establishment of the default interchange rules themselves.

Class plaintiffs assert, for example, that the "drastically and immediately reduced interchange fees" mandated by the Reserve Bank of Australia ("RBA") did not result in the "death spiral" the networks allegedly predicted. (Class Pl. Br. at 75.) But the RBA did not outlaw the network establishment of interchange rules; it merely issued regulations requiring a reduction in average network-established interchange rate levels. And the fact that the "death spiral" did not occur does not demonstrate any lack of reasonable necessity to the establishment of some pre-arranged network interchange rules.

Similarly, class plaintiffs dispute the testimony of Visa's witness who explained that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ But this argument also challenges the current level of interchange rates, not the necessity for establishing some rule to set forth some level of financial interchange between participating issuers and acquirers. Class plaintiffs further dispute the testimony of MasterCard's witness (and inferentially the conclusion in *NaBanco*) that current interchange levels are intended to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮ by arguing that MasterCard does not know precisely what issuers' and acquirers' costs and revenues are. (*Id.*) Like class plaintiffs' other arguments (and the *NaBanco* plaintiff's ar-

gument), this argument also challenges the current interchange rate levels, but does not challenge the need to establish pre-arranged interchange rules to enable the network to function at all.

Class plaintiffs also assert that the networks set default interchange rates to "maximize member banks' profits rather than the profits of the networks." (*Id.* at 29.) While this assertion is disputed, it too amounts to nothing more than an attack on the level of interchange rates and not the need for some pre-arranged rules defining each bank's financial obligations in connection with the interchange of payment card transaction data and funds.

Class plaintiffs' arguments directly addressing debit card interchange rules are similarly a dispute about the level – and not the system – of interchange rates. Class plaintiffs assert, without any evidence other than the fact of their existence, that, in the early 1990s, fifteen of the top twenty PIN debit card networks operated efficiently without positive interchange fees, and that several debit card networks outside the United States likewise operate efficiently without positive interchange fees. (*Id.* at 99.) Whether PIN debit card networks operated efficiently in the early 1990s without default interchange fees is itself a disputed factual question. (Def. Counterstatement ¶ 120.) But even assuming the truth of these broad statements,[15] class plaintiffs merely complain about the level of interchange rates and not the fact of interchange rules. Class plaintiffs simply cannot legitimately dispute that, to the extent they refer to four-party debit

---

[15]    The foreign debit card networks on which class plaintiffs rely, for example, are all regulated networks, and there is no evidence even to suggest that government regulation has maximized debit card output, either in terms of usage or acceptance, in those countries. Moreover, many of those debit card networks have characteristics that render them wholly inapplicable as benchmarks for four-party debit card networks in the United States. For example, those networks involve bilaterally-negotiated interchange at non-zero levels (Netherlands), three-party systems with a sole acquirer owned by the issuing banks (Iceland and Luxembourg), a transfer of payment from acquirers to issuers in the form of dividends (Denmark), or are being phased out of existence (Finland). (Def. Counterstatement ¶¶ 121, 121a, 121c.) Increases in PIN debit interchange rates in the United States are the result of competition among PIN debit networks. (*Id.* ¶¶ 98, 99, 101, 115, 145.)

card networks, those networks had to have established some pre-arranged rules concerning the interchange of debit card transaction data and funds among the participants. That those pre-arranged interchange rules may have mandated that the parties interchange debit transactions at par (zero) or some level lower than current debit card networks in the United States is a dispute about the level of interchange rates, which is beyond the authority of an antitrust court to resolve. *See, e.g., Brennan v. Concord EFS, Inc.*, 369 F. Supp. 2d at 1131-32 (an argument that network interchange fees should be "abolished" is "the same thing as 'set at zero,'" and is "not an antitrust argument at all, for it amounts to a dispute over prices and competition law is not concerned with the setting of a proper price").

Ultimately, there can be no legitimate dispute that some pre-determined, before-the-fact rules must be established setting forth the financial rights and obligations of issuing and acquiring banks when they interchange payment card transactions between them. As previously explained, the current network-established interchange rules are default rules, which apply in the absence of any superseding bilateral agreement. Accordingly, these rules do not bind network members to follow each network's default interchange rate schedule or preclude network members from negotiating bilateral agreements between themselves, but establish default financial rights and obligations where such an agreement has not been negotiated, thereby ensuring the smooth operation of Visa's and MasterCard's four-party payment card networks. Given their default character, each network's interchange rules are less restrictive than the fixed payment rates that the courts approved in *BMI* and *Buffalo Broadcasting*.

Class plaintiffs have not proffered any evidence even to suggest that these default interchange rules are more restrictive than necessary to permit four-party payment card networks like Visa and MasterCard to function efficiently and to compete effectively with three-party

45

payment card networks like American Express and Discover, as well as other payment systems. On this independent ground, class plaintiffs' motion for summary judgment should be denied.

**B.    *Substantial Evidence Contradicts Class Plaintiffs' Argument That Each Network's Establishment Of Default Interchange Rules Constitutes Concerted Activity***

Substantial evidence also contradicts class plaintiffs' threshold argument that each network's establishment of default interchange rules constitutes concerted activity of the type to which Section 1 applies. Section 1 plaintiffs must show, as a threshold matter, that the challenged conduct – in this case, each network's internal default interchange rules – constitutes concerted action rather than independent or unilateral conduct. *AD/SAT v. Associated Press*, 181 F.3d 216, 233 (2d Cir. 1999). In *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984), the Supreme Court held that the inference of concerted action can be drawn only where the plaintiff presents "direct or circumstantial evidence that reasonably tends to prove that [each defendant] had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Id.* at 764 (internal quotation marks and citation omitted).

Furthermore, "antitrust law limits the range of permissible inferences from ambiguous evidence." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp*, 475 U.S. 574, 588 (1986). Accordingly, "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.* Where, as here, class plaintiffs are moving for summary judgment, they must proffer undisputed facts "'to exclude the possibility' that the alleged conspirators acted independently." *Id.* (citations omitted). If defendants' conduct "is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy." *Id.* at 596-97 (citation omitted).

Class plaintiffs characterize Visa and MasterCard as "structural conspiracies," and superficially assert that, because Visa and MasterCard operated prior to their IPOs essentially as

46

joint ventures comprised of competing banks, every decision Visa or MasterCard made concerning any aspect of their business operations constituted concerted action – and thus a conspiracy – among competitors subject to scrutiny under Section 1. But the antitrust laws require a far more rigorous analysis of the operative facts before any particular decision of a joint venture may be found to constitute a conspiracy among competitors within the meaning of Section 1.

Courts have recognized that a joint venture acts as a single entity when it makes decisions concerning the sale of its own products and services. Contrary to class plaintiffs' characterization, substantial evidence supports defendants' argument that each network's internal establishment of default interchange rules, which are simply the terms on which each network commits to provide its payment card network services to its issuing and acquiring members, does not constitute concerted activity subject to Section 1 scrutiny. Rather, the establishment of default interchange rules constitutes the unilateral decision of a single entity, which may not be condemned as unlawful price fixing under Section 1.

In their attempt to prove "concerted" activity with respect to default interchange rules, class plaintiffs rely on evidence that (i) thousands of competing banks were members of Visa or MasterCard prior to each network's IPO; (ii) some members of each network's board of directors were employed by member banks; and (iii) each member bank agreed to abide by each network's default interchange rules. But a bank's status as a member of Visa or MasterCard, and an individual's status as both a board member of Visa or MasterCard and an employee of a member bank, are insufficient as a matter of law to find concerted action. *See, e.g., AD/SAT*, 181 F.3d at 234. Moreover, merely agreeing to abide by a membership association's rules does not constitute a horizontal conspiracy among the members of that association. *See, e.g., Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008). The undisputed evidence that class plain-

47

tiffs have proffered does not prove that defendants consciously committed themselves "to a common scheme designed to achieve an unlawful objective" when each network established its internal default interchange rules.  For each of these reasons, class plaintiffs' motion for summary judgment should be denied.

>    **1.      Each Network's Internal Establishment Of Default Interchange**
>            **Rules Constitutes The Unilateral Act Of A Single Entity**

The question of whether a decision by a joint venture constitutes the unilateral decision of a single entity, and is thus immune from Section 1 scrutiny, or concerted action among the venture's members, and is thus subject to Section 1 scrutiny, depends on the nature of the decision itself.  To the extent that the venture is buying or selling services in its own right, its decisions constitute unilateral action that may not be scrutinized under Section 1.  By contrast, to the extent that the decision regulates the competition among the members of the venture, it may be viewed as concerted action subject to the limitations of Section 1.  Courts have recognized the "dual function" of joint ventures, as Professors Areeda and Hovenkamp explain:

> To the extent that [joint ventures] are buying and selling in their own right, they can fairly be regarded as single entities whose selling decisions are not "price-fixing conspiracies" and whose buying decisions are not "boycott conspiracies" of rejected suppliers.  At the same time, we can conceptualize organizational decisions as continuing agreements among the members to the extent that those decisions bear on the competition among or, in some situations, with the members.  The Supreme Court rested on this distinction in its *American Needle* decision, where it found conspiratorial capacity in the licensing by the NFL of the intellectual property (IP) rights of individual NFL teams.

VII Areeda & Hovenkamp, *Antitrust Law* ¶ 1477, at 338 (3d ed. 2010); *see also AD/SAT*, 181 F.3d at 234 ("every action by a [joint venture] is not concerted action by the association's members").

