

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | MDL Docket No. 1720 (JG)(JO) |

## Class Plaintiffs' Reply Memorandum of Law in Further Support of Their Motion for Summary Judgment

K. Craig Wildfang
Thomas J. Undlin
Ryan W. Marth

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Tel: 612-349-8500
Fax: 612-339-4181

Patrick J. Coughlin
Bonny E. Sweeney
David W. Mitchell
Alexandra S. Bernay

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
Tel: 619-231-1058
Fax: 619-231-7423

H. Laddie Montague, Jr.
Merrill G. Davidoff
Bart D. Cohen
Michael J. Kane

BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Tel: 215-875-3000
Fax: 215-875-4604

Counsel for MDL 1720 Class Plaintiffs and Individual Plaintiffs

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................................................ 1

Summary Judgment Standard ........................................................................ 6

Analysis ............................................................................................................... 7

I.  Defendants have not presented sufficient evidence to raise a
    genuine dispute of material fact as to their conspiracies to set
    default interchange fees before and after the restructurings ........................ 7

    A.  Defendants' default interchange fees and anti-steering
        restraints constitute "concerted activity" because they affect
        competition among the member banks of Visa and
        MasterCard. ...................................................................................... 8

    B.  The Bank Defendants have conspired with each other and
        the networks by adopting and enforcing the rules and
        default interchange fees that Class Plaintiffs challenge ................. 12

        1.  Class Plaintiffs' conspiracy allegations against the
            Bank Defendants are not limited to membership in
            Visa and MasterCard ............................................................... 12

        2.  The fiduciary duties that the bank directors had to the
            networks prior to the restructurings are irrelevant to
            Defendants' status as Section One conspiracies ................... 15

        3.  Defendants' attempt to distinguish Toys 'R' Us and
            Interstate Circuit ignores key, undisputed facts ................. 16

II. Defendants have not presented sufficient evidence to raise a
    genuine issue of disputed fact that relevant markets exist for credit-
    card network services, signature-debit card network services, and
    PIN-debit-card network services. .................................................................. 17

    A.  There is no dispute that cross-elasticity of demand among
        payment forms is low because Defendants can raise the costs
        of accepting credit cards, signature-debit cards, and PIN-
        debit cards without merchants switching to other forms of
        payment .............................................................................................. 18

    B.  Sufficient evidence does not support Defendants' argument
        that merchants can effectively steer between different forms
        of payment. ........................................................................................ 19

i

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

1.    Defendants' rules prevent credit cards, signature-debit cards, and PIN-debit cards from being reasonable substitutes for each other because they deprive merchants of their most effective methods of steering ................................................................... 19

2.    Even if some merchants have installed PIN pads in recent years, the fact that a significant number do not have PIN pads supports that there are separate relevant markets for the acceptance of signature-debit cards and PIN-debit cards ....................................... 22

C.    Defendants' attempt to dispute the unique characteristics of credit cards, signature-debit cards, and PIN-debit cards rests solely on the "cellophane fallacy." ..................................... 22

D.    Defendants' self-serving statements that credit cards, signature-debit cards, PIN-debit cards, and other forms of payment compete with each other are insufficient to create a material dispute of fact as to the definition of the relevant markets ................................................................... 23

III.    Defendants have not presented sufficient evidence to refute Class Plaintiffs' argument that Defendants possess market power in the markets for credit-card network services, signature-debit-card network services, and PIN-debit-card network services. ......................... 24

A.    The Defendants' ability to consistently and significantly increase interchange fees without losing merchant acceptance is sufficient standing alone to establish that they have market power as a matter of law.............................................. 24

B.    Defendants' price discrimination provides further evidence of market power. ....................................................... 26

C.    Defendants do not provide sufficient evidence to support their contention that interchange fees are cost-based.................... 28

D.    Defendants' response does not present sufficient evidence to refute the conclusion that the anti-steering restraints confer market power because those restraints reduce merchants' ability to substitute away from Defendants' payment cards.......... 30

E.    Visa's successful "convergence" strategy provides direct evidence of its market power in signature-debit-card network services and PIN-debit-card network services because it demonstrates its and its banks' ability to "control prices." ................................................................... 31

ii

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

F.   Defendants' market shares add to the evidence of their market power because they are virtually identical to the market shares that they enjoyed at the time of the United States v. Visa and Visa Check decisions. .......................................... 32

G.   In the alternative, Defendants have market power in the relevant market for debit-card network services ............................ 33

IV.   Defendants cite no evidence to dispute that their rules and default interchange fees increase merchants' costs of accepting payment cards ........................................................................................................ 35

A.   Defendants cite no evidence in opposition to Class Plaintiffs' evidence that interchange fees and the anti-steering restraints increase merchants' costs of accepting payment cards. ........................................................................................ 35

B.   Defendants' proposed but-for world is unacceptable because it does not involve a world without the restraints at issue and contradicts the record .................................................... 36

C.   Defendants' attempts to counter Class Plaintiffs' other evidence of harm to competition are also unpersuasive ................ 37

1.   Defendants offer no evidentiary support for their counterintuitive argument that increased payment-card-acceptance costs do not raise retail prices. .................. 38

2.   Defendants have not proffered sufficient evidence to rebut the evidence that Defendants' rules and interchange fees reduce the categories of merchants that accept payment cards ...................................... 39

D.   Defendants cannot offset harms to merchants in payment-card-acceptance markets with evidence of benefits to cardholders and, even if they could, there is no dispute that interchange fees increase the "two-sided price" of payment cards ......................................................................................... 40

E.   Defendants' opposition does not contradict the undisputed evidence that they could have efficiently operated their networks with less restrictive interchange fees .............................. 42

V.   Defendants have not presented sufficient evidence to demonstrate that their default interchange fees and rules are no more restrictive than necessary to attain any procompetitive efficiencies ............................ 44

iii

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

A.   Defendants' argument that some rules governing the authorization, clearance, and settlement of funds are necessary should be rejected because it mischaracterizes Class Plaintiffs' claims....................................................... 44

B.   Increases in payment-card transaction volume do not create a material issue of disputed fact because Defendants' rules have prevented rival payment-card networks from expanding their own transaction volumes....................................... 46

C.   Defendants' analogy of interchange fees to price discounts is a justification conceived for this litigation and is not supported in the record.................................................................. 48

VI.   Neither the *Visa Check* release, the *Illinois Brick* doctrine, nor the *Buffalo Broadcasting* decision bars Class Plaintiffs' claims........................... 50

Conclusion ............................................................................................................ 51

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

# TABLE OF AUTHORITIES

**Page**

## Cases

*AD/SAT v. Associated Press,*
    181 F.3d 216 (2d Cir. 1999) ............................................................. 14

*Am. Express Travel Related Servs. Co. v. Visa U.S.A. Inc.,*
    04 Civ. 8967 (BSJ), 2005 U.S. Dist. LEXIS 42852 (S.D.N.Y. June 23, 2005) .. 14

*Am. Needle v. NFL,*
    130 S.Ct. 2201 (2010) ........................................................... 9, 10, 15, 16

*Argus, Inc. v. Eastman Kodak Co.,*
    801 F.2d 38 (2d Cir. 1986) ............................................................. 6

*Bickerstaff v. Vassar College,*
    196 F.3d 435 (2d Cir. 1999) ............................................................. 6

*Catalano, Inc. v. Target Sales, Inc.,*
    446 U.S. 643 (1980) ................................................................. 35

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ................................................................. 6

*Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.,*
    502 F.3d 91 (2d Cir. 2007) ......................................................... 36, 45

*Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
    504 U.S. 451 (1992) ........................................................... 6, 25, 31

*Freeman v. San Diego Ass'n of Realtors,*
    322 F.3d 1133 (9th Cir. 2003) ...................................................... 12, 16

*Ill. Tool Works Inc. v. Indep. Ink, Inc.,*
    547 U.S. 28 (2008) ................................................................. 27

*Image Tech. Servs., Inc. v. Eastman Kodak Co.,*
    125 F.3d 1195 (9th Cir. 1997) ................................................... 25, 27, 31

v

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.,*
    256 F.R.D. 82 (D. Conn. 2009) ................................................................ 36

*In re IBM Peripheral EDP Devices Antitrust Litig.,*
    481 F. Supp. 965 (N.D. Cal 1979) ......................................................... 32

*K.M.B. Warehouse Distribs. v. Walker Mfg. Co.,*
    61 F.3d 123 (2d Cir.1995) ..................................................................... 30

*Kunstsammlungen Zu Weimar v. Elicofon,*
    536  F. Supp. 829 (E.D.N.Y. 1981) .................................................... 6, 47

*Lipton v. Nature Co.,*
    71 F.3d 464 (2d Cir. 1995) ....................................................................... 6

*Marquette Nat'l Bank v. First of Omaha Serv. Corp.,*
    439 U.S. 299 (1978) .................................................................................. 4

*N. Tex. Specialty Physicians v. F.T.C.,*
    528 F.3d 346 (5th Cir. 2008) ................................................................. 15

*Nat'l Bancard Corp. (NaBanco) v. Visa U.S.A. Inc.,*
    596 F. Supp. 1231 (S.D. Fla. 1984) ..................................................... 3, 5

*Nat'l Soc'y of Prof'l Eng'rs v. United States,*
    435 US 679 (1978) .................................................................................... 1

*NCAA v. Bd. of Regents of the Univ. of Okla.,*
    468 U.S. 85 (1984) ...................................................................... 24, 35, 45

*Premier Elec. Constr. Co. v. Nat'l Elec. Contractors' Ass'n,*
    814 F.2d 358 (7th Cir. 1987) ................................................................. 43

*Quarles v. General Motors Corp.,*
    758 F.2d 839 (2d Cir. 1980) ..................................................................... 6

*Rothery Storage & Van Co. v. Atlas Van Lines,*
    792 F.2d 210 (D.C. Cir. 1986) ............................................................... 17

*Rowe Entm't, Inc. v. William Morris Agency, Inc.,*
    No. 98 Civ. 8272 (RPP), 2005 U.S. Dist. LEXIS 75 (S.D.N.Y. Jan. 5, 2006).... 6, 24, 46

*Starr v. Sony BMG Music Entm't,*
    592 F.3d 314 (2d Cir. 2010) ................................................................. 16

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

*Tadros v. Coleman,*
  717 F. Supp. 996 (S.D.N.Y. 1989) ................................................................ 29, 37

*U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.,*
  7 F.3d 986 (11th Cir. 1993) ............................................................................ 17

*United States v. Am. Express Co.,*
  No. CV-10-4496 (S.D.N.Y. Jun. 14, 2011) ...................................................... 20

*United States v. Dentsply Int'l, Inc.,*
  399 F.3d 181, 193, 196 (3d Cir. 2005) ............................................................ 47

*United States v. E.I. DuPont de Nemours & Co.,*
  351 U.S. 377 (1956) ....................................................................... 19, 23, 24, 31

*United States v. Eastman Kodak, Co.,*
  63 F.3d 95 (2d Cir. 1995) ................................................................................ 23

*United States v. Microsoft Corp.,*
  87 F. Supp. 2d 30 (D.D.C. 2000), *aff'd in part, rev'd in part,* 253 F.3d 34 (D.C.
  Cir. 2001) ................................................................................................ 33, 48

**Statutes**

15 U.S.C. § 1693o-2(b) ...................................................................................... 20

**Other Authorities**

3 P. Areeda & D. Turner,
  Antitrust Law ¶813 ........................................................................................ 31

Areeda & Hovenkamp,
  *Antitrust Law,* VII (3d ed.) .............................................................................. 8

Dennis W. Carlton & Jeffrey M. Perloff,
  Modern Industrial Organization 646 (4th ed. 2005) ................................ 23, 27

