

Feb 11 2011
1:25PM

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

IN RE PAYMENT CARD INTERCHANGE FEE
AND MERCHANT DISCOUNT ANTITRUST
LITIGATION

Case No. 1:05-md-1720-JG-JO

ORAL ARGUMENT REQUESTED

This Document Relates To:  ALL ACTIONS

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THE MOTION
FOR SUMMARY JUDGMENT AS TO THE CLAIMS IN THE
<u>SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT</u>**

**HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER
TO BE FILED UNDER SEAL**

## *Table Of Contents*

Table Of Authorities ................................................................................................ iii

Preliminary Statement ............................................................................................. 1

Statement of Undisputed Facts ............................................................................. 2

    A.    The Parties ............................................................................................ 2

    B.    Interchange In The Visa And MasterCard Payment Card Systems ........................ 3

    C.    The Class Complaint ........................................................................... 6

Summary of Argument ............................................................................................ 7

Argument ................................................................................................................ 10

I.    Plaintiffs' Antitrust Claims Are Barred By The *Visa Check* Releases ............................ 10

II.    Plaintiffs' Antitrust Damages Claims Are Barred By The *Illinois Brick* Doctrine ........... 15

    A.    Plaintiffs Do Not Directly Pay Interchange Fees ............................... 16

    B.    *Illinois Brick* Bars Plaintiffs' Antitrust Damages Action ..................... 18

        1.    *Illinois Brick* Broadly Bars Indirect Purchaser Claims ............................ 18

        2.    *Illinois Brick* Is Fully Applicable To Payment Card Litigation ............... 20

    C.    Neither Of The Two *Illinois Brick* Exceptions Applies To Plaintiffs ................. 24

        1.    The "Cost-Plus" Contract Exception Does Not Apply ........................... 26

        2.    The Ownership And Control Exception Does Not Apply ...................... 26

    D.    The So-Called "Co-Conspirator Exception" Does Not Apply .............................. 29

III.    Plaintiffs' Challenge To The Establishment Of Default Interchange Rules Is Barred By The Controlling Authority Of *Buffalo Broadcasting* And *Paycom* ................. 30

    A.    Section 1 Requires Proof Of An Agreement In Restraint Of Trade ..................... 31

        1.    A Joint Venture Among Competitors That Preserves Their Freedom To Compete Is Not A Restraint ............................................... 32

2.      A Payment Card Network Rule That Allows Participants The Discretion To Enter Into Bilateral Alternative Arrangements To Supersede It Is Not A Restraint ................................................................ 35

B.      The Default Interchange Rules Do Not Restrict Network Members' Competitive Conduct In Any Way ........................................................ 37

IV.     Plaintiffs' Antitrust Claims Fail Because Plaintiffs Have Proffered No Evidence To Establish That The Challenged Rules Have Reduced Output ...................................... 39

V.      Plaintiffs Have Abandoned Their Inter-Network Conspiracy Damages Claim ............... 42

VI.     Defendants Are Entitled To Summary Judgment On Plaintiffs' Section 1 Claims Relating To The No- Surcharge Rules .......................................................................... 44

VII.    Defendants Are Entitled To Summary Judgment On Plaintiffs' Section 2 Claims .......... 45

VIII.   Defendants Are Entitled To Summary Judgment On Plaintiffs' Post-IPO Conspiracy Claims ....................................................................................... 45

IX.     Defendants Are Entitled To Summary Judgment On Class Plaintiffs' Antitrust Claims Because Plaintiffs Have Failed To Present Admissible Evidence To Establish Critical Elements Of Those Claims ....................................................... 45

Conclusion ........................................................................................................... 47

### <u>Table Of Authorities</u>

### <u>Cases</u>

*Adjustre Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543 (2d Cir. 1998) ...............................7

*Arizona v. Shamrock Foods Co.*, 729 F.2d 1208 (9th Cir. 1984) ...............................................29

*In re ATM Fee Antitrust Litig.*, No. C:04-cv-02676-CRB, 2010 WL 3701912 (N.D. Cal. Sept. 16, 2010) .........................................................................................................21, 28, 29

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)...................................................................44

*Broadcast Music, Inc. v. CBS, Inc.*, 441 U.S. 1 (1979)...............................................34, 38, 39

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993)..............*passim*

*Buffalo Broadcasting Co. v. ASCAP*, 744 F.2d 917 (2d Cir. 1984)...............................*passim*

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537 (2d Cir. 1993).................................................................................................................................40

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)....................................................................7

*Chicago Prof'l Sports Ltd. v. National Basketball Ass'n*, 95 F.3d 593 (7th Cir. 1996) ..............39

*Chicago Prof'l Sports Ltd. v. National Basketball Ass'n*, 961 F.2d 667 (7th Cir. 1992) ............40

*Columbia Broadcasting Sys. v. ASCAP*, 620 F.2d 930 (2d Cir. 1980) ...........................9, 30, 31

*Continental Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499 (4th Cir. 2002) ......................35

*Crivera v. City of New York*, No. 03 CV 447, 2004 WL 339650 (E.D.N.Y. Feb. 23, 2004)........14

*Delaware Valley Surgical Supply Inc. v. Johnson & Johnson*, 523 F.3d 1116 (9th Cir. 2008).................................................................................................................................28

*Dickson v. Microsoft Corp.*, 309 F.3d 193 (4th Cir. 2002) .....................................................29

*Federal Paper Bd. Co. v. Amata*, 693 F. Supp. 1376 (D. Conn. 1988) ......................................35

*Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133 (9th Cir. 2003) ..........................27, 28

*Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14 (2d Cir. 1995) ............................7

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968) ...............................18

*Hunter Douglas, Inc. v. Comfortex Corp.*, No. 98 CV 0479 (LEK) (DNH), 1999 U.S. Dist. LEXIS 10906 (N.D.N.Y. Mar. 11, 1999) ................................................................ 14

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) .................................................... *passim*

*Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199 (1990) ............................................. *passim*

*Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008) ................................. 21, 29

*Lefrak v. Arabian Am. Oil Co.*, 487 F. Supp. 808 (E.D.N.Y. 1980) ............................ 26

*Levitch v. CBS*, 495 F. Supp. 649 (S.D.N.Y. 1980), *aff'd*, 697 F.2d 495 (2d Cir. 1983) ............. 35

*Madison Square Garden, L.P. v. National Hockey League*, No. 07 CV 8455 (LAP), 2008 WL 4547518 (S.D.N.Y. Oct. 10, 2008) ................................................................ 13, 14

*Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290 (2d Cir. 2008) ........... 7, 40, 42

*Marin County Bd. of Realtors, Inc. v. Palsson*, 16 Cal. 3d 920, 549 P.2d 833 (1976) .................. 6

*Matsushita Elec. Indus. Co. v. Cinram Int'l, Inc.*, 299 F. Supp. 2d 370 (D. Del. 2004) .............. 35

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ................................... 43

*MCM Partners, Inc. v. Andrews-Bartlett & Assocs.*, 161 F.3d 443 (7th Cir. 1998) ............... 13, 14

*Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752 (1984) ....................................... 9, 43, 44

*National Bancard Corp. (NaBanco) v. Visa U.S.A., Inc.*, 596 F. Supp. 1231 (S.D. Fla. 1984), *aff'd*, 779 F.2d 592 (11th Cir. 1986) ................................................................ 24, 28

*National Bancard Corp. (NaBanco) v. Visa U.S.A., Inc.*, 779 F.2d 592 (11th Cir. 1986) ............ 32

*NCAA v. Board of Regents of the Univ. of Oklahoma*, 468 U.S. 85 (1984) ................................. 33

*New Hampshire v. Maine*, 532 U.S. 742 (2001) ........................................................................ 17

*Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*, 467 F.3d 283 (2d Cir. 2006) ............. *passim*

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720 (JG)(JO), 2008 WL 115104 (E.D.N.Y. Jan. 8, 2008) ................................................ 8, 10, 11

*PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101 (2d Cir. 2002) ............................................... 7

*Record Club of Am., Inc. v. United Artists Records, Inc.*, 611 F. Supp. 211 (S.D.N.Y. 1985) ................................................................................................................... 14

*Reidy v. Runyon*, 971 F. Supp. 760 (E.D.N.Y. 1997) ................................................................ 15

*Royal Printing Co. v. Kimberly-Clark Corp.*, 621 F.2d 323 (9th Cir. 1980) ..............................27

*Temple v. Circuit City Stores, Inc.*, No. 06 CV 5303, 2007 WL 2790154 (E.D.N.Y. Sept. 25, 2007) ............................................................................................................20, 29

*Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90 (2d Cir. 1998) ...............................7

*In re Visa Check/MasterMoney Antitrust Litig.*, 192 F.R.D. 68 (E.D.N.Y. 2000) .....................17

*In re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003), *aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005) ........................................................................................................8, 12

*Visa U.S.A. Inc. v. First Data Corp.*, No. C 02-01786-JSW, 2006 WL 1310448 (N.D. Cal. May 12, 2006) ............................................................................................24, 28

*VKK Corp. v. National Football League*, 244 F.3d 114 (2d Cir. 2001) .....................................13

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96 (2d Cir, 2005) .............................17

*Willsea v. Theis*, No. 98 Civ. 6773 (BSJ), 1999 WL 595629 (S.D.N.Y. Aug. 6, 1999)..............13

## *Statutes*

15 U.S.C. § 1.............................................................................................................................6

15 U.S.C. § 2.............................................................................................................................7

Cal. Bus. & Prof. Code §§ 16700, *et seq.* (West 2008) ..............................................................6

Fed. R. Civ. P. 56(a).................................................................................................................7

## *Other Authorities*

Dennis W. Carlton & Alan S. Frankel, *The Antitrust Economics of Credit Card Networks*, 63 Antitrust L. J. 643 (1995)....................................................................................36, 37

William M. Landes, *Harm to Competition: Cartels, Mergers and Joint Ventures*, 52 Antitrust L. J. 625 (1983) ...................................................................................34, 36, 37

v

## *Preliminary Statement*

Defendants respectfully submit this memorandum of law in support of their motion for summary judgment as to all claims in the Second Consolidated Amended Class Action Complaint (the "Class Complaint"). To account for the differences in claims, legal theories, and undisputed facts relevant to the various complaints included in this consolidated action, defendants have filed separate briefs in support of their motion for summary judgment as to (i) the claims challenging the initial public offerings ("IPOs") of each network in the First Amended Supplemental Class Action Complaint and the Second Supplemental Class Action Complaint (the "IPO Complaints"), as well as plaintiffs' post-IPO conspiracy claims; and (ii) the complaints of the individual plaintiffs (the "Individual Plaintiff Complaints"). To the extent that arguments relating to the various complaints overlap, defendants make those arguments only once, and have incorporated them by reference wherever else they are applicable.

Distilled to its essence, the Class Complaint challenges under federal and state antitrust laws the establishment of default interchange rates by Visa and MasterCard. Plaintiffs allege that, because Visa and MasterCard and the defendant banks have established default interchange rates at artificially high levels, the merchant discount fees that plaintiffs pay to accept Visa- and MasterCard-branded payment cards have been artificially inflated to supracompetitive levels.

The parties have engaged in exhaustive discovery, producing more that eighty-two million pages of documents, exchanging thousands of pages of expert reports, and conducting nearly five hundred fact and expert witness depositions. With the close of discovery, defendants now move for summary judgment on each of plaintiffs' claims for relief. The several discrete and independent grounds for defendants' motion are set forth in detail below.

1

### *Statement of Undisputed Facts*

The following undisputed facts are set forth as general background.  To minimize repetition, additional undisputed facts relevant to particular grounds for summary judgment are set forth in the argument sections of this brief relating to those particular grounds.

### A.      The Parties

Plaintiffs are merchants that accept Visa- and MasterCard-branded credit and/or debit cards (collectively "payment cards") as forms of payment, and trade associations whose members are merchants that accept Visa- and MasterCard-branded payment cards as forms of payment.  (SMF[1] ¶¶ 1-3.)

