

Feb 11 2011
2:04PM

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

IN RE

PAYMENT CARD INTERCHANGE FEE
AND MERCHANT DISCOUNT
ANTITRUST LITIGATION

This Document Relates To:

All Actions

Master File No.: 1:05-md-1720(JG)(JO)

ORAL ARGUMENT REQUESTED

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT ON CLASS PLAINTIFFS'**
**IPO, POST-IPO CONSPIRACY, AND FRAUDULENT CONVEYANCE CLAIMS, AND**
**INDIVIDUAL PLAINTIFFS' POST-IPO CONSPIRACY CLAIMS**

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**TO BE FILED UNDER SEAL**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ iii

PRELIMINARY STATEMENT ........................................................................... 1

STATEMENT OF UNDISPUTED FACTS ........................................................... 4

    A.    The MasterCard IPO ................................................................... 4

    B.    The Visa IPO ............................................................................. 5

ARGUMENT .................................................................................................. 6

I.    Summary Judgment Should Be Granted on Plaintiffs' IPO Claims and Post-IPO
    Conspiracy Claims ................................................................................. 6

    A.    Summary Judgment Should Be Granted on Claims Challenging the
        MasterCard and Visa IPOs Under Section 1 and Section 7 ................... 7

        1.    Banks Do Not Control Either Post-IPO MasterCard or Visa ..................... 7

            (a)    The Post-IPO Compositions of the Visa and MasterCard
                Boards Divest the Banks of Any Purported Control ...................... 8

            (b)    Limited Voting Rights Do Not Give Banks Power over
                Network Decisions Regarding Interchange Rates ......................... 8

            (c)    Restrictions Limiting Stock Ownership to 15% Do Not
                Allow Banks to Exercise Control ............................................. 10

        2.    The IPOs Did Not Violate Section 7 by Creating "Single Entities"
            with Market Power ................................................................. 11

        3.    There is No Anticompetitive Effect, Injury, or Damage to Class
            Plaintiffs Flowing from the IPOs ............................................. 12

    B.    Summary Judgment Should be Granted Dismissing All Plaintiffs' Post-
        IPO Claims Under Section 1 for Lack of Conspiracy ........................ 13

        1.    Plaintiffs Cannot Establish as a Matter of Law the Existence of
            Any Actionable Post-IPO Intra-Network Structural Conspiracy
            Within Either Visa or MasterCard ............................................ 14

        2.    Summary Judgment Should be Granted on the Claims That Posit
            Any Post-IPO Conspiracy Theory ........................................... 16

i

**Page**

II.    Summary Judgment Should Be Granted on Class Plaintiffs' Fraudulent
       Conveyance Claims Against MasterCard .................................................................. 18

       A.    Plaintiffs Cannot Establish a Claim of Constructive Fraudulent
             Conveyance Under Section 275 ......................................................................... 19

             1.    There Is No Evidence That MasterCard Believed During the IPO
                   That It Would Incur Debts Exceeding Its Ability to Pay ......................... 19

             2.    Plaintiffs Cannot Demonstrate That the Assessment Provision Was
                   Eliminated Without Fair Consideration .................................................. 21

       B.    Plaintiffs Cannot Establish an Actual Fraudulent Conveyance Claim
             Under Section 276 ............................................................................................. 22

             1.    There Is No Direct Evidence That MasterCard Acted With Actual
                   Intent to Hinder, Delay, or Defraud Plaintiffs ......................................... 22

             2.    There Is No Evidence of the Existence of Multiple "Badges of
                   Fraud" from Which It Would Be Reasonable to Conclude That
                   MasterCard Acted with Actual Intent to Hinder, Delay, or Defraud
                   Plaintiffs ............................................................................................... 24

III.   Plaintiffs Cannot Establish Single Brand Credit or Debit Markets as a Matter of
       Law ....................................................................................................................... 25

CONCLUSION ............................................................................................................. 27

<u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

CASES

*AD/SAT v. Associated Press,*
181 F.3d 216 (2d Cir. 1999) ........................................................................................ 17

*Am. Airlines v. Christensen,*
967 F.2d 410 (10th Cir. 1992) ..................................................................................... 17

*Am. Express Travel Related Servs. v. Visa U.S.A.,* No. 04 Civ.8967(BSJ), 2005 WL
1515399 (S.D.N.Y. June 23, 2005) .............................................................................. 17

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ....................................................................................................... 6

*Apex Oil Co. v. DiMauro,*
822 F.2d 246 (2d Cir.1987) ..................................................................................... 17, 18

*Casierra v. Target Corp.,*
No. 09-CV-1301(JG)(MDG), 2010 WL 2793778 (E.D.N.Y. July 12, 2010)
(Gleeson, J.) ................................................................................................................... 7

*Drug Mart Pharmacy Corp. v. Am. Home Prods., Corp.,*
288 F. Supp. 2d 325 (E.D.N.Y. 2003) ................................................................... 14, 15

*Gallo v. Prudential Residential Servs., Ltd. P'ship,*
22 F.3d 1219 (2d Cir. 1994) .......................................................................................... 6

*Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.,*
386 F.3d 485 (2d Cir. 2004) ........................................................................................ 12

*Gentile v. Singlepoint Fin., Inc.,*
788 A.2d 111 (Del. 2001) ............................................................................................... 9

*Integrated Res. Real Estate Ltd. P'ships Sec. Litig.,*
850 F. Supp. 1105 (S.D.N.Y. 1993) ............................................................................ 23

*Kendall v. Visa U.S.A., Inc.,*
518 F.3d 1042 (9th Cir. 2008) ..................................................................................... 17

*Kittay v. Flutie New York Corp. (In re Flutie New York Corp.),*
310 B.R. 31 (Bankr. S.D.N.Y. 2004) ........................................................................... 20

*Kleban v. S.Y.S. Rest. Mgmt., Inc.,*
929 F. Supp. 294 (N.D. Il. 1996) ................................................................................. 10

iii

**Page(s)**

*Klonis v. Nat'l Bank of Greece, S.A.,*
    492 F. Supp. 2d 293 (S.D.N.Y. 2007)...............................................................................8

*Levin v. Nat'l Basketball Assoc.,*
    385 F. Supp. 149 (S.D.N.Y. 1974) .................................................................................11

*Lippe v. Bairnco Corp.,*
    249 F. Supp. 2d 357 (S.D.N.Y. 2003)..............................................................22, 23, 24-25

*In re Manhattan Inv. Fund Ltd.,*
    310 B.R. 500 (Bankr. S.D.N.Y. 2002).............................................................................24

*Marin County Bd. of Realtors v. Palsson,*
    549 P.2d 833 (1976).........................................................................................................18

*Menkes v. St. Lawrence Seaway Pilots' Ass'n,*
    269 Fed. Appx. 54 (2d Cir. 2008)....................................................................................13

*MFS/SUN Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.,*
    910 F. Supp. 913 (S.D.N.Y. 1995) .......................................................................19, 21, 24

*Monsanto Co. v. Spray-Rite Serv. Corp.,*
    465 U.S. 752 (1984)..................................................................................................14, 17

*Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.,*
    198 F.3d 823 (11th Cir. 1999) .........................................................................................15

*Neshewat v. Salem,*
    365 F. Supp. 2d 508 (S.D.N.Y. 2005)..............................................................................22

*Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.),*
    376 B.R. 390 (Bankr. S.D.N.Y. 2007) .......................................................................24, 25

*In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig.,*
    No. 05-MD-1720, Slip. Op. (E.D.N.Y. Feb. 12, 2008) ......................................19, 21, 24

