

Feb 11 2011
2:09PM

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

**IN RE PAYMENT CARD**
**INTERCHANGE FEE AND MERCHANT**
**DISCOUNT ANTITRUST LITIGATION**

Case No. 05-MD-01720 (JG) (JO)

ORAL ARGUMENT REQUESTED

---

**This Document Applies to:  All Actions.**

---

NETWORK DEFENDANTS' MEMORANDUM IN SUPPORT
OF THE MOTION FOR SUMMARY JUDGMENT AGAINST
<u>THE CLAIMS IN THE INDIVIDUAL PLAINTIFFS' COMPLAINTS</u>

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER
FILED UNDER SEAL

## Table Of Contents

Page

Table of Authorities ................................................................................................ iii

Preliminary Statement ............................................................................................ 1

Undisputed Facts .................................................................................................... 2

The Claims Of The Individual Plaintiffs ................................................................ 2

Argument ................................................................................................................ 4

I.      Summary Judgment Should Be Granted Against The Claims
        Of The Individual Plaintiffs For The Same Reasons That It
        Should Be Granted Against The Claims Of The Class Plaintiffs ................... 4

II.     Summary Judgment Also Should Be Granted Against The
        Claims Of The Individual Plaintiffs For Independent Reasons ..................... 5

        A.      All Individual Plaintiffs' Claims Should Be Dismissed To
                The Extent That They Are Based On "No Surcharge" Rules ............. 5

                1.      The "No Surcharge" Rules Do Not Unreasonably
                        Restrain Trade Or Result In An Antitrust Injury ................. 6

                2.      No Antitrust Injury Could Flow From The "No Surcharge"
                        Rules In Ten States That Statutorily Prohibit Surcharging .... 11

        B.      All Individual Plaintiffs' Claims Should Be Dismissed To
                The Extent That They Are Based On Asserted Single-Brand
                Markets For Visa Or MasterCard Credit Card Network Services ...... 14

                1.      Evidence Obtained In Discovery Shows That Visa
                        And MasterCard Credit Card Network Services Are Not
                        Unique But Compete With Other Networks' Card Services ..... 15

                2.      Plaintiffs Cannot Establish That They Are "Locked In"
                        To Purchasing Visa Or MasterCard Credit Card Network Services ....... 18

        C.      Plaintiffs' Sherman Act § 2 Claims Based On
                An Asserted Market For All Credit And Charge
                Card Network Services Should Be Dismissed ................................... 20

                1.      Direct Evidence Obtained In Discovery Shows That
                        Neither Visa Nor MasterCard Has Monopoly Power .............. 21

Page

2.    Indirect Evidence Does Not Establish That
      Either Visa Or MasterCard Has Monopoly Power ................................. 24

D.    Plaintiffs' Claims Of *Per Se* Price-Fixing
      Should Be Dismissed As Lacking Any Legal Basis ............................. 28

E.    Plaintiffs' Tying Claims Should Be Dismissed As Abandoned ....................... 29

Conclusion ...................................................................................... 30

**Table Of Authorities**

Page

**Cases**

*AD/SAT, a Division of Skylight, Inc. v. Associated Press*,
    181 F.3d 216 (2d Cir. 1999) .................................................. 17

*Advanced Health-Care Services, Inc. v. Giles Memorial Hospital*,
    846 F. Supp. 488 (W.D. Va. 1994) .......................................... 26

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ........................................................ 4

*Apex Oil Co. v. DiMauro*,
    713 F. Supp. 587 (S.D.N.Y. 1989) .......................................... 28

*Apple Inc. v. Psystar Corp.*,
    586 F. Supp. 2d 1190 (N.D. Cal. 2008) ..................................... 19

*Atlantic Richfield Co. v. USA Petroleum Co.*,
    495 U.S. 328 (1990) ........................................................ 6

*Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*,
    65 F.3d 1406 (7th Cir. 1995) ............................................ 23-24

*Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*,
    441 U.S. 1 (1979) ......................................................... 28

*Broadway Delivery Corp. v. United Parcel Service of America, Inc.*,
    651 F.2d 122 (2d Cir. 1981) ............................................... 24

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977) ..................................................... 6, 8, 9

*Buffalo Broadcasting Co. v. ASCAP*,
    744 F.2d 917 (2d Cir. 1984) ................................................ 5

*Cargill, Inc. v. Montfort of Colorado, Inc.*,
    479 U.S. 104 (1986) ........................................................ 6

*Casierra v. Target Corp.*,
    No. 09-CV-1301 (JG) (MDG), 2010 WL 2793778 (E.D.N.Y. July 12, 2010) ...... 4

*CBC Companies, Inc. v. Equifax, Inc.*,
    561 F.3d 569 (6th Cir. 2009) .............................................. 12

Page

City of Pittsburgh v. West Penn Power Co.,
147 F.3d 256 (3d Cir. 1998) ............................................................... 12

Columbia Broadcasting System v. ASCAP,
620 F.2d 930 (2d Cir. 1980) ................................................................. 5

Commercial Data Servers, Inc. v. International Business Machines Corp.,
262 F. Supp. 2d 50 (S.D.N.Y. 2003) ................................................... 26

Communication Facility Management Corp. v. LDDS Communications, Inc.,
No. CIV. A. 92-6451, 1996 WL 131133 (E.D. Pa. Mar. 21, 1996) ...................................... 8

Consolidated Terminal Systems, Inc. v. ITT World Communications, Inc.,
535 F. Supp. 225 (S.D.N.Y. 1982) ..................................................... 22

Craftsmen Limousine, Inc. v. Ford Motor Co.,
363 F.3d 761 (8th Cir. 2004) ............................................................. 28

De Jesus v. Sears, Roebuck & Co.,
87 F.3d 65 (2d Cir. 1996) ................................................................... 30

Discover Financial Services, Inc. v. Visa U.S.A., Inc.,
No. 04 Civ. 7844, slip opinion (S.D.N.Y. Oct. 24, 2005) .................. 25

Eastman Kodak Co. v. Image Technical Services,
504 U.S. 451 (1992) ........................................................ 14, 18-19, 20

Feldman v. Health Care Service Corp.,
562 F. Supp. 941 (N.D. Ill. 1982) .................................................. 7, 10

Flash Electronics, Inc. v. Universal Music and Video Distribution Corp.,
312 F. Supp. 2d 379 (E.D.N.Y. 2004) ............................... 14, 22, 24-25

Forsyth v. Humana, Inc.,
114 F.3d 1467 (9th Cir. 1997) ........................................................... 24

Gallo v. Prudential Residential Services, Limited Partnership,
22 F.3d 1219 (2d Cir. 1994) ................................................................. 4

Global Discount Travel Services LLC v. Trans World Airlines, Inc.,
960 F. Supp. 701 (S.D.N.Y. 1997) ..................................... 14-15, 19

Hack v. President and Fellows of Yale College,
237 F.3d 81 (2d Cir. 2000) ............................................................... 18

Page

*Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College,*
    106 F. Supp. 2d 406 (N.D.N.Y. 2000) ................................................................. 18

*Illinois Brick Co. v. Illinois,*
    431 U.S. 720 (1977) ..................................................................................... 4

*Illinois Tool Works Inc. v. Independent Ink, Inc.,*
    547 U.S. 28 (2006) ...................................................................................... 23

*In re ATM Fee Antitrust Litigation,*
    554 F. Supp. 2d 1003 (N.D. Cal. 2008) ............................................................. 29

*In re Canadian Import Antitrust Litigation,*
    470 F.3d 785 (8th Cir. 2006) .......................................................................... 11

*In re eBay Seller Antitrust Litigation,*
    No. C 07-01882 JF(RS), 2010 WL 760433 (N.D. Cal. Mar. 4, 2010) ................................. 24

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation,*
    562 F. Supp. 2d 392 (E.D.N.Y. 2008) ............................................. 14, 15, 20-21, 22

*In re Visa Check/MasterMoney Antitrust Litigation,*
    No. 96-CV-5238 (JG), 2003 WL 1712568 (E.D.N.Y. Apr. 1, 2003) ............................ 15, 20

*In re Wireless Telephone Services Antitrust Litigation,*
    385 F. Supp. 2d 403 (S.D.N.Y. 2005) ................................................................ 22

*Indiana Grocery, Inc. v. Super Valu Stores, Inc.,*
    864 F.2d 1409 (7th Cir. 1989) ..................................................................... 26-27

*Kartell v. Blue Shield of Massachusetts, Inc.,*
    749 F.2d 922 (1st Cir. 1984) .................................................................... 6-7, 10

*Kramer v. Pollock-Krasner Foundation,*
    890 F. Supp. 250 (S.D.N.Y. 1995) .................................................................... 22

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.,*
    551 U.S. 877 (2007) ..................................................................................... 28

*National Bancard Corp. v. Visa U.S.A., Inc.,*
    596 F. Supp. 1231 (S.D. Fla. 1984), *aff'd,* 779 F.2d 592 (11th Cir. 1986) ............ 15, 28-29

