

37459724

May 6 2011
9 51PM

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | MDL Docket No. 1720 (JG)(JO) |

**Class Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (Unannotated)**

K. Craig Wildfang
Thomas J. Undlin
Ryan W. Marth

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Tel: 612-349-8500
Fax: 612-339-4181

Patrick J. Coughlin
Bonny E. Sweeney
David W. Mitchell
Alexandra S. Bernay

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
Tel: 619-231-1058
Fax: 619-231-7423

H. Laddie Montague, Jr.
Merrill G. Davidoff
Bart D. Cohen
Michael J. Kane

BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Tel: 215-875-3000
Fax: 215-875-4604

Co-Lead Counsel for MDL 1720 Class Plaintiffs

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

# Table of Contents

Page

Class Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (Unannotated) ........................................................................................... 1

Introduction .............................................................................................................................. 1

Summary of Argument ............................................................................................................. 2

Summary Judgment Standard .................................................................................................. 7

**Part One**   The *Visa Check* release does not bar claims relating to Defendants' anticompetitive conduct that Plaintiffs are challenging in this litigation. ............. 7

 I.   The Visa Check release does not bar claims relating to Defendants' anticompetitive conduct that Class Plaintiffs are challenging in this litigation. ............................................................................................................. 9

  A.   The plain language of the *Visa Check* release belies Defendants' argument that the release absolves them of liability for conduct that occurred on or after January 1, 2004. ...................................................... 9

  B.   Class Plaintiffs have alleged and proven unlawful conduct occurring on or after January 1, 2004, that has inflicted new and continuing antitrust injuries on Class Plaintiffs. ..................................... 10

  C.   Defendants' contemporaneous conduct casts doubt on their interpretation of the *Visa Check* release ................................................. 15

  D.   The cases that Defendants rely upon are distinguishable. ...................... 18

 II.   Public policy against releasing future antitrust claims precludes this Court from immunizing Defendants' anticompetitive conduct, which inflicted new and continuing antitrust injury on merchants on and after January 1, 2004 ................................................................................................................. 20

**Part Two**   the *Illinois Brick* doctrine does not bar Plaintiffs' claims ..................................... 22

 I.   Defendants' conspiracy is formed with the purpose and effect of raising payment-card-acceptance prices to merchants ..................................................... 23

 II.   Class Plaintiffs have standing by virtue of purchasing directly from members of a conspiracy. ....................................................................................... 25

  A.   *Illinois Brick* does not apply to Class Plaintiffs that contract only with an acquiring-bank member of Visa or MasterCard. ...................... 26

  B.   *Illinois Brick* does not apply to merchants that contract with third-party processors or independent sales organizations in addition to acquiring banks. ..................................................................................... 28

- i -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

III.    Merchants are the "direct payors" of interchange fees because they pay the overcharges imposed by supracompetitive interchange fees. ................. 28

       A.    In all Visa and MasterCard transactions, interchange fees are deducted directly by the issuing bank. ..................................... 30

       B.    Acquiring banks, third-party processors, and ISOs are not "direct purchasers" in the Visa and MasterCard systems. .................................. 33

IV.    *Illinois Brick* does not apply because there is no realistic probability that any acquiring bank will sue the networks or issuing banks. ................. 35

V.    Allowing merchant plaintiffs to sue is consistent with Illinois Brick's policy of supporting private antitrust enforcement. ............................. 37

VI.    The *Paycom, ATM,* and *Kendall* decisions do not support denying Plaintiffs standing under *Illinois Brick.* ....................................... 38

VII.    The doctrine of judicial estoppel does not apply to Class Plaintiffs' arguments because Class Plaintiffs have never advocated that acquirers pay interchange fees and no tribunal has ever adopted such a position. In contrast, Visa has advocated that merchants pay interchange fees. ..................... 40

**Part Three**    Neither *Buffalo Broadcasting* nor *Paycom* bars Plaintiffs' claims because Defendants' rules and default interchange fees restrain trade. ............................ 42

I.    Defendants' rules and default interchange fees restrain trade by raising the costs of payment-card acceptance to all merchants. ............................. 43

II.    Defendants' rules and interchange fees greatly reduce the incentive for issuers and acquirers to enter into bilateral interchange-fee agreements. ............. 45

III.    Buffalo Broadcasting and Paycom are distinguishable from this case. ............... 46

**Part Four**    Because Defendants' rules and default interchange fees increase the cost of merchant payment-card acceptance, Class Plaintiffs need not separately show that Defendants' rules and fees reduce output. in any case, Class Plaintiffs have raised disputed issues of material fact relating to the effect of Defendants' rules and interchange fees on output. ........................................... 49

I.    An antitrust plaintiff that demonstrates that the defendants' practices cause prices to increase need not separately demonstrate that those practices also reduce output. ............................................................. 50

II.    Viewed in the light most favorable to Class Plaintiffs, the record contains sufficient evidence to persuade a trier of fact that Defendants' rules and default interchange fees reduce output. ............................................. 52

**Part Five**    Disputed material issues of fact preclude summary judgment on Class Plaintiffs' inter-network conspiracy claims. ....................................... 56

- ii -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

I.     Defendants engaged in an inter-network conspiracy by adopting "twin policies" not to compete with each other on price. ............................................ 57

II.    The record contains evidence of plus factors that weigh against summary judgment. ............................................................................................. 60

       A.    Class Plaintiffs present evidence that, but for an illegal agreement, the networks' "twin policies" not to compete on price for merchant acceptance would have been against their independent interests. ........... 60

       B.    The record contains evidence that Defendants had a motive to conspire. ....................................................................................... 61

       C.    The record contains evidence that duality between Visa and MasterCard facilitates the inter-network conspiracy. .............................. 62

       D.    The payment-card industry is highly susceptible to collusion. ................ 63

III.   Class Plaintiffs present expert testimony demonstrating how the networks' "twin policies" and the plus factors support the inference of an inter-network agreement to fix interchange fees. ......................................................... 64

**Part Six**   Defendants' rules and default interchange fees are subject to Section 1 of the Sherman Act after the networks' IPOs. ............................................. 65

I.     The Bank Defendants did not effectively withdraw from the pre-IPO conspiracies. ................................................................................................ 66

II.    Viewed in the light most favorable to Class Plaintiffs, the record contains sufficient evidence to convince a fact finder that the setting of default interchange fees and anti-steering restraints constituted agreements among competing banks and the networks, even after the networks' restructurings. .............................................................................................. 68

       A.    The post-restructuring networks continue to coordinate the competitive activities of the member banks. ............................................ 70

       B.    Class Plaintiffs have presented sufficient evidence to at least raise a triable issue of fact regarding the existence of post-restructuring conspiracies to set interchange fees and impose the anti-steering restraints. ...................................................................................... 71

       C.    Even without a horizontal agreement among banks, vertical agreements continue to restrict the competitive activities of the banks. ........................................................................................... 75

**Part Seven**   Disputed issues of material fact preclude summary judgment on Class Plaintiffs' "IPO claims" under Section 7 of the Clayton Act. ............................. 76

I.     Section 7 of the Clayton Act does not require that the banks retain control over the post-restructuring networks for the restructurings to have been likely to substantially lessen competition. ......................................................... 76

- iii -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

II.    Even if Class Plaintiffs had to demonstrate post-IPO bank control, Plaintiffs have raised material issues of fact on the extent of the banks' control over the post-IPO networks. .................................................................. 79

    A.    "Control" in the antitrust sense requires an evaluation of the competitive incentives created by a transaction. ....................................... 79

    B.    The restructurings perpetuate a market structure in which the networks can "compete" only by increasing interchange fees to issuing banks. ....................................................................................... 81

    C.    The banks installed corporate-control devices that prevented the post-restructuring networks from taking actions adverse to the banks' interests. ....................................................................................... 82

**Part Eight**    Summary judgment for Defendants on Class Plaintiffs' fraudulent-conveyance claims is not proper. .......................................................................... 89

I.    The Court should stay Plaintiffs' response to the summary judgment motion on the fraudulent conveyance claims and grant Plaintiffs additional discovery under Rule 56(d) .................................................................... 90

II.    Genuine issues of material fact preclude summary judgment on Plaintiffs' actual-fraud claim under NYDCL §276. ........................................................... 93

    A.    The Nominating and Corporate Governance Committee's decision to forbid Houlihan Lokey from valuing contingent legal liabilities suggests fraudulent intent. ......................................................................... 95

    B.    Bank Defendants' use of ownership and board positions to eliminate the special-assessment right demonstrates a close relationship between the parties to the conveyance. ................................ 97

    C.    MasterCard did not obtain adequate consideration for the termination of its special-assessment right. ............................................. 98

    D.    MasterCard's financial condition was impaired. ..................................... 99

III.    Genuine issues of material fact preclude summary judgment on Plaintiffs' constructive-fraud claim under NYDCL §275. ................................................. 100

    A.    MasterCard did not obtain fair value for the release of the special-assessment right. ..................................................................................... 100

    B.    MasterCard and the banks lacked good faith. ......................................... 102

    C.    MasterCard believed it would incur debts beyond its ability to pay ...... 103

**Part Nine**    Class Plaintiffs have presented sufficient evidence to support their claims in addition to Er. Frankel's report. ..................................................................... 104

- iv -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

**Part Ten** Summary judgment for Defendants should be denied on Class Plaintiffs' Section 2 claims and Class Plaintiffs' claims based on the anti-steering restraints. ........................................................................................... 105

Conclusion ........................................................................................................ 105

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

# TABLE OF AUTHORITIES

**Page**

## Cases

*Addyston Pipe & Steel Co. v. United States,*
    175 U.S. 211 (1899) ........................................................................................... 61

*Am. Needle v. NFL,*
    130 S. Ct. 2201 (2010) ............................................................................. 70, 73, 88

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ..................................................................................... 89, 99

*Apex Oil Co. v. Di Mauro,*
    822 F.2d 246 (2d Cir. 1987) ......................................................................... 7, 57, 61

*Arizona v. Maricopa Co. Med. Soc.,*
    457 U.S. 332 (1982) ..................................................................................... 43, 45

*ASI Sign Sys., Inc. v. Architectural Sys., Inc.,*
    No. 99-7962, 2000 U.S. App. LEXIS 4485 (2d Cir. Mar. 21, 2000) ........................... 15

*Atlantic Richfield Co. v. USA Petroleum Co.,*
    495 U. S. 328 (1990) ........................................................................................ 51

*Bank of Am. Nat'l Trust and Savings Ass'n v. Gillaizeau,*
    766 F.2d 709 (2d Cir. 1985) ............................................................................. 15

*Bd. of Trade of Chicago v. United States,*
    246 U.S. 231 (1918) ......................................................................................... 43

*BFP v. Resolution Trust Corp.,*
    511 U.S. 531 (1994.) ........................................................................................ 93

*Blue Shield of Virginia v. McCready,*
    457 U.S. 465 (1982) ......................................................................................... 38

*Brinckerhoff v. Texas E. Prods. Pipeline Co., LLC,*
    986 A.2d 370 (Del. Ch. 2010) ............................................................................. 95

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

*Brooke Group v. Brown & Williamson Tobacco Co.,*
 509 U.S. 209 (1993) ................................................................................ 51, 53

*Buffalo Broadcasting Co., Inc. v. Am. Soc. Of Composers, Authors & Publishers,*
 744 F.2d 917 (2d Cir. 1983) .................................................................. 46, 47

*Bulkmatic Transp. Co. v. Pappas,*
 No 99-cv-12070, 2001 WL 882039 (S.D.N.Y. May 11, 2001) ...................... 98

*California v. ARC America Corp.,*
 490 U.S. 93 (1989) ...................................................................................... 25

*Catalano v. Target Sales, Inc.,*
 446 U.S. 643 (1980) .................................................................................... 25

*Chicago Prof'l Sports Ltd. Part. v. NBA,*
 95 F.3d 593 (7th Cir. 1996) ........................................................................ 52

*Citizen Publ'g Co. v. United States,*
 394 U.S. 131 (1969) .................................................................................... 72

*Coach Leatherware Co. v. AnnTaylor, Inc.,*
 933 F.2d 162 (2d Cir. 1991) ........................................................................ 22

*Consolidated Rail Corp. v. Nevins-Petrillo Warehouse & Distribution Systems, Inc.,*
 619 F. Supp. 900 (S.D.N.Y. 1983) ............................................................... 16

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.,*
 370 U.S. 690 (1962) .......................................................................... 56, 60, 69

*Continental Airlines, Inc. v. United Airlines, Inc.,*
 277 F.3d 499 (4th Cir. 2002) ....................................................................... 47

*Crivera v. City of New York,*
 03 CV 447 (JG), 2004 U.S. Dist. LEXIS 2571 (E.D.N.Y. Feb. 23, 2004) ...................... 21

*Crowthers McCall Pattern, Inc. v. Lewis,*
 129 B.R. 992 (Bankr. S.D.N.Y. 1991) ........................................................ 103

*Diskin v. Daily Racing Form, Inc.,*
 No. 92 Cir. 6347 (MBM), 1994 WL 330229 (S.D.N.Y. Jul. 7, 1994) ........................... 35

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

*DP Aviation v. Smiths Indus. Aero. & Def. Sys.*,
268 F.3d 829 (9th Cir. 2001) ................................................................ 16

*F.T.C. v. H.J. Heinz Co.*,
246 F.3d 708 (D.C. Cir. 2001) .............................................................. 76

*F.T.C. v. Ind. Fed'n of Dentists*,
476 U.S. 447 (1986) ............................................................................. 50

*F.T.C. v. Staples, Inc.*,
970 F. Supp. 1066 (D.D.C. 1997) ....................................................... 56

*Fears v. Wilhelmina Model Agency, Inc.*,
No. 02 Civ 4911 (HB), 2004 U.S. Dist. LEXIS 5045 (S.D.N.Y. Mar. 29, 2004).......... 69

*Federal Paper Board Co, Inc. v. Amata*,
693 F. Supp. 1376 (D. Conn. 1988).................................................... 47

*Flores v. Marquez*,
No. 96-CV-4305-(JG), 1997 WL 1068675 (E.D.N.Y. June 27, 1997).......................... 90

*Flying J Inc. v. TA Operating Corp.*,
No. 1:06-CV-30-TC, 2008 U.S. Dist. LEXIS 92852 (D. Utah Nov. 14, 2008) ...... 11, 20

*Fox Midwest Theatres v. Means*,
221 F.2d 173 (8th Cir. 1955) ............................................................... 20

*Freeman v. San Diego Ass'n of Realtors*,
322 F.3d 1133 (9th Cir. 2003) .......................................................passim

*Golden Budha Corp. v. Canadian Land Co. of Am.*,
931 F.2d 196 (2d Cir. 1991) ................................................................ 89

*Golden Pacific Bancorp v. FDIC*,
273 F.3d 509 (2d Cir. 2001) .................................................................. 9

*Grace Plaza of Great Neck, Inc. v. Heitzler*,
2 A.D.3d 780 (N.Y. App. Div. 2003)................................................. 103

*Hasset v. Goetzmann*,
10 F. Supp. 2d 181 (N.D.N.Y. 1998) ................................................. 99

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

*HBE Leasing Corp. v. Frank,*
48 F.3d 623 (2d Cir. 1995) ........................................................................ 93

*Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.,*
424 F.3d 363 (3d Cir. 2005) ...................................................................... 26

*Hunter Douglas, Inc. v. Comfortex Corp.,*
No. 98-CV-0479 (LEK/DNH), 1999 U.S. Dist. LEXIS 10906 (N.D.N.Y. Mar. 11, 1999) ........................................................................................................ 19

*Illinois Brick Co. v. Illinois,*
431 U.S. 720 (1977) ...........................................................................passim

*In re Am. Express Merchs.' Litig.,*
No. 06-1871-cv, 2011 U.S. App. LEXIS 4507 (2d Cir. Mar. 8, 2011) ....................... 20

*In re ATM Fee Antitrust Litig.,*
No. C 04-02676, 2010 WL 3701912 (N.D. Cal. Sept. 16, 2010)................................. 39

*In re Brand Name Prescription Drugs Antitrust Litig.,*
123 F.3d 599 (7th Cir. 1997) ...................................................................... 66

*In re Checkmate Stereo & Electrs, Ltd.,*
9 B.R. 585 (Bankr. E.D.N.Y. 1981)............................................................ 102

*In re County of Erie,*
546 F.3d 222 (2d. Cir. 2008) ...................................................................... 90

*In re Currency Conversion Fee Antitrust Litig.,*
265 F. Supp.2d 385 (S.D.N.Y. 2003)................................................ 60, 62, 63

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.,*
256 F.R.D. 82 (D. Conn. 2008) .............................................................. 53, 79

*In re Flat Glass Antitrust Litig.,*
385 F.3d 350 (3d Cir. 2004) ................................................................. 57, 74

*In re G-Fees Antitrust Litig.,*
584 F. Supp. 2d 26 (D.D.C. 2008)............................................................. 29

*In re High Fructose Corn Syrup Antitrust Litig.,*
295 F.2d 651 (7th Cir. 2002) ((Posner, J.)...........................................passim

- ix -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

*In re Jacobs,*
    394 B.R. 646 (Bankr. E.D.N.Y. 2008) ........................................................................ 100

*In re Kaiser,*
    722 F.2d 1574 (2d Cir. 1983) .................................................................................... 94

*In re Lids Corp.,*
    281 B.R. 535 (Bankr. D. Del. 2002) ........................................................................... 96

*In re Linerboard Antitrust Litig.,*
    305 F.3d 145 (3d Cir. 2002) ...................................................................................... 25

*In re MarketXT Holdings Corp.,*
    376 B.R. 390 (Bankr. S.D.N.Y. 2007) ....................................................................... 89

*In re NASDAQ Market-Makers Antitrust Litig.,*
    169 F.R.D. 493 (S.D.N.Y. 1996) .............................................................................. 35

*In re Norstan Apparel Shops, Inc.,*
    367 B.R. 68 (Bankr. E.D.N.Y. 2007) ....................................................................... 103

*In re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig.,*
    No. 05-MD-1720 (JG)(JO), 2008 WL 115104 (E.D.N.Y. Jan. 8, 2008) ............. 9, 10, 13

*In re Sharp Int. Corp.,*
    302 B.R. 760 (E.D.N.Y. Bankr. 2003) ................................................................ 102, 103

*In re Sugar Indus. Antitrust Litig.,*
    579 F.2d 13 (3d Cir. 1978) ........................................................................................ 25

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
    267 F.R.D. 291 (N.D. Cal. 2010) ......................................................................... 25, 26, 63

*In re Visa Check/MasterMoney Antitrust Litig.,*
    192 F.R.D. 68 (E.D.N.Y. 2000) .......................................................................... 41, 48, 50, 62

*In the Matter of Polypore Int'l,*
    No. 9327, 2010 FTC LEXIS 97 (Dec. 13, 2010) ........................................................ 77

*Int'l Shortstop, Inc. v. Rally's, Inc.,*
    939 F.2d 1257 (5th Cir. 1991) ................................................................................... 91

- x -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

*Interphoto Corp. v. Minolta Corp.,*
   295 F. Supp. 711 (S.D.N.Y. 1969) ................................................................. 44

*Kansas v. UtiliCorp United, Inc.,*
   497 U.S. 199 (1990) ......................................................................................... 25

*Kendall v. Visa U.S.A., Inc.,*
   518 F.3d 1042 (9th Cir. 2008) ......................................................................... 40

*Kotteakos v. United States,*
   328 U.S. 750 (1946) ......................................................................................... 71

*Law v. NCAA,*
   902 F. Supp. 1394 (D. Kan. 1995) ................................................................. 46

*Lawlor v. Nat'l Screen Serv.,*
   349 U.S. 322 (1955) ........................................................................... 10, 11, 20, 21

*Leegin Creative Leather Prods. Inc. v. PSKS, Inc.,*
   551 U.S. 877 (2007) ......................................................................................... 75

*Levitch v. Columbia Broadcasting System, Inc.,*
   495 F. Supp. 649 (S.D.N.Y. 1980) ................................................................. 47

*Lippe v. Bairnco Corp.,*
   249 F. Supp. 2d 357 (S.D.N.Y. 2003) ........................................................ 93, 97

*Madison Square Garden, L.P. v. NHL,*
   07 CV 8455 (LAP), 2008 U.S. Dist. LEXIS 80475 (S.D.N.Y. Oct. 10, 2009) ......... 18, 19

*Major League Baseball Props., Inc. v. Salvino,*
   542 F.3d 290 (2d Cir. 2008) ..................................................................... 24, 51, 52

*Matsushita Elec. Indus Co. v. Cinram Int'l, Inc.,*
   299 F. Supp. 2d 370 (D. Del. 2004) ............................................................... 47

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
   475 U.S. 574 (1986) ................................................................................... 57, 74

*Max Sugarman Funeral Home, Inc. v. A.D.B. Investors,*
   926 F.2d 1248 (1st Cir. 1991) ......................................................................... 94

- xi -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

*MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.,*
   161 F. 3d 443 (7th Cir. 1998) ................................................................. 19

*McTamney v. Stolt Tankers & Terminals (Holdings), S.A.,*
   678 F. Supp. 118 (E.D. Pa. 1987) ........................................................... 80

*MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs.,*
   910 F. Supp. 910 (S.D.N.Y. 1995) .................................................... 94, 103

*Minnesota Mining and Mfg. Co. v. Graham-Field, Inc.,*
   No. 96 cv 3839, 1997 U.S. Dist. LEXIS 4457 (S.D.N.Y. Apr. 9, 1997)...................... 20

*Mitsubishi Motor Corp. v. Soler Chrysler-Plymouth, Inc.,*
   473 U.S. 614 (1985).......................................................................... 20

*Mktg. Assistance Plan, Inc. v. Assoc. Milk Producers, Inc.,*
   338 F. Supp. 1019 (S.D. Tex. 1972) ......................................................... 20

*Monsanto Co. v. Spray-Rite Serv. Corp.,*
   456 U.S. 752 (1984).......................................................................... 57

*Morton's Market. v. Gustafson Dairy,*
   198 F.3d 823 (11th Cir. 1999) ........................................................ 66, 67, 68

