

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

IN RE PAYMENT CARD INTERCHANGE FEE AND
MERCHANT DISCOUNT ANTITRUST LITIGATION

*This Document Relates To:*

Hy-Vee, Inc. v. Visa U.S.A. Inc., et al.,
Case No.1:05-CV-03925

Supervalu Inc. v. Visa U.S.A. Inc., et al.,
Case No: 1:05-CV-4650

Publix Super Markets, Inc. v. Visa U.S.A. Inc., et
al., Case No: 1:05-CV-4677

Raley's v. Visa U.S.A. Inc., et al.,
Case No: 1:05-CV-4799

The Kroger Company, et al. v. MasterCard, et al.,
Case No: 1:06-CV-0039

The Kroger Company, et al. v. Visa U.S.A. Inc., et
al., Case No: 1:05-CV-05078

Rite Aid Corporation, et al. v. MasterCard
Incorporated, et al., Case No: 1:06-CV-0078

Rite Aid Corporation, et al. v. Visa U.S.A. Inc., et
al., Case No: 1:05-CV-05352

BI-LO, LLC, et al. v. MasterCard Incorporated, et
al., Case No: 1:06-CV-2534

BI-LO, LLC, et al. v. Visa U.S.A. Inc., et al.,
Case No: 1:06-CV-02532

QVC, Inc. v. Visa U.S.A. Inc., et al.,
Case No: 1:07-CV-0592

Wakefern Food Corp. v. Visa U.S.A. Inc., et al.,
Case No: 1:06-CV-5765

Meijer, Inc., et al v. Visa U.S.A. Inc., et al.;
Case No: 1:05-CV-4131

Master File No. 05-MD-1720 (JG)(JO)

**INDIVIDUAL PLAINTIFFS'
RESPONSE IN OPPOSITION
TO DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT**

*CONTAINS HIGHLY
CONFIDENTIAL
INFORMATION*

**TO BE FILED UNDER SEAL**

**TABLE OF CONTENTS**

**PAGES(S)**

I.  SUMMARY OF RESPONSE .................................................................................... 1

II.  VISA'S AND MASTERCARD'S ANTICOMPETITIVE MERCHANT RESTRAINTS ARE CENTRAL TO THE INDIVIDUAL PLAINTIFFS' ANTITRUST CLAIMS ........................... 2

III.  THE COURT SHOULD DENY DEFENDANTS' SUMMARY JUDGMENT MOTION AGAINST IN THE INDIVIDUAL PLAINTIFFS' CLAIMS ............................................ 6

    A.  The MasterCard and Visa No-Surcharge Rules Both Cause Antitrust Injury .......................................................................................................... 7
        (1)  *Defendants' Attempt to View the No-Surcharge Rule in Isolation is Legally Impermissible* .................................................................. 8
        (2)  *Defendants Blatantly Ignore the Facts of This Case* ..................... 11
        (3)  *Defendants' Authority is Inapposite* .............................................. 16
        (4)  *There is a Dispute About the Meaning of the State "No-Surcharge" Statutes Which This Court Cannot Resolve on Defendants' Summary Judgment Motion* ........................................ 19
        (5)  *The State "No-Surcharge" Statutes Do Not Shield Defendants from Liability* ............................................................................... 23
    B.  Substantial Evidence Supports the Individual Plaintiffs' Allegations That Each Defendant has Monopoly Power ................................................ 26
        (1)  *Substantial Direct Evidence Supports the Individual Plaintiffs' Allegations of Monopoly Power* .................................................. 26
            (a)  Substantial Evidence Supports the Individual Plaintiffs' Allegations of Defendants' Monopoly Power ........................ 26
            (b)  Defendants' New Arguments are Meritless ............................ 34
        (2)  *Substantial Indirect Evidence Supports The Individual Plaintiffs' Allegations of Defendants' Monopoly Power* ............................... 37
            (a)  Extensive Evidence Shows Each Defendant's Substantial Power in a TPPC Market ........................................................ 37
            (b)  Extensive Evidence Shows Each Defendant's Substantial Power in a Market for the Sale of its Own Services to Merchants .............................................................................. 41
            (c)  Defendants' Arguments Are Meritless ................................... 45
    C.  The Case Law and Substantial Evidence Support the Individual Plaintiffs' *Per Se* Claims ........................................................................ 54
        (1)  *Defendants Committed Per Se Violations of §1 of the Sherman Act* ................................................................................................ 54
        (2)  *Defendants' Authority is Inapposite* .............................................. 57

IV.  AFTER THEIR IPOs, DEFENDANTS MAINTAINED OR ENTERED INTO BOTH VERTICAL AND HORIZONTAL UNLAWFUL AGREEMENTS AND FAILED TO WITHDRAW FROM THEIR PRE-IPO CONSPIRACIES ........................................... 61

i

**PAGES(S)**

A. Post-IPO MasterCard and Visa Both Participated in a Series of
Unlawful Vertical Agreements ................................................................62

B. Each Defendant Participated in a Post-IPO Horizontal Conspiracy..........65

    (1) *Defendants Did Not Withdraw from Their Pre-IPO Horizontal*
*Conspiracies*...............................................................................65

    (2) *MasterCard and Visa Participated in Post-IPO Horizontal*
*Conspiracies with Their Member Banks* ....................................68

    (3) *Defendants' Authority is Inapposite* ........................................74

V. THE COURT SHOULD DENY DEFENDANTS' SUMMARY JUDGMENT MOTION
AGAINST THE INDIVIDUAL PLAINTIFFS' CLAIMS WHICH IS BASED ON
CERTAIN ARGUMENTS INCORPORATED BY REFERENCE IN DEFENDANTS'
MOTION AGAINST THE SECOND CONSOLIDATED AMENDED CLASS
ACTION COMPLAINT ..............................................................................76

A. The *Wal-Mart* Releases Do Not Bar the Individual Plaintiffs' Claims ........76

    (1) *This Court, the Second Circuit, and the Ninth Circuit Have*
*Already Rejected Defendants' Interpretation of the Release* .........77

    (2) *The Language of the Release Does Not Bar Claims or Damages*
*Accruing After January 1, 2004*................................................79

    (3) *Defendants' Past Statements and Course of Conduct Belie their*
*New-Found Interpretation of the Release*....................................83

    (4) *Defendants' Interpretation of the Release Is Contrary to the*
*Overwhelming Weight of Authority* .............................................85

B. The *Illinois Brick* Doctrine Does Not Bar the Individual Plaintiffs'
Claims.................................................................................................88

    (1) *Merchants (Including the Individual Plaintiffs) Directly Pay*
*Interchange Fees*.....................................................................89

    (2) *Illinois Brick Does Not Bar Claims by the Individual Plaintiffs*
*Who Purchase Directly from a Co-Conspirator* ...........................92

    (3) *Defendants' Objections to the Application of the Co-Conspirator*
*Rule are Meritless*...................................................................96

    (4) *There Is No Realistic Possibility that the Acquiring Banks Will*
*Sue MasterCard or Visa*...........................................................97

    (5) *The Individual Plaintiffs Have Standing to Sue for Damages*
*Because Their Acquirers Either Are, or Are Owned or Controlled*
*By, A Card Issuer/Co-Conspirator* .............................................98

    (6) *Defendants' Remaining Authority is Inapposite*..........................100

C. Defendants' Establishment of Default Interchange Rules (In
Conjunction With the Merchant Restraints) is an Unreasonable
Restraint of Trade................................................................................101

    (1) *Bilateral Contracts Do Not Provide the Individual Plaintiffs With a*
*"Realistically Available" Alternative to the Networks' Default*
*Interchange Agreements*...........................................................102

**PAGES(S)**

(2)   *Defendants' Cases Are Inapposite*................................................................105

(3)   *Whether Bilateral Contracts Provide the Individual Plaintiffs With a "Realistically Available" Alternative to the Networks' Default Interchange Agreements is, at a Minimum, a Disputed Question of Fact*........................................................................................106

VI.   CONCLUSION ..............................................................................................106

# TABLE OF AUTHORITIES

## CASES                                                                        PAGE(S)

*324 Liquor Corp. v. Duffy,*
    479 U.S. 335 (1987)................................................................. 23

*A&E Prods. Group, L.P. v. The Accessory Corp.,*
    2001 WL 1568238 (S.D.N.Y. 2001).......................................... 12

*AD/SAT v. Associated Press,*
    181 F.3d 216 (2d Cir. 1999)....................................................... 27

*Advanced Health-Care Servs. Inc. v. Giles Mem'l Hosp.,*
    846 F. Supp. 488 (W.D. Va. 1994) ............................................ 41

*Albert v. Carovano,*
    851 F.2d 561 (2d Cir. 1988)....................................................... 54

*Ambook Enters. v. Time, Inc.,*
    612 F.2d 614 (2d Cir. 1979)....................................................... 71

*American Express Travel Related Servs. Co. v. Visa U.S.A.,*
    No. 04 vic. 8967 (BSJ), 2005 WL 1515399 (S.D.N.Y. June 23, 2005) ......... .............74, 75

*American Needle, Inc. v. NFL,*
    130 S.Ct. 2201 (2010)................................................................ 58

*American Tobacco Co. v. U.S.,*
    328 U.S. 781 (1946)................................................................... 69

*Apex Oil Co. v. DiMauro,*
    713 F. Supp. 587 (S.D.N.Y. 1989) ...........................................59, 69

*Apple & Eve, LLC v. Yantai N. Andre Juice Co.,*
    610 F. Supp. 2d 226 (E.D.N.Y. 2009) ...................................... 85

*Arizona v. Maricopa County Med. Soc'y,*
    457 U.S. 332 (1982)................................................................... 61

*Arizona v. Shamrock Foods Co.,*
    729 F.2d 1208 (9th Cir. 1984).................................................92, 93

*Atlantic Richfield Co. v. U.S.A. Petroleum,*
    495 U.S. 328 (1990)................................................................... 19

*Baker v. Latham Sparrowbush Assoc.,*
    808 F. Supp. 981 (S.D.N.Y. 1992) ............................................ 54

**PAGE(S)**

Berkeley Photo, Inc. v. Eastman Kodak Co.,
    608 F.2d 263 (2d Cir. 1979)................................................................................ 80

Blue Shield of Va. v. McCready,
    457 U.S. 465 (1982)......................................................................................... 11

Blue Yonder, LLC v. State Tax Assessor,
    No. BCD-10-3, 2011 WL 1553453, (Me. Apr. 26, 2011) ................................. 20

Boulder Cnty Bd. Of Comm'rs v. Healthsouth Corp.,
    246 P.3d 948 (Colo. 2011)............................................................................... 20

Branton v. F.C.C.,
    993 F.2d 906 (D.C. Cir. 1993) ........................................................................ 34

Brennan v. Concord EFS, Inc.,
    369 F. Supp. 2d 1127 (N.D. Cal. 2005)......................................................58, 59

Broadcast Music, Inc. v. CBS, Inc.,
    441 U.S. 1 (1979) ..........................................................................3, 57, 58, 59

Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,
    429 U.S. 477 (1977)......................................................................................... 11

Buffalo Broad. Co. v. ASCAP,
    744 F.2d 917 (2d Cir. 1984).........................................101, 102, 104, 105, 106

Business Elecs. Corp. v. Sharp Elecs. Corp.,
    485 U.S. 717 (1988)......................................................................................... 62

Cahill v. Regan,
    157 N.E.2d 505 (N.Y. 1959)............................................................................. 81

California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,
    445 U.S. 97 (1980) .......................................................................................... 23

Catalano, Inc. v. Target Sales, Inc.,
    446 U.S. 643 (1980)........................................................................................ 62

CBC Co., Inc. v. Equifax, Inc.,
    561 F.3d 569 (6th Cir. 2009) .......................................................................... 23

City of Pittsburgh v. West Penn Power Co.,
    147 F.3d 256 (3d Cir. 1998)............................................................................ 23

**PAGE(S)**

*Coit v. State,*
   808 S.W. 2d 473 (Tex. Crim. App. 1991) ...................................................................... 20

*Commercial Data Servcs, Inc. v. IBM Corp.,*
   262 F. Supp. 2d 50 (S.D.N.Y. 2003) ....................................................................40, 41

*Communication Facility Mgmt. v. LDDS Comm'n,*
   Civ. A. 92-6451, 1996 WL 131133 (E.D. Pa. March 21, 1996)........................................ 19

*Continental Airlines, Inc. v. United Airlines, Inc.,*
   277 F.3d 499 (4th Cir. 2002) ............................................................... 101, 105

*Continental Ore Co. v. Union Carbide & Carbon Corp.,*
   370 U.S. 690 (1962)............................................................................... 8, 9

*Craftsman Limousine, Inc. v. Ford Motor Co.,*
   363 F.3d 761 (8th Cir. 2004) ...................................................................... 59

*Cruz v. Montanez,*
   984 A.2d 705 (Conn. 2009) ...................................................................... 20

*Diskin v. Daily Racing Form, Inc.,*
   No. 92 Civ. 6347 (MBM), 1994 WL 330229 (S.D.N.Y. July 7, 1994)................................ 93

*Dresses For Less, Inc. v. CIT/Commercial Servs., Inc.,*
   No. 01 Civ. 2669 (WHP), 2002 WL 31164482 (S.D.N.Y. Sept. 30, 2002) ........................ 74

*Drug Mart Pharmacy Corp. v. American Home Prods. Corp.,*
   288 F. Supp. 2d 325 (E.D.N.Y. 2003) .......................................................... 66

*Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
   504 U.S. 451 (1992)............................................................................33, 44, 46

*Empagran, S.A. v. F. Hoffman-LaRoche, Ltd.,*
   315 F.3d 338 (D.C. Cir. 2003) .................................................................... 11

*F. Hoffmann-LaRoche Ltd. v. Empagran S.A.,*
   542 U.S. 155 (2004)............................................................................... 11

*Federal Paper Bd. Co., Inc. v. Amata,*
   693 F. Supp. 1376 (D. Conn. 1988)............................................................105

*Feldman v. Health Care Serv. Corp.,*
   562 F. Supp. 941 (N.D. Ill. 1982) ................................................................ 19

**PAGE(S)**

*Fisher v. City of Berkeley,*
   475 U.S. 260 (1986) ................................................................................. 23

*Fishman v. Estate of Wirtz,*
   1981-2 Trade Cas. ¶ 64,378 (N.D.Ill. 1981) ................................................. 25

*Florida Hosp. v. AHCA,*
   823 So.2d 844 (Fla. 1st DCA 2002) ........................................................... 20

*Fontana Aviation, Inc. v. Cessna Aircraft, Inc.,*
   617 F.2d at 478 (7th Cir. 1980) ............................................................... 94

*Fortner Enters., Inc. v. U.S. Steel Corp.,*
   394 U.S. 495 (1969) ............................................................................... 34

*Fox Midwest Theatres, Inc. v. Means,*
   221 F.2d 173 (8th Cir. 1955) ................................................................... 87

*Freeman v. San Diego Assoc. of Realtors,*
   322 F.3d 1133 (9th Cir. 2003) ................................................................. 97

*Fresh Made, Inc. v. Lifeway Foods, Inc.,*
   2002-2 Trade Cas. (CCH) P73,779 (E.D. Pa. 2002) ....................................... 86

*FTC v. Staples, Inc.,*
   970 F. Supp. 1066 (D.D.C. 1997) ............................................................. 47

*Geneva Pharms. Tech. Corp. v. Barr Labs, Inc.,*
   386 F.3d 485 (2d Cir. 2004) ......................................................... 35, 44, 46

*Graham v. Doker Trucking Group,*
   161 P.3d 695 (Kan. 2007) ....................................................................... 20

*Great Am. Ins. Co. v. M/V Handy Laker,*
   2003 AMC 116 (S.D.N.Y. 2002) ............................................................... 85

*H.L. Hayden Co. v. Siemens Med. Sys., Inc.,*
   879 F.2d 1005 (2d Cir. 1989) .................................................................... 8

*Hack v. President & Fellows of Yale Coll.,*
   237 F.3d 81 (2d Cir. 2000) .......................................................... 49, 50, 53

*Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll.,*
   106 F. Supp. 2d 406 (N.D.N.Y. 2000) ............................................ 49, 50, 53

**PAGE(S)**

*Howard Hess Dental Labs. v. Dentsply Int'l, Inc.*,
    424 F.3d 363 (3d Cir. 2005) ...................................................................... 93

*Hunter Douglas, Inc. v. Comfortex Corp.*,
    No. 98-CV-0479, 1999 U.S. Dist. LEXIS 10906 (N.D.N.Y. Mar. 11, 1999) ...................... 86

*Ice Cream Liquidation, Inc. v. Land O' Lakes, Inc.*,
    253 F. Supp. 2d 262 (D. Conn. 2003) ........................................................... 12

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977) ........................................... 88, 89, 92, 93, 96, 97, 99, 100

*Illinois Tool Works Inc. v. Indep. Ink, Inc.*,
    547 U.S. 28 (2006) .............................................................................. 31

*In re Am. Express Merchs. Litig.*,
    554 F.3d 300 (2d Cir. 2009) ...................................................................... 87

*In re American Express Merchs. Litig.*,
    634 F.3d 187 (2d Cir. 2011) ...................................................................... 88

*In re ATM Fee Antitrust Litig.*,
    554 F. Supp. 2d 1003 (N.D. Cal. 2008) .................................................. 56, 57, 58, 60

*In re ATM Fee Antitrust Litig.*,
    C 04-02676 CRB, 2010 WL 3701912 (N.D. Cal. Sept. 16, 2010) ...................... 96, 97, 100

*In re ATM Fee Antitrust Litig.*,
    No. C:04-cv-02676-CRB, 2010 WL 2557519 (N.D. Cal. June 21, 2010) ...................... 58

*In re Brand Name Prescription Drugs Antitrust Litig.*,
    186 F.3d 781 (7th Cir. 1999) ...................................................................... 70

*In re Canadian Import Antitrust Litig.*,
    470 F.3d 785 (8th Cir. 2006) ...................................................................... 23

*In re Flat Glass Antitrust Litig.*,
    385 F.3d 350 (3d Cir. 2004) ...................................................................... 70

*In re G-Fees Antitrust Litig.*,
    584 F. Supp. 2d 26 (D.D.C. 2008) ............................................................... 98

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    2008 WL 5082872 (E.D.N.Y. 2008) ..................................................... 25, 76, 80, 81

**PAGE(S)**

*In re Public Offering,*
No. 98 Civ. 7890 (LMM), 2004 WL 350696 (S.D.N.Y. Feb. 25, 2004) .............................. 88

*In re Visa Check/MasterMoney Antitrust Litig.,*
No. 96-CV-5238 (JG),
2003 WL 1712568 (E.D.N.Y. Apr. 1, 2003)................ 29, 33, 38, 39, 76, 77, 79, 80, 81, 83

*In re Warfarin Sodium Antitrust Litig.,*
214 F.3d 395 (3d Cir. 2000)...................................................................................... 88

*Insignia Sys. v. News Am. Mktg. In-Store,*
Civil No. 04-4213 (JRT/AJB), 2011 WL 505339 (D. Minn. Feb. 4, 2011) ......................... 87

*Interstate Circuit, Inc. v. U.S.,*
306 U.S. 208 (1939).................................................................................... 68, 71, 72

*Jewish Hosp. Ass'n v. Stewart Mech. Enters.,*
628 F.2d 971 (6th Cir. 1980) ...................................................................................... 98

*K.M.B. Warehouse v. Walker Mfg.,*
61 F.3d 123 (2d Cir. 1995) .................................................................................... 26, 62

*Kartell v. Blue Shield of Mass., Inc.,*
749 F.2d 922 (1st Cir. 1984)............................................................................ 17, 18, 19

*Kass v. Kass,*
91 N.Y.2d 554 (N.Y. 1998) ...................................................................................... 79

*Katz v. Los Gatos-Saratoga Joint Union H.S. Dist.,*
111 Cal. Rptr. 3d 546 (Cal. Ct. App. 2004)................................................................... 20

*Kendall v. Visa U.S.A., Inc.,*
518 F.3d 1042 (9th Cir. 2008).................................................................74, 75, 100, 101

*Kendall v. Visa, Inc.,*
No. C 04-04276 JSW, 2005 WL 2216941 (N.D. Cal. July 25, 2005)...............................100

*Kline v. Coldwell Banker & Co.,*
508 F.2d 226 (9th Cir. 1974) ...................................................................................... 74

*Knevelbaard Dairies v. Kraft Food, Inc.,*
232 F.3d 979 (9th Cir. 2000) ...................................................................................... 11

*Kovacevic v. Avalon at Eagles' Crossing Homeowners Ass'n.,*
117 Cal. Rptr. 3d 53 (Cal. Ct. App. 2010) ................................................................... 20

**PAGE(S)**

*Lawlor v. Nat'l Screen Serv. Corp.,*
    349 U.S. 322 (1955) .................................................................................. 86

*Leegin Creative Leather Prods. v. PSKS, Inc.,*
    551 U.S. 877 (2007) ....................................................... 12, 35, 56, 61, 62, 63

*Levitch v. CBS,*
    495 F. Supp. 649 (S.D.N.Y. 1980) ...............................................................105

*Link v. Mercedes-Benz, Inc.,*
    788 F.2d 918 (3d Cir. 1986) ...................................................................... 94

*Lowell v. American Cyanamid Co.,*
    177 F.3d 1228 (11th Cir. 1999) ................................................................. 93

*Madison Square Garden, L.P. v. National Hockey League,*
    No. 07 CV 8455 (LAP), 2008 WL 4547518 (S.D.N.Y Oct. 10, 2008) ..................... 85, 86, 87

*Martin v. Glenzan Assocs., Inc.,*
    426 N.Y.S.2d 347 (N.Y. App. Term. 1980) .................................................. 80

*Matsushita Elec. Indus. Co., Ltd. v. Cinram Int'l, Inc.,*
    299 F. Supp. 2d 370 (D. Del. 2004) ...........................................................105

*MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.,*
    161 F.3d 443 (7th Cir. 1998) .................................................................... 86

*Merck-Medco Managed Care v. Rite-Aid Corp.,*
    201 F.3d 436, 1999 WL 691840 (4th Cir. 1999) .......................................... 70

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,*
    473 U.S. 614 (1985) ................................................................................. 88

*Monsanto Co. v. Spray-Rite Service Corp.,*
    465 U.S. 752 (1984) .......................................................................69, 70

*Morton's Mkts., Inc. v. Gustafson's Dairy, Inc.,*
    198 F.3d 823 (11th Cir. 1999) ...............................................................66, 67

*Murray-Gardner Mgmt. v. Iroquois Gas Transmission Sys., L.P.,*
    646 N.Y.S.2d 418 (N.Y. App. Div. 1996) .................................................... 81

*Nat'l Helicopter Corp. of Am. v. City of N.Y.,*
    137 F.3d 81 (2d Cir. 1998) ...................................................................... 81

**PAGE(S)**

*National Bancard Corp. v. Visa U.S.A., Inc.,*
596 F. Supp. 1231 (S.D. Fla. 1984) ............................................................ 98

*National Bancard Corp. v. Visa U.S.A., Inc.,*
779 F.2d 592 (11th Cir. 1986).............................................57, 58, 59, 98, 105

*National Soc'y of Prof'l Eng'rs v. U.S.,*
435 U.S. 679 (1978).............................................................................. 3

*NCAA v. Bd. of Regents,*
468 U.S. 85 (1984) ...........................................................3, 26, 35, 59

*Nelson v. Monroe Reg'l Med. Ctr.,*
925 F.2d 1555 (7th Cir. 1991).............................................................. 11

*New Hampshire v. Maine,*
532 U.S. 742 (2001)............................................................................ 85

*Newman v. Silver,*
713 F.2d 14 (2d Cir. 1983) ................................................................ 54

*Nicholas Labs., Ltd. v. Almay, Inc.,*
723 F. Supp. 1015 (S.D.N.Y.)............................................................ 80

*Nifty Foods Corp. v. Great Atl. & Pac. Tea Co.,*
614 F.2d 832 (2d Cir. 1980)............................................................40, 41

*Norfolk & Dedham Mut. Fire Ins. Co. v. Morrison,*
924 N.E. 2d 260 (Mass. 2010) ........................................................... 20

*Northern Cal. Pharm. Ass'n v. U.S.,*
306 F.2d 379 (9th Cir. 1962) ............................................................. 73

*Paper Sys., Inc. v. Nippon Paper Indus. Co., Ltd.,*
281 F.3d 629 (7th Cir. 2002) ............................................................. 93

*Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.,*
467 F.3d 283 (2d Cir. 2006)..............................................16, 56, 57, 100, 105

*Pepsico, Inc. v. Coca-Cola Co.,*
114 F. Supp. 2d 243 (S.D.N.Y. 2000) ................................................ 38

*Phillips v. Williams,*
241 P.3d 696 (Okla. Civ. App. 2010) ................................................. 20

**PAGE(S)**

*Polsky v. Radio Shack,*
    666 F.2d 824 (3d Cir. 1981) ........................................................................ 86

*Port Dock & Stone Corp. v. Old Castle Ne., Inc.,*
    507 F.3d 117 (2d Cir. 2007) ........................................................................ 12

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.,*
    124 F.3d 430 (3d Cir. 1997) ............................................................49, 50, 53

*R. I. Realty Co. v. Terrell,*
    172 N.E. 262 (N.Y. 1930) ........................................................................... 80

*Re/Max Int'l, Inc. v. Realty One, Inc.,*
    173 F.3d 995 (6th Cir. 1999) ...................................................................... 70

*Record Club of Am., Inc. v. United Artists Records, Inc.,*
    611 F. Supp. 211 (S.D.N.Y. 1985) .............................................................. 86

*Redel's Inc., v. Gen. Elec. Co.,*
    498 F.2d 95 (5th Cir. 1974) ........................................................................ 87

*Reiter v. Sonatone Corp.,*
    486 F. Supp. 115 (D. Minn. 1980) .............................................................. 94

*Reiter v. Sonotone Corp.,*
    442 U.S. 330 (1979) .................................................................................... 12

*Reyn's Pasta Bella, LLC v. Visa U.S.A., Inc.,*
    259 F. Supp. 2d 992 (N.D. Cal. 2003) ..................................56, 57, 58, 78, 84

*Richard's Lumber & Supply Co. v. U.S. Gypsum Co.,*
    545 F.2d 18 (7th Cir. 1976) ........................................................................ 86

*Royal Printing Co. v. Kimberly-Clark Corp.,*
    621 F.2d 323 (9th Cir. 1980) .................................................................97, 98

*RSA Media, Inc. v. AK Media Group, Inc.,*
    260 F.3d 10 (1st Cir. 2001) ....................................................................23, 25

*Schroder v. State,*
    307 S.W. 3d 578 (Tex. Crim. App. 2010) ................................................... 20

*Schultz v. Harrison Radiation Div. Gen. Motors Corp.,*
    660 N.Y.S. 2d 685 (N.Y. App. Div. 2004) .................................................. 20

**PAGE(S)**

*Schwegmann Bros. v. Calvert Distillers Corp.,*
　341 U.S. 384 (1951)......................................................................................... 23

*SouthTrust Corp. v. Plus Sys., Inc.,*
　913 F. Supp. 1517 (N.D. Ala. 1995)..................................................................19, 58

*Stale v. Finch,*
　244 P.3d 673 (Kan. 2011)................................................................................. 20

*Standard Oil Co. v. U.S.,*
　337 U.S. 293 (1949)........................................................................................ 63

*Starr v. Sony BMG Music Entm't,*
　592 F.3d 314 (2d Cir. 2010)................................................... 68, 69, 70, 71, 74, 75

*Stinton v. Robin's Wood, Inc.,*
　842 N.Y.S. 2d 477 (N.Y. App. Div. 2007) ...................................................... 20

*Tamoxifen Citrate Antitrust Litig.,*
　466 F.3d 187 (2d Cir. 2006)............................................................................... 8

*Telecor Commc'ns, Inc. v. S. W. Bell Tel. Co.,*
　305 F.3d 1124 (10th Cir. 2002).......................................................................... 46

*Temple v. Circuit City Stores, Inc.,*
　No. 6 CV 5303 (JG), 2007 WL 2790154 (E.D.N.Y. Sept. 25, 2007).................... 96, 97, 100

*Tennessean Truckstop, Inc. v. NTS, Inc.,*
　875 F.2d 86 (6th Cir. 1989) .........................................................................18, 19

*Tex. Indus. v. Radcliff Materials,*
　451 U.S. 630 (1981)........................................................................................ 87

*Texaco, Inc. v. Dagher,*
　547 U.S. 1 (2006) .......................................................................................... 56

*TFWS, Inc. v. Franchot,*
　572 F.3d 186 (4th Cir. 2009) ........................................................................... 23

*Three Rivers Motor Co. v. Ford Motor Co.,*
　522 F.2d 885 (3d Cir. 1975).........................................................................85, 86

*Times-Picayune Pub. Co. v. U.S.,*
　345 U.S. 594 (1953)........................................................................................ 44

**PAGE(S)**

*Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.,*
  530 F.3d 204 (3d Cir. 2008) ........................................................................... 87

*Toys 'R' Us v. FTC,*
  126 F.T.C. 415 (1998) ..................................................................................... 63

*Toys 'R' Us. v. FTC,*
  221 F.3d 928 (7th Cir. 2000) ..................................................... 68, 69, 70, 72

*U.S. Anchor Mfg. Co. v. Rule Indus.,*
  7 F.3d 986 (11th Cir. 1993) .......................................................................46, 86

*U.S. Gypsum Co. v. Indiana Gas Co.,*
  350 F.3d 623 (7th Cir. 2003) .......................................................................... 88

*U.S. v. Archer-Daniels-Midland Co.,*
  866 F.2d 242 (8th Cir. 1989) .......................................................................... 46

*U.S. v. Berger,*
  224 F.3d 107 (2d Cir. 2000)............................................................................ 66

*U.S. v. Container Corp.,*
  393 U.S. 333 (1969).......................................................................................... 56

*U.S. v. Delta Dental of R.I.,*
  943 F. Supp. 172 (D.R.I. 1996) ................................................. 12, 17, 18, 64

*U.S. v. General Motors Corp.,*
  384 U.S. 127 (1966).......................................................................................... 69

*U.S. v. Microsoft Corp.,*
  253 F.3d 34 (D.C. Cir. 2001) .....................................................................27, 46

*U.S. v. Nerlinger,*
  862 F.2d 967 (2d Cir. 1988)............................................................................ 66

*U.S. v. Sax,*
  39 F.3d 1380 (7th Cir. 1994) .....................................................................66, 68

*U.S. v. Socony-Vacuum Oil Co.,*
  310 U.S. 150 (1940).....................................................................................56, 61

*U.S. v. Visa U.S.A., Inc.,*
  344 F.3d 229 (2d Cir. 2003)...........................................................16, 33, 35, 44, 65

**PAGE(S)**

*U.S. v. Visa,*
    163 F. Supp. 2d 322 (S.D.N.Y. 2001) ...................................................26, 31, 38, 43, 47

*Vandervelde v. Put & Call Brokers & Dealers Ass'n,*
    344 F. Supp. 118 (S.D.N.Y. 1972) ............................................................................... 73

*Vincent v. New Haven,*
    941 A.2d 932 (Conn. 2008) ......................................................................................... 20

*Visa U.S.A., Inc. v. First Data Corp.,*
    No. C02-01786 JSW, 2006 WL 1310448 (N.D. Cal. May 12, 2006).........8, 9, 15, 16, 91, 98

*VKK Corp. v. NFL,*
    244 F.3d 114 (2d Cir. 2001)......................................................................................... 86

*Walgreen Co. v. American Express,*
    Case No. 08-cv-2317 (NGG)(RER) (E.D.N.Y. 2008)....................................................... 37

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.,*
    396 F.3d 96 (2d Cir. 2005) .....................................................................................77, 80

*Wellnx Life Sci. Inc. v. Iovate Health Sci. Research, Inc.,*
    516 F. Supp. 2d 270 (S.D.N.Y. 2007) .......................................................................... 75

*Westmoreland Asbestos v. Johns-Manville Corp.,*
    39 F. Supp. 117 (S.D.N.Y. 1941) ................................................................................ 87

*Wine Markets Int'l, Inc. v. Boss,*
    177 F.R.D. 128 (E.D.N.Y. 1998) ................................................................................... 8

*Zenith Radio Corp. v. Hazeltine Research, Inc.,*
    395 U.S. 100 (1969)..............................................................................................25, 81

## STATUTES

Sherman Act, 15 U.S.C. § 1 ...................................................................................2, 54, 61
Sherman Act, 15 U.S.C. § 2 ........................................................................................... 61

## OTHER AUTHORITIES

ABA, *Indirect Purchaser Litigation Handbook* (2007)............................................................ 99
Frank H. Easterbrook, *On Identifying Exclusionary Conduct,*
    61 NOTRE DAME L. REV. 972 (1986).............................................................................. 35
George J. Stigler, Price and Nonprice Competition,
    76 J. POL. ECON 149 (1968)......................................................................................... 31
Phillip E. Areeda, Herbert Hovenkamp & John L. Solow,
    ANTITRUST LAW (3d ed. 2007) ...........................................................29, 30, 32, 48, 53

**PAGE(S)**

Reserve Bank of Australia "Reform of Australia's Payment Systems,
    Preliminary Conclusions of the 2007/08 Review ........................................................... 14
Richard A. Posner, ANTITRUST LAW (2d ed. 2001) ....................................................... 31, 35, 36
Robert H. Bork, THE ANTITRUST PARADOX 269 (rev'd ed. 1993) ................................................. 36
Thomas G. Krattenmaker & Steven C. Salop, *Anticompetitive Exclusion:*
    *Raising Rivals' Costs to Achieve Power Over Price*, 96 YALE L. J. 209 (1986) .................. 35
U.S. D.O.J. and FTC, Horizontal Merger Guidelines (Aug. 19, 2010) § 4.1.2 .......................... 43

xvi

The Individual Plaintiffs, pursuant to the Federal Rules of Civil Procedure and the Local Rules of this Court, submit this Response in opposition to Defendants' summary judgment motions.

