

LEXISNEXIS' FILE & SERVE
38451543
E-SERVICE
Jun 30 2011
4:26PM

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION <br><br> This Document Relates To:  ALL ACTIONS | Case No. 1:05-md-1720-JG-JO <br><br> ORAL ARGUMENT REQUESTED |

**DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT AS TO THE CLAIMS IN THE SECOND
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**


**HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER
TO BE FILED UNDER SEAL**

### *Table of Contents*

Table Of Authorities ..................................................................................................... iii

Preliminary Statement .....................................................................................................1

Argument .........................................................................................................................1

I.     The *Visa Check* Release Entitles Defendants To Summary Judgment ............................1

      A.     Class Plaintiffs' Argument That Defendants Seek Immunity For Future
           Antitrust Violations Is Specious .........................................................................3

      B.     The Release Bars Plaintiffs' Antitrust Challenge To Defendants' Continu-
           ing Adherence To Rules Established Before January 1, 2004 .............................4

      C.     Plaintiffs' Attempt To Distinguish *Madison Square Garden* Is Unavailing...........6

      D.     Plaintiffs' Public Policy Argument Is Meritless...................................................8

II.    The *Illinois Brick* Doctrine Entitles Defendants To Summary Judgment .........................9

      A.     Plaintiffs Are Not Direct Payers Of Interchange Fees.......................................10

      B.     Plaintiffs' Argument That There Is No Realistic Probability That Any Di-
           rect Payer Will Sue Defendants Lacks Factual And Legal Support ....................17

      C.     The Holdings And Rationales Of *Paycom*, *Kendall*, And *ATM* Are Appli-
           cable ................................................................................................................19

III.   The Principles Of *Buffalo Broadcasting* And *Paycom* Entitle Defendants To
      Summary Judgment ...................................................................................................20

      A.     Plaintiffs Have Failed To Present Evidence That Default Interchange
           Rules Restrain Competitive Conduct.................................................................22

      B.     Plaintiffs Have Failed To Present Evidence To Establish The Absence Of
           Any Realistically Available Commercial Alternative .........................................23

      C.     Plaintiffs Have Failed To Distinguish *Buffalo Broadcasting* And *Paycom* ..........26

IV.   The Lack Of Evidence Of Any Restriction In Output Entitles Defendants To Sum-
      mary Judgment ..........................................................................................................28

      A.     As A Matter Of Law, Proof Of A Restriction In Output Is Required As A
           Predicate For A Finding That Prices Exceed A Competitive Level....................29

      B.     Plaintiffs' Assertions About Restrictions In Output Are Unsupported................31

V.      Plaintiffs' Abandonment Of Their Inter-Network Conspiracy Claim And The
        Lack Of Evidence To Support That Claim Entitle Defendants To Summary Judg-
        ment .................................................................................................................... 35

        A.      Each Network's Policy To Compete For Issuers With The Other And With
                American Express Does Not Constitute Evidence Of Inter-Network Con-
                spiracy .................................................................................................... 36

        B.      Profit Motive And Opportunity To Conspire Do Not Tend To Exclude The
                Possibility That Each Network Acted Independently With Respect To The
                Challenged Rules ...................................................................................... 38

VI.     Defendants Are Entitled To Summary Judgment For Additional Reasons ...................... 39

Conclusion ................................................................................................................ 40

### *Table Of Authorities*

### *Cases*

*Apex Oil Co. v. DiMauro*, 822 F.2d 246 (2d Cir. 1987) ............................................................38

*Arizona v. Maricopa County Med. Soc.*, 457 U.S. 332 (1982)....................................................25

*In re ATM Fee Antitrust Litig.*, No. C04-02676, 2010 WL 3701912 (N.D.
    Cal. Sept. 16, 2010) ................................................................................... 10, 13, 19, 20

*In re Baby Food Antitrust Litig.*, 166 F.3d 112 (3d Cir. 1999) ...................................................38

*Banc of Am. Secs., LLC v. Solow Bldg. Co. II, LLC*, 47 A.D.3d 239, 847
    N.Y.S.2d 49 (1st Dep't 2007) ............................................................................................6

*Bano v. Union Carbide Corp.*, 273 F.3d 120 (2d Cir. 2001)........................................................8

*Blomkest Fertilizer, Inc. v. Potash Corp. of Sask., Inc.*, 203 F.3d 1028
    (8th Cir. 2000) ..................................................................................................................37

*Broadcast Music Inc. v. CBS, Inc.*, 441 U.S. 1 (1979).........................................................27, 29

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209
    (1993)...............................................................................................28, 29, 30, 34, 35

*Buffalo Broadcasting Co. v. ASCAP*, 744 F.2d 917 (2d Cir. 1984).......................... 20, 24, 25, 27

*Chicago Prof'l Sports Ltd. P'ship v. National Basketball Ass'n*, 95 F.3d
    593 (7th Cir. 1996) ...........................................................................................................30

*Chicago Prof'l Sports Ltd. P'ship v. National Basketball Ass'n*, 961 F.2d
    667 (7th Cir. 1992) ...........................................................................................................30

*Columbia Broadcasting Sys., Inc. v. ASCAP*, 620 F.2d 930 (2d Cir. 1980) ..........................20, 24

*Crivera v. City of New York*, No. 03 CV 447 (JG), 2004 WL 339650
    (E.D.N.Y. Feb. 23, 2004)...................................................................................................8

*FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447 (1986)............................................................30

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968) ......................................17

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).................................................................9, 18

*Jewish Hosp. Ass'n v. Stewart Mech. Enters.*, 628 F.2d 971 (6th Cir. 1980) .............................14

*Kansas v. UtiliCorp United, Inc.* 497 U.S. 199 (1990) ...................................................... 19

*Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008) ...................................... 10, 12, 19

*In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953 (N.D. Cal. 2007) ...................................................................................................................... 39

*Leider v. Ralfe*, No. 01 Civ. 3137(HB), 2003 WL 22339305 (S.D.N.Y. Oct. 10, 2003) ...................................................................................................... 15

*In re Linerboard Antitrust Litig.*, 305 F.3d 145 (3d Cir. 2002) .................................... 13

*Madison Square Garden, L.P. v. National Hockey League*, No. 07-CV-8455 (LAP), 2008 WL 4547518 (S.D.N.Y. Oct. 10, 2008) ................................. 2, 5, 6, 7

*McCarthy v. Recordex Serv. Inc.*, 80 F.3d 842 (3d Cir. 1996) ...................................... 16

*Monahan v. New York City Dep't of Corrections*, 214 F.3d 275 (2d Cir. 2000) ........................................................................................................................... 9

*National Bancard Corp. (NaBanco) v. Visa U.S.A., Inc.*, 596 F. Supp. 1231 (S.D. Fla. 1984), *aff'd*, 779 F.2d 592 (11th Cir. 1986) ............................ 18

*National Collegiate Athletic Ass'n v. Board of Regents of the Univ. of Okla.*, 468 U.S. 85 (1984) ........................................................................... 26, 29

*National Soc'y of Prof'l Engineers v. United States*, 435 U.S. 679 (1978) ................................ 30

*Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*, 467 F.3d 283 (2d Cir. 2006) ...................................................................................................... 10, 19, 20, 22

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, No. 1:05-md-1720 (JG)(JO), 2008 WL 115104 (E.D.N.Y. Jan. 8, 2008) ................... 1, 3, 6

*In re Refrigerant Compressors Antitrust Litig.*, No. 2:09-md-02042, 2011 WL 2433392 (E.D. Mich. June 13, 2011) ...................................................... 13

*Reify v. Runyon*, 971 F. Supp. 760 (E.D.N.Y. 1997) ...................................................... 8

*Reyn's Pasta Bella, LLC v. Visa U.S.A., Inc.*, 442 F.3d 741 (9th Cir. 2006) ................................ 3

*In re Sugar Antitrust Litig.*, 579 F.2d 13 (3d Cir. 1978) ............................................. 13

*Sun Microsystems Inc. v. Hynix Semiconductor Inc.*, 608 F. Supp. 2d 1166 (N.D. Cal. 2009) ...................................................................................................... 16

*Temple v. Circuit City Stores, Inc.*, Nos. 06 CV 5303 (JG), 06 CV 5304 (JG), 2007 WL 2790154 (E.D.N.Y. Sept. 25, 2007) ...................................................... 13, 15

*United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001), *aff'd*,
    344 F.3d 229 (2d Cir. 2003)................................................................................30

*In re Visa Check/MasterMoney Antitrust Litig.*, 192 F.R.D. 68 (E.D.N.Y. 2000),
    *aff'd*, 280 F.3d 124 (2d Cir. 2001) ...................................................................9

*In re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y.
    2003), *aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d
    96 (2d Cir. 2005) ...............................................................................................1

*Visa U.S.A., Inc.. v. First Data Corp.*, No. C 02-01786 (JSW), 2006 WL 516662
    (N.D. Cal. Mar. 2, 2006)..................................................................................18

*VKK Corp. v. National Football League*, 244 F.3d 114 (2d Cir. 2001) ........................5

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005)....................3, 9

*Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287 (11th Cir. 2003).........38, 39

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971)...........................5

### *Other Authorities*

IIA Philip E. Areeda & Herbert Hovenkamp, Antitrust Law (3d ed. 2007) ................30

William Landes, *Harm to Competition: Cartels, Mergers, and Joint Ventures*,
    52 Antitrust Law Journal 625 (1983) ...........................................................30

### *Preliminary Statement*

Defendants respectfully submit this reply memorandum in support of their motion for summary judgment as to all claims in the Second Consolidated Amended Class Action Complaint. As demonstrated below, none of the arguments that plaintiffs have advanced in their effort to avoid having summary judgment entered against them has merit.

### *Argument*

**I.    *The* Visa Check *Release Entitles Defendants To Summary Judgment***

The release in *In re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003), *aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005) ("*Visa Check*") – to which all of the named plaintiffs are bound – is unambiguous. *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, No. 1:05-md-1720 (JG)(JO), 2008 WL 115104, at *10 (E.D.N.Y. Jan. 8, 2008). It released Visa, MasterCard, and their member banks from all antitrust claims that each plaintiff "ever had, now has, *or hereafter can, shall or may have, relating in any way to any conduct prior to January 1, 2004* concerning any claims alleged in the Complaint or any of the complaints consolidated therein." (SMF[1] ¶ 20 (emphasis added).)

---

[1]    Defendants' Statement Of Material Facts As To Which There Is No Genuine Issue To Be Tried, dated February 11, 2011 ("SMF").

