

LEXISNEXIS® FILE & SERVE
38451543
E-SERVICE
Jun 30 2011
4 26PM

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

IN RE

PAYMENT CARD INTERCHANGE FEE
AND MERCHANT DISCOUNT
ANTITRUST LITIGATION

This Document Relates To:

All Actions

Master File No.: 1:05-md-1720(JG)(JO)

ORAL ARGUMENT REQUESTED

**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT ON CLASS PLAINTIFFS' IPO,**
**POST-IPO CONSPIRACY, AND FRAUDULENT CONVEYANCE CLAIMS,**
**AND INDIVIDUAL PLAINTIFFS' POST-IPO CONSPIRACY CLAIMS**

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**TO BE FILED UNDER SEAL**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................. iii

PRELIMINARY STATEMENT .............................................................................1

ARGUMENT ..........................................................................................................1

I.     Plaintiffs Have Failed To Overcome Defendants' Showing That Summary Judgment Should Be Granted On Plaintiffs' IPO Claims And Post-IPO Conspiracy Claims ...............................................................................................1

     A.    Class Plaintiffs Have Not Raised A Genuine Dispute Of Material Fact With Respect To Their IPO Complaint Claims Challenging The MasterCard And Visa IPOs Under Section 1 Of The Sherman Act And Section 7 Of The Clayton Act ................................................................1

          1.    Plaintiffs Cannot Establish Anticompetitive Effects Merely By Showing Post-Transaction Price Increases ..................................2

               (a)    Case Law Does Not Support Plaintiffs' Position ...........................2

               (b)    Judge Gleeson's Opinion Does Not Support Plaintiffs' Position .................................................................................4

               (c)    Plaintiffs' Other Arguments Are Unavailing ................................5

          2.    The Undisputed Factual Record Manifests That Banks Do Not Exercise Control Over The Post-IPO Networks' Interchange and Rule-making Decisions Either Directly Or Indirectly ...............................9

     B.    Plaintiffs Have Not Raised A Genuine Issue Of Fact Sufficient To Defeat Summary Judgment On All Plaintiffs' Post-IPO Conspiracy Claims Under Section 1 .....................................................................................14

          1.    Plaintiffs Have Not Established A Basis For An Inference Of A Post-IPO Conspiracy As A Matter of Law. ...........................................14

               (a)    Plaintiffs Cannot Establish A Post-IPO Conspiracy Based Upon Application Of *American Needle* .......................................14

               (b)    Plaintiffs Have Not Proffered Substantial Evidence Of A Post-IPO "Hub and Spoke" Conspiracy .......................................16

               (c)    Plaintiffs Cannot Establish An Inference Of A Conspiracy By Identifying Bilateral Vertical Agreements .............................20

**Page**

2.     Defendants Withdrew From Any Alleged Pre-IPO Conspiracies.............24

II.    Plaintiffs Have Failed To Overcome Defendants' Showing That Summary Judgment Should Be Granted On Plaintiffs' Fraudulent Conveyance Claims ................26

    A.    Plaintiffs Fail To Establish Any Material Factual Dispute Precluding Summary Judgment For Defendants On The Constructive Fraudulent Conveyance Claim Under Section 275 ............................................................27

        1.    Plaintiffs Fail To Cite Evidence Establishing That The Assessment Provision Was Eliminated Without Fair Consideration. ..........................27

        2.    Plaintiffs' Bad Faith Contentions Do Not Suffice To Defeat Summary Judgment ...............................................................................28

        3.    Plaintiffs Fail To Cite To Evidence Establishing That MasterCard Believed It Was Insolvent .......................................................................29

    B.    Plaintiffs Fail To Establish Any Material Factual Dispute Precluding Summary Judgment For Defendants On The Actual Fraudulent Conveyance Claim Under Section 276 ............................................................30

        1.    MasterCard's Instruction To Houlihan Lokey Is Not Indicative Of Fraudulent Intent .....................................................................................31

        2.    Plaintiffs Fail To Cite Evidence Demonstrating The Presence Of Any Badge Of Fraud ...............................................................................32

    C.    Class Plaintiffs' Request for Additional Discovery Of Privileged Materials Is Without Merit And Should Be Denied ..........................................................34

        1.    Plaintiffs Cannot Satisfy The Requirements Of Rule 56(d) ....................34

        2.    The Communications Plaintiffs Seek Are Protected From Discovery By The Attorney-Client Privilege............................................36

CONCLUSION...........................................................................................................38

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*AD/SAT, Div. of Skylight, Inc. v. Associated Press,*
    181 F.3d 216 (2d Cir. 1999)..........................................................................................22

*In re Allou Distribs., Inc.,*
    446 B.R. 32 (Bankr. E.D.N.Y. 2011) ............................................................................27

*Am. Airlines v. Christensen,*
    967 F.2d 410 (10th Cir. 1992)................................................................................ 21-22

*Am. Express Travel Related Servs. Co. v. Visa U.S.A.,*
    No. 04 Civ. 8967(BSJ), 2005 WL 1515399 (S.D.N.Y. June 23, 2005) ........................... 3

*Am. Needle, Inc. v. Nat'l Football League,*
    130 S.Ct. 2201 (2010)............................................................................................ 14-15

*United States v. Berger,*
    224 F.3d 107 (2d Cir. 2000)..........................................................................................26

*Brinckerhoff v. Texas E. Prods. Pipeline Co.,*
    986 A.2d 370 (Del. Ch. 2010)......................................................................................32

*Brunswick Corp. v. Pueblo Bowl-o-Mat, Inc.,*
    429 U.S. 477 (1977) ...................................................................................................... 3

*Bulkmatic Transp. Co. v. Pappas,*
    No. 99-cv-12070, 2001 WL 882039 (S.D.N.Y. May 11, 2001) ....................................33

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.,*
    996 F.2d 537 (2d Cir. 1993)........................................................................................... 3

*Case v. Fargnoli,*
    702 N.Y.S.2d 764 (N.Y. Sup. 1999) .............................................................................34

*Chin v. Rogoff & Co.,*
    No. 05-cv-8360, 2008 WL 2073934 (S.D.N.Y. May 8, 2005) .......................................37

*CIT Group/Commercial Servs., Inc. v. 160-09 Jamaica Ave. Ltd.,*
    25 A.D.3d 301 (N.Y. App. Div. 2006) ..........................................................................33

*Citizen Publ'g Co. v. United States,*
    394 U.S. 131 (1969) .....................................................................................................17

*In re County of Erie,*
    546 F.3d 222 (2d Cir. 2008)..........................................................................................37

**Page(s)**

*United States v. Dairy Farmers of Am.*,
  426 F.3d 850 (6th Cir. 2005)....................................................................................13

*United States v. Delta Dental of R.I.*,
  943 F. Supp. 172 (D.R.I. 1996)................................................................................24

*Deutsche Bank Trust Co. of Ams. v. Tri-Links Inv. Trust*,
  43 A.D.3d 56 (N.Y. App. Div. 2007) ......................................................................36

*Dickson v. Microsoft Corp.*,
  309 F.3d 193 (4th Cir. 2002)....................................................................................20

*E & L Consulting, Ltd. v. Doman Indus. Ltd.*,
  472 F.3d 23 (2d Cir. 2006).......................................................................................18

*United States v. E.I. du Pont de Nemours & Co.*,
  353 U.S. 586 (1957) .................................................................................................. 3

*United States v. E.I. du Pont de Nemours & Co.*,
  366 U.S. 316 (1961) .................................................................................................13

*United States v. Eisen*,
  974 F.2d 246 (2d Cir. 1992)................................................................................ 25-26

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
  256 F.R.D. 82 (D. Conn. 2009)................................................................................. 8

*In re Evanston Nw. Healthcare Corp.*,
  2007 WL 2286195 (FTC Aug. 6, 2007) (Commission Opinion)...........................2-3

*Geneva Pharm. Tech. Corp. v. Barr Labs., Inc.*,
  386 F.3d 485 (2d Cir. 2004)...................................................................................... 6

*In re Ins. Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir. 2010)....................................................................................16

*Int'l Shortstop, Inc. v. Rally's, Inc.*,
  939 F.2d 1257 (5th Cir. 1991)............................................................................. 37-38

*Interstate Circuit, Inc. v. United States*,
  306 U.S. 208 (1939) .................................................................................................19

*Kendall v. Visa U.S.A. Inc.*,
  518 F.3d 1042 (9th Cir. 2008)............................................................................. 22-23

*Kramer v. Sooklall (In re Singh)*,
  434 B.R. 298 (Bankr. E.D.N.Y. 2010) ...................................................................32

**Page(s)**

*Leegin Creative Leather Prods. Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007) ............................................................................. 23-24

*Leviton Mfg. Co., Inc. v. Greenberg Traurig LLP*,
    No. 09-cv-8083, 2010 WL 4983183 ........................................................ 36-37

*Lids Corp. v. Marathon Inv. Partners, L.P. (In re Lids Corp.)*,
    281 B.R. 535 (Bankr. D. Del. 2002) .............................................................32

*McTamney v. Stolt Tankers & Terminal (Holdings), S.A.*,
    678 F. Supp. 118 (E.D. Pa. 1987) ...............................................................13

*MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*,
    910 F. Supp. 913 (S.D.N.Y. 1995) .......................................................... 29-30

*MM Ariz. Holdings LLC v. Bonanno*,
    658 F. Supp. 2d 589 (S.D.N.Y. 2009) ..........................................................35

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984) .................................................................................22

*Morton's Mkt. v. Gustavson Dairy*,
    198 F.3d 823 (11th Cir. 1999)) ..................................................................25

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. The Stroh Cos.*,
    265 F.3d 97 (2d Cir. 2001) .......................................................................35

*Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.)*,
    376 B.R. 390 (Bankr. S.D.N.Y. 2007) .........................................................32

*Olle v. Columbia Univ.*,
    332 F. Supp. 2d 599 (S.D.N.Y. 2004) ..........................................................36

*Pall Corp. v. Cuno, Inc.*,
    268 F.R.D. 167 (E.D.N.Y. 2010) ................................................................37

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    No. 05-MD-1720, 2008 WL 5082872 (E.D.N.Y. Nov. 25, 2008) ..................... 4

*PepsiCo, Inc. v. Coca-Cola Co.*,
    315 F.3d 101 (2d Cir. 2002) ......................................................................16

*United States v. Pippin*,
    903 F.2d 1478 (11th Cir. 1990) .............................................................. 25-26

*In re Polypore Int'l, Inc.*,
    No. 9327, 2010 FTC Lexis 97 (Dec. 13, 2007) .............................................. 4

**Page(s)**

*S. Indus., Inc. v. Jeremias,*
  66 A.D.2d 178 (N.Y. App. Div. 1978) .......................................................................29

*United States v. Sax,*
  39 F.3d 130 (7th Cir. 1995)........................................................................... 25-26

*Starr v. Sony BMG Music Entm't,*
  592 F.2d 314 (2d Cir. 2010)........................................................................20

