

38451543

Jun 30 2011
4:26PM

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION** | **Case No. 05-MD-01720 (JG) (JO)** |
| | **ORAL ARGUMENT REQUESTED** |
| **This Document Applies to:  All Actions.** | |

**NETWORK DEFENDANTS' REPLY MEMORANDUM IN SUPPORT
OF THE MOTION FOR SUMMARY JUDGMENT AGAINST
THE CLAIMS IN THE INDIVIDUAL PLAINTIFFS' COMPLAINTS**

**HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER
FILED UNDER SEAL**

# **Table Of Contents**

Page

Table of Authorities ................................................................. iii

Preliminary Statement ................................................................ 1

Argument ................................................................................ 1

I.  Summary Judgment Should Be Granted Against
    The Individual Plaintiffs' Claims  For The Same
    Reasons As Against The Class Plaintiffs' Claims ................................ 1

II. Summary Judgment Also Should Be Granted Against
    The Individual Plaintiffs' Claims For Independent Reasons  ...................... 2

    A.  Plaintiffs Proffer No Legal Or Factual Basis
        For Claims Based On "No Surcharge" Rules  ................................... 2

        1.  Plaintiffs Cannot Overcome Defendants' Showing
            That "No Surcharge" Rules Do Not Unreasonably
            Restrain Trade Or Result In An Antitrust Injury  ..................... 2

            a.  Plaintiffs Identify No Authority Finding An
                Inability To Surcharge Consumers Constitutes An
                Unreasonable Restraint Of Trade Or An Antitrust Injury  .......... 2

            b.  Plaintiffs Cannot Distinguish The Cases Holding
                That An Inability To Surcharge Consumers Is Not An
                Unreasonable Restraint Of Trade Or An Antitrust Injury  .......... 4

            c.  Because Plaintiffs Suffer No Antitrust Injury From The
                "No Surcharge" Rules, Summary Judgment Dismissing
                Plaintiffs' Claims Based On Those Rules Is Appropriate  .......... 7

        2.  Plaintiffs Cannot Overcome Defendants' Showing That
            No Antitrust Injury Could Flow From "No Surcharge"
            Rules In Ten States That Statutorily Prohibit Surcharging .............. 9

            a.  The Ten State Statutes Do Not Permit
                Surcharging One Credit Card In Lieu Of Another ..................... 10

            b.  Plaintiffs Identify No Authority For Finding
                An Antitrust Injury Based On Rules That
                Prohibit Conduct Illegal Under State Law  ....................... 14

Page

B. Plaintiffs Proffer No Legal Or Factual Basis
For Their Asserted Single-Brand Markets For
Visa Or MasterCard Credit Card Network Services ........................................... 16

C. Plaintiffs Proffer No Legal Or Factual Basis For The
Monopoly Power Element Of Their Sherman Act § 2 Claims .......................... 20

    1. Plaintiffs' Claims Based On An Alleged Market
For All Credit And Charge Card Network
Services Should Be Dismissed As Abandoned ...................................... 20

    2. Plaintiffs Identify No Direct Evidence Of
Monopoly Power Even If The Asserted Market
Also Includes Debit Card Network Services ........................................... 21

    3. Plaintiffs Identify No Indirect Evidence Of
Monopoly Power Even If The Asserted Market
Also Includes Debit Card Network Services ........................................... 25

D. Plaintiffs' Claims Of *Per Se* Antitrust Violations
Should Be Dismissed As Lacking Any Legal Basis ........................................... 27

    1. Plaintiffs Concede That Visa And MasterCard
Default Interchange Is Not Unlawful *Per Se* ........................................ 27

    2. Plaintiffs Identify No Legal Basis For Finding The
Challenged Visa And MasterCard Rules Unlawful *Per Se* ................... 28

E. Plaintiffs Concede That Their Tying Claims Should Be Dismissed .................. 30

Conclusion ................................................................................................................... 30

# Table Of Authorities

Page

**Cases**

*A&E Products Group L.P. v. Accessory Corp.*,
No. 00 CIV. 7271(LMM), 2001 WL 1568238 (S.D.N.Y. Dec. 7, 2001) ............................ 3

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ................................................................................................. 1

*Broadway Delivery Corp. v. United Parcel Service of America, Inc.*,
651 F.2d 122 (2d Cir. 1981) ................................................................................. 25, 26

*City of Groton v. Connecticut Light & Power Co.*,
662 F.2d 921 (2d Cir. 1981) ................................................................................. 8

*Continental Ore Co. v. Union Carbide and Carbon Corp.*,
370 U.S. 690 (1962) ................................................................................................. 7

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
504 U.S. 451 (1992) ................................................................................................. 24

*Empagran, S.A. v. F. Hoffman-LaRoche, Ltd.*,
315 F.3d 338 (D.C. Cir. 2003),
*rev'd*, 542 U.S. 155 (2004) ................................................................................. 3

*Fishman v. Estate of Wirtz*,
No. 74 C 2814, 1981 WL 2153 (N.D. Ill. Oct. 28, 1981),
*aff'd*, 807 F.2d 520 (7th Cir. 1986) ................................................................. 15

*Hack v. President and Fellows of Yale College*,
237 F.3d 81 (2d Cir. 2000) ................................................................................. 17

*Heublein, Inc. v. United States*,
996 F.2d 1455 (2d Cir. 1993) ............................................................................. 14

*H.L. Hayden Co. of New York, Inc. v. Siemens Medical Systems, Inc.*,
879 F.2d 1005 (2d Cir. 1989) ............................................................................. 7

*Hyek v. Field Support Services, Inc.*,
702 F. Supp. 2d 84 (E.D.N.Y. 2010) ................................................................. 21, 28

*Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*,
253 F. Supp. 2d 262 (D. Conn. 2003) ............................................................... 3

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977) ................................................................................................. 1

Page

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*,
   No. 05-MD-1720 (JG) (JO), 2008 WL 5082872 (E.D.N.Y. Nov. 25, 2008) ...................... 15

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*,
   562 F. Supp. 2d 392 (E.D.N.Y. 2008) ................................................................... 18

*In re Visa Check/MasterMoney Antitrust Litigation*,
   No. 96-CV-5238 (JG), 2003 WL 1712568 (E.D.N.Y. Apr. 1, 2003) .............................. 21, 24

*In re Tamoxifen Citrate Antitrust Litigation*,
   466 F.3d 187 (2d Cir. 2006) .................................................................................. 7

*Kartell v. Blue Shield of Massachusetts, Inc.*,
   749 F.2d 922 (1st Cir. 1984) .............................................................................. 4-5

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
   232 F.3d 979 (9th Cir. 2000) ................................................................................ 3

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007) ................................................................................... 3, 28-29

*Nelson v. Monroe Regional Medical Center*,
   925 F.2d 1555 (7th Cir. 1991) ............................................................................... 3

*Northeastern Telephone Co. v. AT&T*,
   651 F.2d 76 (2d Cir. 1981) ................................................................................... 8

*Port Dock & Stone Corp. v. Old Castle Northeast, Inc.*,
   507 F.3d 117 (2d Cir. 2007) ................................................................................. 3

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3d Cir. 1997) ............................................................................... 17

*Reiter v. Sonotone Corp.*,
   442 U.S. 330 (1979) .......................................................................................... 3

*Rite Aid Corp. v. American Express Travel Related Services Co.*,
   No. 08-CV-02317 (NGG) (RER), Mem. & Order (E.D.N.Y. Mar. 3, 2010) ...................... 24

*SouthTrust Corp. v. Plus System, Inc.*,
   913 F. Supp. 1517 (N.D. Ala. 1995) ....................................................................... 6

*State Oil v. Khan*,
   522 U.S. 3 (1997) ............................................................................................ 29

Page

*Taylor v. City of New York,*
 269 F. Supp. 2d 68 (E.D.N.Y. 2003) ................................................. 21

*Tennessean Truckstop, Inc. v. NTS, Inc.,*
 875 F.2d 86 (6th Cir. 1989) .......................................................... 5-6

*United States v. Delta Dental of Rhode Island,*
 943 F. Supp. 172 (D.R.I. 1996) ................................................. 3, 4, 5

*United States v. Visa U.S.A. Inc.,*
 344 F.3d 229 (2d Cir. 2003) ........................................................ 24

*Visa U.S.A. Inc. v. First Data Corp.,*
 No. C 02-01786 JSW, 2006 WL 1310448 (N.D. Cal. May 12, 2006) ................... 3, 9

*Wine Markets International Inc. v. Bass,*
 177 F.R.D. 128 (E.D.N.Y. 1998) ..................................................... 7

*Zenith Radio Corp. v. Hazeltine Research, Inc.,*
 395 U.S. 100 (1969) ................................................................ 15

**Statutes**

California Civil Code § 1748.1 (West 2010) ............................................ 12

Colorado Revised Statutes § 5-2-212 (2010) ........................................... 10

Colorado Revised Statutes § 24-19.5-101 (2010) ....................................... 13

Colorado Revised Statutes § 24-19.5-103 (2010) ....................................... 13

Florida Statutes § 501.0117 (2010) ............................................... 10, 13-14

Kansas Statutes Annotated § 16a-2-403 (2010) ......................................... 10

