

Feb 11 2011
1:25PM

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION<br><br><br>This Document Relates To:  ALL ACTIONS | Case No. 1:05-md-1720-JG-JO<br><br>ORAL ARGUMENT REQUESTED |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THE MOTION
TO EXCLUDE CERTAIN OPINIONS OF CLASS PLAINTIFFS'
<u>ECONOMIC EXPERT DR. ALAN S. FRANKEL</u>**

**HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER
TO BE FILED UNDER SEAL**

## *Table of Contents*

Table of Authorities ...................................................................................................... ii

Preliminary Statement .................................................................................................. 1

Background .................................................................................................................... 1

Summary of Argument .................................................................................................. 3

Legal Standards ............................................................................................................ 5

Argument ...................................................................................................................... 9

I.      Dr. Frankel's Opinions That Plaintiffs Suffered Injury In Fact And Sustained
        Measurable Damages Are Unreliable, Irrelevant, And Should Be Excluded .................... 9

        A.      Dr. Frankel's "But For" Worlds Do Not Eliminate The Challenged
                Conduct, But Simply Challenge The Level Of Default Interchange Rates .......... 10

        B.      Dr. Frankel Provides No Economic Analysis Or Explanation As To How
                Or Why Default Interchange Fees Would Be Reduced In His "But For"
                Worlds ............................................................................................................ 15

II.     Dr. Frankel's Opinion That The Establishment Of Default Interchange Fees Has
        Had Anticompetitive Effects Is Unreliable, Irrelevant, And Should Be Excluded .......... 20

Conclusion .................................................................................................................... 25

i

**_Table of Authorities_**

**_Cases_**

*In re Aluminum Phosphide Antitrust Litig.*, 893 F. Supp. 1497 (D. Kan. 1995) ................... 15, 17

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256 (2d Cir. 2002) .................................... 6

*Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325 (7th Cir. 1986) .................... 12

*Brennan v. Concord EFS, Inc.*, 369 F. Supp. 2d 1127 (N.D. Cal. 2005) .............................. 11, 14

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993) ...................... 21

*Broadcast Music Inc. v. CBS, Inc.*, 441 U.S. 1 (1979) ............................................................... 21

*Chicago Prof'l Sports Ltd. P'ship v. National Basketball Ass'n*, 961 F.2d 667 (7th Cir. 1992) ....................................................................................................................................... 21

*Chicago Prof'l Sports Ltd. P'ship v. National Basketball Ass'n*, 95 F.3d 593 (7th Cir. 1996) ............................................................................................................................. 11, 12, 21

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 544 F.3d 1323 (Fed. Cir. 2008) .................. 20

*Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314 (S.D.N.Y. 2009) ....................................................................................................................... 17

*Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039 (8th Cir. 2000) ..................... 7, 8, 10, 15

*Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ................................. 1, 5, 7

*Donnelly v. Ford Motor Co.*, 80 F. Supp. 2d 45 (E.D.N.Y. 1999) ................................................ 7

*Eastern Auto Distribs., Inc. v. Peugeot Motors of Am., Inc.*, 795 F.2d 329 (4th Cir. 1986) ......... 15

*In re Fresh Del Monte Pineapples Antitrust Litig.*, No. 04-md-1628, 2009 WL 3241401 (S.D.N.Y. Sept. 30, 2009), *aff'd sub nom. American Banana Co. v. J. Bonafede Co.*, No. 09-4561-cv, 2010 WL 4342217 (2d Cir. Nov. 3, 2010) .................................... 15

*General Elec. Co. v. Joiner*, 522 U.S. 136 (1997) ................................................................. 6, 8

*Hartwell v. Danek Med., Inc.*, 47 F. Supp. 2d 703 (W.D. Va. 1999) ............................................ 8

*Herman Schwabe, Inc. v. United Shoe Machinery Corp.*, 297 F. 2d 906 (2d Cir. 1962) ....... 17, 18

*Home Placement Serv., Inc. v. Providence Journal Co.*, 819 F.2d 1199 (1st Cir. 1987) ............ 20

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ................................................. 6

*Leverette v. Louisville Ladder Co.*, 183 F.3d 339 (5th Cir. 1999).............................. 7

*Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290 (2d Cir. 2008) .................... 20

*Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558 (S.D.N.Y. 2007) ...................... 7

*McGlinchy v. Shell Chem. Co.*, 845 F.2d 802 (9th Cir. 1988).................................... 17

*Metrix Warehouse, Inc. v. Daimler-Benz AG*, 828 F.2d 1033, (4th Cir. 1987).......................... 17

*Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984)..................................... 11

*National Bancard Corp. (NaBanco) v. Visa U.S.A., Inc.*, 779 F.2d 592 (11th Cir. 1986)........... 19

*Oxford Gene Tech. Ltd. v. Mergen Ltd.*, 345 F. Supp. 2d 431 (D. Del. 2004) ............................ 7

*Roussell v. Brinker Int'l, Inc.*, Civ. A. No. H-05-3733, 2008 WL 2714079 (S.D. Tex. July 9, 2008) ............................................................................ 7

*Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249 (2d Cir. 2005).................................... 6

*Town of Concord v. Boston Edison Co.*, 915 F.2d 17 (1st Cir. 1990) ............................ 12

*United States v. Rice*, 52 F.3d 843 (10th Cir. 1995) ................................................ 16

*United States v. Trenton Potteries Co.*, 273 U.S. 392 (1927) .................................... 11

*United States v. Visa U.S.A., Inc.*, 344 F.3d 229 (2d Cir. 2003)................................. 19

*United States v. Williams*, 506 F.3d 151 (2d Cir. 2007) .......................................... 5

*Yankees Entertainment & Sports Network, LLC v. Cablevision Sys. Corp.*, 224 F. Supp. 2d 657 (S.D.N.Y. 2002).............................................................. 12

### Statutes

Fed. R. Evid. 702 ...................................................................................... *passim*

### Other Authorities

2A Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law (3d ed. 2007)................................ 9

3B Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law (3d ed. 2008).............................. 12

ABA Section of Antitrust Law, Antitrust Law Developments (6th ed. 2007)........................... 18

Dennis W. Carlton & Alan S. Frankel, *The Antitrust Economics of Credit Card Networks*, 63 Antitrust L. J. 643 (1995) ......................................................................................... 23

Dennis W. Carlton &  Jeffrey M. Perloff, Modern Industrial Organization (4th ed. 2005).......... 22

William Landes, *Harm to Competition: Cartels, Mergers, and Joint Ventures*, 52 Antitrust Law Journal 625 (1983) ....................................................................................... 22

