

37456931
May 6 2011
6:07PM

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | MDL Docket No. 1720 (JG)(JO) |

**Class Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Exclude Certain Opinions of Class Plaintiffs' Economic Expert Dr. Alan S. Frankel**

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Tel: 612-349-8500

BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Tel: 215-875-3000

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
Tel: 619-231-1058

*Co-Lead Counsel for MDL 1720 Class Plaintiffs*

CONTAINS HIGHLY CONFIDENTIAL MATERIAL -- TO BE FILED UNDER SEAL

## TABLE OF CONTENTS

I.    Introduction ....................................................................................................1

II.   Dr. Frankel's Opinions Fully Satisfy the Daubert Criteria ...............................3

      A.    Summary of Dr. Frankel's Opinions..........................................................3

      B.    Defendants Have Not Met the Daubert Standard to Exclude
            Dr. Frankel's Opinions..............................................................................7

            1.    Dr. Frankel is Well-Qualified. ...............................................12

            2.    Dr. Frankel's Opinions are Based on Reliable Methodologies..............14

                  a.    Fixed Interchange Fees Artificially Inflate the Prices
                        Merchants Pay for Card Network Acceptance Services. ............15

                  b.    Dr. Frankel Explained How Defendants' Conduct Reduces
                        Output. ...................................................................................18

                  c.    Dr. Frankel's But-For Worlds Are Properly Analyzed and
                        Supported by Economic Theory and Empirical Evidence..........21

                        i.    Primary But-For World...................................22

                        ii.   Alternative But-For World...............................30

                  d.    Dr. Frankel Estimated Overcharges as the Difference
                        Between the Actual Price Paid and the Estimated Price in
                        Both But-For Worlds. ............................................................31

                  e.    Dr. Frankel's But-For Methodology is Well-Established..........32

            3.    Dr. Frankel's Opinions Will Assist the Jury.........................................35

      C.    A Restraint That Artificially Inflates Price is Anticompetitive Regardless
            of its Effect on Output.............................................................................36

III.  Conclusion ....................................................................................................40

# <u>TABLE OF AUTHORITIES</u>

CASES

*Allen v. City of New York,*
    466 F. Supp. 2d 545 (S.D.N.Y. 2006).......................................................35

*American Ad Management, Inc. v. GTE Corp.,*
    92 F.3d 781 (9th Cir. 1996) ......................................................................38

*Amorgianos v. Nat'l R.R. Passenger Corp.,*
    303 F.3d 256 (2d Cir. 2002)......................................................7, 9, 10, 35

*Apex Hosiery Co. v. Leader,*
    310 U.S. 469 (1940)...................................................................................37

*B.F. Goodrich v. Betkoski,*
    99 F.3d 505 (2d Cir. 1996).........................................................................35

*Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.,*
    784 F.2d 1325 (7th Cir. 1986) ...................................................................34

*Berkey Photo, Inc. v. Eastman Kodak,*
    603 F.2d 263,303 (2d Cir. 1979).................................................................33

*Board of Trade of City of Chicago v. U.S.,*
    246 U.S. 231 (1918)...................................................................................36

*Borawick v. Shay,*
    68 F.3d 597 (2d Cir. 1995)...........................................................................7

*Boucher v. U.S. Suzuki Motor Corp.,*
    73 F.3d 18 (2d Cir. 1996) .............................................................................9

*Bradburn Parent/Teacher Stores, Inc. v. 3M,*
    2004 WL 1842987 (E.D. Pa. Aug. 14,2004) ............................................34

*Brennan v. Concord EFS, Inc.,*
    369 F. Supp.2d 1127 (N.D. Cal. 2005) .....................................................34

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,*
    509 U.S. 209 (1993)........................................................................38, 39, 40

*California Dental Ass'n v. F.T.C.,*
    526 U.S. 756 (1999)...................................................................................14

*Chicago Prof'l Sports Ltd. P'ship v. National Basketball Ass'n,*
    95 F.3d 593 (7th Cir. 1996) .........................................................34, 38, 39, 40

*Chicago Prof'l Sports Ltd P'ship v. National Basketball Ass'n*,
   961 F.2d 667 (7th Cir. 1992) ...................................................................38, 39

*City of Tuscaloosa v. Harcros Chems., Inc.*,
   158 F.3d 548 (11th Cir. 1998) ...................................................................10

*Clorox Co. v. Sterling- Winthrop, Inc.*,
   117 F.3d 50 (2d Cir. 1997)...................................................................33

*Concord Boat Corp. v. Brunswick Corp.*,
   207 F.3d 1039 (8th Cir. 2000) ...................................................................22

*Conwood Co. v. U.S. Tobacco Co.*,
   290 F.3d 768 (6th Cir. 2002) ...................................................................10

*Cordes & Co. Financial Services v. A.G. Edwards & Sons, Inc.*,
   502 F.3d 91 (2d Cir. 2007)...................................................................32

*Daubert v. Merrell Dow Pharmaceuticals*,
   509 U.S. 579 (1993) ................................................................... passim

*Deutsch v. Novartis Pharmaceuticals Corp.*,
   2011 WL 790702 (E.D.N.Y. Mar. 8, 2011)...................................................................9

*Deutscher Tennis Bund v. ATP Tour, Inc.*,
   610 F.3d 820 (3d Cir. 2010)...................................................................15

*Discover Financial Services v. Visa U.S.A., Inc.*,
   582 F. Supp. 2d 501 (S.D.N.Y. 2008)...................................................................10

*Fleischman v. Albany Medical Center*,
   728 F. Supp. 2d 130 (N.D.N.Y. 2010)...................................................................11, 35

*FTC v. Indiana Federation of Dentists*,
   476 U.S. 447 (1986)...................................................................37

*Geneva Pharm. Tech. Corp. v. Barr Labs.*,
   386 F.3d 485 (2d Cir. 2004)...................................................................33

*Hudgens v. Bell Helicopters/Textron*,
   328 F.3d 1329 (11th Cir. 2003) ...................................................................35

*ID Sec. Systems Canada, Inc. v. Checkpoint Systems, Inc.*,
   198 F. Supp. 2d 598 (E.D. Pa. 2002) ...................................................................9

*In re Baycol Products Litigation*,
   532 F. Supp. 2d 1029 (D. Minn. 2007) ...................................................................9

*In re Benjumen,*
    408 B.R. 9 (E.D.N.Y. 2009) ........................................................................8

*In re Ethylene Propylene Diene Monomer Antitrust Litig.,*
    256 F.R.D. 82 (D. Conn. 2009)..................................................................32

*In re Flat Glass Antitrust Litig.,*
    385 F.3d 350 (3d Cir. 2004)......................................................................14

*In re High Fructose Corn Syrup Antitrust Litig.,*
    295 F.3d 651 (7th Cir. 2002) .............................................................10, 14

*In re High Pressure Laminates Antitrust Litig.,*
    2006 WL 931692 (S.D.N.Y. Apr. 7, 2006).............................................11

*In re Industrial Silicon Antitrust Litig.,*
    1998 WL 1031507 (W.D. Pa. Oct. 13, 1998) .........................................11

*In re Linerboard Antitrust Litig.,*
    305 F.3d 145 (3d Cir. 2002)......................................................................34

*In re Linerboard Antitrust Litig.,*
    497 F. Supp. 2d 666 (E.D. Pa. 2007) ................................................10, 32

*In re Live Concert Antitrust Litig.,*
    247 F.R.D. 98 (C.D. Cal. 2007).................................................................34

*In re Mercedes-Benz Antitrust Litig.,*
    2006 WL 2129100 (D.N.J. Jul. 26, 2006)................................................11

*In re NASDAQ Market-Makers Antitrust Litig.,*
    169 F.R.D. 493 (S.D.N.Y. 1996) ..............................................................33

*In re Paoli R.R. Yard PCB Litigation,*
    35 F.3d 717 (3d Cir. 1994).........................................................................9

*In re Polypropylene Carpet Antitrust Litig.,*
    93 F. Supp.2d 1348 (N.D. Ga. 2000) ........................................................11

*In re Scrap Metal Antitrust Litig.,*
    527 F.3d 517 (6th Cir. 2008) .....................................................................10

*In re Southeastern Milk Antitrust Litig.,*
    2010 WL 5102974 (E.D. Tenn. Dec. 8, 2010)................................7, 10, 14

*In re Static Random Access Memory (SRAM) Antitrust Litig.,*
    2010 WL 5071694 (N.D. Cal. Dec. 7, 2010).............................................10

*In re Sulfuric Acid Antitrust Litig.*,
446 F. Supp. 2d 910 (N.D. Ill. 2006) ............................................................... 10

*In re Visa Check/MasterMoney Antitrust Litig.*,
192 F.R.D. 68 (E.D.N.Y. 2000) ......................................................... 28, 33, 34

*In re Zyprexa Products Liability Litig.*,
489 F. Supp. 2d 230 (E.D.N.Y. 2007) .............................................................. 7

*Lakie v. SmithKline Beecham*,
965 F. Supp. 49 (D.D.C. 1997) ......................................................................... 9

*Law v. National Collegiate Athletic Ass'n*,
185 F.R.D. 324 (D. Kan. 1999) ......................................................................... 9

*Litton Systems, Inc. v. American Tel. and Tel. Co.*,
700 F.2d 785 (2d Cir. 1983) ............................................................................. 11

*McIntosh v. Monsanto Co.*,
462 F. Supp. 2d 1025 (E.D. Mo. 2006) ........................................................... 10

*Milward v. Acuity Specialty Products Group, Inc.*,
2011 WL 982385 (1st Cir. Mar. 22, 2011) ....................................................... 9

*Natchitoches Parish Hosp. Service Dist. v. Tyco Intern., Ltd.*,
2009 WL 3053855 (D. Mass. Sept. 21, 2009) ................................................. 10

*National Collegiate Athletic Ass'n v. Board of Regents of Univ. of Okla.*,
468 U.S. 85 (1984) ............................................................................................ 36

*National Society of Professional Engineers v. U.S.*,
435 U.S. 679 (1978) .............................................................................. 15, 36, 37

*New York v. Julius Nasso Concrete Corp.*,
202 F.3d 82 (2d Cir. 2000) ............................................................................... 11

*Nimely v. City of New York*,
414 F.3d 381 (2d Cir. 2005) ....................................................................... 7, 8, 35

*Ohio ex rel Montgomery v. Louis Trauth Dairy, Inc.*,
925 F. Supp. 1247 (S.D. Ohio 1996) ............................................................... 11

*Peoria Day Surgery Center v. OSF Healthcare System*,
2009 WL 1231303 (C.D. Ill. Apr. 29, 2009) ................................................... 10

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*,
998 F.2d 1224 (3d Cir. 1993) ........................................................................... 10

*Realcomp II, Ltd. v. F.T.C.*,
  635 F.3d 815 (6th Cir. Apr. 6, 2011) ..................................................................15

*Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*,
  161 F.3d 77 (1st Cir. 1998) ..............................................................................9

*Southwire Co. v. J.P. Morgan Chase & Co.*,
  528 F. Supp. 2d 908 (W.D. Wis. 2007) ............................................................10

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
  282 U.S. 555 (1931) ..........................................................................................11

*Sun Microsystems Inc. v. Hynix Semiconductor Inc.*,
  608 F. Supp. 2d 1166 (N.D. Cal. 2009) ......................................................10, 32

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001) ..............................................................................14

*Town of Concord v. Boston Edison Co.*,
  915 F.2d 17 (1st Cir. 1990) ..............................................................................34

