

38451543

Jun 30 2011
4:26PM

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | Case No. 1:05-md-1720-JG-JO |
| | ORAL ARGUMENT REQUESTED |
| This Document Relates To:  ALL ACTIONS | |

**DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION TO EXCLUDE CERTAIN OPINIONS OF CLASS PLAINTIFFS'
ECONOMIC EXPERT DR. ALAN S. FRANKEL**

**HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER
TO BE FILED UNDER SEAL**

## ***Table Of Contents***

Table Of Authorities ..................................................................................................ii

Preliminary Statement ...............................................................................................1

Argument ...................................................................................................................2

I.   Dr. Frankel Failed To Hypothesize A "But For" World That Would Eliminate The Allegedly Collective Conduct That Forms The Antitrust Basis For Class Plaintiffs' Challenge To The Default Interchange Rules ........................................................2

    A.   Dr. Frankel Did Not Eliminate The Network Establishment Of Interchange Rules In His Primary "But For" World ..............................................................3

    B.   Class Plaintiffs Do Not Even Argue That Dr. Frankel Eliminated The Network Establishment Of Interchange Rules In His Alternative "But For" World........................................................................................................7

II.   Dr. Frankel's "But For" Worlds Do Not Account For The Historical Facts And Development Of The Payment Card Industry ...................................................8

    A.   Dr. Frankel Did Not Account For An Antitrust Judicial History That Provides A Unique Indicator That Network-Set Interchange Rates Are Procompetitive ...............................................................................................9

    B.   Dr. Frankel Did Not Account For The Independent Behavior Of Member Banks In The Absence Of Network-Established Interchange Rules .................12

    C.   Dr. Frankel Did Not Account For The Fact That His Proxy Interchange Rates Are Regulated Rates And Are Not The Result Of Competition ................15

III.   Dr. Frankel Has Failed To Provide Any Economic Analysis To Demonstrate That Output In His Defined "Relevant Markets" Has Been Reduced As A Result Of The Networks' Default Interchange Rules ...............................................17

    A.   As A Matter Of Law, Proof Of A Restriction In Output Is Required As A Predicate For A Finding That Prices Exceed A Competitive Level ....................18

    B.   Dr. Frankel's Assertions About Restrictions In Output Are Wholly Unsupported ........................................................................................20

Conclusion................................................................................................................24

### *Table Of Authorities*

### *Cases*

*Brennan v. Concord EFS, Inc.*, 369 F. Supp. 2d 1127 (N.D. Cal. 2005).......................................4

*Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.*, 441 U.S. 1 (1979)......................................................................................................... 11, 18

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993)............................................................................................ 17, 18, 19, 23

*Chicago Prof'l Sports Ltd. P'ship v. National Basketball Ass'n*, 961 F.2d 667 (7th Cir. 1992) ...........................................................................19

*Chicago Prof'l Sports Ltd. P'ship v. National Basketball Ass'n*, 95 F.3d 593 (7th Cir. 1996) ......................................................................................4, 19

*Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314 (S.D.N.Y. 2009) ...............................................................12

*Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039 (8th Cir. 2000) ....................................2

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984)..........................................7

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)........................................11

*Herman Schwabe, Inc. v. United Shoe Mach. Corp.*, 297 F.2d 906 (2d Cir. 1962) ......................................................................................... 11, 22

*McGlinchy v. Shell Chem. Co.*, 845 F.2d 802 (9th Cir. 1988)....................................................11

*Metrix Warehouse, Inc. v. Daimler-Benz AG*, 828 F.2d 1033 (4th Cir. 1987).............................................................................................................11

*National Bancard Corp. (NaBanco) v. Visa U.S.A., Inc.*, 596 F. Supp. 1231 (S.D. Fla. 1984), *aff'd*, 779 F.2d 592 (11th Cir. 1986) ...................................5, 9, 10

*National Collegiate Athletic Ass'n v. Board of Regents of Univ. of Okla.*, 468 U.S. 85 (1984) ...........................................................................18

*United States v. Visa U.S.A, Inc.*, 344 F.3d 229 (2d Cir. 2003)..................................................10

### *Statutes*

Fed. R. Evid. 702 .......................................................................................................................1

## ***Other Authorities***

Delegation of the United States to the Competition Committee, *Roundtable
    on Two-Sided Markets*, Organisation for Economic Co-operation and
    Development (June 4, 2009) ........................................................................................10

William Landes, *Harm to Competition: Cartels, Mergers, and Joint Ventures*,
    52 Antitrust Law Journal 625 (1983) ...........................................................................19

### *Preliminary Statement*

Defendants respectfully submit this reply memorandum of law in support of their motion, pursuant to Rule 702 of the Federal Rules of Evidence ("Rule 702"), to exclude as inadmissible the opinions of class plaintiffs' economic expert, Dr. Alan S. Frankel, regarding injury and damages attributable to, and the competitive effects of, each network's establishment of default interchange rules.

Defendants showed in their moving brief that Dr. Frankel's opinions are unreliable and irrelevant, and thus inadmissible, for three discrete reasons.  First, Dr. Frankel failed to hypothesize a "but for" world that would eliminate the conduct that class plaintiffs challenge in this lawsuit – the allegedly "concerted" network establishment of default interchange rules.  (Def. Br.[1] at 10-14.)  Second, Dr. Frankel failed to account for the competitive and economic factors that have influenced the development of the payment card industry (particularly network default interchange rules) and to provide any economic analysis or explanation as to how or why, in light of those factors, default interchange fees would be reduced in the "but for" worlds he has hypothesized.  (*Id.* at 15-20.)  And third, Dr. Frankel failed to conclude that output in the relevant markets has been reduced as a result of the challenged default interchange rules; absent a restriction in output, Dr. Frankel's opinion that the challenged default interchange rules have had an anticompetitive effect is unsupportable.  (*Id.* at 20-24.)

None of the arguments that class plaintiffs advance in opposition overcomes these three fundamental flaws in Dr. Frankel's opinions.  Accordingly, Dr. Frankel's opinions regard-

---

[1]   Defendants' Memorandum Of Law In Support Of The Motion To Exclude Certain Opinions Of Class Plaintiffs' Economic Expert Dr. Alan S. Frankel, dated February 11, 2011 ("Def. Br.").

ing injury, damages and the competitive effects of the challenged default interchange rules should be excluded as inadmissible.

