

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | MDL Docket No. 1720 (JG)(JO) |

**DEFENDANTS' COUNTER-STATEMENT IN OPPOSITION TO CLASS PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS, PURSUANT TO LOCAL RULE 56.1(b)**

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**TO BE FILED UNDER SEAL**



### *Table of Contents*

**Page**

Preliminary Statement ...................................................................................................3

I.    Response to Class Plaintiffs' Statement ...........................................................5

II.   Defendants' Statement of Additional Material Facts ....................................477

      A.    Early History Of United States Payment Card Systems ...................477

      B.    Network Services Provided By Visa And MasterCard.....................483

      C.    Competition Between Payment Networks .......................................485

            1.    Network Competition for Issuing Banks ...............................485
            2.    Network Competition for Acquiring Banks...........................488

      D.    Credit Cards, Signature Debit Cards, And PIN-Debit Cards Are
            Substitutes........................................................................................492

      E.    Payment Card Rewards Programs ....................................................493

      F.    Merchant Benefits Of Accepting Payment Cards.............................496

      G.    Other Payment Networks Have Similar Merchant Acceptance Rules as
            Visa and MasterCard.........................................................................500

      H.    Market Share Data Does Not Prove Market Power...........................503

      I.    Additional Procompetitive Rationales for Interchange......................505

      J.    Merchant Pricing...............................................................................510

      K.    Defendants' Experts Have Offered Opinions on Debit......................510

      L.    Alternative Systems ..........................................................................512

## *Preliminary Statement*

Pursuant to Rule 56.1(b) of the Local Rules of the United States District Courts

for the Southern and Eastern Districts of New York, defendants respectfully submit this counter-

statement in opposition to class plaintiffs' motion for summary judgment, including class

plaintiffs' Local Rule 56.1 separate statement.  A copy of the evidence on which defendants rely

to support each of the material facts on which they rely is submitted herewith as exhibits to the

transmittal affidavit of Peter E. Greene, dated May 13, 2011.

The following general objections are incorporated by reference in each of the

following specific responses and objections as though fully set forth therein:

Defendants dispute the admissibility of certain evidence as inadmissible because

it reflects matters that are outside the relevant time period applicable in this case.  Defendants

object to the admissibility of such evidence reflecting matters that occurred before January 1,

2004, to the extent such matters are being offered for purposes of proving an element of liability

on the grounds, and to the extent, that such evidence is inconsistent with this Court's decision in

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, No. 05-md-1720

(JG)(JO), 2008 WL 115104 (E.D.N.Y. Jan. 8, 2008).

Defendants also do not dispute that Visa and MasterCard have promulgated

certain rules, bylaws, and operating regulations related to merchant conduct at the point of sale,

including the networks' No Surcharge Rules (Oct. 2010 Visa Operating Regulations, Rule 5.1.C;

Dec. 2010 MasterCard Rules, U.S. Region Rule 5.11.2), the Honor-All-Cards Rules (Oct. 2010

Visa Operating Regulations, Visa U.S. Region Rule 5.2.B.; Dec. 2010 MasterCard Rules, U.S.

Region Rule 5.8.1.), non-discrimination rule (Oct. 2010 Visa Operating Regulations, U.S.

Region Rule 5.2.D.2; Dec. 2010 MasterCard Rules, Rule 5.11.1.), and rules related to discounts

at the point of sale (Oct. 2010 Visa Operating Regulations, Rule 5.2.D.2; Dec. 2010 MasterCard Rules, Rule 5.13).  However, defendants object to individual plaintiffs' repeated references to such rules as the "Anti-Steering Restraints" as inaccurate, misleading, argumentative, and unfairly prejudicial.

I.      **Response to Class Plaintiffs' Statement**


**Plaintiffs' Paragraph 1:**

1       **Defendants' conduct affects interstate commerce.  Every day, consumers use Visa and MasterCard branded credit and debit cards to purchase goods and services throughout the United States.  In 2008 alone, Visa and MasterCard branded credit card and signature debit card purchase volume was $2.217 trillion.[1]**

---
[1]      **McCormack Rep. ¶ 7.  (SUFEX001)**


*Defendants' Response to Paragraph 1:*

                Undisputed.  Defendants note that the Nilson Report defines "purchase volume" as spending at merchants.  (2009 Nilson Rep.,[1] at 1.)

---
[1]    HSN Consultants Inc., 2009 The Nilson Report, Issue 924 (Apr. 2009) ("2009 Nilson Rep.").

<u>Plaintiffs' Paragraph 2:</u>

**2      Credit-card, PIN debit and offline-debit-card transactions involve three steps: authorization, clearance, and settlement.**

*Defendants' Response to Paragraph 2:*

Disputed.  The processing of credit card, PIN debit, and offline debit card transactions involves numerous functions, including authorization, clearance, and settlement. (OCC Handbook,[2] at 6-9; McCormack Rep.[3] ¶¶ 20-22.)

a.      **MasterCard's Global Product Group executive, Jeffrey Portelli, testified that one of the core functions of Visa and MasterCard is to provide "switching services" which include "authorization, clearing and settlement."[2]**

_____
[2]      Portelli Dep. 22:16-23:2, May 14, 2008. (SUFEX002)

*Defendants' Response to Paragraph 2a:*

Undisputed.

b.      **Mr. Portelli defined "clearing" as "when a transaction goes through our system so the acquirer sends the actual financial transaction to our network so we can clear it onto the issuer."[3]**

_____
[3]      Portelli 30(b)(6) Dep, 202:14-19, December 12, 2008. (SUFEX003)

*Defendants' Response to Paragraph 2b:*

Undisputed.

c.      **The MasterCard Chargeback Guide defines "Clearing and Statement" as follows: "In summary, clearing is the movement of data from the acquirer to MasterCard, and from MasterCard to the issuer. Settlement is the process used to exchange funds between members for the net value of the monetary**

_____
2      Office of the Comptroller of the Currency, *Merchant Processing, Comptroller's Handbook* (Dec. 2001) ("OCC Handbook").

3      Report of Mike McCormack (Jul. 2, 2009) ("McCormack Rep.").

transactions cleared for that processing day. Interchange is the exchange of transaction data between members."[4]

_____
[4]     MasterCard Chargeback Guide at 1.3, effective April 16, 2010 (available at http://www.mastercard.com/us/merchant/pdf/TB_CB_Manual.pdf) (last accessed January 12, 2011). (SUFEX004)

_Defendants' Response to Paragraph 2c:_

Disputed.  The quoted definition is the definition that the MasterCard Chargeback

Guide provides "Clearing and Settlement," not "Clearing and Statement."  (MasterCard

Chargeback Guide (Apr. 16, 2010),[4] at 1.3.)

   d.     **The Visa Operating Regulations define "Authorization" as "A process where an Issuer, a VisaNet Processor, or Stand-In Processing approves a Transaction."[5]**

_____
[5]     Visa Inc. Operating Regulations at p. 962, effective October 13, 2010 (available at http://usa.visa.com/download/merchants/visa-international-operating-regulations-main.pdf) (last accessed January 11, 2011).  (SUFEX005)

_Defendants' Response to Paragraph 2d:_

Undisputed.

   e.     **The Visa Operating Regulations define "Clearing" as "All of the functions necessary to collect a Clearing Record from an Acquirer in the Transaction Currency and deliver it to the Issuer in the Billing Currency, or to reverse this transaction, or to process a Fee Collection Transaction."[6]**

_____
[6]     Visa Inc. Operating Regulations at p. 982, effective October 13, 2010 (available at http://usa.visa.com/download/merchants/visa-international-operating-regulations-main.pdf) (last accessed January 11, 2011).  (SUFEX006)

_Defendants' Response to Paragraph 2e:_

Undisputed.

_____
[4]   Available at http://www.mastercard.com/us/merchant/pdf/TB_CB_Manual.pdf (last visited Apr. 12, 2011).

f.   **Visa Senior VP of Consumer Debit Products, Stacey Pinkerd, testified, "Typically a Visa debit card transaction is processed consistent with how they process other Visa transactions in the -- in the industry and that's typically a dual-message format. There's an initial authorization and then the -- if that's approved, then it's followed up with a settlement transaction."[7] Pinkerd testified that if the authorization is successful, "what comes back is yes, you can accept this card, some message like that" and then "The settlement message or the clearing transaction is then submitted to Visa by the acquirer, then through the issuer, and it results in actually funds settlement. So movement of funds from the issuer to the acquirer."[8] Pinkerd also testified that typically during settlement, the issuer transfers the transaction amount to the merchant's acquirer, minus the interchange fee, which is retained by the issuer.[9]**

---

[7]   Pinkerd Dep. 34:5-14, August 19, 2008. (SUFEX006)

[8]   Pinkerd Dep. 34:15-35:3, August 19, 2008. (SUFEX006)

[9]   Pinkerd Dep. 60:22-61:14, August 19, 2008. (SUFEX006)

*Defendants' Response to Paragraph 2f:*

Undisputed.

g.   **Thomas Sladowski of Chase Manhattan Bank testified, "On-line transactions run on the same railroad tracks as ATM transactions. When the NYCE network, which was the first that we participated in brought on-line point of sale up, we didn't have to do anything from a Chase perspective to actually support that. I came in to us looking like and feeling like an ATM transaction. When we offered off-line transactions, ███████████████████████ They do not come in looking like ATM transactions.** ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████ **to them to manage our relationships with FDR, which is our outside processor."[10]**

---

[10]   (*Wal-Mart* case) Sladowski Dep. 119-120, Jan. 26, 2000. (SUFEX007)

*Defendants' Response to Paragraph 2g:*

Undisputed.

Defendants object to the admissibility of Mr. Sladowski's testimony from *In re Visa Check/MasterMoney Antitrust Litigation* ("*Visa Check*"). The testimony is an out of court statement for which no exception to the hearsay rule has been established. (Fed. R. Evid. 801, 802.) In addition, it relates to events prior to the relevant time period applicable in this case, and is thus irrelevant to any issue in support of class plaintiffs' motion for summary judgment. (Fed. R. Evid. 401, 402.)

**h.      The Visa Operating Regulations define "Settlement" as "The reporting of Settlement Amounts owed by One Member to another, or to Visa, as a result of Clearing."[11]**

---

[11]      **Visa Inc. Operating Regulations at p. 1085, effective October 13, 2010 (available at http://usa.visa.com/download/merchants/visa-international-operating-regulations-main.pdf) (last accessed January 11, 2011). (SUFEX005)**

*Defendants' Response to Paragraph 2h:*

Undisputed.

**i.      Visa Senior VP of Consumer Debit Products, Stacey Pinkerd described a PIN debit transaction as one that "includes a customer's personal identification number in the message that is typically authenticated by the card issuer during the course of the authorization."[12]**

---

[12]      **Pinkerd Dep. 32:20-33:3, August 19, 2008. (SUFEX006)**

*Defendants' Response to Paragraph 2i:*

Undisputed.

**j.      An August 2003 Visa presentation entitled "Debit Cards - From Then to Now" states that "Funds Settlement" typically occurs in 1-3 days for offline debit transactions and 1-2 days for online debit.[13]**

---

[13]      **Pinkerd Dep. Ex. 25776 at VUSAMDL1-03556173, August 19, 2008. (SUFEX006)**

*Defendants' Response to Paragraph 2j:*

Undisputed.

Defendants object to the admissibility of Pinkerd Dep. Ex. 25776, dated August 2003. The deposition exhibit relates to events prior to the relevant time period applicable in this case, and is thus irrelevant to any issue in support of class plaintiffs' motion for summary judgment. (Fed. R. Evid. 401, 402.)

<u>**Plaintiffs' Paragraph 3:**</u>

**3      To be a member of Visa or MasterCard, banks have to execute a membership
agreement.**[14]



<u>*Defendants' Response to Paragraph 3:*</u>

          Undisputed.

          Defendants object to the admissibility of many of the documents on which class

plaintiffs rely as irrelevant to their assertion.  (Fed. R. Evid, 401, 402.)  Some of the Visa and

MasterCard agreements cited by class plaintiffs are partnership and supplemental funding

agreements.  (*See, e.g.,* ████████████████ █████████████████ ██████

████████████████████[8])  Such agreements can,

for example, ███████████████████████████

████████████████████████ (*Id.*;

_____

5    Amended and Restated Partnership II Agreement between ████████████

6    Customer Business Agreement between ███████████████████

7    ████████████Brand Agreement.

8    ████████████████████████

11

Gardner Dep.[9] at 72-74.)  Banks do not need to sign such partnership and supplemental funding agreements to become members of Visa or MasterCard.  Proper examples of membership agreements with Visa do not contain financial incentives that are in partnership agreements and supplemental funding agreements.  (*See, e.g.*, VUSAMDL00053398 to 00053400;[10] VUSAMDL00053545 to 00053548;[11] VUSAMDl00053459 to 00053465.[12])  A proper example of a MasterCard membership agreement is (████████████████[13]) (although class plaintiffs describe it as a Visa agreement).

---

[9]  Deposition of John Gardner (Aug. 15, 2008) ("Gardner Dep.").  Mr. Gardner manages account executives that call on financial institutions for Visa.  (Gardner Dep. at 13-14.)

[10]  Signet Credit Card Bank Membership Agreement and Application for Membership.

[11]  Citibank (South Dakota), N.A. Membership Agreement and Application for Membership.

[12]  First Deposit National Bank Membership Agreement and Application for Membership.

[13]  Member Business Agreement between MasterCard International Incorporated ████████████████

<u>**Plaintiffs' Paragraph 4:**</u>

**4      Many of the agreements that the Member Banks executed with the pre-IPO Networks (which required them to abide by and enforce the Networks' Rules) continued in effect after the IPOs and nearly all continue in effect to this day.[15]**

---
[15]      *Id.; see also* John Gardner Dep. 68:07-69:21, Aug. 15, 2008 (testifying that in order to become a member bank of Visa, financial banks had to execute an agreement with Visa, but after March 2008, financial banks did not need to re-execute new agreements). (SUFEX020)

*Defendants' Response to Paragraph 4:*

Disputed. As the citations in footnote 14 of class plaintiffs' Statement of

Uncontested Facts on which class plaintiffs rely demonstrate, some agreements that Member

Banks executed with the pre-IPO Networks continued after the IPOs, and some did not.

Further, agreements between Member Banks and the Networks themselves do not

require that Member Banks enforce the Networks' Rules. (*See, e.g.,* VUSAMDL00053398 to

00053400; VUSAMDL00053545 to 00053548; VUSAMDL00053459 to 00053465;

HSBC_303788 to 303817.) However, acquirers are responsible for ensuring that their merchants

comply with Visa's and MasterCard's operating regulations. (Oct. 2010 Visa Rules,[14] at 356;

2010 MasterCard Rules[15] §§ 9.1.3, 9.5.1.)

---
[14]      Visa International Operating Regulations (Oct. 15, 2010) ("Oct. 2010 Visa Rules"), available at http://usa.visa.com/download/merchants/visa-international-operating-regulations-main.pdf (last visited Apr. 12, 2011).

[15]      MasterCard Rules (Oct. 29, 2010, updated Dec. 10, 2010) ("2010 MasterCard Rules") available at http://www.mastercard.com/us/merchant/pdf/BM-Entire_Manual_public.pdf.

<u>**Plaintiffs' Paragraph 5:**</u>

**5      Timothy Murphy confirmed that banks were members of the same subsidiary membership corporation (MasterCard International Incorporated) before and after the IPO[16];  membership standards did not change significantly post-IPO[17];  the membership status and interests did not change after the IPO[18].**

---

[16]     **T. Murphy Dep. 58:21-60:10. (SUFEX021)**

[17]     **T. Murphy Dep. 375:7-14. (SUFEX021)**

[18]     **T. Murphy Dep. 589:2-22. (SUFEX022)**

*Defendants' Response to Paragraph 5:*

Disputed.  Class plaintiffs mischaracterize Mr. Murphy's testimony regarding whether membership standards changed post-IPO.  Mr. Murphy testified, "[I]n terms of membership standards, you know, and sort of risk management and the membership side, I don't have any knowledge of any significant changes, you know, pre – following the IPO versus what went before."  (T. Murphy Dep.[16] at 375.)

---

[16]   Deposition of Timothy Murphy (Feb. 28-29, 2008) ("T. Murphy Dep.").  Mr. Murphy testified as MasterCard's Rule 30(b)(6) witness regarding corporate restructuring and the public sale of ownership shares.  (T. Murphy Dep. at 11; T. Murphy Dep. Ex. 21850 (30(b)(6) Deposition Notice).)

<u>Plaintiffs' Paragraph 6:</u>

**6        Each of the following Bank Defendants have been Member Banks of Visa U.S.A. from at least January 1, 2000 to the present.**

*Defendants' Response to Paragraph 6:*

As described below, defendants dispute this assertion as it relates to Barclays

Bank Delaware.

       **a.        JPMorgan Chase & Co. and Chase Bank USA, N.A.**[19]

---

[19]        JPMorgan Chase & Co. and Chase Bank USA, N.A. Resp. to Class Plaintiffs' First Set of Req. for Admis. to Bank Defs. at 9 No. 1, Dec. 19, 2008. (SUFEX023)

*Defendants' Response to Paragraph 6a:*

Undisputed.

       **b.        SunTrust Bank.**[20]

---

[20]        SunTrust Resp. to Class Plaintiffs' First Set of Req. for Admis. to Bank Defs. at 11 No. 1-2, Dec. 19, 2008. (SUFEX024)

*Defendants' Response to Paragraph 6b:*

Undisputed.

       **c.        First National Bank of Omaha.**[21]

---

[21]        First National Bank of Omaha Resp. to Class Plaintiffs' First Set of Req. for Admis. to Bank Defs. at 8-9 No. 1-2, Dec. 19, 2008. (SUFEX025)

*Defendants' Response to Paragraph 6c:*

Undisputed.

       **d.        Fifth Third Bank Corp.**[22]

---

[22]        Fifth Third Bancorp. Resp. to Class Plaintiffs' First Set of Req. for Admis. to Bank Defs. at 10 No. 1-2, Dec. 19, 2008. (SUFEX026)

*Defendants' Response to Paragraph 6d:*

        Undisputed.

    e.      **Citibank, N. A.**[23]

---

[23]     **Citigroup Resp. to Class Plaintiffs' First Set of Req. for Admis. to Bank Defs. at 10 No. 1-2, Dec. 19, 2008. (SUFEX027)**

*Defendants' Response to Paragraph 6e:*

        Undisputed.

    f.      **Bank of America.**[24]

---

[24]     **Bank of America Resp. to Class Plaintiffs' First Set of Req. for Admis. to Bank Defs. at 13 No. 1, Dec. 19, 2008. (SUFEX028)**

*Defendants' Response to Paragraph 6f:*

        Undisputed.

    g.      **Barclays Bank Delaware.**[25]

---

[25]     **Barclays Financial Corp. Resp. to Class Plaintiffs' First Set of Req. for Admis. to Bank Defs. at 13 No. 1, Dec. 19, 2008. (SUFEX029)**

*Defendants' Response to Paragraph 6g:*

        Disputed.  As stated in the document on which plaintiffs rely, Barclays Bank

Delaware has been a member of Visa since November 13, 2001.  (Barclays RFA Resp.[17] at 13.)

    h.      **National City.**[26]

---

[26]     **National City Corp. and National City Bank of Kentucky Resp. to Class Plaintiffs' First Set of Req. for Admis. to Bank Defs. at 16-17 No. 1, Dec. 19, 2008.  National City Bank was acquired by PNC Financial Services Group, Inc. on December 31, 2008. (SUFEX030)**

---

17    Responses and Objections of Defendant Barclays Financial Corp. to Plaintiffs' First Set of Requests for Admission to Bank Defendants (Dec. 16, 2008) ("Barclays RFA Resp.").

*Defendants' Response to Paragraph 6h:*

      Undisputed.

    **i.**     **HSBC Bank Inc. USA, N.A.**[27]

---

[27]     HSBA Finance Corp. and HSBC North America Holdings Inc. Resp. to Class Plaintiffs' First Set of Req. for Admis. to Bank Defs. at 9 No. 1, Dec. 19, 2008. (SUFEX031)

*Defendants' Response to Paragraph 6i:*

      Undisputed.

    **j.**     **Wachovia Corp. and Wachovia Bank N.A.**[28]

---

[28]     Wachovia Corp. and Wachovia Bank N.A. Resp. to Class Plaintiffs' First Set of Req. for Admis. to Bank Defs. at 11 No. 1, Dec. 19, 2008.  Wachovia Corporation was acquired by Wells Fargo & Company on December 31, 2008, and completed its merger on January 1, 2009. (SUFEX032)

*Defendants' Response to Paragraph 6j:*

      Undisputed.

    **k.**     **Wells Fargo.**[29]

---

[29]     Wells Fargo Resp. to Plaintiffs' Corrected First Set of Req. for Admis, at 10,  No. 1, February 20, 2009, "Admitted that one or more Wells Affiliates has been a member of Visa USA since January 1, 2000." (SUFEX033) *See also* ███████████████████████████████████████████ ███████████████

*Defendants' Response to Paragraph 6k:*

      Undisputed.

    **l.**     **Capital One.**[30]

---

[30]     Capital One Bank (USA), N.A., Capital One, N.A., and Capital One Financial Corp. Resp. to Class Plaintiffs' First Set of Req. for Admis. to Bank Defs. at 8-9 No. 1, Dec. 19, 2008. (SUFEX036)

*Defendants' Response to Paragraph 6l:*

      Undisputed.

m.    **Texas First Bank.**[31]

_____

[31]    Texas Independent Bancshares Resp. to Class Plaintiffs First Set of Req. for Admis. to Bank Defs. at 9-10 No. 1, Jan. 9, 2009. (SUFEX037)

*Defendants' Response to Paragraph 6m:*

Undisputed.

.

<u>Plaintiffs' Paragraph 7:</u>

7       Until the Visa IPO on March 18, 2008, each member bank of Visa owned stock in Visa, which entitled it to elect representatives to the Visa Board of Directors.[32]

---

[32]     **Visa Inc. Form 424(b)(4), filed March 19, 2008, at p. 7 (stating that all Class B stock was held by "financial institution customers" of Visa U.S.A. and all Class C stock was held by "financial institution customers" of Visa Europe and the other Visa regions) and p. 209 (stating "Prior to the closing of this offering, our regional classes of common stock were exchanged for class C common stock or, in the case of members of Visa U.S.A., for class B common stock. . . Prior to this offering, we had no class A common stock outstanding." and listing JPMorgan Chase, Bank of America, National City, Citigroup, U.S. Bancorp and Wells Fargo as five of top six Principal Stockholders (the sixth was Visa Europe).) (SUFEX038); *see also* Fleischer Report at ¶ 67 (citing Visa, Inc. Final Prospectus at 219-21). (SUFEX039)**

*Defendants' Response to Paragraph 7:*

        Disputed.  Class plaintiffs mischaracterize the evidence on which they rely.  Prior to the Visa IPO, the board of directors of Visa U.S.A. Inc. ("Visa U.S.A.") consisted of some directors who were appointed, some directors who were elected based on voting rights allocated per the Visa bylaws, and some directors who were officers of Visa.  (2005 Visa U.S.A. By-Laws,[18] at VUSAMDL00046317-18.)

        None of the evidence class plaintiffs proffer in Paragraph 7 supports the characterization that member banks of Visa U.S.A. had representatives on the Visa U.S.A. Board of Directors.  Such a characterization is misleading and unfairly prejudicial.  Prior to October 3, 2007, Visa U.S.A. was a Delaware non-stock membership corporation.  (1970 Visa U.S.A. Cert. of Incorp.,[19] at VUSAMDL00007128-29 (Visa U.S.A. Inc. incorporated as National BankAmericard Incorporated); 2006 Visa U.S.A. Cert. of Incorp.,[20] at VUSAMDL00052966.)

---

[18]    Visa U.S.A. Inc. By-Laws (May 15, 2005) ("2005 Visa U.S.A. By-Laws"), bearing control numbers VUSAMDL00046270 to 00046333.

[19]    Visa U.S.A. Inc. Certificate of Incorporation (May 26, 1970), bearing control numbers VUSAMDL00007127 to 00007139 ("1970Visa U.S.A. Cert. of Incorp.").

[20]    Visa U.S.A. Inc. Certificate of Incorporation and Bylaws (Jun. 15, 2006), bearing control numbers VUSAMDL00052960 to 0053033 ("2006 Visa U.S.A. Cert. of Incorp.").

On October 3, 2007, Visa U.S.A. because a subsidiary of Visa Inc., which issued common stock to the financial institution members of Visa U.S.A. and other Visa Inc. subsidiaries.  (Visa Form 8-K,[21] at 2-3.)  Under Delaware law, each member of the Visa U.S.A. Board owed a fiduciary duty to the corporation, and did not sit as a representative of any constituent, member, or shareholder of Visa U.S.A.  (*Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939); *Phillips v. Insituform of N. Am., Inc.*, Civ. A. No. 9173, 1987 WL 16285, at *10 (Del. Ch. Aug. 27, 1987); *see also Oberly v. Kirby*, 592 A.2d 445, 472-73 (Del. 1991) ("[P]rinciples of corporate law generally govern the activities of [a nonstock] corporation. . . ."); *Scattered Corp. v. Chicago Stock Exch., Inc.*, 671 A.2d 874, 879 (Del. Ch. 1994) ("*Oberly* stands for the principle that the conduct of directors of nonstock corporations should be evaluated under corporate law fiduciary standards. . . .").)

Visa's Code of Conduct found in its Employee Handbook clearly states that "[i]t is Visa's policy that each . . . director of Visa has a duty at all times to place the interests of Visa first."  (VUSAMDL1-09039825 to 09039898, at 884;[22] *see also id.* ("Each . . . director must conduct himself or herself . . . in such a manner as to avoid any actual or potential conflicts of interest or any abuse of such . . . director's position of trust and responsibility. . . . [D]irectors of Visa should not take inappropriate advantage of their positions for their personal benefit or for the benefit of another person or entity.").)  Visa's General Counsel also periodically gave privileged presentations to the Board of Directors regarding ██████████████████

---

[21]  Form 8-K of Visa Inc. (filed Oct. 4, 2007) ("Visa Form 8-K"), available at http://investor.visa.com/phoenix.zhtml?c=215693&p=irol-SECText&TEXT=aHR0cDovL2lyLmludC53ZXN0bGF3ZXNwcmVzcy5jb20vaW50ZXJ3ZXN0L3YxLzAwM DExOTMxMjUtMDctMjI2EyNzk3L3htbA%3d%3d (last visited Apr. 19, 2011).

[22]  Visa Employee Handbook Version 1.3 (Mar. 2006).



(*See, e.g.,* Floum Dep.[23] at 132 ▮▮▮

▮▮▮); Allen Dep.[24] at 76-77 ▮▮▮

▮▮▮).)

Former Visa Board members were aware of their duties to Visa and separated their roles as Board members from their roles as bank executives. For example, former Visa U.S.A. and Visa International Service Association ("Visa International") Board member John Stumpf testified that: "I know I thought independently when I got to the Visa board meeting about what my duties were to Visa." (Stumpf Dep.[25] at 68.) Former Visa U.S.A. and Visa International Board member Joseph Saunders testified that:

> Q.   Isn't one advantage of having a representative serve on the network board also to influence the direction of the network?
>
> A.   Loosely speaking, but you have different responsibilities if you're on the board of Visa than you do when you're running a company. And there's a separation of responsibility, and you have to be aware of that.
>
> Q.   Okay.
>
> A.   You have to handle yourself appropriately.

---

[23]   Deposition of Joshua Floum (Dec. 2, 2008) ("Floum Dep."). Mr. Floum testified as the general counsel and corporate secretary for Visa. (Floum Dep. at 11.)

[24]   Deposition of Paul Allen (Dec. 16, 2008) ("Allen Dep."). Mr. Allen is the former executive vice president, general counsel, and secretary of Visa. (Allen Dep. at 15.)

[25]   Deposition of John Stumpf (Oct. 9, 2008) ("Stumpf Dep."). Mr. Stumpf is president and chief executive officer of Wells Fargo & Company and is a former member of the Visa U.S.A. Board of Directors and Visa International Board of Directors. (Stumpf Dep. at 15, 28-29.)

Q.   You understand that – I take it from your testimony – that a person who is operating a bank and also serving on the Visa board has to wear two different hats occasionally.

A.   There's no question.

(Saunders Dep.[26] at 37.)   Former Visa Board member Benjamin Jenkins also testified that:

I viewed my role to be board member of Visa USA and to provide direction and assistance there, believing, frankly, that the long-term nature of our company is well served with a strong Visa, but I saw myself as . . . not a representative but an individual person serving the interests of Visa.

(Jenkins Dep.[27] at 33-34.)   Other former Visa U.S.A. and Visa International Board members

similarly testified that they viewed themselves as individuals in their role as a Board member and

recognized that they had a fiduciary duty to act in Visa's best interests.   (*See, e.g.,* Campbell

Dep.[28] at 29-32 (testifying that Campbell regarded himself as a member of the Visa U.S.A.

Board rather than a representative of Chase on the Board); Scharf Dep.[29] at 37-38, 108-11

(testifying that has a fiduciary duty, duty of care, and duty of loyalty as a member of the Visa

and has acted consistently with his duties since joining the Board).)

Consistent with their fiduciary duties, Board members would vote based on what

was in the best interests of Visa overall rather than vote on what was in the best interests of the

---

[26]   Deposition of Joseph Saunders (Oct. 2, 2008) ("Saunders Dep.").   Mr. Saunders testified as chief executive officer and chairman of the Board for Visa Inc. and was a former member of the Visa U.S.A. Board of Directors and Visa International Board of Directors.   (Saunders Dep. at 12, 15.)

[27]   Deposition of Benjamin P. Jenkins, III (Nov. 7, 2008) ("Jenkins Dep.").   Mr. Jenkins testified as vice chairman and president of the general banking group for Wachovia and was a former member of the Visa U.S.A. Board of Directors.   (Jenkins Dep. at 14, 22, 27.)

[28]   Deposition of William Campbell (Feb. 26, 2008) ("Campbell Dep.").   Mr. Campbell testified as a senior advisors to Chase and was a former member of the Visa U.S.A. Board of Directors and Visa International Board of Directors.   (Campbell Dep. at 12-13, 27-29, 54.)

[29]   Deposition of Charles W. Scharf (Nov. 5, 2008) ("Scharf Dep.").   Mr. Scharf testified as head of the retail financial services group for Chase and member of the Visa Inc. Board of Directors.   (Scharf Dep. at 10, 37.)   Mr. Scharf was also a former member of the Visa U.S.A. Board of Directors and Visa International Board of Directors.   (*Id.* at 13-14; Scharf Dep. Ex. 28001.)

bank by which they were employed.  For example, Pat Phillips, a former Visa U.S.A. and Visa International Board member, testified:  "But that's not our responsibility to respond to a single issue – issuer, certainly not in the case ourselves, but to do what was right for the association overall.  And so vote in favor of it because it was the right thing."  (Phillips Dep.[30] at 95.)  In addition, Board members would avoid conflicts of interest should they arise between their duties to Visa as a Board member and their duties as bank executives.  Mr. Jenkins testified that did not participate in card branding decisions for Wachovia because he was on the Visa Board.  (Jenkins Dep. at 104-05.)  Similarly, Mr. Stumpf testified that he was not privy to Wells Fargo's agreement with Visa and did not participate in card branding decisions for Wells Fargo because he was on Visa's Board.  (Stumpf Dep. at 86, 100.)

---

[30]   Deposition of Pat Phillips (Aug. 14, 2008) ("Phillips Dep.").  Mr. Phillips was the former head of card activities for Bank of America and was a former member of the Visa U.S.A. Board of Directors and Visa International Board of Directors.  (Phillips Dep. at 14, 19-21.)

Plaintiffs' Paragraph 8:

8        Before May 2006, Section 5.01(a) of the Bylaws of Visa U.S.A. limited membership on its Board of Directors to representatives of its Member Banks.[33]

—————————
[33]        VUSAMDL00046270-333, at VUSAMDL00046316-17. (SUFEX040)

*Defendants' Response to Paragraph 8:*

        Disputed.  Class plaintiffs mischaracterize the evidence on which they rely.  The May 15, 2005 Visa U.S.A. Inc. By-Laws do not limit membership on the Visa U.S.A. Board of Directors to representatives of Member Banks:

> Directors must be (i) officers of this corporation, (ii) officers of Charter Members other than Acquiring Associate, Group, Credit Participant, or Debit Participant Members having sales volume or check guarantee accounts as defined in *Section 3.0* and having at least the equivalent rank of Chief Executive Officer or Chief Administrative Officer, or, if such organization's total assets exceed 15 billion dollars, adjusted for the equivalent value of U.S. dollars as of January 1, 1981, a person who in the performance of his regular duties reports to such an officer, or (iii) in the case of the Second Special Director At large, persons who previously held the title of Chairman, Vice Chairman, or Chief Executive Officer of a Charter Member, or (iv) in the case of the Third Special Director At large for Technology, persons who meet the qualifications stated in either clause (ii) or (iii) of this *Section 5.01*(b).

(2005 Visa U.S.A. By-Laws, at VUSAMDL00046316-17; *see also* Paragraph 8b.)

        None of the evidence class plaintiffs proffer in Paragraph 8, or subparagraphs a-b, supports the characterization that member banks of Visa U.S.A. had representatives on the Visa U.S.A. Board of Directors.  Such a characterization is misleading and unfairly prejudicial.  As discussed in Defendants' Response to Paragraph 7, each member of the Visa U.S.A. Board owed a fiduciary duty to the corporation, and did not sit as a representative of any constituent, member, or shareholder of Visa U.S.A.  (See Defendants' Response to Paragraph 7.)

        a.        **Visa's Tolan Steele confirmed that Visa's Board was comprised of member banks.**[34]

24

[34]   **Steele Dep. 38:16-39:10. (SUFEX041)**

*Defendants' Response to Paragraph 8a:*

        Disputed.  Class plaintiffs mischaracterize the evidence on which they rely.  Mr. Steele testified that he believed all the members of the Visa U.S.A. board were employees of member banks, but he clarified that he was "not familiar with the criteria for board selection." (Steele Dep.[31] at 39.)

        **b.**    **Section 5.01(b) of the Visa U.S.A. Inc. By-Laws, dated May 15, 2005, required Directors to be officers of Visa or officers or executives of Charter Member banks.[35]**

[35]   **VUSAMDL00046270-333, at VUSAMDL00046316-17. (SUFEX040)**

*Defendants' Response to Paragraph 8b:*

        Undisputed.

---

[31]  Deposition of Tolan Steele (Apr. 2-3, 2008) ("Steele Dep.").  Mr. Steele testified as head of global interchange strategy for Visa.  (Steele Dep. at 28.)

**Plaintiffs' Paragraph 9:**

**9      The following individuals representing financial institutions served on the Visa
U.S.A. Board of Directors.[36]**

| Years | Board Member | Affiliation |
|-------|-------------|-------------|
| 2000-2002 | James D. Dixon | Bank of America Corporation |
| 2000-2002 | Philip G. Heasley | First USA Bank |
| 2000-2002 | Leslie S. Biller | Wells Fargo & Co. |
| 2000-2003 | F. Phillips Giltner | First National of Nebraska |
| 2000-2003 | Michael R. Zucchini | Fleet Boston Financial |
| 2000-2003 | G. Malcolm Williamson | Visa International |
| 2000-2005 | G. Patrick Philips | Bank of America Corporation |
| 2000-2005 | William P. Boardman | Bank One Corporation/Goldman Sachs & Co. |
| 2000-2005 | H. Jay Sarles | Fleet Boston Financial Corporation/Bank of America Corporation |
| 2000-2005 | Carl F. Pascarella | Visa U.S.A. Inc. |
| 2000-May06 | James M. Wells, III | SunTrust Banks, Inc. |
| 2000-May06 | Charles T. Doyle | Texas First Bank/Texas Independent Bancshares, Inc. |
| 2001-2002 | Tyree B. Miller | Bank One Corporation |
| 2001-May06 | Benjamin P. Jenkins III | First Union/Wachovia Corporation |
| 2002-May06 | William I. Campbell | Bank One Card Services/J.P. Morgan Chase |
| 2002-May06 | Charlie Scharf | Bank One Corporation/J.P. Morgan Chase |
| 2002-May06 | Bruce R. Lauritzen | First National Bank of Nebraska/First National Bank of Omaha |
| 2002-May06 | Joseph W. Saunders | Providian Financial Corporation/Washington Mutual |
| 2002-May06 | John G. Stumpf | Wells Fargo & Co. |
| 2003-May06 | Peter Raskind | National City Corporation |
| 2003-May06 | Christopher Rodrigues | Visa International Service Association |

[36]      Visa USA's Answer to Interrogatory No. 1 of All Plaintiffs' Consolidated First Set of Omnibus
Discovery Requests to Network Defendants, p. 33. (SUFEX042)

*Defendants' Response to Paragraph 9:*

Disputed.  None of the evidence class plaintiffs proffer in Paragraph 9 supports

the characterization that member banks of Visa U.S.A. had representatives on the Visa U.S.A.

Board of Directors.  Such a characterization is misleading and unfairly prejudicial.  As discussed

in Defendants' Response to Paragraph 7, each member of the Visa U.S.A. Board owed a

fiduciary duty to the corporation, and did not sit as a representative of any constituent, member, or shareholder of Visa U.S.A.

Not all of the individuals listed in the table above are affiliated with a financial institution.  G. Malcolm Williamson, Carl F. Pascarella, and Christopher Rodrigues are listed as being affiliated with Visa entities.

Defendants object to the admissibility of class plaintiffs' references to Visa U.S.A. board members prior to 2004.  Such evidence relates to events prior to the relevant time period applicable in this case, and is thus irrelevant to any issue in support of class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)

**Plaintiffs' Paragraph 10:**

**10      Visa internal documents and witnesses characterized pre-IPO directors as representatives of banks.[37]**

[37]      **Howe Dep. 120:1-10, July 27, 2006 (SUFEX043); Gardner AmEx Litig. Dep 296:12-16 (SUFEX044) & Ex. 20 at VUSAMDL00071191, July 7, 2005 (Visa proposal stating: "Providian currently has representation on the Visa USA Board of Directors. … Washington Mutual/Providian will have ability to appoint a representative to each of the following Visa Executive Councils") (SUFEX045); Greiner AmEx Litig. Dep. 168:7-19 (SUFEX046) & Ex. 23 at PVN 000183325, Mar. 1, 2002 ("Visa and Providian hereby acknowledge that Providian's representative was elected to the position of director on the Board of directors of Visa U.S.A. Inc. as of October 24, 2002") (SUFEX047); Dahir AmEx Litig. Dep. 401:9-13, Mar. 1, 2007 (referring to "Citibank" as having "two votes out of 14"). Indeed, one Visa witness referred to the entire bank as the target of Visa's offer of a board position (SUFEX048). In response to questioning on Visa's desire to have Capital One's chairman to serve on the Board of Visa USA, Elizabeth Williams referred to Visa's efforts to get "them"—Capital One—on the Board. E. Williams Dep. 110:22-112:3, Dec. 4, 2007. (SUFEX049)**

**Communications from the banks to the Networks also demonstrates this understanding. For example, in a letter to Visa's President and COO, Jamie Dimon of JP Morgan Chase wrote to request an immediate substitution of one Chase executive for another "as JP Morgan Chase's representative to the Visa International Board of Directors, and as its representative to the Executive Committee of that Board." Campbell AmEx Litig. Dep. Ex. 1, at VUSA 107862590, Nov. 22, 2004. (SUFEX050)**

*Defendants' Response to Paragraph 10:*

Undisputed.

Defendants object to the admissibility of the cited documents because they are

misleading and unfairly prejudicial.  (Fed. R. Evid. 403.)

Defendants object to the admissibility of Gardner AmEx Litig. Dep. (SUFEX044).

The testimony relates only to Visa executive council membership, not membership on the Visa

board, and is therefore irrelevant.  (Fed. R. Evid. 401, 402.)

Defendants object to the admissibility of AmEx Litig. Dep Ex. 1 (SUFEX050).

The deposition exhibit was not properly authenticated. (Fed. R. Evid. 901.)

As discussed in Defendants' Response to Paragraph 7, each member of the Visa

U.S.A. Board owed a fiduciary duty to the corporation, and did not sit as a representative of any

constituent, member, or shareholder of Visa U.S.A.

**Plaintiffs' Paragraph 11:**

**11      Between May 2006 and March 18, 2008, four "independent" directors served on Visa U.S.A.'s Board alongside the bank directors.[38]**

---

[38]      CHASE003795543-722 at CHASE003795693; CHASE003795712. The following individuals were nominated to fill the four "independent" director positions: John Swainson, Jon Madonna, Linda B. Keene, Philip D. DeFeo. (SUFEX051) *Id.*

*Defendants' Response to Paragraph 11:*

Disputed.  None of the evidence class plaintiffs proffer in Paragraph 11 supports

the characterization that members of the Visa U.S.A. Board were "bank directors."  Such a

characterization is misleading and unfairly prejudicial.  As discussed in Defendants' Response to

Paragraph 7, each member of the Visa U.S.A. Board owed a fiduciary duty to the corporation,

and did not sit as a representative of any constituent, member, or shareholder of Visa U.S.A.

(*See* Defendants Response to Paragraph 7.)

As defined in Visa U.S.A.'s Certificate of Incorporation in place at the time, a

director not associated with a member bank must be:

> [A] member of the Board of Directors of the corporation that (A) the voting members of the Board of Directors have determined is "independent" at the time such member was nominated for election or was appointed to the Board of Directors by the voting members of the Board of Directors and (B) the voting members of the Board Directors have not subsequently determined to no longer be independent; provided however, that a person shall not be an "Independent Director" if such person (1) is then, or has been during the previous five years, employed by, (2) is entitled to retirement benefits . . . (3) is then, or has been during the previous five years, a member of the board of directors (or similar governing body) of, or (4) otherwise has a "material financial interest in": (a) the corporation, (b) Visa International Service Association, a Delaware corporation, (c) any direct or indirect member of the corporation or Visa International Service Association, (d) any other entity that operates any of the Visa regions, or (e) any entity that is designated by the Board of Directors of the corporation as a competitor of the corporation.

(2006 Visa U.S.A. Cert. of Incorp., at VUSAMDL00052972.)

29

<u>Plaintiffs' Paragraph 12:</u>

**12     Each of the following Bank Defendants have been Member Banks of MasterCard International Incorporated from at least January 1, 2000 to the present.**

*Defendants' Response to Paragraph 12:*

As described below, defendants dispute this assertion as it relates to Barclays

Bank Delaware and HSBC.

**a.     SunTrust Bank.**[39]

_____

[39]     SunTrust  Resp. to Class Plaintiffs' First Set of Req. for Admis. to Bank Defs. at 11 No. 2, Dec. 19, 2008. (SUFEX024)

*Defendants' Response to Paragraph 12a:*

Undisputed.

**b.     First National Bank of Omaha.**[40]

_____

[40]     First National Bank of Omaha Resp. to Class Plaintiffs' First Set of Req. for Admis. to Bank Defs. at 8-9 No. 1-2, Dec. 19, 2008. (SUFEX025)

*Defendants' Response to Paragraph 12b:*

Undisputed.

**c.     Fifth Third Bank Corp.**[41]

_____

[41]     Fifth Third Bancorp. Resp. to Class Plaintiffs' First Set of Req. for Admis. to Bank Defs. at 10 No. 2, Dec. 19, 2008. (SUFEX026)

*Defendants' Response to Paragraph 12c:*

Undisputed.

**d.     Citibank, N. A.**[42]

_____

[42]     Citigroup Resp. to Class Plaintiffs' First Set of Req. for Admis. to Bank Defs. at 10 No. 2, Dec. 19, 2008. (SUFEX027)

*Defendants' Response to Paragraph 12d:*

      Undisputed.

    e.    **Barclays Bank Delaware.**[43]

---

[43]    **Barclays Financial Corp. Resp. to Class Plaintiffs' First Set of Req. for Admis. to Bank Defs. at 13 No. 2, Dec. 19, 2008. (SUFEX029)**

*Defendants' Response to Paragraph 12e:*

      Disputed.  As stated in the document on which class plaintiffs rely, Barclays Bank

Delaware has been a member of MasterCard since April 6, 2001.  (Barclays RFA Resp. at 13.)

    f.    **National City.**[44]

---

[44]    **National City Corp. and National City Bank of Kentucky Resp. to Class Plaintiffs' First Set of Req. for Admis. to Bank Defs. at 16-17 No. 2, Dec. 19, 2008.  National City Bank was acquired by PNC Financial Services Group, Inc. on December 31, 2008, and completed its merger on June 21, 2010. (SUFEX030)**

*Defendants' Response to Paragraph 12f:*

      Undisputed.

    g.    **HSBC Bank Inc.**[45]

---

[45]    **HSBA Finance Corp. and HSBC North America Holdings Inc. Resp. to Class Plaintiffs' First Set of Req. for Admis. to Bank Defs. at 9 No. 2, Dec. 19, 2008. (SUFEX031)**

*Defendants' Response to Paragraph 12g:*

      Disputed.  As stated in the document on which class plaintiffs rely, HSBC Bank

USA, N.A. has been a member of MasterCard since at least January 1, 2000 to the present.

(HSBC RFA Resp.[32] at 9.)

    h.    **Wachovia Corp. and Wachovia Bank N.A.**[46]

---

[32]    Responses of Defendants HSBC Finance Corporation and HSBC North America Holdings Inc. to Plaintiffs' First Set of Requests for Admission to Bank Defendants (Dec. 19, 2008) ("HSBC RFA Resp.").

---

[46]     Wachovia Corp. and Wachovia Bank N.A. Resp. to Class Plaintiffs' First Set of Req. for Admis. to Bank Defs. at 11 No. 2, Dec. 19, 2008.  Wachovia Corporation was acquired by Wells Fargo & Company on December 31, 2008, and completed its merger on January 1, 2009. (SUFEX032)

*Defendants' Response to Paragraph 12h:*

      Undisputed.

    **i.**    **Wells Fargo.**[47]

---

[47]     Wells Fargo Resp. to Plaintiffs' Corrected First Set of Req. for Admis., at 10, No. 2, February 20, 2009, "Admitted that one or more Wells Affiliates has been a member of MasterCard International since January 1, 2000." (SUFEX033)

*Defendants' Response to Paragraph 12i:*

      Undisputed.

    **j.**    **Capital One.**[48]

---

[48]     Capital One Bank (USA), N.A., Capital One, N.A., and Capital One Financial Corp. Resp. to Class Plaintiffs' First Set of Req. for Admis. to Bank Defs. at 8-9 No. 1-2, Dec. 19, 2008. (SUFEX036)

*Defendants' Response to Paragraph 12j:*

      Undisputed.

    **k.**    **Chase Bank USA, N.A.**[49]

---

[49]     JPMorgan Chase & Co. and Chase Bank USA, N.A. Resp. to Class Plaintiffs' First Set of Req. for Admis. to Bank Defs. at 10 No. 2, Dec. 19, 2008. (SUFEX023)

*Defendants' Response to Paragraph 12k:*

      Undisputed.

    **l.**    **Bank of America.**[50]

---

[50]     Bank of America Resp. to Class Plaintiffs' First Set of Req. for Admis. to Bank Defs. at 13 No. 2, Dec. 19, 2008. (SUFEX028)

*Defendants' Response to Paragraph 12l:*

Undisputed.

.

<u>Plaintiffs' Paragraph 13:</u>

13      Until the MasterCard IPO on May 26, 2006, each member bank of MasterCard
owned stock in MasterCard, which entitled it to elect representatives to the MasterCard
Board of Directors.[51]

---

[51]      MasterCard Inc. Form 424(b)(4) Prospectus, filed May 25, 2006, at p. 145 (stating, "Under our
existing bylaws, only principal members of MasterCard International are allowed to own shares of our
common stock. . ." and listing top four "Principal Stockholders" as JPMorgan Chase, Citigroup, Bank of
America and HSBC) (SUFEX052); *see also* Fleischer Report at ¶ 26 (citing MasterCard, Inc. Registration
Statement (Form S-4), at 58 (May 7, 2002)). (SUFEX039)

*Defendants' Response to Paragraph 13:*

Disputed.  As the document on which class plaintiffs rely acknowledges, only

"principal members" of MasterCard owned stock prior to the MasterCard IPO.  (MasterCard

Prospectus,[33] at 145; *see also* 2003 MasterCard Rules,[34] at MCI_MDL02_10094639 ("Class A

shares and Class B shares may be held only by Class A members of MasterCard International

Incorporated and, with the prior approval of the Board of Directors, their Designated Affiliates."))

Class plaintiffs present no evidence regarding how directors are elected. ·

None of the evidence class plaintiffs proffer in Paragraph 13 supports the

characterization that member banks had representatives on the MasterCard International or

MasterCard U.S. Boards of Directors.  Such a characterization is misleading and unfairly

prejudicial.

MasterCard Incorporated was incorporated as a Delaware stock corporation in

May 2001.  (*See* MasterCard Amendment No. 4 to S-1.[35] at 63.)  MasterCard conducts its

---

[33]   MasterCard Inc. Form 424(b)(4) Prospectus (May 25, 2006) ("MasterCard Prospectus").

[34]   MasterCard October 2003 Bylaws and Rules (Oct. 2003) ("2003 MasterCard Rules"), bearing control numbers
MCI_MDL02_10094623 to 10094953.

[35]   MasterCard Incorporated Amendment No. 4 to Form S-1 Registration Statement (filed Apr. 14, 2006)
("MasterCard Amendment No. 4 to S-1"), available at
http://www.sec.gov/Archives/edgar/data/1141391/000119312506080576/ds1a.htm (last visited Apr. 27, 2011).

business principally through MasterCard Incorporated's principal operating subsidiary, MasterCard International Incorporated, a Delaware membership corporation that was formed in November 1966. (*Id.*) MasterCard's financial institution customers are generally principal members of MasterCard International, who participate directly in MasterCard International's business, or affiliate members of MasterCard International, who participate indirectly in MasterCard International's business through a principal member. (JAMES00001 to 00264,[36] at 005-006.)

In June 1989, the MasterCard International Board of Directors established unincorporated regional associations of MasterCard members, each having a board with employees of members serving as directors. (1996 MasterCard Bylaws,[37] at MCI_MDL_00013229.) The first regional board established by the MasterCard International board of directors was the U.S. board, and it was delegated specific powers, subject to the right of the MasterCard International board of directors to overrule the action taken by the U.S. board. (*Id.*) ███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████ (T. Murphy Dep. Ex. 21852,[38] at CITI INT 002459197.)

Under Delaware law, each member of the MasterCard International and MasterCard U.S. Boards owed a fiduciary duty to the corporation, and did not sit as a representative of any constituent, member, or shareholder of MasterCard International or

---

[36]   Form 10-K of MasterCard Inc. (filed Feb. 19, 2009).

[37]   MasterCard International Incorporated Bylaws (May 1996) ("1996 MasterCard Bylaws"), bearing control numbers MCI_MDL_00013136 to 00013322.

[38]   Steve Freiberg Briefing (Aug. 2, 2004), CITI INT 002459190 to 002459250.

MasterCard U.S. (*Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939); *Phillips v. Insituform of N. Am., Inc.*, Civ. A. No. 9173, 1987 WL 16285, at *10 (Del. Ch. Aug. 27, 1987).)

The MasterCard Code of Conduct for Directors requires all MasterCard International and MasterCard U.S. directors to "conduct[] business in a legally and ethically appropriate manner." (MasterCard Code of Conduct,[39] at MCI_MDL04_00004878.) Specifically, the MasterCard Code of Conduct states:

> By virtue of their professional and business relationships with member institutions that own and do business with MasterCard, the Company's directors are called on regularly to make decisions in which they have dual interests. The fact that a director faces such dual interests does not present a conflict of interest under the Code since generally MasterCard and its directors are aware of these relationships. When a director becomes aware of any personal interest he or she may have that conflicts with an interest of the Company and of which the director should reasonably believe the Company and/or his or her fellow directors are unaware, the director should promptly disclose the conflict to the General Counsel. Depending on the nature of the conflict, the Company may require that such director recuse himself or herself from taking part in any decisions in which such conflict resides.

(MasterCard Code of Conduct, at MCI_MDL04_00004879.)

Former MasterCard Board members were aware of their duties to MasterCard and separated their roles as Board members from their roles as bank executives. For example, former MasterCard Board member Richard Fairbank testified that, with respect to his service on the MasterCard Board, "[t]he very clear understanding I had is that I was there as a fiduciary governor of MasterCard." (Fairbank Dep.[40] at 65-66.) Mr. Fairbank further testified that: "Q. Did you consider it an advantage to Capital One that you were on the board of MasterCard USA

---

[39]   Code of Conduct for Directors ("MasterCard Code of Conduct") (contained within Minutes of the Meeting of the Boards of Directors of MasterCard International Incorporated and of MasterCard Incorporated (Jul. 8, 2004), bearing control numbers MCI MDL04 00004820 to 00004989).

[40]   Deposition of Richard Fairbank (Apr. 17, 2009) ("Fairbank Dep."). Mr. Fairbank testified as chairman, president, and chief executive officer of Capital One Financial Corporation, and a member of the MasterCard U.S. and MasterCard Global boards. (Fairbank Dep. at 20-21, 53.)

and, hence, had the ability to influence the interchange rates? . . . A. No." (*Id.* at 177.) Former MasterCard Board member Lance Weaver also testified that, as a Board member, he recognized he had a fiduciary obligation to act in MasterCard's best interest. ("Q. But you had a fiduciary obligation to act in the best interest of MasterCard . . . correct? A. Correct.") (Weaver Dep.[41] at 190.) Former MasterCard Board member Siddarth Mehta similarly testified that he was aware of his fiduciary obligations to MasterCard as a Board member. ("Q. Did you attempt to represent Household when you were on the U.S. Region Board? . . . A. No. Q. No? Who were you representing? I was looking after the interest of MasterCard.") (Mehta Dep.[42] at 140.)

Consistent with their fiduciary duties, Board members would vote based on what was in the best interests of MasterCard overall rather than vote on what was in the best interests of the bank they were employed by. (*See, e.g.,* Fairbank Dep. at 65-66; 67-68; Selander Dep.[43] at 127-28 ("I did know the people who participated in that board and I believe those individuals recognized their fiduciary obligation to do what was in the best interest of MasterCard, and I believe that they also were trying to find ways to ensure the maximization of the system which I've described as the rationale for a balancing mechanism like interchange."); Thom Dep.[44] at 45-46 (explaining that directors "operat[ed] as individual board directors and not represent[atives of] their companies."); T. Murphy Dep. at 116-17 (stating that board members were obligated to

---

[41]   Deposition of Lance Weaver (Sept. 17, 2008) ("Weaver Dep."). Mr. Weaver testified as a North American card executive for Bank of America. (Weaver. Dep. at 8.)

[42]   Deposition of Siddarth Mehta (Oct. 1, 2008) ("Mehta Dep."). Mr. Mehta is the former chief executive officer of HSBC North America. (Mehta Dep. at 10.)

[43]   Deposition of Robert W. Selander (Nov. 17, 2008 & Jan. 26, 2009) ("Selander Dep."). Mr. Selander testified as MasterCard's president and chief executive officer. (Selander Dep. at 7.)

[44]   Deposition of Christopher Thom (Jan. 18, 2008) ("Thom Dep."). Mr. Thom is the former chief risk officer at MasterCard. (Thom Dep. at 10.)

recuse themselves from participating in decisions that would be a conflict of interest, which they did do).)

MasterCard's General Counsel would also periodically give presentations to the Board of Directors regarding what their fiduciary duties were and how to carry out their duties. (*See, e.g.,* MasterCard Code of Conduct.)

<u>Plaintiffs' Paragraph 14:</u>

14    Before the MasterCard IPO on May 26, 2006, Article IV-I of the Bylaws of
MasterCard limited membership on MasterCard's Board of Directors to representatives of
MasterCard Member Banks, by requiring each director to "be an officer of a member
institution of MasterCard International Incorporated or an individual otherwise uniquely
qualified to provide guidance as to the Corporation's affairs."[52]

---

[52]    MCI_MDL-2_00017997-00018355 at 00018014. (SUFEX054)

<u>*Defendants' Response to Paragraph 14:*</u>

            Disputed.  The MasterCard International April 2005 Bylaws and Rules Article IV-

I required members of the Board "to be an officer of a member institution of MasterCard

International Incorporated or an individual otherwise uniquely qualified to provide guidance as

to the Corporation's affairs."  (2005 MasterCard Rules,[45] at MCI_MDL02_00018014.)

            None of the evidence class plaintiffs proffer in Paragraph 14 supports the

characterization that member banks had representatives on the MasterCard International Board

of Directors.  Such a characterization is misleading and unfairly prejudicial.  As discussed in

Defendants' Response to Paragraph 13, each member of the MasterCard International Board

owed a fiduciary duty to the corporation, and did not sit as a representative of any constituent,

member, or shareholder of MasterCard International.  (*See* Defendants' Response to Paragraph

13.)

---

[45]    MasterCard International Bylaws and Rules (Apr. 2005) ("2005 MasterCard Rules"), bearing control numbers
MCI_MDL02_00017997 to 00018355.

<u>**Plaintiffs' Paragraph 15:**</u>

**15      Internal MasterCard documents and witnesses characterized pre-IPO directors as
representatives of banks.**[53]

<hr>

[53]      McWilton Dep. 100:11-18, July 17, 2008; Gelb Dep 30: 15-18, Dec. 6, 2007. (SUFEX055)

<u>*Defendants' Response to Paragraph 15:*</u>

    Disputed.  Class plaintiffs present no evidence that internal MasterCard

documents characterized pre-IPO directors as representatives of banks, and their characterization

is misleading, unfairly prejudicial, and irrelevant.  MasterCard International April 2005 Bylaws

and Rules Article IV-I required members of the Board "to be an officer of a member institution

of MasterCard International Incorporated or an individual otherwise uniquely qualified to

provide guidance as to the Corporation's affairs."  (2005 MasterCard Rules, at MCI_MDL-

2_00018014.)

    As discussed in Defendants' Response to Paragraph 13, each member of the

MasterCard International Board owed a fiduciary duty to the corporation, and did not sit as a

representative of any constituent, member, or shareholder of MasterCard International.  (*See*

Defendants' Response to Paragraph 13.)

<u>Plaintiffs' Paragraph 16:</u>

**16     Several of the Bank Defendants were represented on the MasterCard Boards of Directors before the MasterCard IPO.**

*Defendants' Response to Paragraph 16:*

Disputed. None of the evidence class plaintiffs proffer in subparts a-b of Paragraph 16 supports the characterization that member banks had representatives on the MasterCard International or MasterCard U.S. boards of directors. Such a characterization is misleading and unfairly prejudicial. MasterCard International April 2005 Bylaws and Rules Article IV-I required members of the Board "to be an officer of a member institution of MasterCard International Incorporated or an individual otherwise uniquely qualified to provide guidance as to the Corporation's affairs." (2005 MasterCard Rules, at MCI_MDL-2_00018014.) As discussed in Defendants' Response to Paragraph 13, each member of the MasterCard International and MasterCard U.S. Boards owed a fiduciary duty to the corporation, and did not sit as a representative of any constituent, member, or shareholder of MasterCard International or MasterCard U.S. (*See* Defendants' Response to Paragraph 13.)

     a.     **The MasterCard U.S. Board of Directors was composed of the following individuals who were representatives of member banks:[54]**

| Years | Board Member | Affiliation |
|-------|-------------|-------------|
| 2000 | William F. Aldinger III | Household International |
| 2000 | Robert B. Willumstad | Travelers Bank |
| 2002 | Thomas A. Wimsett | National Processing Company |
| 2000-2001 | Kathryn V. Marinello | GE Capital Consumer Financial Services |
| 2000-2002 | Ronald N. Zebeck | Fingerhut Financial Services Corp/METRIS |
| 2000-2002 | Eula Adams | First Data Corporation |
| 2000-2002 | Michael G. Rhodes | MDNA America Bank, N.A. |
| 2000-2002 | John A. Klein | People's Bank |
| 2000-2004 | Richard J. Srednicki | AT&T Universal Card Services Corp. |
| 2000-2004 | Patrick J. Swanick | Key Electronic Services |
| 2000-2004 | Mark H. Wright | USAA Federal Savings Bank |
| 2000-2006 | Richard D. Fairbank | Capital One Bank |

| Years | Board Member | Affiliation |
|-------|--------------|-------------|
| 2000-2006 | Siddharth N. Mehta | Household International |
| 2000-2006 | Alan J. Heuer | MasterCard International |
| 2000-2006 | Ruth Ann Marshall | MasterCard International |
| 2001-2006 | Steven J. Freiberg | Citigroup |
| 2002-2004 | Jeffrey R. Dye | GE Capital Financial |
| 2003-2004 | Edward H. Murphy | MBNA America Bank, N.A. |
| 2003-2004 | Jon L. Gorney | National Processing, Inc. |
| 2003-2004; 2006 | Mark K. Vitelli | People's Bank |
| 2003-2005 | David Wesselink | Metris Companies, Inc. |
| 2003-2006 | Richard W. Vague | Juniper Financial |
| 2005-2006 | Mark J. Formica | Citizens Financial Group |
| 2005-2006 | Charles Drucker | Fifth Third |
| 2005-2006 | Mark W. Begor | GE Consumer Finance |
| 2005-2006 | Timothy J. King | KeyBank, NA |
| 2005-2006 | Lance L. Weaver | MBNA America Bank, N.A. |
| 2005-2006 | Stephen J. Rotella | Washington Mutual |

[54]     **MasterCard's May 15, 2007 Supplemental Answer to Interrogatory No. 1 of All Plaintiffs'
Consolidated First Set of Omnibus Discovery Requests to Network Defendants, at p. 1-4. (SUFEX057)**

*Defendants' Response to Paragraph 16a:*

Disputed.  Class plaintiffs have not provided any evidence in support of their

assertion that directors on the MasterCard U.S. board were representatives of member banks.  As

discussed in Defendants' Response to Paragraph 13, directors on the MasterCard U.S. region

board had a fiduciary duty to MasterCard.  (*See* Defendants' Response to Paragraph 13.)

Not all of the MasterCard U.S. Board of Directors members listed in the above

table are affiliated with a member bank.  Alan J. Heuer and Ruth Ann Marshall are listed as

being affiliated with MasterCard International, not a bank.

Defendants object to the admissibility of class plaintiffs' references to MasterCard

U.S. board members prior to 2004.  Such evidence relates to events prior to the relevant time

period applicable in this case, and is thus irrelevant to any issue in support of class plaintiffs'

motion for summary judgment.  (Fed. R. Evid. 401, 402.)

**b.    The MasterCard Global Board of Directors was composed of the following individuals:[55]**

| Years | Board Member | Affiliation |
|---|---|---|
| 2000 | Ernesto Emilio Grether | Argencard, S.A. |
| 2000 | Norman J. Tice | MasterCard International |
| 2000 | Patrick Boylan | Nat West Bank (until 7/27/00) |
| 2001 | Louis-Noel Joly | Europay International |
| 2002 | Jacques F. Bischoff | Europay Switzerland (after 6/29/02) |
| 2000-2001 | Dr. Kurt Richolt | Europay International, S.A. |
| 2000-2002 | John Francis Mulcahy | Commonwealth Bank of Australia |
| 2000-2002 | Ronald N. Zebeck | Metris Companies, Inc. |
| 2000-2003 | Dr. Peter Hoch | Bayerische Hypotheke und Weschel Bank/MasterCard Europe |
| 2000-2003 | Jean-Pierre Ledru | Caisse Nationale de Credit Agricole |
| 2000-2003 | William R.P. Dalton | HSBC Bank plc |
| 2000-2004 | Hiroshi Arai | Orient Corporation |
| 2000-2004 | Mark H. Wright | USAA Federal Savings Bank |
| 2000-2005 | Lance Weaver | MBNA |
| 2000-5/24/06 | Baldomero Falcones Jaquotot | Banco Centro Hispanico |
| 2000-5/24/06 | Robert W. Pearce | Bank of Montreal |
| 2000-5/24/06 | Donald L. Boudreau | Chase Manhattan Bank |
| 2000-5/24/06 | Robert B. Willumstad | Citibank, N.A. |
| 2000-5/24/06 | William F. Aldinger | Household International/HSBC North America Holdings Inc. |
| 2000-5/24/06 | Robert W. Selander | MasterCard International |
| 2000-5/24/06 | Norman C. McLuskie | The Royal Bank of Scotland |
| 2001-2002 | David A. Coulter | Chase Manhattan Bank USA, NA |
| 2001-5/24/06 | Augusto Escalante Juanes | Banco de Mexico, S.A. |
| 2002-2003 | Jan. A.M. Hendrikx | EURO Kartensysteme und EUROCARD und eurochecque GmbH |
| 2002-2004 | Donald M. Layton | JP Morgan Chase & Co. |
| 2002-5/24/06 | Jac J. Verhaegen | Rabobank (after 6/28/02) |
| 2003-5/24/06 | Richard D. Fairbank | Capital One Financial Corporation |
| 2003-5/24/06 | Silvio Barzi | Clarima/Unicredio Italiano |
| 2003-5/24/06 | Michael T. Pratt | Westpac Banking Corporation |
| 2004-5/24/06 | Michel Lucas | Banquet Federative du Credit Mutuel |
| 2004-5/24/06 | Bernd Fieseler | Deutscher Sparkassen und Giroverband |
| 2004-5/24/06 | Iwao Ijima | Orient Corporation |
| 2004-5/24/06 | D'ato Tan Teong Hean | Southern Bank Berhad |
| 2005-5/24/06 | Siddharth Mehta | HSBC North America Holdings Inc. |
| As of May 24, 2006 | Marc Olivie | Agfa-Gevaert Group |
| As of May 24, 2006 | Edward Su-ning Tian | China Netcom Croup Corporation (Hong Kong Ltd.) |

43

| Years | Board Member | Affiliation |
|-------|-------------|-------------|
| As of May 24, 2006 | David R. Carlucci | IMS Health, Inc. |
| As of May 24, 2006 | Mark Schwartz | Soros Fund Management LLC |
| As of May 24, 2006 | Richard Haythorthwaite | Star Capital Partners |
| As of May 24, 2006 | Manoel Luis Ferrao de Amorim | Telefonica International S.A. |

---

[55]   MasterCard's May 15, 2007 Supplemental Answer to Interrogatory No. 1 of All Plaintiffs' Consolidated First Set of Omnibus Discovery Requests to Network Defendants, p. 4-8. (SUFEX057)

_Defendants' Response to Paragraph 16b:_

      Disputed.  As the document on which class plaintiffs rely shows, Peter Hoch did not serve on the MasterCard Global Board of Directors in 2001.  (MasterCard Suppl. Interr. Resp.,[46] at 4-8.)

      Defendants object to the admissibility of class plaintiffs' references to MasterCard Global board members prior to 2004.  Such evidence relates to events prior to the relevant time period applicable in this case, and is thus irrelevant to any issue in support of class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)

---

[46]   Letter from M. Freimuth to W. Blechman & K. Wildfang containing supplemental interrogatory responses (May 15, 2007) ("MasterCard Suppl. Interr. Resp.").

## Plaintiffs' Paragraph 17:

17      Several of the Bank Defendants have had representatives on Visa committees
throughout the relevant time period.[56]

_____

[56]      Visa's Supplemental Responses to Interrogatories Nos. 3-5 of All Plaintiffs' Consolidated First Set of
Omnibus Discovery Requests to Network Defendants, as reflected in May 18, 2007 letter from Rottenberg to
Wildfang & Blechman at p. 2-9 (SUFEX058), March 19, 2008 letter from Lee to Wildfang & Blechman at p.
2-14 (SUFEX059), and July 23, 2009 letter from Hartman to Marth & Almon at p. 3-8 (SUFEX060). _See also_
VUSAMDL1-02602776-2778, at VUSAMDL1-02602776 (Oct. 31, 2005 e-mail from Tolan Steele to numerous
Visa personnel regarding the "Timeline for Communicating April 2006 IRF changes on Commercial," stating
that "I know there are questions coming in, already, from various commercial/small business issuers engaged
in business planning for 2006 – I, for one, have already had a conversation with USBank on what we expect
the system numbers to look like.  David [Cramer]/Raghav [Lal]/Dave [Costa], please come to this meeting on
Tuesday with some short list of the Members to whom you'd propose we "push" information to – we need to
agree on the list and how much information we will/can share.  I'm assuming it looks like the [Commercial
Executive Council] and [Small Business Executive Council] rosters, but you know better than I." (SUFEX061)

_Defendants' Response to Paragraph 17:_

Disputed.  The terms "relevant time period" and "committees" are not defined

terms, and are therefore vague and ambiguous.  The term "several" is also irrelevant and unfairly

prejudicial in that it attempts to create guilt by association.

Post-restructuring and post-IPO, committees of Visa Inc.'s board of directors have

had no participants who had an affiliation with a financial institution.  (_Id._; Visa Final

Prospectus,[47] at FLEI 02907-08.)

With regards to bank employees who served on Visa board committees in 2007 or

before, none of the evidence class plaintiffs proffer in Paragraph 17 supports the characterization

that member banks of Visa U.S.A. had representatives on the Visa U.S.A. Board of Directors.

Such a characterization is misleading and unfairly prejudicial.  As discussed in Defendants'

Response to Paragraph 7, each member of the Visa U.S.A. Board owed a fiduciary duty to the

_____

[47]      Visa Inc. Form 424B4 Final Prospectus (Mar. 18, 2008) ("Visa Final Prospectus"), bearing control numbers
FLEI 02720 to 03222.

corporation, and did not sit as a representative of any constituent, member, or shareholder of

Visa U.S.A.  (*See* Defendants' Response to Paragraph 7.)

<u>**Plaintiffs' Paragraph 18:**</u>

**18      Several of the Bank Defendants have had representatives on MasterCard committees throughout the relevant time period.**[57]

_____

[57]      **MasterCard's Supplemental Responses to Interrogatories Nos. 3–5 of All Plaintiffs' Consolidated First Set of Omnibus Discovery Requests to Network Defendants, as reflected in October 2, 2006 letter from Powell to Kane at p. 2 (SUFEX062), Oct. 22, 2007 letter from Powell to Marth at p. 3-37 (SUFEX063) and August 12, 2009 letter from Freimuth to Marth & Almon at p. 2-21. (SUFEX064)**

<u>*Defendants' Response to Paragraph 18:*</u>

Disputed.  The MasterCard boards of directors have committees on which board members served.  None of the evidence class plaintiffs proffer in Paragraph 18 supports the characterization that member banks of MasterCard International had representatives on the MasterCard International board of directors.  Such a characterization is misleading and unfairly prejudicial.  As discussed in Defendants' Response to Paragraph 13, each member of the MasterCard International board owed a fiduciary duty to the corporation, and did not sit as a representative of any constituent, member, or shareholder of MasterCard.  (*See* Defendants' Response to Paragraph 13.)

47

<u>Plaintiffs' Paragraph 19:</u>

**19    The Visa U.S.A. Board of Directors agreed to and approved – and from time to time modified – the Rules that Plaintiffs challenge in this litigation, including the Default Interchange Fee Rule, and the Anti-Steering Restraints.**

*Defendants' Response to Paragraph 19:*

      Disputed.  Until October 2007, Visa's Member Rules unit had "responsibility . . . to develop operating regulations, either make revisions or create new ones, delete them, . . . which [were] then presented to the [Visa U.S.A.] board." (Baum Dep.[48] at 27; *see also* Somerville Dep.[49] at 435-36.)  The Visa U.S.A. Board of Directors had responsibility for approving the operating regulations that were presented to them. (*See* Somerville Dep. at 147-48; Baum Dep. at 27.)  "[U]ntil 2003, all of the operating regulation changes would go to the board of directors at their meetings, and in 2003, the process changed to a mail vote," which required a unanimous vote. (Somerville Dep. at 435-37.)  Beginning in October 2007, the Visa Operating Regulations Committee or VORC, an internal Visa committee made up of "a cross-functional group of managers," would consider operating regulation changes proposed by Visa business units, "deliberate on it and, as appropriate, decide to make the rule change and then publish it." (Somerville Dep. at 177-78.)

      Defendants dispute class plaintiffs' definition of "Interchange Fee" as "a fee that Merchants pay to the Issuing Bank" because it is inaccurate, misleading, and unfairly prejudicial. An interchange fee is compensation paid by the acquiring bank to the issuing bank via Visa or

---

[48]   Deposition of Elaine Baum (May 1, 2008) ("Baum Dep.").  Ms. Baum is the former senior vice president for member rules and policy compliance at Visa. (Baum Dep. at 11.)

[49]   Deposition of Una Somerville (Dec. 19, 2008 and Apr. 7, 2009) ("Somerville Dep.").  Ms. Somerville testified as Visa's Rule 30(b)(6) witness regarding the merchant acceptance rules. (Somerville Dep. at 11-12; Somerville Dep. Ex. 36000 (30(b)(6) Deposition Notice).)

MasterCard for the transaction passing through interchange.  (*See* Paragraphs 64 & 69.)  Class

plaintiffs have presented no evidence that merchants pay any fees to issuing banks.

Defendants dispute the term "Anti-Steering Restraints" as vague, inaccurate,

argumentative, and misleading.

On April 28, 2006, Visa established a Board committee consisting of four

directors not associated with any member bank that assumed "sole responsibility for establishing

the Company's interchange reimbursement fees, service fees, processing fees and other fees and

fines to be levied upon members of the Company, together with incentive fee rates and payments

and all matters relating to other fees, all of which shall be established by or under the direction of

the Committee." (Independent Directors Committee Charter,[50] at VUSAMDL1-07065341; *see*

*also* Second Suppl. Compl.[51] ¶ 96; 2006 Visa U.S.A. Cert. of Incorp., at VUSAMDL00053022.)

With Visa's introduction of directors not associated with a member bank, the process for

approving interchange rates changed as decisions regarding interchange were approved by the

four directors who had "no relationship with financial institutions from an employment

standpoint." (Sheedy 30(b)(6) Dep.[52] at 570-71; *see also* Partridge Dep.[53] at 70-71; Scharf Dep.

at 117; Campbell Dep. at 389-91.)

  a.  **Visa's Rule 30(b)(6) designee on merchant rules testified that between 1980
      and July 2006, all revisions to Visa rules and bylaws were the responsibility**

---

[50]  Independent Directors Committee Charter (May 11, 2006), VUSAMDL1-07065341 to 07065343, at 5341
("Independent Directors Committee Charter").

[51]  Second Supplemental Class Action Complaint (Jan. 29, 2009) ("Second Suppl. Compl.").

[52]  Deposition of William M. Sheedy (Jun. 17-18, 2008) ("Sheedy 30(b)(6) Dep."). Mr. Sheedy testified as Visa's
Rule 30(b)(6) witness regarding interchange.  (Sheedy 30(b)(6) Dep. at 8, 17-18; Sheedy Dep. Ex. 23950
(30(b)(6) Deposition Notice).)

[53]  Deposition of John M. Partridge (Sept. 4-5, 2008) ("Partridge Dep."). Mr. Partridge testified as Visa's Rule
30(b)(6) witness regarding corporate restructuring and the public sale of ownership shares.  (Partridge Dep. at
14-15; Partridge Dep. Ex. 32800 (30(b)(6) Deposition Notice).)

**of the Member Rules department, and any change to Visa's operating regulations had to be approved by Visa's Board of Directors.[58]**

---

[58]   Baum Dep. 26:25-28:13. (SUFEX065)

*Defendants' Response to Paragraph 19a:*

Disputed.  Elaine Baum was not Visa's Rule 30(b)(6) designee on merchant rules.

**b.      An internal Visa document dated October 1, 2001, entitled "Visa Department Template Application – Who We Are: Mbr Rules & Policy Compliance" states, "All revisions to the Visa U.S.A. Operating Regulations must be approved by the Visa U.S.A. Board of Directors."[59]**

---

[59]   Aafedt Dep. Ex. 21001, at VUSAMDL1-03157562. (SUFEX066)

*Defendants' Response to Paragraph 19b:*

Undisputed.

<u>**Plaintiffs' Paragraph 20:**</u>

**20      The Board of Directors of the Visa International Service Association agreed to and approved – and from time to time modified – the Rules that Plaintiffs challenge in this litigation, including the Default Interchange Fee Rule, and the Anti-Steering Restraints.**[60]

---
[60]      Hunt Dep. 28:13-29:14, 35:1-3, 42:14-23, Jan. 30, 2008 (SUFEX067); Howe 30(b)(6) Dep. 61:11-62:8, July 27, 2006. (SUFEX043)

*Defendants' Response to Paragraph 20:*

Disputed.  Class plaintiffs mischaracterize the evidence on which they rely.  Ms. Hunt testified that the Visa International Board of Directors did not approve operating regulations, it only approved the operating principles which were later distilled into operating regulations.  (Hunt Dep.[54] at 28-29.)  The president's council (formerly known as the management executive council), consisting of top Visa executives from each of the regions, approved the operating regulations.  (*Id.*)  Class plaintiffs provide no support for their assertion that Visa International modified the Default Interchange Fee Rule or the so-called Anti-Steering Restraints.

Defendants dispute class plaintiffs' definition of "Interchange Fee" as "a fee that Merchants pay to the Issuing Bank" because it is inaccurate, misleading, and unfairly prejudicial.  An interchange fee is compensation paid by the acquiring bank to the issuing bank via Visa or MasterCard for the transaction passing through interchange.  (*See* Paragraphs 64 & 69.)  Class plaintiffs have presented no evidence that merchants pay any fees to issuing banks.

Defendants dispute the term "Anti-Steering Restraints" as vague, inaccurate, argumentative, and misleading.

---
[54]      Deposition of Donna Hunt (Jan. 30, 2008) ("Hunt Dep.").  Ms. Hunt is the former head of global operating regulations for Visa International.  (Hunt Dep. at 8-9.)

Plaintiffs' Paragraph 21:

**21      As a condition of membership in Visa U.S.A., each bank agrees to abide by and enforce the Visa U.S.A. Operating Regulations, including the Default Interchange Rule, the Anti-Steering Restraints, and the Honor-All-Cards Rule.[61]**

---

[61]      Visa U.S.A. Inc. Operating Regulations,  Section 1.2.A and 1.2.C at p. 1-2 (May 15, 2008) (SUFEX068); CITI INT 115512 (SUFEX012); WF 0010142-43 (Wells Fargo Visa Brand Agreement providing that Visa's Regulations govern the agreement, effective Oct. 2006) (SUFEX035); CHASE000127302 (JPMorgan Chase Bank Master Agreement same, effective Jan. 1, 2005) (SUFEX069); BFC 0001175-1229 (MasterCard Brand Agreement with Juniper Bank, dated Jan. 1, 2002) (SUFEX070); WMB0000I511-1541 (MasterCard Brand Agreement with Washington Mutual, dated Oct. 2005) (SUFEX071); Somerville 30(b)(6) Dep. 439:3-12, Apr. 7, 2009 (SUFEX072); Floum Dep. 83:8-84:2, Dec. 2, 2008 (SUFEX073); Banaugh Dep. 83:12-25, May 9, 2008 (SUFEX074); Sabiston Dep. 80:15-19, 202:19-24, 204:4-15, Apr. 24, 2008 (SUFEX075); Banaugh 30(b)(6) Dep. 190:1-6, Aug. 4, 2006. (SUFEX076)

*Defendants' Response to Paragraph 21:*

Disputed.  Evidence on which class plaintiffs rely does not support the facts

asserted.  Acquirers are responsible for ensuring that their merchant complies with Visa's

operating regulations.  (Oct. 2010 Visa Rules, at 356.)

Defendants dispute the term "Anti-Steering Restraints" as vague, inaccurate,

argumentative, and misleading.

a.      **On October 15, 2008, Bank of America's 30(b)(6) designee for Merchant Rules, Kelly Ann Davila, testified that Bank of America's merchant contracts have "always contained a provision which required the merchants to comply with the subject rules" and that "Bank of America has always been required to enforce the subject rules with respect to merchants."[62]**

---

[62]      Davila 30(b)(6) Dep. 133:9-134:9, Oct. 15, 2008.

*Defendants' Response to Paragraph 21a:*

Disputed.  Class plaintiffs' characterization of Ms. Davila's deposition testimony

is inaccurate because Ms. Davila did not testify as quoted above by plaintiffs.  The first quotation

proffered by class plaintiffs is part of a question asked of Ms. Davila. (Davila Dep.[55] at 133.)

The second quotation proffered by class plaintiffs is an incorrect quotation from a question asked

by plaintiffs' counsel, which was rephrased after an objection by defense counsel. (*Id.* at 133-34.)

       **b.**      **On September 17, 2008, Chase's 30(b)(6) designee for Merchant Rules, Robert Nadeau, testified that the acquirers are responsible for enforcing the Visa and MasterCard rules.[63]**

---

[63]    Nadeau 30(b)(6) Dep. 123:8-13, Sep. 17, 2008.

*Defendants' Response to Paragraph 21b:*

       Disputed.  Mr. Nadeau testified as a Chase representative regarding merchant

agreements and merchant rules. (Nadeau Dep.[56] at 91-92; Nadeau Dep. Ex. 33326.[57])

       **c.**      **On December 4, 2008, Wells Fargo's 30(b)(6) designee for Merchant Rules, Veronica Flanagan, testified, "So we ensure that our Merchant Agreement includes the Subject Rules. And we investigate and respond to any notices from the payment networks, advising us that we have a merchant that may be out of compliance."[64]**

    .

---

[64]    Flanagan 30(b)(6) Dep. 94:12-16, Dec. 4, 2008.

*Defendants' Response to Paragraph 21c:*

       Undisputed.

---

[55]   Deposition of Kelly Ann Davila (Oct. 15, 2008) ("Davila Dep.").  Ms. Davila testified as Bank of America's Rule 30(b)(6) deponent regarding merchant rules.  (Davila Dep. at 6-7.)

[56]   Deposition of Robert Nadeau (Sept. 17, 2008) ("Nadeau Dep.").

[57]   30(b)(6) Deposition Notice.

<u>**Plaintiffs' Paragraph 22:**</u>

**22      Visa International Rules required that its "Members "must comply when operating and participating in the Visa, Visa Electron, Visa Cash, Plus, Interlink, and TravelMoney Programs, unless Visa specifically grants a variance," and its "Member[s] must comply with the Visa International By-laws, the Visa International Operating Regulations, and the Regional Operating Regulations."[65]**

---

[65]      Visa International Operating Regulations, Sections 1.1B and 1.1.C.4 (May 15, 2008). (SUFEX077)

<u>*Defendants' Response to Paragraph 22:*</u>

          Undisputed.

<u>Plaintiffs' Paragraph 23:</u>

**23      The MasterCard Board of Directors adopted – and from time to time modified – the Rules and Bylaws that Plaintiffs challenge in this litigation, including the Default Interchange Fee Rule, and the Anti-Steering Restraints. In 2000, the Board delegated rule-making authority to the CEO. Even after that time—both before and after the IPO— MasterCard continues to solicit "input [from the banks] as to how, when, where to make a rules change."[66]**

---
[66]      Doyle 30(b)(6) Dep. 215:97-25, 217:23-218:21, 329:14-331:4, 331:9-18, Apr. 22, 2008. (SUFEX078)

*Defendants' Response to Paragraph 23:*

            Disputed.  Class plaintiffs mischaracterize the evidence on which they rely.  Ms. Doyle, on whose testimony class plaintiff rely, testified that while "an item could be put before a board and a board could approve a resolution that MasterCard head in a certain direction.  I don't know that specific rules were ever submitted to the board. . . . [A]ctual execution of the rules would be done by [MasterCard] staff." (Doyle Dep.[58] at 218; *id.* at 161 (application of the discount at point of interaction rule is a regional management decision).)  Prior to the IPO the MasterCard chief executive officer received recommendations from management regarding rules, and had approval authority.  (Van Ryn Dep.[59] at 289-91.)  If the chief executive officer wanted more input, he would ask the board for input before signing off on a rule change.  (*Id.*; Lampasona Dep.[60] at 160-61;  *see also* Van Ryn Dep. at 291.)

---
[58]      Deposition of Deborah Doyle (Apr. 22, 2008) ("Doyle Dep.")  Ms. Doyle testified as MasterCard's Rule 30(b)(6) witness regarding the merchant rules.  (Doyle Dep. at 8-9; Doyle Dep. Ex. 23050 (30(b)(6) Deposition Notice).)

[59]      Deposition of Caroline Van Ryn (Aug. 14, 2008) ("Van Ryn Dep.").  Ms Van Ryn testified as a business leader in MasterCard's U.S. product delivery team.  (Van Ryn Dep. at 8-9.)

[60]      Deposition of Peter Lampasona (Mar. 25, 2008) ("Lamposana Dep.").  Mr. Lampasona testified as the vice president of rules, standards, and strategy at Mastercard.  (Lamposana Dep. at 5-6.)

Defendants dispute class plaintiffs' definition of "Interchange Fee" as "a fee that Merchants pay to the Issuing Bank" because it is inaccurate, misleading, and unfairly prejudicial. An interchange fee is compensation paid by the acquiring bank to the issuing bank via Visa or MasterCard for the transaction passing through interchange. (*See* Paragraphs 64 & 69.) Class plaintiffs have presented no evidence that merchants pay any fees to issuing banks.

Defendants dispute the term "Anti-Steering Restraints" as vague, inaccurate, argumentative, and misleading.

Defendants dispute class plaintiffs' assertion that MasterCard "continues" to solicit input from banks on rule changes after rule-making authority was delegated to the CEO. Class plaintiffs have not provided any evidence that MasterCard solicited input from banks regarding rule changes before rule-making authority was delegated to the CEO.

.

56

<u>**Plaintiffs' Paragraph 24:**</u>

**24      Pursuant to MasterCard Rules "Member[s] must agree . . . that [they] will comply with all applicable provisions of the Certificate of Incorporation and the Standards of this Corporation as in effect from time to time, and with applicable law."[67]**

---

[67]      MasterCard Rule 1.3 (May 15, 2008) (SUFEX079); Doyle Dep. 22:23-23:2, Apr. 22, 2008 (SUFEX078.

<u>*Defendants' Response to Paragraph 24:*</u>

       Undisputed.

<u>**Plaintiffs' Paragraph 25:**</u>

**25    As a condition of membership in MasterCard International Incorporated, each bank agrees to abide by and enforce MasterCard's ByLaws and Rules, including the Default Interchange Rule, the Anti-Steering Restraints, and the Honor-All-Cards Rule.**[68]

[68] ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████
████████████████████████████████
██████████ *see also* SUF ¶ 21 a-c.

*Defendants' Response to Paragraph 25:*

Disputed. Evidence on which class plaintiffs rely does not support the facts

asserted. Acquirers are responsible for ensuring that their merchants comply with MasterCard's

bylaws and rules. (2010 MasterCard Rules, §§ 9.1.3, 9.5.1)

Defendants dispute the term "Anti-Steering Restraints" as vague, inaccurate,

argumentative, and misleading.

a.    **The European Commission found that even after the MasterCard IPO, "the decisions of [MasterCard's] management bodies are still binding upon the organization's members and no bank can participate in the card activities of the MasterCard organization without complying in all respects with all [its] bylaws, rules, and published policies of the organization."**[69]

[69]    E.C. decision at 102. (SUFEX081)

*Defendants' Response to Paragraph 25a:*

Undisputed.

Defendants object to the admissibility of the E.C. decision. The E.C. decision is

unfairly prejudicial, and is an out of court statement for which no exception to the hearsay rule

has been established. (Fed. R. Evid. 403, 801, 802.)

**Plaintiffs' Paragraph 26:**

26      Section 2.04(a)(2) of the June 15, 2006, edition of the Visa U.S.A. Bylaws states, "**Principal Member. As conditions of membership, a Principal Member . . . Shall issue Cards bearing the Visa service mark or other marks adopted by the Corporation, which requirement may be satisfied by the issuance of Cards by its Affiliates which are members.**"[70]

---

[70]     Visa U.S.A. Inc. Certificate of Incorporation and Bylaws, June 15, 2006, VUSAMDL1-07904056-132, at VUSAMDL1-07904082. (SUFEX082)

*Defendants' Response to Paragraph 26:*

Undisputed.

**Plaintiffs' Paragraph 27:**

**27     MasterCard Rule 2.6, entitled "Obligation to Issue Cards," requires its Member Banks to "have issued and outstanding a reasonable number of cards based on such criteria as the Corporation may deem appropriate from time to time."[71]**

_____

[71]     **MasterCard Rule 2.6 (available at http://www.mastercard.com/us/merchant/pdf/BM-Entire_Manual_public.pdf (last accessed Sept.16, 2010)). (SUFEX079)**

_Defendants' Response to Paragraph 27:_

Undisputed.

<u>Plaintiffs' Paragraph 28:</u>

**28      The Member Bank representatives that sat on the Visa U.S.A. and Visa International Boards of Directors often circulated Board materials to other bank employees to seek their input.**

*Defendants' Response to Paragraph 28:*

   Disputed.  Evidence on which class plaintiffs rely in subparagraphs a-i does not

support their assertion that materials were distributed "often."  Board members of Visa U.S.A.

and Visa International testified that they did not circulate board materials to other employees at

their banks.  (Jenkins Dep. at 37; C. Doyle Dep.[61] at 74; Stumpf Dep. at 40-41 ("Q.  Did you ever

circulate those [board pre-read] materials to other Wells Fargo employees for review before your

meeting?  A.  For Visa International?  Q.  Correct.  A.  I do not recall doing that, no.").)

   None of the evidence class plaintiffs proffer in Paragraph 28, or subparagraphs a-i,

supports the characterization that member banks of Visa U.S.A. had representatives on the Visa

U.S.A. Board of Directors.  Such a characterization is misleading and unfairly prejudicial.  Prior

to October 3, 2007, Visa U.S.A. and Visa International were Delaware non-stock corporations.

(1970 Visa U.S.A. Cert. of Incorp., at VUSAMDL00007128-29; 2006 Visa U.S.A. Cert. of

Incorp., at VUSAMDL00052966; Visa International Cert. of Incorp.,[62] at VI-IC-021S7848;

Corporate Disclosure Statement of Visa International Service Association (Aug. 10, 2005); 2004

Visa International By-Laws,[63] at VI-IC-00328330.)  On October 3, 2007, Visa International and

Visa U.S.A. because subsidiaries of Visa Inc., which issued common stock to the financial

---

[61]   Deposition of Charles T. Doyle (Dec. 12, 2008) ("C. Doyle Dep.").  Mr. Doyle was a member of the Visa U.S.A. board from 1990-2007, and the Visa International board from 2000-2007.  (Doyle Dep. at 20-21.)

[62]   Visa International Service Association Certificate of Incorporation (Jun. 6, 1974) ("Visa International Cert. of Incorp."), bearing control numbers VI-IC-021S7843 to 021S7870.

[63]   Visa International By-Laws and Regional Board Delegations (May 15, 2004) ("2004 Visa International By-Laws"), bearing control numbers VI-IC-00328321 to 00328412.

institution members of Visa International, Visa U.S.A. and other Visa Inc. subsidiaries. (Visa

Form 8-K, at 2-3.) As discussed in Defendants' Response to Paragraph 7, each member of the

Visa U.S.A. and Visa International boards owed a fiduciary duty to the corporation, and did not

sit as a representative of any constituent, member, or shareholder of Visa U.S.A. As Visa

International was also a Delaware non-stock corporation, its directors owed a similar fiduciary

duty to Visa International. (*See* Defendants' Response to Paragraph 7.)

a. **When asked whether he was aware that some Visa board members "would circulate materials related to the Board activities and seek input on how to vote on matters that came before the Board based upon the interests of the respective financial institutions they represented," Visa's William Sheedy testified that he was "aware that in certain instances individuals who were Directors of Visa U.S.A. would circulate Board materials to employees of financial institutions in order to become better informed on Board topics and items that were being considered for Board resolution."[72]**

---

[72]   **Sheedy Dep. 168:18-169:8. (SUFEX083)**

*Defendants' Response to Paragraph 28a:*

Undisputed.

b. **Visa's former general counsel testified that he was aware that some of Visa Member Bank representatives would disseminate confidential board materials meant only for the Member Bank representative to other employees at the members' respective financial institutions: "I'm aware that some directors from time to time would arrange for the copying and dissemination of all or portions of the pre-read material to selected individuals at their organizations."[73]**

---

[73]   **Allen Dep. 86:21-87:14, Dec. 12, 2008. (SUFEX084)**

*Defendants' Response to Paragraph 28b:*

Disputed. None of the evidence plaintiffs proffer in Paragraph 28b supports the

characterization that disseminated information was confidential in nature. None of the evidence

class plaintiffs proffer in Paragraph 28b supports the characterization that member banks had

representatives on the Visa U.S.A. or Visa International boards of directors. Such a characterization is misleading and unfairly prejudicial. As discussed in Defendants' Response to Paragraph 7, each member of the Visa U.S.A. and Visa International boards owed a fiduciary duty to the corporation, and did not sit as a representative of any constituent, member, or shareholder of Visa U.S.A. or Visa International. (*See* Defendants' Response to Paragraph 7.)

   Defendants object to the admissibility of Mr. Allen's deposition testimony. Mr. Allen retired from Visa on January 31, 2003 (Allen Dep. at 11-12), and his testimony therefore relates to events prior to the relevant time period applicable in this case, and is thus irrelevant to any issue in support of class plaintiffs' motion for summary judgment. (Fed. R. Evid. 401, 402.)

  **c.** **Visa's former President and CEO agreed that during 2002 and 2007 Visa proposals (i.e., business strategy, modifications to interchange rates, modifications to the operating regulations) and background information were provided to Visa board members prior to the actual board meeting so that banks could review and analyze the materials.[74]**

---

[74] **Joseph Saunders Dep. 65:02-66:07, Oct. 2, 2008. (SUFEX085)**

*Defendants' Response to Paragraph 28c:*

   Disputed. Class plaintiffs mischaracterize Mr. Saunders' deposition testimony. When Mr. Saunders was asked, "Tell me the kinds of recommendations or business proposals that would be shared with the board member banks, the banks staff, prior to a meeting so that the staff at your bank can understand it or advise you or recommend or not recommend the change," he responded, "Only operating regulations." (Saunders Dep. at 67.) When asked specifically about interchange rates, Mr. Saunders testified, "I would never have reviewed those with anybody that worked for me. That was for a board member, not for a bank." (*Id.* at 66.)

  **d.** **A May 2004 Visa presentation to the U.S. Board of Directors titled "Visa Business Responses to Payment Industry Trends," was circulated among Chase employees and contained, among others, the following comments,**

> "Thanks – This is important and we must have [a] strong voice in the subsequent analysis/decision making.  See comments."[75]

---
[75]   Ex. 28019, CHASE003627088-7127. (SUFEX086)

*Defendants' Response to Paragraph 28d:*

Disputed.  Class plaintiffs mischaracterize the evidence on which they rely.  Ex. 28019, CHASE003627088-7127 does not support the assertion that the handwritten comments were circulated among Chase employees.

Defendants object to the admissibility of Ex. 28019, CHASE003627088-7127. The quoted handwriting was not properly authenticated (Fed. R. Evid. 901), and is an out of court statement for which no exception to the hearsay rule has been established.  (Fed. R. Evid. 801, 802.)

e.   **Member Bank representatives have also shared information that they obtained as a member of a Visa or MasterCard committee or council group comprised of representatives from different financial institutions.  For example, Ira Goldman has sought comments or recommendations from Chase employees on matters that were to be voted on by the MasterCard International Operations Committee to "bring [the information] back to the committee member that represents -- that sits on the committee [so that] at least [the committee member] is aware of some of the commentary that its employees have concerning the topic."[76]**

---
[76]   Ira Goldman Dep. 74:08-75:19, Apr. 24, 2008 (SUFEX087).  *See also* Visa USA Supplemental Resp. To First Set of Omnibus Disc. at ¶ 50 (dated Dec. 15, 2006) (listing at least fourteen organizations in which Visa and MasterCard are both members. (SUFEX088)

*Defendants' Response to Paragraph 28e:*

Disputed.  To the extent class plaintiffs' assertion should be taken to mean that information was shared between representatives on different committees of Visa and MasterCard, they have not provided such evidence.

     f.     At Wells Fargo, President and CEO John Stumpf received comments from a number of bank employees after their review of Visa Board of Directors notes.  In an October 19, 2005 e-mail offering the "consolidated comments from the reviewers," Wells Fargo executive Kevin Rhein stated that fellow bank employee "Bob Falkenberg noted that he attended the Visa Small Business Executive Committee two weeks ago, and Visa presented their strategy for the Visa Small Business Signature Card.  He concurs that this is an important step for the Visa brand to effectively compete in the small business space with Amex.  As an issuer, there are challenges.  Unlike Consumer, there isn't a higher level of interchange.  The minimum reward level proposed by Visa was ▮▮▮▮. . . . Judging from the responses of the other competitors in the room, there was more of an interest in the potential strength of this product for new originations.  However, there was some concern about using this for existing portfolio strategies as the higher cost structure would erode current profit levels."[77]

---

[77]     WFINT0000590603, at WFINT0000590603 (SUFEX089).  *See also* WFINT000590342 (Mar. 14, 2006 email from Kevin Rhen to Wells Fargo CEO John Stumpf offering comments on the March Visa Board materials). (SUFEX090)

*Defendants' Response to Paragraph 28f:*

     Disputed.  The March 14, 2006 email on which class plaintiffs rely is from Kevin Rhcin, not Kevin Rhen.

     g.     Peggy Yankovich, a Bank of America Senior Vice President and member of Visa's Commercial Solutions Executive Council, testified that she was asked to provide input regarding issues being considered by the Visa Board of Directors.[78]  Specifically, Yankovich testified that she was asked to analyze whether issues impacting commercial cards would be good or bad for Bank of America.[79]

---

[78]     Yankovich Dep. 284:9-17. (SUFEX091)

[79]     Yankovich Dep. 285:9-18. (SUFEX091)

*Defendants' Response to Paragraph 28g:*

     Disputed.  Class plaintiffs' characterization of Ms. Yankovich's testimony is unclear because class plaintiffs' do not say to whom she was asked to provide input.

h. **Alehandro Stein, a Bank of America Senior Vice President, testified that he and other Bank of America employees were asked to prepare Visa Board member Pat Phillips for Visa Board of Directors meetings.[80]  Stein testified that "subject matter experts" at Bank of America were selected to prepare Mr. Phillips depending on the topics listed in the Visa Board agenda.[81]  Stein testified that in preparing Mr. Phillips for a Visa Board meeting, he would "receive input from the subject matter experts and then create a summary version of their input that would be the headline for Pat."[82]**

---

[80]     Stein Dep. 167:20-170:11. (SUFEX092)

[81]     Stein Dep. 170-171:22. (SUFEX092)

[82]     Stein Dep. 184:7-185:9. (SUFEX092)

*Defendants' Response to Paragraph 28h:*

Disputed.  Mr. Stein's first name is Alejandro.

i. **An email dated January 29, 2003, from Bank of America Senior Vice President Ben Pai to Senior Vice President Alehandro stein states:**

   **Typically, the process works this way:**

   • **Prior to the meeting, Visa sends the Board materials to Pat Phillips. Pat looks through the material and highlights areas he wants further commentary on.**

   • **Pat's admin . . . will call or email to let you know that the stuff has arrived. She will also schedule a meeting before Pat leaves so you can take Pat through your summary.**

   • **You will need to make hard copies, usually around 35, of the materials because Visa generally won't send them electronically for security reasons. You will hand-deliver the copies to Charlotte associates and overnight copies to out-of-town associates.**

   • **You would then send an email to the distribution informing them that the materials are here, and give them a due date for returning their comments to you. Most of these people have done this several times and "know the drill." The deadlines are usually tight because Visa doesn't give us a lot of lead time.**

   • **You prepare a report for Pat summarizing your take on the issues and comments you get back from the team. Then you take Pat through the report.[83]**

66

>   **The email also attaches a sample report containing Bank of America employees' comments on Visa Board of Directors issues.[84]**

---

[83]   Stein Dep. Ex. 28801, at BOFAIC 01328131. (SUFEX093)

[84]   Stein Dep. Ex. 28801, at BOFAIC 01328132-69. (SUFEX093)

*Defendants' Response to Paragraph 28i:*

>   Disputed. Mr. Stein's first name is Alejandro.

<u>**Plaintiffs' Paragraph 29:**</u>

**29     The Member Bank representatives that sat on the MasterCard Boards of Directors often circulated Board materials to other bank employees to seek their input.**

<u>*Defendants' Response to Paragraph 29:*</u>

Disputed.  Evidence on which plaintiffs rely in subparagraphs a-c of Paragraph 29 relates only to members of the MasterCard International board of directors, not the MasterCard U.S. board.  (*See* Paragraphs 16a &16b.)  Furthermore, this evidence does not support the assertion that materials were distributed "often."

MasterCard U.S. board members were allowed to circulate certain materials to employees of the banks at which they worked.  Evidence on which class plaintiffs rely in subparagraphs a-c only relates to members of the MasterCard U.S. board (*see* Paragraph 16a), and does not demonstrate that any of these board members took actions that were inconsistent with this policy.





(*Id.* at CITI INT 002459209-11.)

None of the evidence class plaintiffs proffer in subparts a-c of Paragraph 29 supports the characterization that member banks had representatives on the MasterCard U.S. board.  Such a characterization is misleading and unfairly prejudicial.  As discussed in Defendants' Response to Paragraph 13, each member of the MasterCard U.S. board owed a    . fiduciary duty to MasterCard, and did not sit as a representative of any constituent, member, or shareholder of MasterCard International or MasterCard U.S.  (*See* Defendants' Response to Paragraph 13.)

> a.    **Explaining his forwarding of MasterCard information to Chase executives, former CEO of Chase Card Services Rick Srednicki testified: "there's two hats that you wear; one is the business manager for Chase and the other is the Board member for [MasterCard.]  My business manager of Chase hat required me to tell them" that MasterCard's debit rate increases could be delayed.[85]**

[85]    **Srednicki Dep. 194: 1-7 (referencing Ex. 24,116). (SUFEX094)**

*Defendants' Response to Paragraph 29a:*

Disputed.  Mr. Srednicki's first name is Richard.  Evidence on which class

plaintiffs rely is incomplete and misleading.  (Fed. R. Evid. 106.)  Mr. Srednicki's full quotation

demonstrates he did not provide any materials to other Chase employees: "My business manager

of Chase hat required me to tell them nothing about what they [board of directors] said, but to

tell them that it [MasterCard's debit interchange rate increase] could be delayed."  (Srednicki

Dep.[64] at 194.)

      **b.**      **In a February 2004 email, Patricia Reilly of JP Morgan Chase writes to Richard Srednicki, a MasterCard Board member, the following question relating to information discussed by the MasterCard Board of Directors:**

> **(1) The CMS folks called yesterday to say that Visa told them that the MasterCard Board was meeting in emergency session yesterday to consider raising interchange again for April.  I told Thanassis' folks that the Board meeting was planned well in advance and that I doubted there was any further discussing about interchange changes for this April but I would check with you.  Can you confirm that they didn't bring any new changes to you yesterday??[86]**

---

[86]    Ex. 24120 CHASE001414545 (SUFEX95); MasterCard's May 15,2007 Supplemental Answer to Interrogatory No. 1 of All Plaintiffs' Consolidated First Set of Omnibus Discovery Requests to Network Defendants, p. 1-4. (SUFEX57)

*Defendants' Response to Paragraph 29b:*

Undisputed.

      **c.**      **Steven League, former Director of Industry Relations for MBNA/Bank of America, testified, "Within Industry Relations, our staff would receive pre-read materials in advance of board meetings and potentially committee meetings where an MBNA executive might serve on a [Visa or MasterCard] board or a committee and review the agenda items and any areas that might be of interest to a senior business manager in the bank."[87]  Specifically, League recalled receiving pre-read materials for MasterCard Board meetings from Lance Weaver, even though League was not a member of the**

---

[64]    Deposition of Richard Srednicki (Jun. 25, 2008) ("Srednicki Dep.").  Mr. Srednicki was the former chief executive officer of Chase card services. (Srednicki Dep. at 12-13.)

**Board or any committees.[88]  League also testified that Michael Wright received such materials and that Mr. Wright would distribute these MasterCard Board of Directors meeting pre-read materials to "a senior executive [within MBNA] who might have that functional area [who] might be asked for any input about their perspective on the subject of the pre-read material."[89]**

---

[87]     League Dep. 87:19- 88:5. (SUFEX096)

[88]     League Dep. 88:6-89:11. (SUFEX096)

[89]     League Dep. 90:18-92:3. (SUFEX096)

_Defendants' Response to Paragraph 29c:_

Disputed.  Class plaintiffs mischaracterize the evidence on which they rely.  Mr. League testified that Michael Wright may give a portion of pre-read materials to a hypothetical senior executive. (League Dep.[65] at 90-92.)  Further, MasterCard board members were allowed to distribute certain materials to employees at the bank at which they were employed without violating any fiduciary duty to MasterCard. (_See_ Defendants' Response to Paragraph 29.)

---

[65]   Deposition of Steven League (Apr. 4, 2008) ("League Dep.").  Mr. League is a former manager in industry relations at MBNA, which merged with Bank of America. (League Dep. at 8-9, 80.)

<u>Plaintiffs' Paragraph 30:</u>

30      The member banks were active in the development of the Visa Signature and the MasterCard World premium-credit-card products.

<u>*Defendants' Response to Paragraph 30:*</u>

Disputed.  Class plaintiffs' assertion is misleading and unfairly prejudicial.

Although Visa and MasterCard may from time to time seek input from their issuer customers

regarding the desirability and likely competitiveness of the products they develop, defendants

dispute class plaintiffs' assertion that the member banks "were active" in the development of the

Visa Signature and MasterCard World premier credit card products.  None of the evidence class

plaintiffs proffer in subparagraphs a-f below supports the assertion; indeed none of the evidence

has anything whatsoever to do with the development of the Visa Signature card product.

a.      **A November 2005 MasterCard memorandum entitled "Recommendation for New Premium Card Program" states, "In view of the competitive pressures noted above, our issuers are increasingly asking that MasterCard develop an elite affluent product competitively positioned against Amex. We have received specific input from issuers that we will be at a significant disadvantage if we do not have something that addresses this competitive shortcoming. In the absence of such a product issuers will be forced to turn to Amex to build up their affluent card portfolios."[90]**

_____

[90]     **Murdock Dep. Ex. 25462, at MCI_MDL02_08910478. (SUFEX097)**

<u>*Defendants' Response to Paragraph 30a:*</u>

Undisputed.

b.      **MasterCard 30(b)(6) witness for Premium Cards, Jeffrey Portelli, testified that he met with individuals representing Capital One in the course of his work on the MasterCard World Elite Program and the Enhanced Value Program.[91]  Portelli explained, "We would have talked about the -- and again, now you're asking questions about World Elite and advanced value proposition. We would have had opportunity if the account leads had asked us tom come in and speak, I know personally I did go and meet with Capital One as part of a much broader discussion about what MasterCard was doing in terms of segmentation and products to meet the different needs of**

segments and so forth. So yes, you would have had conversations with banks."[92]

_____
[91]    Portelli 30(b)(6) Dep. 108:2-19. (SUFEX003)

[92]    Portelli 30(b)(6) Dep. 108:23-109:13. (SUFEX003)

_Defendants' Response to Paragraph 30b:_

        Undisputed.

    c.    **On November 4, 2004, Visa employee Brian Wood emailed Chase, stating, "Yesterday, Visa's Corporate Relations sent a blast fax to our Members informing them of two key announcements made by Visa . . . . The first announcement deals with Visa creating a new rewards-focused credit product platform that we have been developing with the help of Chase's Product Development team for quite some time."[93]  The email attaches a Visa Business Review article stating, "New Product Platform Will Help Issuers Compete More Effectively with American Express and Other Competitors . . . Visa is enhancing its leading consumer credit products by creating a new rewards-focused credit product platform called Visa Traditional rewards . . . . Details are also provided on corresponding changes to Visa Interchange Reimbursement Fees for rewards-based consumer credit products, including Visa Traditional Rewards and Visa Signature . . . ."[94] When asked about this document, Raymond Fischer, the chief financial officer of JPMorgan Chase Card Services, testified that Chase has "worked from time to time with Visa on new product development, yes."[95]**

_____
[93]    Fischer Dep. Ex. 22826, at CHASE000165884. (SUFEX098)

[94]    Fischer Dep. Ex. 22826, at CHASE000165885. (SUFEX098)

[95]    Fischer Dep. 290:16-17. (SUFEX099)

_Defendants' Response to Paragraph 30c:_

        Undisputed.  Defendants note that documents and testimony on which class plaintiffs rely do not discuss the Visa Signature card.

    d.    **A March 2005 Capital One "Card Association Management: 2005 Goals and Strategic Considerations" presentation noted that "[Capital One] was instrumental in the design of the new Visa Rewards higher interchange products."[96]**

[96]      CO00003-00033239-3254, at CO00003-00033240. (SUFEX100)

_Defendants' Response to Paragraph 30d:_

Undisputed.

e.      **A November 2004 Visa email from Brian Wood discussing two recent Visa announcements states that Visa has created a new rewards-focused credit product platform that Visa had "been developing with the help of Chase's Product Development team for quite some time."[97]**

[97]      CHASE000165884 – 5894, at CHASE000165884 (Ex. 22,826) (SUFEX098). _See also_ Raymond Fischer Dep. 289:08- 291:16 (testifying that Chase has "work[ed] with Visa in terms of developing products that made sense for our bank and then make recommendations to Visa about, you know, things that would be useful to us as an issuing bank"). (SUFEX099)

_Defendants' Response to Paragraph 30e:_

Undisputed.  Defendants note that the document and testimony relied on by class

plaintiffs do not discuss the Visa Signature card.

f.      **A memorandum contained in the materials from the MasterCard U.S. Region Board Meeting on March 12, 2003 states:**

**At the US Board meeting in November 2002, the Board expressed the view that a product development priority for MasterCard should be the creation of a high-end transactor program. Other key recommendations were that it should generate a good level of profitability and be competitive with programs offered particularly by American Express.**

**Subsequently, MasterCard conducted interviews with representatives of several Board Member institutions to gain further insight into their respective needs. Members responses differed significantly, based on their objectives** ██████████████

██████████████████████████████████

██████████████████████████████████
███████

██████████████████████████████████
████████████████████

██████████████████████████████████████
██████████████████████████

74

Based on member views, it was generally agreed that key characteristics of the programs should include:



[98]

---

[98]      Portelli 30(b)(6) Dep. Ex. 24885, at MCI_MDL04_00001978-79. (SUFEX101)


*Defendants' Response to Paragraph 30f:*

Undisputed.

<u>Plaintiffs' Paragraph 31:</u>

31      The challenged rules of Visa

<u>*Defendants' Response to Paragraph 31:*</u>

   Disputed.  The only Visa rule challenged by class plaintiffs is Visa's default

interchange rule (Class Plaintiff Brief[66] at 1-2), which is not discussed in subparagraphs a-i.

   Defendants object to the admissibility of evidence cited in subparagraphs a-i

because it relates to conduct outside the scope of class plaintiffs' motion, and is irrelevant to any

issue in support of class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)

  **a.      Honor-All-Cards Rule**

    **i.      Pre-IPO Visa U.S.A.**

      **A.      In the November 2005 edition of the Visa U.S.A. Operating Regulations, under the heading "Honoring Cards," Section 5.2.B.3.a states in relevant part, "A Merchant that wishes to accept Visa Cards must accept any valid Visa Card in its category of acceptance, as specified in *Section 5.2.B.1*, that a Cardholder properly presents for payment. This means that the Merchant must permit the Cardholder to choose whether he or she pays for a transaction with that Visa Card or with some other means of payment accepted by the Merchant. The Merchant may request or encourage a Cardholder to use a means of payment other than a Visa Card."[99]**

---

[99] **Visa U.S.A. Inc. Op. Regs. Nov. 15, 2005, VUSAMDL00007206-8287, at VUSAMDL00007634.**

<u>*Defendants' Response to Paragraph 31a.i.A:*</u>

   Undisputed.

---

[66] Class Plaintiffs' Memorandum of Law In Support of Their Motion for Summary Judgment (Feb. 12, 2011) ("Class Plaintiff Brief").

Defendants object to the admissibility of the cited rule because it relates to conduct outside the scope of class plaintiffs' motion, and is irrelevant to any issue in support of class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)

      **ii.**    **Post-IPO Visa Inc.**

            **A.**    **In the April 2010 edition of the Visa Operating Regulations, Core Principle 6.2, entitled "Honor All Cards Properly Presented," states, "Visa merchants may not refuse to accept a Visa product that is properly presented for payment, for example, on the basis that the card is foreign-issued, or co-branded with a competitor's mark. Merchants may steer customers to an alternative method of payment, such as providing discounts for cash, but may not do so in a confusing manner that denies consumer choice. Merchants may decline to accept a Visa product that is not covered by their acceptance contract, and may also consider whether present circumstances create undue risk."[100]  Under the heading "Honoring Cards," the April 2010 Visa Operating Regulations also state, "A Merchant must accept all Cards properly presented for payment as specified in the 'Merchant Acceptance Standards' table."[101]**

---

[100]    **Visa Int'l Op. Regs. Apr. 1, 2010, at p. 391, available at http://usa.visa.com/download/merchants/visa-international-operating-regulations-main.pdf) (last accessed October 20, 2010. (SUFEX005)**

[101]    **Visa Int'l Op. Regs. Apr. 1, 2010, at p. 442, available at http://usa.visa.com/download/merchants/visa-international-operating-regulations-main.pdf) (last accessed October 20, 2010. (SUFEX005)**

*Defendants' Response to Paragraph, 31a.ii.A:*

    Disputed.  The document provided by class plaintiffs at SUFEX005 contains the October 15, 2010 Visa International Operating Regulations, not the April 1, 2010 Visa International Operating Regulations.  The proper Honor All Cards rule in the October 15, 2010 Regulations, is entitled, "Honor All Cards - U.S. Region 5.2.B," and states, "A U.S. Merchant that wishes to accept Visa Cards must accept any valid Visa Card in its category of acceptance that a Cardholder properly presents for payment. This means that the Merchant must permit the

Cardholder to choose whether to pay for a transaction with that Visa Card or with some other means of payment accepted by the Merchant. The Merchant may request or encourage a Cardholder to use a means of payment other than a Visa Card." (Oct. 2010 Visa Rules, at 406.)

Defendants object to the admissibility of the cited rule because it relates to conduct outside the scope of class plaintiffs' motion, and is irrelevant to any issue in support of class plaintiffs' motion for summary judgment. (Fed. R. Evid. 401, 402.)

  **b.**  **Default Interchange Rule**

    **i.**  **Pre-IPO Visa U.S.A.**

      **A.**  **In the November 2005 edition of the Visa U.S.A. Operating Regulations, Section 9.5, entitled "Interchange Reimbursement Fees," states in relevant part, "This section specifies Interchange Reimbursement Fees assessed by Visa to recognize one Member's support of another. These Interchange Reimbursement Fees apply in all circumstances where Members have not set their own financial terms for the Interchange of Visa Transactions. An Acquirer pays an Interchange Reimbursement Fee for each Interchange Transaction completed within the 50 United States and the District of Columbia, as specified in *Section 9.5.A* through *Section 9.5.E*. An Issuer pays an Interchange Reimbursement Fee for each Interchange Transaction completed within the 50 United States and the District of Columbia, as specified in *Section 9.5F*."[102]**

---

[102] Visa U.S.A. Inc. Operating Regulations, November 15, 2005, VUSAMDL00007206-8287 at VUSAMDL00007792. (SUFEX102)

*Defendants' Response to Paragraph 31b.i.A:*

  Undisputed.

  Defendants object to the admissibility of the cited rule because it relates to conduct outside the scope of class plaintiffs' motion, and is irrelevant to any issue in support of class plaintiffs' motion for summary judgment. (Fed. R. Evid. 401, 402.)

ii.   **Post-IPO Visa Inc.**

A.   **In the April 2010 Visa Operating Regulations, Core Principle 10.2, entitled "Participants Pay or Receive Interchange for Transactions," states, "Participating acquirers and issuers pay or receive interchange every time a Visa product is used. For example, acquirers pay interchange to issuers for purchase transactions and issuers pay interchange to acquirers for cash transactions and credit vouchers. In the case of a credit or a chargeback, interchange flows in reverse."[103]   Core Principle 10.3, entitled "Visa Determines Interchange Reimbursement Fees," states, "Interchange reimbursement fees are determined by Visa and provided on Visa's published fee schedule, or may be customized where members have set their own financial terms for the interchange of a Visa transaction or Visa has entered into business agreements to promote acceptance and card usage."[104]**

[103]   Visa International Operating Regulations, April 1, 2010, p. 961 (available at http://usa.visa.com/download/merchants/visa-international-operating-regulations-main.pdf) (last accessed October 20, 2010). (SUFEX005)

[104]   Visa International Operating Regulations, April 1, 2010, p. 962 (available at http://usa.visa.com/download/merchants/visa-international-operating-regulations-main.pdf) (last accessed October 20, 2010). (SUFEX005)

*Defendants' Response to Paragraph 31b.ii.A:*

Disputed.  The document provided by class plaintiffs at SUFEX005 contains the

October 15, 2010 Visa International Operating Regulations, not the April 1, 2010 Visa

International Operating Regulations.

Defendants object to the admissibility of the cited rule because it relates to

conduct outside the scope of class plaintiffs' motion, and is irrelevant to any issue in support of

class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)

c.   **No Surcharge Rule**

i.   **Pre-IPO Visa U.S.A.**

A.   **In the November 2005 edition of the Visa U.S.A. Operating Regulations, Rule 5.2F, entitled "Prohibitions," states, "A**

79

**merchant must not: . . . Add any surcharge to Transactions."[105]**

_____
[105]    Visa U.S.A. Inc. Operating Regulations, November 15, 2005, VUSAMDL00007206-8287 at VUSAMDL00007637-38. (SUFEX102)

_Defendants' Response to Paragraph 31c.i.A:_

Undisputed.

Defendants object to the admissibility of the cited rule because it relates to

conduct outside the scope of class plaintiffs' motion, and is irrelevant to any issue in support of

class plaintiffs' motion for summary judgment. (Fed. R. Evid. 401, 402.)

ii.    **Post-IPO Visa Inc.**

A.    **Under the heading "Surcharges 5.1C," the April 2010 edition of the Visa International Operating Regulations states, "A Merchant must not add any surcharges to Transactions, unless local law expressly requires that a Merchant be permitted to impose a surcharge. Any surcharge amount, if allowed, must be included in the Transaction amount and not collected separately."[106]**

_____
[106]    Visa International Operating Regulations, April 1, 2010, at p. 449 "Merchant Agreement Requirements" (available at http://usa.visa.com/download/merchants/visa-international-operating-regulations-main.pdf) (last accessed October 20, 2010). (SUFEX005)

_Defendants' Response to Paragraph 31c.ii.A:_

Disputed.  The document provided by class plaintiffs at SUFEX005 contains the

October 15, 2010 Visa International Operating Regulations, not the April 1, 2010 Visa

International Operating Regulations.

Defendants object to the admissibility of the cited rule because it relates to

conduct outside the scope of class plaintiffs' motion, and is irrelevant to any issue in support of

class plaintiffs' motion for summary judgment. (Fed. R. Evid. 401, 402.)

**d.      Rules require that a Member Bank be a party to every merchant agreement.**

*Defendants' Response to Paragraph 31d:*

          Disputed.  Evidence on which class plaintiffs rely in subparagraphs i.A and ii.A

does not support the assertion that Visa rules require a Member Bank to be a party to every

merchant agreement.  Visa rules allow members to contract with third parties to facilitate issuing

and acquiring activities, including VisaNet processors who have a direct connection to VisaNet.

(Oct. 2010 Visa Rules, at 73.)  The member must also execute a written contract with each

VisaNet processor and each third party agent that performs cardholder or merchant solicitation

and/or stores, processes, or transmits cardholder or transaction data on behalf of the Member.  (*Id.*

at 79, 86.)  Acquirers are also responsible for reviewing Merchant Agreements used by its

Agents.  (*Id.* at 642.)

          Defendants object to the admissibility of the cited rule because it relates to

conduct outside the scope of class plaintiffs' motion, and is irrelevant to any issue in support of

class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)

          **i.      Pre-IPO Visa U.S.A.**

                    **A.      In the November 2005 edition of the Visa U.S.A. Operating
                              Regulations, under the heading "Merchant Agreement
                              Requirements," Section 4.2.C.1.a states, "An Acquirer must
                              have a Merchant Agreement with each of its Merchants."[107]
                              Section 4.2.C.1.b states, "An Acquirer may only accept
                              Transaction Receipts from a Merchant with which it has a
                              valid Merchant Agreement."[108]**

---

[107]      Visa U.S.A. Inc. Operating Regulations, November 15, 2005, VUSAMDL00007206-8287 at
VUSAMDL00007528. (SUFEX102)

[108]      Visa U.S.A. Inc. Operating Regulations, November 15, 2005, VUSAMDL00007206-8287 at
VUSAMDL00007528. (SUFEX102)

*Defendants' Response to Paragraph 31d.i.A:*

Disputed. The document provided by class plaintiffs at SUFEX005 contains the

October 15, 2010 Visa International Operating Regulations, not the April 1, 2010 Visa

International Operating Regulations.

Defendants object to the admissibility of the cited rule because it relates to

conduct outside the scope of class plaintiffs' motion, and is irrelevant to any issue in support of

class plaintiffs' motion for summary judgment. (Fed. R. Evid. 401, 402.)

**ii.     Post-IPO Visa Inc.**

**A.     Under the heading "Merchant Agreement Requirements," the April 2010 edition of Visa's Operating Regulations state, "An Acquirer must: Have a Merchant Agreement with each of its Merchants [and] . . . Ensure that its Merchant complies with the Visa International Operating Regulations regarding payment acceptance [and] Ensure that required acceptance requirement provisions are included in its Merchant Agreement or as a separate addendum [and] Only accept Transaction Receipts from a Merchant with which it has a valid Merchant Agreement."[109]**

---

[109]     **Visa International Operating Regulations, April 1, 2010, at p. 393-94 (available at http://usa.visa.com/download/merchants/visa-international-operating-regulations-main.pdf) (last accessed October 20, 2010). (SUFEX005)**

*Defendants' Response to Paragraph 31d.ii.A:*

Disputed. The document provided by class plaintiffs at SUFEX005 contains the

October 15, 2010 Visa International Operating Regulations, not the April 1, 2010 Visa

International Operating Regulations.

Defendants object to the admissibility of the cited rule because it relates to

conduct outside the scope of class plaintiffs' motion, and is irrelevant to any issue in support of

class plaintiffs' motion for summary judgment. (Fed. R. Evid. 401, 402.)

e.   **Rules require that all card-acceptance agreements with merchants require the merchant to abide by Network Rules.**

i.   **Pre-IPO Visa U.S.A.**

A.   **In the November 2005 edition of the Visa U.S.A. Operating Regulations, under the heading "Merchant Agreement Requirements" Rule 4.2.C.1.c. states, "The Acquirer must ensure that the Merchant complies with the applicable sections of the:** *Visa U.S.A. Inc. Operating Regulations* • **and** • *Visa International Operating Regulations.*[110]  **Section 4.2.D, entitled "Merchant Qualification Standards," states, "Prior to entering into a Merchant Agreement, an Acquirer must determine that the prospective Merchant is financially responsible and will abide by the** *Visa U.S.A. Inc. Operating Regulations* **and** *Visa International Operating Regulations,* **as well as applicable law."**[111]

---

[110]   Visa U.S.A. Inc. Operating Regulations, November 15, 2005, VUSAMDL00007206-8287 at VUSAMDL00007528. (SUFEX102)

[111]   Visa U.S.A. Inc. Operating Regulations, November 15, 2005, VUSAMDL00007206-8287 at VUSAMDL00007533. (SUFEX102)

*Defendants' Response to Paragraph 31e.i.A:*

Undisputed.

Defendants object to the admissibility of the cited rule because it relates to

conduct outside the scope of class plaintiffs' motion, and is irrelevant to any issue in support of

class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)

ii.   **Post-IPO Visa Inc.**

A.   **Under the heading "Merchant Agreement Requirements," the April 2010 edition of the Visa International Operating Regulations states, "An Acquirer must: . . . Include language in the Merchant Agreement that obligates its Merchant to . . . Comply with the** *Visa International Operating Regulations* **regarding use of the Visa-Owned Marks [and] Ensure that its Merchant complies with the** *Visa International Operating Regulations* **regarding payment acceptance . ."**[112]

83

---

[112]     Visa International Operating Regulations, April 1, 2010, at p. 393-94 "Merchant Agreement Requirements" (available at http://usa.visa.com/download/merchants/visa-international-operating-regulations-main.pdf) (last accessed October 20, 2010). (SUFEX005)

*Defendants' Response to Paragraph 31e.ii.A:*

     Disputed.  The document provided by class plaintiffs at SUFEX005 contains the

October 15, 2010 Visa International Operating Regulations, not the April 1, 2010 Visa

International Operating Regulations.

     Defendants object to the admissibility of the cited rule because it relates to

conduct outside the scope of class plaintiffs' motion, and is irrelevant to any issue in support of

class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)

     **f.     No minimum/maximum rule.  Until the enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act , Visa Operating Regulation 5.2F prohibited merchants from "[e]stablishing a minimum or maximum Transaction amount as a condition for honoring a Visa card."[113]**

---

[113]     Visa U.S.A. Inc. Operating Regulations (Nov. 15, 2005) Vol. 1 - General Rules at VUSAMDL00007637-38. These rules apply to all merchants who accept Visa cards. (SUFEX102) See Visa Op. Reg. (Nov. 15, 2005) Vol.1, 4.2.C titled "Merchant Agreement Requirements" and 4.2.D titled "Merchant Qualification Standards" at VUSAMDL00007528, 533 (SUFEX102); Visa International Operating Regulations, U.S. Region 5.2.F, April 1, 2010, at p. 448 "Merchant Agreement Requirements" (available at http://usa.visa.com/download/merchants/visa-international-operating-regulations-main.pdf) (last accessed October 20, 2010). ("A U.S. Merchant must not establish a minimum or maximum Transaction amount as a condition for honoring a Visa Card or Visa Electron Card.") (SUFEX005); Somerville 30(b)(6) Dep. 368:18-369:12. (SUFEX072)

*Defendants' Response to Paragraph 31f:*

     Disputed.  The document provided by class plaintiffs at SUFEX005 contains the

October 15, 2010 Visa International Operating Regulations, not the April 1, 2010 Visa

International Operating Regulations.

Defendants object to the admissibility of the cited rule because it relates to conduct outside the scope of class plaintiffs' motion, and is irrelevant to any issue in support of class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)

     **i.**      **Pre-IPO Visa U.S.A.**

          **A.**      **In the November 2005 edition of the Visa U.S.A. Operating Regulations, Rule 5.2.F, entitled "Prohibitions," states, "A merchant must not: . . . Establish a minimum or maximum Transaction amount as a condition for honoring a Visa Card or Visa Electron Card."[114]**

_____

[114]     **Visa U.S.A. Inc. Operating Regulations, November 15, 2005, VUSAMDL00007206-8287 at VUSAMDL00007637-38. (SUFEX102)**

_Defendants' Response to Paragraph 31f.i.A:_

     Undisputed.

     Defendants object to the admissibility of the cited rule because it relates to conduct outside the scope of class plaintiffs' motion, and is irrelevant to any issue in support of class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)

     **ii.**     **Post-IPO Visa Inc.**

          **A.**      **Under the heading "Minimum Maximum – U.S. Region 5.2.F," the April 2010 edition of the Visa International Operating Regulations states, "A U.S. Merchant must not establish a minimum or maximum Transaction amount as a condition for honoring a Visa Card or Visa Electron Card."[115]**

_____

[115]     **Visa International Operating Regulations, April 1, 2010, at p. 448 "Merchant Agreement Requirements" (available at http://usa.visa.com/download/merchants/visa-international-operating-regulations-main.pdf) (last accessed October 20, 2010). (SUFEX005)**

*Defendants' Response to Paragraph 31f.ii.A:*

Disputed.  The document provided by class plaintiffs at SUFEX005 contains the

October 15, 2010 Visa International Operating Regulations, not the April 1, 2010 Visa

International Operating Regulations.

Defendants object to the admissibility of the cited rule because it relates to

conduct outside the scope of class plaintiffs' motion, and is irrelevant to any issue in support of

class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)

**g.**     **No discrimination rule.  Until the enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Visa Rules prevented merchants from offering a discount to a customer who paid with another brand of Payment Card instead of a Visa.[116]  Visa interpreted this rule to prohibit merchants from providing a discount for a consumer who used an offline-debit card or a competing brand of credit card if that discount was not also available to a consumer who used a Visa credit card.[117]**

---

[116]     **Somerville 30(b)(6) Dep. 364:4-16. (SUFEX072)**

[117]     **Aafedt Dep. 46:24-48:13; 49:4-19, Jan. 29, 2008. (SUFEX103)**

*Defendants' Response to Paragraph 31g:*

Undisputed.

Defendants object to the admissibility of the cited rule because it relates to

conduct outside the scope of class plaintiffs' motion, and is irrelevant to any issue in support of

class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)

**i.**     **Pre-IPO Visa U.S.A.**

**A.**     **In the November 2005 edition of the Visa U.S.A. Operating Regulations, Rule 5.2.D.2, entitled "Discounts," states, "A Merchant may offer a discount as an inducement for a Cardholder to us a means of payment that the Merchant prefers, provided that the discount is: . . . • Non-discriminatory as between a Cardholder who pays with a Visa Card and a cardholder who pays with a 'comparable card.'"[118]**

[118]    Visa U.S.A. Inc. Operating Regulations, November 15, 2005, VUSAMDL00007206-8287 at VUSAMDL00007636. (SUFEX102)

*Defendants' Response to Paragraph 31g.i.A:*

Undisputed.

Defendants object to the admissibility of the cited rule because it relates to conduct outside the scope of class plaintiffs' motion, and is irrelevant to any issue in support of class plaintiffs' motion for summary judgment. (Fed. R. Evid. 401, 402.)

**ii.    Post-IPO Visa Inc.**

**A.    Under the heading "Discount Offer – U.S. Region 5.2.D.2," the April 2010 edition of the Visa International Operating Regulations states, "A U.S. Merchant may offer a discount as an inducement for a Cardholder to use a means of payment that the Merchant prefers, provided that the discount is: . . . ▪ Non-discriminatory, as between a Cardholder who pays with a Visa Card and a cardholder who pays with a 'comparable card."[119]**

[119]    Visa International Operating Regulations, April 1, 2010, at p. 445 "Merchant Agreement Requirements" (available at http://usa.visa.com/download/merchants/visa-international-operating-regulations-main.pdf) (last accessed October 20, 2010). (SUFEX005)

*Defendants' Response to Paragraph 31g.ii.A:*

Disputed.  The document provided by class plaintiffs at SUFEX005 contains the October 15, 2010 Visa International Operating Regulations, not the April 1, 2010 Visa International Operating Regulations.

Defendants object to the admissibility of the cited rule because it relates to conduct outside the scope of class plaintiffs' motion, and is irrelevant to any issue in support of class plaintiffs' motion for summary judgment. (Fed. R. Evid. 401, 402.)

    **h.**    **Visa rules prohibit an acquirer from signing up merchants located outside of the acquirer's "Country of Domicile" unless the acquirer first obtains approval from the Network.**[120]

---

[120]    Visa International Operating Regulations, October 15, 2010, at p. 363 "Acquirer's Jurisdiction" (available at http://usa.visa.com/download/merchants/visa-international-operating-regulations-main.pdf) (SUFEX005); *see also* Visa International Operating Regulations, May 15, 2008, at 4.1.C.1 "Restrictions on Cross-Border Merchant Contracting." (SUFEX077)

*Defendants' Response to Paragraph 31h:*

    Undisputed.

    Defendants object to the admissibility of the cited rule because it relates to conduct outside the scope of class plaintiffs' motion, and is irrelevant to any issue in support of class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)

    **i.**    **Visa rules prevent Issuers from issuing cards bearing multiple networks' marks marks and prevent merchants and acquirers from processing transactions outside of the VisaNet system.**[121]  **These rules were in force in substantially similar form before Visa's IPO.**[122]

---

[121]    Visa International Operating Regulations, October 15, 2010, at p. 126 "Merchant Agreement Requirements," and 599 "Clearing of Transactions Through VisaNet – U.S. Region" (available at http://usa.visa.com/download/merchants/visa-international-operating-regulations-main.pdf) ("The following must not appear on any part of a Visa or Visa Electron Card: • Any Trade Name or Mark that identifies or is associated with any entity, or its subsidiaries or affiliates, deemed competitive by Visa, including: - American Express Company - Discover Financial Services - MasterCard International (including Maestro)"). (SUFEX005)

[122]    Visa U.S.A. Inc. Operating Regulations, November 15, 2005, VUSAMDL00007206-8287 at VUSAMDL00007345, VUSAMDL00007702. (SUFEX102)

*Defendants' Response to Paragraph 31i:*

    Disputed.  The document provided by class plaintiffs at SUFEX005 contains the October 15, 2010 Visa International Operating Regulations, not the April 1, 2010 Visa International Operating Regulations.

    The October 2010 Rules allow for processing transactions outside of the VisaNet system, and under the heading "Clearing of Transactions through VisaNet - U.S. Region," they

state, "In the U.S. Region, all Transactions must be processed through VisaNet, except those processed by another means approved by Visa, as specified in 'Required Transaction Processing through VisaNet - U.S. Region.'" (Oct. 2010 Visa Rules, at 599.) The October 2010 Visa Rules further state, "A Member requesting to process Transactions by a means other than through VisaNet must complete a 'VisaNet Processing Exception Request' (available upon request) and submit it to Visa." (*Id.*) The November 2005 Rules also allow for processing transactions outside the VisaNet system. (2005 Visa Rules,[67] at VUSAMDL00046802 ("A Member requesting to process Transactions by a means other than through VisaNet must complete a VisaNet Processing Exception Request and submit it to Visa U.S.A.").)

Defendants object to the admissibility of the cited rule because it relates to conduct outside the scope of class plaintiffs' motion, and is irrelevant to any issue in support of class plaintiffs' motion for summary judgment. (Fed. R. Evid. 401, 402.)

.

---

[67]  Visa U.S.A. Inc. Operating Regulations (May 15, 2005) ("2005 Visa Rules"), bearing control numbers VUSAMDL00046334 to 00047401.

<u>Plaintiffs' Paragraph 32:</u>

32      The challenged rules of MasterCard[123]

---
[123]      Heuer Dep. 306:22-207:21 (testifying that before and after the IPO, MasterCard had a "no surcharge rule," an "honor all cards rule," a "no discrimination rule," and a "no minimum, no maximum rule"). (SUFEX104)

<u>*Defendants' Response to Paragraph 32:*</u>

Disputed.  The only MasterCard rule challenged by class plaintiffs is

MasterCard's default interchange rule (Class Plaintiff Brief at 1-2), which is not discussed in

subparagraphs a-j.

Defendants object to the admissibility of evidence cited in subparagraphs a-j

because it relates to conduct outside the scope of class plaintiffs' motion, and is irrelevant to any

issue in support of class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)

a.      **Honor-All-Cards Rule**

i.      **Pre-IPO MasterCard**

A.      **In the October 2005 edition of the MasterCard Rules, Rule 9.11.1, entitled "Honor All MasterCard Cards," states, "The merchant must honor all valid MasterCard cards without discrimination when properly presented for payment. The merchant must maintain a policy that does not discriminate among customers seeking to make purchases with a MasterCard card."[124]**

---
[124]      MasterCard International Bylaw and Rules, October 2005, MCI_MDL0200018358-718 at MCI_MDL02_00018588. (SUFEX105)

<u>*Defendants' Response to Paragraph  32a.i.A:*</u>

Undisputed.

Defendants object to the admissibility of the cited rule because it relates to

conduct outside the scope of class plaintiffs' motion, and is irrelevant to any issue in support of

class plaintiffs' motion for summary judgment. (Fed. R. Evid. 401, 402.)

      **ii.    Post-IPO MasterCard**

           **A.    In the May 2010 edition of the MasterCard Rules, Rule 5.11.2, entitled "Charges to Cardholders," states, "A Merchant must not directly or indirectly require any Cardholder to pay a surcharge or any part of any Merchant discount or any contemporaneous finance charge in connection with a Transaction. A merchant may provide a discount to its customers for cash payments. A Merchant is permitted to charge a fee (such as a bona fide commission, postage, expedited service or convenience fees, and the like) if the fee is imposed on all like transactions regardless of the form of payment used, or as the Corporation has expressly permitted in writing. For purposes of this Rule: 1. A surcharge is any fee charged in connection with a Transaction that is not charged if another payment method is used. 2 The Merchant discount fee is any fee a Merchant pays to an Acquirer so that the Acquirer will acquire the Transactions of the Merchant."[125]**

[125]    MasterCard Rules, May 12, 2010, at p. 114 (available at http://www.mastercard.com/us/merchant/pdf/BM-Entire_Manual_public.pdf) (last accessed October 20, 2010). (SUFEX079)

*Defendants' Response to Paragraph 32a.ii.A:*

      Disputed. The above language does not reflect MasterCard's Honor All Cards

Rule. The Honor All Cards Rule that appears in the 2010 MasterCard Rules states, "Merchants

that choose to accept Debit MasterCard Cards must honor all valid Debit MasterCard Cards

without discrimination when properly presented for payment" and "Merchants that choose to

accept Other Cards must honor all Other Cards without discrimination when properly presented

for payment." (2010 MasterCard Rules, Ch. 15a, § 5.8.1.)

Defendants object to the admissibility of the cited rule because it relates to conduct outside the scope of class plaintiffs' motion, and is irrelevant to any issue in support of class plaintiffs' motion for summary judgment. (Fed. R. Evid. 401, 402.)

**b.     Default Interchange Rule**

**i.     Pre-IPO MasterCard**

**A.     In the October 2005 edition of the MasterCard Rules, Rule 10.4, entitled "Interchange Fees, Cash Disbursement Accomodation Fees, and ATM Cash Disbursement Fees" states, "An interchange transaction between members results in the payment of the appropriate interchange fee, cash disbursement accomodation fee, or ATM cash disbursement fee, as applicable, as part of the net settlement process. These fees generally are designed to compensate a member for costs incurred as the result of the interchange of transactions. The Corporation periodically publishes a fee schedule."[126]**

---

[126]     MasterCard International Bylaw and Rules, October 2005, MCI_MDL0200018358-718 at MCI_MDL02_00018599. (SUFEX105)

*Defendants' Response to Paragraph  32b.i.A:*

Undisputed.

Defendants object to the admissibility of the cited rule because it relates to conduct outside the scope of class plaintiffs' motion, and is irrelevant to any issue in support of class plaintiffs' motion for summary judgment. (Fed. R. Evid. 401, 402.)

**ii.     Post-IPO MasterCard**

**A.     In the May 2010 edition of the MasterCard Rules, Section 9.4, entitled "Interchange and Service Fees" states, "A Transaction or cash disbursement cleared and settled between Members gives rise to the payment of the appropriate interchange fee or service fee, as applicable. The Corporation has the right to establish default interchange fees and default service fees . . . it being understood that all such fees set by the Corporation apply only if there is no applicable bilateral interchange fee or service fee agreement between two members in place."[127]**

---

[127]     MasterCard Rules, May 12, 2010, at p. 155 (available at http://www.mastercard.com/us/merchant/pdf/BM-Entire_Manual_public.pdf ) (last accessed October 20, 2010).  (SUFEX079)

*Defendants' Response to Paragraph  32b.ii.A:*

> Undisputed.

> Defendants object to the admissibility of the cited rule because it relates to

conduct outside the scope of class plaintiffs' motion, and is irrelevant to any issue in support of

class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)

**c.     No Surcharge Rule**

**i.     Pre-IPO MasterCard**

**A.     In the October 2005 edition of the MasterCard Rules, Rule 9.12.2, entitled "Charges to Cardholders" states, "A merchant must not directly or indirectly require any MasterCard cardholder to pay a surcharge or any part of any merchant discount or any contemporaneous finance charge in connection with a MasterCard card transaction."[128]**

---

[128]     MasterCard International Bylaw and Rules, October 2005, MCI_MDL02_00018358-718 at MCI_MDL02_00018588. (SUFEX105)

*Defendants' Response to Paragraph  32c.i.A:*

> Undisputed.

> Defendants object to the admissibility of the cited rule because it relates to

conduct outside the scope of class plaintiffs' motion, and is irrelevant to any issue in support of

class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)

**ii.     Post-IPO MasterCard**

**A.     In the May 2010 edition of the MasterCard Rules, Rule 5.11.2, entitled "Charges to Cardholders" states, "A merchant must not directly or indirectly require any MasterCard cardholder to pay a surcharge or any part of any merchant discount or**

> any contemporaneous finance charge in connection with a Transaction."[129]

---

[129]   MasterCard Rules, May 12, 2010, at p. 114 (available at http://www.mastercard.com/us/merchant/pdf/BM-Entire_Manual_public.pdf) (last accessed October 20, 2010). (SUFEX079)

*Defendants' Response to Paragraph 32c.ii.A:*

Undisputed.

Defendants object to the admissibility of the cited rule because it relates to conduct outside the scope of class plaintiffs' motion, and is irrelevant to any issue in support of class plaintiffs' motion for summary judgment. (Fed. R. Evid. 401, 402.)

   **d.    Rules require that a Member Bank be a party to every merchant agreement.**

   **i.    Pre-IPO MasterCard**

   **A.    In the October 2005 edition of the MasterCard Rules, Rule 9.1.1, entitled "The Merchant Agreement," states, "Each member must directly enter into a written merchant agreement with each merchant from which it acquires transactions. A member shall not submit into interchange any transaction arising in connection with any commercial entity that makes goods or services available to MasterCard cardholders for purchase with a MasterCard® card, unless the commercial entity has a valid merchant agreement with the member."[130]**

---

[130]   MasterCard International Bylaw and Rules, October 2005, MCI_MDL0200018358-718 at MCI_MDL02_00018580. (SUFEX105)

*Defendants' Response to Paragraph 32d.i.A:*

Undisputed.

Defendants object to the admissibility of the cited rule because it relates to conduct outside the scope of class plaintiffs' motion, and is irrelevant to any issue in support of class plaintiffs' motion for summary judgment. (Fed. R. Evid. 401, 402.)

94

ii.    **Post-IPO MasterCard**

A.    **In the May 2010 edition of the MasterCard Rules, Rule 5.1 states, "Each Member in its capacity as an Acquirer must directly enter into a written Merchant Agreement with each Merchant from which it acquires Transactions, whether such Transactions are submitted to the Member directly by the Merchant or through a Member Service Provider acting for or on behalf of such Member. An acquirer shall not submit into interchange any Transaction resulting from the acceptance of a card by an entity or person except pursuant to a Merchant Agreement then in effect between the Acquirer and the entity or person. The Merchant Agreement must reflect the Acquirer's primary responsibility for the Merchant relationship and must otherwise comply with the Standards."[131]**

---

[131]    MasterCard Rules, May 12, 2010, at p. 95 (available at http://www.mastercard.com/us/merchant/pdf/BM-Entire_Manual_public.pdf) (last accessed October 20, 2010). (SUFEX79)

*Defendants' Response to Paragraph 32d.ii.A:*

Undisputed.

Defendants object to the admissibility of the cited rule because it relates to conduct outside the scope of class plaintiffs' motion, and is irrelevant to any issue in support of class plaintiffs' motion for summary judgment. (Fed. R. Evid. 401, 402.)

e.    **Rules require that all card-acceptance agreements with merchants require the merchant to abide by Network Rules.**

i.    **Pre-IPO MasterCard**

A.    **In the October 2005 edition of the MasterCard Rules, Rule 9.8, entitled "Merchant Agreement," states, "Each merchant agreement must contain the substance of these Standards applicable to the nature and manner of the merchant's business. The agreement must reflect that the acquirer has primary responsibility for the merchant relationship and is responsible for ensuring the merchant's compliance with the Standards. The merchant's failure to comply with these provisions may result in a penalty to the member or other disciplinary action."[132]**

95

[132]     MasterCard International Bylaw and Rules, October 2005, MCI_MDL0200018358-718 at MCI_MDL02_00018588. (SUFEX105)

*Defendants' Response to Paragraph 32d.i.A:*

> Undisputed.

> Defendants object to the admissibility of the cited rule because it relates to conduct outside the scope of class plaintiffs' motion, and is irrelevant to any issue in support of class plaintiffs' motion for summary judgment. (Fed. R. Evid. 401, 402.)

> **ii.      Post-IPO MasterCard**

> > **A.      In the May 2010 edition of the MasterCard Rules, Rule 5.1.2 states, "Each Merchant Agreement must contain the substance of each of the Standards set forth in Rules 5.6 through 5.12 . . . ."[133]  Rule 5.2.2 states, "The Acquirer is responsible for ensuring that each of its Merchants complies with the Standards, and the Acquirer is itself responsible to the Corporation and to other Members for any Merchant's or Sub-merchant's failure to do so."[134]**

[133]     MasterCard Rules, May 12, 2010, at p. 95 (available at http://www.mastercard.com/us/merchant/pdf/BM-Entire_Manual_public.pdf ) (last accessed October 20, 2010). (SUFEX079)

[134]     MasterCard Rules, May 12, 2010, at p. 97 (available at http://www.mastercard.com/us/merchant/pdf/BM-Entire_Manual_public.pdf ) (last accessed October 20, 2010). (SUFEX079)

*Defendants' Response to Paragraph 32d.ii.A:*

> Undisputed.

> Defendants object to the admissibility of the cited rule because it relates to conduct outside the scope of class plaintiffs' motion, and is irrelevant to any issue in support of class plaintiffs' motion for summary judgment. (Fed. R. Evid. 401, 402.)

> **f.      No minimum/maximum rule.  Until the enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act, MasterCard Rules prevented**

> **merchants from placing minimum transaction amounts on purchases made with a MasterCard card.**[135]

_____

[135]     MasterCard Rule 5.11.1, May 12, 2010, at p. 114 (available at http://www.mastercard.com/us/merchant/pdf/BM-Entire_Manual_public.pdf) (last accessed October 20, 2010) (SUFEX079); Doyle 30(b)(6) Dep. 147:14-148:7. (SUFEX078)

_Defendants' Response to Paragraph 32f:_

Undisputed.

Defendants object to the admissibility of the cited rule because it relates to conduct outside the scope of class plaintiffs' motion, and is irrelevant to any issue in support of class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)

     **i.**     **Pre-IPO MasterCard**

           **A.**     **In the October 2005 edition of the MasterCard Rules, Rule 9.12.3, entitled "Minimum/Maximum Transaction Amount Prohibited" states, "A merchant must not require or post signs indicating that it requires, a minimum or maximum transaction amount to accept a valid MasterCard card."**[136]

_____

[136]     MasterCard International Bylaw and Rules, October 2005, MCI_MDL0200018358-718 at MCI_MDL02_00018590. (SUFEX105)

_Defendants' Response to Paragraph  32f.i.A:_

Undisputed.

Defendants object to the admissibility of the cited rule because it relates to conduct outside the scope of class plaintiffs' motion, and is irrelevant to any issue in support of class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)

     **ii.**     **Post-IPO MasterCard**

           **A.**     **In the May 2010 edition of the MasterCard Rules, Rule 5.11.3, entitled "Minimum/Maximum Transaction Amount Prohibited" states, "A Merchant must not require, or indicate that it requires, a minimum or maximum Transaction amount to accept a valid and properly presented Card."**[137]

[137]      MasterCard Rules, May 12, 2010, at p. 114 (available at http://www.mastercard.com/us/merchant/pdf/BM-Entire_Manual_public.pdf) (last accessed October 20, 2010). (SUFEX079)

*Defendants' Response to Paragraph 32f.ii.A:*

Undisputed.

Defendants object to the admissibility of the cited rule because it relates to conduct outside the scope of class plaintiffs' motion, and is irrelevant to any issue in support of class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)

g.      **No discrimination rule.  Until the enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act, MasterCard Rules prohibited merchants from offering a discount at the point of sale to a customer who paid with a Debit Card instead of a MasterCard Credit Card or with a PIN-Debit instead of Signature debit.**

*Defendants' Response to Paragraph 32g:*

Disputed.  Class plaintiffs mischaracterize the evidence on which they rely in subparagraphs i.A and ii.A.  "Merchants have always been able to provide – not always, but for a very long time – provide discounts for cash, and merchants have been allowed to encourage PIN usage. Merchants have been allowed to say we prefer a check. We prefer another brand. They are allowed to do that."  (Doyle Dep. at 71.)

Defendants object to the admissibility of the cited rule because it relates to conduct outside the scope of class plaintiffs' motion, and is irrelevant to any issue in support of class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)

i.      **Pre-IPO MasterCard**

A.      **In the October 2005 edition of the MasterCard Rules, Rule 9.12.1, entitled "Discrimination" states, "A merchant must not engage in any acceptance practice that discriminates against or discourages the use of MasterCard cards in favor of any other acceptance brand."[138]**

98

[138]     MasterCard International Bylaw and Rules, October 2005, MCI_MDL0200018358-718 at MCI_MDL02_00018589. (SUFEX105)

_Defendants' Response to Paragraph 32g.i.A:_

      Undisputed.

      Defendants object to the admissibility of the cited rule because it relates to conduct outside the scope of class plaintiffs' motion, and is irrelevant to any issue in support of class plaintiffs' motion for summary judgment. (Fed. R. Evid. 401, 402.)

      **ii.**    **Post-IPO MasterCard**

          **A.**    **In the May 2010 edition of the MasterCard Rules, Rule 5.11.1, entitled "Discrimination" states, "A Merchant must not engage in any acceptance practice that discriminates against or discourages the use of a Card in favor of any other acceptance brand."[139]**

[139]     MasterCard Rules, May 12, 2010, at p. 113 (available at http://www.mastercard.com/us/merchant/pdf/BM-Entire_Manual_public.pdf) (last accessed October 20, 2010). (SUFEX079)

_Defendants' Response to Paragraph 32g.ii.A:_

      Undisputed.

      Defendants object to the admissibility of the cited rule because it relates to conduct outside the scope of class plaintiffs' motion, and is irrelevant to any issue in support of class plaintiffs' motion for summary judgment. (Fed. R. Evid. 401, 402.)

          **B.**    **MasterCard's 30b(6) designee for Merchant Rules testified that MasterCard US Region Rule 11.5B.4[140] requires that if a discount is provided for another form of payment, the discount cannot be rung up a the point of sale, but rather must appear on the cardholder's statement.[141]**

[140]     MasterCard Rule 11.5B.4 states, "Subject to other Standards, a Card or Access Device may not access a discount or other benefit at the Point of Interaction (POI) unless such discount or other benefit may be accessed by any valid and properly presented Card. The following are the only discount practices

permitted in conjunction with a particular Card at the POI: 1. A discount or other benefit accessed after the Transaction has been completed (for example, a credit on the billing statement or a rebate); and 2. A discount or other benefit accessed at the time of or after the Transaction has been effected by a separate instrument and not by the Card (for example, a coupon or a voucher). The promotion at the POI of a discount or other benefit that may be accessed by any particular Card is prohibited." Doyle 30(b)(6) Dep. Ex. 23051 at MCI_MDL02_11822288-89. (SUFEX106)

[141]      Doyle 30(b)(6) Dep. 152:17-153:7. (SUFEX078)

*Defendants' Response to Paragraph 32g.ii.B:*

Disputed. Class plaintiffs' characterization of Ms. Doyle's testimony is incorrect.

When discussing discounts on other forms of payment, Ms. Doyle testified that "[a] merchant

can offer a discount on any other card pretty much any way they want." (Doyle Dep. at 153.)

When asked specifically whether a merchant could ring up a 10 percent discount on a Discover

card directly at the point of interaction, Ms. Doyle responded, "Yes." (*Id.* at 154.)

The testimony on which class plaintiffs rely relates only to how merchants can

provide discounts when a customer uses "a particular MasterCard-issued card" (*Id*. at 152), not

forms of payment other than MasterCard.

Defendants object to the admissibility of the cited rule because it relates to

conduct outside the scope of class plaintiffs' motion, and is irrelevant to any issue in support of

class plaintiffs' motion for summary judgment. (Fed. R. Evid. 401, 402.)

h.     **MasterCard Rule 5.11.1 prevents merchants from offering a discount at the point of sale to a customer who paid with another brand of Payment Card instead of a MasterCard: "A Merchant must not engage in any acceptance practice that discriminates against or discourages the use of a Card in favor of any other acceptance brand."[142]**

[142]      MasterCard Rules, May 12, 2010, at p. 113 (available at http://www.mastercard.com/us/merchant/pdf/BM-Entire_Manual_public.pdf) (last accessed October 20, 2010). (SUFEX079)

*Defendants' Response to Paragraph 32h:*

Undisputed.

Defendants object to the admissibility of the cited rule because it relates to conduct outside the scope of class plaintiffs' motion, and is irrelevant to any issue in support of class plaintiffs' motion for summary judgment. (Fed. R. Evid. 401, 402.)

  **i.**  **MasterCard Rule prohibits an acquirer from processing transactions submitted by merchants located outside of the acquirer's home region unless the acquirer first obtains approval from the Network.[143]**

_____

[143]  **MasterCard Rules, December 10, 2010, Rule 2.3.1 "Extending or Otherwise Modifying the Area of Use," at p. 2-3, and Rule 3.9, "Transaction Requirements," at p. 3-19 (available at http://www.mastercard.com/us/merchant/pdf/BM-Entire_Manual_public.pdf) (SUFEX079); _see also_ MasterCard Bylaws and Rules, April 2005, Rule 2.6 "Extension of Area of Use," at p. 2-5. (SUFEX107)**

_Defendants' Response to Paragraph 32i:_

  Undisputed.

  Defendants object to the admissibility of the cited rule because it relates to conduct outside the scope of class plaintiffs' motion, and is irrelevant to any issue in support of class plaintiffs' motion for summary judgment. (Fed. R. Evid. 401, 402.)

  **j.**  **MasterCard Rule 4.2.12 prevents Issuers from issuing cards bearing multiple Networks' marks.[144]**

_____

[144]  **MasterCard Rules, May 12, 2010, at p. 4-8-4-9 (available at http://www.mastercard.com/us/merchant/pdf/BM-Entire_Manual_public.pdf) ("Unless expressly permitted by the Corporation, none of the following marks or any similar or related mark, or any mark owned by or affiliated with one of these entities, may appear on a Card: 1. American Express 2. JCB 3. Diners Club 4. Discover 5. Visa 6. Any other name, logo, or mark identifying or in any way associated with a payment service that the Corporation deems to be competitive with any MasterCard product or Program. Any such competitor's credit or debit POI mark, logo, or name, regardless of whether registered, may not appear on a Card, nor may a payment application of any such competitor reside on the magnetic stripe or chip of a Card.") (SUFEX079)**

_Defendants' Response to Paragraph 32j:_

  Disputed. Evidence on which class plaintiffs rely does not support the facts asserted. The MasterCard rules expressly permit marks from other networks on cards with MasterCard marks. (2010 MasterCard Rules, Chap. 15b, § 4.2.6.6 (2) ("Issuers that display

regional debit brands on their Debit MasterCard Cards must place the MasterCard Brand Mark

on the back (in equal size and prominence with those regional debit brands) as well as on the

front of the Card.").)  Chase debit cards with MasterCard marks also have Star network marks.

(Miller Dep.[68] at 40-41; Huber Dep.[69] at 52-54.)

        Defendants object to the admissibility of the cited rule because it relates to

conduct outside the scope of class plaintiffs' motion, and is irrelevant to any issue in support of

class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)

---

[68]   Deposition of Stephanie Miller (Nov. 28, 2007) ("Miller Dep."). Ms. Miller testified as a senior financial analyst in the finance group. (Miller Dep. at 9.)

[69]   Deposition of Marsha Huber (Feb. 20, 2008) ("Huber Dep."). Ms. Huber testified as senior vice president of debit card operations at Chase. (Huber Dep. at 14.)

<u>Plaintiffs' Paragraph 33:</u>

**33      The bank-elected Boards of Directors of MasterCard designed the MasterCard Restructuring and IPO and voted to execute their restructuring plan.**[145]

---

[145]      Sheedy Dep. Ex. 34810 at TIB_MDL_044095 (SUFEX108). Atkins Rep. ("In addition, at the Board's direction, the NCGC conducted a detailed review and analysis of a number of possible courses of action that MasterCard could pursue.) (SUFEX109); see also id. at 12; Murphy Dep. Ex. 21865, at MCI_MDL04_00004996 (resolving that MasterCard in its then-current form would not be an acceptable alternative) (SUFEX110); Murphy Dep. Ex. 21910, at MCI_MDL04_00005207 (resolving to approve the option 5(f) term sheet) (SUFEX111); MCI_MDL02_11888072-87 at 73-78 (resolving to approve the redemption of old MasterCard stock in the IPO) (SUFEX112).  Murphy Dep. 507:3-509:4, 585:14-586:24, Feb, 29, 2008. (SUFEX022)

<u>*Defendants' Response to Paragraph 33:*</u>

Disputed.  Class plaintiffs mischaracterize the evidence on which they rely.

MCI_MDL02_11888072 to 11888087,[70] at 073-078 states that Global Board decided to proceed

with an IPO "based on and in reliance upon the information and reports presented to the Board,"

including the "opinion of Houlihan Lokey and the reports and presentations of management and

counsel for the Corporation," and other information "relevant to its determination."

(MCI_MDL02_11888072 to 11888087,[71] at 073-078.)

MasterCard's IPO was designed by management, not the MasterCard Board.  (*See*

*e.g.*, MCI_MDL04_00004990 to 00005155,[72] at 4996 (passing a resolution "that management is

authorized to work with the Nominating and Corporate Governance Committee towards the

development of a new governance and ownership structure"); T. Murphy Dep. at 131-33 (stating

that the management team prepared business model options); MCI_MDL02_11853734 to

---

[70]      Minutes of the Meeting of the Boards of Directors of MasterCard International Incorporated and of MasterCard Incorporated (Apr. 27, 2006).

[71]      Minutes of the Meeting of the Boards of Directors of MasterCard International Incorporated and of MasterCard Incorporated (Apr. 27, 2006).

[72]      Minutes of the Meeting of the Boards of Directors of MasterCard International Incorporated and of MasterCard Incorporated (Nov. 18, 2004).

11853762,[73] at 3746 (presentation by management suggesting "that the Board at this point in time give serious consideration to a new ownership/governance structure").)

Defendants object to the admissibility of Sheedy Dep. Ex. 34810. The deposition exhibit is titled Visa International Meeting of the Board of Directors, does not discuss the MasterCard restructuring, and is irrelevant in support of class plaintiffs' assertion regarding the MasterCard Restructuring and IPO. (Fed. R. Evid. 401, 402.)

     **a.**     **The European Commission found that "[t]he member banks were a driving force behind the new governance model and they approved the preceding and subsequent 'outsourcing' of interchange related decision making from boards of bank directors [ ] to an** ▮▮▮▮▮▮▮▮▮▮ **on the Global Board whose task it would be to manage interchange in a manner that is** ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."[146]**

---

[146]   Commission Decision (E.C.), at 109 ¶ 379, COMP/34.579 of 19 Dec. 2007 ("E.C. Decision"). (SUFEX081)

*Defendants' Response to Paragraph 33a:*

     Undisputed.

     Defendants object to the admissibility of the E.C. Decision. The E.C. Decision is unfairly prejudicial, and is an out of court statement for which no exception to the hearsay rule has been established. (Fed. R. Evid. 403, 801, 802.)

     **b.**     **On July 14, 2005, Board of Directors of MasterCard Incorporated and MasterCard International Incorporated – which was composed of representatives of Member Banks – voted to approve changes to MasterCard's structure and its 2006 Initial Public Offering.**[147]

---

[147]   Selander Dep Ex. 28441 at MCI_MDL04_00005207-5208. (SUFEX111)

---

[73]  MasterCard International, "Confronting a Business Model and Structure Under Global Assault . . . . .MasterCard's Review and Recommendations" (Oct. 26, 2004).

*Defendants' Response to Paragraph 33b:*

Disputed. The evidence which class plaintiffs proffer in Paragraph 33b does not support the characterization that member banks had representatives on the MasterCard International Board of Directors. Such a characterization is misleading and unfairly prejudicial. As discussed in Defendants' Response to Paragraph 13, each member of the MasterCard International Board owed a fiduciary duty to the corporation, and did not sit as a representative of any constituent, member, or shareholder of MasterCard International.

**c.** **MasterCard expert J.T. Atkins acknowledged that "At the July 2005 [MasterCard] Board meeting, the Directors approved Option 5F. The drafting of a registration statement was commenced and the IPO was announced publicly on August 31, 2005."[148]**

_____
[148]   **Atkins Report at p. 13 (citing Murphy 30(b)(6) Dep. Ex. 21910 at MCI_MDL04_00005207-208). (SUFEX111)**

*Defendants' Response to Paragraph 33c:*

Undisputed.

<u>Plaintiffs' Paragraph 34:</u>

**34      The MasterCard Restructuring was undertaken as a response to court rulings that decided it to be a "structural conspiracy."**

*Defendants' Response to Paragraph 34:*

Disputed.  MasterCard provided the explanation for its restructuring:

We believe that the new ownership and governance structure that we will achieve through the offering transactions will enhance our business over the long term in various ways.  In particular, we believe that perceived conflicts of interest in our business will be addressed by transitioning to a board of directors that includes a majority of directors who are independent of us and of our customers and through the broader diversity of our share ownership.  As a result, we believe we will be competitively advantaged compared with other four-party payment card systems as customers will view our new structure as a more stable base upon which to build, manage and grow their payments business.  We also believe the new structure will benefit our business by providing us with publicly traded equity that we may use as a tool to better align the incentives of our management with those of our stockholders and to attract, retain and motivate our employees and as currency with which to effect acquisitions, as well as by providing us with enhanced access to the public markets to raise capital.

(MasterCard Amendment No. 8 to S-1,[74] at MCI_MDL02_10411163; *see also id.* at

MCI_MDL02_10411228-29; T. Murphy Dep. at 53-58.)

Evidence establishes that the MasterCard Restructuring was undertaken to

"enhance [MasterCard's] business over the long term in various ways."  In particular, "things

like access to capital, things like having a – an acquisition currency that would be potentially

attractive to – to other parties . . . just generally speaking that becoming a public company would

continue to enhance our ability to execute our strategy, enhance our ability to commercialize the

company and its culture . . . and – and this really can't be underestimated, a more general view

that a public company status would help the company, you know, deliver value, you know, just

---

[74]   MasterCard Amendment No. 8 to Form S-1 Registration Statement (May 23, 2006) ("MasterCard Amendment No. 8 to S-1"), bearing control numbers MCI_MDL02_10411152 to 10411437.

be more effective in terms of executing against its strategy."  (Murphy 30(b)(6) Dep. at 54-55.)

Robert Selander explained that MasterCard's "first concern [regarding IPO considerations] was

ensuring that the company would be able to execute its strategy . . ."  (Selander Dep. at 359.)

> a.   **The European Commission concluded that a "clear driving force" behind MasterCard's IPO was to avoid "exposure to antitrust risks" finding that "[r]ather than modifying the business model to bring it in line with EU competition law, the banks chose to change the governance of their co-ordination specifically for antitrust sensitive decision making" and "[t]he member banks effectively *'outsourced'* this decision making to a new management body and made sure that their direct influence on the Global Board's directors would be limited to minority rights."[149]**

_____
[149]   **Commission Decision (E.C.), at 108 ¶ 378, COMP/34.579 of 19 Dec. 2007 ("E.C. Decision") (emphasis in original). (SUFEX081)**

*Defendants' Response to Paragraph 34a:*

> Undisputed.

> Defendants object to the admissibility of the E.C. Decision.  The E.C. Decision is

unfairly prejudicial, and is an out of court statement for which no exception to the hearsay rule

has been established.  (Fed. R. Evid. 403, 801, 802.)

> b.   

_____
[150]   **Schorr Ex. 21110, at CITIINT 002519050 (SUFEX113)**

*Defendants' Response to Paragraph 34b:*

      Disputed.  The document on which class plaintiffs rely was an exhibit to the deposition of Citigroup employee Christopher Robinson, not Gail Schorr.  Ms. Schorr was the court reporter.

      Defendants object to the admissibility of Robinson Dep. Ex. 21110, at CITIINT 002519050.  The deposition exhibit is an out of court statement for which no exception to the hearsay rule has been established.  (Fed. R. Evid. 801, 802.)  Mr. Robinson testified that he did not know who was the author of the document (Robinson Dep.[75] at 252-55, 258), and that he cannot recall hearing of ████████████████████████████████ (*Id.* at 258.)

> **c.**    **A MasterCard Global Update presentation assessing restructuring options stated:  "Status Quo:  Clearly fails the antitrust standard because MasterCard, as currently constituted, has already been judged a structural conspiracy."[151]**

---

[151]    **Murphy Ex. 21904, at -111. (SUFEX114)**

*Defendants' Response to Paragraph 34c:*

      Undisputed.

> **d.**    **Robert Selander made a presentation to MasterCard's regional Board of Directors in the summer of 2005 illustrating, among other things, MasterCard's concern regarding "U.S. Antitrust Certainty" in connection with the various restructuing options the Board was considering.[152]**

---

[75]    Deposition of Christopher Robinson (Jan. 30, 2008) ("Robinson Dep.").  Mr. Robinson testified as the chief financial officer of the CitiCards business in the U.S. and Canada.  (Robinson Dep. at 15.)



[152]    Tim Murphy Dep. Ex. 21904, at MCI_MDL02_10147110, Feb. 29, 2008.  (SUFEX114)

*Defendants' Response to Paragraph 34d:*

      Undisputed.

    e.    **"Q.  Was the primary reason [for MasterCard's IPO] ongoing litigation and regulatory investigation around the world?  A.  It was -- it was a primary reason, yes."[153]**

[153]    Lance Dep. 232:24-233:4 (SUFEX115)

*Defendants' Response to Paragraph 34e:*

      Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading.

(Fed. R. Evid. 106.)  The quoted language from Mr. Weaver's deposition is inconsistent with Mr.

Weaver's complete testimony.  Mr. Weaver clarified that "ongoing litigation and regulatory

investigation around the world" were "a" primary reason for MasterCard's IPO, not "the"

primary reason as he was originally asked.  (Weaver Dep. at 232-33.)  Mr. Weaver further

testified that "there were a variety of reasons" for the MasterCard IPO, "one of which was

pending litigation against the company, one of which was how to best grow the company going

forward, one of which was just the best way to execute the company's strategy going forward."

(*Id.* at 232.)

> **f.**  **Top-level MasterCard executives concluded that interchange was under a "serious threat in several key geographic markets" including the United States.**[154]

---
[154]   Heuer Ex. 27058 (SUFEX116); see also Selander Ex. 28413, at --51204 ("Legal risks in the US pose a significant threat to the overall business."), at --51206 ("legal and regulatory threats …"threaten the foundations of the traditional interchange system," making "the case for a new business model compelling"). (SUFEX117)

*Defendants' Response to Paragraph 34f:*

> Undisputed.

> **g.**  **MasterCard's consultant Boston Consulting Group concluded that legal liability from Interchange-related suits could be as high as** ▮▮▮▮▮▮.[155]

---
[155]   Selander Ex. 28418, at 3. (SUFEX118)

.

*Defendants' Response to Paragraph 34g:*

> Disputed.  Class plaintiffs mischaracterize the evidence on which they rely.  The

Boston Consulting Group document discusses threats to the value of the MasterCard system in

the United States, but does not conclude that the only potential threats are the result of

interchange-related lawsuits.  (Selander Ex. 28418, at 3.)

> Defendants dispute the admissibility of Selander Ex. 28418.  The conclusion of

Boston Consulting group is an out of court statement for which no exception to the hearsay rule

has been established.  (Fed. R. Evid. 801, 802.)

> **h.**  **Mr. Tim Murphy, President of MasterCard's U.S. Region, confirmed that the Nominating and Corporate Governance Committee was tasked with finding "a governance structure that addressed the perceived antitrust issues," and "achiev[ing]** *its primary goal, which was the -- the -- the risk*

*mitigation*, you know, and to the extent of the conflict, that the given so-called 90 percent test, that the former would prevail."[156]

---
[156]  Tim Murphy Dep. 277:24-278:18, Feb. 28, 2008 (emphasis added).  (SUFEX021)

*Defendants' Response to Paragraph 34h:*

> Undisputed.

i.  Mr. Murphy explained that the "so-called 90 percent standard,"  meant that "any structural change meriting serious consideration must afford MasterCard a high probability that an antitrust allegation would be dismissed without a trial on the merits."[157]

---
[157]  Tim Murphy Dep. 87:23-91:9 (SUFEX021), 357:13-358 (quoting Murphy, Tim Dep. Ex. 21867 at MCI_MDL04_00005437-38. (SUFEX119)

*Defendants' Response to Paragraph 34i:*

> Undisputed.

j.  Dato Tan Teong Hean, Global Board Director and member of the Nominating and Corporate Governance Committee, explained the new governance structure was being "devised chiefly to shield the business from further litigation and anti-competition pressures."[158]

---
[158]  Selander Dep. Ex. 28431, at MCI_MDL02_10133527. (SUFEX120)

*Defendants' Response to Paragraph 34j:*

> Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading.

(Fed. R. Evid. 106.)  In the proper context, the quoted language was used as a hypothetical to set

up a question from Dato Tan Teong Hean regarding what would happen if such a governance

structure were in place.  (Selander Dep. Ex. 28431, at MCI_MDL02_10133527.)

k.  Lance Weaver, Executive Vice President of Bank of America, and member of MasterCard's Nominating and Corporate Governance Committee, agreed that the "primary reason" MasterCard considered a new business model was to address the "then pending" litigation risks[159] and "any structural change meriting serious consideration must afford MasterCard a high probability

that an antitrust allegation would be dismissed without a trial on the merits."[160]

---

[159]   Weaver Dep. 231:15-233:04; 246:19-247:09, Sept. 17, 2008. (SUFEX115)

[160]   Lance Weaver Dep. 336:23-337:25, Sept. 17, 2008. (SUFEX115)

*Defendants' Response to Paragraph 34k:*

Disputed.  Class plaintiffs mischaracterize Mr. Weaver's testimony.  Mr. Weaver

only testified that he recalled hearing the above language, and was not asked whether he agreed

that was MasterCard's primary reason.  (Weaver Dep. at 231-33, 246-47.)

l.   **In a March 3, 2004 email titled "Credit card cases around the world" sent to a number of employees of competing banks as well as MasterCard personnel Chase's Richard Srednicki wrote that "After our Board discussion this is worth a read.  We need to follow up with a plan and options to reduce our risk," to which National City's Jon Gorney replied in March 21st email: "I agree with you.  It seems to me that we need to take a very serious look at the interchange process.  If we don't, I think someone else will."[161]**

---

[161]   CHASE002971509. (SUFEX121)

*Defendants' Response to Paragraph 34l:*

Disputed.  Mr. Srednicki's email was sent on March 8, 2004, not March 3, 2004.

Class plaintiffs' characterization of CHASE002971509 also is misleading and unfairly

prejudicial.  The email was sent to members of the U.S. Region Board of MasterCard

Incorporated.

m.   **The European Commission found that "[t]he banks agreed to the IPO and the ensuing changes in the organization's governance in order to perpetuate the [interchange fee] as part of the business model in a form which they perceived to be less exposed to antitrust scrutiny."[162]**

---

[162]   Commission Decision (E.C.), at 4 ¶ 3, COMP/34.579 of 19 Dec. 2007 ("E.C. Decision"). (SUFEX081)

112

*Defendants' Response to Paragraph 34m:*

Undisputed.

Defendants object to the admissibility of the E.C. Decision. The E.C. Decision is unfairly prejudicial, and is an out of court statement for which no exception to the hearsay rule has been established. (Fed. R. Evid. 403, 801, 802.)

<u>**Plaintiffs' Paragraph 35:**</u>

**35    The member banks of MasterCard that participated in MasterCard's restructuring understood that MasterCard would continue to operate in their best interest after its IPO.**

*Defendants' Response to Paragraph 35:*

        Disputed.  Evidence on which class plaintiffs rely in subparagraphs a-g does not support the facts asserted.  Defendants dispute the phrase "that participated in MasterCard's restructuring" to the extent it means anything other than member banks whose membership and/or stock options were affected by MasterCard's IPO.  Further, defendants dispute the phrase "continue to operate in their best interest" to the extent it means that prior to its IPO MasterCard operated in its member banks' best interest.  MasterCard's goal has been to increase output of its payment card products.  (Munson Dep.[76] at 76 ("The goal, of course, from MasterCard's point of view, being to establish a demand equilibrium, at which point the overall demand for the MasterCard service should be maximized, output maximized."); Heuer Dep.[77] at 50-54 (Mr. Heuer agreed that "MasterCard's strategy is to incent both the widespread issuance and acceptance of MasterCard cards" and that MasterCard takes into account competition, costs, and incentives made to issuers and merchants.); Selander Dep. at 83-84 ("Interchange is a balancing mechanism which MasterCard sets in many parts of the world and we do it in a way that is intended to maximize the number of merchants that accept MasterCard, the number of cardholders that carry MasterCard, to create as large a base of transactions as we can.").)  Finally, defendants dispute that MasterCard operated in its member banks' best interests following its

---

[76]   Deposition of Carl Munson, Jr. (Sept. 17, 2008) ("Munson Dep.").  Mr. Munson testified as group executive and associate general counsel of MasterCard.  (Munson Dep. at 18-19.)

[77]   Deposition of Alan J. Heuer (Oct. 16, 2008) ("Heuer Dep.").  Mr. Heuer testified as vice chairman of MasterCard.  (Heuer Dep. at 7.)

IPO.  Class plaintiffs have presented no evidence that MasterCard operated in its member banks

best interests following the IPO, rather than in the interests of its shareholders and customers.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████

      a.     **The European Commission found that "the member banks [of MasterCard] legitimately expected and therefore agreed that [the Global Board of Directors] would henceforth set [interchange fees] in a manner that is in their common interest."[163]**

---

[163]    Commission Decision (E.C.), ¶ 379, COMP/34.579 of 19 Dec. 2007 ("E.C. Decision"). (SUFEX081)

*Defendants' Response to Paragraph 35a:*

      Undisputed.      .

      Defendants object to the admissibility of the E.C. Decision.  The E.C. Decision is

unfairly prejudicial, and is an out of court statement for which no exception to the hearsay rule

has been established.  (Fed. R. Evid. 403, 801, 802.)

      b.     **A March 2005 Chase Payment Steering Committee presentation states: "A public company model could still meet issuer needs; currency to achieve this will shift from governance roles to the value of customer contracts." Next steps are to "convene a group of banks (JPMC, BofA, Wells, USB) and associated counsels to work with Visa to flesh out potential solutions and considerations.  Socialize possible options with JPMC senior management . . . present coordinated recommendation to Visa." This and other versions of this document in production were widely distributed inside Chase to numerous executives including Dimon, Webb, Mandelbaum, Campbell, Scharf, Miller, Hricik.[164]**

---

[164]    DiSimone Dep. Ex. 25550, at CHASE003802278-279, Mar. 24, 2005. (SUFEX122)  [Note: Use the marked first page from the dep for the stamp but the version from Encore for the rest of the pages for

compiling the SJ exhibit, because the marked copy as scanned in on CaseMap and Merrill is impossible to read]

*Defendants' Response to Paragraph 35b:*

Disputed.  Class plaintiffs do not offer any evidence in support of their assertion

that "[t]his and other versions of this document in production were widely distributed inside

Chase."

Defendants object to the admissibility of DiSimone Dep. Ex. 25550, at

CHASE003802278-279.  The deposition exhibit is an out of court statement for which no

exception to the hearsay rule has been established (Fed. R. Evid. 801, 802), and it does not

discuss MasterCard, and is therefore irrelevant to class plaintiffs' assertions regarding

MasterCard.  (Fed. R. Evid. 401, 402.)

c.   **Richard Fairbanks stated that he believes there will be "little-to-no change"
in Capital One's relationship with MasterCard as a result of the IPO.
Further, he believes that the "networks will maintain their issuer focus for
many years to come."[165]**

---

[165]    CO0003-00645342, at CO000-00645372. (SUFEX123)

*Defendants' Response to Paragraph 35c:*

Disputed.  The chairman, president, and chief executive officer of Capital One

Financial Corporation is named Richard Fairbank, not Fairbanks.

d.   **Bank of America's Lance Weaver maintained the expectation that after the
IPO, the new MasterCard would still act in the interests of its large bank
customers:**

**A:  Yeah, I – I guess my view of it was that the banks were going to
become important customers of this new public company, so this new
public company needed to be responsive to these large customers and that
it wasn't necessary for the customers to con -- have any further control of
the company other than being large customers of the company.**

116

> Q.  MasterCard had a new governance structure where the banks did not maintain any control would still be acting in the interest of the banks?
>
> A.  Of their big customers.
>
> THE WITNESS:  Yeah.
>
> Q.  And that was your expectation; correct?
>
> A.  That was my ex -- I would summarize that as my expectation, yes.[166]

---
[166]   Lance Weaver Dep. 350:15-352:15, Sept. 17, 2008 (objections of counsel omitted). (SUFEX115)

*Defendants' Response to Paragraph 35d:*

Undisputed.

e.   Citi's Steven Freiberg testified that "MasterCard had the same objective, pre and post [IPO]…And so what drove them prior, drove them basically post. So I would say consistency from the standpoint of what drives setting interchange rates which is to maintain a competitive marketplace was the constant."[167]

---
[167]   Steven Freiberg Dep. 165:1-170:22, Nov. 20, 2008. (SUFEX124)

*Defendants' Response to Paragraph 35e:*

Undisputed.

f.   MasterCard admitted in its Form S-1, filed with the SEC on May 23, 2006, its unchanged focus on its bank customers, writing: "We are, and will continue to be, significantly dependent on our relationships with our issuers and acquirers."[168]

---
[168]   McWilton Dep. Ex. 24626, at MCI_MDL02_10411177, May 23, 2006. (SUFEX125)

*Defendants' Response to Paragraph 35f:*

Disputed.  The cited document does not support the fact asserted as it does not discuss MasterCard's "focus."  (McWilton Dep. Ex. 24626, at MCI_MDL02_10411177.)

g.    **On July 6, 2006, following the MasterCard IPO, Fifth Third Bank acknowledged that certain "industry dynamics" were "issuer-centric."[169]**

---

[169]    **FT-00336375, at FT-00336390. (SUFEX126)**

*Defendants' Response to Paragraph 35g:*

Disputed.  Class plaintiffs mischaracterize the evidence on which they rely.  In the cited document, on the slide with the heading "Industry Dynamics" there is a bullet point that states "Processor/Network consolidation."  (FT-00336375 to 00336408,[78] at 390.)  Under this bullet point the there is a line that reads "BofA / NPC – MBNA Purchase – 'Issuer Centric.'" (*Id.*)  Thus, the presentation actually suggests that Bank of America's purchase of National Processing Company, an acquirer, and MBNA, an issuer, was an issuer-centric deal.  Evidence is also an out of court statement for which no exception to the hearsay rule has been established.

---

[78]    Fifth Third Bank Processing Solutions, "Collaborating for Value" (Jul. 6, 2006).

<u>Plaintiffs' Paragraph 36:</u>

**36     The Member Banks of MasterCard received assurances that MasterCard would continue to act in their best interests even after the IPO.[170]**

---

[170]     See Selander Dep. Ex. 28441, at MCI_MDL04_00005201-5202. (SUFEX111)

*Defendants' Response to Paragraph 36:*

> Disputed.  Evidence on which class plaintiffs rely in subparagraphs a-j does not support the facts asserted.  Defendants dispute the phrase "continue to operate in their best interest" to the extent it means that prior to its IPO MasterCard operated in its member banks' best interest prior to its IPO.  MasterCard's goal has been to increase output of its payment card products.  (Munson Dep. at 76; Heuer Dep. at 46-54; Selander Dep. at 83-84.)  Further, defendants dispute that member banks received assurances from MasterCard that it would operate in their best interests following the IPO.  ███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████

> Documents on which class plaintiffs rely demonstrates only that MasterCard assured its customers that they were important.

   a.     **The European Commission found that "[t]he banks were a driving force behind the IPO of MasterCard Incorporated.  They agreed to it as they knew that the new management on the Global Board would continue to act in their common interest."[171]**

---

[171]     Commission Decision (E.C.), at 35 ¶ 99, COMP/34.579 of 19 Dec. 2007 ("E.C. Decision"). (SUFEX081)

119

*Defendants' Response to Paragraph 36a:*

Undisputed.

Defendants object to the admissibility of the E.C. Decision.  The E.C. Decision is

unfairly prejudicial, and is an out of court statement for which no exception to the hearsay rule

has been established.  (Fed. R. Evid. 403, 801, 802.)

b.     **The European Commission also found that MasterCard's member banks "agreed to the IPO of MasterCard Incorporated after MasterCard's management assured them that the banks' interests will continue to be preserved under a new 'enhanced customer approach,' and via the local input of the banks in the decision making."[172]**

---

[172]     **EC Decision at ¶ 378. (SUFEX081)**

*Defendants' Response to Paragraph 36b:*

Undisputed.

Defendants object to the admissibility of the E.C. Decision.  The E.C. Decision is

unfairly prejudicial, and is an out of court statement for which no exception to the hearsay rule

has been established.  (Fed. R. Evid. 403, 801, 802.)

c.     **To allay European concerns about MasterCard competing with its issuing and acquiring member banks after the IPO, board minutes reflected that MasterCard management had "very strongly indicated its intent not to compete with its customers and efforts will be made to find effective ways for management to strongly communicate this intent."[173]**

---

[173]     **Murphy Dep. Ex. 21882, at MCI_MDL02_10212862. (SUFEX127)**

*Defendants' Response to Paragraph 36c:*

Disputed. The deposition exhibit cited by class plaintiffs does not contain

MasterCard board minutes, but rather is from a presentation to the MasterCard board of directors

containing recommendations by the Nominating and Corporate Governance Committee.  (T.

Murphy Dep. Ex. 21882.)  The portion of the exhibit on which class plaintiffs rely does not

discuss Europe or European concerns.  (*Id.* at MCI_MDL02_10212862.)

Evidence on which class plaintiffs rely is incomplete and misleading.  (Fed. R.

Evid. 106.)  The deposition exhibit reads in full, "The Committee recommends against any non-

compete requirement on the Corporation.  Instead, management has very strongly indicated its

intent not to compete with its customers and efforts will be made to find effective ways for

management to strongly communicate this intent."  (T. Murphy Dep. Ex. 21882, at

MCI_MDL02_10212862.)

Defendants object to the admissibility of T. Murphy Dep. Ex. 21882, at

MCI_MDL02_10212862.  The deposition exhibit discussing MasterCard's decisions regarding

its intent to compete with its customers is irrelevant to class plaintiffs' motion for summary

judgment.  (Fed. R. Evid. 401, 402.)

> **d.**   **An October 2004 MasterCard New Business Model/Governance Issues Update, which Selander and Heuer presented to a director, listed as the first item under "IPO Structuring Considerations," that "IPO structure should protect broad business interests of current members."[174]**

---

[174]   Selander Dep. Ex. 28423, at MCI_MDL02_11829756. (SUFEX128)

*Defendants' Response to Paragraph 36d:*

Disputed.  Class plaintiffs have provided no evidence that any draft of the

document, or the language in question, was presented to a director.

Defendants object to the admissibility of Selander Dep. Ex. 28423.  The

deposition exhibit still in draft form and the cover note contains the request, "Please make any

comments or changes" (Selander Dep. Ex. 28423, at MCI_MDL02_11829742), and is an out of

court statement for which no exception to the hearsay rule has been established.  (Fed. R. Evid.

801, 802.)

> e.   **In the course of devising a new governance structure, MasterCard's board emphasized "the significance of protecting the legitimate present and future interests and concerns of MasterCard's owners."[175]  MasterCard testimony confirms the same.[176]  MasterCard's 30(b)(6) designee for Corporate Reorganization, Timothy Murphy, testified that MasterCard's Board implemented a provision that no individual entity may own more than 15% of the outstanding Class A stock.[177]  Murphy testified that one reason for this provision was to avoid the possibility that** ███████████[178]

---

[175]   **Murphy Dep. Ex. 21865, at MCI_MDL04_00004996 (resolution of the Global Board of Directors). (SUFEX110)**

[176]   **Murphy Dep. 277:24-278:18. (SUFEX027)**

[177]   **Murphy 30(b)(6) Dep. 141:21-142:5, Feb. 28, 2008.  (SUFEX021)**

[178]   **Murphy 30(b)(6) Dep. 148:10-149:6, Feb. 28, 2008. (SUFEX021)**

_Defendants' Response to Paragraph 36e:_
.
>        Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading.

(Fed. R. Evid. 106.)  In Murphy Dep. Ex. 21865, at MCI_MDL04_00004996, the concern

regarding "the significance of protecting the legitimate present and future interests and concerns

of MasterCard's owners" was listed as one of three items to take into account.  (Murphy Dep. Ex.

21865, at MCI_MDL04_00004996.)  ███████████████████

███████████████████

███████████████████

███████████████

>        Class plaintiffs' characterization of Mr. Murphy's testimony on pages 148-49 of

his transcript is inconsistent with the actual testimony.  Mr. Murphy testified, "Wal-Mart could

buy 15 percent, Home Depot could buy 15 percent, Sears could buy 15 percent, who else, Best

Buy could buy 15 percent, and substantially all of the equity of the company could be owned by

the merchants." (T. Murphy Dep. at 148-49.)

     **f.**     **In an email dated March 1, 2005, Allan Silverman, head of Citi Cards UK,**
          **wrote to Citigroup colleague Faith Massingale,** ███████████████

███████████████████████

███████ **."**[179]

---

[179]    **Massingale Dep. Ex. 26272, at CITI INT 002518631-32. (SUFEX129)**

*Defendants' Response to Paragraph 36f:*

     Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading.

(Fed. R. Evid. 106.)  The sentence immediately following the one quoted by class plaintiffs

states, ████████████████████████████

██████████████████ " (Massingale Dep. Ex. 26272, at CITI INT

002518632)

     **g.**     **A July 2006 MasterCard Annual Meeting Q & A Master Document states:**
          **"How will the IPO change your relationship with your customers?  Being a**
          **publicly traded company gives us a more stable base on which to implement**
          **our customer-focused strategy and bring value to our customers' payments**
          **businesses. This will only enhance our already strong customer**
          **relationships."**[180]

---

[180]    **McWilton Dep. Ex. 24627, at MCI_MDL02_11589957, July 7, 2008 (emphasis added). (SUFEX130)**

*Defendants' Response to Paragraph 36g:*

     Undisputed.

     **h.**     **In response to the question, "So the—the goal was subject to that concern,**
          **to—to protect the business interests of the MasterCard Member Banks in**
          **pursuing the restructuring; correct?," MasterCard's Rule 30(b)(6) witness**
          **on corporate restructuring testified, "That is correct.  To give—to give**
          **recognition to and to protect the legitimate commercial interests of the banks**
          **in the restructuring as people who were—as institutions that were selling**

stock in an—in an enterprise that they had co-invested in as a joint venture over three decades."[181]

_____
[181]   Murphy Dep. 278:25-299:13. (SUFEX021)

*Defendants' Response to Paragraph 36h:*

     Undisputed.

    i.    **MasterCard Board minutes of March 2, 2005 report the following regarding the discussion on MasterCard's potential restructuring: "[Mr. Tan] pointed out that, even without control, banks would remain the company's customers and thus drive the business."[182]**

_____
[182]   Weaver Dep. Ex. 21875, at MCI_MDL04_00000344, Mar. 2, 2005. (SUFEX131)

*Defendants' Response to Paragraph 36i:*

     Undisputed.

    j.    **A MasterCard Annual Meeting Q&A document posed the following question and answer:**

        **"Will the new governance structure change the way interchange rates are set?  No. MasterCard, not its board, will continue to determine interchange rates based on the cost incurred by issuers, competitive pressures from other payment methods (i.e., the market forces making the acceptance of cards attractive to merchants), the need to provide incentives to member banks and merchants to increase the efficiency of the system, and other market considerations."[183]**

_____
[183]   McWilton Dep. Ex. 24627, at MCI_MDL02 11589956, July 7, 2006. (SUFEX130)

*Defendants' Response to Paragraph 36j:*

     Undisputed.

Plaintiffs' Paragraph 37:

**37     The bank-elected Boards of Directors of Visa designed the Visa Restructuring and IPO and voted to execute their restructuring plan.**

*Defendants' Response to Paragraph 37:*

Disputed.  Prior to the IPO, the Visa U.S.A. board consisted of  some directors who were appointed, some directors who were elected by member banks based on voting rights allocated per the Visa bylaws, and some directors who were officers of Visa.  (2005 Visa U.S.A. By-Laws, at VUSAMDL00046317-18.)  Prior to the IPO, the Visa International board consisted of some directors who were appointed, some directors who were elected by member banks based on voting rights allocated by country and per the Visa bylaws, some directors who were officers of Visa, and, if the board so voted, a strategic director appointed by the board.  (2004 Visa International By-Laws, at VI-IC-00328359-61.)  The Visa restructuring and IPO were the result of work performed by Visa management that was overseen by a subcommittee of Visa International directors.  (Partridge Dep. at 39-42.)  Management was tasked with designing a global solution for the restructuring plan.  (*See id.*)  As the Visa Boards did not design the restructuring plan, the Boards did not vote on "their" restructuring plan.

a.     **In January 2005, the president of the Visa International Board of Directors, Christopher Rodrigues wrote a memorandum to Bill Campbell and Peter Hawkins entitled "Project George next steps."[184]  The document states, "Context after the VI Board meeting . . . the Regions now understand that: Old Visa's days are numbered. No one can stay as they are . . . ."[185] Rodrigues also wrote, "Subject to necessary permissions being granted for an interim state (or a rapid acceptable resolution of the end state) VUSA will indemnify the rest of the world for any retrospective liability."[186]**

---

[184]     Partridge Dep. Ex. 32804, at VI-IC-02710990. (SUFEX132)

[185]     *Id.* (SUFEX132)

[186]     *Id.* at VI-IC-02710991 (SUFEX132).

*Defendants' Response to Paragraph 37a:*

      Disputed.  Christopher Rodrigues was president and chief executive officer of

Visa International.  (Visa Form S-4,[79] at 274.)

      Defendants object to the admissibility of the evidence on which class plaintiffs

rely in Paragraph 37a.  The evidence is irrelevant to class plaintiffs' assertion that the bank-

elected Boards of Directors of Visa designed the Visa Restructuring and IPO and voted to

execute their restructuring plan.  (Fed. R. Evid. 401, 402.)

      **b.**    **Minutes from the Visa International Board of Directors meeting on May 8-9, 2006 show that two separate  projects examined the IPO question and independently arrived at the same conclusion – that Visa should pursue an IPO strategy that involved a "global float with regionality."[187]  The US region promised to accept retrospective liability for "the current US litigation" if the other Visa regions agreed to this option.[188]**

---

[187]    **Sheedy Dep. Ex. 34810, at TIB_MDL_044089-90. (SUFEX108)**

[188]    ***Id.* at TIB_MDL_044091. (SUFEX108)**

*Defendants' Response to Paragraph 37b:*

      Undisputed.

      Defendants object to the admissibility of Sheedy Dep. Ex. 34810, at

TIB_MDL_044089-90.  The document is irrelevant to class plaintiffs' assertion that the bank-

elected Boards of Directors of Visa designed the Visa Restructuring and IPO and voted to

execute their restructuring plan.  (Fed. R. Evid. 401, 402.)

      **c.**    **A May 15, 2006 memorandum from Visa Asia Pacific president and Visa International board member Rupert Keeley to the Visa Asia Pacific Board of Directors reflected that the Visa International Board was considering restructuring the company and conducting an initial public offering.[189]**

---

[79]    Visa Inc. Form S-4 Registration Statement (filed Jun. 22, 2007) ("Visa Form S-4"), available at http://www.sec.gov/Archives/edgar/data/1403161/000119312507140569/ds4.htm (last visited Apr. 13, 2011) .

[189]       Partridge Dep. Ex. 32859, at VI-IC-02757995. (SUFEX133)


*Defendants' Response to Paragraph 37c:*

Undisputed.

Defendants object to the admissibility of Partridge Dep. Ex. 32859, at VI-IC-02757995.  The document is irrelevant to class plaintiffs' assertion that the bank-elected Boards of Directors of Visa designed the Visa Restructuring and IPO and voted to execute their restructuring plan.  (Fed. R. Evid. 401, 402.)

   d.    **On October 9, 2006, the heads of Visa's regional boards of directors executed a Memorandum of Understanding to change Visa's corporate structure.[190]**


[190]       VUSAMDL00209450-519, at VUSAMDL00209482-97. (SUFEX134)


*Defendants' Response to Paragraph 37d:*

Undisputed.

   e.    **The Visa U.S.A. Board of Directors meeting minutes for August 23, 2007 reflected that the board approved the global restructuring.[191]**


[191]       VUSAMDL00178121-53, at VUSAMDL00178125. (SUFEX135)


*Defendants' Response to Paragraph 37e:*

Undisputed.

   f.    **The current president of Visa's U.S. region, Bill Sheedy testified that there was "very strong and active engagement across the Board" from Visa member bank directors supervising the Visa restructuring process.[192]**


[192]       Sheedy Dep. Ex. 34810, at TIB_MDL_044095. (SUFEX108)

_Defendants' Response to Paragraph 37f:_

Disputed.  None of the evidence class plaintiffs proffer in Paragraph 37f supports the characterization that members of the Visa U.S.A. Board were "bank directors."  Such a characterization is misleading and unfairly prejudicial.  As discussed in Defendants' Response to Paragraph 7, each member of the Visa U.S.A. Board owed a fiduciary duty to the corporation, and did not sit as a representative of any constituent, member, or shareholder of Visa U.S.A.

Class plaintiffs have not provided any evidence regarding Mr. Sheedy's testimony.

<u>Plaintiffs' Paragraph 38:</u>

**38      Visa testimony and internal documents confirm that Visa designed its Restructuring in response to court rulings that it was a conspiracy among competing banks.**

*Defendants' Response to Paragraph 38:*

Disputed.  Evidence establishes that the Visa Restructuring was undertaken to "enable Visa Inc. to compete more effectively and better serve our customers;" "streamline decision making, facilitate business growth and enhance Visa Inc.'s ability to coordinate business on a global basis, while preserving [Visa's] existing competitive advantages, such as strong local market relationships, expertise and execution;" "enable Visa Inc. to facilitate a common, global approach, where appropriate, to the legal, regulatory and competitive issues arising in today's marketplace, while also presenting an opportunity to increase operational efficiency;" and, "facilitate an initial public offering of shares in Visa Inc."  (Visa Form S-4, at iii.)

   a.   **A December 2005 presentation also states "Legal antitrust risk is primarily a USA issue, with uniquely large financial implications"[193] and observes that "Visa USA must reduce Member liability to protect the US business; while dealing with the Visa International and other Visa regions' liability exposure."[194]  The document concludes that "The USA anti-trust risk mitigation is optimized via a ownership model that puts Member financial institutions in a minority position."[195]**

---

[193]      *Id.* at VI-IC-02617144. (SUFEX136)

[194]      *Id.* at VI-IC-02617155. (SUFEX136)

[195]      *Id.* at VI-IC-02617156. (SUFEX136)

*Defendants' Response to Paragraph 38a:*

Undisputed.

   b.   **Before it restructured, Visa concluded that it faced liability in the ███████ ████████████████ from interchange-related lawsuits.[196]**

[196]     **Partridge Dep. Ex. 32815. (SUFEX137)**

*Defendants' Response to Paragraph 38b:*

        Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading.

(Fed. R. Evid. 106.)  Partridge Dep. Ex. 32815 was sent to Visa by Burson-Marsteller, not

created by Visa.  When asked about the document at his deposition, Mr. Partridge testified:

> "Q.   Would it be fair to infer from this document that someone in connection
> with Project George had made an estimation of the risk as a result of the
> interchange lawsuits in the United States?
>
> A.   I don't have any idea where this number came from.  Q.   Do you have any
> reason to believe that it's not accurate?
>
> MR. VIZAS:  Object.  Calls for speculation.
>
> THE WITNESS:  Without understanding where it came from, I can't -- I mean,
> this is a draft from somebody from Burson-Marsteller to somebody in charge of
> Visa International communications.  I don't know what this was -- who directed
> them to do this, what this was going to be used for, whether it ever got used for
> anything.  I don't know.  I mean, it's -- it's an e-mail, which I don't have the
> context for."

(Partridge Dep. at 173-74.)

        Defendants object to the admissibility of Partridge Dep. Ex. 32815.  This

document is an out of court statement for which no exception to the hearsay rule has been

established.  (Fed. R. Evid. 801, 802.)

        **c.**    **Visa's Bill Sheedy agreed that potential antitrust liability was a reason for the
restructuring: "I recall it was a factor at the time, among business people,
that it was a problem that we were being sued frequently, and that the
structure of the company appeared to be bringing about some of those
suits."[197]**

[197]     **Sheedy Dep. 89:9-24. (SUFEX083)**

130

*Defendants' Response to Paragraph 38c:*

Disputed.  Defendants object to class plaintiffs' characterization of Mr. Sheedy's testimony, which speaks for itself.

**d.    A March 2005 presentation recognized that "Key factors precipitating legal and regulatory challenges" is "Visa's joint venture structure generates a higher level of scrutiny on matters such as interchange."[198]  This presentation also observes that "Legal and regulatory challenges to interchange are spreading globally."[199]**

---

[198]    Sheedy Ex. 34831, at VI-IC-02736628. (SUFEX138)

[199]    *Id.* at VI-IC-02736629. (SUFEX138)

*Defendants' Response to Paragraph 38d:*

Undisputed.

Defendants object to the admissibility of Sheedy Ex. 34831.  This document is an out of court statement for which no exception to the hearsay rule has been established.  (Fed. R. Evid. 801, 802.)  It is a draft presentation, as can be inferred from the cover email which states "[w]e would welcome your comments on the presentation."  (Sheedy Dep. Ex. 34831, at VI-IC-02736620.)  When asked about the draft presentation at his deposition, Mr. Sheedy testified the he "can't recall which slides [he] used" from the draft presentation.  (Sheedy Dep.[80] at 616.)

**e.    Visa's CEO testified that Visa restructured because the association model was "simply untenable for the future" in light of antitrust decisions against the network and its banks.[200]**

---

[200]    Saunders Dep. 156:19-158:2. (SUFEX085)

*Defendants' Response to Paragraph 38e:*

---

[80]    Deposition of William Sheedy (Nov. 20-21, 2008) ("Sheedy Dep.").  Mr. Sheedy testified as the president of Visa North America.  (Sheedy Dep. at 8.)

Disputed.  Class plaintiffs mischaracterize the evidence on which they rely.  Mr. Saunders did not testify as to whether the association model was untenable in light of antitrust decisions.  (Saunders Dep. 156-58)

Evidence on which class plaintiffs rely is incomplete and misleading.  (Fed. R. Evid. 106.)  When Mr. Saunders was asked whether "continuing in an open association model that it had done was simply untenable for the future?," Mr. Saunders responded, "Yeah, for any one of a number reasons."  (Saunders Dep. at 157-58.)

      **f.**     **According to Mr. Partridge, the Visa Check settlement prompted Visa U.S.A. to decide "to take a look at their governance and structure" in April 2004.[201] He agreed that attempting to reduce antitrust risk made restructuring an urgent matter.[202]**

[201]    **Partridge Dep. 68:3-15. (SUFEX139)**

[202]    **Partridge Dep. 92:13-21. (SUFEX139)**

*Defendants' Response to Paragraph 38f:*

Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading. (Fed. R. Evid. 106.)  Mr. Partridge testified as follows: "Q.  And was the reason for the Visa U.S.A. board feeling some urgent need to do this quickly the continuing antitrust exposure that they were faced with?  A.  Again, you know, I think that it – the issue around the antitrust – I mean, you know, they clearly wanted to come up with, you know, a solution for them that would reduce that risk.  And so they did have a sense of urgency, yes."  (Partridge Dep. at 92.)

      **g.**     **An internal memo reflected that "litigation was a key factor in our bringing on independent directors to the board (just as MC did) and turning over the interchange setting function to them. It was also a primary reason for looking at a publicly traded model similar to MC's efforts."[203]**

[203]    **Schultz Ex. 24808, at -931. (SUFEX140)**

*Defendants' Response to Paragraph 38g:*

> Disputed.  The document on which class plaintiffs rely is an email, not a "memo."

(Schultz Ex. 24808.)

**h.    In a document dated December 19, 2005, Visa International estimated that "[b]y 2006, it is estimated the U.S. risk as a result of interchange lawsuits could be as high as ████████"[204]**

---

[204]    Partridge Dep. Ex. 32815, at VI-IC-02619729. (SUFEX137)

*Defendants' Response to Paragraph 38h:*

> Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading.

(Fed. R. Evid. 106.)  Partridge Dep. Ex. 32815 was sent to Visa by Burson-Marsteller, not created by Visa.  When asked about the document at his deposition, Mr. Partridge testified:

> "Q.  Would it be fair to infer from this document that someone in connection with Project George had made an estimation of the risk as a result of the interchange lawsuits in the United States?
>
> A.   I don't have any idea where this number came from.  Q.   Do you have any reason to believe that it's not accurate?
>
> MR. VIZAS:  Object.  Calls for speculation.
>
> THE WITNESS:  Without understanding where it came from, I can't – I mean, this is a draft from somebody from Burson-Marsteller to somebody in charge of Visa International communications.  I don't know what this was – who directed them to do this, what this was going to be used for, whether it ever got used for anything.  I don't know.  I mean, it's – it's an e-mail, which I don't have the context for."

(Partridge Dep. at 173-74.)

> Defendants object to the admissibility of Partridge Dep. Ex. 32815.  This document is an out of court statement for which no exception to the hearsay rule has been established.  (Fed. R. Evid. 801, 802.)

133

    **i.**    **Visa's ex-CEO, John Philip Coghlan, also confirmed that one of Visa's reasons for restructuring was that "the issue of Visa being a magnet for or a target for litigation in part as a result of its current form."[205]**

---

[205]    **Coghlan Dep. 171:11-172:1. (SUFEX141)**

*Defendants' Response to Paragraph 38i:*

    Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading. (Fed. R. Evid. 106.)  When asked about reasons for Visa's reorganization, Mr. Coghlan testified that "[t]here were a number of concerns and considerations; very important among them was Visa's competitiveness with respect to MasterCard, which was moving into a new direction and American Express, both within the United States, and then also issues about competitiveness globally.  And then there was also the issue of Visa being a magnet for or a target for litigation in part as a result of its current form."  (Coghlan Dep.[81] at 171.)

    .

---

[81]    Deposition of John Philip Coghlan (Dec. 16, 2008) ("Coghlan Dep.").  Mr. Coghlan is the former chief executive officer of Visa U.S.A. (Coghlan Dep. at 22-23.)

<u>Plaintiffs' Paragraph 39:</u>

**39     Visa's member banks understood that Visa would continue to operate in the their best interests after its IPO.**

*Defendants' Response to Paragraph 39:*

Disputed.  Evidence on which class plaintiffs rely in subparagraphs a-d does not support the facts asserted.  Further, defendants dispute the phrase "continue to operate in their best interests" to the extent it means that prior to its IPO Visa operated in its member banks' best interests.  (Sheedy Dep. at 168 ("The clients of Visa U.S.A. were issuing financial institutions, acquiring financial institutions, and through the acquiring financial institutions, certainly merchants. . . .  [T]he Board of Visa U.S.A. looked out for the interest of Visa, and as it relates to the participation of financial institutions and merchants in the payment system, I think they were looking out for the interests of all parties in order to optimize Visa."); Saunders Dep. at 274 (testifying prior to the IPO, Visa was "concerned about all its clients").)  Finally, defendants dispute that Visa operated in its member banks' best interests following its IPO.

Class plaintiffs have presented no evidence that Visa operated in its member banks' best interests following the IPO, rather than in the interests of its shareholders and customers.  (*See* Sheedy 30(b)(6) Dep. at 309-10 ("In my role responsible for strategy, corporate development, interchange fees for Visa globally, I answer to the shareholders that own this company"); Saunders Dep. at 274-75 (testifying that after the IPO Visa became "a publicly traded company that has clients, and we're concerned about our clients" including "merchants to some extent, and acquirers that are not banks").)

     a.     A 2006 ▮▮▮ presentation titled Associations Board Decision explains that although "by leaving the Visa regional boards, ▮▮▮ may no longer have a voice in strategic discussions and decisions affecting our business . . . [and] will also lose the "advance notice" advantage on any Visa changes, along with pieces of information gleaned from side conversations regarding

our competitors [sic] strategies or derived from the very questions or concerns that are being Raised," this risk is mitigated since "Because of its size, █████ accounts for over 10% of Visa's volume in the region, [therefore] it is expected that Visa will not take any decisions that would impact ██████ business negatively. Currently there is a very close relationship between the Visa regional and ██████ regional teams, and if this is further strengthened, the impact on Visa information flow will be mitigated. ██████████ will anyway need to work with the Visa regional teams to define alternative ways and channels to ways to keep the information flow."[206]

[206] ██████████ Dep. Ex. 26269, at ████████ 002518678 , July 19, 2006 (emphasis added). (SUFEX142)

*Defendants' Response to Paragraph 39a:*

Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading. (Fed. R. Evid. 106.)  ██████████ Dep. Ex. 26269, at █████ 002518678 does not discuss the Visa IPO, but rather ██████ decision to not have an employee sit on the Visa regional boards. (██████ Dep. Ex. 26269, at ████████ 002518677.)  The document is not an official pronouncement from ███; instead, it is a document entitled "Association discussion paper" from an individual named ██████████, whom the plaintiffs do not identify. (*Id.* at ██████ 002518673.)  Moreover, the statement "[b]ecause of its size, ██████ accounts for over 10% of Visa's volume in the region, [therefore] it is expected that Visa will not take any decisions that would impact ██████ business negatively" on its face relates to the "region" of Asia. (*Id.* at ██████ ████ 002518678.)

b. ██████ states that it maintains the expectation that the IPO would not lessen its relationship with and influence on Visa: "The change in governance is significant as it will affect primarily the large multi-regional institutions like ██████████ which as consolidation trends continue will account for the majority of the volume in the future: by 2010 Visa expect that 60% of its volume will come from multiregional members. So it is reasonable to expect that Visa will work to ensure that its large members who are no longer represented on the regional boards are not put at a competitive disadvantage and continue to receive the same level of support from Visa."[207]

136



[207] ▮▮▮▮ **Dep. Ex. 26269, at** ▮▮▮▮ 002518680 , July 19, 2006. (SUFEX142)

*Defendants' Response to Paragraph 39b:*

> Disputed. Evidence on which class plaintiffs rely is incomplete and misleading. (Fed. R. Evid. 106.) ▮▮▮▮ Dep. Ex. 26269, at ▮▮▮▮ 002518678 does not discuss the Visa IPO, but rather ▮▮▮▮ decision to not have an employee sit on the Visa regional boards. (▮▮▮▮ Dep. Ex. 26269, at ▮▮▮▮ 002518677.) The "change in governance," as used in the quotation relied on by class plaintiffs, does not relate to the Visa IPO, but the makeup of the Visa regional boards. The document is not an official pronouncement from ▮▮; instead, it is a document entitled "Association discussion paper" from an individual named ▮▮▮▮ whom the plaintiffs do not identify. (*Id.* at ▮▮▮▮ 002518673.)

**c. Visa's John Partridge testified:**

> **Q. Well, when you use the term "competitive structure" with respect to Visa, are you saying competitive only for the Visa entity or also successful issuing bank businesses as well?**
>
> **A: I think that they are interested in Visa being successful and competitive. They also are interested in making sure that the business of electronic payments that were – in which they participate would continue to be a viable business and a successful business. So to the extent that they participate in that, they are interested, yes.**
>
> **Q. Right. So take Chase, for example. Chase had an interest in the restructuring discussion because with a large Visa issuing business, it wanted Visa, the entity, to succeed, but it also wanted Chase's Visa business card business to succeed as well?**
>
> **A. Yes.**
>
> **Q. Correct?**
>
> **A. Right.**
>
> **Q. So Chase and other banks that were on the board of Visa U.S.A. looked at restructuring proposals with those goals in mind; correct?**

A.  Well, the banks -- the banks certainly did when they had to vote on the restructuring, absolutely they had to look at that, yes.[208]

---

[208]  Partridge Dep. 186:3-187:7, Sept. 4, 2008. (SUFEX139)

*Defendants' Response to Paragraph 39c:*

Undisputed.

d.  The minutes from the Visa International Asia Pacific Board of Directors meeting on April 18, 2006, state that under the "Global Float" option (which was similar to the finally adopted restructuring plan) "The new corporation will be a profit-seeking entity, with a need to maximize shareholder value while serving its chosen customers better than its competition. This means it will behave differently from today's association. Over time, it can be expected to restructure and reorganize to reduce costs, change its mix of businesses and ensure commercial pricing for all customers. In the long term, we would expect the company to take these actions, *although clearly its interests will not be served by alienating its customers.*"[209]  The minutes also state, "In addition, *constraints may be imposed on the actions of the new company to give comfort to members.* For example, for a transitional period, the company might not be permitted to: • Allow itself to be taken over • Sell its major assets • Merge with another company • Exit its core payments business • Remove the upper limit on ownership by a single entity . . . . These constraints may 'sunset' after a period of time or if bank ownership falls below a specified percentage."[210]

---

[209]  Partridge 30(b)(6) Dep. Ex. 32846, at VI-IC-02792351-52 (emphasis added). (SUFEX143)

[210]  Partridge 30(b)(6) Dep. Ex. 32846, at VI-IC-02792352 (emphasis added). (SUFEX143)

*Defendants' Response to Paragraph 39d:*

Disputed.  Visa ultimately adopted the global float with regionality option.

(Partridge Dep. at 305-06.)  Under the global float with regionality option, Visa became a for-profit global company, floated on a stock exchange with the public owning a majority of the global company and banks owning a minority share. (Partridge Dep. Ex. 32846,[82] at VI-IC-

---

[82]  Visa International Asia Pacific Board of Directors' Meeting (Apr. 18, 2006), bearing control numbers VI-IC-2792289 to 02792579.

2792357.)  In some regions, the company has operating companies that are majority or wholly-owned by the public company while in other regions there are regional licensees that are majority-owned by local banks and minority-owned by the public company.  (*Id.*)  Under the global float option, Visa would have become a single, for-profit global company, floated on a stock exchange, and majority-owned by the public without regional licensees.  (*Id.* at 350.)

<u>Plaintiffs' Paragraph 40:</u>

**40     Visa's Member Banks received assurances that Visa would continue to operate in their best interests even after the IPO.**

*Defendants' Response to Paragraph 40:*

Disputed.  Evidence on which class plaintiffs rely in subparagraphs a-d does not support the facts asserted.  Defendants dispute the phrase "continue to operate in their best interest" to the extent it means that Visa operated in its member banks' best interest prior to its IPO.  (*See, e.g.,* Sheedy Dep. at 168; Saunders Dep. at 274-75.)  Defendants dispute that member banks received assurances from Visa that it would operate in their best interests following the IPO.  Documents on which class plaintiffs rely suggest that Visa assured its customers that they were important, but such communications are not assurances to Member Banks that Visa would act in their best interests after the IPO.

      a.     **A May 12, 2005, Chase internal email among senior executives summarized a conversation with Visa personnel regarding Visa's consideration of implementing independent directors. The email reflected that Visa's member-bank directors preferred certain corporate reorganization options "because it will take a full vote of the membership (12-14M banks) to change anything about how Visa operates- so Visa believes it will always remain bank/issuer centric."[211]**

---

[211]     **Webb Dep. Ex. 27628, at CHASE001479508. (SUFEX144)**

*Defendants' Response to Paragraph 40a:*

Undisputed.

Defendants note that, as class plaintiffs acknowledge, the May 12, 2005 email on which they rely relates to Visa's consideration of adding additional directors not associated with a member bank to the Visa board, not to the Visa IPO. (*See also* Webb Dep.[83] at 190-91.)

      **b.**    **Visa's 30(b)(6) witness on Reorganization, John Partridge, testified that the member banks on the board of Visa U.S.A. "understood that, as a customer, you have certain control over any company that you do business with if you're a customer."[212] Partridge also testified that the banks were concerned about whether they would continue to have successful card issuing businesses after the restructuring.[213] Partridge confirmed that "the banks certainly did [have this goal in mind] when they had to vote on the restructuring."[214] Partridge also testified that Visa Board implemented a provision stating that no single entity would be permitted to own more than 15% of the stock of Visa Inc. without Board approval.[215] Partridge testified that the Visa Inc. Board could use the ownership limitation to prevent another network from acquiring a 15% interest in Visa.[216]**

---

[212]    **Partridge 30(b)(6) Dep. 185:5-7. (SUFEX139)**

[213]    **Partridge 30(b)(6) Dep. 186:18-24. (SUFEX139)**

[214]    **Partridge 30(b)(6) Dep. 187:2-7. (SUFEX139)**

[215]    **Partridge 30(b)(6) Dep. 339:8 – 342:16, Sep. 5, 2008.**

[216]    **Partridge 30(b)(6) Dep. 341:21-342:4, Sep. 5, 2008.**

*Defendants' Response to Paragraph 40b:*

      Disputed. None of the evidence class plaintiffs proffer in Paragraph 40b supports the characterization that member banks were on the Visa U.S.A. Board. Such a characterization is misleading and unfairly prejudicial. As discussed in Defendants' Response to Paragraph 7, each member of the Visa U.S.A. Board owed a fiduciary duty to the corporation, and did not sit as a representative of any constituent, member, or shareholder of Visa U.S.A. (*See* Defendants' Response to Paragraph 7.)

---

83    Deposition of Susan Webb (Oct. 27, 2008) ("Webb Dep."). Ms. Webb testified as an executive vice president in treasury services for Chase. (Webb Dep. at 9.)

Evidence on which class plaintiffs rely is incomplete and misleading.  (Fed. R. Evid. 106.)  Mr. Partridge testified that the 15% stock ownership limitation "[t]urned out to be comfort to new investors and not for the comfort of the members."  (Partridge Dep. at 340.)

      c.      **A July 28, 2006 Visa presentation at the USA Board of Directors Meeting included a slide stating that "Visa USA is the surviving entity in the merger, and Visa USA members continue to be bound by the Visa USA charter, bylaws, Op Regs and all contractual obligations."[217]**

---

[217]    **FNBO-0924613, at FNBO-0924618 (July 28, 2006 Visa presentation at the USA Board of Directors Meeting included a slide stating that "Visa USA is the surviving entity in the merger, and Visa USA members continues to be bound by the Visa USA charter, bylaws, Op Regs and all contractual obligations." (SUFEX145)**

*Defendants' Response to Paragraph 40c:*

      Undisputed.

      Defendants note that Visa U.S.A. was not the surviving entity after the IPO and there no longer exist Visa U.S.A. operating regulations or bylaws.

      d.      **Visa's notice to its non-voting members of the changes to be made to its governance structure, including the appointment of independent directors, advised that "the changes we're making will not disrupt Visa's ongoing operations or change the nature of our relationship."[218]**

---

[218]    **WFINT0000029683-85, at WFINT0000029683. (SUFEX146)**

*Defendants' Response to Paragraph 40d:*

      Undisputed.

<u>Plaintiffs' Paragraph 41:</u>

**41      Until May 2006, the levels of Default Interchange Fees for Visa U.S.A. were established by a vote of its Board of Directors.**[219]

---

[219]      VUSAMDL1-03177861-72, at VUSAMDL1-03177871 (Visa U.S.A. Board materials from May 2000 meeting, stating, "The current interchange reimbursement fee structure was extended at the October 1999 Visa U.S.A. Board of Directors meeting. The rates, unchanged from April 1999, remain in effect through March 2001.") (SUFEX147); VUSAMDL1-03177861-72; VUSAMDL1-08090164-173, at VUSAMDL1-08090166 (Visa U.S.A. Board materials and Minutes from May 2000 meeting, approving consumer credit and corporate interchange rate adjustments effective April 2001) (SUFEX148); VUSAMDL2-00033712-18, at VUSAMDL2-00033715 (SUFEX149); VUSAMDL1-03850083-89, at VUSAMDL2-03850087 (Visa U.S.A. Board materials and Minutes from June 2001 meeting approving online debit interchange rate adjustments effective October 2001) (SUFEX150); VUSAMDL2-00002353-538, at VUSAMDL2-00002357 (Visa U.S.A. Board Minutes from October 2001 meeting, delaying scheduled online debit interchange rate increase until March 1, 2002) (SUFEX151); VUSAMDL2-00002158-352, at VUSAMDL2-00002165-66 (Visa U.S.A. Board Minutes from February 2002 meeting, approving online debit interchange rate increase effective March 2002) (SUFEX152); VUSAMDL1-08118456-648, at VUSAMDL1-08118458 (Visa U.S.A. Board Minutes from May 2002 meeting, approving consumer credit and corporate interchange rate adjustments effective October 1, 2002) (SUFEX153); VUSAMDL2-00032832-35, at VUSAMDL2-00032833 (Visa U.S.A. Board Minutes from January 2003 meeting, approving consumer credit, corporate, and offline debit interchange rate adjustments effective April 2003) (SUFEX154); VUSAMDL1-08706643-51, at VUSAMDL1-08706648 (Visa U.S.A. Board Minutes from June 2003 meeting, approving consumer credit, corporate, and offline debit interchange rate adjustments effective October 2003) (SUFEX155); TIB_MDL_037929-8002, at TIB_MDL_037933 (Visa U.S.A. Board Minutes from October 2003 meeting, approving online and offline debit interchange rate adjustments effective January 31, 2004) (SUFEX156); VUSAMDL1-08118443-55, at VUSAMDL1-08118448; VUSAMDL1-08118452 (Visa U.S.A. Board Minutes from February 2004 meeting, approving consumer credit and corporate interchange rate adjustments effective April 1, 2004, and granting management authority to "modify IRF in reaction to a second MC IRF increase for April 2004") (SUFEX157); VUSAMDL1-08117097-101, at VUSAMDL1-08117100 (SUFEX158); Lauritzen Dep. Ex. 00005, at VUSAMDL1-06210211 (Visa U.S.A. Board materials and Minutes from April 2004 meeting, approving consumer credit interchange rate adjustments effective October 2004) (SUFEX159); VUSAMDL1-08118314-58, at VUSAMDL1-08118321 (Visa U.S.A. Board Minutes from October 2004 meeting, approving online and offline debit interchange rate adjustments effective April 2005) (SUFEX160); VUSAMDL1-08118372-414, at VUSAMDL1-08118376 (Visa U.S.A. Board Minutes from July 2004 meeting, approving consumer credit interchange rate adjustments effective April 2005) (SUFEX161); VUSAMDL1-08090308-14, at VUSAMDL1-08090310 (SUFEX162); VUSAMDL1-08090287-307, at VUSAMDL1-08090296 (Visa U.S.A. Board materials and Minutes from October 2005 meeting, approving offline debit and commercial card interchange rate adjustments effective April 2006) (SUFEX163); Sheedy Amex Dep. 22:7-19, 49:11-50:13, 50:21-52:l8, May 2, 2007 (SUFEX164); Charles Doyle, Texas First Banks and Texas Independent Bancshares, Chairman of the Board, Dep. 60:14-19, Nov. 29, 2006. (SUFEX165) See, e.g., VUSAMDLl-00407267-7268 (Board of Directors Meeting Executive Summary, May 2002) (SUFEX166); VUSAMDL1-03744136 (Visa Business Review, June 2002) (SUFEX167); VUSAMDLI-05171216 (Email from B. Sheedy to Visa U.S.A. Employees announcing Board approval of rate increases effective Apr. 2003) (SUFEX168); VUSAMDLI-05194890-4896 (Visa Business Review, Oct. 2003) (SUFEX169); Steele Dep. 38:16-39:10. (SUFEX041)

<u>*Defendants' Response to Paragraph 41:*</u>

Disputed.  Before April 2006, Visa management made recommendations on

default interchange rates, and Visa's Board of Directors approved any changes to the default

interchange rates. (Sheedy Decl.[84] ¶ 12.) In April 2006, Visa established a Board committee with four directors not associated with a member bank who were solely responsible for approving Visa's default interchange rates. (Id.; Independent Directors Committee Charter at VUSAMDL1-07065341; see also Second Suppl. Compl. ¶ 96; 2006 Visa U.S.A. Cert. of Incorp. at VUSAMDL00053022.) After April 2006, Visa Board of Director members who were also employed by financial institutions no longer were involved in the setting of default interchange rates and did not approve changes to default interchange rates. (Sheedy Decl. ¶ 12; Sheedy 30(b)(6) Dep. at 570-71; see also Partridge Dep. at 70-71; Scharf Dep. at 117; Campbell Dep. at 389-91.) Since March 2008, following Visa's IPO, senior Visa executives have had final authority for setting default interchange rates. (Sheedy Decl. ¶ 12; Floum Dep. 55; Saunders Dep. 170; VUSALITIIICID-2-00750666-667[85], at 666; VUSALITIIICID2-00750662-665[86], at 664.)

Defendants dispute class plaintiffs' definition of "Interchange Fee" as "a fee that Merchants pay to the Issuing Bank" because it is inaccurate, misleading, and unfairly prejudicial. An interchange fee is compensation paid by the acquiring bank to the issuing bank via Visa or MasterCard for the transaction passing through interchange. (See Paragraphs 64 & 69.) Class plaintiffs have presented no evidence that merchants pay any fees to issuing banks.

    a.    **Pat Phillips, former Bank of America President of Card Services, and former Chairman of Visa USA's Board of Directors, confirmed that "at all times from 1990 through 2005, interchange fees could not be changed without a vote to that effect by the Visa Board."[220]**

---

[84]    Declaration of William M. Sheedy (May 3, 2011) ("Sheedy Decl.").

[85]    Memorandum from B. Sheedy to Visa Inc. Regional Presidents (Jan. 17, 2008).

[86]    "Changes to Visa Inc. Interchange Decision-Making Process."

[220]   **Phillips Dep. 224:15-22. (SUFEX170)**

*Defendants' Response to Paragraph 41a:*

   Disputed.  Class plaintiffs mischaracterize the deposition testimony on which they rely.  When asked if it would be "fair to say then that at all times from 1990 through 2005, interchange fees could not be changed without a vote to that effect by the Visa board," Mr. Phillips testified, "I don't know of any way that it could have been."  (Phillips Dep. at 224.)

.

<u>Plaintiffs' Paragraph 42:</u>

**42      The Visa International Board of Directors established uniform schedules of default Interchange Fees for transactions in which a Visa-branded Payment Card issued outside of the United States was used at a merchant location in the United States.**[221]

---

[221]      Sheedy Dep. 325:25-327:16. (In response to the question, "How would the interchange fee be determined where a Canadian citizen makes a purchase with a Royal Bank of Canada Visa credit card issued in Canada at a merchant located in the United States," Visa's Bill Sheedy testified, "In that instance they may be different. The Canadian card used at a point of sale location in the United States acquired by a U.S. acquirer would – that transaction from an acquiring perspective would incur U.S. domestic interchange rates, and from an issuing perspective when we settle – when Visa settles that transaction with the Canadian issuer, it will be settled at international interchange rates, which is a different rate structure cross-border.") (SUFEX171)

*Defendants' Response to Paragraph 42:*

Disputed.  Visa International senior management would create a proposal, for the Visa International board to approve, that would set interchange rates between countries.  (Howe Dep.[87] at 38.)   After the IPO, interchange rates that were set by Visa International were set by a management group in Visa.  (Reid Dep.[88] at 182-83.)

Defendants dispute class plaintiffs' definition of "Interchange Fee" as "a fee that Merchants pay to the Issuing Bank" because it is inaccurate, misleading, and unfairly prejudicial. An interchange fee is compensation paid by the acquiring bank to the issuing bank via Visa or MasterCard for the transaction passing through interchange.  (*See* Paragraphs 64 & 69.)  Class plaintiffs have presented no evidence that merchants pay any fees to issuing banks.

---

[87]   Deposition of Gaylon Howe (Jul. 27 2006) ("Howe Dep.").  Mr. Howe testified as Visa International's 30(b)(6) designee (Howe Dep. at 1, 5-6.)

[88]   Deposition of Margaret Reid (Feb. 22, 2008) ("Reid Dep.")  Ms. Reid testified as head of cross product policy and acceptance for Visa.  (Reid Dep. at 28-29.)

<u>Plaintiffs' Paragraph 43:</u>

**43     From May 2006 to March 18, 2008, four non-bank-representative directors of Visa U.S.A. established Default Interchange Fees for transactions conducted on the Visa Network, pursuant to the Board's decision to outsource this decision making to "independent" directors.[222]**

---

[222]     Partridge Dep. 90:15-91:17, Sept. 4, 2008 (SUFEX139); VUSAMDL1-07065341-43, at VUSAMDL1-07065342 (SUFEX172); *Id.* at 55:10-56:9. (SUFEX139)

<u>*Defendants' Response to Paragraph 43:*</u>

Disputed.  None of the evidence class plaintiffs proffer in Paragraph 43 supports the characterization that member banks of Visa U.S.A. had representatives on the Visa U.S.A. board.  Such a characterization is misleading and unfairly prejudicial.  As discussed in Defendants' Response to Paragraph 7, each member of the Visa U.S.A. Board owed a fiduciary duty to the corporation, and did not sit as a representative of any constituent, member, or shareholder of Visa U.S.A.  (*See* Defendants' Response to Paragraph 7.)

Defendants dispute class plaintiffs' definition of "Interchange Fee" as "a fee that Merchants pay to the Issuing Bank" because it is inaccurate, misleading, and unfairly prejudicial.  An interchange fee is compensation paid by the acquiring bank to the issuing bank via Visa or MasterCard for the transaction passing through interchange.  (*See* Paragraphs 64 & 69.)  Class plaintiffs have presented no evidence that merchants pay any fees to issuing banks.

Defendants dispute class plaintiffs' use of the word "outsource" to describe the process by which directors not associated with a member bank were chosen in order to approve default interchange rates.

As defined in Visa's Certificate of Incorporation in place at the time, a non-bank affiliated director must be:

[A] member of the Board of Directors of the corporation that (A) the voting members of the Board of Directors have determined is "independent" at the time such member was nominated for election or was appointed to the Board of Directors by the voting members of the Board of Directors and (B) the voting members of the Board Directors have not subsequently determined to no longer be independent; provided however, that a person shall not be an "Independent Director" if such person (1) is then, or has been during the previous five years, employed by, (2) is entitled to retirement benefits . . . (3) is then, or has been during the previous five years, a member of the board of directors (or similar governing body) of, or (4) otherwise has a "material financial interest in": (a) the corporation, (b) Visa International Service Association, a Delaware corporation, (c) any direct or indirect member of the corporation or Visa International Service Association, (d) any other entity that operates any of the Visa regions, or (e) any entity that is designated by the Board of Directors of the corporation as a competitor of the corporation.

(2006 Visa U.S.A. Cert. of Incorp., at VUSAMDL00052972.)

148

## Plaintiffs' Paragraph 44:

**44      Historically, Visa claimed that its interchange fees were cost based premised on a methodology devised by Arthur Andersen.**[223]

---
[223]      Visa U.S.A. & Anderson Consulting, Visa U.S.A. Inc. Interchange Reimbursement Fee Theory and Methodology 12 (Mar. 1989) (SUFEX173); VUSAMDL100057150-7450, at VUSAMDL100057174 (SUFEX174); Sheedy Dep. Ex. 0306930 (*Visa Check*). (SUFEX175)

*Defendants' Response to Paragraph 44:*

Disputed.  The term "historically" is vague as it does not provide a definite timeframe.  At many points prior to this litigation Visa interchange fee rates were based on factors other than cost.

The documents on which class plaintiffs rely demonstrate that beginning in the 1980s interchange fees ceased to be solely cost-based.  For example, in Sheedy Dep. Ex. 0306930 [sic] (*Visa Check*), on which class plaintiffs rely, under the heading "CURRENT METHODOLOGY (1981 updated)," the document states that "[i]n some markets, members may be entitled to derive profits on the total resources used to provide for the payment system.  A RoR or profit margin may be calculated and added to the cost of reimbursement."  (Sheedy Dep. Ex. 3 (*Visa Check*), at 0306929.)  The document further states under the heading "CURRENT METHODOLOGY OBSERVATIONS" that "a principle was established that interchange should be used to influence the industry by inducing members to make investments and changes in processing procedures which would help the system accomplish specific long-range business goals.  Rates could deviate from a pure cost-base."  (*Id.* at 0306930.)

Similarly, in the Visa U.S.A. Inc. Interchange Reimbursement Fee Theory and Methodology document relied on by class plaintiffs, Arthur Andersen recommended that "a 'rate of return' or profit margin be added to the cost of reimbursement" because "[t]he current practice of reimbursing members for only their costs is neither competitively desirable nor reasonable."

149

(Visa U.S.A. & Anderson Consulting, Visa U.S.A. Inc. Interchange Reimbursement Fee Theory and Methodology (Mar. 1989), at 3.)  Arthur Andersen also recommended in 1989 that "for competitive reasons there may be times when it is necessary to adopt rates based on factors other than cost." (*Id.* at 4.)

Sheedy 30(b)(6) Dep. at 65-70 (explaining that costs associated with acquirer and issuer functions are "part of the analysis" Visa "would have done around" the 1980s as well as the analysis "done today as Visa considered interchange reimbursement fees.")

150

<u>Plaintiffs' Paragraph 45:</u>

**45      However, Visa's Interchange Fees are not related to the costs of providing network acceptance services.[224]**

---

[224]      *See, e.g.,* Bamberger Decl. ¶¶ 55, 59 (showing that "Visa and MasterCard base their interchange fees on merchants' varying elasticity of demand, or sensitivity to price increases.") (SUFEX176); Richard Morrissey, Visa Vice President of Interchange, Dep. 101:1-10, 148:18150: 13, Jan. 30, 2008 (agreeing that "Visa's goal was to try to align its interchange fees to the merchant price elasticity of demand for categories of merchants.") (SUFEX177); Tolan Steele, Visa Senior Vice President of Interchange, Dep. 314:1-320:23, Apr. 3, 2008 (stating that Visa "will look at overall economics and transactional economics on the margin as a function of understanding how Visa transactions compare both in their costs and their revenue to issuers and acquirers relative to competitive networks.") (SUFEX178); Steven Jonas, MasterCard Vice President of Interchange, Dep. 62:5-65:13, Apr. 23, 2008 (agreeing that "there are some cases benchmarks out there that [MasterCard] may be able to turn to [determine] . . . at about [the] level, merchants should have a willingness to accept MasterCard cards.") (SUFEX179); Richard Morrissey, Visa Vice President of Interchange, Dep. Ex. 30507 at VUSAMDLI-05576121 (March 12, 2004 email from Richard Morrissey to Robert Towne, "re: Determine Elasticity_ver04.ppt," containing presentation stating Visa's objectives to "[d]evelop an economic model and process by which Visa's interchange fee structure is evaluated in the context of merchant price elasticity, with the objective of optimizing Member interchange fee revenue.") (SUFEX180); Commission Decision (E.C.) COMP/34.579 of 19 Dec. 2007 ("E.C. Decision") ¶¶ 172-75 (finding that "the cost study therefore does not serve to identify and measure specific issuing costs which are then allocated to acquirers. It is merely a tool for estimating the willingness of merchants to pay."). (SUFEX081) Nicholas Baxter Dep. Ex. 32001 at FNBO 0853837 ("Interchange rates have been rising faster than inflation over the last few years while the other costs for banks that collect that fee have been coming down.") (SUFEX181)

<u>*Defendants' Response to Paragraph 45:*</u>

Disputed.  Tolan Steele's deposition testimony (SUFEX178) which class

plaintiffs cite explicitly states that Visa takes costs into consideration as one of the factors when

setting interchange rates.  Every default interchange fee that Visa sets or has set is:

> determined by the need to maintain the viability of the Visa payment system in response to competitive pressures in the marketplace – including competition from other payment card networks, such as the MasterCard, American Express, Discover, Star, and NYCE networks, as well as numerous other non-card options, including cash, checks, and electronic fund transfers.

> To do this, Visa considers – and has considered – costs incurred by participants in the Visa system.  Such costs affect the ability of participants in the Visa system to choose profitably Visa branded payment cards over competing choices.  As a result, Visa seeks, to the extent feasible, to understand those costs and take them into account when setting default interchange rates.  However, the decision whether a particular default interchange rate is appropriate has always turned on whether that rate will improve the competitive position of the Visa payment system -- not simply whether it will adequately reimburse a particular participant in the system for a particular set of costs.

(Visa U.S.A. Interr. Resp.,[89] at 1-3; *see also* Sheedy 30(b)(6) Dep. at 65-70 (explaining that costs associated with acquirer and issuer functions are "part of the analysis" Visa "would have done around" the 1980s as well as the analysis "done today as Visa considered interchange reimbursement fees."); Jorgensen Dep.[90] at 120-21 (testifying that compensating issuers for the costs of issuing the cards "is one of the dynamics" of interchange).)

Defendants dispute class plaintiffs' definition of "Interchange Fee" as "a fee that Merchants pay to the Issuing Bank" because it is inaccurate, misleading, and unfairly prejudicial. An interchange fee is compensation paid by the acquiring bank to the issuing bank via Visa or MasterCard for the transaction passing through interchange. (*See* Paragraphs 64 & 69.) Class plaintiffs have presented no evidence that merchants pay any fees to issuing banks.

At his deposition, Richard Morrissey did not agree that "Visa's goal was to try to align its interchange fees to the merchant price elasticity of demand for categories of merchants" (SUFEX177), but only agreed that the quote is what was written in a document. (Morrissey Dep.[91] at 150.)

Defendants object to the admissibility of evidence on which class plaintiffs rely in Paragraph 55:

- Bamberger Decl.[92] ¶¶ 55, 59 only concerns whether class plaintiffs' allegations are subject to class-wide determination (Bamberger Decl. at 2), and is not relevant to the

---

[89]   Defendant Visa U.S.A. Inc.'s Second Supplemental Response to Plaintiffs' Consolidated First Set of Omnibus Discovery to Network Defendants (Dec. 15, 2006) ("Visa U.S.A. Interr. Resp.").

[90]   Deposition of Chris Jorgensen (Jul. 9, 2008) ("Jorgensen Dep."). Mr Jorgensen testified as the director of interchange strategy for Visa. (Jorgensen Dep. at 51-52.)

[91]   Deposition of Richard Morrissey (Jan. 30-31, 2008) ("Morrissey Dep."). Mr. Morrissey testified as the vice president, interchange strategy group for Visa. (Morrissey Dep. at 12-16; Morrissey Dep. Ex. 30500.)

[92]   Declaration of Gustavo Bamberger (May 8, 2008) ("Bamberger Decl.").

merits of class plaintiffs claims at issue in class plaintiffs' motion for summary

judgment.  (Fed. R. Evid. 401, 402, 702.)  Class plaintiffs' characterization of

Bamberger Decl. ¶¶ 55, 59 is also incomplete and misleading.  (Fed. R. Evid. 106.)

Bamberger did not discuss what factors Visa takes into consideration in setting

interchange rates, but rather whether the networks have the ability to engage in price

discrimination.  (Bamberger Decl. ¶¶ 55, 59.)

- Deposition testimony by Steven Jonas, a MasterCard vice president (SUFEX179),

  and the European Commission Decision (SUFEX081) relate to MasterCard's default

  interchange fees and are irrelevant to class plaintiffs' assertions regarding Visa's

  interchange fees.  (Fed. R. Evid. 401, 402.)  Additionally, the E.C. Decision is

  unfairly prejudicial, and is an out of court statement for which no exception to the

  hearsay rule has been established.  (Fed. R. Evid. 403, 801, 802.)

- The Morrissey deposition exhibit (SUFEX180) only discusses a prospective desire to

  develop a model regarding the interchange fee structure and is irrelevant to class

  plaintiffs' assertions regarding Visa's actual interchange fees.  (Fed. R. Evid. 401,

  402.)

a.     **According to an internal Visa presentation entitled "Interchange 101,"
       "Interchange has evolved from a purely cost-based proposition to one based
       on a range of market factors, over time."[225]**

- **An October 2004 Visa presentation that Visa's Tolan Steele describes
  as "a standard 'IRF Overview' presentation that we use when briefing
  Members" contains a slide (depicted below) showing that Visa's
  "Interchange Fee Strategy Historical Continuum" has moved from
  "Transfer Costs" to "Maximize Member Profits":[226]**



So, we've gone over some the factors and competitive pressure that go into the IRF fee rates; ██████████████████████████████
████████████████████████████

:

Any questions?

- A March 2006 Visa presentation entitled "SLT Strategy Effort: Core Business" explains, "As currently structured, Visa's primary role is to maximize member returns from Visa payments by optimizing across the value chain . . . Manage interchange to maximize long-term Member Net Present Value."[227]

---

[225]   Steele Dep. Ex. 31421, at VUSAMDL1-08471805. (SUFEX182)

[226]   Jorgensen Dep. Ex. 24475, at VUSAMDL1-06290200; 207. (SUFEX183)

[227]   VUSAMDL1-07905305-12, at VUSAMDL1-07905310. (SUFEX184)

*Defendants' Response to Paragraph 45a:*

Undisputed.  Defendants note that the documents plaintiffs cite, however, indicate that Visa has different characterizations for the purpose of interchange.  For example, Jorgenson Dep. Ex. 24475 indicates that "[i]nterchange balances the unique demand characteristics of each side in order to optimize the growth of the network" and that "Visa tries to maximize system

154

output by determining the optimal interchange rate." (Jorgenson Dep. Ex. 24475,[93] at

VUSAMDL1-06290205, 208; *see also id.* at 210 ("Interchange maximizes the overall value of

the network in order to optimize the value for both sides").) Other Visa documents also indicate

that the purpose of interchange is to maximize system output. (*See, e.g.,* VUSAMDL1-

08557497 to 08557516,[94] at 499.) ("maximizes the overall value of the network in order to

optimize the value for both sides"); VUSAMDL1-08555815 to 0855828,[95] at 823 ("Balances the

unique demand characteristics of each side to optimize the system"); *id.* ("Balances the differing

demands (and price elasticities) of both sides"); VUSAMDL1-06287146 to 06287165,[96] at 164

("There are a variety of dimensions to managing IRF effectively, in support of the overarching

objective of maximizing the Visa network."); VUSAMDL1-00445878 to 00445910,[97] at 882

("The goal of interchange reimbursement fees is to maximize system output. As such, there are

many factors that go into determining interchange rates; including cost of a transaction, broader

strategic objectives, competitive landscape, etc.").)

> **b.   When asked whether "it would be correct to say in 1997 that the Visa interchange strategy was directed towards maximizing member shareholder value," Visa's 30(b)(6) designee for Interchange Methodology, William Sheedy, testified, "I would say that at this time, given that Visa was an association owned by financial institutions, that the Visa organization's objective was to support the interests of its member financial institutions and that the dimensions of Visa's business, interchange being an element of that, would have been meant to be aligned with that strategy."[228] Sheedy further explained, "It's my understanding that at this time that the financial institutions that owned Visa, the vast majority of them were profit**

---

93   Email from C. Jorgenson to P. Moran, T. Steele, R. Towne, and R. Morrissey (Oct. 4, 2004) attaching Interchange Discussion bearing control numbers VUSAMDL1-06290200 to 06290227.

94   Visa BB&T Interchange Update (Jan. 30, 2006).

95   Visa, Interchange Overview or: "Mommy, where do basis points come from?"

96   Visa USA Interchange Reimbursement Fee (IRF) Overview (Feb. 28, 2005).

97   Visa, Interchange Fee Discussion (Oct. 30, 2003).

> maximizing entities and, therefore, were incented and very often had a
> fiduciary responsibility of increasing and optimizing their profits."[229]

---

[228]   Sheedy 30(b)(6) Dep. 127:25-128:13, June 17, 2008. (SUFEX185)

[229]   Sheedy 30(b)(6) Dep. 128:17-23, June 17, 2008. (SUFEX185)

*Defendants' Response to Paragraph 45b:*

Disputed.  Mr. Sheedy was Visa's 30(b)(6) witness on the topic of Visa's

methodology for setting interchange fees from January 1, 2000 to the end of the discovery period.

(Sheedy 30(b)(6) Dep. Ex. 23950 (30(b)(6) Deposition Notice); Sheedy 30(b)(6) Dep. at 17.)

Defendants object to the admissibility of Mr. Sheedy's testimony cited by class

plaintiffs.  The testimony therefore relates to events prior to the relevant time period applicable

in this case, and is thus irrelevant to any issue in support of class plaintiffs' motion for summary

judgment.  (Fed. R. Evid. 401, 402.)

c.    **A November 2003 letter from John Gardner, a Visa executive who acted as a
      liaison between Visa and its member banks, to ███████████ stated
      that, "Visa's unique business model, ownership structure, and governance
      are focused on maximizing ███████████ profitability for your entire
      enterprise card business. As a bank-owned, bank-governed entity operating
      on a not-for-profit basis, Visa's primary focus is to develop high-value, low-
      cost payment solutions and tolls that will help you meet the unique business
      needs of your customers while enhancing profitability for your shareholders.
      Our association model means that Visa puts the emphasis on maximizing
      profitability for ███████████ and the Visa Membership, not on Visa
      itself."[230]**

---

[230]   Gardner Dep. Ex. 32059A, at VUSAMDL1-05251026, Aug. 15, 2008. (SUFEX186)

*Defendants' Response to Paragraph 45c:*

Disputed.  In Mr. Gardner's letter quoted above, the word "tolls" should be

"tools."

      d.    **Mr. Pinkerd testified that** ████████████████████████
             ████████████.[231]

---

[231]    Pinkerd Dep. 42:21-43:12, 53:22-54:3, Aug. 19, 2008. (SUFEX006)

*Defendants' Response to Paragraph 45d:*

      Evidence on which class plaintiffs rely is incomplete and misleading.  (Fed. R.

Evid. 106.)  Class plaintiffs do not define whether Mr. Pinkerd was discussing processing costs

for Visa, issuers, acquirers, merchants, or any other entity.  Class plaintiffs have not provided

any foundation to support that Mr. Pinkerd was competent to testify about costs for an entity

other than Visa.  (Fed. R. Evid. 602.)

      e.    **Notwithstanding reductions in transaction processing costs as reflected in declining acquirer margins, a $50 non-supermarket PIN debit card transaction incurred an Interlink interchange fee of about** ██ **in 1996,** ██ **in 1999,** ██ **in 2002, and** ██ **in 2005.**[232]

---

[232]    **Frankel Report ¶ 93;** *see, e.g.,* **"NYCE Explains July 1 Interchange Fee Hike," American Banker, May 6, 2003 ("NYCE will raise the maximum interchange fee from 34 cents to 40 cents for the PIN debit transactions it processes. The fee structure varies by type of retailer and annual gross sales… Over the last two years, the PIN debit networks have waged fierce interchange fee competition, spurred by steep increases in Interlink, Visa's PIN debit network."). (SUFEX187)**

*Defendants' Response to Paragraph 45e:*

      Disputed.  Class plaintiffs do not present any evidence in support of their

assertion that there have been reductions in processing costs.  Class plaintiffs also do not present

any evidence in support of their assertion that acquirer margins have declined.

      Interlink interchange fees have increased due to competition for issuance among

PIN debit networks.  Dr. Frankel recognizes the existence of this competition in the same

paragraph as that cited by class plaintiffs: "Other PIN debit networks have raised their own

interchange fees in response to Interlink's increases." (Frankel Rep.[98] ¶ 93.)  Evidence from

Visa's PIN debit rivals shows that they, like Visa, compete for issuance by increasing

interchange fees.  (Pinkerd Dep. Ex. 25879,[99] at VUSAMDL1-08504909 (rival PIN debit

networks generally increased interchange fees at the time that Interlink did so); Rathgaber Dep.

Ex. 43638[100] (█████████████████████████████████████████████

████████).)  NYCE adopted ████████████████████████████

████████████████████████████████████████████████

(Rathgaber Dep. Ex. 43632[101].)  As a result, NYCE set its interchange rates higher than those of

all other PIN networks, including Interlink. (Pinkerd Dep. Ex. 25796[102], at VUSAMDL1-

06230965 (identifying NYCE as having the highest estimated effective PIN debit IRF in July

2004 of ██████ per transaction, and explaining that "NYCE's July IRF [2004] adjustment

appears to have been made in an effort to increase its Member value proposition relative to

Interlink and others.").)

     **f.**     **The various categories of Visa Interchange Fees currently bear no
relationship to the costs of Visa or its Member Banks.**

- **Mr. Sheedy conceded that "Visa's costs were not an important factor
in considering changes to interchange fees."[233]**

- **Tolan Steele of Visa, Inc. also confirmed that he was aware that at one
time, "one of the more central components of managing interchange**

---

[98]   Report of Alan S. Frankel, Ph.D. (Jul. 2, 2009) ("Frankel Rep.").

[99]   Email from R. Morrissey to T. Steele (Mar. 30, 2006) attaching "Interchange 101: Interchange Strategy &
Fees," bearing control numbers VUSAMDL1-08054853 to 08054921.

[100]  NYCE "Network Annual Interchange Review" (Mar. 11, 2005), bearing control numbers NYCE-MDL1720-
00296 to 00343.

[101]  NYCE Network Oversight Board "2003 Interchange Discussion" (Jan. 14, 2003), bearing control numbers
NYCE-MDL1720-00030 to 00045.

[102]  Email from T. Steele to W. Sheedy, C. Jorgensen, P. Moran, S. Pinkerd, and J. Sachs (Oct. 26, 2004) attaching
"IRF Topics," bearing control numbers VUSAMDL1-06230956 to 06230991.



was around [ ] looking at costs and cost recovery" but that currently

██████████████████████████████████████████████████████████████

████████████████████████████ [234]

- **Visa's expert Dr. Klein agreed that Visa's interchange fees are not cost-based.** [235]

---

[233]    Sheedy 30(b)(6) Dep. 155:20-156:5, June 17, 2008. (SUFEX185)

[234]    Steele Dep. 314:01-320:23, Apr. 3, 2008; see also 323:10-324:5 (noting that Visa was not able to make arguments that interchange was cost-based because "it's value-based," not cost-based). (SUFEX178)

[235]    Klein Dep. 399:07-401:14, Mar. 24, 2010.  (SUFEX188)

*Defendants' Response to Paragraph 45f:*

Disputed.  As described in Defendants' Response to Paragraph 45, Visa considers and has considered costs incurred by participants in the Visa system when setting default interchange rates to maintain the viability of the Visa payment system.  (*See* Defendants' Response to Paragraph 45.)

Evidence on which class plaintiffs rely is incomplete and misleading.  (Fed. R. Evid. 106.)  Mr. Steele did not confirm that various categories of Visa interchange fees currently bear no relationship to the costs of Visa or its member banks.  In the sentence immediately following that quoted by class plaintiffs, Mr. Steele continued to testify that he could "



." (Steele Dep. at 320.)  Mr. Steele also testified that "

(Steele Dep. at 319.)

159

Dr. Klein agreed with a Visa document that stated "[t]he determination of fees is moved from a more cost-based approach . . . to a more market-based approach over the years." (Klein Dep.[103] at 400-01.)  This language does not stand for the proposition that interchange fees are not cost-based, as costs still play a factor in determining interchange fees.

Defendants dispute class plaintiffs' definition of "Interchange Fee" as "a fee that Merchants pay to the Issuing Bank" because it is inaccurate, misleading, and unfairly prejudicial. An interchange fee is compensation paid by the acquiring bank to the issuing bank via Visa or MasterCard for the transaction passing through interchange.  (*See* Paragraphs 64 & 69.)  Class plaintiffs have presented no evidence that merchants pay any fees to issuing banks.

     **g.**   **The costs of the technology necessary to operate a Payment-Card Network have decreased significantly.**

- **A 2005 Wells Fargo Merchant Services marketing plan commented: "The pattern of steadily rising prices for credit card payments seems a little off, especially since the cost of processing electronic payments is undoubtedly falling with the scale and lower cost information technology."[236]**

- **According to a 2005 Visa Consumer Credit Card Issuer Benchmark Study, average issuer cost of authorization, clearing and settlement in 2005 was ▮▮▮▮ per transaction, ▮▮▮▮ less than in 1996.  Payment processing costs similarly decreased.[237]**

- **According to a 2000 Visa Deposit Products Study, based on extensive review of ▮▮▮▮ Visa debit card issuers, the direct expense of operating their debit portfolios fell from ▮▮▮▮ to ▮▮▮▮ of POS (point of sale) transaction volume for Signature debit from 1993 to 1999 and from ▮▮▮▮ to ▮▮▮▮ for PIN (personal identification number) debit during the same period.[238]**

- **According to a Visa 2007 Debit Card Study, the average expense of operating Visa debit portfolios dropped from ▮▮▮▮ to ▮▮▮▮ per transaction for Signature debit from 2003 to 2006.  And during the same time period, PIN debit expenses fell from ▮▮▮▮ to ▮▮▮▮ per transaction.[239]**

---

[103]   Deposition of Benjamin Klein (Mar. 23-24, 2010) ("Klein Dep.").

[236]   WFINT0000025400. (SUFEX189)

[237]   *See* Haarma Dep. 104:1-107.22 (SUFEX190); Haarma Ex. 5, at VUSAMDL1-06716003-004, VUSAMDL1-06715965. (SUFEX191)

[238]   VUSAMDL00066340-6400, at VUSAMDL00066340-6345. (SUFEX192)

[239]   VUSAMDL00174013-4034, at VUSAMDL00174013-4020. (SUFEX193)

*Defendants' Response to Paragraph 45g:*

> Disputed.  Defendants' dispute class plaintiffs' use of the word "significantly" because it is vague and ambiguous.

> Defendants note that the two Visa debit card studies cited in the last two bullet points only deal with ███████ debit issuers, and ███████████████████████████.  As recognized by Hannu Haarma, on whom class plaintiffs rely, "if you are a small issuer, you don't have the economies of scale at all.  It will cost you more automatically." (Haarma Dep.[104] at 105.)

**h.    Fraud rates and Issuers' costs associated with fraud have rates decreased.**[240]

- A May 2005 "Interchange Reimbursement Fees – Delivering Value and Driving Innovation" presentation Visa's Bill Sheedy gave to Wachovia and others at the 2005 Payments Conference in Santa Fe stated that "Fraud rates have decreased by 7% per year from 1990-2004, even as Visa volume has increased 16% annually," followed by graphs illustrating the trend.[241]

- Stacey Pinkerd, Visa Head of Consumer Debit Products, testified that the fraud rate at the POS is ███ basis points on non-PIN debit and ███ basis points on PIN debit

- "Fraud rates have decreased by 7% per year from 1990 – 2004, even as Visa volume has increased 16% annually."[242]

- "Overall fraud numbers for US Issuers remain at relatively low levels....Further analysis of counterfeit losses show that the average

---

[104]   Deposition of Hannu Haarma (Aug. 2, 2007) ("Haarma Dep.").  Mr. Haarma testified as an employee of Visa who performed benchmarking studies.  (Haarma Dep. at 18-19.)

loss per account in 2006 to date has decreased approximately 18% from 2004 figures illustrating that while the number of cases has increased along with losses in absolute terms, issuers have become more effective in limiting the losses on an account basis . . . ."[243]

- In response to an August 2004 Reuters article regarding issuers seeking reimbursement from a merchant for fraud charges due to a security breach of the merchant's systems, Rosetta Jones, Corporate Relations for Visa, wrote, "[I]f this [issuers wanting retailers to reimburse for the cost of fraud] becomes a trend, which I fear it will likely become, our messaging and external 'justification' around [Interchange] as a reimbursement for cost of doing business (i.e. fraud) becomes less believable."[244]

- Michael Wright, a Bank of America 30(b)(6) designee, testified that chip was not implemented in the United States because fraud rates were so low that it did not justify the cost as opposed to Europe where fraud was much higher.[245]

- "Ongoing security innovations and fraud prevention efforts have kept fraud rates within the Visa system low compared to historical averages."[246]

- According to the 2000 Visa Deposit Products Study, the average costs of fraud management plus net fraud losses for Visa's debit card issuers dropped from ▮▮▮▮ to ▮▮▮▮ of POS transaction volume for Signature debit from 1993 to 1999. Fraud costs for PIN debit dropped from ▮▮▮▮ to ▮▮▮▮ during the same period.[247]

- According to the Visa 2007 Debit Card Study, the average cost of fraud management plus net fraud losses for Visa's debit card issuers dropped from ▮▮▮▮ to ▮▮▮▮ of POS transaction volume for Signature debit from 2001 to 2006. Fraud costs for PIN debit stayed level at ▮▮▮▮ during the same period, which Visa described as ▮▮▮▮▮▮▮▮▮[248]

---

[240]    Baxter Dep. 58:7-11, May 28, 2008 (SUFEX194) (Fraud losses to the industry increased over time, but declined as a percentage). STB_MDL16_00014402, at STB_MDL16_00014417 (SUFEX195)(fraud rates "decrease by 2/3 when cardholders are prompted to input ZIP codes.").

[241]    WB0076247, at WB076 (SUFEX196)

[242]    WFINT0000030311-323, at WFINT0000030320. (SUFEX197) *See also* WFINT0000048543-555 at 52. (SUFEX198)

[243]    WFINT0000058023-66, at WFINT0000058028. (SUFEX199)

[244]    Steven Ruwe Ex. 25322, at VUSAMDL1-03811591. (SUFEX200)

[245]     **Michael Wright Dep. 52:20-53:5. (SUFEX201)**

[246]     **WFINT0000195079-80, at 79. (SUFEX202)**

[247]     **VUSAMDL00066340-6400, at VUSAMDL00066391. (SUFEX192)**

[248]     **VUSAMDL00174013-4034, at VUSAMDL00174031. (SUFEX193)**

*Defendants' Response to Paragraph 45h:*

      Disputed. Class plaintiffs' blanket assertion is contrary to evidence, and they do not provide any citations that support some of the evidence on which they rely.

      PIN fraud rates, and associated costs, have increased for defendant SunTrust during the relevant period. On purchasing cards, ███████████████████████ ████████████████████. (STB_MDL_00043042 to 00043061,[105] at 049.) On corporate cards, ██████████████████████████████████████████ ███████. (*Id.*) ████████████████████████████████████████ ███████████████████████████ (*Id.* at 046; *see also* STB_MDL_00087519 to 00087533,[106] at 529 (containing a chart showing that "PIN Fraud has doubled from last year."); STB_MDL_00087697 to 00087701,[107] at 697 ("Recently the card industry has seen a 20% growth in the rate of PIN transaction fraud, ████████████ ██████████████████████████████."); STB_MDL_00087739 to 00087795,[108] at 744 ("The amount of PIN based fraudulent transactions at the point of sale has increased dramatically in the marketplace (20% in the last 6 months for the industry).")

---

[105]   SunTrust Profitability Project – Data Overview.

[106]   SunTrust Commercial Card Payments.

[107]   SunTrust Request for Project Activation, PIN Fraud Protection.

[108]   SunTrust Project Charter, PIN Fraud Detection (Mar. 5, 2004).

Class plaintiffs have not provided evidence in support of their reliance on Stacey Pinkerd. Further, defendants object to the admissibility of Mr. Pinkerd's deposition testimony. The testimony, as characterized by class plaintiffs, is irrelevant to their assertion that costs associated with fraud have rates decreased because Mr. Pinkerd's purported testimony does not discuss a change in fraud rates over time, or even provide fraud rates at a particular time. (Fed. R. Evid. 401, 402.)

Mr. Wright was asked, "Did you ever hear from any source at any time that chip cards weren't implemented in the United States because the fraud – fraud rate was so low that the cost of implementing the chip technology didn't merit it?" and replied, "I recall holding a general impression similar to that, but I don't recall receiving that information specifically." (Wright Dep.[109] at 52-53.)

Defendants note that the two Visa debit card studies cited in the last two bullet points only deal with ███████ debit issuers, and █████████████████████ As recognized by Hannu Haarma, on whom class plaintiffs rely, "if you are a small issuer, you don't have the economies of scale at all. It will cost you more automatically." (Haarma Dep. at 105.)

---

[109] Deposition of Michael Raymond Wright (Oct. 29, 2008) ("Wright Dep."). Mr. Wright testified as an employee of Bank of America in the industry relations group. (Wright Dep. at 67-68.)

<u>Plaintiffs' Paragraph 46:</u>

**46     For years, Visa's Interchange Fees have been, and continue to be, set based on
merchants' elasticity of demand not cost.[249]**

---

[249]     **STB_MDL_00373189, at STB_MDL_00373232  (SUFEX203)(the card network will eventually raise
the merchant fee "to the highest possible level, which may be higher than the sum of the merchants'
transactional benefit and the merchants' initial margin without the cards.")**

*Defendants' Response to Paragraph 46:*

         Disputed.  As discussed in Defendants' Response to Paragraph 45, "every default

interchange rate that Visa sets or has set is determined by the need to maintain the viability of the

Visa payment system in response to competitive pressures in the marketplace – including

competition from other payment card networks, such as MasterCard, American Express,

Discover, Star, and NYCE networks, as well as numerous other non-card options, including cash,

checks, and electronic fund transfers."  (Visa U.S.A. Interr. Resp., at 4; *see* Defendants'

Response to Paragraph 45.)  In doing so, "Visa considers – and has considered – costs incurred

by participants in the Visa system."  (*Id.*)

         Visa sets default interchange rates for all its payment card products – credit,

signature debit, and Interlink PIN debit – in order to maximize the volume of transactions that

are processed through the Visa payment network.  (Sheedy 30(b)(6) Dep. at 75-77 ("the

fundamental objective of interchange fees . . . is to maximize the throughput in the Visa system");

Jorgensen Dep. at 121-22 (interchange is the "means by which Visa intended to maximize

system output").)  Because interchange is paid by acquirers to issuers and is not Visa revenue,

Visa's primary interest in interchange rates is setting them at a level that balances demand on

both sides of the network.  (Sheedy 30(b)(6) Dep. at 284-85 (The ideal rate structure "would

optimize the output of the system based on, in theory, an optimal level of issuer demand and

acquirer merchant demand.").)  If merchants do not accept Visa, cardholders will have less of an

incentive to use Visa cards, banks will have less of an incentive to issue Visa cards, and Visa will suffer competitively. (Sheedy Decl. ¶¶ 13, 22; *see also* Towne 30(b)(6) Dep.[110] at 28-29 ("The whole goal of interchange recommendations are to facilitate growth. The way to facilitate growth is to achieve balance in terms of the value proposition to issuers as well as the value proposition to acquirers and their clients, the merchants.").) Likewise, if banks do not issue Visa cards or cardholders do not use Visa cards, merchants will have less of an incentive to accept Visa cards, and Visa will suffer competitively. (Sheedy Decl. ¶ 13.) Thus, interchange is a tool that Visa can and does use to maximize system output. (Sheedy 30(b)(6) Dep. at 75-77 ("the fundamental objective of interchange fees . . . is to maximize the throughput in the Visa system").)

At the same time, Visa has created lower default interchange rates in order to enhance the value of Visa's payments network relative to other payment forms and to promote acceptance in certain merchant segments. (Sheedy 30(b)(6) Dep. at 225-26; Saunders Dep. at 73-74 (recalling votes to lower interchange rates for utilities, and fast food chains, among other merchant segments).) For example, Visa has created special interchange rates for supermarkets, utility companies, and governmental entities, to expand acceptance in those segments. (*Id.*; *see also* VUSAMDL00177999 to 00178007,[111] at 8001 (describing Visa's use of interchange to "expand acceptance and drive additional usage in the utility bill payment segment").) Visa also introduced a Small Ticket Payment Service to provide a special interchange rate category for small-value transactions without a cardholder signature, in a number of everyday spend

---

[110] Deposition of Robert Towne (Aug. 30, 2007) ("Towne 30(b)(6) Dep."). Mr. Towne testified as Visa's 30(b)(6) witness regarding the consideration of, business justification for, and adoption of interchange rate modifications. (Towne 30(b)(6) Dep. at 12; Towne 30(b)(6) Dep. Ex. 1 (30(b)(6) Deposition Notice).)

[111] Visa Independent Directors Committee meeting minutes (Apr. 17, 2007).

categories, including quick-service restaurants, movie theatres, parking lots and garages, and

public transit. (Steele Dep. at 187-88 (describing Visa's reduction of interchange rates for small

ticket transactions under $15 at quick-service restaurants "which were mainly cash").) This

program has allowed Visa to stimulate card usage for small ticket payments, enhance

convenience to merchants and consumers, and obtain greater usage in segments that typically

have relied on cash payments. (*Id.*)

Defendants dispute class plaintiffs' definition of "Interchange Fee" as "a fee that

Merchants pay to the Issuing Bank" because it is inaccurate, misleading, and unfairly prejudicial.

An interchange fee is compensation paid by the acquiring bank to the issuing bank via Visa or

MasterCard for the transaction passing through interchange. (*See* Paragraphs 64 & 69.) Class

plaintiffs have presented no evidence that merchants pay any fees to issuing banks.

Defendants object to the admissibility of STB_MDL_00373189, at

STB_MDL_00373232. The document is a preliminary draft of an article by Fumiko Hayashi,

and is an out of court statement for which no exception to the hearsay rule has been established.

(Fed. R. Evid. 801, 802.)

    a.    **Visa sets Interchange Fees for Credit-Card Network Services, Offline-Debit-Card Network Services, PIN-Debit Card Network Services at merchants' "reserve prices."**

- **Visa's expert, Dr. Klein agreed that the justification for interchange fees has moved to a "market-based" approach.[250]**

- **A Visa internal draft of a PowerPoint presentation relating to "Elasticity" states that one of Visa's objectives is to "[d]evelop an economic model and process by which Visa's interchange fee structure is evaluated in the context of merchant price elasticity, with the objective of optimizing Member interchange fee revenue."[251] This document defines "Price Elasticity" as "[n]umber of substitutes," "[d]egree of necessity," "[p]roportion of budget," and "[o]ther factors."[252]**

- **Among the recommendations counseled by this draft Visa**

presentation regarding merchant elasticity is "develop an equation and gather data to determine when a merchant will drop Visa."[253]

- A Visa "Key Insight" directs to "Design [interchange fees] based on merchant value (i.e., price elasticity)."[254]

- Three of the Visa executives with the greatest responsibility for setting interchange fees, William Sheedy, Richard Morrissey,  and Tolan Steele each testified that merchant price sensitivity was one factor Visa considers when setting interchange.[255]

- Pat Phillips of Visa testified that the merchant categories for interchange fees that Visa created were based on the value of card acceptance to merchants as well as merchant elasticity of demand stating, in part, "one of the approaches [Visa] looked at [as] a basis for establishing rates for different market segments was … how much value to the customer…the merchant's business model did the acceptance of different payment products have?  And comparably, what alternatives did the individual merchant category have in establishing their methods of payment?"[256]

- A February 2003 memorandum circulated amongst Visa's Interchange Strategy Team suggested that "Rates for merchant categories need to reflect [merchant category code] elasticity."[257] The document also suggested that Visa "Design IRF based on merchant value (i.e. price elasticity)."[258]

- Visa's William Sheedy was asked when Visa first explicitly articulated its consideration of merchant price elasticity in setting interchange fees. Sheedy responded, "I believe it was articulated and discussed at Visa in such a way that it's been an aspect of how we've considered interchange fees over my 15 years at Visa and the way that I've heard interchange fees described going back to the inception of Visa. I believe that it's always been a dimension and a consideration in the context of interchange fees."[259]

- Sheedy confirmed that Visa's Volume Tiered Interchange Program "was an opportunity for Visa to evaluate the merchant acquirer price elasticity to support [Visa's] interchange strategy."[260]  Referring to debit tiers, a draft Executive Summary for a 2003 Visa board meeting states, "By creating tiers for IRF, Visa believes it can maximize the IRF revenue from these retail merchants."[261]

- An April 2006 Visa PowerPoint deck edited by Bill Sheedy states, "Visa manages interchange within a distinct merchant segmentation" and depicts a grid grouping merchant segments according to "Merchant Sensitivity to Cost" and "Strategic Importance of Bankcards."[262]  Sheedy testified, "when I have used this grid and

when I've presented against it, we would categorize and plot merchants and merchant segments based on the level of penetration that we've had in their business and our perceptions of their sensitivity to cost."[263]  This grid also appears in a March 2005 presentation by Bill Sheedy.[264]  As depicted below, this version of the grid reflects the



Merchant segmentation is increasingly complex in more developed countries

_____

[250]     Klein Dep. 399:07-401:14, Mar. 24, 2010.  (SUFEX188)

[251]     VUSAMDL1-08530963 at 965 (SUFEX204) ("* Price elasticity as it relates to acceptance of Visa products").

[252]     VUSAMDL1-08530963 at 967. (SUFEX204)

[253]     Towne Dep. Ex. 26052, at 14.  (SUFEX204) (Is this the same as VUSAMDL1-08530963 at 977?)

[254]     Jorgensen Ex. 24,486, at VUSAMDL1-00432795. (SUFEX205)

[255]     Sheedy Dep. 141:14-151:17, 312:09-22, 327:04-13, June 17, 2008 (SUFEX185); Steele Dep. 236:09-236:22, Apr. 2, 2008. (SUFEX041)

[256]     Phillips Dep. 113:06-115:14, Aug. 14, 2008. (SUFEX170)

[257]     Sheedy Dep. Ex. 34811, at VUSAMDL1-00432792. (SUFEX205)

[258]     *Id.* at VUSAMDL1-00432795 (SUFEX205); *see also* Morrissey Dep. Ex. 30507, at VUSAMDL1-05576137 (SUFEX180) ("Price elasticity helps Visa determine the pricing level that optimizes Visa volume"); Steele Dep. Ex. 31416, at VUSAMDL1-06312853 (chart plotting merchant categories according to "merchant sensitivity to cost") (SUFEX206); Morrissey Dep. Ex. 30508 ("Rates for merchant categories need to reflect MCC elasticity") (SUFEX205); Jonas Dep. Ex. 23150 ("I did generally get what I needed . . . a sense of the elasticity from each of the industries"). (SUFEX207)

[259]     Sheedy 30(b)(6) Dep. 312:23-313:16; 327:4-9. (SUFEX185)

[260]     Sheedy 30(b)(6) Dep. 334:21-24. (SUFEX185)

[261]     Sheedy 30(b)(6) Dep. Ex. 23973 at VUSAMDL1-08822395. (SUFEX208)

[262]     Sheedy Dep. Ex. 34825, at p. 15. (SUFEX209)

[263]     Sheedy Dep. 430:2-7. (SUFEX171)

[264]     Sheedy Dep. Ex. 34832, at VI-IC-00056731. (SUFEX210)

[265]     *Id.* (SUFEX210)

[266]     *Id.* (SUFEX210)

*Defendants' Response to Paragraph 46a:*

   Disputed.  Class plaintiffs mischaracterize the evidence on which they rely:

- Dr. Klein testified only that Visa has moved to a "more market-based approach" to setting interchange fees, and does not discuss merchants' reserve prices.  (Klein Dep. at 399-401.)

- The Visa internal draft of a PowerPoint presentation (SUFEX204) only discusses an aspirational economic model regarding interchange fees (Towne Dep. Ex. 26052, at 14), and therefore suggests that the actual model used by Visa is *not* evaluated in the context of merchant price elasticity.

- When Mr. Steele was asked about Steele Dep. Ex. 31416, at VUSAMDL1-06312853 (SUFEX206) at his deposition, he testified that merchant sensitivity to pricing was

only one factor "among many" that Visa will use to determine whether an interchange adjustment will expand total output.  (Steele Dep. at 236.)

- Defendants dispute class plaintiffs' assertion that three of the Visa executives with the "greatest responsibility for setting interchange fees," William Sheedy, Richard Morrissey, and Tolan Steele each testified that merchant price sensitivity was one factor Visa considers when setting interchange.  Class plaintiffs provide no citation for their reliance on testimony by Mr. Morrissey.  Further, this statement that that these three Visa executives with the "greatest responsibility for setting interchange fees," contradicts class plaintiffs' assertion in Paragraphs 41 and 42 that the Visa U.S.A. and Visa International boards established interchange fees.

Defendants dispute class plaintiffs' definition of "Interchange Fee" as "a fee that Merchants pay to the Issuing Bank" because it is inaccurate, misleading, and unfairly prejudicial. An interchange fee is compensation paid by the acquiring bank to the issuing bank via Visa or MasterCard for the transaction passing through interchange.  (*See* Paragraphs 64 & 69.)  Class plaintiffs have presented no evidence that merchants pay any fees to issuing banks.

Defendants object to the admissibility of Jonas Dep. Ex. 23150.  The deposition exhibit is irrelevant to class plaintiffs' assertions regarding how Visa sets interchange because Mr. Jonas is a vice president at MasterCard and the deposition exhibit does not relate to how Visa sets interchange.  (Fed. R. Evid. 401, 402.)

**b.    Visa's Peter Zuercher testified that in mid-2006, Visa considered implementing a cap on interchange rates for merchants in "emerging markets" because "there was limited demand for Visa products at a certain – at a certain interchange rate. And if we lowered the cap, if we lowered the rate to a certain level instead of this cap, the demand would have increased."[267]**

---

[267]    Zuercher Dep. 205:10-209:7. (SUFEX211)

*Defendants' Response to Paragraph 46b:*

> Undisputed.

> c.   **One of the recommendations that is provided in a draft Visa document on merchant elasticity is to "[d]evelop an equation and gather data to determine when a merchant will drop Visa."[268]**

―――――――――
[268]   VUSAMDL1-08530963, at VUSAMDL1-08530977. (SUFEX204)

*Defendants' Response to Paragraph 46c:*

> Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading.

(Fed. R. Evid. 106.)  Robert Towne testified that he had never seen an equation to determine

when a merchant will drop Visa, and has no knowledge of one ever being developed.  (Towne

Dep.[112] at 414.)  Class plaintiffs have offered no evidence that such an equation was ever

developed.

> d.   **Bank Defendants acknowledge that Visa Rules require the payment of default Interchange fees.[269]**

―――――――――
[269]   **JPMorgan Chase & Co. and Chase Bank USA, N.A. Resp. to Req. for Admis. to Plfs' First Set of Req. for Admis. to Bank Defs at 11 No. 5, Dec. 19, 2008 (SUFEX023); SunTrust Bank Resp. to Req. for Admis. to Plfs' First Set of Req. for Admis. to Def. Visa at 13 No. 5, Dec. 19, 2008 (SUFEX024); Capital One Bank (USA), N.A., Capital One, N.A., and Capital One Financial Corp. Resp. to Req. for Admis. to Plfs' First Set of Req. for Admis. to Def. Visa at 10 No. 5, Dec. 19, 2008 (SUFEX036); First National Bank of Omaha Resp. to Req. for Admis. to Plfs' First Set of Req. for Admis. to Def. Visa at 9-10 No. 5, Dec. 19, 2008 (SUFEX025); Fifth Third Bancorp Resp. to Req. for Admis. to Plfs' First Set of Req. for Admis. to Def. Visa at 9-11 No. 5, Dec. 19, 2008 (SUFEX026); Citigroup Resp. to Req. for Admis. to Plfs' First Set of Req. for Admis. to Def. Visa at 11 No. 5, Dec. 19, 2008 (SUFEX027);  Bank of America Resp. to Req. for Admis. to Plfs' First Set of Req. for Admis. to Def. Visa at 15 No. 5, Dec. 19, 2008 (SUFEX028); Barclays Financial Corp. Resp. to Req. for Admis. to Plfs' First Set of Req. for Admis. to Def. Visa at 14-15 No. 5, Dec. 19, 2008 (SUFEX029); National City Corp. and National City Bank of Kentucky Resp. to Req. for Admis. to Plfs' First Set of Req. for Admis. to Def. Visa at 18 No. 5, Dec. 19, 2008 (SUFEX030); HSBC Finance Corp. and HSBC North America Holdings Inc. Resp. to Req. for Admis. to Plfs' First Set of Req. for Admis. to Def. Visa at 11 No. 5, Dec. 19, 2008 (SUFEX031); Wachovia Corp. and Wachovia Bank N.A. Resp. to Req. for Admis. to Plfs' First Set of Req. for Admis. to Def. Visa at 13 No. 5, Dec. 19, 2008 (SUFEX032); Wells Fargo Resp. to Plfs' Corrected First Set of Req. for Admis., at 12, No. 5, Feb. 20, 2009 (SUFEX033); and Texas Independent**

―――――――――
[112]   Deposition of Robert Towne (Sept. 4-5, 2008) ("Towne Dep.").  Mr. Towne testified as a senior account executive in the acquirer relations group at Visa, Inc.  (Towne Dep. at 16.)

**Bancshares Resp. to Req. for Admis. to Plfs' First Set of Req. for Admis. to Def. Visa at 10-11 No. 5, Jan. 9, 2009. (SUFEX037)**

*Defendants' Response to Paragraph 46d:*

      Disputed.  In the bank defendants' responses to plaintiffs' requests for admission, on which class plaintiffs rely, the bank defendants admitted that Visa's rules require the payment of a default interchange fee for all Visa transactions where the issuing bank has not negotiated a bilateral agreement with the acquiring bank.

173

<u>**Plaintiffs' Paragraph 47:**</u>

**47      Visa engages in price discrimination in the setting of Interchange Fees for Credit-Card Network Services, Offline-Debit-Card Network Services, and PIN-Debit-Card Network Services.**

<u>*Defendants' Response to Paragraph 47:*</u>

Disputed.  As discussed in Defendants' Responses to Paragraphs 45 and 46, Visa considers a variety of factors to set interchange rates in order to maximize system output.  (*See* Defendants' Response to Paragraphs 45 and 46; *see  also* Sheedy Decl. ¶¶ 13-20.)

Evidence on which plaintiffs rely in subparagraphs a-f supports the proposition that Visa has differential pricing, not that such pricing is the product of price discrimination. One factor that Visa considers is cost.  As Tolan Steele testified, "

(Steele Dep. at 319.)

_____

113

114



).)

Defendants dispute class plaintiffs' definition of "Interchange Fee" as "a fee that Merchants pay to the Issuing Bank" because it is inaccurate, misleading, and unfairly prejudicial. An interchange fee is compensation paid by the acquiring bank to the issuing bank via Visa or MasterCard for the transaction passing through interchange. (*See* Paragraphs 64 & 69.) Class plaintiffs have presented no evidence that merchants pay any fees to issuing banks.

      a.      **Defendants' expert, Dr. Klein acknowledges "the fact that Visa sets differential interchange fees to categories of merchants."** [270]

---

[270]    **Klein Report ¶ 174. (SUFEX212) See e.g., VUSAMDL1- 05576120, 31, 39  (SUFEX180) (Visa document titled "Measuring Merchant Price Elasticity of Demand October, 2003" showing merchant categories and ranking versus interchange rate; VUSAMDL00077927810  (SUFEX102) (Visa U.S.A. Inc. Operating Regulations Vol. 1 – 9.5.A, Nov. 15, 2005, "Consumer Product Transactions" show the qualification for specific Interchange Reimbursement Fees).**

*Defendants' Response to Paragraph 47a:*

      Undisputed.

---

115 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

116 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

b.     **Visa establishes separate interchange-rate for each merchant category for each of its card products (credit, premium credit, signature debit, commercial, and PIN-debit) and further differentiates interchange fees based on merchants' transaction volume.** [271]

---

[271]     Tabaczynski 30(b)(6) Dep. 71:11-72:22, July 18, 2006 (SUFEX213); Visa U.S.A. Interchange Reimbursement Fees, April 2010, at p. 4 (available at http://usa.visa.com/download/merchants/april-2010-visa-usa-interchange-rate-sheet.pdf) (SUFEX215); Interlink Interchange Reimbursement Fees, April 2010, at 2-4 (available at http://usa.visa.com/download/merchants/april-2010-interlink-interchange-rate-sheet.pdf). (SUFEX214)

*Defendants' Response to Paragraph 47b:*

Undisputed.

c.     **Visa currently lists 30 separate signature-debit-card interchange fee categories.** [272]

---

[272]     Visa U.S.A. Consumer Debit Interchange Reimbursement Fees, effective Apr. 2010, at 2, available at http://usa.visa.com/download/merchants/april-2010-visa-usa-interchange-rate-sheet.pdf. (SUFEX215)

*Defendants' Response to Paragraph 47c:*

Undisputed.

d.     **Visa currently has 104 categories of Interchange Fees for Consumer Credit Cards, Commercial Cards, Offline Debit Cards, and PIN-Debit Cards issued and used in the United States.** [273] **In 2001, Visa had only 21 different categories of fees.** [274]

---

[273]     Visa U.S.A. Interchange Reimbursement Fees. April 2010, at p. 2-5 (available at http://usa.visa.com/download/merchants/april-2010-visa-usa-interchange-rate-sheet.pdf (SUFEX215) (last accessed October 4, 2010)); Interlink Interchange Reimbursement Fees, April 2010, at p. 2 (SUFEX214) (available at http://usa.visa.com/download/merchants/april-2010-interlink-interchange-rate-sheet.pdf (last accessed October 4, 2010)).

[274]     Visa Business Review, April 2001, VUSALITIIICID2-00062593-621, at VUSALITIIICID2-00062617. (SUFEX216)

*Defendants' Response to Paragraph 47d:*

Disputed.  Defendants dispute class plaintiffs' definition of "Interchange Fee" as

"a fee that Merchants pay to the Issuing Bank" because it is inaccurate, misleading, and unfairly

prejudicial.  An interchange fee is compensation paid by the acquiring bank to the issuing bank

via Visa or MasterCard for the transaction passing through interchange.  (*See* Paragraphs 64 &

69.)  Class plaintiffs have presented no evidence that merchants pay any fees to issuing banks.

> **e.   Robert Towne of Visa testified that "[d]ifferent interchange fees can apply to different merchant segments in instances when similar goods are purchased and the transaction amounts are similar."  Towne further testified that even though the exact same Visa card product was used to purchase the products from, for example, a supermarket and a drug store, different interchange rates would apply to each transaction based on the location or characteristics of the merchant.** [275]

---

[275]   **Towne Dep. 231:20-233:6, Sept. 4, 2008. (SUFEX217)**

*Defendants' Response to Paragraph 47e:*

> Undisputed.

> **f.   A report by the Federal Reserve Bank of Kansas City explains that Visa has led the PIN debit marketplace towards higher interchange fees in the United States and instituted price discrimination practices with Interlink acceptance services.** [276]

---

[276]   **Fumiko Hayashi, Richard J. Sullivan, and Stuart E. Weiner,** *A Guide to the ATM and Debit Card Industry*, **Federal Reserve Bank of Kansas City (2006), at 12  (SUFEX218) ("Interlink has been the market leader, dramatically raising its interchange fee in 2002. Most of the PIN debit networks since have raised their interchange fees[…] Both signature and PIN debit networks now provide discounted interchange rates to large volume retailers[…] In addition, special interchange fees for retail segments have moved beyond supermarkets.").**

*Defendants' Response to Paragraph 47f:*

> Disputed.  The report by the Federal Reserve Bank of Kansas City does not

discuss price discrimination.

## Plaintiffs' Paragraph 48:

**48    Interchange Fees are not set to balance the two sides of the claimed two-sided market.**

*Defendants' Response to Paragraph 48:*

Disputed.  None of the evidence on which class plaintiffs rely in subparagraphs a-c supports class plaintiffs' assertion.

The "goal of Visa's interchange reimbursement fee strategy, to maximize output from the system, will only be achieved through a proper balance of tactical responses to competitors, such as MasterCard, American Express and Discover, benchmarking Visa against all other forms of payment, considering the value of Visa to merchants, and promoting card issuance."  (VUSAMDL2-00000070 to 00000081,[117] at 72; *see also* Steele Dep. at 267-68 ("The operation of a two-sided market is, in my view, a manner in which the central party – in this case Visa – looks at its two participants, the acquirers and the issuers, and thinks about how value is passed between the two of them also in recognition of the businesses they're operating in, the acquiring marketplace and the issuer marketplace, and to – and to set that interchange in such a way to maximize the throughput on the system."); *id.* at 321 ("Interchange is a strategic tool that Visa uses to accomplish many things, certainly one of which is expanding network participation and driving increased system volume."); Sheedy 30(b)(6) Dep. at 75-77 ("the fundamental objective of interchange fees . . . is to maximize the throughput in the Visa system"); *id.* at 285-86 (The ideal rate structure "would optimize the output of the system based on, in theory, an optimal level of issuer demand and acquirer merchant demand."); Visa U.S.A. Interr. Resp., at 1-

---

[117]   Visa Board Meeting Executive Summary (May 24, 2000).

322; VUSAMDL1-03585517 to 03585520,[118] at 518 ("Given the competitive marketplace, increased interchange fees to card issuing financial institutions have historically allowed Issuers to lower costs to cardholders and also permit Issuers to add features and benefits to cards, which help increase usage and provide cardholders greater utility thereby benefiting Merchants through incremental sales and customer satisfaction."); Jorgensen Dep. at 121-22 (interchange is the "means by which Visa intended to maximize system output"); Towne 30(b)(6) Dep. at 28-29 ("The whole goal of interchange recommendations are to facilitate growth.  The way to facilitate growth is to achieve balance in terms of the value proposition to issuers as well as the value proposition to acquirers and their clients, the merchants."); Sheedy Decl. ¶¶ 13-20.)

For MasterCard, "[i]nterchange is a balancing mechanism which MasterCard sets in many parts of the world and we do it in a way that is intended to maximize the number of merchants that accept MasterCard, the number of cardholders that carry MasterCard, to create as large a base of transactions as we can."  (Selander Dep. at 83-84; *see also* Munson Dep. at 76 ("The goal, of course, from MasterCard's point of view, being to establish a demand equilibrium, at which point the overall demand for the MasterCard service should be maximized, output maximized."); Heuer Dep. at 50-54 (Mr. Heuer agreed that "MasterCard's strategy is to incent both the widespread issuance and acceptance of MasterCard cards" and that MasterCard takes into account competition, costs, and incentives made to issuers and merchants.); MCI_MDL02_01351706 to 01351732,[119] at 716 ("MasterCard's objective in setting interchange fees is to maximize both the issuance and acceptance of MasterCard cards."); MasterCard

---

[118]  Visa Check Card, Interlink, and ATM Interchange Reimbursement Fee Modifications, Visa Business Review (Nov. 2004).

[119]  MasterCard, "Ten Things Every MasterCard Member Should Know About Interchange Fees" (Oct. 2005).

Worldwide Fact Sheet[120] ("Interchange is established to incent banks to issue payment cards and merchants to accept those cards . . . By shifting some of the cost of the payment system from issuers and their cardholders to acquirers and their merchants, a system operator like MasterCard can encourage greater utilization of its cards. Often referred to as 'balancing the system' this makes the system more efficient and valuable to cardholders and merchants."); Kapteina Dep.[121] at 144, 185-86 (MasterCard's Interchange Committee considered several factors when setting rates, including cost, competition, technology, incenting acceptance and issuance, and the business environment); T. Murphy Decl. ¶¶ 14, 16-23.)

Defendants dispute class plaintiffs' definition of "Interchange Fee" as "a fee that Merchants pay to the Issuing Bank" because it is inaccurate, misleading, and unfairly prejudicial. An interchange fee is compensation paid by the acquiring bank to the issuing bank via Visa or MasterCard for the transaction passing through interchange. (*See* Paragraphs 64 & 69.) Class plaintiffs have presented no evidence that merchants pay any fees to issuing banks.

     **a.**    **When asked whether the "theoretical basis for the setting of interchange fees described in Professor Baxter's article play[ed] any role in Visa's development of multiple interchange fees for various categories of merchants," Sheedy testified, "My experience with Visa over my 15-year tenure and in this period in particular when we were rolling out – when we were implementing interchange fee programs that were customized to different market segments, merchant categories, that we were focused not on theory, but on implementing fee programs and business practices that would support the operation of our business and the growth of Visa payments. I wouldn't have naturally or generally thought at this time when we were pursuing these business activities as relating them back to an economic article that was written more than ten years prior."[277]**

---

[120]  MasterCard Worldwide, "Fact Sheet: Interchange and the Payments Industry," available at http://www.mastercard.com/us/company/en/docs/Interchange%20backgrounder.pdf (last visited Apr. 27, 2011) ("MasterCard Worldwide Fact Sheet").

[121]  Deposition of Elizabeth Kapteina (Oct. 11, 2007) ("Kapteina Dep."). Ms. Kapteina testified as a business leader for the U.S. region of MasterCard. (Kapteina Dep. at 15.)

[277]      Sheedy 30(b)(6) Dep. 99:21-100:22. (SUFEX185)

*Defendants' Response to Paragraph 48a:*

       Undisputed.

    **b.**    **Similarly, when asked for the theoretical justification for Visa's volume-tiered interchange program, Sheedy testified, "I operate a function within a company and we take actions in that function designed to improve our business. It's not theory. So we roll out programs with a business strategy and a set of business objectives in mind. … We don't roll them out with theories in mind."** [278]

[278]      Sheedy 30(b)(6) Dep. 152:19-153:4. (SUFEX185)

*Defendants' Response to Paragraph 48b:*

       Undisputed.

    **c.**    **Sheedy confirmed that Visa does not know or attempt to determine the optimal output when setting interchange fees.** [279]

[279]      Sheedy 30(b)(6) Dep. 284:10-285:25; Sheedy 30(b)(6) Dep. 286:23-287:20. (SUFEX185)

*Defendants' Response to Paragraph 48c:*

       Disputed.  Class plaintiffs' mischaracterize Mr. Sheedy's testimony.  Mr. Sheedy acknowledged that he is "not sure that Visa can know what the optimal output is." (Sheedy 30(b)(6) Dep. at 286-87.)  Nevertheless, he recognized that the desire to get to the optimal output was a theoretical way to explain Visa's business decisions.  (*Id.* at 285-87.)  Further, class plaintiffs' citation to Mr. Sheedy's testimony is incomplete and misleading.  (Fed. R. Evid. 106.)  In the testimony cited by class plaintiffs, Mr. Sheedy testified that setting interchange requires a balancing of the two sides of the payment card market.  (Sheedy 30(b)(6) Dep. at 284.)

<u>**Plaintiffs' Paragraph 49:**</u>

**49      Visa and its acquirers enforce Visa's default Interchange fees.**

<u>*Defendants' Response to Paragraph 49:*</u>

Disputed.  Defendants dispute class plaintiffs' use of the term "enforce" because it is vague and ambiguous.  In Paragraph 49g class plaintiffs set forth the only piece of evidence on which class plaintiffs rely in support of their assertion that Visa acquirers enforce Visa's default Interchange fees, but the deposition testimony they cite is from a former Visa employee discussing his responsibilities while employed at Visa.

Interchange fees are determined by Visa and are provided on Visa's published fee schedule.  (Oct. 2010 Visa Rules, at 900.)  An interchange reimbursement fee is a default transfer price between acquirers and issuers within the Visa system.  (*Id.* at 899.)  In clearing and settlement, Visa settles funds between the issuer and acquirer by calculating the settlement obligation of the issuer and the amount due to the acquirer, net of certain applicable fees and charges.  (Visa Form 10-K,[122] at VUSAMDL1-09079931, 36.)

Acquirers then have discretion as to whether they pass on the full amount of the interchange fees to merchants.  Class Plaintiffs' economics expert, Dr. Frankel, has acknowledged that most agreements between merchants and merchant acquirers permit merchant acquirers to increase the merchant discount fees in response to an increase in interchange fees.  (Frankel Dep.[123] at 164-65.)  But no Visa or MasterCard rule requires merchant acquirers to pass

---

[122]   Form 10-K of Visa Inc. (Dec. 21, 2007) ("Visa Form 10-K"), bearing control number VUSAMDL1-09079924 to 09080133.

[123]   Deposition of Alan Frankel (Sept. 20-22, 2010) ("Frankel Dep.").

on the interchange fees imposed on them to merchants.  (Rossi Dep.[124] at 117.)  Competition

sometimes leads merchant acquirers to absorb some portion of an interchange fee increase.  As

Dr. Frankel testified:

> Q.     Okay.  In the instances, Dr. Frankel, that you believe exist where acquirers have the contractual right to increase the merchant discount in the event the interchange rate increases, do you have an understanding as to whether acquirers universally exercise that right and do in fact increase the merchant discount?
>
> A.     Well, there's two things to keep separate here.  One is the change over time.  And I'm aware that some acquirers have from time to time said that they do not always pass through to their merchants or change the level of the merchant discount rate by the full amount that the interchange fee increases.  But that doesn't mean that there's not a one-for-one payment of the interchange fee by the merchant because over time the acquirers' margin has been reduced through efficiencies in competition.
>
> And so the way that contracts reprice, even when an interchange fee increases by ten basis points say, the merchant may only pay a nine basis point increase, that's because the acquirer margin has been eroded over time through efficiency and competition.

(Frankel Dep. at 166-67.)

Dr. Frankel also testified that, even where merchant acquirers have passed on one

hundred percent of such increases, they have not always done so contemporaneously with the

interchange increases, but have absorbed the increases for some period of time before raising the

merchant discount fee.  (Frankel Dep. at 168-69.)  More specifically, Dr. Frankel testified that

when he opined in his expert report that "[c]hanges in interchange fees are matched by changes

in merchant discount fees" (Frankel Rep. ¶ 153), he meant "over time given a time for

interchange changes to filter through in some cases, but not necessarily instantaneously."

(Frankel Dep. at 168-69.)

---

[124]  Deposition of Debra Rossi (Mar. 25, 2008) ("Rossi Dep.").  Ms. Rossi testified as the executive vice president and manager of Wells Fargo's merchant payments business.  (Rossi Dep. at 13.)

Plaintiffs' industry expert, Mr. McCormack, also testified that merchant acquirers sometimes absorb increases in interchange fees:

> Q.     Did you make any effort to determine whether there was any evidence in the discovery record of this case, or otherwise, that acquirers in some circumstances absorbed interchange increases without passing on those costs to merchants?
>
> MR. DAVIDOFF:  Objection to the form of the question.  Objection; overbroad.
>
> THE WITNESS:  That's a different subject than what you were asking me earlier.  I mean, there are situations where acquirers will choose to lessen their acquirer service fee in instances where there's an interchange increase.
>
> I am aware of those types of situations.  It's not common from my perception, but it occasionally happens.
>
> \*     \*     \*
>
> Q.     When you stated that acquirers, in certain circumstances, decreased their acquirer service fee in light of an interchange increase, could you provide more detail by what you mean?
>
> A.     Well, it's not a practice when I had direct involvement with merchant pricing at ▮▮▮▮▮▮ that we followed.  We endeavored to ensure that any interchange fee was paid by the merchant.
>
> But I'm aware of situations whereby if an acquirer, be it a bank, ISO, or processor, has a relationship with a merchant and there's some sensitivity to raising the merchant's discount rate, that in certain situations a business decision may be made that they – if the interchange were to increase, that they absorb that in their acquirer service fee margin as a pricing accommodation.

(McCormack Dep.[125] at 159-61.)

In his expert report, Class Plaintiffs' industry expert, Mr. McCormack, has purported to demonstrate that, between 1990 and 2006, merchant acquirers' service fees – that portion of the merchant discount fee retained by merchant acquirers – have declined by approximately 46% on average, from 52 basis points (0.52%) to 28 basis points (0.28%) of

---

[125]   Deposition of Mike McCormack (Aug. 25, 2010) ("McCormack Dep.").

purchase volume. (McCormack Rep. ¶¶ 12, 86.) Figures 3 and 11 of Mr. McCormack's report show that, during the same period, interchange fees increased by approximately 41% on average, from 132 basis points (1.32%) to 186 basis points (1.86%) of purchase volume, and merchant discount fees increased by approximately 16% on average, from 192 basis points (1.92%) to 223 basis points (2.23%) of purchase volume. (McCormack Rep. ¶¶ 12 (Figure 3), 86 (Figure 11).) The fact, according to Class Plaintiffs' expert, Mr. McCormack, that average interchange fees have increased almost three times as much as average merchant discount fees, and that merchant acquirers' service fees have been cut nearly in half over the same period of time, demonstrates that merchant acquirers have absorbed some of the interchange fee increases. As Mr. McCormack explained, "acquirers often sacrifice their own margins to meet price demands of large merchants." (McCormack Rep. ¶ 89.)

Evidence from merchant acquirers and from plaintiffs themselves establishes that increases in interchange fees are not always fully reflected as increases in merchant discount fees to merchants. For instance, in December 2004, merchant acquirer US Data Capture, Inc. ("USDC") explained to class plaintiff Crystal Rock that, "[i]n October 2002, April 2003, January 2004 and April of 2004 Visa/MasterCard increased their base interchange rates to US based processing companies. Virtually all companies pass these increases onto their merchant base, however, in all cases USDC did not increase your rate and absorbed all such increases." (CROCK01263 to 01264,[126] at 263.)

In February 2004, merchant acquirer Transcom Payment Services announced to its sales associates that it would "██████████████████████████████████

████████████████████████████████████████████████████████

---

[126] Email between P. Gatof and R. Avoletta (Dec. 17, 2004).

███████ (Aviles Dep. Ex. 42697[127]; Aviles Dep.[128] at 108-09.) ████████

███████████████████████████████████████████

███████████ (Aviles Dep. at 109-10.)

   Class plaintiff Leon's Transmission Service, Inc.'s ("Leon's Transmission") contract with merchant acquirer Payment Resources International provided Leon's Transmission "a one-year guarantee with no interchange increase regardless of whether Visa or MasterCard increased their rates." (Archer Dep.[129] at 127.)  When, at the end of the one-year period, Payment Resources International suggested that it was time to raise Leon's Transmission's merchant discount fees, Leon's Transmission simply changed merchant acquirers.  (*Id.* at 128.)

   Merchant acquirer Chase Paymentech Solutions ("Paymentech") has not always passed on increases in interchange rates to its merchant customers.  The merchant discount fees for merchants with bundled rate pricing do not uniformly increase when interchange rates increased.  (Wechsler Dep.[130] at 77.)  In March 2003, Paymentech informed its merchant customer, ██████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███ (CHASE003107854 to 003107855,[131] at 854.)

---

[127] Email between Sales Associates and Mark  (Feb. 23, 2004), bearing control number NCGA 003199.

[128] Deposition of James M. Aviles (Nov. 11, 2008) ("Aviles Dep.").  Pursuant to Rule 30(b)(6), Mr. Aviles testified on behalf of Merchant e-Solutions, Inc. regarding payment card processing.  (Aviles Dep. at 16-17; Aviles Dep. Ex. 42690 30(b)(6) Deposition Subpoena.)

[129] Deposition of Vincent Wayne Archer (Jan. 17, 2008) ("Archer Dep.").  Mr. Archer testified as the administrative controller of Leon's Transmission.  (Archer Dep. at 24.)

[130] Deposition of Robert Wechsler (Oct. 1, 2008) ("Wechsler Dep.").  Mr. Wechsler was executive vice president of global sales and service for Paymentech between 2002 and December 2006.  (Wechsler Dep. at 12.)

[131] Letter from Paymentech to Fortunoff (Mar. 10, 2003).

186

Merchant acquirer Wells Fargo Merchant Services has also not always passed on increases in interchange rates to its merchant customers because interchange is only one of the factors considered when it decides how to price a merchant client:

> Q:      So the committee receives the information about any changes in interchange rates and fees by Visa and MasterCard.  How does it then take that information and use it to adjust what [Wells Fargo Merchant Services] will charge to particular merchants?



(Healy Dep.[132] at 54-55.)

For example, merchant . (Mattea Dep.[133] at 119-21.)

---

[132] Deposition of Tim Healy (May 7, 2008) ("Healy Dep.").  Mr. Healy testified as the finance manager at Wells Fargo.  (Healy Dep. at 10.)

[133] Deposition of Karen Mattea (Mar. 18, 2009) ("Mattea Dep.").  Ms. Mattea was the pricing planning manager for CPSI between 2001 and October 2005.  (Mattea Dep. at 13.)

██████████████████████████████████████████████████████

██████████████████████████████████████████████

████████ (Pukas Dep.[134] at 271.)

Merchant acquirer Fifth Third Processing Solutions ("Fifth Third") has also priced merchant discount fees below applicable interchange fees in those circumstances where the merchant's overall business relationship with Fifth Third warranted such pricing. (Baker Dep.[135] at 59-61.) Fifth Third entered into such a pricing arrangement in its ████████████

███████████████████████. (*Id.*) Fifth Third's merchant acquiring relationship with ████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████. (*Id.* at 79-81.)

a.   **Andy Offenberg, formerly of Visa's Interchange Compliance and Systems Implementation group, explained that the** ████████████████

████████████████████████████████████ **Mr. Offenberg further testified as to Visa's February 2006** ████████████████████████████████████

████████████████████████████[280] **As shown in an Executive Management Committing briefing, this enhanced process was to** ████████

████████████████████████████████████████

████████████████████████████[281]

---

[280]      **Offenberg Dep. 137:6-21, 176:16-178:13, 178:23-179:21, 179:22-180:8, Jan. 9, 2008. (SUFEX219)**

---

[134]   Deposition of Julia Pukas (Mar. 7, 2008) ("Pukas Dep."). Ms. Pukas was the business manager and president of Citicorp Payment Services, Inc. between 1997 and 2005. (Pukas Dep. at 14-16.)

[135]   Deposition of David Baker (Sept. 4, 2008) ("Baker Dep."). Mr. Baker is a former executive in Fifth Third's merchant acquiring business. (Baker Dep. at 12-19.)

[281]    Offenberg Dep. 137:6-21, 176:16-178:13, 178:23-179:21, 179:22-180:8, Jan. 9, 2008. (SUFEX219)

*Defendants' Response to Paragraph 49a:*

Disputed.  Class plaintiffs mischaracterize Mr. Offenberg's deposition testimony.

The process about which Mr. Offenberg testified above was a proposed process, not a process

that was in effect.  (Offenberg Dep.[136] at 176-78.)

**b.     Tolan Steele testified that the purpose of his** ███████████████
███████████████
[282]

---
[282]    Steele Dep. 33:17-34: 17, 37:3-9, Apr. 2, 2008. (SUFEX041)

*Defendants' Response to Paragraph 49b:*

Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading.

(Fed. R. Evid. 106.).  Mr. Steele testified the purpose of the his ███████████████

███████████████████████████████

███████████████████████

(Steele Dep. at 33-34.)

**c.     A slide for an acquirer workshop presentation stated that Visa is** █████
████████████████████ [283]

---
[283]    Steele Dep. Ex. 31413, at VUSAMDL1–06291270, Mar. 23, 2005. (SUFEX220)

*Defendants' Response to Paragraph 49c:*

Undisputed.

**d.     Peter Zuercher, Visa's Director of Interchange Strategy, described the work
        of Visa's interchange compliance department as "**████████████

---
[136]  Deposition of Alex Offenberg (Jan. 9, 2008) ("Offenberg Dep.").  Mr. Offenberg testified as group director for
       business development and strategic projects at Visa.  (Offenberg Dep. at 13.)

██████████████████████████████████████████████████ ” Visa
monitors all transactions processed through VisaNet by issuers and acquirers.
[284]

---

[284]     Zuercher Dep. 47:18-48:13, Feb. 8, 2008 (SUFEX 211); see also Morrissey Dep. 398:23-399:10, Jan. 31, 2008. (SUFEX221)

*Defendants' Response to Paragraph 49d:*

> Undisputed.

> e.     **In a letter to a Visa director, Bill Sheedy explains Visa's proposal for "**████████████████████████**" He notes that while Visa was already** ████████████████████████████████████████
> ████████████████████████ [285]

---

[285]     Floum Dep. Ex. 28909, at VUSAMDL1-06276619, undated (SUFEX222); see also Sheedy Dep. 640:5-20, Nov. 21, 2008  (SUFEX171)(██████████████████████████████████████████
████████████ ).

*Defendants' Response to Paragraph 49e:*

> Undisputed.

> f.     **A letter from Visa Head of U.S. Aquirer and Merchant Sales, Douglas Hambry, to** ████████████ **supermarket and the ensuing internal email exchange shows Visa enforcing the repercussions of** ████████ **non-compliance with volume requirements for a lower interchange rate.** [286]

---

[286]     Hambry Dep. Ex. 32593 (SUFEX223), VUSAMDL1-060203487-89, Jan. 14, 2005; Ex. 23594 (SUFEX224), VUSAMDL1-06233762-63, Jan. 24, 2005; Ex. 32595 (SUFEX225), VUSAMDL1-06295151-53, Jan. 25, 2005; Ex. 32596 (SUFEX226), VUSAMDL1-05241927-30, Jan. 27, 2005.

*Defendants' Response to Paragraph 49f:*

> Disputed.  Class plaintiffs mischaracterize the evidence on which they rely.  The

letters and emails cited by plaintiffs deal with ████████████ not being eligible for the volume

interchange discounts because they had chosen limited acceptance, in a manner inconsistent with

the *Visa Check* settlement, making them ineligible for lower rates.  (Hambry Dep. Ex. 32593, at

VUSAMDL1-06020348 (writing to John Boyd, the Group VP & Treasurer for ███████,

Doug Hambry explained that "Partially in exchange for these added incentives, the Visa

Operating Regulations require 100% of a merchant's and its subsidiaries' stores accept the Visa

product(s) for the applicable Visa Credit or Debit Performance Threshold. . . . [W]e checked our

records to see whether ████████████ had ever registered as a limited acceptance

merchant as required by the Settlement Agreement . . . and discovered that neither ████████

████████ had ever provided such a notice.")

> **g.    Patrick Moran of Fifth Third testified that his bank's interchange team was
> charged to "ensure members comply with all [Visa] rules and regulations."
> Moran further testified that fines were a common way in which Visa took
> action against a member that was in violation of its rules. [287]**

---

[287]    **Moran Dep. 188:15-190:1, Oct. 7, 2008. (SUFEX227)**

_Defendants' Response to Paragraph 49g:_

Disputed.  Class plaintiffs' description of Mr. Moran's testimony is incorrect.  Mr.

Moran was a vice president in the interchange strategy group at Visa from 2000 to 2004. (Moran

Dep.[137] at 11-12.)  His testimony quoted above by class plaintiffs relates to a 2003 presentation

received during the course of his employment at Visa.  (_Id._ at 184-188; Moran Dep. Ex.

33710[138].)

Defendants note that Mr. Moran's testimony was the only purported evidence on

which class plaintiffs relied in support of their assertion that acquirers enforce Visa's default

interchange fees.

---

[137]   Deposition of Patrick Moran (Oct. 7, 2008) ("Moran Dep.").  Mr. Moran testified as vice president of portfolio
and product management at Fifth Third.

[138]   Email from R. Morrissey to R. Towne, W. Sheedy, P. Moran, C. Jorgensen, and L. Lehman (Mar. 17, 2003)
attaching "Visa: Business Planning Interchange Group," bearing control numbers VUSAMDL1-06154227 to
06154255.

<u>Plaintiffs' Paragraph 50:</u>

**50      Since Visa's IPO, the non-bank-representative members of the Board of Directors of Visa U.S.A. establish uniform schedules of Default Interchange Fees that apply to all Visa transactions in the United States.**

*Defendants' Response to Paragraph 50:*

      Disputed.  Class plaintiffs do not provide any evidence in support of this assertion. Visa's default interchange fees only apply in the absence of a bilateral agreement between an acquiring bank and an issuer.  (Oct. 2010 Visa Rules, Ch. 10, Core Principle 10.3.)

      Class plaintiffs do not provide any evidence in support of their characterization that member banks of Visa U.S.A. had representatives on the Visa U.S.A. board.  Such a characterization is misleading and unfairly prejudicial.  As discussed in Defendants' Response to Paragraph 7, each member of the Visa U.S.A. Board owed a fiduciary duty to the corporation, and did not sit as a representative of any constituent, member, or shareholder of Visa U.S.A. (*See* Defendants' Response to Paragraph 7.)

      Defendants dispute class plaintiffs' definition of "Interchange Fee" as "a fee that Merchants pay to the Issuing Bank" because it is inaccurate, misleading, and unfairly prejudicial. An interchange fee is compensation paid by the acquiring bank to the issuing bank via Visa or MasterCard for the transaction passing through interchange.  (*See* Paragraphs 64 & 69.)  Class plaintiffs have presented no evidence that merchants pay any fees to issuing banks.

<u>Plaintiffs' Paragraph 51:</u>

**51    Visa employs the same methodology to set interchange fees after its IPO as it used before the IPO.**

*Defendants' Response to Paragraph 51:*

Disputed.  Class plaintiffs have not defined the timeframe before the Visa IPO to which they are referring.  Without a specified timeframe, this assertion appears to contradict class plaintiffs' assertions in Paragraphs 44-45 that the methodology for setting interchange fees has changed over time.  The only evidence on which class plaintiffs rely in support of this assertion, which appears in subparagraph a, does not discuss Visa's methodology to set interchange after its IPO, and thus does not support class plaintiffs' assertion that the methodology has not changed.

Visa only sets default interchange fees that apply in the absence of a bilateral agreement between an acquiring bank and an issuer.  (Oct. 2010 Visa Rules, Ch. 10, Core Principle 10.3)

a.    **After the implementation of independent directors, Visa's interchange fee-setting process did not change.**[288]  **Visa's CEO, Joseph Saunders, acknowledged that "you still had Sheedy's group doing their thing; it just went to a different subset of the board made up of independent directors [for final approval]."** [289]

_____

[288]    Saunders Dep. 147:13-148:18. (SUFEX085)

[289]    *Id.*  (SUFEX085)

*Defendants' Response to Paragraph 51a:*

Disputed.  Class plaintiffs' characterization of Mr. Saunders' testimony is incorrect.  When asked whether "the Visa management executives' process for analyzing and recommending IRF rate modifications change[ed] after the addition of independent directors in

May of 2006," Mr. Saunders responded, "I don't know." (Saunders Dep. at 147.)  Moreover, Mr. Saunders' testimony relates only to the interchange methodology after the addition of directors not affiliated with any bank to the Visa board, which occurred in 2006, *before* the Visa IPO.  (*Id.* at 147-48.)

The quotation that class plaintiffs claim Mr. Saunders "acknowledged" was asked of Mr. Saunders, and he did not acknowledge or adopt the phrasing of the question.  (*Id.*)

194

<u>Plaintiffs' Paragraph 52:</u>

52      Until July 8, 2004, the levels of Default Interchange Fees for MasterCard were
established by a vote of its Board of Directors. [290]

---

[290]      Marketing U.S. Region Bulletin No. 1, announcing 2000-2001 consumer and corporate interchange
rates, effective June 9, 2000, MCI_MDL02_01352647-53 at MCI_MDL02_01352647 (SUFEX228); Marketing
U.S. Region Bulletin No. 1, announcing 2001-2002 consumer and corporate interchange rates, effective April
6, 2001, MCI_MDL02_01353230-33 at MCI_MDL02_01353230 (SUFEX229); Marketing U.S. Region Bulletin
No. 2, announcing U.S. Region Payment Transaction Interchange Rate, effective April 6, 2001,
MCI_MDL02_00018771-74 at MCI_MDL02_00018771 (SUFEX230); Marketing U.S. Region Bulletin No. 2,
announcing 2002-2003 consumer and corporate interchange rates, effective April 5, 2002,
MCI_MDL02_01518064-67 at MCI_MDL02_01518064 (SUFEX231); Marketing U.S. Region Bulletin No.1,
announcing 2003-2004 consumer and corporate interchange rates, effective April 4, 2003,
MCI_MDL02_01353238-42 at MCI_MDL02_01353238 (SUFEX232); Marketing U.S. Region Bulletin No. 3,
announcing Maestro rates, effective July 1, 2003, MCI_MDL02_00018760-61 at MCI_MDL02_00018760
(SUFEX233); Marketing U.S. Region Bulletin No. 4, announcing new consumer debit, consumer credit and
corporate card interchange rates, effective August 1, 2003, MCI_MDL02_01350255-60 at
MCI_MDL02_01350255 (SUFEX234); Marketing U.S. Region Bulletin No. 9, announcing consumer debit
and Maestro interchange rates, effective April 2004, MCI_MDL02_00018749-53 at MCI_MDL02_00018750
(SUFEX235); Marketing U.S. Region Bulletin No. 1, modifying previously announced consumer debit
interchange rate changes, effective April 2004, MCI_MDL02_07053271-75 at MCI_MDL02_07053271-75.
(SUFEX236)

<u>*Defendants' Response to Paragraph 52:*</u>

Disputed.  The MasterCard U.S. board did not establish interchange fees, but

rather approved proposed interchange fees.  (Jonas Methodology Dep.[139] at 12-14, (Members of

the interchange committee and senior management discuss, analyze and consider interchange

proposals.  Before 2004, the MasterCard U.S. board "approve[d] the [interchange] proposals for

the US Region."); Heuer Dep. at 37-40 (Before 2004, interchange rates were set following "an

annual cost study . . . and then with discussion with people that worked on the merchant side and

the issuing side and product area, the legal, the financial, recommendations were put together"

and "presented for [US Board] approval.").)

---

[139]   Deposition of Steven Jonas (Apr. 23-24, 2008) ("Jonas Methodology Dep.").  Mr. Jonas testified as
MasterCard's Rule 30(b)(6) designee on the methodology used to set MasterCard interchange fees.  (Jonas
Methodology Dep. at 7.)

Defendants dispute class plaintiffs' definition of "Interchange Fee" as "a fee that Merchants pay to the Issuing Bank" because it is inaccurate, misleading, and unfairly prejudicial. An interchange fee is compensation paid by the acquiring bank to the issuing bank via Visa or MasterCard for the transaction passing through interchange. (*See* Paragraphs 64 & 69.) Class plaintiffs have presented no evidence that merchants pay any fees to issuing banks.

<u>Plaintiffs' Paragraph 53:</u>

**53     From July 8, 2004 to May 26, 2006, MasterCard management established Default Interchange Fees for transactions conducted on the MasterCard Network, pursuant to the Board's decision to outsource this decision-making to management.** [291]

---

[291]     Murphy 30(b)(6) Dep. 221:25-223:11 (SUFEX021); Selander Dep. Ex. 28416 at MCI_MDL04_00004822-4823. (SUFEX237)

*Defendants' Response to Paragraph 53:*

Disputed. Class plaintiffs mischaracterize the evidence on which they rely, and their use of the term "outsourced" is misleading and unfairly prejudicial. Mr. Murphy, on whom class plaintiffs rely, testified that MasterCard "wanted to reflect the reality that these were management decisions based on an analysis of rates and competitive circumstances, and we wanted the governance to reflect – to reflect that." (T. Murphy Dep. at 223.) Similarly, Carl Munson confirmed that MasterCard's decision to have management set default interchange fees was a confirmation of management's authority to set interchange post-IPO: "Interchange fee decision making, like most decisions at most corporations, is a day-to-day management function, not requiring any kind of special board authorization or approval. [The delegation] was the confirmation that . . . interchange fees falls into that category of ordinary, day-to-day management decision making." (Munson Dep. at 164-65.)

Defendants dispute class plaintiffs' definition of "Interchange Fee" as "a fee that Merchants pay to the Issuing Bank" because it is inaccurate, misleading, and unfairly prejudicial. An interchange fee is compensation paid by the acquiring bank to the issuing bank via Visa or MasterCard for the transaction passing through interchange. (*See* Paragraphs 64 & 69.) Class plaintiffs have presented no evidence that merchants pay any fees to issuing banks.

<u>Plaintiffs' Paragraph 54:</u>

**54      Historically, MasterCard claimed that its interchange fees were cost based premised on a methodology devised by Edgar Dunn & Co. [292]**

_____
[292]      **MCI_MDL_00437277 (SUFEX238); MCI_MDL01_01822736 (SUFEX239); see also Frankel Rep. ¶¶ 417-19 (SUFEX240) (citing MasterCard's website).**

_Defendants' Response to Paragraph 54:_

Disputed.  Class plaintiffs mischaracterize the evidence on which they rely.  At many points prior to this litigation MasterCard interchange fee rates were based on factors other than cost.  For example, MCI_MDL_00437271 to 00437280,[140] on which class plaintiffs rely, provides examples of when MasterCard interchange rates were not cost-based: "When the cost-based rate is not implemented, the rate is either capped at a specific amount (as it was in 1982 and 1983 @ 1.50% + $.05), or the prior year rate is held (1986-1990, rate was held at 1.32% + $.07)."  (MCI_MDL_00437271 to 00437280, at 277.)

The term "historically" is vague as it does not provide a definite timeframe.  MasterCard has considered various factors when establishing default interchange fees.  MasterCard's goal has been to increase output of its payment card products.  (Munson Dep. at 76 ("The goal, of course, from MasterCard's point of view, being to establish a demand equilibrium, at which point the overall demand for the MasterCard service should be maximized, output maximized."); Heuer Dep. at 50-54 (Mr. Heuer agreed that "MasterCard's strategy is to incent both the widespread issuance and acceptance of MasterCard cards" and that MasterCard takes into account competition, costs, and incentives made to issuers and merchants.); Selander Dep. at 83-84 ("Interchange is a balancing mechanism which MasterCard sets in many parts of the world

_____
[140]      Notes on Interchange (Jul. 15, 1993).

and we do it in a way that is intended to maximize the number of merchants that accept

MasterCard, the number of cardholders that carry MasterCard, to create as large a base of

transactions as we can.").)  In determining default interchange fees, MasterCard also considered

factors such as its business objectives, the competitive environment, and the desire to incent

certain technologies.  (Jonas Methodology Dep. at 69-70, 516-17; *see also* Kapteina Dep. at 144,

185-86 (the interchange committee considered the business leader's analysis as well as other

factors – including cost, competition, technology, incenting acceptance and issuance, and the

business environment).)

> a.   **Steve Jonas described MasterCard's historical annual study of costs as "part of MasterCard's rate-setting process and *legal defense*." (emphasis added).** [293]

---

[293]   **Jonas Dep. Ex. 23106, at -868. (SUFEX241)**

*Defendants' Response to Paragraph 54a:*

> Undisputed.

<u>Plaintiffs' Paragraph 55:</u>

55      MasterCard's Interchange Fees are no longer cost based. [294]

---

[294]      *See, e.g.*, Bamberger Decl. ¶¶ 55, 59 (SUFEX176) (showing that "Visa and MasterCard base their
interchange fees on merchants' varying elasticity of demand, or sensitivity to price increases."); Morrissey
Dep. 101:1-10, 148:18150: 13, Jan. 30, 2008 (SUFEX177) (agreeing that "Visa's goal was to try to align its
interchange fees to the merchant price elasticity of demand for categories of merchants."); Steele Dep. 314:1-
320:23, Apr. 3, 2008 (SUFEX178) (stating that Visa "will look at overall economics and transactional
economics on the margin as a function of understanding how Visa transactions compare both in their costs
and their revenue to issuers and acquirers relative to competitive networks."); Jonas Dep. 62:5-65:13, Apr. 23,
2008 (SUFEX179) (agreeing that "there are some cases benchmarks out there that [MasterCard] may be able
to turn to [determine] . . . at about [the] level, merchants should have a willingness to accept MasterCard
cards."); Morrissey Dep. Ex. 30507, at VUSAMDLI-05576121 (SUFEX180) (March 12, 2004 email from
Richard Morrissey to Robert Towne, "re: Determine Elasticity_ver04.ppt," containing presentation stating
Visa's objectives to "[d]evelop an economic model and process by which Visa's interchange fee structure is
evaluated in the context of merchant price elasticity, with the objective of optimizing Member interchange fee
revenue."); Commission Decision (E.C.) COMP/34.579 of 19 Dec. 2007 ("E.C. Decision") ¶¶ 172-75
(SUFEX081) (finding that "the cost study therefore does not serve to identify and measure specific issuing
costs which are then allocated to acquirers. It is merely a tool for estimating the willingness of merchants to
pay."). Nicholas Baxter Dep. Ex. 32001 (SUFEX181) at FNBO 0853837 ("Interchange rates have been rising
faster than inflation over the last few years while the other costs for banks that collect that fee have been
coming down.")

*Defendants' Response to Paragraph 55:*

Disputed.  Cost is a factor that MasterCard considers in setting default

interchange rates.  "'Cost' has been one of several factors MasterCard takes into consideration in

setting default interchange rates applicable to MasterCard-branded card transactions.

MasterCard commissions periodic cost studies by a third-party consultant, who surveys certain

participating financial institutions concerning some of the costs they  incur in issuing

MasterCard-branded cards.  Additionally, MasterCard reviews public information on the

interchange and/or merchant discount structures of competing payment card networks as well as

the costs and benefits of other payment types, and considers other competitive and economic

factors." (MasterCard Interr. Resp.,[141] at 3; *see also* Dunn Dep.[142] at 302; Munson Dep. at 130.)

---

[141]      Defendants MasterCard International Incorporated's and MasterCard Incorporated's Supplemental Response to
Class Plaintiffs' and Non-Class Plaintiffs' First Set of Omnibus Discovery to Network Defendants (Dec. 15,
2006) ("MasterCard Interr. Resp.").

As Timothy Murphy testified, MasterCard's methodology for setting interchange fees starts by using "a cost-based methodology looking at a set of cost drivers." (T. Murphy Dep. at 223-24.) Elizabeth Kapteina also testified that cost is one of the factors in setting MasterCard interchange rates. (Kapteina Dep. at 202-03, 312-13.) Class plaintiffs' expert Alan Frankel acknowledges that MasterCard continues to use costs when determining interchange fees: "Historically, MasterCard has noted internally that three types of costs are included in its calculations: ███████████████████ These categories have continued to be used, although the terminology has changed somewhat." (Frankel Rep. ¶ 419.)

Among other considerations, MasterCard "determine[s] interchange rates based on the cost incurred by issuers, competitive pressures from other payment methods (i.e., the market forces making the acceptance of cards attractive to merchants), the need to provide incentives to member banks and merchants to increase the efficiency of they system, and other market considerations." (McWilton Dep. Ex. 24627[143], at MCI_MDL02 11589957) (class plaintiffs rely on this same evidence in Paragraph 36j).)

Defendants dispute class plaintiffs' definition of "Interchange Fee" as "a fee that Merchants pay to the Issuing Bank" because it is inaccurate, misleading, and unfairly prejudicial. An interchange fee is compensation paid by the acquiring bank to the issuing bank via Visa or MasterCard for the transaction passing through interchange. (*See* Paragraphs 64 & 69.) Class plaintiffs have presented no evidence that merchants pay any fees to issuing banks.

---

*(cont'd from previous page)*

[142]   Deposition of Peter Dunn (Apr. 17-18, 2008) ("Dunn Dep."). Mr. Dunn testified both in his individual capacity and as the corporate representative for Edgar Dunn & Co. (Dunn Dep. at 13-14.)

[143]   "Annual Meeting Q&A" (Jul. 7, 2006), bearing control numbers MCI_MDL02_11589956 to 11589984.

Defendants object to the admissibility of evidence on which class plaintiffs rely in

Paragraph 55:

- Bamberger Decl. ¶¶ 55, 59 only concerns whether class plaintiffs' allegations are subject to class-wide determination (Bamberger Decl. at 2), and is not relevant to the merits of class plaintiffs claims at issue in class plaintiffs' motion for summary judgment. (Fed. R. Evid. 401, 402, 702.)  Class plaintiffs' characterization of Bamberger Decl. ¶¶ 55, 59 is also incomplete and misleading.  (Fed. R. Evid. 106.) Bamberger did not discuss what factors Visa takes into consideration in setting interchange rates, but rather whether the networks have the ability to engage in price discrimination.  (Bamberger Decl. ¶¶ 55, 59.)

- Richard Morrissey and Tolan Steele are both Visa employees, and their cited testimony deposition testimony, and Morrissey Dep. Ex. 30507, are irrelevant to class plaintiffs' assertions regarding how MasterCard's default interchange fees are established.  (Fed. R. Evid. 401, 402.)

- Steven Jonas' deposition testimony and European Commission decision on which class plaintiffs rely do not discuss how interchange fees are set, and are therefore irrelevant to class plaintiffs' assertions regarding how MasterCard's default interchange fees are established.  (Fed. R. Evid. 401, 402.)  Additionally, the E.C. Decision is unfairly prejudicial, and is an out of court statement for which no exception to the hearsay rule has been established.  (Fed. R. Evid. 403, 801, 802.)

Evidence on which class plaintiffs rely in subparagraphs a-i is similarly insufficient.

    a.    **The European Commission found that "MasterCard's cost based benchmarks include cost items that are neither intrinsic in the payment functionality of a card nor related to services that clearly benefit the customers that bear the expenses of this [interchange fee]." [295]**

[295]     E.C. Decision ¶¶ 10, 147-150 (describing evolution of MasterCard's justification for interchange from costs to fictional "balancing" function). (SUFEX081)

*Defendants' Response to Paragraph 55a:*

Undisputed.

Defendants object to the admissibility of the E.C. Decision.  The E.C. Decision is unfairly prejudicial, and is an out of court statement for which no exception to the hearsay rule has been established.  (Fed. R. Evid. 403, 801, 802.)

   **b.    Elizabeth Kapteina, MasterCard's Vice President of U.S. Region Interchange, admitted that MasterCard's interchange fees are not based on or related to costs.** [296]

[296]    Kapteina Dep. 312:20-313:19, 371:13-373:23, Oct. 11, 2007. (SUFEX242)

*Defendants' Response to Paragraph 55b:*

Disputed.  Class plaintiffs mischaracterize Ms. Kapteina's testimony.  In the portion of Ms. Kapteina's deposition on which class plaintiffs rely, Ms. Kapteina testified that cost is one of the factors in setting interchange rates: "[Q.]  We've discussed earlier that cost is one of the factors in analyzing interchange performance, correct?  A. Yes.  Q. And – A. And setting interchange rates."  (Kapteina Dep. at 312-13.)

   **c.    A December 2004 email from MasterCard's Vice President of Interchange, Steve Jonas, to Joy Thoma, MasterCard head of Business Resources, states, "I know we don't really focus on costs as a significant contributor to interchange rates."** [297]

[297]    MCI_MDL02_08058713-15, at MCI_MDL02_08058713. (SUFEX243)

*Defendants' Response to Paragraph 55c:*

Undisputed.

**d.**   **Steven Jonas stated during a presentation regarding interchange fees to MBNA that Edgar Dunn's Cost Study "does not support the business case" for setting interchange fees.** [298]

---

[298]   League Dep. Ex. 22732, at BOFAIC06455261. (SUFEX244)

*Defendants' Response to Paragraph 55d:*

Disputed.  Class plaintiffs' have not presented any evidence that Mr. Jonas made the above statement.  The quoted language is from a handwritten note appearing on the front of a presentation given by Steven Jonas to MBNA (which was later acquired by Bank of America) titled "U.S. Region Corporate Interchange Rate Program."  Bank of America employee Steven League testified that the handwritten notes are his (League Dep. at 234), and he does not recall whether Mr. Jonas made the statement cited by class plaintiffs.  (*Id.* at 239-240.)

**e.**   **In 2003, MasterCard decided it would** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



**Rather, MasterCard** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮. [300]
**Jonas testified that MasterCard has** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ [302]

---

[299]   Jonas Dep. 91:25-92:25, Apr. 23, 2008. (SUFEX179)

[300]   Jonas Dep. 92:12-25, Apr. 23, 2008. (SUFEX179)

[301]   Jonas Dep. 93:17-95:10, Apr. 23, 2008. (SUFEX179)

[302]   Jonas Dep. 93:17-95:10, Apr. 23, 2008. (SUFEX179)

*Defendants' Response to Paragraph 55e:*

Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading. (Fed. R. Evid. 106.) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

think we've had discussions about effective rates . . . are still well below that calculated cost."

(Jonas Methodology Dep. at 95.)

   f.   Steve Jonas testified that for many years, MasterCard's goal in setting interchange rates was establishing an overall rate that was slightly higher than Visa's rate. [303]

---

[303]   Jonas Dep. 121:19-24. (SUFEX179)

*Defendants' Response to Paragraph 55f:*

   Undisputed.

   g.   MasterCard's current goal in setting Interchange Fees is to preserve competitive parity with Visa ████████████ [304]

---

[304]   Id. at 123:2-4. (SUFEX179)

*Defendants' Response to Paragraph 55g:*

   Disputed.  As discussed in Defendants' Response to Paragraph 48, MasterCard's

current goal in setting default interchange fees is to increase system output.  (*See* Defendants'

Response to Paragraph 48.)  Additionally, MasterCard "determine[s] interchange rates based on

the cost incurred by issuers, competitive pressures from other payment methods (i.e., the market

forces making the acceptance of cards attractive to merchants), the need to provide incentives to

member banks and merchants to increase the efficiency of the system, and other market

considerations."  (McWilton Dep. Ex. 24627[144], at MCI_MDL02 11589957) (class plaintiffs rely

on this same evidence in Paragraph 36j).)

   Defendants dispute class plaintiffs' definition of "Interchange Fee" as "a fee that

Merchants pay to the Issuing Bank" because it is inaccurate, misleading, and unfairly prejudicial.

---

[144]   "Annual Meeting Q&A" (Jul. 7, 2006), bearing control numbers MCI_MDL02_11589956 to 11589984.

An interchange fee is compensation paid by the acquiring bank to the issuing bank via Visa or

MasterCard for the transaction passing through interchange.  (*See* Paragraphs 64 & 69.)  Class

plaintiffs have presented no evidence that merchants pay any fees to issuing banks.

> h.     **In response to the question, "Looking just at interchange, keeping everything else constant, wouldn't you agree that the cost of incentivizing issuance on the network has increased between 1995 and today?" MasterCard's head of Interchange, Steven Jonas, testified, "In the sense that MasterCard has determined that in**

[REDACTED]

---

[305]     **Jonas Dep. 110:9-20, May 17, 2007. (SUFEX245)**

*Defendants' Response to Paragraph 55h:*

> Undisputed.

> i.     **An internal MasterCard document indicates that "MasterCard pricing strategies must be calibrated to maximize business growth, customer profitability, and stickiness to our customers." [306]**

---

[306]     **MCI_MDL02_03113548-03113551 at 548. (SUFEX246)**

*Defendants' Response to Paragraph 55i:*

> Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading.

(Fed. R. Evid. 106.)  Class plaintiffs suggest that the above language relates to interchange fees,

but the quoted language refers to "IT Services" pricing, not interchange rates.

(MCI_MDL02_03113548-03113551 at 548.)

<u>Plaintiffs' Paragraph 56:</u>

**56      MasterCard sets Interchange Fees for Credit-Card Network Services, and Offline-Debit-Card Network Services at merchants' "reserve prices."**

*Defendants' Response to Paragraph 56:*

Disputed.  See Defendants Responses to Paragraphs 48 and 55, discussing how

MasterCard interchange fees are established.  (*See* Defendants' Responses to Paragraph 48, 55.)

Defendants dispute class plaintiffs' definition of "Interchange Fee" as "a fee that

Merchants pay to the Issuing Bank" because it is inaccurate, misleading, and unfairly prejudicial.

An interchange fee is compensation paid by the acquiring bank to the issuing bank via Visa or

MasterCard for the transaction passing through interchange.  (*See* Paragraphs 64 & 69.)  Class

plaintiffs have presented no evidence that merchants pay any fees to issuing banks.

Class plaintiffs do not offer a definition of "reserve prices."

a.      **The EC concluded that MasterCard's cost study is "merely a tool for estimating the willingness of merchants to pay," so that it could set interchange fees at just under the level that would prompt merchants to introduce their own store-brand cards.** [307]

---

[307]      **EC Decision ¶¶ 172, 174. (SUFEX081)**

*Defendants' Response to Paragraph 56a:*

Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading.

(Fed. R. Evid. 106.)  EC Decision ¶¶ 172, 174 is misleading because the decision does not

discuss how MasterCard sets interchange rates.  (EC Decision ¶¶ 172, 174.)

Defendants object to the admissibility of the E.C. Decision.  The E.C. Decision is

unfairly prejudicial, and is an out of court statement for which no exception to the hearsay rule

has been established.  (Fed. R. Evid. 403, 801, 802.)

b.      To the EC, MasterCard described "as erroneous the view that interchange fees are a payment for costs incurred by issuers and attributable to acquirers and merchants. Instead, interchange fees would be a *'proxy for merchants' elasticity of demand.'*"[308]

---

[308]      EC Decision ¶ 150 (emphasis in original). (SUFEX081)

*Defendants' Response to Paragraph 56b:*

Undisputed.

Defendants object to the admissibility of the E.C. Decision.  The E.C. Decision is unfairly prejudicial, and is an out of court statement for which no exception to the hearsay rule has been established.  (Fed. R. Evid. 403, 801, 802.)

c.      **MasterCard's Associate General Counsel testified in a hearing before the European Commission that** ███████████████████████████████████████████████████████████████████████████████████████████████████████████████ [309]

---

[309]      EC Decision ¶¶ 175 (quoting MasterCard Inc's Associate General Counsel). (SUFEX081)

*Defendants' Response to Paragraph 56c:*

Undisputed.

Defendants object to the admissibility of the E.C. Decision.  The E.C. Decision is unfairly prejudicial, and is an out of court statement for which no exception to the hearsay rule has been established.  (Fed. R. Evid. 403, 801, 802.)

d.      **The vice president of MasterCard's interchange group testified that one of the "measures" MasterCard takes into consideration when setting interchange fees is a** █████████████████████████████ [310]

---

[310]      Jonas Dep. 65:18-68:13, Apr. 23, 2008. See also id. at 33:09-19. (SUFEX179)

*Defendants' Response to Paragraph 56d:*

    Undisputed.

    e.    **In a MasterCard document titled "Update on Strategy Review" of 2004, MasterCard acknowledged the** ███████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████████ ████████████████████████████████ ███████████████████████████████████

    **[311]**

_____

[311]    **MCI_MDL02_11828209, at 212. (SUFEX247)**

*Defendants' Response to Paragraph 56e:*

    Undisputed.

    f.    **The Vice President of MasterCard's Interchange Fees testified that one of the "measures" MasterCard takes into consideration when setting interchange fees is a** ████████████████████████████

    **[312]**

_____

[312]    **Jonas Dep. 65:18-68:13, Apr. 23, 2008. See also id. at 33:09-19. (SUFEX179)**

*Defendants' Response to Paragraph 56f:*

    Disputed.  Defendants dispute class plaintiffs' definition of "Interchange Fee" as "a fee that Merchants pay to the Issuing Bank" because it is inaccurate, misleading, and unfairly prejudicial.  An interchange fee is compensation paid by the acquiring bank to the issuing bank via Visa or MasterCard for the transaction passing through interchange.  (*See* Paragraphs 64 & 69.)  Class plaintiffs have presented no evidence that merchants pay any fees to issuing banks.

    g.    **A report by MasterCard executive Fred Gore showed that** ████████ **[313]** ████████████████████████

_____

[313]    **Gore Dep. Ex. 20315, at MCI_MDL02_01161430. (SUFEX248)**

*Defendants' Response to Paragraph 56g:*

Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading. (Fed. R. Evid. 106.)  The slide on which class plaintiffs rely is entitled "How Merchants View Payments," and represents what purport to be merchants' views of payment systems, not MasterCard's.  (Gore Dep. Ex. 20315, at MCI_MDL02_01161430.)

Defendants object to the admissibility of Gore Dep. Ex. 20315, at MCI_MDL02_01161430.  The language reflecting merchants views is an out of court statement for which no exception to the hearsay rule has been established.

**h.**    **Gore agreed that MasterCard considers** ███████████████ ███████████. **[314]**

---

[314]    **Gore Dep. 215:14-18. (SUFEX249)**

*Defendants' Response to Paragraph 56h:*

Undisputed.

210

<u>**Plaintiffs' Paragraph 57:**</u>

**57      Steve Jonas, MasterCard's 30(b)(6) designee for Interchange Methodology, testified that despite the fact that MasterCard's justification for interchange fees is that "interchange fees are the mechanism by which operator of four-party payment systems redress the imbalance between issuers' and acquirers' costs and revenues,"** ▮ **. [315] Jonas also testified that the purpose of interchange was to** ▮ **[316]**

---

[315]      **Jonas 30(b)(6) Dep. 35:6-36:16, April 23, 2008. (SUFEX179)**

[316]      **Jonas Dep. 44:17-25. (SUFEX179)**

*Defendants' Response to Paragraph 57:*

          Disputed.  Mr. Jonas was MasterCard's designated representative to answer questions about the methodology by which MasterCard establishes interchange fees.  (Jonas Methodology Dep. at 7.)  Class plaintiffs' citation to "Jonas Dep. 44:17-25" is incomplete and misleading.  (Fed. R. Evid. 106.).  Mr. Jonas testified, "I would say the purpose of the interchange fees has been to help grow the network to develop a – to provide an economic proposition for issuers that incent them to issue MasterCard cards, and to have such a structure that helps grow merchant's acceptance, and in general, grows the network."  (Jonas Methodology Dep. at 44.)

<u>**Plaintiffs' Paragraph 58:**</u>

**58     MasterCard engages price discrimination in the setting of Interchange Fees for Credit-Card Network Services and Offline-Debit-Card Network Services.**

<u>*Defendants' Response to Paragraph 58:*</u>

Disputed.  See Defendants Response to Paragraph 55, discussing how MasterCard interchange fees are established.  (*See* Defendants' Response to Paragraph 55.)  The evidence on which plaintiffs rely in subparagraphs a-e stands only for the fact that MasterCard has differential pricing, not that such pricing is the product of price discrimination.



---

[145]  PULSE PIN Debit Pricing (Effective Jun. 1, 2005).

[146]  NYCE Network Update (Dec. 12, 2006).

███████████████████████

███████████

Defendants dispute class plaintiffs' definition of "Interchange Fee" as "a fee that Merchants pay to the Issuing Bank" because it is inaccurate, misleading, and unfairly prejudicial. An interchange fee is compensation paid by the acquiring bank to the issuing bank via Visa or MasterCard for the transaction passing through interchange. (*See* Paragraphs 64 & 69.) Class plaintiffs have presented no evidence that merchants pay any fees to issuing banks.

     a.    **Citing an interview with Steve Jonas of MasterCard, Prof. Elzinga described MasterCard's interchange tier system as tailoring interchange fees to the circumstances of particular types of merchants.** [317]

---

[317]    **Elzinga Rep. at 91. (SUFEX250)**

*Defendants' Response to Paragraph 58a:*

    Disputed.

    Class plaintiffs' characterization of Prof. Elzinga's report is incomplete and misleading. (Fed. R. Evid. 106.) Prof. Elzinga wrote, "Steven Jonas of MasterCard confirmed during my interview with him that MasterCard's multiple interchange fees had proliferated over time as MasterCard sought to increase acceptance (and volume) in new merchant categories by tailoring interchange fees to the circumstances of particular types of merchants." (Elzinga Rep.[147] at 91.)

     b.    **MasterCard's structure is designed to deliver different interchange rates by card type to support its business objectives.** [318]

---

[318]    **Id. at 190:19-23. (SUFEX179)**

---

[147]    Report of Professor Kenneth G. Elzinga (Dec. 14, 2009) ("Elzinga Rep.").

*Defendants' Response to Paragraph 58b:*

      Undisputed.

    **c.**    **MasterCard establishes separate interchange rates for each merchant category and for each of its card products (credit, premium credit, commercial, signature debit, and PIN-debit).** [319]

———————————
[319]    **Kapteina Dep. Ex. 9, at 6-9, Oct. 2007; MasterCard Worldwide U.S. and Interregional Interchange Rates, at 6-9, April 2010 (SUFEX251) , available at http://www.mastercard.com/us/merchant/pdf/MasterCard_Interchange_Rates_and_Criteria.pdf**

*Defendants' Response to Paragraph 58c:*

      Undisputed.

    **d.**    **MasterCard currently has over 275 categories of Interchange Fees for Credit Cards, Offline Debit Cards, and PIN-Debit Cards.** [320]  **In 2000, MasterCard had only 19 different categories of fees.** [321]  **MasterCard currently has 32 different Signature Debit rates.** [322]

———————————
[320]    **MasterCard Worldwide U.S. and Interregional Interchange Rates http://www.mastercard.com/us/merchant/pdf/MasterCard_Interchange_Rates_and_Criteria.pdf (last accessed on September 14, 2010). (SUFEX252)**

[321]    **MCI_MDL02_01349359 at 9365. (SUFEX253)**

[322]    **MasterCard Worldwide U.S. and Interregional Interchange Rates, at 6-9, April 2010, available at 74–86 http://www.mastercard.com/us/merchant/pdf/MasterCard_Interchange_Rates_and_Criteria. pdf. (SUFEX252)**

*Defendants' Response to Paragraph 58d:*

      Disputed.  Defendants dispute class plaintiffs' definition of "Interchange Fee" as "a fee that Merchants pay to the Issuing Bank" because it is inaccurate, misleading, and unfairly prejudicial.  An interchange fee is compensation paid by the acquiring bank to the issuing bank via Visa or MasterCard for the transaction passing through interchange.  (*See* Paragraphs 64 & 69.)  Class plaintiffs have presented no evidence that merchants pay any fees to issuing banks.

    **e.**    **Dr. James confirms this undisputed fact in his report stating that "MasterCard, like Visa and American Express, classifies merchants into**

214

**categories such as supermarkets or restaurants and sets category-specific interchange fee." [323]**

---
[323]     **James Rep. at 47. (SUFEX254)**

*Defendants' Response to Paragraph 58e:*

Undisputed.

.

<u>Plaintiffs' Paragraph 59:</u>

**59      MasterCard and its acquirers enforce MasterCard's default interchange fees.**

*Defendants' Response to Paragraph 59:*

    Disputed.  Defendants dispute class plaintiffs' use of the term "enforce" because it is vague and ambiguous.  Class plaintiffs have presented no evidence in Paragraphs 59 or 59a that MasterCard's acquirers enforce Visa's default interchange fees.  MasterCard sets default interchange rates that apply to MasterCard transactions, unless there is a bilateral agreement between MasterCard members.  (2003 MasterCard Rules, § 10.1; 2008 MasterCard Rules,[148] § 9.4; 2010 MasterCard Rules, § 9.4.)  Acquirers then have discretion as to whether they pass on the full amount of the interchange fees to merchants.  (*See* Defendants' Response to Paragraph 49.)

    **a.      MasterCard has two groups responsible for enforcing card acceptance rules, the Rule and Brand Standards groups, and requires its acquirers to monitor merchant compliance with its rules.** [324]

---

[324] Doyle Dep. 23:10-17, Apr. 21, 2008 (SUFEX255); Doyle 30(b)(6) Dep. 27:2-8, Apr. 22, 2008 (SUFEX078); Banaugh Dep. 83:12-25, May 9, 2008 (SUFEX074); Sabiston Dep. 202:19-204:4-15, Apr. 24, 2008 (SUFEX075); Banaugh 30(b)(6) Dep. 190:1-6, Aug. 4, 2006. (SUFEX076)

*Defendants' Response to Paragraph 59a:*

    Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading.  (Fed. R. Evid. 106.)  MasterCard's default interchange fee rule is not one of the rules for which acquirers monitor compliance.  The 2010 MasterCard Rules state that "[e]ach Merchant Agreement must contain the substance of each of the Standards set forth in Rules 5.6 through 5.12."  (2010 MasterCard Rules, § 5.1.2, at 5-1.)  The default interchange fee is Rule 9.4 (2010

---

[148] MasterCard Rules (Feb. 2008) ("2008 MasterCard Rules"), bearing control numbers MCW_DOJ_00481680 to 00481897.

MasterCard Rules, § 9.4), and is not included in the required terms of contracts between acquirers and merchants.  Therefore, deposition testimony from Michelle Banaugh and Diana Sabiston that the respective acquirers for which they work are responsible for monitoring compliance with MasterCard Rules is inapplicable to MasterCard's default interchange rule.

.

## Plaintiffs' Paragraph 60:

**60     After the IPO, the Board of Directors of MasterCard delegated authority for setting interchange to the CEO who establishes uniform schedules of Default Interchange Fees that apply to all MasterCard transactions, including in the United States.** [325]

---
[325]     MCI_MDL04_00013633. (SUFEX256)

*Defendants' Response to Paragraph 60:*

Disputed.  Class plaintiffs' assertion is incorrect.  MasterCard International

delegated the authority for setting interchange to the CEO in 2004 (MCI_MDL04_00004820 to

00004989,[149] at 822), prior to its IPO.  Additionally, MasterCard's default interchange fees do

not apply to all MasterCard transactions.  The default interchange fees "apply only if there is no

applicable bilateral interchange fee or service fee agreement between two Members in place."

(2010 MasterCard Rules, § 9.4.)

Defendants dispute class plaintiffs' definition of "Interchange Fee" as "a fee that

Merchants pay to the Issuing Bank" because it is inaccurate, misleading, and unfairly prejudicial.

An interchange fee is compensation paid by the acquiring bank to the issuing bank via Visa or

MasterCard for the transaction passing through interchange.  (*See* Paragraphs 64 & 69.)  Class

plaintiffs have presented no evidence that merchants pay any fees to issuing banks.

   a.     **The European Commission found that after its IPO, "MasterCard
          Incorporated and its subsidiaries continue co-ordinating the market
          behaviour of the organisation's member banks" and, for example,
          MasterCard "continues to publish the results of multilateral agreements on
          interchange fees in the payment organisation on the MOL database so that
          all banks know and abide by the agreements." [326]  The European
          Commission also found that as "before the IPO the three legal entities
          representing the organisation continue to enforce interchange fee agreements
          between the member banks by supervising the application of the correct**

---
[149]   Minutes of the Meeting of the Boards of Directors of MasterCard International Incorporated and of MasterCard
Incorporated (Jul. 8, 2004).

> **interchange clearing message where the scheme owner MasterCard Incorporated processes the members' card transactions."** [327]

------

[326]    **Commission Decision (E.C.), at 103 ¶ 355, COMP/34.579 of 19 Dec. 2007 ("E.C. Decision").** (SUFEX081)

[327]    **Commission Decision (E.C.), at 103 ¶ 355, COMP/34.579 of 19 Dec. 2007 ("E.C. Decision").** (SUFEX081)

*Defendants' Response to Paragraph 60a:*

Undisputed.

Defendants object to the admissibility of the E.C. Decision. The E.C. Decision is unfairly prejudicial, and is an out of court statement for which no exception to the hearsay rule has been established. (Fed. R. Evid. 403, 801, 802.)

<u>Plaintiffs' Paragraph 61:</u>

**61      The European Commission found that "[t]he banks agreed to the IPO and the ensuing changes in the organisation's governance in order to perpetuate the MIF as part of the business model in a form which they perceived to be less exposed to antitrust scrutiny."** [328]

---

[328]      **Commission Decision (E.C.), at 4 ¶ 3, COMP/34.579 of 19 Dec. 2007 ("E.C. Decision"). (SUFEX081)**

*Defendants' Response to Paragraph 61:*

    Undisputed.

    Defendants object to the admissibility of the E.C. Decision.  The E.C. Decision is unfairly prejudicial, and is an out of court statement for which no exception to the hearsay rule has been established.  (Fed. R. Evid. 403, 801, 802.)

<u>Plaintiffs' Paragraph 62:</u>

**62    MasterCard employs the same methodology to set interchange fees after its IPO as it had used before the IPO.**

*Defendants' Response to Paragraph 62:*

      Undisputed.  As discussed in Defendants' Response to Paragraph 60, MasterCard delegated the authority for setting interchange to the CEO in 2004.  (*See* Defendants' Response to Paragraph 60.)  The CEO retained this authority following the MasterCard IPO.

    a.    **MasterCard's Associate General Counsel, Carl Munson, confirmed that the rate setting process is that same pre- and post-IPO: "Hopefully, maybe we are doing a little better job today, maybe we are a little more complete, but essentially the process is unchanged.  Except that today we wouldn't take that final step and go to a board." [329][330]  This was also confirmed by several other MasterCard executives. [331]**

---

[329]    Munson Dep. 162:16-167:14, 9/17/08. (SUFEX257)

[330]    Munson Dep. 167:12, Sept. 17, 2008. (SUFEX257)

[331]    Abrams Dep. 200:19-24, 201:23-202:3, Mar. 13, 2008 (SUFEX258); Murphy Dep. 225:8-13, Feb. 28, 2008 (SUFEX021); Freiberg Dep. 75:9-18, Nov. 20, 2008 (SUFEX124); Heuer Dep. 42:13-20, Oct. 16, 2008. (SUFEX104)

*Defendants' Response to Paragraph 62a:*

      Disputed.  Class plaintiffs' characterization of Mr. Munson's testimony is inconsistent with the quotation on which they rely.  Mr. Munson's testimony that that "today we wouldn't take that final step and go to a board" does not support class plaintiffs' assertion "that the rate setting process is the same pre- and post-IPO."

    b.    **Stephen Freiberg of Citibank, one of MasterCard's largest U.S. issuers, testified that MasterCard's objective in setting interchange, "to maintain a competitive position in the marketplace," was the same before and after the IPO. [332]**

---

[332]    Freiberg Dep. 105:18-21, 170:6-22, Nov. 20, 2008. (SUFEX124)

*Defendants' Response to Paragraph 62b:*

Undisputed.

<u>Plaintiffs' Paragraph 63:</u>

**63     Following are Defendants' effective interchange rates for credit cards, signature-debit cards, and PIN-debit cards from 2003 to 2009:** [333]

### Effective Interchange Rates

| Credit | Jun 00 | Apr 01 | Apr 02 | Oct 02 | Apr 03 | Aug 03 | Apr 04 | Apr 05 | Apr 06 | Apr 07 | Apr 08 | Apr 09 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **MasterCard** | | | | | | | | | | | | |
| Overall | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | |
| Consumer | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | |
| World | - | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | |
| Corporate | - | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | |
| | | | | | | | | | | | | |
| **Visa Overall** | - | ■ | - | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | - |
| Consumer | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | - |
| Rewards | - | - | - | - | - | - | - | - | - | - | - | - |
| Signature | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | - |
| Corporate | ■ | ■ | ■ | ■ | ■ | ■ | - | ■ | ■ | ■ | - | - |
| MasterCard | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | - |
| Visa | ■ | | | | | | | | | | ■ | - |
| | | | | | | | | | | | | - |
| Visa Interlink PIN | - | - | - | - | - | ■ | ■ | ■ | ■ | ■ | ■ | |

**Apr 1999 - Aug 2003 list the effective rate for the period beginning with the listed month and ending the month prior to the next listed month.**

**Apr 2003 - Apr 2009 list the effective rate during the listed month.**

**\* Estimated in source documents**

---

[333]     MCI_MDL02_06988826, MCI_MDL02_00044015 (SUFEX259), NEW_YORK-246464-v1-MasterCard Systemwide Interchange Report.XLS (ICAT00810) (SUFEX261), MasterCard Systemwide Interchange Report for US (2007 Update.xls (ICAT001383) (SUFEX262), Interchange Reporting Request - Updated 23APR09.xlsm (ICAT001816) (SUFEX263), MasterCard Systemwide Interchange Report_GCMS Cleared Purchase Vol_US Issued Acquired 2009.xls (ICAT001886) (SUFEX264), MCI_MDL02_01492266 (SUFEX265), MCI_MDL02_10468758 (SUFEX266), MCI_MDL02_00026781 (SUFEX267), VUSAMDL1-00254038 (SUFEX268), VUSAMDL1-0024078 (SUFEX269), TIB_MDL_016412 (SUFEX270), VUSAMDL1-00111796 (SUFEX271), VUSAMDL1-03548885 (SUFEX272), VUSAMDL1-00108708 (SUFEX273), VUSAMDL1-00254819 (SUFEX274), VUSAMDL1-00228097 (SUFEX275), VUSAMDL1-03613527 (SUFEX276), VUSAMDL1-08118649 (SUFEX277), VUSAMDL00209974.xls (ICAT001808) (SUFEX278), Spreadsheet entitled Fig6_7_tab07.xls, produced with backup materials to expert report of William Wecker, Dec. 14, 2009. (SUFEX279)

<u>*Defendants' Response to Paragraph 63:*</u>

Undisputed.

223

<u>Plaintiffs' Paragraph 64:</u>

64      Interchange Fees are revenues solely to Issuing Banks. [334]

_____

[334]     *See, e.g.,* JPMorgan Chase Annual Report (2009), at 54-55, 184 (SUFEX280); Bank of America Annual Report (2009), at 41, 104-05 (SUFEX281); Capital One Finance Corp., 2009 Form 10-K, at 50 (SUFEX282); HSBC Finance Corp., 2009 Form 10-K, at 123-24. (SUFEX283)

<u>*Defendants' Response to Paragraph 64:*</u>

Disputed. Class plaintiffs' assertion is ambiguous. Class plaintiffs' definition of "Interchange Fee" as "a fee that Merchants pay to the Issuing Bank" is inaccurate, misleading and unfairly prejudicial. Class plaintiffs have presented no evidence that merchants pay any fees to issuing banks. "An interchange fee is compensation paid by the acquiring bank to the issuing bank via [Visa or MasterCard] for the transaction passing through interchange." (OCC Handbook, at 15; *see also Visa Check* Compl.[150] ¶ 8(o); GAO Rep.,[151] at 7; Oct. 2010 Visa Rules, Core Principle 10.2; 2010 MasterCard Rules, § 9.1; Madairy Dep.[152] at 167.) As plaintiff class representative NATSO acknowledged: "Interchange is actually a fee, which is set by V/MC, but that is paid by the acquirer to the card issuer." (NATSO 006498.[153]) Plaintiff class representative Traditions Ltd. also recognized that "interchange is – is a fee that flows from the

_____

[150]   Second Amended Consolidated Class Action Complaint in *In re Visa Check/MasterMoney Antitrust Litig.*, No. 96-CV-5238-JG (E.D.N.Y.), available at 1999 WL 34848247 ("*Visa Check* Compl.").

[151]   United States Government Accounting Office, Report to Congressional Addressees, *CREDIT CARDS, Rising Interchange Fees Have Increased Costs for Merchants, but Options for Reducing Fees Pose Challenges* (Nov. 2009) ("GAO Rep.").

[152]   Deposition of David C. Madairy (Jan. 17, 2008) ("Madairy Dep."). Mr. Madairy testified as the manager of association controls for Bank of America Merchant Services. (Madairy Dep. at 7-8.)

[153]   Email from L. Van Arsdale to L. Mullings (Oct. 6, 2005).

acquiring bank to the issuing bank." (Schumann Dep. at 62-63;[154] *see also* Schermerhorn Dep.

Ex. 10028,[155] at 1; Schermerhorn Dep.[156] at 88-89.)

Interchange fees are also revenues to merchants that have cobrand and affinity

agreements with issuing banks. (*See, e.g.,* CHASE003415360 to 003415474,[157] at 465 ("███████

████████████████████████████████████████████████████████████████████████

███████████████████████████████"), 467 (defining Actual Total

Return to include "interchange fees"); CHASE003816759 to 003816810,[158] at 773.)

     **a.**     **Visa's 2005 Consumer Credit Card Issuer Benchmark Study** ███

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████" The

**document goes on to explain that** ███████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████ [335]

_____
[335]    **Haarma Dep. Ex. 5, at VUSAMDL1-06715956, VUSAMDL1-06715959. (SUFEX191)**

*Defendants' Response to Paragraph 64a:*

     Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading.

(Fed. R. Evid. 106.)  The document on which class plaintiffs rely states that the rise in

interchange revenue was "helped by the growing popularity of rewards programs and expanding

merchant acceptance."  (Haarma Dep. Ex. 5, at VUSAMDL1-06715959)

_____
[154]  Deposition of Michael Schumann (Nov. 15, 2007) ("Schumann Dep."). Mr. Schumann testified as the corporate secretary and treasurer of plaintiff Traditions Ltd. (Schumann Dep. at 50.)

[155]  "Assessing Your Co-op's Merchant Credit Card Processing Agreements."

[156]  Deposition of David Schermerhorn (Dec. 4, 2007) ("Schermerhorn Dep."). Mr. Schermerhorn testified as the supplier programs manager at plaintiff National Community Grocers Association. (Schermerhorn Dep. at 37.)

[157]  ███████████████████████████████████████

[158]  ███████████████████████████████████████████████████████
███████

**b.** **According to MasterCard, "Interchange is wealth redistribution to issuers."** [336]

---
[336] **Hanft Dep. Ex. 28202, at MCI_MDL_02_11822351 (2004). (SUFEX284)**

*Defendants' Response to Paragraph 64b:*

Disputed. Class plaintiffs mischaracterize the evidence on which they rely. The quoted language in the document on which class plaintiffs rely represents the purported view of merchants. (Hanft Dep. Ex. 28202, at MCI_MDL_02_11822351.) The language is not MasterCard's view.

**c.** **Visa's William Sheedy agreed that "interchange fees are an important revenue stream for Visa issuing banks."** [337]

---
[337] **Sheedy Dep. 214:24-215:3. (SUFEX083)**

*Defendants' Response to Paragraph 64c:*

Undisputed.

**d.** **An internal Capital One document reflects that it makes** ███████████
███████████████████████████████████████████████████
████████ [338]

---
[338] **Gregory Ex. 35700, at 9, 14. (SUFEX285)**

*Defendants' Response to Paragraph 64d:*

Undisputed.

**e.** **An internal Bank of America reflects that** █████████████████
███████████████:[339]



---

[339]    Pyke Dep. Ex. 31257, at BOFAIC 00486262. (SUFEX286)

*Defendants' Response to Paragraph 64e:*

        Undisputed.

    **f.**    **Bank Defendants' financial statements, internal documents and deposition testimony uniformly reflect that interchange fees are income for their issuing, not acquiring, businesses.** [340]

---

[340]    BOFAIC 00224842-946, at BOFAIC 00224861 (SUFEX287); BOFAIC 00224869 (SUFEX287); CITI INT 001485708-5876, at CITI INT 001485711 (SUFEX288); Wright Dep. Ex. 27717, at BOFAIC 01843496 (SUFEX289); CO0003-000139294-9319, at CO0003-000139319 (SUFEX290); Rossi Dep. 84:1-7 (SUFEX291); Barth Dep. 37:16-38:7; 75:16-76:8; 138:2-5 (SUFEX292); Kilga Dep. Ex. 25534, at HSBC_174663 (SUFEX293); CO0003-00010075-0078, at CO0003-00010076 (SUFEX294); WMB00020651-0679, at WMB00020665 (SUFEX295); WMB E 000132008-3224, at WMB E 00013221, WMB E 0013215. (SUFEX296)

*Defendants' Response to Paragraph 64f:*

        Disputed.  Class plaintiffs mischaracterize the evidence on which they rely.  Class plaintiffs cite to a table ███████████████████ as evidence for their assertion with respect to Citibank.  (CITI INT 001485708 to 001485876, at 711.)  This table shows only that ████████████████████ and does not support class plaintiffs'

assertion that interchange revenue was part of the issuing rather than acquiring business.  █████

████████████████████████████████████████████████████

█████████████████████████████████████   (*Id.* at CITI INT 0014857727.)

      The Capital One, HSBC, and Washington Mutual documents on which class

plaintiffs rely only discuss financials relating to the banks' issuing lines of business, and

therefore do not support class plaintiffs' assertion.  (CO0003-000139294 to 000139319, at 319

(recognizing interchange as a "revenue stream"); CO0003-00010075 to 00010078, at 76

(recognizing a profit from interchange); Kilga Dep. Ex. 25534, at HSBC_174663 (describing

interchange as a percentage of total issuing income); WMB00020651 to 00020679, at 665

(listing interchange as a component of "Fee Income"); WMB E 00013208 to 00013224, at 3221,

3215 (████████████████████████████████████████████████

███████████████████████).)

      **g.**    **Visa's Income and Expense Reporting Form for Member Banks (Schedule 2) reflect interchange fees as income solely for issuers not acquirers.** [341]

---

[341]    NC_IF_01_0002781-86 at NC_IF_01_0002781; NC_IF_01_0002784. (SUFEX297)

*Defendants' Response to Paragraph 64g:*

      Undisputed.

      **h.**    **A Citi document provides a "recap" regarding the flow of interchange and net settlement with the associations.  As Doug Morrison of Citi testified:** ████

████████████████████████████████████████

████████████████████████████ [342]

███████████████████████████████

---

[342]    Morrison Dep. 83:6-11, Apr. 30, 2008. (SUFEX298)

_Defendants' Response to Paragraph 64h:_

    Undisputed.

.

<u>**Plaintiffs' Paragraph 65:**</u>

**65    Interchange fees are approximately ▇▇▇ of Credit Card issuing banks' revenue.** [343]

---

[343]     ***See, e.g.,*** McCahill Decl. Ex. 66 (Bank of America e-mail referencing SEC filing: "We could cite the credit issuer statistics here - ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇) (SUFEX299); McCahill Decl. Ex. 64, McGee Dep. 76:4-10 (▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ of revenue" for credit cards) (SUFEX300); McCahill Decl. Ex. 67, at 26 (roughly ▇ percent of Capital One's income derived from sources other than interchange) (SUFEX290); McCahill Decl. Ex. 68, Freiberg Dep. 19:12-21:8 (about ▇ percent of Citi's credit card revenue comes from interchange). (SUFEX124) Deposition of Defendants' Expert Edward Snyder 202-02  (SUFEX301) (admitting that interchange fees are approximately ▇▇▇ of issuer's revenue).

*Defendants' Response to Paragraph 65:*

Disputed.  Class plaintiffs mischaracterize the evidence on which they rely.  The cited evidence suggests that the ▇▇▇ figure that class plaintiffs assert is inaccurate, and ▇▇▇ is a more accurate figure.  Further, most issuing banks have many sources of income aside from credit cards, and interchange is well below ▇▇▇ of income at such banks.  For example, Citigroup's Steven Freiberg, on whom class plaintiffs rely, testified that interchange revenue was

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇ ▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

McCahill Decl. Ex. 66 (SUFEX299) lists that "IRF" is ▇▇▇, but does not say ▇▇▇ of what.  The types of revenue listed in the Bank of America email are (a) "interest income," (b) "fee income," (c) IRF, and (d) "other."  Bank of America has many other sources of income outside of these four categories, such as from mortgages, student loans, etc.

---

159    Deposition of Steven J. Freiberg (Nov. 20, 2008) ("Freiberg Dep.").  Mr. Freiberg testified as the chief executive officer of Global Cards at Citi.  (Freiberg Dep. at 22.)

McGee Dep. 76:4-10 (SUFEX300) only discusses interest revenue and defendants object to the admissibility of the testimony as irrelevant. (Fed. R. Evid. 401, 402.) Mr. McGee testified that he did not have any understanding what percentage of revenue for credit products was associated with interchange fee revenue. (McGee Dep.[160] at 75-76.)

McCahill Decl. Ex. 67, at 26 does not say that the remainder of income was associated from interchange. In fact, the presentation states, "Interchange: 16% of Non-Interest Income in 1999." (SUFEX290.)

The only document on which class plaintiffs rely that uses a 20% figure is Dr. Snyder's deposition testimony, but Dr. Snyder did not cite to any evidence in support of his 20% figure.

---

[160] Deposition of Liam McGee (Nov. 5, 2008) ("McGee Dep."). Mr. McGee testified as president of consumer banking at Bank of America. (McGee Dep. at 14-15.)

<u>Plaintiffs' Paragraph 66:</u>

66      Interchange Fees increase the price that merchants pay to accept Payment Cards.

*Defendants' Response to Paragraph 66:*

Disputed.  There are instances where interchange is not passed through to

merchants.  (*See* Defendants' Response to Paragraph 49.)

Defendants dispute class plaintiffs' definition of "Interchange Fee" as "a fee that

Merchants pay to the Issuing Bank" because it is inaccurate, misleading, and unfairly prejudicial.

An interchange fee is compensation paid by the acquiring bank to the issuing bank via Visa or

MasterCard for the transaction passing through interchange.  (*See* Paragraphs 64 & 69.)  Class

plaintiffs have presented no evidence that merchants pay any fees to issuing banks.

**a.      The European Commission found that MasterCard's mandatory "fallback"
interchange fees "restricts competition between acquiring banks by inflating
the base on which acquiring banks set charges to merchants and thereby sets
a floor under the merchant [discount] fee," which is nonnegotiable. [344]**

---

[344]     **Commission Decision (E.C.), at ¶¶ 2, 408, 410, 412, 413, 421, 435, 503, 664, COMP/34.579 of 19 Dec.
2007 ("E.C. Decision"). (SUFEX081)**

*Defendants' Response to Paragraph 66a:*

Disputed.  Class plaintiffs' characterization of the European Commission decision

is incorrect and unfairly prejudicial.  The European Commission found that "[m]erchants view

the costs of MasterCard's interchange fees as the non-negotiable part of the merchant fee."

(Commission Decision (E.C.), at ¶ 503, COMP/34.579 of 19 Dec. 2007.)  Visa's and

MasterCard's rules expressly allow interchange fees to be negotiated.  (Oct. 2010 Visa Rules, Ch.

10, Core Principle 10.3; 2010 MasterCard Rule 9.4.)

Defendants object to the admissibility of the E.C. Decision.  The E.C. Decision is unfairly prejudicial, and is an out of court statement for which no exception to the hearsay rule has been established.  (Fed. R. Evid. 403, 801, 802.)

        **b.**      **In a memorandum to the merchant community, Visa's Victor Dahir explained, "In order to halt their share decline, [MasterCard has] substantially raised interchange. In effect, what MasterCard is doing is reaching right into [merchants'] pocket – taking your money and handing it to a card issuer to pay for conversions of Visa cards to MasterCard. It may sound absurd, but, it is true. MasterCard is using your money to grow their market share. How ironic it is that MasterCard is using increased pricing to merchants in order to fund share growth of a higher priced card product that will then detract even further from merchant profits." [345]**

---

[345]    **Dahir Dep. Ex. 1, at VUSAMDL00069706, Nov. 15, 2999. (emphasis in original) (SUFEX302)**

*Defendants' Response to Paragraph 66b:*

      Undisputed.

      Defendants object to the admissibility of Dahir Dep. Ex. 1, dated Nov. 15, 1999. The deposition exhibit relates to events prior to the relevant time period applicable in this case, and is thus irrelevant to any issue in support of class plaintiffs' motion for summary judgment. (Fed. R. Evid. 401, 402.)

        **c.**      **According to Defendants' expert Professor James, "I'm not here to argue that an increase in the interchange doesn't affect the merchant's costs, clearly it does…"[346]**

---

[346]    **James Dep. 65:9-11. (SUFEX303)**

*Defendants' Response to Paragraph 66c:*

      Undisputed.

        **d.**      **Defendants' expert, Dr. Klein, also agrees that interchange fees increase merchants cost: "Higher interchange fees have the effect of increasing the cost to acquirers and therefore increasing the fee acquirers charge to merchants." [347]**

[347]     Klein Rep. ¶¶ 27, 29. (SUFEX212)


*Defendants' Response to Paragraph 66d:*

>        Undisputed.

>   e.     **Defendants' expert, Dr. Topel recognized that interchange fees affect merchant costs.** [348]

[348]     Topel Rep. 9. (SUFEX304)


*Defendants' Response to Paragraph 66e:*

>        Undisputed.

>   f.     **Defendants' expert, Prof. Elzinga, agreed that "[t]he merchant pays the interchange fee in the economic sense."** [349]

[349]     Elzinga Dep. 321:6-8, Mar. 10, 2010. (SUFEX305)


*Defendants' Response to Paragraph 66f:*

>        Undisputed.

>   g.     **Jetro CFO Brian Emmert testified that Jetro increased its retail prices "to offset the increase in interchange fees."** [350]

[350]     Emmert Dep. 97:24-98:9. (SUFEX306)


*Defendants' Response to Paragraph 66g:*

Undisputed.  Defendants note that Mr. Emmert testified that Jetro "made a one-time increase to our selling price to offset the increase in interchange fees." (Emmert Dep.[161] at 98.)

---

[161]  Deposition of Brian Emmert (Jan 17, 2008) ("Emmert Dep.").  Mr. Emmert testified as the chief financial officer of class plaintiff Jetro Cash & Carry Enterprises Inc. and Jetro Holdings.  (Emmert Dep. at 6.)

h.    According to ██████ VP and Treasurer, increases in interchange and increases in his merchant discount rate were "one and the same":

[351] ██████████████

*Defendants' Response to Paragraph 66h:*

Disputed. ████████ testimony on which class plaintiffs rely is ambiguous as to whether he believes (a) increases in interchange and the merchant discount rate are one and the same, or (b) interchange and the merchant discount rate are one and the same.

i.    **Leon's Transmission's Controller Wayne Archer testified that increases in his company's merchant discount fee were due to increases in interchange.** [352]

[352]   **Archer Dep. 169:19-170:14. (SUFEX308)**

*Defendants' Response to Paragraph 66i:*

Undisputed.

Defendants object to the admissibility of Archer Dep. 169:19-170:14. The deposition testimony reflects information contained in a notice that Mr. Archer received from a processor, and is an out of court statement for which no exception to the hearsay rule has been established. (Fed. R. Evid. 801, 802.)

j.    ████████████████████████████ testified that when interchange rates increased, merchant discount fees increased as well. [353]

[353]   ████████████ **(SUFEX309);** *see also* **Culver Dep. 278:16-20  (SUFEX310) (Although merchant discount fee includes amounts in addition to interchange, to CHS executive Paul Culver, interchange and merchant discount are essentially synonymous).**

235

*Defendants' Response to Paragraph 66j:*

Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading.

(Fed. R. Evid. 106.) ███████ testified that when interchange rates increased, merchant

discount fees "typically" or "generally" increased.  (██████[162] at 100.)

       **k.**    **Discount Optics learned of increases in interchange when it was charged higher fees for card acceptance.  When asked how these increases were communicated to Discount Optics, EVP Deborah Opper replied "they just automatically appeared on our bill." [354]**

---

[354]    **Opper Dep. 156:16-21. (SUFEX311)**

*Defendants' Response to Paragraph 66k:*

Undisputed.

---

[162]  Deposition of ████████ (Jan. 30, 2008) ██████████████████
████████████████████

<u>Plaintiffs' Paragraph 67:</u>

**67      The Interchange Fee fixes a component of the price paid by merchants to accept Visa or MasterCard Payment Cards, regardless of the merchant's Acquiring Bank.**

*Defendants' Response to Paragraph 67:*

Disputed.  Merchants have paid merchant discount fees below the cost of interchange fees.  (Mattea Dep. at 119-21; Baker Dep. at 59-61.)  Moreover, the networks' default interchange fees only apply in the absence of a bilateral agreement between an acquiring bank and an issuer.  (Oct. 2010 Visa Rules, Ch. 10, Core Principle 10.3; 2010 MasterCard Rules, § 9.4.)  Therefore, default interchange fees do not act as a floor across all acquiring banks.

Defendants dispute class plaintiffs' definition of "Interchange Fee" as "a fee that Merchants pay to the Issuing Bank" because it is inaccurate, misleading, and unfairly prejudicial.  An interchange fee is compensation paid by the acquiring bank to the issuing bank via Visa or MasterCard for the transaction passing through interchange.  (*See* Paragraphs 64 & 69.)  Class plaintiffs have presented no evidence that merchants pay any fees to issuing banks.

   a.      **A MasterCard presentation to MBNA dated January 18, 2005, entitled "U.S. Region Corporate Interchange Rate Programs," contains the following chart showing "Interchange Process Flow":[355]**



[355]    **League Dep. Ex. 22732, at BOFAIC 06455261. (SUFEX244)**

*Defendants' Response to Paragraph 67a:*

    Undisputed.

    b.    **A Visa PowerPoint slide sent from Visa Senior Vice President of Client Services, David Cramer, to Wachovia employee Neeraj Khanna on March 1, 2006, contains the following chart:** [356]



[356]    **VUSAMDL1-02603213-18, at VUSAMDL1-02603216. (SUFEX312)**

238

*Defendants' Response to Paragraph 67b:*

Undisputed.

c.   **The European Commission found that MasterCard's mandatory "fallback" interchange fees "restricts competition between acquiring banks by inflating the base on which acquiring banks set charges to merchants and thereby sets a floor under the merchant [discount] fee," which is nonnegotiable.** [357]

---

[357]   Commission Decision (E.C.), at ¶¶ 2, 408, 410, 412, 413, 421, 435, 503, 664, COMP/34.579 of 19 Dec. 2007 ("E.C. Decision") (SUFEX081); *see also,* Commission Decision (E.C.), at ¶¶ 459 -60, COMP/34.579 of 19 Dec. 2007 ("E.C. Decision") (determining that merchant discount fees would be reduced by the amount of MasterCard's interchange fees, stating "[i]n the absence of MasterCard's [interchange fees], the prices acquirers charge to merchants would not take into account the artificial cost base of the [interchange fees] and would only be set taking into account the acquirer's individual marginal cost and his mark Up.', (SUFEX081)

*Defendants' Response to Paragraph 67c:*

Disputed. Class plaintiffs' characterization of the European Commission decision is incorrect and unfairly prejudicial. The European Commission found that "[m]erchants view the costs of MasterCard's interchange fees as the non-negotiable part of the merchant fee." (Commission Decision (E.C.), at ¶ 503, COMP/34.579 of 19 Dec. 2007.) Visa's and MasterCard's rules expressly allow interchange fees to be negotiated. (Oct. 2010 Visa Rules, Ch. 10, Core Principle 10.3; 2010 MasterCard Rules, § 9.4.)

Defendants object to the admissibility of the E.C. Decision. The E.C. Decision is unfairly prejudicial, and is an out of court statement for which no exception to the hearsay rule has been established. (Fed. R. Evid. 403, 801, 802.)

d.   **When Michael Schumann of Plaintiff Traditions Ltd. was shopping for the lowest possible merchant discount rate, a prospective Acquirer informed him that "Nobody can reduce the Interchange fee. That is set by Visa and M/C."** [358]

---

[358]   TRAD005231-36, at TRAD005231. (SUFEX313) See also, FNBO-0941353 at 55 (SUFEX314) (United Bank Card Terms and Conditions stating that "[a]ssessments and Interchange are the standard fees that the ASSOCIATIONS charge . . . . FNBO has no direct control over these fees. ██████████████████████████ ).

239

*Defendants' Response to Paragraph 67d:*

Undisputed.

Defendants object to the admissibility of TRAD005231 to 005236,[163] at 231. The document is an email from a prospective acquirer, and is an out of court statement for which no exception to the hearsay rule has been established. (Fed. R. Evid. 801, 802.)

**e.    Patrick Moran of Fifth Third testified that "an increase in interchange directly correlates to an [increase] in the merchant discount that we charge that customer." [359]**

_____

[359]    **Moran Dep. 60:13-20; 70:11-71:05, Oct. 7, 2008. (SUFEX227)**

*Defendants' Response to Paragraph 67e:*

Disputed.

Evidence on which class plaintiffs rely is incomplete and misleading. (Fed. R. Evid. 106.) The quoted testimony only applies to "interchange plus" customers. (Moran Dep. at 71.)

**f.    ▊▊▊▊ of merchant ▊▊▊▊ testified that increases in Visa and MasterCard interchange fees were identical to increases in the merchant discount fees that ▊▊▊▊ paid stating, "to me, those were one and the same." [360]**

_____

[360]    ▊▊▊▊ **49:02-08, Oct. 16, 2008. (SUFEX307)**

*Defendants' Response to Paragraph 67f:*

Disputed. ▊▊▊▊ testimony on which class plaintiffs rely is ambiguous as to whether he believes (a) increases in interchange and the merchant discount rate are one and the same, or (b) interchange and the merchant discount rate are one and the same.

_____

[163]  Email from R. Nasser to M. Schumann (Sept. 22, 2005).

g.      In a post-trial memorandum in the MountainWest case, Visa U.S.A. wrote, "[A]ny effect on merchant discount (and, in the case of VISA, interchange fee) rates operate at the system level and are largely impervious to being competed away by member-level price competition." [361]

---

[361]      Visa U.S.A. post-trial memorandum, MountainWest Financial v. Visa U.S.A., VUSAMDL00717534-551, at VUSAMDL00717548. (SUFEX315)

*Defendants' Response to Paragraph 67g:*

Undisputed.

<u>**Plaintiffs' Paragraph 68:**</u>

**68      No merchant pays a Merchant-Discount Fee that is lower than the Interchange Fee.**

<u>*Defendants' Response to Paragraph 68:*</u>

      Disputed.  Class plaintiffs' assertion is contrary to the evidence.  Evidence on which class plaintiffs rely in subagraphs a-k does not refute this.

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████ For example, ██████████████████████████████

██████████████████████████████████████████████

████████████████████████. (Mattea Dep. at 119-21.)  In determining how to react to an interchange rate increase by either network, CPSI analyzed ████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

(Pukas Dep. at 271.)

      Merchant acquirer Fifth Third Processing Solutions has also priced merchant discount fees below applicable interchange fees in those circumstances where the merchant's overall business relationship with Fifth Third Processing Solutions warranted such pricing.  (Baker Dep. at 59-61.)  Fifth Third Processing Solutions entered into such a pricing arrangement ████████████████████████████████████. (*Id.*)  Fifth Third Processing Solutions' merchant acquiring relationship with ████████████████████████████

████████████████████████████████████████████

242

███████████████████████████████████████████

███████████████████████████. (*Id.* at 79-81.)

Defendants dispute class plaintiffs' definition of "Interchange Fee" as "a fee that Merchants pay to the Issuing Bank" because it is inaccurate, misleading, and unfairly prejudicial. An interchange fee is compensation paid by the acquiring bank to the issuing bank via Visa or MasterCard for the transaction passing through interchange. (*See* Paragraphs 64 & 69.) Class plaintiffs have presented no evidence that merchants pay any fees to issuing banks.

    **a.**    **The European Commission found that MasterCard's mandatory "fallback" interchange fees "restricts competition between acquiring banks by inflating the base on which acquiring banks set charges to merchants and thereby sets a floor under the merchant [discount] fee," which is nonnegotiable.** [362]

---

[362]    **Commission Decision (E.C.), at ¶¶ 2, 408, 410, 412, 413, 421, 435, 503, 664, COMP/34.579 of 19 Dec. 2007 ("E.C. Decision"). (SUFEX081)**

*Defendants' Response to Paragraph 68a:*

Disputed. Class plaintiffs' characterization of the European Commission decision is incorrect and unfairly prejudicial. The European Commission found that "[m]erchants view the costs of MasterCard's interchange fees as the non-negotiable part of the merchant fee." (Commission Decision (E.C.), at ¶ 503, COMP/34.579 of 19 Dec. 2007.) Visa's and MasterCard's rules expressly allow interchange fees to be negotiated. (Oct. 2010 Visa Rules, Ch. 10, Core Principle 10.3; 2010 MasterCard Rules, § 9.4.)

Defendants object to the admissibility of the E.C. Decision. The E.C. Decision is unfairly prejudicial, and is an out of court statement for which no exception to the hearsay rule has been established. (Fed. R. Evid. 403, 801, 802.)

    **b.**    **Debra Rossi, Head of Merchant Payment Solutions for Wells Fargo testified that Interchange is "the floor of what we would charge."** [363]

[363]    **Rossi Dep. 225:14-15, Mar. 25, 2008. (SUFEX291)**

*Defendants' Response to Paragraph 68b:*

      Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading. (Fed. R. Evid. 106.)  Immediately after Ms. Rossi provided the above testimony, she was asked if she knows "whether any bank has ever priced its merchant discount rate to its merchant discount customers below the interchange rate," and Ms. Rossi testified that she had "seen examples." (Rossi Dep. at 225-26.)

     **c.**    **Chris Jorgenson, a former member of Visa's Interchange Strategy & Fees Group, testified that he was "not aware of any instance" in which an acquiring bank changed a merchant discount rate that was less than the applicable interchange reimbursement fee.** [364]

[364]    **Jorgensen Dep. 193:17-22, July 9, 2008. (SUFEX316)**

*Defendants' Response to Paragraph 68c:*

      Undisputed.

     **d.**    **Defendants' expert Kevin Murphy agreed that an acquirer has no incentive to offer a merchant discount that is lower than the interchange fee, "unless they're getting some other benefit."** [365]

[365]    **Murphy Dep. 440:12-15. (SUFEX317)**

*Defendants' Response to Paragraph 68d:*

      Undisputed.

     **e.**    **Mike Duffy, CEO of Chase Paymentech, testified that he was not aware of any merchant discount fee lower than the interchange fee.** [366]

[366]    **Duffy Dep. 58:22-59:1. (SUFEX318)**

*Defendants' Response to Paragraph 68e:*

Disputed.  Class plaintiffs mischaracterize Mr. Duffy's deposition testimony.  Mr. Duffy testified that he was not aware of any merchants that pay Chase Paymentech a merchant discount fee that is lower than the interchange fee.  (Duffy Dep.[164] at 58-59.)

  **f.** **Similarly, Chase's Ira Goldman did not know of "any situation in which an acquiring bank has charged a merchant discount fee that's lower than the interchange rate that applies to that merchant's card acceptance." [367]**

_____

[367] **Goldman Dep. 91:4-9. (SUFEX087)**

*Defendants' Response to Paragraph 68f:*

Disputed.  Class plaintiffs mischaracterize Mr. Goldman's deposition testimony.  When Mr. Goldman was asked whether he was "aware of any situation in which an acquiring bank has charged a merchant discount fee that's lower than the interchange rata that applies to that merchant's card acceptance," he responded, "I don't know that." (Goldman Dep.[165] at 91.)

Defendants object to the admissibility of the Goldman Dep. at 91.  Class plaintiffs have not provided any foundation to support that Mr. Goldman was competent to testify as whether any merchant had a discount fee lower than interchange.  (Fed. R. Evid. 602.)

  **g.** **Walter Macnee of MasterCard agreed that generally a merchant discount fee would not be lower than the interchange fee charged on the transaction. [368]**

_____

[368] **Macnee Dep. 297:11-14. (SUFEX319)**

_____

[164] Deposition of Michael Duffy (Feb. 11, 2008) ("Duffy Dep.").  Mr. Duffy testified as president and chief executive officer of Chase Paymentech Solutions.  (Duffy Dep. at 9.)

[165] Deposition of Ira Goldman (Apr. 24-25, 2008) ("Goldman Dep.").  Mr. Goldman testified as business operations director and association liaison at Chase.  (Goldman Dep. at 20.)

*Defendants' Response to Paragraph 68g:*

        Undisputed.

**h.**    **Gary Beck of Visa USA testified that in his 25 years of experience working for acquirers in the payment card industry, he did not "know of any merchant who has ever paid a merchant discount fee that was lower than the interchange fee." [369]**

---

[369]    Beck Dep. 56:4-18. (SUFEX320)

*Defendants' Response to Paragraph 68h:*

        Disputed.  Class plaintiffs mischaracterize the evidence on which they rely.  Mr. Beck testified that he had spent 25 years working in the payment card industry, but clarified that at times he worked on the issuing side and for American Express.  (Beck Dep.[166] at 56.)

**i.**    **Riaz Bhamani, a Senior Vice President in Bank of America's Merchant Acquiring Division, gave the following testimony:**



[370]

---

[370]    Bhamani Dep. 54:13-20. (SUFEX321)

*Defendants' Response to Paragraph 68i:*

        Undisputed.

---

166   Deposition of Gary Beck (Jan 11, 2008) ("Beck Dep.").  Mr. Beck testified as a vice president of merchant relations for Visa.  (Beck Dep. at 60.)

**j.**      **Eric Barth testified that** ██████████████████████████
██████████████████████████████████ [371]

---
[371]      Barth Dep. 132:11-22. (SUFEX292)

*Defendants' Response to Paragraph 68j:*

    Undisputed.

**k.**      **Tim Healy of Wells Fargo testified as follows: "At Wells Fargo Merchant Services, LLC, I'm unaware of any merchants that are priced at a discount rate that is lower than interchange." [372]**

---
[372]      Tim Healy Dep. 58:11-16, May 7, 2008. (SUFEX322)

*Defendants' Response to Paragraph 68k:*

    Disputed. Evidence on which class plaintiffs rely is incomplete and misleading.

(Fed. R. Evid. 106.) Immediately after Mr. Healy provided the above testimony, he was asked

whether it "would [] be correct to say that the interchange rate charged by Visa and MasterCard

is the floor on the merchant discount," and he responded, "No." (Healy Dep. at 58.) Mr. Healy

further testified:

    Q. So the committee receives the information about any changes in interchange rates and fees by Visa and MasterCard. How does it then take that information and usc it to adjust what the Alliance will charge to particular merchants?

    A. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████

    ████████████████████████████████████████
████████████████████████████████

    ████████████████████████

247

(*Id.* at 54-55.)

<u>**Plaintiffs' Paragraph 69:**</u>

**69      Interchange Fees are not negotiable between merchants and Acquirers.** [373]

<hr>

[373]      Friedman Dep. 77: 12 – 79:3 (SUFEX323); *See also* Exhibit 24355 MCI_MDL02_11822343. (SUFEX284)

*Defendants' Response to Paragraph 69:*

          Disputed.  Class plaintiffs' definition of "Interchange Fee" as "a fee that Merchants pay to the Issuing Bank" is inaccurate, misleading and unfairly prejudicial.  Class plaintiffs have presented no evidence that merchants pay any fees to issuing banks.

          Merchants do not pay interchange fees.  "An interchange fee is compensation paid by the acquiring bank to the issuing bank via [Visa or MasterCard] for the transaction passing through interchange."  (OCC Handbook, at 15; *see also Visa Check* Compl. ¶ 8(o); GAO Rep., at 7; Oct. 2010 Visa Rules, Core Principle 10.2; 2010 MasterCard Rules, § 9.1; Madairy Dep. at 167.)  Interchange is not always passed on to merchants.  (*See, e.g.,* Frankel Dep. at 164-67; McCormack Dep. at 159-61; CROCK01263 to 01264,[167] at 263; Aviles Dep. Ex. 42697[168]; Aviles Dep. at 108-10; Archer Dep. at 127-28; Wechsler Dep. at 77; CHASE003107854 to 003107855,[169] at 854; Healy Dep. at 54-55.)  Indeed, some acquirers have priced merchants below the cost of interchange.  (*See, e.g.,* Mattea Dep. at 119-21; Pukas Dep. at 271; Baker Dep. at 59-61.)  Acquirers can negotiate interchange with issuing banks to enter bilateral agreements for a payment of interchange other than the default rate.  (Oct. 2010 Visa Rules, Ch. 10, Core Principle 10.3; 2010 MasterCard Rules, § 9.4.)

<hr>

[167]   Email between P. Gatof and R. Avoletta (Dec. 17, 2004).

[168]   Email between Sales Associates and Mark  (Feb. 23, 2004), bearing control number NCGA 003199.

[169]   Letter from Paymentech to Fortunoff (Mar. 10, 2003).

Some merchants negotiate bundled or blended merchant discount fee rates so that the merchant pays the same merchant discount fee for each transaction, notwithstanding variations in the merchant acquirer's cost for those transactions depending, among other things, on the specific interchange fee category or agreement applicable to each transaction. (GAO Rep., at 11; Frankel Dep. at 161.)

Defendants object to the admissibility of Friedman Dep. at 77 and Friedman Exhibit 24355. Mr. Friedman is a former employee of MasterCard (Friedman Dep.[170] at 6-7), and class plaintiffs have presented no evidence that Mr. Friedman, or MasterCard employees generally, have any personal knowledge of negotiations between merchants and acquirers. (Fed. R. Evid. 602.) This evidence is therefore inadmissible as irrelevant as to class plaintiffs' assertions regarding negotiations between merchants and acquirers. (Fed. R. Evid. 401, 402.)

      a.     **Chase Paymentech CEO Mike Duffy testified that his company cannot negotiate lower interchange rates for its merchant customers. When asked why not he replied, "We have no say in that matter."** [374]

------

[374]    **Duffy Dep. 71:3-8. (SUFEX318)**

*Defendants' Response to Paragraph 69a:*

    Undisputed.

      b.     **According to Julia Pukas, Business Manager of CitiGroup as an acquirer** [375]

------

[375]    **Julia Pukas Dep. 130:24-131:04, Mar. 7, 2008. (SUFEX324)**

------

[170]  Deposition of Theodore Friedman (Jul. 2, 2008) ("Friedman Dep."). Mr. Friedman testified as senior vice president of global credit products at MasterCard. (Friedman Dep. at 12-13.)

*Defendants' Response to Paragraph 69b:*

Disputed.  Class plaintiffs mischaracterize the evidence on which they rely, and the evidence on which class plaintiffs rely is incomplete and misleading.  (Fed. R. Evid. 106.) Ms. Pukas did not testify that she was referring to Citi's negotiations with merchants.  (Pukas Dep. at 130-31.)  Moreover, Ms. Pukas made clear that merchants may negotiate their overall rates with acquirers and/or processors.  (Pukas Dep. at 113.)

Defendants object to the admissibility of Ms. Pukas' deposition testimony.  Ms. Pukas worked for Citi's acquiring business (Pukas Dep. at 14-16), but Ms. Pukas testified that Citi's issuing side had the ability to negotiate interchange rates.  (Pukas Dep. at 164-65.)  Class plaintiffs do not provide any foundation to support that Ms. Pukas was competent to testify as to Citi's issuing business.  (Fed. R. Evid. 602.)

    c.     ███████████████████████████ confirmed that interchange fee were "nonnegotiable. [376]  For example, ███████████ testified:

> **Q.  Using the standard pricing as that term is used here, was the price that was told to the merchant negotiable in any fashion by the merchant?**
>
> **A.  I think the inputs to the price were negotiable. You know, it's a conversation between the salesperson and the merchant, and the – the salesperson had a variety of levers that they could – they could play with in the pricing model, and the end result was, here's the price to charge the merchant.**
>
> **Q.  Do you recall which inputs were negotiable?**
>
> **A.  One of them was probably the level of spread that we were going to make. One of them was the transaction fee a customer might charge. You know, I think one of them was the statement fee that a customer would pay. There may have been a few other components.**
>
> **Q.  Was the Interchange fee negotiable?**
>
> **A.  Interchange was never negotiated with a merchant. [377]**

[376]  ████████████████████████████████████████████

[377] ███████████████████████

*Defendants' Response to Paragraph 69c:*

       Disputed.  Class plaintiffs mischaracterize the evidence on which they rely.  The testimony quoted above stands for the proposition that Bank of America did not negotiate interchange fees with merchants, not that such fees were "non-negotiable."  The terms "non-negotiable" or "not negotiable" suggest that the interchange fee is a term of trade between a merchant and its acquirer, and is in some way fixed such that it is not amenable to negotiation or one or both parties declines to negotiate that term.  By contrast, Mr. Bhamani testified only that ████████████████████████████████████████████  In the testimony cited, Mr. Bhamani was asked separately about "interchange" and "inputs" to the merchant discount fee.  This testimony does not support the characterization of interchange as "non-negotiable" or "not negotiable."

      **d.**      **████████████████████████████████ testified that ██████████████ could not negotiate interchange fee rates.** [378]

---

[378]  ██████████ **167:14-168:21. (SUFEX328)**

*Defendants' Response to Paragraph 69d:*

       Disputed.  Class plaintiffs mischaracterize ████████████ deposition testimony.  ████████████ testified that ████████ never tried to negotiate "pricing or terms in any way with either MasterCard or Visa."  ██████████████ [171] at 167.)

      **e.**      **████████████████████████████████████████████ [379]**

---

[171]  Deposition of ████████ (Aug. 25, 2008) ██████████████████████ ███████████████████████████████

[379]   Barth Dep. 37:1-7. (SUFEX292)

*Defendants' Response to Paragraph 69e:*

      Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading.

(Fed. R. Evid. 106.)  The terms"non-negotiable" or "not negotiable" suggest that the interchange

fee is a term of trade between a merchant and its acquirer, and is in some way fixed such that it is

not amenable to negotiation or one or both parties declines to negotiate that term. By contrast,

Mr. Barth testified that the interchange fee is "an expense of National Data, so they couldn't

negotiate discount" (Barth Dep.[172] at 37), meaning that it is not a term of trade between National

Data and its merchant customers. This testimony does not support the characterization of

interchange as "non-negotiable" or "not negotiable."

    **f.**    **Ted Friedman of MasterCard agreed that interchange sets the floor for merchant discount rate pricing and merchants cannot negotiate interchange fees with their acquirers.** [380]

[380]   Friedman Dep. 78:16-79:3. (SUFEX323)

*Defendants' Response to Paragraph 69f:*

      Undisputed.

    **g.**    **Robert Selander testified that in the MasterCard system it is not possible for an acquirer to negotiate interchange with a merchant.** [381]

[381]   Selander Dep. 76:2-6. (SUFEX329)

*Defendants' Response to Paragraph 69g:*

      Undisputed.

---

[172]   Deposition of Eric Barth (Jun. 27, 2008) ("Barth Dep."). Mr. Barth is a former Bank of America employee whose responsibilities involved mergers and acquisitions of the acquiring business. (Barth Dep. at 21, 105-07.)

     h.     **In testifying as to a dispute Chase Paymentech resolved by offering one of its customers lower merchant discount fees, Robert Wechsler testified that these concessions did not include lower interchange because "Chase Paymentech has nothing to do with interchange fees." [382]  Similarly, Michael Duffy testified that Chase Paymentech could not "negotiate a lower interchange rate" to drive down merchants' costs, because "[w]e have no say in that matter." [383]**

---

[382]    Wechsler Dep. 130:25-131:14. (SUFEX330)

[383]    Duffy Dep. 71:3-8. (SUFEX318)

*Defendants' Response to Paragraph 69h:*

     Undisputed.

     i.     **When asked whether Merchants are "able to negotiate interchange" with their acquirer, Julie Pukas, a Citigroup Business Manager and member of the Visa U.S.A. Acquirers Executive Council and MasterCard Acquirer Committee, testified, "Citi did not negotiate interchange rates." [384]**

---

[384]    Pukas Dep. 130:24-131:4. (SUFEX324)

*Defendants' Response to Paragraph 69i:*

     Disputed.  Class plaintiffs mischaracterize the evidence on which they rely, and the evidence on which class plaintiffs rely is incomplete and misleading. (Fed. R. Evid. 106.) Ms. Pukas did not testify that she was referring to Citi's negotiations with merchants. (Pukas Dep. at 130-31.)  Moreover, Ms. Pukas made clear that merchants may negotiate their overall rates with acquirers and/or processors. (Pukas Dep. at 113.)

     Defendants object to the admissibility of Ms. Pukas' deposition testimony.  Ms. Pukas worked for Citi's acquiring business (Pukas Dep. at 14-16), but Ms. Pukas made clear that Citi's issuing side had the ability to negotiate interchange rates. (Pukas Dep. at 164-65.)  Class plaintiffs do not provide any foundation to support that Ms. Pukas was competent to testify as to Citi's issuing business. (Fed. R. Evid. 602.)

**j.**    **Brian Emmert, Jetro's Chief Financial Officer, testified, "I do not have the
ability to negotiate an interchange fee. The interchange fee is what is assessed
on me and I have to pay directly to the banks. It goes through Visa and
MasterCard. I have no ability to come back to them and say I want to
negotiate that interchange fee. It's whatever they raise the price to is what I
have to pay." [385]**

---

[385]    **Emmert Dep. 320:12-21. (SUFEX306)**

*Defendants' Response to Paragraph 69j:*

Undisputed.

255

<u>Plaintiffs' Paragraph 70:</u>

**70      Defendants have increased effective interchange fees by "upgrading" consumers' cards to higher-interchange premium credit cards.**

*Defendants' Response to Paragraph 70:*

Disputed.  Class plaintiffs' assertion is  incomplete, misleading, and unfairly prejudicial.  (Fed. R. Evid. 106, 403.)  Consumers cards are only upgraded to rewards card products, which sometimes offer higher interchange, if the consumer and the card program meets the requirements for the rewards card product.  (*See* Allen Dep. at 193-94 ("So, in fact, Visa, while you were there, would, in fact, allow any issuer to flip an existing consumer card portfolio to a signature card?  A.  No, I don't think that's an accurate statement.  Q.  Why not?  A.  Well, because there are criteria in the  rules with respect to the attributes of a signature card.  Those attributes differ from the attributes for a consumer credit card.  So just to imply that a consumer could move over from one card to another I'm not sure is necessarily the case.  Obviously the card itself, the signature card would have to qualify under Visa rules."); Buse 30(b)(6) Dep.[173] at 216 ("[I]f an issuer had a card program that met the Traditional Rewards criteria, that existing card program would have been eligible to become a Traditional Rewards program."); Groch Dep.[174] at 132 ("Q.  Does Fifth Third attempt to upgrade customers to World MasterCard when possible?  A.  If the customer qualifies for World MasterCard, we will attempt to cross-sell them that, yes.").)

      **a.      A presentation entitled "Visa U.S.A. Inc. Premium Credit Strategy," given at the Visa U.S.A. Board of Directors meeting on May 11, 2006, states, "In light**

---

[173] Deposition of Elizabeth Buse (Apr. 11, 2008) ("Buse 30(b)(6) Dep.").  Ms. Buse testified as Visa's Rule 30(b)(6) designee on premium cards.  (Buse 30(b)(6) Dep. at 11-13; Buse 30(b)(6) Dep. Ex. 31604 (30(b)(6) Deposition Notice).)

[174] Deposition of Jon P. Groch (Jul. 29, 2008) ("Groch Dep.").  Mr. Groch testified as senior vice president of bank cards for Fifth Third Bank.  (Groch Dep. at 36.)

of major changes to the consumer credit landscape, the Board approved a new Visa consumer credit strategy •



" [386]

---

[386]  Buse Dep. Ex. 32637, at VUSAMDL00086430. (SUFEX331)

*Defendants' Response to Paragraph 70a:*

Undisputed.

b.  **MasterCard's 30(b)(6) designee for Interchange Methodology, Steve Jonas, explained MasterCard's Account Level Processing program as follows: "[W]hile the account number remains the same, the card essentially becomes a different product type. A core might become an Enhanced, or an Enhanced might become a World. And again, the — it delivered operational efficiencies because even though an issuer could always reissue a card and an account number. But it's because the product type has changed, Core has become Enhanced, Enhanced has become World, et cetera, that the interchange structure that would apply now changes." [387]**

---

[387]  Jonas 30(b)(6) Dep. 567:5-18. (SUFEX332)

*Defendants' Response to Paragraph 70b:*

Disputed.  Mr. Jonas was MasterCard's designated representative to answer questions about the methodology by which MasterCard establishes interchange fees.  (Jonas Methodology Dep. at 7.)

c.  **MasterCard's February 2007 Marketing Bulletin states, "Overview of Account Level Management . . . MasterCard is pleased to offer issuers of consumer and commercial credit cards in the U.S. region the opportunity to participate in two new Account Level Management programs that will deliver more flexibility and value at the account level . . . MasterCard Product Graduation facilitates upgrades and migrations both within and across different card programs at the account level without changing the account number." [388]  The Bulletin also states that one of the "Issuer**

257

Benefits" of this program is that it will "enable issuers to migrate the right accounts across products to seamlessly upgrade features and benefits." [389]

[388]   MCI_MDL02_11622806-13, at MCI_MDL02_11622807. (SUFEX333)

[389]   MCI_MDL02_11622806-13, at MCI_MDL02_11622808. (SUFEX333)

*Defendants' Response to Paragraph 70c:*

Undisputed.

d.   **MasterCard's 30(b)(6) designee for Technology, Dana Lorberg, testified that the "Product Graduate Program" allows MasterCard to "migrate the product of a card without reissuing the card" and confirmed that "The merchant does not know the interchange rate at the time of the transaction."** [390]

[390]   Lorberg 30(b)(6) Dep. 135:16-137:7. (SUFEX334)

*Defendants' Response to Paragraph 70d:*

Disputed.  Class plaintiffs mischaracterize the evidence on which they rely.  Ms. Lorberg testified that "[t]he merchant does not know the interchange rate at the time of the transaction . . . because of all of the variables of interchange."  (Lorberg 30(b)(6) Dep.[175] at 135-37.)

e.   **Visa CEO Joseph Saunders testified that Visa's Account Level Management program "enables somebody to maintain the same account number whether we issue a new card or not." [391]**

[391]   Saunders Dep. 114:21-115:6. (SUFEX085)

*Defendants' Response to Paragraph 70e:*

Undisputed.

---

[175] Deposition of Dana Lorberg (Nov. 4, 2008) ("Lorberg 30(b)(6) Dep.").  Ms. Lorberg testified as MasterCard's 30(b)(6) designee on technology issues.  (Lorberg Dep. at 8-9.)

258

 **f.**   **Richard Srednicki, Chase's former CEO and former member of MasterCard's board, gave the following testimony:**

 **Q.** ████████████████████████████████████
████████████████████████████████

 **A:** ████████████████████████████████████
████████████████████████████████████
████████████████████████████████
████████████

 **Q.** ████████████████████████████████
████████████████████

 **A.** ████████████████████████████████.
[392]

---

[392]   Srednicki Dep. 90:5-24, June 25, 2008 (objections of counsel omitted). (SUFEX094)

*Defendants' Response to Paragraph 70f:*

 Disputed.  Class plaintiffs' description of Mr. Srednicki's job is inaccurate.  Mr. Srednicki is the former chief executive officer of Chase Card Services.  (Srednicki Dep. at 13.) He was a member of the MasterCard U.S. board.  (*See* Paragraph 16a)

 **g.**   **Citibank draft "**████████████████**" presentation dated 5/19/05 provides: "**████████████████████████████
████████████████████████████████████
████████████████████████████████
████████████████████████████
████████████████████████████" [393]

---

[393]   Knitzer Ex. 23661, at CITI INT 001671861. (SUFEX335)

*Defendants' Response to Paragraph 70g:*

 Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading. (Fed. R. Evid. 106.)  Knitzer Ex. 23661, at CITI INT 001671861 discusses a prospective

259

opportunity, not an action that had been taken.  When Citi employee Peter Knitzer was asked

about the presentation, ████████████████████████████████████████████████

(Knitzer Dep.[176] at 266-68.)  Additionally, Mr. Knitzer explained that ████████████

████████████████████████████████████████████████████████████████████

(*Id.*)

> **h.**   **When asked whether Bank of America/MBNA employed "████████**
> **████████████████," Bank of America Senior**
> **Vice President of Card Marketing, Michael Daly, testified, "On occasion, I**
> **think there have been ████████████████████**
> **██████████████," [394]**

_____
[394]   **Daly Dep. 209:17-22. (SUFEX336)**

*Defendants' Response to Paragraph 70h:*

>   Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading.

(Fed. R. Evid. 106.)  Mr. Daly testified as follows:

>   Q.  In your experience at MBNA and Bank of America, have ████████████
>   ████████████████████████████████████?

>   A.  ██████████████████████████████████████████
>   ██████████████████████████████████████████
>   ██████████████████████████████?

>   Q. Can you tell me ████████████████████?

>   A.  ██████████████████████████████████████████
>   ██████████████████████████████████████████
>   ██████████████████████████████████████████
>   ████████████████████████?

>   Q.  In your experience, ████████████████████████████
>   ████████████████?

_____
[176]   Deposition of Peter Knitzer (May 21, 2008) ("Knitzer Dep.").  Mr. Knitzer testified as chairman and chief executive officer of Citibank North America.  (Knitzer Dep. at 12.)

A. ███████████████████████████████████████
███████████████████████████.

(Daly Dep.[177] at 209.)

     i.     **A letter written in 2004 from US Bank's Acquiring Arm to Visa's Senior Vice President in charge of acquirer relations, Linda Perry, indicates that "the fact that neither an acquirer or merchant will be able to identify at the point of sale a Traditional Rewards transaction with its higher cost presents a challenge." This letter also suggested that issuers fund additional rewards by "reduc[ing] internal operating costs" rather than increasing interchange fees. [395]**

---

[395]    **Schultz Ex. 24803, at VUSAMDL1-08658595. (SUFEX337)**

*Defendants' Response to Paragraph 70i:*

     Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading. (Fed. R. Evid. 106.)  Defendants note that, as the letter makes clear, the writer is discussing a "proposed program," not a program that has already been put into effect.  (Schultz Dep. Ex. 24803, at VUSAMDL1-08658594.)  The letter suggested increasing interchange fees across all cards instead of enacting the proposed program: "It would be just as effective, and far more logical, to meet the increased revenue needs through a general interchange increase across an existing platform."  (*Id.* at VUSAMDL1-08658595.)

     Defendants object to the admissibility of Schultz Dep. Ex. 24803.  The deposition exhibit is a letter from US Bank's Acquiring Arm and is therefore an out of court statement for which no exception to the hearsay rule has been established.

---

[177]  Deposition of Michael Daly (Feb. 22, 2008) ("Daly Dep.").  Mr. Daly testified as director of product management for Bank of America.  (Daly Dep. at 105.)

261

<u>Plaintiffs' Paragraph 71:</u>

**71      Interchange Fees set at current levels reduce the number of merchants that accept Payment Cards.**

*Defendants' Response to Paragraph 71:*

        Disputed.  Class plaintiffs and their experts agree that interchange fee increases have not resulted in merchants dropping acceptance of Visa and/or MasterCard.  (Class Compl.[178] ¶ 279; Frankel. Rep. ¶ 95; *see also* Vellturo Rep.[179] ¶ 150.)

        Interchange is set at a level to maximize output.  (McWilton Dep.[180] at 27 ("Q. And do you have a view as to whether or not interchange rates affect volume?  A.  To the extent that interchange rates are set as a method – at a level which balances the economics of the system and maximizes both issuance and acceptance, both sides of the equation, it would tend to increase volume."; *see also* Defendants Response to Paragraph 55 (discussing how MasterCard interchange fees are established; VUSAMDL1-03585517 to 03585520,[181] at 518 ("Visa is able to provide a valuable payment system by balancing the interests of consumers and our Member financial institutions with those of the Merchant community.  Interchange fees serve as a mechanism thorough which Visa balances these differing interests in a manner than supports an optimal balance of cards and Merchants in the system."); *id.* ("Given the competitive marketplace, increased interchange fees to card issuing financial institutions have historically allowed Issuers to lower costs to cardholders and also permit Issuers to add features and benefits

---

[178]  Second Consolidated Amended Class Action Complaint (Jan. 29, 2009) ("Class Compl.").

[179]  Expert Report of Christopher A. Vellturo (Jul. 2, 2009) ("Vellturo Rep.").

[180]  Deposition of Chris McWilton (Jul. 17, 2008) ("McWilton Dep.").  Mr. McWilton testified as the president of global accounts at MasterCard.  (McWilton Dep. at 15.)

[181]  Visa Business Review, Visa Check Card, Interlink, and ATM Interchange Reimbursement Fee Modifications, Nov. 2004, Issue No. 041109.

to cards, which help increase usage and provide cardholders greater utility thereby benefiting Merchants through incremental sales and customer satisfaction."); Pinkerd Dep.[182] at 80 ("I believe that we are – our strategy is to increase overall usage of Visa payment products and – and for the benefit of all of the parties that participate in that system.").)

Lower interchange would make cards less valuable to cardholders, which would make acceptance less valuable to merchants. (*See* Munson Dep. at 130-32 ("The point is that, as we said before, interchange fees are a way of allocating costs between the two sides of the business, so that the service is attractive to both cardholders and merchants, such that the output is maximized. If interchange fees are set too low, it will have a negative effect on the issuing side. If interchange fees are set too high, it will have a negative effect on the acquiring and the merchant side. So the point is, yes, interchange fees have to be set at what MasterCard believes to be the appropriate level to maximize the output of our system, and if we get it wrong, that won't happen. … We have to make sure that our cards are attractive to our issuers and to the issuers' cardholders. And if we set the fees too low, that may not happen. Our cards may not be able to be as competitive as they might be and the brand will be harmed. The value of the service will be below what it could be and will be less competitive."); *see also* Grossman Dep.

[183] at 95 (█████████████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
█████████████████████████████████████████████████████████);

---

[182] Deposition of Stacey Pinkerd (Aug. 19, 2008) ("Pinkerd Dep."). Mr. Pinkerd testified as the head of the consumer debit product management group at Visa. (Pinkerd Dep. at 14.)

[183] Deposition of Michael Grossman (Dec. 15, 2008) ("Grossman Dep."). Mr. Grossman testified as a former employee of Tempo Payments, Inc. (Grossman Dep. at 30.)

*id.* at 96-97 (█████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████"); T. Murphy Decl. ¶¶ 16-23.)

████████████████████████████████████████

█████████████████████████████████████████████ ██████████

████████████████████████████████████████████

███████████████████████████████████████████ .

██████████████████████████ █████████ Discover calculated its percentage

of parity with MasterCard and Visa as ████████████████████████████

████████████████████████████████████████. (*See*

MDL1729-0034580 to 0034612, at 588, 592.)  Discover further noted that "████████████████

███████████████████████████." (MDL1720-0025735 to 0025774, at

747; *see also* Murphy Rep.[186] ¶ 318 (recognizing that "while Discover historically offered

generally (somewhat) lower merchant fees than those charged for Visa and MasterCard

---

[184] ████████████████████████████████████████

[185] ██████████████████████████████

[186] Expert Report of Professor Kevin M. Murphy (Dec. 14, 2009) ("Murphy Rep.").

264

transactions, it has not been able to obtain the kind of widespread acceptance for its cards that the other networks have achieved.  It has always trailed Visa and MasterCard substantially in merchant and cardholder acceptance.").)  Rather than further lower prices, Discover ████████

████████████████████████████████████████████

████████████████████████████████.  (*See* MDL1729-0034580 to 0034612, at 594-98.)

Tempo, a PIN debit network that was discontinued in 2008, entered the payments market and "established itself as focused on providing an alternative to merchants that was lower priced."  (Grossman Dep. at 12, 98.)  However, Tempo ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████ "  (*Id.* at 110-11.)  Tempo had approximately ████████ merchants that contracted to accept Tempo cards.  (*Id.* at 31.)

Defendants dispute class plaintiffs' definition of "Interchange Fee" as "a fee that Merchants pay to the Issuing Bank" because it is inaccurate, misleading, and unfairly prejudicial. An interchange fee is compensation paid by the acquiring bank to the issuing bank via Visa or MasterCard for the transaction passing through interchange.  (*See* Paragraphs 64 & 69.)  Class plaintiffs have presented no evidence that merchants pay any fees to issuing banks.

     a.    **Plaintiffs' and Defendants' experts agree that reducing Interchange Fees would induce more merchants to accept Visa and MasterCard Payment Cards than currently accept the cards.**

- **Professor Murphy acknowledges in his report that "lower merchant fees induce additional merchants to accept the card . . . ."** [396]

- **Professor Elzinga noted, "Visa and MasterCard have, in recent years, attracted new groups of merchants, such as supermarkets, gas stations, utility providers, and fast food ('quick serve') restaurants, by establishing programs that provide favorable interchange rates on**

their transactions." [397]

- Similarly, Plaintiffs' expert Alan Frankel writes, "By raising the price merchants pay to accept credit and debit cards, interchange fees deter some merchants from accepting the cards altogether (although not enough to have deterred previous price increases). This is why, despite their enforcement of anti-steering rules, there is still a limit to the ability of MasterCard and Visa to profitably raise interchange fees and an eventual limit on their market power. [398]

---

[396]   **Murphy Report at ¶ 111. (SUFEX338)**

[397]   **Elzinga Report at p. 91. (SUFEX250)**

[398]   **Frankel Report at ¶ 160. (SUFEX240)**

*Defendants' Response to Paragraph 71a:*

      Disputed.  Defendants dispute class plaintiffs' definition of "Interchange Fee" as "a fee that Merchants pay to the Issuing Bank" because it is inaccurate, misleading, and unfairly prejudicial.  An interchange fee is compensation paid by the acquiring bank to the issuing bank via Visa or MasterCard for the transaction passing through interchange.  (*See* Paragraphs 64 & 69.)  Class plaintiffs have presented no evidence that merchants pay any fees to issuing banks.

      Defendants object to the admissibility of Prof. Murphy's report in support of class plaintiffs' assertion.  The cited portion of the report discusses merchant fees (Murphy Rep. ¶ 111), and is therefore irrelevant to class plaintiffs' claims regarding interchange fees.  (Fed. R. Evid. 401, 402.)

      Defendants note that the expert reports on which class plaintiffs rely demonstrate that interchange fees at current levels have increased merchant acceptance, not decreased it.

    b.    **In his deposition, Visa's Bill Sheedy admitted that lowering interchange rates for specific merchant categories has led to increased acceptance. He testified that, "over the last five years thousands of utility companies have been added as acceptors of Visa where they had not early – previously, and I don't think – we don't believe that that would have been possible had it not been for significant interchange rate reductions for those merchants. Another**

example that comes to mind is ██████████, our second largest merchant in terms of transactions in the Visa system. They accepted Visa cards historically, but at a very small number of their outlets and they didn't exhibit preference. ████████████████████████████████

████████████████████████████████████████████████████

████████████████████were an important element to making that happen." [399]

---

[399]    Sheedy Dep. 285:16-286:23). (SUFEX083)

*Defendants' Response to Paragraph 71b:*

Undisputed.  Defendants note that Mr. Sheedy's testimony demonstrates that interchange fees at current levels have increased merchant acceptance, not decreased it.

    c.    **An internal Visa Interchange Strategy document dated February 2003 states that, "high rates are and will continue to limit penetration in new markets**

████████████████████████████████████████████**,"** [400]

---

[400]    Sheedy Dep. Ex. 34811, at VUSAMDL1-00432792). (SUFEX205)

*Defendants' Response to Paragraph 71c:*

Undisputed.

Defendants object to the admissibility of Sheedy Dep. Ex. 34811, dated February 2003.  The deposition exhibit relates to events prior to the relevant time period applicable in this case, and is thus irrelevant to any issue in support of class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)  Further, defendants note that the deposition exhibit is a draft and does not necessarily represent Visa's final opinion on the matter.

    d.    **Similarly, under the heading "Interchange Business Review – Key Insights," a March 2003 Visa document states, "Current IRF and product economics may limit penetration in new markets."** [401]

---

[401]    Sheedy Dep. Ex. 34812, at VUSAMDL1-08524777). (SUFEX339)

*Defendants' Response to Paragraph 71d:*

Undisputed.

Defendants object to the admissibility of Sheedy Dep. Ex. 34812, dated March

2003.  The deposition exhibit relates to events prior to the relevant time period applicable in this

case, and is thus irrelevant to any issue in support of class plaintiffs' motion for summary

judgment.  (Fed. R. Evid. 401, 402.)  Further, defendants note that the deposition exhibit is a

draft and does not necessarily represent Visa's final opinion on the matter.

    **e.**    **Visa's 30(b)(6) witness on the topic of Interchange Methodology, Bill Sheedy, was asked whether "Visa would have to consider a relatively lower interchange rate in order to grow the – grow the acceptance" with merchants that are relatively more price sensitive. [402]  Sheedy responded, "Holding all other considerations constant, yes, one of the things that we would consider for those category of merchants is whether or not a rate reduction would be required for that category to enable acquirers to go out and – and effectively sell acceptance and increase the throughput in the system for those types of transactions." [403]**

---

[402]    **Sheedy 30(b)(6) Dep. 147:3-6. (SUFEX185)**

[403]    **Sheedy 30(b)(6) Dep. 147:7-15. (SUFEX185)**

*Defendants' Response to Paragraph 71e:*

Disputed.  Mr. Sheedy was Visa's 30(b)(6) witness on the topic of Visa's

methodology for setting interchange fees from January 1, 2000 to the end of the discovery period.

(Sheedy 30(b)(6) Dep. Ex. 23950; Sheedy 30(b)(6) Dep. at 17.)

    **f.**    **MasterCard President of Global Accounts and former CFO, Chris McWilton, testified that** ███████████████████████████████ [404]
███████████████████████████

---

[404]    **McWilton Dep. 26:17-27:8. (SUFEX055)**

*Defendants' Response to Paragraph 71f:*

Disputed. Evidence on which class plaintiffs rely is incomplete and misleading. (Fed. R. Evid. 106.) Mr. McWilton clarified that interchange rates are set at a level to increase total output: "Q. And do you have a view as to whether or not interchange rates affect volume? A. To the extent that interchange rates are set as a method – at a level which balances the economics of the system and maximizes both issuance and acceptance, both sides of the equation, it would tend to increase volume." (McWilton Dep. at 27.)

    **g.**    **Fred Gore, former Senior Vice President of U.S. Acceptance for MasterCard, testified that the level of the cost of acceptance has deterred some merchants from accepting MasterCard credit cards.** [405]

---

[405]    **Gore Dep. 226:7-12. (SUFEX249)**

*Defendants' Response to Paragraph 71g:*

Undisputed.

    **h.**    **Gore also said that if MasterCard lowered its interchange rates by ■ percent, it is likely that more merchants would accept MasterCard.** [406]

---

[406]    **Gore Dep. 229:3-7. (SUFEX249)**

*Defendants' Response to Paragraph 71h:*

Undisputed.

    **i.**    **Jonas testified that in order for supermarkets to begin accepting credit cards in 1991-92, interchange was set lower than the rate that otherwise would have applied.** [407]

---

[407]    **Jonas Dep. 199:8-14, Apr. 23, 2008. (SUFEX179)**

_Defendants' Response to Paragraph 71i:_

      Undisputed.  Defendants note that Mr. Jonas' testimony demonstrates that interchange fees at current levels have increased merchant acceptance, not decreased it.

<u>Plaintiffs' Paragraph 72:</u>

**72     In combination with the Honor-All-Cards Rules and the Default Interchange Fees, the Anti-Steering Restraints reduce the number of merchants that accept Payment Cards.**

*Defendants' Response to Paragraph 72:*

        Dispute.  The absence of the above rules would make cards less valuable to cardholders, which would make acceptance less valuable to merchants.  (*See, e.g.,* Somerville Dep. at 194 ("I think [all the rules] all go together in general to protect the brand, protect consumers, make sure that we have an efficient and secure  processing system. . . .  MR. BLECHMAN:  Q.  When you used the word 'consumers' in your answer, did you mean cardholder? . . .  THE WITNESS:  I mean the consumer is the ultimate recipient of the benefit of using Visa.  The cardholder is the individual that's conducting the transaction at the time.");  Coghlan Dep. at 242-43 ("Q.  Does [the no surcharge rule] have any value to merchants? . . .  THE WITNESS:  I do think it has value to merchants in stimulating the sort of confidence of Visa cardholders that they can come in to this shopping environment and bring their preferred payment method and be treated in a means that they  would consider fair and consistent.  So I think it has value to merchants via the value to consumers.");  Doyle at 60-61 ("Q.  What was the business rationale for the discrimination rule? . . . A.  That any acceptance practice that discriminates our brand is not good for our brand.  Q.  And when you say not good for your brand, what does that mean?  A.  Discrimination is not good for anybody. . . . Being discriminated against is not a positive experience at the point of sale, and it's not a good experience.  Q.  So you're talking about the cardholder experience in that instance?  A.  I'm even talking about the merchant experience.  I mean, you want a consistent and positive experience at the point of interaction for both parties.");  Munson Dep. at 200-02; Sheedy Decl. ¶¶ 31, 35, 37, 39, 42.)

Defendants dispute class plaintiffs' definition of "Interchange Fee" as "a fee that Merchants pay to the Issuing Bank" because it is inaccurate, misleading, and unfairly prejudicial. An interchange fee is compensation paid by the acquiring bank to the issuing bank via Visa or MasterCard for the transaction passing through interchange. (*See* Paragraphs 64 & 69.) Class plaintiffs have presented no evidence that merchants pay any fees to issuing banks.

Defendants dispute the term "Anti-Steering Restraints" as vague, inaccurate, argumentative, and misleading.



    a.    **A September 2004 MasterCard document entitled "Elimination of the 'No Surcharge' Rule Frequently Asked Questions – For Internal Staff Briefing, and for circulation to Members via September, 2004, Operations Bulletin" states,** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ [408]

---

[408]    **MCI_MDL02_08234968-12, at MCI_MDL02_08234969. (SUFEX340)**

*Defendants' Response to Paragraph 72a:*

Disputed.  There should be an ellipses before the sentence that begins ▮▮▮▮▮ ▮▮▮▮▮▮▮▮ as this sentence is separated from the prior sentence in class plaintiffs' quoted language by more than a paragraph.

    b.    **A December 2002 analysis conducted by** ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ [409] **The document states that "Surcharging . . . . Allows merchants to recover expense per transaction charged by their terminal provider . . . Allows some merchants with low profit per transaction to accept PIN based payments [and] Produces new volume from merchants that would not accept PIN transactions without surcharging." [410] The document states that the "Rationale for Prioritization" is that surcharging** ▮▮▮▮▮▮▮▮ [411] ▮▮▮▮▮▮▮▮▮▮

272

[409] ██████████████████████

[410] ██████████████████████

[411] ██████████████████████

*Defendants' Response to Paragraph 72b:*

Undisputed.

Defendants object to the admissibility of VUSAMDL1-07486295 to 07486322, dated December 2002.  The document relates to events prior to the relevant time period applicable in this case, and is thus irrelevant to any issue in support of class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)  Further, note that the analysis explicitly states that it is a "WORKING DOCUMENT" (VUSAMDL1-07486295 to 07486322,[187] at 295) and does not necessarily contain Visa's final opinion on the matter.

   c.   **The December 2002 Visa analysis entitled "POS Networks Competitive Analysis" also states, "Surcharging is prohibited by the Interlink rules except for some grand-fathered merchants in five Western states until November, 2003.** ██████████████████████████████████████
██████████████████████████ [412] **The document also states, "Interlink is the sole PIN based network that does not allow surcharging.** ████████████████
███████████████████ [413] **The document also states,** ██████████████████████████████████████████
██████████████████████ **Action required would be a change in Visa's Operating Regulations to allow surcharging." [414]**

---

[412]   **VUSAMDL1-07486295-322, at VUSAMDL1-07486319. (SUFEX341)**

[413]   **VUSAMDL1-07486295-322, at VUSAMDL1-07486319. (SUFEX341)**

[414]   **VUSAMDL1-07486295-322, at VUSAMDL1-07486319. (SUFEX341)**

---

[187]   Visa POS Networks Competitive Analysis, Working Document (Dec. 2003).

273

*Defendants' Response to Paragraph 72c:*

Disputed.

Defendants object to the admissibility of VUSAMDL1-07486295 to 07486322,

dated December 2002. The document relates to events prior to the relevant time period

applicable in this case, and is thus irrelevant to any issue in support of class plaintiffs' motion for

summary judgment. (Fed. R. Evid. 401, 402.) Further, note that the analysis explicitly states

that it is a "WORKING DOCUMENT" (VUSAMDL1-07486295 to 07486322,[188] at 295) and

does not necessarily contain Visa's final opinion on the matter.

**d.   MasterCard Rules allow for colleges and universities to impose surcharges – or "convenience fees" in MasterCard parlance – on tuition payments, while Visa Rules do not permit this. As a result, several universities accept MasterCard Payment Cards, but not Visa. [415]**

---

[415]   *See* **VUSALITIIICID2-00537820, at VUSALITIIICID2-00537820 (Letter from Texas A&M stating that it accepts MasterCard because it is allow to charge a convenience fee). (SUFEX343)**

*Defendants' Response to Paragraph 72d:*

Disputed. Class plaintiffs rely on a letter regarding Texas A&M for their

assertion that several universities accept MasterCard payment cards, but not Visa, but the Texas

A&M website states that the university accepts Visa: "The University accepts Visa, MasterCard,

American Express and Discover." (Texas A&M Website.[189])

Convenience fees are different from surcharges. Convenience fees apply to all

consumers who use a modality of payment, regardless of the type of payment used. (Doyle Dep.

---

[188]   Visa POS Networks Competitive Analysis, Working Document (Dec. 2003).

[189]   Texas A&M University-Commerce: Payment Methods, at http://web.tamu-commerce.edu/admissions/registrar/paymentMethods.aspx (last visited Mar. 23, 2011) ("Texas A&M Website").

at 113-15; *see also* Forsey Dep.[190] at 223-24; Hanft Dep.[191] at 247.)  Class plaintiffs have

presented no evidence that convenience fees and surcharges are the same.

    **e.**    **A MasterCard deck discussing its strategy for gaining acceptance** ▮



[416]

_____

[416]    Forsey Dep. Ex. 21416, at MCI_MDL02_01430290. (SUFEX342)

*Defendants' Response to Paragraph 72e:*

    Undisputed.

    **f.**    **A Visa presentation titled "Interchange Discussion" that was prepared by Visa's Interchange Strategy team and considered a "standard" interchange presentation that is used to "brief" member banks illustrates why the networks foster the lack of transparency in payment card pricing: "consumers typically are shielded from an explicit price. Explicit prices to consumers typically mute demand."** [417]

_____

[417]    Jorgensen Dep. Ex. 24475, at 5. (SUFEX183)

*Defendants' Response to Paragraph 72f:*

    Disputed.  Class plaintiffs mischaracterize the evidence on which they rely.  The

presentation to which plaintiffs cite was the "most recent" presentation that had been put together,

not a "standard" presentation.  (Jorgensen Dep. Ex. 24475[192], at VUSAMDL1-06290200.)

_____

[190]    Deposition of Gareth J. Forsey (Feb. 8, 2008) ("Forsey Dep.").  Mr. Forsey testified as the chief global commerce development officer of MasterCard.  (Forsey Dep. at 20-21.)

[191]    Deposition of Noah Hanft (Nov. 7, 2008) ("Hanft Dep.").  Mr. Hanft testified as general counsel, corporate secretary, and chief franchise officer of MasterCard.  (Hanft Dep. at 10-11.)

[192]    Email from C. Jorgenson to P. Moran, T. Steele, R. Towne, and R. Morrissey (Oct. 4, 2004) attaching Interchange Discussion bearing control numbers VUSAMDL1-06290200 to 06290227.

g.     **A July 2008 letter from the Executive Director of Student Business Services at Texas A&M University to Wells Fargo's community banking president announces that the university will no longer accept Visa cards because Visa "refus[es] to allow institutions to assess a convenience fee based on a percentage of the amount paid by those that use our online payment processor." [418]**

------------

[418]     VUSALITIIICID2-00537820-821, at VUSALITIIICID2-00537820. (SUFEX343)

*Defendants' Response to Paragraph 72g:*

Undisputed.  But, defendants note that the Texas A&M Website states that the

university accepts Visa: "The University accepts Visa, MasterCard, American Express and

Discover."  (Texas A&M Website.)

.

276

**Plaintiffs' Paragraph 73:**

73    MasterCard internal documents refer to magnetic-stripe payment cards as "cash cows."

*Defendants' Response to Paragraph 73:*

Disputed. As discussed below, evidence on which class plaintiffs rely is incomplete and misleading. (Fed. R. Evid. 106.)

    a.    **A MasterCard presentation regarding technology and risk mitigation stated that** ██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
[419]

_____

[419]    Thom Dep. Ex. 20708, at MCI_MDL02_02177654 (SUFEX344); *see also* Thom Dep. 107:8-17, Jan. 18, 2008. (SUFEX354)

*Defendants' Response to Paragraph 73a:*

Disputed. The evidence on which class plaintiffs rely is ambiguous. It is unclear whether the "cash cow" language is referring to magnetic-stripe payment cards.

    b.    **A MasterCard risk management presentation explained** ██████████
██████████████████████████████████████████████
██████████████████████████████████████████ [420]

_____

[420]    Kranzley Dep. Ex. 25381, at MCI_MDL_02_06865487 (SUFEX345); *see also* Kranzley Ex. 25377 at MCI_MDL02_05923726 ("American bankers are very good at milking a cash cow and ███████████
██████████████████████"). (SUFEX346)

*Defendants' Response to Paragraph 73b:*

Disputed. Evidence on which class plaintiffs rely is incomplete and misleading. (Fed. R. Evid. 106.) Christopher Thom testified that chip technology was implemented more frequently in countries where issuing banks had smaller card portfolios, where switching to chip technology was more "doabl[e]." (Thom Dep. at 105-06.)

<u>**Plaintiffs' Paragraph 74:**</u>

**74      "Bilateral" agreements between Issuers and merchants are extremely rare in the Visa and MasterCard systems.**

*Defendants' Response to Paragraph 74:*

     Disputed.  Issuers and acquirers have entered into bilateral agreements that supersede the networks' default interchange schedules.  Bilateral settlement agreements are possible and have occurred in the MasterCard system.  (Lorberg Dep.[193] at 261-62 (stating that MasterCard's technology can support bilateral relationships between merchants and acquirers or issuers and acquirers where default interchange is not applied and that MasterCard currently has approximately ▮ such "business service arrangement[s]"); Rethorn Dep.[194] at 174, ("Q.  Okay.  Now, how are member-to-member business service arrangements and bilateral agreements or arrangements related, if any – in any way?  A.  I think you probably would be – it would probably be fair to say they're – they're like terms.); *id.* at 191; T. Murphy Dep. at 241-42 (stating that MasterCard's rules allow bilateral agreements); Marshall Dep.[195] at 203 ("Q.  Do you know of any reason why a merchant could not negotiate a bilateral agreement which would include an interchange fee rate with an issuing bank member of MasterCard?  A.  I don't know a reason why they could not do that.  I don't know that that's restricted.").)

     Visa issuers and acquirers have entered into bilateral agreements as well.  Under the Visa USA Member-Supplied Interchange Fee Service Agreement ▮

---

[193]   Deposition of Dana Lorberg (Sept. 10, 2008) ("Lorberg Dep.").  Ms. Lorberg testified as group head of global network products at MasterCard.  (Lorberg Dep. at 6, 21-22.)

[194]   Deposition of Michael Rethorn (May 15, 2008) ("Rethorn Dep.").  Mr. Rethorn testified as group head at MasterCard and has responsibility for authorization and clearing systems.  (Rethorn Dep. at 9-10.)

[195]   Deposition of Ruth Ann Marshall (Jul. 30, 2008) ("Marshall Dep.").  Ms. Marshall was former president of the Americas for MasterCard.  (Marshall Dep. at 8.)

███████████████████████████████████████████████

███████████████████████████████████████████████

(VUSAMDL1-07039436 to 07039438,[196] at 37; Morrissey Dep. at 377-78; Morrissey Dep. Ex.

30531.[197]) Since at least 1984, Visa has never had bylaws or operating regulations that have

prevented bilateral interchange.  (Sheedy Decl. ¶ 29.)

>   a.   **Gary Beck, Visa Vice President of Merchant Relations, testified that he is not aware of an issuer ever deviating from the Associations' fee schedules.** [421]

---

[421]   Beck Dep. 51:3-57:3, Jan. 11, 2008  (SUFEX320). *See also*, C00003-00007163 at 67 (Capital One presentation titled "Card Association Assumptions NPV LC Meeting" dated Sept. 8, 2005 stating that "[i]ndividual issuers do not have negotiating power to receive higher Interchange or lower expenses."). (SUFEX347)

*Defendants' Response to Paragraph 74a:*

>   Undisputed.

>   b.   **Visa's Global Head of Interchange Strategy, Tolan Steele, was aware of only one Merchant that had a bilateral agreement in the Visa system,** ██████ ███████████████████████████████████ **during the relevant time period.** [422], [423] **According to Mr. Steele,** ███████████████████████████ . [424] ████████████████████████████████████████

---

[422]   Steele Dep. 67:3-69:22. (SUFEX041)

[423]   Morrissey Dep. 236:3-237:20.  (SUFEX177)

[424]   Steele Dep. 68:12-69:6. (SUFEX041)

*Defendants' Response to Paragraph 74b:*

>   Disputed.  Class plaintiffs mischaracterize Mr. Steele's testimony.  Mr. Steele did

not testify that ███████████████████████████████████████████████

---

[196]   Visa USA Member-Supplied Interchange Fee Service Agreement - Acquirer Registration Form.

[197]   Email between R. Morrissey and R. Towne  (Dec. 22, 2004), bearing control number VUSAMDL1-05576518.

███████████ (Steele Dep. at 68-69.)  Class plaintiffs' characterization of Mr. Steele's

testimony suggests ███████████████████████████████, but Mr.

Steele's testimony █████████████████ (*Id.*)

      c.    **Richard Morrissey, who reports to Tolan Steele, testified in his deposition that he was aware of only ███ such agreements.** [425]

---

[425]    Morrissey Dep. 235:1-236:24. (SUFEX177)

*Defendants' Response to Paragraph 74c:*

      Undisputed.  Defendants note that Mr. Morrissey also testified that he could not

remember if there was a ███ such agreement.  (Morrissey Dep. at 236.)

      d.    **According to MasterCard's Vice President of Interchange, Stephen Jonas, every merchant pays the applicable interchange fee in accordance with the published fee schedule, but a limited number of merchants receive a rebate of a portion of the interchange fee paid pursuant to agreements made with MasterCard.** [426]

---

[426]    Jonas Dep. 227:23-229:8, Apr. 23, 2008  (SUFEX179) & Ex. 4 (SUFEX348); *see also* Abrams Dep. 197:11-198:5  (SUFEX258) & Ex. 2105. (SUFEX349)

*Defendants' Response to Paragraph 74d:*

      Disputed.  Class plaintiffs mischaracterize the evidence on which they rely.  The

deposition testimony to which class plaintiffs cite does not support any of their above assertions

regarding Mr. Jonas' testimony.  (Jonas Dep. at 227-29.)  Mr. Abrams' deposition testimony on

which class plaintiffs rely stands only for the proposition that MasterCard's default interchange

rates apply to all members.  (Abrams Dep.[198] at 197-98.)

---

[198]  Deposition of Steve Abrams (Mar. 13, 2008) ("Abrams Dep.").  Mr. Abrams testified as the global product group executive for commercial products at MasterCard.  (Abrams Dep. at 4.)

Class plaintiffs also do not cite any evidence in support of their assertion that merchants pay interchange fees. To handle the merchant's payment card transactions, the merchant acquirer charges the merchant a fee, known as the "merchant discount fee." (GAO Rep., at 7; Class Compl. ¶ 8(r); Frankel Rebuttal Rep.[199] ¶ 136; Frankel Dep. at 157; McCormack Rep. ¶¶ 24, 78; McCormack Dep. at 128; Oct. 2010 Visa Rules, Core Principle 10.2; 2010 MasterCard Rules, § 5.11.2; Topor Dep. at 60; Ivancikova Dep.[200] at 104; Zuritsky Dep.[201] at 124; Wenning Dep.[202] at 143-44; Schumann Dep. at 61; Berman Dep.[203] at 172; Gule Dep.[204] at 191; Mullings Dep.[205] at 175-76; Schermerhorn Dep. at 91.) According to class plaintiffs' industry expert, Mr. McCormack, merchant discount fees "include not only interchange fees alone, but also the acquirer fee and other Visa and MasterCard network fees." (McCormack Rebuttal Rep.[206] ¶ 7.)

Defendants object to the admissibility of Jonas Dep. Ex. 4, dated May 16, 2003. (Jonas Dep. Ex. 4.) The deposition exhibit relates to events prior to the relevant time period

---

[199]  Rebuttal Report of Alan S. Frankel, Ph.D. (Jun. 22, 2010) ("Frankel Rebuttal Rep.").

[200]  Deposition of Daniela Ivancikova (Jan. 8, 2008) ("Ivancikova Dep."). Ms. Ivancikova was the director of operating revenue systems at plaintiff Parkway Corporation until July 6, 2007. (Ivancikova Dep. at 6-7.)

[201]  Deposition of Robert Zuritsky (Apr. 30, 2008) ("Zuritsky Dep."). Mr. Zuritsky testified as president of plaintiff Parkway Corporation. (Zuritsky Dep. at 5.)

[202]  Deposition of Thomas F. Wenning (May 23, 2008) ("Wenning Dep."). Mr. Wenning testified as senior vice president and general counsel of plaintiff National Grocers Association. (Wenning Dep. at 8.)

[203]  Deposition of Carl Berman (Apr. 10, 2008) ("Berman Dep."). Mr. Berman testified as co-owner of plaintiff Photos Etc. (Berman Dep. at 31-32.)

[204]  Deposition of Roberta Gule (Feb. 21, 2008) ("Gule Dep."). Ms. Gule was the accounts receivable manager at plaintiff Crystal Rock. (Gule. Dep. at 31.)

[205]  Deposition of Lisa Mullings (Aug. 13, 2008) ("Mullings Dep."). Ms. Mullings testified as President and CEO of plaintiff NATSO, Inc. (Mullings Dep. at 124.)

[206]  Rebuttal Report of Mike McCormack (Jun. 22, 2010) ("McCormack Rebuttal Rep.").

applicable in this case, and is thus irrelevant to any issue in support of class plaintiffs' motion for

summary judgment.  (Fed. R. Evid. 401, 402.)

      **e.**      **David Kresge, a Senior Vice President of Bank of America, testified that he**



[427]

---

[427]    **Kresge Dep. 160:09-15, Apr. 3, 2008. (SUFEX327)**

*Defendants' Response to Paragraph 74e:*

      Undisputed.

      Defendants also object to class plaintiffs' reliance on Mr. Kresge's deposition

testimony because they do not provide any foundation to support that Mr. Kresge was competent

to testify as to the interchange rates other issuers use.  (Fed. R. Evid. 602)

282

<u>Plaintiffs' Paragraph 75:</u>

**75     The networks' rules discourage interchange-fee-based competition in for merchant acceptance.**

<u>*Defendants' Response to Paragraph 75:*</u>

Disputed.  As the various merchant categories discussed by class plaintiffs in Paragraphs 47 and 58 demonstrate, the networks compete against each other on interchange for merchant acceptance.  (*See* Paragraphs 47, 58.)  Documents on which class plaintiffs rely in subparagraphs a-h demonstrate that there is interchange fee-based competition for merchant acceptance.  (*See, e.g.,* CO00003-00033239 to 00033254,[207] at 253 ("█████████████████ ██████████████████████████████████████████.").)

Class plaintiffs assertion that there is interchange-fee-based competition "in for" merchant acceptance is vague and ambiguous.

a.     **In October 2002, Bill Sheedy's administrative assistant sent a meeting appointment to Visa personnel entitled "Bi-lateral Meeting."** [428] **The memorandum attached to the meeting invitation, under the heading "Risks to Member Profitability," states, "[I]f Bi-laterals are broadly adopted the potential risk exists at that merchants will gain negotiating leverage versus the Issuers since the Interchange Fees will be set by individual Issuers rather than the Visa Association. Presumably in this case Issuers will face a 'prisoners dilemma' and competing Issuers will through their negotiations lower the Interchange for all Issuers."** [429]

---

[428]     **Sheedy Dep. Ex. 34838, at VUSAMDL1-06180107-110) (SUFEX350); Sheedy Dep. 643:19-644:7. (SUFEX171)**

[429]     **Sheedy Dep. Ex. 34838, at VUSAMDL1-06180110. (SUFEX350)**

---

[207]     Card Association Management: 2005 Goals and Strategic Considerations (Mar. 2005).

*Defendants' Response to Paragraph 75a:*

Disputed. Evidence on which class plaintiffs rely is incomplete and misleading. (Fed. R. Evid. 106.) Mr. Sheedy testified that he believes that Visa never adopted the view contained in the language quoted above: "It appears, whomever wrote this document at the time that they wrote this believed that that was a risk. As I sit here, I don't believe that Visa held this view." (Sheedy Dep. at 645-46.)

Defendants dispute the admissibility of Sheedy Dep. Ex. 34838, dated October 18, 2002. The deposition exhibit relates to events prior to the relevant time period applicable in this case, and is therefore inadmissible as irrelevant to any issue in support of class plaintiffs' motion for summary judgment.

   b.   **In a September 2002 email, Visa's William Sheedy stated that one of the downsides of pursuing "preferential acceptance" deals with merchants is the effect on "[Long Term] Member profitability." [430]**

---

[430] . **Sheedy Dep. Ex. 34814, at VUSAMDL1-06236077. (SUFEX351)**

*Defendants' Response to Paragraph 75b:*

Disputed. Evidence on which class plaintiffs rely is incomplete and misleading. (Fed. R. Evid. 106.) The evidence to which class plaintiffs cite is Mr. Sheedy recounting potential thoughts of others from a meeting in the cited email. The remainder of the email also discusses the benefits of ▮▮▮▮▮▮▮▮▮▮. (Sheedy Dep. Ex. 34814, at VUSAMDL1-06236077.)

Defendants object to the admissibility of Sheedy Dep. Ex. 34814, at VUSAMDL1-06236077, dated September 2002. The deposition exhibit relates to events prior to the relevant time period applicable in this case, and is thus irrelevant to any issue in support of class plaintiffs' motion for summary judgment. (Fed. R. Evid. 401, 402.) In addition, Mr.

Sheedy's recounting potential thoughts of others is an out of court statement for which no

exception to the hearsay rule as been established.  (Fed. R. Evid. 801, 802.)

      **c.**     **In August 2003, a Visa task force identified the potential to negotiation interchange away as a risk of the bilateral agreement program.** [431]

_____

[431]     **VUSAMDL1-01223991, at VUSAMDL1-01223992. (SUFEX352)**

*Defendants' Response to Paragraph 75c:*

      Disputed.  Class plaintiffs mischaracterize the evidence on which they rely.  The

document to which class plaintiffs cite is a memo to a Visa task force.  (VUSAMDL1-01223991

to 01223991, at 991.)

      Defendants object to the admissibility of VUSAMDL1-01223991, dated August 6,

2003.  The document relates to events prior to the relevant time period applicable in this case,

and is therefore inadmissible as irrelevant to any issue in support of class plaintiffs' motion for

summary judgment.  (Fed. R. Evid. 401, 402.)  Visa members currently have the ability to

negotiate bilateral agreements on interchange.  (Oct. 2010 Visa Rules, Core Principle 10.3.)

      **d.**     **Mr. Sheedy also stated in an email to Bob Pifke, "[t]he first iteration of negative market response to a Visa exclusive acceptance deal is relatively easy to predict – MC would attempt to convince certain merchants to kick Visa out." Mr. Pifke responds, "As long as no merchant bites, the approach is a complete win for us. If someone does bite, ala ▮▮▮▮▮, then we better make sure we are not too aggressive in our 'deal pricing.'"** [432]

_____

[432]     **Id. at VUSAMDL1-06231996. (SUFEX353)**

*Defendants' Response to Paragraph 75d:*

      Undisputed.

      **e.**     **According to MasterCard Executive, Willard Thom, MasterCard's merchant team felt that the Honor All Cards rule inhibited the use of bilaterals.** [433]

[433]   Thom Dep. 184:2-185:18 (SUFEX354); Thom Dep. Ex. 20713, at MCI_MDL02_11423289. (SUFEX355)

*Defendants' Response to Paragraph 75e:*

Disputed. Evidence on which class plaintiffs rely is incomplete and misleading. (Fed. R. Evid. 106.). Mr. Thom testified that "for an issuer to have a bilateral with an acquiring bank, it's just not a workable solution en masse" because the "cost would be enormous" to do so. (Thom Dep. at 185-86.)

Class plaintiffs' reference to "Willard Thom" is incorrect. Mr. Thom's first name is Christopher.

f.   **A March, 2005 Capital One "Card Association Management: 2005 Goals and Strategic Considerations" presentation recognized that "The growth of bilateral pricing arrangements are only limited by the rules which mandate bankcard equality at all accepting merchants."** [434]

[434]   CO00003-00033239-3254, at CO00003-00033253. (SUFEX100)

*Defendants' Response to Paragraph 75f:*

Disputed. Evidence on which class plaintiffs rely is incomplete and misleading. (Fed. R. Evid. 106.). The Capital One presentation to which class plaintiffs cite recognizes that

██████████████████████████████████████████████████████████

████████████ (CO00003-00033239 to 00033254, at 253.)

g.   ████████████ testified that when she attempted on behalf of ████████ to **negotiate directly with issuers on interchange,** ████ **"they were receiving a higher interchange [and] would not give up the interchange that they were receiving." JP Morgan Chase also refused to lower its interchange fees.** [435]

[435]   ████████ Dep. 219-222. (SUFEX356)

*Defendants' Response to Paragraph 75g:*

Disputed.  Class plaintiffs mischaracterize the evidence on which they rely.  Class plaintiffs do not cite any evidence in support of their assertion that JPMorgan Chase refused to lower its interchange fees.  Rather, ███████ testified that ██████ has had conversations with issuers about direct negotiations, but have been told by the issuers that they can't do that." (███████[208] at 220.)

Defendants object to the admissibility of ████████ testimony regarding what she was told by a US Bank representative.  The testimony is an out of court statement for which no exception to the hearsay rule has been established.  (Fed. R. Evid. 801, 802.)

**h.    MasterCard was concerned about the risk that a group of large merchants could use ████████████████████ to force interchange lower. [436]**

---

[436]    **MCI_MDL02_00032560-2561, at 2561. (SUFEX357)**

*Defendants' Response to Paragraph 75h:*                           .

Undisputed.  Defendants note that the fact that a group of large merchants could use ████████████████████ to force lower interchange undermines class plaintiffs' assertion and demonstrates that there is interchange fee-based competition for merchant acceptance.

---

[208]  Deposition of ██████████ (Sept. 3, 2008) ██████████████████████████ ██████████████

287

**Plaintiffs' Paragraph 76:**

76      The Networks' no-surcharge rules limit merchants' ability to put competitive pressure on interchange fee rates.

*Defendants' Response to Paragraph 76:*

        Disputed.  Merchants have a variety of means to put competitive pressure on

interchange fee rates by steering consumers to other payment forms.  For example, under

MasterCard's rules, "[m]erchants have always been able to provide -- not always, but for a very

long time -- provide discounts for cash, and merchants have been allowed to encourage PIN

usage.  Merchants have been allowed to say we prefer a check.  We prefer another brand.  They are

allowed to do that."  (Doyle Dep. at 71.)  Visa rules also permit merchants to steer to other forms

of payment.  (*See. e.g.,* Somerville Dep. at 152-53 ("We have a specific rule that allows the

merchant to encourage the use of a payment product.  Q.  What rule is that?  A.  The same one

that we just referenced.  5.2.B.3.a.  Q.  Thanks.  Question seven, next page or point seven, next

page.  'Assume a merchant posts a sign that says or otherwise makes the following

communication to consumers at the point of sale.  "Visa's discount fees are killing us.  Please

pay with anything but Visa."'  Can a merchant post such a sign under Visa's operating regs today?

A.  Yes.  Q.  And what operating regulation governs that conduct?  A.  We don't really have a

regulation that would prohibit that.  Q.  Do you have an operating regulation that allows it?  A.

I suppose you could say that the section that we referenced before would cover that if this is an

encouragement to use something other than Visa.").)

        Additionally, merchants in ten states—New York, California, Texas, Florida,

Connecticut, Massachusetts, Maine, Oklahoma, Kansas, and Colorado—cannot be limited by the

networks no-surcharge rules because state law already prohibits surcharging.  (N.Y. Gen. Bus.

Law § 518 (McKinney 2010); Cal. Civ. Code § 1748.1(a) (West 2010); Tex. Fin. Code §

339.001(a) (Vernon 2009); Fla. Stat. § 501.0117(1) (2010); Conn. Gen. Stat. § 42-133ff(a)

(2010); Mass. Gen. Laws ch. 140D, § 28A(a)(2) (West 2010); Me. Rev. Stat. tit. 9-A, § 8-303(2)

(2009); Okla. Stat. tit. 14A, § 2-211A (2010); Kan. Stat. Ann. § 16a-2-403 (2010); Colo. Rev.

Stat. § 5-2-212(1) (2010).)

      a.     **MasterCard allows utility merchants to impose surcharges – which it refers to as "convenience fees" – on MasterCard transactions. If a utility merchant chooses not to surcharge,** ███████████████████████████████████████████████████

*Defendants' Response to Paragraph 76a:*

      Disputed. Defendants dispute class plaintiffs' definition of "Interchange Fee" as

"a fee that Merchants pay to the Issuing Bank" because it is inaccurate, misleading, and unfairly

prejudicial. An interchange fee is compensation paid by the acquiring bank to the issuing bank

via Visa or MasterCard for the transaction passing through interchange. (*See* Paragraphs 64 &

69.) Class plaintiffs have presented no evidence that merchants pay any fees to issuing banks.

      Convenience fees are different from surcharges. Convenience fees apply to all

consumers who use a modality of payment, regardless of the type of payment used. (Doyle Dep.

at 113-15; *see also* Forsey Dep. at 223-24; Hanft Dep. at 247.) Class plaintiffs have presented no

evidence that convenience fees and surcharges are the same.

      b.     **The European Commission found that MasterCard's no-surcharge rules limits merchants' ability to steer customers to lower-cost payment options.** [437]

---

[437]    Commission Decision (E.C.), at 143-44 ¶¶ 510-21, COMP/34.579 of 19 Dec. 2007 ("E.C. Decision"). (SUFEX081)

*Defendants' Response to Paragraph 76b:*

      Undisputed. Defendants note that according to the European Commission, as a

practical matter, "there is no indication that surcharging has actually been implemented to an

appreciable extent since 2005." (Commission Decision (E.C.), at 143-44 ¶¶ 512, COMP/34.579

of 19 Dec. 2007.) Additionally, "surcharging does not take place to a significant extent even in

countries where surcharging has been allowed in the past." (*Id.* ¶ 513.)

Defendants object to the admissibility of the E.C. Decision. The E.C. Decision is

unfairly prejudicial, and is an out of court statement for which no exception to the hearsay rule

has been established. (Fed. R. Evid. 403, 801, 802.)

   c.   **In a submission to the Reserve Bank of Australia, MasterCard stated,
        "[Networks] set interchange fees to avoid widespread surcharging and other
        forms of card usage discouragement behavior."** [438]

_____
[438]   Payment System Regulation, Response by MasterCard Worldwide to the Issues for the 2007/08
Review, August 31, 2007. (SUFEX358)

*Defendants' Response to Paragraph 76c:*

   Undisputed.

   d.   **In another submission to the Reserve Bank of Australia, MasterCard stated,
        "MasterCard believes that the ability of merchants to impose a surcharge
        places a significant constraint on any potential increase in interchange fees if
        the Bank were to step-back from interchange fee setting regulation under
        Option 3."** [439] **MasterCard also stated that it "accepts that . . . the ability of
        merchants to impose a surcharge on particular types of payment cards does
        place an effective constraint on the setting of interchange fees . . . ."** [440]

_____
[439]   Response by MasterCard Worldwide to the Preliminary Conclusions of the 2007/08 Review, June 30,
2008, at p. 8 (available at http://www.rba.gov.au/payments-system/reforms/review-card-reforms/pdf/review-
0708-pre-conclusions/mc-30062008.pdf). (SUFEX359)

[440]   Response by MasterCard Worldwide to the Preliminary Conclusions of the 2007/08 Review, June 30,
2008, at p. 9 (available at http://www.rba.gov.au/payments-system/reforms/review-card-reforms/pdf/review-
0708-pre-conclusions/mc-30062008.pdf). (SUFEX359)

*Defendants' Response to Paragraph 76d:*

   Undisputed.

e.   **Visa created a special, reduced interchange rate of $0.75 per transaction for utility merchants, but in order to receive that reduced interchange rate, the utility has to agree not to assess a "convenience fee" or surcharge.** [441]

_____
[441]   **VUSALITIIICID1-00439456-460, at VUSALITIIICID1-00439456. (SUFEX360)**

_Defendants' Response to Paragraph 76e:_

Disputed.  Class plaintiffs mischaracterize the evidence on which they rely.  The document on which class plaintiffs rely only discusses convenience fees, and does not discuss surcharges.  Convenience fees are different from surcharges.  A convenience fee is a flat or fixed fee regardless of the amount due.  (Oct. 2010 Visa Rules, at 445; _see also_ McElhinney Dep. Ex. 32509,[209] at VUSAMDL1-07038084-85 ("A 'convenience fee' is a charge imposed upon the Visa cardholder at the point of sale for providing a bonafide _convenience_ to the customer in connection with the payment transaction, not for the privilege of using the Visa payment card."); Somerville Dep. at 228 ("[T]he convenience fee is treated differently than surcharge.  The convenience fee is really defined as a fee that's associated with the convenience of  using a different payment channel.  So, in other words, there's a convenience factor associated with completing that transaction for the cardholder, and so that it's perfectly clear to the cardholder that there is a fee associated with using that payment channel.  We require disclosure to the cardholder so that they can see that that's separate and distinct from the value of the goods or services that they're purchasing.").)

Class plaintiffs have presented no evidence that convenience fees and surcharges are the same.

f.   **Before the European Commission, MasterCard stated,** ▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

_____
[209]   Visa U.S.A. Inc. Convenience Fee Guidelines (Jan. 2001).

291

████████████████████████████████████████████

[442]

---

[442]    **Reply of MasterCard International Incorporated and MasterCard SPRL to the Supplementary Statement of Objections dated 21 June 2006, submitted to the European Commission on behalf of MasterCard (Oct. 15, 2006), MCI_MDL02_11815441-682, at MCIMDL_02_11815620-21. (SUFEX361)**

*Defendants' Response to Paragraph 76f:*

Undisputed.

292

<u>Plaintiffs' Paragraph 77:</u>

77      Defendants' filings with the SEC, internal documents and testimony in this case, show that the Member Banks of Visa and MasterCard compete with each other to Issue Payment Cards in the United States.


*Defendants' Response to Paragraph 77:*

      Undisputed.

    a.    **Capital One's Form 10-K filing for the fiscal year ended December 31, 2003, states, "As a marketer of credit card and other financial products, we face intense competition in all aspects of our business from numerous bank and non-bank providers of financial services. Many of these companies are substantially larger and have more resources than we do. We compete with international, national, regional and local issuers of Visa® and MasterCard® credit cards. [443]**

_____
[443]      **Gregory Dep. Ex. 29509, at CO0003-00624051. (SUFEX282)**


*Defendants' Response to Paragraph 77a:*

      Undisputed.

    b.    **According to MasterCard's expert, Christopher James, "There are thousands of issuing banks and thousands of acquiring banks in the MasterCard payment system. The issuers compete with each other for customers willing to hold and use the cards they offer. As part of this competition, issuers have developed different strategies and customized card offerings." [444]**

_____
[444]      **James Rep. at p. 7. (SUFEX254)**


*Defendants' Response to Paragraph 77b:*

      Undisputed.

    c.    **Visa expert, Dr. Benjamin Klein wrote in his report, "Moreover, cash-back, rewards in kind, and promotion are elements of the competitive market process by which issuers compete for cardholders.'[445]**

_____
[445]      **Klein Rep. at p. 7. (SUFEX212)**

*Defendants' Response to Paragraph 77c:*

      Undisputed.

    d.    **MasterCard's 30(b)(6) witness on Corporate Restructuring, Timothy Murphy, testified: "[Q.] Before the IPO, MasterCard's issuers competed for signing up MasterCard cardholders; correct? A. That's correct. Q. Since the IPO, MasterCard issuers continue to compete against each other to sign up people to become MasterCard cardholders; true? A. That is correct." [446]**

---

[446]    **Murphy 30(b)(6) Dep. 714: 6-14. (SUFEX022)**

*Defendants' Response to Paragraph 77d:*

      Undisputed.

    e.    **A 2005 Chase presentation states, "The top 10 competitors now control roughly ▆▆ of the general purpose card market (and a comparable share of Private Label). Our expectations is that there will be ▆▆▆▆▆▆ ▆▆▆▆▆ by 2010."[447] The document lists these ten "competitors" as follows, under the heading "Issuer": ▆▆▆▆▆▆▆▆▆▆** [448]
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

---

[447]    **Campbell Dep. Ex. 30956, at CHASE003633346. (SUFEX362)**

[448]    **Campbell Dep. Ex. 30956, at CHASE003633346. (SUFEX362)**

*Defendants' Response to Paragraph 77e:*

      Undisputed.

      Defendants object to the admissibility of Campbell Dep. Ex. 30956, at CHASE003633346. The source of the figures in the 2005 Chase presentation regarding other issuers is unclear and they are therefore out of court statements for which no exception to the hearsay rule has been established. (Fed. R. Evid. 801, 802.)

    f.    **Issuers compete for cardholders on the basis of cardholder interest rates. [449]**

---

[449]    **Groch Dep. 88:12-89:4, July 29, 2008 (SUFEX363) & Ex. 25037, at FT110031-35, undated (SUFEX364); Fellman Dep. 128:5-129:1, July 31, 2008 (SUFEX365); Marshall Dep. 85:10-13, July 30, 2008**

(SUFEX366); Mehta Dep. 52:23-53:12, Oct. 1, 2008 (SUFEX367); Lauritzen Dep. 13:10-18, Sept. 14, 2007. (SUFEX368)

*Defendants' Response to Paragraph 77f:*

          Undisputed.

    **g.**     **Issuers compete in order  to be "first in wallet"—or a consumer's preferred card.** [450]

_____

[450]    **Dinehart Dep. 74:7-13, Oct. 17, 2006 (SUFEX369);** *see also* **Garofalo Dep. 165:6-166:3, Mar. 5, 2008 (SUFEX370); Taglione Dep. 243:19-244:11, Aug. 20, 2008  (SUFEX371), & Ex. 32787, at CHASE000207760 (Chase's loss in sales = Citibank's gain), CHASE000207766, Nov. 10, 2005. (SUFEX372)**

*Defendants' Response to Paragraph 77g:*

          Undisputed.

.

<u>Plaintiffs' Paragraph 78:</u>

78      Defendants' filings with the SEC, internal documents and testimony in this case, show that the Member Banks of Visa and MasterCard compete with each other to acquire merchants in the United States.

<u>*Defendants' Response to Paragraph 78:*</u>

        Undisputed.

      a.      The Member Banks of Visa and MasterCard compete against each other in "the acquiring of merchants' transactions." [451]  *Visa*, 344 F.3d at 242.

_____

[451]      *Visa*, 344 F.3d at 242. (SUFEX373)

<u>*Defendants' Response to Paragraph 78a:*</u>

        Undisputed.

      b.      Prof. Elzinga acknowledges that "[b]ank *acquirers* also compete for merchants on several dimensions, including the sophistication of risk tools used to provide a secure processing environment, the quality and efficiency of customer service (particularly in processing exceptional transactions such as charge-backs) and the structure and level of merchant discount fees." [452]

_____

[452]      *Id.* at 126–27 (citations removed). (SUFEX373)

<u>*Defendants' Response to Paragraph 78b:*</u>

        Undisputed.

      c.      MasterCard's 30(b)(6) witness on Corporate Restructuring, Timothy Murphy, testified: "Q. Before the IPO, MasterCard acquirers competed with each other to acquire transactions from merchants involving MasterCard card products; true? A. That is correct. Q. Since the IPO, MasterCard acquirers continue to compete against each other to acquire transactions from merchants involving MasterCard card products; true? A. That is correct." [453]

_____

[453]      Timothy Murphy 30(b)(6) Dep. 714: 15-24. (SUFEX022)

*Defendants' Response to Paragraph 78c:*

        Undisputed.

    **d.**    **Jamie Landheer, a vice president in Fifth Third's Merchant Services department, gave the following testimony:**

**Q:**    **Now, when you negotiate to retain the business of one of your acquiring clients, do you price compete with other acquiring banks or other acquiring banks or other banks who are in the business of acquiring credit card transactions?**

**A:**    **We could, yes.**

**Q:**    **You could or you do?**

**A:**    **In the existing space with the existing merchants, it happens both ways.**

**Q:**    **And sometimes they go out and seek bids from competitors; sometimes they just negotiate with you?**

**A:**    **You are correct.**

**Q:**    **In those situations where they seek multiple bids, one from you, one from competitors, et cetera, are you price competitive with the acquiring banks, the other acquiring banks from whom goods are sought?**

**A:**    **Yes.**

**Q:**    **Do you believe that the acquiring side of the business is highly competitive?**

**A:**    **I do, yes.**

**Q:**    **Do you know of any price competition amongst issuing banks for the business of merchants?**

**A:**    **No.**[454]

---

[454]    **Landheer Dep. 218:23-219:23. (SUFEX374)**

*Defendants' Response to Paragraph 78d:*

Undisputed.

.

## Plaintiffs' Paragraph 79:

79    **Between 1999 and 2007, offline-debit-card usage increased.** [455]

_____

[455]    **Frankel Rep. ¶ 69, Fig. 3.9 (citing Nilson Report, Issues 712 (SUFEX375), 738 (SUFEX376), 760 (SUFEX377), 784 (SUFEX378), 805 (SUFEX379), 828 (SUFEX380), 851 (SUFEX381), 874 (SUFEX382).**

_Defendants' Response to Paragraph 79:_

    Undisputed.

.

299

**Plaintiffs' Paragraph 80:**

80      Between 1999 and 2007, credit-card usage increased. [456]

_____

[456]      Frankel Rep. ¶ 69, Fig. 3.9 (citing Nilson Report, Issues 712  (SUFEX375), 738  (SUFEX376), 760 (SUFEX377), 784 (SUFEX378), 805 (SUFEX379), 828 (SUFEX380), 851 (SUFEX381), 874  (SUFEX382)

_Defendants' Response to Paragraph 80:_

Undisputed.

300

<u>**Plaintiffs' Paragraph 81:**</u>

**81      While debit comprised approximately 3% of total dollar volume on all payment methods in 1997, by 2007 it had risen to 15.4% of total dollars.**

<u>*Defendants' Response to Paragraph 81:*</u>

Disputed.  Class plaintiffs' reference to "debit" is ambiguous because it is unclear whether this includes both PIN and signature debit.  Further, class plaintiffs do not provide a source for their figures.

<u>Plaintiffs' Paragraph 82:</u>

**82      A 2003 Visa PowerPoint presentation titled "Consumer Debit & Prepaid Products" recognized that "check cards are not displacing credit cards."** [457]

---

[457]      **VUSAMDL1-03556169 at 176. (SUFEX008)**

*Defendants' Response to Paragraph 82:*

Undisputed.

Defendants object to the admissibility of VUSAMDL1-03556169, dated August 2003.  The document relates to events prior to the relevant time period applicable in this case, and is thus irrelevant to any issue in support of class plaintiffs' motion for summary judgment. (Fed. R. Evid. 401, 402.)

302

<u>**Plaintiffs' Paragraph 83:**</u>

**83      Since the Honor All Cards rule was modified, Visa's Credit-Card and Offline-Debit-Card system output increased every single year since 2004.** [458]

_____
[458]      Towne Dep. 449:9–450:6. (SUFEX383)

<u>*Defendants' Response to Paragraph 83:*</u>

    Undisputed.

<u>Plaintiffs' Paragraph 84:</u>

**84      An internal Visa document reflects that both PIN and signature debit has had steady growth from 1996 to 2004 despite differences in pricing.** [459]

_____

[459]      **Debit: Focus on Opportunities to Maximize Returns, Apr. 2004, at VUSAMDL1-03557371. (SUFEX384)**

_Defendants' Response to Paragraph 84:_

   Disputed.  Class plaintiffs mischaracterize the evidence on which they rely.  The document on which class plaintiffs rely does not discuss differences in pricing between PIN and signature debit.  (VUSAMDL1-03557367 to 03557395, at 371.)

<u>**Plaintiffs' Paragraph 85:**</u>

**85     Consumers do not view credit cards and debit cards as acceptable substitutes for each other.**

*Defendants' Response to Paragraph 85:*

Disputed.  Class plaintiffs' use of the term "acceptable" is vague and ambiguous.

If class plaintiffs' assertion were true, then merchants would not have the ability to steer consumers from credit to debit transactions.  But, evidence demonstrates that merchants have been successful in their attempts to steer.  Plaintiffs' representatives have recognized that they have been able to steer their customers to make PIN-debit payments rather than Visa or MasterCard signature or off-line debit payments.





---

210 ████████████████████████████████████████████████

211 ████████████████████████████████████████████████

212 Email between R. Hans, D. Bernauer, S. Schuler, and M. Quane  (Aug. 18, 2003), bearing control numbers WLGVMCED00009372 to 00009375.

213 Email between ███████████████████ (Dec. 27, 2002), bearing control numbers ████████ 098351 to 098352.



(Koudsi Dep.[216] at 223-24 (SuperValu prompted customers to enter a PIN to make a PIN debit rather than signature debit payment on larger transactions); Schumann Dep. at 123-25 (recognizing that that Traditions has discouraged payment by Visa or MasterCard cards because "credit card fees are a big overhead item for us" and Traditions wanted to "steer people to different forms of payment."); Schumann Dep. Ex. 10007,[217] at 7-8;



---

214 ████████████████████████████████████████████

215 ██████████████████████████████

216 Deposition of Samia Koudsi (Aug. 5, 2008) ("Koudsi Dep."). Ms. Koudsi testified as the principle business systems analyst for individual plaintiff Supervalu. (Koudsi Dep. at 7.)

217 Traditions Ltd.'s Objections and Answers to Defendant Visa U.S.A. Inc.'s First Set of Interrogatories to Each of the Putative Class Plaintiffs (Jun. 2006).

218 █████████████████████████████████████████

219 ███████████████████████████████



Visa and MasterCard recognize that they allow merchants to steer consumers to other forms of payment. Under MasterCard's rules, "[m]erchants have always been able to provide -- not always, but for a very long time -- provide discounts for cash, and merchants have been allowed to encourage PIN usage. Merchants have been allowed to say we prefer a check. We prefer another brand. They are allowed to do that." (Doyle Dep. at 71.) Visa rules also permit merchants to steer to other forms of payment. (*See. e.g.,* Somerville Dep. at 152-53 ("We have a specific rule that allows the merchant to encourage the use of a payment product. Q. What rule is that? A. The same one that we just referenced. 5.2.B.3.a. Q. Thanks. Question seven, next page or point seven, next page. 'Assume a merchant posts a sign that says or



otherwise makes the following communication to consumers at the point of sale. "Visa's discount fees are killing us. Please pay with anything but Visa."' Can a merchant post such a sign under Visa's operating regs today? A. Yes. Q. And what operating regulation governs that conduct? A. We don't really have a regulation that would prohibit that. Q. Do you have an operating regulation that allows it? A. I suppose you could say that the section that we referenced before would cover that if this is an encouragement to use something other than Visa.").)

The *Visa Check* settlements stated that Visa and MasterCard would not enact any rules in the United States that prohibit merchants from encouraging or steering Visa or MasterCard POS debit cardholders to use other forms of payment or that prohibit merchants from providing a discount to consumers who pay by any other form of payment. (Visa Settlement Agreement ¶ 9;[223] MasterCard Settlement Agreement ¶ 9.[224])

Visa has recognized that merchant steering has been aggressive. For example, ████████ ensures "that there is a PIN pad at every checkout, so there's no place that a consumer might pay, at least in their face-to-face store, for which PIN is not an option, [and] they also have trained their cashiers . . . to be prompting people to pay with debit cards and with PIN debit in particular." (Steele Dep. at 522.) ██████████████████████████████

████████████████████████████████████████████

████. (Rathgaber Dep. Ex. 43658,[225] at NYCE-MDL1720-01267.)

---

[223] Visa Settlement Agreement, *Visa Check*, No. 96-CV-5238 (E.D.N.Y. filed Jun. 4, 2003) ("Visa Settlement Agreement").

[224] MasterCard Settlement Agreement, *Visa Check*, No. 96-CV-5238 (E.D.N.Y. filed Jun. 4, 2003) ("MasterCard Settlement Agreement").

[225] ████████████████████████████████████████████

Debit card use has increased as a percentage of both all payments and all electronic payments since the *Visa Check* litigation, and this growth has been at the expense of credit cards, as well as cash and checks. The following shifts occurred in U.S. consumer payment systems between 2005 and 2009:

| Payment System | 2005 | | | | 2009 | | | |
|---|---|---|---|---|---|---|---|---|
| | Volume (Bil.) | Share | Trans (Bil.) | Share | Volume (Bil.) | Share | Trans (Bil.) | Share |
| Checks | $1,897.11 | 27.94% | 26.06 | 19.67% | $1,522.22 | 19.81% | 18.49 | 12.57% |
| Cash | $1,417.28 | 20.88% | 49.04 | 37.02% | $1,573.77 | 20.49% | 49.31 | 33.52% |
| Money Orders | $87.70 | 1.29% | 0.77 | 0.58% | $80.00 | 1.04% | 0.67 | 0.46% |
| Official Checks | $24.92 | 0.37% | 0.14 | 0.11% | $22.70 | 0.30% | 0.13 | 0.09% |
| Travelers Cheques | $5.67 | 0.08% | 0.08 | 0.06% | $4.71 | 0.06% | 0.06 | 0.04% |
| Credit Cards | $1,708.38 | 25.16% | 23.62 | 17.83% | $1,842.52 | 23.98% | 24.49 | 16.65% |
| Debit Cards | $859.57 | 12.66% | 22.08 | 16.67% | $1,430.41 | 18.62% | 38.28 | 26.02% |
| Prepaid Cards | $111.31 | 1.64% | 3.94 | 2.98% | $162.60 | 2.12% | 5.06 | 3.44% |
| EBT Cards | $28.36 | 0.42% | 1.06 | 0.80% | $54.46 | 0.71% | 1.85 | 1.26% |
| Preauthorized Payments | $381.70 | 5.62% | 3.27 | 2.47% | $511.55 | 6.66% | 4.21 | 2.86% |
| Remote Payments | $266.79 | 3.93% | 2.41 | 1.82% | $477.45 | 6.21% | 4.57 | 3.11% |
| Total | $6,188.80 | 100.00% | 132.47 | 100.00% | $7,682.40 | 100.00% | 147.13 | 100.00% |

(2010 Nilson Rep. 962,[226] at 10; *see also* Paragraphs 79, 81, 83, 84.) The Nilson Report also showed that the market share of debit cards grew from 13% in 2005 to 21% in 2010. (2010 Nilson Rep. 962, at 10.) During that same time, the market shares of credit cards (25% in 2005 to 24% in 2010), cash (21% to 19%), and checks (28% to 18%) all decreased over that period. (*Id.*)

Since at least the mid-1990s, PIN debit transaction volume increased each year: 775.2 million (1995); 1.096 billion (1996); 1.6 billion (1997); 2 billion (1998); 2.9 billion (1999); 3.8 billion (2000); 4.136 billion (2001); 4.3 billion (2002); 5.3 billion (2003); 6.525 billion (2004); 8.520 billion (2005); 10.411 billion (2006); 11.667 billion (2007). (ATM & Debit News

---

[226] HSN Consultants Inc, 2010 The Nilson Report, Issue 962 (Dec. 2010) ("2010 Nilson Rep. 962").

EFT Data Book, 2008 Ed., Sept. 27, 2007, p. 3; ATM & Debit News EFT Data Book, Sept. 21, 2006, p. 3; ATM & Debit News EFT Data Book, 2006 Ed., Sept. 15, 2005, p. 3; ATM & Debit News EFT Data Book, 2005 Ed., Sept. 16, 2004, p. 3; ATM & Debit News EFT Data Book, 2004 Ed., Sept. 11, 2003, p. 3; ATM & Debit News EFT Data Book, 2003 Ed., Sept. 12, 2002, p. 3; ATM & Debit News EFT Data Book, 2002 Ed., Sept. 13, 2001, p. 3; *see also* Vellturo Rep. Exs. 11, 11-A, 11-A.1, 11-B.)

An internal study conducted by plaintiff Payless ShoeSource found that stores observed a decline in consumers' use of cash and checks after the company installed PIN pads and began to accept PIN-debit cards.  (PSS 031427 to 031443, at 432.[227])

Plaintiffs have testified that they view credit cards and debit cards as substitutes.



Platkin Dep.[231] at 112-13 (Capital Audio is

---

[227]  Payless ShoeSource, Debit Performance Phone Sample.

[228]  ████████████████████████████████████████

[229]  ████████████████████████████████████████

[230]  Tender Types Received at ██████████ bearing control number ██████████

[231]  Deposition of Susan Platkin (Mar. 13, 2008) ("Platkin Dep.").  Ms. Platkin testified as accounts payable manager at Capital Audio.  (Platkin Dep. at 22.)

indifferent as to what type of payment card is used); Fiereck Dep.[232] at 263-64 (agreeing that "Visa and MasterCard compete with checks, cash, and other forms of payment for merchant business"); D'Agostino Dep.[233] at 309 (testifying that debit cards and checks are "[d]efinitely" interchangeable).)

      a.    **Citing an analysis compiled with Visa data, Dr. Alan Frankel writes in his report that, "credit and debit cards' different characteristics and historical usage patterns lead customers to use particular forms of payment more heavily for some transactions than others . . . . As transactions get larger, the use of debit cards increases as much or more than credit cars, but as transactions grow larger still, purchasers are more likely to use checks or credit cards."[460] Defendants' experts do not dispute this point.**

---

[460]    **Frankel Rep. ¶ 40. (SUFEX240)**

*Defendants' Response to Paragraph 85a:*

    Disputed.  Dr. Frankel does not cite an analysis compiled with Visa data in the paragraph of his report to which class plaintiffs cite.  The document to which Dr. Frankel cites in paragraph 40 of his report is a 1998 paper which he authored.  (Frankel Rep. ¶ 40.)

    Defendants dispute the admissibility of Frankel Rep. ¶ 40.  The evidence on which Dr. Frankel relies in his report relates to events prior to the relevant time period applicable in this case, and is therefore inadmissible as irrelevant to any issue in support of class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)

      b.    **A study published by the Federal Reserve Bank of Boston in 2007 found that "Cost, convenience, and timing are the three most important fundamental characteristics that determine respondents' adoption and use of all payment methods. Safety and privacy also are important for methods more susceptible to consequences like identity theft that are costly to**

---

[232]  Deposition of Linda Fiereck (Mar. 27, 2008) ("Fiereck Dep.").  Ms. Fiereck testified as accounts receivable supervisor at Coborn's.  (Fiereck Dep. at 11-12.)

[233]  Deposition of Nicholas J. D'Agostino III (Jan. 10, 2008) ("D'Agostino Dep.").  Mr. D'Agostino is president and chief operating officer of plaintiff D'Agostino's Supermarkets.  (D'Agostino Dep. at 16.)

consumers."[461]  The study reported, "One of the most striking findings, and one that makes it clear that a great deal more study will be needed to gain a full understanding of consumer payment choice, is that consumers' payment choices are quite heterogeneous, varying by venue (retail store or whatever venue is used for recurring bill payment), and within a given venue, by bill payment type and (for retail store payments) by payment amount."[462]  The study contained the following chart illustrating this phenomenon:[463]



**Figure 5**
**Payment Choices at Retail Stores**
*(From all respondents)*

Dove Survey results are based on the 2005 American Bankers Association/Dove Survey of Consumer Payment Preferences, Question # 4, parts A, C, D, and E, which ask for respondents' most used payment method for purchases at Grocery, Department, Discount, and Drug Stores, respectively.

Figure based on Fed Survey Question #43.

**Figure 3.2**

**Payment Instrument Transaction Shares at Various Sizes for 2004**



Source: Garcia-Swartz, D., Hahn, R. and A. Layne-Farrar (2006) "The Move Towards a Cashless Society: A Closer Look at Payment Instrument Economics," Review of Network Economics, 5: 175, citing Visa U.S.A. (2005) data.

[461]     The Boston Fed Study of Consumer Behavior and Payment Choice: A Survey of Federal Reserve System Employees," Federal Reserve Bank of Boston, Public Policy Discussion Papers No. 07-1, February 14, 2007, p. 7 (SUFEX385). This study is cited by Dr. Frankel at ¶ 37 of his Report. (SUFEX240)

[462]     *Id.* at p. 21. (SUFEX240)

[463]     *Id.* at p. 78. (SUFEX240)

*Defendants' Response to Paragraph 85b:*

      Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading.

(Fed. R. Evid. 106.)  The Federal Reserve of Boston stated, "Our results include several findings

that seem important and suggest the need for further study and consideration."  (Boston Federal

Reserve Study,[234] at 7.)

      **c.**      **Visa made a similar finding in its 2007 Payment Panel Study:**[464]



---

[234]  The Boston Fed Study of Consumer Behavior and Payment Choice: A Survey of Federal Reserve System Employees, Federal Reserve Bank of Boston, Public Policy Discussion Papers No. 07-1, Feb. 14, 2007 ("Boston Federal Reserve Study")

[464]   **VUSAMDL1-09055099-139, at VUSAMDL1-09055111.** ▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮ *Id.* (SUFEX386)

*Defendants' Response to Paragraph 85c:*

        Disputed.  The chart from the Visa 2007 Payment Panel Study is not similar to

any of the findings discussed by class plaintiffs in Paragraph 85b.

       **d.**    **The 2007 Visa Payment Panel Study Factbook also shows that in 2006,
consumers used credit cards for** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[466]

[465]   **VUSAMDL1-09055026-98, at VUSAMDL1-09055044. (SUFEX387)**

[466]   *Id.* **at VUSAMDL1-09055045. (SUFEX387)**

*Defendants' Response to Paragraph 85d:*

        Undisputed.

       **e.**    **Capital One's presentation introducing the Virtual Debit card states:**

        **"Debit cards serve a unique purpose for consumers and they are
unlikely to ever switch debit card spend onto credit cards."[467]**

[467]   **CO0003-00266613, at CO0003-00266617. (SUFEX388)**

*Defendants' Response to Paragraph 85e:*

        Undisputed.

<u>Plaintiffs' Paragraph 86:</u>

**86    Defendants' testimony and internal documents show that Credit Card Network Services differ from Debit Card Network Services.**

*Defendants' Response to Paragraph 86:*

Disputed.  In Paragraphs 112h and 112i class plaintiffs reference the "Network market" and "Payment-Card market," which both suggest that Credit Card Network Services and Debit Card Network Services are in the same market.  (*See* Paragraphs 112h, 112i.)

Merchants do not differentiate between Credit Card Network Services and Debit Card Network Services.  For example, ███████ is indifferent as to the following forms of payment: Visa, MasterCard, Discover, American Express, Bonus Pay credit, debit, cash, check, gift certificates and gift cards, EBT, food stamps, vendor coupons, and college/university ID cards.  ████████████████████████████[235].)  Similarly, ██████ views various forms of tender such as cash, checks, debit cards and credit as essentially interchangeable except for fees paid by ████████████████ at 59-60; *see also* Platkin Dep. at 112-13 (Capital Audio is indifferent as to what type of payment card is used); James Rep.[236] at 33-37.)

Overall, debit payments have grown as a percentage of both all payments and all electronic payments.  This growth is not the result of entirely new spending, but rather payments shifted from credit cards, and other payment methods.  If merchants did not think that Credit Card Network Services and Debit Card Network Services were interchangeable, then they would not care about their ability to steer payments away from credit cards.  (*See* Defendants' Response to Paragraph 85)

---

[235]   Tender Types Received at ███████ bearing control number ████████

[236]   Report of Christopher M. James (Dec. 14, 2009).

    a.      **When asked whether he had an opinion as to why credit card transactions are so much more profitable to issuers than are debit transactions, Visa's William Sheedy testified, "It's a different business . . . the credit business has dimensions of expense and composition of revenues that's just different than the debit business or the acquiring business."[468]**

---

[468]    Sheedy Dep. 186:3-23. (SUFEX083)

*Defendants' Response to Paragraph 86a:*

    Undisputed.

    b.      **After the Visa Check settlement, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[469]**

---

[469]    Jonas Dep. 531:2-7. (SUFEX332)

*Defendants' Response to Paragraph 86b:*

    Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading.

(Fed. R. Evid. 106.)  After the *Visa Check* settlement, MasterCard began removing debit

program information from its credit card interchange cost analysis.  (Jonas Modification 30(b)(6)

Dep.[237] at 88.)

    c.      **MasterCard consistently refers to credit, debit, and commercial as different products.[470]**

---

[470]    *See, e.g.,* Jonas Dep. 361:22-362:7; Id. at 436:9-13. (SUFEX332)

*Defendants' Response to Paragraph 86c:*

    Disputed.  Class plaintiffs mischaracterize the evidence on which they rely.  Mr.

Jonas testified:

---

[237]  Deposition of Steven Jonas (Sept. 18, 2007) ("Jonas Modification 30(b)(6) Dep.").  Mr. Jonas testified as MasterCard's Rule 30(b)(6) designee on the consideration of, business justification for, and adoption of the interchange rate modifications announced in June, 2003 and made effective in August, 2003.  (Jonas Modification 30(b)(6) Dep. Ex. 1 (30(b)(6) Deposition Notice); Jonas Modification 30(b)(6) Dep. at 272-273.)

Q.  Do you see there that that's a deck relating to the corporate program?

A.  Mm-hmm.

Q.  And then at 275, do you see a deck relating to the consumer credit and World programs?

A.  Yes.

Q.  And then at 297, do you see a deck relating to the debit programs?

A.  Yes.

(Jonas Methodology Dep. at 361-62.)  Mr. Jonas further testified, "I'm looking at the first page of the spreadsheet – impact within a card program, and then rolls the overall impacts up into the major card types: consumer, credit, debit and commercial."  (*Id.* at 436.)

      **d.**      **Edgar Dunn & Co., MasterCard's consultant on the bank costs attributed to interchange, conducts separate cost studies for credit and debit card products.[471]**

---

[471]     **MasterCard 2003 Debit Interchange Study (note – debit only) – MCI_MDL02_11404654. (SUFEX389)**

*Defendants' Response to Paragraph 86d:*

      Undisputed.

      **e.**      **Under the heading, "How is my Debit Card different from a credit card?" the FAQ portion of the Bank of America website states, "You can use your Debit Card everywhere Visa® Debit cards are accepted, just like a credit card. However, your Debit Card is not a credit card, so you don't pay interest charges. We deduct each purchase amount from your Bank of America checking account and list the details on your monthly statement."[472]**

---

[472]     **http://www.bankofamerica.com/deposits/checksave/index.cfm?template= lc_faq_checkcards (last accessed November 3, 2010). (SUFEX290)**

*Defendants' Response to Paragraph 86e:*

      Undisputed.

    f.      Under the heading, "What's the difference between a credit card and a debit card?" MasterCard's website states, "A credit card allows you to pay via installments and/or a revolving line of credit, with the limit set by the issuer. Your monthly payment can range from a minimum amount, set by your bank, to your entire outstanding balance. Generally, if you pay the entire bill at the end of the month, no interest is charged. If a balance is outstanding, you will be charged interest at a predetermined annual percentage rate (APR) which differs from issuer to issuer. A debit card is linked to your checking or savings account, and the amount of your purchases is deducted directly from that account. A debit card functions as a paperless checking account."[473]

---

[473]    http://www.mastercard.com/us/personal/en/faqs/faqs_bycategory.html (last accessed November 3, 2010). (SUFEX391)

*Defendants' Response to Paragraph 86f:*

    Undisputed.

    g.      Barclays answers this same question as follows: "With a debit card you can pay for goods in shops and withdraw money at cash machines. The money is automatically taken from your current account when you spend. You must therefore have funds in your account or an agreed overdraft to cover the transaction . . . . A credit card is separate from your current account and is a credit facility to allow you to buy things immediately, up to a pre-arranged limit, but pay for at a later date. The cost of the purchase is added to your credit card account and you get a statement every month. You then have a choice of paying off the bill with no charge or paying at least a minimum amount and spreading the repayments over a period of time."[474]

---

[474]    http://ask.barclays.co.uk/help/day2day_banking/creditdebit (last accessed November 3, 2010). (SUFEX392)

*Defendants' Response to Paragraph 86g:*

    Undisputed.

    h.      Under the heading, "What's the difference between a Maestro card and a credit card?" Maestro's website states, "Your Maestro card is linked to your bank account, and the amount of your purchases is deducted directly from that account. Generally, you enter your PIN on a keypad when you want to purchase an item with Maestro . . . . A credit card allows you to pay via installments [sic] and/or a revolving line of credit, with the limit set by the issuer. Your monthly payment can range from a minimum amount, set by your bank, to your entire outstanding balance. Generally, if you pay the

entire bill at the end of the month, no interest is charged. If a balance is outstanding, you will be charged interest at a predetermined annual percentage rate (APR), which differs from issuer to issuer."[475]

_____
[475]    http://www.maestrocard.com/uk/general/faq.html (last accessed November 3, 2010). (SUFEX393)

*Defendants' Response to Paragraph 86h:*

    Undisputed.

i.    Defendants' expert, Prof. Kevin Murphy, writes, "Debit and credit payment cards provide somewhat different benefits . . . . Standard credit card programs, which are marketed to consumers that may not qualify for premium cards because they pose higher credit risk or have limited credit history . . . . Premium credit card programs, such as "gold," "platinum," "signature" or "world" cards, which tend to be marketed to those with higher incomes, often offer rewards and other cardholder benefits, while possibly offering lower interest rates and/or higher credit limits than standard cards . . . . Debit cards, both Personal Identification Number ("PIN") and Signature debit, which provide no credit, enable the cardholder to authorize a transfer of funds from his or her bank account to the retailer using either a PIN or signature."[476]

_____
[476]    Murphy Report at ¶ 50 (citing FDIC, "Credit Cards - General Overview," in *Risk Management Examination Manual of Credit Card Activities*, March 2007, p. 12, available at www.fdic.gov/regulations/examinations/credit_card/pdf_version). (SUFEX394)

*Defendants' Response to Paragraph 86i:*

    Undisputed.

j.    Marsha Huber, Chase Senior Vice President of debit card operations, acknowledged that Chase does not market its debit card as a substitute for credit cards.[477]

_____
[477]    Huber Dep. 137:21-138:3 (SUFEX395)

*Defendants' Response to Paragraph 86j:*

    Undisputed.

k. ████████████████████████████ **Visa divides its Issuer Functional Cost Studies into three different classes for different card products: consumer debit, consumer credit, and commercial credit.**[478]

---
[478]   **Demanett Dep. Ex. 20409, at 9 (§ 9.3). (SUFEX035)**

*Defendants' Response to Paragraph 86k:*

Undisputed.

l. **According to an April 25, 2006 Bank of America presentation titled "Card Payments Overview,"** ████████████████████████████████
████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████ [479]

---
[479]   **BOFAIC 00209275-9304, at BOFAIC 00209298. (SUFEX396)**

*Defendants' Response to Paragraph 86l:*

Undisputed.  ·

m. ██████████████████████████████████████████
█████████████████████████████████[480]

---
[480]   **Wayne Malone, head of debit at Citibank, Dep. 56:15-24, July 28, 2008. (SUFEX397)**

*Defendants' Response to Paragraph 86m:*

Disputed.  Class plaintiffs mischaracterize the evidence on which they rely.  Over an objection to form, Mr. Malone was asked █████████████████████

██████████████  █████████████████████████

████████████████████████████████████████

---
238  Deposition of Wayne Malone (Jul. 28, 2008) ("Malone Dep.").  Mr. Malone is the former head of debit cards at Citi.  (Malone Dep. at 21.)



Mr. Malone also had responsibility for debit cards at Citi from 1999 to 2005 (Malone Dep. at 21), and not at the time of his deposition in 2008. (Malone Dep. at 23.)

**Plaintiffs' Paragraph 87:**

87      Merchants' proprietary cards can be used only to make purchases from a single merchant.[481]

_____

[481]      *See, e.g.*, Krumme Dep. Dec. 3, 1999 (SUFEX398) (Krumme of JCB International testified that "In my understanding a general-purpose card would have utility in a wide range of merchant establishments as opposed to a private label card which would have limited utility in specific merchant locations, is in my mind a distinction that I would make . . . . My opinion is that in terms of their needs for a general-purpose card, I would not expect that they would consider private label – a private label card an adequate substitute."). Culver Dep. 36:2-5; 79:6-11 (SUFEX399)(only Cenex merchants accept Cenex proprietary cards; the difference between Cenex co-brand and proprietary cards is that the latter can only be used at Cenex).

██████████████████████████████    ████████████████████████████████████
████████████████████████

*Defendants' Response to Paragraph 87:*

            Disputed.  Class plaintiffs mischaracterize the evidence on which they rely.

████████████████████████████████    suggests that private label cards can be used at more than a single

merchant: ██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

_____

239   Agreement for American Express Card Acceptance, bearing control numbers ████████████████████

<u>Plaintiffs' Paragraph 88:</u>

**88      Significant price differences exist between Credit-Card Network Services, Signature Debit-Card Network Services and PIN Debit Card Network Services.**

*Defendants' Response to Paragraph 88:*

        Disputed.  Class plaintiffs' use of the word "significant" is vague and ambiguous.

Additionally, the evidence on which class plaintiffs rely in Paragraph 88c demonsrates that the

ranges for total cost of acceptance of offline debit and credit transactions overlap.

       **a.      According to a February 12, 2004 draft Bank of America presentation on Payments and Strategy entitled "Merchant costs of payment methods (per $100 sale)" the costs of acceptance to merchants were as follows:[482]**

| | |
|---|---|
| Credit | ■■■ |
| Signature Debit | ■■■ |
| PIN Debit | ■■ |
| Check | ■ |
| ACH | ■ |
| ARC | ■ |

[482]      Phillips, Aug. 14, 2008, Dep. Ex. 32633, at BOFAIC00468581. (SUFEX170)                .

*Defendants' Response to Paragraph 88a:*

        Disputed.  Class plaintiffs mischaracterize the evidence on which they rely.

Phillips, Aug. 14, 2008, Dep. Ex. 32633, is titled "Payments & Strategy: Ensure that BAC has a

rational value proposition across payment products and future threats are addressed

appropriately."  (Phillips Dep. Ex. 32633, at BOFAIC 00468572.)

       **b.      A McKinsey Study entitled "Driving Continued Growth and Profitability in a New Debit Environment" from February 2006, contained the following Chart of Merchant Transaction Costs by Payment Type for a typical supermarket transaction (not defined), in the "all-in" cost by payment type in basis points was as follows:[483]**

| | |
|---|---|
| Cash | ■■■ |
| Credit | ■■■ |
| Signature Debit | ■■■■■■ |

| Signature Debit | █████████████ |
| Check | ████ |
| PIN Debit | ████ |

---
[483]     **CHASE000577280, at CHASE000577282— 84 (SUFEX401)**

*Defendants' Response to Paragraph 88b:*

Undisputed.

Defendants object to the admissibility of CHASE000577280 to 000577306.  The

McKinsey study on which class plaintiffs rely in support of this assertion is an out of court

statement for which no exception to the hearsay rule has been established.   (Fed. R. Evid. 801,

802.)

Defendants note that the above chart shows ██████████████

███████████████████.

    **c.**    **According to a MasterCard deck entitled** █████████████
████████

- **PIN debit total interchange in US is** ██████**, with total cost of acceptance** ████ **bps on volume.**
- **Offline debit has** ██████ **total interchange, and total cost of acceptance is** ████ **bps on volume.**
- **Credit has** ██████ **in total interchange, and total cost of acceptance is** ████ **bps on volume.**
- **Checks cost of acceptance is** ████ **bps on volume.**
- **Cash cost of acceptance is** ████ **bps on volume.** [484]

---
[484]     **"Capturing the U.S. Debit Card Opportunity," Aug. 17, 2003, MCI_MDL02_06709410-MCI_MDL02_06709432 at 9422. (SUFEX402)**

*Defendants' Response to Paragraph 88c:*

Undisputed.

Defendants dispute the admissibility of MCI_MDL02_06709410 to 06709432, dated August 17, 2003.  The document relates to events prior to the relevant time period applicable in this case, and is therefore inadmissible as irrelevant to any issue in support of class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)  In addition, the McKinsey document is also an out of court statement for which no exception to the hearsay rule has been established.  (Fed. R. Evid. 801, 802.)

Defendants note that acceptance costs for offline debit and credit overlap, which undermines class plaintiffs' assertion that significant price differences exist between Credit-Card Network Services, Signature Debit-Card Network Services and PIN Debit Card Network Services.

**d.    According to an April 25, 2006 Bank of America presentation titled "Card Payments Overview," the acceptance cost of PIN debit was less than either credit or signature debit payment cards, and the presentation noted that "merchant payment preferences are diametrically opposed to the preferences of Bank of America and the Customer."[485]**

_____
[485]    **BOFAIC 00209275-9304, at BOFAIC 00209297. (SUFEX396)**

_Defendants' Response to Paragraph 88d:_

Undisputed.

<u>Plaintiffs' Paragraph 89:</u>

**89      Merchants would risk losing sales if they did not accept both Visa and MasterCard branded credit cards and debit cards.**

*Defendants' Response to Paragraph 89:*

Undisputed.

a.      When asked whether Plaintiff D'Agostino would lose customers if it stopped accepting MasterCard, Nicholas D'Agostino testified, "I think it would depend on what other choices they had. Meaning, I know for a fact that, basically 100 percent of my customers shop in other stores that sell the same things that l do and a large percentage use us as a secondary place to shop. If their primary place of business or if a place that they go to frequently was still taking MasterCard and I wasn't, it is conceivable they would make the decision, you know, to use them and not me. If no one was taking MasterCard, then obviously they would find some other form of payment."[486]

_____
[486]    D'Agostino Dep. 116:3-117:7, 119:18-120:6, Jan. 10, 2008. (SUFEX403)

*Defendants' Response to Paragraph 89a:*

Undisputed.

b.      ███████████████████████ testified that it is important for ██████ "to accept multiple forms of payment."[487]

_____
[487]    ████ Dep. 131. (SUFEX404)

*Defendants' Response to Paragraph 89b:*

Undisputed.

c.      ████████████████████████ testified that ████████████████ accept credit cards and debit cards because of "Competitive reasons," meaning that "Everybody else accepts them.  So for us not to accept it, it's a competitive disadvantage."

*Defendants' Response to Paragraph 89c:*

Disputed.  Class plaintiffs provide no evidence of ████████ testimony.

      **d.**     **Dr. James agreed that it was possible that if a merchant chose not to accept MasterCard cards, the merchant could conceivably go out of business.**[488]

---

[488]    James Dep. 177:07-178:11, Mar. 25, 2010. (SUFEX303)

*Defendants' Response to Paragraph 89d:*

        Disputed.  Class plaintiffs mischaracterize the evidence on which they rely.  Dr. James testified, "whether certain businesses would think that the loss of business associated with not accepting the card was sufficient to make their business unprofitable, that's certainly a possibility." (James Dep.[240] at 178.)

      **e.**     ███████████████████████████████████████
**believes it would lose customers if it stopped accepting Visa cards.**[489]

---

[489]    ███████Dep. 60-61. (SUFEX405)

*Defendants' Response to Paragraph 89e:*

        Undisputed.

      **f.**     ███████████████████████████ **testified that "If we didn't take [Visa, MasterCard, and American Express], it would be suicide. . . . consumers would go shop at our competitors instead."**[490]

---

[490]    ████████ 93-94. (SUFEX406)

*Defendants' Response to Paragraph 89f:*

        Undisputed.

      **g.**     **MasterCard President Ruth Ann Marshall testified MasterCard was never concerned that a major merchant such as Wal-Mart would stop accepting MasterCard products because "there are too many Wal-Mart consumers carrying the card. And I think it would have been very detrimental to their customer service."**[491]

---

[240]  Deposition of Prof. Christopher James (Mar. 25, 2010) ("James Dep.").

---
[491]    **Marshall Dep. 249-50. (SUFEX366)**

*Defendants' Response to Paragraph 89g:*

> Disputed.  Class plaintiffs mischaracterize Ms. Marshall's deposition testimony.

Ms. Marshall testified:

> Q.  Was there any particular concern that major merchants would stop taking MasterCard?
>
> MS. RAVELO:  Objection to the form.
>
> THE WITNESS:  I don't recall there being a major – I don't recall that to be a concern, though – I mean we just talked about Dell and Wal-Mart.  And those are examples of – obviously we had a concern because we cut deals with them to continue to do business.

(Marshall Dep. at 249.)

> h.    ████████████████████ testified that ██████ would be at a **competitive disadvantage and would lose sales if it did not accept Visa and MasterCard.**[492]

---
[492]    ██████**Dep. 130-31 (SUFEX407)**

*Defendants' Response to Paragraph 89h:*

> Disputed.  Class plaintiffs mischaracterize the evidence on which they rely.  In the testimony cited by class plaintiffs, ████████ did not testify that ██████ would lose sales if it did not accept Visa and MasterCard.  (██████████[241] at 130-31.)

> i.    **When asked if** ██████ **would consider dropping Visa or MasterCard debit cards upon an increase in applicable interchange fees,** ████████████
> ████████████████████████████
> ████████████████████████[493]

---
[241]  Deposition of ████████ (Jun. 27, 2008) ████████████
████████████



[493] ■■■■■■■ 94:3-14. (SUFEX407)

*Defendants' Response to Paragraph 89i:*

Undisputed.

j.   ■■■■■■■■■■■■■■■■ continues to accept both credit and debit cards ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

[494] ■■■■■ Dep. 378:15-16, 379:22-380:2. (SUFEX408)

[495] ■■■■■ Dep. 363:22-24. (SUFEX408)

*Defendants' Response to Paragraph 89j:*

Undisputed.

k.   **Stuart Zlotnikoff, Vice President of Plaintiff National Grocers Association, testified that he is not aware of a single merchant who accepts Visa or MasterCard credit cards, who does not also accept Visa or MasterCard debit cards. Similarly, he was unaware "of any merchant that accepts Visa or MasterCard debit cards who doesn't also accept the respective credit cards for that brand."[496]**

[496] Zlotnikoff Dep. 219:15-25. (SUFEX409)

*Defendants' Response to Paragraph 89k:*

Undisputed.

329

<u>Plaintiffs' Paragraph 90:</u>

90      Even after the *Visa Check* settlement, instances of limited acceptance – in which a
merchant accepts only the credit cards or only the debit cards of a particular Network –
are rare.

*Defendants' Response to Paragraph 90:*

        Undisputed.

    a.    **A discussion document from the a Chase/McKinsey Study entitled, "Driving
Continued Growth and Profitability in a New Debit Environment," states
that after the *Visa Check* settlement, long term growth forecast is still strong
and merchants will be unable to drop signature debit despite the difference
in price for fear of lost sales.**[497]

---

[497]    **CHASE000577282-84. (SUFEX401)**

*Defendants' Response to Paragraph 90a:*

        Undisputed.

        Defendants object to the admissibility of CHASE000577280 to 000577306.  The
McKinsey study on which class plaintiffs rely in support of this assertion is an out of court
statement for which no exception to the hearsay rule has been established.   (Fed. R. Evid. 801,
802.)

        Defendants note that the McKinsey study to which class plaintiffs cite is a
forecast, and does not support class plaintiffs' assertion that instances of limited acceptance are
actually rare.

    b.    **A Visa document notes that "[n]ine months after the changes to HAC,
incidence of Limited Acceptance is very, very low – fewer than 25 merchants
have dropped acceptance of debit category products."**[498]

---

[498]    **VUSAMDL1_05594646, at 661. (SUFEX410)**

*Defendants' Response to Paragraph 90b:*

      Undisputed.

    c.    **MasterCard expected that no merchants other than Wal-Mart would stop accepting signature debit.[499]  No top 30 debit merchant had opted out of debit acceptance as of June 2004.[500]**

_____

[499]    **MCI_MDL02_01651453. (SUFEX411)**

[500]    **MCI_MDL02_08811981. (SUFEX412)**

*Defendants' Response to Paragraph 90c:*

      Undisputed.

    d.    **Wal-Mart stopped accepting MasterCard signature debit cards on February 1, 2004.[501]  By July, it had resumed acceptance.[502]  The period of nonacceptance was short enough that a MasterCard employee in December 2005 stated that Wal-Mart's plan to stop acceptance "never materialized," and that all merchants in the U.S., including Wal-Mart, accepted MasterCard and Maestro.[503]**

_____

[501]    **MCI_MDL02_00130398. (SUFEX413)**

[502]    **MCI_MDL02_00131382;  (SUFEX414) http://www.mastercard.com/us/company/en/newsroom/ pr_894.html (last accessed December 29, 2010). (SUFEX415)**

[503]    **MCI_MDL02_09452372, at 2374. (SUFEX416)**

*Defendants' Response to Paragraph 90d:*

      Undisputed.

    e.    **A March 2004 Visa presentation by Bill Sheedy at the "Chicago Member Meeting" entitled "Interchange Fee Update" states, "At Settlement, Check Card Business Expectations Were as Follows . . . • Majority of current merchant acceptance is retained • 1 to 3 national and/or super-regional merchants in the supermarket and/or retail categories discontinue • Larger group of middle market merchants (50+) and small market merchants (1,000+) discontinue • Significantly increased point-of-sale steering to PIN • Effective IRF of ▮▮▮▮."[504]  The presentation continues: "Business Outlook for Check Card Has Improved Dramatically . . . As of January 31, 2004: • ▮▮ merchants totaling ▮▮▮▮▮ in annualized check card volume have discontinued (▮▮▮▮▮ of system volume) • Effective IRF of ▮▮▮▮."[505]**

[504]   Moran Dep. Ex. 33714, at VUSAMDL1-08183830. (SUFEX417)

[505]   Moran Dep. Ex. 33714, at VUSAMDL1-08183832. (SUFEX417)

*Defendants' Response to Paragraph 90e:*

      Undisputed.

    f.    **Several merchants testified that they did not discontinue acceptance of Visa or MasterCard or debit cards even after the *VisaCheck* settlement allowed them to do so.**[506]

[506]   James Dep. 136:24-137:13 (Food Lion) (SUFEX418); Gregoire Dep. 82:22-83:15 (Delhaize) (SUFEX419); Fletcher Dep. 126:22-127:8 (Delhaize) (SUFEX420); Coward Dep. 132:22-133:4 (Publix) (SUFEX421); Reeve Dep. 256:2-14 (Hy-Vee) (SUFEX422); Hanna Dep. 527:20-528:3 (Kroger) (SUFEX423); Snyder Dep. 694:7-18 (Super Valu) (SUFEX424); Marques Dep. 93:2-14 (Pathmark). (SUFEX328)

*Defendants' Response to Paragraph 90f:*

      Undisputed.

<u>**Plaintiffs' Paragraph 91:**</u>

**91      PIN-debit-card networks have lower operating costs than signature-debit-card networks.**

<u>*Defendants' Response to Paragraph 91:*</u>

Disputed.  Class plaintiffs' use of the term "operating costs" is vague and ambiguous because it is unclear whether they are referring to costs for consumers, merchants, payment card networks, or issuers of PIN and signature debit cards.  All of the evidence on which class plaintiffs rely in support of their assertion in subparagraphs a-c relates to merchant or network costs, not costs of consumers or issuing banks.  It is unclear why class plaintiffs suggest that merchants' costs should be included in the networks' operating costs, or why costs of consumers and issuing banks should be excluded.

a.      **Former Visa board member Pat Phillips gave the following testimony:**



Q:

A:

Q:

A:

[507]

---

[507]      **Phillips Dep. 67:13-68:4, Aug. 14, 2008. (SUFEX170)**

*Defendants' Response to Paragraph 91a:*

Undisputed.

b. **Stacey Pinkerd, Visa Head of Consumer Debit Products, testified that the fraud rate at the POS is ███ basis points on non-PIN debit and ███ basis points on PIN debit. Pinkerd also testified that ███████████ ████████████████████████████** [508]

---

[508]    Pinkerd Dep. 42:21-43:12, 53:22-54:3. (SUFEX006)

*Defendants' Response to Paragraph 91b:*

Undisputed.

c. **MasterCard Senior VP of Debit Products, Art Kranzley, confirmed that "credit losses and fraud losses would be lower in a PIN transaction, than on a signature debit" and that it is "because the signature debit transaction has higher credit losses and higher fraud losses, that the interchange rate is higher."**[509]

---

[509]    Kranzley Dep. 125:22-126:11, Aug. 6, 2008. (SUFEX425)

*Defendants' Response to Paragraph 91c:*

Undisputed.

<u>**Plaintiffs' Paragraph 92:**</u>

**92      Defendants' expert Robert Topel admits that PIN-Debit-Card Network services and Offline-Debit-Card services are distinct products and thus in separate in markets.**[510]

_____

[510]      **Topel Rep. ¶ 29. (SUFEX304)**

<u>*Defendants' Response to Paragraph 92:*</u>

Disputed.  Class plaintiffs' characterization of Prof. Topel's report is inaccurate.

Paragraph 29 of Prof. Topel's report, on which class plaintiffs rely, does not state that credit and

debit are in separate markets.  Dr. Topel wrote:

> Although Dr. Frankel points to a few debit systems with zero interchange fees, as noted above credit cards provide advantages—and require issuers to undertake costs—that that debit cards do not provide or require. These debit systems therefore do not answer the question of what would happen in the U.S. if interchange for the Visa and MasterCard credit card systems were reduced to zero. Moreover, the foreign debit "benchmarks" he relies on do not support his arguments in any event, even with respect to the damages he claims for debit interchange.  Instead, they support my point that, for the networks to remain competitive, value would need to be transferred from merchants, on one side of the card platform, to cardholders on the other.

(Topel Rep.[242] ¶ 29.)

_____

[242]   Expert Report of Robert H. Topel (Dec. 14, 2009).

<u>Plaintiffs' Paragraph 93:</u>

**93      Visa and MasterCard have been able to increase Interchange Fees in the markets for General-Purpose-Card Network Services, Offline-Debit-Card Network Services, and PIN-Debit-Card Network Services without losing merchant acceptance.**

<u>*Defendants' Response to Paragraph 93:*</u>

Disputed.  Defendants dispute class plaintiffs' definition of "Interchange Fee" as "a fee that Merchants pay to the Issuing Bank" because it is inaccurate, misleading, and unfairly prejudicial.  An interchange fee is compensation paid by the acquiring bank to the issuing bank via Visa or MasterCard for the transaction passing through interchange.  (*See* Paragraphs 64 & 69.)  Class plaintiffs have presented no evidence that merchants pay any fees to issuing banks.

Evidence on which class plaintiffs rely in subparagraphs a-m, or elsewhere, does not support their assertion that there are separate markets for "General-Purpose-Card Network Services, Offline-Debit-Card Network Services, and PIN-Debit-Card Network Services."

    a.      **Defendants' expert, Dr. Klein generally agrees that merchants have not dropped acceptance despite increases in interchange fees.**[511]

---

[511]      *See* Klein Rep. at 76, 78 making references to increased interchange fees and merchants not dropping interchange ("Visa increased interchange fees in response to…") and ("Rather, the fact that merchants have not dropped acceptance of Visa . . . ."). (SUFEX212)

<u>*Defendants' Response to Paragraph 93a:*</u>

Undisputed.

    b.      **Prof. Elzinga agreed that despite the increase in Visa and MasterCard interchange fees, few merchants stopped accepting Visa or MasterCard cards.**[512]

---

[512]      Elzinga Rep. at 51. (SUFEX250)

336

*Defendants' Response to Paragraph 93b:*

Disputed. Class plaintiffs' characterization of Prof. Elzinga's report is inaccurate. Prof. Elzinga stated in his report that "[p]laintiffs' experts all seem to endorse the view that one can infer market power in network services from the fact that few merchants stopped accepting Visa or MasterCard when the Visa and MasterCard interchange fees rose over time. . . . But this argument is flawed." (Elzinga Rep. at 51.)

**c.   William Sheedy of Visa, Inc. testified that he "was not aware of any merchants that decided to stop accepting Visa as a result of [five interchange] rate increases" that occurred from 2002 to 2005.[513]**

---

[513]   **Sheedy Dep. 592:10-13, June 18, 2008. (SUFEX426)**

*Defendants' Response to Paragraph 93c:*

Undisputed.

**d.   MasterCard is unaware of any merchants that had accepted MasterCard card products and later stopped accepting.[514]   Similarly, MasterCard is not "aware of any merchants dropping acceptance of MasterCard as a result of any increase in interchange fees."[515]**

---

[514]   **Jonas 30(b)(6) Dep. 588:19-589:17. (SUFEX332)**

[515]   **Jonas Dep. 119:7-19, May 17, 2007. (SUFEX245)**

*Defendants' Response to Paragraph 93d:*

Disputed. Evidence on which class plaintiffs rely is incomplete and misleading. (Fed. R. Evid. 106.) When Mr. Jonas was asked whether he could identify any merchant who had declined to accept MasterCard products as a result of announced interchange rate increases, he replied, "I – I cannot, but it may not have been reported to me if a merchant did. Frankly, it may not have even been reported to MasterCard if it did. It depends on the merchant, the size of the merchant, and it may very well be many merchants drop in and out of the network. If they

leave an acquirer, they may go to another acquirer and continue to accept. They may never come back into the network. If the merchant is not one that we monitor, top merchants, big volume merchants, I have no idea how many merchants may be dropping in and out of the network." (Jonas Methodology Dep. at 588-89.)

Class plaintiffs' statement that "MasterCard is not 'aware of any merchants dropping acceptance of MasterCard as a result of any increase in interchange fees'" is incorrect. Class plaintiffs cited to Mr. Jonas' May 17, 2007 deposition in support of this assertion, but in that deposition, Mr. Jonas testified in his personal capacity, not as a representative of MasterCard pursuant to Rule 30(b)(6). MasterCard employee Ruth Ann Marshall testified that Neiman Marcus used to accept MasterCard, but no longer does. (Marshall Dep. at 205.)

e.    **Visa documents indicate that interchange rates have increased since 1997.**[516]

---

[516]    VUSAMDL1-07152472 at 2477 (Chart created by Visa illustrating the dramatic interchange increases from 1997 to 2003) (SUFEX427); VUSAMDL1-06291936 at 970 (SUFEX428) (Visa presentation material to BankOne titled "Interchange Fee Discussion" showing dramatic interchange increases from 1990 to 2004)

_Defendants' Response to Paragraph 93e:_

Disputed. Evidence on which class plaintiffs rely is incomplete and misleading. (Fed. R. Evid. 106.)

Defendants dispute the admissibility of Jorgensen Dep. Ex. 24483. The document was not authenticated (Fed. R. Evid. 901), and Mr. Jorgensen testified that he does not recognize the document. (Jorgensen Dep. at 224-25.)

Defendants dispute the admissibility of Towne Dep. Ex. 26069, at VUSAMDL1-06291970. The chart to which class plaintiffs cite shows that system-wide interchange has increased in terms of total dollars (Towne Dep. Ex. 26069, at VUSAMDL1-06291970), and is irrelevant to class plaintiffs' assertion that interchange rates have increased. (Fed. R. Evid. 401,

402.)  Class plaintiffs' characterization of the document is unfairly prejudicial.  (Fed. R. Civ. P.

403.)

      **f.**    **MasterCard documents indicate that interchange rates have increased since 1995.**[517]

---

[517]    **Heuer Dep. Ex. 23 (SUFEX116), MCI_MDL02_08789858 at 863 (SUFEX429) (U.S. Region Interchange Rates 1991-2000); MCAD 010213608, at 608  (SUFEX430) (Consumer Effective Rates from 1995 to 2001); Marshall Dep. 68:23-69:02, July 30, 2008 (SUFEX366) (Ruth Ann Marshall of MasterCard agreed that MasterCard overall effective interchange rates had increased from 1999 to 2006).**

*Defendants' Response to Paragraph 93f:*

      Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading.

(Fed. R. Evid. 106.)  The document labeled by class plaintiffs as "Heuer Dep. Ex. 23" is actually

Heuer Dep. Ex. 27058.

      Defendants object to the admissibility of Heuer Dep. Ex. 27058.  The deposition

exhibit does not discuss increases in MasterCard interchange rates (Heuer Dep. Ex. 27058), and

is therefore irrelevant to class plaintiffs' assertion.  (Fed. R. Evid. 401, 402.)

      **g.**    **In a Master*Card* internal document discussing MasterCard's New Business Model, MasterCard states that with regard to interchange fees,**

██████████████████████████████████████████
████████[518]

---

[518]    **MCI_MDL02_11822343, at 351 (2004). (SUFEX284)**

*Defendants' Response to Paragraph 93g:*

      Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading.

(Fed. R. Evid. 106.)  In the MasterCard document discussing MasterCard's New Business Model,

MasterCard states that "[t]oday . . . Acquirers/Merchants are reluctant participants and 'take it or

leave it,'" and "[t]omorrow . . . Acquirers/Merchants are our customers."

(MCI_MDL02_11822343 to 11822368, at 351.)

    **h.**    **Ruth Ann Marshall of MasterCard testified that she was not aware of any merchants that had ever dropped acceptance of credit cards.**[519]

---

[519]    Marshall Dep. 206:07-20, July 30, 2008. (SUFEX366)

*Defendants' Response to Paragraph 93h:*

    Disputed.  Class plaintiffs' assertion is incomplete and misleading (Fed. R. Evid. 106), and is inconsistent with Ms. Marshall's deposition testimony.  Ms. Marshall testified that Neiman Marcus used to accept MasterCard, but no longer does.  (Marshall Dep. at 205.)

    **i.**    **William Sheedy of Visa agreed that despite a ▮▮▮ percent increase in interchange fees related to reward-based products, the likelihood that merchants would stop accepting Visa would be "minimal."**[520]

---

[520]    Sheedy Dep. 551:02-10, June 18, 2008. (SUFEX426)

*Defendants' Response to Paragraph 93i:*

    Disputed.  Class plaintiffs mischaracterize the evidence on which they rely.  Mr. Sheedy agreed that it was Visa's assessment that despite a ▮▮▮ percent increase in interchange fees related to reward-based products, the likelihood that merchants would stop accepting Visa would be "minimal."  (Sheedy Dep. at 551.)

    **j.**    **Visa's former CEO, John Coghlan, testified that despite high interchange fees, he was not aware of any merchant that had stopped accepting Visa during his tenure.**[521]

---

[521]    Coghlan Dep. 133:25-134:18, Dec. 16, 2008. (SUFEX141)

*Defendants' Response to Paragraph 93j:*

    Undisputed.

    **k.**    **Visa's Head of Consumer Debit Products, Stacey Pinkerd, testified since February of 2003, the overall effective rate for Interlink has increased.**[522] **Mr. Pinkerd also testified that he was not aware of any merchant that had stopped accepting Interlink during this time period.**[523]

340

[522]    Pinkerd Dep. 214:15-18, Aug. 19, 2008. (SUFEX006)

[523]    Pinkerd Dep. 175:07-09, Aug. 19, 2008. (SUFEX006)

*Defendants' Response to Paragraph 93k:*

    Undisputed.

l.    MasterCard's 30(b)(6) designee for post-*Wal-Mart* settlement interchange fee adjustments, Steven Jonas, testified that MasterCard considered and implemented credit interchange fee increases simultaneously with its debit interchange fee reductions mandated by the *Wal-Mart* settlement.[524]

[524]    Jonas 30(b)(6) Dep. 58:5-62:6. (SUFEX431)

*Defendants' Response to Paragraph 93l:*

    Undisputed.

m.    Visa's 30(b)(6) deponent for Interchange Methodology, William Sheedy, gave the following testimony:

Q:    Now, you testified earlier that Visa had announced earlier in 2003 credit card interchange fee increases that took effect in April of 2003; correct?

A:    Yes, I believe I did.

Q:    And then at the end of April, 2003 the merchant plaintiffs in Wal-Mart negotiated as part of a settlement a reduction in Visa Check Card interchange fees; correct?

A:    The end of 2003?

Q:    End of April, 2003 was the initial settlement in the Wal-Mart case; correct?

A:    Yes

Q:    And that settlement provided for reduced check card interchange fees between August and December of 2003; correct?

A:    For the class merchants.

Q:    Right. And then in June, Visa considers increasing credit card interchange fees as of the same date, August 1, 2003; correct?

A:    I can't recall whether or not it was August 1st. I do recall that it was an August -- August implementation.[525]

---

[525]    Sheedy 30(b)(6) Dep. 218:22-219:24, June 17, 2008. (SUFEX185)

*Defendants' Response to Paragraph 93m:*

Disputed.  Mr. Sheedy was Visa's 30(b)(6) witness on the topic of Visa's methodology for setting interchange fees from January 1, 2000 to the end of the discovery period. (Sheedy 30(b)(6) Dep. Ex. 23950; Sheedy 30(b)(6) Dep. at 17.)

Defendants object to the admissibility of Mr. Sheedy's testimony relating to interchange fee adjustments in 2003.  Such evidence relates to events prior to the relevant time period applicable in this case, and is thus irrelevant to any issue in support of class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)

342

Plaintiffs' Paragraph 94:

94      Immediately upon the expiration of the mandatory fee decrease required under the *Visa Check* settlement, Visa and MasterCard increased signature-debit-card interchange fees.

*Defendants' Response to Paragraph 94:*

Disputed.  The interchange fees required under the *Visa Check* settlements

terminated on January 1, 2004.  (Visa Settlement Agreement ¶ 8(a); MasterCard Settlement

Agreement ¶ 8(a).)  Evidence on which class plaintiffs rely in subparagraphs a-d does not

support their assertion that Visa and MasterCard increased their signature debit interchange fees

immediately following this date.

    a.    Visa's "VisaNet Processor Digest" for January 1, 2004 states, "As a result of the recent Merchant litigation settlement, Visa bifurcated its honor all cards rule, creating effectively three acceptance choices for merchants: 1) accept all Visa products; 2) accept only Visa consumer debit products; or 3) accept only Visa credit and business-related products. A component of the settlement was the implementation of certain interchange fees for the class merchants from August to December 2003. With the expiration of these settlement rates and the change in the honor all cards rule, Visa is restructuring and modifying its offline debit interchange reimbursement fees consistent with these new acceptance choices and to effectively position the rate structure to optimize the long-term value proposition for Visa members and merchants. The document explains that the new interchange rate structure "ensures Visa Members have the interchange rates necessary to sustain offering debit products to customers, who have generated more than $270 billion in merchant sales with Visa debit cards for the period year-to-date ending November 30, 2003."[526]

---
[526]      VUSAMDL1-07895174–82, at VUSAMDL1-07895176. (SUFEX432)

*Defendants' Response to Paragraph 94a:*

Disputed.  Class plaintiffs do not properly use quotation marks in subparagraph a

to demonstrate which part of the purported fact was included in the cited document.  The

sentence that ends ". . . optimize the long-term value proposition for Visa members and

343

merchants" is the end of the quoted language from the document on which they rely.

(VUSAMDL1-07895174 to 07895182, at 176.)

Class plaintiffs' characterization of the evidence on which they rely is incomplete

and misleading.  (Fed. R. Evid. 106.).  The document on which class plaintiffs rely further states,

"Effective January 31, 2004, Visa will introduce new rates, which serve to lower fees from pre-

settlement rates for all merchant categories, and create a performance driven fee structure for

supermarket and retail merchant segments based on volume, number of transactions, as well as

fraud and chargeback levels."  (VUSAMDL1-07895174 to 07895182, at 176.)

**b.** **MasterCard's 30(b)(6) designee for the post-*VisaCheck* adjustments, Steven Jonas, gave the following testimony:**

**Q:** **Taking you back to May of 6 2003, it's my understanding of your testimony earlier that it was essentially MasterCard's perception that as to credit interchange MasterCard was at a roughly ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ in May of 2003, that was the principal driver of the proposal that you made to the board to raise credit card interchange fees; is that right?**

**A:** **It was one of the key drivers, yes.**[527]

---

[527] **Jonas 30(b)(6) Dep. 215:5-17, Sep. 18, 2007. (SUFEX431)**

*Defendants' Response to Paragraph 94b:*

Disputed.  Mr. Jonas was designated by MasterCard to discuss "the consideration

of, business justification for, and adoption of the interchange rate modifications announced in

June, 2003 and made effective in August, 2003.  (Jonas Modification 30(b)(6) Dep. Ex. 1; Jonas

Modification 30(b)(6) Dep. at 272-273.)

Defendants object to the admissibility of Jonas 30(b)(6) Dep. at 215.  Mr. Jonas'

testimony regarding MasterCard's credit interchange in May 2003 relates to events prior to the

relevant time period applicable in this case, and is thus irrelevant to any issue in support of class

plaintiffs' motion for summary judgment. (Fed. R. Evid. 401, 402.)

      c.     **A December 2003 MasterCard Board of Directors presentation states, "On Friday, December 12, Visa announced new debit rates that are a significant departure from rates implemented pursuant to the settlement agreement" and** ███████████████████████████████████████ ████████████████████████████████████████████**"[528]**

_____

[528]      **Jonas 30(b)(6) Dep. Ex. 23123, at MCI_MDL_02_07064926-33. (SUFEX433)**

*Defendants' Response to Paragraph 94c:*

      Undisputed.  Defendants note that this document discusses interchange

modifications in April 2004, and does not support class plaintiffs' assertion that MasterCard

increased its signature debit interchange rates immediately upon the expiration of the mandatory

fee decrease required under the *Visa Check* settlement.

      d.     **MasterCard's 30(b)(6) designee for Interchange Methodology, Steve Jonas, testified that MasterCard set its January 2004 signature debit interchange fee** ███████████████**.[529]**

_____

[529]      **Jonas 30(b)(6) Dep. 528:7-14, 529:15-24, April 24, 2008. (SUFEX332)**

*Defendants' Response to Paragraph 94d:*

      Disputed.  Mr. Jonas was MasterCard's designated representative to answer

questions about the methodology by which MasterCard establishes interchange fees. (Jonas

Methodology Dep. at 7.).  Class plaintiffs mischaracterize Mr. Jonas' deposition testimony.  Mr.

Jonas testified that changes to MasterCard's signature interchange rates in January 2004 were

███████████████████████████████. (*Id.* at 529.)

<u>Plaintiffs' Paragraph 95:</u>

**95     Merchants have continued to accept Visa and MasterCard Credit Cards, even as the Member Banks shifted their issuing portfolios to Premium Credit Cards that carried higher Interchange Fees than standard cards.**

*Defendants' Response to Paragraph 95:*

Disputed.  Defendants dispute class plaintiffs' definition of "Interchange Fee" as "a fee that Merchants pay to the Issuing Bank" because it is inaccurate, misleading, and unfairly prejudicial.  An interchange fee is compensation paid by the acquiring bank to the issuing bank via Visa or MasterCard for the transaction passing through interchange.  (*See* Paragraphs 64 & 69.)  Class plaintiffs have presented no evidence that merchants pay any fees to issuing banks.

Class plaintiffs do not provide any evidence in subparagraphs a-c, or elsewhere, in support of their assertion that Member Banks shifted their issuing portfolios to Premium Credit Cards.

     **a.     Visa's Global Head of Product, Elizabeth Buse, testified that she was not aware of any merchant in the United States that had dropped  the acceptance of Visa credit products in response to higher interchange fees associated with Visa Signature, Visa Mainstream, or Visa Traditional Rewards products, and Visa did not consider whether launching these products would reduce merchant acceptance of Visa cards.[530]**

_____

[530]     **Buse Dep. 173:22-174:11, Apr. 11, 2008. (SUFEX434)**

*Defendants' Response to Paragraph 95a:*

Disputed.  Class plaintiffs mischaracterize Ms. Buse's deposition testimony.  In the testimony on which class plaintiffs rely, Ms. Buse did not testify that Visa did not consider whether launching Visa Signature, Visa Mainstream, or Visa Traditional Rewards would reduce merchant acceptance of Visa cards.  (Buse 30(b)(6) Dep. at 173-174.)

     **b.     A MasterCard document titled "Options to Create A Differentiated Basis For Higher Interchange For High Transactor Business" dated April of 2005,**

**notes that despite higher interchange on rewards-based Visa cards, the** [531]

██████████████████████████████████████

---
[531]     MCI_MDL02_08791774 at 776. (SUFEX435)

*Defendants' Response to Paragraph 95b:*

       Disputed. Evidence on which class plaintiffs rely is incomplete and misleading.

(Fed. R. Evid. 106.) The quoted language is a forecast by MasterCard about merchants'

potential reactions to a new Visa product. (MCI_MDL02_08791774 to 08791786, at 776.)

     **c.**    **In a MasterCard document discussing higher interchange fees associated with rewards-based cards it is noted that while some large merchants may be able to** ████████████████████████████████

████████████████████████████ [532]

---
[532]     MCI_MDL02_09052587 at 589 (2005). (SUFEX436)

*Defendants' Response to Paragraph 95c:*

       Disputed. This is the same document that class plaintiffs cite in Paragraph 95b,

but is at indexed at a different bates range. Evidence on which class plaintiffs rely is incomplete

and misleading. (Fed. R. Evid. 106.) The quoted language is a forecast by MasterCard about

merchants' reaction to a new Visa product. (MCI_MDL02_08791774 to 08791786, at 776.)

<u>Plaintiffs' Paragraph 96:</u>

96      **Merchants cannot discontinue the acceptance of Visa and MasterCard Payment Cards.**

*Defendants' Response to Paragraph 96:*

      Disputed.  Neiman Marcus used to accept MasterCard, but no longer does. (Marshall Dep. at 205.)  Some universities have also discontinued the acceptance of Visa and MasterCard payment cards.  (MCI_MDL02_06937562 to 06937567[243] at 64; "Major [acceptance for tuition] program terminations included Ohio State University, University of Indiana, Tufts University and Boston College."))

      a.      **Mitchell Goldstone, owner of Plaintiff Photos, Etc., testified that he was "forced" to accept Visa and MasterCard credit products because if he did not he would go "out of business."[533]**

------

[533]    **Goldstone Dep. 275:11-74, Aug. 6, 2008. (SUFEX437)**

*Defendants' Response to Paragraph 96a:*

      Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading. (Fed. R. Evid. 106.)  Defendants note that Mr. Goldstone testified that he would be out of business "[b]ecause a very large portion, as an example, of my business is online, and if we don't have the Visa/MasterCard brand, customers won't – won't order."  (Goldstone Dep.[244] at 276.)

      b.      **Michael Schumann, co-owner of Plaintiff Traditions Classic Home Furnishings, testified: "I would like to not accept credit cards, but that's not a viable option for me because if I didn't accept Visa and MasterCard I would be out of business."[534]**

------

243   Memorandum from J. Reed to G. Forsey & TJ Sharkey (Jun. 23, 2006).

244   Deposition of Mitchell Goldstone (Aug. 6, 2008) ("Goldstone Dep.").  Mr Goldstone testified as one of the owners of Photos, Etc.  (Goldstone Dep. at 25.)

[534]     Schumann Dep. 142:22-143:8. (SUFEX438)

_Defendants' Response to Paragraph 96b:_

      Undisputed.

    c.    **A January 2005 MasterCard document entitled "Merchant Interviews" states, "Merchants compelled to accept cards due to strong customer demand."[535]  The document also states that "Accepting cards has become a business reality" and "Small merchants feel accepting cards is essential to business."[536]**

[535]     MCI_MDL02_08162623-99, at MCI_MDL02_08162629. (SUFEX439)

[536]     MCI_MDL02_08162623-99, at MCI_MDL02_08162643-44. (SUFEX439)

_Defendants' Response to Paragraph 96c:_

      Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading. (Fed. R. Evid. 106.)

      Defendants object to the admissibility of MCI_MDL02_08162623 to 08162699, at 629, 643-44.  The quoted language from this document on which class plaintiffs rely reflects out of court statements made by merchants (MCI_MDL02_08162623 to 08162699, at 629, 643-44) for which no exception to the hearsay rule has been established.  (Fed. R. Evid. 801, 802.)

    d.    ███████████████████████████████████████████[537]

[537]     ██████ Dep. 307:25-308:2. (SUFEX440)

_Defendants' Response to Paragraph 96d:_

      Undisputed.

    e.    **Chase Paymentech Relationship Manager, Lori Cullen, replied to an e-mail from a Gucci treasury employee complaining about an interchange increase: "the only power play you have is to not accept their cards and that is probably retail suicide."[538]**

[538]     Cullen Dep. Ex. 22381, at CHASE003115537. (SUFEX441)

*Defendants' Response to Paragraph 96e:*

        Undisputed.

     f.      **A survey by the Association of Financial Professionals of 654 financial professionals concluded "U.S. businesses have no other option but to continue accepting plastic as a form of payment . . . It is consumers' desire to pay with credit cards that makes it nearly impossible for many organizations to refuse to accept them."[539]**

[539]     Drury Dep. Ex. 31,152 at 1. (SUFEX442)

*Defendants' Response to Paragraph 96f:*

        Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading.

(Fed. R. Evid. 106.)

        Defendants object to the admissibility of Drury Dep. Ex. 31152.  The survey by

the Association of Financial Professionals on which class plaintiffs rely is an out of court

statement for which no exception to the hearsay rule has been established.  (Fed. R. Evid. 801,

802.)

     g.      **Brian Emmert, the Chief Financial Officer of Plaintiff Jetro, testified that at one time Jetro considered exclusive acceptance with Discover Card, but ultimately Jetro decided against it stating, "[i]t was proposed for all of the locations and we initially spoke about [how] we wanted to see what the reaction was and the only way we would do it – we didn't have – excuse the language – we didn't have the balls to see if we could do it all at every location.  We didn't want to take the risk [of losing sales]."[540]**

[540]     Emmert Dep. 248:14-249:12, Jan. 17, 2008. (SUFEX306)

*Defendants' Response to Paragraph 96g:*

        Undisputed.

h.    **In response to the question,** ███████████████████████████████

███████████████████████████████████████████████████

*Defendants' Response to Paragraph 96h:*

Undisputed.

i.    **Visa's former CEO, John Coghlan, agreed that merchants had no choice but to accept rewards-based cards that carried higher interchange rates than traditional payment cards.**[541]

---

[541]    **Coghlan Dep. 223:01-10, Dec. 16, 2008. (SUFEX141)**

*Defendants' Response to Paragraph 96i:*

Disputed.  Class plaintiffs mischaracterize the evidence on which they rely.  The testimony to which class plaintiffs cite reflects Mr. Coghlan's understanding of Visa's Honor All Cards Rule, and does not relate to whether merchants can discontinue acceptance of Visa payment cards.  (Coghlan Dep. at 223.)

j.    **MasterCard President Ruth Ann Marshall testified MasterCard was never concerned that a major merchant such as Wal-Mart would stop accepting MasterCard products because "there are too many Wal-Mart consumers carrying the card. And I think it would have been very detrimental to their customer service."**[542]

---

[542]    **Marshall Dep. 249-50. (SUFEX366)**

*Defendants' Response to Paragraph 96j:*

Disputed.  Class plaintiffs' characterization of Ms. Marshall's deposition testimony is inaccurate.  Ms. Marshall testified:

Q.  Was there any particular concern that major merchants would stop taking MasterCard?

MS. RAVELO:  Objection to the form.

351

THE WITNESS:  I don't recall there being a major – I don't recall that to be a concern, though – I mean we just talked about ██████████ .  And those are examples of – obviously we had a concern because we cut deals with them to continue to do business.

(Marshall Dep. at 249.)

## Plaintiffs' Paragraph 97:

**97      PIN debit transactions, unlike signature debit transactions, permitted cardholders to receive cash back from participating merchants; as of 2004, customers requested cash back from roughly 20 percent of all such transactions."[543]**

_____

[543]      Frankel Rep. ¶ 38 (citing *United States v. First Data Corporation, and Concord EFS, Inc.,* Department of Justice, Competitive Impact Statement, January 23, 2004, p. 7.). (SUFEX443)

*Defendants' Response to Paragraph 97:*

      Undisputed.

.

353

<u>**Plaintiffs' Paragraph 98:**</u>

**98     PIN-Debit Cards and Offline-Debit Cards have unique characteristics.**

*Defendants' Response to Paragraph 98:*

        Disputed.  Class plaintiffs' assertion is incomplete and misleading.  (Fed. R. Evid. 106.)  The Rule 30(b)(6) designee for PIN-debit network NYCE testified ██████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████  ███  ██████████████████████████████████

██████████████████████████████████████████████████  Similarly, Visa and

MasterCard each view debit as competing with cash and checks.[246]  (Pinkerd Dep. Ex. 25795[247], at VUSAMDL1-04131531 (comparing spend on debit and credit to spend on checks, and demonstrating that the "share of total spending by payment method," which demonstrates that "[b]oth debit and credit have grown at the expense of paper"); MCI_MDL02_11778835 to 11778985,[248] at 896-897 (comparing acceptance costs and payment mix between all payment methods); MCI_MDL_00092240 to 00092284,[249] at 248 (comparing transaction share and dollar share of debit and cash); MCI_MDL02_01321922 to 01321947,[250] at 941-45 (discussing usage and preferences of debit versus cash).)  As Visa's head of debit products explained, "[d]ebit card

---

[245]  Deposition of Steven A. Rathgaber (Feb. 17, 2009) ("Rathgaber Dep.").  Mr. Rathgaber testified as NYCE's Rule 30(b)(6) designee on NYCE's business strategy, fees, rules, and policies, and merchant value proposition. (Rathgaber Dep. at 10-11; Rathgaber Dep. Ex. 43625 30(b)(6) Deposition Subpoena.)

[246]  *See* Paragraphs 85, 99 for discussion of Visa and MasterCard testimony and documents that demonstrate competition between credit and debit.

[247]  Visa: "Sustaining Debit Momentum" (Oct. 2003), VUSAMDL1-04131528 to 04131554.

[248]  MasterCard Debit Value Matrix.

[249]  A Look at the Evoloving Payments Landscape.

[250]  MasterCard Consumer Usage & Preference Strategy: Debit Insights.

transactions, we classify within our concept of debit transactions as being, you know, cash and

checks included in that as well as ACH and other competing types of debit instruments like

merchant issued cards, ACH cards from supermarkets or from other stores." (Pinkerd Dep. at

30.)

In addition, plaintiffs recognize that PIN debit and signature debit compete with

each other, and plaintiffs' representatives testified that they steered their customers to make PIN-

debit payments rather than Visa or MasterCard signature debit payments.  (Coward Dep. at 58;

Coglianese Dep. at 213-17; Coglianese Dep. Ex. 41120,[251] at WLGVMC 098351; Cox Dep. at

75-76, Cox Dep. Ex. 15652,[252] at ALBEDVMC00149437.)

> a.   **Albert Naffah of MasterCard Australia explained in an email the low fraud rate associated with PIN debit:  "Indeed the New Zealand market which has supported PIN@POS more than five years ago continues to display amongst the lowest levels of fraud in the world."[544]**

---
[544]   **MCW_DOJ_00432843-50. (SUFEX444)**
.

*Defendants' Response to Paragraph 98a:*

Undisputed.

Defendants dispute the admissibility of MCW_DOJ_00432843 to 00432850.  The

document relates to conduct outside the geographic area applicable in this case, and is therefore

inadmissible as irrelevant to any issue in support of class plaintiffs' motion for summary

judgment.

---
[251]   Email between M. Quane, R. Polark, and R. Hans (Dec. 27, 2002), bearing control numbers WLGVMC 098351 to 098352.

[252]   Email between M. Koci, L. Cox, and G. Morton (May 29, 2002), bearing control number ALBEDVMC00149437.

b.      Defendants' expert, Prof. Kevin Murphy, writes, "Signature and PIN debit provide a different mix of services to cardholders and merchants and charge somewhat different fees."[545]

---

[545]     Murphy Rep. ¶ 50. (SUFEX338)

*Defendants' Response to Paragraph 98b:*

Undisputed.

c.      MasterCard's 10-K filing for the fiscal year ended December 31, 2007, states, "General purpose cards have different attributes depending on the type of accounts to which they are linked: 'pay later' cards, such as  credit or charge cards, typically access a credit account . . . 'pay now' cards, such as debit cards, typically access a demand deposit or current account maintained by the cardholder; and 'pay before' cards, such as prepaid or electronic purse cards, typically access a pool of value previously funded "and explains that" 'Pay Now' cards may be further categorized into several sub segments:

- Signature-based debit cards are cards where the primary means of cardholder validation at the point of sale ('POS') is for the cardholder to sign a sales receipt. MasterCard and Visa-branded cards constitute the majority of signature-based debit cards.

- PIN-based debit cards are cards in connection with which cardholders generally enter a personal identification number ('PIN') at a POS terminal for validation. PIN-based debit card brands include our Maestro brand and Visa's Electron® and Interlink® brands. The MasterCard brand also functions as a PIN-based debit brand in the United States.

- Cash access cards, such as our Cirrus-branded cards, are cards which permit cardholders to obtain cash principally at ATMs by entering a PIN. In addition to Cirrus, the primary global cash access card brand is Visa's Plus® brand."[546]

---

[546]     Dunn Dep. Ex. 22874, at p. 6 (SUFEX445); *see also* MasterCard 10-K, Feb. 19, 2009, at p. 5. (SUFEX446)

_Defendants' Response to Paragraph 98c:_

   Disputed.  SUFEX446, dated February 19, 2009, is for the fiscal year that ended

December 31, 2008, not "MasterCard's 10-K filing for the fiscal year ended December 31,

2007."

.

357

<u>**Plaintiffs' Paragraph 99:**</u>

99      **When MasterCard conducts competitive analyses,** ███████████████
███████████████████████████████████████████████████████████████
███████

<u>*Defendants' Response to Paragraph 99:*</u>

       Disputed.  Evidence demonstrates that class plaintiffs' assertion is inaccurate.  A

MasterCard Payment Study analyzed ████████████████████████████████████

████████████████████████████████ (MCI_MDL02_08613177 to

08613281,[253] at 202-11; *see also* MCI_MDL02_01145550 to 01145620,[254] at 554, 563-66

(████████████████████████████████████████); MCI_MDL02_08425101 to

08425159,[255] at 148-50 (████████████████████████████████████████████

████); MCI_MDL02_11565929[256] (████████████████████████████████████

██████████████████); Doyle Dep. at 203 ("[MasterCard] compete[s] against cash, ACH,

checks, other payments brands, both global payments brands as well as domestic payments

brands."); Portelli 30(b)(6) Dep.[257] at 155 ("[MasterCard] compete[s] against cash and check, we

compete against Amex, Visa."); *cf* Fierick Dep. at 263-64 (Coborns employee testifying

MasterCard and Visa compete with checks, cash, and American Express); Pomerleau Dep.[258] at

---

[253]  2003 U.S. Payment Study.

[254]  Payment Method Decision Research.

[255]  Competitive Assessment of Cardholder Usage and Preference.

[256]  Total MasterCard: MasterCard & Visa Effective Rate Summaries – Credit and Debit Combined Analysis" (undated).

[257]  Deposition of Jeffrey Portelli (Dec. 12, 2008) ("Portelli 30(b)(6) Dep."). Pursuant to Rule 30(b)(6), Mr. Portelli testified as MasterCard's representative regarding premium cards. (Portelli 30(b)(6) Dep. at 4.)

[258]  Deposition of Ricky Pomerleau (Dec. 9, 2008) ("Pomerleau Dep."). Mr. Pomerleau testified as Wright Express' Rule 30(b)(6) designee on Wright Express' business strategy for fleet card issuance, merchant

*(cont'd)*

73 (Wright Express employee discussing competition with Wright Express, Visa, MasterCard, and other payment forms); Rathbager Dep. at 46-47 (NYCE employee discussing competition with Visa, MasterCard and other payment forms.).)

In subparagraph b, class plaintiffs present evidence that MasterCard compares its "World" credit card with American Express. American Express' principal payment cards are charge and credit payment card products. (2010 American Express 10-K,[259] at 1.) Class plaintiffs present no evidence that MasterCard only compared its products against American Express' credit products.

a.   **Mr. Jonas testified that MasterCard looked predominantly to** ███████████
   ███████████████████████████ [547] █.

---
[547]   **Jonas Dep. 534:18-535:4. (SUFEX332)**


*Defendants' Response to Paragraph 99a:*

Undisputed.

b.   **MasterCard designed the features of its premium "World" credit card—
   including the interchange fee for that card—to be competitive with American
   Express and the Visa premium "Signature" card.**[548]

   • **A November 2005 MasterCard memorandum entitled
      "Recommendation for New Premium Card Program" states:**

   ████████████████████████████████████
   ████████████████████████████████
   ████████████████████████████

---
*(cont'd from previous page)*
acceptance strategy and value proposition, card usage strategies, cardholder fees and value proposition, and rules and policies applicable to merchants. (Pomerleau Dep. at 9-10; Pomerleau Dep. Ex. 43250 (30(b)(6) Deposition Subpoena).)

259   Form 10-K of American Express Company (filed Feb. 28, 2011) ("2010 American Express 10-K"), available at http://www.sec.gov/Archives/edgar/data/4962/000095012311019072/y87970e10vk.htm (last visited Apr. 29, 2011).

██████  **Global Product is recommending a new Premium product be launched in the U.S.**

**Two key factors drive this recommendation:**

**1.** ███████████████████████████████
███████████████████████████████████
███████████████████████████████████
██████████████████████

**2.** ███████████████████████████████
███████████████████████████████ to compete effectively against Amex for these very same customers.

███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
█████████████████████████ [549]

- A January 31, 2005 email from MasterCard Vice President of Global Communications Sharon Gamsin to Steven Jonas states, "Attached is a version of our usual relatively bland interchange statement - question becomes whether we just want to come out and say that in order to get issuers to continue to issue MasterCard premium cards, ██████████████████████ - and go into an explanation about how we always said that would the outcome of the DOJ decision…… let me know if you have any other ideas within the confines of not wanting to go into much detail about interchange."[550]

- A June 2006 MasterCard presentation entitled "Global Priority: Affluent 2007 Execution Strategy & Plan" states that Phase I of MasterCard's "Long-term Affluent Strategy" is to "Develop elite affluent program to compete directly with Amex Platinum."[551]  The document also states that Visa is "Increasing Signature rates to compete with Amex."[552]

- MasterCard's 30(b)(6) designee for interchange strategy, Steven Jonas, testified that with the expansion of MasterCard World in 2005, "the effective rate of the World Card program was intended to increase" to █ percent overall.[553]  Jonas explained, "[M]y recollection is that given that the information we had, which to the best of our

> knowledge was ▇ percent, if we established the effective interchange rate at ▇ percent, that would continue to support issuer decisions to issue World MasterCard cards."[554]

[548]　　Jonas 30(b)(6) Dep. Ex. 23129, at MCI_MDL02_01990668 (SUFEX447);  Murdock Dep. Ex. 25458, at MCI_MDL02)11287628 (SUFEX448); Murdock Dep. Ex. 25458 at MCI_MDL02)11287647 (SUFEX448); Jonas 30(b)(6) Dep. Ex. 23129 at MCI_MDL02_03451879-85 (SUFEX447); Jonas 30(b)(6) Dep. 328:9-15 (SUFEX332); Jonas 30(b)(6) Dep. 344:17-21. (SUFEX332)

[549]　　Murdock Dep. Ex. 25462, at MCI_MDL02_08910477. (SUFEX097)

[550]　　Jonas 30(b)(6) Dep. Ex. 23129, at MCI_MDL02_01990668. (SUFEX447)

[551]　　Murdock Dep. Ex. 25458, at MCI_MDL02)11287628. (SUFEX448)

[552]　　Murdock Dep. Ex. 25458, at MCI_MDL02)11287647. (SUFEX448)

[553]　　Jonas 30(b)(6) Dep. 253:10-15. (SUFEX431)

[554]　　Jonas 30(b)(6) Dep. 254:6-10. (SUFEX431)

_Defendants' Response to Paragraph 99b:_

Undisputed.  MasterCard has responded to increased competition from American Express by introducing its World and World Elite cards.  (_See, e.g.,_ (Murdock Dep.[260] at 96-97 (World Elite was developed to allow MasterCard's banks to compete with American Express for affluent customers); Portelli Dep.[261] at 117-18 (World Elite was a "retention strategy for our issuers to retain their high net-worth customers," intended to target Amex's affluent segment.).)

Defendants note that American Express' principal payment cards are charge and credit payment card products.  (2010 American Express 10-K, at 1.)  Class plaintiffs present no evidence that MasterCard only compared its products against American Express' credit products.

    **c.**    **A MasterCard analysis conducted for the February 2006 meeting of its US Interchange Working Group shows that MasterCard** ▇▇▇▇▇▇▇▇▇

[260]　Deposition of Wendy Murdock (Aug. 7, 2008) ("Murdock Dep.").  Ms. Murdock testified as the chief product officer at MasterCard.  (Murdock Dep. at 8.)

[261]　Deposition of Jeffrey Portelli (May 14, 2008) ("Portelli Dep.").  Mr. Portelli testified as group executive for diversification and business expansion for MasterCard.  (Portelli Dep. at 5-6.)

**interchange rates of its signature debit product** ████████████████ █████████████████████.[555]



───────────
[555]    **Jonas 30(b)(6) Dep. Ex. 23145, at MCI_MDL02_08743306. (SUFEX449)**

*Defendants' Response to Paragraph 99c:*

  Disputed.  Class plaintiffs mischaracterize the document on which they rely.

Jonas 30(b)(6) Dep. Ex. 23145, at MCI_MDL02_08743306 provides an example of MasterCard

comparing its signature debit interchange rates against ██████████████████████, but

it does not support class plaintiffs' assertion ████████████████████████████████

████████████████████.

  **d.**  **Conversely, this analysis from MasterCard's February 2006 Interchange Working Group meeting shows that MasterCard compares interchange rates for its online product** ████████████████████████ ███████████████████[556]



US Region Maestro
Net Competitive Position for Issuers

[556]    **Jonas 30(b)(6) Dep. Ex. 23145, at MCI_MDL02_08743316. (SUFEX449)**

_Defendants' Response to Paragraph 99d:_

Disputed.  Class plaintiffs mischaracterize the document on which they rely.

Jonas 30(b)(6) Dep. Ex. 23145, at MCI_MDL02_08743316, provides an example of MasterCard

comparing its online debit interchange rates █████████████████████, but it

does not support class plaintiffs' assertion ███████████████████████████

███████████████████

     **e.**    **MasterCard's U.S. Board supported management's plan to set MasterCard's offline-Debit Interchange rates** ███████████████████.[557]

[557]    **MCI_MDL02_06362678-79 (SUFEX450);** _see also_ **MCI_MDL02_11371490-99. (SUFEX451)**

_Defendants' Response to Paragraph 99e:_

Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading.

(Fed. R. Evid. 106.)

Defendants dispute the admissibility of both documents on which class plaintiffs rely, MCI_MDL02_06362678 to 06362679 and MCI_MDL02_11371490 to 11371499, both dated December 18, 2003.  (MCI_MDL02_06362678 to 06362679; MCI_MDL02_11371490 to 11371499.)  These documents relate to events prior to the relevant time period applicable in this case, and are therefore inadmissible as irrelevant to any issue in support of class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)

.

### Plaintiffs' Paragraph 100:

**100   When Visa conducts competitive analyses, it compares its credit products only against ███████████████ it compares its offline-debit product only against ███████████ and it compares its Interlink PIN-Debit products only against ███████**

*Defendants' Response to Paragraph 100:*

Disputed.  Evidence demonstrates that class plaintiffs' assertion is inaccurate.  In a 2005 presentation, Visa compared credit products against ████████████████ ███████████████████████████ (VUSAMDL1-05594646 to 05594673,[262] at 656, 658.)  In the same presentation, Visa compared its debit products against █████████████████████████████ (*Id.*)  Additionally, the chart on which class plaintiffs rely in Paragraph 100d (Sheedy 30(b)(6) Dep. Ex. 24004, at VUSAMDL2-00027736) shows that Visa compared both its offline Visa Check Card and online Interlink brand with ████████████████

.

    a.    **A March 2005 PowerPoint slide drafted by Visa's Tolan Steele shows Visa's analysis of the "On-Line Debit Market Landscape" and describes market shares of only PIN debit networks:[558]**

---

[262]  Visa Strategy Slides (Mar. 24, 2005).



[558] Steele Dep. Ex. 31414 at VUSAMDL1-05594663 (SUFEX410). Steele authenticated this document and testified that he drafted this slide. Steele Dep. 200:25-201:23. (SUFEX041)

*Defendants' Response to Paragraph 100a:*

        Disputed. Evidence on which class plaintiffs rely is incomplete and misleading.

(Fed. R. Evid. 106.) Steele Dep. Ex. 31414 identifies ATM networks, PayPal, Debitman, cash,

checks, and ACH as competitors for debit cards. (Steele Dep. Ex. 31414, at VUSAMDL1-

05594656.)

        **b.    A Visa competitive interchange analysis reflected in a March 2006 PowerPoint presentation entitled "Interchange Update" shows that Visa compares the interchange rates of its "Consumer Offline Debit" product** ███████

███████ [559]



[559]   **VUSALITIIICID3-00014175-93, at VUSALITIIICID3-00014178. (SUFEX452)**

*Defendants' Response to Paragraph 100b:*

        Disputed.  Class plaintiffs mischaracterize the document on which they rely.

VUSALITIIICID3-00014175 to 00014193, at VUSALITIIICID3-00014178, provides an

example of Visa comparing interchange rates of its Consumer Offline Debit product against

████████████████████████████████████████████████████████████████

████████████████████████████████████████████

      **c.**    **Conversely, a Visa analysis reflected in an April 2005 Board of Directors presentation entitled "Interlink Network Strategy" shows that** ██████████████

████████████████████████.[560]

367



[560]   **Pinkerd Dep. Ex. 25875, at VUSAMDL1-04944983. (SUFEX453)**

_Defendants' Response to Paragraph 100c:_

Disputed.  Class plaintiffs mischaracterize the document on which they rely.

Pinkerd 30(b)(6) Dep.[263] Ex. 25875, at VUSAMDL1-04944983; provides an example of Visa

comparing interchange rates of its online product against other PIN debit services, but does not

support class plaintiffs' assertion that this is the only comparison Visa makes regarding online

debit product.

> **d.    An April 2006 Visa Independent Director Orientation presentation entitled "Visa USA's Interchange Reimbursement Fee Strategy" presents the "Competitive Landscape by Product" and compares Visa's Interchange rates against those of its competitors for Consumer Credit, Consumer Debit, and Commercial card products.[561] The chart presenting this comparison characterizes debit networks "MC, Star, NYCE, PayPal" as "Key Competitors" only in the "Consumer Debit" market.[562]**

---

[263]   Deposition of Stacey Pinkerd (Aug. 20, 2008) ("Pinkerd 30(b)(6) Dep.").  Mr. Pinkerd testified as Visa's Rule 30(b)(6) witness regarding Visa debit convergence.  (Pinkerd 30(b)(6) Dep. at 9-10; Pinkerd 30(b)(6) Dep. Ex. 25850 (30(b)(6) deposition notice).)

---

[562]    Sheedy 30(b)(6) Dep. Ex. 24004, at VUSAMDL2-00027736. (SUFEX454)

_Defendants' Response to Paragraph 100d:_

    Undisputed.

    Defendants note that the chart referenced by class plaintiffs shows that Visa compared both its offline Visa Check Card and online Interlink brand with MasterCard, Star, NYCE, and PayPal. (Sheedy 30(b)(6) Dep. Ex. 24004, at VUSAMDL2-00027736.)

    **e.    Visa designed the features of its premium "Signature" credit card— including the interchange fee for that card—to be comparable with American Express and the MasterCard premium "World" card.[563],[564]**

- **Visa's current head of Interchange Strategy, Tolan Steele, testified that Visa compares its interchange rates for "premium rewards credit" card products against "what an issuer would receive in transaction revenue if they were to issue a bank-flagged or what's sometimes called bank-issued American Express card."[565]**

- **A Visa presentation entitled "Visa Signature Overview" states, "Higher Interchange . . . Visa Signature IRF mirrors commercial IRF on T&E transactions • System-wide IRF at ▮▮▮▮▮▮ on traditional credit products • Supported by higher costs and competitive pressure (American Express)."[566]**

- **A December 2005 memorandum drafted by Visa Interchange Strategy team-member Chris Jorgensen for Visa's independent directors states, "Visa Signature was originally introduced in February 1998 as an upscale consumer credit product designed for affluent consumers with high amounts of travel and entertainment spend . . . Visa Signature was reintroduced to the marketplace in April 2005 in order to better compete with Bank-issued Amex products. With the re-launch of Visa Signature, a new, unique IRF structure, with a higher Issuer effective rate, was created for the Visa Signature product to increase the value proposition to Issuers . . . From an IRF effective rate standpoint, the Visa Signature effective rate is at parity with MasterCard's World Card product."[567]  Regarding this passage, Tolan Steele testified, "There is mention on the very second page of Visa Signature and other Visa -- well, the Visa Signature product competing with bank-issued AMEX products which at this time was a concern."[568]**

- **The Visa Business Review article for February 2004 states, "As a result of MasterCard's recently announced fee increase as well as**

American Express' appeal to banks based primarily on its higher merchant fees, the Visa USA Board of Directors is responding to the competitive marketplace by approving modifications to credit and commercial interchange reimbursement fees effective April 2004 . . . Developments in the marketplace, such as the recently announced increase in credit and commercial fees by MasterCard and American Express' efforts to market to banks based on higher merchant fees (and their recently announced intention to partner with MBNA), are significant competitive developments that Visa must address . . . Visa continues to work with merchant partners and Visa Members to determine the best way to grow preference and acceptance for Visa products in light of the recent MBNA/American Express partnership announcement and American Express' active marketing of their higher merchant fees to Visa Member financial institutions."[569] Visa's 30(b)(6) designee for Interchange Methodology, William Sheedy reviewed this document and testified that the document accurately reflected the "drivers" for the interchange modifications.[570] Visa "felt at the time, among the other considerations that we would always bring to an interchange fee decision, that these changes would more positively position Visa relative to member brand decisions given MasterCard's recently announced fee increase as well as American Express's appeal to banks from its higher merchant discount revenue."[571]

- A March 2005 Visa presentation found in National City's files, entitled "Visa Consumer Credit Rewards Strategy" states, "Enhanced Interchange on Visa Signature better competes with American Express."[572] The document describes Visa's plans to impose a ███ interchange rate on Visa Signature.[573]

- William Sheedy, Visa's 30(b)(6) designee for Interchange Methodology, testified that Visa Signature was "relaunched" in 2004.[574] Sheedy also testified that in "2004-2005 Visa introduced modifications to Visa Signature and introduced card programs for rewards-based products that were -- had a particular focus on growing a category and responding to what we were seeing were shifts in consumer demand towards rewards-based products that were -- had a particular focus on growing a category and responding to what we were seeing were shifts in consumer demand towards rewards-based products and an increasing competitive threat from American Express."[575] Sheedy confirmed that the Visa Signature credit card re-launch was an aspect of this effort.[576]

- Defendants' expert Kenneth Elzinga observed that Visa's "broad strategy in issuing Visa Signature cards was an effort to draw affluent consumers away from American Express."[577]

370

[563]   Steele Dep. 423:6-9. (SUFEX178)

[564]   Sheedy 30(b)(6) Dep. 390:3-11. (SUFEX426)

[565]   Steele Dep. 61:11-62:5. (SUFEX041)

[566]   Buse 30(b)(6) Dep. Ex. 31615, at VUSAMDL00086233, May 11, 2008. (SUFEX455)

[567]   Steele Dep. Ex. 31448, at VUSAMDL1-09011296. (SUFEX456)

[568]   Steele Dep. 423:6-9. (SUFEX178)

[569]   Sheedy 30(b)(6) Dep. Ex. 23977, at VUSAMDL1-07814071; VUSAMDL1-07814073. (SUFEX457)

[570]   Sheedy 30(b)(6) Dep. 392:7-17, June 18, 2008. (SUFEX426)

[571]   Sheedy 30(b)(6) Dep. 390:3-11, June 18, 2008. (SUFEX426)

[572]   Lamba Dep. Ex. 21507, at NC_IF_06_0000973. (SUFEX458)

[573]   Lamba Dep. Ex. 21507, at NC_IF_06_0000974. (SUFEX458)

[574]   Sheedy 30(b)(6) Dep. 419 4-8. (SUFEX426)

[575]   Sheedy 30(b)(6) Dep. 231:19-232:3. (SUFEX185)

[576]   Sheedy 30(b)(6) Dep. 232:4-7. (SUFEX185)

[577]   Elzinga Rep. at p. 91, n.195. (SUFEX250)

_Defendants' Response to Paragraph 100e:_

Disputed. Mr. Sheedy was Visa's 30(b)(6) witness on the topic of Visa's methodology for setting interchange fees from January 1, 2000 to the end of the discovery period. (Sheedy 30(b)(6) Dep. Ex. 23950; Sheedy 30(b)(6) Dep. at 17.)

Defendants note that American Express' principal payment cards are charge and credit payment card products. (2010 American Express 10-K, at 1.) Class plaintiffs present no evidence that Visa only compared its products against American Express' credit products.

Elizabeth Buse similarly testified that a reason for developing the Visa Signature product "was to find a way that we had both a compelling value proposition for the American Express cardholder for the issuer who wanted to target that cardholder, and one that had better

economics for the merchant than the American Express value proposition." (Buse 30(b)(6) Dep. at 62-63.)

## Plaintiffs' Paragraph 101:

**101     Like MasterCard, Visa's filings with the SEC separately describes the features of its "Consumer Credit" and "Consumer Deposit Access" product platforms, subdividing the latter into "Visa Debit" and "Interlink Debit," thereby demonstrating that it does not view PIN-debit-card network services as competing with offline-debit-card network services.**[578]

---

[578]      Visa Inc., Annual Report (Form 10-K) (2008), at pp. 6, 11, 17 (SUFEX459) (Visa's 10-K filing dated November 21, 2008, states, "In the debit card market segment, Visa and MasterCard are the primary global brands. In addition, our Interlink and Visa Electron brands compete with Maestro, owned by MasterCard, and various regional and country-specific debit network brands, such as STAR, owned by First Data Corporation, PULSE, owned by Discover, NYCE, owned by Metavante Corporation, and others in the United States, Interac in Canada, and EFTPOS in Australia. In addition to our PLUS brand, the primary cash access card brands are Cirrus, owned by MasterCard, and many of the online debit network brands referenced.").

*Defendants' Response to Paragraph 101:*

Disputed.  Class plaintiffs do not offer any evidence regarding MasterCard's filings with the SEC.

The chart referenced by class plaintiffs in Sheedy 30(b)(6) Dep. Ex. 24004, at VUSAMDL2-00027736, on which class plaintiffs rely in Paragraph 100d, compared both its offline Visa Check Card and online Interlink brand with MasterCard, Star, NYCE, and PayPal, and demonstrates that Visa views its PIN debit card network services as competing with offline debit card network services.  (*See* Paragraph 100d; Sheedy 30(b)(6) Dep. Ex. 24004, at VUSAMDL2-00027736.)  Additionally, another Visa presentation recognizes that "[o]ne-half of debit card users fluctuate between signing and PIN use." (VUSAMDL1-04131528 to 04131554,[264] at 541.)

Evidence demonstrates that Visa and MasterCard each view debit as competing with cash and checks.  (Pinkerd Dep. Ex. 25795, at VUSAMDL1-04131531 (comparing spend on debit and credit to spend on checks, and demonstrating that the "share of total spending by

---

[264]   Sustaining Debit Momentum, Consumer Debit Products, Visa USA (Oct. 2003).

payment method," demonstrates that "[b]oth debit and credit have grown at the expense of paper"); MCI_MDL02_11778835 to 11778985[265] at 896-897 (comparing acceptance costs and payment mix between all payment methods); MCI_MDL_00092240 to 00092284,[266] at 248 (comparing transaction share and dollar share of debit and cash); MCI_MDL02_01321922 to 01321947,[267] at 941-45 (discussing usage and preferences of debit versus cash).)

        As Visa's head of debit products explained, "[d]ebit card transactions, we classify within our concept of debit transactions as being, you know, cash and checks included in that as well as ACH and other competing types of debit instruments like merchant issued cards, ACH cards from supermarkets or from other stores." (Pinkerd Dep. at 30; *see also* ███████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████

---

[265]   MasterCard Debit Value Matrix.

[266]   A Look at the Evoloving Payments Landscape.

[267]   MasterCard Consumer Usage & Preference Strategy: Debit Insights.

374

## Plaintiffs' Paragraph 102:

**102    Merchants without PIN pads cannot accept PIN-debit cards.**[579]

[579]    **Zuritsky Dep. 44:10-25, Apr. 30, 2008  (SUFEX460) (President of parking-garage operator testifying that Parkway tried accepting PIN-debit cards but stopped because the entering of PIN numbers by its customers was incompatible with the "volatile" environment of a parking facility).**

*Defendants' Response to Paragraph 102:*

Disputed.  Class plaintiffs' description of Mr. Zuritsky's deposition testimony does not support their assertion that merchants without PIN pads cannot accept PIN debit cards. Merchants have the ability to perform PIN-less debit transactions, which do not require merchants to have PIN pads.  (Pinkerd Dep. at 102-03; Lyons Dep.[268] at 125-26; Baum Dep. at 150; ████████████████████████████████████████████████████████; DiSimone Dep.[269] at 208; VUSAMDL1-00039455 to 00039456,[270] at 455.)

Evidence on which class plaintiffs rely is incomplete and misleading.  (Fed. R. Evid. 106.)  Merchants can easily purchase purchase PIN pads.  (*See, e.g.*, Zentner Dep.[271] Ex. 18552,[272] at PAYLS0214224 ("Payless purchased and installed PIN-enabled point of sale ('POS') terminals in our stores to respond to customer demand and to achieve cost savings associated

---

[268]    Deposition of Richard Lyons (May 29, 2008) ("Lyons Dep.").  Mr. Lyons testified as executive vice president in MasterCard's Global Products group.  (Lyons Dep. at 6.)

[269]    Deposition of Harry DiSimone (Aug. 14 & Sept. 11, 2008) ("Disimone Dep.).  Mr. DiSimone worked at Chase until January 1, 2008, had responsibilities with private label cards, and was a liaison with Chase Paymentech. (DiSimone Dep. at 7-8.)

[270]    ATM & Debit News, Vol. 4 No 22 (Mar. 25, 2004).

[271]    Deposition of Arlen Zentner (Jul. 23-24, 2008) ("Zentner Dep.").  Mr. Zentner testified as the manager of treasury operations at Payless.  (Zentner Dep. at 11.)

[272]    Declaration of Arlen R. Zentner in connection with the investigation by the United States Department of Justice into the proposed acquisition of Concord EFS, Inc. by First Data Corporation (Sept. 17, 2003).

with PIN debit transactions.  No one subsidized the cost of these terminals.").  The number of merchant outlets with PIN debit capabilities has grown rapidly throughout the relevant period, increasing by 61 percent from 2000 to 2006.  (Klein Rep.[273] ¶ 229 (citing the Nilson Report).)

---

[273]   Expert Report of Dr. Benjamin Klein (Dec. 14, 2009).

**Plaintiffs' Paragraph 103:**

103    The internal documents and websites of Visa, MasterCard, and the major PIN-Debit networks reflect a large disparity in acceptance locations between Offline-Debit and PIN-Debit. Visa and MasterCard claim to have 24 million[580] and 12.1 million[581] merchant-acceptance locations for their Offline-Debit networks, respectively. In contrast, the following PIN-Debit networks claim significantly less expansive merchant acceptance: Interlink (1.4 million);[582] NYCE (2 million);[583] Star (2.2 million);[584] ACCEL/Exchange (1.3 million).[585]

---

[580]    "The Visa Comprehensive Debit Strategy," VUSALITIIICID1-00161675-702 at VUSALITIIICID1-00161681 (Sept. 13, 2005). (SUFEX461)

[581]    MasterCard 2009 Annual Report at p. 12 (available at http://phx.corporate-ir.net/External.File?item=UGFyZW50SUQ9NTU3MzV8Q2hpbGRJRD0tMXxUeXBlPTM=&t=1) (last accessed November 1, 2010). (SUFEX462)

[582]    http://usa.visa.com/personal/using_visa/interlink.html (last accessed Nov. 1, 2010). (SUFEX214)

[583]    http://www.nyce.net/retailers/Brand/index.htm (last accessed Nov. 1, 2010). (SUFEX463)

[584]    https://www.firstdata.com/en_us/products/financial-institutions/debit-solutions (last accessed Nov. 1, 2010). (SUFEX464)

[585]    http://www.accelexchange.com/aboutUs.aspx (last accessed Nov. 1, 2010). (SUFEX465)

*Defendants' Response to Paragraph 103:*

Disputed.  The numbers presented above by class plaintiffs are incomplete and misleading (Fed. R. Evid. 106), and some are incorrect.  Class plaintiffs compare the number of merchants who accept some payment products on a global basis to the number of merchants in the United States who accept other payment products.  Based on the documents on which class plaintiffs rely:

- According to Visa, "Visa check cards are welcomed at more than 24 million locations worldwide."  (VUSALITIIICID1-00161675 to 00161702, at 681.)  Class plaintiffs do not provide any evidence regarding MasterCard offline debit card acceptance.

- According to MasterCard, its online debit product, Maestro, "was accepted for purchases at more than 12.1 million merchant locations globally."  (MasterCard 2009

377

Annual Report,[274] at 12.)  Class plaintiffs do not provide any evidence regarding Visa online debit card acceptance.

- According to Visa, "[w]ith more than 1.4 million merchant locations, Interlink is one of the easiest ways to make those everyday purchases and get cash back in large cities and small towns across America." (http://usa.visa.com/personal/using_visa/interlink.html.)

- According to NYCE, "the NYCE brand is proudly displayed at over . . . two million retail locations throughout the country and in all US territories, including Puerto Rico."  (http://www.nyce.net/retailers/Brand/index.htm.)

- According to Star, "The STAR® Network gives your customers access at more than 2.2 million retail and ATM locations across the U.S." (https://www.firstdata.com/en_us/products/financial-institutions/debit-solutions.)

- The website to which class plaintiffs cite regarding merchant acceptance of ACCEL/Exchange does not contain evidence regarding merchant acceptance figures. (http://www.accelexchange.com/aboutUs.aspx.)

---

[274] Available at http://phx.corporate-ir.net/External.File?item=UGFyZW50SUQ9NTU3MzV8Q2hpbGRJRD0tMXxUeXBlPTM=&t=1) (last visited Nov. 1, 2010).

**Plaintiffs' Paragraph 104:**

**104    Some issuing banks impose surcharges on cardholders for processing debit transactions as PIN transactions instead of Offline transactions.**

*Defendants' Response to Paragraph 104:*

   Disputed.  Class plaintiffs do not rely on any admissible evidence in subparagraphs a & b in support of this assertion.

  a.  **Dr. Frankel writes, "a survey by the New York Public Interest Research Group found that 47 percent of 31 New York banks surveyed charged PIN debit card holders surcharges equal to $0.86, on average, per purchase, with some as high as $1.50."[586]**

---

[586] **Frankel Rep. at ¶ 439 (citing news report of 2003 study found at VUSAMDL1-03121135-37, at VUSAMDL1-03121136). (SUFEX466)**

*Defendants' Response to Paragraph 104a:*

   Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading. (Fed. R. Evid. 106.)      .

   Defendants object to the admissibility of Frankel Rep. ¶ 439.  This paragraph of Dr. Frankel's report cites a September 2, 2003 news article about a survey by the New York Public Interest Research Group.  Despite the fact that class plaintiffs attempt to introduce the article through Dr. Frankel, it is an out of court statement for which no exception to the hearsay rule has been established.  (Fed. R. Evid. 801, 802.)  In addition, the 2003 article relates to events outside the relevant time period applicable in this case, and is therefore inadmissible as irrelevant to any issue in support of class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)

  b.  **A September 2002 Visa document entitled "Debit Card Briefing" states, "Many Visa Check card Issuers are taking action to stem the tide of merchant conversion of offline transactions by employing incentives for offline transactions. Examples include disincentives such as fees for PIN use**

379

**and positive incentives such as rewards points for offline transactions. Except for the incentives offered among a small percentage of card portfolios, consumers have little reason today to care about the differences between offline and online transactions. Generally, consumers understand that in either case the purchase amount is deducted from their checking accounts, and very few demonstrate any preference as how it is done – if they are prompted by the merchant to use a PIN, many do so readily."[587]**

---

[587]    **VUSAMDL1-00103261, at VUSAMDL1-00103264. (SUFEX467)**

*Defendants' Response to Paragraph 104b:*

Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading.

(Fed. R. Evid. 106.)

Defendants object to the admissibility of VUSAMDL1-00103261 to 00103265, at 264, dated September 2002.  The document relates to events outside the relevant time period applicable in this case, and is therefore inadmissible as irrelevant to any issue in support of class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)

380

**Plaintiffs' Paragraph 105:**

**105     Visa persuaded several large Issuing Banks to remove PIN-Debit bugs from the back of consumers' bank cards.**

*Defendants' Response to Paragraph 105:*

Disputed.  Class plaintiffs do not provide any evidence in subparagraphs a-h that banks removed all non-Visa-affiliated PIN debit bugs from the back of consumers' bank cards.  Much of the evidence on which class plaintiffs rely does not discuss the removal of PIN debit bugs from the back of consumers' bank cards.  The remainder of the evidence suggests that several banks made business-minded decisions to include Visa-affiliated PIN debit bugs on the back of consumers' bank cards.

Visa competed with other PIN debit networks for exclusive PIN debit issuance as it preferred to increase its PIN debit output.  (*See* Pinkerd Dep. at 167-70 ("Q.  Okay.  Is -- when Visa goes out to pitch a brand agreement with a member bank, does it prefer to obtain exclusivity with respect to the PIN network processing?  . . . .  THE WITNESS:  I'm not sure what the actual language is on most of these -- not all of the agreements, but we prefer to process as many of the transactions as, you know, that the issuers are willing to process with us.  MR. HATCH:  Q.  But has it been part of Visa strategy to try to eliminate the multiple bugs  on the back of Visa Check Cards?  . . . .  THE WITNESS:  It has been our strategy to process as many of these transactions for our members as we possibly can. . . .  It's been our strategy to make Interlink and Plus, for that matter, the preferred processing option in all cases for our members, so to the extent that that -- that they choose to participate in the network exclusively, that's great and to the extent that we get half their business, that's half their business.  So -- but our intent and our strategy is always to get as much of their business as possible. . . .  We want to -- whether the issuer chooses to use us exclusively or not, that's -- that's their choice.  We would love to be

their exclusive provider and feel that we can do that, but it's -- that's their choice.").)  PIN debit

networks offered favorable benefits to banks if the bank used that network exclusively, or made

other promises to that network that foreclosed the bank's ability to use other networks freely.

(*See* Jenkins Dep. Ex. 34639[275] at WB0347617, 619, 622-25; Rhein Dep. Ex. 33357,[276] at

WFINT0000069097 to WFINT0000069099; Scharf Dep. Ex. 28046.[277])

> PIN debit networks other than Interlink also competed for preferred issuance

agreements.  NYCE's President testified that NYCE has between 250 and 500 such agreements.

(Rathgaber Dep. at 59-60.)

> As Benjamin Klein explained, preferred issuance arrangements are an

economically efficient way of competing for issuance, not evidence of market power.  (Klein

Rep. ¶ 214; *see also* Benjamin Klein, *Exclusive Dealing as Competition "On the Merits*," 12

Geo. Mason L. Rev. 119, 137-60 (2003).)

> Defendants dispute Paragraph 105 to the extent class plaintiffs' assertion means

that issuers have no PIN Debit bugs on the back of consumers' bank cards.

> **a.** **A Visa Debit strategy slide stated that: "Gap between PIN and offline Interchange debit encourages merchant steering away from Visa to regional network . . . .** ████████████████████████
> ████████████████████████████████
> ████████████████████████████████
> ████████████████████ ᵥᵥ[588]

---

[588]    **Sheedy Dep. Ex. 23964, at VUSAMDL1-0432793 (SUFEX205)**

[275]   Wachovia: "Network Review Update" (Feb. 24, 2003), bearing control numbers WB0347613 to 0347626.

[276]   ██████████ Partnership Extension Agreement Term Sheet, bearing control numbers WFINT0000069097 to 0000069106.

[277]   Email from D. Cohen to M. Huber attaching "Bank One: Debit & ATM Network Conversion Network Recommendation" (Jan. 6, 2003), bearing control numbers CHASE003636982 to 003637034.

*Defendants' Response to Paragraph 105a:*

      Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading. (Fed. R. Evid. 106.)  The document is a draft document and does not necessarily provide Visa's final opinion on the matter.  The document states, "Regional 'bugs' undermine IRF revenue (and banks have contractual obligations to maintain regional bugs." (Sheedy Dep. Ex. 23964, at VUSAMDL1-0432793.)

      Defendants object to the admissibility of Sheedy Dep. Ex. 23964, dated February 18, 2003 (Sheedy Dep. Ex. 23964, at VUSAMDL1-0432790).  The deposition exhibit relates to events prior to the relevant time period applicable in this case, and is therefore inadmissible as irrelevant to any issue in support of class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)

    **b.**    **In 1998, Visa entered into an agreement with** ▮▮▮▮▮▮▮▮▮**, in which** ▮▮▮



[589]

*Defendants' Response to Paragraph 105b:*

      Disputed.  Class plaintiffs mischaracterize the evidence on which they rely. According to the document on which class plaintiffs rely, Visa paid ▮▮▮▮▮▮▮ over ▮▮

      Defendants object to the admissibility of *In re Visa Check* Class Pls' Stmt. Undis. Facts Ex. 429, dated April 13, 1998.  The document relates to events prior to the relevant time

period applicable in this case, and is therefore inadmissible as irrelevant to any issue in support

of class plaintiffs' motion for summary judgment. (Fed. R. Evid. 401, 402.)

      **c.**     **In 2005, ▮▮▮▮ entered into an exclusive agreement with Visa "whereby it would remove every other bug from the back of the card."[590]**

[590] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*Defendants' Response to Paragraph 105c:*

      Disputed. Class plaintiffs mischaracterize the evidence on which they rely. ▮▮▮

▮▮▮testified:

> [Q.] Why did – why did ▮▮▮ decide in 2005 to do an exclusive deal with Visa where over time, excluding the MasterCard▮▮▮▮▮▮program, it would remove every other bug from the back of the card?
>
> ▮▮▮▮▮▮▮▮ Objection to the form.
>
> A. So ▮▮▮ went through a request for proposal and a bid process with multiple networks. And through that RFP process and presentation and bid process and analysis process, you know, made a business decision to, you know, go into this agreement with Visa.

(▮▮▮ Dep. at 124.) ▮▮▮▮▮ further testified that at the time of her deposition in 2008, ▮▮▮

was still processing cards over the Star PIN debit network. (*Id.* at 53-54.)

      **d.**     **"Q. As a result of that agreement, does ▮▮▮ issue any debit cards that carry a bug on the back? You know what I mean by a bug? A. Yes, I do. Q. That have a bug -- that has a bug on the back that is anything other than Interlink? A. All the Visa cards have the Interlink bug on the back and no other network bugs on the back, except for Plus. Q. All right. Which is also a Visa brand? A. Yes, it is. Yes. Yes. Yes."[591]**

[591] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*Defendants' Response to Paragraph 105d:*

      Undisputed. Defendants note that ▮▮▮▮▮▮ testimony only relates to ▮▮▮▮

issued debit cards that have a Visa signature debit bug on the front.

> e.  **The Executive Summary from Visa's board of directors meeting on June 5, 2001 states, "Visa will work with Members to secure Interlink as their primary PIN point-of-sale debit brand by adding Interlink, where appropriate, to Visa check cards to gain online PIN point-of-sale capability, cash back functionality, and a better debit business model than their regional programs currently afford them."[592]**

---
[592]    Pinkerd 30(b)(6) Dep. Ex. 25855, at VUSAMDL1-03850086. (SUFEX150)

*Defendants' Response to Paragraph 105e:*

> Undisputed.

> Defendants object to the admissibility of Pinkerd 30(b)(6) Dep. Ex. 25855, at VUSAMDL1-03850086, dated June 5, 2001.  The deposition exhibit relates to events prior to the relevant time period applicable in this case, and is therefore inadmissible as irrelevant to any issue in support of class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)

> f.  **Stacey Pinkerd of Visa testified that, "It's been [Visa's] strategy to make Interlink and Plus, for that matter, the preferred processing option in all cases for our members . . . ."[593]**

---
[593]    Pinkerd Dep. 168:19-169:08, Aug. 19, 2008. (SUFEX006)

*Defendants' Response to Paragraph 105f:*

> Undisputed.  Defendants note that Mr. Pinkerd's testimony docs not discuss removing bugs from payment cards.

> g.  **In a September 11, 2002 presentation titled " 'Marks on the Card' Business Strategy Discussion," Wells Fargo stated that "if all online POS volume moved to Visa's Interlink network, (highest rate), the annual revenue opportunity is ▮▮▮▮▮▮ " further noting under "Customer Impact" that "Cards would have to be reissued . . .▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"[594]**

---
[594]    WFINT0000375373, at WFINT0000375377. (SUFEX468)

*Defendants' Response to Paragraph 105g:*

      Undisputed.

      Defendants object to the admissibility of WFINT0000375373 to 0000375381, at

377, dated September 11, 2002.  The document relates to events prior to the relevant time period

applicable in this case, and is therefore inadmissible as irrelevant to any issue in support of class

plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)

      Defendants note that the evidence on which class plaintiffs rely does not discuss

removing bugs from payment cards.

      **h.**    **A Visa Marketing Services Project Brief dated June 6, 1997, states, "One of the goals of the mainstreaming debit initiative is to issue Visa Check Cards and Interlink cards without the regional marks  . . . . Thus in the long run at which point we can offer Members product functionality as good as and better than the regional networks, we will be able to influence Members to remove all regional marks from their plastics."[595] Robert Baker, Visa's former Senior VP of Deposit & Cash Products, testified in his deposition that Visa encouraged "several of the larger issuers" to "drop the regional marks from their off-line debit point-of-sale check card and put Interlink on the card, and use Plus" as their ATM mark. In Visa's presentations to issuing banks, it emphasized the profitability differences between issuing debit cards with and without regional bugs.[596]**

---

[595]   *Wal-Mart* SUF Ex. 372, at '874. (SUFEX469)

[596]   *Wal-Mart* SUF Ex. 330, at 67-68, 103-104, 136-37. (SUFEX470)

*Defendants' Response to Paragraph 105h:*

      Undisputed.

      Defendants object to the admissibility of *Wal-Mart* SUF Ex. 372, dated June 6,

1997, and *Wal-Mart* SUF Ex. 330, dated February 9, 2000.  This evidence relates to events prior

to the relevant time period applicable in this case, and is therefore inadmissible as irrelevant to

any issue in support of class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)

<u>**Plaintiffs' Paragraph 106:**</u>

**106    Defendants' Rules leave merchants with little-to-no ability to shift transaction volume between Visa and MasterCard or to other forms of payment.**

*Defendants' Response to Paragraph 106:*

>          Disputed.  The evidence on which class plaintiffs rely in subparagraphs a-e states that merchants are not willing to steer customers to other forms of payment, and does not support class plaintiffs' assertion that merchants are unable to do so.  Additionally, much of this evidence is inadmissible.  Evidence cited by class plaintiffs in Paragraphs 115h and 115j states that merchants have the ability to steer consumers to desired forms of payment, and have been successful in their efforts.  (*See* Paragraphs 115h, 115j.)

>          The discovery record also demonstrates that merchants have the ability to shift transaction volume between Visa and MasterCard, or to other forms of payment.  Mr. Schumann of Traditions testified that Traditions has discouraged payment by Visa or MasterCard cards because "credit card fees are a big overhead item for us" and Traditions wanted to "steer people to different forms of payment."  (Schumann Dep. at 123-25; Schumann Dep. Ex. 10007,[278] at 7-8.)

>          Plaintiffs' representatives testified that they steered their customers to make PIN-debit payments rather than Visa or MasterCard signature or off-line debit payments.  (Coward Dep. at 58 ("Q. Well – okay.  And so when you say if the card swiped is PIN or signature debit, Publix will prompt to enter a PIN; meaning that by doing that, Publix tries to steer customers towards using the card as a PIN debit card instead of as a signature debit card?  A.  Yes.");

---

[278] Traditions Ltd.'s Objections and Answers to Defendant Visa U.S.A. Inc.'s First Set of Interrogatories to Each of the Putative Class Plaintiffs (Jun. 2006).

Coglianese Dep. at 213-17, Coglianese Dep. Ex. 41121,[279] at WLGVMCED00009372

(Walgreens was converting 60 to 70 percent of possible debit customers to PIN-debit rather than

Visa or MasterCard signature debit); Coglianese Dep. Ex. 41120,[280] at WLGVMC 098351

(Walgreens' Spin the Bin program was used to steer Visa signature debit card payments to PIN

debit payments); Cox Dep. at 75-76, Cox Dep. Ex. 15652,[281] at ALBEDVMC00149437

(Albertson's steered signature debit transactions to PIN based debit); Koudsi Dep. at 223-24

(SuperValu prompted customers to enter a PIN to make a PIN debit rather than signature debit

payment on larger transactions); Zentner Dep.[282] at 189 (Payless steered customers to PIN debit

transactions by prompting for PIN).)

   Visa has recognized that merchant steering has been aggressive.  For example,

█████ ensures "that there is a PIN pad at every checkout, so there's no place that a consumer

might pay, at least in their face-to-face store, for which PIN is not an option, [and] they also have

trained their cashiers . . . to be prompting people to pay with debit cards and with PIN debit in

particular." (Steele Dep. at 522.) ███████████████████████████

████████████████████████████████████████

█████ (Rathgaber Dep. Ex. 43658, at NYCE-MDL1720-01267.)

   The *Visa Check* settlements explicitly state that Visa and MasterCard will not

enact any rules in the United States that prohibit merchants from encouraging or steering Visa or

---

[279] Email between R. Hans, D. Bernauer, S. Schuler, and M. Quane (Aug. 18, 2003), bearing control numbers WLGVMCED00009372 to 00009375.

[280] Email between M. Quane, R. Polark, and R. Hans (Dec. 27, 2002), bearing control numbers WLGVMC 098351 to 098352.

[281] Email between M. Koci, L. Cox, and G. Morton (May 29, 2002), bearing control number ALBEDVMC00149437.

[282] Deposition of Arlen R. Zentner (Jul. 23, 2008) ("Zentner Dep."). Mr. Zentner testified as the manager of treasury operations for plaintiff Payless ShoeSource, Inc. (Zentner Dep. at 11.)

MasterCard POS debit cardholders to use other forms of payment or that prohibit merchants

from providing a discount to consumers who pay by any other form of payment.  (Visa

Settlement Agreement ¶ 9; MasterCard Settlement Agreement ¶ 9.)

> **a.**     **An internal memorandum drafted by Visa's Interchange Strategy Team in February 2003 observed, "Experience suggests that existing merchants are unable (or unwilling to shift share significantly) . . . ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ "[597]  Similarly, a presentation drafted by the same team in March 2003 states, "Learnings . . . Merchants unable or unwilling to move share"[598] and "More established merchants unable (or unwilling to shift share significantly)."[599]**

---

[597]     Sheedy Dep. Ex. 34811, at VUSAMDL1-00432792. (SUFEX205)

[598]     Sheedy Dep. Ex. 34812,  at VUSAMDL1-08524774). (SUFEX339)

[599]     *Id.* at VUSAMDL1-08524777 (SUFEX339)

*Defendants' Response to Paragraph 106a:*

> Undisputed.

> Defendants object to the two documents on which class plaintiffs rely, Sheedy

Dep. Ex. 34811, dated February 18, 2003, and Sheedy Dep. Ex. 34812, dated March 14, 2003.

These documents relate to events prior to the relevant time period applicable in this case, and are

therefore inadmissible as irrelevant to any issue in support of class plaintiffs' motion for

summary judgment.  (Fed. R. Evid. 401, 402.)

> **b.**     **In a September 13, 2002 email discussing "Preferential Acceptance," Visa's Bill Sheedy stated, "merchants have not shown much appetite to influence consumers' choice of payment and I'm not sure if I've seen anything that has changed this . . . ."[600]**

---

[600]     Sheedy Dep. Ex. 34814, at VUSAMDL1-06236078). (SUFEX351)

*Defendants' Response to Paragraph 106b:*

Disputed. Evidence on which class plaintiffs rely is incomplete and misleading.

(Fed. R. Evid. 106.)

Defendants note that the fact that merchants have not shown much "appetite" to influence consumers' choice of payment suggests that merchants have the ability to steer consumers to other payment forms, but have chosen not to.

    **c.**    **A MasterCard Executive Management document of April 2004 states that there is "limited opportunity" to "incent share shift at merchants" because "merchants have aversion to showing payment brand preference at POS."[601]**

_____

[601]    **MCI_MDL02_11615530, at 541. (SUFEX471)**

*Defendants' Response to Paragraph 106c:*

Undisputed.

Defendants note that the fact that merchants have an aversion to showing payment brand preference suggests that merchants have the ability to steer consumers to other payment forms, but have chosen not to.

    **d.**    **A Visa document discussing "key insights" for credit cards acknowledges that "[m]erchants [are] unable (or willing to shift share significantly)," because they are "[u]nwilling to risk alienating a customer and lose a sale for small transaction cost benefit" and merchants "[h]ave limited understanding of customer's options and preferences."[602]**

_____

[602]    **VUSAMDL02_00046655, at 55. (SUFEX472)**

*Defendants' Response to Paragraph 106d:*

Undisputed.

Defendants object to the admissibility of VUSAMDL02_00046655 to 00046662, which was created prior to the end of 2003. (VUSAMDL02_00046655 to 00046662, at 656

("Gap between Visa & MasterCard interchange becomes an issue when Visa partnerships come up for renewal at end of 2003").)  The document relates to events prior to to relevant time period applicable in this case, and is therefore inadmissible as irrelevant to any issue in support of class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)

Defendants note that the fact of merchants not being able to shift share significantly because they are unwilling to risk alienating customers suggests that merchants have the ability to steer consumers to other payment forms, but have chosen not to.

    **e.**    **Another MasterCard Executive Management document from May 2004 sharing merchant feedback reiterated that most merchants were "unwilling to aggressively push the MasterCard brand", making them unlikely to shift share.[603]**

---

[603]    **MCI_MDL02_10115432, at 5448. (SUFEX473)**

*Defendants' Response to Paragraph 106e:*

Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading. (Fed. R. Evid. 106.)

Defendants object to the admissibility of MCI_MDL02_10115432 to 10115467, at 5448.  The document relays "merchant feedback" regarding shifting MasterCard's share at the merchants, and is an out of court statement for which no exception to the hearsay rule has been established.  (Fed. R. Evid. 801, 802.)

Defendants note that the fact that merchants have the ability to aggressively push the MasterCard brand suggests that merchants have the ability to steer consumers to other payment forms, but have chosen not to.

**Plaintiffs' Paragraph 107:**

**107      Following are the market shares of Visa, MasterCard, American Express, and Discover by General-Purpose-Credit-Card transaction volume from 2006 to 2009:**[604]

---

[604]      *Nilson Reports* Nos. 889 (SUFEX474) (Oct. 2007), 902  (SUFEX475) (May 2008), 924  (SUFEX476) (Apr. 2009), 947  (SUFEX477) (Apr. 2010).

| General Purpose Credit | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|
| Visa | 42.5% | 42.2% | 42.4% | 43.4% |
| MasterCard | 29.1% | 28.7% | 28.2% | 27.1% |
| American Express | 23.0% | 23.7% | 24.0% | 23.8% |
| Discover | 5.5% | 5.3% | 5.5% | 5.7% |

*Defendants' Response to Paragraph 107:*

Undisputed.

.

392

### Plaintiffs' Paragraph 108:

**108      Following are the market shares of Visa and MasterCard by signature-debit-card transaction volume from 2006 to 2009:[605]**

---

[605]      *Nilson Reports* Nos. 889 (SUFEX474) (Oct. 2007), 902  (SUFEX475) (May 2008), 924  (SUFEX476) (Apr. 2009), 947  (SUFEX477) (Apr. 2010).  All years except 2006 represent Signature and PIN debit combined.  2006 represents Signature debit only.

| Debit | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|
| Visa | 75.8% | 73.8% | 72.6% | 73.0% |
| MasterCard | 24.2% | 26.2% | 27.4% | 27.0% |

*Defendants' Response to Paragraph 108:*

Undisputed.

393

## Plaintiffs' Paragraph 109:

**109   The market shares (by volume) in the market for PIN-debit-card network services are as follows:**

### Top POS Debit Systems[606]

| System | 2005 | 2006 |
|--------|------|------|
| Interlink | 35.9% | 39.3% |
| Star | 34.1% | 32.1% |
| NYCE | 11.6% | 11.5% |
| Pulse Pay | 6.5% | 6.3% |
| Accel | 2.1% | 2.0% |

---

[606]   ***Nilson Reports* No. 879 (SUFEX478) (May 2007). May 2007 was the last published report of PIN-debit market shares in Nilson Reports.**

*Defendants' Response to Paragraph 109:*

Undisputed.

**Plaintiffs' Paragraph 110:**

110    Following are issuers' market shares in the markets for issuance of credit cards, signature debit cards, and PIN-debit cards.

a.    Top 5 Issuers of General Purpose Credit Cards[607]

| Issuing Bank | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|
| JPMorgan Chase[608] | 23.3% | 23.5% | 23.4% | 24.9% | 25.3% |
| Bank of America | 20.4% | 20.0% | 19.0% | 18.3% | 17.8% |
| Citigroup | 17.2% | 17.1% | 16.4% | 15.6% | 15.1% |
| Capital One | 7.9% | 8.2% | 7.8% | 6.4% | 7.5% |
| U.S. Bank | 4.9% | 4.8% | 4.8% | 4.9% | 5.5% |

[607]    *Nilson Reports* Nos. 872-74 (Jan. to Feb. 2007) (SUFEX479) (SUFEX480) (SUFEX482), 895-97 (Jan. to Feb. 2008) (SUFEX481) (SUFEX482) (SUFEX483), 902 (May 2008) (SUFEX475), 918-20 (Jan. to Feb. 2009) (SUFEX484) (SUFEX485) (SUFEX486), 924 (Apr. 2009) (SUFEX476), 942 (Feb. 2010). (SUFEX487)

[608]    In 2008, JPMorgan Chase acquired Washington Mutual. Market share for 2008-09 represent the combined share of the merged companies.

*Defendants' Response to Paragraph 110a:*

Undisputed.

b.    Market Share of Top 5 Issuers of Signature Debit-Cards[609]

| Issuing Bank | 2007 | 2008 | 2009 |
|---|---|---|---|
| Bank of America | 14.1% | 18.4% | 17.7% |
| Wells Fargo | 7.2% | 14.4% | 14.3% |
| JPMorgan Chase | 4.9% | 11.6% | 12.2% |
| U.S. Bank | 3.1% | 3.5% | 3.4% |
| PNC Bank | 0.8% | 3.0% | 3.0% |

[609]    *Nilson Reports* Nos. 900 (SUFEX488), 918 (SUFEX484), 923 (SUFEX489), 942 (SUFEX487), 947 (SUFEX477). From 2008, JPMorgan Chase acquired Washington Mutual, Wells Fargo acquired Wachovia, and PNC Bank acquired National City. Market share for 2008-09 represent the combined share of the merged companies.

*Defendants' Response to Paragraph 110b:*

Undisputed.

c.     **Market Share Top 5 Issuers of PIN Debit**[610]

| Issuing Bank | 2008 | 2009 |
|---|---|---|
| Bank of America | 22.8% | 23.0% |
| Wells Fargo | 16.2% | 16.4% |
| JPMorgan Chase | 12.9% | 11.5% |
| PNC Bank | 2.2% | 2.9% |
| U.S. Bank | 2.2% | 2.3% |

---

[610]     *Nilson Reports* Nos. 918 (Nov. 2008) (SUFEX484), 923 (April 2009) (SUFEX489), 942 (Feb. 2010) (SUFEX487), 947 (SUFEX477)(March 2010). From 2008, JPMorgan Chase acquired Washington Mutual, Wells Fargo acquired Wachovia, and PNC Bank acquired National City. Market share for 2008-09 represent the combined share of merged companies.

*Defendants' Response to Paragraph 110c:*

Undisputed.

<u>Plaintiffs' Paragraph 111:</u>

**111    The top 5 Acquirers account for 60 % of all Visa and MasterCard credit-card and debit-card transactions in the United States.**

**Market Share of Top 5 Acquirers[611]**

| Acquirer | 2006 | 2007 | 2008 | 2009 |
|----------|------|------|------|------|
| BofA Merchant Serv. | 14.8% | 11.9% | 11.2% | 18.7% |
| First Data | 16.5% | 15.1% | 16.9% | 15.9% |
| Chase Paymentech | 29.5% | 25.5% | 22.5% | 12.0% |
| Elavon (Nova) | 8.2% | 7.3% | 7.2% | 7.0% |
| Fifth Third Processing Serv. | 6.9% | 6.6% | 6.5% | 6.5% |

---

[611]    **Nilson Reports Nos. 947 (SUFEX477) (March 2010), 942 (SUFEX487)(Feb. 2010), 922 (SUFEX490)(March 2009) and 899 (SUFEX491)(March 2008). Market share calculated as percentage of Visa and MasterCard credit and signature debit purchase volume. In Nov. 2008, Chase Paymentech separated from its joint venture with First Data. Bank of America and First Data began a joint venture in June 2009.**

*Defendants' Response to Paragraph 111:*

        Disputed. Evidence on which class plaintiffs rely is incomplete and misleading.

(Fed. R. Evid. 106.) The evidence presented above relates to credit and signature debit

transactions only, not PIN debit transactions.

<u>Plaintiffs' Paragraph 112:</u>

**112    Significant barriers to entry exist in the markets for Credit-Card Network Services, Offline-Debit-Card Network Services, and PIN-Debit-Card Network Services.**

*Defendants' Response to Paragraph 112:*

Disputed. Barriers to entry are a legal concept, and Paragraph 112 does not set forth a statement of fact, but asserts a conclusion of law, and is therefore improper.

Defendants dispute that there are separate markets for Credit Card Network Services, Offline Debit Card Network Services, and PIN Debit Card Network Services. Class plaintiffs undermine such a distinction by referring to a "Network market" and "Payment-Card market" in Paragraphs 112h and 112i, respectively. (*See* Paragraphs 112h, 112i.)

There have been recent examples of the successful introduction of new payment networks. Ebay Inc. owns two successful payment networks, PayPal and Bill Me Later. PayPal is a payment network that "enables individuals and businesses to securely, easily and quickly send and receive payments online in approximately 190 markets worldwide." (2010 eBay 10-K,283 at 6.). Many merchants, including plaintiffs Rite-Aid, Walgreen's, Capital Audio, NRA, and NATSO, accept PayPal as a form of payment. (Rite-Aid Website;[284] Dorsey Dep.[285] at 31; CAPAUDIO005056 to 005063,[286] at 62; NRA011153 to 011181,[287] at 79-80; NATSO Interr.

---

[283]   Form 10-K of eBay Inc. (filed Jan. 28, 2011) ("2010 eBay 10-K"), available at http://investor.ebayinc.com/secfiling.cfm?filingID=1065088-11-3 (last visited Apr. 15, 2011).

[284]   https://www.riteaidonlinestore.com/account/default.asp?catid=52341&state= state_checkout&ditac=10762 (last visited May 3, 2011) ("Rite-Aid Website").

[285]   Deposition of Sally Dorsey (Sept. 8, 2006) ("Dorsey Dep."). Pursuant to Fed. R. Civ. P. 30(b)(6), Ms. Dorsey, was designated to testify on behalf of Walgreen's. (Dorsey Dep. at 6-7.)

[286]   Example of Capital Audio bank account statement (Mar. 2008).

[287]   Example of Payment Processing Invoice from Paypal to NRA (Apr. 30, 2007).

Resp.,[288] at 11.)  Bill Me Later, which was acquired by eBay in November 2008, enables U.S. merchants to offer, and U.S. consumers to obtain, credit at the point of sale.  (2010 eBay 10-K, at 6.)  In 2010, Ebay's payments segment, comprised PayPal and Bill Me Later (*id.* at 45), provided net revenue of $3,435,647,000, an increase of 23% from 2009.  (*Id.* at 47.)

> Further, as defendants' expert Professor Kenneth Elzinga explained, in addition to entry by new competitors, market power analysis must also consider supply response or expansion on the part of existing competitors, which is a relevant factor in this matter.  (Elzinga Rep. at 116-20.)  "If a firm's rivals have substantial excess production capacity, even a dominant firm might be unable to maintain high prices. . . because any attempt by the firm in question to curtail its output level (in order to raise prices above the competitive level) would invite rivals to expand their output promptly in order to take advantage of the higher prices."  (*Id.* at 117.)

a.  **According to Visa expert, Dr. Benjamin Klein "I would say that entry into the general purpose credit card market is something that – de novo entry is something that would be very costly and given that the market is highly competitive would be a very difficult proposition.  So, I mean, I think entry is something that's costly, difficult, will take – would take a lot of time, and success would be uncertain because of the market conditions."[612]**

---
[612]   **Klein Dep. 600:24-601:06, Mar. 24, 2010. (SUFEX188)**

*Defendants' Response to Paragraph 112a:*

> Undisputed.

b.  **According to Victor Dahir of Visa, it would be "difficult" for a someone to start a new payment card network in the United States,[613] and that "building a global brand and acceptance network would cost between ▮▮▮▮▮▮ ▮▮▮▮▮▮[614]**

---
[288]   NATSO's Objections and Answers to Second Set of Interrogatories to Each of the Putative Class Plaintiffs (Jun. 1, 2008) ("NATSO Interr. Resp.").

[613]    **Dahir Dep. 209:17-23, Oct. 22, 2008. (SUFEX492)**

[614]    *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 342 (S.D.N.Y. 2001) (Bamberger Decl.) (SUFEX493)

*Defendants' Response to Paragraph 112b:*

        Undisputed.

      c.    **A Visa USA 2001 Corporate Strategy presentation provided that "[i]t is questionable, based upon historical experience, whether there is room for more than a handful of strong, differentiated general purpose payment card brands – high fixed costs, need for scale economies, hard to differentiate, merchant/consumer demand for ubiquity. It is likely, though not certain, that strong payment system brands will retain significant advantages, such as scale economies inherent in building a global brand . . . ."[615]**

[615]    **Dahir Ex. 27417, at VUSAMDL2-00031877. (SUFEX494)**

*Defendants' Response to Paragraph 112c:*

        Undisputed.

        .    Defendants object to the admissibility of Dahir Ex. 27417, dated June 18, 2001. The presentation relates to events prior to relevant time period applicable in this case, and is therefore inadmissible as irrelevant to any issue in support of class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)

      d.    **Visa's former CEO, John Coghlan, estimated that it would cost a new entrant ██████ to establish a competitive payment-card network.[616]**

[616]    **Coghlan Dep. 160:14-161:23, Dec. 16, 2008. (SUFEX141)**

*Defendants' Response to Paragraph 112d:*

        Undisputed.

      e.    **A former CEO for Visa, Joseph Saunders, testified that "it would be very difficult" for a bank to establish its own card network in the United States today.[617]**

[617]     Saunders Dep. 231:09 (SUFEX085)

_Defendants' Response to Paragraph 112e:_

        Disputed.  Mr. Saunders is the current CEO of Visa.  (Saunders Dep. at 12.)

        Defendants object to the admissibility of Saunders Dep. at 231.  As noted in the

objection on the record, Mr. Saunders' testimony is speculative and class plaintiffs have not

provided any foundation for which he is qualified to provide testimony regarding a bank's ability

to establish its own card network in the United States.  (Fed. R. Evid. 602.)

      f.    **MasterCard CEO Bob Selander testified in prior litigation that "building a global acceptance network takes time and takes money. So to create a network such as the one that MasterCard has created over the last four [sic forty] years is very expensive, takes a lot of time."[618]**

[618]     Selander Dep. 120:8-16, Mar. 14, 2007 (Velluro Rep.) (SUFEX495)

_Defendants' Response to Paragraph 112f:_

        Undisputed.

        Defendants object to the admissibility of the cited deposition of Bob Selander.

Mr. Selander's testimony from a prior litigation is an out of court statement for which no

exception to the hearsay rule has been established.  (Fed. R. Evid. 801, 802.)

      g.    **Large Issuing Banks that have considered entering the Network market have concluded that entry would not be feasible.**



        •  **Richard Srednicki, former CEO of Chase Card Services, testified that** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[619]

        •  **Another Chase witness testified:** ▮▮▮▮▮▮▮▮▮



- **Bank of America** ████████████████████████
  █████████████[621]

- **M.V. Rajamannar of Citigroup testified that there were** ██████████

.

---

[619]    Srednicki Dep. 277-78, 280. (SUFEX094)

[620]    Fischer Dep. 92-93. (SUFEX099)

[621]    Hammonds Dep. 142-143. (SUFEX496)

[622]    Rajamannar Dep. 113:22-114:2, Oct. 21, 2008. (SUFEX497)


*Defendants' Response to Paragraph 112g:*

Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading.

(Fed. R. Evid. 106.).  Mr. Rajamannar's testimony, on which class plaintiffs rely, was in

response to the the question, "███████████████████████████████████████████"

(Rajamannar Dep.[289] at 113-14.)  Mr. Rajamannar further testified ███████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████  (Rajamannar Dep. at 114.)

### h. Recent attempts to enter the Network market have not been successful.

- **Debitman Card, Inc. (n/k/a Tempo),** ███████████████████████
  ████████████████████████████████████ [623]

- **In his deposition, Tempo's CEO, Michael Grossman, testified** ██
  ██████████████████████████████████████████████
  ███████████████████████████████████████████
  ████████████████████████████████████
  ██████████████████████████████████████████
  ██████████ 624]

- ████████████████████████████████████████████
  ███████████████████████ [625]

- **Entrepreneur Joseph Randazza** ████████████████████████
  ██████████████████████████████████████████████
  █████████████████████████████████████████████
  ████████████████████████ [626]

- **In 2007, Revolution Money was launched by Steve Case, the co-founder of AOL, to provide an internet-based payment-card platform, in which users receive cards with no identifying information and initiate transactions using a PIN.**[627]  **Revolution Money was acquired by American Express in January 2010 and advertises only 650,000 merchant locations.**[628]

---

[623]   Grossman Dep. 84:9-87:13. (SUFEX498)

[624]   Grossman Dep. 322:25-323:17. (SUFEX498)

[625]   Grossman Dep. 84-87, 264-67. (SUFEX498)

---

[289]   Deposition of M.V. Rajamannar (Oct. 21, 2008) ("Rajamannar Dep.").  Mr. Rajamannar testified as the chief marketing officer for credit cards for Citigroup.  (Rajamannar Dep. at 44.)

[626]    Randazza Dep. 10-11, 171. (SUFEX499)

[627]    Press Release, American Express Co., *American Express to Acquire Revolution Money to Develop Next Generation Payment Products* (Nov. 18, 2009).

[628]    Press Release, American Express Co., *American Express Completes Acquisition of Revolution Money* (Jan. 15, 2010); Alan S. Frankel Rep. ¶ 136 (citing Press Release, *Revolution Money, Revolution Money Secures $42 Million in Series C Funding from Goldman Sachs Affiliate and Existing Investors.*" (Apr. 6, 2009).

*Defendants' Response to Paragraph 112h:*

Disputed.  Class plaintiffs use of the term "successful" is vague and ambiguous, and their characterizations of the evidence on which they rely are misleading.  Class plaintiffs have not offered a definition for the "Network market."

There are recent examples of successful payment networks.  Discover introduced a signature debit product in 2006.  (Press Release, Discover Financial Services, Discover Financial Services Breaks into Signature Debit Market with Introductions of Discover Debit (Feb. 13, 2006).)  That entry was successful given that signature consumer and business debit cards are available from both Discover Bank and various third-party bank issuers.  (*See, e.g.,* Discover Website;[290] Central National Bank Website[291] ("Central National Bank offers a Visa® or Discover® debit card with all of its checking accounts"); Brenham National Bank Website[292] ("Discover Business Debit Cards are available for Customers of Brenham National Bank"); Andarko Bank Website[293] ("The Anadarko Bank and Trust Co. Anytime Discover Debit Card is a convenient alternative to paper checks.").)

---

[290]  Available at http://www.discoverbank.com/ATM.html (last visited Apr. 4, 2011) ("Discover Website").

[291]  Available at http://cnb-ok.com/consumer/anytime-check-card/ (last visited Apr. 4, 2011) ("Central National Bank Website").

[292]  Available at http://www.bnbank.com/go/other-services/debit-cards/business-debit-card/business-debit-card (last visited Apr. 4, 2011) ("Brenham National Bank Website").

[293]  Available at http://abandt.biz/personal_anytimecard.html (last visited Apr. 4, 2011) "(Andarko Bank Website").

eBay Inc. owns two successful payment networks, PayPal and Bill Me Later. PayPal is a payment network that "enables individuals and businesses to securely, easily and quickly send and receive payments online in approximately 190 markets worldwide." (2010 eBay 10-K, at 6.) Many merchants, including plaintiffs Rite-Aid, Walgreen's, Capital Audio, NRA, and NATSO, accept PayPal as a form of payment. (Rite-Aid Website; Dorsey Dep., at 31; CAPAUDIO005056 to 005063,[294] at 62; NRA011153 to 011181[295], at 79-80; NATSO Interr. Resp.,[296] at 11.) Bill Me Later, which was acquired by eBay in November 2008, enables U.S. merchants to offer, and U.S. consumers to obtain, credit at the point of sale. (2010 eBay 10-K, at 6.) In 2010, eBay's payments segment, comprised PayPal and Bill Me Later (2010 eBay 10-K, at 45), provided net revenue of $3,435,647,000, an increase of 23% from 2009. (*Id.* at 47.)

Other successful new networks include Google Checkout and Amazon Payments. (2010 Google 10-K,[297] at 5; Google Checkout Website;[298] Amazon Payments Website.[299])

Revolution Money introduced a PIN-debit payment card product that operated successfully to gain acceptance and was ultimately purchased by American Express. ("American Express to Buy Revolution Money," *New York Times Deal Book*[300], (reporting that American Express was acquiring Revolution Money for $300 million); Elzinga Rep. 123.) According to

---

[294] Example of Capital Audio bank account statement (Mar. 2008).

[295] Example of Payment Processing Invoice from Paypal to NRA (Apr. 30, 2007).

[296] NATSO's Objections and Answers to Second Set of Interrogatories to Each of the Putative Class Plaintiffs (Jun. 1, 2008) ("NATSO Interr. Resp.").

[297] Form 10-K of Google Inc. (filed Feb. 11, 2011) ("2010 Google 10-K"), available at http://www.sec.gov/Archives/edgar/data/1288776/000119312511032930/d10k.htm (last visited May 1, 2011).

[298] Available at http://checkout.google.com/ (last visited Apr. 25, 2011).

[299] Available at https://payments.amazon.com/ (last visited Apr. 25, 2011).

[300] Available at http://dealbook.blogs.nytimes.com/2009/11/18/american-express-to-buy-revolution-money (last visited Apr. 27, 2011).

Dan Schulman, group president, enterprise growth at American Express, the Revolution Money

acquisition was the foundation for a new American Express payment product called Serve.

(Tampa Bay Business Journal, Revolution Money leads American Express to open platform

Serve.[301])

Defendants object to the admissibility of the two press releases on which class

plaintiffs rely regarding Revolution Money at footnotes 627 and 628.  These press releases are

out of court statements for which no exception to the hearsay rule has been established.  (Fed. R.

Evid. 801, 802.)

    i.    **Since the formation of the Visa and MasterCard joint ventures, the only successful entrant into the Payment-Card market was Discover.**

        •  **Discover is the only successful market entrant since the 1960s.[629]  It entered in 1995 and currently enjoys a 5% market share of General-Purpose-Card purchase volume (based on 2008 data).[630]**

---

[629]    **Ezlinga Rep. at 121. (SUFEX250)**

[630]    **Ezlinga Rep. at 121. (SUFEX250)**

*Defendants' Response to Paragraph 112i:*

Disputed.  Class plaintiffs do not offer a definition of the "Payment-Card market."

Class plaintiffs mischaracterize Prof. Elzinga's report.  Prof. Elzinga wrote in his report,

"Plaintiffs contend that, because of the alleged barriers to entry, the only successful market

entrant since the 1960s has been Discover." (Elzinga Rep. at 121.)  Defendants object to the

admissibility of Elzinga Rep. at 121 because it reflects an allegation in class plaintiffs' complaint,

---

[301]  Margie Manning, "Revolution Money leads American Express to open platform Serve," Tampa Bay Business Journal (Mar. 28, 2011), available at http://www.bizjournals.com/tampabay/blog/2011/03/revolution-money-leads-american.html (last visited Apr. 13, 2011).

which is an out of court statement for which no exception to the hearsay rule has been established. (Fed. R. Evid. 801, 802.)

Discover introduced a signature debit product in 2006. (Press Release, Discover Financial Services, Discover Financial Services Breaks into Signature Debit Market with Introductions of Discover Debit (Feb. 13, 2006).) Discover signature debit consumer and business debit cards are available from both Discover Bank and various third-party bank issuers. (*See, e.g.,* Discover Website; Central National Bank Website ("Central National Bank offers a Visa® or Discover® debit card with all of its checking accounts"); Brenham National Bank Website[302] ("Discover Business Debit Cards are available for Customers of Brenham National Bank"); Andarko Bank Website ("The Anadarko Bank and Trust Co. Anytime Discover Debit Card is a convenient alternative to paper checks.").)

Revolution Money introduced a PIN-debit payment card product that operated successfully to gain acceptance and was ultimately purchased by American Express. ("American Express to Buy Revolution Money," *New York Times Deal Book*[303], (reporting that American Express was acquiring Revolution Money for $300 million); Elzinga Rep. ¶ 123.) According to Dan Schulman, group president, enterprise growth at American Express, the Revolution Money acquisition was the foundation for a new American Express payment product called Serve.

---

[302]   Available at http://www.bnbank.com/go/other-services/debit-cards/business-debit-card/business-debit-card ("Brenham National Bank Website") (last visited Apr. 4, 2011).

[303]   Available at http://dealbook.blogs.nytimes.com/2009/11/18/american-express-to-buy-revolution-money (last visited Apr. 27, 2011).

(Tampa Bay Business Journal, Revolution Money leads American Express to open platform Serve.[304])

j.    **There has been no significant entry in the PIN-debit networks, only large consolidation in their ranks.**[631]

- **According to The Federal Reserve Bank of Kansas City study "The number of PIN debit networks declined from 23 in 2002 to 14 in 2006.**[632] "  **The study also included the following chart, entitled "Concentration of Online (PIN) Debit Transaction Volume":**[633]





**Chart 15:** *Concentration of Online (PIN) Debit Transaction Volume*

Notes: For data prior to 2002, transaction volume for individual networks includes in-network and gateway transactions. Market share calculations are based on total online (PIN) debit transactions as shown in Chart 10. Because a single transaction is possibly counted as an in-network transaction for one network and as a gateway transaction for other(s), market shares for a group of networks may be inflated and sometimes above 100 percent. The level of market share for a group of networks is probably less meaningful than the trend in market share.

For 2002 and after, transaction volume for individual networks includes in-network transactions. Market share calculations are based on the sum of in-network transactions for the complete list of individual networks.

Data are shown for 1990 and after. While data for calculations of market share are available for earlier years, we believe the results are not reliable.

Source: EFT Network Data Book (various years).

---

[631]    **Rep. at 72, July 2, 2009 (citing Fumiko Hayashi, Richard Sullivan and Stuart Weiner, "A Guide to the ATM and Debit Card Industry: 2006 Update," at pp. 10, 35  (SUFEX218) (available at http://www.kc.frb.org/PUBLICAT/PSR/BksJournArticles/ATMDebitUpdate.pdf) (last accessed Oct. 15, 2010).**

[632]    **Fumiko Hayashi, Richard Sullivan and Stuart Weiner, "A Guide to the ATM and Debit Card Industry: 2006 Update," at p. 10 (SUFEX218) (available at http://www.kc.frb.org/PUBLICAT/PSR/BksJournArticles/ATMDebitUpdate.pdf) (last accessed Oct. 15, 2010).**

[633]    **Fumiko Hayashi, Richard Sullivan and Stuart Weiner, "A Guide to the ATM and Debit Card Industry: 2006 Update," at p. 35 (SUFEX218) (available at http://www.kc.frb.org/PUBLICAT/PSR/BksJourn Articles/ATMDebitUpdate.pdf) (last accessed Oct. 15, 2010).**

---

304    Margie Manning, "Revolution Money leads American Express to open platform Serve," Tampa Bay Business Journal (Mar. 28, 2011), available at http://www.bizjournals.com/tampabay/blog/2011/03/revolution-money-leads-american.html (last visited Apr. 13, 2011).

*Defendants' Response to Paragraph 112j:*

      Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading. (Fed. R. Evid. 106.)  The Federal Reserve Bank of Kansas City study, on which class plaintiffs rely, states, "The number of PIN debit networks declined from 23 in 2002 to 14 in 2006.  While hardly a sure sign of stability, the number of networks, after declining each year from 1996 to 2004, was the same in 2004 and 2006."  (Kansas City Federal Reserve Study.[305])

      Defendants object to the admissibility of The Kansas City Federal Reserve with regards to its discussion of PIN debit networks prior to 2004.  Such evidence relates to events prior to the relevant time period applicable in this case, and is therefore inadmissible as irrelevant to any issue in support of class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)

---

[305]  Fumiko Hayashi, Richard Sullivan and Stuart Weiner, "A Guide to the ATM and Debit Card Industry: 2006 Update," at 10 (SUFEX218), available at http://www.kc.frb.org/PUBLICAT/PSR/BksJournArticles/ATMDebitUpdate.pdf.

### Plaintiffs' Paragraph 113:

**113     There has been no successful entry in the Offline–Debit-Card market since Visa and MasterCard created their Offline-Debit-Card products. Discover attempted to enter the market in 2006 but as of 2009 *Nilson Reports*, a leading industry trade publication, did not report Discover to have any market share in offline debit.[634]**

---

[634]     Press Release, Discover Financial Services, Discover Financial Services Breaks into Signature Debit Market with Introduction of Discover Debit (Feb. 13, 2006) (SUFEX500); *Nilson Reports* No. 942 (Feb. 2010). (SUFEX487)

*Defendants' Response to Paragraph 113:*

Disputed.  Class plaintiffs' characterization of the evidence on which they rely is incorrect.  The Nilson Report cited by class plaintiffs states, "Discover brand debit and prepaid cards numbers were low and are counted with credit figures."  (*Nilson Reports* No. 942 (Feb. 2010) at 6.)

Banks do issue Discover-branded offline debit cards.  (*See, e.g.,* Central National Bank Website ("Central National Bank offers a Visa® or Discover® debit card with all of its checking accounts"); Brenham National Bank Website ("Discover Business Debit Cards are available for Customers of Brenham National Bank"); Andarko Bank Website ("The Anadarko Bank and Trust Co. Anytime Discover Debit Card is a convenient alternative to paper checks.").)

Defendants object to the admissibility of the Discover press release on which they rely.  The press release is an out of court statement for which no exception to the hearsay rule has been established.  (Fed. R. Evid. 801, 802.)

<u>**Plaintiffs' Paragraph 114:**</u>

**114    Visa initially entered the PIN-debit market by acquiring Interlink. When Visa acquired Interlink it did not intend to promote it.**

*Defendants' Response to Paragraph 114:*

Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading. (Fed. R. Evid. 106.)

Defendants object to the admissibility of evidence regarding Visa's actions at the time it acquired Interlink.  Such evidence relates to events prior to the relevant time period applicable in this case, and is thus irrelevant to any issue in support of class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)

Evidence shows that Visa promoted Interlink throughout the time period applicable to class plaintiffs' motion for summary judgment.  The Visa presentation on which class plaintiffs rely in Paragraph 115k states that "[i]ssuer commitments to Interlink and geographic dispersion of issuance remain critical … Expediting migration from the current ▮ percent share of Interlink to the ▮ percent share threshold is key."  (*See* Paragraph 115k; Pinkerd 30(b)(6) Dep. Ex. 25869[306], at VUSAMDL1-01336619; *see also* Pinkerd Dep. at 141 (Visa  does  "a lot of work with merchants and with card issuers to promote [the Interlink] brand and that network. . . ."; *id.* at 92 ("We have certainly promoted  the Interlink network to – with the desire for members to prefer to process their transactions through that network over other competitive offerings."); Pinkerd Dep. Ex. 25875,[307] at VUSAMDL1-04944985, 988 (noting that

---

[306]  Email from W. Sheedy to C. Keeney and S. Pinkerd (Mar. 12, 2004) attaching "Visa: Interchange Fee Update," bearing control numbers VUSAMDL1-01336604 to 01336625.

[307]  Email from T. Steele to S. Pinkerd and J. Sachs ccing C. Jorgenson re: Interlink Network Strategy final.ppt (Apr. 5, 2005), attaching Interlink Network Strategy presentation, bearing document control numbers VUSAMDL1-04944974 to 04944988.

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

███████████████ ); Pinkerd Dep. Ex. 25880,[308] at VUSAMDL1-06745789 (Visa planned in 2007 to deepen issuers' relationsips in Interlink).)

      a.    **Handwritten notes by a Visa employee indicated that Visa "would like to see [signature debit] disappear. Much bigger than Amex."[635]**

---

[635]   *Wal-Mart* Plfs' Summary Judgment Ex. 456 at '450. (SUFEX501)

*Defendants' Response to Paragraph 114a:*

      Disputed.  Class plaintiffs offer no evidence in support of their assertion that the handwritten notes are by a Visa employee.

      Defendants object to the admissibility of *Wal-Mart* Plfs' Summary Judgment Ex. 456.  The document relates to events prior to the relevant time period applicable in this case, and is therefore inadmissible as irrelevant to any issue in support of class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)  In addition, class plaintiffs have not provided any evidence that the handwriting was authenticated.  (Fed. R. Evid. 901.)

      b.    **In a 1996 email, another employee described Visa's "current Deposit Access product strategy" as "call[ing] for limiting the deployment of pinpads in the U.S. Visa does not want to inadvertently take actions that may promote the use of regional POS networks."[636]**

---

[636]   *Wal-Mart* Plfs' Summary Judgment Ex. 460 at '488. (SUFEX502)

*Defendants' Response to Paragraph 114b:*

---

[308]   Visa Consumer Debit FY07 Priorities (Jul. 2006), bearing document control numbers VUSAMDL1-06745780 to 067458000.
.

Undisputed.

Defendants object to the admissibility of *Wal-Mart* Plfs' Summary Judgment Ex. 460, dated July 18, 1996. The email relates to events prior to the relevant time period applicable in this case, and is therefore inadmissible as irrelevant to any issue in support of class plaintiffs' motion for summary judgment. (Fed. R. Evid. 401, 402.)

Visa's decision to not take actions that inadvertently promote the use of regional POS networks does not mean that Visa was not promoting Interlink.

    **c.**    **Similarly, a Visa manager commented that he "thought we established early on that we only care about the 700,000 existing [on-line capable] POS merchants and we were not concerned about growing the business."[637]**

--------

[637]    *Wal-Mart* Plfs' Summary Judgment Ex. 463 at '463-64. (SUFEX503)

*Defendants' Response to Paragraph 114c:*

Disputed. Evidence on which class plaintiffs rely is incomplete and misleading. (Fed. R. Evid. 106.) The Visa manager stated, "I thought we established early on that we only care about the 700,000 existing [on-line capable] POS merchants and we were not concerned about growing the business. Must make an investment. Merchants reject ATM transactions, and route to credit." (*Wal-Mart* Plfs' Summary Judgment Ex. 463 at VA1487462 to 1487463.)

Defendants object to the admissibility of *Wal-Mart* Plfs' Summary Judgment Ex. 463, dated December 23, 1997. The document relates to events prior to the relevant time period applicable in this case, and is therefore inadmissible as irrelevant to any issue in support of class plaintiffs' motion for summary judgment. (Fed. R. Evid. 401, 402.)

    **d.**    **When Visa acquired Interlink it 1991, it had a 52% market share of signature-debit-card volume in the Untied States.[638] By 1999, its share fell to 9% of volume and only 3% of transactions.[639]**

413

---

[638]    *Wal-Mart* Plfs' Summary Judgment Ex. 259 (SUFEX568) (Nilson Reports Nos. 522, 525, 545, 549, 564, 569, 589, 591, 615, 617, 640, 641, 664, 665, 687, 689, 711, 712).

[639]    *Id.* (SUFEX568)

*Defendants' Response to Paragraph 114d:*

  Disputed. Evidence on which class plaintiffs rely is incomplete and misleading. (Fed. R. Evid. 106.)

  Defendants object to the admissibility of *Wal-Mart* Plfs' Summary Judgment Ex. 259 and the Nilson Reports on which class plaintiffs rely. The documents relate to events prior to the relevant time period applicable in this case, and are therefore inadmissible as irrelevant to any issue in support of class plaintiffs' motion for summary judgment. (Fed. R. Evid. 401, 402.)

414

### Plaintiffs' Paragraph 115:

**115     Visa successfully pursued a strategy of "converging" Interchange Fees for Offline Debit-Cards with Interchange Fees for PIN-Debit Cards.**

*Defendants' Response to Paragraph 115:*

    Disputed.  Defendants dispute class plaintiffs' definition of "Interchange Fee" as "a fee that Merchants pay to the Issuing Bank" because it is inaccurate, misleading, and unfairly prejudicial.  An interchange fee is compensation paid by the acquiring bank to the issuing bank via Visa or MasterCard for the transaction passing through interchange.  (*See* Paragraphs 64 & 69.)  Class plaintiffs have presented no evidence that merchants pay any fees to issuing banks.

    Increases in PIN debit interchange are the result of competition between debit networks.  (*See* Klein Rep. ¶¶ 204-35.) ███████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████         .

███████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

    An October 2004 Visa presentation recognized that "NYCE's July IRF adjustment appears to have been made in an effort to increase its Member value proposition

---

309  █████████████████████████████████████████████

███████████████████████

relative to Interlink and others." (Pinkerd Dep. Ex. 25796,[310] at VUSAMDL1-06230965.) The

presentation estimated the effective interchange rates by PIN debit network: Pulse ▇▇▇ NYCE

▇▇▇, Star ▇▇▇), and Interlink ▇▇▇. (*Id.*)

   Visa's signature debit and Interlink interchange rates are not equal.  For example,

beginning in October 2010, Visa's signature debit interchange rate for "CPS/Retail Debit—

Performance Threshold I," which requires a minimum of 52 million transactions totaling at least

$3.4 billion, has been 0.62% + $0.13. (Oct. 2010 Visa Interchange Rates.[311])  But, beginning in

October 2010, the Interlink interchange rate for "Eligible Retail Merchant—Performance

Threshold I," which requires a minimum of 88 million transactions totaling at least $4.0 billion,

has been 0.50% + $0.10, with a $0.60 cap. (Oct. 2010 Interlink Interchange Rates.[312])  The

volume thresholds for the two products are not the same. (Oct. 2010 Visa Interchange Rates; Oct.

2010 Interlink Interchange Rates.)

  a. **A June 1990 presentation by Arthur Andersen to Visa's Board of Directors**
    **concludes that "uncontained" growth of on-line debit would ultimately lead**
    **to the "demise" of off-line debit and would cause annual system-wide losses**
    **of ▇▇▇▇ resulting from lower credit card interchange fees.[640]**

---

[640] *Wal-Mart* Pls' Summary Judgment Ex. 299 (SUFEX504) at '611-12; *see also* Frankel Rep. at ¶ 442
(citing *Wal-Mart* Summary Judgment Ex. 299 at '611-12; *see also* Frankel Report at ¶ 442 (citing Plfs'
Summary Judgment Ex. 179 (SUFEX505) (*Wal-Mart case*) WALSJ0283-0283.0007, MD2314-0219-0224,
MCI-0711138-43, at MD2314-0223, MCI-0711142; Plfs' Summary Judgment Ex. 457 (SUFEX506) (Wal-Mart
case) WALSJ0568-WALSJ0568.0108, 0013839-0013945, at 0013876).

*Defendants' Response to Paragraph 115a:*

---

[310] Email from T. Steele to W. Sheedy, C. Jorgensen, P. Moran, S. Pinkerd, and J. Sachs (Oct. 26, 2004) attaching
"IRF Topics," bearing control numbers VUSAMDL1-06230956 to 06230991.

[311] Available at http://usa.visa.com/download/merchants/october-2010-visa-usa-interchange-rate-sheet.pdf (last
visited Apr. 15, 2011) ("Oct. 2010 Visa Interchange Rates").

[312] Available at http://usa.visa.com/download/merchants/october-2010-interlink-interchange-rate-sheet.pdf ("Oct.
2010 Interlink Interchange Rates").

Undisputed.

Defendants object to the admissibility of all of the evidence on which class

plaintiffs rely in Paragraph 115a.  This evidence is from the *Visa Check* litigation and relates to

events prior to the relevant time period applicable in this case, and is therefore inadmissible as

irrelevant to any issue in support of class plaintiffs' motion for summary judgment.  (Fed. R.

Evid. 401, 402.)  In addition, *Wal-Mart* Pls' Summary Judgment Ex. 299 is a presentation from

Anderson Consulting to the Visa U.S.A. Board of Directors (*Wal-Mart* Pls' Summary Judgment

Ex. 299), and is an out of court statement for which no exception to the hearsay rule has been

established.  (Fed. R. Evid. 801, 802.)

        b.     **The February 1999 Visa Business Review article states, "Visa will increase**
               **the Interlink supermarket rate as well as the retail rate for the first time**
               **since 1992" and announces new Interlink rates of \$0.15 cents for**
               **supermarkets, 0.45% + \$0.03 for Non-Supermarkets, with a \$0.20 cap.**[641]

---

[641]    **VU0875380-98, at VU0875383, '385.  (SUFEX507)**

*Defendants' Response to Paragraph 115b:*

     Disputed.  Visa sets Interlink interchange rates in order to maximize system

output and to respond to rate adjustments from competitive networks.  (Pinkerd Dep. Ex. 25875

at 985.)

     Defendants object to the admissibility of VU0875380 to 0875398, dated February

1999.  The document relates to events prior to the relevant time period applicable in this case,

and is therefore inadmissible as irrelevant to any issue in support of class plaintiffs' motion for

summary judgment.  (Fed. R. Evid. 401, 402.)

        c.     **Visa's 30(b)(6) witness on the topic of Interchange Methodology, William**
               **Sheedy, described Visa's "Convergence Strategy" as follows: "When I refer**
               **to the term 'convergence,' it reflected a belief, a strategy that would have off-**
               **line debit interchange rates declining on a trending basis and online debit**

**interchange rates increasing on a trending basis so as to affect something closer to convergence of these two categories of interchange rates, hence the phrase – the term 'convergence.'"[642]  Sheedy testified that one of the business objectives for the convergence strategy was "a concern around the economics of online debit interchange transactions, and as we perceived it, those transactions were not viewed as profitable or sufficient level of interchange from an issuer point of view."[643]**

---

[642]     **Sheedy 30(b)(6) Dep. 468:20-469:4. (SUFEX426)**

[643]     **Sheedy 30(b)(6) Dep. 469:5-25. (SUFEX426)**

*Defendants' Response to Paragraph 115c:*

Disputed.  Mr. Sheedy was Visa's 30(b)(6) witness on the topic of Visa's methodology for setting interchange fees from January 1, 2000 to the end of the discovery period.  (Sheedy 30(b)(6) Dep. Ex. 23950; Sheedy 30(b)(6) Dep. at 17.)  Class plaintiffs' characterization of the evidence is incomplete and misleading.  Mr. Sheedy went on to testify that "there was also an aspect of the convergence strategy which reflected that there was increasing deployment of PIN pads in the U.S. marketplace, preferences exhibited by consumers and merchants for how they wanted to use their off-line debit product and their online debit product in certain circumstances, and a general view that we held at the time that we would discuss convergence that an interchange rate structure that would bring into better alignment online debit interchange rates and off-line debit interchange rates would be viewed as more sustainable and more attractive in the marketplace as compared to the environment that we had when we first looked at convergence where these rates were dramatically different."  (Sheedy 30(b)(6) Dep. at 470.)

d.      **Visa's 30(b)(6) witness for Debit Convergence, Stacey Pinkerd, testified "Consistent with our convergence strategy, we have increased the effective rates on Interlink transactions over time.  And we have, in some cases, decreased the rates of interchange rates on Visa debit card transactions to be consistent with our objectives of convergence and building a sustainable revenue stream over time"[644]  Pinkerd also testified, "Convergence is a moving of the effective rates of offline debit transactions and online debit**

**transactions closer together so that they -- we offer a better blended value proposition to the marketplace that will encourage greater merchant adoption, greater issuer adoption and ultimately greater consumer usage of cards."[645]**

---

[644]   Pinkerd 30(b)(6) Dep. 107:25-108:6, Aug. 20, 2008. (SUFEX508)

[645]   Pinkerd 30(b)(6) Dep. 141:12-18, Aug. 20, 2008. (SUFEX508)

*Defendants' Response to Paragraph 115d:*

Disputed.  Class plaintiffs' characterization of the evidence on which they rely is

incomplete and misleading.  (Fed. R. Evid. 106.)  As reflected in objections in the record, the Mr.

Pinkerd's deposition testimony on which class plaintiffs rely relates to topics outside the scope of

the 30(b)(6) deposition.  (Pinkerd 30(b)(6) Dep. at 108.)

   e.   **Visa's June 5, 2001 board presentation projected the ultimate goal of a converged debit rate of ▮▮▮ basis points by 2010, which was between the then-current rates for PIN and signature, as shown by this graph.[646] This document shows that Visa estimated that its convergence strategy would avert a projected decrease in cumulative Interchange revenue to Visa issuers of ▮▮▮ in 2005 and ▮▮▮ in 2010.[647]**



419

[646]     Pinkerd 30(b)(6) Dep Ex. 25854, at VUSAMDL2-00007710. (SUFEX509)

[647]     Pinkerd 30(b)(6) Dep Ex. 25854, at VUSAMDL2-00007710. (SUFEX509)

*Defendants' Response to Paragraph 115e:*

  Disputed.  Class plaintiffs mischaracterize the evidence on which they rely.  The cited document projected a transaction shift "costing issuers ███████ in 2005 and ███ in 2010."  (Pinkerd 30(b)(6) Dep Ex. 25854, at VUSAMDL2-00007710.)  The document did not state that a convergence strategy would prevent a loss in interchange revenue.

  Defendants object to the admissibility of Pinkerd 30(b)(6) Dep Ex. 25854, dated June 5, 2001.  The document relates to events prior to the relevant time period applicable in this case, and is therefore inadmissible as irrelevant to any issue in support of class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)

  f. **Visa's intention when acquiring Interlink was to neutralize the competitive threat from PIN-debit by either killing the product or moving PIN-Debit interchange rates to the level of Signature Debit interchange.  Since the time it acquired Interlink in 1991, the "foundation" of Visa's debit strategy was to "ensure that Visa Debit is Visa's premier debit product having far greater market value, utility, and acceptance than Interlink."[648]**

    • **A 1991 Visa memorandum entitled "Confidential Visa Debit Strategy Draft Proposal" reflects that Interlink is "less desirable than Visa Debit to an issuer because of the reduced fee potential resulting from the limited utility…. If Interlink is not properly defined, it has the potential of emerging as a primary product, creating a threat to the Visa brand and income derived from the Visa brand. The Visa Board is concerned about this threat and has received assurances by management that the secondary product, Interlink, will be 'controlled.'"[649]**

[648]     Pinkerd 30(b)(6) Dep. Ex. 25851, at WALSJ0411.0003. (SUFEX510)

[649]     *Id.* (SUFEX510)

*Defendants' Response to Paragraph 115f:*

Disputed.  The document on which class plaintiffs rely was labeled a "DRAFT PROPOSAL"  (Pinkerd 30(b)(6) Dep. Ex. 25851, at WALSJ0411.0002), and does not necessarily provide Visa's final opinion on the matter.

Defendants object to the admissibility of Pinkerd 30(b)(6) Dep. Ex. 25851, at WALSJ0411.0003, dated May 8, 1991.  The memorandum relates to events prior to the relevant time period applicable in this case, and is therefore inadmissible as irrelevant to any issue in support of class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)

PIN debit output has increased during the relevant time period.  (Vellturo Rep. Exs. 11, 11-A, 11-A.1, 11-B.; Elzinga Rep. Ex. 6.)

**g.    Visa 30(b)(6) designee for Convergence, Stacey Pinkerd, testified that Visa's convergence strategy was adopted in response to "continued deployment of PIN pads among merchants."[650]**

---

[650]    Pinkerd 30(b)(6) Dep. 72:13-73:7, Aug. 20, 2008. (SUFEX508)

*Defendants' Response to Paragraph 115g:*

Disputed.  Class plaintiffs mischaracterize Mr. Pinkerd's deposition testimony. Mr. Pinkerd testified that Visa' convergence strategy was adopted based on Visa's "assessment . . . of what was happening in the debit marketplace in total, not just the PIN debit marketplace."  (Pinkerd 30(b)(6) Dep. at 72.)  Mr. Pinkerd did not testify that the "continued deployment of PIN pads among merchants" was a reason that Visa adopted in convergence strategy.

**h.    In a March 2005 PowerPoint slide regarding interchange strategy, Visa cites the threat to debit interchange posed by "PIN-pad deployment and merchant steering at the [point of sale]."[651]**

---

[651]    Morrissey Dep. Ex. 30532, at VUSAMDL-1-05594661. (SUFEX410)

*Defendants' Response to Paragraph 115h:*

Disputed.  Class plaintiffs mischaracterize the evidence on which they rely.  The document does not state that PIN-pad deployment and merchant steering at the point of sale are threats to debit interchange.  Rather, the document states that PIN-pad deployment and merchant steering at the point of sale have lowered Visa Check Card volume thus impacting Visa Check Card interchange.  (Morrissey Dep. Ex. 30532, at VUSAMDL-1-05594661.)  Further, Morrissey Dep. Ex. 30532 is draft document and does not necessarily provide Visa's final opinion on the matter.

    i.    **A Visa memorandum dated February 14, 2001, sets a "Long Term" goal of "Convergence of signature and PIN based interchange reimbursement fees" and the need to "slow down the proliferation of PIN capable terminals in existing and new merchant segments."[652]  The document explains that, "[i]f the deployment of PIN capable terminals and merchant steering continues at the current rate then eventually PIN based transactions will succeed in the debit marketplace. A convergence of rates between signature and PIN based transactions will allow our Members to sustain a predictable debit business model and allow their consumers to choose signature versus PIN without being steered by the merchant or assessed fees by Member for performing this type of transaction."[653]**

---

[652]    **Pinkerd 30(b)(6) Dep. Ex. 25788, at VUSAMDL1-05329114 (SUFEX511); Pinkerd 8-19-2008 Dep. 180:24-181:14. (SUFEX508)**

[653]    **Pinkerd 30(b)(6) Dep. Ex 25788, at VUSAMDL1-05329118. (SUFEX511)**

*Defendants' Response to Paragraph 115i:*

Undisputed.

Defendants object to the admissibility of Pinkerd 30(b)(6) Dep. Ex. 25788, dated February 14, 2001.  The memorandum relates to events prior to the relevant time period applicable in this case, and is therefore inadmissible as irrelevant to any issue in support of class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)  In addition, class plaintiffs offer no evidence that Pinkerd 30(b)(6) Dep. Ex 25788 was authenticated.  (Fed. R. Evid. 901.)

Mr. Pinkerd's deposition testimony to which class plaintiffs cite contains Mr. Pinkerd's

testimony that he does not recall seeing Pinkerd 30(b)(6) Dep. Ex. 25788.  (Pinkerd 30(b)(6) Dep.

at 180-81.)

     **j.**     **Richard Morrissey of Visa testified that Visa's goal in aligning offline and online debit interchange rates was "to make it so that the merchant was indifferent to the two products."[654]**

---

[654]     **Richard Morrissey Dep. 184:14-188:05, Jan. 30, 2008 (SUFEX177). See also VUSAMDL1-06230956 at 974 (SUFEX512) (discussing the effects of debit convergence "PIN pads have largely been rolled out in Grocery, Fuel, and Discount Retail – the reduction in the gap between signature and PIN may deter steering, but if steered the adjustment will help the issuer business case" and "In Specialty Retail and Pharmacy, the concern is largely around new PIN pad deployment – by reducing the gap, the incentive for deployment should be reduced").**

*Defendants' Response to Paragraph 115j:*

     Undisputed.

     **k.**     **Another March 2004 Visa presentation entitled "Interchange Fee Update" explains, "Convergence of Off-line and On-Line IRF Remains Key … Issuer commitments to Interlink and geographic dispersion of issuance remain critical … Expediting migration from the current ▮ percent share of Interlink to the ▮ percent share threshold is key: - Current Share ▮ - Mid-2004 ▮ - First Quarter 2005 ▮."[655]**

---

[655]     **Pinkerd 30(b)(6) Dep. Ex. 25869, at VUSAMDL1-01336619. (SUFEX513)**

*Defendants' Response to Paragraph 115k:*

     Undisputed.

     Defendants object to the admissibility of Pinkerd 30(b)(6) Dep. Ex. 25869.  The

document is a draft presentation (Pinkerd 30(b)(6) Dep. Ex. 25869, at VUSAMDL1-01336604),

and class plaintiffs offer no evidence that it was authenticated.  (Fed. R. Evid. 901.)

     **l.**     **On the slide entitled "Consumer Debit Interchange Strategy" in an April 2006 Visa PowerPoint presentation the first item is "Manage convergence of Visa debit IRF."[656]  The two sub-bullet points state, "Continue check card reductions and Interlink adjustments" and "Create merchant and bank indifference to PIN or offline debit."[657] The following page states, "While the**

gap in effective per-item IRF has narrowed between off-line and on-line, a considerable difference remains."[658]  These two slides also appear in an "Independent Director Orientation" PowerPoint deck dated April 11, 2006.[659]

---

[656]    Sheedy Dep. Ex. 34825, at p. 20. (SUFEX209)

[657]    *Id.* (SUFEX209)

[658]    *Id.* at p. 21. (SUFEX209)

[659]    Pinkerd 30(b)(6) Dep. Ex. 25878, at VUSAMDL2-00027740-41. (SUFEX454)

*Defendants' Response to Paragraph 115l:*

Undisputed.

m.   A 2006 report published by the Federal Reserve Bank of Kansas City states, "Currently, signature debit has a 3-to-1 lead in merchant outlets over PIN debit. However, most large merchants accept PIN debit, which is one reason why the current lead in transaction volume for signature over PIN debit is only 1.6-to-1."[660]  The Report shows that, as of 2005, nearly six million merchants accepted signature debit, while less than 2 million accepted PIN debit.[661]

---

[660]    Fumiko Hayashi, Richard Sullivan and Stuart Weiner, "A Guide to the ATM and Debit Card Industry: 2006 Update," at FRANKEL 5800 (SUFEX218), available at http://www.kansascityfed.org/PUBLICAT/PSR/BksJournArticles/ATMDebitUpdate.pdf.

[661]    Fumiko Hayashi, Richard Sullivan and Stuart Weiner, "A Guide to the ATM and Debit Card Industry: 2006 Update," at FRANKEL 5801 (SUFEX218), available at http://www.kansascityfed.org/PUBLICAT/PSR/BksJournArticles/ATMDebitUpdate.pdf.

*Defendants' Response to Paragraph 115m:*

Undisputed.

n.   Visa's convergence strategy was ultimately successful. On April 30, 2010, the American Banker reported, "Visa this month changed its debit interchange rates by raising PIN-based transaction costs and lowering signature transactions; both are now 0.95% of each purchase plus 20 cents. The signature debit rate was previously 1.03% plus 15 cents, and PIN was 0.75% plus 17 cents."[662]

[662]   "Visa Overhauls Its Debit Fees Amid Strong Results," American Banker, April 30, 2010 Frankel Rebuttal Rpt. ¶ 60 n.145. (SUFEX514)

*Defendants' Response to Paragraph 115n:*

      Disputed.  Class plaintiffs' use of the term "successful" is vague and ambiguous. Visa Check Card and Interlink interchange rates are not the same.  For example, beginning in October 2010, Visa's signature debit interchange rate for "CPS/Retail Debit—Performance Threshold I," which requires a minimum of 52 million transactions totaling at least $3.4 billion, has been 0.62% + $0.13.  (Oct. 2010 Visa Interchange Rates.)  But, beginning in October 2010, the Interlink interchange rate for "Eligible Retail Merchant—Performance Threshold I," which requires a minimum of 88 million transactions totaling at least $4.0 billion, has been 0.50% + $0.10, with a $0.60 cap.  (Oct. 2010 Interlink Interchange Rates.)  The volume thresholds for the two products are not the same.  (Oct. 2010 Visa Interchange Rates; Oct. 2010 Interlink Interchange Rates.)

      Defendants object to the admissibility of the American Banker article on which class plaintiffs rely and Frankel Rebuttal Rpt. ¶ 60 n.145.  The American Banker article is an out of court statement for which no exception to the hearsay rule has been established.  (Fed. R. Evid. 801, 802.)  Similarly, the portion of Dr. Frankel's rebuttal report on which class plaintiffs rely cites to a weblog post (Frankel Rebuttal Rep. ¶ 60 n.145) that is an out of court statement for which no exception to the hearsay rule has been established.  (Fed. R. Evid. 801, 802.)

      **o.**    **A study by the Federal Reserve Bank of Kansas City found, "Interlink has been the market leader, dramatically raising its interchange fee in 2002. Most of the PIN debit networks since have raised their interchange fees, although more gradually in most instances. After setting an interchange rate that was below market for many years, MasterCard's Maestro raised its rate dramatically in 2003, to now be among the highest."**[663]

425

[663]   **Fumiko Hayashi, Richard J. Sullivan, and Stuart E. Weiner, A Guide to the ATM and Debit Card Industry: 2006 Update, Federal Reserve Bank of Kansas City (2006), p. 12  (SUFEX218) (available at http://www.kansascityfed.org/PUBLICAT/PSR/BksJournArticles/ATMDebitUpdate.pdf).**

*Defendants' Response to Paragraph 115o:*

Undisputed.

Defendants dispute the admissibility of The Fumiko Hayashi article on which they rely.  The article, which discusses 2002 and 2003 interchange increases, relates to events prior to the relevant time period applicable in this case, and is therefore inadmissible as irrelevant to any material fact in support of class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)

426

<u>Plaintiffs' Paragraph 116:</u>

116     **The Payment-Card issuing market is mature.**

*Defendants' Response to Paragraph 116:*

        Disputed.  The terms "mature" and "Payment-Card issuing market" are not

defined and are vague and ambiguous.  The number of credit and debit cards in circulation has

increased during the relevant time period from 1,699.9 million in 2004 to 1,753.8 million by the

end of 2009.  (2005 Nilson Rep. 842,[313] at 6; 2010 Nilson Rep. 961,[314] at 10.)

        a.     **As Visa stated in an April 2003 draft press release: "At this point, the card**
               **payment market in the U.S. is fully developed, highly competitive and nearly**
               **ubiquitous."[664]**

_____
[664]     **Steele 11.6.08 Dep. Ex. 34516, at VI-IC-02549525.  (SUFEX515)**

*Defendants' Response to Paragraph 116a:*

        Disputed.  Class plaintiffs' description of the type of document is inaccurate.

Steele 11.6.08 Dep. Ex. 34516 is an email from Russ Yarrow to Cheryl Heinonen, not a draft

press release.  (Steele 11.6.08 Dep. Ex. 34516.)

        Defendants object to the admissibility of Steele 11.6.08 Dep. Ex. 34516, dated

April 28, 2003.  The email relates to events prior to the relevant time period applicable in this

case, and is thus irrelevant to any issue in support of class plaintiffs' motion for summary

judgment.  (Fed. R. Evid. 401, 402.)  Additionally, class plaintiffs provide no evidence that Mr.

Yarrow was competent to opine on the development of the "card payment market in the U.S."

_____
[313]   HSN Consultants Inc., 2005 The Nilson Report, Issue 842 (Sept. 2005) ("2005 Nilson Rep.").

[314]   HSN Consultants Inc., 2010 The Nilson Report, Issue 961 (Dec. 2010) ("2010 Nilson Rep. 961").

(Fed. R. Evid. 602.), or that the language suggested in his email represented the final opinion of

Visa.

b.    **An October 2003 draft speech for Ruth Ann Marshall proclaimed: "It is now some fifty years since the first general purpose credit card was introduced. So congratulations everyone, our industry is ready for AARP, because we are <u>mature</u>. We are established."[665]**

---

[665]    **Marshall Ex. 25156, at MCI_MDL_02_05203536 (emphasis in original) (SUFEX516); see also Olebe Ex. 24893 (SUFEX517) at 5 ("The U.S. credit card market has grown increasingly saturated"); Marshall Ex. 25102A (SUFEX518) at MCI_MDL_02_09135834 (MC November 2003 slide on "key learnings" of economic research states "direct mail drives account growth but has diminished as <u>response rates have declined</u>," followed by a handwritten note, "mature" (emphasis in original)).**

*Defendants' Response to Paragraph 116b:*

Undisputed.

Defendants object to the admissibility of Marshall Dcp. Ex. 25156, dated October

27, 2003.  The document relates to events prior to the relevant time period applicable in this case,

and is thus irrelevant to any issue in support of class plaintiffs' motion for summary judgment.

(Fed. R. Evid. 401, 402.)

Defendants object to the admissibility of Olebe Dep. Ex. 24893, a presentation by

McKinsey and Co. (Olebe Dep. Ex. 24893.)  The language from the presentation on which class

plaintiffs rely is an out of court statement for which no exception to the hearsay rule has been

established.  (Fed. R. Evid. 801, 802.)

Defendants object to the admissibility of Marshall Dep. Ex. 25102A, dated

November 19, 2003.  The document relates to events prior to the relevant time period applicable

in this case, and is thus irrelevant to any issue in support of class plaintiffs' motion for summary

judgment.  (Fed. R. Evid. 401, 402.)  Additionally, the handwritten note on which class plaintiffs

rely was not authenticated.  (Fed. R. Evid. 901.)

    **c.**    **Richard Taglione testified that "Within the U.S., the credit card market is mature."[666]**

---
[666]    Taglione Dep. 316:22-23. (SUFEX371)

*Defendants' Response to Paragraph 116c:*

    Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading.

(Fed. R. Evid. 106.)  Mr. Taglione clarified that the U.S. consumer credit card market was

mature, but the business card and corporate card market was not.  (Taglione Dep.[315] at 317.)

    **d.**    **Visa characterizes the credit card issuing marketplace as "mature."[667]**

---
[667]    Haarma Ex. 5, at VUSAMDL1-06715956, VUSAMDL1-06715959. (SUFEX191)

*Defendants' Response to Paragraph 116d:*

    Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading.

(Fed. R. Evid. 106.)  Mr. Sheedy testified that as used by Visa, a mature market would compare

to a "high growth market.  Mature markets would be slower growing and be a market in which

there's been an established business that's been built."  (Sheedy 30(b)(6) Dep. at 320.)

    **e.**    **In her deposition, Ruth Ann Marshall testified to the meaning of her statement that "We have now reached credit card inflation, with too many cards and issuers chasing too few prospects."  She explained that "issuers were over-soliciting" and that "consumers were saturated with solicitation from credit card . . . issuers," and were complaining about over-solicitation. Marshall further testified that this phenomenon of issuers going after cardholders did not drive down the interchange rate at all.[668]**

---
[668]    Marshall Dep. 288:15-289:19. (SUFEX366)

---
[315]   Deposition of Richard Taglione (Aug. 20, 2008) ("Taglione Dep.").  Mr. Taglione testified as finance director of Chase's credit card business.  (Taglione Dep. at 9.)

429

*Defendants' Response to Paragraph 116e:*

        Disputed. Class plaintiffs' description of Ms. Marshall's deposition testimony is inaccurate. Ms. Marshall did not explain that "issuers were over-soliciting," but responded to a question containing that language. (Marshall Dep. at 289.)

        **f.**    **Issuers documents discuss growth in terms of taking share from competitors rather than growing the Networks' volumes. For example, one Citi Powerpoint deck asks "How can we target our competitors' customers?"[669] A different Citi document notes that "Chase's Loss in Sales = Citibank's Gain."[670]**

---

[669]    **Taglione Ex. 32790, at 21. (SUFEX519)**

[670]    **Taglione Ex. 32787, at 5. (SUFEX372)**

*Defendants' Response to Paragraph 116f:*

        Disputed. Both documents to which class plaintiffs cite were produced by Chase, not Citigroup.

**Plaintiffs' Paragraph 117:**

**117     The Canadian Interac Debit-Card Network has been highly successful without Interchange Fees.**

*Defendants' Response to Paragraph 117:*

Disputed.  Defendants dispute class plaintiffs' definition of "Interchange Fee" as "a fee that Merchants pay to the Issuing Bank" because it is inaccurate, misleading, and unfairly prejudicial.  An interchange fee is compensation paid by the acquiring bank to the issuing bank via Visa or MasterCard for the transaction passing through interchange.  (*See* Paragraphs 64 & 69.)  Class plaintiffs have presented no evidence that merchants pay any fees to issuing banks.

Class plaintiffs' use of the term "highly successful" is vague and ambiguous.  Walter Macnee, on whom class plaintiffs rely in Paragraph 117a, testified that he considered the U.S. debit system to be better than the Canadian debit system "for all the participants" because "there is an increased [innovation] in the U.S. because there is investment on all sides of the equation.  In Canada the Interac system was created, crafted in the early 90s and it is exactly the same form as it was then, there has been zero investment, zero innovation and it doesn't really do anything, you can't cross the border with it.  It is a very limited system.  And this is just because there is no money in the system to reinvest."  (Macnee Dep.[316] at 190-91.)

According to the document on which class plaintiffs rely in subparagraphs a, d, e, g, and i, "Interac operates within confines of a 1996 Consent Order with the Canadian Competition Bureau" which "mandated that all revenue earned through Interac must be on the basis of cost, and that this revenue must be derived solely through switch fees."  (Scharf Dep. Ex. 28036, at CHASE002906375, 385.)

---

[316]   Deposition of Walter Macnee (Oct. 17, 2008) ("Macnee Dep.").  Mr. Macnee testified as the president of global markets at MasterCard, and the former president of MasterCard Canada.  (Macnee Dep. at 63, 130-31.)

a. **The Canadian Interac Debit-Card System operates with zero interchange fees.**[671]

_____

[671]     Scharf Dep. Ex. 28036 (SUFEX520), at CHASE002906375, Nov. 5, 2008 (A report by Dove Consulting titled "Debit in Canada: An Overview of the Canadian Debit System and Comparison with the U.S. Model, February 2004" stating that "Interac oversees a distributed network. Individual direct connectors switch and settle all transactions"). See also, MacNee Dep. 90:10-13, 183:9-22, 189:5-12, Oct. 17, 2008 (SUFEX319) (agreeing that Interac operates without interchange and that the Canadian debit card system "works very well. It's technologically proficient . . . . it has a fairly good record of accuracy . . . ."); Bamberger Decl. ¶ 76 (citing Victor Lubasi, "Debit card competition: Signature versus PIN," Chicago Fed Letter, December 2005.).  (SUFEX521)

_Defendants' Response to Paragraph 117a:_

Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading.

(Fed. R. Evid. 106.)  Mr. Macnee later clarified that he believes the U.S. debit system is better,

and the Interac system lacks innovation and investment by all market participants.  (MacNee Dep.

at 190-91.)  According to Scharf Dep. Ex. 28036, "Interac operates within confines of a 1996

Consent Order with the Canadian Competition Bureau" which "mandated that all revenue earned

through Interac must be on the basis of cost, and that this revenue must be derived solely through

switch fees."  (Scharf Dep. Ex. 28036, at CHASE002906375, 385.)

Defendants object to the admissibility of Scharf Dep. Ex. 28036, a report by Dove

Consulting.  The report is an out of court statement for which no exception to the hearsay rule

has been established.  (Fed. R. Evid. 801, 802.)

Defendants object to the admissibility of Bamberger Decl. ¶ 76.  Dr. Bamberger's

declaration only concerns whether class plaintiffs' allegations are subject to class-wide

determination (Bamberger Decl. at 2), and is not relevant to the merits of class plaintiffs claims

at issue in class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402, 702.)

b. **The Canadian Interac Network is an association of members in Canada that enable the shared cash dispensing services and Interac Direct Payment (IDP), which is the debit at point of sale services, in Canada.**[672] **Interac is a non-**

432

profit association with members whose services fees cover operating expenses.[673]

---

[672]   Honor, Dep. 60:1-5, 62:13-63:23, Dec. 4, 2008 (SUFEX522) (explaining the Interac process from the consumer's perspective as "the consumer presents the card, the merchant typically would swipe it, and then the PIN pad would be handed to the consumer to validate that it's okay to take that money out of their account, which account, their checking or their savings account, and they're asked to enter a PIN.").

[673]   Honor, Dep. Ex. 29002, Dec. 4, 2008. (SUFEX523)

_Defendants' Response to Paragraph 117b:_

Undisputed.

c.   **Cathy Honor, Royal Bank of Canada Head of Global Cards and former Board Member of Canadian Interac, explained that Interac funds its operations by assessing per-transaction fees on its members, which are intended to fund Interac's costs of doing business. She explained that "total costs are divided by the total transactions; and then depending on what – how many transactions [the merchant was] responsible for, [it]'d be charged that. So the fee would constantly be varying, depending on the costs . . .[thus,] it's a cost recovery" system.[674]**

---

[674]   Honor, Dep. 93:23-94:13, Dec. 4, 2008. (SUFEX522)

_Defendants' Response to Paragraph 117c:_

Undisputed.

d.   **"In Canada, a majority of consumers pay a per-transaction fee to their bank for debit card purchases (but the merchant incurs no interchange expense)."[675]**

---

[675]   Scharf, Dep. Ex. 28036, at 2 (CHASE002906376), Nov. 5, 2008 (A report by Dove Consulting titled "Debit in Canada: An Overview of the Canadian Debit System and Comparison with the U.S. Model, February 2004"). (SUFEX520)

_Defendants' Response to Paragraph 117d:_

Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading.

(Fed. R. Evid. 106.)

Defendants object to the admissibility of Scharf Dep. Ex. 28036, a report by Dove

Consulting.  The report is an out of court statement for which no exception to the hearsay rule

has been established.  (Fed. R. Evid. 801, 802.)

     **e.** ████████████████████████████████████████████████ [676]
           ████████████████████████████████████████

---

[676]    **Honor, Dep. 67:25-68:15, Dec. 4, 2008. (SUFEX522)**

*Defendants' Response to Paragraph 117e:*

     Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading.

(Fed. R. Evid. 106.)  ███████████████████████████████████

████  (Honor Dep.[317] at 67-68.)

     Defendants object to the admissibility of Honor, Dep. at 67-68.  The quoted

language was read into the record by plaintiffs' counsel, and is taken from the Interac website

(Honor Dep. at 60-61, 67-68.)  This is an out of court statement for which no exception to the

hearsay rule has been established.  (Fed. R. Evid. 801, 802.)

       **f.**    **Canadian banks have promoted a more efficient payment system "by levying transaction fees directly on consumers" and assessing "higher fees for checks than debit purchases."[677]**

---

[677]    **Scharf Dep. Ex. 28036 at 2 (CHASE002906376), Nov. 5, 2008 (A report by Dove Consulting titled "Debit in Canada: An Overview of the Canadian Debit System and Comparison with the U.S. Model, February 2004" finding that "[i]n 2002, 23% of all payments made by Canadians were by check while 36% were by debit; in the U.S., 50% of payments were by check and only 19% by debit. Using this metric, Canada has made greater progress than the U.S. in promoting a more efficient payment system."). (SUFEX520)**

---

317    Deposition of Cathy Honor (Dec. 4, 2008) ("Honor Dep.").  Ms. Honor testified both in her individual capacity as head of global cards for the Royal Bank of Canada and as the Royal Bank of Canada's Rule 30(b)(6) witness. (Honor Dep. at 23, 65.)

*Defendants' Response to Paragraph 117f:*

Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading.

(Fed. R. Evid. 106.)  The Dove Consulting report states that "by levying transaction fees directly

on consumers, Canadian financial institutions can tailor their pricing to particular customer

segments."  (Scharf Dep. Ex. 28036, at CHASE002906376.)

Defendants object to the admissibility of Scharf Dep. Ex. 28036, a report by Dove

Consulting.  The report is an out of court statement for which no exception to the hearsay rule

has been established.  (Fed. R. Evid. 801, 802.)  In addition, the report's reference to percentages

of payments made by check versus debit in 2002 relates to events outside the relevant time

period applicable in this case, and is therefore inadmissible as irrelevant to any issue in support

of class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)

> **g.    Canada's debit system operates successfully as it is widely accepted by merchants, widely used by cardholders and thus, "represents a best-in-class example of a well functioning electronic payments system."[678]**

---

[678]    Scharf Dep. Ex. 28036, at 2 (CHASE002906376) (SUFEX520), Nov. 5, 2008 (A report by Dove Consulting titled "Debit in Canada: An Overview of the Canadian Debit System and Comparison with the U.S. Model, February 2004").

*Defendants' Response to Paragraph 117g:*

Disputed.  Class plaintiffs mischaracterize the repot on which they rely.  The

Dove Consulting report states, "To some, Canada's debit system represents a best-in-class

example of a well functioning electronic payments system."  (Scharf Dep. Ex. 28036, at

CHASE002906377.)

Defendants object to the admissibility of Scharf Dep. Ex. 28036, a report by Dove

Consulting.  The report is an out of court statement for which no exception to the hearsay rule

has been established.  (Fed. R. Evid. 801, 802.)

> h.   Merchants like Interac because "it takes cash out of their system, which is very expensive . . . [and] it's free [because t]here's no interchange . . . ."[679] Interac "transactions are processed immediately, and the funds are typically debited from the customer's account right away. Similarly, the customer's funds are normally transferred to the merchant on the same, or within one, business day."[680]

---

[679]   Honor Dep. 70:9-20, Dec. 4, 2008.  (SUFEX522)

[680]   Honor Dep. 77:19-24, Dec. 4, 2008. (SUFEX522)

*Defendants' Response to Paragraph 117h:*

Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading.

(Fed. R. Evid. 106.)

Defendants object to the admissibility of Ms. Honor's deposition testimony.

Class plaintiffs have presented no evidence that Ms. Honor is competent to testify about

merchants' thoughts of Interac.  (Fed. R. Evid. 602.)  The quotation at class plaintiffs' footnote

680 was read into the record by plaintiffs' counsel, and is taken from the Interac website.

(Honor Dep. at 60-61, 77.)  It is therefore an out of court statement for which no exception to the

hearsay rule has been established.  (Fed. R. Evid. 801, 802.)

> i.   A September 2007 report from Interac's website entitled, "Interac Association: A Backgrounder" states that "Canadians love to use their debit cards...[and] more than two billion purchases were made using Interac Direct Payment [in 2006[."[681]

---

[681]   Honor Dep. 69:1-10 (SUFEX522), Dep. Ex. 29002, Dec. 4, 2008. (SUFEX523)

*Defendants' Response to Paragraph 117i:*

Disputed.  Class plaintiffs' reference to 2006 is incorrect.  The report states, "In

2001, for the first time ever, more than two billion purchases were made using *Interac* Direct

Payment."  (Honor Dep. Ex. 29002, at 2.)

Defendants object to the admissibility of Honor Dep. Ex. 29002, a report from the Interac website. The report is an out of court statement for which no exception to the hearsay rule has been established. (Fed. R. Evid. 801, 802.) In addition, the evidence from the report on which class plaintiffs rely relates to events prior to relevant time period applicable in this case, and is therefore inadmissible as irrelevant to any material fact in support of class plaintiffs' motion for summary judgment. (Fed. R. Evid. 401, 402.)

> **j.**  **A consulting report comparing U.S. and Canadian debit markets reported that Canada has a greater percentage of debit usage and "the more efficient model."[682]**

---

[682]   Scharf Dep. Ex. 28036, at 2 (SUFEX520), 25 (CHASE002906374, 75 & 99), Nov. 5, 2008 (A report by Dove Consulting titled "Debit in Canada: An Overview of the Canadian Debit System and Comparison with the U.S. Model, February 2004"). See also, Honor Dep. 70:18-20, 75:16-76:16 (SUFEX522) (███████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
█████████████████████████████).

*Defendants' Response to Paragraph 117j:*

Undisputed.

Defendants object to the admissibility of Scharf Dep. Ex. 28036, a report by Dove Consulting. The report is an out of court statement for which no exception to the hearsay rule has been established. (Fed. R. Evid. 801, 802.)

Defendants object to the admissibility of Honor Dep. at 70, 75. Ms. Honor's testimony regarding payment card transactions are processed in Canada is inadmissible as irrelevant to any issue in support of class plaintiffs' motion for summary judgment. (Fed. R. Evid. 401, 402.)

<u>Plaintiffs' Paragraph 118:</u>

**118    The Norwegian Bank Axept debit-card network has been highly successful without Interchange Fees.**

*Defendants' Response to Paragraph 118:*

    Disputed.  Defendants dispute class plaintiffs' definition of "Interchange Fee" as "a fee that Merchants pay to the Issuing Bank" because it is inaccurate, misleading, and unfairly prejudicial.  An interchange fee is compensation paid by the acquiring bank to the issuing bank via Visa or MasterCard for the transaction passing through interchange.  (*See* Paragraphs 64 & 69.)  Class plaintiffs have presented no evidence that merchants pay any fees to issuing banks.

    Class plaintiffs' use of the term "highly successful" is vague, ambiguous, and misleading.  The cards issued on the Norwegian Bank BankAxept debit-card network  may be used only in Norway unless they are co-branded with Visa or MasterCard.  (Payment Cards Western Europe 2008,[318] at 6.)  BankAxept is operated by BBS, a joint venture between Norwegian banks, which performs nearly all of the typical functions of an acquirer.  (*See id.* at 33 ("Merchant processing, including the maintenance of merchant databases and production of merchant statements and remuneration, is carried out. . . in the case of BankAxept transactions, by BBS on behalf of the banks.").)

    a.  **The E.C. found that the "Bank Axept card became a success despite the absence of (multilateral or bilateral) interchange fees in the System."[683]**

---

[683]  **E.C. Decision ¶¶ 604. (SUFEX081)**

---

[318]  "Payment Cards Western Europe 2008: Norway," Retail Banking Research Ltd., bearing control numbers FRANKEL 121 to 164.

*Defendants' Response to Paragraph 118a:*

Undisputed.

Defendants object to the admissibility of the E.C. Decision.  The E.C. Decision is

unfairly prejudicial, and is an out of court statement for which no exception to the hearsay rule

has been established.  (Fed. R. Evid. 403, 801, 802.)

      **b.**     **According to Norges Bank, the Norwegian central bank, in 2009, over 6
million Bank Axept cards were in issue in Norway, and the cards were
accepted at over 102,000 merchant locations. Norges Bank estimated the
population of Norway to be 4.81 million in 2009.**[684]

---

[684]    **Norges Bank, 2009 Annual Report on Payment Systems at 40, 42 (May 2010) (SUFEX524),** *available
at http://www.norges-bank.no/upload/80704/annual_report_on_payment_systems_2009.pdf.*

*Defendants' Response to Paragraph 118b:*

Disputed.  The 2009 Norges Bank Annual Report provided by class plaintiffs

does not discuss Bank Axept cards or the population of Norway.  (Norges Bank, 2009 Annual

Report.)[319]                                        .

Defendants object to the admissibility of the 2009 Norges Bank Annual Report.

The Annual Report is an out of court statement for which no exception to the hearsay rule has

been established.  (Fed. R. Evid. 801, 802.)

      **c.**     **In 2009, Bank Axept cards were used in 986.8 million transactions in Norway,
constituting over 88% of all payment-card transactions.**[685]

---

[685]    *Id.* at 45. (SUFEX524)

---

[319]  Norges Bank, 2009 Annual Report on Payment Systems (May 2010), *available at http://www.norges-
bank.no/upload/80704/annual_report_on_payment_systems_2009.pdf*, last visited May 3, 2011 ("Norges Bank,
2009 Annual Report").

*Defendants' Response to Paragraph 118c:*

        Disputed.  The 2009 Norges Bank Annual Report provided by class plaintiffs does not discuss Bank Axept cards.  (Norges Bank, 2009 Annual Report.)

        Defendants object to the admissibility of the 2009 Norges Bank Annual Report.  The Annual Report is an out of court statement for which no exception to the hearsay rule has been established.  (Fed. R. Evid. 801, 802.)

        **d.      In 2009, NKr 359.4 billion ($ 57.2 billion) of transaction volume was conducted using Bank Axept cards at payment terminals in Norway. This constituted 81% of all payment-card-transaction volume at Norwegian payment terminals.[686]**

---

[686]    *Id.* at 40, 48. (SUFEX524)

*Defendants' Response to Paragraph 118d:*

        Disputed. The 2009 Norges Bank Annual Report provided by class plaintiffs does not discuss Bank Axept cards.  (Norges Bank, 2009 Annual Report.)

        Defendants object to the admissibility of the 2009 Norges Bank Annual Report.  The Annual Report is an out of court statement for which no exception to the hearsay rule has been established.  (Fed. R. Evid. 801, 802.)

<u>**Plaintiffs' Paragraph 119:**</u>

**119     The EFTPOS Debit-Card Network in New Zealand had been highly successful without Interchange Fees.**

<u>*Defendants' Response to Paragraph 119:*</u>

   Disputed.  Defendants dispute class plaintiffs' definition of "Interchange Fee" as "a fee that Merchants pay to the Issuing Bank" because it is inaccurate, misleading, and unfairly prejudicial.  An interchange fee is compensation paid by the acquiring bank to the issuing bank via Visa or MasterCard for the transaction passing through interchange.  (*See* Paragraphs 64 & 69.)  Class plaintiffs have presented no evidence that merchants pay any fees to issuing banks.

   Class plaintiffs' use of the term "highly successful" is vague and ambiguous.  The only evidence on which class plaintiffs rely in support of their assertion in Paragraph 119, contained in subparagraph a, does not provide any evidence of "success" in the EFTPOS Debit-Card Network in New Zealand.

   a. **In New Zealand many debit transactions settle without payment of interchange.**[687]

---

[687]     http://www.rba.gov.au/PaymentsSystem/Reforms/DebitCardSystemsAus/options _for_eftpos_interchange_fee_reform.pdf. (Bamberger Decl. ¶ 76) (SUFEX525)

<u>*Defendants' Response to Paragraph 119a:*</u>

   Disputed.  Class plaintiffs mischaracterize the evidence on which they rely.  The document states, "Two interconnected EFTPOS networks exist in New Zealand; interchange agreements exist for switching transactions between the two systems.  For several years prior to 1998 the interchange fee was zero, however an interchange fee of 6 cents payable from issuer to acquirer was reinstated for certain inter-network transactions, apparently due to the threat of network interoperability being withdrawn."

(http://www.rba.gov.au/PaymentsSystem/Reforms/DebitCardSystemsAus/options

_for_eftpos_interchange_fee_reform.pdf.)  Further, the document cited by class plaintiffs does

not reference the number of debit transaction in New Zealand and therefore does not support

class plaintiffs' assertion that in New Zealand many debit transactions settle without payment of

interchange.

   Defendants object to the admissibility of the Reserve Bank of Australia website

on which class plaintiffs rely, which is a discussion paper titled Options for EFTPOS Interchange

Fee Reform, dated July 2002.

(http://www.rba.gov.au/PaymentsSystem/Reforms/DebitCardSystemsAus/options

_for_eftpos_interchange_fee_reform.pdf)  This discussion paper relates to events prior to the

relevant time period applicable in this case, and is therefore inadmissible as irrelevant to any

issue in support of class plaintiffs' motion for summary judgment.

   Defendants object to the admissibility of Bamberger Decl. ¶ 76.  Dr. Bamberger's

declaration only concerns whether class plaintiffs' allegations are subject to class-wide

determination (Bamberger Decl. at 2), and is not relevant to the merits of class plaintiffs claims

at issue in class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402, 702.)

<u>Plaintiffs' Paragraph 120:</u>

**120     Early PIN debit networks in the United States functioned without interchange fees, or with interchange fees that were paid to merchants.**

*Defendants' Response to Paragraph 120:*

Disputed.  Class plaintiffs' reference to early PIN debit networks is vague and ambiguous.  PIN debit networks have operated with interchange fees paid from acquirers to issuers.  (*See, e.g.,* Paragraph 115b (listing Interlink as having acquirer-paid interchange), 120d.) Class plaintiffs do not provide any evidence that PIN debit networks operated efficiently or successfully without interchange.  The sources on which plaintiffs rely, including the expert declaration of Franklin Fisher (cited in Dr. Frankel's report), indicate that early PIN debit networks operated with some centrally set default interchange fee, only that the fee passed from issuers to acquirers.  (*See* Fisher Rep. ¶ 47 ("[I]nterchange fees for the regional on-line debit cards are not necessarily acquirer paid.  Until the early 1990s, almost all of the regional on-line POS debit networks had an issuer-paid interchange fee.").)

All evidence cited by class plaintiffs in subparagraphs a-d relates to conduct prior to January 1, 2004, and therefore relates to events prior to relevant time period applicable in this case, and is therefore inadmissible as irrelevant to any issue in support of class plaintiffs' motion for summary judgment.  Additionally, none of this evidence supports class plaintiffs' assertion that interchange fees were paid to merchants.

a.     When asked, "Did some PIN debit networks operate in the United States without interchange being paid to the issuing bank?" Visa's Senior VP of Consumer Debit Products, Stacey Pinkerd, testified, "I believe that there were some networks in the country, yes, that operated and did not have a stated issuer interchange rate."[688]  When asked to identify these debit networks, Pinkerd testified that there were "lots of them" and that "they were out most with the ATM networks."[689]  Pinkerd further explained, "So these were ATM networks and they — they, to a large degree, as far as my understanding of how the industry evolved, adopted point of sale

**transactions as a component of the ATM network, in addition to the point -- to the ATM network and, many of them, interchange was not included, at least when they initially made those changes."[690]**

---

[688]    Pinkerd Dep. 215:24-216:6, Aug. 19, 2008. (SUFEX006)

[689]    Pinkerd Dep. 216:7-13, Aug. 19, 2008. (SUFEX006)

[690]    Pinkerd Dep. 216:22-217:4, Aug. 19, 2008. (SUFEX006)

*Defendants' Response to Paragraph 120a:*

Undisputed.

Defendants object to the admissibility of Pinkerd Dep. at 215-16.  As noted by the

objection on the record (Pinkerd Dep. at 215-16), Mr. Pinkerd's testimony is inadmissible

because it is based on speculation, and he did not have personal knowledge of the subject.  (Fed.

R. Evid. 602.)

b.    **Dr. Alan Frankel writes, "Similarly, when ATM networks began processing PIN debit transactions, interchange fees on those transactions were paid to merchants, who were the terminal owners, or the networks eliminated the fees altogether. Of the top 20 PIN debit networks in the United States around 1991, 15 had no interchange fee, 4 paid interchange to merchants and only one paid interchange to issuers."[691]**

---

[691]    Frankel Rep. at ¶ 431 (citing Visa Check Exhibit 311, at '087  (SUFEX526). *See also* Declaration of Franklin M. Fisher, in re: *Visa Check / MasterMoney* Antitrust Litigation, December 13, 2002, Exhibit 6 (SUFEX527), listing 11 "major on-line networks" in 1992, 8 with no interchange, 2 with "issuer-paid interchange fees", and Interlink as the only network with "acquirer-paid interchange fees.").

*Defendants' Response to Paragraph 120b:*

Undisputed.

Defendants object to the admissibility of the Declaration of Franklin M. Fisher

from the *Visa Check* litigation.  The Declaration is an out of court statement for which no

exception to the hearsay rule has been established.  (Fed. R. Evid. 801, 802.)

Class plaintiffs have not provided Exhibit 6 to the Declaration of Franklin M.

Fisher.



**c.**

_____
[692]    (*Wal-Mart* case) Dooley Dep. p. 25, Sep. 22, 1999. (SUFEX528)

_Defendants' Response to Paragraph 120c:_

  Undisputed.

  Defendants object to the admissibility of Dooley Dep. p. 25 (*Wal-Mart* case),

dated September 22, 1999.[320]  The deposition testimony is an out of court statement for which no

exception to the hearsay rule has been established.  (Fed. R. Evid. 801, 802.)

  **d.**  **Dr. Frankel writes, "After Visa acquired Interlink, it imposed an interchange fee (payable to the issuing bank) in that network , and other networks followed."[693]**

_____
[693]    **Frankel Rep. ¶ 431 (citing David Evans and Richard Schmalensee, Paying With Plastic (1999, 1st edition), p. 307). (SUFEX529)**

_Defendants' Response to Paragraph 120d:_

  Undisputed.

  Defendants object to the admissibility of Frankel Rep. ¶ 431, which relies on

David Evans and Richard Schmalensee, Paying With Plastic (1999, 1st edition), p. 307.  Despite

class plaintiffs' attempt to introduce this evidence through Dr. Frankel, it is an out of court

_____
[320]    Deposition of Dale Allen Dooley (Sept. 22, 1999) (*Wal-Mart*) ("Dooley Dep.").

statement for which no exception to the hearsay rule has been established.  (Fed. R. Evid. 801, 802.)

**Plaintiffs' Paragraph 121:**

**121    Payment-Card Networks in other countries have been highly successful without Interchange Fees.**

*Defendants' Response to Paragraph 121:*

Disputed.  Class plaintiffs' assertion is incomplete and misleading.  (Fed. R. Evid. 106.)

Class plaintiffs' use of the term "highly successful" is vague, ambiguous, and misleading.  Class plaintiffs have not provided evidence that any foreign payment card networks have maximized output of their network.  Moreover, many foreign networks have characteristics that render them wholly inapplicable as benchmarks for four-party debit card networks in the United States.  For example, the Netherlands debit network involves bilaterally-negotiated interchange at non-zero levels, and until March 2004 had a single acquirer, which according to the Netherland Bankers Association, operated with "an implicit interchange fee."  (Reply of the Netherlands' Bankers Association,[321] at 2.)  Luxembourg, another country cited by class plaintiffs, operates as a three-party system with a sole acquirer jointly owned by the issuing banks.  (European Payment Cards Yearbook,[322] at TOPEL  03060.)  Finland's debit network system is characterized by highly concentrated acquiring (the two largest banks account for 82% of the acquiring), and the network is being phased out of existence.  (Topel Rep. ¶ 29; *see also* Competition in Nordic Retail Banking,[323] at 12.)  Further, the debit cards issued on all three of

---

[321]   Feedback Form, Reply of the Netherlands' Bankers Association to Interim report on Cards (Jun. 15, 2006) ("Reply of the Netherlands' Bankers Association").

[322]   Richard Rolfe, "European Payment Cards Yearbook – Luxembourg," *European Card Review* (2008), bearing control numbers TOPEL 03059 to 03064.

[323]   Report from the Nordic Competition Authorities: Competition in Nordic Retail Banking ("Competition in Nordic Retail Banking").

these debit networks have limited functionality and cannot be used for international transactions. (*See* De Nederlandsche Bank Quarterly Bulletin,[324] at 48 (the Netherlands); Payment and Settlement Systems in the European Union,[325] at 292 (Luxembourg); A Qualitative Study to Identify Factors that Influence Finnish Consumers to Change their Payment Behaviour,[326] at 19 (Finland).)

Defendants dispute class plaintiffs' definition of "Interchange Fee" as "a fee that Merchants pay to the Issuing Bank" because it is inaccurate, misleading, and unfairly prejudicial. An interchange fee is compensation paid by the acquiring bank to the issuing bank via Visa or MasterCard for the transaction passing through interchange. (*See* Paragraphs 64 & 69.) Class plaintiffs have presented no evidence that merchants pay any fees to issuing banks.

      a.    **The Danish network Dankort, on which 96.5% of usage is not subject to interchange fees, is "a considerable success," with very high usage per capita.**[694]

---

[694]    **EC Decision ¶¶ 564, 566. (SUFEX081)**

*Defendants' Response to Paragraph 121a:*

Disputed. Evidence on which class plaintiffs rely is incomplete and misleading. (Fed. R. Evid. 106.) The document on which class plaintiffs rely recognizes that the Danish Act on Payment Instruments has prohibited banks from charging merchants a fee for Dankort card acceptance, except via telephone and internet orders since 1999, which account for only approximately 3.5% of the total volume of Dankort payments. (EC Decision ¶¶ 564, 567; *see*

---

[324]   De Nederlandsche Quarterly Bulletin (Dec. 2007), bearing control numbers TOPEL 01027 to 01097.

[325]   European Central Bank, "Blue Book: Payment and Settlement Systems in the European Union, Volume 1, Euro Area Countries," (Aug. 2007).

[326]   Eerika Keinonen, "A Qualitative Study to Identify Factors that Influence Finnish Consumers to Change their Payment Behaviour," Bank of Finland, 2007 *BoF Online,* No. 11 (Sept. 18, 2007).

*also* Weiner, Interchange Fees in Various Countries,[327] at 20-22 (In 2003, an amendment to the Act introduced a positive merchant service charge to Dankort transactions and reduced the fees on Maestro and Visa Electron from 0.75% to 0.4%, with a maximum of DKK 4. In 2005, the Dankort merchant service charge was replaced by an annual fee per retailer.).) Payment Business Services A/S ("PBS"), a joint venture between the National Central Bank and approximately 130 domestic banks, operates as the acquirer for all Dankort transactions. (Competition in Nordic Retail Banking, at 58.) Debit cards issued on the Danish network Dankort can be used only in Denmark unless they are co-branded with Visa. (Payment Systems in Denmark,[328] at 7.3.) Further, the Dankort network requires a transfer of payment from acquirers to issuers in the form of dividends. (PBS Annual Report 2008, at 17, 19-20;Topel Rep. ¶ 29.)

Defendants object to the admissibility of the E.C. Decision. The E.C. Decision is unfairly prejudicial, and is an out of court statement for which no exception to the hearsay rule has been established. (Fed. R. Evid. 403, 801, 802.)

      **b.** **Citing figures compiled by various central banks and regulatory authorities, Plaintiffs' expert Dr. Alan Frankel notes that per capita usage of debit-cards in countries in which domestic debit networks operative without interchange fees are among the highest in the world.[695]**

---

[327] Stuart Weiner and Julian Wright, "Interchange Fees in Various Countries: Developments and Determinants," Sept. 6, 2005, available at http://www.kansascityfed.org/publicat/pscp/2005/Weiner-Wright.pdf (last visited Apr. 27, 2011) ("Weiner, Interchange Fees in Various Countries").

[328] Danmarks NationalBank: Payment Systems in Denmark (2005) "Payment Systems in Denmark," available at http://www.nationalbanken.dk/DNUK/Publications.nsf/d8a9f2b39990e07880256a3e004157b5/1e8fec8f259e61f fc125706c003d4409/$FILE/UK_payment.pdf (last visited May 5, 2011).

Figure 9.1



2006 Debit Card Usage per Capita

---
[695]     Frankel Rep. ¶ 346 & fig. 9. (SUFEX240)

*Defendants' Response to Paragraph 121b:*

        Undisputed.

        Defendants object to the admissibility of the evidence on which class plaintiffs rely in Paragraph 121b.  Despite class plaintiffs' attempt to introduce evidence statements from foreign entities through Dr. Frankel, they are out of court statements for which no exception to the hearsay rule has been established.  (Fed. R. Evid. 801, 802.)

        **c.**      **There are no interchange fees on Visa or MasterCard transactions in Iceland, yet card penetration and per capita volume are the highest in the world.**[696]

---
[696]     4/27/04 Memo. re Interchange Problem, MCI_MDL02_10577059 – 061. (Bamberger Decl. ¶ 76) (SUFEX530)

450

*Defendants' Response to Paragraph 121c:*

Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading. (Fed. R. Evid. 106.)  The memorandum on which class plaintiffs rely, Thom Dep. Ex. 20714, MCI_MDL02_10577059 to 10577061, states that small merchants are paying "higher fees" while the "biggest merchants enjoy lower merchant fees than the cost of acquiring." (*Id.* at MCI_MDL02_10577061.)  Additionally, the document states that the Icelandic example indicates that "[a]n interchange fee is necessary in a four party payment scheme." (*Id.*)

In the past, Iceland did not have interchange fees because it was essentially a three party system, where the single acquirer for each network was owned by the issuers, and therefore were able to charge substantial fees directly to merchants.  (Topel Rep. ¶ 29.) Moreover, following the break-up of the sole acquirer in Iceland, the network became a four-party system—and interchange fees were then introduced on credit card transactions.  (*Id.*)

Defendants object to the admissibility of Thom Dep. Ex. 20714.  The deposition exhibit is a memorandum from "Kreditkort hf, Iceland," and is an out of court statement for which no exception to the hearsay rule has been established.  (Fed. R. Evid. 801, 802.)

Defendants object to the admissibility of Bamberger Decl. ¶ 76.  Dr. Bamberger's declaration only concerns whether class plaintiffs' allegations are subject to class-wide determination (Bamberger Decl. at 2), and is not relevant to the merits of class plaintiffs claims at issue in class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402, 702.)

**Plaintiffs' Paragraph 122:**

**122     After the Reserve Bank of Australia capped Interchange Fees and allowed merchant surcharging, the Payment-Card industry in Australia continued to grow in terms of cardholders, merchants, and transaction volume.**

*Defendants' Response to Paragraph 122:*

Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading. (Fed. R. Evid. 106.)

Although there has been growth in Australia, growth has slowed after the Reserve Bank of Australia capped interchange fees, especially in four party systems.  (Reserve Bank of Australia, Market Shares of Credit and Charge Card Schemes[329] (showing stronger growth of American Express and Diners Club as compared to Visa and MasterCard); *see also* Murphy Rep. ¶ 310 ("After RBA regulations were implemented in November 2003, forcing a reduction in the average Australian Visa and MasterCard merchant discount of 0.52 percentage points by September 2006, the growth in Visa and MasterCard credit card transactions slowed and sales shifted to charge cards such as American Express"), 311-16, Ex. 6.1.)  MasterCard's Vice President of Strategy, Business Development, and Corporate Affairs for Australia and New Zealand testified that MasterCard has continued to grow in Australia due to its "significant increase in [its] investment in Australia over the last five or six years, totally independent of the regulatory environment." (Naffah Dep.[330] at 151.)  MasterCard also "benefited from the demise of Bankcard.  [MasterCard] were the major recipients of those cardholders, as they were reissued with replacement cards by their banks." (*Id.* at 152.)  Although MasterCard's significant

---

[329]   Available at http://www.rba.gov.au/statistics/tables/xls/c02hist.xls?accessed=1903-00:54:47 (last visited Apr. 4, 2011.)

[330]   Deposition of Albert Naffah (Oct. 7, 2008) ("Naffah Dep."). Mr. Naffah testified as MasterCard's 30(b)(6) witness regarding interchange fees and payment card regulation in Australia.  (Naffah Dep. at 41, 285; Naffah Dep. Ex. 26740 (30(b)(6) Deposition Notice).)

investment in its Australian business and the collapse of Bankcard improved MasterCard's business in Australia post-regulation, "[MasterCard] could have done a whole lot better but for the regulations." (*Id.* at 153.)

Additionally, since 2002, all credit card fees have gone up in Australia, with aggregate cardholder fees per account more than doubling from $47 in 2002 to $106 in 2008. (Murphy Rep. ¶ 249; Murphy Rep. Ex. 5.4; *see also id.* ¶ 250 (0.24 percentage point increase in cardholder fees in Australia from 2003 to 2008).) Further, rewards paid on Visa and MasterCard credit cards in Australia dropped from 0.35% in 2003 to 0.27% in 2008. (Murphy Rep. Ex. 5.5.) Dr. Murphy concluded that the "mandated reduction in merchant fees in Australia was entirely offset by increases in cardholder fees and reductions in benefits. Given that the reduced net benefits to cardholders reduce value for merchants, this would imply that the Australian regulation likely reduced the total value provided by the card networks." (Murphy Rep. ¶ 250.)

Defendants dispute class plaintiffs' definition of "Interchange Fee" as "a fee that Merchants pay to the Issuing Bank" because it is inaccurate, misleading, and unfairly prejudicial. An interchange fee is compensation paid by the acquiring bank to the issuing bank via Visa or MasterCard for the transaction passing through interchange. (*See* Paragraphs 64 & 69.) Class plaintiffs have presented no evidence that merchants pay any fees to issuing banks.

     a.    **In 2003, the Reserve Bank of Australia ("RBA") capped the effective Interchange rates of Visa and MasterCard in Australia at approximately 0.55%, which represented a reduction from the then-prevailing effective rates of 0.95%. In 2006, the RBA revised the interchange benchmark to 0.5%.[697]**

---

[697]    Naffah Ex. 26709, at 31 (SUFEX531); Naffah Dep. 174:8-10 (SUFEX532); Naffah Ex. 26736 at 3. (SUFEX533)

*Defendants' Response to Paragraph 122a:*

> Undisputed.  Defendants note that the above interchange rates are for credit products.

       **b.**    **Before the RBA reform took effect, MasterCard predicted a "death spiral" in which reduced Interchange would lead to declining issuance, which would lead to declining acceptance, which would in turn lead to further declining issuance.[698]**

---

[698]    Naffah Ex. 26706, at MCI_MDL03_00001111. (SUFEX534)

*Defendants' Response to Paragraph 122b:*

> Undisputed.

       **c.**    **After the RBA capped the Interchange rates of Visa and MasterCard, merchant fees in Australia fell.**

- **When interchange fees were reduced in Australia, MasterCard CEO Robert Selander explained that "There was a transfer of wealth annualized at about […] $500 million a year into the merchant community out of the bank community[…]"[699]**

- **The RBA found that merchant fees for four-party cards fell 0.56 percentage points to 0.84% from 2003-07, which was greater than the decline in interchange, indicating increased competition among acquirers. [700]**

- **MasterCard Australia's representative, Albert Naffah, testified that number of and competition among acquirers has increased since the RBA reforms. [701]**

- **The decrease in merchant fees that followed the RBA reforms exceeded the sum of the increase in Cardholder fees and decrease in Cardholder rewards.**

---

[699]    "MasterCard Chief Claims Edge, Looks Ahead," American Banker, Aug. 1, 2007.

[700]    Naffah Ex. 26709, at 22; Naffah Ex. 26732, at 22. (SUFEX531)

[701]    Naffah Dep. 176:3-177:4. (SUFEX532)

*Defendants' Response to Paragraph 122c:*

Disputed.  Class plaintiffs offer no evidence in support of their assertion that after the RBA capped the Interchange rates of Visa, merchant fees in Australia fell.

Class plaintiffs offer no evidence in support of their assertion that "[t]he decrease in merchant fees that followed the RBA reforms exceeded the sum of the increase in Cardholder fees and decrease in Cardholder rewards."

Class plaintiffs offer no evidence regarding Visa merchant fees in Australia.

**d.    Since the RBA reforms, the number of merchants accepting Payment Cards in Australia increased.**

- **Mr. Naffah further testified that more merchants accepted MasterCard after the reforms took effect than prior to the reforms, and MasterCard's consultants reported an increased MasterCard merchant acceptance rate of approximately 40% from the time of the reforms to 2007.** [702]

- **A Media Release by the Reserve Bank of Australia in April 2001 states, "Following a decision by the Payments System Board, the Reserve Bank has today brought credit card schemes in Australia under its regulatory oversight. It has formally 'designated' as payment systems subject to its regulation under the *Payment Systems (Regulation) Act 1998*, the credit card systems operated in Australia by Bankcard, MasterCard and VISA. Designation is the first step in establishing standards and access regimes for a payment system to deal with public interest issues. The decision to designate was taken after consultations with a range of interested parties. The credit card systems designated by the Bank have two unique characteristics that raise public interest questions about efficiency and competition: • the systems have wholesale fees (known as interchange fees) set collectively by the financial institutions that are members of these systems, but that are otherwise competitors in providing credit card services to cardholders and merchants. Interchange fees are an important determinant of the fees facing cardholders and merchants in credit card systems; and • membership of the international card systems (MasterCard and VISA), either for credit card issuing or acquiring, is restricted in Australia to authorised deposit-taking institutions. Such membership rules based on institutional status may be more restrictive than necessary to protect the safety and integrity of the systems. Bankcard is currently reviewing its membership rules."** [703]

- **A report commissioned by MasterCard, citing MasterCard data, states that the number of merchant acceptance locations in Australia grew by almost 40% in four years, from roughly 500,000 to 700,000 following a 47% reduction in average interchange fees and elimination of the no-surcharge rule.**[704]

---

[702]    Naffah Dep. at 67:13-19. (SUFEX532)

[703]    Press Release, Reserve Bank of Australia, Designation of Credit Card Schemes in Australia (Apr. 12, 2001), *available at http://www.rba.gov.au/media-releases/2001/mr-01-09.html.* (SUFEX536)

[704]    Naffah Dep. Ex. 26734, at 25-26 (SUFEX537), Oct. 10., 2008 (Robert Stillman, William Bishop, Kyla Malcolm, Nicole Hildebrandt, "Regulatory intervention in the payment card industry by the Reserve Bank of Australia, Analysis of the evidence," CRA International, April 28, 2008); Frankel Rep. ¶ 161. (SUFEX240)

*Defendants' Response to Paragraph 122d:*

Disputed. Class plaintiffs mischaracterize Mr. Naffah's deposition testimony. Mr. Naffah testified, "I think we have more merchants accepting cards today than we did prior to November 2003." (Naffah Dep. at 67.) Class plaintiffs do not present any evidence that Mr. Naffah testified that MasterCard's consultants reported an increased MasterCard merchant acceptance rate of approximately 40% from the time of the reforms to 2007.

Defendants note that plaintiffs provide no evidence regarding causation between the 47% reduction in average interchange fees and the growth of merchant acceptance locations in Australia. The document on which class plaintiffs rely suggests that such causation does not exist: "Merchant surveys find that most merchants which have started to accept credit cards since 2003 have done so because customers regularly asked to use these cards. The RBA claims that the removal of the no-surcharge rules has led to increased merchant acceptance of payment cards. The RBA claims that some merchants have begun to accept credit cards with a surcharge

where previously they were unwilling to accept cards.  The RBA provided no support for this

claim."  (Naffah Dep. Ex. 26734,[331] at 26.)

       **e.**       **The number of credit and charge card accounts in Australia increased from approximately 10.8 million to 14.8 million in the seven years following the RBA reforms.[705]**

---

[705]    RBA Credit and Charge Card Statistics, Table C-1, available at http://www.rba.gov.au/statistics/tables/xls/c01hist.xls (SUFEX538); *see also* Naffah Dep. 67:13-68:3, Oct. 7, 2008 (SUFEX532) (testifying to increase in number and value of MasterCard transactions following RBA reforms).

_Defendants' Response to Paragraph 122e:_

       Undisputed.  Defendants note that the Australian figures include both charge and

credit cards, not just credit cards.

       **f.**       **After the RBA reforms, the number and volume of Payment-Card transactions increased.[706]**

          •   **Visa's Bill Sheedy testified, "I am generally aware that since 2003 the number of Visa transactions [in Australia] and the dollar volume in the Visa system have grown."[707]**

          •   **MasterCard's Q3 2005 economic update on the Australian market cites growth in Visa and MasterCard gross dollar volume of 5% and 31%, respectively from 2002 to 2004.[708]**

          •   **The RBA reported that transaction volume on credit cards also increased by 75.5% during this time period from $104.4 in 2003 to $183.3 billion in 2010.[709]**

---

[706]    Steele Dep. 147:7-14, 152:1-10, Nov. 5, 2008. (SUFEX539); Naffah Dep. 67:20-68:13 (SUFEX532); *see generally* RBA Credit and Charge Card Statistics, Table C-1, available at, http://www.rba.gov.au/statistics/tables/xls/c01hist.xls?accessed=Tuesday, 12-Oct-2010 05:15:41 EST. (SUFEX538)

[707]    Sheedy Dep. 540:13-16. (FUFEX083)

[708]    Naffah Ex. 26723. (SUFEX541)

---

[331]  Robert Stillman, William Bishop, Kyla Malcolm, Nicole Hildebrandt, "Regulatory intervention in the payment card industry by the Reserve Bank of Australia, Analysis of the evidence," CRA International (Apr. 28, 2008).

[709]      Reserve Bank of Australia, Payments Data, *available at http://www.rba.gov.au/payments-system/resources/statistics/index.html* (last visited Jan. 17, 2011). (SUFEX542)

*Defendants' Response to Paragraph 122f:*

        Disputed.  Class plaintiffs' citation to the deposition transcript of Mr. Sheedy is not supported by his testimony.

    **g.**    **After the RBA reforms, issuing banks in Australia remained profitable.[710]**

- **A March 2004 Visa presentation stated that Australian issuers not only recouped their lost interchange revenue by increased account fees, but were expected to increase revenue by 11% just one year after the reforms.[711]**

- **A 2005 Datamonitor Report produced by Visa reported that Australian credit card issuers "largely mitigated the effect of losing interchange revenues benefiting from increased revenue in other areas."[712]**

_____

[710]      Naffah Dep. 223:9-21. (SUFEX532)

[711]      Hunt Ex. 30418, at 7. (SUFEX543)

[712]      Steele Ex. 34316, at 42. (SUFEX544)

*Defendants' Response to Paragraph 122g:*

        Undisputed.

    **h.**    **After the RBA reforms, the MasterCard[713] network remains profitable in Australia. Class Plaintiffs are aware of no evidence to indicate that Visa does not also remain profitable.[714]**

_____

[713]      Naffah Dep. 68:21-69:5. (SUFEX532)

[714]      An internal Visa Asia/Pacific document projects Visa's CAGR to increase of 8% and an 18% payment-volume increase by 2013. T. Steele Ex. 34300 VUSAMDL1-09079690-715 at 09079714.  (SUFEX545)

*Defendants' Response to Paragraph 122h:*

        Undisputed.

<u>**Plaintiffs' Paragraph 123:**</u>

**123    There is no evidence that payment cards with rewards increase consumers' spending.**

*Defendants' Response to Paragraph 123:*

       Disputed.  Evidence shows that using rewards cards leads cardholders to spend more and purchase more from a merchant.  (Murphy Rep. ¶147, Ex. 4.8; *see also id.* ¶ 287 ("individuals' cardholding behavior and their spending levels are related.  Individuals holding cards of any type spend more than they do when they hold no cards, and either moving up the cardholder benefit hierarchy or adding an American Express card is associated with a further increase in spending."); Sheedy Dep. at 451 ("Our data suggests that consumers that carry rewards based products purchase higher ticket amounts and on average spend more money with merchants than do consumers that don't carry rewards based products."); McCurdy Dep.[332] at 314 ("███████████████████████████████████████████████████████ .

███████████████████"); Rajamannar Dep. at 228 ("even internal data analysis clearly shows that people with rewards cards spend a lot more per account on an average than people who do not have a rewards card. Very clearly."); Saunders Dep. at 112 ("Q.  Well, typically a Visa Signature card would generate more interchange fee income for an issuing bank than a Visa Traditional credit card, correct?  A.  And more volume, considerably more volume."); Pomcrleau Dep. at 46 (███████████████████████████████████████

████████████████████████████████████████████████████"); Groch

---

[332] Deposition of Stephen B. McCurdy (Mar. 24, 2009) ("McCurdy Dep.").  Mr. McCurdy testified as American Express' Rule 30(b)(6) witness regarding steering and surcharging in Australia and the United Kingdom, American Express' merchant discount rates, American Express' card issuance and merchant acceptance business model, and competition between American Express and other payment cards for merchant acceptance. (McCurdy Dep. at 11-12; McCurdy Dep. Ex. 29800 (30(b)(6) Deposition Notice).)

Dep. at 135 ("People with rewards spend more."); Buse Dep. at 251 ("it's a requirement, that Visa Signature cardholders spend more on their cards than Visa Traditional Rewards cardholders and those Visa Traditional Rewards cardholders spend more than the Visa credit cardholders."); Portelli 30(b)(6) Dep. at 155 ("I mean standard, Premium World, Signature, Amex, rewards-based cards, consumers tend to spend more."); McElhinney Dep.[333] at 184 ("What I've talked to merchants about is how, typically with the Signature cardholders, they are very loyal to their rewards program. They do spend more on average. The ticket sizes are higher. The monthly spend is higher"); Fulton Dep.[334] at 139 ("rewards customers will spend more"); Kapteina Dep. at 407-08 ("The average ticket for a World Elite supermarket category is higher than a standard Gold or Platinum card."); VUSAMDL1-03585517 to 03585520,[335] at 518 ("Given the competitive marketplace, increased interchange fees to card issuing financial institutions have historically allowed Issuers to lower costs to cardholders and also permit Issuers to add features and benefits to cards, which help increase usage and provide cardholders greater utility thereby benefiting Merchants through incremental sales and customer satisfaction.").)

Evidence also shows that payment cards increase consumers' spending, regardless of whether the cards have a rewards feature. (Steele Dep. at 277 ("We've seen this in Visa, our average ticket in the fastfood segment is higher than what is reported to be the average ticket overall. And we believe that is in part because consumers are able to spend within the broader limits of their account type and not limited to the cash they have in their pocket. That

---

[333]   Deposition of Bruce McElhinney (Jul. 29, 2008) ("McElhinney Dep."). Mr. McElhinney testified as the Head of U.S. and Canada Client Sales for Visa. (McElhinney Dep. at 15.)

[334]   Deposition of Henry W. Fulton, III (Feb. 12, 2009) ("Fulton Dep."). Mr. Fulton testified as senior vice president of home equity and reverse mortgages and former head of credit cards for Bank of America. (Fulton Dep. at 7-8.)

[335]   Visa Business Review, Visa Check Card, Interlink, and ATM Interchange Reimbursement Fee Modifications, Issue No. 041109 (Nov. 2004).

adds value for the merchant in the form of incremental sales."); CardTrak, Nuggets and Cards

(Jul. 25, 2005) (McDonald's acknowledged that accepting payment cards, including debit, has

been key to increasing sales, delivering higher than average ticket-lift); Sheedy Decl. ¶ 31; T.

Murphy Decl. ¶ 31.)

       Members of the putative plaintiff class in this case themselves recognized in the

*Visa Check* litigation that: "It is undisputed that the acceptance of credit cards leads to

incremental sales for merchants." (Statement of Undisputed Facts Pursuant to Local Rule 56.1 in

Support of Plaintiffs' Motion for Summary Judgment, at 6 n.18, 22, *In re Visa*

*Check/MasterMoney Antitrust Litig.*, CV-96-5238 (E.D.N.Y.).)

       The profits on the incremental sales merchants realize because they accept

payment cards exceeds the costs merchants pay to accept payment cards. (Murphy Rep. ¶ 124.)

     a.    **Visa's Tolan Steele and Tom Brown gave a presentation to Washington Mutual on January 12, 2006, entitled "Framing the Interchange Debate."[715] Steele testified that he was one of the authors of the presentation document.[716] The presentation states, "There is no causal relationship between card payments and increased ticket size. It is difficult to imagine how such a relationship could be proven, but this data does not provide evidence that customers spend more than they normally would because they pay with a card rather than cash."[717] The presentation describes this fact as one of "a number of drawbacks" to asserting that "Accepting Visa increases revenue."[718]**

---

[715]   **Steele Dep. Ex. 31468. (SUFEX546)**

[716]   **Steele Dep. 578:3-20. (SUFEX198)**

[717]   **Steele Dep. Ex. 31468, at VUSAMDL1-08557440. (SUFEX546)**

[718]   **Steele Dep. Ex. 31468, at VUSAMDL1-08557440. (SUFEX546)**

*Defendants' Response to Paragraph 123a:*

       Undisputed.

b.  A █████ memorandum dated January 8, 2002, entitled "Impact Analysis on Recent Issuer Upgrades to ████████████ states, ██████████████████████

██████████████████████████████████████████

████████████████████████████ [719]  The memorandum lists one of the "Pros" of portfolio flipping as ████████████████████ [720]

The memorandum discusses the possibility of ████████████

██████████████████████████████████████████ and

lists one of the "Cons" of this approach as ██████████████ [721]

[719] ████████████████████████████████

[720] ████████████████████████

[721] ████████████████████████

_Defendants' Response to Paragraph 123b:_

      Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading. (Fed. R. Evid. 106.)  With regards to the statement that "[a]n analysis of ████████████ ████ Signature volume by month since the upgrade shows no increase in consumer spending," the document states, "We surmise that September 11 is a major reason behind our not seeing a lift in Signature card volume – particularly in T&E, the hardest hit segment generally in terms of consumer spending."  (VUSAMDL1-08829789 to 08829797, at 794.)

      Defendants object to the admissibility of ████████████████████, dated January 8, 2002.  The document relates to events prior to relevant time period applicable in this case, and is therefore inadmissible as irrelevant to any issue in support of class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)

c.  When asked if MasterCard ██████████████████████████

██████████████████████████

MasterCard's 30(b)(6) designee for Interchange Methodology, Steve Jonas, testified, "██████████████████████████████

████████████████████████████████████████
████████████████ ᵗᵗ[722]

---
[722]    **Jonas 30(b)(6) Dep. 351:24-352:23. (SUFEX332)**

*Defendants' Response to Paragraph 123c:*

      Disputed.  Mr. Jonas was MasterCard's designated representative to answer

questions about the methodology by which MasterCard establishes interchange fees.  (Jonas

Methodology Dep. at 7.)

      **d.**    **An internal Visa email exchange regarding interchange increases implemented without card reissuance contained this commentary: "Many merchants see this as nothing more than an interchange increase.  Their analysis tells them that the same cardholder, presenting the same card is now holding a more expensive piece of plastic.  They do not see any increase in sales, just an increase in cost."  A later message in the chain states: "The merchants have done their homework.  Their own analysis has told them that the interchange rate on a set of existing Visa account numbers has increased from consumer to commercial... a customer using the Mileage Plus Visa card has not changed his spending behavior; [the merchant] is just paying more for the transaction.  To make matters worse the Issuer has not re-issued the plastic."[723]**

---
[723]    **Allen Ex. 35613, at VUSAMDL1-09026724, VUSAMDL1-09026722. (SUFEX548)**

*Defendants' Response to Paragraph 123d:*

      Undisputed.

      Defendants object to the admissibility of Allen Dep. Ex. 35613, dated January 10,

2002.  The deposition exhibit relates to events prior to relevant time period applicable in this

case, and is therefore inadmissible as irrelevant to any issue material fact in support of class

plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)  In addition, statements

reflecting merchants beliefs quoted by class plaintiffs are out of court statements for which no

exception to the hearsay rule has been established.  (Fed. R. Evid. 801, 802.)

   e.    **A MasterCard PowerPoint presentation entitled "US Region Enhanced World Interchange Rate Programs," sent from Steve Jonas to Ruth Ann Marshall, Fred Gore and Joy Thoma on November 18, 2005, analyzes the effect on MasterCard's overall effective interchange rate from a 230 basis point "Enhanced World" product and states, "Total Consumer [Effective Rate] depends on whether Enhanced World [Gross Dollar Volume] is incremental, shifted from World, or shifted from Std/Gold/Plat."[724] When asked for the basis for MasterCard's assumptions "with respect to how much volume would be incremental, how much volume would shift" for MasterCard's World Elite product, MasterCard's 30(b)(6) witness for Interchange Methodology, Steve Jonas, testified,**



[725]

---

[724]    Jonas 30(b)(6) Dep. Ex. 23142, at MCI_MDL02_08746071. (SUFEX549)

[725]    Jonas 30(b)(6) Dep. 353:25-355:13. (SUFEX332)

*Defendants' Response to Paragraph 123e:*

    Disputed.  Mr. Jonas was MasterCard's designated representative to answer questions about the methodology by which MasterCard establishes interchange fees.  (Jonas Methodology Dep. at 7.)

   f.    **Visa's former CEO, John Philip Coghlan, testified that he had never seen "data gathered by or for Visa that compared actual disposable income spending by persons who had a premium card compared to what they spent before they had the premium card" and agreed that data showing that**

"average spend is higher on a card with a rewards component as opposed to nonrewards cards" does not "say anything about whether the person who has the card is actually spending more before or after they get a rewards card."[726]  Coghlan also testified that he was not aware of any Visa data that would support an assertion that "merchants are better off because people, as a group, buy more stuff because they have rewards card."[727]

---

[726]    Coghlan Dep. 112:1-19. (SUFEX141)

[727]    Coghlan Dep. 117:5-118:7. (SUFEX141)

*Defendants' Response to Paragraph 123f:*

Undisputed.

g.    **MasterCard former Senior VP of Acceptance, Fred Gore, testified that he had never** ███████████████████████████████████████[728]

---

[728]    Gore Dep. 193:25-194:6. (SUFEX249)

*Defendants' Response to Paragraph 123g:*

Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading.

(Fed. R. Evid. 106.)  Mr. Gore clarified the above statement and stated, "████████████████████████████████████████████████████████████████████████████" (Gore Dep.[336] at 194.)

h.    **The European Commission's 2007 decision regarding MasterCard's multilateral interchange fee states, "MasterCard in particular failed to provide empirical evidence for its central claim that the MIF maximizes the scheme's 'output' and for a causal link to other objective efficiencies claimed. It was therefore not established that the restrictive effects of the MIF in the acquiring markets are duly offset by objective efficiencies. Despite repeated requests by the Commission MasterCard failed to submit any empirical evidence on the positive effects of its MIF on system output and related efficiencies."[729]**

---

[336]   Deposition of Fred Gore (Jan 8, 2008) ("Gore Dep.").  Mr. Gore is the former senior vice president for U.S. acceptance at MasterCard.  (Gore Dep. at 19-20.)

[729]     **E.C. Decision at ¶ 6. (SUFEX081)**

*Defendants' Response to Paragraph 123h:*

      Undisputed.  Defendants note that the European Commission decision does not

discuss whether payment cards with rewards increase consumers' spending.

      Defendants object to the admissibility of the E.C. Decision.  The E.C. Decision is

unfairly prejudicial, and is an out of court statement for which no exception to the hearsay rule

has been established.  (Fed. R. Evid. 403, 801, 802.)

      **i.**    **An October 2005 MasterCard presentation entitled** ████████
                          **states,** ████████████████
                         ████████████████████
                         ████████████████ **It is unclear**
            **whether Signature has generated any** *incremental* **spend on these existing**
            **high-spend cards."**[730]  **The document also shows that Bank of America,**
            **Chase, Citibank, Capital One and MBNA have "Moved to higher**
            **interchange (Visa Signature or World)."**[731]

[730]     **Portelli Dep. Ex. 23604, at MCI_MDL02-01458113, May 14, 2008. (emphasis in original). (SUFEX550)**

[731]     **Portelli Dep. Ex. 23604, at MCI_MDL02_014458113, May 14, 2008. (SUFEX550)**

*Defendants' Response to Paragraph 123i:*

      Disputed.  Evidence on which class plaintiffs rely is incomplete and misleading.

(Fed. R. Evid. 106.)

      Defendants object to the admissibility of Portelli Dep. Ex. 23604.  Class plaintiffs

have provided no evidence that MasterCard is competent to testify about Visa Signature credit

products.  (Fed. R. Evid. 602.)

      **j.**    **When asked whether she was "aware of any data at MasterCard revealing**
            **whether a cardholder with a World Elite credit card form MasterCard is**
            **more or less valuable to a grocery store or a drugstore than a MasterCard**

**cardholder with a MasterCard standard credit card," Elizabeth Kapteina, a Director in MasterCard's Interchange group, testified,** ████████████████
████████ [732]

---

[732]   **Kapteina Dep. 407:8-17. (SUFEX242)**

*Defendants' Response to Paragraph 123j:*

Disputed.  Class plaintiffs' characterization of Ms. Kapteina's deposition

testimony is incomplete and misleading.  (Fed. R. Evid. 106.)  Defendants note that Ms.

Kapteina also provided the testimony below:

Q.   Are you aware of any data at MasterCard revealing whether a MasterCard cardholder with a World Elite card spends more money in a grocery store or a drugstore than a MasterCard cardholder with a MasterCard standard credit card?

MS. RAVELO:  Objection to the form.

████████████

█████████████████

████████████████████████████████

(Kapteina Dep. at 407-08.)

k.   **In an internal email regarding Chase's plans** ████████████
██████████████████████████ **Visa employee Jim McCarthy**
**stated that he was "**█████████████████████████████████
███████████████████████████████████
█████ **"**[733]

---

[733]   **VUSAMDL1-09235318-20, at VUSAMDL1-09235318. (SUFEX551)**

*Defendants' Response to Paragraph 123k:*

Undisputed.  Defendants note that the email on which class plaintiffs rely states

that Visa Signature cardholders are high spenders.

**l.      The Wal-Mart 10-K for March 31, 2008 shows that Wal-Mart does not attribute its increase in sales over the previous year to the fact that it began accepting MasterCard Credit Cards. Rather, Wal-Mart attributes the increase in Sam's sales to relatively low fuel sales in the year prior to accepting MasterCard and relatively higher fuel sales in the following year. The slower growth rate at Wal-Mart-branded stores is attributed to cannibalization resulting from the opening of new stores.[734]**

_____

[734]      **Wal-Mart Stores, Inc., Annual Report (Form 10-K) 9-10 (Mar. 31, 2008). (SUFEX552)**

_Defendants' Response to Paragraph 123l:_

Disputed.  This paragraph contradicts class plaintiffs' assertion in Paragraph 90d that Wal-Mart's plan to stop accepting MasterCard in 2004 "never materialized."  (_See_ Paragraph 90d.)

Defendants object to the admissibility of the Wal-Mart 10-K for March 31, 2008. The document is an out of court statement for which no exception to the hearsay rule has been established.  (Fed. R. Evid. 801, 802.)

468

<u>Plaintiffs' Paragraph 124:</u>

**124     In the United States, interchange fees are not completely passed through to cardholders.**

*Defendants' Response to Paragraph 124:*

       Disputed.  Defendants do not present any information in subparagraphs a-k that

quantifies for a cardholder, or a group of cardholders, the value of the benefits received as

compared to the value of interchange fees.

    a.    **Defendants' Expert, Prof. Kenneth Elzinga, wrote, "If the interchange fee increase was not passed along to the cardholder to the same extent that it was passed along to the merchant, then the increase in the total price is . . . the difference between the amount passed along to the merchant and the amount passed along to the cardholder . . . ."[735]**

_____
[735]     **Elzinga Report at p. 33. (SUFEX250)**

*Defendants' Response to Paragraph 124a:*

       Undisputed.

    b.    **Visa's 2008 Consumer Credit Card Issuer Benchmark Study found that, as of 2007, only ▮▮▮▮ of cardholder accounts provided any type of rewards.[736]**

_____
[736]     **VUSAMDL00210966-1059, at VUSAMDL00210983. (SUFEX553)**

*Defendants' Response to Paragraph 124b:*

       Undisputed.

    c.    **Visa's 2008 Consumer Credit Card Issuer Benchmark Study also found that, as of 2007, issuers' cardholder rewards expenses were less than ▮▮▮ of interchange fees received.[737]**

_____
[737]     **VUSAMDL00210966-1059, at VUSAMDL00210985. (SUFEX553)**

*Defendants' Response to Paragraph 124c:*

Disputed.  Evidence cited by class plaintiffs does not support their assertion that Visa's 2008 Consumer Credit Card Issuer Benchmark Study found that, as of 2007, issuers' cardholder rewards expenses were less than ▮ of interchange fees received. (VUSAMDL00210966 to 00211059, at 0985.)

d.     **Dr. Frankel wrote that "previous empirical and theoretical investigations . . . have . . . concluded that pass-through of interchange fees to consumers is substantially less than 100%."**[738]

_____
[738]     **Frankel Rebuttal at ¶ 219 (citing Jean-Charles Rochet and Jean Tirole, "Cooperation among competitors: some economics of payment card associations," 4 RAND Journal of Economics 33 (2002) (SUFEX554), p. 552; Jean-Charles Rochet, "The Theory of Interchange Fees: A Synthesis of Recent Contributions," 2 Review of Network Economics 2 (2003) at 102). (SUFEX555)**

*Defendants' Response to Paragraph 124d:*

Undisputed.

Defendants object to the admissibility of all evidence on which class plaintiffs rely in Paragraph 124d.  All of this evidence relates to conduct prior to January 1, 2004, and therefore relates to events prior to relevant time period applicable in this case, and is therefore inadmissible as irrelevant to any issue in support of class plaintiffs' motion for summary judgment.  (Fed. R. Evid. 401, 402.)  In addition, all of the evidence which class plaintiffs attempt to introduce through Dr. Frankel consists of court statements for which no exception to the hearsay rule has been established.  (Fed. R. Evid. 801, 802.)

e.     **Taking the sum of total interchange fees, annual fees and cardholder fees, and subtracting the amount of cardholder rewards and affinity payments made to consumers and banks' co-branding and affinity partners, Visa's Profit Analysis Report data demonstrate that the total price increased by approximately ▮ during the period that Interchange Fees increased between 1996 and 2008.**[739]

_____
[739]     **Frankel Rebuttal Ex. 5.3 at ¶ 239. (SUFEX556)**

*Defendants' Response to Paragraph 124e:*

Disputed.  Defendants dispute class plaintiffs' definition of "Interchange Fee" as "a fee that Merchants pay to the Issuing Bank" because it is inaccurate, misleading, and unfairly prejudicial.  An interchange fee is compensation paid by the acquiring bank to the issuing bank via Visa or MasterCard for the transaction passing through interchange.  (*See* Paragraphs 64 & 69.)  Class plaintiffs have presented no evidence that merchants pay any fees to issuing banks.

f.   ███████████ **the chief financial officer of** ██████████ **Services, testified that rewards expense is treated as contra-revenue against interchange revenue, explaining as follows: "Yes. So in this context, and these items that all sum to the line non-interest income, that total non-interest income number of** ████████ **would be considered revenue for external reporting purposes, so we have various items that sum into that. The interchange income, for instance, of** █████████ **and then it gets reduced by rewards and then the revenue sharing number of** ████████**. Those items with the brackets around it would be considered contra revenue items reducing the gross revenue, and that's how we get -- they're contra revenue."[740]**

[740]  ████████████████████ .

*Defendants' Response to Paragraph 124f:*

Undisputed.

g.   **An April 2005** ████ **memorandum entitled "marketing Functional Business Review" analyzes "Rewards Products - Metrics & Stats" and concludes: "Generating over** ███ **in profit/year."[741]**

[741]  ██████████████████████████████

*Defendants' Response to Paragraph 124g:*

Undisputed.  Defendants note that the above finding is also consistent with an increase in profit due to a lift in spend due to cardholders with rewards cards spending more.

h.   **A 2005** █████ **presentation entitled** ████████ **Card Services Discussion with** █████████ **states "Interchange is the amount we earn from merchants for**

the convenience of allowing their customers to use a credit card . . . . We share a portion of the interchange with both our customers (rewards) and partners (revenue sharing)" and contains a pie chart with the following quantities: Revenue Share ███ Rewards ████ and Net Interchange - ███ [742]

[742]    ████████████████████████████████████████████

_Defendants' Response to Paragraph 124h:_

Undisputed.

    i.    **Visa and MasterCard's recommended minimum reward levels are not intended to match interchange rates.**

- **Murphy Exhibits 5.1A and 5.1B depict alleged "Minimum Mandated Rewards" for Visa and MasterCard transactions at Grocery Stores and Electronics stores, as well as the interchange rates applicable on these transactions. [743] These exhibits show that the ████████████ ████████████████████████████████ [744] For example, a grocery store transaction using a "Traditional Rewards" card carries a ████ interchange rate on MasterCard and a ████ interchange rate on Visa, but the mandated rewards are only ████ and ████, respectively.[745] The interchange rate for an electronics store transaction using a "Non-Rewards" card is ████ for MasterCard and ████ for Visa, but the minimum mandated rewards level for both is ███.[746]**

- **In a 2009 proceeding in the United States Tax Court, Capital One gave the following statement: "Capital One objects, however, to any inference that Interchange Fees are designed to compensate Issuing Banks for their rewards programs. As VISA's Mr. Sheedy explained during trial: 'We don't move interchange fees or set interchange fees in order to compensate for rewards.'"[747]**

---

[743]    **Murphy Exhibits 5.1A and 5.1B. (SUFEX338)**

[744]    **Murphy Exhibits 5.1A and 5.1B. (SUFEX338)**

[745]    **Murphy Exhibits 5.1A and 5.1B. (SUFEX338)**

[746]    **Murphy Exhibits 5.1A and 5.1B. (SUFEX338)**

[747]    **Petitioners Answering Brief, Interchange Issue, Capital One Financial Corporation and Subsidiaries, Petitioners, v. Commissioner of Internal Revenue, Respondent, June 1, 2009, p. 38. (SUFEX559)**

*Defendants' Response to Paragraph 124i:*

        Undisputed.

    **j.**    **MasterCard does not specify the minimum amount of rewards that actually have to be provided to consumers on its premium "World Elite" credit card. In the "World Elite MasterCard Implementation Guide," MasterCard states that "[a]t least one World Elite card reward must be equal to or greater in value than** ███ **of redeemed points." It then states that "[o]ther reward values may be set at the issuer's discretion but should be in line with industry trends and norms." The document states that "as a rule of thumb," most premium-card rewards "are worth no less than** ███ **"[748]**

---

[748]    MCI_MDL02_06584328, at MCI_MDL02_06584342.

*Defendants' Response to Paragraph 124j:*

        Undisputed.

    **k.**    **Plaintiffs' Expert, Alan Frankel, cites Visa and MasterCard interchange rates and rewards requirements to show that "interchange fee rates have increased without increases in required rewards. For example, MasterCard increased effective interchange fee rates for World cards by** ██ **basis points and** <u>decreased</u> **required rewards by** ██ **basis points."[749] Dr. Frankel continues, "Similarly, Visa increased its Signature card interchange fee rates by** ██ **basis points and** <u>decreased</u> **required rewards by** ██ **basis points."[750]**

---

[749]    Frankel Rebuttal at ¶ 225 (citing MCI_MDL02_08243706 (SUFEX560) (noting that World rewards requirement was ██ basis points for all rewards and was being relaxed in June 2004 to at least one reward in the program being worth ██ basis points); MCI_MDL02_01144537  (SUFEX561)(noting that World rewards requirement as of January 2005 was that at least one reward must have a value equal to or greater than ██ basis points); MCI_MDL02_00027699 (SUFEX562) and MCI_MDL02_06907028 (showing effective interchange for World cards increasing from ███ to ███ in late 2004)). (SUFEX563)

[750]    Frankel Rebuttal at ¶ 225 (citing VUSAMDL1-05122601 (SUFEX564) (showing Visa Signature rewards requirement of "an average retail redemption value of ███ for points redeemed.") and VUSAMDL1-03714286 at 293 (SUFEX565) (showing by March 2005 that the requirement had been reduced to "a minimum consumer value of ██ basis points")).

*Defendants' Response to Paragraph 124k:*

        Disputed.  Class plaintiffs mischaracterize the document marked SUFEX564

which states that Visa Signature *non-travel* rewards must have an average redemption value of

███.  (*Id.* at VUSAMDL1-05122601.)

Evidence shows that the interchange rates for Visa and MasterCard rewards cards help fund the issuers' rewards program at the levels set by Visa and MasterCard as well as fund the other required benefits such rewards cards must offer in order to receive the higher interchange rate. (Murphy Rep. ¶¶ 242-43 ("The key observation from this exhibit is that the *incremental* rewards exceed the *incremental* interchange when comparing non-rewards cards to rewards cards or to different levels of rewards cards. . . . [M]erchants pay an incremental interchange rate for a World Elite cardholder relative to a non-rewards cardholder of only ███ percentage points, even though MasterCard requires that cardholders receive incremental rewards of at least ███ percentage points. . . . In effect, both Visa and MasterCard require that a cardholder receives additional rewards that are two to four times the incremental default interchange rates applicable to transactions on such cards."); *see also* Murphy Rep. Exs. Exhibit 5.1A and 5.1B (incremental interchange rate is smaller than the mandated incremental rewards based on MasterCard and Visa data for grocery stores, electronic stores); Buse Dep. at 224-25 ("[For Visa Signature] [w]e introduced the requirement that there be a minimum of ███ basis points of rewards to ensure that it would have a value proposition for that consumer. We required that it have a no preset spend limit and that it have four categories of benefit -- dining, which is a program where you can make reservations at restaurants; access, which is that cardholders get special access to events we sponsor like the Tony's, like the Kentucky Derby; concierges, which means there is an 800 number that the cardholder can call for concierge services; and then the rewards that I've already mentioned. . . . For the issuers, we developed a platform that allowed them to -- with a series of benefits that allowed them cost effectively to provide each of those cardholder benefits that I mentioned, and we introduced a higher interchange rate for the Visa Signature."); Buse 30(b)(6) Dep. at 252-53 ("the individual

programs on those products comply with the program requirements and whether the

characteristics of those products -- that is, what is the spend on Visa Signature versus Visa

Traditional Rewards versus a Visa, a regular Visa credit card -- would correspond to what we

would expect to be the spend characteristics, which as I've described previously, is lowest on

nonrewards credit, higher on Traditional Rewards and highest on Visa Signature."); Wright Dep.

Ex. 27716,[337] at BOFAIC 01832934 ("The member is also responsible for funding the Concierge

and Rewards benefits that are required on World, but not required on Platinum. This is due to

the significant interchange differential associated with the World Card."); Kaiser Dep.[338] at 169-

70 (For Signature and Traditional Rewards, Visa was "requiring higher services and

enhancements and benefits like the car rental insurance, lost luggage protection, those types of

services. They were requiring the value of the reward program, be rich, meaning it had to be an

expensive reward value proposition to the customer so that it would be more interesting to the

higher-spending customers. It would have higher spending, a higher, rewards of higher value

that would be interesting to affluent customers, sort of defining elements that would be

interesting to the higher more affluent higher-spending customer.").) Interchange does not cover

all the benefits and rewards consumers receive from payment cards offering rewards. (*See*

Groch Dep. at 146 ("Q. How do you fund the Rewards programs? A. When you say fund, I'm

not sure what you're referring to. Q. Well, do you use interchange revenues? A. You know,

---

[337] Email from C. Hunter, forwarded by M. Wright (May 24, 2002), bearing control numbers BOFAIC 01832933 to BOFAIC 01832935.

[338] Deposition of Caryn Kaiser (Feb. 29, 2009) ("Kaiser Dep."). Mr. Kaiser testified as a Senior Director responsible for Chase Travel Plus, Chase Perfect Card, and Chase Rewards Plus of Chase Card Services. (Kaiser Dep. at 29.)

we use interchange revenues.  We use other revenues as well."); Garofalo Dep.[339] at 199-200

("[T]here is a list of things I think you also pointed out that the card member gets.  Whether it be

concierge service, whether it be NPSSL . . . as well as other benefits.  Again, interchange is

absolutely an important part to help offset the expense of those items.  It is not a one to one

relationship, but there is obviously additional expense we incur.").

---

[339] Deposition of Edward F. Garofalo (Mar. 5, 2008) ("Garofalo Dep.").  Mr. Garofalo testified as the manager of the Citi Brands Portfolio for CitiGroup.  (Garofalo Dep. at 26-27.)

II.      **Defendants' Statement of Additional Material Facts**

A.      **Early History Of United States Payment Card Systems**

125.    Starting in the early 1900's, individual merchants provided credit, often without fees or interest, to enable certain customers to "buy now, pay later." (Mandell, *The Credit Card Industry*,[340] at 17-18 ("The use of credit cards by retailers began in 1914 when some large stores gave cards to their wealthier clients.").) Merchants issued proprietary charge cards to develop loyal customers who would buy more of the merchants' products. (Stearns, "Think of it as Money,"[341] at 31.)

126.    In the 1950s, Diners Club, American Express, and Carte Blanche introduced competing payment card systems. (*See, e.g.,* Stearns, "Think of it as Money," at 36, 40-41.) Unlike the individual merchants that had theretofore offered credit to their own customers, these companies were independent third-party suppliers of payment card services, responsible for recruiting merchants from multiple retail categories, recruiting cardholders, collecting cardholder receivables, and making disbursements to merchants. (Stearns, "Think of it as Money," at 33, 35.) These companies also operated for profit, and charged participating merchants a merchant discount of as much as six or seven percent of each transaction. (Stearns, "Think of it as Money," at 36.) Initially, the payment cards offered by Diners Club, Carte Blanche, and American Express could be used only within the travel and entertainment sector, which limited merchant acceptance to merchants in the travel and entertainment industry and

---

[340]   Lewis Mandell, *The Credit Card Industry, A History*, (1990) ("Mandell, *The Credit Card Industry*"), bearing control numbers MURPHY 03070 to 03157.

[341]   David L. Stearns, "Think of it as Money: A History of the VISA Payment System, 1970-1984," submitted for the Degree of PhD by Research University of Edinburgh (Aug. 2007), bearing control numbers MURPHY 05594 to 05826.

potential cardholders generally to higher-income travelers. (Stearns, "Think of it as Money," at 35.)

127.   In 1958, Bank of America introduced BankAmericard – which later became Visa – to compete with Diners Club, Carte Blanche, American Express, and other charge and credit cards. (Timothy Wolter, *Carry Your Credit in Your Pocket -- The Early History of the Credit Card at Bank of America and Chase Manhattan*, Enterprise & Society 315, 332 (June 2000).)  Like its competitors, Bank of America functioned as both issuer and acquirer, issuing cards to cardholders and servicing participating merchants, and funded its network's operations by charging participating merchants a merchant discount fee. (*See, e.g.*, Stearns, "Think of it as Money," at 50.)  BankAmericard had four advantages over its competitors' payment cards.  First, BankAmericard targeted a much broader group of consumers, and not just wealthy consumers, and a much broader group of merchants, including merchants outside the travel and entertainment industry. (*Id.* at 41.)  Second, BankAmericard offered cardholders revolving unsecured credit lines and the option to repay their debt over several months with interest, or to pay the full balance due at the end of each payment period. (*Id.* at 41-42.)  Third, BankAmericard charged cardholders no annual fee. (Mandell, *The Credit Card Industry*, at xx)  Finally, settlement occurred almost immediately upon deposit of merchants' sales drafts, rather than days later as had been true for competing payment card systems. (*See, e.g.,* Stearns, "Think of it as Money," at 42; Nocera, *A Piece of the Action*,[342] at 27.)  These BankAmericard features facilitated cardholder and merchant growth.

---

[342]  Joseph Nocera, *A Piece of the Action: How the Middle Class Joined the Money Class* (1994) ("Nocera, *A Piece of the Action*").

128.     By 1966, Bank of America had recognized the benefits of widespread acceptance and attempted to expand nationwide by licensing the BankAmericard program to banks in other states to process BankAmericard transactions in their regions.  (Mandell, *The Credit Card Industry*, at 31; *see also* Bank of America Plans Nationwide Licensing Of Its Credit Cards, Wall Street Journal, May 25, 1966.)  Bank of America created a "mark" to be printed on all payment cards and hung in the windows of participating merchants, so that cardholders easily could identify locations where they could use their cards.  Merchants displaying this mark agreed to accept all cards carrying the mark.  (Stearns, "Think of it as Money," at 46.)  The introduction of a uniform mark, combined with a network of regional banks required to honor all transactions under the mark, helped the BankAmericard network spread across the United States during the 1960s.

129.     Merchants received substantial benefits from participating in the BankAmericard network.  The system acquired and cleared transactions in exchange for a six percent merchant discount and $25 monthly rental fee for the BankAmericard card imprinter.  (*Id.* at 44.)  Bank of America took a three-pronged approach to convincing merchants to accept the BankAmericard.  First, it promised to recruit and deliver enough cardholders to provide increased sales and profits that would more than offset the merchant's six percent discount and card imprinter rental fee.  (*Id.* at p. 45.)  Second, Bank of America accelerated the transfer of payment risk from the merchant to the issuing bank after a transaction.  (Stearns, "Think of it as Money," at 58 ("The authorization process is more than just a technical function—it also formally transfers the responsibility for fraud from the merchant to the issuer."); *see also*, Nocera, *A Piece of the Action*, at 27.)  Third, Bank of America offered merchants transactional benefits,

such as improved cash flow, by paying merchants immediately upon receipt of sales drafts. (Stearns, "Think of it as Money," at 44; Nocera, *A Piece of the Action*, at 27.)

130.    When Bank of America allowed other banks to enter the BankAmericard system as franchisees, "cardholders from one bank could now use their card to make purchases at merchants represented by a different bank." (Stearns, "Think of it as Money," at 50**.**) This meant that, with respect to any given transaction, it was now possible for one bank to be the cardholder's issuing bank and a different bank to be the merchant's acquiring bank. Rules had to be established to govern the interchange of the transaction information and funds between the issuing and acquiring banks on each transaction where the two functions were performed by different banks. "Interchange" provided the means for "the two banks [ ] to clear and settle those transactions." (Stearns, "Think of it as Money," at 50; *see also* Nocera, *A Piece of the Action*, at 67 ("It is impossible to overstate the importance of a workable interchange system; without it, nationwide bank credit cards simply cannot exist. . . . A merchant will accept a credit card because he knows, absolutely, that his bank will reimburse him, no matter what. A bank will pay the merchant, knowing absolutely that it will get its money from other banks. A customer will take his credit card out of his wallet knowing absolutely that it is as acceptable to the merchant as cash. Interchange is the structure that supports our faith that a credit card will do what we expect it to").) And because BankAmericard did not charge cardholders a fee for using the card, interchange provided a means for allocating the merchant discount when the issuing and merchant servicing functions on a given transaction were performed by different banks.

131.    Under the BankAmericard system, individual acquiring banks set their own merchant discount fees. (*See* Stearns, "Think of it as Money," at 56 ("the amount [of the merchant discount] is negotiated when the merchant signs the contract with the

bank.")  Originally, however, the BankAmericard franchise agreements provided that when the card issuing and merchant servicing functions were performed by different banks, the merchant-acquiring bank had to remit to the card-issuing bank either the actual merchant discount fee earned on the particular transaction, or an amount equal to the merchant bank's "average" merchant discount fee.  (*National Bancard Corp. (NaBanco) v. Visa U.S.A., Inc.*, 779 F.2d 592, 595 (11th Cir. 1986).)   The allocation of the entire merchant discount fee to issuers reduced acquiring banks' incentives to compete for and sign up merchants and caused acquiring banks to look for ways to evade the requirement, such as by underreporting the amount of the merchant discount.  (*See* Nocera, *A Piece of the Action*, at 68; *see also* Stearns, "Think of it as Money," at 75.)  Issuing banks retaliated by refusing to accept transactions from acquiring banks that they thought had violated the rules, and by holding sales drafts from merchant banks for weeks to accrue interest they otherwise would not have earned.  (Nocera, *A Piece of the Action*, at 68-69.)

132.   In 1970, Bank of America spun BankAmericard off to create National BankAmericard Inc. ("NBI").  (Mandell, *The Credit Card Industry*, at 31.)  NBI recognized that "[e]stablishing a fixed and fair fee was crucial to the viability of the system, as issuers needed a high-enough fee to make a profit, yet acquirers needed a low-enough fee to be able to offer competitive merchant discounts." (Stearns, "Think of it as Money," at 76.)  In 1971, NBI imposed a formal, system-wide interchange fee for transactions with different issuing and acquiring banks.  (*See National Bancard Corp. v. Visa U.S.A.*, 596 F. Supp. 1231, 1239 (S.D. Fla. 1984); *see also* Stearns at 77-78.)  The fee was uniform across all members and was to be paid by acquiring banks to issuing banks.  (*NaBanco*, 596 F. Supp. at 1239; Stearns, "Think of it as Money," at 78.)  Acquiring banks were free to set their own merchant discount, but they paid the same interchange rate independent of the level of the merchant discount they set.  (David Evans,

*More Than Money: The Development of a Competitive Electronic Payments Industry in the United States*, Payment Card Economics Review, at 12 (2004) ("The merchant's bank could cut whatever deal it could manage with the merchant, and the cardholder's bank could offer any terms it chose to cardholders. But the merchant's bank had to pay the cardholder's bank an "interchange fee," calculated according to a system-wide formula established by Visa.")

133.   In 1976, NBI changed its name to Visa. (Stearns, "Think of it as Money," at 130-31.)

134.   By 1979, Visa's interchange rules required any acquiring bank that submitted a transaction for clearance and settlement through the Visa network – known as the Visa Base II computer system – to pay the cardholder's issuing bank the established interchange rate for that transaction. (*See National Bancard Corp. v. Visa U.S.A.*, 596 F. Supp. 1231, 1239 (S.D. Fla. 1984).)  Banks could bypass the Base II system, however, in which case Visa's interchange rates would not apply.  (*Id.*)

135.   In 1966, a consortium of banks introduced a second general-purpose card network – Interbank Card Association, which later became MasterCard – to compete with Diners Club, Carte Blanche, American Express, BankAmericard and other existing payment card systems. (MasterCard Company Milestones;[343] *see also* Stearns, "Think of it as Money," at 50-51.)  Like Bank of America, Interbank saw nationwide acceptance as essential to network success with cardholders. (Stearns, "Think of it as Money," at 49.)  MasterCard's first task in 1966 "was to develop an efficient system through which its members could offer to their customers a credit card with national – and later international – acceptance."

---

[343]   "Company Milestones," MasterCard Worldwide, available at www.mastercard.com/us/company/en/ourcompany/company_milestones.html (last visited Apr. 25, 2011) ("MasterCard Company Milestones").

(MCI_MDL0_00795309 to 00795346,[344] at 310, *see also* MCI_MDL02_01064648 to

01064666,[345] at 650, (Karl Hinke, Chairman of the Interbank Card Association in the 1960s is

quoted as describing Interbank/MasterCard as "a worldwide system which could be used

anywhere, by anyone.").

      136.   However, unlike Bank of America, the Interbank network did not maintain

a single identifiable network image across the United States, which slowed merchant acceptance

and confused cardholders. (Stearns, "Think of it as Money," at 50-51; Mandell, *The Credit Card*

*Industry*, at 31.) In 1969, after struggling to increase nationwide merchant acceptance, Interbank

purchased the Master Charge name and logo (overlapping yellow and orange balls) and

eventually placed the mark on all cards issued by Interbank members. (Stearns, "Think of it as

Money," at 51; Mandell, *The Credit Card Industry*, at 31.)

      137.   In 1979, Interbank became MasterCard. (MasterCard Company

Milestones.)

**B.**    **Network Services Provided By Visa And MasterCard**

      138.   The Visa and MasterCard networks provide network services by

facilitating the transfer electronically of data and funds among merchants, merchant acquirers,

and issuers when credit and debit cards are used to make purchases. (McCormack Rep. ¶ 16.)

Visa and MasterCard accomplish this function by, among other things, each separately

prescribing standard data formats and common operating rules to govern the transfer of data and

funds. (*Id.*) The payment card network services that Visa and MasterCard provide include pre-

transaction services, such as advertising and other network efforts to recruit and deliver

---

[344]  Letter from MasterCard outside counsel Breed, Abbot & Morgan responding to DOJ request for information (Dec. 18, 1981).

[345]  Corporate Overview presented by Robert Selander (Oct. 11, 2005).

cardholders to merchants, transaction services, such as authorizing, clearing and settling the

transaction, and post-transaction services, such as dispute resolution, fraud protection, and

charge-back and charge-off procedures.  (MasterCard Amendment No. 8 to S-1, at

MCI_MDL02_10411225; Visa Final Prospectus, at FLEI 02726 ("we manage and promote our

brands for the benefit of our customers through advertising, promotional and sponsorship

initiatives and by encouraging card usage and merchant acceptance; . . . we provide transaction

processing services (primarily authorization, clearing and settlement) to our customers through

VisaNet, our secure, centralized, global processing platform; we provide various other value-

added services to our customers, including risk management, debit issuer processing, loyalty

services, dispute management and value-added information services."); 2009 Visa Inc. Form 10-

K[346], at 7-13 (Nov. 19, 2010) (describing Visa's various network services.); Sheedy Decl. ¶ 6; T.

Murphy Decl. ¶¶ 6, 9-11.)  Payment card network services also include the promise of universal

acceptance and payment guarantees that are ensured through each network's honor-all-cards and

default interchange rules.  (Jonas Methodology Dep. at 73-74, Munson Dep. at 87-88 ("When we

are talking about, you know, why do merchants take cards or not …   The merchant has to be

assured that the customer -- that the merchant is going to get paid.  And, of course, one of the

great advantages of a MasterCard card is that the merchant can do business with people all over

the world who may not have sufficient cash, but of course the quid pro quo is that the

MasterCard system has to deliver on that guarantee."); Sheedy Decl. ¶¶ 22-23; Morrissey Dep. at

177-78; T. Murphy Decl. ¶¶ 25, 26, 30.)

---

[346]   Form 10-K of Visa Inc. (filed Nov. 19, 2010) ("2009 Visa Inc. 10-K"), available at
http://www.sec.gov/Archives/edgar/data/1403161/000119312510265236/d10k.htm (last visited May 1, 2011).

C.      **Competition Between Payment Networks**

139.    Visa and MasterCard thus compete to provide these network services to two groups of customers:  issuing banks and acquiring banks.  (Steele Dep. at 313 (Visa "think[s] broadly about the economic position of issuers and acquirers in the setting of interchange); Munson Dep. at 77 ("Information gained from issuers and acquirers and merchants" is considered to determine the proper cost-sharing balance); Jonas Methodology Dep. at 120-21 (We have to . . . make sure that we have a competitive proposition on both sides of the business."); T. Murphy Decl. ¶ 7-12; Sheedy Decl. ¶¶ 6-7; 2009 Visa Inc. 10-K, at 7 to 13 (describing the network services that are provided to issuing and acquiring banks.)

1.      **Network Competition for Issuing Banks**

140.    Visa and MasterCard develop their network services to assist issuing banks to develop and sell payment card products to consumers in competition with both the payment card products of American Express, Discover, and other debit card network service providers, as well as with other forms of payment, including cash, checks, and electronic payment networks like PayPal and others.

141.    MasterCard believes that competing interchange rates are a "very important consideration" when it sets its own interchange rates.  (Jonas Methodology Dep. at 120; *Id.* at 406 ██████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████; Portelli 30(b)(6) Dep. at 73 ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████; *id.* at 166 █████████████████████████

485

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

███████████; Murdock Dep. at 96-97 ████████████████████

████████████████████████████████████

███████████████████████; Murdock Dep. Ex. 25452,[347] at MCI_MDL02_01547700

█████████████████████████████████████

███████; MCI_MDL02_00977965 to 00977989,[348] at 978, 981, ████████

████████████████████████████████████████████; T.

Murphy Decl. ¶ 17.)

142.   Visa understands that the "goal of Visa's interchange reimbursement fee strategy, to maximize output from the system, will only be achieved through a proper balance of tactical responses to competitors, such as MasterCard, American Express and Discover, benchmarking Visa against all other forms of payment, considering the value of Visa to merchants, and promoting card issuance." (VUSAMDL2-00000070 to 00000081,[349] at 72. *see also* VUSAMDL1-03237662 to 03237666,[350] at 664 (an increase in Visa Signature interchange rates and the introduction of a new interchange fee rate schedule for Visa Traditional Rewards reflected "an effort to respond to the unique economics of issuing rewards cards, to limit the number of new rates for ease of implementation, and to ensure Visa remains a competitive brand

---

[347] Email from A. Heuer to W. Murdock (Mar. 23, 2005) attaching MasterCard Advisors "First Half 2005 Blitz," bearing control numbers MCI_MDL02_01547697 to 01547702.

[348] MasterCard International, US Region World Elite Interchange Rate Programs Proposal (Mar. 10, 2006).

[349] Visa Board Meeting Executive Summary (May 24, 2000).

[350] Visa Business Review (Nov. 2004).

for Issuers in the face of competition from American Express, MasterCard and Discover, and to make inroads against other payment methods such as cash and check"); VUSAMDL2-00002158 to VUSAMDL2-00002352,[351] at 2161 (resolution of Visa board that "Visa should become more competitive with MasterCard, and potentially American Express, with respect to the card issuance decisions of Visa Members, which enhanced competitiveness shall include interchange reimbursement fees offered to card issuers"); VUSAMDL1-00024618 to 00024631,[352] at 24 (Visa policy statement that "Visa will not be competitively disadvantaged in connection with card issuance decisions by MasterCard's higher interchange fees or American Express' higher merchant discount (or for that matter, by product feature, function or service quality."); Towne 30(b)(6) Dep. at 28-29 ("The whole goal of interchange recommendations are to facilitate growth. . . . One of the considerations is the options which issuers have available to them with respect to alternative payment brands.  So, the level of interchange is one factor that is considered in the competitiveness and attractiveness of Visa payment cards to our members."); Buse Dep. at 221-22 (Visa launched the Signature card because "particularly affluent consumers, were looking for a combination of benefits – a credible affluent brand, a certain level of rewards, a certain type of a collection of benefits – and Visa did not have a product that could compete for the value proposition that affluent consumers were looking for in 2004. . . . American Express had a very strong value proposition for that consumer.  So we had to be sure that if our issuers wanted to issue a card that was meaningful to the affluent consumer, that they would have a Visa platform on which they could do it."); Sheedy Decl. ¶¶ 13-16, 20.)

---

[351]   VISA U.S.A. Inc. Meeting of the Board of Directors, (Feb. 15, 2002).

[352]   Memorandum from S. Piper to J. Berry (Oct. 10, 2002).

143.    Indeed, many class plaintiffs recently admitted in a lawsuit brought by them against American Express that Visa and MasterCard raised their interchange rates in response to competition from American Express.  (*In re American Express Anti-Steering Rules Antirust Litig.*, MDL No. 221 (NGG)(RER) (E.D.N.Y.), Consolidated Class Action Compl. ¶ 51; *see also id.* ¶ 52 (in response to competition from Visa and MasterCard, American Express raised its own prices).)

144.    ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

145.    ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

## 2.    Network Competition for Acquiring Banks

146.    On the other side of the two-sided payments platform, Visa and MasterCard develop their network services to assist acquiring banks to incorporate those network services into the bundle of merchant services, including point-of-sale equipment, virtual terminals, encryption software, and other products and services to permit merchants to accept payment cards, that the acquiring banks sell to merchants, like class plaintiffs.

147.    Visa and MasterCard compete with each other, American Express, and other forms of payment on this side of the payment platform as well.  (Sheedy Decl. ¶ 7; T. Murphy Decl. ¶¶ 7, 17.)  For example, Visa and MasterCard each has offered lower interchange rates for merchants that traditionally accepted only paper-based payments like cash and checks – such as fast food restaurants and utilities – to incent them to accept its cards and increased competition with those paper based forms of payment.  When setting interchange fees, MasterCard considers "████████████████████████████████████████████████

████████████████████████████████████████████████████"  (Dunn Dep. at 302; *see also* MCI_MDL02_00947729 to 00947731,[353] at 730-31 ("In 2000, MasterCard introduced its Quick Payment Service (QPS) program aimed at facilitating our members' ability to penetrate small ticket merchant segments, like quick service restaurants ["QSRs"], which have traditionally accepted cash. . . . In 2003, MasterCard introduced PayPass, a contactless payment program that allows consumers to simply tap their *PayPass*-enabled MasterCard card . . . studies have shown that MasterCard *PayPass* shaves 12-18 seconds off an average QSR purchase. . . . ██

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████.");  Jonas Methodology Dep. at 69-70 (MasterCard considers "the business objectives, the competitive

---

[353]   MasterCard Acceptance at Quick Service Restaurants – Key Messages & Talking Points (Jul. 13, 2005).

environment, and the desire to incent new technologies," as well as cost and "many other factors" when setting interchange.); T. Murphy Decl. ¶¶ 7, 17.)

148.    Visa has introduced interchange fee programs for quick service restaurants and utility companies "in order to help [Visa] generate incremental growth in categories where we felt that there was untapped volume opportunity")  (Sheedy 30(b)(6) Dep. at 225-26; Saunders Dep. at 73-74 (recalling votes to lower interchange rates for utilities, and fast food chains, among other merchant segments); Steele Dep. at 187-88 (describing Visa's reduction of interchange rates for small ticket transactions under $15 at quick-service restaurants "which were mainly cash"); VUSAMDL1-09024563 to 09024592,[354] at 91 ███████████████

████████████████████████████████████████████████████

████████████████████ ); VUSAMDL00177999 to 00178007,[355] at 8001 (describing Visa's use of interchange to "expand acceptance and drive additional usage in the utility bill payment segment"); Morrissey Dep. at 177-78 ("Visa offers services through its acquirers that they can give to merchants, and that has to do with the ability to manage the transactions, to get reporting on the transactions, to get reporting on how they've done, how they would process chargebacks, what type of things are allowed to be charged back, payment guarantee, certain programs that we developed for merchants associated with risk scoring in terms of, you know, standard processing, make sure transactions get processed, the fact that we're usually up in terms of our percentage of time up, you know, the account verified by Visa services, account updater services, the stop recurrent payment services and there's probably a whole host of other merchant services that I -- that are available."); Sheedy Decl. ¶ 16.)

---

[354]  Visa Board meeting presentation (Apr. 10-11, 2006).

[355]  Visa Independent Directors Committee meeting minutes (Apr. 17, 2007).

149. ███████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████

150.     Visa and MasterCard themselves do not sell network services to merchants, and merchants do not purchase network services as such from either Visa or MasterCard. (GAO Rep., at 6-7.) These network services are packaged by acquiring banks into "merchant services" that are sold to merchants. (GAO Rep., at 6-7; MCI_MDL02_11073165 to 11073367,[356] at 321 (identifying services that acquirers have to provide to merchants).)

151.     For these merchant services, merchants acquiring banks charge a merchant discount fee. (GAO Rep., at 7; Class Compl. ¶ 8(r); Frankel Rebuttal Rep. ¶ 136; Frankel Dep. at 157; McCormack Rep. ¶¶ 24, 78; McCormack Dep. at 128; Oct. 2010 Visa Rules, Core Principle 10.2; 2010 MasterCard Rules § 5.11.2; Topor Dep. at 60; Ivancikova Dep. at 104; Zuritsky Dep. at 124; Wenning Dep. at 143-44; Schumann Dep. at 61; Berman Dep. at 172; Gule Dep. at 191; Mullings Dep. at 175-76; Schermerhorn Dep. at 91.)

152.     Merchant acquirers are free to set the merchant discount fee they charge their merchant customers on the basis of their own profit goals and cost demands, and merchant discount fees are accordingly negotiated between each merchant and its merchant acquirer. (GAO Rep., at 7; Oct. 2010 Visa Rules, Core Principle 10.2.) Plaintiffs acknowledge that the

---

[356]   MasterCard Merchant Rules Manual (Jul. 2004).

networks do not establish a merchant's merchant discount fees. (*See, e.g.*, Fletcher Dep.[357] Ex. 18704,[358] at DHZEDVMC00001170; Fletcher Dep. at 133.) The merchant acquiring business is competitive (OCC Handbook, at 1, 13; McCormack Rep. ¶ 85), and merchant discount fees vary from merchant to merchant as merchant acquirers compete for merchant accounts.

#### D.   Credit Cards, Signature Debit Cards, And PIN-Debit Cards Are Substitutes

153.   Visa and MasterCard employees testified that consumers can and do readily switch among payment methods. (Abrams Dep. at 42 (MasterCard competes with cash, check, and ACH; Sheedy 30(b)(6) Dep. at 76-77 (one of Visa's goals in setting interchange is to "penetrate cash and check and volume from alternative means of payment), 116 ("we compete with cash and check and other card programs, and ACH and PIN debit"); *see also* MDL1720-0032761 to 0032806,[359] at 2781 ("The majority of debit cardholders . . . use a combination of the two [PIN and signature functionalities]. With one card supporting two functions, it is not surprising that many consumers use the two capabilities interchangeably.").) As Visa's head of debit products explained, "we classify within our concept of debit transactions as being, you know, cash and checks included in that as well as ACH and other competing types of debit instruments like merchant issued cards, ACH cards from supermarkets or from other stores." (Pinkerd Dep. at 30.)

154.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[357] Deposition of Patti Fletcher (Jul. 24, 2008) ("Fletcher Dep."). Ms. Fletcher testified as the Rule 30(b)(6) witness for plaintiff Delhaize America, Inc. regarding forms of payment (Fletcher Dep. at 8; Fletcher Dep. Ex. 18700 (30(b)(6) Deposition Notice).)

[358] Promotional Agreement between Visa USA Inc. and Food Lion LLC, bearing control numbers DHZEDVMC00001168 to 00001171(Apr. 2002).

[359] PULSE Sales and Business Development Organizational Review (undated).



155.    The Small Business & Entrepreneurship Council has recognized that credit cards and other forms of electronic payments are a "compliment to the mix of other payment choices like checks and cash."  (ALBVMC 035345 to 035353,[361] at 347.)

E.    **Payment Card Rewards Programs**

156.    In 1986, Discover introduced a credit card program that offered cash rewards with no annual fee.  (Bankrate Website;[362] CreditCards.com Website.[363])  In 1993,

---

[360]  Deposition of Suzanne Smits (Apr. 14-15, 2009) ("Smits Dep.")  Ms. Smits testified as Discover's Rule 30(b)(6) witness on Discover's operating regulations, acceptance rules, and merchant discount rates.  Smits Dep. Ex. 36100 (30(b)(6) Deposition Notice).)

[361]  Testimony of Karen Kerrigan, President & CEO of Small Business & Entrepreneurship Council, *The Law and Economics of Interchange*, before the Subcommittee on Commerce, Trade and Consumer Protection, Committee on Energy and Commerce, U.S. House of Representatives (Feb. 15, 2006).

[362]  *See* "Discover," *Bankrate.com*, at http://www.bankrate.com/brm/discover.asp (last visited Apr. 26, 2011) ("Discover Website").

[363]  "Reward Programs - A Short History," *CreditCards.com*, at http://www.creditcards.com/reward-programs-a-short-history.php (last visited Apr. 26, 2011) ("CreditCards.com Website").

American Express introduced rewards programs that gave cardholders the opportunity to earn

one point for every dollar spent on the American Express Optima card, with points redeemable

for restaurant meals, flowers, books, concert tickets and vacation packages.  (Credit Card

News.[364])

157.    In three-party systems like American Express and Discover, these

cardholder rewards programs were funded primarily by merchant discount fees that the network

charged to merchants that accepted the network's card.  (2010 American Express 10-K, at 3

("This [higher average spending per card] enables us to earn a premium discount rate and

thereby invest in greater value-added services for merchants and Cardmembers"); Business

Insider Website at 4[365] (American Express "uses this higher discount revenue to invest in

rewards programs which provide a higher payout than competing programs"); Murphy Rep. ¶¶

11 n.5, 121-22, 127.)

158.    In four-party systems like Visa and MasterCard, these cardholder rewards

programs were funded primarily by interchange revenues that flowed from acquiring banks, who

collected merchant discount fees from participating merchants, to issuing banks, who provided

the rewards to their cardholders.  (Olebe Dep.[366] at 145-46 ("Q.  And what was the justification

for having higher rates for the Enhanced World program?  A.  I think it would be, based on the

overall cost of the program being higher, they were trying to balance the economics for the

---

[364]   "Optima puts on a new face and jumps into the Rewards game," *Credit Card News*, Vol. 5 Issue 23, at 4 (Mar. 15, 1993) ("Credit Card News").

[365]   Available at http://www.businessinsider.com/blackboard/american-express (last visited Apr. 28, 2011).

[366]   Deposition of Edward Olebe (Jul. 25, 2008) ("Olebe Dep."). Mr. Olebe testified as MasterCard's Rule 30(b)(6) witness regarding premium cards.  (Olebe Dep. at 10-12; Olebe Dep. Ex. 24875 (30(b)(6) Deposition Notice).)

issuer."); T. Murphy Decl. ¶ 29; VUSAMDL1-03585517 to 03585520,[367] at 518 ("Given the competitive marketplace, increased interchange fees to card issuing financial institutions have historically allowed Issuers to lower costs to cardholders and also permit Issuers to add features and benefits to cards, which help increase usage and provide cardholders greater utility thereby benefiting Merchants through incremental sales and customer satisfaction).  As Prof. Murphy explained, these rewards effectively provide cardholders with a discount on the goods and services they buy from merchants that accept the cards:

> The direct value from convenience and other transactions-associated benefits is only part of the benefit provided to merchants by payment card systems, however. Further gains are achieved by efficiently structuring the terms of merchants' transactions with cardholders.  This is accomplished in four-party card networks, such as those challenged by Plaintiffs, through use of a positive interchange fee to implicitly lower the price paid by cardholders for transactions with cards. In particular, through interchange, a portion of the merchant discount that merchants pay to their merchant acquirers is transferred by those acquirers to card issuers, who transfer part of what they receive to cardholders by offering more attractive terms and conditions for cards (e.g., better rewards).

(Murphy Rep. ¶ 11; *see also id.* ¶¶ 121, 122 n.131, 128.)

159.    The default interchange rules allow Visa and MasterCard to incent issuers to provide a wider variety of card features to consumers.  For example, Visa and MasterCard can and do provide higher interchange to incent issuers to offer cards that provide airline miles, cash refunds, or other rewards to consumers who spend more on cards.  (Sheedy 30(b)(6) Dep. at 235 (testifying how "the higher interchange on Visa Signature and Traditional rewards programs in part reflects the higher cost structure and the economics of those products to service affluent consumers and a portion of that cost structure is rewards"); Murdock Dep. at 96-97

---

[367]    Visa Business Review, Visa Check Card, Interlink, and ATM Interchange Reimbursement Fee Modifications, Issue No. 041109 (Nov. 2004).

(MasterCard's World Elite product was developed to allow MasterCard's banks to compete with American Express for affluent customers by offering cardholder benefits).)

160.    As a result of the dramatic growth of rewards programs, millions of cardholders receive cash back or other rewards when they use their payment cards. (MCI_MDL02_00092240 to 00092284,[368] at 264 (chart showing over 40% of cardholders enrolled in rewards programs since 2003.); VUSAMDL1-09055099 to 09055139,[369] at 5112 (█ ████████████████████████████████████████████████████ ); GAO Rep. at 25-26 (noting that some "consumers have benefited from competition in the credit card market, as those using credit cards enjoy lower fees and interest rates and greater rewards," and that "71 percent of cardholders held a rewards card in 2008.").)

**F.    Merchant Benefits Of Accepting Payment Cards**

161.    Professor Murphy has shown that higher interchange generates additional incremental sales for merchants that accept payment cards because even if an increase in the merchant discount exceeds cost reductions to a merchant, the merchant still gains from the increase in incremental sales because the effective price faced by cardholders declines.  (Murphy Rep. ¶ 199; Murphy Rep. Ex. 4.12.)  In other words, "the higher interchange causes a corresponding reduction in cardholder effective price, which results in such a large expansion in merchant sales so that the merchant benefits as well.  (Murphy Rep. ¶ 199.)

162.    Professor Murphy recognized that "[w]hile a major gain to merchants from card acceptance comes from incremental sales (which are a direct consequence of the value payment cards provide to cardholders), merchants also obtain a variety of transactional

---

[368]   A Look at the Evolving Payments Landscape (Dec. 2004).

[369]   Visa Payment Panel Study 2007 Highlights.

efficiencies from accepting payment cards. These include record keeping, reduced time cost of transactions, labor cost savings at automated transaction terminals (e.g., pay-at-the pump), guaranteed payment, increased security, and more." (Murphy Rep. at 80.)

163.    The GAO has concluded that benefits merchants receive from accepting payment cards include more satisfied customers, reduced bad checks and cash thefts, and improved operational efficiencies. (May 2008 GAO Rep.,[370] at 16-17) Card acceptance also enabled the government to conduct business over the Internet, which could lower labor costs associated with sales and provide greater convenience to customers. (*Id.*) The government found that cards were less costly to process than checks, and the government obtained funds faster when customers use credit or debit cards than when they use checks. (*Id.*) Cards reduced the cost to federal entities from transporting cash, reduced theft of cash and lowered bad check expenses. (*Id.*) Additional operational efficiencies were a reduction in costs and reduced exposure to fraud and errors from misplacing or miscounting cash and checks. (*Id.*)

164.    The May 2008 GAO Report also found that other services industry retailers have noted transactional benefits of payment cards. Amtrak has reported reduced labor costs when customers purchase tickets using cards, and reduced employee theft of cash by accepting cards onboard Amtrak trains for tickets and food and beverage sales. (*Id.* at 17-18.) The Department of the Interior found it streamlined its bookkeeping by accepting credit cards, because card sales involve less paperwork than other payment forms. (*Id.* at 17.)

---

[370] *Credit and Debit Cards, Federal Entities Are Taking Actions to Limit Their Interchange Fees, but Additional Revenue Collection Cost Savings May Exist*, GAO Report to Congressional Requesters (May 2008) ("May 2008 GAO Rep.").

165.   Other merchants have also noted benefits of accepting payment cards, including "more customers, more sales, and fewer hassles connected with getting paid," and the ability to avoid dealing with collection agencies.  (ALBVMC 035345 to 035353,[371] at 349-50)

166.   The Small Business & Entrepreneurship Council listed "Access to consumer purchasing power – increased sales; Rapid and certain payment; Reduced costs and headaches in dealing with bounced checks; Reduced worries and losses with respect to theft issues; Enabler of internet commerce . . . ; Costs associated with billing, collections, and taking credit risks are circumvented; A compliment to the mix of other payment choices like checks and cash – increased choices for consumers; Improved efficiency" as "benefits that electronic payments (credit cards and other forms) have provided."  (*Id.* at 347.)

167.   Visa's Richard Morrissey described benefits that merchants receive from accepting payment cards: "Do you have an understanding of whether that value to merchants has changed over time?  A.  Well, our perception is that as more transactions move to electronic payments, it creates a whole host of benefits in terms of moving away from having to manage as much cash, faster checkout, having electronic transactions, being able to handle returns electronically and so much easier, not having to manage the theft associated with cash. So I would think that as more volume moves to electronics payments that they reap more and more of those benefits, especially as we add new features that they can use to automate the process and provide additional services."  (Morrissey Dep. at 440-42; *see also* Sheedy 30(b)(6) Dep. at 403 ("authorizations at the point of sale, the speed of those authorizations benefit merchants.  The security features that are on products, how that benefits merchants.  The increased purchasing

---

[371]   Testimony of Karen Kerrigan, President & CEO of Small Business & Entrepreneurship Council, *The Law and Economics of Interchange*, before the Subcommittee on Commerce, Trade and Consumer Protection, Committee on Energy and Commerce, U.S. House of Representatives (Feb. 15, 2006).

power that consumers have, that benefits merchants as they try to sell products.  There are a long list of benefits that I believe merchants receive from accepting Visa products that are directly linked to the features and the functionalities of Visa cards."); Steele Dep. at 277-78 (merchants have increased "speed at their point of sale, the total number of customers he can service in a particular time through a given lane and the number of lanes they have to keep open and staff for -- we know again through acceptance of payment cards in general, but also through the waiver of our signature requirement, designed to speed things up at the point of sale, that greater throughput puts merchants in position to get by with fewer cashiers, take more payments more quickly and that again has value in the form of reduced labor costs and all of the other costs that come with having employees."); *id.* at 278 (merchants receive value "in reduced cash handling and the pilferage . . . that can occur when cash is on hand in a store and employees or, you know, other unreputable people can get access to cash and take it away, steal it [because] with Visa, the account monies are transferred electronically and we know deposited more quickly in the merchant's bank"); *compare with* MCI_MDL02_06958361 to 06958379,[372] at 364 (costs of cash include, "bank charge costs, deposit preparation time, security/insurance, tender time and transportation costs.").)

168.    Issuing banks bear the cost of payment guaranteed services for credit and debit card transactions.  (MCI_MDL02_06093408 to 06093440,[373] at 437 (referencing "payment guarantee" as an issuer cost); Munson Dep. at 105 (describing the components of issuer costs including "processing costs, payment guarantee, which is default and fraud, and financial

---

[372]  The Real Merchant Cost of Cash.

[373]  Interchange Overview: MasterCard Interchange Methodology Cost Analysis (Jun. 2006).

carrying costs."); T. Murphy Decl. ¶¶ 26, 29-30; Visa Payment Card Fraud and Merchants[374]

("In face-to-face transactions, merchants are not liable for fraud when the transaction is properly

authenticated. This represents the vast majority of Visa transactions.").)

     **G.**    **Other Payment Networks Have Similar Merchant Acceptance Rules as Visa and MasterCard**

    169.   The ██████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████ (AMEXMT00032149 to 00032183,[375] at 159.) *See also*

McNeal Dep.[376] at 149-50; AMEXM50388284 to 50388287,[377] at 285 (███████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

    170.   ████████████████████████████████████

████████████████████████████████████████████████████

---

[374] Available at http://usa.visa.com/merchants/risk_management/payment_card_fraud.html (last visited May 2, 2011).

[375] AXP Question & Answer Summary Package.

[376] Deposition of Glenda McNeal (Apr. 22, 2009) ("McNeal Dep."). Ms. McNeal testified as American Express' rule 30(b)(6) witness on American Express card acceptance provisions and policies regarding acceptance. (McNeal Dep. Ex. 36200.)

[377] Important Information about American Express Prepaid Cards.

[378] ████████████████████████████████████████████████████

[379] Terms and Conditions for American Express Card Acceptance.





173.

---
[383] ████████████████████████████████

[384] ██████████████████████████

[385] ██████████████████████████

[386] Deposition of Suzanne Smits (Apr. 14-15, 2009) ("Smits Dep.").  Pursuant to Rule 30(b)(6), Ms. Smits testified on behalf of Discover Network.  (Smits Dep. at 13-14.)

174. Class plaintiff CHS does not allow surcharging on its proprietary Cenex card. (Culver Dep.[387] at 471-72; Culver Dep. Ex.[388] 40302, at CHS 017563 ("Under no circumstances shall Marketer impose any additional charges on any Cardholder for purchases of Products paid for by a valid Card.")

175.

176.

## H.    Market Share Data Does Not Prove Market Power

177. Dr. Vellturo's calculation of credit and charge card purchase volume for 2004 to 2008 in total and by card network shows that from 2004 to 2008, MasterCard's share of all credit and charge card purchases was approximately 28-30%. (Vellturo Rep. Ex. 11.) Specifically, Dr. Vellturo's calculation shows that MasterCard's share of total credit and charge

---

[387] Deposition of Paul Culver (Aug. 29, 2008) ("Culver Dep."). Pursuant to Rule 30(b)(6), Mr. Culver testified on behalf of CHS regarding all agreements between CHS and any entity for which CHS manages payment card processing. (Culver Dep. at 555-56; Culver Dep. Ex. 40306 (30(b)(6) Deposition Notice).)

[388] CHS Cenex Card Master Merchant Agreement.

[389] Wright Express Charge Card Acceptance Agreement, bearing control numbers WEXV00000528 to 00000533.

card purchase volume in 2004 was $433.70 of $1,431.44 billion (approximately 30.3%), in 2005 was $472.23 of $1,583.30 billion (approximately 29.8%), in 2006 was $508.67 of $1,748.79 billion (approximately 29.1%), in 2007 was $548.10 of $1,910.12 billion (approximately 28.7%), and in 2008 was $547.30 of $1,942.40 billion (approximately 28.2%). (*Id.*) MasterCard's change in share from approximately 30.3% in 2004 to approximately 28.7% in 2008 is a decrease of approximately 7%.

178.   Dr. Vellturo's calculation of credit and charge card purchase volume for 2004 to 2008 in total and by card network shows that from 2004 to 2008, Visa share of all credit and charge card purchases was approximately 42-43%. (Vellturo Rep. Ex. 11.) Specifically, Dr. Vellturo's calculation shows that Visa's share of total credit and charge card purchase volume in 2004 was $610.71 of $1,431.44 billion (approximately 42.7%), in 2005 was $675.27 of $1,583.30 billion (approximately 42.6%), in 2006 was $742.39 of $1,748.79 billion (approximately 42.5%), in 2007 was $807.00 of $1,910.12 billion (approximately 42.2%), and in 2008 was $823.74 of $1,942.40 billion (approximately 42.4%). (*Id.*) Visa's change in share from approximately 42.7% in 2004 to approximately 42.4% in 2008 is a decrease of approximately 1%.

179.   Dr. Vellturo's calculation of credit and charge card purchase volume for 2004 to 2008 in total and by card network shows that American Express's share of total credit and charge card purchase volume in 2004 was $303.73 of $1,431.44 billion (approximately 21.2%), and in 2008 was $465.23 of $1,942.40 billion (approximately 23.9%). (Vellturo Rep. Ex. 11.) American Express's change in share from approximately 21.2% in 2004 to approximately 23.9% in 2008 is an increase of approximately 13%.

180.    Dr. Vellturo's calculation of credit and charge card purchase volume for 2004 to 2008 in total and by card network shows that Discover's share of total credit and charge card purchase volume in 2004 was $73.60 of $1,431.44 billion (approximately 5.1%), and in 2008 was $106.13 of $1,942.40 billion (approximately 5.5%).  (Vellturo Rep. Ex. 11.) Discover's change in share from approximately 5.1% in 2004 to approximately 5.5% in 2008 is an increase of approximately 8%.

I.    **Additional Procompetitive Rationales for Interchange**

181.    Default interchange rules avoid the need for time-consuming and inefficient individual bi-lateral arrangements between the thousands of bank issuers and hundreds of bank acquirers that today are in the Visa network and in the MasterCard network. (Sheedy Decl. ¶ 25; Sheedy Dep. at 97 ("I'm aware of many discussions within Visa that concluded that the default interchange rate structure that exists today, the structure, is necessary because of the impracticalities associated with bilateral arrangements among thousands of financial institutions."); *see id.* at 109-113 ("look[ing] at the merchant, the acquirer, the issuer . . . [and] at the multitude of relationships that exist in the U.S. since we have tens of -- over 10,000 financial institutions and over seven and a half million merchants, I can't imagine a scenario where bilateral arrangements at a practical level can supplant the default interchange rate structure"); Towne Dep. Ex. 26,026, VUSAMDL2-0024218 to 0024241 at 224 (members process transactions under the "traditional, Visa-established IRF rates" given "the efficiency of doing so"); T. Murphy Decl. ¶¶ 24-28; Munson Dep. at 201-02 (although MasterCard allows bilateral agreements, they are not feasible for every transaction); Hanft at 123-24 (there are "too many issuers and acquirers in most jurisdictions to have simply kind of have a required bilateral arrangement with no fallback interchange rates").)

182.    Visa and MasterCard can and do provide interchange incentives to improve the quality of network services by adopting new and improved technologies.  For example, Visa has used interchange as a "strategic tool . . . to, without changing volumes, strengthen system security, improve transaction quality in terms of the data quality being provided on the transaction, and drive other issuer incentives or acquirer incentives to generally improve the quality of the Visa network."  (Steele Dep. at 321; *see also* Towne Dep. at 427-28 ("Visa established a different interchange fee associated with electronically-authorized transactions.  The results of that interchange fee modification along with other efforts by Visa had the resulting impact that there was a very rapid migration to electronically-authorized transactions that resulted in benefits for all stakeholders; customers had faster speed at points of sale, issuers had more accurate information, merchants experienced more rapid checkouts, less chargebacks.  The system was more efficient in terms of less paper.); Jorgensen Dep. at 159-61 (testifying about Visa's use of default interchange rates "to incent technology and operational improvements"); Sheedy Decl. ¶ 17.)

183.    MasterCard similarly recognizes that many factors are considered in setting interchange rates, including "the desire to incent new technologies."  (Jonas Methodology Dep. at 69-70; *see also* Kapteina Dep. at 182 (in listing factors that MasterCard uses to set rates, deponent answered: "Technology, such as you've heard [sic] the Mobile Speed Pass. . . . If something new like that were to come out in the marketplace we might want to incent the usage of that."); T. Murphy Decl. ¶¶ 17, 21.)

184.    Visa and MasterCard can and do provide interchange incentives to improve the quality of network services by reducing fraud and chargeback levels.  For example, Visa introduced performance-drive debit and credit interchange fee structures tied, among other

things, to fraud and chargeback levels.  (VUSAMDL1-06224291 to 06224311,[390] at 303; *see also* VUSAMDL1-05929654 to 05929672,[391] at 664 ("The fraud and chargeback performance requirements ensure that best practices are being utilized at the point of sale by offering incentives in the form of reduced interchange to those merchants that have lower levels of fraud and chargebacks when compared to the Visa system."); Sheedy Decl. ¶ 17.)  In order to improve fraud controls, MasterCard "████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ████████████████████████████████"  (Jonas 30(b)(6) Dep. Ex. 23132[392], at MCI_MDL02_03305644; T. Murphy Decl. ¶¶ 17, 21.)

185.    The improved fraud controls and processing efficiencies that consumers receive from default interchange likewise benefit merchants.  (Sheedy 30(b)(6) Dep. at 404-05 ("I'm certain that there's data within Visa that speak to reductions in fraud tied to product features, risk features, increasing speed of authorization at the point of sale, the benefits of reduced tender time for – for electronic payments tied to Visa cards.  I have seen data tied that relates to higher levels of transaction activity, Ticket lift that benefit merchants, and the purchasing power from the thousands of dollars that cardholders have, typical cardholders have in purchasing power on credit lines and access to funds to be able to purchase goods from merchants that I believe that's why the merchants are in the business, so it's beneficial to them."); Sheedy Decl. ¶ 32; T. Murphy Decl. ¶¶ 30-31.)

---

[390]  Visa Board Meeting Presentation (Feb. 20, 2004).

[391]  Visa Business Review (Feb. 2005).

[392]  Email from B. Kapteina to S. Gamsin, B. Coleman, and S. Jonas (Feb. 14, 2005) attaching communication talking points document, bearing control numbers MCI_MDL02_03305643 to MCI_MDL02_03305646.

186.     Default interchange also can drive increased consumer usage of Visa or

MasterCard cards, such as through banks issuers' rewards programs, which provides merchants

with the benefit of incremental sales.  (*See* VUSAMDL1-03585517 to 03585520,[393] at 518

("Given the competitive marketplace, increased interchange fees to card issuing financial

institutions have historically allowed Issuers to lower costs to cardholders and also permit Issuers

to add features and benefits to cards, which help increase usage and provide cardholders greater

utility thereby benefiting Merchants through incremental sales and customer satisfaction.");

(Sheedy Dep. at 451 ("Our data suggests that consumers that carry rewards based products

purchase higher ticket amounts and on average spend more money with merchants than do

consumers that don't carry rewards based products."); Steele Dep. at 268-69 ("Visa credit

cardholders spend more, and I view that to be a result of Visa's marketing and branding and

promotion sponsorships and so forth, all of which leads to a high level usage and spend which

again if that -- you know, it has value to the merchant in the sense that those represent

incremental sales opportunities.  We also have, through the Visa Incentive Network, a marketing

platform . . . [so] merchants can identify cardholders to be targeted for promotions.  They could

be consumers or credit cardholders that shop in their area and in that merchant's category, but

not at that merchant, and help that merchant acquire those customers as new customers and make

incremental sales."); Sheedy Decl. ¶ 31; Kapteina Dep. at 408 (deponent is aware of data

showing the "average ticket for a World Elite supermarket category is higher than a standard

Gold or Platinum card."; T. Murphy Decl. ¶¶ 18, 31; Murphy Rep. ¶147, Ex. 4.8.)

---

[393]   Visa Business Review, Visa Check Card, Interlink, and ATM Interchange Reimbursement Fee Modifications, Issue No. 041109 (Nov. 2004).

187.    Default interchange further provides revenue to bank issuers that allows them to guarantee payment to acquirers for properly authorized Visa and MasterCard card payments, which also benefits merchants.  (Sheedy 30(b)(6) Dep. at 491-92 ("Are there parties to electronic payment transactions who benefit from the payment guarantee other than the merchant? . . . THE WITNESS:  I think the acquirer benefits from the payment guarantee."); Saunders Dep. at 254 ("there are a litany of things that we provide people, one of which is surety of payment and, you know, all of that is embraced in the interchange fee, and the interchange fee does not cover everything that we spend money on"); *id.* at 255 ("Acceptance of credit cards and debit cards ensures the surety of payment at the point of sale, and it eliminates risk that's associated with insufficient funds and it eliminates the risks that are associated with handling cash.  It eliminates the fraud.  It eliminates a lot of things.  It all depends on who you are as to what extent it does those things."); Payment Card Fraud and Merchants[394] ("In face-to-face transactions, merchants are not liable for fraud when the transaction is properly authenticated.  This represents the vast majority of Visa transactions."); Sheedy Decl. ¶ 32; Jonas Methodology Dep. at 191-92 (merchants benefit from doing business with card-carrying customers while receiving the payment guarantee offered by payment cards); Munson Dep. at 87-88 ("When we are talking about, you know, why do merchants take cards or not . . . . The merchant has to be assured that the customer -- that the merchant is going to get paid.  And, of course, one of the great advantages of a MasterCard card is that the merchant can do business with people all over the world who may not have sufficient cash, but of course the quid pro quo is that the MasterCard system has to deliver on that guarantee."); T. Murphy Decl. ¶¶ 25-26, 30.)

---

[394]   Available at http://usa.visa.com/merchants/risk_management/payment_card_fraud.html (last visited Apr. 29, 2011).

**J.**     **Merchant Pricing**

188.     Merchants set their prices above their marginal costs.  Class plaintiffs' expert, Dr. Frankel, agrees that "it's probably the case that in most markets in the United States price exceeds marginal cost by at least some amount." (Frankel Dep. at 61.)  Professor Murphy also recognized that "price typically exceeds incremental (or marginal) cost." (Murphy Rep. ¶ 100.)

**K.**     **Defendants' Experts Have Offered Opinions on Debit**

189.     Professor Murphy made clear that his economic analysis of the justification for credit interchange rates would apply equally to signature and PIN debit card interchange rates.  (Murphy Rep. ¶ 332 (while "[t]he analysis I presented so far has focused on credit cards and credit card networks, [the] same economic framework is applicable to debit cards and debit card networks.").)  Professor Murphy also explained that, while debit cards provide cardholders and merchants with less value than credit cards, they still provide the same procompetitive benefits he identified for credit cards, just at a lower level.  (Murphy Rep. ¶ 333.)  Thus, Professor Murphy concluded that his "effective discount" procompetitive justification does apply to debit cards.  (Murphy Rep. at ¶¶ 12, 95, 332; Murphy Dep.[395] at 156.)  Professor Murphy likewise testified at his deposition that his conclusion that "payment cards add value" would "look the same" from a qualitative perspective, "as if he was talking about debit cards as well as credit cards." (Murphy Dep. at 156.)

190.     Professor Kenneth Elzinga provided opinions regarding the pro-competitive role interchange plays in balancing the two-sides of the market and increasing output, including with respect to signature and PIN debit.  (Elzinga Rep. at 40-56.)

---

[395]   Deposition of Kevin M. Murphy (Apr. 13, 2010) ("Murphy Dep.").

191.    Dr. Benjamin Klein also opined on the pro-competitive role interchange plays in balancing the two sides of the market and increasing output. Dr. Klein specifically analyzed interchange in the context of PIN debit and concluded that "[h]igher PIN debit interchange fees lead to cardholder benefits because competition among banks for checking account customers leads them to pass through much of the benefits they obtain from higher interchange fees." (Klein Rep. ¶ 219; *see also id.* ¶¶ 206-22 (analyzing the role of Interlink interchange fees in competition for PIN debit issuance).)

192.    Professor Topel's explained that, even though he did not describe such a "but for" world, his analysis with respect to credit cards also would apply to signature debit cards:

> Q.  Up until now we've talked about a but-for world as to all-purpose credit cards. Is there anywhere in your reports that you describe what the but-for world would look like for debit cards without a default, collectively set default interchange rule?
>
> A.  Well, since signature debit cards have many of the features of credit cards, including rewards and clearing over the same network and the like, then -- on the other hand, they offer less of the elasticity-enhancing attributes of credit cards. So you would expect, at least I would expect their interchange rates and merchant discounts to be lower, smaller transfer of value. But with that in mind, given the similarities, most of the analysis that I offer here would be equally applicable to signature debit if that's what your question is.

(Topel Dep.[396] at 143-44.) Professor Topel further explained that his analysis about the importance of default interchange with respect to "a transfer of value across the platforms" applies to PIN debit cards as well. (Topel Dep. at 149-51.) Although Professor Topel did not construct a "but for" world relating to PIN debit, he stated, "I don't want to convey the impression that the analysis, the model, the importance of a transfer of value applies to signature debit and credit only. It applies to PIN debit in different magnitudes." (Topel Dep. at 150-51.)

---

[396]  Deposition of Robert H. Topel (Apr. 20, 2010) ("Topel Dep.").

L.     **Alternative Systems**

193.    In the absence of collectively set interchange the MasterCard IPO could have been accomplished as early as January 1, 2004.  (Selander Decl.[397] ¶ 6 ("Moreover, if the ownership and governance structure of MasterCard was the cause of the inability to implement a balancing mechanism in the 1998-2000 time frame, I would have taken steps to have MasterCard pursue and effectuate its IPO not only earlier than May 2006 but before January 1, 2004.").)

194.    In lieu of an IPO, the networks could have considered a variety of different acquirer fees, as MasterCard did.  (FASCAC[398] ¶¶ 86-93; Selander Decl. ¶ 3

("███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████"); MCI_MDL02_11828397 to 11828656,[399] at 8432 ("████████

███████████████████████████████████████████

███████████████████████████████").)

195.    An "independent" third-party such as Microsoft could purchase Visa or MasterCard and set interchange or alternative fees to maximize network transaction volume.

---

[397] Decl. of Robert W. Selander (Jun. 24, 2009).

[398] First Amended Supplemental Class Action Complaint (Jan. 29, 2009) ("FASCAC").

[399] MasterCard International "New Business Model U.S.Team" (Aug. – Nov. 2004).

(*See* FASCAC ¶¶ 7, 141-43, 163-64.) Class plaintiffs' counsel could not say that merchant fees would have been lower in that case. (Nov. 18, 2009 Oral Argument Tr.[400] at 65:5-17.)

196.   Class plaintiffs suggested that the networks could have been sold to third parties to eliminate the collective setting of interchange. (FASCAC ¶ 163.)

---

[400]   *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 05-MDL-1720 (JG), Transcript of Civil Cause for Oral Argument Before the Honorable James Orenstein, United States Magistrate Judge (Nov. 18, 2009).

Dated:   New York, New York
         May 6, 2011

Respectfully submitted,

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

By:   /s/ Gary R. Carney _____
      Andrew C. Finch
      Gary R. Carney
      1285 Avenue of the Americas
      New York, New York 10019-6064
      Tel.: (212) 373-3000
      Fax: (212) 757-3990
      gcarney@paulweiss.com

      Kenneth A. Gallo
      Joseph J. Simons
      2001 K Street, N.W.
      Washington, DC 20006-1047
      Tel.: (202) 223-7300
      Fax: (202) 223-7420

**WILLKIE FARR & GALLAGHER LLP**
      Keila D. Ravelo
      Wesley R. Powell
      Matthew Freimuth
      787 Seventh Avenue
      New York, New York 10019-6099
      Tel.: (212) 728-8000
      Fax: (212) 728-8111

      *Attorneys for Defendant MasterCard Incorporated and MasterCard International Incorporated*

514

**ARNOLD & PORTER LLP**

By:   /s/ Robert C. Mason
       Robert C. Mason
       399 Park Avenue
       New York, NY  10022-4690
       Telephone:  (212) 715-1000
       Facsimile:  (212) 715-1399
       robert.mason@aporter.com

       Robert J. Vizas
       One Embarcadero Center, 22nd Floor
       San Francisco, CA  94111-3711
       Telephone:  (415) 356-3000
       Facsimile:  (415) 356-3099

       Mark R. Merley
       Matthew A. Eisenstein
       555 12th Street, N.W.
       Washington, DC  20004-1206
       Telephone:  (202) 942-5000
       Facsimile:  (202) 942-5999

       *Attorneys for Defendants Visa Inc., Visa U.S.A. Inc.,*
       *and Visa International Service Association*

515

**MORRISON & FOERSTER LLP**

By:   /s/ Mark P. Ladner
      Mark P. Ladner
      Michael B. Miller
      1290 Avenue of the Americas
      New York, NY   10104-0050
      Telephone:  (212) 468-8000
      Facsimile:  (212) 468-7900
      mladner@mofo.com

*Attorneys for Defendants Bank of America, N.A., BA Merchant Services LLC (f/k/a Defendant National Processing, Inc.), Bank of America Corporation, and MBNA America Bank, N.A.*

**SHEARMAN & STERLING LLP**

By:   /s/ James P. Tallon
      James P. Tallon
      Wayne D. Collins
      Lisl J. Dunlop
      599 Lexington Avenue
      New York, NY 10022-6069
      Tel.: (212) 848-4000
      Fax: (212) 848-7179
      jtallon@shearman.com

*Attorneys for Defendants Barclays Financial Corp. and Barclay's Bank plc*

**O'MELVENY & MYERS LLP**

By:   /s/ Andrew J. Frackman
      Andrew J. Frackman
      Times Square Tower
      7 Times Square
      New York, N.Y. 10036
      Tel.: (212) 326-2000
      Fax: (212) 326-2061
      afrackman@omm.com

*Attorneys for Defendants Capital One Bank (USA),*
*N.A., Capital One F.S.B., and Capital One Financial*
*Corp.*

**SKADDEN, ARPS, SLATE, MEAGHER**
**& FLOM LLP**

By:   /s/ Peter E. Greene
      Peter E. Greene
      Peter S. Julian
      Four Times Square
      New York, NY   10036
      Telephone:  (212) 735-3000
      Facsimile:  (212) 735-2000
      peter.greene@skadden.com

      Michael Y. Scudder
      155 North Wacker Drive
      Chicago, IL  60606-1720
      Telephone:  (312) 407-0700
      Facsimile:  (312) 407-0411
      michael.scudder@skadden.com

*Attorneys for Defendants JPMorgan Chase & Co.,*
*Chase Bank USA, N.A., Chase Manhattan Bank*
*USA, N.A., Chase Paymentech Solutions, LLC,*
*JPMorgan Chase Bank, N.A., as acquirer of certain*
*assets and liabilities of Washington Mutual Bank,*
*Bank One Corporation, and Bank One Delaware*

517

**SIDLEY AUSTIN LLP**

By:   /s/ David F. Graham
      David F. Graham
      Eric H. Grush
      One South Dearborn Street
      Chicago, IL 60603
      Tel.: (312) 853-7000
      Fax: (212) 853-7036
      dgraham@sidley.com


      Benjamin R. Nagin
      787 Seventh Avenue
      New York, N.Y. 10019
      Tel.: (212) 839-5300
      Fax: (212) 839-5599

*Attorneys for Defendants Citibank (South Dakota),*
*N.A., Citibank, N.A., Citigroup Inc., and Citicorp*

                    .


**KEATING MUETHING & KLEKAMP PLL**

By:   /s/Richard L. Creighton
      Richard L. Creighton
      Joseph M. Callow, Jr.
      Drew M. Hicks
      One East Fourth Street
      Suite 1400
      Cincinnati, OH 45202
      Tel.: (513) 579-6400
      Fax: (513) 579-6457

*Attorneys for Defendant Fifth Third Bancorp*

518

**KUTAK ROCK LLP**

By:  /s/ John P. Passarelli
     John P. Passarelli
     James M. Sulentic
     The Omaha Building
     1650 Farnam Street
     Omaha, NE 68102-2186
     Tel.: (402) 346-6000
     Fax: (402) 346-1148
     john.passarelli@kutakrock.com

*Attorneys for Defendant First National Bank of Omaha*


**WILMER CUTLER PICKERING HALE AND DORR LLP**

By:  /s/ Christopher R. Lipsett
     Christopher R. Lipsett
     David S. Lesser
     399 Park Avenue
     New York, N.Y. 10022
     Tel.: (212) 230-8800
     Fax: (212) 230-8888
     chris.lipsett@wilmerhale.com

     Ali M. Stoeppelwerth
     Perry A. Lange
     1875 Pennsylvania Ave., N.W.
     Washington, D.C. 20006
     Tel.: (202) 663-6000
     Fax: (202) 663-6363

*Attorneys for HSBC Finance Corporation and HSBC North America Holdings, Inc.*

**JONES DAY**

By:   /s/ John M. Majoras
      John M. Majoras
      Joseph W. Clark
      51 Louisiana Avenue, NW
      Washington, DC   20001
      Telephone:  (202) 879-3939
      Facsimile:  (202) 626-1700
      jmmajoras@jonesday.com

*Attorneys for Defendants National City Corporation,*
*National City Bank of Kentucky*


**PULLMAN & COMLEY, LLC**

By:   /s/ Jonathan B. Orleans
      Jonathan B. Orleans
      Adam S. Mocciolo
      850 Main Street
      Bridgeport, CT   06601-7006
      Telephone:  (203) 330-2000
      Facsimile:  (203) 576-8888
      jborleans@pullcom.com

*Attorneys for Defendant Texas Independent*
*Bancshares, Inc.*

**ALSTON & BIRD LLP**

By:   /s/ Teresa T. Bonder
      Teresa T. Bonder
      Valarie C. Williams
      Kara F. Kennedy
      1201 W. Peachtree Street, N.W.
      Atlanta, GA 30309
      Tel.: (404) 881-7000
      Fax: (404) 881-7777
      teresa.bonder@alston.com

*Attorneys for Defendant Suntrust Banks, Inc.*

**PATTERSON BELKNAP WEBB & TYLER LLP**

By:   /s/ Robert P. LoBue
      Robert P. LoBue
      Norman W. Kee
      Patterson Belknap Webb & Tyler LLP
      1133 Avenue of the Americas
      New York, NY 10036
      Tel.: (212) 336-2596
      Fax: (212) 336-2222
      rplobue@pbwt.com

*Attorneys for Defendants Wachovia Bank, NA.,*
*Wachovia Corporation, and Wells Fargo*
*& Company*