

35898276

Feb 11 2011
1:25PM

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION<br><br><br>This Document Relates To:  ALL ACTIONS | Case No. 1:05-md-1720-JG-JO |

## DEFENDANTS' STATEMENT OF MATERIAL FACTS
## <u>AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED</u>

### HIGHLY CONFIDENTIAL
### SUBJECT TO PROTECTIVE ORDER
### TO BE FILED UNDER SEAL

# REDACTED

### *Table Of Contents*

Preliminary Statement ..................................................................................................1

I.    Undisputed Material General Background Facts ............................................1

    A.    The Parties ..............................................................................................1

    B.    Interchange In The Visa And MasterCard Payment Card Systems....................5

    C.    The Class Complaint ..............................................................................9

II.   Undisputed Material Facts Relating To Defendants' Argument That Plaintiffs'
    Claims Are Barred By The *Visa Check* Release ........................................11

    A.    The *Visa Check* Settlement And Release .........................................11

    B.    The Visa And MasterCard Default Interchange Rules Have Not Changed
        Materially Since The *Visa Check* Settlement And Release...............13

    C.    The Visa And MasterCard Honor-All-Cards Rules Have Not Changed
        Materially Since The *Visa Check* Settlement And Release...............15

    D.    The Visa And MasterCard No-Surcharge Rules Have Not Changed
        Materially Since The *Visa Check* Settlement And Release...............17

    E.    The Visa And MasterCard No Minimum/Maximum Purchase Rules Have
        Not Changed Materially Since The *Visa Check* Settlement And Release ...........17

    F.    The Visa And MasterCard Non-Discrimination Rules Have Not  Changed
        Materially Since The *Visa Check* Settlement And Release...............19

    G.    The Visa And MasterCard No-Bypass Rules Have Not  Changed
        Materially Since The *Visa Check* Settlement And Release...............20

    H.    The Visa And MasterCard No-Multi-Issuer Rules Have Not  Changed
        Materially Since The *Visa Check* Settlement And Release...............21

III.  Undisputed Material Facts Relating To Defendants' Argument That Plaintiffs'
    Claims Are Barred By The *Illinois Brick* Doctrine ........................................22

    A.    Merchant Acquirers Pay "Interchange Fees" To Issuers .....................23

    B.    Merchants Pay "Merchant Discount Fees" To Merchant Acquirers ....................24

    C.    Merchant Acquirers Do Not Always Pass On To Merchants The Full
        Amount Of Interchange Fees.................................................................26

IV.    Undisputed Material Facts Relating To Defendants' Argument That Plaintiffs' Default Interchange Fee Claims Are Barred By *Buffalo Broadcasting* and *Paycom* .......33

    A.    Defendants May Enter Into Bilateral Agreements  That Alter The Default Interchange Rates......................................................................................33

    B.    Bank Defendants May Issue Payment Cards Of Other Networks, Which Are Realistically Available Alternatives.......................................................35

    C.    Bank Defendants May Issue Private Label Cards, Which Are Realistically Available Alternatives.............................................................................39

    D.    Bank Defendants May Invest In Other Electronic Payment Systems, Which Are Realistically Available Alternatives................................................40

V.    Undisputed Material Facts Relating To Defendants' Argument That Plaintiffs Have Failed To Present Evidence Of Any Reduction In Output .....................................41

VI.    Undisputed Material Facts Relating To Defendants' Argument That Plaintiffs Have Abandoned Their Inter-Network Conspiracy Claim ................................................43

VII.    Undisputed Material Facts Relating To Defendants' Argument That Plaintiffs Have Not Presented Evidence To Support Their Challenge To The No-Surcharge Rules .......................................................................................................................46

    A.    The "No Surcharge" Rules Do Not Unreasonably Restrain Trade Or Result In An Antitrust Injury..............................................................................46

    B.    No Antitrust Injury Could Flow From The "No Surcharge"  Rules In The Ten States That Statutorily Prohibit Surcharging ................................................46

VIII.    Undisputed Material Facts Relating To Defendants' Argument That Plaintiffs Lack Evidence To Support Their Alleged Single-Brand Markets ...................................49

IX.    Undisputed Material Facts Relating To Defendants' Argument That Plaintiffs Lack Evidence To Support Their Monopolization Claims ...............................................59

X.    Undisputed Material Facts Relating To Defendants' Argument That Plaintiffs Have Failed To Present Evidence To Support Their IPO And Post-IPO Claims ............64

    A.    The MasterCard IPO .......................................................................................64

    B.    The Visa IPO ..................................................................................................67

    C.    Banks Do Not Control Either Post-IPO MasterCard or Visa ..............................70

        1.    The Post-IPO Compositions of the Visa and MasterCard Boards Divest the Banks of Any Purported Control............................................70

2.    Limited Voting Rights Do Not Give Banks Power Over Network Decisions Regarding Interchange Rates ................................................... 70

3.    Limited Voting Rights Do Not Give Banks Power Over Network Decisions Regarding Interchange Rates ................................................... 71

D.    There Is No Evidence of the Existence of Any Post-IPO Intra-Network Structural Conspiracy Within Visa or MasterCard ............................................... 72

E.    There Is No Evidence Supporting Plaintiffs' Fraudulent Conveyance Claims Against MasterCard ................................................................................. 73

***Preliminary Statement***

Pursuant to Rule 56.1 of the Local Rules of the United States District Court for the Eastern District of New York, defendants respectfully submit this statement of material facts as to which, for purposes of defendants' motions for summary judgment, there is no genuine issue to be tried.  This statement of material facts is consolidated and is submitted in support of defendants' motion for summary judgment as to the claims in (i) the Second Consolidated Amended Class Action Complaint (the "Class Complaint"), (ii) the First Amended Supplemental Class Action Complaint and the Second Supplemental Class Action Complaint, which challenge the initial public offerings ("IPOs") of each network (the "IPO Complaints"), and (iii) the complaints of the individual plaintiffs (the "Individual Plaintiff Complaints").  A copy of the evidence on which defendants rely to support each of the following undisputed material facts is submitted herewith as exhibits to the transmittal affidavit of Peter E. Greene, dated February 11, 2011, and submitted herewith.

## I.   **Undisputed Material General Background Facts**

### A.   **The Parties**

1.      Plaintiffs are merchants that accept Visa- and MasterCard-branded credit and/or debit cards (collectively "payment cards") as forms of payment, and trade associations whose members are merchants that accept Visa- and MasterCard-branded payment cards as forms of payment.  (Class Compl.[1] ¶¶ 1, 2, 9-47; BI-LO Compl.[2] ¶¶ 2-3; Hy-Vee Compl.[3] ¶ 2;

---

[1]      Second Consolidated Amended Class Action Complaint (Jan. 29, 2009) ("Class Compl.").

[2]      Complaints in *BI-LO, LLC, et al. v. Visa U.S.A. Inc., et al.*, No. 06-CV-2532-JG (E.D.N.Y.) (May 22, 2006), and *BI-LO, LLC, et al. v. MasterCard Incorporated, et al.*, No. 06-CV-2534-JG (E.D.N.Y.) (May 22, 2006) ("BI-LO Compl.").

Kroger Compl.[4] ¶¶ 2-9; Meijer Compl.[5] ¶ 2; Publix Compl.[6] ¶ 2; QVC Compl.[7] ¶ 2; Raley's

Compl.[8] ¶ 2; Rite Aid Compl.[9] ¶¶ 2-3; Supervalu Compl.[10] ¶ 2; Wakefern Compl.[11] ¶ 2.)

        2.      Plaintiffs Photos Etc. Corporation, Traditions Ltd., Capital Audio Elec-

tronics Inc., CHS Inc., Coborn's, Incorporated, Crystal Rock, LLC, D'Agostino Supermarkets,

Inc., Discount Optics, Inc., Jetro Cash & Carry Enterprises, LLC, Leon's Transmission Service,

Inc., Parkway Corporation, Payless ShoeSource, Inc., Affiliated Foods Midwest Cooperative,

Inc., National Association of Convenience Stores, NATSO, Inc., National Community Pharma-

cists Association, National Cooperative Grocers Association, National Grocers Association, and

---

*(cont'd from previous page)*

[3]    Amended Complaint in *Hy-Vee, Inc. v. Visa U.S.A. Inc. et al.*, No. 05-CV-3925-JG (E.D.N.Y.) (Apr. 24, 2006) ("Hy-Vee Compl.").

[4]    Amended Complaints in *The Kroger Co., et al v. MasterCard Incorporated, et al.*, No. 05-CV-6913-DAB (S.D.N.Y.) (Aug. 31, 2005), and *The Kroger Co., et al. v. Visa U.S.A. Inc., et al.*, No. 05-CV-6409-DAB (S.D.N.Y.) (Aug. 31, 2005) ("Kroger Compl.").

[5]    First Amended Complaint in *Meijer, Inc., et al. v. Visa U.S.A. Inc., et al.*, No. 05-CV-4131-JG (E.D.N.Y.) (July 13, 2006) ("Meijer Compl.").

[6]    Complaint in *Publix Super Markets, Inc. v. Visa U.S.A. Inc., et al.*, No. 05-CV-4677-JG (E.D.N.Y.) (Sept. 29, 2005) ("Publix Compl.").

[7]    Complaint in *QVC, Inc. v. Visa U.S.A. Inc., et al.*, No. 07-CV-0592-JG (E.D.N.Y.) (Feb. 9, 2007) ("QVC Compl.").

[8]    Complaint in *Raley's v. Visa U.S.A. Inc., et al*, No. 05-CV-4799-JG (E.D.N.Y.) (Oct. 12, 2005) ("Raley's Compl.").

[9]    Complaints in *Rite Aid Corp., et al. v. Visa U.S.A. Inc., et al.*, No. 05-CV-5352-JG (E.D.N.Y.) (Nov. 14, 2005), and *Rite Aid Corp., et al. v. MasterCard Incorporated, et al.*, No. 06-CV-0078-JG (E.D.N.Y.) (Jan. 6, 2006) ("Rite Aid Compl.").

[10]    Complaint in *Supervalu Inc., v. Visa U.S.A. Inc., et al*, No. 05-CV-4650-JG (E.D.N.Y.) (Sept. 30, 2005) ("Supervalu Compl.").

[11]    Complaint in *Wakefern Food Corp. v. Visa U.S.A. Inc., et al.*, No. 06-CV-5765-JG (E.D.N.Y.) (Oct. 3, 2006) ("Wakefern Compl.").

National Restaurant Association (the "Class Plaintiffs") have brought this class action on behalf of themselves and a putative class of similarly situated merchants.  (Class Compl. ¶¶ 1-3, 9-47.)

3.   Plaintiffs BI-LO, LLC and Bruno's Supermarkets, Inc. (BI-LO Compl. ¶¶ 2-3), Hy-Vee, Inc. (Hy-Vee Compl. ¶ 2), The Kroger Company, Albertson's, Inc., Safeway, Inc., Ahold U.S.A., Inc., Walgreen Company, Maxi Drug, Inc., Eckert Corporation, and Delhaize America, Inc. (Kroger Compl. ¶¶ 2-9), Meijer, Inc. and Meijer Stores Limited Partnership (Meijer Compl. ¶ 2), Publix Super Markets, Inc. (Publix Compl. ¶ 2), QVC, Inc. (QVC Compl. ¶ 2), Raley's (Raley's Compl. ¶ 2), Rite Aid Corporation and Pathmark Stores, Inc. (Rite Aid Compl. ¶¶ 2-3), SuperValu Inc. (Supervalu Compl. ¶ 2), and Wakefern Food Corporation (Wakefern Compl. ¶ 2) (collectively the "Individual Plaintiffs") have brought the Individual Plaintiff Complaints on behalf of themselves.

4.   Defendant Visa – which includes Visa International (f/k/a Visa International Service Association), Visa U.S.A. Inc., and Visa Inc. (collectively "Visa") – is a global company with approximately 16,400 financial institution members located around the world. Membership in Visa is open to any eligible financial institution meeting a number of financial, legal, and regulatory criteria specified in Visa's Bylaws and Operating Rules.  (McCormack Rep.[12] ¶ B-1 (App. B).)  Until March 2008, when it was restructured through an IPO, Visa was operated as a non-stock joint venture by its member banks.  (Class Compl. ¶ 50; Hy-Vee Compl. ¶ 3; Kroger Compl. (Visa) ¶ 10; McCormack Rep. ¶¶ B-3, B-4 (App. B).)

5.   Defendant MasterCard – which includes MasterCard Inc., and MasterCard International Inc. (collectively "MasterCard") – is a global company with 2,400 principal members located around the world, and approximately 21,600 affiliate members, sponsored by one or

---

[12]   Report of Mike McCormack (July 2, 2009) ("McCormack Rep.").

more principal members.  Membership in MasterCard is open to any eligible financial institution meeting a number of financial, legal, and regulatory criteria specified in MasterCard's Bylaws and Rules. (McCormack Rep. ¶ B-2 (App. B).)  Until May 2006, when it was restructured through an IPO, MasterCard was operated as a joint venture by its member banks.  (Class Compl. ¶ 52; Hy-Vee Compl. ¶ 4; Kroger Compl. (MasterCard) ¶ 10; McCormack Rep. ¶¶ B-3, B-4 (App. B); MCI_MDL02_10956864 to 10957026,[13] at 6870, 7009.)

6.    The bank defendants include Bank of America, N.A., BA Merchant Services LLC (f/k/a Defendant National Processing, Inc.), Bank of America Corporation, and MBNA America Bank, N.A. (collectively "Bank of America"); Barclays Bank plc, Barclays Bank Delaware, and Barclays Financial Corp. (collectively "Barclays"); Capital One Bank, (USA), N.A., Capital One F.S.B., and Capital One Financial Corporation (collectively "Capital One"); Chase Bank USA, N.A., Chase Paymentech Solutions, LLC, JPMorgan Chase Bank, N.A., and JPMorgan Chase & Co. (collectively "Chase"); Citibank (South Dakota), N.A., Citibank N.A., and Citigroup Inc., Citicorp (collectively "Citibank"); Fifth Third Bancorp; First National Bank of Omaha; HSBC Finance Corporation, N.A. and HSBC North American Holdings, Inc. (collectively "HSBC"[14]); National City Corporation and National City Bank of Kentucky (collectively "National City"), SunTrust Banks, Inc. and SunTrust Bank (collectively "Sun-Trust"); Texas Independent Bancshares, Inc.; Washington Mutual, Inc., Washington Mutual

---

[13]    Form 10-K of MasterCard Inc. (filed March 16, 2006).

[14]    The Class Complaint refers to some affiliated HSBC entities in paragraphs 73 and 93 as though they were sued as defendants in this case, but they have not been served with any summons or identified in the caption of any complaint as defendants herein, are not parties, and have not participated as parties.

Bank (collectively "Washington Mutual"[15]); and Wachovia Bank, N.A., Wachovia Corporation, and Wells Fargo & Company (collectively "Wells Fargo").  The defendant banks have been members, customers, and/or shareholders of Visa and MasterCard at various times before and after the network IPOs.  (Class Compl. ¶¶ 54-93, 265, 269.)

### B.   Interchange In The Visa And MasterCard Payment Card Systems

7.      The bank defendants or their affiliates serve either (or both) of two separate functions in the Visa and MasterCard networks.  They issue payment cards to cardholders (and are referred to as "issuers") and/or they acquire and process payment card transactions from merchants (and are referred to as "merchant acquirers").  (Class Compl. ¶¶ 8(b), 8(p); McCormack Rep. ¶ 15.)  The Visa and MasterCard networks facilitate the transfer electronically of data and funds among merchants, merchant acquirers, and issuers when credit and debit cards are used to make purchases.  (McCormack Rep. ¶ 16.)  Visa and MasterCard accomplish this function by, among other things, each separately prescribing standard data formats and common operating rules to govern the transfer of data and funds.  (*Id.*)

8.      In the Visa and MasterCard networks, payment card transactions involve at least four parties in addition to the network itself:  (i) the cardholder; (ii) the issuer that issued the cardholder's payment card; (iii) the merchant that accepts the cardholder's payment card as a form of payment; and (iv) the merchant acquirer with which the merchant has contracted to

---

[15]     Washington Mutual, Inc. has filed for bankruptcy protection and all claims against it are automatically stayed pursuant to 11 U.S.C. § 362.  In addition, as to all claims relating to Washington Mutual Bank prior to its FDIC receivership, the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, 12 U.S.C. § 1821 ("FIRREA"), deprives the court of jurisdiction to hear any claim relating to any act or omission if plaintiffs do not exhaust the FDIC claims process.

process the payment card transaction.  (GAO Rep.,[16] at 6; McCormack Rep. ¶ 17.)  Visa and MasterCard payment card transactions may involve additional parties where the merchant acquirer network member has contracted with a third party processor, an independent sales organization ("ISO"), or a membership service provider to provide merchant processing services. (GAO Rep., at 6-7 & n.6; OCC Handbook,[17] at 1-4; McCormack Rep. ¶¶ C-8 to C-18 (App. C).)

9.       In the United States, there are thousands of issuers that issue Visa- and MasterCard-branded payment cards to cardholders (GAO Rep., at 6), and hundreds of merchant acquirers – including acquiring members of Visa and MasterCard, as well as third party processors, ISOs, and membership service providers – that process Visa- and MasterCard-branded payment card transactions for merchants.  (OCC Handbook, at 4; 2010 Nilson Rep.,[18] at 10-11; McCormack Rep. App. D.)

10.       Typically, when a cardholder presents a Visa- or MasterCard-branded payment card for payment, the merchant must seek authorization for the transaction.  (OCC Handbook, at 6-7; McCormack Rep. ¶ 20.)  The merchant inputs the cardholder's payment card information into a terminal and transmits that information to its merchant acquirer (or some other third-party intermediary), which, in turn, transmits the information through the Visa or MasterCard network for authorization by the issuing bank that issued the cardholder's payment card. (*Id.*)  If it approves the transaction, the issuing bank transmits a message through the network to

---

[16]       United States Government Accounting Office, Report to Congressional Addressees, *CREDIT CARDS, Rising Interchange Fees Have Increased Costs for Merchants, but Options for Reducing Fees Pose Challenges* (Nov. 2009) ("GAO Rep.").

[17]       Office of the Comptroller of the Currency, *Merchant Processing, Comptroller's Handbook* (Dec. 2001) ("OCC Handbook").

[18]       HSN Consultants Inc, 2010 The Nilson Report, Issue 945 (March 2010) ("Nilson Rep.").

the merchant acquirer for ultimate transmission to the merchant that the transaction has been authorized.  (*Id.*)  The merchant then completes the transaction with the cardholder.  (*Id.*)

11.     Completed transactions are cleared and settled through the appropriate network in a process called "interchange."  (OCC Handbook, at 8-9, McCormack Rep. ¶¶ 21-23.) The transaction is "settled" when the issuing bank transfers funds to the network, the network transfers funds to the merchant acquirer, and the merchant acquirer pays the merchant.  (*Id.*)

12.     Visa and MasterCard require each issuing bank to accept all properly authorized transactions presented by a merchant acquirer, and to transfer funds to the merchant acquirer in exchange for a discount established either by bilateral agreement between the issuer and the acquirer or, absent such an agreement, by Visa or MasterCard.  (Oct. 2010 Visa Rules,[19] Ch. 7, at 612, Ch. 10, Core Principle 10.3; 2010 MasterCard Rules[20] §§ 3.9.2, 9.4.)  The discount is called the "interchange fee," which, as plaintiffs themselves have previously acknowledged, is "a fee that the bankcard acquiring institution pays to the card issuing institution for each retail transaction where the issuer's card is used as a payment device at one of the acquirer's retail store accounts."  (*Visa Check* Compl.[21] ¶ 8(o).)  Plaintiff class representative NATSO acknowledged that "[i]nterchange is actually a fee, which is set by [Visa or MasterCard], but that is paid by the acquirer to the card issuer."  (NATSO 006498.[22])

---

[19]     Visa International Operating Regulations (Oct. 15, 2010) ("Oct. 2010 Visa Rules").

