**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| The Kroger Co., Albertson's, Inc., Safeway Inc., Ahold U.S.A., Inc., Walgreen Co., Maxi Drug, Inc., d/b/a Brooks Pharmacy, Eckerd Corporation, Delhaize America, Inc., H.E. Butt Grocery Company, and The Great Atlantic & Pacific Tea Company, Inc., | Civil Action No.: 05-CV-00039-JG-JO |

        Plaintiffs,

vs.

MasterCard Incorporated and MasterCard International Incorporated,

        Defendants.

_____/

### SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs The Kroger Co., Albertson's, Inc., Safeway Inc., Ahold U.S.A., Inc., Walgreen Co., Maxi Drug, Inc. d/b/a Brooks Pharmacy, Eckerd Corporation, Delhaize America, Inc., H.E. Butt Grocery Company and The Great Atlantic & Pacific Tea Company, Inc. bring this lawsuit action against Defendants MasterCard Incorporated and MasterCard International Incorporated (collectively "MasterCard") under the antitrust laws of the United States.  For their Second Amended Complaint, Plaintiffs allege as follows:

### NATURE OF ACTION

1.     This is a civil antitrust action challenging illegal, horizontal agreements entered into by MasterCard and its member banks restraining trade in the general-purpose credit card services market.  Defendants and their co-conspirator member banks have illegally agreed: (1) to fix, set and enforce interchange fees associated with general and premium credit cards paid by retail merchants such as Plaintiffs; (2) to eliminate Plaintiffs' and other merchants' ability to negotiate lower interchange fees through a set of restraints incorporated in MasterCard rules

known as the "No Surcharge" rule, "Honor All Cards" rule, "All Outlets" rule, "No By-pass" rule and "No Multi-Issuer" rule; and (3) to unlawfully tie together credit card products and separate network services.  These horizontal restraints have restricted competition in the relevant market and have allowed MasterCard to extract supracompetitive, artificially inflated interchange fees from Plaintiffs and other retail merchants.    Moreover, MasterCard, as an entity, has monopolized or attempted to monopolize the market for network services through a set of restraints which create barriers to entry and are designed to exclude competition from other sellers of such services.    This has enabled MasterCard to extract monopoly rents and to maintain its monopoly power in the relevant market.  Plaintiffs seek damages from January 1, 2004 forward as well as injunctive and other relief.

## PLAINTIFFS

2.        Plaintiff The Kroger Co. ("Kroger") is an Ohio corporation with its principal place of business in Cincinnati, Ohio.  Kroger brings this action on its own behalf and on behalf of its affiliated assignors, including Kroger Limited Partnership I, KRGP Inc., Kroger Texas L.P., The Kroger Co. of Michigan, Dillon Companies, Inc., Fred Meyer, Inc., Fred Meyer Jewelers, Inc., FMJ, Inc., Fred Meyer Stores, Inc., Healthy Options, Inc., Junior Food Stores of West Florida, Inc., Kwik Shop, Inc., Mini-Mart, Inc., Quik Stop Markets, Inc., Food 4 Less Holdings, Inc., Ralphs Grocery Company, Smith's Food & Drug Centers, Inc., Turkey Hill, L.P., and THGP Co., Inc.    The reference in this Second Amended Complaint to "Kroger" includes its assignors. Kroger owns and operates retail stores at which MasterCard payment cards are accepted as payment for goods and services.    Kroger has paid supracompetitive, artificially inflated interchange fees to members of the illegal conspiracy as set forth more fully below, and has sustained injury and damage as a result of the unlawful conduct of Defendants and their co-conspirators.

3.     Plaintiff Albertson's, Inc. ("Albertson's") is a Delaware corporation with its principal place of business in Boise, Idaho.  Albertson's brings this action on its own behalf and on behalf of its affiliated assignors, including American Drug Stores, Inc., Jewel Food Stores, Inc. and Shaw's Supermarkets, Inc.   The reference in this Second Amended Complaint to "Albertson's" includes its assignors.   Albertson's owns and operates retail stores at which MasterCard payment cards are accepted as payment for goods and services.  Albertson's has paid supracompetitive, artificially inflated interchange fees to members of the illegal conspiracy as set forth more fully below, and has sustained injury and damage as a result of the unlawful conduct of Defendants and their co-conspirators.

4.     Plaintiff Safeway Inc. ("Safeway") is a Delaware corporation with its principal place of business in Pleasanton, California.  Safeway brings this action on its own behalf and on behalf of its affiliated assignors, including Carr-Gottstein Foods Co., Dominick's Finer Foods, LLC, Genuardi's Family Markets LP, Randall's Food & Drugs LP, and The Vons Companies, Inc.  The reference in this Second Amended Complaint to "Safeway" includes its assignors.  Safeway owns and operates retail stores at which MasterCard payment cards are accepted as payment for goods and services.  Safeway has paid supracompetitive, artificially inflated interchange fees to members of the illegal conspiracy as set forth more fully below, and has sustained injury and damage as a result of the unlawful conduct of Defendants and their co-conspirators.

5.     Plaintiff Ahold U.S.A., Inc. ("Ahold") is a Delaware corporation with its principal place of business in Quincy, Massachusetts.  Ahold brings this action on its own behalf and on behalf of its affiliated assignors, including The Stop & Shop Supermarket Company LLC, Giant Food Stores, LLC, Giant of Maryland LLC, Tops Markets, LLC and Peapod, LLC.  The reference in this Second Amended Complaint to "Ahold" includes its assignors.  Ahold owns and operates retail stores in several states at which MasterCard payment cards are accepted as payment for

goods and services.  Ahold has paid supracompetitive, artificially inflated interchange fees to members of the illegal conspiracy as set forth more fully below, and has sustained injury and damage as a result of the unlawful conduct of Defendants and their co-conspirators.

