**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: **PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGTION**<br><br>**This Document Relates To:**<br>**ALL CLASS ACTIONS** | **MDL Docket No. 1720 (JG)(JO)**<br><br>**Civil No. 05-5075 (JG)(JO)** |

**MEMORANDUM IN SUPPORT OF CLASS PLAINTIFFS' MOTION**
**FOR CLASS SETTLEMENT PRELIMINARY APPROVAL**

**TABLE OF CONTENTS**

I.   INTRODUCTION ............................................................................................................1

II.  FACTUAL BACKGROUND ........................................................................................4

    A.   The Parties Settled at an Advanced Stage in this Litigation ...........................................4

    B.   The Networks Abandoned their Joint Venture Structures and the Banks Divested
         Their Ownership of the Networks During this Action....................................................7

    C.   The Department of Justice Obtained Relief from Visa and MasterCard Based
         Upon the Record Compiled by Class Plaintiffs in this Action ......................................8

    D.   The Settlement Agreement Resulted from a Long and Contentious Mediation
         and Settlement Process .................................................................................................9

III. THE PROPOSED SETTLEMENT FALLS WELL WITHIN THE RANGE
     OF POSSIBLE APPROVAL........................................................................................10

    A.   The Settlement is Presumptively Fair Because it Resulted from the
         Arm's-Length Negotiations of Experienced and Informed Counsel ..........................11

    B.   The *Grinnell* Factors Support Preliminary Approval....................................................12

         1.   Further Litigation Would Be Protracted and Risky ...............................................12

         2.   The Parties are Well-Informed about the Strengths and Weaknesses
              of their Claims at this Advanced Stage................................................................15

         3.   The Monetary Compensation and Rule Changes are More than Reasonable
              in Light of the Risks of Further Litigation...........................................................15

         4.   The Release Terms are Standard in their Substance ...........................................16

## TABLE OF CONTENTS
*(contd.)*

IV.  PRELIMINARY CERTIFICATION OF THE SETTLEMENT
     CLASSES IS WARRANTED ...................................................................17

     A.  The Settlement Classes Satisfy the Requirements in Rule 23(a) ................................17

         1.  The Classes Are So Numerous That Joinder Is Impracticable ..........................18

         2.  There Are Many Questions Common to all Class Members ..............................18

         3.  Class Plaintiffs' Claims Are Typical of Those of the Classes ...........................19

         4.  The Settlement Classes are Fairly and Adequately Represented ........................19

     B.  The Damages Class Satisfies The Requirements Of Rule 23(b)(3) ...........................20

         1.  Common Questions of Law and Fact Predominate ...............................................20

         2.  A Class Action is the Superior Method for Resolving this Case ........................22

     C.  The Requirements Of Rule 23(b)(2) Are Satisfied ......................................................23

V.   THE NOTICE PLAN AND PLAN OF ALLOCATION AND
     DISTRIBUTION ARE REASONABLE .........................................................................23

VI.  CONCLUSION....................................................................................................................25

## TABLE OF AUTHORITIES

**Cases**                                                                                                      **Page(s)**

*Amchem Prods., Inc. v. Windsor,*
    521 U.S. 591 (1997)........................................................................................17, 21, 22

*Bourlas v. Davis Law Associates,*
    237 F.R.D. 345 (E.D.N.Y. 2006) ....................................................................23

*Charrons v. Pinnacle Group N.Y. LLC,*
    269 F.R.D. 221 (S.D.N.Y. 2010) ....................................................................18

*Comcast Corp. v. Behrend,*
    No. 11-864 (U.S. Jun. 25, 2012) ....................................................................13

*Consolidated Rail Corp. v. Town of Hyde Park,*
    47 F.3d 473 (2d Cir. 1995)..............................................................................18

*Continental Orthopedic Appliances, Inc. v. Health Ins. Plan of Greater N.Y., Inc.,*
    198 F.R.D. 41 (E.D.N.Y. 2000) ....................................................................21

*Cuevas v. Citizens Fin. Group, Inc.,*
    2012 WL 1865564 (E.D.N.Y. May 22, 2012) .................................................22

*D'Alauro v. GC Services, Ltd. Partnership,*
    168 F.R.D. 451 (E.D.N.Y. 2006) ....................................................................22

*Detroit v. Grinnell Corp.,*
    495 F.2d 448 (2d Cir. 1974)......................................................................11, 16

*Fox Midwest Theaters, Inc. v. Means,*
    221 F.2d 173 (8th Cir. 1955) ..........................................................................17

*In re Air Cargo Shipping Servs. Antitrust Litig.,*
    2009 WL 3077396 (E.D.N.Y. Sept. 25, 2009) ...............................................15

*In re American Int'l Group, Inc. Sec. Litig.,*
    689 F.3d 229 (2d Cir. 2012)...........................................................17, 20, 21, 22

*In re ATM Fee Antitrust Litig.,*
    686 F.3d 741 (9th Cir. 2012) ..........................................................................13

*In re Chambers Dev. Sec. Litig.,*
    912 F. Supp. 822 (W.D. Pa. 1995)..................................................................13

*In re Currency Conversion Fee Antitrust Litig.,*
    224 F.R.D. 555 (S.D.N.Y. 2004) ....................................................................23

*In re Currency Conversion Fee Antitrust Litig.*,
  263 F.R.D. 110 (S.D.N.Y. 2009) ........................................................................11, 16

*In re Currency Conversion Fee Antitrust Litig.*,
  2006 WL 3247396 (S.D.N.Y. Nov. 8, 2006) ............................................10, 12, 15

*In re Global Crossing Sec. ERISA Litig.*,
  225 F.R.D. 436 (S.D.N.Y. 2004) .................................................................................10

*In re IMAX Sec. Litig.*,
  2012 WL 2359653 (S.D.N.Y. June 20, 2012) ...............................................21, 24

*In re Lehman Brothers Sec. Litig.*¸
  2012 WL 2478483 (S.D.N.Y. June 29, 2012) ............................................................17

*In re Literary Works in Electronic Databases Copyright Litig.*,
  654 F.3d 242 (2d Cir. 2011)...............................................................................16, 17

*In re NASDAQ Market-Makers Antitrust Litig.*,
  169 F.R.D. 493 (S.D.N.Y. 1996) ................................................................................18

*In re NASDAQ Market-Makers Antitrust Litig.*,
  187 F.R.D. 465 (S.D.N.Y. 1998) ................................................................................14

*In re NASDAQ Mkt. Makers Antitrust Litig.*,
  176 F.R.D. 99 (S.D.N.Y. 1997) ..................................................................................10

