UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------- X
                                         :
**In Re PAYMENT CARD INTERCHANGE**       :
**FEE AND MERCHANT DISCOUNT**            :  MDL No. 1720 (JG) (JO)
**ANTITRUST LITIGATION**                 :
                                         :  **Declaration of Pete Korpady In Support**
This Document Applies to:                :  **Of Objections of First Data Corporation,**
                                         :  **First Data Merchant Services, TASQ**
    ALL CLASS ACTIONS :  **Technology, Inc., TRS Recovery Services**
                                         :  **Inc., and TeleCheck to Plaintiffs' Motion**
                                         :  **for Preliminary Approval**
                                         :
---------------------------------------- X

I, Pete Korpady, declare as follows:

    1.    I am the Senior Vice President, Global Network Management of First Data Corporation. I have worked at First Data Corporation for approximately three years and I work at First Data Corporation's Atlanta, Georgia Headquarters. I am responsible for managing First Data's relationship with all payment networks, and the teams I manage have responsibility for all compliance activities associated with card acceptance and issuing processing on behalf of First Data. I make this declaration in support of First Data Corporation's Objections to Plaintiffs' Motion for Preliminary Approval. I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

    2.    First Data Corporation ("FDC" or "the Company") is a global payment processing company that has operations in 34 countries, serving approximately 6.2 million merchant locations. FDC was incorporated in Delaware in 1989 and was the subject of an initial public offering in connection with a spin-off from American Express in 1992. In 2007, FDC was acquired through a merger transaction with an entity controlled by affiliates of Kohlberg Kravis Roberts & Co. ("KKR"). The merger resulted in the equity of FDC becoming privately held.

    3.    FDC provides services to merchants, financial institutions and card issuers, including merchant transaction processing services; credit, debit, private-label, gift, payroll and other prepaid card offerings; fraud protection and authentication solutions; electronic check

acceptance services through TeleCheck; e-commerce and mobile payment solutions; and PIN-secured debit acceptance through FDC's STAR Network.  FDC provides these services through its affiliates and subsidiaries, including First Data Merchant Services, TASQ Technology, Inc., TRS Recovery Services Inc., and TeleCheck.  Neither FDC nor its affiliates and subsidiaries are retail merchants that provide goods and services to consumers who pay with credit cards.  But as described below, infra at paragraph 9, FDC and several of its affiliates accept Visa- and MasterCard-branded cards in connection with incidental goods and services they provide to their customers.

4. FDC operates in three segments:  Retail and Alliance Services, Financial Services and International.  The first two segments consist of operations that will be affected by the proposed settlement agreement and the releases found therein.

5. The Retail and Alliance Services segment is comprised of merchant acquiring and processing services, prepaid services and check verification, settlement and guarantee services.  Retail and Alliance Services businesses facilitate the acceptance of consumer transactions at the point of sale ("POS"), whether it is a transaction at a physical merchant location or over the internet.  Merchant acquiring services facilitate the merchants' ability to accept credit, debit, stored-value and loyalty cards by authorizing, capturing and settling the merchants' transactions.  Acquiring services also provide POS devices and other equipment necessary to capture merchant transactions.  The Company's strategy with banks, independent sales organizations and referral/sales partners provides the Company with broad geographic coverage, regionally and nationally, as well as a presence in various industries.  The alliance/referral partner structure allows the Company to be the processor for multiple financial institutions, any one of which may be selected by the merchant as their bank partner.  Additionally, bank partners provide brand loyalty and a distribution channel through their branch networks which increases merchant retention.

6. The Financial Services segment is comprised of:  (1) credit and retail card processing services; (2) debit network and processing services; (3) output services; and (4) other

services including remittance processing.  Financial Services provides issuer card and network solutions for credit, retail and debit card processing, debit network services (including the STAR network), output services to financial institutions and other organizations offering credit, debit and retail cards to consumers and businesses to manage customer accounts.  Financial Services also provides personal identification number ("PIN") debit network services through the STAR Network which enables PIN secured debit transaction acceptance at approximately 2.1 million ATM and retail locations in the U.S. as of December 31, 2011.  Financial services also offers payment management solutions for recurring bill payment and services to improve customer communications, billing, online banking and consumer bill payment as well as information services.  Revenue and profit growth in these businesses is derived from retaining and growing the core business and improving the overall cost structure.  Growing the core business comes primarily from an increase in debit and credit card usage, growth from existing clients and sales to new clients and the related account conversions.

       7.      The International segment is comprised of:  (1) credit, retail, debit and prepaid card processing; (2) merchant acquiring and processing; and (3) ATM and POS processing, driving, acquiring and switching services.  The merchant acquiring and card issuing services provided by the International segment are similar in nature to the services described above in the Retail and Alliance Services and Financial Services segments other than they include substantially all the services provided outside of the U.S. International has operations in 34 countries.  For a description of the International segment's merchant acquiring and card issuing businesses refer to the Retail and Alliance Services and Financial Services segment descriptions provided above.

