UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

IN RE PAYMENT CARD           :
INTERCHANGE FEE AND          :     MDL Docket No. 1720
MERCHANT DISCOUNT            :
ANTITRUST LITIGATION         :     MASTER FILE NO.
                             :     1:05-md-1720-JG-JO
This Document Relates To:    :
                             :
ALL CLASS ACTIONS            :
                             :
                             :

---

## REPLY MEMORANDUM OF LAW IN SUPPORT OF CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

### FILED UNDER SEAL

# REDACTED

**TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   STANDARDS FOR CLASS CERTIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . 7

III.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    A.    Plaintiffs Have Satisfied the "Predominance" Requirement by Showing that the
        Critical Issues in the Case, Including Injury, are Common to the Class . . . . . . . 11

    B.    There Are No Conflicts Within the Proposed Class, and Plaintiffs Have
        Established They Can Prove Injury and Damages on a Class-Wide Basis. . . . . 12

            1.    Plaintiffs Satisfy Rule 23(a)(4), as There is No Disabling Conflict Among
                Class Members. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

            2.    The Injunctive Class is Cohesive and Satisfies F.R.C.P. 23(b)(2). . . . . . 14

            3.    Defendants' Conflict and Predominance Arguments are Also Based on
                Erroneous and Unfounded  Assumptions Regarding Co-Branding
                Agreements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

            4.    Co-Branding Merchants Account for a Minuscule Percentage of Class
                Membership, and a Small Percentage of Transaction Volume; Even if
                These Agreements Presented Some Individual Issues, They Are Not
                "Predominant." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

            5.    Individually-Negotiated Agreements Between a Handful of Merchants and
                 the Networks Do Not Create Disabling Conflicts or
                Destroy Commonality. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

            6.    Merchant-Issuers are Not Members of the Proposed Class. . . . . . . . . . . 32

            7.    Defendants' Speculation that Other Merchants Could be Harmed by the
                 Relief Plaintiffs Seek does not Create any Conflict of Interest Within the
                Class or Destroy Commonality. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

            8.    Defendants' Claim of Offsets is Contrary to Settled Law. . . . . . . . . . . . 35

            9.    Co-Branding Agreements do not Create Individual Issues.  . . . . . . . . . 40

    C.    Plaintiffs Can Establish the Class-Wide Impact of an Intra-Network Conspiracy

i

for All Class Members. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

1.  Plaintiffs' Proposed World Without Interchange Fees   Properly
    Considered Plausible Changes in Addition to the Elimination of
    Interchange Fees  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

2.  Dr. Snyder's Proposed Changes to the Rules of Visa and MasterCard that
    Might Have Occurred in a World Without Interchange Fees are
    Unsupported Speculation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

3.  The Plausibility of a World Without Interchange Fees is Supported by
    Defendants' Own Consultants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

4.  Other Payment Networks Have Operated Successfully Without
    Interchange Fees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

5.  Dr. Snyder Failed to Analyze the Effect of Interchange Fees if Defendants
    Would Have Had acted in Accordance with the Antitrust Laws. . . . . . 47

6.  Defendants' Characterization of Payment Card Transactions as "Factoring"
    is a Counter-Factual Fiction Defendants Adopted Strictly for Litigation
    Purposes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

7.  The Court Would Not be "Price-Setting" by Concluding that Defendants
    Would Not Have Charged Interchange Fees in the But-For World. . . . . 55

8.  Plaintiffs Can Establish Injury on a Class-Wide Basis in the But-For
    World  in which Interchange Fees are Reduced By 72 Percent. . . . . . . 56

D.  Dr. Snyder's Opinions are Unreliable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

1.  Dr. Snyder Has No Experience in Dealing with Payment Card
    Networks. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

2.  Dr. Snyder's Claim that Issuing Banks Almost Always Bear the Risk of
    Loss is Wrong. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

3.  Defendants Evidently Chose Dr. Snyder Because He has Never Before
    Written about the Payment Card Industry. . . . . . . . . . . . . . . . . . . . . . . 65

E.  Dr. Bamberger's Opinions Satisfy the IPO Standard. . . . . . . . . . . . . . . . . . . 66

F.  Plaintiffs can Prove Liability and Class-Wide Injury Arising from Defendants'
    Inter-Network Conspiracy Using Evidence Common to All Class Members. . . 69

ii

G.   Plaintiffs Rely on Common Proof to Demonstrate that the Illinois Brick Indirect Purchaser Rule Does Not Apply. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

   1.   Merchants Pay Interchange Fees to Card-Issuing Banks and Suffer Antitrust Injury from Collective Setting of Interchange Fees. . . . . . . . 73

      a.   Acquiring Banks Suffer No Antitrust Injury from the Collective Setting of Interchange Fee. . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

      b.   Third-Party Processors and ISO's Suffer No Antitrust Injury from Collective Setting of Interchange Fees. . . . . . . . . . . . . . . . . . . . 77

   2.   Kendall was Erroneously Decided, and Kendall and Paycom are Distinguishable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

   3.   Even  if Illinois Brick Applied, Evidence Common to All Class Members Reflects that Exceptions Apply. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

H.   Plaintiffs Can Prove Damages on a Class-Wide Basis. . . . . . . . . . . . . . . . . . . 82

I.   Plaintiffs Can Prove Market Power on a Class-Wide Basis. . . . . . . . . . . . . . . 85

IV.   CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

iii

# TABLE OF AUTHORITIES

## CASES

*In re ATM Fee Antitrust Litig.,*
    554 F. Supp. 2d 1003 (N.D. Cal. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 56, 77

*In re Alcoholic Beverages Litig.,*
    95 F.R.D. 321 (E.D.N.Y. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 39

*Allied Orthopedic Appliances Inc. v. Tyco Healthcare Group L.P.,*
    247 F.R.D. 156 (C.D. Cal 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 59, 71

*Amara v. CIGNA Corp.,*
    2002 WL 31993224 (D. Conn. Dec. 20, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Amchem Products, Inc. v. Windsor,*
    521 U.S. 591 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*American Seed Co., Inc. v. Monsanto Co.,*
    238 F.R.D. 394 (D. Del. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Arden Architectural Specialties, Inc. v. Washington Mills Electro Minerals Corp.,*
    2002 WL 31421915 (W.D.N.Y. Sept. 17, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . 57, 70

*Arizona v. Shamrock Foods Co.,*
    729 F.2d 1208 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

*In re Auction Houses Antitrust Litig.,*
    193 F.R.D. 162 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39,

*Barnes v. The American Tobacco Company,*
    161 F.3d 127 (3d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*Berkey Photo, Inc. v. Eastman Kodak Co.,*
    603 F.2d 263 (2d Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Blades v. Monsanto Co.,*
    400 F.3d 562 (8th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 42, 71

*Blue Shield of Virginia v. McCready,*
    457 U.S. 465 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73, 76

*Bogosian v. Gulf Oil Corp.,*

561 F.2d 434 (3d Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 38

*In re Brand Name Prescription Drugs Antitrust Litig.,*
    123 F.3d 599 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

*Brennan v. Concord EFS, Inc.,*
    369 F. Supp. 2d 1127 (N.D. Cal. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*In re Carbon Black Antitrust Litig.,*
    2005 WL 102966 (D. Mass. Jan. 18, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70, 71

*In re Cardizem CD Antitrust Litig.,*
    200 F.R.D. 297 (E.D. Mich. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 35, 36, 83

*Chattanooga Foundry & Pipe Works v. City of Atlanta,*
    203 U.S. 390 (1906) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 82

*Coleman v. GMAC,*
    220 F.R.D. 64 (M.D. Tenn. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Cordes & Co. Fin. Serv., Inc. v. A.G. Edwards & Sons, Inc.,*
    502 F.3d 91 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 36

*Crane v. Int'l Paper Co.,*
    2005 WL 3627139 (D.S.C. Apr. 19, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80, 81

*Danvers Motor Co.., Inc.. v. Ford Motor Co.,*
    543 F.3d 141 (3d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Diskin v. Daily Racing Form, Inc.,*
    1994 WL 330229 (S.D.N.Y. Jul. 7, 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

*Drug Mart Pharm. v. American Home Prods.,*
    296 F. Supp. 2d 423 (E.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

*Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130,*
    657 F.2d 890 (7th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Freeland v. AT & T Corp.,*
    238 F.R.D. 130 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Freeman v. San Diego Association of Realtors,*
    322 F.3d 1133 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77, 81

*General Tel. Co. v. Falcon,*
    457 U.S. 147 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*In re Graphics Processing Units Antitrust Litig.,*
    253 F.R.D. 478 (N.D. Cal. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
*Griffin v. Burns,*
    570 F.2d 1065 (1st Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Groover v. Michelin of North America, Inc.,*
    192 F.R.D. 305 (M.D. Ala. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Halford v. Goodyear Tire & Rubber Co.,*
    161 F.R.D. 13 (W.D.N.Y. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Hanover Shoe Inc. v. United Shoe Mach. Corp.,*
    392 U.S. 481 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 36, 37, 83

*Hawaii v. Standard Oil Co.,*
    405 U.S. 251 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 76

*In re High Fructose Corn Syrup Antitrust Litig.,*
    295 F.3d 651 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71, 87

*Hnot v. Willis Group Holdings Ltd.,*
    241 F.R.D. 204 (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Horton & Goose Creek Indep. School Dist.,*
    690 F.2d 470 (5th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Howard Hess Dental Lab, Inc. v. Dentsply Intern., Inc.,*
    424 F.3d 363 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80, 82

*IPO Sec. Litig.,*
    471 F.3d 24 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-10

*Illinois Brick Co. v. Illinois,*
    431 U.S. 720 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.,*
    225 F.R.D. 208 (S.D. Ohio 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Jacobi v. Bache & Co., Inc.,*
    1972 Trade Cas. (CCH) ¶ 73,980 (S.D.N.Y. 1972) . . . . . . . . . . . . . . . . . . . . . 16, 17

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

*Leider v. Ralfe*,
    2003 WL 22339305 (S.D.N.Y. Oct. 10, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

*In re Linerboard Antitrust Litig.*,
    203 F.R.D. 197 (E.D. Pa. 2001) aff'd. 305 F.3d 145 (3d Cir. 2002) . . . . . 7, 30, 57, 67, 68

*In re Live Concert Antitrust Litig.*,
    247 F.R.D. 98 (C.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Loeb Industries, Inc. v. Sumitomo Corp.*,
    306 F.3d 469 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*Los Angeles Memorial Coliseum Comm'n v. National Football League*,
    791 F.2d 1356 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84, 85

*In re Master Key Antitrust Litig.*,
    528 F.2d 5 (2d Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

In Re Medical X-Ray Film Antitrust Litig.,
    1997 WL 33320580 (E.D.N.Y. Dec. 26, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

*Meijer, Inc. v. Abbott Labs.*,
    2008 WL 4065839 (N.D. Cal. Aug. 27, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*Meijer, Inc. v. Warner Chilcott Holdings Co.*,
    246 F.R.D. 293 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 29

*In re NASDAQ Market-Makers Antitrust Litig.*,
    169 F.R.D. 493 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 36, 57, 70, 78

*NaBanco v. Visa*,
    596 F. Supp. 1231 (S.D. Fla. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 61, 66, 77, 78

*In re Nassau County Strip Search Cases*,
    461 F.3d 219 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*,
    247 F.R.D. 253 (D. Mass. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*National Bancard Corp. v. Visa U.S.A., Inc.*,

596 F.Supp. 1231 (S.D. Fla. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*In re New Motor Vehicles Canadian Export Antitrust Litig.,*
522 F.3d 6 (1st Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

*Norwalk CORE v. Norwalk Redevelopment Agency,*
395 F.2d 920 (2d. Cir. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*Ohio Valley Elec. Corp. v. General Elec. Co.,*
244 F. Supp. 914 (S.D.N.Y. 1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

*Paper Sys. Inc. v. Nippon Paper Indus. Co.,*
281 F.3d 629 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

*Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.,*
467 F.3d 283 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

*Philadelphia Elec. Co. v. Anaconda Am. Brass Co.,*
43 F.R.D. 452 (E.D. Pa. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

*Phillips v. Klassen,*
502 F.2d 362 (D.C. Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Pickett v. Iowa Beef Processors,*
209 F.3d 1276 (11th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Presidio Golf Club v. National Linen Supply Corp.,*
1976 WL 1359 (N.D. Cal. Dec. 30, 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Reiter v. Sonotone Corp.,*
442 U.S. 330 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*In re Relafen Antitrust Litig.,*
218 F.R.D. 337 (D. Mass. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*In re Rezulin Products Liability Litigation,*
210 F.R.D. 61 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Richards v. FleetBoston Financial Corp.,*
235 F.R.D. 165 (D. Conn. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 19, 30

*Robinson v. Metro-North Commuter R.R. Co.,*
267 F.3d 147 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

viii

*Robinson v. Texas Auto. Dealers Ass'n,*
    387 F.3d 416 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 71

*Sharif v. New York State Educ. Dep't,*
    127 F.R.D. 84 (S.D.N.Y. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*In re St. Jude Med., Inc.,*
    425 F.3d 1116 (8th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re Sulfuric Acid Antitrust Litig.,*
    2007 WL 898600 (N.D.Ill. Mar. 21, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70, 87

*Teamsters Local 445 v. Bombardier, Inc.,*
    546 F.3d 196 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Teva Pharm. USA, Inc. v. Abbott Labs.,*
    252 F.R.D. 213 (D. Del. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Visa U.S.A., Inc.,*
    163 F. Supp. 2d 322 (S.D.N.Y. 2001) aff'd. 344 F.3d 229 (2d Cir. 2003) . . . . . . . . 55, 87

*In re Urethane Antitrust Litig.,*
    251 F.R.D. 629 (D. Kan. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 29

*Valley Drug Co. v. Geneva Pharm., Inc.,*
    350 F.3d 1181 (11th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 82

*Velez v. Novartis Pharm. Corp.,*
    244 F.R.D. 243 (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*In re Visa Check/MasterMoney Antitrust Litig.,*
    192 F.R.D. 68 (E.D.N.Y. 2000) aff'd. 280 F.3d 124 (2d Cir. 2001) . . . . . . . . . . . passim

*Visa U.S.A. Inc. v. First Data Corp.,*
    Case No. 02-1786 (N.D. Cal. May 25, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 23, 66

*Visa v. First Data Corp.,*
    2006 WL 1310448 (N.D. Cal. May 12, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*In re Vitamins Antitrust Litig.,*
    209 F.R.D. 251 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57, 70

*Walters v. Reno,*

145 F.3d 1032 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Waste Mgmt. Holdings, Inc. v. Mowbray,*
    208 F.3d 288 (1st Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*In re Wellbutrin SR Direct Purchaser Antitrust Litig.,*
    2008 WL 1946848 (E.D. Pa. May 2, 2008) . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 29, 35

*Wilder v. Bernstein,*
    499 F. Supp. 980 (S.D.N.Y. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## STATUTES

Fed.R.Civ.P. 23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 14

## MISCELLANEOUS

Alba Conte & Herbert B. Newberg, 1 *Newberg on Class Actions* § 3:30 (4th ed. 2005) . . . . . . 17

American Bar Ass'n Antitrust Section, *Proving Antitrust Damages: Legal and Economic
Issues* 209-13 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 82

Areeda et al., 2A *Antitrust Law* ¶ 392c (3d ed. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . 84, 85

Herbert Hovenkamp, *Federal Antitrust Policy: The Law of Competition And its
Practice,* § 17.6b (2d ed. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 82

*Manual for Complex Litigation* § 21.142 (4th ed. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

x

## I.  PRELIMINARY STATEMENT

Class Plaintiffs respectfully submit this Reply Memorandum of Law in support of their pending motion for class certification.  Class Plaintiffs' opening brief, expert declaration, and voluminous evidentiary support, overwhelmingly established that:

- Despite being cloaked in the veneer of an otherwise "lawful joint venture," the conduct challenged is a classic horizontal price-fixing agreement, buttressed by restraints intended to cement Defendants' collective market power;

- The adverse impact of Defendants' collective actions upon the merchant class is both enormous and universal.  As a result of the challenged conspiracy, merchants have paid billions of dollars in price-fixed interchange fees to the Defendant card-issuing banks, interchange fees which those banks deduct from every transaction, at rates which vastly exceed those that prevail elsewhere in the world;

- Plaintiffs can readily prove that the impact of Defendants' conduct is felt class-wide, and can calculate the damages suffered by the merchant class formulaically;

- The network rules Plaintiffs seek to enjoin, including the rules requiring the payment of fixed interchange fees and the anti-steering rules, affect all class members, making the class cohesive and free of individual issues.

Defendants' opposition – most notable for its lack of supporting evidence from either the public record or the discovery record in this case, and premised almost entirely by the ipse dixits of an expert who invariably opposes class certification – attempts to gloss over the near-routine certification of classes in cases like this one, which challenge horizontal price-fixing agreements, as well as the certification of a substantially identical class by this very Court in *In re Visa Check/MasterMoney Antitrust Litig.*, 192 F.R.D. 68 (E.D.N.Y. 2000) ("*Visa Check I*"), *aff'd, In*

*re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124 (2d Cir. 2001) ("*Visa Check II*").
And while Defendants' arguments opposing class certification are premised in large part on
alleged "conflicts" among class members, Defendants' opposition is devoid of any support for
their position from even one of the thousands of merchants whom Defendants claim would be
harmed by the relief Plaintiffs seek in this case.

 Defendants' attacks on the plausibility of the "but-for" worlds Plaintiffs advanced in
their opening papers fare no better. These attacks are based almost entirely on the speculation of
their own expert and his unsubstantiated criticism of the plausibility of the but-for worlds posited
by Plaintiffs' expert. Defendants' expert ignores the fact that Plaintiffs' posited but-for worlds
are reflected in the actual existence of strikingly similar "worlds" in other developed countries in
which Visa and MasterCard dominate the market – "worlds" which would have existed in the
United States, absent the antitrust violations that precipitated this case. Finally, Defendants for
the first time purport to raise a standing issue with their claim that merchants do not "directly"
pay interchange fees. This position is both unsupported by Defendants' own expert, and contrary
to an array of the evidence in the record.

 Defendants' entire conflict and common impact arguments boil down to the assertion that
the existence of "co-branding" agreements – which affect less than one percent of all class
members, and provide for the exchange of independent consideration pursuant to independent
agreements entirely separate from the card acceptance services at issue in this case – requires
denial of class certification. However, Defendants' contention – which is contradicted by the
factual record – that what certain card-issuing banks pay to that small percentage of merchants
pursuant to co-branding agreements: (a) would disappear entirely in a world with reduced or no
interchange fees; (b) creates predominating issues of individual impact; (c) should serve as

"offsets" to damages; and (d) constitutes the basis for a finding of class conflict. They are incorrect on all counts.

Defendants' theories find no support in the contemporaneous record, antitrust damages principles or Rule 23 precedent. First, the record uniformly reflects that co-branding agreements compensate merchants for goodwill, trade names, customer lists, customer leads, frequent flyer miles, hotel points, and other services that all have their own significant and independent value and thus are entirely independent of the central question in this case, *i.e.*, whether Defendants have overcharged class members for card acceptance services and if so, by how much. In a price-fixing case such as this, in which the class seeks recovery of the traditional remedy of overcharge damages for price-fixed services, the presence of such independent agreements, the consideration paid pursuant to them, and the question of whether or to what extent such agreements would have existed in the but-for world are all utterly irrelevant.

Defendants' claim that the independent consideration paid pursuant to these agreements should form the basis for an offset is fundamentally baseless. It runs contrary to the well-established rule that damages in a horizontal price-fixing case are measured strictly by the unlawful overcharge to the victims, and Defendants nowhere explain how, consistent with a sound application of the principles and Second Circuit law underlying Rule 23, unrelated "benefits" to a relative handful of class members would somehow negate          in annual interchange fees collectively extracted from the class as a whole. Moreover, even if the question were relevant (which it is not), the notion that such agreements would have "disappeared" in a but-for world is contradicted both by a common sense appraisal of the economics of those agreements, and real world examples (such as Australia, where they continue to exist despite interchange fees that are a fraction of those in the United States). Thus, the presence of a

REDACTED

relatively small number of co-branding agreements between card-issuing banks and certain merchants presents no basis for a denial of class certification, a denial which, in light of the overwhelmingly large number of important common issues, would needlessly relegate those complex common issues to an unwieldy number of individual proceedings.  If it proves anything, Defendants' focus on separate agreements involving a tiny percentage of class members only highlights their inability to rebut Plaintiffs' evidence that numerous and fundamental common issues overwhelmingly predominate in this case.  Likewise, Defendants' attempt to justify interchange payments to card-issuing banks with the notion that credit card transactions constitute "factoring" finds absolutely no support in the evidentiary record and is a position from which even Defendants' expert has been forced to retreat.

As a result of the absence of genuine factual support for their position, Defendants' attack on class certification is exceptionally narrow, and barely addresses the wide-ranging and most significant issues that are common to all class members.  Plaintiffs' foremost allegation attacks Defendants' collusive imposition and enforcement of rules requiring merchants to pay fixed interchange fees on every Visa- and MasterCard-branded credit and debit card transaction, fees that total in the tens of billions of dollars every year.  At all relevant times, Defendants fixed interchange fees by merchant category, card type and transaction volume on both the Visa and MasterCard networks, and have repeatedly exercised their market power by raising those fees.[1] Defendants do not even suggest that the threshold and centrally important issue of the legality of

---

[1]   *See* Plaintiffs' Memorandum of Law in Support of Class Plaintiffs' Motion for Class Certification ("Pls.' Mem.") at 7-19, 46, 53-57 and Exs. 56-66, 136-147 and 160-165 to the Declaration of Michael J. Kane in Support of Class Plaintiffs' Motion for Class Certification (here, "Kane Decl."). *See also* Ex. 3 to the Declaration of Matthew P. McCahill in Support of Plaintiffs' Reply Memorandum of Law in Support of Plaintiffs' Motion fo Class Certification. All other exhibits appended to the McCahill Declaration will be referred to here as "McCahill Decl. Ex. __."

those collectively imposed and fixed interchange fees, and other network-wide rules, is not common to all class members.

Those issues are the most significant in a long list of issues that are common to the class, the commonality and predominance of which Defendants cannot and do not dispute. In particular, Defendants dispute none of the following:

- Evidence that Defendants require merchants to pay fixed interchange fees so as to fix the price of card acceptance services at supra-competitive levels is common to the class.[2]

- Evidence that acquiring banks did not negotiate interchange fees with merchants or with issuer banks is common to the class.[3]

- Evidence that merchant contracts with acquiring banks require merchants to obey the Networks' rules is common to the class. These include the rule that is central to this case, which requires all member banks to require merchants to pay the applicable interchange fee.[4]

- That all merchants are likewise bound by the anti-steering rules, which serve to restrain them from avoiding the consequences of having to pay fixed interchange fees. The legality of these rules are issues that will be resolved through evidence common to the class.[5] In fact, Defendants admit that the anti-steering rules support the system they have established.

- With minimal exceptions, merchants have no practical choice other than to accept Visa and MasterCard payment cards. That issue is common to the class.[6]

- Fixed, mandatory interchange fees are not necessary for the operation of a mature payment card network. That issue is common to the class.[7]

- The restructuring agreements that resulted in MasterCard's and Visa's initial public offerings,[8] and the IPOs themselves are antitrust violations. Those issues are common to the class.[9]

---

[2] *See* Pls.' Mem. at 12-26.

[3] *See* Pls.' Mem. at 44-45.

[4] *See* Pls.' Mem. at 13-17.

[5] *See* Pls.' Mem. at 19-22.

[6] *See* Pls.' Mem. at 55-56.

