UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

In re PAYMENT CARD INTERCHANGE
FEE AND MERCHANT DISCOUNT
ANTITRUST LITIGATION

---

This Document Relates To:

    ALL ACTIONS.

---

MDL No. 1720(JG)(JO)

Civil No. 05-5075(JG)(JO)

MEMORANDUM IN SUPPORT OF CLASS
PLAINTIFFS' JOINT MOTION FOR
AWARD OF ATTORNEYS' FEES,
EXPENSES AND CLASS PLAINTIFFS'
AWARDS

Judge:      The Honorable John Gleeson
Date:       September 12, 2013
Time:       10:00 a.m.
Courtroom:  6C

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION .................................................................................................1

II.    FACTUAL BACKGROUND .................................................................................3

    A.    Pre-Filing Preparation ..............................................................................3

    B.    Prosecution of the Case............................................................................3

        1.    Pre-Consolidation Proceedings....................................................3

        2.    Leadership, Pleadings, Discovery and Class Certification .........4

        3.    Class Counsel Petitioned All Three Branches of the Federal Government on Behalf of the Class ...........................................7

        4.    Expert Discovery, Dispositive Motions, and Trial Preparation.................9

    C.    Mediation and Settlement ......................................................................10

III.   ARGUMENT .......................................................................................................12

    A.    Attorneys' Fees .......................................................................................12

        1.    Counsel are Entitled to an Award of Attorneys' Fees and Expenses from the Common Fund...........................................12

        2.    Counsel Seek a Reasonable Percentage of the Common Fund.................13

        3.    Counsel's Fee Request is Consistent with the *Goldberger* Factors...........15

            a.    The Audited Time and Labor Expended by Counsel Support the Requested Fee..............................................15

            b.    The Magnitude and Complexity of the Litigation Support the Requested Fee ......................................................16

            c.    The Risks Entailed in the Litigation Support the Requested Fee....................................................................17

                (1)    Lack of Government Action ...............................17

                (2)    Resources Committed to the Case .....................18

                (3)    Risks Arising from Substantive Issues ..............18

831560_1

**Page**

d.      The Quality of Counsel's Representation Supports the Requested Fee ...................................................................20

(1)    Quality of Plaintiffs' Counsel ............................................20

(2)    Quality of Defendants' Counsel.........................................20

e.      The Fee Request Is Consistent with the Size and Scope of the Settlement..............................................................................21

f.      Public Policy Considerations Support the Requested Fee ............21

4.      The Requested Fee Is Reasonable in Light of Counsel's Lodestar ...........22

a.      The Review Process Resulted in a Conservative Figure as to Counsel's Hours........................................................................22

b.      Counsel's Hourly Rates Are Reasonable .......................................22

c.      The Resulting Multiplier is Reasonable.........................................23

B.      Class Counsel's Expenses Are Reasonable ...........................................24

C.      Class Plaintiffs are Entitled to Incentive Awards and Reimbursement for Their Expenses.....................................................................................24

IV.    CONCLUSION.....................................................................................................25

831560_1

# TABLE OF AUTHORITIES

**Page**

## CASES

*American Needle, Inc. v. National Football League*,
   538 F.3d 736 (7th Cir. 2008) ........................................................................8

*Baffa v. Donaldson Lufkin & Jenrette Sec. Corp.*,
   No. 96 CIV. 0583, 2002 WL 1315603
   (S.D.N.Y. June 17, 2002) ............................................................................13

*Blomkest Fertilizer v. Potash Corp. of Saskatchewan*,
   203 F.3d 1028 (8th Cir. 2000) .....................................................................18

*Boeing Co. v. Van Gemert*,
   444 U.S. 472 (1980) .....................................................................................12

*Brown v. Phillips Petroleum Co.*,
   838 F.2d 451 (10th Cir. 1988) .....................................................................13

*Camden I Condo. Ass'n, Inc. v. Dunkle*,
   946 F.2d 768 (11th Cir. 1991) .....................................................................13

*City of Detroit v. Grinnell Corp.*,
   495 F.2d 448 (2d Cir. 1974).............................................................14, 17, 18

*Goldberger v. Integrated Res., Inc.*,
   209 F.3d 43 (2d Cir. 2000)................................................................. *passim*

*In re Agent Orange Prod. Liab. Litig.*,
   818 F.2d 226 (2d Cir. 1987).........................................................................18

*In re Am. Bank Note Holographics, Inc.*,
   127 F. Supp. 2d 418 (S.D.N.Y 2001).....................................................13, 18

*In re AOL Time Warner, Inc. Sec. & ERISA Litig.*,
   No. 02 Civ. 5575, 2006 WL 3057232
   (S.D.N.Y. Oct. 25, 2006) .............................................................................24

*In re Arakis Energy Corp. Sec. Litig.*,
   No. 95CV3421, 2001 WL 1590512
   (E.D.N.Y. Oct. 31, 2001)..............................................................................24

*In re ATM Fee Antitrust Litig.*,
   686 F.3d 741 (9th Cir. 2012) .......................................................................19

**Page**

*In re Baby Food Antitrust Litig.*,
    166 F.3d 112 (3d Cir. 1999)..................................................................18

*In re Carbon Dioxide Indus. Antitrust Litig.*,
    229 F.3d 1321 (11th Cir. 2000) ............................................................18

*In re Citric Acid Litig.*,
    191 F.3d 1090 (9th Cir. 1999) ..............................................................18

*In re Currency Conversion Fee Antitrust Litig.*,
    263 F.R.D. 110 (S.D.N.Y. 2009) ..........................................................20

*In re Elan Sec. Litig.*,
    385 F. Supp. 2d 363 (S.D.N.Y. 2005).................................................14

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
    586 F. Supp. 2d 732 (S.D. Tex. 2008) .............................................22, 23

*In re First Texas Sav. Ass'n v. Fin. Interchange, Inc.*,
    55 Antitrust & Trade Reg. Rep. (BNA) 340 (Aug. 19, 1988) ................18

*In re Independent Energy Holdings PLC Sec. Litig.*,
    No. 00 Civ. 6689, 2003 WL 22244676
    (S.D.N.Y. Sept. 29, 2003) ...............................................................14, 22

*In re Lloyd's Am. Trust Fund Litig.*,
    No. 96 Civ. 1262, 2002 WL 31663577
    (S.D.N.Y. Nov. 26, 2001) ....................................................................23

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
    246 F.R.D. 156 (S.D.N.Y. 2007) ...............................................13, 14, 20, 22

*In re NASDAQ Market–Makers Antitrust Litig.*,
    187 F.R.D. 465 (S.D.N.Y. 1998) ....................................................20, 24

*In re Veeco Instruments Inc. Sec. Litig.*,
    No. 05MDL01695, 2007 WL 4115808
    (S.D.N.Y. Nov. 7, 2007) ......................................................................23

*In re Visa Check/MasterMoney Antitrust Litig.*,
    297 F. Supp. 2d 503 (E.D.N.Y. 2003) .............................................14, 15, 16, 17

- iv -

**Page**

*In re Vitamin C Antitrust Litig.*,
No. 06-MD-1738, 2012 WL 5289514
(E.D.N.Y. Oct. 23, 2012) ...................................................................17, 23, 24

