UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

IN RE PAYMENT CARD
INTERCHANGE FEE AND
MERCHANT DISCOUNT
ANTITRUST LITIGATION

MDL Docket No. 1720

MASTER FILE NO.
1:05-md-1720-JG-JO

**NATIONAL RETAIL FEDERATION STATEMENT OF OBJECTION
TO FINAL APPROVAL OF THE PROPOSED RULE 23(B)(2) AGREEMENT**

EMERY CELLI BRINCKERHOFF AND ABADY LLP
Andrew G. Celli, Jr.
Diane L. Houk
Adam R. Pulver
75 Rockefeller Plaza, 20th Floor
New York, NY 10019
(212) 763-5000

*Attorneys for National Retail Federation*

DATED:  May 28, 2013

## TABLE OF CONTENTS

PAGE NO(s).

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT .............................................................................................................6

    I.     The Proposed Settlement Does Nothing to Alter Visa's and
         MasterCard's Dominance in the Credit Card Acceptance Market ............ 8

    II.    The Proposed Settlement Fails To Address the High Cost
         of Interchange ............................................................................... 11

    III.   The Rule 23(b)(2) Release Improperly Immunizes the Networks ........... 13

    IV.   The "Consideration" Afforded to the Rule 23(b)(2) Class
         Is Illusory and Thus, Inadequate ................................................... 15

         A.     The Surcharging Provision .......................................................16

         B.     The All-Outlets Provision .........................................................20

         C.     The Bona Fide Purchasing Group Provision ...............................22

CONCLUSION...............................................................................................25

EXHIBITS

Declaration of Steven I. Sadove, Chairman of the Board of Directors of the
    National Retail Federation
       Dated May 24, 2013.................................................................Exhibit 1

Declaration of Mallory Duncan, Senior Vice-President and General Counsel
    of the National Retail Federation
       Dated May 23, 2013.................................................................Exhibit 2

Declaration of Neiman Marcus, Inc.
       Dated May 21, 2013.................................................................Exhibit 3

Declaration of Brooks Brothers Group, Inc.
       Dated May 22, 2013.................................................................Exhibit 4

Declaration of Talbots, Inc.
       Dated May 21, 2013.................................................................Exhibit 5

Declaration of Gap Inc. d/b/a Gap, Gap Outlet, Banana Republic, Banana
    Republic Factory Stores, Old Navy, Piperlime, Athleta, and Intermix
       Dated May 20, 2013.................................................................Exhibit 6

Declaration of Tiffany & Company
      Dated May 21, 2013................................................................Exhibit 7

Declaration of Estée Lauder Companies Inc.
      Dated May 20, 2013................................................................Exhibit 8

Declaration of Euromarket Designs, Inc., d/b/a Crate & Barrel and CB2, and
      Meadowbrook LLC, d/b/a The Land of Nod
      Dated May 21, 2013................................................................Exhibit 9

Declaration of J. Crew Group, Inc.
      Dated May 22, 2013................................................................Exhibit 10

Declaration of Domino's Pizza LLC
      Dated May 16, 2013................................................................Exhibit 11

Declaration of New York & Company, Inc.
      Dated May 22, 2013................................................................Exhibit 12

Declaration of Express, Inc.
      Dated May 22, 2013................................................................Exhibit 13

Declaration of Sonic Corp.
      Dated May 17, 2013................................................................Exhibit 14

Declaration of Brookstone Company, Inc.
      Dated May 20, 2013................................................................Exhibit 15

Declaration of Belk, Inc.
      Dated May 14, 2013................................................................Exhibit 16

Declaration of rue21, Inc.
      Dated May 20, 2013................................................................Exhibit 17

Declaration of Destination XL Group, Inc.
      Dated May 16, 2013................................................................Exhibit 18

Declaration of Pacific Sunwear of California, Inc.
      Dated May 17, 2013................................................................Exhibit 19

Declaration of Dave's Pet City
      Dated May 22, 2013................................................................Exhibit 20

Declaration of Lipert International Inc. d/b/a Keith Lipert Gallery
      Dated May 21, 2013................................................................Exhibit 21

## PRELIMINARY STATEMENT

The National Retail Federation ("NRF") is the nation's largest retail trade association. The NRF represents merchants of all types and sizes, from large department store chains, to small Main Street single-location operations.[1] As the voice of retailers large and small, and the umbrella organization for segment-specific retail trade associations across the United States, the NRF develops and articulates policy positions on behalf of the industry through education, advocacy, and litigation efforts.

Like the millions of retailers it represents, the National Retail Federation is a merchant and a member of the Rule 23(b)(2) class.[2] It accepts credit card and debit card transactions and is itself subject to the rules, restrictions, and interchange rates that are imposed on retailers by Visa and MasterCard. The National Retail Federation opposes all aspects of the proposed Class Settlement Agreement and has opted out of the Rule 23(b)(3) portion of the Agreement. However, like its constituent members, it nonetheless will be bound by the proposed Rule 23(b)(2) Class Settlement (the "Settlement") if the Court approves it. The splitting of the overall settlement into two classes – one for relief under Rule 23(b)(2) and one for relief under Rule 23(b)(3) – is an artifice designed to protect the credit card companies on all fronts, and leave the class with no means of escape from the most onerous terms of the Settlement. Pursuant to the direction of its Executive Committee and Board, which is comprised of the CEOs of thirty-six American retail businesses, the National Retail Federation submits this Objection to the Settlement.

---

[1] The NRF's membership includes traditional department stores, specialty, apparel, grocery, quick-service restaurants, discount stores, online, independent, and chain establishments, among others. Ex. 2, ¶2.

[2] The NRF is located at 325 7th Street, N.W., Suite 1100, Washington DC, 20004, 202-783-7971.

