# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | MDL Docket No. 1720 (JG)(JO) |

## CLASS PLAINTIFFS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF SETTLEMENT FINAL APPROVAL

K. Craig Wildfang
Thomas J. Undlin
Ryan W. Marth

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Tel: 612–349–8500
Fax: 612–339–4181

Patrick J. Coughlin
Bonny E. Sweeney
David W. Mitchell
Alexandra S. Bernay

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
Tel: 619–231–1058
Fax: 619–231–7423

H. Laddie Montague
Merrill Davidoff
Bart D. Cohen
Michael J. Kane

BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Tel: 215–875–3000
Fax: 215–875–4604

Co-Lead Counsel for MDL 1720 Class Plaintiffs

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................1

II.  ARGUMENT ....................................................................................................4

    A.   The objectors ignore the applicable standard for final approval. ..........4

    B.   The Objectors criticize the settlement for not achieving complete relief, but ignore the risks of litigation and the impact of this settlement, the networks' IPOs, and other reforms. ...................7

        1.   This settlement addresses the core conduct that Class Plaintiffs challenged. ........................................................................8

        2.   The default interchange rules ......................................................10

        3.   The honor-all-cards Rules............................................................13

        4.   The "on us" Rules ........................................................................15

        5.   The multi-issuer and no-bypass Rules.........................................16

        6.   The Objectors downplay the risks of litigation. .........................17

    C.   The relief in the settlement is far more than "adequate." (*Grinnell* factors 7, 8, and 9). ........................................................21

        1.   The cash portion of the settlement easily satisfies the fair, reasonable and adequate test. .................................................21

        2.   The changes to the networks' no-surcharge rules provided valuable benefits for all Class members.....................23

            a.   Surcharging provides merchants valuable leverage. ............................................................................24

            b.   State laws restricting surcharging are limited and subject to constitutional challenge. ...................25

            c.   Level-playing field provisions do not eliminate the value of the surcharging right. ...................29

            d.   Surcharge caps do not significantly limit surcharging benefit.............................................31

e.     Surcharge-disclosure requests are procompetitive and do not justify rejecting the settlement. ..................... 32

f.     Many of the Objectors have previously advocated for the right to surcharge or have taken advantage of loopholes to impose surcharges themselves. ............ 33

g.     Surcharging is not difficult to understand or implement. .......................................................... 34

h.     Professor Hausman's attacks on Dr. Frankel's report in support of the settlement rest on false premises and ignore key data from Australia relating to surcharging. ....................................... 34

3.     The buying-group provisions increase merchants' bargaining power with Visa and MasterCard. ........................... 37

4.     Locking in relief that was first secured in the Durbin Amendment and the DOJ consent decree is valuable to merchants and supports approving the settlement. ................. 40

5.     The settlement allows merchants to experiment with unique acceptance and steering strategies. ................................ 42

D.     The Rule 23(b) (2) Class Settlement release satisfies due-process requirements. ............................................................. 43

1.     The release of future claims does not violate due process ........ 43

2.     The Rule 23(b)(2) Settlement Class does not require an opt-out right. ..................................................................... 47

E.     The releases appropriately bar only claims that were or could have been asserted in this litigation. ....................................... 52

1.     Competitor claims are not released. ............................... 59

2.     Foreign claims are not released. .................................... 60

3.     Claims based on emerging technologies are not released. ....... 60

4.     The release does not require an end date. ................................. 63

F.     The Rule 23(b)(2) Settlement Class is cohesive. ....................................... 64

G.    The Class Plaintiffs are adequate representatives .................................. 68

    1.    Class Plaintiffs' interests converge with these of the merchant class. ................................................................ 68

    2.    The inclusion of American Express's merchant business in the class does not defeat representativeness. ......................... 71

H.    The settlement negotiation process was fair. .......................................... 72

I.    The reaction of the Classes supports final approval............................. 74

J.    Other objections lack merit....................................................................... 76

    1.    The notice in this case meets the standards of due process. ................................................................................. 76

    2.    The settlement is procedurally fair. ............................................... 79

    3.    Discover's objection demands a solution to a problem of its own creation. ................................................................. 79

    4.    The timing of the 8-month interchange reduction fund is most beneficial to merchants......................................................... 80

    5.    Health insurers' objections are speculative................................. 81

    6.    The releases do not bar claims by states acting in their sovereign capacity. ......................................................................... 84

    7.    The plan of allocation should be approved. ................................ 84

    8.    The settlement is superior to the *VisaCheck* settlement this Court approved in 2003......................................................... 85

III.    CONCLUSION..................................................................................................... 86

# TABLE OF AUTHORITIES

**CASES**

*Albertson's Inc. v. Amalgamated Sugar Co.*,
   503 F.2d 459 (10th Cir. 1974) ............................................................. 67

*Amchem Products, Inc. v. Windsor*,
   521 U.S. 591 (1997) ................................................................... 48, 69

*American Needle, Inc. v. National Football League*,
   130 S. Ct. 2201 (2010) ....................................................................... 18

*Amgen Inc. v. Conn. Ret. Plans' & Trust Funds*,
   133 S.Ct. 1184 (2013) ......................................................................... 19

*Authors Guild v. Google, Inc.*,
   770 F. Supp. 2d 666 (S.D.N.Y.) ............................................... 58, 59, 70

*Brennan v. Concord EFS, Inc.*,
   369 F. Supp. 2d 1127 (N.D. Cal. 2005) ............................................... 12

*Broadcast Music, Inc. v. CBS, Inc.*,
   441 U.S. 1 (1979) ............................................................................... 13

*Buffalo Broadcasting Co. v. ASCAP*,
   744 F.2d 917 (2d Cir. 1984) ............................................................... 14

*Casa Orlando Apartments, Ltd. v. Fed. Nat. Mortgage Ass'n*,
   624 F.3d 185 (5th Cir. 2010) ............................................................. 67

*Ceasar v. Pataki*,
   2000 WL 1154318 (S.D.N.Y. 2000) ................................................... 72

*Chicago Prof'l Sports Ltd. v. NBA*,
   95 F.3d 593 (7th Cir. 1996) ............................................................... 12

*City of Detroit v. Grinnell Corp.*,
   495 F.2d 448 (2d Cir. 1974) ........................................................ passim

*Clarke v. Advanced Private Networks, Inc.*,
   173 F.R.D. 521 (D. Nev. 1997) ........................................... 45, 49, 50, 51

*Comcast Corp. v. Behrend*,
   133 S.Ct. 1426 (2013) ......................................................................... 19

*Dalton v. Educational Testing Serv.*,
663 N.E.2d 289 (N.Y. 1995) ................................................................ 39

*Dunlop v. Pan Am. World Airways, Inc.*,
672 F.2d 1044 (2d Cir. 1982) .............................................................. 54

*Expressions Hair Design v. Schneiderman*,
No. 1:13-cv- 3775, Hr'g (Jun. 14, 2013) ............................................. 27

*Fox Midwest Theaters, Inc. v. Means*,
221 F.2d 173 (8th Cir. 1955) ............................................................... 57

*Garst v. Franklin Life Ins. Co.*,
1999 U.S. Dist. LEXIS 22666, *75 (N.D. Ala. June 25, 1999) ............ 81

*Glendora v. Gannett*,
858 F. Supp. 369 S.D.N.Y.,
*aff'd* 40 F. 3d 1238 (2d Cir. 1994) ....................................................... 8

*Gooch v. Life Insurance Investors Co. of America*,
672 F.3d 402 (6th Cir. 2012) ............................................................... 49

*Grant v. Bethlehem Steel Corp.*,
823 F.2d 20 (2d Cir. 1987) .................................................................. 76

*Greenspun v. Bogan*,
492 F.2d 375 (1st Cir. 1974) ............................................................... 78

*Gulino v. Symbol Tech., Inc.*,
2007 WL 3036890 (E.D.N.Y Oct. 17, 2007) ....................................... 70

*Handschu v. Special Services Division*,
605 F. Supp. 1384, 1395 (S.D.N.Y. 1985) ................................. 6, 7, 45, 46

*Image Technical Services, Inc. v. Eastman Kodak Co.*,
125 F.3d 1195 (9th Cir. 1997) ............................................................. 12

*In re Aftermarket Auto. Lighting Products Litig.*,
No. 2:09-ml-2007-GW-PJW (C.D. Cal. Feb. 23, 2012) ....................... 23

*In re ATM Fee Antitrust Litig.*,
686 F.3d 741 (9th Cir. 2012) ............................................................... 19

*In re Automotive Refinishing Paint Antitrust Litig*,
2004 U.S. Dist. LEXIS 29162, 10 (E.D. Pa. Oct. 13, 2004) ................. 23

*In re Currency Conversion Fee Antitrust Litig*,
    263 F.R.D. 110 (S.D.N.Y. 2009) ............................................................ 23

*In re Digital Music Antitrust Litig.*,
    812 F. Supp. 2d 390 (S.D.N.Y. 2011) ...................................................... 53

*In re Global Crossing Sec. and ERISA Litig.*,
    225 F.R.D. 436 (S.D.N.Y. 2004) ............................................................... 5

*In re Lehman Brothers Securities Litig.*,
    2012 WL 2478483 (S.D.N.Y. June 29, 2012) ........................................... 53

*In re Linerboard Antitrust Litig*,
    321 F. Supp. 2d 619 (E.D. Pa. 2004) ....................................................... 23

*In re Literary Works in Electronic Databases Copyright Litig.*,
    654 F.3d 242, 247-48 (2d Cir. 2011) ....................................................... 44

*In re Managed Care Litig.*,
    2010 U.S. Dist. Lexis 142863 (S.D. Fla. Aug. 15, 2010) ................. 46, 47

*In re Managerial, Prof'l & Technical Employees*,
    2006 WL 38937 (D.N.J. Jan. 5, 2006) ................................................ 67, 68

*In re MetLife Demutualization Litig.*,
    689 F. Supp. 2d 297 (E.D.N.Y. 2010) ........................................................ 5

*In re NASDAQ Market-Makers Antitrust Litig.*,
    169 F.R.D. 493 (S.D.N.Y. 1996) ............................................................... 83

*In re Packaged Ice Antitrust Litig*,
    2011 U.S. Dist. LEXIS 150427 (E.D.Mich. December 13, 2011) ............. 23

*In re PaineWebber Ltd. Pshps Litig.*,
    171 F.R.D. 104 (S.D.N.Y. 1997) ............................................................... 85

*In re Pet Food Prods. Liab. Litig.*,
    2008 WL 4937632 (D.N.J. Nov. 18, 2008) ................................................. 7

*In re Plastic Tableware Antitrust Litig*,
    1995 U.S. Dist. LEXIS 17014, 4 (E.D. Pa. Oct. 25, 1995) ...................... 23

*In re Pressure Sensitive Labelstock Antitrust Litig*,
    584 F. Supp. 2d 697 (M.D. Pa. 2008) ...................................................... 23

*In re Puerto Rican Cabotage Antitrust Litig.*,
815 F. Supp. 2d 448 (D.P.R. 2011) ...................................................................... 23

*In re Veeco Instruments, Inc. Sec. Litig.*,
2007 WL 4115809 (S.D.N.Y., Nov. 7, 2007) .......................................................... 5

*In re VisaCheck/MasterMoney Antitrust Litig.*,
297 F.Supp. 2d 503 (E.D.N.Y. 2003) ...........................................................passim

*In re WorldCom, Inc. Sec. Litig.*,
388 F. Supp. 2d 319 (S.D.N.Y. 2005) .................................................................. 85

*Kartman v. State Farm Mut. Auto. Ins. Co.*,
634 F.3d 883 (7th Cir. 2011) ............................................................................... 67

*Kendall v. Visa U.S.A., Inc.*,
518 F.3d 1042 (9th Cir. 2008) ...................................................................... 12, 19

*Lawlor v. Nat'l Screen Serv. Corp.*,
349 U.S. 322 (1955) ............................................................................................ 57

*McClintic v. Lithia Motors, Inc.*,
2012 U.S. Dist. LEXIS 3846 (W.D. Wash. Jan. 12, 2012) .................................... 40

*Meijer, Inc. v. 3M (Antitrust)*,
2006 U.S. Dist. LEXIS 56744 (E.D.Pa. August 14, 2006) .................................... 23

*NACS v. Bd. of Governors of the Fed. Reserve Sys.*,
Civ. No. 11-02075, 2013 U.S. Dist. LEXIS 107581 (D.D.C. July 31,
2013) .............................................................................................................. 25, 41

*Nat'l ATM Council, Inc. v. Visa Inc.*,
No. 1:11–cv–01803(ABJ), 2013 U.S. Dist LEXIS 19306 ...................................... 18

*Nat'l Bancard Corp. v. Visa U.S.A., Inc.*,
596 F. Supp. 1231 (S.D. Fla. 1984) ..................................................................... 11

*Nat'l Bancard Corp. v. Visa U.S.A., Inc.*,
779 F.2d 592 (11th Cir. 1986) ........................................................................ 11, 12

*National Super Spuds, Inc. v. N.Y. Mercantile Exchange*,
660 F.2d 9 (2d Cir. 1981) .................................................................................... 54

*New York v. Microsoft Corp.*,
209 F. Supp. 2d 132 (D.D.C. 2002) ....................................................................... 5

*NLRB v. General Elec. Co.,*
418 F.2d 736 (2d Cir. 1969) ................................................. 39

*Ortiz v. Fireboard Corp.,*
527 U.S. 815 (1999) ................................................. 48, 69

*Paycom Billing Servs. v. MasterCard Int'l,*
467 F.3d 283 (2d Cir. 2006) ................................................. 8, 19

*Phillips Petroleum Co. v. Shutts,*
472 U.S. 797 (1985) ................................................. 48

Pl. Resp. to Pub. Cmts. at 26, *United States v. American Express Co.*
(E.D.N.Y. Jun. 14, 2011) ................................................. 28, 35

*Primetime 24 Joint Venture v. NBC,*
219 F. 2d 92 (2d. Cir. 2000) ................................................. 73

*Robertson v. NBA,*
556 F.2d 682 (2d Cir. 1977) ................................................. 46

*Sheppard v. Consol. Edison Co.,*
2000 WL 33313540 (E.D.N.Y. Dec. 21, 2000) ................................................. 70

*Stukenberg v. Perry,*
675 F.3d 832 (5th Cir. 2012) ................................................. 67

*TBK Partners v. Western Union Corp.,*
675 F.2d 456 (2d Cir. 1982) ................................................. 4, 76

*Thompson v. Metro. Life Ins. Co.,*
216 F.R.D. 55 (S.D.N.Y. 2003) ................................................. 78

*Thrifty Oil Co. v. Superior Court,*
91 Cal. App. 4th 1070, (Cal. App. 2001) ................................................. 27

*Township of Concord v. Boston Edison Co.,*
915 F.2d 17 (1st Cir. 1990) ................................................. 12

*United States v. Microsoft,*
253 F.3d 34 (D.C. Cir. 2001) ................................................. 9, 13, 17

*United States v. Trenton Potteries Co.,*
273 U.S. 392 (1927) ................................................. 12

*United States v. Visa U.S.A. Inc.*,
    344 F.3d 229 (2d Cir. 2003) .................................................................. 17

*Velez v. Majik Cleaning Serv., Inc.*,
    2007 WL 7232783 ................................................................................ 5

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011)...............................passim

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
    396 F.3d 96 (2d Cir. 2005) ...............................................................passim

*Walsh v. Northrup Grumman Corp.*,
    162 F.R.D. 440 (E.D.N.Y. 1995) ........................................................ 72

*Weinberger v. Kendrick*,
    698 F.2d 61 (2d Cir. 1983) .................................................................. 4

*Zimmerman v. Zwicker & Assos.*, P.C.,
    2011 WL 65912 (D.N.J. Jan. 10, 2011) ............................................. 69

## STATUTES

14A Okl. St. §2-417 ...................................................................................... 26

2010 Act Pub. L. No. 111-148, 124 Stat. 119, 885 (2010), §2718,
    Section 10101(f).................................................................... 76, 77

9-A M.R.S. §8-509 ........................................................................................ 26

ALM G1 ch. 140D, §28A.............................................................................. 26

C.R.S. §5-2-212 ............................................................................................ 26

Cal. Civ. Code §1748.1 ................................................................................. 26

Conn. Gen. Stat. §42-133ff........................................................................... 26

Fla. Stat. §501.0117 ...................................................................................... 26

K.S.A. § 16a-2-403 ....................................................................................... 26

NY CLS Gen Bus §518 ................................................................................ 26

Tex. Finance Code §339.001 ........................................................................ 26

## RULES

Fed. R. Civ. P. 23 ................................................................................ 80

Fed. R. Civ. P. 23(b)(1) ................................................................. 44, 45

Fed. R. Civ. P. 23(b)(1)(B) ................................................................. 46

Fed. R. Civ. P. 23(b)(2) ..........................................................passim

Fed. R. Civ. P. 23(b)(3) ..........................................................passim

Fed. R. Civ. P. 23(e)(2) ...................................................................... 3

## OTHER AUTHORITIES

Adam J. Levitin, *An Analysis of the Proposed Interchange Fee Litigation Settlement*, Georgetown Law and Economics Research Paper No. 12-033 (Aug. 12, 2012)............................................................ 20

Benjamin Klein *et al*, Competition in Two-Sided Markets: The Antitrust Economics of Payment Card Interchange Fees, 73 ANTITRUST L.J. (2006).......................................................................................... 13

C. Wright & A. Miller, Federal Practice and Procedure §1775 (3d. ed. 2013) ......................................................................................... 77

Christine Varney, Remarks at Prepared for the Center for American Progress: Vigorous Antitrust Enforcement in this Challenging Era (May 11, 2009)............................................................................. 37

David S. Evans & Richard Schmalensee, Paying with Plastic: The Digital Revolution in Buying and Borrowing (2d ed. 2006) .......................... 13

Harry First and Andrew I. Gavil, Re-framing Windows: The Durable Meaning of the *Microsoft Antitrust Litigation*, 2006 Utah L. Rev. .................... 37

Julie Hirschfeld Davis & Lisa Lerner, *Romney Vowing Dodd-Frank Repeal Hits JPMorgan Risky Trades*, Bloomberg (May 14, 2012) .................... 37

McLaughlin on Class Action §6.17 ................................................. 71

Tim Chen, *New Bill Crentes Obstacles for Durbin Amendment*, Forbes (Mar. 29, 2011) ...................................................................... 37

## I.    INTRODUCTION

Class Plaintiffs respectfully request that this Court grant final approval of this historic and transformative settlement. The objections, the vast majority of which are the result of a massive campaign of misinformation, provide no basis for this Court to deny final approval of this settlement. None of the objections effectively rebut Class Plaintiffs' demonstration that the settlement is fair, reasonable and adequate. In considering Class Plaintiffs' motion for final approval, this Court must decide whether the proposed settlement is fair, reasonable and adequate "in light of the best possible recovery" **and** in light of the risks Class Plaintiffs faced in establishing liability, proving damages, and maintaining the class through trial and appeal. *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974). It is a comparative exercise. The issue for the Court is *not* whether the settlement achieves a complete victory for the classes, as objectors assert, nor is it, as objectors also appear to suggest, whether some absent class members can imagine a hypothetical better outcome, regardless of whether it is realistic.

Despite an unprecedented, months-long campaign urging class members to object to the settlement, the overwhelming majority of class members – more than 99% – have not opposed the settlement. And the objections that have been filed are without merit and should be rejected. While some of the objections raise concerns that disappear when compared to the actual terms of the settlement, a number of objectors (some of whom were stirred up by the aggressive campaign of a small number of very large merchants and trade associations) fault Class Plaintiffs for not completely eliminating Visa's and MasterCard's market power, or for otherwise not achieving what cannot be achieved by settlement. But that impossibly high

threshold is not the standard for evaluating the settlement. Lacking any meritorious argument that the settlement does not meet the *Grinnell* standards, the objectors make misguided attacks on the release which are contrary to the plain text and obvious intent of the language of the settlement, and contrary to the applicable case law.

The releases are reasonable and appropriate to resolve this complex litigation and to accomplish a comprehensive settlement that will prevent relitigation of settled questions central to this case. The releases are standard in scope: they release only claims that were alleged and those claims that could have been alleged based on the identical factual predicate of the claims in this litigation. The releases properly bar claims for future damages based on the going-forward rules structure agreed to in this settlement. The going-forward rules structure is the result of bargained-for injunctive relief that requires the networks to change certain rules and practices but that is anticipated to have broader impacts on the relevant unchanged rules, producing a different market dynamic. The releases do not extinguish claims based on new rules or new conduct and do not protect Defendants from suit if they revert to their old rules. The releases remain in effect only so long as Defendants abide by the settlement's terms, and bar future claims only so long as the factual predicate for a future claim is identical to that of the MDL 1720 cases.

