UNITED STATES DISTRICT COURT       <u>FOR ONLINE PUBLICATION ONLY</u>
EASTERN DISTRICT OF NEW YORK

IN RE PAYMENT CARD INTERCHANGE
FEE AND MERCHANT DISCOUNT
ANTITRUST LITIGATION

MEMORANDUM AND ORDER
CONTAINING PERMANENT
<u>INJUNCTION</u>
05-MD-1720 (JG)

A P P E A R A N C E S

BERGER & MONTAGUE, P.C.
    1622 Locust Street
    Philadelphia, PA 19103
By:   H. Laddie Montague, Jr.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
    2800 LaSalle Plaza
    800 LaSalle Avenue South
    Minneapolis, MN 55402
By:   K. Craig Wildfang

ROBBINS GELLER RUDMAN & DOWD LLP
    655 West Broadway, Suite 1900
    San Diego, CA 92101
By:   Bonny E. Sweeney
    *Co-Lead Counsel for the Plaintiff Class*

BINDER & SCHWARTZ LLP
    28 West 44th Street
    New York, NY 10036
By:   Neil S. Binder
    *Attorneys for Settlement Recovery Group, LLC*

SHEPPARD, MULLIN, RICHTER & HAMPTON
    30 Rockefeller Plaza
    New York, NY 10112
By:   Daniel L. Brown, Esq.
    *Attorneys for Premier Enterprises Group, Inc.*

JOHN GLEESON, United States District Judge:

A. *Preliminary Statement*

In a letter dated November 14, 2013, Berger & Montague, P.C., Robins, Kaplan, Miller & Ciresi L.L.P., and Robbins Geller Rudman & Dowd LLP, as co-lead counsel for the plaintiff class ("Class Counsel") in this antitrust action, notified the Court that misleading solicitations were being made to class members to induce them to sign up with a third-party claims filing company. *See* No. 05-MD-1720, ECF No. 6088. Class Counsel sought injunctive relief that would protect class members' interest in the settlement funds. *See id.*

The application concerned Settlement Recovery Group, LLC ("SRG"), a third-party claims filing company, and Premier Enterprises Group, Inc. ("Premier"). Pursuant to a referral agreement with SRG, Premier made misleading solicitations to class members on SRG's behalf. The conduct of SRG and Premier is but one facet of a larger phenomenon that occurred in an earlier related class action, *In re Visa Check/MasterMoney Antitrust Litigation* ("*Visa Check*") and has replicated itself in this one: the need to protect the class members who will share in the settlement fund in this case, especially the small and relatively unsophisticated merchants who constitute the overwhelming majority of the class, from overreaching by third-party claims filing companies.[1] It raises important questions regarding the breadth of a court's authority to police the behavior of third parties – nonparties to the case – in their dealings with the class. More

---

[1]     *Visa Check*, like the instant case, involved defendants Visa U.S.A. Inc. and MasterCard International Incorporated. The plaintiff class there, like the one here, consisted of millions of merchants, ranging from corner stores to such retailing behemoths as Wal-Mart Stores, Sears, Safeway, The Limited, Circuit City, and the National Retail Federation. *See In re Visa Check/MasterMoney Antitrust Litig.*, No. 96-CV-5238, 2003 WL 1712568 (E.D.N.Y. Apr.1, 2003) ("*Visa Check I* ") (deciding parties' motions for summary judgment); *In re Visa Check/MasterMoney Antitrust Litig.*, 192 F.R.D. 68 (E.D.N.Y. 2000) ("*Visa Check II*") (certifying class), *aff'd*, 280 F.3d 124 (2d Cir. 2001); *In re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003) ("*Visa Check III*") (approving class settlement and plan of allocation and awarding attorneys' fees), *aff'd sub nom.*, *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005); *In re Visa Check/MasterMoney Antitrust Litig.*, No. 96-CV-5238, 2006 WL 1025588 (E.D.N.Y. Mar. 31, 2006) ("*Visa Check IV*") (ordering injunctive relief against third-party claims filing company).

precisely, it requires the Court to reconcile the legitimate interests that claims filing companies have in soliciting business with the need to protect merchants not only from confusion but from needlessly ceding a significant portion of their future claims – in the case of SRG, over one-third of their individual recovery – to overreaching claims filing companies.

The Court's authority is clear, and its obligation to protect class members is strong. The only effective way to avoid confusion and intolerable inefficiencies in the claims filing process is to be firm: any third-party claims filing company that knowingly makes – directly or through an agent acting on its behalf – material false or misleading statements to merchants in an effort to solicit their business risks being permanently enjoined from filing claims in this case.

For the reasons discussed below, Premier is permanently enjoined from engaging, directly or indirectly, in claims filing services in relation to any settlement in this case. As for SRG, the conduct alleged by Class Counsel is sufficiently egregious to trigger such a permanent injunction. However, evidentiary issues that arose at the hearing, taken together with remedial steps SRG took in the immediate aftermath of its improper conduct, counsel against the issuance of a permanent injunction against SRG. Finally, the other claims filing companies whose conduct has been the subject of evidentiary hearings – Managed Care Advisory Group, Spectrum Settlement Recovery, Financial Recovery Services, Inc., and Refund Recovery Services LLC – have shown cause why injunctive relief against them should not be ordered.

B. *Background*

1. *Overview of the Case*

In this antitrust action, the class plaintiffs allege that Visa U.S.A. Inc. ("Visa"), MasterCard International, Inc. ("MasterCard") and a number of banks conspired to fix interchange fees, which are part of the price merchants pay on each transaction involving Visa- or

Master-Card-branded credit cards, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The plaintiffs' arguments are more fully set forth in *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 05-MD-1720, 2013 WL 6510737, at *1 (E.D.N.Y. Dec. 13, 2013) ("*Interchange I*") (approving settlement and plan of allocation), and I assume familiarity with that decision here. *See also In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 05-MD-1720, 2014 WL 92465, at *1 (E.D.N.Y. Jan. 10, 2014) ("*Interchange II*") (awarding attorneys' fees).

This case was litigated for more than eight years before I approved the parties' negotiated Settlement Agreement in an Order dated December 13, 2013. *Interchange I*, 2013 WL 6510737, at *2-3. "The settlement has two principal components: a fund of about $7.25 billion (before reductions for opt-outs, which reduced the fund to about $5.7 billion), against which merchants who did not opt out of a Rule 23(b)(3) class may make damages claims; and injunctive relief in the form of various credit card network rules changes, which apply to all members of a Rule 23(b)(2) class." *Interchange II*, 2014 WL 92465, at *1. Arguments for and against the settlement were presented at length in writing and at a fairness hearing I held on September 12, 2013. *Interchange I*, 2013 WL 6510737, at *1.

In addressing the damages-fund component of the settlement, I rejected various objections and certified the Rule 23(b)(3) damages class and approved the proposed plan of allocation. *See Interchange I*, 2013 WL 6510737, at *21-26 (addressing objectors' arguments against certification of class), 26 n. 20 (addressing Rule 23 certification requirements). The Settlement Agreement defined the Rule 23(b)(3) class as follows:

> A "Rule 23(b)(3) Settlement Class" under Federal Rules of Civil Procedure 23(a) and (b)(3), from which exclusions shall be permitted, consisting of all persons, businesses, and other entities that have accepted Visa–Branded Cards and/or MasterCard–

4

> Branded Cards in the United States at any time from January 1, 2004 to the [November 27, 2012] Settlement Preliminary Approval Date, except that this Class does not include the named Defendants, their directors, officers, or members of their families, financial institutions that have issued Visa- or MasterCard–Branded Cards or acquired Visa- or MasterCard–Branded Card transactions at any time from January 1, 2004 to the Settlement Preliminary Approval Date, or the United States government.

*Id.* at *1 n.3, *4. Class Counsel estimate that the class contains at least 12 million merchants that may file claims against the $5.7 billion settlement fund. *Interchange II*, 2014 WL 92465, at *1, *8 n.12.

The December 13, 2013 Order is currently on appeal to the United States Court of Appeals for the Second Circuit. *See, e.g.,* No. 05-MD-1720, ECF Nos. 6125, 6128, 6135, 6164, 6174, 6176.

2. *The* Visa Check *Case*

*Visa Check* was a separate but related multi-district litigation. The *Visa Check* class plaintiffs alleged that the networks' practice of requiring merchants that accepted Visa- and MasterCard-branded credit cards to also accept the networks' debit products constituted an illegal tying arrangement, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. *Visa Check III*, 297 F. Supp. 2d at 507. They further alleged that the networks attempted to monopolize the debit card market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. *Id.*

In 2003, just as a trial was about to commence, the class plaintiffs entered into separate settlement agreements with Visa and MasterCard, providing for, *inter alia*, the creation of a combined settlement fund of $3.05 billion. *Id.* at 508. By Order dated December 19, 2003, I approved the *Visa Check* settlement agreements and the plan of allocation for distributing the settlement funds. The *Visa Check* plaintiff class contained approximately five million members.

*Id.* at 506.  The actual number of claims filed was lower – in excess of 815,000 claims.  *Interchange II*, 2014 WL 92465, at *8 n.12; No. 96-CV-5238, ECF No. 1486 ("Zola Aff.") ¶ 4.

  The *Visa Check* plan of allocation provided for annual payouts by Visa and MasterCard over a period of ten years.  It also "set[] forth a method for estimating the damages of each class member and allocating settlement funds accordingly.  Class members . . . receive[d] monetary awards . . . directly proportional to their debit and credit purchase volume (as well as online debit transactions) during the class period, *i.e.*, from October 25, 1992 to June 21, 2003 . . . ."[2]  *Visa Check IV*, 2006 WL 1025588, at *1.

  This approach made the claims submission process simple for class members.  Merchants already in the Visa Transactional Database – the overwhelming majority of the class – did not need to provide any information to recover a monetary award from the net settlement funds based on their purchase volumes from October 1, 1996 to June 21, 2003 (the relevant time period for which there was Visa transaction data).  *See Visa Check III*, 297 F. Supp. 2d at 519, 519 n.21.  Each individual class member's recovery was estimated by applying statistical models to the Visa data for that period; different methods of calculation were used for debit and credit charges and for online debit charges.  *See* No. 96-CV-5238, ECF No. 1284 ("Nov. 2, 2005 R & R") at 5-6.  The Visa data was useful in estimating the damages owed by both Visa and MasterCard to the vast majority of the class because virtually all merchants who accepted Visa also accepted MasterCard.[3]  *Visa Check III*, 297 F. Supp. 2d at 519 n.21.

---

[2]   The *Visa Check* plan of allocation also provided that "if additional settlement funds remain after all approved claims have been paid, an additional pro rata distribution may be paid to all class members who received and cashed their checks."  *Visa Check IV*, 2006 WL 1025588, at *1.

[3]   The Visa Transactional Database used in the *Visa Check* action consisted of data maintained by Visa and "provide[d] extensive records of merchant acceptance of credit and debit card transactions from October 1996 to July 2003."  No. 96-CV-5238, ECF No. 1177 ("Amended Plan of Allocation") at iii (quoted in Nov. 2, 2005 R & R at 6).  It was the principal database used under the Amended Plan of Allocation "because it is the only database that accurately distinguishes between the vast majority of Class Members' off-line debit and credit card

For the class period prior to October 1996, class members submitting claims needed to produce information, such as merchant contracts or processor statements, indicating the periods when they accepted Visa and/or MasterCard debit cards.  *Id.* at 519.  Claimants could provide "processor statements showing the number and/or dollar volume of online debit transactions accepted during the Class period" – a minimal requirement that relieved class members of what might otherwise have been the "insurmountable" burden of "produc[ing] the necessary records of transactions."  *Id* (citations omitted).

*Visa Check* class members received notice of their estimated cash payments as calculated by the Claims Administrator as well as of their right to challenge those estimates.  Nov. 2, 2005 R & R at 6-9.  A class member wishing to challenge its estimate was required to state what it believed its claim should be and provide supporting documentation.  Amended Plan of Allocation ¶ 7.1.  Upon reviewing a challenge, the Claims Administrator could choose to "consult with Visa, MasterCard, or the Class Member's acquiring bank or processor, as appropriate," or request additional information or documentation from the merchant before making a determination.  *Id.* ¶¶ 7.2-7.3.  The merchant would ultimately receive a determination letter stating that their estimated payment had been increased, decreased or would remain unchanged.  *See id.*  Determination letters included notice of the merchant's right to appeal by petitioning counsel for the *Visa Check* class and subsequently the Court for review of the Claims Administrator's calculations.  *Id.* ¶¶ 7.2, 7.4.

Though there are important differences between the *Visa Check* action and the present *Interchange Fee* case, the two cases are similar in several respects.  "[B]oth are antitrust cases involving the two largest networks and banks, with merchants as plaintiffs; both involve

_____

purchase volumes over a substantial portion of the Class Period," in contrast to the data available from MasterCard. *See* Nov. 2, 2005 R & R at 17 (citation omitted).

novel and complex legal questions; in their history, both encompassed many years of litigation involving many thousands of hours of lawyering; and in their results, both ended in huge settlement funds accompanied by programmatic reforms of (possibly) even greater monetary value." *Interchange II*, 2014 WL 92465, at *4. And both presented the difficult issue that is now before the Court: What measures, if any, may properly be taken by the Court to protect class members from the false or misleading solicitations of third-party claims filing companies?

