UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | MDL Docket No. 1720 (JG)(JO) |

**MEMORANDUM OF LAW IN SUPPORT OF NUSSBAUM LAW GROUP, P.C.'s MOTION FOR APPOINTMENT AS LEAD INJUNCTIVE RELIEF COUNSEL**

## TABLE OF CONTENTS

I.      INTRODUCTION.................................................................................................1

II.     FACTUAL BACKGROUND ...............................................................................2

        A.     Proceedings in this Action ......................................................................2

        B.     Injunctive Relief Counsel........................................................................5

        C.     Nussbaum Law Group..............................................................................7

III.    ARGUMENT .....................................................................................................13

        A.     The Governing Law Emphasizes Counsel's Work and Experience in
               This Action. ...........................................................................................13

        B.     The Second Circuit's Opinion Dictates the Bifurcation of Lead Counsel's
               Responsibilities. . ...................................................................................16

IV.     CONCLUSION ..................................................................................................17

## <u>TABLE OF AUTHORITIES</u>

CASES

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ..........................................................4, 16

*CVS Pharmacy, Inc. v. American Express Travel Related Services Co*., No. 08-cv-02316 (E.D.N.Y.) ..........................................................................................8

*In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-02481 (S.D.N.Y.) .........................12

*In re ATM Fee Antitrust Litig.*, No. 04-cv-2676 (N.D. Cal.) .......................................................9

*In re Buspirone Antitrust Litig.*, No. 01-md-1413 (S.D.N.Y.) ......................................................9

*In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 515 (E.D. Mich. 2003) .............................9

*In re Children's Ibuprofen Oral Suspension Antitrust Litig*., No. 04-mc-00535 (D.D.C.) .......10

*In re DDAVP Direct Purchaser Antitrust Litig.*, No. 05-cv-02237 (S.D.N.Y.) ........................10

*In re Foreign Exchange Benchmark Rates Antitrust Litig.*, No. 13-cv-7789 (S.D.N.Y.) ...........9

*In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242 (2d Cir. 2011) ...........5

*In re London Silver Fixing, Ltd. Antitrust Litig.*, No. 14-md-2573 (S.D.N.Y.) ........................12

*In re Lorazepam & Clorazepate Antitrust Litig.*, No. 99-ms-00276 (D.D.C.) ..........................11

*In re Metoprolol Succinate Direct Purchaser Antitrust Litig.*, No. 06-cv-00052 (D. Del.) ......10

*In re Methionine Antitrust Litig.*, No. 00-md-01311 (N.D. Cal.) ...............................................10

*In re Microcrystalline Cellulose Antitrust Litig.*, No. 01-cv-00111 (E.D. Pa.) ........................10

*In re Neurontin Marketing and Sales Practices Litig.*, No. 04-cv-10981 (D. Mass.) ...............11

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, --- F.3d ---, 2016 WL 3563719 (2d Cir. June 30, 2016) ................................................... *passim*

*In re Puerto Rican Cabotage Antitrust Litig.,* No. 08-md-1960 (D.P.R.) ..................................10

*In re Relafen Antitrust Litig.*, No. 01-cv-12239 (D. Mass.) .......................................................10

*In re Remeron Antitrust Litig.*, No. 03-cv-0085 (D.N.J.) ...........................................................11

*In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 146-47 (2d Cir. 2001) ...............5

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 533 (3d Cir. 2004) ...................................9

*In re Zinc Antitrust Litig.*, No. 14-cv-3728 (S.D.N.Y.). ...............................................................12

*Meijer, Inc. v. Abbott Labs.*, No. 07-cv-05985 (N.D. Cal.) ..........................................................10

*Meijer, Inc. v. Braintree Labs., Inc.*, No. 07-cv-00142 (D. Del.) ................................................10

*Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.*, No. 05-cv-02195 (D.D.C.) .................10

*North Shore Hematology-Oncology Associates, P.C. v. Bristol-Myers Squibb Co.*,
   No. 04-cv-00248 (D.D.C.) ........................................................................................................10

*Oncology & Radiation Associates, P.A. v. Bristol-Myers Squibb Company &
   American Bioscience*, No. 01-cv-02313 (D.D.C.) .....................................................................10

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999) ............................................................4, 16

*Wal-Mart Stores Inc. v. Visa, U.S.A.*, 396 F.3d 96, 118 (2d Cir. 2005) .....................................14

**RULES**

Fed. R. Civ. P. 23(a)(4) ...................................................................................................................3

Fed. R. Civ. P. 23(c)(4)(B)..............................................................................................................4

Fed. R. Civ. P. 23(c)(5)..................................................................................................................16

Fed. R. Civ. P. 23(g)(1)..................................................................................................................13