In *American Needle, Inc. v. National Football League*, 130 S. Ct. 2201 (2010), the Supreme Court reiterated the criteria for determining whether the decision of a jointly owned en-

tity constitutes concerted action within the meaning of Section 1. The inquiry, wrote the Court, does not depend on whether the venture is comprised of separately incorporated entities – a consortium of competitors – but whether *the decision at issue* "deprive[es] the marketplace of independent centers of decisionmaking," and "therefore of actual or potential competition." *Id.* at 2213 (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769 (1984)). Where each member NFL team separately owned its team logos and trademarks, the Court determined that the decision to license those independently owned trademarks jointly constituted concerted action subject to scrutiny under Section 1.

The Court in *American Needle* was persuaded by the fact that the intellectual property rights in the case were those of the individual football teams, which had previously been licensed individually by the teams and were subsequently licensed collectively by the NFL under common, exclusive terms. As Professors Areeda and Hovenkamp have observed, "[t]he NFL owns its own intellectual property rights, however, and presumably the NFL's licensing of its own 'NFL' mark would be a unilateral act." VII Areeda & Hovenkamp, *Antitrust Law* ¶ 1478, at 363 (3d ed. 2010). The NFL's decision to license its own intellectual property and to establish the terms of such a license would not "depriv[e] the marketplace of independent centers of decisionmaking," and "therefore of actual or potential competition," because no other entity has the right or ability to license the NFL's own intellectual property in competition with the NFL. The NFL's licensing of its own mark would be no different than the NFL's decision to hire a new commissioner or office manager, or to purchase new vehicles for NFL officials, all of which should be regarded as unilateral acts because they do not regulate or otherwise affect the competitive behavior of the member teams. *Id.* at 357.

Likewise, not every decision of Visa and MasterCard constitutes concerted action among competitors subject to scrutiny under Section 1. Visa and MasterCard each provides to its respective issuing and acquiring banks a product – a payment card brand with network services – that is different from what any bank can itself offer alone. (Def. Counterstatement ¶ 138.) Those branded payment card network services include the promise of universal acceptance and payment guarantees that are ensured through each network's rules, including its default interchange rules. (*Id.*) These Visa and MasterCard payment card products can be provided only by each network; no single member bank provides the product with the array of payment card network services that the Visa and MasterCard provide to their member banks. As such, each network's establishment of the financial terms on which it provides its product to its members does not, in the words of *American Needle*, deprive the marketplace of independent centers of decisionmaking. Accordingly, under applicable Supreme Court precedent, each network's establishment of default interchange rules is not concerted activity subject to Section 1 scrutiny.[16]

---

[16]  Because the decision in *American Needle* requires courts to examine the nature of a challenged network rule before automatically characterizing it as "unilateral" or "concerted" conduct, it may be appropriate to characterize network rules that circumscribe the competitive behavior of the member banks as concerted activity, while rules relating to the terms of each network's sale of its own payment card network services should be viewed as unilateral behavior. Thus, for example, courts have held that network rules that prohibit issuing banks from issuing competing payment cards, like the exclusivity rules at issue in *United States v. Visa U.S.A., Inc.*, 344 F.3d 229 (2d Cir. 2003), or that prevent competing banks from using processing services other than those provided by the network, like the rule at issue in *Visa U.S.A. Inc.. v. First Data Corp.*, No. C 02-01786, 2006 WL 516662 (N.D. Cal. Mar. 2, 2006), constitute concerted conduct, finding that such rules constrained member banks' ability to engage in competitive behavior that they could otherwise have done. Such decisions are distinguishable from internal network decisions about how best to offer the network payment card services that the networks alone provide; such latter decisions do not deprive the marketplace of independent centers of decisionmaking, or actual or potential competition, because none of the banks actually or potentially compete with Visa or MasterCard to provide such network services.

2.    *Substantial Evidence Refutes Class Plaintiffs' Claim That*
      *Each Defendant Consciously Committed Itself To A Common*
      *Scheme To Achieve An Unlawful Purpose With Respect To Each*
      *<u>Network's Internal Establishment Of Its Default Interchange Rules</u>*

Class plaintiffs' claim that defendants acted in concert with respect to each net-

work's internal establishment of default interchange rules fails for the independent reason that

the evidence that class plaintiffs have proffered does not prove that any defendant "consciously

committed itself to a common scheme to achieve an unlawful purpose," the *sine qua non* of con-

certed action under the antitrust laws. Class plaintiffs' sole evidence in this regard is that: (i)

prior to each network's IPO, thousands of financial institutions were members of Visa and/or

MasterCard; (ii) pursuant to each network's bylaws, some members of each network's board of

directors were also employees of member banks; and (iii) each bank defendant agreed to abide

by the network's default interchange rules. As a matter of law, class plaintiffs' evidence is insuf-

ficient to permit a jury to infer that defendants conspired in violation of Section 1. Indeed, sub-

stantial evidence refutes class plaintiffs' contention that defendants were consciously committed

to a common scheme to achieve an unlawful goal. For these reasons, summary judgment in class

plaintiffs' favor should be denied.

Membership in an association is not sufficient to infer a conspiracy. In *AD/SAT*,

in which the plaintiff alleged that the members of the Associated Press had conspired to boycott

it in violation of Section 1, the court held that this circuit has not adopted a "walking conspiracy"

theory in place of a showing that each defendant actually conspired in violation of Section 1.

181 F.3d at 234. After explaining that some decisions of a membership association may properly

be regarded as unilateral action by a single entity, the court held:

> Regardless of whether trade associations are ever "continuing conspira-
> cies" of their members, we think it clear in this case that a finding of concerted
> action based on the defendants' status as members of the AP would seriously un-
> dermine the standards articulated by the Supreme Court in *Matsushita* and *Mon-*

51

*santo.* Consistent with those decisions, an antitrust plaintiff must present evidence tending to show that association members, in their individual capacities, consciously committed themselves to a common scheme designed to achieve an unlawful objective. Accordingly, we must examine the evidence submitted by AD/SAT pertaining to *each defendant* to determine whether, viewed in the light most favorable to AD/SAT, this evidence could give rise to a reasonable inference of concerted action by the defendants.

*Id.* (emphasis added); *accord Capital Imaging Assocs. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 545 (2d Cir. 1993) (holding that members of a physicians' practice association had the capacity to conspire among themselves but that "[t]he mere opportunity to conspire does not by itself support the inference that such an illegal combination actually occurred"); *American Express Travel Related Servs. Co. v. Visa U.S.A.*, No. 04 Civ. 8967 (BSJ), 2005 WL 1515399, at *4-5 (S.D.N.Y. June 23, 2005) (rejecting theory that member banks are liable under Section 1 solely based upon membership in Visa or MasterCard). Thus, class plaintiffs' reliance on the bank defendants' status as members on Visa and MasterCard, and their recitation of labels like "structural conspiracies" and "consortia of competitors," are insufficient to entitle plaintiffs to summary judgment on the issue of whether each network's internal establishment of default interchange rules constitutes concerted conduct subject to Section 1 scrutiny.

The addition of the fact that some members of each network's board of directors were also member bank employees does not satisfy class plaintiffs' burden of proof on their motion for summary judgment. Visa and MasterCard are organized under the laws of Delaware, and Delaware law imposes on every member of each network's board of directors a fiduciary duty to act in the best interest of the association on whose board he or she served. The Delaware Supreme Court has described the duty of loyalty as follows:

Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests. . . A public policy, existing through the years, and derived from a profound knowledge of human characteristics and motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only

52

> affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers. The rule that requires an undivided and unselfish loyalty to the corporation demands that there be no conflict between duty and self interest.

*Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939); *accord Phillips v. Insituform of N. Am., Inc.*, No. Civ. A. 9173, 1987 WL 16285, at *10 (Del. Ch. Aug. 27, 1987) ("the law demands of directors . . . fidelity to the corporation and all of its shareholders and does not recognize a special duty on the part of directors elected by a special class to the class electing them.").

Class plaintiffs have proffered no evidence – let alone, undisputed evidence – even to suggest that any board member failed to fulfill his or her fiduciary obligations to act in Visa's or MasterCard's best interest. Merely listing the members of each association's board of directors and the financial institution, if any, with which they were associated is insufficient as a matter of law to prove that the bank defendants conspired in violation of Section 1 when each network established its internal default interchange rules. Class plaintiffs must present undisputed evidence showing that "association members, *in their individual capacities, consciously committed themselves to a common scheme* designed to achieve an unlawful objective." *AD/SAT*, 181 F.3d at 234 (emphasis added).

Not only have class plaintiffs failed to proffer any evidence to support the notion that network board members breached their fiduciary obligations to each network, substantial evidence demonstrates that the bank employees did not act as competitors when they served as directors on the Visa or MasterCard boards. Since 2003, Visa's Code of Conduct has provided that "[i]t is Visa's policy that each . . . director of Visa has a duty at all times to place the interests of Visa first." (Def. Counterstatement ¶ 7.) MasterCard's Code of Conduct has contained a similar requirement since 2003. (*Id.* ¶ 13.) Further, bank employees who served on the Visa or

53

MasterCard boards testified that ██████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ Delaware law imposed the same fiduciary obligations to act in the

company's best interest on those persons with the responsibility for establishing each network's

default interchange rules after June 2004 (in MasterCard's case) and May 2006 (in Visa's case),

and there is not an iota of evidence to suggest that those individuals did not fulfill their fiduciary

duties to each network. As the Supreme Court explained in *American Needle*, "while the presi-

dent and a vice president of a firm could (and regularly do) act in combination, their joint action

generally is not the sort of 'combination' that § 1 is intended to cover." 130 S. Ct. at 2212.