Dep't of Justice & F.T.C.,
  1992 Horizontal Merger Guidelines § 1.) ...................................................... 19

Dep't of Justice & F.T.C.,
  Horizontal Merger Guidelines § 4.1.1 (2010) ................................................ 21

Herbert Hovenkamp & Christopher Leslie,
  *The Firm as Cartel Manager,* 64 Vand. L. Rev. 813 (2011) ............................ 7, 9

vii

Herbert Hovenkamp,
    *Exclusive Joint Ventures and Antitrust Policy,*
    1995 Colum. Bus. L. Rev. 1 (1995) .................................................................. 32

Herbert Hovenkamp,
    *Federal Antitrust Policy: The Law of Competition and its Practice* 80
    (3d ed. 2005) ............................................................................................ 28

Renata B. Hesse & Joshua H. Soven, *Defining Relevant Product Markets in*
    *Electronic Payment Network Antitrust Cases,*
    *73 Antitrust L.J. 709 (2006)* .................................................................... 41

Compl., *United States v. American Express Travel Related Servs. Co. Inc.,*
    No. CV-10-4496(NGG)(RER) (S.D.N.Y. Dec. 21, 2010) .................................. 28

Ver. Compl., *United States v. First Data Corp.,*
    No. 03-CV-02169 (D.D.C. Oct. 23, 2003.) ...................................................... 41

William M. Landes & Richard A. Posner,
    *Market Power in Antitrust Cases,* 94 Harv. L. Rev. 937 (1981) ...................... 23

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

## Introduction

There are only four issues that this Court needs to resolve on Class Plaintiffs' motion for summary judgment on their intra-network conspiracy claims under the Rule of Reason: (i) did the Defendants "agree" on rules and default interchange fees; (ii) do Defendants possess market power; (iii) do Defendants' agreements harm competition; and (iv) can Defendants prove a procompetitive justification for their conduct? To decide these questions, the Court need not open the "field of antitrust inquiry to any argument in favor of a challenged restraint that may fall within the realm of reason." *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 US 679, 688 (1978). Instead it should focus "directly on the challenged restraint's impact on competitive conditions." *Id*. Defendants' attempts to justify the price increases caused by their rules and interchange fees fail because they are supported only with conjecture or provide no link between their justification and the conduct Class Plaintiffs challenge. Specifically, Defendants' arguments do not disturb the following undisputed facts:

- There is no dispute that the Visa and MasterCard networks are the creation of agreements among thousands of banks, that they established rules and interchange fees by votes of the banks, and that each member bank agreed to those rules and enforced them against merchants. Even after the restructurings, there is no dispute that the banks continue to adhere to and enforce them and that the "new" post-restructuring networks were the creation of agreements among the bank representatives that governed the networks.

- There is no dispute that the Defendants possess market power— "the power to control prices or exclude competition." Defendants do not dispute that both networks have increased interchange fees

1

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

significantly since the time of *Visa Check* and that merchants have continued to accept their cards, despite continually and significantly increasing interchange fees.

- There is no dispute that Defendants' rules and interchange fees increase merchants' costs of accepting payment cards. Defendants claim that interchange fees benefit merchants but do not attempt to provide empirical evidence of that benefit. Even in the "two-sided" market that Defendants urge this Court to analyze—contrary to Supreme Court precedent—they do not provide reliable evidence that interchange fees do not cause prices to increase.

- There is no dispute that Defendants cannot show a procompetitive justification for their conduct because Defendants do not provide any admissible evidence to tie their proffered "justifications" to the conduct that Class Plaintiffs challenge—default interchange fees and the anti-steering restraints. They primarily attempt to excuse their conduct by arguing that transaction volume has increased in recent years, but do not—and cannot—show that the volume increases are the product of the challenged conduct.

Because the material facts that relate to each of these issues are undisputed—both before and after the networks' restructurings—summary judgment for Class Plaintiffs should be granted.

**The *NaBanco* decision and evidence from the early days of the payment-card industry are inapplicable to this case.**

Defendants' implicit argument that the Eleventh Circuit's 1987 decision in *NaBanco* governs or has any persuasive force over the outcome in this case lacks merit.[1] The *NaBanco* decision was based on a discovery record largely from the 1970s and closed in 1982—a time when Visa was still in its infancy, before it

---

[1]  In addition, Defendants' description of the early days of the payment-card industry contains a number of inaccuracies and misleading statements. Unless those statements are material to this Court's analysis on Class Plaintiffs' motion for summary judgment, however, those are addressed only in Class Plaintiffs' Reply Statement of Facts in Further Support of Their Motion for Summary Judgment.

2

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

achieved the market power that this Court and the Second Circuit found it to have by the early 2000s. The *NaBanco* court estimated then that "probably less than five percent" of all payments were made on Visa credit cards. *Nat'l Bancard Corp. (NaBanco) v. Visa U.S.A. Inc.*, 596 F. Supp. 1231, 1258 (S.D. Fla. 1984). The court also found no barriers to entry for new credit-card networks—a finding that is at odds with subsequent experience and court rulings. *Id.* at 1259; *In re Visa Check/MasterMoney Antitrust Litig.*, No. 96-CV-5238 (JG), 2003 WL 1712568, at *3 (E.D.N.Y. Apr. 1, 2003); *United States v. Visa U.S.A. Inc.*, 163 F. Supp. 2d 322, 341 (S.D.N.Y. 2001); (Defs.) CSF ¶ 112(a)-(i).) At the time of *NaBanco*, merchants could profitably refuse to accept Visa and MasterCard payment cards—most department stores and grocery stores did not accept cards. (Frankel Rep. ¶ 423 (SUFEX 240).) During the relevant period for this litigation, however, merchants risk going out of business if they do not accept Visa and MasterCard. (CSF ¶¶ 89(a)-(c), 90(f), 96(e)-(f), (h)-(k).)  Because Visa had not yet achieved market penetration by the time of the *NaBanco* decision, the plaintiff's own expert at the time concluded that regional ATM networks would force Visa out of business unless it lowered its interchange fees. *NaBanco*, 596 F. Supp. at 1258.

The regulatory landscape of the late 1970s also looked drastically different than today. For the first three decades of Visa and MasterCard's existence, prohibitions on interstate branch banking inhibited the ability of individual banks, such as California-based Bank of America, to offer credit cards to consumers outside of their home states.  (*See* Frankel Rep. ¶ 400.) Meanwhile

3

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

state usury laws capped the interest rates that issuing banks could charge cardholders, and prime interest rates at the time exceeded 20%. These two factors combined to make credit-card lending particularly unprofitable until the early 1980s.[2] (*Id.* ¶¶ 408-10.) Even if interchange reimbursement was necessary for a payment-card network to germinate and grow in the environment of the 1970s, because conditions for profitability in credit-card issuing were not present at the time, conditions are now radically different. Now, having been freed from those strictures, payment-card profits are among the highest of any banking services. (McFarlane Rep. ¶¶ 164-65 (SUFEX 60).)

The mechanics of a payment-card transaction also looked drastically different in the *NaBanco* era than today. Longtime Visa employee, Steve Ruwe, testified that through the early 1980s, Visa transactions were "paper-based," such that the merchant created a transaction record by imprinting the card number onto a piece of paper. (RSF ¶ 127.) The merchant then submitted the paper to its acquirer, which electronically sent the transaction information to the network, which in turn sent it to the issuer, which debited the cardholder's account. (*Id.*) These early paper "drafts" were physically circulated among the various actors in the transaction, which added further time and expense to the process. (Frankel Rep. ¶¶ 343, 402 n.488; McCormack Rep. ¶ C-2 at 69 (SUFEX 001).) Because the merchant did not generate an electronic record of the transaction, merchants

---

[2]     The Supreme Court's *Marquette* decision paved the way for national card issuers to avoid usury laws by locating in the states that had the most favorable laws. *Marquette Nat'l Bank v. First of Omaha Serv. Corp.*, 439 U.S. 299 (1978).

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

used large books of bad credit-card numbers—called "Warning Bulletins" in the Visa system—to determine whether a particular card should not be accepted by a merchant. (RSF ¶ 127.) Because many of today's innovations in data processing had not yet occurred at the time of *NaBanco*, the process of authorizing, clearing, and settling a payment-card transaction and losses to fraud were significantly more expensive than they are today. Moreover, in the *NaBanco* era, interchange fees were claimed to be based explicitly on cost. But as technology greatly reduced the costs used to justify interchange fees, Defendants no longer claimed to base the level of interchange fees on any measure of costs. (*See* RSF ¶ 131.)

In light of the market conditions above—the finding that Visa lacked market power, prohibitions on interstate banking, and cumbersome transaction processing—the *NaBanco* court concluded that Visa's interchange fee "serves to share substantial costs and risks between VISA members." 596 F. Supp. at 1253. The court was also persuaded by the fact that Visa's interchange fees were set in cooperation with an independent auditor that measured issuers' and acquirers' costs and recommended interchange fees that reimbursed issuers for their costs of operating a card business. *Id.* at 1262.

In short, the payment-card industry of today bears almost no resemblance to the industry at the time of *NaBanco*. Transaction volume in 2007 was 40 times its 1980 level, with 7 million merchants now accepting Defendants' cards. (Frankel Rep. ¶ 423.) And as opposed to the late 1970s, when local and state banks predominated, a handful of large issuing banks now account for the

5

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

overwhelming majority of payment-card transaction volume. (Defs.' CSF ¶ 110(a)-(c).) Defendants can no longer seriously argue that they lack the market power to raise interchange fees frequently and significantly without losing merchant acceptance to rival networks. *Visa*, 163 F. Supp. 2d at 340; *Visa Check*, 2003 WL 1712568, at *3.

## Summary Judgment Standard

Once the movant has put forth a *prima facie* case that it is entitled to summary judgment, the nonmovant must present "sufficient, specific facts to establish that there is a genuine issue of material fact for trial." *Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir. 1995) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). Especially in antitrust cases, a party may not resist summary judgment by relying upon "mere conjecture or speculation." *Argus, Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 42 (2d Cir. 1986) (citing *Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1980). Nor may a party defeat summary judgment by relying solely on self-serving or conclusory testimony from its own deposition or declaration. *See Rowe Entm't, Inc. v. William Morris Agency, Inc.*, No. 98 Civ. 8272 (RPP), 2005 U.S. Dist. LEXIS 75, at *144 n.112 (S.D.N.Y. Jan. 5, 2006) (citing *Bickerstaff v. Vassar College*, 196 F.3d 435, 455 (2d Cir. 1999); *Kunstsammlungen Zu Weimar v. Elicofon*, 536 F. Supp. 829, 841 (E.D.N.Y. 1981) ("The conclusory assertion [made by the defense witness at his deposition] . . . will not serve to create a fact question.").

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

## Analysis

I.     **Defendants have not presented sufficient evidence to raise a genuine dispute of material fact as to their conspiracies to set default interchange fees before and after the restructurings.**

The Second Circuit held that Visa and MasterCard "are not single entities" but rather are "consortiums of competitors [that] are owned and effectively operated by some 20,000 banks, which compete with one another in the issuance of payment cards and the acquiring of merchants' transactions." *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 242 (2d Cir. 2003). The court therefore recognized that the Visa and MasterCard rules—such as the exclusivity provisions challenged in that case and the rules challenged in this case[3]—are "horizontal restraint[s] adopted by 20,000 competitors." *Id.* Professor Hovenkamp agrees that "finding a single entity for the [pre-restructuring networks] would have been absurd." Herbert Hovenkamp & Christopher Leslie, *The Firm as Cartel Manager*, 64 Vand. L. Rev. 813, 867 (2011).