Defendant Visa is a global company with approximately 16,400 financial institution members located around the world.  (SMF ¶ 4.)  Membership in Visa is open to any eligible financial institution meeting a number of financial, legal, and regulatory criteria specified in Visa's Bylaws and Operating Rules.  (*Id.*)  Until March 2008, when it was restructured through an IPO, Visa was operated as a joint venture by its member banks.  (*Id.*)  Defendant MasterCard is a global company with 2,400 principal members located around the world, and approximately 21,600 affiliate members, sponsored by one or more principal members.  (SMF ¶ 5.)  Membership in MasterCard is open to any eligible financial institution meeting a number of financial, legal, and regulatory criteria specified in MasterCard's Bylaws and Rules.  (*Id.*)  Until May

---

[1]     Statement of Material Facts As To Which There Is No Genuine Issue to Be Tried ("SMF"), dated February 11, 2011, and submitted herewith.

2006, when it was restructured through an IPO, MasterCard was operated as a joint venture by its member banks. (*Id.*)[2]

The bank defendants include Bank of America, Barclays, Capital One, Chase, Citibank, Fifth Third Bancorp, First National Bank of Omaha, HSBC, National City, SunTrust, Texas Independent Bancshares, Inc., Washington Mutual, and Wells Fargo. (SMF ¶ 6.) The defendant banks have been members, customers, and/or shareholders of Visa and MasterCard at various times before and after the network IPOs. (*Id.*)

**B.      Interchange In The Visa And MasterCard Payment Card Systems**

The bank defendants serve either (or both) of two separate functions in the Visa and MasterCard networks. They issue payment cards to cardholders (and are referred to as "issuers") and/or they acquire and process payment card transactions from merchants (and are referred to as "merchant acquirers"). (SMF ¶ 7.) The Visa and MasterCard networks facilitate the transfer electronically of data and funds among merchants, merchant acquirers, and issuers when credit and debit cards are used to make purchases. (*Id.*) Visa and MasterCard accomplish this function by, among other things, each separately prescribing standard data formats and common operating rules to govern the transfer of data and funds. (*Id.*)

In the Visa and MasterCard networks, payment card transactions involve at least four parties in addition to the network itself: (i) the cardholder; (ii) the issuer that issued the cardholder's payment card; (iii) the merchant that accepts the cardholder's payment card as a form of payment; and (iv) the merchant acquirer with which the merchant has contracted to process the payment card transaction. (SMF ¶ 8.) Visa and MasterCard payment card transac-

---

[2]   Following the networks' IPOs, which changed the corporate structure of each network, the bank defendants are no longer "members" of Visa Inc. or MasterCard Incorporated.

tions may involve additional parties where the merchant acquirer has contracted with a third party processor, an independent sales organization ("ISO"), or a membership service provider to provide merchant processing services. (*Id.*) In the United States, there are thousands of issuers that issue payment cards to cardholders, and hundreds of merchant acquirers – including acquiring members of Visa and MasterCard, as well as third party processors, ISOs, and membership service providers – that process payment card transactions for merchants. (SMF ¶ 9.)

Typically, when a cardholder presents a Visa- or MasterCard-branded payment card for payment, the merchant must seek authorization for the transaction. (SMF ¶ 10.) The merchant inputs the cardholder's payment card information into a terminal and transmits that information to its merchant acquirer (or some other third-party intermediary with which the merchant has contracted), which, in turn, transmits the information through the Visa or MasterCard network for authorization by the issuing bank that issued the cardholder's payment card. (*Id.*) If it approves the transaction, the issuing bank transmits a message through the network to the merchant acquirer for ultimate transmission to the merchant that the transaction has been authorized. (*Id.*) The merchant then completes the transaction with the cardholder. (*Id.*) Completed transactions are cleared and settled through the appropriate network in a process called "interchange." (SMF ¶ 11.) The transaction is "settled" when the issuing bank transfers funds to the network, the network transfers funds to the merchant acquirer, and the merchant acquirer pays the merchant. (*Id.*)

Visa and MasterCard require each issuing bank to accept all properly authorized transactions presented by a merchant acquirer and transmitted over the Visa or MasterCard network, and to transfer funds to the merchant acquirer in exchange for a discount established either by bilateral agreement between the issuer and the acquirer or, absent such an agreement, by Visa

or MasterCard. (SMF ¶ 12.) The discount is called the "interchange fee," which, as plaintiffs themselves have acknowledged, is "a fee that the bankcard acquiring institution pays to the card issuing institution for each retail transaction where the issuer's card is used as a payment device at one of the acquirer's retail store accounts." (*Id.*) As plaintiff class representative NATSO acknowledged: "Interchange is actually a fee, which is set by [Visa or MasterCard], but that is paid by the acquirer to the card issuer." (*Id.*)

Merchants do not contract directly with Visa or MasterCard or with issuers to accept payment cards; merchants contract either with a merchant acquirer, which may be affiliated with the Visa or MasterCard network, or with a third-party processor, ISO, or membership service provider that is not itself affiliated with Visa or MasterCard but that has contracted with a merchant acquirer of one of the networks to perform certain functions. (SMF ¶ 13.) To handle the merchant's payment card transactions, the merchant acquirer charges the merchant a fee, known as the "merchant discount fee." (*Id.*)

In addition to their default interchange rules, Visa and MasterCard have each established rules regarding merchant acceptance of its respective payment cards. Among other things, these merchant acceptance rules require merchants to: (i) impose no surcharge on cardholders for using Visa- or MasterCard-branded payment cards (the "no-surcharge" rules); (ii) accept all Visa- or MasterCard-branded credit cards if the merchant accepts any Visa- or MasterCard-branded credit cards (the "honor-all-cards" rules as they apply to credit cards); (iii) accept all Visa- or MasterCard-branded debit cards if the merchant accepts any Visa- or MasterCard-branded debit cards (the "honor-all-cards" rules as they apply to debit cards); (iv) provide discounts to users of Visa-branded payment cards equivalent to those provided to users of competitive-branded payment cards, and not discriminate against MasterCard-branded payment cards in

5

favor of competitive payment cards (the "non-discrimination" rules); and (v) refrain from conditioning acceptance of Visa- and MasterCard-branded payment cards on minimum or maximum purchase amounts (the "no minimum/maximum purchase" rules).  (SMF ¶¶ 22-36.)

**C.**     **The Class Complaint**

The Class Complaint contains twenty claims for relief.  (SMF ¶ 14.)  In fifteen of those claims for relief, plaintiffs seek damages or injunctive relief against either Visa and its member banks or MasterCard and its member banks for the allegedly unlawful establishment of default interchange fees within each network (the "intra-network interchange fee claims").[3]  The putative legal bases for these fifteen intra-network interchange fee claims are Section 1 of the Sherman Act, 15 U.S.C. § 1 ("Section 1"), and, as against Visa and its member banks, the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq.* (West 2008).[4]  In one claim for relief, plaintiffs seek damages against Visa and MasterCard and their member banks under Section 1 for the allegedly unlawful establishment of default interchange fees between the networks (the "inter-network interchange fee claim").[5]  In two claims for relief, plaintiffs seek injunctive relief under Section 1 for each network's establishment of the challenged merchant acceptance

---

[3]   Plaintiffs challenge the intra-network establishment of default interchange fees in the First, Second, Fourth, Fifth, Tenth, Eleventh, Twelfth, Thirteenth, Fourteenth, Fifteenth, Sixteenth, Seventeenth, Eighteenth, Nineteenth, and Twentieth Claims for Relief of the Class Complaint.  The last four of these claims for relief relate to defendants' continued adherence to default interchange rules following each network's IPO.

[4]   "A long line of California cases has concluded that the Cartwright Act is patterned after the Sherman Act and both statutes have their roots in the common law.  Consequently, federal cases interpreting the Sherman Act are applicable to problems arising under the Cartwright Act."  *Marin County Bd. of Realtors v. Palsson, Inc.*, 16 Cal. 3d 920, 925, 549 P.2d 833, 835 (1976).

[5]   Plaintiffs challenge the alleged inter-network setting of interchange fees in the Third Claim for Relief of the Class Complaint.

6

rules, particularly the no-surcharge rules,[6] and in the remaining two claims for relief, plaintiffs seek injunctive relief for alleged monopolization by Visa and MasterCard and their member banks in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 ("Section 2").[7]

### *Summary of Argument*

Summary judgment is appropriate where, after "[e]xamining the evidence in the light most favorable to the nonmoving party," *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 547 (2d Cir. 1998), the record shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Although all reasonable inferences are drawn in favor of the non-moving party, those inferences "must be reasonable in light of competing inferences of acceptable conduct." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002). Summary judgment is particularly favored in antitrust cases because of the concern that protracted litigation will chill pro-competitive market forces. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 322-26 (2d Cir. 2008); *PepsiCo*, 315 F.3d at 104-05; *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 95 (2d Cir. 1998).

"[T]he burden on the moving party may be discharged by 'showing' – that is pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *see also Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("In moving for summary judgment

---

[6] Plaintiffs' challenge to the merchant acceptance rules is contained in the Sixth and Seventh Claims for Relief of the Class Complaint.

[7] Plaintiffs' Section 2 monopolization claims are contained in the Eighth and Ninth Claims for Relief of the Class Complaint.

against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim").  As demonstrated below, defendants are entitled to summary judgment on each of the claims in the Class Complaint for several independent reasons:

First, all of plaintiffs' claims are barred by the release executed as part of the court-approved settlement in *In re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003), *aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005) ("*Visa Check*").  This Court has already held that plaintiffs' claims here fall within the scope of the settlement and release in *Visa Check*, and that plaintiffs here are bound by the *Visa Check* release, which bars plaintiffs from pursuing "all claims arising out of conduct occurring before January 1, 2004 [the operative date of the release] related to the claims at issue in the *Visa Check* litigation." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720 (JG)(JO), 2008 WL 115104, at *11 (E.D.N.Y. Jan. 8, 2008) ("*Interchange Fee*").  The record evidence shows that all of plaintiffs' claims arise out of defendants' continued adherence to rules that existed before January 1, 2004, relate to the claims at issue in the *Visa Check* litigation, and either were or could have been challenged in *Visa Check*.  Thus, the *Visa Check* release precludes plaintiffs from pursuing those claims.  (Part I below.)

Second, because the undisputed evidence shows that plaintiffs do not pay directly the interchange fees they assert were illegally set, but rather pay merchant discount fees – the price of which is *not* claimed to be collusively set – plaintiffs are barred by the direct purchaser rule of *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), from pursuing any of their damages claims.  Under *Illinois Brick*, plaintiffs may not recover antitrust damages for an overcharge first imposed upon, and then allegedly passed on by, an intervening payer.  Accordingly, *Illinois*

8

*Brick* and its progeny compel summary judgment in defendants' favor on all of plaintiffs' treble damages claims.  (Part II below.)

Third, the undisputed evidence establishes that Visa and MasterCard interchange rules are default rules that apply only in the absence of bilateral interchange agreements between members of Visa or MasterCard superseding the default rules.  As such, the network default interchange rules do not restrain the competitive freedom of any defendant to enter into bilateral agreements to supersede those rules or to engage in any competitive activity in which it could have engaged if it had not joined Visa or MasterCard.  Under the controlling principles established in *Buffalo Broadcasting Co. v. ASCAP*, 744 F.2d 917, 933 (2d Cir. 1984), *Columbia Broadcasting Sys. v. ASCAP*, 620 F.2d 930, 936 (2d Cir. 1980), and *Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*, 467 F.3d 283, 291-92 (2d Cir. 2006), the default interchange rules do not constitute a restraint in violation of Section 1, thus mandating summary judgment in defendants' favor as to plaintiffs' challenge to the establishment of those rules.  (Part III below.)

Fourth, plaintiffs concede that they cannot prove that the network rules they challenge have restricted output in any relevant market.  This concession is fatal to plaintiffs' ability to prove that the rules have had any anticompetitive effect in a relevant market, and, under the authority of *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993), compels summary judgment on all of plaintiffs' antitrust claims.  (Part IV below.)