*In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig.,*
    No. 05-MD-1720, 2008 WL 5082872 (E.D.N.Y. Nov. 25, 2008) ................1-2, 7, 10, 21

*PepsiCo v. Coca-Cola Co.,*
    315 F.3d 101 (2d Cir. 2002) .....................................................................................14, 18

*Picard v. Taylor (In re Park S. Sec., LLC),*
    326 B.R. 505 (S.D.N.Y. 2005) .........................................................................................23

*Podiatrist Assoc. Inc. v. La Cruz Azul de Puerto Rico, Inc.,*
    332 F.3d 6 (1st Cir. 2003) ..................................................................................................8

                                                                                              **Page(s)**

*Salomon v. Kaiser (In re Kaiser)*,
    722 F.2d 1574  (2d Cir. 1983) ........................................................................ 25

*Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*,
    403 F.3d 43 (2d Cir. 2005) ............................................................................ 25

*Sullivan v. NFL*,
    34 F.3d 1091 (1st Cir. 1994) ......................................................................... 11

*United States v. Nerlinger*,
    862 F.2d 967 (2d Cir. 1988) .................................................................... 14, 15

*United States v. United States Gypsum Co.*,
    438 U.S. 422 (1978)................................................................................. 14, 15

*Wellnx Life Scis., Inc. v. Iovate Health Scis. Research, Inc.*,
    516 F. Supp. 2d 270 (S.D.N.Y. 2007)........................................................... 17

*In re W. Nat'l Corp.*,
    No. 15927, 2000 WL 710192 (Del. Ch. May 22, 2000) ................................. 10


**STATUTES**

Del. Code Ann. tit. 8 § 203 ................................................................................ 10

N.Y. Debt. & Cred. Law § 275 .................................................................... 19, 20

N.Y. Debt. & Cred. Law § 276 .......................................................................... 22

15 U.S.C. § 1 (Sherman Act §1) ................................................................ passim

15 U.S.C. § 18 (Clayton Act § 7) .................................................................... 1,7


**OTHER AUTHORITIES**

Fed. R. Civ. P. 56(c)............................................................................................ 1

Fed. R. Civ. P. 56(d)(1) ...................................................................................... 6

3A William M. Fletcher, *Fletcher Cyclopedia of the Law of Corporations* § 1041.70
    (2008) ............................................................................................................ 10

v

Pursuant to Federal Rule of Civil Procedure 56(c) and in support of their motion for summary judgment, defendants respectfully submit this memorandum of law directed at the class claims in the plaintiffs' First Amended Supplemental Class Action Complaint ("FASCAC"), which challenges MasterCard's initial public offering ("IPO"), and Second Supplemental Class Action Complaint ("SSCAC"), which challenges Visa's IPO (collectively, the "IPO Complaints"), as well as at the post-IPO conspiracy claims contained in the Second Consolidated Amended Class Action Complaint (the "Class Complaint") and the thirteen operative complaints of the individual merchant plaintiffs (the "Individual Plaintiffs' Complaints").

## PRELIMINARY STATEMENT

Summary judgment should be granted against class plaintiffs on their claims that the MasterCard and Visa IPOs violated Section 1 of the Sherman Act, 15 U.S.C. § 1 ("Section 1") and Section 7 of the Clayton Act, 15 U.S.C. § 18 ("Section 7"), as well as on all plaintiffs' claims that each network and the banks conspired in violation of Section 1 after their IPOs. Because plaintiffs cannot raise a genuine issue of material fact on any of these claims, or on their fraudulent conveyance claim against MasterCard, defendants are entitled to judgment as a matter of law.

This Court has already held that plaintiffs' initial allegations challenging MasterCard's IPO, and the reasonable inferences they created, "actually demonstrated that the Banks do not retain sufficient control to allow them [after the IPO] to continue to impose anticompetitive interchange fees," and that plaintiffs "failed to . . . plausibly allege that the Banks will retain control of the post-IPO MasterCard in ways that may have an anticompetitive effect." *In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig.*, No. 05-MD-

1

1720, 2008 WL 5082872, at *10-*11 (E.D.N.Y. Nov. 25, 2008) ("Nov. 25, 2008 Order").[1]
Having now completed exhaustive discovery, class plaintiffs cannot raise a material issue of fact
to overcome defendants' demonstration that the bank defendants did not possess sufficient
control over MasterCard or Visa following their respective IPOs to enable them to impose
default interchange rates or merchant acceptance rules in a manner that restrained competition or
threatened any anticompetitive effects as required under Section 1 and Section 7.

Class plaintiffs also cannot demonstrate that the IPOs caused anticompetitive
effect, injury or damages for independent reasons.  Plaintiffs cannot establish that either network
has augmented any market power simply by becoming a publicly-held company.  Nor do
plaintiffs show that the sale of MasterCard or Visa to a completely independent third party (e.g.,
Microsoft) would have left the plaintiffs any better off than they are today, or that a third party-
owned MasterCard or Visa would not continue to set interchange rates at the same (or higher)
levels than they were set before their respective IPOs.  Unless a sale of either network to a third
party like Microsoft would violate the antitrust laws as well, plaintiffs can point to no difference
between the effects of the IPOs and third-party sale transactions that are clearly permissible
under the antitrust laws.

Moreover, the class and individual plaintiffs likewise lack evidence to present any
triable issue of fact on their claim that defendants have violated Section 1 after their IPOs.
Because the new boards of directors at both MasterCard and Visa are comprised of majorities of
non-bank directors, the entire basis of plaintiffs' claimed "structural conspiracy" over default
interchange and merchant acceptance rules has been eliminated.  Further, although defendants

---

[1]   After dismissing plaintiffs' Supplemental Complaint challenging the MasterCard IPO, the
     Court granted plaintiffs leave to amend their pleading.  With the benefit of discovery, class

2

vigorously dispute plaintiffs' allegations that the banks' prior ownership and governance participation constituted a combination or conspiracy in violation of Section 1, the IPOs at a minimum constituted an effective and public withdrawal from any such asserted conspiracy. Nor can plaintiffs identify any new conspiracy after the IPOs based upon concerted action between the banks and either network that is grounded in fact.

Class plaintiffs also have not established any factual basis for their claim that the elimination of MasterCard's ability to assess banks for litigation costs constituted a fraudulent conveyance purportedly depriving plaintiffs of an opportunity to recover a substantial judgment in this case. The undisputed record evidence demonstrates that MasterCard's Board of Directors concluded and publicly disclosed in good faith that the assessment provision was to be eliminated in conjunction with the IPO, that MasterCard had adequate capital to effect the IPO, and that contingent liabilities from this litigation and others could not be reasonably estimated. In view of the openness of the IPO transaction and MasterCard's consequent ample capitalization, plaintiffs have provided no basis to conclude that MasterCard either sought to deceive plaintiffs or received inadequate consideration for the elimination of an assessment provision it had *never* attempted to exercise.

Finally, class plaintiffs cannot establish a factual basis to support the single-brand Visa or MasterCard credit or debit card markets alleged in their IPO Complaints. Summary judgment therefore should be entered dismissing all claims relying upon such alleged markets.

---

plaintiffs subsequently filed the FASCAC and the SSCAC, both of which are subject to motions to dismiss brought by defendants that remain pending as of this date.