*Nifty Foods Corp v. Great Atlantic & Pacific Tea Co., Inc.,*
    614 F.2d 832 (2d Cir. 1980) ........................................................................... 26

Page

*Pacific Bell Telephone Co. v. Linkline Communications, Inc.,*
  129 S. Ct. 1109 (2009) ............................................................................... 20

*Paycom Billing Services, Inc. v. MasterCard International, Inc.,*
  467 F.3d 283 (2d Cir. 2006) .......................................................................... 5

*PepsiCo, Inc. v. Coca-Cola Co.,*
  315 F.3d 101 (2d Cir. 2002) ......................................................................... 21

*Queen City Pizza, Inc. v. Domino's Pizza,*
  124 F.3d 430 (3d Cir. 1997) ..................................................................... 17-18

*Rebel Oil Co. v. Atlantic Richfield Co.,*
  51 F.3d 1421 (9th Cir. 1995) .................................................................... 26, 27

*Reyn's Pasta Bella, LLC v. Visa U.S.A., Inc.,*
  259 F. Supp. 2d 992 (N.D. Cal. 2003), *aff'd*, 442 F.3d 741 (9th Cir. 2006) ........................ 29

*RSA Media, Inc. v. AK Media Group, Inc.,*
  260 F.3d 10 (1st Cir. 2001) ......................................................................... 12

*SouthTrust Corp.* v. *Plus System, Inc.,*
  913 F. Supp. 1517 (N.D. Ala. 1995) .............................................................. 8, 29

*Tennessean Truckstop, Inc. v. NTS, Inc.,*
  875 F.2d 86 (6th Cir. 1989) .................................................................... 7-8, 9

*Texaco Inc. v Dagher,*
  547 U.S. 1 (2006) ................................................................................. 28

*Townshend v. Rockwell International Corp.,*
  No. C99-0400SBA, 2000 WL 433505 (N.D. Cal. Mar. 28, 2000) ...................................... 27

*United States v. E. I. du Pont de Nemours and Co.,*
  351 U.S. 377 (1956) ............................................................................ 15, 20

*United States v. Visa U.S.A. Inc.,*
  163 F. Supp. 2d 322 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003) ..................... 15, 20

*Yentsch v. Texaco, Inc.,*
  630 F.2d 46 (2d Cir. 1980) ..................................................................... 29-30

Page

**Statutes**

California Civil Code § 1748.1 (West 2010) ............................................... 12

Colorado Revised Statutes § 5-2-212 (2010) ........................................... 13

Connecticut General Statutes § 42-133ff (2010) ..................................... 12

Florida Statutes § 501.0117 (2010) .......................................................... 12

Kansas Statutes Annotated § 16a-2-403 (2010) ...................................... 13

Maine Revised Statutes, title 9-A, § 8-303 (2009) .................................. 13

Massachusetts General Laws, chapter 140D, § 28A (West 2010) .............. 13

New York General Business Law § 518 (McKinney 2010) ....................... 12

Oklahoma Statutes, title 14A, §2-211A (2010) ....................................... 13

Texas Financial Code § 339.001 (Vernon 2009) ..................................... 12

15 United States Code § 1 (Sherman Act § 1) ............................... 3, 5, 11, 28

15 United States Code § 2 (Sherman Act § 2) ............................. 3, 20, 22, 27

**Other Authorities**

Federal Rule of Civil Procedure 56 ...................................................... 1, 4

IIB Phillip E. Areeda et al., *Antitrust Law* ¶ 516 (3d ed. 2007) .................. 24

IIB Phillip E. Areeda et al., *Antitrust Law* ¶ 517 (3d ed. 2007) .................. 23

IIB Phillip E. Areeda et al., *Antitrust Law* ¶ 534 (3d ed. 2007) .................. 17

IIB Phillip E. Areeda et al., *Antitrust Law* ¶ 563 (3d ed. 2007) .................. 14

IIIB Phillip E. Areeda et al., *Antitrust Law* ¶ 801 (3d ed. 2007) ................. 20

**Preliminary Statement**

Defendants Visa U.S.A. Inc. and Visa International Service Association ("Visa"), and defendants MasterCard Incorporated and MasterCard International Incorporated ("MasterCard"), submit this memorandum in support of the motion, pursuant to Federal Rule of Civil Procedure 56, for summary judgment against the claims in the Complaints of the individual plaintiffs.  Defendants are filing separate memoranda in support of summary judgment against the claims of the class plaintiffs in the Second Consolidated Amended Class Action Complaint (the "Class Complaint") and the First Amended and Second Supplemental Class Action Complaints (the "Supplemental Class Complaints").

Summary judgment should be granted dismissing the claims of the individual plaintiffs for several reasons.  As an initial matter, those claims fail for many of the same reasons established in defendants' memoranda in support of summary judgment against the claims in the Class Complaint and the Supplemental Class Complaints.  (Part I below.)  In addition, the individual plaintiffs' claims fail as a matter of law for five independent reasons.  (Part II below.)

First, the individual plaintiffs base their claims in substantial part on Visa and MasterCard "no surcharge" rules, but cannot show that those rules unreasonably restrained trade or resulted in an antitrust injury for which they could obtain relief.  (Part II.A below.)

Second, the individual plaintiffs cannot establish two of the three principal product markets that they assert — single-brand markets for Visa and for MasterCard credit card network services.  Evidence obtained in discovery establishes that those services are interchangeable with other brands and types of card network services, and plaintiffs were not "locked in" to purchasing those services.  (Part II.B below.)

Third, in their third asserted product market for all credit and charge card network services, the individual plaintiffs cannot prove that either Visa or MasterCard has monopoly

power, or a dangerous probability of obtaining such power, to support their claims for monopolization or attempted monopolization.  (Part II.C below.)

Fourth, there is no legal basis for the individual plaintiffs' claims that Visa's or MasterCard's setting of default interchange rates constitutes a *per se* violation of the antitrust laws.  (Part II.D below.)

Fifth, the individual plaintiffs have abandoned their "tying" claims.  (Part II.E below.)

## Undisputed Facts

A statement of undisputed general background facts can be found in the defendants' memorandum of law in support of the motion for summary judgment against the claims in the Class Complaint ("Defs' Class Compl. Memo."), and in the defendants' statement of material facts as to which there is no genuine issue ("SMF").  Additional undisputed facts specific to this motion are included in the SMF and are referenced in the argument sections below.

## The Claims Of The Individual Plaintiffs

The individual plaintiffs include large grocery and drug retailers, as well as the home shopping network QVC.  They filed thirteen operative complaints, each of which alleges essentially the same facts and claims.[1]  Those complaints assert that there are three principal relevant markets, consisting of "Network Services for General Purpose Payment Cards" (including both "Credit Cards" and "Charge Cards"), "Network Services for Visa Credit Cards," and "Network Services for MasterCard Credit Cards."  Hy-Vee Compl. ¶¶ 26(A), 32; Kroger

---

[1]  To avoid burdening the Court with duplicative citations, defendants provide citations only to the complaint filed against both Visa and MasterCard in the *Hy-Vee* action ("Hy-Vee Compl."), which is substantively identical to the complaints filed in the *Meijer*, *Supervalu*, *Publix Super Markets*, *Raley's*, *Wakefern Food*, and *QVC* actions, and to the complaints filed separately against Visa and MasterCard in the *Kroger* actions ("Kroger Compls."), which are substantively identical to each other and to the complaints filed in the *Rite Aid* and *BI-LO* actions.

Compls. ¶¶ 23(A), 29.[2]  Plaintiffs claim that in those asserted markets, Visa and MasterCard each violated federal antitrust law.

First, plaintiffs claim that Visa and its member banks, and MasterCard and its member banks, adopted "no surcharge" and other operating rules that, by themselves or in conjunction with the setting of default interchange fees, unreasonably restrained trade, in violation of Sherman Act § 1.  *See* Hy-Vee Compl. Counts III-VI; Kroger Compls. Counts II-III.

Second, plaintiffs claim that Visa and MasterCard each engaged in monopolization, or attempted monopolization, by adopting "no surcharge" and other operating rules, in violation of Sherman Act § 2.  *See* Hy-Vee Compl. Counts XI-XIV; Kroger Compls. Counts VI-VII.

Third, plaintiffs claim that Visa and its member banks, and MasterCard and its member banks, collectively set default interchange fees in a *per se* violation of Sherman Act § 1.  *See* Hy-Vee Compl. Counts I-II; Kroger Compls. Count I.

Fourth, plaintiffs claim that Visa and MasterCard each unlawfully "tied" network services for non-premium and premium cards, and for non-payment guarantee services and payment guarantee services, in violation of Sherman Act § 1.  *See* Hy-Vee Compl. Counts VII-X; Kroger Compls. Counts IV-V.

Plaintiffs claim that as a result of the asserted antitrust violations, Visa and MasterCard raised default interchange fees to supra-competitive levels, for which plaintiffs seek damages since January 1, 2004, as well as injunctive relief.  *See* Hy-Vee Compl. Counts I-XIV & Prayer for Relief; Kroger Compls. Counts I-VII & Prayer for Relief.