*MountainWest Financial v. VISA U.S.A. Inc.,*
   2:91-CV-0478 (D. Utah Nov. 24, 1992) ...................................................... 62

*Mullane v. Cent. Hanover Bank & Trust Co.,*
   339 U.S. 306 (1950)........................................................................... 9

*NaBanco v. Visa,*
   596 F. Supp. 1231 (S.D. Fla. 1984) .................................................. 35, 36, 41

*Nat'l Soc'y of Prof'l Engineers v. United States,* 435 U.S. 679 (1978) ....................... 50

*NCAA v. Bd. of Regents of Univ. of Okla.,*
   468 U.S. 85 (1984)....................................................................... 43, 50

*New Hampshire v. Maine,*
   532 U.S. 742 (2001)........................................................................... 41

*New York ex rel. Spitzer v. St. Francis Hosp.,*
   94 F. Supp. 2d 399 (S.D.N.Y. 2000).......................................................... 24

- xii -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

*New York v. Henderickson Bros. Inc.,*
    840 F.2d 1065 (2d Cir. 1987) ................................................................. 11, 34

*Otokoyama Co. v. Wine of Japan Import, Inc.,*
    175 F.3d 266 (2d Cir. 1999) ..................................................................... 45

*Pall Corp. v. Cuno, Inc.,*
    268 F.R.D. 167 (E.D.N.Y. 2010) ............................................................... 91

*Paper Systems, Inc. v. Nippon Paper Indus. Co., Ltd.,*
    281 F.3d 629 (7th Cir. 2002) .................................................................... 26

*Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.,*
    467 F.3d 283 (2nd Cir. 2006) ................................................... 38, 42, 46, 48

*Podiatrist Ass'n, Inc. v. La Cruz Azul de P.R., Inc.,*
    332 F.3d 6 (1st Cir. 2003) ........................................................................ 88

*Re/Max Int'l v. Realty One,*
    173 F.3d 995 (6th Cir. 1999) .................................................................... 60

*Record Club of Am., Inc. v. United Artists Records, Inc.,*
    611 F. Supp. 211 (S.D.N.Y. 1985) ............................................................ 19

*Redel's Inc. v. Gen. Elec. Co,*
    498 F.2d 95 (5th Cir. 1974) ...................................................................... 20

*Reiter v. Sonotone Corp.,*
    442 U.S. 330 (1979) ................................................................................. 50

*Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.,*
    68 F.3d 1478 (2d Cir. 1995) ..................................................................... 11

*Royal Printing Co. v. Kimberly Clark Corp.,*
    621 F.2d 323 (1980) ................................................................. 26, 28, 35, 36

*Schneider v. Revici,*
    817 F.2d 987 (2d Cir. 1987) ..................................................................... 11

*Southern Industries v. Jeremias,*
    66 A.D.2d 178 (N.Y. App. Div. 1978) ...................................................... 102

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

*Standard Oil Co. v. United States,*
337 U.S. 293 (1949) ................................................................................ 69

*Starr v. Sony BMG Music Entm't,*
592 F.3d 314 (2d Cir. 2010) ........................................................ 73, 74, 75

*Todd v. Exxon Corp.,*
275 F.3d 191 (2d Cir. 2001) ................................................................ 43, 59

*Toys "R" Us Inc. v. FTC,*
221 F.3d 928 (7th Cir. 2000) ...................................................................... 71

*Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.,*
512 F.2d 1264 (9th Cir. 1975) ...................................................... 10, 15, 19

*U.S. Football League v. NFL,*
842 F.2d 1335 (2d Cir. 1988) ..................................................................... 83

*United States v. Berger,*
224 F.3d 107 (2d Cir. 2000) ....................................................................... 66

*United States v. Dairy Farmers of Am.,*
426 F.3d 850 (6th Cir. 2005) ................................................................ 80, 88

*United States v. E.I. du Pont de Nemours & Co.,*
351 U.S. 377, 391-92 (1956) .................................................. 54, 76, 80, 88

*United States v. Eisen,*
974 F.2d 246 (2d Cir. 1992) ................................................................ 67, 68

*United States v. Gen. Elec. Co.,*
358 F. Supp. 731 (S.D.N.Y. 1973) ............................................................. 21

*United States v. Microsoft Corp.,*
253 F.3d 34 (D.C. Cir. 2001) .............................................................. 53, 83

*United States v. Nerlinger,*
862 F.2d 967 (2d Cir. 1988) ....................................................................... 66

*United States v. Sax,*
39 F.3d 1380 (7th Cir. 1995) ...................................................................... 67

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

*United States v. Socony-Vacuum Oil Co.,*
  310 U.S. 150 (1940).............................................................................. 24, 43, 50

*United States v. Topco Assocs., Inc.,*
  405 U.S. 596 (1972)................................................................................. 46

*United States v. Visa U.S.A. Inc.,*
  344 F.3d 229 (2d Cir. 2003) ...................................................................... 48

*Uzdavines v. Weeks Marine, Inc.,*
  418 F.3d 138 (2d Cir. 2005) ...................................................................... 41

*Verizon Commc'n Inc. v. Law Offices of Curtis V. Trinko, LLP,*
  540 U.S. 398 (2004)................................................................................. 52

*Video Serv. of Am., Inc. v. Maxwell Corp. of Am.,*
  No. 04-2594, 2007 U.S. Dist. LEXIS 54107 (D.N.J. July 26, 2007)............................ 104

*Visa U.S.A. Inc. v. First Data Corp.,*
  No. C 02-01786 JSW, 2006 WL 1310448 (N.D. Cal. May 12, 2006) ......... 35, 36, 37, 41

*VKK Corp. v. NFL,*
  244 F.3d 114 (2d Cir. 2001) ...................................................................... 20

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.,*
  396 F.3d 96 (2d Cir. 2005) ................................................................... 10, 41

*Werbungs Und Commerz Union Austalt v. Collectors' Guild, Ltd.,*
  930 F.2d 1021 (2d Cir. 1991) .................................................................... 16

*Zenith Radio Corp. v. Hazeltine Research, Inc.,*
  401 U.S. 321 (1971)......................................................................... 10, 13, 14

**Statutes and Rules**

15 U.S.C. § 1 ..................................................................................... passim

15 U.S.C. § 15 ................................................................................. 11, 34

15 U.S.C. § 18 .......................................................................... 6, 76, 77, 89

Fed. R. Civ. P. 56(a) ............................................................................. 7

Fed. R. Civ. P. 56(f)(1)........................................................................ 22

- xv -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

Fed. R. Civ. P. 56(d) ................................................................................. 89, 90, 93

N.Y. Debtor & Credit Law §272 ................................................................ 100, 102

N.Y. Debtor & Credit Law §273 ........................................................................ 103

N.Y. Debtor & Credit Law §275 ........................................................... 100, 103, 104

N.Y. Debtor & Credit Law §276 ........................................................ 93, 94, 99, 104

**Other Authorities**

2A Phillip E. Areeda & Herbert Hovenkamp,
    Antitrust Law (3d ed. 2007) ........................................................ 28, 29, 50, 53

George W. Stocking & Willard Mueller, The Cellophane Case
    and the New Competition, 45 Am. Econ. Rev. 29 (1955) ......................... 54

Herbert Hovenkamp, Federal Antitrust Policy: the Law of Competition and its
    Practice (3d ed. 2005) ....................................................................... 53

Herbert J. Hovenkamp & Christopher R. Leslie,
    *The Firm as Cartel Manager*, 64 Vand. L. Rev. 813 (2011) ..................... 70, 73

Lawrence A. Sullivan & Warren S. Grimes,
    *The Law of Antitrust* (2000) ............................................................. 76

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

## Introduction

As Class Plaintiffs argued in their motion for summary judgment, there is no material dispute that the competing banks that controlled the Visa and MasterCard networks collectively established interchange fees and anti-steering restraints, and imposed them on merchants. There is also no dispute that Defendants continued to set interchange fees and impose anti-steering restraints even after the networks' restructurings. Nor is there any dispute that those fees and rules raise the price of payment-card acceptance for merchants.

None of Defendants' several arguments for summary judgment controvert the principal argument underlying Class Plaintiffs' summary-judgment motion: Defendants' conduct is governed by agreements whose purpose and effect is to raise the prices merchants pay them. Several of these arguments — the arguments based on the *Visa Check* release, *Illinois Brick, Buffalo Broadcasting*, output, and the post-IPO conspiracy — are contradicted by the undisputed factual record. Class Plaintiffs have presented sufficient evidence to raise material issues of fact on these issues and all other issues that Defendants raise in their motions. Summary judgment for Defendants is therefore improper.

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

## Summary of Argument

Each of Defendants' arguments in support of their motions for summary judgment either misstates the factual record, omits key facts, contradicts principles of antitrust law, or suffers from a combination of these infirmities.[1]

In particular, the release in the *Visa Check* matter—in which the plaintiffs never challenged any agreements regarding interchange fees or anti-steering restraints—does not preclude Plaintiffs from challenging that conduct in this litigation. The plain language of that release limits its effect to pre-2004 conduct. And since 2004, the banks that controlled the Visa and MasterCard networks reauthorized the rules that Plaintiffs challenge in this litigation, set new schedules of default interchange fees, and planned and executed IPOs, which they now claim fundamentally changed their conduct. Moreover, Defendants' argument is contrary to sound public policies against releasing the future claims of absent class members.

Defendants' argument that *Illinois Brick* bars Plaintiffs' claims is contrary to Supreme Court precedent dating back far beyond *Illinois Brick* itself. It also omits key facts, and mischaracterizes the flow of funds in payment card transactions, in which interchange fees are deducted from the amounts due merchants rather than "paid" by

---

[1] Defendants present nine bases for summary judgment against all or part of the claims asserted in the Second Consolidated Amended Class Action Complaint, and move for summary judgment as to each of the claims in the supplemental complaints relating to the networks' IPOs. Yet none of these arguments presents any issues unique to a particular merchant and nowhere do Defendants argue that they cannot challenge Class Plaintiffs' claims on a class-wide basis.

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

any party. Because Defendants do not dispute the substance of those rules, the Court may decide the *Illinois Brick* issue for Plaintiffs as a matter of law.

Defendants' argument that Plaintiffs cannot prove a restraint of trade similarly fails on both legal and factual grounds. The Supreme Court recognizes that every contract by its nature restrains trade, and courts therefore do not require plaintiffs to separately prove a "restraint on trade." Moreover, as Class Plaintiffs argue in their affirmative motion for summary judgment, undisputed facts reflect that the Defendants' rules and default interchange fees restrain trade by raising the price of payment-card acceptance for all merchants, and by effectively eliminating price competition. At the very least, however, these facts preclude summary judgment for Defendants.

Defendants' argument that Plaintiffs must show reduced output in the relevant markets to establish a Section 1 Sherman Act violation is erroneous. Output reduction is merely one of several means of proving anticompetitive effect. Another way is showing that a defendant's conduct increased prices. Class Plaintiffs can show that Defendants' rules and default interchange fees raise the price of acceptance to all merchants. Nevertheless, Class Plaintiffs have also submitted evidence sufficient, at a minimum, to summary judgment for Defendants on this issue. This evidence includes evidence that Defendants' conduct narrows the relevant market, reduces the number of merchants that accept payment cards, delays innovation and technological developments, and reduces the total output of goods and services in the economy.

- 3 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

Material issues of fact also preclude summary judgment for Defendants on Class Plaintiffs' inter-network conspiracy claims for injunctive relief.[2] Specifically, the record reflects that Visa and MasterCard announced "twin policies" to respectively "not be competitively disadvantaged," and to engage in "competitive response." After announcing those policies, the networks eliminated the 3-5 basis-point difference in effective interchange fees that had persisted to that point, and repeatedly "signaled" each other to ensure that their interchange-fee increases would be matched.

Summary judgment for Defendants is also unjustified as to Class Plaintiffs' claims based on Defendants' anti-steering restraints. Defendants attempt to parse the effects of the anti-steering restraints away from their other rules, which is contrary to both the relevant law and their own expert's testimony that the networks' rules "work together." (Kahn Dep. Tr. 214:8-215:1.) The cumulative effects of the anti-steering restraints and Defendants' other rules mandate the denial of Defendants' motion. For example, the anti-steering restraints, along with Defendants' other rules and practices, raise the prices merchants pay to accept payment cards, reduce the number of merchants that accept cards, and increase prices for all consumers.

Plaintiffs also present sufficient evidence to defeat Defendants' motion for summary judgment as to Plaintiffs' monopolization claims. The evidence at a minimum creates triable issues of fact as to both the monopoly-power and exclusionary-conduct

---

[2]     Recent evidence, as well as evidence that Class Plaintiffs expect to obtain in the discovery that will be served to complete the factual record for trial may lead Class Plaintiffs to seek leave to revive the damages claims arising from Defendants' inter-network conspiracy.

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

elements of Plaintiffs' Section 2 claims. Defendants' rules reduce the substitutability of payment options for merchants and therefore have the effect of narrowing the scope of the relevant market to brand-specific acceptance markets, or at the very broadest, to credit-card and debit-card-acceptance markets. In either of these markets, sustained price increases reflect that Defendants have market power. By reducing merchants' ability to substitute other forms of payment for Defendants' cards, Defendants have inhibited the growth of rival payment systems, which in turn allows Defendants to maintain supracompetitive interchange fees.

As Class Plaintiffs demonstrated in their motion for summary judgment, the undisputed facts establish that Defendants' rules and default interchange fees continue to violate Section 1 of the Sherman Act after the networks' respective IPOs and Defendants have not withdrawn from the intra-network conspiracies. Even if the Court denies Class Plaintiffs' summary-judgment motion, however, evidence submitted is sufficient to create genuine issues of material fact and preclude summary judgment for Defendants. Because the banks created the post-IPO networks through agreements, they created a "hub-and-spoke" post-restructuring conspiracy. Furthermore, it is undisputed that Defendants' conduct continues to be governed by vertical agreements, which subjects those agreements to scrutiny under the Rule of Reason.

Defendants' arguments do not support summary judgment for Defendants on Class Plaintiffs' IPO claims. First, Defendants' assertion that Judge Gleeson's order dismissing Class Plaintiffs' First Supplemental Complaint and the antitrust laws

- 5 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

generally require that the banks remain in legal control of the post-IPO networks to show liability under Section 7 of the Clayton Act is incorrect. In fact, Class Plaintiffs need only show a likelihood that the networks' restructurings will substantially lessen competition. Class Plaintiffs have done so through evidence that interchange fees have continued to exist and even increase after the restructurings—contrary to Defendants' predictions that interchange would be eliminated or reduced if they maintained their pre-IPO structures. The record also includes evidence of harm to competition in the form of increased "network fees" charged directly by Visa and MasterCard to merchants after the restructurings. And even though the law does not require Class Plaintiffs to present evidence of post-IPO bank control of Visa and MasterCard, Class Plaintiffs have in fact presented evidence that banks continue to control the networks by maintaining "issuer-centric" business models and through corporate-control devices that prevent change to those business models.

Finally, with respect to Class Plaintiffs' fraudulent-conveyance claims against MasterCard, summary judgment is inappropriate because Class Plaintiffs have raised material issues of fact related to the relevant legal issues, and because Class Plaintiffs have been denied discovery on information necessary to prove their claims. The evidence in the record is sufficient to withstand a summary-judgment motion, and includes Defendants' estimations of MasterCard's antitrust liability to Plaintiffs at ██ ██ and their instructions to their consultants to render an opinion that MasterCard had sufficient capital to proceed with the IPO, by ignoring those liabilities. And while

- 6 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

Defendants may claim that the ████████████ does not reflect the probability that MasterCard and the Bank Defendants would actually be found liable, the Defendants have withheld that evidence under a claim of attorney-client privilege, which precludes them from disputing the ████████████ until they waive the privilege.

## Summary Judgment Standard

To prevail on a motion for summary judgment, the moving party must demonstrate that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). All evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are drawn in its favor. *Apex Oil Co. v. Di Mauro*, 822 F.2d 246, 252 (2d Cir. 1987). Although the nonmoving party must come forward with specific facts showing that a genuine issue for trial exists, it must do so only after the moving party has satisfied its initial burden. *Id.* at 252.

## Part One

### The *Visa Check* release does not bar claims relating to Defendants' anticompetitive conduct that Plaintiffs are challenging in this litigation.

Defendants' contention that the *Visa Check* release absolves them of all liability in this case rests on the false premise that Plaintiffs have not challenged new and continuing anticompetitive conduct that occurred after January 1, 2004. The record in this case shows that Plaintiffs have challenged, and submitted evidence of, new conduct

- 7 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

that Defendants have engaged in since that date, including new adoptions of schedules of interchange fees, regular readoptions of and revisions to the network rules that Plaintiffs challenge, and conducting IPOs in an attempt to transform their conduct from "concerted" to "unilateral" within the meaning of Section 1 of the Sherman Act. Defendants cannot secure a release of claims based on post-settlement conduct.

As the Court may remember, at the first status conference in this matter on January 12, 2006, the Court asked the parties for presentations about their respective views of the case. Among the speakers that day was David Gersch, counsel for Visa. The Court asked Mr. Gersch a series of questions regarding the setting of interchange fees by "the associations." (Tr. at 46-48.) In response to the Court's questions about whether the system had changed over time, Mr. Gersch acknowledged that "[t]here's always changes going on in any respect, there are always being modifications." (Tr. at 46:l-7.) The Court pressed further:

> 8      THE COURT: Now, the question I was getting to, has
> 9      the method by which these rates are determined. If you want to
> 10     defer answering to one of your colleagues that's also fine,
> 11     but has the method by which these rates are determined changed
> 12     in any, you know, material way over the years or is it
> 13     essentially the association has always had the same approach
> 14     about how it sets rates?
>
> 15     MR. GERSCH: I think it has been evolving, I don't
> 16     think you can say it is the same method.

This candid exchange is consistent with the fully developed record.

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

I.      The *Visa Check* release does not bar claims relating to Defendants'
        anticompetitive conduct that Class Plaintiffs are challenging in this
        litigation.[3]

        A.      The plain language of the *Visa Check* release belies Defendants'
                argument that the release absolves them of liability for conduct
                that occurred on or after January 1, 2004.

Courts analyze settlement releases using principles of contract law, determining

first whether the plain language of the release is ambiguous. *Golden Pacific Bancorp v.*

*FDIC*, 273 F.3d 509, 514 (2d Cir. 2001) (citations omitted). The plain language of the

release with respect to the period beginning January 1, 2004, is clear and unambiguous,

the Release cannot be construed to confer indefinite prospective immunity on

Defendants.

The plain language of the release states in pertinent part, "[MasterCard and Visa]

shall be released and forever discharged from all manner of claims, . . . that any

Releasing Party [Class Member] ever had, now has, or hereafter can, shall or may have,

relating in any way to any conduct prior to January 1, 2004 concerning any claims

alleged in the Complaint or any of the complaints consolidated therein. . . ." *See In re*

*Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 2008 WL 115104, at

---

3       Defendants' release argument does not apply to *all* merchants. If a merchant did not exist at the
time of the *Visa Check* release, opted out of the class, or did not accept Visa or MasterCard payment cards
at that time, it is not bound by the terms of the release because it is not a "Class Member," within the
meaning of the release. *See In re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig.*, No. 05-MD-
1720 (JG)(JO), 2008 WL 115104, at *3 (E.D.N.Y. Jan. 8, 2008). If those merchants are deemed to have
released their claims without any chance to litigate them, they would be deprived of their fundamental
due-process rights. *See Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314-15 (1950). Defendants
do not appear to argue otherwise. (*See* Hr'g Tr. 5:11-20, Nov. 19, 2009 (MasterCard's counsel stating that
merchants that began accepting Visa or MasterCard after 2003 or opt-out merchants "would not be a
member of [the *Visa Check* and MDL 1720] classes.")).

- 9 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

*3. The release does not contain any language suggesting that liability for any conduct occurring after January 1, 2004 is extinguished. The Second Circuit agreed, holding that "[c]onduct occurring after December 31, 2003 is not precluded from being the subject of a future suit" and the release "precludes actions for conduct occurring prior to January 1, 2004." *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 104 (2d Cir. 2005); *see also Interchange Fee*, 2008 WL 115104, at *10-11 ("Every court to consider the scope of the Settlement has similarly concluded that it released all claims arising out of conduct occurring before January 1, 2004.").

> **B.** **Class Plaintiffs have alleged and proven unlawful conduct occurring on or after January 1, 2004, that has inflicted new and continuing antitrust injuries on Class Plaintiffs.**

The evidence reflects that Defendants have engaged in new, unlawful conduct since January 1, 2004. New harm from an agreement to fix prices gives rise to a new cause of action. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338-342 (1971). And a new cause of action accrues whenever a plaintiff pays a fixed price for a product. *Id; Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 512 F.2d 1264, 1270 (9th Cir. 1975). For that reason, a prior settlement cannot foreclose antitrust claims in a current action in which plaintiffs allege and prove anticompetitive conduct that inflicts new injuries that were not present in the earlier action. *Lawlor v. Nat'l Screen Serv.*, 349 U.S. 322, 328 (1955). To preclude the new claims would "extinguish [. . .] claims which did not even then exist and which could not possibly have been sued upon in the previous

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

case." *Id.* [4] Interpreting releases not to extinguish claims based on future conduct is in line with sound antitrust policy because a plaintiff cannot seek antitrust damages until it has suffered "actual injury" to its "business or property." 15 U.S.C. § 15(b); *New York v. Henderickson Bros. Inc.*, 840 F.2d 1065, 1076 (2d Cir. 1987).

Examples of Defendants' post-release unlawful conduct include, but are not limited to the following:

- Between January 2004 and the present, both Visa and MasterCard issued new interchange-fee schedules and modifications on at least 12 different occasions, which changed the amount, design, and structure of the interchange fees. (CSF ¶¶ 36.2-36.3) The networks also readopted their rules on a semiannual basis during this time period. (CSF ¶¶ 36.4-36.5.)

- Since January 2004, Visa and MasterCard interchange fees have been charged pursuant to hundreds of billions of transactions in which merchants accepted Visa or MasterCard payment cards. (CSF ¶ 36.6.)