## I.    **SUMMARY OF RESPONSE**

Plaintiffs oppose each of Defendants' motions for summary judgment and assert that there are pivotal factual issues to be litigated and resolved by the finder of fact.  Nowhere in their papers have Defendants satisfied their burden of showing the presence of clear, uncontroverted facts that would entitle them to summary judgment, and in several key respects, Defendants have misstated the law.

Section II provides the context for this Response by explaining the importance of Visa's and MasterCard's Merchant Restraints to the Individual Plaintiffs' antitrust claims and opposition to Defendants' motions.  Frequently in their argument, Defendants ignore the Merchant Restraints or try to isolate one among them rather than address how this integrated scheme of Rules makes their challenged conduct unlawful.

Section III explains why the Court should deny Defendants' summary judgment motion directed at the Individual Plaintiffs' claims.[1]  We demonstrate in Section III.A that Defendants' No-Surcharge Rule, when properly viewed among the Merchant Restraints (or even in isolation), is anticompetitive and causes the Individual Plaintiffs antitrust injury.  We show in Section III.B that each Defendant has monopoly power in both the Third Party Payment Card market (which

---

[1]      Defendants filed three summary judgment motions and supporting memorandums.  Two of them are expressly directed at the Individual Plaintiffs – Network Defendants' Memorandum Regarding the Claims in the Individual Plaintiffs' Complaints ("Def. Ind. Plf. Memo") and Defendants' Memorandum Regarding Plaintiffs' Post-IPO Claims ("Def. IPO Memo").  The third is titled to the Class Plaintiffs but Defendants have incorporated by reference certain of the arguments against the Individual Plaintiffs ("Def. Class Memo.").  To assist the Court in tracking the Individual Plaintiffs' response to a specific defense memorandum, we have organized this Response to correspond with each of the three memoranda in support of Defendants' summary judgment motions.

includes the sale of all credit, charge and debit cards services to merchants) and the narrower market consisting of the sale of Visa or MasterCard credit card services.  In Section III.C, we explain how and why certain of Defendants' anticompetitive conduct challenged in some of the Individual Plaintiffs' claims is a *per se* violation of the Sherman Act Section 1.[2]

Section IV presents the law and facts demonstrating that Visa's and MasterCard's IPOs do not save them from antitrust liability.  The IPOs do not constitute a withdrawal from the separately alleged conspiracies against Visa and MasterCard and their respective member banks.  Indeed, the identical, unlawful Merchant Restraints which existed before the IPOs remain in effect afterwards.

Section V refutes the arguments in Defendants' Class memorandum which are incorporated by reference against the Individual Plaintiffs.  We show in Section V.A that the *Wal-Mart* releases do not bar the Individual Plaintiffs' claims.  In Section V.B, we demonstrate that the *Illinois Brick* doctrine does not bar the Individual Plaintiffs' claims.  In Section V.C, we explain why Defendants' default interchange rules, in conjunction with the Merchant Restraints, constitute an unreasonable restraint of trade.

## II.   VISA'S AND MASTERCARD'S ANTICOMPETITIVE MERCHANT RESTRAINTS ARE CENTRAL TO THE INDIVIDUAL PLAINTIFFS' ANTITRUST CLAIMS

The Networks' Merchant Restraints are at the core of the Individual Plaintiffs' antitrust cases[3] against the Visa and MasterCard Defendants (individually and collectively the

---

[2]     The Individual Plaintiffs are not pursuing their tying claims, so the Court need not devote its time to them in its consideration of Defendants' motions.  Individual Plaintiffs propose to procedurally remove the tying claims from the case at the time that the pretrial stipulation is filed.

[3]     The Individual Plaintiffs sued Visa and MasterCard separately.  We do not allege that the Networks conspired with each other to restrain trade.  We do allege that each Network conspired with its member banks to restrain trade and monopolize the relevant market(s).

"Network(s)" or "Defendants").[4]   As used in this Response, the "Merchant Restraints" mean the No-Surcharge Rule, the No-Discount Rule, and the Honor-All-Cards Rule.

The Merchant Restraints prevent merchants from using the most elemental economic tool – a price signal – to guide their customers to the lower cost payment mechanism by adding a charge (surcharging) to reflect a more expensive credit card, lowering the price (discounting) to reflect a less costly card, or selectively accepting only those credit cards which have lower acceptance costs (honoring some but not all cards).   "Prices are the principal means by which buyers are informed of the social costs of their consumption decisions.   The elimination of pricing information at the point of sale nearly guarantees an inefficient allocation of resources; the market's 'invisible hand' cannot function because buyers lack appropriate information and incentives to guide their decisions."   Initial Report of Dr. Joseph Stiglitz ¶ 39 ("Stiglitz Init. Rpt."); *see also* Stiglitz Dep. at 49-50, 76-78; *National Soc'y of Prof'l Eng'rs v. U.S.*, 435 U.S. 679, 692-93 (1978) ("ban [on bids by other engineers] impedes the ordinary give and take of the marketplace, and substantially deprives the customer of the ability to utilize and compare prices in selecting engineering services"); *NCAA v. Bd. of Regents*, 468 U.S. 85, 107 (1984) ("restraint that has the effect of reducing the importance of consumer preference in setting price and output is not consistent with this fundamental goal of antitrust law"); *cf. Broadcast Music, Inc. v. CBS, Inc.*, 441 U.S. 1, 23 (1979) ("competitive pricing as the free market's means of allocating resources" is the "central nervous systems of the economy.")

The Merchant Restraints have had a profound anticompetitive effect on merchants, including the Individual Plaintiffs.   They have caused merchants to pay supracompetitive

---

[4]      Visa and MasterCard have stipulated and agreed with the Individual Plaintiffs that in return for not suing their financial institution members, both Networks "waive and will not assert" that the Individual Plaintiffs must sue those member banks as co-conspirators to pursue overcharge damages.  (Dk. 1443)

interchange rates upon acceptance of the Networks' credit cards.[5]   They have impaired merchants' ability to "push back" against the Networks' price increases by pricing credit card usage appropriately or rejecting the cards altogether.   *See* Stiglitz Init. Rpt. ¶ 41.   They have prevented merchants from varying their retail prices depending upon the cost to the merchant of the payment means used by the shopper, *id.* ¶ 48, causing some shoppers who use low-cost payment means to forgo some purchases that they otherwise might have made because the merchant passed on the cost of high interchange fees to all customers.   *Id.* ¶ 49.   They have prevented networks from using lower prices to enter or expand in the payment card business because merchants cannot use price signals to steer shoppers to the new entrant's lower-cost card.   *Id.* ¶ 55.   They have caused shoppers who use low-cost payment methods such as cash, check, PIN debit cards or no-rewards credit cards to subsidize shoppers who use the most costly high-reward credit cards, *id.* ¶ 48; Reply Report of Dr. Joseph Stiglitz at 9 ("Stiglitz Reply Rpt.").   They have incentivized issuers to over-extend credit.   Stiglitz Init. Rpt. ¶ 56.[6]   They have enabled issuing banks to inefficiently solicit cardholders using monopoly profits.   Stiglitz Reply Rpt. ¶ 50-51.   And they have reduced merchants' acceptance of the Networks' credit cards.   *Id.* ¶ 45; *see also* Stiglitz Reply Rep. at 64-65.

In the absence of the Merchant Restraints, Visa and MasterCard would have to compete against each other (and other payment networks) on price (*i.e.*, interchange rates) at the point

---

[5]       Individual Plaintiffs' expert, Dr. Christopher Vellturo, found that for those Individual Plaintiffs who are supermarkets, and those who are drug stores, their Visa interchange rates are approximately ██████ and ██████ respectively, above what Dr. Vellturo determined was the competitive level.  For MasterCard, Dr. Vellturo found that the supermarket and drug store Individual Plaintiffs' interchange rates are approximately ██████ and ██████ respectively, above the competitive level.   *See* Initial Report of Dr. Christopher Vellturo ("Vellturo Init. Rpt."), Exs. 26A-27A.

[6]       *See also* Initial Report of Prof. Katherine Porter ¶¶ 6, 26-29, 34; Reply Report of Prof. Katherine Porter at 34.

of sale. Each could lower its interchange rates to incent a merchant to discount the transaction price in favor of its credit cards, not to surcharge its credit cards, or to accept all of them. This would be a rational, market-based response to price competition. *See* Stiglitz Init. Rpt. ¶ 57; Stiglitz Reply Rpt. at 25; Vellturo Reply Rpt. ¶¶ 16, 164, 169. In Australia, after the central bank there required Visa and MasterCard to remove their no-surcharge rules,[7] the Networks responded by lowering their interchange rates below regulated levels for merchants who could steer cardholders with price signals at the point of sale to pay with lower-cost payment means. *See* Reply Report of Dr. Christopher Vellturo ("Vellturo Reply Rpt.") ¶¶ 39-51.

The Networks' Merchant Restraints violate the antitrust laws in at least two dimensions. First, they are the product of an unlawful horizontal agreement among each Network and its member banks, and a series of unlawful vertical agreements between each Network and its banks, to restrain competition for merchant transaction volume preference at the point of sale. The Board of Directors of each Network consisted of its member banks who competed against each other, and those rivals approved the Merchant Restraints which they and the Networks' other member banks (who were also competitors) enforced against merchants. Even after the MasterCard and Visa IPOs in 2006 and 2008, respectively, these unlawful horizontal agreements persist.

Second, the Networks' Merchant Restraints have enabled Visa and MasterCard to acquire and maintain monopoly power in either of two relevant markets defined by Dr. Vellturo: the market for the sale of credit, charge and debit card network services to merchants (the "Third Party Payment Card" or "TPPC" market), or the market for the sale of Visa or MasterCard credit card services to merchants. In both of these markets, Visa and MasterCard have each

---

[7] American Express subsequently voluntarily removed its No-Surcharge Rule. *See* Individual Plaintiffs' Counter-Statement of Facts ("SOF") ¶ 84a(55).

demonstrated the power to increase default interchange rates to, and maintain them at, supracompetitive levels without any significant loss of merchant acceptance.   This has happened because, as noted earlier, the Merchant Restraints prevent the substitution of one Network's credit card for another at the point of sale.

There is a common theme in our Response to Defendants' summary judgment motions: the Merchant Restraints.   Defendants' arguments often ignore the role of the Merchant Restraints in the challenged conduct or the underlying economics which explain why such conduct is anticompetitive, or they mistakenly and artificially isolate one Merchant Restraint when it actually is part of an integrated scheme that must be analyzed collectively.   The parties may have genuine disputes about material facts regarding the effect, or the measurement of the effect, of the Merchant Restraints on merchants (including the Individual Plaintiffs) or competition in a relevant market, but there can be no credible dispute that on this record, viewed in the light most favorable to the Individual Plaintiffs, there is compelling evidence supporting the Individual Plaintiffs' antitrust claims and, as such, Defendants' summary judgment motions should be denied.

## III.   THE COURT SHOULD DENY DEFENDANTS' SUMMARY JUDGMENT MOTION AGAINST IN THE INDIVIDUAL PLAINTIFFS' CLAIMS

Defendants move for summary judgment on multiple grounds.   They contend that their No-Surcharge Rules supposedly do not cause the Individual Plaintiffs' antitrust injury. Defendants claim they lack monopoly power.   They argue that their conduct is not a *per se* Section 1 violation.   And they assert that the Individual Plaintiffs have abandoned their tying claims.   All of these arguments ignore the substantial facts, economics and well-settled law which support the Individual Plaintiffs' claims.   In this Section, we demonstrate that the Defendants' No-Surcharge Rules proximately cause the Individual Plaintiffs antitrust injury, Including the payment of supracompetitive interchange fees (*i.e.*, precisely the kind of injury

which the antitrust laws were designed to prevent). We describe some of the overwhelming evidence in this record demonstrating that Defendants have substantial market power (*i.e.*, monopoly power). We explain why each Defendant's conspiracy with its financial institution members is a *per se* violation of Section 1 and how the case law supports the Individual Plaintiffs' *per se* claims. Finally, we show that the Individual Plaintiffs have not abandoned their tying claims in this case.

### A.    The MasterCard and Visa No-Surcharge Rules Both Cause Antitrust Injury

In a counterintuitive argument, Defendants contend that the No-Surcharge Rule cannot cause an antitrust injury because it supposedly keeps prices low, and an agreement to keep prices low cannot cause an injury the antitrust laws are meant to prevent. Def. Ind. Plf. Memo. at 6.

Defendants' argument has no merit for four separate reasons. First, Defendants' analysis of the No-Surcharge Rule in isolation from the other Merchant Restraints is impermissible as a matter of law. Second, their argument blatantly ignores the substantial evidence that the No-Surcharge Rule eliminates horizontal price competition between the issuing banks and between each of MasterCard and Visa and other payment cards, and keeps interchange fees anticompetitively high (*i.e.*, antitrust injury) – not low. Third, Defendants' reliance on cases where a buyer merely seeks to prevent the seller from raising its price above the bargained-for rate is badly misplaced. Those cases involve no injury to horizontal price competition and no payment by the plaintiff of any price, much less a supracompetitive price. Fourth, Defendants' contention that the Individual Plaintiffs can suffer no antitrust injury in the ten states that have no-surcharge statutes ignores the gravamen of Individual Plaintiffs' claims, the relevant facts and law, and misreads those state statutes.

7

(1)      Defendants' Attempt to View the No-Surcharge
Rule in Isolation is Legally Impermissible

Defendants have moved for summary judgment on the Individual Plaintiffs' claims "to the extent they are based on" the No-Surcharge Rule.  Def. Ind. Plf. Memo. at 5. This effort to analyze the No-Surcharge Rule in isolation from the other Merchant Restraints is impermissible as a matter of law.[8]

In *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962), the plaintiff alleged that the defendants had undertaken a number of conspiratorial acts in violation of the antitrust laws.  The appellate court analyzed each act separately and in isolation from the other acts in the allegedly illegal scheme.  The Supreme Court reversed and held it was error to analyze each act as if it were "separate and unrelated" to the others.

> In cases such as this, plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. "... [T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but by looking at it as a whole.

*Id.* at 698-99 (citation omitted).  This holding is routinely cited and followed by the Second Circuit and this Court.  *See, e.g., H.L. Hayden Co. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1012 (2d Cir. 1989); *In re Tamoxifen Citrate Antitrust Litig.*, 466 F.3d 187, 200-01 (2d Cir. 2006); *Wine Markets Int'l, Inc. v. Bass*, 177 F.R.D. 128, 134 (E.D.N.Y. 1998).

In *Visa U.S.A., Inc. v. First Data Corp.*, No. C02-01786 JSW, 2006 WL 1310448 (N.D. Cal. May 12, 2006) ("*First Data*"), the court applied the holding in *Continental Ore* to an antitrust claim challenging some of Visa's operating rules.  The plaintiff, First Data, claimed that

---

[8]      Defendants' own expert, Barbara Kahn, testified that the Merchant Restraints operate as an integrated scheme: "I think the most important rules here – and I have actually thought about this, but I think they're all important, and I think they work best as a group, and I do think that there [are] interactions and synergies so that – and by that I mean that, as a group, they're more important – the sum of the parts is – you know, when they're all together, there is more.  So there is interaction between them.  They work together."  SOF ¶ 84a(8).

Visa's rules banning intraprocessing and discounts at the point of sale (*i.e.*, one of the Merchant Restraints challenged in this case) prevented member banks from negotiating lower interchange fees.  2006 WL 1310448 at *4.  Visa argued in that case, as it does here, that those rules should be separately analyzed.  *Id.* at *4 & n.2.  The court disagreed.  Citing *Continental Ore*, it held "Visa's argument is improper ... because it attempts to separate the various allegations of the anticompetitive conduct," and that the two Visa rules had to be analyzed "in tandem and in combination with the other conduct" to determine whether they caused an unlawful restraint. *Id.* at *4 n.2.

In their summary judgment motion, MasterCard and Visa ask the Court – as Visa did the *First Data* court – to disregard *Continental Ore* and appraise the legality of the No-Surcharge Rule separately and in isolation from the other Merchant Restraints.  Defendants advance this argument despite the clear record that (i) both Visa and MasterCard intended the offending Merchant Restraints to be an integrated set of restraints,[9] and (ii) Individual Plaintiffs are challenging these rules as an interrelated set of restraints, each designed to support the anticompetitive effect of the others.  The challenged restraints include not only the No-Surcharge Rule, but also the Honor-All-Cards Rule and the No Discount Rule.  As explained earlier, the No-Discount Rule prevents merchants from offering lower prices to customers who use lower cost credit cards – such as non-premium cards.  It also prevents a merchant from offering to discount a particular issuer's credit card or a particular network's cards, thereby steering customers to that issuer or network, in return for lower interchange fees.  *See* SOF ¶¶ 84(3), 84(5); Initial Report of Dr. Christopher Velltturo ¶¶ 184-191, 225 ("Velltturo Init. Rpt."); Stiglitz Init. Rpt. ¶¶ 67, 80-81.  The Honor-All-Cards Rule similarly prevents price competition that would otherwise drive interchange rates lower. If a merchant could simply refuse to accept

---

[9]     *See* SOF ¶ 84a(8) (testimony of Visa's and MasterCard's expert, Barbara Kahn).

9

high-cost credit cards, the issuers of those cards would lose transactions.  In order to avoid a decrease in business, the high-cost card issuer or high-cost network would have to lower its interchange fees so that merchants would no longer refuse to accept its now competitively priced cards.  *See* SOF ¶¶ 84(b)-84(7); Stiglitz Inlt. Rpt. ¶¶ 67-69; Vellturo Reply Rpt. ¶ 49 n.39.

The No-Surcharge Rule, No-Discount Rule and Honor-All-Cards Rule *work together* to prevent a merchant from using price signals to customers at the point of sale either to offer a lower price (discounting), to charge a higher price to recoup costs (surcharging), or to decline the card because it is too costly for the merchant to accept.[10]  Collectively, the Merchant Restraints present a comprehensive scheme that broadly prevents merchants from using price signals to steer customers to lower-cost credit cards.  The No-Surcharge Rule is one piece of that scheme.  Even if the No-Surcharge Rule, when viewed in isolation, somehow kept prices to retail customers lower (which, as explained below, it clearly does not), it must be viewed, as a matter of law, as a part of the entire scheme.  The overall scheme sets the default interchange fee high and then prevents merchants from using horizontal price competition among the Networks or Banks to drive it lower.  *See* SOF ¶¶ 84a(1)-84a(8); Vellturo Init. Rpt. ¶¶ 169-175, 186-208; Stiglitz Init. Rpt. ¶¶ 40-42.  The result is that merchants pay higher interchange fees. *See id.*  No court has ever held that a plaintiff who suffers such injury (*i.e.*, a higher price) due

---

[10]  The interrelationship between the rules is best illustrated by looking at the 10 states that have a statute that addresses "surcharging" of credit cards.  Assuming, for analysis of Defendants' argument only, that these 10 states prohibit merchants from employing surcharging in any form, then in those 10 states Defendants' Honor-All-Cards Rules has a draconian effect on merchants' ability to obtain lower prices by steering cardholders' choices of payment systems.  If surcharging high-cost credit cards in favor of lower-cost credit cards were prohibited by those state statutes (and it is not), then the affected merchants would be unable to impose a cost on high-fee credit cards for either steering or recoupment.  Discounting aside, the merchants' only direct option for dealing with high-fee credit cards would be to decline to accept them while continuing to accept lower-cost credit cards – a practice prohibited by the Honor-All-Cards Rule.

to a defendants' interference with horizontal price competition has not suffered "antitrust injury." Defendant's papers cite no such authority for no such authority exists.

        (2)     *Defendants Blatantly Ignore the Facts of This Case*

        In order to obtain relief under the antitrust laws, a plaintiff must suffer "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *see Blue Shield of Va. v. McCready*, 457 U.S. 465, 479 (1982) (plaintiff suffered antitrust injury because harm to her and her class "was precisely 'the type of loss that the claimed violations ... would be likely to cause'").

        The courts uniformly hold that where, as here, a horizontal conspiracy among competitors raises the price the plaintiff pays to a co-conspirator, the plaintiff has suffered exactly the type of injury the antitrust laws were meant to prevent and "antitrust injury" is shown. *See, e.g., Empagran, S.A. v. F. Hoffman-LaRoche, Ltd.*, 315 F.3d 338, 357-58 (D.C. Cir. 2003) ("*Empagran I*") (where defendant competitors conspired so as to increase the price plaintiffs paid them, court held "antitrust injury" was established because "plaintiffs' paying of inflated prices ... was loss of the type that violations of the Sherman Act would be likely to cause");[11] *Nelson v. Monroe Reg'l Med. Ctr.*, 925 F.2d 1555, 1562 (7th Cir. 1991) (antitrust injury "means injury from higher prices or lower output, the principal vices proscribed by the antitrust laws") (citation omitted); *Knevelbaard Dairies v. Kraft Food, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000) (where conspiracy among competitors "causes buyers to pay more, or sellers to receive less, than the price that would prevail in a market free from the unlawful restraint,

---

[11]    The Supreme Court granted *certiorari* in *Empagran* and held that foreign plaintiffs who purchased vitamins in foreign countries from foreign suppliers could not sue under the Sherman Act, but that a purchaser in the United States" could. *F. Hoffmann-LaRoche Ltd. v. Empagran S.A.*, 542 U.S. 155 (2004) ("*Empagran II*").

antitrust injury occurs"); *Ice Cream Liquidation, Inc. v. Land O' Lakes, Inc.*, 253 F. Supp. 2d 262, 272 (D. Conn. 2003) (plaintiff suffers antitrust injury where he is "forced to pay prices not set by free market competition" or where he "pay[s] more ... than the price that would prevail in a market free of the unlawful restraint").

Similarly, a vertical agreement or even unilateral conduct prohibited by Section 2 that interferes with horizontal price competition also causes antitrust injury to a party who must pay the increased price. *See, e.g., Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 892-93 (2007) (vertical agreements may cause plaintiff to pay higher prices when they facilitate horizontal cartel and prices designed solely to obtain monopoly profits); *Reiter v. Sonotone Corp.*, 442 U.S. 330, 342 (1979) (plaintiff who pays price "artificially inflated by reason of respondents' anticompetitive conduct" suffers injury within meaning of antitrust laws); *Port Dock & Stone Corp. v. Old Castle Ne., Inc.*, 507 F.3d 117, 123-24 (2d Cir. 2007) (those who suffer injury when defendant acquires monopoly power are "dealers or consumers who were forced to buy at higher prices"); *A&E Prods. Group, L.P. v. The Accessory Corp.*, 2001 WL 1568238, *3-4 (S.D.N.Y. 2001) (plaintiff suffered antitrust injury due to defendant's acts of monopolization because defendant was able to increase market price); *U.S. v. Delta Dental of R.I.*, 943 F. Supp. 172, 182 (D.R.I. 1996) (vertical agreements may "eliminate a dynamic mechanism by which prices are notched down to competitive level and result in higher prices being paid by consumers").

In this case, Defendants argue that antitrust injury is absent because, as a matter of undisputed fact, the No-Surcharge Rule supposedly keeps prices low. This argument completely ignores the factual record. Substantial evidence shows that the Merchant Restraints, including the No-Surcharge Rule, eliminate price competition between the Networks and between the Issuers for merchant transaction volume at the point of sale and result in the

Individual Plaintiffs paying *higher* interchange fees.[12]   *See* SOF ¶¶ 84a(66)-84a(95);  Vellturo Init. Rpt. ¶ 147 & Ex. 8, ¶ 150 & Ex. 9; ¶¶ 186-208Vellturo Reply Rpt. Appendix A.  Defendants do not even dispute this evidence in this record, they simply ignore it.  Defendants' argument, at best, is that the retail prices paid by the Individual Plaintiffs' customers do not go up because the Individual Plaintiffs are prevented from surcharging their customers' use of credit cards. This contention also is factually incorrect and disputed by the Individual Plaintiffs.  Substantial evidence shows that the excessive interchange fees that  Defendants' horizontal conspiracy imposes on the Individual Plaintiffs are a cost to merchants and are passed on to their retail customers in the form of higher retail prices.  *See* SOF ¶¶ 84a(9)-84a(30); Stiglitz Init. Rpt. ¶¶ 47-48; Vellturo Init. Rpt. ¶¶ 245-249.  Even retail customers who do not pay with Defendants' credit cards have to pay higher retail prices to cover the cost of the excessive interchange fees that Defendants impose on the Individual Plaintiffs.  *See* SOF ¶¶ 84a(24)-84a(30); Vellturo Init. Rpt. ¶ 248.

More fundamentally, all the Individual Plaintiffs need prove to demonstrate antitrust injury is that the interchange fees *they* pay have increased or remained at a supracompetitive level because Defendants have restrained price competition.  The question of whether the Individual Plaintiffs' customers also suffer a price increase is, therefore, not only

---

[12]     Defendants contend that the merchants do not pay interchange fees, but only pay a discount fee to their acquiring bank.  Def. Class Memo. at 16-18.  This is utterly false. We demonstrate in Section V.B.1, *infra,* that the Individual Plaintiffs do, in fact, pay the interchange fee, and Defendants' and the banks' documents show this.  Further, the Individual Plaintiffs' agreements with their acquirers

factually disputed, but is irrelevant to the question of whether the Individual Plaintiffs have suffered antitrust injury.