Defendants demonstrated in their moving brief (Def. Br.[2] at 10-15), and class plaintiffs have conceded (Class Pl. Opp. Br.[3] at 69), that the rules and fees that plaintiffs challenge in this case -- the network rules establishing default interchange rates, the requirement to honor all payment cards, and the prohibition on surcharging and discrimination -- are "the very same rules and fees" that they challenged in the *Visa Check* litigation. (SMF ¶¶ 22-36.) Similarly, citing the merchant acceptance rules from 2003 forward, the individual plaintiffs acknowledge in their brief in support of their own motion for summary judgment that "[b]oth Networks have changed the numbering and some wording of the Anti-Steering Merchant Restraints over time, but their meaning applicable to this Motion remains unchanged." (Ind. Pl. Br.[4] at 12.) Because plaintiffs here challenge conduct that occurred prior to January 1, 2004 that concerned claims that were or could have been asserted in the *Visa Check* litigation, the settlement and release in that earlier litigation bar them from asserting claims based on that conduct here.

In their attempt to avoid their obligations under the *Visa Check* release, plaintiffs argue: (i) that the release cannot be interpreted to give defendants indefinite prospective immunity for future antitrust violations; (ii) that defendants have engaged in new conduct after January 1, 2004 by continuing to adhere to the rules they established before January 1, 2004; (iii) that the decision in *Madison Square Garden, L.P. v. National Hockey League*, No. 07-CV-8455 (LAP), 2008 WL 4547518, at *8 (S.D.N.Y. Oct. 10, 2008) ("*MSG*"), is distinguishable; and (iv) that a

---

[2] Defendants' Memorandum Of Law In Support Of The Motion For Summary Judgment As To The Claims Of The Second Consolidated Amended Class Action Complaint, dated February 11, 2011 ("Def. Br.").

[3] Class Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (Unannotated), dated May 6, 2011 ("Class Pl. Opp. Br.").

[4] Memorandum Of Law In Support Of The Individual Plaintiffs' Motion For Partial Summary Judgment, dated February 11, 2011 ("Ind. Pl. Br.").

2

release from prospective antitrust liability is unenforceable as a matter of public policy.  (Class Pl. Opp. Br. at 7-22.)  Each of plaintiffs' arguments fails.

A.    **Class Plaintiffs' Argument That Defendants Seek Immunity For Future Antitrust Violations Is Specious**

Contrary to plaintiffs' assertion (Class Pl. Opp. Br. at 9-10), defendants do not seek indefinite prospective immunity for future antitrust violations.  They seek only to enforce the plain terms of the contractual release between them and those merchants that participated in the *Visa Check* settlement.  Defendants do not claim that any putative class member in the instant litigation that did not exist or accept Visa or MasterCard at the time of the *Visa Check* settlements, or that opted out of such settlements, is bound by the *Visa Check* release.  Nor do defendants claim that any merchant, regardless of whether it participated in the *Visa Check* settlement, is barred from bringing an antitrust claim challenging rules or conduct that do not in some way "relate to the factual predicate of the *Visa Check* litigation." *Interchange Fee*, 2008 WL 115104, at *11.  But as this Court and plaintiffs themselves have recognized (Class Pl. Opp. Br. at 10), "[e]very court to consider the scope of the Settlement has similarly concluded that it released all claims arising out of conduct occurring before January 1, 2004." *Interchange Fee*, 2008 WL 115104, at *10; *accord Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 104 (2d Cir. 2005) (release "precludes actions for conduct occurring prior to January 1, 2004").  And, although plaintiffs may wish it to be so, no court has held that claims based on defendants' continuing adherence to conduct occurring before January 1, 2004, are beyond the scope of the *Visa Check* release. *See, e.g., Reyn's Pasta Bella, LLC v. Visa U.S.A., Inc.*, 442 F.3d 741, 749 (9th Cir. 2006) ("Plaintiffs argue the *Wal-Mart* release does not bar claims based on Defendants' alleged fixing of the interchange rates after January 1, 2004.  We need not address the question because Plaintiffs have failed to allege such claims.").

3

**B.    The Release Bars Plaintiffs' Antitrust Challenge To Defendants'
Continuing Adherence To Rules Established Before January 1, 2004**

Class plaintiffs argue that, since January 1, 2004, defendants have engaged in

"new and continuing anticompetitive conduct" that includes "new adoptions of schedules of in-

terchange fees, regular readoptions of and revisions to the network rules that Plaintiffs challenge,

and conducting IPOs in an attempt to transform their conduct from 'concerted' to 'unilateral'

within the meaning of Section 1 of the Sherman Act." (Class Pl. Opp. Br. at 7-8, 10-15.)  But in

their effort elsewhere to support their challenge to the IPOs, class plaintiffs inconsistently have

argued that the rules and fees that they challenge are "the very same rules and fees" both before

and after the IPOs, notwithstanding the adoption of revised default interchange fee schedules or

the re-adoption of the challenged rules since the IPOs.  (Class Pl. Opp. Br. at 69.)  Class plain-

tiffs contend that "the IPOs changed nothing about . . . the methods by which [defendants] set

interchange fees."  (*Id.* at 67-68.)  And the individual plaintiffs rely on the merchant acceptance

rules adopted in 2003 when they assert in support of their own motion for summary judgment

that "[b]oth Networks have changed the numbering and some wording of the Anti-Steering Mer-

chant Restraints over time, but their meaning applicable to this Motion remains unchanged."

(Ind. Pl. Br. at 12.)

The internal inconsistency in plaintiffs' argument arises from plaintiffs' failure to

distinguish the continuing effect on merchants after January 1, 2004, of rules and practices estab-

lished before January 1, 2004, which is subject to the *Visa Check* release, from substantively new

rules and practices established or adopted after January 1, 2004, and which are not subject to the

release.  By releasing defendants from liability for all antitrust claims the releasing merchants

"ever had, now have, or hereafter can, shall or may have, relating in any way to any conduct

prior to January 1, 2004," the releasing merchants unequivocally recognized that rules and prac-

tices adopted before January 1, 2004, might impact the releasing merchants after January 1, 2004, and thus give rise to claims accruing after that date, but those claims were expressly included within the terms of the release.  Otherwise put, it is irrelevant *when* the alleged effect on merchants might be felt or *when* the claim might accrue; if the rule or practice giving rise to that impact or claim was established before January 1, 2004, liability for that rule or practice has been released as to those merchants that participated in the *Visa Check* settlement.  *See, e.g., Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 342-43 (1971) (1957 release "extended not only to past but also to all future damages arising out of pre-1957 conspiratorial acts").

For this reason, Judge Preska got it exactly right in a case on all fours with this one:  a releasing party may not later challenge the released party's continued adherence to pre-release conduct that was the subject of the release.  *MSG*, 2008 WL 4547518, at *8 .  Like the challenge to "continued adherence to a pre-release restraint" in *MSG*, class plaintiffs' challenge to defendants' continued adherence to pre-release default interchange and other rules that pre-dated the *Visa Check* settlement is barred by the *Visa Check* release.  Specifically, the default interchange and merchant acceptance rules that class plaintiffs challenge here existed prior to January 1, 2004, and concerned claims that were or could have been asserted in the *Visa Check* litigation.  (SMF ¶¶ 22-34.)  Thus, the settlement and release in that earlier litigation bar plaintiffs from asserting claims based on that conduct here.

Judge Preska's decision followed Second Circuit precedent in *VKK Corp. v. National Football League*, 244 F.3d 114, 126 (2d Cir. 2001), in which the court wrote approvingly that "[i]t is not uncommon, we assume, for a release to prevent the releasor from bringing suit against the releasee for engaging in a conspiracy that is later alleged to have continued after the release's execution," notwithstanding the fact that "[s]uch a release would seem always to pro-

5

tect the ongoing conspiracy because it always prevents the releasor from beginning litigation that would establish the scheme's illegality." *Id.* at 126. Class plaintiffs try to distinguish *VKK* by arguing that it involved the "part and parcel" doctrine (Class. Pl. Opp. Br. at 19), but Judge Preska rejected the same proposed distinction in *MSG*, explaining that "the Court's *rationale* . . . was predicated on the enforceability . . . of releases of 'conspiracies alleged to continue post-release' – like the one at issue in this case." 2008 WL 4547518, at *8 (emphasis in original).

Plaintiffs' construction of the *Visa Check* release to apply only to claims that had accrued at the time of the release (*see* Class Pl. Opp. Br. at 9-10; Ind. Pl. Opp. Br.[5] at 79-83) would read the words "or hereafter can, shall or may have, relating in any way to any conduct prior to January 1, 2004" out of the release. The release, however, must be read to give meaning to the plain language of all its terms. *See, e.g., Interchange Fee*, 2008 WL 115104, at *10 ("The plain language of the release provision thus extinguishes any claim that could be asserted by a *Visa Check* class member against Visa and MasterCard if that claim related to the *Visa Check* claims, regardless of whether such claims were actually asserted in the complaint – and also regardless of whether such claims *could* have been so asserted under applicable pleading rules and case law.") (emphasis in original). Because the language is unambiguous, there is no reason for this Court to look to parol evidence to determine its meaning. *See Banc of Am. Secs., LLC v. Solow Bldg. Co. II, LLC*, 47 A.D.3d 239, 243, 847 N.Y.S.2d 49, 52 (1st Dep't 2007).

## C.  Plaintiffs' Attempt To Distinguish *Madison Square Garden* Is Unavailing

Plaintiffs' attempt to distinguish *MSG* on the ground that "the restrictions that allegedly harmed the plaintiff – relating to licensing, advertising, and broadcasting – were already

---

[5]  Individual Plaintiffs' Response in Opposition to Defendants' Motions for Summary Judgment, dated May 6, 2011 ("Ind. Pl. Opp. Br.").

in place in their final form at the time of the settlement agreement" (Class Pl. Opp. Br. at 18) is no distinction whatsoever. Like class plaintiffs here, plaintiff Madison Square Garden made exactly the same argument that "the release does not apply to its claims because they are based on 'current conduct, not historical conduct.'" *MSG*, 2008 WL 4547518, at *6. Judge Preska quickly disposed of that argument because, as here, the plain language of the release showed that it was intended to "foreclose a challenge to *policies* existing at the time of the release," regardless of non-substantive alterations in the rules that had been made since execution of the release. *Id.*

Plaintiffs also argue that, unlike the plaintiff in *MSG*, plaintiffs here have allegedly been harmed since January 1, 2004, "each time that a merchant pays a supracompetitive interchange fee." (Class Pl. Opp. Br. at 14.) But plaintiffs simply misunderstand Madison Square Garden's argument, which was that, as the owner of the New York Rangers, MSG was injured by the existing pre-release rules of the National Hockey League every time the league enforced those rules to prevent MSG from doing something – entering an intellectual property license, or signing a cable television broadcast license, or selling advertising space in its hockey arena – that violated the leagues' rules. The court in *MSG* made it clear that the league's continued *application* of pre-release rules was not "new" conduct. *MSG*, 2008 WL 4547518, at *8. The league's continued adherence to its pre-release merchandizing and licensing rules did not constitute "new" anticompetitive conduct each time that the league prevented MSG from selling clothing or other products with club marks. Similarly, the league's continued adherence to its pre-release rules regarding broadcast rights did not constitute "new" conduct each time that MSG was prevented from broadcasting its games outside its defined territory. And the league's continued ad-

7

herence to its advertising rules did not constitute "new" conduct each time that MSG was unable to sell signage or advertising in its hockey arena.