*Texaco Inc. v. Dagher,*
  547 U.S. 1 (2006) ........................................................................................21

*Thornton v. Syracuse Sav. Bank,*
  961 F.2d 1042 (2d Cir. 1992)......................................................................36

*Toscano v. Prof'l Golfers' Ass'n,*
  258 F.3d 978 (9th Cir. 2001)......................................................................22

*Toys "R" Us, Inc. v. FTC,*
  221 F.3d 928 (7th Cir. 2000), (1998) ................................................... 18-19

*United States v. Topco Assocs., Inc.,*
  405 U.S. 596 (1972) ...................................................................................18

*United States v. U.S. Gypsum Co.,*
  438 U.S. 422 (1978) ...................................................................................24

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP,*
  540 U.S. 398 (2004) ...............................................................................8-9

*Wall St. Assocs. v. Brodsky,*
  257 A.D.2d 526 (N.Y. App. Div. 1999) .....................................................30

*Williamson Oil Co. v. Philip Morris USA,*
  346 F.3d 1287 (11th cir. 2003)...................................................................19

## STATUTES

N.Y. Debt. & Cred. Law § 275..........................................................26, 27, 29-30, 37

N.Y. Debt. & Cred. Law § 276..................................................................26, 30, 34

15 U.S.C.§ 1 ("Section 1") ...................................................................passim

15 U.S.C. § 18 ("Section 7") ...............................................................passim

## OTHER AUTHORITIES

Fed. R. Civ. P. 12(b)(6)...............................................................................20

**Page(s)**

Fed. R. Civ. P. 56(d) ................................................................................ 34-35

Herbert Hovenkamp & Christopher R. Leslie, *The Firm as Cartel Manager*,
    64 Vand. L. Rev. 813 (2011) ................................................................16

U.S. Department of Justice Antitrust Division, Policy Guide to Merger Remedies (2011) .......... 8

## PRELIMINARY STATEMENT

Defendants respectfully submit this reply memorandum of law in further support of their motion for summary judgment on (i) the claims in the class plaintiffs' First Amended Supplemental Class Action Complaint ("FASCAC"), which challenges MasterCard's IPO, and Second Supplemental Class Action Complaint, which challenges Visa's IPO (collectively the "IPO Complaints"), and (ii) the post-IPO conspiracy clams contained in the Second Consolidated Amended Class Action Complaint ("SCACAC") and the thirteen operative complaints of the individual plaintiffs.[1]

## ARGUMENT

**I.    Plaintiffs Have Failed To Overcome Defendants' Showing That Summary Judgment Should Be Granted On Plaintiffs' IPO Claims And Post-IPO Conspiracy Claims**

Summary judgment should be granted to defendants unless plaintiffs can point to evidence that creates a "genuine dispute" as to a "material fact" relevant to their claims.  Fed. R. Civ. P. 56.  Neither class nor individual plaintiffs have raised any legal or factual dispute that warrants denial of defendants' summary judgment motion for dismissal of plaintiffs' IPO and post-IPO conspiracy claims.

**A.    Class Plaintiffs Have Not Raised A Genuine Dispute Of Material Fact With Respect To Their IPO Complaint Claims Challenging The MasterCard And Visa IPOs Under Section 1 Of The Sherman Act And Section 7 Of The Clayton Act**

Defendants demonstrated that summary judgment should be entered on class plaintiffs'

---

[1]    This reply memorandum addresses the arguments asserted by class and individual plaintiffs in their respective oppositions to defendants' motion for summary judgment as to the IPO and post-IPO conspiracy claims.  (*See* Class Pls.' Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. ("Class Opp'n") at 65-89 (Parts Six and Seven); Individual Pls.' Resp. in Opp'n to Defs.' Mots. for Summ. J. ("Ind. Pls.' Opp'n") at 61-75 (Part IV).)  This reply also addresses the arguments asserted by class plaintiffs in their opposition to defendants' motion for summary judgment as to the fraudulent conveyance claims against MasterCard, including plaintiffs' motion for relief under Rule 56(d).  (*See* Class Opp'n at 89-104 (Part Eight).)

Section 1 and Section 7 claims in the IPO Complaints because class plaintiffs have not presented any evidence to establish either an actual or threatened anticompetitive effect caused by MasterCard's and Visa's respective IPOs. (*See generally* Mem. of Law in Supp. of Defs.' Mot. for Summ. J. on Class Pls.' IPO, Post-IPO Conspiracy, and Fraudulent Conveyance Claims, and Individual Pls.' Post-IPO Conspiracy Claims ("Defs.' Mem.") at 6-13.) The undisputed facts show that those IPOs and restructurings divested MasterCard and Visa member banks of any control over interchange or merchant rule decisions, and that the post-IPO MasterCard and Visa entities have been governed by respective boards of directors with majorities of independent, non-bank affiliated directors. As such, there is no basis to find that the post-IPO networks acted in a manner to benefit bank members rather than MasterCard's and Visa's own independent interests. Class plaintiffs thus fail entirely to make the showing of bank control required by Judge Gleeson's opinion dismissing the prior complaint challenging MasterCard's IPO.

In their opposition papers, class plaintiffs argue that they can defeat summary judgment without a showing of bank control, based on post-IPO increases in interchange and network fees. Alternatively, they argue that they can demonstrate bank control. These arguments fail and cannot overcome defendants' showing that summary judgment should be granted.

### 1. Plaintiffs Cannot Establish Anticompetitive Effects Merely By Showing Post-Transaction Price Increases

#### (a) Case Law Does Not Support Plaintiffs' Position

Class plaintiffs initially argue that under Section 7 of the Clayton Act, 15 U.S.C. § 18, plaintiffs can establish anticompetitive effects through evidence of continued imposition of the challenged restraints post-IPO and the presence of post-IPO increases in interchange and other fees. (Class Opp'n at 76-79.) Mere evidence of post-transaction price increases, however, cannot establish Section 7 liability for a consummated transaction. *See, e.g., In re Evanston Nw.*

2

*Healthcare Corp.*, 2007 WL 2286195 at *53 (FTC. Aug. 6, 2007) (Commission Opinion) (under

Section 7, courts reviewing transactions "assess the totality of the circumstances, weighing a

variety of factors to determine the transaction's effects on competition. . . . [P]rice increases,

however, do not by themselves establish the exercise of market power.") (internal citation

omitted).

Black-letter antitrust law under Section 7 and Section 1 of the Sherman Act, 15 U.S.C.

§ 1, requires plaintiffs to establish that the challenged transaction or restraint ***caused*** the

threatened lessening of competition or actual anticompetitive effects in the relevant market. *See*

*United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 607 (1957) (transaction

challenged under Section 7 must result in a reasonable likelihood of a lessening of competition);

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir.

1993) (plaintiff has the burden of showing restraint caused actual adverse competitive effects).

Nor may plaintiffs establish an antitrust claim if the purported injury they suffer is not the type

about which the antitrust laws are concerned, but rather arises from other causes. *See generally*

*Brunswick Corp. v. Pueblo Bowl-o-Mat, Inc.*, 429 U.S. 477, 489 (1977) ("Plaintiffs must prove

antitrust injury, which is to say injury . . . that flows from that which makes defendants' acts

unlawful.").

Accordingly, it is well established in the Section 7 case law that unless a price increase is

due to enhanced market power resulting from the challenged transaction, or some other

competition-lessening cause tied to the transaction, it is of no moment by itself.  That is,

plaintiffs must show that the fee increases they complain of were the result of a reduction in

*competition* due to the IPOs, and would not have occurred otherwise.  Absent such requirements,

any transaction in an industry that is apt to experience price increases (*e.g.*, due to increasing

3

costs) would be automatically illegal regardless of the competitive significance of the firms

involved.  Plaintiffs' argument simply ignores the necessity for plaintiffs to show anticompetitive

effects caused or meaningfully threatened by the IPOs and that plaintiffs suffered antitrust

injury.[2]

        **(b)**        **Judge Gleeson's Opinion Does Not Support Plaintiffs' Position**

As purported support for their position, class plaintiffs cite a fragment of a sentence in

Judge Gleeson's earlier dismissal opinion (Class Opp'n at 77), claiming that he recognized that,

apart from matters of "control," it would suffice to show anticompetitive effect if an independent

post-IPO MasterCard or Visa "will continue or impose the restraints plaintiffs fear."  *See In re*

*Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2008 WL

5082872, at *10 (E.D.N.Y. Nov. 25, 2008) ("Nov. 25, 2008 Op.").  According to class plaintiffs,

this means that they can demonstrate liability under Section 7 of the Clayton Act merely by

showing "post transaction price increases" — even if those price increases were entirely the

result of independent, profit-maximizing conduct by each network acting in its own competitive

self-interest, and not subject to bank control.  (Class Opp'n at 77.)

Read in context, however, the language from Judge Gleeson's opinion reflects that the

Court found that a showing of continued bank control after the IPO was necessary for plaintiffs'

theory of harm in the First Supplemental Class Action Complaint ("FSC").  *See* Nov. 25, 2008

Op. at *10 ("plaintiffs cannot plausibly allege that MasterCard will continue to impose

---

[2]    Plaintiffs rely on a series of merger cases that are inapplicable here.  For example, in *In re Polypore Int'l, Inc.*, No. 9327, 2010 FTC Lexis 97 (Dec. 13, 2007), the FTC was addressing a situation where two competitors had been merged into one, and the remaining entity thereafter raised prices.  Thus, liability was not based on the mere fact of a post-merger price increase, but rather because a reduction in competition caused by the specific merger at issue caused the higher prices.  *Id.* at **3-4, 17-19.  Here, unlike in *Polypore*, any interchange increase was not driven by a diminished number of competitors, and the IPOs in fact eliminated the industry structure that plaintiffs claim itself was anticompetitive.

4

supracompetitive interchange fees following its IPO, because its board would not be controlled by the Banks"). The language that plaintiffs cite is not to the contrary. In ruling on the motion to dismiss, Judge Gleeson had to assume as true the allegations that the default interchange and other rules resulted in "supracompetitive" prices because they were (allegedly) designed to maximize the profits of the banks rather than the network itself. *Id.* Under those assumptions, an independent network would not maintain the challenged rules ***unless*** the banks organized the IPO in a way that contractually (*e.g.*, through the bylaws, corporate charter, or contracts) precluded the network from changing them, which would be just another form of continuing bank control. This is the sense in which the Court concluded that plaintiffs have put forth no reason to believe that the independent "entity will continue or impose the restraints plaintiffs fear" — there was no allegation supporting the notion that post-IPO MasterCard was unable to change the challenged rules even if it concluded that doing so was in its own self-interest.

Under plaintiffs' interpretation of Judge Gleeson's language, plaintiffs could show anticompetitive effects from the IPOs simply by pleading and proving the continuation of default interchange and other network rules ("the restraints that plaintiffs fear") after the IPOs regardless of whether those actions were in the independent self-interest of the networks, and regardless of whether the decision to do so was the result of vibrant inter-network competition. But plaintiffs made those allegations in the FSC (*see, e.g.*, FSC ¶¶ 13-14, 91), and Judge Gleeson rejected them as an insufficient basis for showing anticompetitive effects as a result of the MasterCard IPO. *See* Nov. 25, 2008 Op. at **9-10. Thus, Judge Gleeson's opinion provides no support for plaintiffs' argument.