Maine Revised Statutes tit. 9-A, § 8-103 (2009) ...................................... 10

Maine Revised Statutes tit. 9-A, § 8-303 (2009) ...................................... 10

Massachusetts General Laws ch. 140D, § 1 (West 2010) ................................. 10

Massachusetts General Laws ch. 140D, § 28A (West 2010) .............................. 10

Oklahoma Statutes tit. 14A, § 2-211A (2010) ...................................... 10-11

Page

Oklahoma Statutes tit. 17, § 39.2 (2010) ......................................................  14

**<u>Other Authorities</u>**

IIB Philip E. Areeda et al., *Antitrust Law* ¶ 516 (3d ed. 2007) ......................................  23

IIB Phillip E. Areeda et al., *Antitrust Law* ¶ 534 (3d ed. 2007) ......................................  19

Act of Feb. 27, 1976, Pub. L. No. 94-222, 90 Stat. 197 ......................................  11

Federal Rule of Civil Procedure 56(a) ......................................................................  1

Florida Senate Bill 509 Senate Staff Analysis (Apr. 17, 1987) ......................................  12

Florida House Bill 448 House Committee on Commerce
   Final Staff Analysis (June 18, 1987) ......................................................  12

NYLS' Governor's Bill Jacket to 1984, ch. 160, S. 8367, Assemb. 10189 (NY 1984) ............  12

Senate Report 97-23 (1981) ......................................................................  11

**Preliminary Statement**

Defendants Visa U.S.A. Inc. and Visa International Service Association ("Visa"), and

defendants MasterCard Incorporated and MasterCard International Incorporated ("MasterCard"),

submit this reply memorandum in further support of their motion for summary judgment against

the claims in the Complaints of the individual plaintiffs, and in reply to the Individual Plaintiffs'

Response in Opposition to Defendants' Motions for Summary Judgment ("Ind. Pls.' Opp'n") and

the Individual Plaintiffs' Rule 56.1 Counter Statement of Facts ("Ind. Pls.' Counter Stmt.").[1]

**Argument**

To survive summary judgment, the individual plaintiffs must show that there is a

"genuine dispute" as to a "material fact" supporting "each claim . . . or the part of each claim" on

which defendants seek summary judgment.  Fed. R. Civ. Proc. 56(a).  To make that showing,

plaintiffs must proffer evidence that is "significantly probative."  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 249 (1986).  As demonstrated below, plaintiffs fail to satisfy that burden.

**I.     Summary Judgment Should Be Granted Against**
**The Individual Plaintiffs' Claims For The Same**
**Reasons As Against The Class Plaintiffs' Claims**

The individual plaintiffs' claims fail for the same reasons as the class plaintiffs' claims.

Specifically, the individual plaintiffs create no genuine dispute that:  (1) their claims are barred by

the settlement releases in the *In re Visa Check/MasterMoney Litigation* (*see* Defs.' Class Compl.

Reply Mem. at 1-9); (2) their damages claims are barred by the direct purchaser rule announced in

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) (*see id.* at 9-20); (3) their claims based on the

---

[1]  Defendants are separately filing reply memoranda in support of summary judgment against the class plaintiffs' claims in the Second Consolidated Amended Class Action Complaint ("Defs.' Class Compl. Reply Mem."), and in the First Amended and Second Supplemental Class Action Complaints ("Defs.' Supp. Compls. Reply Mem."), as well as a reply to the class and individual plaintiffs' counterstatements of facts under Local Civil Rule 56.1 ("Defs.' Reply SMF").

setting of default interchange are barred because default interchange does not restrain trade (*see id.* at 20-27); and (4) their claims are barred because they cannot establish that any allegedly anticompetitive conduct reduced output in the asserted markets (*see id.* at 28-34).

In addition, like the class plaintiffs, the individual plaintiffs proffer no evidence of any collusion among Visa, MasterCard, or banks that could support their claims under Sherman Act § 1 after the Visa and MasterCard IPOs.  *See* Defs.' Supp. Compls. Reply Mem. at 14-26.

## II.    Summary Judgment Also Should Be Granted Against The Individual Plaintiffs' Claims For Additional Reasons

The individual plaintiffs' claims also fail as a matter of law for additional reasons.

### A.    Plaintiffs Proffer No Legal Or Factual Basis For Their Claims Based On "No Surcharge" Rules

#### 1.    Plaintiffs Cannot Overcome Defendants' Showing That The "No Surcharge" Rules Do Not Unreasonably Restrain Trade Or Result In An Antitrust Injury

Defendants' opening memorandum demonstrated that summary judgment is warranted to the extent that the individual plaintiffs' claims are based on Visa or MasterCard "no surcharge" rules, since those rules have neither unreasonably restrained trade nor resulted in an antitrust injury.  *See* Network Defs.' Mem. in Support of the Mot. For Summ. J. Against the Claims in the Individual Pls.' Compls. ("Defs.' Ind. Compls. Mem.") at 6-11.  None of the arguments that plaintiffs offer in response creates a genuine issue for trial.  *See* Ind. Pls.' Opp'n at 7-19.

##### a.    Plaintiffs Identify No Authority Finding An Inability To Surcharge Consumers Constitutes An Unreasonable Restraint Of Trade Or An Antitrust Injury

The individual plaintiffs argue that they suffered an antitrust injury because the Visa and MasterCard "no surcharge" rules resulted in plaintiffs paying higher interchange fees.  *See* Ind. Pls.' Opp'n at 11-16.  As support, plaintiffs rely on cases finding an antitrust injury when "a horizontal conspiracy among competitors raises the price the plaintiff pays to a co-conspirator,"

or when conduct "that interferes with horizontal price competition also causes injury to a party who must pay the increased price." *Id.* at 11-12.  But those cases — including the *Visa v. First Data* case — do not apply here, since they do not address whether there was an antitrust injury from "no surcharge" rules or other practices that limited the plaintiffs in imposing higher prices on consumers.[2]  Plaintiffs identify no decision finding that "no surcharge" or similar rules result in an antitrust injury or unreasonably restrain trade; to the contrary, as defendants demonstrated, every court to consider the issue has held that they do not.  *See* Defs.' Ind. Compls. Mem. at 6-8. Accordingly, the individual plaintiffs' supposed evidence that they "paid" higher interchange fees could not establish an antitrust injury or unreasonable restraint of trade from the Visa or MasterCard "no surcharge" rules.  *See* Ind. Pls.' Opp'n at 12-15.

Moreover, the individual plaintiffs concede that in the Visa and MasterCard networks, the merchant receives from its acquiring bank the purchase price minus the merchant discount fee. Ind. Pls.' Counter Stmt. ¶¶ 57(2)-57(3).  Merchants thus receive discounted payments from

---

[2]  *See* Ind. Pls.' Opp'n at 11-16, citing *Empagran, S.A. v. F. Hoffman-LaRoche, Ltd.,* 315 F.3d 338, 357 (D.C. Cir. 2003) (addressing "injury [that] was allegedly caused by defendants' conspiracy to fix vitamin prices around the world"), *rev'd*, 542 U.S. 155 (2004); *Nelson v. Monroe Reg'l Med. Ctr.*, 925 F.2d 1555, 1561 (7th Cir. 1991) (addressing claims "related to the merger between the Monroe Clinic and Monroe Medical Center"); *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 982 (9th Cir. 2000) (addressing "alleged price-fixing that controlled the NCE bulk cheese price"); *Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*, 253 F. Supp. 2d 262, 272 (D. Conn. 2003) (addressing allegations that "defendants have used their domination of the butter market to fix the price of butter"); *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 883 (2007) (addressing claim that manufacturer "refused to sell to retailers that discounted Brighton goods below suggested prices"); *Reiter v. Sonotone Corp.*, 442 U.S. 330, 335 (1979) (addressing claim that defendants "illegally fixed higher prices for the hearing aids and related services"); *Port Dock & Stone Corp. v. Old Castle Ne., Inc.*, 507 F.3d 117, 119 (2d Cir. 2007) (addressing claim that defendant "monopolized the market . . . by buying out its only significant manufacturing competitor" and then "refused to sell" to plaintiff); *A&E Prods. Group L.P. v. Accessory Corp.*, No. 00 CIV. 7271(LMM), 2001 WL 1568238, *2 (S.D.N.Y. Dec. 7, 2001) (addressing counterclaim that defendant "gained control over the hanger market through the use of predatory tactics, including acquiring its competitors"); *United States v. Delta Dental of R.I.*, 943 F. Supp. 172, 174 (D.R.I. 1996) (addressing defendant's "Prudent Buyer clause (also referred to as 'Most Favored Nation' or 'MFN' clause)"); and *Visa U.S.A. Inc. v. First Data Corp.*, No. C 02-01786 JSW, 2006 WL 1310448, at *4 (N.D. Cal. May 12, 2006) (addressing Visa's "intraprocessing ban and the rule limiting discounts").

acquiring banks for the goods and services that merchants sell to cardholders. *Id.* Plaintiffs'
claim that those payments are *lower*, because interchange fees — and thus merchant discount
fees — are *higher* than they would be if merchants were permitted to surcharge, is just like the
claim that the First Circuit rejected in *Kartell v. Blue Shield of Massachusetts, Inc.*, 749 F.2d 922
(1st Cir. 1984). There, doctors similarly argued that because of Blue Shield's ban against
doctors surcharging its insureds, "Blue Shield's payments for doctors' services are 'too low'"
and "Blue Shield's low prices lead doctors to charge higher prices to others." *Id.* at 929. The
First Circuit rejected those arguments and held that the surcharging ban did not unreasonably
restrain trade, reasoning that "an antitrust court . . . will not interfere with a buyer's
(nonpredatory) determination of price" because the "buyer is entitled to use its market power to
keep prices down." *Id.*; *see also* Defs.' Ind. Compls. Mem. at 9-10.