### *Preliminary Statement*

Defendants respectfully submit this memorandum of law in support of their motion to exclude as inadmissible under Rule 702 of the Federal Rules of Evidence ("Rule 702") the opinions of class plaintiffs' economic expert, Dr. Alan S. Frankel, regarding (i) injury and damages attributable to the challenged conduct and (ii) the competitive effects of the challenged conduct.[1]  Dr. Frankel's opinions are not predicated on any valid methodology properly applied to the facts of this case.  Instead, they are based on speculation, and advance positions contrary to antitrust law and fundamental, well established economic principles that Dr. Frankel himself acknowledges.  Accordingly, his opinions on injury and damages caused by, and the competitive effects of, the challenged conduct are either unreliable or irrelevant, or both, and should be precluded under Rule 702 and *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

### *Background*

To prevail on their challenge to the establishment of default interchange fees, class plaintiffs must establish that the challenged conduct has caused them "injury in fact," *i.e.*, that they would have paid a lower net price for the defendants' services – in this case, payment card network services – if each network had not engaged in the challenged conduct – in this case, collectively setting default interchange rates.  Class plaintiffs must also be able to calculate the amount of any damages they claim to have sustained as a proximate result of the challenged conduct.  Finally, because the antitrust laws were intended to protect competition and not competi-

---

[1]   True and complete copies of the Report of Alan S. Frankel, Ph.D. (July 2, 2009) ("Frankel Rep."), the Rebuttal Report of Alan S. Frankel, Ph.D. (June 22, 2010) ("Frankel Reb. Rep."), and the Deposition of Alan Frankel (Sept. 20-22, 2010) ("Frankel Dep.") are attached as Exhibits 17-25 to the Declaration of Matthew Freimuth, dated February 11, 2011, and submitted herewith.

tors, class plaintiffs must prove that the establishment of default interchange fees by each network has had an anticompetitive effect in a properly defined relevant market. Class plaintiffs rely on Dr. Frankel to prove each of these elements of their antitrust case.

Dr. Frankel opines that the challenged network establishment of default interchange rates has injured plaintiffs by causing an increase in "the prices that merchants pay for card network services." (Frankel Rep. ¶ 144.) To support his opinion, Dr. Frankel has constructed two hypothetical "but for" worlds, either of which he contends would have existed in the absence of – *i.e.*, "but for" – the challenged establishment of default interchange rates. In each "but for" world, according to Dr. Frankel, interchange fees would have been lower and plaintiffs therefore would have paid lower merchant discount rates. (*Id.* ¶¶ 287, 314.)

In his first, or primary, "but for" world, Dr. Frankel opines that the networks would have eliminated any collectively adopted rules setting a default interchange fee, but would have retained all other network rules, including the rules requiring issuing banks to accept for settlement all Visa- and MasterCard-branded payment card transactions effected on the issuer's network-branded payment cards (what Dr. Frankel has characterized as "universal acceptance"). (Frankel Dep. at 411-15.) In this primary "but for" world, according to Dr. Frankel, the networks would have operated without any interchange payments. Dr. Frankel opines that, under this view of the "but for" world, plaintiffs have been injured by the sum of all interchange fees from the entire Class Period – █████████████████████████████ ███████████████████████████████ (Frankel Rep. ¶¶ 296, 313, 324, 331 (Table 9.1).).

In his second, or alternative, "but for" world, Dr. Frankel allows that some level of collectively set default interchange fees would be necessary "to permit the networks to operate

successfully." (Frankel Rep. ¶ 314.) In Dr. Frankel's alternative "but for" world, therefore, each network would continue to set default interchange rates, but would set those rates sufficient only to maintain network viability. (Frankel Rep. ¶¶ 314, 320.) Using the regulated levels of interchange fees permitted in Australia and the United Kingdom, as well as a regulated rate applicable to MasterCard in the European Union, as proxies for the level at which the networks could operate successfully, Dr. Frankel concludes that plaintiffs have been injured in the amount of the difference between the actual default interchange fees and the default interchange fees that would be necessary to maintain the networks' viability. (Frankel Rep. ¶ 320.) Dr. Frankel calculates that "overcharge" as between ████████████████ (Frankel Rep. ¶¶ 335-36 (Table 9.10).)

Dr. Frankel also opines that the collective setting of default interchange rates has had "anticompetitive effects in the relevant markets, most directly by increasing the prices merchants pay in the relevant card network services markets." (Frankel Rep. ¶ 11(c).) This anticompetitive effect, according to Dr. Frankel, has, in turn, led to higher retail prices for consumers. (Frankel Rep. ¶¶ 205-06.) In addition, "[m]erchants do not get more 'value' when 'more cardholders use the card' because cards are relatively expensive to merchants due to interchange fees, so increased usage by cardholders increases merchants' costs." (Frankel Rep. ¶ 217.)

### *Summary of Argument*

As demonstrated below, Dr. Frankel's opinions suffer from several material defects that render them unreliable and therefore inadmissible under Rule 702. *First*, Dr. Frankel has not constructed reliable "but for" worlds on which to support his opinions that plaintiffs have suffered injury in fact or measurable damages as a result of the network establishment of default interchange rates. While an economist's "but for" world is supposed to be constructed by removing the challenged conduct and hypothesizing what a competitive world would look like

without the challenged conduct, Dr. Frankel fails to remove the challenged conduct – in this case, the network adoption of rules governing issuing banks' financial obligations when settling Visa- or MasterCard-branded payment card transactions – from either of his "but for" worlds. This failing is most obvious in Dr. Frankel's alternative "but for" world, where he expressly retains network set default interchange fees, but simply lowers them. But the failing also exists in Dr. Frankel's primary "but for" world, which, as we show below, retains a network established rule that payment card transactions would be settled at par – *i.e.*, with no positive interchange fee – and so simply reduces the default interchange rate to zero.

*Second*, Dr. Frankel provides no analysis or explanation as to how or why, in a competitive environment and without resort to regulation, network established interchange rates in his "but for" worlds would have been reduced from their current levels either to zero or to some level of network viability. Conceding that no four-party credit card system in the world operates without a positive interchange rate, Dr. Frankel does not explain how Visa and Master-Card would do so and be able to compete for issuers with American Express and Discover. And he ignores, in his alternative "but for" world, the fact that the foreign interchange rates he uses as proxies for viability are all government-regulated rates that did not result from marketplace competition.

*Finally*, Dr. Frankel's opinion that the establishment of default interchange rates has had an adverse competitive effect is likewise unreliable, and thus inadmissible under Rule 702, because Dr. Frankel was unable to opine that output in any relevant market has been reduced by the establishment of default interchange fees. Antitrust law is clear: conduct can have an anticompetitive effect in a relevant market only if it results in a reduction of output in that relevant market. Faced with the undisputed fact that payment card transactions – and merchants'

4

use of payment card transaction services – have increased during the Class Period, Dr. Frankel testified that the effect of the challenged conduct on output was "ambiguous." (Frankel Dep. at 378, 1008-09.) Dr. Frankel's failure to testify that output has been reduced is fatal to his opinion.