*United Nat'l Maintenance Inc. v. San Diego Convention Ctr. Corp.*,
  2010 WL 3034025 (S.D. Cal. Aug. 3, 2010) ....................................................10

*United States v. Container Corp. of Am.*,
  393 U.S. 333 (1969) ..........................................................................................14

*United States v. Kelly*,
  2008 WL 5068820 (E.D.N.Y. Jul. 10, 2008) ......................................................7

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) ............................................................................19

*United States v. Visa U.S.A., Inc.*,
  163 F. Supp. 2d 322 (S.D.N.Y. 2001) ..............................................................37

*Univac Dental Co. v. Dentsply Intern., Inc.*,
  2010 WL 1816745 (M.D. Pa. Apr. 27, 2010) ................................................7, 10

*Yankees Entertainment & Sports Network LLC v. Cablevision Sys. Corp.*,
  224 F. Supp. 2d 657 (S.D.N.Y. 2002) ..............................................................34

## I.    Introduction

Defendants' motion to exclude Dr. Frankel's expert economic opinions addressing the anticompetitive effects of Defendants' conduct, and the resulting injury and damages sustained by merchants is fundamentally flawed.  Although Defendants claim that their motion challenges the reliability of Dr. Frankel's methodologies, they essentially ask the Court, improperly, to weigh Dr. Frankel's opinions under the guise of fulfilling its *Daubert* gatekeeping function.  Dr. Frankel's opinions are based on established economic theory and well-established and accepted methodologies for estimating damages in price-fixing cases.  Dr. Frankel employs the standard approach to defining relevant antitrust markets.  He conducts a standard "structure-conduct-performance" assessment of the relevant markets and their firms to assess the amenability of those markets to anti-competitive behavior and the likelihood that any price-fixing or anticompetitive collusion would be successful.  Finally, as has been done and accepted in scores of antitrust cases, Dr. Frankel carefully analyzes what a "but-for" world (without the challenged antitrust conduct) would look like; what the challenged price would be in that but-for world; and compares the differences between the but-for (competitive) price and the price actually paid by the class.  That difference constitutes the damages.

Dr. Frankel describes two, alternative, but-for worlds to establish impact and damages. Dr. Frankel's first but-for world analyzes a world in which the challenged competitive restraints – rules requiring payment of fixed interchange fees on every payment card transaction and the anti-steering restraints – would not have existed thereby creating a competitive world.[1]  In that

---

[1] Interchange fees are collectively set in the Visa system by Visa and its member banks and the MasterCard System by MasterCard and its member banks.  Both Visa and MasterCard has rules requiring merchants to pay the applicable interchange fee on every transaction.  Class Plaintiffs' Statement of Uncontested Facts ¶¶ 41-43, 49, 52-53, 59-61.

world, Dr. Frankel concludes that merchants would not have paid any interchange fees, since there is no economic incentive to do so and the compulsion has been removed. This world is consistent with economic theory and experience because interchange fees are not compensation to issuing banks for any service provided to merchants. It is also consistent with common-sense experience in the real world, where consumers and firms don't volunteer to pay taxes.

Dr. Frankel's alternative but-for world responds to Defendants' "death spiral" claim that interchange fees are necessary to the continued existence of the networks. In that world, Dr. Frankel explains that the networks would have set interchange fees at the lowest level necessary for them to have continued to operate. In this alternative but-for world, Dr. Frankel identifies three benchmarks in which interchange fees are substantially lower than those in the United States. Each benchmark rate applies in a foreign jurisdiction where Visa and MasterCard have unquestionably operated successfully. Dr. Frankel's opinions are supported by detailed factual and economic analyses, empirical evidence and economic theory and will assist the jury in understanding and deciding the issues in this case. Both of Dr. Frankel's but-for worlds are also consistent with the applicable legal standards, as discussed below.

Defendants do not dispute that Dr. Frankel is qualified to provide his economic opinions. He is one of the world's preeminent experts on the economics of payment card networks.

Defendants' disagreement with Dr. Frankel's opinions does not provide any reason to exclude them and is an improper basis for their motion. The weight to be given to Dr. Frankel's opinions is solely for the jury to decide.

For all of these reasons, which are detailed below, Defendants' motion should be denied.

II.     **Dr. Frankel's Opinions Fully Satisfy the *Daubert* Criteria**

A.      **Summary of Dr. Frankel's Opinions**

To form his opinions and reach his conclusions, Dr. Frankel, brought to bear his not only his academic training, but also his extensive expertise and experience with payment card systems in the United States and around the world.  Dr. Frankel has also further studied and analyzed the relevant economic issues in this case, and had access to the entire discovery record, including the enormous document databases, in this case.  The primary economic issues Dr. Frankel addresses are: (1) the relevant market definition; (2) market power; (3) the competitive effects of the challenged conduct; and (4) injury and damages.[2]  Each of his conclusions is briefly summarized below.

As to the relevant market definition, Dr. Frankel concludes "the relevant markets in this case are no broader than general purpose card acceptance (network) services, offline debit card acceptance services, and PIN debit card acceptance services. Moreover, marketplace conditions – particularly, defendants' adoption and enforcement of the anti-steering rules – narrow the product markets further to separate card acceptance services markets for MasterCard general purpose cards, Visa general purpose cards, MasterCard offline debit cards, Visa offline debit cards, and Visa's Interlink PIN debit cards."  Frankel Report ¶ 11(a) and § 3.  With respect to the

---

[2] Dr. Frankel also addressed: coordination between Visa and MasterCard, Frankel Report § 7; the competitive implications of joint venture structures and their conversions to publicly held corporations, Frankel Report § 8; the history and structure of the credit and debit card industry in the United States, Frankel Report, App. A; and events in Australia after the Reserve Bank of Australia required Visa and MasterCard to reduce their interchange fees by nearly fifty percent, Frankel Report, App. B.  A true and correct copy of the Report of Alan S. Frankel, Ph.D. (July 2, 2009) (the "Frankel Report") is attached as Exhibit SUFEX240 to the Declaration of Ryan W. Marth In Support of Class Plaintiffs' Motion for Summary Judgment.  A true and correct copy of the Rebuttal Report of Alan S. Frankel, Ph.D. (June 22, 2010) ("Frankel Rebuttal Report") is attached as Exhibit SUFEX 556 to the Declaration of Ryan W. Marth In Support of Class Plaintiffs' Motion for Summary Judgment.

market power of Visa and MasterCard, Dr. Frankel concludes that "MasterCard and Visa each possess market power in their respective relevant markets. They also collectively possess market power as do their member banks." Frankel Report ¶ 11(b) and § 4.  Defendants do not challenge Dr. Frankel's opinions on relevant market and market power.

Dr. Frankel further concludes that Defendants' conduct has anticompetitive effects in the relevant markets.  Specifically, consistent with opinions he has offered throughout the world – and on which regulatory authorities around the world have uniformly concluded that Defendants' fixed interchange fees and the anti-steering restraints are anticompetitive[3] – Dr. Frankel concludes that fixed interchange fees have the obvious anticompetitive effect of artificially inflating prices paid by merchants to accept Visa and MasterCard branded payment cards without any offsetting pro-competitive benefits.  Frankel Report ¶ 11(c-d) and §§ 5-6.  Dr. Frankel further concludes that fixed interchange fees combined with the anti-steering restraints prevent price competition for card acceptance services in the relevant markets.  Frankel Report § 5.2.  Defendants do not challenge Dr. Frankel's opinion that interchange fees increase the price that merchants pay to accept Visa and MasterCard branded payment cards.

Contrary to Defendants' assertion that Dr. Frankel's opinions are irrelevant because he did not analyze the effect of Defendants' conduct on output in any relevant market, Defs.' Mem. at 21-22, Dr. Frankel explains that Defendants' conduct reduced output as measured by categories of merchants that do not accept Defendants' cards and the reduced sales of

---

[3] *See* Frankel Report ¶ 447 (identifying countries/areas in which interchange fees have been reduced as a result of regulatory investigations, including Australia,  Austria, Belgium, Chile, Colombia, Denmark, the European Union, Greece, Hungary, Ireland, Israel, Italy, Luxemburg, Malta, Mexico, The Netherlands, Poland, Portugal, Spain, Sweden, Switzerland and Turkey).

goods/services in the economy.[4]  Frankel Report ¶¶ 160-62, 229.  Dr. Frankel identifies a

category of merchants that does not accept cards because of high fees and shows that merchant

acceptance in Australia increased after Visa's and MasterCard's interchange fees were reduced

by the Reserve Bank of Australia.  Frankel Report ¶¶ 161-62.  Dr. Frankel also identifies

countries in which the transactions on debit card network clear at par, and observes that such

countries are among the top 10 countries in the world in terms of *per capita* usage of debit cards.

Frankel Report ¶ 346 and Figure 9.1.

Dr. Frankel also opines that merchants have been injured and suffered damages because

of Defendants' anticompetitive conduct, based on his analysis of but-for worlds.  Frankel Report

§ 9.  Defendants argue that Dr. Frankel's methodologies for constructing his but-for worlds are

improper because they do not utilize appropriate benchmarks and do not remove the challenged

restraint.  Defs.' Mem. at 11-20.  To the contrary, Dr. Frankel's methodology for constructing

but-for worlds is well established and supported by empirical evidence and economic theory.  Dr.

Frankel properly constructs a primary but-for world in which the anticompetitive restraints –

rules requiring payment of interchange fees on every transaction and the anti-steering restraints –

would not have existed.  Frankel Report ¶¶ 286-87, 289-91, 294-95, 301, 319.  Empirical

evidence and economic theory shows that in a competitive market without the restraint,

merchants would not have paid interchange fees because they receive no services from issuers

for the fee and the fee is unnecessary to the networks' existence.   Frankel Report ¶¶ 294-97,

321-25.  Dr. Frankel's conclusions are supported by real world evidence of four-party payment

systems that operate efficiently without interchange fees.  Frankel Report § 9.4.1.  Dr. Frankel

---

[4] Defendants' argument is also contrary to settled law that anticompetitive effect is established
by showing that defendants' conduct artificially inflated prices, without any showing of reduced
output.  See § II.C, *infra*.

estimated overcharge damages by the difference between the real world and but-for world price – the amount of interchange fees paid by merchants.  Frankel Report §§ 9.2-9.3.

Dr. Frankel's alternative but-for world responds to Defendants' argument that interchange fees are necessary to the continued existence of the network.  Frankel Report ¶¶ 314-15.  Accepting that argument for these purposes only, Dr. Frankel then employs a "less-restrictive" analysis – looking for benchmarks where it is inferable that Visa and MasterCard can survive at interchange fee rates less restrictive than those imposed on merchants in the United States.  The but-for fees are premised on real world examples of other places where the networks have operated successfully notwithstanding interchange fees that are substantially lower than those in the United States.  Frankel Report ¶¶ 315-21.  In this world, Dr. Frankel estimated overcharge damages by the difference between actual interchange fees paid and a conservatively derived benchmark fee.  Frankel Report §§ 9.2-9.3.

While Defendants challenge Dr. Frankel's opinions on impact and damages, significantly, they do not challenge his basic methodology:  constructing a but-for world without the challenged conduct and determining the price that would have been paid.  Rather, Defendants' motion is predicated on a dispute between economists about economic theory.  Defendants, and their experts, insist that these issue can be analyzed only under the so-called "Two-Sided Market" theory which focuses on the competitive effects of Defendants' conduct on both merchants and cardholders.  Dr. Frankel's analyses and opinions focus solely on the competitive effects of Defendants' conduct on merchants – consistent with Class Plaintiffs' complaint, the theory of the case, and proper economic theory.  This dispute between economists about economic theory and its correct application is precisely what should be resolved by the

jury and not precluded under *Daubert*.  These are disagreements as to ultimate conclusions on

liability, injury and damages not the methodology and reliability of opinions.