***Argument***

I.    ***Dr. Frankel Failed To Hypothesize A "But For" World That Would Eliminate The Allegedly Collective Conduct That Forms The Antitrust Basis For Class Plaintiffs' Challenge To The Default Interchange Rules***

   Plaintiffs do not dispute that the case law requires a "but for" world – the hypothetical world that would likely have existed but for the challenged conspiracy that plaintiffs allege restrained competition – to be constructed so as to eliminate the allegedly unlawful concerted behavior. "Notwithstanding the complex nature of the conduct at issue, [plaintiffs' expert] was required to construct a hypothetical market, a 'but for' market, free of the restraints and conduct alleged to be anticompetitive." *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055 (8th Cir. 2000) (citation omitted). Defendants have shown that Dr. Frankel failed to construct such a "but for" world. (Def. Br. at 10-14.) That failure renders his opinions regarding injury in fact and damages resulting from the challenged default interchange rules unreliable and thus inadmissible.

   In their opposition brief, class plaintiffs argue that Dr. Frankel has constructed a "but for" world without the challenged network-established interchange rules. (Class Pl. Opp. Br.[2] at 1.) But that is not so.

---

[2] Class Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Exclude Certain Opinions of Class Plaintiffs' Economic Expert Alan S. Frankel, dated May 6, 2011 ("Class Pl. Opp. Br.").

2

**A.    *Dr. Frankel Did Not Eliminate The Network Establishment Of Interchange Rules In His Primary "But For" World***

Class plaintiffs' opposition brief confirms that Dr. Frankel failed to construct a primary "but for" world in which there were no network interchange rules.[3]  Under Dr. Frankel's theory, any rule established by the network constitutes collective conduct for purposes of Section 1 of the Sherman Act.  Yet, class plaintiffs and Dr. Frankel steadfastly resist any "but for" world in which issuing banks would have been permitted to act independently with respect to the interchange rates they charge.  Instead, in his primary "but for" world, Dr. Frankel has postulated that each network would have replaced its current default interchange rule with a rule – which, to be consistent with his view, would be collectively set – prohibiting each individual issuing bank from deciding independently whether, and how much, to deduct as an interchange fee from the amount it transmits to the acquiring bank at settlement.  (Class Pl. Opp. Br. at 25.)

Dr. Frankel's assumed new rule prohibiting issuers from independently determining what interchange rates to charge as a condition of settlement would have been established by each network in the same manner as the current challenged default interchange rules; by requiring issuers to settle payment card transactions at par, it would simply set the interchange rate at zero rather than at a positive level, as the networks do in the actual world.  Indeed, because Dr. Frankel's new network interchange rule would not allow member banks to supersede it by bilateral agreement (as the current default interchange rules do), Dr. Frankel's primary "but for"

---

[3]    In addition, and contrary to class plaintiffs' assertion (Class Pl. Opp. Br. at 1), Dr. Frankel did not remove from his "but for" worlds the alleged "anti-steering rules" that class plaintiffs challenge in this litigation.  At his deposition, Dr. Frankel unequivocally testified:  "I think I testified earlier that my but-for worlds – my primary and alternative but-for worlds and the damages computations that flow from them do not hinge on whether or not there would have been anti-steering rules in those but-for worlds."  (Deposition of Alan S. Frankel (Sept. 20-22, 2010) ("Frankel Dep.") at 917; *see also* Class Pl. Opp. Br. at 26 & n.24.)

3

world would restrain independent competitive conduct, unlike the current default interchange rules.

Class plaintiffs and Dr. Frankel vainly attempt to overcome this flaw in Dr. Frankel's primary "but for" world by the expedient of trying to redefine the conduct that class plaintiffs challenge. They refer to the challenged conduct as the "rules requiring payment of fixed interchange fees on every payment card transaction." (Class Pl. Opp. Br. at 1.) In so doing, however, class plaintiffs and their expert try to avoid consideration of the concerted action requirement of Section 1 by recasting the claim as one challenging only positive interchange fees. But, as defendants previously showed (Def. Br. at 10-12), an argument that positive interchange fees should be "abolished" is "the same thing as 'set at zero,'" and is "not an antitrust argument at all, for it amounts to a dispute over prices and competition law is not concerned with setting a proper price." *Brennan v. Concord EFS, Inc.*, 369 F. Supp. 2d 1127, 1131-32 (N.D. Cal. 2005); *see also Chicago Prof'l Sports Ltd. P'ship v. National Basketball Ass'n*, 95 F.3d 593, 597 (7th Cir. 1996) ("the antitrust laws do not deputize district judges as one-man regulatory agencies").

To be subject to Section 1 scrutiny at all, the networks' default interchange rules must constitute collective activity among competitors that unreasonably restricts the competitive behavior of the member banks. It makes no difference under the antitrust laws whether the challenged rules establish positive interchange rates (where issuers remit a discounted amount to acquirers for each transaction), set negative interchange rates (where issuers pay acquirers more than the face amount of each transaction), or require transactions to settle at par (where issuers transmit to acquirers the face amount of each transaction). Section 1 courts are not called on to scrutinize the reasonableness of the price that results from concerted action, but only whether the collective action unreasonably restrains the participants' competitive behavior.

Accordingly, if Visa and MasterCard are permitted under Section 1 to establish default interchange rules that define the financial rights and obligations of their member banks when they settle payment card transactions because, for example, such rules are determined to be reasonably necessary to the day-to-day functioning of each network and thus procompetitive, *see, e.g.*, *National Bancard Corp. (NaBanco) v. Visa U.S.A., Inc.*, 596 F. Supp. 1231 (S.D. Fla. 1984), *aff'd*, 779 F.2d 592 (11th Cir. 1986) ("*NaBanco*"), then the antitrust laws do not dictate the level of the default interchange rates themselves.  If, however, Visa and MasterCard were not permitted under Section 1 to establish such default interchange rules because such rules were determined to be collective action that, on balance, is anticompetitive, then the default interchange rate levels would be irrelevant; no network-established default interchange rate level would be permissible.  Moreover, if network establishment of default interchange rules constituted unlawful concerted activity under Section 1, then Dr. Frankel's network rule mandating settlement at par would be as unlawful as the current rules.

Given plaintiffs' interchange claims, Dr. Frankel was required to construct a primary "but for" world in which no network interchange rules existed to define the respective rights and obligations of issuers and acquirers regarding the settlement of transactions.  Individual issuing banks would have to be free to negotiate with acquiring banks as to how much money to transmit to such acquiring banks whenever those acquiring banks submitted transaction receipts for settlement.  And acquiring banks would have to be free to accept whatever reimbursement individual issuing banks transmit to them in settlement, and to decide unilaterally how much to remit to their merchant customers for those transactions thereafter.  In a properly constructed "but for" world consistent with class plaintiffs' theory of violation, an economist, conducting an appropriate economic analysis of the kind that is wholly lacking here, would have

analyzed the likely behavior of issuing and acquiring banks and estimated the resulting levels of interchange rates.  No such economic analysis was even possible here because Dr. Frankel constructed his "but for" worlds without removing the network establishment of interchange rules.