[20]     MasterCard Rules (Oct. 29, 2010, updated Dec. 10, 2010) ("2010 MasterCard Rules").

[21]     Second Amended Consolidated Class Action Complaint in *In re Visa Check/MasterMoney Antitrust Litig.*, No. 96-CV-5238-JG (E.D.N.Y.), available at 1999 WL 34848247 ("*Visa Check* Compl.").

[22]     Email from L. Van Arsdale to L. Mullings (Oct. 6, 2005).

7

13.     Merchants do not contract directly with Visa or MasterCard or with issuers to accept payment cards; merchants contract either with a merchant acquirer, which may be affiliated with the Visa or MasterCard network, or with a third-party processor, ISO, or membership service provider that is not itself affiliated with Visa or MasterCard but that has contracted with a merchant acquirer of one of the networks to perform certain functions.  (GAO Rep., at 6-7.)  To handle the merchant's payment card transactions, the merchant acquirer charges the merchant a fee, known as the "merchant discount fee."  (GAO Rep., at 7; Class Compl. ¶ 8(r); Frankel Rebuttal Rep.[23] ¶ 136; Frankel Dep.[24] at 157; McCormack Rep. ¶¶ 24, 78; McCormack Dep.[25] at 128; Oct. 2010 Visa Rules, Core Principle 10.2; 2010 MasterCard Rules § 5.11.2; Topor Dep.[26] at 60; Ivancikova Dep.[27] at 104; Zuritsky Dep.[28] at 124; Wenning Dep.[29] at 143-44; Schumann Dep.[30] at 61; Berman Dep.[31] at 172; Gule Dep.[32] at 191; Mullings Dep.[33] at 175-76;

---

[23]     Rebuttal Report of Alan S. Frankel, Ph.D. (June 22, 2010) ("Frankel Rebuttal Rep.").

[24]     Deposition of Alan Frankel (Sept. 20-22, 2010) ("Frankel Dep.").

[25]     Deposition of Mike McCormack (Aug. 25, 2010) ("McCormack Dep.").

[26]     Deposition of Kathy Topor (Jan. 30, 2008) ("Topor Dep.").  Ms. Topor was the senior director of tax for plaintiff Rite Aid Corporation.  (Topor Dep. at 12.)

[27]     Deposition of Daniela Ivancikova (Jan. 8, 2008) ("Ivancikova Dep.").  Ms. Ivancikova was the director of operating revenue systems at plaintiff Parkway Corporation until July 6, 2007.  (Ivancikova Dep. at 6-7.)

[28]     Deposition of Robert Zuritsky (Apr. 30, 2008) ("Zuritsky Dep.").  Mr. Zuritsky testified as president of plaintiff Parkway Corporation.  (Zuritsky Dep. at 5.)

[29]     Deposition of Thomas F. Wenning (May 23, 2008) ("Wenning Dep.").  Mr. Wenning testified as senior vice president and general counsel of plaintiff National Grocers Association.  (Wenning Dep. at 8.)

[30]     Deposition of Michael Schumann (Nov. 15, 2007) ("Schumann Dep.").  Mr. Schumann testified as the corporate secretary and treasurer of plaintiff Traditions Ltd.  (Schumann Dep. at 50.)

Schermerhorn Dep.[34] at 91.)  According to Class Plaintiffs' industry expert, Mr. McCormack, merchant discount fees "include not only interchange fees alone, but also the acquirer fee and other Visa and MasterCard network fees."  (McCormack Rebuttal Rep.[35] ¶ 7.)

C.     **The Class Complaint**

14.     Table 1 describes each of the twenty claims for relief contained in the Class Complaint.  (Class Compl. ¶¶ 292-357, 371-97, 409-28, 443-68.)

---

*(cont'd from previous page)*

[31]   Deposition of Carl Berman (Apr. 10, 2008) ("Berman Dep.").  Mr. Berman testified as co-owner of plaintiff Photos Etc.  (Berman Dep. at 31-32.)

[32]   Deposition of Roberta Gule (Feb. 21, 2008) ("Gule Dep.").  Ms. Gule was the accounts receivable manager at plaintiff Crystal Rock.  (Gule. Dep. at 31.)

[33]   Deposition of Lisa Mullings (Aug. 13, 2008) ("Mullings Dep.").  Ms. Mullings testified as President and CEO of plaintiff NATSO, Inc.  (Mullings Dep. at 124)

[34]   Deposition of David Schermerhorn (Dec. 4, 2007) ("Schermerhorn Dep.").  Mr. Schermerhorn testified as the supplier programs manager at plaintiff National Community Grocers Association.  (Schermerhorn Dep. at 37.)

[35]   Rebuttal Report of Mike McCormack (June 22, 2010) ("McCormack Rebuttal Rep.").

**TABLE 1**

| Claim for Relief | Defendants[36] | Challenged Conduct | Statutory Basis | Relief Sought |
|---|---|---|---|---|
| 1 | Visa | intra-network credit card interchange | 15 USC § 1 | damages |
| 2 | MasterCard | intra-network credit card interchange | 15 USC § 1 | damages |
| 3 | Visa/MasterCard | inter-network credit card interchange | 15 USC § 1 | damages |
| 4 | Visa | intra-network credit card interchange | Cartwright Act | damages |
| 5 | Visa/MasterCard | credit card interchange | 15 USC § 1 | injunction |
| 6 | Visa | intra-network merchant rules | 15 USC § 1 | injunction |
| 7 | MasterCard | intra-network merchant rules | 15 USC § 1 | injunction |
| 8 | Visa | monopolization | 15 USC § 2 | injunction |
| 9 | MasterCard | monopolization | 15 USC § 2 | injunction |
| 10 | Visa | intra-netw'k offline debit interchange | 15 USC § 1 | damages |
| 11 | MasterCard | intra-netw'k offline debit interchange | 15 USC § 1 | damages |
| 12 | Visa | intra-netw'k offline debit interchange | Cartwright Act | damages |
| 13 | Visa/MasterCard | intra-netw'k offline debit interchange | 15 USC § 1 | injunction |
| 14 | Visa | intra-network PIN-debit interchange | 15 USC § 1 | damages |
| 15 | Visa | intra-network PIN-debit interchange | Cartwright Act | damages |
| 16 | Visa | intra-network PIN-debit interchange | 15 USC § 1 | injunction |
| 17 | Visa | post-IPO intra-network interchange | 15 USC § 1 | damages |
| 18 | MasterCard | post-IPO intra-network interchange | 15 USC § 1 | damages |
| 19 | Visa | post-IPO intra-network interchange | Cartwright Act | damages |
| 20 | Visa/MasterCard | post-IPO intra-network interchange | 15 USC § 1 | injunction |

---

[36]    "Defendants" includes the identified network defendant and its defendant member banks.

II.    **Undisputed Material Facts Relating To Defendants' Argument
       That Plaintiffs' Claims Are Barred By The *Visa Check* Release**

       15.    In their Class Complaint, plaintiffs allege that "[f]or more than 40 years

America's largest banks have fixed the fees imposed on Merchants for transactions processed

over the Visa and MasterCard Networks and have collectively imposed restrictions on Merchants

that prevent them from protecting themselves against those fees."  (Class Compl. Preamble ¶ 1.)

       A.    **The *Visa Check* Settlement And Release**

       16.    In *In re Visa Check/MasterMoney Antitrust Litig.*, 192 F.R.D. 68

(E.D.N.Y 2000), *aff'd*, 280 F.3d 124 (2d Cir. 2001), this Court certified a class of merchants

"virtually identical" to the class putatively represented by Class Plaintiffs in this case.  (Class

Compl. ¶ 119.)

       17.    The merchant class in *Visa Check* alleged that Visa and MasterCard and

their respective member banks "collectively fix the Visa . . . [and] MasterCard interchange fees."

(*Visa Check* Compl. ¶ 45.)  The *Visa Check* class alleged that under Visa and MasterCard rules,

"retailers are even prohibited from asking a consumer whether she would not mind using a dif-

ferent payment system," including "far less costly forms of payment."  (*Id.* ¶ 74, 87.)  In their

summary judgment motion, the *Visa Check* class claimed that "Visa and MC rules specifically

prohibited merchants from engaging in any attempts to discourage the holder of any Visa or MC

payment card from using that card -- through verbal or other means, or through discounting or

surcharging" and that "Visa and MC's rules explicitly prohibit merchants from surcharging

Visa/MC transactions."  (*Visa Check*, Mem. In Supp. of Pls.' Mot. For Sum. J. at 8, 66 (June 7,

2000).)

11

18.    The merchant class in *In re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003), settled their claims by entering into a settlement agreement with each of Visa and MasterCard, dated June 4, 2003, which this Court approved on January 23, 2004. *Visa Check*, 297 F. Supp. 2d 503, 508 (E.D.N.Y. 2003); *Visa Check*, No. 96-CV-5238, Order and Final Judgment (E.D.N.Y. Jan. 23, 2004).

19.    The *Visa Check* settlements:  (i) required the payment of more than $3 billion in cash (Visa Settlement Agreement[37] ¶ 3 ($2.025 billion); MasterCard Settlement Agreement[38] ¶ 3 ($1.025 billion)); (ii) lowered, by roughly one-third, debit interchange rates for the period from August 1, 2003, through December 31, 2003, a reduction valued by plaintiffs at tens of billions of dollars (Visa Settlement Agreement ¶ 8; MasterCard Settlement Agreement ¶ 8); (iii) required changes to certain network rules, including the honor-all-cards rules (Visa Settlement Agreement ¶ 4; MasterCard Settlement Agreement ¶ 4), and other merchant acceptance rules (Visa Settlement Agreement ¶ 9; MasterCard Settlement Agreement ¶ 9); and (iv) left in place the default interchange rules, the no-surcharge rules, the non-discrimination rules and a host of other rules allegedly affecting merchant acceptance of Visa and MasterCard payment cards. *Visa Check*, 297 F. Supp. 2d at 508-12.

20.    The settlement agreements in *Visa Check* each contained a release that provided, in full:

> [MasterCard and Visa and their member banks] shall be released and forever discharged from all manner of claims, demands, actions, suits, causes of action against the Released parties [MasterCard, Visa and their member banks], whether

---

[37]    Visa Settlement Agreement, *Visa Check*, No. 96-CV-5238 (E.D.N.Y. filed Jun. 4, 2003) ("Visa Settlement Agreement").

[38]    MasterCard Settlement Agreement, *Visa Check*, No. 96-CV-5238 (E.D.N.Y. filed Jun. 4, 2003) ("MasterCard Settlement Agreement").

class, individual, or otherwise in nature, damages whenever incurred, liabilities of any nature whatsoever, including costs, expenses penalties and attorneys' fees, known or unknown, suspected or unsuspected, in law or equity, that any Releasing Party ever had, now has or hereafter can, shall or may have, relating in any way to any conduct prior to January 1, 2004 concerning any claims alleged in the Complaint or any of the complaints consolidated therein, including, without limitation, claims which have been asserted or could have been asserted in this litigation which arise under or relate to any federal or state antitrust, unfair competition, unfair practices, or other law or regulation, or common law, including, without limitation, the Sherman Act, 15 U.S.C. § 1 *et seq.* Each Class Member hereby covenants and agrees that it shall not, hereafter, seek to establish liability against any of the Released Parties based, in whole or in part, upon any of the Released Claims.

(Visa Settlement Agreement ¶ 28; MasterCard Settlement Agreement ¶ 30).

21.     Of the Individual Plaintiffs,



(VUSAMDL1-07013669 to 07013689[39] ¶ 15; MCI_MDL02_11105816 to 11105822[40] ¶ 7.)

**B.      The Visa And MasterCard Default Interchange Rules Have Not Changed Materially Since The *Visa Check* Settlement And Release**

22.     Visa first adopted the use of interchange fees in the early 1970s.  (Sheedy Dep.[41] at 31-32.)  In May 2005, Visa's default interchange rule was amended to provide expressly:  "This section specifies Interchange Reimbursement Fees assessed by Visa to recognize

---

[39]   

[40]

[41]   Deposition of William M. Sheedy (June 17-18, 2008) ("Sheedy Dep.")  Mr. Sheedy testified as Visa's Rule 30(b)(6) witness regarding interchange.  (Sheedy Dep. at 8, 17-18; Sheedy Dep. Ex. 23950 (30(b)(6) Deposition Notice).)

one Member's support of another.  These Interchange Reimbursement Fees apply in all circum-
stances where Members have not set their own financial terms for the Interchange of Visa Trans-
actions." (May 2005 Visa Rules[42] § 9.5.)  The May 2005 default interchange fee language re-
mained in the Visa interchange rule until April 2010.  (Nov. 2005 Visa Rules[43] § 9.5; 2006 Visa
Rules[44] § 9.5; 2007 Visa Rules[45] § 9.5; 2008 Visa Rules[46] § 9.5.)  In April 2010, Visa redrafted
its default interchange rule to read:  "Interchange reimbursement fees are determined by Visa and
provided on Visa's published fee schedule, or may be customized where members have set their
own financial terms for the interchange of a Visa transaction or Visa has entered into business
agreements to promote acceptance and card usage."  (Apr. 2010 Visa Rules,[47] Core Principle
10.3.)  That language has remained unchanged in the October 2010 Visa rules.  (Oct. 2010 Visa
Rules, Core Principle 10.3.)

      23.    MasterCard has had a default interchange rule since at least January 1,
2004, pursuant to which MasterCard sets default interchange rates that apply to MasterCard
transactions, unless there is a bilateral agreement between MasterCard members.  The October
2003 MasterCard rules provided:  "A member that processes through the Corporation's clearing

---

[42]    Visa U.S.A. Inc. Operating Regulations (May 15, 2005) ("May 2005 Visa Rules"), bearing
control numbers VUSAMDL00046334 to 00047401.

[43]    Visa U.S.A. Inc. Operating Regulations (Nov. 15, 2005) ("Nov. 2005 Visa Rules"), bear-
ing control numbers VUSAMDL00007206 to 00008287.

[44]    Visa U.S.A. Inc. Operating Regulations (Nov. 15, 2006) ("2006 Visa Rules"), bearing con-
trol numbers VUSAMDL00174211 to 00175306.

[45]    Visa U.S.A. Inc. Operating Regulations (May 15, 2007) ("2007 Visa Rules"), bearing con-
trol numbers VUSAMDL00175837 to 00176966.

[46]    Visa U.S.A. Inc. Operating Regulations (Nov. 15, 2008) ("2008 Visa Rules"), bearing con-
trol numbers VUSAMDL000224944 to 000226019.

[47]    Visa International Operating Regulations (Apr. 1, 2010) ("Apr. 2010 Visa Rules").

systems is required to net settle in accordance with the Corporation's settlement Standards. However, an acquirer and an issuer may, with respect to a particular transaction, agree to settle directly between themselves pursuant to a bilateral agreement." (2003 MasterCard Rules[48] § 10.1.)  The February 2008 MasterCard Rules were amended to provide:  "The corporation has the right to establish default interchange fees and default service fees . . . it being understood that all such fees set by the Corporation apply only if there is no applicable bilateral interchange fee or service fee agreement between two Members in place." (2008 MasterCard Rules[49] § 9.4.) This language remains in place in the 2010 MasterCard Rules.  (2010 MasterCard Rules § 9.4.)

## C.    The Visa And MasterCard Honor-All-Cards Rules Have Not Changed Materially Since The *Visa Check* Settlement And Release

24.    Since 1976, Visa has had a rule requiring merchants that accept Visa-branded payment cards to honor all properly presented Visa-branded payment cards.  (Somerville Dep.[50] at 124.)  As a result of the *VisaCheck* settlements, Visa's honor-all-cards rule permits merchants to choose to accept all properly presented Visa-branded debit cards, or all properly presented Visa-branded credit cards, or both.  (Class Compl. ¶ 144; Visa Settlement Agreement ¶¶ 4, 9; Somerville Dep. at 126.)  The 2003 Visa rules provided:  "Effective January 1, 2004, a Merchant that wishes to accept Visa Cards must accept any valid Visa Card in its category of

---

[48]    MasterCard Bylaws and Rules (Oct. 2003) ("2003 MasterCard Rules"), bearing control numbers MCI_MDL02_10094623 to 10094953.

[49]    MasterCard Rules (Feb. 2008) ("2008 MasterCard Rules"), bearing control numbers MCW_DOJ_00481680 to 00481897.

[50]    Deposition of Una Somerville (Dec. 19, 2008 and Apr. 7, 2009) ("Somerville Dep.")  Ms. Somerville testified as Visa's Rule 30(b)(6) witness regarding the merchant acceptance rules.  (Somerville Dep. at 11-12; Somerville Dep. Ex. 36000 (30(b)(6) Deposition Notice).)

acceptance . . . that a Cardholder properly presents for payment." (2003 Visa Rules[51] §

5.2.B.3.b.). This language remains unchanged in the April and October 2010 Visa rules, except

that the 2010 rules refer to "a U.S. Merchant," rather than "a Merchant." (Apr. 2010 Visa Rules,

Ch. 6, § 5.2.B; Oct. 2010 Visa Rules, Ch. 6, § 5.2.B.) The categories of acceptance to which the

rules refer consist of the Visa Credit and Business Category and the Visa Debit Category. (Oct.

2010 Visa Rules, Glossary at 1034.)

   25. MasterCard has had an honor-all-cards rule since 1966. (Doyle Dep.[52] at

36.) Like the Visa honor-all-cards rule, MasterCard's honor-all-cards rule changed as a result of

the *Visa Check* settlements. (Class Compl. ¶ 144; MasterCard Settlement Agreement ¶¶ 4, 9.)

The 2004 MasterCard rules required "merchants that choose to accept Debit MasterCard cards to

honor all valid Debit MasterCard cards without discrimination when properly presented for pay-

ment" and "merchants that choose to accept other MasterCard cards to honor all other Master-

Card cards without discrimination when properly presented for payment." (2004 MasterCard

Rules[53] § 17.C.1.) The relevant language in MasterCard's honor-all-cards rule remains materi-

ally unchanged in the 2010 MasterCard rules: "Merchants that choose to accept Debit Master-

Card cards must honor all valid Debit MasterCard cards without discrimination when properly

presented for payment" and "Merchants that choose to accept Other Cards must honor all Other

---

[51] Visa International Operating Regulations (Nov. 15, 2003) ("2003 Visa Rules"), bearing control numbers VUSAMDL00041978 to 00043129.

[52] Deposition of Deborah Doyle (Apr. 22, 2008) ("Doyle Dep.") Ms. Doyle testified as MasterCard's Rule 30(b)(6) witness regarding the merchant rules. (Doyle Dep. at 8-9; Doyle Dep. Ex. 23050 (30(b)(6) Deposition Notice).)

[53] MasterCard Rules (Apr. 2004) ("2004 MasterCard Rules), bearing control numbers MCI_MDL02_07292595 to 07292930.

Cards without discrimination when properly presented for payment. (2010 MasterCard Rules, Ch. 15a, § 5.8.1.)