6.     Plaintiff Walgreen Co. ("Walgreen") is an Illinois corporation with its principal place of business in Deerfield, Illinois.  Walgreen brings this action on its own behalf and on behalf of its affiliated assignors, including Walgreens Health Initiatives, Inc. f/k/a WHP Health Initiatives, Inc., Walgreens Mail Service, Inc. f/k/a Walgreens Healthcare Plus, Inc. and Walgreens Home Care, Inc. f/k/a Walgreens Advance Care, Inc.  The reference in this Second Amended Complaint to "Walgreen" includes its assignors.  Walgreen owns and operates retail stores at which MasterCard payment cards are accepted as payment for goods and services. Walgreen has paid supracompetitive, artificially inflated interchange fees to members of the illegal conspiracy as set forth more fully below, and has sustained injury and damage as a result of the unlawful conduct of Defendants and their co-conspirators.

7.     Plaintiff Maxi Drug, Inc. d/b/a Brooks Pharmacy ("Brooks") is a Delaware corporation with its principal place of business in Warwick, Rhode Island.  Brooks owns and operates retail stores at which MasterCard payment cards are accepted as payment for goods and services.  Brooks has paid supracompetitive, artificially inflated interchange fees to members of the illegal conspiracy as set forth more fully below, and has sustained injury and damage as a result of the unlawful conduct of Defendants and their co-conspirators.

8.     Plaintiff Eckerd Corporation ("Eckerd") is a Delaware corporation with its principal place of business in Warwick, Rhode Island.  Eckerd owns and operates retail stores at which MasterCard payment cards are accepted as payment for goods and services.  Eckerd has paid supracompetitive, artificially inflated interchange fees to members of the illegal conspiracy as

set forth more fully below, and has sustained injury and damage as a result of the unlawful conduct of Defendants and their co-conspirators.

9.      Plaintiff Delhaize America, Inc. ("Delhaize") is a North Carolina corporation with its principal place of business in Salisbury, North Carolina.  Delhaize brings this action on its own behalf and on behalf of its affiliated assignors, including Food Lion, LLC, Hannaford Bros. Co., Kash n' Karry Food Stores, Inc. and The J.H. Harvey Co., LLC.   The reference in this Second Amended Complaint to "Delhaize" includes its assignors.  Delhaize owns and operates retail stores at which MasterCard payment cards are accepted as payment for goods and services.  Delhaize has paid supracompetitive, artificially inflated interchange fees to members of the illegal conspiracy as set forth more fully below, and has sustained injury and damage as a result of the unlawful conduct of Defendants and their co-conspirators.

9(A)    Plaintiff H.E. Butt Grocery Company ("HEB") is a Texas corporation with its principal place of business in San Antonio, Texas.  HEB owns and operates retail stores at which Visa payment cards are accepted as payment for goods and services.   HEB has paid supracompetitive, artificially inflated interchange fees to members of the illegal conspiracy as set forth more fully below, and has sustained injury and damage as a result of the unlawful conduct of Defendants and their co-conspirators.

9(B)    The Great Atlantic & Pacific Tea Company ("A&P") is a Maryland corporation with its principal place of business in Montvale, New Jersey.  A&P owns and operates retail stores at which Visa payment cards are accepted as payment for goods and services.  A&P has paid supracompetitive, artificially inflated interchange fees to members of the illegal conspiracy as set forth more fully below, and has sustained injury and damage as a result of the unlawful conduct of Defendants and their co-conspirators.

9(C)    The reference to "Plaintiffs" in this pleading refers to The Kroger Co., Albertson's, Inc., Safeway Inc., Ahold U.S.A., Inc., Walgreen Co., Maxi Drug, Inc. d/b/a Brooks Pharmacy, Eckerd Corporation, Delhaize America, Inc., H.E. Butt Grocery Company, and The Great Atlantic & Pacific Tea Company as defined in this Second Amended Complaint.

## DEFENDANTS

10.    Defendant MasterCard Incorporated is a private, SEC-registered share company, organized under the laws of Delaware with its principal place of business in the Southern District of New York, specifically Purchase, New York.   Defendant MasterCard International Incorporated is a non-stock, membership corporation and the principal operating subsidiary of Defendant MasterCard Incorporated.   The shares of Defendant MasterCard Incorporated are owned by the members of Defendant MasterCard International Incorporated.   As a practical matter, MasterCard is controlled by the 25 member banks that issue over approximately 98% of the MasterCard payment cards issued to cardholders in the United States and acquire over 95% of all MasterCard transactions from retail merchants.   Both Defendants are and have been active participants in the illegal activity alleged below, and are collectively referred to in this Second Amended Complaint as "MasterCard."