*In re Nigeria Charter Flights Contract Litig.*,
  233 F.R.D. 297 (E.D.N.Y. 2006) ................................................................................22

*In re Playmobil Antitrust Litig.*,
  35 F. Supp. 2d 231 (E.D.N.Y. 1998) .........................................................................18

*In re Sony SXRD Rear Projection TV Class Action Litig.*,
  2008 WL1956267 (S.D.N.Y. May 1, 2008) ..............................................................23

*In re Sturm, Ruger, & Co., Inc. Sec. Litig.*,
  2012 WL 3589610 (D. Conn. Aug. 12, 2012) .........................................................21

*In re Visa Check/MasterMoney Antitrust Litig.*,
  280 F.3d 124 (2d Cir. 2001)........................................................................................19

*In re Visa Check/MasterMoney Antitrust Litig.*,
  297 F. Supp. 2d 503 (E.D.N.Y. 2003) ...................................................13, 14, 15, 16, 25

*Lawlor v. National Screen Service Corp.*,
  349 U.S. 322 (1955)......................................................................................................17

*Maley v. Del Global Techs. Corp.,*
 186 F. Supp. 2d 358 (S.D.N.Y. 2002) ................................................................16

*Moore v. PaineWebber, Inc.,*
 306 F.3d 1247 (2d Cir. 2002) ...........................................................................21

*Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.,*
 660 F.2d 9 (2d Cir. 1981) .................................................................................17

*Popalawski v. Metroplex on the Atlantic, LLC,*
 2012 U.S. Dist. LEXIS 46408 (E.D.N.Y. Apr. 2, 2012) ......................................21

*Reid v. SuperShuttle, International, Inc.,*
 2012 WL 3288816 (E.D.N.Y Aug. 10, 2012) .....................................................19

*TBK Partners, Ltd. v. Western Union Corp.,*
 675 F.2d 456 (2d Cir. 1982) ..............................................................................16

*Toure v. Amerigroup Corp.,*
 2012 WL 3240461 (E.D.N.Y. Aug. 6, 2012) ......................................................12

*Tsereteli v. Residential Asset Securitization Trust 2006-A8,*
 2012 WL 2532172 (S.D.N.Y. June 29, 2012) .....................................................19

*United States v. American Express Co.,*
 No. 10-4496 (E.D.N.Y.), Dkt. No. 143 .................................................................8

*United States v. Visa U.S.A., Inc.,*
 344 F.3d 229 (2d Cir. 2003) .................................................................................7

*West Virginia v. Chas. Pfizer & Co.,*
 314 F. Supp. 710 (S.D.N.Y. 1970), *aff'd*, 440 F.2d 1079 (2d Cir. 1971) ...............15

*Wal-Mart Stores, Inc. v. Dukes,*
 131 S. Ct. 2541 (2011) ...............................................................................18, 23

*Wal-Mart Stores, Inc. v. Visa USA, Inc.,*
 396 F.3d 96 (2d Cir. 2005) ...........................................................10, 11, 14, 17, 24

*Warren v. Xerox Corp.,*
 2008 WL 4371367 (E.D.N.Y. Sept. 19, 2008) ....................................................15

## OTHER AUTHORITIES

Fed. R. Civ. P. 23 .................................................................................. *passim*

## I.     __INTRODUCTION.__

Class Counsel,[1] on behalf of proposed class representatives and the class members they seek to represent,[2] respectfully request that this Court grant preliminary approval of a settlement that will deliver the largest private damage recovery in United States antitrust history (estimated to be approximately $7.25 billion) and continue a series of reforms that will restructure the payment card industry, making it more competitive.  These reforms introduce transparency at the point of sale, give merchants the tools they need to exert downward pressure on the costs of payment card acceptance, and will benefit merchants and ultimately consumers.  As a result of the reforms, merchants will be able to use discounts or surcharges to encourage their customers to use a less expensive payment form or a different payment card brand or product.  Merchants' new ability to steer transactions to lower cost payment methods and to surcharge credit card transactions to recover those costs should incentivize Visa and MasterCard to moderate or lower their fees.

After more than seven years of complex, expensive and hard-fought litigation, the parties, with the assistance of two nationally-recognized mediators and the Court, agreed to settle the case on terms set forth in the Class Settlement Agreement, which  provides:

### __Two cash funds totaling up to approximately $7.25 billion__

●    A cash recovery of up to $6.05 billion,[3] to compensate Rule 23(b)(3) merchant class members for past damages.  *See* Class Settlement Agreement ¶¶ 9-10 attached as Exhibit 1 to the motion for preliminary approval (hereafter "Settlement Agreement").  This sum is larger than any private recovery under the antitrust laws.

---

[1]  Class Counsel are Robins, Kaplan, Miller & Ciresi L.L.P.; Berger & Montague, P.C.; and Robbins Geller Rudman & Dowd LLP.

[2]  The proposed class representatives ("Class Plaintiffs") are: Photos Etc. Corp.; Traditions, Ltd.; Capital Audio Electronics, Inc.; CHS Inc.; Crystal Rock LLC;  Discount Optics, Inc.; Leon's Transmission Service, Inc.; Parkway Corp.; and Payless ShoeSource, Inc.

[3]  This fund is subject to reduction for opt-outs, capped at 25 percent of that amount, which would result in the fund being no less than $ 4,537,500,000.  Settlement Agreement ¶¶ 17-20.

- An additional estimated $1.2 billion fund to be paid to Rule 23(b)(3) merchant class members that do not opt out and that accept Visa and MasterCard credit card transactions during an eight-month period, which will begin shortly after the time period ends to opt out. This fund represents the cash value of an eight-month, ten basis-point reduction in interchange fees attributable to Visa and MasterCard credit card transactions. The accumulated fund will become non-refundable to Defendants upon preliminary approval even if the Settlement Agreement is never finally approved.[4] Settlement Agreement ¶¶ 11-13.

### Rule changes required within *60 days* after the Court grants preliminary approval so that merchants will quickly benefit from these rule changes

- Visa and MasterCard no-surcharge rules will be changed to permit merchants to surcharge credit cards at the brand level (*i.e.*, Visa or MasterCard) in an amount that does not exceed the merchant's average Visa or MasterCard "merchant discount rate" or the Maximum Surcharge Cap as long as the merchant complies with certain additional requirements set forth in the settlement agreement.[5] Settlement Agreement ¶¶ 42, 55.

- Visa and MasterCard no-surcharge rules will be changed to permit merchants to surcharge credit cards at the product level (*i.e.*, different kinds of cards such as consumer card, commercial card, reward card, etc.) in an amount that does not exceed the merchant's cost of acceptance for the particular Visa or MasterCard credit card product minus the Durbin Amendment's cap on debit card interchange fees ("product level surcharging") subject to the same limitations on surcharging at the brand level. Settlement Agreement ¶¶ 42, 55.