       8.      In connection with this objection, First Data has undertaken to identify revenues of its subsidiaries that are derived from card acceptance by First Data companies.  Although, it represents a relatively miniscule proportion of First Data revenues, First Data subsidiaries do accept card transactions for certain payments.

9. Overall, receipts of Visa- and MasterCard-branded transactions accepted by First Data subsidiaries over the past 12 months represent less than 0.5% of First Data's 2011-reported revenue.

    a. First Data Merchant Services is a subsidiary of FDC that provides comprehensive payment processing and payment solutions. First Data Merchant Services accepts Visa- and MasterCard-branded cards in connection with the sale and leasing of POS terminals and related equipment. It also accepts American Express-branded cards for payment in its operations.

    b. TASQ Technology, Inc. is a subsidiary of FDC that provides point-of-sale (POS) equipment and services to banks and ISOs. TASQ Technology, Inc. accepts Visa- and MasterCard-branded cards in its operations. It also accepts American Express-branded cards for payment in its operations.

    c. TRS Recovery Services Inc. is a subsidiary of FDC that provides check loss recovery services. TRS Recovery Services Inc. accepts Visa- and MasterCard-branded cards in collecting amounts due from check writers who have written bad checks.

    d. In addition, certain First Data subsidiaries accept incidental credit card transactions from employees such as at the company cafeteria, for shipping services available from a company mailroom, or even for charitable contributions that can be made through the First Data Foundation. For example, TeleCheck, a subsidiary, offers its employees shipping services through the company mailroom that can be paid for with Visa- and MasterCard-branded cards.

10. FDC plays an important role in the payments industry. There are a number of different entities involved in a merchant transaction including the cardholder, card issuer, card association, merchant, merchant acquirer, electronic processor for credit and signature debit transactions, and debit network for PIN debit transactions. The card issuer is the financial institution that issues credit or debit cards, authorizes transactions after determining whether the

cardholder has sufficient available credit or funds for the transaction, and provides funds for the transaction. Some of these functions may be performed by an electronic processor (such as FDC's Financial Services business) on behalf of the issuer. The card associations, Visa or MasterCard, a debit network (such as STAR Network) or another payment network (such as Discover) route transactions between FDC and the card issuer. The merchant is a business from which a product or service is purchased by a cardholder. The acquirer (such as FDC or one of its alliances) contracts with merchants to facilitate their acceptance of cards. A merchant acquirer may do its own processing or, more commonly, may outsource those functions to an electronic processor such as the Retail and Alliance Services segment. The acquirer/processor serves as an intermediary between the merchant and the card issuer by: (1) obtaining authorization from the card issuer through a card association or debit network; (2) transmitting the transaction to the card issuer through the applicable card association, payment network, or debit network; and (3) paying the merchant for the transaction. The Company typically receives the funds from the issuer via the card association, payment network, or debit network prior to paying the merchant.

11. A transaction occurs when a cardholder purchases something from a merchant who has contracted with FDC, an alliance partner or a processing customer. When the merchant swipes the card through the POS terminal (which is often sold or leased, and serviced by FDC), FDC obtains authorization for the transaction from the card issuer through the card association, payment network or debit network, verifying that the cardholder has sufficient credit or adequate funds for the transaction. Once the card issuer approves the transaction, FDC or the alliance acquires the transaction from the merchant and then transmits it to the applicable debit network, payment network or card association, which then routes the transaction information to the card issuer. Upon receipt of the transaction, the card issuer delivers funds to FDC via the card association, payment network or debit network. Generally, FDC funds the merchant after receiving the money from the card association, payment network or debit network. Each participant in the transaction receives compensation for processing the transaction.

12. The Company and its alliances, as merchant acquirers/processors, have certain contingent liabilities for the transactions acquired from merchants. This contingent liability arises in the event of a billing dispute between the merchant and a cardholder that is ultimately resolved in the cardholder's favor. In such a case, the transaction is "charged back" to the merchant and the disputed amount is credited or otherwise refunded to the cardholder. FDC may, however, collect this amount from the card association if the amount was disputed in error. If FDC or the alliance is unable to collect this amount from the merchant, due to the merchant's insolvency or other reasons, FDC or the alliance will bear the loss for the amount of the refund paid to the cardholder. FDC often mitigates its risk by obtaining collateral from merchants considered higher risk because they have a time delay in the delivery of services, operate in industries that experience chargebacks or are less creditworthy.

13. The effect of the current surcharge rules on FDC can be illustrated with the following example: in a transaction using a Visa or MasterCard for $100.00 with an interchange rate of 1.5% (the cap on certain debit transactions has been changed to $0.21), the card issuer will fund the association $98.50 and bill the cardholder $100.00 on its monthly statement. The card association will retain assessment fees of approximately $0.10 and forward $98.40 to FDC. The Company will retain, for example, $0.40 and pay the merchant $98.00. The $1.50 retained by the card issuer is referred to as interchange and it, like assessment fees, is set by the card association. The $0.40 is the merchant discount and is negotiated between the merchant and the merchant acquirer.