[7] *See* Pls.' Mem. at 22-24, 57-64.

- • The definition of the relevant markets, and Defendants' market power in those markets are issues that are common to the class.[10]

- • MasterCard's and Visa's IPOs threaten to reduce competition in the relevant market. That issue is common to the class.[11]

In short, Plaintiffs have established by a preponderance of the evidence that common issues predominate, both in the sense of their importance to the case and the quantum of proof which will be introduced at a trial of this matter, based solely on what Defendants do *not* say in opposing class certification. Even if the issues Defendants raise in their opposition were in fact relevant individual issues, which they are not, the Court would be justified in certifying the class because the common issues that Defendants do not contest are predominant.[12] The abundance of pages in Defendants' submission does not reflect an abundance of individual issues. Those pages in fact reflect just the opposite: a forced and unpersuasive effort to overcome what is a well-supported and well-founded motion for class certification.

---

[8] Contemporaneously with the filing of this Reply Memorandum, Class Plaintiffs are filing and serving a Second Supplemental Class Action Complaint challenging the Visa restructuring that culminated with its IPO in March of 2008.

[9] *See* Pls.' Mem. at 73.

[10] *See* Pls.' Mem. at 72.

[11] *See* Pls.' Mem. at 73.

[12] Rule 23 does not require the absence of individual issues, it only requires that common issues "predominate." *Visa Check II*, 280 F.3d at 140 ("The predominance requirement calls only for predominance, not exclusivity, of common questions.") (quoting *In re Alcoholic Beverages Litig.*, 95 F.R.D. 321, 327-28 (E.D.N.Y. 1982)); *Freeland v. AT & T Corp.*, 238 F.R.D. 130, 142 (S.D.N.Y. 2006) ("Predominance is established if the legal or factual issues that can be resolved through generalized proof are 'more substantial than the issues subject only to individualized proof.'") (citation omitted). Defendants cannot credibly dispute that the primary issues in this case are the legality of their interchange fees and interchange-related restraints, and that those issues, as well as a host of other common issues, will be resolved through evidence common to the class.

Plaintiffs have satisfied their burden under Fed.R.Civ.P. 23 and the law of this Circuit, and the Court should certify the classes.

## II.     STANDARDS FOR CLASS CERTIFICATION

Plaintiffs' opening brief provided the Court with evidence sufficient to determine that "each of the Rule 23 requirements has been met," in the form of comprehensive empirical investigation and analysis using recognized and accepted methodologies. *IPO Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006) ("*IPO*").[13] The record evidence summarized in Plaintiffs' Memorandum, and the analysis reflected in Dr. Bamberger's Declarations have shown that each relevant economic and legal issue in this case can be resolved using evidence common to the class.[14] Dr. Bamberger's opinion, together with the evidentiary record relevant to these issues, show that, under a rigorous analysis, Plaintiffs have satisfied Rule 23's "typicality," "adequacy" and "predominance" standards – as required by the *IPO* court.

Defendants' overarching premise is that this Court should deny class certification here, even though it granted certification in *Visa Check I* to a virtually identical class, because the intervening *IPO* decision has set a new standard for class certification in the Second Circuit under which, they claim, certification would have been denied in *Visa Check I*. Defendants are wrong. Pursuant to *IPO* and its progeny, this Court must receive evidence sufficient to establish by a preponderance of the evidence that each requirement of Rule 23 is fulfilled, and must conduct a rigorous analysis as to each prerequisite, even if these inquiries delve into the merits of

---

[13] *See also In re Linerboard Antitrust Litig.*, 305 F.3d 145, 153-154 (3d Cir. 2002) ("*Linerboard*").

[14] *See generally*, Kane Decl. Ex. 1, Declaration of Gustavo Bamberger, Ph.D. ("Bamberger Decl."); McCahill Decl. Ex. 1, Reply Declaration of Gustavo Bamberger, Ph.D. ("Bamberger Reply Decl.").

the substantive claims.[15] *Teamsters Local 445 v. Bombardier, Inc.*, 546 F.3d 196, 202-04 (2d Cir. 2008) ("*Bombardier*"); *IPO*, 471 F.3d at 41. This unsurprising holding clarified prior precedent and built on long-standing Supreme Court precedent. *General Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982) ("*Falcon*"); *IPO*, 471 F.3d at 33. *IPO* thus made clear that a court is to definitively assess all class certification issues, "notwithstanding their overlap with merits issues," arguably a point that was previously ambiguous in the Second Circuit. *IPO*, 471 F.3d at 41.

Such a probing analysis is exactly what Plaintiffs have expected and encouraged, citing reliable expert opinion and numerous facts of record that establish each relevant Rule 23 requirement and the propriety of class certification. Indeed, the facts in *IPO* and *Bombardier* further reflect why Plaintiffs' claims are appropriately adjudicated on a class-wide basis. In *IPO*, the plaintiffs' securities fraud claims depended on proof of reliance and lack of knowledge by every member of the class. Because such issues of subjective thought and belief would require individualized assessment of class members, common issues could not predominate. *IPO*, 471 F.3d at 42-45. Similarly, in *Bombardier*, the "'decisive' question" was whether the plaintiffs could show "that common proof could be used to establish the *reliance* element of their [securities fraud] claim." *Bombardier*, 546 F.3d at 199 (emphasis added). Unlike *IPO* and *Bombardier*, the substantive issues in this case center on Defendants' actions, rather than Plaintiffs' and class members' states of mind, and are thus readily subject to common proof and determination.

---

[15] To avoid the risk of a "mini-trial" on the underlying claims, the district judge retains "considerable discretion" to limit the discovery and hearing on Rule 23 questions. *IPO*, 471 F.3d at 41.

Defendants suggest that the Second Circuit's ruling in *IPO* draws into question the propriety of the certification decision in *Visa Check I*. In fact, the opposite is true. While the Second Circuit rejected the "not fatally flawed" standard it had applied to the plaintiffs' expert in *Visa Check I*, the inquiry and analysis of the *Visa Check I* court otherwise conform squarely to *IPO*. In *Visa Check I*, this Court carefully scrutinized and weighed the facts and expert evidence proffered by both sides in concluding that the plaintiffs had "carried their burden of establishing the prerequisites of a class action under Rule 23(a)" and Rule 23(b)(3). *Visa Check I*, 192 F.R.D 68, 74-90. Although the Court recited language from *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 292 (2d Cir.1999), and *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974), the opinion also stated that a "court may certify a class action only if it is 'satisfied after a rigorous analysis' that [Rule 23's] prerequisites have been established." *Id.* at 79 (citing *Falcon*, 457 U.S. at 161). As though presaging *IPO*, the Court continued: "This analysis will inevitably be 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action,'" such that "the court may be required to 'probe behind the pleadings before coming to rest on the certification question.'" *Id.* (internal citations omitted).

Moreover, the substance of the analysis in *Visa Check I* demonstrates that the Court applied a rigorous standard that satisfied *IPO*. In resolving defendants' motion to strike plaintiffs' expert report and the motion for class certification, the Court meticulously summarized and evaluated the competing opinions and evidence of the experts. *Id.* at 74-78, 81-88. Addressing the plaintiffs' antitrust claims element by element, the Court considered the experts' respective theoretical and empirical support for the parties' arguments as to typicality, adequacy and predominance. *Id.* at 80-88. The Court focused on the defendants' principal contention that injury-in-fact was not amenable to resolution by common proof. *Id.* at 81. After

examining in detail the defendants' arguments, the plaintiffs' responses thereto, and the strengths and weaknesses of both sides, the Court concluded that the plaintiffs' expert had successfully refuted defendants' assertions with "both empirical evidence and economic theory." *Id.* at 84. Thus, to resolve the motion to strike and the class certification questions, this Court in *Visa Check I* outlined and evaluated the points and counterpoints of the opposing experts and rendered an extremely thorough and well-reasoned decision under any standard. *See VisaCheck II*, 280 F.3d at 135 ("The district court, in an almost fifty page opinion, thoroughly considered each of defendants' criticisms of Carlton's [plaintiffs' expert's] theory and Carlton's response to each of those criticisms and concluded in each case that Carlton's response sufficiently addressed the criticism.").

Recognizing this exact point, the Court of Appeals in *IPO* expressly noted that "[i]t is not clear that the district court in *Visa Check I*" had actually applied the more lenient "not fatally flawed rule" when it evaluated the plaintiffs' expert report and granted certification. *IPO*, 471 F.3d at 36 & n.7, 42. Thus, when viewed in terms of its substantive analysis, *Visa Check I* could serve as a model example of the type of scrutiny *IPO* demands.

Now, as before *IPO*, the question at this juncture remains whether the requirements of Rule 23 are met. "This Court has noted that 'the holdings of *In re IPO* are both significant and narrow – a district judge must consider all the evidence in determining whether Rule 23 has been satisfied, but a district judge may not go beyond the boundaries of Rule 23 when making such a determination.'" *Velez v. Novartis Pharm. Corp.*, 244 F.R.D. 243, 257 (S.D.N.Y. 2007) (citing *Hnot v. Willis Group Holdings Ltd.*, 241 F.R.D. 204, 209 (S.D.N.Y. 2007)). Here, Plaintiffs have provided compelling evidence to establish each applicable requirement of Rule 23 and class certification is warranted.

### III.   ARGUMENT

**A. Plaintiffs Have Satisfied the "Predominance" Requirement by Showing that the Critical Issues in the Case, Including Injury, are Common to the Class.**

Defendants stake their argument as to predominance on a handful of issues, which collectively affect only a tiny percentage of class members.  But their focus cannot remove from the Court's predominance calculus the extensive list of critical common issues Defendants ignore, from the necessity and legality of fixed interchange fees, the legality of the networks' other restrictive rules, to the effect of the networks' IPOs, and more.  *See supra* § I.   The Second Circuit unequivocally held in *In re Nassau County Strip Search Cases*, 461 F.3d 219 (2d Cir. 2006) ("*Nassau County*"), that the "central concern" of the predominance requirement is the "fundamental cohesion" of the proposed class, even where some critical common issues are uncontested:

> That the class-wide proof comes in the form of a simple concession rather than contested evidence certainly shortens the time that the court must spend adjudicating the issue, but it does nothing to alter the fundamental cohesion of the proposed class, which is the central concern of the predominance requirement. *See* 2 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 4:25 (4th ed. 2002) ("[T]he predominance test does not involve a comparison of court time needed to adjudicate common issues weighed against time needed to dispose of individual issues...."); 7AA Wright & Miller, *Federal Practice and Procedure* § 1778 (3d ed. 2005) ("[C]lockwatching is not very helpful in ascertaining whether class-action treatment would be desirable in a particular case."). Similarly, the fact that an issue is conceded or otherwise resolved does not mean that it ceases to be an "issue" for the purposes of predominance analysis. Even resolved questions continue to implicate the "common nucleus of operative facts and issues" with which the predominance inquiry is concerned. *See Waste Mgmt. Holdings, Inc. v. Mowbray,* 208 F.3d 288, 299 (1st Cir. 2000) ("[T]he fact that an issue has been resolved on summary judgment does not remove it from the predominance calculus."). Just as much as do contested issues, resolved issues bear on the key question that the analysis seeks to answer: whether the class is a legally coherent unit of representation by which absent class members may fairly be bound.

*Id.*, 461 F.3d at 228; *Cordes & Co. Fin. Serv., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 108 (2d Cir. 2007) ("*Cordes*") (citing *Nassau County*). Even absent this rule, the issues Defendants raise would have no bearing on the Court's predominance determination.

### B. There Are No Conflicts Within the Proposed Class, and Plaintiffs Have Established They Can Prove Injury and Damages on a Class-Wide Basis.

Relying on co-branding agreements that affect less than one percent of the class, a handful of merchants' individually negotiated agreements with Visa or MasterCard, and amorphous and unsupported claims that some unidentified merchants might be harmed by the relief Plaintiffs seek, Defendants claim that conflicts of interest among class members preclude certification of the classes, and that injury and damages can only be proven on a merchant-by-merchant basis. But Defendants' arguments distort the standards for predominance and manageability under Rule 23(b)(3), ignore adequacy standards under Rule 23(a)(4) and the cohesiveness requirement of Rule 23(b)(2), and are contrary to well-established law governing defenses in antitrust overcharge cases. Equally important, these arguments are based on flawed assumptions and erroneous factual assertions.

### 1. Plaintiffs Satisfy Rule 23(a)(4), as There is No Disabling Conflict Among Class Members.

As Plaintiffs demonstrated in their opening submission, no fundamental conflict exists on any issue central to this suit because Plaintiffs are challenging Defendants' uniform course of unlawful conduct, which has harmed all merchants. Pls.' Mem. at 34-35. Nevertheless, relying primarily on *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181 (11th Cir. 2003) ("*Valley Drug*"), Defendants contend that there are conflicting interests within the class because merchants with co-branding or directly-negotiated network-merchant agreements may have

- 12 -

benefited from the illegal imposition and fixing of interchange fees.[16]  Even if the factual

premise were correct,[17] Defendants' reliance on *Valley Drug* is misplaced.

       Numerous courts have rejected *Valley Drug*'s analysis as wrong and inconsistent with

*Hanover Shoe Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968) ("*Hanover Shoe*"), and

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) ("*Illinois Brick*"), which prohibit the defensive

or offensive use of pass-on in determining antitrust damages.  Where, as here, plaintiffs seek to

recover overcharges imposed by a cartel, it is legally irrelevant that certain class members might

otherwise benefit from the illegal conduct.  *See, e.g.*, *In re Wellbutrin SR Direct Purchaser

Antitrust Litig.*, 2008 WL 1946848, at *8 (E.D. Pa. May 2, 2008) ("*Wellbutrin*") ("Regardless of

whether some class members profited from the alleged activity in this case, the controlling

question is whether the class members suffered an overcharge: if an overcharge occurred, *all*

class members are entitled to recover, whether or not some plaintiffs experienced a net benefit

while others experienced a net loss . . . . [B]ecause all class members have the right to pursue

overcharge damages, they have the same incentive to do so, and there is no conflict among class

members allegedly harmed by the same antitrust violation."); *Meijer, Inc. v. Warner Chilcott

Holdings Co.*, 246 F.R.D. 293, 303-04 (D.D.C. 2007) (*Valley Drug* wrongly decided because it

was contrary to the Supreme Court's holdings in *Hanover Shoe* and *Illinois Brick*; the "otherwise

benefiting" argument was legally irrelevant and could not be the basis for a conflict of interest);

*Teva Pharm. USA, Inc. v. Abbott Labs.*, 252 F.R.D. 213, 227 (D. Del. 2008) (same);  *Meijer, Inc.

v. Abbott Labs.*, 2008 WL 4065839, at *5 ("*Meijer*") (N.D. Cal. Aug. 27, 2008) (rejecting

---

[16] Throughout this memorandum, Plaintiffs use the term "co-branding agreements" to encompass both co-branding and "affinity" agreements.  As Defendants note, there is no practical difference between the two for the Court's immediate purposes. *See* Defs.' Mem. at 68 n.154.

[17] *See infra* §§ III.B.3, 5.

"otherwise benefiting" conflicts argument).[18]  For these reasons, the Court should reject

Defendants' argument that a conflict of interest exists.[19]

### 2.    The Injunctive Class is Cohesive and Satisfies F.R.C.P. 23(b)(2).

Defendants oppose certification of a Rule 23(b)(2) class on the ground that the class is

not sufficiently cohesive.  Again relying on their specious conflation of distinct economic

---

[18] *See also In re Urethane Antitrust Litig.*, 251 F.R.D. 629, 641-42, 644 (D. Kan. 2008) (in a cartel overcharge case, there is no conflict of interests even if some class members allegedly benefited in some manner by the higher prices); *J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.*, 225 F.R.D. 208, 217 (S.D. Ohio 2003) (no conflict even if some class members profited from alleged misconduct).

Each of the other cases upon which Defendants rely in this context is inapposite.  None involved the payment of cartel overcharges by every class member and significantly, in each of the cases, defendants *proved* that certain class members had not suffered any injury, and were clearly direct beneficiaries of the conduct at issue. The plaintiff in *Pickett v. Iowa Beef Processors*, 209 F.3d 1276 (11th Cir. 2000), alleged that the defendant bought large quantities of cattle through forward contracts so as to depress prices paid for cattle bought on the spot market. Plaintiffs moved to certify a class of all cattle producers who sold directly to defendant. However, the court found that there was a conflict of interest between those who sold at the spot price, and those who sold through forward contracts, as the latter benefitted from the conduct at issue. 209 F.3d at 1280-81. Plaintiffs in *Phillips v. Klassen*, 502 F.2d 362 (D.C. Cir. 1974), moved to certify a class of beneficiaries of a retirement package, alleging that they were coerced into resigning.  The court denied class certification, based on its finding that certain employees likely were not coerced into resigning, but understood the ramifications of their resignation, and were happy to benefit from the package. 502 F.2d at 366-68. Plaintiffs in *Danvers Motor Co. v. Ford Motor Co.*, 543 F.3d 14, 143 (3d Cir. 2008), moved to certify a class of Ford dealers, challenging differences in the application of the standards and processes necessary to achieve certification pursuant to a Ford dealer program.  The court predictably found conflicts between dealers who had not been certified, and those who had been certified, and enjoyed the benefits of certification as a result. *Id.* at 148.

[19] Defendants' conflicts argument smacks of the fox guarding the chicken coop. Defendants are not concerned about the interests of any merchant class members in making this argument; rather they are advancing their own interests by seeking denial of class certification. *See, e.g., Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130*, 657 F.2d 890, 895 (7th Cir. 1981). Any merchant that believes that Plaintiffs' success in this case would be contrary to its interests can simply opt out of the damages class. *See Meijer*, 2008 WL 4065839, at *5 (the opportunity to opt out from a class action provides adequate protection from a potential conflict as sophisticated businesses are in the best position to determine what is in their own best interest); *Wellbutrin*, 2008 WL 1946848, at *7 n.18 ("class members who do not wish to participate in the class litigation may opt out of the class"); *Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*, 247 F.R.D. 253, 268-69 (D. Mass. 2008).

arrangements, principally co-branding agreements and separate arrangements with the networks, Defendants maintain that certain class members benefit from interchange fees and therefore would be adversely affected by their elimination as a result of injunctive relief. Defendants are once again incorrect, both in fact and law.

As explained with respect to the Rule 23(b)(3) class, all Plaintiffs are subject to the Networks' rules requiring that card-issuing banks deduct interchange fees from every transaction of funds otherwise owed to merchants. These deductions are separate and apart from any independent co-branding agreement, or separate arrangement with Visa or MasterCard. Similarly, all class members are subject to the anti-steering restraints and the miscellaneous exclusionary restraints challenged in Plaintiffs' complaint. All class members thus have a like interest in the removal of these anticompetitive restraints. The issues here involve a set of rules that are applied in the same way to each class member. If the rules violate the antitrust laws, or result from an antitrust violation, or facilitate the unlawful exercise of market power, they do so for each and every class member. Thus, this case falls squarely within Rule 23(b)(2)'s criteria: "[T]he party opposing the class has acted or refused to act on grounds applicable to the class.".

The injury alleged here can clearly be characterized as a group harm as it touches every merchant who has an agreement with an acquiring bank to accept Visa and/or MasterCard payment cards. Where a group harm occurs, "there is a presumption of cohesion and unity between absent class members and the class representatives such that adequate representation will generally safeguard absent class members' interests and thereby satisfy the structures of due process." *Robinson v. Metro-North Commuter Railroad Co.*, 267 F.3d 147, 165 (2d Cir. 2001).

There is no evidence in this case to rebut that presumption of cohesion. This cohesion is exemplified by the merchants who have co-branding agreements or supplemental agreements

- 15 -

with an issuing bank and who are plaintiffs in the class litigation[20] or in one of the coordinated

individual actions.[21]  All these plaintiffs seek the same injunctive relief: enjoining application of

prices and rules that violate the antitrust laws would directly benefit all proposed class members

by giving them the freedom to operate in a competitive environment without the constraints of

mandatory supra-competitive interchange fees and merchant restrictions.  *See Jacobi v. Bache &*

*Co., Inc.*, 1972 Trade Cas. (CCH) ¶ 73,980, 1972 WL 560, at *2 (S.D.N.Y. Feb. 8, 1972)

("*Jacobi*").

    Defendants' arguments depend on the erroneous premise that interchange fee payment

obligations and co-branding and merchant-work agreements are inextricably linked aspects of a

single set of economic obligations.  They are not, as Plaintiffs' expert, Dr. Bamberger explains,[22]

and as Visa's own expert in *Visa U.S.A., Inc. v. First Data Corp.*, Dr. Benjamin Klein, has

explained.  Dr. Benjamin Klein, Rebuttal Report in *Visa U.S.A. Inc. v. First Data Corp.*, Case

No. 02-1786, ¶¶ 106, 114, 117 (N.D. Cal. May 25, 2005) (McCahill Decl. Ex. 9, "Klein Rebuttal

Report").  *See infra* § III.B.3.  These agreements are wholly independent of merchants'

interchange fee obligations, providing payment for separate rights and services, and they do not

create a conflict within the class.  Injunctive relief that eliminated the interchange and merchant

restrictions would do nothing to prohibit issuing banks from continuing to negotiate and enter

---

[20] *See, e.g.*, McCahill Decl. Ex. 4 (co-brand agreement for class representative Payless).

[21] *See, e.g.*, McCahill Decl. Ex. 5, McCahill Decl. Ex. 6 (Visa and MasterCard acceptance agreements with individual plaintiff Kroger); McCahill Decl. Ex. 7, McCahill Decl. Ex. 8 (Visa and MasterCard acceptance agreements with individual plaintiff Publix).

[22] Bamberger Reply Decl. ¶¶ 94-109.  "But payments by a card issuer to a merchant under a co-branding agreement are the result of market transactions in which issuers pay for and receive a variety of assets, goods or services from merchants.  These payments by issuers are consideration for the economic value of the assets, goods or services provided by merchants." *Id.* at ¶ 98.

such marketing and service relationships with merchants.[23] In fact, in Australia, after a marked

reduction in interchange fees, from levels already well below U.S. levels, such arrangements

have persisted.[24] Thus, no conflict exists to preclude certification of an injunctive relief class.

Further, even assuming some merchants wanted to maintain the *status quo*, injunctive

relief is appropriate to eliminate conduct that is of general application and which violates the

antitrust laws. As the court held in *Jacobi*: "The object of an anti-trust action is the restoration

of competition to the industry involved: the fact that some members of the class may differ as to

the desirability of a particular remedy for the antitrust violation, *or even desire the maintenance*

*of the status quo*, does not preclude their being included within the class bringing the action."

1972 WL 560, at *2 (emphasis added), *cited in* Alba Conte & Herbert B. Newberg, 1 *Newberg*

*on Class Actions* § 3:30 (4th ed. 2005). *See also Horton & Goose Creek Indep. School Dist.*, 690

F.2d 470, 485, 488 (5th Cir. 1982) (finding adequacy of representation, certifying 23(b)(2) class

despite "very real possibility" that some class members favored policy to be enjoined).[25] These

cases thus illustrate and recognize that "unanimity is an impossible goal and is not a prerequisite

to a class action." *Groover v. Michelin of North America, Inc.*, 192 F.R.D. 305, 306 (M.D. Ala.

---

[23] *See Halford v. Goodyear Tire & Rubber Co.*, 161 F.R.D. 13, 15 (W.D.N.Y. 1995) (no conflict among class members where requiring defendant to reinstate specific benefits would not prevent maintenance of other benefits).

[24] Bamberger Reply Decl. ¶ 116.