*In re WorldCom, Inc. Sec. Litig.*,
388 F. Supp. 2d 319 (S.D.N.Y. 2005)...............................................................21, 22

*J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.*,
485 F.3d 880 (6th Cir. 2007) ...........................................................................18

*Masters v. Wilhelmina Model Agency, Inc.*,
473 F.3d 423 (2d Cir. 2007)...............................................................................13

*McDaniel v. County of Schenectady*,
595 F.3d 411 (2d Cir. 2010).........................................................................14, 23

*NaBanco Bancard Corp. v. Visa U.S.A., Inc.*,
779 F.2d 592 (11th Cir. 1986) .....................................................................17, 18

*Roberts v. Texaco, Inc.*,
979 F. Supp. 185 (S.D.N.Y. 1997)................................................................24, 25

*Superior Offshore Int'l, Inc. v. Bristow Group, Inc.*,
490 Fed. Appx. 492 (3d Cir. 2012)....................................................................18

*Velez v. Novartis Pharms. Corp.*,
No. 04 Civ. 09194, 2010 WL 4877852
(S.D.N.Y. Nov. 30, 2010) ..................................................................................23

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
396 F.3d 96 (2d Cir. 2005)...................................................................13, 14, 17

*Weseley v. Spear, Leeds & Kellogg*,
711 F. Supp. 713 (E.D.N.Y. 1989) ....................................................................16

*Williamson Oil Co., Inc. v. Philip Morris USA*,
346 F.3d 1287 (11th Cir. 2003) .........................................................................18

## STATUTES, RULES AND REGULATIONS

Federal Rules of Civil Procedure
Rule 23(b)(2)...........................................................................................4
Rule 23(b)(3)...........................................................................................4
Rule 23(h) ..............................................................................................13

831560_1

**Page**

**SECONDARY AUTHORITIES**

Manual for Complex Litigation (Fourth) (2004)
    § 14.121.................................................................................................................13

## I.      INTRODUCTION

On behalf of all plaintiffs' counsel in the class action proceedings in MDL 1720, Class Counsel[1] submit this Memorandum in Support of Class Plaintiffs' Joint Motion for Award of Attorneys' Fees, Expenses and Class Plaintiffs' Awards.  Class Counsel and nearly 60 additional law firms who worked on this case over an eight-year period procured the historic resolution of a case that will bring unprecedented competition in the payment card market.  The settlement will affect as great a segment of the United States economy as any previous antitrust class action.  The cash portion of the settlement is unprecedented as well.  This petition seeks fees totalling approximately 10 percent of the estimated value of the cash funds, and reimbursement of expenses through November 30, 2012 in the amount of $27,037,716.97.

The cash portion of the settlement may total as much as $7.25 billion—a figure more than double the recovery in any previous private antitrust action.  The settlement further provides for injunctive relief in the form of changes to rules that the defendant payment card networks have maintained since their inception—changes that merchants sought and Defendants successfully resisted for years before this case, and which Defendants implemented pursuant to the Court's preliminary approval of the settlement.  Those changes allow merchants and, in turn, consumers to reap the benefits of a payments market that is more transparent, competitive and efficient than ever before.  Those benefits are also likely to translate into billions of dollars in savings beyond the cash portion of the settlement, as they reduce merchants' costs of accepting credit cards and limit the networks' ability to raise interchange fees.

---

[1]      Pursuant to the Settlement Agreement, "'Class Counsel' means the law firms of Robins, Kaplan, Miller & Ciresi L.L.P., Berger & Montague, P.C., and Robbins Geller Rudman & Dowd LLP."  *See* Dkt. No. 1656-1 ¶ 1(i).  For the purposes of this Motion, it should further include the firms of Hulett Harper Stewart LLP and Freedman Boyd Hollander Goldberg Urias & Ward P.A., who assisted Class Counsel as to key decisions involving litigation strategy over the entire course of the case.

Such an extraordinary settlement could result only from a similarly extraordinary effort by Class Counsel and their co-counsel. Class Counsel's conservative calculations reflect an investment of nearly 500,000 hours of attorney and paralegal time through November 30, 2012, worth approximately $161 million based on historical rates.[2] But the investment of substantial time would not have sufficed, as the task at hand—addressing myriad novel substantive, procedural and expert issues, in the face of opposition from 19 titans of the financial services industry, the best defense counsel in the nation and an array of renowned experts—required work of the highest quality on Class Counsel and Class Supporting Counsel's part. The settlement in this case reflects the quality of that work. Only a small handful of plaintiffs' firms maintain the expertise and resources to prosecute, supervise, and finance an effort of this magnitude. Class Counsel are among those few firms.[3] And all of the non-lead firms (collectively, "Class Supporting Counsel") are sufficiently expert themselves that they made meaningful contributions to the effort with Class Counsel's guidance and supervision.

Sophisticated individual plaintiffs routinely agree to pay 30 percent of their recovery for representation of similar quality. Indeed, many of the named plaintiffs here agreed to pay more than that. *See* Declaration of Professor Charles Silver ("Silver Decl.") at 10, attached hereto as Ex. 4. And courts routinely award more than 20 percent of the class recovery to counsel for lesser results. *See id.* at 13-16 (Table 1). Class Counsel in this case seek approximately 10 percent of the recovery, a figure that falls well within the standards governing awards in this Circuit. Foremost among those standards is the principle that "a fee award should be assessed based on scrutiny of the unique circumstances of each case." *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 53 (2d Cir. 2000).

---

[2]    *See* Declaration of Thomas J. Undlin ("Undlin Decl."), ¶5 and Ex. A, attached hereto as Ex. 1.

[3]    *See, e.g.,* Ex. 1, Undlin Decl.; Declaration of H. Laddie Montague, Jr. ("Montague Decl."), ¶2, attached hereto as Ex. 2; Declaration of Bonny E. Sweeney ("Sweeney Decl."), ¶9, attached hereto as Ex. 3.

Many circumstances of this case are unique. A class action seeking damages and injunctive relief from a group of large financial institutions, raising esoteric issues that go to the heart of how the payment card industry operates in dealing with merchants, is clearly unique and complex litigation. Class Counsel's fee request—$720 million—within the mainstream, and given the circumstances of this litigation, is well-justified.

## II.     FACTUAL BACKGROUND

### A.     Pre-Filing Preparation

Robins Kaplan Miller & Ciresi L.L.P. ("Robins Kaplan") began its investigation of Class Plaintiffs' claims in 2004, when it learned of widespread dissatisfaction with inflated interchange fees among merchants and merchant trade associations. *See* Declaration of K. Craig Wildfang ("Class Counsel Decl."), ¶14; 19-20, attached hereto as Ex. 5. That effort encompassed consultation with economists, industry experts, antitrust experts from the academic community, merchants and merchant trade groups. *Id.* Eventually, two small merchants, Photos Etc. Corp. and Traditions Ltd., agreed to step forward before any others. *Id.* ¶15. Prior to and concurrent with the Robins Kaplan investigation, long-time class action leaders Berger & Montague, P.C. and Robbins Geller Rudman & Dowd LLP ("Robbins Geller") were developing expertise as to litigation involving payment cards by pursuing a series of complex cases alleging various antitrust violations by several of the Defendants in this case.[4]

### B.     Prosecution of the Case

#### 1.     Pre-Consolidation Proceedings

Robins Kaplan filed the initial complaint in this proceeding in June 2005. *See* Ex. 5, Class Counsel Decl. ¶¶22-24. Scores of similar complaints followed in subsequent weeks, including both

---

[4]     *See, e.g., In re Currency Conversion Fee Anitrust Litig.*, MDL 1409 (S.D.N.Y.) (settled for $336 million); *Schwartz v. Visa Int'l, et al.*, No. 822404-4 (Cal. Super. Ct., Alameda Cnty.).

class actions, and non-class actions on behalf of major retailers. *Id.* ¶25. After successfully coordinating their preliminary efforts, Robins Kaplan, Berger & Montague, and Robbins Geller agreed to seek their appointment as co-lead counsel, based on their class action expertise, their resources, and their respective records of having successfully managed complex litigation through trial. *Id.* ¶26.