Illustrative of the scope of opposition to the Settlement from all segments of the industry, twenty retailers, all NRF members, have submitted declarations in support of this Objection. The supporting declarants represent a cross-section of the American retail industry, from iconic national department store chains and apparel outlets, to specialty shops and restaurants.  Merely to list these declarants is to illustrate the breadth of opposition to the Settlement:  Neiman Marcus, Brooks Brothers, Talbots, The Gap, Tiffany & Company, Estée Lauder, Crate & Barrel, J. Crew, Domino's Pizza, New York & Company, Express, Sonic Drive-In Restaurants, Brookstone, Belk Stores, rue21, Destination XL, and Pacific Sunwear.  Also attached are declarations from the Chief Executive Officer of one of the best-known department stores in the United States – Saks Fifth Avenue – and the proprietors of two small retail businesses, Dave's Soda and Pet City of Agawam, Massachusetts, and The Keith Lipert Gallery of Washington, D.C.  Like the NRF itself, these supporting declarants firmly believe that the proposed Settlement, in all of its aspects, is profoundly inimical to the well being of their businesses, and to the proper functioning of the retail industry as a whole.[3]

The National Retail Federation objects to the proposed Settlement on three fundamental and interconnected grounds.

First, and most importantly, the Settlement fails to address the core evil that motivated this class action, and that continues to plague the industry:  the outsized economic power of, and the manipulation of interchange rates by, Visa, MasterCard, and their constituent banks.   For many years, Visa and MasterCard, in coordination with the banks, set and enforced interchange rates in lockstep fashion.  Rather than competing for

---

[3]So committed are they to the proposition that the proposed Class Action Settlement Agreement is contrary to their interests, each and every one of the supporting declarants have both objected to the Settlement, and opted out of the Rule 23(b)(3) monetary settlement as well.

retailer acceptance of their credit and debit cards based on the price of interchange, as they would in a competitive market, Visa and MasterCard, and each of their member banks, have instead virtually consistently raised rates across the board. Moreover, the networks have insulated themselves and their banks from competitive pressures by forcing retailers to abide by dozens of artificial "acceptance rules" from which there is no escape. These actions have accorded MasterCard and Visa unprecedented market power. By the very conservative estimate of the Kansas City Federal Reserve Bank, Visa and MasterCard control approximately 80% of the credit card market. *See* footnote 6, *infra*; Declaration of Mallory Duncan ("Ex. 2"), ¶13. The overwhelming majority of merchants have no choice but to accept both forms of payment – or risk devastating consumer rejection. *See* Section I, *infra*.

Against this backdrop, the proposed Settlement offers *no* relief on the core issue of collusion over interchange. Unlike settlements and orders in other price-fixing cases, this Settlement makes no pretense at eliminating communication or price coordination between and among competitors alleged to have been in collusion. Neither does it constrain the credit card companies and their bank partners in when, how, or at what level they can set interchange. Rather, the Settlement imposes on retail merchants a mandatory, industry-wide scheme – without the benefit of even a word of legislative, executive, or regulatory-authority input – that, instead of controlling interchange rates, ratifies the networks' pricing practices for all time. *See* Section II, *infra*.

Through the mechanism of the mandatory Rule 23(b)(2) release and covenant not to sue (all, the "Release"), the Settlement would entrench MasterCard's and Visa's duopoly position by immunizing them from damages claims *going forward*. This

3

is the second principal reason that the NRF objects to the Settlement – and it is the single most prevalent complaint voiced to the NRF by its members.  Retailers simply cannot understand how the American system of justice can permit class action lawyers whom they have never met and who know nothing about their business to craft a "settlement" that will preclude them forevermore from seeking redress on future losses, without so much as offering them the opportunity to opt out.  The Release is, in fact, unprecedented and contrary to established law.  But, at a business level, one can certainly understand why MasterCard and Visa would want it:  it gives the credit card networks *carte blanche* to set and manipulate interchange rates going forward without fear of future private suits. *See* Section III, *infra*.  There is nothing that the credit card networks could give that is worth this unbridled loss of control over retailers' front-of-store operations.

Especially in light of the structure of the retail industry and the entrenched status of Visa and MasterCard, the two "rules reforms" and the "promise to negotiate" that are touted as "consideration" for the Release in fact offer retailers little or nothing of value.  This constitutes the NRF's third core objection to the Settlement.  As the supporting declarations make plain, the Settlement's promise of relief through tweaks to the No-Surcharging and the All-Outlets Rules, and the so-called Bona Fide Purchasing Groups Provision, is a hollow one.  *See* Section I.D.1-3, *infra*.  All three forms of "consideration" are illusory.

First, it is not a solution to price-fixing to suggest that a fixed, supra-competitive price be passed onto consumers; that is precisely what the Settlement's Surcharging Provision purports to do.  Far from putting a brake on high interchange rates, the Surcharging Provision simply passes along the costs—with no direct or discernible

impact on interchange itself.  Moreover, as a practical matter, most retailers will not be

able to surcharge, regardless of the Settlement.  For instance, millions of small retailers

(like Dave's Soda and Pet City of Massachusetts) operate solely in jurisdictions where

credit card surcharging is prohibited by state law.  For them, Visa and MasterCard's

agreement to permit limited surcharging offers no relief at all.  For most retailers

operating in many states, surcharging under the Settlement is effectively impossible for

other reasons.  In order to surcharge, retailers must be willing to sacrifice their business

relationship with American Express – which few if any can afford to do.  Even then,

surcharging could occur only in states where it is not banned by state law, and only at the

risk of widespread customer dissatisfaction.  Put simply, this Settlement will *not* result in

widespread surcharging, and will have *no* meaningful impact on the status quo.  *See*

Section IV(A), *infra*.

Likewise, the Settlement's All-Outlets Provision merely tinkers with the

credit card companies' long standing All-Outlets Rule, and would have little practical

impact.  Although the Provision would allow a retailer to choose to accept or decline

credit card products at different "banner" stores under its ownership, for the vast majority

of American retailers, who operate under a *single* "banner," this is a nicety, not a real

change.  For them, the Settlement's All-Outlets Provision is every bit as restrictive and

anti-competitive as the pre-settlement Rule.  And for that minority of retailers who do

operate under multiple "banners," the prospect of eliminating acceptance of one major

credit card at one "banner" but not at other "banners" is a mirage.  MasterCard and Visa's

raw market power *mandates* that retailers accept both cards, and, to make matters worse,

the new rule as written does not permit the type of market testing necessary to determine

whether it would be possible for retailers to survive without one or the other.  *See* Section IV(B), *infra*.