Any evaluation of the fairness and adequacy of this settlement must also account for the changes in the industry which have occurred while the litigation has been pending - changes facilitated and promoted by the litigation itself. When this case was filed eight years ago, the world's two largest credit card networks – Visa and MasterCard – were effectively owned and governed by a cartel of the country's largest banks. Long-standing Visa

and MasterCard rules prohibited merchants from surcharging credit-card transactions, discounting at the point of sale, or providing any incentive for consumers to use cheaper forms of payment. And the rules that established this anticompetitive environment were not even available for merchants to see. Armed with market power and shielded from merchant pressure, the networks competed by offering progressively higher-cost cards to lure issuing banks – the only beneficiaries of that competition – away from each other and American Express.

Now, as a direct result of this proposed settlement, the litigation, and legal and regulatory changes that it spurred, the outlook is significantly brighter for merchants. Visa and MasterCard are for the first time independent of the banks, which divested their ownership in both Visa and MasterCard shortly after this lawsuit was filed. Debit-card rates are now regulated by federal law, capped at a quarter of the prior rates (and may drop even further). Merchants now have numerous tools to foster transparency and put competitive pressure on rates: they may offer immediate discounts to consumers who pay with cash, check, debit, or a particular credit card; they may post separate prices at the point of sale for various forms of payment; they may negotiate collectively with the card networks; and they may surcharge Visa and MasterCard credit-card transactions. And the cash recovery to the class is over double that of any previous antitrust class action. For all of the Objectors' claims that the settlement has no value because it constitutes something less than their vision of a perfect world, the Objectors have not identified any private antitrust action in which plaintiffs achieved anything comparable in scope. In short, the reforms that Class Plaintiffs have obtained as a result of this litigation more than satisfy the standard for approval under *Grinnell*.

## II.   ARGUMENT

### A.   The objectors ignore the applicable standard for final approval.

Rule 23(e)(2) provides that the proposed settlement of a class action must be "fair, reasonable and adequate."  In *Detroit v. Grinnell Corp.*, the court of appeals established nine factors a court must assess in applying the Rule. *See* Pls.' Mem. at 10 (listing factors) [Dkt. No. 2111-1]. 495 F.2d 448 (2d Cir. 1974). The objections are directed overwhelmingly to just one of those nine factors – "(8) the range of reasonableness of the settlement in light of the best possible recovery," on the premise that the settlement is lacking because it does not eliminate every rule or practice that Class Plaintiffs challenged at the outset of the litigation. *See Grinnell*, 485 F.2d at 463.

But there is no authority for the Objectors' implicit claim that a proposed settlement must achieve everything plaintiffs sought at the outset of the litigation, without regard for the risks of litigation. As the court of appeals held in *Grinnell*:

> The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved. In fact there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery.

*Id.*, 495 F.2d at 455 & n.2. [1] The court then emphasized that "*[t]he most important factor*" is the strength of the case for plaintiffs on the merits,

---

[1]   The court of appeals has since affirmed that principle,[1] and district courts in the circuit have repeatedly applied it. *See, e.g., Weinberger v. Kendrick*, 698 F.2d 61, 65 (2d Cir. 1983) (Friendly, J.) (approving settlement where "recovery [was] only a negligible percentage of the losses suffered by the class"); *TBK Partners v. Western Union Corp.*, 675 F.2d 456, 463-64 (2d Cir. 1982) (quoting *Grinnell*). Of course, no

*Footnote continued on next page . . .*

balanced against the amount offered in settlement." *Id*. at 455 (emphasis added).

The Objectors' distortion of *Grinnell* is compounded by their refusal to recognize that their wish list is unattainable due to enormous changes in the market, the risks of prevailing on the foundational legal and actual predicates of attaining the relief they seek, as well as the limits of a Court's ability to regulate. What Objectors claim is the "best possible recovery" is a scenario that amounts to the following: (1) this Court determines that the means by which Visa and MasterCard currently set interchange fees constitutes unlawful price-fixing, even though the banks no longer own or control Visa and MasterCard;[2] (2) this Court's subsequent determination that the only proper injunctive relief would be elimination of the default interchange and honor-all-cards rules; and (3) after the inevitable appeals fail in their entirety, the parties and the Court will successfully divine and agree on means to rebuild the market from scratch, consistent with the Court's judgment and the appellate holdings. Of course, no such thing has transpired in the history of private antitrust litigation, and the Objectors predictably cite no precedent for obtaining what they seek.

What the Objectors seek is – by their own admission – achievable only via legislation. Mallory Duncan, General Counsel of Objector National Retail

---

. . . footnote continued from prior page

reasonable person could possibly consider $7.25 Billion "negligible." *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 340 (E.D.N.Y. 2010) (quoting *Grinnell*); *In re Veeco Instruments, Inc. Sec. Litig.*, 2007 WL 4115809, at *11 (S.D.N.Y., Nov. 7, 2007) (same); *Velez v. Majik Cleaning Serv., Inc.*, 2007 WL 7232783, at *6 (same); *In re Global Crossing Sec. and ERISA Litig.*, 225 F.R.D. 436, 461 (S.D.N.Y. 2004) (same).

[2] The equitable claims of the Class and the Individual Plaintiffs would be tried to the Court pursuant to ¶16 of the Clayton Act. *See New York v. Microsoft Corp.*, 209 F. Supp. 2d 132, 138-39 (D.D.C. 2002).

Federation, testified to Congress that the task of reshaping industries lies in the legislative rather than the judicial branch:

> [T]he courts . . . are very good at deciding liability, and they can determine damages. But if we are talking about fixing this, we are talking about prospective remedy, that is not something a court is very good at. So it is really the prerogative of Congress to come up with the kind of nuanced solutions we need to help correct an anticompetitive market.

Credit Card Interchange Fees, Hr'g Before Antitrust Task Force, House Comm. on Judiciary (Jul. 19, 2007); Marth Decl.,Ex. A at 42. And W. Stephen Cannon, speaking for the Merchants Payments Coalition (and whose firm, Constantine Cannon, represents dozens of the largest Objectors in this case) told Congress the following:

> [W]hile courts are effective at remedying past unlawful conduct, Congress [is] better suited to prevent *future* anticompetitive conduct in a complex industry such as electronic payment systems. In large part, this is because there are only a limited number of injunctive relief options available to courts to affect on-going conduct.

Stmt. of W. Stephen Cannon on Behalf of the Merchants Payments Coalition, Inc., at 17; Hr'g on "Credit Card Fair Fee Act of 2008" (House Comm. on Judiciary, Antitrust Task Force (May 15, 2008)); Marth Decl.,Ex. B (emphasis in original).

The Objectors failed to get all of the relief they sought in Congress. As a result, the existing law is not what they want it to be. The court in *Handschu v. Special Services Division*, when confronted with like-minded objectors, rejected their claims:

> It is beside the point for objectors to posit [future] restraints on [defendants'] conduct as they would prefer them to be, and then criticize the settlement because it falls short of a state of law they devoutly desire but have not yet achieved.

* * *

> The settlement does not achieve everything they wish for. Few settlements do. But insisting on everything disregards the limitations, legal and equitable, arising out of present law which furnish the primary benchmarks by which the settlement must be evaluated.

*Handschu v. Special Servs. Div.*, 605 F. Supp. 1384, 1395, 1417 (S.D.N.Y. 1985). *See also In re Pet Food Prods. Liab. Litig.*, 2008 WL 4937632, at *10 (D.N.J. Nov. 18, 2008). ("For those Objectors who feel that stronger statutes or enforcement should be in place, their voice can be heard by contacting their respective legislators. While the Court certainly sympathizes with the Objectors, this Court cannot make new laws; its purpose is to interpret the laws as written."), *vacated in part on other grounds*, 629 F.3d 333 (3d Cir. 2010). This Court is not Congress nor a legislature, and has no authority to grant Objectors' wish that it act as one.

### B. The Objectors criticize the settlement for not achieving complete relief, but ignore the risks of litigation and the impact of this settlement, the networks' IPOs, and other reforms.

The objectors fault the settlement for failing to eliminate Visa's and MasterCard's default interchange rules, honor-all-cards rules, no-multi-issuer rules, Visa's no-bypass rule, and the no-minimum-purchase rule for debit. The Objecting Plaintiffs even make the extravagant claim that the "proposed settlement is worse for the class than losing." Obj. Pl. Br. at 4 [Dkt. No. 2670]. These complaints fail to account for the substantial litigation risks Class Plaintiffs faced, the limits of achievable relief, and the transformations of the marketplace accomplished by the networks' corporate restructurings, and legal and regulatory reforms.

## 1. This settlement addresses the core conduct that Class Plaintiffs challenged.

The objectors are incorrect to claim that the Class Plaintiffs did not address the "core conduct" that they complained of. In their first consolidated complaint, Class Plaintiffs alleged that "Visa and MasterCard member banks […] effectively control the decisions of both Networks," by setting rules and interchange fees for the networks, to serve their collective interest. 1st Consol. Am. Cl. Action Compl., ¶¶131-34. [Dkt. No. 317]. After the filing of that complaint, however, this litigation and other antitrust threats prompted the banks that owned and controlled both MasterCard and Visa to divest their ownership interests in both networks. *See* Wildfang Supp. Decl., ¶ 42; Wildfang Decl., ¶¶37-46, Apr. 11, 2013 [Dkt. No 2113-6]. Divestiture had a dual effect: on the one hand, the restructurings gave Class Plaintiffs the most sweeping relief—divestiture of the banks' interests in the networks—that the Class could have received in litigation;[3] while on the other hand, it significantly strengthened the Defendants' argument that they were no longer "structural conspiracies" after their IPOs and thus the setting of interchange fees no longer constituted horizontal price-fixing. *See, e.g.,* Defs.' IPO Summ. J. Br. at 1-17 [Dkt. No. 1478];[4] *United States v. Microsoft,* 253

---

[3]  Indeed, in the Second Circuit obtaining an injunction that would have required the banks to divest their ownership interests in Visa and MasterCard may have been impossible to achieve. *See, Glendora v. Gannett,* 858 F. Supp. 369, 372 S.D.N.Y. ("Potentially disruptive remedies such as divesture of completed transactions …. have never been granted in private suits."), *aff'd* 40 F. 3d 1238 (2d Cir. 1994).

[4]  Even before the IPOs, some plaintiffs had difficulty proving conspiracy within Visa and MasterCard. For example, the Second Circuit affirmed the dismissal of a payments processor's claim that MasterCard's chargeback rules constituted an unlawful conspiracy. *See Paycom Billing Servs. v. MasterCard Int'l,* 467 F.3d 283, 292-93 (2d Cir. 2006).

F.3d 34, 80 (D.C. Cir. 2001) ("[D]ivestiture is a remedy that is imposed only with great caution…").[5]

In addition, before the IPOs the bank-controlled networks set interchange fees to benefit the banks, because the banks receive the interchange-fee revenues. However, since the IPOs the economic interests of Visa and MasterCard have diverged from those of the banks. Because the networks obtain their revenue from transaction fees, and not from interchange, their incentives are to generate more transaction volume. One way to increase transaction volume, especially when merchants have new discounting and surcharging tools, is to *reduce* the level of interchange fees to incentivize merchants to steer customers to *e.g.* a Visa card instead of a MasterCard. Over time these differing incentives, together with the other relief obtained in the settlement, should lead to significant reductions in interchange fees.

With the structural conspiracy that pervaded the networks before Visa's and MasterCard's IPOs ended, the settlement dismantles a key part of the three-legged stool that created the "hold up problem" that elevated interchange fees. *See* Cl. Pls.' Summ. J. Br. at 6–7 [Dkt. No. 1538] (citing

---

[5]   Objecting Plaintiffs' counsel, Jeffrey I. Shinder, recognized that the restructurings strengthened Defendants' argument:

> One interesting question that merchant case will raise is whether or not the new corporate forms of Visa and MasterCard fix the problem, or at least fix the problem from the perspective of traditional antitrust analysis. […] I am not so sure that MasterCard has insulated itself from antitrust attack and price fixing by changing itself, but it has certainly improved its position and has an argument it didn't have before it restructured. One could argue that one of the main reasons it restructured was to protect itself against the interchange case.

Panel Discussion II: Consumer Issues at 7-8 (Fordham Univ. Sch. of Law 2008), Marth Decl., Ex. C.

Frankel Merits Expert Rep., ¶¶118-203, SUFEX240). As Dr. Frankel explained in his merits expert reports, this "hold up problem" arose because the networks' honor-all-cards rules required merchants to accept all of a network's cards, which when combined with the default interchange rule, allowed the Defendants to credibly argue that a default interchange rate had to be established to prevent issuers from "holding up" merchants by demanding outrageous fees, knowing that the merchant had to accept its card and pay the fee. Frankel Merits Rep. ¶¶230–31. The no-surcharge and no-discount rules constituted the third leg of the stool, in that they hid payment-card costs from consumers, and rendered merchants powerless to influence the choice of payment at the point of sale. *Id*. ¶¶169–88. Without these anti-steering restraints, Defendants could not have maintained supracompetitive prices. But like a three-legged stool requires each of its legs to stand, the networks' market power could not have stood without each of these three rules in place. Thus, by substantially cutting back the no-surcharge rule, this settlement may reasonably be expected to destabilize the stool that supported the Defendants' market power, particularly if merchants exercise the initiative to take advantage of the new rules.[6]

## 2. The default interchange rules

Nearly all of the objectors urge the Court to deny final approval of the settlement because it does not require Visa and MasterCard to eliminate their

---

[6] In this context, the objections of multiple municipalities are particularly misplaced. Those entities are most able to take advantage of their ability to surcharge, as they do not face competition from other merchants. Moreover, to the extent that government entities make cardholders aware of the costs associated with their card use by imposing surcharges, that would reduce resistance to surcharging by private merchants.

default interchange rules. *See, e.g.*, Obj. Pls.' Br. at 46-47 [Dkt. No. 2670]; Target Br. at 5 (the settlement does not limit the ability of Visa and MasterCard to set interchange rates) [Dkt. No. 2495-1]; Form Objections, ¶1.[7] These objections are predicated on rhetoric and the false assumption that default interchange rules are clearly *per se* illegal while ignoring the risks Class Plaintiffs faced when they challenged the default interchange rules in 2005. More importantly, they ignore the post-2005 marketplace changes – including Visa's and MasterCard's transformation from bank-owned joint ventures to publicly-held corporations that are arguably single entities – that rendered those claims even more precarious.

The only U.S. courts that have considered challenges to the networks' default interchange rules held that those rules are ***not*** anticompetitive and not unlawful. In 1986, prior to the reorganizations of the networks, the Eleventh Circuit upheld Visa's default interchange rule against a Sherman Act Section 1 challenge after a full trial on the merits. *Nat'l Bancard Corp. v. Visa U.S.A., Inc.*, 779 F.2d 592, 605 (11th Cir. 1986) ("*NaBanco*"). The trial court concluded that the default interchange rule was "of vital import" to the payment-card system because it relieved issuing and acquiring banks of the need to negotiate potentially thousands of bilateral agreements, and assured universal acceptance. *Nat'l Bancard Corp. v. Visa U.S.A., Inc.*, 596 F. Supp. 1231, 1259-61 (S.D. Fla. 1984). The court of appeals agreed, finding that the national payment system would not function without a rule setting in

---

[7] As detailed in Section II.I. below and in the Declaration of Alexandra S. Bernay, the vast majority of objections were submitted on forms generated on websites of the principal objectors. Bernay Decl., ¶¶ 21-35, & Exs. 1-9. The term "Form Objections" refers to the objections generated by the objecting trade associations' websites.

advance the amount of interchange to be paid on each transaction. *NaBanco,* 779 F.2d at 602.

While various objectors correctly point out that some of the factual underpinnings for *NaBanco* have eroded, they overlook the Ninth Circuit's much more recent decision in *Kendall,* which affirmed the dismissal of challenges aimed at Visa and MasterCard's default interchange rules. *Kendall v. Visa U.S.A., Inc.,* 518 F.3d 1042, 1052 (9th Cir. 2008). They also fail to mention other recent decisions holding that the absence of a default-interchange rule is the same as an interchange fee set at zero. *Brennan v. Concord EFS, Inc.,* 369 F. Supp. 2d 1127, 1131-32 (N.D. Cal. 2005).

These decisions are noteworthy because, if "zero interchange" is merely another regulated price, eliminating interchange in a judgment would violate the well-settled rule that antitrust courts will not regulate price. *See, e.g.,* *United States v. Trenton Potteries Co.,* 273 U.S. 392, 397–98 (1927) (noting that courts will not inquire into reasonableness of price levels); *Image Technical Services, Inc. v. Eastman Kodak Co.,* 125 F.3d 1195, 1224-25 (9th Cir. 1997) (reversing ten year injunction requiring Eastman Kodak to sell parts to ISOs at "reasonable prices" because Kodak "should be permitted to charge all of its customers [] any nondiscriminatory price that the market will bear"); *Chicago Prof'l Sports Ltd. v. NBA,* 95 F.3d 593, 597 (7th Cir. 1996) ("the antitrust laws do not deputize district judges as one-man regulatory agencies"); *Township of Concord v. Boston Edison Co.,* 915 F.2d 17, 25 (1st Cir. 1990) (Breyer, J.) ("antitrust courts normally avoid direct price administration, relying on rules and remedies (such as structural remedies, *e.g.,* prohibiting certain vertical mergers) that are easier to administer"); *Brennan,* 369 F.Supp.2d at 1131-32 (because "competition law is not concerned with getting a proper price," a dispute over price is not an antitrust argument). If Class Plaintiffs

could not have eliminated interchange fees in this litigation, it follows that they also could not have obtained a reduction in fees by judicial decisions.

Practical barriers also exist to eliminating or reducing interchange fees. The objectors could not point to a single four-party credit-card network in the world—and Class Plaintiffs are not aware of one—that operates without a default interchange fee. Without such a real-world example, a court may be reluctant to order the relief Class Plaintiffs sought. *See United States v. Microsoft Corp.*, 253 F.3d 34, 105–06 (D.C. Cir. 2001) (remanding for new determination of remedy and expressing skepticism that divestiture of defendant could be accomplished, given lack of past examples of unitary companies that were successfully divested). Class Plaintiffs also had to contend with the fact that the companion case litigated by large individual plaintiffs did not challenge the default interchange rule as anticompetitive and did not seek its elimination.

### 3. The honor-all-cards rules

Some of the objectors[8] argue that the settlement should not be approved because it does not eliminate the networks' honor-all-cards rules. But some courts and commentators have found these and similar rules to be procompetitive. The honor-all-cards rules find support in the Supreme Court's decision in *Broadcast Music, Inc. v. CBS,* in which the Court held that a "blanket license" to thousands of composers' music - a system that is analogous to the Honor-All-Cards Rule as "greater than the sum of its parts" and therefore must be analyzed under the rule of reason. *Broadcast Music, Inc. v. CBS, Inc.*, 441 U.S. 1, 21–22 (1979). In subsequent proceedings under the

---

8    *See, e.g.*, Obj. Pls.' Br. at 5, 10; The Home Depot Br. at 10 [Dkt. No. 2591]; Blue Cross and Blue Shield Br. at 5 [Dkt. No. 2643].

rule of reason, the blanket license was upheld. *Buffalo Broadcasting Co. v. ASCAP*, 744 F.2d 917 (2d Cir. 1984). A number of economists and antitrust scholars that have studied payment systems have concluded that rules that require merchants to honor all transactions in a given system are procompetitive.[9]  Even Objecting Plaintiffs' counsel has previously taken the position that the honor–all-cards rule as applied to one product – *i.e.*, Visa or MasterCard branded credit cards – is procompetitive. In a panel discussion in which he appeared in 2008 at Fordham Law School, Mr. Shinder stated:

> [The Honor-All-Cards Rule] is a classic example of a restraint that was actually necessary for the functioning of the joint venture. When Visa and MasterCard were formed-think about this: You have thousands of banks across the country issuing these cards,  thousands of banks acquiring merchants, millions of merchants accepting these cards-you need to have a seamless acceptance experience. We all take it for granted, but you needed to have a rule that ensured to you, as a consumer, that when you proffer the Visa card, the merchant is going to take it. It's not going to say, "I'll take a Chase Visa card, but I don't like Citibank, so I'm going to turn that one down."