> 3. *Overreaching by a Third-Party Claims Filing Company in* Visa Check

On September 9, 2005, lead counsel for the *Visa Check* plaintiff class notified the Court that Spectrum Settlement Recovery ("Spectrum"), a third-party claims filing company, was "'intentionally spreading misinformation to confuse Class members and complicate the allocation process in an attempt to create a need for its services.'" *Visa Check IV*, 2006 WL 1025588, at *2 (quoting No. 96-CV-5238, ECF No. 1240 ("Dec. 13, 2005 Order")). In its response, Spectrum described its business – the business of third-party claims filing companies – and its value proposition in relation to the *Visa Check* action:

> Spectrum is one of the nation's largest claim filing and fund recovery services for commercial and securities class-action settlements . . . . Most businesses have neither the technical expertise, nor the time to devote corporate personnel to obtain and sift through corporate records needed to properly support a claim for such settlements. Spectrum increases participation rates by generating corporate interest in submitting claims. It does this by managing the claims filing process for the customer, which has in effect outsourced to Spectrum the package of work required to submit . . . in this case, a solid challenge, if appropriate, to the estimate from the Claims Administrator. This includes compiling and analyzing transaction data for the applicable claim period, testing the data to determine the maximum claim amount, preparing the claim, filing the claim and monitoring the claim and the claims administrator through to the final payout.

No. 96-CV-5238, ECF No. 1194 (Spectrum Opp.) at 2-3.

I referred the application to Special Master Robin M. Wilcox, who reported on November 2, 2005 that Spectrum had indeed made the following "incorrect or misleading" statements in communications to class members:

> (1) . . . the Visa Transactional Database failed to distinguish between credit card and off-line debit transactions; (2) . . . class members "may be eligible to collect significant top line revenue from $100,000 to $6,000,000;" (3) . . . the claims administrator would become "adversarial" with respect to the merchants and "is obligated to rely only on the questionable information provided by MasterCard and Visa;" and (4) . . . the estimated cash payment sent to class members was an "offer" or "partial offer."

*Visa Check IV*, 2006 WL 1025588, at *2 (quoting Nov. 2, 2005 R & R at 24-29). Counsel for the class requested both a declaration that contracts between Spectrum and class members were void and an injunction prohibiting Spectrum from soliciting class members in the future and requiring it to correct the misstatements already made to class members. *Id.* I adopted Special Master Wilcox's findings as well as her recommendation that I refrain from granting the injunctive relief sought. *Id.* Instead, I directed counsel for the class "to (1) publish a notice on the case website correcting Spectrum's statements; and (2) send the same corrective notice to all class members with whom Spectrum had communicated." *Id.* (citing Dec. 13, 2005 Order).

On February 15, 2006, counsel for the *Visa Check* class again requested injunctive relief against Spectrum. The request was based on a new set of allegedly misleading statements made to class members. "'Spectrum is once again using misrepresentations – this time that the U.S. government's potential claim [to participate in the settlement] will delay payments to class members – to gin up business.'" *Id.* at *3 (quoting No. 96-CV-5238, ECF No. 1254 (Lead Counsel Memo of Law) at 2). In addition to stating or suggesting in numerous solicitations that the government's claim would "push back the payment date" for claims, *id.* at *3, *5, Spectrum

also stated that "the government's claim, if validated, will reduce the amount of your recovery," *id.* at *3. By that stage of the litigation, Spectrum had expanded its services and was not merely contracting with merchants to file their claims but also purchasing their claims outright. *Id.* at *2.

Counsel for the class argued that Spectrum's false and misleading statements warranted an order requiring it to send corrective notices to class members and allowing any merchants who were misled by those statements to void their contracts with Spectrum. *Id* at *3. I agreed and granted counsel's motion. *Id.* at *4. In doing so, I observed as follows:

> It is hardly unreasonable to expect – and indeed require – Spectrum to get the facts right when it solicits business from class members. If it fails to do . . . Spectrum will bear the cost of its errors . . . . In short, as Spectrum concedes, it was "not as careful with the wording" of its communications to class members as "[the Court] would have liked." Spectrum must now be held accountabl[e] for its carelessness.

*Id.* at *6 (citation omitted). Pursuant to my authority under the All Writs Act, 28 U.S.C. § 1651(a), I ordered counsel for the class to (1) send a corrective notice (already agreed upon with Spectrum) to every class member that was solicited to sell its claim to Spectrum, and (2) mail a notice to all class members under contract with Spectrum "that the contract may be voided by the merchant without legal ramification" upon the provision of a notarized statement that the class merchant "relied on misleading marketing materials in entering the contract." *Id.* at *4-5, *6-7, *8. I followed the March 31, 2006 decision ("March 31 Order") with a second order dated April 18, 2006 ("April 18 Order") setting forth the specific forms of notice to be sent to class members.

Spectrum filed a notice of appeal on April 4, 2006 and an emergency motion for a stay pending appeal on April 12, 2006 with the United States Court of Appeals for the Second Circuit. No. 96-CV-5238, ECF Nos. 1289, 1316. On April 21, 2006, the Second Circuit granted a temporary stay of this Court's mandatory injunction.

10

On May 12, 2006, the parties filed a joint application with this Court requesting approval of certain modifications to the March 31 and April 18 Orders. *Id.*, ECF No. 1309. In that application, the parties apprised the Court that Spectrum had agreed to dismiss its appeal provided the following changes were accepted by the Court: (1) class members rescinding contracts with Spectrum would be required to specify which misleading statements they had relied upon or without which they would not have entered into the contract; and (2) Spectrum would be enabled to contest individual claims for rescission before the Court. *Id.* I denied the joint application on June 5, 2006, *id.*, ECF No. 1310, reiterating my earlier finding that "equity requires that class members be authorized to rescind their contracts without having to litigate reliance, provided they state under oath that they entered into their contracts with Spectrum in reliance on its false or misleading statements." *Id.* I also noted the striking reversal in position on the part of counsel for the class, who had previously argued that the specter of having to litigate reliance would have a chilling effect on class members who felt they had been misled and were being "held hostage" by their contracts with Spectrum. *Id.* (quoting *id.,* ECF No. 1267 (March 1, 2006 Letter) at 2).

On June 27, 2006, Spectrum withdrew its motion for a stay pending appeal and requested that Second Circuit dissolve the temporary stay it had granted, citing as its motivation the burden the temporary stay had placed on Spectrum's ongoing business related to the *Visa Check* action. *Id.*, ECF No. 1325. The Second Circuit dismissed the appeal on June 28, 2006. *Id.*

4. *The Procedure for Filing Claims in This Case*

The claims filing process in this case is governed by the Plan of Administration and Distribution (the "Plan"), which I approved alongside the Settlement Agreement in the December 13, 2013 Order. *Interchange I*, 2013 WL 6510737, at *27; No. 05-MD-1720, ECF No.

11

1656-1, App. I (Plan) at I-1; *id.*, ECF No. 2112-1 ("Additional Info.") at 1.    The settlement

provides for the creation of two funds totaling $7.25 billion.  Plan at I-1, I-10; Additional Info. at

1, 10-11.  As mentioned above, opt-outs from the class reduced the total settlement fund to $5.7

billion.

   The bulk of the funds will be distributed by the Class Administrator to members of

the Rule 23(b)(3) damages class on a pro rata basis according to the actual or estimated amount

individual merchants paid in interchange fees on Visa- and MasterCard-branded card transactions

during the class period, from January 1, 2004 to November 28, 2012.  Additional Info. at 2.  As in

the *Visa Check* action, actual or estimated recovery amounts will be based on transaction data

available in Visa's databases and not data maintained by MasterCard or other sources, which

"either lack sufficient coverage and consistency and/or do not include sufficient transactional

information on Interchange Fees Paid to provide meaningful and systematic assistance in valuing

claims."[4]  Additional Info. at 3.  Two Visa databases, the SQL-AIM Database and the MISD

Database, provide data from the class period and "together . . . include all U.S. Visa-Branded

Card transactions processed through Visa's systems," including sales transaction amounts and the

"vast majority" of interchange fees paid on transactions.[5]  *Id.*  A third database, the Visa

Merchant Profile Database, houses merchants' identifying information and provides the link

between individual class members and the Visa transaction data.  *Id.* at 4.

   To arrive at class members' recovery amounts, the Claims Administrator will take

a two-step approach.  First, it will determine whether a class member's transactions can be found

---

[4]  The Claims Administrator may seek data from MasterCard upon requests from class merchants "who may have a disproportionate share of transaction volume on MasterCard-Branded Cards."  Such claimants may also choose to "submit information from which its MasterCard Interchange Fees Paid can be accurately estimated." Additional Info. at 3.

[5]  The Visa data is not without gaps.  Class Counsel note that the Claims Administrator may provide estimates "for a small number of discrete months in which actual Interchange Fees Paid data is not available from Visa." *Id.* at 4 n.4.

in the Visa data.  If so, "the face value of [the merchant's] claim will be equal to the amount of actual Interchange Fees Paid."  *Id*.  If not, the Claims Administrator will make a reasonable estimate of the class member's claim value.   Typically, this will require the class member to provide information such as identifying information, Visa-specific sales transaction volume, total payment card sales transaction value, average default Visa interchange rates, the period during which Visa- or MasterCard-branded cards were accepted, and/or total annual retail sales.  *See id.* at 4-5, 6-7.  Depending on the information provided by the claimant to the Claims Administrator, a corresponding calculation methodology will be used to estimate the value of its claim.  *Id.* at 5.[6]

The majority of claims will be valued at the first stage of the calculation process – that is, Visa transaction data exists for most class merchants during the damages period.  Thus, the claims process will be simple for most damages class members.  The merchants will receive a preprinted claim form containing their estimated recovery amount and may perfect their claim simply by signing and mailing back the claim form by the specified deadline.  *Id.* at 9, 13-14. This one step is all that is required of class merchants looking to secure their recovery under the settlement.  Before claims forms are made available, the Claims Administrator may ask class members for identifying information to input into the Visa databases or transaction information to be used to estimate claims, or class members may themselves choose to provide such information

---

[6]      Whereas the bulk of the funds will be distributed on a pro rata basis according to how much a class merchant paid in interchange fees, the distribution of $1.2 billion – the so-called "Interchange Fund" – will be based on a percentage (one-tenth of one percent) of the claimant's Visa and MasterCard credit card sales during the "Interchange Reduction Period."  *Id.*, ECF No. 1656-2 (Class Counsel Memo in Support of Mot. for Preliminary Approval) at 25.  During that period, which began within 60 days of the close of the opt-out period, Visa and MasterCard were required to "withhold or adjust 10 basis points from the default interchange amounts" typically provided to issuing banks on their acquired and issued Visa- and MasterCard- branded card transactions to which default interchange rates ordinarily apply.  Additional Info. at 10-11; Plan at I-10.  The Claims Administrator will calculate these claims as a percentage of sales volume based on the same Visa transaction data used in the calculation process described in the text.  Thus, where the sales-volume data for individual merchants is available in the Visa databases, an exact claim value will be determined; otherwise, the Claims Administrator will arrive at an estimate, typically based on additional information requested from merchants, in this case, their "credit card transaction volume figures" for the Interchange Reduction Period.  Additional Info. at 11-12.

in advance by preregistering.[7]  *Id.* at 6-7.  Ultimately, however, the responsibility for generating actual or estimated claims values lies with the Claims Administrator; class merchants need only sign and return their preprinted claim forms.

Any merchant may of course challenge the amount of the claim as calculated by the Claims Administrator.  Upon receiving a first-time challenge, the Claims Administrator may require the merchant to provide additional identifying information to run a fresh search on the Visa databases for the merchant's relevant transaction data.  *Id.*  The Claims Administrator may also request transaction information if it determines that the claims values must be estimated.  *Id.* at 7, 14.  If the merchant continues to dispute the Claims Administrator's calculation, it "must state what it believes is a more accurate estimate and/or explain how it can be more accurately calculated, including supporting documentation."  *Id.*  After reviewing the challenge and documentation provided by the merchant, the Claims Administrator will determine if the claims values should be adjusted and then notify the merchant of its final decision.  *Id.* at 8, 14-15.  This notice will also inform the merchant of the right to appeal, first to Class Counsel and then to the Court.  *Id.*

5.  *The Allegations of Overreaching By Third Party Claims Filing Companies in This Case*

According to Class Counsel, overreaching by third-party claims filing companies in relation to the *Interchange Fee* case before me now began not only before I approved the settlement on December 13, 2013, but even before the September 12, 2013 fairness hearing.  In fact, the first hearing in this case regarding the allegedly misleading and false statements of a claims filing company took place on the same day as the fairness hearing.  The stream of

---

[7]     The Claims Administrator has established a preregistration system on the case website, which permits merchants to provide certain categories of information to assist the Claims Administrator in the preparation of their claims forms.  Additional Info. at 8-9.

complaints and confused inquiries from class members related to claims filing companies has been steady ever since. The problem is already a many-headed hydra: the allegations of misleading activity involve far-ranging claims and representations about the litigation, numerous points of contact and delivery systems, and a long list of actors. Several actors have been singled out by Class Counsel as requiring further scrutiny; I outline Class Counsel's complaints about these third-party claims filing companies in the following sections.