**OTHER**

Elizabeth Chamblee Burch, *Judging Multidistrict Litigation*, 90 N.Y.U. L. Rev. 71 (2015) ....15

Hon. Stanwood R. Duval, Jr., *Considerations in Choosing Counsel for
   Multidistrict Litigation Cases and Mass Tort Cases*, 74 La. L. Rev. 391 (2014) ...................16

Jaime Dodge, *Facilitative Judging: Organizational Design in Mass-Multidistrict
   Litigation*, 64 Emory L.J. 329 (2014). .....................................................................................15

Manual for Complex Litigation, Fourth...................................................................................14, 15

Stephanie A. Scharf and Roberta D. Liebenberg, *First Chairs at Trial: More Women
   Need Seats at the Table*, American Bar Association, ABA Publishing (2015) .........................15

Thomas Barta, Markus Kleiner, and Tilo Neumann, *Is there a payoff from
   top-team diversity?*, McKinsey (Apr. 2012) ............................................................................15

Vivian Hunt, Dennis Layton, and Sara Prince, *Why diversity matters*,
  McKinsey (Jan. 2015) .................................................................................................................15

## I.    INTRODUCTION

Pursuant to the Court's August 11, 2016 order, and its additional guidance during that day's status conference, Nussbaum Law Group, P.C. ("NLG") moves for its appointment as lead counsel for the class as to injunctive relief claims only ("Injunctive Relief Counsel"). As the Court is aware, this is an exceptionally complex proceeding, entailing wide-ranging claims by a plaintiff class comprised of millions of merchants with varying interests, against over 20 of the leading networks and banks in the payment card industry. It has transpired over 11 years and, after the Second Circuit's reversal of the order approving its settlement, remains further from resolution than at any point since well before that settlement was finalized. The road ahead for this litigation is a long one, and will require an exceptional degree of relevant knowledge and experience on the part of counsel responsible for pursuing it. NLG's relevant knowledge and experience stand apart from that of any other firm that might seek to represent the class in pursuing its injunctive relief claims.

The Second Circuit's opinion, as well as earlier Supreme Court precedent, substantially dictate that the Court appoint separate class counsel who will seek only injunctive relief, and who will protect the singular interests of the future merchants who were the focus of the court's concerns. NLG is uniquely qualified for the position because its principal, Linda Nussbaum, previously represented major merchants in opt-out litigation which was successfully resolved in this very proceeding. NLG Director Bart Cohen invested thousands of hours in representing the class as a shareholder at one of the three class co-lead counsel firms (collectively, "Co-Lead Counsel"). No other firm can claim broader, more meaningful or more successful relevant experience. NLG's related experience, which is further detailed below, is all the more reason why its motion should be granted.

## II.    FACTUAL BACKGROUND

### A.    Proceedings in this Action

This case is among the most complex that any counsel and court will face, both substantively and procedurally. The pending complaint includes 20 counts, alleging that over 20 defendants—the world's two largest payment card networks and many of the world's largest banks, which previously owned those networks—promulgated and enforce a web of anticompetitive network rules that artificially enable Defendants to fix, maintain and stabilize supra-competitive default interchange fees, which are charged to merchants for their acceptance of credit cards, offline debit cards and PIN-debit cards. Those rules include the "Honor-All-Cards Rule," which requires any merchant that accepts any credit card on the Visa or MasterCard network to accept all credit cards on that network, without regard to the bank that issued them or the associated interchange fees. The rule applies to debit cards as well, and precludes merchants from refusing cards that carry comparatively high interchange fees.

The rules further include the "No-Surcharge Rule," which precludes merchants from imposing surcharges on credit and debit card transactions, as they might otherwise do to mitigate the costs imposed on them by interchange fees.  The networks' rules also include the "All Outlets Rule," the "No-Minimum-Purchase Rule," the "No-Bypass Rule," the "No Multi-Issuer Rule," and scores of additional rules contained in massive network rulebooks, that have collectively resulted in billions of dollars in overcharges to merchants during the relevant period. The result is that Defendants alone produced 4.5 million documents totaling 65 million pages from nearly 900 custodians during the pre-settlement phase of this action alone. The parties proffered the opinions of over two dozen experts, and held over 900 depositions, at which nearly

11,000 exhibits were marked. The mediation process that resulted in the proposed settlement spanned over four years.