Likewise, the decisions regarding each network's internal default interchange rules by Master-

---

17 ███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████ Even if the assertion
were undisputed – and it is not undisputed (Def. Counterstatement ¶¶ 28, 29) – the assertion
does not undermine defendants' position that network board members fulfilled their fiduciary
duties to the entities on whose boards they served, regardless of where they sought advice
and guidance on the payment cards business.

Card's internal management or a committee of Visa's non-bank-associated board members are not the sort of "combination" that Section 1 was intended to cover.

Finally, class plaintiffs' assertion that the banks agreed to abide by each network's default interchange rules – both before and after each network's respective IPO – does not satisfy class plaintiffs' burden of proof on their motion for summary judgment. An individual bank's acceptance of network terms and adherence to network rules does not suggest an inference of concerted action, as "merely charging, adopting or following the fees set by a Consortium is insufficient as a matter of law to constitute a violation of Section 1 of the Sherman Act." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008); *see also American Airlines v. Christensen*, 967 F.2d 410, 413-14 (10th Cir. 1992) (finding that the mere acceptance by members of terms under an agreement set by an airline does not result in concerted action sufficient to support a Section 1 violation).[18]

Plaintiffs' reliance on *Interstate Circuit, Inc. v. United States*, 306 U.S. 208 (1939) and *Toys "R" Us v. Federal Trade Comm'n*, 221 F.3d 928 (7th Cir. 2000), is misplaced. In contrast to the evidence here, those courts relied on the fact that the competing participants acted against their own independent self-interest when agreeing to the challenged conduct. *See Interstate Circuit*, 306 U.S. at 221-23; *Toys "R" Us*, 221 F.3d at 935-36. Here, by contrast, each member bank's decision to abide by the network's interchange rules was in that bank's inde-

---

[18] While the question of each bank's commitment to a common scheme prior to each network's respective IPO, based on the bank's adherence to each network's default interchange rules, may require the resolution of disputed facts, the question of each bank's participation in an alleged conspiracy following each network's IPO should be resolved in defendants' favor for the reasons set forth in Part I.B. of the Memorandum on Law in Support of Defendants' Motion for Summary Judgment on Class Plaintiffs' IPO, Post-IPO Conspiracy, and Fraudulent Conveyance Claims, and Individual Plaintiffs' Post-IPO Conspiracy Claims, dated February 11, 2011.

pendent self-interest because, absent the default interchange rules, the network could not efficiently function.  Each member bank would be required to expend valuable time and resources to negotiate individual bilateral arrangements with every other member bank for the clearance and settlement of payment card transactions.  Each member bank's decision to abide by the default interchange rules was not conditioned on every other bank's agreement, even though each bank undoubtedly anticipated that other members would make the same value assessment it made about those rules.  Where participating in the network and following the network's rules is in each participating entity's independent economic self-interest, evidence that a participant in a network was aware that other participants also abide by that network's rules is not sufficient to infer a horizontal conspiracy among the network participants.  *See, e.g., Wellnx Life Sciences, Inc. v. Iovate Health Sciences Research, Inc.*, 516 F. Supp. 2d 270, 291 (S.D.N.Y. 2007) ("The fact that each [competitor] knew that its horizontal competitors were going to be presented with the same offer . . . or that others had already [agreed with the defendant], or 'believ[ed]' that other competitors would fall in line, does not suffice to 'raise[ ] a suggestion of a preceding agreement'" (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007))).[19]

\*      \*      \*

In conclusion, the facts and evidence that class plaintiffs have proffered in support of their motion for summary judgment do not prove that defendants have engaged in concerted

---

[19]  Plaintiffs also contend that this Court may infer an actionable horizontal conspiracy when a "group of competitors allows a third party to control their competitive activities," citing *American Needle* and *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 214 (D.C. Cir. 1986).  (Class Pl. Br. at 104.)  In those cases, however, the defendants ceded their competitive activities to third parties.  *American Needle*, 130 S. Ct. at 2207; *Rothery Storage*, 792 F.2d at 214.  Defendant banks have never ceded their competitive activities – issuing payment cards and acquiring merchants – and have continued to compete vigorously in those activities.

conduct with respect to each network's internal establishment of default interchange rules. In-deed, substantial evidence supports the conclusion that each network's establishment of default interchange rules constitutes the unilateral action of a single entity under the controlling princi-ples of *American Needle*. Each network is entitled to set the terms for the provision of its pay-ment card services to its members, and that decision is a unilateral act by a single entity not sub-ject to scrutiny under Section 1. That thousands of competing banks were members of each net-work, that some members of each network's board of directors were also employed by member banks, and that member banks agreed to abide by each network's default interchange rules when dealing with other members, do not suffice to prove that defendants in this case consciously committed themselves to a common scheme to achieve an unlawful objective with respect to each network's default interchange rules. Class plaintiffs have not satisfied their burden of prov-ing that defendants conspired in violation of Section 1, and for this reason their motion for sum-mary judgment should be denied.

C.      ***Substantial Evidence Contradicts Class Plaintiffs' Proffered Relevant Market Definitions, As Well As Their Claim That <u>Visa And MasterCard Possess Market Power In Those Markets</u>***

Rule of reason analysis under Section 1 requires "an inquiry into market power and market structure designed to assess the [challenged conduct's] actual effect." *Copperweld Corp.*, 467 U.S. at 768. To demonstrate whether challenged conduct has had an adverse impact on competition under the rule of reason, the plaintiff must properly define the relevant market in which to measure the competitive effects of that conduct. *See, e.g.*, *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 496 (2d Cir. 2004). Once the relevant market has been properly defined, the plaintiff must establish that the defendants possess substantial market power in that market. *See, e.g.*, *United States v. Visa U.S.A., Inc.*, 344 F.3d at 238; *Capital Imaging Assocs.*,

57

996 F.2d at 543. "Substantial market power is an indispensable ingredient of every claim under the full Rule of Reason." *Chicago Prof'l Sports*, 95 F.3d at 600.

Class plaintiffs assert that the undisputed facts prove the existence of three separate and discrete "relevant" markets: (i) the credit card network services market, (ii) the signature debit card network services market, and (iii) the PIN debit card network services relevant market. Class plaintiffs then assert that the undisputed facts prove defendants' possession of market power in each of these three "relevant" markets. As demonstrated below, the facts relevant to the "deeply fact-intensive inquiry" required for the proper definition of the relevant markets in which defendants compete, *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 562 F. Supp. 2d 392, 399 (E.D.N.Y. 2008) ("*Interchange Fee*"), are hotly disputed. Moreover, the facts required to demonstrate whether defendants possess market power – that is, the power "to raise prices by restricting output," *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 107 (2d Cir. 2002) – are equally disputed. For these additional reasons, therefore, class plaintiffs' motion for summary judgment should be denied.

## I.    *Substantial Evidence Contradicts Class Plaintiffs' Claim That The Relevant Markets Are The Three Narrow Markets Class Plaintiffs Assert*

Definition of the relevant product market depends on the "the commercial realities faced by consumers." *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 482 (1992). This Court has already described the fact-intensive inquiry necessary to define relevant product markets thus:

> The contours of the relevant market track the cross-elasticity of demand: the extent to which products or services are perceived by consumers to be reasonably interchangeable for the same purposes. The inquiry is one of degree; the more that consumers perceive two products to be fungible, the more likely they will be to respond to an increase in one by purchasing the other – and the less likely each supplier is to be able to raise its prices without decreasing its output. Companies should be treated as competitors in a market if – considering price, use, and quali-

ties – consumers treat their products as acceptable substitutes for the purposes for which the products were intended. The cross-elasticity of demand analysis depends on information about consumer behavior and perceptions and is accordingly "a deeply fact-intensive inquiry."

*Interchange Fee*, 562 F. Supp. 2d at 399 (citations omitted). Because market definition is a "deeply fact-intensive inquiry," it is rarely susceptible to resolution by summary judgment. *See Capital Imaging Assocs.*, 996 F.2d at 541. And it is not susceptible to summary judgment here.

To define the parameters of the relevant market for purposes of assessing the competitive impact of particular challenged conduct, the court must start with the products or services affected by the challenged conduct and then determine whether other products or services are reasonably interchangeable with the affected products or services. *See, e.g., United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956) (relevant product market consists of all products that are reasonably interchangeable by consumers for the same purposes when considering function, price, and quality of potentially competing products.); *United States v. Visa U.S.A., Inc.*, 344 F.3d at 239 ("A distinct product market comprises products that are considered by consumers to be 'reasonably interchangeable' with what the defendant sells"); *Interchange Fee,* 562 F. Supp. 2d at 404 (evaluating the extent to which consumers can substitute products for the same purposes in light of price, use and qualities of each potential alternative as a way to define relevant market).