Defendants now urge this Court to stray from the Second Circuit's holding by characterizing interchange fees as a "financial term on which [the networks] provide [their] product[s] to members," which they argue does not invoke the concerns of Section One.[4] (Defs.' Br. at 50.) This characterization is

---

[3]     While the court did not address the default interchange rule and the anti-steering restraints, the court provided no indication that its conclusion would be any different with respect to those rules.

[4]     Defendants often change their characterization of interchange fees. For example, during class certification, Defendants argued that the interchange fee was to pay for risk Defendants assumed when purchasing the credit risk from the merchant when the merchant accepted a card.

7

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

simply wrong and is not supported by any evidence in the record. There is no material dispute of fact that default interchange fees are not fees for services because the networks do not retain interchange fees and they fund their operations with other fees and assessments that they impose on their member banks. (Cl. Pls.' CSF ¶¶ 39(b) & n.88.) When viewed accurately, there can be no material dispute of fact that—even under Defendants' formulation of the law— the default interchange rules and anti-steering restraints are subject to Section One of the Sherman Act before and after the networks' IPOs.

A.   **Defendants' default interchange fees and anti-steering restraints constitute "concerted activity" because they affect competition among the member banks of Visa and MasterCard.**

Defendants' opposition brief does not depart significantly from the rule of law that Class Plaintiffs set out in their opening brief. (Cl. Pls.' Br. at 26-29.) Defendants have not disputed that agreements among the banks and networks are at the very least vertical agreements subject to Section One of the Sherman Act before and after the restructurings. (*See* Defs.' Opp. Br. at 23-28; Defs' IPO Br. at 6-16.) And Defendants agree with Class Plaintiffs that while joint ventures may be characterized as single entities when "buying and selling in their own right," they are subject to Section One "to the extent that [their] decisions bear on the competition among or, in some instances, with the members." (Defs.' Opp. Br. at 48 (citing VII Areeda & Hovenkamp, *Antitrust Law* ¶ 1477, at 338 (3d ed.

---

(Defs.' Mem. Opp. Cl. Pls.' Mot. Cl. Cert. at 3, 13, 64-65.) That justification does not appear in any of the Defendants' dispositive-motion papers.

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

2010).) The Areeda/Hovenkamp treatise that Defendants cite for this proposition draws its authority from the Supreme Court's recent decision in *American Needle v. NFL*, which held that NFL Properties' collective licensing of NFL teams' intellectual property was subject to Section One because it deprived the marketplace of potential competition among the teams. *See id*; *Am. Needle v. NFL*, 130 S.Ct. 2201, 2213 (2010).

In a separate article—which interprets *American Needle* in the same way as the treatise cited by Defendants—Professor Hovenkamp applies the holding in *American Needle* to conclude that Visa and MasterCard's interchange fees were subject to Section One both before and after the networks' IPOs. Hovenkamp & Leslie, 64 Vand. L. Rev. at 867-72. The article reasons that "agreements on merchant acceptance and other transfer fees" are subject to Section One because they "would be price agreements for that portion of the fee that the banks agreed to charge." *Id*. at 870. Hovenkamp and Leslie then conclude that "the MasterCard and Visa IPOs have the characteristics of centrally managed cartels," because the networks "ha[ve] the power to control the independent business" of the banks. *Id*. at 871. In other words, it is unnecessary under *American Needle* for the banks to "coordinate their behavior with one another" because "the central organization solves that problem." *Id*. at 872.

While the legal standard for concerted conduct that Defendants set forth on pages 48-49 of their opposition brief is not subject to significant

9

disagreement,[5] Defendants' application of that standard to the facts is simply wrong. Defendants assert that interchange fees are "the financial terms on which [each network] provides its product to its members." (Defs.' Opp. Br. at 50 & n.16.) Interchange fees are not fees for any services that the networks provide to the banks or Merchants. (Cl. Pls.' CSF ¶¶ 39(b) & n.88, 39.) The networks do not finance any of their activities through the interchange fee and Defendants have never argued as such. (RSF ¶ 138.)   Rather, the networks' operations are funded through switch fees and membership dues that they levy on their issuing and acquiring member banks. (*Id.*) If interchange fees were the cost of "network services" to banks, then the networks would be "paying" issuing banks a collective annual "price" of over ▮▮▮▮▮▮ for "network services." (*See* Frankel Rep. Table 9.1.) It is illogical that the networks would be paying issuers for a service that issuers supposedly purchase from the networks. Rather than supporting Defendants' characterization of default interchange fees as a fee for services, the record establishes that they act as collectively imposed taxes on all

---

[5]      This is not to say that Defendants' view of *American Needle* is completely accurate. On page 50 of their opposition brief, they argue that Visa and MasterCard "network services" do not deprive the marketplace of independent centers of decisionmaking because "they can be provided only by each network; no single bank provides the product with the array of payment card network services that the [*sic*] Visa and MasterCard provide to their member banks." (Defs' Opp. Br. at 50.) This was the position urged by the networks in an *amici curiae* brief to the Supreme Court and rejected. *Am. Needle*, 130 S.Ct. at 2214 ("[The NFL argues] that nonetheless, as the Court of Appeals held, they constitute a single entity because without their cooperation, there would be no NFL football...But the Court of Appeals' reasoning is unpersuasive. The justification for cooperation is not relevant to whether that cooperation is concerted or independent action."); Brief for Mastercard Worldwide & Visa Inc. as Amici Curiae Supporting Respondents, *Am. Needle v. NFL*, 130 S. Ct. 2201 (2010) (No. 08-661); (RSFEX 928).

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

payment-card transactions, which increase all merchants' costs of payment-card acceptance. (*See* Defs.' CSF ¶¶ 66(a)-(k).)

It is undisputed that Defendants' interchange fees and rules do in fact affect competition among member banks. The interchange fee is imposed by rule on all Visa and MasterCard transactions in which a "bilateral" agreement is not in place.[6] (Defs.' CSF ¶¶ 31(b), 32(b), 69; RSF ¶ 69.) There is also no dispute that the interchange fee is not negotiable between merchants and acquirers and acts as a floor to any merchant-discount rate that an acquiring bank can offer a merchant. (SUF ¶¶ 68-69; Elzinga Dep. 318:8-19, Mar. 10, 2010 (SUFEX305).)

Defendants attempt to create a fact issue by pointing to isolated instances in which a merchant discount is less than an interchange fee. But even in those isolated instances in which an acquiring bank has a contract with a merchant that provides no acquirer margin or a negative margin, those favorable deals were provided in recognition for extensive banking relationships between the merchant and acquirer in other lines of the acquiring bank's business. (CSF ¶¶ 52-57; RSF ¶ 74.) And even if a merchant could negotiate a negative acquirer margin, it would still pay less without the interchange fee. (*See* Elzinga Dep. 318:8-19.) Thus, no matter how efficient or competitive an acquiring bank is, it

---

[6]     Defendants attempt to dispute this proposition by pointing to the theoretical possibility for "bilateral" interchange-fee agreements between issuers and acquirers and the fact that a handful of merchants (for example ████████ have co-branding deals with issuing banks that provide for incrementally lower interchange fees on transactions with the co-branded card. (Defs' CSF ¶ 74.) But Defendants point to no "bilateral" agreement between an issuer and an acquirer for the processing of transactions at anything other than the default interchange rate. (CSF ¶¶ 58-63; RSF ¶¶ 67(c), 69, 74, 74(b), 181.) And Defendants have not cited to any co-branding deal in which an interchange-fee discount is not a payment for a service (for example customer lists) that the merchant provides to the issuer. (CSF ¶ 62(b) n.163.)

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

cannot allow the merchant to escape the networks' interchange fees, which establishes that interchange fees restrain competition among the banks. *See Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1154 (9th Cir. 2003).

**B.     The Bank Defendants have conspired with each other and the networks by adopting and enforcing the rules and default interchange fees that Class Plaintiffs challenge.**

Class Plaintiffs demonstrated that the banks collectively adopted the rules and fees that Class Plaintiffs challenge, collectively attempted to restructure the networks into "single entities," and were involved in every step of a payment-card transaction before and after the restructurings. (Cl. Pls.' Br at 8-9; SUF ¶¶ 3-4, 9-10, 15-25, 49, 59.) Notwithstanding this, Defendants argue that their conduct is not subject to Section One for the "independent reason" that Class Plaintiffs have not demonstrated a "conscious commitment to a common scheme." (Defs.' Opp. Br. at 51.) Defendants' argument fails, however, because it ignores several of Class Plaintiffs' conspiracy allegations and misreads the case law on antitrust conspiracy in the context of joint ventures.

**1.     Class Plaintiffs' conspiracy allegations against the Bank Defendants are not limited to membership in Visa and MasterCard.**

Defendants contend that Class Plaintiffs' evidence of conspiracy is limited to (i) the banks' membership in the pre-restructuring networks; (ii) the service of some bank employees on the networks' boards of directors; and (iii) the banks' agreement to abide by the networks' rules. (Defs.' Opp. Br. at 51.) Defendants'

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

argument tells only part of the story, however. Each of the Bank Defendants was represented on one of the networks' pre-restructuring boards of directors. (Defs.' CSF ¶¶ 9, 16.) As such each of these member-bank representatives had an important role in the conduct that Class Plaintiffs challenge – they adopted the rules that Class Plaintiffs challenge, they set the networks' schedules of default interchange fees, and they planned and voted on the networks' restructurings. (Defs.' CSF ¶¶ 19-20, 23, 33, 37, 41-42, 52.) The Bank Defendants' involvement does not end with their agreement to abide by the networks' rules. Rather, the acquiring banks also enforce the networks' anti-steering restraints and must settle interchange funds according to network rules. (Defs.' CSF ¶¶ 49, 59; CSF ¶¶ 36.11-36.12, 57.10 .) Finally, the Bank Defendants are hardly innocent bystanders. ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████ (Cl. Pls.' CSF ¶ 8(g); Frankel Rep. Table 9.1.)

Because Defendants collectively set default interchange fees and enforced the anti-steering restraints, their reliance on the *AD/SAT v. Associated Press* line of cases falls apart.[7] *AD/SAT* stands for the limited proposition that the Second Circuit did not adopt the "walking conspiracy" theory of liability—a theory that

---

[7]      In addition to *AD/SAT*, Defendants cite several other trade-association cases in their opposition to Individual Plaintiffs' motion for summary judgment. (Defs.' Mem. Opp. Ind. Pls.' Mot. Summ. J. at 25-27.) As Individual Plaintiffs explain in their reply brief, none of those cases involve fact patterns in which the association member promulgated rules which they later abided by an enforced. (Ind. Pls.' Rep. Br. Sec. III.C.)

13

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

Class Plaintiffs have never relied upon.[8] *AD/SAT v. Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999). *AD/SAT* is also distinguishable on its facts. In that case, a provider of advertisement-transmission services to newspapers accused the AP's member newspapers of violating Section One by conspiring to boycott it in favor of AP's own service. *Id.* at 224. There was no allegation, however, that the newspaper-members of the AP adopted a rule that members could not use the competing service or agreed to enforce such a rule. *Id.* at 220-43.

When joint-venture members promulgate rules that restrict competition, courts find associations to be conspiracies of their members. For example, in Judge Jones's decision in *American Express Travel Related Services Co. v. Visa U.S.A., Inc.*—cited by Defendants—the court concluded that American Express had sufficiently alleged a conspiracy among the member banks to enter into exclusive-dealing arrangements with large issuers. *Am. Express Travel Related Servs. Co. v. Visa U.S.A. Inc.*, 04 Civ. 8967 (BSJ), 2005 U.S. Dist. LEXIS 42852, at *24-25 (S.D.N.Y. June 23, 2005). Without relying on the "walking conspiracy" doctrine, the court was persuaded by the fact that the banks "voted for the procedure of" the agreements, and "agree[d] to subsidize" the issuers that entered into exclusive-dealing arrangements, and that each bank benefitted from

---

[8]     Even though Class Plaintiffs have not pursued this case under a "walking conspiracy" theory, Defendants used the related term, "structural conspiracy" to describe the Second Circuit's holding that Visa and MasterCard were "consortiums of competitors" rather than single entities. (Defs.' CSF ¶¶ 34(c).)