Fifth, plaintiffs have abandoned their damages claim based on an alleged inter-network interchange fee conspiracy, and have made no effort to proffer any evidence of such a conspiracy.  Under *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752 (1984), and its progeny, plaintiffs' failure to present evidence that tends to exclude the possibility that the al-

9

leged conspirators acted independently requires summary judgment in defendants' favor as to the inter-network conspiracy claim. (Part V below.)

Finally, for the reasons incorporated by reference from the memorandum in support of the motion for summary judgment as to the Individual Plaintiffs' Complaints and all plaintiffs' IPO-related claims, defendants are entitled to summary judgment as to class plaintiffs' two injunctive relief claims relating to the merchant acceptance rules, their two monopolization claims for injunctive relief, and their claims relating to defendants' conduct after the networks' respective IPOs. (Parts VII, VIII, and IX below.)

### *Argument*

**I.      Plaintiffs' Antitrust Claims Are Barred By The *Visa Check* Releases**

This Court has already determined that the claims at issue in the instant case fall within the scope of the settlement and releases in the *Visa Check* litigation, and that plaintiffs here are bound by the *Visa Check* settlement and releases. *Interchange Fee*, 2008 WL 115104, at *11. For that reason, this Court has held that, as a matter of law, plaintiffs are barred from pursuing "all claims arising out of conduct occurring before January 1, 2004 [the operative date of the release] related to the claims at issue in the *Visa Check* litigation." *Id.* Discovery has now confirmed that all of plaintiffs' non-IPO claims arise out of defendants' continued adherence to rules that existed before January 1, 2004, relate to the claims at issue in the *Visa Check* litigation, and either were or could have been challenged in *Visa Check*. Plaintiffs' claims thus are barred in their entirety by the *Visa Check* releases.

The *Visa Check* releases to which plaintiffs are bound release Visa, MasterCard, and their member banks from all antitrust claims that each plaintiff "ever had, now has, or hereafter can, shall or may have, relating in any way to any conduct prior to January 1, 2004 concern-

10

ing any claims alleged in the Complaint or any of the complaints consolidated therein, including, without limitation, claims which have been asserted or could have been asserted in this litigation." (SMF ¶ 20; *see also* SMF ¶ 21.)  Furthermore, each plaintiff "covenant[ed] and agree[d] that it shall not, hereafter, seek to establish liability against any of the Released Parties based, in whole or in part, upon any of the Released Claims."  (SMF ¶ 20)

This Court recognized that the factual predicate for plaintiffs' claims in the instant case is the same as the factual basis for their claims in the *Visa Check* action.  As this Court explained, plaintiffs here:

> seek damages for harms they allegedly suffered due to concerted activity among the defendants that violated federal antitrust law.  They complain about the agreements into which the defendants entered, the exclusionary rules they implemented, and the supracompetitive interchange fees they charged.  The factual allegations on which those complaints are predicated plainly relate to the factual predicate of the *Visa Check* litigation, which included the nature and extent of defendants' collaboration, the effect of any such collaboration on competition and interchange fees, and the resulting harm to merchants in the plaintiff class.

*Interchange Fee*, 2008 WL 115104, at *11 (citations omitted).

Plaintiffs cannot dispute that each network's default interchange rules, as well as its no-surcharge rule, its honor-all-cards rule, its non-discrimination rule, and the other rules that plaintiffs challenge in this case existed when plaintiffs settled the *Visa Check* case. (SMF ¶¶ 22-36.)  Plaintiffs themselves allege that "[f]or more than 40 years America's largest banks have fixed the fees imposed on Merchants for transactions processed over the Visa and MasterCard Networks and have collectively imposed restrictions on Merchants that prevent them from protecting themselves against those fees." (SMF ¶ 15.)  Plaintiffs could have challenged all those rules in the *Visa Check* litigation, and could have addressed those rules in the *Visa Check* settlement.  Indeed, defendants' default interchange, no-surcharge and honor-all-cards rules were at issue in the *Visa Check* case, and the honor-all-cards rules were modified as a result. (SMF ¶¶

11

17, 19.) But rather than negotiate additional changes to the existing rules in the *Visa Check* settlement, plaintiffs negotiated "the largest antitrust settlement in history," *Visa Check*, 297 F. Supp. 2d at 508,



        Having negotiated a settlement that modified the honor-all-cards rules but left in place the default interchange and other merchant rules, defendants have adhered to those rules, including the modified honor-all-cards rules, since January 1, 2004. (SMF ¶¶ 23-36.) The undisputed facts establish that the challenged rules have remained materially unchanged since the *Visa Check* settlement and releases. (*Id.*) Since before January 1, 2004, for example, default interchange rules have consistently provided for default interchange rates to be applied to payment card transactions in the absence of bilateral agreements between member institutions superseding the default interchange rates. (SMF ¶¶ 22-23.) Similarly, Visa and MasterCard have had no surcharge rules for more than thirty years. (SMF ¶¶ 26-27.) And the networks' honor-all-cards rules, which the *Visa Check* settlement modified, have remained unchanged since January 1, 2004. (SMF ¶¶ 24-25.)

        Because plaintiffs released defendants from antitrust liability for all claims that existed at the time of the releases and were or could have been asserted in the *Visa Check* action, and covenanted not to sue defendants with respect to each of the released claims, plaintiffs may

not now seek to impose antitrust liability on defendants for their adherence to rules like the honor-all-cards rules, which were expressly challenged and modified in the *Visa Check* litigation, or like the default interchange, no-surcharge, or non-discrimination rules, which existed at the time of the *Visa Check* settlement and were addressed and could have been challenged in that lawsuit.

The decision in *Madison Square Garden, L.P. v. National Hockey League*, No. 07 CV 8455 (LAP), 2008 WL 4547518 (S.D.N.Y. Oct. 10, 2008) ("*MSG*"), is instructive. There, the court held that a broad release barred a subsequent antitrust challenge to the NHL's continued enforcement of league rules and policies that existed at the time the release was executed. Rejecting the plaintiff's challenge to the NHL's continued adherence to certain league rules and policies, Judge Preska reasoned: "Because this very antitrust 'claim' 'exist[ed]' at the time of the release, and because the only allegations in the Complaint demonstrate that the League *continued* its enforcement of pre-existing policies, the Court has little trouble concluding that the Release evidences that the 'parties had in mind a general settlement of all accounts up to that time.'" *Id.* at *6 (emphasis in original) (citing *Willsea v. Theis*, No. 98 Civ. 6773 (BSJ), 1999 WL 595629, at *12 (S.D.N.Y. Aug. 6, 1999) (Jones, J.) (characterizing as "nonsense" the argument that a release did not bar a subsequent challenge by the releasing party to post-release continuation of the released conduct – in that case, continued enforcement of a copyright that had been the subject of a prior lawsuit, settlement, and release)).

Other courts have adhered to the same reasoning. *See, e.g.*, *VKK Corp. v. National Football League*, 244 F.3d 114, 126 (2d Cir. 2001) ("It is not uncommon, we assume, for a release to prevent the releasor from bringing suit against the releasee for engaging in a conspiracy that is later alleged to have continued after the release's execution"); *MCM Partners, Inc. v.*

*Andrews-Bartlett & Assocs.*, 161 F.3d 443, 448 (7th Cir. 1998) (where the defendants' post-release refusal to deal with the plaintiff was based on "continued adherence" to a pre-release agreement, "the claim is clearly based on pre-[release] conduct and, as such, is expressly barred by the Release"); *Record Club of Am., Inc. v. United Artists Records, Inc.*, 611 F. Supp. 211, 217 n.8 (S.D.N.Y. 1985) (release barred continuing effect after execution of the release where plaintiff's claim, if any, existed before the execution of the release); *Hunter Douglas, Inc. v. Comfortex Corp.*, No. 98 CV 0479 (LEK) (DNH), 1999 U.S. Dist. LEXIS 10906, at *21 (N.D.N.Y. Mar. 11, 1999) (release barred a claim challenging ongoing practices that had "not been altered materially since the parties executed" a release).

Enforcing the *Visa Check* releases to bar plaintiffs' claims in this case fulfills the public policy goals that encourage settlement of litigation by ensuring that defendants can compromise disputes and obtain a release without facing subsequent litigation by the same plaintiffs challenging defendants' continued adherence to the rules as they existed at the time of (and as modified by) the settlement and release. As Judge Preska emphasized in the *MSG* case, a defendant could never settle an antitrust claim predicated on the defendant's rules if the settlement's release did not bar the releasing party from thereafter asserting claims based on the defendant's continued adherence to those rules as they existed at the time of the release. 2008 WL 4547518, at *8. To permit plaintiffs here to pursue their claims would improperly allow plaintiffs to retain the benefits of their *Visa Check* settlement and seek in subsequent litigation what they were unable to obtain at the negotiating table. *See, e.g., Crivera v. City of New York*, No. 03 CV 447, 2004 WL 339650, at *4 (E.D.N.Y. Feb. 23, 2004) (Gleeson, J.) ("Once an individual executes a valid settlement agreement, he cannot subsequently seek both the benefit of the agreement and

14

the opportunity to pursue the claim he agreed to settle") (citing *Reidy v. Runyon*, 971 F. Supp. 760, 764 (E.D.N.Y. 1997)).

Plaintiffs have released defendants from all antitrust liability arising out of the challenged rules that, as the undisputed record makes clear, existed at the time of the *Visa Check* settlement and either were or could have been challenged in that case. Plaintiffs' claims are thus barred by the *Visa Check* release, and defendants are entitled to summary judgment in their favor on those claims.

## II.   Plaintiffs' Antitrust Damages Claims Are Barred By The *Illinois Brick* Doctrine

Plaintiffs lack standing to seek damages based on alleged unlawfully inflated interchange fees because, as a matter of undisputed fact, plaintiffs do not directly pay interchange fees. Rather, as class plaintiffs' experts have acknowledged, the price merchants pay for card acceptance is the merchant discount fee. (SMF ¶ 13.) But plaintiffs make no claim that merchant discount fees have been illegally fixed. Instead, each of plaintiffs' damages claims is based entirely on plaintiffs' status as indirect payers of interchange fees: plaintiffs assert that (i) defendants artificially inflated the default interchange fees that merchant acquirers pay to issuers in the settlement of payment card transactions, and (ii) merchant acquirers then passed on the alleged overcharge in interchange fees to merchants in the form of higher merchant discount fees that merchants pay for card acceptance services.

Under *Illinois Brick*, plaintiffs may not recover antitrust damages for an overcharge first imposed upon, and then allegedly passed on by, an intervening payer. Accordingly, application of *Illinois Brick* and its progeny compel summary judgment in defendants' favor on all plaintiffs' antitrust damages claims.

15

A.      **Plaintiffs Do Not Directly Pay Interchange Fees**

Each network maintains its own schedule of default interchange fees.  (SMF ¶ 40.)  In general, however, each network classifies payment card transactions for default interchange purposes according to several categories, including the type of payment card (such as whether the payment card was a debit card or a credit card, and the level of rewards offered), the mode of processing (such as whether the card was present or not present, whether the transaction information was manually or electronically entered into the system, and the level of security protocols observed), the merchant's line of business, and the size of the merchant's transaction volume.  (SMF ¶¶ 40-41.)