## STATEMENT OF UNDISPUTED FACTS

### A.    The MasterCard IPO

Beginning in late 2003, MasterCard's Board of Directors and management undertook a comprehensive strategic business review which included the exploration of potential organizational changes. Ultimately, MasterCard's Board decided to undertake a restructuring and initial public offering, which was consummated in May 2006. (Statement of Material Facts As to Which There Is No Genuine Issue to Be Tried ("SMF") ¶ 130.) To effect the restructuring, MasterCard issued reclassified Class A shares to the investing public and redeemed a portion of its member banks' existing shares with part of the proceeds. (*Id.* ¶ 131.) The banks' remaining shares were reclassified as non-voting Class B shares. (*Id.*) In addition to receiving Class B shares in the IPO, each member bank also received one Class M share. (*Id.* ¶ 132.) The Class M shareholders had the right to elect up to three directors (but not more than one-quarter of all directors) and to approve certain extraordinary corporate actions, none of them having anything to do with the setting of default interchange rates or maintenance of the other challenged network rules. (*Id.*) All shares of the Class M common stock were extinguished on June 1, 2010, when the Class B shares dropped to less than 15% of MasterCard's outstanding shares. (*Id.* ¶ 133.) Through the IPO, the Board was restructured to be comprised of a majority of independent (*i.e.*, non-bank) directors. (*Id.* ¶ 134.) The company also restricted any one Class A shareholder to no more than 15% of MasterCard's shares. (*Id.*)

Pursuant to its duties under Delaware law, prior to the IPO the Board determined that MasterCard had adequate capital to effect the redemption of bank shares. (SMF ¶¶ 157-164.) In making this determination of capital adequacy, the Board assessed the contingent liabilities it faced from litigations which had been disclosed in various SEC filings. (*Id.* ¶¶ 158-159, 163-164, 168.) MasterCard determined and publicly disclosed in its filings that the

4

contingent liabilities associated with this litigation were impossible to quantify and could not reasonably be estimated. (*Id.* ¶ 168.) The Board also ███████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████ The Board thus concluded that MasterCard would be adequately capitalized following the redemption. (*Id.* ¶¶ 162-164.)

Prior to the IPO, the MasterCard By-laws and Rules provided that MasterCard could assess its member banks in order to meet extraordinary litigation judgment or settlement expenses. (*Id.* ¶ 135.) MasterCard, however, had ████████████████████████ ███████████████████ As part of its restructuring, MasterCard eliminated the special assessment provision under its former structure and retained approximately $650 million from the redemption proceeds to U.S. banks to use for litigation and other corporate purposes. (*Id.*)

**B.    The Visa IPO**

On October 11, 2006, Visa announced its intention "to restructure its organization in order to create a new public global corporation called Visa Inc." (SMF ¶ 139.) Pursuant to certain restructuring steps taken in 2007 and 2008, defendants Visa U.S.A. and Visa International became subsidiaries of defendant Visa Inc., with Visa's member banks holding common stock in those subsidiaries. (*Id.* ¶ 140.)

On March 18, 2008, Visa Inc. completed an initial public offering, through which Visa sold more than 400 million shares of voting class A common stock to the general public. (*Id.* ¶ 141.) Post-IPO, banks that had previously held common stock as members of Visa's subsidiaries received shares of Visa Inc. based on geographic region: members of Visa U.S.A. acquired class B common stock; banks associated with other geographic regions of Visa International acquired class C common stock. (*Id.* ¶ 142.)

The three classes of Visa stock have different voting and control rights. One share of class A stock entitles its holder to one vote. (*Id.* ¶ 143.) Class B and C common stock, held by the banks, cannot vote, except in the case of certain "significant transactions" such as "a proposed consolidation or merger, a decision to exit our core payments business or any other vote required by law." (*Id.*) Post-IPO, Visa's member financial institutions may hold only class B and C common stock and are not permitted to hold class A common stock. (*Id.* ¶ 144.) After the Visa IPO, absent approval of Visa's Board of Directors, no individual entity may own more than 15% of the aggregate shares of the outstanding Visa common stock. (*Id.* ¶ 152.)

Only holders of class A common stock may elect directors to the Visa Board, which, for approximately three years after the date of the IPO, must be composed of the Visa CEO, ten (10) non-bank directors, and six (6) directors representing the Visa regions (only two (2) of whom may come from Visa's U.S. Region). (*Id.* ¶ 145-146.) At all times after the IPO, at least 58% of directors must be non-bank directors. (*Id.* ¶ 146.) Effective January 27, 2011, Visa amended its Board composition so that Visa's Board now consists solely of ten (10) non-bank directors and no longer includes any directors representing the Visa regions. (*Id.* ¶ 147.)

## ARGUMENT

### I.    Summary Judgment Should Be Granted on Plaintiffs' IPO Claims and Post-IPO Conspiracy Claims

Under Rule 56, summary judgment is mandated unless the plaintiff can offer evidence showing that the challenged claim or portion thereof is "genuinely at issue." Fed. R. Civ. P. 56(d)(1). To make that showing, a plaintiff must proffer evidence that is "significantly probative." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If the plaintiff can offer "little or no evidence," summary judgment is warranted. *Gallo v. Prudential Residential Servs.,*

*Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994); *accord, Casierra v. Target Corp.*, No. 09-CV-1301(JG)(MDG), 2010 WL 2793778, at *1-2 (E.D.N.Y. July 12, 2010) (Gleeson, J.).

**A.      Summary Judgment Should Be Granted on Claims Challenging the MasterCard and Visa IPOs Under Section 1 and Section 7**

Section 1 of the Sherman Act prohibits contracts, combinations and conspiracies in restraint of trade or commerce. 15 U.S.C. § 1. Section 7 of the Clayton Act prohibits acquisitions of capital or stock, the effect of which may be substantially to lessen competition, or to tend to create a monopoly. 15 U.S.C. § 18. As this Court has recognized, "Section 1 requires actual 'restraint' while Section 7 requires only the possibility of an anticompetitive effect.… It is therefore generally assumed that if a plaintiff's Section 7 claim cannot survive … its Section 1 claim will fail as well." Nov. 25, 2008 Order at *4 (citation omitted). Here, because plaintiffs cannot identify facts demonstrating that the networks' IPOs may substantially lessen competition or tend to create a monopoly, plaintiffs' antitrust challenge to the IPOs themselves cannot withstand defendants' motion for summary judgment.

**1.      Banks Do Not Control Either Post-IPO MasterCard or Visa**

The parties do not dispute the structural features of the MasterCard and Visa IPOs. Plaintiffs' argument that those undisputed structural features enable the banks to exercise control over the networks, however, is contrary to law and unsupported by any facts. The undisputed record proof shows that the banks cannot and do not control either MasterCard or Visa post-IPO. Thus, plaintiffs have not shown any anticompetitive effects and summary judgment is appropriate for the same reasons that this Court dismissed plaintiffs' prior complaint challenging the MasterCard IPO.