---

[2]  Plaintiffs assert six other relevant markets, but only in connection with their abandoned tying claims — *i.e.*, markets for (i) network services associated with non-premium Visa credit cards; (ii) network services associated with premium Visa credit cards; (iii) network services associated with non-premium MasterCard credit cards; (iv) network services associated with premium MasterCard credit cards; (v) network services associated with general purpose payment cards other than payment guarantee services; and (vi) payment guarantee services.  *See* Hy-Vee Compl. ¶¶ 116, 123, 130, 139; Kroger Compls. ¶¶ 79, 86.

## Argument

A defendant may seek summary judgment "on all or part of the claim." Fed. R. Civ. P. 56(b). Summary judgment is mandated unless the plaintiff can offer evidence showing that the challenged claim or portion thereof is "genuinely at issue." Fed. R. Civ. P. 56(d)(1). To make that showing, a plaintiff must proffer evidence that is "significantly probative." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If the plaintiff can offer "little or no evidence," summary judgment is warranted. *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223-24 (2d Cir. 1994); *accord Casierra v. Target Corp.*, No. 09-CV-1301 (JG) (MDG), 2010 WL 2793778, at *1-2 (E.D.N.Y. July 12, 2010) (Gleeson, J.). For the reasons described below, the individual plaintiffs cannot satisfy their burden of showing that there is a genuine issue of material fact precluding summary judgment.

## I.    Summary Judgment Should Be Granted Against The Claims Of The Individual Plaintiffs For The Same Reasons That It Should Be Granted Against The Claims Of The Class Plaintiffs

Summary judgment should be granted against the claims of the individual plaintiffs for the same reasons that it should be granted against the claims of the class plaintiffs. First, settlement releases in the *In re Visa Check/MasterMoney Litigation* bar the claims in all counts of the individual plaintiffs' complaints. (*See* Defs.' Class Compl. Memo. at 10-15; SMF ¶¶ 15-36.)

Second, the damages claims in all counts of the individual plaintiffs' complaints are barred by the direct purchaser rule announced in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). (*See* Defs.' Class Compl. Memo at 15-30; SMF ¶¶ 37-57.) ████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████

- 4 -

Third, Counts I-II and V-VI of the Hy-Vee-style Complaints, and Counts I and III of the Kroger-style Complaints, are barred to the extent that they are based on the setting of default interchange, since default interchange does not restrain trade under the principles established in *Buffalo Broadcasting Co. v. ASCAP*, 744 F.2d 917 (2d Cir. 1984), *Columbia Broadcasting System v. ASCAP*, 620 F.2d 930 (2d Cir. 1980), and *Paycom Billing Services, Inc. v. MasterCard International, Inc.*, 467 F.3d 283 (2d Cir. 2006). (*See* Defs.' Class Compl. Memo at 30-39; SMF ¶¶ 58-75.)

Fourth, the individual plaintiffs cannot prevail on any of their claims because they cannot establish that any allegedly anticompetitive conduct reduced output in the asserted markets. (*See* Defs.' Class Compl. Memo. at 39-42; SMF ¶¶ 76-80.)

In addition, like the class plaintiffs, the individual plaintiffs also cannot prove any collusion — among Visa and the banks, or among MasterCard and the banks — after the MasterCard and Visa IPOs. (*See* Defs.' Supp. Class Compl. Memo. at 13-18; SMF ¶¶ 129-147, 155-156.) Thus, summary judgment should be granted dismissing the Sherman Act § 1 claims asserted in Counts I-VI of the Hy-Vee-style Complaints, and Counts I-III of the Kroger-style Complaints, to the extent that those counts seek damages against MasterCard after its IPO was completed on May 31, 2006, or against Visa after its IPO was completed on March 18, 2008, and to the extent that those counts seek injunctive relief.

**II.     Summary Judgment Also Should Be Granted Against The Claims Of The Individual Plaintiffs For Independent Reasons**

     **A.     All Individual Plaintiffs' Claims Should Be Dismissed To The Extent That They Are Based On "No Surcharge" Rules**

Summary judgment also should be granted dismissing all of the individual plaintiffs' claims to the extent that they are based on Visa and MasterCard "no surcharge" rules. To obtain relief under the antitrust laws, plaintiffs must prove conduct that results in an "injury of the type

the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Proof of such an antitrust injury is necessary regardless of whether plaintiffs seek damages or injunctive relief. *Cargill, Inc. v. Montfort of Colo., Inc.*, 479 U.S. 104, 111-13 (1986). Here, by limiting the individual plaintiffs' ability to impose *higher* prices on consumers, the "no surcharge" rules have neither unreasonably restrained trade nor resulted in an injury that the antitrust laws were intended to prevent. Moreover, ten states have statutorily prohibited merchants from surcharging consumers who pay with credit cards, and in those states plaintiffs' alleged injuries flow from the operation of those statutes rather than from "no surcharge" rules.

### 1. The "No Surcharge" Rules Do Not Unreasonably Restrain Trade Or Result In An Antitrust Injury

A defendant's practice that reduces prices typically does not unreasonably restrain trade or result in an antitrust injury. As the Supreme Court concluded, "[l]ow prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition" and "cannot give rise to antitrust injury." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990). Accordingly, courts repeatedly have dismissed antitrust claims that a defendant prohibited the plaintiff from imposing surcharges on consumers, on the ground that the defendant's conduct reduced prices and therefore did not unreasonably retrain trade or result in an antitrust injury.

For example, *Kartell v. Blue Shield of Massachusetts, Inc.*, 749 F.2d 922 (1st Cir. 1984), addressed an antitrust challenge to agreements that Blue Shield negotiated to make payments directly to doctors for medical services provided to insured consumers, in which Blue Shield prohibited participating doctors from surcharging those consumers. *Id.* at 923-24. Justice (then Judge) Breyer, writing for a unanimous panel of the First Circuit, held that the surcharging ban

- 6 -

"do[es] not . . . show an unreasonable restraint of trade." *Id.* at 924.  He noted that "[a]ntitrust law rarely stops the buyer of a service from trying to determine the price or characteristics for the product that will be sold." *Id.* at 925.  He then reasoned that "Blue Shield in essence 'buys' medical services for the account of [its insureds]," finding that "[t]he relevant antitrust facts are that Blue Shield pays the bill and seeks to set the amount of the charge." *Id.* at 925-26.  He emphasized that "courts have unanimously upheld contracts . . . in which those who directly provide goods or services to insureds have agreed to cap or forego completely additional charges to those insureds in return for direct payment from the insurer." *Id.*

Nor did it matter that Blue Shield "provide[d] some form of health insurance to about 56 percent of the Massachusetts population." *Id.* at 924.  Justice Breyer reasoned that even assuming that gave Blue Shield "market power," in the absence of evidence that the prices it paid doctors were below their costs and "predatory," Blue Shield could impose price-lowering terms "that reflected its market power." *Id.* at 928.  That was consistent with the antitrust laws because "the Congress that enacted the Sherman Act saw it as a way of protecting consumers against prices that were too *high*, not too low." *Id.* at 931 (emphasis in original); *see also, e.g., Feldman v. Health Care Serv. Corp.*, 562 F. Supp. 941, 950-51 (N.D. Ill. 1982) (granting summary judgment for insurer that banned its participating pharmacies from surcharging its insureds because "the antitrust laws are not intended to protect profit margins but consumer welfare").

Defendants are not aware of any reported decision holding a "no surcharge" rule unlawful under the antitrust laws.  Indeed, courts have applied the reasoning in *Kartell* to uphold surcharging bans by payment networks.  In *Tennessean Truckstop, Inc. v. NTS, Inc.*, 875 F.2d 86 (6th Cir. 1989), the Sixth Circuit affirmed the dismissal of a truckstop owner's claim that NTS's ban against charging its credit cardholders more than 105% of the prices paid by cash customers violated federal antitrust law.  *Id.* at 87-90.  Relying on *Kartell*, the Sixth Circuit reasoned that

despite differences between providers of health insurance and credit card network services, "from an economic standpoint the functions they perform are similar" because "NTS pays truck stops for gasoline, just as Blue Shield pays doctors for medical services." *Id.* at 90. Thus, "even if NTS has market power," it simply negotiated lower prices for the truckers. *Id.* Moreover, the Sixth Circuit noted that because "NTS (unlike Blue Shield in the First Circuit case) is not alleged to have made any attempt to influence the base price" of the truckstop's goods, its "case is a stronger one for the defendant than *Kartell* was." *Id.* The Sixth Circuit thus concluded that the "surcharge cap is obviously a proconsumer device, and if it has cost [the truckstop] some profit, the 'injury' is not 'of the type the antitrust laws were intended to prevent.'" *Id.* (quoting *Brunswick*, 429 U.S. at 489); *see also Commc'n Facility Mgmt. Corp. v. LDDS Commc'ns, Inc.*, No. CIV. A. 92-6451, 1996 WL 131133, at *4 (E.D. Pa. Mar. 21, 1996) (granting summary judgment because hotel "has not suffered any recognizable antitrust injury because of the surcharge cap" that a telephone service provider imposed on hotel's telephone charges to its customers).