- The banks that owned and governed Visa and MasterCard outsourced the setting of interchange fees to "independent," non-bank directors and management respectively, in an attempt to avoid antitrust liability for the collective setting of interchange fees. (SUF ¶¶ 34(a), 43, 53.)

---

[4]   Other courts have also held that general releases do not foreclose claims based on conduct occurring after the execution of the release. *See, e.g., Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.*, 68 F.3d 1478, 1485 (2d Cir. 1995) ("Although the releases shields the [defendants] from any liability for any conduct through their effective dates, they do not protect the [defendants] from liability arising from any subsequent conduct"); *Schneider v. Revici*, 817 F.2d 987, 993 (2d Cir. 1987) ("To release . . . from all liabilities' can plausibly be understood only to relinquish claims currently existing, rather than to promise not to sue in the future on claims that may subsequently arise."); *Flying J Inc. v. TA Operating Corp.*, No. 1:06-CV-30-TC, 2008 U.S. Dist. LEXIS 92852,*12 (D. Utah Nov. 14, 2008) (broad language in the release could not be read to release claims that arose after the release and were based on post-settlement conduct).

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

- Those banks later planned and implemented restructurings and IPOs with the goal of changing the networks' business model to place the setting of interchange fees outside the scope of Section 1 of the Sherman Act. (SUF ¶¶ 34, 38.)

## 1.   Defendants have adopted new schedules of default interchange fees since January 2004 and have imposed those fees on merchants.

As is clear from Class Plaintiffs' three operative Complaints and the substantial factual record submitted in connection with Class Plaintiffs' affirmative motions for summary judgment, Class Plaintiffs challenge a combination of conduct and agreements among Visa and its Member Banks and MasterCard and its Member Banks. As the record makes clear, Defendants acted as a well-managed cartel, setting interchange fees as high as possible without losing merchant acceptance. (SUF ¶¶ 46(a), 56.)

Visa and MasterCard typically modify interchange-fee rates twice a year, once in April and again in October. During the 2004-to-present damage period, both Visa and MasterCard adopted new interchange-fee schedules on at least 12 different occasions. (CSF ¶¶ 36.4-36.5.) In reality, the number of interchange-fee changes — mostly increases — is much greater, as several different categories of interchange fees are typically adjusted with each new schedule that is released. (CSF ¶¶ 36.2-36.3 & corresponding footnotes.) The new interchange-fee rates on these schedules were then applied to over 260 billion merchant transactions between 2004 and today, resulting in over ███████ in interchange-fee overcharges imposed on merchants. (CSF ¶¶ 36.6,

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

36.13; Frankel Rpt. Fig. 9.1.)[5] By the terms of this Court's decision, each time a new interchange fee is set or charged, a new price-fixing agreement occurs. *Interchange Fees,* 2008 WL 115104, at *14.

This Court already recognized that setting new interchange-fee schedules constitutes new conduct. In its decision limiting Plaintiffs' damages to the post-2004 period, it observed that "[a] card network's decision to charge a higher (or lower) interchange fee must to some extent be ratified with each new transaction-it is always, at least in theory, subject to renegotiation absent an exercise of bargaining power . . . ." *In re Interchange Fees,* 2008 WL 115104, *at 14; *see also Zenith,* 401 U.S. at 338-342. In other words, each time Defendants set new interchange rates, it is a new and illegal price-fixing agreement.

### 2. Since January 1, 2004 Defendants re-adopted their rules on several occasions and continue to enforce those rules against merchants.

Defendants admit that the challenged rules in this case have changed since January 2004. (*See* Defs.' SCACAC Br. at 12.)[6] Specifically, each network has re-adopted

---

[5]     Several expert reports and deposition transcripts are cited directly in this memorandum: Expert Report of Alan S. Frankel (SUFEX 240); Rebuttal Report of Alan S. Frankel (SUFEX 558); Expert Report of Christopher A. Vellturo (SUFEX 582); Expert Report of Joseph Stiglitz (SUFEX 583); Expert Report of Kevin M. Murphy (SUFEX 338); Expert Report of Barbara Kahn (SUFEX 585); Expert Report of Bruce L. McFarlane (CSFEX ___); Expert Report of Victor Fleischer (SUFEX 039); Kahn Deposition Transcript (SUFEX 587).

[6]     The parties' pleadings are referred to as follows: Class Plaintiffs' Memorandum of Law in Support of Their Motion for Summary Judgment (Cl. Pls.' Br.); Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment on Class Plaintiffs' IPO, Post-IPO Conspiracy, and Fraudulent Conveyance Claims, and Individual Plaintiffs' Post-IPO Conspiracy Claims (Defs.' IPO Br.);

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

and revised the rules at least 12 times since January 2004. (CSF ¶¶ 36.4-36.5.) As Defendants' expert Barbara Kahn acknowledged, the Defendants' rules are designed to work together to assure that the Defendants' business objectives are met. (Kahn Dep. Tr. 214:8-215:1.) Even if — as Defendants argue — this is not sufficiently "new" conduct to allow for causes of action based on post-2004 conduct, Defendants continue to execute new acceptance contracts with merchants that incorporate the rules and continue to actively enforce those rules. (CSF ¶¶ 36.4-36.5, 36.11-36.12; SUF ¶¶ 21, 25, 49, 59 (setting forth required incorporation, enforcement of network rules).) The new adoptions, revisions, and enforcements of these rules are new, material conduct that is not barred by the release. *See Zenith*, 401 U.S. at 338-42.

> **3.     Since January 1, 2004 the banks that controlled both networks outsourced the setting of interchange fees and then restructured the networks an attempt to fundamentally change their business models.**

The Defendants engaged in a number of transactions in an attempt to immunize their conduct from liability under Section 1 of the Sherman Act. On July 8, 2004, MasterCard's board outsourced the setting of its interchange fees to management. (SUF ¶ 53.) Visa followed suit on April 28, 2006 by outsourcing interchange-fee setting to directors who were not affiliated with member banks. (SUF ¶ 43.) Both networks

---

Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment as to the Claims in the Second Consolidated Amended Class Action Complaint (Defs.' SCACAC Br.); Class Plaintiffs' Statement of Undisputed Facts (SUF); Defendants' Statement of Material Facts (Defs.' SUF); Class Plaintiffs' Counterstatement of Facts in Response to Defendants' Statement of Material Facts (CSF); Individual Plaintiffs' Counterstatement of Facts in Response to Defendants' Statement of Material Facts (Ind. Pls.' CSF).

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

outsourced their fee setting to reduce their exposure to price-fixing claims such as those now before the Court. (SUF ¶¶ 34, 38.) As fully described in Part Seven below, the Defendants attempted further structural change through their respective restructurings culminating in IPOs. Defendants now take the position that "[a]fter the implementation of the IPOs, the banks possessed no control," and "the IPOs terminated the structural mechanism [that fixed interchange fees]." (Defs.' SCACAC Br. at 14-15.) Defendants cannot on one hand argue that the restructurings brought about fundamental changes in the way they do business while on the other hand arguing that the release bars Plaintiffs' allegations of new conduct because nothing has changed. Accordingly, the Defendants' restructurings and post-restructuring interchange-fee setting constitutes new conduct that was not released by the *Visa Check* settlement. *See Twin City Sportservice*, 512 F.2d at 1270.

## C.   Defendants' contemporaneous conduct casts doubt on their interpretation of the *Visa Check* release.

To the extent that this Court believes that the language of the release is ambiguous, it may consider evidence outside of the four corners of the release. *See Bank of Am. Nat'l Trust and Savings Ass'n v. Gillaizeau*, 766 F.2d 709, 715 (2d Cir. 1985). When interpreting a release—or any other contract—that is ambiguous, courts give effect to the intent of the parties to the release. *See ASI Sign Sys., Inc. v. Architectural Sys., Inc.*, No. 99-7962, 2000 U.S. App. LEXIS 4485, at *5 (2d Cir. Mar. 21, 2000). Thus, a court may consider agreements executed around the same time as the release to help it shed light

- 15 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

on the parties' intent. *See Werbungs Und Commerz Union Austalt v. Collectors' Guild, Ltd.*, 930 F.2d 1021, 1025-26 (2d Cir. 1991). The parties' conduct around the time that the release is executed may also be probative of the parties' own interpretation of the breadth of a release. *See id.*[7]

> **1.    Settlement agreements that Visa and MasterCard executed with opt-outs from the *Visa Check* litigation explicitly release past *and* future conduct, reflecting that they intended those releases to be broader in scope than the class release.**

Some of the settlement releases that Visa and MasterCard negotiated with class members that opted out of the *Visa Check* litigation were significantly broader on their faces than the class release. For example, MasterCard's settlement agreement with Dell Computers released MasterCard from all claims "based on conduct occurring on or after January 1, 2004." (CSF ¶ 36.10.) ██████████████████████████ ████████████████████████ (CSF ¶ 36.10.) These settlements were negotiated by the same counsel that negotiated with the class and were executed within months of the class settlement. (CSF ¶¶ 36.8-36.10.) The contrast between the release in the opt-out agreements and the class-settlement agreement shows that Visa and MasterCard knew how to draft language that clearly released future conduct, yet chose not to include that language from the class settlement.

---

[7]    The testimony of persons who negotiated the agreement may also be probative of the parties' intent for the scope of the release. *DP Aviation v. Smiths Indus. Aero. & Def. Sys.*, 268 F.3d 829, 839 (9th Cir. 2001). Defendants have not sought or offered any such testimony, including the testimony of individuals who negotiated the agreements for Visa and MasterCard. The failure to offer such testimony, when it could have been offered, may warrant the inference that the evidence would be unhelpful. *Consolidated Rail Corp. v. Nevins-Petrillo Warehouse & Distribution Systems, Inc.*, 619 F. Supp. 900 (S.D.N.Y. 1983).

- 16 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

2.     **The fact that both networks restructured to avoid the claims Plaintiffs assert in MDL 1720 belies Defendants' contention that the parties intended for the *Visa Check* release to apply to post-2003 conduct.**

The Defendants' conduct in planning and executing restructurings to escape liability in MDL 1720 further undermines their argument that the *Visa Check* release extinguished claims based on conduct since January 1, 2004 concerning fixed interchange fees and the anti-steering restraints. Both the MasterCard and Visa restructurings were conducted for the purpose of avoiding future—*i.e.*, post-2003—antitrust liability. (SUF ¶¶ 34, 38.) The reasons for and facts surrounding the restructurings at the very least raise genuine issues of material fact as to whether the claims that Plaintiffs assert based on post-2003 conduct are barred by the release.

The *Visa Check* settlement and the Second Circuit's decision in *United States v. Visa* prompted the banks that controlled the networks to seek a structural solution to protect themselves from future antitrust suits alleging concerted conduct by the networks' member banks. (SUF ¶¶ 38(f),(g),(i); *see generally, id.* ¶¶ 33-34, 37-38.)

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ (SUF ¶ 34(i).) Visa also admitted that the ████████████████████████████████████████ behind its corporate restructuring. (SUF ¶ 38(a).)

- 17 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

The motivation behind the restructurings is important because virtually all of the bank representatives who sat on the networks' boards at the time of the *Visa Check* settlement were also on the boards for some or all of the networks' restructuring processes. (SUF ¶¶ 9, 16.) The bank directors would not have engaged in lengthy, complicated, and costly restructuring processes to attempt to avoid prospective liability problem if they believed that the *Visa Check* releases had already solved that problem. In fact, Class Plaintiffs are not aware of any instance during the networks' restructuring processes in which a bank director expressed his or her belief that the *Visa Check* releases barred future claims based on interchange-fee fixing or the anti-steering restraints, and Defendants have not proffered any such evidence.

### D.     The cases that Defendants rely upon are distinguishable.

Because Plaintiffs allege that Defendants engaged in new, anticompetitive conduct after December 31, 2003, Defendants' reliance on *Madison Square Garden* and other cases is misplaced. In *Madison Square Garden*, the restrictions that allegedly harmed the plaintiff—relating to licensing, advertising, and broadcasting—were already in place in their final form at the time of the settlement agreement. *Madison Square Garden, L.P. v. NHL*, 07 CV 8455 (LAP), 2008 U.S. Dist. LEXIS 80475, at *14 (S.D.N.Y. Oct. 10, 2009). Thus, as Defendants acknowledge, the court in that case concluded that the "'claim existed' at the time of the release." (Defs.' SCACAC Br. at 13 (citing *Madison Square Garden*, 2008 U.S. Dist. LEXIS 80475, at *6)). In this case, by

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

contrast, the harm to members of the Class occurs each time that a merchant pays a supracompetitive interchange fee. *See Twin City Sportservice*, 512 F.2d at 1270. Moreover, the plaintiff in that case was a member of the NHL joint venture, which adopted the challenged policies, rather than a victim of future price-fixing. *Madison Square Garden*, 2008 U.S. Dist. LEXIS 80475, at *5.

The other cases Defendants rely on involve conduct that occurred or was known in its entirety before the time of the release. For example, the court in *MCM* concluded that the plaintiffs' "claim [was] clearly based on pre-[release] conduct and, as such, [was] expressly barred by the Release." *MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 161 F. 3d 443, 448 (7th Cir. 1998). The *Record Club* court also found that plaintiffs' claims were "based upon agreements executed in settlement of the underlying lawsuits" and "arose during the period from the beginning of the world to the date the settlement agreement was executed." *Record Club of Am., Inc. v. United Artists Records, Inc.*, 611 F. Supp. 211, 216 (S.D.N.Y. 1985). The *Hunter Douglas* case is distinguishable because the agreement at issue in that case was in place when the parties settled their previous lawsuit. *Hunter Douglas, Inc. v. Comfortex Corp.*, No. 98-CV-0479 (LEK/DNH), 1999 U.S. Dist. LEXIS 10906, at *21 (N.D.N.Y. Mar. 11, 1999). Thus, any harm that the agreement caused had occurred at the time of settlement. *See id*. Finally, Defendants' reliance on *VKK Corp. v. NFL* is misplaced because the case involves the "part and parcel" doctrine, in which the release was alleged to be an instrument of the conspiracy.

- 19 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

*VKK Corp. v. NFL*, 244 F.3d 114, 121 (2d Cir. 2001). Class Plaintiffs do not allege that the *Visa Check* release operates in that way.

## II. Public policy against releasing future antitrust claims precludes this Court from immunizing Defendants' anticompetitive conduct, which inflicted new and continuing antitrust injury on merchants on and after January 1, 2004.

Releases that would effectively immunize defendants from future antitrust liability are unenforceable for public-policy reasons. For example, in *Lawlor*, the Supreme Court recognized that, to hold otherwise would "confer on [defendants] a partial immunity from civil liability for future violations," which is inconsistent with antitrust laws. *Lawlor v. Nat'l Screen Serv.*, 349 U.S. 322, 328 (1955). More recently, the Second Circuit recognized the "firm principle of antitrust law that an agreement which in practice acts as a waiver of future liability under the federal antitrust statutes is void as a matter of public policy." *In re Am. Express Merchs.' Litig.*, No. 06-1871-cv, 2011 U.S. App. LEXIS 4507, at *27 (2d Cir. Mar. 8, 2011). Other courts have also recognized the policy against immunity from future antitrust violations. *See Mitsubishi Motor Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985); *Minnesota Mining and Mfg. Co. v. Graham-Field, Inc.*, No. 96 cv 3839, 1997 U.S. Dist. LEXIS 4457, at *3 (S.D.N.Y. Apr. 9, 1997); *Redel's Inc. v. Gen. Elec. Co*, 498 F.2d 95, 99 (5th Cir. 1974).[8] To afford the Release

---

[8] *See also, Fox Midwest Theatres v. Means*, 221 F.2d 173, 180 (8th Cir. 1955) (it is against public policy to absolve a party from liability of future anticompetitive conduct; *Mktg. Assistance Plan, Inc. v. Assoc. Milk Producers, Inc.*, 338 F. Supp. 1019, 1022 (S.D. Tex. 1972) (release "could not settle disputes which had not yet arisen or serve as a license to engage in unlawful monopoly activities against the releasors; [s]uch an absolution would violated public policy"); *Flying J v. TA Operating Corp.*, No. 1:06-CV-30-TC, 2008 U.S.

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

prospective application to bar Class Plaintiffs' current claims would grant Defendants perpetual antitrust immunity for conduct that harms merchants in the amount of over $40 billion per year[9], and would clearly conflict with public policy.[10]

Defendants' reliance on *Crivera* in this context is also misplaced. Plaintiffs are not seeking an opportunity to pursue claims based on events that were known in their entirety when they agreed to settle in the *Visa Check* litigation. *Crivera v. City of New York*, 03 CV 447 (JG), 2004 U.S. Dist. LEXIS 2571, at *4-9, 12-15 (E.D.N.Y. Feb. 23, 2004) (finding sexual harassment and discrimination claims against plaintiff's ex-husband were matters outside the marriage that were known to the plaintiff at the time her divorce settlement release was executed). The Release is specifically limited in scope to conduct prior to January 1, 2004. (Defs.' SUF ¶ 20.) Class Plaintiffs' claims are predicated on the proven evidence of Defendants' conduct occurring on or after January 1, 2004. Accordingly, the public policy against prospective waivers of antitrust claims supports a construction of the Release that extinguishes Defendants' liability only for conduct prior to January 1, 2004.

---

Dist. LEXIS 92852, at *12 (D. Utah Nov. 14, 2008) (concluding "prospective release of antitrust claims would be void as against public policy").

[9]     *See* Frankel Rpt. Fig. 9.1.

[10]    *See also United States v. Gen. Elec. Co.*, 358 F. Supp. 731, 740 (S.D.N.Y. 1973) (relying on *Lawlor* and acknowledging the "public policy considerations against giving a defendant . . . perpetual immunity" for future violations). And as the Court pointed out during the parties' Rule 12 oral arguments, to suggest that as long as Defendants do not change their rules there is no new conduct would leave Defendants with an incentive to not change rules in a way that may benefit merchants, etc., which would go against public policy. Hr'g Tr. 162:08-25;163:24-164:22 (Nov. 18, 2009) (K. Gallo).

- 21 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

If Defendants were granted perpetual antitrust immunity, they would be permitted to continue to harm merchants and consumers by collectively setting interchange fees and imposing restrictions on merchants that effectively eliminate price competition. Such conduct would greatly harm competition.

### Part Two

### The *Illinois Brick* doctrine does not bar Class Plaintiffs' claims.

Defendants' argument that *Illinois Brick* precludes Class Plaintiffs' claims is based entirely on a mischaracterization of those claims. In particular, Defendants repeatedly contend that Plaintiffs allege only that Defendants fixed interchange fees, and that Plaintiffs do not allege that Defendants fixed merchant-discount fees. *See* Defs.' Mem. at 8, 15, 29. That is not the case, as the Supreme Court's definition of "fix" includes all action purposefully and effectively directed at raising prices. The undisputed facts reflect that Defendants' actions with regard to merchant-discount fees—as well as interchange fees—fall squarely within that definition.

It is also undisputed that all members of the Class contract directly with acquiring-bank member of Visa and MasterCard, and that issuing banks directly deduct interchange fees from the sums that are due merchants. Based on these undisputed facts, this Court can rule that *Illinois Brick* does not apply as a matter of law. Fed. R. Civ. P. 56(f)(1); *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir. 1991) (affirming summary judgment for nonmoving party). Contrary to these undisputed

- 22 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

facts, Defendants argue that their own acquiring banks are the true victims of their conspiracy to set supracompetitive interchange fees and impose anti-steering restraints. Defendants' motion is unsupported by the record and therefore should be denied.

## I.   Defendants' conspiracy is formed with the purpose and effect of raising payment-card-acceptance prices to merchants.

Defendants set interchange fees for the purpose and with the effect of establishing floors for corresponding merchant-discount fees.[11] (SUF ¶¶ 46, 56.) As Class Plaintiffs detailed in their Statement of Undisputed Facts, Defendants set interchange fees based on characteristics of the merchants that pay them, as a function of the merchants' respective categories, transaction volumes and, for individual transactions, the environments in which merchants accept those transactions (*i.e.*, internet, card-not-present, or face-to-face). (SUF ¶¶ 47, 58.) Defendants then set interchange fees at the "reserve price" of each merchant category, attempting to gauge the highest possible interchange fee that they can extract for a given transaction at a particular merchant. (SUF ¶¶ 46, 56.) Defendants do not vary their interchange fees

---

[11]     Defendants' citation of instances in which acquiring banks refrained from imposing interchange fee increases—as opposed to interchange fees—on their merchant customers adds nothing in this context. Interchange fees at virtually all times serve as a floor for their corresponding merchant discount fees, regardless of whether the latter are immediately affected by increases in the former. By way of illustration, an acquiring bank may charge a merchant discount fee of 2.5 percent where the corresponding interchange fee is 2 percent. If the network raises the interchange fee to 2.25 percent, the acquiring bank may not immediately raise the corresponding merchant discount fee (or, as Defendants put it, "pass on the increase"). But the merchant discount fee nevertheless continues to exceed the corresponding interchange fee, and Defendants have cited no instance of an interchange fee increase in which that was not the case. Defendants' claim that acquiring banks have in any sense "paid" interchange fees in this context is false.

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

based on *any* characteristic of *any* acquiring bank. (*Id.*) Even Defendants' most recent explanation for interchange fees—that they are "balancing the system" between issuer demand and merchant demand—reflects that Defendants treat interchange fees as prices paid by merchants rather than by acquiring banks. (CSF ¶ 57.8).

As Defendants acknowledge, *Illinois Brick* does not apply when "the claimed conspirators have allegedly *fixed* the retail price paid directly by the plaintiff." (Defs.' SCACAC Br. at 29) (emphasis amended). But this is in fact exactly what Defendants have done in this case with respect to merchant-discount fees, as well as interchange fees. As the Supreme Court held, "a combination formed *for the purpose and with the effect* of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940) (emphasis added).[12] *See also Major League Baseball Props., Inc. v. Salvino*, 542 F.3d 290, 336-337 (2d Cir. 2008) (Sotomayor, J., concurring) ("an agreement between competitors . . . that has the *purpose* and *effect* of fixing, stabilizing, or raising prices may be a *per se* violation of the Sherman Act, even if no explicit price is referenced in the agreement") (emphasis in original).