If a merchant could impose a surcharge on the goods purchased with a high-cost credit card, then retail customers would switch to lower-cost payment forms.[13]   In order to avoid losing cardholder transactions, a high-cost card issuer would have to lower its interchange fees so the merchant would not steer cardholders away from its now lower-priced card.  *See* SOF ¶¶ 84a(66)-84a(95); Vellturo Init. Rpt. ¶¶ 194-198, 200-208; Vellturo Reply Rpt. ¶¶ 127-137.   Substantial evidence further shows that merchants would not even have to impose surcharges on high-cost credit cards in order to trigger price competition between issuers and networks provided they could credibly threaten to surcharge high-cost cards.   In that event, Defendants would reduce interchange fees to avoid having their cards surcharged and losing transactions.[14]  *See* SOF ¶¶ 84a(67), 84a(69)-(71), 84a(75)-84a(77), 84a(90)-84a(92); Vellturo

---

[13]   The Networks' own documents, and the unrebutted opinions of the Individual Plaintiffs' expert, Dr. Dan Ariely, show that cardholders are price sensitive and if the cost of using their card went up due to even a small surcharge they would quickly switch to a less-expensive card or payment form.  *See* SOF ¶¶ 84a(31)-84a(47); Ariely Rpt. ¶¶ 19-20, 22 (citing admission by Visa and MasterCard expert Glenn Hubbard); *id.* ¶¶ 23-24 ██████████████████ ███████████████████████████████████████████████████████████████████ SOF ¶ 84a(33); Drury Dep. Ex. 31162 at 20 ██████████████████████████████████████ ███████████████████████████ *see also* Reserve Bank of Australia "Reform of Australia's Payment Systems, Preliminary Conclusions of the 2007/08 Review at 18 ███████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████ SOF ¶ 84a(51); Vellturo Reply Rpt. ¶¶ 121-123; Vellturo Init. Rpt. ¶¶ 195-197, 203-209.

[14]   As noted earlier, in the absence of the Merchant Restraints, merchants also could precipitate price competition by offering a discount to lower-cost credit cards so that consumers would switch from the higher-cost cards to get the discount, or decline the high-cost card altogether.  *See* Vellturo Init. Rpt. ¶¶ 186-192, 199-200.  Even Defendants' experts admit that surcharging higher-cost cards is as least as effective as discounting at steering consumers to

Reply Rpt. ¶¶ 39-51, 127-137; Vellturo Init. Rpt. ¶¶ 194-198.[15]   The evidence shows that if interchange fees went down, then merchants' lower costs would result in lower retail prices. *See* Vellturo Init. Rpt. ¶¶ 245-249; Stiglitz Init. Rpt. ¶¶ 47-48.

Thus, even viewing the No-Surcharge Rule in isolation as Defendants' argument improperly does, substantial evidence demonstrates that the No-Surcharge Rule blocks price competition that would lower the interchange fees charged the Individual Plaintiffs.   Because higher prices resulting from the elimination of price competition is exactly the kind of injury the antitrust laws are meant to prevent, the Individual Plaintiffs have clearly suffered antitrust injury.   Furthermore, even if the prices paid by retail customers were relevant to whether the Individual Plaintiffs have suffered antitrust injury, the substantial evidence shows that prices to the retail customers are also driven up by the No-Surcharge Rule and would go down if that Rule were eliminated.

The conclusion that the Individual Plaintiffs have suffered antitrust injury is strongly confirmed by *First Data.*   As noted earlier, First Data alleged in similar fashion to the

_____ (Continued)
lower-cost payment forms.  *See* Expert Report of Barbara Kahn ¶¶ 148-49 (defense expert); *see also* Ariely ¶¶ 8, 26-30.

[15]      The evidence from Australia is revealing.



Individual Plaintiffs' allegations here that some of Visa's Merchant Restraints, including the No-Discount Rule, eliminated the economic incentive for issuers to lower interchange fees and resulted in excessive interchange rates. 2006 WL 1310448 at *6. Visa moved for summary judgment claiming that First Data suffered no antitrust injury. First Data responded that Visa had "stifl[ed] competition which otherwise would have ... reduced the [interchange] rates." *Id.* The court denied Visa's motion, ruling that First Data's claimed injury was "exactly the type antitrust laws are meant to prevent: 'an increase in price resulting from a dampening of competitive forces'." *Id.* The Individual Plaintiffs here have suffered the same type of injury. The No-Surcharge Rule, like the restraints challenged in *First Data,* eliminates the incentive for issuers or Networks to reduce the interchange fee to avoid losing transaction volume and results in merchants paying higher interchange fees. In this case, just as in *First Data,* antitrust injury has been clearly shown.

    *(3)    Defendants' Authority is Inapposite*

In order to evade the foregoing law and substantial evidence, Defendants cite a raft of totally inapposite cases in which a buyer – or insurance company standing in the shoes of a buyer – agrees to a price with the seller and prohibits the seller from later reneging on the deal and raising the price. In these cases, it is hard to imagine how competition could be hurt because the "conspiracy" is nothing but an agreement between a buyer and seller to make a purchase at a certain price. An injury to horizontal price competition, such as is present here,[16] is not even implicated.

---

[16]    MasterCard and Visa are indisputably horizontal competitors. Abundant evidence also demonstrates that the bank members of each Network constitute a consortium of horizontal competitors. *See, e.g., Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.,* 467 F.3d 283, 286 (2d Cir. 2006); *U.S. v. Visa U.S.A., Inc.,* 344 F.3d 229, 235 (2d Cir. 2003) ("*Visa II*").

The Defendants' argument is primarily based on three distinguishable cases. Their lead case is *Kartell v. Blue Shield of Mass., Inc.*, 749 F.2d 922 (1st Cir. 1984). There, Blue Shield, acting unilaterally, agreed to pay doctors a certain amount for their services, but only if the doctor agreed not to raise the price by imposing a surcharge on the patient. *Id.* at 923. The plaintiff doctor claimed this was price fixing by Blue Cross. Judge Breyer stated that "Blue Shield in essence 'buys' medical services for the account of others" from the doctor and held that the case must be analyzed as if Blue Shield was the buyer and the doctor the seller of medical services. *Id.* at 924-25, 926. Viewed in that way, the allegedly unlawful conduct was nothing more than an agreement between a buyer and a seller under which the seller was held to his bargain and prohibited from later raising his price by imposing a surcharge on the patient; or, as Judge Breyer held, "to refuse to allow the condition [prohibition on the surcharge] would disable the buyer from holding the seller to the price of the contract." *Id.* at 925. Judge Breyer stated the obvious – that the antitrust laws do not prevent a buyer from negotiating the price of the goods he purchases from the seller, *id.* at 925-26, and held "the lawfulness of the term in question stems from the fact that it is an essential part of the price bargain between a buyer and seller." *Id.* at 928. As a result, Judge Breyer held that no reduction in competition or "unreasonable restraint of trade" had occurred. *Id.* at 924-25. Because the court found no anticompetitive agreement, it had no occasion to even address whether such an agreement had caused antitrust injury.

*Kartell* is distinguishable from this case. It clearly lacks the critical elements of antitrust injury that are present here. In *Kartell,* the defendant did nothing to interfere with horizontal price competition or raise price; and the doctor did not purchase anything at any price, much less at a supracompetitive price from Blue Shield. *Kartell* was distinguished on precisely this ground in *Delta Dental.* There, the defendant insurance company prohibited

dentists from selling their services to any other insurance company at a price lower than the price Delta Dental paid. The defendants' argument that *Kartell* required dismissal was rejected because, unlike *Kartell* (and like the facts in this case), the plaintiff in *Delta Dental* alleged that the conduct eliminated horizontal competition and "ultimately results in higher prices for Rhode Island dental service consumers." 934 F. Supp. at 177, 179.

*Kartell* would be comparable to this case only if the defendant, Blue Shield, had done something to eliminate horizontal price competition between itself and other insurance companies so as to raise the premium rates paid to them by the insureds. But nothing of the sort is alleged in *Kartell*. In fact, no competitor of Blue Shield or the rates that it charges are even mentioned in the opinion.

Another distinguishable case on which Defendants rely from this case is *Tennessean Truckstop, Inc. v. NTS, Inc.*, 875 F.2d 86 (6th Cir. 1989). In that case, like *Kartell*, there was no allegation that horizontal price competition was injured or that the plaintiff suffered antitrust injury by paying higher prices to anyone. The defendant issued credit cards to truckers to use at truck stops. It allowed the truck stops to surcharge the cards, but capped the surcharge at 5%. No conspiracy with, or even the existence of, a competing card issuer was alleged. The court looked to *Kartell* for precedent and held that the defendant served the same economic function as Blue Shield because it was negotiating a price for the truckers. *Id.* at 90. In other words, this is just another case of a buyer (the card issuer negotiating for the trucker) trying to hold the seller (the truckstop) to its bargain. The court was careful to note that it was expressing no opinion as to whether the conduct would be unlawful if it eliminated horizontal competition as a result of the challenged conduct. *Id.* at 91.

The last case in this trilogy cited by Defendants and which is factually distinguishable from this one is *SouthTrust Corp. v. Plus Sys., Inc.*, 913 F. Supp. 1517 (N.D. Ala.

18

1995). There, the owner of an ATM network prohibited the plaintiff from charging consumers a fee for using the plaintiff's ATM machines. The defendant network was not alleged to have conspired with any other network; there was no allegation that horizontal price competition had been restrained or that the plaintiff was required to pay a higher price for anything; and the court found that there was "no identifiable threat of injury to competition" at all. *Id.* at 1522. Relying on *Kartell* and *Tennessean Truckstop*, the court viewed the network as having negotiated a purchase price with the plaintiff which the plaintiff wanted to exceed by imposing an additional charge on the consumer. *Id.* The current case, of course, contains all of the elements of antitrust injury that are missing in *SouthTrust*.[17]

> ### (4)    There is a Dispute About the Meaning of the State "No-Surcharge" Statutes Which This Court Cannot Resolve on Defendants' Summary Judgment Motion

Defendants next contend that ten state statutes prohibit merchants from surcharging credit cards, and thus the cause of the Individual Plaintiffs' injury in those states supposedly are the statutes and not Defendants' No-Surcharge Rules. Defendants argue that these statutes "have statutorily prohibited plaintiffs from imposing surcharges on credit card payments." Def. Ind. Plf. Memo. at 12.

The Individual Plaintiffs read these state statutes differently than do the Defendants. Nine of the ten state statutes prohibit surcharging credit cards "in lieu of payment by cash, check or similar means;"[18] they do not prohibit surcharging credit cards in lieu of

---

[17]    Defendants also cite *Atlantic Richfield Co. v. U.S.A. Petroleum*, 495 U.S. 328 (1990); *Feldman v. Health Care Serv. Corp.*, 562 F. Supp. 941, 950-51 (N.D. Ill. 1982); and *Communication Facility Mgmt. v. LDDS Comm'n*, Civ. A. 92-6451, 1996 WL 131133 (E.D. Pa. March 21, 1996). Def. Ind. Pl. Memo. at 6-8. In none of these cases was the elimination of horizontal price competition or the payment of supracompetitive prices by the plaintiffs even alleged.

[18]    Only the Connecticut statute prohibits all surcharging; six of the seventeen Individual Plaintiffs do not even have stores in Connecticut.

payment *by another credit card.*[19]   Thus, the statutes do not prohibit merchants from surcharging high-cost credit cards if they refrain from surcharging low-cost credit cards, because the surcharge on the high-cost card would be in lieu of payment with a different credit card – not "cash, check or similar means."   The evidence in this case shows that merchants do not need to steer to cash or checks to precipitate price competition.   Rather, they can achieve that end by surcharging high-cost credit cards but not low-cost credit cards, or by surcharging Visa credit cards but not MasterCard credit cards.   *See* SOF ¶¶ 84a(66)-84a(95); Velluro Init. Rpt. ¶¶ 200-208; Velluro Reply Rpt. ¶¶ 39-50.   Defendants cite no authority to indicate that such conduct would violate any of these nine state statutes.

Defendants themselves interpret these state statutes in practice differently than they tell this Court in argument.   In all ten of the states that have no-surcharge statutes,

---

[19]      The law in all ten of these provides that a legislature states what it intends in a statute and a court is not supposed to add words.  *See Blue Yonder, LLC v. State Tax Assessor*, No. BCD-10-3, 2011 WL 1553453 at *4, (Me. Apr. 26, 2011) ("We will not read additional language into a statute."); *Boulder Cnty. Bd. Of Comm'rs v. Healthsouth Corp.*, 246 P.3d 948, 951 (Colo. 2011) (when interpreting a statute, courts do not add words to the statute); *Stale v. Finch*, 244 P.3d 673, 678 (Kan. 2011) ("We will not speculate on the legislature's intent and will not read the statute to add something not readily found in it," *quoting Graham v. Doker Trucking Group*, 161 P.3d 695 (Kan. 2007)); *Kovacevic v. Avalon at Eagles' Crossing Homeowners Ass'n.*, 117 Cal. Rptr. 3d 53, 57 (Cal. Ct. App. 2010) ("We may not insert words into a statute under the guise of interpretation," *citing Katz v. Les Gatos-Saratoga Joint Union H.S. Dist.*, 111 Cal. Rptr. 3d 546 (Cal. Ct. App. 2004)); *Norfolk & Dedhan Mut. Fire Ins. Co. v. Morrison*, 924 N.E. 2d 260, 265 (Mass. 2010) ("We will not expand or limit the meaning of a statute unless such is required by the object and plain meaning of the statute."); *Phillips v. Williams*, 241 P.3d 696, 701 (Okla. Civ. App. 2010) (it is for court to ascertain meaning of words of statute and "neither to add nor to subtract, neither to delete nor distort"); *Cruz v. Montanez*, 984 A.2d 705, 713 (Conn. 2009) ("Courts may not by construction supply omissions ... or add exceptions," *quoting Vincent v. New Haven*, 941 A.2d 932 (Conn. 2008)); *Schroder v. State*, 307 S.W. 3d 578, 580 (Tex. Crim. App. 2010) ("Where the statute is clear and unambiguous ... it is not for the courts to add or subtract from a statute," *quoting Coit v. State*, 808 S.W. 2d 473, 475 (Tex. Crim. App. 1991)); *Stinton v. Robin's Wood, Inc.*, 842 N.Y.S. 2d 477, 482 (N.Y. App. Div. 2007) (courts "must apply the terms of the statute as written," *quoting Schultz v. Harrison Radiation Div. Gen. Motors Corp.*, 660 N.Y.S. 2d 685 (N.Y. App. Div. 2004)); *Florida Hosp. v. AHCA*, 823 So.2d 844, 848 (Fla. 1st DCA 2002) ("Courts are not at liberty to add words to statutes that were not placed there by the Legislature").

Defendants allow certain merchants, but not the Individual Plaintiffs, to surcharge credit cards – Defendants simply use a different name to describe the charge. Rather than call the charge on credit cards a surcharge, the Networks euphemistically label it a "convenience fee." In fact, they are functionally and economically the same.[20]

Robert Towne, formerly Visa's Senior Vice President in the Interchange Strategy Group and later a Senior Account Executive in the Merchant and Acquirer Relations Group, testified that a "convenience fee is a charge that a merchant can assess a cardholder in connection with acceptance," while the "surcharge" prohibited under Visa's No-Surcharge Rule is a "charge … in connection with acceptance." Towne Dep. at 482-83 (Sept. 5, 2008), SOF ¶ 96(148). In other words, the No-Surcharge Rule prohibits the fee otherwise allowed by the Convenience Fee Rule. Visa and MasterCard refer to convenience fees and surcharges interchangeably. SOF ¶ 96(149). Visa admits that "[c]onvenience fees and surcharges achieve the same objective" in that both fees recoup the cost of the transaction. SOF ¶ 96(150). MasterCard describes its convenience fee as relaxing or an exception to its No-Surcharge Rule. Id. Dr. Vellturo explained that there is no economic difference between a surcharge and a convenience fee. See Vellturo Init. Rpt. ¶¶ 214-216. Thus, viewed for what it is, the "convenience fee" is simply a contrived label used by Defendants to allow certain merchants to surcharge credit cards.

---

[20] Visa's and MasterCard's "convenience fee" and "no-surcharge" rules are set forth in Paragraphs 96(144)-96(147) of Individual Plaintiffs' Counter-Statement of Facts. In substance, the convenience fee rule provides that a merchant can charge a fee for a shopper's payment in an alternative payment channel (e.g., card-not-present environment such as the internet) outside the merchant's customary payment channel (e.g., brick-and-mortar stores) provided it is disclosed to the shopper. SOF ¶¶ 96(144)-96(147). The no-surcharge rule, in contrast to the "convenience fee" rule, prohibits a merchant from adding a charge to a transaction for paying with the card. SOF ¶¶ 96(141)-96(143), 96(146).

Defendants' conduct in the ten states with no-surcharge statutes demonstrates that they themselves do not read those statutes as prohibiting surcharging of credit cards. Defendants have allowed merchants in those states to charge convenience fees despite the no-surcharge statutes.  We provide examples of this in our Counter-Statement of Facts.  *See* SOF ¶¶ 96(155)-96(162).   If, as Defendants argue, these state no-surcharge statutes prohibit surcharges on credit cards, and if there is no functional difference between a surcharge and a convenience fee – and Defendants' documents and testimony essentially say there is not – then Defendants should not have allowed merchants in those states to charge a convenience fee. But they have and, depending upon the merchant, still do,[21] which is powerful evidence that Defendants themselves do not read the ten state no-surcharge statutes to prohibit surcharging of credit cards as they argue in their motion papers.   Theirs is an argument of "convenience" that is belied by Defendants' conduct in the marketplace.

At a minimum, the parties have a genuine dispute about the meaning of the ten state no-surcharge statutes and whether the convenience fee which Defendants allow merchants in those states to charge really is a surcharge by another name.   On that basis alone, Defendants' summary judgment motion should be denied.[22]

---

[21] ███████████████████████████████████████████████
███████████████████████████████████████.  SOF ¶ 96(154).   This is powerful confirmation of what Dr. Stiglitz and Dr. Vellturo opined, namely, that if merchants are able to use price signals (read surcharging or discounting) to precipitate price competition for their transaction volume at the point of sale, then the resulting Network competition will result in lower interchange rates.   *See* Stiglitz Init. Rpt. ¶ 42; Vellturo Init. Rpt. ¶¶ 186-208.

[22]     Although this Court need not reach the issue, if the ten statutes really did prohibit surcharging, then they would be preempted by the Sherman Act.  These state statutes are what courts characterize as "hybrid" statutory schemes which restrain competition and purport to enforce a price established by private parties – here, the default interchange rates set by Defendants and their co-conspirators which the state statutes supposedly enforce by preventing merchants from employing price competition through surcharging to drive those rates lower.  Federal law, here the Sherman Act, would preempt each such state statute unless first, the state statute was pursuant to a clearly articulated, affirmatively expressed policy; and

(5)     The State "No-Surcharge" Statutes Do
        Not Shield Defendants from Liability

Defendants' argument artificially separates the state no-surcharge statutes from

the Networks' Rules.  We demonstrate below that even if the ten state statutes mean what

Defendants say they mean – and we disagree – those ten state statutes do not protect

Defendants from liability under the federal antitrust laws for three reasons related to the

integrated character of the Merchant Restraints.

First, even if the Individual Plaintiffs could not surcharge credit cards in the ten

states with no-surcharge statutes – and we disagree with Defendants on this point as noted

_____ (Continued)

second, the state actively supervises for reasonableness any price that is set by the private
party and enforced by the statutory scheme.  *See California Retail Liquor Dealers Ass'n v.
Midcal Aluminum, Inc.*, 445 U.S. 97 (1980) ("*Midcal*") (state statute which restrained
competition by requiring wine producers to post resale price and wholesalers to sell at that price
preempted by Sherman Act due to absence of active state supervision); *Fisher v. City of
Berkeley*, 475 U.S. 260 (1986); (identifying state statutes that enforce a privately determined
price as "hybrid" statutes that must satisfy the *Midcal* test); *324 Liquor Corp. v. Duffy*, 479 U.S.
335 (1987) (state statute which restrained competition by requiring liquor retailers to charge at
least 112% of the privately determined price preempted by Sherman Act because of no active
state supervision); *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 388 (1951)
("hybrid" statute because price charged left to discretion of private party and state merely
enforced price); *see also TFWS, Inc. v. Franchot*, 572 F.3d 186, 189 n.1 (4th Cir. 2009)
('hybrid' restraint on trade is governmentally-imposed trade restraint enforcing private pricing
decisions).  There is no evidence in the record in this case that any of the ten states review for
reasonableness any of the interchange rates that are subject to the states' no-surcharge
statutes, *i.e.*, none of the states actively supervise the price set by Defendants and enforced by
the statute.  As "hybrid" restraints on trade, and based on the foregoing cases, this Court could
find that all of the state no-surcharge statutes are preempted by the Sherman Act.

Defendants' authorities are inapposite.  They principally rely on *In re Canadian
Import Antitrust Litig.*, 470 F.3d 785 (8th Cir. 2006), Def. Ind. Pl. Memo. at 11, but that case
involves a conflict between the Sherman Act and another *federal* statute, and there was no
contention that one federal statute preempted another.  Defendants' other cases are similarly
inapposite.  *CBC Co., Inc. v. Equifax, Inc.*, 561 F.3d 569, 571-73 (6th Cir. 2009) (involves
second federal statute, not state law, and plaintiff made only "conclusory allegations" of
anticompetitive private conduct); *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 259-
60, 266-67 (3d Cir. 1998) (involves comprehensive state regulatory scheme and state agency
had to approve the prices charged by private party); *RSA Media, Inc. v. AK Media Group, Inc.*,
260 F.3d 10 (1st Cir. 2001) (plaintiff's injury was not caused by defendants but rather by third-
party lessors who refused to lease property to plaintiff).

above – the Individual Plaintiffs could still precipitate horizontal price competition and drive interchange fees lower in those states by either discounting low-priced cards or simply refusing to accept the high-priced cards – except that Defendants' No-Discount Rule and Honor-All-Cards Rule prevent them from doing so.  Thus, even if the Individual Plaintiffs could not surcharge in the ten states with no-surcharge statutes, they could still precipitate horizontal price competition and drive the interchange rates to the competitive level "but-for" Defendants' other Merchant Restraints.  Eliminating just one of the three steering devices from the merchants' arsenal would have no impact on the competitive result, so long as the other two are available. *See* Vellturo Init. Rpt. ¶¶ 186-192, 199, 200; Vellturo Reply Rpt. ¶ 335.

Second, accepting for purposes of argument only Defendants' reading of the ten state statutes, the Individual Plaintiffs could still threaten to and in fact surcharge in those of the other 40 states in which they do business unless Defendants lowered their interchange rates.  SOF ¶¶ 96(1)-96(9).[23]  Once again, it is only Defendants' nationwide imposition of the No-Surcharge Rule on the Individual Plaintiffs that prevents them from using price competition to drive interchange rates lower in all 50 states by surcharging, or threatening to surcharge, in the 40 states without a no-surcharge statute.  It is self-evident that the ten state statutes on which Defendants rely cannot prevent surcharging or the threat of surcharging elsewhere to drive interchange rates lower everywhere.  Thus, the cause of the Individual Plaintiffs' high interchange fees in these 10 states is not the state no-surcharge statutes, but rather the Networks' nationwide No-Surcharge Rule or, alternatively, Defendants' other Anti-Steering Rules.

---

[23]    The Individual Plaintiffs are multi-state businesses with retail stores throughout the United States.  Even those Individual Plaintiffs with stores in the ten states with no-surcharge statutes also have stores in state without those laws.

Third, Defendants assume that if their No-Surcharge Rule and a state no-surcharge statute both cause the same injury to the Individual Plaintiffs, then Defendants are absolved from having caused the injury. This assumption is incorrect. Defendants' conduct need not be the exclusive cause of the Individual Plaintiffs' injury. It is sufficient that the Defendants' conduct is a "material cause" of the claimed injury, *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114, n.9 (1969) or a "substantial contributing factor." *Fishman v. Estate of Wirtz*, 1981-2 Trade Cas. ¶64,378 (N.D.Ill. 1981), *aff'd.*, 807 F.2d 520, 533-35 (7th Cir. 1986).

This Court has already ruled on this issue – in the Class Plaintiffs' favor – in this case in considering whether, as a matter of law, Defendants' conduct or the IPO which MasterCard contends made it a single entity caused the Class Plaintiffs' alleged injury. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1820 (JG)(JO), 2008 WL 5082872 (E.D.N.Y. 2008) ("*Payment Card*"). MasterCard argued that post-IPO, it is a single entity and that whatever injury the Class suffered post-IPO was caused by the operation of law, not MasterCard's private conduct. As it has here, MasterCard relied on *RSA Media*, 260 F.3d at 10. This Court rejected that argument and held that where "the defendants' conduct and the applicable law are *both* 'but for' causes of the alleged injury," the plaintiffs have sufficiently plead an injury that "flows from that which makes the defendants' acts unlawful." *Payment Card*, 2008 WL 5082872 at *14. This Court's opinion is controlling here. Any injury to the Individual Plaintiffs suffered as a result of the ban on surcharging is, at most, caused by "both" Defendants' No-Surcharge Rule and the state statutes. As this Court has already held, such dual causation does not prevent Defendants' conduct from being the legal cause of the injury.

**B.**     ***Substantial Evidence Supports the Individual Plaintiffs'***
***Allegations That Each Defendant has Monopoly Power***

There is overwhelming direct and indirect evidence in this record that each Defendant has monopoly power in both of the relevant markets defined by the Individual Plaintiffs' expert economist, Dr. Vellturo.   In this Section, we describe that evidence and dispense with Defendants' arguments – which are nothing more than thinly-disguised genuine disputes about material facts in this case – about the metrics used to define those markets.

(1)     *Substantial Direct Evidence Supports the*
*Individual Plaintiffs' Allegations of Monopoly Power*

This Court previously denied MasterCard's motion to dismiss the Individual Plaintiffs' Section 2 claims, holding that "[i]f the Individual Plaintiffs can prove [certain] allegations [in their Complaints], they will succeed in demonstrating that MasterCard has the ability to control prices and exclude competition – that is, they will establish MasterCard's monopoly power."  Order of Jan. 11, 2008 at 13 (Dk. 878).  "Specifically, [Individual Plaintiffs] claim that MasterCard has controlled prices by setting 'pricing tiers' for different groups of merchants, increasing the level of its interchange fees, and establishing different rates for general and premium cards, all without losing business."  *Id.*  The discovery record copiously supports these allegations of direct evidence of monopoly power, and accordingly Defendants are not entitled to summary judgment.

(a)     Substantial Evidence Supports the Individual
Plaintiffs' Allegations of Defendants' Monopoly Power

(i)     Prices Substantially Above Competitive Level.   "Market power" is the "the ability to raise prices above those that would be charged in a competitive market."  *U.S. v. Visa*, 163 F. Supp. 2d 322, 340 (S.D.N.Y. 2001) ("*Visa I*") (quoting *NCAA*, 468 U.S. at 109 n.38); see also *K.M.B. Warehouse v. Walker Mfg.*, 61 F.3d 123, 129 (2d Cir. 1995) (market power is the "the ability to raise price significantly above the competitive level without

26

losing all of one's business") (citation omitted). "Monopoly power" is substantial market power, *i.e.*, the ability to raise prices substantially above the competitive level. *See AD/SAT v. Associated Press*, 181 F.3d 216, 226-27 (2d Cir. 1999) (quoting 2A Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW 501, at 86 (1995 rev. ed.); *see also U.S. v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001) (*en banc*) ("a firm is a monopolist if it can profitably raise prices substantially above the competitive level").

Substantial evidence here shows that Visa's and MasterCard's interchange fees to large retail merchants such as the Individual Plaintiffs are outlandishly above competitive rates and reflect each Network's monopoly power. The Individual Plaintiffs' economist, Dr. Vellturo, explains that, absent the Merchant Restraints, PIN debit cards would be highly substitutable by merchants for Defendants' credit card services. Vellturo Init. Rpt. ¶¶ 184, 188-92; *see also* SOF ¶¶ 84a(37), 84a(93), 84a(96)-84a(98), 111(4)-111(5). Dr. Stiglitz concurs. Stiglitz Init. Rpt. ¶¶ 67-69. On the conservative assumptions that existing PIN debit rates are themselves competitive, and that the Individual Plaintiffs would be willing to pay an additional 13 basis points for the fraud protection required by credit cards, the competitive rates (but for Defendants' unlawful conduct) for the Individual Plaintiff supermarkets and drugstores are █████████████████ respectively, in 2008.[24] Vellturo Rpt. ¶¶ 260-63 and Ex. 26A, 27A, *see also* SOF ¶¶ 111(3)-111(5). Dr. Vellturo's conclusion has subsequently been dramatically confirmed by the results in Australia, where, in fact, Visa and MasterCard credit card services to large merchants like the Individual Plaintiffs have been competed down to about ████████

---

[24]     The Individual Plaintiffs in fact believe that the drugstore rates would have been much lower, and that the calculated ████████ is an artifact of above-competitive PIN debit rates.

████████████████████████████████████████████████████ SOF ¶¶ 84a(89)-

84a(93); Vellturo Reply Rpt. at ¶¶ 39-51, 128-130.

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ Given that significant antitrust

concern begins to arise when prices exceed the competitive level by 5% to 10% (*e.g.*,

U.S.D.O.J. and FTC Horizontal Merger Guidelines (Aug. 19, 2010) § 4.1.2.), the enormous gaps

between the actual and competitive rates here indicate Defendants' substantial market power

by any definition.

(ii)    Pricing Unrelated to Costs.  The record contains substantial

evidence "that MasterCard is a supplier that can set the price of its product without regard to its

costs."  Order of Jan. 11, 2008 at 13 (Dk. 878).  So is Visa.  This cannot happen in markets

where suppliers have little or no market power, because price competition among suppliers

keeps their prices close to their costs.  Vellturo Init. Rpt. ¶ 159.  Where a supplier has

significant market power, however, the "customer elasticity (willingness to pay) plays a greater

role in price formation."  *Id.* ¶ 160; *see also id.* ¶¶ 101-103.