Likewise, plaintiffs may be affected by the default interchange and other network rules each time they accept a Visa- or MasterCard-branded payment card at the register, but if that effect "relat[es] in any way to any conduct prior to January 1, 2004" (SMF ¶ 20), it is not "new" conduct for purposes of the *Visa Check* release. Like the challenged rules and policies in *MSG*, the challenged default interchange and merchant acceptance rules in this case existed at the time of the *Visa Check* settlement and release, and any claims by merchants that participated in the *Visa Check* settlement arising out of those challenged rules are barred by that release.

### D.   Plaintiffs' Public Policy Argument Is Meritless

Plaintiffs' assertion that the *Visa Check* release violates public policy against re-leasing future antitrust violations (Class Pl. Opp. Br. at 20-22; Ind. Pl. Opp. Br. at 86-87) has no merit. Indeed, it is plaintiffs' pursuit of their claims in the face of the *Visa Check* release that violates the public policy favoring settlements and releases. *See, e.g., Bano v. Union Carbide Corp.*, 273 F.3d 120, 129 (2d Cir. 2001) ("it is axiomatic that the law encourages settlement of disputes"); *Crivera v. City of New York*, No. 03 CV 447 (JG), 2004 WL 339650, at *4 (E.D.N.Y. Feb. 23, 2004) ("Once an individual executes a valid settlement agreement, he cannot subse-quently seek both the benefit of the agreement and the opportunity to pursue the claim he agreed to settle.") (quoting *Reify v. Runyon*, 971 F. Supp. 760, 764 (E.D.N.Y. 1997)).

At bottom, what plaintiffs seek is an annuity perpetually allowing them to chal-lenge the same pre-release conduct they already released. Under plaintiffs' theory, the parties here could settle this case today, plaintiffs could execute a release, and, regardless of the terms of the settlement agreement, plaintiffs could file a new lawsuit challenging the same default inter-

8

change and merchant acceptance rules next week unless the networks abandoned all of the challenged rules. *Monahan v. New York City Dep't of Corrections*, 214 F.3d 275, 289 (2d Cir. 2000) ("This semantic cartwheel would virtually eliminate the doctrine of *res judicata* for a significant subset of those claims resolved by settlement agreement. Parties would have no incentive to modify a controversial policy if the amended version was subject to renewed attack. The efficiencies created by a mutually agreeable settlement would be lost.").

## II.     *The Illinois Brick Doctrine Entitles Defendants To Summary Judgment*

The Supreme Court's decision in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), bars antitrust claims for damages when the allegedly "fixed" price is purportedly passed on as part of another price. Where, as here, there is an intermediary with independent pricing discretion between the plaintiff and the alleged antitrust violator that may absorb some portion of the alleged overcharge resulting from the violator's alleged antitrust violation, plaintiffs lack standing under *Illinois Brick*.

In their moving brief (Def. Br. 15-30), defendants established: (i) that interchange fees are fees "that the acquiring institution pays the card-issuing institution every time it processes a payment by one of the card-issuing institution's cardholders at one of the acquiring institution's retailers," *In re Visa Check/MasterMoney Antitrust Litig.*, 192 F.R.D. 68, 72 (E.D.N.Y. 2000) (Gleeson, J.), *aff'd*, 280 F.3d 124 (2d Cir. 2001); *accord Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 102 (2d Cir. 2005) (defining "interchange fee" as a "fee the acquiring institution must pay to the card-issuing institution"); (ii) that, as plaintiffs admitted in their Class Complaint, merchants pay merchant discount fees, *not* interchange fees, to acquiring banks, third-party payment card processors, and independent service organizations ("ISOs") with which they contract to process payment card transactions; (iii) that acquiring banks, third-party

9

processors and ISOs are intermediaries between the merchants and defendant issuers and networks in the clearance and settlement process; and (iv) that each of those intermediaries has independent pricing discretion such that it can -- and, as plaintiffs have conceded, sometimes does -- absorb some portion of the interchange fees levied on it and due to the card issuing bank, rather than pass the entire amount of the interchange fees on to the merchants as part of the merchant discount fees that merchants are charged.  (SMF ¶¶ 13, 37-57; Class Pl. Opp. Br. at 23 n.11.)  The undisputed facts accordingly establish that the *Illinois Brick* rule bars plaintiffs from pursuing their damages claims.  Indeed, this case exemplifies the alleged overcharge apportionment and multiple recovery issues that underlie the *Illinois Brick* doctrine.

In their effort to avoid the *Illinois Brick* doctrine, plaintiffs argue:  (i) that they are direct payers of interchange fees for services that they purchase directly from members of the alleged conspiracy (Class Pl. Opp. Br. at 23-33); (ii) that *Illinois Brick* does not apply because there is no realistic probability that direct payers will sue defendants (*id.* at 35-37); and (iii) that the precedent in this circuit and elsewhere – *Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*, 467 F.3d 283 (2d Cir. 2006), *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008), and *In re ATM Fee Antitrust Litig.*, No. C04-02676, 2010 WL 3701912 (N.D. Cal. Sept. 16, 2010) – holding that the rule of *Illinois Brick* barred damage claims in analogous circumstances, is distinguishable.  (Class Pl. Opp. Br. at 38-40.)  As demonstrated below, the arguments that plaintiffs have advanced to escape the bar of *Illinois Brick* have no merit.

A.    **Plaintiffs Are Not Direct Payers of Interchange Fees**

Plaintiffs have advanced four separate arguments to support their assertion that they directly purchase from, and thereby directly pay interchange fees to, defendants.  None of those arguments overcomes the undisputed fact that plaintiffs directly pay *merchant discount*

10

*fees*, and not interchange fees, to intermediary acquiring banks, third-party processors and ISOs that all have independent pricing discretion with respect to the merchant discount fees they charge their merchant customers, or avoids the overcharge apportionment and multiple recovery issues that the *Illinois Brick* rule is designed to eliminate and that are inherent in plaintiffs' damages claims.

First, plaintiffs assert that they are effectively the direct payers of interchange fees because the network-established default interchange rates allegedly "fix" a floor for merchant discount rates that plaintiffs pay to acquiring banks, third-party processors and ISOs. Although plaintiffs have never alleged, much less provided any evidence to establish, that the level of merchant discount fees themselves has been subject to any illegal agreement – in fact, plaintiff have conceded that merchant acquiring is competitive (Class Pl. SUF[6] ¶ 78) – plaintiffs now argue that, purportedly having established default interchange rates with the purpose and effect of raising merchant discount rates, defendants have thereby fixed the merchant discount fees that plaintiffs pay. (Class Pl. Opp. Br. at 23-25.) Plaintiffs' argument is wholly inconsistent with *Illinois Brick*, and should be rejected. Indeed, plaintiffs have admitted as much by their acknowledgment that "every instance of price fixing has the *effect* of raising downstream prices, and that *Illinois Brick* in many cases precludes action by the downstream purchasers that is based only on that effect." (Class Pl. Opp. Br. at 24-25.)

As a matter of law, the purchaser of an end product from one entity that costs more as a result of an alleged overcharge in the price of an input – in this case, interchange rates – by different entities is not, for purposes of *Illinois Brick*, the direct purchaser of the price-fixed

---

[6]   Class Plaintiffs' Statement of Undisputed Facts Pursuant to Local Rule 56.1, Updated March 9, 2011 ("Class Pl. SUF").

item. If it were otherwise, the State of Illinois would have been entitled to recover for the over-charge in the price of the bricks that had the effect of increasing the price of the building that the State purchased. Nor does it matter that the alleged upstream price fixers may have anticipated, expected or even intended that their customers would pass on the alleged overcharge to indirect customers further downstream. *See, e.g., Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1049 (9th Cir. 2008) ("In this sense, the Consortiums indirectly establish the merchant discount fee, much as the cost of eggs sets a floor for the price of an omelet on a menu. Just like the restaurateur, the banks charge the merchant a higher price than their cost of business to make a profit. . . . [T]he allegation is barred by *Illinois Brick* to the extent that the Consortiums do not directly set the merchant discount fee; the acquiring bank sets that fee."). Contrary to class plaintiffs' argument (Class Pl. Opp. Br. at 25), no Supreme Court or Second Circuit case has endorsed the notion that a defendant's alleged purpose in establishing an upstream price is relevant to the application of the *Illinois Brick* rule; indeed, such an approach would mire the court in assessments of subjective intent that would undermine *Illinois Brick*'s bright line rule.

Second, plaintiffs contend that the individual plaintiffs and some (though by no means all) of the members of the putative class are direct payers of interchange fees because they purchased merchant payment card services from acquiring banks that are members of Visa or MasterCard and are either co-conspirators with, or owned and controlled by, the defendant banks. (Class Pl. Opp. Br. at 25-27; Ind. Pl. Opp. Br. at 92-96.) Contrary to plaintiffs' argument, how-ever, the so-called "co-conspirator" exception to the *Illinois Brick* rule, which has never been adopted by the Second Circuit, does not save plaintiffs' damages claims because the networks and their member banks have allegedly agreed only to establish the default interchange rates as between themselves. They have not been alleged, must less shown, to have agreed to fix the

12

merchant discount fees that the merchant plaintiffs pay their acquiring banks, third-party processors and ISOs, or to have restrained the pricing discretion those intermediaries exercise when determining the merchant discount fees to charge the merchant plaintiffs. *See, e.g., In re Refrigerant Compressors Antitrust Litig.*, No. 2:09-md-02042, 2011 WL 2433392 (E.D. Mich. June 13, 2011) (denying standing under Illinois Brick to purchasers of finished goods in which the allegedly price-fixed product was a component); *In re ATM Fee Antitrust Litig.*, No. C04-02676, 2010 WL 3701912 (N.D. Cal. Sept. 16, 2010) (holding that co-conspirator exception does not apply where plaintiff does not directly pay the allegedly fixed price). In addition, since the acquiring banks, third-party processors and ISOs exercise independent pricing discretion when determining the merchant discount fees to charge the merchant plaintiffs, plaintiffs' invocation of the "co-conspirator" exception does not solve the overcharge apportionment and multiple recovery problems that the *Illinois Brick* doctrine was intended to eliminate from antitrust damage cases. *See Temple v. Circuit City Stores, Inc.*, Nos. 06 CV 5303 (JG), 06 CV 5304 (JG), 2007 WL 2790154, at *7 n.12 (E.D.N.Y. Sept. 25, 2007) (rejecting argument that intermediary who acquiesces in antitrust violation by agreeing to pay price-fixed input price and not absorb entire overcharge becomes a co-conspirator, thereby permitting indirect purchasers to sue for damages).[7]

---

[7]    The Third Circuit decisions in *In re Sugar Antitrust Litig.*, 579 F.2d 13, 18 (3d Cir. 1978), and *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 159 (3d Cir. 2002), on which class plaintiffs' rely for the proposition that a plaintiff may sue conspirators who, themselves or through a subsidiary, allegedly "pass on" fixed prices as part of the price of another product (Class Pl. Opp. Br. at 25 n.13), are inapposite. In those cases, the plaintiffs claimed that they had purchased the price-fixed item *directly* from the defendant or its subsidiary. Here, the undisputed facts establish that class plaintiffs acquire card acceptance services from acquiring banks, third-party processors and ISOs to whom they pay merchant discount fees. They never acquire from defendants the intermediation services that issuers provide to acquirers and for which acquirers pay interchange fees to issuers.