### (c) Plaintiffs' Other Arguments Are Unavailing

Class plaintiffs nonetheless contend that they have satisfied Section 7 by "present[ing] sufficient evidence for a trier of fact to conclude that post-restructuring increases in interchange

fees to merchants would not have been possible without the IPOs." (Class Opp'n at 77.)  There are two potential versions of class plaintiffs' theory — either that prices increased after the IPO or that prices did not fall after the IPO — both of which lack any genuine evidentiary support demonstrating that such effects were caused by a reduction in competition linked to the IPOs.

First, class plaintiffs cannot avoid the clear Second Circuit law, established in *Geneva Pharmaceuticals Technology Corp. v. Barr Laboratories, Inc.*, 386 F.3d 485 (2d Cir. 2004), that a transaction itself cannot be said to threaten any competitive harm if the competitive environment both before and after the transaction remains unchanged.  *Id.* at 510-11.  Class plaintiffs do not attempt to distinguish *Geneva Pharmaceuticals* for good reason: there is no dispute that Visa's and MasterCard's competitive positions, their market shares and concentration in the industry were not affected by the IPOs.

Second, as demonstrated above, the mere fact of a price increase is insufficient to condemn a transaction as a matter of law.  That conclusion holds universally and with even more emphasis in this case because of the two-sided nature of the platform at issue here.  The record reflects███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ █████████████████████████████  As a general matter, therefore, plaintiffs cannot credibly point merely to increasing interchange as probative evidence of anticompetitive effects, and particularly so here.

6

Third, class plaintiffs appear to argue that the interchange levels existing before the IPOs could not have been maintained but for the IPOs.[3] But just as with post-IPO interchange increases, class plaintiffs provide no evidence that there is anything specific to the IPOs that keeps merchant fees high. They point to alleged ██████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████ Those documents, however, say nothing about ███████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████ Indeed, plaintiffs provide no evidence that merchant fees would be any different under those alternatives — and have suggested just the opposite.[4]

Tellingly, for example, plaintiffs do not contest that a wholly independent third-party owner, *e.g.*, Microsoft, would have competed with other networks in precisely the same way MasterCard and Visa have done after their IPOs — including competing for issuers and cardholders by maintaining default interchange arrangements and other network rules that have been challenged. This, however, demonstrates that it is the results of competition itself that are

---

[3] Class plaintiffs also assert that ███████████████████████████████████ ████████████████████████████████████████████████████ ████████████████ (Class Opp'n at 78-79.) But plaintiffs are mixing apples and oranges. Network initiatives such as ███████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████

[4] *See, e.g.,* FASCAC ¶¶ 220, 149, 149(e) (implying that sale to an independent third party would lead to the same increases in interchange exhibited post-IPO when the networks are run by independent boards); Hr'g Tr. for Oral Arg., Nov. 18, 2009, at 65:5-17 (plaintiffs' counsel agreeing that a network purchased by an independent third party like Microsoft "might be no differen[t]" than the post-IPO networks run as they are by a majority of independent directors).

the true source of plaintiffs' complaint here, not some lessening of competition due to the IPOs. Plaintiffs seek to avoid this point by misstating the law.[5]

In essence, class plaintiffs want to put defendants in a "Catch-22" situation. Plaintiffs allege that defendants violate the antitrust laws because the pre-IPO structures enable the collective setting of interchange and enforcement of merchant rules, but then contend that defendants cannot eliminate the collective action at the heart of plaintiffs' allegations and lodge network business decisions with non-bank controlled MasterCard and Visa entities. But a transaction that eliminates and remedies plaintiffs' claimed legal flaw (*i.e.*, the alleged structural conspiracy) cannot constitute a harm to competition and indeed, by definition is procompetitive.[6] Plaintiffs' machinations reveal that it is not defendants' conduct but the level of interchange that plaintiffs want this Court to remedy through judicial fiat. Plaintiffs' thinly veiled request for the Court to become a regulator is contrary to law and should be rejected. *See generally Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) (declining to

---

[5]   Plaintiffs cite to *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litigation*, 256 F.R.D. 82 (D. Conn. 2009), for the proposition that they do not have to assess competitive effects by comparing prices to those in a "but for" world without the conduct. (Class Opp'n at 79.) But that case is a class certification decision discussing common proof of antitrust injury and, moreover, holds that a plaintiff seeking to establish damages as a basis for injury does need to compare actual and "but for" prices. *Id.* at 88.

[6]   This becomes clear in the merger context. If a consortium of banks similar to those that owned MasterCard or Visa were to purchase American Express and institute an interchange system, that would create the same alleged anticompetitive problem that plaintiffs complain of here. While defendants do not believe that any such structure would be anticompetitive, if a plaintiff were correct that joint ownership by the banks raised prices via concerted action in an anticompetitive manner, the obvious remedy would be for the banks to divest their interests in American Express, which would be a procompetitive result. *See, e.g.*, U.S. Department of Justice Antitrust Division, Policy Guide to Merger Remedies (2011) at 5 ("if a competitive problem exists with a horizontal merger, the typical remedy is to prevent common control over some or all of the assets, thereby effectively preserving competition. Thus, the Division will pursue a divestiture remedy in the vast majority of cases involving horizontal mergers. Divestiture of overlapping assets, usually an existing business entity, can effectively preserve competition that the merger otherwise would eliminate.").

require "antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing — a role for which they are ill suited").

Finally, class plaintiffs cannot argue that every type of structural change in MasterCard or Visa is problematic without undermining the basis for their main complaint. If class plaintiffs argue that third party sales or other transactions that put the networks under control of non-bank entities are also anticompetitive because they would fail to result in lower merchant fees, that would have to mean that concerted bank control did not cause high fees in the first place since those non-bank structures would produce the same fee levels as a bank-owned network. Because concerted control is the lynchpin of class plaintiffs' main complaint (*see infra* pp. 9-10), that complaint would have to fail.

### 2. The Undisputed Factual Record Manifests That Banks Do Not Exercise Control Over The Post-IPO Networks' Interchange and Rule-making Decisions Either Directly Or Indirectly

Plaintiffs alternatively attempt to demonstrate threatened anticompetitive effects by resurrecting their control theory, *i.e.*, that after the IPOs the banks allegedly continue to control the networks' imposition of interchange rates and rules but with a new figment of single entity decision-making. (Class Opp'n at 79-89.) Plaintiffs' theory of harm in the FSC and which is re-pleaded in the current IPO Complaints follows directly from their theory of harm in their main complaint, the Second Consolidated Amended Class Action Complaint. In that main complaint, plaintiffs attack the alleged collective setting of interchange and rules as horizontal restraints, arguing that they were collectively imposed by the issuer banks and resulted in higher fees to merchants than in the absence of such conduct because the bank-owned networks maximized profits for the banks. (*See* Nov. 25, 2008 Op. at **9-10; *see also* Class Opp'n at 67 ("Documents and testimony from both networks indicate that ████████████████████

████████████████████████████████████████████████

████████████) (emphasis added).)  Plaintiffs contend that proper application of Section 1 of the Sherman Act to the networks prior to the IPOs would eliminate the alleged collectively set interchange and network rules.

In challenging the IPOs, class plaintiffs contend that the transactions enabled the defendants to avoid scrutiny under Section 1.  But as Judge Gleeson explained, because it is collective action that is the alleged anticompetitive conduct here, the IPOs can only be problematic under plaintiffs' theory if they result in the banks continuing to control the networks or if the IPOs were structured in a way that prevents the new ownership from modifying default interchange or changing the challenged rules.  (*See supra* pp. 4-5.)  Here, plaintiffs fail to establish a genuine disputed issue of fact either that the banks control the post-IPO networks or structured the IPOs so as to preclude either network from modifying default interchange or the challenged rules.

Defendants demonstrated that the banks lack control over post-IPO default interchange or network rules.  (*See* Defs.' Mem. at 7-11.)  Plaintiffs do not dispute that, through the IPOs, the networks restructured their boards so that persons affiliated with bank members could occupy only a small minority of seats on each network's board, that Visa's Board currently has no bank-affiliated directors, and that MasterCard's member banks no longer own any shares that give them a veto right over any company decision.  (Defs.' SMF ¶¶ 133-34, 146-47; Class Pls.' Counterstatement of Facts in Resp. to Defs.' Rule 56.1 Statement of Facts ("Class Pls.' Counter Stmt.") ¶¶ 133-34, 146-47; Individual Pls.' Rule 56.1 Counter Statement of Facts ("Ind. Pls.' Counter Stmt.") ¶¶ 133-34, 146-47.)  Those facts are dispositive, and none of the facts or law that plaintiffs proffer can controvert that.

First, plaintiffs assert that the banks maintained control by giving "themselves veto rights in the post-restructuring networks and install[ing] limitations on any single party's ownership share in the networks . . . ." (Class Opp'n at 81.)  But plaintiffs do not dispute that those limited rights provided the banks no power over decisions regarding default interchange or network rules.  (*See* Class Opp'n at 84-85; Defs.' Mem. at 8-10; Defs.' SMF ¶¶ 131-132, 142-145, 149; Class Pls.' Counter Stmt. ¶¶ 131-132, 142-145, 149; Ind. Pls.' Counter Stmt. ¶¶ 131-132, 142-145, 149.)  All plaintiffs provide in opposition is a tortured theory that somehow elimination or even a lowering of interchange rates might be tantamount to a decision to "cease to perform a central function in [the network's] stated business model" and thus trigger the limited veto rights. (Class Opp'n at 84-85.)  But a plain reading of both the MasterCard and Visa veto provisions — which this Court can conduct as a matter of law — reveals that they do not grant the banks any veto rights over network interchange and rule modifications but only over decisions to cease to operate a payment card network business altogether.  (*See* Defs.' Mem. at 8-9; Defs.' SMF ¶¶ 132, 149.)

Second, plaintiffs argue that the banks ███████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████
████████████████████████████████ (Class Opp'n at 80-81.)[7]  Yet the couple of fragments of evidence that plaintiffs cite could not show any agreement to maintain or raise interchange rates after the IPOs.  (*See id.*)  Such evidence suffers from a fundamental defect that

---

[7]  Although plaintiffs contend that the banks can exercise indirect control through this purported "hold-up" problem caused by the network rules (*see* Class Opp'n at 80-81), this merely begs the question of who has control over the rules.  The decision of each network to retain those rules after the IPOs is merely a competitive decision made in each network's independent self-interest, and plaintiffs offer no evidence to the contrary.  Similarly, plaintiffs offer no explanation as to why each network's actions in response to "market incentives" (*id.* at 81) is not a fundamental reflection of competition.

plaintiffs cannot overcome — that the IPOs provided the banks no power to vote to prevent post-IPO MasterCard or Visa from raising, decreasing or eliminating default interchange rates, or modifying or eliminating any merchant rules.  Plaintiffs' reliance on ███████████████████ ███████████████████████ bank veto rights over unrelated decisions, anti-takeover devices and/or foundation structures, do not alter the core fact that the banks hold no post-IPO control over the ability of each network to make its own business decisions, based on its own interests, on default interchange and merchant rules.  Plaintiffs' reliance upon Section 2 monopolization cases (*see id.* at 83) — where an intent to monopolize is an element of the claim — cannot support a finding of anticompetitive effects based upon ███████████████████ ██████████ when plaintiffs cannot show that the IPO provided any mechanism for maintaining bank control, the structures adopted are to the contrary and, in any event, there are  no actual or threatened post-transaction effects that can support a Section 1 or Section 7 claim.