> **b.** **Plaintiffs Cannot Distinguish The Cases Holding
> That An Inability To Surcharge Consumers Is Not An
> Unreasonable Restraint Of Trade Or An Antitrust Injury**

The individual plaintiffs argue that three of the cases holding that "no surcharge" rules
did not unreasonably restrain trade or result in an antitrust injury are distinguishable. *See* Ind.
Pls.' Opp'n at 16-19. Those cases do not support the distinctions that plaintiffs try to make.

The individual plaintiffs assert that "[i]n *Kartell*, the defendant [Blue Shield] did nothing
to interfere with horizontal price competition or raise price," and that the *Delta Dental* case
recognized that distinction. Ind. Pls.' Opp'n at 17-18. But the plaintiff physicians in *Kartell* in
fact claimed that due to Blue Shield's ban against physicians surcharging its insureds, "[p]rice
competition among physicians for services covered by Blue Shield's service benefit policies is
'virtually eliminated.'" *Kartell*, 749 F.2d at 929. The physicians likewise argued that Blue
Shield's surcharging ban horizontally "extend[ed] its 'competitive edge' over other health
insurers, and increas[ed] its dominance in the health insurance business." *Id.* The First Circuit

rejected those arguments in finding that Blue Shield's surcharging ban was not an unreasonable restraint of trade. *See id.* at 929-30. *Delta Dental* is not to the contrary, since that case did not address the defendant insurer's "no surcharge" requirement that participating dentists accept its payment "as full payment for covered services," but instead addressed a challenge to the insurer's separate "most favored nations" requirement. 943 F. Supp. at 183-84.

The individual plaintiffs also assert that in *Kartell*, "the doctor[s] did not purchase anything at any price, much less at a supracompetitive price from Blue Shield." Ind. Pls.' Opp'n at 17. But like the doctors in Blue Shield, plaintiffs receive discounted payments from acquiring banks for the goods and services that plaintiffs provide to consumer cardholders. Ind. Pls.' Counter Stmt. ¶¶ 57(2)-(3). Plaintiffs' claim that Visa and MasterCard "no surcharge" rules make interchange rates higher, and the discounted payments that plaintiffs receive lower, is just like the doctors' claim in *Kartell* that Blue Shield's surcharging ban "enabl[es] it to secure still lower doctor charges." 749 F.2d at 930. The First Circuit found no antitrust problem with that, since the lower payments to doctors simply reflected that "Blue Shield can attract more subscribers because it can charge them less" by "pass[ing] those savings along to its subscribers in the form of lower prices." *Id.* There similarly is no antitrust problem with plaintiffs receiving lower payments from acquiring banks — allegedly due to higher interchange fees — because card-issuing banks can attract more cardholders by using interchange to lower the effective prices that consumer cardholders pay, through cash back rewards, lower finance charges, or other rewards or features of credit cards that have economic value to consumers.

The individual plaintiffs similarly attempt to distinguish *Tennessean Truckstop, Inc. v. NTS, Inc.*, 875 F.2d 86 (6th Cir. 1989), on the ground that "there was no allegation that horizontal price competition was injured or that the plaintiff suffered antitrust injury by paying higher prices to anyone." Ind. Pls.' Opp'n at 18. In that case, however, the plaintiff truckstop

alleged that a credit card network's surcharge cap was part of a conspiracy with truckstops to "'fix and stabilize the price of motor and diesel fuel . . . by limiting the credit card price of motor and diesel fuel to no more than 105% of the cash price.'" *Tenneseean Truckstop*, 875 F.2d at 87. The plaintiff truckstop argued that was like cases involving "a group of sugar refiners [that] had agreed among themselves to pay a uniform price" and "horizontal price-fixing." *Id.* at 88-89. Moreover, the truckstop's claim that the surcharge cap "cost [it] some profit," *id.* at 90, is just like plaintiffs' claim here that when they received lower discounted payments from acquiring banks for goods and services sold to cardholders, they "paid" higher interchange fees.

The individual plaintiffs also assert that the Sixth Circuit noted that "it was expressing no opinion as to whether the conduct would be unlawful if it eliminated horizontal competition." Ind. Pls.' Opp'n at 18, citing *Tennessean Truckstop*, 875 F.2d at 91. But the Sixth Circuit said that not about the credit card network's surcharge cap, but in addressing an entirely separate claim, not mentioned in the complaint, that the credit card network had conspired horizontally with Texaco in administering "Texaco's truck card program." *See* 875 F.2d at 90.

Finally, the individual plaintiffs assert that in *SouthTrust Corp. v. Plus System, Inc.*, 913 F. Supp. 1517 (N.D. Ala. 1995), there "was no allegation that horizontal price competition had been restrained or that the plaintiff was required to pay a higher price for anything." Ind. Pls.' Opp'n at 19. But just as plaintiffs claim that Visa and MasterCard each conspired with banks to impose "no surcharge" rules that had the effect of raising prices for payment card network services, the complaint in *SouthTrust* alleged that an ATM network (Plus) conspired with Alert and Honor, who were "members and licensees of Plus," to "fix the price for ATM services by restraining SouthTrust from surcharging for use of its ATMs." 913 F. Supp. at 1519, 1520. The court nevertheless held that the "[t]he no-surcharge rule challenged by SouthTrust poses no identifiable threat of injury to competition" and "enhances consumer welfare." *Id.* at 1522.

c.     **Because Plaintiffs Suffer No Antitrust Injury From The "No Surcharge" Rules, Summary Judgment Dismissing Plaintiffs' Claims Based On Those Rules Is Appropriate**

Relying on *Continental Ore Co. v. Union Carbide and Carbon Corp.*, 370 U.S. 690 (1962), the individual plaintiffs argue that defendants' "effort to analyze the No-Surcharge Rule in isolation from the other Merchant Restraints is impermissible as a matter of law." Ind. Pls.' Opp'n at 8. But addressing a challenged practice separately is permissible when it does not unreasonably restrain trade or result in an antitrust injury, and thus cannot operate with other challenged practices to be anticompetitive.

In *Continental Ore*, the Supreme Court concluded that the lower court erred in requiring the plaintiff "both to demand materials from the defendants and to exhaust all other sources of supply" to prove that the defendants conspired to monopolize, and in ignoring various types of evidence that the plaintiff had proffered. 370 U.S. at 699-702. In reaching that result, the Supreme Court suggested that the lower court should not have examined separately each episode in which the plaintiff claimed to have demanded material from the defendants or exhausted other sources of supply, "as if they were five completely and unrelated lawsuits," and in "tightly compartmentalizing the various factual components" of each episode "and wiping the slate clean after scrutiny of each." *Id.* at 698-99. The subsequent cases from within the Second Circuit that plaintiffs cite simply note that suggestion without applying it.[3]

Second Circuit cases applying *Continental Ore* have concluded that such joint consideration of a defendant's challenged practices is not required when an individual practice is

---

[3]  *See* Ind. Pls.' Opp'n at 8, citing *In re Tamoxifen Citrate Antitrust Litig.*, 466 F.3d 187, 190, 201 (2d Cir. 2006) (noting *Continental Ore* in passing and affirming dismissal of plaintiffs' claims); *H.L. Hayden Co. of New York, Inc. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1008-09, 1012 (2d Cir. 1989) (noting *Continental Ore* in passing and affirming summary judgment for defendants); and *Wine Mkts. Int'l Inc. v. Bass*, 177 F.R.D. 128, 134-35 (E.D.N.Y. 1998) (Spatt, J.) (noting *Continental Ore* and denying motion to strike allegations regarding dismissed price-fixing claim as also pertaining to other claims).

not anticompetitive, and thus cannot operate with other challenged practices to be anticompetitive.  For example, in *Northeastern Telephone Co. v. AT&T*, 651 F.2d 76 (2d Cir. 1981), a jury found that the defendants engaged in practices that were anticompetitive, but on appeal the Second Circuit held that there was evidence sufficient to find only one of the six practices anticompetitive, and reversed and ordered a new trial because the jury's liability finding might have been based on the other five practices.  *Id.* at 81-82, 94-96.  The plaintiff argued that the jury's verdict should be upheld because the six practices had to be analyzed together under *Continental Ore*, but the Second Circuit rejected that argument, holding that because proof that five of the practices were anticompetitive "was utterly lacking," treating the plaintiff's claims "collectively cannot have any synergistic effect."  *Id.* at 95 n.28.