## *Legal Standards*

Rule 702, which governs the admissibility of expert testimony, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness quali-fied as an expert by knowledge, skill, experience, training, or education, may tes-tify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. Class plaintiffs bear the burden of showing by a preponderance of the evi-dence that the proffered opinions of Dr. Frankel satisfy Rule 702. *See United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007); *see also* Fed. R. Evid. 702 advisory committee's note (2000 Amendments) (stating that "the admissibility of all expert testimony is governed by the princi-ples of Rule 104(a)" and thus "the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence").

In *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Su-preme Court held that, in determining whether to admit testimony under Rule 702, district courts must make a threshold assessment of "whether the reasoning or methodology underlying the [ex-pert] testimony is scientifically valid and of whether that reasoning and methodology properly can be applied to the facts in issue." *Id.* at 592-93. This threshold assessment is necessary be-cause testimony cast as expert opinion can be "both powerful and quite misleading because of the difficulty in evaluating it." *Id.* at 595 (citation omitted). Accordingly, the "gatekeeping" mandate of Rule 702 exists to "ensur[e] that an expert's testimony both rests on a reliable foun-

5

dation and is relevant to the task at hand." *Id.* at 597; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (holding that *Daubert*'s gatekeeping obligation applies to all expert testimony).

In assessing reliability, the Court "should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (internal quotation omitted). Determining whether proffered opinions satisfy these standards requires a qualitative focus on all aspects of the expert's methodology. As the Second Circuit put the point, "it is critical that an expert's analysis be reliable at every step." *Amorgianos*, 303 F.3d at 267.

The Supreme Court has stressed that these principles require a sufficiently reliable connection between the methodology and the expert's conclusions for such conclusions to be admissible. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "[N]othing in either *Daubert* or the Federal Rules of Evidence," the Court has underscored, "requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Id.* Faced with those circumstances, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.; see also Amorgianos,* 303 F.3d at 270 (applying these standards and affirming exclusion of purported expert testimony). Accordingly, "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable testimony." *Amorgianos*, 303 F.3d at 266; *accord Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 253 (2d Cir. 2005).

6

Moreover, an expert opinion should be excluded on relevance grounds if it does not "fit" the case. *Donnelly v. Ford Motor Co.*, 80 F. Supp. 2d 45, 50 (E.D.N.Y. 1999) ("In order for expert testimony to 'assist the trier of fact to understand the evidence or to determine a fact in issue,' Fed. R. Evid. 702, the testimony must not only be reliable but must be relevant in that it 'fits' the facts of the case"). Opinions that are premised on an incorrect legal standard do not fit the case and should be excluded from evidence. *Leverette v. Louisville Ladder Co.*, 183 F.3d 339, 341 (5th Cir. 1999) (affirming trial court's exclusion of expert testimony on alleged product defect where, *inter alia*, testimony did not address correct legal standard); *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 572-73 (S.D.N.Y. 2007) (adopting special masters' recommendation that portion of expert opinion on trademark dilution damages be excluded where the proposed testimony did "not 'fit' with the substantive law of dilution") (citation omitted); *see also Oxford Gene Tech. Ltd. v. Mergen Ltd.*, 345 F. Supp. 2d 431, 435-36 (D. Del. 2004) (excluding expert opinion on patent invalidity where proposed testimony did not follow applicable legal test); *Roussell v. Brinker Int'l, Inc.*, Civ. A. No. H-05-3733, 2008 WL 2714079, at *27 (S.D. Tex. July 9, 2008) (excluding expert opinion on employee conduct, reasoning that, among other things, "to the extent that Dr. Lynn's assessment of the voluntary nature of server tip sharing is based on an incorrect legal standard, there is a substantial risk that his testimony will confuse issues, and should thus be excluded under Federal Rule of Evidence 403").

The Supreme Court likewise has emphasized that opinions rooted in speculation run afoul of Rule 702. *See Daubert*, 509 U.S. at 590 (explaining that specialized knowledge within the meaning of Rule 702 "connotes more than subjective belief or unsupported speculation"); *see also Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056-57 (8th Cir. 2000)

(reversing jury verdict and holding that the district court should not have admitted an expert's opinion resting on "mere speculation").

These principles have particular force where economic issues at the heart of a proper rule of reason analysis often entail significant complexity. *Cf. Joiner*, 522 U.S. at 148 (Breyer, J., concurring) ("Of course, neither the difficulty of the task nor any comparative lack of expertise can excuse the judge from exercising the 'gatekeeper' duties that the Federal Rules of Evidence impose," in large part because "when law and science intersect, those duties often must be exercised with care"); *see also Hartwell v. Danek Med., Inc.*, 47 F. Supp. 2d 703, 711 (W.D. Va. 1999) ("While there are certainly times when, given the complexity of issues or the ferocity of the debate, it may seem expedient just to let opposing experts do battle at trial, the Supreme Court has made clear that to do so, without due circumspection, would be shirking my duty as evidentiary 'gatekeeper' to the trial process.").

The Eighth Circuit's decision in *Concord Boat* illustrates this point.  The district court in *Concord Boat* denied a pre-trial *Daubert* motion and permitted plaintiffs' economic expert to testify as to defendant's alleged monopoly power, reasoning that the best course given the complexity of the expert's task – namely, "construct[ing] a hypothetical market, a 'but for' market, free of the restraints and the conduct alleged to be anticompetitive" – was to permit the jury to weigh the expert's testimony as it saw fit.  *Concord Boat*, 207 F.3d at 1055.  The district court charted this course in part based on plaintiffs' counsel's assurances that the expert's trial testimony would rest upon a properly constructed "but for" world, one (in the circumstances at issue) that segregated lawful from unlawful conduct.  *See id.*  The Eighth Circuit reversed, holding that *Daubert* compelled the district court not to defer to jury weighing, but rather to undertake the

requisite "preliminary assessment" of reliability through a "thorough analysis of the expert's economic model and his proffered opinion." *Id.*

   As shown below, Dr. Frankel's proffered opinions on injury and damages and the competitive effects of the establishment of default interchange rates fail to meet these standards and therefore should be excluded.