**B.**      **Defendants Have Not Met the *Daubert* Standard to Exclude Dr. Frankel's Opinions.**

The *Daubert* standard, codified in Rule 702 of the Federal Rules of Evidence,[5] governs

the admissibility of expert testimony.  *See Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S.

579 (1993); *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002).  In

describing that admissibility standard, Defendants ignore that *Daubert* – and Rule 702 –

articulates a *liberal* standard for the admission of expert testimony.  As the Second Circuit has

recognized, *Daubert* "loosen[ed] the strictures on scientific evidence set by *Frye*, [and therefore,]

*Daubert* reinforce[d] the idea that there should be a presumption of admissibility of evidence."

*Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995).  The Federal Rules of Evidence have a

"liberal thrust" and "liberal admissibility standards" that "recognize[] that our adversary system

provides the necessary tools for challenging reliable, albeit debatable, expert testimony."

*Amorgianos*, 303 F.3d at 265, 267.  *See also Nimely v. City of New York*, 414 F.3d 381, 395 (2d

Cir. 2005) ("It is a well-accepted principle that Rule 702 embodies a liberal standard of

admissibility for expert opinions, representing a departure from the previously widely followed,

and more restrictive, standard of *Frye*.").[6]

---

[5] *See* Fed. R. Evid. 702 Advisory Committee Notes on the 2000 Amendments.

[6] *See also, United States v. Kelly*, 2008 WL 5068820, at *8 (E.D.N.Y. Jul. 10, 2008) ("The Second Circuit applies a liberal approach as it pertains to the admission of expert testimony."); *In re Zyprexa Products Liability Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007) (noting that "the assumption the court starts with is that a well qualified expert's testimony is admissible"); *Univac Dental Co. v. Dentsply Intern., Inc.*, 2010 WL 1816745, at *3 (M.D. Pa. Apr. 27, 2010) (ruling that expert's testimony was admissible "[i]n light of the liberal standards that apply to the calculation of antitrust damages and the admissibility of expert opinion testimony."); *In re Southeastern Milk Antitrust Litig.*, 2010 WL 5102974, at *1 (E.D. Tenn. Dec. 8, 2010) ("[O]ne aspect of the *Daubert* opinion bears mentioning: although noting that the trial court has the

Under *Daubert*, the court serves a "gatekeeping" function by "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597. As gatekeeper, the court must determine whether the following three requirements for admissibility are met: (1) the witness must be "'qualified as an expert' to testify as to a particular matter"; (2) the expert's opinion must be "based upon reliable data and methodology"; and (3) "the expert's testimony (as to a particular matter) [must] assist the trier of fact." *Nimely*, 414 F.3d at 397 (internal quotes and cites omitted).

The court's gatekeeping function "is *not* intended to serve as a replacement for the adversary system." *In re Benjumen*, 408 B.R. 9, 21 (E.D.N.Y. 2009) (citations omitted) (emphasis added). Indeed, the Supreme Court recognizes that expert opinion evidence should be tested by the adversary system:

> Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence. …These conventional devices, rather than wholesale exclusion … are the appropriate safeguards where the basis of scientific testimony meets the standard of Rule 702.

*Daubert*, 509 U.S. at 596.

Therefore, when reviewing expert testimony for admissibility, the court should admit testimony even if it believes the expert's technique has flaws that may render the conclusions inaccurate. As the Second Circuit recognized, "[a] minor flaw in an expert's reasoning or a

---

responsibility of ensuring that an expert's proposed testimony rests 'on a reliable foundation and is relevant,' *i.e.*, the 'gatekeeping rule,' Rule 702 nevertheless manifests a *liberal* approach in determining the admissibility of expert opinions. Often overlooked in the *Daubert* opinion is the Court's reminder that our adversary system of justice presumes that the jury is capable of understanding the evidence; understanding and heeding the judge's instructions; and then separating the evidentiary wheat from the chaff…") (emphasis in original) (internal cites omitted).

slight modification of an otherwise reliable method [does] not render an expert's opinion *per se* inadmissible." *Amorgianos*, 303 F.3d at 267.[7]

In addition, the novelty of the theory or its application does not render the opinion inadmissible as long as it based on a reliable methodology. *Deutsch v. Novartis Pharmaceuticals Corp.*, 2011 WL 790702, at *15 (E.D.N.Y. Mar. 8, 2011). "[S]cience is constantly evolving, and the fact that a theory is new or in the process of becoming generally accepted does not prevent its admission in court." *In re Baycol Products Litigation*, 532 F. Supp. 2d 1029, 1066 (D. Minn. 2007). In a *Daubert* challenge, the proponents "do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are *correct*, they only have to demonstrate by a preponderance of evidence that their opinions are reliable. … The evidentiary requirement of reliability is lower than the merits standard of correctness." *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 744 (3d Cir. 1994) (emphasis in original).

"*Daubert* neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance." *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998).[8] The focus of the court's evaluation "must be

---

[7] *See also Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (only testimony that is "speculative or conjectural," "based on assumptions that are so unrealistic and contradictory as to suggest bad faith," or "in essence an apples and oranges comparison" may be excluded, and "other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony") (internal quotes and citations omitted).

[8] *See Milward v. Acuity Specialty Products Group, Inc.*, 2011 WL 982385, at *3 (1st Cir. Mar. 22, 2011) (same); *ID Sec. Systems Canada, Inc. v. Checkpoint Systems, Inc.*, 198 F. Supp. 2d 598, 605 (E.D. Pa. 2002) ("The standard for determining whether a witness may offer expert testimony does not require the proponent of the testimony to prove, with absolute precision, that the expert's opinion is correct. The court must determine only that the opinion is reliable."); *Law v. National Collegiate Athletic Ass'n*, 185 F.R.D. 324, 329-30 (D. Kan. 1999) ("case presented a classic battle of the experts, a battle in which the jury must decide the victor"); *Lakie v. SmithKline Beecham*, 965 F. Supp. 49, 54 (D.D.C. 1997) (A trial judge must refrain from "evaluat[ing] the credibility of opposing experts and the persuasiveness of competing scientific studies...").

solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509

U.S. at 595.[9]  As a result, the "rejection of expert testimony is the exception rather than the rule."

*See* Fed. R. Evid. 702, Notes of Advisory Committee on 2000 Amendments.  As aptly noted by a

court denying a *Daubert* motion in an antitrust class action:

> In many "*Daubert* hearings," the party opposing admissibility of an expert's testimony essentially asks the court to weigh or evaluate the expert's opinion under the pretense of fulfilling its *Daubert* gatekeeping role.  In many of the motions, arguments couched in terms of sufficiency of the data, or reliability of methodology, in reality were assertions that this court should reject certain data - facts, of course- in favor of others.  The court may not resolve factual disputes in performing a *Daubert* analysis.  From that, it follows that if the resolution of a *Daubert* issue involves a mixed question of fact and law, the expert's opinion should be admitted into evidence.

*In re Southeastern Milk Antitrust Litig.*, 2010 WL 5102974, at *1 (E.D. Tenn. Dec. 8, 2010).  In

antitrust cases, courts routinely reject similar efforts by defendants to use *Daubert* to exclude

expert opinion, where, as here, the expert has utilized reliable methodologies and the expert's

opinion will assist the jury.[10]

---

[9] *See also Amorgianos*, 303 F.3d at 266 (stating that the court must "focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions.").

[10] *See, e.g., Discover Financial Services v. Visa U.S.A., Inc.*, 582 F. Supp. 2d 501, 502-08 (S.D.N.Y. 2008); *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 524-32 (6th Cir. 2008); *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 791-94 (6th Cir. 2002); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 660-61 (7th Cir. 2002); *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562-66 (11th Cir. 1998); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1236-40 (3d Cir. 1993); *Univac Dental Co.*, 2010 WL 1816745, at *3-4; *In re Southeastern Milk Antitrust Litig.*, 2010 WL 5102974, at *1-*2; *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 2010 WL 5071694, at *4-6 (N.D. Cal. Dec. 7, 2010); *United Nat'l Maintenance Inc. v. San Diego Convention Ctr. Corp.*, 2010 WL 3034025, at *4 (S.D. Cal. Aug. 3, 2010); *Sun Microsystems Inc. v. Hynix Semiconductor Inc.*, 608 F. Supp. 2d 1166, 1207-11 (N.D. Cal. 2009); *Natchitoches Parish Hosp. Service Dist. v. Tyco Intern., Ltd.*, 2009 WL 3053855, at *3-*5 (D. Mass. Sept. 21, 2009); *Peoria Day Surgery Center v. OSF Healthcare System*, 2009 WL 1231303, at *1-2 (C.D. Ill. Apr. 29, 2009); *In re Linerboard Antitrust Litig.*, 497 F. Supp. 2d 666, 668-84 (E.D. Pa. 2007); *Southwire Co. v. J.P. Morgan Chase & Co.*, 528 F. Supp. 2d 908, 926-30 (W.D. Wis. 2007); *McIntosh v. Monsanto Co.*, 462 F. Supp. 2d 1025, 1031-33 (E.D. Mo. 2006); *In re Sulfuric Acid Antitrust Litig.*, 446 F.

The liberal standards of admissibility under *Daubert* are especially applicable in the context of a challenge to an expert's opinion estimating damages in an antitrust case. As the Supreme Court has long recognized: "The wrongdoer is not entitled to complain that [damages] cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise." *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931). In accord with this principle, the Second Circuit has acknowledged that "the … burden of proving antitrust damages is not as rigorous as in other types of cases," and that "[d]amage issues in [antitrust] cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts." *New York v. Julius Nasso Concrete Corp.*, 202 F.3d 82, 88 (2d Cir. 2000) (internal quotes and cites omitted).[11]

Moreover, the Second Circuit, recognizing that one of the limitations involved in proving antitrust damages is establishing what the market price of the commodity or service would have been in an unmanipulated market, has found that "[w]here … there is a dearth of market information unaffected by the collusive action of the defendants, the plaintiff's burden of proving damages, is, to an extent, lightened." *Julius Nasso Concrete*, 202 F.3d at 88 (internal quotes and

---

Supp. 2d 910, 920-26 (N.D. Ill. 2006); *In re Mercedes-Benz Antitrust Litig.*, 2006 WL 2129100, at *6-10, 18 (D.N.J. Jul. 26, 2006); *In re Polypropylene Carpet Antitrust Litig.*, 93 F. Supp.2d 1348, 1359-70 (N.D. Ga. 2000); *In re Industrial Silicon Antitrust Litig.*, 1998 WL 1031507, at *1-4 (W.D. Pa. Oct. 13, 1998); *Ohio ex rel. Montgomery v. Louis Trauth Dairy, Inc.*, 925 F. Supp. 1247, 1252-54 (S.D. Ohio 1996).