Plaintiffs attempt to defend Dr. Frankel's "but for" world by quoting Dr. Frankel's view that "merchants 'would not have paid [interchange] fees through mutually voluntary agreements with card issuing banks' because 'merchants do not receive services from an issuing bank when the issuer's cardholder initiates a card transaction.'"  (Class Pl. Opp. Br. at 22-23, quoting Frankel Rep. ¶ 296.)  Setting aside the fact that, in a properly constructed "but for" world, individual issuing banks would have been free to negotiate interchange fees with individual acquiring banks and not necessarily with merchants, Dr. Frankel's view is merely a word game, not economics.  In plaintiffs' lexicon, the *benefits* that merchants receive from payment card issuance do not result from a *service*:  "Although payment cards may result in incremental sales to individual merchants, at some point in time, this is not a service provided by the issuers to merchants."  (Class Pl. Opp. Br. at 23 n.19.)  But regardless of whether these benefits are called a "service," it is undisputed that card issuance provides benefits to merchants.  And those benefits are worth more than the fees that merchants pay – or else merchants would not accept the cards.  The only reason why merchants would not pay interchange fees in Dr. Frankel's "but for" world is that he assumes the existence of network rules that allow merchants to receive all the benefits of payment card acceptance without paying for them, and that preclude individual issuing banks from requiring some payment from acquirers as a condition of settlement.

Plaintiffs also attempt to justify the assumed network rules prohibiting issuers from setting their own fees as a condition of settlement by pointing to Dr. Frankel's assertion that if member banks were permitted to decide unilaterally – without default rules – how to settle

6

transactions, then issuing banks would have "market power" enabling them to charge interchange fees.  (Class Pl. Opp. Br. at 26.)  Dr. Frankel has not substantiated his assertion that individual issuing banks would have market power in a "but for" world that allowed the terms of settlement to be determined by individual issuers rather than by default network rules.  But even if individual issuing banks did have market power, that would be irrelevant.  Section 1 does not prohibit the unilateral exercise of market power.  *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767-68 (1984).

The fact that Dr. Frankel dislikes the legally permissible "but for" world in which individual issuing banks could exercise their independent judgment as to the interchange fees they would charge acquiring banks in settlement does not allow him to hypothesize, instead, a "but for" world in which collectively set rules effectively mandate an interchange rate of zero. To offer an opinion as to injury in fact and damages calculation, Dr. Frankel was obliged to compare the actual world to a legally permissible "but for" world, and he has not done so.

**B.      *Class Plaintiffs Do Not Even Argue That Dr. Frankel Eliminated The Network Establishment Of Interchange Rules In His Alternative "But For" World***

In Dr. Frankel's alternative "but for" world, the networks would continue to establish interchange fees, albeit at levels reduced to some level approximated by the interchange fees established through regulatory fiat in Australia and Europe, which Dr. Frankel has assumed, without any supporting evidence, would be sufficient for network "viability" in the United States market.  There is not even the pretense of removing the challenged central establishment of default interchange rules in this alternative "but for" world.  Dr. Frankel's alternative "but for" world should be rejected as a matter of law because, if the network establishment of default interchange rules are sufficiently necessary to require that interchange fees be "collectively" established at some subsistence level, then the collective establishment of default interchange fees at

7

any level is not a violation of Section 1, and all the interchange claims should be dismissed. Dr. Frankel's alternative "but for" world is entirely irrelevant, and is therefore inadmissible.

*       *       *

Because Dr. Frankel's "but for" worlds do not permit an economic analysis of interchange rate levels in an alternative marketplace without network-established interchange rules, Dr. Frankel's opinions that plaintiffs suffered injury in fact and damages as a result of the current default interchange rules are unreliable, and thus inadmissible, as a matter of law.

## II.    Dr. Frankel's "But For" Worlds Do Not Account For The Historical Facts And Development Of The Payment Card Industry

As defendants showed in their moving brief (Def. Br. at 15-20), an expert constructing a "but for" world must consider all competitive and economic factors that influence the marketplace and explain how, accounting for those competitive and other factors, competition in the relevant market would have led to the realization of the posited "but for" world. (*See* Def. Br. at 15 (citing cases).) Defendants demonstrated that Dr. Frankel did not consider any, much less all, of the relevant competitive and economic factors regarding the payment card industry when he constructed his "but for" worlds.

In their opposition brief, class plaintiffs assert that "[t]he absence of interchange fees is . . . the outcome one would expect to have evolved in the competitive payment markets without restrictions or impediments on merchants' ability to steer freely among payment methods or networks.'" (Class Pl. Opp. Br. at 24, quoting Frankel Rep. ¶ 313.) Plaintiffs advance several arguments in an attempt to support this view of how the market would have "evolved," but none of those arguments provide a reliable basis to accept Dr. Frankel's "but for" world. Indeed, in their attempt to justify Dr. Frankel's conclusions, class plaintiffs continue to ignore

8

critical competitive and economic factors that are material to any analysis of interchange rules in the payment card industry.

**A.**   *Dr. Frankel Did Not Account For An Antitrust Judicial History That Provides A Unique Indicator That Network-Set Interchange Rates Are Procompetitive*

Dr. Frankel has observed that the PIN-debit card networks initially evolved without interchange fees.  (Class Pl. Opp. Br. at 24.)  But this is *not* the way that credit cards and signature debit cards developed.  They evolved with default interchange fees, and Dr. Frankel has wholly ignored the reasons that interchange rules are commonplace in the ongoing operation of vast four-party payment networks.  As defendants previously explained, antitrust court decisions themselves have historically encouraged the use of payment card network interchange rules like the rules at issue here.