**D.     The Visa And MasterCard No-Surcharge Rules Have Not Changed Materially Since The *Visa Check* Settlement And Release**

26.     Since 1980, Visa has prohibited the addition of any surcharges to transactions involving Visa-branded payment cards. (Somerville Dep. at 445.) The 2003 Visa rules provided: "A Merchant must not add: . . . [a]ny surcharge to Transactions." (2003 Visa Rules § 5.2.F.) The April 2010 Visa rules provide: "A U.S. Merchant must not: [a]dd any surcharge to Transactions, except as specified for a Tax Payment Transaction." (Apr. 2010 Visa Rules, Ch. 6, § 5.2.F.) The language in the October 2010 Visa rules remains the same. (Oct. 2010 Visa Rules, Ch. 6, § 5.2.F.)

27.     Since 1972, MasterCard has prohibited the addition of surcharges to transactions involving MasterCard-branded payment cards. (Doyle Dep. at 76.) In 2003, the MasterCard no-surcharge rule provided: "A merchant must not directly or indirectly require any MasterCard cardholder to pay a surcharge or any part of any merchant discount or any contemporaneous finance charge in connection with a MasterCard card transaction," although the rule permitted a merchant "to charge a fee . . . if the fee is imposed on all like transactions regardless of the form of payment used." (2003 MasterCard Rules § 9.12.2.) In 2010, MasterCard's no-surcharge rule remains materially unchanged, except that it now permits a merchant to charge a fee "if the fee is imposed on all like transactions regardless of the form of payment used, or as the Corporation has expressly permitted in writing." (2010 MasterCard Rules § 5.11.2.)

**E.     The Visa And MasterCard No Minimum/Maximum Purchase Rules Have Not Changed Materially Since The *Visa Check* Settlement And Release**

28.     Since 1979, Visa has prohibited the establishment of minimum or maximum transaction amounts as a prerequisite for honoring a Visa-branded payment card. (Somer-

17

ville Dep. at 367.)  In 2003, the Visa rules provided:  "A Merchant must not: . . . [e]stablish a minimum or maximum Transaction amount as a condition for honoring a Visa Card, Electron Card, or Visa Electron Card."  (2003 Visa Rules § 5.2.F.)  The April 2010 Visa rules similarly provide:  "A U.S. Merchant must not establish a minimum or maximum Transaction amount as a condition for honoring a Visa Card or Visa Electron Card" (Apr. 2010 Visa Rules, Ch. 6, § 5.2.F), and that language has remained unchanged in the October 2010 Visa rules (Oct. 2010 Visa Rules, Ch. 6, § 5.2.F.)

29.    Since 1972, MasterCard had prohibited the establishment of minimum transaction amounts as a prerequisite for honoring a MasterCard-branded payment card, and since the early 1990s, it had prohibited the establishment of maximum transaction amounts as a prerequisite for honoring MasterCard-branded payment cards.  (Doyle Dep. at 134.)  In 2003, the MasterCard rules provided:  "A merchant must not require, or post signs indicating that it requires, a minimum or maximum transaction amount to accept a valid MasterCard card."  (2003 MasterCard Rules § 9.12.3.)  The 2008 MasterCard rules likewise provided: "A Merchant must not require, or indicate that it requires, a minimum or maximum Transaction amount to accept a valid and properly presented Card."  (2008 MasterCard Rules § 5.9.3.)  The 2010 MasterCard Rules modify the no minimum purchase rule so that a "Merchant may set a minimum Transaction amount to accept a Card that provides access to a credit account" so long as "the minimum Transaction amount does not differentiate between issuers," "the minimum Transaction amount does not differentiate between MasterCard and another acceptance brand," and "the minimum Transaction amount does not exceed USD 10 (or any higher amount established by the Federal Reserve by regulation)."  (2010 MasterCard Rules, Chap. 15, § 5.11.3.)  The 2010 MasterCard Rules modify the no maximum purchase rule to permit merchants to set a maximum transaction

amount when the merchant "is a department, agency or instrumentality of the U.S. Government; or is a corporation owned or controlled by the U.S. Government; or is a Merchant whose primary business is reflected by" specified MCCs. (*Id.*)

      **F.**    **The Visa And MasterCard Non-Discrimination Rules Have Not Changed Materially Since The *Visa Check* Settlement And Release**

      30.    Since 1993, Visa has permitted merchants to offer discounts for cash and other payment methods at the point of sale, provided that any discount offered when cardholders used certain non-Visa-branded payment cards are also offered to Visa cardholders. (Somerville Dep. at 452.) The 2003 Visa rules provided: "A Merchant may offer a discount as an induce-ment for a Cardholder to use a means of payment that the Merchant prefers, provided that the discount is: [c]learly disclosed as a discount from the standard price and [n]on-discriminatory as between a Cardholder who pays with a Visa Card and a cardholder who pays with a 'comparable card.'" (2003 Visa Rules § 5.2.D.2.a.) This language remains unchanged in the April and Octo-ber 2010 Visa rules, except that the 2010 rules refer to "a U.S. Merchant," rather than "a Mer-chant." (Apr. 2010 Visa Rules, Ch. 6, § 5.2.D.2; Oct. 2010 Visa Rules, Ch. 6, § 5.2.D.2.)

      31.    Since the early 1990s, MasterCard has prohibited merchants from engag-ing in any acceptance practice that discriminates against or discourages the use of MasterCard cards in favor of any other acceptance brand. (Doyle Dep. at 58.) MasterCard's non-discrimination rule has not changed since January 1, 2004. (*Id.* at 62.) The language of Master-Card's non-discrimination rule contained in its 2003 rules – "A merchant must not engage in any acceptance practice that discriminates against or discourages the use of MasterCard cards in fa-vor of any other acceptance brand" ( 2003 MasterCard Rules § 9.12.1) – remains the same in the 2010 MasterCard rules. (2010 MasterCard Rules § 5.11.1.)

32.     Since at least 2000, MasterCard has permitted merchants to offer discounts for cash payments at the point of sale.  (Doyle Dep. at 71-72).  The language of MasterCard's cash discount rule contained in its 2003 rules – "A merchant may provide a discount to its customers for cash payments" (2003 MasterCard Rules § 9.12.2) – remains the same in the 2010 MasterCard Rules.  (2010 MasterCard Rules § 5.11.2.)

### G.     The Visa And MasterCard No-Bypass Rules Have Not Changed Materially Since The *Visa Check* Settlement And Release

33.     Since 1992, Visa has restricted arrangements that bypass the Visa network (called VisaNet) for the processing of transactions using Visa-branded payment cards  (Somerville Dep. at 460-62.)  In 2003, Visa's rules provided:  "All Transactions must be processed through VisaNet, except: On-Us Transactions and Transactions under Private Arrangements . . . implemented prior to April 1, 2002."  (2003 Visa Rules § 6.2.J.)  In May 2005, the Visa rules provided:  "Effective May 15, 2005, all Transactions must be processed through VisaNet, except those processed by another means approved by Visa U.S.A., as specified in Section 6.2.A.1" and "Private Arrangements are prohibited."  (May 2005 Visa Rules at 6.2.J.)  Section 6.2.A.1 of the May 2005 Visa rules sets forth the process by which a member could seek an exception to the Visa rule restricting bypass transactions.  (May 2005 Visa Rules § 6.2.A.1.)  The April 2010 Visa rules provided:  "In the U.S. Region, all Transactions must be processed through VisaNet, except those processed by another means approved by Visa" (Apr. 2010 Visa Rules, Ch. 7, at 647), and the language remains unchanged in the October 2010 Visa rules.  (Oct. 2010 Visa Rules, Ch. 7, at 599.)

34.     MasterCard has not prohibited the bypassing of the MasterCard network system when processing MasterCard-branded payment card transactions at any time since January, 1, 2004.  (Doyle Dep. at 302-03.)  Explaining the ability of a merchant to bypass the

20

MasterCard system in connection with the authorization, clearance, or settlement of transactions involving a MasterCard-branded payment card, MasterCard's Rule 30(b)(6) witness, Deborah Doyle, testified the "the rules do specifically allow for issuers and acquirers, and an acquirer can do it on behalf of their merchant, so you come up with separate arrangements to authorize, clear, and settle transactions between them." (*Id.*)

**H.    The Visa And MasterCard No-Multi-Issuer Rules Have Not Changed Materially Since The *Visa Check* Settlement And Release**

35.    Since at least 1992, Visa has had rules regarding the placement of multiple issuers, or multiple networks, on a single Visa-branded payment card.  (Somerville Dep. at 295.) The 2003 Visa rules provided:  "No Member may use the Marks of the American Express Company, MasterCard International (including Maestro), Morgan Stanley Dean Witter & Co., or the subsidiaries or affiliates of these entities on Visa Cards."  (2003 Visa Rules § 10.2.C.5.a.)  The October 2010 Visa Rules modify the no-multi-issuer rule, replacing "MasterCard International" with "MasterCard Worldwide," and "Morgan Stanley Dean Witter & Co." with "Discover Financial Services": "No U.S. Member may use the Marks of the American Express Company, MasterCard Worldwide (including Maestro), Discover Financial Services, or the subsidiaries or affiliates of these entities on Visa Cards."  (Oct. 2010 Visa Rules, Ch. 4, at 118.)

36.    Since at least October 2003, MasterCard has had rules regarding the placement of marks from multiple networks on a single MasterCard-branded payment card.  The 2003 MasterCard rules provided:  "The following marks and similar or related marks may not appear on a MasterCard Card: American Express; JCB; Diners Club; Discover; Visa; [a]ny other name, logo, or mark identifying or in any way associated with a payment service that the Corporation deems to be competitive with any MasterCard product or program."  (2003 MasterCard Rules § 5.7.3.)  The 2010 MasterCard Rules provide:  "Unless expressly permitted by the Corporation,

21

none of the following marks or any similar or related mark, or any mark owned by or affiliated with one of these entities, may appear on a Card: American Express; JCB; Diners Club; Discover; Visa; [a]ny other name, logo, or mark identifying or in any way associated with a payment service that the Corporation deems to be competitive with any MasterCard product or program." (2010 MasterCard Rules § 4.2.12.)

### III.   Undisputed Material Facts Relating To Defendants' Argument That Plaintiffs' Claims Are Barred By The *Illinois Brick* Doctrine

37.     Each of the hundreds of merchant acquirers has the independence and discretion to set its own merchant discount fees and to decide whether and how much of the interchange fees to pass on; merchant acquirers bear the risk of interchange fee fluctuations.  Plaintiffs do not allege that these hundreds of merchant acquirers have participated in an alleged conspiracy to fix interchange fees.  Indeed, Dr. Frankel, one of plaintiffs' experts, opined that "[a]cquirers have no influence over the interchange fee."  (Frankel Rep.[54] ¶ 150.)

38.     Many merchants contract for payment card processing services with ISOs. (GAO Rep., at 7 n.6.)  ISOs purchase processing services from larger merchant acquirers for resale to their own merchant customers.  (Madairy Dep.[55] at 27; Duffy Dep.[56] at 87-90.)  Plaintiffs do not allege that any ISO has participated in an alleged conspiracy to fix interchange fees.

---

[54]   Report of Alan S. Frankel, Ph.D. (July 2, 2009) ("Frankel Rep.").

[55]   Deposition of David C. Madairy (Jan. 17, 2008) ("Madairy Dep.").  Mr. Madairy testified as the manager of association controls for Bank of America Merchant Services.  (Madairy Dep. at 7-8.)

[56]   Deposition of Michael Duffy (Feb. 11, 2008) ("Duffy Dep.").  Mr. Duffy is president and chief executive officer of Chase Paymentech Solutions.  (Duffy Dep. at 9.)

A. **Merchant Acquirers Pay "Interchange Fees" To Issuers**

39.    "An interchange fee is compensation paid by the acquiring bank to the is-

suing bank via [Visa or MasterCard] for the transaction passing through interchange." (OCC

Handbook, at 15; *see also Visa Check* Compl. ¶ 8(o); GAO Rep., at 7; Oct. 2010 Visa Rules,

Core Principle 10.2; 2010 MasterCard Rules § 9.1; Madairy Dep. at 167.)  As plaintiff class rep-

resentative NATSO acknowledged:  "Interchange is actually a fee, which is set by V/MC, but

that is paid by the acquirer to the card issuer."  (NATSO 006498.)  Plaintiff class representative

Traditions Ltd. also recognized that "interchange is – is a fee that flows from the acquiring bank

to the issuing bank."  (Schumann Dep. at 62; *see also* Schermerhorn Dep. Ex. 10028,[57] at 1;

Schermerhorn Dep. at 88-89.)

40.    Visa and MasterCard each maintains a schedule of default interchange

fees that may be assessed against acquiring members, depending on the characteristics of the

payment card transaction submitted to the network for clearance and settlement.  (GAO Rep., at

11.)  The default schedules are not identical for each network, either in the parameters of the

categories for which different interchange fees apply, or for the amount of the interchange fees

applicable to similar categories.  In 2009, for example, Visa had 60 different interchange rate

categories and MasterCard had 243 different interchange rate categories.  (GAO Rep., at 14-15.)

In general, however, each network classifies payment card transactions for interchange purposes

according to several categories, including the type of payment card (such as whether the payment

card was a debit card or a credit card, and the level of rewards offered), the mode of processing

(such as whether the card was present or not present, whether the transaction information was

manually or electronically entered into the system, and the level of security protocols observed),

---

[57]    "Assessing Your Co-op's Merchant Credit Card Processing Agreements."

the merchant's line of business, and the size of the merchant's transaction volume.  (GAO Rep., at 10-11.)

41.     The default interchange fee paid by the acquiring member for a particular payment card transaction is determined by the categories applicable to that particular transaction.

## B.     Merchants Pay "Merchant Discount Fees" To Merchant Acquirers

42.     Merchant acquirers bear the risk of merchant default in the case of charge-backs.  (GAO Rep., at 9; OCC Handbook, at 10.)  Class Plaintiffs' industry expert, Mr. McCormack, testified that "the acquirer is also financially responsible for the transactions in the event transactions are charged back to the merchant and the merchant is unable to make good on the chargebacks.  So in the situation where a bankruptcy occurs and the merchant is unable to pay chargebacks, the acquirer becomes responsible for that activity."  (McCormack Dep. at 107.)

43.     Merchant acquirers are free to set the merchant discount fee they charge their merchant customers on the basis of their own profit goals and cost demands, and merchant discount fees are accordingly negotiated between each merchant and its merchant acquirer. (GAO Rep., at 7; Oct. 2010 Visa Rules, Core Principle 10.2.)  Plaintiffs acknowledge that the networks do not establish a merchant's merchant discount fees.  (*See*, *e.g.*, Fletcher Dep.[58] Ex. 18704,[59] at DHZEDVMC00001170, Fletcher Dep. at 133.)  The merchant acquiring business is competitive (OCC Handbook, at 1, 13; McCormack Rep. ¶ 85), and merchant discount fees vary from merchant to merchant as merchant acquirers compete for merchant accounts.

---

[58]     Deposition of Patti Fletcher (July 24, 2008) ("Fletcher Dep.").  Ms. Fletcher testified as the Rule 30(b)(6) witness for plaintiff Delhaize America, Inc. regarding forms of payment (Fletcher Dep. at 8; Fletcher Dep. Ex. 18700 (30(b)(6) Deposition Notice).)

[59]     Promotional Agreement between Visa USA Inc. and Food Lion LLC, bearing control numbers DHZEDVMC00001168 to 00001171(Apr. 2002).

44.     Many merchants, including many Class Plaintiffs, negotiate "bundled" or "blended" rate merchant discount fees, which means that the merchant pays the same merchant discount fee for each transaction, notwithstanding variations in the merchant acquirer's cost for those transactions depending, among other things, on the specific interchange fee category or agreement applicable to each transaction.  (GAO Rep., at 11; Frankel Dep. at 161.)  According to plaintiffs' industry expert, Mr. McCormack, "for merchants with less that $1 million in annual sales, bundled pricing was the most prevalent method of merchant discount pricing."  (McCormack Rep. ¶ 84.)  In addition, according to Mr. McCormack, 52% of merchants with $1 million to $5 million in annual bankcard purchase volumes had bundled rate pricing arrangements.  (Id.)  Approximately ▇▇ of Citigroup's merchant services division's customers paid bundled rate pricing. (Pukas Dep.[60] at 219-20.)  Approximately ▇▇ of the Fifth Third Processing Solutions' merchant customers have bundled rate pricing.  (Baker Dep.[61] at 61.)  ▇▇▇▇ of Chase Paymentech Solutions' merchant customers have bundled rate pricing.  (Duffy Dep. at 63-64.)  And ▇▇▇▇ of Bank of America Merchant Services' smaller merchant customers have bundled rate pricing.  (Kresge Dep.[62] at 168-69.)

---

[60]   Deposition of Julia Pukas (Mar. 7, 2008) ("Pukas Dep.").  Ms. Pukas was the business manager and president of Citicorp Payment Services, Inc. between 1997 and 2005.  (Pukas Dep. at 14-16.)

[61]   Deposition of David Baker (Sept. 4, 2008) ("Baker Dep.").  Mr. Baker is a former executive in Fifth Third's merchant acquiring business.  (Baker Dep. at 12-19.)

[62]   Deposition of David Kresge (Apr. 3, 2008) ("Kresge Dep.").  Mr. Kresge was the treasury sales executive for merchant services for commercial and corporate banking for Bank of America Merchant Services from February 2005 until February 2007.  (Kresge Dep. at 10, 88.)

45.     Other merchants negotiate "interchange-plus" contracts with merchant acquirers.  (Frankel Dep. at 161.)  These types of arrangements are not all identical.  As Class Plaintiffs' industry expert, Mr. McCormack, explained:

> Unbundled pricing is referred to using a number of terms in the industry, including "interchange plus," or "cost plus."  Acquirers and their third parties have created a number of hybrid types of unbundled pricing, so oftentimes a single term is used amongst industry participants to describe the billing and reporting methods, yet there are subtle differences in the form and method of computations and degrees of merchant reporting amongst the acquirer products.

(McCormack Rep. ¶ 83.)

46.     Merchants that have entered into interchange-plus contracts typically pay their merchant acquirers an amount equal to the applicable default interchange rates plus the merchant acquirers' fees.  (GAO Rep., at 11.)  Such contracts do not require merchants to purchase a pre-arranged fixed-quantity of processing services from their merchant acquirers.  (*See*, *e.g.*, D'Agostino Dep.[63] at 156.)  Indeed, merchants, including class representatives, affirmatively encourage their customers to use other payment methods so as to reduce the use of payment cards and quantity of processing services they purchase from their merchant acquirer.  (Zentner Dep.[64] at 189.)

**C.     Merchant Acquirers Do Not Always Pass On To Merchants The Full Amount Of Interchange Fees**

47.     Class Plaintiffs' economics expert, Dr. Frankel, has acknowledged that most agreements between merchants and merchant acquirers permit merchant acquirers to in-

---

[63]     Deposition of Nicholas J. D'Agostino III (Jan. 10, 2008) ("D'Agostino Dep.").  Mr. D'Agostino is president and chief operating officer of plaintiff D'Agostino's Supermarkets.  (D'Agostino Dep. at 16.)