## CO-CONSPIRATORS

11.    MasterCard is an association of banks and financial institutions who are actual or potential competitors for (1) the issuance of credit cards, and (2) the provision of network services related to credit cards including, but not limited to, acquisition of credit card transactions, and the issuance and promotion of various electronic payment services and other related financial services to retail merchants.   MasterCard and its co-conspirator banks are business entities that are distinct from each other.   MasterCard member banks agree with one another and with MasterCard to abide by all MasterCard bylaws, rules and regulations.   By

means of these bylaws, rules and regulations, MasterCard member banks have agreed among themselves and with MasterCard to fix interchange fees charged to retail merchants and to impose a number of restraints on retail merchants including Plaintiffs, the purpose and effect of which are to insulate the collusively set interchange fees from competitive market forces.

12.     MasterCard and each of its member banks have engaged in a conscious commitment to a common scheme to fix interchange fees and to adopt and enforce rules and regulations (*e.g.*, the Merchant Restraints defined below) designed to prevent market forces from lowering those fees.  Member banks that issue MasterCard payment cards as well as member banks that acquire MasterCard transactions from retail merchants such as Plaintiffs are knowing participants in the common scheme to restrain trade alleged in this Second Amended Complaint.  In light of the intentional involvement of the MasterCard member banks as individual entities in this anticompetitive scheme, each such bank is both a participant in and a beneficiary of the illegal conspiracy.

13.     MasterCard and its co-conspirator member banks collusively set the interchange fee and Merchant Restraints (defined below), and then MasterCard-member acquiring banks enforce those Restraints against Plaintiffs, and require Plaintiffs to agree to pay the collusively set interchange fee.  MasterCard and its co-conspirator member banks have structured the enforcement of the MasterCard rules, and the routing of the charge for the interchange fee, so as to create an artifice that does not reflect commercial realities.  This gerrymandering of the payment and rule-enforcement processes is designed by Defendants and their co-conspirators to conceal their unlawful conduct and to evade the law.  On each occasion on which a Plaintiff pays an interchange fee to a MasterCard-member acquiring bank, that payment is in commercial reality a payment to the issuing bank by the retail merchant that is charged the fee.

## JURISDICTION

14.     Count I of this Second Amended Complaint is a civil antitrust claim arising under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.  This Court has subject-matter jurisdiction over Count I pursuant to 28 U.S.C. §§ 1331 and 1337(a).

15.     Count II of this Second Amended Complaint is a civil antitrust claim arising under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.  This Court has subject-matter jurisdiction over Count II pursuant to 28 U.S.C. §§ 1331 and 1337(a).

16.     Count III of this Second Amended Complaint is a civil antitrust claim arising under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.  This Court has subject-matter jurisdiction over Count III pursuant to 28 U.S.C. §§ 1331 and 1337(a).

17.     Count IV of this Second Amended Complaint is a civil antitrust claim arising under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.  This Court has subject-matter jurisdiction over Count IV pursuant to 28 U.S.C. §§ 1331 and 1337(a).

18.     Count V of this Second Amended Complaint is a civil antitrust claim arising under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.  This Court has subject-matter jurisdiction over Count V pursuant to 28 U.S.C. §§ 1331 and 1337(a).

19.     Count VI of this Second Amended Complaint is a civil antitrust claim arising under Section 2 of the Sherman Act, 15 U.S.C. § 2, and Sections 4 and 16 of the Clayton Act,

15 U.S.C. §§ 15(a) and 26.  This Court has subject matter jurisdiction over Count VI pursuant to 28 U.S.C. §§ 1331 and 1337(a).

20.     Count VII of this Second Amended Complaint is a civil antitrust claim arising under Section 2 of the Sherman Act, 15 U.S.C. § 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.  This Court has subject matter jurisdiction over Count VII pursuant to 28 U.S.C. §§ 1331 and 1337(a).

21.     The allegations in this Second Amended Complaint should be read in the alternative if necessary to avoid inconsistency.

## VENUE

22.     Venue is proper in this Court pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391, in that each Defendant is an inhabitant of this District or is found or transacts business there.

## TERMS OF ART

23.     The terms below have the following meanings as used in this Second Amended Complaint:

(A)     "General Purpose Payment Cards" are payment cards enabling the holder to purchase goods or services to be paid by the issuer of the card on behalf of the cardholder, repayment of which is set by agreement between the issuer and the holder.  The terms of that agreement generally result in different classes of cards known as follows:

(1)     "Credit Cards" are payment cards not specific to a particular merchant which enable the cardholder to obtain goods, services or cash on credit issued by the issuing bank which is a member of a credit card association like MasterCard.

(2)      "Charge Cards" are similar to Credit Cards except that the contract between the issuer and the cardholder requires full payment of the outstanding balance on a monthly basis.

(3)      "Premium Cards" are Credit Cards that offer rewards or other benefits to the cardholder and impose higher interchange fees on retail merchants than standard or non-premium cards.

(B)      An "Issuing Bank" is a member of a card association like MasterCard that issues payment cards to consumers for use as a payment device.  Subject to the restrictions alleged below, Issuing Banks compete with one another to issue cards to consumers and to encourage the use of their card by consumers.

(C)      An "Acquiring Bank" is a member of a card association like MasterCard that acquires payment transactions from merchants and enforces card association rules, regulations and fee structures.  Subject to the restrictions alleged below, Acquiring Banks compete with one another for the acquisition business of retail merchants.

(D)      "Network Services" are the collection of services that MasterCard and other card associations provide retail merchants that accept payment cards.  These Network Services include authorization, clearance and settlement of retail transactions by the Acquiring Bank from the Issuing Bank using the MasterCard network and the purported Payment Guarantee Service.