- Merchants will be permitted to surcharge Visa and MasterCard credit card transactions and to discount credit and debit transactions regardless of the device used to deliver the payment. This prevents Visa and MasterCard from blunting the settlement reforms by adopting rules prohibiting discounting or surcharging if, for example, the consumer presents a mobile telephone payment device instead of a plastic card.

- Merchants that operate multiple businesses under different "trade names" or "banners" will be permitted to accept Visa or MasterCard at fewer than all of the merchant's trade names or banners. This will allow a merchant to develop or expand a low-price, low-cost segment of its business. Settlement Agreement ¶¶ 41, 54.

---

[4] An irrevocable benefit of this magnitude upon preliminary approval only is unprecedented.

[5] The parties did not reach the settlement in a vacuum. It necessarily accounts for a marketplace that includes the competitors of Visa and MasterCard.

- Visa and MasterCard will be obligated to negotiate in good faith with merchant buying groups that meet certain criteria for the purpose of reaching commercially reasonable agreements.[6]  Settlement Agreement ¶¶ 43, 56.

### Preservation of legislative and consent decree reforms

- The settlement locks in the $10 minimum for credit card transactions enacted by Congress through the Durbin Amendment even if Congress repeals that part of the legislation.  Settlement Agreement ¶¶ 44, 57.

- The settlement locks in the reforms imposed by the Final Judgment in the Department of Justice lawsuit against Visa and MasterCard even if those reforms are terminated.  Settlement Agreement ¶¶ 40, 53.

The full extent of the rule changes required by the settlement must be considered in conjunction with the restructuring of the Visa and MasterCard networks that followed the filing of these class actions.  When Class Plaintiffs filed suit in 2005, Visa and MasterCard were organized as joint ventures owned by competing member banks that collected billions of dollars in interchange fees from merchants.  Those same banks that received interchange fees collectively set interchange fees through their membership in the networks.  At the time, Visa, MasterCard and their member banks were viewed as structural price-fixing conspiracies.  Within approximately a year after the first class action was filed, the banks that owned and controlled both MasterCard and Visa made final decisions to abandon their joint ventures, and to restructure Visa and MasterCard as publicly-owned single entities.  MasterCard completed its restructuring in 2006, and Visa followed suit less than two years later.  These structural changes are of enormous importance and in themselves set the framework for a substantially different and more competitive payment card marketplace.

Moreover, and significantly, the settlement achieves reforms that prior litigants, Congress, and the Department of Justice did not:

---

[6] If a merchant group believes that a network is not fulfilling its obligation to negotiate in good faith, it may seek relief from the Court declaring that the network has breached the Settlement Agreement.  Settlement Agreement ¶¶ 43, 56.

3

- The *Wal-Mart* settlement (2003) eliminated the tie between Visa and MasterCard credit and debit cards, but did not alter the ownership structure of Visa and MasterCard or modify their no-surcharging and no-discounting rules.

- The Durbin Amendment (2010) removed certain restrictions imposed by payment card networks on discounting credit and debit cards—*i.e.*, no longer could a payment card network prohibit a merchant from discounting a Visa, MasterCard, American Express, Discover, etc. credit or debit card.  But the Durbin Amendment did not allow for discounting at the brand or product level—*i.e.*, by card type (consumer card, commercial card, rewards card, etc.)—even though there are substantial differences among the card types in acceptance costs.  The Durbin Amendment did not prohibit the no-surcharging rules.

- The Justice Department extended the Durbin Amendment reforms in a Final Judgment settling a lawsuit against Visa and MasterCard (2011) under which those networks agreed to remove their merchant prohibitions on product-level discounting. Under the decree, Visa and MasterCard are required to permit merchants to offer a discount, rebate, incentive, benefit, service or otherwise encourage customers to use a particular brand or type of a card, or a particular form of payment other than the card the customer initially presents, or permit the merchant to express a preference for or promote a particular brand or type of card or particular type of payment form.  However, the Final Judgment did not prohibit the no-surcharging rules.

This settlement far exceeds the "within the range of reasonableness" standard that is a prerequisite for preliminary approval and notice to the class.  This Court should permit the notice and comment period to begin so that all class members may receive neutral, factual information about the settlement, so that there can be a full and fair exposition of all of the legal and factual issues underlying the settlement, and so that the Court can determine—on a complete record—whether the settlement should be finally approved.

## II.    FACTUAL BACKGROUND.

### A.    The Parties Settled at an Advanced Stage in this Litigation.

The parties agreed to settle this case only after seven years of contentious litigation. At the time of settlement, discovery was complete, the parties had exchanged expert reports and taken the depositions of all experts, and motions to dismiss, motions for

summary judgment, and Class Plaintiffs' motion to certify the class had been fully briefed and argued, and were pending before the Court.

The first of more than 40 class complaints was filed in June of 2005.  Later that year, the Judicial Panel on Multidistrict Litigation consolidated all class cases, and 19 similar individual cases before this Court.[7] *Payment Card Interchange Fee & Merchant Discount Fee Antitrust Litig.,* MDL 1720, Dkt. No. 70 (J.P.M.L. Oct. 19, 2005).  In early 2006, the Court appointed Class Counsel as co-lead counsel for the Class Plaintiffs.  Dkt. No. 279.  The First Consolidated Amended Class Action Complaint ("Complaint") was filed on April 24, 2006.  Dkt. No. 317.

Class Plaintiffs alleged that each of the networks conspired with its member banks to establish default interchange fees for Visa and MasterCard transactions, and that Visa and MasterCard rules insulated those interchange fees from competitive pressure by preventing merchants from steering customers to less expensive forms of payment (the "anti-steering restraints").  The most effective of these anti-steering restraints were network rules preventing surcharging and discounting.

Fact discovery commenced in 2006 and continued over the next five years.  Class Plaintiffs reviewed more than 50 million pages of documents and deposed more than 400 witnesses.  Expert discovery was likewise extensive.  Class Plaintiffs served seven expert reports, comprising nearly 2,000 pages.  Individual Plaintiffs' expert reports comprised over 1,400 pages. Defendants 12 reports comprised nearly 1,500 pages.   Defendants' experts testified at their depositions for a total of 18 days, Class Plaintiffs' experts for eight days, and Individual Plaintiffs' experts for six days.

---

[7] All plaintiffs in these individual cases are members of the Rule 23(b)(2) Settlement Class.