14. In many spheres, FDC competes with Visa and MasterCard directly. For example, FDC's STAR Network competes with Interlink, owned by Visa, in PIN debit transactions. FDC's acquiring and processing business competes with CyberSource, the acquiring business owned by Visa.

15. The proposed settlement agreement would have a negligible impact on surcharge rules as they affect merchants and other entities. If the settlement agreement is approved, Visa and MasterCard would reduce their interchange fees for eight months, and would allow

merchants to pass surcharges for such fees on to customers who pay with Visa- and MasterCard-branded credit cards.  However, the total dollar amount of the payments Visa and MasterCard would make to the merchants would amount to two months' worth of interchange fees for Visa and MasterCard.  The releases in the settlement Agreement, on the other hand, would give Visa and MasterCard *permanent* relief from all future lawsuits based on interchange fees or, possibly, all antitrust cases even remotely connected to fees and surcharges.  Moreover, although technically merchants can pass on surcharges to their customers, the settlement agreement contains several pages of restrictions on even that ability.

16. For example, the settlement agreement is superseded by state laws that prohibit passing surcharges on to consumers.  There are ten states that currently do not allow businesses to surcharge consumers for paying with credit cards.  Those states are California (Cal. Civ. Code § 1748.1(a)); Colorado (Colo. Rev. Stat. Ann. § 5-2-212(1)); Connecticut (Conn. Gen. Stat. Ann. § 42-133ff(a)); Florida (Fla. Stat. Ann. § 501.0117(1)); Kansas (Kan. Stat. Ann. § 16a-2-403); Maine (Maine Rev. Stat. Ann. tit. 9-A, § 8-303(2)); Massachusetts (Mass. Gen. Laws Ann. ch. 140D, § 28A(a)(2)); New York (N.Y. Gen. Bus. Law § 518); Oklahoma (Okla. Stat. Ann. tit. 14A, §§ 2-211, -417); and Texas (Tex. Fin. Code Ann. § 339.001(a)).  For FDC and its affiliates, which have a significant percentage of their offices and facilities in these states, 77% of its subsidiaries' transactions are in these ten states.

17. Moreover, the settlement agreement also requires that merchants cannot treat Visa- and MasterCard-card transactions any differently than they treat other card transactions, including American Express.  American Express cards do not allow merchants to pass on surcharges to consumers, and so any merchant that accepts American Express cards would be prohibited from passing surcharges on to customers who pay with Visa and MasterCard.  Various FDC affiliates accept American Express-branded cards, including in states other than the ten above that prohibit surcharges.  In the past twelve months, every transaction in a state other than the ten above was through an entity that accepts American Express cards for payment.

18.     When you add together the transactions in ten states that prohibit surcharging and transactions by entities that accept American Express, the proposed settlement agreement would literally take away all equitable relief FDC could get through the various exceptions to equitable relief discussed above.

19.     Attached hereto as exhibits A through C graphical slides that describe authorization, clearing, and settlement of transactions over VisaNet, respectfully, and exhibit D a glossary of terms.  Exhibit A shows authorization occurs when (1) a cardholder swipes her card (2) the merchant sends the authorization request to the acquirer processor, (3) who in turn sends the request to Visa, (4) Visa routes the transaction information to the appropriate issuer processor (5) the issuer processor confirms the cardholder's credit limit and approves or declines the transaction back to Visa, (6) Visa forwards the response to the acquirer processor, (7) who then forwards it back to the merchant, (8) and the merchant either completes or declines the purchase at the point of sale.  First Data and its affiliates participate in each of the 8 steps depicted in Exhibit A.

20.     Exhibit B shows clearing occurs when (1) the merchant sends the day's sales to its acquirer processor, (2) the acquirer processor posts he transactions to the merchant's account, (3) and sends on the transaction data to Visa, (4) who then sends the data to the appropriate issuers, (5) who then post the transactions to the appropriate cardholder accounts.  First Data and its affiliates participate in each of the 5 steps depicted in Exhibit B.

21.     Exhibit C shows settlement occurs when (1) Visa sends the net settlement data (sales amount less fees) to the issuer processor, (2) and sends the same information to the acquirer processor, (3) the issuer processor sends the settlement data to the issuer, (4) and the acquirer processor sends the settlement data to the acquirer, (5) the acquirer deposits the settlement amount (less fees) into the merchant's account, (6) Visa requests the appropriate amount form the issuer, (7) and Visa wires the payment amount less fees to the acquirer, (8) the issuer processor sends a monthly bill to the cardholder, (9) and the cardholder pays the issuing bank.  First Data and its affiliates participate in each of the 9 steps depicted in Exhibit C.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Dated: October 29, 2012

*[signature]*

Pete Korpady
SVP, Head of Global Network Management
First Data Corporation
5565 Glenridge Connector NE GH2-26
Atlanta, GA 30342
Telephone: (404) 890-2525