[25] *See also Norwalk CORE v. Norwalk Redevelopment Agency,* 395 F.2d 920, 937 (2d. Cir. 1968) ("*Norwalk CORE*") ("The fact that some members of the class were personally satisfied with the defendants' [challenged conduct] is irrelevant."); *Richards v. FleetBoston Financial Corp.*, 235 F.R.D. 165, *170 (D. Conn. 2006) ("*Richards*")(no antagonism among the class members, notwithstanding defendants' argument that many class members were better off under the benefits plans the named plaintiff sought to enjoin); *Sharif v. New York State Educ. Dep't*, 127 F.R.D. 84, 89 (S.D.N.Y. 1989); *Wilder v. Bernstein*, 499 F. Supp. 980, 993 (S.D.N.Y. 1980) ("The fact that some members of the class may be personally satisfied with the existing system and may prefer to leave the violation of their rights unremedied is simply not dispositive of a determination under Rule 23(a)").

2000) (citations omitted) (certifying class despite inclusion of those who preferred to continue receipt of welfare benefits under the contested system; holding that in class of thousands, "the opinion of seventy-five is not controlling").[26]

Defendants misconstrue the "cohesiveness" requirement of Rule 23(b)(2), as exemplified by their reliance on medical monitoring cases such as *Barnes v. The American Tobacco Company*, 161 F.3d 127 (3d Cir. 1998) ("*Barnes*"). The *Barnes* plaintiffs moved to certify a 23(b)(2) class for medical monitoring of cigarette smokers. The Third Circuit relied on *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), in which a 23(b)(2) class of persons exposed to asbestos was decertified because of differences among class members in the time they were exposed to asbestos, the different ways they were exposed, and the different time periods over which they were exposed. These material differences raised too many individual factual issues, leading to disparate applications of legal rules. 161 F.3d at 142. The *Barnes* court applied *Amchem* to the smokers and reached the same conclusion holding that issues of a smoker's "addiction, causation, the defenses of comparative and contributory negligence, the need for

---

[26] Under Rule 23(b)(2), "Action or inaction is directed to the class within the meaning of this subdivision even if it has taken effect or is threatened only as to one or a few members of a class, provided it is based on grounds which have general application to the class." Advisory Committee's Note to Rule 23(b)(2). In *Coleman v. GMAC*, 220 F.R.D. 64, 89 (M.D. Tenn. 2004), the court emphasized the Committee's Note:

> [C]ertification of a Rule 23(b)(2) class is proper, despite the fact that not all class members may have suffered the injury posed by the class representative, as long as the challenged policy or practice was generally applicable to the class as a whole.

*Id. See also Griffin v. Burns*, 570 F.2d 1065, 1073 (1st Cir. 1978) (citing other cases). The *Griffin* case involved discrepancies in absentee or shut-in ballots, where class members included some who might have wanted the election results to stand. The court still certified a Rule 23(b)(2) class: "But not all class members need be aggrieved by or desire to challenge defendant's conduct in order for some to seek relief under (b)(2)." (citing other cases). 570 F.2d at 1073. *See also, Norwalk CORE*, 395 F.2d at 937; *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998).

- 18 -

medical monitoring and statute of limitations presented too many individual issues to permit certification." 161 F.2d at 143. Thus, in sharp contrast to this case, which involves injuries arising from uniformly-applied rules, in *Barnes* there was no cohesion among class members.[27]

Finally, even if the co-branding agreements and merchant-network arrangements were relevant (which they are not), by Defendants' own admissions, they would affect only the tiniest fraction of the proposed class. *See* Defs.' Mem. at 68. Because "[t]he question of remedies is not appropriate for resolution at [the class certification] stage," the Court can readily certify the Injunctive Relief Class and address at a later juncture any putative variations regarding relief. *Richards*, 235 F.R.D. 165, 170; *Amara v. CIGNA Corp.*, 2002 WL 31993224, at *2 (D. Conn. Dec. 20, 2002) (although "providing the relief requested in the complaint on a class-wide basis may actually harm some members of the class . . . this problem can be addressed when the court determines what remedy should be provided if plaintiff prevails on the merits of her claims"). Tellingly, the Federal Rules expressly contemplate this possibility. Fed. R. Civ. P.23(c)(1)(C) advisory committee's notes ("Following a determination of liability, for example, proceedings to define the remedy may demonstrate the need to amend the class definition or subdivide the class."). As the cases above amply demonstrate, some disagreements within a class are to be expected, and do not defeat certification under Rule 23(b)(2).

---

[27] Defendants also rely on *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1121-22 (8th Cir. 2005), and *In re Rezulin Products Liability Litigation*, 210 F.R.D. 61 (S.D.N.Y. 2002), both medical monitoring cases. The *St. Jude* court, relying on *Barnes* concluded: "Proposed medical monitoring classes suffer from cohesion difficulties and numerous courts across the country have denied certification of such classes." 425 F.3d at 1122. The court in *Rezulin* explained it better – there is no cohesion where subjective evaluation is necessary to determine if a class member is entitled to relief, but there can be cohesion where that determination is made by an objective evaluation, *i.e.*, a doctor's diagnosis (subjective) versus a blood test (objective). 210 F.R.D. at 74. In the case *sub judice*, if such determination were necessary, which it is not, it could be made objectively from the contracts involved.

Where, as here, an antitrust violation affects an entire class, and the class seeks institutional reform through injunctive relief,[28] cohesion exists and Rule 23(b)(2) is satisfied.

### 3. Defendants' Conflict and Predominance Arguments are Also Based on Erroneous Assertions Regarding Co-Branding Agreements.

Legal shortcomings aside, Defendants' co-branding argument is based on incorrect factual premises  Defendants claim that payments from card issuers to merchants pursuant to co-branding agreements "affect the price merchants pay for network services," on the premise that they are essentially "interchange rebates." Defs.' Mem. at 68.  However, not even Defendants' expert, Dr. Snyder, can support that claim.  In his declaration, Dr. Snyder characterizes these payments as "interchange rebates" or "interchange related payments" or "interchange revenue" but in his testimony,[29] Dr. Snyder backs away from these characterizations, instead labeling them as payments *funded by* interchange fees.[30]

Defendants' testimony and contemporaneous documents in fact reflect the *absence* of any meaningful connection between interchange fees, on the one hand, and co-branding payments on

---

[28] *Manual for Complex Litigation* § 21.142 (4th ed. 2005).

[29] *See* Bamberger Reply Decl. ¶ 98.

[30] *See e.g.*, Declaration of Edward A. Snyder, Ph.D., Regarding Class Certification ("Snyder Decl.") ¶ 103

## REDACTED

; ¶ 127 (discussing benefits of interchange-related payments); ¶ 134.  Moreover, Dr. Snyder's claim that these payments are funded by interchange fees is without merit.  His claim is based

## REDACTED

the other.[31]  What those documents do reflect is that co-branding payments are, without exception, paid in consideration for assets, goods and/or services provided by co-branding merchants, pursuant to transactions entirely separate from routine payment card transactions.[32]

Defendants' theory is premised on conflating the two transactions, a conflation which is devoid of support in the contemporaneous record.  Every merchant must enter into a merchant acquiring agreement with an acquiring bank as a precondition to receiving card acceptance service.[33]  A small percentage of those merchants subsequently enter into co-branding agreements – frequently with banks other than their acquiring banks.[34]  Defendants have not identified any instance in which any single merchant's acquiring agreement is explicitly tied to the same merchant's co-branding agreement.  And Defendants have not identified a single merchant that believes its co-branding revenue is endangered by this action.  In fact, after Defendants served their opposition papers, co-branding merchant Target – which *collects*

---

[31] *See, e.g.,* McCahill Decl. Ex. 11, Allen Dep. Tr. 132:9-133:24 (Visa's former Secretary/ General Counsel unaware of any co-branding agreements that eliminated or reduced interchange fees paid on those transactions). *See also* Kane Decl. Ex. 41 (Chase document referencing Starbucks co-branding agreement: REDACTED

[32]

REDACTED

*See also* Bamberger Reply Decl. ¶¶ 98-109 (concluding that co-branding payments are fore the goods, services and assets provided by merchants to issuers).

[33] *See* Pls.' Mem. at 10.

[34] *See, e.g.,* McCahill Decl. Ex. 20, and McCahill Decl. Ex. 21, (Payless's merchant acquiring agreements with NPC, later bought by Bank of America) and McCahill Decl. Ex. 4 (Payless's co-brand agreement with Barclays); McCahill Decl. Ex. 15 (Marriott Co-Brand) and McCahill Decl. Ex. 22 (Marriott Acquiring Agreement).

interchange fees by virtue of its ownership of a large card-issuing bank – called for

Congressional action to reduce interchange fees.[35]

The two types of agreements are not merely unrelated, but at polar opposites in their very

nature. Merchants' acquiring agreements uniformly require the payment of interchange fees, at

standard rates established by the networks. Conversely, the terms of co-branding agreements are

negotiable in their entirety.

<strong>REDACTED</strong>

Card-issuing banks enter into co-branding agreements to increase the extent and

profitability of their card operations.[37]  Because most merchants have ongoing relationships with

certain customers, they may help card-issuing banks identify and recruit potential cardholders

from among those customers. *See* Bamberger Reply Decl. ¶ 104 ("The nine co-branding

---

[35] McCahill Decl. Ex. 23, *Credit Card Fees Targeted by Retailers Who Say Banks Overcharge*, Bloomberg News, Nov. 29, 2008.  By virtue of its ownership of an issuing bank, Target is not a class member, *see* Pls.' Mem. at 4-5.  For the same reason, neither is Nordstrom, Defendants' implication to the contrary notwithstanding.  Defs.' Mem. at 35.

[36] *See, e.g*, McCahill Decl. Ex. 12, at CHASE003420737; McCahill Decl. Ex. 13, at 11-12; McCahill Decl. Ex. 15, at BOFAIC06513502; McCahill Decl. Ex. 4, at PAYLS0443401; McCahill Decl. Ex. 16, at CHASE03420673; McCahill Decl. Ex. 17, at CHASE003415465.

[37] Henry Fulton, former Director of Marketing for Bank of America's credit card business, testified in another proceeding that banks, and in particular Bank of America, enter into merchant co-branding agreements to increase profitability.  McCahill Decl. Ex. 24, Fulton DOJ Dep. Tr. at 23:4-25:2. *See also* McCahill Decl. Ex. 25, Weaver Dep. Tr. 10:18-12:17, 18:2-15, 62:11-63:16

, McCahill Decl. Ex. 11, Allen Dep. Tr. 132:9-133:24  (former Visa Secretary and General Counsel

<strong>REDACTED</strong>

); McCahill Decl.
Ex. 26, Selander Dep. Tr. 183:8-184:10 (former MasterCard CEO

- 22 -

agreements analyzed by Professor Snyder confirm that payments to co-branding merchants from

issuers include payments for the use of valuable merchant assets, goods or services

REDACTED
.")  In *Visa U.S.A., Inc. v. First Data Corp.*,

Visa's expert economist Dr. Benjamin Klein recognized

REDACTED

REDACTED

Klein Rebuttal Report ¶ 106 (emphasis added).  Dr. Klein further opined that

REDACTED

*Id.* ¶ 113.

Dr. Klein also explained that

# REDACTED

*Id.* ¶ 114 (emphasis added).  Dr. Snyder did not read Dr. Klein's reports and did not know he was Visa's expert in the *First Data* case.[38]

Defendants' contemporaneous documents and their fact witnesses' testimony likewise reflect that the

# REDACTED

---

[38] McCahill Decl. Ex. 2 Deposition Transcript of Edward A. Snyder, Ph.D. 512:21-513:15 ("Snyder Dep. Tr.").  However, Dr. Snyder did vouch for Dr. Klein's expertise during his deposition, and cited one of Dr. Klein's articles in his declaration.  Snyder Dep. Tr. 135:8-136:9, 512:21-513:7.

[39]  McCahill Decl. Ex. 25, Weaver Dep. Tr. 14:23-16:6.  *See also* McCahill Decl. Ex. 27, at CHASE001458377 ("Our Partnerships at Work – Amazon.com Visa…

# REDACTED

[40]  McCahill Decl. Ex. 28, at BOFAIC00395172.

Visa's head of merchant co-branding agreements testified unequivocally that Visa

## REDACTED

Contemporaneous MasterCard documents similarly reflect that payments to merchants,

including potential co-branding partners, ". . .

## REDACTED

,"[42]  Gareth Forsey, MasterCard's Chief

Global Commerce Development Officer, testified that MasterCard

## REDACTED
[43]

At his deposition, Dr. Snyder conceded that services and property rights provided by

merchants pursuant to co-branding agreements have independent economic value.[44]  And, Dr.

Snyder does not belief that payments for legitimate services rendered should be offset against

damages from a cartel overcharge.  Plaintiffs posed to Dr. Snyder a hypothetical involving a

lawn-cutting business victimized by a cartel in the retail market for lawnmowers, and inquired as

to whether a cartel retailer's payments to the victim for cutting the lawn around its place of

---

[41]  McCahill Decl. Ex. 29, Beidler Dep. Tr. 246:24-249:17; *see also* McCahill Decl. Ex. 11,
Allen Dep. Tr. 132:9-133:24 (
                                       ).  Dr. Snyder claimed he relied upon Ms. Beidler's
deposition testimony, *see* Snyder Decl. App. C at C9, but his conclusions regarding co-branding
agreements are contrary to that testimony.

[42]  McCahill Decl. Ex. 30, - at MCI_MDL02_01401333, 1335.  *See also* McCahill Decl. Ex.
31,Wright Dep. Tr. 85:5-89:5; 102:14-108:12    REDACTED

[43]  McCahill Decl. Ex. 32, Forsey Dep. Tr. 55:4-15.

[44]  Snyder Dep. Tr. 577:4-578:19.  For example, United Airlines recorded as revenue the $100
million payment it received from Chase for the license of its trademark.  *See* McCahill Decl. Ex.
33, United Airlines Form 10-Q for Quarter Ended Sept. 30, 2008 at 31.  *See also* McCahill Decl.
Ex. 34, Southwest Airlines Co., Annual Report (Form 10-K) for the Year Ended Dec. 31, 2007,
at 42 (Feb. 4, 2008) ("Southwest 10-K") (records as other revenue, 25 percent of the funds
received for the sale of flight credits to account for use of the company's frequent flyer list, and
use of the company's logo on co-branded credit cards).

- 25 -

business should be offset against the victim's damages.  Dr. Snyder responded: "I don't see any reason to take that into account."[45]  However, Dr. Snyder and Defendants fail to recognize the independent economic value of the services and property rights in their improper offsets analysis.  *See* Bamberger Reply Decl. ¶ 101 (showing that treating payments to co-branding merchants as an "offset" to inflated interchange fees as "inappropriate").

The economic value of these services and property rights is further evidenced by the fact that airlines sell miles and hotels sell rewards points to many purchasers other than card-issuing banks.[46]  Airlines and hotels earn significant revenue from these sales, which are recorded as liabilities in their financial statements until they are redeemed, at which point they are recorded as revenues.  For example, each of the airlines whose co-branding agreements Dr. Snyder analyzed (United Airlines, American Airlines and Southwest) earns significant revenue from the sale of airline miles to entities other than card-issuing banks (*e.g.*, hotels, car rental agencies,

---

[45] Snyder Dep. Tr. 510:20-512:9.  Nor would the situation be any different if, instead of paying for the price fixed lawn mower with a separate payment, payment was effected through a credit against the amounts owed the lawn cutting company by Home Depot.

[46] *See, e.g.,* McCahill Decl. Exs. 35-41 (identifying numerous entities and industries that purchase miles from major airlines). *See also* McCahill Decl. Ex. 33, at 13, 31, 50; McCahill Decl. Ex. 42, AMR Corp. (American Airlines) Annual Report (Form 10-K) for the Period Ending Dec. 31, 2007, at 9 (in 2007, sold approximately 100 million miles to over 1,000 entities, including its co-branding credit card partner); McCahill Decl. Ex. 34, at 5 (Southwest sells frequent flyer certificates to a number of companies in various industries, including its co-branding credit card partner).

retail stores).[47]  Likewise, Marriott sells rewards points to partners, such as car rental agencies,

which it recognizes as revenue.[48]

Dr. Snyder's analysis of co-branding agreements is also the result of a selective sampling

of the record.[49]  Dr. Snyder admitted that the nine agreements he examined are not, and were not

intended to be, representative of the remainder.[50]  Chase is the bank party to six of the nine

agreements.[51]  Dr. Snyder cherry-picked certain arrangements providing for some of the largest

payments to merchants to show that certain merchants *may* be paid more by their co-branding

partners than they pay in interchange fees to all issuers, *i.e.*, .

# REDACTED
                                                                    Even though, as stated, a comparison of

these payments is not a relevant one for the purposes of the issues in this case, ⟨

                                  out of the thousands of merchants with co-branding agreements

presents a highly misleading picture of the significance of these agreements to the class as a

whole.

Dr. Snyder's and/or Defendants' self-serving selection of agreements, of course,

diminishes the credibility of the analysis and the opinions based on them.  But more

fundamentally, as Dr. Bamberger explains, Dr. Sndyer's analysis is basically flawed, as he ties

*all* of the banks' payments to merchants to interchange fees, with no regard to the revenue the

---

[47]  *See* McCahill Decl. Ex. 33, at 13 and 31 (United Airlines recorded as liability titled
"Advanced purchase of miles," and when redeemed the company records it as deferred revenue
over $1 billion sold to Chase alone); McCahill Decl. Ex. 42 , at 41 ("American Airlines revenue
earned from selling AAdvantage miles . . . is deferred and recognized over the period the
mileage is expected to be used"); McCahill Decl. Ex. 34, at 42.

[48]  *See* McCahill Decl. Ex. 43, Marriott Int'l, Inc. Annual Report (Form 10-K) for the Period
Ended Dec. 28, 2007, at 56, 71.

[49]  *See* Bamberger Reply Decl. ¶ 119 n.194.

[50]  Snyder Dep. Tr. 565:6-567:3.

[51]  McCahill Decl. Exs. 12, 13, 15-18, 44-47.

banks earn from cardholders' interest payments, and with no regard for the many assets and services that merchants provide to the banks.[52] Dr. Bamberger further concludes that Dr. Snyder's analysis is flawed because it is based "fundamentally on the extreme and incorrect assumption that co-branding revenues would have disappeared in the but-for world."[53] Because the empirical evidence reflects that these payments would have existed in the but-for world, Dr. Bamberger concludes that Dr. Snyder's analysis fails to show that even a single merchant would have been worse off in a but-for world with no or reduced interchange fees.[54]

> **4.      Co-Branding Merchants Account for a Minuscule Percentage of Class Membership and a Small Percentage of Transaction Volume; Even if These Agreements Presented Some Individual Issues, They Are Not "Predominant."**

Defendants concede that their co-branding agreement argument – representing their principal challenge to certification – applies to  REDACTED  class members.[55]  And, in the aggregate, merchants with co-branding agreements account for                     of total transaction volume.[56]  Dr. Snyder explicitly admitted as much at his deposition.[57]  In fact, the

---

[52] Bamberger Reply Decl. ¶¶ 103, 105-09.  *See, e.g.* Snyder Decl., App. E.  *See also infra* § III.C.6 (detailing card-issuing banks' revenue).

[53] Bamberger Reply Decl. ¶ 119.

[54] Bamberger Reply Decl. ¶¶ 119-22.  This is best exemplified by Dr. Snyder's analysis of Payless, in which he concludes that Payless would be worse off in the but-for world.  However, his analysis relied on Payless's preliminary revenue projections, which were based on unduly aggressive assumptions.  REDACTED                            McCahill Decl. Ex. 48.
Pearson Dep. Tr. 261:15-263:21, 264:10-272:14, 274:16-275:15, 286:14-287:7.

REDACTED

. *See* Snyder Decl. ¶¶ 111-112.

[55] *See* Defs.' Mem. at 7 (seven million merchants are in the class, but only "thousands" are parties to co-branding agreements).

[56] *See* Defs.' Mem. at 68.

# REDACTED

argument affects far _____ . of total volume; while merchants who are parties to co-branding agreements may account for _____ . of the transaction volume of the entire class, only a small percentage of that transaction volume represents transactions made using a co-branded card.[58]   And those merchants pay fixed and standard interchange fees for all of those transactions.[59]

Even assuming these co-branding agreements presented individual issues of fact of injury – which they do not – Defendants do not and cannot cite any authority denying class certification in a price-fixing case where the same generalized evidence will be used to prove injury as to over 99 percent of class members.  That is because it is well-established that a plaintiff is not required to show "the fact of injury actually exists for each class member."  *In re Cardizem CD Antitrust Litig.*, 200 F.R.D 297, 307. (E.D. Mich. 2001) ("*Cardizem*").  "Significantly, 'courts have routinely observed that the inability to show injury as to a few does not defeat class certification where the plaintiffs can show widespread injury to the class.'"  *Meijer, Inc. v. Warner Chilcott Holdings Co.*, 246 F.R.D. 293, 310 (D.D.C. 2007) (citations omitted).[60]

---

[57]  Snyder Dep. Tr. 549:13-25.  Defendants pointedly fail to specify how many class members are parties to co-brand or affinity agreements, even though that information is exclusively within their control.  Even if the Court were to assume that the "thousands" Defendants reference means 10,000, that would mean that 99.86 percent of the merchant class members are *not* parties to such agreements.

[58]  *See* Bamberger Reply Decl. ¶ 94 n.163.

[59]  *See* McCahill Decl. Ex. 29, Beidler Dep. Tr. 55:7-56:7    **REDACTED**
and 102:6-18
McCahill Decl. Ex. 32, Forsey Dep. Tr. 55:4-15
(MasterCard's Chief Global Commerce Development Officer testified that

[60]  *See also Wellbutrin*, 2008 WL 1946848, at *10 (same); *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 523 (S.D.N.Y. 1996) ("*NASDAQ*") (same).  *See also In re Urethane Antitrust Litig.*, 251 F.R.D. 629, 638 (D. Kan. 2008) ("Class certification is appropriate as long as the alleged antitrust violation has caused widespread injury to the class as a whole.").

- 29 -

### 5.   Individually-Negotiated Agreements Between a Handful of Merchants and the Networks Do Not Create Disabling Conflicts or Destroy Commonality.

Defendants further contend that the classes should not be certified because     merchants

– out of out of seven million – receive payments pursuant to so-called "individually negotiated

interchange-related agreements."[61]  Defendants cannot seriously contend that disabling conflicts

exist warranting denial of class certification, or that injury and damages cannot be determined on

a class-wide basis, simply because     out of seven million merchants have such agreements.  To

begin with, as discussed above, even assuming some of those merchants disagree with the goals

of this litigation, they can opt out.  And, in any event, had any class members expressed

opposition to the objectives of this case – which none have – Rule 23 does not give every

member of the class a veto over certification.  Disagreement by a small number of class members

does not preclude certification.[62]  *See, e.g., Richards v. FleetBoston Financial Corp.*, 235 F.R.D.

165, 170 (D. Conn. 2006).

Moreover, Defendants' carefully worded contention that these agreements are

individually negotiated "interchange-related" agreements must be clarified.  These are

agreements between merchants and the networks, the existence of which reflects that interchange

---

*See also Linerboard*, 305 F.3d at 158 (certifying class where some class members' "contracts
were tied to a factor independent of the price of linerboard").