At the same time, firms that had filed cases alleging claims subsumed in the Robins Kaplan complaint (the "no-surcharge rule" or "NSR" cases), filed a motion with the Judicial Panel on Multidistrict Litigation to consolidate those cases only in the Northern District of California. Robins Kaplan, Berger & Montague, and Robbins Geller moved for consolidation before Judge Gleeson in the E.D.N.Y. and argued that position before the Panel. The Panel elected to consolidate the actions in this Court, based primarily on the fact that "Judge Gleeson [was] already familiar with the operation of the credit card networks." Panel Order at 2.

### 2.    Leadership, Pleadings, Discovery and Class Certification

The Panel's Order accelerated plaintiffs' counsel's efforts to agree on a leadership structure for the case. Those efforts resulted in a motion, supported by a significant majority of plaintiffs' counsel, that Robins Kaplan, Berger & Montague, and Robbins Geller serve as interim co-lead counsel, which the Court granted. *See* Ex. 5, Class Counsel Decl. ¶26.

In April of 2006, Class Counsel filed a consolidated amended complaint alleging 16 counts under federal and state antitrust laws, and the existence of two classes—a damages class pursuant to Rule 23(b)(3), and an injunctive relief class pursuant to Rule 23(b)(2). Dkt. No. 317. That complaint was followed in May 2006 by a supplemental complaint alleging violations arising from MasterCard's intervening initial public offering. Dkt. No. 332. Defendants moved to dismiss both complaints, the earlier one only in part, and the latter one in its entirety. Dkt. No. 387.

- 4 -

As the pleadings and motion practice progressed, Class Counsel—after a series of laborious meet-and-confer sessions—began to compile, review and organize the massive discovery record that was produced by the 19 defendants, including the two dominant payment networks and nearly all of the nation's largest credit card issuers. The Defendants were represented by able, experienced counsel from large, prestigious firms who used their best efforts to limit the amount and use of any discovery they produced. As a result, Plaintiffs were required to negotiate a comprehensive protective order early in the case, followed by substantial motion practice over discovery issues.[5]

The process of culling and reviewing 65 million pages of documentary evidence necessarily entailed educating and managing personnel from dozens of Class Supporting Counsel, and coordinating with the plaintiffs who had filed non-class actions. Class Counsel held a series of training seminars so those involved in reviewing and analyzing the fruits of discovery had a common understanding and common goals. That effort further necessitated diligent and ongoing efforts to monitor both the quality and quantity of each firm's work, to ensure that it was being done properly and efficiently. Class Counsel repeatedly had to reassess the contours of the process to ensure that it could be completed in time to allow for the identification of key witnesses and the preparation, scheduling and conduct of hundreds of depositions before the fact-discovery deadline.[6] At the same time, Class Counsel and 19 named plaintiffs were faced with compiling and producing their own documents and preparing for and defending their own depositions. Concurrent with that, Class Counsel issued subpoenas to and received documents from 43 non-parties, met and conferred with

---

[5]     Magistrate Judge Orenstein embraced Class Plaintiffs' suggestion that he hold regularly scheduled status conferences before the Court to keep matters current, with joint status reports to be filed immediately before each conference. That encouraged resolution by the parties of routine discovery disputes, leaving only the most contentious ones for the Court to decide.

[6]     The parties established a committee for the purpose of scheduling depositions, which in many instances were multi-tracked.

831560_1

their counsel, engaged in motion practice, compiled and reviewed their documents and, in many instances, deposed their witnesses as well.  *See* Ex. 5, Class Counsel Decl., Ex. 6.  Overall, Class Plaintiffs' counsel took or defended more than 370 depositions.  *Id.*, Exs. 3-4.

After substantial discovery had occurred, in early May 2008, Class Plaintiffs filed a motion for class certification that was supported by a 78-page memorandum, a wide-ranging expert report and over a thousand pages of exhibits.  Defendants' response was likewise comprehensive, supported by expert reports and raised myriad defenses.  Class Plaintiffs' reply, filed in January 2009, was even more extensive than the initial submission, touching on industry-specific factual and expert issues far afield from those raised in any previous antitrust class action, including: (1) Defendants' claim that their "co-branding" agreements with scores of merchants precluded the Court's finding predominance of common issues; (2) Defendants' novel characterization of payment card transactions as "factoring"; and (3) Defendants wide-ranging speculation as to what might have transpired in a "but-for" world lacking for interchange fees.  Defendants successfully pressed the Court to allow a sur-reply submission later that year.  Those submissions culminated in a day-long oral argument in November 2009, followed by yet more letter briefing.

Concurrent with their class certification reply submission, Class Plaintiffs filed three complaints: a Second Consolidated Amended Class Action Complaint, which included extensive information gleamed from discovery and additional claims; a First Amended Supplemental Class Action Complaint re-pleading the challenge to MasterCard restructuring; and a Second Supplemental Class Action Complaint challenging the Visa restructuring that was consummated the previous year. Defendants moved to dismiss each of those complaints in their entirety, and added a motion to strike allegations against defendant Chase Paymentech.  Soon after, Defendants added a motion to disqualify Class Plaintiffs' class expert.  In early June of 2009, Plaintiffs responded to all three

- 6 -

motions to dismiss and the motion to strike, and a month later, responded to the disqualification motion.

### 3. Class Counsel Petitioned All Three Branches of the Federal Government on Behalf of the Class

While Defendants' foreign affiliates have long been subjected to government regulation relating to interchange fees, Defendants had escaped any such regulation in the United States until relatively recently. While this case was pending, Robins Kaplan retained a lobbying firm to assist the merchant community in securing federal legislation regulating interchange fees, an effort in which Class Counsel joined. *See* Ex. 5, Class Counsel Decl. ¶¶107-109. Ultimately, in 2010, Congress passed the Durbin Amendment to the Dodd-Frank Act, which for the first time capped debit card interchange fees based on Defendants' costs in processing debit card transactions. As a result of the Durbin Amendment and rulemaking for which it provided, merchants have saved an estimated $9 billion per year in debit-card fees.[7] The Durbin Amendment further raised the prospect that merchants might actively steer their customers to debit cards (rather than credit cards) if Class Counsel could secure the amendment of the networks' "anti-steering" rules via these actions. Class Counsel ultimately succeeded in doing just that.