Finally, the Settlement's Bona Fide Purchasing Group Provision is an empty promise.  So deeply embedded is the culture of monopoly in this industry that Visa and MasterCard seem to expect retailers to stand up and applaud at their newfound willingness to sit down and negotiate in good faith.   And that is all that the Bona Fide Purchasing Group provision requires.  Under the Bona Fide Purchasing Group Provision, MasterCard and Visa need not yield an inch on interchange, or on any other restrictive rule, in their talks with retailers.  Nor would they have the slightest incentive to do so.  With perpetual immunity from suit, and unchallenged dominance of the credit card payment market, Visa and MasterCard can be expected to behave the same in a post-Rule 23(b)(2) Settlement world as they behaved in the pre-settlement one – or maybe worse.  *See* Section IV(C), *infra*.

For these reasons and more, the National Retail Federation objects to the preliminary Class Action Settlement Agreement in its entirety and provides this Statement of Objection to the Rule 23(b)(2) Settlement.  The National Retail Federation respectfully asks this Court to find that the Rule 23(b)(2) Settlement is not lawful, fair, or adequate.

## ARGUMENT

The district court may not approve a class action settlement unless it finds that the proposed settlement is "substantively fair."  *See, e.g.*, *Authors Guild v. Google, Inc.*, 770 F. Supp. 2d 666, 674 (S.D.N.Y. 2011); *Blessing v. Sirius XM Radio Inc.*, No. 11-3696-CV, 2012 WL 6684572 (2d Cir. Dec. 20, 2012).  In reviewing a proposed settlement, the Court is acting as a fiduciary of the class, and "is subject therefore to the

high duty of care that the law requires of fiduciaries." *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 280 (7th Cir. 2002); *see also Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 22 (2d Cir. 1987). "When a settlement is negotiated prior to class certification, as is the case here, it is subject to a higher degree of scrutiny in assessing its fairness." *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (citations omitted); *see also In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011); *Karvaly v. eBay, Inc.*, 245 F.R.D. 71, 86 (E.D.N.Y. 2007).[4]

While it is true, as a general matter, that public policy favors settlement, "class actions that are essentially hollow should be avoided so that the public retains or grows its confidence in class actions and the legal system." *City of Livonia Employees' Ret. Sys. v. Hanson*, 238 F.R.D. 476, 482 (D.S.D. 2006). The Rule 23(b)(2) Settlement here is hollow indeed. At its core, it fails to address the most problematic practice at issue in the case – i.e., the fixing of interchange rates; it cuts off class members' forward-looking rights to address that practice and its effects through private litigation; and it offers members of the Rule 23(b)(2) class limited or no relief at all in return. *Parker v. Time Warner Entm't Co., L.P.*, 239 F.R.D. 318, 337 (E.D.N.Y. 2007) ("a total lack of value exchanged for a release of claims is a strong indicator that a settlement is unfair, at least with respect to those disadvantaged members of the class").

---

[4]On a motion for approval of a settlement, "the burden is on the settlement proponents to persuade the court that the agreement is fair, reasonable, and adequate for the absent class members who are to be bound by the settlement." *In re Katrina Canal Breaches Litig.,* 628 F.3d 185, 196 (5th Cir. 2010) (citing 4 Newberg on Class Actions § 11:42 at 118). The fact that a court preliminarily approved a settlement, as the Court has here, *see* Doc. No. 1745, does not preclude a finding that the settlement is unfair or otherwise deficient on a motion for final approval, as "[t]he standards for preliminary approval of a class settlement are not as stringent as those applied for final approval." *In re Motor Fuel Temperature Sales Practices Litig.*, MDL 1840, 2011 WL 4431090, at *5 (D. Kan. Sept. 22, 2011) (citing *Karvaly*, 245 F.R.D. at 86). The Court explicitly acknowledged this at the Preliminary Approval Hearing. *See* Trans. at 61:9-62:23.

From the perspective of the National Retail Federation, what the Class Plaintiffs have agreed to is not a settlement; it is surrender.  The proposed Rule 23(b)(2) Settlement is not fair, reasonable, or adequate.  This Court, as a fiduciary of the absent class members, should reject it.

## I.      The Proposed Settlement Does Nothing to Alter Visa's and MasterCard's Dominance in the Credit Card Acceptance Market

The National Retail Federation's Objection to the Settlement is grounded in the practical experience of America's retailers.  For decades, retailers have been forced to operate in an environment where two major credit card networks controlled by the nation's largest banks have dominated the U.S. card market.   The Settlement will effectively ratify that dominance for all time, while offering retailers virtually nothing of practical significance in return.

The market for credit card acceptance in the United States is marked by three immutable features:  *first*, that Visa and MasterCard dominate the market; *second*, that interchange – the fees that merchants pay to issuing banks on each credit card transaction – which is set by Visa and MasterCard, has consistently risen over time for no discernible reason other than that they have the power to raise it; and, *third*, that as interchange has risen, Visa and MasterCard have resisted the efforts of retailers to negotiate for lower rates, and worked to enforce a raft of rules that restrict retailer choice.  Whether these and other factors amount to an anti-trust violation is not the focus of this

Objection; that these conditions *exist*, and will *persist* unchecked under the Settlement's quasi-regulatory regime, is.[5]

The status of Visa and MasterCard as dominant forces in the U.S. credit card market is beyond cavil.  Reliable studies show that approximately 80% of all credit card transactions that take place in this country are conducted with plastic cards bearing the logo of one of the two credit card giants.[6]  Payment card acceptance is a huge business – consumers spent more than a trillion dollars on credit cards in 2012 – and the impact of interchange rates upon retailers is immense.  Using the average interchange rate of 2% per transaction, in the last year alone, retailers paid more than $40 billion in interchange fees.  Declaration of Stephen I. Sadove ("Ex. 1"), ¶6; Ex. 2, ¶11.[7]  Historically, interchange fees represent one of the largest, often the second or third largest, operating expenses for U.S. retailers after payroll.  Ex. 1, ¶6; Ex. 2, ¶11; Declaration of Keith Lipert Gallery ("Ex. 21"), ¶2.