> * * *

> The Honor-All-Cards Rule, as applied to one product, which is what Visa and MasterCard were back in 1966-credit cards-was

---

[9]    *See, e.g.*, Benjamin Klein *et al*, Competition in Two-Sided Markets: The Antitrust Economics of Payment Card Interchange Fees, 73 ANTITRUST L.J. 571, 592-93 (2006) ("An honor-all-cards rule is the essence of a payment card system because it assures each cardholder that his card will be accepted at all merchants that display the mark of the card payment system."); *id.* at 592 n.38 ("Even the merchant plaintiffs in the *Wal-Mart* litigation agreed there were significant benefits to the honor-all-cards rule and did not challenge its necessity."); David S. Evans & Richard Schmalensee, Paying with Plastic: The Digital Revolution in Buying and Borrowing at 65-66 (2d ed. 2006) (describing how honor-all-cards rules evolved to make cards attractive to Merchants and consumers); *see also* Defs' Mem. Supp. Fin. Appr. at 10-11[Dkt. No. 2110].

> procompetitive. As Wal-Mart's lawyer, we never argued that, in
> that guise, it was anything other than pro-competitive.

Panel Discussion II: Consumer Issues at 5-6 (Fordham Univ. Sch. of Law 2008), Marth Decl.,Ex. C.[10]

But now, only five years later, Mr. Shinder, Wal-Mart, and his other clients are insisting that Class Counsel "bet the farm" to obtain the elimination of a rule that he said, five years ago, was procompetitive. Class Counsel would surely not be fulfilling their fiduciary responsibilities to the Classes if they were to make such a mad gamble.

### 4.    The "on us" rules

The Home Depot argues that the settlement is inadequate because it does not allow it to negotiate with acquiring banks to receive more favorable interchange rates on "on us" transactions, *i.e.,* those transactions in which the issuing bank and acquiring bank are the same. The Home Depot Br. at 10; Kimmet (The Home Depot) Decl., ¶¶13-14. The criticism is misplaced. The networks' rules do not currently prohibit this practice. Both networks impose default interchange fees only when the issuer and acquirer have not entered into a bilateral interchange-fee agreement. *See* Visa Core Principal 10.3, Marth Decl., Ex. D.; MasterCard Rule 9.3, Jun. 2013, Marth Decl., Ex. E. Thus, if The Home Depot or any other merchant were able to persuade its acquirer to give it a favorable interchange rate for "on us" transactions, Visa and

---

[10]   Objectors Wal-Mart, Sears, The Limited and the NRF were class representatives in *In re VisaCheck*, the settlement of which left intact the default interchange rule, the ownership of Visa and MasterCard by the banks, and made changes to the honor-all-cards rule which resulted in the current version of these rules. These objectors and their counsel are, thus, in an important sense, among the authors of the current honor all cards rules they now criticize this settlement for not eliminating.

MasterCard's rules would not stand in the way. And because the practice is not currently forbidden, any new Visa or MasterCard rule that inhibited the practice would constitute new conduct that is not released by this settlement.

### 5. The multi-issuer and no-bypass rules

It is a recurring defect in the Objectors' presentations that they routinely ignore the practical impossibility of obtaining relief in a settlement which the counter-party correctly estimates to be virtually un-achievable in the litigation. Several objectors[11] attack the settlement for not eliminating the networks' "no-multi-issuer" rules, which prevent merchants from using a credit card issued by one bank to process transactions through another bank. They also criticize the settlement for not eliminating Visa's no-bypass rule. 99 Cents Stores Br. at 9-10 [Dkt. No. 2667]; Hermes Br. at 4-6 [Dkt. No. 2654]. Besides lacking any analysis relevant to whether the absence of such provisions render the settlement inadequate,[12] these objections are simply unrealistic. Requiring issuing banks - many of which spend millions of dollars a year developing and marketing payment-card products - to issue cards that also  process transactions for a free-riding and competing bank,  is

---

[11]  *See* Obj. Pls. Br. at 47; 99 Cents Stores Br. at 9-10 [Dkt. No. 2667]; Hermes Br. at 6 [Dkt. No. 2654].

[12]  Objecting Plaintiffs' expert, Professor Hausman, merely references the no-bypass rule as another restrictive policy, but provides no analysis. [Dkt. No. 2670-5]. Hausman Rep. ¶47. His report does not even mention the no-multi-issuer rule. Class Counsel concluded that, whatever the benefit to merchants from eliminating those rules, if any, it was not great enough to justify giving up something. Moreover, in the litigation the Individual Plaintiffs took the position that the no bypass rules were *pro-competitive* or else in the negotiation that might have greater volume. Fairness Hr'g Tr. ** 2003 WL 25728442 at * 45 (E.D.N.Y. Sept. 25, 2003) ("[Demanding that Class Counsel get certain relief] is a luxury that objectors have of simply trying to throw some mud up here and say 'why didn't you get this and why didn't you get that?'") (Argument of L. Constantine) , Marth Decl., Ex. F.

not a remedy that a court would grant without compelling facts, which the objectors do not offer. *See Microsoft*, 253 F.3d at 105-06 (expressing skepticism towards injunctive relief that would be difficult to attain in marketplace.)

### 6.    The Objectors downplay the risks of litigation.

The objectors overlook key risks of continued litigations, including but not limited to13 the effect of the networks' restructuring, the Defendants' *Illinois Brick* arguments, and the risks of certifying and maintaining a class.

Implying that Class Plaintiffs could easily establish a § 1 conspiracy, the objectors rely heavily on the Second Circuit's holding in *United States v. Visa* that Visa and MasterCard were "consortiums of competitors." *United States v. Visa U.S.A. Inc.,* 344 F.3d 229, 242 (2d Cir. 2003). But this argument ignores the networks' restructurings. [14] At the very least, Visa's and MasterCard's

---

[13]   Other risks include the effect of the *VisaCheck* release on the Class's claims, the risk of not establishing a pre-IPO conspiracy, and the risk of not establishing that the default-interchange rule or no-surcharge rule was anticompetitive. *See* Defs.' Rep. Br. at§§ I.A. – I.D. Tellingly, the Defendants in MDL 1720 have moved to dismiss certain objectors' claims based on the default-interchange rule and the honor-all-cards rule, on the theory that they challenge the identical factual predicate of the claims in the *VisaCheck* case. Defs.' Mem. Sup. Mot. Dismiss. at 10-15, *Target Corp. v. Visa U.S.A. Inc.*, No. 1:13-CV-3477-AKH (S.D.N.Y. Aug. 13, 2013).

Recently, the Competition Tribunal of Canada dismissed the Commissioner of Competition's complaint against Visa and MasterCard's no-surcharge rule. Summ. of Confid. Decision, Competition Tribunal of Canada, *Comm'r v. Visa Canada Corp.* (CT-2010-10), available at http://www.ct-tc.gc.ca/CasesAffaires/CasesDetails-eng.asp?CaseID=333. Even though the basis for dismissal – the lack of a "resale" in a payment-card transaction – was peculiar to Canadian law, the decision highlights the risks Class Plaintiffs faced in prosecuting their anti-steering-restraint claims.

[14]   Contrary to Objecting Plaintiffs' speculation, Class Counsel took extensive discovery regarding the networks' IPOs, including three years of post-IPO document discovery of MasterCard, Rule 30(b)(6) depositions of both networks regarding the restructurings and the processes leading up to them, and supplemental discovery of the networks aimed at discovering communications between the networks and banks after the IPOs.

IPOs gave the defendants a strong argument that their interchange-fee setting was unilateral rather than concerted conduct. Defs.' Memo. Sup. Summ. J. IPO at 13-17.

The objectors dismiss the changes to payment-card markets brought on by the IPOs, claiming that the Supreme Court's decision in *American* Needle – holding that the NFL teams could "conspire for the purposes of the § 1 through NFL Properties – eliminates the risk that Class Plaintiffs faced. Obj. Pls.' Br. at 57-58 (citing *American Needle, Inc. v.* NFL, 130 S.Ct. 2201 (2010). But *American Needle* decision did not eliminate the risk that Class Plaintiffs faced, as highlighted by the *National ATM Council* decision, which rejected the plaintiffs' attempt to assign Section 1 liability post-IPO Visa based on the same interpretation of *American Needle* that Class Plaintiffs proffered at summary judgment. *Nat'l ATM Council, Inc. v. Visa Inc.*, No. 1:11–cv-01803(ABJ), 2013 U.S. Dist LEXIS 19306, at *68–70 (dismissing Section 1 claims against post-IPO Visa and distinguishing *American Needle* from post-IPO Visa structure). Instead of addressing the *National ATM Council* decision, the objectors dismissively state that it "has nothing to do with the facts of this case." Obj. Pls.' Br. at 58 n.68. That is incorrect. Even though that case addressed a different theory of competitive harm than this case, it considered and rejected the argument that Class Plaintiffs made in this case that likened the IPOs' "delegation" of authority from the banks to the network via the restructuring to the NFL teams' coordination of licensing activities through NFLPA. *See Nat'l ATM Council*, 2013 U.S. Dist LEXIS, at *68; Cl. Pls.' Br. Opp. Summ. J. at 68–75. The court also concluded that the plaintiffs' "allegations that banks used to belong to the bankcard associations does not provide factual support for…a [continued] horizontal conspiracy to restrain trade." *Nat'l ATM Council,* 2013 U.S. Dist *LEXIS,* at *60.

The objectors also downplay the risk that the Defendants' *Illinois Brick* argument posed for the Class. The risk is easy to see– since the date of the first amended complaint, three appellate-court decisions, including one in the Second Circuit, held that *Illinois Brick* precluded damages claims against the payment-card networks. *In re ATM Fee Antitrust Litig.*, 686 F.3d 741 (9th Cir. 2012); *Kendall v. Visa U.S.A. Inc.*, 518 F.3d 1042; *Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*, 467 F.3d 283 (2d Cir. 2006). The *ATM Fee* case in particular presents an acute risk to Class Plaintiffs' claims. In that case, the court granted summary judgment for the defendants on *Illinois Brick* grounds and rejected three exceptions to the *Illinois Brick* rule that Class Plaintiffs relied upon in this case: the co-conspirator exception, the ownership-and-control exception, and the exception for "no realistic possibility that direct purchasers will sue." *ATM Fee*, 686 F.3d at 750-58. While Class Plaintiffs attempted to distinguish each of these three cases at summary judgment, they must acknowledge the risk that this Court, or the court of appeals, or even the Supreme Court, would not be persuaded by their distinctions.

Similarly, as explained in their moving papers, Class Plaintiffs risked that the class would not be certified or maintained on appeal.[15] While the objectors claim that Class Plaintiffs overstate the risk, they provide only conclusory statements to support their argument. Moreover, objectors' own statements belie the assertion that certification is a foregone conclusion. The Home Depot argues that supposed "lack of cohesion" among class members justifies denying the Rule 23(b)(2) settlement class, and Sears argues that

---

[15] The Supreme Court has granted certiorari and decided three cases raising class certification issues the last three terms. *Comcast Corp. v. Behrend*, 133 S.Ct. 1426 (2013); *Amgen Inc. v. Conn. Ret. Plans' & Trust Funds*, 133 S.Ct. 1184 (2013), *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011).

large and small merchants should not be in the same class. The Home Depot Br. at 19-24; Sears Obj. ¶¶29-30 [Dkt. No. 2470]. To the limited extent that those arguments are valid as to a settlement class, if the Class returns to litigation should the settlement fail to be approved, Defendants will certainly argue that they would be just as valid as to a litigation class. Objecting Plaintiffs' own counsel publicly acknowledged this risk by opining that Class Plaintiffs "are going to have a hard time getting the class certified."  Panel Discussion II: Consumer Issues at 13 (Fordham Univ. Sch. of Law 2008), Marth Decl., Ex. C. While these arguments are not persuasive for the reasons stated below, they illustrate the risks that Class Plaintiffs would have faced in certifying and maintaining a litigation class.

If the objectors succeed in defeating the settlement and the settlement classes, they will also have significantly undermined class certification in this important litigation. It is quite apparent that the big-box-retailer merchants in the class are capable of and willing to defend their interests. The same cannot be said of the millions of small merchants who lack the sophistication, resources, and ability to defend themselves from Visa, MasterCard and the powerful issuing banks. Defeat of this settlement and the settlement classes could make it impossible for these smaller merchants to recover damages, or secure important injunctive relief, including but not limited to the right to recover the costs of card acceptance.

C.  **The relief in the settlement is far more than "adequate."**

1.  **The cash portion of the settlement easily satisfies the fair, reasonable and adequate test.**

Several objectors[16] contend that the monetary relief provided in the settlement is inadequate, even though the Cash Fund ($6.05 billion before reductions for opt-outs) and the Interchange Reduction Fund (approximately $1.2 billion) together represent the largest-ever cash payment in an antitrust class action settlement. *See* J. Connor, Private Recoveries in International Cartel Cases Worldwide: What do the Data Show? at 5, AAI Working Paper No. 12–03, Marth Decl., Ex. G; Obj. Pls.' Br. at 47; *Cf. Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 119 (2d Cir. 2005) (calling the creation of a $3 billion cash fund and equitable relief "staggering").

Despite Objectors' arguments to the contrary, the settlement fund is more than reasonable even "in light of the best possible recovery" and certainly "in light of all the attendant risks of litigation." *Grinnell*, 1495 F.2d at 463. The objectors' argument that Class Plaintiffs should have insisted on a cash payment closer to their expert's damages projection ignores the reality a jury award based on that damages estimate—which could total nearly a trillion dollars after trebling—would far exceed the defendants' ability to pay and even if Class Counsel could persuade a jury to award such a number, the judgment would be difficult to sustain on appeal. *See Grinnell*, 495 F.2d at 463 (Considering factor (7) – the ability of the Defendants to withstand a greater judgment). In fact, even one critic of the proposed settlement cited by

---

[16]    *See* 1001 Property Solutions Obj. at 4; ACE Hardware Obj. at 3, 8-10; Portland Obj. at 1; St. Joseph Obj. at 2, 6; Equilon & Motiva Obj. at 11-13; Home Depot Obj. at 43-45; Ingram *et al*. Obj. 6-7, Enterprise Obj. at 4; Maison Weiss Obj. at 2-3; Obj. Pls.' Br. at 47; Teatro Dallas Obj. at 1-2.

objectors, Professor Adam Levitin, agrees that the monetary portion settlement appears reasonable in light of any potential recovery. Adam J. Levitin, *An Analysis of the Proposed Interchange Fee Litigation Settlement*, Georgetown Law and Economics Research Paper No. 12-033 at 6 (Aug. 12, 2012). The estimated $7.25 billion that defendants agreed to pay represents approximately 2.5% of total interchange fees paid by class members during the class period, and thus 2.5% of the ***largest possible*** estimate of actual damage to merchants. Frankel Merits Rep. at 155 & Table 9.10, SUFEX240-0155.

The objectors also ignore the multiple ways in which the 2.5% figure ignores the risks that Class Plaintiffs faced. Any one of several eventualities would significantly reduce Class Plaintiffs' potential recovery, such that $7.25 billion would represent a much larger share of potential damages. For example, the jury could credit Dr. Frankel's alternative but-for world which estimated significantly lower damages than his primary but-for world, the jury could find that the IPOs cut off Defendants' liability, or the jury could credit the damages estimate of damage expert, Dr. Robert Topel, who estimated damages at .19% to .20% of Dr. Frankel's estimate). If the jury made any of these alternative findings, the cash portion of the settlement would represent between 9% and 30% of potential damages.

But even taking Dr. Frankel's primary damages calculation as a given, the cash portion of the settlement compares highly favorably with other antitrust class action settlements, and demonstrates that the settlement is more than fair, reasonable and adequate. In the *VisaCheck* case, for example, which involved the same class and related network rules, the monetary relief was $3.2 billion, paid over ten years. *In re VisaCheck/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d 503, 507 (E.D.N.Y. 2003); *see also* Civ. Minutes at 4, *In re*

*Aftermarket Auto. Lighting Products Litig.*, No. 2:09-ml-2007-GW-PJW (C.D.
Cal. Feb. 23, 2012) (approving settlement that represented 5.6% of sales),
Marth Decl., Ex. I; *In re Linerboard Antitrust Litig*, 321 F. Supp. 2d 619, 627
(E.D. Pa. 2004) (less than 2% of sales); *In re Automotive Refinishing Paint
Antitrust Litig,* 2004 U.S. Dist. LEXIS 29162, 10 (E.D. Pa. Oct. 13, 2004) (BASF,
DuPont) (approximately 2% of sales); *In re Automotive Refinishing Paint
Antitrust Litig.*, 2004 U.S. Dist. LEXIS 29162, 10 (E.D. Pa. Oct. 13, 2004)
(Akzo) (4.2% of sales); *In re Plastic Tableware Antitrust Litig*, 1995 U.S. Dist.
LEXIS 17014, 4 (E.D. Pa. Oct. 25, 1995) (approximately 3.5% of sales); *In re
Currency Conversion Fee Antitrust Litig*, 263 F.R.D. 110, 124 (S.D.N.Y. 2009)
(approximately 9% of total fees); *In re Puerto Rican Cabotage Antitrust Litig*, 815
F. Supp. 2d 448, 472 (D.P.R. 2011) (approximately 1.5% of sales); *In re Pressure
Sensitive Labelstock Antitrust Litig*, 584 F. Supp. 2d 697, 702 (M.D. Pa. 2008)
(approximately 1.5% of sales); *In re Packaged Ice Antitrust Litig*, 2011 U.S. Dist.
LEXIS 150427, *53-54 (E.D.Mich. December 13, 2011) (approximately 2.2% of
sales); *Meijer, Inc. v. 3M* (Antitrust), 2006 U.S. Dist. LEXIS 56744 at 9 (E.D.Pa.
August 14, 2006) (2% of sales). Even without considering the landmark
injunctive relief which accompanies this recovery the relief in this settlement
falls squarely within the range of previously approved antitrust settlements.

### 2. The changes to the networks' no-surcharge rules provided valuable benefits for all Class members.

Many objectors argue that the surcharging relief provided for by the
settlement is "worthless" because it is short of their ideal: They complain that
the provision does not apply to debit, that surcharging is prohibited in 11
states, and that merchants' ability to surcharge is limited by the "level-
playing-field" provisions in the Settlement Agreement. Some objectors also

assert that merchants will not take advantage of the right to surcharge because supposedly they do not want to antagonize their customers, the modified rules are hard to understand or implement, and they do not want to disclose the surcharge to their customers. Obj. Pls.' Br. at 49-52.[17] None of these criticisms withstand scrutiny.

### a. Surcharging provides merchants valuable leverage.

The no-surcharge reforms provide valuable leverage to merchants. Significantly, the ability to surcharge fosters price transparency by educating consumers about the costs of accepting credit cards which result in higher retail prices. Merchants that choose to surcharge benefit directly in two ways: increased revenue in the form of card surcharges; and decreased card-acceptance costs customers switching to cheaper, alternative forms of payment. Frankel Rep. Decl., ¶¶ 68–69. Even those merchants that choose not to surcharge increase their bargaining power with payment-card networks through the threat of surcharging, the pressure exerted on the networks to lower fees to avoid losing transactions, and consumers migrating away from cards that other merchants surcharge. *Id.*, ¶ 69. In the long run, consumers should benefit as well through lower retail prices. Visa's limited experimentation with "convenience fees" in the utility-bill-pay segment demonstrates that, when Visa loosened its surcharging restrictions in this segment, non-surcharging utility merchants received lower interchange fees in consideration for foregoing their rights to impose "convenience fee[s]." Ind. Pls.' Counterstmt. Facts, ¶ 96 (154) & nn.344-47 [Dkt. No. 1541]. In

---

[17] *See also* Barneys Br. at 13-14 [Dkt. No. 2637]; Target Br. at 8-9, n.5; Retailers and Merchants Br. at 22-23 [Dkt. No. 2421]; Ace Hardware Br. at 12-13 [Dkt. No. 2362]; Jo-Ann Stores Br. at ¶4 [Dkt. No. 2634].

Australia, where surcharging became common after the central bank required the networks to repeal their surcharge bans, surcharging successfully reduced American Express's merchant fees, even though those fees were not subject to regulation. Frankel Rep. Decl., ¶¶ 24, 27, 44-62.