### a.   *Managed Care Advisory Group, Inc.*

In a letter dated August 27, 2013, Class Counsel alerted the Court to a solicitation campaign embarked upon by third-party claims filing company Managed Care Advisory Group, Inc. ("MCAG") through partnerships with credit card processing companies, including Heartland Payment Systems, Inc. ("Heartland") and Global Payments Inc. ("Global"), which Class Counsel argued would cause widespread confusion within the damages class and disrupt the administration of the settlement. No. 05-MD-1720, ECF No. 5964 ("Aug. 27 Letter") at 1; *id.*, ECF No. 6002 ("MCAG OTSC Response") at 1. MCAG's partners had begun informing their class-member clients (*i.e.*, merchants for whom they provided credit card processing services) that they intended to have MCAG file their claims against any settlement funds in this case. *Id.*, ECF No. 5969 (MCAG Response) at 2.

More precisely, in a barrage of direct mail communications from MCAG's various partner processing companies, class members were told that unless they "opted out," in some cases by a certain deadline, MCAG would file claims on their behalf against the *Interchange Fee* settlement funds, Aug. 27 Letter at 1; No. 05-MD-1720, ECF No. 5964-1 ("Aug. 27 Bernay Decl.") ¶¶ 3, 8, 9; *id.*, ECF No. 6016-1 ("Sept. 11 Bernay Decl.) ¶¶ 3-7, despite the fact that neither MCAG nor the processors had been authorized by the merchants to file such claims. The

imposed claims filing service would cost the merchants up to 20% of their recovery as well as an additional upfront "settlement administration fee." *See id.*; Aug. 27 Bernay Decl. ¶¶ 3, 7-9, Exs. 1-4; Sept. 11 Bernay Decl. ¶¶ 3-7.

Class Counsel, Class Administrator Epiq Systems, Inc. ("Epiq") and entities such as the Texas Attorney General's Office received numerous inquiries and complaints from class members that received communications as part of MCAG's opt-out campaign. *See id.* Class members' concerns and frustrations were many: they lacked information about the settlement and claims filing process generally; they did not want to be automatically bound to a service they had not themselves chosen or with which they were unfamiliar; they were confused about the deadlines set forth in the "opt-out" communications; they questioned whether the communications were legitimate and whether the opt-out policy was legal; they wished to opt out but were either unwilling or unable to do so, that is, they were unwilling to disclose sensitive information (namely tax identification numbers) or did not know their merchant identification number with their credit card processing company – both of which were required entries on the MCAG opt-out forms. *See id.*

In addition to their concern about the confusion within the damages class, Class Counsel expressed their concern that MCAG's opt-out program would interfere with the administration of the settlement: "There is an enormous risk, under MCAG's plan, that there will be many thousands, potentially hundreds of thousands, of duplicate claims because many of the merchants for whom MCAG plans to file will not be aware that the company is filing on their behalf and will file claims." Aug. 27 Letter. As a result, Class Counsel sought injunctive relief against MCAG and its partners in the form of a cease and desist order that would also cancel any

contracts created under the opt-out program and provide for corrective notice to the damages class.  *Id.*

On September 4, 2013, I issued an order directing MCAG and its partners Heartland and Global to show cause at the September 12, 2013 fairness hearing why the injunctive relief sought should not be granted.  No. 05-MD-1720, ECF No. 5975.  At the hearing, I determined that Heartland had sent opt-out communications to its approximately 170,000 class-member customers and that Global had sent communications to its approximately 250,000 direct customers and possibly "hundreds and hundreds of thousands" more communications to its customers through resellers.  *Id.*, ECF No. 6094 ("MCAG Tr.") at 137-38.  MCAG estimated that in total approximately 500,000 merchants had been contacted through the opt-out program.  *Id.* at 138.

MCAG and its partners argued that this type of opt-out campaign had been used in numerous other settlements without issue, including other settlements administered by Epiq, because such "auto-enrollment" was authorized by the pre-existing contracts between the credit card processors and class merchants.  MCAG OTSC Response at 4-5.  Indeed, at the hearing, Global declared, "[T]his is the way business is done in this industry and how we have conducted business with our customers for a long period of time."  MCAG Tr. at 131.  I rejected this reasoning and found that the pre-existing contractual relationship class members had with credit card processors was different in kind and did not come remotely close to an authorization to make claims in the class action settlement.  *Id.* at 130-132.

I enjoined MCAG and its partners from continuing with the opt-out campaign at the hearing, finding that they were not authorized to automatically enroll class members in MCAG's claims filing service and that irreparable harm would result from the continuation of the

17

program due to the tremendous confusion it would cause, especially when the opt-out communications were "compared to what's going to come in the class notice." *Id.* at 141.  I also noted that the program created the risk for duplicative claims, which would be a source of inefficiency in the administration of the settlement. *Id.*  I directed MCAG and its partners to halt the opt-out program and to craft a corrective mechanism together with Class Counsel. *Id.* at 142. Agreed-upon corrective notices were subsequently sent out to several thousand merchants.   No. 05-MD-1720, ECF No. 6127 at 1 n.2.  *See also id.*, ECF Nos. 6156 at 2-3, 6036; 6213.

Class Counsel subsequently alleged that MCAG again made misleading statements to members of the damages class.  *See id.*, ECF No. 6214 ("Jan. 22 Letter").  An evidentiary hearing regarding those allegations MCAG was held on May 16, 2014.

b.  *Settlement Recovery Group*

As mentioned in the Preliminary Statement, Class Counsel informed the Court by letter dated November 14, 2013 that SRG was falsely representing to class members that signing up with SRG was a prerequisite to recovery and that class members must sign up with SRG right away to receive their refund.  *See id.*, ECF No. 6088 ("Nov. 14 SRG Letter").  Numerous merchants contacted Epiq, confused about whether they needed to sign up with SRG to recover under the settlement.[8]  *See id.*  Each had received "official-sounding voicemails from men identified as only 'Ryan' or 'Mark' at merchantclaim.com" who left a call-back number and told class members that they would not receive their share of the settlement unless they signed up with SRG and further that time was running out for them to take part in the settlement.   *See id.*

---

[8]  Class Counsel appended to its November 14 letter 23 separate emails received from class merchants who were solicited to sign up with SRG.  *See* No. 05-MD-1720, ECF No. 6088-2 (Nov. 14 SRG Letter, Ex. 1).  Class Counsel indicated that those 23 messages were a sampling of a larger number of SRG-related emails received by Epiq.  *See id*, ECF No. 6088-1 (Bernay Decl.) ¶ 3.  It also estimated that Epiq had received more than 100 calls from class merchants regarding SRG.  *Id.* ¶ 4.

18

Class members who called the telephone number provided in the solicitation messages received no further information, just a message prompting them to leave a fax number or email address where the sign-up form could be sent to them. *Id.* Those who visited the website merchantclaim.com were able to download an official-looking form – actually the sign-up form for SRG – which contained additional false and misleading statements suggesting that class members must sign up with SRG to receive their share of the settlement. Also, unlike the voicemail solicitations, the form disclosed that SRG's services would cost class members 35% of any recovery they receive. *Id.* Buried in "dense boilerplate language" at the end of the form's second page was disclosure language informing class members that SRG was not affiliated with the Class Administrator and that class members did not need to sign up with SRG to file a claim against the settlement funds. *Id.* Class Counsel sought an Order from the Court granting injunctive relief, requiring SRG to immediately cease and desist from making misleading solicitations to class members, to cancel all contracts entered into with class members and to take various forms of corrective action. *Id.*; *id.*, ECF No. 6088-3 (Proposed Order).

I issued an order on November 18, 2013 directing SRG and its principals to show cause why the injunctive relief sought should not be granted and furthermore why they should not be enjoined from providing claims filing services in relation to this case. SRG in response informed the Court that it was unaware of the misleading solicitations, which had been made by a company called Premier Enterprises Group. *Id.*, ECF No. 6098 (SRG OTSC Response) at 1. SRG and Premier had entered into an agreement under which Premier would refer potential claimants to SRG. *Id.* SRG claimed that upon learning about class members' complaints, it directed Premier to cease all solicitation activity and shut down the website and also terminated its agreement with Premier. *Id.* SRG indicated that it was working with Class Counsel to take

19

corrective action and was "willing[] to resolve entirely the issues raised in Class Counsel's letter," including by "offer[ing] each merchant who has signed up with SRG through a referral by Premier an opportunity to rescind its services contract." *Id.* SRG objected to the entry of an order enjoining its activities in relation to the case. *Id.*

Class Counsel challenged SRG's argument that the steps it had taken on its own rendered an injunction unnecessary. It pointed out that the precise nature of the relationship between SRG and Premier had not yet been determined and expressed its own belief that Premier was in fact an agent of SRG. *See id.*, ECF No. 6104 ("Nov. 22 SRG Letter") at 2. Class Counsel also had not yet been able to find out from SRG how many (and which) class members had received misleading solicitations from SRG or Premier. *Id.* Moreover, Class Counsel found that the callback number provided in the misleading voicemail solicitations remained active. *Id.*

At a court appearance on November 25, 2013, I ordered SRG to turn over to Class Counsel its referral agreement with Premier, a list of all the class members who signed up with SRG, and a record of all contacts which took place between SRG and Premier in relation to this case. I directed both Class Counsel and SRG to submit their agreed-upon corrective measures to the Court or separate submissions outlining any disagreements on the issue. Finally, after indicating that I would likely hold an evidentiary hearing to determine which individuals or entities should be held responsible for the misleading solicitations made to class members, I directed Class Counsel to inform the Court whether or not discovery would be appropriate before the hearing took place.[9]

---

[9] Premier President Lane Courkamp did not appear at the hearing, and I ordered Premier to show cause why it should not be enjoined from involvement of any kind in claims processing in relation to this case. In its November 26, 2013 response, Premier disclaimed any desire or intent to engage in further activity related to this case. No. 05-MD-1720, ECF No. 6111 at 1. Counsel for Premier was present in the courtroom at the January 17, 2014 evidentiary hearing

The parties filed separate letters to the Court on November 27, 2013 setting forth their disagreements as to corrective measures.  *Id.*, ECF Nos. 6112, 6113.  Class Counsel also provided a draft corrective notice to be sent to the approximately 4,200 class merchants that had signed up with SRG through Premier, informing them that their existing contracts were void but could be reinstated.  *See id.*, ECF No. 6112-2.  On December 3, 2013, I issued an order scheduling an evidentiary hearing and directing SRG to send the draft corrective notice to all class merchants that had signed up with them and further that it provide to Class Counsel copies of any solicitation materials it or any party soliciting on its behalf proposed to distribute to class members in this case. [10]  *Id.*, ECF No. 6116.

After limited discovery, conducted at Class Counsel's request with which SRG complied, *id.*, ECF No. 6117, both Class Counsel and SRG presented evidence at an evidentiary hearing held on January 17, 2014.  They have since also submitted proposed findings of fact and conclusions of law relating to the relationship between SRG and Premier and the genesis of the misleading solicitations involving SRG.  *See* ECF Nos. 6237 ("Class Counsel Findings"), 6261 ("SRG Findings"), 6269 ("Class Counsel Opp. to SRG Findings).

c.  *Schedule of Evidentiary Hearings*

At the Court's direction, on January 22, 2014, Class Counsel submitted to the Court a list of claims filing companies which it alleged had knowingly made material false or misleading solicitations to class members along with dates on which those companies were available to appear for evidentiary hearings regarding those solicitations.  *See* Jan. 22 Letter; No. 05-MD-1720, ECF No. 6193 ("Jan. 13 Order") at 2.  Class Counsel identified the following claims filing companies in its list: MCAG, Spectrum, Refund Recovery Services, LLC ("Refund

---

[10]     According to the testimony of an SRG executive, SRG did in fact rescind all of its contracts with class merchants referred to SRG by Premier.  No. 05-MD-1720, ECF No. 6219 at 16-17.