That process was substantially complicated by Plaintiffs' demands for injunctive relief, in the form of the networks' amendment of the above-referenced rules. Both consolidated class complaints, and all of the individual complaints filed prior to the initial class settlement included claims for injunctive relief, and the parties litigated the case accordingly. However, neither Class Plaintiffs' co-lead counsel ("Co-Lead Counsel") nor the court appointed separate counsel to either litigate or settle only those claims. On appeal of the district court's approval of the settlement, the Second Circuit held that the oversight had resulted in "[s]tructural defects in this class action," which "created a fundamental conflict between the (b)(3) and (b)(2) classes and sapped class counsel of the incentive to zealously represent the latter." *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, --- F.3d ----, 2016 WL 3563719, at *8 (2d Cir. June 30, 2016) ("2d Cir. Op."). That in turn led the court to vacate the district court's certification of the settlement class, and "conclude that class members of the (b)(2) class were inadequately represented in violation of both Rule 23(a)(4) and the Due Process Clause. Procedural deficiencies produced substantive shortcomings in this class action and the settlement." *Id.* at *4.

Those "substantive shortcomings" included a lack of relief for certain members of the (b)(2) class. In particular, "the most valuable relief the Settlement Agreement secure[d] for the (b)(2) class [was] the ability to surcharge at the point of sale," *id.* at *10, i.e., elimination of the "No Surcharge Rule." But the value of that relief was compromised for "any merchant that operates in New York, California, or Texas (among other states that ban surcharging), or accepts American Express (whose network rules prohibit surcharging and include a most-favored nation

3

clause). Merchants in New York and merchants that accept American Express can get no advantage from the principal relief their counsel bargained for them." *Id.* The court further cited the limited term of the proposed injunctive relief, which, combined with a broad  release commencing concurrent with the expiration of that term, would have sacrificed the rights of certain future merchants without granting them any relief: "In sum, regardless what Visa or MasterCard do with their network rules after July 20, 2021, no merchant will ever be permitted to bring claims arising out of the network rules that are *unaffected* by this Settlement Agreement, including most importantly, the honor-all-cards rule or existence of default interchange fees." *Id.* at *3 (emphasis in original).[1]

The court concluded that "'it is obvious after *Amchem* [*Prods., Inc. v. Windsor*, 521 U.S. 591 (1997),] that a class divided between holders of present and future claims...requires division into homogenous subclasses under Rule 23(c)(4)(B), with separate representation to eliminate conflicting interests of counsel.'" *Id.* at *5 (quoting *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999)). In the status report that preceded the August 11 status conference, Co-Lead Counsel suggested that "[b]ased on the Second Circuit's opinion, it is prudent that the (b)(3) and (b)(2) classes each be represented by separate class counsel."[2] Co-Lead Counsel further contend that the class would be best served if they maintain their role in representing the class, but for the limited purpose of seeking damages.

---

[1] The release also includes damages claims directed at Visa's Fixed Acquirer Network Fee ("FANF"). The class has not yet asserted any such claims because Visa did not impose the fee until after the close of summary judgment briefing.

[2] "Co-Lead Counsel" includes Robins Kaplan LLP, Berger & Montague, P.C., and Robbins Geller Rudman & Dowd LLP. See Order, Feb. 24, 2006 (ECF 279) (appointing co-lead counsel).

### B.      Injunctive Relief Counsel

NLG substantially concurs in Co-Lead Counsel's assessments, but does not presume the certification of another (b)(2) class, as the case might be better resolved by the payment of damages and an award of injunctive relief to a (b)(3) class only. *See In re Visa Check/ MasterMoney Antitrust Litig.*, 280 F.3d 124, 146-47 (2d Cir. 2001) (affirming certification of (b)(3) class only where class sought injunctive relief). It is most prudent for the Court to appoint additional class counsel whose role would be strictly limited to pursuing injunctive relief, as it is class members who would benefit only from such relief whom the Second Circuit deemed disadvantaged for their lack of separate representation to this point.

The Second Circuit's opinion substantially delineates the task with which Injunctive Relief Counsel would be faced. First, the representation would necessarily be limited to the pursuit of injunctive relief, as opposed to damages claims. To that end, Injunctive Relief Counsel would necessarily be most mindful of future merchants who are entitled to injunctive relief only, as "named plaintiffs with claims in multiple subgroups cannot adequately represent the interests of any one subgroup because their incentive is to maximize their own total recovery, rather than the recovery for any single subgroup." 2d Cir. Op. at *7 (citing *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242 (2d Cir. 2011)). In the broadest sense, Injunctive Relief Counsel's mission would entail seeking broader injunctive relief than was provided for by the previous settlement, ensuring that it is available to all future merchants and, in the event of another settlement, negotiating a narrower release than was provided for by the previous settlement.

More specifically, that mission would include at least the following. First, the court repeatedly expressed concern with the Honor-All-Cards Rule. 2d Cir. Op. at *2, *3, *10, *11.