In this case, as noted above, Visa and MasterCard provide to their member banks a product – a payment card brand with network services – that permits those member banks to interact and exchange payment card transaction data and funds among themselves. (Def. Counterstatement ¶ 138.) The payment card network services that Visa and MasterCard provide include pre-transaction services, such as advertising and other network efforts to recruit and deliver cardholders to merchants, transaction services, such as authorizing, clearing and settling the

59

transaction, and post-transaction services, such as dispute resolution, fraud protection, and charge-back and charge-off procedures. (*Id.*) Payment card network services also include the promise of universal acceptance and payment guarantees that are ensured through each network's honor-all-cards and default interchange rules. (*Id.* ¶¶ 138, 181-87.)

Visa and MasterCard develop their network services to enable issuing banks to develop and sell network-based payment card products to consumers in competition with both the payment card products of American Express, Discover, and other debit card network service providers, as well as with other forms of payment, including cash, checks, and electronic payment networks like PayPal and others. (*Id.* ¶¶ 85, 99, 99a, 100, 100e, 140-45, 153-55, 159-60.) In *NaBanco*, for example, the court found a broad relevant market that included a variety of payment systems:

> The cross-elasticity of both demand for and supply of VISA and other payment devices is quite high. Both cardholders and merchants who testified at trial considered the VISA services equivalent or sufficiently close to a variety of payment systems used in retail sales, including other credit cards, travelers cheques, cash, ATM cards, personal checks, and check guarantee cards. While each of these different payment service devices was not considered to be a close substitute for a VISA card for purchases of every possible product at every possible price, all payment services taken together were sufficient to provide, at the least, several close substitutes for a VISA card in any possible context. Cash, for example, might be a good substitute for face-to-face transactions involving small dollar amounts, while checks would be better for larger transactions involving long-distance exchanges.
>
> Testimony by VISA experts also confirmed substitutability between VISA and other, technologically innovative, payment devices including but not limited to regional ATM cards, debit cards, as well as retail proprietary cards and new multi-purpose cards like the Sears/Merrill Lynch cards now available.

596 F. Supp. at 1257-58 (citations omitted).

In addition, Visa and MasterCard develop their network services to enable acquiring banks to incorporate some or all of those network services into the bundle of merchant services, including point-of-sale equipment, virtual terminals, encryption software, and other prod-

ucts and services to permit merchants to accept network-based payment cards, that the acquiring banks sell to merchants, like class plaintiffs, and for which they charge a merchant discount fee. (Def. Counterstatement ¶¶ 47, 58, 146-52.) Importantly, although acquiring banks compete intensely for the merchants' payment card processing business, Visa and MasterCard themselves do not provide processing services to merchants, and merchants do not purchase such services from either Visa or MasterCard. (*Id.* ¶ 150.) Instead, merchants like class plaintiffs purchase "merchant services" from acquiring banks. (*Id.* ¶¶ 151-52.) Accordingly, if the relevant markets were limited to the three narrow "network services" markets that class plaintiffs assert, then class plaintiffs, who are neither competitors nor consumers in any of those "markets," would likely lack antitrust standing to pursue their claims. *See, e.g., Klickads, Inc. v. Real Estate Bd. of N.Y., Inc.*, No. 04 Civ. 8042 (LBS), 2007 WL 2254721, at *9 (S.D.N.Y. Aug. 6, 2007) (plaintiff lacked standing to assert Sherman Act claim where it was "neither a consumer nor a competitor in the relevant market" (citing *Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 537-44 (1983))).

Class plaintiffs make six arguments in their effort to separate credit card network services, signature debit network services and PIN debit card network services into three separate relevant markets: (i) Visa and MasterCard have increased payment card interchange rates without losing merchants; (ii) the default interchange rates on signature debit cards are different than the default interchange rates on PIN debit cards, and merchants nevertheless accept both; (iii) merchant acceptance rules like the no-surcharge rules prevent merchants from steering cardholders between credit, signature debit and PIN debit payment cards; (iv) consumers use credit and debit cards differently; (v) Visa and MasterCard documents refer to credit cards, signature debit cards and PIN debit cards separately; and (vi) some merchants lack PIN debit card terminals and

thus cannot accept PIN debit cards. As demonstrated below, class plaintiffs' arguments are insufficient to prove, as a matter of undisputed fact, that credit card, signature debit card and PIN debit card network services are in separate relevant markets or that the relevant market does not consist of more than credit card and debit card network services.

### a.    Increases In Visa And MasterCard Default Interchange Rates Are Not Evidence Of Separate Narrow Relevant Product Markets

Class plaintiffs complain that Visa and MasterCard have raised network default interchange rates for credit cards, signature debit cards and PIN debit cards without substantial loss of merchant acceptance. Nothing about those increases distinguishes credit card network services from debit card network services, or signature debit card network services from PIN debit card network services. The alleged increases in default interchange rates for all three types of payment cards simply do not support the relevant market definitions that class plaintiffs advocate.

### b.    Different Default Interchange Rates Do Not Establish Different Relevant Markets

According to class plaintiffs, "[t]he networks' recent interchange fee announcements reveal that Visa had 104 separate interchange categories, while MasterCard had 275." (Class Pl. Br. at 50.) Although class plaintiffs do not argue that the provision of network services for each of the networks' combined 379 default interchange categories constitutes 379 separate product markets on the basis of price differentiation, they do assert that the differential nine years ago, in 2002, between "average non-supermarket signature-debit-card interchange fee[s]" and average non-supermarket PIN debit card interchange fees was sufficiently large that the "price gaps in and of themselves help establish separate relevant markets for PIN debit card

and signature-debit-card network services." (*Id.* at 88.) Class plaintiffs' assertion is wrong as a matter of law and as a matter of fact.

As a matter of law, "a price differential alone is insufficient to infer two separate product markets." *HDC Med., Inc. v. Minntech Corp.*, 474 F.3d 543, 547 (8th Cir. 2007); *see also United States v. Continental Can Co.*, 378 U.S. 441, 455 (1964) ("[P]rice is only one factor in a user's choice between one [product] or the other. That there are price differentials between the two products . . . are relevant matters but not determinative of the product market issue."); IIB Areeda & Hovenkamp, *Antitrust Law* ¶ 562c, at 381 (3d ed. 2007) ("Products can be near-perfect substitutes even when their prices or qualities differ."). Whether a particular price differential is wide enough to separate products into different relevant product markets for antitrust purposes is a question of fact for the jury.[20]

Moreover, as a matter of fact, the alleged gap between signature debit card interchange rates and PIN debit interchange rates has essentially vanished. Class plaintiffs acknowledge that interchange rates for Visa's signature debit and Interlink, Visa's PIN debit product, have "converged." As of April 30, 2010, "both [Interlink and signature debit] are now 0.95% of each purchase plus 20 cents." (Class Pl. Br. at 96.) Accordingly, even if an interchange rate gap existed at one time, it no longer does, and class plaintiffs' argument with respect to price differentials should be rejected.

---

[20] The decision in *Geneva Pharmaceuticals Technology Corp. v. Barr Labs. Inc*, 386 F.3d 485 (2d Cir. 2004), on which class plaintiffs rely, is not to the contrary, but made clear that price differentials are not dispositive with respect to market definition. *Id.* at 497.

**c.    Merchants Can And Do Steer Cardholders Between Credit, Signature Debit, And PIN Debit Payment Cards**

Class plaintiffs' reliance on the challenged merchant acceptance rules to define the relevant market in which to assess the competitive impact of default interchange is both legally and factually misplaced.  As a matter of law, the relevant market in which to assess the competitive effect of challenged conduct is not defined with reference to the particular contractual restraints alleged by the plaintiff.  *See*, e.g., *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir. 1997) ("A court making a relevant market determination looks not to the contractual restraints assumed by particular plaintiff when determining whether a product is interchangeable, but the uses to which the product is put"); *Ajir v. Exxon Corp.*, No. C 93-20830-RMW, 1995 WL 429234, at *3 (N.D. Cal. July 7, 1995) ("Just because Exxon's direct serve dealers may contractually purchase gasoline from only one source – Exxon – does not mean that the relevant market is Exxon gasoline"; the relevant market held to be all gasoline), *aff'd*, 185 F.3d 865 (9th Cir. 1999).

Moreover, contrary to class plaintiffs' contention, merchants can and do frequently steer customers between credit, signature debit and PIN debit card usage.  (Def. Counter-statement ¶¶ 76, 85, 86, 106, 115h, 115j, 153-55.)  Merchants have available to them – and they use – a variety of forms of steering, including offering discounts for cash or PIN debit use, asking customers to use another payment form, steering to PIN debit by asking a customer to enter his personal identification number, or offering a rebate or other form of discount in connection with a cardholder's card statement.  (*Id.*)  Class plaintiffs themselves testified that they have successfully steered customers from, for example, signature debit to PIN debit.  (*Id.* ¶¶ 85, 106.)  The existence of the challenged merchant acceptance rules that require merchants to honor all cards and to refrain from surcharging or discriminating against Visa and MasterCard payment

64

cards does not support defining the relevant market in this case as narrowly as class plaintiffs advocate.

### d.    Consumers Readily Substitute Among Credit Cards, Debit Cards, And Other Forms Of Payment

Contrary to class plaintiffs' assertion, consumers readily substitute among credit cards, debit cards, and other forms of payment, such as cash, checks and other electronic payment systems like PayPal. As the court in *NaBanco* recognized, not every form of payment is interchangeable for every other form of payment for every purchase. Nevertheless, "all payment services taken together were sufficient to provide, at the least, several close substitutes for a VISA card in any possible context. Cash, for example, might be a good substitute for face-to-face transactions involving small dollar amounts, while checks would be better for larger transactions involving long-distance exchanges." *NaBanco*, 596 F. Supp. at 1258.