14

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

the exclusive-dealing arrangements. *Id.* at *17-18.[9] If voting for and subsidizing

exclusive-dealing arrangements is concerted activity, voting on default

interchange rules and fees and anti-steering restraints, enforcing those rules, and

profiting from their existence must also constitute concerted activity. (CSF ¶¶ 22-

36.13.)

> ### 2.    The fiduciary duties that the bank directors had to the networks prior to the restructurings are irrelevant to Defendants' status as Section One conspiracies.

Defendants cannot escape Section One liability for decisions made by the

bank-representative directors by pointing to the form of the pre-restructuring

networks' corporate organization and the bank representatives' fiduciary duties

to the networks. Courts routinely look beyond the corporate "form" to view the

"substance" of the agreements that are made under the corporate shell. *Am.*

*Needle*, 130 S.Ct. at 2209-10; *N. Texas*, 528 F.3d at 356. Defendants provide no

citation for the proposition that otherwise concerted activity may be excused if

the conspirators have a fiduciary duty to a separate organization. Nor can they

because the Supreme Court recognizes that "illegal restraints often are in the

common interests of the parties to the restraint." *See Am. Needle*, 130 S.Ct. at 2213.

And one court already rejected an argument by pre-restructuring Visa that its

bank-directors' fiduciary duties to the network removed their conduct from the

---

[9]      In another recent example, the Fifth Circuit affirmed the FTC's conclusion that a physician group was a conspiracy of its members because they elected board members, responded to group polls which requested members' minimum reimbursement rates, and knew that other members were doing the same. *N. Tex. Specialty Physicians v. F.T.C.*, 528 F.3d 346, 356-57 (5th Cir. 2008).

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

scope of Section One. Order at 5-6, *Visa U.S.A. Inc. v. First Data*, No. 3:02-cv-01786-JSW, 2006 U.S. Dist. LEXIS 18482, at *10-12 (N.D. Cal. Mar. 2, 2006) (applying *Freeman*, 322 F.3d at 1148; *see also Visa*, 344 F.3d at 242 (rejecting networks' single-entity defense).

### 3. Defendants' attempt to distinguish *Toys 'R' Us* and *Interstate Circuit* ignores key, undisputed facts.

In a single conclusory paragraph, Defendants argue that the banks are absolved of Section One liability because each bank was acting in its self-interest by enacting and complying with default interchange fee rules and the anti-steering restraints. (Defs.' Opp. Br. at 55-56.) As Class Plaintiffs explain in their opposition to Defendants' motion for summary judgment, Defendants' recitation of the law is only half correct. (Cl. Pls.' Opp. Br. at 73-75;) *Am. Needle*, 130 S.Ct. at 2213 ("[I]llegal restraints often are in the common interests of the parties to the restraint.") The correct inquiry is whether the Defendants' conduct would be in their self interest *but for* the conspiracy. *See Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 327 (2d Cir. 2010) (holding that a restraint was in defendants' self-interest only because their "rivals were doing the same."). In a competitive market—one in which default interchange fees and the anti-steering restraints did not guarantee uniform conduct by the banks—it would not have been in any individual issuing bank's interest to charge a supracompetitive fee or to prohibit merchants from preferring its cards over a rival's. (*See* Klein Rep. ¶¶ 27, 119 (SUFEX212); James Rep. ¶¶ 9, 13 (SUFEX254); Topel Rep. ¶ 9 (SUFEX304);

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

Murphy Rep. ¶ 240 (SUFEX338; Murphy Dep. 173:20-24 (SUFEX588); James Dep. 65:9-11 (SUFEX303).)  Because Defendants would not have engaged in the conduct that Class Plaintiffs challenge without the assurances through the rules and default interchange fees that other banks are doing the same, Defendants' decisions to adhere to and enforce those rules constitutes a Section One agreement.

II.     **Defendants have not presented sufficient evidence to raise a genuine issue of disputed fact that relevant markets exist for credit-card network services, signature-debit card network services, and PIN-debit-card network services.**

Class Plaintiffs demonstrated how facts that are nearly identical to the undisputed facts in this case led the Second Circuit and this Court to conclude that a relevant market existed for general-purpose-card network services and that debit-card network services were distinct products from general-purpose-card network services. (Cl. Pls.' Br. at 37-39, 87-89.)  Even though they use  this Court to reverse course, Defendants do not point to a single fact that would justify a relevant-market or market-power conclusion that is contrary to *United States v. Visa* or *Visa Check.* (*See* Defs.' Opp. Br. at 57-80.) Instead, Defendants improperly attempt to compartmentalize the various categories of Class Plaintiffs' relevant-market and market-power arguments, instead of addressing all of the record evidence in its totality. *Visa,* 163 F. Supp. 2d at 335; *see also, U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.,* 7 F.3d 986, 994-96 (11th Cir. 1993); *Rothery Storage & Van Co. v. Atlas Van Lines,* 792 F.2d 210, 218-19 (D.C. Cir. 1986).

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

A.   **There is no dispute that cross-elasticity of demand among payment forms is low because Defendants can raise the costs of accepting credit cards, signature-debit cards, and PIN-debit cards without merchants switching to other forms of payment.**

Class Plaintiffs present undisputed evidence that purchase volumes for credit cards, signature-debit cards, and PIN-debit cards have increased despite interchange-fee increases for those products. (Defs.' CSF ¶¶ 63, 89, 93, 95, 177-80.) This fact alone was sufficient for the Second Circuit to affirm the finding of a "general purpose card network services" market and for this Court to conclude as a matter of law that the relevant markets were no broader than "general purpose credit" and "charge card services." *Visa*, 344 F.3d at 239; *Visa Check*, 2003 WL 1712568, at *3. In their counterstatement of facts, Defendants imply that the *Visa Check* relevant-market conclusions should no longer apply because debit-card purchase volume has been growing faster than credit-card purchase volume. (Defs.' CSF ¶ 85.) But nothing about this fact indicates that *merchants* have the ability to substitute forms of payment any better than they did at the time of *Visa Check*. Moreover, the trend that Defendants cite was present even before *Visa Check* and did not stand in the way of this Court concluding that separate relevant markets existed for the acceptance of credit cards and debit cards. (*See* Frankel Rep. Figs. 3.5, 3.6, 3.7.) *Visa Check*, 2003 WL 1712568, at *3.

18

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

**B.    Sufficient evidence does not support Defendants' argument that merchants can effectively steer between different forms of payment.**

Defendants' argument that merchants' limited ability to steer and therefore the acceptance of credit cards, signature-debit cards, and PIN-debit cards should fall into the same relevant market also misses the mark. The relevant legal question for market-definition purposes is not whether a defendant's customers—merchants in this case—have *any* ability to substitute products but whether the possibility of substitution is sufficient to make a price increase on one product unprofitable.[10] *See Visa*, 163 F. Supp. 2d at 335-36 (citing *United States v. E.I. DuPont de Nemours & Co.*, 351 U.S. 377, 394-95 (1956); Dep't of Justice & F.T.C., 1992 Horizontal Merger Guidelines § 1.)

**1.    Defendants' rules prevent credit cards, signature-debit cards, and PIN-debit cards from being reasonable substitutes for each other because they deprive merchants of their most effective methods of steering.**

The undisputed factual record establishes that Defendants' rules have left merchants with only limited opportunity to steer. Aside from providing discounts for cash customers, merchants cannot provide financial incentives for consumers to use one form or brand of payment over another. (RSF ¶¶ 76, 85, 94;

---

[10]    In an effort to buttress their claim, Defendants point to excerpts from merchant depositions, in which select merchants testified that various forms of payment were "interchangeable." For the reasons discussed in paragraphs 85 and 86 of Class Plaintiffs' reply statement of facts, these statements were taken out of context and do not support the proposition that these merchants could drop or substitute away from particular brands of payment cards in response to a small but significant and nontransitory increase in price. *See Visa*, 163 F. Supp. 2d at 336 (citing 1992 Horizontal Merger Guidelines).

19

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

Cl. Pls.' CSF ¶¶ 99-101.)[11] For example, a merchant may deploy PIN pads to encourage PIN-debit transactions over signature-debit transactions and may suggest that a consumer use a different form of payment, but recently cannot reinforce that suggestion with a financial dis-incentive that educates the consumer of the cost of the payment brand he or she is choosing. (RSF ¶¶ 85, 98, 106.) There is no dispute that the forms of steering that Defendants prohibit—surcharging and other forms of steering that allow merchants to attach a price to a consumer's payment choice—are the most effective methods of influencing cardholder behavior at the point of sale. Defendants' expert, Barbara Kahn, wrote in her report that a surcharge "adds additional disutility" to the consumer compared with a cash discount because "consumers feel the sting of losses more than they feel the advantage of gains." (Kahn Rep. ¶¶ 106-07 (SUFEX 585); *accord* Frankel Rep. ¶¶ 189-98; Ariely Rep. ¶¶ 5-10 (SUFEX 584).)

The ineffectiveness of the limited, allowable steering methods that Defendants allow is underscored by the fact that merchants who "encouraged"

---

[11]     Two recent developments will enhance merchants' ability to steer. The Justice Department recently approved a settlement with Visa and MasterCard, which requires the networks to repeal or modify many of their rules that restrict merchants from using preferential discounts for consumers who pay with a particular brand of type (*i.e.*, premium credit, standard credit, commercial credit, signature debit, or PIN debit) of payment card. Pl. Resp. to Public Cmts. On Prop. Final. J., *United States v. Am. Express Co.*, No. CV-10-4496 (S.D.N.Y. Jun. 14, 2011), *available at http://www.justice.gov/atr/cases/f272200/272275.pdf*. On July 21, 2010, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, which includes provisions, commonly known as the Durbin Amendment, that prohibit network exclusivity rules and routing restrictions on debit-card transactions and prohibits networks from imposing or maintaining rules that restrict merchants' ability to offer discounts for preferred forms of payment. 15 U.S.C. § 1693o-2(b) (2010). Despite these recent changes—which have not yet been fully implemented—the Defendants shaped the relevant markets in part through the rules that they are now forced to modify or repeal. Thus, for purposes of this motion—which seeks summary judgment on damages claims and defines relevant markets based on Defendants' *retrospective* conduct—Class Plaintiffs treat Defendants' rules as if they are fully intact.

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

consumers to use less-expensive forms of payment than Defendants' cards testified that they were unable to eliminate or significantly reduce acceptance of Defendants' cards. (RSF ¶ 76; Vellturo Rep. ¶¶ 209-13 (SUFEX 582).) Defendants' documents reveal that they also view surcharging as an effective steering mechanism because they set interchange fees to avoid surcharging in countries where it is allowed, and offer lower interchange-fee rates to merchants who do not impose "convenience fees" in sectors where those are allowed. (SUF ¶¶ 71-72; Ind. Pls.' CSF ¶¶ 96(141)-96(162).)