As explained above, absent a superseding bilateral agreement between the issuer and acquirer, the networks impose the obligation to pay the network established default interchange fees on merchant acquirers, and the payment of that fee is made by the acquirer, not the merchant, to the issuer.  (SMF ¶ 39.)  The default interchange fee applicable to an acquirer for a particular payment card transaction is determined by the categories applicable to that particular transaction.  (SMF ¶¶ 40-41.)  And because cardholders may use different types of payment cards, and merchants may alter their processing and security protocols over time, the default interchange fee applicable to an acquirer varies from transaction to transaction, even at a single merchant.  (*Id.*)

As also explained above, merchants do not contract directly with Visa or Master-Card or with issuers to accept payment cards; they contract with a merchant acquirer to handle the merchant's payment card transactions, in consideration for which merchants pay merchant acquirers a merchant discount fee.  (SMF ¶ 13.)  The undisputed facts that merchants pay merchant discount fees to their merchant acquirers, and that acquirers pay interchange fees to issuers, comport precisely with plaintiffs' allegations in the *Visa Check* complaint (SMF ¶ 12), which

16

this Court accepted in its opinion granting class certification, *In re Visa Check/Master Money Antitrust Litig.*, 192 F.R.D. 68, 72 (E.D.N.Y. 2000) (Gleeson, J.) (defining the "interchange fee" as "the fee that the acquiring institution pays the card-issuing institution every time it processes a payment by one of the card-issuing institution's cardholders at one of the acquiring institution's retailers"), and which the Second Circuit accepted in its opinion affirming this Court's approval of the *Visa Check* settlement, *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 102 (2d Cir. 2005) (defining the "interchange fee" as a "fee the acquiring institution must pay to the card-issuing institution"). Having convinced the courts in *Visa Check* to accept one definition of "interchange fees," plaintiffs here are judicially estopped from arguing the contrary position that merchants directly pay interchange fees. *See, e.g., New Hampshire v. Maine*, 532 U.S. 742, 755 (2001).

Each of the hundreds of merchant acquirers is free to set the merchant discount fee it charges its merchant customers on the basis of its own profit goals and cost demands. (SMF ¶ 37.) Merchant discount fees are accordingly negotiated between each merchant and its merchant acquirer. (SMF ¶ 43.) The merchant acquiring business is competitive, and merchant discount fees vary from merchant to merchant as merchant acquirers compete for merchant accounts. (*Id.*) No Visa or MasterCard rule requires merchant acquirers to "pass on" the interchange fee imposed on them to merchants, and each merchant acquirer makes its own independent decisions about whether to pass on interchange fees and, if so, how much of the interchange fees to pass on, as well as when to pass on those fees. Absent a contractual provision to the contrary in its agreement with its merchant customer, the merchant acquirer bears the risk of interchange fee fluctuations. (SMF ¶ 42.)

17

Many merchants, including several plaintiffs, negotiate "blended rate" merchant discount fees, which means that the merchant pays the same merchant discount rate for each transaction, notwithstanding variations in the merchant acquirer's cost for those transactions depending, among other things, on the specific interchange fee category applicable to each transaction. (SMF ¶ 44.)  Moreover, while agreements between merchants and merchant acquirers often permit merchant acquirers to increase the merchant discount fee in response to an increase in interchange fees, merchant acquirers do not uniformly do so. (SMF ¶¶ 47-57.)  Indeed, as class plaintiffs' experts conceded, merchant acquirers have absorbed increases in interchange fees, and, even where they have passed on such increases, have not always done so fully or contemporaneously with the interchange increases. (SMF ¶ 48.)

**B.**     ***Illinois Brick* Bars Plaintiffs' Antitrust Damages Action**

**1.**     ***Illinois Brick* Broadly Bars Indirect Purchaser Claims**

In *Illinois Brick*, the Supreme Court established a bright line rule that antitrust *plaintiffs* may not seek damages for alleged overcharges that they did not pay directly, but that they claim were passed on to them.  The rule is the reciprocal application of the Court's holding in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968), that antitrust *defendants* may not avoid the payment of damages to direct purchasers on the ground that those purchasers passed the challenged overcharges on to others.

The Supreme Court first addressed the treatment of "passed on" overcharges in antitrust damages actions in *Hanover Shoe*.  There, the plaintiff shoe manufacturer alleged that the defendant had monopolized the shoe machine business and sought treble damages for the amount of the overcharge it had paid the defendant.  *Id.* at 483-84.  The defendant argued that the plaintiff had suffered no legally cognizable injury because the plaintiff had simply passed the

18

illegal overcharge on to its own customers, purchasers of the plaintiff's shoes. *Id.* at 487-88. The Court rejected the "passing-on" defense as a matter of law for two reasons. First, the deter-mination of how much of the illegal overcharge was actually passed on, and the apportionment of the illegal overcharge among different levels along the vertical chain of distribution, would be "virtually unascertainable." *Id.* at 493. Second, recognition of the passing-on defense would se-verely weaken the effectiveness of antitrust enforcement by diminishing the incentives for each plaintiff to challenge a defendant's anticompetitive behavior. *Id.* at 494.

In *Illinois Brick*, the Court applied the reasoning of *Hanover Shoe* and held that indirect purchasers may not sue to recover overcharges allegedly passed on to them. *Illinois Brick*, 431 U.S. at 728. The Court reaffirmed that "the effectiveness of the antitrust treble-damages action would be substantially reduced by adopting a rule that any party in the chain may sue to recover the fraction of the overcharge allegedly absorbed by it," and therefore concluded that the rule "regarding pass-on in antitrust damages actions . . . must apply equally to plaintiffs and defendants." *Id.* at 728-29.

The Court reached this conclusion for two principal reasons. First, "[a] one-sided application of *Hanover Shoe* substantially increases the possibility of inconsistent adjudications and therefore of unwarranted multiple liability for the defendants by presuming that one plaintiff (the direct purchaser) is entitled to full recovery while preventing the defendant from using that presumption against the other plaintiff [indirect purchaser]." *Id.* at 730. Second, "the costs to the judicial system and the efficient enforcement of the antitrust laws" of permitting indirect pur-chaser claims would be substantial. *Id.* at 732. The difficulties of determining how much of an unlawful overcharge was passed on to the indirect purchaser "applies with no less force to the assertion of pass-on theories by plaintiffs than it does to the assertion by defendants." *Id.* In-

19

deed, as the Court observed, "the evidentiary complexities and uncertainties involved in the defensive use of pass-on against a direct purchaser are multiplied in the offensive use of pass-on by a plaintiff several steps removed from the defendant in the chain of distribution." *Id.*; *see also Temple v. Circuit City Stores, Inc.*, No. 06 CV 5303, 2007 WL 2790154, at *6 (E.D.N.Y. Sept. 25, 2007) (Gleeson, J.) (the Supreme Court in *Illinois Brick* "balanced the possibility of perfect compensation with the need for administrative efficiency, and concluded that it is better to sacrifice the former for the latter").

### 2.   *Illinois Brick* Is Fully Applicable To Payment Card Litigation

Recently, the Second Circuit held that merchant plaintiffs were indirect purchasers, and thus barred by *Illinois Brick* from bringing a damages action alleging that MasterCard and its member banks had conspired to set certain charges which, like interchange fees, were levied on acquiring banks, and which in turn were allegedly passed on to merchants. In *Paycom Billing Services, Inc. v. MasterCard International, Inc.*, 467 F.3d 283 (2d Cir. 2006), an internet merchant argued that MasterCard's "chargeback" policy violated Section 1. Pursuant to that policy, whenever a cardholder disputed a charge on her payment card, the cardholder's issuing bank could, but did not have to, require the merchant's acquirer to return the funds to the issuing bank pending resolution of the dispute. *Id.* at 286-87, 291. The chargeback, if made, was against the acquirer, not the merchant. *Id.* at 291. If an acquirer's merchant customer had excessive chargeback activity, the acquirer might also be subject to fines and penalties. *Id.* at 287. The acquirer "usually" passed on these reimbursement obligations and fines to the merchant by deducting the "chargeback" funds and any fines from the merchant's account.

Judge Winter, writing for a unanimous panel, held that Paycom – a merchant – was barred from pursuing its damages claim. *Id.* at 291-92. The court reasoned that "Paycom's

20

complaint alleges that the chargebacks and chargeback fines and penalties are imposed by issu-

ing banks and MasterCard on acquiring banks. Paycom is, therefore, in a position analogous to

the indirect purchasers in *Illinois Brick*." *Id.* at 291. The court acknowledged that "the acquiring

banks are alleged 'almost always' to pass-on these fees to the merchants," but held that "even if

one hundred percent of the chargebacks, fines, and penalties were passed-on, Paycom, as an indi-

rect payor of the chargebacks and chargeback fines and penalties, would still lack antitrust stand-

ing." *Id.* at 291-92.

Other antitrust challenges to network interchange fees seeking damages recently

have been dismissed on *Illinois Brick* grounds as well. In *Kendall v. Visa U.S.A., Inc.*, 518 F.3d

1042 (9th Cir. 2008), for example, the Ninth Circuit affirmed the district court's dismissal of

merchants' treble damages claims in an antitrust action where, as in the instant case, a group of

merchants sought damages based on allegations that payment card networks and issuers had con-

spired to fix interchange fees. The appeals court held that the merchants, like plaintiff merchants

here, were barred by *Illinois Brick* from pursuing a damages claim for price-fixing of interchange

fees where they did not allege that the defendants had fixed the "merchant discount fee the ac-

quiring bank chooses to charge, or not to charge, the merchant." *Id.* at 1050.

Similarly, in *In re ATM Fee Antitrust Litigation*, No. C 04-cv-02676, 2010 WL

3701912 (N.D. Cal. Sept. 16, 2010), the district court recently held that the rule of *Illinois Brick*

compelled summary judgment for the defendants where a putative class of bank customers al-

leged that an ATM network and several large banks fixed ATM interchange fees paid by card-

issuing banks to unrelated ATM owners. In ATM networks, when a card-issuing bank's cus-

tomer uses an ATM that is not owned by its bank (a "foreign ATM"), the card-issuing bank pays

an interchange fee to the foreign ATM owner. *Id.* at *1. The plaintiff customers contended that

the issuing banks passed on these interchange fees to them as part of separate "foreign ATM fees." *Id.* at *2. The court characterized the case as "a fairly straightforward application of the rule set forth in *Illinois Brick*," and – on reasoning fully applicable here – held that summary judgment was warranted because the plaintiffs "do not pay this allegedly unlawful fee directly (their banks do) and therefore are not directly harmed by it." *Id.* at *2, *11.

Defendants are unaware of any case in which a merchant's antitrust damages claim for allegedly inflated interchange fees has prevailed in the face of an *Illinois Brick* challenge. And plaintiffs' damages claims here likewise should not prevail. Plaintiffs cannot dispute that they pay merchant discount fees to their merchant acquirers (or to other third-party intermediaries yet further removed from the alleged collusion), and that they would be harmed by the purportedly unlawful interchange fees *only indirectly* in the form of higher merchant discount fees. (SMF ¶¶ 13, 37-38.) It is acquirers, not merchants, that pay interchange fees directly to card issuers. According to plaintiffs, merchant acquirers (or other third-party intermediaries) generally pass those allegedly inflated interchange fees on to their merchant customers, but the undisputed evidence establishes that merchant acquirers do not consistently pass 100% of every increase in interchange fees on to merchants. (SMF ¶¶ 47-57.) And even if plaintiffs could prove (and they cannot) that all acquirers passed on 100% of all interchange fee increases, *Illinois Brick* would still bar plaintiffs' claims. *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 210 (1990). There is no claim, much less evidence, of an agreement of any nature – agency or otherwise – that acquirers will pass on interchange fees to their merchant customers. Just as in *Paycom*, merchant acquirers bear a risk of merchant default in payment to them, and thus retain complete independence to determine the level of the merchant discount fees they charge to their

22

customers, as well as when and how much of the interchange fees to pass on to their merchant customers or to absorb themselves. (SMF ¶¶ 42-43, 47-57.)

Permitting merchants to seek antitrust damages for allegedly inflated interchange fees – fees that merchant acquirers, and not merchants, pay directly – would raise precisely the concerns that caused the Supreme Court to bar such claims in *Illinois Brick*. First, "[h]owever appealing th[e] attempt to allocate the overcharge [between the direct and indirect purchasers] might seem in theory, it would add whole new dimensions of complexity to treble-damages suits and seriously undermine their effectiveness." *Illinois Brick*, 431 U.S. at 737. The factfinder would be required to trace the amount of any alleged overcharge in interchange rates through the stream of commerce among the several intermediary acquirers that stand between the merchants and the payment card issuing banks that charge the interchange fee to determine whether, when, and what part, if any, of the alleged overcharge was paid by the merchants. *See UtiliCorp*, 497 U.S. at 210 ("[e]ven if, at some point, a utility can pass on 100 percent of its costs to its customers, various factors may delay the passing-on process," such that the direct purchaser may be forced to absorb some portion of the alleged overcharge). Indeed, the evidentiary complexities of permitting merchants to assert a pass-on theory to recover against the issuers that receive the interchange fees would be multiplied several times, since plaintiff merchants are often several steps removed from the issuers in the chain of distribution. (SMF ¶ 38.) *See Illinois Brick*, 431 U.S. at 732.