        **(a)**      **The Post-IPO Compositions of the Visa and MasterCard Boards Divest the Banks of Any Purported Control**

Plaintiffs cannot dispute that both the MasterCard and Visa IPOs structured the post-IPO boards so that board directors affiliated with banks have only minority positions. (SMF ¶¶ 134, 146.) Indeed, Visa's Board currently has no directors affiliated with banks. (*Id.* ¶ 147.) Minority representation on a board of directors is insufficient to establish control as a matter of law. *See, e.g., Podiatrist Assoc. Inc. v. La Cruz Azul de Puerto Rico, Inc.*, 332 F.3d 6, 14 (1st Cir. 2003) (granting defendants summary judgment on the ground that eight of 19 board seats was "plainly not enough to show control"); *see also Klonis v. Nat'l Bank of Greece, S.A.*, 492 F. Supp. 2d 293, 301 (S.D.N.Y. 2007) (finding that subsidiary was not a mere department controlled by parent company where only 3 of 10 directors on subsidiary's board were affiliated with parent). The uncontradicted testimony of MasterCard and Visa management and board members ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮

        **(b)**      **Limited Voting Rights Do Not Give Banks Power over Network Decisions Regarding Interchange Rates**

Nor is there any factual basis for plaintiffs' argument that the banks continue to exercise some degree of control over MasterCard and Visa by virtue of the banks' limited voting rights over certain extraordinary transactions such as a merger or decision to exit the network payments business. "It is a fundamental principle that the rules used to interpret statutes, contracts, and other written instruments are applicable when construing corporate charters and

bylaws … [As such, they are] construed as … written, and the language, if simple and unambiguous, is given the force and effect required." *Gentile v. Singlepoint Fin., Inc.*, 788 A.2d 111, 113 (Del. 2001) (citation omitted).

Here, the plain language of the documents creating the limited voting rights bank shareholders possess (in the case of MasterCard prior to June 2010) does not mention interchange or rule-making. Visa's Certificate of Incorporation, for example, specifies that banks can vote to "authorize the Corporation to exit its core payments business," which the Certificate of Incorporation defines as "*to no longer operate a consumer debit/credit payments business.*" (SMF ¶ 149) (emphasis added). MasterCard's Class M shares for banks no longer exist. (*Id.* ¶ 133.) Even when applicable, though, the MasterCard Certificate of Incorporation stated that a majority of Class M shareholders must approve any decision by MasterCard "to cease to engage in the business of providing *core network authorization, clearing and settlement services* for branded payment card transactions." (*Id.* ¶ 132) (emphasis added). Those present or former voting powers of banks manifestly do not provide them with the authority to decide issues relating to default interchange or merchant acceptance rules.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████ Plaintiffs cannot dispute this. To the contrary, plaintiffs' proffered expert, Victor Fleischer, conceded at his deposition that the post-IPO structure does not leave the banks with corporate control over default interchange rates or merchant acceptance rules. (*Id.* ¶ 151.)

Numerous courts have held that shareholder voting rights pertaining to discrete corporate decisions do not give those shareholders control over other corporate decisions. *See In*

*re W. Nat'l Corp.*, No. 15927, 2000 WL 710192, at \*6 (Del. Ch. May 22, 2000) (minority

shareholder's power to veto business combination did not indicate control over later merger);

*Kleban v. S.Y.S. Rest. Mgmt., Inc.*, 929 F. Supp. 294, 301 (N.D. Il. 1996) (power to veto

proposed real estate sites for restaurant development did not give defendant power to control

representations made regarding future restaurant developments, investments in the

developments, or in financial statements).  Here, in the complete absence of any facts suggesting

that the banks' limited post-IPO voting rights enabled them to control decision-making

respecting default interchange rates or merchant acceptance rules, plaintiffs' bald assertions to

the contrary do not raise a genuine issue of fact and should be rejected.

> **(c)    Restrictions Limiting Stock Ownership to 15% Do Not Allow Banks to Exercise Control**

The provisions that restrict any party from acquiring more than 15% of each

network's stock also do not support plaintiffs' claims.  (SMF ¶ 152-153.)  Those provisions are

not anticompetitive and do not allow the banks to exercise control over MasterCard or Visa.

Public firms routinely adopt this type of ownership limitation.  *See, e.g.*, 3A

William M. Fletcher, *Fletcher Cyclopedia of the Law of Corporations* § 1041.70 (2008) ("It is a

common tactic for a board of directors to adopt defensive measures against a hostile takeover.");

Del. Code Ann. tit. 8 § 203 (anti-takeover statute, limiting ability of "interested shareholder"

with 15% or more of a corporation's outstanding voting stock from entering a "business

combination" with corporation).  And this Court has already held that plaintiffs' assertions

regarding the 15% cap on ownership are insufficient to establish that the IPOs result in anything

other than "independent [networks], run by directors and managers with a fiduciary duty to act in

[each network's] best interests, rather than in the interests of its customers or competitors."  Nov.

25, 2008 Order at \*10.

Moreover, it cannot be disputed that the ownership limitations do not allow banks to control the networks; rather, the opposite is true: they help deter *any* individual third party—including potentially a bank—from taking over either network other than through an agreed and properly approved business combination. (SMF ¶ 154.) Here, too, plaintiffs' proffered expert acknowledged that the 15% ownership limitation cannot be used to prevent either the elimination or lowering of interchange rates by the Visa Board. (*Id.*)

Plaintiffs' reliance on *pre*-IPO statements from banks and the networks that plaintiffs characterize ██████████████████████████████████████████████ ████████████████████████████████████████████████ Such statements are legally irrelevant in the face of plaintiffs' inability to demonstrate that the actual voting, governance, and ownership restrictions *after* the IPOs have enabled banks to control interchange rate-setting or merchant rule-making.

Nor is there any merit to plaintiffs' argument that the ownership limitations created anticompetitive barriers to entry. The ownership limitations do not prevent *additional* competitors from entering; they restrict only a change in the ownership of an existing competitor, which is not anticompetitive. *See, e.g., Sullivan v. NFL*, 34 F.3d 1091, 1099 (1st Cir. 1994) ("replacement of one [party] with another [is] an action having little evident effect on competition"); *Levin v. Nat'l Basketball Assoc.*, 385 F. Supp. 149 (S.D.N.Y. 1974) (barring plaintiff from buying into league of 17 teams by purchasing an existing team was not anticompetitive).

2. **The IPOs Did Not Violate Section 7 by Creating "Single Entities" with Market Power**

Plaintiffs' argument that the IPOs harm competition by creating Visa and MasterCard "single entities"—each with sufficient market power to set supracompetitive

11

interchange fees—is also mistaken.  Whatever market power Visa or MasterCard may have possessed before their respective IPOs, these transactions have neither augmented that power nor increased market concentration in any relevant market.

The Second Circuit has recognized that, where a transaction itself has no effect on the degree of concentration or competition in the relevant market, a plaintiff cannot claim antitrust harm from the transaction.  In *Geneva Pharmaceuticals Technology Corp. v. Barr Laboratories, Inc.*, 386 F.3d 485, 510-11 (2d Cir. 2004), a generic drug manufacturer filed suit under Section 1 and Section 7 challenging a transaction in which one defendant (who was a 75% owner of another defendant that already allegedly possessed market power through its ownership of an exclusive dealing agreement) purchased the remaining 25% of the second defendant.  The court concluded that:

> [T]he acquisition itself *had no effect on the degree of concentration or competition in the [relevant] market.*  Further the . . . exclusive dealing agreement, which is the crux of the antitrust claims, was entered into before the purchase [of the remaining 25%].  Plaintiffs have alleged no potential antitrust harm *stemming from the acquisition*, and thus, at most, allege that the purchase gave [defendant] unity of ownership."

*Id.* at 511 (emphasis added).  Like the transaction in *Geneva Pharmaceuticals*, the IPOs here have had no effect on the degree of concentration or competition in any alleged market.

### 3.   There is No Anticompetitive Effect, Injury, or Damage to Class Plaintiffs Flowing from the IPOs

Finally and independently, the effects and injuries of which plaintiffs complain do not flow from any alleged competition-reducing aspect of the IPOs.  Plaintiffs have not and cannot offer any evidence that in the absence of the 15% restriction, the sale of MasterCard or Visa to an independent third party—such as Microsoft—would likely result in a reduction in interchange levels that would have made plaintiffs better off.