The district court in *SouthTrust Corp.* v. *Plus System, Inc.*, 913 F. Supp. 1517 (N.D. Ala. 1995), applied *Tennessean Truckstop* to reach the same conclusion with respect to a payment network's ban on surcharging. *Id.* at 1521-22. There, SouthTrust claimed that the Plus ATM network's ban against a member bank surcharging the ATM transactions of consumers who did not use the bank's ATM card was an antitrust violation. *Id.* at 1520. The court granted summary judgment dismissing the claim, reasoning that "[t]he no-surcharge rule . . . poses no identifiable threat of injury to competition" because "it enhances consumer welfare by limiting prices consumers will pay . . . and restricting the ability of [member banks] to opportunistically profit." *Id.* at 1521-22.

- 8 -

As these cases demonstrate, the individual plaintiffs here cannot establish an antitrust injury from the Visa and MasterCard "no surcharge" rules.[3] From an economic standpoint, the Visa and MasterCard networks function like Blue Shield in *Kartell* and NTS in *Tennessean Truckstop.* Whereas Blue Shield "delivered" prospective patients to participating doctors, so too here Visa and MasterCard "deliver" prospective consumers to card-accepting merchants. Like Blue Shield and NTS, the Visa and MasterCard networks negotiate the upper boundary of the prices to be paid by Visa and MasterCard cardholders. (SMF ¶¶ 11-13, 26-27.) Also like NTS (and unlike Blue Shield), Visa and MasterCard are not alleged to have made any attempt to fix merchants' actual base prices for the goods and services that they sell. On that ground, Visa's and MasterCard's "case is a stronger one for the defendant than *Kartell.*" *Tennessean Truckstop*, 875 F.2d at 90.

Moreover, if the Visa and MasterCard "no surcharge" rules have cost plaintiffs some profit, that injury is not "'of the type that that the antitrust laws were intended to prevent.'" *Id.* (quoting *Brunswick*, 429 U.S. at 489). Accordingly, to the extent that the individual plaintiffs claim that they were injured because they could not obtain *higher* payments by *surcharging* consumer cardholders, plaintiffs cannot establish an unreasonable restraint of trade or an antitrust injury.

Plaintiffs' economists have asserted that if merchants had been permitted to surcharge consumer cardholders, that would have put pressure on Visa and MasterCard to lower their respective interchange fees and lowered merchants' costs. But that is simply a claim that the payments for cardholder purchases that merchants agreed to receive directly from acquiring

---

[3] The Visa rule has provided: "A Merchant must not . . . Add any surcharge[s] to Transactions." (SMF ¶ 26.) The MasterCard rule has provided: "A merchant must not directly or indirectly require any [MasterCard] cardholder to pay a surcharge or any part of any merchant discount . . . in connection with a [MasterCard card] transaction." (SMF ¶ 27.)

banks were *too low — i.e.*, that the threat of surcharging would have reduced both interchange fees and merchant discount fees, and thereby *increased* the direct payments that the merchants received from their acquiring banks.  The First Circuit in *Kartell* rejected the same argument that because of Blue Shield's surcharging ban, "Blue Shield's payments for doctors' services are 'too low.'"  749 F.2d at 929.  The First Circuit concluded that "an antitrust court . . . will not interfere with a buyer's (nonpredatory) determination of price," because the "buyer is entitled to use its market power to keep prices down."  *Id.*  Likewise, where acquiring banks have negotiated agreements with merchants, in which merchants agree to treat payment cards as the equivalent of cash from the consumers' standpoint, and acquiring banks have agreed to pay merchants any price that the merchant sets (less the merchant discount fee) as long as that price is not augmented by a surcharge on consumers, an antitrust court should not interfere with the acquiring banks' efforts to keep consumers' prices down.

Plaintiffs further assert that the "no surcharge" rules result in higher interchange fees that merchants pass on to all consumers, including those who pay with cash or checks.  *See* Class Compl. ¶¶ 194, 197.  But nothing in the "no surcharge" rules forces merchants to raise their prices, or to establish any particular prices for retail goods that the merchants sell to any consumers.  As the court explained in *Feldman*, "[t]o the extent that plaintiffs claim to be forced to charge cash and carry customers more in order to obtain a certain overall profit, we note that that is a business decision to be made by plaintiffs . . . [the surcharging ban] does not establish a price fixed for third parties by defendants nor can it be said to be an unreasonable effect [of] defendants' [surcharging ban]."  562 F. Supp. at 950 (internal quotation omitted).

Furthermore, both Visa's and MasterCard's operating rules have expressly allowed merchants to avoid imposing any fees or other costs on customers paying with cash or checks through discounts.  For example, MasterCard's rules have provided that "[a] merchant may

- 10 -

provide a discount to its customers for cash payments." (SMF ¶ 32.) Visa's rules similarly have provided that "[a] Merchant may offer a discount as an inducement for a Cardholder to use a means of payment that the Merchant prefers," including for payments with cash or checks. (SMF ¶ 30.)

In short, the Visa and MasterCard "no surcharge" rules have not unreasonably restrained trade or resulted in an antitrust injury to the individual plaintiffs. Summary judgment should therefore be granted dismissing Counts III-VI and XI-XIV of the Hy-Vee-style Complaints, and Counts II-III and VI-VII of the Kroger-style Complaints, to the extent that they are based on the "no surcharge" rules.

### 2. No Antitrust Injury Could Flow From The "No Surcharge" Rules In Ten States That Statutorily Prohibit Surcharging

An antitrust plaintiff also does not suffer an antitrust injury where the asserted injury flows from the operation of federal or state law regardless of the allegedly anticompetitive effects of the defendants' conduct. For example, in *In re Canadian Import Antitrust Litigation*, 470 F.3d 785 (8th Cir. 2006), a class of consumers alleged that pharmaceutical manufacturers conspired in violation of Sherman Act § 1 to suppress the importation of Canadian drugs for personal use, and thereby raise drug prices in the United States. *Id.* at 787-88. The Eighth Circuit affirmed the dismissal of those claims because the alleged conspiracy obstructed only drug imports that would have been unlawful in any event. *Id.* at 788-92. The court found that "[t]he absence of competition from Canadian sources in the domestic prescription drug market . . . is caused by the federal statutory and regulatory scheme adopted by the United States government," and so "the alleged conduct of the defendants did not cause an injury of the type that the antitrust laws were designed to remedy." *Id.* at 791. Other courts likewise have rejected

antitrust claims as a matter of law where the plaintiff would have suffered its asserted injury by virtue of federal or state law regardless of the defendants' alleged conduct.[4]

In this case, the individual plaintiffs claim that in markets for credit card network services, plaintiffs were injured by their inability to surcharge consumers' credit card payments. Yet ten states — including several of the most populous states — have statutorily prohibited plaintiffs from imposing surcharges on credit card payments since at least January 2004:

- In New York, "[n]o seller in any sales transaction may impose a surcharge on a holder who elects to use a credit card in lieu of payment by cash, check, or similar means." N.Y. Gen. Bus. Law § 518 (McKinney 2010). (SMF ¶ 85.)

- In California, "[n]o retailer in any sales, service, or lease transaction with a consumer may impose a surcharge on a cardholder who elects to use a credit card in lieu of payment by cash, check, or similar means." Cal. Civ. Code § 1748.1(a) (West 2010). (SMF ¶ 86.)

- In Texas, "[i]n a sale of goods or services, a seller may not impose a surcharge on a buyer who uses a credit card for an extension of credit instead of cash, a check, or a similar means of payment." Tex. Fin. Code § 339.001(a) (Vernon 2009). (SMF ¶ 87.)

- In Florida, "[a] seller or lessor in a sales or lease transaction may not impose a surcharge on the buyer or lessee for electing to use a credit card in lieu of payment by cash, check, or similar means, if the seller or lessor accepts payment by credit card." Fla. Stat. § 501.0117(1) (2010). (SMF ¶ 88.)

- In Connecticut, "[n]o seller may impose a surcharge on a buyer who elects to use any method of payment, including, but not limited to, cash, check, credit card or electronic means, in any sales transaction." Conn. Gen. Stat. § 42-133ff(a) (2010). (SMF ¶ 89.)

---

[4] *See, e.g., CBC Cos., Inc. v. Equifax, Inc.*, 561 F.3d 569, 573 (6th Cir. 2009) (affirming dismissal of antitrust claims because "[n]o cognizable antitrust injury exists where the alleged injury is a 'byproduct of the regulatory scheme' or federal law rather than of the defendant's business practices"); *RSA Media, Inc. v. AK Media Group, Inc.*, 260 F.3d 10, 15 (1st Cir. 2001) (affirming summary judgment because plaintiff "was not excluded from the market for outdoor billboards because of [the defendant]'s threats; it was excluded because of the Massachusetts regulatory scheme that prevents new billboards from being built"); *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 266 (3d Cir. 1998) (concluding that antitrust claims were properly dismissed because plaintiff's "inability to choose to buy from either [allegedly conspiring defendant] is an injury visited upon it by the regulated nature of utility services, not caused by an agreement between [defendants]").