It may be the case that every instance of price fixing has the *effect* of raising downstream prices, and that *Illinois Brick* in many cases precludes action by

---

[12] *See also Socony-Vacuum*, 310 U.S. at 222 (prices are "fixed" if "the range within which purchases or sales will be made is agreed upon"), 224 ("Proof that a combination was formed for the purpose of fixing prices and that it caused them to be fixed or contributed to that result is proof of the completion of a price-fixing conspiracy under § 1 of the Act."), *quoted in New York ex rel. Spitzer v. St. Francis Hosp.*, 94 F. Supp. 2d 399, 412 (S.D.N.Y. 2000).

- 24 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

downstream purchasers that is based only on that effect. But what distinguishes this case from cases in which *Illinois Brick* applies is that Defendants' *purpose* in fixing interchange fees—as reflected in their exclusive focus on merchants in their pricing decisions—is to fix, stabilize and raise merchants' costs of accepting payment cards. That is why merchant-discount fees are "fixed" just as much as are interchange fees. That is also why *Illinois Brick* had no bearing on this case or other cases like it in which conspirators fix a component of a price, for the sole purpose of raising prices paid by non-conspirators. *See, e.g., Catalano v. Target Sales, Inc.,* 446 U.S. 643, 645-46 (1980).[13] Defendants' repeated claims that Plaintiffs do not allege their having fixed merchant discount fees are wrong.

## II.   Class Plaintiffs have standing by virtue of purchasing directly from members of a conspiracy.

The *Illinois Brick* Court recognized that its indirect-purchaser rule should not apply when the direct purchaser "is owned or controlled by" its customer. *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 735-36 (1977). In post-*Illinois Brick* cases, the Supreme Court therefore defined "indirect purchasers" as parties that are not "the immediate buyers from the alleged antitrust violators." *Kansas v. UtiliCorp United, Inc.,* 497 U.S. 199, 207 (1990); *California v. ARC America Corp.,* 490 U.S. 93, 97 (1989). Extending this reasoning,

---

[13]    *In re Linerboard Antitrust Litig.,* 305 F.3d 145, 159-60 (3d Cir. 2002) (plaintiffs who purchased from defendants corrugated sheets and boxes containing price-fixed linerboard were "direct purchasers"); *In re Sugar Indus. Antitrust Litig.,* 579 F.2d 13, 18 (3d Cir. 1978) (plaintiff who purchased candy containing price-fixed sugar from defendants was "direct purchaser"); *In re TFT-LCD (Flat Panel) Antitrust Litig.,* 267 F.R.D. 291, 306 (N.D. Cal. 2010) ) (plaintiffs who purchased finished LCD products containing price-fixed LCD panels from defendants were "direct purchasers").

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

lower federal courts have refused to apply *Illinois Brick* to situations in which the nominally "direct purchaser" is a co-conspirator or defendant. *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291, 306 (N.D. Cal. 2010). Other circuits have adopted the rule that *Illinois Brick* is inapplicable when the supposed "direct purchaser" is itself part of a conspiracy to fix prices.[14]

Class Plaintiffs fall into one of two categories, neither of which are "indirect purchasers": (i) merchants that contract only with acquiring-bank members of Visa or MasterCard; and (ii) merchants that contract with third-party processors or independent sales organizations ("ISOs"), in addition to acquiring banks. Both of these are discussed below.

### A. *Illinois Brick* does not apply to Class Plaintiffs that contract only with an acquiring-bank member of Visa or MasterCard.

Each Visa and MasterCard acquiring bank is either a defendant in this action or a co-conspirator with the Defendants. (SCACAC ¶¶ 55-104.) For merchants that contract with a Bank Defendant for network services, *Illinois Brick* does not apply because they purchase directly from a business unit of a defendant. *See Royal Printing Co. v. Kimberly Clark Corp.*, 621 F.2d 323, 324, 326 (1980).

---

[14]     *Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 378 (3d Cir. 2005) ("[W]e have found no precedent holding that plaintiffs, who purchase directly from dealers who are part of a price-fixing conspiracy with the initial seller, may not recover damages from the initial seller.); *Paper Systems, Inc. v. Nippon Paper Indus. Co., Ltd.*, 281 F.3d 629, 631-32 (7th Cir. 2002) (holding that *Illinois Brick* does not bar claims by plaintiffs that were "the first purchasers from outside the conspiracy"); *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 604-05 (7th Cir. 1997) (Posner, J.) (noting same in dicta); *Lowell v. Am. Cyanamid Co.*, 177 F.3d 1228, 1230, 1232 (11th Cir. 1999) (same).

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

For merchants that contract with non-defendant acquiring banks, *Illinois Brick* does not apply because those merchants purchased directly from an active member of the conspiracy to fix interchange fees and impose the anti-steering restraints. Before the networks' restructurings, the acquiring banks selected network board members that set restrictive network rules and default interchange fees. (SUF ¶¶ 33-40.) Both before and after the IPOs, the acquiring banks abided by and enforced the default-interchange rules, anti-steering restraints, and other network rules. (SUF ¶¶ 3, 6, 12, 21, 25, 49, 59.) The networks' rules required that the acquiring banks be responsible for ensuring their merchants' compliance with the rules. (SUF ¶¶ 21, 25.) And even the non-defendant acquirers are also recipients of interchange fees as the networks' rules require that all member banks "have issued and outstanding a reasonable number of … cards." (SUF ¶¶ 26, 27.) Thus, far from being innocent, injured parties, the acquiring banks are undisputedly integral pieces in the conspiracies to impose default interchange fees and anti-steering restraints. Under this scenario, if large banks gained damages immunity by "nominally sell[ing] services through another entity rather than to [merchants] directly," a "major loophole" in antitrust enforcement would open. *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1146 (9th Cir. 2003).

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

**B.**   *Illinois Brick* **does not apply to merchants that contract with third-party processors or independent sales organizations in addition to acquiring banks.**

Even those merchants that contract with third-party processors and ISOs are direct purchasers of network services for purposes of *Illinois Brick*. Network rules require that all third-party processors and ISOs have member-bank sponsors in order to sign up merchants. (CSF ¶¶ 8(b)-8(c), 8(e), 8(f), 38(b).) Once a merchant is signed up, the rules require the acquiring bank to be a party to all merchant agreements, to settle funds with the merchant, and to set the acquirer margin. (SUF ¶¶ 31(e), 32(e); CSF ¶ 57.20.) Thus, even merchants that use third-party processors or ISOs receive funds directly from acquiring banks. (*Id.*) *see Royal Printing*, 621 F.2d at 324. And many of these acquiring-bank sponsors are themselves large acquirers, large issuers, or defendants in this case. (CSF ¶¶ 8(e)-8(g).)

**III.   Merchants are the "direct payors" of interchange fees because they pay the overcharges imposed by supracompetitive interchange fees.**

The Supreme Court's decision in *Illinois Brick* bars federal-law damages claims based on overcharges to an intermediary that the intermediary passed on to the plaintiff. *Illinois Brick*, 431 U.S. at 730-36. It does not, as Defendants imply, prevent recovery any time that an intermediary inserts itself between the antitrust violator and overcharged plaintiff. 2A Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 346, at 169-73 (3d ed. 2007) ("Areeda/Hovenkamp"). Nor does *Illinois Brick* impose a requirement that the plaintiff be in contractual privity with the price fixer in order to

- 28 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

obtain damages. *See Freeman,* 322 F.3d at 1146; *In re G-Fees Antitrust Litig.,* 584 F. Supp. 2d 26, 34 (D.D.C. 2008); (Defs.' Mem. Opp. Mot. Cl. Cert., Oct. 6, 2008, at 85 (conceding this point). Thus, the focus of the indirect-purchaser inquiry is on who paid the overcharge rather than on who is closest in proximity to the violator. *See Freeman,* 322 F.3d at 1145-46; Areeda/Hovenkamp, *supra,* at 169-73.

Judicial decisions illustrate courts' focus on the payor of the overcharge. In *Freeman,* for example, the court disregarded the fact that the plaintiff real-estate agents paid fees to their associations rather than directly to the associations' joint-venture multiple-listing service, reasoning that "[d]efendants can't turn a horizontal agreement to fix prices into something innocuous just by changing the way they keep their books." 322 F.3d at 1146. More recently, a district court denied a motion to dismiss mortgagors' claims that Fannie Mae and Freddie Mac fixed a "mortgage guarantee fee," even though the mortgagors purchased mortgages from intermediate lenders rather than from Fannie and Freddie. *G-Fees,* 584 F. Supp. 2d at 34. The court reasoned that the intermediate lenders were "mere conduits" that transmitted the overcharges from Fannie and Freddie to the real victims-the mortgagors. *Id.* at 33-34.

The undisputed record evidence establishes that merchants are the "direct payors" of interchange-fee overcharges:

- The long-time head of Visa's Interchange Strategy Group admits that issuing banks cannot recover interchange fees from acquiring banks' (CSF ¶ 37(e);)

- 29 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

- Issuing banks deduct interchange fees from the sums due to merchants before acquiring banks ever touch those funds (SUF ¶¶ 64(h), 67(b))

- Acquiring banks-including the Bank Defendants-account for interchange fees as "contra revenue, rather than revenue." (SUF ¶ 124(f).)

- ISOs act as agents of acquiring banks (CSF ¶ 38(b).)

At the very least, however, this evidence creates a genuine issue of material fact as to who the direct purchaser is. Accordingly, Defendants' motion for summary judgment should be denied.

## A.   In all Visa and MasterCard transactions, interchange fees are deducted directly by the issuing bank.

### 1.   Defendants' documents and testimony confirm that issuing banks directly deduct interchange fees from transaction funds.

The Defendants' depiction of a payment-card transaction—in which the acquiring bank purchases a "network service" for the price of an interchange fee and then resells the service to the merchant for the merchant-discount fee —is contrary to the record. (Defs.' SCACAC Br. at 16-17.) Documents created by the networks for business purposes reflect that issuers deduct interchange fees from sums that are due merchants before acquirers ever handle the funds. (SUF ¶¶ 67(a)-(b).)

- 30 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL





The networks' executives confirmed that the merchant is the direct payor of interchange fees. Each day, the networks determine each member bank's net-settlement position (*i.e.*, the net amount of funds that it should receive or pay based upon that day's payment-card transactions) and report those positions to the banks. (CSF ¶ 57.10.) The banks then pay funds into the networks or receive funds from them, according to their net-settlement positions. In the case of the issuing banks, they typically remit funds equal to the transaction volume conducted on their cards-less the interchange fees they are due-to each of the respective networks. (*Id.*) The networks remit funds to the acquiring banks in the amount of their merchants' aggregate transaction volume, less the interchange fees associated with those transactions. (*Id.*) Defendants do not dispute that they settle funds in this matter.

- 31 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

## 2.     The flow of funds does not vary for merchants that use third-party processors or ISOs.

Even merchants who have relationships with third-party processors or ISOs,
settle transactions according to the network-mandated transaction flow described
above. For example, ████████████████████████████████
████████████████████████████████████████████(CSF
¶¶ 8(e)-8(f).) The fact that funds are settled through acquiring-bank members for all
merchants has two direct-purchaser implications. First, it confirms that all merchants
have a direct financial relationship to a co-conspirator bank, which supports Plaintiffs'
argument that *Illinois Brick* does not apply to their claims. *See Freeman*, 322 F.3d at 1146.
Second, it undercuts Defendants' *Illinois Brick* policy argument that allowing merchants
to recover interchange-fee overcharges would lead to a difficult apportionment of
damages among "different levels along the vertical chain of distribution." (Defs.'
SCACAC Br. at 19.)

## 3.     The form of a merchant's contract-"interchange-plus," or "bundled" pricing-is immaterial to the direct-purchaser question.

Contrary to Defendants' arguments, the fact that some merchants have
"interchange-plus" contracts while others have "bundled" rates, does not alter the
*Illinois Brick* analysis. Rather, the distinction between these types of merchant contracts
reflects differences only in the acquirer margin. (CSF ¶¶ 44(a)-(c), 45(a)-(c); McCormack
Rpt. ¶¶ 85-89.) As described above, fees are deducted directly by the issuing bank. If an

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

acquirer offers a merchant a flat or "bundled" rate, it is choosing to allow its acquirer margin to vary inversely to the interchange fee. (*See* CSF ¶¶ 88-89.) Even in the examples that Defendants cite-- Federated Department Stores and Luipold — Fifth Third offered the favorable rate to Federated in "recognition for the extensive banking relationship" that it had with these two merchants. (Defs.' SUF ¶ 57; CSF ¶ 57(b).) Thus, the effect of Fifth Third's favorable merchant discount for Federated and Luipold is no different than Fifth Third cutting a check to them in recognition for their loyalty; it does not alter the flow of funds in which the interchange fee is taken directly from the merchant. (CSF ¶¶ 57(a), (b).) Defendants' implication that interchange fees are not directed at raising merchant discount fees above what they would otherwise be for Federated or any other merchant is fallacious.

### B.    Acquiring banks, third-party processors, and ISOs are not "direct purchasers" in the Visa and MasterCard systems.

#### 1.    Defendants' accounting for interchange fees reflects that merchants-not acquiring banks-pay interchange fees.

The Defendants' accounting records reflect yet another instance in which the contemporaneous records they used for routine business purposes are contrary to their litigation positions. Those records establish that ███████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████ (CSF ¶ 57.15; SUF ¶¶ 64, 65; MacFarlane Rpt. ¶¶ 9-13.) Merchants account for interchange fees as an expense-

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

"the using up of assets or consuming services in the process of generating revenue."
(CSF ¶ 57.16; McFarlane Rpt. ¶¶ 10, 78-82.) Acquirers, in contrast, do not account for
interchange fees as revenue or as an expense. (CSF ¶ 57.17.) Rather, they account for
interchange fees as "contra-revenue", *i.e.*, as an offset to gross revenue. (*Id.*) Acquirers
exclude the fees from net revenues and from expenses. (*Id.*) One acquirer, SunTrust,
██████████████████████████████████████████████████████ (*Id.*)
Accounting guidelines confirm that interchange fees are properly considered "contra
revenue" for acquiring banks because, among other things, acquirers are not the
primary obligors on payment-card transactions, bear no inventory risk, do not establish
interchange fees, and do not change the services provided to merchants based on the
corresponding interchange fees. (CSF ¶ 57.18.) In sum, as plaintiffs' expert, Bruce
McFarlane explained, because interchange fees have no impact on acquirers' profits,
they are appropriately recorded as a contra-revenue. (McFarlane Rpt. ¶ 64.)

　　　　Because interchange fees are not an expense to acquiring banks, they do not pay
overcharges, have not suffered injury to their business or property, and lack standing to
pursue claims arising from interchange fees. *See* 15 U.S.C. § 15 (2010); *New York v.
Hendrickson Bros.*, 840 F.2d 1065, 1076 (2d Cir. 1988). Consequently, merchants must be
able to recover damages if the Defendants' conduct is going to have any redress at all.
*See Freeman*, 322 F.3d at 1146 (warning of "major loophole" in antitrust enforcement that
would open if price fixers escaped liability by nominally selling services through a third
party).

- 34 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

### 2. Third-party processors and ISOs are not "direct purchasers" because they are agents of acquiring banks.

The networks' rules mandate that third-party processors and ISOs are agents for acquiring banks. (CSF ¶ 38(b).) It is well established that a plaintiff that contracts with an intermediary that is a mere agent of the antitrust violator is not barred by *Illinois Brick* from recovering damages. *See Diskin v. Daily Racing Form, Inc.*, No. 92 Cir. 6347 (MBM), 1994 WL 330229, at *5 (S.D.N.Y. Jul. 7, 1994); *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 505 (S.D.N.Y. 1996). In fact, Defendants in this case have asserted in other litigation that merchants, not third-party processors or ISOs, have standing under *Illinois Brick* to seek damages relating to interchange. *See, e.g., NaBanco v. Visa,* 596 F. Supp. 1231, 1247 (S.D. Fla. 1984); *Visa U.S.A. Inc. v. First Data Corp.*, No. C 02-01786 JSW, 2006 WL 1310448, at *4 (N.D. Cal. May 12, 2006).

## IV. *Illinois Brick* does not apply because there is no realistic probability that any acquiring bank will sue the networks or issuing banks.

Federal courts make an exception to *Illinois Brick* for situations in which there is "no realistic possibility" that nominal "direct purchasers" will sue the violators. *See Freeman*, 322 F.3d at 1146. The exception exists when, among other things, the "direct purchaser" was owned or controlled by the violator. *See id.; Royal Printing*, 621 F.2d at 326.

There is no realistic probability that acquiring banks, third-party processors, or ISOs will sue the Defendants to recover interchange-fee overcharges. ███████

- 35 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████ Moreover, as in *Royal Printing*, the acquirers have no incentive to sue because they are related corporate entities to larger banking entities that adopted the rules and engaged in the conduct that Class Plaintiffs challenge, while profiting from network interchange fees-to the tune of ████████ annually. (Frankel Rpt. Fig. 9.3).

Defendants' reference to the *NaBanco* and *First Data* cases to show that third-party processors can sue is unpersuasive. Both NaBanco and First Data were suing as competitors of the Visa member banks rather than as their customer in a card-acceptance market. NaBanco was a processor that was not an issuing bank and sued because it feared that it was at a competitive disadvantage to banks that were both issuers and acquirers and could therefore give merchants interchange-fee discounts. *NaBanco*, 596 F. Supp. 2d at 1239-40. Similarly, First Data's theory of harm posited that Visa's honor-all-cards rule, combined with its ban on intraprocessing—processing transactions outside of VisaNet when the merchant and issuer use the same processor—prevented issuers from "compet[ing] for partnerships with merchants by offering the merchants customized and lower interchange rates." (CSF ¶ 57.12).[15] As a result of

---

[15]    While the *First Data* court at one point characterizes First Data as seeking damages for "the payment of inflated fees" as a result of Visa's ban on intraprocessing, it is doubtful that the court was referring to interchange fees. *First Data*, 2006 WL 1310448 at *3. This is because part of First Data's theory was that Visa inhibited its ability to compete by overcharging it to process transactions for merchants and Visa member banks. (CSF ¶ 57.12.) In fact, the source the court cites for this proposition—¶ 78 of First

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

Visa's ban, First Data alleged that it lost processing business, which in turn kept interchange fees at inflated levels. *First Data*, 2006 WL 1310448 at *3. Thus, supracompetitive interchange fees imposed on merchants were a byproduct of, rather than the source of, the injury to First Data.

## V.   Allowing merchant plaintiffs to sue is consistent with *Illinois Brick*'s policy of supporting private antitrust enforcement.

The *Illinois Brick* Court insisted that the rule it laid down promoted private enforcement of the antitrust laws by easing the path to recovery for direct purchasers. *Illinois Brick*, 431 U.S. at 744-46. It concluded that barring indirect purchasers from suing furthered this goal by avoiding multiple layers of liability and complex apportionment of damages. *See id.* at 740. But the Court recognized that its bright-line rule would not always further the underlying interest of encouraging private enforcement. *Illinois Brick*, 431 U.S. at 732.

Allowing merchants to recover interchange-fee overcharges from the banks does not pose either of the risks that the *Illinois Brick* Court foresaw. First, calculating merchants' damages is far from complex. Because Class Plaintiffs' expert posits a but-for world in which default interchange fees did not exist and issuers collect 100 percent of interchange fees, Plaintiffs are able to precisely calculate the amount of overcharge

---

Data's expert's surrebuttal report—does not even mention that First Data or any acquirer pays interchange fees. (CSF ¶ 57.12.) . Moreover, First Data's counterclaim referenced interchange fees only by way of background, and made no explicit reference to those fees in the counts it alleged. *See* Defs.' 2d Am. Counterclaims ¶ 77, *First Data* (N.D. Cal. Oct. 6, 2005) (CSF ¶ 57.12.)

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

imposed on the merchant plaintiffs. (Frankel Rpt. Fig. 9.1.) Even Defendants' expert was able to compute several damages calculations. (Topel Rpt. Ex. 18.) Secondly, as noted above, there is no risk of multiple layers of suits because acquirers have not been injured "in their business or property" sufficient to bring an interchange-fee damages claim. Finally, merchants were the target of Defendants' agreements to impose interchange fees and enforce the anti-steering restraints, and thus should be allowed to seek monetary redress from the injuries those agreements caused them. (CSF ¶ 57.7;) *See Blue Shield of Virginia v. McCready*, 457 U.S. 465, 477-79 (1982) (holding that clinical-psychology patient had standing to sue health plan that excluded coverage for her care because patients were the target of plan's conduct).

## VI. The *Paycom, ATM*, and *Kendall* decisions do not support denying Plaintiffs standing under *Illinois Brick*.

The decisions that defendants rely on do not support their argument. In *Paycom*, the plaintiffs, unlike Class Plaintiffs in this case, failed to allege an agreement of any kind involving either the network or the card-issuing banks, and the court would have affirmed the dismissal of their claims for that reason alone. *Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*, 467 F.3d 283, 292-93 (2nd Cir. 2006). Conversely, Class Plaintiffs' claims in this case stem entirely from agreements between and among the networks and card-issuing banks, and *Illinois Brick* is inapplicable in large part because of those agreements. Moreover, the *Paycom* decision–cited for the proposition that acquirers are the true payors of interchange–involved the completely different practice of

- 38 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

"chargebacks" to merchants. *Id.* at 291 Unlike payment-card interchange fees, which the networks' rules mandate to be paid at default levels in the absence of a bilateral agreement, each issuing bank has the discretion whether to issue a chargeback. *Id.* Moreover, chargebacks are not deducted from funds due the issuer, but rather are billed to the acquirer, which subsequently "decides on its own" whether to seek recovery from the merchant's account. *Id.* Thus, in the case of chargebacks, acquiring banks are not acting as mere delivery agents, but are actually passing on the chargeback and the fines that they receive from the issuing banks to the merchants. *See id.*

The decision in *ATM* is also inapposite. In that case, consumer plaintiffs sued the Star ATM Network and several large banks for agreeing on common ATM interchange fees to be paid from the card-issuing bank to the ATM owner. *In re ATM Fee Antitrust Litig.*, No. C 04-02676, 2010 WL 3701912 (N.D. Cal. Sept. 16, 2010). But the *ATM* court proceeded from the assumption that the plaintiffs did "not dispute that they pay the purportedly unlawful interchange fee only indirectly." *Id.* at *5.[16] As set forth above, Class Plaintiffs in this case do argue that they directly pay fixed interchange fees and merchant-discount fees.