---

²⁵      This is *below* the regulatory maximum weighted-average rates in Australia.
Vellturo Reply Rpt. ¶ 127.



28

Here, the record is replete with evidence that Visa and MasterCard both "make interchange pricing decisions (invariably increasing the fees) independently of costs; instead, Defendants set interchange fees based on merchant willingness to pay the interchange fees." *Id.* ¶ 161; SOF ¶¶ 111(19)-111(23).  This evidence includes Visa testimony and documents indicating that its interchange fees are "not cost based" but are "value based." Vellturo Init. Rpt. ¶ 161 & n.238.  For example, William Sheedy, the Visa executive responsible for setting interchange fees, testified that ████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████ SOF ¶ 111(20).  MasterCard's testimony is to the same effect. SOF ¶ 111(24).  ██████████████████████████████████████████████ ████████████████████████████████████████ SOF ¶ 111(23).  A seller can base its price on buyers' valuations only when it has substantial control over the price, and not when competition dictates the price.  IIB Phillip E. Areeda, Herbert Hovenkamp & John L. Solow, ANTITRUST LAW ¶ 517a, at 151-52 (3d ed. 2007).

     (iii) <u>Increased Prices Despite Reduced Costs and Increased Volumes</u>.  MasterCard and Visa each has "increase[d] the level of its interchange fees" despite the reduced costs of providing the credit card services to merchants.  Order of Jan. 11, 2008 at 13 (Dk. 878); *see also In re Visa Check/MasterMoney Antitrust Litig.*, No. 96-CV-5238 (JG), 2003 WL 1712568 at *3 (E.D.N.Y. Apr. 1, 2003) (Gleeson, J.) (finding "appreciable economic power" because "merchants have not switched to other payment devices despite significant increases in the interchange fees on the defendants' credit cards") ("*Visa Check*").  The average effective interchange rates on Visa and MasterCard credit card transactions increased by 42.1% and 37.3%, respectively, from 1995 to 2009, and by 17.1% and 19.6%, respectively, from 2003 to 2009.  *See* Vellturo Init. Rpt. ¶ 65 & Exs. 8 & 9; Vellturo Reply Rpt. Exs. 3 & 4.  These

29

increases are especially staggering given that, during that time, Defendants enjoyed substantially reduced costs in information technology, computing, switches, and telecommunications, and significant economies of scale and scope. SOF ¶¶ 111(62)-111(71); Vellturo Init. Rpt. ¶¶ 64, 102, and Ex. 7.

The Individual Plaintiffs suffered these increasing prices despite Defendants' lower transaction costs and despite the Individual Plaintiffs' own substantially increasing volumes of purchases from Defendants. *See* SOF ¶ 111(71); Vellturo Init. Rpt. Ex. 13. For example,



SOF ¶ 111(71); Vellturo Init. Rpt. Exs. 16A, 26B. The same pattern is true for other Individual Plaintiffs for both Visa and MasterCard. *See* Vellturo Init. Rpt. Exs. 16C, 18C.

(iv)    Supracompetitive Profits.    The record reveals that interchange fees yielded supracompetitive profits to Defendants' issuing banks. This is partially reflected in the fact that credit card portfolios are sold at premium prices. Stiglitz Reply Rpt. at 34. It is also seen in the issuing banks' use of supracompetitive profits on interchange fees to build brand loyalty. SOF ¶¶ 111(54)-111(58); Vellturo Rpt. ¶ 226 ("Issuing banks have used interchange fees to build their brands at the shopper level with merchants picking up the tab"). Much of the issuing banks' profits on supracompetitive interchange fees are dissipated in inefficient, non-price competition for additional cardholders. SOF ¶¶ 111(59)-111(61); Stiglitz Init. Rpt. ¶¶ 50-51; Vellturo Init. Rpt. ¶¶ 234-41. This is a common problem for monopolists and cartels whose excess profits tend to get converted into inefficient costs or dissipated in inefficient non-price forms of competition. IIB Areeda, Hovenkamp & Solow, ANTITRUST LAW ¶ 405, at 30 ("cartel members, though abiding by the cartel price, may endeavor to increase their

sales by offering additional services, and by this competitive escalation of costs reduce or eliminate their excess profits"); George J. Stigler, Price and Nonprice Competition, 76 J. Pol. Econ 149, 150-52 (1968) (nonprice competition can dissipate all of the profits that flow from cartel agreements); Richard A. Posner, Antitrust Law (2d ed. 2001) at 16 (noting "the tendency of monopoly profits to be converted into social costs").  That phenomenon is manifested here in inefficient, non-price competition in the form of issuers' wasteful solicitations for card members and non-monetary "rewards" to high-interchange cardholders.  SOF ¶¶ 111(59)-111(61); Stiglitz Rpt. ¶¶ 50-51; Vellturo Rpt. ¶¶ 234-41.[27]

        (v)    Substantial Price Discrimination.  A supplier's ability to engage in substantial price discrimination is a significant indicator of monopoly power.  It is true, as Defendants suggest, that some modest degree of price discrimination is consistent with relatively competitive markets in which suppliers may have some pricing discretion as a result, for example, of product differentiation.  See, e.g., Illinois Tool Works Inc. v. Indep. Ink, Inc., 547 U.S. 28, 44-45 (2006); Vellturo Reply Rpt. ¶ 98.  But substantial and sustained price discrimination is a clear indicator of substantial market power, i.e., monopoly power.  Visa I, 163 F. Supp. 2d at 340 ("Defendants' ability to price discriminate also illustrates their market power"); Posner, Antitrust Law at 81 ("persistent or systematic discrimination … is a symptom of monopoly"); IIB Areeda, Hovenkamp & Solow, Antitrust Law ¶ 517a, at 151 (market power is indicated by "persistent and systematic price discrimination"); see also Vellturo Reply Rpt. ¶ 98.  Substantial price discrimination indicates an ability to price based significantly on customers' individual demand elasticities rather than on the supplier's own costs, and this

---

[27]     Defendants' experts have erroneously asserted that, in calculating the price (interchange fee) charged by Defendants to merchants, the Defendants' cost of providing "rewards" to certain cardholders should be deducted.  Defendants have not pursued those erroneous theories in their motions or briefs, so we do not address them.

cannot happen when rivals constrain a firm's prices to the competitive level.  IIB Areeda, Hovenkamp & Solow, ANTITRUST LAW ¶ 517a, at 153.  The supplier's lower prices are presumed to be above its costs, and substantially higher prices are therefore presumed to be substantially above costs and thus not sufficiently constrained by other suppliers.  *Id.; see also id.,* ¶ 517b, at 151-152.  Here, Defendants have acknowledged that their price discrimination is based on merchant elasticity of demand, and not on varying costs of providing the service.  SOF ¶¶ 111(19)-111(26); Vellturo Init. Rpt. ¶¶ 161-62.[28]

The Individual Plaintiffs have adduced significant evidence that both Visa and MasterCard have set "pricing tiers" for different groups of merchants and have established different rates for general and premium cards.  ███████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████  █████████████████████████████████████████████████████

████████████████████████████   ███████████████████████

Moreover, not only the breadth but also the degree of price discrimination was enormous.  ██

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[28]      The magnitude of the price discrimination, and Defendants' acknowledgement that it is not cost-based, overcomes any difficulties that might otherwise arise in using price discrimination to infer substantial market power.  IIB Areeda, Hovenkamp & Solow, ANTITRUST LAW ¶ 517b at 153.



32



(vi)   <u>Forced Acceptance of Anticompetitive Terms</u>.  MasterCard and Visa have each succeeded in forcing nearly all merchants that accept their cards to comply with the Merchant Restraints.[31]  Visa's and MasterCard's ability to force merchants to accept such non-competitive conditions of service is a strong indicator of substantial market power. *Visa Check*, 2003 WL 1712568 at *4 ("Visa indisputably possesses sufficient market power 'to force merchants to do something that they would not do in a competitive market.'"); *see generally Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 464 (1992) ("Market power is the power 'to force a purchaser to do something that he would not do in a competitive market'") (citation omitted).

(vii)   <u>No Loss of Card Acceptance</u>.  Visa and MasterCard each has achieved the substantial price increases, "value-based" pricing, substantial price discrimination, and imposition of non-competitive terms "all without losing business."  Order of Jan. 11, 2008 at 13 (Dk. 878).  Despite the supracompetitive and ever-increasing fees, neither Visa nor MasterCard experienced any significant loss of merchant acceptance during the relevant time.  SOF ¶¶ 111(74)-111(78), 111(107)-111(112); Vellturo Rpt. ¶ 134 & n.203; *see also id.* ¶ 135 & n.205, ¶ 150 & n.225.  This was a central fact in prior courts' conclusions that both Visa and MasterCard have market power.  *Visa II*, 344 F.3d at 240; *Visa Check*, 2003 WL 1712568 at *3.  Indeed, Defendants have now conceded that potential loss of merchant

---

31

acceptance plays no role in their setting of interchange rates.   SOF ¶¶ 111(107)-111(112); Vellturo Rpt. ¶ 147.

(b)   Defendants' New Arguments are Meritless

The factors identified in the preceding section are classic, well-known indicators of market power, and the evidence supporting them, and the fact that the market power is very substantial, is easily sufficient to support a jury verdict.   Faced with that reality, Defendants try to obscure the facts with irrelevancies and contortions.   Those tactics fail.

(i)   <u>Evidence of Restricted Output</u>.   Defendants suggest that the record does not show that they raised interchange fees by restricting the output of credit card transactions.   Def. Ind. Plf. Br. at 22-23.   Defendants' contention is both wrong and irrelevant for three reasons.

First, in previously identifying the evidence needed to establish substantial market power, the Court did not focus on the effect of the Merchant Restraints on output, and for good reason.   The touchstone of antitrust concern is reduced output or higher prices.   As the courts have recognized, higher prices cause reduced output.   *See, e.g., Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 503 (1969) ("reduced output is the almost invisible result of higher prices"); *Branton v. F.C.C.*, 993 F.2d 906, 911-12 (D.C. Cir. 1993) (describing "fundamental principle "that increased price reduces output," *i.e.*, "that demand curves are downward sloping").

Reliable measures of what output would have been absent Defendants' unlawful conduct are often elusive, and direct measures of output are not required to sustain a jury's conclusion that a defendant has substantial market power.   No court has ruled that direct evidence of reduced output is a necessary element to show monopoly power.

34

Instead, based on the most basic of economic principles – the Law of Demand[32] – courts evaluating anticompetitive conduct have focused on reduced output *or* increased prices.  *See, e.g., Leegin*, 551 U.S. at 893 (condemning conduct that "decreases output or reduces competition in order to increase price"); *NCAA*, 468 U.S. at 109 (condemning "agreement not to compete in terms of price or output"); *Visa II*, 344 F.3d at 238 (condemning conduct that has "substantial adverse effects on competition, such as increases in price, or decreases in output or quality"); Frank H. Easterbrook, *On Identifying Exclusionary Conduct*, 61 Notre Dame L. Rev. 972, 979 (1986) ("Elaborate econometric measures of output ... often ... are indeterminate"). Accordingly, "[t]he goal in defining the relevant market is to identify the market participants and competitive pressures that restrain an individual firm's ability to raise prices *or* restrict output."  *Geneva Pharms. Tech. Corp. v. Barr Labs, Inc.*, 386 F.3d 485, 496 (2d Cir. 2004).

Second, if evidence of an output effect were necessary, the proper measure of output in this case would not be the output of credit card transactions.  The Merchant Restraints impair competition from lower-cost alternative methods of payment, and may thus artificially increase the output of credit card transactions.  SOF ¶¶ 128(1)-128(2); Stiglitz Init. Rpt. ¶ 74 & n.91.  Therefore, using credit card transactions as the appropriate measure of output would be "economic nonsense."  SOF ¶¶ 128(1)-128(2); Stiglitz Init. Rpt. ¶ 74; *see also* Thomas G. Krattenmaker & Steven C. Salop, *Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power Over Price*, 96 Yale L. J. 209, 283 (1986) (advocates of output metrics "have erroneously evaluated only the output of the firm adopting the restraint, not the entire market").[33]

---

[32]     The Law of Demand provides that an increase in price reduces the quantity demanded by consumers.  Posner, Antitrust Law at 9 ("price is inverse to quantity").

[33]     Defendants manage to wave two red herrings at once in asserting that the output of credit card transactions is greater today than it was in the past.  *See* Def. Ind. Pl. Br.

If output evidence were required, then the proper measure would be the output of all payment mechanisms that are affected by the Merchant Restraints, certainly including at least all forms of electronic payment.  SOF ¶¶ 128(1)-128(2); Stiglitz Init. Rpt. ¶¶ 73, 76 & n.93; Robert H. Bork, THE ANTITRUST PARADOX 269 (rev'd ed. 1993) (firms are presumed to know which rivals threaten them, so in price-fixing cases "[t]he fact of agreement defines the market").   By preventing merchants from giving appropriate price signals to shoppers to use the lowest-cost payment methods with the features they value, the Merchant Restraints unambiguously raised the total cost and thereby reduced the output of payment mechanisms below the levels that they would have been absent the Merchant Restraints. Stiglitz Rpt. ¶¶ 10G, 10J, 38, 73; Stiglitz Reply Rpt. at 10; Vellturo Init. Rpt. ¶ 192 n.269; Vellturo Init. Rpt. at 136; *see also* SOF ¶¶ 84a(9)-84a(30) (showing how supracompetitive interchange fees result in higher retail prices).[34]

> (ii)    Price Discrimination by Others.    Defendants' contention that American Express and Discover also engage in price discrimination (Def. Ind. Plf. Br. at 23) is irrelevant.   There is simply no expert testimony in this case as to the market power of American Express or Discover.   Moreover, both American Express and Discover have the same or substantially similar Merchant Restraints which the Individual Plaintiffs challenge in this case,

_____ (Continued)

at 22.  The proper metric is output of all payment mechanisms, not that of credit cards, and the proper comparison is output with the Merchant Restraints versus without them, not actual output with the Merchant Restraints today versus actual output in the past with those restraints.  SOF ¶¶ 128(1)-128(2); Vellturo Init. Rpt. ¶ 57; Stiglitz Init. Rpt. ¶ 74; Stiglitz Reply Rpt. at 66 n.142.

[34]    While much of the issuing banks' profits from high interchange fees are dissipated in non-price competition ("rewards," etc.) to attract more card usage and thereby more of the monopoly profits, that competition is not sufficient to offset the lost output from the higher prices.  If it were, then the market would have delivered that volume without needing the Merchant Restraints.  *See* Posner, ANTITRUST LAW at 14 ("if consumers valued the additional services generated by this [dissipative] competition above its cost, presumably the services would have been produced in a price-competitive market as well").

and which Judge Gleeson in this case and Judge Garaufis in the *American Express* case have already ruled can support a Section 2 claim. *See* Order of May 14, 2008 (Dk. 974), MDL 1720; Order of March 3, 2010 (Dk. 47), *Walgreen Co. v. American Express*, Case No. 08-cv-2317 (NGG)(RER) (E.D.N.Y. 2008) (Dk. 1).

> (2)   *Substantial Indirect Evidence Supports The Individual Plaintiffs' Allegations of Defendants' Monopoly Power*

In addition to the extensive direct evidence addressed above, the Individual Plaintiffs are also entitled to show Defendants' monopoly power through indirect evidence such as large market shares and barriers to entry. This evidence confirms and reinforces the direct evidence of Defendants' monopoly power. SOF ¶¶ 111(83)-111(96).

The Individual Plaintiffs' economists opine that Visa and MasterCard each has substantial shares and market power in two alternative relevant markets: (1) a TPPC market consisting of the sale of credit card, charge card, and debit card network services to merchants; or (2) a narrower market consisting of only the sale of Visa or MasterCard credit card network services to merchants. SOF ¶ 111(1); Vellturo Init. Rpt. ¶¶ 34, 145-152. Defendants' attacks on this evidence fall far short of entitlement to summary judgment.

> (a)   Extensive Evidence Shows Each Defendant's Substantial Power in a TPPC Market

Relevant markets are appropriately defined by reference to economically discrete sets of customers to whom the product or service is sold. Vellturo Rpt. ¶ 145 n.218; Vellturo Reply Rpt. ¶ 64. Here the discrete set of customers is the merchants (as opposed to the cardholders), so the market definition exercise must focus on the set of network services that are reasonably interchangeable from the *merchants' point of view*. Vellturo Rpt. ¶¶ 138-39.

Dr. Vellturo explains at length that merchants perceive no substantial difference among credit card, charge cards and debit cards (except for their prices) – they are all efficient means of electronic payment.  *Id.* ¶¶ 35, 67, 74-77, 138-39; *see also* Stiglitz Rpt. ¶ 68.  Dr. Vellturo's preferred market definition is much narrower than the TPPC market because the Merchant Restraints in fact very substantially reduce the cross-elasticity of demand at the merchant level among these otherwise interchangeable forms of payment.  *See infra* at 41-45.  But if the jury insists on a broader market definition, then it should include debit cards as well as credit cards and charge cards.  From the merchant's perspective, all three types of cards perform the same function in the same way, and there is no evidence of greater cross-elasticity of demand between, say, two brands of credit cards than between credit cards and debit cards.  Vellturo Init. Rpt. ¶ 138 & n.213.  Neither Defendants nor their experts contend to the contrary.[35]  Defendants' arguments against this alternative market definition fail.

        (i)     <u>Market Shares</u>.  This Court has already concluded that "a finding that MasterCard's market share is less than 30% would not, in any event, foreclose the possibility that the Individual Plaintiffs may succeed on their Section 2 claims."  Order of Jan. 11, 2008 at 12 (Dk. 878).[36]  The Court elaborated:

---

[35]     Several courts have concluded that a market including debit cards and charge cards was too broad.  *See, e.g., Visa I*, 163 F. Supp. 2d at 336-37; *Visa Check*, 2003 WL 1712568 at *3.  But those courts did not have the benefit of the expert reports and evidence here.  Similarly, the fact that the Individual Plaintiffs' Complaints allege a narrower market does not preclude their experts from urging, or the jury from accepting, a broader one.  *See, e.g., Pepsico, Inc. v. Coca-Cola Co.*, 114 F. Supp. 2d 243, 246 (S.D.N.Y. 2000) (assessing on the merits at summary judgment a market definition different from that alleged in complaint), *aff'd*, 315 F.3d 101, 105-06 (2d Cir. 2002).

[36]     The Court's opinion addressed a narrower market alleged in the Individual Plaintiffs' Complaints, which did not include debit cards.  But the Court's reasoning regarding the necessary level of market share is nevertheless fully applicable.

> The Individual Plaintiffs allege that the entry barriers to the general purpose market are so high that there have not been new competitors in over 20 years., Moreover, they claim that MasterCard's conduct has neutralized the ability of market forces to correct supra-competitive pricing and that the rules it imposes on merchants force them to purchase network services at prices they would not pay if they had economically feasible alternatives.  In the context of such allegations, MasterCard's assertion that its market share is less than 30% ..., while relevant, cannot be dispositive;  if the Individual Plaintiffs prove their allegations they may succeed in demonstrating that MasterCard wields monopoly power (or is dangerously likely to acquire it) notwithstanding its limited share of the market.

*Id.* at 15 (citation omitted).

The record shows that each Defendant has substantial shares in the TPPC market; Visa's share is consistently at or above 50%, and MasterCard's at or above 25%.  SOF ¶¶ 128(3)-128(4); Vellturo Init. Rpt. ¶ 156 & Ex. 15.  These shares understate each Defendant's monopoly power because each accumulates the combined power of its issuing banks.  Vellturo Init. Rpt. ¶ 156.  The record also fully vindicates the Individual Plaintiffs' allegations that the Merchant Restraints very substantially reduced the elasticity of demand between each of Defendant's services and those of other payment cards for sales to merchants.  Vellturo Init. Rpt. ¶¶ 144, 152; Stiglitz Init. Rpt. ¶ 41; *see also Visa Check*, 2003 WL 1712568 at *3 ("there is no cross-elasticity of demand at the merchant level between defendants' products and all other forms of payment").  By reducing the cross-elasticities of demand they face, each Defendant lowered the own price elasticity of demand it faces, thereby preserving and enhancing its monopoly power.  Vellturo Rpt. ¶ 125.

The Individual Plaintiffs' allegations of very high entry barriers, and lack of significant entry in the TPPC market in the last 20 years, are likewise fully supported.  SOF ¶¶ 111(83)-111(96); Vellturo Init. Rpt. ¶¶ 73, 157.  No new entrant since 1991

has achieved more than a 0.11% share of point-of-sale transaction volume.  SOF ¶ 111(83);

Vellturo Init. Rpt. Ex. 15.  The alleged "new entrants" touted by Defendants' experts "are all

small, essentially 'niche' or entirely nascent entities with no hope of growing into competitive

threats anytime in the near future for 'brick and mortar' retailers."  Vellturo Reply Rpt. ¶ 92; *see*

*also id.* ¶¶ 69, 91.[37]

Defendants try to undermine the evidence regarding entry barriers

by asserting that their shares have declined over time, and that courts have held that such a

decline precludes a finding of substantial market power as a matter of law.  *See* Def. Ind. Plf.

Br. at 25.  Defendants' contentions are frivolous.  They cite to alleged shares of credit card and

charge card transactions, Def. Ind. Plf. Br. at 25, 27, but the Individual Plaintiffs' alternative

TPPC market includes debit card transactions as well.  SOF ¶ 111(1); Vellturo Init. Rpt. ¶¶ 34,

156.  In the time period discussed by Defendants – 2004 to 2008 – Visa's share of the TPPC

market for total dollar volume of transactions grew from 49.8% to 50.7%.  SOF ¶ 128(3);

Vellturo Init. Rpt. Ex. 15.  MasterCard's share grew from 25.9% to 26.2%.  *Id.*

Moreover, the cases cited by Defendants hold only that declining

market share is a factor a jury may take into consideration in determining monopoly power, not

that it is determinative.  *See Nifty Foods Corp. v. Great Atl. & Pac. Tea Co.*, 614 F.2d 832, 841

(2d Cir. 1980) (plaintiff proffered only market share evidence); *Commercial Data Servcs, Inc. v.*

*IBM Corp.*, 262 F. Supp. 2d 50, 63 (S.D.N.Y. 2003) (evidence showed substantial cross elasticity

of demand, and that defendant had no power to set prices); *Advanced Health-Care Servs. Inc.*

---

[37]     In addition to the payment cards cited by Defendants' experts, there have also been two new debit card systems since 1990.  Cartel Networks entered in 2000 and achieved transaction volume of $117 million (.006% of the TPPC market) by 2002; Networks entered in 1996 and achieved $105 million of transaction volume (.005% of the TPPC market) by 2002. *See* Nilson Reports for 1996 and 2002, Vellturo Init. Rpt. Ex. 15; Vellturo Reply Rpt. ¶¶ 67-92. Their volumes have not been sufficient to be reported by Nilson since 2002.

*v. Giles Mem'l Hosp.*, 846 F. Supp. 488, 493 (W.D. Va. 1994) (no evidence of entry barriers, increased prices, or decline in quality).  And those cases all concerned *substantial* decreases in market shares.  *Nifty Foods*, 614 F.2d at 841 (decline of 15.3 share points); *Commercial Data Servs.*, 262 F. Supp. 2d at 74 (decline of 12 share points); *Advanced Health-Care*, 846 F. Supp. at 494 (defendant's share declined to 0 – it went out of business).  Defendants' own numbers, based on only credit cards and charge cards, show only a *de minimus* decline from 2004 to 2008 of just .3 share points for Visa and 2.1 share points for MasterCard.  Def. Ind. Plf. Br. at 25.  This clearly is not the magnitude of decline found potentially relevant in Defendants' cases.  Moreover, lengthening the time horizon reveals remarkably stable shares for both Visa and MasterCard over an extended period.  SOF ¶ 128(4).

Defendants similarly miss the mark in contending that there are no barriers to expansion by existing competitors in the market (as opposed to barriers to entry by new competitors).  *See* Def. Ind. Plf. Br. at 27.  The record contains substantial evidence that the Merchant Restraints prevented competitors from constraining Defendants' interchange fees by taking transaction volume from Defendants.  SOF ¶¶ 111(93)-111(96); Stiglitz Init. Rpt. ¶ 41; Vellturo Init. Rpt. ¶¶ 144, 152.  For example, even if Discover had the technological capacity to process all the transactions in the TPPC market, the Merchant Restraints prevented retailers from using price signals to steer shoppers to Discover in exchange for lower interchange fees.  SOF ¶¶ 111(93)-111(96); Vellturo Init. Rpt. ¶¶ 173-75.  The Merchant Restraints "prevent merchants from using price signals to steer usage to a new entrant's (or would-be expander's) lower-cost card."  Stiglitz Init. Rpt. ¶ 55.

      (b)    Extensive Evidence Shows Each Defendant's Substantial Power in a Market for the Sale of its Own Services to Merchants

The evidence showing Defendants' substantial market power also is sufficient to permit a jury to conclude that Visa has 100% of a market for the sale of Visa credit

41

card services to merchants, and that MasterCard has 100% of the market for the sale of MasterCard credit card services to merchants.  This Court has already concluded that "where a product's characteristics make it unique or circumstances prevent consumers from substituting alternatives for the same purposes, it may be alone in the relevant product market."  Order of Jan. 11, 2008 at 17 (Dk. 878).  The Court noted the Individual Plaintiffs' allegations concerning the effect of MasterCard's prohibition on using price signals at the point of sale:

> [Individual Plaintiffs'] customers understandably have no reason to select payment cards on the basis of price, thereby giving merchants a strong incentive to accept all cards – and therefore a strong disincentive to purchase network services only from, for example, Visa.   The Individual Plaintiffs therefore assert that consumers who use MasterCard-branded credit cards rather than the Visa analogs do so for reasons other than preferences arising from price competition between the brands in a market for network services; to the contrary, the Individual Plaintiffs contend that their customers are insulated from such cost considerations.

*Id.* at 19 (citation omitted).

Very substantial evidence in the record supports the Individual Plaintiffs' allegations that the Merchant Restraints significantly reduce the cross-elasticity of demand between each Defendant's network services to merchants and alternative payment means.  This evidence includes the expert opinions of Dr. Stiglitz and Dr. Vellturo (Stiglitz Init. Rpt. ¶ 4; Vellturo Init. Rpt. ¶¶ 144, 152); Defendants' own predictions regarding the effect of eliminating the Merchant Restraints in the United States (SOF ¶¶ 84a(31)-84a(37), 84a(47), 84a(81)-84a(82)); Defendants' own expert reports and presentations to competition authorities in other jurisdictions (SOF ¶¶ 84a(40)-84a(46), 84a(66)-84a(70), 84a(72)-84a(79), 84a(92)); large Australian merchants' use (or threat) of surcharging to reduce their interchange fees on Visa and MasterCard to substantially less than the regulatory maximum average 50 basis points (SOF ¶¶ 84a(50)-84a(54), 84a(92)); large Australian merchants' use (or threat) of surcharging American Express cards to reduce their merchant service fees by half or more (SOF ¶¶ 84a(55)-

84a(56), 84a(92, 84a(94)), and the conclusions reached by authorities in other jurisdictions (SOF ¶¶ 84a(48), 84a(50)-84a(51), 84a(71)).

Under the "hypothetical monopolist" or "SSNIP" test, a buyer's failure to shift away from a product or service to another product in response to a small but significant, non-transitory increase in price (generally 5% - 10%) establishes that the products are not in the same relevant market.  U.S. D.O.J. and FTC, Horizontal Merger Guidelines (Aug. 19, 2010) § 4.1.2; *Visa I*, 163 F. Supp. 2d at 335.  That standard is easily met here.  Vellturo Init. Rpt. ¶¶ 145, 147-48, 150; Vellturo Reply Rpt. ¶¶ 63-65.  Despite an increase of Visa and MasterCard interchange rates of 28.6% and 31.5%, respectively, essentially no merchants have stopped accepting Visa and MasterCard credit cards, and their volume of transactions have grown enormously.  SOF ¶¶ 111(71), 111(101), 111(102); Vellturo Init. Rpt. ¶¶ 147, 150, 64, 102, Exs. 7-9.

Similarly, despite substantially different interchange rates on Visa credit cards versus MasterCard credit cards, the Individual Plaintiffs have not been able to switch usage to the lower-cost service.  SOF ¶¶ 84a(1)-84a(7). ███████████████

43

Again, however, the Individual Plaintiffs have not shifted sales to the Discover card because the Merchant Restraints effectively prevent it. *Id.*

The Court of Appeals has already concluded, based *inter alia* on the level of interchange fees charged by Visa and MasterCard and the presence of the Merchant Restraints, that each of them "separately" has market power in the broader market. *Visa II*, 344 F.3d at 239. The evidence here establishes that this market power is very substantial – Visa and MasterCard are pricing their network services to merchants as much as 330% of the competitive level. Vellturo Init. Rpt. Exs. 26A-27A. The conclusion that Visa and MasterCard each has substantial market power would fully support a jury's conclusion that they do not reside in the same relevant antitrust market, that the TPPC market is too broad, and that a narrower market would include only each of Visa and MasterCard. Vellturo Init. Rpt. ¶¶ 145-150; Stiglitz Init. Rpt. ¶ 66.[38]

That is exactly the conclusion reached by the UK's Office of Fair Trading ("OFT"). SOF ¶ 111(113). The evidence there, as here, showed that MasterCard had steadily increased its interchange fees to merchants without experiencing the loss of acceptance by any significant number of merchants. *Id.* The presence of neither Visa nor other forms of payment constrained MasterCard's interchange fees to the competitive level: the evidence showed that "a sufficiently high number of merchants would [not] be likely to switch away or exit from

---

[38]    Evidence that shows directly that a defendant has priced its product above the competitive level supports a narrower market definition because potential substitutes are not in fact constraining defendant's price to the competitive level and therefore should not be included in the relevant market. *See, e.g., Eastman Kodak Co.,* 504 U.S. at 469 n.15 ("whether considered in the conceptual category of 'market definition' or 'market power,' the ultimate inquiry is the same"); *Times-Picayune Pub. Co. v. U.S.,* 345 U.S. 594, 612 n.31 (1953) ("The [market definition] circle must be drawn narrowly to exclude any other products to which, within reasonable variations in price, only a limited number of buyers will turn"); *Geneva Pharms.,* 386 F.3d at 500-01 (direct evidence of market power also used to support very narrow market definition).

accepting MasterCard branded credit and charge card schemes to relying only on other forms of payments methods, such that those other forms of payment methods should be included in the relevant wholesale and acquiring markets." *Id.* Using the standard SSNIP test, the OFT concluded that "the relevant product markets for the consideration of the [interchange fee] agreement are the provision of wholesale and acquiring services for MasterCard branded credit and charge cards." *Id.*[39]

        (c)     Defendants' Arguments Are Meritless

        (i)    <u>Functional Interchangeability</u>.  Defendants nevertheless assert that the Individual Plaintiffs must produce evidence that Defendants' network services "are not interchangeable" with other payment mechanisms.  Def. Ind. Plf. Br. at 15. Defendants then cite various evidence that their payment cards perform the same function as other payment systems, and that other payment systems "compete" with Visa and MasterCard for merchant acceptance. *Id.* at 15-17.