Plaintiffs' argument that the "co-conspirator" exception should apply because "bank members of MasterCard and Visa agreed to impose the Merchant Restraints on the merchants which prevent horizontal price competition from driving the default interchange rates lower" (Ind. Pl. Opp. Br. at 96) is beside the point. Regardless of their theory of liability, plaintiffs have based their theory of damages on a claim for alleged interchange fee overcharges that they argue were passed on to them as part of the merchant discount fees they were charged by their acquirer, third-party processors or ISOs. Such a damages theory is precisely the kind of theory to which the *Illinois Brick* rule is addressed. In light of the independent pricing discretion exercised by intermediary acquiring banks, third-party processors and ISOs when determining the merchant discount fees to charge the merchant plaintiffs, the *Illinois Brick* doctrine is fully applicable.

Plaintiffs' reliance on *Jewish Hosp. Ass'n v. Stewart Mech. Enters.*, 628 F.2d 971 (6th Cir. 1980) (Ind. Pl. Opp. Br. at 98-99), is similarly misplaced. That decision makes clear that the "owned or controlled" exception "is limited to relationships involving such functional economic or other unity between the direct purchaser and either the defendant or the indirect purchaser that there effectively has been only one sale." *Id.* at 975. No such single sale equivalent exists here. Given the thousands of member banks in the Visa and MasterCard systems, the acquiring bank for a transaction is often neither owned nor controlled by the issuing bank, and plaintiffs have made no attempt to identify or isolate instances of such ownership or control in connection with their damages claims.

Moreover, despite their current argument that acquirers, third-party processors and ISOs are co-conspirators, class plaintiffs have conceded that such intermediaries cannot be co-conspirators in the establishment of network default interchange rates because "[a]cquirers

14

have no influence over the interchange fee and cannot reduce it." (Frankel Rep. ¶ 150.) And class plaintiffs have not sued all of the alleged co-conspirators, as they must to avoid the *Illinois Brick* bar on a co-conspirator theory. *Temple*, 2007 WL 2790154, at *7 n.10 ("the general rule requires dismissal of a complaint that fails to join the other members of the conspiracy as co-defendants"); *Leider v. Ralfe*, No. 01 Civ. 3137(HB), 2003 WL 22339305, at *4 (S.D.N.Y. Oct. 10, 2003) (joinder of all alleged co-conspirators is necessary to prevent multiple recoveries). Having sued only a dozen of the more than 20,000 financial institutions that are members of Visa or MasterCard, class plaintiffs cannot now avoid the indirect plaintiff rule of *Illinois Brick* by the simple expediency of asserting that all 20,000 members of Visa and MasterCard are co-conspirators and that some members of the putative class allegedly purchased merchant services from Visa or MasterCard members.

Third, plaintiffs argue that those members of the putative class that did not purchase merchant services from members of Visa or MasterCard are nonetheless direct payers of interchange fees because the hundreds of intermediary acquiring banks, third-party processors and ISOs that are not members of Visa or MasterCard (and from which those putative class members allegedly purchased merchant payment card services) contracted with an acquiring bank member of Visa or MasterCard. (Class Pl. Opp. Br. at 28.) But there is nothing in the record that would support the proposition that network rules either dictate the pricing by those intermediary acquiring banks, third-party processors and ISOs, or require those acquiring banks, third-party processors and ISOs to "pass on" to their merchant customers all or any part of the network-established default interchange fees. It is undisputed that such intermediaries have maintained the independence and discretion to set their own merchant discount fees, to decide whether and how much of the interchange fees assessed on them to pass on, and to determine

15

how much of the risk of fluctuating interchange fees to bear. (SMF ¶¶ 37, 47-57.) Acquirers are also financially responsible for transactions in the event transactions are charged back to the merchant and the merchant is unable to make good on the chargebacks. (SMF ¶ 42.) As such, intermediary acquiring banks and other payment card processors are not, as plaintiffs suggest, simply agents of the issuing banks as part of an alleged interchange price-fixing scheme. *See, e.g., McCarthy v. Recordex Serv. Inc.,* 80 F.3d 842 (3d Cir. 1996); *Sun Microsystems Inc. v. Hynix Semiconductor Inc.,* 608 F. Supp. 2d 1166, 1179-80 (N.D. Cal. 2009) (rejecting "purchasing agent" argument "as yet another misguided attempt to fashion a 'new formulation of the *Illinois Brick* rule'") (citation omitted).[8]

Finally, plaintiffs argue that they are the direct payers of interchange fees because (i) some issuing banks deduct interchange fees from the funds due to the acquiring banks at the time of settlement and (ii) some acquiring banks account for interchange fees as "contra-revenue." (Class Pl. Opp. Br. at 28-35; *see* Ind. Pl. Opp. Br. at 90.) These accounting arguments are wholly irrelevant to the *Illinois Brick* analysis. The key fact for *Illinois Brick* purposes is that the intermediary acquirers, third-party processors and ISOs with whom the merchants deal di-

---

[8]    In *McCarthy v. Recordex Serv. Inc.,* 80 F.3d 842 (3d Cir. 1996), for example, the court distinguished between agents that were mere employees controlled by the indirect purchaser and those that were independent contractors with pricing discretion independent of the indirect purchaser, such that issues relating to the passing on of the allegedly price-fixed price remained to be resolved. In holding that attorneys – who were acknowledged to be the "agents" of their clients – were "independent contractors" for *Illinois Brick* purposes, the Third Circuit stated that "the most important factor is the degree of control exercised by the principal: The legal distinction between an employee and an independent contractor is so well established as to require little, if any, discussion. The characteristics of the former relationship is that the master not only controls the result of the work but has the right to direct the way in which it shall be done, whereas the characteristic of the latter is that the person engaged in the work has the exclusive control of the manner of performing it, being responsible only for the result." *Id.* at 853 (citation omitted).

rectly retain independent pricing discretion with respect to the amount of the merchant discount fees they charge to merchants. And that key fact is undisputed. Indeed, class plaintiffs have conceded that acquirers do not immediately change the merchant discount fees they charge to merchants to reflect changes in interchange rates. (SMF ¶¶ 37, 47-57.) And their concessions that the difference between types of merchant agreements – "bundled rate" and "interchange-plus" agreements – "reflects differences only in the acquirer margin" (Class Pl. Opp. Br. at 32), and that "if an acquirer offers a merchant a flat or 'bundled' rate, it is choosing to allow its acquirer margin to vary inversely to the interchange fee" (*Id.* at 33), further support the application of the *Illinois Brick* doctrine in this case. It is precisely the existence of the acquirer margin and differences in that margin from acquirer to acquirer – and even from merchant to merchant for the same acquirer – that result in an overcharge apportionment issue that the rule of *Illinois Brick* was intended to eliminate. To paraphrase the explanation that the Supreme Court provided in *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968):

> Even if it could be shown that the [acquirer, third-party processor, or ISO] raised his price in response to, and in the amount of, the overcharge and that his margin of profit and total sales had not thereafter declined, there would remain the nearly insuperable difficulty of demonstrating that the particular [acquirer, third-party processor, or ISO] could not or would not have raised his prices absent the overcharge or maintained the higher price had the overcharge been discontinued. Since establishing the applicability of the passing-on defense would require a convincing showing of each of these virtually unascertainable figures, the task would normally prove insurmountable.

*Id.* at 493 (footnote omitted).

**B.      Plaintiffs' Argument That There Is No Realistic Probability That Any Direct Payer Will Sue Defendants Lacks Factual And Legal Support**

Plaintiffs' claim that there is no realistic probability that the direct purchasers – those intermediaries that pay interchange fees directly – will sue defendants to recover alleged

17

interchange fee overcharges (Class Pl. Opp. Br. at 35-37; Ind. Pl. Opp. Br. at 97-98) is both factually inaccurate and legally irrelevant under *Illinois Brick.*

As a matter of undisputed fact, this argument is belied by the lawsuits brought by NaBanco and First Data. *National Bancard Corp. (NaBanco) v. Visa U.S.A., Inc.*, 596 F. Supp. 1231 (S.D. Fla. 1984), *aff'd*, 779 F.2d 592 (11th Cir. 1986); *Visa U.S.A., Inc.. v. First Data Corp.*, No. C 02-01786 (JSW), 2006 WL 516662 (N.D. Cal. Mar. 2, 2006). Plaintiffs attempt to distinguish these cases by asserting that NaBanco and First Data sued as competitors rather than customers. But that alleged distinction, even if true, is irrelevant. Those cases conclusively establish that acquiring banks, third-party processors, and ISOs are able to sue the networks – and have done so. And in each of those cases, the courts rejected the argument that merchants, rather than the processors, were the proper parties for *Illinois Brick* purposes. *NaBanco*, 596 F. Supp. at 1247; *First Data*, 2006 WL 1310448, at *7. Faced with this history, class plaintiffs' contention that there is not a realistic probability that acquirers, third-party processors and ISOs would assert whatever antitrust claims they believe they have against defendants is simply not credible.

Plaintiffs' "no realistic probability" argument also lacks legal support. In *Illinois Brick*, the Supreme Court expressly acknowledged "that direct purchasers sometimes may refrain from bringing a treble-damages suit for fear of disrupting relations with their suppliers." 431 U.S. at 746. Yet, the majority concluded that "on balance . . . the legislative purpose in creating a group of 'private attorneys general' to enforce antitrust laws . . . is better served by holding direct purchasers to be injured to the full extent of the overcharge paid by them than by attempting to apportion the overcharge among all that may have absorbed part of it." *Id.* (citation omitted). Thus, contrary to class plaintiffs' argument (Class Pl. Opp. Br. at 37-38), neither the Supreme Court nor this circuit has adopted a "no realistic probability" exception to the *Illinois Brick* rule;

18

such an exception would require the kind of fact-intensive, case-by-case assessment that the Supreme Court has clearly held to be inconsistent with the bright line rule of *Illinois Brick. See Kansas v. UtiliCorp United, Inc.* 497 U.S. 199, 216 (1990) ("ample justification exists for our stated decision not to 'carve out exceptions to the [direct purchaser] rule for particular types of markets'") (alteration in original; citation omitted).