Third, plaintiffs also claim that the banks "installed limitations on any single party's ownership share in the networks, which gave them further assurance that the networks would not stray from their interests." (*Id*. at 81; *see also id*. at 82-89.)  This Court has already rejected the shareholding restrictions as an indicia of control; indeed, these ownership caps are a routine limitation adopted by countless corporations, would prevent any one bank from controlling either network, and are not a means through which banks can exercise control over default interchange levels or rules.  (*See* Defs.' Mem. at 10-11.)  Likewise, the foundation created by MasterCard in its IPO does not support plaintiffs' control theory (*see* Class Opp'n at 85-86) since the foundation itself has an independent board of directors that is not beholden to the banks.  And plaintiffs have offered no evidence that the foundation can control post-IPO MasterCard decisions on default interchange or merchant rules.  (*See* Defs.' Reply to Class and Individual

Pls.' Counterstatement of Facts in Resp. to Defs.' Rule 56.1 Statement of Facts ("Defs.' Reply SMF") p.452.)

Finally, plaintiffs' cited cases are inapposite.  They all address facts of post-transaction control that are not present here.  In *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316 (1961), the Court rejected a proposed Section 7 remedy plan that would provide for du Pont ceding to du Pont shareholders its voting rights in 40 million shares of General Motors because the "du Pont shareholders will ipso facto also be General Motors voters" and therefore it would "be in their interest to vote in such a way as to induce General Motors to favor du Pont, the very result which we found illegal on the first appeal."  *Id.* at 331.  In *United States v. Dairy Farmers of America*, 426 F.3d 850 (6th Cir. 2005), the defendant was unable to avoid liability where it transferred voting rights in a company it had acquired to another owner with whom it had "closely aligned" interests to act anticompetitively, and where it remained a financier of the acquired company.  *Id.* at 852-54, 861-62.  And in *McTamney v. Stolt Tankers & Terminal (Holdings), S.A.*, 678 F. Supp. 118 (E.D. Pa. 1987), the court held that "defendants *controlled* the business activities of [the target companies] including payments to particular creditors," as it wound down the affairs of the business.  *Id.* at 119-20 (emphasis added).  In contrast to these cases, the relevant issue to plaintiffs' theory of harm here is the existence of bank control that would allow the banks to prevent the networks from changing the challenged rules or lowering default interchange — both of which are entirely lacking.

In sum, plaintiffs have not and cannot proffer any evidence that creates a genuine issue of fact regarding the banks' lack of control over post-IPO network decisions on default interchange or merchant rules.

**B.      Plaintiffs Have Not Raised A Genuine Issue Of Fact Sufficient To Defeat Summary Judgment On All Plaintiffs' Post-IPO Conspiracy Claims Under Section 1**

Defendants established in their moving papers that the class and individual plaintiffs lack evidence to support a finding of a post-IPO conspiracy regarding default interchange rates or merchant rules between MasterCard or Visa and their member banks.  (*See* Defs.' Mem. at 13-15.)  Plaintiffs offer no facts or law that could prove plaintiffs' post-IPO conspiracy claims.

**1.      Plaintiffs Have Not Established A Basis For An Inference Of A Post-IPO Conspiracy As A Matter of Law.**

Class and individual plaintiffs offer three theories which they argue support a post-IPO conspiracy among Visa and its banks and MasterCard and its banks.  First, plaintiffs contend that the networks have coordinated the competitive activities of the banks, relying upon the recent Supreme Court opinion in *American Needle, Inc. v. National Football League*, 130 S.Ct. 2201 (2010).  Second, plaintiffs assert that they have proffered substantial evidence of an actionable "hub and spoke" conspiracy.  Third, plaintiffs assert that each vertical membership agreement between a network and a bank constitutes an unlawful Section 1 violation.  (*See* Class Opp'n at 70-75; Ind. Pls.' Opp'n at 61-75.)  None of these theories can survive summary judgment.

**(a)      Plaintiffs Cannot Establish A Post-IPO Conspiracy Based Upon Application Of *American Needle***

Class plaintiffs rely on *American Needle* to argue that the networks' role is sufficient to bring unilateral post-IPO network decisions regarding default interchange and the merchant rules within the scope of Section 1.  (Class Opp'n at 70.)  But plaintiffs' reliance on *American Needle* is misplaced.

First, the issue in *American Needle* was solely whether a joint venture organization — not a publicly-owned stand-alone corporation — was to be treated as a single entity or a combination of entities subject to Section 1.  *Am. Needle*, 130 S.Ct. at 2206.  Second, the Supreme Court in

*American Needle* determined that the licensing entity created by the competing NFL teams was

subject to Section 1 because it eliminated "independent centers of decisionmaking" from teams

that had once competed in exactly the same competitive area, while it remained under the control

of those same teams. *Id.* at 2213. In particular, in determining that the challenged conduct in

*American Needle* was "collective," the Court repeatedly emphasized the significance of

functional "control" exercised by the NFL teams over the licensing joint venture — including

their required assent to the licensing decisions at issue. *See id.* at 2214 ("NFLP's licensing

decisions are made by the 32 potential competitors, and each of them actually owns its share of

the jointly managed assets."). Moreover, the Supreme Court explicitly contrasted "typical

decisions by corporate shareholders" — which are generally *not* subject to Section 1 — with a

situation where venture conduct requires approval by competing venture members with divergent

interests — which may be subject to Section 1. *Id.* at 2215.

Here, by contrast, there is no dispute that the networks and banks are separate entities

after the network IPOs. Unlike in *American Needle* where the individual teams collectively

owned the NFL and the licensing entity, the banks clearly do not own or control the post-IPO

networks — public shareholders own and control these entities and elect a majority (or all) of

each network's board of directors. In short, the critical component in *American Needle* of joint

control and decision-making by competitors is entirely lacking.[8] Thus, *American Needle* does

not provide any basis to defeat defendants' summary judgment motion.

---

[8]   Class plaintiffs' reference to "coordination of competitors' activities" (Class Opp'n at 70)
obscures the relevant inquiry: is such "coordination" accomplished by the competitors
themselves or through an entity they control, or, by contrast, is the "coordination" merely a
characterization of a vertical policy unilaterally adopted by an independent entity? The latter
does not suffice. Nor may plaintiffs justifiably rely upon Professor Hovenkamp's article.
(*Id.*) Hovenkamp incorrectly dismisses the banks' lack of control of the post-IPO networks,
contrary to the undisputed facts, and thus erroneously concludes that the value of MasterCard

**(b)      Plaintiffs Have Not Proffered Substantial Evidence Of A Post-IPO "Hub and Spoke" Conspiracy**

Nor have plaintiffs demonstrated a material issue of fact regarding the existence of an actionable post-IPO "hub and spoke" agreement.  As defendants set out in their prior papers, even assuming that plaintiffs can establish a series of bilateral agreements running between individual banks and Visa or MasterCard, plaintiffs have failed to establish any horizontal agreement among banks that could serve as the "rim" of any such conspiracy.  (*See* Defs.' Mem. at 16-18; Defs.' Opp'n to Ind. Pls.' Mot. for S.J. at 34-39.)

While class plaintiffs admit they have no direct evidence of communications among banks, they nevertheless contend that this Court should infer a conspiracy because each bank agrees to comply with the network rules knowing that all the other banks will be agreeing to the same rules.  (Class Opp'n at 71-72.)  But knowledge that one's competitors will be agreeing to the same rules is insufficient as a matter of law to support a finding of conspiracy.  *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 110 (2d Cir. 2002) (fact that all competitor distributors knew that manufacturer would require all other distributors to adhere to manufacturer's exclusionary loyalty provision was "insufficient evidence of a horizontal agreement"); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 331 (3d Cir. 2010) ("allegations that each [competitor] insurer knew about the 'competitive protections' purchased by the other insurer-partners manifestly do not describe a horizontal conspiracy to unreasonably restrain trade") (internal quotation marks omitted); *see generally* Defs.' Opp'n to Ind. Pls.' Mot. for S.J. at 35-37.

---

is only maximized if the value of the banks' businesses are also maximized.  There is no basis for this conclusion.  *See* Herbert Hovenkamp & Christopher R. Leslie, *The Firm as Cartel Manager*, 64 Vand. L. Rev. 813, 872 (2011); Letter to Hon. James Orenstein from Kenneth Gallo, July 20, 2010 [DE 1414] at 3 (discussing earlier version of Hovenkamp article).

16

Plaintiffs also suggest that the banks have somehow appointed the networks as "joint-selling" agents of the banks' services, citing *Citizen Publishing Co. v. United States*, 394 U.S. 131 (1969). (Class Opp'n at 72-73.) In *Citizen Publishing*, however, two newspapers created a new entity that handled all pricing and sales for both papers. 394 U.S. at 133-34. The newspapers wholly owned the new entity they created, the avowed purpose of which was to "end any business or commercial competition between the two papers." *Id.* at 134. And the two newspapers creating the new entity horizontally agreed on prices, i.e., "the subscription and advertising rates were set jointly." *Id.* Here, in contrast, there is no evidence of a remotely comparable arrangement. The banks do not own or control either of the networks; the IPOs did nothing to end or alter pre-existing competition among card issuers; network pricing is not "set jointly" post-IPO; and rather than being *required* by some horizontal agreement to "fix" interchange or any other price, each network is entirely free to make its own decisions, including whether to have any interchange or other fee at all. In short, rather than being "agents" subject to the control of another, each network is a fully independent actor following its IPO.

Individual plaintiffs also argue that an inference of a conspiracy is warranted because, they speculate, it could be contrary to a bank's independent self-interest to follow and enforce rules that could prevent its competitors from being disfavored (and thereby potentially benefit it). (Indiv. Opp'n at 72.) Similarly, class plaintiffs contend that the banks have an interest in imposing interchange and the anti-steering restraints only because all other banks are guaranteed to do the same. (Class Opp'n at 73-75.)