Similarly, in *City of Groton v. Connecticut Light & Power Co.*, 662 F.2d 921 (2d Cir. 1981), the Second Circuit considered a judgment in which the district court had segregated the plaintiffs' claims based on rules and tariffs from claims based on defendants' other practices, and found that the rules and tariffs did not support an antitrust claim.  *Id.* at 925.  On appeal, the plaintiffs argued that "the court should have examined all the issues together," but the Second Circuit held that it "must . . . analyze the various issues individually."  *Id.* at 927, 28.  The Second Circuit rejected "the notion that if there is a fraction of validity to each of the basic claims and the sum of the fractions is one or more, the individual plaintiffs have proved a violation of section 1 or section 2 of the Sherman Act."  *Id.* at 928-29.  The Second Circuit therefore affirmed the judgment for the defendants on the rules and tariffs claims because even though it found certain "price squeeze" claims might be valid, it "fail[ed] to find any indication that . . . the overall 'synergistic effect' . . . of the rates, acts, and practices of the appellees gives rise to violations of . . . the Sherman Act," given that "there was no anticompetitive or exclusionary conduct, except, possibly, for two specific price-squeezes."  *Id.* at 935.

Here, because defendants similarly have established that the "no surcharge" rules do not unreasonably restrain trade or result in an antitrust injury, it is proper for this Court to consider the "no surcharge" rules separately from the other challenged rules, and to grant summary judgment dismissing the individual plaintiffs' claims to the extent that they are based on the "no surcharge" rules. Although plaintiffs assert that the Visa and MasterCard "no surcharge" rules are "interrelated" and "work together" with other challenged rules (*see* Ind. Pls.' Opp'n at 9-10), as a matter of law the "no surcharge" rules are not anticompetitive and thus could not operate with the other rules to be anticompetitive. Nor could any anticompetitive operation of Visa's "no surcharge" rule be found based on *Visa v. First Data*, as plaintiffs suggest. *See* Ind. Pls.' Opp'n at 8-9. That decision did not even address Visa's "no surcharge" rule, much less whether it is interrelated with Visa's other rules challenged in this case, and instead addressed whether First Data had standing to sue. *See Visa U.S.A.*, 2006 WL 1310448 at *2-4.

In sum, the individual plaintiffs identify no authority for finding "no surcharge" rules to be unlawful. Nor do plaintiffs offer any basis for distinguishing decisions that uniformly hold "no surcharge" rules are lawful because they do not unreasonably restrain trade or result in an antitrust injury. Summary judgment should therefore be granted dismissing plaintiffs' claims to the extent that they are based on the Visa and MasterCard "no surcharge" rules.

**2.  Plaintiffs Cannot Overcome Defendants' Showing That No Antitrust Injury Could Flow From "No Surcharge" Rules In Ten States That Statutorily Prohibit Surcharging**

Defendants' opening memorandum also demonstrated that the individual plaintiffs suffered no antitrust injury from the Visa or MasterCard "no surcharge" rules in the ten states that statutorily prohibit merchants from surcharging consumers who pay with credit cards, since in those states plaintiffs' alleged injuries flow from the operation of the statutes rather than from

the "no surcharge" rules.  *See* Defs.' Ind. Compls. Mem. at 11-13.  In response, the individual

plaintiffs offer two arguments, neither of which has any merit.  *See* Ind. Pls.' Opp'n at 19-25.

**a.     The Ten State Statutes Do Not Permit<br>Surcharging One Credit Card In Lieu Of Another**

The individual plaintiffs first argue that nine of the ten state statutes "prohibit surcharging

of credit cards 'in lieu of payment by cash, check or similar means,'" and therefore "do not

prohibit surcharging credit cards in lieu of payment by another credit card."  Ind. Pls.' Opp'n at

19-20.  But on its face, that statutory language protects consumers from surcharging when they

use a credit card to pay in lieu of another form of payment.  Nothing in that statutory language

suggests that the statutory protection should be denied to consumers who might otherwise have

elected to pay with another credit card.

Moreover, the statutory context supports that meaning.  For example, several of the state

statutes define a "surcharge" as "any additional amount imposed" at the time of sale by a

merchant "for the privilege using a credit . . . card."  Colo. Rev. Stat. § 5-2-212(1) (2010); Fla.

Stat. § 501.0117(1) (2010); Kan. Stat. Ann. § 16a-2-403 (2010); *see also* Mass. Gen. Laws ch.

140D, § 1 (West 2010); Me. Rev. Stat. tit. 9-A, § 8-103(DD) (2009).  That definition of the

prohibited "surcharge" encompasses *all* payments with a credit card, and thus includes a credit

card offered in lieu of another credit card, contrary to what the individual plaintiffs claim.

Similarly, several of the state statutes symmetrically provide that a credit card issuer

"may not . . . prohibit any such seller from offering a discount to a cardholder to induce the

cardholder to pay cash, check or similar means rather than use a credit card."  Mass. Gen. Laws

ch. 140D, § 28A(a)(1) (West 2010); Me. Rev. Stat. tit. 9-A, §8-303(1) (2009); *see also* Fla. Stat.

§ 501.0117(1) (2010) (allowing discounts for "inducing payment by cash, check, or other means

not involving use of a credit card"); Okla. Stat. tit. 14A, § 2-211A (2010) (allowing discounts for

- 10 -

"inducing payment by cash, check, or similar means rather than by use of . . . credit card").  If, as the individual plaintiffs claim, surcharging a proffered credit card in lieu of another credit card were permitted, one would expect as a matter of symmetry that the statutes also would have required that discounting be permitted for the "other" credit card that would have been proffered. But the statutes do not require that discounting be permitted for any credit card payments.

Statutory language and legislative history also confirm that the state statutes are intended to prohibit surcharging of all credit card payments.  The language of those statutes is modeled on a former federal statute that, before it lapsed without further congressional action in 1984, likewise prohibited surcharging a consumer "who elects to use a credit card in lieu of payment by cash, check, or similar means."  Act of Feb. 27, 1976, Pub. L. No. 94-222, 90 Stat. 197 (formerly 15 U.S.C. § 1666f(a)(2)).  A Senate report on that statute states that "prohibiting surcharges allows the competitive free market to operate," and explains that the statute "assure[s] that consumers will be seeing at least the highest possible price they will have to pay when they see a tagged or posted price," so that "consumers cannot be lured into an establishment on the basis of the 'low, rock-bottom price' only to find at the cash register that the price will be higher if a credit card is used."  S. Rep. 97-23, at 4 (1981).  The individual plaintiffs' interpretation that surcharging is permitted on a credit card is inconsistent with that statutory purpose, since that interpretation would allow a consumer to be lured into a merchant's store on the basis of a low advertised price, only to find at the cash register that her price is higher because the credit card that she offers for payment in lieu of another will be surcharged.

Legislative history of the state statutes is to the same effect.  For example, in New York, the sponsor's memorandum stated that the legislation was intended to prohibit higher prices on credit card payments:

> The expiration of a Federal ban on surcharges on credit card purchases places credit card users at an unfair disadvantage.  While merchants are permitted to offer cash discounts, they would attempt to offset the 3% fee charged (to them) by banks or card corporations for credit services by increasing the price of a good or service purchased on a credit card.
>
> In effect, two price scales would exist for the merchant who would advertise a certain price and, at the time of the sale, raise or lower the price according to the method of payment.  Consequently, the consumer would be subject to dubious marketing practices and variable purchase prices.

NYLS' Governor's Bill Jacket to ch. 160, S. 8367, Assemb. 10189, at 5 (NY 1984).  The sponsor's memorandum thus described the legislation as an act "prohibiting the imposition of a surcharge on persons purchasing goods or services using a credit card," and declared that the act "would enjoin any merchant from levying a surcharge on sales or services charged to a credit card" — regardless of whether the credit card was offered in lieu of another credit card.  *Id.*

Legislative history in the other states similarly shows that the statutes were meant to prohibit surcharging of all credit card payments.  *See*, *e.g.*, Cal. Civ. Code § 1748.1(e) (West 2010) ("[i]t is the intent of the Legislature to promote the effective operation of the free market and protect consumers from deceptive price increases for goods and services by prohibiting credit card surcharges . . ."); Fla. S.B. 509 Senate Staff Analysis (Apr. 17, 1987) at 2 (Florida legislation "would benefit a credit card customer because the price of the purchase . . . could not be greater solely for using a credit card for payment," and "[t]he 'regular' or advertised price would be the amount in which persons electing to use credit cards would pay"); Fla. H.B. 448 House Comm. on Commerce Final Staff Analysis (June 18, 1987) at 2 (same).