### ***Argument***

**I.**  **Dr. Frankel's Opinions That Plaintiffs Suffered Injury In Fact And Sustained Measurable Damages Are Unreliable, Irrelevant, And Should Be Excluded**

   To demonstrate that the class plaintiffs have suffered "injury in fact" and to calculate damages, Dr. Frankel compared interchange levels in the actual world to interchange levels in the two hypothetical "but for" worlds in which, Dr. Frankel says, the challenged conduct did not occur. (Frankel Rep. ¶¶ 287-89.) But Dr. Frankel did not apply either of the two well recognized methodologies typically used in overcharge cases (the "before and after" or "yardstick" approaches) to derive his "but for" worlds. *See, e.g.*, 2A Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 399b, at 445 (3d ed. 2007) ("The procedure used to estimate illegal overcharges involves a choice between well-established methodologies – the before-and-after approach and the yardstick approach. If an expert elects to use either of these accepted methodologies, one cannot complain that the methodology itself is unreliable."); *see also id.* ¶ 392d, at 335 ("There are two fundamental approaches to measuring damages: (1) the before-and-after approach and (2) the 'yardstick' approach."). Moreover, Dr. Frankel did not construct a "but for" world that eliminated the challenged conduct (*i.e.*, the "collective" setting of interchange rates by network rule); effectively, he just reduced the level of default interchange rates to zero in his primary "but for" world and to some level of viability in his alternative "but for" world. In addition,

9

Dr. Frankel offered no economic analysis whatsoever for how or why in a competitive environment the level of interchange rates would decline either to zero or to some viability level. These flaws render Dr. Frankel's "but for" worlds unreliable and irrelevant as evidence of what would have occurred in the absence of the challenged agreement to establish network default interchange rates. And without a reliable "but for" world against which to compare the actual world, Dr. Frankel's opinions that class plaintiffs suffered injury in fact or measurable damages have no foundation and must be excluded.

### A.    Dr. Frankel's "But For" Worlds Do Not Eliminate The Challenged Conduct, But Simply Challenge The Level Of Default Interchange Rates

To constitute a reliably useful tool in determining whether plaintiffs have suffered injury in fact or sustained measurable damages, the "but for" world must be constructed so as to eliminate the allegedly unlawful behavior. *See Concord Boat*, 207 F.3d at 1055 ("Notwithstanding the complex nature of the conduct at issue, [plaintiffs' expert] was required to construct a hypothetical market, a 'but for' market free of the restraints and conduct alleged to be anticompetitive") (citation omitted). Only such a "but for" world would permit the finder of fact to compare the actual world, with its allegedly unlawful behavior, with a hypothetical competitive world free of the allegedly unlawful behavior, and determine whether, in the actual world, plaintiffs have been overcharged and, if so, by how much. Dr. Frankel's "but for" worlds, however, fail to eliminate the network rule affecting interchange rates that class plaintiffs assert to be collective price setting.

Class plaintiffs challenge the network established default interchange rates, which they characterize as the collective setting of interchange rates. Although Dr. Frankel frequently refers to the challenged conduct as the rules that "have required merchants to pay interchange fees" (*see, e.g.*, Frankel Rep. ¶¶ 294-97), in fact, that is not what plaintiffs challenge. Because

Section 1 only proscribes concerted action between two or more actors, *see, e.g., Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984), it is only the *collective* behavior of each network and its member banks establishing rules to govern the financial arrangements between issuing and acquiring banks when they settle network-branded payment card transactions that could be subjected to Section 1 scrutiny and thus form the basis for plaintiffs' damage claims. So plaintiffs challenge the collective establishment of rules regulating the financial arrangements between network member banks in connection with the settlement of payment card transactions. (Class Complaint ¶¶ 3, 102, 104, 159, 249, 251, 298, 305, 319, 377, 384, 415, 422.)

In each of Dr. Frankel's "but for" worlds, however, the networks continue to establish the rules governing the financial arrangements among issuing and acquiring banks in the settlement of payment card transactions. Dr. Frankel changes only the level of the resulting default interchange fees – not the extent to which they are allegedly set "collectively" at the network level as a result of network rules regulating the financial arrangements in connection with the settlement of payment card transactions. But the antitrust laws are concerned only with conduct, and are not arbiters or regulators of the proper price level. Simply put, if particular price-setting conduct is permissible, the price level is not an antitrust concern. *See, e.g., United States v. Trenton Potteries Co.*, 273 U.S. 392, 397-98 (1927) (explaining that the lawfulness of a price setting agreement must be judged "in the light of its effect on competition" and not by judicial assessments of the reasonableness of price levels); *see also Brennan v. Concord EFS, Inc.*, 369 F. Supp. 2d 1127, 1131-32 (N.D. Cal. 2005) (the district court held that an argument that network interchange fees should be "abolished" is "the same thing as 'set at zero,'" and is "not an antitrust argument at all, for it amounts to a dispute over prices and competition law is not concerned with the setting of a proper price"); *Chicago Prof'l Sports Ltd. P'ship v. National Basketball*

11

*Ass'n*, 95 F.3d 593, 597 (7th Cir. 1996) ("the antitrust laws do not deputize district judges as one-man regulatory agencies"); *Town of Concord v. Boston Edison Co.*, 915 F.2d 17, 24-25 (1st Cir. 1990) (noting that "courts normally avoid direct price administration"); *Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1340 (7th Cir. 1986) (courts should not become "little versions of the Office of Price Administration"); *Yankees Entertainment & Sports Network, LLC v. Cablevision Sys. Corp.*, 224 F. Supp. 2d 657, 674-75 (S.D.N.Y. 2002) (asking a court to determine whether a price is "reasonable" amounts to "nothing less than price regulation of the kind undertaken by regulatory agencies – something for which both the federal courts and the antitrust litigation process are extremely ill-suited and which is, in any event, inconsistent with antitrust's fundamental 'market' orientation") (quoting 3B Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 771b, at 195 (3d ed. 2008)).

This flaw in Dr. Frankel's opinions is most obvious in his alternative "but for" world, where he opines that the networks would continue to establish default interchange rates, but that those rates would simply be lower than current rates. Such a "but for" world is wholly at odds with the foregoing antitrust law, which requires that a "but for" world eliminate the challenged conduct and does not permit courts to be regulators of price levels. The antitrust laws are clear that, if the network establishment of default interchange fees is permissible – as Dr. Frankel allows that it is in his alternative "but for" world – then antitrust courts may not regulate the level at which the networks set those default interchange rates. Accordingly, Dr. Frankel's alternative "but for" world does not comport with the antitrust laws and, on that basis alone, cannot be deemed reliable.

This flaw in Dr. Frankel's opinion similarly infects his primary "but for" world. Dr. Frankel opined that, in his primary "but for" world, any collectively established network

rules setting a positive default interchange fee would be eliminated.  (Frankel Rep. ¶ 295.)  In that world, however, according to Dr. Frankel, all other network rules, including the rules requiring issuing banks to accept for settlement all Visa- and MasterCard-branded payment card transactions effected on the issuer's network-branded payment cards (what Dr. Frankel has characterized as "universal acceptance") would be retained.  (Frankel Dep. at 411-15.)  If eliminating the default interchange rules – but retaining the rules that require universal acceptance by issuing banks – would permit each issuing bank to determine unilaterally, and without any agreement with other members of the networks or the networks themselves, the amount of any discount it would retain when settling transactions with acquirers through the network, Dr. Frankel has offered no reason why interchange rates independently established by individual issuing banks would fall, let alone fall to zero or to any of the regulated foreign rates to which Dr. Frankel has referred.  In fact, Dr. Frankel admits that if individual issuers were permitted unilaterally to set their own interchange rates, they would set positive rates (*i.e.*, rates above zero), especially in the presence of the honor-all-cards rules governing merchants, which Dr. Frankel retains in his "but for" worlds.  (Frankel Dep. at 256-57.)