[11] *See also Litton Systems, Inc. v. American Tel. and Tel. Co.*, 700 F.2d 785, 823 (2d Cir. 1983) ("[W]here there is a basis on which a jury can reasonably infer significant antitrust injury, [the court] should be very hesitant before determining that damages cannot be awarded."); *Fleischman v. Albany Medical Center*, 728 F. Supp. 2d 130, 148 (N.D.N.Y. 2010) ("'An antitrust plaintiff must provide only sufficient evidence to support a 'just and reasonable estimate' of damages. … A benchmark need not be perfect to allow for this reasonable estimate of damages.") (quoting *United States Football League v. National Football League*, 842 F.2d 1335, 1378 (2d Cir.1988)); *In re High Pressure Laminates Antitrust Litig.*, 2006 WL 931692, at *1 (S.D.N.Y. Apr. 7, 2006) ("A plaintiff must not be denied relief, once he or she has proved injury, simply because of some difficulty in providing precise damages.").

cites omitted).  Here, Dr. Frankel's thorough analyses and well-founded opinions regarding impact and damages fully satisfy *Daubert*'s  standard for admissibility, and would satisfy an even more stringent standard.

As set forth in greater detail below, under *Daubert* and the standards for awarding damages in antitrust actions articulated above, Dr. Frankel's opinions fully satisfy the Second Circuit's requirements for admissibility since (1) he is qualified as an expert (§II.A.1., *infra*); (2) his opinions are based on reliable methodology (§II.A.2., *infra*); and (3) his opinions will assist the trier of fact (§II.A.3., *infra*).

### 1.      Dr. Frankel is Well-Qualified.

Defendants concede, as they must, that Dr. Frankel is well-qualified to provide expert economic opinions in this case.  Dr. Frankel is one of the leading authorities and experts on the economics of payment card networks, including the competitive effects of Visa's and MasterCard's fixed interchange fees and anti-steering restraints.[12]  He has been recognized by courts, agencies and tribunals as an expert on economics and payment systems.  Frankel Report ¶ 6. He has performed economic analyses and formed opinions regarding the competitive effects of fixed interchange fees and the anti-steering restraints in connection with government/regulatory investigations around the world, including the European Commission, United Kingdom, New Zealand, and Australia.  In two of those investigations – U.K. Office of Fair Trading and New Zealand Commerce Commission – Dr. Frankel was retained by the regulatory authorities to assist them in discharging their public duties to evaluate the economic issues raised by the restraints imposed by Visa and MasterCard in payment card market in their jurisdictions.

---

[12]    Dr. Frankel's *curriculum vitae* is Exhibit 1 to the Frankel Report and Appendix A to the Frankel Rebuttal Report.

The economic issues analyzed by Dr. Frankel in the foreign regulatory investigations are substantially similar to those in this case.  Dr. Frankel's economic opinions and conclusions in those investigations are like those he has offered here – fixed interchange fees artificially inflate the price merchants pay to accept Visa and MasterCard branded payment cards and the anti-steering restraints prevent merchants from exerting competitive pressure on interchange fees. Consistent with Dr. Frankel's opinions, numerous regulatory authorities worldwide have found that fixed interchange fees are anticompetitive and set at supracompetitive levels.  Frankel Report ¶ 447.

In addition to addressing these issues as a litigation expert, Dr. Frankel has been studying and analyzing the history and structure of payment card networks, including the economic effects of the conduct challenged here, since 1990.  Frankel Report ¶ 7.  His economic analyses and opinions on these issues have been published in ten peer-reviewed articles – including articles co-authored with Professor Dennis Carlton.  *Id.*[13]

Dr. Frankel has spoken at numerous conferences around the world about the history and competitive effects of payment card networks, including interchange fees.  Several of these conferences have been sponsored by the Federal Reserve Banks of New York, St. Louis, Chicago, and Kansas City.  Frankel Report ¶ 8.

Currently, Dr. Frankel is the Director of Coherent Economics, LLC, and a Senior Advisor in the Chicago office of Compass Lexecon, a leading economic consulting firm.  Frankel Report ¶ 3.  He is also a Senior Editor of the Antitrust Law Journal, the leading professional journal dedicated to legal and economic issues arising in antitrust, competition and consumer protection

---

[13]  Dr. Carlton is the co-author of the leading treatise on industrial organization economics, *i.e.* the study of the economics of competition and restraints on competition.  *See* Dennis W. Carlton & Jeffrey M. Perloff, Modern Industrial Organization (4th ed. 2005).

disputes.  *Id.*  He received a Ph.D. in economics in 1986 from the University of Chicago.
Frankel Report ¶ 4.

> **2.      Dr. Frankel's Opinions are Based on Reliable Methodologies.**

In antitrust cases, economists apply economic theory and analyze empirical evidence to
determine the challenged conduct's competitive effects in the relevant markets.  *See*
*Southeastern Milk Antitrust Litig.*, 2010 WL 5102974, at *2 (expert economists "explain the
economic causes and effects of particular actions").  Such analyses invariably contain a study of
various industry characteristics, including, *inter alia*, seller concentration, barriers to entry into
the market, substitutability, and elasticity of demand, among others.[14]  The purpose of such
analyses is to determine whether the challenged conduct harms or promotes competition.  *See*
*California Dental Ass'n v. F.T.C.*, 526 U.S. 756, 779-80 (1999) ("'[T]he essential inquiry
remains the same -- whether or not the challenged restraint enhances competition.'") (quoting
*National Collegiate Athletic Ass'n v. Board of Regents of Univ. of Okla.*, 468 U.S. 85, 104
(1984) ("Under the Sherman Act the criterion to be used in judging the validity of a restraint on
trade is its impact on competition.")).  *Accord* 7 Areeda & Hovenkamp, *Antitrust Law* ¶1503a at
372-74 (1986 ed.) ("Every antitrust suit should begin by identifying the ways in which a

---

[14] Time and again, courts have looked to economic factors as powerful evidence pertinent to the
existence of an antitrust conspiracy.  *See, e.g., United States v. Container Corp. of Am.*, 393 U.S.
333, 336-37 (1969) (explaining that "the corrugated container industry is dominated by relatively
few sellers," "the product is fungible," and "demand is inelastic" in reversing the dismissal of a
price-fixing complaint); *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 361 (3d Cir. 2004)
(considering, *inter alia*, market concentration and whether product was standardized); *In re High
Fructose Corn Syrup Antitrust Litig*, 295 F.3d 651, 656-57 (7th Cir. 2002) (reversing grant of
summary judgment for defendants after considering, among other things, expert's opinion on
market concentration, substitutability, and elasticity of demand and finding that these
characteristics created an environment that was favorable to price fixing); *Todd v. Exxon Corp.*,
275 F.3d 191, 208 (2d Cir. 2001) (vacating dismissal of antitrust action after considering market
concentration, product fungibility, and elasticity of demand.

challenged restraint might possibly impair competition."; "Identifying the type of possible harm to competition is the first essential step.").[15]

An examination of Dr. Frankel's reports – divorced from Defendants' rhetoric and mischaracterizations – shows that he performed a thorough analysis, confronted the complex questions presented by the facts of this case, and rendered well-supported opinions and conclusions that will be helpful to the jury. Specifically, Dr. Frankel applied well-accepted economic theory and methodologies to investigate whether, and determine that, fixed interchange fees, and the anti-steering restraints, harm competition in the relevant markets without any pro-competitive benefits. Dr. Frankel concludes and describes in his reports: (1) how fixed interchange fees increase the price that merchants pay for card acceptance services; and (2) how rules requiring payment of the fee, in combination with the anti-steering restraints and honor-all-cards rules, effectively eliminate price competition.

### a.     Fixed Interchange Fees Artificially Inflate the Prices Merchants Pay for Card Network Acceptance Services.

As Dr. Frankel explains, a fundamental economic principle is that "[a]ll else equal, higher prices harm those who pay them." Frankel Report ¶ 141. Here, because collectively fixed interchange fees artificially increase the price that merchants pay for Visa and MasterCard card network acceptance services the challenged conduct has an obvious anticompetitive effect.

---

[15] *See also National Society of Professional Engineers*, 435 U.S. 679, 691 (1978) ("'The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition.'") (quoting *Board of Trade of City of Chicago v. U.S.*, 246 U.S. 231, 238 (1918)); *Realcomp II, Ltd. v. F.T.C.*, 635 F.3d 815, 826 (6th Cir. Apr. 6, 2011) ("In all cases, the criterion to be used in judging the validity of a restraint on trade is its impact on competition.") (internal cites and quotes omitted); *Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820, 831 (3d Cir. 2010) ("[For] analysis of anticompetitive effect … the purpose of the inquiry is always to assess the effect of the conduct on competition: Whether the ultimate finding is the product of a presumption or actual market analysis, the essential inquiry remains the same—whether or not the challenged restraint enhances competition.") (internal cites and quotes omitted).

Frankel Report ¶¶ 140-45.  That anticompetitive effect is illustrated by "Visa and MasterCard and their consultants[' argument] that cards are more efficient payment methods than, say, cash or checks."  Frankel Report ¶ 148.  If cards are more efficient, then card acceptance should reduce costs, which in turn, in a competitive environment, should result in lower prices to merchants.  Frankel Report ¶ 148.  Instead of lower prices, however, merchants pay higher prices due to fixed interchange fees.  Because "[i]nterchange fees control and maintain the overall level of prices charged to merchants for card network services," they "therefore have a direct anticompetitive effect."  Frankel Report ¶ 148.

Dr. Frankel's conclusion that interchange fees artificially inflate merchant fees is supported by the evidence.  The evidence shows that price competition is prevented by rules requiring payment of fixed interchange fees and the anti-steering restraints: "Acquirers have no influence over the interchange fee and cannot reduce it, and issuing banks are not competing for merchant business."  Frankel Report ¶ 150.  The evidence further shows that while acquirer-based fees to merchants (as a component of the merchant discount) have been trending down, the interchange fee (as a component of the merchant discount) has increased and at a rate more than any reduction in the acquirer margin.  Frankel Report ¶ 152.  Consequently, merchants' payment card acceptance costs have increased.  *Id.*  Numerous economists, as well as Visa and MasterCard, have recognized that interchange fees increase merchant fees.  Frankel Report ¶¶ 154-56.  Furthermore, merchant fees in Australia decreased by at least the amount of the decrease in Visa's and MasterCard's interchange fees mandated by the Reserve Bank of Australia.  Frankel Report ¶ 159.  Defendants' experts do not contest any of this evidence or Dr. Frankel's conclusion that interchange fees increase merchant discount fees charged by MasterCard and Visa member banks.  Frankel Rebuttal Report ¶ 122.

16

Defendants' price-fixing mechanism, a rule requiring payment of interchange fees on every transaction, is more effective for maintaining the unlawful agreement than the typical price-fixing mechanism. Frankel Report ¶ 145. In particular, Dr. Frankel finds that fixing interchange fees, rather than fixing merchant discount fees, prevents cartel members from cheating, through rebates and discounts. Frankel Report ¶ 145. That is so because fixed interchange fees are akin to a revenue sharing arrangement which eliminates members' incentive to cheat on the cartel:

> The pool of interchange fee proceeds is divided among the banks proportionately to the size of each bank's card issuing business. No bank has an incentive to discount its merchant fees below the cartel level (unless perhaps if the merchant could somehow help the bank expand its card issuing charge volume). This revenue sharing arrangement is more stable, and therefore more profitable, than a simple cartel price fixing agreement. In fact, this is essentially how the actual MasterCard and Visa interchange fee agreements operate, with the exception that they are administered on a transaction-by-transaction basis with highly developed price discrimination regimes.

Frankel Report ¶ 146.