In *NaBanco*, for example, the district court rejected the precise claim that class plaintiffs and Dr. Frankel advance here, concluding:  "Essentially, NaBanco has asked the court to 'fix' its own price for [the interchange rate] but in accordance with terms NaBanco considers fair.  Alternatively, NaBanco has asked the court to enjoin VISA from setting any particular [interchange rate], thus permitting each merchant bank (or NaBanco) to establish individually-negotiated [interchange rates] with issuer banks."  596 F. Supp. at 1241.  The court determined that the establishment of network interchange rates was "vital" to the day-to-day functioning of the network, insofar as it eliminated "the costly uncertainty and prohibitive time and expense of 'price negotiations at the time of the exchange' between the thousands of VISA members.  In doing so, it guarantees the universal acceptability that is at the heart of the competitive success of the product."  *Id.* at 1259-60 (citation omitted).  Moreover, the court explained, Visa's interchange rule balances – "equillibrates" – the supply and demand for Visa network services between network members.  *Id.* at 1261.  Indeed, the court concluded – and the Eleventh Circuit

affirmed – that the establishment of network interchange rules was procompetitive because it eliminated substantial transaction costs on transactions in which two different network members combined to offer a single service – network payment card services – to a merchant and a cardholder. *Id.* at 1264.

Similarly, in *United States v. Visa U.S.A., Inc.*, 344 F.3d 229 (2d Cir. 2003), the Second Circuit concluded that competition among the four major payment card networks – Visa, MasterCard, American Express, and Discover – to sell their technical, infrastructure, and financial services to issuer banks would be increased with the elimination of certain Visa and Master-Card exclusivity rules. *Id.* at 240. The United States Department of Justice made clear that it expected that the elimination of the networks' exclusivity rules, which it had sought in *United States v. Visa*, might result in an increase in interchange rates. The government explained:

> In *United States v. Visa U.S.A., Inc.*, the DOJ had to consider [the possibility that competition would drive interchange rates higher] when it challenged exclusionary rules that restricted the ability of American Express and Discover to compete for issuing banks. Because American Express sets the highest prices to merchants of all of the credit card networks, it seemed possible that a ban on the exclusionary rules would drive Visa and MasterCard to raise their interchange fees to be closer to the merchant fees of American Express. This would, however, have occurred as part of an increase in competition. Since the banning of the exclusionary rules in 2004, Visa and MasterCard have introduced premium cards with higher interchange rates targeted at the same high-end consumers that American Express targets. This may have happened for a variety of reasons, but it is consistent with a conclusion that increased competition with American Express led to an increase in interchange fees.

Delegation of the United States to the Competition Committee, *Roundtable on Two-Sided Markets*, Organisation for Economic Co-operation and Development, at 5, ¶ 12 (June 4, 2009), *available at* http://www.ftc.gov/bc/international/docs/roundtabletwosided.pdf.

In his reports and testimony, Dr. Frankel has wholly ignored this relevant antitrust judicial history of the payment card industry. Remarkably, class plaintiffs do not even cite the *NaBanco* decision in their opposition brief. Despite an antitrust history finding that networks'

10

interchange rules are "vital" and "procompetitive," and the Department of Justice's explicit recognition that increased competition following *United States v. Visa* might lead to increased interchange rates, Dr. Frankel simply assumed that, at some unspecified time, defendants in a competitive "but for" world would have either eliminated those procompetitive rules altogether or reduced the default interchange rates to some undefined viability level.  Dr. Frankel has offered no economic analysis or explanation whatsoever as to how his "but for" worlds fit with this judicial history of interchange rules in the payment card industry.  As defendants previously explained, nowhere in his construction of his "but for" worlds has Dr. Frankel addressed – much less analyzed with the rigor required of an expert by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) – how Visa and MasterCard could have competed with American Express for issuers without default interchange fees, or why, in such a competitive environment, Visa and MasterCard would have eliminated fees that a court has found on balance to be procompetitive.

An admissible economic analysis cannot simply ignore this relevant history, as Dr. Frankel has done.  Judicial and executive branch experience, such as exists with respect to payment card interchange rules, is precisely what the Supreme Court has recognized as being a "unique indicator" of the competitive virtues of a practice.  *See Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.*, 441 U.S. 1, 13 (1979).  Dr. Frankel's failure to consider this history is fatal to the reliability and relevance of Dr. Frankel's "but for" worlds and to the injury and damages opinions he bases on those "but for" worlds.  *See, e.g.*, *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 807 (9th Cir. 1988) (excluding expert damages testimony that "had no basis in the record"); *Metrix Warehouse, Inc. v. Daimler-Benz AG*, 828 F.2d 1033, 1044-45 (4th Cir. 1987) (expert's assumption was "contrary to the clear weight of the evidence"); *Herman Schwabe, Inc.*

11

*v. United Shoe Mach. Corp.*, 297 F.2d 906, 911 (2d Cir. 1962) (excluding damages testimony where expert provided "[n]o basis" for his assumptions); *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314, 319 (S.D.N.Y. 2009) ("no basis in fact or reality" for expert's assumptions).

> **B.     Dr. Frankel Did Not Account For The Independent Behavior Of Member Banks In The Absence Of Network-Established Interchange Rules**

Dr. Frankel has also asserted, with no supporting evidence whatsoever, that network-established interchange rules have raised merchant discount fees and, on that basis alone, are anticompetitive.  Accordingly, Dr. Frankel concluded, he would simply abolish the network-established interchange rules in his primary "but for" world (although not in his alternative "but for" world).  As defendants have explained, however, Dr. Frankel has not really abolished network-established interchange rules; he simply replaced the current network-established default rules with a network-established rule mandating that no issuer may deduct any interchange fee from any transaction at settlement.

The critical question is how the market would have performed if the current well-established system of default interchange fees were prohibited at some unidentified date after *NaBanco* – indeed, at some date after January 1, 2004 (*i.e.*, the date in the *Visa Check* release).  How would competitive forces have caused interchange rates to be reduced either to zero or to some unspecified level sufficient for each network's viability?  If Dr. Frankel had actually abolished the network establishment of interchange rules, he would have had to account in his "but for" worlds for the independent behavior of member banks when they settled payment card transactions between them.  Since payment card issuers are the gateways to cardholders' funds in the first instance, they alone could determine how much to deduct from the amount to be transmitted to acquirers in settlement.  But Dr. Frankel collected no data and did no study or analysis

to explain how competition among individual issuing banks would have caused a reduction in interchange rates or how long such an evolutionary process would take.

In a properly constructed "but for" world that accounted for the independent behavior of member banks, it is likely that some issuers may have negotiated bilateral agreements with some acquirers.  Some institutions may have favored their own acquiring affiliates with lower interchange rates than they offered to independent acquirers and third-party processors. And given class plaintiffs' acknowledgement that payment cards offer merchants incremental sales (Frankel Dep. at 137-38; *see also id.* at 112), their concession that the magnitude of those incremental sales can be affected by the way in which the interchange fees are used to provide incentives for cardholders to use their payment cards to make purchases (*id.*), and their admission that merchants are less price sensitive than cardholders, such that a change in cardholder rewards has a greater impact on cardholder behavior than an equivalent change in merchant discount fees would have on merchant behavior (Class Pl. Opp. Br. at 18), it is likely that some merchants may not have found acquirers willing to process their payment card transactions in the "but for" world unless those merchants paid higher merchant discount rates than they currently pay.  But Dr. Frankel analyzed none of this; he simply ignored it.