[64]     Deposition of Arlen R. Zentner (July 23, 2008) ("Zentner Dep.").  Mr. Zentner testified as the manager of treasury operations for plaintiff Payless ShoeSource, Inc.  (Zentner Dep. at 11.)

crease the merchant discount fees in response to an increase in interchange fees.  (Frankel Dep. at 164-65.)  But no Visa or MasterCard rule requires merchant acquirers to pass on the interchange fees imposed on them to merchants.  (Rossi Dep.[65] at 117.)  Competition sometimes leads merchant acquirers to absorb some portion of an interchange fee increase.  As Dr. Frankel testified:

> Q.   Okay.  In the instances, Dr. Frankel, that you believe exist where acquirers have the contractual right to increase the merchant discount in the event the interchange rate increases, do you have an understanding as to whether acquirers universally exercise that right and do in fact increase the merchant discount?
>
> A.   Well, there's two things to keep separate here.  One is the change over time.  And I'm aware that some acquirers have from time to time said that they do not always pass through to their merchants or change the level of the merchant discount rate by the full amount that the interchange fee increases.  But that doesn't mean that there's not a one-for-one payment of the interchange fee by the merchant because over time the acquirers' margin has been reduced through efficiencies in competition.
>
> And so the way that contracts reprice, even when an interchange fee increases by ten basis points say, the merchant may only pay a nine basis point increase, that's because the acquirer margin has been eroded over time through efficiency and competition.

(Frankel Dep. at 166-67.)

48.   Dr. Frankel also testified that, even where merchant acquirers have passed on one hundred percent of such increases, they have not always done so contemporaneously with the interchange increases, but have absorbed the increases for some period of time before raising the merchant discount fee.  (Frankel Dep. at 168-69.)  More specifically, Dr. Frankel testified that when he opined in his expert report that "[c]hanges in interchange fees are matched by

---

[65]   Deposition of Debra Rossi (Mar. 25, 2008) ("Rossi Dep.").  Ms. Rossi testified as the executive vice president and manager of Wells Fargo's merchant payments business.  (Rossi Dep. at 13.)

changes in merchant discount fees" (Frankel Rep. ¶ 153), he meant "over time given a time for interchange changes to filter through in some cases, but not necessarily instantaneously." (Frankel Dep. at 168-69.)

49.     Plaintiffs' industry expert, Mr. McCormack, also testified that merchant acquirers sometimes absorb increases in interchange fees:

> Q.     Did you make any effort to determine whether there was any evidence in the discovery record of this case, or otherwise, that acquirers in some circumstances absorbed interchange increases without passing on those costs to merchants?
>
> MR. DAVIDOFF:  Objection to the form of the question.  Objection; overbroad.
>
> THE WITNESS:  That's a different subject than what you were asking me earlier.  I mean, there are situations where acquirers will choose to lessen their acquirer service fee in instances where there's an interchange increase.
>
> I am aware of those types of situations.  It's not common from my perception, but it occasionally happens.
>
> *     *     *
>
> Q.     When you stated that acquirers, in certain circumstances, decreased their acquirer service fee in light of an interchange increase, could you provide more detail by what you mean?
>
> A.     Well, it's not a practice when I had direct involvement with merchant pricing at ▮▮▮▮▮ that we followed.  We endeavored to ensure that any interchange fee was paid by the merchant.
>
> But I'm aware of situations whereby if an acquirer, be it a bank, ISO, or processor, has a relationship with a merchant and there's some sensitivity to raising the merchant's discount rate, that in certain situations a business decision may be made that they – if the interchange were to increase, that they absorb that in their acquirer service fee margin as a pricing accommodation.

(McCormack Dep. at 159-61.)

50.     In his expert report, Class Plaintiffs' industry expert, Mr. McCormack, has purported to demonstrate that, between 1990 and 2006, merchant acquirers' service fees – that

28

portion of the merchant discount fee retained by merchant acquirers – have declined by approximately 46% on average, from 52 basis points (0.52%) to 28 basis points (0.28%) of purchase volume.  (McCormack Rep. ¶¶ 12, 86.)  Figures 3 and 11 of Mr. McCormack's report show that, during the same period, interchange fees increased by approximately 41% on average, from 132 basis points (1.32%) to 186 basis points (1.86%) of purchase volume, and merchant discount fees increased by approximately 16% on average, from 192 basis points (1.92%) to 223 basis points (2.23%) of purchase volume.  (McCormack Rep. ¶¶ 12 (Figure 3), 86 (Figure 11).)  The fact, according to Class Plaintiffs' expert, Mr. McCormack, that average interchange fees have increased almost three times as much as average merchant discount fees, and that merchant acquirers' service fees have been cut nearly in half over the same period of time, demonstrates that merchant acquirers have absorbed some of the interchange fee increases.  As Mr. McCormack explained, "acquirers often sacrifice their own margins to meet price demands of large merchants."  (McCormack Rep. ¶ 89.)

51.    Evidence from merchant acquirers and from plaintiffs themselves establishes that increases in interchange fees are not always fully reflected as increases in merchant discount fees to merchants.  For instance, in December 2004, merchant acquirer US Data Capture, Inc. ("USDC") explained to class plaintiff Crystal Rock that, " █████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████  (CROCK01263 to 01264,[66] at 263.)

---

[66]    Email between P. Gatof and R. Avoletta (Dec. 17, 2004).

52.     In February 2004, merchant acquirer Transcom Payment Services announced to its sales associates that it would ██████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████ (Aviles Dep.[67] Ex. 42697[68]; Aviles Dep. at 108-09.)  It was "not an unusual practice" for "Transcom ████████████████████████████

████████████████████ (Aviles Dep. at 109-10.)

53.     Class plaintiff Leon's Transmission Service, Inc.'s ("Leon's Transmission") contract with merchant acquirer Payment Resources International ████████████

██████████████████████████████████████████████████████

████████████████████████ (Archer Dep.[69] at 127.) ████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████ (Id. at 128.)

54.     ████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

---

[67]    Deposition of James M. Aviles (Nov. 11, 2008) ("Aviles Dep.").  Pursuant to Rule 30(b)(6), Mr. Aviles testified on behalf of Merchant e-Solutions, Inc. regarding payment card processing.  (Aviles Dep. at 16-17; Aviles Dep. Ex. 42690 (30(b)(6) Deposition Subpoena).)

[68]    Email between Sales Associates and Mark, bearing control number NCGA 003199 (Feb. 23, 2004).

[69]    Deposition of Vincent Wayne Archer (Jan. 17, 2008) ("Archer Dep.").  Mr. Archer testified as the administrative controller of Leon's Transmission.  (Archer Dep. at 24.)



(Wechsler Dep.[70] at 77.)

(CHASE003107854 to 003107855,[71] at 854.)

55.

(Healy Dep.[72] at 54-55.)

---

[70]   Deposition of Robert Wechsler (Oct. 1, 2008) ("Wechsler Dep."). Mr. Wechsler was executive vice president of global sales and service for Paymentech between 2002 and December 2006. (Wechsler Dep. at 12.)

[71]   Letter from Paymentech to Fortunoff (Mar. 10, 2003).

[72]   Deposition of Tim Healy (May 7, 2008) ("Healy Dep."). Mr. Healy testified as the finance manager at Wells Fargo. (Healy Dep. at 10.)

31

56. ███████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████████████████

████████████████████ (Mattea Dep.[73] at 119-21.) ██████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████████████

(Pukas Dep. at 271.)

57. ██████████████████████████

██████████████████████████████

██████████████████████████████

(Baker Dep. at 59-61.) ████████████████████████

████████████████████ (*Id.*) ██████████████████████

███████████████████████████████████

██████████████████████████████

██████████████████████████ (*Id.* at 79-81.)

---

[73]    Deposition of Karen Mattea (Mar. 18, 2009) ("Mattea Dep.").  Ms. Mattea was the pricing and planning manager for CPSI between 2001 and October 2005.  (Mattea Dep. at 13.)

IV.    **Undisputed Material Facts Relating To Defendants' Argument That Plaintiffs' Default Interchange Fee Claims Are Barred By *Buffalo Broadcasting* and *Paycom***

A.    **Defendants May Enter Into Bilateral Agreements That Alter The Default Interchange Rates**

58.    The Visa interchange rules are default rules that apply only in those circumstances in which issuing and acquiring members of Visa have not set their own financial terms for the interchange of Visa transactions.  (May 2005 Visa Rules § 9.5; Nov. 2005 Visa Rules § 9.5; 2006 Visa Rules § 9.5; 2007 Visa Rules § 9.5; 2008 Visa Rules § 9.5; Apr. 2010 Visa Rules, Core Principle 10.3; Oct. 2010 Visa Rules, Core Principle 10.3.)  Every Visa issuer retains the competitive independence to enter into a bilateral agreement with each Visa acquirer to supersede the default interchange rates Visa has established.  (Allen Dep.[74] at 121-22.)

59.    The MasterCard interchange rules likewise are default rules that apply only in those circumstances in which if there is no applicable bilateral interchange fee or service fee agreement in place between an issuing member and an acquiring member of MasterCard.  (2003 MasterCard Rules § 10.1; 2004 MasterCard Rules § 10.1; 2005 MasterCard Rules[75] § 10.1; 2008 MasterCard Rules § 9.4; 2010 MasterCard Rules § 9.4.)  Every MasterCard issuer retains the competitive freedom to enter into a bilateral agreement with each MasterCard acquirer to supersede the default interchange rates MasterCard has established.  (Thoma Dep.[76] at 160.)

---

[74]    Deposition of Paul Allen (Dec. 16, 2008) ("Allen Dep.").  Mr. Allen is the former executive vice president, general counsel, and secretary of Visa.  (Allen Dep. at 15.)

[75]    MasterCard Rules (Apr. 2005) ("2005 MasterCard Rules"), bearing control numbers MCI_MDL02_10094260 to 10094622.

[76]    Deposition of Joy Thoma (June 29, 2006) ("Thoma Dep.").  Ms. Thoma testified as head of business resources for MasterCard.  (Thoma Dep. at 15.)

60.     Plaintiffs acknowledge that such bilateral agreements among member banks are feasible.  (Class Compl. ¶¶ 169, 170.)  And Class Plaintiffs' expert, Dr. Frankel, has testified that bilateral agreements were "clearly" feasible when Visa and MasterCard operated paper processing systems and are probably far easier now that Visa and MasterCard have converted to an electronic environment.

61.     Visa has the capability to "do customized interchange agreements between issuers and acquirers or, if they happened to be the same, with merchants."  (Dahir Dep.[77] at 117.)  Likewise, MasterCard has the ability to process customized interchange rates established by bilateral agreements.  (Forsey Dep.[78] at 294-95.)

62.     Issuers and acquirers have entered into bilateral agreements that supersede the networks' default interchange schedules.  Under the Visa USA Member-Supplied Interchange Fee Service Agreement, dated December 23, 2004, ██████████████████ agreed to an interchange rate of ██████████████ for transactions on the ██████████ ████████████████████████████ acquired by ██████ (VUSAMDL1-07039436 to 07039438,[79] at 37; Morrissey Dep.[80] at 377-78; Morrissey Dep. Ex. 30531[81].)

---

[77]    Deposition of Victor Dahir (Oct. 22, 2008) ("Dahir Dep.").  Mr. Dahir is the former chief financial officer of Visa.  (Dahir Dep. at 12.)

[78]    Deposition of Gareth J. Forsey (Feb. 8, 2008) ("Forsey Dep.").  Mr. Forsey testified as the chief global commerce development officer of MasterCard.  (Forsey Dep. at 20-21.)

[79]    Visa USA Member-Supplied Interchange Fee Service Agreement - Acquirer Registration Form.

[80]    Deposition of Richard Morrissey (Jan. 30-31, 2008) ("Morrissey Dep.").  Mr. Morrissey testified as the vice president, interchange strategy group for Visa.  (Morrissey Dep. at 12-13; Morrissey Dep. Ex. 30500.)

[81]    Email between R. Morrissey and R. Towne, bearing control number VUSAMDL1-05576518 (Dec. 22, 2004).

63.    MasterCard's network allows for business service arrangements—"an arrangement with MasterCard between two or more members that defines . . . the card program identifier, business rules, and interchange processing requirements for transactions occurring between the participating members."  (MCI_MDL02_09011629 to 09012422,[82] at 1808.)

## B.    Bank Defendants May Issue Payment Cards Of Other Networks, Which Are Realistically Available Alternatives

64.    Network members are free to issue payment cards as members of other networks.  (Class Compl. ¶¶ 211-12.)

65.    Each bank defendant or its affiliates is a member of *both* Visa and MasterCard, and thus has the right to issue payment cards and acquire merchant transactions on competitive payments networks.  (Class Compl. ¶ 211.)

66.    Members of Visa and MasterCard are free to issue American Express and Discover Cards, and some defendants do issue American Express cards.  For example, in addition to issuing both Visa and MasterCard payment cards, defendants Citibank, Bank of America and HSBC, or their affiliates, issue American Express cards.  (Freiberg Dep.[83] at 116-17; Fellman Dep.[84] at 179; Mehta Dep.[85] at 49; HSBC Interr. Resp.,[86] at 3.)  An affiliate of defendants HSBC also issues Discover payment cards.  (HSBC Interr. Resp., at 3.)

---

[82]    MasterCard GCMS Reference Manual (Apr. 2006).

[83]    Deposition of Steven J. Freiberg (Nov. 20, 2008) ("Freiberg Dep.").  Mr. Freiberg testified as the chief executive officer of Global Cards at Citi.  (Freiberg Dep. at 22.)

[84]    Deposition of Herbert M. Fellman (Jul. 31, 2008) ("Fellman Dep.").  Mr. Fellman testified as a senior vice president in the debit card line of business at Bank of America.  (Fellman Dep. at 7-8.)

[85]    Deposition of Siddharth Mehta (Oct. 1, 2008) ("Mehta Dep.").  Mr. Mehta is the former chief executive officer of HSBC North America.  (Mehta Dep. at 10.)

67.     Defendant Citibank also issues Diners Club payment cards.  (Knitzer Dep.[87] at 87.)

68.     Defendant Chase issues Star payment cards.  (CHASE003660534 to 003660542;[88] CHASE003660543 to 003660551[89])

69.     Most merchants, including the individual plaintiffs and the class representatives, accept Visa, MasterCard, American Express, and Discover payment cards as forms of payment.  (Capital Audio Interr. Resp.,[90] at 4; CHS Interr. Resp.,[91] at 5; Coborn's[92] Interr. Resp., at 5; Crystal Rock Interr. Resp.,[93] at 3; D'Agostino Interr. Resp.,[94] at 5; Jetro Interr. Resp.,[95] at 5;

_____

(cont'd from previous page)

[86]   Supplemental Responses of Defendants HSBC Finance Corporation and HSBC North America Holdings Inc. to Plaintiffs' Consolidated First Set of Omnibus Discovery to Bank Defendants (Oct. 22, 2007) ("HSBC Interr. Resp.").

[87]   Deposition of Peter Knitzer (May 21, 2008) ("Knitzer Dep.").  Mr. Knitzer testified as chairman and chief executive officer of Citibank North America.  (Knitzer Dep. at 12.)

[88]   Star Member Institution Agreement between Star Networks, Inc. and JPMorgan Chase Bank, N.A. (Oct. 1, 2005).

[89]   Star Member Institution Agreement, Addendum for Special Terms between Star Networks, Inc. and JPMorgan Chase Bank, N.A. (Oct. 1, 2005).

[90]   Capital Audio Electronics Inc.'s Objections and Answers to Defendant Visa U.S.A.'s First Set of Interrogatories to Each of the Putative Class Plaintiffs (June 8, 2006) ("Capital Audio Interr. Resp.").

[91]   CHS Inc.'s Objections and Answers to Defendant Visa U.S.A.'s First Set of Interrogatories to Each of the Putative Class Plaintiffs (June 12, 2006) ("CHS Interr. Resp.").

[92]   Coborn's Inc.'s Objections and Answers to Defendant Visa U.S.A.'s First Set of Interrogatories to Each of the Putative Class Plaintiffs (June 12, 2006) ("Coborn's Interr. Resp.").

[93]   Crystal Rock, LLC's Objections and Answers to Defendant Visa U.S.A.'s First Set of Interrogatories to Each of the Putative Class Plaintiffs (June 12, 2006) ("Crystal Rock Interr. Resp.").

[94]   D'Agostino Supermarkets, Inc.'s Objections and Answers to Defendant Visa U.S.A.'s First Set of Interrogatories to Each of the Putative Class Plaintiffs (June 12, 2006) ("D'Agostino Interr. Resp.").

Leon's Transmission Interr. Resp.,[96] at 3; Payless Visa Interr. Resp.,[97] at 4; National Grocers In-

terr. Resp.,[98] at 5; Ahold Interr. Resp.,[99] at 3; Delhaize Interr. Resp.,[100] at 3; Maxi Drug Interr.

_____

*(cont'd from previous page)*

[95]   Jetro Cash and Carry Enterprises, Inc. and Jetro Holdings, Inc.'s Objections and Answers to Defendant Visa U.S.A.'s First Set of Interrogatories to Each of the Putative Class Plaintiffs (June 12, 2006) ("Jetro Interr. Resp.").

[96]   Leon's Transmission Service, Inc.'s Objections and Answers to Defendant Visa U.S.A.'s First Set of Interrogatories to Each of the Putative Class Plaintiffs (June 12, 2006) ("Leon's Transmission Interr. Resp.").

[97]   Payless ShoeSource, Inc.'s Objections and Answers to Defendant Visa U.S.A.'s First Set of Interrogatories to Each of the Putative Class Plaintiffs (June 13, 2006) ("Payless Visa Interr. Resp.").

[98]   National Grocers Association's Objections and Answers to Defendant Visa U.S.A.'s First Set of Interrogatories to Each of the Putative Class Plaintiffs (June 10, 2006) ("National Grocers Interr. Resp.").

[99]   Ahold U.S.A., Inc.'s Supplemental Response to Certain Interrogatories of Defendants Visa U.S.A., Inc., Visa International, Inc. and MasterCard Incorporated's First Set of Interrogatories (Oct. 29, 2007) ("Ahold Interr. Resp.").

[100]   Delhaize America, Inc.'s Supplemental Response to Certain Interrogatories of Defendants Visa U.S.A., Inc., Visa International, Inc. and MasterCard Incorporated's First Set of Interrogatories (Oct. 29, 2007) ("Delhaize Interr. Resp.").

Resp.,[101] at 3; Hy-Vee Interr. Resp.,[102] at 3; Kroger Interr. Resp.,[103] at 3; Supervalu Interr. Resp.,[104] at 6–8; Safeway Interr. Resp.,[105] at 3; Walgreen's Interr. Resp.,[106] at 3.)

       70.     Many merchants, including plaintiffs Kroger, Rite-Aid, Photos Etc, CHS Inc., Coborn's (at Coborn's Little Dukes Stores), Delhaize (at Hannaford Bros. and Kash n' Karry), and QVC, accept Diners Club as a form of payment. (Hanna Dep.[107] at 37; Photos Etc. Interr. Resp.,[108] at 5; CHS Interr. Resp., at 5; Supervalu Interr. Resp., at 8; Coborn's Interr. Resp., at 5; Delhaize Interr. Resp., at 3; Rite-Aid Website[109].)

---

[101]    Maxi Drug, Inc. (d/b/a Brooks Pharmacy) and Eckerd Corporation's Supplemental Response to Certain Interrogatories of Defendants Visa U.S.A., Inc., Visa International, Inc. and MasterCard Incorporated's First Set of Interrogatories (Oct. 29, 2007) ("Maxi Drug Interr. Resp.").

[102]    Hy-Vee, Inc.'s Supplemental Response to Certain Interrogatories of Defendants Visa U.S.A., Inc., Visa International, Inc. and MasterCard Incorporated's First Set of Interrogatories (Oct. 29, 2007) ("Hy-Vee Interr. Resp.").

[103]    The Kroger Co.'s Supplemental Response to Certain Interrogatories of Defendants Visa U.S.A., Inc., Visa International, Inc. and MasterCard Incorporated's First Set of Interrogatories (Oct. 29, 2007) ("Kroger Interr. Resp.").