(E)      "Interchange Fee" is the fee that retail merchants pay the Issuing Bank in order to receive payment for each retail transaction in which the Issuing Bank's card is used as a method of payment.  Under the agreement by and among MasterCard and its member banks, the Interchange Fee is set by Association rules and enforced by member banks through their contracts with retail merchants.

(F)     "Payment Guarantee Services" are services available to retail merchants to insure against credit card fraud, check fraud and other forms of payment fraud.

(G)     The "No Surcharge Rule" is a MasterCard association rule which forbids retail merchants from charging cardholders a surcharge on their cards to reflect cost differences among various payment methods.  *See* MasterCard Bylaws & Rules § 9.12.2.  For example, retail merchants are prohibited from surcharging cardholders who use a premium MasterCard card rather than a standard MasterCard card, or surcharging cardholders who use a MasterCard card rather than a Visa card.  Among other effects, this rule eliminates any incentive by competing networks to charge a lower Interchange Fee than MasterCard (and vice versa), since those lower Interchange Fees will not be visible to consumers and will not lead to increased usage.  The rule also gives MasterCard an incentive to encourage consumers to use the most expensive (to the merchant) rather than the most cost-efficient payment method.

(H)     The "Honor-All-Cards Rule" is a MasterCard association rule which requires a retail merchant to accept all MasterCard products (regardless of category or issuer) if the retail merchant accepts any MasterCard product.  *See* MasterCard Bylaws & Rules § 9.11.1. This rule is enforced in two ways.  With respect to products in the same category (*e.g.*, standard cards and premium cards, or cards issued by different member banks), the rule is an express condition of participating in the MasterCard network.  With respect to products in different categories (*e.g.*, credit and debit cards), the rule is enforced by penalizing merchants by withholding favorable pricing from merchants who decline one of the products, *i.e.*, economic coercion.

(I)     The "All-Outlets" Rule is a MasterCard association rule which requires a retail merchant with multiple outlets to accept MasterCard in all of its outlets, even if those

11

outlets are owned by a separate corporate entity, operated under a different brand name, or employ a different business model.

(J)     The "No-Bypass Rule" is a MasterCard association rule which prohibits retail merchants and member banks from by-passing the MasterCard system to clear, authorize or settle card transactions even if the Issuing and Acquiring Bank are the same.

(K)     The "No-Multi-issuer Rule" is a MasterCard association rule which prohibits a bank card that processes any other card association transaction from also processing MasterCard transactions.

(L)     The No-Surcharge Rule, the Honor-All-Cards Rule, the All-Outlets Rule, the No-Bypass Rule and the No-Multi-issuer Rule are referred to collectively below as the "Merchant Restraints."

## TRADE AND COMMERCE

24.     Defendants are engaged in interstate commerce, and the unlawful activities alleged below have occurred in, and have substantially affected, interstate commerce.

## INJURY TO CONSUMER WELFARE AND COMPETITION

25.     Defendants' conspiracy to fix Interchange Fees and to insulate those fees from competitive forces reduces consumer welfare and results in a transfer of wealth from consumers to Issuing Banks.  It does so in at least each of the following ways:

(A)     Supracompetitive Interchange Fees result in higher retail prices and lead to a reduction in output and economic welfare, causing cash customers, low-income customers, and other customers who use low-cost payment methods to subsidize credit card users, and standard card customers to subsidize high end or premium card users;

12

(B)    Supracompetitive Interchange Fees create incentives for issuing banks to encourage the use of high-cost payment methods rather than low-cost payment methods, encouraging inefficiency and misallocation of resources; and

(C)    Supracompetitive Interchange Fees distort competition between payment methods in favor of products with the highest Interchange Fees.

26.    The collective setting of Interchange Fees and the Merchant Restraints by MasterCard member banks restrict competition among those banks for the provision of card network services to merchants.  Absent Defendants' conspiracy, both Issuing and Acquiring Banks could negotiate individually with retail merchants, and merchants would be free to accept or reject the cards issued by particular issuing banks and to surcharge their customers for the use of such cards as appropriate.  Under these circumstances, prices and output would be responsive to cost and consumer preferences rather than being set at monopolistic levels by a cartel of commercial banks.

## RELEVANT MARKET

27.    The relevant market consists of the relevant geographic market and the relevant product market.

28.    The relevant geographic market is the United States.

29.    There are at least two relevant product markets in which the restraints and other conduct alleged in this Second Amended Complaint have had an anticompetitive effect:

(A)    Network Services for General Purpose Payment Cards is a relevant product market.  *See United States v. Visa and MasterCard*, 344 F.3d 229, 239 (2d Cir. 2003).

(B)    Network Services for MasterCard Credit Cards is a relevant product market.

(C)     The term "relevant market" as used in this Second Amended Complaint refers to the relevant product markets alleged in paragraphs 28(A) and 28(B) in the alternative unless one or the other product market is specifically alleged below.

30.     In the relevant market, the sellers are card companies and their member banks, and the buyers are retail merchants.  The Interchange Fee is the price paid by retail merchants to receive payment for a transaction associated with a General Purpose Payment Card.  Retail merchants as a group pay billions of dollars a year to purchase Network Services sold by sellers in the relevant market, and this amount is increasing rapidly from year to year.

31.     A seller that was the only provider of Network Services associated with General Purpose Payment Cards in the United States could raise Interchange Fees to retail merchants substantially above the competitive level without losing sufficient business to make the price increase unprofitable.  Retail merchants cannot substitute other payment methods (such as cash, checks or debit cards) because of the importance of General Purpose Payment Cards to their customers.