In 2008, Class Plaintiffs moved to certify two classes: an "injunctive relief class," pursuant to Rule 23(b)(2), and a "damages class," pursuant to Rule 23(b)(3). Class Plaintiffs also filed a second amended complaint, which included many of Class Plaintiffs' earlier claims and added claims regarding Visa PIN debit cards. Defendants subsequently filed motions to dismiss and for summary judgment seeking to dismiss all of Class Plaintiffs' claims. Defendants contend, among other things: (1) they cannot be properly charged with having conspired after the networks' respective IPOs; (2) those IPOs at a minimum cut short the damages periods for each of the intra-network conspiracies; (3) the release in the *Visa Check* case precludes all of the Class's claims; (4) interchange fees are pro-competitive and do not improperly restrain trade, (5) Visa and MasterCard's rules are not anticompetitive, (6) Class Plaintiffs' allegations must be judged under the rule of reason rather than the per se rule; and (7) injunctive relief in the nature of regulation of interchange rates is legally unavailable. *See, e.g.*, Dkt. Nos. 1172, 1178, 1180, 1495-2 and 1534. The Court heard oral arguments on class certification, Defendants' motion to exclude the testimony of Class Plaintiffs' class certification expert, the parties' summary judgment motions, and motions to disqualify the parties' principal economic experts. Several other *Daubert* motions were submitted on the papers: three against Class Plaintiffs' experts, three against Individual Plaintiffs' experts, and two against Defendants' experts. These motions, which raise substantial risks, remain unresolved.[8]

---

[8] On July 17, 2012, the Court entered the following Order: "In light of the Memorandum of Understanding pursuant to which the parties anticipate settling the cases in this multi-district litigation, *see* docket entry [1588], all pending motions for relief (including motions concerning discovery, class certification, dismissal, summary judgment, and the preclusion of expert opinion testimony) are deemed withdrawn without prejudice to reinstatement if the settlement is not consummated."

**B.** **The Networks Abandoned their Joint Venture Structures and the
Banks Divested Their Ownership of the Networks During this Action.**

From their establishment in the 1960s, Visa and MasterCard were organized as

joint ventures owned and controlled by their member banks, and were dedicated to serving

the banks' collective financial interests.  Shortly after the first class action was filed, the

banks that owned and controlled both Visa and MasterCard and sat on their boards and

committees made final decisions to abandon their joint venture structures.  They did so, in

part, because they believed that such action was necessary to avoid "ruinous" antitrust

liability. Dkt. No. 1152 ¶ 149(d).  Visa and MasterCard to that point were held to be

"consortiums of competitors."  *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 242 (2d

Cir. 2003).  MasterCard and its banks moved first, concluding MasterCard's IPO in mid-

2006, at which point MasterCard took additional steps to minimize the banks' influence

over its management.  Visa followed suit, in 2008, with its own restructuring and IPO.

Shortly after MasterCard's IPO, Class Plaintiffs filed a supplemental complaint,

alleging among other things, that MasterCard's IPO was an unlawful "acquisition" under

Section 7 of the Clayton Act and an unlawful "combination" under Section 1 of the

Sherman Act. Judge Gleeson granted Defendants' motion to dismiss, but granted Class

Plaintiffs leave to amend.  Class Plaintiffs amended their complaint challenging

MasterCard's IPO, and filed an additional supplemental complaint challenging Visa's IPO.

Defendants moved again to dismiss.  Those motions have been briefed and argued.  Like

the others, these motions pose risks to Class Plaintiffs' claims for injunctive relief and

damages after the IPOs.

C.    **The Department of Justice Obtained Relief from Visa and MasterCard Based Upon the Record Compiled by Class Plaintiffs in this Action.**

In response to a civil investigative demand, Class Counsel delivered the extensive discovery record developed in this case, along with certain related work product,[9] to the Antitrust Division of the U.S. Department of Justice and several state attorneys general, each of which had opened an investigation into Visa's, MasterCard's and American Express's anti-steering rules.  Dkt. No. 1235.  Class Counsel subsequently consulted with and advised the Division staff as to what that record reflected regarding Defendants' conduct, which included in-person meetings and dozens of phone calls.

In part as a result of those efforts, the government authorities secured for merchants important modifications to certain Visa and MasterCard rules that Class Plaintiffs had also challenged.  In late 2010, Visa and MasterCard entered into a consent decree with the Department of Justice that required them to permit merchants to offer a discount, rebate, incentive, service, benefit or otherwise show preference for, or encourage customers to use, a particular competing card brand or competing card products or particular form of payment or cash other than the particular card the customer presents for payment.  *United States v. American Express Co.*, No. 10-4496 (E.D.N.Y.), Dkt. No. 143.[10]  As explained by the Department of Justice during the Tunney Act review and comment process, merchants' right to discount includes the right to adopt a "two price" (or even "three price") policy under which a merchant may announce and display different prices depending upon the method of payment.  This provides important relief for merchants in states that prohibit

---

[9] Class Counsel was permitted to share that work product with the Department of Justice without waiving the privilege attached to it.  Dkt. No. 1312-1 at ¶ 11.

[10] American Express rejected the consent decree, and is contesting both the DOJ's and private plaintiffs' allegations challenging its anti-steering rules.

surcharging for credit cards, which will be permitted if this Settlement is approved.[11] Those rule changes are incorporated into the Settlement Agreement, thus preserving them in the event that the consent decree is terminated.

> **D.    The Settlement Agreement Resulted from a Long and Contentious Mediation and Settlement Process.**

The parties began an exhaustive mediation process in 2008.  The parties commenced that process with Hon. Edward Infante, a former Chief Magistrate Judge (N.D. Cal.) (now with JAMS), who was later joined by Professor Eric Green, the founder of Resolutions LLC.[12]  Judge Infante and Professor Green are two of the most experienced mediators in complex litigation in the country.  The mediation process was arduous, complex, extremely lengthy, often on the verge of collapsing, and always at arm's length. On more than one occasion, Judge Gleeson and Magistrate Judge Orenstein, with the consent of all the parties, assisted the mediators and the parties.

After summary judgment and *Daubert* arguments the Court held settlement conferences over the course of two days in December 2011 with all parties (including the proposed class representatives).  In late December, the mediators made comprehensive proposals to the parties to fully and finally resolve the litigation.  After weeks of in-depth discussions, the mediators' proposals, which embodied the essential terms of the settlement, were accepted by all parties.  Negotiations as to the final text of the agreement took place over the next several months, resulting in the proposed Settlement Agreement.

---

[11] The Department of Justice provided this clarification in response to a question from Class Counsel.

[12] Professor Green mediated the *Visa Check* settlement previously approved by the Court.