[61]  Defendants have not identified the number of merchants that have these alleged "interchange-
related" agreements.  However, Dr. Snyder identified only     in his report.  *See* Snyder Decl.,
Exs. 19, 20A, 20B.  Out of the     merchants identified, at least three are not class members in
this case: Nordstrom (card issuer); Target (card issuer) and the United States Postal Service
(government entity).  Dr. Snyder was unaware that these merchants were not class members.
Snyder Dep. Tr. 91:10-93:22.  In fact, Dr. Snyder admitted that he never read the class definition
in the complaint.  *Id.*

[62]  To the extent some payments to merchants must be taken into account in determining their
individual damages, data regarding those payments is available and the calculation can be done
easily and formulaically.  Bamberger Reply Decl. ¶ 127.  As a matter of well-established
precedent, individual damages issues may not preclude class certification.  Pls.' Mem. at 71-72.

fees are appropriately characterized as payments by merchants.   But, as both Visa and
MasterCard witnesses have testified, the networks generally do not agree to deviate from
standard interchange fees for the benefit of any merchants, but rather, have entered into a small
number of agreements under which the *networks* make payments to certain merchants.
MasterCard's Vice President of Interchange, Steven Jonas, testified that .

REDACTED

[63]   Similarly, the Visa witnesses responsible for interchange fees testified that
agreements with merchants ,

REDACTED

The agreements cited by Defendants themselves make clear that

REDACTED

---

[63] McCahill Decl. Ex. 49, Jonas  Dep. Tr. 232:23-233:8.  *See also* McCahill Decl. Ex. 50, at
MCI_MDL02_00083079
late 1990s as a response t

REDACTED

[64] McCahill Decl. Ex. 51, Sheedy  Dep. Tr. 108:11-111:5, 606:17-611:14

.); McCahill Decl. Ex. 52, Steele  Dep. Tr. 65:23-69:2.  Moreover, a
knowledgeable Visa employee testified that there are          which allow
merchants to deviate from standard interchange fees for their categories.  And
, which is not even a member of the class.  McCahill Decl. Ex. 53, Morrissey
Dep. Tr. 236:3-237:20.  Apparently,         . has agreed not to charge itself interchange fees on
purchases made at its stores with cards it issues.  McCahill Decl. Ex. 52, Steele  Dep. Tr. 68:12-
69:6.

. Bamberger Reply Decl. ¶ 123.[65]

**REDACTED**                         . In many instances, that

consideration entails the settlement of litigation and/or the release of valuable claims.[66]  Finally,

it defies logic that payments from one of the networks to, *e.g.*, encourage merchant acceptance or

settle litigation, can act as an "offset" to interchange fees paid in their entirety to other entities,

*i.e.*, the card-issuing banks.

For all of these reasons, Defendants' conflicts and predominance arguments are

meritless.[67]

### 6.     Merchant-Issuers are Not Members of the Proposed Class.

Defendants also argue that the classes cannot be certified because merchants that issue

Visa and MasterCard payment cards benefit directly from their receipt of interchange fees, and

so have interests that conflict with those of other class members.  This argument requires little

discussion.  The few merchants that issue Visa and MasterCard payment cards are not members

of the proposed class.  *See* First Consol. Am. Class Action Compl. ¶¶ 90-93, 97.

---

[65] Dr. Snyder, on the other hand, admitted he was not familiar with their purposes and terms, as he had not read most of them.   Snyder Dep. Tr. 422:20-435:6.  He also was not aware that most of them have expired. *Id.* at 432:18-435:6.

[66] McCahill Decl. ¶ 3.

[67] If the Court should determine that any of the above-referenced payments are in fact offsets, Plaintiffs can use existing data to formulaically compute the corresponding offsets to damages. Bamberger Reply Decl. ¶¶ 109, 127.  However, Dr. Bamberger concludes in his economic analysis that these few merchants with individually negotiated deals are injured by the inflated interchange fees, analyzed in either of Dr. Bamberger's alternative but-for worlds.  Bamberger Reply Decl. ¶¶124-126.  The payments should not under any circumstance have any bearing at the class certification stage.

7.   **Defendants' Speculation that Other Merchants Could be Harmed by the Relief Plaintiffs Seek does not Create any Conflict of Interest Within the Class or Destroy Commonality.**

Defendants also speculate, without support or elaboration, that "numerous other merchants" "could" be harmed by the relief Plaintiffs seek, if cardholders shifted to American Express, or rewards were reduced, or sales volume were decreased, and that these "harmed" merchants would have a conflict of interest or require individualized assessment of injury and damages. *See, e.g.,* Defs' Mem. at 36. Defendants' speculation is wrong.

For example, Defendants' speculation that cardholders might shift to American Express and thus merchants would have been harmed by paying higher merchant fees is based on Dr. Snyder's fundamentally flawed analysis. According to Dr. Bamberger, Dr. Snyder's analysis is wrong because he assumes that "American Express merchant fees in the but-for world would have been the same as in the actual world."[68] The empirical evidence shows that in a world in which Visa's and MasterCard's interchange fees would have been eliminated or substantially reduced, American Express would have been forced to lower its merchant fees to compete.[69] In Australia, since 2003, American Express has reduced its merchant fees by 40 basis points in response to the Visa's and MasterCard's reduced rates. If American Express did not reduce its rates, many merchants would have refused to accept its cards.[70] Although Dr. Snyder's analysis of the impact on merchants of a shift in cardholder usage to American Express is based on the level of its fees remaining the same, he admitted he had not done anything to determine what the level of American Express's fees would have been in the-but for world.[71] According to Dr.

---

[68] Bamberger Reply Decl. ¶ 134. As stated elsewhere, the offsets argument is legally irrelevant.

[69] Bamberger Reply Decl. ¶¶ 137, 139.

[70] *See, e.g.,* McCahill Decl. Ex. 54, Schumann Dep. Tr. 272:15-273:14.

[71] Snyder Tr. 538:3-539:9.

Bamberger, properly taking into account a reduction in American Express's merchant fees demonstrates that each of the merchants analyzed by Dr. Snyder is actually better off in the but-for world even with a shift to American Express.[72]

Likewise, Defendants' claim that any reduction in interchange fees would have resulted in reduced sales for the merchant class is wrong. Defendants' argument is predicated on a mischaracterization of Dr. Bamberger's testimony. He did not opine or testify that in the but-for world, potential price increases in cardholder fees would have resulted in reduced sales volume for merchants.[73] He testified only that, as a matter of economic theory, when the price of a product increases, all else being equal, sales of that product will decrease.[74] Moreover, Defendants' contention is contrary to their own expert. Dr. Snyder opined "that determining the incremental sales attributable to payment cards and payment cards with particular features, *e.g.*, rewards, is quite difficult empirically. Observations to the effect that average transaction values are higher when credit cards are used versus cash should not be taken to mean that the credit cards are necessarily the cause of the higher sales, as the decision to use a card can be driven by the decision about what to purchase." Snyder Decl. ¶ 48 n.59.[75] In addition to being unsubstantiated (by Dr. Snyder's own admission) and theoretically unsound, Defendants' lost

---

[72] Bamberger Reply Decl. ¶¶ 140-41.

[73] Defs.' Mem. at 77-78.

[74] Ex. 1 to the Declaration of Jennifer E. Novoselsky in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification, Deposition of Dr. Gustavo Bamberger Dep. Tr. ("Bamberger Dep. Tr.") 150:6-153:24. Here, the "product," or service, is credit card usage, and not retail merchants' sales. To the extent that incremental sales to consumers would be paid for with cash, checks or debit cards, merchants' total sales to consumers would be unaffected.

[75] *See also* Snyder Decl. App. D, ¶17 (consumers use cards to purchase televisions, but cash to buy chewing gum).

sales argument is irrelevant, because a court may only consider merchants' lost sales in assessing

lost profits, and not in assessing overcharges.[76]

**8.      Defendants' Claim of Offsets is Contrary to Settled Law.**

Defendants' offsets argument – their claim that impact and damages must be separately

analyzed for each co-branding merchant, for each merchant that negotiated directly with a

network, and for each merchant that might face reduced sales in the but-for world – is contrary to

established precedent dictating the overcharge measure of injury and damages.  The Supreme

Court has held that in overcharge cases like this one, plaintiffs are injured in the full amount of

the illegal overcharge, and the court must not complicate the trial by embarking on the analysis

needed to determine whether the victim has "partially recouped its loss in some other way."

*Hawaii v. Standard Oil Co.*, 405 U.S. 251, 262 n.14 (1970).

Arguments similar to those made by Defendants have been routinely rejected by lower

courts as well.  In *Wellbutrin*, the court held that any economic benefits received by some

victims of an illegal overcharge were "legally irrelevant" because "a party may recover for an

antitrust overcharge whether or not the party experiences a net loss or a net gain."  *Id.*, 2008 WL

1946848, at *6.  Similarly, in *Cardizem*, the court rejected, as contrary to settled law, defendants'

argument  that individual issues would predominate because plaintiffs were required to offset

---

[76]  Herbert Hovenkamp, *Federal Antitrust Policy: The Law of Competition And its Practice* §
17.6b (2d ed. 1999) (the lost profits damages analysis takes into consideration increased cost of
doing business); American Bar Ass'n Antitrust Section, *Proving Antitrust Damages: Legal and
Economic Issues* 209-13. (1996).  However, if the Court should determine that these payments
are in fact appropriate offsets, then the offset should be limited to those instances in which the
funds can be directly attributed to interchange fee revenue.  For example, payments based on a
percentage of outstanding balances or fees for enlisting new cardholders are unrelated to
interchange fee revenue.  Moreover, as Dr. Bamberger concludes, Dr. Snyder improperly
attributes 100 percent of the payments to interchange fee revenue. Bamberger Reply Decl. ¶ 107.
Yet,
Thus, only a portion of the payments should be considered an offset. Because these payments
can be assessed formulaically, damages can be assessed on a class-wide basis.

REDACTED

- 35 -

from their overcharge damage estimate any "benefits" they may have received as a result of Defendants' illegal price-fixing. The court held that the offsets argument did not relate to the fact of injury but rather, at most, to the amount of damages. *Id.* 200 F.R.D. at 317.[77]

Defendants Visa and MasterCard made a similar argument to this Court in *Visa Check I*. In that case, Defendants argued that there "would be a decline in the volume of off-line debit transactions in the 'but-for,' untied world with lower off-line debit interchange fees. That decline, considered in conjunction with defendants' assertion that some merchants garner incremental sales from accepting the cards, would create 'winners' and 'losers' and render class-

---

[77] In this illegal overcharge case, class members are injured because they paid artificially inflated interchange fees. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 342 (1979) ("where petitioner alleges a wrongful deprivation of her money because the price of the hearing aid she bought was artificially inflated by reason of respondents' anticompetitive conduct, she has alleged an injury in her 'property' under § 4"); *Hanover Shoe Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 489 (1968) ("We think it sound to hold that when a buyer shows that the price paid by him for materials purchased for use in his business is illegally high and also shows the amount of the overcharge, he has made out a prima facie case of injury and damage within the meaning of § 4"). Proof of overcharge establishes injury because the "injury occurs and is complete when the defendant sells at the illegally high price." *Cardizem*, 200 F.R.D. at 313 (citation omitted).

Thus, to prove injury, Plaintiffs must demonstrate only that they paid more for access to the networks than they would have in the absence of the price fixing conspiracies. *See Hanover Shoe*, 392 U.S. at 489, *Chattanooga Foundry & Pipe Works v. City of Atlanta*, 203 U.S. 390, 396 (1906); *Cordes*, 502 F.3d at 107 ("If the fee paid were higher than the but-for fee, then the plaintiff suffered an injury-in-fact"). "[A]n individual [class member] could prove fact of damage simply by proving that the free market prices would be lower than the prices paid and that he made some purchases at the higher price." *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 455 (3d Cir. 1977), *quoted in Uniondale Beer Co., Inc. v. Anheuser-Busch, Inc.*, 117 F.R.D. 340, 343 (E.D.N.Y. 1987). *See also NASDAQ*, 169 F.R.D. at 523 ("[P]laintiffs' *prima facie* case will not require proof that overcharges were imposed upon the rental of each item rented to plaintiffs." (quoting *Presidio Golf Club v. National Linen Supply Corp.*, 1976 WL 1359, at *5 (N.D. Cal. Dec. 30, 1976)).

Moreover, it is well-established that the presence of some individual damages issues will not preclude class certification. Pls.' Mem. at 71-72. That line of authority is particularly applicable here since this is an issue which affects an infinitesimally small number of class members and the information on co-branding payments is the possession of the Bank Defendants and/or the class members. Subtracting all or some of those payments is a simple and formulaic process.

wide assessment of injury inappropriate." 192 F.R.D. at 85. The Court rejected this argument as "immaterial when an antitrust plaintiff proceeds on an 'overcharge theory' of damages." *Id. See also In re Relafen Antitrust Litig.*, 218 F.R.D. 337, 344 (D. Mass. 2003) (rejecting net economic harm argument as "irrelevant" under *Hanover Shoe* where a plaintiff seeks damages in the form of overcharges.).

Cases upon which Defendants rely do not dictate a different result. Defendants have not cited any authority for the proposition that a court must offset against an illegal overcharge the conspirators' unrelated payments for the victims' services. In addition, none of Defendants' cases involved price lists from which class members were rarely allowed to deviate. On the contrary, the courts in those cases found that injury could not be determined on a class-wide basis, because the prices at issue were *not* based on fixed list prices, and resulted from individual negotiations based on a variety of factors, including local market conditions and product type. By contrast, here all merchants pay the required fixed interchange fees as set forth in the nationwide price lists.

For example, in *Blades v. Monsanto Co.*, 400 F.3d 562 (8th Cir. 2005), the Eighth Circuit found that injury could not be proven on a class-wide basis because there were no nationwide fixed price lists, and prices varied widely. Significantly – and contrary to Defendants' claim in their brief – the Eighth Circuit did *not* find "that negotiations 'often lowered the "overall" price' paid or led to 'discounts or rebates to certain [class members] to offset any alleged premium,' causing some class members to pay 'no premium' at all." Defs.' Mem. at 72. The language Defendants quote is from the district court's opinion. The Eighth Circuit in fact rejected the district court's rationale that "varying discounts from the list prices" would require each farmer

- 37 -

"to prove separately that he paid an actual transaction price that was supra-competitive." *Blades*, 400 F.3d at 572.

Defendants' reliance on *Robinson v. Texas Auto. Dealers Ass'n*, 387 F.3d 416 (5th Cir. 2004) is even more misplaced. The court in *Robinson* found that all class members negotiated with the defendants, but that some considered the surcharge at issue in doing so, and some did not, which necessarily raised individual issues. Defendants in this case cite *Robinson* in conjunction with the proposition that co-branding merchants "negotiated" as to interchange fees,[78] but have not produced an iota of evidence that any of those merchants actually did so. In fact, the evidence is all to the contrary.[79]

Defendants also argue that Plaintiffs cannot rely on the *Bogosian* presumption of injury as to the inter-network conspiracy claim because Plaintiffs have provided no supporting evidence of class-wide injury.[80] Defendants' argument is wrong. As discussed below, and as Dr. Bamberger concludes, if Plaintiffs prove the conspiracy, Plaintiffs will establish that it increased interchange fees artificially by eliminating the difference between Visa's and MasterCard's respective interchange fees.[81] For that reason, this claim, as well as the intra-network conspiracy claims, are ideally suited for application of the seminal decision in *Bogosian*.[82]

---

[78] *See* Defs.' Mem. at 44-47.

[79] *See supra* §§ III.A.3, 5. The other cases relied upon by Defendants also are inapposite because the defendants in those cases – unlike Defendants in this case – did not use price lists.

[80] Defendants do not argue that the *Bogosian* presumption of injury does not apply to Plaintiffs' intra-network conspiracy claims, and thus implicitly concede that it does.

[81] *See infra* § III.F; Bamberger Reply Decl. ¶¶ 156-61.

[82] *Bogosian*, in which the court held that a conspiracy to fix list prices on a nationwide basis presumptively injures all those who purchased the affected product/service, has been followed by the Second Circuit and courts within this Circuit. *See, e.g., In re Master Key Antitrust Litig.*, 528 F.2d 5, 12 n.11 (2d Cir. 1975) ("if the appellees establish ... that the defendants engaged in an unlawful national conspiracy which had the effect of stabilizing prices above competitive levels, and further establish that the appellees were consumers of that product, we would think that the

- 38 -

This case presents the paradigm for application of the presumption of injury because Defendants have fixed and imposed a virtually invariable nationwide interchange fee schedule for each defendant network, and have adopted rules that require that those interchange fees be automatically – and typically instantaneously – deducted by each and every card-issuing bank, from funds otherwise owed to every class member on each and every payment card transaction.. *See infra* § III.C. Defendants admit that class-wide proof of an overcharge is sufficient to establish injury: "In circumstances where an overcharge analysis can be appropriate, as in a typical price fixing or tying case, it may make sense to hold, as some courts do, that demonstration of a class-wide overcharge is sufficient to show injury." Defs.' Mem. at 59. Defendants attempt to avoid this standard by inventing individual injury inquiries, which are both legally and factually erroneous, fails.[83] In that context, Defendants' suggestion that

_____

jury could reasonably conclude that appellants' conduct caused injury to each appellee"); *In re Alcoholic Beverages Litig.*, 95 F.R.D. 321, 327 (E.D.N.Y.1982) ("as a general rule, an illegal price-fixing scheme presumptively impacts upon all purchasers of a price-fixed product in a conspiratorially affected market"); *In re Auction Houses Antitrust Litig.*, 193 F.R.D. 162, 166 (S.D.N.Y. 2000).

[83] Defendants' claim that the presumption of injury does not apply because Plaintiffs have not set forth "some evidence that every member of the class has been injured in fact by the allegedly unlawful conduct" is wrong. The Court is required to determine only whether a collusively-fixed nationwide price list prevails in the industry. For that reason, Defendants' reliance on *American Seed Co., Inc. v. Monsanto Co.*, 238 F.R.D 394 (D. Del. 2006), *aff'd*, 271 Fed. Appx. 138 (3d Cir. 2008), is misplaced. In that case, there was no fixed list price that governed purchases of genetically modified seeds. The market for the seeds was – unlike the market in this case -- highly individualized, and prices varied accordingly. *Id.*, 238 F.R.D. at 400. Moreover, in this case, again unlike *American Seed*, Plaintiffs' expert has analyzed the market and proven the existence of an overcharge.

In that vein, Defendants mischaracterize Plaintiffs' intra-network conspiracy allegations. In particular, Defendants claim that Plaintiffs have not conducted an overcharge analysis because "rather than removing a restraint, and then determining what the price would have been in the then-more competitive environment, they assume they can have the price *eliminated* by judicial decree." Defs'. Mem. at 59 (emphasis added). As Dr. Bamberger explains, and Dr. Snyder conceded at his deposition, the but-for world which is used to assess injury and damages is properly based on what the but-for world would have looked like if Defendants had complied with the antitrust laws, rather than violating them. Bamberger Reply Decl. ¶ 19 n.37. Plaintiffs

- 39 -

damages issues affecting a handful of class members by virtue of payments they receive under agreements with Visa or MasterCard trump a long list of complex and central common issues which unite those merchants with the millions of others in the class is decidedly weak.[84]  The presumption of injury applies on a class-wide basis.

### 9.    Co-Branding Agreements do not Create Individual Issues.

Based on its prominence in their memorandum, Defendants rely more heavily on the purported relevance of co-branding agreements than they do any other facts in the record.[85]  The fact that those agreements are irrelevant speaks volumes as to validity of their arguments generally.[86]

---

have used a traditional price-fixing overcharge analysis: the interchange fees merchants actually paid, less what the fees would have been in the but-for competitive world in which the anticompetitive conduct is not present.  The fact that those rates might be zero, as opposed to some other number, in the but-for world in no sense distinguishes this case from any other price-fixing case.  If anything, it demonstrates that Defendants' violation is more grievous than most, as it has resulted in class members paying prices that are a result of nothing other than collusion.  *See also infra* §§ III.C, F, G, H.

[84] *See supra* § I.  *See infra* §§ C, F, G, H, I.

[85]  *See* Defs.' Mem. at 26 (citing co-branding agreements before any other factual issues in section entitled "Argument").

[86]  Defendants contend that Plaintiffs conceded in their opening brief that the payments were "interchange rebates."  Defs.' Mem. at 68.  Plaintiffs did not.  Plaintiffs recognize that a handful of co-branding agreements do in fact provide for an actual interchange fee rebate.  For example,

## REDACTED

McCahill Decl. Ex. 16, at CHASE003420695-0696.  While this unusual provision does not affect the injury analysis, Plaintiffs agree that such a provision may be considered a reduction of          damages, as it would in the event that any other merchant that has a similar provision.  This type of payment data exists and can be dealt with formulaically to determine damages on a class-wide basis.

**C.    Plaintiffs Can Establish the Class-Wide Impact of an Intra-Network Conspiracy for All Class Members.**

Defendants' contention that Plaintiffs cannot prove class-wide injury because Dr. Bamberger's proposed but-for worlds are implausible is incorrect.  Plaintiffs can establish class-wide injury because Dr. Bamberger has shown that virtually all merchants have paid an overcharge, using either of two plausible but-for worlds.[87]  In one but-for world, the rule requiring card-issuing banks to automatically deduct fixed interchange fees on every payment card transaction would not have existed, which would have resulted in interchange fees never existing or being eliminated.[88]  In the other but-for world, the networks would have acted in accordance with the antitrust laws by adopting the least restrictive alternative, which would have resulted in interchange fees having been set at a level at least 72 percent lower than in the actual world, because Defendants cannot demonstrate that Visa's and MasterCard's success depends on their setting average interchange fees above that level.[89]

Dr. Bamberger has concluded that, in either case, merchants will have paid higher interchange fees than they would have absent Defendants' conspiracy.  *See* Bamberger Decl. ¶¶ 89-94, 109-110; Bamberger Reply Decl. ¶¶ 1, 93.  Dr. Bamberger's conclusion as to these alternative but-for worlds is supported by his analysis of the market, Defendants' data and standard interchange fees.[90]  *See generally,* Bamberger Decl.; Bamberger Reply Decl.

---

[87] Bamberger Decl. ¶¶ 72, 79, 93-94, 98, 106; Bamberger Reply Decl. ¶ 93.

[88] Bamberger Decl. ¶¶ 73-78, 82-84, 89-91.

[89] Bamberger Decl. ¶¶ 79-82, 93.

[90]  Plaintiffs need not respond to Defendants' arguments regarding merchants, such as Target, Nordstrom, State Farm, GE and Cabela's, who issue Visa- and MasterCard-branded credit cards because those merchants are not, and have never been, members of the class.  The class definition has always excluded co-conspirators, and all card-issuing members of the Visa and MasterCard networks are identified as co-conspirators.  *See* First Consol. Am. Class Action Compl. ¶¶ 90-93, 97.  Dr. Snyder admitted at his deposition that he did not know whether the

- 41 -

### 1. Plaintiffs' Proposed World Without Interchange Fees Properly Considered Plausible Changes in Addition to the Elimination of Interchange Fees.

Defendants contend that Plaintiffs' but-for world without interchange fees cannot be the basis for establishing class-wide injury because it is implausible. Specifically, they contend that Dr. Bamberger's proposed but-for world ignored potential changes in the market and instead impermissibly held "all else equal" but for the elimination of interchange fees. Defs.' Mem. 65-63. Defendants' contention is baseless.

Contrary to Defendants' contention, Dr. Bamberger identified in his original declaration and in his deposition testimony a number of "differences between the actual and but-for worlds other than differences in the level of interchange fees": (1) issuing banks' profits would have been lower in the but-for world because they would not have been as profitable without interchange fee income; (2) cardholder fees would have increased; (3) rewards to cardholders would have decreased; *and* (4) "these changes would not have fully offset the loss of interchange fee revenue for issuing banks."[91] Dr. Bamberger's findings are supported by the empirical evidence as each of these changes actually occurred in Australia following the significant reduction of Visa's and MasterCard's interchange fees.[92] Despite these changes, Visa and MasterCard have continued to operate successfully in Australia.[93]

---

class definition in the complaint excluded any entities, and thus was unaware that these merchants were not class members. Snyder Dep. Tr. 91:10-93:22.