Also while this action was pending, the Department of Justice and several states' Attorneys General began an investigation into certain network rules at issue in this action. That led the DOJ to ask Class Counsel to produce discovery materials from this action, first informally, then via a civil investigative demand. Since the DOJ could not see those materials without substantial assistance from Class Counsel, Class Counsel secured an amendment to the protective order allowing for their release, and a Court order (over Defendants' objections) to the effect that Class Counsel would not

---

[7]     *See* Federal Reserve Board, Average Debit Card Interchange Fee by Payment Card Network (available at http://www.federalreserve.gov/paymentsystems/regii-average-interchange-fee.htm).

831560_1

waive work-product privilege protections by sharing work product with the DOJ. The DOJ had unfettered access to Class Plaintiffs' document and deposition databases, and additional work product from that point, all at a minimal cost to the DOJ. As a result, the DOJ filed antitrust claims attacking most of the anti-steering rules of Visa, MasterCard, and American Express and secured a consent judgment against Visa and MasterCard.[8] The consent judgment limited several of Visa's and MasterCard's rules targeted in this action, thus obtaining some of the relief being sought in this case. Significantly, neither the default interchange fee rules nor the surcharge rules were challenged by the DOJ.

In 2009, Class Counsel recognized the threat to Class Plaintiffs' claims posed by the Supreme Court's grant of *certiorari* in *American Needle, Inc. v. National Football League*, 538 F.3d 736 (7th Cir. 2008), in which the Seventh Circuit held that the NFL and its 32 teams were a "single entity" for the purposes of that case. The Supreme Court's affirmance of that decision could have undermined Class Plaintiffs' many conspiracy-based claims in this action, which arose from events during the period in which the Defendant banks operated joint ventures under the Visa and MasterCard umbrellas. Working with antitrust experts and other interested parties, Class Counsel drafted and filed an *amicus* brief seeking the reversal of the Seventh Circuit decision, which the Supreme Court ultimately did.

Class Counsel also drafted an *amicus* brief—which included an expert declaration drafted at Class Counsel's expense—defending the Durbin Amendment in *TCF National Bank v. Bernanke*, No. 4:10-cv-04149 (D.S.D.) (filed Mar. 11, 2011), Dkt. No. 131, in which a card-issuing bank attacked the Amendment on constitutional grounds. The district court refused to grant the requested

---

[8]    *See* Final Judgment as to Defendants MasterCard International, Inc. and Visa, Inc. in *United States v. American Express* (available at http://www.justice.gov/atr/cases/f273100/273170.htm).

- 8 -

preliminary injunction.  On appeal, Class Counsel filed an additional *amicus* brief in the Eighth Circuit Court of Appeals, which subsequently affirmed the denial.  The case was later dismissed. *TCF National Bank v. Bernanke*, No. 11-1805 (8th Cir. June 29, 2011).  *See generally* Ex. 5, Class Counsel Decl. ¶117.

### 4.    Expert Discovery, Dispositive Motions, and Trial Preparation

Upon the close of fact discovery, Class Counsel served the reports of five experts, including a comprehensive report by Dr. Alan Frankel that addressed most of the substantive aspects of the claims asserted in the Second Consolidated Amended Class Action Complaint.  The Individual Plaintiffs served a similar number of reports.  Defendants responded with 12 expert reports from some of the most esteemed testifying experts available.  *See* Ex. 5, Class Counsel Decl. ¶145. Plaintiffs deposed each of Defendants' experts, which in each instance required a substantial investment of time by the most senior counsel, as well as dozens of hours on the part of junior counsel and paralegals.  That was followed by six expert rebuttal reports by Class Plaintiffs' experts, and the defense of Class Plaintiffs' experts' depositions.  Finally, 17 months after the process began, Defendants served sur-rebuttal reports by two of their experts, after which they deposed each of Class Plaintiffs' experts.

Two months later, all parties filed summary judgment and *Daubert* motions. Class Plaintiffs sought partial summary judgment and Defendants sought it as to the entirety of Class Plaintiffs' case.  The preparation of Class Plaintiffs' submissions and Class Plaintiffs' response to Defendants' submission required the investment of thousands of hours of attorney and paralegal time. That time was spent in large part scouring the massive work product compiled over the course of the case for the best evidence supporting Class Plaintiffs' claims, and turning that evidence into briefs and appendices that told a complex story in a relatively simple way.  The Court heard oral argument as to all of the pending summary judgment motions in late 2011.  The preparation and defense of the

- 9 -

multiple *Daubert* motions likewise required counsel to present exceptionally complex material in a concise and coherent manner.

All Plaintiffs requested the earliest possible trial date. As a result, a joint trial for the Class and Individual Plaintiffs was scheduled for September 2012. As that date approached, Class Counsel engaged and worked closely with jury consultants, drafted jury instructions, verdict forms and motions *in limine*, and selected exhibits and assessed their admissibility.

### C.    Mediation and Settlement

The negotiation process that resulted in the Settlement Agreement began five years before the parties signed the Agreement, when Plaintiffs addressed the issue with one Defendant and the Court subsequently raised the possibility as to all Defendants. That induced the parties to seek out a mediator. They eventually agreed on retired United States Chief Magistrate Judge Edward A. Infante. Later, the parties agreed that it would be helpful to have a second mediator due to the complexity of the negotiations. The parties agreed that Professor Eric D. Green should fill that role, beginning in July 2009.

The first mediation session with Judge Infante took place in May 2008, followed by another session that June. Declaration of The Honorable Edward A. Infante (Ret.) ("Infante Decl."), ¶5, attached to Class Plaintiffs' Memorandum of Points and Authorities in Support of Final Approval of Settlement ("Mem. Final App.") as Ex. 1, filed concurrently herewith. Over the course of the next three years, Class Counsel and Defendants' counsel, sometimes joined by Individual Plaintiffs' counsel, held numerous meetings, and exchanged dozens of telephone calls, e-mails and other written communications, all in an attempt to bring the parties together. *Id.* ¶¶5-6. Despite those efforts, the parties remained far apart until after the summary judgment arguments in November 2011, when the Court reiterated its encouragement to settle and offered, with the consent of all parties, to assist with the settlement process. Soon thereafter, all parties agreed to consider a

mediators' proposal that included the basic terms for a settlement. The mediators made a comprehensive mediator's proposal on December 22, 2011. *Id.* ¶8; Declaration of Eric Green ("Green Decl."), ¶¶24-25, attached to Mem. Final App. as Ex. 2. By February 21, 2012, all of the named plaintiffs and all Defendants accepted the proposal and agreed to negotiate toward a final settlement agreement through the process laid out by the mediators and the Court. Mem. Final App. Ex. 1, Infante Decl. ¶8. What was left, which was no small task, was to negotiate the final agreements based on the principal terms set forth in the Mediators' Proposal.

Over the next several months, Class Counsel, Defendants' Counsel, Professor Green, and Judge Infante—with timely encouragement by the Court—labored to turn the Mediators' Proposal into a detailed agreement that would govern the parties' dealings going forward. Although bound by the terms of the Proposal, those discussions were as difficult as any that had preceded them. Almost every term was carefully negotiated and articulated, everyone recognizing that the terms would have dramatic impact on the costs and mechanics of card acceptance. The parties agreed in principle to all the primary terms of an agreement on June 21, 2012, after a two-day settlement conference. The final agreement—except for the Appendices—was reached on July 13, 2012, six months after the Mediators' Proposals were accepted. Mem. Final App. Ex. 1, Infante Decl. ¶9.