High interchange is not an outlier phenomenon.  Interchange rates in the United States have consistently risen over time.[8]   With rare exceptions over the last

---

[5]Moreover, there is a lack of transparency built into the very process of charging interchange which is done per transaction with more than a dozen various applicable rates that are only disclosed to the merchant after interchange fees have been charged to the retailer's bank account. Ex. 21, ¶5.

[6] Shy, Ozy and Zhy Wang, *Why Do Payment Card Networks Charge Proportional Fees?,* Federal Reserve Bank of Kansas City, n. 5 (revised January 2010).

[7] *Credit Cards: Rising Interchange Fees Have Increased Costs for Merchants, But Options for Reducing Fees Pose Challenges*, U.S. Government Accountability Office, Nov. 2000, at 16 (showing that Visa and MasterCard interchange rate rose, for different card types, from 22% to 82% during the period 1991 to 2009).

[8]Interestingly, in Australia where regulatory authorities have directly regulated interchange, such rates have declined over time.  Ex. 2, ¶14.

decade, the average amount of interchange collected by Visa and MasterCard has increased 15% annually.   Rising interchange is inexorable.  Ex. 2, ¶14.

As interchange rates have risen, Visa and MasterCard have reinforced their dominant market position by enforcing various rules that restrict retailers' freedom. For example, as a condition of acceptance, these two networks have required retailers to adhere to the Honor All Cards Rules, Regular Price Rules, Non-Discrimination Rules, All-Outlets Rules, and the No-Surcharge Rules.[9]  These Rules make it impossible for retailers to pick and choose among cards depending on interchange rates, to decline to accept particular credit cards in some, but not all, of their locations based on customer demand, or to steer consumers based on the cost of card acceptance.  Such Rules have deprived the retail industry of the very optionality, choice, and freedom to act – or not act – that is the hallmark of a competitive market.  Ex. 2, ¶15.

Lastly, and not surprisingly, having established their position as the must-accept payment method for American retailers, and having reinforced that position through a cartel of banks, Visa and MasterCard, along with  the banks, have refused to deviate from the published interchange rates.  Negotiation over interchange is all but unheard of.  In its place, the networks' conduct and Rules create a Hobson's choice for retailers: accept Visa's and MasterCard's interchange rates as published from every bank in the country, for all locations, or be shut out of the market.  Dr. Dean Baker, an economist and the Co-Director of the Center for Economic and Policy Research, said

---

[9]Further reflective of their market power, Visa and MasterCard have radically altered their interpretation of Rules to further expand their impact, and further restrict retailers.  For example, whereas Honor All Cards once meant that a retailer was compelled to accept all cards of one or the other brand, irrespective of the issuing bank, today it means that the retailer must accept all *types* of cards, including the high-interchange "rewards" cards that the networks so heavily promote.

"We have two credit companies, Visa and MasterCard, who comprise almost the entire market. This gives them substantial bargaining power. Few retailers could stay in business if they did not accept both cards." Dean Baker, *How Credit Card Companies Want to Debit You,* The Guardian, Mar. 30, 2011. *See also* U.S. Government Accountability Office (November, 2009) *Credit Cards: Rising Interchange Fees Have Increased Costs for Merchants but Options for Reducing Fees Pose Challenges* (Publication No. GAO-10-45) ("As more consumers demand to use Visa and MasterCard cards, merchants feel limited in their ability to refuse these cards even as interchange fee rates rise or as consumers increasingly use rewards cards that have higher interchange rates.").

## II.     The Proposed Settlement Fails To Address the High Cost of Interchange

Against this backdrop, the Settlement's failure to address the problem of high interchange rates is inexplicable. As the history set forth above makes clear, for years, retailers have suffered under the yoke of increasing and oppressive interchange rates. This class action, purportedly brought on behalf of all American retailers, was aimed at precisely that evil; its very purpose was to address this endemic problem. But the proposed injunctive relief in the Settlement does nothing at all to control interchange. Ex. 1, ¶5. [10] It does not require Visa and MasterCard to lower rates, or to offer discounts or special arrangements, even for a limited period. And it does not address the kinds of conduct – price signaling and coordination, communications between the networks and their bank partners, etc. – that are at the core of any price-fixing conspiracy. Indeed, the Settlement goes to the opposite extreme, expressly disavowing any control over the credit

---

[10]While the Rule 23(b)(3) monetary settlement class will obtain *some* relief for past damages, that relatively modest payment should not be considered when analyzing whether the Rule 23(b)(2) Settlement is fair and adequate.

card networks' most onerous practice: "Nothing in this Class Settlement Agreement," it reads, "shall limit the ability of any [Visa or MasterCard] Defendant to set interchange rates, whether default rates or rates applicable (either by rule or negotiated agreement) to individual merchants, groups of merchants, or merchants trade associations." Settlement, ¶¶51 and 64.

It did not have to be this way. Class actions and government enforcement proceedings aimed at price-fixing routinely result in injunctive relief directly aimed at the conduct at issue, or at least at its immediate effects. Specifically, courts regularly impose injunctions against price-fixing generally, or against specific forms of communication and coordination among competitors. *See, e.g., In re Elec. Books Antitrust Litig.*, No. 11-md-02293, Dkt. No. 278 (S.D.N.Y. Feb. 2, 2013) (injunction entered by court prohibiting defendants from, *inter alia*, coordinating prices or limiting sellers' ability to set prices); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 3:07-md-01827-SI (N.D. Cal. Dec. 23, 2011) (settlement agreement approved by court, enjoining defendants from, *inter alia*, "price fixing, market allocation, [or] bid rigging", including by meeting with other manufacturers to discuss pricing); *Sullivan v. DB Invs., Inc.*, No. 2:04-CV-02819-SRC-TJB, Dkt. No. 122 (E.D. Pa. May 31, 2006) (stipulated settlement approved by court, prohibiting defendant from, *inter alia*, entering into range of exclusivity agreements with third-party producers, or setting or fixing the prices of diamonds sold by third-party producers.)[11] None of those remedies, and nothing like them, appears in this Settlement.