Some objectors also object on the ground that the settlement does not give them the right to surcharge debit cards. But for the overwhelming majority of merchants this objection makes no sense as merchants should be seeking to encourage customers to shift purchases to low-cost debit transactions. As objector National Retail Federation acknowledges, "Retailers have been particularly reluctant to surcharge debit, which is the cheapest form of payment card and one that retailers seek to encourage." NRF Br. at 19 [Dkt. No. 2538]. Objectors that wish to surcharge federally regulated debit cards exemplify the unattainable height of their wish list – they are unhappy with a "low cost" payment card system and demand a "no-cost" payment card system. The Settlement Agreement provides a more rational approach to these concerns, by securing the ability to surcharge debit cards if the debit card interchange fees are no longer capped under the Durbin Amendment.[18]

### b. State laws restricting surcharging are limited and subject to constitutional challenge.

The objectors exaggerate the effect that state-surcharging laws have on the value of the surcharging relief. First, there is no basis for the contention that a multi-state merchant would be prohibited from surcharging at all of its

---

[18] The economic value to merchants of successfully steering customers to use their debit cards through discounting or surcharging strategies increased substantially with the decision in *NACS v. Bd. of Governors of the Fed. Reserve Sys.*, that held that the Federal Reserve had misapplied the Durbin Amendment. Civ. No. 11-02075 (RJL) (Jul. 31, 2013). *See* Marth Decl., ¶ U.

outlets by virtue of the fact that it operates in one or more states with a surcharge statute on its books. Visa and MasterCard themselves do not interpret their rules so restrictively and nothing in the terms of the Settlement Agreement disallows such conduct. Long Form Notice at 8, Marth Decl., Ex. J.[19] Secondly, the state statutes restricting surcharging are not as broad as the objectors claim. One of them – New York's – is currently being challenged on constitutional grounds. *See* Compl., *Expressions Hair Design v. Schneiderman*, No. 1:13-cv-03775 (S.D.N.Y. Jun. 4, 2013), Marth Decl., Ex. V. In a recent court appearance in that case, the New York Attorney General took the position that its statute does not restrict surcharging at all, so long as the surcharge is disclosed in advance, stating:

> The way our office interprets the statute is that it doesn't -- we are going after merchants who entice consumers to commence an economic transaction by advertising one price and then, once they arrive at the register, informing them when they pull out their credit card that they are going to be subject to a surcharge above and beyond that. So as long as the two prices -- the credit card price and cash price -- are displayed with equal prominence, our office doesn't think that violates the statute.

> THE COURT: So you are interpreting a false advertising statute.

> MR. COYLE: Essentially, yes, that's how our office enforces it.

---

[19]   The Class Notice, which was consented to by Defendants and which was approved by the Court, makes this clear:

> ". . . the fact that a merchant's ability to surcharge may be restricted under the laws of one or more states is not intended to limit that merchant's ability under the settlement to surcharge Visa or MasterCard credit cards where permitted by state law."

Notice, at p. 8.

*Expressions Hair Design v. Schneiderman*, No. 1:13-cv- 3775, Hr'g at 5-6 (Jun. 14, 2013), Marth Decl., Ex. K; Mem. Sup. Atty. Gen. Mot. Dismiss at 24-25 ("The State also has a strong interest in facilitating dual pricing so as not to insulate credit card companies from competition. …[U]nder the attorney general's interpretation, the statute is well-tailored to both purposes. Sellers are liable under the statute only when they fail to disclose the credit card price with equal prominence as the cash price, thus protecting credit card users from an unpleasant surprise at the point of sale. …And sellers are free to impose dual pricing schemes under the statute, regardless of the label they use to characterize it.") Marth Decl., Ex. L.[20] The California Court of Appeals has interpreted that state's statute in a similar fashion. *Thrifty Oil Co. v. Superior Court*, 91 Cal. App. 4th 1070, 1078-79 (Cal. App. 2001). If the plaintiff in *Schneiderman* succeeds in its constitutional challenge, or if other statutes – most of which are nearly identical to the New York statute – are subject to similar interpretations, most state-law limitations on merchants' surcharging rights will be eliminated.[21]

---

[20]   Objectors also argue that the surcharging relief will be available to even fewer class members in the future because many other states are considering adopting no-surcharge statutes. Obj. Pls.' Br. at 11. However, as the Declaration of Theodore Grindal in Support of Final Approval ("Grindal Decl.") demonstrates, most of these bills have failed.

[21]   The states that have statutes purporting to restrict merchants' surcharge rights are listed below. Most of the statutes are identical to the New York statute California, Cal. Civ. Code §1748.1 ("No retailer in any sales, service, or lease transaction with a consumer may impose a surcharge on a cardholder who elects to use a credit card in lieu of payment by cash, check, or similar means."); Colorado, C.R.S. §5-2-212 ("[N]o seller or lessor in any sales or lease transaction or any company issuing credit or charge cards may impose a surcharge on a holder who elects to use a credit card in lieu of payment by cash, check, or similar means."); Connecticut, Conn. Gen. Stat. §42-133ff ("No seller may impose a surcharge on a buyer who elects to use any method of payment, including, but not limited to, cash,

*Footnote continued on next page . . .*

To the extent that any state maintains a surcharge ban that is not construed as New York's and passes constitutional muster, the relief secured by the DOJ allows merchants to impose *de facto* surcharges in those states. In response to questions posed by Class Plaintiffs, DOJ clarified that its settlement with Visa and MasterCard would allow a merchant to post multiple prices at the point of sale to reflect discounts for various forms of payment. Pl. Resp. to Pub. Cmts. at 26, *United States v. American Express Co.* (E.D.N.Y. Jun. 14, 2011). Thus, a merchant could adopt a "two price" policy, one price for its preferred forms of payment (*e.g.* cash, check, debit) and another price for its disfavored forms of payment (*e.g.* credit cards) without that policy constituting a "surcharge." *Id.* Frankel Rep. Decl., ¶ 70.

---

*. . . footnote continued from prior page*

check, credit card or electronic means, in any sales transaction.); Florida, Fla. Stat. §501.0117 ("A seller or lessor in a sales or lease transaction may not impose a surcharge on the buyer or lessee for electing to use a credit card in lieu of payment by cash, check, or similar means, if the seller or lessor accepts payment by credit."); Kansas, K.S.A. § 16a-2-403 ("No seller or lessor in any sales or lease transaction or any credit or debit card issuer may impose a surcharge on a card holder who elects to use a credit or debit card in lieu of payment by cash, check or similar means."); Maine, 9-A M.R.S. §8-509 ("A seller in a sales transaction may not impose a surcharge on a cardholder who elects to use a credit card or debit card in lieu of payment by cash, check, or similar means."); Massachusetts, ALM G1 ch. 140D, §28A ("No seller in any sales transaction may impose a surcharge on a cardholder who elects to use a credit card in lieu of payment by cash, check or similar means."); New York, NY CLS Gen Bus §518 ("No seller in any sales transaction may impose a surcharge on a holder who elects to use a credit card in lieu of payment by cash, check or, similar means."); Oklahoma, 14A Okl. St. §2-417 ("No seller in any sales transaction may impose a surcharge on a cardholder who elects to use a credit card in lieu of payment by cash, check or similar means."); Texas, Tex. Finance Code §339.001 ("In a sale of goods or services, a seller may not impose a surcharge on a buyer who uses a credit card for an extension of credit instead of cash, a check, or a similar means of payment.")

### c. Level-playing field provisions do not eliminate the value of the surcharging right.

Nor do the settlement's "level-playing-field" provisions eliminate the value of the surcharging right. The level-playing field provisions apply only to (i) higher priced products, that (ii) restrict surcharging or networks that completely bar surcharging. By restricting merchants from surcharging Visa and MasterCard but not higher-priced products, the level-playing-field provisions merely codify a merchant's natural response to free-market conditions. In other words, even absent the level-playing-field provisions, merchants would be unlikely to surcharge Visa and MasterCard to steer consumers to higher-priced products. Thus, to the extent that the level-playing-field provisions impose any limitation on merchants' ability to surcharge, those limitations are a result of other networks' rules rather than the Settlement Agreement itself.

The level-playing-field provision also helps prevent issuing-bank detection to American Express or other networks that restrict surcharging. In the absence of the level-playing-field provisions, a large issuing bank could avoid the proscriptions of this settlement by shifting its card portfolio to American Express. If just a few banks followed this strategy, merchants' card-acceptance costs could increase as more of their transaction volume is processed on American Express, which generally has higher merchant fees than Visa or MasterCard. At the same time, merchants would have ability to recover their increased American Express acceptance costs. Thus, by disincentivizing bank defection to American Express, the level-playing-field provisions may benefit rather than harm merchants.

Class Plaintiffs' expert, Dr. Frankel fully explains the ways in which the rollback of the no-surcharge rule is a significant improvement even over the

Department of Justice's consent decree with Visa and MasterCard. Frankel Rep. Dec. ¶ 29. Dr. Frankel explains that the rollback of the no-surcharge rule will benefit merchants by (1) creating a vehicle for making the costs of different payment mechanisms transparent to consumers at the point of sale; (2) providing a revenue stream to help defray the costs of high-payment cards; (3) incentivizing customers to move to lower cost payment mechanisms, thereby reducing merchants' overall costs of accepting payment cards; and (4) creating pressure to reduce interchange rates. Frankel Rep. Decl., ¶¶ 4, 32. He shows that while some of these benefits will apply to only some merchants, others will apply to all merchants. *See id*. ¶¶ 68, 69; Frankel Rep. Decl., ¶¶ 19-43. While Objectors' expert, Dr. Hausman argues that eliminating the honor-all-cards rule would have been preferable, Dr. Frankel explains why Dr. Hausman is wrong – that the elimination of the no-surcharge rule provides greater benefits to merchants:

> As I explained in my initial report, "[a]lthough merchants are generally reluctant to stop accepting cards because of the possibility of lost sales, there is less risk of such lost sales from surcharging." If a merchant drops acceptance of a Network's cards, the merchant cannot accept any transactions under any terms from customers using that Network. If the customer does not carry a credit card that the merchant continues to accept, or the customer has strong preferences to use a particular card, the customer may be likely to patronize a different, less preferred merchant (in order to continue using the cardholder's preferred, or only, credit card). If, on the other hand, the merchant continues to accept the Network's cards with a surcharge, then some customers who prefer to patronize the surcharging merchant will continue to do so and pay the surcharge (in which case the merchant also obtains the additional surcharge revenue to defray the cost of card acceptance) rather than switch to another merchant. By surcharging costly credit card transactions, the merchant can also profitably offer lower posted prices to customers who use lower cost payment brands and methods. Lower posted prices will tend to increase the

> merchant's sales and profits on sales to users of lower cost
> payment methods such as debit cards and cash.

Frankel Rep. Decl., ¶ 14. See also Id. at ¶ 17 ("If the customer lacks any other payment method, then the customer is certain to leave if the merchant does not accept the card, while with a surcharge some of those customers will stay and pay the surcharge. Similarly, some customers will choose to leave even if they have alternative payment mechanisms if they cannot use their preferred card, but, again, some of those customers would remain and pay the surcharge if that were an option."). Dr. Hausman's claims here that surcharging will not benefit merchants or competition are contrary to his opinions in New Zealand where he opined that surcharging would benefit merchants and competition in the payment card market. *See, e.g.*, Frankel Rep. Decl., ¶ 20, n.31.

### d.   Surcharge caps do not significantly limit surcharging benefit.

Similarly, complying with the caps on surcharging does not seriously affect merchants' ability to exert competitive pressures on interchange fees. The Settlement Agreement allows the networks to cap surcharges at merchants' costs of acceptance or at a "super cap" level that is at least double the network's effective interchange rate. Sett. Ag. ¶¶ 42(a)(3), 42(b)(3), 55(a)(3), 55(b)(3). Objectors seize upon the "cap" concept as a point of contention, but ignore that by being able to surcharge for their entire cost of acceptance (up to the "super cap") means they can recover their costs not only of interchange, but also all other merchant fees imposed by acquiring banks and other network fees. And, even surcharges under these caps would be effective at influencing consumer choice, as recognized by Plaintiffs' and Defendants' experts in this litigation, because even small "penalties" produce

reactions with consumers, greater than do discounts. Ariely Rep., ¶¶ 19-25, SUFEX584-0009; Kahn Rep., ¶¶ 101, 105, SUFEX585-0040, 0042. Consumers' reactions will influence their choices of payment forms and thereby drive competition.

### e. Surcharge-disclosure requests are procompetitive and do not justify rejecting the settlement.

Several objectors[22] complain about the settlement's requirement that merchants disclose surcharges at the point of entry, at the point of sale, and on the sales or transaction receipt. The disclosure requirements are procompetitive, however, because disclosure promotes pricing transparency by informing consumers of the charges they will face if they use a particular form of payment. Disclosure therefore furthers the aims of the no-surcharge rollback by reinforcing the message to consumers that their chosen forms of payment carry costs. It is also a reasonable compromise because it protects both merchants and the Defendants from the loss of customer goodwill that could ensue if consumers were assessed surcharges without disclosure. *See* Kahn Rep., ¶107, SUFEX858-0042.[23] Merchants have complained for years that interchange fees are a hidden tax to consumers that the networks' rules prevented them from disclosing. Now that this impediment has been removed so that merchants can disclose the fees and inform customers that

---

[22]  *See* Giant Eagle Obj. at 4, 6; ACE Hardware Obj. at 12; Barneys *et al* Obj. at 13; Maison Weiss Obj. at 5.

[23]  Merchants may be legally required to disclose surcharges as well. As noted above, New York and California interpret their surcharge laws to require disclosure. As such, these laws and the disclosure provisions in this Settlement Agreement are akin to the federal regulations that require disclosure of ATM surcharges.

surcharges are being charged to recover these fees, objectors' of disclosure requirements as onerous makes no sense.

### f. Many of the Objectors have previously advocated for the right to surcharge or have taken advantage of loopholes to impose surcharges themselves.

Before they objected that the relief provided by the settlement is inadequate because most merchants will not surcharge, several objectors advocated for the right to surcharge, or themselves took advantage of loopholes in Visa's and MasterCard's rules to allow them to impose surcharges. Objectors Wal-Mart, NACS, Consumer Union, RILA, and IKEA have all previously advocated for the right to surcharge before Congress, in Canada, and in Europe. Marth Decl., Exs. M and N. And while the City of Portland objects that surcharging is "not practical or reasonable and contrary to the public good," it currently imposes a "convenience fee" (equivalent to a surcharge) on all credit card transactions made through its official payments website. *See* Obj. of City of Portland [Dkt. No. 5691] and *see* Marth Decl., Ex. W (screenshot of www.portlandoregon.gov web page regarding convenience fee). The City of Norman, Oklahoma also objected to the settlement, arguing that the surcharging relief is of no value because surcharges are prohibited in that state. Obj. of City of Norman [Dkt. No. 5372]. The city, however, also charges a "convenience fee" of $3.00 on all credit and debit card payments made to the City through the internet or telephone. *See* Marth Decl., Ex. X (screenshots of http://www.ci.norman.ok.us web pages regarding convenience fee).

### g. Surcharging is not difficult to understand or implement.

Surcharging provisions are understandable and implementing surcharging is manageable. The requirements are simple:

- Merchants may surcharge the full average discount fee incurred (as determined by the prior month or last 12 months);

- Merchants may surcharge brand-wide (*e.g.*, all Visa or MasterCard credit cards), or they may employ a more nuanced strategy and impose surcharges on one or more product groups (*e.g.*, Visa Signature cards, or MasterCard World Elite cards, which carry higher fees for many merchants);

- Merchants must disclose to consumers that the surcharge does not exceed the merchant's cost of acceptance, and disclose the amount of the surcharge before it is incurred (much like an ATM surcharge) and on a receipt; and

- If another more expensive network brand that the merchant accepts continues to restrict surcharging, then the merchant may not surcharge Visa and MasterCard without also surcharging transactions on that competitor network.

There is nothing complicated about surcharging and merchants are free to start doing so. To the extent that acquirers do not yet support the data field for reporting surcharges to Visa and MasterCard, both Visa and MasterCard have agreed that merchants may begin surcharging without that information being transmitted.

### h. Professor Hausman's attacks on Dr. Frankel's report in support of the settlement rest on false premises and ignore key data from Australia relating to surcharging.

The expert proffered by the Objecting Plaintiffs and Objectors, Professor Jerry Hausman attempts to rebut Dr. Frankel's conclusions regarding the significance of the injunctive relief. Professor Hausman's arguments fail, however, because they overstate obstacles to surcharging, reflect unrealistic

expectations as to what this Court could order, and ignore relevant data from Australia. And Professor Hausman utterly fails to address the threshold question of whether the honor-all-cards rules are in fact anti-competitive.[24]

Professor Hausman's conclusion that the rollback of Visa and MasterCard's no-surcharge rules will have "no effect, or at most a very small effect" on interchange rates demonstrates a lack of understanding of the Settlement Agreement. Hausman Rep., ¶ 54. For example, he repeats the objectors' (incorrect) mantra that through the agreement Visa and MasterCard "adopt" American Express's rules. This is incorrect both because American Express's rule appears broader than the "level-playing-field" provisions – it purports to allow surcharging only if all networks, including lower-priced ones, are surcharged – and because the level-playing field provisions expire upon the repeal of a higher-price competitor's no-surcharge rule. Sett. Ag., ¶¶ 42(a)(iv), 42(b)(iv), 55(a)(iv), 55(b)(iv) [Dkt. No. 1656-1]. He also overstates the impact of state "bans" on surcharging, as at least two large states – New York and California – interpret their statutes to allow disclosed surcharging which is exactly what the settlement permits. Hausman Rep., ¶¶ 57-60;[25] Wildfang Supp. Decl., ¶¶ 66-69. Other state statutes have identical language to New York's. Even if those states interpreted their statutes contrary to New York's, merchants in those states are able to send price signals to consumers by posting separate prices at the point of sale. Pl. Resp. to Pub. Cmts. at 26, *United States v. American Express Co.* (E.D.N.Y. Jun. 14,

---

[24]   As noted above in Section II.B.3, most knowledgeable experts in the field believe the honor-all-cards rules are pro-competitive – including Mr. Shinder before he appeared for the Objecting Plaintiffs.

[25]   *See also supra* Section II.C.2.a, (surcharging in other states will exert downward pressure on interchange fees in states that prohibit surcharging).

2011). These incorrect or overstated assumptions that Professor Hausman makes regarding the settlement undercut his conclusions.

Compounding his faulty assumptions, Professor Hausman ignores key data from Australia in predicting that surcharging will not be effective to reduce interchange rates. He errs by focusing on the effect in Australia of surcharging on Visa and MasterCard regulated rates rather than on American Express's unregulated rates. *See* Hausman Rep., ¶¶ 69-70. His conclusion that "surcharging has had ***no effect*** on" Visa and MasterCard rates is the wrong analysis. The purpose of surcharging is to incentivize customers to use cheaper payment forms. The Reserve Bank of Australia mandated that Visa and MasterCard fees be reduced to an average of 45 basis points, making those cards the cheapest credit cards for merchants in Australia. The relevant question, which Professor Hausman should have examined but did not, is what effect, if any, did surcharging have on credit cards that cost merchants more than Visa and MasterCard. If Professor Hausman had focused on American Express's unregulated rates, he would have discovered that its rates decreased by a greater amount than Visa and MasterCard's rates and that surcharging had the desired effect of moving transactions to cheaper payment alternatives. Frankel Rep. Decl., ¶¶ 46-57, 61-62; Appendix A ¶¶ 6-8, Fig. 2 and Fig. 3. The scenario that Professor Hausman ignored – unregulated rates dropping in the presence of surcharging to approach a competitor's lower regulated rates – mirrors the situation in the United States in which merchants are now free to use surcharging to steer merchants toward regulated debit-card rates. *See* Frankel Rep. Decl., ¶39. Professor Hausman's observation that few Australian consumers actually pay a surcharge does not impact the conclusion to be drawn from American Express's rate decrease. *See* Hausman Rep., ¶¶ 71-73.

Rather, it proves surcharging's effectiveness at steering consumers to less costly forms of payment. Frankel Rep. Decl.¶¶ 48-49; Ariely Rep., ¶ 12-25, SUFEX584-0007.

Finally, Professor Hausman ignores the threshold issue of whether the honor-all-cards rules, the elimination of which he proposes to be the centerpiece of a future injunction entered by this Court, can be proved to be anticompetitive. Obviously, before this Court could entertain entering such an injunction it would have to have concluded that the honor-all-cards rules are, on balance, anticompetitive. And there are reasons why this Court might conclude to the contrary. Finally, Professor Hausman also ignores the feasibility of operating a payment-card network without an honor-all-cards rule. He cites no example of – and Class Plaintiffs are not aware of – any payment-card network in the world that operates without an honor-all-cards rule. As discussed above, counsel for Objecting Plaintiffs and Objectors who proffer the opinion of Professor Hausman, have argued publicly that the honor-all-credit-card rules are *pro-competitive. See supra* Section II.B.3.

### 3. The buying-group provisions increase merchants' bargaining power with Visa and MasterCard.

In many industries, large purchasers or groups of small purchasers frequently obtain better pricing from suppliers than do individual small purchasers acting alone. The networks' default-interchange schedules exemplify this principle by providing the best interchange rates to those merchants that have the greatest volume. Marth Decl., Exs. Y and Z. By allowing groups of merchants to join together to negotiate with Visa and MasterCard, the buying-group provisions promise to empower merchants in their dealings with the networks by allowing them to bargain collectively.