Recovery"), Financial Recovery Strategies, Inc. ("FRS"), Manor Capital Recovery ("Manor"),

Vantage Capital Services, Inc. ("Vantage"), and Class Action Claims Recovery LLC ("CAC

Recovery").[11] Jan. 22 Letter.  Some of the allegations are set forth below, and evidentiary

hearings have been held regarding Refund Recovery, FRS, MCAG and Spectrum.[12]

   The Court is aware of the following allegations made either at or in relation to the

evidentiary hearings or in other submissions from Class Counsel.

     i. *Spectrum*

   In a letter dated December 31, 2013, United Airlines, Inc. ("United") wrote to

Class Counsel alleging that Spectrum had induced United to sign up for its services by falsely

representing that "failure to enter into a contract at that time would result in the loss of data

critical to the claims process."  *See* No. 05-MD-1720, ECF No. 6156-2 at 1.  A Spectrum

represented had written in an email dated July 15, 2011:

> The Visa/ MC Settlement Database . . . will be shut down as of
> *August 15, 2011*.  This <evidence> is invaluable to our proposed
> revenue / data modeling efforts for Continental's recovery . . . .  As
> you know, we are focused on <u>ultimate claim value maximization</u>
> so acting now is the right step to take and the right time.

*Id.* at 13.  United claimed to have relied on this information in signing up with Spectrum only to

later discover that "there was no urgent need for historical data" – such data was preserved and

would remain available.  *Id.* at 10.  United then sought to void its contract with Spectrum, but

Spectrum disputed its right to do so.  *Id* at 1.  In addition to its false-statement and inducement

claims, United further alleged that Spectrum's statements to the Court, including Spectrum's

---

[11] Class Counsel's submissions to the Court do not include updated allegations related to MCAG, but these will no doubt be presented at the evidentiary hearing scheduled for MCAG on May 16, 2014.

[12] After being identified in Class Counsel's January 22 letter, Vantage apparently reached out to Class Counsel and offered to do whatever was necessary to meet its demands.  No. 05-MD-1720, ECF No. 6220 (Vantage Letter).  According to Vantage, the company made all the changes requested by Class Counsel and also sent corrective notices to affected class merchants.  *Id.*  Class Counsel have not sought to schedule an evidentiary hearing regarding Vantage since submitting the January 22 letter.

assertion that it had made no improper communications to class members, were false based on United's own dealings with the company.  *Id.*

Class Counsel raised their allegations in regard to Spectrum at an evidentiary hearing held on May 1, 2014.  The submission of their proposed findings of fact and conclusions of law was completed on June 13, 2014.

*ii.  Refund Recovery*

Class Counsel wrote to Refund Recovery on December 12, 2013 regarding statements on the company's website that were "misleading and incomplete."  *Id.*, ECF No. 6127-1 at 28.  Specifically, Class Counsel alleged that even though claim forms were not yet available, the website "misleadingly suggest[ed] that class members c[ould] begin the 'refund process' now . . . [and] that merchants need only 'download and fill out . . . two forms to receive [their] refund.'"  *Id.*  Class Counsel also objected to the placement of a disclaimer "in miniscule type" at the bottom of Refund Recovery's website as well as the website's lack of information about the official Court-approved website and the current stage of litigation (*i.e.*, no mention of the fact that the settlement had not yet been approved by the Court at that point).  As a result, "[c]lass members [were] being duped into giving up 25% of their claim value . . . ."  *Id.*  Class Counsel thus demanded that Refund Recovery remove all misleading language from its website and include the missing litigation-related information and a reference to the Court-approved website and also supply Class Counsel with a contact list of all class merchants that had signed up for its services.  *Id.* at 2.

After receiving Class Counsel's letter, Refund Recovery took down its website. *Id.*, ECF No. 6288 at 1.  At a March 7, 2014 evidentiary hearing regarding Refund Recovery, Class Counsel argued that the website statements were false and/or misleading and were made

23

knowingly by the company, allegations that Refund Recovery denied.  *See id.*, ECF No. 6277.

On March 24, 2014, both Class Counsel and Refund Recovery filed proposed findings of fact and

conclusions of law related to the allegations against Refund Recovery with the Court.  *See id.*,

ECF Nos. 6288, 6289.

*iii.*      **FRS**

Class Counsel first contacted FRS by letter dated July 15, 2013.  *Id.*, ECF No.

6127-1 at 2.  Class Counsel alleged that a direct mail solicitation sent by FRS to class members

was misleading and based on false premises.  *Id.*  Class Counsel found that the solicitation

"mimic[ked] the format of an official, Court-approved document" and took issue with the official-

sounding section heading – "Action Required" – used in its text.  *Id.* at 2, 6.  The solicitation also

suggested that class merchants not enrolled in FRS's "RateLock Protection" program "may be at

risk" and further that the claim filing process is a time-consuming and complicated one involving

many steps to secure full recovery – steps better undertaken by FRS than class members

themselves.  *Id.* at 2, 5, 6, 8.  Class Counsel demanded that FRS cease and desist all

communications with class members, remove references to the *Interchange Fee* action from its

website, rescind any contracts entered into by class merchants, and provide Class Counsel with:

all written communications (including attachments) between FRS and class members, a

description of all oral communications between FRS and class members, and all contracts

between FRS and class members.  *Id.* at 3.

Class Counsel wrote to FRS again on December 12, 2013.  *Id.* at 33.  In spite of

having exchanged of "a number of communications" with FRS since the "summer" (when Class

Counsel's earlier letter was sent), Class Counsel outlined a number of remaining, "significant"

issues with regard to FRS's website.  *Id.*

24

Class Counsel alleged that the website was misleading because it indicated, "Early Registration Now Available," and contained a button which claimants could supposedly "click to register and make [their] claim," despite the fact that the settlement had not yet been approved by this Court and no claim forms had been generated. *Id.* Moreover, FRS had failed to remove the "Action Required" section heading in its direct mail solicitation, to which a link was provided on the website, or to remove the language suggesting that the claims filing process would be complicated and time-consuming for class merchants (*e.g.*, requiring them to locate unidentified "required" documents to secure full recovery). *See id.* FRS also failed to include on its website information about the state of the litigation, reference to the Court-approved website, "information that class members can file claims without [FRS's] services, at no cost," or any mention of its own fee. *See id.* at 34.

Additionally, Class Counsel had discovered a link to a YouTube video stating "that the 'best way' for class members to learn more about their rights is to log on to FRS' website and that the FRS website has 'all the details and eligibility information you need'" and that "class members can 'conveniently register to make a claim'" through FRS. *Id.* at 33. Class Counsel demanded that the video and any others like it be removed from the internet as the content was "untrue" and "extremely misleading." *Id.* at 33-34.

Class Counsel again demanded specific corrective action on the part of FRS: (1) removal of the misleading language from its website as well as the YouTube video, and (2) the inclusion of prominent references to the Court-approved website in its own web-based solicitations, to be accompanied by an explanation that class members could learn more about the litigation by visiting the Court-approved website or by contacting the Class Administrator or

Class Counsel.  *Id.* at 34.  Class Counsel also demanded a contact list of all class merchants that had signed up with FRS.  *Id.*

Class Counsel raised its allegations in regard to FRS again at an evidentiary hearing held on March 28, 2014.  *See id.*, ECF No. 6294 (FRS Tr.).  Both Class Counsel and FRS have filed proposed findings of fact and conclusions of law related to the allegations against FRS with the Court.  *See id.*, ECF Nos. 6303, 6304, 6306, 6307.

<em>iv.</em>      <em>Manor and Vantage</em>

Class Counsel wrote to both Manor and Vantage on December 12, 2013 regarding "misleading" and "incomplete" statements on the companies' websites.  *Id.*, ECF No. 6127-1 at 30.  Even though no claim form was available, the sites indicated otherwise, and further declared, "[i]t's a complex 27-page court document outlining a process that must be performed accurately or the claim will be disqualified."  *Id.*  Both sites went on in this vein: "[A]dding to the complexity of filing a claim is that there are two funds."  "[It] is also unknown if the claim process will provide merchants with an estimated amount but what has been documented is that given the lack of data available this estimate (if provided) is likely to be about 50% less than what a merchant may be due."  *Id.* at 30-31.  As a result, the companies informed class merchants that they would benefit from "expert" assistance, especially because "[t]he added clout of the recovery firm with the settlement administrator will provide for greater negotiation power for maximizing claim value."  *Id.* at 31.

Class Counsel strongly objected to these "misleading," "incomplete," "unsupported," and "untrue" statements.  *Id.* at 30-31.  It also noted that although the companies disclosed that their claims filing services would cost class merchants up to 25% of their potential claim value, they failed to make reference to the Court-approved website or inform class members

26

that they could file claims at no cost without signing up with a third-party claims filing company. *Id.* at 31.  Accordingly, Class Counsel demanded that the companies remove the objectionable language, insert the missing information and reference to the Court-approved website, and provide Class Counsel with a list of all class members which had signed up for their services.  *Id.*

v.   *CAC Recovery*

In a letter dated December 12, 2013, Class Counsel notified CAC Recovery that statements made on the company's website indicating that "early registration" was "now" available and further that class members must take a "Required Action Step" – signing up with CAC Recovery – were misleading and incomplete.  *Id.* at 26.  Class Counsel also complained that the website made no reference to the official Court-approved website and did not inform class members that they could file their own claims at no cost without retaining CAC Recovery's services.  *Id.*  Class Counsel thus demanded that (1) the misleading language be removed from the website, (2) reference be made to the Court-approved website prominently on all webpages advertising the company's services with explanation that merchants may visit the Court-approved site or contact the Class Administrator or Class Counsel for litigation-related information, and (3) a list of all class merchants that had signed up with CAC Recovery be provided to Class Counsel. *Id.* at 26-27.

6. *The Court's Efforts Thus Far to Protect the Merchants*

Most of the allegations outlined above – and indeed several others related to the solicitations of additional third-party claims filing companies – were first brought to the Court's attention by Class Counsel in its December 13, 2013 memorandum in support of a Motion for a

Proposed Order regarding all misleading third-party claims filing companies.[13]  *See id.,* ECF No. 6127 ("Claims Filing Memo").  In the memorandum, Class Counsel noted the Court's declared intent to preemptively deter overreaching on the part of claims filing companies by "permanently enjoin[ing] any . . . entities [found to have knowingly made false or misleading communications to class members] from involvement of any kind in claims-processing services with respect to any future settlement of this case."  *Id.* at 2 (quoting *id.*, ECF No. 6116 at 2).  At the November 25, 2013 court appearance pertaining to SRG, I also stated from the bench: "I have no interest whatsoever in solving these problems as they arise.  I want to prevent them."  *Id.* (quoting Nov. 25, 2013 Hrg. Tr. at 16).

　　　　　Class Counsel wrote to inform the Court that proactive deterrence measures were indeed needed because numerous third-party claims filing companies had "used various misleading methods to lure class members into signing up for services, often at a cost exceeding one third of . . . class members' expected recovery."  Claims Filing Memo at 1.  Thus, Class Counsel proposed the entry of an order that would not only make it clear that overreaching companies may be permanently enjoined by the Court but also would impose affirmative obligations on claims filing companies to ensure that class members received certain key information in all solicitations.  *See id.* at 2, 3-4; *id.*, ECF No. 6127-3 ("Proposed Order") at 2.

　　　　　Specifically, Class Counsel sought an order requiring claims filing companies to include in any solicitations to class merchants – regardless of form or format – the following points:

---

[13]　　　　Appended to Class Counsel's December 13 memorandum were not only its cease and desist letters containing allegations against the claims filing companies later singled out for evidentiary hearings, but also letters addressed to three additional claims filling companies.  *See* No. 05-MD-1720, ECF No. 6127-1 at 12-22, 23-25.  Presumably, the absence of these three companies from Class Counsel's January 22 letter regarding evidentiary hearings indicates that Class Counsel ultimately concluded that they had not knowingly made material false or misleading solicitations to class members. The complaints about MCAG were brought to the Court's attention in August 2013, as discussed in the text above.

1.  A statement that claims forms are not yet available.

2.  A statement making clear that class members need not sign up for a third-party service in order to participate in any monetary relief and explaining that no-cost assistance will be available from the Class Administrator and Class Counsel during the claims-filing period.

3.  Information directing class members to the Court-approved website for additional information.

Proposed Order at 2.  Class Counsel's proposed order also provided that all claims filing companies that had signed up class members would have 21 days to send a notice – to be approved of by Class Counsel and delivered at the companies' own expense – to those class members informing them that if they had been misled by solicitations, they could void their claims-filing contracts.  *Id.* at 2-3.  Noncompliance with the order would subject claims filing companies to being permanently enjoined from any claims filing activity in relation to the case. *Id.*

I entered Class Counsel's proposed order on December 20, 2013 ("December 20 Order").  No. 05-MD-1720, ECF No. 6137.  On the same day, Spectrum filed a letter to the Court objecting on a number of grounds to the affirmative obligations created by the order, including the ground that "there has been no suggestion to the Court that any communication made by Spectrum to its clients and prospective clients has been improper."  *Id.*, ECF No. 6139 at 1-2. Spectrum requested the opportunity to be heard, specifically asking the Court to "hold Class Counsel's motion in abeyance and issue an Order to Show Cause requiring Class Counsel to formally serve Spectrum, permit Spectrum and other affected parties to respond to Class Counsel's motion on a briefing schedule . . . ."  *Id.* at 2.  Spectrum swiftly followed this request

29

with a letter motion to vacate the December 20 Order.[14]  *Id.*, ECF No. 6140.  Class Counsel

responded to Spectrum's motion on December 24, 2013, *id.*, ECF No. 6141, and Spectrum filed

its reply on December 26, 2013, *id.*, ECF No. 6142.