5

Injunctive Relief Counsel would necessarily pursue amendment of that rule, so as to spare future merchants the costs of accepting Visa- and MasterCard-branded cards with the highest interchange fees. Second, the court repeatedly expressed concern that the previous settlement did not directly address default interchange fees. *Id.* at *2, *3, *10, *11. Injunctive Relief Counsel would pursue feasible alternatives to such fees that would reduce merchants' costs, without imposing excessive technological or financial burdens on Defendants. Injunctive Relief Counsel would also further develop discovery as to Visa's FANF, which is not yet encompassed with the class action, with an eye towards seeking relief as to that.

Most importantly, Injunctive Relief Counsel would pursue settlement terms that maximize the relief to future merchants, with the understanding that Defendants may maintain valid practical concerns that limit the availability of such relief. That will require extensive knowledge as to the operation of the networks, particularly including the ability to distinguish between the rules and policies that are necessary to their operation and those that are not. The ability to make that distinction will in turn depend on Injunctive Relief Counsel's experience in dealing with Defendants and their counsel—experience that resides in NLG more than in any other firm that might seek to represent the class for this purpose. *See infra* § II.C. The position will further require a well-developed understanding of current merchants' views as to the rules that most burden their operations, and why. Finally, if it proves necessary, Injunctive Relief Counsel will select and work with industry experts whose insights will bolster counsel's work product, and serve as a substantive basis for both litigating and negotiating as to injunctive relief issues.

If those negotiations prove to be successful, Injunctive Relief Counsel will have to negotiate release terms that maintain reasonable rights for current and future merchants, while

affording Defendants peace sufficient to ensure their acquiescence. Finally, Defendants must know that Injunctive Relief Counsel are ready, willing and able to try this case if settlement discussions prove fruitless. Defendants have to this point forcefully withstood demands for broader injunctive relief coming from highly-skilled counsel. They cannot maintain any doubt that such resistance will in the future be met with Injunctive Relief Counsel's withdrawal from negotiations, and preparation for trial.

C.    **Nussbaum Law Group**

The fact that this case has now been pending for over 11 years, during which counsel have developed a massive record and mastered its content, distinguishes this counsel selection process from most others, and is particularly relevant to the Court's task in ensuring the best possible representation for current and future merchants. It is also the foremost reason why NLG is singularly well-suited for that role. Linda Nussbaum is NLG's founder and Managing Director. Ms. Nussbaum's work on MDL 1720 began nearly concurrent with the beginning of the proceeding itself, as she served as counsel for a group of 20 individual plaintiffs with large claims, who were among the first to file individual cases.[3] She maintained a highly active role in the case continually thereafter, which included primary responsibility among individual plaintiffs for deposing high-ranking officers of JPMorgan Chase (including chairman and CEO Jamie Dimon) and Citibank. Ms. Nussbaum necessarily developed exhaustive knowledge as to both the relevant law and facts over the course of that representation, as well as productive relationships with both Co-Lead Counsel and Defendants' counsel. She personally represented four major

---

[3] Those plaintiffs were: Ahold U.S.A., Inc.; Albertsons LLC; Albertson's, Inc.; BI-LO, LLC; Delhaize America, Inc.; Eckerd Corporation; The Great Atlantic & Pacific Tea Company; H.E. Butt Grocery Company; Hy-Vee, Inc.; The Kroger Co.; Maxi Drug, Inc. (and doing business as Brooks Pharmacy); Meijer, Inc.; Meijer Stores Limited Partnership; Pathmark Stores, Inc.; QVC, Inc.; Raley's; Rite Aid Corporation; Safeway Inc.; SuperValu Inc.; and Walgreen Co.

7

merchants—Hewlett Packard, Bed Bath & Beyond, Burlington Coat Factory, and Wegman's—whose claims were resolved in 2015. Those settlements are final.

NLG Director Bart Cohen was until 2014 a shareholder at Berger & Montague, P.C. ("B & M"), Co-Lead Counsel for the Class Plaintiffs. His work on the case commenced concurrent with the firm's work, in mid-2005. He billed thousands of hours to the case, which included primary responsibility for deposing Bank of America witnesses, training non-lead counsel for document review and monitoring their subsequent work, and coordinating final editing of Class Plaintiffs' class certification submissions. Mr. Cohen also fielded inquiries from dozens of merchant class members with questions about the proposed settlement. The result is that NLG's collective knowledge as to the facts, law, parties and counsel involved in this proceeding is exhaustive, and includes unique insight as to the concerns of merchants both small and large merchants—whose understanding of the practical, day-to-day effects of Defendants' violations is unparalleled.