Class plaintiffs simply cannot dispute that consumers in fact substitute among credit cards, debit cards, and other forms of payment in connection with a wide variety of purchases, notwithstanding differences in features associated with those cards. Substantial evidence, for example, demonstrates that debit card use has increased significantly as a percentage of both all payments and all electronic payments since the *Visa Check* litigation, and this growth has been at the expense of credit cards, as well as cash and checks. (Def. Counterstatement ¶¶ 79, 81, 83, 84, 85.) An internal study conducted by plaintiff Payless ShoeSource found that stores observed a decline in consumers' use of cash and checks after the company installed PIN pads and began to accept PIN debit cards. (*Id.* ¶ 84.)

Class plaintiffs themselves have testified that, given their customers' ability to switch between forms of payment, all forms of payment are interchangeable from their perspective as well. Plaintiff representative Coborn's, for example, agreed that "Visa and MasterCard

65

compete with checks, cash, and other forms of payment for merchant business." (*Id.* ¶ 85.) Likewise, documentary evidence established that plaintiff ███████ is indifferent as to the following forms of payment:  Visa, MasterCard, Discovery, American Express, Bonus Pay credit, debit, cash, check, gift certificates and gift cards, EBT, food stamps, vendor coupons, and college/university ID cards. (*Id.* ¶¶ 85, 86.)  Class plaintiff D'Agostino Supermarkets similarly agreed that debit cards and checks are "[d]efinitely" interchangeable. (*Id.* ¶ 85.)

The evidence is undisputed that merchants successfully steer customers from signature debit cards to PIN debit cards. (*Id.* ¶¶ 85, 106.)  Indeed, class plaintiffs aspire to be able to increase their ability to steer consumers among various forms of payment in their effort to reduce costs of acceptance, and complain that they could successfully steer customers among the various payment options if the challenged merchant acceptance rules were eliminated.

The fact that the various forms of payment exhibit differentiated features does not relegate them to separate relevant markets for antitrust purposes; indeed, markets are commonly comprised of differentiated products that are nonetheless substitutable for one another. *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. at 394-95 (rejecting government's argument that relevant product market should be defined as cellophane and not flexible packaging materials due to cellophane's differing characteristics); *United States Football League v. National Football League*, No. 84 Civ. 7484, 1986 WL 10620, at *6 (S.D.N.Y. July 31, 1986) (defining relevant product market to be comprised of products that are reasonably interchangeable substitutes from a buyer's point of view, stating "[t]his does not mean that products must be identical to be in the same relevant market").  The ease with which consumers substitute between various forms of payment substantially undermines class plaintiffs' effort to prevail on their claim that

the relevant markets here are narrow and consist separately of network services for credit cards, signature debit cards and PIN debit cards.

### e. *Visa And MasterCard Recognize The Substitutability Of Credit Cards, Signature Debit Cards, And PIN Debit Cards*

Visa, MasterCard, American Express and other network service providers all testified that █████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████ Likewise, Visa's head of debit products explained that ███████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████ In recognition of consumers' ability to substitute credit and debit cards for cash and checks, Visa and MasterCard have responded competitively by adopting interchange levels that would allow acquiring bank members to sell merchant services to merchants in industries, like quick service restaurants and utilities, that have traditionally accepted only cash, money orders, checks, or direct payment from deposit accounts. (*Id.* ¶¶ 146-48.) Indeed, ample evidence shows that Visa and MasterCard recognize the substitutability of a range of payment forms. (*Id.* ¶ 153.)

Plaintiffs' reliance on documents that describe differences between credit cards and debit cards is misplaced. At a minimum, those documents specifically identify ATM networks, PayPal, Debitman, cash, checks and ACH as competitors for debit cards, thus eliminating the basis for plaintiffs' alleged debit-only markets. (*Id.* ¶¶ 100, 100d.)

67

          **f.**     ***Merchants Without PIN Debit Card Terminals Can Easily***
                ***Obtain Them And Begin Accepting PIN Debit Cards***

        Class plaintiffs' argument that "PIN debit-card network services and signature-

debit-card network services are not reasonable substitutes for each other because many mer-

chants lack the equipment necessary to process PIN debit transactions" (Class Pl. Br. at 90) is

unpersuasive. Merchants can easily purchase PIN pads. (Def. Counterstatement ¶ 102.) More-

over, merchants who wish to accept PIN debit without the use of a customer's personal identifi-

cation number also have "PIN-less" and other card-not-present acceptance options available to

them. (*Id.*) Class plaintiffs' contrary argument should be rejected.

          **2.**     ***Whether Either Network Has Market Power In A Properly***
                ***Defined Relevant Market Is A Triable Issue For The Jury***

        Genuine issues of material fact also preclude class plaintiffs from prevailing on

the issue of whether Visa and MasterCard possess sufficient market power in any relevant mar-

ket to render each network's establishment of default interchange rules likely to harm competi-

tion under Section 1. The existence of market power, like the definition of the relevant market,

is a fact-intensive inquiry rarely susceptible to a summary judgment decision. *Andrea Theatres*

*Inc. v. Theatre Confections, Inc.*, No. 84 CV 4833, 1987 WL 17457, at *3 (E.D.N.Y. Sept. 11,

1987) (holding that summary judgment on questions of market power should be used sparingly

in complex antitrust suits). This Court already held in the *Visa Check* case that MasterCard's

market power raised a question of fact, and, as shown below, its market share has since de-

creased. *Visa Check*, 2003 WL 1712568, at *4. Given the continued intense competition among

Visa, MasterCard, American Express, Discover, and other forms of payment, class plaintiffs

simply cannot prove that, as a matter of undisputed facts, Visa and MasterCard each has substan-

tial market power in some properly defined relevant market.

68

Class plaintiffs make five arguments in their effort to demonstrate each network's market power: (a) Visa and MasterCard have raised interchange rates without losing merchants; (b) Visa and MasterCard allegedly "price discriminate" among merchant categories in establishing their internal default interchange rates; (c) default interchange rates are allegedly unrelated to the costs of providing services to merchants; (d) each network's merchant acceptance rules constitute a source of each network's market power; and (e) each network has a high market share in the narrowly defined markets for credit card, signature debit card and PIN debit card network services. In addition, class plaintiffs allege that Visa's market power in signature and PIN debit network services is evidenced by (f) its efforts to "converge" signature debit and PIN debit interchange rates, and (g) its preferred or exclusive issuance agreements with debit card issuers. As demonstrated below, class plaintiffs' mischaracterization and misinterpretation of certain relevant facts, and their failure to account for other relevant facts, render their conclusion about each network's market power incorrect, and compel the denial of their motion for summary judgment.

### a. Increases In Visa And MasterCard Default Interchange Rates Are Not The Result Of Market Power But Intense Competition For Issuer Business

Class plaintiffs err when they argue that increases in default interchange rates since 2003 with no substantial loss of merchant acceptance prove that Visa and MasterCard have the power to control prices and thus have substantial market power in some relevant market. Evidence of a price increase, without evidence of whether the price has increased above competitive levels or whether, for instance, the product's quality has improved or consumers' demand for the product has increased, is meaningless. In the instant case, class plaintiffs' failure to proffer evidence concerning the circumstances leading to interchange rate increases is telling. Substantial evidence establishes that increases in interchange rates during the past eight years have

69

resulted from intense competition among Visa, MasterCard, American Express and Discover for the business of issuing banks, and that each network's default interchange rates have increased precisely because neither Visa nor MasterCard has the power to control prices. And while the intensified competition among Visa, MasterCard, American Express, and Discover to obtain the business of issuers has resulted in the introduction of premium payment cards with increased interchange rates, it has also led to a substantial increase in rewards and benefits to cardholders, and a concomitant increase in market output as cardholders have substantially increased their use of payment cards.

As explained above, the federal courts in New York and the Department of Justice intended that the elimination of the Visa and MasterCard rules preventing issuing banks from issuing American Express or Discover payment card as a result of the decision in *United States v. Visa* would increase competition among Visa, MasterCard, American Express, and Discover for the loyalty and business of issuing banks, and expected that that increase in competition would compel Visa and MasterCard to raise their interchange rates. MasterCard responded to the increased competition by introducing its World and World Elite cards, while Visa responded by introducing its Signature card. (Def. Counterstatement ¶¶ 99b, 100e, 141, 142.) Issuers were encouraged, through selectively higher interchange rates, to issue these products in competition with American Express. Visa and MasterCard rules require issuers that issue the World or Signature cards to commit a substantial portion of the interchange revenue they receive to enhanced cardholder rewards and benefits. (*Id.* ¶¶ 70, 124k.)

The networks face the same kind of competition for issuer loyalty and business with respect to their debit card network services. Although class plaintiffs do not allege that any competing debit card networks possess significant market power in any relevant market, compet-

70

ing debit card networks have raised their interchange rates to encourage issuers to participate in

their networks. ████████████████████████████████████████████

████████████████████████████████████████████ These

competing debit card networks raised interchange fees without losing transaction volume. Debit

card usage has increased substantially since 2004. (*Id.* ¶¶ 79, 81, 83, 84, 85.)