Even Defendants' most compelling example of steering—PIN-pad deployment at the point of sale—fails to create a disputed issue of material fact on the question of relevant-market definition. For market definition, the relevant question is not whether *any* substitution occurs but whether the substitution that does occur is effective to make price increases unprofitable (*i.e.,* "transitory"). *See* Dep't of Justice & F.T.C., Horizontal Merger Guidelines § 4.1.1 (2010) ("Horizontal Merger Guidelines").[12] The agencies therefore recognize that a relevant market may not "include the full range of substitutes from which customers choose." *Id.* There is no dispute that even the steering that has occurred from signature debit to PIN debit has not prevented the Defendants from increasing interchange fees on both types of debit cards. (Defs.' CSF ¶¶ 63, 84, 85, 89, 93.) Because PIN prompting has not been sufficient to make price increases in the signature-debit

---

[12]     While the agencies' Horizontal Merger Guidelines are not technically binding on the courts, their market definition methodology—specifically the "hypothetical monopolist test"— are frequently used to define relevant markets. *See Visa,* 163 F. Supp. 2d at 335-36.

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

or PIN-debit markets unprofitable, the Defendants have not raised a material issue of disputed fact on the existence of separate relevant markets for the acceptance of signature-debit cards and PIN-debit cards.

> **2.** **Even if some merchants have installed PIN pads in recent years, the fact that a significant number do not have PIN pads supports that there are separate relevant markets for the acceptance of signature-debit cards and PIN-debit cards.**

The fact that some merchants have purchased PIN pads to accept PIN-debit transactions does not create a single relevant market for all debit transactions. The fact that many merchants still do not have PIN pads in fact suggests the existence of separate relevant markets for the acceptance of signature-debit cards and PIN-debit cards. (*See* Defs.' Opp. Br. at 68.) Moreover, Defendants do not dispute that PIN-debit cards are not a realistic option for internet merchants and other merchants that transact significant business outside of the face-to-face retail environment. (*See* Defs.' CSF ¶ 102.)

> **C.** **Defendants' attempt to dispute the unique characteristics of credit cards, signature-debit cards, and PIN-debit cards rests solely on the "cellophane fallacy."**

Class Plaintiffs presented undisputed evidence that credit cards, signature-debit cards, and PIN-debit cards have unique characteristics for consumers; average ticket amount varies between credit and debit, and PIN-debit cards are accepted by significantly fewer merchants than signature-debit cards or credit cards. (Defs' CSF ¶¶ 85-86, 103.) Defendants' only response to this

22

evidence is a citation to the Supreme Court's *DuPont* decision, in which it held that cellophane and other flexible packaging materials were in the same relevant market, despite cellophane's unique characteristics, because buyers switched to other materials when DuPont raised the price for cellophane. But this case has been roundly criticized by commentators for failing to account for the fact that switching occurred only because DuPont was already pricing at the monopoly price. The case is so widely recognized as wrongly decided that it has earned the name, the "cellophane fallacy." *See, e.g., United States v. Eastman Kodak, Co.*, 63 F.3d 95, 103 (2d Cir. 1995) (citing William M. Landes & Richard A. Posner, *Market Power in Antitrust Cases*, 94 Harv. L. Rev. 937, 960-61 (1981), and recognizing that *duPont* has been "criticized by many commentators"); Dennis W. Carlton & Jeffrey M. Perloff, Modern Industrial Organization 646 (4th ed. 2005) (RSFEX 294). This court should not accept Defendants' invitation to turn the cellophane fallacy into a plastic fallacy.

> **D.    Defendants' self-serving statements that credit cards, signature-debit cards, PIN-debit cards, and other forms of payment compete with each other are insufficient to create a material dispute of fact as to the definition of the relevant markets.**

In response to the evidence that transaction volumes for credit, signature debit, and PIN-debit increase despite rising acceptance costs, Defendants cite to statements of their own witnesses that the various electronic and paper-based forms of payment compete with each other. But Defendants cannot manufacture a disputed issue of material fact by citing only to self-serving testimony. *See*

23

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

*Rowe Entm't*, 2005 U.S. Dist. LEXIS 75, at *144 n.112. And even if the statements that Defendants cite on page 67 of their opposition brief are to be believed, they establish at most that there is *some* substitution among various forms of payment. But a properly defined relevant market does not require that there be no substitution with other products, but rather that any substitution is insufficient to make a price increase for the products in the relevant market unprofitable. *See Visa*, 163 F. Supp. 2d at 335; Merger Guidelines § 4.1.1. And as mentioned above, Defendants have not presented any evidence that limited substitution among payment forms has prevented interchange-fee increases in credit cards, signature-debit cards, or PIN-debit cards.

III.    **Defendants have not presented sufficient evidence to refute Class Plaintiffs' argument that Defendants possess market power in the markets for credit-card network services, signature-debit-card network services, and PIN-debit-card network services.**

   A.    **The Defendants' ability to consistently and significantly increase interchange fees without losing merchant acceptance is sufficient standing alone to establish that they have market power as a matter of law.**

Market power is the "power to control prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). While courts often define market power as the ability to price above a competitive level, they frequently conclude that a party has market power based solely on the fact that its customers do not substitute away from it when it raises prices. *See United States v. Visa*, 163 F. Supp. 2d at 340 (*citing NCAA v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 109 n.38 (1984)). The courts in *United States v. Visa* and *Visa*

24

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

*Check*, for example, relied heavily upon merchants' inability to avoid interchange-fee increases when concluding that, respectively, both networks and Visa possessed market power. *Id*; *Visa Check*, 2003 WL 1712568, at *3-4. The cases that Defendants cite to the contrary are inapplicable because each involved allegations of monopoly power, which requires a higher level of proof than market power. *See, e.g., Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992).

In light of the fact that sustained interchange-fee increases to merchants were sufficient to find market power in *Visa Check* and *United States v. Visa*, the facts that Defendants proffer to avoid the same conclusion in this case are unpersuasive. Defendants do not dispute that both networks have increased interchange fees without losing merchant acceptance. (Defs.' CSF ¶¶ 63, 89, 93.) Nonetheless, Defendants assail Class Plaintiffs' "failure to proffer evidence concerning the circumstances leading to interchange fee increases," which they contend are the "intense competition" for issuer business. (Defs.' Opp. Br. at 68.) But the "intense competition" for issuers existed at the time of *United States v. Visa* and *Visa Check* as well, and did not stand in the way of those courts concluding that the Defendants had market power over merchants. *See Visa*, 163 F. Supp. 2d at 340. One of the reasons that Judge Jones concluded that the networks possessed market power was that their "cards are such preferred payment methods that customers would choose not to shop at merchants who do

25

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

not accept them." *Id*. Defendants have not presented a persuasive reason for this Court to depart from previous analyses of the Defendants' market power.

**B.     Defendants' price discrimination provides further evidence of market power.**

Class Plaintiffs demonstrate that Defendants apply different categories of interchange fees based upon, among other things, the type of merchant accepting the card and that merchant's transaction volume. (*See* Cl. Pls.' Br. at 50-51; SUF ¶¶ 46, 56.) While Defendants take issue with the label of "price discrimination" that Class Plaintiffs—and Judge Jones—affix to this behavior, they do not dispute that it does in fact occur. (Defs.' CSF ¶¶ 46, 47, 47(f), 56, 58;) *Visa*, 163 F. Supp. 2d at 340. But despite their complaints about the phrase "price discrimination," Defendants fail to explain how "the non-uniformity of interchange rates" that they admit they set does not fall within the definition of "price discrimination." (Defs.' Opp. Br. at 72-73.) Instead Defendants attempt to liken price discrimination in interchange fees to coupons or loyalty discounts that merchants provide. (Defs.' Opp. Br. at 72.) This comparison is inaccurate, however, because, merchants' coupons and loyalty discounts are potentially available to all customers, while the Defendants' preferential interchange-fee rates are available only to large merchants in certain segments and only to very few merchants that meet transaction-volume thresholds. (*See* Defs.' CSF ¶ 47(a)-(f).) Finally, Defendants cite cases and commentary for the proposition that price discrimination "may provide evidence of market power" but is not sufficient

26

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

standing alone to support a finding of market power. (Defs.' Opp. Br. at 72-73 (quoting, among other sources, *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 44-45 (2008).) Class Plaintiffs agree; while they have never argued that price discrimination alone justifies a conclusion of market power, it is further evidence of Defendants' "power to control prices." *See Visa*, 163 F. Supp. 2d at 340.

Defendants note that other payment-card networks "that Class Plaintiffs do not claim possess any meaningful market power"—such as American Express, Discover, and NYCE—set nonuniform prices for merchants, and therefore reason that price discrimination cannot be a sign of Visa and MasterCard's market power. The market power of other payment-card networks is not at issue in this case, however. It may be that these networks have at least sufficient market power to price discriminate among merchant categories. *See* Dennis Carlton & Jeffrey Perloff, *Modern Industrial Organization* 294 (4th ed. 2005) (establishing the ability to "price above marginal cost" as a condition for price discrimination). Or these networks may be adopting similar pricing structures to the market leaders, Visa and MasterCard. In any case, the fact that other firms in a market engage in similar pricing practices to a defendant does not preclude a finding that the defendant possesses market power. *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 488 (Scalia, J. dissenting) (noting that a firm without market power can engage in practices that would harm competition if conducted by a larger rival). Moreover, in the case of American Express, the Department of Justice is currently suing for the repeal of American Express's

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

anti-steering restraints and has alleged that American Express does in fact possess market power. (Am. Compl. ¶¶ 55-68), *United States v. American Express Travel Related Servs. Co. Inc.*, No. CV-10-4496(NGG)(RER) (S.D.N.Y. Dec. 21, 2010), *available at http://www.justice.gov/atr/cases/f265400/265401.pdf.*

### C.   Defendants do not provide sufficient evidence to support their contention that interchange fees are cost-based.

Class Plaintiffs present undisputed evidence that Defendants no longer use cost studies as a basis for setting interchange fees. In response Defendants claim that so-called "operational efficiencies to merchants" facilitated by payment cards make interchange fees cost-based. (Defs.' Opp. Br. at 74.) This argument attempts to answer the wrong question, however, and therefore should be rejected. In a market-power inquiry, a firm's costs are relevant to determine whether it can price above its own marginal cost. *See* Herbert Hovenkamp, Federal Antitrust Policy: The Law of Competition and its Practice 80 (3d ed. 2005). The costs of its customers do not factor into this equation. Thus, even if Defendants' argument that payment cards lead to incremental sales for merchants were correct, it does not affect the conclusion that payment-card interchange fees are set independent of issuers' or networks' costs.[13] In fact, to the extent that Defendants are considering merchants' costs and their need to accept payment cards when setting interchange fees, they reinforce the

---

[13]   Since virtually all sizeable merchants now accept payment cards, and aggregate retail sales are logically limited by incomes and economic growth, the old shibboleth that acceptance of cards leads to incremental sales no longer makes sense.

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

conclusion that they price discriminate to set interchange fees at merchants' reserve prices. *See Visa*, l63 F. Supp. 2d at 340 (finding price discrimination and market power because "[b]oth Visa and MasterCard charge differing interchange fees based, in part, on the degree to which a given merchant category needs to accept general purpose cards.").

Defendants' attempts to address Class Plaintiffs' evidence on this point also fall short of creating an issue of disputed fact. To counter statements of defense witnesses and documents that demonstrate that interchange fees are no longer cost-based, Defendants cite almost exclusively to self-serving and conclusory testimony—which this Court need not consider on summary judgment—that cost is one of many factors considered in setting interchange fees. (Defs.' CSF ¶¶ 46, 55); *Tadros v. Coleman*, 717 F. Supp. 996, 1006 (S.D.N.Y. 1989). And even if this Court accepted those statements as true, Defendants still have no answer for the fact that the level of the "costs" that Defendants claim to consider when setting interchange fees have been decreasing in recent years while interchange fees have been increasing. (SUF ¶ 45; Defs.' CSF ¶ 63.) Nor have Defendants disputed the admission of MasterCard's Associate General Counsel to the European Commission that MasterCard performs cost studies only to determine how high it can set interchange fees before risking that merchants will discontinue accepting its cards. (Defs' CSF ¶ 56c.)