Second, permitting merchants to bring the antitrust damage claims they advance here would, in light of *Hanover Shoe*, raise the risk of multiple recoveries and inconsistent adjudications that also underlay the decision in *Illinois Brick*. Merchant acquirers could also seek damages against the networks and/or the issuers for the alleged overcharge and, under *Hanover*

23

*Shoe*, would be entitled to recover the entirety of any alleged overcharge. Indeed, they have: National Bancard Corporation, a merchant acquirer, brought the seminal case in which interchange fees were challenged and held to be lawful under the antitrust laws. *National Bancard Corp. (NaBanco) v. Visa U.S.A., Inc.*, 596 F. Supp. 1231, 1247 (S.D. Fla. 1984) (holding that merchant acquirer that pays the interchange fee is the direct purchaser; the merchants are not), *aff'd*, 779 F.2d 592 (11th Cir. 1986) ("*NaBanco*"). More recently, First Data Merchant Services, one of the country's largest merchant acquirers, made a similar claim against Visa. *Visa U.S.A. Inc. v. First Data Corp.*, No. C 02-01786-JSW, 2006 WL 1310448 (N.D. Cal. May 12, 2006) (seeking treble damages on theory that interchange fees are set at supracompetitive levels, forcing merchant acquirers like First Data to pay artificially high interchange fees).

C.    **Neither Of The Two *Illinois Brick* Exceptions Applies To Plaintiffs**

The Supreme Court has rejected attempts to carve out exceptions to the direct purchaser rule for particular circumstances beyond two potential narrow exceptions that the Court suggested in its *Illinois Brick* decision: (i) where the direct purchaser has entered into a pre-existing cost-plus contract to sell a specified quantity to the indirect purchaser, *Illinois Brick*, 431 U.S. at 732 n.12; and (ii) where the direct purchaser is owned or controlled by its customer, the indirect purchaser. *Id.* at 735-36 & n.16; *see also UtiliCorp*, 497 U.S. at 210 The Court reasoned that only in these two limited circumstances would the apportionment "effect of the overcharge [be] essentially determined in advance, without reference to the interaction of supply and demand that complicates the determination in the general case." *Illinois Brick*, 431 U.S. at 736.

In crafting those two narrow exceptions and rejecting other possible exceptions, the Court acknowledged that some injuries might go unremedied in cases where direct purchasers refrain from bringing a treble-damages suit for fear of disrupting business relations with their

24

suppliers. *Id.* at 746.  But, the Court held, "on balance, and until there are clear directions from Congress to the contrary, we conclude that the legislative purpose in creating a group of 'private attorneys general' to enforce the antitrust laws . . . is better served by holding direct purchasers to be injured to the full extent of the overcharge paid by them than by attempting to apportion the overcharge among all that may have absorbed a part of it." *Id.* (citation omitted).

   In *UtiliCorp*, the Supreme Court expressly rejected efforts to expand the two narrow exceptions to the *Illinois Brick* rule.  In that case, the States of Kansas and Missouri, acting as *parens patriae* on behalf of consumers within their states, sued several natural gas pipeline and production companies for price-fixing.  497 U.S. at 204-05.  Consumers had not purchased natural gas from the defendants; rather, the defendants had sold their natural gas to public utility companies that, in turn, sold to consumers at prices that were regulated.  *Id.*  As a result of such regulation, the public utilities had likely passed most, if not all, of any illegal overcharge on to their customers.  *Id.* at 205.  The Court refused to expand the exceptions to the *Illinois Brick* rule, and held that, as indirect purchasers of natural gas, consumers (and therefore the States acting as *parens patriae*) were barred from seeking antitrust treble damages.  *Id.* at 208.  In so doing, the Court acknowledged that "[t]he rationales underlying *Hanover Shoe* and *Illinois Brick* will not apply with equal force in all cases.  We nonetheless believe that ample justification exists for our stated decision not to 'carve out exceptions to the [direct purchaser] rule for particular types of markets.'  The possibility of allowing an exception, even in rather meritorious circumstances, would undermine the rule."  497 U.S. at 216 (quoting *Illinois Brick*, 431 U.S. at 744).  "Having stated the rule in *Hanover Shoe*, and adhered to it in *Illinois Brick*, we stand by our interpretation of [the antitrust laws]."  *Id.* at 217.

### 1.    The "Cost-Plus" Contract Exception Does Not Apply

As a matter of undisputed fact, plaintiffs have not entered into pre-existing "cost-plus" contracts with the direct payers of interchange – namely, the merchant acquirers – to purchase a fixed quantity of services for a prearranged cost-plus price. (SMF ¶¶ 43-46.) To qualify for the "cost-plus" contract exception to *Illinois Brick*, such contracts must provide for a prearranged fixed quantity to be purchased regardless of ultimate price, so that the direct purchaser is completely insulated from the adverse effects of any increase in its costs. *See, e.g., UtiliCorp*, 497 U.S. at 218 (explaining that, in the absence of a pre-existing cost-plus contract for a fixed quantity of gas, the Court could not ascertain the precise apportionment of any injury caused by an alleged overcharge by the upstream producers); *Illinois Brick*, 431 U.S. at 736 (explaining that the "cost-plus" contract exception would insulate the direct purchaser "from any decrease in its sales as a result of attempting to pass on the overcharge, because its customer is committed to buying a fixed quantity regardless of price.  The effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand that complicates the determination in the general case."); *Lefrak v. Arabian Am. Oil Co.*, 487 F. Supp. 808, 823 n.21 (E.D.N.Y. 1980) (the "cost-plus" exception does not apply where the indirect purchaser bought pursuant to a requirements contract).  It is undisputed that plaintiffs' contracts with their merchant acquirers do not require plaintiffs to purchase a prearranged fixed quantity of services, and thus the "cost-plus" exception to *Illinois Brick* does not apply.

### 2.    The Ownership And Control Exception Does Not Apply

The Court also allowed for a possible exception to the *Illinois Brick* rule where "the direct purchaser is owned or controlled by its customer," that is, by the indirect purchaser. *Illinois Brick*, 431 U.S. at 736 n.16.  For this exception to apply to the instant case, the merchants

26

would need to establish that they own or control their merchant acquirers. It is undisputed, however, that the merchants do not own or control their merchant acquirers, and thus this second exception to the *Illinois Brick* rule does not apply.

Some courts outside the Second Circuit have interpreted *Illinois Brick*'s ownership or control exception to permit indirect purchasers to seek damages where the direct purchaser is owned or controlled by its supplier – the antitrust violator. *See, e.g., Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1145-46 (9th Cir. 2003); *Royal Printing Co. v. Kimberly-Clark Corp.*, 621 F.2d 323, 326 (9th Cir. 1980) ("*Illinois Brick* does not bar an indirect purchaser's suit where the direct purchaser is a division or subsidiary of a co-conspirator"). In *Freeman*, eleven competing real estate agent associations formed a joint venture – Sandicor – in which they shared ownership and through which they sold certain real estate database services to Sandicor subscribers. 322 F.3d at 1140-41. Subscribers sued the real estate agent associations, alleging that they had fixed the price of database services. *Id.* at 1141-42. The court rejected the defendants' *Illinois Brick* argument, holding that, even though the plaintiffs had purchased the database services directly from Sandicor, and not directly from the defendants, Sandicor was wholly owned by the defendants and was therefore not realistically likely to sue the defendants for price fixing. *Id.* at 1145-46. Relying on its decision in *Royal Printing*, where the court had observed that a parent corporation was likely to "forbid its subsidiary or division [from] bring[ing] a lawsuit that would only reveal the parent's own participation in the conspiracy," 621 F.2d at 326, the court in *Freeman* held that, in that circumstance, "there is no realistic possibility that the direct purchaser will sue its supplier over the antitrust violation." 322 F.3d at 1145-46.

Neither the Supreme Court nor the Second Circuit has adopted *Freeman*'s interpretation of *Illinois Brick*. Nor should this Court do so, given the Supreme Court's strong admo-

nition that lower courts should not expand the exceptions to the *Illinois Brick* rule. *See, e.g., UtiliCorp*, 497 U.S. at 217 ("even assuming that any economic assumptions underlying the *Illinois Brick* rule might be disproved in a specific case, we think it an unwarranted and counterproductive exercise to litigate a series of exceptions"). In any event, *Freeman* would have no application where, as here, history shows that plaintiffs cannot establish that merchant acquirers could not or would not sue. To the contrary, there is a history of merchant acquirers bringing exactly such challenges. *See NaBanco*, 596 F. Supp. at 1247; *Visa U.S.A. Inc. v. First Data Corp.*, 2006 WL 1310448. Ninth Circuit authority involving antitrust challenges to interchange fees confirms this conclusion. *See Kendall*, 518 F.3d at 1050 (rejecting merchant plaintiffs' reliance on *Freeman* because of the absence of "any facts establishing that there is no realistic possibility the Banks will not sue the [networks]"); *In re ATM Fee Antitrust Litig.*, 2010 WL 3701912, at *10 (rejecting plaintiffs' reliance on *Freeman* because there was "a 'realistic possibility' that one or more" of the ATM network's bank members would bring an antitrust suit if ATM interchange fees were artificially inflated).

Finally, even if plaintiffs could show that acquirers might not challenge artificially inflated interchange fees, such a showing would not entitle them to sue. The Supreme Court has expressly rejected the argument that there should be an exception to the *Illinois Brick* rule in cases where the direct purchasers may refrain from bringing a treble damages action for fear of disrupting their business relationship with their suppliers. *Illinois Brick*, 431 U.S. at 746; *accord Delaware Valley Surgical Supply Inc. v. Johnson & Johnson*, 523 F.3d 1116, 1123 (9th Cir. 2008) (observing that "the Supreme Court has already rejected" the argument that an indirect purchaser should be entitled to sue where it "has a greater incentive than a [direct purchaser] to bring an antitrust claim").

**D.**     <u>The So-Called "Co-Conspirator Exception" Does Not Apply</u>

Some lower federal courts have held that *Illinois Brick* does not apply to a suit by a plaintiff consumer alleging a vertical conspiracy between the supplier and its wholesale customer (the direct purchaser) to fix the *retail* price of the goods or services purchased by consumers. *See, e.g., Dickson v. Microsoft Corp.*, 309 F.3d 193, 214-15 (4th Cir. 2002); *Arizona v. Shamrock Foods Co.*, 729 F.2d 1208, 1211-12 (9th Cir. 1984). Although some courts have referred to this situation as a "co-conspirator exception," it is not actually an exception to the *Illinois Brick* rule. *In re ATM Fee Antitrust Litig.*, 2010 WL 3701912, at *6. Rather, the *Illinois Brick* rule is simply inapplicable where the claimed conspirators have allegedly fixed the *retail* price paid directly by the plaintiff; the plaintiff in such a case is a direct purchaser of the price-fixed goods or services.

Critically, it is insufficient to allege that the wholesale customer simply agreed to pay its supplier – the alleged wrongdoer – an artificially inflated price. If that were enough, every agreement by a direct purchaser to buy goods or services from an alleged antitrust violator would constitute a conspiracy that would permit the indirect purchaser to bring its own antitrust lawsuit – the antithesis of the holding and rationale of *Illinois Brick*. *See, e.g., Temple*, 2007 WL 2790154, at *7 n.12 (Gleeson, J.) (rejecting argument that intermediary who acquiesces in antitrust violation by purchasing from antitrust violator and does not absorb entire alleged overcharge becomes a co-conspirator, thereby permitting the indirect purchaser to sue for damages). To render *Illinois Brick* inapplicable by reason of a conspiracy theory, a plaintiff must allege that the wholesaler and its supplier unlawfully agreed to fix the price the wholesaler charged to the plaintiff. *In re ATM Fee Antitrust Litig.*, 2010 WL 3701912, at *5-*6. Thus, to apply here, plaintiffs must allege and prove that defendants conspired to fix not interchange fees, but the *merchant discount fees* that plaintiffs pay directly. Plaintiffs have done neither.