Indeed, plaintiffs cannot demonstrate that either network would act any

differently at all after its IPO than it would if sold to an independent third party.  Unless

plaintiffs contend that any sale of Visa or MasterCard to such a third party would also be

anticompetitive (which they cannot and do not contend), the IPOs themselves can have no

anticompetitive effect, cause no antitrust injury, and inflict no damages on plaintiffs.  *See*

*Menkes v. St. Lawrence Seaway Pilots' Ass'n*, 269 Fed. Appx. 54, 55 (2d Cir. 2008) ("An

antitrust claimant must demonstrate that she has sustained an [injury] that flows from that which

makes defendants' acts unlawful.") (quoting *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d

408, 438 (2d Cir. 2005)).

In short, plaintiffs can point to no facts that could establish that the IPOs harmed

or threatened to harm competition.  Summary judgment for defendants should therefore be

granted on both of class plaintiffs' IPO Complaints.

**B.** **Summary Judgment Should be Granted Dismissing All Plaintiffs' Post-IPO Claims Under Section 1 for Lack of Conspiracy**

The class and individual plaintiffs also lack any evidence that could establish a

post-IPO intra-network conspiracy regarding default interchange or merchant rules between

MasterCard or Visa and their respective bank customers.  The MasterCard and Visa IPOs

eliminated any purported bank control over the network boards, and transformed MasterCard and

Visa into independent corporations that in no way could be considered structural conspiracies.

Moreover, while defendants dispute plaintiffs' allegations that the banks' prior voting ownership

of Visa and MasterCard, and the participation by some banks in each network's governance,

constituted a "combination" in violation of Section 1, the IPOs resulted in all defendants' open

and comprehensive withdrawals from any such "combinations."  Nor can plaintiffs maintain a

Section 1 claim by asserting new conspiracies with absolutely no factual support, such as the

13

class plaintiffs' alleged post-IPO "hub and spoke" conspiracies predicated on each bank's agreement to abide by each network's rules.

> **1. Plaintiffs Cannot Establish as a Matter of Law the Existence of Any Actionable Post-IPO Intra-Network Structural Conspiracy Within Either Visa or MasterCard**

Fundamentally, "Section 1 of the Sherman Act requires that there be a 'contract, combination . . . or conspiracy' . . . in order to establish a violation." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984) (quoting 15 U.S.C. § 1); *see also PepsiCo v. Coca-Cola Co.,* 315 F.3d 101, 109 (2d Cir. 2002) ("to prove a Section 1 violation of the Sherman Act, a plaintiff must show 'a combination or some form of concerted action between at least two legally distinct economic entities'") (internal citation omitted). After the implementation of the IPOs, the banks possessed no control over the conduct of either Visa or MasterCard, through the boards of directors or otherwise. Plaintiffs thus can no longer rely upon allegations of any "structural conspiracy" among the networks and their respective banks to support a Section 1 claim. For this reason alone, the class and individual plaintiffs' post-IPO Section 1 claims are subject to summary judgment.

Alternatively, even assuming, *arguendo*, that plaintiffs' purported Section 1 structural conspiracies once existed prior to the IPOs, the networks and banks plainly withdrew from them—at the latest—through the mechanism of the IPOs. To withdraw from a conspiracy, a defendant must take affirmative action that is inconsistent with the object of the conspiracy and that is "communicated in a manner reasonably calculated to reach co-conspirators." *Drug Mart Pharmacy Corp. v. Am. Home Prods., Corp.*, 288 F. Supp. 2d 325, 328-29 (E.D.N.Y. 2003) (quoting *United States v. United States Gypsum Co.*, 438 U.S. 422, 464-65 (1978) (internal quotations omitted)); *see also United States v. Nerlinger*, 862 F.2d 967, 974 (2d Cir. 1988). There are no stringent requirements or formulas that must be met by a defendant to establish

14

withdrawal from a conspiracy. *See United States Gypsum,* 438 U.S. at 463-464. Rather, withdrawal requires only acts that are inconsistent with the objects of the conspiracy, not an "accompanying pronouncement of *mea culpa*." *Drug Mart*, 288 F. Supp. 2d at 330.

Here, the IPOs terminated the structural mechanism through which the member banks were alleged to have jointly set interchange rates. To be sure, defendants do not agree with plaintiffs' allegations that the pre-IPO Visa or MasterCard structures constituted any type of actionable conspiracy. But notwithstanding this disagreement, the IPOs manifested the banks' effective "resignation" from any such purported structural conspiracy, as well as the "resignations" of MasterCard and Visa. *See, e.g., Nerlinger*, 862 F.2d at 974; *Drug Mart*, 288 F. Supp. 2d at 330-31.

Moreover, all the structural changes in the Visa and MasterCard IPOs were widely and publicly disclosed through MasterCard's and Visa's SEC filings and press releases. (SMF ¶ 130-134, 139-147.) Plaintiffs thus cannot plausibly dispute that both the MasterCard and Visa IPOs communicated defendants' withdrawal from the alleged conspiracies through public offerings of which the world had notice. *See, e.g., Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 838-39 (11th Cir. 1999) (finding that defendant's exit from the dairy business and withdrawal from the conspiracy was successfully communicated to the others through the "extensive publicity regarding the sale [of the dairy]"); *Drug Mart*, 288 F. Supp. 2d at 330 (holding that defendants' withdrawal from the conspiracy was sufficiently communicated by "virtue of the public settlement notices and elaborate approval process mandated by Rule 23").

Accordingly, any class and individual plaintiffs' Section 1 claims should be extinguished as of the date of each network's IPO.

15

**2.      Summary Judgment Should be Granted on the Claims That Posit Any Post-IPO Conspiracy Theory**

Defendants are also entitled to summary judgment on class and individual plaintiffs' claims based on any theory of post-IPO intra-network conspiracies, including the two alleged intra-network post-IPO "hub and spoke" conspiracies, because there is no factual basis to support the existence of any post-IPO conspiracy involving either the MasterCard or Visa systems.

First, plaintiffs have no evidence that either network and its respective bank customers engaged in any type of antitrust conspiracy after the IPOs. Class plaintiffs' economist Dr. Frankel offers a conclusory opinion in his report that after the IPOs, defendants "are able to continue to administer the anticompetitive arrangement [of setting default interchange fees] on behalf of the member banks which created them, and on their own behalf," but he provides no support for that assertion in his report. (SMF ¶ 155.) Moreover, he testified that he could not cite any communications between or among the banks regarding the level of default interchange rates either since Visa installed independent directors on its board on April 28, 2006 or after Visa's 2008 IPO. (*Id.*) Individual plaintiffs' economist Dr. Vellturo likewise could not identify any post-IPO communications between banks and Visa concerning interchange levels. (*Id.* ¶ 156.)

Second, in the absence of any facts directly establishing any post-IPO agreement among the networks' banks, the class plaintiffs assert that such agreements should nonetheless be inferred from the banks' post-IPO ███████████████████████████ These new post-IPO conspiracy claims are premised on the purported existence of two separate "hub-and-spoke" conspiracies under which each network's banks allegedly agreed *with each other* to ███████

To survive a motion for summary judgment, however, the plaintiff must present facts "'that tend[] to exclude the possibility that the [defendants] were acting independently." *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir. 1987) (quoting *Monsanto Co.*, 465 U.S. at 764); *AD/SAT v. Associated Press,* 181 F.3d 216, 235 (2d Cir. 1999) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Plaintiffs here cannot meet this standard. An individual bank's ██████████████████████████████████ does not support an inference of concerted action, as "merely charging, adopting or following the fees set by a Consortium is insufficient as a matter of law to constitute a violation of Section 1 of the Sherman Act." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008); s*ee also Am. Express Travel Related Servs. v. Visa U.S.A.*, No. 04 Civ.8967(BSJ), 2005 WL 1515399, at \*4-5 (S.D.N.Y. June 23, 2005) (rejecting theory that member banks are liable under Section 1 solely based upon membership in Visa or MasterCard); *Am. Airlines v. Christensen*, 967 F.2d 410, 413-14 (10th Cir. 1992) (finding that the mere acceptance by members of terms under an agreement set by an airline does not result in concerted action sufficient to support a Section 1 violation).