- In Massachusetts, "[n]o seller in any sales transaction may impose a surcharge on a cardholder who elects to use a credit card in lieu of payment by cash, check or similar means."  Mass. Gen. Laws ch. 140D, § 28A(a)(2) (West 2010).  (SMF ¶ 90.)

- In Maine, "[a] seller in a sales transaction may not," or "[n]o seller in any sales transaction may," "impose a surcharge on a cardholder who elects to use a credit card . . . in lieu of payment by cash, check or similar means."  Me. Rev. Stat. tit. 9-A, § 8-303(2) (2009).  (SMF ¶ 91.)

- In Oklahoma, "[n]o seller in any sales transaction may impose a surcharge on a cardholder who elects an open-end credit card . . . account instead of paying by cash, check or similar means."  Okla. Stat. tit. 14A, §2-211A (2010).  (SMF ¶ 92.)

- In Kansas, "[n]o seller or lessor in any sales or lease transaction . . . may impose a surcharge on a card holder who elects to use a credit . . . card in lieu of payment by cash, check or similar means."  Kan. Stat. Ann. § 16a-2-403 (2010).  (SMF ¶ 93.)

- In Colorado, "no seller or lessor in any sales or lease transaction . . . may impose a surcharge on a holder who elects to use a credit or charge card in lieu of payment by cash, check, or similar means."  Colo. Rev. Stat. § 5-2-212(1) (2010).  (SMF ¶ 94.)

It is undisputed that one or more individual plaintiffs have accepted Visa or MasterCard credit cards at stores in all of those states since January 2004.  (SMF ¶ 95.)

Because ten states barred plaintiffs from surcharging consumers who paid with Visa or MasterCard credit cards, plaintiffs' alleged injuries from their inability to surcharge credit card transactions in those states would have occurred regardless of the Visa or MasterCard "no surcharge" rules.  Summary judgment should therefore be granted dismissing Counts III-VI and XI-XIV of the Hy-Vee-style Complaints, and Counts II-III and VI-VII of the Kroger-style Complaints, to the extent that they are based on asserted injuries from the "no surcharge" rules in those ten states.

**B.      All Individual Plaintiffs' Claims Should Be Dismissed To The Extent That They Are Based On Asserted Single-Brand Markets For Visa Or MasterCard Credit Card Network Services**

Summary judgment also should be granted dismissing all of the individual plaintiffs' claims to the extent that they are based on asserted single-brand product markets for Visa or MasterCard credit card network services.  As this Court previously noted, a single-brand market may be found "where a product's characteristics make it unique."  *In re Payment Card Interchange Fee and Merchant Disc. Antitrust Litig.*, 562 F. Supp. 2d 392, 403 (E.D.N.Y. 2008) (Gleeson, J.).  Such "circumstances preventing consumers from substituting one product for another" may occur "where consumers are 'locked in' to a brand," under the theory recognized in *Eastman Kodak Co. v. Image Technical Services*, 504 U.S. 451 (1992).  *In re Payment Card*, 562 F. Supp. 2d at 403.

This Court previously found that the individual plaintiffs' complaints adequately alleged a single-brand market for MasterCard credit card network services, but noted that "[i]t may be that MasterCard will succeed in defeating the Single-Market Brand theory by means of a motion for summary judgment."  *Id.* at 405 n.8.  As the Court recognized, "[i]t is undoubtedly true that in most cases, the relevant product market will encompass products or services provided by multiple suppliers."  *Id.* at 403, *citing* IIB Phillip E. Areeda et al., *Antitrust Law* ¶ 563d (3d ed. 2007) ("[a] single brand or differentiated product within a product class is presumptively not a separate market . . .").  Indeed, a claim that a particular brand of product is unique "is exactly the sort of argument courts have routinely rejected in the past."  *Flash Elecs., Inc. v. Universal Music & Video Distrib. Corp.*, 312 F. Supp. 2d 379, 391 (E.D.N.Y. 2004) (Dearie, J.); *see also, e.g., Global Disc. Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701, 705 (S.D.N.Y. 1997) (Sotomayor, J.) ("the law is clear" that in general, "the distribution of a single

brand, like the manufacture of a single brand, does not constitute a legally cognizable market")
(internal quotation omitted).

No court has ever concluded that the evidence established single-brand markets for Visa
or MasterCard card network services.[5] Evidence obtained in discovery in this case similarly
demonstrates that summary judgment is warranted because the individual plaintiffs cannot
establish that either Visa or MasterCard credit card network services are unique, or that plaintiffs
were "locked in" to purchasing such services.

     1.     **Evidence Obtained In Discovery Shows That Visa
And MasterCard Credit Card Network Services Are Not
Unique But Compete With Other Networks' Card Services**

To show that Visa or MasterCard credit card network services are unique, the individual
plaintiffs must establish that they "are not interchangeable" with other brands of payment card
network services. *In re Payment Card*, 562 F. Supp. 2d at 404; *see also, e.g., United States v.
E. I. du Pont de Nemours and Co.*, 351 U.S. 377, 395 (1956) ("the relevant market" consists of
products "reasonably interchangeable by consumers for the same purposes"). Evidence obtained
in discovery, however, shows that plaintiffs view Visa and MasterCard credit card network
services as interchangeable with each other and with other brands of card network services.

For example, a former employee of the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ testified that
▮▮▮▮▮▮ thought that Visa and MasterCard are interchangeable, competing payment brands.

---

[5]  *See In re Visa Check/MasterMoney Antitrust Litig.*, No. 96-CV-5238 (JG), 2003 WL 1712568, at *3
(E.D.N.Y. Apr. 1, 2003) (Gleeson, J.) (holding that "[t]here is no genuine issue of material fact requiring
trial . . . that the relevant market, at its broadest, is the provision of general purpose credit and charge card
services"); *United States v. Visa U.S.A. Inc.*, 163 F. Supp. 2d 322, 335 (S.D.N.Y. 2001) (finding evidence
at trial established a "general purpose [credit and charge] card network services market" and a "general
purpose [credit and charge] card market"), *aff'd*, 344 F.3d 229, 238-39 (2d Cir. 2003); *National Bancard
Corp. v. Visa U.S.A., Inc.*, 596 F. Supp. 1231, 1257-58 (S.D. Fla. 1984) (finding evidence at trial
established a "market for payment systems" including "credit cards, travelers cheques, cash, ATM cards,
personal checks, and check guarantee cards"), *aff'd*, 779 F.2d 592, 604 & n.20 (11th Cir. 1986).

(SMF ¶ 97.)  A Vice-President for the ██████████████████ likewise testified that in his

opinion, Visa and MasterCard are interchangeable.  (SMF ¶ 98.)  Representatives of plaintiffs

██████████████████████████████████████████████

similarly testified that Visa and MasterCard network services to merchants are interchangeable

with each other, with other payment systems such as American Express or Discover, or with

other forms of payment such as cash and checks.  (SMF ¶ 99.)  Representatives of plaintiffs

████████████████████ testified that they tried to influence customers to use forms of payment

other than Visa or MasterCard credit cards, showing that they found those other forms of

payment to be interchangeable.  (SMF ¶ 100.)  Plaintiffs' representatives likewise testified that

they viewed Visa and MasterCard as competing with each other and with other payment systems

for merchant business.  (SMF ¶¶ 101-102.)

In addition, discovery obtained from sellers of payment card network services shows that

they compete with Visa and MasterCard credit card network services for merchant acceptance

and usage.  For example, the corporate designee of American Express testified that American

Express competes both with Visa and with MasterCard for merchant acceptance and usage, and

American Express documents produced in discovery also describe this competition.  (SMF

¶¶ 103-104.)  The Discover corporate designee likewise testified that Discover competes with

Visa and MasterCard for merchant usage of its network services.  (SMF ¶ 105.)  The corporate

designee of the payment network Wright Express testified that Wright Express views itself as

competing against both Visa and MasterCard payment cards.  (SMF ¶ 106.)  A corporate

designee of the NYCE debit card network similarly testified that NYCE's network competes for

merchants with a number of competing payment products, including credit cards.  (SMF ¶ 107.)

Visa and MasterCard testimony and documents further show that Visa and MasterCard compete

for merchant acceptance or usage with each other, American Express, and Discover.  (SMF ¶¶ 108-109.)