---

[16]     To be certain, this assumption was not correct. The plaintiffs in *ATM* did in fact allege that the defendants agreed to fix interchange fees for the purpose and with the effect of artificially raising and maintaining foreign ATM fees, which plaintiffs paid to defendants and have appealed in part on that basis. *See, e.g., In re ATM Fee Antitrust Litig.*, No. 3:04-cv-02676, Dkt. No. 625, ¶ 113 (3d Am. Compl., Oct. 16, 2009) ("Defendants have continued to impose fixed Interchange Fees because the Bank Defendants mark them up to set Foreign ATM Fees, which generate substantial revenues for Bank Defendants.") Nonetheless, the court's assumption forms the basis for its opinion and also distinguishes it from this case.

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

Defendants claim that *Kendall* bars Plaintiffs' claims in this case, in large part because *Kendall* involved interchange fees. But the similarities between *Kendall* and this case end there, as is evident in the first sentence of *Kendall*: "This case concerns the pleading requirements to state a claim for antitrust violations under Section 1 of the Sherman Act . . . .". *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1044 (9th Cir. 2008).[17] The plaintiffs' efforts to establish the co-conspirator exception to *Illinois Brick* likewise foundered on their failure to allege a conspiracy involving the initial sellers.[18] *Id.* at 1050. This case is long past that stage. Moreover, Defendants do not contend at this stage that Plaintiffs have not properly alleged a conspiracy (at least pre-IPO), but only that *Illinois Brick* bars Plaintiffs' claims for damages. *Kendall* has no bearing on this case.

**VII.  The doctrine of judicial estoppel does not apply to Class Plaintiffs' arguments because Class Plaintiffs have never advocated that acquirers pay interchange fees and no tribunal has ever adopted such a position. In contrast, Visa has advocated that merchants pay interchange fees.**

Moreover, Defendants' argument that Class Plaintiffs are "judicially estopped" from arguing that merchants directly pay interchange fees because of two sentences in the *Visa Check* litigation is unavailing. (Defs.' SCACAC Br. at 17 (citing *In re Visa*

---

[17]    The plaintiffs' allegations against the bank defendants in *Kendall* were sparse and unfocused as compared to Plaintiffs' allegations in this case. *Id.* at 1048. That resulted in the court's reaching the erroneous conclusion that the networks, rather than card-issuing banks, retain interchange fees, and adding that "the issuing bank makes nothing in its transaction with Visa, but profits, in part, by being one of the owners of Visa through an association." *Id.* at 1045-46 & n.3. As this Court is well aware, those conclusions are wrong. (SUF ¶ 64.)

[18]    The plaintiffs' claims in *Kendall* were further undermined by their apparent failure to identify the initial sellers. *Id.* at 1046 n.3.

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

*Check/MasterMoney Antitrust Litig.,* 192 F.R.D. 68, 72 (E.D.N.Y. 2000) and *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.,* 396 F.3d 96, 102 (2d Cir. 2005)). In order for a party to be judicially estopped from advancing a particular position in litigation, it must have (i) taken a position that is inconsistent with one taken in a prior proceeding, (ii) that was adopted by the tribunal to which it was advanced, (iii) when the risk that inconsistent results will impact judicial integrity is certain. *Uzdavines v. Weeks Marine, Inc.,* 418 F.3d 138, 147-148 (2d Cir. 2005) (citing *New Hampshire v. Maine,* 532 U.S. 742 (2001)).

Defendants take out of context a single sentence describing interchange fees in the factual background sections of the class-certification opinion in the *Visa Check* case. The question whether merchants were "direct purchasers" of interchange fees for purposes of *Illinois Brick* was not at issue at all in *Visa Check,* much less at the class-certification stage. The depiction of "interchange fees" in those opinions was not a factual finding and did not have any material impact on the Courts' legal analysis. Thus, a finding in this case that merchants are the direct payors of interchange fees would have no impact on judicial integrity. *See New Hampshire,* 532 U.S. at 749.

Unlike the merchant Plaintiffs, who have consistently advocated that they are the victims of supracompetitive interchange fees, Visa has changed its position on the direct-purchaser issue to suit its immediate needs. In the *NaBanco* litigation, and again in 2006, Visa argued that merchants were the direct payors of interchange fees. *First Data,* 2006 WL 1310448, at *4. Even though Visa's advocacy of inconsistent positions does not rise to the level of judicial estoppel–they were not adopted by other tribunals–

- 41 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

it does demonstrate the inherent disingenuousness of Defendants' attempt to bind Class Plaintiffs to dicta in previous cases, while leaving Visa free to take chameleon-like positions to adapt to its immediate legal threat.

### Part Three

### Neither *Buffalo Broadcasting* nor *Paycom* bars Plaintiffs' claims because Defendants' rules and default interchange fees restrain trade.

Defendants' argument that collectively-set interchange fees are immune from antitrust scrutiny because bilateral interchange-fee agreements are theoretically permitted is contrary to law and unsupported in the factual record. Even though bilateral arrangements are theoretically possible, none actually exist, in large part because the networks' rules create insurmountable disincentives to bilateral agreements. Moreover, even if bilaterals did exist, they would have to be negotiated based on a fixed "list price" — the default interchange fee — that was established pursuant to agreements among the banks and networks. The default interchange fees therefore restrain trade by artificially inflating the price at which any lower fee could theoretically be negotiated. In addition to the default interchange rule, Class Plaintiffs challenge numerous network rules and policies that together cause substantial anticompetitive effects by eliminating price competition in the network-services markets. Default interchange fees, along with certain anti-steering restraints, including the no-surcharge rule and the anti-discrimination rule, as well as the honor-all-cards

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

›

rule collectively eliminate price competition. Defendants' other proffered examples of "freedom" to compete are irrelevant and provide no realistic competitive alternatives.

## I.      Defendants' rules and default interchange fees restrain trade by raising the costs of payment-card acceptance to all merchants.

As the Supreme Court recognizes, "every contract is a restraint of trade" as "[t]o bind, to restrain, is of their very essence." *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 98 (1984); *Bd. of Trade of Chicago v. United States,* 246 U.S. 231, 238 (1918). A horizontal restraint is "an agreement among competitors on the way in which they will compete with one another." *NCAA*, 468 U.S. at 99. Trade is restrained within the meaning of the statute even when the restraint does not completely eliminate competition. *See Socony-Vacuum*, 310 U.S. at 220-21 (agreements that curtail, but do not eliminate, price competition may be illegal). Applying this logic, the Supreme Court has held that a group of physicians engaged in an antitrust conspiracy when they agreed to set maximum fees that they would claim for reimbursement from payors, even though the physicians could seek less than the group maximums and more for services provided outside of the group's contract. *Arizona v. Maricopa Co. Med. Soc.*, 457 U.S. 332, 356-57 (1982).[19]

---

[19]     *See also Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) (Sotomayor, J.) (vacating dismissal in case where plaintiffs alleged information sharing decreased oil industry workers' salaries. No allegation that salaries were required to be at an-agreed upon level.)

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

The evidence that Class Plaintiffs cite in their affirmative summary-judgment brief not only raises a material issue of fact, but conclusively establishes that summary judgment for Class Plaintiffs is proper on this issue. (*See* Cl. Pls.' Aff. Br. at 36-37.) To summarize, Defendants limit the way that they compete with each other by enacting and enforcing the default interchange rules, honor-all-cards rules, and no-surcharge rules and other anti-steering restraints. The rules inflate the cost of payment-card acceptance for all merchants by creating what Visa and MasterCard refer to as the "hold-up problem." (SUF ¶¶ 31-32; Cl. Pls.' Br. at 34-36.) When the networks set interchange fees that apply to all issuing banks' cards, they have been able to take advantage of the banks' collective market power to further increase interchange fees without merchants dropping acceptance. (*See* SUF ¶ 93.) In this way, the hold-up problem stifles any incentive that an issuer might have to accept a transaction at anything less than the default rate. And even if a merchant were able to offer an issuer something of value in exchange for a lower interchange fee, the parties would negotiate a bilateral fee as a discount to the default rate. Fixing these type of "list prices" can be equally illegal as fixing final prices. *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.2d 651, 656 (7th Cir. 2002) ((Posner, J.); *Interphoto Corp. v. Minolta Corp.*, 295 F. Supp. 711 (S.D.N.Y. 1969).

The anti-steering restraints further restrain trade by preventing merchants from imposing downward pressure on interchange fees. When analyzing the effect of Defendants' rules, the European Commission found that the MasterCard interchange

- 44 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

fee "forms part of a network of inter-related or similar arrangements that, taken together, have a cumulative restrictive effect on competition." (E.C. Decision ¶ 653; Kahn Rep. ¶ 96; Kahn Dep. 214:8-215:1;) *Otokoyama Co. v. Wine of Japan Import, Inc.*, 175 F.3d 266, 273 (2d Cir. 1999) (If a "foreign decision is competent evidence of a relevant fact, it is relevant and admissible to prove that fact.")

## II.   Defendants' rules and interchange fees greatly reduce the incentive for issuers and acquirers to enter into bilateral interchange-fee agreements.

Bilateral agreements between issuers and acquirers do not exist in either the Visa or MasterCard system. The one example that Defendants put forward in their summary-judgment ███████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████ Defs.' SUF ¶ 62.) Defendants also fail to mention that this "bilateral agreement" was only one of several agreements between ███████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████. (*See* CSF ¶ 62(b) n.163.) Defendants' argument that they may fix list prices so long as they allow the ██████████████████████████████████ is not supported by the law. (Defs.' SCACAC Br. at 35;) *see Maricopa*, 457 U.S. at 332; *High Fructose Corn Syrup*, 295 F.3d at 656. Moreover, the record demonstrates that bilateral agreements are so rare that Richard T. Morrissey, Vice President of the Interchange Strategy of Visa testified that,

- 45 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

███████████████████████████████████████████████████

████████████████████████ (SUF ¶¶ 74, 75.) Similarly an internal

MasterCard document observes that bilateral agreements are "unlikely" because they

are "[n]ot in either party's interest." (CSF ¶ 75.5,)

Defendants' other examples of supposed competitive freedoms are irrelevant.

For example, the ability of the banks to issue American Express/Discover and store-

branded cards is immaterial because neither addresses the problem of supracompetitive

fees on Visa and MasterCard cards. A party cannot escape liability for an agreement

that harms competition in one relevant market by arguing that the agreement doesn't

restrain trade in a different market. *See United States v. Topco Assocs., Inc.*, 405 U.S. 596,

610 (1972); *Law v. NCAA*, 902 F. Supp. 1394, 1406 (D. Kan. 1995) (holding that

procompetitive effects in one market cannot offset anticompetitive effects in another).

### III.   *Buffalo Broadcasting* and *Paycom* **are distinguishable from this case.**

Defendants spend several pages of their brief rehashing the facts of *Buffalo*

*Broadcasting*, but that case is not dispositive to this one. First of all, the *Buffalo*

*Broadcasting* decision came only after a full trial on the merits and arose in an industry

that had been operating under a consent decree with the Department of Justice

Antitrust Division for 50 years. *Buffalo Broadcasting Co., Inc. v. Am. Soc. Of Composers,*

*Authors & Publishers*, 744 F.2d 917, 920, 922-24 (2d Cir. 1983). Secondly, the plaintiff

television stations in *Buffalo Broadcasting* had at least three options for purchasing

- 46 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

recorded music in the relevant market in addition to the challenged blanket license: (i)
music purchased directly from individual composers; (ii) source licenses; and (iii)
program-specific licenses. *Id.* at 921-22. The ruling in *Buffalo Broadcasting* is therefore
consistent with black-letter law holding that when the plaintiff cannot establish that the
challenged horizontal agreement restrains competition, there is no Section 1 violation.
*See Buffalo Broadcasting, id.* at 933.[20] In this case, on the other hand, Defendants' honor-
all-cards rules do not allow merchants that accept Visa or MasterCard to accept less
than all of that network's credit cards or signature-debit cards. (SUF ¶¶ 31(a), 32(a).)
And the default interchange fees act as artificially inflated list prices, even in those rare
cases in which a fee other than the default interchange fee is applied. (SUF ¶¶ 66-67.)
Moreover, in *Buffalo Broadcasting* the Second Circuit did not consider the defendants'
collective power in the market for performing rights, as there was no question that it
was limited. In this case, by contrast, this Court has already ruled that Visa had market

---

[20]   Defendants' contention that the principles espoused in *Buffalo Broadcasting* are not limited to
music licensing is unpersuasive and inapt. The other cases relied on by Defendants are similarly
inapposite. *Matsushita Elec. Indus Co. v. Cinram Int'l, Inc.,* 299 F. Supp. 2d 370 (D. Del. 2004), is unavailing.
In that case, dealing with DVD licenses, there were no restrictions on members' licensing outside of the
patent pool. Moreover, the *Matsushita* court relied on *Buffalo Broadcast* specifically on the issue of licensing
intellectual property rights, a far cry from the situation here. *See id.* at 378-79. *Levitch v. Columbia
Broadcasting System, Inc.,* 495 F. Supp. 649 (S.D.N.Y. 1980) is also unpersuasive. The court in *Levitch* tied its
decision to the determination of the relevant market and found that because there were so many
alternative sources for the programs at issue, the defendants did not actually control the market in such a
way that they could control prices or exclude competition. *Id.* at 667. Here, of course, Class Plaintiffs
allege Defendants have a stranglehold on the relevant markets. *Federal Paper Board Co, Inc. v. Amata,* 693 F.
Supp. 1376 (D. Conn. 1988) stands for the uncontroversial position that impact on competition is essential
to a Sherman Act claim and that anticompetitive effect is "not to be blithely assumed." *Id.* at 1384, n.9. In
*Continental Airlines, Inc. v. United Airlines, Inc.,* 277 F.3d 499, 517 (4th Cir. 2002), a competitor case, the
court remanded the case for further proceedings under the quick-look analysis or rule of reason, noting
that the issues raised would be better considered on a full record at the district court.

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

power as a matter of law and the Second Circuit affirmed a district court's findings that both Visa and MasterCard had market power. *United States v. Visa U.S.A. Inc.*, 344 F.3d 229, 239 (2d Cir. 2003); *In re Visa Check/MasterMoney Antitrust Litig.*, No. 96-CV-5238 (JG), 2003 WL 1712568, at *3 (E.D.N.Y. Apr. 1, 2003).

In *Paycom* the Second Circuit affirmed the district court's dismissal of the complaint because there was no agreement among MasterCard, acquirers and issuers about how to handle chargebacks. 467 F.3d at 292. Instead, each issuing bank was "free to decide on its own" whether to issue a chargeback "against the acquiring bank, not the merchant" and the acquiring bank was similarly free to decide "on its own" whether to assess the chargeback against the merchant's account." *Id.* at 291. Because there was no agreement, the court never reached the issue of whether there was a "restraint." In this case, Class Plaintiffs have indisputably shown the existence of an agreement—the detailed set of rules that dictate how interchange is processed through the Visa and MasterCard networks. (CSF ¶¶ 8(b)-(g); SUF ¶¶ 19-25, 31-32.)

As noted in Part Two above, the flow of funds for chargebacks and interchange are fundamentally different. Whereas network rules require that the issuer directly withhold interchange fees from merchants on all transactions, they leave issuers and acquirers free to determine whether to impose chargebacks. (CSF ¶ 57.10; SUF ¶ 67;) *See Paycom*, 467 F.3d at 291. Defendants' reliance on *Paycom* therefore misses the mark, as the chargebacks at issue were wholly voluntary and therefore there was no agreement that restrained competition in the relevant market. *Id.* Moreover, the *Paycom* court

- 48 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

concluded that if there were an agreement among banks to pass chargebacks to merchants, that agreement "would be a *per se* violation of Section 1." *Id*. at 292. In this case, the agreement, among the banks to impose interchange fees and anti-steering restraints on merchants is undisputed. (CSF ¶¶ 57(3), 57(20); SUF ¶¶ 19-25, 31-32.)

## Part Four

**Because Defendants' rules and default interchange fees increase the cost of merchant payment-card acceptance, Class Plaintiffs need not separately show that Defendants' rules and fees reduce output. In any case, Class Plaintiffs have in fact raised disputed issues of material fact relating to the effect of Defendants' rules and interchange fees on output.**

As Class Plaintiffs demonstrated in their affirmative summary-judgment brief, it is undisputed that Defendants' rules and interchange fees increase the costs of payment-card acceptance for merchants. (Cl. Pls.' Aff. Summ. J. Br. at 59-61; SUF ¶¶ 66-67.) Because Class Plaintiffs can demonstrate that Defendants' rules and interchange fees artificially inflate price, they need not separately demonstrate an effect on output. But nonetheless, Class Plaintiffs have in fact put forward evidence that Defendants' practices reduce output by reducing the overall demand in the economy, reducing payment-card acceptance among certain categories of merchants, and slowing technological development in the payment-card industry. This evidence is sufficient to raise an issue of material fact with respect to the effect of Defendants' conduct on output.

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

I.    **An antitrust plaintiff that demonstrates that the defendants' practices cause prices to increase need not separately demonstrate that those practices also reduce output.**

Price is "the central nervous system of the economy." *Socony-Vacuum*, 310 U.S. at 224 n.59. Thus, courts routinely find that harm to competition exists when competitors "agree[] not to compete in terms of price *or* output." *NCAA*, 468 U.S. at 109 (emphasis added); *Visa*, 344 F.3d at 238 (declaring that a plaintiff may demonstrate harm to competition "through increases in price or decreases in output or quality"). Refusing to compete in terms of price or product quality is condemned because it "impairs the ability of the market to advance social welfare by ensuring the provision of goods and services to consumers at a price approximating the marginal cost of providing them." *F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447, 459 (1986). For example, in *Nat'l Soc'y of Prof'l Engineers v. United States*, an engineer trade association's rules against price-based bidding was held to be illegal without any evidence of reduced output and contrary to the engineers' argument that their rules increased output by improving building quality. 435 U.S. 679, 693-94 (1978).

In a Section 1 price-fixing case, no independent showing of reduced output is necessary because anticompetitive effect is proved by the fact that the price-fixing agreement artificially inflated the price. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 342 (1979) (holding that injury exists from paying an elevated price for a product*); see also NCAA*, 468 U.S. at 107-08 (1984). Thus, "any agreement reasonably calculated to yield higher prices is presumptively an agreement to reduce output." Areeda/Hovenkamp, *supra*, ¶

- 50 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

1901, at 206. None of the cases relied on by Defendants are to the contrary. *Brooke Group v. Brown & Williamson Tobacco Co.*, for example, concerned a unilateral—as opposed to collective—decision to engage in predatory (*i.e.*, below-cost) pricing. 509 U.S. 209, 233 (1993). In particular, the plaintiff alleged that a cigarette manufacturer was flooding the market with cheap cigarettes and providing discounts in an attempt to drive the plaintiff from the market. *Id.* Unlike price-fixing—which raises prices—"predatory pricing" cases such as *Brooke Group* are disfavored because "[l]ow prices benefit consumers regardless of how those prices are set, and so long as they are not above predatory levels, they do not threaten competition." *Id.* at 223 (quoting *Atlantic Richfield Co.* v. *USA Petroleum Co.*, 495 U. S. 328, 340 (1990). It was in the context of a "disfavored" predatory-pricing claim that the Court stated that "supracompetitive pricing entails a reduction in output." (*See* Defs.' SCACAC Br. at 39 (quoting *Brooke Group*, 509 U.S. at 233.)) In the same opinion, however, the Court recognized that a jury may infer competitive injury even in the face of growing product demand, where there is "some evidence that tends to prove that output was restricted *or prices were above a competitive level.*" *Brooke Group*, 509 U.S. at 234 (emphasis added). Accordingly, the Court partly rested its decision on the plaintiff's failure to present "price and output data" that supported "a reasonable inference that [the defendants] elevated prices above a competitive level." *Id.*

*Salvino* and the *Chicago Bulls* cases are not in the same league as this case, as neither case supports the proposition that a reduction in output is a prerequisite for an

- 51 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

antitrust claim. In *Chicago Bulls III*, the court did not reach the plaintiff's proof of competitive harm because it remanded for a decision on whether the NBA and its teams were a "single entity" when entering into broadcasting arrangements. *Chicago Prof'l Sports Ltd. Part. v. NBA*, 95 F.3d 593, 600 (7th Cir. 1996) (*Chicago Bulls III*). Thus, when the court stated that "[a] high price is not itself a violation of the Sherman Act," it had not been determined whether the "high price" was the product of a Section 1 "agreement" among competitors or a lawful, unilateral action. *Id.*; *see Verizon Commc'n Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). And in *Salvino* the court granted summary judgment in part because the plaintiff failed to prove its allegation that a revenue-sharing component to the licensing agreement between Major League Baseball and its teams constituted an unlawful price agreement. *Salvino*, 542 F.3d at 320-26. Thus, contrary to Defendants' argument, the plaintiff's failure to prove a reduction in output was not fatal to its claim.

## II.    Viewed in the light most favorable to Class Plaintiffs, the record contains sufficient evidence to persuade a trier of fact that Defendants' rules and default interchange fees reduce output.

Even though Class Plaintiffs do not need to submit evidence of output restrictions to defeat summary judgment for Defendants, they have in fact done so. Defendants' argument that they are entitled to summary judgment because transaction volume has increased during the relevant time period is flawed. (*See* Defs.' SCACAC Br.