        *Functional* substitutability, however, would not require a jury to include products in the same relevant market; instead, the jury may properly conclude that functionally interchangeable products are not in the same relevant market if they do not constrain each other's prices to the competitive level.  Indeed, this Court has already held that "[t]he contours of the relevant market track the cross-elasticity of demand."  Order of Jan. 11, 2008 at 9 (Dk. 878).  Products are in the same relevant market only if consumers "respond to

---

    [39]    In *Visa Check,* 2003 WL 1712568 at *3, the Court found a market consisting of only Visa and MasterCard credit cards because "[t]he evidence establishes conclusively that merchants have not switched to other payment devices despite significant increases in the interchange fees on Defendants' credit cards."  *See also id.* (focusing on "the fact that there is no cross-elasticity of demand at the merchant level between defendants' products and all other forms of payment").  There was no need in that case for the court to consider any narrower markets.  Here, the Court's logic and analysis would permit a jury to find the narrower markets because there is "no cross-elasticity" at the merchant level between Visa and MasterCard's products.

an increase [in price] in one by purchasing the other." *Id.*; *see also id.* at 10 ("markets determined by "cross-elasticity of demand analysis"); *id.* at 15 ("a competitor in a market with high entry barriers could raise its prices unfettered by the prospect of a new entrant into the market who would undercut prices"); *id.* (focusing on whether "MasterCard's conduct has neutralized the ability of market forces to correct the supra-competitive pricing"); *id.* at 17 (focusing on whether customers have "economically feasible alternative").   The Court emphasized that the Merchant Restraints eliminate shoppers' "reason to select payment cards on the basis of price, thereby giving merchants a strong incentive to accept all cards – and therefore a strong disincentive to purchase network services only from, for example, Visa." *Id.* at 19.   Other courts have similarly held that functional interchangeability is not a sufficient condition for concluding that two products are in the same market.  The sufficient condition is that the two products constrain each other's prices to the competitive level. *See, e.g.*, *Eastman Kodak*, 504 U.S. at 469 & n.15 (market power is determined by the "extent to which consumers will change their consumption of one product in response to a price change in another, *i.e.*, the 'cross-elasticity of demand.'"); *Geneva Pharms.*, 386 F.3d at 496 (products are in the same market only when the ability of purchasers to switch to a substitute "restrains a firm's ability to raise prices above the competitive level"); *Telecor Commc'ns, Inc. v. S. W. Bell Tel. Co.*, 305 F.3d 1124, 1132 (10th Cir. 2002) ("[r]easonable interchangeability does not depend on product similarity"); *U.S. v. Microsoft Corp.*, 253 F.3d at 53-54 ("The test of reasonable interchangeability, however, required the District Court to consider only substitutes that constrain pricing in the reasonably foreseeable future ...."); *U.S. Anchor Mfg. Co. v. Rule Indus.*, 7 F.3d 986, 995-99 (11th Cir. 1993) (despite functional interchangeability, absence of price-related demand and supply elasticities limits market); *U.S. v. Archer-Daniels-Midland Co.*, 866 F.2d 242, 248 & n.1 (8th Cir. 1989) (sugar and high fructose corn syrup [HFCS], though

46

functionally interchangeable, are not in the same market because "a small change in the price of HFCS would have little or no effect on the demand for sugar"); *Visa I*, 163 F. Supp. 2d at 335 ("For goods or services to be in the same market as the defendants, substitutability in the eyes of consumers must be sufficiently great that the Defendants' charging of supracompetitive prices for its product would drive away not just some consumers but a large enough number to make such pricing unprofitable (and hence induce the Defendants to restore the competitive price)."); *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1074, 1080 (D.D.C. 1997) (absence of cross-elasticity of demand limits market despite functional interchangeability of products).  For the same reason, products are not in the same market merely because they "compete" with each other in some abstract sense or in non-price dimensions.  *Id.*.

Substantial evidence here shows that no other payment mechanisms constrain Visa's or MasterCard's prices to merchants to the competitive level. Specifically, "the pricing of their credit card services is not constrained by products that are functionally interchangeable."  SOF ¶¶ 111(6)-111(10); Vellturo Init. Rpt. ¶ 164; *see also id.* ¶ 152; Stiglitz Init. Rpt. ¶¶ 37, 66, 68.  Despite functional interchangeability for merchants, each of Visa's and MasterCard's prices to merchants is as much as ▮▮▮▮ of the competitive level. SOF ¶¶ 111(6)-111(10).

(ii)    <u>Parallel Price Moves</u>.  Defendants next assert that their prices to merchants are close and rise in tandem, and that this is definitive evidence that their services to merchants are in the same product market.  Def. Ind. Plf. Br. at 17.  This argument is, to put it bluntly, nonsense.

Only Defendants' effective *average* prices to *particular* merchants are *sometimes* relatively close.  The rates for *particular* cards to a particular merchant – *e.g.*, a

basic Visa card versus a premium MasterCard card, or vice versa – vary by as much as 70%.[40] *See* SOF at ¶ 111(127).   The Visa and MasterCard average effective prices also vary significantly among merchants.   *See supra* at 31-33.   Even Defendants' average effective rates to the Individual Plaintiffs diverged by more than 5% from each other (the SSNIP standard indicating that products are in separate markets) more than 54% of the time from 2004 to 2008, and more than 70% of the time from 2006 to 2008.   *See* SOF 128(4); Vellturo Init. Rpt. Exs. 27B & 27B.

Correlated price movements, if they existed, would not be definitive evidence that Visa and MasterCard services to merchants are in the same product market.   Instead, such correlation may reflect the opposite – that "the market is already monopolized."   IIB Areeda, Hovenkamp & Solow, Antitrust Law ¶ 534a2, at 265.   Measuring price correlations at above-competitive prices invites falling prey to the Cellophane trap.   *Id.* 8534b, at 266; *see U.S. v. Eastman Kodak Co.*, 63 F.3d 95, 103 (2d Cir. 1995) (describing Cellophane fallacy).

Moreover, "rather than high cross-elasticity of demand, correlated price movements might reflect the similar responses of different markets to similar changes, as when all prices move up in response to changes in common costs...."   IIB Areeda, Hovenkamp & Solow, Antitrust Law ¶ 534c, at 268.   For example, stainless steel refrigerators and dishwashers, although in different markets, may have highly correlated price changes resulting from increases in the cost of steel or changes in demand for new houses.   The jury here may

---

[40] ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████   Of course, Visa charges merchants substantially more for its standard cards than its premium cards, and there is no substantial cross-elasticity of demand between them.   So different types of Visa cards could, in an appropriate case, be found to be in different markets, but the jury may not need to reach that issue.   *See infra* at ___.

properly conclude that each Defendant is alone in its market for sales to merchants, but that Defendants face common demand factors from their issuing banks.  Velturo Init. Rpt. ¶¶ 226, 234; Stiglitz Init. Rpt. ¶¶ 50-51.   The evidence is that both Visa and MasterCard raised interchange fees to merchants in response to demands from their issuing banks for more profits.  SOF ¶ 84a(65); Velturo Init. Rpt. ¶ 142 n.215; ¶¶ 234-40.  The purportedly correlated interchange-fee hikes may reflect only that Defendants responded similarly to these common pressures.  Visa's and MasterCard's ability to charge interchange fees ███ of the competitive level is overwhelming evidence of substantial market power over merchants.  That conclusion is not at all undermined by the fact that each of them had the power to take advantage of merchants in order to satisfy the banks' demands for more revenue and profit.

                    (iii)     <u>Market Power from Contracts</u>.  Seizing on broad language in narrow cases, Defendants assert that the product markets here cannot properly be defined with reference to the Merchant Restraints.  Def. Ind. Plf. Br. at 17-18.  In those cases, which involved bundled products and exclusive dealing arrangements, the antitrust plaintiffs asserted that the contract terms to which they had agreed created the market power about which they complained.   The courts concluded that there was sufficient competition, *before* plaintiff accepted the contract, that plaintiffs could have avoided the complained-of contract terms by simply buying an alternative service instead.  *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 440 (3d Cir. 1997) ("The franchise transaction between Domino's Pizza, Inc. and plaintiffs was subjected to competition at the pre-contract stage."); *Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 86 (2d Cir. 2000) ("there are many institutions of higher learning providing superb educational opportunities"); *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll.*, 106 F. Supp. 2d 406, 412 (N.D.N.Y. 2000) ("[I]f Hamilton were to inflate the cost of residential housing significantly, the cost of attending Hamilton would rise prompting

prospective students to select other similar colleges offering a more reasonably priced educational package.").

        The plaintiffs in *Queen City Pizza* could have decided to be a Domino or Pizza Hut franchisee; plaintiffs in *Hack* and *Hamilton* needed to attend only one of many possible schools.  Merchants, however, cannot use pre-contract, *ex-ante* competition to avoid accepting Visa or MasterCard in favor of some other rival.  "With respect to choosing which forms of payment to accept, merchants are largely price insensitive."  Vellturo Init. Rpt. ¶ 127.  For example, if a customer refuses to continue shopping at Kroger if it does not accept Visa, then Kroger's non-acceptance would cost it all of the profits on the sale of groceries to that customer.  The mathematics show that the loss of a very small percentage of Visa cardholders would prevent a merchant from refusing to accept Visa. *Id.* ¶¶ 131-32.  The same is true, of course, for MasterCard.  *Id.*  Accordingly, merchants cannot avoid the high interchange fees or the Merchant Restraints by playing Visa and MasterCard off against each other, or other suppliers, *ex ante*: "even a small loss of business makes merchants' threatening to refuse acceptance an infeasible means of keeping interchange fees down." *Id.* ¶ 133; *see also* SOF ¶¶ 111(115)-111(125).

        Notably, the Merchant Restraints are not themselves the source of Visa's and MasterCard's power to force merchants to accept the cards.  Early in their development, Visa and MasterCard were innovators in offering electronic payment mechanisms. Vellturo Init. Rpt. ¶¶ 38-39, 42-43, 47; Stiglitz Init. Rpt. ¶¶ 12-17.  Through their success in signing up users, they had market power, *i.e.,* they were able to charge merchants a fee that exceeded the cost of supply.  In this early development, some aspects of the Merchant Restraints may have helped Visa and MasterCard overcome the "chicken and egg" problem. Vellturo Init. Rpt. ¶¶ 38-39; Stiglitz Init. Rpt. ¶ 36.  Thus, unlike the cases cited by Defendants,

Visa's and MasterCard's market power here originally existed independently of the Merchant Restraints.

By the mid-1990s, however, Visa and MasterCard were confronted with significant entry by PIN debit cards. SOF ¶¶ 111(4)-111(5); Vellturo Init. Rpt. ¶¶ 183-92; Stiglitz Init. Rpt. ¶¶ 67-69. These cards, which were functionally interchangeable with Defendants' cards but far less expensive, would have drastically reduced Visa's and MasterCard's market power. *Id.* At that time, and in that context, the Merchant Restraints became means of limiting price competition and thereby preventing the competitive erosion of the market power that Defendants had previously obtained. *Id.*

Absent the Merchant Restraints, merchants would still be required to accept Visa or MasterCard, but merchants would get that acceptance at competitive prices. While still accepting both Visa and MasterCard, merchants could use price signals to customers to significantly affect the *volume* of Visa or MasterCard usage. Vellturo Init. Rpt. ¶¶ 139, 144, 188, 194; *see also* SOF ¶¶ 84a(31)-84a(61). The Merchant Restraints do not create Defendants' market power, but they do increase that power and prevent it from being eroded. Dr. Vellturo explains: merchants' acceptance depends on "the marginal profitability of [their] business, and the propensity with which users of a given card will move to another retailer that accepts their card should the merchant no longer accept it." *Id.* ¶ 133. Intense competition among merchants requires that, once some retailers start accepting Visa or MasterCard, the retailer's competitors must do so as well. *Id.* ¶ 135. This a classic "collective action" problem: the merchants *collectively* would be better off if none of them accepted the cards at supracompetitive prices, but each merchant's *individual* interest is to accept the cards, even at supracompetitive prices and with anticompetitive terms, given that its competitors do so. *Id.* ¶ 59.

The reality of this phenomenon is confirmed by Visa's and MasterCard's pricing strategies.   When certain categories of merchants (such as fast-food restaurants) resist accepting the cards, Visa and MasterCard gain acceptance at a few of the merchants by offering low, introductory interchange fees.  SOF ¶¶ 111(25)-111(26); Vellturo Init. Rpt. ¶ 167.  After other merchants in the category start accepting the cards to compete with the initial acceptors, Visa and MasterCard then raise the rates to supra-competitive levels. *Id.*  At that point, the collective action problem prevents any of the merchants from dropping acceptance despite the supracompetitive prices.  Vellturo Init. Rpt. ¶ 59.

More generally, Visa and MasterCard have trapped merchants in an interchange-fee "spiral."   The networks and their issuers give "rewards" to certain cardholders for using the card.  The Merchant Restraints prevent the merchants from giving any price signals as to the cost of those cards.  As a result, the cardholders have increased loyalty to the card.  The increased loyalty decreases merchants' ability to resist accepting the card. Vellturo Reply Rpt. ¶ 105; Stiglitz Reply Rpt. ¶¶ 24, 45-46; *see also* SOF ¶¶ 111(39)-111(56) (discussing Network and issuer strategies to shift existing cardholders to high-interchange rewards cards).   Merchants' decreased ability to resist acceptance increases Visa's and MasterCard's ability to increase interchange fees, and thereby increase "rewards," and thereby increase cardholder loyalty, and thereby further decrease merchants' ability to resist acceptance – an ever-upward spiral of power over merchants and increasing interchange fees. *Id.*

The combination of the collective action problem and the interchange "spiral" makes the Individual Plaintiffs' fate analogous to that of the plaintiffs in *Kodak* and other "lock-in" cases. *See* Def. Ind. Plf. Br. at 18-19.  But regardless of the precision of the analogy, the determinative fact is that the Individual Plaintiffs must accept Visa and MasterCard, and cannot avoid accepting either of them (and their anticompetitive terms) by

pre-contract competition with other forms of payment.  This fact definitively distinguishes *Queen City, Hack, Hamilton* and other similar cases.[41]

Finally, Defendants' cases are also inapposite because of the nature of the restraints at issue.  The courts there carefully noted that the restraints did not reduce cross-elasticity of demand between the defendant and its competitors.  Instead, in *Queen City*, for example, the court found that the requirement that franchisees buy ingredients only from Domino's ensured product consistency and thus promoted inter-brand competition (cross-elasticity of demand) and consumer welfare.  *Id.* at 440-41 (such contract terms "prevent franchisees from free-riding – offering products of sub-standard quality insufficient to maintain the reputational value of the franchise product"); *see also* IIB Areeda, Hovenkamp & Solow, ANTITRUST LAW ¶ 519B at 196 (only effect of franchisor overcharging franchisees for pizza ingredients is that franchisees "will sell fewer pizzas and other pizza restaurants will sell more").  Substantial evidence here, in contrast, shows that the Merchant Restraints directly reduce competition and cross-elasticity between each of Visa and MasterCard and alternative suppliers of payment services by prohibiting price signals to guide customers to the lower-cost cards.  The analogous restraints in the pizza supply industry would be those that: (1) were imposed by each of two associations of pizza franchisors, together encompassing 75% of all pizza franchisors; (2) required the franchisee to give each customer a "free" pizza with the purchase of any other product, *e.g.*, soft drinks; and (3) prohibited the franchisee from varying the price of the soft drink based on the price the franchisor charges the franchisee for the pizza ingredients.  Varying the *Queen City* facts to fit our facts here demonstrates just how inapposite it and similar cases are.

---

[41]     Notably, the cases cited by Defendants confirm that markets are defined by cross-elasticity of demand.  *Queen City,* 124 F.3d at 437-38; *Hack,* 237 F.3d at 86; *Hamilton,* 106 F. Supp. 2d at 411.

### C. The Case Law and Substantial Evidence Support the Individual Plaintiffs' Per Se Claims

#### (1) Defendants Committed Per Se Violations of §1 of the Sherman Act

Defendants ask the Court to declare the *per se* rule inapplicable to their horizontal conspiracy to impose the Merchant Restraints on merchants.   According to Defendants, the rule of reason must govern the Individual Plaintiffs' claims.  Def. Ind. Plf. Memo. at 28.  Defendants, however, misperceive the Individual Plaintiffs' *per se* legal theory and assume that it relates only to the establishment of a default interchange fee.[42]  *Id.*  As is made clear in the Individual Plaintiffs' own summary judgment motion, their *per se* theory is that Visa and its member banks and MasterCard and its member banks have conspired not only to establish the default interchange rates, but also to impose the Merchant Restraints on the merchants so as to preclude the price competition which would otherwise drive those interchange rates lower.  Those Merchant Restraints preclude not only the price competition that would otherwise occur (1) between Visa issuers and (2) between MasterCard issuers, but also (3) the price competition that would otherwise occur between MasterCard, Visa, Discover and other card networks.  SOF ¶¶ 84a(1)-84a(8); Stiglitz Init. Rpt. ¶¶ 40-42; Velturo Init. Rpt. at 169-175.  Defendants' summary judgment motion on the *per se* rule, however, completely ignores the Merchant Restraints and addresses only the question of whether the establishment

---

[42]      Defendants point to Counts I and II of the Individual Plaintiffs' Complaints to identify our legal theory.  Those Counts incorporate all prior allegations of the Complaint, including the purpose and effect of the Merchant Restraints.  *See, e.g.,* Meijer First Amend. Compl. ¶¶ 1, 12(E), (G), (H), (L), 15, 29, 30, 35, 37.  A Complaint is merely the statement of facts that support a claim, not a statement of a legal theory.  *Baker v. Latham Sparrowbush Assoc.*, 808 F. Supp. 981, 989 (S.D.N.Y. 1992) ("Federal pleading is by statement of claim upon which relief may be based rather than by legal theory.  Plaintiffs need only plead facts showing entitlement to relief ... and are not required to specify the legal theory upon which the claim is based") (citation omitted); *Newman v. Silver*, 713 F.2d 14, 15-16, n.1 (2d Cir. 1983) (plaintiff is not required to plead legal theory and the court's duty is to grant relief to which plaintiff is entitled "whether demanded or not"); *Albert v. Carovano*, 851 F.2d 561, 571, n.3 (2d Cir. 1988) (plaintiff is not required to plead legal theory).

of a default interchange fee is *per se* illegal. Defendants' argument omits all reference to the Merchant Restraints, which are the foundation of the Individual Plaintiffs' *per se* legal theory.

As noted earlier, the Merchant Restraints prevent merchants from using price to direct customers to lower-cost payment cards. *See supra* Section III.A. If merchants could surcharge some cards or discount others, then issuers or networks would have to lower their interchange fees and engage in price competition to avoid losing transactions. *See* SOF ¶¶ 84a(31)-84a(61), 84a(66)-84a(95). For example, if a merchant surcharged Visa cards, Visa would have to lower its rates in order to avoid losing sales to MasterCard and vice versa. *See* Stiglitz Init. Rpt. ¶¶ 40-42; *see* SOF ¶¶ 84a(66)-84a(95) (showing how card networks have lowered or would lower interchange rates in response to surcharging or the threat of surcharging). Similarly, if it were not for MasterCard's No-Discount Rule, a merchant could discount Visa cards and MasterCard would have to lower its rates or face the loss of transactions to Visa and vice versa. *See* SOF ¶ 111(5); Vellturo Init. Rpt. ¶¶ 186-192, 199-200, 225. In other words, due to cardholder preference for using the card that is less expensive to use, the networks and the issuers would have to engage in horizontal price competition or lose transactions to payment cards that are less expensive for the cardholder to use. *See* SOF ¶¶ 84a(66)-84a(95); Vellturo Init. Rpt. ¶¶ 186-199; Stiglitz Init. Rpt. ¶¶ 40-42, 67. This price competition is blocked by the Merchant Restraints, and the horizontal agreement among competing card issuers to impose those rules on the merchants and eliminate that horizontal price competition is *per se* illegal. The joint setting of the default interchange fees – which is the only conduct that Defendants address in their motion – is merely the starting point of the analysis.

As the Individual Plaintiffs have already shown, a horizontal agreement that "interferes with the setting of price by free market forces"[43] or "any [horizontal] combination which tampers with price structures"[44] is *per se* unlawful.[45] The cases cited by Defendants agree with this formulation. *See, e.g., Leegin*, 551 U.S. at 893 (horizontal agreement among competing entities that "reduces competition in order to increase price is, and ought to be, *per se* unlawful"); *Texaco, Inc. v. Dagher*, 547 U.S. 1, 5 (2006) ("Price-fixing agreements between two or more competitors, otherwise known as horizontal price-fixing agreements, fall into the category of arrangements that are *per se* unlawful"); *In re ATM Fee Antitrust Litig.*, 554 F. Supp. 2d 1003, 1010-11 (N.D. Cal. 2008) (courts have had sufficient experience with "horizontal price-fixing agreements between competitors" so that they "are subject to *per se* condemnation"); *Reyn's Pasta Bella, LLC v. Visa U.S.A., Inc.*, 259 F. Supp. 2d 992, 998 (N.D. Cal. 2003) (*per se* restraints include "horizontal price-fixing arrangements – agreements formed between competitors" that have the effect of "raising, depressing, fixing, pegging or stabilizing the price") (citation omitted).

Judge Winter's opinion in *Paycom*, 467 F.3d at 283, is particularly instructive on this point. Def. Ind. Plf. Memo. at 5. There, a merchant complained that MasterCard and its members had conspired to fix the price of chargebacks that merchants had to pay to their acquiring banks. The trial court dismissed the claim and the Second Circuit affirmed because there was no allegation that MasterCard's member banks "have agreed jointly" to impose chargebacks on the merchants. 467 F.3d at 291-92. The court made clear, however, that had there been "an agreement among those banks" to impose chargebacks on to the merchants, it

---

[43]   *U.S. v. Container Corp.*, 393 U.S. 333, 337 (1969).

[44]   *U.S. v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 221 (1940).

[45]   *See* Memorandum in Support of Individual Plaintiffs' Motion for Summary Judgment at 19-21.

"would be a *per se* violation of Section 1." *Id.* at 292. In this case, MasterCard and Visa argue that the chargeback payments in *Paycom* are analogous to interchange fees here. Def. Class Memo. at 20-21. If that is true, then the agreements among their member banks to impose the default interchange fees on the merchants by preventing them from steering customers to lower-cost cards are also *per se* illegal.

       (2)    *Defendants' Authority is Inapposite*

Defendants attempt to escape *per se* illegality by citing inapposite authority. They claim that *ATM*, 554 F. Supp. 2d at 1003; *Reyn's Pasta Bella,* 259 F. Supp. 2d 992; *National Bancard Corp. v. Visa U.S.A., Inc.,* 779 F.2d 592 (11th Cir. 1986) ("*NaBanco*"); and *SouthTrust Corp.,* 913 F. Supp. at 1517, require that their conduct be judged under the rule of reason. Def. Ind. Pl. Memo. at 28-29. Defendants' analysis is wrong because in those cases, unlike in this one, the challenged restraint was *necessary* for the defendants' product or service to be available at all. In this case, unlike Defendants' cases, the record demonstrates that Visa's and MasterCard's Merchant Restraints are not necessary for credit card services to be available at all. As such, they are subject to the *per se* rule.

Each of these cases cited by Defendants relies on *Broadcast Music,* 441 U.S. at 1. There, a joint venture comprised of music composers issued blanket licenses to music broadcasters for the use of all of the composers' works. Although the composers were horizontal competitors and the blanket license fixed the price at which all of them would license their works, the Supreme Court recognized a narrow exception to the application of the *per se* rule. The Court pointed out that if each radio station, television show, music hall or tavern had to negotiate separately a license for each song it played, the transaction costs would be "prohibitive" and the licensing of music would be a "virtual impossibility." *Id.* at 20. As a result, the Court held that the *per se* rule against horizontal price-fixing would not be applied "where

the agreement on price is necessary to market the product at all." *Id.* at 23. *Accord American Needle, Inc. v. NFL*, 130 S.Ct. 2201, 2216 (2010) ("when 'restraints on competition are essential if the product is to be available at all' *per se* rules of illegality are inapplicable") (citation omitted).

In *ATM*, an ATM network fixed the price that card issuers pay to ATM machine owner members.[46]   554 F. Supp. 2d at 1003.   The court held that the jointly determined fee was "necessary if the product is to be marketed 'at all'" and that it, therefore, should be judged under the rule of reason.   *Id.* at 1013-14.   Machine owners were not, however, barred from imposing surcharges on the cardholders who used the ATM machines and there was no ruling that such a restraint was necessary for the product to be marketed at all.   *In re ATM Fee Antitrust Litig.*, No. C:04-cv-02676-CRB, 2010 WL 2557519 *2 (N.D. Cal. June 21, 2010).   In *Reyn's Pasta Bella*, the question was whether Visa's interchange fee was *per se* unlawful.   The court found that the interchange fee "was necessary to the creation of that product" and due to the rule announced in *Broadcast Music* not subject to the *per se* rule.   259 F. Supp. 2d at 999-1000.   Again, the case did not mention in any way the Merchant Restraints.   In *NaBanco,* a card processor alleged that Visa's interchange fees injured its ability to compete against Visa members.   The court held the *per se* rule inapplicable under *Broadcast Music* because an interchange fee was "necessary [and] without which the system would not function."   779 F.2d at 601-02.[47]   Again, there was no mention of the Merchant Restraints.[48]   *SouthTrust,* like *ATM,*

---

[46]      Although this fee is referred to as an "interchange fee," it should not be confused with "interchange fee" in this case.   The fee in *ATM* is a fee paid *by* card issuers to machine owners, not *to* card issuers by merchants.   554 F. Supp. 2d at 1008.

[47]      *Reyn's Pasta Bella* interprets *NaBanco* as standing for the proposition that "the interchange fee … was necessary to the creation of that product" and therefore not subject to the *per se* rule under *Broadcast Music*.   259 F. Supp. 2d at 998-1000.   *Brennan v. Concord EFS, Inc.*, 369 F. Supp. 2d 1127, 1133-34 (N.D. Cal. 2005), reads *NaBanco* in exactly the same way

58

involved a fee paid by card issuers to ATM machine owners.  The court relied on *Broadcast Music* and *NaBanco* to find the *per se* rule inapplicable.  None of these cases address the MasterCard or Visa Merchant Restraints and none of them held that credit card services cannot be made available at all unless such Merchant Restraints are employed.

Under the *Broadcast Music* line of cases, in order to avoid the *per se* rule, MasterCard and Visa must each prove that, as a factual matter,[49] its Merchant Restraints are necessary if credit card services are to be available "at all."  Defendants have never advanced such a factual assertion – and with good reason. The undisputed evidence shows that both MasterCard and Visa allow governmental bodies, public utilities, and universities to impose "convenience fees" on card transactions.  SOF ¶¶ 96(149), 96(153)-96(154).  These, of course, are nothing more than surcharges by a different name.  SOF ¶¶ 96(149)-96(150).  This surcharging activity has not prevented credit cards from being "available at all" either at those entities or elsewhere.  Furthermore, in 2002 the Reserve Bank of Australia prohibited MasterCard, Visa and other credit card networks from preventing surcharging.  SOF ¶ 84a(150).  As of 2010, 38.9% of the large merchants in Australia surcharge credit cards, SOF ¶ 84a(60), but this has not prevented credit cards from being "available at all" in that country and

_____ (Continued)
(rejection of *per se* rule in *NaBanco* based on *Broadcast Music* and factual finding, after trial, that interchange fee "was a necessary term without which the system would not function.").

[48]     The *NaBanco* court went out of its way to state that it was not considering whether any of Visa's other Rules and "restraints" were anticompetitive.  *See* 779 F.2d at 602 n.18.

[49]     Defendants argue that whether to apply the *per se* rule is a question of law.  The cases they cite, however, all state that the applicability of the *per se* rule requires "a factual inquiry into the restraint's competitive effect."  *NaBanco*, 779 F.2d at 596; *Apex Oil Co. v. DiMauro*, 713 F. Supp. 587, 595 (S.D.N.Y. 1989) (same); *Craftsman Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 772 (8th Cir. 2004).  *See also Concord EFS*, 369 F. Supp. 2d at 1133 (pointing out that in *Broadcast Music, NCAA,* and *NaBanco*, courts applied rule of reason only after defendant had proven at trial that horizontal restraint at issue was necessary for product to be available at all).