   **C.**    **The Holdings And Rationales Of *Paycom, Kendall,* And *ATM* Are Applicable**

   Plaintiffs' efforts to distinguish *Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*, 467 F.3d 283 (2d Cir. 2006), *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008), and *In re ATM Fee Antitrust Litig.*, No. C04-02676, 2010 WL 3701912 (N.D. Cal. Sept. 16, 2010) (Class. Pl. Br. at 38-40; Ind. Pl. Opp. Br. at 100-01), fail.

   Contrary to plaintiffs' assertion, the challenged rules in *Paycom* were network rules relating, among other things, to chargebacks that, like the default interchange rules at issue here, involved the respective rights and obligations of issuing and acquiring banks as between themselves in connection with the settlement of payment card transactions. Like the default interchange rules at issue here, the MasterCard chargeback rules at issue in *Paycom* permitted, but did not require, an acquiring bank to pass on a chargeback to its merchant customer, and acquiring banks "typically" passed those chargebacks on to their merchant customers. The Second Circuit, in a decision by Judge Winter, held that merchants were indirect payers of chargebacks assessed on them, and that the *Illinois Brick* doctrine barred Paycom's damages claim. Class plaintiffs' effort to distinguish *Paycom* by arguing that the court could have decided the case on different grounds is irrelevant. What is relevant is that one of the grounds on which the court decided the case was *Illinois Brick*.

19

The *Kendall* case involved the very same default interchange rules that plaintiffs challenge in this case. Although the case was decided at the pleading stage, the court articulated principles of law, including the requirements of *Illinois Brick*, that are fully applicable to the instant case. And it was on the basis of those principles of law that the court in *Kendall* dismissed the merchants' claims that payment card networks and issuers had conspired to fix interchange fees.

The *ATM* case involved bank network interchange rules like the challenged default interchange rules at issue here. Plaintiffs concede that the same assertion they make here, to wit, that interchange fees were fixed for the purpose and with the effect of raising other fees that plaintiffs paid directly, was made and rejected in *ATM*. (Class Pl. Opp. Br. at 39 n.16.) In fact, the *ATM* court characterized the case as "a fairly straightforward application of the rule set forth in *Illinois Brick*" and granted summary judgment to the defendants because the plaintiffs "do not pay this allegedly unlawful fee directly (their banks do) and therefore are not directly harmed by it." *In re ATM Fee Antitrust Litig.*, 2010 WL 3701912, at *2, *11.

In short, from the perspective of the *Illinois Brick* doctrine, *Paycom*, *ATM* and *Kendall* are indistinguishable from the instant case.

### III. The Principles Of Buffalo Broadcasting *and* Paycom Entitle Defendants To Summary Judgment

The decisions in *Buffalo Broadcasting Co. v. ASCAP*, 744 F.2d 917, 933 (2d Cir. 1984), *Columbia Broadcasting Sys., Inc. v. ASCAP*, 620 F.2d 930, 936 (2d Cir. 1980), and *Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*, 467 F.3d 283, 291-92 (2d Cir. 2006), make clear that the challenged rule of a joint venture does not restrain competition in violation of Sec-

tion 1 when the rule does not restrain any of the venturers' abilities to engage in any competitive behavior in which they could have engaged had they not joined the venture.

Defendants demonstrated in their moving brief (Def. Br. at 30-39), and plaintiffs do not dispute, that neither network's default interchange rule prevents any bank defendant from entering into bilateral arrangements to supersede the default interchange rates or to reduce merchant discount fees, or from engaging in any other competitive activity outside the Visa and MasterCard networks – such as participating in competitive payment card networks or issuing their own payment cards on whatever terms they wish. (SMF ¶¶ 58-75.) Since the default interchange rules that plaintiffs challenge have not themselves been shown to restrict any bank defendant from varying the default interchange rate applied to its Visa and MasterCard transactions, or from engaging in any competitive behavior in which it could have engaged in the absence of its participation in Visa and MasterCard, under controlling precedent those default interchange rules do not restrain competition in violation of Section 1.

In their opposition brief, class plaintiffs acknowledge that *Buffalo Broadcasting* is "consistent with black-letter law holding that when the plaintiffs cannot establish that the challenged horizontal agreement restrains competition, there is no Section 1 violation." (Class Pl. Opp. Br. at 47.) But class plaintiffs attempt to avoid the effect of *Buffalo Broadcasting* and *Paycom* on their interchange claims by advancing three arguments. They argue that: (i) the default interchange rules limit competition in a way that class plaintiffs analogize to fixed "list prices" (*id.* at 43-45); (ii) other network rules render bilateral agreements and other alternative arrangements not realistically available or irrelevant (*id.* at 45-46); and (iii) *Buffalo Broadcasting* and *Paycom* are distinguishable (*id.* at 46-48). Each of these arguments is without merit.

21

### A. Plaintiffs Have Failed To Present Evidence That Default Interchange Rules Restrain Competitive Conduct

Plaintiffs argue that the networks' default interchange rules constitute a restraint of trade because, plaintiffs claim, "every contract is a restraint of trade." (*Id.* at 43.) But the cases plaintiffs cite do not involve default, or non-exclusive, agreements that do not constrain the competitive behavior of the participants.

The teaching of *Buffalo Broadcasting* is that an agreement among joint venturers that does not preclude any venturer from competing with the venture does not restrain competition, and such an agreement therefore does not violate Section 1. The teaching of *Paycom* is similar. There, the plaintiff contended that the systematic imposition on merchants of chargeback fines and penalties reflected an agreement among MasterCard members to fix the price that merchants pay. *Paycom*, 467 F.3d at 291. But the relevant MasterCard rule provided that chargeback fines and penalties, if levied, were to be levied against the acquiring banks, not the merchants. And, while acquiring banks typically passed on chargeback fines and penalties imposed on them to their merchant customers, the court found that the acquiring banks were free to decide on their own whether to pass on such charges and, if so, how much of the charge to pass on. Given the acquirers' retention of discretion, the court found no agreement and thus no restraint. *Id.*

Plaintiffs' argument that the adoption by legitimate joint ventures, like Visa and MasterCard, of a default interchange rule that permits superseding bilateral agreements is akin to collective setting by individual competitors of list prices from which participants offer discounts is inconsistent with *Buffalo Broadcasting* itself. ASCAP had established a price for the challenged blanket license, but that license did not constitute a restraint precisely because it did not

22

restrain individual composers and broadcasters from negotiating broadcast licenses to supersede the blanket license.

**B.    Plaintiffs Have Failed To Present Evidence To Establish The Absence Of Any Realistically Available Commercial Alternative**

Plaintiffs' claim that the rights of Visa and MasterCard participants to enter into bilateral agreements to supersede the network default interchange rates and to participate in other networks to offer payment card services entirely outside the Visa and MasterCard systems are not realistic or relevant (Class Pl. Opp. Br. at 45-46; Ind. Pl. Opp. Br. at 102-04) is factually and legally incorrect.

First, to the extent that class plaintiffs argue that the default interchange rules they challenge should be viewed together with other network rules, such as the honor-all-cards and no-surcharge rules, as part of an interrelated set of arrangements that have a cumulative effect on competition, plaintiffs' argument misses the mark. Defendants expressly limited their *Buffalo Broadcasting* argument to the class plaintiffs' claims in their First, Second, Fourth, Fifth, Tenth, Eleventh, Twelfth, Thirteenth, Fourteenth, Fifteenth, Sixteenth, Seventeenth, Eighteenth, Nineteenth and Twentieth Claims for Relief. Those fifteen claims for relief assert that each network's default interchange rule, by itself, violates Section 1. Class plaintiffs have challenged the merchant acceptance rules, like the no-surcharge rules and the honor-all-cards rules, separately in the Sixth and Seventh Claims for Relief. Class plaintiffs cannot now conflate their claims in an effort to avoid summary judgment.[9]

---

[9]    Nor could plaintiffs show that default interchange rules must be considered together with other challenged network rules in any event. This Court can properly grant summary judgment dismissing claims to the extent that they are based on network rules that, like the Visa and MasterCard default interchange rules, do not restrain trade and are therefore not anti-

*(cont'd)*

23

Second, to the extent that plaintiffs argue that bilateral agreements do not exist in either the Visa or MasterCard system, they are simply wrong as a matter of undisputed fact. Defendants provided an example of such a bilateral agreement between ███████████████ (SMF ¶ 62.) Plaintiffs' effort to distinguish that agreement on the grounds that, at about the same time, ███████████████ also entered into other agreements that provided consideration to █████ is unpersuasive. The fact remains undisputed that there is an agreement between ███████████ ████ that establishes a different interchange rate for transactions effected at ████████████ ████-issued Visa payment cards.

Moreover, the plaintiff has the burden of proving that no alternative realistically exists. *See Buffalo Broadcasting*, 744 F.2d at 925. That defendants have not presented numerous examples of bilateral agreements is in no way proof that such agreements are not realistically available. For example, in *Columbia Broadcasting Sys., Inc. v. ASCAP*, 620 F.2d 930 (2d Cir. 1980), there were *no* instances of performing rights having been obtained from individual copyright holders, yet the court found such an option realistically available. *Id.* at 936. And as the Second Circuit stated in *Buffalo Broadcasting*, to determine whether an alternative is realistically available, the court's task is to "search the record for evidence that the blanket license is functioning to restrain willing buyers and sellers from negotiating for the licensing of performing rights to individual compositions at reasonable prices." *Buffalo Broadcasting*, 744 F.2d at 932. Here, plaintiffs have failed to present any evidence that the network default interchange rules

---

*(cont'd from previous page)*

competitive. *See* Network Defendants' Reply Memorandum in Support of the Motion for Summary Judgment Against the Claims in the Individual Plaintiffs' Complaints, dated June 30, 2011, at 7-9.

have functioned "to restrain willing buyers and sellers from negotiating" for alternatives to network default interchange fees.

Third, to the extent that plaintiffs argue that bilateral agreements and other arrangements are not realistic alternatives because they are not identical to the Visa and MasterCard payment products, or may be more costly, their argument is legally insufficient. A realistic alternative need not provide the identical product. None of the alternatives the Second Circuit considered in *Buffalo Broadcasting* were identical to the challenged blanket license. Nor does an alternative need to be less costly to be realistic. In *Buffalo Broadcasting*, the court rejected the plaintiffs' argument that individual program licenses were not an alternative to the blanket license because they were more costly. *Buffalo Broadcasting*, 744 F.2d at 926.

Fourth, plaintiffs assert, without any evidence, that the ability of the defendant banks to provide payment products and services outside the Visa and MasterCard systems – by, for example, joining other competitive payment networks, such as American Express and Discover, or providing their own proprietary cards – does not rise to the level of providing a realistic alternative to merchants. This argument not only lacks evidentiary support, but is wholly inconsistent with the way that the Supreme Court itself has analyzed whether a realistic alternative exists. In *Arizona v. Maricopa County Med. Soc.*, 457 U.S. 332 (1982), for example, the Court explained that "the blanket license arrangement [in *CBS*] did not place any restraint on the right of any individual copyright owner to sell his own compositions separately to any buyer at any price." *Id.* at 355. Similarly, here, the default interchange rules do not place any restraint on the right of any Visa or MasterCard member to provide its own payment card services, or to provide such services as a participant in another payment card network, to any merchant at any price.