Yet, plaintiffs ask the wrong question in two respects. First, while any given bank would, of course, prefer that its competitors be disfavored, the rules are general in application and prevent that bank from being disfavored as well; plaintiffs present no evidence at all that the

17

protection afforded by this neutral application is, *ex ante*, on balance generally against banks' independent self-interests.  Further, if a bank determines that conduct is in its unilateral self-interest, it will always be the case that the bank would prefer that its competitors not be advantaged in the same way.  Under plaintiffs' theory, therefore, an inference of conspiracy would always be warranted, leading to absurd results.[9]  Asking whether banks would prefer that their competitors be disadvantaged thus simply begs the relevant inquiry.[10]  Moreover, each individual bank that is associating its own brand with a network also has a unilateral self-interest in ensuring that merchants do not injure either the network brand or derivatively its own by failing to honor Visa or MasterCard payment cards without penalizing or deceiving consumers who wish to pay with those cards.  (*See* Defendants' Counter-Statement In Opposition To

---

[9]   For example, if an inference of conspiracy is warranted every time an actor enters into conduct that would benefit it even though it knew it might benefit competitors, it would mean that every distribution agreement with exclusive territory provisions would be *per se* illegal.  A distributor agreeing with a manufacturer to serve as an exclusive distributor within a defined territory by definition knows that other distributors will be granted other territories that will benefit them. While that may be counter to the first distributor's interests, it does not justify an inference of a horizontal conspiracy with other distributors, which is generally *per se* illegal.  *See, e.g., United States v. Topco Assocs., Inc.* 405 U.S. 596 (1972) ("[t]his Court has reiterated time and time again that horizontal territorial limitations are naked restraints of trade with no purpose except stifling of competition…Such limitations are per se violations of the Sherman Act") (internal citations and quotation omitted).  To the contrary, vertical exclusive distribution agreements between a manufacturer and a number of distributors are generally lawful under the antitrust laws.  *See, e.g., E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 30 (2d Cir. 2006) (finding an exclusive distribution agreement did not violate Section 1, and noting that "exclusive distributorship arrangements are presumptively legal").

[10]   The appropriate inquiry is whether it would be in the bank's unilateral self-interest to engage in conduct regardless of whether its competitors would also be advantaged, which is the approach the court undertook in one of plaintiffs' primary cases.  *See Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 935-36 (7th Cir. 2000), *aff'g*, 126 F.T.C. 415 (1998) (court assessed whether each toy manufacturer acted against its individual self-interest in isolation without regard to whether other competitors would also benefit from same arrangement with Toys "R" Us).

Individual Plaintiffs' Statement Of Undisputed Facts (Defs.' Counter Stmt. to Indiv. Pls.) ¶¶ 111-175.)

Second, even if, hypothetically, some particular bank might prefer some different rules, that too is not the relevant question: the inquiry for a bank is whether it is in its self-interest to join a network with these rules or not join the network at all.  Plaintiffs provide no reason why it is against a bank's independent self-interest to join the networks, even if a bank might prefer a different version of a particular network rule.  In these circumstances, no inference of conspiracy can be drawn.  *See Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1310 (11th Cir. 2003) (granting summary judgment for defendants on conspiracy claim since courts "must exercise prudence in labeling a given action as being contrary to the actor's economic interests, lest we be too quick to second-guess well-intentioned business judgments of all kinds . . . Thus if a benign explanation for the action is equally or more plausible than a collusive explanation, the action cannot constitute a plus factor" supporting an inference).

Plaintiffs rely heavily on *Toys "R" Us* and *Interstate Circuit, Inc. v. United States*, 306 U.S. 208 (1939), as support for their contentions that the Court may draw an inference of a conspiracy where the participants in a series of vertical agreements knew that other participants would be entering into comparable agreements.  (Class Opp'n at 71; Indiv. Pls.' Opp'n at 68-72.) Yet, as defendants have discussed in detail, the holdings in those cases were based on evidence that the challenged practices were radically different than prior industry practices, were adopted after communications by the alleged conspirators about those practices, and were plainly against the independent self-interest of the participants.  (*See* Defs.' Opp'n to Ind. Pls.' Mot. for S.J. at 37-38.)

19

*Starr v. Sony BMG Music Entertainment*, 592 F.2d 314 (2d Cir. 2010), relied upon by

plaintiffs, is not to the contrary.  (Class Opp'n at 73-75; Ind. Pls.' Opp'n at 68-71, 74, 75.)  The

court in *Starr* was not addressing a summary judgment motion but a different standard for

pleading a conspiracy under Fed. R. Civ. P. 12(b)(6).  Moreover, *Starr* involved joint ventures

which operated with explicit "Most Favored Nations" side-letter agreements among defendants

that were designed to maintain high prices and which were deliberately kept "secret" because of

a recognition that they raised antitrust issues.  *Starr*, 592 F.2d at 324.

### (c)   Plaintiffs Cannot Establish An Inference Of A Conspiracy By Identifying Bilateral Vertical Agreements

Finally, individual and class plaintiffs cannot rely upon the vertical post-IPO Visa and

MasterCard membership agreements with their respective banks as a basis for a Section 1

violation.  (*See* Indiv. Pls.' Opp'n at 62-68; Class Opp'n at 75.)  Initially, neither class nor

individual plaintiffs have pursued a vertical restraint theory regarding interchange or the

merchant rules; their liability and damages experts have not opined on this theory, and class

plaintiffs did not base their class certification motion on the alleged impact of vertical, post-IPO

membership agreements between the banks and networks.[11]

In any event, plaintiffs' new theory is fundamentally flawed.  A vertical theory based on

the setting of interchange is particularly problematic. Under plaintiffs' theories, post-IPO

interchange is a price charged to the merchants.  In reality, default interchange is a fee that the

---

[11]   Such a vertical theory presents legal and factual issues that are different from those attendant
to a horizontal theory.  For example, plaintiffs would have to demonstrate individual bank
market power and anticompetitive effects arising from individual contracts between one
network and one bank alone, a showing that plaintiffs have not attempted to undertake.  *See*,
*e.g.*, *Dickson v. Microsoft Corp.*, 309 F.3d 193, 207-13 (4th Cir. 2002) (dismissing Section 1
claims based on individual agreements between Microsoft and computer manufacturers
where plaintiffs failed to allege facts showing that each individual contract reflected market
power by the manufacturer or led to anticompetitive effects).

networks require acquirers to pay issuers in the absence of a bilateral agreement and is thus a cost to acquirers that may be passed on to merchants in whole or in part. In either case, default interchange is a fee set by the networks and paid by their bank customers.[12] Since every seller has to be able to set prices applicable to its customers, it cannot be the case that a seller setting a price to be paid by a customer is illegal. *See Texaco Inc. v. Dagher*, 547 U.S. 1, 7 (2006) (a single entity or integrated joint venture "must have the discretion to determine the prices of the products it sells"); *American Needle*, 130 S.Ct at 2215 (agreements and activities within a single firm are presumed to be independent action as long as they are designed to maximize the firm's profits).

Arguments regarding the establishment of the other rules through vertical agreements are similarly unavailing. Several Circuit Courts of Appeal have squarely held that a Section 1 claim based on vertical agreements cannot stand as a matter of law where the vertical agreement provides only that one entity contractually agrees to follow the rules set by another entity. Thus, in *American Airlines v. Christensen*, 967 F.2d 410, 413-14 (10th Cir. 1992), plaintiff brought a Section 1 challenge to agreements between American Airlines and members of the airline's rewards program that restricted members from selling rewards miles to third-parties. The Tenth Circuit held that such agreements did not constitute "concerted action" under Section 1, concluding that "[n]o evidence in the record suggests that American did not independently set the terms under which it would offer its travel awards, and the mere fact that its members accepted those terms does not generate the kind of concerted action needed to violate Section 1."

---

[12]   It is of no moment that the networks impose the interchange fee on acquirers but have them pay it directly to issuers. The networks could just as easily have the fee paid to the network, and then increase network payments to issuers correspondingly. To argue otherwise is to argue form over substance. In either case, the network determines the cost to its customers (i.e., the acquirers).

*Id.* at 413-14, *citing Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984); *see also Toscano v. Prof'l Golfers' Ass'n*, 258 F.3d 978, 984 (9th Cir. 2001) (rejecting a professional golfer's Section 1 challenge to a vertical agreement in which a local tournament sponsor agreed to adhere to PGA Tour rules).

Thus, insofar as the plaintiffs are predicating Section 1 claims on the banks' agreements to adopt Visa and MasterCard post-IPO default interchange and merchant rules, plaintiffs' claims are insufficient as a matter of law. As in *American Airlines* and *Toscano*, the defendant banks do not violate Section 1 by agreeing to follow rules established by the networks.

At bottom, plaintiffs are making the thinly-disguised contention that the networks and banks are engaged in a "walking conspiracy" based upon the vertical membership agreements. But the law in the Second Circuit is clear that Section 1 liability may not be predicated upon a "walking conspiracy" theory. *See AD/SAT, Division of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 233-234 (2d Cir. 1999) ("the Supreme Court's decisions in *Monsanto* and *Matsushita* call into doubt" prior decisions allowing a "membership-ratification theory as a basis for antitrust conspirator liability," and that more recent Second Circuit decisions "have not adopted a 'walking conspiracy' theory" with respect to associations). Rather, under Section 1, alleged co-conspirators must have "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto*, 465 U.S. at 768; *AD/SAT*, 181 F.3d at 234.

The Ninth Circuit squarely addressed this argument in the context of the Visa and MasterCard networks in *Kendall v. Visa U.S.A. Inc.*, 518 F.3d 1042 (9th Cir. 2008). Merchant plaintiffs there alleged that the banks charged merchants a merchant discount fee based upon interchange rates set by Visa and MasterCard, which the banks "adopt[ed]," and that the banks "participated in an individual capacity with the Consortiums in charging the fixed minimum

22

merchant discount fees." *Id.* at 1048. The Ninth Circuit affirmed the dismissal, holding that "merely charging, adopting, or following the fees set by a Consortium is insufficient as a matter of law to constitute a violation of Section 1 of the Sherman Act." 518 F.3d at 1048.

Further, Judge Jones in *American Express Travel Related Services Co. v. Visa U.S.A.*, No. 04 Civ. 8967(BSJ), 2005 WL 1515399 (S.D.N.Y. June 23, 2005), confirmed that plaintiffs cannot predicate a Section 1 claim merely on a "walking conspiracy" or allegations that the banks "find it economically to their advantage not to opt out of systems which establish a non-competitive merchant discount." *Id.* at *4-5. Rather, Judge Jones held that plaintiff stated a claim in that case because it pled facts showing that defendants committed themselves to a scheme designed to achieve an unlawful objective by engaging in pre-IPO management of the networks and voting on exclusivity rules that had the effect of curbing competition among the banks to issue cards of other networks. *Id.* Here, in contrast, the plaintiffs' allegations of a Section 1 violation are based upon mere membership in the post-IPO networks and compliance with network rules that are effectively no different than the allegations rejected as a matter of law in *Kendall*.