Finally, the individual plaintiffs' proposed interpretation of the state statutes — that a merchant could surcharge a consumer who would have paid with another credit card in lieu of the one offered — makes no practical sense.  When a cashier rings up a sale and a consumer hands over a credit card for payment, how is the cashier supposed to know what form of payment

the consumer would have offered "in lieu of" that credit card?  Unless the cashier interrogates each consumer to establish that she would have used another credit card, imposing the surcharge would violate the law.  And what if the consumer refuses to speculate about what other means of payment she might have offered, or says she does not know?  There is no reason to think that state legislatures silently intended to force cashiers to make and resolve such inquiries to impose a surcharge, rather than intending that merchants not surcharge all credit card payments.[4]

As support for their interpretation, the individual plaintiffs cite state cases saying that "a court is not supposed to add words" to a statute.  Ind. Pls.' Opp'n at 20 n.19.  But because the statutes here do not expressly say that one credit card can be surcharged in lieu of another, words would need to be added to support plaintiffs' interpretation.  Plaintiffs also point to evidence that Visa's and MasterCard's respective network rules allow "convenience fees" that plaintiffs assert are "fundamentally and economically the same" as surcharging.  *Id.* at 20-21.  Yet such evidence, even if credited, could not establish what state legislatures intended in passing state "no surcharge" statutes.  Moreover, several of the state statutes do distinguish convenience fees from surcharges and expressly allow convenience fees in certain circumstances.  *See*, *e.g.*, Colo. Rev. Stat. § 24-19.5-101 & § 24-19.5-103 (2010) ("[a] state governmental entity may impose a convenience fee on persons who use alternative forms of payment" that are defined to include "credit [and] charge . . . cards"); Fla. Stat. § 501.0117(1) (2010) (defining circumstances in which "[a] convenience fee . . . is not considered to be a surcharge and is exempt" from the

---

[4]  Indeed, merchants have acknowledged that the state statutes apply to all credit card payments.  For example, in litigation challenging American Express's "no surcharge" rules, the merchant class plaintiffs allege that they should be permitted to steer consumers away from using American Express cards by imposing a surcharge "where the merchant is located in one of the 40 states and the District of Columbia where such surcharges are legal."  *In re Am. Express Anti-Steering Rules Antitrust Litig.*, MDL No. 2221 (NGG) (RER), DE #119, Consolidated Class Action Complaint ¶ 27 (Mar. 23, 2011).

surcharging ban); Okla. Stat. tit. 17, § 39.2 (2010) (defining when the state corporation commission may add a charge "as a convenience fee for the acceptance of the credit . . . card").[5]

Finally, the individual plaintiffs suggest that because they proffer "a genuine dispute about the meaning of the ten state no-surcharge statutes . . . Defendants' summary judgment motion should be denied."  Ind. Pls.' Opp'n at 22.  But plaintiffs proffer no genuine dispute about the meaning of those statutes and, in any event, questions "of statutory construction and legislative history present legal issues that may be resolved by summary judgment."  *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993).

### b.  Plaintiffs Identify No Authority For Finding An Antitrust Injury Based On Rules That Prohibit Conduct Illegal Under State Law

The individual plaintiffs further argue that even if they cannot surcharge credit card payments in the ten states, those states' statutes "do not protect Defendants from liability" because plaintiffs "could still . . . drive the interchange rates to the competitive level 'but for' Defendants' *other Merchant Restraints*" and "could still threaten to and in fact surcharge in those of the *other 40 states* in which they do business."  Ind. Pls.' Opp'n at 23-24 (emphasis added). But regardless of what injury plaintiffs may claim from other Visa or MasterCard rules, or in the other forty states, plaintiffs still could not prove an antitrust injury from the "no surcharge" rules in the ten states that statutorily prohibit surcharging.

The individual plaintiffs try to suggest that in the ten states, the Visa and MasterCard "no surcharge" rules were still "a 'material cause' of the claimed injury . . . or a 'substantial

---

[5]  The individual plaintiffs also assert in a footnote that "if the ten statutes really did prohibit surcharging, then they would be preempted by the Sherman Act."  Ind. Pls.' Opp'n at 22 n.22.  Yet plaintiffs identify no authority showing how a state statute adopting a lapsed federal "no surcharge" law could possibly be preempted as conflicting with federal law.  *See id.*  To the contrary, because federal courts uniformly have held that network "no surcharge" rules do not unreasonably restrain trade or result in an antitrust injury, state "no surcharge" statutes could not conflict with the Sherman Act.

contributing factor'" because plaintiffs' injuries were "caused by 'both' Defendants' No-Surcharge Rule and the state statutes."  Ind. Pls.' Opp'n at 25.  But as defendants demonstrated, federal courts have held that a defendant's conduct is not such a "cause" or "contributing factor" when the claimed injury would result from federal or state law in any event.  *See* Defs.' Ind. Compls. Mem. at 11-12.  Plaintiffs cannot dispute those precedents, and claim to distinguish them only on the irrelevant ground that they do not address whether one "statute preempted another."  Ind. Pls.' Opp'n at 23 n.22.

Moreover, the individual plaintiffs identify no decisions finding an antitrust injury where a defendant prevented the plaintiff from engaging in conduct already prohibited by law.  Two of the three cases on which plaintiffs rely do not address that issue.[6]  In the third case, this Court suggested that plaintiffs could assert an antitrust injury from MasterCard's IPO even if Sherman Act § 1 contributed to that injury by not barring MasterCard's post-IPO operations as a single entity.  *See* Ind. Pls.' Opp'n at 25, citing *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, No. 05-MD-1720 (JG) (JO), 2008 WL 5082872, at *13-14 (E.D.N.Y. Nov. 25, 2008).  But this Court specifically distinguished MasterCard's IPO from a situation where there was no "antitrust injury" because "had [the defendant] simply remained passive, [plaintiff]'s injury would still occur" due to the effect of a state regulatory scheme.  *Id.* at *14.  That is the situation here, where the injury that plaintiffs claim from not being able to surcharge still would have occurred in the ten states that prohibit surcharging even if Visa and MasterCard had "remained passive" and had not applied their "no surcharge" rules in those states.

---

[6]  *See* Ind. Pls.' Opp'n at 25, citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 113 (1969) (addressing whether plaintiff "had failed to prove any injury to its export business . . . which resulted from pool activities" of defendants); and *Fishman v. Estate of Wirtz*, No. 74 C 2814, 1981 WL 2153, at *2-3 (N.D. Ill. Oct. 28, 1981) (addressing whether defendants were liable despite arguments that they "did not refuse to deal with plaintiffs regarding a lease"), *aff'd*, 807 F.2d 520, 533 (7th Cir. 1986).

In short, plaintiffs proffer no law or facts that could establish that they suffered an antitrust injury from an inability to surcharge in the ten states in which surcharging has been illegal.  Summary judgment therefore should be granted dismissing plaintiffs' claims to the extent that they are based on the application of the "no surcharge" rules in those ten states.

### B. Plaintiffs Proffer No Legal Or Factual Basis For Their Asserted Single-Brand Markets For Visa Or MasterCard Credit Card Network Services

Defendants also demonstrated that summary judgment should be granted dismissing the individual plaintiffs' claims to the extent that they are based on asserted single-brand markets for Visa or MasterCard credit card network services.  *See* Defs.' Ind. Compls. Mem. at 14-20.  In response, the individual plaintiffs do not dispute any of the dispositive law or facts.  Specifically, plaintiffs do not dispute that proof of a single-brand market for Visa or MasterCard credit card network services requires evidence that those services are each unique and not interchangeable for the same purpose with each other or with other brands or types of payment.  *See* Defs.' Ind. Compls. Mem. at 14-15; Ind. Pls.' Opp'n at 41-53.  Plaintiffs likewise do not dispute the evidence obtained in discovery that shows Visa and MasterCard credit card network services are interchangeable with each other and other brands and types of payment.  *See* Defs.' Ind. Compls. Mem. at 15-18; Defs.' Statement of Material Facts ("Defs.' SMF") ¶¶ 97-109; Ind. Pls.' Opp'n at 41-53; Ind. Pls.' Counter Stmt. ¶¶ 97-109.  Indeed, plaintiffs maintain that "merchants perceive no substantial difference among credit card[s], charge cards and debit cards (except for their prices)," and that "PIN debit cards . . . were functionally interchangeable with Defendants' cards," including their credit cards.  Ind. Pls.' Opp'n at 38, 51.

The individual plaintiffs nonetheless argue that single-brand markets exist because the challenged Visa and MasterCard rules "significantly reduce the cross-elasticity of demand between each Defendant's network services to merchants and alternative payment means," and

- 16 -

limit the ability "to switch usage to the lower-cost service."  Ind. Pls.' Opp'n at 42-43; *see also id.* at 53.  As support, plaintiffs point to evidence concerning what the supposed effects would be if surcharging were permitted.  *See id.* at 42-43, citing Ind. Pls.' Counter Stmt. ¶¶ 84a(31)-84a(37), 84a(40)-84a(48), 84a(50)-84a(56), 84a(66)-84a(79), 84a(81)-84a(82), 84a(92), 84a(94); Stiglitz Initial Report ¶ 4; and Vellturo Initial Report ¶¶ 144, 152.  But any such evidence that cross-elasticity of demand might be greater without the "no surcharge" rules cannot prove whether in the world with the "no surcharge" rules, the cross-elasticity of demand has been such that Visa and MasterCard credit card network services are unique rather than interchangeable with each other and other brands and types of payment.