Perhaps recognizing this defect, Dr. Frankel testified at his deposition that, in his hypothetical "but for" worlds, network rules would require universal acceptance, but would *not* permit each issuing bank independently to determine the amount of interchange fees it would retain for settling payment card transaction.

> As I've explained in my report, a rule that required universal acceptance by merchants of any card, honor all cards rule, with a rule that permits individual members – issuing member banks to impose their fees and if implemented in a way that requires merchants to pay the fees of any bank that imposes them at the level stated by the bank, if the merchant wants to accept any of the network's transactions would be an anticompetitive set of rules.

*                *                *

13

> [T]here [would be] no rule that requires merchants to accept transactions from every issuer while permitting individual issuers to charge the merchant a fee.

(Frankel Dep. at 413-14.)

The system Dr. Frankel constructs in his primary "but for" world, which would require each issuing bank to accept for settlement all transactions effected using its cards, but would prohibit individual issuing banks in the primary "but for" world from deciding independently whether to charge acquiring banks an interchange fee and, if so, the amount of that fee, is economically indistinguishable from a network rule setting an interchange rate at zero. To the extent that the current default interchange rules constitute collective action, any rule that would effectively require issuers to settle payment card transactions at par – *i.e.*, without charging an interchange fee – would clearly also constitute collective action, setting a mandated interchange rate at zero. (Frankel Dep. at 854 (explaining that "[o]nce the rate is zero or essentially there's no more interchange fees, you have a par settlement system").) But if the antitrust laws permit the networks to adopt a rule requiring issuers to settle at par, then the antitrust laws permit the networks to adopt a rule requiring issuers to settle at some discount from par. The difference is only the price level and that is not an antitrust concern. *See Brennan*, 369 F. Supp. 2d at 1131-32 (argument that network interchange fees should be "abolished" is "the same thing as 'set at zero,'" and is "not an antitrust argument at all, for it amounts to a dispute over prices and competition law is not concerned with the setting of a proper price").

Because neither of Dr. Frankel's "but for" worlds eliminates the allegedly unlawful collective conduct, neither provides a relevant or reliable tool for comparing the actual world to a hypothetical world without the allegedly unlawful conduct, and thus neither provides a basis from which to opine as to whether class plaintiffs suffered injury in fact or measurable damages.

14

**B.    Dr. Frankel Provides No Economic Analysis Or Explanation As To How Or Why Default Interchange Fees Would Be Reduced In His "But For" Worlds**

An expert constructing a "but for" world must consider all competitive and other factors that influence the marketplace and explain how, accounting for those competitive and other factors, competition in the relevant market would have led to the realization of the "but for" world in the absence of the allegedly unlawful conduct. *See, e.g., Eastern Auto Distribs., Inc. v. Peugeot Motors of Am., Inc.*, 795 F.2d 329, 338 (4th Cir. 1986) (concluding that an expert's damages testimony was properly excluded when it failed to take account of such competitive factors as a more efficient dealer force, the increase in demand for Peugeot products during this period, the shift in demand from gas to diesel automobiles, and the introduction of new Peugeot models); *Concord Boat*, 207 F.3d at 1057 (stressing the necessity to incorporate "all aspects of economic reality" into antitrust economic analysis); *In re Aluminum Phosphide Antitrust Litig.*, 893 F. Supp. 1497, 1503 (D. Kan. 1995) ("In applying the 'before and after' model of damages, it is fundamentally necessary to explain the pattern of forces outside the violation period using factors that might have changed (*i.e.*, supply, demand, and differences in competition) to predict the prices during the conspiratorial period"); *see also In re Fresh Del Monte Pineapples Antitrust Litig.*, No. 04-md-1628, 2009 WL 3241401, at *8 (S.D.N.Y. Sept. 30, 2009) (stating that *Daubert* requires consideration of all "material facts"), *aff'd sub nom. American Banana Co. v. J. Bonafede Co.*, No. 09-4561-cv, 2010 WL 4342217 (2d Cir. Nov. 3, 2010).

Another material flaw in Dr. Frankel's "but for" world construction – and thus his opinions concerning injury in fact and damages – is his failure to explain, through economic analysis or modeling or empirical studies, how competition and the economic and other factors influencing the payment cards industry during the Class Period would have resulted in any competitive equilibrium along the lines he posits.  Indeed, with no analysis whatsoever, Dr. Frankel

15

simply asserts that the levels of default interchange fees – and thus the level of the merchant discount fees paid by merchants – would decline, and that is not sufficient to permit his opinion to be admitted into evidence.

Dr. Frankel concludes, on the basis of no economic analysis, that, if default interchange rules had not existed, merchants "would not have had an economic incentive to agree to pay any interchange fee" because, in his view and, again unaccompanied by any economic or empirical analysis, merchants "do not receive services from an issuing bank." (Frankel Rep. ¶¶ 296-97.) Dr. Frankel merely asserts that the absence of interchange fees is the outcome "one would expect to have evolved in the competitive payment markets without restrictions or impediments on merchants' ability to steer freely among payment methods or networks." (Frankel Rep. ¶ 313.) And he testified in his deposition that he knew of nothing that would have prevented the networks evolving and operating over time without interchange fees. (Frankel Dep. at 253, 259-62, 438.) Finally, in the alternative, Dr. Frankel opines that, to the extent default interchange fees are necessary for the viability of the Visa and MasterCard networks, the interchange levels established by regulation in Australia, the United Kingdom, and the European Union would be appropriate proxies to estimate a "less restrictive alternative" for network viability within the United States. (Frankel Rep. ¶¶ 218, 288, 314-16, 319, 320 ("Estimating damages under the alternative but-for world involves proportionate reductions of [actual] interchange fee payments to reflect the levels shown to be viable in Australia and the U.K.").)

Mere assertions are insufficient to support an expert opinion, particularly where, as here, those assertions do not fit with the undisputed facts of the case. *See, e.g.*, *United States v. Rice*, 52 F.3d 843, 847 (10th Cir. 1995) ("Traditionally, hypothesis may be an appropriate subject for expert testimony when based upon conclusions from established evidentiary facts, but

[not when] based entirely on pure surmise."); *In re Aluminum Phosphide Antitrust Litig.*, 893 F. Supp. at 1502 (stating that an expert's opinion may be considered irrelevant and inadmissible when "based on neither evidence nor science"); *Herman Schwabe, Inc. v. United Shoe Machinery Corp.*, 297 F. 2d 906, 911 (2d Cir. 1962) (expert's conclusion is properly excluded when no basis for an underlying assumption has been established).