Dr. Frankel also shows how the anti-steering restraints imposed by Defendants prevent merchants from exerting competitive pressure on interchange fees. Frankel Report ¶¶ 169-206. For example, Dr. Frankel explains:

> Anti-steering rules have an anticompetitive effect by blunting or reversing what otherwise would be the normal competitive effects of high fees on the use of costly credit and debit cards. In particular, the rules limit or remove merchants' abilities to send accurate price signals to customers. Customers' choice of payment instruments imposes costs on merchants, but anti-steering rules inhibit merchants' ability to send price signals to customers reflecting those costs. The anti-steering rules, therefore, maintain and prevent the erosion of the market power of MasterCard, Visa and their member banks and enable them to maintain higher fees for card network services.

Frankel Report ¶ 170. Dr. Frankel's opinion is supported by the empirical evidence, including evidence that prohibiting surcharging constrains merchants' ability to assert competitive pressure

on interchange fees: "American Express, MasterCard, Visa and economists writing on their behalf have reported in various forums that surcharging effectively constrains interchange fees even when not invoked, as the threat itself often has significant effects."  Frankel Report ¶ 178; *see also id.* ¶¶ 179-87 (identifying evidence of the competitive effects of surcharging).

Dr. Frankel also examines and rejects Defendants' argument that interchange fees are not anticompetitive because the fees are used to balance the claimed two sides of the payment card market.  Frankel Report § 6.2.3.  Dr. Frankel explains that "[t]he 'two-sided market' argument used to defend interchange fees simply re-labels a profit maximizing monopoly pricing strategy as 'competitive balancing.'"  Frankel Report ¶ 225.  Under the balancing argument, because merchants are less price-sensitive than cardholders, merchants bear a much higher portion of the system costs through interchange fees, which increase the prices paid by merchants.  Frankel Report ¶¶ 222-24.  By raising the price to merchants above the competitive level through collectively fixed interchange fee, Defendants have exercised market power and hence have engaged in anticompetitive conduct.  Frankel Report ¶¶ 224-25.

**b.     Dr. Frankel Explained How Defendants' Conduct Reduces Output.**

Defendants erroneously contend that Dr. Frankel did not analyze the effects of Defendants' conduct on output.  *See* Defs.' Mem. at 21.  To the contrary, Dr. Frankel demonstrates that Defendants' conduct results in reduced output, as measured by reduced sales in the economy: "because the overall costs to merchants increase, merchant's prices will increase and their overall sale of goods and services will decline due to the anticompetitive conduct."  Frankel Report ¶ 229.  Higher fees also results in certain categories of merchants not accepting Visa and MasterCard branded cards, another indication of reduced output.  Frankel Report ¶ 160.  Dr. Frankel's conclusion is again supported by the empirical evidence.  In Australia, after the

18

RBA required Visa and MasterCard to reduce their interchange fees, "the number of merchant acceptance locations in Australia grew by about 40%." Frankel Report ¶ 161.

Dr. Frankel also explains that Defendants' proposed output measure, transaction volume on Visa and MasterCard branded cards, is the wrong one because: "[e]xclusionary behavior that reduces the substitutability of other products can increase the unit output of a monopolist while simultaneously allowing it to raise price– that is, exclusionary behavior can increase the unit output of the firm with market power." Frankel Report ¶ 226; Frankel Rebuttal Report ¶¶ 303, 306-07, 309. *See United States v. Microsoft Corp.*, 253 F.3d 34, 65 (D.C. Cir. 2001) (affirming that Microsoft's commingling of Windows and Internet Explorer was anticompetitive because it enhanced its own market share at the expense of rivals). Increased transaction volume is also the wrong output measure here because "distortions in payment markets caused by the networks' interchange fee and anti-steering rules can induce merchants' customers to choose to make more of their transactions using costly cards than would occur absent the anticompetitive rules. This may increase card usage, but only at merchants that accept cards." Frankel Report ¶ 227. For that reason, output is appropriately measured as "the overall output of goods and services (and usage of all payment methods) which would have prevailed absent defendant's anticompetitive conduct." Frankel Report ¶ 226. As Dr. Frankel shows, output is reduced by that measure.

Defendants' incorrectly assert that Dr. Frankel agreed that Defendants' conduct increased output in the relevant markets. Defs.' Mem. at 22. Defendants mischaracterize Dr. Frankel's statements. While Dr. Frankel recognized that Visa and MasterCard card transaction volume has increased at merchants accepting the cards, he explains that transaction volume might have been greater had Defendants' conduct not discouraged certain merchants from accepting their cards. Frankel Report ¶ 227; Frankel Rebuttal Report ¶ 310.

19

Despite Defendants' distortion of Dr. Frankel's testimony regarding analyzing output and its effect on competition, Defs.' Mem. at 22-24, it is consistent with his opinion:[16]

- Dr. Frankel testified that in the context of a hypothetical merger, *not* horizontal price fixing, increased price "could" shift the demand curve.[17]  Frankel Dep. Tr. at 43-45.

- Dr. Frankel explained that an increase in output does not demonstrate that the challenged conduct is procompetitive.  Frankel Dep. Tr. at 206.

- Dr. Frankel did not agree that output is dispositive for determining whether a joint venture's conduct is procompetitive or anticompetitive (Frankel Dep. Tr. at 209-10):

   A.    In a hypothetical situation where the question is merely whether forming a joint venture versus not forming it was anticompetitive and there were no complications to the analysis and output was properly measured, I believe I would agree with his statement.

   Q.    And how do you measure output?

   [A.]    I think it depends on the context.  As he goes on to say, it might be difficult to determine the effects on output in some cases.  One of the reasons for that is just how to measure output.  But some types of anticompetitive conduct, like exclusionary conduct if undertaken by a joint venture, might increase the venture's own output while decreasing what I would consider to be the relevant measure of output for purposes of this sort of test.

- Although recognizing that a "procompetitive justification for interchange is 'possibly theoretically,'" Dr. Frankel explained that he disagreed with the "possible theoretical justification" because in the real world cash customers pay higher prices and card users may not receive sufficient enough rewards to offset higher prices.  Frankel Dep. Tr. at 112-13.

- Dr. Frankel agreed only that an individual merchant's demand curve could be shifted by card acceptance – not the demand curve for merchants in the aggregate.  Frankel Dep. Tr. at 135-36.  He did not agree that shifts in demand could be

---

[16] True and complete copies of Alan Frankel's Deposition Transcripts (dated Sept. 20-22, 2010) are attached as Ex. 19 to the Declaration of Matthew Freimuth, dated February 11, 2011.

[17] Whether interchange fees result in incremental sales for merchants in the aggregate is, at best, a disputed issue of fact in this case.  Defendants have not submitted any admissible evidence to demonstrate this claim.  *See* Class Plaintiffs' S.J. motion and Plaintiffs' motion to exclude Kevin Murphy's testimony.

related to use of interchange fees, and responded to a hypothetical asking him to assume the result.  (Frankel Dep. Tr. at 137):

> Q.      Dr. Frankel, if the shift in demand is caused at least in part by the use of revenues generated by those fees to incentivize consumers, you would agree with me then, wouldn't you, that the shift is not unrelated to the fees?
>
> [A.]    The magnitude of the shift might be related in that sense.  It could be either positive or negatively related depending on how much of the fee revenue is used in that way.

- Defendants conflate Dr. Frankel's opinion on but-for world output with real world output.  Frankel Dep. Tr. at 210-13, 377-78, 1008-09.  Dr. Frankel correctly noted that output in the but-for world is measured by what output would have been without the challenged conduct – such as what credit card transaction volume would have been in a world without interchange fees. *Id.* at 211-12.  Moreover, consistent with the opinions in his reports, Dr. Frankel testified whether defendants' conduct increased network output is ambiguous because defendants' conduct discouraged certain merchant categories from accepting the cards. *Id.* at 210-13, 377-78.

- Dr. Frankel's opinion that fixed interchange fees result in higher retail prices is not an assumption but rather is based on established economic theory – increase in marginal costs result in increased prices, which results in lower sales.  Frankel Rebuttal Report ¶ 311.

In sum, Dr. Frankel's testimony is consistent with his opinions that Defendants' proposed measure of output is the wrong and output, as correctly measured, has decreased as a result of the challenged conduct.

####        c.      Dr. Frankel's But-For Worlds Are Properly Analyzed and Supported by Economic Theory and Empirical Evidence.

Consistent with the accepted methodology, *see infra* § II.B.2.e, Dr. Frankel analyzed but-for worlds to determine the price merchants would have paid in a competitive world.  As Dr. Frankel explains, "Economists typically determine damages arising from unlawful conduct such as that at issue in this case by assuming that liability has been established, and by comparing the price paid by a plaintiff in the actual world (which plaintiffs contend are supracompetitive

because of anticompetitive conduct) to the price that the plaintiff would have paid in a counterfactual but-for world in which the unlawful conduct did not occur." Frankel Report ¶ 289. Here, Dr. Frankel performed a thorough analysis to analyze two, alternative, but-for worlds based on slightly different assumptions.[18] In Dr. Frankel's primary but-for world, the challenged competitive restraint, rules requiring payment of interchange fees, would not have existed. In Dr. Frankel's alternative but-for world, interchange fees would have been set at a less restrictive level in which the assumption is that *some* level of default interchange fees are *necessary* for the network to exist.

### i.       Primary But-For World

To evaluate his primary but-for world, Dr. Frankel used standard economic analysis. Specifically, Dr. Frankel assumed and analyzed a world in which the alleged competitive restraint, mandated payment of interchange fees, would not have existed because Dr. Frankel concludes that those rules "cause competitive harm (without generating benefits which offset this harm)." Frankel Report ¶¶ 294-95. In this but-for world, after extensive analysis, Dr. Frankel concludes that merchants "would not have paid [interchange] fees through mutually voluntary

---

[18] Defendants' reliance on *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039 (8th Cir. 2000), to claim Dr. Frankel's but-for worlds are improperly constructed because he did not consider certain evidence is misplaced. In *Concord Boat*, in reversing a contrary finding by the jury, affirmed by the trial court, the Eight Circuit determined that plaintiffs' expert ignored evidence that did not support his but-for world, including evidence that Brunswick achieved a high market share prior to engaging in the alleged anticompetitive conduct and other market events unrelated to the anticompetitive conduct. *Concord Board*, 207 F.3d at 1056-57. By contrast, as discussed in detail throughout this section, Dr. Frankel extensively analyzed and considered the record evidence and real world market events in constructing his two, alternative, but-for worlds.

agreements with card issuing banks" because "merchant do not receive services from an issuing bank when the issuer's cardholder initiates a card transaction."[19]  Frankel Report ¶ 296.

Dr. Frankel's conclusion is confirmed by empirical evidence.  Visa, MasterCard and Defendants' experts agree that interchange fees are not payment for any service provided by issuing banks.  Frankel Report ¶ 296, Frankel Rebuttal Report ¶¶ 329-31.  For example, in another litigation, Visa, MasterCard and Capital One asserted that interchange fees are not compensation for any service provided by issuing banks.  Frankel Rebuttal Report ¶ 331 n.676.  Likewise, Defendants' experts here, Professors James, Elzinga and Murphy, recognize that issuing banks provide services to the cardholder, not to the merchant.  Frankel Rebuttal Report ¶ 330.  Dr. Frankel therefore finds that "merchant[s] would not have had an economic incentive to agree to pay any interchange fee."  Frankel Report ¶ 297.[20]  Defendants' expert Dr. Topel agrees

---

[19] Although payment cards may result in incremental sales to individual merchants, at some point in time, this is not a service provided by issuers to merchants, as Defendants' claim.  Defs.' Mem. at 17.  Rather, this so-called benefit actually shows that Defendants have market power because merchants must accept Defendants' payment cards or lose sales to competitors who do:

> Defendants' experts' defense of interchange fees hinges on their claim that Defendants have the power to 'deliver' customers to merchants.  However, the corollary of this is that the banks then have the power to withhold those customers, and therefore the power to extract a higher price from merchants for card acceptance services, demonstrating the existence of market power.  Because the networks enforce anti-steering rules, merchants face an all or nothing choice whether to suffer significant losses or accept the cards at a high price.