Determining the independent terms of trade that individual members of Visa and MasterCard would have established in the absence of the network default interchange rules is the function of a properly constructed "but for" world.  To construct a reliable, and thus admissible, "but for" world, Dr. Frankel should have used economic evaluative tools to predict what industry participants would have done in the absence of a network default interchange rule and to estimate what interchange rates and, ultimately, merchant discount rates would have been.  But Dr. Frankel did nothing other than assume a network rule that, in fact, provides no opportunity for

13

independent competitive behavior.  He simply replaced one network-established rule – a default rule that expressly permitted independent decisionmaking – with another network-established rule that would bar such independent variations, and decreed – with no more economic analysis than that "higher prices harm those that pay them" (Class Pl. Opp. Br. at 15; Frankel Rep.[4] ¶ 141) and that "consumers and firms don't volunteer to pay taxes" (Class Pl. Opp. Br. at 2) – that inter-change rates either would have been abolished altogether (in his primary "but for" world) or would have been substantially reduced to subsistence levels (in his alternative "but for" world). Dr. Frankel's failure to consider and account for the independent behavior of industry partici-pants in the absence of the challenged "collectively" established rules renders his "but for" worlds unreliable and unrealistic, and the opinions about injury and damages for which those "but for" worlds form the foundation inadmissible.

Class plaintiffs cannot justify Dr. Frankel's primary "but for" world by relying on "merchants' ability to steer freely among payment methods or networks" (Class Pl. Opp. Br. at 24, quoting Frankel Rep. ¶ 313) because Dr. Frankel himself did not rely on that factor.  As noted above, Dr. Frankel unequivocally testified at his deposition:  "I think I testified earlier that my but-for worlds – my primary and alternative but-for worlds and the damages computations that flow from them do not hinge on whether or not there would have been anti-steering rules in those but-for worlds."  (Frankel Dep. at 917.)

Moreover, class plaintiffs cannot justify Dr. Frankel's primary "but for" world by asserting, with no evidentiary basis whatsoever, that a system with interchange fees could not survive because "issuing banks that charged interchange fees would lose out to issuing banks that did not charge such a fee to merchants."  (Class Pl. Opp. Br. at 25.)  If this argument were cor-

---

[4]    Report of Alan S. Frankel, Ph.D. (July 2, 2009) ("Frankel Rep.").

rect, there would be no interchange fees today, for issuing banks are free to charge less than the default rate. Of course, the history of the payment cards industry, including its antitrust judicial history, demonstrates that that has not happened. Even in Australia, where surcharging and steering are permitted, competition has not driven interchange fees below the legal ceiling – let alone to zero. It is one thing to say that a bank would lose out if it were the *first* bank to charge interchange fees when no one else did. But in the United States, issuing banks have been charging interchange fees for many years, and Dr. Frankel has provided no economically sound basis for concluding that, if the network rules establishing default interchange rates were abolished, interchange rates by individual issuers would fall to zero. Dr. Frankel has not shown that any individual issuing bank would be better off by eliminating its interchange fees. And given the intensity with which card issuing banks compete for cardholders by offering payment cards with rewards and cash-back features, even the suggestion that a bank would unilaterally abolish its interchange fee policies is suspect.

### C.       Dr. Frankel Did Not Account For The Fact That His Proxy Interchange Rates Are Regulated Rates And Are Not The Result Of Competition

Dr. Frankel has never explained how competition would have resulted in the interchange rates he opined would have prevailed in his two "but for" worlds. In his primary "but for" world, Dr. Frankel simply asserted, with no analysis or data to support him, that merchants would not have paid any interchange fees because they would have had no economic incentive to do so and the compulsion would have been removed. (Class Pl. Opp. Br. at 2.) But seven million retail outlets, representing more than 95% of the retail sales in the United States, currently

15

accept Visa- and MasterCard-branded payment cards.  (Class Pl. Sum. Jud. Br.[5] at 75.)  Visa and MasterCard and their member banks do not compel merchants to accept Visa- and MasterCard-branded payment cards.  And while they are not compelled to do so, many merchants also accept American Express cards, which generally are more costly for the merchant than Visa or Master-Card acceptance is.  The only "compulsion" to accept payment cards that exists today is competi-tion:  merchants accept payment cards because their customers want to use them and their com-petitors accept them.

As class plaintiffs themselves recognize, payment cards provide merchants with incremental sales, and the possible loss of those incremental sales to their competitors is suffi-cient to lead nearly all United States merchants to accept payment cards and to pay the merchant discount fees each currently negotiates with its acquiring bank or processor.  Dr. Frankel has ac-knowledged that no four-party credit card system exists anywhere in the world that does not es-tablish interchange rules permitting issuers to deduct interchange fees from the amount they transmit to acquirers in settlement of transactions (Frankel Dep. at 264), and he has proffered no data or studies or analysis whatsoever even to suggest that Visa and MasterCard would have de-veloped at any point in their history as four-party networks without interchange rates greater than zero.

Likewise, Dr. Frankel has not offered any data or studies or economic analysis to explain how, in his alternative "but for" world, competition would have led Visa and MasterCard to "have set interchange fees at the lowest level necessary for them to have continued to oper-ate."  (Class Pl. Opp. Br. at 2.)  Dr. Frankel's reliance on the maximum average default inter-

---

[5]    Class Plaintiffs' Memorandum of Law In Support of Their Motion for Summary Judgment, dated Feb. 11, 2011 ("Class. Pl. Sum. Jud. Br.").

change rates mandated by government regulation in Australia, the United Kingdom, and the European Commission, is misplaced.  Even assuming that the economies and the payment card industries in Australia, Britain and Europe were comparable to the economy and payment card industry in the United States – and neither class plaintiffs nor Dr. Frankel has offered any analysis of that question whatsoever – Dr. Frankel has ignored the fact that the interchange rates in Australia, Britain and Europe are established by regulatory fiat, not by competition.  Those regulated rates have no relevance at all to the interchange rates that would have existed in the United States under the forces of competition.  In sum, regulated markets – particularly foreign regulated markets – are no proxy for a competitive result in the United States.  Accordingly, Dr. Frankel's reliance on foreign regulated markets and interchange rates to construct his alternative "but for" world renders that "but for" world irrelevant and unreliable as a tool to assess injury in fact and the calculation of damages in this case.