[104]    Supervalu Direct Action Plaintiffs' Supplemental Response to Defendant Visa U.S.A.'s First Set of Interrogatories to Each of the Putative Class Plaintiffs (Oct. 29, 2007) ("Supervalu Interr. Resp.").

[105]    Safeway, Inc.'s Supplemental Response to Defendant Visa U.S.A., Inc.'s First Set of Interrogatories (Oct. 15, 2007) ("Safeway Interr. Resp.").

[106]    Walgreen's, Inc.'s Supplemental Response to Certain Interrogatories of Defendants Visa U.S.A., Inc., Visa International, Inc. and MasterCard Incorporated's First Set of Interrogatories (Oct. 29, 2007) ("Walgreen's Interr. Resp.").

[107]    Deposition of Kathy L. Hanna (Sept. 3, 2008) ("Hanna Dep."). Ms. Hanna testified as the assistant treasurer of Kroger (Hanna Dep. at 18.)

[108]    Photos Etc. Corporation's Objections and Answers to Defendant Visa U.S.A.'s First Set of Interrogatories to Each of the Putative Class Plaintiffs (June 9, 2006) ("Photos Etc. Interr. Resp.").

[109]    https://www.riteaidonlinestore.com/account/default.asp?catid=52341&state= state_checkout&ditac=10762 (last visited Feb. 8, 2011) ("Rite-Aid Website").

71.    Merchants, including plaintiffs Walgreen's, Wakefern, Publix, and Meijer, accept the Revolution Money card as a form of payment.  (WLGVMC107077 to 107085,[110] at 79; Walgreen's RFA Resp.,[111] at 8-9; Wakefern RFA Resp.,[112] at 28; Publix RFA Resp.,[113] at 15; Meijer RFA Resp.,[114] at 22.)

### C.    Bank Defendants May Issue Private Label Cards, Which Are Realistically Available Alternatives

72.    Members of Visa and MasterCard are free to issue "private label" or "proprietary" payment cards, and some defendants do issue private label cards.  For example, defendants Citibank, Chase, and HSBC, or their affiliates, have entered into agreements with merchants to issue private label cards for those merchants.  (*See, e.g.,* CITI INT 002235004 to

---

[110]    Example of Merchant Billing Statement to Walgreen's from Fifth Third Processing Solutions (Jan. 16, 2008).

[111]    Plaintiff Walgreen Co.'s Response to Defendants' First Set of Requests for Admission (Dec. 19, 2008) ("Walgreen's RFA Resp.").

[112]    Wakefern Food Corporation's Responses to Defendants' First Set of Requests for Admission to Plaintiff Wakefern Food Corporation (Dec. 19, 2008) ("Wakefern RFA Resp.").

[113]    Publix's Responses to Defendants' First Set of Requests for Admission to Plaintiff Publix Super Markets, Inc. (Dec. 19, 2008) ("Publix RFA Resp.").

[114]    Meijer's Responses to Defendants' First Set of Requests for Admission to Plaintiffs Meijer, Inc. and Meijer Limited Partnership (Dec. 19, 2008) ("Meijer RFA Resp.").

002235440[115]; CHASE002992687 to 002992845[116]; CHASE002991742 to 002991805[117]; HSBC_376992 to 377038[118]; HSBC_585704 to 585745.[119])

73.    Merchants, ███████████████████████████████████████

██████████████████████████████████████ ███████████████████████

██████████████████████████████████[1])

**D.    Bank Defendants May Invest In Other Electronic Payment Systems, Which Are Realistically Available Alternatives**

74.    Members of Visa and MasterCard are free to invest in other electronic payment systems, including, for example, PayPal.  Defendant Chase Paymentech Solution performs merchant acquiring services for merchants using PayPal.  (Class Compl. ¶ 74; Martinez Dep.[122] at 36-37; Paymentech Website.[123])

---

[115]    Credit Card Program Agreement By and Among ████████████████████████ ██████████████████. (June 1, 2005).

[116]    Consumer Card Comarketing and Operating Agreement ██████████████████ ██████████████(Dec. 8, 2005).

[117]    Payment Card Joint Marketing Agreement By and Between ███████████████ ████████ (July 1, 2005).

[118]    Merchant Agreement between ████████████████████████████(Aug. 13, 2001).

[119]    Amended and Restated Credit Card Program Agreement Between ███████████ ██████████████ (Feb. 1, 2006).

[120]    Traditions Ltd's Objections and Answers to Defendant Visa U.S.A.'s First Set of Interrogatories to Each of the Putative Class Plaintiffs (June 8, 2006) (███████████ ██████).

███    ████████████████████████████████████

[122]    Deposition of Adrian Martinez (June 23, 2008) ("Martinez Dep.).  Mr. Martinez testified as a senior vice president and head of payments and lending at HSBC Bank USA, N.A. (Martinez Dep. at 10-12.)

75.     Merchants, including plaintiffs Rite-Aid, Walgreen's, Capital Audio, NRA, and NATSO, accept PayPal as a form of payment.  (Rite-Aid Website; Dorsey Dep.[124] at 31; CAPAUDIO005056 to 005063,[125] at 62; NRA011153 to 011181[126], at 79-80; NATSO Interr. Resp.,[127] at 11.)

## V.     Undisputed Material Facts Relating To Defendants' Argument That Plaintiffs Have Failed To Present Evidence Of Any Reduction In Output

76.     Class Plaintiffs define the following thirteen "relevant" markets:  (i) general purpose credit cards (Class Compl. ¶¶ 8(hh), 271); (ii) general purpose credit card acceptance (network) services (Class Compl. ¶¶ 8(hh), 272; Frankel Rep. ¶¶ 11(a), 85); (iii) Visa general purpose credit card acceptance services (Class Compl. ¶ 289; Frankel Rep. ¶¶ 11(a), 85); (iv) MasterCard general purpose credit card acceptance services (Class Compl. ¶ 289; Frankel Rep. ¶¶ 11(a), 85); (v) debit cards (Class Compl. ¶ 359); (vi) debit card network services (Class Compl. ¶ 361); (vii) offline debit cards (Class Compl. ¶¶ 8(hh), 358); (viii) offline debit card acceptance (network) services (Class Compl. ¶¶ 8(hh), 360; Frankel Rep. ¶¶ 11(a), 85); (ix) Visa offline debit card acceptance services (Class Compl. ¶ 360; Frankel Rep. ¶¶ 11(a), 85); (x) MasterCard offline debit card acceptance services (Class Compl. ¶ 360; Frankel Rep. ¶¶ 11(a),

---

*(cont'd from previous page)*

[123]     http://www.chasepaymentech.com/portal/server.pt?mode=2&uuID={AB44BBF0-6788-96FB-8B0D-6D41EB486000}&ba=paypal (last visited Feb. 8, 2011) ("Paymentech Website").

[124]     Deposition of Sally Dorsey (Sept. 8, 2006) ("Dorsey Dep.").  Pursuant to Fed. R. Civ. P. 30(b)(6), Ms. Dorsey, was designated to testify on behalf of Walgreen's.  (Dorsey Dep. at 6-7.)

[125]     Example of Capital Audio bank account statement (Mar. 2008).

[126]     Example of Payment Processing Invoice from Paypal to NRA (Apr. 30, 2007).

[127]     NATSO's Objections and Answers to Second Set of Interrogatories to Each of the Putative Class Plaintiffs (June 1, 2008) ("NATSO Interr. Resp.").

85); (xi) PIN-debit cards (Class Compl. ¶¶ 8(hh), 398); (xii) PIN-debit card acceptance services (Class Compl. ¶¶ 8(hh), 399; Frankel Rep. ¶¶ 11(a), 85); and Visa Interlink PIN-debit card acceptance services (Frankel Rep. ¶¶ 11(a), 85).

77.     The individual plaintiffs define the following nine "relevant" markets:  (i) general purpose payment card network services (*e.g.*, Hy-Vee Compl. ¶ 32(A) Meijer Compl. ¶ 17(A)); (ii) Visa credit card network services (*e.g.*, Hy-Vee Compl. ¶ 32(B); Meijer Compl. ¶ 17(B)); (iii) MasterCard credit card network services (*e.g.*, Hy-Vee Compl. ¶ 32(C); Meijer Compl. ¶ 18(C)); (iv) non-premium Visa credit card network services (*e.g.*, Hy-Vee Compl. ¶ 116; Meijer Compl. ¶ 92); (v) premium Visa credit card network services (*e.g.*, Hy-Vee Compl. ¶ 116; Meijer Compl. ¶ 92); (vi) non-premium MasterCard credit card network services (*e.g.*, Hy-Vee Compl. ¶ 123; Meijer Compl. ¶ 99); (vii) premium MasterCard credit card network services (*e.g.*, Hy-Vee Compl. ¶ 123; Meijer Compl. ¶ 99); (viii) general purpose payment card network services other than payment guarantee services (*e.g.*, Hy-Vee Compl. ¶¶ 130, 139; Meijer Compl. ¶¶ 106, 115); and (ix) general purpose card payment guarantee services (*e.g.*, Hy-Vee Compl. ¶¶ 130, 139; Meijer Compl. ¶¶ 106, 115).

78.     Payment card transaction volume and its concomitant use of payment card network services – and thus output in any of plaintiffs' proposed relevant markets – has increased substantially during the last two decades.  Class Plaintiffs' industry expert, Mr. McCormack, reported that the aggregate general purpose credit and signature debit card purchase volumes for Visa and MasterCard increased from $222 billion in 1990 to $2.217 trillion in 2008. (McCormack Rep. ¶ 7.)  In the five years between 2003 and 2008, Mr. McCormack reported that aggregate general purpose credit and signature debit card purchase volume increased by 67%, from $1.327 trillion in 2003 to $2.217 trillion in 2008.  (McCormack Rep. Figure 1A.)

79.     Class Plaintiffs' expert, Dr. Frankel, has asserted that the challenged inter-change fee and merchants rules *increase* the usage of defendants' cards at merchants that accept those cards.  (Frankel Rebuttal Rep. ¶ 310; Frankel Dep. at 302.)  According to Dr. Frankel, the challenged conduct causes there to be *too many* transactions using defendants' payment cards, not too few.  (Frankel Rep. ¶ 229.)

80.     Nonetheless, Dr. Frankel, testified that he cannot tell whether the chal-lenged rules have impeded the growth in output.  (Frankel Dep. at 210-13, 377-78.)  Dr. Frankel testified that "the analysis of output is not properly applied to the markets [he'd] defined" (*Id.* at 213), but could only be applied to a hypothetical relevant market that neither Dr. Frankel nor plaintiffs have defined, and which might include both debit and credit cards, as well as all elec-tronic methods of payment.  (*Id.* at 210-14, 381-82.)  Dr. Frankel could say only that the effect of the challenged rules on transaction volume has been "ambiguous."  (*Id.* at 378.)

## VI.     Undisputed Material Facts Relating To Defendants' Argument That Plaintiffs Have Abandoned Their Inter-Network Conspiracy Claim

81.     At the November 19, 2009, oral argument on plaintiffs' motion for class certification, plaintiffs informed the Court that they had abandoned their damages claim alleging that Visa and MasterCard and their member banks had conspired between the two networks to establish default interchange rates.  Specifically, plaintiffs stated:

> [MR. DAVIDOFF:]  Earlier, I went through my outline in some haste to try to abbreviate things and make time to answer Your Honor's questions and I meant to clarify on the inter-network claim to alert Your Honor that while we do have an injunctive relief claim in that, we very strongly have that, there is no separate damages.  Or [sic: Our] damages experts did not put in a separate dam-ages figure on the –

> THE COURT:  So, Mr. Graham's right; you don't have it there because you're not seeking it.

43

MR. DAVIDOFF:  At this point we are not seeking incremental damages for the inter-network damages, that is correct.  In our merits reports.

\*       \*       \*

[MR. GRAHAM:]  So, do we have a motion to have a 23(b)(3) certification of Count 3 or not?  That is what's unclear to me.

THE COURT:  Okay.

MR. DAVIDOFF:  On the inter-network claim.

\*       \*       \*

THE COURT:  But what's the answer to his question?  Is it no?

MR. DAVIDOFF:  I guess it's no.

THE COURT:  Okay.

\*       \*       \*

MR. DAVIDOFF:  We were going to include the inter-network claim only insofar as –

THE COURT:  23(b)(2).

MR. DAVIDOFF:  – the 23(b)(2) class.  And if Your Honor wants us to submit that, we will.

(Nov. 19, 2009 Hearing Tr.[128] at 215-18.)

82.     In his report, Class Plaintiffs' expert, Dr. Frankel, described "some economic factors that affect the ability and incentive for the defendants to coordinate the actions of MasterCard and Visa."  (Frankel Rep. ¶ 254.)  Dr. Frankel reported, for example, that the merchant acceptance rules "ensure that merchants treat cardholders the same whether they present MasterCard or Visa cards."  (Frankel Rep. ¶ 256.)  Dr. Frankel wrote that MasterCard and Visa

---

[128]     *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 05-MDL-1720 (JG), Transcript of Civil Cause for Oral Argument Before the Honorable James Orenstein, United States Magistrate Judge (Nov. 19, 2009).

compete "at the margins and over which of them will offer the greatest interchange fee revenue to their member banks." (*Id.*)  Dr. Frankel also described, as other factors that affect the ability and incentive to coordinate the behavior of Visa and MasterCard, the similarity of each network's default interchange fee schedules (Frankel Rep. ¶¶ 257-59), Visa's public announcement that it would "not be disadvantaged on interchange fees in securing issuer brand decisions" by MasterCard's default interchange rate schedule (Frankel Rep. ¶ 261), and the opportunity for Visa and MasterCard to share information through publicly announced default interchange rate changes and as a result of the banks' membership in both networks.  (Frankel Rep. ¶¶ 263-65.)

83.     Dr. Frankel did not opine in his report that the economic factors he identified as affecting the ability and incentive for defendants to coordinate the actions of MasterCard and Visa were inconsistent with independent competitive behavior.  (Frankel Rep. ¶¶ 253-65.)

84.     At his deposition, Dr. Frankel testified that he has not concluded that any inter-network conspiracy has occurred.  Specifically, Dr. Frankel testified:

> No, I have not opined that I have found evidence of a conspiracy.  I have opined that there are certain economic characteristics of the market and of some conduct that heightens concern.

*     *     *

> Q.     Have you searched the record for evidence inconsistent with the existence on [sic: of] an inter-association conspiracy?

> MR. WILDFANG:  Object to the form of the question.

> THE WITNESS:  I did not set out to determine whether an inter-association conspiracy exists or doesn't exist in the sense of trying to detect and uncover documents or testimony that established a direct and explicit agreement between Visa and MasterCard.  That was not my assignment or intent or opinion. I merely explained some of the economic factors that might be relevant to a finder of fact inquiring into this issue, and some of which may on their face rise to a legal conclusion that there is an inappropriate intersystem coordination.

> But I haven't attempted to reach that conclusion because I believe that's not my job.

45

(Frankel Dep. at 966, 1072-73.)

## VII.   Undisputed Material Facts Relating To Defendants' Argument That Plaintiffs Have Not Presented Evidence To Support Their Challenge To The No-Surcharge Rules

### A.   The "No Surcharge" Rules Do Not Unreasonably Restrain Trade Or Result In An Antitrust Injury

The undisputed facts supporting this argument can be found in paragraphs 11-13, 26-27, 30, and 32 above.

### B.   No Antitrust Injury Could Flow From The "No Surcharge" Rules In The Ten States That Statutorily Prohibit Surcharging

85.     Since at least January 1, 2004, New York General Business Law Section 518 has provided that "[n]o seller in any sales transaction may impose a surcharge on a holder who elects to use a credit card in lieu of payment by cash, check, or similar means."  (N.Y. Gen. Bus. Law § 518 (McKinney 2010).)

86.     Since at least January 1, 2004, California Civil Code Section 1748.1(a) has provided that "[n]o retailer in any sales, service, or lease transaction with a consumer may impose a surcharge on a cardholder who elects to use a credit card in lieu of payment by cash, check, or similar means."  (Cal. Civ. Code § 1748.1(a) (West 2010).)

87.     Since at least January 1, 2004, Texas Finance Code Section 339.001(a) has provided that "[i]n a sale of goods or services, a seller may not impose a surcharge on a buyer who uses a credit card for an extension of credit instead of cash, a check, or a similar means of payment."  (Tex. Fin. Code § 339.001(a) (Vernon 2009).)

88.     Since at least January 1, 2004, Florida Statutes Section 501.0117(1) has provided that "[a] seller or lessor in a sales or lease transaction may not impose a surcharge on the buyer or lessee for electing to use a credit card in lieu of payment by cash, check, or similar means, if the seller or lessor accepts payment by credit card."  (Fla. Stat. § 501.0117(1) (2010).)

46

89.     Since at least January 1, 2004, Connecticut General Statutes Section 42-133ff(a) has provided that "[n]o seller may impose a surcharge on a buyer who elects to use any method of payment, including, but not limited to, cash, check, credit card or electronic means, in any sales transaction."  (Conn. Gen. Stat. § 42-133ff(a) (2010).)

90.     Since at least January 1, 2004, Massachusetts General Laws Chapter 140D, Section 28A(a)(2) has provided that "[n]o seller in any sales transaction may impose a surcharge on a cardholder who elects to use a credit card in lieu of payment by cash, check or similar means."  (Mass. Gen. Laws ch. 140D, § 28A(a)(2) (West 2010).)

91.     Since at least January 1, 2004, Maine Revised Statutes Title 9-A, Section 8-303(2) has provided that "[a] seller in a sales transaction may not," or "[n]o seller in any sales transaction may," "impose a surcharge on a cardholder who elects to use a credit card . . . in lieu of payment by cash, check or similar means."  (Me. Rev. Stat. tit. 9-A, § 8-303(2) (2009).)

92.     Since at least January 1, 2004, Oklahoma Statutes Title 14A, Section 2-211A has provided that "[n]o seller in any sales transaction may impose a surcharge on a card-holder who elects an open-end credit card . . . account instead of paying by cash, check or similar means."  (Okla. Stat. tit. 14A, § 2-211A (2010).)

93.     Since at least January 1, 2004, Kansas Statutes Annotated Section 16a-2-403 has provided that "[n]o seller or lessor in any sales or lease transaction . . . may impose a surcharge on a card holder who elects to use a credit . . . card in lieu of payment by cash, check or similar means."  (Kan. Stat. Ann. § 16a-2-403 (2010).)

94.     Since at least January 1, 2004, Colorado Revised Statutes Section 5-2-212(1) has provided that "no seller or lessor in any sales or lease transaction . . . may impose a

surcharge on a holder who elects to use a credit or charge card in lieu of payment by cash, check, or similar means." (Colo. Rev. Stat. § 5-2-212(1) (2010).)

     95.    Since at least January 1, 2004, plaintiffs have accepted Visa- or Master-Card-branded credit cards at stores in California, New York, Connecticut, Massachusetts, Maine, Florida, Texas, Oklahoma, Kansas, or Colorado. For example, individual plaintiff Albertson's operates stores in California, Connecticut, Massachusetts, Maine, Florida, Texas, Oklahoma, Kansas, and Colorado. (ALBVMC088905 to 089007, at 914.[129]) Individual plaintiff Pathmark operates supermarkets in New York. (PATH001770 to 002097, at 1779.[130]) Individual plaintiff Rite Aid operates stores in California, New York, Connecticut, Maine, and Colorado. (RA-E1311805 to 1311906, at 821.[131]) Individual plaintiff Safeway has retail operations in California, Texas, and Colorado. (SWYVMC 003745 to 003840, at 3768.[132]) Class plaintiff Traditions Ltd. owns and operates retail furniture stores in Florida. (Class Compl. ¶ 10.) Class Plaintiff D'Agostino has eighteen locations in and around New York City, and Class Plaintiff Leon's Transmission is an automotive transmission service serving Southern California. (Class Compl. ¶¶ 10, 15, 19.) Class plaintiff Payless operates stores in all fifty states (Payless MasterCard Interr. Resp.,[133] at 4), Class plaintiff CHS owns stores in Colorado, Kansas, and Oklahoma (CHS

---

[129]    Form 10-K of Albertson's, Inc. (filed Mar. 28, 2006).