32.     At all relevant times, MasterCard has had substantial market power as demonstrated by: (1) its ability to raise Interchange Fees without losing business to other sellers or other payment methods; (2) its ability to price discriminate among different classes of merchants based, in part, on each class's ability to resist higher Interchange Fees; and (3) its ability to shift Credit Card usage from standard cards with historically increasing Interchange Fees to Premium Cards with even higher (and faster growing) Interchange Fees.

33.     There are significant barriers to entry in the relevant market.  No company has entered the market since 1985.  Entry is estimated to cost over $1 billion to overcome the alleged "chicken-and-egg" problem of developing a merchant acceptance network without an initial network of cardholders who, in turn, are needed to induce merchants to accept the

system's cards in the first place.  This "chicken-and-egg" justification for Interchange Fees is, in fact, an admission of the existence of substantial entry barriers.

## FACTUAL ALLEGATIONS

34.     MasterCard is a national bank-card association whose members include banks, regional banking associations, and other financial institutions.  MasterCard was established by its members to develop, promote, and operate a national bank credit card network.

35.     MasterCard's predecessor, the Interbank Card Association, was a credit card program established in 1966.  In 1969, the program was purchased by the California Bank Association and its name was changed to "Master Charge."   In 1979, the association was renamed MasterCard.

36.     During MasterCard's early years, merchants that accepted general-purpose credit cards made paper records of transactions, which were then processed to the merchant's Acquiring Bank and the cardholder's Issuing Bank.

37.     Since its simple and somewhat crude beginnings, the MasterCard system has evolved into a mature system that places anticompetitive tariffs on the technologically efficient card payments market structure.

38.     The general purpose credit card market today is a saturated market characterized by concentration in both Issuing and Acquiring Banks and low and decreasing transactional costs.  These are vastly different economic characteristics from those that existed in the relevant market in the early 1980s during the last adjudicated challenge to collective price-setting by member banks.  *See National Bancard Corp. v. Visa U.S.A., Inc.*, 779 F.2d 592 (11th Cir. 1986).  A comparison of market characteristics in or about 2004 and those in the early 1980s illustrates how radically different in every important economic characteristic the general purpose credit card market is today from its early years.

(A)     In the early 1980s, about 16% of consumers had payment cards.   In 2004, that figure had materially changed and was about 78%.   In fact, in 2004, issuing banks sent out over five <u>billion</u> mail solicitations annually to maintain a growth in cardholders of 2.7 <u>million</u>, which was roughly equivalent to the growth in the population of the United States.

(B)     In the early 1980s, there were approximately $8 <u>billion</u> of transactions using general purpose payment cards.   By 2004, the figure had increased over <u>20,000 percent</u> to about $1.7 <u>trillion</u>.   In 2004, interchange fees generated the highest profit margins of all banking services.

(C)     In the early 1980s, interstate banking was in its incipiency.   It had been nonexistent, and its prohibited status was a primary motivation for the creation of a Bank Card Association in the 1960's.   By 2004, in contrast to the early 1980s, interstate banking was the norm.   In the early 1980s, the top 10 card issuing banks issued only about 35% of the cards issued.   In 2004, in contrast to the early 1980s, the top 10 issuing banks issued approximately 82% of the cards issued, the top 25 issuing banks issued about 98% of the cards issued, and the trend is toward further consolidation.

(D)     In the early 1980s, card transactions were primarily paper, card authorizations were primarily person-to-person by telephone, and the manpower and time involved in these transactions was considerable.   By 2004, these industry characteristics had materially changed.   By then, virtually all of the steps in card authorization and processing were conducted electronically and almost instantaneously.   The resulting cost savings and rapidly declining costs and increasing volume has, counter-intuitively and unexpectedly, been accompanied by <u>increasing</u> interchange fees to retail merchants.

(E)      In the early 1980s, member banks were free to by-pass the MasterCard system, and the interchange fee was not mandatory.  In 2004, by custom, agreement and practice, the MasterCard member banks treat both practices as mandatory.

39.      MasterCard member banks, in concert with MasterCard, fix Interchange Fees paid by merchants.  Issuing Banks do not and have not independently negotiated Interchange Fees with merchants in a systematic and competitively significant manner.  As a result of the Merchant Restraints, a retail merchant has no practical ability to negotiate a lower Interchange Fee because the merchant is required to accept a MasterCard card issued by that bank as long as it accepts MasterCard cards issued by other banks, and is prohibited from creating normal economic incentives to reduce prices by surcharging.  Thus, the merchant's only option in the face of an increase in Interchange Fees is to decline MasterCard products entirely, an option that merchants are not in an economic position to exercise.

40.      MasterCard member banks, in concert with MasterCard, have devised, adopted and agreed to enforce the Merchant Restraints, which have the purpose and effect of preventing retail merchants like Plaintiffs from resisting increases in Interchange Fees by rejecting or influencing customers to reject more expensive cards and more expensive services. The Merchant Restraints have the effect of severing the connection that exists in a properly functioning market between higher prices (*i.e.*, Interchange Fees) and lower consumer demand (*i.e.*, MasterCard Credit Card usage).  Indeed, the effect of the Merchant Restraints is to create a paradoxical relationship in which higher prices lead to <u>higher</u> demand.  Not surprisingly, the Merchant Restraints have resulted in exorbitant Interchange Fees that bear no relationship to the cost of the services being purchased.