**III.    THE PROPOSED SETTLEMENT FALLS WELL WITHIN THE RANGE OF POSSIBLE APPROVAL.**

At preliminary approval, a court must assess the terms of a settlement only to determine whether it falls within the range of possible approval.  *In re Currency Conversion Fee Antitrust Litig.*, 2006 WL 3247396, at *5 (S.D.N.Y. Nov. 8, 006) (citing *In re NASDAQ Mkt. Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997).  A court must determine whether the settlement is "at least sufficiently fair, reasonable and adequate to justify notice to those affected and an opportunity to be heard." *NASDAQ,* 176 F.R.D. at 102 (citations omitted).  In conducting this inquiry, the court must consider the negotiation process leading to the settlement and the settlement's substantive terms. *Wal-Mart Stores, Inc. v. Visa USA, Inc.*, 396 F.3d 96, 116 (2d Cir. 2005); *In re Global Crossing Sec. ERISA Litig.*, 225 F.R.D. 436, 455 (S.D.N.Y. 2004).  Preliminary approval should be granted "[w]here the proposed settlement appears to be the product of serious, informed non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class and falls within the reasonable range of approval." *Currency Conversion Fee*, 2006 WL 3247396, at *5 (citing *NASDAQ*, 176 F.R.D. at 102).

At preliminary approval, a court may consider some of the factors it would consider at the final approval stage, which are:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

10

*Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974) (citations omitted).

Unlike most settlements, here, preliminary approval will provide immediate benefits to absent class members by creating a fund projected to be $1.2 billion and by requiring Visa and MasterCard to implement rule changes that will provide merchants with the tools they need to exert competitive pressure on their costs of acceptance. It will also give merchants the opportunity to consider how the settlement will affect their own businesses, with a full airing of the settlement's benefits.

**A.      The Settlement is Presumptively Fair Because it Resulted from the Arm's-Length Negotiations of Experienced and Informed Counsel.**

This class action settlement is entitled to a presumption of fairness because it resulted from arm's-length negotiations between experienced, capable counsel at an advanced stage of the case. *Wal-Mart*, 396 F.3d at 116 ("'A presumption of fairness, adequacy and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery.'") (citation omitted).[13]  Class counsel are highly experienced in antitrust, class actions and the payment card industry.[14]

In this context, the opinions of experienced and informed counsel supporting settlement are entitled to considerable weight. *E.g., Currency Conversion Fee*, 263 F.R.D. at 122 (citing the "extensive" class action experience of counsel).  The mediators' and the Court's participation further ensures that negotiations were non-collusive and conducted at

_____

[13] *See also In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 122 (S.D.N.Y. 2009) ("Where a settlement is the product of arm's length negotiations conducted by experienced counsel knowledgeable in complex class litigation, the negotiation enjoys a presumption of fairness.") (citation omitted).

[14] The experience and qualifications of Class Counsel are described in the Memorandum of Law In Support of Certain Class Plaintiffs And Certain Non-Class Plaintiffs To Consolidate, Coordinate, Appoint Lead and Liaison Counsel and Other Relief, Dkt. No. 27-3, and in the supporting materials accompanying that memorandum of law.

arm's length.  *See Toure v. Amerigroup Corp.*, 2012 WL 3240461, at *2 (E.D.N.Y. Aug. 6, 2012) (involvement of a mediator "raise[s] a presumption that the settlement achieved meets the requirements of due process"); *Currency Conversion Fee*, 2006 WL 3247396, at *5.

The settlement resulted from extensive and frequently contentious negotiations that commenced in 2008, reached a broad final resolution based on the parties' acceptance of the mediators' proposals early this year, and resulted in the detailed settlement agreement after months of negotiations.  During those final months alone, the parties held many in-person meetings, maintained frequent communications through the mediators and even more frequent communications without the mediators.  *Currency Conversion*, 2006 WL 3247396, at *5 (mediator's "participation in the negotiations substantiates the parties' claim that the negotiations took place at arm's length").  On several of those occasions (and particularly during those sessions leading up to the memorandum of understanding), the proposed class representatives attended the sessions along with class counsel.

## B.    The *Grinnell* Factors Support Preliminary Approval.

Class Plaintiffs decided to settle the case because the certainty of obtaining billions of dollars and wide-ranging pro-competitive rule changes (which address the claims in the case) on the one hand, trumped the certainty of delay and uncertainty of results had Class Plaintiffs pursued the case through trial, and the appeals that would have certainly followed in the event of a favorable result at trial, or earlier, after class certification.  This decision is entirely consistent with precedent, and with the record in this case.

### 1.    Further Litigation Would Be Protracted and Risky.

Multiple dispositive motions are unresolved, and even if those motions were all resolved in Class Plaintiffs' favor, a trial involving complex facts and untested legal

theories would be substantially unpredictable.  As this Court has recognized, the uncertainty arising from the risk of a lengthy trial followed by years of the appellate review process in antitrust cases militates in favor of granting approval.  *Visa Check*, 297 F. Supp. 2d 503, 510 (E.D.N.Y. 2003).  *See also In re Chambers Dev. Sec. Litig.*, 912 F. Supp. 822, 838 (W.D. Pa. 1995) (given this uncertainty, "[a] very large bird in the hand in this litigation is surely worth more than whatever birds are lurking in the bushes").

The risks Class Plaintiffs face on the multiple motions to dismiss and for summary judgment are underscored by the fact that, in a case Defendants argue is precedent for the pending motions, the Ninth Circuit recently endorsed one dispositive argument raised by Defendants, *i.e.*, that merchants are not "direct purchasers" with standing to sue for damages under federal antitrust law.  *See In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 747-58 (9th Cir. 2012), *pet. for reh'g pending*.

Further highlighting Class Plaintiffs' risk, the Supreme Court recently granted *certiorari* in an antitrust class action in which defendants challenged an order certifying the class.  *See Comcast Corp. v. Behrend*, No. 11-864 (U.S. Jun. 25, 2012) (which threatens to redraw the requisites for certification of a damages class).[15]  If Class Plaintiffs failed to win certification for a litigated class, the risks to Defendants would be dramatically reduced, and their incentives to settle the case for the level and scope of monetary and injunctive relief contained in the proposed settlement would diminish.

---

[15] The Retail Litigation Center, Inc., on whose board of directors Wal-Mart, Target and other large retailers sit, has submitted an *amicus curiae* brief in the Supreme Court supporting the position of Comcast opposing class certification.  *See* RLC Urges Supreme Court to Overturn Harmful Class Action Standard. www.rila.org/news/topnews/Pages/RLCUrgesSupremeCourttoOverturnHarmfulClassActionStandard.aspx.