[91] Bamberger Reply Decl. ¶ 18.

[92] Bamberger Reply Decl. ¶ 18.

[93] Bamberger Reply Decl. ¶ 18. Because Dr. Bamberger considered and analyzed plausible industry changes in his proposed but-for world, Defendants' reliance on *Blades v. Monsanto Co.*, 400 F.3d 562 (8th Cir. 2005) and *Allied Orthopedic Appliances Inc. v. Tyco Healthcare Group L.P.*, 247 F.R.D. 156 (C.D. Cal 2007) where the experts allegedly failed to do so, is complete misplaced.

2.   **Dr. Snyder's Proposed Changes to the Rules of Visa and MasterCard that Might Have Occurred in a World Without Interchange Fees are Unsupported Speculation.**

Based on the unsubstantiated speculation of Dr. Snyder, Defendants contend that Dr. Bamberger's proposed but-for world is implausible because in that world several significant rules of Visa and MasterCard might have changed. Defs.' Mem. at 61-66. This contention is specious.

Dr. Snyder proposed that the networks "*might*" change: (1) the requirement that issuers accept all payment card transactions, (2) the scope of issuer requirements, and (3) the fees charged to acquirers.[94] However, as Dr. Bamberger explains, Dr. Snyder's speculation is not based on any empirical evidence or observations of similar markets.[95] In fact, the real world empirical evidence is to the contrary. Visa and MasterCard interchange fees in Australia were approximately half of what they were in the United States, even before the Reserve Bank of Australia ("RBA") took any action. And yet the networks' Australian rules were substantially identical to their United States rules.[96] The RBA then studied the effects of interchange fees and all of the defenses for those fees offered by MasterCard and Visa, and concluded that the fees were not subject to normal competitive forces and card acceptance costs therefore were too high. The RBA thus ordered Visa and MasterCard to reduce their interchange fees by almost half again. After the RBA action, the networks interchange fees stood at only about 28 percent of what they were in the United States. Still, the network rules remained the same. [97] And the

---

[94] Snyder Decl. ¶ 28 (emphasis added).

[95] Bamberger Reply Decl. ¶¶ 20-27.

[96] Bamberger Reply Decl. ¶ 24.

[97] Bamberger Reply Decl. ¶¶ 24-25; see also Br. at – [CITE]

- 43 -

networks' rules are substantially the same in several other geographical areas where interchange fees are a small fraction of what they are in the United States.[98]

Dr. Snyder was forced to admit that neither Visa nor MasterCard have made any of the rule changes in Australia about which he speculated.[99]  MasterCard made substantially the same argument to the European Commission ("EC"), and the EC also rejected the argument that the networks' rules would change in the absence of interchange fees, because none changed in Australia, which, like Dr. Bamberger, the EC found to be a useful and reliable benchmark.[100]

### 3.    The Plausibility of a World Without Interchange Fees is Supported by Defendants' Own Consultants.

Defendants claim that Plaintiffs' but-for world without interchange fees is economically implausible, and cannot be used as a basis for proving impact on the class,[101] is undermined by, among other things, Defendants' own economic consultants and contemporaneous documents. As noted in Plaintiffs' opening brief, both Richard Schmalensee (Visa's expert economist in the *Visa Check* case and other cases) and William Baxter (Visa's expert in the *NaBanco* case) have concluded that credit card networks have matured so that they can survive without interchange fees.[102]  Likewise, Jean-Charles Rochet, who has published Visa-funded research papers, concluded that payment card systems can function without interchange fees.  *See* Bamberger

---

[98] Bamberger Reply Decl. at ¶¶ 26-27.

[99] Snyder Dep. Tr. 265:2-266:10.

[100] Kane Decl. Ex. 2 ¶ 617.

[101] Defs.' Mem. at 3-6, 53-66.

[102] Dr. Schmalensee and David Evans have concluded that Visa would have survived even if it had lost the *NaBanco* case and interchange fees were eliminated as a result. *See* McCahill Decl. Ex. 55, Drs. Richard Schmalensee and David S. Evans, *Paying with Plastic: The Digital Revolution in Buying and Borrowing*, Cambridge, 280-81, (1st ed. 1999).  Dr. Snyder testified that the book was informative and useful.  Snyder Dep. Tr. 134:19-136:20.  Not surprisingly, Dr. Snyder relied on the second edition of the book, which did not address the issue.

Decl. ¶ 78. Defendants do not address, much less refute, these damning conclusions coming from their own camp.

### 4. Other Payment Networks Have Operated Successfully Without Interchange Fees.

The plausibility of a but-for world without interchange fees is also reflected in the various payment card systems that have operated successfully without interchange fees.[103] Plaintiffs' initial submissions identified several credit and debit card networks that have operated without interchange fees for a sustained period of time, as have the ACH network and check-clearing systems in the United States.[104]

## REDACTED

[105]

Contrary to the empirical evidence, Dr. Snyder argues that these benchmarks are inappropriate and that the Visa and MasterCard systems would not have been able to operate absent interchange fees. Dr. Bamberger, on the other hand, has relied on that evidence to conclude that Dr. Snyder is incorrect. In his reply declaration, Dr. Bamberger explains that, in this context, "an appropriate benchmark is a payment system with the following characteristics":

---

[103] Dr. Snyder also admitted there are many types of transactions involving at least two parties and a facilitator where there are no preexisting contractual relationships, such as the mail and package delivery services, which function efficiently. Snyder Dep. Tr. 173:16-174:15.

[104] *See* Pls.' Mem. at 60; Bamberger Decl. ¶¶ 76-77. Dr. Snyder opined that checks were not a relevant benchmark because they clear at par due to regulatory intervention. Snyder Decl. ¶ 87. Yet, as Dr. Bamberger noted, the article Dr. Snyder relied upon to support his opinion explained that "government intervention was required only where checking account markets were monopolized; elsewhere, competition led to the elimination of interchange fees on checks." Bamberger Reply Decl. ¶ 86. *See also* McCahill Decl. Ex. 56, Stevens, Non-Par Banking: Competition and Monopoly in Markets for Payments Services, Working Paper 9817, *Federal Reserve Bank of Cleveland*, at 18-20 (1998). Dr. Snyder also claimed that ACH is not a relevant benchmark, but admitted that he was unfamiliar with the ACH system. Snyder Dep. Tr. 269:8-272:8.

[105] McCahill Decl. Ex. 57, at MCI_MDL02_09398745.019. *See also id.* at MCI_MDL02_06933671-3672.

- First, because interchange fees for a particular card type in the actual world have the effect of: (1) increasing the cost to merchants of accepting that card type; and (2) increasing the benefit to issuers of issuing that card type (all else equal), an appropriate benchmark network has the property that issuing and acquiring can be done by separate firms (*i.e.*, it is a "four-party" network);

- Second, because the actual world is characterized by the widespread use of Visa and MasterCard payment cards, an appropriate benchmark network has the property that it is widely used by cardholders; *and*

- Finally, Visa and MasterCard have advanced the argument that interchange fees are needed when a network is initially established (*e.g.*, to solve a claimed "chicken-and-egg" problem). Because the Visa and MasterCard networks in the United States have been long established, an appropriate benchmark has the property that it is an established network."

Bamberger Reply Decl. ¶ 37. Dr. Bamberger further explains that "benchmarks that share these characteristics provide valuable and reliable information that allows an economist to evaluate whether the Visa and MasterCard networks at issue in this case could have operated successfully in a but-for world in which interchange fees were lower or absent."[106] Because each of the payment networks – including Visa and MasterCard in Australia, foreign debit card networks, and domestic ACH and check clearing systems – referenced in his initial declaration meet these criteria, Dr. Bamberger concludes that they are "relevant benchmarks."[107]

Dr. Bamberger also has analyzed each of the reasons Dr. Snyder claimed that these payment card systems are not appropriate benchmarks. Based on the empirical evidence, Dr. Bamberger has concluded that each reason proffered by Dr. Snyder is irrelevant to determining an appropriate benchmark in this case, and is contrary to the facts and/or based on faulty data or

---

[106] Bamberger Reply Decl. ¶ 38.

[107] Bamberger Reply Decl. ¶ 39.

comparisons.[108]  In particular, with respect to using payment networks in foreign countries as

benchmarks, Dr. Bamberger explains as follows:

> [The] reason *why* interchange fees are lower in other countries – *i.e.*, whether
> through competition law proceedings, other regulatory proceedings, or the
> decisions of the networks and their member banks – is not relevant to an
> economic evaluation of whether networks can operate successfully with lower or
> no interchange fees. If Visa and/or MasterCard interchange fees in a country are
> reduced or eliminated as a result of regulatory intervention (*e.g.*, as in Australia),
> and the Visa and MasterCard networks in those countries continue to operate
> successfully, such evidence is highly relevant to my evaluation of continue to
> operate successfully, such evidence is highly relevant to my evaluation of the
> effects on members of the proposed classes of the elimination of a requirement to
> pay interchange fees, or of a substantial reduction in the level of required
> interchange fees, and of any claim that reducing or eliminating interchange fees
> would have led a "death spiral."

Bamberger Reply Decl. ¶ 42.  Dr. Bamberger therefore concludes that "to the extent that

payment networks with" the characteristics described above "operate successfully with no

required interchange fees, or with interchange fees substantially lower than the U.S. Visa and

MasterCard levels, the existence of such networks provides economic evidence that the Visa and

MasterCard networks in the United States would have operated successfully in the but-for

world."[109]

### 5.  Dr. Snyder Failed to Analyze the Effect of Interchange Fees if Defendants Would Have Had acted in Accordance with the Antitrust Laws.

Dr. Snyder's opinions are inconsistent with his own methodology for developing a but-

for world.  Dr. Snyder testified that the but-for world is the world that would have existed absent

the conspiracy, and that its purpose is to isolate the effect of the conspiracy.[110]  Here, the but-for

world is one without rules requiring merchants to pay interchange fees to card-issuing banks, but

---

[108]  Bamberger Decl. ¶¶ 40-89.

[109]  Bamberger Reply Decl. ¶ 90.

[110]  Snyder Dep. Tr. 231:5-233:23, 444:4-445:18.

in which the networks' authorization, clearance and settlement services remain.[111]  However, Dr. Snyder did not attempt to isolate the effects of removing the rule on the interchange fees that merchants would have paid.

Dr. Bamberger concludes that Dr. Snyder's but-for world analysis is improper because it is based on his speculation, rather than empirical evidence "considering the effect of reducing interchange fees in the *current* actual world."[112]  Dr. Snyder attempts to create the post-conspiracy world by speculating as to what would happen if the conspiracy was dismantled.  He does so by attempting to analyze "the overall financial effect of lower interchange rates on . . . merchant[s]" in a post-conspiracy world, rather than properly determining whether merchants paid higher interchange fees in reality than in the but-for world (in which Defendants never conspired).[113]  He proposes a post-conspiracy world, buttressed only by his speculation as to how Defendants' other rules would change, to determine the "overall financial effect" of their eliminating interchange fees, *i.e.*, a lost profits analysis, rather than by determining whether merchants paid higher interchange fees in the real world than in the but-for world – the overcharge analysis appropriate for a horizontal price-fixing case.

Dr. Snyder also contends that, absent interchange fees, co-branding agreements "would not likely have existed."[114]  That contention is both irrelevant and wrong.[115]  Dr. Bamberger shows that the empirical evidence reflects that co-branding agreements would have existed in a but-for world without interchange fees, and do exist in real markets in which interchange fees are

---

[111] Bamberger Decl. at ¶¶ 74-78; Bamberger Reply Decl. ¶¶ 14-34.

[112] Bamberger Reply Decl. ¶ 19 n.37 (emphasis in original).

[113] Snyder Decl. ¶ 20.

[114] Snyder Decl. ¶ 105.

[115] *See supra* § III.B.8.

absent or markedly lower than they are currently in the United States.[116]   Dr. Bamberger
concludes that issuing banks still would have had an incentive to enter into such agreements
because the merchant's brand name, customer list and other property rights would still have been
valuable.[117]   Merchants would have continued to benefit financially by enlisting additional
cardholders and earning revenue from the resulting transactions.   *Id.*   Most of the card-issuing
banks' revenues are derived from cardholders' interest payments.[118]

> 6.   **Defendants' Characterization of Payment Card Transactions as
> "Factoring" is a Counter-Factual Fiction Defendants Adopted Strictly
> for Litigation Purposes.**

Early in their Memorandum, Defendants make much of the benefits merchants derive
from accepting payment cards.   *See* Defs.' Mem. at 17-19.   And both Defendants and Dr. Snyder
make much of the premise that merchants should not expect to enjoy those benefits for free.[119]
In Plaintiffs' but-for worlds, however, merchants would have in fact paid for those purported
benefits *without* having paid fixed interchange fees.   As Dr. Bamberger explains, acquiring banks
set the non-interchange portion of merchant discount fees competitively.[120]   Dr. Snyder admitted
at his deposition that any purported benefits merchants enjoy from accepting payment cards are
accounted for in that portion of the merchant discount fees they pay.[121]

---

[116] Bamberger Reply Decl. ¶¶ 110-18.

[117] Bamberger Reply Decl. ¶¶ 112-18.

[118] *See infra* § III.C.6.

[119] *See, e.g.*, Defs.' Mem. at 64; Snyder Decl. ¶¶ 80-81.

[120] Bamberger Reply Decl. ¶ 143.   Merchant discount fees are comprised of interchange fees –
which are fixed and serve as a floor for merchant discount fees – and additional fees, which are
competitively established by merchant acquiring banks.   *See* First Consolidated Amended Class
Action Complaint ¶ 8(l) (Dkt. No. 317).

[121] Snyder Dep. Tr. 282:10-20.

Faced with that reality, Defendants were forced to manufacture a reason why merchants would have had to pay card-issuing banks for services above and beyond those services for which they did, simply pay their acquiring banks. The result is that, for the first time in any public context, Defendants now characterize routine credit card transactions (but not debit card transactions, which are also at issue in this action) as the transfer of "receivables" from merchants to card-issuing banks, and claim that interchange fees represent a "discount" merchants must pay those banks for accepting the risks associated with those "receivables."[122] That premise appears early and often in both Defendants' memorandum and Dr. Snyder's declaration, most frequently in the context of their repeated claims that networks cannot operate without interchange fees.[123]

Yet at virtually all times before Defendants served their opposition submission, they characterized the transaction between acquiring and issuing banks as the transfer of data and funds, via network services which are generally identified as "authorization," "clearance" and "settlement."[124] Acquiring banks facilitate the process by providing merchants access to these

---

[122] MasterCard may have relied on the "factoring" argument in its proceeding before the E.C. Plaintiffs cannot know either way because MasterCard's submissions in that proceeding are not available to the public. However, if MasterCard did rely on that argument, it abandoned the argument before the E.C. issued its verdict. Kane Decl. Ex. 2 ¶ 725 ("As to MasterCard's initial view that the [interchange fee] was a 'fee for services' provided by issuing banks which benefit merchants, MasterCard explicitly abandoned this concept in its more recent submissions.").

[123] *See, e.g.,* Defs.' Mem. at 3, 5, 11, 13; Snyder Decl. ¶¶ 16-17, 57.

[124] When faced with legal threats of a different nature that Visa was forced to defend publicly, Visa General Counsel Josh Floum stated just that to Congress:

> [T]he network facilitates the transaction between the issuer and the acquirer, each of which is, in turn, responsible for establishing these rates and fees in contract with their respective cardholders and retailers. When a cardholder uses his or her credit card with a retailer, the retailer transfers the billing information to its acquirer, which transfers the billing request to the cardholder's issuer. The acquirer then credits the transaction amount charged to the retailer's account, less the merchant discount rate that it charges to the retailer. Accordingly, the retailer

- 50 -

services.[125]  Conversely, in the only apparent instance in which Defendants' contemporaneous

documents refer to "factoring," they characterize it as a form of fraud.[126]

      Dr. Snyder nevertheless repeats Defendants' "factoring" characterization, rather than

relying on any evidence generated for a purpose other than this case.[127]  In particular, he opined

that the flow of funds related to the transfer of receivables "is appropriately analyzed as a form

of factoring arrangement, a common practice for purchasing receivables."[128]  However, during

his deposition, Dr. Snyder admitted that this characterization is not supported by Defendants'

contemporaneous business records, or any other evidence in this case.  In fact, it represents his

personal views regarding the nature of the transaction and the flow of funds.[129]  Dr. Snyder

effectively conceded that merchants' credit card transactions are not merchants' "receivables," as

that term is generally defined, and the associated flow of funds is not "factoring," as that term is

---

receives prompt payment.  The issuer subsequently pays the acquirer the amount
of the transaction less the interchange fee, which (absent a bilateral agreement) is
set in default form by the open-loop system, and posts the transaction to the
cardholder's account.  The cardholder thereafter pays the issuer the transaction
amount.

McCahill Decl. Ex. 58, May 15, 2008 Floum Testimony Before the House Committee on the
Judiciary at 7-8.  *See also* Kane Decl. Ex. 14 at 3, 7-10.

[125]  *See* Pls.' Mem. at 8-12.  *See also* McCahill Decl. Ex. 59, at CHASE003812768-2769;
McCahill Decl. Ex. 60, at CHASE003812740-2741; McCahill Decl. Ex. 61, at
CITIINT002100845-0847.

[126]  *See* McCahill Decl. Ex. 62, *Rules for Visa Merchants* at 10 ("Depositing transactions for a
business that does not have a valid merchant agreement is called laundering or factoring.
Laundering is not allowed; it is a form of fraud associated with high chargeback rates and the
potential for promoting illegal activity.").

[127]  Snyder Decl. ¶¶ 16, 17, 46.

[128]  Snyder Decl. ¶ 57.  Dr. Snyder also opined that the "honor all paper rule" was essential to the
provision of these services.  Yet, he admitted that he could not identify any such rule in the
networks' operating rules.  Snyder Dep. Tr. 407:10-408:18.

[129]  Snyder Dep. Tr. 106:18-111:3, 112:17-115:18, 125:13-128:22.

generally defined.[130]  JPMorgan Chase CEO Jamie Dimon – who testified *after* Defendants

served their opposition papers -- was even more forthright in assessing Defendants' reliance on

the "factoring" analogy:

> Q.     Have you ever thought of your credit card business as being a factoring
>        business?
>
> A.     No.

McCahill Decl. Ex. 63, Dimon Dep. Tr. 413:21-24.

Mr. Dimon also explained that issuing banks undertake great effort to assess the risks

attendant to providing loans to cardholders.[131]  Card-issuing banks invest substantial resources in

marketing to cardholders (but none in marketing to merchants), approving lines of credit, and

authorizing transactions.  Issuing banks decide how much risk to take (*e.g.*, whether to issue

"sub-prime" card accounts to riskier cardholders or authorize a transaction that might be

---

[130]  Snyder Dep. Tr. at 107:22-109:4 (the networks' rules call them "transaction receipts" rather than "receivables," and receipts and receivables are not the same thing); *id.* at 111:4-112:6 (merchants cannot seek to collect "receivables" directly from their customers); *id.* at 113:6-13 (merchants cannot transfer "receivables" to anyone other than their acquiring banks); *id.* at 114:16-116:15 (is not aware of any other type of "receivable" that can be sold to only one party); *id.* at 121:15-123:20 (acquiring banks never hold the "receivables," but merely pass them through the networks); *id.* at 123:21-125:12 ("the receivable here is not a general receivable" because the acquiring bank cannot transfer the receivable to any bank, it must be the card issuing bank); *id.* at 125:13-126:6 ("I think that I refer to factoring in my analysis and say that when you analyze this process, it's useful to refer to factoring to help understand it.  I don't characterize it as factoring *per se* and there are differences between what happens in the context of the network and factoring more generally"); *id.* at 126:7-17 (he is unaware of any other factoring arrangement in which every step of the process is predetermined by rules); *id.* at 126:18-128:22 (factoring "analogy breaks down.  It's a useful analogy, but it's limited."); *id.* at 190:8-191:19, 278:9-280:21 (issuing banks, not the merchant, extends credit or loan to the customer based on creditworthiness).

[131]  McCahill Decl. Ex. 63, Dimon Dep. Tr. 412:22-413:20.  Numerous issuing bank employees, including Liam McGee, currently the head of Bank of America's consumer bank, and Bruce Lauritzen, former FNBO CEO and Visa Board member, testified that cardholder balances are considered loans, *see* McCahill Decl. Ex. 64, McGee Dep. Tr. 66:9-21 (testifying that "a loan would be if the customer used the credit card and then carried the balance past the payment date.  That, in effect, would be a loan.") and McCahill Decl. Ex. 65, Lauritzen Dep. Tr. 13:10-14:14 (FNBO views credit cards as loans).

profitable to the bank but might also be fraudulent). In fact, the extension of credit to cardholders is the heart of card issuers' business, as interest constitutes the majority of card issuers' income from credit card transactions.[132] Conversely, by virtue of the "honor all cards" rule, merchants have *no* say in determining whether credit will be extended to the cardholders with whom they do business.[133] Yet, contrary to this evidence and common sense, Defendants now claim that merchants are paying them fixed interchange fees for assuming the risk of extending that credit to cardholders.

As Dr. Bamberger recognizes, the "merchant plays no role in establishing a line of credit or authorizing charges against a line of credit, has no discretion whether to permit a particular customer to use a credit card for a particular transaction, and has no option to collect the amount owed directly from the card customer."[134] And the interchange fees for all of those transactions are established in advance by the networks' schedules, which apply without regard to the risk

---

[132] *See, e.g.,* McCahill Decl. Ex. 66 (Bank of America e-mail referencing SEC filing: "We could cite the credit issuer statistics here ·

# REDACTED

[133] *See, e.g.,* McCahill Decl. Ex. 64, McGee Dep. Tr. 66:22-68:10 (Bank of America does not seek merchants' input in determining whether to issue credit cards of any kind to consumers); McCahill Decl. Ex. 69, at FNBO-0998984, 8992 (merchant agreement reflecting that credit card terms and enhancements "will be established by FNB and are subject to change from time to time in FNB's sole and absolute discretion"); McCahill Decl. Ex. 70, at FNBO-0252831 (merchant agreement summary reflecting that issuing bank responsible for "Credit underwriting/Card issuance"). Even the co-brand agreements relied upon by Dr. Snyder clearly reflect that credit decisions are made solely by issuing banks. *See, e.g.,* McCahill Decl. Ex. 12, at CHASE003420721-0723; McCahill Decl. Ex. 13, at 3; McCahill Decl. Ex. 14, at BOFAIC06513482; McCahill Decl. Ex. 15, at CHASE003422506; McCahill Decl. Ex. 16, at CHASE003420646; McCahill Decl. Ex. 18, at CHASE003421044.

[134] Bamberger Reply Decl. ¶ 148.

associated with any particular cardholder.[135] The result is that merchants are prevented from bargaining based on the credit risks of their cardholder customers.

Thus, it is not surprising that the "factoring" construct is reflected nowhere in Defendants' contemporaneous documents, including the networks' operating rules.[136] Dr. Bamberger has concluded that Defendants' and Dr. Snyder's factoring argument is erroneous because it "does not reflect the relationship between acquiring and issuing banks" and is contrary to Dr. Snyder's own testimony.[137] Dr. Bamberger concludes that credit card transactions are like a funds delivery service, and not the origination and sale of a receivable.[138] Defendants' "factoring" argument has no bearing on Plaintiffs' but-for world without interchange fees.