Over the next few months, the parties continued to negotiate the terms of the several Appendices, including forms of notice, the notice plan, the plan of distribution and administration, a proposed final judgment and a preliminary approval order. Ex. 5, Class Counsel Decl. ¶232. As to allocation, Class Counsel developed a plan based on a diverse collection of existing data sets, to ensure that merchants would file claims without difficulty or an excessive investment of their time. Appendix I to SA.

Class Counsel then moved quickly to engage a Claims Administrator, and received detailed proposals from nine candidates within two weeks, interviewing five of them extensively. Ex. 5, Class Counsel Decl. ¶211. At the same time, Class Counsel engaged a plain language expert to consult as to the notice, selected banks to administer the settlement funds, prepared the motion for preliminary approval, and issued subpoenas to 25 merchant processors—most of whom were not affiliated with Defendants—in order to compile a complete list of class members. Declaration of Nicole F.J. Hamann ("Hamann Decl."), ¶7, attached to Mem. Final App. as Ex. 5. The process played out over several months as to certain processors who resisted production and a motion was filed (then withdrawn when the parties agreed to a production schedule). *See* Dkt. Nos. 1757, 1758.

For over eight years, Class Counsel zealously prosecuted this action, and secured a result unprecedented in the history of antitrust law. While those efforts and the results are extraordinary, the fees Class Counsel seek are by almost all measures well within what is commonplace in class litigation.

## III.    ARGUMENT

### A.    Attorneys' Fees

#### 1.    Counsel are Entitled to an Award of Attorneys' Fees and Expenses from the Common Fund

The "equitable fund" doctrine provides that plaintiffs' attorneys in a class action may petition the court for compensation from any benefits to the class that resulted from their efforts. *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980). The Second Circuit has held that courts may use both the "percentage of the fund" and the "lodestar" methods to compute fees in common fund cases. *See*

2 of 33

*Goldberger*, 209 F.3d at 50. However, "[t]he trend in this Circuit is toward the percentage method." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005).[9]

The use of the percentage method dispenses with the "cumbersome, enervating, and often surrealistic process of lodestar computation." *Goldberger*, 209 F.3d at 50 (quotation marks and citations omitted). However, the Court of Appeals recommends considering the hours submitted by counsel as a "cross-check" on the reasonableness of the requested percentage. *Id.* (quotation marks omitted). Regardless of which method of calculation a court uses, the key consideration in awarding fees is what is reasonable under the circumstances. *Id.* at 47. *See also* Fed. R. Civ. P. 23(h) ("In a certified class action, the court may award reasonable attorney's fees . . . ."). In addition, the award must be based on "the total funds made available, whether claimed or not." *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 437 (2d Cir. 2007)

## 2. Counsel Seek a Reasonable Percentage of the Common Fund

The Manual for Complex Litigation provides that "[g]enerally, the factor given the greatest emphasis [in awarding a percentage of a fund] is the size of the fund created, because 'a common fund is itself the measure of success . . . [and] represents the benchmark from which a reasonable fee will be awarded.'" Manual for Complex Litigation (Fourth), § 14.121 (2004) (quoting 4 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 14:6, at 547, 550 (4th ed. 2002)); *see also Camden I Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991) (same); *see also Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 456 (10th Cir. 1988) ("a decisive factor in [a] common fund class action case is the amount involved and the results obtained"). The amount involved and the results obtained are unprecedented in this case. Additionally, "'market rates, where available, are

---

[9]        *See also In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 246 F.R.D. 156, 171 (S.D.N.Y. 2007); *Baffa v. Donaldson Lufkin & Jenrette Sec. Corp.*, No. 96 CIV. 0583, 2002 WL 1315603, at *1 (S.D.N.Y. June 17, 2002) (citing *In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 431 (S.D.N.Y 2001)).

the ideal proxy for [class counsel's] compensation.'" *Wal-Mart*, 396 F.3d at 123 (quoting *Goldberger*, 209 F.3d at 52).  *See also* Ex. 4, Silver Decl. at 7-12.  Counsel in this case seek a percentage that is far below that which any single class member would have paid to prosecute this action alone, and far below what private plaintiffs typically pay.

Finally, the Court of Appeals and district courts in this Circuit have repeatedly held that "a fee award should be assessed based on scrutiny of the unique circumstances of each case." *McDaniel v. County of Schenectady*, 595 F.3d 411, 426 (2d Cir. 2010) (quoting *Goldberger*, 209 F.3d at 53).[10]  *See also Goldberger*, 209 F.3d at 51-52 (rejecting the "essential notion of a benchmark"); *Merrill Lynch*, 246 F.R.D. at 174 ("'[R]eference to awards in other cases is of limited usefulness'") (citing, *inter alia*, *Goldberger*, 209 F.3d at 53).[11]  As to that, Plaintiffs are well aware that Second Circuit district courts, including this Court, have in several instances cited the premise that fee percentages in "megafund" cases should necessarily be smaller than those in other cases. However, the Court of Appeals has never required its application.  This petition is based on the premise that "a fee award should be assessed based on the unique circumstances of each case"— particularly a case as unique as this one.  *See also In re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d 503, 525, n.33 (E.D.N.Y. 2003) (criticizing class counsel for reliance on inapt

---

[10]    Counsel is well aware that the quoted sentence from *Goldberger* further requires the Court to act with "a jealous regard to the rights of those who are interested in the fund." *Goldberger*, 209 F.3d at 50 (quoting *Grinnell I*, 495 F.2d at 469 (internal quotation marks omitted)).

[11]    *See also In re Elan Sec. Litig.*, 385 F. Supp. 2d 363, 373 n.11 (S.D.N.Y. 2005) ("This award is based upon 'the unique circumstances of [this] case,' *Goldberger*, 209 F.3d at 53, and should not be considered as precedent for any other fee applications submitted to the Court in other cases."); *In re Independent Energy Holdings PLC Sec. Litig.*, No. 00 Civ. 6689, 2003 WL 22244676, at *7 (S.D.N.Y. Sept. 29, 2003) ("Case citations are of limited usefulness as a 'fee award should be assessed based on scrutiny of the unique circumstances of each case.'") (citation omitted).

- 14 -

831560_1

cases).[12]  Here, Class Plaintiffs' request–which is far below those typically awarded in litigation of any kind–is entirely consistent with that premise.

### 3.    Counsel's Fee Request is Consistent with the *Goldberger* Factors

"[T]he traditional criteria in determining a reasonable common fund fee, includ[e]: '(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation . . .; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.'"  *Goldberger*, 209 F.3d at 50 (citation omitted); (additional cites).  All of those factors are consistent with counsel's request in this case.  *See also Visa Check*, 297 F. Supp. 2d at 523 ("[A]pplication of the six *Goldberger* factors indeed compels the award of an extraordinary fee.").

### a.    The Audited Time and Labor Expended by Counsel Support the Requested Fee

The long and dedicated efforts undertaken by Class Counsel are detailed in the Class Counsel Declaration.  *See also supra* §II.  The lodestar figure of $161 million—reflecting the work of Class Counsel and Class Supporting Counsel through November 30, 2012—is a necessary result of the scope of that effort.  In order to minimize any duplication that might result from the involvement of so many firms, Class Counsel actively coordinated and supervised the efforts of all Class Counsel from the outset.