---

[11]*See, also, In re Currency Conversion Fee Antitrust Litig.*, No. 01-MD-1409-WHP, (S.D.N.Y. Aug. 15, 2006), available at http://www.ccfsettlement.com/documents/mdl_1409_settlement_agreement1384141.pdf, (settlement agreement, approved by court, under which defendants agree not to "contract, combine or conspire in violation of United States antitrust laws regarding Foreign Transaction Fees"); *In re New Motor Vehicles Canadian Export Antitrust Litig.*, No. 2:03-md-01532-DBH,

The problem that most directly plagues American retailers is inflated interchange rates caused by the lack of competition. The cartel-like behavior of Visa, MasterCard, and the banks results in U.S. retailers and customers paying the highest interchange fees in the industrialized world. It is at the center of all of the retailers' complaints about the payment system in the United States. The Settlement's failure to engender competition among the banks or to offer retailers any protection from high interchange renders it deeply objectionable to the National Retail Federation, and to the industry as a whole. Ex. 2, ¶17.

### III.    The Rule 23(b)(2) Release Improperly Immunizes the Networks

In contrast to its failure to protect retailers from high interchange, the Settlement is expansive in its protection of Visa and MasterCard from retailers. In a Release consuming nearly ten pages of text, Defendants' Counsel, with the acquiescence of nominal Class Counsel, carefully articulates the many respects in which the credit networks and the banks are relieved of liability, for conduct both in the past and into the future. It is to this aspect of the Settlement – the Release – that the NRF's members have objected most loudly and consistently. Ex. 1, ¶5.

The core of the objection is found at Paragraphs 68(a), (g) and (h) of the Settlement, which expressly provides that all members of the Rule 23(b)(2) class – which means, *all* retailers, including those not yet in existence who have no capacity to object – are barred from suing Visa and MasterCard for the "future effects" of the credit networks' past and future conduct with respect to "interchange rules, interchange fees, or interchange rates." This is permanent immunity for the card networks and their bank

---

Dkt. Nos. 353-5 and 353-6 (D. Me. Apr. 25, 2006) (settlement agreement, approved by court, under which defendants agreed not to form any agreements that violate the Sherman Act).

partners.  Since the Release is the only provision in the Settlement where interchange is even mentioned in the context of forward-looking injunctive relief, there is a certain cruel irony to this.  Far from constraining Visa and MasterCard in their price-fixing activities, the Settlement only acts as a restraint on the *retailers*, who are precluded from bringing suit with respect to these matters – *forever*.  Such a provision, if implemented, would allow Visa and MasterCard to engage in the very conduct that precipitated this class action in the first place, without fear of reprisals.  It is deeply unfair and more than the NRF and its members should be asked to bear.[12]

Worse yet, the Release purports to immunize Visa and MasterCard from claims involving not only interchange, but virtually *every* network-created rule set forth in the hundreds of pages that govern the relationship between merchants on the one hand, and the banks and/or MasterCard and Visa on the other.  Settlement, ¶ 68. Plainly, the Release reaches matters far beyond the "*identical* factual predicate" of the claims brought, i.e., the fixing of interchange,[13] and, in that sense, it violates applicable law.  *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 248 (2d Cir. 2011) (quoting *TBK Partners,* 675 F.2d 456, 460 (2d Cir. 1982)).  Because claims involving everything from the networks' No-Discrimination Rules, to their No-Bypass Rules – and even any "similar" rules, s*ee* Settlement, Para. 68(c) and (h) – would undoubtedly require

---

[12] *See* Declaration of Neiman Marcus ("Ex. 3"), ¶14; Declaration of Brooks Brothers ("Ex. 4"), ¶11; Declaration of Talbots ("Ex. 5"), ¶10; Declaration of The Gap ("Ex. 6"), ¶23; Declaration of Tiffany & Company ("Ex. 7"), ¶14; Declaration of Estée Lauder ("Ex. 8"), ¶15; Declaration of Crate & Barrel ("Ex. 9"), ¶23; Declaration of J. Crew ("Ex. 10"), ¶24; Declaration of Domino's Pizza ("Ex. 11"), ¶13; Declaration of New York & Company ("Ex. 12"), ¶12; Declaration of Express ("Ex. 13"), ¶12; Declaration of Sonic Drive-In Restaurants ("Ex. 14"), ¶13; Declaration of Brookstone ("Ex. 15"), ¶13; Declaration of Belk Stores ("Ex. 16"), ¶13; Declaration of rue21 ("Ex. 17"), ¶13; Declaration of Destination XL ("Ex. 18"), ¶13; Declaration of Pacific Sunwear ("Ex. 19"), ¶12; Declaration of Dave's Pet City ("Ex. 20"), ¶10; Ex. 21, ¶18.

[13] *In Re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, Class Settlement Agreement, pp. 1-3 (July 13, 2012).

"proof of further facts" than the facts underlying the settled claim, such claims cannot be released as a matter of law. *TBK Partners*, 675 F.2d at 462. *See also Schwartz v. Dallas Cowboys Football Club, Ltd.*, 157 F. Supp. 2d 561, 577 (E.D. Pa. 2001) (refusing to approve settlement of antitrust class action that included release of claims as to practices that "were not at the core of this class action"). And yet, this is precisely what the Release envisions. So broad a release would present an insuperable obstacle to the future vindication of whatever rights retailers may still have left. For this reason as well, the Release cannot support the Settlement.

Of course, even if a broad release is *permissible*, it must be supported by adequate consideration. *See, e.g., Karvaly,* 245 F.R.D. at 87 (denying approval of settlement, finding that compliance with pre-existing duty insufficient consideration for general release); *Schwartz*, 157 F. Supp. 2d at 578 (finding broad release not justified by limited benefits conferred by settlement). As set out in detail below, the hollow, illusory injunctive relief provided by the Settlement does not even approach such adequacy.

## IV.   The "Consideration" Afforded to the Rule 23(b)(2) Class Is Illusory and Thus, Inadequate

As "consideration" for the Release, the Settlement articulates two "rules changes" and a promise which Defendants' Counsel and nominal Class Counsel contend will benefit the class in both the near and long term. For a host of practical reasons, however, these "reforms" are either useless or unavailable to the great majority of the members of the class. As such, they cannot serve as fair consideration for the very real rights the Rule 23(b)(2) class would be forced to surrender.