The Objectors do not dispute the general principle that collective negotiation could lead to better terms for merchants, but nonetheless discount the relief because, they claim, buying groups were never prohibited under the networks' rules. *See* Obj. Pls.' Br. at 53. Although it may be true that Visa and MasterCard did not have rules prohibiting buying groups, it was the *practice* of both Visa and MasterCard to refuse to negotiate over interchange rates with merchant buying groups or other groups of merchants. *See* Wildfang Supp. Decl., ¶ 6. Obtaining the ability of merchants to aggregate their volumes for purposes of negotiating better rates was always at the top of many of the Objecting Plaintiffs' list of desired relief. *See id.* In yet another instance of objectors changing their tune, the objections of objector National Retail Federation claim that the settlement has no value to merchants and yet one of their principal complaints about the pre-settlement payment-card markets is the inability of merchants to negotiate collectively. NRF Obj. at 3, 8, 10. The NRF asserts that "the market for credit card acceptance in the United States is marked by three immutable features," one of which is "that as interchange has risen, Visa and MasterCard have resisted the efforts of retailers to negotiate for lower rates…." and "…. negotiation over interchange rates is all but unheard of." NRF Br. at 8, 10.[26] Although the lack of negotiation over interchange rates is one of its principal complaints, it is apparent that the NRF and its members have made *no effort* to take advantage of this important new tool for merchants. Plainly, merchants

---

[26]  The Florida Retail Federation believes the right to surcharge enhances the ability to negotiate: "We assert that while most businesses do not wish to charge their customers additional money, the ability to do so is a negotiating point which helps to keep debit transaction fees low." [Dkt. No. 1635].

should not be heard to complain when they don't even try to use tools available to them under the settlement.

The objectors ignore that the buying-group provisions also affirmatively require the networks to "exercise [their] good faith" in negotiations with merchant groups and in "making determination[s] whether to accept or reject a proposal." Sett. Ag., ¶¶ 43, 56. The inclusion of the term "good faith" is highly significant and is not accidental – it is a term of art that appears in several legal contexts. The common law in New York, for example, implies a covenant of good faith and fair dealing in all contracts, which prohibits either party to a contract from doing "anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Dalton v. Educational Testing Serv.*, 663 N.E.2d 289, 389 (N.Y. 1995). When a contract has an element of discretion, the common law imputes a "promise not to act arbitrarily or irrationally in exercising that discretion." *Id*. Perhaps analogous, labor law also imposes a duty of good-faith bargaining, which obligates parties to make "a serious attempt to resolve differences and reach a common ground," rather than "go[ing] through the motions of 'negotiation'" or stick to a "predetermined resolve not to budge from an initial position." *NLRB v. General Elec. Co.*, 418 F.2d 736, 761–62 (2d Cir. 1969).

The buying-group provisions of the Settlement Agreement also allow merchants to seek a declaration from this Court that the network is violating its duty of good-faith negotiation. Combined with the affirmative obligation to bargain in good faith, the Court's jurisdiction over negotiations makes the buying-group provisions an unprecedented and powerful tool in the hands of merchants.

### 4. Locking in relief that was first secured in the Durbin Amendment and the DOJ consent decree is valuable to merchants and supports approving the settlement.

Contrary to the objectors' arguments, "locking in" the relief secured in the DOJ consent decree and the Durbin Amendment is highly valuable to merchants. With respect to the DOJ consent decrees, the Settlement Agreement locks in the relief until July 2021, even if it is terminated before that date. If the relief in the consent decrees is modified, the Class gets the benefit of those modifications. The Settlement Agreement independently provides merchants with the freedom to impose minimum-transaction amounts of up to $10 on credit-card purchases, thus locking in a portion of the Durbin Amendment. As to the debit card interchange fee, to the extent the rate cap is eliminated, the Settlement Agreement's surcharge provisions will begin to apply to debit cards. The cases the objectors rely on – which merely require the defendants to "follow the law," are distinguishable. *McClintic v. Lithia Motors, Inc.*, 2012 U.S. Dist. LEXIS 3846 (W.D. Wash. Jan. 12, 2012). Unlike those cases, these provisions effectively require the Defendants to follow the **former law** if the law changes to the detriment of the merchants.

At the time of the settlement – in the middle of a Presidential-election year – the possibility that the DOJ consent decree or the Durbin Amendment, could change was not only theoretical. In recent years, administration changes have brought significant policy and litigation-strategy shifts at the Antitrust Division.[27] Nor was the Durbin Amendment – part of the larger

---

[27] In the early 2000s, when the D.C. Circuit remanded the district court's break-up remedy in the *Microsoft* case that the Clinton-era Antitrust Division had sought, the Bush-administration Antitrust Division decided not to seek a split of Microsoft and

*Footnote continued on next page . . .*

Dodd-Frank financial-regulation law – safe from repeal, as the Republican challenger to President Obama, Mitt Romney, vowed to repeal Dodd-Frank if elected and the Senate was widely expected to flip to the Republican control. Julie Hirschfeld Davis & Lisa Lerner, *Romney Vowing Dodd-Frank Repeal Hits JPMorgan Risky Trades*, Bloomberg (May 14, 2012), Marth Decl., Ex. O. And the possibility remains that a new administration or a new Congress will take action to weaken or eliminate the debit-card-rule relief provided by the Durbin Amendment.[28] Now that a court has found that the Federal Reserve failed to comply with the Congressional mandate in the Durbin Amendment by setting too high of a rate, renewed legislative efforts to completely repeal the Durbin Amendment are more likely. *See* Mem. Op., *NACS v. Bd. of Governors*, Civ. No. 11-02075 (RJL) (Jul. 31, 2013), Marth Decl., Ex. U. Because a change in the political winds could weaken relief that merchants attained in other forums, shielding that relief from those winds, as the Settlement Agreement does, is valuable to merchants.

---

*. . . footnote continued from prior page*

agreed to a significantly narrower remedy in a consent decree. Harry First and Andrew I. Gavil, Re-framing Windows: The Durable Meaning of the *Microsoft Antitrust Litigation*, 2006 Utah L. Rev. 641, 687-88. Similarly, when President Obama's first appointee took over as Assistant Attorney General for Antitrust, her first official action was to abandon unilateral-conduct-enforcement guidelines that her predecessor put in place just eight months earlier. Christine Varney, Remarks at Prepared for the Center for American Progress: Vigorous Antitrust Enforcement in this Challenging Era (May 11, 2009), available at http://www.justice.gov/atr/public/speeches/245711.htm.

[28] In the spring of 2011, before the Federal Reserve had even published its final rules relating to debit-card interchange rate caps, Senator Tester (D-MT) led a concerted effort to derail the relief through a delay for further study. Tim Chen, *New Bill Crentes Obstacles for Durbin Amendment*, Forbes (Mar. 29, 2011).

### 5. The settlement allows merchants to experiment with unique acceptance and steering strategies.

The settlement also opens up new avenues for merchants to experiment with innovative acceptance and steering strategies. Before the settlement, merchants had to accept or decline Visa and MasterCard payment cards at each of their outlets, under each of their banners, on an all-or-nothing basis. Under this regime, few merchants could risk the lost sales that might ensue by dropping Visa or MasterCard chain-wide. *See* Emmert Dep. Tr. at 248:14–250:2, (Jan. 17, 2008), Marth Decl., Ex. P (objector Jetro considered accepting only Discover at only one location. Moreover, contrary to the objectors' claims, the networks did prohibit merchants from making banner-by-banner acceptance decisions.[29] *See* Obj. Pls.' Br. at 14. As a result of the reforms to the all-outlets rule provided for by this settlement, merchants may now choose to accept Visa or MasterCard at fewer than all of their banners. And the networks may not penalize these merchants by treating them differently at the banners that do accept the networks' cards. Sett. Ag., ¶¶ 41, 54.

Contrary to the objectors' arguments, neither the Settlement Agreement nor the networks' rules prohibit merchants from designing "tests" to study the effects of surcharging or other acceptance practices at fewer than all of their locations. Even within a given banner, merchants may experiment with

---

[29] The objectors also claim that the networks never prohibited merchants from making banner-by-banner acceptance decisions, citing the example of Sam's Club and Costco. Obj. Pl's. Br. at 14. The record evidence contradicts this, however, as Individual Plaintiff Albertsons testified that it contemplated dropping Visa at a low-cost banner but decided to accept Visa after Visa threatened to withhold favorable "tiered" pricing if Albertsons did not accept at all of its banners. Morton Dep. 291:5-292:17, (Oct. 15, 2008), Marth Decl., Ex. Q. A Visa witness confirmed Albertsons' interpretation. Gallo Dep. 283:11-284:16, (Apr. 24, 2008), Marth Decl., Ex. R.

surcharging at one or more store locations but not all locations. Despite objectors' attacks on surcharging, neither the Settlement Agreement nor the networks' existing rules expressly disallow surcharging at fewer than all locations.

Combined, these provisions of the settlement allow multi-outlet merchants to experiment with strategies – such as surcharging or exclusive acceptance of a brand – before deciding whether to roll them out within all store locations or all banners.

### D. The Rule 23(b) (2) Class Settlement release satisfies due-process requirements.

#### 1. The release of future claims does not violate due process.

The Objecting Plaintiffs, the Target Objectors, The Home Depot, and other objectors[30] claim that the Rule 23(b)(2) release violates due process because it releases future-damages claims without providing a right to opt out. *See, e.g.*, The Home Depot Br. at 18; Obj. Pls.' Br. at 7; Target Br. at 16-17. But these arguments ignore the fact that the Rule 23(b)(2) injunctive-relief settlement requires changes to the networks' rules and conduct as part of a settled resolution regarding permissible going-forward conduct.

Contrary to objectors' claims, the networks' rules and conduct challenged in this litigation have not been left unchanged. The Rule 23(b)(2) injunctive-relief settlement required the networks to change their business practices and conduct by modifying or changing certain rules and practices, as described above. And the changes made pursuant to the settlement are

---

[30] *See, e.g.*, Barneys Br. at 8-10; Teatro Dallas Br. at 2-5 [Dkt. No. 2560]; Hermes Br. at 10-12; 99 Cents Only Br. at 14-15 ; First Data Br. at 9-13 [Dkt. No. 2427]; Discover Br. at 9 [Dkt. No. 2659]; Old Warsaw Br. at 8-11 [Dkt. No. 5835].

anticipated to impact even those relevant rules that have been left unaltered. Thus, a new market dynamic emerges as a result of the bargain between the Classes and Defendants. The injunctive relief achieved through the settlement and with other rules modifications which occurred during the course of this litigation increase price transparency and permit merchants to exert competitive pressure on Visa and MasterCard to lower their respective interchange rates. Frankel Decl., ¶¶ 4, 8-19; Frankel Rep. Decl., ¶¶ 2, 41. In exchange for changing the networks' rules and conduct, Defendants get a forward-looking release of the settled rules-related conduct, as well as the unchanged relevant existing rules as part of the overall bargain regarding what constitutes a permissible going-forward system. As long as the Defendants comply with the terms of the bargained for injunctive relief (the new or revised rules) and do not alter the other rules imposed or adhered to at the time of Preliminary Approval, those rules and conduct are released for damage claims going forward. *See* Settl. Ag., ¶¶ 33(g & h) and 68 (g & h).

The objectors cannot dispute that the injunctive relief results in new rules and a new course of conduct. This negotiated agreement regarding the rules and conduct, that will be permitted on a going-forward basis appropriately limits damages claims with respect to the discontinued conduct. Allowing objectors to seek future damages for the rules and conduct that form the core basis of the injunctive-relief provisions of this settlement would amount to impermissible collateral attacks on the settlement, effectively undermining the settlement and preventing finality. Without an assurance of finality, no defendant would ever agree to a Rule 23(b)(2) injunctive-relief settlement. *In re Literary Works in Electronic Databases Copyright Litig.*, 654 F.3d 242, 247-48 (2d Cir. 2011) ("[p]arties often reach broad settlement agreements encompassing claims not presented in the

complaint in order to achieve comprehensive settlement of class actions, particularly when a defendant's ability to limit his future liability is an important factor in his willingness to settle."); *Wal-Mart Stores, Inc. v. Visa USA, Inc.*, 396 F. 3d 96, 106 (2d Cir. 2005) ("[p]ractically speaking, 'class action settlements simply will not occur if the parties cannot set definitive limits on defendants' liability.'"); *See also Clarke v. Advanced Private Networks, Inc.*, 173 F.R.D. 521, 523 (D. Nev. 1997).

Disregarding the networks' new practices and conduct required by the settlement, Objectors erroneously claim they are entitled to seek future damages based on the purported ongoing and "continuing unlawful interchange fee practices." *See, e.g.*, Target Obj. Br. at 13-14, 17 (characterizing interchange fee practices as "anti-competitive"). But the interchange-fee practices are just one of a number of the networks' practices and conduct that were challenged as restraining trade in payment-card markets. The contention that the settlement should have changed either the process for setting interchange rates or reduced interchange rates goes to the adequacy of the (b)(2) settlement, not whether future damages claims challenging the new settled practices and conduct can be released without a right to opt out. Objectors have not cited a single case requiring that every business practice challenged in class action litigation must be changed in order to be appropriately released. *See Handschu*, 605 F. Supp. at 1395, 1417.

Moreover, objectors' contention that the networks' ongoing interchange-fee practices are unlawful is just that – a contention. As articulated in Section II.B.2., no U.S. Court has declared a multilateral default interchange fee to be illegal. Defendants have always contended, and continue to contend, that the networks' interchange-fee practices are legal and necessary to the networks' existence and operation. The issue is certainly open to doubt – and hence

compromise. And as discussed above, the banks' divestiture of their ownership of Visa and MasterCard significantly transforms the antitrust analysis.

Because the illegality of the challenged conduct is not a certainty, the Court may approve a settlement that releases that ongoing conduct, including the future effects of that conduct. *See Armstrong v. Bd. Of School Directors*, 616 F.2d 305, 321 (7th Cir. 1980); *Robertson v. NBA*, 556 F.2d 682, 687 (2d Cir. 1977); *Handschu*, 605 F. Supp. at 1395. Nearly all of the objectors ignore this established law and its significance, while the Target Objectors assert that "no such rule can be found in "*Robertson* or any other case." To the contrary, the court of appeals, in *Robertson*, explicitly held that a class settlement can release challenged, ongoing conduct that is not clearly illegal:

> [Objectors] argue in the alternative that the settlement agreement cannot be approved because it perpetuates for ten years two "classic group boycotts" in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1 - the "College Draft" and the "Compensation Rule." It is true that a settlement that authorizes the continuation of clearly illegal conduct cannot be approved, but a court in approving a settlement should not in effect try the case by deciding unsettled legal questions. [], "the alleged illegality of the settlement agreement is not a legal certainty." The challenged practices have not been held to be illegal per se in any previously decided case. The settlement agreement here must be looked at as a whole: it radically modified draft practices; it virtually eliminated option clauses; and it modified the compensation rule, eliminating it altogether after ten years, [] In light of these facts, the settlement authorizes no future conduct that is clearly illegal.

*Robertson*, 556 F.2d at 686 (citations omitted). *See also Handschu*, 605 F. Supp. at 1405. Similarly, in *In re Managed Care Litig.*, the court held that claims based on "ongoing" conduct could be released "when the only 'prospective' application of the release in question is the continued adherence to a pre-

release restraint on trade." 2010 U.S. Dist. Lexis 142863, at *63 (S.D. Fla. Aug. 15, 2010).

Finally, in attempting to transform the (b)(2) class into a Rule 23(b)(3) class, the Target Objectors assert that gaining the right to surcharge is a damages remedy, not an injunctive remedy, because to the extent that merchants surcharge they will receive money from consumers. *See* Target Obj. Br. at 11-16. The settlement requires Visa and MasterCard to change their conduct to permit merchants to surcharge Visa and MasterCard branded credit cards. The settlement neither requires merchants to surcharge nor consumers to pay surcharges. In other words, the roll-back of surcharge provisions applies equally to all (b)(2) class members. Merchants decide whether to surcharge and whether doing so will encourage consumers to shift transactions from high-cost credit credits to lower-cost payment options. This benefits all merchants by putting pressure on high-cost payment-card networks to lower fees to avoid surcharges. Accordingly, contrary to objectors' claim that customers who use Visa or MasterCard branded credit cards will pay more money to merchants, both consumers and merchants will save money as a result of the ability for merchants to surcharge and cash – and check-paying customers will no longer subsidize high cost card use. *See* Target Obj. Br. at 12.

### 2. The Rule 23(b)(2) Settlement Class does not require an opt-out right.

Prohibiting the right to opt out of the Rule 23(b)(2) Settlement Class conforms to the rule and is appropriate because the (b)(2) settlement does not involve monetary damages, much less deprive any class member of the right to seek monetary damages for ongoing and continuing conduct that is "clearly illegal." Thus, the due-process concerns that arise when an absent

class member releases a claim for retrospective monetary damages is absent here. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985).[31] The Defendants' challenged rules and conduct, along with the changes to those rules and conduct under the (b)(2) settlement, apply to the class as a whole.[32] Under these circumstances, as the Supreme Court recognized in *Dukes*, "(b)(2) does not require that class members be given opt-out rights, presumably because it is thought (rightly or wrongly) that depriving people of their right to sue in this manner complies with the Due Process Clause." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2559, 2559 (2011).

Contrary to the objectors'[33] arguments, the certification of a Rule 23(b)(2) Settlement Class for injunctive relief and a separate and distinct Rule 23(b)(3) Settlement Class for damages satisfies due-process requirements and is consistent with the Supreme Court's decision in *Dukes*. In *Dukes*, the Supreme Court explained that because damages claims are claims for "individualized

---

[31] *Shutts* involved a case for past money damages filed in a state court and seeking to represent a nationwide class, applying Kansas law. The Court specifically acknowledged that its ruling did not extend to a (b)(2) class: "we intimate no view concerning other types of class actions, such as those seeking injunctive relief." *Shutts*, 472 U.S. at 812, n.3.

[32] For that reason, contrary to objectors' assertions, the b(2) settlement does not raise any of the structural concerns of a single class for settlement purposes as in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) and *Ortiz v. Fireboard Corp.*, 527 U.S. 815 (1999). In *Amchem*, the significant differences in the claims between class members presently injured by asbestos exposure and those future claimants who were exposed but whose injuries had not manifested undermined class cohesion and the predominance requirement of single (b)(3) class. Similarly, in *Ortiz*, there were conflicts of interest between class members currently injured and those who might suffer injury in the future. In addition, plaintiffs moved solely for a Rule 23(b)(1) class but failed to show the fund was limited.

[33] *See, e.g.*, 1001 Property Solutions Br. at 7-11 [Dkt. No. 2613]; First Data Br. at 14-17; Target Br. at 7-13; Old Warsaw Br. at 3-7; 99 Cents Only Br. at 11; Hermes Br. at 7-8.

relief," due process requires notice and an opportunity to opt out. In contrast, injunctive-relief claims do not require notice and opportunity to opt out because the challenged conduct "can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Dukes*, 131 S. Ct. at 2557. Thus, when "declaratory relief is a separable and distinct type of relief that will resolve an issue common to all class members" it is appropriate to certify a Rule 23(b)(2) class separate and distinct from a Rule 23(b)(3) class. *Gooch v. Life Insurance Investors Co. of America*, 672 F.3d 402, 428 (6th Cir. 2012). That, of course, is the case here. Those who would opt out of the (b)(2) class would still obtain the benefits of the rules changes obtained by the settlement, and, importantly, the benefits from the changes to the marketplace effected by the competition these rules changes introduce.

This principle was recognized by the court in *Clarke v. Advanced Private Networks, Inc.*, which is cited by the Objecting Plaintiffs. Obj. Pls.' Br. at 22; 173 F.R.D. 521 (D. Nev. 1997). In *Clarke*, plaintiffs sought damages, and only incidentally sought equitable relief, arising out of their purchase of an interest in a partnership. 173 F.R.D. at 522. The proposed settlement provided solely for structural relief transforming the partnership into a corporation. Class members received stock, no "monetary payment of claims whatsoever," and released all claims for *past* damages claims, rather than future damages. *Id.* at 523. Unlike in this case, in *Clarke*, the plaintiffs sought certification only of a Rule 23(b)(1) settlement class with no opt-out rights. The court held that this violated due process because "[t]he fact that the parties have negotiated an agreement whereby plaintiffs release their damages claims [*i.e.,* future damages claims] in exchange for defendants' concessions regarding the transformation of the partnership into a corporation and other matters does not transform the original damages

claims into claims for injunctive relief." *Id.* The Court recognized that if the plaintiffs had made a motion for class certification seeking a Rule 23(b)(2) class for structural relief – to give defendants "the peace they desire" going forward – and a separate Rule 23(b)(3) class for damages arising from the purchase of a partnership interest, it could have certified two separate classes. The court explained that "where a structural solution is imposed, it would be senseless to allow an opt out because such an adjudication would, as a practical matter, be dispositive of the interests of other members not parties." *Id.* (citing Fed. R. Civ. P. 23(b)(1)(B)).