   I issued an order on December 30, 2013 ("December 30 Order") denying both

Spectrum's initial request and subsequent motion to vacate and reaffirming my intention to

proactively protect class members from overreaching claims filing companies by "preventing

confusion and deception before they can happen," as opposed "to taking remedial measures after

they happen." *Id.*, ECF No. 6147 at 1.  However, I also found it appropriate to enlarge the time

for claims filing companies to send the required notices by two weeks.  *See id.* at 2.  Finally, I

invited "[a]ny person or entity, including Spectrum, wishing to be heard on . . . any . . . aspect of

the December 20 Order [to] do so in writing on or before January 3, 2014 and orally in my

courtroom on January 10, 2014 at 3:30 pm." *Id.* at 2.

   Several third-party claims filing companies submitted letters to the Court in

response to the December 30 Order: MCAG, FRS, Class Action Recovery Service ("CARS"),

Class Action Capital ("CAC"), and Spectrum.[15]  *Id.*, ECF Nos. 6149 ("MCAG Letter"), 6150-1

("Spectrum Memo"), 6153 ("FRS Letter"), 6159 ("CARS Letter"), 6160 (CAC Mot. for

Extension of Time), 6168 ("CAC Letter").  The companies presented a range of arguments,

including objections to: the potential breadth of communications into which the Court-required

---

[14]  Spectrum filed its December 20, 2013 letter without having seen that the Court had entered the December 20 Order; thus, Spectrum's letter was responding to the prospect of the entry of the Proposed Order as opposed to the fact of its entry.  No. 05-MD-1720, ECF No. 6140.  Upon realizing that the Proposed Order had been adopted by the Court, Spectrum filed a second letter on December 23, 2013, requesting that the December 20 Order be vacated as to Spectrum and that the motion be reconsidered by the Court "with the benefit of a response by Spectrum" as the motion "raises important issues to which Spectrum should be granted a right to respond." *Id.*

[15]  Despite the denial of its letter motion to vacate in the Court's December 30 Order, Spectrum went on to file "Spectrum Settlement Recovery's Memorandum of Law in Support of Its Motion to Vacate, or in the Alternative, to Modify the Court's December 20, 2013 Order" and an accompanying memorandum of law.  No. 05-MD-1720, ECF No. 6150-1.  Class Counsel's response to Spectrum together with the other claims filing companies was titled "Class Counsel's Memorandum of Law in Opposition to Spectrum Settlement Recovery's Motion to Vacate or in the Alternative, Modify the Court's December 20, 2013 Order." *Id.*, ECF No. 6156.

language would need to be inserted, CAC Letter, *see* MCAG Letter; the required language indicating that assistance from Class Counsel or the Claims Administrator was available at "no cost" given that both would receive fees from the settlement, CAC Letter, FRS Letter; the impact of the required language on commercial free speech rights, FRS Letter, Spectrum Memo; Class Counsel's approval power over the mandatory notices to class members, CARS Letter, FRS Letter; class members' ability to rescind contracts without first litigating issues such as reliance or allowing claims filing companies to take corrective action, CARS Letter, FRS Letter, Spectrum Memo; and the specter of permanent injunction as a remedy, Spectrum Memo.  Class Counsel responded to the companies' various arguments, concerns and suggestions in writing on January 7, 2010.  *Id.*, ECF No. 6156.

A few days later, at the January 10, 2014 proceeding regarding third-party claims filing companies, the Court heard from Class Counsel as well as Spectrum, FRS and another claims filing company, Claims Compensation Bureau ("CCB").[16]  *See id.*, ECF No. 6185 ("Claims Filing Tr.") at 39-40.  I reiterated my intention to permanently enjoin third-party claims filing companies responsible for the knowing distribution of materially false or misleading communications to class members.  *See id.* at 10.  In addition to hearing objections to the December 20 Order, I asked those present to address my concerns related to claims filing companies as well as my evolving plan to reconcile the legitimate interests of the claims filing companies with my strong interest in protecting merchants, especially unsophisticated merchants, from false or misleading solicitations that could result in the merchants needlessly signing away up to a third or more of their damages claims.  *Id.* at 12.  Inspired in part by Spectrum's objection to the prospect of a court order compelling claims filing companies to send corrective notices to

---

[16]     United was also briefly heard, apparently wishing to voice its general support for scrutinizing claims filing contracts and to summarize its allegations regarding Spectrum.  Claims Filing Tr. at 39-40.

31

class members, I informed the parties of my intention to send a communication directly from the Court to any merchant on whose behalf a claim is filed by a claims filing company.  *Id.*

Specifically, I outlined a two-stage notification procedure in relation to claims filing companies.  First, at the beginning of the claims-filing process, the Court would require that "statements be made that are simple and clear regarding not having to sign up with a third-party service," which would "attend[] every single solicitation, every website, every email solicitation, every telephone communication, every solicitation imaginable."  *Id.* at 15-16.  This statement would be drafted and agreed upon by Class Counsel and the companies together and could "include a statement that there might be some cases where a third-party service might serve [class members'] interest," as requested by claims filing companies.  *Id.*; *see also id.* at 31-32 ("I'm willing to . . . give you an opportunity to work in good faith with Class Counsel, so that you can come up with a truthful communication that accommodates my interest, my obligation to these class members, and doesn't abridge your legitimate rights.").  In the second notice, to be sent at the end of the claims filing process directly from the Court (via the Claims Administrator) to merchants whose claims were filed by claims filing companies, the merchants will be informed "that to the extent they feel that they were engaged with a claims processing firm based on material false statements . . . or misleading statements, they can let the Court know."  *Id.* at 48.

At the proceeding, the claims filing companies presented various arguments against the December 20 Order.  CCB asserted, as had other companies in written submissions, that their services provided superior value to class members as compared to the no-cost assistance that could be offered by Class Counsel or the Claims Administrator.  *Id.* at 27.  When probed on this point, CCB – a seventeen-year veteran of the industry "believed to be the largest third-party claims filing company" – stated that from its work on the *Visa Check* action it had thus far

32

identified a total of two cases in which CCB had "achieved a recovery for the class member far in excess of the calculation from the claims administrator." *Id.* at 21, 25.

Having heard from all the entities that wished to be heard regarding the December 20 Order, either at the court proceeding or in writing, I outlined the steps I intended to take in relation to third-party claims filing companies from the bench. *Id.* at 46-48. Those steps were then memorialized in the Court's January 13, 2014 Order ("January 13 Order), which held the December 20 Order in abeyance pending further order, directed the scheduling of evidentiary hearings as discussed above, and set forth the two-part notification process described at the proceeding. *Id.*, ECF No. 6193 at 1-2. For the first notice, to be disseminated up front by the claims filing companies, the Court directed the companies to collaborate to arrive at a truthful, accurate statement to be inserted into any solicitation, regardless of form, directed at class members that includes:

a. A statement that claims forms are not yet available.

b. A statement making clear that class members need not sign up for a third-party service in order to participate in any monetary relief and explaining that no-cost assistance will be available from the Claims Administrator and Class Counsel during the claims-filing period.

c. Information directing class members to the Court-approved website for additional information.

*Id.* at 1. On February 7, 2014, as directed, Class Counsel submitted to the Court an overview of its discussions with claims filing companies, the final draft notice arrived at between the entities and the remaining substantive objections. *See id.* at 2; ECF No. 6236. On that same date, also as directed, CCB and CARS filed letters setting out their remaining concerns and objections related to the notice. *See id.*, ECF Nos. 6193, 6233, 6235.

Regarding the second notice to be sent directly by the Court at the back end of the claims filing process, in the January 13 Order I directed Class Counsel "to propose such a communication to the Court after conferring with counsel for such companies." *Id.*, ECF No. 6193 at 2.  Class Counsel filed its proposed language with the Court on April 14, 2014.  *See id.*, ECF No. 6300.

Finally, on February 25, 2014, I informed the parties of my intention to order that the up front notice be included not only in all third-party claims filing companies' solicitations to class members, but "also on any contracts drafted by third-party claims filing services to be signed by class members."  I invited any entities wishing to be heard on this new requirement to write to the Court on or before March 12, 2014.  Only Class Counsel wrote to the Court on the subject, endorsing the proposed change.  *Id.*, ECF No. 6267.  I hereby order that that change and charge Class Counsel with appropriately notifying all third party claims filing companies of that requirement.

C. *Findings of Fact and Conclusions of Law Regarding SRG and Premier*

1.     *The Solicitation Campaign*

Class Counsel allege that SRG knowingly made material false and misleading statements to class members via its agent Premier.  SRG denies that Premier was its agent and disclaims any knowledge of Premier's activity in making the solicitations at issue.  I make the following findings of fact based on the evidence adduced at the evidentiary hearing regarding SRG held on January 17, 2014.

SRG is a third-party claims filing company that completes claim forms and then files claims on behalf of class members in class actions.  During the period after clients sign up for its services but before claims are filed, SRG may interact with the Claims Administrator on

34

behalf of its clients and update clients about the claims filing process and settlement, and it will "collect substantiating documentation and hopefully maximize[s] the refunds that businesses get." *Id.,* ECF No. 6219 ("SRG Tr.") at 60-61.  SRG charges clients for its services on a contingent basis: if the merchant class members in this case sign up with SRG and later recover under the settlement, SRG will receive 35% of their recovery.

In order to secure new clients, SRG both undertakes its own solicitation efforts and enters into agreements under which other companies solicit class members on SRG's behalf in exchange for a portion of any fee paid to SRG.  One such agreement was entered into by SRG and Premier in relation to this case.  Premier is an independent sales organization that sells business products and services, including credit card processing services, through a call center.  It is not itself a claims processing company and had no relationship with SRG until the two companies were introduced via email on June 4, 2013.  Marc Rosenberg, a Senior Account Executive at SRG, and Lane Courkamp, President of Premier, negotiated an agreement over a series of telephone conversations and email.  On June 19, 2013, Rosenberg and Courkamp executed a one-page contract, entitled "Referral Agreement," binding their two companies.

Under the contract, Premier would introduce "Qualified Prospects" (that is, members of the *Interchange Fee* damages class) directly to SRG so that SRG could "secur[e] agreements under which [it] would prepare and submit claims on behalf of" class merchants.  P.'s Ex. 3.  The contract further provided: "It is understood that the Referrer [Premier] is ONLY acting as a Referrer for . . . introduction purposes, and shall have NO authority to enter into any commitments on [SRG's] behalf.  Likewise, the Referrer [Premier] has NO authority to bind [SRG] or make any representations other than those contained in the written materials provided by the company." *Id.*  SRG agreed to pay Premier 50% of the fees it received from *Interchange*

35

*Fee* class members introduced to the company by Premier.  Premier would also receive an additional 3% success fee once it had referred 500 unique claimants to SRG.

The lines drawn by the agreement to limit Premier's role in SRG's solicitation efforts blurred very quickly.  Indeed, as demonstrated in a series of emails exchanged before the SRG-Premier agreement was finalized, it was always understood between Rosenberg and Courkamp that Premier would deliver to SRG contracts already signed by class members – not mere "introductions" to "prospects" – and those contracts required only SRG's signature to become fully executed agreements binding upon class members.

In an email dated June 12, 2013, Rosenberg wrote to Courkamp, "As we discussed, the arrangement where businesses *complete the paperwork and send directly to you* works for us." Pl.'s Ex. 2 (June 12, 2013 1:18 pm email) (emphasis added).  Attached to that email was a copy of SRG's "Claims Recovery Agreement" – "the standard agreement that a business owner would have to sign" to sign up for SRG's services.  *Id.*  In an email to Courkamp sent the following day, June 13, 2013, Rosenberg again made reference to the process by which Premier will "submit[] the claim recovery forms . . . for the various merchants you bring on."  *Id.* (June 13, 2013 1:21pm email).  Courkamp too understood the nature of the role Premier was expected to play for SRG; in an email to Rosenberg, he referred to "the revenue that will be generated by the *clients* I sent to you" – clients, not "prospects" as set forth in the Referral Agreement.  *Id.* (June 12, 2013 6:46pm email) (emphasis added).  Indeed, Rosenberg confirmed at the evidentiary hearing that SRG received "signed claim recovery agreement[s]" from Premier and further that when referring to class-member clients in an email to Courkamp, he characterized them as merchants "we" – SRG and Premier together – "signed up."  SRG Tr. at 22, 36.

36

Upon the receipt of claims recovery agreements signed by class merchants and secured by Premier, SRG would countersign the agreements to finalize the contractual relationship.  SRG would then send a copy of the agreement to the class merchant.  In this way, Premier arranged for SRG to enter into 4200 contracts with class merchants.  SRG solicited between 300 and 400 additional merchants through its own efforts.