NLG's relevant expertise is in no sense limited to that it has developed in the course of this proceeding. Ms. Nussbaum is also among a small group of counsel responsible for pressing the individual claims of several large merchants against American Express ("Amex"), for rules related to, and akin to, those at issue in this proceeding.[4] *See CVS Pharmacy, Inc. v. American Express Travel Related Services Co.*, No. 08-cv-02316 (E.D.N.Y.). *See also* 2d Cir. Op., at *3, *10, *11 (citing interplay of settlement terms and American Express rules). Amex, like Visa and MasterCard, enforces an honor-all-cards rule, prohibits surcharging and otherwise enforces a

---

[4] The individual plaintiffs NLG represents in the American Express litigation include: Ahold U.S.A., Inc.; Albertson's LLC; BI- LO LLC; CVS Pharmacy, Inc.; The Great Atlantic & Pacific Tea Company, Inc.; H.E. Butt Grocery Co.; Hy-Vee, Inc.; The Kroger Co.; Meijer, Inc.; Publix Super Markets, Inc. ; Raley's Inc.; Rite Aid Corporation and Rite Aid Hdqtrs. Corp.; Safeway Inc.; SuperValu Inc.; and Walgreen Co.

broad range of rules directed at enabling it to charge merchants exorbitant interchange fees for every transaction. When the related class proceeding was stayed, individual plaintiffs took the lead in prosecuting the private litigation, with Ms. Nussbaum in a prominent position. To that end, Ms. Nussbaum deposed American Express CEO Kenneth Chenault, as well as other high-ranking AmEx officials, and worked closely with plaintiffs' experts.[5] Mr. Cohen, for his part, spent thousands of hours pursuing class plaintiffs' claims in *In re ATM Fee Antitrust Litig.*, No. 04-cv-2676 (N.D. Cal.), before and concurrent with his work on this proceeding. Those claims, which were against several of the same defendants in this case for their imposition of interchange fees on ATM transactions, addressed both legal and factual issues similar to those in this case.

NLG's relevant experience is also not limited to substantive issues. In *In re Foreign Exchange Benchmark Rates Antitrust Litig.*, No. 13-cv-7789 (S.D.N.Y.), Ms. Nussbaum is currently acting in a role akin to NLG's proposed role in this action. Earlier in the proceeding, certain class members raised the prospect that a subclass (the "Exchange Class") had been inadequately represented in settlement negotiations. So as to address those concerns, co-lead counsel appointed two firms, including NLG, to represent the Exchange Class for the purpose of allocating the proceeds of the pending settlements, which now total over $2 billion. In that case, as in this one, NLG has been and necessarily will be particularly cognizant of the strictures established by the Second Circuit in this case.

Earlier, in *In re Buspirone Antitrust Litig.*, No. 01-md-1413 (S.D.N.Y.), Ms. Nussbaum was among the first attorneys to recognize the need for separate representation for consumers and end-payors—a practice that has since become commonplace in pharmaceutical litigation.[6] In

---

[5] Mr. Cohen has also worked on the case against American Express for NLG.

[6] *See, e.g., In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 533 (3d Cir. 2004); *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 515 (E.D. Mich. 2003).

*In re Microcrystalline Cellulose Antitrust Litig.* ("*MCC*") , No. 01-cv-00111 (E.D. Pa.), Ms. Nussbaum served along with B & M as co-lead counsel for the entire class, as well as for one of three subclasses. The court in *MCC* certified a class comprised of three subclasses, and appointed Ms. Nussbaum and B & M to lead the three as a whole. Ms. Nussbaum and B & M also represented one of three subclasses. Two other firms respectively served as lead counsel for each of the other two subclasses.

NLG's class leadership experience and record of accomplishment otherwise compare well with any other firm's. Ms. Nussbaum has been appointed co-lead or lead counsel in several other major class actions, cases that have resulted in recoveries totaling in the billions, some of which were by themselves in the hundreds of millions of dollars. *See, e.g., In re Relafen Antitrust Litig.*, No. 01-cv-12239 (D. Mass.) (co-lead counsel) ($175 million settlement, April 2004); *In re Methionine Antitrust Litig.*, No. 00-md-01311 (N.D. Cal.) (co-lead counsel) ($107 million settlement, June 2003). Ms. Nussbaum has successfully served in a variety of leadership structures, from sole lead, to one of two, three, or four co-leads, to a leadership committee of as many as six firms.[7] She is unique among leaders of the plaintiffs' antitrust class action bar for having also been retained by over a dozen Fortune 500 companies to serve as antitrust counsel in