Such competitive market behavior – leading to improved product quality and in-

creased output – severely undermines any argument that Visa and MasterCard possess market

power or that they can control prices and restrict output. *See, e.g., Geneva Pharm. Tech. Corp. v.

Barr Labs. Inc*, 386 F.3d at 500 (refusing to recognize plaintiff's proof that defendant's high

prices is evidence of monopoly power without any analysis of defendant's costs); *Blue Cross &

Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1412 (7th Cir. 1995) (refusing to

infer market power from defendant's high prices and high rate of return relative to its competi-

tors because higher prices may reflect a higher quality that is more costly to provide.); *Xerox

Corp. v. Media Sciences, Inc.*, 660 F. Supp. 2d 535, 549-50 (S.D.N.Y. 2009) (monopoly power

cannot be inferred just from higher prices because "[c]ompetitive markets are characterized by

both price and quality competition, and a firm's comparatively high price may simply reflect a

superior product").

Nor does class plaintiffs' assertion that Visa and MasterCard both raised their in-

terchange rates serve as evidence that either network alone possesses market power. (Class Pl.

Br. at 47.) To the contrary, such evidence demonstrates only that neither network was able "to

insulate its prices from competition" with the other. *Interchange Fee*, 562 F. Supp. 2d at 399;

*see also In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d 403, 421 (S.D.N.Y. 2005)

(plaintiffs could not frame "defendants' allegedly parallel actions as evidence of their respective

market power"). Substantial evidence relating to the price of network services therefore refutes

class plaintiffs' market power argument.

### b.   Price Differentiation Among Merchant Categories Is Not Price Discrimination

Class plaintiffs assert that "[t]he networks' recent interchange fee announcements

reveal that Visa had 104 separate interchange categories, while MasterCard had 275." (Class Pl.

Br. at 50.) They contend that, by establishing "separate interchange fees for each merchant cate-

gory, for each of the networks' products (credit, signature-debit, PIN debit, and commercial), and

for an individual merchant's acceptance volume" (id.), Visa and MasterCard have engaged in the

kind of price discrimination that evidences an ability to control price. Class plaintiffs are wrong.

The non-uniformity of interchange rates applicable to payment card transactions

does not amount to price discrimination of the kind the antitrust laws associate with market

power. It is common among all payment card networks, including, for example, Discover,

NYCE and PULSE, credit and debit card networks that class plaintiffs do not claim possess any

meaningful market power. (Def. Counterstatement ¶¶ 47, 58.) Indeed, the non-uniformity of

interchange rates is, in all respects, no different than the non-uniform prices merchants, like class

plaintiffs themselves, employ when they offer their customers loyalty programs or coupon re-

demption or volume discounts. Merchants with no significant market power whatsoever are able

to engage in promotional activities, the resulting non-uniform prices from which "discriminate"

in favor of preferred customers. As a matter of law, such "price discrimination" is insufficient to

demonstrate market power. See Illinois Tool Works Inc. v. Independent Ink, Inc., 547 U.S. 28,

44-45 (2006) ("while price discrimination may provide evidence of market power . . . it is gener-

ally recognized that it also occurs in fully competitive markets"); In re Brand Name Prescription

Drugs Antitrust Litig., 288 F.3d 1028, 1031-32 (7th Cir. 2002) ("Price discrimination by a firm

that is not a monopolist and is not colluding with its competitors is generally not an antitrust violation at all; as we said, it is common in competitive industries. . . . Indeed often . . . the differential scheme enables the industry to achieve a larger output than with a uniform price."); *see also* IIB Areeda & Hovenkamp, *Antitrust Law* ¶ 517 (3d ed. 2007) ("price discrimination evidence has very limited utility for proving [market] power" because "many instances of price discrimination are quite consistent with robust but imperfect competition"); William J. Baumol & Daniel G. Swanson, *The New Economy and Ubiquitous Competitive Price Discrimination: Identifying Defensible Criteria of Market Power*, 70 Antitrust L.J. 661, 664-65 (2003) (evidence of price discrimination by itself is not enough to demonstrate market power, and in some cases, it may even establish a presumption of its absence).

### c. Default Interchange Rates Are Related To The Costs That Issuers And Acquirers Incur To Provide Services To Merchants

Class plaintiffs are incorrect when they assert that default interchange rates are unrelated to the costs of providing services to merchants. Substantial evidence demonstrates that merchants benefit from payment cards in numerous ways, and the costs of those benefits are funded by the merchant discount fees they pay. To the extent that a merchant's acquiring bank pays some portion of the merchant discount fees to issuing banks in the form of interchange fees, those interchange fees fund the incremental sales and other benefits issuers provide to merchants.

Class plaintiffs cannot seriously dispute that merchant benefits from credit cards include more satisfied customers, reduced bad checks and cash thefts, reduced costs of processing checks and transporting cash, improved record keeping, faster transaction times, reduced labor costs at automated transaction terminals like gas pumps and automated checkout lines, guaranteed payment, increased security, and an increased ability to conduct business over the Internet. (Def. Counterstatement ¶¶ 163-67.) Some of these benefits, like guaranteed payment, bear a cost

73

that is borne initially by the issuing banks that guarantee payment even if the cardholder defaults on his financial obligation to the issuing banks, and that cost is funded by interchange fees. (*Id.* ¶ 168.)

In addition to the operational efficiencies and cost savings that merchants realize on each payment card transaction, however, Professor Murphy, defendants' economic expert, has established that payment card acceptance also results in increased transactions, or incremental sales, for merchants that accept payment cards. (*Id.* ¶ 123.) The fact that payment card acceptance increases sales is also not disputed. Members of the putative plaintiff class in this case themselves recognized in the *Visa Check* litigation that: "It is undisputed that the acceptance of credit cards leads to incremental sales for merchants." (*Id.*) In essence, issuers provide merchants with incremental sales by encouraging cardholders to use their payment cards to make incremental purchases. And issuers encourage cardholders to make incremental purchases by providing them with increased benefits and rewards, which operate as an effective discount, much like the use of coupons, volume discounts, holiday sales, loyalty programs and preferred provider networks, and which are funded by interchange fees. (*Id.* ¶¶ 140-42, 158.)

In sum, therefore, substantial evidence establishes that interchange rates are related to the costs of providing services to merchants, and plaintiffs' contrary argument is simply not supported by the facts.

### d. *Merchant Acceptance Rules Do Not Convey Market Power*

Class plaintiffs' argument that the merchant acceptance rules "are a source of market power in each of the relevant markets because they prevent merchants from reducing their acceptance of payment cards as prices increase" (Class Pl. Br. at 53) similarly fails for several reasons. First, contrary to class plaintiffs' assertion, the merchant acceptance rules do not

prohibit merchants from steering cardholders to other forms of payment by PIN-prompting, discounts for cash and other methods.  (Def. Counterstatement ¶¶ 76, 85, 86, 106, 115h, 115j, 153-55.)  Second, class plaintiffs cannot dispute that other payment card networks, including American Express, Discover, and debit card networks, as well as a private label payment card network operated by class plaintiff representative CHS, require merchants to agree to the same kinds of merchant acceptance rules, including honor-all-cards and no-surcharging rules, as the rules challenged here.  (*Id.* ¶¶ 169-76.)  Yet class plaintiffs do not contend that those other payment card networks possess market power in any relevant market, or that the adoption of such rules "is a source of market power" with respect to any of those other networks.

Merchant acceptance rules designed to encourage payment card usage, to increase transaction volume output and to prevent merchant free-riding, are procompetitive.  For this reason, such rules have been adopted independently throughout the payment card industry, and their adoption by Visa and MasterCard does not constitute evidence that Visa or MasterCard possesses market power in any relevant market.

### e. *Class Plaintiffs' Market Share Data Does Not Prove Substantial Market Power*

Having failed adequately to define a relevant product market, class plaintiffs can hardly prevail on proving either network's market share, or on relying on those market shares to prove that Visa or MasterCard possesses the requisite substantial market power that is the "indispensable ingredient" of every claim under the rule of reason. *Chicago Prof'l Sports*, 95 F.3d at 600.

Moreover, even in the narrow "markets" that class plaintiffs define, substantial evidence refutes class plaintiffs' claim that the market power of Visa and MasterCard may be demonstrated by their market shares.  There is considerable evidence of firms' ability to enter the

business of payment card network services, or to expand the payment card network services they already offer. Discover, for example, successfully introduced its signature debit card in 2006. (Def. Counterstatement ¶¶ 112h, 112i.) Revolution Money similarly introduced a PIN debit payment card product that operated successfully to gain acceptance and was ultimately purchased by American Express. (*Id.*) And despite the expense of creating a new credit card network to rival the existing credit card networks, no technical or financial barriers exist to prevent a large bank or group of banks from forming a competing credit card network if Visa and MasterCard were competitively unresponsive to the needs of their current customers. Because substantial evidence suggests that barriers to entry are relatively low, elevated market shares are insufficient to confer meaningful market power on existing market participants. *See, e.g., Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1425 (9th Cir. 1993) ("100% market share does not demonstrate that [a firm] had the power to control prices or exclude competition in the absence of any evidence that [it] could prevent entry of other market participants").