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

**D.    Defendants' response does not present sufficient evidence to refute the conclusion that the anti-steering restraints confer market power because those restraints reduce merchants' ability to substitute away from Defendants' payment cards.**

The anti-steering restraints—such as the no-surcharge rule and the networks' prohibition on discounting competing payment cards—undisputedly limit merchants' ability to substitute away from supracompetitive prices, which is one of the key indicators of market power. *See K.M.B. Warehouse Distribs. v. Walker Mfg. Co.*, 61 F.3d 123, 129 (2d Cir.1995). Nothing in Defendants' opposition would allow a rational jury to conclude otherwise. Defendants first stress that their rules *do* allow cash discounts and PIN prompting. PIN-prompting does not allow steering from credit to debit, however, and as noted in Section II.B.1. above, Defendants do not dispute that their rules prevent merchants from using monetary incentives to influence consumers' choice of payment cards and that surcharging—the most effective form of steering—is prohibited. (RSF ¶ 76; Defs.' CSF ¶¶ 76; Kahn Rep. ¶¶ 103-04.)[14] Secondly, Defendants argue that, because other networks employ similar restraints, the Defendants' restraints cannot indicate market power. (Defs.' Opp. Br. at 75.) This argument does not address whether merchants can stop accepting other networks' cards, which would allow them to resist price increases by other

---

[14]    Defendants improperly assume that transaction volume is the only appropriate measure of output. (*See* Defs.' Opp. Br. at 28-30.) As Class Plaintiffs explain in their opposition to Defendants' motion for summary judgment, however, several other measures of output could be relevant, such as the number of merchants accepting Defendants' cards, the number of cardholders carrying Defendants' cards, or the overall output in the economy. (*See* Cl. Pls.' Opp. Br. at 52-56.) For purposes of this motion, however, Class Plaintiffs address only Defendants' argument that payment-card transaction volume has increased.

30

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

networks, even without the ability to surcharge. (*See* Defs.' CSF ¶ 89, 90(f), 96(e)-(f), (h)-(k).) It also ignores the basic antitrust principle that a restraint may violate the law when enacted by a firm with market power but be competitively innocuous when enacted by a smaller firm. *Eastman Kodak*, 504 U.S. at 488 (Scalia, J. dissenting; citing 3 P. Areeda & D. Turner, Antitrust Law ¶ 813, at 300-02); *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1217 (9th Cir. 1997) (quoting same).

<div style="margin-left:2em">

**E.**   **Visa's successful "convergence" strategy provides direct evidence of its market power in signature-debit-card network services and PIN-debit-card network services because it demonstrates its and its banks' ability to "control prices."**

</div>

Class Plaintiffs argue that Visa's "convergence" strategy demonstrates its debit-card market power.  Defendants respond that the strategy was neither "unlawful" nor "motivated by anticompetitive animus." (Defs.' Opp. Br. at 79.) But Class Plaintiffs have never argued that the convergence strategy in and of itself was unlawful. Rather, it shows that Visa and its member banks had market power through the "power to control prices." *E.I. duPont*, 351 U.S. at 391. ■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■ (Defs.' CSF ¶¶ 115e, n.) And the fact that other PIN-debit networks increased their interchange-fee rates at the same time does not provide a "procompetitive" explanation for Visa's conduct but rather indicates that it and

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

its member banks were "price makers," which is further direct evidence of market power. *See In re IBM Peripheral EDP Devices Antitrust Litig.*, 481 F. Supp. 965, 977 (N.D. Cal 1979); Herbert Hovenkamp, Exclusive Joint Ventures and Antitrust Policy, 1995 Colum. Bus. L. Rev. 1, 118 (1995).

> **F.    Defendants' market shares add to the evidence of their market power because they are virtually identical to the market shares that they enjoyed at the time of the *United States v. Visa* and *Visa Check* decisions.**

When Judge Jones concluded (based on 1999 data) that Visa and MasterCard possessed market power in the general-purpose-card-network-services market, Visa's share of the market was 47% while MasterCard's was 26%. *Visa*, 163 F. Supp. 2d at 341. In 2003, this Court concluded that Visa possessed market power in that market as a matter of law based on market shares that fluctuated between 43 and 47%.[15] *Visa Check*, 2003 WL 1712568, at *3-4. Defendants do not explain how their most-recent market shares of 43.4%, 73%, and 39.3% (Visa credit, signature-debit, and PIN-debit) and 27.1% and 27% (MasterCard credit and signature-debit), would warrant a different conclusion.

Defendants cannot credibly argue that Class Plaintiffs' evidence of market power is mitigated by the minimal entry that the payment-card industry has seen. (*See* Defs.' Opp. Br. at 75-76.) Defendants assert that "Discover successfully

---

[15]    Of course, this Court concluded that fact issues remained with respect to the market power of MasterCard, which had market shares ranging from 26-28%. *Visa Check*, 2003 WL 1712568, at *3-4. As Class Plaintiffs noted in their motion for summary judgment, market shares are only an indirect measure of market power, and MasterCard's market power is shown best through direct proof. (Cl. Pls.' Br. at 46.)

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

introduced its signature-debit card in 2006," and that "Revolution Money . . .

operated a PIN-debit payment card product that operated successfully." But

Defendants do not provide any empirical evidence to show that either of these

"entrants" gained any foothold in the market, (*See* Defs.' CSF ¶ 112(h)). Nor can

they. Revolution Money was able to amass only 650,000 merchant locations,

contrasted with over 20 million globally for Visa and MasterCard payment cards.

(SUF ¶ 112h; Defs.' CSF ¶ 103.) And according to Discover's website, its

signature-debit card is issued by only three small banks in the Midwest,

compared with the tens of thousands that issue Visa or MasterCard debit cards.[16]

(RSF ¶ 113) *Visa*, 344 F.3d at 242. It is a well-settled principle of antitrust law that

only effective entry is considered when determining market power. *See United*

*States v. Microsoft Corp.*, 87 F. Supp. 2d 30, 36-37 (D.D.C. 2000), *aff'd in part, rev'd*

*in part*, 253 F.3d 34 (D.C. Cir. 2001).  Horizontal Merger Guidelines § 9. The paltry

examples that Defendants cite are hardly effective.

### G.   In the alternative, Defendants have market power in the relevant market for debit-card network services.

Even if this Court does not conclude that signature-debit-card network

services and PIN-debit-card network services are separate relevant markets as a

matter of law, no rational jury could dispute that Defendants have market power

in a relevant market no broader than debit-card network services. As Class

---

[16]   Defendants' expert, Benjamin Klein, provided deposition testimony in the *Visa Check*
litigation that further undermines Defendants' latest arguments on entry. In that case, he testified
that there were barriers to entry in the credit-card market and that, as of the late 1990s, there had
been no successful entrant since Discover. (Klein Dep. Tr. 176:5-183:20, May 16, 2000.) (RSFEX923)

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

Plaintiffs demonstrated in their opening briefs, merchants, cardholders, and the Defendants themselves view credit cards and debit cards as separate products. (SUF ¶¶ 84, 85, 97(c).) Pricing evidence confirms that credit and debit do not constrain the pricing of each other. (*Id.* ¶¶ 92-95, 106.) And even assuming that PIN-pad deployment were an effective method for merchants to substitute PIN-debit card network services for signature-debit-card network services, it would not improve merchants' ability to substitute from credit to debit. Inside a debit-card-network-services market, Visa unquestionably has market power—the power to control prices—because it was able to set a debit-interchange-convergence goal in 2001 of converging PIN-debit and signature-debit interchange-fee rates to "115 -120" basis points by 2010 and attain that goal on target in April 2010. (SUF ¶ 115.) Similarly the direct evidence that MasterCard has market power—interchange fee increases without losing merchant acceptance—also establishes its market power in an "all debit" market. In addition to the direct evidence of market power, Visa has a 64.1% share of an "all debit" market, which clearly establishes that it has market power. (RSF ¶ 178;) *Visa*, 163 F. Supp. 2d at 341; *Visa Check*, 2003 WL 1712568, at *3-4.

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

IV.   **Defendants cite no evidence to dispute that their rules and default interchange fees increase merchants' costs of accepting payment cards.**

A.   **Defendants cite no evidence in opposition to Class Plaintiffs' evidence that interchange fees and the anti-steering restraints increase merchants' costs of accepting payment cards.**

Defendants do not seriously dispute Class Plaintiffs' evidence that default interchange fees and the anti-steering restraints inflate merchants' costs of accepting payment cards.[17] (*See* Defs.' CSF ¶ 66.) In fact, Defendants' experts admit that interchange fees increase merchants' costs of accepting payment cards. (*Id.* ¶¶ 66(c)-(f).) Evidence that a collectively adopted restraint increases prices or reduces output is sufficient, standing alone, to compel a conclusion that the restraint harms competition. *See NCAA*, 468 U.S. at 104. In fact, Dr. Klein admits that it would be anticompetitive for a network to adopt a minimum merchant discount fee (Klein Dep., 357:8-358:8, Mar. 24, 2010.) Because the antitrust laws do not distinguish between fixing a minimum price and fixing a component of a price, Dr. Klein's admission serves as an admission that the networks' default interchange fees are anticompetitive. *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 648-50 (1980).

---

[17]    In the section of their brief relating to procompetitive justifications for their conduct, Defendants argue that the true "price" of payment cards is the combined "price" to merchants and cardholders. (Defs.' Opp. Br. at 30-34.) As explained in Section IV.C. below, this argument improperly attempts to balance harm in one market against alleged benefits in another and therefore may be rejected as a matter of law.

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

**B.**     **Defendants' proposed but-for world is unacceptable because it does not involve a world without the restraints at issue and contradicts the record.**

Defendants argue that, if they only knew that their collective adoption of interchange fees and rules was illegal, they would have conducted IPOs before the damages period in this case. (Defs.' Opp. Br. at 35-37.) Defendants' attempt to dodge the undisputed fact is impermissible as a matter of law. According to Defendants' argument, the new "single-entity" networks would have used their market power to charge the same level of fees — possibly under the guise of "network fees" — to extract the same monopoly rents from merchants that the banks had taken through the interchange fee. (Defs.' Opp. Br. at 35-37.) In other words, Defendants argue that the but-for world in this case should be a world in which they engaged in the same behavior under a different label. But Defendants cite no authority for the proposition that this alternative world is an acceptable but-for world for antitrust purposes. To the contrary, it is well settled that the proper but-for world in an antitrust case is one in which the challenged conduct did not exist. *See Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 108 (2d Cir. 2007); *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 88 (D. Conn. 2009); *see also generally Visa Check*, 192 F.R.D. 68, 82-83 (E.D.N.Y. 2000) (finding that class plaintiffs' expert's "but-for" world in which Visa and MasterCard never implemented a credit-debit tying arrangement could be proven by class-wide evidence).

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

Defendants' alternative but-for world also lacks support in the record. Their sole support is a self-serving and conclusory affidavit by MasterCard's CEO that was submitted as part of this litigation. Not only does this not create a disputed issue of material fact, *Tadros*, 717 F. Supp. at 1006, but it defies common sense. The collective setting of interchange fees by banks was under investigation in Europe since at least 1997. (RSF ¶ 193.) In this country, the collectively adopted exclusionary rules were challenged by the Department of Justice in 1998, found to be illegal by the district court in 2001, and by the court of appeals in 2003. *Visa*, 163 F. Supp. 2d at 406, *aff'd* 344 F.3d at 243; Compl., *United States v. Visa U.S.A. Inc.*, No. 98-civ-7076 (S.D.N.Y. Oct. 7, 1998). Yet despite these early warnings that the banks' collective decisions violated the antitrust laws, MasterCard and Visa did not consummate their IPOs until 2006 and 2008, respectively. (Defs.' SUF ¶¶ 130, 141.) Moreover, both networks considered *and rejected* the unilateral network fees that the Defendants now claim they would have adopted in the but-for world. (Cl. Pls.' CSF ¶¶ 156.3-156.4.)