29

\*      \*      \*

Under *Illinois Brick* and its progeny, plaintiff merchants may not recover antitrust damages for purported overcharges in the interchange fees because plaintiffs did not pay those alleged illegal overcharges directly. Because all plaintiffs' damages claims are predicated on their merchant acquirers having passed on the allegedly unlawful interchange fee overcharges, defendants are entitled to summary judgment on each of plaintiffs' damages claims.

**III.    Plaintiffs' Challenge To The Establishment Of Default Interchange Rules Is Barred By The Controlling Authority Of *Buffalo Broadcasting* And *Paycom***

The Visa and MasterCard default interchange rules do not restrain the competitive freedom of any defendant to enter into bilateral agreements to supersede the default interchange rates or to engage in any competitive activity in which it could have engaged if it had not joined Visa or MasterCard. Under principles established in *Buffalo Broadcasting Co. v. ASCAP*, 744 F.2d 917, 933 (2d Cir. 1984), *Columbia Broadcasting Sys. v. ASCAP*, 620 F.2d 930, 936 (2d Cir. 1980) ("*CBS*"), and *Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*, 467 F.3d 283, 291-92 (2d Cir. 2006), the default interchange rules thus cannot constitute a restraint amenable to scrutiny under Section 1.

It is undisputed that the challenged interchange rules establish only *default* interchange fees. Every Visa issuer retains the unimpaired competitive independence to enter into a bilateral agreement with each and every Visa acquirer to supersede the default interchange rates Visa has established. (SMF ¶ 58.) Likewise, every MasterCard issuer retains the unconstrained competitive freedom to enter into a bilateral agreement with each MasterCard acquirer to supersede the default interchange rates MasterCard has established. (SMF ¶ 59.) Class plaintiffs acknowledge that such bilateral agreements are feasible (SMF ¶ 60; *see also* SMF ¶¶ 61, 63), and the undisputed facts establish that such bilateral agreements in fact exist. (SMF ¶ 62.) Nor do

30

the challenged default interchange rules restrain any bank defendant's competitive freedom to compete outside the Visa and MasterCard payment systems. The undisputed facts show that neither Visa nor MasterCard prohibits its members from providing any payment card service that the member could have provided if it had not joined the network or if the network did not exist. The challenged default interchange rules simply do not restrain defendants' competitive behavior in any way.

### A.     Section 1 Requires Proof Of An Agreement In Restraint Of Trade

A Section 1 claim requires a plaintiff to prove three related but analytically distinct elements:  (i) the existence of an agreement (ii) that creates a restraint on interstate commerce (iii) which is unreasonable.  Whether the defendants have entered into an agreement that restrains trade at all under Section 1 is a *threshold* question. *See Buffalo Broadcasting*, 744 F.2d at 924 ("We think the initial and, as it turns out, dispositive issue on the merits is whether the blanket licensing of performing rights to the local television stations has been proven to be a restraint of trade"); *CBS*, 620 F.2d at 934 (identifying as a "threshold contention" the question whether "the balancing of pro- and anti-competitive effects need not be undertaken" where the challenged conduct is not a "restraint at all").

If an agreement does not prohibit its parties from engaging in uninhibited competitive behavior with respect to the subject of the agreement, it is not an agreement in restraint of trade within the meaning of Section 1.  For example, an agreement among competitors to enter into *non-exclusive* intellectual property licenses within a joint venture, which agreement does not restrain competition among the participants freely to enter into intellectual property licenses outside the joint venture, does not constitute an agreement in restraint of trade, and thus does not violate Section 1. *Buffalo Broadcasting*, 744 F.2d at 933.  Similarly, an agreement among mem-

bers of MasterCard to a default chargeback rule that permits, but does not require, issuers to is-

sue chargebacks and acquiring banks to pass those chargebacks on to merchants, does not consti-

tute an agreement in restraint of trade because nothing in the "MasterCard rules or an agreement

among acquiring banks have prevented [the merchant] from negotiating with acquiring banks to

create an individualized solution to [the merchant's] costs of fraud." *Paycom*, 467 F.3d at 292;

*see also National Bancard Corp. (NaBanco) v. Visa U.S.A., Inc.*, 779 F.2d 592, 600 & n.13 (11th

Cir. 1986) (Visa-established interchange fees did not violate the Sherman Act when individual

acquirers and issuers were free to bypass Visa's rules and negotiate their own fees).

### 1.    A Joint Venture Among Competitors That Preserves Their Freedom To Compete Is Not A Restraint

In *Buffalo Broadcasting*, local television stations challenged the blanket licensing

practices of the American Society of Composers, Authors and Publishers ("ASCAP"), an unin-

corporated membership association of music composers, authors, and publishers that had ob-

tained from its members the non-exclusive right to license music performing rights to others for

the music on which its members held the copyright.  ASCAP offered television and radio broad-

casters a blanket license to broadcast all the compositions of its members.  ASCAP did not per-

mit a broadcaster to alter the venture product in any way, for example, by reducing the scope of

the blanket license by selecting fewer than all of ASCAP's repertory.  But because ASCAP pos-

sessed only non-exclusive licensing authority, nothing prevented a broadcaster from negotiating

different licensing arrangements with any individual composer, or group of ASCAP members.

Similarly, nothing in the ASCAP agreement prevented any ASCAP member from licensing his

music in any other way, including by joining or forming a competing joint venture, or licensing

individually.  Nevertheless, virtually all radio and television broadcasters bought ASCAP's blan-

ket license. *See Buffalo Broadcasting*, 744 F.2d at 919-23.

The Second Circuit held that ASCAP's blanket license did not constitute a restraint under Section 1 because it did not impede the competitive independence of the individual songwriter members of ASCAP to negotiate separate licenses for the use of their own compositions with broadcasters outside ASCAP. *Id.* at 933. Writing for the court, Judge Newman explained that the local broadcasters had not presented any evidence that ASCAP's blanket license was "functioning to restrain willing buyers and sellers from negotiating for the licensing of performing rights to individual compositions." *Id.* at 932. Although it might be "difficult" for plaintiff local broadcasters to license compositions outside ASCAP, it remained "possible." *Id.* at 929. Judge Newman concluded that "[t]he blanket license is not even amenable to scrutiny under section 1 unless it is a restraint of trade. . . . Since the blanket license restrains no one from bargaining over the purchase and sale of music performance rights, it is not a restraint unless it were proven that there are no realistically available alternatives. . . . Not having been proven to be a restraint, it cannot be a violation of section 1." *Id.* at 933.

In his concurring opinion, Judge Winter emphasized that a non-exclusive joint venture that does not inhibit the freedom of its members to compete with products and services of their own does not violate Section 1: "[S]o long as composers or producers have no horizontal agreement among themselves to refrain from source or direct licensing and there is no other artificial barrier, such as a statute, to their use, a non-exclusive blanket license cannot restrain competition." *Id.* at 934 (Winter, J., concurring). In those circumstances, the non-exclusive joint venture "is simply one alternative competing on the basis of price and services with others." *Id.* (Winter, J., concurring). Contrasting the competitive effect of the non-exclusive character of the blanket licenses with the arrangement struck down in *NCAA v. Board of Regents of the Univ. of Oklahoma*, 468 U.S. 85 (1984), Judge Winter wrote: "I think all would agree that, if the NCAA

merely offered a *non-exclusive* license to all football games between member schools and the member schools were free to negotiate television rights on their own, the action would have been dismissed on the pleadings." 744 F.3d at 934 (Winter, J., concurring).

In *Buffalo Broadcasting*, it was irrelevant that no single ASCAP member could duplicate the ASCAP blanket license that ASCAP offered. In earlier litigation involving the same blanket license, the Supreme Court had observed that ASCAP's blanket license was comprised of the individual compositions of its members plus certain additional services such that "the whole is truly greater than the sum of its parts; it is, to some extent, a different product." *Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 21-22 (1979) ("*BMI*"). "[T]o the extent the blanket license is a different product, ASCAP is not really a joint sales agency offering the individual goods of many sellers, but is a separate seller offering its blanket license, of which the individual compositions are raw material. ASCAP, in short, made a market in which individual composers are inherently unable to compete fully effectively." *Id.* at 22-23 (footnotes omitted). In other words, ASCAP did not interfere with competition that could otherwise take place; instead, it added a new option to the marketplace – the blanket license. The members were permitted to set the price of that new product because doing so did not interfere with competition that otherwise could have occurred. The *BMI* Court explained:

> Here, the blanket license fee is not set by competition among individual copyright owners, and it is a fee for the use of any of the compositions covered by the license. But the blanket license cannot be wholly equated with a simple horizontal arrangement among competitors. ASCAP does set the price for its blanket license, but that license is quite different from anything any individual owner could issue. The individual composers and authors have neither agreed not to sell individually in any other market nor use the blanket license to mask price fixing in such other markets.

*Id.* at 23-24; *see also* William M. Landes, *Harm to Competition: Cartels, Mergers and Joint Ventures*, 52 Antitrust L. J. 625, 634 (1983) (ASCAP blanket license was procompetitive be-

34

cause "not only does ASCAP's blanket license lower transaction costs compared to direct licensing, but it also expands output" to the extent it offers one more option in the marketplace).

The principles that guided the Second Circuit in *Buffalo Broadcasting* are not limited to music licensing; those doctrinal antitrust principles have been applied with equal vigor in other industries. *See, e.g., Continental Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 516 (4th Cir. 2002) (relying on *Buffalo Broadcasting* to hold that carry-on baggage template program may constitute a market innovation and would not restrain trade "if an alternative opportunity . . . is realistically available"); *Matsushita Elec. Indus. Co. v. Cinram Int'l, Inc.*, 299 F. Supp. 2d 370, 376-79 (D. Del. 2004) (relying on *Buffalo Broadcasting* to grant summary judgment dismissing antitrust counterclaims; patent pool did not restrain trade because the defendant "realistically could avail itself of individual licenses" outside of the patent pool); *Federal Paper Bd. Co. v. Amata*, 693 F. Supp. 1376, 1384 n.9 (D. Conn. 1988) (relying on *BMI* to hold that no restraint existed where defendant's alleged kickback arrangements with certain suppliers did not prevent plaintiff from doing business with individual suppliers); *Levitch v. CBS*, 495 F. Supp. 649, 666 (S.D.N.Y. 1980) (relying on *BMI* to hold that television broadcasting network's policy of airing only in-house documentary programs did not violate Section 1 because network affiliate stations were free to seek programming produced outside the network), *aff'd*, 697 F.2d 495 (2d Cir. 1983).

### 2. A Payment Card Network Rule That Allows Participants The Discretion To Enter Into Bilateral Alternative Arrangements To Supersede It Is Not A Restraint

In *Paycom*, the Second Circuit recently applied the key principle underlying *Buffalo Broadcasting* – that an agreement that does not prevent the exercise of independent competitive conduct does not violate Section 1 – in the context of dismissing the antitrust complaint

challenging MasterCard's chargeback rule. The chargeback rule, designed to protect a card-holder from fraudulent charges, permitted card issuers to require merchant acquirers to return funds to the issuer whenever a cardholder disputed a charge on his payment card. As explained above, merchant acquirers, to which chargebacks were issued, were then free to decide inde-pendently whether to assess the chargebacks against the merchants, and typically did so.

The Second Circuit held that, because MasterCard's chargeback rule did not re-quire merchant acquirers to pass chargebacks on to merchants, the rule did not create an agree-ment that restrained competition. The absence of a restraint was dispositive: "Nothing in . . . MasterCard's rules . . . prevented Paycom from negotiating with acquiring banks to create an in-dividual solution to Paycom's costs of fraud." *Paycom*, 467 F.3d at 292.