Further, where participating in the network and following the network's rules is in each participating entity's independent economic self-interest, evidence that ████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████ *See, e.g.*, *Wellnx Life Scis., Inc. v. Iovate Health Scis. Research, Inc.*, 516 F. Supp. 2d 270, 291 (S.D.N.Y. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)) ("The fact that each [competitor] knew that its horizontal competitors were

17

going to be presented with the same offer . . . or that others had already [agreed with the defendant], or 'believ[ed]' that other competitors would fall in line, does not suffice to 'raise[ ] a suggestion of a preceding agreement'"). Plaintiffs cannot dispute that each individual bank serves its independent economic self-interest by issuing payment cards (or acquiring payment card transactions) in competition with other bank issuers (or acquirers) subject to the terms and conditions of the networks. *See Apex Oil*, 822 F.2d at 254 (holding that actions in a defendant's independent self-interest provide an insufficient basis upon which to infer conspiracy).

In the absence of any facts supporting the existence of a horizontal agreement—the proverbial "rim" around each purported hub-and-spoke conspiracy—plaintiffs' post-IPO conspiracy claims cannot withstand defendants' motion for summary judgment. *See PepsiCo*, 315 F.3d at 110 (affirming summary judgment where plaintiff "failed to proffer sufficient evidence of a horizontal agreement among the [competitors]," or rim, of the alleged hub-and-spoke conspiracy). Summary judgment should therefore be granted dismissing plaintiffs' claims under Section 1 in both the Class Complaint and in the Individual Plaintiffs' Complaints, as well as class plaintiffs' related California Cartwright Act claims, to the extent those claims are based on any conduct after each of the network's respective IPOs.[2]

## II.     Summary Judgment Should Be Granted on Class Plaintiffs' Fraudulent Conveyance Claims Against MasterCard

In their First Amended Supplemental Class Action Complaint, the class plaintiffs assert that MasterCard's elimination of its special assessment provision—which MasterCard had *never* invoked—was a fraudulent conveyance under Sections 275 and 276 of New York's Debtor

---

[2]  "A long line of California cases has concluded that the Cartwright Act is patterned after the Sherman Act and both statutes have their roots in the common law. Consequently, federal cases interpreting the Sherman Act are applicable to problems arising under the Cartwright Act." *Marin County Bd. of Realtors v. Palsson*, 549 P.2d 833, 835 (1976).

and Creditor Law because it allegedly impacted plaintiffs' ability to obtain a judgment in this

case.  (FASCAC ¶¶ 303-324.)  Plaintiffs, however, have demonstrated no factual basis for a

finding either that MasterCard received inadequate consideration for the elimination of the

assessment provision at a time when it knew it would be insolvent, or that when MasterCard

made its capital adequacy determination in connection with its IPO, it purposefully took steps to

conceal a purported catastrophic litigation liability it allegedly knew it faced.  Summary

judgment is warranted.

### A.   Plaintiffs Cannot Establish a Claim of Constructive Fraudulent Conveyance Under Section 275

Under Section 275, "[e]very conveyance made and every obligation incurred

without fair consideration when the person making the conveyance or entering into the

obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is

fraudulent as to both present and future creditors."  N.Y. Debt. & Cred. Law § 275.  Thus, to

prove a claim for constructive fraudulent conveyance under Section 275, plaintiffs must establish

that at the time of the IPO MasterCard believed it would be unable to pay its debts as they

matured and came due, *and* that it did not receive fair consideration in exchange for the

elimination of the assessment provision. *See In re Payment Card Interchange Fee & Merch.*

*Discount Antitrust Litig.*, No. 05-md-1720, Slip. Op. at 35-36 (E.D.N.Y. Feb. 12, 2008)

(hereinafter "Report & Recommendation").  Plaintiffs can do neither.

### 1.   There Is No Evidence That MasterCard Believed During the IPO That It Would Incur Debts Exceeding Its Ability to Pay

First, plaintiffs' claim is legally insufficient because there is no evidence that

MasterCard itself believed at the time of the IPO that it would be unable to pay its current or

future debts.  Under Section 275, plaintiffs must "adduce[] . . . evidence of an actual belief by the

defendants that [the company] would be unable to pay its debts." *MFS/SUN Life Trust-High*

*Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 943 (S.D.N.Y. 1995). Plaintiffs attempt to satisfy this prong by arguing that MasterCard knew it faced massive liability from this litigation and others at the time of the IPO but nonetheless went forward with the elimination of the special assessment provisions.

The record shows no such thing. ███████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ ████████████ This alone precludes liability under Section 275.

*See Kittay v. Flutie New York Corp. (In re Flutie New York Corp.)*, 310 B.R. 31, 55 (Bankr. S.D.N.Y. 2004) (Section 275 requires a showing of inability to pay "*probable* liabilities") (emphasis added). ████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████

Plaintiffs can offer no evidence showing that at the time of the IPO MasterCard believed that it would be unable to meet any litigation obligations. Instead, plaintiffs have sought to transform random MasterCard business documents and third-party reports into

██████████████████████████████████████████████████

████████████████████████████████ But there is no evidence that a single one of these documents, which discuss, *inter alia,*████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████ As this Court has already held, "[n]either the plaintiffs' prediction of the 'likely' results of a victory

on their antitrust claims nor the corresponding estimate of third parties says anything about what *MasterCard* intended or believed in releasing its right of assessment." Report & Recommendation at 36; *see also* Nov. 25, 2008 Order at *11.

>   **2.     Plaintiffs Cannot Demonstrate That the Assessment Provision Was Eliminated Without Fair Consideration**

Plaintiffs also assert that the $650 million retained from the IPO redemption proceeds was the only benefit MasterCard received in exchange for the elimination of the assessment provision, and thus was insufficient to cover plaintiffs' self-inflated damages estimate in this case. Such a speculative valuation of this case cannot withstand summary judgment. Plaintiffs offer no basis for valuing the assessment provision as equivalent to the value of the contingent liabilities generated by their litigation, which the Board determined were not estimable, and do not offer an estimate of their own. Further, plaintiffs nowhere have established that the assessment provision was legally enforceable or that MasterCard's Board would have ever elected to attempt to invoke the assessment against its bank customers—factors that would bear on the value of this right. (SMF ¶ 137.)

Moreover, plaintiffs improperly fail to credit the additional indisputable benefits MasterCard received from its reorganization and IPO, of which the elimination of the assessment provision was a component part. In assessing reasonably equivalent value, *all* benefits received are relevant. *See, e.g., MFS/SUN Life*, 910 F. Supp. at 937 (a "corporate transaction may give rise to indirect benefits to the debtor that must also be included in the calculation" of whether reasonably equivalent consideration was given). Here, in addition to the $650 million in retained proceeds, the IPO provided MasterCard with heightened access to capital markets, enhanced credit facilities, fresh guidance from independent directors and a current market capitalization of approximately $30 billion. (SMF ¶¶ 165, 169-172.) Plaintiffs have failed to establish any facts

showing that MasterCard did not receive reasonably equivalent value for the elimination of the assessment provision made pursuant to that IPO.