Notwithstanding this evidence, the individual plaintiffs allege that separate single-brand product markets exist because Visa and MasterCard both substantially raised default interchange fees without merchants dropping acceptance of Visa or MasterCard credit card network services. *See* Hy-Vee Compl. ¶ 34; Kroger Compls. ¶ 31.  But "[w]hen the prices of two products . . . change in the same direction and by similar amounts over a substantial period of time, they are presumptively in the *same market*."  IIB Phillip E. Areeda et al., *Antitrust Law* ¶ 534c (3d ed. 2007) (emphasis added); *see also, e.g., AD/SAT, a Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 228 (2d Cir. 1999) ("one hallmark of reasonable interchangeability between two particular goods is uniformity in price").  Here, proffered experts of the class plaintiffs concluded that competition between Visa and MasterCard led each of them to match the other's default interchange fees.  (SMF ¶ 110.)  Evidence from Visa and MasterCard likewise shows that each was concerned about competition from the other, and would not allow itself to be disadvantaged by the default interchange fees set by the other.  (SMF ¶ 111.)

Plaintiffs' economists also have asserted that single-brand product markets exist because Visa's and MasterCard's respective "no surcharge" and other operating rules limit plaintiffs' ability to steer consumers to use other forms of payment.  But as demonstrated above, regardless of such rules, plaintiffs and sellers of payment card network services view Visa and MasterCard credit card network services as interchangeable with, and in competition with, each other and other brands and forms of payment.  In addition, plaintiffs agreed to follow the "no surcharge" and other operating rules pursuant to their acceptance contracts with acquiring banks, and "no court has defined a relevant product market with reference to the particular contractual restraints of the plaintiff."  *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir.

- 17 -

1997).  "A court making a relevant market determination looks not to the contractual restraints assumed by a particular plaintiff when determining whether a product is interchangeable, but the uses to which the product is put . . . ."  *Id.*  Otherwise, "any exclusive dealing arrangement, output or requirement contract, or franchise tying agreement would support a claim for violation of antitrust laws."  *Id.* (affirming dismissal of claim that franchise contract supply restrictions defined a single-brand market); *see also*, *e.g.*, *Hack v. President and Fellows of Yale College*, 237 F.3d 81, 85 (2d Cir. 2000) (affirming dismissal because single-brand market could not be based on "[e]conomic power derived from contractual arrangements affecting a distinct class of consumers"); *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College*, 106 F. Supp. 2d 406, 413 (N.D.N.Y. 2000) (granting summary judgment because "a contractual restraint assumed by a particular class of consumers is not a proper basis for a market delineation").

### 2.    Plaintiffs Cannot Establish That They Are "Locked In" To Purchasing Visa Or MasterCard Credit Card Network Services

The individual plaintiffs also cannot establish that they are "locked in" to purchasing Visa or MasterCard credit card network services, under the theory recognized in *Eastman Kodak*. In that case, the Supreme Court addressed a claim that Kodak unlawfully tied the provision of Kodak copier services to the sale of Kodak parts, in violation of federal antitrust law.  504 U.S. at 459.  The Supreme Court rejected Kodak's argument that competition from other manufacturers in the primary market for copiers necessarily precluded a finding that Kodak had market power in separate aftermarkets for parts and services.  *See id.* at 464-79.  The Supreme Court found that competing parts manufacturers might be able to show that when consumers made initial purchases of Kodak copiers, they lacked sufficient information about the package of equipment, parts, and services for that package to be priced competitively, and that consumers' costs of dropping Kodak copiers after their initial purchases and switching instead to copiers of

- 18 -

other manufacturers would be high.  *See id.* at 473-77.  In those circumstances, the Supreme

Court determined that consumers might be "locked in" to purchasing Kodak parts and services in

derivative aftermarkets at supra-competitive prices, which might support a finding of single-

brand aftermarkets for Kodak parts and Kodak services.  *See id.* at 481-82.

      Plaintiffs cannot establish such a single-brand aftermarket in this case.  The individual

plaintiffs do not claim to have made a purchase of a primary product that then "locked" them in

to purchasing Visa or MasterCard credit card network services in a derivative aftermarket.

Plaintiffs instead claim to have made only a primary purchase of Visa and MasterCard credit

card network services in a market in which "the sellers are the card companies and their member

banks, and the buyers are retail merchants."  Hy-Vee Compl. ¶ 33; Kroger Compls. ¶ 30.  Courts

in such circumstances have rejected claims that plaintiffs were "locked in" to a single-brand

primary market rather than a separate derivative aftermarket.  *See, e.g., Apple Inc. v. Psystar*

*Corp.*, 586 F. Supp. 2d 1190, 1197 (N.D. Cal. 2008) (dismissing counterclaim asserting "not a

single-brand aftermarket dependent on and derivative of a specific company's primary product

but instead that a single brand of primary product . . . constitutes an independent market");

*Global Disc.*, 960 F. Supp. at 705 (dismissing claim of single-brand market for "tickets for travel

on TWA between certain city pairs" because "[u]nlike *Kodak*, the purchase of a TWA ticket

from City X to City Y does not require further TWA ticket purchases down the line").

*     *     *

      In short, the individual plaintiffs cannot establish that there are single-brand markets in

this case.  The discovery record shows that Visa and MasterCard credit card network services are

not unique, but are interchangeable both with each other and with other networks' card services,

and that there is no "lock in" to accepting such services in a separate and derivative aftermarket.

Summary judgment should therefore be granted dismissing all counts of the Hy-Vee-style

- 19 -

Complaints, and all counts of the Kroger-style Complaints, to the extent that they are based on

the asserted single-brand markets for Visa or MasterCard credit card network services.

> **C.**   **Plaintiffs' Sherman Act § 2 Claims Based On An Asserted Market For All Credit And Charge Card Network Services Should Be Dismissed**

Summary judgment also is warranted on the individual plaintiffs' Sherman Act § 2

claims to the extent that they alternatively are based on an asserted market for all credit and

charge card network services.  Sherman Act § 2 applies in "rare instances in which a dominant

firm may incur antitrust liability for purely unilateral conduct."  *Pac. Bell Tel. Co. v. Linkline*

*Commc'ns, Inc.*, 129 S. Ct. 1109, 1118 (2009).  As this Court has recognized, a Sherman Act § 2

claim requires that the plaintiff prove, among other things, a single defendant's "possession of

monopoly power" to support a monopolization claim, or its "dangerous probability of achieving

monopoly power" to support an attempted monopolization claim.  *In re Payment Card*, 562 F.

Supp. 2d at 398 (internal quotations omitted).  The individual plaintiffs cannot make such a

showing in their asserted market for all credit and charge card network services.

Monopoly power generally is defined to be a single defendant's "'power to control prices

or exclude competition.'"  *Id.* (quoting *E.I. du Pont*, 351 U.S. at 391)).  It "requires 'something

more' than the 'market power' standard that is relevant to claims brought under Section 1 of the

Sherman Act."  *Id.* at 398-99 (quoting *Eastman Kodak*, 504 U.S. at 481); *see also, e.g.*, IIIB

Phillip E. Areeda et al., *Antitrust Law* ¶ 801 (3d ed. 2007) ("monopoly power . . . is

conventionally understood to mean 'substantial' market power").[6]  A plaintiff may prove

---

[6]  Prior decisions have found that Visa or MasterCard had economic power in certain respects, but have not concluded that either Visa or MasterCard had monopoly power.  *See In re Visa Check*, 2003 WL 1712568, at *4 (Visa had appreciable economic power to support a tying claim); *United States v. Visa*, 344 F.3d at 239-40 (Visa and MasterCard each had market power based in part on former rules that excluded American Express from selling network services to their respective bank customers).

monopoly power either with direct evidence, or with indirect evidence such as the defendant's share of the relevant market, the strength of existing competitors, and barriers to entry by new competitors. *See In re Payment Card*, 562 F. Supp. 2d at 399, 402.

Here, although this Court previously found that plaintiffs' pleading allegations did not "necessarily preclude[] the possibility that [they] will prove that MasterCard has or is dangerously likely to acquire monopoly power," the Court emphasized that "[a]t this relatively early stage of the litigation, the court is unable to weigh [the alleged] evidence and determine its significance." *Id.* at 403. Evidence obtained in discovery now shows that neither Visa nor MasterCard has the monopoly power to control prices or exclude competition in the asserted market for all credit and charge card network services.

### 1.   Direct Evidence Obtained In Discovery Shows That Neither Visa Nor MasterCard Has Monopoly Power

As this Court previously found, to be direct evidence of monopoly power, evidence must establish that a single defendant "can sell a product or service for a supra-competitive price untroubled by market forces; in other words, [that] it is able to exert power to insulate its prices from competition." *In re Payment Card*, 562 F. Supp. 2d at 399. That requires the defendant to have "the ability to raise price by restricting output." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 107 (2d Cir. 2002) (internal quotations omitted). Here, despite plaintiffs' claims that Visa and MasterCard increased their respective default interchange fees to supra-competitive levels, the evidence obtained in discovery shows that neither Visa nor MasterCard has the power, or any dangerous probability or achieving the power, to control prices or to restrict output to raise prices.