- 52 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

at 41-42.)[21] First, this argument confuses the question of aggregate output with the relevant question in an antitrust case—would output have been greater if the challenged conduct had never occurred? *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 502 U.S. 209, 233; *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 88 (D. Conn. 2008).[22] Secondly, Defendants' focus on aggregate transaction volume ignores the effect of their anti-steering restraints. Exclusionary conduct—such as the anti-steering restraints—is successful if it increases the sales of the defendant relative to its rivals. (*See* Herbert Hovenkamp, Federal Antitrust Policy: the Law of Competition and its Practice § 6.4 (3d ed. 2005); Frankel Reb. Rpt. ¶ 303.) Thus, a defendant in an exclusionary-conduct case cannot justify its conduct by arguing that the conduct increased its own sales. *See United States v. Microsoft Corp.*, 253 F.3d 34, 65 (D.C. Cir. 2001) (affirming that Microsoft's commingling of Windows and Internet Explorer was anticompetitive because it enhanced Microsoft's own market share at the expense of rivals).

---

[21]     The fallacies in Defendants' output arguments are also discussed in Class Plaintiffs' opposition to Defendants' motion to exclude the opinions of Dr. Frankel at II.B.&C.

[22]     If the Defendants' proffered rule of law were correct, any defendant could escape liability for fixing prices simply by showing that the number of widgets sold increased during the alleged cartel period. *See EPDM*, 256 F.R.D. at 88; *see also* Cl. Pls.' Br. at 79 (explaining how sales of a product—such as cellular phones—could increase because of increasing demand, even in the face of cartel activity). *See* Areeda/Hovenkamp, *supra*, ¶ 1901, at 207 ("[I]n most cases, and in virtually all per se cases, the impact on output is assessed by inference from the nature of the agreement and surrounding circumstances rather than by actual empirical measurement.")

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

Accordingly, as explained by Dr. Frankel and other experts,[23] a well-recognized effect of anticompetitive conduct by a firm with market power, or a group of firms that collectively have market power, is that the relevant market—*i.e.*, the set of products to which buyers can turn in the face of further price increases in the sale of the price-fixed product—is artificially narrowed. Thus, in the relevant market in the real world with anticompetitive restraints, "output" may stay the same, or even increase, whereas in the "but for" world, without the anticompetitive restraints, the relevant market might include many other products, which would have yielded even greater output. (Frankel Rpt. ¶¶ 87, 97-101.) This effect is so well-recognized that one aspect of it even has a name, the "Cellophane Fallacy," after the now-recognized error made by the Supreme Court in its decision in *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391-92 (1956); (*see also* Frankel Rpt. n.16 (citing George W. Stocking & Willard Mueller, The Cellophane Case and the New Competition, 45 Am. Econ. Rev. 29 (1955).)

Using Dr. Frankel's definition of output, a reasonable trier of fact could conclude that the Defendants' rules and default interchange fees reduce the overall output of goods and services in the economy. As detailed in Class Plaintiffs' affirmative summary-judgment motion, these rules and fees increase merchants' costs of payment-card acceptance. (Cl. Pls.' Br. at 59-61; SUF ¶ 66; Ind. Pls.' CSF § VII A.2.b.) Because the anti-steering restraints prevent merchants from passing on their costs specifically to consumers who pay with the highest-priced cards, they can recover their costs only by

---

[23]     Stiglitz Rpt. ¶¶ 65-66; Vellturo Rpt. ¶¶ 144-50.

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

raising prices to all consumers. (Frankel Rpt. ¶¶ 226-29; CSF ¶ 78(b).) Based on the basic economic principle that increases in price lead to decreases in quantity demanded, Dr. Frankel concludes that Defendants' rules and interchange fees have the effect of reducing the total output of goods and services in the economy. (Frankel Rpt. ¶¶ 226-29.)

The output effect of Defendants' practices is not limited to overall output. As Class Plaintiffs demonstrated in their affirmative summary-judgment motion, Defendants' rules and default interchange fees have undisputedly decreased acceptance among certain segments of merchants. (Cl. Pls.' Br. 68-72; SUF ¶¶ 71-72.) The record also contains "natural-experiment" evidence from Australia that, after the RBA capped interchange fees and forced the networks to repeal their no-surcharge rules, Visa and MasterCard transaction volume, the number of Visa and MasterCard cardholders, and the number of merchant-acceptance locations, increased. (SUF ¶ 22.) Class Plaintiffs have also presented evidence that the supracompetitive profits that U.S. banks derive from the collective setting of interchange fees, combined with the lack of competition from other payment systems, has caused the banks and networks to inhibit implementation of superior technologies that have taken hold in other industrialized countries. (CSF ¶ 80.3.)

Thus, the combined effects on merchant acceptance and substitutability, aggregate prices, and technological developments, combined with Australian evidence, are sufficient to persuade a trier of fact that defendants' rules and interchange fees

- 55 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

reduce output. *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699-99 (1962) (holding that the effect of all of a defendant's conduct must be viewed *in toto*); *see also F.T.C. v. Staples, Inc.*, 970 F. Supp. 1066, 1076-77, 1082 (D.D.C. 1997) (preliminarily enjoining merger based, in part, on "natural experiment" evidence that merging office superstores had lower prices in geographic markets with a greater number of office superstores).

## Part Five

### Disputed material issues of fact preclude summary judgment on Class Plaintiffs' inter-network conspiracy claims.

Defendants erroneously assert that Class Plaintiffs have abandoned their inter-network conspiracy claim. While Class Plaintiffs no longer seek damages for these claims, as Defendants correctly point out, Class Plaintiffs continue to seek declaratory and injunctive relief. (SCACAC Count Five & ¶¶ 324-25.)

Defendants also err when they assert that Class Plaintiffs "can present no evidence whatsoever that would tend to exclude the possibility that Visa and MasterCard have acted independently." (Defs.' SCACAC Br. at 44.) To the contrary, Class Plaintiffs have presented evidence that Visa and MasterCard agreed to enact "twin policies" not to compete on price for merchant acceptance and have also submitted evidence of "plus factors" that strengthen the inference of an agreement.

At summary judgment, a plaintiff need only present direct or circumstantial evidence that reasonably tends to prove the defendants had a "conscious commitment

- 56 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 456 U.S. 752, 768 (1984). A plaintiff can defeat summary judgment by showing that "the inference of conspiracy is reasonable in light of competing inferences." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). Courts should therefore avoid the "trap" of "suppos[ing] that if no single item of evidence presented by the plaintiff points unequivocally to conspiracy," summary judgment for the defendant is appropriate. *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655 (7th Cir. 2002) (Posner, J.). Because plaintiff must often rely on circumstantial evidence to prove a price-fixing agreement, courts allow plaintiffs to rely on "plus factors" in addition to parallel conduct. *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253-54 (2d Cir. 1987). These plus factors "serve as proxies for direct evidence of an agreement." *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004).

## I.   Defendants engaged in an inter-network conspiracy by adopting "twin policies" not to compete with each other on price.

Viewed in the light most favorable to Class Plaintiffs, the record establishes that Visa and MasterCard engaged in an unprecedented change in pricing structure in 2002, which followed their announcement of twin policies "not to be disadvantaged" (Visa) and to adopt a "competitive response" (MasterCard). (CSF ¶¶ 84.3, 84.6.) These policies resulted in stair-step price increases by the networks. (CSF ¶¶ 84.13-84.16.)

Before 2002, MasterCard had historically maintained an average effective interchange rate that was 3-5 basis points higher than Visa's. This changed on May 30,

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

2002, when Visa's board—which at the time consisted solely of representatives of member banks—adopted a policy that it would "not be competitively disadvantaged" vis-à-vis MasterCard's effective interchange-fee rates and American Express's merchant-discount rates. (CSF ¶ 84.3.) At this time, many of these banks also served on important MasterCard committees. (SUF ¶ 18 & n.57.) Visa's policy was adopted after discussions with its member banks and continually reiterated in subsequent interactions with issuers. (CSF ¶ 84.3.) In June 2002, Visa publicly announced its new policy, along with the attendant interchange increases to match MasterCard. (CSF ¶ 84.5.) When MasterCard became aware of Visa's policy not to be disadvantaged on interchange fees, it abandoned its previous strategy to maintain a 3-5 basis point advantage and adopted a reciprocal policy of "competitive response" to Visa. (CSF ¶ 84.6.) MasterCard's strategy for achieving parity is to copy Visa's interchange rates for each card product within each card type (*i.e.* debit, consumer credit, and commercial). (CSF ¶ 84.11.) For example, MasterCard matches the interchange rates on Visa's four types of consumer credit cards, which vary by interchange rate and cardholder rewards. (CSF ¶ 84.11(b).) Visa acknowledges that its interchange structure is "easily emulated" by MasterCard. (CSF ¶ 84.4(g).)

      After the networks announced their twin policies, their pricing behaviors abruptly changed. The gap in interchange fees between the networks disappeared, as the networks' interchange fees increased in parallel fashion. As each network generally adjusted its interchange fees twice per year, this pricing pattern is not likely to result

- 58 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

from coincidence alone. (CSF ¶¶ 84.13-84.16); *see High Fructose Corn Syrup*, 295 F.3d at 659 (holding that a change in course strengthened the inference of an agreement). Internal documents from both networks reveal that the networks were adjusting their interchange fees with the purpose and effect of achieving their stated goal of parity:

- On January 3, 2003, Visa's William Sheedy recommended a telephonic board meeting to match MasterCard's increase, which occurred 11 days later. (CSF ¶ 84.14.) This interchange-fee-rate adjustment was out of the ordinary because both networks typically modified interchange fees twice annually, once in April and once in October. (CSF ¶¶ 36.4-36.5.)

- After MasterCard set its interchange fees for April 2004, at a December 2003 board meeting, MasterCard's Steve Jonas predicted that Visa was "planning to make changes to their current [debit] rates – the very rates that we are 'matching.'" (CSF ¶ 84.15(a).) When Visa raised its debit rates as predicted, MasterCard not only matched its rates but also matched Visa's tiered interchange structure for debit, even though it had never used one before. (CSF ¶ 84.15(b-c).)

- But when Visa announced additional changes just three months later, MasterCard analyzed these rate changes and concluded that "no immediate rate/Board action is recommended" because "Visa achieved parity." (CSF ¶ 84.15(d).) This statement tends to show that MasterCard's board acted to change interchange fees only when its goal of "parity" became out of line.

These examples of back-and-forth announcements between the networks demonstrate how the networks' interchange-fee increases were not unilateral decisions to increase fees, but rather communications to arrive at agreement on effective interchange rates. *See Todd v. Exxon Corp.*, 275 F.3d 191, 212-13 (2d Cir. 2001) (Sotomayor, J.) (overturning dismissal on plaintiffs' claim that information sharing allowed defendants to communicate to arrive at an agreement).

- 59 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

## II.     The record contains evidence of plus factors that weigh against summary judgment.

In this case, Class Plaintiffs have presented evidence of four well-recognized plus factors that buttress their evidence of an agreement based on the networks' twin policies: (i) but for an agreement, the networks' "twin policies" would not have been in their independent interests; (ii) a motive to conspire; (iii) a high degree of communication between the networks through their dual member banks; and (iv) the susceptibility of the industry to collusion. *See High Fructose Corn Syrup*, 295 F.3d at 655, 659; *In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp.2d 385, 418 (S.D.N.Y. 2003). When viewed together, these factors create an inference of conspiracy strong enough to defeat summary judgment for Defendants. *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-99 (1962).

### A.     Class Plaintiffs present evidence that, but for an illegal agreement, the networks' "twin policies" not to compete on price for merchant acceptance would have been against their independent interests.

Evidence of defendants acting against the independent interests that they would have in a competitive market is one of the strongest plus factors. *See Re/Max Int'l v. Realty One*, 173 F.3d 995, 1009-10 (6th Cir. 1999). In a competitive market, either network could gain market share by offering merchants lower interchange fees, possibly in exchange for those merchants dropping other acceptance brands. (Frankel Rpt. ¶ 257.) As Visa's William Sheedy recognized, the gains to the price-cutting network could increase as the price gap widened and merchants began dropping the higher-priced

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

card brand. (CSF ¶ 84.21.) To avoid acceptance losses, the rival network would likely also drop its fees and begin competing aggressively for merchant acceptance—a move that would not have served the interests of the banks that owned and governed the networks in 2002. (*Id.*, CSF ¶ 84.21; SUF ¶¶ 7-10, 13-18; Frankel Rpt. ¶ 257.) When the networks announced publicly, and to their dual members, that they would maintain parity instead of competing for merchant acceptance, Visa and MasterCard provided assurances to each other that this type of "ruinous competition" would not occur. *See Addyston Pipe & Steel Co. v. United States*, 175 U.S. 211, 235-37 (1899); (Frankel Rpt. ¶ 262.)

**B.     The record contains evidence that Defendants had a motive to conspire.**

The record contains evidence that Defendants had a profit motive to ensure that MasterCard and Visa interchange fees increased in step with each other. *See Apex Oil Co. v. Di Mauro*, 822 F.2d 246, 254 (2d Cir. 1987) (recognizing motive to conspire as a plus factor). Dr. Frankel recognizes that "independent" Visa and MasterCard entities may have had an incentive to undercut each other on interchange fees to expand merchant acceptance, as neither of the networks kept any of the interchange fees itself. (Frankel Rpt. ¶¶ 257-59.) But the networks were far from "independent." Instead, both Visa and MasterCard were controlled by banks, which benefit from high interchange fees. (SUF ¶¶ 9, 16, 45(a), 45(b), 55(i).) The motive to conspire therefore becomes clear; the banks understood that interchange-fee based competition by the networks would

- 61 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

negatively affect their revenues and persuaded the networks to guarantee that they would not engage in such competition. (Frankel Rpt. ¶¶ 263-65.) In fact, Visa itself argued in previous litigation that a bank that issued cards on two competing networks would have an incentive to act in a way that guaranteed the networks would increase interchange. Visa Mem. Sup. J. R. 50(b) at 48, *MountainWest Financial v. VISA U.S.A. Inc.*, 2:91-CV-0478 (D. Utah Nov. 24, 1992) (attached at 2d Marth Aff. Ex. __.)

### C. The record contains evidence that duality between Visa and MasterCard facilitates the inter-network conspiracy.

This Court and the Southern District of New York have both recognized that the policy of duality, which facilitates high-level inter-firm communications (a well-recognized plus factor) between Visa and MasterCard, at the very least facilitates parallel conduct. *See Visa Check*, 2003 WL 1712568, at *6; *In re Currency Conversion Fee*, 265 F. Supp. 2d at 419.

Throughout the relevant period member banks had 

- 62 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

████████████████████████████ (CSF ¶ 84.17-84.18.)██████████████

████████████████████████████(CSF ¶ 84.18.)

Combined with the other plus factors, duality helps maintain the inter-network agreement. The fact that the major member banks know each network's competitive plans increases the banks' ability to hold the networks to their agreement to maintain interchange-fee parity. *See Currency Conversion Fees*, 265 F. Supp. 2d at 419.

### D.     The payment-card industry is highly susceptible to collusion.

Class Plaintiffs have adduced evidence demonstrating that the market for network services is highly concentrated and susceptible to collusion. (*See* Frankel Rpt. ¶¶ 123-31, 263-64.) Courts recognize that a market is susceptible to collusion when, among other things, products are homogenous, few sellers exist in the market, customer demand is inelastic, and prices are transparent. *See, e.g., High Fructose Corn Syrup*, 295 F.3d at 656-57; *In re TFT-LCD Litig.*, 586 F. Supp. 2d 1109, 1114 (N.D. Cal. 2008) (upholding complaint alleging market concentration and homogeneous products). Because these factors make it easier for firms to illicitly coordinate their conduct, they also may strengthen the inference of conspiracy.

Given the steady stream of antitrust judgments against Defendants, it is hardly surprising that the payment-card industry in the United States is susceptible to collusion. Visa's ████████████████████████████████████████████████

████████████████████. (CSF ¶ 84.3(g).) Defendants have contributed to this homogeneity

- 63 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

by creating systems of rules that are nearly identical for Visa and MasterCard, which decreases the ability of merchants to distinguish between the networks, and makes agreement more likely. (SUF ¶¶ 19-27.) The inelasticity of customer (*i.e.,* merchant) demand for network services is demonstrated by the fact that MasterCard and Visa can raise prices without losing merchant acceptance. (SUF ¶¶ 46, 56, 93, n.224.) Finally, as Class Plaintiffs demonstrated in their affirmative summary-judgment motion, the relevant markets are highly concentrated, which facilitates the monitoring of an inter-network agreement. (SUF ¶¶ 63, 107-109.)

Allegations reflecting a market's susceptibility to collusion through market concentration and other factors support the inference of such collusion. *See, e.g., High Fructose Corn Syrup*, 295 F.3d at 656. Class Plaintiffs' evidence demonstrating a market susceptible to conspiracy provides a further basis upon which to deny Defendants' motion for summary judgment on the inter-network conspiracy claims.

## III.   Class Plaintiffs present expert testimony demonstrating how the networks' "twin policies" and the plus factors support the inference of an inter-network agreement to fix interchange fees.

Defendants ask the Court to grant summary judgment on Class Plaintiffs' inter-network conspiracy claims in part because they claim that Dr. Frankel "carefully did not opine" that certain facts consistent with coordination between Visa and MasterCard were inconsistent with permissible behavior. But the law does not require plaintiffs to present expert testimony that conclusively disproves all legitimate explanations for the

- 64 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

defendants' conduct. *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 660-61 (7th Cir. 2004) (Posner, J.). That is the province of the jury. *Id.* at 661. Rather, expert testimony is helpful to explain how the facts demonstrate that a market was susceptible to collusion or behaved anticompetitively. *Id.* at 655. As demonstrated by the references to Dr. Frankel's report throughout Part Five, his report has demonstrated "that there are certain economic characteristics of the market and of some conduct that heightens concern." (Frankel Rpt. ¶¶ 253-65; Defs.' SUF ¶ 84.)

## Part Six

### Defendants' rules and default interchange fees are subject to Section 1 of the Sherman Act after the networks' IPOs.

As fully set forth in Part Five of Class Plaintiffs' Motion for Summary Judgment, nearly every aspect of Defendants' conduct is restricted by agreements among the banks and networks, which establishes that Section 1 "agreements" exist as a matter of law, even after the networks' restructurings. Moreover, Class Plaintiffs have put forth evidence that the networks' IPOs were conducted with the purpose and effect of preserving those restrictive agreements. Against this factual record, Defendants cannot meet their burden of showing that no triable issues of fact remain or that they are entitled to judgment as a matter of law.

- 65 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

I.      **The Bank Defendants did not effectively withdraw from the pre-IPO conspiracies.**

Class Plaintiffs respectfully submit that the networks' IPOs did not as a matter of law constitute withdrawals. (*See* Cl. Pls.' Br. at 108-11.) At the very least, however, Defendants have not carried their burden to dispel all material issues of fact on the issue of withdrawal. "A mere change of policy, a mere cessation of involvement is not effective withdrawal from a conspiracy." *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 616 (7th Cir. 1997) (Posner, J.); *accord United States v. Berger*, 224 F.3d 107, 118 (2d Cir. 2000). Defendants correctly point out that a defendant must publicly announce its withdrawal and take actions inconsistent with the conspiracy. (Defs.' IPO Br. at 14-15.) But they omit two other Second Circuit requirements: (i) taking no "subsequent acts to promote the conspiracy" and (ii) receiving no additional benefits from the conspiracy. *Berger*, 244 F.3d at 118-19 (citing *United States v. Eisen*, 974 F.2d 246, 269 (2d Cir. 1992) and *United States v. Nerlinger*, 862 F.2d 967, 974 (2d Cir. 1988)).

Two cases illustrate the distinction between receiving and ceasing to receive the cartel's benefits. In *Morton's Market v. Gustafson Dairy*, cited by Defendants, a company that sold the dairy that had engaged in price fixing on school-milk contracts and completely exited the market was held to have effectively withdrawn. 198 F.3d 823, 839 (11th Cir. 1999). The court contrasted this effective withdrawal with a scenario that arose earlier in the litigation, in which a different defendant was held not to have effectively withdrawn by stating its withdrawal but continuing to honor the price-fixed

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

contracts. *Id.* In *United States v. Eisen,* by contrast, an attorney who had resigned from a law firm that engaged in illegal activities was held not to have effectively withdrawn because he continued to receive proceeds from the firm's illegal activity. 974 F.2d at 269; *see also Morton's Mkt.,* 198 F.3d at 839 (distinguishing *Eisen*); *see also United States v. Sax,* 39 F.3d 1380, 1387 (7th Cir. 1995) (holding that sale of drug-dealing enterprise, standing alone, was insufficient to withdraw from conspiracy).

Viewed in the light most favorable to Class Plaintiffs, the record contains sufficient evidence to convince a reasonable trier of fact that the Bank Defendants did not effectively withdraw from the pre-restructuring conspiracies. Documents and testimony from both networks indicate that ██████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████ (SUF ¶¶ 6-16, 41, 52.) ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████

As fully discussed in Part Seven below, the banks implemented restraints on the networks' conduct that assured that the post-restructuring networks would not alter their behavior. (CSF ¶¶ 156.18-156.19.) And the limited discovery that the Class Plaintiffs have received on this topic confirms that ██████████████████████

- 67 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

███████████████████████████████████

███████████████████████████████████████

████████████████████████████ the banks continue to earn

billions of dollars annually in supracompetitive interchange fees (Frankel Rebuttal Rpt.

§§ 6, 8.) Thus, far from disavowing the goals of their conspiracy, Bank Defendants

merely set up new entities to continue to administer those conspiracies and ensure that

they continued to profit from their activities. *See Morton's Mkt.*, 198 F.3d at 839; *Eisen*,

974 F.2d at 269. In fact, Defendants' arguments for withdrawal in this case are weaker

than the defendants' arguments in *Eisen* and *Morton's Market*, because in addition to

profiting from the pre-IPO conspiracies, the banks ███████████████████

██████████████████████████████████

████████████████████████████████████

████████████████████

## II. Viewed in the light most favorable to Class Plaintiffs, the record contains sufficient evidence to convince a fact finder that the setting of default interchange fees and anti-steering restraints constituted agreements among competing banks and the networks, even after the networks' restructurings.