Defendants make no assertion to the contrary. Finally, if a merchant surcharged MasterCard, but not Visa or Discover, MasterCard might lose transaction volume, but credit cards would still be available. Indeed, Visa's sales and those of Discover would go up. SOF ¶¶ 84a(31)-84a(61); Vellturo Init. Rpt. ¶¶ 194-208.[50]

The mirror image of this conclusion applies to discounting. If a merchant discounted Visa cards, MasterCard would lose transaction volume, but credit card services would not be rendered unavailable. Indeed, the volume of card services provided by Visa would go up. *See* Vellturo Init. Rpt. ¶¶ 186-190; *see also* SOF ¶ 84a(87).

The same would be true if a merchant discounted Chase-issued Visa cards or surcharged a Citi-issued Visa card. The transactional volume of Citi's Visa cards would go down, but the transactional volume of Chase's Visa cards would go up. *See* SOF ¶¶ 84a(31)-84a(61); Vellturo Init. Rpt. ¶¶ 194-208. Discounting and surcharging would change the respective transactional volume enjoyed by networks and banks, but there is no evidence that they would eliminate the availability of credit cards "at all." Indeed, all the evidence is to the contrary.

Finally, Defendants suggest that the courts have had insufficient experience with the type of restraint present in this case to condemn it *per se*. Def. Ind. Plf. Memo. at 28. This very argument was rejected in *ATM*, which holds that courts have had sufficient experience with horizontal price arrangements between competitors to "subject [them] to *per se* condemnation" and that Defendants cannot avoid the *per se* rule "on the ground that courts have limited experience with ATM interchange fees." 554 F. Supp. 2d at 1011. The court further held that "the fact that courts may not have experience with the *particular* restraint at issue is, for the

---

[50]  The evidence shows, and Defendants' experts admit, that consumers are price sensitive and will switch from one credit card to another if the price of using one card is comparatively higher than the price of using the alternative card. SOF ¶ 84a(47).

most part, irrelevant." *Id.* (emphasis original).  *Accord Arizona v. Maricopa County Med. Soc'y*, 457 U.S. 332, 351 (1982) (rejecting "the argument that the *per se* rule [against horizontal price-fixing] must be rejustified for every industry").

Horizontal arrangements that eliminate price competition among competitors have been *per se* unlawful for 71 years – since *Socony-Vacuum*, 310 U.S. at 150.  The courts have had more than enough experience with such arrangements and unfailingly hold them *per se* unlawful except in the very limited circumstances in which, but for the restraint, the product would not be available "at all."  MasterCard and Visa do not qualify for that exception, and the respective horizontal agreements among their competitor members to impose the Merchant Restraints on merchants so as to eliminate horizontal price competition are *per se* unlawful.

## IV.    AFTER THEIR IPOs, DEFENDANTS MAINTAINED OR ENTERED INTO BOTH VERTICAL AND HORIZONTAL UNLAWFUL AGREEMENTS AND FAILED TO WITHDRAW FROM THEIR PRE-IPO CONSPIRACIES

Section 1 of the Sherman Act prohibits "every contract, combination … or conspiracy" that unreasonably restrains competition.   15 U.S.C. § 1; *Leegin*, 551 U.S. at 885.   Both MasterCard and Visa have moved for summary judgment on the Individual Plaintiffs' Sherman Act Section 1 claims for the time period subsequent to their respective IPOs.  Def. IPO Memo. at 13-18.   According to Defendants, the Individual Plaintiffs "lack any evidence" that either MasterCard or Visa entered into any contract or conspiracy with its member banks regarding the Merchant Restraints subsequent to their IPOs.[51]

As explained below, Defendants' argument that there is no evidence of a post-IPO agreement is incorrect.  The *undisputed* evidence demonstrates that each Network entered into

---

[51]    Defendants have not sought summary judgment on the exclusionary conduct element of Individual Plaintiffs' Section 2, 15 U.S.C. § 2, claims for monopolization and attempt to monopolize, presumably because Section 2 prohibits unilateral behavior and does not require a contract or conspiracy.

a series of vertical agreements with each of its member banks that remained in full force and effect post-IPO.  In those vertical agreements, each bank agreed with the Network in writing ██ ████████████████████████████████████████.  The evidence further demonstrates that, for two separate reasons, MasterCard and Visa each participated in post-IPO horizontal conspiracies between themselves and their respective member banks.  First, neither MasterCard nor Visa withdrew from the pre-IPO horizontal conspiracies with their respective member banks.  Second, both MasterCard and Visa participated in post-IPO tacit horizontal conspiracies with their respective member banks in which the banks agreed to ██████████████████ ██████████████████.

### A.    Post-IPO MasterCard and Visa Both Participated in a Series of Unlawful Vertical Agreements

The Section 1 prohibition against "every contract, combination or conspiracy" that unreasonably restrains competition includes both vertical and horizontal agreements.  Unlike agreements among competitors that limit horizontal price competition and are *per se* illegal,[52] vertical agreements between different distributive levels of a market are usually judged under the rule of reason.  *Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 724 (1988); *K.M.B. Warehouse*, 61 F.3d at 127 (vertical agreement between manufacturer and distributor judged under rule of reason).

In *Leegin*, the Supreme Court addressed the legality of a series of restrictive vertical agreements entered into by the defendant.  The Court pointed out that vertical agreements have the potential to assist in organizing cartels, eliminating horizontal competition and discouraging sellers from cutting price and held that the anticompetitive consequences of vertical restraints "must not be ignored or underestimated" *Id.* at 892-93.  In determining

---

[52]    *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 649-50 (1980) (horizontal agreements among competitors that limit price competition are *per se* illegal).

whether a vertical restraint is anticompetitive, the Court stated that "the number of [firms] that make use of the practice in a given industry can provide Important instruction," and held that the vertical agreement "should be subject to more careful scrutiny ... if many competing [firms] adopt the practice." *Id.* at 897; *see also Standard Oil Co. v. U.S.*, 337 U.S. 293, 309, 314 (1949) (anticompetitive market impact of vertical agreements determined by looking at the number of competitors that employ such agreements and whether there is "widespread adoption of such contracts"); *Toys 'R' Us v. FTC*, 126 F.T.C. 415, 612-14 (1998), *aff'd*, 221 F.3d 928 (7th Cir. 2000) (rule of reason requires analysis of the anticompetitive impact of the series of vertical agreements because "an examination limited to each individual agreement in isolation ... would blind us to the anticompetitive nature and effect of [the] course of conduct").

MasterCard's IPO occurred in May 2006.  Visa's IPO occurred in March 2008.  Def. IPO Memo. at 4-6.  In both cases, the member banks essentially sold a portion of their ownership interest in each Network to the public.[53]  The equity ownership of the two Networks changed hands and Defendants contend that operating control did as well, but the operating entity remained the same.  *Id.* at 8-10.

In order to be a member of Visa or MasterCard, both before and after the IPOs, a member bank must execute a membership agreement.   SOF ¶¶ 172(4)-172(7); 172(16)-172(17).   In these membership agreements, the member banks agreed in writing with MasterCard and Visa to ███████████████████████████████████████████ ███████████████████████████████████████   ████████████████ ██████████████████████████████   In fact, the rules of both Networks specifically require that

---

[53]     MasterCard sold stock to the public and used the funds to redeem a portion of the member banks' equity ownership in MasterCard.  Def. IPO Memo. at 4.  Visa, Inc. sold stock to the public and the member banks then exchanged their ownership interest in the operating subsidiaries Visa USA and Visa International for Class B or C common stock in Visa, Inc.  *Id.* at 4-5.

each bank member must agree to ██████████████████████████████████████
█████████████████████████████████

The pre-IPO membership agreements – in which the banks agreed ██████████████
█████████████████████████████████ – did not terminate when the IPOs were implemented. Those vertical agreements continued in full force and effect after the IPOs, SOF ¶¶ 172(8)-172(9), 172(20), and constitute explicit post-IPO agreements between each Network and its member banks to the effect that the banks will █████████████████████████████
███████████████████   █████████████████████████████████████
█████████████████████████████████████████████   ████████
███████████

It is therefore clear that each Network entered into a series of written vertical agreements pre-IPO with its member banks that continued in full force and effect post-IPO in which the member banks agreed ████████████████████████████████████████
████████████ Defendants' contention that there are no agreements in effect between the Networks and their member banks post-IPO with regard to ███████████████████ is simply false.

Despite this record, Defendants suggest that MasterCard and Visa unilaterally promulgated their rules (including the Merchant Restraints) and the member banks then unilaterally followed them. The written membership agreements are not, however, unilateral. They are signed bilateral agreements in which member banks agree ████████████████████
████████████████████████████████████████████████████ Concerted action within the meaning of Section 1 is "amply demonstrated by an express agreement." *Delta Dental*, 943 F. Supp. at 174-75 (where dentist "agrees to comply explicitly with [defendant's] agreement, which incorporates by reference [defendant's] Rules and

64

Regulations," the requisite concerted action is shown).   Moreover, the MasterCard and Visa rules were not unilaterally promulgated.  They were promulgated pre-IPO at a time when the member banks controlled the Networks' boards of directors and each Network was a structural conspiracy.  SOF ¶¶ 172(3), 172(15).  Those rules were never changed and the member banks agreed ███████████████████████   ████████████████████████████   ██████████████████   Thus, the Networks entered into a series of vertical agreements with their member banks ████████████████████████████████████████████ ██████████████   As a result, their contention that there is no evidence of any post-IPO agreement █████████████████████ must be rejected.

### B.   Each Defendant Participated in a Post-IPO Horizontal Conspiracy

#### (1)   Defendants Did Not Withdraw from Their Pre-IPO Horizontal Conspiracies

For purposes of summary judgment, MasterCard and Visa do not dispute that prior to their IPOs: (1) the bank members of Visa and the bank members of MasterCard controlled the Boards of Directors of those two Networks and promulgated and enforced the Merchant Restraints; and (2) each Network operated as a structural horizontal conspiracy comprised of its competing bank members.[54]  MasterCard and Visa do, however, contend that at the time of their IPOs, they withdrew from those horizontal conspiracies.  Def. IPO Memo. at 14-15.  Specifically, Defendants contend that, even though they never changed or eliminated their Merchant Restraints, they somehow withdrew from the conspiracies simply by executing the IPOs.  This argument has no merit.  Where, as here, Defendants continue the same conduct and take no affirmative steps to defeat or disavow the goals of their conspiracies, the defense of withdrawal is unavailable as a matter of law.

---

[54]   See, e.g., Visa II, 344 F.3d at 242.

In order to withdraw from a conspiracy, a defendant must undertake "affirmative action to disavow or defeat the purpose of the conspiracy." *U.S. v. Nerlinger*, 862 F.2d 967, 974 (2d Cir. 1988);[55] *Drug Mart Pharmacy Corp. v. American Home Prods. Corp.*, 288 F. Supp. 2d 325, 328-29 (E.D.N.Y. 2003) (in order to withdraw "a defendant must take an affirmative action 'to disavow or defeat the purpose of the conspiracy'") (citation omitted); *Morton's Mkts., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 838 (11th Cir. 1999) (conspirator must take affirmative steps "to *disavow or to defeat* the conspiratorial objectives").

It is not enough for a defendant merely to cease conspiring, and even "resignation" from the conspiracy, "standing alone, does not constitute withdrawal." *U.S. v. Berger*, 224 F.3d 107, 118-19 (2d Cir. 2000); *Drug Mart*, 288 F. Supp. 2d at 328-29 ("mere cessation of activity is not enough;" withdrawal requires affirmative acts "inconsistent with the object of the conspiracy"); *Morton's Mkts.*, 198 F.3d at 838.  Furthermore, a defendant must not "receive any additional benefits from the conspiracy" or take any subsequent act that promotes the purpose of the conspiracy.  *Berger*, 224 F.3d at 118; *U.S. v. Sax*, 39 F.3d 1380, 1387 (7th Cir. 1994) (defendant held not to have withdrawn from conspiracy because he continued to endorse its purpose and profit from it).

The "burden of establishing withdrawal lies on the defendant." *Berger*, 224 F.3d at 188; *Drug Mart*, 288 F. Supp. 2d at 329.  MasterCard and Visa cannot meet this burden.  Neither has done anything to disavow or defeat the purpose of its pre-IPO conspiracy to impose the Merchant Restraints on merchants.  The purpose of those rules was – and is – to prevent

---

[55]     *Nerlinger* is a criminal fraud case, but the law of withdrawal is the same in civil antitrust cases as it is for a criminal conspiracy.  *See, e.g.*, *Drug Mart Pharmacy Corp. v. American Home Prods. Corp.*, 288 F. Supp. 2d at 329 n.5 (E.D.N.Y. 2003) ("the law of withdrawal from a conspiracy has developed primarily in the criminal context; however, the same standard has been applied to civil [antitrust] conspiracy cases. *See, e.g.*, *Morton's Mkt.*, 198 F.2d at 838 (11th Cir. 1999)"); *see also In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 616 (7th Cir. 1997) (same)").

merchants from differentially pricing credit card services so as to steer customers to lower-cost credit cards and precipitate price competition between MasterCard and Visa or between their issuing banks.  Neither MasterCard nor Visa has done anything "inconsistent" with that purpose. In fact, MasterCard and Visa have not only failed to disavow or do anything that would defeat the objectives of their pre-IPO conspiracies, but have affirmatively required their member banks ██████████████████████████████████████████   ████████████████████ ████████████████████████   MasterCard and Visa continue to benefit from the fact that merchants still cannot price one Network's cards below the other so as to create horizontal price competition between them or their member banks.

Despite the foregoing, Defendants insist that by restructuring so that an independent board of directors supposedly operates each Network, they did something inconsistent with the object of their pre-IPO conspiracies.  *See* Def. IPO Memo. at 14-15.  This contention is untrue and a non-sequitur.  *At most*, Defendants' IPOs are inconsistent with the manner in which they previously conspired – *i.e.*, through their member banks' control of their board of directors.  But the IPOs are in no way inconsistent with the purpose of the pre-IPO conspiracies, which was to preclude merchants from using price to steer customers to lower cost payment cards.  Defendants have done nothing to disavow or defeat that purpose. Indeed, by perpetuating the same Merchant Restraints, they have insured that the effect of the conspiracy will continue and that they will continue to benefit from it.  Under these facts, Defendants' contention that they have withdrawn from the pre-IPO conspiracy is deficient as a matter of law.

A change in the ownership of a conspirator does not amount to withdrawal – especially if the conduct continues and the supposedly withdrawing conspirator continues to benefit.  *See, e.g., Morton's Mkts.*, 198 F.3d at 838 ("sale of [defendant's] business was not a

disavowal of the conspiracy. Nor did it do anything to defeat the continuation" of the pricing behavior); *Sax*, 39 F.3d at 1387 (accepting defendant's contention that he withdrew from conspiracy by selling his business "would turn the doctrine of withdrawal on its head" because sale "can hardly be characterized as '*some act to disavow or defeat the purpose of the conspiracy*" – especially when the defendant "continued to wholeheartedly endorse" the purpose of the conspiracy and benefit from it). Here, the two Networks continue to endorse the purpose of their conspiracies by perpetuating the Merchant Restraints; and both of them continue to benefit from those Rules. Consequently, Defendants plainly cannot meet their burden of demonstrating withdrawal.

> (2) *MasterCard and Visa Participated in Post-IPO Horizontal Conspiracies with Their Member Banks*

Post-IPO, both MasterCard and Visa also participated in "hub-and-spoke" conspiracies with their member banks to adhere to and impose the Merchant Restraints on the merchants. In a hub-and-spoke conspiracy, there is a central "hub" that is vertically related to a series of "spokes," each of which competes with the other spokes. Without more, there is no horizontal conspiracy among the competitor-spokes, but if each competitor engages in conduct that would be contrary to its self-interest if done independently, then the existence of a horizontal conspiracy among them will be inferred. *See, e.g., Interstate Circuit, Inc. v. U.S.*, 306 U.S. 208, 217-22 (1939); *Toys 'R' Us. v. FTC*, 221 F.3d 928, 934-36 (7th Cir. 2000); *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 327 (2d Cir. 2010).

In this case, the "hub" is each Network and the "spokes" are their respective member banks. The conduct that would be contrary to the self-interest of each member bank if done independently is: (1) agreeing to ███████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████ As explained more fully below, it is

68

contrary to the independent economic self-interest of the member banks to prohibit the merchants from ██████████████████████████████████████████ ██████  But this conduct is easily understood if it is pursuant to a "conscious commitment to a common scheme" among the banks.  Then each competitor is assured that if it ████████ ████████████████████████████████████████████████████ ████████████████████████████  In other words, the conduct is inexplicable if pursued independently, but is perfectly understandable as a conspiracy among the member banks that allows all of them to avoid horizontal competition.

A "contract, combination … or conspiracy" within the meaning of Section 1 of the Sherman Act need not be formal, written or even express.  *American Tobacco Co. v. U.S.*, 328 U.S. 781, 809 (1946) ("no formal agreement is necessary to constitute an unlawful conspiracy"); *U.S. v. General Motors Corp.*, 384 U.S. 127, 142-43 (1966) ("it has long been settled that explicit agreement is not a necessary part of a Sherman Act conspiracy").  Rather, a conspiracy may be tacit or inferred from "a course of dealings or other circumstances." *American Tobacco*, 328 U.S. at 809-10; *Starr*, 592 F.3d at 321 ("the crucial question … is whether the challenged conduct 'stems from an independent decision or from an agreement, tacit or express'") (citation omitted); *Apex Oil Co. v. DiMauro*, 822 F.2d 246 (2d Cir. 1987) ("the best proof available most often will only tend to show the existence of an informal, perhaps even tacit, rather than explicit, agreement").

The plaintiff may prove a conspiracy, whether express or tacit, by "either direct or circumstantial evidence."  *Toys 'R' Us*, 221 F.3d at 934; *Apex Oil*, 822 F.2d at 252.  When circumstantial evidence is used, the standards announced in *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 761 (1984) are applicable and a conspiracy may be shown by evidence that "tends to exclude the possibility that the [defendants] were acting independently" or that

"reasonably tends to prove ... 'a conscious commitment to a common scheme.'" 465 U.S. 752, 764, 768 (1984) (citation omitted); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

In order to satisfy the *Monsanto* test, it is not necessary for the plaintiff "to exclude *all* possibility that the [defendant] acted independently" because "that would amount to an absurd and legally unfounded burden to prove with 100% certainty that an antitrust violation occurred." *Toys 'R' Us*, 221 F.3d at 934-35; *In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781, 787 (7th Cir. 1999). Rather, *Monsanto* requires "only that there must be *some* evidence which, if believed, would support a finding of concerted behavior." *Toys 'R' Us*, 221 F.3d at 935.

The most frequently used and most powerful evidence that tends to exclude the possibility that each competitor acted independently is evidence that the conduct in question would be contrary to the self-interest of the competitor if done independently, but redounds to its benefit if done pursuant to a conscious commitment to a common scheme with the other competitors. *Merck-Medco Managed Care v. Rite-Aid Corp.*, 201 F.3d 436, 1999 WL 691840 at *10 (4th Cir. 1999) ("Evidence of acts contrary to an alleged conspirator's economic interest is perhaps the strongest plus factor indicative of a conspiracy"); *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1009 (6th Cir. 1999) (determination that conduct in question would be contrary to defendants' economic self-interest if done independently "will consistently tend to exclude the likelihood of independent conduct"); *Starr*, 592 F.3d at 327 (conspiracy can be proved by "behavior that would ... contravene each defendant's self-interest 'in the absence of similar behavior by rivals'") (citation omitted).[56]

---

[56]     In *Starr*, the Second Circuit, relying on *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360-61 (3d Cir. 2004), pointed out that in a competitive market it would be "contrary to [defendant's] interest" not to "cut its price with the hope of increasing its market share if its

The leading case is *Interstate Circuit*.[57]   There, eight motion picture distributors were asked by one exhibitor to refuse to provide films to exhibitor competitors that charged less than 25 cents for admission or showed double features.   306 U.S. at 217.   Each of the distributors complied with the request.   *Id.* at 216-17.   The Supreme Court found no direct evidence of an agreement between the eight distributors, but held that a conspiracy could be established by "inferences drawn from the course of conduct."   *Id.* at 221.   In holding that a horizontal conspiracy among the distributors had been proved, the Court pointed out that each of the distributors knew that the requesting exhibitor (*i.e.*, the hub) had made the same request of each of the other distributors (*i.e.*, the spokes) and also that:

> Each [distributor] was aware that all were in active competition and that without substantially unanimous action with respect to the restrictions ... there was risk of a substantial loss of the business ... of the ... independent exhibitors, but that with it there was a prospect of increased profits.

*Id.* at 222.   In other words, if any one distributor had independently tried to impose these unattractive restraints on exhibitors, it would have lost business to the other seven distributors and the conduct would have been contrary to its self-interest.   But if all the distributors acted together, each would know that it would not lose business to its rivals due to the restraints that each of them imposed on the exhibitors because all of them would be doing it.   From this evidence, the Supreme Court inferred a horizontal conspiracy among the eight distributors.

_____ (Continued)
competitors were setting prices above marginal cost."   592 F.3d at 324.   The court therefore found a sufficient basis to infer a conspiracy and deny defendant's summary judgment motion because the defendant had raised its prices even though its costs were going down.   *Id.*   The same is true here.   The evidence plainly shows that █████████████████████████████



_____

[57]   *See Ambook Enters. v. Time, Inc.*, 612 F.2d 614, 613 (2d Cir. 1979) ("The leading case for the proposition that an agreement can be inferred from commonality of the conduct is *Interstate Circuit*.").

71

The decision in *Toys 'R' Us* is to the same effect.  There, manufacturer competitors were asked by one retailer to refuse to sell to discounters and all of them complied. The issue was whether "a horizontal agreement among the ... manufacturers" had been proven. 221 F.3d at 934.  The FTC characterized the case as the modern equivalent of *Interstate Circuit*. The Seventh Circuit agreed.  *Id.* at 935.  Judge Wood pointed out that each manufacturer was afraid it would lose sales to its rivals if it acted independently, but that each manufacturer would agree to the request "if it could be sure its competitors were doing the same thing."  *Id.* at 935-36.  As the court bluntly concluded, "[t]hat is a horizontal agreement."  *Id.* at 936.

The same is true here.  It would be plainly contrary to the economic self-interest of a member bank[58] to independently agree to ████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████      ████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████  In that case, all of the horizontal competitors would benefit, just as in *Interstate Circuit* and *Toys 'R' Us,* and the existence of "a horizontal conspiracy" among the competitors would be proven – just as it was in both of those cases.  Stated differently, the fact that the member banks continue post-IPO to act in a way that would be contrary to their self-interest if done alone constitutes strong evidence that "tends to exclude the possibility that [they are] acting independently" and demonstrates a "conscious commitment to a common scheme."

---

[58]    All of the Individual Plaintiffs' acquirers either issue credit cards themselves or are owned or controlled by banks that issue credit cards.  *See* SOF ¶¶ 57(23), 57(26)-57(30).

In this context, the No-Discount Rule also has an inter-network dimension. All of the major bank members of MasterCard are also members of Visa and vice versa. SOF ¶ 172(23). It would be contrary to the independent self-interest of a MasterCard issuer to ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████   ████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████   Again, this is compelling evidence that tends to exclude the possibility of independent action and demonstrates a post-IPO horizontal conspiracy and a conscious commitment to a common scheme among the banks to █████████████████████████████████████

Although the horizontal conspiracy is among the bank members (*i.e.,* the spokes), the two Networks (*i.e.,* the hubs) also are liable for the resulting violations. This is true regardless of whether MasterCard and Visa are viewed as having conspired with the banks to █████████████████████████████████ or as the "continuing mechanism through which [the Network] members conspired to enforce [the] … restrictive pricing regulation." *Vandervelde v. Put & Call Brokers & Dealers Ass'n*, 344 F. Supp. 118, 155 (S.D.N.Y. 1972); *Northern Cal. Pharm. Ass'n v. U.S.*, 306 F.2d 379, 388 (9th Cir. 1962) (association liable for knowing participation in conspiracy of its members); *Kline v. Coldwell Banker & Co.*, 508 F.2d

---

[59] In addition to the tacit agreement proven by conduct contrary to independent self-interest, there is also evidence of █████████████████████   ████████████████████████ ████████████████████████████████████████████████████████████████████████ █████████████████████   ██████████████████████████████████████████████ ████████████████████████████████████████████████████████████

226, 232 (9th Cir. 1974) (same); *Dresses For Less, Inc. v. CIT/Commercial Servs., Inc.*, No. 01 Civ. 2669 (WHP), 2002 WL 31164482 at *17 (S.D.N.Y. Sept. 30, 2002) (same).

      (3)    *Defendants' Authority is Inapposite*

          In an effort to defeat the overwhelming evidence of a horizontal conspiracy, Defendants rely on inapposite and discredited authority. For example, they argue that in *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008), the court held that a member bank's adherence to network rules does not support a claim of conspiracy. Def. IPO Memo. at 17. In actuality, *Kendall* holds that the plaintiff had alleged only legal conclusions and failed to allege "any facts to support their theory that the banks conspired or agreed with each other or with the Consortium." *Id.* Among other things, the plaintiff did not allege a written membership agreement whereby each bank agreed to adhere to the network rules or that the member banks had undertaken specific conduct contrary to their independent self-interest.

          In *American Express Travel Related Servs. Co. v. Visa U.S.A.*, No. 04 vic. 8967 (BSJ), 2005 WL 1515399 (S.D.N.Y. June 23, 2005), Visa tried, as it does here, to rely on *Kendall* to establish that its bank members did not conspire. Judge Jones rejected that attempt and held that the *Kendall* complaint was dismissed because "it is indeed devoid of any mention of the individual [banks] intentional involvement in the horizontal ... scheme" or that they had "actively participated ... in the alleged scheme." *Id.* at *4.[60] More recently, in *Starr*, 592 F.3d at 324, the Second Circuit also rejected a defendant's attempt to rely on *Kendall*. There, the

---

[60]    Although Defendants completely ignore Judge Jones' rejection of their *Kendall* analysis, they do cite *American Express* for the irrelevant proposition that one does not become a co-conspirator simply by being a member of an association. Def. IPO Memo. at 17. No one in this case has ever contended that a bank is liable simply because it is a member of MasterCard or Visa. Rather, the banks are participating co-conspirators because they knowingly agreed to and did ████████████████████████████████ Indeed, in *American Express,* the court denied MasterCard's and Visa's motion to dismiss precisely because bank members had "supported" the network rules that were challenged by the plaintiff. *American Express Travel Related Servs. Co. v. Visa U.S.A.*, 2005 WL 1515399, at *5.

court held that the plaintiff had adequately asserted a conspiracy by alleging that the defendants had acted in a way that was contrary to their independent self-interest by raising price even though costs were decreasing (which is also true here, *see* SOF ¶¶ 111(62)-111(71)). 592 F.3d at 325. The court rejected the defendants' attempt to rely on *Kendall* because the *Kendall* plaintiffs had "alleged no facts to support their theory that defendant banks conspired." *Id.* The Individual Plaintiffs in this case, just like the plaintiffs in *American Express* and *Starr*, are not bound by the pleading deficiencies in the poorly drafted *Kendall* complaint.[61]

Defendants also misuse the decision in *Wellnx Life Sci. Inc. v. Iovate Health Sci. Research, Inc.*, 516 F. Supp. 2d 270, 291 (S.D.N.Y. 2007), claiming that it addresses whether members of a network conspire when they are required to and abide by network rules. Def. IPO Memo. at 17. *Wellnx*, however, has nothing to do with a network, network rules, or network members abiding by them. The case involves two manufacturers of dietary supplements and a claim by one of them that the other organized a horizontal conspiracy of magazines to boycott the plaintiff's advertisements. *Id.* at 289-90. Each of the alleged horizontal competitors, however, could independently earn financial incentives by refusing to deal with the plaintiff and each of them had an independent "substantial profit motive" for doing so. *Id.* at 291. The court, therefore, found that each horizontal competitor had not acted in a way that was contrary to its independent self-interest and that a conspiracy among them could not be inferred. *Id.* What was missing in *Wellnx*, however, is plainly present here – conduct contrary to each bank's independent self-interest.

---

[61] The *Kendall* complaint was so poorly drafted that it led the court to badly misunderstand the nature and manner of operation of the Visa network. *See* note 69, *infra*.

**V.   THE COURT SHOULD DENY DEFENDANTS' SUMMARY JUDGMENT MOTION AGAINST THE INDIVIDUAL PLAINTIFFS' CLAIMS WHICH IS BASED ON CERTAIN ARGUMENTS INCORPORATED BY REFERENCE IN DEFENDANTS' MOTION AGAINST THE SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

In this Section, we address certain arguments in Defendants' memorandum titled to the Class which are incorporated by reference against the Individual Plaintiffs.  We demonstrate below that the *Wal-Mart* releases do not bar the Individual Plaintiffs' claims; the *Illinois Brick* doctrine likewise does not bar the Individual Plaintiffs' claims; and Defendants' establishment of default interchange rules in conjunction with the Merchant Restraints is an unreasonable restraint of trade.

**A.    The Wal-Mart Releases Do Not Bar the Individual Plaintiffs' Claims**

Defendants claim that the releases in the *Visa Check* litigation (the "Release") immunized their future unlawful conduct and extinguished the Individual Plaintiffs' damage claims.   Defendants advance this argument even though the Release, on its face, only discharges claims relating "to any conduct prior to January 1, 2004."  *See Payment Card*, 2008 WL 115104 at *3.  Defendants acknowledge that their argument is an "extreme position."[62]

Defendants' argument is deficient for at least four reasons.  First, their interpretation of the Release has already been rejected by this Court, the Second Circuit, and the Ninth Circuit. Second, Defendants' interpretation of the Release is contrary to the language of the Release. Third, Defendants' interpretation of the Release is inconsistent with Defendants' previous statements and course of conduct.  Fourth, Defendants' interpretation of the Release is at odds

---

[62]    *See* Tr. (Dk. 738) (Nov. 21, 2006) at 35 (ln. 12-16) (MasterCard's counsel addressing the effect of the *Visa Check* Release: "I didn't have in mind taking an *extreme position* that we could engage in price fixing in 2 – we can start this 2003 and because we start this 2003 we get immunity for continuing illegal conduct in 2004, 5 and [6]. I didn't mean to suggest that at all.") (italics added).

with the overwhelming weight of authority holding that the release of future anticompetitive conduct is contrary to public policy.