25

In sum, plaintiffs must provide evidence that answers the question, where is the restraint in a rule that establishes a schedule of default interchange rates to be used in the absence of a superseding bilateral agreement among the participants?  This Court can search the record in vain for evidence that the default interchange rules, by themselves, have functioned to restrain willing buyers and sellers from negotiating superseding bilateral agreements or other alternative arrangements for the processing of payment card transactions.  Plaintiffs have the burden of presenting evidence that they have no realistic alternatives other than to accept default interchange rates.  But they have presented no such evidence, and that failure of proof compels summary judgment in defendants' favor.

**C.**     **Plaintiffs Have Failed To Distinguish *Buffalo Broadcasting* And *Paycom***

Plaintiffs' attempt to distinguish *Buffalo Broadcasting* on the grounds that the decision was rendered after a trial (Class Pl. Opp. Br. at 46) is irrelevant.  While it is true that the district court rendered its decision after trial, defendants rely on the holding and the *ratio decidendi* of the Second Circuit's decision, a decision that *reversed* the trial court.  The Second Circuit concluded that the non-exclusive "blanket license is not even amenable to scrutiny under section 1 unless it is a restraint of trade. . . .  Since the blanket license restrains no one from bargaining over the purchase and sale of music performance rights, it is not a restraint unless it were proven that there are no realistically available alternatives. . . .  Not having been proven to be a restraint, it cannot be a violation of section 1."  744 F.2d at 933.  In his concurring opinion, Judge Winter succinctly explained the rationale of the *Buffalo Broadcasting* decision by comparing that case to the arrangement struck down in *National Collegiate Athletic Ass'n v. Board of Regents of the Univ. of Okla.*, 468 U.S. 85 (1984) ("*NCAA*"), writing:

26

> In that case, the NCAA attempted to sell exclusive television rights to football games between member colleges. The member institutions had agreed among themselves to abide by the rules of the NCAA and to boycott collectively any institution that violated those rules. I think all would agree that, if the NCAA merely offered a *non-exclusive* license to all football games between member schools and the member schools were free to negotiate television rights on their own, the action would have been dismissed on the pleadings.

744 F.2d at 934 (Winter, J., concurring) (emphasis in original).

Plaintiffs' attempt to distinguish *Buffalo Broadcasting* on the ground that the *Buffalo Broadcasting* defendants lacked market power (Class Pl. Opp. Br. at 47-48) is specious. Nothing in the court's decision relied on the absence of market power. Indeed, as the Supreme Court recognized, "[a]lmost every domestic copyrighted composition [was] in the repertory either of ASCAP, with a total of three million compositions, or of BMI, with one million." *Broadcast Music Inc. v. CBS, Inc.*, 441 U.S. 1, 5 (1979) ("*BMI*"). While market power is entirely irrelevant to the holding of *Buffalo Broadcasting* and its progeny, it is clear from the *BMI* decision that BMI and ASCAP had a combined penetration at least equal to, and likely greater than, the combined penetration of Visa and MasterCard.

Finally, plaintiffs' effort to distinguish *Paycom* on the basis that chargebacks were "wholly voluntary and therefore there was no agreement" (Class Pl. Opp. Br. at 48-49; *see* Ind. Pl. Opp. Br. at 105) is no distinction at all. Just as plaintiffs here argue that network rules imposing default interchange fees on acquiring banks constitute an agreement to establish a floor for merchant discount fees because acquirers allegedly pass on some or all of the interchange fees to merchants as part of the merchant discount fee the merchant pays the acquirer, Paycom argued that the MasterCard rules imposing chargebacks on acquiring banks constituted an agreement to charge merchants because acquirers typically assessed the chargeback against the merchant's account. But each MasterCard acquiring member was free to decide on its own whether to as-

sess a chargeback on its merchant customer. The court determined that there was no agreement to charge the merchant due to the existence of that discretion. So too here, where the undisputed evidence establishes that each acquirer, payment processor or ISO who contracts with a merchant is free to decide on its own whether and how much of the interchange rate it faces to assess on its merchant customers. (SMF ¶¶ 37 , 47-57.) Just as in *Paycom*, the missing element in plaintiffs' case is the absence of evidence, indeed even an allegation, that acquirers, third-party payment processors and ISOs agreed jointly whether and how much of the interchange rate assessed on them to pass on to their merchant customers.

## IV.  The Lack Of Evidence Of Any Restriction In Output Entitles Defendants To Summary Judgment

The Supreme Court in *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993), held that "[s]upracompetitive pricing entails a restriction in output." *Id.* at 233. As defendants demonstrated in their moving brief (Def. Br. at 39-42), plaintiffs cannot show that output in any of the relevant markets they allege has been restricted as a result of the challenged network rules. Indeed, class plaintiff's expert, Dr. Frankel, confessed that he could not opine that default interchange rules had restricted output in any relevant market; the most he could say was that the effect of the challenged default interchange rules on transaction volume has been "ambiguous." (SMF ¶ 80.)

Class plaintiffs advance two responses in their opposition brief. First, they argue that a restriction in output is not necessary to find that prices are above a competitive level. (Class Pl. Opp. Br. at 50-52.) Second, they argue that there is sufficient evidence that output was in fact restricted because: (a) fewer merchants accept payment cards than would have accepted them in a "but for" world with zero or lower interchange rates; (b) interchange fees have re-

stricted the output of goods and services in the economy generally, and (c) banks in the United States have failed to implement some allegedly superior technology. (*Id.* at 53-54.) None of these arguments suffices to save plaintiffs' claims.

### A.    As A Matter Of Law, Proof Of A Restriction In Output Is Required As A Predicate For A Finding That Prices Exceed A Competitive Level

Class plaintiffs' argument that a restriction in output is not necessary to find that prices are above a competitive level is simply contrary to *Brooke Group*. In *Brooke Group*, the Court was faced with evidence of increased prices in a market the plaintiff had alleged was affected by the defendants' anticompetitive practices. The Court was clear that, without evidence of a restriction in output, price increases were not evidence of anticompetitive effects in the market. "Only if those higher prices are a product of nonmarket forces has competition suffered. If prices rise in response to an excess of demand over supply, or segment growth slows as patterns of consumer preferences become stable, the market is functioning in a competitive manner. Consumers are not injured from the perspective of the antitrust laws by the price increases; they are in fact causing them." 509 U.S. at 232. The Court held that a plaintiff must show that the defendants had "elevated prices above a competitive level." *Id.* at 233.

Contrary to class plaintiffs assertion (Class Pl. Opp. Br. at 51), the holding in *Brooke Group* is not limited to allegations of predatory pricing. Indeed, the Court in *Brooke Group* cited *NCAA*, 468 U.S. at 104-08, and *BMI*, 441 U.S. at 19-20, neither of which involved predatory pricing, as well as a host of academic authorities, when it succinctly held: "Supracompetitive pricing entails a restriction in output." *Brooke Group*, 509 U.S. at 233.

The clear holding of *Brooke Group* is applicable here. Class plaintiffs repeatedly assert that defendants have "artificially inflated" default interchange rates above the competitive

29

level. (Class Pl. Opp. Br. at 49, 50.) But, critically, class plaintiffs and their expert have provided no basis to distinguish competitive from supracompetitive interchange rate levels. Like the price increases in *Brooke Group*, interchange rate increases that flow from the competition among Visa, MasterCard, American Express and Discover for the business of issuers -- as the Department of Justice anticipated would occur in the wake of *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003) – or from the increase in cardholder demand for lower cardholder fees and greater payment card rewards are not supracompetitive; they represent a competitive result. As the *Brooke Group* Court made clear, prices become supracompetitive, thereby causing harm to competition, only when output is restricted as a result of the increase. *Brooke Group*, 509 U.S. at 233; *see also Chicago Prof'l Sports Ltd. P'ship v. National Basketball Ass'n*, 95 F.3d 593, 597 (7th Cir. 1996) ("The core question in antitrust is output. Unless a contract reduces output in some market, to the detriment of consumers, there is no antitrust problem."); *Chicago Prof'l Sports Ltd. P'ship v. National Basketball Ass'n*, 961 F.2d 667, 673 (7th Cir. 1992) (an alleged restraint that "in the end expands output serves the interests of consumers and should be applauded rather than condemned"); William Landes, *Harm to Competition: Cartels, Mergers, and Joint Ventures*, 52 Antitrust Law Journal 625, 627, 635 (1983).[10]

---

[10] Plaintiffs misleadingly take out of context the statement from Professors Areeda and Hovenkamp that "any agreement reasonably calculated to yield higher prices is presumptively an agreement to reduce output." (Class. Pl. Opp. Br. at 50.) Indeed, Professors Areeda and Hovenkamp explain in the next sentence that they merely mean that as an economic matter "a price increase always accompanies an output reduction." IIA Philip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1901 (3d ed. 2007). Later, Professors Areeda and Hovenkamp make clear that, as is plain from *Brooke Group*, "output reductions are a 'prerequisite' for the other primary type of anticompetitive effect typically recognized by courts – namely, supracompetitive pricing." *Id.* at ¶ 1912e. The other decisions on which plaintiffs rely – *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 459 (1986) and *National Soc'y of Prof'l Engineers*
*(cont'd)*

Accordingly, class plaintiffs' assertion that evidence of a restriction in output is not necessary to a finding of supracompetitive prices is contrary to controlling authority.

**B.**   **Plaintiffs' Assertions About Restrictions In Output Are Unsupported**

As defendants explained in their moving brief (Def. Br. at 42), class plaintiffs' expert, Dr. Frankel, admitted at his deposition that he cannot tell whether the challenged default interchange rules have impeded the growth in card usage, *i.e.*, output. (SMF ¶ 80.)  In fact, Dr. Frankel has opined that the challenged conduct has actually encouraged payment card usage – too much usage, in his view.  (SMF ¶ 79.)  In an attempt to reconcile his view that he cannot tell whether the challenged rules restrict output with his view that the challenged rules in fact caused too much output, Dr. Frankel contends that "the analysis of output is not properly applied to the markets [he] defined" (SMF ¶ 80, but could only be applied to a hypothetical relevant market that neither he nor plaintiffs have defined.  Class plaintiffs and their expert are wrong.

In their opposition brief, class plaintiffs argue that, although they have alleged that the relevant markets in which competition has been harmed are markets for payment card network services (or even narrower single brand Visa- and MasterCard-only markets) (*see, e.g.,* Compl.[11] ¶¶ 8hh, 105, 246, 272, 297, 310, 358, 376, 383, 398, 414, 455), payment card transaction volume in those markets is not the appropriate measure of output.  (Class Pl. Opp. Br. at 53.) This assertion is erroneous.  Class plaintiffs claim that they have suffered anticompetitive harm

---

*(cont'd from previous page)*

 *v. United States*, 435 U.S. 679, 693-94 (1978) – are irrelevant on the issue of output because each involved claims of restrictions on price that were *per se* illegal, or unlawful under the "quick look doctrine," so that the Court had no need to, and did not, consider whether, under the rule of reason applicable here, output had been restricted.