Plaintiffs thus have not and cannot come forward with any evidence that the banks and the networks entered into those post-IPO network agreements with a "conscious commitment to achieve an unlawful objective," particularly when the record reveals that ███████████████ ████████████████████████████████████████████████████████████ ██████████████████ In such circumstances, plaintiffs have not identified a genuine issue of fact regarding the existence of an actionable conspiracy and summary judgment is warranted.[13]

---

[13] Although plaintiffs cite to *Leegin Creative Leather Prods. Inc. v. PSKS, Inc.*, 551 U.S. 877, 897-98 (2007), for the proposition that vertical agreements that cause higher prices may be actionable, *Leegin* does not address the type of vertical agreement being challenged here, in

### 2.     Defendants Withdrew From Any Alleged Pre-IPO Conspiracies.

As stated in defendants' moving papers, defendants vigorously dispute the existence of any actionable conspiracy, at any time.  However, because no "conspiracy" exists after the MasterCard and Visa IPOs, for reasons discussed above, this Court can determine that there is no post-IPO conspiracy on this basis alone.  And given the absence of any "conspiracy" after the IPOs, there is nothing post-IPO for defendants to have "withdrawn" from.  Should it reach the issue, however, this Court should hold as a matter of law that defendants withdrew from plaintiffs' alleged pre-IPO conspiracy.

As defendants demonstrated in their opening papers, to withdraw from a "conspiracy," there need only be "[a]ffirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 464-465 (1978).  Here, the practices challenged were certain "collective" decisions allegedly made by the banks with each network.  And it is precisely that allegedly "collective" decision-making which the IPOs brought to an end.  The banks and networks undertook "an affirmative act inconsistent with the object of the conspiracy" by implementing IPOs that eliminated the very ownership and governance structure giving rise to the claim of improper "collective" action, and through which the pre-IPO conspiracies allegedly were effected.  (*See* Defs' Mem. at 14-15.)  There is no dispute that the actions undertaken in the IPOs were themselves highly publicized to all network members as well as to the public at large.

---

which a downstream participant in a network or other program merely agrees to follow the counter-party's rules as a condition of participating, and there is no evidence of a conscious commitment to achieve an unlawful objective.  Moreover, the seller in *Leegin* allegedly set the price to its customer's customer, which is not the case here.  Plaintiffs' reliance on a Rhode Island district court opinion in *U.S. v. Delta Dental of Rhode Island*, 943 F. Supp. 172 (D.R.I. 1996) is also inapposite, as that case pre-dates the cases cited by defendants and because the "most favored nations" provision at issue in that case precluded participating dentists from working with other insurance providers.

(Defs.' SMF ¶¶ 130-134, 139-147; Class Pls.' Counter Stmt. ¶¶ 130-134, 139-147; Indiv. Pls.' Counter Stmt. ¶¶ 130-134, 139-147.)

      The individual plaintiffs assert that the two networks did not "disavow or defeat" the "conspiracy" after the IPOs because the "purpose" of the conspiracy has always been to impose the merchant restraints to "prevent merchants from differentially pricing credit card services so as to steer customers to lower-cost credit cards and precipitate price competition between MasterCard and Visa or between their issuing banks." (Indiv. Pl. Opp'n at 66-67.) But the IPOs did "disavow" and "defeat" the asserted structural character of the networks that plaintiffs posit as the basis for the claimed conspiracy to approve and maintain default interchange and the challenged network rules. Visa and MasterCard were not also required to abandon those practices, which have substantial redeeming and procompetitive virtues. *See* Defs.' Opp'n to Ind. Pls.' Mot. for S.J. at 15-19, 34.[14]

      Class Plaintiffs argue the defendants have not withdrawn from the alleged conspiracy because the banks continue to "promote" and receive "additional benefits" from the conspiracy. (Class Opp'n at 66-68.) But the alleged conspiracies purportedly facilitated by the Visa and MasterCard pre-IPO structures have been eliminated; accordingly, there is no longer a conspiracy for defendants to promote, or from which a defendant could derive a benefit.

      None of the cases that plaintiffs cite is to the contrary. Plaintiffs cite *United States v. Eisen*, 974 F.2d 246 (2d Cir. 1992), and *United States v. Pippin*, 903 F.2d 1478 (11th Cir. 1990), a case cited in *Morton's Market v. Gustafson Dairy*, 198 F.3d 823 (11th Cir. 1999), to support

---

[14]  Plaintiffs' cited cases do not support their position because in those actions the alleged conspiracy continued. *See United States v. Berger,* 224 F.3d 107, 119 (2d Cir. 2000) (conspirator continued to perpetuate the ongoing conspiracy through fraud); *United States v. Sax*, 39 F.3d 1380, 1387 (7th Cir. 1995) (drug distributors continued to conduct conspiracy

their argument that a withdrawal cannot be found where defendants continue to receive benefits from the conspiracy. But in *Pippin* and *Eisen*, the conspirators continued to receive benefits directly from unlawful contracts entered into *during* the conspiracies. *Pippin*, 903 F.2d at 1481-82 (post-withdrawal, conspirator continued to receive compensation under contracts that were executed as part of bid rigging conspiracy); *Eisen*, 974 F.2d at 269 (attorney continued to receive payments from cases he tried prior to resigning from law firm engaged in conspiratorial fraud). Here, if the Court finds that each network has set new post-IPO rules and default interchange, whatever post-IPO benefits the banks may be receiving from the existence of the network rules and interchange fees are not derived from any pre-IPO conduct.

*          *          *

For all the reasons stated above, summary judgment should be granted for defendants with respect to class plaintiff's challenges to the IPOs under Section 7 of the Clayton Act and Section 1 of the Sherman Act, and class and individual plaintiffs' claims under Section 1 of the Sherman Act based on asserted post-IPO conspiracies.

## II.    Plaintiffs Have Failed To Overcome Defendants' Showing That Summary Judgment Should Be Granted On Plaintiffs' Fraudulent Conveyance Claims

In their opening papers, defendants demonstrated that summary judgment should be granted on class plaintiffs' fraudulent conveyance claims under Sections 275 and 276 of New York's Debtor and Creditor Law. (*See* Defs.' Mem. at 18-25.) Plaintiffs proffer no substantial evidence in opposition to defendants' motion that can salvage their claims. Instead, they contend that they need access to MasterCard's privileged litigation assessment materials in order to respond to defendants' summary judgment motion. Plaintiffs' Rule 56(d) request, however, is

---

through which defendant laundered money in real estate ventures). Here, by contrast, the alleged structural conspiracy has been extinguished by the IPOs.

nothing more than a smokescreen masking their lack of proof.  That motion should be denied and summary judgment on the fraudulent conveyance claims be entered in favor of defendants.

**A.  Plaintiffs Fail To Establish Any Material Factual Dispute Precluding Summary Judgment For Defendants On The Constructive Fraudulent Conveyance Claim Under Section 275**

In order to succeed on their Section 275 claim, plaintiffs "must establish by a preponderance of the evidence" that at the time it eliminated its special assessment provision in connection with the IPO, MasterCard both "believe[d] it [would] incur debt beyond its ability to pay" and did not receive fair consideration.  *See In re Allou Distribs., Inc.*, 446 B.R. 32, 62 (Bankr. E.D.N.Y. 2011).  Plaintiffs raise three points in opposition to the motion: (i) that MasterCard did not obtain fair value for the release of the special assessment right; (ii) that MasterCard and the banks lacked good faith; and (iii) that MasterCard believed it would incur debts beyond its ability to pay.  None permits plaintiffs to avoid summary judgment.

**1.  Plaintiffs Fail To Cite Evidence Establishing That The Assessment Provision Was Eliminated Without Fair Consideration.**

First, plaintiffs contend that MasterCard received $650 million in exchange for the elimination of the special assessment provision, and that the adequacy of this compensation raises a material disputed question of fact.  (Class Opp'n at 100.)  But other than asserting that there is a factual question, plaintiffs make no mention in their papers of what reasonable compensation would be.  That is because they can offer nothing but speculation as to the amount of litigation costs the assessment provision purportedly was designed to cover.  (*See* Defs.' Mem. at 21.)  Since plaintiffs cannot establish the value of MasterCard's contingent liabilities, they cannot establish a fact question over the value of the assessment provision.

Furthermore, plaintiffs fail to address adequately important facts respecting the value of the provision.  Although they point to evidence that ███████████████████████████

27

███████████████████████████████████████████████████

████████████████████████████████████ Plaintiffs are left only to "dispute any inference that the special-assessment was not valuable to MasterCard." (Class Pls.' Counter Stmt. ¶ 136.a.) But the fact that the provision ███████████████████████████ in no way demonstrates that the amount of value MasterCard received in the IPO is inadequate.

The undisputed record shows that MasterCard received enormous financial benefits through the IPO that has resulted in it having a current market capitalization of approximately $35 billion. (Defs.' Reply SMF at 511.) Plaintiffs claim, incorrectly, that "there is no reason to attribute the benefits of the IPO . . . to the consideration MasterCard received for releasing its special assessment. Those alleged benefits would follow no matter what deal the banks and MasterCard made for the release of the special-assessment right." (Class Opp'n at 102.) Plaintiffs miss the point — the undisputed record shows that ██████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████ Plaintiffs offer no legitimate reason why the benefits of the IPO should not therefore be considered in assessing the reasonably equivalent value of the assessment provision.

> **2.    Plaintiffs' Bad Faith Contentions Do Not Suffice To Defeat Summary Judgment**

Plaintiffs' attempt to attribute bad faith to either MasterCard or the banks in deciding to eliminate the assessment provision is without merit. "[A] person seeking to set aside a conveyance upon the basis of lack of good faith must prove that one or more of the following factors is lacking: (1) an honest belief in the propriety of the activities in question; (2) no intent

28

to take unconscionable advantage of others; and (3) no intent to, or knowledge of the fact that the activities in question will hinder, delay, or defraud others." *S. Indus., Inc. v. Jeremias*, 66 A.D.2d 178, 183 (N.Y. App. Div. 1978).

Plaintiffs suggest, inaccurately, that ██████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ███████████████ To the contrary, the record clearly shows that MasterCard considered the contingent liabilities as part of its own capital adequacy analysis, determined that such liabilities were not quantifiable, publicly disclosed that fact, and then entered into the IPO to *strengthen* the capital position of the company. (Class Pls.' Counter Stmt. ¶¶ 159, 165, 168; Defs.' Reply SMF at 509-11.) Plaintiffs' contention that the MasterCard Board released the assessment right solely to benefit the banks (Class Opp'n at 103), is also demonstrably unsupported. MasterCard's CEO has testified that ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████ Plaintiffs simply offer no evidence that MasterCard acted in bad faith by eliminating the assessment when it "intend[ed] or believ[ed] that [it would] incur debts beyond [its] ability to pay." N.Y. Debt. & Cred. Law § 275.