Moreover, the challenged Visa and MasterCard rules could not establish single-brand markets regardless of how they might influence demand elasticity, since "no court has defined a relevant product market with reference to the particular contractual restraints on the plaintiff." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir. 1997); *see also*, *e.g.*, *Hack v. President and Fellows of Yale College*, 237 F.3d 81, 85 (2d Cir. 2000); Defs.' Ind. Compls. Mem. at 17-18.  Plaintiffs claim that the cases so holding are distinguishable because "[t]he courts concluded that there was sufficient competition, *before* plaintiff accepted the contract, that plaintiffs could have avoided the complained-of contract terms by simply buying an alternative service instead."  Ind. Pls.' Opp'n at 49; *see also id.* at 50-53.  Yet there is no factual dispute that interchangeable alternatives to Visa or MasterCard credit card network services were available to plaintiffs before they contracted to accept such services.  *See* Defs.' SMF ¶¶ 97-111; Ind. Pls.' Counter Stmt. ¶¶ 97-111.  Plaintiffs' suggestion that they were unwilling to forego accepting Visa and MasterCard services, because "non-acceptance would cost [them] all of the profits on the sale" to a consumer (Ind. Pls.' Opp'n at 50), also could not prove that those services are unique.  As this Court previously recognized, "unwillingness to

substitute one product for another does not make the products different or preclude them from being interchangeable." *In re Payment Card*, 562 F. Supp. 2d 392, 403 (E.D.N.Y. 2008).

The individual plaintiffs similarly argue that "a buyer's failure to shift away from a product or service to another product in response to a small but significant, non-transitory increase in price (generally 5% - 10%) establishes that the products are not in the same relevant market." Ind. Pls.' Opp'n at 43. But plaintiffs do not dispute their economist's calculations showing that from 2004 to 2008, when Visa and MasterCard allegedly increased interchange rates, shares of total credit and charge card purchase volume did shift away from Visa and MasterCard and to American Express and Discover. *See* Defs.' Ind. Compl. Mem. at 22-23; Defs.' SMF ¶¶ 113-118; Ind. Pls.' Counter Stmt. ¶¶ 113-118. Plaintiffs instead claim that no merchants *stopped* accepting Visa or MasterCard "[d]espite an increase of Visa and MasterCard interchange rates of ▮▮▮▮▮▮▮▮ respectively." Ind. Pls.' Opp'n at 43. Yet because plaintiffs claim that both Visa and MasterCard raised interchange rates by similar amounts, that could not establish that either Visa or MasterCard credit card network services are in a separate market from the other. To the contrary, such similar rate movements would suggest that Visa and MasterCard credit card network services compete with one another in the same market. *See* Defs.' Ind. Compls. Mem. at 17.

The individual plaintiffs further argue that "functionally interchangeable products are not in the same relevant market if they do not constrain each other's prices . . . ." Ind. Pls.' Opp'n at 45. Plaintiffs then proffer evidence that prices for *PIN debit* network services were lower than — and so supposedly did not constrain — the price of Visa or MasterCard credit card network services. *See id.* at 47, citing Ind. Pls.' Counter Stmt. ¶¶ 111(6)-111(10); Vellturo Initial Report ¶¶ 152, 164; and Stiglitz Initial Report ¶¶ 37, 66, 68. Yet even if credited, such evidence could not show such a lack of price constraint from other brands of credit card network services like

American Express and Discover, or other types of payment like checks or cash, and thus could not prove separate single-brand markets for Visa and MasterCard credit card network services.[7]

Finally, the individual plaintiffs argue that average Visa and MasterCard credit card interchange rates moving in a similar fashion is not "definitive" evidence that they are in the same market, because there could be other explanations for those interchange rate movements. *See* Ind. Pls.' Opp'n at 47-49.  But regardless of whether it is "definitive," it suggests that Visa and MasterCard compete with one another in the same market; indeed, the Areeda treatise that plaintiffs cite emphasizes that "[w]hen the prices of two products . . . change in the same direction and by similar amounts over a substantial period of time, they are presumptively in the same market."  IIB Phillip E. Areeda et al., *Antitrust Law* ¶ 534c (3d ed. 2007).  To survive summary judgment, therefore, plaintiffs have the burden of proffering evidence that could prove Visa and MasterCard credit card network services do not compete with one another.

The individual plaintiffs proffer no such evidence.  Instead, they argue that Visa's and MasterCard's interchange rates have varied for particular cards and for particular merchants.  *See* Ind. Pls.' Opp'n at 47-48, citing Ind. Pls.' Counter Stmt. ¶ 111(127).  The evidence that plaintiffs offer as support regarding particular cards supposedly shows that "the interchange rate for a *traditional* Visa credit card for a merchant in the 'lodging' category in April 2009 was ▮▮ basis points, while the interchange rate for a *premium* MasterCard credit card for that merchant category was as high as ▮▮ basis points."  Ind. Pls.' Counter Stmt. ¶ 111(127) (emphasis added). Even if true, a differential for two different cards for one type of merchant during one month in 2009 is not significantly probative that Visa and MasterCard credit card network services have

---

[7]  The individual plaintiffs' claimed evidence that MasterCard in the United Kingdom increased interchange rates unconstrained by Visa's interchange rates (*see* Ind. Pls.' Opp'n at 44-45), is irrelevant to whether that occurred in the geographic market of the United States, in which plaintiffs claim trade was restrained in this case.  *See*, *e.g.*, Hy-Vee Compl. ¶ 31; Kroger Compls. ¶ 28.

been in separate single-brand product markets since 2004. Plaintiffs' other claimed evidence, that Visa's and MasterCard's average effective rates "to the Individual Plaintiffs diverged" (Ind. Pls. Opp'n at 48), likewise could prove nothing about whether the credit card services that Visa and MasterCard provide to many millions of merchants have been in separate markets.

In sum, the individual plaintiffs cannot dispute the substantial evidence from discovery that shows Visa and MasterCard credit card network services are interchangeable with each other and other brands and types of payment, and plaintiffs proffer no contrary evidence that could prove separate single-brand markets for such services. Summary judgment should therefore be granted dismissing the individual plaintiffs' claims to the extent that they are based on asserted single-brand markets for Visa or MasterCard credit card network services.

### C. Plaintiffs Proffer No Legal Or Factual Basis For The Monopoly Power Element Of Their Sherman Act § 2 Claims

#### 1. Plaintiffs' Claims Based On An Alleged Market For All Credit And Charge Card Network Services Should Be Dismissed As Abandoned

Defendants also demonstrated that summary judgment is warranted on the individual plaintiffs' Sherman Act § 2 claims to the extent that they are alternatively based on an asserted market for all credit and charge card network services, rather than single-brand Visa and MasterCard markets for such services. In such an alternative market, defendants demonstrated that plaintiffs cannot prove that either Visa or MasterCard has possessed the monopoly power, or dangerous probability of monopoly power, needed to prove a violation of Sherman Act § 2. *See* Defs.' Ind. Compls. Mem. at 20-27.

In response, the individual plaintiffs abandon their Complaint allegations of an alternative market for all credit and charge card services. *See*, *e.g.*, Hy-Vee Compl. ¶¶ 26A, 32; Kroger Compls. ¶¶ 23A, 29. Plaintiffs now assert that "each Defendant has monopoly power in both of

the relevant markets defined by the individual plaintiffs' expert economist, Dr. Vellturo," which are claimed to be the single-brand markets and, alternatively, a "market consisting of the sale of credit card, charge card, *and debit card network services* to merchants."  Ind. Pls.' Opp'n at 26, 37 (emphasis added); *see also id.* at 38 ("a broader market definition . . . should include debit cards as well as credit cards and charge cards"); Ind. Pls.' Counter Stmt. ¶ 111(1).

The individual plaintiffs proffer no explanation for how they now could assert such a market for all credit, charge, and debit card network services, contrary to the facts that they previously asserted in support of separate markets for credit and debit card network services as class members in the *Visa Check* case.  *See* Defs.' SMF Ex. 243 (*Visa Check* Second Am. Cons. Compl.) at ¶¶ 127-129, 142-143.  Indeed, in *Visa Check*, the plaintiffs convinced this Court to find that the facts showed credit and debit card network services to be in separate markets as a matter of law.  *In re Visa Check*, 2003 WL 1712568, at *2-3.

In any event, because the individual plaintiffs have abandoned their alleged market for all credit and charge card network services, summary judgment should be granted dismissing their Sherman Act § 2 claims to the extent that they are based on such a market.  Courts in this district repeatedly have held that "'[f]ederal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.'"  *Hyek v. Field Support Servs., Inc.*, 702 F. Supp. 2d 84, 102 (E.D.N.Y. 2010) (Hurley, J.) (collecting cases and quoting *Taylor v. City of New York,* 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003)).

### 2. Plaintiffs Identify No Direct Evidence Of Monopoly Power Even If The Asserted Market Also Includes Debit Card Network Services

In addition, the individual plaintiffs identify no direct evidence that Visa or MasterCard has monopoly power, or a dangerous probability of achieving such power, even in the new

claimed market for all credit, charge, and debit card network services.  As defendants pointed

out, and plaintiffs do not dispute, plaintiffs' economists maintain that Visa and MasterCard each

repeatedly took steps not to be competitively disadvantaged by the other's changes in default

interchange rates.  *See* Defs.' Ind. Compls. Mem. at 21-22; Defs.' SMF ¶¶ 110-111; Ind. Pls.'

Counter Stmt. ¶¶ 110-111.  That includes the default interchange rates for the debit card network

services that plaintiffs now assert are included in the claimed market.  *See id.* and cited exhibits.