Thus, for example, although a key assumption of Dr. Frankel's methodology is his assertion that merchants receive no benefits from issuers (Frankel Rep. ¶ 296), Dr. Frankel admitted at his deposition that merchants do in fact receive benefits, including incremental sales, from issuers, and acknowledged that the magnitude of those benefits can be affected by the way in which the interchange fees are used to provide incentives for cardholders to use their payment cards to make purchases. (Frankel Dep. at 137-38; *see also id.* at 112.) Similarly, when evaluating the "but for" world with respect to the IPOs, Dr. Frankel assumed that there were no interchange fees up until the time that the IPOs occurred. (Frankel Dep. at 444.) But Dr. Frankel had no basis for that assumption.

Courts routinely exclude expert testimony based on assumptions that, like Dr. Frankel's assumptions, are contrary to the evidence and without any factual basis. *See, e.g.,* *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 807 (9th Cir. 1988) (excluding expert damages testimony that "had no basis in the record"); *Metrix Warehouse, Inc. v. Daimler-Benz AG*, 828 F.2d 1033, 1044-45 (4th Cir. 1987) (expert's assumption was "contrary to the clear weight of the evidence"); *Herman Schwabe*, 297 F.2d at 911 (excluding damages testimony where expert provided "[n]o basis" for his assumptions); *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314, 319 (S.D.N.Y. 2009) ("no basis in fact or reality").

17

Similarly, although Dr. Frankel opines that "one would expect" the payment card industry to have evolved competitively without default interchange fees, he conceded that no four-party credit card system exists anywhere in the world without interchange. (Frankel Dep. at 264 ("I can't identify any country in the world in which there are four-party credit systems today that don't have interchange fees").) A court's gatekeeper function entails the obligation to prevent such implausible "expert" testimony from reaching the jury. *Herman Schwabe*, 297 F.2d at 912 (expert improperly assumed pre-tax profit figure "nearly six times the average" of plaintiff's pre-tax profits during the damages period); ABA Section of Antitrust Law, Antitrust Law Developments, at 843 (6th ed. 2007) (citing cases).

Far from analyzing the effects competition would have in his "but for" world, Dr. Frankel simply ignores competition between networks. He does not explain how issuers could be paid approximately ███████ less per year in interchange fees in his "but for" world – shifting substantial costs from the issuer/cardholder side of the business from the acquiring/merchant side (Frankel Dep. at 370-72) – without the networks, for example, imposing other fees or reductions in services on merchants or adopting different structural changes. This is significant, because a key source of competition between networks is interchange fees; in his "but for" world Dr. Frankel admits that elimination of interchange fees would cause Visa and MasterCard cardholder fees to be higher, and rewards "significantly" lower. (Frankel Rep. ¶ 383 ("Co-brand payments, *like a bank's funding of its own rewards and rebate programs*, would likely be *significantly lower* in a but-for world with no (or lower) interchange fees") (emphasis added); (Frankel Dep. at 369-72.) Yet he simply does not analyze how Visa and MasterCard could remain competitive with American Express and Discover if Visa and MasterCard's cardholder offerings were worth less than these other networks' offerings.

18

In a similar vein, in constructing his "but for" worlds, Dr. Frankel also ignores the decisions in *United States v. Visa U.S.A., Inc.*, 344 F.3d 229 (2d Cir. 2003), following which Visa and MasterCard were required to permit American Express and Discover to compete with them for issuers, resulting in increased interchange fees as networks competed for issuers by offering greater interchange payments, and *National Bancard Corp. (NaBanco) v. Visa U.S.A., Inc.*, 779 F.2d 592 (11th Cir. 1986), where the court stated "[a]n abundance of evidence was submitted from which the district court plausibly and logically could conclude that [Visa's default interchange fee] on balance is procompetitive because it was necessary to achieve stability and thus ensure the one element vital to the survival of the VISA system-universality of acceptance." *Id.* at 605. But nowhere in his construction of his "but for" worlds does Dr. Frankel address – much less analyze with the rigor required of an expert by *Daubert* – how Visa and MasterCard could have competed with American Express for issuers without default interchange fees, or why, in such a competitive environment, Visa and MasterCard would have eliminated fees that a court has found on balance to be procompetitive.

Just as Dr. Frankel failed to account for all relevant actual world factors when he constructed his primary "but for" world, he has failed to consider all relevant factors when constructing his alternative "but for" world. He ignores, for example, the undisputed fact that the default interchange rates in Australia, the United Kingdom, and the European Union are all regulated interchange rates, mandated by government regulators, and did not evolve as the product of marketplace competition. Dr. Frankel does not offer any economic analysis to explain how or why, in a competitive United States marketplace, the same or even similar default interchange rates would obtain absent government regulation. Nor does he provide any analysis to demonstrate that the payment card business in Australia, the United Kingdom, or the European Union is

19

at all analogous to the payment card business in the United States for this purpose.  *See, e.g.*, *Home Placement Serv., Inc. v. Providence Journal Co.*, 819 F.2d 1199, 1205-09 (1st Cir. 1987).

And Dr. Frankel's suggestion that his "alternative" approach is based on the "less restrictive alternative" (Frankel Rep. ¶ 314) is also without merit.  The less restrictive alternative analysis is part of the burden-shifting analysis courts conduct under the rule of reason (*see* Areeda, ¶ 1913a.) and concerns specification of *conduct* that is less restrictive of competition than the challenged restraint – not, as Dr. Frankel would have it, identification of a *price* that is less than the actual price.  It is the less *restrictive* alternative doctrine, not the less *expensive* alternative doctrine.  *See, e.g.*, *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 544 F.3d 1323, 1332 (Fed. Cir. 2008) (plaintiff must show an alternative to the challenged conduct that is "less restrictive of competition"); *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 308 (2d Cir. 2008) (same).

*       *       *

In conclusion, Dr. Frankel has collected no data and conducted no economic analysis from which to reliably conclude that interchange fees in the "but for" world would be lower than interchange fees in the actual world.  He has simply asserted that they would be and, in so doing, has ignored the realities of the payment card industry that contradict his assertions.  For Dr. Frankel to have ignored these realities when he constructed his "but for" worlds reflects a methodological deficiency that renders his "but for" worlds wholly unreliable, irrelevant, and inadmissible.

## II.    Dr. Frankel's Opinion That The Establishment Of Default Interchange Fees Has Had Anticompetitive Effects Is Unreliable, Irrelevant, And Should Be Excluded

Dr. Frankel has opined that the challenged interchange and merchant acceptance rules have had anticompetitive effects by increasing the merchant discount that merchants pay

20

for card acceptance. (Frankel Rep. ¶¶ 140, 144.) From this observation, Dr. Frankel concludes that – "[a]ll else equal" – "higher prices harm those who pay them" and thus "[i]n the markets for card network services, higher merchant fees cause direct harm to merchants – the consumers of card network services." (Frankel Rep. ¶ 141.) This result, Dr. Frankel opines, is anticompetitive and leads to the additional anticompetitive result of higher retail prices for consumers as merchants pass on higher merchant discount fees to their own retail customers. (Frankel Rep. ¶¶ 205-06.)