Frankel Rebuttal Report ¶ 67; *see also id.* ¶ 74 (having no choice but to accept Defendants' payment cards shows market power).  Dr. Frankel further explains that Defendants' experts' claimed "'benefits' to the merchant primarily reflect a shift in sales from other merchants.  The merchant wins sales from its rivals by accepting this new, convenient payment method, but, by definition, other merchants will lose sales and their demand curves will shift in (to the left).  Total sales are therefore largely unchanged as customers just move from one merchant to another."  Frankel Rebuttal Report ¶ 197.

[20] Because Dr. Frankel's but-for world properly excludes the challenged restraint, rules requiring payment of interchange fees, Defendants' claim that Dr. Frankel had no basis for concluding that there would not have been interchange fees prior to the IPOs is erroneous.  Defs.' Mem. at 17; Frankel Report ¶ 300.  If Defendants are implicitly claiming that the IPOs are an alternative but-

that merchants would not have paid interchange fees without a rule requiring them to do so.

Topel Report ¶¶ 11, 25.[21]

Real world evidence also demonstrates that merchants would not have an economic incentive to pay interchange fees. Where payment card transactions clear at par merchants have not negotiated to pay interchange fees. Frankel Report ¶ 297. Merchants have not negotiated to pay more than the interchange fee mandated by the challenged rules, further confirming that merchants will not voluntarily pay interchange fees. Frankel Report ¶ 297. As Dr. Frankel opines, a world without interchange fees is consistent with economic theory and experience:

> The absence of interchange fees is consistent with economic theory and economic history. It is the outcome one would expect to have evolved in the competitive payment markets without restrictions or impediments on merchants' ability to steer freely among payment methods or networks. It is, in fact, the outcome that resulted historically in the United States with respect to four-party check transactions, in which highly competitive markets saw the competitive elimination of interchange fees. It is how PIN debit card networks initially evolved in the United States. A competitive marketplace would also have resulted in a no-interchange fee outcome with respect to general purpose cards.

for world, this claim is implausible. The IPOs were done to avoid legal liability for their collective anticompetitive conduct, such as interchange fees. Frankel Report ¶ 299. In a but-for world in which Defendants would not have collectively set and required payment of interchange fees, the IPOs are unnecessary and thus unlikely. *Id.* Moreover, the IPOs are an implausible but-for world because:

> An argument that the post-IPO MasterCard and Visa organizations can lawfully require merchants to pay interchange fees – even if they could not under their prior joint venture organizations – is akin to an argument that cartel members, having completed a merger, can now unilaterally charge a high price that reflects their (now unilateral) market power. But if the previously colluding banks can continue to charge a high price that formerly was attainable to them only through that collusion, then this chain of events, as a matter of economic logic, implies that the merger itself was anticompetitive. Similarly, employing the IPO to impose a charge that could only previously have been imposed through anticompetitive conduct would imply that the IPO was anticompetitive.

Frankel Report ¶ 300.

[21] A true and correct copy of the Expert Report of Robert H. Topel (Dec. 14, 2009) is attached as Exhibit SUFEX 304 to the Declaration of Ryan W. Marth In Support of Class Plaintiffs' Motion for Summary Judgment.

24

Frankel Report ¶ 313.  In such a case, issuing banks that charged interchange fees would lose out to issuing banks that did not charge such a fee to merchants.  Accordingly, in a competitive but-for world, merchants would have no incentive to pay, and therefore would not have paid, interchange fees to issuing banks.  However, merchants would have paid a fee to acquirers as compensation for services provided, which would have been (and has been) competitively set.[22] Frankel Report ¶ 89; Frankel Rebuttal Report ¶ 330.  Also, in the but-for world, cardholders would have paid fees (subject to competition) – but not interchange fees – to issuing banks as compensation for services provided.[23]  Frankel Report ¶¶ 348, 406.

Dr. Frankel also explains why it would be improper to construct a but-for world in which Defendants replicate their anticompetitive conduct by imposing new rules permitting card issuers to unilaterally impose mandatory interchange fees paid by merchants.  Frankel Report ¶¶ 360-63; *see* Defs.' Mem. at 12-14.  To force merchants to pay interchange fees in the but-for world, Defendants contend there would have been rules permitting issuing banks to reject payment card transactions submitted by merchants who did not have an interchange fee agreement bilaterally negotiated with the bank.  Frankel Report ¶¶ 360-61.  This is belied by Defendants' other contention that universal acceptance of all properly submitted transactions is indispensable to the networks' existence—if merchants and cardholders did not know that card transactions would be

---

[22] Between 1995 and 2004, competition resulted in the average acquirer's fee decreasing from .47% to .37%.  Frankel Report ¶ 89.

[23] *See also* Frankel Dep. Tr. at 415 ("But an economic consequence of eliminating a requirement to pay fees or an alternative set of rules that enables each issuing bank to require the payment of fees by merchants in a competitive framework would result in no payment of fees because there are no costs associated with providing—there are no costs incurred by the issuer to deliver services to the merchant for those transactions and so the competitive price would be zero in that framework.").

accepted by issuing banks, merchants would not accept cards and cardholders would not carry them. *Id.* Consequently, in the but-for world, Dr. Frankel retains the rules that ensure universal acceptance.[24]  Frankel Report ¶¶ 361-63.

However, such rules in conjunction with rules requiring merchants to pay interchange fees "would have created a hold up problem in which each issuing bank would have had market power over every merchant." Frankel Report ¶ 363.  Because these rules would have given each issuing bank market power, they are anticompetitive and hence not a proper but-for world. *Id.* Moreover, because Defendants claim that a system of bilaterally negotiated interchange fees is highly inefficient, the imposition of a rule requiring merchants to enter into bilateral agreement with all card issuers in the but-for world is not realistic.  Frankel Report ¶ 362.  In sum, "a set of alternative rules and practices that are designed to preserve banks' ability to exercise market power would not be an appropriate but-for world from an economic perspective." Frankel Dep. Tr. at 411-12.

Payment card networks can operate successfully without interchange fees because interchange fees are not indispensable to the network's existence.  Frankel Report ¶ 341.  Dr. Frankel's conclusions are supported by "the existence of a number of highly successful four-party payment methods without interchange fees."  Frankel Rebuttal ¶ 337.  For example, in the United States, in 1991, 15 out of the top 20 PIN debit networks operated without an interchange fee.  This industry-wide practice changed only after Visa acquired Interlink and exercising market power imposed an interchange fee.  Frankel Report ¶ 345.  PIN debit card systems in a several foreign countries, including Canada, New Zealand and Norway, have also operated

---

[24] For example, the networks' Honor All Cards rules require a merchant that accepts the networks' branded cards (i.e. Visa or MasterCard) to accept all such cards regardless of the interchange fee associated with a particular card product or the identity of the issuing bank. Class Plaintiffs' Statement of Uncontested Facts ¶¶ 31.a, 32.a.

successfully for years without interchange fees.  Frankel Report ¶ 346; Frankel Rebuttal Report ¶ 337.

Two additional examples of four-party payment systems, in the United States, that have operated successfully without any interchange fees are the checking system and the Automated Clearing House ("ACH") system.  Both systems are similar to payment card systems because they involve the settlement, clearing and transfer of funds between parties.  Frankel Report ¶¶ 342-44.  Despite having no interchange fees, checking accounts are profitable to banks because banks earn revenue by charging various fees to customers and lending the customer's money to others.  Because debit cards are linked to checking accounts they generate similar types of revenue for banks.  Accordingly, the issuance of debit cards would be profitable in a world in which there would not have been interchange fees.  Frankel Report ¶ 347.  Similarly, banks would have continued to issue credit cards in the but-for world because even without interchange fees they would have continued to earn significant revenue through the fees charged to cardholders for extending credit and providing other services.  Frankel Report ¶ 348.

Defendants' contention that Dr. Frankel's opinion should be excluded because there is no four-party credit card network without interchange fees is based on a false premise.  Defs.' Mem. at 18.  No four-party credit card networks exists without interchange fees because "the MasterCard and Visa brands account for almost all four-party general purpose credit card volume worldwide (91% in 2009)."  Frankel Rebuttal Report ¶ 340; *see also* Frankel Report ¶ 375 ("MasterCard and Visa are the dominant four-party general purpose card networks worldwide.").[25]   Defendants' contention is further flawed because it is a disagreement as to the

---

[25] An additional 8% of global volume is accounted for by Amex – a three-party system – and China UnionPay—a regulated monopoly whose rates are set by the Chinese government. Frankel Rebuttal ¶ 340.

appropriate benchmarks to be used in Dr. Frankel's analysis.  Such disagreements do not provide

any basis for excluding expert testimony but rather present, at most, a credibility issue for the

jury.[26]  *See Daubert*, 509 U.S. 595;  *In re Visa Check/MasterMoney Antitrust Litig.*, 192 F.R.D.

68 (E.D.N.Y. 2000).  Nevertheless, Dr. Frankel's chosen benchmarks are appropriate because

each is a four-party payment system unaffected by anticompetitive conduct.   Frankel Report ¶

374. ("The point of using a yardstick measure as a benchmark is to find a product or geographic

market that is different from that which was affected by the anticompetitive conduct.").

Defendants' claim that Dr. Frankel's but-for world is improper because it "ignores

competition between networks" is equally spurious.  Defs.' Mem. at 18-19.  Dr. Frankel explains

that Visa and MasterCard would have competed effectively with American Express and Discover

in the but-for world.  Specifically, Dr. Frankel concludes that American Express and Discover

would have had to reduce their merchant fees to remain competitive in a world in which there

would not have been interchange fees on Visa and MasterCard branded credit card transactions.

Dr. Frankel's conclusion is supported by American Express lowering its merchant fees in

Australia to remain competitive with Visa and MasterCard after the RBA required Visa and

MasterCard to lower their interchange fees.  Frankel Report ¶¶ 166-68, 240-41, 457.  He

observed that:

> MasterCard, Visa and their consultants have claimed that they need interchange
> fees to compete for issuers with three-party networks, particularly, American
> Express; this argument was made prominently in Australia.[]  American Express
> sets its merchant fees somewhat above those that merchants pay to accept
> MasterCard or Visa transactions.  For many years, American Express' merchant
> acceptance lagged significantly behind that of MasterCard and Visa, but by
> offering lower merchant discount rates to categories of merchants that previously

---

[26] Defendants do not challenge, on this motion, that the foreign debit card networks, or checking or ACH, are inappropriate benchmarks for the but-for world in which there would not have been interchange fees for Visa and MasterCard branded signature debit cards and Visa PIN debit cards.

28

did not accept its cards (combined with other strategies), American Express has been able to significantly reduce its acceptance gap with MasterCard and Visa. But if MasterCard and Visa did not require the payment of interchange fees on transactions initiated with cards issued by their member banks, then economic theory (as well as the experience in Australia) indicates that American Express likely would have had to reduce its own fees by far more than it did to attain this increased merchant acceptance."

Frankel Report ¶ 240.