III.    *Dr. Frankel Has Failed To Provide Any Economic Analysis To Demonstrate That Output In His Defined "Relevant Markets" Has Been Reduced As A Result Of The Networks' Default Interchange Rules*

The Supreme Court in *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993), held that "[s]upracompetitive pricing entails a restriction in output." *Id.* at 233.  Yet, as defendants demonstrated in their moving brief (Def. Br. at 20-24), Dr. Frankel confessed that he could not opine that default interchange rules had restricted output in any relevant market.  As such, his opinion that the default interchange rules are anticompetitive because they cause merchant discount fees to be supracompetitive lacks the basis required by the holding in *Brooke Group* and should be held inadmissible.

Class plaintiffs advance two responses in their opposition brief.  First, they argue that a restriction in output is not necessary to find that prices are above a competitive level.

17

(Class Pl. Opp. Br. at 36-40.)  Second, they argue that Dr. Frankel has opined that output was in fact restricted because he asserted – again with no evidence or analysis at all – that: (a) fewer merchants accept payment cards than would have accepted them in a "but for" world with zero or lower interchange rates; and (b) merchants pass on higher merchant discount rates to consumers in the form of higher retail prices for goods and services, thereby reducing the output of goods and services in the economy generally.  (*Id.* at 18.)  Neither of these arguments suffices to save Dr. Frankel's fatally flawed opinion.

### A.   As A Matter Of Law, Proof Of A Restriction In Output Is Required As A Predicate For A Finding That Prices Exceed A Competitive Level

Class plaintiffs' argument that a restriction in output is not necessary to find that prices are above a competitive level is simply contrary to *Brooke Group*.  In *Brooke Group*, the Court was faced with evidence of increased prices in a market the plaintiff had alleged was affected by the defendants' anticompetitive practices.  The Court was clear that, without evidence of a restriction in output, price increases were not evidence of anticompetitive effects in the market.  "Only if those higher prices are a product of nonmarket forces has competition suffered.  If prices rise in response to an excess of demand over supply, or segment growth slows as patterns of consumer preferences become stable, the market is functioning in a competitive manner.  Consumers are not injured from the perspective of the antitrust laws by the price increases; they are in fact causing them."  509 U.S. at 232.  The Court held that a plaintiff must show that the defendants had "elevated prices above a competitive level."  *Id.* at 233.

Contrary to class plaintiffs' assertion (Class Pl. Opp. Br. at 38), the holding in *Brooke Group* is not limited to allegations of predatory pricing.  Indeed, the Court in *Brooke Group* cited *National Collegiate Athletic Ass'n v. Board of Regents of Univ. of Okla.*, 468 U.S. 85, 104-08 (1984), *Broadcast Music*, 441 U.S. at 19-20, neither of which involved predatory

pricing, as well as a host of academic authorities, when it succinctly held: "Supracompetitive pricing entails a restriction in output." *Brooke Group*, 509 U.S. at 233.

The clear holding of *Brooke Group* is applicable here. Class plaintiffs and Dr. Frankel repeatedly assert that defendants have raised default interchange rates "above the competitive level" (Class Pl. Opp. Br. at 18) and argue that merchants have been harmed because "higher prices harm those that pay them." (*Id.* at 15.) But, critically, Dr. Frankel has provided no economic analysis or data to distinguish competitive from supracompetitive interchange rate levels. Like the price increases in *Brooke Group*, interchange increases that flow from the competition among Visa, MasterCard, American Express and Discover for the business of issuers – as the Department of Justice anticipated would occur in the wake of *United States v. Visa* – or from the increase in cardholder demand for lower cardholder fees and greater payment card rewards are not supracompetitive. That is a competitive result. As the *Brooke Group* Court made clear, prices become supracompetitive, thereby causing harm to competition, only when output is restricted as a result of the increase. *Brooke Group*, 509 U.S. at 233; *see also Chicago Prof'l Sports Ltd. P'ship v. National Basketball Ass'n*, 95 F.3d 593, 597 (7th Cir. 1996) ("The core question in antitrust is output. Unless a contract reduces output in some market, to the detriment of consumers, there is no antitrust problem."); *Chicago Prof'l Sports Ltd. P'ship v. National Basketball Ass'n*, 961 F.2d 667, 673 (7th Cir. 1992) (an alleged restraint that "in the end expands output serves the interests of consumers and should be applauded rather than condemned"); William Landes, *Harm to Competition: Cartels*, *Mergers, and Joint Ventures*, 52 Antitrust Law Journal 625 (1983).

Accordingly, class plaintiffs' assertion that evidence of a restriction in output is not necessary to a finding of supracompetitive prices is contrary to controlling authority.

**B.**      **_Dr. Frankel's Assertions About Restrictions In Output Are Wholly Unsupported_**

As defendants explained in their moving brief (Def. Br. at 23), Dr. Frankel admitted at his deposition that he cannot tell whether the challenged default interchange rules have impeded the growth in card usage, *i.e.*, output.  (Frankel Dep. at 210-13, 377-78, 1008-09.)  In fact, he has opined that the challenged conduct has actually encouraged payment card usage – too much usage, in his view.  (*See* Frankel Rep. ¶ 229; Frankel Reb. Rep.[6] ¶ 310; Frankel Dep. at 302.)  In an attempt to reconcile his view that he cannot tell whether the challenged rules restrict output with his view that the challenged rules in fact caused too much output, Dr. Frankel has contended that "the analysis of output is not properly applied to the markets [he] defined" (Frankel Dep. at 213), but could only be applied to a hypothetical relevant market that neither he nor plaintiffs have defined.  Dr. Frankel is wrong.

In their opposition brief, class plaintiffs argue that, although they have alleged that the relevant markets in which competition has been harmed are various markets for payment card network services (or even narrower single brand Visa- and MasterCard-only markets) (*see, e.g.*, Compl.[7] ¶¶ 8hh, 105, 246, 272, 297, 310, 358, 376, 383, 398, 414, 455), payment card transaction volume in those markets is not the appropriate measure of output.  (Class Pl. Opp. Br. at 19.)  This assertion is erroneous.  Class plaintiffs claim that they have suffered anticompetitive harm in the markets alleged because default interchange rates have allegedly increased the price of payment card network services to supracompetitive levels.  To prove that the price of payment card network services is supracompetitive, class plaintiffs must demonstrate that output in the markets they have alleged for payment card network services has been restricted.  Output in

---

[6]    Rebuttal Report of Alan S. Frankel, Ph.D. (June 22, 2010) ("Frankel Reb. Rep.").