[130]    Form 10-K of Pathmark Stores, Inc. (filed Apr. 7, 2006).

[131]    Form 10-K of Rite-Aid Corporation (filed Apr. 28, 2006).

[132]    Form 10-K of Safeway Inc. (filed Mar. 10, 2006).

[133]    Payless ShoeSource Inc.'s Objections and Answers to Defendants MasterCard International Incorporated and MasterCard Incorporated's First Set of Interrogatories (June 13, 2006) ("Payless MasterCard Interr. Resp.")

Dep. Replacement Letter,[134] at 5; CHS00001 to 00021, 21), and Class plaintiff Capital Audio has retail locations in New York.  (Platkin Dep.[135] at 14-15.)

96.     Moreover, the class of merchants Class Plaintiffs seek to represent is nationwide and thus has members throughout California, Colorado, Connecticut, Florida, Kansas, Maine, Massachusetts, New York, Oklahoma, and Texas.  (Class Compl. ¶ 108.)

## VIII.   Undisputed Material Facts Relating To Defendants' Argument That Plaintiffs Lack Evidence To Support Their Alleged Single-Brand Markets

97.     A former employee of the individual plaintiff ███████ testified that ████████ thought that Visa and MasterCard are interchangeable, competing payment brands. Specifically, ████████████████ testified that:



---

[134]    Letter from R. Abbey to G. Carney (July 21, 2006) ("CHS Dep. Replacement Letter").

[135]    Deposition of Susan Platkin (March 13, 2008) ("Platkin Dep.").  Ms. Platkin testified as the accounts payable manager of class plaintiff Capital Audio Electronics Inc.  (Platkin Dep. at 22.)

████████████ ██ ██████

98.    A vice president for the individual plaintiff ██████ similarly acknowl-

edged that he believed Visa and MasterCard are interchangeable.  (████████ ██ ███████

███████████████████████████████████████████████████████████████████████████

██████

99.    Representatives of plaintiffs D'Agostino Supermarkets, ████████

████████, Coborn's, Raley's, Capital Audio, and █████████ testified that Visa and Master-

Card network services to merchants are interchangeable with each other, with other payment sys-

tems such as American Express or Discover, or with other forms of payment such as cash and

checks.  (D'Agostino Dep. at 118  ("Q.  You consider Visa and MasterCard as interchangeable?

A.  Yes.");  ███████████ ██ ████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████ ████████████████ ████





██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████; Thueringer[142] Dep. at 112-13 ("Q.  Do you see any differences in the Visa payment card from a MasterCard payment card from Coborn's perspective?  A.  I really don't.  Q.  Do you think the two are interchangeable?  A.  They're both used for the same purpose."); ████████ ████████████████████████████

██████████████████████████████████████████████████

████████████████████; Platkin Dep. at 112-13 (Capital Audio is indifferent as to what type of payment card is used); ████████ █████████████████████████████████

██████████████████████████████████

      100.    Representative of plaintiffs ████ and Traditions testified that they have tried to influence customers to use forms of payment other than Visa or MasterCard credit cards. Specifically, ████████████████ testified about such efforts and that they have been successful at ████:

████████████████████████████████████████

███████████████████████

██████████

█████████████████████████████

---

*(cont'd from previous page)*

141    ███████████████████████████████████████

142    Deposition of Robert Thueringer (Feb. 12, 2008) ("Thueringer Dep.")  Mr. Thueringer testified as chief operating officer for class plaintiff Coborn's.  (Thueringer Dep. at 6.)

143    █████████████████████████████████████████
        ██████████████████████████████

144    ███████████████████████████████████████████
        ████████████████████████████████



(████████████ ██████████████████████████████████████████ ██

████████████ █████████████████ testified that ███████ has discouraged payment by Visa or MasterCard cards because "credit card fees are a big overhead item for us" and ████████ wanted to "steer people to different forms of payment."  (████████ Dep. at 123-25; ████████ Dep. Ex. 10007,[147] at 7-8.)

       101.   Plaintiffs' representatives testified that they steered their customers to make PIN-debit payments rather than Visa or MasterCard signature or off-line debit payments. (Coward Dep. at 58 (██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████ ██████████████████████ ██████████████

(██████████████████████████████████████████████

---

[145]   Deposition of Karen Bullock (July 1, 2008) ("Bullock Dep.")  Ms. Bullock testified as manager of credit services for individual plaintiff QVC.  (Bullock Dep. at 32.)

[146]   ██████████████████████████████████████████ ████████████████████████████ ████████████

[147]   ████████████ Objections and Answers to Defendant Visa U.S.A. Inc.'s First Set of Interrogatories to Each of the Putative Class Plaintiffs (June 2006).

[148]   ██████████████████████████████████████████ ██████████████████████████████ ████████████████████████

[149]   Email between R. Hans, D. Bernauer, S. Schuler, and M. Quane, bearing control numbers WLGVMCED00009372 to 00009375 (Aug. 18, 2003).



102.    Plaintiffs' representatives testified that they viewed Visa and MasterCard as competing with each other and with other payment systems for merchant business.  (*See, e.g.,* Carney Dep. at 115-16 (MasterCard, Visa, and American Express compete with each other for merchant acceptance); Fiereck Dep.[154] at 263-64 ("Q.  And do you think that Visa and Master-Card compete for merchant business?  A.  I believe so.  Q.  Do you think that Visa and Master-Card compete with American Express and Discover for merchant business?  A.  Yes.  Q.  Do you think that Visa and MasterCard compete with checks, cash, other forms of payment for merchant business?  A.  Yes.  Q.  From your perspective at Coborn's, do you think that cash and check, and Visa and MasterCard, and American Express are all competitors?  A.  I believe they would



[154] Deposition of Linda Fiereck (Mar. 27, 2008) ("Fiereck Dep.")  Ms. Fiereck is in accounts re-ceivable in cash management at class plaintiff Coborn's.  (Fiereck Dep. at 4.)

be.  Yes."); Fletcher Dep. at 202 (MasterCard, Visa, and American Express compete with each other for Delhaize's business).)

103.    The corporate designee of American Express testified that American Express competes with both Visa and MasterCard for merchant acceptance and usage.  Mr. McCurdy of American Express testified that American Express ████████████████████

████████████████████████████████████████████████████████

██████ (McCurdy Dep.[155] at 282; *see also id.* at 15-23 (████████████████████████

████████████████████████████████).)

104.    American Express documents produced in discovery also describe its competition with both Visa and MasterCard for merchant acceptance.  (AMEXM50305800 to 50305822,[156] at 20 (████████████████████████████████

████████████████████████████ █████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████ ██████████████████████████████████████████

████████████████████████████)

---

[155]    Deposition of Stephen B. McCurdy (Mar. 24, 2009) ("McCurdy Dep.")  Mr. McCurdy testified as American Express' Rule 30(b)(6) witness regarding steering and surcharging in Australia and the United Kingdom, American Express' merchant discount rates, American Express' card issuance and merchant acceptance business model, and competition between American Express and other payment cards for merchant acceptance.  (McCurdy Dep. at 11-12; McCurdy Dep. Ex. 29800 (30(b)(6) Deposition Notice).)

[156]    Executive Summary, Competitive Review, Visa and MasterCard (June 2001).

[157]    Competitive Review, Visa and MasterCard, App. A (June 2001).

[158]    Competitive Overview on Contactless Payments (July 18, 2006).

105.    The Discover corporate designee testified that Discover competes with

Visa and MasterCard for merchant usage of its network services:

████████████████████████████████████████████████████████
████████████████████████████████████████

████████████████████████

████████████████████████

(Smits Dep.[159] at 491-93; *id.* at 494-95 ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████.)

106.    The corporate designee of the payment network Wright Express testified

that ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████  ████████████████ ██ ██████████

107.    A corporate designee for the NYCE debit card network testified that the

████████████████████████████████████████████████████████████████

---

[159]    Deposition of Suzanne Smits (Apr. 14-15, 2009) ("Smits Dep.")  Ms. Smits testified as Discover's Rule 30(b)(6) witness on Discover's operating regulations, acceptance rules, and merchant discount rates.  Smits Dep. Ex. 36100 (30(b)(6) Deposition Notice).)

[160]    Deposition of Ricky Pomerleau (Dec. 9, 2008) ("Pomerleau Dep.")  Mr. Pomerleau testified as Wright Express' Rule 30(b)(6) designee on Wright Express' business strategy for fleet card issuance, merchant acceptance strategy and value proposition, card usage strategies, cardholder fees and value proposition, and rules and policies applicable to merchants. (Pomerleau Dep. at 9-10; Pomerleau Dep. Ex. 43250 (30(b)(6) Deposition Subpoena).)

██████████████ (Rathgaber Dep.[161] at 46-47 (██████████████

████████████████████████████████████████████████████████).)

108.    Visa testimony and documents show that it competed for merchant accep-

tance and usage with MasterCard and American Express.  (Buse Dep.[162] at 62-63 (stating that a

big part of developing the Visa Signature product "was to find a way that we had both a compel-

ling value proposition for the American Express cardholder for the issuer who wanted to target

that cardholder, and one that had better economics for the merchant than the American Express

value proposition."); Gallo Dep.[163] Ex. 23270[164] (Visa competing for an acceptance deal with a

merchant that already had an acceptance deal with American Express); Steele Dep.[165] at 206-07

(stating that "within that broad category of merchants, the desire was to make sure that we did a

better assessment of Visa's relative value as compared to our competitor products in the number

of cardholders we offer, the total spend driven through the Visa network, promotional capabili-

ties and so forth as inputs to understand what the appropriate level of interchange would be on

---

[161]    Deposition of Steven A. Rathgaber (Feb. 17, 2009) ("Rathgaber Dep.")  Mr. Rathgaber testified as NYCE's Rule 30(b)(6) designee on NYCE's business strategy, fees, rules, and policies, and merchant value proposition.  (Rathgaber Dep. at 10-11; Rathgaber Dep. Ex. 43625 (30(b)(6) Deposition Subpoena).)

[162]    Deposition of Elizabeth Buse (Apr. 11, 2008) ("Buse Dep.").  Ms. Buse testified as Visa's Rule 30(b)(6) designee on premium cards.  (Buse Dep. at 11-13; Buse Dep. Ex. 31604 (30(b)(6) Deposition Notice).)

[163]    Deposition of Paul Gallo (Apr. 24, 2008) ("Gallo Dep.).  Mr. Gallo testified as senior account executive in merchant sales for Visa.  (Gallo Dep. at 7.)

[164]    Agenda for meeting with Costco, bearing control numbers VUSAMDL1-01746397 to 01746402.

[165]    Deposition of Tolan Steele (Apr. 2, 2008) ("Steele Dep.").  Mr. Steele testified as head of global interchange strategy for Visa.  (Steele Dep. at 28.)

various transaction types"); VUSAMDL1-05235818 to 05235836,[166] at 18-22 (providing an overview of Visa's Merchant Sales team and how it provides a strategic advantage over Master-Card).)

109.    MasterCard testimony and documents show that it competes for merchant acceptance with American Express, Discover, and Visa.  (Friedman Dep.[167] at 91-92 (Master-Card's acceptance advantage over American Express has shrunk and in order to increase its acceptance advantage, MasterCard has been focusing on areas where it can expand merchant acceptance); Friedman Dep. Ex. 24356,[168] at MCI_MDL02_11615537 ("Must address Amex's growing acceptance base in the U.S. to guarantee MC's acceptance proposition remains valid."); Marshall Dep.[169] at 112 (MasterCard's best interests are to maintain greater merchant acceptance than American Express); MCI_MDL02_03886137 to 03886139[170] (discussing MasterCard's negotiations with a merchant and competing with Visa for acceptance with that merchant); MCI_MDL02_11789423 to 11789429[171] (discussing competitive response to a merchant accep-

---

[166]    Visa, Driving Merchant Acceptance (June 4, 2003).

[167]    Deposition of Theodore Friedman (July 2, 2008) ("Friedman Dep.")  Mr. Freidman was the former senior vice president of global credit products for MasterCard.  (Freidman Dep. at 12.)

[168]    MasterCard International, EMG Strategy Work Session 3: Merchants and Acquirers Team Pre-read, bearing control numbers MCI_MDL02_11615530 to 11615586 (Apr. 2, 2004).

[169]    Deposition of Ruth Ann Marshall (July 30, 2008) ("Marshall Dep.")  Ms. Marshall was former president of the Americas for MasterCard.  (Marshall Dep. at 8.)

[170]    Email between A. Gracia and G. Forsey (June 14, 2006).

[171]    Memorandum to T.J. Sharkey from Steve Carnevale (Feb. 6, 2007).

tance deal with Visa); MCI_MDL02_03399891 to 03399894[172] (discussing potential competition with Visa for a merchant acceptance program).)

110.    Plaintiffs' experts Mr. McCormack and Dr. Frankel concluded that competition between Visa and MasterCard lead each of them to match to the other's default interchange fees.  (McCormack Rep. ¶ 4 ("In 2002, Visa implemented and communicated a policy to its bank membership not to be disadvantaged by MasterCard's interchange fees, which was followed by MasterCard announcing a similar policy."); *id.* ¶¶ 57-63 (describing several instances in which Visa or MasterCard matched the other's interchange fee increases pursuant to those policies); Frankel Rep. ¶ 261 (Visa and MasterCard adopted practices not to be disadvantaged by the other's interchange fees); Frankel Rebuttal Rep. ¶ 80 ("the evidence indicates that the networks [Visa and MasterCard] . . . have taken steps to assure each other that [interchange] price increases will be matched").)

111.    Evidence from Visa and MasterCard shows that each network was concerned about competition from the other, and would not allow itself to be disadvantaged by the default interchange fees set by the other.  (Sheedy Dep. Ex. 23995,[173] at VUSAMDL2-00001359 ("Visa will not be competitively disadvantaged in connection with card issuance decisions by MasterCard's higher interchange fees or American Express' higher merchant discount (or for that matter, by product feature, function or service quality)."); Sheedy Dep. at 512-13 ("Does – does that – that helps refresh your recollection that this is – in this time period you were – that – that Visa instituted this policy of in a sense not being disadvantaged by either MasterCard or

---

[172]    Email between S. Stevens, D. Raymond, T. Zebrowski, and B. Wasserman (Sept. 3, 2004).

[173]    Visa U.S.A. Board of Directors Meeting, bearing control numbers VUSAMDL2-00001358 to 00001366 (May 30, 2002).

American Express in interchange rates?  A.  Yes."); Jonas Dep.[174] at  203-04 ("Q.  Has Master-Card, to your knowledge, communicated to its member banks that it will design its interchange fees so that it's not at a disadvantage to Visa with respect to interchange fees?  A.  I believe in an effort to win issuing business we've indicated that yes, we will take -- we will make efforts to not be disadvantaged."); Jonas Methodology Dep.[175] Ex. 23121[176] (███████████████████████ ██████████████████████████████).)

## IX.  Undisputed Material Facts Relating To Defendants' Argument That Plaintiffs Lack Evidence To Support Their Monopolization Claims

112.    The Individual Plaintiffs' economist, Christopher Vellturo, acknowledged that credit card output increased since at least 2004:

Q.  I see, okay.  I got it.  With respect to the real world market you identified, MasterCard credit card acceptance services to merchants, do you agree that output's been increasing in that market while the merchant rules have been in place?

A.  Output has been increasing over time in all credit markets, and the rules have been in place the whole time, so I think by construction output has increased during that period.

(Vellturo Dep.[177] at 224-25.)  Dr. Vellturo further testified that:

Q.  You also talked yesterday with Mr. Gallo about output, and I wanted to follow up on a couple of points there as well.  I don't think you were asked this question

---

[174]    Deposition of Steven J. Jonas (Sept. 18, 2007) ("Jonas Dep.")  Mr. Jonas testified as MasterCard's Rule 30(b)(6) designee on the considerations and business justifications for setting MasterCard's interchange fees.  (Jonas Dep. at 8-9; Jonas Dep. Ex. 1 (30(b)(6) Deposition Notice).)

[175]    Deposition of Steven J. Jonas (Apr. 23, 2008) ("Jonas Methodology Dep")  Mr. Jonas testified as MasterCard's Rule 30(b)(6) designee on the methodology used to set MasterCard interchange fees.  (Jonas Methodology Dep. at 7.)

[176]    Email from B. Kapteina, bearing control numbers MCI_MDL02_00997971 to 00997973 (July 20, 2004).

[177]    Deposition of Christopher A. Vellturo (Sept. 29-30, 2010) ("Vellturo Dep.").

with respect to Visa, so let me ask it with respect to Visa.  Is output – has output been increasing in the market you define for Visa credit card services to merchants?

A.  How are you measuring output in your question?

Q.  Transaction volume in dollars.

A.  Yes, the transaction volume in dollars at the merchants has been – with respect to Visa has been increasing fairly consistently over a number of years.

(Vellturo Dep. at 595.)

113.    Dr. Vellturo calculated credit and charge card purchase volume from 2004 to 2008 in total and by card network.  (Vellturo Rep.[178] Ex. 11.)

114.    Dr. Vellturo's calculation shows that from 2004 to 2008, total credit and charge card purchase volume increased from $1,431.44 to $1,942.40 billion.  (Vellturo Rep. Ex. 11.)  That is an increase of approximately 36%.

115.    Dr. Vellturo's calculation shows that from 2004 to 2008, purchase volume for American Express credit and charge cards increased from $303.73 to $465.23 billion.  (Vellturo Rep. Ex. 11.)  That is an increase of approximately 53%.

116.    Dr. Vellturo's calculation shows that from 2004 to 2008, purchase volume for Discover credit cards increased from $73.60 to $106.13 billion.  (Vellturo Rep. Ex. 11.)  That is an increase of approximately 44%.

117.    Dr. Vellturo's calculation shows that from 2004 to 2008, purchase volume for Visa credit cards increased from $610.71 to $823.74 billion.  (Vellturo Rep. Ex. 11.)  That is an increase of approximately 35%.

---

[178]    Expert Report of Christopher A. Vellturo (July 2, 2009) ("Vellturo Rep.").

118.    Dr. Vellturo's calculation shows that from 2004 to 2008, purchase volume for MasterCard credit cards increased from $433.70 to $547.30 billion.  (Vellturo Rep. Ex. 11.) That is an increase of approximately 26%.

119.    Plaintiffs' economists maintain that Visa and MasterCard both have engaged in price discrimination by setting different default interchange fees for different merchant classes or categories.  For example, Dr. Christopher Vellturo, stated in his report that "Visa Defendants and MasterCard Defendants practice price discrimination on interchange fees on a substantial scale.  As demonstrated in Exhibits 16 through 19, Visa and MasterCard both charge different interchange rates (for comparable volumes) to different merchant classes."  (Vellturo Rep. ¶¶ 165-67, Exs. 16-19.)  For the Class Plaintiffs, Dr. Frankel, stated in his report that Visa and MasterCard both "administer increasingly complex and systematic price discrimination regimes. That is, they segment the merchant marketplace into increasingly fine categories and sizes and set different interchange fees to different merchants."  (Frankel Rep. ¶ 107.)