41.     Interchange Fees were devised in the early days of the MasterCard network for the purpose of paying for the costs of transferring transactional paper between Acquiring and Issuing Banks, and purportedly to balance network costs between issuers and acquirers.

42.     The justification offered in the early 1980s for Interchange Fees was that the fees were to induce banks to issue cards to cardholders and to "acquire" merchants for the associations. With the maturation of the market as alleged earlier, those purported justifications ceased to have any currency as early as the 1990's and certainly well before the 21st Century.

43.     Today, in contrast to the early 1980s, MasterCard has irrefutably established market power as a matter of adjudicated fact and appellate affirmation.  *See United States v. Visa and MasterCard*, 344 F.3d 229, 239 (2d Cir. 2003).  As the Second Circuit noted, even in the face of frequent and significant increases in Interchange Fees, merchants have no choice but to continue to accept MasterCard Credit Cards.

44.     In view of the present-day universal penetration of MasterCard payment cards, banks now would find it in their interest to issue MasterCard payment cards and acquire merchants for the associations, even without the promise of collusively set Interchange Fees. MasterCard's and its co-conspirator member banks' unlawful conduct has prevented that from happening and has created inefficiencies in the relevant market.

45.     The MasterCard network could function efficiently without collectively fixed Interchange Fees and/or the Merchant Restraints.  Even if MasterCard and its member banks did not fix Interchange Fees, MasterCard could continue to operate as a clearinghouse between Issuing and Acquiring Banks.  In other words, establishing Interchange Fees and rules designed to prevent merchant resistance to the Interchange Fees are not functional necessities for the existence and operation of the MasterCard network.  There exist examples of similar networks

that function very efficiently without collectively-set Interchange Fees.  Checks represent but one such example.

46.     The collective fixing of the Interchange Fee is not reasonably necessary to the operation of the MasterCard network.  Market forces rather than collective action should determine the level of Interchange Fees.

47.     In their never-ending quest to extract higher revenue from retail merchants like Plaintiffs through the exercise of unchallenged market power, MasterCard and its co-conspirator member banks have instituted a number of pricing tiers for different classes of merchants and have set Interchange Fee levels for general and premium cards using those pricing tiers. Through the coercive application of those pricing tiers and Interchange Fee levels, MasterCard and its co-conspirator member banks enforce their operating rules which insulate the Interchange Fees from pressure by normal market forces.

48.     In addition to fixing Interchange Fees and insulating those fees from competitive forces, Defendants also illegally tie and bundle together separate and distinct services and charge merchants a single price (the Interchange Fee) for those services.

49.     For example, Interchange Fees purportedly pay for the costs of many separate and distinct services, one of which is the limited Payment Guarantee Services.

50.     MasterCard member banks, in concert with MasterCard, use their market power to force merchants to buy services from MasterCard that, absent the tie, could be purchased at competitive prices from other sellers.

51.     There exists a demand among merchants for each of the services described above that is separate and distinct from the demand for the other services.  If MasterCard and its  member banks did not tie and bundle together these separate and distinct services, many merchants could and would choose to purchase the Payment Guarantee Services included in the

Interchange Fee from other vendors or would self-insure against fraud.  Even those retailers that might choose to purchase the various unbundled services from MasterCard would benefit from lower prices that MasterCard would be forced to offer in response to competition from other providers of these services.

52.     Defendants' tying and bundling of the fees for these separate and distinct services prevents other firms from competing on the merits to offer those services independently, and at lower prices, to merchants.

53.     Plaintiffs and other retail merchants suffer harm from Defendants' bundling of these services in the form of Interchange Fees for the tied and bundled services that are set at a higher rate than if those services were offered separately.  This harm outweighs any efficiency benefit that may arguably arise from the tying and bundling of separate and distinct services.

54.     These restraints on competition are not reasonably related to the operations of MasterCard and, even if they were reasonably necessary, they are more restrictive than necessary to effectuate the business of MasterCard.

## COUNT I

## *PER SE* UNLAWFUL PRICE-FIXING (RE: INTERCHANGE FEE)

55.     Plaintiffs incorporate by reference each and every allegation contained in paragraphs 1 through 24 and 34 through 54 above.

56.     As alleged more fully below, the collective setting of Interchange Fees by Defendants and their co-conspirators constitutes horizontal price fixing and is a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

57.     Defendants and their co-conspirators have entered into and engaged in a continuing combination and conspiracy to fix, increase, and/or maintain Interchange Fees

charged to Plaintiffs and others in unreasonable restraint of trade and commerce in *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

58.     The combination and conspiracy among Defendants and their co-conspirators described in the preceding paragraphs consisted of a continuing course, pattern and practice of conduct regarding the setting of Interchange Fees to Plaintiffs and others in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

59.     The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were to refrain from competing on the setting of Interchange Fees to Plaintiffs and others; and to fix, increase and/or maintain Interchange Fees charged to Plaintiffs and others.

60.     In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in a number of overt acts, including, without limitation: they agreed to exchange, and did exchange, current and future price information about Interchange Fees; they agreed to coordinate, and did coordinate, the Interchange Fees they would charge to Plaintiffs and others; they agreed on Interchange Fees to charge Plaintiffs and others; and they agreed to fix, increase and/or maintain, and fixed, increased and/or maintained, Interchange Fees charged to Plaintiffs and others in relation to each other.