Assuming the class were certified (and that the class certification order survived interlocutory appeal), the trial of this action would delay its resolution by many years, as post-trial motions and appeals would inevitably follow regardless of the result.  Defendants continue to maintain that their conduct has been lawful in all respects and that core damages and injunctive relief sought by the Class Plaintiffs are not achievable even assuming a favorable finding on liability.  Every major contested issue would be the subject of complex expert testimony.  Given the complexity of the factual and legal issues, the number of defendants, the expert testimony, the extraordinarily voluminous discovery conducted in this case, and the stakes at issue, the damages trial could carry on for months.  And the trial to the Court of Class Plaintiffs' claims for injunctive relief would require the post-trial preparation and submission of similarly detailed and voluminous proposed findings of fact and conclusions of law, and the adoption by the Court of findings of fact and conclusions of law, all of which would likely take many months, and would themselves be appealed.

For all these reasons, the outcome at trial is uncertain and the risks entailed in proceeding to trial are large and unpredictable.  *See Wal-Mart*, 396 F.3d at 118 ("'Indeed, the history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal.'") (quoting *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 475-76 (S.D.N.Y. 1998)); *NASDAQ*, 187 F.R.D. at 476 (parties cannot predict whose testimony on damages will be credited in a battle of the experts); *In re Visa Check/MasterMoney*

*Antitrust Litig.*, 297 F. Supp. 2d 503, 511 (E.D.N.Y. 2003) (proving damages to a jury is complex and difficult).[16]

This settlement ensures that members of the proposed class will be compensated for their damages and benefit from injunctive relief in the near future.

> **2.   The Parties are Well-Informed about the Strengths and Weaknesses of their Claims at this Advanced Stage.**

There is no question that this case has "proceeded to a stage at which counsel have demonstrated a thorough understanding of the complexity of the issues and the strengths and weaknesses of their respective claims, defenses, and strategies." *Currency Conversion Litig.*, 2006 WL 3247396, at *5. *See also In re Air Cargo Shipping Servs. Antitrust Litig.*, 2009 WL 3077396, at *8 (E.D.N.Y. Sept. 25, 2009) ("The purpose of the third *Grinnell* factor is to 'assure the Court that counsel for plaintiffs have weighed their position based on a full consideration of the possibilities facing them.'") (Citations omitted).

This settlement was reached only after the completion of exhaustive fact and expert discovery, briefing and argument on numerous complex motions and four years of mediation, all spanning more than seven years.  This *Grinnell* factor is easily satisfied.  *See Visa Check*, 297 F. Supp. 2d at 511 (substantial discovery and advanced procedural posture favored approval of class settlement); *Warren v. Xerox Corp.*, 2008 WL 4371367, at *5 (E.D.N.Y. Sept. 19, 2008).

> **3.   The Monetary Compensation and Rule Changes are More than Reasonable in Light of the Risks of Further Litigation.**

Considering the "complexity, expense and likely duration of the litigation," the "risks of establishing liability … [and] damages," and the "reasonableness of the

---

[16] *See also West Virginia. v. Chas. Pfizer & Co.*, 314 F. Supp. 710, 743-44 (S.D.N.Y. 1970), *aff'd*, 440 F.2d 1079 (2d Cir. 1971) ("no matter how confident one may be of the outcome of litigation, such confidence is often misplaced.").

settlement fund" in light of all the attendant risks of litigation, the approximately $7.25 billion settlement by itself brings the settlement well within the possible range of approval as a "fair, reasonable, and adequate" settlement of the Settlement Class's claims.[17]  In addition to the risk of recovering damages generally, there exists the additional risk that the Court or the jury would find that no claims for damages accrued after MasterCard and Visa restructured in 2006 and 2008 respectively.  Moreover, as described above, the settlement further provides for substantial injunctive relief which will exert competitive pressure on the Visa and MasterCard payment networks, thus transforming the marketplace.

### 4.    The Release Terms are Standard in their Substance.

As is customary in class action settlements, the releases here release all claims relating in any way to the conduct and acts that are alleged or could have been alleged in the operative complaints.  Also consistent with typical class action releases, they "achieve a comprehensive settlement that [will] prevent relitigation of settled questions at the core of [this] class action."  *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982).  *See also In re Literary Works in Electronic Databases Copyright Litig.,* 654 F.3d 242, 247-48 (2d Cir. 2011) ("Parties often reach broad settlement agreements encompassing claims not presented  in the complaint in order to achieve comprehensive settlement of class actions, particularly when a defendant's ability to limit his future

---

[17] *See Grinnell*, 495 F.2d at 463.  *See also Maley v. Del Global Techs. Corp.,* 186 F. Supp. 2d 358, 362 (S.D.N.Y. 2002) (approval granted where "[d]elay, not just at the trial stage but through post-trial motions and the appellate process, would cause Class Members to wait [for] years for any recovery, further reducing its value"); *Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d at 510 (fact that the class faced a long trial and the additional time it would take to exhaust all appeals "weigh[ed] heavily in favor of approving the Settlements"); *Currency Conversion Fee*, 263 F.R.D. at 124 (finding the fact that "the action would have continued for years with motions for summary judgment, interlocutory appeals, a possible trial, and the inevitable post-trial motions and further appeals" favors approval of the settlement).

liability is an important factor in his willingness to settle."); *Wal-Mart,* 396 F. 3d at 106 ("Practically speaking, 'class action settlements simply will not occur if the parties cannot set definitive limits on defendants' liability.'" (citations omitted)).  But, the releases do not release new anticompetitive conduct in the future, which includes, *inter alia*, reversion to the old rules which will be modified by the settlement.  *See, e.g., Lawlor v. National Screen Service Corp.*, 349 U.S. 322, 329 (1955); *Literary Works,* 654 F. 3d at 247-50; *Wal-Mart Stores, Inc.,* 396 F. 3d at 106-07; *Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.,* 660 F.2d 9, 18 (2d Cir. 1981); *Fox Midwest Theaters, Inc. v. Means*, 221 F.2d 173, 180 (8th Cir. 1955); *In re Lehman Brothers Sec. Litig.¸* 2012 WL 2478483, at *6 (S.D.N.Y. June 29, 2012).

## IV.    CERTIFICATION OF THE SETTLEMENT CLASSES IS WARRANTED.

As explained below and in Class Plaintiffs' class certification submissions, this action meets all of the requirements of Rule 23(a), as well as Rules 23(b)(2) and 23(b)(3), thus demonstrating that the two proposed classes may be certified for settlement purposes.[18]  *See, e.g., Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613-14 (1997) (a settlement class must satisfy each requirement set forth in Rule 23(a), as well as at least one of subsections of Rule 23(b)); *In re American Int'l Group, Inc. Sec. Litig.*, 689 F.3d 229,  238 (2d Cir. 2012) (same).