---

[135] *See* McCahill Decl. Ex. 51, Sheedy Dep. Tr. 110:18-111:5; McCahill Decl. Ex. 52, Steele Dep. Tr. 65:08-:21.

[136] *See* Kane Decl. Ex. 29 at Visa Op. Regs. 6.2.A.4, 6.2.D.1, 6.2.I, 6.2.K, 4.2.G. *See also* Kane Decl. Ex. 30 at MC Rule 10.4 ("interchange [rates] . . . generally are designed to compensate a member for costs incurred as the result of the interchange of transactions"). *See also* McCahill Decl. Ex. 71, Visa Op. Regs. 3.12 and 9.3 and Definitional Sections "Acquirer" through "Transaction," and McCahill Decl. Ex. 72, MasterCard Rules 10.1-10.3; McCahill Decl. Ex. 62, *Rules for Visa Merchants* at 6-8 (description of transaction flow absent the word "receivable"); McCahill Decl. Ex. 73 at VI-IC-02673165-3167 (interchange is a balancing device based on demand elasticities); McCahill Decl. Ex. 74, at VUSAMDL1-8471801 (no reference to "receivables"); McCahill Decl. Ex. 75 (same); *see also* McCahill Decl. Ex. 76, Gregory Dep. Tr. 141:10-142:5 (Senior Relationship Manager for Capital One: "I don't recall anyone specifically, in conversations or written, to have called that a 'receivable.'"). The networks have issued numerous versions of MasterCard's Rules and Visa's Operating Regulations during the relevant period. As such, the numbering schemes have changed in both those documents. For ease of reference, the versions cited here (as McCahill Decl. Exs. 71-72) are the same 2005 versions of the MasterCard Rules and Visa Operating Regulations cited in Plaintiffs' opening memorandum (as Kane Decl. Exs. 29-30). The substance of the rules at issue here has not changed during the relevant period..

[137] Bamberger Reply Decl. ¶¶ 145-49.

[138] Bamberger Reply Decl. ¶ 149.

7.    **The Court Would Not be "Price-Setting" by Concluding that Defendants Would Not Have Charged Interchange Fees in the But-For World.**

Defendants contend that Dr. Bamberger's world without interchange fees is legally impermissible because it would require the Court to set prices. On the contrary, Plaintiffs are challenging the networks' rules requiring merchants to pay fixed interchange fees on each transaction, and seeking a jury verdict as to what interchange fees would have been in a but-for world, for the purpose of determining class members' damages.[139] Dr. Bamberger's but-for world without interchange fees is predicated on what would have happened if Defendants had not engaged in the conspiracy to impose and enforce those rules. There is no bar to plaintiffs challenging such rules, or asking a jury to make the above-referenced factual finding.[140]

Defendants' reliance on two decisions in *In re ATM Fee Antitrust Litigation* is unavailing. Both decisions were limited to whether price-fixing of ATM interchange fees in the context of a joint venture can be a *per se* violation of section 1 of the Sherman Act. The first decision was on a motion to dismiss and held that plaintiffs had adequately alleged a *per se* claim. *Brennan v. Concord EFS, Inc.*, 369 F. Supp. 2d 1127, 1131-32 (N.D. Cal. 2005). The second decision was on a motion for summary judgment, that went only to whether the *per se*

---

[139] *See supra* § III.C.

[140] Even if Plaintiffs were seeking the "abolition" of Defendants' rules, that would not be improper. For example, in *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001), the government challenged, among other things, Visa's and MasterCard's rules prohibiting member banks from issuing American Express and Discover branded credit cards. 163 F. Supp. 2d at 327. These rules were found to violate the antitrust laws and were abolished. *Id.* at 327, 406. Similarly, in *Visa Check*, plaintiff merchants challenged, as an unreasonable restraint of trade, defendant networks' rules requiring merchants that accepted Visa and MasterCard branded credit cards to also accept their debit cards. 192 F.R.D. at 71. Plaintiffs further contended that defendants' unlawful conduct resulted in plaintiff merchants paying higher interchange fees on debit card transactions than they would have absent the challenged rules. *Id.* at 84-85. As this Court and Defendants are aware, those rules were abolished as a part of a settlement.

rule was applicable to defendants' conduct.  The court held only "it seems inappropriate to the Court to subject such a venture's conduct to a *per se* analysis."  *In re ATM Fee Antitrust Litig.*, 554 F. Supp. 2d. 1003, 1016-17 (N.D. Cal. 2008).  Significantly, the court did not find the collusive imposition of a rule mandating interchange fees to be legal.  *Id.*  Rather, the court held that the case should proceed under a rule of reason analysis, which requires taking a "deeper look at the purpose and effect of the interchange fee."  *Id.* at 1017.

Accordingly, Dr. Bamberger's opinions regarding a world without interchange fees are properly based on what would have happened if Defendants had not engaged in the conduct at issue – the collusive imposition of rules requiring merchants to pay interchange fees for every transaction.

> **8.      Plaintiffs Can Establish Injury on a Class-Wide Basis in the But-For World in which Interchange Fees Would Have Been Reduced By 72 Percent.**

Should the existence of interchange fees be found to have been necessary for payment card network services to have existed, Plaintiffs have proffered an alternative but-for world that applies the least restrictive alternative legal standard and determines a benchmark to measure damages, under which the fee would have been set in a less restrictive manner.[141]  This benchmark reflects the level at which fees would have been set to ensure the viability of each network, but would not have allowed Defendants to earn monopoly profits through their cartel

---

[141] *See United States v. Visa, U.S.A., Inc.*, 163 F. Supp.2d 322, 345 (S.D.N.Y. 2001) (in a rule of reason case, if a restraint has pro-competitive effects, plaintiffs may still establish "that the restraints' objectives can be achieved in a substantially less exclusionary manner").  *See also* McCahill Decl. Ex. 77, Federal Trade Commission and the U.S. Department of Justice, Antitrust Guidelines for Collaborations Among Competitors (April 2000) § 3.36(b) ("if the participants could have achieved or could achieve similar efficiencies by practical, significantly less restrictive means, then the Agencies conclude that the relevant agreement is not reasonably necessary to their achievement").

activity. [142] *See Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 294 (2d Cir. 1979) ("Excessive prices, maintained through exercise of a monopolist's control of the market, constituted one of the primary evils that the Sherman Act was intended to correct"). [143] Plaintiffs' alternative but-for world is therefore a legally permissible less restrictive alternative, and indeed a conservative measure of damages.

Dr. Bamberger's alternative but-for world using a benchmark such as Australia's substantially lower interchange fees is economically plausible and supported by empirical evidence, and thus is an appropriate basis with which to prove common impact. Dr. Bamberger concludes that Australia is an appropriate benchmark to determine damages for a number of reasons. [144] First and foremost:

> Both Australia and the United States are widely considered "developed" or "advanced" economies. For example, the International Monetary Fund classifies 31 countries – including Australia and the United States – as "Advanced

---

[142] According to Dr. Bamberger, viability means that the networks would have operated successfully such that they "would have existed; issuing banks would have had an economic incentive to issue Visa and MasterCard payment cards; and merchants would have had an economic incentive to accept Visa and MasterCard payment cards." Bamberger Reply Decl. ¶ 14.

[143] Defendants' citation to *Berkey Photo* is based entirely on the false premise that Plaintiffs are asking the Court to set a price for Defendants' services by judicial fiat. *See* Defs.' Mem. at 55. Plaintiffs are doing no such thing, but are doing what plaintiffs in every price-fixing class action seek to do, *i.e.*, establish that the fact of injury, and measure of damages, can be proven through common evidence. *See supra* § III.C. *See infra* § III.H. Plaintiffs' reliance on benchmarks to that end is no more contrary to *Berkey Photo* than it was in the scores of other cases in which class plaintiffs successfully did the same. *See Visa Check I.*, 192 F.R.D. at 75-76, 84 (finding antitrust injury susceptible to common proof where plaintiffs' expert relied on Canadian market as a benchmark); *NASDAQ,* 169 F.R.D. at 521 (approving plaintiffs' proposed methodologies to prove impact and damages, including comparing defendants' profits on price-fixed stock spreads with benchmarks of trades not affected by conspiracy). *See also Arden Architectural Specialties, Inc. v. Washington Mills Electro Minerals Corp.*, 2002 WL 31421915, at *11 (W.D.N.Y. Sept. 17, 2000) ("*Arden*"); *In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 137 (C.D. Cal. 2007); *Vitamins*, 209 F.R.D. at 267-68; *In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, 220 (E.D. Pa. 2001), *aff'd* 305 F.3d 145 (3d Cir. 2002).

[144] Bamberger Decl. ¶ 81; Bamberger Reply Decl. ¶¶ 44-69.

Economies." The World Bank lists both Australia and the United States as "High-Income Economies." Both Australia and the United States are members of the Organization for Economic Co-operation and Development.

Bamberger Reply Decl. ¶ 48. Dr. Bamberger further concludes that Visa and MasterCard branded cards are widely held by consumers, and widely accepted by merchants, in both countries. *Id.* ¶ 47 & n.86. Significantly, as Dr. Bamberger points out,

# REDACTED

Moreover, Dr. Bamberger's conclusion that Australia is an appropriate benchmark is shared by other economists, including Dr. Snyder, and Defendants' own witnesses. *Id.* ¶ 52-55. When it suits his purposes, Dr. Snyder refers to the Australian experience to support his arguments. Although Dr. Bamberger disagrees with those arguments, Dr. Snyder has implicitly conceded that Australia is an appropriate benchmark. *Id.* ¶ 52. *See also* Snyder Decl. ¶¶ 97, 131. Other economists have also cited Australia as a benchmark when discussing what might happen in the payment card world in the future.[145]

Dr. Snyder, arguing against his own use of Australia as a benchmark, posits that Australia is not an appropriate benchmark based on several alleged differences between the United States and Australia: (1) the basis for interchange fees; (2) American Express' market share and acceptance;[146] (3) the prevalence of cash; (4) the prevalence of Chase rewards; (5) merchant

---

[145] *See* Bamberger Reply Decl. ¶¶ 53-54.

[146] In addition to concluding that the difference in American Express' market share in Australia compared to the United States is irrelevant, Dr. Bamberger has concluded that the Australian experience refutes Dr. Snyder's opinion that if Visa's and MasterCard's interchange fees had been substantially reduced, they could not have competed with American Express. Bamberger Reply Decl. ¶¶ 28-33. In particular, after the rate reductions, the three networks' respective

concentration; and (6) the number of interchange categories.  Based on economic analysis and

the empirical evidence, Dr. Bamberger concludes that each of Dr. Snyder's alleged differences

are irrelevant and contrary to the facts.  Bamberger Reply Decl. ¶¶ 56-69.

Defendants argue that Plaintiffs cannot establish class-wide injury in the but-for world

with substantially reduced interchange fees because Plaintiffs' proposed benchmark is only an

average network-wide price decrease.  Defs.' Mem. at 75-76.  However, the cases cited by

Defendants in support of their argument are inapposite.  In *In re Graphics Processing Units*

*Antitrust Litig.*, 253 F.R.D. 478 (N.D. Cal. 2008), plaintiffs could not establish class-wide injury

because over 99.5 percent of sales dollar volume was based on "customized negotiations

between wholesalers and either defendant . . . without any regard to a price list" and "many of

the graphics products sold were particularly customized to the needs of a specific purchaser."

250 F.R.D. at 490-91.  Because prices for those class members were not based on a fixed price

list, plaintiffs' expert attempted to demonstrate a correlation "across defendants' graphics

products and across all purchasers."  *Id.* at 493.  The correlation used averages of certain

products and purchases rather than "disaggregated data for individual products and particular

customers (*e.g.*, Microsoft, Dell, individual consumers, etc.)."  *Id.*  Accordingly, the correlation

analysis did not establish that all or nearly all class members suffered injury.

Defendants' reliance on *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group,*

*L.P.*, 247 F.R.D. 156 (C.D. Cal. 2008), is equally misplaced.  In *Tyco,* plaintiffs were not

challenging a horizontal price fixing conspiracy.  Rather, plaintiffs challenged defendant's

business practices that allegedly foreclosed competition from generic versions of the product

resulting in increased prices.  In contrast to a price fixing conspiracy that directly impacts the

---

market shares changed very little.  *Id.* ¶ 30.  In addition, in response to the rate reductions,
American Express reduced its merchant discount fee by a similar amount.  *Id.* ¶¶ 33, 137-40.

price paid by each customer based on a fixed list price, the court found that the impact of the "three different types of anticompetitive conduct" on the prices paid by customers would vary based on numerous factors that could not be accounted for by using an average price. 247 F.R.D. at 168. Thus, the court found that plaintiffs could not use a common method to establish the prices that would have been paid by each customer in the but-for world and thus could not prove injury on a class-wide basis. *Id.* at 168-69.

In stark contrast to the *GPU* and *Tyco* cases, Plaintiffs in this case are not relying upon average prices to determine injury. Rather, as Dr. Bamberger testified, it is reasonable to conclude from the empirical evidence that, in Plaintiffs' but-for world, the interchange fees that every merchant paid would have been approximately 72 percent lower than in the actual world, regardless of merchant category, card type or volume.[147]   The payment rate data exists and the overcharge can be determined formulaically. Bamberger Decl. ¶¶ 110, 117-20. Accordingly, overcharge injury can be established on a class-wide basis.

### D.     Dr. Snyder's Opinions are Unreliable.

Dr. Snyder's opinions do not provide any reliable basis for determining whether Dr. Bamberger's proposed but-for worlds are plausible, whether conflicts exist between class members, or whether injury and damages can be determined class-wide. Dr. Snyder ignored wide-ranging and critical pre-existing evidence, as well as conflicting expert evidence proffered by Visa that flatly contradict his opinions. His deposition confirmed this, and resulted in no explanation for his having done so.

---

[147] Bamberger Dep. Tr. 292:3-299:6.

1.    **Dr. Snyder Has No Experience in Dealing with Payment Card Networks.**

Dr. Snyder has no experience with payment card markets.  Dr. Snyder admitted that he has never written about or researched payment card markets or networks.[148]  Dr. Snyder is unfamiliar with much of the relevant economic literature.  For example, Dr. Snyder testified that he was unfamiliar with the work of Professor William Baxter.[149]  Professor Baxter is the author of the seminal economic analysis that Visa and MasterCard have cited for over 25 years as the theoretical basis for their use of fixed interchange fees.[150]  Professor Baxter was also Visa's expert in the *NaBanco* case, the decision on which Visa has relied for over 25 years as its legal defense for fixing interchange fees.[151]  Dr. Snyder relies in his Declaration on the *NaBanco* case.[152]

Much of what Dr. Snyder does claim to know is wrong.  His limited knowledge of payment card networks is based primarily on his review of articles and books written by antitrust economists who have regularly consulted for or testified on behalf of Visa or MasterCard.[153]  Dr. Snyder testified that he did not believe it was inappropriate to rely upon these biased sources of information.[154]  His other primary sources of information concerning the purpose and effects of

---

[148] Snyder Dep. Tr. 22:12-21.

[149] Snyder Dep. Tr. 66:25-67:18.

[150] William F. Baxter, *Bank Interchange of Transactional Paper: Legal and Economic Perspectives,* 26 J.L. & ECON. 541 (1983).

[151] *See National Bancard Corp. v. Visa U.S.A., Inc.*, 596 F. Supp. 1231, 1237 (S.D. Fla. 1984).

[152] Snyder Decl. ¶ 7 n.18, ¶ 25 n.74, ¶ 37 nn.108 & 109.

[153] Some of those economists are Richard Schmalensee, Benjamin Klein, David Evans and Jean Tirole.  Dr. Snyder did not even review the expert report of Dr. Klein proffered by Visa in the Fist Data litigation which, as described above, is contrary in significant respects to the position presented by Dr. Snyder with respect to co-brand agreements in this case.

[154] Snyder Dep. Tr. 606:8-14.

interchange fees were internal Visa and MasterCard documents (including agreements that

Defendants selected for him), position papers defending the *status quo*, and books and articles by

economists who have repeatedly worked with the networks to defend their business practices.[155]

Dr. Snyder did not consider or otherwise address contrary points of view.

Dr. Snyder's opinions regarding the nature of credit card transactions are also

contradicted by the record evidence and the publicly available materials.  For example:

- Jamie Dimon, CEO of Defendant JP Morgan Chase, admitted that credit card transactions are not factoring;[156]

- Visa and MasterCard documents do not refer to credit card transactions as receivables and the flow of funds as factoring;[157]

- First Data Corp., a significant independent sales organization and processor, does not characterize its role in the acquiring and processing of credit card transactions as the purchase and sale of credit card receivables, nor does it believe that it is engaging in factoring;[158] *and*

- Merchant acquiring contracts state that the acquirer is providing access to the Visa and MasterCard networks, and facilitating the processing and settlement of payment card transactions.  They do not state the acquirer is purchasing receivables or engaging in factoring.[159]

Dr. Snyder was also ignorant of basic facts regarding interchange fees:

- he had no idea how interchange fees were set at Visa and MasterCard before their IPOs, and has not analyzed whether they were set by the banks to maximize bank profits;[160]

- he had no idea how, if at all, Visa and MasterCard compare their respective rates (*e.g.*, by merchant category, effective rates);[161]

---

[155] *See supra* § III.C.3.

[156] McCahill Decl. Ex. 63, Dimon Dep. Tr. 412:22-414:8.

[157] *See supra* § III.C.6.

[158] McCahill Decl. Ex. 78, First Data Corp. Form 10-K for the Period Ending Dec. 31, 2005 at 8.

[159] *See supra* III.C.6.

[160] Snyder Dep. Tr. 151:5-152:25.

[161] Snyder Dep. Tr. 328:21-331:8.

- he did not know if differences in the networks' respective merchant categories results in merchants paying significantly different interchange fees for Visa and MasterCard transactions;[162]

- he did not know how issuing banks compare the networks' interchange fees in deciding to issue Visa or MasterCard cards;[163]

- he did not know what factors issuing banks consider in determining the proportion of Visa and MasterCard cards to issue;[164]

- he did not believe that there is a "hold up" problem in connection with payment card transactions,[165] even though the networks have long used that problem to justify their fixing interchange fees;[166]

- he has not studied whether default interchange fees are based on different cost structures;[167] *and*

- he has not studied whether any merchant pays a merchant discount less than the default interchange fee.[168]

Finally, Dr. Snyder's lack of understanding of the payment card business is further exemplified by his testimony that issuing banks would stop issuing credit cards without interchange fee revenue.[169] Dr. Snyder admitted that credit card issuers generate approximately $130 billion per year, or 80 percent of their total revenue, from interest income and fees other than interchange.[170] Because the vast majority of income received by banks on credit cards is not from interchange fees, others have recognized that banks would not exit the business, even if

---

[162] Snyder Dep. Tr. 332:19-333:6.

[163] Snyder Dep. Tr. 333:7-334:16, 337:10-20.

[164] Snyder Dep. Tr. 336:8-22.

[165] Snyder Dep. Tr. 128:23-129:8.

[166] McCahill Decl. Ex. 79, John Small & Julian Wright, The Bilateral Negotiation of Interchange Fees in Payment Schemes 1 (Jan. 2002) (unpublished).

[167] Snyder Dep. Tr. 583:7-22.

[168] Snyder Dep. Tr. 584:20-25.

[169] Snyder Dep. Tr. 203:4-204:17, 211:24-214:21.

[170] Snyder Dep. Tr. 207:13-23.

interchange fee revenue disappears.[171]  In addition, banks in Australia have not exited the

business despite the significant reduction in interchange fees.[172]  Dr. Snyder's unsupported

opinion that issuing banks would simply exit the business without interchange fee revenue

therefore strains credulity.

> **2.  Dr. Snyder's Claim that Issuing Banks Almost Always Bear the Risk of Loss is Wrong.**

Fundamental to Dr. Snyder's opinions are his claims that card issuing banks bear nearly

all of the risk of loss on credit card transactions because merchants receive a payment

guarantee.[173]  He further claims that the payment guarantee is a reason for interchange fees.[174]

---

[171] *See* McCahill Decl. Ex. 80, at RBC015126

# REDACTED

[172] *See, e.g.,* McCahill Ex. 83, at WESTPAC-PROD-18107 (In a letter to the Reserve Bank of Australia, Australian payment card issuer Westpac, one of the four largest banks in Australia, wrote that "Lower costs to merchants have been offset by increased net fees charged to cardholders, in the form of higher fees, lower benefits and reduced interest free periods.  This has resulted in banks substantially maintaining profitability levels, competitive impacts aside, following the reforms."). In addition, Dr. Bamberger is "not aware of any Australian bank that stopped issuing Visa or MasterCard credit cards following the reduction of interchange fees in that country." Bamberger Reply Decl. ¶18.  *See also* McCahill Ex. 84, Campbell Dep. Tr. 95:4-14, 121:15-20 (Australian issuer WesPac able to maintain profitability after RBA reforms and neither major nor smaller banks exited the issuing business since the interchange reforms went into effect).

[173] Snyder Dep. Tr. 136:21-137:14, 140:14-22, 196:15-197:25, 402:15-406:4.

Dr. Snyder's assertion is incorrect, as Dr. Bamberger shows.[175]  Also, Dr. Snyder's opinions are belied by class-wide evidence he ignored:

- Internet merchants do not receive a payment guarantee, but pay interchange fees that are among the highest;[176]

- he was not aware that merchants do not get the payment guarantee on "chargebacks;"[177]

- he claims that issuers bear the risk of loss on fraud; however, an article relied upon by Dr. Snyder establishes that merchants suffer greater fraud loss on payment card transactions than issuing banks: 1) in 2007, internet merchants suffered $3.6 billion in credit card losses; 2) in 2006, brick & mortar merchants suffered $2 billion in credit and debit card losses; 3) in 2006, banks suffered $1.24 billion in credit card losses; and 4) in 2005, banks suffered $626 million in debit card losses.[178]

### 3. Defendants Evidently Chose Dr. Snyder Because He has Never Before Written about the Payment Card Industry.

For over twenty years, Visa and MasterCard have been enmeshed in litigation and regulatory investigations world-wide regarding their business practices, including proceedings relating to interchange fees.  During the course of those proceedings, they have retained dozens of economists and consulting firms, each of whom before or during those proceedings developed

---

[174] Snyder Decl. ¶¶ 15-17.

[175] Bamberger Reply Decl. ¶ 84 ("A study published by the Federal Reserve Bank of Kansas City estimates that merchants bear more fraud-related costs on credit and debit card transactions than do banks.").

[176] Bamberger Reply Decl. ¶ 84.  Dr. Snyder was unaware if any merchant category did not receive the payment guarantee.  Snyder Dep. Tr. 139:4-140:22, 406:5-407:9.

[177] Snyder Dep. Tr. 406:21-407:9 (he had not analyzed chargeback data).  "Chargebacks" result when payment card transactions are deemed after the fact to be erroneous, for any number of reasons.  Any payments from banks to merchants that result from such transactions are reversed pursuant to the chargeback process.  Banks also generally, but not invariably, assess chargeback fees against the affected merchants.  *See* McCahill Decl. Ex. 71, Visa Op. Reg. 7.4.B.  *See also* McCahill Decl. Ex. 85, Duffy Dep. Tr. 55:19-56:2. (CEO of Chase Paymentech noting that acquiring banks impose chargeback fees on merchants).