Class Counsel has undertaken an additional, wide-ranging effort to audit the lodestar figure to eliminate excessive, redundant and certain other time.  Shortly after the Court preliminarily approved the Settlement, Class Counsel developed a plan to standardize the mass of time records

---

[12]    To the extent the Court is inclined to consider other cases involving large settlements, those are compiled and analyzed in the Silver Declaration.  They further reflect that Class Counsel's request is well within the established range for such cases.  *See* Ex. 4, Silver Decl. at 13-16 (Table 1).

- 15 -

compiled over the course of the case, so as to ensure fairness to the class, present the most accurate figures to the Court as to the necessary scope of counsel's work, and to maximize fairness in the allocation of fees to dozens of firms with differing roles in the case, local markets and timekeeping practices.  *See generally* Ex. 1, Undlin Decl. ¶¶4-11.

That effort included a letter to Class Supporting Counsel, detailing their initial responsibilities in auditing their own submissions. *Id.* ¶6.  After reviewing those submissions, Class Counsel sent another letter to Class Supporting Counsel, seeking additional details and adding objective criteria governing the reduction of all time and expenses. *Id.* ¶7.  As those submissions arrived, Class Counsel developed plans to audit them as to matters with which only Class Counsel was familiar, and to engage the outside accounting firm of CliftonLarsonAllen LLP ("CLA") to audit those submissions for consistency with the criteria. *Id.* ¶11.  Concurrently, Class Counsel audited its own massive time records based on the same criteria, and those records will also be subject to further audit by CLA. *Id.*  By virtue of the massive scope of the project, CLA's work is ongoing.  By virtue of class counsels' internal reviews thus far, the initial total lodestar has been reduced by over $13.9 million, reflecting the elimination of excess or redundant efforts and imposition of objective timekeeping criteria. *Id.* ¶12.

### b.    The Magnitude and Complexity of the Litigation Support the Requested Fee

The magnitude of this litigation is evident, particularly in the result.  Moreover, "[t]he complexity of federal antitrust law is well known."  *Visa Check*, 297 F. Supp. 2d at 510 (citing *Weseley v. Spear, Leeds & Kellogg*, 711 F. Supp. 713, 719 (E.D.N.Y. 1989) (antitrust class actions "are notoriously complex, protracted, and bitterly fought")).  The *Visa Check* case—which resulted in a cash settlement worth 40 percent of the one in this case—was "'a very complicated one, presenting, on virtually every legal point, unique issues with uncertain outcomes.'" 297 F. Supp. 2d

at 523 (quoting counsel's expert). That is more so in this case, which raised even thornier legal issues.

### c.    The Risks Entailed in the Litigation Support the Requested Fee

The risks counsel undertook in this case are consistent with its scope and complexity, and justify a substantial award for reasons recognized in other cases and reasons unique to this case.

### (1)    Lack of Government Action

"It is well-established that litigation risk must be measured as of when the case is filed." *Goldberger*, 209 F.3d at 55. As of 2005, interchange fees had been attacked in other countries, but only by government agencies, and not in any court of law. The United States government had been decidedly silent as to the issue. Moreover, the only private litigation to address the issue was resolved in defendants' favor. *See NaBanco Bancard Corp. (NaBANCO) v. Visa U.S.A., Inc.*, 779 F.2d 592 (11th Cir. 1986).[13] Class Plaintiffs' counsels' decision to commit the resources to prosecute a case of this magnitude against that backdrop was fraught with risk. The Second Circuit and district courts in this Circuit have recognized that the lack of previous government action as a key factor in assessing risk in this context. *See, e.g.*, *Wal-Mart*, 396 F.3d at 122; *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 471 (2d Cir. 1974) (citations omitted), *abrogated on other grounds by Goldberger*, 209 F.3d 43; *In re Vitamin C Antitrust Litig.*, No. 06-MD-1738, 2012 WL 5289514, at *7 (E.D.N.Y. Oct. 23, 2012). As in *Visa Check*, "Lead Counsel did not benefit from any previous or simultaneous government litigation. Indeed, the government piggybacked on Class Counsel's efforts." 297 F. Supp. 2d at 523-24 & n.31. In this case, the subsequent government litigation relied primarily on the discovery record developed in MDL No. 1720.

---

[13]    The plaintiffs in *Visa Check*, 297 F. Supp. 2d at 513, alleged that the default interchange fee rule was the product of collusion and violated the antitrust laws. That issue was not the subject of relief in the settlement of that case.

### (2)    Resources Committed to the Case

Class Plaintiffs' counsel collectively committed nearly half a million hours of their time and tens of millions of dollars in expenses, in support of substantially untested legal theories, without any assurance of any compensation at all.  The historical record is replete with antitrust class actions—primarily actions far less novel than this one—in which a court granted summary judgment for defendants, as well as cases in which defendants prevailed at trial or on appeal.[14]

The Second Circuit has long recognized that the risk associated with a case undertaken on a contingent basis is an important factor in determining an appropriate fee award:

No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success. Nor, particularly in complicated cases producing large recoveries, is it just to make a fee depend solely on the reasonable amount of time expended.

*Grinnell*, 495 F.2d at 470 (citation omitted).  *See also In re American Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 433 (S.D.N.Y. 2001) (citing *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 226, 236 (2d Cir. 1987)).

### (3)    Risks Arising from Substantive Issues

American tribunals have ruled as to the legality of interchange fees only twice.  *See NaBANCO*, 779 F.2d 592; *In re First Texas Sav. Ass'n v. Fin. Interchange, Inc.*, 55 Antitrust & Trade Reg. Rep. (BNA) 340 (Aug. 19, 1988) (Kauper, Arb.).  In both instances, defendants prevailed.  Here, Class Plaintiffs' antitrust standing was at best uncertain at the outset of the case.

---

[14]    *See, e.g., Superior Offshore Int'l, Inc. v. Bristow Group, Inc.*, 490 Fed. Appx. 492 (3d Cir. 2012) (affirming summary judgment for defendants); *J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.*, 485 F.3d 880 (6th Cir. 2007) (same); *Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287 (11th Cir. 2003) (same); *Blomkest Fertilizer v. Potash Corp. of Saskatchewan*, 203 F.3d 1028 (8th Cir. 2000) (same); *In re Citric Acid Litig.*, 191 F.3d 1090 (9th Cir. 1999) (same); *In re Baby Food Antitrust Litig.*, 166 F.3d 112 (3d Cir. 1999) (same).  *See also In re Carbon Dioxide Indus. Antitrust Litig.*, 229 F.3d 1321 (11th Cir. 2000) (jury verdict against opt-out plaintiffs).

- 18 -

Since then, the Ninth Circuit resolved the issue in defendants' favor under similar circumstances. *See In re ATM Fee Antitrust Litig.*, 686 F.3d 741 (9th Cir. 2012). Multiple additional aspects of Plaintiffs' claims—*e.g.*, the tendency of the networks' rules to facilitate Defendants' price-fixing—have never been addressed by any court. Class Plaintiffs' challenges to the networks' reorganizations were likewise novel. *See* Ex. 5, Class Counsel Decl. ¶41; 43-44.