A.      **The Surcharging Provision**

The first "rules change" is a limited modification of Visa and

MasterCard's longstanding ban on surcharging.  Under the Settlement's Surcharging

Provision, retailers would be allowed to surcharge credit card transactions, under certain,

tightly-controlled conditions. Settlement, ¶¶ 42(a) and 55(a).  Class Counsel argues that

this change will benefit the class because it will allow retailers to pass on the (high) cost

of interchange to their customers.

But, in the fiercely competitive and un-concentrated retail market, where

margins average just 2% and a lost customer today usually means a lost customer forever,

retailers at every level of the industry have uniformly expressed profound reluctance –

indeed, an unwillingness – to risk customer backlash and the attendant lost sales by

surcharging.  Ex. 2, ¶20; Ex. 3, ¶5; Ex. 4, ¶5; Ex. 7, ¶5; Ex. 8, ¶10; Ex. 10, ¶21; Ex. 12,

¶5; Ex. 13, ¶5; Ex. 15, ¶5; Ex. 16, ¶5; Ex. 17, ¶5; Ex. 19, ¶5; Ex. 20, ¶5; Ex. 21, ¶10.  Not

a single one of the nineteen declarant retailers, who hail from a variety of segments and

states, is considering or will consider surcharging; *all* affirm that it is highly unlikely that

they will surcharge.  Ex. 3, ¶9; Ex. 4, ¶8; Ex. 5, ¶7; Ex. 6, ¶¶10, 20; Ex. 7, ¶9; Ex. 8, ¶¶9-

10; Ex. 9, ¶19; Ex. 10, ¶¶9, 21; Ex. 11, ¶5; Ex. 12, ¶5; Ex. 13, ¶7; Ex. 14, ¶7; Ex. 15, ¶7;

Ex. 16, ¶7; Ex. 17, ¶7; Ex. 18, ¶7; Ex. 19, ¶7; Ex. 20, ¶7; Ex. 21, ¶13.

Even if retailers were willing to surcharge, in large swaths of the country,

they are not allowed to do so.  As of May 2013, eleven states – including the four most

populous ones – prohibit the surcharging of credit card transactions as a matter of state

law:  California, Colorado, Connecticut, Florida, Kansas, Maine, Massachusetts, New

York, Oklahoma, Texas, and Utah.[14]  An additional seventeen states have indicated that

they are considering similar bans, now and in the future.  *See, e.g.*, K. Wack, "18 States

Considering Bans on Credit Card Surchargers," *American Banker*, Mar. 28, 2013.[15]  Ex.

2, ¶20.  The fact that so many state legislatures have expressed their antipathy toward

surcharging cannot be ignored.  In all events, it is indisputable that retailers operating in

no-surcharging states will derive *no* benefit from the Surcharging Provision of the

Settlement.

        Hardest hit by these state-law bans are exactly the sorts of merchants this

Court should be most concerned to protect: small and regional retailers who operate

exclusively in no-surcharging states.  Take Dave Ratner, for example.  Thirty-eight years

ago, Mr. Ratner founded Dave's Soda and Pet City, a small store carrying,

unsurprisingly, soda pop and pet supplies.  Today, he is the sole proprietor of a "mini-

chain" with seven locations in Massachusetts and Connecticut.  Ex. 20, ¶2.  Like many

other small retailers, Dave's Pet City will never surcharge its customers for credit card

use – because he cannot.  Both Massachusetts and Connecticut have outlawed the

practice.  Ex. 20, ¶¶5-6.  For Mr. Ratner, and the millions of others like him, the

Settlement's surcharging "relief" is no relief at all.  Ex. 2, ¶¶20-21.

---

[14]*See* Cal. Civ. Code § 1748.1(a); Colo. Rev. Stat. Ann. § 5-2-212(1); Conn. Gen. Stat. Ann. § 42-133ff(a); Fla Stat. Ann. § 501.0117(1); Kan. Stat. Ann. § 16a-2-403; Maine Rev. Stat. Ann. tit. 9-A § 8-303(2); Mass. Gen. Laws Ann. ch. 140D, §28A(a)(2); N.Y. Gen. Bus. Law § 518; Okla. Stat. Ann. tit. 14A, §§ 2-417; Tex. Fin. Code Ann. § 339.001(a); Utah Code Ann. 13-38a-302 (enacted  April 2013). Mississippi has also recently passed a statute prohibiting the imposition of surcharges on purchases made using state-issued credit or other purchasing cards. *See* Miss. H.B. No. 964.

[15]Available at http://www.americanbanker.com/ issues/178_61/18-states-considering-bans-on-credit-card-surcharges-1057901-1.html (written prior to Utah's adoption of ban).

The state-law prohibitions significantly impact larger merchants as well. The eleven no-surcharging states represent more than 40% of the U.S. population, and a huge quantum of credit card transactions – certainly millions of transactions worth billions of dollars annually – occur in those states. Ex. 2, ¶21. Whether it is Neiman Marcus or Domino's, Brooks Brothers or Pacific Sunwear, Express or Estée Lauder, multi-state retailers doing business in those states where state law forbids surcharging will not be able to take advantage of the Surcharging Provision on any of those transactions.[16]  Ex. 3, ¶¶5-6; Ex. 4, ¶6; Ex. 5, ¶6; Ex. 6, ¶¶15-19; Ex. 7, ¶6; Ex. 8, ¶7; Ex. 9, ¶¶15-17; Ex. 10, ¶¶16-19; Ex. 11, ¶6; Ex. 12, ¶6; Ex. 13, ¶6; Ex. 14, ¶6; Ex. 15, ¶6; Ex. 16, ¶6; Ex. 17, ¶6; Ex. 18, ¶6; Ex. 19, ¶6; Ex. 20, ¶6.