This settlement is consistent with *Dukes* and *Clarke* because Class Plaintiffs are not combining damages claims with equitable-relief claims in a single mandatory (b)(2) class. Class Plaintiffs have always sought equitable relief to change the networks' rules and conduct going forward while separately seeking damages for the alleged harm caused by those rules and conduct in the past.[34] The (b)(2) injunctive-relief-class settlement provides for structural relief resulting in new rules and conduct while discontinuing the former conduct. The (b)(3) damages-class settlement provides for damages for that discontinued conduct while providing the right to opt out for merchants to seek damages for that conduct on their own. Because Class Plaintiffs sought both compensation for previous wrongs and forward-looking structural reforms, it is appropriate to certify a Rule 23(b)(3) damages class and a separate 23(b)(2) injunctive-relief class. *See* Cl. Pls.' Supp. Mem. Final Approval at 40-43.

---

[34] As previously pointed out, the circumstances existing as a result of the settlement are vastly and materially different from when the complaints in MDL 1720 were filed. (*See* Cl. Pls.' Br. in Supp. of Prelim. Approval at 3-9 [Dkt. No. 1656-2].)

Objecting Plaintiffs agree that a court may certify both a separate (b)(2) injunction class and a (b)(3) damages class but claim that courts that have done so have not extinguished damages claims through a (b)(2) release. (Obj. Pls.' Br. at 23-24.) But in this case, no past-damages claims are being extinguished or barred through the (b)(2) settlement and no future damages claims based on *per se* illegal conduct are being released. First, as explained, because Defendants' rules and conduct have been modified by the injunctive relief on a going-forward basis, the Class has no damages claims for ongoing or continuing conduct since November 27, 2012. The only remaining claims are for past damages which have not been extinguished or barred for any merchant that opted out of the (b)(3) class. Second, the cases recognize the unremarkable principle that a (b)(2) and a separate (b)(3) class is necessary to preserve any damages claims that class members may have if they choose to opt out of the (b)(3) class. *See Clarke*, 173 F.R.D. at 523. The very narrow and unique circumstances under which opt out rights from a (b)(2) class have been permitted are simply not present here. Class Plaintiffs are not aware of any injunctive-relief settlement resulting in a new course of conduct (structural relief), in which a party could seek future damages based on the changed conduct. *See* Pls.' Mem. at 41-43; Defs.' Br. at 18-19 [Dkt. No. 2110]; Obj. Pls.' Br. at 23-24.

Accordingly, the certification of separate (b)(2) and (b)(3) settlement classes in this case comports with due process.

### E. The releases appropriately bar only claims that were or could have been asserted in this litigation.

The objectors contend that the settlement should not be approved because the Rule 23(b)(2) and (b)(3) releases are impermissibly overbroad.[35] The objectors claim that the language of the releases, in particular the future-effects provisions, combined with the definition of Rules in the Settlement Agreement, operates to release "a virtually limitless range of claims," providing Defendants "immunity" from all future merchant claims, including antitrust claims. Equilon Br. at 6 [Dkt. No. 5833]; Obj. Pls.' Br. at 3-4. But objectors' contentions are premised on speculative and erroneous prognostications of the type of claims they believe will be barred rather than the claims that are in fact barred.

The releases explicitly release only those claims that "are alleged or which could have been alleged" in this litigation. Settl. Ag. ¶¶ 33 & 68. As to the future effects of Rules and future effect of conduct, the boundaries of the releases are clear: 1) Defendants are released from any future claims based upon the rules and conduct prescribed by the Settlement Agreement only so long as Defendants continue to impose and adhere to those same rules and engage in the same conduct; 2) Defendants are released from claims challenging rules that existed prior to November 27, 2012 and which were not rescinded or modified by the Settlement Agreement if and only if Defendants continue to impose and adhere to those same rules *and* those

---

[35]   Objecting Plaintiffs, the Target Objectors, The Home Depot, First Data Resources, American Express, Discover, the Form Objectors and all other claim that the scope of the releases is too broad. *See, e.g.*, Obj. Pls.' Br. at 21-24, 28-36; Target Br. at 10-15; The Home Depot Br. at 10-13, 30-37; First Data Br. at 20-23; In-N-Out Burger Br. at 5-8 [Dkt. No. 5767]; Dell Br. at 15-17 [Dkt. No. 2592]; United Airlines Br. at 1 [Dkt. No. 3161].

rules were or could have been the subject of the Plaintiffs' claims; and 3) Defendants are released from claims challenging rules and conduct that are "substantially similar" to the rules and conduct in 1) and 2), above. Sett. Ag., ¶¶ 33 (g), (h) and 68 (g),(h).

Objectors misconstrue the purpose and intent of the phrase "substantially similar." A "substantially similar" rule or conduct is one that does not have a material difference from the prior rule or conduct. That phrase protects Defendants from liability only if the networks make non-substantive, non-material changes to the released rules and conduct. If Defendants maintain the status quo, those same rules and conduct continue to be released.

The releases expressly identify the claims and conduct that are released but do not attempt to identify the myriad claims and conduct, known and unknown, that are not released. Such an exercise would have been impractical and not in the interests of the Classes as the parties surely would have failed to identify at least some claims that are not covered by the release. The releases were negotiated and drafted with the knowledge, understanding, and intent that in addition to the claims actually alleged in this case, the settlement released *only* those claims that could have been alleged based on the same set of facts as the claims actually alleged. *See* Cl. Pls.' Mem. Supp. Final Appr. at 44-48; Wildfang Supp. Decl., ¶ 52; *also Wal-Mart Stores, Inc. v. Visa USA, Inc.*, 396 F.3d 96, 106 (2d Cir. 2005); *In re Lehman Brothers Securities Litig.*, 2012 WL 2478483, at *6 (S.D.N.Y. June 29, 2012); *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 399-400 (S.D.N.Y. 2011) ("a settlement may be framed to prevent future suits 'depending on the very same set of facts,' [] but future claims are barred only 'where there is a realistic identity of issues' between the former and future cases and 'where

the relationship between the suits is at the time of the class action foreseeably obvious to notified class members'").

Contrary to objectors' assertions, under the court of appeals' decision in *National Super Spuds,* and its progeny, the propriety of the release is not dependent on the Court determining *now* the identity of every particular claim that is or is not covered by the release under the identical-factual-predicate doctrine. *See National Super Spuds, Inc. v. N.Y. Mercantile Exchange*, 660 F.2d 9 (2d Cir. 1981); The Home Depot Br. at 33; Obj. Pls.' Br. at 35. It must determine only that the release does not clearly bar claims that were not and could not have been alleged in this litigation. In *Super Spuds*, the objectors claimed that a release in a class-action settlement that explicitly released claims for unliquidated contracts was illegal because the class plaintiffs did not hold and could not plead claims related to those contracts. The class plaintiffs held only liquidated contracts, asserted claims solely for liquidated contracts, and the settlement provided monetary payments based solely on liquidated contracts. The settlement provided no additional payments based on unliquidated contracts even though claims were released. *Super Spuds*, 660 F.2d at 17-18. The court of appeals held that because class plaintiffs had the "authority to represent class members solely with respect to liquidated contracts, plaintiffs had no power to release any claims based on any other contracts." *Id.* at 18. The release was improper because it barred claims which depended upon "proof of further facts" that were not the basis of the settled claim.[36] *Id.* at n.7.[37]

---

[36] The Home Depot's reliance on *Dunlop v. Pan Am. World Airways, Inc.*, 672 F.2d 1044, 1050-51 (2d Cir. 1982) is equally misplaced. In that case, the Defendant asserted that the ambiguous release barred unlitigated state law claims and the state claims were in fact dismissed. The Court of Appeals held that it could not wait

*Footnote continued on next page . . .*

In this case, the releases do not bar future claims that depend on "proof of further facts." Objectors' contention that the clause in paragraphs 33 and 68 that "any claims based on or relating to (a)-(i) above are claims that were or could have been alleged in this Action" impermissibly expands the releases to include claims that could not have been alleged based on the identical factual predicate mischaracterizes the scope of the releases. Certain rules and conduct are identified in ¶¶ 33(a)-(i) and 68(a)-(i) in order to add clarity, not to expand the release to include claims that the parties knew could not have been alleged based on the identical factual predicate. Only those rules and conduct that were or could have been the subject of this litigation subject to the limitations in paragraphs 33 and 68 (g-h) are released.

Unquestionably, it was reasonable for the parties to settle and release claims:

- relating to those rules that enabled Visa and MasterCard to set and maintain their respective default interchange fees in the United States at supracompetitive levels that were actually challenged or could have been challenged in this litigation;

- relating to conduct that enabled Visa and MasterCard to set and maintain their respective default interchange fees in the United States at

——————————————— *. . . footnote continued from prior page*

for N.Y. state court to rule on the illegality of the release but must instead find the release illegal because plaintiff had no authority to extinguish state law claims and rights.

[37]  The court of appeals explained "We assume that a settlement could properly be framed so as to prevent class members from subsequently asserting claims relying on a legal theory different from that relied upon in the class action complaint but depending upon the very same set of facts. This is not such a case. The settlement before us would bar Richards and others similarly situated from asserting claims, distinct from those represented by the class action plaintiffs, which depend not only upon a different legal theory but upon proof of further facts, namely, the holding of unliquidated contracts after May 7, wrongful default on those contracts, and the damages caused by the default."

supracompetitive levels that was actually challenged or could have been challenged in this litigation;

- relating to rules or conduct that enabled merchant fees[38] to be set and maintained at supracompetitive levels that were actually challenged or could have been challenged in this litigation; and

- alleging that Visa and MasterCard are structural conspiracies based on the mere existence of the entirety of their respective rules, and all claims related to their respective IPOs.

Class Plaintiffs have not settled or released future claims relating to new rules or conduct yet to occur. *See* Pls.' Mem. at 50, 52; Defs.' Br. at 28. What constitutes new conduct cannot be specified in detail because it is a fact-specific inquiry which cannot be analyzed until it happens. Nevertheless, the following hypotheticals provide examples of certain types of new conduct and rules that are clearly not covered by the release, and thus future claims would not be barred:

- Visa and MasterCard agree to fix interchange rates;

- Visa or MasterCard and the Bank Defendants jointly agree to the interchange rates to be charged on Visa or MasterCard credit-card transactions;

- Visa or MasterCard adopts a new anticompetitive rule or engages in new, allegedly anticompetitive conduct that causes interchange rates to be artificially inflated;

- Visa or MasterCard express a new interpretation of or somehow apply their honor-all-cards rules in a new way that may be anticompetitive; and

- Visa or MasterCard revert to the old rules which are modified or eliminated by the settlement.[39]

---

[38] Although damages claims going forward for Visa's Fixed Acquirer Network Fee are released, merchants can still challenge the legality of that fee by bringing an antitrust, or other, claim for injunctive relief. Settlement Agreement, ¶ 72(d). To the knowledge of Class Counsel, no merchant has brought such a claim for injunctive relief. Wildfang Supp. Decl., at ¶ 52.

- Standard commercial disputes between a merchant and Visa, MasterCard, or a Defendant Bank.

Contrary to objectors' assertions, because the releases do not cover and release new, future anticompetitive conduct and rules, they do not violate the public policy against granting antitrust immunity through settlement. *See, e.g.*, *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 329 (1955); *Fox Midwest Theaters, Inc. v. Means*, 221 F.2d 173, 180 (8th Cir. 1955). In *Lawlor*, the release violated public policy because it barred claims based on different conduct that did not exist and could not have been alleged in the settled case. *Lawlor*, 349 U.S. at 328. But, as explained at II.D.2, continuing conduct that is not "clearly illegal" can be released going forward. The interchange-fee rules and related rate-setting conduct, the honor-all-cards rules, the no-bypass rules and the no-multi-issuer rules are not "clearly illegal." Indeed, after reviewing the record in this case, the Department of Justice in its 2010 complaint against Visa and MasterCard and American Express, alleging antitrust violations did not challenge those rules as being anticompetitive. Thus, claims challenging the existence of those Rules and related conduct, along with member banks' agreement to abide by those rules can be released on a going forward basis. Objectors' assertions that such continuing conduct cannot be released because "issues may arise – market definition, market conditions, market

---

*. . . footnote continued from prior page*

[39] The Home Depot is flat wrong that the "settlement instead would authorize Defendants to adopt in the future the very same rules that were supposed to be changed by the settlement while freeing Defendants in perpetuity from civil antitrust liability for their payment-card practices." *See* The Home Depot Br. at 36. Defendants agree that reversion to the old rules is not released: "If Visa or MasterCard instead decides to adopt rules that are not substantially similar, or to revert to old rules modified by the settlement, future merchants, just like the current merchants in the Rule 23(b)(2) Settlement Class, will not have released claims based on those rules." Defs.' Br. at 24.

power – are not static; they *change* over time" or that a particular rule "may well have a *different* effect on competition in the future" miss the point. *See* The Home Depot Br. at 31 (emphasis added). Objectors hypothesize changed circumstances that have yet to occur and thus could not have been alleged in this case. The critical point is that claims challenging new future conduct and new rules are not released.

The releases do not grant antitrust immunity or impermissibly release unknown future claims because the structural relief provided is remedial in nature and addresses the competitive harms that were the subject of this litigation. Thus, the (b)(2) release appropriately bars claims challenging the structural relief going forward only so long as Defendants continue to impose and adhere to those same Rules and engage in the same conduct. Contrary to objectors' assertions, this is not the type of forward-looking business arrangement that caused the court to reject the release in *Authors Guild v. Google, Inc.*, 770 F. Supp. 2d 666, 675, n.7 (S.D.N.Y.). In *Authors Guild*, the case was "about the scanning of books and the display of 'snippets,' but the [settlement agreement]" release included "claims regarding the display and sale of entire books." 770 F. Supp. 2d at 673. The complaint did not allege that Google was making full books available online and the case did not involve complete access to copyrighted materials. The settlement went far beyond the claims in the case, however, by expressly creating new business relationships, including full scanning of books with the right to sell the entire books rather than use the snippets for search purposes. *Id.* at 678. Because the release proposed to bar all claims challenging this forward-looking business arrangement - which was neither challenged in the complaint nor based on the identical factual predicate of the alleged claims -

the court found the release to be impermissible and rejected the settlement. *Id.* at 679.[40]

### 1. Competitor claims are not released.

American Express, Discover, and First Data argue that the Settlement Agreement impermissibly releases competitor claims that could not have been alleged in this case. Cardtronics similarly asserts that its claims as an ATM operator have been released. But the claims in this case were brought by and on behalf of merchants. The settlement class includes only merchants. Only claims that merchants alleged or could have alleged against Defendants in this litigation ***in their capacity as merchants*** have been released. As the parties have repeatedly stated, and as expressly set forth in the class notice, class members are releasing only those claims "that arise from or relate to their capacity as merchants that accept Visa-Branded Cards and/or MasterCard-Branded Cards in the United States." This means that the release does not bar any claim that a class member has made or can make in its capacity as a payment-card-network competitor of Visa and/or MasterCard or ATM operator or in any capacity other than as a merchant. *See* Pls.' Mem. Supp. Final Appr. at 45-46; Defs.' Br. at 21-22, n. 6 ("the notice provided to the class was revised to make clear that the settlement releases would not generally apply to claims made by class members in their capacities as payment network competitors of Visa or MasterCard."). Class Plaintiffs understand that Defendants have proposed language to be added

---

[40] The settlement also was not approved because the court concluded that the settlement would have changed a fundamental aspect of copyright law. *Id.* at 680-82.

to the Class Settlement Order and Final Judgment to make clear that claims of competitor payment card networks and ATM operators are not released.

### 2. Foreign claims are not released.

Contrary to certain objectors'[41] claims, the definitions of released parties and releasing parties under the settlement do not release claims that the foreign, related entities of merchants in the United States may have in foreign countries, for foreign transactions, against foreign related entities of Visa or MasterCard. The settlement class is limited to the United States, and the Settlement Agreement releases only claims that could have been brought in the United States. As the class notice makes clear, the only claims that are released are those that arise from or relate to a class member's capacity as a merchant that accepts Visa-Branded Cards and/or MasterCard-Branded Cards *in the United States*. *See* Revised Class Notice at page F2-12 [Dkt. No. 1740-2] (emphasis added).

If a class member, or its related entity, has a claim in a foreign jurisdiction, such claims could not have been made in this litigation and are not released by the Settlement Agreement. Thus, the foreign objectors' objection should be overruled.

### 3. Claims based on emerging technologies are not released.

Objectors' concern that the development of emerging payment technologies will be thwarted by the releases is without merit. The defined terms in the Settlement Agreement apply only to the terms of the Settlement

---

[41] *See* Auto Europe Obj. at 2-5 [Dkt. No. 2630].

Agreement.[42]  *See* Sett. Ag. ¶ 1 ("For purposes of this Class Settlement Agreement, the following words and terms shall be defined to have the meanings set forth below…."). The inclusion of mobile payments and other devices in the definition of "credit card" and "debit card" as defined in the Settlement Agreement does not affect the application of Visa's and MasterCard's honor-all-cards rules to those technologies.

The operative versions of Visa's and MasterCard's honor-all-cards rules – *i.e.,* those in effect as of the date of Preliminary Approval – have not been altered by the settlement.[43]  Thus, to the extent that Visa or MasterCard, in

---

[42]   The agreement defined "credit card" and "debit card" to include mobile payments so that mobile payments would fall within the purview of the new or modified rules and conduct required under the settlement; *e.g.,* it permits surcharging of Visa- and MasterCard-branded mobile payments.

[43]   Visa's Honor All Cards Rule states:

> Visa merchants may not refuse to accept a Visa Product that is properly presented for payment, for example, on the basis that the card is foreign-issued, or co-branded with the Merchant's competitor's mark. Merchants may attempt to steer customers who initially present a Visa card to an alternative method of payment, such as by providing discounts for cash, but may not do so in a confusing manner that denies consumer choice. Merchants may also consider whether present circumstances create undue risk, for example if the sale involves high-value electronics, but the card signature panel is not signed, and the cardholder does not have any other identification.

> "Visa Product" means "Any Visa Card, Visa Electron Card, component, or secure feature that relates to Card production, manufacture, or fulfillment managed under the Approved Vendor Program."  See April 15, 2003 Visa International Operating Regulations Glossary > Terms and Definitions.

MasterCard's Honor All Cards Rule states:

> **Honor All Debit MasterCard Cards**. Merchants that choose to accept Debit MasterCard Cards must honor all valid Debit MasterCard Cards without discrimination when validly presented for payment. The Merchant must maintain a policy that does not discriminate among customers seeking to make purchases with a Debit MasterCard Card.

> **Honor All Other MasterCard Cards**. Merchants that choose to accept Other Cards must honor all Other Cards without discrimination when validly

*Footnote continued on next page . . .*

the future, modifies or interprets its application of its honor-all-cards rule to apply to existing technologies, other non-card payments technology not currently in existence, that would constitute new conduct or a new rule not covered by the release. McCormack Rep., ¶ 4 n.6. Any other new conduct in the future by Visa or MasterCard to thwart competition from "innovative technologies that do not yet exist" would likewise not be released. *See* The Home Depot Br. at 29.

Furthermore, neither the Settlement Agreement nor the honor-all-cards rules requires a merchant to purchase new devices in order to enable the merchant to accept Visa or MasterCard credit cards via new technology. *See* McCormack Rep., ¶ 4.

Objecting Plaintiffs submit the Report of Stephen C. Mott in a wrongheaded effort to bolster their complaints regarding the release as well as the definition of various terms in the settlement. *See, e.g.*, Obj. Pls.' Br. at 30-31 n. 24. As detailed in the Report of Mike McCormack submitted concurrently with Class Plaintiffs' Reply, Mr. Mott's hypothetical-filled report fails to support the strained interpretations the Objecting Plaintiffs seek to put on the terms in the settlement. In fact, as Mr. McCormack details, the parade of horribles imagined by Mr. Mott, including the claim that the expansion of card-not-present-rules will undermine competing contactless offerings in the future, are wholly speculative and unsupported by the networks' rules or prior practices. *See* McCormack Rep., ¶¶ 4, 23-24.

---

*. . . footnote continued from prior page*

presented for payment. The Merchant must maintain a policy that does not discriminate among customers seeking to make purchases with another Card.

"Other Card" means "any Access Device, Program or Card that is not defined as "debit" or "Debit MasterCard Card."  *See* June 14, 2013 MasterCard United States Rules §15a Definitions.