The SRG-Premier agreement provided that Premier was limited to making representations "contained in the written materials provided by [SRG]" when soliciting class members.   The written materials SRG provided to Premier consisted of a one-page information sheet on the *Interchange Fee* settlement and a one-page overview sheet about SRG.  At Courkamp's request, Rosenberg also provided Premier with SRG's phone number and a list of merchants' commonly asked questions and general responses that SRG would provide. Courkamp emailed Rosenberg on June 14, 2013 to let him know that he would be working all weekend to put together Premier's solicitation campaign.

Ultimately, Premier, operating under the name "Merchant Claim Center" (a fact communicated to Rosenberg), distributed to class members a solicitation entitled "Frequently Asked Questions" which contained both a brief informational question-and-answer section and a section in which class merchants were directed to fill out personal information, including contact information and tax identification numbers.  Attached to that page was a copy of SRG's claims recovery agreement, which the Frequently Asked Questions sheet directed merchants to complete. Premier then launched a multi-pronged campaign to distribute its solicitation materials to class merchants, which included phone calls, voicemails, a website, and emails.  The Frequently Asked Questions forms populated with merchants' information and the signed agreements that Premier secured from class members were all provided to SRG, meaning that SRG saw the contents of the

37

one-page Frequently Asked Questions form as early as the first time a class merchant signed up through Premier.  SRG did not object to the contents of Premier's solicitation.

SRG became aware of class merchants' complaints regarding Premier's solicitations as early as July 18, 2013, on which date Rosenberg received a call from a merchant who reported that when Premier called her, she was told that there would be no fee for SRG's services.  Rosenberg accepted Courkamp's explanation that the merchant must have misinterpreted Premier when told that there was no up front cost to sign up with SRG.

On July 25, 2013, Rosenberg received an email with the subject line "This is a shady way to run your business" from another merchant.  P.'s Ex. 9.  In it, the merchant complained that she had twice been misled by Premier on the phone, believing that she was talking to a representative of the class and not a third party.  She was also informed by the automated telephone system that she could request a claim form, though approved claim forms were not yet available.  Finally, she was emailed Premier's solicitation materials, including the SRG claims recovery agreement, and learned for the first time that by signing up she would need to pay SRG 35% of her recovery.  The merchant called the Premier solicitation process "[s]hady and lame" and asked to be removed from the company's database.  *Id.*  Although Rosenberg forwarded the complaint to Courkamp, there is no indication that further action was taken by SRG.

Appended to the July 25 email complaint was the original email message sent to the merchant by Premier, which indicated that it would "need to send back" the documents provided by Premier "in order for the Settlement Recovery Group to initiate [the merchant's] claim in the $7.25 Billion Class-Action Payment Card Antitrust Settlement."  *Id.*  This complaint was followed by a November 1, 2013 letter from the State of Wisconsin's Bureau of Consumer

Protection regarding a complaint it had received from a merchant.  Among other things, the

merchant reported being solicited over the phone by a caller named Ryan, who stressed that there

was no fee for the claim to be filed.  That complaint appended an email from Premier with a

nearly identical message to that received by the author of the July 25 email complaint, implying

that the merchant would need to return the Frequently Asked Questions sheet and signed

agreement to recover under the settlement.  When Courkamp responded on November 7, 2013

that the third complaint was merely a query as to whether the company was legitimate, Rosenberg

agreed, expressing to Courkamp that the complaint "is a ridiculous action [the merchant] took

based on pure speculation.  Some people don't have anything better to do."  P.'s Ex. 11.

   At around the same time, Rosenberg also received an email complaint from a

merchant that received a late night voicemail solicitation.  He wrote to Courkamp, "Just want to

be careful with this.  Is the phone blast saying that you are SRG?"  P.'s Ex. 13.  Rosenberg's

email message revealed not only Rosenberg's knowledge of one of the means by which Premier

was making solicitations (voicemail) but also the mass-nature of that means ("blasts").

Furthermore, Rosenberg's concern when confronted with the complaint is clearly not whether or

not Premier was engaging in improper solicitation practices but whether SRG's name was being

connected to the solicitations when Premier behaved badly and angered class merchants.

   By early November, SRG was clearly aware that Premier was distributing the

Frequently Asked Questions form, making solicitations through multiple channels – telephone

representatives, automated telephone systems, voicemail blasts and email messages – and

furthermore that varied but consistent complaints had been made regarding the solicitations.  SRG

was also aware of the immense volume of solicitations being made by Premier.  In Courkamp's

November 7, 2013 email to Rosenberg regarding the third merchant complaint, he dismissed the

importance of "one underlined complaint" where Premier had made "tens of thousands of contacts."  *Id.*  By the time Class Counsel wrote to the Court expressing concerns about the solicitations regarding SRG, Premier had contacted approximately one million merchants.

At the evidentiary hearing regarding SRG, Rosenberg testified that until he had contact with Courkamp about one week after Class Counsel filed its November 14, 2013 letter, he was unaware of how many solicitations Premier was making to class merchants.  But Rosenberg had regular communication with Courkamp – exchanging over 100 emails and 50 phone calls between June and November 2013 – and with several other Premier employees, including individuals named Mark, Ryan, Sharla and Brittany.  Rosenberg also testified that before Class Counsel's intervention, he knew only that Premier was making phone calls and leaving voicemails to solicit class members.  Rosenberg could not recall if he had ever spoken with Courkamp about what was being said in those calls and voicemails to solicit class merchants.  Indeed, even after receiving class members' complaints, he could not recall if he took steps to investigate the complaints beyond forwarding them to Courkamp.  The one question he thought to ask Courkamp in connection with the complaints was "if he was representing himself as SRG." SRG Tr. at 28.

Class Counsel filed their motion for injunctive relief against SRG on November 14, 2013.  SRG terminated its agreement with Premier on November 20, 2013 and directed Premier to cease its solicitation campaign, including taking down the campaign's website, in connection with SRG and this case.  Premier shut down the website immediately, and later, when informed by SRG that Class Counsel had discovered the toll-free telephone number was active, Premier also disabled the toll-free number.

After terminating the SRG-Premier agreement, SRG sent corrective letter notices to class members that had signed up for its services. The notices informed those class members that their contracts with SRG were void but they could contract SRG to reinstate the contracts. Of the 4200 class members that had signed up with SRG through Premier, 120 expressed interest in reinstating their claims filing contracts with SRG. By the time of the evidentiary hearing, no class members had reinstated their contracts with SRG.

2. *Premier's Misleading Statements to Class Merchants*

In its solicitation campaign on behalf of SRG, Premier knowingly made multiple statements and representations to class members that were misleading and material. Those misleading statements were made knowingly and for the purpose of signing up merchants.

First, Premier's use of the "doing business as" ("DBA") alias "Merchant Claim Center" was misleading. The name "Merchant Claim Center" could easily be interpreted by merchants as indicating an official entity associated with the administration of the settlement. There was no indication to the merchants that "Merchant Claim Center" was the DBA of a third-party company like Premier, or that the Merchant Claim Center materials were not required for claims filing but rather constituted solicitations to sign up with (and handover a significant fee to) SRG. The confusion caused by the solicitations using this DBA indicate that the name suggested a Court-approved entity – class members complained that they had been misled into thinking the entity contacting them was official and/or associated with the Claims Administrator. Although SRG claims it "had no relationship with Merchant Claim Center," SRG Findings ¶ 69, Rosenberg was informed before the launch of the solicitation campaign that Premier would be using the "Merchant Claim Center" DBA. SRG Tr. at 22-23.

41

There were misleading statements in several of the solicitations advanced under the DBA.  First, class members were called and received pre-recorded voicemails from men identifying themselves as Ryan or Mark, which informed them:

> This is [Ryan/Mark] over at the Merchant Claim Center calling about the legal notice sent to you about the money you could receive from the Visa/Mastercard class-action settlement – which ended up totaling 7.25 billion dollars.  *And to date we have not received the simple form required to start your claim through our office.  This is important because your settlement payment is not automatic, so you must take action to receive your part of the settlement.  Now – there is no cost to file your claim, but if you don't file before the deadline – then you could lose your portion of the settlement.*

P.'s Ex. 37, 38.[17]  This message was followed by one of two statements: (1) "To obtain the simple form you need to start your claim through our office, simply go to www.MerchantClaim.com and if you have any questions, just call the number at the bottom of the form," *id.*; or (2) "So, please call me back so I can send you the simple one page form needed to start the claim process through our office.  I can be reached at 1-800-256-5161 x745," P.'s Ex. 40, 41.

Class members that picked up the phone when Premier called received a nearly identical pre-recorded message, which concluded by prompting them to "press 1 now to find out how to obtain the simple form needed to start your claim."  P.'s Ex. 37, 38; *see* P.'s Ex. 40, 41.  Those who pressed "1" then heard a pre-recorded message which either directed them to the Merchant Claim Center website to download the "simple form" or prompted them to provide their contact information over the telephone.  P.'s Ex. 37, 38, 40, 41.  In some cases, before being given the website information, merchants were also told, "Due to the large number of people

---

[17]    For reasons discussed further below, the facts set forth in this and the next two paragraphs, which are drawn from  Class Counsel's Exhibits 36-40, do not constitute findings of fact as against SRG.

requesting information, we have created a self service web page for you to quickly download the simple form needed to file your claim through our office."  P.'s Ex. 38.

Premier's telephone scripts were problematic in many ways.  Aside from the misleading, official-sounding "Merchant Claim"DBA, Premier created an impression of authority by suggesting to class members that a settlement had been reached and class members needed to obtain "a simple form" from Premier in order to begin the claims process.  This suggested that Premier – the Merchant Claim Center – was distributing claims forms, which in fact were (and remain) not yet available and will be prepared by the Claims Administrator.  Furthermore, the impression of Premier's authority was reinforced by the mention of a deadline – even though there was (and remains) no such deadline.  The supposed deadline indicated that some urgency attached to the instant filing of the "simple form," as did the statement directing class members to a "self service web page" for "quick" access to the form in light of "the large number of people" demanding Premier's attention.  In sum, the telephone solicitations created the false impression that class members needed to sign the form provided by Premier without delay in order to successfully file their claims and not miss out on their piece of the large settlement in this case.  Based on that message, the natural conclusion for class members to draw was that Merchant Claim Center was in some form affiliated with the Court-approved Claims Administrator.

Class members who continued to the Merchant Claim Center website found available for download both Premier's Frequently Asked Questions sheet, with a section for merchants' information, and SRG's claims recovery agreement.  The Frequently Asked Questions sheet – titled "Frequently Asked Questions About how to Claim Your Portion of the Proposed $7.25 Billion Settlement in the Payment Card Interchange Fee Merchant Discount Antitrust Litigation Class Action" – contained a number of misleading statements.  P.'s Ex. 8.  It answered

the question "Is the claims process difficult and time consuming?" by stating: "No.  The Settlement Recovery Group does all of the work for you and manages the entire process from start to finish.  To get the process started, you simply need to send back this authorization form and the attached agreement."  *Id.*  The form went on to assure class members that they do not need to hire an attorney to recover under the settlement:  "The Settlement Recovery Group works directly with the Class Action Claims Administrator on your behalf.  The Settlement Recovery Group is an expert in the process of obtaining the maximum refund that you qualify to receive."  *Id.*

The Frequently Asked Questions sheet was misleading in a number of ways.  Its statements suggested to the merchants that the claims filing process is a complicated one that requires the hand of an expert – SRG – to navigate.  It also indicated that full recovery under the settlement would involve direct interaction or negotiation with the Claims Administrator and implied that securing maximum recovery would require SRG's assistance.  Furthermore, the language of the Frequently Asked Questions could cause confusion as to whether or not the completion of the sheet alongside the SRG claims recovery agreement is required to "get the [claims] process started."  In reality, nothing is required of class members unless they receive a direct communication from the Claims Administrator requesting specific information.  For the overwhelming majority of class members (regardless of whether they were first asked for information), the claims filing process will involve signing and returning a claims form pre-filled with all their relevant data, including the actual or estimated amount of their claim.  It is a simple, one-step process – one that leaves merchants with their full pre-determined recovery and saves them from needlessly handing over a significant portion of their claim to a third-party claims filing company.

Finally, the Frequently Asked Questions sheet was ambiguous on the issue of SRG's fees.  It first states, in reference to signing up with SRG, that "[t]here are <u>no out-of-pocket costs</u> to file a claim."  *Id.*; *see* P.'s Ex. 10 (July 18, 2013 3:29pm email) (noting that Premier routinely told class merchants there was "no up-front cost" for SRG's services).  However, the sheet then disclosed that "[a] recovery fee of <u>35%</u> (Thirty Five Percent) will be deducted from any refund you receive from this proposed settlement."  P.'s Ex. 8.  It emphasizes to merchants: "[Y]ou do not pay anything unless you get money back from this proposed settlement."  *Id.*  As a result, based on the Frequently Asked Questions sheet (and direct communications with Premier indicating that there would be "no upfront cost"), merchants were confused about whether or not they ultimately would be required to pay a fee to SRG for its services.  *See, e.g.*, SRG Tr. at 28, 92.  Despite receiving merchants' completed Frequently Asked Questions sheets and several complaints from merchants, SRG did not investigate Premier's actions or ask Premier to alter or cease its solicitations until the intervention of Class Counsel.