---

[7] *See, e.g., Oncology & Radiation Associates, P.A. v. Bristol-Myers Squibb Company & American Bioscience* , No. 01-cv-02313 (D.D.C.) (sole lead) ($65.8 million, October 2003); *North Shore Hematology-Oncology Associates, P.C. v. Bristol-Myers Squibb Co.* , No. 04-cv-00248 (D.D.C.) (sole lead) ($50 million, November 2004); *In re Children's Ibuprofen Oral Suspension Antitrust Litig.*, No. 04-mc-00535 (D.D.C.) (sole lead) ($9.7 million, April 2006); *Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.* , No. 05-cv-02195 (D.D.C.) (co-lead) ($22 million, April 2009); *In re Puerto Rican Cabotage Antitrust Litig.* , No. 08-md-1960 (D.P.R.) (co-lead) ($52.25 million cash portion, $13.6 million base rate freeze, December 2010); *In re DDAVP Direct Purchaser Antitrust Litig.* , No. 05-cv-02237 (S.D.N.Y.) (co-lead) ($20.25 million, November 2011); *Meijer, Inc. v. Abbott Labs.* , No. 07-cv-05985 (N.D. Cal.) (co-lead) ($52 million, August 2011); *In re Metoprolol Succinate Direct Purchaser Antitrust Litig.* , No. 06-cv-00052 (D. Del.) (co-lead) ($20 million, January 2012); *Meijer, Inc. v. Braintree Labs., Inc.*, No. 07-cv-00142 (D. Del.) (co-lead) ($17.25 million, April 2012).

individual antitrust cases, including the several she previously represented in this case, and continues to represent in the American Express case.

Ms. Nussbaum represented Kaiser Foundation Health Plan ("Kaiser") as a plaintiff through a five-week trial and the appeal of a landmark RICO case involving the prescription drug Neurontin. *See In re Neurontin Marketing and Sales Practices Litig.*, No. 04-cv-10981 (D. Mass.). After six years of litigation, the court held a jury trial, where the jury returned a RICO verdict for Kaiser for over $47 million, which was statutorily trebled to over $142 million. Following the trial, Judge Patti Saris commented that "[this was] a fabulous trial[.] [I]t's the kind of thing that you become a judge to sit on." For her lead trial work on that case, Ms. Nussbaum was recognized as "Litigator of the Week" by the AmLaw Litigation Daily and named as a Finalist for the Public Justice Foundation's 2011 Trial Lawyer of the Year Award.

Ms. Nussbaum's work as lead counsel has repeatedly been lauded by other courts. After several years of contested litigation *In re Remeron Antitrust Litig.*, No. 03-cv-0085 (D.N.J.), settled for $75 million. In approving the settlement of that case, Judge Faith Hochberg of the District of New Jersey recognized the skill and contribution of the co-lead counsel, commenting that: "[W]e sitting here don't get to see such fine lawyering, and it's really wonderful for me both to have tough issues and smart lawyers. On behalf of the entire federal judiciary I want to thank you for the kind of lawyering we wish everybody would do." Chief Judge Thomas Hogan of the District of Columbia complimented Ms. Nussbaum's work as co-lead counsel in *In re Lorazepam & Clorazepate Antitrust Litig.*, No. 99-ms-00276 (D.D.C.): "Obviously, the skill of the attorneys, and I'm not going to spend the time reviewing it, I'm familiar with counsel, and they, as I said, are among the best antitrust litigators in the country." No court has ever deemed Ms. Nussbaum's representation of any class "inadequate," either substantively or procedurally.

Finally, Ms. Nussbaum is currently acting as lead counsel in other pending actions involving antitrust violations in the financial sector: *In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-02481 (S.D.N.Y.) (co-lead counsel in suit against Goldman Sachs, JPMorgan, and other financial institutions), and *In re Zinc Antitrust Litig.*, No. 14-cv-3728 (S.D.N.Y.). Earlier this year, a court in this district endorsed Ms. Nussbaum and co-lead-counsel's request for her to stay "significantly involved" in litigating on behalf of the class in *In re London Silver Fixing, Ltd. Antitrust Litig.*, No. 14-md-2573 (S.D.N.Y.) (antitrust and Commodities Exchange Act action against Scotiabank, Deutsche Bank, HSBC, and UBS). *See generally* Decl. of Linda P. Nussbaum in Supp. of Nussbaum Law Group, P.C.'s Mot. for Appointment as Lead Inj. Relief Counsel ("Nussbaum Decl.") (submitted herewith).

Mr. Cohen has over 25 years of experience in class and other complex litigation, including over 20 years with B & M, and has maintained sole, primary and/or lead responsibility for individual antitrust actions and non-antitrust class actions. Ms. Nussbaum's and Mr. Cohen's work would be supplemented by that of other NLG lawyers with substantial relevant experience and records of accomplishment.[8]

---

[8] Other NLG lawyers who would work on this matter include Bradley Demuth, a former Second Circuit law clerk and seasoned trial lawyer with over 15 years of experience litigating a range of complex commercial and antitrust class actions, including for several years as an antitrust lawyer at Skadden, Arps, Slate, Meagher & Flom LLP and Cadwalder, Wickersham & Taft; and Hugh Sandler, a former associate at Crowell & Moring and Dewey with particular expertise representing multi-national banks and in litigating various finance-related disputes, winner of the 2015 Public Justice's Trial Lawyer of the Year Award, and a recognized "Rising Star" in both 2014 and 2015. NLG's firm biography contains a complete description of its practice. *See* Nussbaum Decl., Ex. A.