Nor is meaningful market power created here because of so-called "network effects" or "network externalities," as class plaintiffs might argue. Barriers to entry are created as a result of network externalities when high fixed costs exist on both sides of the network platform. In the computer operating system market, for example, it has generally been impractical and costly for each consumer to have multiple operating systems on a computer, so consumers have tended to prefer the operating system with the most applications. Similarly, it has been costly for software developers to write applications that worked on multiple operating systems, so software developers have tended to write for the operating system with the most users. A potential operating systems competitor that wished to attract consumers would have to overcome this "chicken and egg" problem by developing a very large stock of applications, or by overcom-

ing the fixed cost of writing applications by finding a way to run applications that previously worked only on existing operating systems.

By contrast, the network effects that exist in payment card systems, while important, do not create a barrier to entry and do not create meaningful market power. The fixed cost to a merchant of accepting an additional brand of payment card is negligible, so the typical merchant accepts cards issued by many different networks, even if customers carry only one or two payment cards. As plaintiffs themselves argue, merchants will choose to accept payment cards from networks with small numbers of users and correspondingly small "market shares" – the only condition being that cardholders receive sufficient value from their preferred card that a small fraction would shop elsewhere, or would use other cards, if a merchant did not accept it. (Frankel Rep. ¶ 57.) Because merchants can easily accept many cards, entry barriers are low or negligible, and even large card networks do not have meaningful market power.

In addition, plaintiffs' own assessment of the relative market shares of credit card network services providers in the United States shows that the market shares of Visa and MasterCard declined between 2004 and 2008. According to one of plaintiffs' economic experts, Dr. Christopher Vellturo, from 2004 to 2008, MasterCard's share of credit and charge card transaction volume in the United States declined by approximately seven percent, from 30.3% to 28.2%, while Visa's share declined by approximately one percent, from 42.7% to 42.4%. (Def. Counterstatement ¶¶ 177-78.) By contrast, during the same period, American Express's share of credit and charge card purchases rose by approximately twelve percent, from 21.2% to 23.9%, and Discover's share rose by approximately eight percent, from 5.1% to 5.5%. (*Id.* ¶¶ 179-80.) The evidence of defendants' declining market shares further weakens class plaintiffs' claim that Visa and MasterCard possess substantial market power in the relevant market. *See, e.g., Com-*

77

*mercial Data Servers, Inc. v. International Bus. Machs. Corp.*, 262 F. Supp. 2d 50, 74 (S.D.N.Y. 2003) (granting summary judgment *for defendant* where defendant's competitors had significantly increased their market shares during the relevant time period and defendant "had a relatively low, and declining, market shares").

        MasterCard's declining market share in particular further confirms as correct this Court's previous holding in *Visa Check* that MasterCard cannot be found to have market power as a matter of law. *In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568, at *4 (finding a dispute of material fact as to whether MasterCard's below 30% share of the alleged "credit and charge card services" was sufficient to establish market power). Indeed, market shares as low as MasterCard's share – below thirty percent – have repeatedly been held to be insufficient to establish meaningful market power as a matter of law. *See, e.g., Commercial Data*, 262 F. Supp. 2d at 74 ("Courts have consistently held that firms with market shares of less than 30% are presumptively incapable of exercising market power" (quoting *Union Carbide Corp. v. Montell N.V.*, 27 F. Supp. 2d 414, 417 (S.D.N.Y. 1998))). Even higher market shares, like those that class plaintiffs attribute to Visa, do not establish market power without a factual inquiry into the nature of competition in the alleged market. *See, e.g., State of New York v. Anheuser-Busch, Inc.*, 811 F. Supp. 848, 873 (E.D.N.Y. 1993) ("39% share is below that which has been deemed sufficient to confer market power"); *Winter Hill Frozen Foods & Servs., Inc. v. Haagen-Daz Co.*, 691 F. Supp. 539, 547 (D. Mass. 1988) ("A 43% market share, however, does not alone establish that [defendant] has market power."); IIB Areeda & Hovenkamp, *Antitrust Law* ¶ 532b (3d ed. 2007).

*f.*     ***Visa's Convergence Of Default Interchange Rates For Signature And PIN Debit Card Transactions Does Not <u>Establish Visa's Market Power In Any Relevant Market</u>***

Class plaintiffs contend that evidence that Visa has "converged" the interchange rates for transactions involving its signature and PIN debit cards to "destroy – or at least marginalize – the regional PIN debit networks" is further evidence of Visa's alleged market power. (Class Pl. Br. at 95.) To show the "convergence" class plaintiffs rely on an April 10, 2010 report from *American Banker*, that "Visa this month changed its debit interchange rates by raising PIN debit transaction costs and lowering signature transactions; both are now 0.95% plus 20 cents." (*Id.* at 96.) But they provide no evidence whatsoever for their claim that Visa was motivated by anticompetitive animus toward regional PIN debit card networks.

There is nothing nefarious or unlawful about the so-called "convergence" of default interchange rates, and class plaintiffs do not precisely explain why the establishment of the same interchange rates for two of Visa's debit card products evidences meaningful market power. Indeed, their own moving brief reveals that the increase in PIN debit rates constituted a competitive act: "Visa not only successfully increased its own rates but also led other PIN debit networks to increase their own interchange rates to incent debit-card issuers to also participate in their networks." (*Id.* at 97.) ███████████████████████████ ████████████████████████████████████████ ██████████████████████████████ Substantial evidence thus supports defendants' view that the increase in Visa's default interchange rate for PIN debit transactions, and the closing of the gap between default interchange rates for transactions using Visa-branded PIN debit cards and default interchange rates for transactions using Visa-branded signature debit cards, is explained by the same vigorous competition for issuer loyalty and business

79

that explains the increase in credit card interchange rates following the decision in *United States v. Visa.*

    **g.**    *Visa's Preferred Or Exclusive Issuance Agreements With Debit Issuers Does Not Establish Visa's Market Power In Any Relevant Market*

    Finally, class plaintiffs assert that Visa's alleged market power in PIN debit card network services market is "enhanced" by its negotiation of agreements with several debit card issuers for exclusivity or preference in their debit card programs.  (Class Pl. Br. at 97.)  But exclusive agreements are common and are protected by the antitrust laws.  *See, e.g.*, *Paddock Publications, Inc. v. Chicago Tribune Co.*, 103 F.3d 42, 45 (7th Cir. 1996) (Easterbrook, J.) ("Competition-for-the-contract is a form of competition that antitrust laws protect rather than proscribe, and it is common. . . . Exclusive contracts make the market hard to enter in mid-year but cannot stifle competition over the longer run, and competition of this kind drives down the price[s], to the ultimate benefit of consumers.")  ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████

████████████████████  Substantial evidence thus refutes class plaintiffs' claim that Visa's issuing agreements demonstrate that it possesses meaningful market power.

## II.

### CLASS PLAINTIFFS' ANTITRUST CHALLENGE TO THE NETWORKS' ESTABLISHMENT OF DEFAULT INTERCHANGE RATES IS BARRED BY THE *VISA CHECK* RELEASE, THE PRINCIPLES OF *BUFFALO BROADCASTING* AND *PAYCOM*, AND THE *ILLINOIS BRICK* DOCTRINE

In their motion for summary judgment, class plaintiffs ignore the threshold issues that preclude the grant of summary judgment in their favor, including the facts that (i) they are barred from challenging the network interchange rules as a result of the *Visa Check* release, (ii) the principles of *Buffalo Broadcasting* and *Paycom* establish that the default interchange rules of each network, adopted in its capacity as a non-exclusive joint venture, do not constitute "restraints" subject to Section 1, and (iii) the *Illinois Brick* doctrine precludes class plaintiffs from asserting a damage claim based on the networks' default interchange rules. On these independent grounds, class plaintiffs' motion for summary judgment should be denied.

### A.   The **Visa Check** *Release Precludes Class Plaintiffs' Challenge To Each Network's Default Interchange Rules*

As defendants demonstrated in their motion for summary judgment (Def. SJ Br. (Class) at 10-15), and as plaintiffs themselves concede, Visa and MasterCard have established internal default interchange rates for decades, including at the time of the *Visa Check* litigation, settlement, and release. Class plaintiffs challenged the setting of default interchange fees in the *Visa Check* complaint. When they settled the *Visa Check* litigation in 2003, class plaintiffs released Visa, MasterCard and their member banks from any antitrust claim relating to the continued establishment of default interchange rates. Accordingly, the *Visa Check* release bars class plaintiffs from pursuing the antitrust claims on which they now move for summary judgment, and their motion for summary judgment should be denied on this basis.

81

**B.** **_The Networks' Default Interchange Rules Do Not Constitute Restraints_**

Class plaintiffs cannot prevail on their motion for summary judgment for the independent reason that neither network's default interchange rule restrains defendants' competitive behavior. As defendants demonstrated in their motion for summary judgment, the Visa and MasterCard default interchange rules do not restrain the competitive freedom of any defendant to enter into bilateral agreements to supersede the default rates or to engage in any competitive activity in which it could have engaged if it had not joined Visa or MasterCard. (Def. SJ Br. at 30-39.) Indeed, as defendants showed in their motion for summary judgment, substantial evidence establishes that some Visa and MasterCard issuers have applied interchange rates that differ from the network-established default rates, have issued payment cards of competing payment systems, such as American Express, and have issued private label cards for merchants. (*Id.* at 35-36.) Under the principles established in *Buffalo Broadcasting Co. v. ASCAP*, 744 F.2d 917, 933 (2d Cir. 1984), *Columbia Broadcasting Sys. v. ASCAP*, 620 F.2d 930, 936 (2d Cir. 1980), and *Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*, 467 F.3d 283, 291-92 (2d Cir. 2006), the default interchange rules adopted by Visa and MasterCard do not constitute a restraint under Section 1, and, on this basis as well, class plaintiffs' motion for summary judgment should be denied.