### C.  Defendants' attempts to counter Class Plaintiffs' other evidence of harm to competition are also unpersuasive.

Even though the price increase to merchants is sufficient evidence of harm to competition, Class Plaintiffs put forward other examples of competitive harm attributable to Defendants' conduct. None of Defendants' explanations for these harms are sufficient to create a genuine dispute of material fact.

37

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

      1.     **Defendants offer no evidentiary support for their counterintuitive argument that increased payment-card-acceptance costs do not raise retail prices.**

Class Plaintiffs' argument that interchange fees increase retail prices is based on elementary economics and supported by ample record testimony that merchants have raised their prices in response to increases in interchange fees. (SUF ¶¶ 66(g), 67(e); Ind. Pls.' CSF ¶¶ 84a(9)-(30).) In response, Defendants speak generally of transactional benefits of payment cards, but they cannot quantify those benefits, and they do not offer any evidence to respond to Class Plaintiffs' evidence that interchange fees increase merchants' costs, which are eventually passed on to consumers. (*See* Defs.' CSF ¶¶ 162-67.) Defendants' argument is also flawed because it conflates transactional benefits of payment cards generally with increased costs due to interchange fees, without any explanation for why those transactional benefits would not exist if interchange fees were nonexistent or lower.

Defendants also attempt to discount Class Plaintiffs' evidence by arguing that interchange fees do not increase retail prices for merchants that price above marginal cost. (Defs.' Opp. Br. at 37-39.) But Defendants' argument is entirely theoretical and is contradicted by the testimony of several large merchants—presumably those who are best able to price above marginal costs—that they do in fact increase their prices in response increases in payment-card and other overhead costs. (Ind. Pls.' CSF ¶¶ 84a(9)-84a(30).)

<div align="center">38</div>

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

Defendants claim that their expert, Prof. Murphy, found that "available empirical evidence" refutes Class Plaintiffs' argument that interchange fees increase merchants' card-acceptance costs. But the report and testimony of Prof. Murphy that Defendants cite to is unreliable. As fully set forth in Class Plaintiffs' motion to exclude Prof. Murphy, his data did not show a statistically significant relationship between card holding and prices. (*See* Pls.' Mem. Supp. Mot. Exclude Murphy at 44-46.) Moreover, even if Prof. Murphy were taken at his word, his analysis would create a fact issue only with respect to the effect of *credit-card holding* on prices, but it would leave untouched Class Plaintiffs' evidence that *credit-card and debit-card interchange fees* increase prices for merchants and consumers. Without reliable evidence that interchange fees are necessary for payment-card networks to exist, Prof. Murphy's opinions or the benefits of credit cards cannot defeat summary judgment.

> **2.    Defendants have not proffered sufficient evidence to rebut the evidence that Defendants' rules and interchange fees reduce the categories of merchants that accept payment cards.**

In their opening papers, Class Plaintiffs demonstrated that Defendants' rules and default interchange fees cause certain categories of merchants not to accept payment cards. While Defendants attempt to dispute Class Plaintiffs' conclusion, they do not credibly rebut the evidence that Class Plaintiffs offer. (*See* Defs.' CSF ¶¶ 71-72.) For example, Defendants do not dispute that their experts admitted that, all things equal, lower interchange fees would induce more

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

merchants to accept payment cards. (*Id.* ¶ 71a.) Nor do they dispute that merchant acceptance in Australia increased after the RBA mandated that the networks reduce interchange fees. (*Id.* ¶ 122.) And they also agree that their internal documents indicated that their interchange-fee levels inhibited penetration in the early 2000s, which they were able to correct only by lowering interchange fees to those segments of merchants. (*Id.* ¶¶ 71b-i.) Class Plaintiffs presented evidence that card acceptance among colleges and universities and utilities, for example, continues to lag behind other sectors (SUF ¶¶ 72(d), (g).) Defendants provide no explanation for how, in light of the undisputed evidence cited above, that the elimination of interchange fees would not improve acceptance in these and other lagging sectors. In fact, their primary economics expert agrees that eliminating or lowering interchange fees would induce more merchants to accept payment cards. (Murphy Rep. ¶ 111; *see also* Elzinga Rep. ¶ 91 (SUFEX250).)

> **D.  Defendants cannot offset harms to merchants in payment-card-acceptance markets with evidence of benefits to cardholders and, even if they could, there is no dispute that interchange fees increase the "two-sided price" of payment cards.**

In their opening brief, Class Plaintiffs cited a line of antitrust cases that hold that a court cannot offset harm in the market at issue in a case with purported benefits in another. (Cl. Pls.' Br. at 61-63.) Defendants do not attempt to distinguish any of those cases. (Defs' Opp. Br. at 30-34.) Instead, they selectively pull quotes from government materials and three cases that they

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

claim prevent this Court from following this established precedent.[18] (*Id.*) But while the materials that Defendants cite acknowledge the two-sided nature of various payment-card industries, none of them advocate balancing the harms to one set of customers against the benefits to another. Class Plaintiffs have never argued that payment-card networks do not serve two sets of customers. (*See* SCACAC ¶¶ 100, 148-53.) Even when firms serve distinct sets of customers, however, it is entirely proper for an antitrust court to focus its analysis on the customer market that is affected by a particular restraint.[19] For example, the *Visa Check* court defined relevant markets based on merchant elasticity and analyzed competitive effects from the merchants' perspective because the defendants' restraints were aimed solely at merchants. *Visa Check*, 2003 WL 1712568, at *3-4. In *United States v. Visa*, on the other hand, the court examined the effect of the defendants' rules on issuers and merchants because they were aimed at other network competitors. 163 F. Supp. 2d at 329.

---

[18]    The *Flying J* case denied a motion to dismiss, which was not directed at the merits of the plaintiff's case and was not dependent on any argument that the trucker-fleet-card market was "two-sided."

[19]    Courts and the antitrust agencies routinely examine the effect of conduct and transactions on one particular group of customers, even when the defendant operates in a "two-sided" market. For example, when the Department of Justice challenged the merger of First Data and Concord EFS, owners of two of the largest PIN-debit networks, the government noted that the firms operated in "two-sided" markets but nonetheless analyzed relevant markets and competitive effects centered around one "side" of the market. Ver. Compl. ¶¶ 25-28, *United States v. First Data Corp.*, No. 03-CV-02169 (D.D.C. Oct. 23, 2003.) When examining the effect of the proposed merger on merchants, the government rejected the parties' argument that it should offset interchange fees with the purported benefits they provided to issuers. Renata B. Hesse & Joshua H. Soven, *Defining Relevant Product Markets in Electronic Payment Network Antitrust Cases*, 73 *Antitrust L.J.* 709, 737-38 (2006). In fact, Defendants' expert, Prof. Elzinga could not think of a DOJ or F.T.C. merger case that examined the "total price" in a "two-sided market." (Elzinga Dep. 613:3-614:8.)

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

But even assuming it were proper to offset benefits to cardholders against harms to merchants, Defendants have failed to present sufficient credible evidence that interchange fees do not also increase the "two-sided" price of their payment cards. As Class Plaintiffs demonstrated in their opening brief, even taking Defendants' expert reports and testimony as true, the benefits that cardholders supposedly receive from interchange fees are less than the amount of those fees paid by merchants. (Cl. Pls.' Br. at 63-67.) Defendants do not even address these arguments. Thus, even when the record is viewed most favorably to Defendants, there can be no dispute that interchange fees increase prices, even for both sides of a "two-sided" market.

### E.   Defendants' opposition does not contradict the undisputed evidence that they could have efficiently operated their networks with less restrictive interchange fees.

Pointing to evidence of foreign payment-card networks that operate without interchange fees or with significantly lower fees, Class Plaintiffs show that Defendants could operate without interchange fees or even if some transfer of funds from merchants to issuers were necessary, Defendants could operate with significantly less restrictive fees. As they did at the class-certification stage, Defendants begin their attack on Class Plaintiffs' primary and alternative but-for worlds by mischaracterizing them as merely a challenge to "current levels of interchange fees." (*See* Defs.' Opp. Br. at 43-44; Defs.' Mem. Opp. Cl. Cert. at 53-54.) Class Plaintiffs have never made such an argument. Rather, Class Plaintiffs

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

argue that Defendants could successfully operate payment-card networks even if there were no default-interchange rule.[20] (*See* 2d Consol. Am. Cl. Action Compl. ¶¶ 249-60; Cl. Pls.' Br. at 99-100.)

Defendants' attempt to discredit Class Plaintiffs' evidence of payment-card networks in the United States and abroad fails for several reasons. First, their assertion that the foreign debit-card networks "are all regulated networks," is misleading. As fully set forth in Class Plaintiffs' Reply Statement of Fact, at least the Interac network in Canada, the Norwegian Bank Axept network, and the EFTPOS network in New Zealand arrived at a system without interchange fees in the absence of any government regulation. (RSF ¶¶ 117-19(a); SUF ¶¶118-20.) The presence of some intervention in some form by national competition or banking authorities in the debit-card market does not alter this fact. (*See id.* ¶¶ 117-19(a).) And even if—as Defendants assert—these networks originated and prospered without interchange fees solely as a result of government intervention, there would still be no dispute that it is possible for a four-party payment card network to attract issuers, acquirers, cardholders, and merchants without rules requiring the payment of interchange fees. (*See* Defs.' CSF ¶ 121(b).)

---

[20]     The illogic of Defendants' argument is apparent when it is applied to other antitrust cases. For example, in *Premier Electrical*, the Seventh Circuit struck down as *per se* illegal a rule adopted by a trade association of electrical contractors and a union that the union obtain a one percent contribution to a joint pension fund from all contractors it dealt with that were not members of the contractors' association. *Premier Elec. Constr. Co. v. Nat'l Elec. Contractors' Ass'n*, 814 F.2d 358, 359 (7th Cir. 1987) (Easterbrook, J.). If the Defendants were correct that requiring the repeal of a rule was tantamount to price fixing, Judge Easterbrook would have been engaging in the same "price regulation" in *Premier Electrical* that he condemned in the *Chicago Bulls* decision that defendants rely upon in their opposition brief.

43

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

Nor is Class Plaintiffs' alternative but-for world an attempt at price regulation because it does not seek for this Court to establish future interchange fees. Rather, it provides an alternative benchmark for retrospective damages in the event that the jury concludes that some transfer of funds from merchants to issuers was necessary for the Defendants to operate payment-card networks. Class Plaintiffs argue that even if the Defendants needed some transfer of funds from merchant to issuer to make their systems function effectively, they could have done so by establishing interchange fees that were limited to the levels that they would need to achieve these efficiencies. (Cl. Pls.' Br. at 74-86.) Accordingly, evidence such as the Australian experience after the RBA reforms is not offered to show that Defendants should have set interchange fees at Australian levels. Rather, it calculates damages based on a maximum level of interchange fees that would have been necessary to, for example, properly allocate costs or incent issuance.