The legal principle of *Buffalo Broadcasting* is fully supported by the economic aim of the antitrust law because non-exclusive arrangements do not constrain the competitive behavior of their participants expand output and offer more, rather than fewer, consumer choices. William M. Landes, *Harm to Competition: Cartels, Mergers and Joint Ventures*, 52 Antitrust L. J. at 634 ("Nonexclusivity means that ASCAP competes against its own members who have the option to license their compositions directly to a user of music"). Indeed, class plaintiffs' eco-nomic expert has written that the same principle applies and makes economic sense in the credit card business. "The ability of members of a joint venture like Visa to issue their own proprietary cards in competition with Visa cards places a restraint on the pricing of Visa cards. . . . In the *BMI* case and in *NaBanco*, the organizations in each case (BMI and Visa, respectively) were able to escape antitrust liability in part by showing that their members had the ability to remain mem-bers of the joint venture and also compete with the joint venture as separate firms." Dennis W.

36

Carlton & Alan S. Frankel, *The Antitrust Economics of Credit Card Networks*, 63 Antitrust L. J. 643, 667 (1995).

**B.  The Default Interchange Rules Do Not Restrict
    Network Members' Competitive Conduct In Any Way**

Just as the non-exclusive license in *Buffalo Broadcasting* permitted individual composers to license their compositions directly and the MasterCard rule in *Paycom* allowed the issuing and acquiring banks to make their own competitive decisions on chargebacks, each network's default interchange rule permits member banks to enter into bilateral agreements that alter the default interchange fees. (SMF ¶¶ 58-59.) There is nothing about the challenged default interchange rules that prevents any merchant from negotiating with issuing or acquiring banks, or the networks themselves, to create an individualized solution. Significantly, unlike in *Buffalo Broadcasting*, where the only proof of the unimpaired independence of songwriters to negotiate licenses outside ASCAP was theoretical because no local television station had ever tried to negotiate an independent license agreement with an individual songwriter, bilateral interchange fee arrangements between member banks are not merely theoretical; they are realistic alternatives that have been negotiated and exist. (SMF ¶¶ 60-63.) The fact that many members have elected, or even typically elect, to adhere to the default interchange fees may simply be evidence that the default rules of the two networks have "virtues of convenience that make [them] a legitimate object [for] customer preference." *Buffalo Broadcasting*, 744 F.2d at 927; *see also Paycom*, 467 F. 3d at 292; William M. Landes, *Harm to Competition: Cartels, Mergers and Joint Ventures*, 52 Antitrust L. J. at 634 ("ASCAP beats the competition (its members) by saving users so much [in avoided transaction costs] that they prefer to deal with ASCAP rather than individual members").

Moreover, the undisputed facts demonstrate that neither the Visa default interchange rules nor the MasterCard default interchange rules impede the competitive freedom of

37

network members to compete with each network and each other by joining other networks and issuing other brands of payment cards. (SMF ¶¶ 64-68.) For example, as class plaintiffs acknowledge, virtually all members of Visa are members of MasterCard as well. (SMF ¶ 65.) And several members also issue American Express and/or Discover cards. (SMF ¶ 66.) Members of Visa and MasterCard have also joined various ATM networks in connection with their issuance and acceptance of debit cards. (SMF ¶¶ 68.) Visa and MasterCard members may also acquire merchant transactions from other networks. (SMF ¶¶ 74.) Furthermore, Visa and MasterCard members are entirely free to compete by negotiating agreements with merchants to issue private label payment cards. (SMF ¶¶ 72.) The undisputed evidence in this record establishes that merchants, including the class representatives, accept Visa, MasterCard, American Express, Discover, Diners Club, Revolution Money, private label cards, and PayPal as forms of payment. (SMF ¶¶ 69-71; 73; 75.) Indeed, nothing in either network's default interchange rules restrains members of either network from engaging in any competitive activity whatsoever in which they could have engaged if they had not joined Visa or MasterCard.

To be sure, no single issuing bank can offer merchants the full range of network services the merchants obtain from the Visa or MasterCard networks. In this respect, however, the case is identical to *BMI* and *Buffalo Broadcasting*. In those cases, only ASCAP could offer the blanket license. Indeed, unlike this case, where network rules permit individual network members to negotiate superseding interchange agreements among themselves, in *Buffalo Broadcasting*, only ASCAP could price the blanket license. The individual licenses that the members were free to provide were "a different product." *BMI*, 441 U.S. at 22. The blanket license was "simply one alternative competing on the basis of price and services with others." *Buffalo Broadcasting*, 744 F.2d at 934 (Winter, J., concurring). Nevertheless, as the Second Circuit rea-

soned, since the challenged conduct of the venture – here the network default interchange rules – does not restrict the ability of any member of the venture to compete with the venture or with other members with its own products and services, it does not constitute a restraint of trade, and therefore does not violate Section 1. *Id.* (Winter, J., concurring) ("so long as [venture members] have no horizontal agreement among themselves to refrain from [competing among themselves or with the venture] . . . a non-exclusive blanket license cannot restrain competition").

In conclusion, the challenged default interchange rules do not restrain the competitive independence of Visa and MasterCard members. As such, the default interchange rules do not constitute an agreement in restraint of trade. Defendants are therefore entitled to summary judgment on plaintiffs' antitrust challenges to those default interchange rules.

## IV.   Plaintiffs' Antitrust Claims Fail Because Plaintiffs Have Proffered No Evidence To Establish That The Challenged Rules Have Reduced Output

As a matter of law, an alleged restraint has no anticompetitive effect – and thus is not unlawful – unless it can be shown to have reduced output in some relevant market. As the Supreme Court has unequivocally held, higher prices and price increases, even by alleged oligopolists, are not by themselves anticompetitive. *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 232, 237 (1993); *see also Chicago Prof'l Sports Ltd. v. National Basketball Ass'n*, 95 F.3d 593, 597 (7th Cir. 1996) ("A high price is not itself a violation of the Sherman Act.") (citing *BMI*, 441 U.S. at 9-10, 19-20, 22 n.40 (1979)). "Supracompetitive pricing," which the antitrust laws proscribe, "entails a restriction in output." *Brooke Group*, 509 U.S. at 233. "The core question in antitrust is output. Unless a contract reduces output in some market, to the detriment of consumers, there is no antitrust problem." *Chicago Prof'l Sports*, 95 F.3d at 597. By contrast, an alleged restraint that "in the end expands output serves the interests

of consumers and should be applauded rather than condemned." *Chicago Prof'l Sports Ltd. v. National Basketball Ass'n*, 961 F.2d 667, 673 (7th Cir. 1992).

Plaintiffs bear the burden of proving that the rules they challenge have reduced output in some relevant market. *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537, 543 (2d Cir. 1993) (under the rule of reason, "plaintiff bears the initial burden of showing that the challenged action has had an actual adverse effect on competition as a whole in the relevant market"). The absence of any evidence of a restriction in output in some relevant market compels judgment in defendant's favor. *Brooke Group*, 509 U.S. at 234, 243; *see also Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 322-26 (2d Cir. 2008) (affirming summary judgment in defendant's favor where, *inter alia*, plaintiff failed to proffer evidence that output had been restricted in any relevant market).

Plaintiffs define nearly a score of "relevant" markets, all of which involve plaintiffs' purchase of payment card network services associated with the processing of payment card transactions. (SMF ¶¶ 76-77.) They complain, however, not that the default interchange and merchant acceptance rules they challenge have reduced output in any of those relevant markets, but rather that the challenged rules have *increased* the use of payment cards and thus have *increased* output in those markets. (SMF ¶¶ 78-79; *see also* SMF 112-18.) According to plaintiffs, default interchange rates and the challenged merchant acceptance rules have led to an over-utilization of payment cards as consumers have been encouraged to use their payment cards too often. (SMF ¶ 79.)

There should be no dispute that payment card transaction volume and its concomitant use of payment card network services – and thus output in any of plaintiffs' proposed relevant markets – has increased during the last two decades. Plaintiffs' industry expert, for in-

stance, reported that the aggregate general purpose credit and signature debit card purchase volumes for Visa and  (*Id.*) And plaintiffs' aggregate purchase of payment card services associated with processing that increased purchase volume necessarily has increased as well.

In *Brooke Group*, the Supreme Court rejected the plaintiff's assertion that competition in the relevant market had been adversely affected where, like here, the undisputed facts established that output in that market had expanded following the defendant's alleged antitrust violation. The Court explained:

> In the present setting, in which output expanded at a rapid rate following Brown & Williamson's alleged predation, output in the [relevant market] can only have been restricted in the sense that it expanded at a slower rate than it would have absent Brown & Williamson's intervention. *Such a counterfactual proposition is difficult to prove in the best of circumstances; here, the record evidence does not permit a reasonable inference that output would have been greater without Brown & Williamson's entry into the [relevant market].*

509 U.S. at 233 (emphasis added). "One could speculate," the Court noted, "that the rate of [market] growth would have tripled, instead of doubled, without Brown & Williamson's alleged predation. But there is no concrete evidence of this." *Id.* at 234. With no evidence to support the plaintiff's allegations, the theoretical speculation of the plaintiff's expert was insufficient to prevent judgment in the defendant's favor. *Id.* at 242-43.

Like the plaintiff in *Brooke Group*, plaintiffs here face a setting in which output has expanded rapidly in the face of the existence for many years of the default interchange and other merchant acceptance rules plaintiffs challenge. But, unlike the plaintiff in *Brooke Group*, plaintiffs here do not assert that output would have expanded even more rapidly in the absence of

the challenged rules.  Class plaintiffs' expert, Dr. Frankel, testified that he cannot tell whether the challenged rules have impeded the growth in output.  (SMF ¶ 80.)  Indeed, Dr. Frankel admitted that "the analysis of output is not properly applied to the markets [he'd] defined" (*id.*), but could only be applied to a hypothetical relevant market that neither Dr. Frankel nor plaintiffs have defined.  Accordingly, no relevant market has been defined in this case in which even to conduct an analysis of the effect of defendants' challenged conduct on output, let alone to reach a conclusion about that effect.  The most Dr. Frankel could say was that the effect of the challenged rules on transaction volume has been "ambiguous."  (*Id.*)  Plaintiffs' concession on this point constitutes a failure of proof on an essential element of plaintiffs' antitrust claims, and summary judgment in defendants' favor on those claims should be granted.  *See, e.g., Salvino, Inc.*, 542 F.3d at 318 (affirming summary judgment in defendant's favor on plaintiff's Section 1 claim and holding that "while Salvino calls the Clubs' exclusivity agreement a 'naked output . . . restriction[ ]' – asserting that there is an '*express* agreement to reduce output' and that the agreement 'restricts output *by its terms*' – and repeatedly characterizes the Clubs' agreement as one to reduce the number of licenses, Salvino has pointed to no evidence to support its characterization") (alterations in original; citations omitted).

## V.    Plaintiffs Have Abandoned Their Inter-Network Conspiracy Damages Claim

At the November 19, 2009 oral argument before this Court on plaintiffs' motion for class certification, plaintiffs represented to the Court that they had abandoned their damages claim alleging that Visa and MasterCard and their member banks had conspired between the two networks to establish default interchange rates.  (SMF ¶ 81.)  Because the Class Complaint contains only a single claim alleging such an inter-network conspiracy – the Third Claim for Relief –

and because that claim is pleaded as a claim for damages only, plaintiffs' conceded abandonment of the claim compels summary judgment in defendants' favor dismissing that damages claim.

To be sure, plaintiffs told the Court on November 19, 2009, that they still intended to pursue a claim for injunctive relief with respect to the alleged inter-network interchange fee conspiracy. (*Id.*) But the claim in the Class Complaint is not pleaded that way, and after more than eighty million pages of document production and nearly five hundred depositions, plaintiffs have completely failed even to try to develop evidence sufficient to raise a genuine issue of fact for trial as to such a conspiracy.

Plaintiffs' economic expert, Dr. Frankel, identified several facts which he concluded are consistent with "coordination" between Visa and MasterCard with respect to default interchange fees. (SMF ¶ 82.) These facts include the existence of the challenged merchant acceptance rules, the similarity of each network's default interchange fee schedules, Visa's public announcement that it would "not be disadvantaged in securing issuer brand decisions" by MasterCard's default interchange fee schedule, and the opportunity of Visa and MasterCard to share information through publicly announced default interchange rate changes and as a result of the banks' membership in both networks. (*Id.*) But Dr. Frankel carefully did not opine that these facts are in any way inconsistent with permissible independent competitive behavior, and he emphasized that he has not concluded that any inter-network conspiracy has occurred. (SMF ¶¶ 83-84.) Dr. Frankel does not, therefore, raise a genuine issue of fact to be tried as to plaintiffs' alleged inter-network conspiracy claim.

The Supreme Court has repeatedly made clear that "antitrust law limits the range of permissible inferences from ambiguous evidence in a [Section] 1 case." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). Thus, in *Monsanto Co. v. Spray-Rite*

*Service Corp.*, 465 U.S. 752 (1984), the Court held that conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy. *Id.* at 764. Even "conscious parallelism" – a common reaction of "firms in a concentrated market [that] recogniz[e] their shared economic interests and their interdependence with respect to price and output decisions" – is "not in itself unlawful." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553-54 (2007) (quoting *Brooke Group*, 509 U.S. at 227). The antitrust laws permit firms in concentrated industries to respond to one another's competitive behavior in an interdependent way. *Id.* To survive a motion for summary judgment, a Section 1 plaintiff must present "evidence that tends to exclude the possibility" that the alleged conspirators acted independently. *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. at 764.

Here, plaintiffs can present no evidence whatsoever that would tend to exclude the possibility that Visa and MasterCard have acted independently in establishing their default interchange rates. For this independent reason, defendants are entitled to summary judgment in their favor as to plaintiffs' inter-network conspiracy claim.

## VI.  Defendants Are Entitled To Summary Judgment On Plaintiffs' Section 1 Claims Relating To The No- Surcharge Rules

This Court should grant summary judgment as to the Class Complaints' two claims for injunctive relief in the Sixth and Seventh Claims for Relief to the extent those claims challenge the no-surcharge rules, for the reasons set forth in defendants' memorandum in support of the motion for summary judgment as to the Individual Plaintiffs' Complaints, which defendants hereby adopt and incorporate by reference.

44

## VII.   <u>Defendants Are Entitled To Summary Judgment On Plaintiffs' Section 2 Claims</u>

Similarly, for the reasons set forth in defendants' memorandum in support of the motion for summary judgment as to the Individual Plaintiffs' Complaints, which defendants hereby adopt and incorporate by reference, defendants are entitled to summary judgment as to the Class Complaint's monopolization claims (the Eighth and Ninth Claims for Relief).

## VIII.   **Defendants Are Entitled To Summary Judgment On Plaintiffs' Post-IPO Conspiracy Claims**

For the reasons set forth in defendants' memorandum in support of the motion for summary judgment as to the IPO-related claims, which defendants hereby adopt and incorporate by reference, defendants are entitled to summary judgment on plaintiffs' post-IPO conspiracy claims in the Class Complaint (the Seventeenth, Eighteenth, Nineteenth, and Twentieth Claims for Relief).

## IX.   **Defendants Are Entitled To Summary Judgment On Class Plaintiffs' Antitrust Claims Because Plaintiffs Have Failed To Present Admissible Evidence To Establish Critical Elements Of Those Claims**

Defendants are separately moving to exclude as inadmissible under Rule 702 of the Federal Rules of Evidence the opinions of class plaintiffs' economic expert, Dr. Alan S. Frankel, regarding (i) injury and damages attributable to the challenged conduct and (ii) the competitive effects of the challenged conduct. Dr. Frankel's opinions are the sole evidence class plaintiffs have offered on these essential elements of their antitrust claims. If Dr. Frankel's opinions on these subjects are excluded as inadmissible – as defendants respectfully submit that they should be – there will be no record evidence to support class plaintiffs' claims that they have suffered injury or measurable damages as a result of the establishment of default interchange rates and merchant acceptance rules, or that the establishment of default interchange rates and mer-

45

chant acceptance rules has had an anticompetitive effect in any properly defined relevant market.
On this independent ground, defendants would be entitled to summary judgment on plaintiffs'
antitrust claims.

### *Conclusion*

For all of the foregoing reasons, defendants are entitled to summary judgment in their favor on all of the claims in plaintiffs' Second Consolidated Amended Class Action Complaint.

Dated:   New York, New York
          February 11, 2011

Respectfully submitted,

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

By:   /s/ Gary R. Carney
     Andrew C. Finch
     Gary R. Carney
     1285 Avenue of the Americas
     New York, New York 10019-6064
     Tel.: (212) 373-3000
     Fax: (212) 757-3990
     gcarney@paulweiss.com

     Kenneth A. Gallo
     Joseph J. Simons
     2001 K Street, N.W.
     Washington, DC 20006-1047
     Tel.: (202) 223-7300
     Fax: (202) 223-7420

**WILLKIE FARR & GALLAGHER LLP**

     Keila D. Ravelo
     Wesley R. Powell
     Matthew Freimuth
     787 Seventh Avenue
     New York, New York 10019-6099
     Tel.: (212) 728-8000
     Fax: (212) 728-8111

     *Attorneys for Defendant MasterCard Incorporated and MasterCard International Incorporated*

47

**ARNOLD & PORTER LLP**

By:   /s/ Robert C. Mason
        Robert C. Mason
        399 Park Avenue
        New York, NY  10022-4690
        Telephone:  (212) 715-1000
        Facsimile:  (212) 715-1399
        robert.mason@aporter.com

        Robert J. Vizas
        One Embarcadero Center, 22nd Floor
        San Francisco, CA  94111-3711
        Telephone:  (415) 356-3000
        Facsimile:  (415) 356-3099

        Mark R. Merley
        Matthew A. Eisenstein
        555 12th Street, N.W.
        Washington, DC  20004-1206
        Telephone:  (202) 942-5000
        Facsimile:  (202) 942-5999

*Attorneys for Defendants Visa Inc., Visa U.S.A. Inc., and Visa International Service Association*

48

**MORRISON & FOERSTER LLP**

By:   /s/ Mark P. Ladner
         Mark P. Ladner
         Michael B. Miller
         1290 Avenue of the Americas
         New York, NY  10104-0050
         Telephone:  (212) 468-8000
         Facsimile:  (212) 468-7900
         mladner@mofo.com

*Attorneys for Defendants Bank of America, N.A., BA Merchant Services LLC (f/k/a Defendant National Processing, Inc.), Bank of America Corporation, and MBNA America Bank, N.A.*

**SHEARMAN & STERLING LLP**

By:   /s/ James P. Tallon
         James P. Tallon
         Wayne D. Collins
         Lisl J. Dunlop
         599 Lexington Avenue
         New York, NY 10022-6069
         Tel.: (212) 848-4000
         Fax: (212) 848-7179
         jtallon@shearman.com

*Attorneys for Defendants Barclays Financial Corp. and Barclay's Bank plc*

49

**O'MELVENY & MYERS LLP**

By:   /s/ Andrew J. Frackman
      Andrew J. Frackman
      Times Square Tower
      7 Times Square
      New York, N.Y. 10036
      Tel.: (212) 326-2000
      Fax: (212) 326-2061
      afrackman@omm.com

*Attorneys for Defendants Capital One Bank (USA),*
*N.A., Capital One F.S.B., and Capital One Financial*
*Corp.*


**SKADDEN, ARPS, SLATE, MEAGHER**
**    & FLOM LLP**

By:   /s/ Peter E. Greene
      Peter E. Greene
      Peter S. Julian
      Four Times Square
      New York, NY   10036
      Telephone:  (212) 735-3000
      Facsimile:  (212) 735-2000
      peter.greene@skadden.com

      Michael Y. Scudder
      155 North Wacker Drive
      Chicago, IL  60606-1720
      Telephone:  (312) 407-0700
      Facsimile:  (312) 407-0411
      michael.scudder@skadden.com


*Attorneys for Defendants JPMorgan Chase & Co.,*
*Chase Bank USA, N.A., Chase Manhattan Bank*
*USA, N.A., Chase Paymentech Solutions, LLC,*
*JPMorgan Chase Bank, N.A., as acquirer of certain*
*assets and liabilities of Washington Mutual Bank,*
*Bank One Corporation, and Bank One Delaware*

50

**SIDLEY AUSTIN LLP**

By:   /s/ David F. Graham _____
        David F. Graham
        Eric H. Grush
        One South Dearborn Street
        Chicago, IL 60603
        Tel.: (312) 853-7000
        Fax: (212) 853-7036
        dgraham@sidley.com

        Benjamin R. Nagin
        787 Seventh Ave
        New York, N.Y. 10019
        Tel.: (212) 839-5300
        Fax: (212) 839-5599

*Attorneys for Defendants Citibank (South Dakota), N.A., Citibank, N.A., Citigroup Inc., and Citicorp*

**KEATING MUETHING & KLEKAMP PLL**

By:   /s/Richard L. Creighton _____
        Richard L. Creighton
        Joseph M. Callow, Jr.
        Drew M. Hicks
        One East Fourth Street
        Suite 1400
        Cincinnati, OH 45202
        Tel.: (513) 579-6400
        Fax: (513) 579-6457

*Attorneys for Defendant Fifth Third Bancorp*

51

**KUTAK ROCK LLP**

By:   /s/ John P. Passarelli
      John P. Passarelli
      James M. Sulentic
      The Omaha Building
      1650 Farnam Street
      Omaha, NE 68102-2186
      Tel.: (402) 346-6000
      Fax: (402) 346-1148
      john.passarelli@kutakrock.com

*Attorneys for Defendant First National Bank of Omaha*


**WILMER CUTLER PICKERING HALE AND DORR LLP**

By:   /s/ Christopher R. Lipsett
      Christopher R. Lipsett
      David S. Lesser
      399 Park Avenue
      New York, N.Y. 10022
      Tel.: (212) 230-8800
      Fax: (212) 230-8888
      chris.lipsett@wilmerhale.com

      Ali M. Stoeppelwerth
      Perry A. Lange
      1875 Pennsylvania Ave., N.W.
      Washington, D.C. 20006
      Tel.: (202) 663-6000
      Fax: (202) 663-6363

*Attorneys for HSBC Finance Corporation and HSBC North America Holdings, Inc.*

52

**JONES DAY**

By:  /s/ John M. Majoras
     John M. Majoras
     Joseph W. Clark
     51 Louisiana Avenue, NW
     Washington, DC  20001
     Telephone:  (202) 879-3939
     Facsimile:  (202) 626-1700
     jmmajoras@jonesday.com

*Attorneys for Defendants National City Corporation, National City Bank of Kentucky*

**PULLMAN & COMLEY, LLC**

By:  /s/ Jonathan B. Orleans
     Jonathan B. Orleans
     Adam S. Mocciolo
     850 Main Street
     Bridgeport, CT   06601-7006
     Telephone:  (203) 330-2000
     Facsimile:  (203) 576-8888
     jborleans@pullcom.com

*Attorneys for Defendant Texas Independent Bancshares, Inc.*

**ALSTON & BIRD LLP**

By:  /s/ Teresa T. Bonder
     Teresa T. Bonder
     Valarie C. Williams
     Kara F. Kennedy
     1201 W. Peachtree Street, N.W.
     Atlanta, GA 30309
     Tel.: (404) 881-7000
     Fax: (404) 881-7777
     teresa.bonder@alston.com

*Attorneys for Defendant Suntrust Banks, Inc.*

53

**PATTERSON BELKNAP WEBB & TYLER LLP**

By:  /s/ Robert P. LoBue _____
   Robert P. LoBue
   Norman W. Kee
   Patterson Belknap Webb & Tyler LLP
   1133 Avenue of the Americas
   New York, NY  10036
   Tel.:  (212) 336-2596
   Fax:  (212) 336-2222
   rplobue@pbwt.com

*Attorneys for Defendants Wachovia Bank, NA.,*
*Wachovia Corporation, and Wells Fargo*
*& Company*

54