**B.    Plaintiffs Cannot Establish an Actual Fraudulent Conveyance Claim Under Section 276**

Plaintiffs' actual fraud claim under Section 276 also must fail. Under Section 276, "[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." N.Y. Debt. & Cred. Law § 276. To defeat summary judgment under Section 276, plaintiffs must show that there is sufficient clear and convincing evidence demonstrating actual fraud. *See Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 374 (S.D.N.Y. 2003) ("On . . . motions for summary judgment . . . the issue is whether . . . the record contains sufficient evidence from which a reasonable jury could find actual fraud under the clear and convincing standard.); *see also Neshewat v. Salem*, 365 F. Supp. 2d 508, 522 (S.D.N.Y. 2005) (same). Plaintiffs cannot meet that burden.

**1.    There Is No Direct Evidence That MasterCard Acted With Actual Intent to Hinder, Delay, or Defraud Plaintiffs**

Plaintiffs assert that MasterCard knew that it faced enormous legal liability in this case, but nonetheless eliminated the assessment provision and conducted the IPO without disclosing the value of the contingent litigation liabilities or permitting Houlihan Lokey to value them independently. But there is no dispute that the MasterCard Board believed that the elimination of the assessment provision ███████████████████████████████ assessed the litigation contingent liabilities and concluded that they could not be estimated, and then made public disclosures regarding the subject litigations and assessment provision. Plaintiffs have not demonstrated any genuine disputed facts supporting their assertion of an intent to defraud.

22

MasterCard's public filings make clear that the IPO would enable MasterCard to strengthen its capital position and reduce the risk of litigation. (SMF ¶ 165.) These are manifestly legitimate and compelling business reasons, and do not evince an intent to defraud the plaintiffs. *See Lippe*, 249 F. Supp. 2d at 383 (finding no fraudulent conveyance where company was "looking for lawful ways to reduce the adverse impact" of litigation); *Picard v. Taylor (In re Park S. Sec., LLC)*, 326 B.R. 505, 518 (Bankr. S.D.N.Y. 2005) ("evidence of a legitimate supervening purpose" cuts against a finding of fraudulent intent). The elimination of the assessment provision was an integrated component of the IPO that in MasterCard's judgment was necessary in order for the IPO to proceed. (SMF ¶ 138.)

Moreover, there is no dispute that MasterCard publicly disclosed that it faced contingent liabilities, that the magnitude of those liabilities was highly uncertain and thus could not reasonably be estimated, and that MasterCard was extinguishing the assessment provision in connection with its reorganization. (SMF ¶ 168.) Such disclosure "weighs heavily against a finding of fraud." *Lippe*, 249 F. Supp. 2d at 384. *See also Integrated Res. Real Estate Ltd. P'ships Sec. Litig.*, 850 F. Supp. 1105, 1130 (S.D.N.Y. 1993) (same).

Although plaintiffs suggest that MasterCard's ███████████████████████████ ████████████████████████████████████████████████████████████████

███████████████████████████████ such speculation is belied by MasterCard's undisputed

actions. ██████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

2. **There Is No Evidence of the Existence of Multiple "Badges of Fraud" from Which It Would Be Reasonable to Conclude That MasterCard Acted with Actual Intent to Hinder, Delay, or Defraud Plaintiffs**

Where, as here, direct evidence of actual fraud is lacking, plaintiffs can only establish an inference of fraud if they can demonstrate the existence of a number of "badges of fraud." *Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.)*, 376 B.R. 390, 405 (Bankr. S.D.N.Y. 2007). Plaintiffs here fall short. There is no credible evidence of any "circumstances that so commonly accompany fraudulent transfers that their presence gives rise to an inference of intent to defraud." Report & Recommendation at 33-44; *In re Manhattan Inv. Fund Ltd.*, 310 B.R. 500, 505 n.3 (Bankr. S.D.N.Y. 2002).

Initially, for all the reasons discussed above, plaintiffs have not demonstrated that there is clear and convincing evidence that MasterCard was in dire financial condition at the time of the "conveyance" in connection with the IPO. *See MFS/SUN Life*, 910 F. Supp. at 935 (noting "the transferor's knowledge of the creditor's claim and the transferor's inability to pay it" as among badges of fraud); *Lippe*, 249 F. Supp. 2d at 375 (noting "transferor's insolvency as a result of the conveyance" as among badges of fraud). There is simply no evidence that MasterCard's financial condition was impaired such that it would be unable to meet any contingent litigation liabilities that might not ripen until years after the IPO. *See MFS/SUN Life*, 910 F. Supp. at 935 (finding no basis for actual fraud where defendants "had a reasonable belief that [their] debts would be paid off over time").

Nor do the circumstances surrounding the elimination of the assessment provision clearly evince a fraudulent motive because, for example, the action was conducted in secrecy. *See, e.g.*, *Lippe*, 249 F. Supp. 2d at 382. The existence of the pending litigations, MasterCard's conclusion that potential damages could not be reasonably estimable, and the elimination of the assessment provision were all publicly disclosed; thus, "[t]he transactions here were not done in

24

'secret' and there was no effort to 'hide' any aspect of the transfers." *Id.* at 384. Accordingly,
"[a] reasonable jury could only find that this factor weighs heavily against a finding of fraud."
*Id.*

Courts have also inferred fraudulent intent where the transferor retained control
and use of the transferred property. *Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp
Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005). MasterCard, of course, extinguished its ability to
unilaterally assess its members. In no way can it be argued that MasterCard "retain[ed]
possession, benefit or use" of the assessment option, when it is the elimination of that very
provision about which plaintiffs complain. *Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574,
1582 (2d Cir. 1983). Finally, although a "badge of fraud" has additionally been found in
situations where there is an "unconscionable discrepancy between the value of the property
transferred and the consideration received," *Nisselson*, 376 B.R. at 406, as demonstrated above,
plaintiffs have not met their burden of demonstrating that here.

In sum, class plaintiffs have not established any genuine issues of fact sufficient
to salvage their fraudulent conveyance claims under either Section 275 or 276. Summary
judgment should be entered in favor of defendants on class plaintiffs' fraudulent conveyance
claim against MasterCard.

### III. Plaintiffs Cannot Establish Single Brand Credit or Debit Markets as a Matter of Law

In their IPO Complaints against MasterCard and Visa, class plaintiffs assert
single-brand markets for MasterCard credit card network services, MasterCard off-line debit card
network services, Visa credit card network services, Visa off-line debit card network services,
and Visa's Interlink on-line debit card network services. (*See* FASCAC ¶¶ 229, 248; SSCAC
¶¶ 199, 207, 215.) But the evidence obtained in discovery shows that none of these single-brand

25

card network services is unique, and that merchants are not locked into accepting any of them. (SMF ¶¶ 97-99.)  Plaintiffs also testified that they steered customers from  MasterCard and Visa off-line debit to on-line debit transactions, further evidencing that they viewed Visa's Interlink and other online debit network services as interchangeable in use with both MasterCard and Visa off-line debit card network services.  (*Id.* ¶¶ 100-101.)  Accordingly, summary judgment should be granted dismissing all of the class plaintiffs' claims to the extent they rely upon single-brand MasterCard or Visa markets, for the same reasons established with respect to the individual plaintiffs' proposed single-brand Visa and MasterCard credit card network services markets in defendants' memorandum supporting summary judgment on the claims of the individual plaintiffs.  (*See* Dcfs.' Individual Compl. Mem. at 14-20.)

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant

summary judgment and dismiss the class plaintiffs' IPO and fraudulent conveyance claims, all

plaintiffs' post-IPO conspiracy claims under Sherman Act § 1, and class plaintiffs' claims to the

extent that they are based on asserted single-brand markets for MasterCard or for Visa credit,

off-line debit, or on-line debit card network services.

Dated:   New York, New York      Respectfully submitted,
February 11, 2011

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

By:  /s/ Gary R. Carney
Andrew C. Finch
Gary R. Carney
1285 Avenue of the Americas
New York, NY 10019-6064
Tel.: (212) 373-3000
Fax: (212) 757-3990
gcarney@paulweiss.com

Kenneth A. Gallo
Joseph J. Simons
2001 K Street, N.W.
Washington, DC 20006-1047
Tel.: (202) 223-7300
Fax: (202) 223-7420

**WILLKIE FARR & GALLAGHER LLP**

  Keila D. Ravelo
  Wesley R. Powell
  Matthew Freimuth
  787 Seventh Avenue
  New York, NY 10019-6099
  Tel.: (212) 728-8000
  Fax: (212) 728-8111

*Attorneys for Defendant MasterCard Incorporated
and MasterCard International Incorporated*

**ARNOLD & PORTER LLP**

  /s/ Robert C. Mason

By:   Robert C. Mason
  399 Park Avenue
  New York, NY 10022-4690
  Tel.: (212) 715-1000
  Fax: (212) 715-1399
  robert.mason@aporter.com


  Robert J. Vizas
  One Embarcadero Center, 22nd Floor
  San Francisco, CA 94111-3711
  Tel.: (415) 356-3000
  Fax: (415) 356-3099


  Mark R. Merley
  Matthew A. Eisenstein
  555 12th Street, N.W.
  Washington, DC 20004-1206
  Tel.: (202) 942-5000
  Fax: (202) 942-5999

*Attorneys for Defendants Visa Inc., Visa U.S.A. Inc.,
and Visa International Service Association*

28

**MORRISON & FOERSTER LLP**

/s/ Mark P. Ladner

By: Mark P. Ladner
Michael B. Miller
1290 Avenue of the Americas
New York, NY 10104-0050
Tel.: (212) 468-8000
Fax: (212) 468-7900
mladner@mofo.com

*Attorneys for Defendants Bank of America, N.A., BA Merchant Services LLC (f/k/a Defendant National Processing, Inc.), Bank of America Corporation, and MBNA America Bank, N.A.*

**SHEARMAN & STERLING LLP**

/s/ James P. Tallon

By: James P. Tallon
Wayne D. Collins
Lisl J. Dunlop
599 Lexington Avenue
New York, NY 10022-6069
Tel.: (212) 848-4000
Fax: (212) 848-7179
jtallon@shearman.com

*Attorneys for Defendants Barclays Financial Corp. and Barclay's Bank plc*

**O'MELVENY & MYERS LLP**

/s/ Andrew J. Frackman
By:   Andrew J. Frackman
      Times Square Tower
      7 Times Square
      New York, NY 10036
      Tel.: (212) 326-2000
      Fax: (212) 326-2061
      afrackman@omm.com

*Attorneys for Defendants Capital One Bank (USA), N.A., Capital One F.S.B., and Capital One Financial Corp.*

**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**

/s/ Peter E. Greene
By:   Peter E. Greene
      Peter S. Julian
      Four Times Square
      New York, NY 10036
      Tel.: (212) 735-3000
      Fax: (212) 735-2000
      peter.grccne@skadden.com

      Michael Y. Scudder
      155 North Wacker Drive
      Chicago, IL  60606-1720
      Tel.: (312) 407-0700
      Fax: (312) 407-0411
      michael.scudder@skadden.com

*Attorneys for Defendants JPMorgan Chase & Co., Chase Bank USA, N.A., Chase Manhattan Bank USA, N.A., Chase Paymentech Solutions, LLC, JPMorgan Chase Bank, N.A., as acquirer of certain assets and liabilities of Washington Mutual Bank, Bank One Corporation, and Bank One Delaware*

30

**SIDLEY AUSTIN LLP**

/s/ David F. Graham

By:  David F. Graham
Eric H. Grush
One South Dearborn Street
Chicago, IL 60603
Tel.: (312) 853-7000
Fax: (312) 853-7036
dgraham@sidley.com


Benjamin R. Nagin
787 Seventh Avenue
New York, N.Y. 10019
Tel.: (212) 839-5300
Fax: (212) 839-5599

*Attorneys for Defendants Citibank (South Dakota), N.A., Citibank, N.A., Citigroup Inc., and Citicorp*


**KEATING MUETHING & KLEKAMP PLL**

/s/Richard L. Creighton, Jr.

By:  Richard L. Creighton, Jr.
Joseph M. Callow, Jr.
Drew M. Hicks
One East Fourth Street
Suite 1400
Cincinnati, OH 45202
Tel.: (513) 579-6400
Fax: (513) 579-6457

*Attorneys for Defendant Fifth Third Bancorp*

31

**KUTAK ROCK LLP**

By: /s/ John P. Passarelli
John P. Passarelli
James M. Sulentic
The Omaha Building
1650 Farnam Street
Omaha, NE 68102-2186
Tel.: (402) 346-6000
Fax: (402) 346-1148
john.passarelli@kutakrock.com

*Attorneys for Defendant First National Bank of Omaha*

**WILMER CUTLER PICKERING HALE AND DORR LLP**

By: /s/ Christopher R. Lipsett
Christopher R. Lipsett
David S. Lesser
399 Park Avenue
New York, N.Y. 10022
Tel.: (212) 230-8800
Fax: (212) 230-8888
chris.lipsett@wilmerhale.com

Ali M. Stoeppelwerth
Perry A. Lange
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Tel.: (202) 663-6000
Fax: (202) 663-6363

*Attorneys for HSBC Finance Corporation and HSBC North America Holdings, Inc.*

**JONES DAY**

/s/ John M. Majoras

By:  John M. Majoras
     Joseph W. Clark
     51 Louisiana Avenue, NW
     Washington, DC   20001
     Tel.: (202) 879-3939
     Fax: (202) 626-1700
     jmmajoras@jonesday.com

*Attorneys for Defendants National City Corporation, National City Bank of Kentucky*


**PULLMAN & COMLEY, LLC**

/s/ Jonathan B. Orleans

By:  Jonathan B. Orleans
     Adam S. Mocciolo
     850 Main Street
     Bridgeport, CT   06601-7006
     Tel.:  (203) 330-2000
     Fax:  (203) 576-8888
     jborleans@pullcom.com

*Attorneys for Defendant Texas Independent Bancshares, Inc.*


**ALSTON & BIRD LLP**

/s/ Teresa T. Bonder

By:  Teresa T. Bonder
     Valarie C. Williams
     Kara F. Kennedy
     1201 W. Peachtree Street, N.W.
     Atlanta, GA 30309
     Tel.: (404) 881-7000
     Fax: (404) 881-7777
     teresa.bonder@alston.com

*Attorneys for Defendant Suntrust Banks, Inc.*

33

**PATTERSON BELKNAP WEBB & TYLER LLP**

/s/ Robert P. LoBue_____

By:  Robert P. LoBue
Norman W. Kee
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
Tel.: (212) 336-2596
Fax: (212) 336-2222
rplobue@pbwt.com

*Attorneys for Defendants Wachovia Bank, NA., Wachovia Corporation, and Wells Fargo & Company*

34