As shown above, plaintiffs' economists claim that Visa and MasterCard each repeatedly took steps not to be competitively disadvantaged by the other's changes in default interchange

fees.  (SMF ¶ 110.)  That evidence demonstrates that neither Visa nor MasterCard *itself* was able to control prices or "to exert power to insulate *its* prices from competition" with the other.  *In re Payment Card,* 562 F. Supp. 2d at 399 (emphasis added); *see also*, *e.g.*, *In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d 403, 421 (S.D.N.Y. 2005) (plaintiffs could not frame "defendants' allegedly parallel actions as evidence of their respective market power").  While plaintiffs might try to argue that this evidence suggests a shared monopoly or oligopoly that included both Visa and MasterCard, courts have held that such multiple-firm conduct cannot establish the monopolization or attempted monopolization by a single firm necessary for a violation of Sherman Act § 2.[7]

Moreover, evidence obtained in discovery shows that neither Visa nor MasterCard has the power to restrict output to increase its default interchange fees.  The individual plaintiffs' economist, Dr. Vellturo, admitted that "[o]utput has been increasing over time in all credit markets."  (SMF ¶ 112.)  Specifically, he calculated credit and charge card purchase volume — and its concomitant use of networks services — in total and by card network.  (SMF ¶ 113.)  That calculation shows that from 2004 to 2008, total credit and charge card purchase volume increased by approximately 36%, from $1,431 to $1,942 billion dollars.  (SMF ¶ 114.)  Moreover, that increase did not exclude competition from American Express or Discover, because they each increased output at a *higher* rate than Visa or MasterCard.  From 2004 to

---

[7]  *See*, *e.g.*, *Flash Elecs.*, 312 F. Supp. 2d at 396-97 (dismissing claim because "[t]he idea of a 'shared monopoly' giving rise to Section 2 liability repeatedly has been received with skepticism by courts" who "have yet to embrace this theory"); *Kramer v. Pollock-Krasner Found.*, 890 F. Supp. 250, 256 (S.D.N.Y. 1995) (dismissing claim because "the offense of monopolization under Section 2 refers to market dominance by a 'single firm' . . . allegations of a shared monopoly, i.e., that the defendants' combined market power constitutes monopolization or attempted monopolization of the relevant market . . . do not constitute a violation of Section 2"); *Consol. Terminal Sys., Inc. v. ITT World Commc'ns, Inc.*, 535 F. Supp. 225, 228-29 (S.D.N.Y. 1982) (dismissing claim because "an oligopoly, or a shared monopoly, does not in itself violate § 2 of the Sherman Act . . . [r]ather, in order to sustain a charge of monopolization or attempted monopolization, a plaintiff must allege the necessary market domination of a particular defendant").

2008, credit and charge card purchase volume increased by approximately 53% for American Express, approximately 44% for Discover, approximately 35% for Visa, and approximately 26% for MasterCard. (SMF ¶¶ 115-118.)

Plaintiffs nonetheless claim to find direct evidence of monopoly power in evidence that Visa and MasterCard engaged in "price discrimination" — *i.e.*, set default interchange fees differentially for different categories of merchants, depending on the value of network services to those merchants rather than on costs. *See* Hy-Vee Compl. ¶ 35; Kroger Compls. ¶ 32. However, "while price discrimination may provide evidence of market power . . . it is generally recognized that it also occurs in fully competitive markets." *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 44-45 (2006); *see also, e.g.*, IIB Phillip E. Areeda et al., *Antitrust Law* ¶ 517 (3d ed. 2007) ("price discrimination evidence has very limited utility for proving [market] power" because "many instances of price discrimination are quite consistent with robust but imperfect competition"). Here, evidence of price discrimination could not establish that either Visa or MasterCard has the *unilateral* power to control market prices. Plaintiffs' economists maintain that Visa and MasterCard *both* have engaged in price discrimination by setting different default interchange fees for different merchant classes or categories. (SMF ¶ 119.) Furthermore, discovery from other competitors that plaintiffs do not claim have monopoly power — American Express and Discover — shows that they too have engaged in such price discrimination. American Express has varied its merchant discount rates depending on the merchant industry and value of American Express to the merchant. (SMF ¶ 120.) Discover's fees to merchants likewise have varied by merchant industry. (SMF ¶ 121.)

The class plaintiffs' economist also has claimed that monopoly power can be shown because interchange fees resulted in high profits for banks that issued Visa or MasterCard cards. Yet "it is always treacherous to try to infer monopoly power from a high rate of return" because

- 23 -

"there is not even a good economic theory that associates monopoly power with a high rate of return."  *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1412 (7th Cir. 1995); IIB Phillip E. Areeda et al., *Antitrust Law* ¶ 516a (3d ed. 2007) ("excess returns do not necessarily show market power").  Courts accordingly have held that evidence of high profits does not constitute direct evidence of monopoly power.  *See, e.g., Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1476 (9th Cir. 1997) (although plaintiffs submitted evidence that defendant hospital "routinely charged higher prices than other hospitals while reaping high profits," with "no accompanying showing of restricted output . . . plaintiffs have failed to present direct evidence of market power"); *In re eBay Seller Antitrust Litig.*, No. C 07-01882 JF(RS), 2010 WL 760433, at *5 (N.D. Cal. Mar. 4, 2010) ("[e]vidence that eBay has raised prices over a period of years, and that several of its employees believe that the company may have raised them too high, proves nothing," since it is not "evidence of either restricted output or supracompetitive prices").

### 2.     Indirect Evidence Does Not Establish That Either Visa Or MasterCard Has Monopoly Power

The evidence also shows that plaintiffs cannot prove that either Visa or MasterCard has monopoly power based on indirect evidence, such as market share, the strength of competition, or market entry barriers.  The Second Circuit has concluded that "a market share below 50% is rarely evidence of monopoly power, a share between 50% and 70% can occasionally show monopoly power, and a share above 70% is usually strong evidence of monopoly power." *Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc.*, 651 F.2d 122, 129 (2d Cir. 1981). Thus, "a monopolization claim may be withdrawn from a jury" where "the defendant's share is less than 50%, or even somewhat above that figure, and the record contains no significant evidence concerning the market structure to show that the defendant's share of that market gives it monopoly power." *Id.*; *see also, e.g., Flash Elecs.*, 312 F. Supp. 2d at 396-97 (dismissing

monopolization and attempted monopolization claims against two defendants because plaintiff alleged only that they had respective market shares of 50% and 25%).

Here, the individual plaintiffs' economist, Dr. Vellturo, calculated credit and charge card purchase volume in total and by network. (SMF ¶ 113.) That calculation shows that from 2004 to 2008, Visa's share of all credit and charge card purchases was approximately 42-43%, and MasterCard's share was approximately 28-30%. (SMF ¶¶ 122-123.) The class plaintiffs' economist similarly calculated that in 2008, Visa's share of all credit and charge card purchase volume was 43% and MasterCard's share was 28%. (SMF ¶ 124.) Both Visa's and MasterCard's market share thus falls below the 50% or somewhat higher threshold.

Another court dismissed claims against MasterCard predicated on an alleged 29% share of credit and charge card network services as "clearly insufficient" to establish "a claim for either actual or attempted monopolization." *Discover Fin. Servs., Inc. v. Visa U.S.A., Inc.*, No. 04 Civ. 7844, slip op. at 3 (S.D.N.Y. Oct. 24, 2005). Nor is MasterCard aware of any authority that would support a finding that a competitor like it, who had a smaller market share than its rival, could have monopoly power or a dangerous probability of achieving it.

In addition, the calculations of the individual plaintiffs' economist show that from 2004 to 2008, American Express and Discover gained market share at the expense of both Visa and MasterCard. His calculations show that American Express's share of credit and charge card purchases rose from approximately 21.2% to 23.9%, an increase of approximately 12%, and that Discover's share rose from approximately 5.1% to 5.5%, an increase of approximately 8%. (SMF ¶¶ 125-126.) At the same time, he calculated that Visa's share fell from approximately 42.7% to 42.4%, a decrease of approximately 1%, and MasterCard's share fell from approximately 30.3% to 28.2%, a decrease of approximately 7%. (SMF ¶¶ 127-128.) Courts repeatedly have held that where, as here, competitors have *gained* market share relative to a

defendant, the defendant does not have monopoly power, or a dangerous probability of achieving such power, as a matter of law. *See, e.g.*, *Nifty Foods Corp v. Great Atl. & Pac. Tea Co.*, 614 F.2d 832, 841 (2d Cir. 1980) (affirming summary judgment for defendant because its decline in market share from 54.5% or 48.3% to 33% could not support a claim for a monopolization or attempted monopolization); *Commercial Data Servers, Inc. v. Int'l Bus. Machs. Corp.*, 262 F. Supp. 2d 50, 74 (S.D.N.Y. 2003) (granting summary judgment because defendant's competitors had "significantly increased their market shares during the relevant time frame" and the defendant "had a relatively low, and declining, market share"); *Advanced Health-Care Servs., Inc. v. Giles Mem'l Hosp.*, 846 F. Supp. 488, 494 (W.D. Va. 1994) (granting summary judgment because "[i]f the defendants' market share is declining and/or other competitors' market shares are rising, then the defendants can hardly possess market power").

Plaintiffs nonetheless suggest that monopoly power can be inferred because entry barriers are high for new firms seeking to provide credit or charge card network services. *See* Hy-Vee Compl. ¶ 36; Kroger Compls. ¶ 33. But even if such entry barriers are high, that could not establish that either Visa or MasterCard has monopoly power in this case, given the strength of existing competition. To constitute indirect evidence of monopoly power, a plaintiff must show "that new rivals are barred from entering the market *and show that* existing competitors lack the capacity to expand their output." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1439 (9th Cir. 1995) (emphasis added). "The ability to control output and prices . . . depends largely on the ability of existing firms to quickly increase their own output in response to a contraction by the defendant," and "[i]f there is undisputed evidence indicating that competitors have expanded output in the recent past . . . summary disposition may be appropriate." *Id.* at 1441; *see also, e.g.*, *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1415 (7th Cir. 1989) ("[i]f a firm can never gain the power to control a given market's total output" due to existing

competition, "it matters little that high barriers to entry might exist to help that firm maintain monopoly power it could never achieve").

Here, as shown above, from 2004 to 2008 both American Express and Discover increased their output of credit card network services, and at a higher rate than Visa or MasterCard. (SMF ¶¶ 115-118.) Courts have rejected claims that a defendant has monopoly power or a dangerous probability of achieving monopoly power based on entry barriers where, as here, existing firms were able to increase output. *See, e.g., Rebel Oil*, 51 F.3d at 1443 (affirming summary judgment against attempted monopolization claim because "[a]lthough there is a genuine issue regarding market share and entry barriers, there appears to be no genuine issue regarding the ability of [defendant]'s existing competitors to increase their output"); *Indiana Grocery*, 864 F.2d at 1413-16 (affirming summary judgment against attempted monopolization claim based on evidence of 35% or 50% market share and high barriers to entry because plaintiff admitted that defendant could not control the sales output of its competitors); *Townshend v. Rockwell Int'l Corp.*, No. C99-0400SBA, 2000 WL 433505, at *12 (N.D. Cal. Mar. 28, 2000) (dismissing attempt to monopolize claim despite allegations of counterclaim-defendant's "50% market share in the product market and . . . entry barriers," since counterclaim-plaintiff "has not alleged that [existing] competitors are unable to expand output").

*    *    *

In sum, the individual plaintiffs cannot create a genuine issue that either Visa or MasterCard has monopoly power, or a dangerous probability of achieving such power, in the asserted market for all credit and charge card network services. Summary judgment should therefore be granted dismissing the Sherman Act § 2 claims in Counts XI-XIV of the Hy-Vee-style Complaints, and Counts VI-VII of the Kroger-style Complaints, to the extent that they are based on an asserted market for all credit and charge card network services.

- 27 -

**D.    Plaintiffs' Claims Of *Per Se* Price-Fixing
        Should Be Dismissed As Lacking Any Legal Basis**

Summary judgment also is warranted against the individual plaintiffs' claims that Visa and the banks, and MasterCard and the banks, set default interchange fees in a *per se* violation of Sherman Act § 1. "Whether to apply a per se or rule of reason analysis" to a claim under Sherman Act § 1 "is a question of law" for the court to decide. *Nat'l Bancard*, 779 F.2d at 596; *see also, e.g.*, *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 772 (8th Cir. 2004) (same); *Apex Oil Co. v. DiMauro*, 713 F. Supp. 587, 595 (S.D.N.Y. 1989) (same).

The rule of reason "presumptively applies," under which "antitrust plaintiffs must demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive before it will be found unlawful." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). In contrast, the Supreme Court has emphasized that the *per se* rule should be applied to very limited categories of conduct that are "manifestly anticompetitive" and "lack . . . any redeeming virtue." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) (internal quotations omitted). In particular, the *per se* rule "is appropriate only after courts have had considerable experience with the type of restraint at issue, . . . and only if courts can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason." *Id.* at 886-87; *see also, e.g.*, *Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 9 (1979) ("[i]t is only after considerable experience with certain business relationships that courts classify them as *per se* violations") (internal quotations omitted).

Here, there is no "considerable" judicial experience that would permit the setting of default interchange fees to be automatically condemned under the *per se* rule. To the contrary, courts repeatedly have held that a payment network's setting of interchange fees must be analyzed under the rule of reason. For example, in *National Bancard*, both the district court and

- 28 -

the Eleventh Circuit refused to apply the *per se* rule to a claim that Visa's setting of credit card interchange fees was unlawful price-fixing, and, in analyzing that practice under the rule of reason, held that it was procompetitive and lawful.  *See* 596 F. Supp. at 1250-65, *aff'd*, 779 F.2d at 596-605; *see also, e.g., In re ATM Fee Antitrust Litig.*, 554 F. Supp. 2d 1003, 1017 (N.D. Cal. 2008) (granting summary judgment against plaintiffs' *per se* challenge to the Star ATM network's "setting of a fixed interchange fee" because it "must be analyzed under the rule of reason"); *Reyn's Pasta Bella, LLC v. Visa U.S.A., Inc.*, 259 F. Supp. 2d 992, 998, 1000 (N.D. Cal. 2003) (merchants' claim that an "agreement between banks within each payment card network to impose a uniform interchange fee" is one that "calls for application of the rule of reason"), *aff'd on other grounds*, 442 F.3d 741 (9th Cir. 2006); *SouthTrust*, 913 F. Supp. at 1523-25 (granting summary judgment against challenge to an ATM network's interchange fee and "no surcharge" rules because the *per se* rule did not apply, and the practices were procompetitive and lawful under the rule of reason).

Summary judgment should therefore be granted dismissing the claims that Visa's or MasterCard's default interchange fees are unlawful *per se* in Counts I-II of the Hy-Vee-style Complaints and Count I of the Kroger-style Complaints.

### E.    Plaintiffs' Tying Claims Should Be Dismissed As Abandoned

Finally, summary judgment should be granted dismissing the tying claims in Counts VII-X of the Hy-Vee-style Complaints, and Counts IV-V of the Kroger-style Complaints, as abandoned.  To prove a tying claim, a plaintiff must establish "five specific elements:  first, a tying and a tied product . . . ; second, evidence of actual coercion by the seller that in fact forced the buyer to accept the tied product . . . ; third, sufficient economic power in the tying product market to coerce purchaser acceptance of the tied product . . . ; fourth, anticompetitive effects in the tied market . . . ; and fifth, involvement of a not insubstantial amount of interstate commerce

in the tied product market . . . ." *Yentsch v. Texaco, Inc.*, 630 F.2d 46, 56-57 (2d Cir. 1980) (internal quotations and citations omitted); *see also, e.g.*, *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir. 1996) (same). Here, the individual plaintiffs' economists offered no opinion on whether there were separate products, coercion, economic power, anticompetitive effects, or damages that could support plaintiffs' tying claims, and plaintiffs cannot otherwise proffer evidence creating a genuine issue for trial on those claims.

## Conclusion

For the foregoing reasons, defendants respectfully request that the Court enter an order granting summary judgment and dismissing the claims in the complaints of the individual plaintiffs.

Dated:  February 11, 2011.                    Respectfully submitted,

**ARNOLD & PORTER LLP**

By:  /s/ Robert C. Mason
Robert C. Mason
399 Park Avenue
New York, NY  10022-4690
Telephone:  (212) 715-1000
Facsimile:   (212) 715-1399
robert.mason@aporter.com

Robert J. Vizas
One Embarcadero Center, 22nd Floor
San Francisco, CA   94111-3711
Telephone:  (415) 356-3000
Facsimile:   (415) 356-3099
robert.vizas@aporter.com

Mark R. Merley
Matthew A. Eisenstein
555 12th Street, N.W.
Washington, DC   20004-1206
Telephone:  (202) 942-5000
Facsimile:  (202) 942-5999
mark.merley@aporter.com
matthew.eisenstein@aporter.com

*Attorneys for Defendants Visa U.S.A. Inc.
and Visa International Service Association*


**PAUL, WEISS, RIFKIND, WHARTON &
    GARRISON LLP**

By: /s/ Gary R. Carney
Andrew C. Finch
Gary R. Carney
1285 Avenue of the Americas
New York, NY   10019-6064
Telephone:  (212) 373-3000
Facsimile:   (212) 757-3990
afinch@paulweiss.com
gcarney@paulweiss.com

Kenneth A. Gallo
Joseph J. Simons
2001 K Street, N.W.
Washington, DC   20006-1047
Telelphone: (202) 223-7300
Facsimile:   (202) 223-7420
kgallo@paulweiss.com
jsimons@paulweiss.com

**WILLKIE FARR & GALLAGHER LLP**

Keila D. Ravelo
Wesley R. Powell
Matthew Freimuth
787 Seventh Avenue
New York, NY   10019-6099
Telephone:  (212) 728-8000
Facsimile:  (212) 728-8111
kravelo@willkie.com
wpowell@willkie.com
mfreimuth@willkie.com

*Attorneys for Defendants MasterCard Incorporated
and MasterCard International Incorporated*