Defendants urge this Court to view each individual bank's adherence to network

rules individually and to conclude that no conspiracy exists if the individual banks may

have independent reasons for adhering to the networks' rules and default interchange

fees. (Defs.' IPO Br. at 16-18.) This argument contradicts the well-established antitrust

- 68 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

principle that "the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Fears v. Wilhelmina Model Agency, Inc.*, No. 02 Civ 4911 (HB), 2004 U.S. Dist. LEXIS 5045, at *13 (S.D.N.Y. Mar. 29, 2004) (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)). The "separate parts" of the conspiracy are certainly numerous: the banks adopted the challenged network rules through the networks' boards, ██████ ████████████████ those rules and the network-established default interchange fees, and agree to restructure the networks to preserve the very same rules and fees that they created when they governed the networks. (SUF ¶¶ 19, 20, 21, 25.) And in determining the effect of a restraint, courts consider the number of firms that make use of a practice in a given industry, and conduct close scrutiny to schemes that are adopted by many competing firms. *Standard Oil Co. v. United States*, 337 U.S. 293, 309, 314 (1949) (noting the import of "widespread adoption of such contracts by Standard's competitors"). But the cumulative effect of those agreements is simple and straightforward – merchants pay inflated prices to accept payment cards. (SUF ¶¶ 66-70.) Below Class Plaintiffs set out three separate legal bases for concluding that Section 1 "agreements" exist post-restructuring, any one of which is sufficient to defeat Defendants' motion.

- 69 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

### A.   The post-restructuring networks continue to coordinate the competitive activities of the member banks.

As Class Plaintiffs fully explain on pp. 103-06 of their affirmative summary-judgment brief, there is no material dispute of fact that the post-restructuring Visa and MasterCard networks continue to coordinate the competitive activity of their member banks. Based on the Supreme Court's recent decision in *American Needle,* this coordination of competitors' activities is sufficient to bring decisions regarding the anti-steering restraints and the level of default interchange fees within the scope of Section 1. *See Am. Needle v. NFL,* 130 S. Ct. 2201, 2212-13 (2010); Herbert J. Hovenkamp & Christopher R. Leslie, *The Firm as Cartel Manager,* 64 Vand. L. Rev. 813, 816, 825, 871-72 (2011) ("Hovenkamp/Leslie") (noting that the "important question" in *American Needle* was "that NFLP was making decisions regarding 'the teams' separately owned intellectual property'") ███████████████████████████████████████████ ██████████████████████████████ *Am. Needle,* 130 S. Ct. at 2213 ("An ongoing § 1 violation cannot evade § 1 scrutiny simply by giving the ongoing violation a name and a label.")

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

**B.     Class Plaintiffs have presented sufficient evidence to at least raise a triable issue of fact regarding the existence of post-restructuring conspiracies to set interchange fees and impose the anti-steering restraints.**

**1.     Class Plaintiffs have presented sufficient evidence of a post-restructuring "hub-and-spoke" conspiracy within each network.**

Neither the record nor the law supports Defendants' contention that, ███████████

████████████████████████████████████████████

████████████████████████████████████████ and cleansed the

networks and banks of all prospective Section 1 liability. (Defs.' IPO Br. at 15.) As Class

Plaintiffs' affirmative summary-judgment brief, a court may infer a horizontal

agreement even without direct communications among horizontal competitors. (Cl. Pls.'

Br. at 104-05, 107-08.) This type of conspiracy—a "hub-and-spoke" conspiracy—exists

when competitors make agreements with a common "hub" with the knowledge that

their competitors are also participating and the competitors' participation is necessary

to effectuate the agreement. *Kotteakos v. United States*, 328 U.S. 750, 755 (1946); *see Toys*

*"R" Us Inc. v. FTC*, 221 F.3d 928, 936 (7th Cir. 2000) (noting potential conspiracy where

"the only condition on which each toy manufacturer would agree to [retailer's]

demands was if it could be sure its competitors were doing the same thing").

The evidence that Class Plaintiffs presented in their Statement of Undisputed

Facts is sufficient to at least preclude summary judgment for Defendants, including:

- 71 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

- The banks created the "new" networks by horizontal agreement (CSF ¶¶ 155(a); SUF ¶¶ 33, 37.)

- ██████████████████████████████████████████
  ███████████████████████████████
  ████████████

- ██████████████████████████████████████████
  ██████████████████████████████████████████

- ███████████████████████████████████████
  ██████████████████████████████████████
  ████████

In addition to the evidence cited in Class Plaintiffs' affirmative summary-judgment motion, the record contains evidence that the banks added further safeguards against changes to the networks' business models via the ownership caps and veto rights described in Part Seven below. Thus, viewed in the light most favorable to Class Plaintiffs, the record can amply support a finding that the networks' restructurings had the effect of appointing fee-setting agents to set the interchange fees and rules that the banks knew they could no longer directly set.

Defendants' argument that because the banks themselves do not set interchange fees, they cannot be held liable for creating the entities that set those fees or for agreeing to abide by those fees contradicts antitrust case law and policy. Courts regularly hold that horizontal competitors violate Section 1 when they appoint a joint-selling agent to price their products, as opposed to setting prices themselves. *E.g., Citizen Publ'g Co. v. United States*, 394 U.S. 131, 134-36 (1969); *High Fructose Corn Syrup*, 295 F.3d at 655.

- 72 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

Professor Hovenkamp states that these holdings are sound because, "[f]rom an antitrust standpoint, there is no difference between agreeing to abide by [the decisions of a cartel ringleader] and agreeing to cede decision making authority to a separate entity." Hovenkamp/Leslie, 64 Vand. L. Rev. at 850. According to Professor Hovenkamp, "[i]t would be foolish for antitrust law to hold that competitors' use of a joint sales agent—or any other single entity—renders them immune from Section One scrutiny." *Id.* at 851.

2. **The banks have an interest in imposing supracompetitive interchange fees and the anti-steering restraints only because the networks' rules guarantee that all other banks will do the same.**

Defendants' argument that the continuation of interchange fees and the anti-steering restraints after the restructurings is *per se* legal, so long as it is in any bank's interest, ignores the fact that their own rules create the incentive for the banks to continue their anticompetitive activity. (SUF ¶¶ 63.1; *see also* Frankel Rpt. ¶¶ 230-32.) It also ignores the fact that these rules were put in place *by the banks themselves* (SUF ¶¶ 19, 20, 23; Frankel Rpt. ¶¶ 231-32.) These unmentioned facts put Defendants' rules and default interchange fees squarely within the Supreme Court's recent language that "illegal restraints often are in the common interests of the parties to the restraint." *Am. Needle*, 130 S. Ct. at 2213.

To the extent that the banks' independent interest does matter, however, the Second Circuit illustrates how this fact should be applied. *Starr v. Sony BMG Music Entm't*, 592 F.3d 314 (2d Cir. 2010). In *Starr*, a class of digital-music purchasers asserted

- 73 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

a Section 1 challenge to the major record labels' joint creation of digital-music-download services, which allegedly charged supracompetitive prices for music and placed onerous restrictions on consumers' ability to play downloaded music on various devices. *Id.* at 318-19. The Second Circuit rejected the record labels' argument that they had independent interests to raise prices and impose use restrictions, reasoning that such conduct was in each's interest only because "their rivals were doing the same." *Id.* at 327; *accord In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360-61 (3d Cir. 2004).

When viewed in the light most favorable to Class Plaintiffs, the record in this case would allow a jury to draw the reasonable inference that each bank is able to impose supracompetitive interchange fees and anti-steering restraints only because its "rivals [are] doing the same." *Starr*, 592 F.3d at 327; *see also Matsushita*, 475 U.S. at 588. Class Plaintiffs presented evidence—undisputed by Defendants ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████ Class Plaintiffs' expert, Dr. Frankel concludes that, absent these agreements, competition would not have allowed interchange fees to exist. (Frankel Rpt. ¶¶ 296-97.) Moreover, if these rules didn't exist, an issuer could gain incremental volume by allowing merchants to discount its cards or surcharge others. (*See* Velltuno Rpt. ¶ 190.) Without the rules prohibiting steering, it would not be in the individual Bank Defendants' interest to keep merchants from preferring their cards. In

- 74 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

other words, in a competitive market, it would not have been "in each individual defendant's self-interest" to impose supracompetitive interchange fees and anti-steering restraints. *Starr*, 592 F.3d at 327. The rules provide the guarantee that "the defendant's rivals [will do] the same." *Id*.

### C.   Even without a horizontal agreement among banks, vertical agreements continue to restrict the competitive activities of the banks.

Even if each of the networks' interchange fees, each of their rules, and the banks' decisions to adhere to and enforce those rules were purely "unilateral" actions after the restructurings, the effect of the banks' agreements would still be subject to Section 1 under the rule of reason. As Class Plaintiffs argued in Part Five of their affirmative summary-judgment motion, even purely vertical agreements that have the effect of inflating prices may be challenged under the rule of reason. (Cl. Pls. Br. at 105-06 (citing *Leegin Creative Leather Prods. Inc. v. PSKS, Inc.*, 551 U.S. 877, 897-98 (2007).) The record is undisputed—and at the very least not dispositive in Defendants' favor—that Defendants' rules and interchange fees in fact increase merchants' costs of accepting payment cards. (SUF ¶¶ 66-70.)

- 75 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

**Part Seven**

**Disputed issues of material fact preclude summary judgment on Class Plaintiffs' "IPO claims" under Section 7 of the Clayton Act.**

I.  **Section 7 of the Clayton Act does not require that the banks retain control over the post-restructuring networks for the restructurings to have been likely to substantially lessen competition.**

Section 7 of the Clayton Act requires that plaintiff demonstrate that a transaction may substantially lessen competition. 15 U.S.C. § 18. In contrast to Sections 1 and 2 of the Sherman Act, which are focused on conduct, Section 7 of the Clayton Act focuses on transactions and seeks to prevent the *creation* of firms that, either unilaterally or in connection with other firms, have the ability to harm competition. *F.T.C. v. H.J. Heinz Co.*, 246 F.3d 708, 713 (D.C. Cir. 2001); Lawrence A. Sullivan & Warren S. Grimes, *The Law of Antitrust* § 9.1, at 511 (2000). Thus, Section 7 has no independent requirement that the parties that execute a transaction continue to control the firm that they created when that firm itself has the power to control prices or exclude competition. *See United States v. E.I. du Pont de Nemours*, 366 U.S. 316, 328-29 (1961) (describing Section 7 as "outlaw[ing] a particular form of economic control . . . acquisitions which tend to create a monopoly of any line of commerce."); *see generally* Sullivan & Grimes § 9.1 at 511-12 (discussing history and policy behind "prophylactic" nature of Section 7). If this requirement did exist, virtually no merger case could ever succeed, as the merging parties typically cease to exist or are subsumed within the surviving corporate entity.

- 76 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

In support of their position that Section 7 contains a separate post-transaction "control" element, Defendants rely solely on a misreading of Judge Gleeson's order dismissing the First Supplemental Complaint. Judge Gleeson bases the dismissal on the lack of an allegation that the restructuring "will not result in an [independent MasterCard] *or* that this entity will continue or impose the restraints plaintiffs fear." (Or. at 21, Nov. 25, 2008 (emphasis added).) Thus, by the terms of Judge Gleeson's order Class Plaintiffs can prevail by showing that the "independent MasterCard" or Visa continues to harm competition. In the case of a consummated transaction such as the restructurings, a plaintiff can meet its burden of demonstrating harm to competition by showing post-transaction price increases. *See In the Matter of Polypore Int'l*, No. 9327, 2010 FTC LEXIS 97, at *80-82 (Dec. 13, 2010).

Class Plaintiffs have presented sufficient evidence for a trier of fact to conclude that post-restructuring increases in interchange fees to merchants would not have been possible without the IPOs. It is undisputed that interchange fees increased after each network's restructuring (CSF ¶¶ 156.1, 156.2; *see* SUF ¶ 63.) The pre-restructuring planning documents from each network indicate that ███████████████████

██████████████████████████████

████████████████████████████████

████████████████████████

████████████████████████████

████████████████████████████

- 77 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████

Class Plaintiffs also presented evidence that ████████████████

███████████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

██████████

██████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████████

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

Defendants seem to suggest that this Court should disregard the evidence above if Class Plaintiffs cannot eliminate the possibility that ▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆ (Defs.' IPO Br. at 12-13.) This argument misstates the law. A plaintiff must show that the challenged conduct—the restructurings in this case—caused competition to be weaker than before the conduct; it need not also compare the conduct with a "but-for" world that never existed. *See EPDM*, 256 F.R.D. at 88 (D. Conn. 2009). And as fully set forth in Section II.B. below, the banks created the networks' rules in such a way that it guaranteed that even the hypothetical "independent" party would have a motive to maintain supracompetitive interchange fees.

## II.   Even if Class Plaintiffs had to demonstrate post-IPO bank control, Plaintiffs have raised material issues of fact on the extent of the banks' control over the post-IPO networks.

### A.   "Control" in the antitrust sense requires an evaluation of the competitive incentives created by a transaction.

Antitrust cases often find that firms can "control" another firm's competitive conduct with less than full "control" in the corporate sense. For example, the Supreme Court held that the partial acquisition of General Motors ("GM") stock by DuPont, which made automobile furnishings and fabrics, was anticompetitive even after GM

- 79 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

divested itself of all voting rights in DuPont and held no more than 23 percent of its common stock. *DuPont,* 366 U.S. at 334-35. The Court reasoned that DuPont's equity interest in GM, combined with the "special relationship" that the two companies had, was likely to give GM an incentive to act in DuPont's interest even if it meant foreclosing competition. *Id.* at 332. Similarly, in *United States v. Dairy Farmers of America,* the Sixth Circuit reversed summary judgment on a Section 7 claim involving a firm's acquisition of nonvoting shares in two competing milk processors equivalent to a 50-percent interest in each company. *United States v. Dairy Farmers of Am.,* 426 F.3d 850, 852-53 (6th Cir. 2005). The court reasoned that the acquisitions were anticompetitive because they reinforced the anticompetitive structure of the industry – in which the target companies previously engaged in bid rigging and had a joint venture with the acquirer – that gave the processors an incentive to "keep [their common shareholder] happy." *Id.* at 854-55. Finally, in *McTamney v. Stolt,* the court denied a motion to dismiss a plaintiff's claim that an unconsummated acquisition was likely to lessen competition because it gave the acquiring company the right to pay the target's creditors, which could allegedly be used to drive the target out of business. *McTamney v. Stolt Tankers & Terminals (Holdings), S.A.,* 678 F. Supp. 118, 120-21 (E.D. Pa. 1987).

Viewed in the light most favorable to Class Plaintiffs, the record indicates that the banks retained effective control over the networks in at least two complimentary ways. First, the networks maintained the rules that created the "hold-up problem," which guaranteed that the networks would "compete" with each other only by

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

increasing interchange fees to incent issuance rather than reducing fees to attract merchant acceptance. (SUF ¶¶ 31, 32; Frankel Rpt. ¶¶ 209-10, 217; Murphy Rpt. ¶ 263-72.) Second, the banks gave themselves veto rights in the post-restructuring networks and installed limitations on any single party's ownership share in the networks, which gave them further assurance that the networks would not stray from their interests. (Defs.' SUF ¶¶ 143-47, 149, 152-54; CSF ¶¶ 149-50, 156.18, 156.19.)

> **B.** **The restructurings perpetuate a market structure in which the networks can "compete" only by increasing interchange fees to issuing banks.**

Documents and testimony from each network's pre-restructuring planning processes indicate that ██████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ In the case of MasterCard, it publicly stated that its restructuring would not change the way that its interchange fees were set, and the European Commission found that the banks approved the restructuring only after they learned that "the banks' interests will continue to be preserved." (SUF ¶¶ 36(b), 36(j); *see also* SUF ¶ 36.)

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

## C. The banks installed corporate-control devices that prevented the post-restructuring networks from taking actions adverse to the banks' interests.

### 1. Documents and deposition testimony indicate that the banks intended the corporate-control devices to preserve effective control over the networks.

The record also reveals that, even with the "hold-up problem" in place, the banks were ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

███████████

████████████████████████████████████

████████████████████████████████████████████

- 82 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL



constitute probative evidence of the competitive effects of the takeover

protections and veto rights that the banks put in place. *Microsoft*, 253 F.3d at 59 (D.C.

Cir. 2001) (holding that parties' intent is probative of the competitive effects of their

conduct); *U.S. Football League v. NFL*, 842 F.2d 1335, 1359 (2d Cir. 1988) (same).

### 2. The banks that controlled Visa and MasterCard designed corporate-control mechanisms that preserved bank control over the networks.

The banks' concerns that they might lose control of the post-restructuring

networks led to the adoption of several structural restrictions on the networks.

First, each network prevented any individual owner or group of owners from

acquiring more than a 15-percent equity stake in the new network. (Defs.' SUF ¶¶ 152-

153.) MasterCard's ownership limitation was absolute, while Visa's may be overridden

by a majority vote of its 17-member board. The practical difference between the two

networks' ownership caps is minimal, however, as the six seats that the Visa banks

retained on its board require only three of 11 non-bank votes to maintain the limitation.

(CSF ¶ 152; Fleischer Rpt. ¶ 69).

- 83 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

Second, both networks gave the banks veto rights over mergers, acquisitions, or a network's exit from "the core payments business." While Visa defines "exiting the core payments business" as "no longer operat[ing] a consumer debit/credit payments business," MasterCard leaves the term undefined. (CSF ¶¶ 149, 150(b).) MasterCard accomplished its veto right with the creation of a new class of bank-owned "Class M" shares, which must have approved any of the extraordinary transactions mentioned above.[24] (Defs.' SUF ¶ 132.) Visa, on the other hand, requires a vote of 80 percent of shares to approve any of these extraordinary transactions, which gives the banks – holders of 50 percent of the outstanding shares at the time of the IPO – an effective veto. (Defs'. SUF ¶ 149; CSF ¶ 149(b).) While MasterCard's Class M shares were extinguished in 2010, for four years they acted as a restraint on MasterCard's activities.

There is at least a triable issue of fact as to whether the right to block an exit from "the core payments business" would have allowed the banks to block a network's decision to eliminate or reduce interchange fees or eliminate the anti-steering restraints. (Defs.' IPO Br. at 8-10.) MasterCard's public filings with the SEC state that it has a "three-tiered business model," which includes processing transactions and administering the interchange-fee system. (CSF ¶ 150(c).) Thus, its member banks may have argued that, by implication, if MasterCard ceases to administer interchange fees it

---

[24]    The Class M shares were set to sunset once bank ownership in MasterCard fell below 15 percent of total outstanding shares. This occurred on [June 1], 2010. (Defs.' SUF ¶ 153.) The 15-percent ownership limitation remains in place, however, and the MasterCard Foundation continues to hold 10.6% percent of outstanding stock in MasterCard. (CSF ¶ 131(b).)

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

will cease to perform a central function in its stated business model. (*Id.*) And because both networks have taken the position in regulatory proceedings that they could not operate a payment system without interchange, the banks could use those positions to argue that elimination or reduction of interchange would constitute an exit from "the core payments business." (CSF ¶ 150(d).) Even the threat of the banks taking these positions may be sufficient to substantially lessen competition by discouraging the networks' "independent" boards from changing their business model in a way that is adverse to the banks' interests. (*See* Fleischer Rpt. ¶ 31.)

Finally, in the case of MasterCard, the banks preserved their control by creating a charitable foundation in connection with the IPO. (*See* Fleischer Rpt. ¶¶ 42-52.) Foundations have been disfavored as shareholders in the United States because they are typically viewed as applying too little pressure on management to increase shareholder value. (*Id.* ¶ 43.)[25] Having such a shareholder with a significant stake in MasterCard—10% at the time of the IPO—further dilutes the influence that the non-bank shareholders can have over MasterCard. (*Id.* ¶ 48.) The banks that designed the MasterCard restructuring prevented the foundation from selling any of its shares until 4 years after the IPO and, even then may do so only to meet its minimum-charitable-distribution requirement under Canadian law. (CSF ¶ 151(f)-(h).) ███████████████

████████████████████████████████████████████████

---

[25]     According to Class Plaintiffs' expert Victor Fleischer, MasterCard is the first public, for-profit financial-services corporation in the United States to make a foundation a significant shareholder. (Fleischer Rpt. ¶ 42.)

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

█████████further demonstrates that the charitable foundation was a pretextual device to maintain control. (CSF ¶ 151(g); Fleischer Rpt. ¶ 44.)

> ### 3. A reasonable trier of fact may conclude that the corporate-control devices are substantially likely to harm competition by preventing the post-restructuring networks from taking actions contrary to the banks' interests.

Defendants' brief repeats their Rule 12 arguments that the structural restrictions are merely common anti-takeover devices. (Defs' IPO Br. at 9-11) But when the factual record and expert testimony is actually considered, and viewed in the light most favorable to Class Plaintiffs, a trier of fact could readily conclude that the restrictions "make[] fundamental business model changes a practical impossibility for several years following the IPO[s]." (Fleischer Rpt. ¶ 54.) The veto rights of both networks come into play only if management and the board of directors come to the conclusion that a particular transaction would be in the best interest of the equity shareholders. (Fleischer Rpt. ¶ 32.) By definition, therefore, the anti-takeover restrictions and veto rights that were part of the networks' restructurings can only serve to protect the banks' interests to the detriment of the public shareholders. (*See id.*) Thus, Class Plaintiffs have at least raised a triable issue of fact as to whether these restraints contribute to the banks' "effective control" over the networks. (Or., Nov. 25, 2008, at 21.)

Professor Fleischer provides theoretical support for Class Plaintiffs' allegations that the veto rights inhibit change to the networks' business model by increasing the transaction costs associated with any such change. Because the term "core payments

- 86 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

business" is vague — undefined for MasterCard and subject to self-serving bank interpretations for both networks — the threat of a veto discourages management from making any changes to the business model that would be contrary to the banks' interests. (Fleischer Rpt. ¶ 31.) The vagueness of the term also addresses the concern of the pre-restructuring board members that a non-bank entity could acquire a network and change its business model because any acquiring firm would have to account for the probability that the banks would exercise their veto rights to block the change. (*Id*; CSF ¶ 150(b).)

The ownership limitations, for example, go beyond ordinary anti-takeover mechanisms because they prevent even "friendly" acquisitions — *i.e.*, acquisitions supported by management. (Fleischer Rpt. ¶ 36.) Thus, the Defendants' analogy of these restrictions to poison pills and staggered boards fails. Whereas those devices are typically used to force potential suitors to negotiate with a corporation's current board and management, the ownership restrictions in combination with the veto rights guarantees that an acquirer must also have the approval of the banks. (*Id*.) Prof. Fleischer also concludes that disciplining management — another common justification for anti-takeover devices — could not have been the purpose of the ownership restrictions and veto rights because the veto rights were limited to banks, and not given to all shareholders. (Fleischer Rpt. ¶¶ 32-33.) Finally, Prof. Fleischer and MasterCard's corporate designee on restructuring topics agreed that █████████████████████

███████████████████████████████████████████

- 87 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

██████████████████████████ The fact that the banks accepted a reduced value for the shares that they sold to the public indicates that the banks must have believed that they were receiving something of value in exchange.

When all of the potential avenues of bank influence and control are considered together, the law does not support summary judgment for Defendants on the basis that the banks fail to "control" the post-restructuring networks. As in *DuPont* and *Dairy Farmers*, the record indicates that the banks have the "ability to influence the competitive behavior" of the networks without having majority control of either network's board. *See Dairy Farmers*, 426 F.3d at 858 (citing *DuPont*, 353 U.S. at 586). In fact, even without the ownership and control restrictions, the record suggests that the banks approved the restructuring transactions only ███████████████ ███████████████████████████████ The cases that Defendants cite to the contrary are inapposite because only one — *Podiatrist Association* — is an antitrust case and even that case is decided under Section 1 rather than Section 7. *Podiatrist Ass'n, Inc. v. La Cruz Azul de P.R., Inc.*, 332 F.3d 6, 11 (1st Cir. 2003); *see also Dairy Farmers*, 426 F.3d at 858 (discussing Supreme Court decisions holding that Section 7 is concerned with "probabilities not certainties.") The *Podiatrist Association* case is further distinguishable in that, as a Section 1 case, it required concerted action. *Podiatrist Ass'n*, 332 F.3d at 11-12, 14; *see Am. Needle*, 130 S.Ct. at 2209. Moreover, the plaintiffs in that case alleged control only through a minority position on a corporation's board of directors. *Podiatrist Ass'n*, 332 F.3d at 11-12, 14. *Podiatrist Association* is therefore

- 88 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

inapplicable to this case because Defendants maintain control through a market structure created to serve their interests and corporate-control devices that guarantee that the "independent" entity does not veer from those interests. Thus, even if this Court concluded that bank control were a prerequisite to a successful Section 7 claim, it should not grant summary judgment for Defendants on that basis.

## Part Eight

### Summary judgment for Defendants on Class Plaintiffs' fraudulent-conveyance claims is not proper.

"'[O]rdinarily, the issue of fraudulent intent cannot be resolved on a motion for summary judgment, being a factual question involving the parties' states of mind.'" *In re MarketXT Holdings Corp.*, 376 B.R. 390, 401 (Bankr. S.D.N.Y. 2007) (quoting *Golden Budha Corp. v. Canadian Land Co. of Am.*, 931 F.2d 196, 201-02 (2d Cir. 1991). Thus, Defendants bear a heavy burden of showing that facts which would warrant summary judgment are undisputed because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions not those of the judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Plaintiffs request this Court to defer their obligation to respond to Defendants' summary judgment motion on the fraudulent-conveyance claims because Defendants have denied Plaintiffs discovery on significant issues of material fact. Accordingly, pursuant to Federal Rule of Civil Procedure 56(d), Plaintiffs request that the Court order additional discovery on these fact issues. The motion should also be denied because

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

material, disputed fact issues exist, making summary judgment for Defendants inappropriate.

**I.     The Court should stay Plaintiffs' response to the summary judgment motion on the fraudulent conveyance claims and grant Plaintiffs additional discovery under Rule 56(d).**

If a party opposing summary judgment shows by affidavit that it cannot present facts that are needed to support its opposition, the court may deny the motion, defer considering it, or allow time for the party opposing the motion to engage in additional discovery. Fed. R. Civ. P. 56(d). The affidavit required by Rule 56(d) must state: "'(1) what facts are sought [to resist the motion] and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts.'" Rule 56(d) is liberally applied "to safeguard against improvident grants of summary judgment . . . ." *Flores v. Marquez*, No. 96-CV-4305-(JG), 1997 WL 1068675, at *2 (E.D.N.Y. June 27, 1997).

Courts recognize the unfairness of "a party us[ing] an assertion of fact to influence the decision maker while denying its adversary access to privileged material potentially capable of rebutting the assertion.'" *In re County of Erie*, 546 F.3d 222, 229 (2d. Cir. 2008). If at summary judgment a defendant asserts a defense of good-faith reliance upon the advice of counsel, the defendant both waives the privilege and subjects itself to Rule 56(d) discovery. *See, e.g., Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

1257, 1266-68 (5th Cir. 1991). And even if the privilege holder does not formally assert an advice-of-counsel defense, it waives its privilege by making factual assertions that can be rebutted by only examining the privileged materials. *Pall Corp. v. Cuno, Inc.*, 268 F.R.D. 167, 168-69 (E.D.N.Y. 2010).

Additional discovery is warranted because Defendants assert factual defenses in their summary-judgment motion that forfeit their privilege assertions, but have not provided discovery on those facts. In opposition to Class Plaintiffs' actual-fraud and constructive-fraud claims, Defendants rely on counsel's determination that contingent legal liabilities were unquantifiable. On the constructive-fraud claim, Defendants contend that Plaintiffs cannot establish factual disputes under either element of the claim—that MasterCard (1) believed it would incur debts beyond its ability to pay at the time of the IPO and (2) failed to obtain fair consideration for the conveyance of its special-assessment right—because board counsel ███████████████████████ ████████████████████ (Defs.' IPO Br. at 20, 21.) On the actual-fraud claim, Defendants contend that ████████████████████████████ ██████████████████ Plaintiffs cannot raise a material issue of fact on MasterCard's belief in its financial condition, using either direct evidence of MasterCard's actual intent or circumstantial evidence of the "badges of fraud." (Defs.' IPO Br. at 22, 24.)

In addition, Defendants rely on the absence of evidence, resulting from the withholding of documents that reflect board-counsel's advice, to rebut fact issues that

- 91 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

Plaintiffs argue preclude summary judgment. As to MasterCard's financial condition, Defendants assert that Class Plaintiffs cite "███████████████████████████████ ██████████████████████████████ ███████████████████████████████████ ████████████████████████████████████ ██████████████████ To the extent that Class Plaintiffs do not have greater support for their claims, it is because Defendants have withheld the evidence that they claim is necessary.

The discovery record alludes to some of the withheld evidence that will support Plaintiffs' claims. ████████████████████████████ █████████████████████████████████ ████████████████████████████ █████████████████████████████████ ████████████████████████████████ ███████████████████████████ ██████████████████████████████ ██████████████████████████████ ████████████████████████████ ███████████████████████████████ ██████████████████████████

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

If the Court orders additional discovery under Rule 56(d), MasterCard will be required to produce a number of documents previously withheld or redacted as privileged.[26] Class Plaintiffs may also reopen the depositions of key MasterCard executives, including potentially CEO Robert Selander, Mr. Hanft, and the 30(b)(6) deposition concerning MasterCard's restructuring, to examine these witnesses on any additional documents ordered produced and on lines of questioning that MasterCard's counsel shut down. (Burke Aff. ¶ 9.)

## II.   Genuine issues of material fact preclude summary judgment on Plaintiffs' actual-fraud claim under NYDCL §276.

Actual fraud exists when a conveyance is made with "actual intent…to hinder, delay, or defraud" present or future creditors. NYDCL §276. "A plaintiff asserting a claim under §276 must prove actual fraud by 'clear and convincing evidence.'" *Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 374 (S.D.N.Y. 2003) (quoting *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 639 (2d Cir. 1995). Because direct evidence of fraudulent intent is rare, however, a plaintiff's proof of fraudulent intent usually consists of circumstantial evidence of certain "objective facts," also known as the "badges of fraud." *Lippe*, 249 F. Supp. 2d at 374-75 (citing *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 540-41 (1994.)) Badges of fraud are circumstances that so commonly accompany fraudulent transfers

---

[26]      Many of these documents are the subject of Class Plaintiffs' Motion to Compel the Production of Evidence that has been Withheld Under a Claim of Privilege. (Dkt. 1261, 1265, 1266.)

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

that their presence gives rise to an inference of intent to defraud The Badges of fraud

include:

(1)     the lack or inadequacy of consideration;
(2)     the family, friendship or close associate relationship between the parties;
(3)     the retention of possession, benefit or use of the property in question;
(4)     the financial condition of the party sought to be charged both before and after the transaction in question;
(5)     the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and
(6)     the general chronology of the events and transactions under inquiry.

*In re Kaiser*, 722 F.2d 1574, 1582-83 (2d Cir. 1983). The presence of multiple badges

generally strengthens the inference of fraud and "can constitute conclusive evidence of

actual intent to defraud." *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d

1248, 1254-55 (1st Cir. 1991); *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport

Servs.*, 910 F. Supp. 910, 935 (S.D.N.Y. 1995).

Defendants contend that the events leading up to MasterCard's IPO

undisputedly show only legitimate business conduct. (Defs.' IPO Br. at 22-24.) But

Defendants ignore significant probative evidence in the record that gives rise to genuine

issues of material fact of actual fraudulent intent, precluding summary judgment on the

NYDCL §276 claim.

- 94 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

## A.  The Nominating and Corporate Governance Committee's decision ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ suggests fraudulent intent.

Although much of the record on whether and how contingent legal liabilities were factored into the board's capital adequacy analysis has been shielded by privilege, the record contains indications of the probability and magnitude of MasterCard's contingent legal liabilities. (CSF ¶ 167.) ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

These facts give rise to the reasonable inference that the Nominating and

Corporate Governance Committee ███████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████Otherwise the

instruction would not have been necessary. Instead, ████████████████████

████████████████████████████████████████████████████████████

██████████████████████

Defendants argue that an inference of actual fraudulent intent is precluded by

MasterCard's public disclosure of the mere existence of contingent liabilities. (Defs.'

IPO Br. at 23.) In its public filings and during its road show for prospective investors,

however, MasterCard refused to provide any estimate of the contingent legal liabilities.

---

27      *See also In re Lids Corp.*, 281 B.R. 535, 546 (Bankr. D. Del. 2002) (criticizing Houlihan Lokey report because valuation of liabilities did not include contingent liabilities).

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

(CSF ¶ 168(a).) Further, MasterCard did not disclose the fact that ███████████ ██████████████████████████

Citing *Lippe v. Bairnco*, Defendants claim that the half-measure disclosures it made "weigh[] heavily against a finding of fraud." (Defs.' IPO Br. at 23 (citing *Lippe*, 249 F. Supp. 2d at 384).) But the disclosures made in the public filings in *Lippe* are neither kith nor kin to MasterCard's omissions made in connection with its IPO. In *Lippe*, the auditor of the defendant, Keene, would not give Keene a "clean" opinion on its financial statements because it did not disclose estimates of its future asbestos-related litigation exposure. 249 F. Supp. 2d at 363. Consequently, Keene *estimated* its exposure and *disclosed* its estimates in subsequent public filings, on which its auditor gave a clean opinion. *Id.* at 363-65. In contrast, MasterCard has not disclosed its estimates of its exposure and apparently ███████████████████████████ ██████████████ These are fact issues, which *Lippe* counsels against deciding in Defendants' favor.

## B. Bank Defendants' use of ownership and board positions to eliminate the special-assessment right demonstrates a close relationship between the parties to the conveyance.

Since its inception and until the IPO in May 2006, the member banks owned MasterCard. (SUF ¶¶ 5, 131.) Thus, MasterCard and the member banks—in particular, the largest member banks that are defendants in the fraudulent-conveyance claims— had a close relationship and played a central role in securing the release of

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

MasterCard's special-assessment right. *See, e.g., Bulkmatic Transp. Co. v. Pappas,* No 99-cv-12070, 2001 WL 882039, at *11-12 (S.D.N.Y. May 11, 2001). The Bank Defendants named in the fraudulent-conveyance claim were all represented on MasterCard's board when it voted to redeem the banks' shares and release the right of special assessment. (SUF ¶ 131.)

**C.    MasterCard did not obtain adequate consideration for the termination of its special-assessment right.**

- 98 -

████████████████████████████████████████████████████

████████████████████████████ *See, e.g., Hasset v. Goetzmann*, 10 F. Supp. 2d

181, 186, 188 (N.D.N.Y. 1998) (finding consideration of $800,000 for assets valued at over

$5 million "grossly inadequate" and evidence of actual fraud).

### D.    MasterCard's financial condition was impaired.

While MasterCard obtained ██████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

██████████████ When those liabilities are factored into a capital-adequacy analysis of

MasterCard at the time of the IPO, MasterCard fails all tests for solvency. (CSF ¶ 164;

Henry Rpt. ¶¶ 76-77.)

A reasonable jury could infer Defendants' actual intent to defraud from this

conduct, thus precluding summary judgment for Defendants on Class Plaintiffs' §276

claim. MasterCard asks the Court to weigh the evidence and draw the competing

inference that MasterCard did not have fraudulent intent. But "credibility

determinations, the weighing of the evidence, and the drawing of legitimate inferences

from the facts are jury functions not those of the judge . ..." *Anderson*, 477 U.S. at 255.

- 99 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

**III.   Genuine issues of material fact preclude summary judgment on Plaintiffs' constructive-fraud claim under NYDCL §275.**

A conveyance is constructively fraudulent under NYDCL §275 when (1) the conveyance is made without "fair consideration" and (2) the conveying party "intends or believes that [it] will incur debts beyond [its] ability to pay as they mature." NYDCL §275. NYDCL §272 defines "fair consideration," as (i) "the exchange of fair value" and (ii) "good faith." The plaintiff bears the burden of establishing these elements by a preponderance of the evidence. *In re Jacobs*, 394 B.R. 646, 660 (Bankr. E.D.N.Y. 2008).

**A.   MasterCard did not obtain fair value for the release of the special-assessment right.**

Class Plaintiffs raise a genuine issue of fact as to ███████████████████

██████████████████████████████████████████████████████

████████████████   ████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████

- 100 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

Defendants assert that there is no factual basis for valuing the assessment

provision as equivalent to a valuation of contingent legal liabilities because ████████

████████████████████████████████████████████████████████

████ The record contradicts this assertion. MasterCard ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

Defendants also argue that certain benefits of the IPO are relevant to whether

MasterCard obtained fair consideration for the release of the special-assessment right.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[28]   MasterCard anticipated that after taxes, it would receive $650 million from the assessment. (CSF ¶ 136.)

- 101 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

right. (Defs.' IPO Br. at 21.) ██████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████ Further, there is no reason to attribute the benefits of the IPO identified by Defendants to the consideration MasterCard received for releasing its special assessment. Those alleged benefits would follow no matter what deal the banks and MasterCard made for the release of the special-assessment right.

## B. MasterCard and the banks lacked good faith.

As used in NYDCL §272, "[t]he term 'good faith' does not merely mean the opposite of the phrase 'actual intent to defraud.'" *Southern Industries v. Jeremias*, 66 A.D.2d 178, 183 (N.Y. App. Div. 1978). Rather, "the lack of good faith imports a failure to deal honestly, fairly, and openly." *Id.*; *In re Checkmate Stereo & Electrs, Ltd.*, 9 B.R. 585, 617 (Bankr. E.D.N.Y. 1981).[29] ████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████ (CSF ¶¶ 161-63.) ████████████

██████████████████████████████████████████████



---

[29] There is some debate among courts applying the NYDCL about "whose good faith matters, with some suggesting that both parties' good faith must be established, and others contending that the good faith requirement applies to the transferee alone." *In re Sharp Int. Corp.*, 302 B.R. 760, 779 (E.D.N.Y. Bankr. 2003) (collecting cases). But fact issues exist as to both MasterCard's and the Bank Defendants' lack of good faith.

- 102 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

███████████████████████████████████████

█████████████████████████ (CSF ¶ 136.) MasterCard, however,

obtained only $650 million for the termination of the special-assessment right. (CSF

¶ 136.) When considering good faith, it cannot be overlooked that the MasterCard board

that released this right consisted solely of member banks, who were the sole

beneficiaries of the release, to the detriment of MasterCard and Class Plaintiffs. These

are not the actions of parties acting honestly, fairly, and openly.

### C.   MasterCard believed it would incur debts beyond its ability to pay.

The requisite belief under NYDCL §275 can be inferred from facts that the

transferor had a "good indication" that it would not be able to pay its debts as they

mature.[30] *Grace Plaza of Great Neck, Inc. v. Heitzler*, 2 A.D.3d 780, 781 (N.Y. App. Div.

2003); *In re Norstan Apparel Shops, Inc.*, 367 B.R. 68, 80 (Bankr. E.D.N.Y. 2007).

Defendants argue that only "probable" debts count under NYDCL §275. (Defs.' IPO Br.

at 20.) But they conflate the showing required under NYDCL §273 with a claim under

§275. "The [NYDCL] identifies several situations involving 'constructive fraud' . . . ." *In*

*re Sharp Intl Corp.*, 403 F.3d 43, 53 (2d Cir. 2005). Only §273 requires a showing of

---

[30]   Contrary to Defendants' argument, Plaintiffs are not required to show under NYDCL §275 an
"actual belief" that MasterCard would be unable to pay its debts as they come due. (Defs.' IPO Br. at 19.)
The standard under this element is an objective one. "Courts interpreting the constructive fraud
provisions of New York's Debtor and Creditor Law have repeatedly stated that the standards apply
'without regard to the actual intent of the transferor or the transferee.'" *MFS/Sun*, 910 F. Supp. at 936
(quoting *Crowthers McCall Pattern, Inc. v. Lewis*, 129 B.R. 992, 997 (Bankr. S.D.N.Y. 1991).

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

"insolvency," which is defined under §271 as the inability of assets to cover *probable* liabilities on existing debts. But NYDCL §275 requires a different showing: that the transferor's belief that "it will incur debts beyond its ability to pay" as they mature. *Id.*

The same evidence that shows disputed, material facts on the actual intent to defraud claim under NYDCL §276 meet the lower burden to show an issue of fact exists concerning whether MasterCard had a good indication it would be unable to pay its debts as they come due.

## Part Nine

### Class Plaintiffs have presented sufficient evidence to support their claims in addition to Dr. Frankel's report.

Defendants argue that if Dr. Frankel's testimony regarding injury to and competitive effects of the challenged conduct are excluded as inadmissible, there will be no evidence in the record to support Class Plaintiffs' claims of injury and damages. This is incorrect. First, as Class Plaintiffs respectfully submit in their opposition to Defendants' motion to exclude Dr. Frankel, there is no basis for his testimony to be withheld from the jury. But even without Dr. Frankel's opinions, Class Plaintiffs could prevail because expert testimony is not a requirement to prove injury in an antitrust action. *See, e.g., Video Serv. of Am., Inc. v. Maxwell Corp. of Am.*, No. 04-2594, 2007 U.S. Dist. LEXIS 54107, at *15-16 (D.N.J. July 26, 2007). In this case, Class Plaintiffs have submitted significant evidence to support their claims, including evidence proving that: (1) there is an agreement among Defendants to set interchange fees and impose the anti-

- 104 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

steering restraints (SUF ¶¶19-27, 41-63); (2) that agreement caused an increase in the price merchants pay to accept payment cards (SUF ¶¶ 64, 67-77); (3) that the payment-card network can function without interchange (SUF ¶¶ 118-122, *see also* SUF ¶ 123); (4) and therefore that Class Plaintiffs have suffered damages in the full amount of actual interchange fees paid. Accordingly, the record includes other evidence that support Class Plaintiffs' claims of injury and damages, even without the testimony of Dr. Frankel.

## Part Ten

### Summary judgment for Defendants should be denied on Class Plaintiffs' Section 2 claims and Class Plaintiffs' claims based on the anti-steering restraints.

Class Plaintiffs oppose Defendants' motion for summary judgment on their claims under Section 2 of the Sherman Act and their claims challenging the anti-steering restraints. Class Plaintiffs also agree with Individual Plaintiffs that summary judgment for Defendants is not proper on Plaintiffs' arguments that brand-specific markets for the acceptance of Visa and MasterCard payment cards exist. Class Plaintiffs therefore incorporate by reference Individual Plaintiffs' arguments in Sections III. A. & B. of their Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment.

## Conclusion

Class Plaintiffs have demonstrated that restrictive agreements among the Bank and Network Defendants raise the price of payment-card acceptance to merchants and

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

otherwise harm competition. None of the arguments Defendants raise in their summary-judgment motions alter that conclusion, as they are belied by the factual record, contrary to law, or both. In some cases the facts that support denial of Defendants' motion are undisputed and therefore warrant summary judgment for Class Plaintiffs. Class Plaintiffs therefore respectfully request that this Court deny Defendants' motions for summary judgment.

May 6, 2011

**Robins, Kaplan, Miller & Ciresi L.L.P.**

By: _____

K. Craig Wildfang
Thomas J. Undlin
Ryan W. Marth

800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Tel: 612-349-8500
Fax: 612-339-4181

Patrick J. Coughlin
Bonny E. Sweeney
David W. Mitchell
Alexandra S. Bernay

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
Tel: 619-231-1058
Fax: 619-231-7423

- 106 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL

H. Laddie Montague, Jr.
Merrill G. Davidoff
Bart D. Cohen
Michael J. Kane

BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Tel: 215-875-3000
Fax: 215-875-4604

*Co-Lead Counsel Class Plaintiffs for MDL 1720*

82060183.10

- 107 -

CONTAINS HIGHLY CONFIDENTIAL MATERIAL – TO BE FILED UNDER SEAL