> (1)    This Court, the Second Circuit, and the Ninth Circuit Have Already Rejected Defendants' Interpretation of the Release

The Second Circuit has already addressed the effect of the Release: "Conduct occurring after December 31, 2003 is *not* precluded from being the subject of a future suit." *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 110 (2d Cir. 2005) (italics added). In affirming this Court's approval of the Release, the Second Circuit held that the "class representatives ... *did not agree to preclude lawsuits arising out of similar conduct in the future.*" *Id.* at 113 (italics added).  The Second Circuit's holding is dispositive of Defendants' motion.

This Court has twice arrived at this same conclusion – first in *Visa Check* and more recently in this lawsuit.  In approving the "substantive terms of the settlement" in *Visa Check*, this Court interpreted the Release to cover "the release of Visa and MasterCard from claims arising out of the conduct at issue in the action *prior to January 1, 2004.*"  *Visa Check*, 297 F. Supp. 2d at 508-9 (italics added); *see also Wal-Mart Stores, Inc.*, 396 F.3d at 104.

Likewise, during the hearing on the Defendants' motion to dismiss the Class Plaintiffs' claims for pre-2004 damages, this Court observed: "[I]t strikes me as a somewhat extraordinary proposition that this language that you have posted here, 'conduct prior to 2004,' would also extinguish claims ... about conduct that also happens later." Tr. (Dk. 738) (Nov. 21, 2006) at 32.  Defense counsel agreed: "Let's assume that there's an alleged price fix in August of 2003.  I am not suggesting that we could defend – and that price fix continues into 2005, 2006, 2007, that agreement continues – I'm not suggesting that we could cut off damages for 2005, six and seven because you have an agreement reached in 2003 that continued into 2005,

six and seven, I'm not suggesting that because that would be continuing illegal conduct in 2005, 2006, 2007." Tr. (Dk. 738) (Nov. 21, 2006) at 32-33.

     The Ninth Circuit has interpreted the Release in the same way.  In *Reyn's Pasta Bella*, 442 F.3d at 749, the plaintiffs argued that the "[R]elease does not bar any claims based on Defendants' alleged fixing of the interchange rates after January 1, 2004."  The court explained that it "need not address [that] question," but was quick to add that "[i]f Plaintiffs wish to state a claim based on Defendants' alleged price-fixing after January 1, 2004, their proper course is to file a fresh complaint." *Id.*  In so stating, the Court implicitly followed this Court's and the Second Circuit's rulings that the Release does not bar claims for conduct occurring on or after January 1, 2004.

     Defendants now wish to conflate past conduct with present acts.  They argue that the Merchant Restraints they now enforce are similar to those previously employed and that their setting of default interchange rates is comparable to how they set those rates prior to 2004.  However, as observed by this Court, this is all *new conduct*, even if it is substantially similar to past behavior.  The Merchant Restraints and the default interchange fee are not self-executing.  They require new conduct for every credit card transaction and the continued enforcement of the challenged Rules.  It is not pre-2004 conduct that requires the merchants to adhere to the Merchant Restraints today.  And, it is not pre-2004 conduct that has caused every subsequent change in the default interchange rate.  It is the new conduct – necessarily occurring after January 1, 2004 – that is at issue in this case; and it is this new conduct that has caused the damages – which again necessarily accrue after January 1, 2004 – that give rise to the Individual Plaintiffs' claims for which relief is sought.

     As Defendants themselves point out: the Release "is not just a contract, this is not like any other contract claim.  It's a contract that was supervised by a Federal District Court

and determined to be fair and [affirmed by] the Second Circuit and it is binding on the class members." Tr. (Dk. 738) (Nov. 21, 2006) at 73.  Unfortunately for the Defendants, the courts that participated in approving the Release (including this Court) have also interpreted it not to release claims for damages that accrue after January 1, 2004.  Even Defendants agreed with that view only a few years ago: "This Court and every other court to consider the Release – the Second Circuit, the District Court for the Northern District of California and the Ninth Circuit – have held that *the Settlements released pre-2004 damages claims* brought by merchants challenging the setting of default interchange rates and alleged tying and rule-making conduct." Defendants Response to Class Plaintiffs' Objections to Recommendation and Report Filed on September 7, 2007 (Dk. 864) at 1 (emphasis added).

(2)    *The Language of the Release Does Not Bar Claims*
*or Damages Accruing After January 1, 2004*

The Release language "must be considered against the backdrop of substantive New York law, which the parties to the *Visa Check* Settlement agreed would govern." *Id.* at 10 (citing Visa Settlement ¶ 38).  That law "contemplates consideration of the precise clause in dispute and the overall context of the agreement in which that clause appears." *Id.; see also Kass v. Kass,* 91 N.Y.2d 554, 566 (N.Y. 1998).

For no fewer than six reasons, the language of the Release and "the overall context of the agreement" unambiguously indicate that the Release extinguishes only claims for damages suffered prior to 2004 and not for claims for damages occurring forever after – even if based on Defendants' "continued adherence" to their anticompetitive schemes.  (Def. Class Memo. at 10.)  First, the date of January 1, 2004 was inserted in the Release for a reason.  It is a plain and unambiguous temporal reference that delineates those claims being released and those claims not being released.  Under Defendants' interpretation that they have been released in perpetuity for continued anticompetitive conduct, the explicit reference to January 1, 2004

79

becomes utterly meaningless.  "Words in a contract should never be construed as meaningless if they can be made significant by any reasonable construction." *Nicholas Labs., Ltd. v. Almay, Inc.*, 723 F. Supp. 1015, 1017 (S.D.N.Y.) (citation omitted), *aff'd*, 900 F.2d 19 (2d Cir. 1990); *see also R. I. Realty Co. v. Terrell*, 172 N.E. 262, 263 (N.Y. 1930) ("[T]he court is required to give some meaning to all the words used."); *Martin v. Glenzan Assocs., Inc.*, 426 N.Y.S.2d 347, 348 (N.Y. App. Term. 1980) ("The court is required to give all the words and phrases used in the [agreement] their plain meaning in order to determine the rights of the parties.") (citation omitted).   The date of January 1, 2004 has no meaning, significance or purpose under Defendants' construction; not so under the interpretation previously set forth by this Court, the Second Circuit, and the Ninth Circuit to the effect that "[c]onduct occurring after December 31, 2003 is not precluded from being the subject of a future suit." *Wal-Mart Stores, Inc.*, 396 F.3d at 110.

Second, in addition to setting forth the January 1, 2004 date, the Release specifies that the only claims being released are those "which have been asserted or could have been asserted in [the *Visa Check*] litigation." The Settlement was negotiated in the Spring 2003, and the final agreement was signed in June.  *Payment Card*, 2008 WL 115104, at *4.  The plaintiffs in *Visa Check* did not and could not have asserted claims for damages arising out of credit card transactions that had not yet occurred and would not occur until 2004, 2005, 2006, 2007, etc.  Among other reasons, no one could know prior to 2004 what the interchange fees would be in 2004, whether they would be above the competitive level or whether MasterCard and Visa would continue to agree to and enforce the Merchant Restraints.  In 2003, no one could have filed a claim for this future, hypothetical conduct that had not and might never occur.  In *Berkeley Photo, Inc. v. Eastman Kodak Co.*, 608 F.2d 263 (2d Cir. 1979), the Second Circuit explicitly held that a "purchaser's [antitrust] claim cannot accrue until it actually pays the

overcharge" and that "[t]he purchaser's cause of action, therefore, accrues only on the date damages are 'suffered.'"  603 F.2d at 295; *see also Zenith Radio,* 401 U.S. at 338 ("In the context of a continuing conspiracy to violate the antitrust laws, ... each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act.").[63]  Because the merchants' claims for anticompetitive overcharges, that they would not pay or suffer until 2004, had not accrued in 2003 when *Visa Check* was settled, claims for those later damages could not have been brought in *Visa Check* and are outside the Release language, which is limited to claims that were or could have been brought in *Visa Check*.

Third, under New York law a release "will not bar subsequent claims unless they are specifically embraced within the release or fall within the fair import of its terms."  *Murray-Gardner Mgmt. v. Iroquois Gas Transmission Sys., L.P.,* 646 N.Y.S.2d 418, 419 (N.Y. App. Div. 1996) (citation omitted) ("[A] release should not be read to include matters of which the parties had no intention to dispose."); *Nat'l Helicopter Corp. of Am. v. City of N.Y.,* 137 F.3d 81, 87 (2d Cir. 1998) (same); *Cahill v. Regan,* 157 N.E.2d 505, 510 (N.Y. 1959) (same).  "This intent must be clearly established and cannot be inferred from doubtful or equivocal ... language, and the burden of proof is on the person claiming the waiver of the right."  *Nat'l Helicopter Corp.,* 137 F.3d at 87-88.  Defendants have not and cannot "clearly establish" that the Release "specifically embraced" claims for damages accruing after January 1, 2004.

---

[63]     The Court in *Zenith Radio Corp.* explained that a plaintiff's right to recover future damages is limited to provable and non-speculative damages that "flow in the future from the acts of the conspirators *on that date.*"  401 U.S. at 339 (emphasis added).  Accordingly, the plaintiffs in *Visa Check* could not recover damages for each act of interchange charge or rule enforcement after the date of the settlement.  As this Court has observed, "[a] card network's decision to charge a higher (or lower) interchange fee must to some extent be ratified with each new transaction − it is always, at least in theory, subject to renegotiation absent an exercise of bargaining power, licit or otherwise, that artificially keeps the subject off the table."  *Payment Card,* 2008 WL 115104, at *14.

Fourth, the Release must be read in conjunction with paragraph 8(a) of the settlement agreement. Paragraph 8(a) provides for a limited reduction in the debit transaction rate between "August 1, 2003, and continuing through December 31, 2003." SOF ¶ 36(3); *see also* ¶ 36(2) (MasterCard). It then provided: "On January 1, 2004 the requirement in the preceding sentence shall terminate, and Visa shall be free to set interchange rates without restriction after that date, *as otherwise permitted by law*." *Id.* (emphasis added); *cf.* Tr. (Dk. 738) (Nov. 21, 2006) at 20. In other words, Visa and MasterCard were not given a "free pass" for the continuation of unlawful conduct after January 1, 2004. This is consistent with the Individual Plaintiffs' interpretation of the Release and with the statements made by Visa and MasterCard to the Second Circuit. *See* Brief of Appellees-Respondents Visa and MasterCard (June 9, 2004) at 47 (available at 2004 U.S. 2nd Cir. Briefs 344 & 2004 U.S. 2nd Cir. Briefs LEXIS 46) ("nothing in paragraph 8 condones illegal price-fixing: The provision by its own terms does not authorize any action that is not 'permitted by law'"). The statements made by Defendants to the Second Circuit are inconsistent, however, with the interpretation of the Release now advanced by the Defendants which would release them from future unlawful conduct.

Fifth, the Release should be read to make sense. Defendants' interpretation does not. For example, how could Defendants ever be sued for an antitrust violation since by definition anything they could ever do – such as a scheme to divide markets or fix default interchange rates – would necessarily relate in some way to their pre-2004 conduct. As this Court observed at the hearing on Defendants' motion to dismiss the Class second amended complaint, under Defendants' reading of the Release they would be absolved of all future wrongdoing unless they first exited the payment card business entirely. *See* Nov. 18, 2009 Hrg. Tr. at 154. Furthermore, under Defendants' interpretation, it does not matter how

82

circumstances change as long as the underlying rule remains similar.  A company with a 5% market share when it enters into a settlement agreement would remain insulated from the antitrust laws years later when it might enjoy a 95% market share and the anticompetitive effects of its conduct are substantial.

Sixth, we know that when the parties intended to release MasterCard and Visa from liability for future conduct, they had no trouble drafting language that clearly so stated. MasterCard and Visa settled with a number of opt-outs from the *Visa Check* Class, and some of them agreed to release future conduct.  Dell Computer, for example, released MasterCard from all claims "based on conduct occurring on *or after January 1, 2004*."  SOF ¶ 36(4) (italics added).  This settlement was negotiated by the same defense counsel who negotiated with the Class, and the agreements were executed within months of the Class settlement.  Obviously, when the parties intended to release future conduct, Defendants knew how to state this intention clearly.  The fact that there is no such statement in the Class Release is powerful evidence that the Class and the Defendants did not intend it to release future conduct.

In sum, the plain and unambiguous language of the Release applies at most to claims accruing prior to January 1, 2004.  As the Defendants aptly summarized the Release: "We get the release out to January 2004 and we pay $3 billion for *that* release."  Nov. 21, 2006 Hrg. Tr. at 20 (Dk. 738) (italics added).

### (3)    Defendants' Past Statements and Course of Conduct Belie their New-Found Interpretation of the Release

Defendants' past statements and course of conduct belie their newly-minted position that the Release applies to claims and damages accruing after January 1, 2004.  For example, in their June 9, 2004 brief to the Second Circuit, Visa and MasterCard stated that the Release was "no broader than the effect of *res judicata* from the district court's judgment." Brief of Appellees-Respondents Visa and MasterCard (June 9, 2004) at 31 n.11 (available at

2004 U.S. 2nd Cir. Briefs 344 & 2004 U.S. 2nd Cir. Briefs LEXIS 46).  And according to Visa and

MasterCard, *res judicata* would only preclude "claims based on Visa's and MasterCard's conduct

*prior to January 1, 2004.*" *Id.* (italics added).

Similarly, in their July 21, 2004 Brief to the Ninth Circuit in *Reyn's Pasta Bella*,

Visa and MasterCard specifically addressed whether the Release applied to post-January 1,

2004 conduct and damages:

> The *Wal-Mart* settlement agreement releases the class members' claims
> based on *conduct that occurred prior to January 1, 2004.* ... The
> operative complaint in this case, which was filed on May 16, 2003, does
> not allege any conduct that has occurred since January 1, 2004, and
> plaintiffs' claims are therefore extinguished.

*See* Brief of Appellees-Respondents Visa and MasterCard (June 9, 2004) at 27 n.9 (available at

2004 U.S. 9th Cir. Briefs 15581; 2004 U.S. 9th Cir. Briefs LEXIS 204) (italics in original).

Defendants have taken a similar position before this Court and even described

the position they now assert in their summary judgment papers as "extreme":

> Court: ...it strikes me as a somewhat extraordinary proposition that this
> language that you have posted here, "conduct prior to 2004," would also
> extinguish claims that in order to be proved about conduct that also
> happens later –

> MasterCard's Counsel: Let's assume that there's an alleged price fix in
> August of 2003.  I am not suggesting that we could defend – and that
> price fix continues into 2005, 2006, 2007, that agreement continues – I'm
> not suggesting that we could cut off damages for 2005, six and seven
> because you have an agreement reached in 2003 that continued into
> 2005, six and seven, I'm not suggesting that because that would be
> continuing illegal conduct in 2005, 2006, 2007.

> * * *

> MasterCard's Counsel:  I didn't have in mind taking an extreme position
> that we could engage in price fixing in 2 – we can start this 2003 and
> because we start this 2003 we get immunity for continuing illegal conduct
> in 2004, 5 and [6].  I didn't mean to suggest that at all.

Tr. (Dk. 738) (Nov. 21, 2006) at 32, 32-33, 35.

If Defendants really intended the Release to apply to post-January 1, 2004 conduct and damages, it is difficult to understand why they waited until summary judgment and millions of pages of discovery, hundreds of depositions, and untold attorneys' fees to raise this issue against the Individual Plaintiffs.  Similarly, why would Defendants engage in expensive and convoluted IPOs in an attempt to shield themselves from antitrust liability if they had already secured a release?  Defendants' conduct post-Release speaks volumes about the lack of merit to their argument.

Whether the Court regards Defendants' past conduct and statements as a waiver, *cf. Apple & Eve, LLC v. Yantai N. Andre Juice Co.,* 610 F. Supp. 2d 226, 229 (E.D.N.Y. 2009), judicial estoppel, *New Hampshire v. Maine,* 532 U.S. 742, 749 (2001), post-contract formation conduct, *Great Am. Ins. Co. v. M/V Handy Laker,* 2003 AMC 116 (S.D.N.Y. 2002), or merely as impugning the viability of Defendants' new-found position, they belie the reading of the Release that Defendants now advance.

> (4)   *Defendants' Interpretation of the Release Is*
>         *Contrary to the Overwhelming Weight of Authority*

In arguing that it is legally permissible to release future anticompetitive conduct, Defendants rely almost exclusively on a single, unreported case – *Madison Square Garden, L.P. v. National Hockey League,* No. 07 CV 8455 (LAP), 2008 WL 4547518 (S.D.N.Y Oct. 10, 2008) ("*MSG*").  *MSG* is an aberration that runs contrary to the overwhelming weight of authority, is plainly distinguishable, and has been all but overruled by the Second Circuit.

Of the handful of cases cited in *MSG,* none support its holding.  In fact, they largely undermine it.  For example, *MSG* relies on *Three Rivers Motor Co. v. Ford Motor Co.,* 522 F.2d 885 (3d Cir. 1975), in support of its conclusion that the release executed by MSG applied to the NHL's subsequent enforcement of policies that were put in place prior to the date of the release.  *Three Rivers Motor,* however, simply does not support that proposition, as it

85

involved the execution of a release and a subsequent antitrust lawsuit for conduct and damages occurring *prior to* the date of the release, not subsequent to it. *Id.* at 887-88.

*MSG* also cites to *Three Rivers Motor* for the proposition that a release of future claims does not violate public policy. Not only does *Three Rivers Motor* expressly hold otherwise, *id.* at 896 n.27, but other courts routinely cite *Three Rivers Motor* for the proposition that a release of a future antitrust violation *does* violate public policy.[64] The other cases cited by *MSG* likewise do not support its holding. *See Richard's Lumber & Supply Co. v. U.S. Gypsum Co.,* 545 F.2d 18 (7th Cir. 1976) (involving a claim for conduct occurring prior to the release date); *MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.,* 161 F.3d 443 (7th Cir. 1998) (involving claim for prior conduct that had continued effects, but no "affirmation" or continuation of past conduct); *Hunter Douglas, Inc. v. Comfortex Corp.,* No. 98-CV-0479, 1999 U.S. Dist. LEXIS 10906 (N.D.N.Y. Mar. 11, 1999) (involving claim to invalidate collateral agreement and explaining that "[i]t is against public policy ... to release antitrust claims not in existence at the time the release is executed"); *Record Club of Am., Inc. v. United Artists Records, Inc.,* 611 F. Supp. 211 (S.D.N.Y. 1985) (providing facial support for *MSG* in footnote, but also noting that as illustrated by *U.S. Anchor Mfg.,* 7 F.3d at 1004 & n.29, *MSG* is in conflict with weight of authority); *VKK Corp. v. NFL,* 244 F.3d 114 (2d Cir. 2001) (involving release of claims for damages occurring and accruing *prior* to date of release).[65]

The overwhelming weight of authority holds that releases of antitrust claims do not, and for public policy reasons cannot, apply to future damages and conduct, continuing or otherwise. *See, e.g., Lawlor v. Nat'l Screen Serv. Corp.,* 349 U.S. 322, 324-328 (1955); *In re*

---

[64]     *See, e.g., Polsky v. Radio Shack,* 666 F.2d 824, 828 (3d Cir. 1981); *Fresh Made, Inc. v. Lifeway Foods, Inc.,* 2002-2 Trade Cas. (CCH) P73,779 (E.D. Pa. 2002).

[65]     These obviously inapposite cases are the only other cases Defendants cite.

*Am. Express Merchs. Litig.*, 554 F.3d 300, 319-20 (2d Cir. 2009); *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 218 n.9 (3d Cir. 2008); *Redel's Inc., v. Gen. Elec. Co.*, 498 F.2d 95, 98-99 (5th Cir. 1974); *Fox Midwest Theatres, Inc. v. Means*, 221 F.2d 173, 179-80 (8th Cir. 1955); *Westmoreland Asbestos v. Johns-Manville Corp.*, 39 F. Supp. 117, 119 (S.D.N.Y. 1941). Indeed, in one of the rare cases to cite *MSG*, the defendant readily admitted it could *not* plausibly argue "that similar conduct alleged to have occurred after the [r]elease is prevented from being the basis for a [new] suit." *Insignia Sys. v. News Am. Mktg. In-Store*, Civil No. 04-4213 (JRT/AJB), 2011 WL 505339 at *1 (D. Minn. Feb. 4, 2011).

Furthermore, *MSG* is plainly distinguishable from this case. *MSG* involved a dispute between members of a joint venture (the NHL). In order to obtain permission from the NHL to become one of its joint venture partners, MSG agreed to release all claims relating to "hockey operations or any NHL activity." 2008 WL 4547518, at *6. Later, MSG sued the NHL for joint venture practices to which it had voluntarily consented when it became an NHL member and from which it had benefited. *Id.* at *1-4. This case would be similar to *MSG* if a Visa or MasterCard member brought suit against either Network and/or its member banks. Seen in this light, there is little difficulty understanding the reluctance in *MSG* to grant relief to a plaintiff that is a member of and benefited from the allegedly unlawful enterprise. *Cf. Tex. Indus. v. Radcliff Materials*, 451 U.S. 630, 639 (1981) ("it is equally clear that the Sherman Act and the provision for treble-damages actions under the Clayton Act were not adopted for the benefit of the participants in a conspiracy to restrain trade"). However, that is not the situation present in this case. Here, the Individual Plaintiffs are not members of the unlawful enterprise, they are outside third parties who have purchased card payment services from Defendants, they have been forced to pay supracompetitive interchange rates and adhere to anticompetitive rules and have never benefitted from their inability to steer. *MSG* is distinguishable on its face.

In addition to the foregoing points, the Second Circuit recently confirmed that "an agreement which in practice acts as a waiver of future liability under the federal antitrust statutes is void as a matter of public policy." *In re American Express Merchs. Litig.*, 634 F.3d 187, 197 (2d Cir. 2011). In so holding, the Second Circuit merely followed *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985), in which the Supreme Court stated that if an arbitration agreement operated "as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy." Defendants' request that the Release be treated as a waiver of future anticompetitive conduct is therefore contrary to public policy and would be "void" even if the Release could be interpreted to have that meaning – which it cannot.

## B.   The Illinois Brick Doctrine Does Not Bar the Individual Plaintiffs' Claims

Defendants assert that the Individual Plaintiffs' damage claims "are barred by the direct purchaser rule announced in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977)." Def. Class Memo. at 4. Under this rule, only a direct purchaser who pays an anticompetitive overcharge is allowed to sue for damages. *Id.* at 734-36. Because *Illinois Brick* does not bar claims for injunctive relief,[66] Defendants' argument is directed only against the Individual Plaintiffs' damage claims.

According to Defendants, the direct purchaser and payer of any interchange fee is the acquiring bank, not the merchant. Def. Class Memo. at 15-16. The Individual Plaintiffs,

---

[66]    *See, e.g.*, *U.S. Gypsum Co. v. Indiana Gas Co.*, 350 F.3d 623, 625-28 (7th Cir. 2003) ("the direct purchaser doctrine does not foreclose equitable relief"); *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 399-400 (3d Cir. 2000) (*Illinois Brick* does not foreclose injunctive relief); *In re Public Offering*, No. 98 Civ. 7890 (LMM), 2004 WL 350696 *8 (S.D.N.Y. Feb. 25, 2004) ("plaintiffs' 'indirect purchaser status' does not bar plaintiffs from seeking injunctive relief").

according to this reasoning, are merely indirect purchasers who lack standing to recover the anticompetitive overcharges passed on to them by the acquirers. *Id.*

Defendants are wrong for six reasons. First, as a matter of fact, the direct purchaser and payer of interchange fees is not the acquiring bank. It is the merchant who directly pays the interchange fees to the issuing bank. Second, *Illinois Brick* does not bar plaintiffs who directly contract with and pay a co-conspirator from pursuing their damage claims. Even if the acquirers are the direct payers of the interchange fee, the Individual Plaintiffs still have standing to sue for damages if the acquirers are co-conspirators. Here, each acquiring bank is a member of both MasterCard and Visa and has agreed to adhere to and impose the Merchant Restraints on the merchants. Each acquirer is therefore a co-conspirator and *Illinois Brick* is no bar to the recovery of damages by the Individual Plaintiffs. The Individual Plaintiffs do not have to name the banks as Defendants because Visa and MasterCard have agreed that in return for not suing their financial institution members, the Networks "waive and will not assert" that the Individual Plaintiffs must sue those member banks as co-conspirators" to recover overcharge damages. *See* Stipulation filed Feb. 4, 2011 (Dk. 1443). Third, the Defendants' objections to the application of the co-conspirator rule are without merit. Fourth, there is no realistic possibility that the acquiring banks will sue the Defendants. Fifth, each of the acquiring entities with whom the Individual Plaintiffs have contracted is owned or controlled by or has a functional economic unity with an issuer/co-conspirator. Due to the "owned or controlled" exception to *Illinois Brick*, the Individual Plaintiffs therefore have standing to sue for overcharge damages. Sixth, Defendants' authority is inapposite.

(1)    *Merchants (Including the Individual Plaintiffs) Directly Pay Interchange Fees*

If acquiring banks purchased interchange services from the issuing banks, then they would owe the issuing banks for the interchange services. Issuing banks, however, do not

89

receive any payment from the acquiring banks.  Instead, issuing banks deduct the interchange fee from the gross transaction amount that is due the merchant for the goods it has sold.  SOF ¶¶57(2)-57(3).   If the cardholder fails to pay the issuing bank, then Visa admits that "the issuing bank has no recourse against Visa [or] the acquiring bank" SOF ¶ 57(4).   In other words, the acquiring bank still owes nothing to the issuer even though no one has paid the issuer for the interchange services supposedly purchased by the acquirer.

It is not disputed that in all Visa and MasterCard transactions, the issuing bank deducts the interchange fee from the sum that is due the merchant for the goods purchased by the cardholder.  Because the issuing bank takes the interchange fees directly out of the funds due the merchant, the direct payer is necessarily the merchant.

This conclusion is not only literally true, but it also comports with Defendants' own treatment of the transaction.  For example, issuing banks account for interchange fees as revenue.  SOF ¶ 57(6).  But acquirers do not treat interchange fees as an expense, as they would if they were the direct purchaser of the interchange services.  *Id.*  Instead, acquirers account for interchange fees as "contra revenue," meaning funds for which the acquirers merely act as a conduit.  *Id.*; *see also* Vellturo Init. Rpt. ¶ 122.  If interchange fees are not an expense to acquirers, then the acquirers cannot possibly be considered the purchaser or direct payer for the service.

The economic substance of the credit card transaction is that the merchant sells goods to the cardholder in return for a promise of payment from the cardholder's issuing bank. The issuing bank then deducts the interchange fee before remitting any funds to the merchant through the acquiring bank.  SOF ¶¶ 58(1)-57(2); Vellturo Init. Rpt. ¶ 118 & n.171.  Thus, the acquirers are not purchasers of, or payers for, interchange services.  They are transfer agents for the issuing banks.  SOF ¶ 57(5).  In the event the issuing bank fails to remit the funds to

90

acquirers, the acquirer bears no risk of loss and disclaims all obligation to the merchant.  SOF ¶¶ 57(5)-57(6); Vellturo Init. Rpt. ¶ 119.  This is further evidence that the acquirer is not the purchaser and the promise to pay runs from the issuer to the merchant, and that it is out of the funds owed to the merchant for the goods purchased that the interchange fee is deducted.  *Id.*  As a result, industry documents from Visa, MasterCard, issuing banks, acquiring banks, consultants and merchants all indicate that it is the merchant – not the acquirer – who pays the interchange fees to the issuers.  SOF ¶ 57(8).

Defendants' challenge to Individual Plaintiffs' standing to recover damages on antitrust overcharges appears to be directed toward Individual Plaintiffs' claims that focus on collective setting of interchange fees Pre-IPO.  Defendants avoid discussing Individual Plaintiffs' standing to challenge the anticompetitive nature of Defendants' merchant restraints.   Perhaps Defendants' position is dictated by Visa's previous position in the *First Data* case:

> First Data, in its purported role as an "acquirer" of Visa transactions, is not the appropriate party to challenge the alleged imposition of Visa's Anti-Discrimination Rules on merchants.
>
> * * *
>
> [T]he rules challenged here – Visa's Anti-Discrimination Rules – are imposed *directly on merchants*. That is, what prevents merchants from disfavoring the Visa cards of particular Issuers, is that *the merchants have agreed contractually not to do so."* (emphasis in original).

Brief of Plaintiff at 13 & 18, *First Data*.  There is no need to treat this issue so narrowly. Without question, it is the merchants who have standing to challenge all of Defendants' anticompetitive activity and Individual Plaintiffs have declined to adopt Visa's truncated position on standing – even though it ends Visa's (and by implication MasterCard's) challenge to Individual Plaintiffs' standing to challenge the merchant restraints.

(2)     *Illinois Brick Does Not Bar Claims by the Individual Plaintiffs Who Purchase Directly from a Co-Conspirator*

Individual Plaintiffs' claims would not be barred even if acquiring banks, rather than merchants, paid the interchange fees to the issuing banks.

In *Illinois Brick,* a group of manufacturers conspired to fix the price of concrete blocks. The manufacturers sold the blocks to wholesalers, who sold them to general contractors, who sold them to the plaintiffs. The Supreme Court held that only the wholesalers – who had directly contracted with and purchased from the price-fixing manufacturers – could sue for the overcharge. *Id.* at 735-36. The general contractors and plaintiffs were deemed to be "indirect purchasers" – meaning they did not directly buy from a wrongdoer. For policy reasons, the Supreme Court held that only a direct purchaser could sue for damages. *Id.* at 734-35.

Numerous courts have subsequently held that if a seller and a direct purchaser both participate in the unlawful conspiracy, then a plaintiff who purchases from the direct purchaser/co-conspirator is allowed to sue for antitrust damages. For example, in *Arizona v. Shamrock Foods Co.*, 729 F.2d 1208 (9th Cir. 1984), the defendant sold dairy products to grocery stores. The grocery stores then sold the dairy products to the plaintiffs. The plaintiffs alleged that the defendant dairy and the grocery stores had conspired to raise the prices paid by the plaintiffs. *Id.* at 1210-11. The defendant dairy argued that it was protected by the *Illinois Brick* indirect purchaser doctrine because it did not directly sell to the plaintiffs. The Ninth Circuit disagreed:

> Numerous ... courts have found *Illinois Brick* inapplicable to claims against remote sellers when the plaintiffs allege that the sellers conspired with intermediaries in the distribution chain to fix the price at which the plaintiffs purchased.

*Id.* at 1212-13 (citation omitted).  *Accord Paper Sys., Inc. v. Nippon Paper Indus. Co., Ltd.*, 281 F.3d 629, 631-32 (7th Cir. 2002) (*Illinois Brick* held not to bar damage claim where defendant manufacturer sold to middleman co-conspirator from whom plaintiff bought because "plaintiffs were the first purchasers from *outside* the conspiracy"); *Lowell v. American Cyanamid Co.*, 177 F.3d 1228, 1230, 1232 (11th Cir. 1999) (quoting from 2 Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW, 264 (rev. ed. 1995): "*Illinois Brick* does not limit suits by consumers against a manufacturer who illegally contracted with its dealers" because "the consumer plaintiff is a direct purchaser from the dealer who ... has conspired illegally with the manufacturer" and stating "*Illinois Brick* does not apply ... where the plaintiff has purchased directly from a conspiring party"); *Howard Hess Dental Labs. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 378 (3d Cir. 2005) (holding that plaintiff who deals directly with alleged co-conspirator can sue for damages: "we have found no precedent holding that plaintiffs, who purchase from dealers who are part of a price-fixing conspiracy with the initial seller, may not recover damages from the initial seller"); *Diskin v. Daily Racing Form, Inc.*, No. 92 Civ. 6347 (MBM), 1994 WL 330229 (S.D.N.Y. July 7, 1994) (*Illinois Brick* does not apply where plaintiff buys directly from co-conspirator of defendant).

Defendants do not dispute this law.  They admit that *Illinois Brick* does not apply when there is a conspiracy between a supplier and intermediaries to impose an anticompetitive overcharge on the plaintiff who purchases from one of the co-conspirator intermediaries.  Def. Class Memo. at 29.  Indeed, Defendants acknowledge that although some courts have referred to this rule as the "co-conspirator exception," "it is not actually an exception to *Illinois Brick*" and that the indirect purchaser rule "is simply inapplicable" where the plaintiff deals directly with a co-conspirator who has agreed to impose anticompetitive constraints on the plaintiff.  Def. Class Memo. at 29.

93

In order to sue for damages based on direct purchases from a co-conspirator, some courts hold that the plaintiff must also name the co-conspirator as a party defendant. *See Link v. Mercedes-Benz, Inc.*, 788 F.2d 918, 931-33 (3d Cir. 1986).  The reason is to prevent the alleged co-conspirator from later filing its own claim and asserting that it is a victim, not a wrongdoer, which could result in the defendant facing double recovery.  *Id.*  Other courts disagree and do not require that the co-conspirators be named in the case.  *Fontana Aviation, Inc. v. Cessna Aircraft, Inc.*, 617 F.2d at 478, 481 (7th Cir. 1980); *Reiter v. Sonatone Corp.*, 486 F. Supp. 115, 119 n.3 (D. Minn. 1980).

In this case, it does not matter which of those two approaches is followed.  As noted earlier, Visa and MasterCard have stipulated and agreed with the Individual Plaintiffs that, in return for not suing their member financial institutions, both Networks "will waive and will not assert" that the Individual Plaintiffs must sue their financial institution members as co-conspirators in order to pursue overcharge damages in this case.  Visa Stip. ¶ 2; MasterCard Stip. ¶ 2 (Dk. 1443).  As a result, MasterCard and Visa both have waived any obligation that the Individual Plaintiffs might otherwise have had to add their acquiring financial institutions as Defendants.

The only question, therefore, is whether the Individual Plaintiffs directly contracted with and pay a co-conspirator.  The answer is "yes."  Each of the Individual Plaintiffs directly contracted with a financial institution member of MasterCard and Visa to perform payment card services[67] – a fact that Defendants do not dispute.  *See* Def. Class Memo. at 16

---

[67]     Most of the Individual Plaintiffs have simply entered into acquiring contracts with MasterCard/Visa member banks.  *See* SOF ¶¶ 57(11)-57(15).  Seven of the Individual Plaintiffs were acquiring bank customers of Concord EFS National Bank when it was acquired by First Data.  SOF ¶ 57(16).  Concord EFS, as a MasterCard and Visa member, had agreed to adhere to and impose the Merchant Restraints on the merchants, and was therefore a co-conspirator.  SOF ¶ 57(17).  Concord EFS was dissolved in February 2004 when it was acquired by First Data.  At that time, another MasterCard and Visa member financial institution became the acquiring

(admitting that "merchants ... contract with a merchant acquirer").   Indeed, the rules of both Networks require that an acquiring financial institution member be a direct signatory to every merchant acceptance agreement.  SOF ¶ 57(9).  This is true even if the merchant also employs the services of a third-party processor such as First Data.  *Id.*  Furthermore, each of those acquiring financial institution members agreed to and was obligated by the Network rules to impose the Merchant Restraints on merchants.  SOF ¶ 57(16).  As a result, there is substantial, indeed undisputed, evidence that each of the Individual Plaintiffs necessarily directly contracted with a co-conspirator.

Nor is there any merit to the defense suggestion that the Individual Plaintiffs pay only a "discount fee" and that the interchange fee is not passed on to them by the acquirers.  Def. Class Memo. at 16.  Substantial evidence shows that the Individual Plaintiffs *do* pay the interchange fees.  SOF ¶ 57(2).  Indeed, the Individual Plaintiffs separately negotiate a discount fee with their respective acquiring bank.  SOF ¶ 57(8).  *That* discount fee is to compensate the acquirer for its services.  *See id.*  The acquiring contracts separately provide that the Individual Plaintiffs must pay the interchange fee established from time to time by MasterCard and Visa.  *See, e.g.*, n.12 *infra*.  Thus, the interchange fee is directly imposed on the merchant by the acquiring bank pursuant to a direct contractual relationship between them.   Because the acquiring bank is a co-conspirator, *Illinois Brick* is no bar to the Individual Plaintiffs' damage claims.

_____ (Continued)
bank for those seven Individual Plaintiffs (SOF ¶ 57(8)).  At first, it was ▓▓▓▓▓▓ and then ▓▓▓▓▓ (SOF ¶¶ 57(18)-57(23)).  Pursuant to agreements executed by the parties after the dissolution of Concord EFS, the merchant signed the agreement for itself, the applicable bank ▓▓▓▓▓▓ signed for itself, or First Data, who was given a power of attorney to sign for the banks, signed on their behalf.  *See* Brown Aff. and attachments, SOF ¶ 57(24).  As a result, all of the Individual Plaintiffs had a direct contractual relationship with an alleged co-conspirator member of MasterCard and Visa.

95

(3)    *Defendants' Objections to the Application*
*of the Co-Conspirator Rule are Meritless*

Relying on *Temple v. Circuit City Stores, Inc.*, No. 6 CV 5303 (JG), 2007 WL 2790154 (E.D.N.Y. Sept. 25, 2007), and *In re ATM Fee Antitrust Litig.*, C 04-02676 CRB, 2010 WL 3701912 (N.D. Cal. Sept. 16, 2010), Defendants argue that, even if they agreed to fix the interchange fees among themselves, the *Illinois Brick* co-conspirator rule is inapplicable because they did not agree to impose the fixed interchange fees on the merchants. Def. Class Memo. at 29-30. The evidence, however, clearly demonstrates that bank members of MasterCard and Visa agreed to impose the Merchant Restraints on the merchants which prevent horizontal price competition from driving the default interchange rates lower. *See* SOF ¶¶ 172(2), 172(4)-172(12), 172(14)-172(17); Velkuro Init. Rpt. ¶¶ 188-206. In other words, Defendants' conspiracy not only sets the default interchange price, but it also imposes that rate on the merchants by preventing them from steering so as to precipitate the price competition that would drive the interchange fees to the competitive level. Nothing in *Temple* or *ATM* is inconsistent with that conclusion.

In *Temple,* MasterCard and Visa unlawfully forced Circuit City to accept debit cards. The plaintiff-customer sued Circuit City, but the court dismissed his complaint because there was no allegation that Circuit City had agreed with anyone to impose any price or anticompetitive restraint on its customers. 2007 WL 2790154 at *2, *7. In this case, unlike in *Temple,* Defendants not only agreed to set the default rate, but they also specifically agreed to enforce that rate by imposing the Merchant Restraints on merchants. As a result, the Individual Plaintiffs not only bought directly from a co-conspirator, but from a co-conspirator who agreed to impose the anticompetitive price and restraints on them.

Defendants' reliance on *ATM* is similarly misplaced. There, the plaintiff was an ATM cardholder who alleged that the ATM network conspired to fix the fees paid by card issuers

96

to ATM machine owners.  2010 WL 3701912 at *1.  There was no allegation, however, of any conspiracy to fix or impose any price on the plaintiff cardholders.  *Id.* at *1-2.  Because the plaintiffs did not directly deal with co-conspirators who had agreed to impose anticompetitive restraints on them, they did not qualify for coverage under the co-conspirator exception to the *Illinois Brick* rule.  Here, of course, the member banks did agree to impose the Merchant Restraints on merchants and, therefore, *ATM*, like *Temple*, provides no shelter for the Defendants.

> **(4)     There Is No Realistic Possibility that the Acquiring Banks Will Sue MasterCard or Visa**

*Illinois Brick* bars indirect purchasers from suing for overcharge damages.  The purpose is to avoid double recovery, or the necessity of apportioning losses between direct and indirect purchasers.   Where the direct purchasers will not sue, however, the possibility of double recovery or the need to apportion the loss is eliminated.  For that reason, courts have held that "indirect purchasers can sue for damages if there is no realistic possibility that the direct purchaser will sue its supplier over the antitrust violation." *Freeman v. San Diego Assoc. of Realtors*, 322 F.3d 1133, 1145-46 (9th Cir. 2003) (citation omitted); *Royal Printing Co. v. Kimberly-Clark Corp.*, 621 F.2d 323, 326 (9th Cir. 1980).  Defendants have cited no case that rejects this rule.

Here, there is "no realistic possibility" that the acquirers will sue MasterCard or Visa for conspiring to prevent horizontal price competition.  All of the Individual Plaintiffs' acquiring banks issue credit cards or are owned or controlled by issuing banks. SOF ¶¶ 57(25), 57(27)-57(31).  In effect, Individual Plaintiffs' acquiring banks would have to sue themselves – to prevent themselves from receiving excessive interchange fees.  In *Freeman*, the court held that it is not realistic to expect a firm to sue an entity in which it has an ownership stake, 332 F.3d at 1146, much less itself.  Defendants nonetheless argue that acquirers realistically will sue

to put an end to the supracompetitive interchange fees.  Def. Class Memo. at 28.  This contention is implausible and, at best, is a fact issue for trial.[68]

> (5)    *The Individual Plaintiffs Have Standing to Sue for Damages Because Their Acquirers Either Are, or Are Owned or Controlled By, A Card Issuer/Co-Conspirator*

Even if the Individual Plaintiffs were not direct purchasers from a co-conspirator – which they are – they still have standing to sue for damages under the "owned or controlled" exception to *Illinois Brick*.  Under that exception, if the direct purchaser is "owned or controlled" by a member of the illegal conspiracy, then the next purchaser in line can sue the co-conspirators for overcharge damages.  *See, e.g., Jewish Hosp. Ass'n v. Stewart Mech. Enters.*, 628 F.2d 971, 974-75 (6th Cir. 1980) (owned or controlled exception is applicable where there is "relationship involving ... functional economic and other unity between the direct purchaser and ... the defendant"); *Royal Printing Co.*, 621 F.2d at 326-27 (indirect purchaser allowed to sue based on purchases from subsidiary of defendant); *In re G-Fees Antitrust Litig.*, 584 F. Supp. 2d 26, 33 (D.D.C. 2008) (owned or controlled exception applies "where there exists a functional or economic unity" between direct purchaser and co-conspirator which can be shown by "ownership or control through interlocking directorates, minority stock ownership, agreements ceding control, a contractual agency relationship, or other modes of control separate from ownership of a majority of the intermediary's common stock").

---

[68]     Defendants' contention that acquirers brought "exactly such challenges" in *First Data*, 2006 WL 1310448, and *NaBanco*, 596 F. Supp. at 1231, is false.  Def. Class Memo. at 28. First Data is not an acquirer, it is an intraprocessor, and it does not issue credit cards.  *See* SOF ¶ 57(26).  First Data itself recognized that it could not sue Visa for interchange fee overcharges attributable to the transactions with Individual Plaintiffs and did not do so.  *See id.*  Similarly, *NaBanco* was not an acquirer member of Visa.  It was a non-member third party who directly contracted with a co-conspirator.  *National Bancard Corp. v. Visa U.S.A., Inc.*, 596 F. Supp. 1231, 1239, 1240 n.10 (S.D. Fla. 1984).  NaBanco was allowed to sue, in part, because the court believed it was unrealistic to expect Visa members to "sue themselves for antitrust violations from which they in fact may benefit."  *Id.* at 1247.

Numerous courts, including the Third, Sixth, Seventh, Ninth, Tenth and Eleventh Circuits and many district courts, have affirmed the existence of the "owned or controlled" exception to *Illinois Brick*. ABA, *Indirect Purchaser Litigation Handbook* at 19 (2007) (and cases cited therein).  The Individual Plaintiffs are aware of no district court or appellate court that has rejected the existence of this exception and Defendants have cited none.  *See* Def. Class Memo. at 26-28.

In this case, even if Defendants were somehow correct (and they are not) and (1) the issuing banks are the direct sellers, (2) the acquiring banks are direct purchasers, and (3) the co-conspirator exception for some reason is inapplicable, the Individual Plaintiffs would still have standing to sue because the acquiring entities with whom they have directly contracted are all owned or controlled by and have a functional economic unity with a card issuer/co-conspirator.

For example, the acquirer for Individual Plaintiff Publix is Fifth Third Processing Solutions, Inc., a wholly owned subsidiary of co-conspirator/issuer Fifth Third Bank.  SOF ¶ 57(28).  Similarly, Chase Paymentech Solutions, LLC, the acquirer for Rite-Aid, has, since January 1, 2004, been majority-owned by a card issuer/co-conspirator.  SOF ¶ 57(27).  At first it was Bank One and then in July 2004, due to a merger, it became majority-owned by JP Morgan Chase.  *Id.*  This is true for all of the Individual Plaintiffs.  At all pertinent times, their acquiring banks either were card issuer/co-conspirators or had a functional economic unity with and were owned or controlled by a card issuer/co-conspirator.  SOF ¶¶ 57(27)-57(31).  As a result, even if Defendants were correct and the direct purchasers are the acquirers, the Individual Plaintiffs' damage claims are not barred by *Illinois Brick* due to the owned or controlled exception.

(6)    *Defendants' Remaining Authority is Inapposite*

Defendants rely on *Paycom* for the proposition that *Illinois Brick* precludes the merchants from suing for damages.  Def. Class Memo. at 20-21.  In *Paycom*, the merchant plaintiff alleged that the MasterCard chargeback system violated the antitrust laws.  The plaintiff did not, however, allege that there was any agreement or network rule that required the acquiring bank to impose chargebacks on the merchant.  *Id.* at 291.  Just as in *Temple* and *ATM*, there was no agreement or conspiracy to impose any anticompetitive restraint or price on the merchant.  As the court clearly stated, "the missing element is an allegation that the acquiring banks pass these costs to ... merchants because the banks have agreed jointly to do so."  *Id.* at 292.  Here, of course, the element found wanting in *Paycom* is plainly present. Defendants agreed in writing to impose the Merchant Restraints on merchants so as to eliminate horizontal price competition.  SOF ¶¶ 172(2), 172(4)-172(12), 172(14)-172(17); Vellturo Init. Rpt. ¶¶ 188-206.

Finally, Defendants again rely on *Kendall*, to argue that *Illinois Brick* applies here. Def. Class Memo. at 21.  As noted earlier, the complaint in *Kendall* was dismissed because the plaintiff failed to allege that the defendants had conspired to fix prices.  *Kendall v. Visa, Inc.*, No. C 04-04276 JSW, 2005 WL 2216941 at *2 (N.D. Cal. July 25, 2005).  On appeal, the court agreed and held that the plaintiffs failed "to plead facts sufficient to establish a conspiracy" except in "conclusory statements."  518 F.3d at 1045, 1048.  Because there was no conspiracy alleged, the court held that the plaintiff could not be deemed to have purchased from a co-conspirator for *Illinois Brick* purposes.  *Id.* at 1050.  The plaintiff in *Kendall* obviously wrote a deficient complaint.  But his failure to allege facts does not mean that those facts cannot be proven.  The Individual Plaintiffs have more than ample evidence of a conspiracy in which the

acquiring banks are co-conspirators.   Defendants cannot escape the consequences of that

conspiracy by arguing that this case should be judged by the paucity of allegations in *Kendall*. [69]

> **C.     *Defendants' Establishment of Default Interchange
> Rules (In Conjunction With the Merchant
> Restraints) is an Unreasonable Restraint of Trade***

Defendants seek summary judgment on the grounds that Visa's and MasterCard's

default interchange rules – which are agreements between each Network and its banks to

charge that Network's default interchange rates – do not constitute an *unreasonable* restraint of

trade in violation of Section 1.  Def. Class Memo. at 30.  Defendants argue that the challenged

agreements are not unreasonable restraints because their issuers and acquirers can or do enter

into bilateral contracts "to supersede the default interchange rates."  *Id.*  The very cases on

which Defendants rely for their argument make clear, however, that actual or theoretical

alternatives to a challenged restraint will save it from violating Section 1 *only if* those options

are "realistically available alternatives."  *Buffalo Broad. Co. v. ASCAP*, 744 F.2d 917, 933 (2d Cir.

1984) ("*Buffalo Broadcasting*"); *see Continental Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d

499, 516 (4th Cir. 2002) (citing *Buffalo Broadcasting*) (requiring "fully effective alternative").

The record demonstrates that bilateral contracts are not a realistically available alternative for

the Individual Plaintiffs because of the Merchant Restraints.  At a minimum, whether bilateral

---

[69]     Perhaps due to the plaintiff's failure to adequately allege facts, the *Kendall* court
was badly confused as to how Visa operates or what are interchange fees.  According to the
court, acquiring banks sometimes charge no fees to the merchants at all, 518 F.3d at 1045;
interchange fees are deducted and kept by Visa and the issuing bank makes nothing on the
transaction, *id.* at 1045–46; the issuing bank is given a portion of the transaction amount by
Visa, but then forwards all of that amount to the acquiring bank, *id.*; and cardholders pay Visa –
not the issuing banks – and Visa then deducts the interchange fee from those payments, which
it keeps for itself, and forwards the balance to the issuing bank, *id.* at 1046, which then
forwards all of what it has received to the acquiring bank.  *Id.*  None of this is even remotely
accurate and is totally inconsistent with the facts as stated by both the Individual Plaintiffs and
Defendants in this case.  Virtually nothing can be garnered from an opinion that so completely
misunderstood the transaction in question.

contract interchange rates are a legally meaningful alternative to Network default rates so as to save Defendants' from violating Section 1 is a fact question not properly resolved on Defendants' summary judgment motion.

(1)   Bilateral Contracts Do Not Provide the Individual
Plaintiffs With a "Realistically Available" Alternative
to the Networks' Default Interchange Agreements

That agreements (embodied in the Networks' Rules) exist between Visa or MasterCard and their respective banks to charge merchants default interchange rates, and that those agreements restrain trade, is not genuinely dispute in this case, *see* SOF ¶ 75(22), and is assumed by the Defendants for purposes of their motion.  The issue presented by Defendants' argument is whether the agreements to charge merchants these default interchange rates *unreasonably* restrain trade?

Defendants argue that their agreements with banks to charge merchants default interchange rates do not unreasonably restrain trade because merchants supposedly can avoid the restraint by contracting with either a Network or an acquirer who has a separate bilateral agreement with an issuer to charge the merchant an interchange rate other than the default price.  Def. Class Memo. at 30, 37.  Defendants' cases, notably *Buffalo Broadcasting* and its progeny, recite that if such a commercial alternative is "realistically available" or a "fully effective alternative" to a buyer, then the restraint is not unreasonable and no Section 1 violation occurs.

But do bilateral contracts (as defined by Defendants) provide the Individual Plaintiffs with a realistically available alternative to the Networks' default interchange rates? The record in this case demonstrates that they do not.

The very purpose and effect of the Merchant Restraints is to prevent merchants from shifting transaction volume from one issuer to another in exchange for reduced

102

interchange fees.   Velturo Init. Rpt. at ¶¶ 176-177, 186-200; Stiglitz Init. Rpt. ¶¶ 40-42.

Consequently, issuers have no financial incentive to charge rates lower than the default rate –

they would get no increased transaction volume in return.  *Id.*; *see also* SOF ¶ 75(2).  That the

rules permit bilateral rate agreements is immaterial; the restraints prevent merchants from

shifting sales and thereby eliciting a lower rate.  The "default" rate becomes a *de facto* fixed

rate.   Velturo Init. Rpt. ¶¶ 176-177, Stiglitz Init. Rpt. ¶¶ 40-42.   Thus, as MasterCard itself

admits, bilateral agreements are "unlikely."  A MasterCard presentation on April 2, 2004 asks:

"Will Merchants seek Bilateral Agreements with Issuers?  We [MasterCard] feel that material

bilateral arrangements are unlikely if 'honor all cards' is retained.  Not in *either* party's interest."

SOF ¶ 75(2) (italics added.)  The paucity of bilateral agreements in the marketplace,[70] and the

failure of those attempted in gaining merchant acceptance, is tangible proof that they do not

offer a "realistic" or "fully effective" commercial alternative to the Networks' default rates.

The Individual Plaintiffs' experience with co-brand cards further illustrates that

bilateral contracts are not a realistically available alternative for Individual Plaintiffs.  Under such

an arrangement, the merchant receives a fee – which is sometimes characterized as a reduction

in the merchant's interchange fee – for providing marketing assistance to the issuing bank

supposedly to grow issuance of credit cards which offer rewards to a cardholder for shopping at

the merchant's store (and, depending upon the card, elsewhere).  Theoretically, the merchants'

net interchange fee may be less than the default rate because the issuer shares some of that

fee with the merchant.  But, for merchants, being paid a fee for helping to *issue* credit cards is

no substitute for getting competitive interchange fees on the credit cards that the merchant

*accepts*.  It is no answer to a buyer who pays an unlawful overcharge on its purchases that it

---

[70]      Morrissey Dep. at 377-78 (although vice president of Visa's interchange strategy, witness testified that he was only aware of two bilateral contracts in Visa system, one with Marriott and the other with Target), SOF ¶ 75(3).  Target itself was an issuer.  *Id.*

can earn a fee by helping to sell the product.   The Sherman Act protects the buyer in his capacity as the purchaser.

In any event, the record shows that Individual Plaintiffs' acceptance of co-brand cards occurs at the margins of their credit card acceptance.[71]  And the facts show a consistent track record of ineffectiveness or failure for Individual Plaintiffs' co-brand programs,[72] which empirically confirms that bilateral agreements are not a realistically available alternative for Individual Plaintiffs to the Networks' supracompetitive default interchange rates.[73]

---

[71]



[72]     Visa itself admits that

*See* Vellturo Init. Rpt. ¶ 172 n.258.  The results were similarly poor for other Individual Plaintiffs.

---

[73]     Another reason why bilateral contracts are not "realistically available" to the Individual Plaintiffs is because Defendants fail to show that such bilateral arrangements would provide the Individual Plaintiffs with *competitive* interchange rates on *all* of their credit card transactions.   If all that bilateral contracts do for the Individual Plaintiffs is substitute one supracompetitive interchange rate for another, which has been their experience, then that is hardly an effective alternative to default rates and the bilateral agreements would continue to unreasonably restrain trade. *See Buffalo Broadcasting*, 744 F.2d at 925 ("[a]n antitrust plaintiff is not obliged to pursue any imaginable alternative, regardless of cost or efficiency, before it can complain that a practice has restrained competition.").

(2)    *Defendants' Cases Are Inapposite*

The cases cited by Defendants present very different facts from those in this case, and thus Defendants' cases are inapposite.  In Defendants' cases, courts found or further proceedings were required to determine whether there were realistically available alternatives to the challenged restraint.  In *Buffalo Broadcasting*, a broadcaster could negotiate with an individual composer to purchase her music and thus avoid a non-exclusive licensing arrangement with the composer's trade group which would have required the broadcaster to buy the compositions of all composers in the group.  744 F.2d at 921-22.  In *Continental Airlines*, 277 F.3d at 504, 516, further proceedings were required to determine whether Continental may have found a "fully effective alternative" to United's baggage sizers.   In *Matsushita Elec. Indus. Co., Ltd. v. Cinram Int'l, Inc.*, 299 F. Supp. 2d 370, 378-79 (D. Del. 2004), the plaintiff "realistically could avail itself of individual [patent] licenses to 'essential' ... [patents]."  In *Federal Paper Bd. Co., Inc. v. Amata*, 693 F. Supp. 1376, 1383-84 & n.9 (D. Conn. 1988), the alleged kickback agreement between the plaintiff's sales agent and its suppliers did not foreclose the plaintiff from negotiating purchases directly with individual suppliers.  In *Levitch v. CBS*, 495 F. Supp. 649, 666 (S.D.N.Y. 1980), *aff'd*, 697 F.2d 495 (2d Cir. 1983), there were no contract impediments to network affiliates obtaining programming outside of the network.  In *NaBanco*, 779 F.2d 592, individual acquirers and issuers were free to bypass Visa's rules and negotiate their own fees as long as they did not use Visa's computer services.  And, as noted earlier, in *Paycom*, 467 F.3d 283, there was no agreement between the network and acquirers under which acquirers had to charge merchants chargebacks, and thus merchants could contract directly with acquirers "to create an individualized solution" to their respective fraud costs.  *Id.* at 292.

In this case, unlike In all of those cases, there already is substantial evidence in the record based on the operation of the Merchant Restraints and Individual Plaintiffs' actual experience in the marketplace which shows that bilateral contracts do not offer them "realistically available alternatives" to the Networks' default interchange agreements.

      *(3)     Whether Bilateral Contracts Provide the Individual Plaintiffs With a "Realistically Available" Alternative to the Networks' Default Interchange Agreements is, at a Minimum, a Disputed Question of Fact*

The foregoing facts, particularly viewed in the light most favorable to the Individual Plaintiffs on Defendants' summary judgment motion, demonstrate that bilateral contracts do not provide the Individual Plaintiffs with a "realistically available" alternative to the Networks' default interchange agreements.  As such, the bilateral contracts do not save the Networks' default interchange rules from violating Section 1.  At a minimum, the determination of whether bilateral contracts provide a legally meaningful alternative to default interchange agreements is a fact question necessarily involving resolution of the parties' disputes *inter alia* as to whether bilateral arrangements are "realistically available" to the Individual Plaintiffs based on the operation of the Merchant Restraints and the Individual Plaintiffs' track record of failure with them; and whether bilateral contract interchange rates to the Individual Plaintiffs would be supracompetitive in the existing Networks' regime with the Merchant Restraints (and we think they would be).  *See Buffalo Broadcasting*, 744 F.2d at 925 (whether alternative is "realistic[]" depends on its costs).  Based on those genuine disputes about material facts, Defendants' summary judgment motion must be denied.

## VI.    CONCLUSION

Based on the foregoing analysis, Defendants' summary judgment motions should be denied.

Dated:  May 6, 2011

Respectfully submitted,

KENNY NACHWALTER, P.A.


By: _____ /s/ William J. Blechman _____
     Richard Alan Arnold, Esquire
     William J. Blechman, Esquire
     Kevin J. Murray, Esquire
     James Almon, Esquire
     201 South Biscayne Boulevard
     Suite 1100
     Miami, Florida 33131
     Tel:     (305) 373-1000
     Fax:    (305) 372-1861
     Email:  wblechman@kennynachwalter.com

**_Counsel for the Kroger Plaintiffs_**

– and –

HANGLEY ARONCHICK SEGAL & PUDLIN


By: _____ /s/ Steve D. Shadowen _____
     Steve D. Shadowen, Esquire
     Eric L. Bloom, Esquire
     Jason L. Reimer, Esquire
     30 North Third Street
     Suite 700
     Harrisburg, PA  17101-1713
     Tel:     (717) 364-1030
     Fax:    (717) 364-1020
     E-mail:  sds@hangley.com

**_Counsel for Rite Aid Plaintiffs_**

– and –

SPERLING & SLATER, P.C.


BY:      /S/ Paul E. Slater
         Paul E. Slater, Esquire
         55 West Monroe
         Suite 3200
         Chicago, Illinois  60603
         Tel:      (312) 641-3200
         Fax:      (312) 641-6492
         E-mail: pes@sperling-law.com

*Counsel for Supervalu Plaintiffs*

406558.1