[11]   Corrected Second Consolidated Amended Class Action Complaint, dated March 27, 2009.

because default interchange rates have allegedly increased the price of payment card network services to supracompetitive levels. To prove that the price of payment card network services is supracompetitive, class plaintiffs must demonstrate that output in the markets they have alleged for payment card network services has been restricted. Output in markets other than the markets for payment card network services where class plaintiffs claim to have suffered anticompetitive injury is wholly irrelevant to the question of whether the price of payment card network services has been increased above a competitive level.

Moreover, output in the markets for payment card network services must be measured by payment card transaction volume. To prove that the cost of payment card network services is supracompetitive, class plaintiffs must prove that output of payment card network services has been restricted. Simply put, they must show that default interchange rates during the relevant period caused payment card transaction volume to be less than it would have been if default interchange rates had been lower. This they have not shown – and cannot show – because the undisputed evidence establishes that the volume of payment card transactions – not just for Visa and MasterCard, but for American Express and Discover as well (SMF ¶¶ 112-18) – has increased substantially during the relevant time period.

Class plaintiffs' assertion that the proper measure of output is the volume of goods and services in the United States economy as a whole, and their speculation that the volume of goods and services in the United States economy has been restricted by the level of network default interchange rates (Class Pl. Opp. Br. at 54), is both unsupported and irrelevant. Plaintiffs have not offered a scintilla of data or any economic study or analysis from which to conclude that the volume of goods and services in the United States economy has been restricted by default interchange rates. Indeed, given class plaintiffs' contentions that defendants have

32

used default interchange rates to encourage the alleged overuse of payment cards (SMF ¶ 79) and that merchants must accept payment cards or risk losing those sales, it is at least counterintuitive to conclude that, while more than seven million retail outlets representing more than 95% of the retail sales in the United States accept payment cards (Class Pl. Sum. Jud. Br.[12] at 75), those cards cause a restriction in the volume of goods and services sold in the United States economy.

Moreover, as a legal matter, the effect of interchange fees on the output of goods and services in the United States economy as a whole is irrelevant. Plaintiffs have not complained that interchange rules have caused them to sell too few goods and services. Indeed, they admit that card acceptance, and the way that interchange fees have been used to encourage payment card usage, can lead to increased sales. (SMF ¶ 79) They have not claimed any harm as a result of a restriction in the retail output of goods and services in United States economy.

Likewise, class plaintiffs' assertion that the level of interchange rates has restricted the number of merchants that accept Visa- and MasterCard-branded payment cards is equally unfounded. As a legal matter, the number of merchants that do not accept payment cards is irrelevant because plaintiffs are not complaining that they have been injured by an inability to accept payment cards. Indeed, if the challenged rules restricted the number of merchants that could accept payment cards, then plaintiffs, who all accept payment cards to compete with their retail rivals, would seem to be benefited rather than harmed by that reduction. In addition, the output of a product or service is not appropriately measured by how many merchants offer the product or service, but by the volume of the product or service actually used or sold. Regarding volume, Dr. Frankel has admitted that, in his "but for" worlds in which he hypothesizes that in-

---

[12]  Class Plaintiffs' Memorandum of Law In Support of Their Motion for Summary Judgment, dated Feb. 11, 2011 ("Class. Pl. Sum. Jud. Br.").

terchange rates would be either zero or substantially lower than they currently are, cardholder rewards would be lower and cardholder fees would be higher.  This admission itself makes any speculation that payment card transaction volume might be higher in the "but for" worlds than it is in the real world counterintuitive, if not wholly implausible.  Not surprisingly, Dr. Frankel offered no opinion that payment card transaction volume would have been greater in the "but for" world.

Furthermore, as a factual matter, class plaintiffs have collected no data and conducted no economic analysis from which to conclude that the current level of default interchange rates has meaningfully restricted the number of merchants that accept payment cards.  Their assertion that the level of default interchange rates has restricted the number of merchants that accept payment cards is not only sheer speculation, but is counterintuitive in light of their concession that more than seven million retail outlets representing more than 95% of the retail sales in the United States already accept payment cards, and the historical growth of payment card acceptance among merchants in virtually all industries has been phenomenal.

Class plaintiffs' argument that defendants erroneously focus solely on output in the real world rather than in the "but for" world (Class Pl. Opp. Br. at 52-53 & n.22) misses the point.  Evidence of increased output in the real world is precisely the sort of evidence on which the Supreme Court relied in *Brooke Group* to find that the challenged conduct had had no anticompetitive effects.  *Brooke Group*, 509 U.S. at 233-34.  The Court noted that although the ultimate question is whether output would have been greater in the "but for" world (as defendants here have always acknowledged as well), the *Brooke Group* plaintiffs, like plaintiffs here, offered no evidence on that question, and therefore did not meet their burden, particularly where, as here, the evidence established that output in the real world had increased.  Plaintiffs' specula-

34

tion that payment card transaction volume might have been greater in the "but for" world than it actually was in the real world is wholly unsupported by any evidence or analysis, and should be rejected. *See id.* at 234 ("One could speculate, for example, that the rate of [market] growth would have tripled, instead of doubled, without Brown & Williamson's alleged predation. But there is no concrete evidence of this.").

Finally, class plaintiffs have proffered not one shred of evidence to support their assertion that default interchange rules might have caused the networks and their member banks to forego technological advances in the payment card industry. Such unsupported speculation simply does not raise a genuine issue of material fact on the question of whether the challenged network rules have reduced output in the relevant markets. They have not, and plaintiffs' failure to raise a genuine issue of fact on this issue renders summary judgment in defendants' favor appropriate.

**V.    *Plaintiffs' Abandonment Of Their Inter-Network Conspiracy Claim And The Lack Of Evidence To Support That Claim Entitle Defendants To Summary Judgment***

Defendants showed in their moving brief (Def. Br. at 42-44) that class plaintiffs have abandoned their inter-network conspiracy claim (the Third Claim for Relief in the Class Complaint). In their opposition brief, class plaintiffs concede that abandonment as to damages, but contend that they "continue to seek declaratory and injunctive relief." (Class Pl. Opp. Br. at 56.) Plaintiffs' contention is belied, however, by their most recent letter describing the seven specific forms of equitable relief they intend to seek, none of which relates in any way to any alleged inter-network conspiracy claim. (Letter from K. Craig Wildfang to Robert J. Vizas, dated May 11, 2011.)

35

Despite its complete abandonment, class plaintiffs try to resurrect their inter-network conspiracy claim by arguing that (i) Visa's policy not to be competitively disadvantaged by MasterCard and American Express in the competition for issuers, and MasterCard's competitive response to that policy, somehow show collusion between the networks; and (ii) the motive and opportunity for the two networks to conspire with each other constitute "plus factors" sufficient to permit a jury to infer the existence of the alleged inter-network conspiracy. Neither argument is availing.

### A. Each Network's Policy To Compete For Issuers With The Other And With American Express Does Not Constitute Evidence Of Inter-Network Conspiracy

Plaintiffs' reliance on Visa's policy, adopted in May 2002, that "it would 'not be competitively disadvantaged' vis-à-vis MasterCard's effective interchange-fee rates and American Express's merchant-discount rates," and MasterCard's "reciprocal policy of 'competitive response,'" adopted eighteen months later in October 2003 (Class Pl. Opp. Br. at 57-59) is misplaced. In view of the undisputed increase in competition among Visa, MasterCard, American Express and Discover for the loyalty and business of issuing banks following the decision in *United States v. Visa,* and its concomitant expected increase in higher rewards payment cards and the default interchange rates associated with those cards, Visa's statement in 2002 that it would not be disadvantaged by the competition for issuers – and MasterCard's "competitive response" eighteen months later – are not evidence of an inter-network conspiracy. If anything, these statements demonstrate intense inter-network competition.[13]

---

[13] Plaintiffs themselves cite abundant evidence that Visa and MasterCard compete vigorously with each other, and with other networks, for issuers. (*See, e.g.,* Class Plaintiffs' Statement of Undisputed Facts Pursuant to Local Rule 56.1, dated February 11, 2011, ¶¶ 28.f; 30.a, c, f;

*(cont'd)*

36

Plaintiffs' assertion that, "but for an illegal agreement, the networks' 'twin policies' would not have been in their independent interests" (Class Pl. Opp. Br. at 60-61) is mere speculation, and is insufficient to defeat defendants' motion for summary judgment. *See, e.g., Blomkest Fertilizer, Inc. v. Potash Corp. of Sask., Inc.*, 203 F.3d 1028, 1035, 1038 (8th Cir. 2000) (affirming summary judgment because plaintiffs and their expert economist presented "only speculation" rather than evidence). Plaintiffs have conceded that competition for issuers intensified after the 2001 decision in *United States v. Visa* and that that increased competition caused default interchange rates to increase for certain high reward payment cards as networks competed to offer issuers better financial terms to issue network-branded payment cards. (Class Pl. SUF ¶¶ 99b, 100e.) Plaintiffs also concede that more than seven million merchant outlets, representing more than 95% of the retail sales in the United States already accept both Visa and MasterCard and could not economically refuse to accept both Visa- and MasterCard-branded cards. (Class Pl. Br. at 75.) At the same time, however, plaintiffs concede, in connection with their allegations that each network engaged in price discrimination with respect to its default interchange rate schedule, that each network did compete for merchants by reducing default interchange rates for merchants in industries that traditionally did not accept payment cards. (Class. Pl. SUF ¶¶ 47, 58, 71b, 71i.) And Dr. Frankel's assertion that either network might gain market share by offering merchants lower interchange rates in the face of that intensified competition for issuers (Class Pl. Opp. Br. at 60) is wholly unsupported conjecture. Rather than tending to exclude the possibility of independent conduct, the undisputed evidence shows that each network

_____

*(cont'd from previous page)*
    45.e; 70.a; 99.b, 100.e; 116.a; Class Plaintiffs' Counterstatement of Facts in Response to Defendants' Rule 56.1 Statement of Facts, dated May 6, 2011, ¶¶ 84.1.a; 84.9.d, f, g; 84.11.b; 84.14.c; 84.15.e; 84.16 n.287.)

acted independently in pursuit of its own interests to compete for issuers, on the one hand, while competing for merchants in industries that had previously been underserved by payment card transactions.

### B.    Profit Motive And Opportunity To Conspire Do Not Tend To Exclude The Possibility That Each Network Acted Independently With Respect To The Challenged Rules

Plaintiffs argue that member banks benefit from high interchange fees, and thus had a "profit motive" to persuade the networks not to engage in competition to lower interchange fees. (Class Pl. Opp. Br. at 61-62.) But, as noted above, each network's independent economic interest in attracting issuers to issue its network-branded payment cards aligned precisely with the independent interests of issuers looking to make a deal to issue network-branded payment cards. Nothing in the plaintiffs' profit motive argument tends to exclude the possibility of independent conduct, since all of the undisputed conduct is fully consistent with each participant pursuing its own independent economic interest. Moreover, as a matter of law, a profit motive cannot serve as a plus factor in any event because "profit is always a motivating factor in the conduct of a business." *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 134-35 (3d Cir. 1999) (affirming grant of summary judgment on section 1 claim); *accord Apex Oil Co. v. DiMauro*, 822 F.2d 246, 254 (2d Cir. 1987) (evidence of profit motive insufficient to defeat summary judgment because it supports "equally valid inference of independent action").

Plaintiffs claim that network "duality" purportedly "facilitates high-level inter-firm communication." (Class Pl. Opp. Br. at 62-63.) But such evidence cannot support an inference of conspiracy because it shows nothing more than an opportunity to conspire – a "plus factor" that courts have uniformly rejected. *See, e.g., Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1319 (11th Cir. 2003) ("the  opportunity to fix prices without any showing that [de-

38

fendants] *actually* conspired does not tend to exclude the possibility that they did not avail them-selves of such opportunity or, conversely, that they actually did conspire.") (emphasis in origi-nal); *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 963-64 (N.D. Cal. 2007).

Plaintiffs argue that the payment card industry is highly susceptible to collusion because card products are homogenous, customer demand is inelastic, and the relevant markets are highly concentrated.  (Class Pl. Opp. Br. at 63-64.)  Such industry characteristics, even if true, are "simply indicia that the . . . industry is an oligopoly, which is perfectly legal." *Williamson Oil Co.*, 346 F.3d at 1317 (affirming grant of summary judgment on section 1 claim despite find-ing that the industry in question had each of the three features identified by plaintiffs here).

In their moving brief, defendants also demonstrated that the opinions of class plaintiffs' expert, Dr. Frankel, do not defeat summary judgment because, at most, he identifies various facts that he contends are consistent with conspiracy, but that do not tend to exclude the possibility of independent conduct.  (Def. Br. at 43.)  Class plaintiffs do not disagree with defen-dants' assessment of Dr. Frankel's testimony, but simply assert that "the law does not require plaintiffs to present expert testimony that conclusively disproves all legitimate explanations for the defendants' conduct."  (Class Pl. Opp. Br. at 64-65.)  True enough, but to defeat summary judgment, plaintiffs must proffer *some* material evidence – expert or otherwise – that tends to exclude the possibility of independent conduct.  Their failure to do so here entitles defendants to summary judgment on plaintiffs' inter-network conspiracy claim.

**VI.    _Defendants Are Entitled To Summary Judgment For Additional Reasons_**

Summary judgment also should be granted in defendants' favor for the reasons set forth in the Reply Memorandum of Law in Further Support of Defendants' Motion for Summary Judgment on Class Plaintiffs' IPO, Post-IPO Conspiracy and Fraudulent Conveyance Claims,

and Individual Plaintiffs' Post-IPO Conspiracy Claims, dated June 30, 2011, and in the Network

Defendants' Reply Memorandum in Support of the Motion for Summary Judgment Against the

Claims in the Individual Plaintiffs' Complaints, dated June 30, 2011, which are incorporated by

reference as if fully set forth herein.

### *Conclusion*

For all the foregoing reasons, as well as for the reasons set forth in defendants'

moving brief, defendants are entitled to summary judgment in their favor on all of the claims in

plaintiffs' Second Consolidated Amended Class Action Complaint.

Dated:   New York, New York        Respectfully submitted,
       June 30, 2011

                                      **PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

                             By:   /s/ Gary R. Carney
                                    Andrew C. Finch
                                    Gary R. Carney
                                    1285 Avenue of the Americas
                                    New York, New York 10019-6064
                                    Tel.: (212) 373-3000
                                    Fax: (212) 757-3990
                                    gcarney@paulweiss.com

                                    Kenneth A. Gallo
                                    Joseph J. Simons
                                    2001 K Street, N.W.
                                    Washington, DC 20006-1047
                                    Tel.: (202) 223-7300
                                    Fax: (202) 223-7420

**WILLKIE FARR & GALLAGHER LLP**

Keila D. Ravelo
Wesley R. Powell
Matthew Freimuth
787 Seventh Avenue
New York, New York 10019-6099
Tel.: (212) 728-8000
Fax: (212) 728-8111

*Attorneys for Defendant MasterCard Incorporated
and MasterCard International Incorporated*


**ARNOLD & PORTER LLP**

By:    /s/ Robert C. Mason
Robert C. Mason
399 Park Avenue
New York, NY  10022-4690
Telephone:  (212) 715-1000
Facsimile:  (212) 715-1399
robert.mason@aporter.com

Robert J. Vizas
One Embarcadero Center, 22nd Floor
San Francisco, CA  94111-3711
Telephone:  (415) 356-3000
Facsimile:  (415) 356-3099

Mark R. Merley
Matthew A. Eisenstein
555 12th Street, N.W.
Washington, DC  20004-1206
Telephone:  (202) 942-5000
Facsimile:  (202) 942-5999

*Attorneys for Defendants Visa Inc., Visa U.S.A. Inc.,
and Visa International Service Association*

41

**MORRISON & FOERSTER LLP**

By:   /s/ Mark P. Ladner
       Mark P. Ladner
       Michael B. Miller
       1290 Avenue of the Americas
       New York, NY 10104-0050
       Telephone: (212) 468-8000
       Facsimile: (212) 468-7900
       mladner@mofo.com

*Attorneys for Defendants Bank of America, N.A., BA Merchant Services LLC (f/k/a Defendant National Processing, Inc.), Bank of America Corporation, and MBNA America Bank, N.A.*


**SHEARMAN & STERLING LLP**

By:   /s/ James P. Tallon
       James P. Tallon
       Wayne D. Collins
       Lisl J. Dunlop
       599 Lexington Avenue
       New York, NY 10022-6069
       Tel.: (212) 848-4000
       Fax: (212) 848-7179
       jtallon@shearman.com

*Attorneys for Defendants Barclays Financial Corp. and Barclay's Bank plc*

**O'MELVENY & MYERS LLP**

By: /s/ Andrew J. Frackman
     Andrew J. Frackman
     Times Square Tower
     7 Times Square
     New York, N.Y. 10036
     Tel.: (212) 326-2000
     Fax: (212) 326-2061
     afrackman@omm.com

*Attorneys for Defendants Capital One Bank (USA), N.A., Capital One F.S.B., and Capital One Financial Corp.*

**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**

By: /s/ Peter E. Greene
     Peter E. Greene
     Peter S. Julian
     Four Times Square
     New York, NY   10036
     Telephone:  (212) 735-3000
     Facsimile:  (212) 735-2000
     peter.greene@skadden.com

     Michael Y. Scudder
     155 North Wacker Drive
     Chicago, IL  60606-1720
     Telephone:  (312) 407-0700
     Facsimile:  (312) 407-0411
     michael.scudder@skadden.com

*Attorneys for Defendants JPMorgan Chase & Co., Chase Bank USA, N.A., Chase Manhattan Bank USA, N.A., Chase Paymentech Solutions, LLC, JPMorgan Chase Bank, N.A., as acquirer of certain assets and liabilities of Washington Mutual Bank, Bank One Corporation, and Bank One Delaware*

43

**SIDLEY AUSTIN LLP**

By:    /s/ David F. Graham
        David F. Graham
        Eric H. Grush
        One South Dearborn Street
        Chicago, IL 60603
        Tel.: (312) 853-7000
        Fax: (212) 853-7036
        dgraham@sidley.com

        Benjamin R. Nagin
        787 Seventh Ave
        New York, N.Y. 10019
        Tel.: (212) 839-5300
        Fax: (212) 839-5599

*Attorneys for Defendants Citibank (South Dakota),*
*N.A., Citibank, N.A., Citigroup Inc., and Citicorp*

**KEATING MUETHING & KLEKAMP PLL**

By:    /s/Richard L. Creighton
        Richard L. Creighton
        Joseph M. Callow, Jr.
        Drew M. Hicks
        One East Fourth Street
        Suite 1400
        Cincinnati, OH 45202
        Tel.: (513) 579-6400
        Fax: (513) 579-6457

*Attorneys for Defendant Fifth Third Bancorp*

44

**KUTAK ROCK LLP**

By:  /s/ John P. Passarelli
     John P. Passarelli
     James M. Sulentic
     The Omaha Building
     1650 Farnam Street
     Omaha, NE 68102-2186
     Tel.: (402) 346-6000
     Fax: (402) 346-1148
     john.passarelli@kutakrock.com

*Attorneys for Defendant First National Bank of Omaha*

**WILMER CUTLER PICKERING HALE AND DORR LLP**

By:  /s/ Christopher R. Lipsett
     Christopher R. Lipsett
     David S. Lesser
     399 Park Avenue
     New York, N.Y. 10022
     Tel.: (212) 230-8800
     Fax: (212) 230-8888
     chris.lipsett@wilmerhale.com

     Ali M. Stoeppelwerth
     Perry A. Lange
     1875 Pennsylvania Ave., N.W.
     Washington, D.C. 20006
     Tel.: (202) 663-6000
     Fax: (202) 663-6363

*Attorneys for HSBC Finance Corporation and HSBC North America Holdings, Inc.*

**JONES DAY**

By:  /s/ John M. Majoras
John M. Majoras
Joseph W. Clark
51 Louisiana Avenue, NW
Washington, DC  20001
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700
jmmajoras@jonesday.com

*Attorneys for Defendants National City Corporation,*
*National City Bank of Kentucky*


**PULLMAN & COMLEY, LLC**

By:  /s/ Jonathan B. Orleans
Jonathan B. Orleans
Adam S. Mocciolo
850 Main Street
Bridgeport, CT  06601-7006
Telephone:  (203) 330-2000
Facsimile:  (203) 576-8888
jborleans@pullcom.com

*Attorneys for Defendant Texas Independent*
*Bancshares, Inc.*


**ALSTON & BIRD LLP**

By:  /s/ Teresa T. Bonder
Teresa T. Bonder
Valarie C. Williams
Kara F. Kennedy
1201 W. Peachtree Street, N.W.
Atlanta, GA 30309
Tel.: (404) 881-7000
Fax: (404) 881-7777
teresa.bonder@alston.com

*Attorneys for Defendant Suntrust Banks, Inc.*

46

**PATTERSON BELKNAP WEBB & TYLER LLP**

By:  /s/ Robert P. LoBue
       Robert P. LoBue
       Norman W. Kee
       Patterson Belknap Webb & Tyler LLP
       1133 Avenue of the Americas
       New York, NY 10036
       Tel.: (212) 336-2596
       Fax: (212) 336-2222
       rplobue@pbwt.com

*Attorneys for Defendants Wachovia Bank, NA., Wachovia Corporation, and Wells Fargo & Company*