### 3. Plaintiffs Fail To Cite To Evidence Establishing That MasterCard Believed It Was Insolvent

Finally, plaintiffs cannot establish that MasterCard believed, at the time of the IPO, that it would incur debt in this litigation or others beyond its ability to pay. Contrary to plaintiffs' contentions (Class Opp'n at 103 n.30), the law in New York is clear that in order to be liable under Section 275, a conveying party must have a subjective belief that it will be unable to pay its debts when due. Plaintiffs' own cited cases make this clear. *See MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 943 (S.D.N.Y. 1995) ("The

defendants argue that in order to prevail, the plaintiffs must prove that the transferor subjectively intended to become incapable of paying its obligations . . . there is support for the defendants' position."); *see also Wall St. Assocs. v. Brodsky*, 257 A.D.2d 526, 528 (N.Y. App. Div. 1999) ("A claim under [section 275] requires, in addition to the conveyance and unfair consideration elements . . ., an element of intent or belief that insolvency will result.").[15]

Plaintiffs cannot meet this standard.  The record evidence manifests that MasterCard executives squarely believed and disclosed that MasterCard had the capital necessary to carry out the redemption element of the IPO even if the litigation liabilities could not be reasonably quantified at that time, and that the IPO would strengthen its capital position. (Defs.' SMF ¶ 166; Class Pls.' Counter Stmt. ¶¶ 162-165, 168; Defs.' Reply SMF at 509-10.)  Plaintiffs and their expert do not dispute that plaintiffs cite only to documents purportedly estimating ███████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████)  None of this evidence supports plaintiffs' naked contention that MasterCard had a "good indication" that it would not be able to meet its debts.

### B.   Plaintiffs Fail To Establish Any Material Factual Dispute Precluding Summary Judgment For Defendants On The Actual Fraudulent Conveyance Claim Under Section 276

Defendants demonstrated in their moving papers that plaintiffs failed to establish their actual fraud claim under Section 276 because they cannot show by clear and convincing evidence, either directly or through the proof of multiple badges of fraud, that MasterCard acted

---

[15]   Even if the plaintiffs were correct, and, contrary to its plain language, Section 275 required instead simply an objective showing of insolvency, the available reliable evidence establishes that MasterCard was in fact solvent (*see* Defs.' Reply SMF at 510-11), and plaintiffs cannot establish otherwise through the speculation of their expert. (*See* Mem. of Law in Supp. of the MasterCard and Bank Defs.' Mot. to Exclude Test. of Kevin F. Henry ("Defs.' Mot. To Exclude Henry") at 6-9.)

with actual intent to defraud plaintiffs.  (Defs.' Mem. at 22-25.)  In response, plaintiffs seek to concoct an issue of fact through four separate points: (i) that MasterCard ███████████ ██████████████████████████████████ (ii) that MasterCard and the banks had a close relationship; (iii) that MasterCard did not obtain adequate compensation for its elimination of the special assessment right; and (iv) that MasterCard's financial condition was impaired.  None of these points has merit.

1.    **MasterCard's** ██████████████████████ **Is Not Indicative Of Fraudulent Intent**

As part of the Board's evaluation of MasterCard's capital adequacy, MasterCard ██████ ████████████████████████████████████████████ ████████████████████████████ the Board examined directly with the assistance of its advisors and counsel.  Plaintiffs assert that ████████████████ ████████████████████████████████████████████ ██████████████████████

Plaintiffs fail to establish, however, how this represents clear and convincing evidence of MasterCard's actual intent to defraud the plaintiffs.  This undisputed evidence reflects that MasterCard ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████ Although plaintiffs assert in a conclusory manner that this "give[s] rise to the reasonable inference that" the instruction was given ████████████ ████████████████████████████████████████████ ████████████████████████████████████ . ███████████████████████████████████

Plaintiffs' only remaining purported "evidence" of actual fraud is ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ But plaintiffs never deposed this director, and even if the Court construes the ambiguous language in plaintiffs' favor, this statement ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ MasterCard's clear and repeated public disclosure of its inability to quantify these contingent liabilities rebuts any inference of fraud. (*See* Defs' Mem. at 24-25.)

### 2. Plaintiffs Fail To Cite Evidence Demonstrating The Presence Of Any Badge Of Fraud

Because the plaintiffs lack any direct evidence of an actual intent on the part of MasterCard to defraud the plaintiffs, they must instead proffer substantial evidence establishing multiple badges of fraud. *Kramer v. Sooklall (In re Singh)*, 434 B.R. 298, 312 (Bankr. E.D.N.Y. 2010); *Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.)*, 376 B.R. 390, 405 (Bankr. S.D.N.Y. 2007). Yet, they lack evidence to prove even a single such badge.

---

[16] Class plaintiffs' citations to two inapposite cases mentioning ▮▮▮▮▮▮▮▮▮ opinions provided in different contexts and circumstances are irrelevant. *See Brinckerhoff v. Texas E. Prods. Pipeline Co.*, 986 A.2d 370 (Del. Ch. 2010); *Lids Corp. v. Marathon Inv. Partners, L.P. (In re Lids Corp.)*, 281 B.R. 535 (Bankr. D. Del. 2002). MasterCard's decision ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

First, plaintiffs assert that at the time of the IPO, certain MasterCard Board seats were held by individuals who were employees of member banks, and that those banks owned stock in MasterCard. (Class Opp'n at 97-98.) Yet, the case law confirms that the circumstances in which a "close relationship" has been found to be indicative of fraud are simply not present here. *See, e.g., CIT Group/Commercial Servs., Inc. v. 160-09 Jamaica Ave. Ltd.*, 25 A.D.3d 301, 301-303 (N.Y. App. Div. 2006) (transfer from corporation whose two officers were family members to another corporation owned by those individuals' family members after default judgment had been obtained found indicative of fraud).[17]

Second, for the reasons stated above and in defendants' opening papers, plaintiffs also cannot show that MasterCard received inadequate consideration when the special assessment provision was extinguished in the IPO. Again citing purported ████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████ This rank speculation has no basis in the record, as even plaintiffs' expert, Mr. Henry, acknowledges. (Defs.' Reply SMF at 509.)

Finally, plaintiffs claim that when contingent "liabilities are factored into a capital-adequacy analysis of MasterCard at the time of the IPO, MasterCard fails all tests for solvency." (Class Opp'n. at 99.) Again, for the reasons detailed above, plaintiffs point to no figure that is an actual estimate of MasterCard's contingent liabilities. Thus, they cannot conclude that

---

[17]   Plaintiffs' citation to *Bulkmatic Transport Co. v. Pappas*, No. 99-cv-12070, 2001 WL 882039 (S.D.N.Y. May 11, 2001), is unavailing. There, the court based its finding on, *inter alia*, the fact that the transferee corporation was also secretly owned by the controlling shareholder of the transferor corporation, "was organized [by the defendant] for the purpose of defrauding the plaintiff" and "that the money transferred from the corporations had been obtained through the purportedly unlawful conduct." *Id.* at *12. There are no such

MasterCard was insolvent, especially given the results of the thorough analysis undertaken by defendants' expert, J.T. Atkins, which clearly demonstrates MasterCard's solvency at the time of the IPO. (Defs.' Reply SMF at 510-11.)

For all of these reasons, plaintiffs are unable to defeat summary judgment on the Section 276 claims as well. *See Case v. Fargnoli*, 702 N.Y.S.2d 764, 768 (N.Y. Sup. 1999) (granting summary judgment for defendants where "circumstantial factors (*i.e.* 'badges of fraud') which bear on the issue of actual intent, under [section] 276, are decidedly mixed" and noting that "[w]hile the relationships between [the transferor and transferee were] close, there was no secrecy or duplicity in the [transfer] and no evidence that [the transferor] knew, at the time, that" he would face debts "exceeding his capacity to pay").

### C.   Class Plaintiffs' Request for Additional Discovery Of Privileged Materials Is Without Merit And Should Be Denied

Plaintiffs' Rule 56(d) motion is directed at compelling disclosure of MasterCard's privileged communications with its counsel regarding its assessment of this litigation and others. (Class Opp'n at 90-93.) Plaintiffs' motion is meritless and should be denied.

### 1.   Plaintiffs Cannot Satisfy The Requirements Of Rule 56(d)

Plaintiffs argue that pursuant to Rule 56(d),[18] they need access to MasterCard's privileged litigation-related communications with counsel made in connection with the IPO capital adequacy analysis in order to rebut defendants' summary judgment argument that MasterCard's Board determined that the company's contingent liabilities were unquantifiable.

---

allegations or evidence here, where the banks' shareholdings were thoroughly disclosed and the IPOs divested the banks of ownership interests. (Defs.' SMF ¶¶ 131, 148.)

[18]   In relevant part, Rule 56(d) of the Federal Rules of Civil Procedure provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may . . . allow time . . . to take discovery."

(Class Opp'n at 91-92.)  But plaintiffs are not entitled to further discovery under Rule 56(d) because they cannot demonstrate that that they were prevented from "present[ing] facts essential to justify [their] opposition."  Fed. R. Civ. P. 56(d).

Plaintiffs' lack of evidence is a direct consequence of their own actions.  First, plaintiffs have taken hundreds of depositions in this case, including those of key MasterCard senior executives and directors involved in the IPO, and had ample opportunity to obtain non-privileged evidence concerning MasterCard's conclusion and disclosure that contingent litigation liabilities could not be reasonably quantified.  Second, if plaintiffs believed that a legal analysis was necessary to test MasterCard's conclusions about the ability to quantify the contingent liabilities, it could have commissioned expert work to do that analysis.  They did not, as their expert, Kevin Henry, admits.  (Defs.' Reply SMF at 511.)  Instead, plaintiffs chose to rely on Mr. Henry's facially flawed expert report in which he speculates as to a contingent liability amount, and then uses that as a false benchmark to assert that MasterCard was insolvent at the time of the IPO. (*See* Defs.' Mot. To Exclude Henry at 5-8.)  Plaintiffs' tactical decisions and speculation should not enable them to gain an unfair advantage by accessing sensitive, privileged information regarding MasterCard's litigation evaluation.  *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. The Stroh Cos.*, 265 F.3d 97, 117 (2d Cir. 2001) ("a district court may refuse to allow additional discovery if it deems the request to be based on speculation as to what could potentially be discovered") (internal quotations omitted).

---

Fed. R. Civ. P. 56(d).  The Court's Rule 56(d) authority is discretionary.  *MM Ariz. Holdings LLC v. Bonanno*, 658 F. Supp. 2d 589, 596 (S.D.N.Y. 2009).

2.     **The Communications Plaintiffs Seek Are Protected From Discovery By The Attorney-Client Privilege.**

Even if plaintiffs could satisfy the requirements of Rule 56(d), that rule does not permit the discovery of privileged information. *See Olle v. Columbia Univ.*, 332 F. Supp. 2d 599, 609 (S.D.N.Y. 2004) (denying request to defer disposition of motion for summary judgment where nonmovant "failed to demonstrate that the materials in question are not privileged"); *see also Thornton v. Syracuse Sav. Bank*, 961 F.2d 1042, 1046 (2d Cir. 1992) (district court did not abuse its discretion in denying request for additional Rule 56 discovery where material sought was privileged).  Plaintiffs contend that MasterCard waived privilege because it has asserted a defense of good-faith reliance on the advice of counsel, or alternatively because it selectively disclosed certain privileged communications while withholding others.  (Class Opp'n at 90-93.) Neither contention is correct.

Initially, MasterCard has not asserted an advice-of-counsel defense to plaintiffs' claims attacking the elimination of the assessment provision as a fraudulent conveyance.  In defending against this claim, MasterCard is not arguing that its elimination of the assessment provision was proper because counsel informed it of its lawfulness.  *See, e.g.*, *Leviton Mfg. Co., Inc. v. Greenberg Traurig LLP*, No. 09-cv-8083, 2010 WL 4983183, at *3 (noting that advice of counsel may be placed in issue where a party relies on good faith belief in lawfulness of his actions as a defense).

Nor is MasterCard asserting a "defense [which it] intends to prove by use of the privileged materials." *Deutsche Bank Trust Co. of Ams. v. Tri-Links Inv. Trust*, 43 A.D.3d 56, 64 (N.Y. App. Div. 2007).  Rather, MasterCard is relying only upon the publicly-disclosed conclusion of the Board that the contingent litigation liabilities could not be quantified as evidence (i) that MasterCard did not believe that it would be unable to pay its debts, as required

36

by Section 275, and (ii) that MasterCard was not willfully deceiving anyone about its capital adequacy at the time of the IPO.  Neither of those defense positions requires MasterCard to rely upon ██████████████████████████████████████████████████████ ████████████████████████████████████████

"New York courts will not find an at issue waiver merely because privileged information is relevant to the issues being litigated." *Leviton*, 2010 WL 4983183, at \*4.  In fact, courts have held that it is only when "privileged documents are *indispensable* to party's claims or defenses" that waiver will be found.  *Chin v. Rogoff & Co.*, No. 05-cv-8360, 2008 WL 2073934, at \*5 (S.D.N.Y. May 8, 2008) (emphasis added).  Plaintiffs make no such contention, asserting only that the documents would lend "support" to their claims.  (Class Opp'n at 92.)  That is an insufficient reason to invade privilege.

Finally, MasterCard has not made selective disclosure of certain privileged communications while withholding others.  (*See* Class Opp'n at 90-91.)  In fact, in their pending motion to compel, plaintiffs themselves have admitted that MasterCard witnesses have not disclosed any legal advice or communications.  (Class Pls.' Letter Mot. to Compel, Jul. 28, 2009 [D.E. 1261] at 3.)  Rather, it is the fact of the Board's conclusion — not the underlying privileged inputs communicated to the Board — that defendants have consistently cited.

In sum, plaintiffs have not offered a justifiable reason why they need access to

---

[19]  Thus, the facts here make this case very different than the cases cited by plaintiffs.  *See Pall Corp. v. Cuno, Inc.*, 268 F.R.D. 167, 169 (E.D.N.Y. 2010) (plaintiff offered declaration of its patent counsel containing his "thoughts, mental impressions, opinions and conclusions as evidence of [plaintiff's] good faith," thus disclosing only self-serving communications); *In re County of Erie*, 546 F.3d 222, 227-29 (2d Cir. 2008) (noting that "a party must *rely* on privileged advice from his counsel to make his claim or defense" for waiver to be found and holding that defense of qualified immunity did not implicate such reliance; further criticizing overly broad application of waiver); *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1268

MasterCard's squarely privileged assessments of this litigation to support their baseless fraudulent conveyance claims.  The Court should not permit this request, and class plaintiffs' Rule 56(d) request to delay summary judgment should be denied.

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court grant summary judgment and dismiss the class plaintiffs' IPO and fraudulent conveyance claims, and all plaintiffs' post-IPO conspiracy claims under Sherman Act Section 1.

Dated:    New York, New York          Respectfully submitted,
          June 30, 2011

                                      **PAUL, WEISS, RIFKIND, WHARTON &**
                                      **GARRISON LLP**

                                      By:   /s/ Gary R. Carney
                                            Andrew C. Finch
                                            Gary R. Carney
                                            1285 Avenue of the Americas
                                            New York, NY 10019-6064
                                            Tel.: (212) 373-3000
                                            Fax: (212) 757-3990
                                            gcarney@paulweiss.com

                                            Kenneth A. Gallo
                                            Joseph J. Simons
                                            2001 K Street, N.W.
                                            Washington, DC 20006-1047
                                            Tel.: (202) 223-7300
                                            Fax: (202) 223-7420

---

(5th Cir. 1991) (dealing with question of plaintiff's good-faith belief that claims in its lawsuit were colorable as defense to counterclaim of tortious interference of contract).

**WILLKIE FARR & GALLAGHER LLP**

Keila D. Ravelo
Wesley R. Powell
Matthew Freimuth
787 Seventh Avenue
New York, NY 10019-6099
Tel.: (212) 728-8000
Fax: (212) 728-8111

*Attorneys for Defendant MasterCard Incorporated*
*and MasterCard International Incorporated*

**ARNOLD & PORTER LLP**

/s/ Robert C. Mason
By:  Robert C. Mason
399 Park Avenue
New York, NY 10022-4690
Tel.: (212) 715-1000
Fax: (212) 715-1399
robert.mason@aporter.com

Robert J. Vizas
One Embarcadero Center, 22nd Floor
San Francisco, CA 94111-3711
Tel.: (415) 356-3000
Fax: (415) 356-3099

Mark R. Merley
Matthew A. Eisenstein
555 12th Street, N.W.
Washington, DC 20004-1206
Tel.: (202) 942-5000
Fax: (202) 942-5999

*Attorneys for Defendants Visa Inc., Visa U.S.A. Inc.,*
*and Visa International Service Association*

**MORRISON & FOERSTER LLP**

/s/ Mark P. Ladner

By: Mark P. Ladner
Michael B. Miller
1290 Avenue of the Americas
New York, NY 10104-0050
Tel.: (212) 468-8000
Fax: (212) 468-7900
mladner@mofo.com

*Attorneys for Defendants Bank of America, N.A., BA
Merchant Services LLC (f/k/a Defendant National
Processing, Inc.), Bank of America Corporation, and
MBNA America Bank, N.A.*

**SHEARMAN & STERLING LLP**

/s/ James P. Tallon

By: James P. Tallon
Wayne D. Collins
Lisl J. Dunlop
599 Lexington Avenue
New York, NY 10022-6069
Tel.: (212) 848-4000
Fax: (212) 848-7179
jtallon@shearman.com

*Attorneys for Defendants Barclays Financial Corp.
and Barclay's Bank plc*

**O'MELVENY & MYERS LLP**

By:   /s/ Andrew J. Frackman
       Andrew J. Frackman
       Times Square Tower
       7 Times Square
       New York, NY 10036
       Tel.: (212) 326-2000
       Fax: (212) 326-2061
       afrackman@omm.com

*Attorneys for Defendants Capital One Bank (USA), N.A., Capital One F.S.B., and Capital One Financial Corp.*

**SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP**

      /s/ Peter E. Greene
By:   Peter E. Greene
      Peter S. Julian
      Four Times Square
      New York, NY 10036
      Tel.: (212) 735-3000
      Fax: (212) 735-2000
      peter.greene@skadden.com

      Michael Y. Scudder
      155 North Wacker Drive
      Chicago, IL  60606-1720
      Tel.: (312) 407-0700
      Fax: (312) 407-0411
      michael.scudder@skadden.com

*Attorneys for Defendants JPMorgan Chase & Co., Chase Bank USA, N.A., Chase Manhattan Bank USA, N.A., Chase Paymentech Solutions, LLC, JPMorgan Chase Bank, N.A., as acquirer of certain assets and liabilities of Washington Mutual Bank, Bank One Corporation, and Bank One Delaware*

41

**SIDLEY AUSTIN LLP**

/s/ David F. Graham

By:   David F. Graham
Eric H. Grush
One South Dearborn Street
Chicago, IL 60603
Tel.: (312) 853-7000
Fax: (312) 853-7036
dgraham@sidley.com


Benjamin R. Nagin
787 Seventh Avenue
New York, N.Y. 10019
Tel.: (212) 839-5300
Fax: (212) 839-5599

*Attorneys for Defendants Citibank (South Dakota),*
*N.A., Citibank, N.A., Citigroup Inc., and Citicorp*


**KEATING MUETHING & KLEKAMP PLL**

/s/Richard L. Creighton, Jr.

By:   Richard L. Creighton, Jr.
Joseph M. Callow, Jr.
Drew M. Hicks
One East Fourth Street
Suite 1400
Cincinnati, OH 45202
Tel.: (513) 579-6400
Fax: (513) 579-6457

*Attorneys for Defendant Fifth Third Bancorp*

**KUTAK ROCK LLP**

/s/ John P. Passarelli
By:   John P. Passarelli
James M. Sulentic
The Omaha Building
1650 Farnam Street
Omaha, NE 68102-2186
Tel.: (402) 346-6000
Fax: (402) 346-1148
john.passarelli@kutakrock.com

*Attorneys for Defendant First National Bank of*
*Omaha*

**WILMER CUTLER PICKERING HALE AND**
**DORR LLP**

/s/ Christopher R. Lipsett
By:   Christopher R. Lipsett
David S. Lesser
399 Park Avenue
New York, N.Y. 10022
Tel.: (212) 230-8800
Fax: (212) 230-8888
chris.lipsett@wilmerhale.com

Ali M. Stoeppelwerth
Perry A. Lange
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Tel.: (202) 663-6000
Fax: (202) 663-6363

*Attorneys for HSBC Finance Corporation and HSBC*
*North America Holdings, Inc.*

**JONES DAY**

/s/ John M. Majoras
By: John M. Majoras
Joseph W. Clark
51 Louisiana Avenue, NW
Washington, DC 20001
Tel.: (202) 879-3939
Fax: (202) 626-1700
jmmajoras@jonesday.com

*Attorneys for Defendants National City Corporation,
National City Bank of Kentucky*


**PULLMAN & COMLEY, LLC**

/s/ Jonathan B. Orleans
By: Jonathan B. Orleans
Adam S. Mocciolo
850 Main Street
Bridgeport, CT 06601-7006
Tel.: (203) 330-2000
Fax: (203) 576-8888
jborleans@pullcom.com

*Attorneys for Defendant Texas Independent
Bancshares, Inc.*


**ALSTON & BIRD LLP**

/s/ Teresa T. Bonder
By: Teresa T. Bonder
Valarie C. Williams
Kara F. Kennedy
1201 W. Peachtree Street, N.W.
Atlanta, GA 30309
Tel.: (404) 881-7000
Fax: (404) 881-7777
teresa.bonder@alston.com

*Attorneys for Defendant Suntrust Banks, Inc.*

44

**PATTERSON BELKNAP WEBB & TYLER LLP**

/s/ Robert P. LoBue
By:  Robert P. LoBue
      Norman W. Kee
      Patterson Belknap Webb & Tyler LLP
      1133 Avenue of the Americas
      New York, NY 10036
      Tel.: (212) 336-2596
      Fax: (212) 336-2222
      rplobue@pbwt.com

*Attorneys for Defendants Wachovia Bank, NA.,
Wachovia Corporation, and Wells Fargo
& Company*