That shows that Visa and MasterCard each lacked the monopoly power to raise its credit or debit

default interchange rates insulated from competition with the other, regardless of plaintiffs'

claim that despite "ever-increasing fees, neither Visa nor MasterCard experienced any significant

loss of merchant acceptance."  Ind. Pls.' Opp'n at 33.

Defendants also demonstrated that neither Visa nor MasterCard has possessed the power

to restrict output to raise prices, because the calculations of the individual plaintiffs' economist,

Dr. Vellturo, show that output in credit and charge card purchase volume has increased.  *See*

Defs.' Ind. Compls. Mem. at 22-23; Defs.' SMF ¶¶ 112-118.  Plaintiffs do not dispute those

facts.  *See* Ind. Pls.' Counter Stmt. ¶¶ 112-118.  Instead, plaintiffs say that in their new claimed

market, "the proper measure would be the output of all payment mechanisms that are affected by

the Merchant Restraints, certainly including at least all forms of electronic payment."  Ind. Pls.'

Opp'n at 36.  But adding Dr. Vellturo's calculation of debit card purchase volume to his

calculation of credit and charge card purchase volume still shows that the total output for all

forms of electronic payment increased — and by more than 60% — from $2,160.30 billion in

2004 to $3,358.54 billion in 2008.  *See* Defs.' SMF Ex. 151 (Vellturo Rep. Ex. 11).

Undisputed evidence thus establishes that Visa and MasterCard each lack monopoly

power to control prices, or to restrict output to control prices, even if debit card services are

included with credit and charge card services in the individual plaintiffs' new claimed market.

Moreover, none of the evidence that plaintiffs proffer could constitute direct evidence that Visa or MasterCard has monopoly power in the new claimed market.

First, plaintiffs assert that interchange rates for Visa and MasterCard credit card network services were above supposedly "competitive" rates for PIN debit card network services. *See* Ind. Pls. Opp'n at 27-28. However, plaintiffs acknowledge that Visa's and MasterCard's credit card interchange rates *both similarly* ███████████████████████ ██████. *Id.* at 28; *see also id.* at 44. Such evidence of similar pricing could not show that either Visa or MasterCard had the power to control its prices insulated from competition with the other. *See* Defs.' Ind. Compls. Mem. at 21-22.

Second, the individual plaintiffs point to evidence that supposedly shows Visa and MasterCard credit card interchange rates yielded high profits — specifically, that those interchange rates were unrelated to costs, increased despite reduced costs, and permitted inefficient practices. *See* Ind. Pls.' Opp'n at 28-31. But as defendants demonstrated, courts have held that evidence of purportedly high profits does not constitute direct evidence of monopoly power. *See* Defs.' Ind. Compls. Mem. at 23-24. Plaintiffs do not dispute any of that legal authority. *See* Ind. Pls.' Opp'n at 28-31. Plaintiffs try to point to the Areeda treatise for support (*see id.* at 29), but that treatise makes clear that "excess returns do not necessarily show market power," because "[e]xcess returns can be earned in a perfectly competitive market." IIB Philip E. Areeda et al., *Antitrust Law* ¶¶ 516a-b (3d ed. 2007).

Third, plaintiffs point to asserted evidence of "price discrimination" — *i.e.*, that "*both* Visa and MasterCard have set 'pricing' tiers for different groups of merchants and have established different rates for general and premium cards." Ind. Pls.' Opp'n at 32 (emphasis added). But again, any such evidence that Visa and MasterCard both engaged in price discrimination could not prove that either of them has a unilateral power to control prices

- 23 -

insulated from competition with the other.  *See* Defs.' Ind. Compls. Mem. at 23.  Moreover, plaintiffs proffer no explanation of how any such price discrimination could possibly show monopoly power when plaintiffs also "do not dispute that American Express has engaged in price discrimination" and "do not dispute that Discover has engaged in price discrimination." Ind. Pls.' Counter Stmt. ¶¶ 120-121.  Plaintiffs suggest that should not matter because the court in their separate action against American Express ruled that their allegations "can support a Section 2 claim" (Ind. Pls.' Opp'n at 37), but that ruling did not even address monopoly power, only a motion "for judgment on the pleadings asserting that Plaintiffs' claims are time-barred." *Rite Aid Corp. v. Am. Express Travel Related Servs. Co.*, No. 08-CV-02317 (NGG) (RER), DE #47, Mem. & Order at 1 (E.D.N.Y. Mar. 3, 2010) (Garaufis, J.).

Finally, the individual plaintiffs claim two cases show monopoly power from Visa's and MasterCard's "forcing nearly all merchants that accept their cards to comply" with their respective network rules.  Ind. Pls.' Opp'n at 33.  Yet those cases addressed whether a defendant had "appreciable economic power" to tie the sale of two separate products in violation of Sherman Act § 1, not whether network rules could establish monopoly power under Sherman Act § 2.  *See id.*, citing *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 464 (1992); and *In re Visa Check/MasterMoney Antitrust Litig.*, No. 96-CV-5238 (JG), 2003 WL 1712568, at *4 (E.D.N.Y. Apr. 1, 2003) (Gleeson, J.).  Plaintiffs likewise gain no support from two cases that, as defendants previously noted, consider only whether Visa or MasterCard had market power under Sherman Act § 1 for claims based on different network rules, not whether Visa or MasterCard had the monopoly power necessary under Sherman Act § 2 to prove claims based on the network rules at issue in this case.  *See* Ind. Pls.' Opp'n at 29, 33, 44; *In re Visa Check*, 2003 WL 1712568, at *3; *United States v. Visa U.S.A. Inc.*, 344 F.3d 229, 239-40 (2d Cir. 2003); Defs.' Ind. Compls. Mem. at 20 n.6.

**3.     Plaintiffs Identify No Indirect Evidence Of Monopoly Power Even If The Asserted Market Also Includes Debit Card Network Services**

The individual plaintiffs likewise identify no indirect evidence that Visa or MasterCard has possessed monopoly power, or a dangerous probability of achieving monopoly power, based on factors such as market share, the strength of competition, or market entry barriers.  *See* Ind. Pls.' Opp'n at 37-41.  Plaintiffs do not dispute the Second Circuit's conclusion that "a monopolization claim may be withdrawn from a jury" where "the defendant's share is less than 50%, or even somewhat above that figure, and the record contains no significant evidence concerning the market structure to show that the defendant's share of that market gives it monopoly power."  *Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc.*, 651 F.2d 122, 129 (2d Cir. 1981).  Plaintiffs also concede that Dr. Vellturo's calculations show that Visa's and MasterCard's share of credit and charge card purchase volume has always been less than 50%.  *See* Defs.' SMF ¶¶ 122-128; Ind. Pls.' Counter Stmt. ¶¶ 122-128, 128(4) & Ex. 2.  Moreover, even including debit with credit and charge card network services in the alternative market that plaintiffs now claim, Dr. Vellturo's calculations show that from 2004 to 2008, Visa's share of the total purchase volume was approximately 48-50%, and MasterCard's share was approximately 24%.  *See* Defs.' Reply SMF ¶ 128(3); Defs.' SMF Ex. 151 (Vellturo Rep. Ex. 11).

The individual plaintiffs claim that Dr. Vellturo's calculations show that "Visa's share is consistently at or above 50%, and MasterCard's at or above 25%."  Ind. Pls.' Opp'n at 39.  But the calculation from Dr. Vellturo on which plaintiffs rely shows Visa's market share as ranging from 49.8% to 51.7%, and falling from 51.7% in 2006 to 50.7% in 2008.  *See* Ind. Pls.' Counter Stmt. Ex. 2 (Vellturo Rep. Ex. 15).  Moreover, Dr. Vellturo arrives at those market shares by calculating a total dollar sales volume that includes cash advances, on which plaintiffs do not claim any restraint of trade.  *See* Ind. Pls.' Counter Stmt. Ex. 2 (Vellturo Rep. at Ex. 11 n.2 &

Ex. 15).  In any event, even accepting any of those market shares, MasterCard's share is well

below 50%, and Visa's share is less than 50% or within the "somewhat above" 50% range that

the Second Circuit concluded is legally inadequate to show monopoly power, without additional

"significant evidence concerning the market structure to show that the defendant's share of that

market gives it monopoly power."  *Broadway Delivery*, 651 F.2d at 129.

       As defendants demonstrated, such monopoly power based on market structure cannot be

shown when existing competitors possess the capacity to expand output.  *See* Defs.' Ind. Compls.

Mem. at 26-27.  Here, Dr. Vellturo's calculations show that regardless of whether the claimed

market includes debit as well as credit and charge card network services, and does or does not

include cash advances, American Express and Discover have had the capacity to expand their

output.  American Express's output of credit, charge, and debit card purchases from 2004 to

2008 increased from $303.73 to $465.23 billion (or from $304.80 to $471.10 billion in total

dollars including cash advances) — an expansion of approximately 53%.  *See* Defs.' SMF ¶ 115

& Ex. 151.  Discover's output increased from $73.60 to $106.13 billion (or from $93.67 to

$120.14 in total dollars including cash advances) — an expansion of approximately 44%.  *See*

Defs.' SMF ¶ 116 & Ex. 151.  Furthermore, Visa and MasterCard each have had the capacity to

expand its output to compete with the other.  Dr. Vellturo's calculations show that from 2004 to

2008, MasterCard's output of credit, charge, and debit card purchases increased from $526.50 to

$856.01 billion (or from $695.90 to $1,053.90 billion in total dollars including cash advances) —

an expansion of approximately 63%.  *See* Defs.' Reply SMF ¶ 128(2); Defs.' SMF Ex. 151

(Vellturo Rep. Ex. 11).  While Dr. Vellturo's calculations do not include data for Visa's Interlink

PIN debit purchases excluding cash advances for 2007 and 2008, his calculations nevertheless

show that from 2004 to 2006 Visa's output of credit, charge, and debit card purchases increased

from $1,045.35 to $1,346.61 billion (or from $1,338.14 billion in 2004 to $2,042.53 billion in 2008 in total dollars including cash advances) — an increase of approximately 32%.  *See id.*

Given that strong ability of existing competitors to expand their output, the individual plaintiffs' asserted evidence and contentions about high entry barriers for new competitors cannot establish that either Visa or MasterCard has monopoly power.  *See* Ind. Pls.' Opp'n at 39-41.  As defendants demonstrated, and plaintiffs do not dispute, courts have rejected claims of monopoly power based on entry barriers as a matter of law where existing competitors were able to increase output.  *See id.*; Defs.' Ind. Compl. Mem. at 27.

In sum, the individual plaintiffs proffer no direct or indirect evidence that could establish that Visa or MasterCard possesses monopoly power in plaintiffs' new claimed market for all credit, charge, and debit card networks services.  Plaintiffs' new purported claims under Sherman Act § 2 based on such an alternative market should therefore be dismissed.

### D.   Plaintiffs' Claims Of *Per Se* Antitrust Violations Should Be Dismissed As Lacking Any Legal Basis

#### 1.   Plaintiffs Concede That Visa And MasterCard Default Interchange Is Not Unlawful *Per Se*

Defendants also demonstrated that summary judgment should be granted dismissing the individual plaintiffs' claims that the setting of default interchange is unlawful *per se*.  *See* Defs.' Ind. Compls. Mem. at 28-29.  There is no considerable judicial experience in finding such conduct manifestly competitive, and lacking in any redeeming or procompetitive virtues, which is necessary to establish *per se* illegality.  *See id.*  To the contrary, courts repeatedly have held that a network's setting of default interchange must be analyzed under the rule of reason.  *See id.*

In response, the individual plaintiffs abandon their claims that the setting of default interchange is unlawful *per se*.  *See* Ind. Pls.' Opp'n at 54-61.  Plaintiffs now assert that it is not the setting of default interchange, but rather the so-called "Merchant Restraints" that "are the

foundation of the Individual Plaintiffs' *per se* legal theory."  Ind. Pls.' Opp'n at 55; *see also id.* at 61 (the alleged agreements "to impose the Merchant Restraints on merchants . . . are *per se* unlawful").  The individual plaintiffs thus distinguish the cases showing that default interchange must be analyzed under the rule of reason as now inapposite under their new theory of *per se* liability.  *See* Ind. Pls.' Opp'n at 57-59.[8]

In these circumstances, summary judgment should be granted dismissing the individual plaintiffs' claims that the setting of default interchange is *per se* illegal.  As shown above, summary judgment is warranted when "a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way."  *Hyek*, 702 F. Supp. 2d at 102.

### 2.	Plaintiffs Identify No Legal Basis For Finding The Challenged Visa And MasterCard Rules Unlawful *Per Se*

In addition, summary judgment should be granted dismissing the individual plaintiffs' new claim that the so-called "Merchant Restraints" — *i.e.*, the challenged Visa and MasterCard rules — are unlawful *per se*.  Plaintiffs can provide no basis for such a claim for the reasons that defendants have explained in opposition to the individual plaintiffs' motion seeking summary judgment that those rules are *per se* unlawful.  *See* Defs.' Opp'n to Ind. Pls.' Mtn. at 4-23.

As defendants demonstrated, courts presumptively apply the rule of reason unless considerable judicial experience shows that the challenged practices "have manifestly anticompetitive effects," "lack . . . any redeeming virtue," and have "limited potential for

---

[8]  Despite the individual plaintiffs' protestations that defendants "misperceived" plaintiffs' *per se* legal theory (Ind. Pls.' Opp'n at 54), plaintiffs' Complaints nowhere allege *per se* liability based on the challenged Visa and MasterCard network rules.  The Complaints allege only that the "setting of Interchange Fees . . . is a *per se* violation," and allege that the challenged rules are violations "in unreasonable restraint of trade" under the rule of reason.  *See, e.g., Hy-Vee* Compl. ¶¶ 64, 75, 86, 95, 104, 110; Kroger Compls. ¶¶ 57, 67, 73.

procompetitive benefits." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) (internal quotations an citations omitted); *State Oil v. Khan*, 522 U.S. 3, 10 (1997); *see* Defs.' Opp'n to Ind. Pls.' Mtn. at 5-6 (discussing cases). Judicial experience does not show that network rules like those challenged in this case meet that standard; to the contrary, courts in numerous cases have concluded that network "no surcharge" rules and Visa and MasterCard "honor all cards" and other rules must be analyzed under the rule of reason, even when those rules were claimed to be the product of a horizontal conspiracy to fix prices. *See* Defs.' Opp'n to Ind. Pls.' Mtn. at 6-9, 20-21. Plaintiffs thus cannot show that *per se* treatment could be warranted here based on their arguments that courts in *other contexts* have found horizontal price-fixing to be "*per se* unlawful," that "[t]he cases cited by Defendants agree with" that, and that courts may lack experience with a particular "type of" horizontal price-fixing and still find it unlawful *per se*. Ind. Pls.' Opp'n at 56, 60-61.

Moreover, as defendants also demonstrated, the individual plaintiffs could not establish that the Visa and MasterCard rules challenged in this case have manifestly anticompetitive effects and lack any redeeming or procompetitive virtues in any event. Regardless of what plaintiffs claim about those rules (*see* Ind. Pls.' Opp'n at 55, 59-60), there is ample evidence that those rules have not reduced output or clearly restrained competition, and have provided substantial benefits to consumers, merchants, and competition. That evidence requires that those rules be analyzed under the rule of reason. *See* Defs.' Opp'n to Ind. Pls.' Mtn. at 10-19; Defs.' Counter-Stmt. In Opp'n to Ind. Pls.' Stmt. ¶¶ 111-175.

In short, as with the setting of default interchange, the individual plaintiffs can identify no basis for finding the challenged Visa or MasterCard rules to be unlawful *per se*. Summary judgment therefore should be granted dismissing plaintiffs' claims of *per se* liability insofar as they are based on those rules.

E.     **Plaintiffs Concede That Their Tying Claims Should Be Dismissed**

Finally, summary judgment should be granted dismissing the individual plaintiffs' "tying" claims as abandoned.  *See* Defs.' Ind. Compls. Mem. at 29-30.  Plaintiffs' opposition concedes that they "are not pursuing their tying claims, so the Court need not devote its time to them in its consideration of Defendants' motions."  Ind. Pls.' Opp'n at 2 n.2.

## Conclusion

For the foregoing reasons, defendants respectfully request that the Court enter an order granting summary judgment and dismissing the claims in the complaints of the individual plaintiffs.

Dated:  June 30, 2011.                    Respectfully submitted,

**ARNOLD & PORTER LLP**

By:  /s/ Robert C. Mason
Robert C. Mason
399 Park Avenue
New York, NY  10022-4690
Telephone:  (212) 715-1000
Facsimile:  (212) 715-1399
robert.mason@aporter.com

Robert J. Vizas
One Embarcadero Center, 22nd Floor
San Francisco, CA   94111-3711
Telephone:  (415) 356-3000
Facsimile:  (415) 356-3099
robert.vizas@aporter.com

Mark R. Merley
Matthew A. Eisenstein
555 12th Street, N.W.
Washington, DC   20004-1206
Telephone:  (202) 942-5000
Facsimile:  (202) 942-5999
mark.merley@aporter.com
matthew.eisenstein@aporter.com

*Attorneys for Defendants Visa U.S.A. Inc.*
*and Visa International Service Association*


**PAUL, WEISS, RIFKIND, WHARTON &**
**    GARRISON LLP**

By:  /s/ Gary R. Carney
Andrew C. Finch
Gary R. Carney
1285 Avenue of the Americas
New York, NY   10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
afinch@paulweiss.com
gcarney@paulweiss.com

Kenneth A. Gallo
Joseph J. Simons
2001 K Street, N.W.
Washington, DC   20006-1047
Telelphone: (202) 223-7300
Facsimile:  (202) 223-7420
kgallo@paulweiss.com
jsimons@paulweiss.com

**WILLKIE FARR & GALLAGHER LLP**

Keila D. Ravelo
Wesley R. Powell
Matthew Freimuth
787 Seventh Avenue
New York, NY   10019-6099
Telephone:  (212) 728-8000
Facsimile:   (212) 728-8111
kravelo@willkie.com
wpowell@willkie.com
mfreimuth@willkie.com

*Attorneys for Defendants MasterCard Incorporated
and MasterCard International Incorporated*