These opinions fail to pass *Daubert* muster. Dr. Frankel makes no attempt to ground his opinions on competitive effects in the available "facts and data" by performing standard economic studies and analyses. The most fundamental deficiency of Dr. Frankel's treatment of anticompetitive effects is his failure to show that the alleged anticompetitive conduct has reduced output in some relevant market.

As a matter of law, an alleged restraint has no anticompetitive effect – and thus is not unlawful – unless it can be shown to have reduced output in some relevant market. "Supra-competitive pricing" "entails a restriction in output." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 233 (1993); *see also Chicago Prof'l Sports*, 95 F.3d at 597 ("A high price is not itself a violation of the Sherman Act.") (citing *Broadcast Music Inc. v. CBS, Inc.*, 441 U.S. 1, 9-10, 19-20, 22 n.40 (1979)). "The core question in antitrust is output. Unless a contract reduces output in some market, to the detriment of consumers, there is no antitrust problem." *Chicago Prof'l Sports*, 95 F.3d at 597. An alleged restraint that "in the end expands output serves the interests of consumers and should be applauded rather than condemned." *Chicago Prof'l Sports Ltd. P'ship v. National Basketball Ass'n*, 961 F.2d 667, 673 (7th Cir. 1992); *see*

21

*also* William Landes, *Harm to Competition: Cartels, Mergers, and Joint Ventures*, 52 Antitrust Law Journal 625 (1983).

Although Dr. Frankel concludes that the challenged conduct resulted in "anticompetitive effects" on the basis of increases in interchange levels during the Class Period (Frankel Rep. ¶¶ 140-41, 144), he expressly premises that conclusion on "[a]ll else [being] equal." (Frankel Rep. ¶ 141.)  In his deposition, however, Dr. Frankel acknowledged that all else is not equal – either as a matter of economic theory or undisputed fact.  On the contrary, he acknowledged the well established economic principle that conduct that increases price may be procompetitive because, for example, it also increases the attractiveness of the merchant's goods or services and thus results in more sales (in economic parlance, "shifts the merchant's demand curve outward") – *i.e.*, it increases output.  (Frankel Dep. at 43-45, 206.)  *See, e.g.*, Dennis W. Carlton & Jeffrey M. Perloff, Modern Industrial Organization at 635-36 (4th ed. 2005) (explaining why a merger that results in a price increase for consumers can be pro-competitive).  And he agreed that the test for distinguishing a procompetitive joint venture from an anticompetitive one proposed by his Lexecon colleague, Professor Landes – a joint venture would be anticompetitive if it was likely to reduce output, and procompetitive if the reverse was true – was a good test. (Frankel Dep. at 209-10).

Dr. Frankel admitted that a procompetitive justification for interchange is "possible theoretically."  (Frankel Dep. at 112-13.)  Dr. Frankel also admitted that card acceptance causes incremental sales for merchants and shifts merchants' demand curves (Frankel Dep. at 134-35); that interchange fees and the merchant acceptance rules influence those incremental sales and at least sometimes probably lower marginal costs for some merchants (Frankel Dep. at 131); and that the shifts in demand could be related to the use of interchange fees by issuers to

22

encourage additional sales.  (Frankel Dep. at 137-38.)  And on the subject of output, Dr. Frankel has opined that default interchange rates and the challenged merchant acceptance rules have led to an over-utilization of payment cards as consumers have been encouraged to use their payment cards too often.  (Frankel Rep. ¶ 229; Frankel Reb. Rep ¶ 310; Frankel Dep. at 302.)  This opinion is consistent with Dr. Frankel's earlier writings, in which he expressed the view that "banks issue more credit cards and consumers use credit cards for more transactions than they would with no interchange fee."  Dennis W. Carlton & Alan S. Frankel, *The Antitrust Economics of Credit Card Networks*, 63 Antitrust L. J. 643, 661 (1995).

Faced with these undisputed facts with which his opinions about the competitive effects of the default interchange rules simply do not fit, Dr. Frankel equivocated in his deposition, testifying that he cannot tell whether the challenged rules have impeded the growth in card usage, *i.e.*, output.  (Frankel Dep. at 210-13, 377-78.)  Indeed, Dr. Frankel admitted that "the analysis of output is not properly applied to the markets [he'd] defined" (Frankel Dep. at 213), but could only be applied to a hypothetical relevant market that neither he nor plaintiffs have defined.  The most Dr. Frankel could say was that the effect of the challenged rules on payment card transaction volume has been "ambiguous."  (Frankel Dep. at 378, 1008-09.)

These marketplace factors establish that "all else is not equal," that is, that merchants can gain incremental sales when payment card networks establish a positive interchange fee.  Yet Dr. Frankel conducted no economic analysis to determine whether the net effect of the default interchange and merchant acceptance rules is a reduction in output.  More specifically, he undertook no study to assess the extent of incremental sales resulting from the use of interchange fees to incentivize merchant sales (Frankel Dep. at 132-35), and similarly conceded that he undertook no investigation of whether card acceptance lowered marginal costs.  (Frankel Dep. at

23

124-26, 130-32.)  Dr. Frankel admitted that his conclusion that retail prices are higher due to the existence of interchange fees is an assumption, and that he has done no economic analysis of retail pricing data, including the retail pricing data of the merchants for whom he is working in this case.  (Frankel Dep. at 236-41.)  Dr. Frankel did nothing to assess the effects of the challenged conduct in this case on any market that he claims would be appropriate.  Indeed, he testified that an analysis of output would not appropriately be applied to any of the markets he has defined. (Frankel Dep. at 213-14.)

   In sum, Dr. Frankel performed no economic analysis to determine the fundamental competitive issue in this case – whether defendants' conduct increased or decreased output. (Frankel Dep. at 1028-29.)  The opinions he expressed about the competitive effects of the challenged rules are therefore unreliable and, under Rule 702, inadmissible.

### *Conclusion*

For the foregoing reasons, the Court should exclude the opinions proffered by Alan S. Frankel that (i) class plaintiffs suffered injury in fact and measurable damages and (ii) the network establishment of default interchange rates has had an anticompetitive effect in some undefined relevant market.

Dated:    New York, New York        Respectfully submitted,
           February 11, 2011

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

By:   /s/ Gary R. Carney
      Andrew C. Finch
      Gary R. Carney
      1285 Avenue of the Americas
      New York, New York 10019-6064
      Tel.: (212) 373-3000
      Fax: (212) 757-3990
      gcarney@paulweiss.com

Kenneth A. Gallo
Joseph J. Simons
2001 K Street, N.W.
Washington, DC 20006-1047
Tel.: (202) 223-7300
Fax: (202) 223-7420

**WILLKIE FARR & GALLAGHER LLP**

Keila D. Ravelo
Wesley R. Powell
Matthew Freimuth
787 Seventh Avenue
New York, New York 10019-6099
Tel.: (212) 728-8000
Fax: (212) 728-8111

*Attorneys for Defendant MasterCard Incorporated and MasterCard International Incorporated*

25

**ARNOLD & PORTER LLP**

By:   /s/ Robert C. Mason
      Robert C. Mason
      399 Park Avenue
      New York, NY  10022-4690
      Telephone:  (212) 715-1000
      Facsimile:  (212) 715-1399
      robert.mason@aporter.com

      Robert J. Vizas
      One Embarcadero Center, 22nd Floor
      San Francisco, CA  94111-3711
      Telephone:  (415) 356-3000
      Facsimile:  (415) 356-3099

      Mark R. Merley
      Matthew A. Eisenstein
      555 12th Street, N.W.
      Washington, DC  20004-1206
      Telephone:  (202) 942-5000
      Facsimile:  (202) 942-5999

*Attorneys for Defendants Visa Inc., Visa U.S.A. Inc., and Visa International Service Association*


**MORRISON & FOERSTER LLP**

By:   /s/ Mark P. Ladner
      Mark P. Ladner
      Michael B. Miller
      1290 Avenue of the Americas
      New York, NY  10104-0050
      Telephone:  (212) 468-8000
      Facsimile:  (212) 468-7900
      mladner@mofo.com

*Attorneys for Defendants Bank of America, N.A., BA Merchant Services LLC (f/k/a Defendant National Processing, Inc.), Bank of America Corporation, and MBNA America Bank, N.A.*

**SHEARMAN & STERLING LLP**

By:  /s/ James P. Tallon
      James P. Tallon
      Wayne D. Collins
      Lisl J. Dunlop
      599 Lexington Avenue
      New York, NY 10022-6069
      Tel.: (212) 848-4000
      Fax: (212) 848-7179
      jtallon@shearman.com

*Attorneys for Defendants Barclays Financial Corp. and Barclay's Bank plc*

**O'MELVENY & MYERS LLP**

By:  /s/ Andrew J. Frackman
      Andrew J. Frackman
      Edward D. Hassi
      Times Square Tower
      7 Times Square
      New York, N.Y. 10036
      Tel.: (212) 326-2000
      Fax: (212) 326-2061
      afrackman@omm.com

*Attorneys for Defendants Capital One Bank (USA), N.A., Capital One F.S.B., and Capital One Financial Corp.*

27

**SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP**

By:   /s/ Peter E. Greene
      Peter E. Greene
      Peter S. Julian
      Four Times Square
      New York, NY   10036
      Telephone:  (212) 735-3000
      Facsimile:  (212) 735-2000
      peter.greene@skadden.com

      Michael Y. Scudder
      155 North Wacker Drive
      Chicago, IL  60606-1720
      Telephone:  (312) 407-0700
      Facsimile:  (312) 407-0411
      michael.scudder@skadden.com

*Attorneys for Defendants JPMorgan Chase & Co.,
Chase Bank USA, N.A., Chase Manhattan Bank
USA, N.A., Chase Paymentech Solutions, LLC,
JPMorgan Chase Bank, N.A., Bank One
Corporation, and Bank One Delaware*

**SIDLEY AUSTIN LLP**

By:    /s/ David F. Graham

David F. Graham
Eric H. Grush
One South Dearborn Street
Chicago, IL 60603
Tel.: (312) 853-7000
Fax: (212) 853-7036
dgraham@sidley.com

Benjamin R. Nagin
787 Seventh Avenue
New York, N.Y. 10019
Tel.: (212) 839-5300
Fax: (212) 839-5599

*Attorneys for Defendants Citibank (South Dakota),*
*N.A., Citibank, N.A., Citigroup Inc., and Citicorp*


**KEATING MUETHING & KLEKAMP PLL**

By:    /s/Richard L. Creighton

Richard L. Creighton
Joseph M. Callow, Jr.
Drew M. Hicks
One East Fourth Street
Suite 1400
Cincinnati, OH 45202
Tel.: (513) 579-6400
Fax: (513) 579-6457

*Attorneys for Defendant Fifth Third Bancorp*

**KUTAK ROCK LLP**

By:     /s/ John P. Passarelli
        John P. Passarelli
        James M. Sulentic
        The Omaha Building
        1650 Farnam Street
        Omaha, NE 68102-2186
        Tel.: (402) 346-6000
        Fax: (402) 346-1148
        john.passarelli@kutakrock.com

*Attorneys for Defendant First National Bank of Omaha*


**WILMER CUTLER PICKERING HALE AND DORR LLP**

By:     /s/ Christopher R. Lipsett
        Christopher R. Lipsett
        David S. Lesser
        399 Park Avenue
        New York, N.Y. 10022
        Tel.: (212) 230-8800
        Fax: (212) 230-8888
        chris.lipsett@wilmerhale.com

        Ali M. Stoeppelwerth
        Perry A. Lange
        1875 Pennsylvania Ave., N.W.
        Washington, D.C. 20006
        Tel.: (202) 663-6000
        Fax: (202) 663-6363

*Attorneys for HSBC Finance Corporation and HSBC North America Holdings, Inc.*

30

**JONES DAY**

By:  /s/ John M. Majoras
      John M. Majoras
      Joseph W. Clark
      51 Louisiana Avenue, NW
      Washington, DC  20001
      Telephone:  (202) 879-3939
      Facsimile:  (202) 626-1700
      jmmajoras@jonesday.com

*Attorneys for Defendants National City Corporation, National City Bank of Kentucky*


**PULLMAN & COMLEY, LLC**

By:  /s/ Jonathan B. Orleans
      Jonathan B. Orleans
      Adam S. Mocciolo
      850 Main Street
      Bridgeport, CT  06601-7006
      Telephone:  (203) 330-2000
      Facsimile:  (203) 576-8888
      jborleans@pullcom.com

*Attorneys for Defendant Texas Independent Bancshares, Inc.*


**ALSTON & BIRD LLP**

By:  /s/ Teresa T. Bonder
      Teresa T. Bonder
      Valarie C. Williams
      Kara F. Kennedy
      1201 W. Peachtree Street, N.W.
      Atlanta, GA 30309
      Tel.: (404) 881-7000
      Fax: (404) 881-7777
      teresa.bonder@alston.com

*Attorneys for Defendant Suntrust Banks, Inc.*

31

**PATTERSON BELKNAP WEBB & TYLER LLP**

By:  /s/ Robert P. LoBue
      Robert P. LoBue
      Norman W. Kee
      Patterson Belknap Webb & Tyler LLP
      1133 Avenue of the Americas
      New York, NY  10036
      Tel.:  (212) 336-2596
      Fax:  (212) 336-2222
      rplobue@pbwt.com

*Attorneys for Defendants Wachovia Bank, NA., Wachovia Corporation, and Wells Fargo & Company*