Dr. Frankel also demonstrates why in the but-for world Defendants' claim banks would have replaced lost interchange fee revenue by imposing new rules is implausible. Defs.' Mem. at 18. For example, Defendants would not have modified their rules to impose on merchants the risk of loss of non-payment of credit card transactions because:

> it is difficult to believe merchants would have continued accepting cards that imposed default risks on them when they do not control the cardholder account relationship and have no way to collect the resulting debts, and when issuers can approve transactions without any concern about the creditworthiness of the cardholder. Essentially, MasterCard and Visa issuers control the credit relationship and receive the resulting interest and fee income, which they can and do adjust to account for risk, so it is appropriate that they should bear the risk.

Frankel Report ¶ 365.

Dr. Frankel further explains that a correctly constructed but-for world would not permit price fixers to replace ill-gotten gains with new fees that would replicate the economic effects of defendants' anticompetitive conduct. Frankel Report ¶ 359; *see also* Frankel Rebuttal Report ¶ 370. In particular, a new fee imposed on merchants to recover the ███████ per year in lost unlawful interchange fees is improper because "[i]t would still represent the banks using their collectively owned and controlled joint venture networks to set prices on behalf of all of the member banks." Frankel Report ¶ 359; *see also* Frankel Rebuttal Report ¶ 370.

Defendants' contention is also specious. If Defendants were correct, then there would never be overcharges in a price-fixing case. Every price fixer could argue to operate successfully

29

it must impose a new fee or cost on its customers to replace the exact amount of its lost ill-gotten gains. Defendants are really arguing that the ███████ per year in interchange fee revenue is the result of lawful conduct. But that argument addresses liability rather than the propriety of a proposed but-for world—what would have happened in a competitive market.

### ii.    Alternative But-For World

Dr. Frankel analyzes an alternative but-for world using established economic theory and methodology. Contrary to Defendants' contention, Dr. Frankel's analysis does reflect less restrictive alternative conduct. Defs.' Mem. at 20. *The purpose of Dr. Frankel's alternative but-for world interchange fee rates is to estimate past damages not to set rates going forward.* Frankel Rebuttal Report ¶ 378. It responds to Defendants' claim that interchange fees are necessary to the networks' existence. Frankel Report ¶¶ 314-18; Frankel Rebuttal Report ¶ 378-80. However, and contrary to Defendants' argument, the alternative but-for world does not set the interchange fee rates, if any, that Defendants will charge in the future. Such future rates, will be set consistent with the terms and scope of any injunction the Court may enter in this case, and not by Dr. Frankel's but-for worlds.

Dr. Frankel examined the process and methodology that would have been used to set interchange fees, in a competitive world, at the level necessary to satisfy the claimed pro-competitive purpose (assumed for the purposes of this exercise) of ensuring the networks operated successfully. As Dr. Frankel explains, the empirical evidences shows that the Visa and MasterCard networks have operated "successfully in many countries at much lower effective interchange fee rates than those in the United States," such as Australia and the United Kingdom. (Frankel Report ¶ 315). Accordingly, Dr. Frankel finds that "[t]he continued success and growth of MasterCard and Visa credit card usage at interchange fee rates of 0.50% in Australia and

30

0.90% in the U.K. indicates that interchange fees of about 2% in the United States are far above any level which might arguably be needed for the defendants to successfully operate their networks and to prevent any claimed "death spiral" collapse of MasterCard and Visa."  Frankel Report ¶ 316.

In addition, Dr. Frankel finds that interchange fees could have been set to reflect a "cost-recovery methodology" or an "alleged costs saving benefits of general purpose cards."  Frankel Report ¶¶ 317-18; Frankel Rebuttal Report ¶ 379.  The empirical evidences shows that such rates would have been substantially lower than those actually charged.  In Australia, the 0.50% rate was based on a cost-recovery methodology while the European Commission "accepted a MasterCard rate of 0.30% because that rate was established based on cost studies measuring the alleged cost saving benefits of general purpose cards."  Frankel Report ¶¶ 316-18.

> ### d. Dr. Frankel Estimated Overcharges as the Difference Between the Actual Price Paid and the Estimated Price in Both But-For Worlds.

In both but-for worlds, Dr. Frankel estimated overcharges, employing standard methodology: the difference between the actual price paid and the estimated price in the but-for world.  Because Dr. Frankel concludes that merchants would not have paid interchange fees in the primary but-for world, the amount of the overcharge is estimated by the entire amount of interchange fees paid.  Frankel Report ¶¶ 289-90, 326-28.  In his alternative but-for world, Dr. Frankel estimated overcharges by subtracting the benchmark fee – the interchange fee rates charged in the United Kingdom, Australia and the European Union –  from the actual fee paid. Frankel Report ¶¶ 334-36.

e.       **Dr. Frankel's But-For Methodology is Well-Established.**

Dr. Frankel's but-for world methodology is well-established.  A but-for world is typically

employed to estimate overcharges paid by customers resulting from defendants' unlawful

conduct.  It does so by estimating the price that customers would have paid if the lawful conduct

had not occurred and then calculating the difference between the estimated, but-for price and the

actual price paid. *See, e.g., Sun Microsystems Inc. v. Hynix Semiconductor Inc.*, 608 F. Supp. 2d

1166, 1200 (N.D. Cal. 2009) ("Generally, an overcharge corresponds to the difference between

the price purchasers actually paid during a conspiracy period, and the prices they would have

paid but for the existence of the conspiracy (*i.e.*, the 'but for' prices)"); *In re Linerboard*

*Antitrust Litigation*, 497 F. Supp. 2d 666 (E.D. Pa. 2007); *Cordes & Co. Financial Services v.*

*A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 107 (2d Cir. 2007); *In re Ethylene Propylene Diene*

*Monomer Antitrust Litig.*, 256 F.R.D. 82, 88 (D. Conn. 2009); ABA Section of Antitrust Law,

Proof of Conspiracy Under Federal Antitrust Laws (2010) at 243-244; Daniel Ferrel McInnis,

Editor's Note, 74 Antitrust L.J. 265, 265-66 (2007) (explaining the benefits of the application of

empirical economic analyses to antitrust cases).

Defendants agree that this methodology is well-accepted in the field of economics and

econometrics.  Defs.' Mem. at 9-10.  Defendants' expert, on class certification, Dr. Snyder also

agreed that this methodology is well-established, including that in the but-for world the

challenged conduct would not have occurred.  Snyder Dep. Tr. at 232-33, 444-45.[27]

Dr. Frankel's methodology for constructing his alternative but-for world is premised on a

less restrictive alternative in response to Defendants' claim that interchange fees are necessary to

---

[27] A true and correct copy of Edward Snyder's Deposition Transcript is attached as Exhibit 2 to
the Declaration of Matthew P. McCahill in support of Class Plaintiffs' Reply Memorandum of
Law in Support of Their Motion for Class Certification.

the networks' continued existence.  In a rule of reason case, a defendant may appropriately argue

pro-competitive benefits from the challenged conduct.  In that case, a plaintiff may seek to

demonstrate that any pro-competitive benefits can be achieved through a less restrictive means.

*See Clorox Co. v. Sterling- Winthrop, Inc.,* 117 F.3d 50, 56 (2d Cir. 1997); *Geneva Pharm. Tech.*

*Corp. v. Barr Labs.,* 386 F.3d 485, 506-07 (2d Cir. 2004). As the Second Circuit has discussed,

this is necessary to ensure that that the restraint does not exceed the limits "reasonably necessary

to meet the competitive problems." *Berkey Photo, Inc. v. Eastman Kodak,* 603 F.2d 263,303 (2d

Cir. 1979) (quoting *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 380-81 (1967)

(*overruled on other grounds*, *Continental T.V., Inc. v. G.T.E. Sylvania, Inc.*, 433 U.S. 36

(1977))).[28]

Dr. Frankel uses foreign interchange fee rates as benchmarks strictly to estimate

damages.  Frankel Report ¶¶ 320-21; Frankel Rebuttal Report ¶ 378.  The use of benchmarks to

estimate damages is well-accepted in price-fixing cases.  *See, e.g., Visa Check,* 192 F.R.D. at 76

(denying defendants' *Daubert* motion where plaintiffs' expert cited two "empirical

'benchmarks'" based on current information from Canada and historical data from the United

States); *In re NASDAQ Market-Makers Antitrust Litig.,* 169 F.R.D. 493, 522 (S.D.N.Y. 1996)

(the "yardstick" approach . . . [has] "been cited with approval by numerous courts in granting

class certification") (citing ABA Antitrust Section, *Antitrust Law Developments* (3d ed. 1992) at

---

[28]  Such a standard is necessary to ensure that the networks' participants do not collectively
exercise market power to set the fee at supra-competitive levels. *See* Federal Trade Commission
and the U.S. Department of Justice, Antitrust Guidelines for Collaborations Among Competitors
(April 2000) (the "FTC/DOJ Guidelines") §3.36(b) ("if participants could have achieved or
could achieve similar efficiencies by practical, significantly less restrictive means, the Agencies
conclude that the relevant agreement is not reasonably necessary to their achievement").

669-73).[29] Dr. Frankel's benchmark rates are backward looking and are used to estimate damages already incurred. The benchmarks are unrelated to any future rates Defendants may charge after liability issues in this case are adjudicated and therefore do not entangle the Court in ratemaking, as Defendants argue. Defs.' Mem. at 11-12. Defendants' argument is erroneous and their cited cares are inapposite.[30]

At base, Defendants' motion challenges Dr. Frankel's chosen yardsticks/benchmarks and conclusions, not the reliability of his methodology. But, where, as here, an expert has "rel[ied] upon the type of methodology and data typically used and accepted" in similar cases, disagreement about the expert's conclusions is not a basis for exclusion. *Visa Check*, 192 F.R.D. at 78 (*quoting Iacobelli Constr., Inc. v. County of Monroe*, 32 F.3d 19, 25 (2d Cir.1994)). The "traditional and appropriate means" of attacking such evidence is not through exclusion, but

---

[29] *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 154 (3d Cir. 2002) (plaintiffs' expert testified she could calculate damages through "'benchmarking,' which uses 'competitive prices for other comparable products to estimate the pattern of prices but-for the alleged misconduct'"); *In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 145 (C.D. Cal. 2007) (where plaintiffs challenged defendant concert promoter's supra-competitive prices, plaintiffs' expert testified he could calculate damages by using "the yardstick approach in which the ticket prices for other promoters act as a benchmark. This approach is also widely upheld by courts.") (citation omitted); *Bradburn Parent/Teacher Stores, Inc. v. 3M*, 2004 WL 1842987, at *3 (E.D. Pa. Aug. 14,2004) (comparison of the price of a similar product is a "standard method[] for proving damages in an antitrust case") (citation omitted).

[30] *See Brennan v. Concord EFS, Inc.*, 369 F. Supp.2d 1127 (N.D. Cal. 2005) (ruling solely on issue of whether plaintiffs stated a *per se* claim – which the court found they did – and the court cited no authority for its premise that abolishing an illegal rule requiring payment of a fee is the same thing, for purposes of antitrust law, as fixing the price as zero); *Chicago Prof'l Sports Ltd. P'ship v. National Basketball Ass'n*, 95 F.3d 593 (7th Cir. 1996) (asking the court to set future contract rates); *Town of Concord v. Boston Edison Co.*, 915 F.2d 17 (1st Cir. 1990) (reversing district based on difficulty in determining fair price in a price squeeze case claim under Section 2); *Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325 (7th Cir. 1986) (addressing prices charged by an alleged monopolist under Section 2); *Yankees Entertainment & Sports Network LLC v. Cablevision Sys. Corp.*, 224 F. Supp. 2d 657 (S.D.N.Y. 2002) (under Section 2, determining "whether, as a matter of law, the essential facility doctrine encompasses cases where the alleged monopoly refuses to pay a 'reasonable price' to carry the challenger's service on its facility").

through the adversarial process. *See B.F. Goodrich v. Betkoski,* 99 F.3d 505, 525-26 (2d Cir. 1996) (subsequent history omitted). Dr. Frankel's analyses and opinions meet the standards of reliability indigenous to the economics field.

### 3. Dr. Frankel's Opinions Will Assist the Jury.

To be admissible under *Daubert*, a "reliable" expert opinion must be "helpful" to aid the jury in "understand[ing] the evidence or [] determin[ing] a fact in issue." Rule 702; *Daubert*, 509 U.S. at 591. *Accord Nimely*, 414 F.3d at 397. The Supreme Court explained that the requirement that the expert's opinion must be helpful to the jury "goes primarily to relevance," in that it "requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert*, 509 U.S. at 591-92. *See also Amorgianos*, 303 F.3d at 265 (an expert witness's testimony must be relevant, *i.e.*, it must have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence") (internal quotes and cites omitted). To satisfy the requirement, an expert's opinion does not need to establish, in and of itself, any of the ultimate issues; it only needs to constitute one "piece of the puzzle" in proving the case. *Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329, 1339-40 (11th Cir. 2003) (holding that exclusion of expert affidavit on grounds of irrelevance was an abuse of discretion where relevance of expert's assertions uncontestable) (citing *City of Tuscaloosa v. Harcros Chem., Inc.*, 158 F.3d 548, 565 (11th Cir.1998)). *Accord Fleischman v. Albany Medical Center*, 728 F.Supp.2d 130, 151-52 (N.D.N.Y. 2010); *Allen v. City of New York*, 466 F. Supp. 2d 545, 550 n.3 (S.D.N.Y. 2006).

It bears emphasis that Defendants do not dispute Dr. Frankel's qualifications to render expert opinions. His opinions will help educate the jury on the issues associated with the history and development of credit and debit cards and associated payment card networks, the relevant

35

markets, defendants' market power and the effects of interchange fees and anti-steering restraints in the relevant markets. His opinions will also inform the jury about injury and damages suffered by merchants, including how the network services system would have developed but for the antitrust violations of Defendants. Finally, Dr. Frankel has thoughtfully and fully responded to the criticisms which had been voiced by Defendants' experts, including the very same criticisms which form the foundation of this motion to exclude. All of these issues are highly relevant to Plaintiffs' claims and will assist the jury in determining liability and damages issues.

### C.   A Restraint That Artificially Inflates Price is Anticompetitive Regardless of its Effect on Output.

Defendants erroneously claim that a showing of reduced output is required to demonstrate the anticompetitive effects of an alleged restraint. *See* Defs' Mem. at 21 ("an alleged restraint has no anticompetitive effect – and thus is not unlawful – unless it can be shown to have reduced output in some relevant market"). Defendants' claim is contrary to controlling law that a restraint that harms competition, such as by artificially inflating price, is anticompetitive regardless of its effect on output.

Whether a restraint violates the antitrust laws depends only on whether it harms competition, and not on whether it reduces output. *See National Society of Professional Engineers v. U.S.*, 435 U.S. 679, 691 (1978). As the Supreme Court recognized, "[t]he true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." *Board of Trade of City of Chicago v. U.S.*, 246 U.S. 231, 238 (1918). For example, both price and non-price restraints harm competition. *See, e.g., NCAA v. Board of Regents*, 468 U.S. 85, 105-06 (1984) (citing as harm to competition the district court's finding that "by fixing a price for television rights to all games, the NCAA creates a price structure that is unresponsive to viewer

36

demand and unrelated to the prices that would prevail in a competitive market."); *FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 459 (1986) ("A refusal to compete with respect to the package of services offered to customers, no less than a refusal to compete with respect to the price term of an agreement, impairs the ability of the market to advance social welfare by ensuring the provision of desired goods and services to consumers at a price approximating the marginal cost of providing them."); *see also Nat'l Society of Prof'l Engineers*, 435 U.S. at 692 (1978) (finding a ban on competitive bidding to be a harm to competition). Competition is harmed by interfering with the operation of the free market. *See also United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 344-45 (S.D.N.Y. 2001) ("Identifying 'anticompetitive effects' under the rule of reason involves analysis of whether the competitive process itself has been harmed.") (citing numerous examples).

A showing of reduced output is merely one type of harm to competition. But, such a showing is no more significant or accepted as a proof of harm than a showing of any other harm to competition.[31] To the contrary, price inflation is at least as significant and accepted a showing of harm to competition as output reduction, and maybe even more so. *See Apex Hosiery Co. v. Leader*, 310 U.S. 469, 500-01 (1940) (" . . . in general restraints upon competition have been

---

[31] Defendants' purported statement of law with respect to output reduction not only contravenes controlling law, it would in many cases require an impracticable showing of harm. As the authors of the leading antitrust treatise explain, a showing of reduced output often is difficult or impossible to prove:

> Without resolving the dispute [the authors were discussing the Justices dispute over the relevant market in the NCAA case], it is enough to note that "output" is not always a clear concept. Even when we define it readily, it is usually difficult to observe. Many alleged restraints are examined before they have had time to work their results. And the longer a restraint has been in effect, the greater is the impact of changes in supply, demand, and other market forces. We are often unable to disentangle the effects of challenged conduct. That is the reason we are so often forced to turn to surrogates for actual effects.

P.E. Areeda and H. Hovenkamp, Antitrust Law, Vol. III (3d ed.) ¶ 1503(b) at 395.

condemned only when their purpose or effect was to raise or fix the market price."); *see also American Ad Management, Inc. v. GTE Corp.*, 92 F.3d 781, 791 (9th Cir. 1996) ("...it is difficult to imag[ine] a more typical example of anti-competitive effect than higher prices ...).

Defendants offer no legal support to their interpretation of the law.  Instead, they selectively quote snippets from the decisions in *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993) and *Chicago Prof'l Sports Ltd P'ship v. National Basketball Ass'n*, 961 F.2d 667 (7th Cir. 1992) ("*Chicago Prof'l Sports I*") and 95 F.3d 593 (7th Cir. 1996) ("*Chicago Prof'l Sports II*"), to give the misleading impression that the cases cited support their position.  But these out-of-context quotations do not, and an examination of the cases shows they are inapposite.

*Brooke Group* involved a claim of predatory pricing, not a claim of horizontal price fixing.  *See* 509 U.S. at 227.  The Court first noted the "general implausibility" of a  predatory pricing claim and found that such claims were even less plausible when they involved tacit concerted action among several firms.  *Id.* at 227-28.  In considering whether the plaintiff in *Brooke Group* had proven that the existence of a period of supracompetitive pricing following the period of alleged predatory pricing, the Court noted that prices actually moved down and that output was increasing.  *Id.* at 233 ("the price and output data do not support a reasonable inference [of supracompetitive pricing].").  It was in this context that the Court made the statement quoted by Defendants here, that "[s]upracompetitive pricing entails a restriction on output."  *Id.*  The Court found that a showing of reduced output was necessary because there was no evidence of an agreement to restrain prices.  Significantly, the Court did not create a rule requiring a showing of reduced output in all antitrust horizontal price-fixing cases.  To the contrary, the Court acknowledged that supracompetitive prices could exist in an expanding

38

market, but held that plaintiff had not proven that based on the evidence before the Court. *Id.* at 233-34.

The restraint at issue in *Chicago Prof'l Sports I* directly involved a restriction on output. In that case, the NBA had imposed a limit on the number of games that could be broadcast by a so-called superstation. *See* 961 F.2d at 669. The district court viewed the limit as a naked restraint on output, and condemned it under a quick look analysis. *Id.* at 674. The NBA offered as one procompetitive justification the need to address free riding. The court rejected that justification and the Seventh Circuit affirmed. *Id.* at 674-77. In affirming, the Seventh Circuit stated that the free rider issue could have been addressed by the league imposing a fee on the broadcast of games, rather than banning the broadcasts themselves, and in that way the league could recoup the benefits provided to the team without reducing the output of games to the consumers. *Id.* Nowhere in that decision did the Seventh Circuit impose a blanket rule that plaintiffs must demonstrate reduced output in the relevant market to show anticompetitive effect.

In *Chicago Prof'l Sports II*, the NBA changed its rules from a ban on superstation broadcasts to a fee on superstation broadcasts. 95 F.3d at 596. The plaintiff team brought an antitrust claim, arguing that the fee was too high. The court found that the fee had no actual impact on the number of games broadcast. *Id.* at 596-97. The Seventh Circuit found that the challenge was nothing more than an internal league dispute with no bearing on the market for games, or on the broader market for broadcast entertainment. *Id.* at 597. In analyzing the plaintiff team's claim, the Seventh Circuit merely distinguished a claim for reduced output from a claim for an excessive, but output neutral, fee. *Id.* Once again, the court did not impose a rule that only a showing of reduced output would support an antitrust claim.

Here, Plaintiffs challenge horizontal price-fixing unlike the conduct challenged in *Chicago Prof'l Sports*, and *Brooke Group*. As demonstrated by the numerous examples cited above, in a price-fixing case there is no requirement that a plaintiff show reduced output in order to prove their claim. The harm to competition in this case, like the harm in *NCAA* case, is the fact that the fixed, inflated prices are unrelated to the prices that would prevail in a competitive market.[32] There is no requirement "as a matter of law" that Dr. Frankel make a showing of reduced output.

**III.    Conclusion**

Defendants' motion is based on a distortion of Dr. Frankel's opinions and work. It is fundamentally flawed because it rests on a disagreement with Dr. Frankel's conclusions rather than any legitimate challenge to his methodologies. Accordingly, Defendants' motion should be denied.

Dated: May 6, 2011                    By: _____ s/ H. Laddie Montague, Jr. _____
                                      H. Laddie Montague, Jr.
                                      Merrill G. Davidoff
                                      Bart D. Cohen
                                      Michael J. Kane
                                      BERGER & MONTAGUE, P.C.
                                      1622 Locust Street
                                      Philadelphia, PA 19103
                                      (215) 875-3000

---

[32] Proof of the anticompetitive effect of the Defendants' price fixing should require no more than the quick look applied in *NCAA*, but even if the court engages in a more extensive rule of reason analysis, proof of the harm to competition from the horizontal price restraint may be shown by actual evidence of price inflation or by evidence of Defendants' market power, both of which Dr. Frankel established through a reliable and accepted  methodology applied by economists time and time again in horizontal price-fixing cases.

K. Craig Wildfang
Thomas J. Undlin
Ryan W. Marth
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
(612) 349-8500

Patrick J. Coughlin
Bonny E. Sweeney
David W. Mitchell
Alexandra S. Bernay
ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058

*Co-Lead Counsel for MDL 1720 Class Plaintiffs*

## **CERTIFICATE OF SERVICE**

I, Bart D. Cohen, certify that on May 6, 2011, I caused a true and correct copy of the foregoing Class Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Exclude Certain Opinions of Class Plaintiffs' Economic Expert Dr. Alan S. Frankel to be served on counsel for all parties via Lexis-Nexis File & Serve.


_____/s/ Bart D. Cohen_____
Bart D. Cohen