[7]    Corrected Second Consolidated Amended Class Action Complaint, dated March 27, 2009.

markets other than the alleged markets for payment card network services where class plaintiffs claim to have suffered anticompetitive injury is wholly irrelevant to the question of whether the price of payment card network services has been increased above a competitive level.

Moreover, output in the markets for payment card network services must be measured by payment card transaction volume.  To prove that the cost of payment card network services is supracompetitive, class plaintiffs must prove that output of payment card network services has been restricted.  Simply put, they must show that default interchange rates during the relevant period caused payment card transaction volume to be less than it would have been if default interchange rates had been lower.  This they have not shown – and cannot show – because the undisputed evidence establishes that the volume of payment card transactions – not just for Visa and MasterCard, but for American Express and Discover as well (Vellturo Rep.[8] Ex. 11) – has increased substantially during the relevant time period.

Dr. Frankel's assertion that the proper measure of output is the volume of goods and services in the United States economy as a whole, and his speculation that the volume of goods and services in the United States economy has been restricted by the level of network default interchange rates (Class Pl. Opp. Br. at 18), is both unsupported and irrelevant.  Dr. Frankel has not offered a scintilla of data or any economic study or analysis from which to conclude that the volume of goods and services in the United States economy has been restricted by default interchange rates.  Indeed, given Dr. Frankel's admission that payment cards currently provide incremental sales to merchants and that merchants must accept payment cards or risk losing those additional sales, it is at least counterintuitive to conclude that, while more than seven million retail outlets representing more than 95% of the retail sales in the United States accept pay-

---

[8]   Expert Report of Christopher A. Vellturo (July 2, 2009) ("Vellturo Rep.").

ment cards (Class Pl. Sum. Jud. Br. at 75), those cards cause a restriction in the volume of goods and services sold in the United States economy. Without some evidentiary basis and analysis, Dr. Frankel's speculation is unreliable and inadmissible. *Herman Schwabe*, 297 F. 2d at 911 (expert's conclusion is properly excluded when no basis for an underlying assumption has been established).

Moreover, as a legal matter, the effect of interchange fees on the output of goods and services in the United States economy as a whole is irrelevant. Plaintiffs have not complained that interchange rules have caused them to sell too few goods and services. Indeed, they admit that card acceptance, and the way that interchange fees have been used to encourage payment card usage, can lead to incremental sales. (Frankel Dep. at 137-38; *see also id.* at 112.) They have not claimed any harm as a result of a restriction in the retail output of goods and services in United States economy.

Likewise, Dr. Frankel's opinion that the level of interchange rates has restricted the number of merchants that accept Visa- and MasterCard-branded payment cards is equally specious. As a legal matter, the number of merchants that do not accept payment cards is irrelevant because plaintiffs are not complaining that they have been injured by an inability to accept payment cards. Indeed, if the challenged rules restricted the number of merchants that could accept payment cards, then plaintiffs, who all accept payment cards to compete with their retail rivals, would seem to be benefited rather than harmed by that reduction. In addition, the output of a product or service is not appropriately measured by how many merchants offer the product or service, but by the volume of the product or service actually used or sold. Regarding volume, Dr. Frankel has admitted that, in his "but for" worlds in which he hypothesizes that interchange rates would be either zero or substantially lower than they currently are, cardholder rewards would be

lower and cardholder fees would be higher. This admission itself makes any speculation that card volume might be higher in the "but for" worlds than it is in the real world counterintuitive, if not wholly implausible. Not surprisingly, Dr. Frankel offered no opinion that payment card transaction volume would have been greater in the "but for" world.

Furthermore, as a factual matter, Dr. Frankel has collected no data and conducted no economic analysis from which to conclude that the current level of default interchange rates has meaningfully restricted the number of merchants that accept payment cards. Dr. Frankel's assertion that the level of default interchange rates has restricted the number of merchants that accept payment cards is not only sheer speculation, but again is counterintuitive. Class plaintiffs concede that more than seven million retail outlets representing more than 95% of the retail sales in the United States already accept payment cards (Class Pl. Sum. Jud. Br. at 75), and the histori-cal growth of payment card acceptance among merchants in virtually all industries has been phe-nomenal.

Finally, Dr. Frankel's speculation that "transaction volume might have been greater had Defendants' conduct not discouraged certain merchants from accepting their cards" (Class Pl. Opp. Br. at 19) is similarly unsupported by any evidence or analysis, and should be rejected. *See*, *e.g.*, *Brooke Group*, 509 U.S. at 234 ("One could speculate, for example, that the rate of [market] growth would have tripled, instead of doubled, without Brown & Williamson's alleged predation. But there is no concrete evidence of this.").

                    *       *       *

The deficiencies in Dr. Frankel's opinions are not merely a matter of weight. Dr. Frankel's views are untethered to the reality of competition in the payment card business and so patently unsupported by economic theory or empirical evidence (or even common sense), that

23

they would not aid the factfinder – indeed, they would likely mislead the jury.  As such, they are unreliable, irrelevant, and should be excluded as inadmissible.

### *Conclusion*

For all of the forgoing reasons, as well as for the reasons set forth in defendants' moving brief, defendants respectfully submit that the Court should exclude the opinions proffered by Dr. Alan S. Frankel that (i) class plaintiffs have suffered injury in fact and measurable damages as a result of the default interchange rules, and (ii) the network establishment of default interchange rules have had an anticompetitive effect.

Dated:   New York, New York          Respectfully submitted,
        June 30, 2011

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

By:   /s/ Gary R. Carney
     Andrew C. Finch
     Gary R. Carney
     1285 Avenue of the Americas
     New York, New York 10019-6064
     Tel.: (212) 373-3000
     Fax: (212) 757-3990
     gcarney@paulweiss.com

     Kenneth A. Gallo
     Joseph J. Simons
     2001 K Street, N.W.
     Washington, DC 20006-1047
     Tel.: (202) 223-7300
     Fax: (202) 223-7420

**WILLKIE FARR & GALLAGHER LLP**

Keila D. Ravelo
Wesley R. Powell
Matthew Freimuth
787 Seventh Avenue
New York, New York 10019-6099
Tel.: (212) 728-8000
Fax: (212) 728-8111

*Attorneys for Defendant MasterCard Incorporated and MasterCard International Incorporated*

**ARNOLD & PORTER LLP**

By:   /s/ Robert C. Mason
Robert C. Mason
399 Park Avenue
New York, NY  10022-4690
Telephone:  (212) 715-1000
Facsimile:  (212) 715-1399
robert.mason@aporter.com

Robert J. Vizas
One Embarcadero Center, 22nd Floor
San Francisco, CA  94111-3711
Telephone:  (415) 356-3000
Facsimile:  (415) 356-3099

Mark R. Merley
Matthew A. Eisenstein
555 12th Street, N.W.
Washington, DC  20004-1206
Telephone:  (202) 942-5000
Facsimile:  (202) 942-5999

*Attorneys for Defendants Visa Inc., Visa U.S.A. Inc., and Visa International Service Association*

**MORRISON & FOERSTER LLP**

By:   /s/ Mark P. Ladner
        Mark P. Ladner
        Michael B. Miller
        1290 Avenue of the Americas
        New York, NY  10104-0050
        Telephone:  (212) 468-8000
        Facsimile:  (212) 468-7900
        mladner@mofo.com

*Attorneys for Defendants Bank of America, N.A., BA Merchant Services LLC (f/k/a Defendant National Processing, Inc.), Bank of America Corporation, and MBNA America Bank, N.A.*

**SHEARMAN & STERLING LLP**

By:   /s/ James P. Tallon
        James P. Tallon
        Wayne D. Collins
        Lisl J. Dunlop
        599 Lexington Avenue
        New York, NY 10022-6069
        Tel.: (212) 848-4000
        Fax: (212) 848-7179
        jtallon@shearman.com

*Attorneys for Defendants Barclays Financial Corp. and Barclay's Bank plc*

26

**O'MELVENY & MYERS LLP**

By:  /s/ Andrew J. Frackman
Andrew J. Frackman
Times Square Tower
7 Times Square
New York, N.Y. 10036
Tel.: (212) 326-2000
Fax: (212) 326-2061
afrackman@omm.com

*Attorneys for Defendants Capital One Bank (USA), N.A., Capital One F.S.B., and Capital One Financial Corp.*


**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**

By:  /s/ Peter E. Greene
Peter E. Greene
Peter S. Julian
Four Times Square
New York, NY   10036
Telephone:  (212) 735-3000
Facsimile:  (212) 735-2000
peter.greene@skadden.com

Michael Y. Scudder
155 North Wacker Drive
Chicago, IL  60606-1720
Telephone:  (312) 407-0700
Facsimile:  (312) 407-0411
michael.scudder@skadden.com

*Attorneys for Defendants JPMorgan Chase & Co., Chase Bank USA, N.A., Chase Manhattan Bank USA, N.A., Chase Paymentech Solutions, LLC, JPMorgan Chase Bank, N.A., as acquirer of certain assets and liabilities of Washington Mutual Bank, Bank One Corporation, and Bank One Delaware*

27

**SIDLEY AUSTIN LLP**

By:   /s/ David F. Graham
   David F. Graham
   Eric H. Grush
   One South Dearborn Street
   Chicago, IL 60603
   Tel.: (312) 853-7000
   Fax: (212) 853-7036
   dgraham@sidley.com


   Benjamin R. Nagin
   787 Seventh Avenue
   New York, N.Y. 10019
   Tel.: (212) 839-5300
   Fax: (212) 839-5599

*Attorneys for Defendants Citibank (South Dakota), N.A., Citibank, N.A., Citigroup Inc., and Citicorp*


**KEATING MUETHING & KLEKAMP PLL**

By:   /s/Richard L. Creighton
   Richard L. Creighton
   Joseph M. Callow, Jr.
   Drew M. Hicks
   One East Fourth Street
   Suite 1400
   Cincinnati, OH 45202
   Tel.: (513) 579-6400
   Fax: (513) 579-6457

*Attorneys for Defendant Fifth Third Bancorp*

**KUTAK ROCK LLP**

By:   /s/ John P. Passarelli
         John P. Passarelli
         James M. Sulentic
         The Omaha Building
         1650 Farnam Street
         Omaha, NE 68102-2186
         Tel.: (402) 346-6000
         Fax: (402) 346-1148
         john.passarelli@kutakrock.com

*Attorneys for Defendant First National Bank of Omaha*

**WILMER CUTLER PICKERING HALE AND DORR LLP**

By:   /s/ Christopher R. Lipsett
         Christopher R. Lipsett
         David S. Lesser
         399 Park Avenue
         New York, N.Y. 10022
         Tel.: (212) 230-8800
         Fax: (212) 230-8888
         chris.lipsett@wilmerhale.com

         Ali M. Stoeppelwerth
         Perry A. Lange
         1875 Pennsylvania Ave., N.W.
         Washington, D.C. 20006
         Tel.: (202) 663-6000
         Fax: (202) 663-6363

*Attorneys for HSBC Finance Corporation and HSBC North America Holdings, Inc.*

**JONES DAY**

By:  /s/ John M. Majoras
 John M. Majoras
 Joseph W. Clark
 51 Louisiana Avenue, NW
 Washington, DC   20001
 Telephone:  (202) 879-3939
 Facsimile:  (202) 626-1700
 jmmajoras@jonesday.com

*Attorneys for Defendants National City Corporation, National City Bank of Kentucky*

**PULLMAN & COMLEY, LLC**

By:  /s/ Jonathan B. Orleans
 Jonathan B. Orleans
 Adam S. Mocciolo
 850 Main Street
 Bridgeport, CT   06601-7006
 Telephone:  (203) 330-2000
 Facsimile:  (203) 576-8888
 jborleans@pullcom.com

*Attorneys for Defendant Texas Independent Bancshares, Inc.*

**ALSTON & BIRD LLP**

By:  /s/ Teresa T. Bonder
      Teresa T. Bonder
      Valarie C. Williams
      Kara F. Kennedy
      1201 W. Peachtree Street, N.W.
      Atlanta, GA 30309
      Tel.: (404) 881-7000
      Fax: (404) 881-7777
      teresa.bonder@alston.com

*Attorneys for Defendant Suntrust Banks, Inc.*

**PATTERSON BELKNAP WEBB & TYLER LLP**

By:  /s/ Robert P. LoBue
      Robert P. LoBue
      Norman W. Kee
      Patterson Belknap Webb & Tyler LLP
      1133 Avenue of the Americas
      New York, NY  10036
      Tel.:  (212) 336-2596
      Fax:  (212) 336-2222
      rplobue@pbwt.com

*Attorneys for Defendants Wachovia Bank, NA., Wachovia Corporation, and Wells Fargo & Company*

31