120.    ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████  ████████████████████████████████

████████████████████████████████████████████



121.

122.    Dr. Vellturo's calculation of credit and charge card purchase volume for 2004 to 2008 in total and by card network shows that from 2004 to 2008, Visa share of all credit and charge card purchases was approximately 42-43%.  (Vellturo Rep. Ex. 11.)  Specifically, Dr. Vellturo's calculation shows that Visa's share of total credit and charge card purchase volume in 2004 was $610.71 of $1,431.44 billion (approximately 42.7%), in 2005 was $675.27 of $1,583.30 billion (approximately 42.6%), in 2006 was $742.39 of $1,748.79 billion (approximately 42.5%), in 2007 was $807.00 of $1,910.12 billion (approximately 42.2%), and in 2008 was $823.74 of $1,942.40 billion (approximately 42.4%).  (*Id.*)  Visa's change in share from approximately 42.7% in 2004 to approximately 42.4% in 2008 is a decrease of approximately 1%.

---

[179]    Establishment Services Discount Rate Schedules & Industry Codes – U.S. as of May 2005, bearing control numbers AMEX50293195 to 50293264.

[180]    Discount Overview, bearing control numbers DFS 019191302 to 019191307.

123.    Dr. Vellturo's calculation of credit and charge card purchase volume for 2004 to 2008 in total and by card network shows that from 2004 to 2008, MasterCard's share of all credit and charge card purchases was approximately 28-30%. (Vellturo Rep. Ex. 11.) Specifically, Dr. Vellturo's calculation shows that MasterCard's share of total credit and charge card purchase volume in 2004 was $433.70 of $1,431.44 billion (approximately 30.3%), in 2005 was $472.23 of $1,583.30 billion (approximately 29.8%), in 2006 was $508.67 of $1,748.79 billion (approximately 29.1%), in 2007 was $548.10 of $1,910.12 billion (approximately 28.7%), and in 2008 was $547.30 of $1,942.40 billion (approximately 28.2%). (*Id.*) MasterCard's change in share from approximately 30.3% in 2004 to approximately 28.7% in 2008 is a decrease of approximately 7%.

124.    For the Class Plaintiffs, Alan Frankel, calculated that in 2008, Visa's share of all credit and charge card purchase volume was 43% and MasterCard's share was 28%. (Frankel Rep. ¶125, Figure 4.5.)

125.    Dr. Vellturo's calculation of credit and charge card purchase volume for 2004 to 2008 in total and by card network shows that American Express's share of total credit and charge card purchase volume in 2004 was $303.73 of $1,431.44 billion (approximately 21.2%), and in 2008 was $465.23 of $1,942.40 billion (approximately 23.9%). (Vellturo Rep. Ex. 11.) American Express's change in share from approximately 21.2% in 2004 to approximately 23.9% in 2008 is an increase of approximately 13%.

126.    Dr. Vellturo's calculation of credit and charge card purchase volume for 2004 to 2008 in total and by card network shows that Discover's share of total credit and charge card purchase volume in 2004 was $73.60 of $1,431.44 billion (approximately 5.1%), and in 2008 was $106.13 of $1,942.40 billion (approximately 5.5%). (Vellturo Rep. Ex. 11.) Dis-

cover's change in share from approximately 5.1% in 2004 to approximately 5.5% in 2008 is an increase of approximately 8%.

127.    Dr. Velluro's calculation of credit and charge card purchase volume for 2004 to 2008 in total and by card network shows that Visa's share of total credit and charge card purchase volume in 2004 was $610.71 of $1,431.44 billion (approximately 42.7%), and in 2008 was $823.74 of $1,942.40 billion (approximately 42.4%).  (Velluro Rep. Ex. 11.)  Visa's change in share from approximately 42.7% in 2004 to 42.4% in 2008 is a decrease of approximately 1%.

128.    Dr. Velluro's calculation of credit and charge card purchase volume for 2004 to 2008 in total and by card network shows that MasterCard's share of total credit and charge card purchase volume in 2004 was $433.70 of $1,431.44 billion (approximately 30.3%), and in 2008 was $547.30 of $1,942.40 billion (approximately 28.2%).  (Velluro Rep. Ex. 11.) MasterCard's change in share from approximately 30.3% in 2004 to 28.2% in 2008 is a decrease of approximately 7%.

X.    **Undisputed Material Facts Relating To Defendants' Argument That Plaintiffs Have Failed To Present Evidence To Support Their IPO And Post-IPO Claims**

A.    **The MasterCard IPO**

129.    Prior to the IPO, members of MasterCard's Global Board and regional boards were employees of MasterCard's member financial institutions or individuals "otherwise uniquely qualified to provide guidance as to the Corporation's affairs."  MasterCard's president and chief executive officer also held a position on the Global Board.  (2001 MasterCard Rules,[181]

---

[181]    2001 MasterCard Bylaws and Rules ("2001 MasterCard Rules") (Apr. 2001), bearing control numbers MCI_MDL02_11256859 to 11257128.

at MCI_MDL02_11256880, 884-86; 2003 MasterCard Rules, Bylaws, Art. IV;

MCI_MDL02_08606437 to 08606799,[182] at 456-57; Class Compl. ¶ 53.)

130.    On May 31, 2006, MasterCard completed its IPO.  (MasterCard Form 10-Q (Aug. 2, 2006),[183] at 7; Class Compl. ¶ 265.)

131.    Pursuant to the IPO plan, MasterCard was restructured as follows: MasterCard redeemed member banks' shares with part of the proceeds from the IPO and issued reclassified Class A common shares, representing 100% of the voting rights and 59% of the equity interest in MasterCard's total capitalization.  (2006 MasterCard S-1 Amendment,[184] at MCI_MDL02_10411162-63.)  MasterCard's member banks' remaining shares were reclassified as Class B common shares, representing no voting rights and 41% of the equity interest in MasterCard's total capitalization.  (*Id.*)

132.    Each member bank also received one share of Class M common stock, representing no equity interest and limited voting rights.  (*Id.*)  Specifically, Class M shareholders could vote to elect up to three, but no more than 25%, of the members of the board of directors.  (*Id.*)  In addition, Class M shareholders had the right to approve by a majority vote "significant corporate actions" under MasterCard's certificate of incorporation.  (*Id.* at 164.)  Significant corporate actions were limited to the following events: (i) "the sale, lease or exchange of all or substantially all the assets of MasterCard"; (ii) "any merger or consolidation"; (iii) the "issu-

---

[182]    Amended and Restated Bylaws of MasterCard Incorporated (amended Feb. 28, 2005).

[183]    Available at http://www.sec.gov/Archives/edgar/data/1141391/000119312506159221/d10q.htm (last visited Feb. 8, 2011).

[184]    MasterCard Amendment No. 8 to Form S-1 Registration Statement (May 23, 2006), bearing control numbers MCI_MDL02_10411152 to 10411437 ("2006 MasterCard S-1 Amendment").

ance of capital stock other than Class A Common Stock, Class B Common Stock, Class M Common Stock"; (iv) a decision "to cease to engage in the business of providing core network authorization, clearing and settlement services for branded payment card transactions"; and (v) any alteration or repeal of the 15% ownership limitation. (*Id.* at 290.) Voting rights of the Class M shareholders did not include a right to vote on interchange fee programs or maintaining other challenged network rules. (*Id.* at 290-91.)

133.    As contemplated in MasterCard's Certificate of Incorporation, all shares of the Class M common stock were permanently extinguished on June 1, 2010, when the owner-ship percentage of Class B shares dropped to less than 15% of MasterCard's outstanding shares. (MasterCard Report on Form 8-K (June 2, 2010).)

134.    The Global Board was restructured to be comprised of a majority of inde-pendent (i.e., non-bank) directors. (2006 MasterCard S-1 Amendment, at MCI_MDL02_10411330.) And no single shareholder would be permitted acquire more than 15% of outstanding shares of MasterCard. (*Id.* at 296.)

135.    Prior to the IPO, MasterCard had had the authority to assess member banks for extraordinary capital needs to pay for or reserve against any accumulated, current, or future expenses or liabilities of the corporation. (MCI_MDL_00013136 to 00013322,[185] at 156; 2001 MasterCard Rules, Bylaws, Art. VI, Sect. 4; 2003 MasterCard Rules, Bylaws, Art. VI, Sect. 4; 2005 MasterCard Rules, at MCI_MDL02_10094354.)

136.    As part of the restructuring, MasterCard relinquished its ability to assess member banks for extraordinary capital needs (2006 MasterCard S-1 Amendment, at

---

[185]    Bylaws: MasterCard International Incorporated (May 1996).

MCI_MDL02_10411180), a provision that MasterCard had never exercised.  (Selander Dep.[186] at 482-83.)  MasterCard retained approximately $650 million from the redemption proceeds to U.S. banks for "general corporate purposes" (*id.* at 190), including defense of "legal and regulatory challenges" and "contingent liabilities."  (MCI_MDL04_00000497 to 00000531,[187] at 527.)

137.    Plaintiffs' experts testified that they did not know whether MasterCard's assessment provision was legally enforceable or whether MasterCard's Global Board would have ever used the special assessment.  (Henry Dep.[188] at 326-333 ("I don't know one way or the other."); Macey Dep.[189] at 300-304.)

138.    MasterCard believed it had to relinquish the assessment provision in order to complete the IPO.   (Selander Dep. at 472-73, 509 ("Q. In your opinion, could the change in governance and ownership that led to the IPO have been done without relinquishing the right of special assessment? A. No."), 558.)

B.    **The Visa IPO**

139.    On October 11, 2006, Visa publicly announced its intention "to restructure its organization in order to create a new public global corporation called Visa Inc." with the global corporation "to begin the IPO process and list its shares on a major stock exchange." (VUSAMDL1-07879144 to 07879146.[190])

---

[186]    Deposition of Robert Selander (Nov. 17, 2008 & Jan. 26, 2009) ("Selander Dep.").  Mr. Selander testified as MasterCard's president and chief executive officer.  (Selander Dep. at 7.)

[187]    Minutes of the Nominating and Corporate Governance Committee (July 13, 2005).

[188]    Deposition Kevin Henry (Aug. 27, 2010) ("Henry Dep.").

[189]    Deposition of Jonathan Macey (Sept. 16, 2010) ("Macey Dep.")

[190]    News Release, Visa Announces Global Restructuring (Oct. 11, 2006).

140.     Pursuant to "a number of corporate re-structuring maneuvers in 2007 and 2008," Visa U.S.A. and Visa International "became subsidiaries of . . . [defendant] Visa, Inc." (Class Compl. ¶¶ 51, 269.)  The defendant banks are "[m]ember [b]anks of the Visa . . . network[]," who became stockholders in Visa after its initial public offering.  (Id. ¶¶ 93, 269.)

141.     On March 18, 2008, Visa completed its initial public offering through which it sold more than 400 million shares of voting Class A common stock to the general public.  (Visa Final Prospectus,[191] at FLEI 02732.)

142.     Post-IPO, banks that had previously held common stock as members of Visa's subsidiaries received shares of Visa based on geographic region:  members of Visa U.S.A. acquired class B common stock; banks associated with other geographic regions of Visa International acquired class C common stock.  (VUSALITIIICID2-00533663 to 00534154,[192] at 3675; Visa Final Prospectus, at FLEI 02732.)

143.     The three classes of Visa stock have different voting and control rights.  One share of class A stock entitles its holder to one vote.  (VUSALITIIICID2-00533663 to 00534154, at 3679; Visa Final Prospectus, at FLEI 02736.)  Class B and C common stock, held by the banks, cannot vote, except in the case of certain "significant transactions" such as "a proposed consolidation or merger, a decision to exit our core payments business or any other vote required by law."  (VUSALITIIICID2-00533663 to 00534154,[193] at 3706; Visa Final Prospectus, at FLEI 02764.)

---

[191]   Visa Inc. Form 424B4 Final Prospectus (Mar. 18, 2008), bearing control numbers FLEI 02720 to 03222 ("Visa Final Prospectus").

[192]   Visa Inc. Amendment 4 to Visa Form S-1 Registration Statement, (Feb. 25, 2008).

[193]   Visa Inc. Amendment 4 to Visa Form S-1 Registration Statement, (Feb. 25, 2008).

144.    Post-IPO, Visa member financial institutions may only hold class B and C common stock and are not permitted to hold voting class A common stock.  (Visa Final Prospectus, at FLEI 02732.)

145.    Only holders of Class A common stock may elect directors to the Visa board.  (Visa Final Prospectus, at FLEI 02732.)

146.    For approximately three years following the Visa IPO, the Visa board must be composed of seventeen directors – the Visa CEO, ten independent directors, and six regional directors affiliated with financial institutions that represent the Visa regions, only two of which may come from Visa's United States region, and at all times at least 58% of directors of the Visa Board must not be non-bank directors.  (VUSALITIIICID2-00533663 to 00534154,[194] at 3700, 3845; Visa Final Prospectus, at FLEI 02758, 02906.)

147.    Effective January 27, 2011, Visa amended its board composition so that Visa's board now consists solely of ten (10) non-bank directors and no longer includes directors representing the Visa regions.  (Visa Inc. Report Form 8-K (Jan. 27, 2011), at 3-4;[195] Visa Inc. Press Release (Jan. 27, 2011).[196])

---

[194]    Visa Inc. Amendment 4 to Visa Form S-1 Registration Statement, (Feb. 25, 2008).

[195]    Available at http://investor.visa.com/phoenix.zhtml?c=215693&p=irol-SEC-Text&TEXT=aHR0cDovL2lyLmludC53ZXN0bGF3YnVzaW5lc3MuY29tL2RvcY3VtZW50L3YxLzAwMDExOTMxMjUtMTEtMDE4ODcyL3htbHA%3d%3d (last visited Feb. 5, 2011) ("Visa Inc. Report Form 8-K (Jan. 27, 2011)").

[196]    "Visa Inc. Announces Results of Annual Meeting Stockholder Vote,"available at http://investor.visa.com/phoenix.zhtml?c=215693&p=irol-newsArticle_print&ID=1520977&highlight (last visited Feb. 5, 2011) ("Visa Inc. Press Release (Jan. 27, 2011)").

### C.  Banks Do Not Control Either Post-IPO MasterCard or Visa

#### 1.  The Post-IPO Compositions of the Visa and MasterCard Boards Divest the Banks of Any Purported Control

148.  According to the testimony of MasterCard and Visa management and board members, the IPOs eliminated any actual or potential bank control of the networks through bank executive membership on the boards.  (Selander Dep. at 473 (in the MasterCard IPO, the banks "were going to be giving up control of the company from an economic standpoint, as well as from a right to vote standpoint."); Partridge Dep.[197] at 183 ("[W]e have ended up with a structure where [the banks] have given up control" over "business strategy"); *id.* at 335 ("Q.  And were there steps taken to try to meet those concerns of the banks [about losing control of Visa]? A.  No.").); Visa Final Prospectus, at FLEI 02732 ("We created a multi-class structure in order to . . . allow stockholder decisions generally to be made by . . . our class A shareholders and not by our financial institution customers that hold our class B and class C common stock. . . .").)

#### 2.  Limited Voting Rights Do Not Give Banks Power Over Network Decisions Regarding Interchange Rates

149.  Visa's Certificate of Incorporation specifies that banks can vote to "authorize the Corporation to exit its core payments business (i.e., to no longer operate a consumer debit/credit payments business)."  (Fifth Amended and Restated Certificate of Incorporation of Visa Inc.[198] at 4.)  A decision to exit the core payments business requires an 80% approval of voting shares.  (Visa Final Prospectus, at FLEI 02951-52.)

---

[197]  Deposition of John M. Partridge (Sept. 4-5, 2008) ("Partridge Dep.").  Mr. Partridge testified as Visa's Rule 30(b)(6) witness regarding corporate restructuring and the public sale of ownership shares.  (Partridge Dep. at 14-15; Partridge Dep. Ex. 32800 (30(b)(6) Deposition Notice).)

[198]  Available at http://phx.corporate-ir.net/External.File?item=UGFyZW50SUQ9MTE3NDZ8Q2hpbGRJRD0tMXxxUeXBlPT

*(cont'd)*

150.    Post-IPO Visa or MasterCard could, if in the best interests of the company, decide to eliminate interchange or undertake significant rule changes independent of any bank vote.  (Selander Dep. at 118, 121, 313-14, 457-459, 465; T. Murphy Dep.[199] at 134-36.; Partridge Dep. at 183, 334-35; Visa Final Prospectus, at FLEI 02732.)

151.    Plaintiffs' proffered expert, Victor Fleischer, acknowledged that the post-IPO structure does not leave banks with corporate control over default interchange rates or merchant acceptance rules.  (Fleischer Dep.[200] at 225 (the banks "did give up formal control over setting interchange fees and other policies that may have anti-competitive conduct" and retained only "the ability to veto major changes to the business").)

### 3.    Limited Voting Rights Do Not Give Banks Power Over Network Decisions Regarding Interchange Rates

152.    After the Visa IPO, absent approval of Visa's board of directors, no individual entity may own more than 15% of the aggregate shares of the outstanding Visa common stock.  (Visa Final Prospectus, at FLEI 02961.)

153.    After the MasterCard IPO, no single shareholder would be permitted acquire more than 15% of outstanding shares of MasterCard.  (2006 MasterCard S-1 Amendment, at MCI_MDL02_10411296.)

---

*(cont'd from previous page)*

M=&t=1 (last visited Feb. 8, 2011) ("Fifth Amended and Restated Certificate of Incorporation of Visa Inc.").

[199]    Deposition of Timothy Murphy (Feb. 28-29, 2008) ("T. Murphy Dep.").  Mr. Murphy testified as MasterCard's Rule 30(b)(6) witness regarding corporate restructuring and the public sale of ownership shares.  (T. Murphy Dep. at 11; T. Murphy Dep. Ex. 21850 (30(b)(6) Deposition Notice).)

[200]    Deposition of Victor Fleischer (Aug. 4, 2010) ("Fleischer Dep.").

154.    The ownership restrictions help deter any individual third party, including potentially a bank, from taking over either Visa or MasterCard.  (*See, e.g.*, Weaver Dep.[201] at 346; Partridge Dep. at 340-342.)  Plaintiffs' expert acknowledged that the 15% ownership limitation cannot be used to prevent either the elimination or lowering of interchange rates by the Visa board.  (Fleischer Dep. at 114-15 ("Q.  If the current board of Visa, Inc., decided that it was in the best interests of the company hypothetically to eliminate the interchange business model, is it your opinion that the 15 percent ownership limit could be used to block that? . . .  A.  No.  That's -- I don't think the 15 percent ownership limitation would prevent that.").)

### D.    There Is No Evidence of the Existence of Any Post-IPO Intra-Network Structural Conspiracy Within Visa or MasterCard

155.    Although Class Plaintiffs' economics expert, Dr. Frankel, asserted that, after the IPOs, defendants "are able to continue to administer the anticompetitive arrangement [of setting default interchange fees] on behalf of the member banks which created them, and on their own behalf" (Frankel Rep. ¶ 284), he offered no support for that assertion and testified that he "didn't investigate it and [he is] not aware of any" communications between or among the banks regarding the level of default interchange rates either since Visa installed independent directors on the board on April 28, 2006 or after Visa's IPO in 2008.  (Frankel Rep. ¶ 284; Frankel Dep. at 590-91.)

156.    Likewise, Individual Plaintiffs' economics expert, Dr. Vellturo, failed to present any basis to support his opinion that banks continued to influence Visa's decisions about interchange.  (Vellturo Rep. ¶ 112.)  Dr. Vellturo could not identify any communications be-

---

[201]    Deposition of Lance Weaver (Sept. 17, 2008) ("Weaver Dep.").  Mr. Weaver testified as a North American card executive for Bank of America.  (Weaver. Dep. at 8.)

tween or among two or more banks regarding the default level of Visa interchange rates after the introduction of independent directors in 2006.  (Vellturo Dep. at 524-26.)

### E. There Is No Evidence Supporting Plaintiffs' Fraudulent Conveyance Claims Against MasterCard

157.    Before MasterCard could conduct its IPO, the Board was required to evaluate the company's assets and liabilities to determine the legal availability of funds for the redemption of common stock from MasterCard's then-existing shareholders as set forth under Section 160 of the Delaware General Corporation Law.  (MCI_MDL04_00005795 to 00005946,[202] at 796; *see also* Del. Code Ann. tit. 8 § 160 (2010).)  MasterCard's Global Board assigned its Nominating and Corporate Governance Committee ("NCGC") to conduct that evaluation.  (MCI_MDL04_00005795 to 00005946,[203] at 796.)

158.    To evaluate MasterCard's contingent litigation liabilities, the NCGC "held several meetings where it ha[d] received reports" from "Simpson Thacher & Bartlett LLP and Paul, Weiss, Rifkind, Wharton & Garrison with respect to the outstanding antitrust litigation against the Corporation, [and] information and reports provided by Axinn, Veltrop & Harkrider LLP with respect to, among other matters, the outcomes in certain historical antitrust cases." (MCI_MDL02_11888072 to 11888087,[204] at 074-75; *see also* MCI_MDL04_00000349 to 00000354,[205] at 351; MDI_MDL04_00000861 to 00000944,[206] at 865.)

---

[202]    Minutes of the Meeting of the Boards of Directors of MasterCard International Incorporated and of MasterCard Incorporated (Jan. 17, 2006).

[203]    Minutes of the Meeting of the Boards of Directors of MasterCard International Incorporated and of MasterCard Incorporated (Jan. 17, 2006).

[204]    Minutes of the Meeting of the Boards of Directors (Apr. 27, 2006).

[205]    Minutes of the Nominating and Corporate Governance Committee (Mar. 11, 2005).

[206]    Minutes of the Nominating and Corporate Governance Committee (Jan. 11, 2006).

159.    The NCGC determined that MasterCard's contingent litigation liabilities were "unquantifiable." (MDI_MDL04_00000861 to 00000944,[207] at 865; T. Murphy Dep. at 602 ("any particular litigation was neither probable nor estimable"), 624-25.)

160.    The Global Board also retained Houlihan Lokey Howard and Zukin ("Houlihan Lokey") "as the financial advisor to the [NCGC] with respect to the valuation of whether MasterCard has sufficient surplus for a redemption." (MCI_MDL04_00000604 to 00000607,[208] at 605.) MasterCard requested that Houlihan Lokey "not take into account unquantifiable contingent liabilities associated with the Company's pending antitrust litigations." (MCI_MDL04_00000608 to 00000681,[209] at 610.)

161.    On December 20, 2005, Houlihan Lokey reported to the NCGC that it had determined after "due diligence" that post-IPO, "the fair value and present fair saleable value of MasterCard's assets would exceed its stated liabilities and identified contingent liabilities, MasterCard should be able to pay its debts as they become absolute and mature, the capital remaining in MasterCard . . . would not be unreasonably small for the business in which MasterCard is engaged . . ., [and] the fair and present fair saleable value of MasterCard's assets would exceed the sum of MasterCard's stated liabilities and total par value of MasterCard's issued outstanding capital stock." (*Id.* at 610-11.)

162.    On January 11, 2006, after considering Houlihan Lokey's capital adequacy opinion, meeting with outside counsel, and receiving "other information as the [NCGC]

---

[207]    Minutes of the Nominating and Corporate Governance Committee (Jan. 11, 2006).

[208]    Minutes of the Meeting of the Nominating and Corporate Governance Committee (Dec. 6, 2005).

[209]    Minutes of the Meeting of the Nominating and Corporate Governance Committee (Dec. 20, 2005).

deemed relevant to its determination," the NCGC concluded that "the funds legally available to the Corporation for the redemption of shares of capital stock," after "carefully considering the uncertainties relating to, and the unquantifiable liabilities, if any, associated with, the pending litigations, are in excess of the aggregate amount to be paid" to the then-current owners of MasterCard stock.  (MDI_MDL04_00000861 to 944, at 865.)  The NCGC further decided to recommend to the Global Board that it "determine that the funds legally available to the Corporation for the redemption of shares of capital stock" were adequate.  (*Id.* at 866.)

163.    The Global Board met on January 17, 2006, and the NCGC reported its capital adequacy determination to the Global Board.  (MCI_MDL04_00005795 to 00005946.[210]) Outside counsel from (a) Milbank, Tweed, Hadley & McCloy, (b) Axinn, Veltrop & Harkrider, (c) Simpson Thacher & Bartlett LLP, (d) Paul, Weiss, Rifkind, Wharton & Garrison LLP, and (e) Richards, Layton and Finder, P.A. advised the Global Board on Delaware law, "outstanding antitrust litigation," and "the outcomes in certain historic historical antitrust cases." (MCI_MDL04_00005795 to 00005946, at 795; MCI_MDL04_00000861 to 0000944,[211] at 864.) Houlihan Lokey also presented its opinion to the Global Board that MasterCard had adequate capital to make a stock redemption without becoming insolvent.  (MCI_MDL04_00005795 to 00005946,[212] at 802; MCI_MDL04_00005795 to 00005946,[213] at 833-94.)

---

[210]    Minutes of the Meeting of the Boards of Directors of MasterCard International Incorporated and of MasterCard Incorporated (Jan. 17, 2006).

[211]    Minutes of the Meeting of the Nominating and Corporate Governance Committee of the Boards of Directors of MasterCard Incorporated and MasterCard International Incorporated (Jan. 11, 2006.)

[212]    Minutes of the Meeting of the Boards of Directors of MasterCard International Incorporated and of MasterCard Incorporated (Jan. 17, 2006).

164.    The Global Board met again on April 27, 2006 and agreed with NCGC's determination that MasterCard's contingent litigation liabilities were "unquantifiable." (MCI_MDL02_11888072 to 11888087,[214] at 075.)  The Global Board resolved that "based on and in reliance upon the information and reports presented to the Board,"  including the "opinion of Houlihan Lokey and the reports and presentations of management and counsel for the Corporation," and other information "relevant to its determination," the "funds legally available to the Corporation . . . based on [Delaware Law] . . . after . . . carefully considering the uncertainties relating to, and the unquantifiable liabilities, if any, associated with, the pending litigations, are in excess of the amount to be paid to holders of shares of Class B Common Stock of the Corporation." (*Id.* at 073-78.)

165.    MasterCard's public filings state that it undertook an IPO in part to strengthen its capital position and reduce the risk of litigation.  (2006 MasterCard S-1 Amendment, at MCI_MDL02_10411163 ("We believe that the new ownership and governance structure … will enhance our business over the long term in various ways" such as removing "perceived conflicts of interest" and allowing "enhanced access to the public markets to raise capital."); T. Murphy Dep. at 265-68 (MasterCard undertook an IPO in part to "address[] perceived, you know, conflicts of interest"), 53-54 (a benefit of the IPO was "access to capital").)

166.    MasterCard's management believed that the IPO would strengthen MasterCard's capital position and ability to pay its debts regardless of pending litigation.  (*See,*

---

*(cont'd from previous page)*

[213]    MasterCard Incorporated, Capital Adequacy Opinion, Houlihan Lokey Howard & Zukin (Jan. 2006).

[214]    Minutes of the Meeting of the Boards of Directors of MasterCard International Incorporated and of MasterCard Incorporated (Apr. 27, 2006).

e.g., Selander Dep. at 508-510; McWilton Dep.[215] at 329 ("If any of the legal and regulatory risks ever resulted in a liability, we felt that our balance sheet was – was pretty strong, and provided us with the flexibility we needed to – run our business on a long-term basis."); T. Murphy Dep. at 53-54 (a benefit of the IPO was "access to capital").)

       167.    Plaintiffs cite to unspecified business documents and third-party materials purportedly estimating possible system-wide impacts or effects on issuing banks' revenue from litigation or regulatory proceedings; and to estimations of the potential impact of government regulation similar to the regulation in Australia on interchange rates in the United States.  (Henry Rep.[216] ¶¶ 29-31, 40-42, 46-49, citing MCI_MDL02_00051202 - 00051297,[217] at 275 (discussing potential effects on system value); MCI_MDL02_11621613 to 11622097,[218] at 990 (discussing regulatory risk to system value and issuer interchange revenue); BCG_0067366 to 0067368[219] (discussing potential system-wide reduction in value and litigation risk); MCI_MDL02_11853234 to 11853240,[220] at 236, 238 (discussing potential erosion of system value from reduced interchange; MCI_MDL02_11822538 to 11822544,[221] at 539 (discussing impact on interchange revenues assuming Australian-like regulatory reduction in interchange

---

[215]    Deposition of Chris McWilton (Jul. 17, 2008) ("McWilton Dep.").  Mr. McWilton testified as the president of global accounts at MasterCard.  (McWilton Dep. at 15.)

[216]    Report of Kevin F. Henry (July 2, 2009) ("Henry Rep.")

[217]    MasterCard International, "Strategy Review Process Book No. 35" (June 7, 2004).

[218]    MasterCard International, "EMG Strategy Work Session 4" (May 7, 2004).

[219]    Boston Consulting Group, "New Business Model Could Mitigate ~$15B Annual US System Value Threat" (undated).

[220]    MasterCard International, Strategy Review, MasterCard International Board of Directors Meeting (July 8, 2004).

[221]    MasterCard International, Strategy Review, Global Board of Directors Wrap-Up Session (July 8, 2004).

rates); MCI_MDL02_00051239 to 00051271,[222] at 239, 240, 245 (industry analyst discussing potential impact on industry interchange revenue); MCI_MDL02_07071149 to 07071162,[223] at 150 (industry analyst positing 15% chance of interchange reduction from regulation or litigation); MCI_MDL02_08907855 to 08907867,[224] at 856 (industry analyst discussing impact of litigation and interchange reduction on issuers).)  None of these documents reflects a litigation damages estimate for MasterCard that it adopted when considering whether to move forward with its IPO.  (Henry Dep. at 133-37, 144-46, 150, 159-63, 165-66, 171-73.)

168.    MasterCard publicly disclosed its determination that its contingent liabilities were non-quantifiable; MasterCard's S-1 stated that "due to the considerable uncertainty associated with [pending litigation], it is currently not reasonably possible to estimate the amount or range of any potential liability."  (2006 MasterCard S-1 Amendment, at MCI_MDL02_10411171; see also, MCI_MDL02_10956864 to MCI_MDL02_10957026,[225] at 892-93 ("it is currently not reasonably possible to estimate the amount or range of any potential liability.")

169.    By becoming a public company, MasterCard increased its credit facility to $500 million.  (MCI_MDL04_00013448 to 00013452.[226])

170.    By becoming a public company, MasterCard sought to increase its access to capital markets.  (2006 MasterCard S-1 Amendment, at MCI_MDL02_10411163.)

---

[222]    Morgan Stanley, "Attacking the Death Star" (April 15, 2004).

[223]    Morgan Stanley, "The Rhetoric of Interchange: An Update from Santa Fe" (May 8, 2005).

[224]    Morgan Stanley, "The Storm Gathers" (Jun. 26, 2005).

[225]    Form 10-K of MasterCard Inc. (filed March 16, 2006).

[226]    Agenda Item 8, Meeting of the Boards of Directors of MasterCard International Incorporated and of MasterCard Incorporated (Sept. 14, 2006).

171.    The IPO transitioned MasterCard's board "to a board of directors that includes a majority of directors who are independent of [MasterCard] and [its] customers." (*Id.* at 163)

172.    MasterCard's current market capitalization is approximately $30 billion. (Real time MasterCard stock update.[227])

Dated:    New York, New York          Respectfully submitted,
          February 11, 2011

                                      **PAUL, WEISS, RIFKIND, WHARTON &**
                                      **GARRISON LLP**

                                      By:    /s/ Gary R. Carney
                                             Andrew C. Finch
                                             Gary R. Carney
                                             1285 Avenue of the Americas
                                             New York, New York 10019-6064
                                             Tel.: (212) 373-3000
                                             Fax: (212) 757-3990
                                             gcarney@paulweiss.com

                                             Kenneth A. Gallo
                                             Joseph J. Simons
                                             2001 K Street, N.W.
                                             Washington, DC 20006-1047
                                             Tel.: (202) 223-7300
                                             Fax: (202) 223-7420

---

[227]    Available at http://finance.yahoo.com/q?s=MA&ql=1 (last visited Feb. 7, 2011).

**WILLKIE FARR & GALLAGHER LLP**

Keila D. Ravelo
Wesley R. Powell
Matthew Freimuth
787 Seventh Avenue
New York, New York 10019-6099
Tel.: (212) 728-8000
Fax: (212) 728-8111

*Attorneys for Defendant MasterCard Incorporated
and MasterCard International Incorporated*

**ARNOLD & PORTER LLP**

By:   /s/ Robert C. Mason
Robert C. Mason
399 Park Avenue
New York, NY  10022-4690
Telephone:  (212) 715-1000
Facsimile:  (212) 715-1399
robert.mason@aporter.com

Robert J. Vizas
One Embarcadero Center, 22nd Floor
San Francisco, CA  94111-3711
Telephone:  (415) 356-3000
Facsimile:  (415) 356-3099

Mark R. Merley
Matthew A. Eisenstein
555 12th Street, N.W.
Washington, DC  20004-1206
Telephone:  (202) 942-5000
Facsimile:  (202) 942-5999

*Attorneys for Defendants Visa Inc., Visa U.S.A. Inc.,
and Visa International Service Association*

**MORRISON & FOERSTER LLP**

By:   /s/ Mark P. Ladner
        Mark P. Ladner
        Michael B. Miller
        1290 Avenue of the Americas
        New York, NY   10104-0050
        Telephone:  (212) 468-8000
        Facsimile:  (212) 468-7900
        mladner@mofo.com

*Attorneys for Defendants Bank of America, N.A., BA Merchant Services LLC (f/k/a Defendant National Processing, Inc.), Bank of America Corporation, and MBNA America Bank, N.A.*

**SHEARMAN & STERLING LLP**

By:   /s/ James P. Tallon
        James P. Tallon
        Wayne D. Collins
        Lisl J. Dunlop
        599 Lexington Avenue
        New York, NY 10022-6069
        Tel.: (212) 848-4000
        Fax: (212) 848-7179
        jtallon@shearman.com

*Attorneys for Defendants Barclays Financial Corp. and Barclay's Bank plc*

**O'MELVENY & MYERS LLP**

By:  /s/ Andrew J. Frackman
     Andrew J. Frackman
     Times Square Tower
     7 Times Square
     New York, N.Y. 10036
     Tel.: (212) 326-2000
     Fax: (212) 326-2061
     afrackman@omm.com

*Attorneys for Defendants Capital One Bank (USA), N.A., Capital One F.S.B., and Capital One Financial Corp.*


**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**

By:  /s/ Peter E. Greene
     Peter E. Greene
     Peter S. Julian
     Four Times Square
     New York, NY  10036
     Telephone:  (212) 735-3000
     Facsimile:  (212) 735-2000
     peter.greene@skadden.com

     Michael Y. Scudder
     155 North Wacker Drive
     Chicago, IL  60606-1720
     Telephone:  (312) 407-0700
     Facsimile:  (312) 407-0411
     michael.scudder@skadden.com

*Attorneys for Defendants JPMorgan Chase & Co., Chase Bank USA, N.A., Chase Manhattan Bank USA, N.A., Chase Paymentech Solutions, LLC, JPMorgan Chase Bank, N.A., as acquirer of certain assets and liabilities of Washington Mutual Bank, Bank One Corporation, and Bank One Delaware*

82

**SIDLEY AUSTIN LLP**

By:   /s/ David F. Graham
 David F. Graham
 Eric H. Grush
 One South Dearborn Street
 Chicago, IL 60603
 Tel.: (312) 853-7000
 Fax: (212) 853-7036
 dgraham@sidley.com

 Benjamin R. Nagin
 787 Seventh Ave
 New York, N.Y. 10019
 Tel.: (212) 839-5300
 Fax: (212) 839-5599

*Attorneys for Defendants Citibank (South Dakota),
N.A., Citibank, N.A., Citigroup Inc., and Citicorp*

**KEATING MUETHING & KLEKAMP PLL**

By:   /s/Richard L. Creighton
 Richard L. Creighton
 Joseph M. Callow, Jr.
 Drew M. Hicks
 One East Fourth Street
 Suite 1400
 Cincinnati, OH 45202
 Tel.: (513) 579-6400
 Fax: (513) 579-6457

*Attorneys for Defendant Fifth Third Bancorp*

**KUTAK ROCK LLP**

By:   /s/ John P. Passarelli
        John P. Passarelli
        James M. Sulentic
        The Omaha Building
        1650 Farnam Street
        Omaha, NE 68102-2186
        Tel.: (402) 346-6000
        Fax: (402) 346-1148
        john.passarelli@kutakrock.com

*Attorneys for Defendant First National Bank of Omaha*


**WILMER CUTLER PICKERING HALE AND DORR LLP**

By:   /s/ Christopher R. Lipsett
        Christopher R. Lipsett
        David S. Lesser
        399 Park Avenue
        New York, N.Y. 10022
        Tel.: (212) 230-8800
        Fax: (212) 230-8888
        chris.lipsett@wilmerhale.com

        Ali M. Stoeppelwerth
        Perry A. Lange
        1875 Pennsylvania Ave., N.W.
        Washington, D.C. 20006
        Tel.: (202) 663-6000
        Fax: (202) 663-6363

*Attorneys for HSBC Finance Corporation and HSBC North America Holdings, Inc.*

84

**JONES DAY**

By:   /s/ John M. Majoras
      John M. Majoras
      Joseph W. Clark
      51 Louisiana Avenue, NW
      Washington, DC   20001
      Telephone:  (202) 879-3939
      Facsimile:  (202) 626-1700
      jmmajoras@jonesday.com

*Attorneys for Defendants National City Corporation, National City Bank of Kentucky*

**PULLMAN & COMLEY, LLC**

By:   /s/ Jonathan B. Orleans
      Jonathan B. Orleans
      Adam S. Mocciolo
      850 Main Street
      Bridgeport, CT   06601-7006
      Telephone:  (203) 330-2000
      Facsimile:  (203) 576-8888
      jborleans@pullcom.com

*Attorneys for Defendant Texas Independent Bancshares, Inc.*

**ALSTON & BIRD LLP**

By:   /s/ Teresa T. Bonder
      Teresa T. Bonder
      Valarie C. Williams
      Kara F. Kennedy
      1201 W. Peachtree Street, N.W.
      Atlanta, GA 30309
      Tel.: (404) 881-7000
      Fax: (404) 881-7777
      teresa.bonder@alston.com

*Attorneys for Defendant Suntrust Banks, Inc.*

**PATTERSON BELKNAP WEBB & TYLER LLP**

By:  /s/ Robert P. LoBue
      Robert P. LoBue
      Norman W. Kee
      Patterson Belknap Webb & Tyler LLP
      1133 Avenue of the Americas
      New York, NY  10036
      Tel.:  (212) 336-2596
      Fax:  (212) 336-2222
      rplobue@pbwt.com

*Attorneys for Defendants Wachovia Bank, NA., Wachovia Corporation, and Wells Fargo & Company*