61.     Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things, participating in conversations and meetings to discuss Interchange Fees to charge retail merchants such as Plaintiffs and others, issuing fee announcements and quotes for Interchange Fees in accordance with the conspiracy; and exchanging information on Interchange Fees and other business information that in a

competitive environment would be deemed commercially sensitive and not shared with competitors.

62.     As part of their unlawful conduct with Defendants, each of the co-conspirator MasterCard member banks knowingly, intentionally and actively participated as business entities distinct from Defendants in the unlawful conspiracy alleged in this Count to fix, increase and/or maintain Interchange Fees charged to Plaintiffs and other retail merchants.

63.     As a result of Defendants' and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during times relevant to the allegations in this Second Amended Complaint, Interchange Fees have been fixed, increased and/or maintained at artificially high and noncompetitive levels in the United States; and Plaintiffs and other retail merchants have been deprived of the benefit of free and open competition in the setting of Interchange Fees.

64.     Plaintiffs have been injured in their business or property by reason of Defendants' and their co-conspirators' antitrust violations in amounts not yet ascertained. Plaintiffs' injury is injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

65.     Defendants' antitrust violation threatens continuing loss and injury to Plaintiffs unless enjoined by this Court.

## COUNT II

## UNREASONABLE RESTRAINT OF TRADE (RE: MERCHANT RESTRAINTS)

66.     Plaintiffs incorporate by reference each and every allegation contained in paragraphs 1 through 54 and 60 through 62 above.

67.    The collective adoption and enforcement of the Merchant Restraints (individually and two or more collectively) by MasterCard and its member banks constitutes a contract, combination or conspiracy in unreasonable restraint of trade.

68.    Defendants' conspiracy has had substantially adverse effects on competition in the relevant market and has resulted in higher prices and lower output than would exist in the absence of that conspiracy.   There are no procompetitive justifications for Defendants' restraints and, even if there were, there are less restrictive means of achieving those alleged justifications.

69.    Defendants and their co-conspirators have had actual knowledge of, and have knowingly participated in, the conspiracy alleged above.

70.    As a direct and proximate result of Defendants' horizontal conspiracy, Interchange Fees have been set at artificial, supracompetitive levels, and Plaintiffs have suffered injury to their business and property by paying such artificially inflated, supracompetitive Interchange Fees.  Plaintiffs' injury is injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

71.    Defendants' antitrust violation threatens continuing loss and injury to Plaintiffs unless enjoined by this Court.

**COUNT III**

**UNREASONABLE RESTRAINT OF TRADE
(RE: INTERCHANGE FEE AND MERCHANT RESTRAINTS)**

72.    Plaintiffs incorporate by reference each and every allegation contained in paragraphs 1 through 54 and 56 through 63 above.

73.    The collective setting of Interchange Fees by MasterCard and its member banks, in conjunction with the Merchant Restraints (individually and two or more collectively), constitutes a contract, combination or conspiracy in unreasonable restraint of trade.

23

74.     Defendants' conspiracy has had substantially adverse effects on competition in the relevant market and has resulted in higher prices and lower output than would exist in the absence of that conspiracy.   There are no procompetitive justifications for Defendants' restraints and, even if there were, there are far less restrictive means of achieving those alleged justifications.

75.     Defendants and their co-conspirators have had actual knowledge of, and have knowingly participated in, the conspiracy alleged above.

76.     As a direct and proximate result of Defendants' horizontal conspiracy, Interchange Fees have been set at artificial, supracompetitive levels, and Plaintiffs have suffered injury to their business and property by paying such artificially inflated, supracompetitive interchange fees.  Plaintiffs' injury is injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

77.     Defendants' antitrust violation threatens continuing loss and injury to Plaintiffs unless enjoined by this Court.

## COUNT IV

### UNLAWFUL TYING OF PREMIUM
### CREDIT CARDS TO MASTERCARD CREDIT CARDS

78.     Plaintiffs incorporate by reference each and every allegation contained in paragraphs 1 through 54 above.

79.     For purposes of this claim, the relevant product markets are: (1) the market for Network Services associated with non-premium, MasterCard credit cards (the tying product market); and (2) the market for Network Services associated with Premium MasterCard credit cards (the tied product market).  The relevant geographic market is the United States.  A seller that was the only provider of network services for either group of cards in the United States

would have the ability to raise Interchange Fees significantly above a competitive level without losing sufficient business to make the price increase unprofitable.

80.  At all times relevant to the allegations in this Count, MasterCard has had substantial market power in the tying market, *i.e.*, MasterCard has had the ability to raise prices substantially above a competitive level without losing sufficient business to make the price increase unprofitable.

81.  By means of the Honor-All-Cards Rule, Defendants have tied the purchase of Network Services associated with Premium Cards to the purchase of Network Services associated with non-premium cards.  As a result of this tying arrangement, Plaintiffs and other retail merchants have been forced to accept Premium Cards and to pay Interchange Fees associated with their use.

82.  The tying arrangement described above has affected a substantial amount of commerce in the market for the tied product.

83.  As a direct and proximate result of Defendants' tying arrangement, Interchange Fees for Premium MasterCard Credit Cards have been set at artificial, supracompetitive levels, and Plaintiffs have suffered injury to their business and property by paying such artificially inflated, supracompetitive Interchange Fees.  Plaintiffs' injury is injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

84.  Defendants' antitrust violation threatens continuing loss and injury to Plaintiffs unless enjoined by this Court.

## COUNT V

## <u>UNLAWFUL TYING OF NETWORK SERVICES</u>

85.  Plaintiffs incorporate by reference each and every allegation contained in paragraphs 1 through 54 above.

86.     For purposes of this claim, the relevant product markets are: (1) the market for Network Services associated with General Purpose Payment Cards <u>other than</u> Payment Guarantee Services (the tying product market); and (2) the market for Payment Guarantee Services (the tied product market).  The relevant geographic market is the United States.  A seller that was the only provider of network services of either type in the United States would have the ability to raise Interchange Fees significantly above a competitive level without losing sufficient business to make the price increase unprofitable.

87.     At all times relevant to the allegations in this Count, MasterCard has had substantial market power in the tying market, *i.e.*, MasterCard has had the ability to raise prices substantially above a competitive level without losing sufficient business to make the price increase unprofitable.

88.     At all times relevant to the allegations in this Count, MasterCard has tied the sale of Payment Guarantee Services to the sale of Network Services other than Payment Guarantee Services.  Merchants have lost the ability to negotiate with individual issuers and/or to purchase Payment Guarantee Services from independent vendors or to self-insure against loss due to fraud.

89.     Various forms of payment guarantees are often sold and purchased independently of general-purpose Network services.

90.     Absent this tying arrangement, many merchants, including Plaintiffs, would have purchased Payment Guarantee Services from sources other than MasterCard or would not have purchased such services at all (*i.e.*, they would have chosen to self-insure against loss due to fraud).  Even those merchants that would have continued to purchase such services from MasterCard would have benefitted from the lower prices MasterCard would have offered in response to competition from other providers of those services.

91.     The tying arrangement described above has affected a substantial amount of commerce in the market for the tied product.

92.     As a direct and proximate result of Defendants' tying arrangement, Interchange Fees for Payment Guarantee Services have been set at artificial, supracompetitive levels, and Plaintiffs have suffered injury to their business and property by paying such artificially inflated, supracompetitive Interchange Fees.  Plaintiffs' injury is injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

93.     Defendants' antitrust violation threatens continuing loss and injury to Plaintiffs unless enjoined by this Court.

## COUNT VI

## <u>MONOPOLIZATION</u>

94.     Plaintiffs incorporate by reference each and every allegation contained in paragraphs 1 through 54 above.

95.     MasterCard has monopoly power in the relevant market.

96.     MasterCard has used its monopoly power to impose on Plaintiffs and other retail merchants regulations and restrictions that have the purpose and effect of excluding competition from and raising the costs of other sellers in the relevant market.   These regulations and restrictions include, but are not limited to, the Merchant Restraints.   The regulations and restrictions imposed by MasterCard make it difficult or impossible for other card associations to increase the usage of their cards by offering lower Interchange Fees or other attractive terms to retail merchants like Plaintiffs.

97.     As a direct and proximate result of Defendants' exclusionary conduct, Interchange Fees have been set at artificial, supracompetitive levels, and Plaintiffs have suffered injury to their business and property by paying such artificially inflated,

supracompetitive Interchange Fees for Network Services. Plaintiffs' injury is injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

98.     Defendants' antitrust violation threatens continuing loss and injury to Plaintiffs unless enjoined by this Court.

### COUNT VII

### ATTEMPTED MONOPOLIZATION

99.     Plaintiffs incorporate by reference each and every allegation contained in paragraphs 1 through 54 above.

100.     MasterCard has a dangerous probability of achieving monopoly power in the relevant market.

101.     MasterCard has a specific intent to achieve monopoly power in the relevant market.

102.     MasterCard has used its market power to impose on Plaintiffs and other retail merchants regulations and restrictions that have the purpose and effect of excluding competition from and raising the costs of other sellers in the relevant market. These regulations and restrictions include, but are not limited to, the Merchant Restraints. The regulations and restrictions imposed by MasterCard make it difficult or impossible for other card associations to increase the usage of their cards by offering lower Interchange Fees or other attractive terms to retail merchants like Plaintiffs.

103.     As a direct and proximate result of Defendants' exclusionary conduct, Interchange Fees have been set at artificial, supracompetitive levels, and Plaintiffs have suffered injury to their business and property by paying such artificially inflated, supracompetitive Interchange Fees for Network Services. Plaintiffs' injury is injury of the type

the antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

104.     Defendants' antitrust violation threatens continuing loss and injury to Plaintiffs unless enjoined by this Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for a judgment against Defendants and for the following relief:

A.     A declaration that Defendants have violated the federal antitrust laws in each of the ways alleged above;

B.     Permanent injunctive relief enjoining Defendants, their directors, officers, employees, agents, successors and members from continuing to commit the antitrust violations alleged above, and requiring them to take affirmative steps to dissipate the effects of their prior violations;

C.     A judgment for three times the damages actually sustained by Plaintiffs during the period from January 1, 2004 forward, as determined by a jury;

D.     The costs of this suit, including a reasonable attorneys' fee; and

E.     Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated:  October 18, 2012

Respectfully submitted,

_____

KENNY NACHWALTER, P.A.
Richard Alan Arnold (RA9337)
William J. Blechman (WB6074)
201 South Biscayne Blvd.
Suite 1100
Miami, Florida  33131-4327
Tel:     (305) 373-1000
Fax:     (305) 372-1861
E-mail:  wblechman@knpa.com

***Attorneys for Plaintiffs***

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served on all counsel of record via ECF on October 19, 2012.

_____
William J. Blechman

438624.1

30