### A.     The Settlement Classes Satisfy the Requirements in Rule 23(a).

Each of the prerequisites of Rule 23(a) (numerosity, commonality, typicality, and adequacy) is satisfied as to both the damages and injunctive relief classes.

---

[18] Defendants do not contest class certification for settlement purposes.  However, in the event that the Settlement Agreement is terminated for any reason, including because the settlement is not finally approved, Defendants have reserved all defenses to and the right to contest class certification.  Settlement Agreement ¶ 99(d).

### 1.    The Class Is So Numerous That Joinder Is Impracticable.

The numerosity requirement of Rule 23(a) is satisfied when the class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  Here, the requirement is satisfied because both classes consist of several million merchants. *See Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).  A list of class members is being compiled from Defendants' and non-party acquirers' and ISO's records, which should enable Class Plaintiffs to identify millions of class members.

### 2.    There Are Many Questions Common to all Class Members.

The commonality requirement is met where "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  The standard established by Rule 23(a)(2) is "minimal." *Charrons v. Pinnacle Group N.Y. LLC*, 269 F.R.D. 221, 230 (S.D.N.Y. 2010) (citing *Lewis Tree Serv., Inc. v. Lucent Techs, Inc.*, 211 F.R.D. 228, 231 (S.D.N.Y. 2002)).  Commonality is also satisfied by demonstrating "that the class members 'have suffered the same injury.'" *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (citation omitted).  "[C]lass actions are particularly appropriate for antitrust litigation concerning price-fixing schemes because price-fixing presumably subjects purchasers in the market to common harm." *In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 240 (E.D.N.Y. 1998).[19]

Here, commonality is satisfied because all class members were allegedly injured by paying supra-competitive fess to accept Visa and MasterCard cards due to Defendants'

---

[19] *See also In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 509-10 (S.D.N.Y. 1996) ("Numerous courts have held that allegations concerning the existence, scope, and efficacy of an alleged antitrust conspiracy present important common questions sufficient to satisfy the commonality requirement of Rule 23(a)(2).") (collecting cases).

course of conduct.  All of the relevant facts focus on Defendants' conduct, and are common to the class.  Accordingly, the settlement classes satisfy Rule 23(a)(2).

### 3. Class Plaintiffs' Claims Are Typical of Those of the Classes.

The typicality requirement is satisfied where "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  For example, typicality is satisfied where "the named Plaintiffs' claims are for the same type of injury under the same legal theory as the rest of the class."  *Reid v. SuperShuttle, International, Inc.*, 2012 WL 3288816, at *4 (E.D.N.Y Aug. 10, 2012).

Class Plaintiffs' claims are typical of the classes as a whole.  Like those of the other members of the classes, Class Plaintiffs' injuries arise out of the same conduct by the same Defendants and are based on the same legal theories.  All members of the two classes seek redress for the overcharges they paid as a result of Defendants' conduct and/or seek to eliminate the wrongful conduct.  Because the same conduct was directed at both the Class Plaintiffs and other members of the classes, the Rule 23(a)(3) standard is met. *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 2012 WL 2532172, at *4 (S.D.N.Y. June 29, 2012).

### 4. The Settlement Classes are Fairly and Adequately Represented.

Rule 23's adequacy requirement is satisfied if "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  Plaintiffs seeking to meet this requirement must make two separate showings: first, that the class members do not have interests that are antagonistic to one another; and second, that class counsel are sufficiently qualified and experienced to manage the litigation.  *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 142 (2d Cir. 2001).

There are no conflicts between the Class Plaintiffs and other class members. Class Plaintiffs challenged the same course of conduct that caused them and all other class members to allegedly pay supra-competitive fees and prevented them from exerting competitive pressure on interchange fees. Consequently, the Class Plaintiffs' interest in proving liability and damages is aligned with that of other class members.

The qualifications and experience of Class Counsel are also not an issue. They diligently represented the interests of the class for over seven years, expended millions of dollars to that end, and will continue to do so. Accordingly, the requirements of Rule 23(a)(4) relating to qualifications of class counsel are satisfied.

**B.      The Damages Class Satisfies The Requirements Of Rule 23(b)(3).**

Rule 23(b)(3) provides for the certification of a damages class where "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The proposed settlement damages class, which consists of all merchants that have accepted Visa or MasterCard credit or debit cards in the United States at any time from January 1, 2004 (inclusive) until the date of preliminary approval, satisfies the Rule 23(b)(3) standard.

**1.      Common Questions of Law and Fact Predominate.**

The predominance standard requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). In the settlement context, "the predominance inquiry will sometimes be easier to satisfy" because settlement may eliminate manageability problems. *American Int'l Group*, 689 F.3d at 240-42 (finding the "manageability concerns posed by numerous

20

individual questions of reliance disappear" in the settlement of a Section 10(b) securities fraud case making a settlement class certifiable even though a litigation class would not be).  Moreover, where, as here, class plaintiffs allege that defendants' conduct caused damages to the settlement class, the predominance requirement is usually satisfied.  *See In re Sturm, Ruger, & Co., Inc. Sec. Litig.*, No. 2012 WL 3589610, at *10 (D. Conn. Aug. 12, 2012); *In re IMAX Sec. Litig.*, 2012 WL 2359653, at *7 (S.D.N.Y. June 20, 2012).  *See also American Int'l Group*, 689 F.3d at 241.

Here, because Class Plaintiffs alleged that injuries arise from conspiracies among the Defendants, issues common to members of the settlement damages class predominate over any individual questions.  *See Amchem*, 521 U.S. at 625 ("Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws."); *Continental Orthopedic Appliances, Inc. v. Health Ins. Plan of Greater N.Y., Inc.*, 198 F.R.D. 41, 46 (E.D.N.Y. 2000) ("[C]ourts frequently will certify a class in an antitrust case that involves allegations of conspiracy or monopoly, because questions regarding the scope and extent of the conspiracy or monopoly are likely to predominate.") (citations omitted).[20]  The complaint rests primarily upon the allegations that Defendants fixed interchange fees, and adopted rules that hindered any competitive pressure to reduce those fees.  As Class Plaintiffs' filings relating to the summary judgment motions show,[21] all members of the settlement damages class would use common proof to establish the existence of the conspiracies and their impact on all members of the class.

---

[20] For the same reasons, the "proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002) (quoting *Amchem*, 521 U.S. at 623); *Popalawski v. Metroplex on the Atlantic, LLC*, 2012 U.S. Dist. LEXIS 46408, at *24-25 (E.D.N.Y. Apr. 2, 2012) (same).

[21] *See, e.g.*, Dkt. Nos. 1494-1, 1494-3, 1495-4, 1543, 1545.

### 2.    A Class Action is the Superior Method for Resolving this Case.

The superiority prong requires "that a class action" be "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).[22] Rule 23(b)(3)'s superiority requirement is met "when the main objectives of Rule 23 are served," including "the efficient resolution of the claims or liabilities of many individuals in a single action, as well as the elimination of repetitious litigation and possibly inconsistent adjudications."  *D'Alauro v. GC Services, Ltd. Partnership*, 168 F.R.D. 451, 458 (E.D.N.Y. 2006) (citing *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)); *see also Cuevas v. Citizens Fin. Group, Inc.*, 2012 WL 1865564 at *5 (E.D.N.Y. May 22, 2012) (superiority exists where the class action will "achieve economies of time, effort, and expense and promote uniformity of decision as to persons similarly situated…") (citation omitted).  The court must balance, in terms of fairness and efficiency, the advantages of class action treatment against alternative available methods of adjudication.  *In re Nigeria Charter Flights Contract Litig.*, 233 F.R.D. 297, 301 (E.D.N.Y. 2006).  The superiority requirement, however, is applied in a more lenient fashion in the settlement context because the court "need not inquire whether the case, if tried, would present intractable management problems."  *Amchem*, 521 U.S. at 620; *American Int'l Group*, 689 F.3d at 239, 240.

Here the superiority requirement is satisfied.  Because the case is settled, no manageability issues will arise.  Nevertheless, a class action would be the only possible

---

[22] As Rule 23(b)(3) further provides, "[t]he matters pertinent to these findings include: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3).

means of resolving the claims of millions of merchants while, at the same time, avoiding the potential for "repetitious litigation" and "inconsistent adjudications" if the claims were brought separately. *Bourlas v. Davis Law Associates*, 237 F.R.D. 345, 354 (E.D.N.Y. 2006). Also, the overwhelming majority of class members who have neither the incentive nor the means to litigate their claims individually may pursue those claims only via the class device. *In re Sony SXRD Rear Projection TV Class Action Litig.*, 2008 WL1956267, at *14 (S.D.N.Y. May 1, 2008) (citation omitted); *In re Currency Conversion Fee Antitrust Litig.*, 224 F.R.D. 555, 566 (S.D.N.Y. 2004) (citation omitted).

### C.      The Requirements Of Rule 23(b)(2) Are Satisfied.

Rule 23(b)(2) requires a showing that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). *See Dukes*, 131 S. Ct. at 2557 ("The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted" and thus "*Rule 23(b)(2)* applies only when a single injunction or declaratory judgment would provide relief to each member of the class.") (internal citations omitted).

The standard is met in this case. Class Plaintiffs challenge Defendants' rules and conduct that affect every member of the proposed injunctive relief settlement class. Likewise, the rule changes achieved through the settlement will apply to all class members. Thus, class certification under Rule 23(b)(2) is appropriate.

### V.      THE NOTICE PLAN AND PLAN OF ALLOCATION AND DISTRIBUTION ARE REASONABLE.

Class Counsel, together with the Class Administrator, have devised a notice program and prepared mail and publication notices that satisfy the Rule 23(c)(2)(B) notice

standards, which govern classes certified pursuant to Rule 23(b)(3). *In re IMAX Sec. Litig.*, 2012 WL 2359653, at *5 (notice requirements for Rule 23(b)(3) classes stricter than for Rule 23(b)(2) classes (citing *Global Crossing*, 225 F.R.D. at 448)). Rule 23(c)(2)(B) requires the court to "direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." As required by Rule 23(c)(2)(B), the notices appended to the Settlement Agreement as Appendix F state concisely and clearly, in plain, easily understood language: (i) the nature of the action; (ii) the definitions of the classes certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3) and the terms of the releases.

Notice regarding a proposed settlement is adequate under both Rule 23 and due process standards if it "fairly apprise[s] the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings," and it can "be understood by the average class member." *Wal-Mart*, 396 F.3d at 114 (internal quotation and citation omitted). In this case, Class Plaintiffs used the services of a plain language expert to ensure that the notices are fully understandable to every class member.

The Notice Plan (attached as appendix E to the Settlement Agreement) was prepared with the aid of an experienced class administrator and provides for widespread direct mailed notice and published notice, robust media coverage, a comprehensive web site and a call-in site. Every criterion for a proper notice has been addressed.

24

The proposed Plan of Administration and Distribution (appendix I to the Settlement Agreement) similarly meets the standards for approval which require the proposed apportionment be "'fair and reasonable' under the particular circumstances of the case. [] 'An allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel.'" *Visa Check*, 297 F. Supp. 2d at 518-19 (internal citations omitted).  Here these requirements are easily met.  Payments to eligible claimants from the $6.05 billion fund will be based on actual or estimated interchange fees attributable to damages class members on Visa and MasterCard-branded transactions from January 1, 2004 through the date of preliminary approval, as compared to the total of all claim values for all damages class members on Visa and MasterCard-branded transactions during that same period of time.  Payments to eligible claimants from the estimated $1.2 billion Default Interchange Payments Fund will be based on one-tenth of one percent of the claimant's Visa and MasterCard credit card sales during the eight-month period as compared to total of all claim values for that fund.

## VI.    <u>CONCLUSION</u>.

For all of the reasons stated above, preliminary approval of the Class Settlement Agreement and certification of the settlement classes are warranted.


Dated:  October 19, 2012            ROBINS, KAPLAN, MILLER & CIRESI, L.L.P.


                                    By:    K. Craig Wildfang
                                           K. Craig Wildfang
                                           Martin R. Lueck
                                           Thomas J. Undlin
                                           Ryan W. Marth
                                           800 LaSalle Avenue, Suite 2800
                                           Minneapolis, MN 55402-2015
                                           (612) 349-8500

BERGER & MONTAGUE, P.C.


By:   H. Laddie Montague, Jr.
      H. Laddie Montague, Jr.
      Merrill G. Davidoff
      Bart D. Cohen
      Michael J. Kane
      1622 Locust Street
      Philadelphia, PA 19103
      (215) 875-3000


ROBBINS GELLER RUDMAN & DOWD LLP


By:   Bonny E. Sweeney
      Bonny E. Sweeney
      Patrick J. Coughlin
      David W. Mitchell
      Alexandra S. Bernay
      655 West Broadway, Suite 1900
      San Diego, CA 92101
      (619) 231-1058

      *Class Plaintiffs' Co-Lead Counsel*