[178] *See* McCahill Decl. Ex. 86, Richard Sullivan, *Can Smart Cards Reduce Payment Fraud and Identity Theft?*, Fed. Reserve Bank of Kansas City Econ. Rev. 38, Third Quarter 2008 at 38.

some level of expertise relating specifically to the payment card industry.[179]  Visa and

MasterCard have also funded economic research on payment card networks.[180]  It is curious that

Defendants chose a relative novice in the field as their expert in this case.[181]

Throughout this Memorandum, Plaintiffs have identified instances in which Defendants'

previous experts have taken positions contrary to Dr. Snyder's positions in this case and/or to

opinions in which they have been discredited.[182]  Dr. Bamberger, on the other hand, has

analyzed, written reports and testified extensively about the payment card industry[183] and has

written a report and testified in this case without having to rehabilitate or disavow any of his

previous work.

**E.    Dr. Bamberger's Opinions Satisfy the *IPO* Standard.**

Defendants' contention that Dr. Bamberger's opinions do not meet the *IPO* standard is

baseless.  *See* Defs.' Mem. at 41-44.  In his reply declaration, Dr. Bamberger has addressed and

refuted each of Defendants' criticisms, using the ample empirical evidence supporting his

---

[179] For example, Visa and/or MasterCard have retained Richard Schmalensee in at least three separate actions, and he has written several articles about the industry.  The networks have retained Benjamin Klein (who has also written about the industry), David Teece and Robert Hall in at least two actions apiece.  They have retained NERA Economic Consulting and LECG Corp. in at least five and four actions respectively.

[180] McCahill Decl. Ex. 55, Drs. Richard Schmalensee and David S. Evans, *Paying with Plastic: The Digital Revolution in Buying and Borrowing* at "Acknowledgements" (1st Ed 1999) .

[181] It further bears mentioning that Dr. Snyder has, to Plaintiffs' knowledge, uniformly opposed class certification in previous class actions in which he has served as an expert.  *See, e.g.,* Snyder Dep. Tr. 25:3-6, 390:2-8 (admitting that he has only been retained by parties opposing class certification).

[182] *See, e.g.,* McCahill Decl. Ex. 55, at 280 (Visa would have survived if it had lost the *NaBanco* case and interchange fees were eliminated); McCahill Decl. Ex. 87, *Visa U.S.A. Inc. v. First Data Corp.*, No. 02-1786 (N.D. Cal.), Dr. Alan Cox, Aug. 26, 2005 Dep. Tr. at 14:9-23 (merchants, not acquiring banks, pay interchange fees and have suffered harm if such fees are illegal).  *See also supra* § III.B.3.  *See also Visa Check*, 192 F.R.D. at 82-87 (rejecting Dr. Schmalensee's opinions).

[183] Bamberger Decl. ¶ 1 and Appendix A.

conclusion that injury can be established with common evidence. *See generally* Bamberger Reply Decl. Dr. Bamberger has articulated and explained his choice of benchmarks and has cited the data necessary to apply his methodology.[184]  For example, as he states in his reply declaration, Australia meets all of the relevant selection criteria and has been recognized and referenced as a proper benchmark, not only by international competition authorities and economic scholars, but by Defendants' own executives and representatives as well.[185]  Similarly, Dr. Bamberger has detailed, with respect to the inter-network conspiracy claims, how he would assess the pre-conspiracy gap between MasterCard and Visa interchange fees in a before-and-after analysis, and has specified and illustrated his damages formula, applicable class-wide.[186]

Defendants specifically point to *Linerboard*, as the exemplary expert report meeting a *IPO*-type rigorous analysis in support of class certification. Defs.' Mem. at 41.  Like the experts in Defendants' proffered authority, Dr. Bamberger has extensively investigated and examined the voluminous empirical evidence of "industry characteristics" and Defendants' rules and practices to reach the conclusion that "'the alleged conspiracy would have a common class-wide impact.'" *Linerboard*, 305 F.3d at 153.[187]  He has similarly provided "potential benchmark[s]" and "explained that the necessary data [is] available to do the analysis and described the types of data he would use." *Linerboard*, 305 F.3d at 154; Bamberger Decl. ¶¶ 73-94, 117-120; Bamberger Reply Decl. ¶¶ 44-69; 156-61.  Dr. Bamberger has delineated benchmark analyses that "could be effectively employed in this situation," including the methodology that "would 'compare[] prices during non-conspiratorial periods with product prices during the alleged

---

[184] Bamberger Decl. ¶¶ 117-120; Bamberger Reply Decl. ¶¶ 35-91.

[185] *See* Bamberger Reply Decl. ¶¶ 44-69.

[186] Bamberger Reply Decl. ¶¶ 153-61.

[187] *See generally* Bamberger Decl., Bamberger Reply Decl.

- 67 -

conspiracy.'" *In re Linerboard,* 305 F.3d at 154-55. *See, e.g.,* Bamberger Reply Decl. ¶¶ 153-61. His conclusion of class-wide injury and the appropriate benchmarks with which to measure it are directly "supported by relevant data," from Defendants' own documents, governmental investigations, and academic studies. *In re Linerboard,* 305 F.3d at 154; Bamberger Reply Decl. ¶¶ 28-32, 52-55. In short, his analysis and opinion comply with the most exacting standards.

By contrast, Dr. Snyder's opinion lacks empirical support. His opinions are rife with inaccuracy and present arguments that lack any legal relevance or empirical backing. For example, Dr. Snyder offers no empirical evidence to support his claim that reductions in interchange fees "might" cause both Visa and MasterCard to fundamentally change the nature of their networks. Snyder Decl. ¶¶ 23, 28. As Dr. Bamberger points out, the empirical evidence supports the exact opposite. Bamberger Reply Decl. ¶¶ 22-27. Dr. Snyder also proffers no empirical evidence to support his claims that Visa and MasterCard would not have been able to compete with American Express or other closed-loop networks in the but-for world. Defs.' Mem. at 62; Snyder Decl. ¶¶ 82, 92. Again, the real world experience and empirical data demonstrate the contrary.[188]

Here, the requisite rigorous analysis shows that Dr. Bamberger's opinions are fully supported by extensive empirical evidence, evidence that comprises, in part, the common proof on which Plaintiffs will rely to prove the claims at issue in this case on a class-wide basis.

---

[188] Bamberger Reply Decl. ¶¶ 28-33. *See also supra* § III.C.4.

**F.      Plaintiffs can Prove Liability and Class-Wide Injury Arising from Defendants' Inter-Network Conspiracy Using Evidence Common to All Class Members.**

Defendants do not dispute that the facts underlying Plaintiffs' inter-network conspiracy claim are common to all class members.  Those include the following:

- 

# REDACTED

-

,[190] *and*

- Class-wide evidence will show that the networks have protected their price-fixing activities by adopting virtually identical policies that discourage competition at the point of sale.[191]

Defendants miss the mark entirely when they claim "analysis of injury will still need to be performed separately for hundreds of interchange categories."[192] Class-wide injury can in fact be established, because, according to Dr. Bamberger, it is reasonable to conclude that the elasticity of demand for each merchant category would have been the same in the but-for world and that, as a result, each interchange fee would have been reduced by approximately the same amount.[193]  Regardless, evidence of "separate groups of products which are separately priced,"

---

[189] Pls.' Mem. at 46.

[190] Pls.' Mem. at 17-19, 46.

[191] Pls.' Mem. at 19-22.

[192] Defs.' Mem. at 50.

[193] Bamberger Dep. Tr. 292:3-299:6.  Dr. Snyder claims that interchange fee rates by category have increased, stayed the same and decreased over the last four years. Snyder Decl. ¶ 63. However, that claim is very misleading.  Dr. Snyder's Exhibit D-2A reflects that, during that period, interchange fee rates for 17 of the top 20 merchant categories increased, as have the overall average and weighted average. *See* McCahill Decl. Ex. 3.  Moreover, two of the remaining three dropped by a minuscule amount.  And the third, service stations, dropped only because of overwhelming and public pressure from the affected merchants. *See* McCahill Decl. Ex. 88, *Gasoline Marketers Underwhelmed by New Visa Interchange Rates*, Digital Transactions, July 1, 2008.

has routinely been found irrelevant for class certification purposes. *Philadelphia Elec. Co. v. Anaconda Am. Brass Co.*, 43 F.R.D. 452, 457 (E.D. Pa. 1968). *See also In re Carbon Black Antitrust Litig., 2005 WL 102966*, at *16 (D. Mass. Jan. 18, 2005) ("*Carbon Black*"); *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 260 (D.D.C. 2002) ("*Vitamins*").

Injury can be established on a class-wide basis as to the inter-network conspiracy claim for substantially the same reasons as it can be for the intra-network conspiracy claims. Defendants' assertion that injury cannot be determined on a class-wide basis because "thousands of merchants" have entered co-branding agreements is specious for all the reasons identified above. *See supra* §§ III.B.3, 5.

Moreover, it is well-established that where, as here, a collusively fixed nationwide list price is the base for negotiating an allegedly individual price, injury can be established on a class-wide basis. *Arden Architectural Specialties, Inc. v. Washington Mills Electro Minerals Corp.*, 2002 WL 31421915, at *9 (W.D.N.Y. Sep. 17, 2002) ("price lists which, at the very least, formed the basis for price negotiations" sufficed to establish common impact); *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 523 (S.D.N.Y. 1996) ("Neither a variety of prices nor negotiated prices is an impediment to class certification if it appears that plaintiffs may be able to prove at trial that, as here, the price range was affected generally.")

In *In Re Medical X-Ray Film Antitrust Litig.*, defendant Kodak argued that "increases in list prices had little or no effect on many end use customers due to price protections, renegotiation of contracts, discounts, and credits negotiated between the manufacturer and distributor." *In Re Medical X-Ray Film Antitrust Litig.*, 1997 WL 33320580, at *9 (E.D.N.Y. Dec. 26, 1997). The Court rejected Kodak's argument, because "[n]umerous courts have held that common proof of impact can be established on the basis of evidence of a conspiracy to fix

base prices that served as a starting point for negotiations on individual sales." *Id.* at *10.[194]
The cases cited by Defendants finding that individually negotiated prices precluded class wide
determination of injury are inapposite. In each of those cases, there were no collusively fixed
price lists so the purchase price was necessarily individually negotiated.[195]

      In stark contrast, it is indisputable that the Defendants in this case adopted fixed
nationwide interchange fees, which each member bank was required to charge.[196] In fact, with
the exception of fewer than     merchants, every merchant pays, and has paid, interchange fees
on every Visa- and MasterCard-branded credit and offline debit card transaction at the published
rates. As discussed above, the so-called "interchange related" payments do not reduce the

REDACTED

---

[194] *See also In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656 (7th Cir. 2002)
("[a]n agreement to fix list prices is . . . a *per se* violation of the Sherman Act even if most or for
that matter all transactions occur at lower prices"); *In re Sulfuric Acid Antitrust Litig.*, 2007 WL
898600, at *7 (Mar. 21, 2007) ("The relevant question is whether any given price that was
charged for sulfuric acid was higher than it would have been in the absence of the alleged
conspiracy, so that Plaintiffs will succeed so long as they can prove all putative class members
suffered an injury and that the injury resulted from anti-competitive harms to the market as a
whole); *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 352-53 (N.D. Cal. 2005) ("class-
wide impact is usually found to exist where the defendants are shown to have used collusively-
set list prices for the product at issue," even where plaintiffs may have negotiated discounts from
price lists); *Carbon Black*, 2005 WL 102966, at *17 (common proof of impact could be shown
where prices actually paid for carbon black bore some relation to defendants' list prices); *In re
Plastic Cutlery Antitrust Litig.*, 1998 WL 135703, at *7-8 (E.D. Pa., Mar. 20, 1998) (defendants'
uniform price lists served as proof of class-wide impact); *In re Citric Acid Antitrust Litig.*, 1996
WL 655791, at *7 (N.D. Cal. Oct. 2, 1996) (common impact could be proven at trial where
"plaintiffs planned to prove at trial that defendants set artificially high list prices for their
products").

[195] *See Blades v. Monsanto Co.*, 400 F.3d 562 (8th Cir. 2005) (no nationwide fixed price list
serving as starting point for negotiations); *Robinson v. Texas Auto. Dealers Ass'n*, 387 F.3d 416
(5th Cir. 2004) (negotiations were not based on a fixed price list; only a certain term was alleged
to be price fixed, and that term was not charged on the sale of every car so not all class members
would be injured); *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6 (1st
Cir. 2008) (not a horizontal price fixing conspiracy and therefore negotiations were not based on
a collusively fixed list price); *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group,
L.P.*, 247 F.R.D. 156 (C.D. Cal. 2008) (plaintiffs did not allege a horizontal price fixing
conspiracy and therefore there was no collusively fixed list price).

[196] *See Pls.' Mem.* at 12-19.

transaction price as they are lump sum payments made on a periodic basis subsequent to the transactions, based on other unrelated consideration.[197]

Class-wide evidence will establish that Defendants' conspiratorial conduct injured the plaintiff class. In fact, Dr. Bamberger has concluded that "[b]ecause all or nearly all members of the proposed classes that accept or previously accepted MasterCard credit cards also accept or previously accepted Visa credit cards, the anticompetitive conduct Class Plaintiffs allege, if proved, likely damaged all or nearly all members of the proposed Damages Class, and applies generally to members of the proposed Injunctive Relief Class."[198] Dr. Bamberger has further concluded that a standard before-and-after analysis can be used to establish that nearly all class members were injured by the upward effect of the inter-network conspiracy on interchange fees paid by all merchants and damages can be determined formulaically.[199] As Dr. Bamberger explains, the amount of damages suffered by a given merchant can be calculated by subtracting the pre-conspiracy Visa/MasterCard interchange fee gap from the actual MasterCard interchange fees during the time period in question.[200]

Defendants' assertion that injury cannot be determined on a class-wide basis as to the inter-network conspiracy claim is without merit.

---

[197] *See supra* § III.B.5. *See also* Kane Decl. Ex. 41.

[198] Bamberger Reply Decl. ¶ 156.

[199] Bamberger Reply Decl. ¶¶ 154-61.

[200] Bamberger Reply Decl. ¶¶ 159-60.

**G.    Plaintiffs Rely on Common Proof to Demonstrate that the *Illinois Brick* Indirect Purchaser Rule Does Not Apply.**

**1.    Merchants Pay Interchange Fees to Card-Issuing Banks and Suffer Antitrust Injury from Collective Setting of Interchange Fees.**

Even though merchants have suffered, and continue to suffer, injury by paying fixed interchange fees, Defendants assert that merchants cannot recover damages because "intermediaries" exist between merchants and the card issuers who collect interchange fees. In fact, pursuant to the networks' rules, every card-issuing bank *deducts* interchange fees from funds otherwise owed to merchants on every transaction. Under Defendants' form-over-substance interpretation of *Illinois Brick*, price-fixers could avoid antitrust liability simply by inserting a complicit intermediary between themselves and their victims.

As the Supreme Court has made clear, however, the *Illinois Brick* rule does not grant antitrust violators immunity from paying *any* damages.[201]  *See, e.g., Blue Shield of Virginia v. McCready*, 457 U.S. 465, 474 (1982).  Rather, it protects defendants from having to pay *duplicative* damages awards, relieves courts of the difficult and uncertain task of apportioning damages among multiple victims along a chain of distribution, and "encourage[s] vigorous private enforcement of the antitrust laws." *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 745 (1977).  If Defendants' interpretation of *Illinois Brick* were adopted in this case, defendants would face no damages exposure, because acquiring banks -- the only party with standing to recover damages, according to their theory – suffered no antitrust injury.

The facts of *Illinois Brick* illustrate its inapplicability here.  In that case, the State of Illinois and 700 other local government entities that paid for the construction of buildings

---

[201] Of course, the *Illinois Brick* rule only bars indirect purchasers' damages claims under federal law.  Plaintiffs' Cartwright Act claims against Visa are unaffected by Defendants' argument. Cal. Bus. & Prof. Code § 16750(a).

containing concrete blocks sued concrete block manufacturers for price-fixing. But the state and local governments were not the only victims of the conspiracy. Rather, masonry contractors first paid the price-fixing overcharge when they purchased the concrete blocks from the defendants. They then submitted bids to general contractors who in turn submitted bids to the plaintiffs. The Court found that plaintiffs were indirect purchasers because the concrete blocks passed "through two separate levels in the chain of distribution before reaching" them. 431 U.S. at 726-27.

### a. Acquiring Banks Suffer No Antitrust Injury from the Collective Setting of Interchange Fees.

Here, it is indisputable that acquiring banks do not occupy the position of the direct-purchaser. They do not purchase *anything* from issuing banks to re-sell to their own customers, at prices that are independently and competitively determined. Rather, pursuant to agreement among Visa and its member banks and MasterCard and its member banks, the issuing banks *withhold* the interchange fee from the settlement funds that are routed through the Visa or MasterCard network to the acquiring bank and then to the merchant.[202] The amount of the interchange fee withheld on any given Visa or MasterCard transaction is not negotiated between issuer and acquirer.[203] It does not depend on the identity of the acquiring bank, or on the terms of the contract between the acquiring bank and the merchant. Rather, it depends solely on the type of merchant, type of issuing card, and type of transaction.[204] As Dr. Bamberger opined, the "acquirer resembles a delivery agent with respect to interchange fees, rather than a party paying those fees." Bamberger Decl. ¶ 31.

---

[202] *See* Pls.' Mem. at 8-12, 24-26, 75; Bamberger Decl. ¶¶ 23-31; Bamberger Reply Decl. ¶¶ 143-152.

[203] *See* Pls.' Mem. at 44-45.

[204] *See* Pls.' Mem. at 13-17, 44, 56.

As mere "delivery agents" who did not purchase anything from Defendants, acquiring banks differs markedly from the masonry contractors in *Illinois Brick*. Acquiring banks are not purchasers in a supply chain, and do not inventory any products or commit to "send" a specified amount of transactions or interchange fees to any issuing bank. Thus, acquiring banks bear no risk that they will be left holding goods or services that they are unable to re-sell (together with the overcharge) to downstream customers.[205] As the Seventh Circuit held, *Illinois Brick* applies to indirect purchasers along a supply chain. *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 482 (7th Cir. 2002) Where that supply chain (Party A, the antitrust violator, sells to Party B, who sells to Party C) does not exist, the rationale for the damages bar also is absent.

Dr. Snyder apparently agrees that acquiring banks are at most collection agents, who collect interchange fees from merchants and deliver those fees to card-issuing banks. He testified that when banks merely facilitate the transfer of payments, such as when funds are transferred through the federal wire system, they are not purchasers even if they are paid a fee for that service.[206] Plaintiffs will rely on common evidence to prove that merchants – not acquiring banks – pay interchange fees.[207] For example, Dr. Bamberger has concluded based on common evidence that interchange payments are appropriately characterized as payments by merchants –

---

[205] As Dr. Bamberger recognizes, acquiring banks do not have the right to retain the transaction or attempt to collect the amount owed from the cardholder. Bamberger Reply Decl. ¶ 147.

[206] Snyder Dep. Tr. 521:7–524:5 ("As an economist, my view is if all the financial intermediary is doing in that situation is moving the funds, I don't view them as being an intermediary in the sense that would move the purchaser at the bottom of the distribution scheme from direct to indirect.") Similarly, he testified that using brokers, such as real estate agents, to facilitate transactions or act as intermediaries for the transfer of funds, does not make the purchasers of goods, such as houses, indirect purchasers. *Id.* at 518:3- 520:13, 524:6- 525:8-25. Dr. Bamberger has also concluded that credit card transactions are like a "funds delivery service." Bamberger Reply Decl. ¶ 149.

[207] Pls. Mem. at 24-26. Plaintiffs anticipate that Defendants will also rely on evidence common to all class members to prove their contention.

- 75 -

not acquiring banks – to issuing banks.[208]  Likewise, common evidence in the form of

Defendants' own documents and witnesses' testimony demonstrates that merchants, not

acquiring banks, pay interchange fees.  Because this evidence focuses on Defendants' conduct,

the networks' rules and the flow of funds, all of which is identical for every merchant, it is

common to the class.

        The Supreme Court's decision in *Blue Shield of Virginia v. McCready*, 457 U.S. 465

(1982), further demonstrates why Defendants' theory is unavailing.  In that case, the Court held

that a Blue Shield subscriber was not barred by *Illinois Brick* from recovering the antitrust

damages she suffered as a result of Blue Shield's unlawful boycott of clinical psychologists,

even though her employer purchased the insurance plan from Blue Shield.  Emphasizing *Illinois*

*Brick*'s concern with duplicative recoveries, the Court rejected Blue Shield's argument that the

subscriber's damages claims were barred because her employer stood as intermediary between

Blue Shield and the subscriber:

> The policies identified in *Hawaii* and *Illinois Brick* plainly offer no
> support for the petitioners here.  Both cases focused on the risk of duplicative
> recovery engendered by allowing every person along a chain of distribution to
> claim damages. . . . . But permitting respondent to proceed in the circumstances of
> this case offers not the slightest possibility of a duplicative exaction from
> petitioners.  McCready has paid her psychologist's bills; her injury consists of
> Blue Shield's failure to pay her. . . .  And whatever the adverse effect of Blue
> Shield's actions on McCready's employer, who purchased the plan, it is not the
> employer as purchaser, but its employees as subscribers, who are out of pocket as
> a consequence of the plan's failure to pay benefits.

457 U.S. at 474-75.

        Similarly, it is merchants – not acquiring banks – who are overcharged as a result of

Defendants' collusive imposition and fixing of interchange fees.  If *Illinois Brick* barred

merchants' claims, Defendants would be immunized from having to pay antitrust damages to

---

[208] Bamberger Decl. ¶¶ 23-31; Bamberger Reply Decl. ¶ 143.

anyone, because acquiring banks: (a) do not suffer any injury; (b) are co-conspirators;[209] *and* (c)

benefit from the conspiracy because they are also card issuers. Significantly, even if acquiring

banks wanted to bring a suit for damages, they are barred from doing so by Visa and MasterCard

rules.[210]

Under these circumstances, *Illinois Brick* does not apply. *See, e.g., Freeman v. San*

*Diego Ass'n of Realtors*, 332 F.3d 1133, 1145-46 ("indirect purchasers can sue for damages if

there is no realistic possibility that the direct purchaser will sue its supplier over the antitrust

violation"); *In re ATM Fee Antitrust Litig.*, 554 F.Supp.2d 1003 n.3 (N.D. Cal. 2008) (an *Illinois*

*Brick* exception would apply "if there is no realistic possibility that [ATM network] members –

who both pay *and receive* the interchange fee – would sue the network for antitrust violations").

Indeed, damages immunity is precisely the opposite of the result intended by the Supreme Court

in its landmark decision.

> **b.** **Third-Party Processors and ISOs Suffer No Antitrust Injury from Collective Setting of Interchange Fees.**

Defendants also assert that all merchants' damages claims are barred by *Illinois Brick*

because certain merchants contract with third-party processors ("TPPs") or independent sales

organizations ("ISOs") for processing services.[211] However, these entities, like acquiring banks,

are merely delivery agents. The merchant still pays the interchange fee. Indeed, Defendants in

this case have asserted in other litigation that merchants, not TPPs or ISOs, have standing under

*Illinois Brick* to seek damages relating to interchange. *See, e.g., NaBanco v. Visa*, 596 F. Supp.

---

[209] *See* First Amended Consolidated Class Action Complaint ¶ 91.

[210] *See* McCahill Decl. Ex. 71, Visa Op. Reg. 1.1.6; McCahill Decl. Ex. 72, MasterCard Rule 1.1.

[211] Defendants erroneously reference other so-called intermediaries, such as aggregators. *See* Defs.' Mem. at 82-83. However, aggregators provide payment acceptance services to merchants who are not authorized to accept Visa or MasterCard. In those instances, the aggregator, not the merchant, is the class member. First Consolidated Amended Class Action Complaint ¶ 97.a.

1231, 1247 (S.D. Fla. 1984) (Visa argued that merchants were more appropriate plaintiffs than

TPP);[212] *Visa U.S.A. Inc. v. First Data Corp.*, 2006 WL 1310448, at *4 (N.D. Cal. May 12,

2006) (same).

      Moreover, *Illinois Brick* does not bar the damages claims of a merchant who contracted

with a TPP or ISO because under Visa's and MasterCard's rules, TPPs and ISOs can *only act as

agents* for member banks.[213] A member bank must be a party to any contract between a merchant

and an ISO or TPP, and that member bank must approve, and bear all responsibility for, any fees

associated with the contract.[214] As courts within this Circuit have held, a plaintiff who contracts

with an intermediary that is a mere agent of the antitrust violator is not barred by *Illinois Brick*

from recovering damages. *Diskin v. Daily Racing Form, Inc.*, 1994 WL 330229, at *5 (S.D.N.Y.

Jul. 7, 1994). *See also In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 505

(S.D.N.Y. 1996) (*Illinois Brick* inapplicable where investor-plaintiffs purchased securities

through securities brokers who acted as agents for investor-plaintiffs). Thus, merchants who

contract with ISOs and TPPs are not barred from recovering damages caused by defendants'

antitrust violations. And because the evidence that will demonstrate the agency relationship

between member banks and ISOs and TPPs derives from Visa's and MasterCard's rules, it is

common to the class.

---

[212] The trial court in *NaBanco* was not persuaded by Visa's arguments that acquiring banks or, alternatively, merchants, were more appropriate plaintiffs than TPP NaBanco in its suit challenging fees, in large part because neither group had filed suit. *Id.*

[213] *See* Pls.' Mem. at 10-11.

[214] *See* Pls.' Mem. at 10-11.

2.      ***Kendall* was Erroneously Decided, and *Kendall* and *Paycom* are Distinguishable.**

Defendants' reliance upon *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008), is misplaced.[215] The district court in *Kendall* granted defendants' repeated motions to dismiss, based strictly on a lack of evidence in the record, which was attributable in its entirety to plaintiffs' failure to satisfy basic pleading standards or to conduct adequate discovery. The plaintiffs in *Kendall*, unlike Plaintiffs in this case, failed to plead or adduce any evidence that merchants, rather than banks, pay interchange fees or that merchants, rather than banks, suffer antitrust injury from defendants' anticompetitive agreement. The only evidence before the court regarding the mechanics of payment card transactions was the declaration of a Visa executive and Visa's own brief, neither of which plaintiffs attempted to refute. *Id.*, 518 F.3d at 1045 n.2. The result was a Ninth Circuit opinion based on erroneous factual assumptions.[216] As this Court has before it the results of wide-ranging discovery, it should not be bound in any sense by the unsupported *Kendall* decision. Moreover, the Ninth Circuit erroneously founded its ruling on the absence of a direct contractual relationship between merchants and Visa and MasterCard. 518 F.3d at 1049. As the Supreme Court made clear in *McCready*, and as Defendants concede, the *Illinois Brick* rule does not impose a privity requirement upon antitrust victims who seek damages. 457 U.S. at 474-75. *See also* Defs.' Mem. at 85.

Defendants' reliance on *Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*, 467 F.3d 283 (2d Cir. 2006), is also misplaced. That case involved chargebacks. Unlike interchange fees,

---

[215] *See* Defs.' Mem. at 81-82.

[216] For example, the Ninth Circuit reached the erroneous conclusion that the networks, rather than card-issuing banks, retain interchange fees, *Kendall*, 518 F.3d 1046 n.3, and added that "[t]he issuing bank makes nothing in its transaction with Visa, but profits, in part, by being one of the owners of Visa through an association." *Id.* at 1045-46. Even Defendants in this case do not dispute that it is in fact card-issuing banks that retain interchange fees pursuant to every payment card transaction.

chargebacks fees are not uniformly deducted by the card issuer from funds that are routed to the merchant. Rather, the card issuer directly imposes the chargeback fee on the acquirer, which then subsequently "decide[s] on its own" *whether* to seek recovery from the merchant's account. 467 F.3d at 291. In the case of chargebacks, acquiring banks are not acting as mere delivery agents.

### 3.   Even if *Illinois Brick* Applied, Evidence Common to All Class Members Reflects that Exceptions Apply.

Even assuming *arguendo* that *Illinois Brick* applies in this case, common evidence demonstrates that a well-established exception applies. Defendants concede that a class member who has a merchant acquiring relationship with one of the bank defendants is not subject to the *Illinois Brick* rule under the "co-conspirator" exception. Defs.' Mem. at 82-83.[217] And despite Defendants' unsupported assertion that only a minority of U.S. merchants have acquiring relationships with defendant banks, those banks, together with their affiliates,[218] comprise the majority of the acquiring market.[219]

A most recent case is particularly instructive in this context. The court in *In re G-Fees Antitrust Litig.*, 584 F. Supp. 2d 26 (D.D.C. 2008), denied defendants' motion to dismiss claims brought by mortgagors who alleged that defendants Fannie Mae and Freddie Mac collectively set guarantee fees ("G-fees") that were included in mortgage prices. Defendants claimed the

---

[217] *See also Howard Hess Dental Lab, Inc. v. Dentsply Intern., Inc.*, 424 F.3d 363 (3d Cir. 2005); *Arizona v. Shamrock Foods Co.*, 729 F.2d 1208 (9th Cir. 1984); *Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629 (7th Cir. 2002); *Crane v. Int'l Paper Co.*, 2005 WL 3627139, at *7-8 (D.S.C. Apr. 19, 2005).

[218] *See, e.g., In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 605 (7th Cir. 1997) (describing "ownership or control" exception to *Illinois Brick*).

[219] *See, e.g.,* McCahill Decl. Ex. 89, *Nilson Report*, Issue 899, March 2008 at 9-11 (identifying the top U.S. acquiring banks and showing that Defendants Chase, Bank of America, Fifth Third and Wells Fargo collectively have over a 50 percent market share).

mortgagors were indirect purchasers and lacked standing because the mortgagees received the G-fees from the mortgagors, and delivered them to Fannie Mae and Freddie Mac. The court disagreed, holding plaintiffs had demonstrated applicability of the "control" exception to *Illinois Brick*. *Id.* at 33-34. The facts are similar to those alleged here. In *G-Fees*, plaintiffs alleged that mortgage lenders included the G-fee costs in their interest charges to borrowers. In this case, Plaintiffs allege that acquiring banks include interchange fees in their charges to merchants.

Defendants' attempt to argue that most class members fall outside the co-conspirator exception fails. As explained above, *see supra* § III.G.1, pursuant to Visa's and MasterCard's rules all merchants have a contract with a member bank. Thus, even under Defendants' narrow view of the co-conspirator exception, all merchants have standing to recover antitrust damages, even those with relationships with TPPs and ISOs.

Moreover, those class members who do not have an acquiring relationship with any of the Bank Defendants or their affiliates still have a relationship with a bank that is a member of the conspiracy, and it is irrelevant that Plaintiffs did not name all co-conspirators as defendants. First Amended Consolidated Class Action Complaint ¶ 91. The cases requiring that co-conspirators be named defendants in order for the exception to apply have done so in order to prevent the recovery of duplicative damages by an intermediary.[220]   Just like the Defendant banks, however, there is no realistic possibility that non-defendant member banks will file suit.[221] Thus, the rationale for naming all co-conspirators is inapplicable. *See also Freeman v. San*

---

[220] *See, e.g., Leider v. Ralfe*, 2003 WL 22339305, at *4 (S.D.N.Y. Oct. 10, 2003); *Crane v. Int'l Paper Co.*, 2005 U.S. Dist. LEXIS 15590, at *25, *28.

[221] Like the Defendant banks, non-defendant acquiring banks suffer no injury because (a) they do not pay interchange; (b) they are co-conspirators; and (c) they benefit from the conspiracy because they are also issuers. Moreover, like the Bank Defendants, they are also precluded by Visa and MasterCard rules from suing the networks. *See, e.g.,* First Amended Consolidated Class Action Complaint ¶¶ 90-93.

*Diego Ass'n of Realtors*, 332 F.3d 1133, 1145-46 (indirect purchaser rule inapplicable if there is no realistic possibility that direct purchaser will sue).

**H.      Plaintiffs Can Prove Damages on a Class-Wide Basis.**

For the same reasons that injury can be established on a class-wide basis, so can damages. *See Ohio Valley Elec. Corp. v. General Elec. Co.*, 244 F. Supp. 914, 933 (S.D.N.Y. 1965) ("[I]n a price fixing case, impact and damages are coextensive; the overcharge constitutes the plaintiff's injury (impact) as well as the measure of his damage (damages) and is the difference between the price actually paid and the price he would have paid absent the conspiracy"). "[T]he standard method of measuring damages in" a price fixing case is "overcharge, not lost profits.... Lost profits damages are disfavored, at least in part because they are more difficult to prove than overcharge damages." *Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 374-75 (3d Cir. 2005).[222]

Accordingly, the damages rule for price fixing cases is simple: "the plaintiff is entitled to the difference between the 'competitive price' and the cartel price, multiplied by the number of units purchased, multiplied by three." Herbert Hovenkamp, *Federal Antitrust Policy, The Law of Competition and Its Practice*, § 17.5a (2d ed.1999). *See also* ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues* 171 (1996) ("[T]he measure of damages in price fixing cases is based on the overcharge itself.... the difference between the actual price paid and the competitive price, or the price that would have been charged absent the illegal agreement.").

---

[222] *See also Chattanooga Foundry*, 203 U.S. at 396; *Drug Mart Pharm. v. American Home Prods.*, 296 F. Supp. 2d 423, 429 (E.D.N.Y. 2003) ("plaintiffs' claim for damages is measured by the amount of the overcharge attributable to the alleged conspiracy").

- 82 -

Here, damages will be measured class-wide using a simple formula: (1) intra-network: actual interchange fees paid less the amount of interchange fees that would have been paid in the but-for world (*e.g.*, either zero or 28 percent of the actual fees paid)[223]; (2) inter-network: the gap between MasterCard and Visa interchange fees in a before-and-after analysis (i.e. the actual interchange fees paid less the amount of interchange fees that would have been absent the conspiracy). Bamberger Decl. ¶¶ 109-10, 114-15; Bamberger Reply Decl. ¶¶ 159-60.

Defendants argue that Plaintiffs' damages models must consider each merchant's actual economic harm by offsetting the non-price effects and net benefits against the overcharges (*e.g.* payments received under co-branding agreements, payments from Visa or MasterCard, lower sales volume and costs of other payment forms) and the consideration of such evidence requires individual inquiry. Defendants' actual economic harm theory of damages is wrong as a matter of law and their proposed offsets are not cognizable. *See supra* § III.B.8.

Defendants' reliance on *Cardizem* to support their argument is misplaced.[224] The court in *Cardizem* rejected an offsets argument, which included lost profits on lost sales, similar to the one made here, because in a price fixing case damages are the full amount of the overcharge: "Defendants' core concern here is that, without inclusion of its offsetting benefits arguments, the overcharge damage theory may result in a windfall to Plaintiffs. The courts have rejected similar concerns, recognizing that this risk 'inheres in *Hanover Shoe*.'" *Cardizem*, 200 F.R.D. at 317 (citation omitted).

---

[223]   If further discovery and analysis suggests that a different benchmark would be more appropriate, that benchmark could also be applied on a class-wide basis.

[224]   *See* Defs.' Mem. at 77.  Dr. Snyder was defendants' expert in the indirect purchaser *Cardizem* litigation.  Dr. Snyder's opinions that injury and damages required individual analysis and therefore were not amenable to class-wide analysis were rejected.  The court certified the class.  *See In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 325, 344 (E.D. Mich. 2001) (finding that injury determination was susceptible to class-wide proof in an indirect purchaser action by using a bottom-across approach).

As to the damages relating to plaintiffs being prevented from purchasing a lower-priced generic version of the drug, the court held solely that the damages calculation must account for "the quantity of generics that were *actually substituted* for Cardizem CD purchases after generic entry" so that damages were not overstated. *Id.* (emphasis added). That was because damages were based on the difference in the price actually paid for the brand name drug (Cardizem) and the price that would have been paid for the generic version in the but-for world, which the customer would have substituted for the brand name drug. For those purchases as to which the purchaser could not substitute the generic version, however, the purchaser did not suffer any overcharge damages. *Id.* (a certain portion of generic drugs bypassed the wholesalers and were sold directly to others in the distribution chain). In stark contrast, in this case, there is no substitution or bypass offset because merchants have no choice but to accept the Visa and MasterCard branded cards and pay the fixed interchange fees on every transaction.

Areeda's antitrust treatise also is inconsistent with Defendants' offsets contention. In fact, Areeda's discussion relating to determining plaintiff's "net harm" does not apply the concept to price fixing overcharge damages. The discussion is limited to "net harm" in the context of foreclosure and tying cases and addresses the direct and clearly identifiable impact of the anticompetitive practice on plaintiff's claimed damages. 2A Areeda *et al.*, Antitrust Law ¶ 392c (3d ed. 2007) ("Areeda"). The only case Areeda cites to support the "net harm" concept is *Los Angeles Memorial Coliseum Comm'n v. National Football League*, 791 F.2d 1356 (9th Cir. 1986). Significantly, that case did not involve allegations of cartel price-fixing and plaintiff did not seek overcharge damages. Rather, plaintiff sought lost profits caused by defendants' anticompetitive conduct. In *Los Angeles Memorial Coliseum*, the court found that plaintiff had to offset certain costs it avoided as a result of the antitrust violation to determine its actual lost

profits.[225] Consistent with the court's opinion, Areeda also states that in foreclosure cases resulting in lost sales plaintiff's lost profit damages must take into account any sales that replaced the lost sales and the costs that were avoided as a result of the lost sales. Otherwise, damages would overcompensate plaintiff for its claimed injury. *Id.* Finally, Areeda defines net harm in tying cases as follows: "net harm to the buyer is equal to the overcharge less the price reduction on the tying good." Areeda ¶ 392c. In other words, damages must take into account the total price of the two goods because plaintiff is buying both. None of the concerns regarding calculating damages raised by the Areeda treatise are present in a cartel price fixing case such as this one.

In this case, merchants have paid a cartel overcharge on every transaction and are seeking damages solely for that overcharge, not lost profits. Accordingly, Plaintiffs have no costs to avoid and no lost sales to offset against the overcharge. *See supra* § III.B.8 (the overcharge is the measure of damages in a price-fixing case).[226]

### I.      Plaintiffs Can Prove Market Power on a Class-Wide Basis.

Defendants argue that market power cannot be established on a class-wide basis because it must be analyzed by "interchange category." Defs.' Mem. at 89-92. Defendants' argument is specious as it is premised on a gross distortion of this Court's decision and class plaintiffs' expert's opinion in the *Visa Check* litigation. Specifically, Defendants argue that "[w]hen this Court certified a merchant class in *Visa Check I*, it expressly accepted the argument by a similar

---

[225] In *Los Angeles Memorial Coliseum*, to determine plaintiff's lost profits caused by being prevented from moving the Raiders from Oakland to Los Angeles, plaintiff was required to reduce profits by the amount of the league's entry fee that it would have been required to pay had it been a new NFL team instead of an existing team moving to a new city. 791 F.2d at 1372-73.

[226] If the court determines that any payments, in part or whole, to merchants under co-branding agreements or agreements with networks should reduce damages, the data exists and damages can still be determined formulaically for those merchants. Bamberger Reply Decl. ¶¶ 109, 127.

- 85 -

class of merchants that market power [] should be demonstrated by interchange *category*, rather than on a class-wide basis." *Id.* at 89 (emphasis in original). The Court did not do so. To the contrary, the Court held that "defendants' market power" was subject to class-wide proof because "[a]ccording to the Carlton Declaration, the plaintiffs [in that case intended to] rely on objective evidence of market share and price discrimination (by category, not by individual merchant) to prove market power." *Visa Check I*, 192 F.R.D. at 87. The Court therefore accepted Dr. Carlton's opinion that market power is determined by analyzing defendants' conduct, including their ability to price discriminate by merchant category.[227] Likewise, in this case, Dr. Bamberger has opined that market power is determined by analyzing defendants' conduct, such as establishing various merchant categories and price discriminating across those categories.[228] Bamberger Decl. ¶¶ 59-60, 70; Bamberger Reply Decl. ¶¶ 8-9.[229]

---

[227] Dr. Carlton did not opine that market power should be determined by merchant category. Again, Defendants distort Dr. Carlton's opinion. *Id.* at 89-90. In response to Defendants' expert that market power must be determined on a merchant by merchant basis, Dr. Carlton opined that market power is determined by analyzing merchants in the aggregate, not individually. He further concluded that defendants' expert's opinion was wrong because defendants did not fix interchange fees on a merchant by merchant basis but rather by merchant category. He also did not conclude that there were any differences in market power across merchant categories or that defendants lacked market power in any particular category. He simply found that differences, if any, in defendants' "market power across" merchant categories was simply a damages issue because it affected, at most, the off-line interchange fee rates by category, not merchant, that would be fixed in the but-for world. Ex. 67 to Novoselsky Decl. ¶¶ 46-48.

[228] Defendants' claim that Dr. Bamberger acknowledged that Defendants have different levels of market power over different merchant categories is irrelevant and wrong. Defs.' Mem. at 89. The claim is irrelevant because, as Dr. Bamberger concludes, the existence of market power is determined in the aggregate for all merchants. Second, the claim is wrong because Dr. Bamberger has not concluded that Defendants' market power varies among any categories. He merely testified as follows: "If in a merchant category, the demand for elasticity was relatively high, then I would interpret the resulting relatively low interchange as reflecting the fact that Visa and MasterCard have relatively less market power over that category than they have over other categories where the elasticity demand is lower." Bamberger Dep. Tr. 195:14-22.

[229] Dr. Bamberger points out that Professor Snyder "does not dispute that Visa and MasterCard have market power. Nor does Professor Snyder identify any merchant category in which he claims that Visa and MasterCard lack market power." Bamberger Reply Decl. ¶ 10.

In *United States v. Visa*, the court also found that determining market power is focused on defendants' conduct, not individual purchasers. 163 F. Supp. 2d at 340-41. Specifically, the court held that Visa and MasterCard had market power because, among other reasons, they price discriminated across merchant categories:

> Defendants' ability to price discriminate also illustrates their market power. Both Visa and MasterCard charge differing interchange fees based, in part, on the degree to which a given merchant category needs to accept general purpose card . . . . The reality is that Visa and MasterCard are able to charge substantially different prices for those hundreds of thousands of merchants who must take credit cards at any price because their customers insist on using those cards.

*Id.* Thus, the different merchant categories that Defendants trumpet in order to create individual issues as to market power actually support Defendants' power to discriminate, and their overall market power.

Defendants attempt to distinguish the *Visa Check* and *United States v. Visa* decisions by arguing that those courts did not "consider the burden caused by analyzing market power category-by-category, or for thousands of" so-called "individually-negotiated interchange deals."[230] Defendants' argument misses the point. Market power is analyzed in the aggregate, based on defendants' conduct, and not on the conduct of any particular merchant. *See also United States v. Visa*, 344 F.3d 229, 239 (2d Cir. 2003). Here, the focus will be on Defendants' conduct, including the fixing of list prices by merchant category based on each category's elasticity of demand not the cost for providing any service to each category. Bamberger Decl. ¶¶ 56, 69.[231]

---

[230] Defs' Mem. at 91 n.213.

[231] *See also In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656 (7th Cir. 2002); *Sulfuric Acid*, 2007 WL 898600, at *7.

Moreover, Dr. Snyder does not even argue that market power cannot be analyzed on a class-wide basis. As Dr. Bamberger recognizes, Dr. Snyder implicitly concedes that market power can be analyzed on a class-wide basis, at least by merchant category. The analysis is not done merchant-by-merchant. Bamberger Reply Decl. ¶ 10. However, Dr. Bamberger has concluded that the market power analysis can and should be done more broadly than at the merchant category level. *Id.* ¶¶ 11-12. He further concluded that Dr. Snyder's argument is not based on any "analysis to show that conducting separate market power analyses for each merchant category would lead him to different results – *i.e.*, that Visa and MasterCard had substantial market power in some merchant categories, but not in others."[232] *Id.* ¶ 12.

Allegedly based on Dr. Bamberger's opinions, Defendants also claim that Plaintiffs will need to show that the interchange fee level is "higher than the individual issuers' marginal costs for that particular category or merchant" to demonstrate market power. Defs.' Mem. at 91-92. Defendants' argument is wrong. Dr. Bamberger has opined that he is "unaware of any cost-based reason" for Defendants' interchange fee increases or pricing differences across merchant categories. Bamberger Decl. ¶¶ 56, 59. Neither Defendants nor Dr. Snyder have argued that interchange fees are cost-based. Defs.' Mem. at 9-19 (silence as to the basis of fixed interchange fees); Snyder Decl. ¶ 61 ("Interchange rates thus give Visa and MasterCard the ability to alter the price structure on their respective networks to balance demand on the two sides of their networks and optimize transaction volume"). In fact, the evidence reflects that they are not. *See* Pls.' Mem. at 23-24.

---

[232] Significantly, Dr. Snyder has not argued that Visa and MasterCard do not have market power and has not identified any merchant category over which they do not have market power. In fact, Dr. Snyder admitted that he has not conducted any such analyses. Snyder Dep. Tr. 305:6-306:20.

In short, Defendants and Dr. Snyder have not performed any economic analysis or cited empirical evidence contrary to Dr. Bamberger's well-supported opinion that market power can be determined using the same common evidence for all class members.[233]

## IV.    CONCLUSION

For the foregoing reasons, as well as the reasons detailed in the Opening Brief, Plaintiffs respectfully request that the Court certify two classes: the "Damages Class," for all merchants who have accepted Visa and/or MasterCard credit and/or debit cards in the United States at any time from and after January 1, 2004; and the "Injunctive Relief Class," for all merchants who currently accept Visa and/or MasterCard credit and/or debit cards in the United States.

Dated:  January 29, 2009                      Respectfully submitted,


BERGER & MONTAGUE, P.C.
H. Laddie Montague, Jr. (HM-8479)
Merrill G. Davidoff
Bart D. Cohen
Michael J. Kane
1622 Locust Street
Philadelphia, PA  19103
 (215) 875-3000

---

[233] As Plaintiffs demonstrated in their opening memorandum, market power will be established class-wide using common evidence. Pls.' Mem. at 53-57.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
K. Craig Wildfang
Thomas B. Hatch
Janet C. Evans
Thomas J. Undlin
2800 LaSalle Plaza
800 LaSalle Avenue South
Minneapolis, MN  55402
(612) 349-8500

COUGHLIN STOIA GELLER RUDMAN &
  ROBBINS LLP
Patrick J. Coughlin
Bonny E. Sweeney
David W. Mitchell
Alexandra S. Bernay
655 West Broadway
Suite 1900
San Diego, CA  92101
(619) 231-1058

*Co-Lead Counsel for Class Plaintiffs*

## CERTIFICATE OF SERVICE

I, Matthew P. McCahill, certify that on January 29, 2009, I caused true and correct copies of the foregoing *Reply Memorandum of Law in Support of Class Plaintiffs' Motion for Class Certification* to be served on all counsel via Lexis-Nexis File & Serve, and further certify that I caused true and correct copies of the *Declaration of Matthew P. McCahill in Support of Class Plaintiffs' Reply Memorandum and Accompanying Exhibits 1-89* and the *Declaration of Michael J. Kane and Accompanying Exhibits 1-180* to be served on the following counsel via Federal Express:

Eric H. Grush
Sidley Austin LLP
One South Dearborn
Chicago, IL 60603


/s/ Matthew P. McCahill
Matthew P. McCahill (MM-8984)