The risks unique to this case were magnified by the risks that go with most antitrust class actions. Class Plaintiffs survived one motion to dismiss only in part. After the complaint was amended and additional complaints filed, Defendants filed new motions to dismiss against the new complaints, all of which remain unresolved. Defendants pressed vigorous and creative defenses in response to Class Plaintiffs' motion for class certification, which also remains unresolved. Defendants filed wide-ranging motions for summary judgment, and a *Daubert* motion seeking the disqualification of Class Plaintiffs' economic expert. If the Court had granted any of Defendants' pending motions—it is unknown what the Court will do absent the approval of this Settlement— or denied Class Plaintiffs' motion for class certification, it would have in all likelihood dashed any hope for meaningful recovery for the Class, and precluded any recovery of fees by Class Counsel. The risks are fully set forth in the Memorandum in Support of Final Approval, filed concurrently herewith.

>           **d.      The Quality of Counsel's Representation Supports the
>                     Requested Fee**

>               **(1)      Quality of Plaintiffs' Counsel**

Class Counsels' records in representing plaintiffs in complex cases are substantially without

parallel.[15]  The results here are consistent with those records.  Class Supporting Counsel were a

coalition of firms with noteworthy records and substantial experience.  *See also In re Currency*

*Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 129 (S.D.N.Y. 2009) ("The law firms of Berger &

Montague and [the predecessor of Robbins Geller] were indefatigable.  They represented the Class

with a high degree of professionalism, and vigorously litigated every issue against some of the ablest

lawyers in the antitrust defense bar.").

>               **(2)      Quality of Defendants' Counsel**

Defendants are collectively represented by over a dozen of the nation's foremost antitrust

practitioners, many (if not most) of whom represented their clients in complex antitrust litigation

before this case.  Their knowledge as to the relevant issues and their clients' respective interests is

exhaustive.  Defendants' incentives to draw on their vast resources were perhaps greater in this case

than in any previous one.  *See In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 246

F.R.D. 156, 174 (S.D.N.Y. 2007) ("'The quality of opposing counsel is also important in evaluating

the quality of Class Counsels' work.'") (citations omitted); *In re NASDAQ Market–Makers Antitrust*

*Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (awarding counsel 14 percent of $1 billion settlement

---

[15]        *In re Currency Conversion Fee Antitrust Litig.*, MDL 1409 (S.D.N.Y.) (Robbins Geller and Berger & Montague
as co-lead counsel secured $336 million settlement); *In re Exxon Valdez*, No. A89-095 Civ. (D. Alaska); and *In re Exxon
Valdez Oil Spill Litig.*, No. 3 AN 89 2533 (Alaska Super Ct., 3d Jud. Dist.) (Berger & Montague was co-chair of
plaintiffs' discovery committee and one of four designated trial counsel and Robbins Geller was on plaintiff coordinating
committee in mutli-billion dollar verdict, later reduced to $507.5 million by the Supreme Court); *In re Enron Corp. Sec.
Litig.*, No. H-01-3624 (S.D. Tex.) ($7.227 billion recovery by Robbins Geller); *State of Minnesota ex rel. Humphrey v.
Philip Morris*, No. A05-2540 (MN. State) (Robins Kaplan took tobacco company to trial).

- 20 -

where defendants' counsel included "the nation's biggest and best defense firms operating on a
seemingly unlimited budget over a period of four years").

> **e.    The Fee Request Is Consistent with the Size and Scope
> of the Settlement**

As Professor Silver details in his declaration, sophisticated clients normally pay contingent
fees of 20 percent or more, and plaintiffs in similarly complex litigation routinely pay their counsel
as much as a third of their recoveries.  *See* Ex. 4, Silver Decl. at 28-29; *see generally id.* at 25-34.
Many of the named plaintiffs in this case have agreed in their retainers to pay Class Counsel a third
of their recoveries.  *Id*. at 10 n.11.  And sophisticated securities class plaintiffs with far larger claims
routinely agree to pay their counsel 15 percent.  *Id.* at 33.  As Professor Silver puts it, "Class
Counsel's request for about 10 percent of the recovery is thus at the far low end of the range and is
therefore unquestionably reasonable."  *Id.* at 34.

> **f.    Public Policy Considerations Support the Requested
> Fee**

The number of firms that have the expertise, resources and inclination to lead the prosecution
of cases such as this one is small, as the overwhelming majority of firms with the expertise and
resources lack the inclination by virtue of a defense orientation.  And the number of those plaintiffs'
firms who have proven their willingness and ability to carry such a case through trial is even smaller
yet.[16]  *See In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 359 (S.D.N.Y. 2005) ("In order to
attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants
understand are able and willing to do so, it is necessary to provide appropriate financial incentives.")

---

[16]    *See Exxon Valdez Oil Spill Litigation* (H. Laddie Montague of Berger & Montague, P.C. was one of four
designated trial counsel that achieved record punitive damages award of over $5 billion, later reduced to $507.5 million);
*Hall v. NCAA*, No. 94-2392-KHV (D. Kan.) (Robbins Geller was lead counsel in successful antitrust jury trial); *Jaffe v.
Household Int'l, Inc.*, No. 02-cv-05893 (N.D. Ill.) (Robbins Geller brought securities class action to trial and received a
verdict worth up to $2.5 billion).

831560_1

(quoted in *Merrill Lynch*, 246 F.R.D. at 175); *see also In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 801 (S.D. Tex. 2008) (quoting *WorldCom*, 388 F. Supp. 2d at 359).

### 4. The Requested Fee Is Reasonable in Light of Counsel's Lodestar

#### a. The Review Process Resulted in a Conservative Figure as to Counsel's Hours

Class Counsel began this case well aware that absent wide-ranging case management efforts, the contributions of so many Class Supporting Counsel could lead to duplication of effort and unnecessary expense. To eliminate unnecessary expense and duplication of effort, Class Counsel established firm guidelines for billing, collected monthly time and expense reports, and reviewed those reports on a regular basis. Ex. 1, Undlin Decl. ¶4.

After the Court preliminarily approved the settlement, Class Counsel twice asked Class Supporting Counsel to audit their own time submissions, based on strict criteria, some of which Class Counsel believe to be unprecedented in this context. *Id.* ¶¶6-7. Class Counsel then reviewed the records themselves to determine whether they met the criteria, and imposed rate caps for document review time. *Id.* ¶¶8-9. The purpose and result of this effort has been to present the Court with a lodestar figure that the Court can rely upon even in a case of this magnitude and the large number of firms that prosecuted it. These review procedures and the anticipated follow-up audit by CLA are fully set forth in the Undlin Declaration.

#### b. Counsel's Hourly Rates Are Reasonable

This Memorandum relies on lodestars based on historical hourly rates charged by the billing attorneys at the time they did the work.[17] Those rates are well within the normal range for counsel with the expertise necessary to prosecute a case of this complexity. *See Independent Energy*, 2003

---

[17]   The exceptions to that rule are the hourly rates of contract attorneys, whose time was necessary to review Defendants' massive document production. Those attorneys are billed at four times their hourly wages.

831560_1

WL 22244676, at *8 (approving rates that were "not extraordinary for a topflight New York City law firm"). They are also within (or below) the range that defense counsel most likely charged to their clients in this case.[18]

### c.    The Resulting Multiplier is Reasonable

The Court of Appeals most recently addressed the "percentage of the fund" method for awarding counsel fees in *McDaniel*, in which the court quoted *Goldberger* for the principle that "[t]he level of risk associated with litigation . . . is 'perhaps the foremost factor' to be considered in assessing the propriety of a multiplier." *McDaniel*, 595 F.3d at 424 (citing *Goldberger*, 209 F.3d at 54). The risk undertaken by Class Plaintiffs' counsel in this case was at highest level, by virtue of their extraordinary investments of time and money, as well as the novel and formidable issues unique to the case. Class Plaintiffs' counsel's request—which seeks a multiple of approximately 4.5 times the lodestar—falls within any range that might govern it. *See, e.g.*, *Enron*, 586 F. Supp. 2d at 803 ("[A] multiplier of 5.2 is warranted, given the unmatched size of the [$7.2 billion] recovery, the obstacles and risks faced by [counsel] from the beginning, and the skill and commitment exhibited by counsel.").[19] *See also Vitamin C*, 2012 WL 5289514, at *10 ("'[i]n this district alone, there are scores of common fund cases where fees alone . . . were awarded in the range of 33-1/3% of the settlement fund' and observing that lodestar multiples of between 3 and 4.5 had 'become common'") (quoting *In re Lloyd's Am. Trust Fund Litig.*, No. 96 Civ. 1262, 2002 WL 31663577, at *26-*27

---

[18]     Many courts in this Circuit use current rates to calculate the lodestar figure. *See, e.g., Velez v. Novartis Pharms. Corp.*, No. 04 Civ. 09194, 2010 WL 4877852, at *23 (S.D.N.Y. Nov. 30, 2010) (quoting *In re Veeco Instruments Inc. Sec. Litig.*, No. 05MDL01695, 2007 WL 4115808, at *9 (S.D.N.Y. Nov. 7, 2007)). Class Counsel relies here on relatively conservative historical rates, but note that application of current rates is instructive.

[19]     *See also Enron*, 586 F. Supp. 2d at 799 ("'[T]here has been a general recognition that multipliers in the range of 3 to 4.5 have become relatively "common"' in cases with recoveries over $1 billion.") (quoting report of expert whose recommendation the court adopted).

- 23 -

(S.D.N.Y. Nov. 26, 2001)). *See also In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, No. 02 Civ. 5575, 2006 WL 3057232, at *27 (S.D.N.Y. Oct. 25, 2006) (citing *NASDAQ*, 187 F.R.D. at 489).[20]

## B.    Class Counsel's Expenses Are Reasonable

Class Plaintiffs' counsel maintained substantial incentives to control out-of-pocket expenses in this case due to the high risk they would not be reimbursed, and due to the virtual certainty that it would be years before they could be recouped. Despite that, Class Plaintiffs' counsel's expense reports have been subjected to an exhaustive audit process comparable to that to which the time records have been subjected. *See* Ex. 1, Undlin Decl. ¶¶6-7.

"'Courts in the Second Circuit normally grant expense requests in common fund cases as a matter of course.'" *Vitamin C*, 2012 WL 5289514, at *11 (quoting *In re Arakis Energy Corp. Sec. Litig.*, No. 95CV3421, 2001 WL 1590512, at *17 n.12 (E.D.N.Y. Oct. 31, 2001)). As in *Vitamin C*, all of the expenses in this case of a type normally incurred in complex actions. 2012 WL 5289514, at *11. *Cf.* Ex. 1, Undlin Decl., Ex. B. There is no reason to depart from the standard practice in this case.

## C.    Class Plaintiffs are Entitled to Incentive Awards and Reimbursement for Their Expenses

Counsel seek incentive awards for the Class Plaintiffs totaling $1.8 million—less than 0.03 percent of the cash settlement. *See Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 203 (S.D.N.Y. 1997) (awarding cash incentives totaling 0.18 percent of the settlement, even where one was "an upward departure from cited precedent"). Several Class Plaintiffs[21] sat for multiple days of deposition

---

[20]    The Settlement Agreement provides that Class Counsel shall allocate any fees awarded among Class Plaintiffs' counsel. *Id.* ¶ 92. The Court therefore need not be burdened with that task.

[21]    In this context, "Class Plaintiffs" is defined by the Settlement Agreement, *i.e.*, "the following plaintiffs named in the Operative Class Complaints in MDL 1720: Photos Etc. Corporation; Traditions, Ltd.; Capital Audio Electronics, Inc.; CHS Inc.; Crystal Rock LLC; Discount Optics, Inc.; Leon's Transmission Service, Inc.; Parkway Corp.; and Payless ShoeSource, Inc." *Settlement Agreement*, ¶1(m).

831560_1

and/or invested substantial hours in producing millions of pages of documents—efforts that far exceed what is typical for named plaintiffs.  Exs. 6-15.[22]  But they did more than merely comply with their discovery obligations.  They traveled to attend meetings of all class representatives and class counsel; they traveled to attend mediation sessions, both before the mediators and with the Court; and in the settlement process, they reviewed and commented on draft settlement proposals. *Id*.  That contribution exceeds what is typical of named plaintiffs, in cases that settle primarily for cash.

## IV.    CONCLUSION

For all of the reasons detailed in this Memorandum, Class Counsel respectfully request that the Court grant Class Plaintiffs' Joint Motion for Award of Attorneys' Fees, Expenses and Class Plaintiffs' Awards.

DATED:  April 11, 2013                    BERGER & MONTAGUE, P.C.
                                          H. LADDIE MONTAGUE, JR.
                                          MERRILL G. DAVIDOFF
                                          BART D. COHEN
                                          MICHAEL J. KANE


                                              s/ H. Laddie Montague, Jr.
                                          H. LADDIE MONTAGUE, JR.

                                          1622 Locust Street
                                          Philadelphia, PA  19103
                                          Telephone:  215/875-3000
                                          215/875-4604 (fax)

---

[22]     Attached hereto as Exhibits 6 through 15 are the declarations of the Class Representatives in the following order:  Capital Audio Electronics, Inc. (Abraham Harari), Parkway Corporation (Howard Trachtman), Parkway Corporation (Robert Zuritsky), Discount Optics, Inc. (Deborah Opper), Crystal Rock LLC (Peter Baker), Leon's Transmission Services, Inc. (Vincent Archer), Payless ShoeSource, Inc. (Miguel R. Rivera and Jay Andrews), Photo Etc. (Mitch Goldstone), Traditions (Michael Schuman), and CHS Inc. (Michael MacDonald).

ROBINS, KAPLAN, MILLER &
  CIRESI L.L.P
K. CRAIG WILDFANG
THOMAS J. UNDLIN
RYAN W. MARTH


<u>       s/ K. Craig Wildfang       </u>
K. CRAIG WILDFANG

2800 LaSalle Plaza
800 LaSalle Avenue South
Minneapolis, MN  55402-2015
Telephone:  612/349-8500
612/339-4181 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
PATRICK J. COUGHLIN
BONNY E. SWEENEY
DAVID W. MITCHELL
ALEXANDRA S. BERNAY


<u>       s/ Bonny E. Sweeney       </u>
BONNY E. SWEENEY

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Co-Lead Counsel for Plaintiffs

831560_1