There is a further limitation on surcharging that undermines any benefit that the Surcharging Provision might afford to merchants. The Surcharging Provision requires merchants who impose surcharges on Visa and MasterCard transactions to surcharge "Competitive Credit Card Brands" whose interchange rates are the same or higher than Visa's or Mastercard's. *See* Settlement ¶¶ 42(a)(iv); 42(b)(iv); 55(a)(iv); 55(b)(iv). This means that, in order to surcharge Visa or MasterCard, merchants who also accept American Express, the third largest credit card network in the U.S., must also surcharge American Express according to its surcharging rules. *Those* rules, in turn, require that the merchants who wish to surcharge American Express transactions must also surcharge all other non-cash/non-check payment methods. American Express Merchant Reference Guide (April 2013), ¶ 3.2. This *includes* general-purpose debit

---

[16]The implicit suggestion that surcharging in *some* states will drive down interchange in *all* states rests on the false premise that Visa and MasterCard will always rely on *national* interchange tables. There is nothing in the Settlement, or in the law, that mandates national tables, and nothing that forbids state-by-state tables that would effectively isolate the impact on surcharge to those few states where it might occur.

products.  Retailers have been particularly reluctant to surcharge debit, which is the cheapest form of payment card and one that retailers seek to encourage.  Ex. 2, ¶22.

For the millions of merchants who accept both American Express and one or both of the two dominant credit networks, the interplay of the Settlement's artfully drafted terms and American Express' rules presents them with a stark choice: drop American Express (to avoid *its* rules) in order to surcharge Visa and MasterCard credit (but not debit), or keep American Express and forgo surcharging altogether.   As a practical matter, it's an easy choice.  As the supporting declarants attest, retailers "need" to accept American Express, which represents up to 30% of their credit card transactions, and will forgo surcharging entirely in order to do so.  Ex. 3, ¶7; Ex. 4, ¶7; Ex. 5, ¶7; Ex. 6, ¶¶11-13; Ex. 7, ¶7; Ex. 8, ¶8; Ex. 9, ¶¶11-13; Ex. 10, ¶¶11-12; Ex. 11, ¶7; Ex. 12, ¶7; Ex. 13, ¶7; Ex. 14, ¶7; Ex. 15, ¶7; Ex. 16, ¶7; Ex. 17, ¶7; Ex. 18, ¶7; Ex. 19, ¶7; Ex. 21, ¶13.

Lastly, even the administrative rules surrounding the Surcharging Provision create unreasonable barriers to surcharging.  Pursuant to Paragraphs 42(c) and 55(c) of the Settlement, a retailer wishing to surcharge credit cards must notify the relevant card network, Visa or MasterCard, in writing, thirty days before imposing a surcharge.  This thirty-day delay sharply inhibits a retailer's flexibility in the marketplace, where, despite the best-laid plans, market conditions may dictate changes in pricing on a weekly or daily basis, and in some markets, on a per-transaction basis.  Ex. 2, ¶24; Ex. 21, ¶10.   There is no conceivable neutral justification for the 30-day notice

rule; it is simply another way in which the consideration afforded retailers under the Settlement is rendered less valuable in the real world.[17]

Put simply, the Surcharging Provisions of the Settlement are an empty promise. In the first place, surcharging is no remedy to the millions of retailers who operate in one or more of the eleven no-surcharging states, and as many as seventeen more. To be sure, in those states where surcharging is allowed, a handful of competitively-protected merchants – like doctors' offices or departments of motor vehicles – may surcharge. But, because surcharging carries such a stigma with customers, and imposes so high a cost on retailers (in part because it would disqualify American Express acceptance, and in part because of the pointless but mandatory delay associated with providing 30-days notice to the networks of a retailer's intent to surcharge), it does not represent meaningful consideration for the Settlement overall.

## B.     The All-Outlets Provision

Like the Surcharging Provision, the Settlement's modification of Visa's and MasterCard's All-Outlets Rules is of virtually no utility in the real world. Historically, under the networks' All-Outlets Rule, retailers were forced to accept Visa-branded or MasterCard-branded cards at *every* location ("all outlets") operated by the same enterprise or at none at all. Whatever else might be said of the All-Outlets Rules, they plainly restrained retailer choice. Retailers simply were not permitted to accept a credit card in one outlet, but decline to accept the same brand in another.

---

[17]Adding insult to injury, Suntrust Bank has already notified its retailer customers that if the Settlement is approved by the Court and the retailer should decide to surcharge which according to the settlement obligates the retailer to clearly disclose the surcharge amount on each transaction receipt, Suntrust will not implement support for this "enhancement" due to the complexity and cost of implementing an electronic infrastructure that complies with the Settlement's requirements. Ex. 21, ¶12.

The Settlement represents a crack in the former rule, but one that hardly any members of the class can meaningfully exploit. The Settlement's All-Outlets Provision states that a retailer who operates stores under different trade names or "banners" may accept a credit card at stores under one of its "banners," while declining to accept the same card at stores under a different "banner." Settlement, ¶¶ 41and 54. Of course, the vast majority of retailers – as large and as well known as Brooks Brothers or Domino's Pizza, and as small and as local as Dave's Pet City and the Keith Lipert Gallery – are ineligible for banner-level partial acceptance by its terms, because either they have only one location, or because all of their locations operate under the same "banner." Ex. 2, ¶26; Ex. 4, ¶9; Ex. 7, ¶11; Ex. 11, ¶10; Ex. 14, ¶10; Ex. 15, ¶10; Ex. 16, ¶10; Ex. 17, ¶10; Ex. 18, ¶10; Ex. 19, ¶9; Ex. 20, ¶8; Ex. 21, ¶15. Most retailers operate under a single brand or "banner;" in fact, they spend many millions in advertising dollars to create customer loyalty to a particular store brand. For the overwhelming majority of retailers, unless they are willing to abandon that time-honored and highly effective strategy and change the trade names of some of their outlets, which are unlikely, they are no better off with the Settlement, than without it. Ex. 2, ¶26; Ex. 4, ¶9.

For those retailers who do operate under more than one "banner," the All-Outlets Provision is of negligible value.  In a market environment where MasterCard and Visa are the dominant players, capturing approximately 80% of transactions annually, partial acceptance, ultimately, is not a viable option. Ex. 2, ¶13; Ex. 3, ¶11; Ex. 6, ¶21; Ex. 8, ¶12; Ex. 9, ¶20; Ex. 10, ¶22; Ex. 12, ¶10; Ex. 13, ¶9. Neiman Marcus and Estée Lauder, both of whom operate stores under more than one trade name, attest to the phenomenon; given customer expectations and Visa and MasterCard's continuing market

power, they say, "we *must* accept their cards at *all* of our trade names."  Ex. 3, ¶11; Ex. 8, ¶12 (emphases added).

More prosaically, even if there were multi-bannered retailers inclined to consider partial acceptance as a strategy, the All-Outlets Provision would not afford them the flexibility necessary to test whether such an approach could work in the real world. At the "banner" level, the All-Outlets Provision, like the Rule itself, is an all-or-nothing proposition: the retailer must accept a network's cards in all of its same-bannered outlets or in none at all.  The Provision does not permit a retailer to decline to accept a particular credit card brand in just one or two stores within the banner.  Testing a new idea in limited locations is a widely accepted method for retailers to gauge the reaction of real-life customers to an important change in practices, such as payment acceptance.  In light of consumer expectations, testing is critically important if a card brand is to be dropped by a merchant.

For these and other reasons, testing is essential to innovation and change – and the All-Outlets Provision forbids it.  Absent the ability to test, partial acceptance of the sort theoretically permitted under the Settlement is unlikely ever to become a reality. Ex. 2, ¶27; Ex. 3, ¶¶10, 12; Ex. 7, ¶10; Ex. 8, ¶11; Ex. 9, ¶21; Ex. 11, ¶9; Ex. 12, ¶9; Ex. 13, ¶8; Ex. 14, ¶9; Ex. 15, ¶9; Ex. 16, ¶9; Ex. 17, ¶9; Ex. 18, ¶9; Ex. 19, ¶10; Ex. 20, ¶9. The class action lawyers who negotiated this Settlement plainly did not understand that.

C.    **The Bona Fide Purchasing Group Provision**

The Bona Fide Purchasing Group Provision is a fig leaf designed to cover the Settlement's most profound deficiencies.  Settlement, ¶¶ 43 and 56.  Nominal Class Counsel contends that, while the Settlement imposes no direct control over interchange,

22

merchants can achieve relief through the Bona Fide Purchasing Group Provision.[18]

Likewise, they say, where the Settlement fails to protect merchants from more onerous

Visa and MasterCard rule changes after 2021, the Bona Fide Purchasing Group Provision

is there as a safety net.  For whatever oppressive tactics or dangers the retail industry may

encounter, it would seem, the answer can be found in the newly-won ability of retailers to

organize into purchasing groups and negotiate with the credit card giants.

        Of course, the concept of negotiating through groups of retailers is hardly

a new idea.  The only thing that stood in the way of group negotiations historically was

MasterCard and Visa's self-imposed and anti-competitive refusal to engage in them.  Ex.

3, ¶13; Ex. 4, ¶10; Ex. 5, ¶9; Ex. 7, ¶13; Ex. 8, ¶14; Ex. 9, ¶22; Ex. 10, ¶23; Ex. 11, ¶12;

Ex. 13, ¶11; Ex. 14, ¶12; Ex. 15, ¶12; Ex. 16, ¶12; Ex. 17, ¶12; Ex. 18, ¶12; Ex. 19, ¶11;

Ex. 21, ¶16.  That refusal was based on the networks' market power – a power that will

remain unchallenged (and unchallengeable) should the Settlement be approved.  Thus,

even as Visa and MasterCard say they are ready to accept the *idea* of negotiating with

groups of merchants, the Settlement leaves in place the condition that renders such

negotiations pointless: Visa and MasterCard's ability to dictate interchange rates.  If there

was any doubt as to the credit card networks' intentions going forward on this critical

issue, Paragraphs 51 and 64 of the Settlement would put it to rest:   "Nothing . . . shall

limit the ability of any [Visa and MasterCard] Defendant to set interchange rates."

Indeed.

        Even de-contextualized from market conditions, and taken on its own

terms, the Bona Fide Purchasing Group Provision offers cold comfort to retailers.  To be

---

[18]  Memorandum in Support of Class Plaintiff's Motion for Final Approval of Settlement, pp. 34-35 (April 11, 2013).

23

sure, the networks' willingness to entertain a negotiation is a promised departure from past practice, where such group negotiations almost never occurred.  But, far from creating a process or environment that requires real compromise, the Provision emphasizes the networks' "discretion" to "reject" any proposal made in negotiations. Settlement, ¶¶ 43 and 56.  The Settlement contains no minimum criteria, conditions, or standards for the networks' behavior or substantive flexibility in negotiations, and it is bounded only by the elastic principle of the networks' "good faith."  *Id*.  Having afforded Visa and MasterCard broad "discretion" on whether to agree to *anything*, the Bona Fide Purchasing Group Provision offers retailers nothing of substance.  It is, to use the word found in the case law, a hollow provision.

Finally, and not surprisingly, the Provision lacks an enforcement mechanism sufficient to bring the networks to heel.  Instead of allowing retailers who believe they have been trifled with to sue for damages in a court convenient to them – the customary process and remedy for a contract breach – the Settlement limits the merchants to seeking "declaratory relief" from this Court and only as to whether the network negotiated in good faith.  Settlement, ¶¶ 43 and 56.  Creating a further disincentive for retailers to enforce what meager rights this Provision grants, the Settlement permits fee-shifting against the merchants in the event they sue for declaratory relief in court and lose.  *Id*.  With no damage award to gain, and the risk of crippling attorneys' fees hanging over their heads, one can hardly imagine a small group of retailers seriously contemplating a proceeding to enforce this Provision.

The Bona Fide Purchasing Group Provision, on its own or in combination with the two "rules changes," is not sufficient consideration for the Release that is at the center of the Settlement.

**CONCLUSION**

For the reasons set forth above and in the accompanying declarations, and for those reasons raised by the other Objectors, the National Retail Federation respectfully requests the Court deny final approval of the Rule 23(b)(2) Settlement.

Dated:  May __, 2013
        New York, New York

      EMERY CELLI BRINCKERHOFF & ABADY LLP


      _____/s/_____
      Andrew G. Celli, Jr.
      Diane L. Houk
      Adam R. Pulver
      75 Rockefeller Plaza, 20th Floor
      New York, New York 10019
      (212) 763-5000

      *Attorneys for the National Retail Federation*