June 14, 2013 MasterCard United States Rules 5.10.1.

In sum, the releases are appropriate to the circumstances of this case and are objectively defined with terms and in scope with accepted precedent: they release only claims that were alleged and those claims that could have been alleged based on the identical factual predicate of the claims in this litigation. Objectors' expressed concerns about the scope of the release are without merit. Because the releases do not release new rules or conduct or the former superseded rules if reinstated, they neither waive future antitrust liability nor include claims that are beyond the identical factual predicate as the claims settled in this litigation. The release does not confer "antitrust immunity" on defendants. Accordingly, the releases are reasonable and appropriate to resolve this complex litigation and to "achiev[e] a comprehensive settlement that [will] prevent relitigation of settled questions at the core of [this] class action." Pls.' Supp. Mem. Final Appr. at 43-44.

### 4. The release does not require an end date.

Certain objectors also argue that the "asymmetry" between the duration of the 23(b)(2) release and the duration of the going-forward relief is unfair.[44] The standard is whether the settlement is fair, reasonable and adequate. The absence of a temporal limitation on the release, contrary to objectors' complaints, does not render the settlement unfair. Nor does it grant Defendants "antitrust immunity" as many objectors assert. Rather, because the release is conduct-based, claims challenging new conduct – including reverting to the former rules that were in effect before but modified or eliminated by this settlement – are not released. The Defendants enjoy the

---

[44] Ace Hardware Corporation at 6; *see also e.g.,* Bridgestone Br. at 4 [Dkt. No. 3074]; The Home Depot at 3; The Regents of the University of California at 4 [Dkt. No. 5332]; Target at 23.

protection of the release only so long as they continue to impose and adhere to the status quo in accordance with the settlement's terms. *See* Pls.' Mem. at 52.

### F.    The Rule 23(b)(2) Settlement Class is cohesive.

The Rule 23(b)(2) Settlement Class is cohesive. Visa's and MasterCard's anti-steering restraints, including the no-surcharge rules, constrained competition in payment-card markets. Harm to competition in the marketplace is classic group-wide harm that is appropriately addressed through a (b)(2) injunctive-relief class. All class members have the same unified interest in remedying the effects of Visa's and MasterCard's anti-steering rules. To claim the class lacks cohesion, the objectors turn the applicable legal standard on its head by focusing on class members' conduct instead of defendants' conduct. In doing so, the objectors fashion a perverse standard that would result in a (b)(2) class rarely, if ever, being certified. Objectors' cohesion argument is simply a challenge to the fairness, reasonableness and adequacy of the settlement. But such an argument does not provide a basis for finding that the (b)(2) settlement class lacks cohesion.

A Rule 23(b)(2) class is warranted when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief [] is appropriate respecting the class as whole." Fed. R. Civ. P. 23(b)(2);[45] *see also Dukes*, 131 S. Ct. 2541 at 2557. Consequently,

---

[45]    A standard that Objecting Plaintiffs understand but do not employ here. Objecting Plaintiffs recognized a b(2) class was appropriate in *VisaCheck* because the "Honor all Cards tying rules were 'generally applicable' to the class as a whole" Obj. Pls.' Br. at 26. The modification/elimination of those rules were generally applicable to the class as whole. However, if the standard for b(2) cohesion was to analyze class members' conduct, a b(2) class could not have been certified in *VisaCheck* because only an infinitesimal number of merchants elected to accept just

Footnote continued on next page . . .

the focus of the (b)(2) inquiry is on the defendants' conduct challenged in this case – does the conduct apply generally to class? The answer is undeniably yes. Visa's and MasterCard's respective anti-steering rules were challenged in this case that applied generally to all merchants. All merchants have the same interest in ending and remedying the alleged anticompetitive effects of the anti-steering rules. In fact, even Wal-Mart which objects to the (b)(2) settlement agrees that "merchants should have the right to surcharge." Wal-Mart Obj., ¶12 [Dkt. No. 2644]. Consequently, the structural relief, including the ability to surcharge, provided by the proposed settlement applies to all merchants because it is intended to remedy Visa's and MasterCard's conduct by modifying their respective rules and making the marketplace more competitive.

Instead of focusing on whether the challenged conduct applies generally to the class, objectors focus strictly on class members' conduct. In particular, the objectors, including The Home Depot, Objecting Plaintiffs, and the Target Objectors, assert that cohesion is lacking on the grounds that some merchants may not be able to surcharge credit-card transactions because they are located in states that have laws limiting surcharging or because they accept American Express, or they may choose not to surcharge for business reasons.[46] The Home Depot also makes the astonishing assertion – directly

——————————————— . . . footnote continued from prior page

Visa or MasterCard credit cards or just Visa or MasterCard debit cards instead of accepting both Visa or MasterCard credit and debit cards.

[46] The assertion that cohesion is lacking because future merchants do not receive any relief under the b(2) settlement because the structural relief expires in July 2021 and competitors do not receive any relief under the b(2) settlement are just wrong. Future merchants and competitors in their capacity as merchants get the same injunctive relief as the current class members as long as the rules modifications remain in place. If Visa or MasterCard reinstate their respective former rules modified under the terms of the settlement after July 2021, then claims by current or

*Footnote continued on next page . . .*

contradicted by *VisaCheck*[47] – that "by definition, [class members] do not share any unity of interest" because they range from "small mom-and-pop stores to the largest retailers in the world" and cohesion is lacking because members of the class object to the settlement. The Home Depot Br. at 21. But neither *Dukes* nor any other case supports objectors' contention that class members' varying situations defeat cohesion. To the contrary, in *Dukes*, the Supreme Court expressly recognized that the "key to a (b)(2) class" is "the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Dukes*, 131 S. Ct. at 2557. Accordingly, a (b)(2) class is appropriate when the challenged conduct can be ended with a single injunction. *Id.* That is the indivisible nature at stake. In *Dukes*, the indivisible nature was absent because the plaintiffs sought to combine into a b(2) class claims for monetary damages with claims for injunctive relief claims, which could require individualized inquiry into

---

*. . . footnote continued from prior page*

future merchants challenging the reinstated former rules as anticompetitive are not released. Finally, The Home Depot's and the Target Objectors' claim that cohesion is lacking because the settlement permits Visa and MasterCard to individually negotiate with merchants to not surcharge is absurd. The right to individually negotiate with a merchant to not surcharge in exchange for consideration such as a lower interchange rate is the heart of competition and the opportunity is available to all class members. Such negotiations should arise from the competitive pressure exerted on Visa and MasterCard by a merchant surcharging or threatening to surcharge. The Florida Retail Federation in its filing of October 9, 2012 [Dkt. No. 1635] confirmed this point: "while most businesses do not wish to charge their customers additional money, *the ability to do so is a negotiating point which helps to keep debit transaction fees low.*" (Emphasis added). Moreover, all marketplace participants, no matter when they come into existence, benefit from the structural changes in this marketplace that are being and will continue to be implemented, based in part by the competitive forces introduced into the marketplace by the rules changes effected by this Settlement.

[47] *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 102 (2d Cir. 2005).

whether the challenged conduct, even if illegal, injured each class member and if so the amount of the damages. *Id.* at 2557-59.

The other cases that the objectors rely upon actually support Class Plaintiffs' position that a (b)(2) class is cohesive and appropriate when the defendants' conduct is generally applicable to the class as a whole. For example, in *Casa Orlando Apartments, Ltd. v. Fed. Nat. Mortgage Ass'n*, the Fifth Circuit recognized that the purpose of Rule 23(b)(2) is to address "group as opposed to individual injuries" because it focuses on "whether the defendant's behavior is generally applicable to the class as a whole." 624 F.3d 185, 198 (5th Cir. 2010). The court found that an injunctive-relief class was inappropriate because the defendants' conduct had ceased with respect to over sixty percent of the proposed class and, therefore, did not apply generally to the Class as a whole. *Id.* at 200. In *M.D. ex. Rel. Stukenberg v. Perry*, cohesiveness was lacking because the plaintiffs did not challenge a specific policy that uniformly affected class members but rather sought individualized injunctive relief on behalf of particular class members. 675 F.3d 832, 846-47 (5th Cir. 2012). In *Albertson's Inc. v. Amalgamated Sugar Co.*, the proposed (b)(2) class was not cohesive because some members of the class benefited from the defendants' conduct while others were harmed. 503 F.2d 459, 463-64 (10th Cir. 1974). In *Kartman v. State Farm Mut. Auto. Ins. Co.*, cohesion was lacking because plaintiffs challenged the alleged underpayment of insurance benefits which was a damages claim presenting individual as opposed to class-wide liability issues. 634 F.3d 883, 892-93 (7th Cir. 2011). And in *In re Managerial, Prof'l & Technical Employees*, the court recognized that "[t]he requirements of (b)(2) are usually satisfied in actions for injunctive relief because they seek to redefine the relationship between the defendant and the class of claimants, so that the relief sought is 'generally applicable to

the class,' as required by (b)(2)" but the standard was not met there because some class members benefitted from defendants' conduct while others did not. 2006 WL 38937, at *9 (D.N.J. Jan. 5, 2006).

Defendants' rules and conduct challenged in this litigation were ongoing and applied to all class members. The settlement's structural relief, including the ability to surcharge, addresses Defendants' anticompetitive conduct by making payment-card markets more transparent and competitive. Consequently, the structural relief and its benefits apply generally to the class as a whole. This case is not a case where "each individual class member would be entitled to a different injunction or declaratory judgment against the" Defendants to end the challenged conduct. *Dukes*, 131 S. Ct. at 2557. That individual class members in this case may choose not to avail themselves of the obtained injunctive relief is irrelevant to the determinative issue of whether Defendants' conduct challenged in this case and the structural relief put in place through this settlement to remedy that conduct apply generally to the class.

### G. The Class Plaintiffs are adequate representatives.

#### 1. Class Plaintiffs' interests converge with these of the merchant class.

The Class Plaintiffs are adequate representatives of both settlement classes. The claims they have brought are for the benefit of the Rule 23(b)(2) and (b)(3) Settlement Classes. The relief obtained in the (b)(2) settlement applies to everyone in the class and benefits every class member to the same extent as if it were relief awarded in a final judgment after a full trial. It does

not adversely affect any Class member.[48]  Consequently, for the same reasons the class is cohesive, Class Plaintiffs have no interests antagonistic to the b(2) class members. *See supra*, Section II.F. The Class Plaintiffs are also adequate representatives because they have been involved in this case from the beginning, have been kept apprised, have fulfilled all of their obligations for discovery, have participated in the mediation, often attending sessions before the mediators and/or the Court, and approved the Mediators' Proposal and the Final Settlement Agreement after careful review.[49]

For the above-stated reasons, Class Plaintiffs' interests do not diverge from members of the settlement classes as they did in *Amchem* and *Ortiz*. In *Amchem Products, Inc. v. Windsor*, the damage claims of presently injured asbestos class members were adverse to those who were exposed but whose injuries had not manifested. 521 U.S. 591 (1997). Similarly, in *Ortiz v. Fireboard Corp.*, there were conflicts of interest between class members currently injured and those who might suffer injury in the future. 527 U.S. 815 (1999).

---

[48]  Objecting Plaintiffs claim that Class Plaintiffs are not adequate class representatives because they support the proposed settlement is baseless. Objecting Plaintiffs misstate the holding in *Zimmerman v. Zwicker & Assos.*, P.C., 2011 WL 65912, at *8 n.9 (D.N.J. Jan. 10, 2011). In *Zimmerman*, the court disapproved the settlement on the grounds that the class was required to release their claims in exchange for no payment, while the plaintiff did receive a monetary payment. *Id.* at *4-6. These *Zimmerman* circumstances are not present here. In addition, the court never reached the issue of whether the class representative was adequate because he agreed to the settlement:  "Given that this Opinion discusses several reasons why the proposed settlement is obviously deficient, this suffices for present purposes. For example, the Court's discussion does not specifically address whether plaintiff is an adequate class representative in view of his acquiescence in what appears to the Court to be an obviously deficient settlement."  *Id.* at *8 n.9.

[49]  Harari (Capital Audio) Decl. ¶ 5; Zuritsky (Parkway) Decl. ¶ 7; Opper (Discount Optics) Decl. ¶¶ 3-4; Baker (Crystal Rock) Decl. ¶ 4; Archer (Leon's) Decl. ¶ 4; Rivera/Andrews (Payless) Decl. ¶¶ 73-75;  Goldstone (ScanMyPhotos) Decl. ¶¶ 21-22;  McDonald (CHS) Decl. ¶¶ 7-9 [Dkt. Nos. 2113-6-13].

In this case, contrary to the objectors' claim, Class Plaintiffs have not sacrificed the interests of future class members. Future merchants have the same injunctive relief as the current class members as long as the rules modifications remain in place. If Visa or MasterCard reinstate its former rules modified under the terms of the settlement, then future class members can challenge the reinstated rules as anticompetitive, just as current class members can, because those claims are not released.

Nor does this case present a situation, as in *Authors Guild Inc. v. Google Inc.*, where the Class Plaintiffs' interests diverged from the members of the class "because many members of the class, perhaps even a majority, benefit" from the challenged conduct and "oppose plaintiffs' efforts." 2013 WL 3286232 at *1 (2d Cir. Jul. 1, 2013). By contrast, in this case, the objectors support the underlying claims challenging Defendants' conduct, and in fact many have brought their own suits seeking damages challenging the same conduct and practices. Objectors do not seek to maintain the status quo but instead complain that the settlement does not go far enough and that the releases are too broad.

Objecting Plaintiffs falsely allege that Class Plaintiffs' agreement to the settlement was obtained in exchange for an incentive award.[50] This accusation is false. Each Class Plaintiff's agreement reflects solely an independent judgment that the proposed settlement is fair, reasonable and

---

[50] The cases cited by Objecting Plaintiffs are inapposite. The cited cases involved excessive payments to named plaintiffs in comparison to the payments to class members. In *Gulino v. Symbol Tech., Inc.*, 2007 WL 3036890, at*3 (E.D.N.Y Oct. 17, 2007), the requested incentive awards were nearly one-third of the entire settlement fund and 200% of the amount the most highly compensated absent class member would receive. Similarly, in *Sheppard v. Consol. Edison Co.*, 2000 WL 33313540 (E.D.N.Y. Dec. 21, 2000), each of the named plaintiffs was to receive approximately $400,000 while payments to class members ranged from $566 to $3,502.

adequate and in the best interests of class members. There is no evidence whatsoever that any Class Plaintiff approved the settlement because it had an expectation that they would receive incentive awards, and none conditioned their agreement to the settlement on receipt of such awards.[51] While Objecting Plaintiffs are free to request that this Court also award them incentive payments, Class Counsel can make such a request only on behalf of their clients. They cannot do so on behalf of the Objecting Plaintiffs whom they no longer represent, nor could they presume that the Objecting Plaintiffs would seek an incentive award in connection with a settlement they profess to oppose. (Wildfang Supp. Decl., ¶ 39.)

## 2. The inclusion of American Express's merchant business in the class does not defeat representativeness.

American Express's assertion that adequacy of representation is lacking because the settlement merchant class has interests that are adversarial and antagonistic to American Express's interests as a payment-card network are without merit. Amex Br. at 12-16 [Dkt. No. 2648]. American Express can point to no prejudice to its payment-card business that arises from its inclusion in its capacity as a merchant in the classes. American Express in its capacity solely as a merchant that accepts Visa and MasterCard branded cards is undeniably a member of the settlement classes even if that portion of its business is extremely small compared to its primary business as a payment card network and card issuer. As a member of the classes it has the same

---

[51]   McDonald (CHS) Supp. Decl. ¶¶ 7-10;  Goldstone (ScanMyPhotos) Decl. ¶¶ 7-10; Schumann (Traditions) Decl. ¶¶ 4-5; Rivera/Andrews (Payless) Supp. Decl. ¶ 7; Archer (Leon's) Supp. Decl. ¶ 5; Baker (Crystal Rock) Supp. Decl. ¶ 6; Harari (Capital Audio) Supp. Decl. ¶ 6; Trachtman (Parkway) Supp. Decl. ¶ 5; Zuritsky (Parkway) Supp. Decl. ¶ 5; Opper (Discount Optics) Supp. Decl. ¶¶ 5-9.

interests as other members in the settlement classes in remedying Defendants' conduct that applied to the class as whole and seeking damages for defendants' past conduct. *See Ceasar v. Pataki*, 2000 WL 1154318, at *7 (S.D.N.Y. 2000); *Walsh v. Northrup Grumman Corp.*, 162 F.R.D. 440, 447 (E.D.N.Y. 1995). That American Express disagrees with surcharging is irrelevant.[52] To the extent that the injunctive relief disadvantages American Express's payment-card business –such as by encouraging merchants to drop it in order to surcharge Visa and MasterCard – it does so regardless of whether American Express is included in the b(2) class.

## H.    The settlement negotiation process was fair.

As described in Class Plaintiffs' opening memorandum, the settlement resulted from an arduous mediation process that spanned multiple years and was conducted under the auspices of two of the country's most highly-respected mediators, with the assistance of the Court. Pls.' Mem. at 4-6; Green Decl. [Dkt. No. 2111–3]; Infante Decl. [Dkt. No. 2111–2]. None of the objectors claim that the settlement was the product of collusion, nor could they. Pls.' Mem. at 11-12.

Notwithstanding the arms-length nature of the settlement negotiations, the Objecting Plaintiffs claim that the settlement is procedurally infirm because they claim not to have been sufficiently involved in the negotiation process. *See* Obj. Pls.' Br at 43–44. The Objecting Plaintiffs' claim that they

---

[52]   Under the settlement, American Express is not required to surcharge at all. And it may surcharge Visa and MasterCard credit cards without surcharging its own cards by complying with Paragraphs 42(a)(v)(C), 42(b)(v)(C), 55(a)(v)(C), and 55(b)(v)(C), which would exempt American Express cards from the level-playing-field provisions if American Express offers its merchant businesses preferable card-acceptance fees.

were not sufficiently included in the negotiations, however, is simply false. Wildfang Supp. Decl., ¶¶ 9-38. Moreover, as discussed below, the Objecting Plaintiffs themselves orchestrated the largely fill-in-the-blank opposition which is far from "overwhelming" (as they mischaracterize it). They publicly misrepresented the terms of the proposed settlement and engineered the mass filing of form objections and opt-outs through misleading communications. *Infra* Section III.I.;[53] Bernay Decl., ¶¶ 9-25.

Objecting Plaintiffs' remaining challenges to the procedural fairness of the settlement are similarly meritless. The joint participation by Visa and MasterCard in settlement negotiations raises no more concerns than their joint participation in settlement discussions in other cases, including the settlement negotiated with the Department of Justice and states. *See, Primetime 24 Joint Venture v. NBC,* 219 F. 2d 92, 1-2 (2d. Cir. 2000) (distinguishing case before the court from an "offer to settle [a] lawsuit, "which is exempt from the antitrust laws by the *Noerr–Pennington* doctrine). And while the Individual Plaintiffs' settlements were contingent on agreement among the Defendants and Class Plaintiffs, any suggestion that those settlements somehow tainted the negotiation process is without basis. *See* Green Decl., ¶ 33; Infante Decl., ¶ 12; Renfrew Decl., ¶¶ 13-15, 18 [Dkt. No. 2111-4].

---

[53] As this Court previously previewed, the misleading opt-out campaign waged by Trade Association objectors may appropriately require remedial action, such as allowing class members who have initially indicated an intent to opt out of the settlement be given the opportunity to opt back in. Or. ¶ 4, Apr. 24, 2013 [Dkt. No. 2170]; Hr'g Tr. at 7, Apr. 11, 2013.

## I.    The reaction of the Classes supports final approval.

Despite an unprecedented campaign by the objectors that turned what is normally an objective information-disseminating process into something akin to a proxy contest or a political campaign and that relied on hyperbole, misleading omissions and outright misrepresentations, less than one-tenth of one percent of class members have objected to the settlement. Bernay Decl., ¶ 35; Hamann Decl., ¶ 4. More than 90% of these objections are boilerplate, form objections downloaded from "MerchantsObject.com" and other websites that this Court found to be "misleading and need[ed] to be corrected."  Bernay Decl., ¶¶ 21, 35.  As this Court knows from the motion practice concerning the websites, the websites were designed to manipulate class members into objecting and opting out without giving due consideration to the information contained in the Court-approved notice. The merchantsobject.com website, for example, funneled visitors from the opening page, which shouted, in red, "OPT OUT & OBJECT!  TAKE ACTION NOW!" directly to a boilerplate form objection.

The Form Objections should be given minimal weight in evaluating the adequacy of the settlement. First, many of the objections likely came from class members who may have been misled by the websites that published the Forms. At least 3,909 Form Objections appear to have been downloaded or copied from MerchantsObject.com, www.natso.com/settlementoptions, nationalgrocers.com and potentially others. See Bernay Decl., ¶ 35.  Others may have been misled by the barrage of misinformation sponsored by the Objecting Plaintiffs and other objectors. *See, e.g.*, Bernay Decl., ¶¶ 9-25, Marth Decl., Ex. S (Target claimed in a statement published by FoxBusiness.com that the settlement "restrict[s] merchants from any future legal action"); and Marth Decl., Ex. AA (the NRF claims that surcharging was unlikely because

the settlement "mandates that all stores in a chain must charge extra for credit cards purchases").

In addition, the Form Objections themselves contain ambiguities and inconsistencies that demonstrate that the signers likely had no real understanding of the terms of the settlement or the issues in the case. The first paragraph in each of the 3,909 Form Objections, for example, states the following objection: "The proposed settlement does not address Visa's and MasterCard's price-fixing of interchange rates for the banks. . ." Bernay Decl., Exs. 1-9. It is unlikely that all of the objectors that signed this Form Objection understood that "price-fixing" here refers to conduct that has never been held to be illegal, *i.e.*, MasterCard's and Visa's establishment of default interchange-fee schedules. Similarly, another paragraph of each Form Objections states: "We operate our store in the state of _____, which has enacted a law that prohibits surcharging of credit card transactions." (*Id.*, Exs. 1-9.) At least 300 class members completed the blank with the name of a state that ***does not*** have a statute limiting surcharging. Bernay Decl., ¶ 36 .

And while there are a number of objections by large retailers,[54] these objections are not representative of the majority of the class (99.99% of whom did not object), or even the majority of large retailers. The vast majority of large merchants did not object to the settlement. Moreover, many large, sophisticated merchants that support the settlement litigated this case from the beginning and are in the best position to evaluate its fairness. These merchants include Class Plaintiffs Payless – one of North America's largest

---

[54]   The opt-out rate similarly supports final approval. The settling parties anticipated that large merchants would opt-out, and accounted for opt-outs in the reduction provision. In fact, the volume of commerce comprised by opt-outs (approximately 25%) corresponded almost exactly to the parties' expectations.

specialty-shoe retailers – and CHS – a Fortune 100 company, as well as the largest grocery and drug-store chains in the United States – Kroger and Walgreen's, respectively. Rivera/Andres (Payless) Decl., ¶ 3; McDonald (CHS) Decl., ¶ 2. These large merchants and eight other Individual Plaintiffs concluded that the settlement is a far superior alternative to the risks of continued litigation. Rivera/Andres (Payless) Decl., ¶ 5; McDonald (CHS) Decl., ¶ 7; Ind. Pls.' Br. at 5 ("Even with many more years of litigation, this antitrust case under the Court's supervision will almost certainly not provide the outcome which the critics seek.").

Under these circumstances, this *Grinnell* factor weighs in favor of final approval. *See, e.g.*, *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 23 (2d Cir. 1987) ("a settlement can be fair notwithstanding a large number of objectors"); *TBK Partners, Ltd. V. W. Union Corp.*, 675 F.2d 456 (2d Cir. 1982) (approving settlement where 45 of the 126 class members objected).

### J. Other objections lack merit.

#### 1. The notice in this case meets the standards of due process.

As they did at preliminary approval, certain objectors raise misguided arguments regarding the Notice sent to the class. *See, e.g.*, Obj. Pls.' Br. at 61-64. They complain that the Class Notice contains "false statements" that render it inadequate. The Objecting Plaintiffs are incorrect. None of the supposed statements the Objecting Plaintiffs point to are false or misleading. The settlement Notice plainly meets the standards of due process. It contains "enough information about the settlement and its implications for participants to enable class members to make an informed decision about whether to be heard concerning the settlement or, if allowed, to opt-out."

McLaughlin on Class Action §6.17; *see also* Cl. Pls.' Mem. at 52-54 (discussing notice efforts and collecting cases).

The Objecting Plaintiffs made identical arguments in April, claiming that the Court-approved Notice needed to be changed in response to Class Plaintiffs' motion regarding their misleading websites. *See* [Dkt. No. 2165]. The Court denied the Objecting Plaintiffs' request; finding it procedurally defective and "without merit." Tr. at 16 (May 3, 2013). The same result should occur here.

Objecting Plaintiffs argue that certain rules changes identified in the notice are incorrect, including changes to the no-discount rule because they "lock in" relief secured in other forums. Obj. Pls.' Br. at 63. The Notice, however, properly refers to changes in the no-discount rules. The settlement provides a basis – apart from the Department of Justice's consent decree – for the obligation on Visa and MasterCard to permit merchants to discount. In fact, the settlement imposes an affirmative obligation on Visa and MasterCard to maintain changes to their respective no-discount rules notwithstanding any future modification or termination of the consent decree that the Networks entered into with the DOJ. But for this provision in the agreement, class members would have no recourse for continuing their right to discount if the consent decree is later modified or terminated. *See supra* Section II.C.4.

Objecting Plaintiffs also argue that the Notice exhibits a bias towards settlement, but this is false. Objecting Plaintiffs claim bias is shown by the statement in the Notice that "Class Plaintiffs and their lawyers believe the settlement is best for all class members." *See* Notice at 5. But "[a] settlement notice generally will state that counsel for the class recommends acceptance of the proposed settlement in the best interests of the class."  §8.32 Newberg

on Class Actions (Fourth ed); *see also Greenspun v. Bogan*, 492 F.2d 375, 382 (1st Cir. 1974) (noting that "[a]ppellees were under no obligation to include arguments for or against the settlement in the notice.")

Objectors Optical Etc. LLC and Top Seed Tennis & Soccer Int'l complain that the class should be re-noticed to include detail regarding the size of the class, the aggregate amount of damages, a quantification of the average loss per class member as a percentage of the class member's sales to customers using Visa Branded Cards and Master Card Branded Cards to effectuate payment, and what percentage of the aggregate damages suffered by the class is constituted by the settlement benefits. Optical Etc. Obj. at 2-3. [Dkt. No. 2666]. "Neither Rule 23 nor due process, however, requires that the notice report the estimated value of damages." *Thompson v. Metro. Life Ins. Co.*, 216 F.R.D. 55, 67 (S.D.N.Y. 2003) (citations omitted) (also overriding objection that notice failed to detail class member's individual benefits under the settlement).

Two objections argue the notice campaign has been "irreparably contaminated" by "conflicting information, and arguably, misinformation, published by various entities seeking to influence the final approval process." Papenhausen Obj. at 5; Kevan McLaughlin Obj. at 5. These objectors ignore that the Court ordered certain measures to be taken to ensure any confusion engendered by certain objectors' publicity campaign against the settlement was limited. Moreover, the Court has indicated that additional steps, including potentially affording opt-outs the opportunity to withdraw a prior election, may be appropriate given the misleading and slanted campaign waged on objectors' websites. *See* Hr'g Tr. at 18-19, (May 3, 2013), ("[I]f there is final approval and then if there are merchants that lose out on participating by sharing in the settlement fund because they were misled, there will be a

remedy for that and that remedy will be here in this court as we go forward.)"

## 2. The settlement is procedurally fair.

The Objecting Plaintiffs fail to rebut Class Plaintiffs' showing that the settlement is the product of arduous, arms-length negotiation between Class Counsel and Defendants. As detailed in the Supplemental Declaration of K. Craig Wildfang, the Objecting Plaintiffs boldly misstate the process that led up to the settlement. First, all of the Class Representatives—including each of the now objecting Plaintiffs—accepted a mediator's proposal that outlined the key components of what was to become the Settlement Agreement. Wildfang Supp. Dec. ¶29 Second, the Class Counsel met frequently with the Class Representatives—including the now-Objecting Plaintiffs—before and after the mediators' proposals were accepted, and during the process of negotiating the Settlement Agreement, soliciting their input on the agreement, and attempting to accommodate their wishes in negotiation sessions with the Defendants. *Id.*¶¶ 9-38. In fact as of July 13, 2012, the date of the filing of the Memorandum of Understanding, several now Objecting Plaintiffs indicated their support of Class Counsel and the settlement, while only NACS had expressed its opposition.

## 3. Discover's objection demands a solution to a problem of its own creation.

Discover demands that this Court reject this settlement to save its "Equal Treatment Rule" from the level-playing-field provisions in the settlement. Discover, however, is a relatively small, low-cost competitor to Visa and MasterCard. *See,* Discover Mem. Supp. Mot. Intervene at 3 [Dkt. No. 2659]. To the extent that its cards are lower-priced than Visa and MasterCard

products, Discover should not be affected by the level-playing-field provisions. Even if its cards were more expensive in a particular instance, the level-playing-field provisions still may not take effect, as Discover acknowledges that its rule applies only in "some [unlikely] situations." Discover Mem. Supp. Mot. Int. at 8. It also admits that it is in the process of "clarifying and amending" its rule to make clear that is not "an obstacle to merchants that want to steer volume to lower priced networks." Hoehnschild Aff., ¶ 24 [Dkt. No. 2567].

Regardless of how frequently or infrequently Discover's Equal Treatment Rule will come into play, it can relieve the "problem" it complains of simply by repealing its rule. Discover would then cease to be a "Competitive Credit Card Brand" that "limit[s]" surcharging, to which the level-playing-field provisions apply. *See* Sett. Ag. 42(a)(v)(B)(iv). Simply put, this Court should not reject a settlement that benefits millions of merchants, in order to protect a competitor's special interest in keeping its own rarely applied rule; particularly when it has the means to fix the "problem" itself.

### 4. The timing of the 8-month interchange reduction fund is most beneficial to merchants.

A small number of objectors disagree with the time period set in the settlement for the 8-month Interchange Reduction Fund period.[55] These objectors, primarily involved in seasonal businesses, such as bicycle sales, summer camps and patio furniture sales, complain that the period, which began July 29, 2013 and will run until March 2014, fails to capture their peak sales volume. While it is the case that a certain percentage of the class

---

[55] *See* Objection of Patio.com [Dkt. No. 1789], Objection of Kevan McLaughlin [Dkt. No. 2474]; Objection of Bicycle South Windsor, LLC [Dkt. No. 1864]; Objection of Miss Sue, Inc. [Dkt. No. 5880].

undoubtedly does more business during parts of the year not covered in the 8-month time frame, based on available data, the settling parties determined that capturing the holiday period would benefit the most class members in the long run. *See* Marth Decl., Ex. T. Thus, objections regarding the timing of the Interchange Reduction Fund should be overruled.

### 5.    Health insurers' objections are speculative.

Two groups of objectors,[56] made up of a number of health -insurance companies, object to the settlement primarily on the basis that certain provisions of the Patient Protection and Affordable Care Act of 2010 (the 2010 Act) could potentially, in the future, affect them differently than other merchant class members. *See* Wellpoint Obj. ¶2-11; Blue Cross Obj. ¶1-14. The Health Insurance Objectors' claims are wholly speculative and overstated.

The Health Insurance Objectors make two primary arguments. First, they claim that a provision of the 2010 Act which limits the amounts insurers can spend on non-health care related activities, could, under very specific circumstances, result in an increased risk of having to pay certain rebates to customers. *See* Wellpoint Obj. ¶3; Blue Cross Obj.¶2. This hypothetical scenario, however, provides no basis to disapprove of the settlement or grant opt-out rights to the Rule 23(b)(2) Class.[57]  The Health Insurance Objectors' argue that if interchange fees are counted towards the 2010 Act's Medical

---

[56]   The Wellpoint, Inc. *et al* objectors [Dkt. No. 2493-1] and the Blue Cross Blue Shield Entities [Dkt. No. 2643] are here referred to as the Health Insurance Objectors.

[57]   "The issue is not whether the proposed settlement could have offered different or even more generous relief; the only question is whether the benefits actually being offered are fair, adequate and reasonable. If they are, the settlement should be approved." *Garst v. Franklin Life Ins. Co.*, 1999 U.S. Dist. LEXIS 22666, *75 (N.D. Ala. June 25, 1999).

Loss Ratio requirement they might have to rebate money to consumers. The 2010 Act requires insurers to spend 80 percent of funds towards insured persons' health care costs, rather than administrative costs. *See* §2718 of the Public Health Service Act, enacted under section 10101(f) of the 2010 Act Pub. L. No. 111-148, 124 Stat. 119, 885 (2010). If more than 20 percent of funds are spent on administrative costs, determined by applying a complex system of measurements, a rebate may issue. The Health Insurance Objectors argue that interchange fees may push them over the 20 percent threshold, but provide no reason to believe that this will be the case, particularly because that aspect of the 2010 Act has yet to go into effect. The Health Insurance Objectors claims regarding the effect of the 2010 Act are speculative at best and provide no reason to disapprove the settlement or provide special treatment to these objectors.[58]

The Health Insurance Objectors' second argument fares no better. They argue that they are unable to take full advantage of certain aspects of the settlement because in the past most insurers did not accept credit-card payments at all or on as wide of a scale as they expect to do in the future. They complain that because many of them did not accept credit card payments during the Class Period, some of them will not receive cash as part of the Rule 23(b)(3) Class or be able to take advantage of all aspects of the

---

[58] Some form objections received from certain pharmacy-related companies raise a slightly different objection regarding the surcharging relief in the settlement. They argue that certain contracts they have with health insurers and pharmacy benefits managers as well as regulations under the Centers for Medicare and Medicaid Services might prohibit surcharging. *See, e.g.*, Obj. of Johnson Family Pharmacy [Dkt. No. 2789]. As with the Health Insurance objections, this is pure speculation and should not impact the Court's decision regarding the settlement.

settlement.[59] *See* Wellpoint Obj. at 14. If certain entities did not accept payment cards during the Class Period, however, they would not be in the Rule 23(b)(3) Class. *See* Sett. Ag., ¶2(a) (defining the Rule 23(b)(3) Class as "all persons, businesses, and other entities that have accepted Visa-Branded Cards and/or MasterCard-Branded Cards in the United States at any time from January 1, 2004 to the Settlement Preliminary Approval Date.") They also argue that some of the health-insurance entities accepted payment cards for only a short period of time. But the fact that some class members only accepted credit cards for part of the Class Period is irrelevant to the Court's determination as to whether to approve the settlement. The Plan of Allocation logically allocates recoveries ratable to damages as measured by interchange fees paid during the class period; class members who paid less in fees were damaged less by the conduct at issue. The Health Insurance Objectors further argue that because of timing provisions in the 2010 Act, they will not receive as much as they might otherwise receive from the Interchange Reduction Fund. *See* Wellpoint Obj. at 14. As with their other arguments, this claim is speculative and irrelevant to the Court's determination. The Health Insurance Objectors argue that the entire class must be identically situated in all respects, but this is not the standard. All class members "need not be aggrieved by or desire to challenge a defendant's conduct in order for some of them to seek relief under Rule 23(b)(2)," since "[w]hat is necessary is that the challenged conduct be premised on a ground

---

[59] *See, e.g.*, *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 516 (S.D.N.Y. 1996) (certifying Rule 23(b)(2) class of overcharged securities investors even though "Plaintiffs have not alleged that all of the members intend to trade in Class Securities in the future").

that is applicable to the entire class." C. Wright & A. Miller, Federal Practice and Procedure §1775 (3d. ed. 2013).

### 6. The releases do not bar claims by states acting in their sovereign capacity.

The state attorneys general objectors object on the grounds that the release might bar "claims that are uniquely and exclusively claims belonging to the States as sovereigns", in particular state law enforcement and *parens patriae* claims. As stated above, the releases extinguishes only barred claims by persons, businesses and entities in their capacity as merchants. *See supra*, Section III.D. Thus, the releases bar claims by States only in their commercial capacity as merchants accepting Visa or MasterCard cards payment and to the extent that the claim is derivative of the released claims of members of the settlement classes. The releases do not extend to the states' law enforcement authority, as sovereigns, and thus do not bar the states' law enforcement claims. Class Plaintiffs understand that Defendants have proposed language to be added to the Class Settlement Order and Final Judgment to resolve the state attorneys general objectors' concerns.

### 7. The plan of allocation should be approved.

The Plan of Allocation, as updated by Class Plaintiffs' April 11, 2013 filing, should be approved. No detailed objections to the plan have been received by objectors, apart from a statement from Ace Hardware that hypothetically – should Ace dispute the accuracy of a claim amount provided by the Class Administrator -- the cost of determining its claim could result in costs to the company in excess of the relief it is ultimately afforded. *See* Ace Hardware Obj.¶9-10. This is purely speculative and Class Counsel anticipate

the claims process to be managed in a way to minimize the iterative process that Ace imagines.

As a general rule, the adequacy of an allocation plan turns on whether counsel has properly apprised itself of the merits of all claims, and whether the proposed apportionment is fair and reasonable in light of that information. *See In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 133 (S.D.N.Y. 1997). "An allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel." *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 344 (S.D.N.Y. 2005) (citations and quotation marks omitted). Here, the Plan of Allocation has been recommended by experienced and competent class counsel after extensive review of the available data it and provides a fair and reasonable method to distribute the settlement funds to the class. The Plan of Allocation should be approved.

### 8. The settlement is superior to the *VisaCheck* settlement this Court approved in 2003.

As this Court knows from its supervision of both cases, and its review of both settlements, the relief afforded merchants as a result of *VisaCheck* was considerably less than the relief resulting from *Payment Card*. And yet, the same merchants and lawyers that urged approval of the *VisaCheck* settlement now argue that this settlement fails to meet the standards for final approval under Rule 23.

The *VisaCheck* settlement modified the Visa and MasterCard "honor all cards" rules to eliminate the "tie" between the networks' debit and credit merchant-acceptance services (while retaining the honor-all-cards rules for all credit cards), and provided temporary (five months') reduction in debit-card interchange fees. Other than this relief, the Visa and MasterCard payment-card networks were unchanged as a result of the *VisaCheck* case. *See* Wildfang Supp. Decl., ¶ 41.

In contrast, the changes to the Visa and MasterCard networks wrought by MDL 1720 and other efforts of Class Counsel have re-shaped the payment-card industry. These changes set forth in detail in ¶¶ 6–9 of the Declaration of K. Craig Wildfang and, ¶¶ 40-45 of the Supplemental Declaration of K. Craig Wildfang – include the divesture of the banks' interest in the networks, the repeal of portions of the networks' anti-steering restraints in a DOJ consent decree, and the regulation of debit-card interchange fees. Adding to all of these game-changing reforms in 2012, Class Counsel were able to negotiate this settlement, which goes even further, as summarized in Class Plaintiffs' Memorandum of Law in Support of Motion for Final Approval at 7-9.

This Court properly found that the settlement in *VisaCheck* met the standard for approval under Rule 23, *VisaCheck*, 297 F.Supp.2d at 520. This Court's decision was affirmed on appeal. *Wal-Mart*, 396 F.3d at 124. Since the settlement now before the Court in this case plainly provides even more extensive relief than the settlement in *VisaCheck*, it follows that this settlement also meets the standards for final approval under Rule 23.

## III. CONCLUSION

Class Plaintiffs have presented to this Court a meaningful Settlement Agreement that gives merchants rights and leverage in payment-card markets for years to come, in addition to compensating them for past injury. The settlement therefore satisfies the *Grinnell* factors as being fair, adequate, and reasonable. Contrary to the objectors' distortions, the releases—when interpreted properly—are standard for a large antitrust case according this type and extent of relief. These overstated arguments certainly do not justify depriving merchants of the settlement's benefits. Thus, when one considers the applicable standards the two alternatives that are presented under—the

settlement with its benefits on one hand versus continued litigation with its risks and delays on the other—this settlement meets the standards for final approval. Class Plaintiffs therefore respectfully request that this Court finally approve the settlement.

August 16, 2013                    Respectfully submitted,

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
K. Craig Wildfang
Thomas J. Undlin
Ryan W. Marth

*s/ K. Craig Wildfang*
K. CRAIG WILDFANG
2800 LaSalle Plaza
800 LaSalle Avenue South
Minneapolis, MN 55402-2015
Telephone: 612/349-8500
612/339-4181 (fax)

BERGER & MONTAGUE, P.C.
H. Laddie Montague, Jr.
Merrill G. Davidoff
Bart D. Cohen
Michael J. Kane

*s/ H. Laddie Montague, Jr.*
H. LADDIE MONTAGUE, JR.
1622 Locust Street
Philadelphia, PA 19103
Telephone: 215/875-3000
215/875-4604 (fax)

ROBBINS GELLER RUDMAN & DOWD LLP
Patrick J. Coughlin
Bonny E. Sweeney
David W. Mitchell
Alexandra S. Bernay

*s/ Bonny E. Sweeney*
BONNY E. SWEENEY

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

*Co-Lead Counsel for Plaintiffs*