The follow-up emails sent by Premier to class members constitute further cause for concern.  In one such email, Premier wrote, "Attached is the claim authorization form and agreement that you need to send back in order for the Settlement Recovery Group to initiate your claim in the $7.25 Billion Class-Action Payment Card Antitrust Settlement.  Please complete the attached forms and fax or email them back to me."  P.'s Ex. 11; *see also* P.'s Ex. 12. (containing substantially similar language).  Again, the communication suggests a false urgency in directing class merchants to complete SRG's claims recovery agreement.

It is clear to me, and I find, that in order to secure business for SRG, Premier knowingly made numerous misleading statements to class members.  Indeed, the statements were so clearly designed to mislead class members – into thinking that they needed to file their claim

soon, that they could do so using a "simple form" which in fact served to sign them up for SRG's services, and that the claims process is an involved one and navigating it alone risks receiving something less than maximum recovery – that I have no problem imputing knowledge of the nature of the statements and an intent to mislead to Premier.

Having established that SRG, via Rosenberg, was aware of Premier's official-sounding DBA, the massive volume of class members being solicited by Premier, the contents of Premier's written solicitation – provided to SRG by the thousands once filled out by merchants – and that there was cause for concern regarding Premier's telephone and email communications based on the numerous complaints made by class members, only one question remains: may SRG be held accountable for the materially false and misleading statements made by Premier?  I conclude that the answer that question is yes because Premier was an agent of SRG.

3.   *Premier's Agency Relationship with SRG*

a.   *Agency Principles*

"'Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.'"  *In re Shulman Transp. Enters., Inc.*, 744 F.2d 293, 295 (2d Cir. 1984) (quoting Restatement (Second) of Agency § 1(1) (1958); *Nelson v. Serwold*, 687 F.2d 278, 282 (9th Cir.1982)).  An agent's authority to act for a principal may be either actual or apparent, and actual authority may be either express or implied.[18]  A claim of actual agency requires facts establishing: "(1) the manifestation by the principal that the agent shall act for him; (2) the agent's

---

[18]  Apparent authority requires that "words or conduct of the principal, *communicated to a third party*, . . . give rise to the appearance and belief that the agent possesses authority to enter into a transaction on behalf of the principal.  Where a third party has reasonably relied on the principal's words or conduct to that effect, the appearance of authority binds the principal."  *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 90 (S.D.N.Y. 2010) (emphasis added) (citations omitted).  The evidence adduced at the evidentiary hearing regarding SRG did not indicate that SRG had ever communicated with class members about Premier and so apparent authority does not apply in this case.

acceptance of the undertaking; *and* (3) the understanding of the parties that the principal is to be in control of the undertaking."  *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 522 (2d Cir.2006) (internal quotation marks and citation omitted).

Control is considered an essential element of agency – a critical indicator of whether or not an agency relationship exists based on the facts in a particular case.  *See Shulman Transp.*, 744 F.2d at 295 ("An essential characteristic of an agency relationship is that the agent acts subject to the principal's direction and control."); *Mar. Ventures Int'l, Inc. v. Caribbean Trading & Fid., Ltd.*, 689 F. Supp. 1340, 1353 (S.D.N.Y. 1988).

> [T]he right of control by the principal may be exercised by prescribing what the agent shall or shall not do before the agent acts, or at the time when he acts, or at both times.  Nevertheless, the control asserted need not "include control at every moment; its exercise may be very attenuated and, as where the principal is physically absent, may be ineffective."

*Cleveland*, 448 F.3d at 522 (quoting Restatement (Second) of Agency § 14 cmt. A).  Indeed, so long as the principal has the right to control the agent, its failure to exercise that right will not disprove the existence of an agency relationship.  *Mar. Ventures Int'l*, 689 F. Supp at 1353 ("A principal who has the right of control may nevertheless neglect to exercise it.  Consequently, when the existence of an agency relationship is otherwise clear, the principal's failure to exercise control is not determinative."  (citing Restatement (Second) of Agency § 14 comment b (1958)).

Actual agency is created by "written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account."  *Itel Containers Int'l Corp. v. Atlanttrafik Express Service Ltd.*, 909 F.2d 698, 702 (2d Cir.1990) (internal quotation marks and citation omitted)).  "The consent for actual authority may be either express or implied from the parties' words and conduct

47

as construed in light of the surrounding circumstances." *Cromer Fin. Ltd. v. Berger,* 137 F.Supp.2d 452, 486 (S.D.N.Y. 2001) (internal quotation marks and citation omitted). An agent may derive implied authority "when verbal or other acts by a principal reasonably give the appearance of authority to the agent." *99 Commercial St., Inc. v. Goldberg*, 811 F. Supp. 900, 906 (S.D.N.Y. 1993).

For instance, actual authority may be inferred from the principal's recognition of or acquiescence to an agent's activities. *See First City Federal Sav. Bank v. Dennis*, 680 F. Supp. 579 (S.D.N.Y. 1988) (agency relationship may be implied where principal recognizes and acquiesces in an act done by the agent); 2A C.J.S. Agency § 47 (2014) ("When agency arises from proof of acquiescence or ratification, it has as complete binding force as agency directly or expressly conferred in advance."). "A principal may be found to have ratified or affirmed unauthorized actions of an agent by acceptance of the benefits flowing from those actions." *Harlem River Consumers Co-op., Inc. v. Assoc. Grocers of Harlem, Inc.*, 408 F. Supp. 1251, 1273 (S.D.N.Y. 1976) (citing Restatement (Second) of Agency § 98); *see also In re South African Apartheid Litig.*, 617 F. Supp. 2d 228, 273 (S.D.N.Y. 2009) ("The acts of an agent are imputed to the principal if the principal adopts the unauthorized act of his agent in order to retain a benefit for himself. Even mere acquiescence is sufficient to infer adoption of wrongdoing." (internal quotations marks and citations omitted)).

"[An] important feature of an agency relationship is that the actions taken by the purported agent are taken . . . for the benefit of the principal – not the agent." *Maung Ng We v. Merrill Lynch & Co., Inc.*, No. 99-CV-9687 (CSH), 2000 WL 1159835, at *9 (S.D.N.Y. Aug. 15, 2000). "When an agent acts on behalf of the principal, then the principal must answer to an innocent third person for the misconduct of an agent acting within the scope of its authority."

48

*Nebraskaland, Inc. v. Sunoco, Inc. (R & M)*, No. 10-CV-1091 (RJD), 2013 WL 5656143

(E.D.N.Y. Oct. 11, 2013) (internal quotation marks and citation omitted).

      b. *Analysis*

      SRG argues that that by the terms of its contract with Premier, Premier could not

have been an agent of SRG; Premier's role was narrowly circumscribed and it was not authorized

to act on SRG's behalf or to bind SRG in any way.  The contract provided that Premier was

authorized only to "refer" class merchants to SRG for "introduction purposes" so that SRG could

then "secur[e] agreements under which [it] would prepare and submit claims on behalf of" those

merchants.  P.'s Ex. 3.  SRG contends that Premier abided by the terms of the contract and thus

could not have been acting as SRG's agent.

      I find that Premier's relationship with SRG was defined not by the letter of the

contract but rather by the terms discussed by Courkamp and Rosenberg.  Together, they fashioned

a much more expansive role for Premier.  Premier did not just "introduce" class members it had

solicited to SRG so that SRG could then secure agreements – Premier went ahead and secured

signed SRG claims recovery agreements from class merchants.  SRG asserts that this arrangement

"was simply the method the parties agreed upon for Premier to refer potential clients to SRG."

But I find that the arrangement went far beyond mere referral – with SRG's assent, Premier

delivered to SRG agreements which required only SRG's rubber stamp to become fully executed

contracts.  The language used by Rosenberg and Courkamp to describe the nature of Premier's

work for SRG is consistent with this finding.  They discussed Premier "bringing on" merchants as

opposed to simply introducing them to SRG, Premier sending "clients" (not "prospects" as

provided in the contract) to SRG, and merchants "we signed up."  There is no reason the

relationship evoked by the contractual language should trump the actual facts in my analysis as to

whether an agency relationship exists in this case.  *See Cleveland*, 448 F.3d at 523 ("Slavish deference to contractual language is inappropriate in the highly-factual and often nuanced agency analysis.")

The communications between Rosenberg and Courkamp reveal both a manifestation by SRG that Premier would act on its behalf and that Premier accepted the undertaking.  In determining whether Premier was an agent of SRG, I must consider not the parties' declared intentions or beliefs, but their manifest conduct.  *First City*, 680 F. Supp. at 585. As such, it is clear to me that Premier acted as an agent of SRG.  The communications show that SRG hired Premier to deliver full-fledged, signed-up clients to SRG, while at the same time allowing SRG to insulate itself from whatever tactics Premier would use to solicit those clients.  It is true that Premier did not sign class members' contracts on SRG's behalf, but it did everything else.  There was no evidence indicating that SRG declined to affix its signature to even one of the thousands of contracts supplied by Premier.  SRG's rubber stamping of contracts presented by Premier was not a sufficiently distinct activity to show that Premier was not acting on SRG's behalf.  Rosenberg denied reviewing the solicitation materials generated and used by Premier in its campaign for SRG.  However, even assuming the truth of the fact denied, ignorance does not insulate SRG from responsibility for the false or misleading statements of its agent.

SRG accepted the pre-signed agreements from class members provided by Premier but remained willfully ignorant of the content of the representations that were made to secure class members' business.  Despite receiving copies of Premier's misleading Frequently Asked Questions sheet the first time a class member's agreement was handed over by Premier – and several thousand times after that – Rosenberg was unaware of its contents.  Rosenberg also claimed to have been oblivious to the volume of solicitations being made by Premier, despite

50

having received Courkamp's email indicating that Premier had made tens of thousands of contacts with class members in this case.  Rosenberg dismissed the various complaints received from class members, failing to investigate class members' claims that the telephone and e-mail solicitations made by Premier were misleading and false.  Instead, Rosenberg trusted Premier to act for SRG as it thought best, hiding his head in the sand except to make sure that Premier was not representing itself to be SRG.  His sole concern – distancing SRG from Premier and whatever disreputable or misleading tactics it made use of – demonstrates that Premier was acting to secure business for SRG such that SRG was not required to dirty its hands but could merely profit from Premier's methods.  After all, SRG had incentive to turn a blind eye – Premier brought in 4,200 contracts, or nearly two-thirds of SRG's clients in this case.  Basically, SRG removed itself from the process of solicitation completely where Premier was at work.  Clearly, Premier acted on SRG's behalf and indeed stood in for SRG both in its solicitation of class members and in securing class members' business for SRG in the form of signed claims filing contracts.

Because Premier acted for SRG in its solicitation campaign, it does not matter that SRG took no part in creating Premier's solicitation materials and did not itself knowingly make any material false or misleading statements.  It is enough that its agent made those statements and that SRG, by routinely accepting the contracts which were the fruits of Premier's solicitation activity, ratified Premier's campaign.  *First City*, 680 F. Supp. at 585 (principals ratified agent's acts by executing documents presented by agent, demonstrating agency relationship).  SRG ratified Premier's technically "unauthorized actions . . . by acceptance of the benefits flowing from those actions."  *Harlem River*, 408 F. Supp. at 1273.  Based on SRG's acceptance of the client agreements secured through Premier's misleading and false statements, I infer its adoption of its agent's wrongdoing.

51

One last point must be addressed – Premier cannot be considered an agent of SRG if SRG did not have the right to control Premier's activities.  It is not essential that SRG made use of that right or that its efforts to control were effective, just that it had the right to direct or control Premier's solicitation campaign.  The question of control is the closest one in this analysis simply because there is no explicit grant of control to SRG and no overt exercise of a right to control in Rosenberg's communications with Courkamp.  However, the communications are once again central in that they give the clear impression that Premier was accountable to, accepted the direction of and ultimately was under the control of SRG.  Not only did Premier require SRG's input before putting together its solicitation campaign (the weakest of the indications of control given Premier's genuine need for information about this settlement and SRG), but also swiftly responded to each of SRG's emails regarding customer complaints and its concerns that the SRG name was being linked with potentially unsavory solicitation practices.  That SRG, in its determination keep Premier-solicited clients rolling in, did not challenge Premier's explanations for the various complaints does not mean that it did not have the right to intervene, direct Premier's activities and generally exercise control over the arrangement.  In fact, the pains taken by Premier to swiftly explain itself indicate that SRG in fact could have stepped in to alter the campaign or modify its arrangement with Premier.  The strongest piece of evidence militating in favor of finding that SRG had a right to control the arrangement is Premier's reaction when given definitive instructions.  When SRG terminated the contract with Premier and asked Premier to shut down its website and later its phone lone, Premier complied immediately.  Considering the totality of the circumstances, I find that SRG had a right to control its arrangement with Premier.  Thus, Premier was an agent of SRG.

On a final note, in line with the outcome of the agency analysis, common sense dictates that the onus for ensuring that solicitations to class members are truthful must necessarily fall on the third-party claims filing company seeking class members' business.  *See Visa Check IV*, 2006 WL 1025588, at *6.  It is only reasonable to hold SRG accountable for its carelessness and willful ignorance in relation to Premier's activities on its behalf.

    D.  *The Appropriate Relief Where a Claims Filing Company Party Has Knowingly Made Material False or Misleading Statements to Merchants*

        1.  *The Authority of the Court*

Nothing prohibits nonparties to a class action litigation from communicating with class members.   Newberg on Class Actions (5th) ("Newberg") § 9:10; Manual for Complex Litigation (4th) ("Manual") § 21.33.  However, "[t]he judge has ultimate control over communications among the parties, third parties, or their agents and class members on the subject matter of the litigation to ensure the integrity of the proceedings and the protection of the class."  Manual § 21.33.  That is, the court may take curative action – such as requiring the distribution of corrective notices or entering injunctive relief – where misleading or false statements are made to class members.  *See id.*  The proper exercise of judicial authority in this context may have either a procedural basis, under Federal Rule of Civil Procedure 23(d), or an equitable basis, under the All Writs Act.  *See* 1 Litigating Tort Cases § 9:16.

Rule 23(d) authorizes courts, *inter alia*, to (1) require that appropriate notice be given to class members "of any step in the action" in order to "protect class members and fairly conduct the action"; (2) "impose conditions on the representative parties or on intervenors"; or (3) deal with similar procedural matters.  Fed. R. Civ. P. 23(d)(1)(B)(i), (C).  In a class action litigation, the Court bears the responsibility to protect the class and preserve the integrity of the

process, and Rule 23(d) gives the Court the discretion to meet that responsibility. *See Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1203 (11th Cir. 1985). Pursuant to Rule 23(d), courts have taken various curative actions to "prevent court-approved class notification materials from being nullified by competing and inaccurate information." 1 Litigating Tort Cases § 9:16; *see e.g.*, *In re Lupron Marketing and Sales Practices Litigation*, 2004 WL 3049754, *1–2 (D. Mass. 2004) (ordering counsel for intervenors to remove website content found to be "blatantly misleading and deliberately intended to deceive potential plaintiffs into believing that the websites are either court-sanctioned or sponsored by the MDL plaintiffs" and to provide corrective notice); *In re McKesson HBOC, Inc. Securities Litigation*, 126 F. Supp. 2d 1239, 1246-47 (N.D. Cal. 2000) (ordering that misleading statements made by outside attorney be remedied by curative notice to solicited class members, inclusion of court-mandated disclosures in attorney's future solicitations, and permitting rescission of solicited agreements); *Georgine v. Amchem Products, Inc.*, 160 F.R.D. 478, 489, 496-98 (E.D. Pa. 1995) (invalidating opt-outs and creating second opt-out period where several law firms opposed to the settlement sent misleading communications and advertisements to absent class members).

This Court also has the authority to enjoin a third party pursuant to the All Writs Act, which provides that "all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). "An injunction, where necessary to protect the court's earlier orders . . . is authorized under the All Writs Act. That power extends to non-parties." *In re Synthroid Marketing Litigation*, 197 F.R.D. 607, 610 (N.D. Ill. 2000) (citing *United States v. New York Tel. Co.*, 434 U.S. 159, 174 (1977) ("The power conferred by the Act extends . . . to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate

54

the implementation of a court order or the proper administration of justice, and encompasses even those who have not taken any affirmative action to hinder justice." (citations omitted)); *United States v. Silva*, 140 F.3d 1098, 1104 (7th Cir.1998)) (noting court's authority to grant injunctive relief against nonparty trade association that sent unauthorized, confusing letter to class members but instead invoking Rule 23 to order offending nonparty to send corrective notice)).  The Supreme Court "has repeatedly recognized the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained." *New York Tel.*, 434 U.S. at 172.  In sum, "[w]here, as here, a district court retains exclusive jurisdiction over settlement agreements and distribution of settlement funds pursuant to those agreements, it may issue orders necessary to protect the settlement from threats by both parties and non-parties."  *Visa Check IV*, 2006 WL 1025588, at *4.

Injunctions issued under the All Writs Act "stem from very different concerns than those motivating . . . injunctions governed by Fed. R. Civ. P. 65," *In re Baldwin-United*, 770 F.2d at 338, and accordingly a court's authority to issue an injunction under the Act is not limited by Rule 65.  *U.S. Commodity Futures Trading Comm'n v. Amaranth Advisors, LLC*, 523 F. Supp. 2d 328, 335 (S.D.N.Y. 2007); *cf. Farm-To-Consumer Legal Def. Fund v. Sebelius*, C 10-4018-MWB, 2012 WL 219376, at *2 (N.D. Iowa Jan. 23, 2012) (finding that authority to issue injunction "requires consideration of the same factors as . . . under Rule 65" without requiring "rigid adherence to the procedures and prescriptions of Rule 65." (internal quotation marks and citation omitted)).  In addition to reviewing the circumstances under which a court may invoke its authority under the All Writs Act, the Second Circuit in *In re Baldwin-United* set forth the additional requirements for injunctions issued pursuant to the Act:

55

> Although Rule 65 does not apply to injunctions issued under the All-Writs Act against non-parties whose actions would impair the court's jurisdiction, we do not abandon the requirements that an injunction be specific and definite enough to apprise those within its scope of the conduct that is being proscribed, and that those subject to the injunction receive appropriate notice of its terms. The normal standard of specificity required for an injunction is that "the party enjoined must be able to ascertain from the four corners of the order precisely what acts" are forbidden.

770 F.2d at 339 (citations omitted) (quoting *Sanders v. Air Line Pilots Ass'n*, 473 F.2d 244, 247 (2d Cir.1972)). Thus, courts may issue injunctions pursuant to the All Writs Act if doing so would be "necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law," 28 U.S.C. § 1651(a), and provided that the terms of the injunction are sufficiently "specific and definite" to apprise the party enjoined of the conduct which is prohibited and that the party enjoined receive notice of the injunction entered against them.

2. *The Need for a Permanent Injunction Here*

I have presided over the *Interchange Fee* action since 2005. As in the *Visa Check* action, with the express consent of all parties I have played an active role in the settlement process, and I intend to play an equally active role in the administration of the settlement. My duties include the protection of the interests of the merchant class. *Visa Check IV*, 2006 WL 1025588, at *4 ("The settlement of a long, hard-fought case has given those class members a tangible interest in settlement funds. I have an affirmative obligation to protect those interests"). This requires that I act to prevent class merchants from being misled or lied to by anyone in connection with this action. In order to protect the integrity of the litigation, I must also guard against confusion among the class that may result from misleading or false communications from third-party claims filers. Indeed, given the size of the class – at least 12 million merchants – the potential for confusion is massive. Furthermore, false or misleading communications frustrate the

56

earlier orders of this Court regarding the settlement and claims filing process by muddying the waters and causing class members to doubt whether the Court-approved notices were in fact accurate or authorized.

Third-party claims filing companies are many and the means they use to communicate with class merchants are nearly instantaneous.  Even if Class Counsel were in a position to know that misleading or false communications would be made by a third-party claims filing company beforehand, which it is not, the damage may be done in an instant.

> [T]he era of the Internet has enabled increasingly cheap and far-ranging . . . campaigns to be launched, challenging the ability and will of the courts to protect the integrity of the class certification and settlement notification process by ensuring that only court-authorized, complete and accurate communications reach class members. . . .  Internet websites can be changed rapidly, enabling determined . . . campaigners to *stay one step ahead of the court and its restraining orders*.  Much more damage can now be done far more quickly and far less expensively, than in the days when the only mode of . . . campaign was a limited and expensive mail campaign . . . or prohibitively expensive print media publication campaigns.

1 Litigating Tort Cases § 9:16 (emphasis added).  A campaign involving automated phone calls, mass emails and web-based solicitations will move too fast for traditional court interventions to be effective.

Thus, the ability to enjoin claims filing companies that have made material false or misleading statements to merchants from further action in relation to this case is a necessary tool in the effort to protect the merchants from overreaching. I find that Premier has made such statements and thus I permanently enjoin it and its principals and agents from engaging in any manner or through any entity in claims filing services related to the settlement in this case.

SRG presents a more difficult decision.  As discussed at length above, Premier's conduct was egregious, and it is fully chargeable to SRG's account.  The misrepresentations in Premier's communications with the merchant class no doubt caused many merchants to needlessly cede 35% of their damages claims to SRG.  I have no doubt that my equitable powers include the authority to permanently enjoin SRG from filing claims in this case.

On the other hand, SRG preserved an evidentiary objection to Class Counsel's Exhibits 36-40, *i.e.*, the "phone scripts" used by Premier.  The objection has merit; there were authentication issues at the hearing, and in my view SRG has the better of the admissibility arguments that the parties have briefed in their post-hearing submissions.

More importantly, almost immediately upon receiving complaints from Class Counsel, SRG took meaningful corrective action.  A Court-approved notice was sent to all merchants who had signed up with SRG through Premier, voiding SRG's contracts with those merchants.  SRG provided to Class Counsel the materials it proposed to distribute in connection with future solicitations.  While it is true that my main goal remains the prevention of misleading communications to merchants, rather than remedying their effects after they occur, I should exercise the equitable powers of the Court in a manner that encourages the sort of swift remedial actions SRG took in this case.

In short, on balance I conclude that the extreme remedy of a permanent injunction is not appropriate for SRG.

### 3.  *The Other Third Party Claims Filing Companies*

In addition to the one devoted to the conduct of SRG and Premier, I have convened four other evidentiary hearings, each one devoted to the solicitation techniques of a third party claims filing company.  Refund Recovery Services, LLC ("RRS") stated to its prospective

customer "Click to begin the refund process online," and "simply download and fill out the two forms to receive your refund."[19]  Financial Recovery Strategies told its prospective customer, *inter alia*, that "if you don't act quickly, your portion of the funds will be distributed to someone else," and that a prompt return of an authorization form would "begin the process of recovering your refunds and preserving your rights to a claim in these matters."[20]  Spectrum's emails to merchants included the header "Visa Interchange Case Deadline," and the statement that "This will be the last opportunity to extract the historical data that we will need to succeed with your claim in the new case."[21]  And MCAG's statements to merchants included the following: "Gathering your own data to supplement a settlement claim can be quite complicated as the claim period coves sales and fee history for each merchant dating back to 2004."  These and other statements deceived merchants in multiple ways, including inducing them to believe that (a) they needed to sign up right away in order to participate in any settlement; (b) there was certain information they needed to preserve right away in order to participate; and (c) without the help of a third party claims filing company, they could not participate in the settlement.

Though I decline to grant permanent injunctive relief against these companies, I reject categorically the assertions by some of them that no reasonable merchant could have been deceived by their statements.  Rather, mindful that permanent injunctive relief is an extreme remedy, and that the conduct of these companies falls far short of that engaged in by Premier, I have concluded that less restrictive measures can adequately blunt the adverse effects of such marketing techniques.  The mandated language in solicitations and in contracts with merchants

---

[19]     March 7, 2014 Hearing Tr. at 28-30.
[20]     March 28, 2014 Hearing Tr. at 28-29; Plaintiffs' Ex. 1.
[21]     May 2, 2014 Hearing Tr. at 49-56.

are among those measures, as will be the future notifications to merchants whose claims are filed by third party claims filing companies.

In addition, Class Counsel have been vigilant in policing the conduct of such companies, contacting them directly when their statements are misleading and even working out corrective communications directly with them.  I commend Class Counsel for those actions, and for the professionalism and thoroughness that has characterized their conduct of the five evidentiary hearings on the subject. I have no doubt they will continue to vigilantly protect the interests of the absent class members going forward.

I had previously expressed an intention to refer future evidentiary hearings with regard to third-party claims filing companies' communications to class members to Special Master Robin M. Wilcox for reports and recommendations.  However, without ruling out such referrals, it occurs to me that it might be useful in the first instance to ask Class Counsel to make fresh determinations, informed by this memorandum and order, regarding whether such hearings are necessary.  I respectfully request the benefit of Class Counsel's judgment regarding the most effective means of addressing inaccurate communications – past and future -- to the merchants by third party claims filing companies.

E. *Conclusion*

For the foregoing reasons, Class Counsel's motion for injunctive relief is granted as against Premier.  Premier is permanently enjoined from engaging in any further activity in relation to the settlement in this case.  Class Counsel are directed to mail a copy of this Memorandum and Order, including the terms of the injunction, to Premier immediately.  Further injunctive relief shall not issue against SRG, Managed Care Advisory Group, Spectrum

Settlement Recovery, Financial Recovery Services, Inc., and Refund Recovery Services LLC.


So ordered.

John Gleeson, U.S.D.J.


Dated: October 3, 2014
       Brooklyn, New York