### III.    ARGUMENT

#### A.    The Governing Law Emphasizes Counsel's Work and Experience in This Action.

The relevant law in this context is such that NLG is not merely "ideally suited" for its proposed role, or such that its claim to be singularly suited is akin to what other firms typically claim in seeking lead roles. The law in fact requires courts to weigh exactly that which distinguishes NLG—its extensive experience in litigating this very case.

Rule 23(g)(1) provides in relevant part as follows:

In appointing class counsel, the court…must consider:

> (i)    the work counsel has done in identifying or *investigating potential claims in the action*;
>
> (ii)    counsel's experience in handling class actions, other complex litigation, and *the types of claims asserted in the action*;
>
> (iii)    counsel's knowledge of the applicable law; and
>
> (iv)    the resources that counsel will commit to representing the class.

*Id.* (emphasis added).

As to subparagraph (i), NLG attorneys have spent thousands of hours "investigating potential claims in the action," including thousands committed to developing those claims in the course of discovery. The scope of the firm's collective knowledge necessarily exceeds that of any firm whose role has been limited, for example, to objecting to the settlements, which entailed a relatively narrow set of issues, many of which will have no bearing on the day-to-day prosecution of the case. Likewise, as to subparagraph (ii), no firm's experience in handling "the types of claims asserted in the action" might exceed the breadth of NLG's experience in handling the very claims—both legally and factually—asserted in the action. NLG attorneys' experience in related and similar cases only furthers its distinction in this context.

As to subparagraph (iii), NLG's knowledge of the applicable law is consistent with its collective experience in working with the law applicable to this case.[9] Finally, as to (iv), the resources that NLG will commit to the class exceed the resources entailed in time and money. They include the institutional knowledge that comes with having repeatedly cooperated with co-counsel among multi-firm leadership groups, including co-counsel with differing interests. *See supra* § II.B.

The Manual for Complex Litigation, Fourth, likewise prescribes factors that dictate the selection of NLG for its proposed role: "The types of appointments and assignments of responsibilities [of lead counsel] will depend on many factors. *The most important is achieving efficiency and economy* without jeopardizing fairness to the parties." *Id.* § 10.221 (emphasis added). As the Court is aware, this is an exceptionally complex case, which will be prosecuted at a brisk pace starting in the near future. Only attorneys like NLG's, who were long ago conversant in every aspect of the case, can maintain the maximal efficiency and economy that would be impossible on the part of firms that are new to the day-to-day prosecution of the case.[10] *See also Wal-Mart Stores Inc. v. Visa, U.S.A.*, 396 F.3d 96, 118 (2d Cir. 2005) (where several years of discovery, summary judgment and mediation preceded settlement, plaintiffs' counsel had a "thorough understanding of their case"). Moreover, NLG's established and successful working relationships with both Co-Lead Counsel and Defendants' Counsel ensure a degree of mutual trust among the constituencies that other firms cannot claim.

---

[9] In addition, by virtue of its New York location and the concentration of its pending cases in New York federal courts, NLG's expertise as to Second Circuit law in particular exceeds that of firms headquartered elsewhere.

[10] The Manual's dictate is the foremost reason why Co-Lead Counsel should maintain primary responsibility for seeking damages on the part of the class.

Magistrate Judge Orenstein cited an additional consideration dictated by the Manual in his Memorandum and Order appointing co-lead counsel in this case: "The Manual …counsels that in making such an appointment, I should consider such factors as the qualification and competence of counsel, the ability of counsel to fairly represent diverse interests, and '*the attorneys' ability to command the respect of their colleagues and work cooperatively with opposing counsel and the court*.'" Mem. and Order, Feb. 24, 2006 (ECF 278), at 3 (citing Manual § 10.224) (emphasis added). NLG attorneys have proven their ability to "command the respect of their colleagues" and "work cooperatively with opposing counsel" by litigating and, in Ms. Nussbaum's case, taking the lead in successfully settling actions in this very proceeding. No other firm seeking a new appointment can make the same claim. Conversely, as Magistrate Judge Orenstein further recognized, counsel who have "previously been at odds on a number of issues" are ill-suited to serve together as co-lead counsel. *Id.* at 5. No holding better addresses the risks entailed by appointing lead counsel whose role has thus far been substantially limited to opposing Co-Lead Counsel, Defendants' counsel and the district court itself at every turn.

Finally, diversity of opinion, sex, and national origin leads to better results,[11] and recent reports and empirical studies confirm the profound disparity in the representation of women in lead counsel roles.[12] Addressing this issue, the Duke Law Center for Judicial Studies—a

---

[11] *See, e.g.,* Vivian Hunt, Dennis Layton, and Sara Prince, *Why diversity matters*, McKinsey (Jan. 2015) (empirical study of 366 public companies found companies with women and minorities in the upper ranks outperformed non-diverse counterparts); Thomas Barta, Markus Kleiner, and Tilo Neumann, *Is there a payoff from top-team diversity?*, McKinsey (Apr. 2012) (empirical study of 180 publicly traded companies from 2008-2010 found companies with women and foreign nationals on senior teams outperformed non-diverse counterparts).

[12] *See, e.g.,* Stephanie A. Scharf and Roberta D. Liebenberg, *First Chairs at Trial: More Women Need Seats at the Table, American Bar Association*, ABA Publishing (2015); Elizabeth Chamblee Burch, *Judging Multidistrict Litigation*, 90 N.Y.U. L. Rev. 71, 93 n.102 (2015); Jaime Dodge, *Facilitative Judging: Organizational Design in Mass-Multidistrict Litigation*, 64 Emory L.J. 329, 364 (2014).

coalition of 22 MDL practitioners and 17 federal and state court judges—adopted MDL Best Practice 4E which provides that a "transferee judge should take into account whether the leadership team adequately reflects the diversity of legal talent available and the requirements of the case" and urged judges to "appoint a diverse group, with respect to not only prior experience and skills, but also gender, race and national origin, age, and sexual orientation."[13] NLG's principal is a woman. Ms. Nussbaum's extensive experience and leadership by themselves eminently qualify her to serve as Injunctive Relief Counsel regardless of her gender. Diversity considerations are all the more reason why she should serve in that role.

  **B.**  **The Second Circuit's Opinion Dictates the Bifurcation of Lead Counsel's Responsibilities.**

  As to structure, Rule 23(c)(5) provides that "[w]hen appropriate, a class may be divided into subclasses that are each treated as a class under this rule." Well before the Second Circuit's holding in this case, the Supreme Court, in *Amchem* and *Ortiz*, rejected proposed settlements because the interests of present and future claimants conflicted to such a degree, and the latter group lacked for separate and adequate representation. In both cases, the Court held that those conflicts required the creation of subclasses, each represented by its own counsel. While the Second Circuit has not explicitly required as much in this case, it has made clear that the Court must appoint counsel charged only with pursuing and protecting the interests of merchants who seek injunctive relief, such that those interests are not compromised for the benefit of merchants who seek only damages.

---

[13] *Id.* at 58-59. *See also* Hon. Stanwood R. Duval, Jr., *Considerations in Choosing Counsel for Multidistrict Litigation Cases and Mass Tort Cases*, 74 La. L. Rev. 391, 393 (2014) (lead counsel selection should address gender, race, and geographic diversity).

NLG thus proposes a leadership structure that would at the outset be defined strictly by the limited purposes of Co-Lead Counsel, on the one hand (i.e., seeking damages), and NLG, on the other hand—the latter strictly limited to pursuing injunctive relief. The two groups' respective missions would substantially coincide while the case is further litigated. At the settlement stage, consistent with the Second Circuit's dictate, those missions would diverge. *See* 2d Cir. Op., at *6 (counsel may not be "in the position to trade diminution of (b)(2) relief for increase of (b)(3) relief"). And only at that stage would it be necessary for the Court to define a class or classes that encompass the two groups. In the interim, it would be most efficient for the Court and counsel to maintain a degree of flexibility, so as to account for events as they develop.

## IV.    CONCLUSION

This Court will be faced with numerous additional decisions and challenges as this case goes forward. Its decisions as to class leadership now will go far to limit the Court's challenges thereafter. NLG already has mastered the bulk of the record in this case by developing it and working with it continually for ten years. NLG has already proven its ability to work with co-counsel, Defendants' counsel and the Court in this matter. NLG has taken a lead role in pursuing similar claims against another defendant in the payment card industry, American Express. The Court can rely on NLG to further prosecute merchants' injunctive relief claims absent the inefficiency that would result if its knowledge or relationships with other counsel were in any sense lacking.

For all of the foregoing reasons, Nussbaum Law Group, P.C. respectfully requests that the Court grant its Motion for Appointment as Lead Injunctive Relief Counsel.

Dated:  August 25, 2016          By: _____s/ Linda P. Nussbaum_____
                                 Linda P. Nussbaum
                                 Bart D. Cohen
                                 NUSSBAUM LAW GROUP, P.C.
                                 1211 Avenue of the Americas, 40th Floor
                                 New York, NY 10036
                                 (917) 438-9189