**C.** **The Illinois Brick _Doctrine Bars Class Plaintiffs' Damages_** **_Claims Based On Each Network's Default Interchange Rules_**

As defendants also demonstrated in their summary judgment motion papers (Def. SJ Br. (Class) at 15-30), and as class plaintiffs do not dispute, merchants like class plaintiffs do not pay interchange fees; they pay merchant discount fees. And as plaintiffs also concede, acquirers do not uniformly pass on increases in interchange fees to merchants in the form of higher merchant discount fees or in "fixed quantity" contracts. Rather, acquiring banks sometimes absorb some or all of an interchange fee increase. Accordingly, the direct purchaser requirement

82

established in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), and its progeny bars plaintiffs from pursuing their antitrust damages challenge to the establishment of default interchange fees.

*     *     *

Because class plaintiffs cannot demonstrate that they are even permitted to pursue their antitrust claims relating to each network's establishment of default interchange rates, this Court should deny class plaintiffs' motion for summary judgment on these threshold grounds.

### *Conclusion*

For all of the foregoing reasons, class plaintiffs cannot prove on the basis of un-disputed facts that each network's internal establishment of default interchange rules violates Section 1 under the rule of reason. Accordingly, class plaintiffs' motion for summary judgment on their First, Second, Fifth, Tenth, Eleventh, Thirteenth, Fourteenth, Seventeenth, Eighteenth, and Twentieth Claims for Relief should be denied.

Dated:   New York, New York
         May 6, 2011

Respectfully submitted,

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

By:   /s/ Gary R. Carney
      Andrew C. Finch
      Gary R. Carney
      1285 Avenue of the Americas
      New York, New York 10019-6064
      Tel.: (212) 373-3000
      Fax: (212) 757-3990
      gcarney@paulweiss.com

      Kenneth A. Gallo
      Joseph J. Simons
      2001 K Street, N.W.
      Washington, DC 20006-1047
      Tel.: (202) 223-7300
      Fax: (202) 223-7420

**WILLKIE FARR & GALLAGHER LLP**

Keila D. Ravelo
Wesley R. Powell
Matthew Freimuth
787 Seventh Avenue
New York, New York 10019-6099
Tel.: (212) 728-8000
Fax: (212) 728-8111

*Attorneys for Defendant MasterCard Incorporated*
*and MasterCard International Incorporated*

**ARNOLD & PORTER LLP**

By:   /s/ Robert C. Mason
      Robert C. Mason
      399 Park Avenue
      New York, NY  10022-4690
      Telephone:  (212) 715-1000
      Facsimile:  (212) 715-1399
      robert.mason@aporter.com

      Robert J. Vizas
      One Embarcadero Center, 22nd Floor
      San Francisco, CA   94111-3711
      Telephone:  (415) 356-3000
      Facsimile:  (415) 356-3099

      Mark R. Merley
      Matthew A. Eisenstein
      555 12th Street, N.W.
      Washington, DC   20004-1206
      Telephone:  (202) 942-5000
      Facsimile:  (202) 942-5999

*Attorneys for Defendants Visa Inc., Visa U.S.A. Inc.,*
*and Visa International Service Association*

84

**MORRISON & FOERSTER LLP**

By:   /s/ Mark P. Ladner
      Mark P. Ladner
      Michael B. Miller
      1290 Avenue of the Americas
      New York, NY   10104-0050
      Telephone:  (212) 468-8000
      Facsimile:  (212) 468-7900
      mladner@mofo.com

*Attorneys for Defendants Bank of America, N.A., BA Merchant Services LLC (f/k/a Defendant National Processing, Inc.), Bank of America Corporation, and MBNA America Bank, N.A.*

**SHEARMAN & STERLING LLP**

By:   /s/ James P. Tallon
      James P. Tallon
      Wayne D. Collins
      Lisl J. Dunlop
      599 Lexington Avenue
      New York, NY 10022-6069
      Tel.: (212) 848-4000
      Fax: (212) 848-7179
      jtallon@shearman.com

*Attorneys for Defendants Barclays Financial Corp. and Barclay's Bank plc*

85

O'MELVENY & MYERS LLP

By:   /s/ Andrew J. Frackman
      Andrew J. Frackman
      Times Square Tower
      7 Times Square
      New York, N.Y. 10036
      Tel.: (212) 326-2000
      Fax: (212) 326-2061
      afrackman@omm.com

*Attorneys for Defendants Capital One Bank (USA), N.A., Capital One F.S.B., and Capital One Financial Corp.*

SKADDEN, ARPS, SLATE, MEAGHER
      & FLOM LLP

By:   /s/ Peter E. Greene
      Peter E. Greene
      Peter S. Julian
      Four Times Square
      New York, NY   10036
      Telephone:  (212) 735-3000
      Facsimile:  (212) 735-2000
      peter.greene@skadden.com

      Michael Y. Scudder
      155 North Wacker Drive
      Chicago, IL  60606-1720
      Telephone:  (312) 407-0700
      Facsimile:  (312) 407-0411
      michael.scudder@skadden.com

*Attorneys for Defendants JPMorgan Chase & Co., Chase Bank USA, N.A., Chase Manhattan Bank USA, N.A., Chase Paymentech Solutions, LLC, JPMorgan Chase Bank, N.A., as acquirer of certain assets and liabilities of Washington Mutual Bank, Bank One Corporation, and Bank One Delaware*

86

**SIDLEY AUSTIN LLP**

By:   /s/ David F. Graham
      David F. Graham
      Eric H. Grush
      One South Dearborn Street
      Chicago, IL 60603
      Tel.: (312) 853-7000
      Fax: (212) 853-7036
      dgraham@sidley.com


      Benjamin R. Nagin
      787 Seventh Avenue
      New York, N.Y. 10019
      Tel.: (212) 839-5300
      Fax: (212) 839-5599

*Attorneys for Defendants Citibank (South Dakota),*
*N.A., Citibank, N.A., Citigroup Inc., and Citicorp*


**KEATING MUETHING & KLEKAMP PLL**

By:   /s/Richard L. Creighton
      Richard L. Creighton
      Joseph M. Callow, Jr.
      Drew M. Hicks
      One East Fourth Street
      Suite 1400
      Cincinnati, OH 45202
      Tel.: (513) 579-6400
      Fax: (513) 579-6457

*Attorneys for Defendant Fifth Third Bancorp*

**KUTAK ROCK LLP**

By:  /s/ John P. Passarelli
      John P. Passarelli
      James M. Sulentic
      The Omaha Building
      1650 Farnam Street
      Omaha, NE 68102-2186
      Tel.: (402) 346-6000
      Fax: (402) 346-1148
      john.passarelli@kutakrock.com

*Attorneys for Defendant First National Bank of Omaha*


**WILMER CUTLER PICKERING HALE AND DORR LLP**

By:  /s/ Christopher R. Lipsett
      Christopher R. Lipsett
      David S. Lesser
      399 Park Avenue
      New York, N.Y. 10022
      Tel.: (212) 230-8800
      Fax: (212) 230-8888
      chris.lipsett@wilmerhale.com

      Ali M. Stoeppelwerth
      Perry A. Lange
      1875 Pennsylvania Ave., N.W.
      Washington, D.C. 20006
      Tel.: (202) 663-6000
      Fax: (202) 663-6363

*Attorneys for HSBC Finance Corporation and HSBC North America Holdings, Inc.*

**JONES DAY**

By: /s/ John M. Majoras _____
   John M. Majoras
   Joseph W. Clark
   51 Louisiana Avenue, NW
   Washington, DC   20001
   Telephone:  (202) 879-3939
   Facsimile:  (202) 626-1700
   jmmajoras@jonesday.com

*Attorneys for Defendants National City Corporation,
National City Bank of Kentucky*


**PULLMAN & COMLEY, LLC**

By: /s/ Jonathan B. Orleans _____
   Jonathan B. Orleans
   Adam S. Mocciolo
   850 Main Street
   Bridgeport, CT   06601-7006
   Telephone:  (203) 330-2000
   Facsimile:  (203) 576-8888
   jborleans@pullcom.com

*Attorneys for Defendant Texas Independent
Bancshares, Inc.*

**ALSTON & BIRD LLP**

By:   /s/ Teresa T. Bonder
     Teresa T. Bonder
     Valarie C. Williams
     Kara F. Kennedy
     1201 W. Peachtree Street, N.W.
     Atlanta, GA 30309
     Tel.: (404) 881-7000
     Fax: (404) 881-7777
     teresa.bonder@alston.com

*Attorneys for Defendant Suntrust Banks, Inc.*


**PATTERSON BELKNAP WEBB & TYLER LLP**

By:   /s/ Robert P. LoBue
     Robert P. LoBue
     Norman W. Kee
     Patterson Belknap Webb & Tyler LLP
     1133 Avenue of the Americas
     New York, NY 10036
     Tel.: (212) 336-2596
     Fax: (212) 336-2222
     rplobue@pbwt.com

*Attorneys for Defendants Wachovia Bank, NA.,
Wachovia Corporation, and Wells Fargo
& Company*

90