V.      **Defendants have not presented sufficient evidence to demonstrate that their default interchange fees and rules are no more restrictive than necessary to attain any procompetitive efficiencies.**

   A.      **Defendants' argument that some rules governing the authorization, clearance, and settlement of funds are necessary should be rejected because it mischaracterizes Class Plaintiffs' claims.**

Class Plaintiffs present evidence that the networks' rules that require the payment of an interchange fee on every transaction are not reasonably necessary to the functioning of a payment-card network. (Cl. Pls.' Br. at 53-55.) Defendants,

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

however, mischaracterize Class Plaintiffs' argument as challenging all "pre-established rules defining the financial rights and obligations of issuing and acquiring banks." But Class Plaintiffs have never argued that all rules that relate to the financial obligations of member banks are anticompetitive. In fact, many of Defendants' rules — such as the standardization of transaction information and other data — are undoubtedly *procompetitive*. (2d Consol. Am. Cl. Action Compl. ¶¶ 100, 125) *see NCAA*, 468 U.S. at 117 ("It is reasonable to assume that most of the regulatory controls of the NCAA are . . . procompetitive."). Rather Class Plaintiffs challenge only those rules that require merchants to pay an interchange fee on every transaction and prevent them from steering customers to lower-cost forms of payment. Accordingly, any justification for their conduct that Defendants offer must be limited to the conduct that Class Plaintiffs challenge. *See id.* at 113-14.

As Class Plaintiffs have argued throughout this case, if these rules were eliminated or never existed, competition would have prevented interchange fees from being charged, which would have resulted in lower card-acceptance costs for merchants than exist today. (*See* Frankel Rep. ¶ 287; Frankel Reb. Rep. ¶¶ 377-81 (SUFEX556); 2d Consol. Am. Cl. Action Compl. ¶¶ 246, 297(f), 304(f).) Class Plaintiffs' theory follows the well-accepted antitrust framework of comparing the "real world" to a "but-for world," without the restraints at issue. *Cordes*, 502 F.3d at 97, 107; *EPDM*, 256 F.R.D. at 88. In other words, Class Plaintiffs seek only the benefit that competition would have provided them but

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

for Defendants' conduct rather than the "price regulation" that Defendants complain of. (*See supra* Sec. IV.D.)

> **B.    Increases in payment-card transaction volume do not create a material issue of disputed fact because Defendants' rules have prevented rival payment-card networks from expanding their own transaction volumes.**

Defendants' argument that their conduct is excused because their transaction volume has increased in recent years fails both because it poses the wrong question and because it ignores the effects of their own anti-steering restraints.[21] To the extent that output increases can be used as procompetitive effects to rebut a showing of harm to competition, the relevant question is not whether output increased in absolute terms, but whether it increased relative to what it would have been in the absence of the defendants' conduct. *EPDM*, 256 F.R.D. at 88. To be certain, Defendants posit that, without their default interchange fees and rules, they could not have increased transaction volume at the rates they accomplished. (*See* Defs.' Opp. Br. at 29-30.) Defendants cite no evidence for the proposition that transaction volume would not have grown at a similar rate in the absence of their rules and default interchange fees. Because Defendants provide no empirical support to back up their conjecture, it cannot create a material issue of disputed fact. *Rowe Entm't,* 2005 U.S. Dist. LEXIS 75, at

---

[21]    As Class Plaintiffs argued in their opposition to Defendants' summary-judgment motion, Defendants' argument also misstates the law, which allows Class Plaintiffs to make a showing of harm to competition by demonstrating a price increase *or* a reduction in output. (Cl. Pls.' Opp. Br. at 50 (citing *NCAA,* 468 U.S. at 109; *Visa,* 344 F.3d at 238).)

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

*144 n.112; *Kunstsammlungen Zu Weimar*, 536 F. Supp. at 841. (Defs.' CSF ¶¶ 48(c), 57.)

Defendants' output argument also ignores the effect of their own anti-steering restraints. While Defendants point out that they do permit some forms of steering, there is no dispute that they do prohibit surcharging, which their own experts have classified as the most effective form of steering, and which has demonstrated the ability to influence consumer choice in other countries. (Defs.' CSF ¶ 76; Kahn Rep. ¶¶ 103-04; Kahn. Dep. 25:20-29:25, Mar. 26, 2010 (SUFEX587).) They also prohibit point-of-sale discounts for payments made with rival brands of payment cards or even their own lower-interchange cards. (Defs.' CSF ¶¶ 31(g), 32(g).)[22] Thus, there can be no dispute that Defendants' rules prevent merchants from utilizing the most effective form of substitution. *See United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 193, 196 (3d Cir. 2005) (holding that the defendant's conduct was exclusionary because it foreclosed the most efficient channels of distribution from rivals, even though alternative channels were available). Because Defendants' own exclusionary conduct inhibits merchants from substituting to other payment forms, the fact that their own

---

[22] MasterCard attempts to dispute that it prohibits point-of-sale discounts for payments made with other brands of payment cards. The testimony that MasterCard cites for this proposition is its Rule 30(b)(6) testimony on merchant rules. (Defs.' CSF ¶ 32(g).) But this testimony contradicts both the plain text of MasterCard's rule that prohibits merchants from "engage[ing] in any acceptance practice that discriminates against or discourages the use of a Card in favor of any acceptance brand," and the merchant-acceptance guides that are published by its acquiring banks. (RSF ¶ 32(g).) There is also no evidence that MasterCard has ever informed its acquiring banks about the interpretation of its rules that it provided in the Rule 30(b)(6) deposition. (*See id.*) Whatever MasterCard's interpretation of its rules may be, however, Defendants point to no evidence that point-of-sale discounting has increased merchants' ability to steer or has inhibited MasterCard's ability to increase interchange fees.

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

transaction volume has increased should be considered sufficient evidence of procompetitive effects to justify denying summary judgment. *See Microsoft*, 253 F.3d at 65 (affirming that Microsoft's commingling of Windows and Internet Explorer was anticompetitive because it enhanced Microsoft's own market share at the expense of rivals); (Klein Dep. 363:4-18, 364:25-365:18 (admitting that exclusionary conduct can be anticompetitive even if it expands the defendant's output).)

> **C.  Defendants' analogy of interchange fees to price discounts is a justification conceived for this litigation and is not supported in the record.**

Defendants attempt to justify their conduct by arguing that payment cards create "transactional benefits" that encourage additional purchases, which they claim provide benefits to merchants. Defendants flatly assert that "payment card usage benefits merchants," which they claim is demonstrated by the fact that merchants accept payment cards despite their costs. (Defs.' Opp. Br. at 33.) But the fact that individual merchants find it beneficial (or, more likely, necessary) to accept payment cards despite Defendants' rules and default interchange fees is irrelevant to assessing the competitive effects of those rules and fees on merchants in general. Even customers of naked cartels receive a benefit from the cartelists' products that exceeds the price-fixed cost; otherwise they would not have purchased the products. (*See* Frankel Rep. ¶ 106.) The reality that even

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

monopolists and cartels need to sell their products does not excuse otherwise anticompetitive conduct.[23]

Moreover, this argument fails to create a disputed issue of material fact for several reasons. First, it impermissibly attempts to equate the benefits of payment cards with benefits of default interchange fees without showing that interchange fees are necessary for the functioning of payment card networks. Secondly, Defendants do not even attempt to quantify the portion of the "transactional benefit" that accrues to merchants. Because they do not quantify this "benefit," they cannot satisfy the necessary antitrust inquiry that the "transactional benefits" accruing to merchants exceed the costs that interchange fees impose on merchants. *See Visa*, 344 F.3d at 243 (affirming conclusion that harms of exclusionary rules outweigh any benefits it may have). Thirdly, as fully described in Plaintiffs' motion to exclude Kevin Murphy, the expert testimony that purports to support and quantify these claimed transactional benefits from card acceptance "in the two-sided market"[24] is unreliable because it erroneously applies the Garcia-Swartz study that it is based on. (*See* Pls.' Mot. Excl. Murphy at 37-41; Pls.' Rep. Mot. Excl. Murphy at 5-8.)

---

[23]   If, for example, the major airlines collectively agreed to double fares between New York and Los Angeles, a lawyer flying between those two cities to attend a hearing would likely find it beneficial to pay the price-fixed price, as opposed to driving while billing the client hundreds of dollars an hour.

[24]   As fully set forth on pp. 38-39 above, the case law does not permit this Court to offset harm caused to merchants with benefits that purportedly flow to cardholders.

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

In addition to their claimed transactional benefits, Defendants claim that payment cards benefit merchants by increasing consumer spending.[25] Once again, Defendants impermissibly attempt to offset the harm of *payment-card interchange fees* with all of the purported benefits of *payment cards*. Putting that error aside, Defendants' only empirical "evidence" on this point is Professor Murphy's report, which attempts to demonstrate a *correlation* between higher levels of interchange-fee-funded payment-card rewards and increased consumer spending. (Murphy Rep. ¶¶ 282-87.) But Professor Murphy does not find — or even claim — a causal relationship between rewards and total spending. (*Id.*) And even if this Court attempted to balance any increased consumer spending from rewards against the cost of interchange fees to merchants, the parties' experts agree that the rewards and other benefits that are transferred to cardholders are less than the amount of interchange fees imposed on merchants. (Murphy Rep. ¶ 122; Frankel Reb. Rep. ¶¶ 184-221.)Thus, there is no disputed issue of material fact that any benefit that rewards bestows on cardholders or merchants is less than the costs that interchange fees impose on merchants.

## VI.    Neither the *Visa Check* release, the *Illinois Brick* doctrine, nor the *Buffalo Broadcasting* decision bars Class Plaintiffs' claims.

In their opposition brief, Defendants incorporate the arguments they raised in their own motion for summary judgment that Class Plaintiffs' claims

---

[25]    Defendants claim that Dr. Frankel concedes this point. (Defs.' Opp. Br. at 33.) He does not. Rather, he specifically writes that payment-card acceptance benefits "an individual merchant" in an amount greater than the cost of acceptance. (*See* Frankel Rpt. ¶¶ 251-52; Frankel Reb. Rep. ¶ 197.)

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

are barred by the release in *Visa Check*, the *Illinois Brick* doctrine, and the *Buffalo Broadcasting* decision. (Defs.' Opp. Br. at 81-83.) Class Plaintiffs accordingly incorporate by reference their response to those arguments in their opposition to Defendants' summary judgment motion. (Cl. Pls.' Opp. Br. at 7-46.)

## Conclusion

There is no doubt that this litigation has produced a voluminous record, fitting for a case of this magnitude. But boiled down to its core, the facts that support Class Plaintiffs' motion for summary judgment are simple and undisputed: Defendants' rules and interchange fees restrain competition among banks; interchange fees and the anti-steering restraints increase merchants' costs of accepting payment cards; and Defendants have significantly and collusively increased interchange fees without losing merchant acceptance. Thus, even when the record is viewed in the light most favorable to Defendants, no rational jury could conclude that the elements of a § 1 violation are not met. Class Plaintiffs therefore respectfully request that this Court enter judgment for Class Plaintiffs on liability on counts 1, 2, 5, 10, 13, 14, 17, 18, and 20 of the Second Consolidated Amended Class Action Complaint.

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

June 30, 2011

**Robins, Kaplan, Miller & Ciresi L.L.P.**

By: _____

    K. Craig Wildfang
    Thomas J. Undlin
    Ryan W. Marth

    800 LaSalle Avenue, Suite 2800
    Minneapolis, MN  55402-2015
    Tel: 612-349-8500
    Fax: 612-339-4181

    Patrick J. Coughlin
    Bonny E. Sweeney
    David W. Mitchell
    Alexandra S. Bernay

    ROBBINS GELLER RUDMAN & DOWD LLP
    655 West Broadway, Suite 1900
    San Diego, CA 92101
    Tel: 619-231-1058
    Fax: 619-231-7423

    H. Laddie Montague, Jr.
    Merrill G. Davidoff
    Bart D. Cohen
    Michael J. Kane

    BERGER & MONTAGUE, P.C.
    1622 Locust Street
    Philadelphia, PA 19103
    Tel: 215-875-3000
    Fax: 215-875-4604

    *Co-Lead Counsel Class Plaintiffs for MDL 1720*

82296464.5

52

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL