# NUSSBAUM LAW GROUP, P.C.
## 1211 Avenue of the Americas, 40th Floor
## New York, New York 10036
## Telephone: (917) 438-
## www.nussbaumlawgroup.com

Linda P. Nussbaum
Direct Dial: (212) 702-7054
Mobile: (914) 874-7152
Email: lnussbaum@nussbaumpc.com

September 19, 2016

**<u>Via ECF and Hand Delivery</u>**

The Honorable Margo K. Brodie
U.S. District Court for the
  Eastern District of New York
225 Cadman Plaza East
Room 626 North
Brooklyn, NY 11201

      **Re:**     *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation,* **Nos. 05-md-1720, 14-md-1720**

Dear Judge Brodie:

      Pursuant to Rules I.D and III.D of Your Honor's Individual Practices and Rules, enclosed with this letter are courtesy copies of the following:

      1.      Nussbaum Law Group, P.C.'s ("NLG") Notice of Motion for Appointment as Lead Injunctive Relief Counsel, a Memorandum of Law, and the Declaration of Linda P. Nussbaum in support of that Motion; and

      2.      NLG's Responding Memorandum of Law in support of that Motion.

      NLG further respectfully requests pursuant to Local Rule 6.1(b)(3) that the Court accept this letter as a reply submission in support of NLG's Motion, as two recent submissions make inaccurate accusations of possibly disqualifying conflicts on the part of NLG that require a response.[1]

      The FCP Group's Response to the pending applications ("FCP Resp.") (ECF 6693) claims that NLG's submission "*confirms* that it lacks…independence from damages counsel and

---

[1] We understand that the Court's relevant instructions did not call for reply submissions. But both the Court and the class would be disserved by the Court's ruling as to these applications based in part on unsubstantiated innuendo and misinformation.

its interest in a large monetary recovery." *Id*. at 16 (emphasis added).[2] The premise of the charge is that NLG Director Bart D. Cohen is entitled to a portion of future fees to be paid to Co-Lead Counsel Berger & Montague, P.C. ("B & M"), his former firm.

The charge and its premise are blatantly false. In fact, Mr. Cohen is not entitled to, and will not receive, any payments from B & M for this proceeding, any other proceeding, or for any other reason related to his former employment there. *See* Ex. 1, Supplemental Decl. of Bart D. Cohen ("Cohen Decl.") ¶ 3.

The FCP Group's submission is similarly lacking as to the law it cites. The FCP Group charges NLG with a potentially serious conflict of interest by virtue of its prior representation of merchants who filed and settled individual cases in this proceeding, and its ongoing representation of many of those same merchants in *In re American Express Anti-Steering Rules Antitrust Litig.*, MDL 2221 (E.D.N.Y.) ("*Amex*"). *See* FCP Resp., at 13-14, 16. The sole legal authority for that claim is ABA Model Rule of Professional Conduct 1.7. *Id*. at 13.

The Second Circuit has repeatedly and squarely addressed this issue, most recently in *In re Austrian & German Bank Holocaust Litig.*, 317 F.3d 91 (2d Cir. 2003): "[W]e have recognized that the traditional rules concerning conflict-free representation, applicable in non-class lawsuits, 'should not be mechanically applied to the problems that arise in the settlement of class action litigation.'" *Id*. at 102 (quoting *In re "Agent Orange" Prod. Liab. Litig.*, 800 F.2d 14, 19 (2d Cir. 1986) ("*Agent Orange*")).[3] *Agent Orange* itself addresses the issue in far more detail. The FCP Group nevertheless ignores *Agent Orange*.

In *Agent Orange*, certain class counsel, including one who "spoke in support of [a proposed settlement] in the fairness hearings conducted by the district court," subsequently objected to that settlement. *Id.*, 800 F.2d at 16-17. The other class counsel moved for the objectors' disqualification, which the Second Circuit denied, citing yet more binding precedent:

> [W]hen an action has continued over the course of many years, the prospect of having those most familiar with its course and status be automatically disqualified whenever class members have conflicting interests would substantially diminish the efficacy of class actions as a method of dispute resolution.
>
> \*       \*       \*
>
> In order to proceed efficiently and fairly and to protect the interests of all members of the class, the court needs, insofar as is practicable, the benefit of the participation of attorneys who are familiar with the litigation. This need has been accommodated in many cases in which a technical conflict may exist, for the attorney for the class is normally allowed to oppose the contentions of class members who have appeared in court in opposition to a proposed settlement of the class action, *see, e.g., Malchman v. Davis*, 706 F.2d 426 (2d Cir. 1983);

---

[2] The FCP Group is comprised of six trade associations that were formerly named class plaintiffs. *See* FCP Resp., at 1 n.1.

[3] *See also* Advisory Comm. Note, Fed.R.Civ.P. 23(g)(1) ("The rule thus establishes the obligation of class counsel, an obligation that may be different from the customary obligations of counsel to individual clients.").

*Weinberger v. Kendrick*, 698 F.2d 61 (2d Cir. 1982), <u>although technically the Code of Professional Responsibility would seem to prohibit his doing so</u>. *See generally* 2 H. Newberg, Newberg on Class Actions § 2710 (1st ed. 1977).

*Agent Orange*, 800 F.2d at 19 (emphasis added) (additional citations omitted).[4]

In any event, the purported "conflict" the FCP Group cites was one of opinion, as opposed to a "conflict of interest" occasioned by polarized views as to the merits of the underlying claims.[5] That is evidenced by how routinely class action firms take differing positions in representing their clients. For example, in *In re Foreign Exchange Benchmark Rates Antitrust Litig.*, No. 13-cv-7789 (S.D.N.Y.), FCP Group counsel Kirby McInerney LLP ("Kirby") told the court in June of 2015 that consolidating two classes under the leadership of existing co-lead counsel would result in a "fundamental conflict." Ex. 2, Kovel Ltr., June 19, 2015, at 3. Less than two months later, Kirby agreed to proceed "under the leadership of [the same] Co-Lead Counsel." Ex. 3, Kovel Ltr., Aug. 6, 2015, at 2.[6] Previously, in *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 2010 WL 1433316 (N.D. Ill. Apr. 7, 2010) ("*Plasma*"), Kirby—contrary to its current position—supported the leadership of lead counsel that had previously sued one of the named plaintiffs in the case. See Ex. 4 *Plasma* Consolidated Am. Compl., at 78, 83 (lead counsel and Kirby identified in signature block). And counsel for the 7-Eleven Plaintiffs—who echo the FCP Group's attack[7]—previously represented the class for over seven years in *In re Visa Check/MasterMoney Antitrust Litigation*, No. 96cv5238 (E.D.N.Y.). That class pressed a claim against only one aspect of the extant Honor-All-Cards rule. *See* Ex. 5, Compl., at 1-3. *See also In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 129-30 (2d Cir. 2001). The FCP Group's absurd claim that NLG's silence as to whether Mr. Cohen is owed compensation by B & M conveys its culpability would dictate that 7-Eleven Plaintiffs' counsel's previous silence as to the broader Honor-All-Cards rule conveyed its support for the rule.[8]

Both the FCP Group and the 7-Eleven Plaintiffs fault NLG for a prior submission with respect to the previous class settlement. *See* Individual Pls.' Mem. in Supp. of Settlement Reforms ("Indiv. Pls.' Mem.") (ECF 5934). But Ms. Nussbaum's name is not even on that

---

[4] *See also In re Holocaust Victim Assets Litig.*, 2007 WL 805768, at *41 (E.D.N.Y. Mar. 15, 2007) (Orenstein, M.J.), *report and recommendation adopted*, 528 F. Supp. 2d 109 (E.D.N.Y. 2007), *as amended* (Dec. 14, 2007) ("[T]he lawyer representing a class as a whole need not be disqualified from defending…an allocation [of settlement proceeds] simply because by doing so he takes a position that is adverse to some class members.") (citing *Agent Orange*). *See also Eubank v. Pella Corp.*, 753 F.3d 718, 723 (7th Cir. 2014) (Posner, J.) (quoting *Agent Orange*).

[5] *See, e.g., Banyai v. Mazur*, 2004 WL 1948755, at *1 (S.D.N.Y. Sept. 1, 2004) (disagreements among class counsel as to proposed settlement "embody reasonable differences in evaluating alternative courses of action. They do not, however, evidence any conflict of interest or wrongdoing on [lead counsel's] part."); Geoffrey P. Miller, *Conflicts of Interest in Class Action Litigation: An Inquiry into the Appropriate Standard*, 2003 U. Chi. Legal Forum 581, 626 (2003: ("[E]ven when disputes among counsel go to matters that would be of concern to the reasonable plaintiff, they will tend to reflect only conflicts of opinion rather than conflicts of interest within the class.").

[6] *See also* FCP Group Mem. (ECF 6676), at 19 (citing Kirby's position in the *Foreign Exchange* case).

[7] *See* 7-Eleven Pls.' Resp. (ECF 6694), at 14-16. The 7-Eleven Plaintiffs are over 50 large merchants who are pursuing individual cases in this proceeding. *See* 7-Eleven Pls.' Proposal (ECF 6668), at 1 n.1.

[8] NLG cannot cite any similar instances involving FCP Group counsel Goldstein & Russell, P.C. due to that firm's barren record of litigating class actions at the trial court level.

memorandum, which is signed by Richard Arnold. *Id.* at 21-22.[9] More importantly, the Individual Plaintiffs' submission decidedly did not "reject[] the arguments the FCP Group successfully vindicated on appeal as 'myths.'" *See* FCP Resp., at 13. That submission termed as "myths" only antitrust propositions that the Second Circuit did not even address, much less "vindicate." *See* Indiv. Pls.' Mem., at 7-14. Likewise, the 7-Eleven Plaintiffs' claim that the memorandum vouched for the legality of the Honor-All-Cards rule and default interchange is taken grossly out of context. *See* 7-Eleven Pls.' Brf., at 15. The memorandum said only that no court or regulator had ever endorsed the premise that they are illegal—which is true to this day. The Second Circuit's opinion said nothing to the contrary.

Moreover, NLG's merchant clients, who have all resolved their claims, are no longer parties to this case. *See* NLG Mem. of Law (ECF 6669-1), at 8. They are more than sufficiently sophisticated to understand that NLG's primary loyalty in the event of its appointment would be to the class as a whole. Any claim that they would even seek, much less demand, undue influence over any forthcoming settlement is at this stage pure speculation. *See In re Parking Heaters Memorandum Antitrust Litig.*, 310 F.R.D. 54, 59 (E.D.N.Y. 2015) (Orenstein, M.J.) (in appointing interim class counsel, the Court was "satisfied that the record does not yet establish that any actual conflict exists, or that any potential conflict cannot be waived"). In any event, the parties' respective submissions reflect that NLG's record of successfully resolving class actions exceeds, by a substantial margin, that of the FCP Group's attorneys combined. That by itself belies their claim that NLG cannot put the interests of a class ahead of any individual plaintiffs, much less class members who are absent from the pending litigation. That record is comprised of verifiable facts, rather than speculation or misinformation. NLG would welcome the opportunity to meet with the Court if it maintains any doubts in this regard.

Finally, NLG's lack of a client with unresolved claims is irrelevant, as "a court may certify a class with class representatives and an appointed class counsel who have had no prior relationship with each other." Moore's Federal Practice (3d ed.) § 23.120[2][c], at 23-462. That is why the court in *Kay v. Wells Fargo & Co.*, 247 F.R.D. 572 (N.D. Cal. 2007), issued a press release seeking new class counsel from outside the case, after finding existing class counsel inadequate. *Id.* at 578-79. *See also* Ex. 6 (press release). That is also why Rule 23(g) addresses only issues related to class counsel, and not issues related to named plaintiffs. *See* Advisory Comm. Note, Fed.R.Civ.P. 23(g) ("Rule 23(a)(4) will continue to call for scrutiny of the proposed class representative, while this subdivision will guide the court in assessing proposed class counsel as part of the certification decision."). And the FCP Group's and 7-Eleven Plaintiffs' reproach of NLG's lack of a client in this case is entirely at odds with their claim that NLG will be subject to undue influence by its clients in other cases.

The FCP Group's reproach is also particularly unfounded in light of the FCP Group's being comprised only of trade associations, whose unique standing as to this litigation makes them somewhat atypical of a class of retail merchants whose primary functions are selling goods and services to the public at large. *See, e.g.,* Indiv. Pls.' Mem., at 18 ("critics [of the previous settlement] appear to believe that shrill criticism can be as effective in Court as it can be in Congress or the media"). Moreover, the fact that 7-Eleven Plaintiffs' counsel currently represents the FCP Group, *see* FCP Resp., at 1 n.1, raises the prospect that the FCP Group will be subject to the influence of the 7-Eleven Plaintiffs (whom 7-Eleven Plaintiffs' counsel also represent in the

[9] *See also* Cohen Decl. ¶ 4 (Mr. Cohen was not involved in class settlement).

4

*Amex* case). That is particularly the case where the 7-Eleven Plaintiffs are comprised of over 50 large merchants, including such behemoths as Amazon.com, Lowe's, Starbucks, Costco, and 7-Eleven itself. Their ongoing involvement in this case is far more indicative that the FCP Group would subordinate the class to those merchants than any alleged indication that NLG, if appointed, would subordinate the class to the interests of a much smaller group of merchants whose claims have been resolved, and are not even parties to this case.

All of the other firms seeking lead counsel appointments have refrained from disparaging each other, much less disparaging each other absent justification. The FCP Group alone has resorted to such tactics. They would have the Court believe that the class will be better-served by vitriol and carelessness as to the facts and law than by a firm with NLG's superior record of proven accomplishment in antitrust class actions. NLG, on the other hand, relies on undisputed facts as to its knowledge and experience, which are certain to benefit the class. NLG respectfully requests that the Court grant its pending Motion for Appointment as Lead Injunctive Relief Counsel.

Respectfully submitted,

NUSSBAUM LAW GROUP, P.C.

/s/ Linda P. Nussbaum                              .
Linda P. Nussbaum
1211 Avenue of the Americas, 40th Floor
New York, NY 10036
Telephone: 212-702-7053

Cc: Counsel for all parties (via ECF, w/o encls.)

# EXHIBIT 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | MDL Docket No. 1720 (MKB)(JO) |

### SUPPLEMENTAL DECLARATION OF BART D. COHEN IN SUPPORT OF NUSSBAUM LAW GROUP, P.C.'s MOTION FOR APPOINTMENT AS LEAD INJUNCTIVE RELIEF COUNSEL

I, BART D. COHEN, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746:

1.      I am a Director of Nussbaum Law Group, P.C.

2.      During the period from 2005 through early 2014, I was a shareholder at Berger & Montague, P.C. ("B & M").

3.      My relationship with B & M is severed in its entirety, for all purposes. I have no interest, financial or otherwise, in B & M's recovery for the above-captioned action, or any other action. I am not entitled to and will not receive any compensation of any kind from B & M in the future for any reason related to my employment there.

4.      I attended none of the mediation sessions with Judge Edward Infante, mediator Eric Green and/or the district court that resulted in the class settlement in this action. I had no authority and no substantive input as to the terms of that settlement.

Done at New York, New York this 19th day of September, 2016.

_____
Bart D. Cohen

# EXHIBIT 2

**KIRBY McINERNEY LLP**

825 Third Avenue
New York, NY 10022
212.371.6600
Fax. 212.699.1194
www.kmllp.com

Of counsel
     Roger W. Kirby
     Alice McInerney

June 19, 2015

**BY ECF**

The Honorable Lorna G. Schofield
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York  10007

      Re:    *Taylor et al. v. Bank of America Corp. et al.*, No. 15-cv-1350 (LGS);
               related to case No. 13-cv-7789 (LGS) (the "Spot Action")

Dear Judge Schofield:

      Our firm, along with co-counsel Morris and Morris LLC and Cafferty Clobes Meriwether & Sprengel LLP ("*Taylor* Action Counsel"), are counsel in the above-referenced matter (the "Futures Action").  In response to the Court's instruction (No. 13-cv-7789, ECF 300), we respectfully respond to the two letters filed on June 12, 2015 in the Spot Action (*Id.*, ECF 296 and 297).  Because this letter is directed to issues raised in both spot letters, we respectfully request the Court permit the filing of a six page response.  In their letters, spot counsel argue that the various futures complaints filed to date should be consolidated with the Spot Action. Additionally, spot counsel seek leave to file an amended complaint that, *inter alia*, for the first time would include "claims under the Commodity Exchange Act," and would add "additional Plaintiffs."  *Id.*, ECF 297.  By consolidating the Futures Action, spot counsel seek to create a consolidated spot and futures class far broader than the class they originally pled and the claims they settled.  As detailed below: (i) the futures complaints should be separately consolidated, with independent interim class counsel appointed; (ii) this consolidated futures action should be coordinated with the Spot Action; and (iii) spot counsel's belated request to include futures claims should be denied.

      Allowing spot counsel to represent a consolidated spot and futures class would result in the type of conflicts prohibited in this Circuit.  In *Literary Works in Elec. Databases Copyright Litig. v. Thomson Corp.*, 654 F.3d 242, 251 (2d. Cir. 2011), the Court vacated approval of a class action settlement based on fundamental conflicts between disparate subclasses of plaintiffs subsumed within the settlement class.  Spot counsel's proposal raises the exact concerns at issue in *Literary Works*; namely that they or their clients would not zealously prosecute the distinct claims raised in the Futures Action.  In fact, spot counsel actively and inaccurately[1] downplay the futures claims even as they seek leave to control them.  Thus, far from being only a matter of

---

[1]  Plaintiffs in the Futures Action have retained as a consulting expert Nejat Seyhun (*see* Declaration of Nejat Seyhun ("Seyhun Decl."), filed herewith) who opines that: (1) the futures market is about a quarter of the total relevant U.S. FX spot market; (2) there is significant evidence of manipulation in the Futures market; and (3) a conservative measurement of the damages at just two periods during the day reflects well into the hundreds of millions of dollars in the futures market.  *See, e.g.*, Seyhun Decl., ¶4.

June 19, 2015
Page 2

judicial economy, as spot counsel contends, their belated attempt to subsume the futures traders is simply unworkable due to the non-uniform interests of the different categories of plaintiffs.

Recent events illustrate *Literary Works'* necessary application here.  Spot counsel settled with at least one defendant based on negotiations that occurred at least several months before the filing of any futures claims in these cases.  This settlement involved a defined class that specifically excluded futures claims by requiring privity with a defendant, and lacked even a single named representative who is alleged to have traded futures contracts.  The settlement itself was based on an "economic analysis" that apparently did not include a proper evaluation of the exchange-based market.  *Taylor* Action Counsel filed their futures case because the two-year statute of limitations under the CEA was running and the Spot Action clearly did not encompass these valuable claims, which belong only to futures traders.  It was only several months after the filing of the Futures Action that spot counsel first indicated an intention to broaden their claims and class beyond the case they filed and already settled.  Taken together, it appears that spot counsel have not prosecuted a futures case, have divergent interests from it, and are now treating it as an afterthought, in order to sweep it within the ambit of already-negotiated settlements, all in direct conflict with *Literary Works*.

Second Circuit precedent makes clear that class actions should be structured from their inception to avoid such conflicts.  Respectfully, the Court should structure a conflict free class of Futures claimants represented by Kirby McInerney LLP, a firm which has zealously represented only Futures traders and is free of any prior connection to the Spot Action or its plaintiffs.

**Different Factual Predicate:** First, the FX futures claims are distinct from the Spot Action.  From its inception, the Spot Action has been directed to injury allegedly suffered in connection with direct, over-the-counter ("OTC") transactions of "FX Instruments" "with a Defendant," "meaning that it does not occur on a centralized exchange."  *See, e.g.*, No. 13-cv-7789, ECF 172, Consolidated Compl. ("CC"), ¶¶ 43, 57.  The spot Consolidated Complaint defines "FX Instruments" as "FX spot transactions, outright forwards, and FX swaps," which are all OTC transactions.  *Id.* ¶ 3.  Further, the alleged antitrust misconduct in the Spot Action is wholly directed to the manipulation of the FX spot market.  *See, e.g., id.* ¶¶ 3-7, 53-54, 57-62, 74-83.  Conversely, the Futures Action concerns transactions of different FX products, based on manipulation in a different FX market, giving rise to different claims.  *See* No. 15-cv-1350, ECF 67.  Indeed, for that very reason, by letter dated June 18, 2015, non-settling defendants contend that all futures claims should be consolidated into a single Futures action against which defendants can move (No. 13-cv-7789, ECF 304).  All Defendants apparently originally took this position, as reflected by the Stipulation to a briefing schedule for a motion to dismiss the Futures Action, entered by the Court on March 24, 2015 (No. 15-cv-1350, ECF 6).

Accordingly, a trial of FX futures claims will require resolution of myriad facts not at issue in the Spot Action, but necessary to prove that Defendants' misconduct caused manipulation and injury in the FX futures market.[2]  Spot counsel are wrong when they claim that

---

[2]  Examples of additional facts that must be proven at a trial of futures claims include, *inter alia*, that FX futures prices "run in parity, or lock-step" with spot market currency prices (*Taylor* Compl., ECF 1, ¶¶ 3, 96-97, 307); price movements in the FX spot market are "directly and immediately" and/or "rapidly" reflected in prices in the FX futures market (*id.* ¶¶ 3, 14, 96, 147, 302, 307); defendants had the ability to influence FX futures prices by

June 19, 2015
Page 3

the Futures Action does not allege "conduct unique to futures trading" (No. 13-cv-7789, ECF 296). For example, the Futures Action alleges manipulation in connection with, *inter alia*, the setting of the 2:00 CT CME Daily Settlement Fix (*see, e.g.*, *Taylor* Compl., ¶¶ 91-92, 101-04, 309), a benchmark created by the CME directly applicable to FX futures trading. That Settlement Fix "is based on the volume weighted average prices of underlying *futures contracts traded on CME Globex* during the 30 second window ending at 2:00 p.m. Central Time." *Id.*, ¶ 92 (emphasis added). *See also* Seyhun Decl. ¶¶ 21-22. Market manipulation centered on the CME fix time window directly targets CME instruments.

**Market Size:**  Spot counsel contend they should be given control of futures claims because "OTC trading accounts for about 98% of the total FX market" (No. 13-cv-7789, ECF 296). This statistic is highly misleading, as it reflects *global* FX trading rather than U.S. FX trading with Defendants, the relevant comparison here. FX futures trading in the U.S. is substantial. A conservative estimate of the volume of FX futures trading in just five of the major G-10 currency pairs[3] on the Chicago Mercantile Exchange ("CME") exceeded $130 trillion during the class period. *See* Seyhun Decl., ¶ 7. The consulting expert opines that U.S. FX futures trading represents between 25.8% and 27.5% of relevant U.S. spot trading with Defendants (or more than one-fifth of the total relevant FX market). *Id.*, ¶¶ 6, 8. He further opines that this percentage could be even higher. *Id.*, Exhibit 4, n.12. This is *more than 10 times larger* than spot counsel's estimate, which misleadingly diminishes the importance of the Futures Action. In addition, damages for FX futures manipulation are substantial, with a conservative estimate of *single* damages for just two periods in the day, are well into the hundreds of millions of dollars. *Id.*, ¶¶ 4, 25-27.

**Fundamental Conflict.**  Courts recognize that consolidating claims based on financial instruments transacted in the separate over-the-counter and on-exchange markets under a single action and leadership raises significant potential for conflicts. *See, e.g.*, *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11-md-2262, 2011 U.S. Dist. LEXIS 122735, at *11 (S.D.N.Y. Oct. 11, 2011) (the "*LIBOR* Order") ("We have concluded that separate putative classes should be maintained for those plaintiffs who engaged in over-the-counter transactions and those plaintiffs who purchased financial instruments on an exchange. These two classes may be differently positioned at various stages of the litigation, creating a potential conflict in their joint representation."). *See also*, *id.*, 2011 U.S. Dist. LEXIS 137242, at *2-3 (S.D.N.Y. Nov. 29, 2011) ("even though all plaintiffs make similar substantive allegations, separate putative classes should be maintained for those plaintiffs who engaged in over-the-counter transactions and those plaintiffs who purchased financial instruments on exchanges").

Spot counsel's request for leave "to add claims under the Commodity Exchange Act ('CEA')" (No. 13-cv-7789, ECF 297) seeks to create a class beyond the definition of the class in

---

manipulating FX spot prices (*id.* ¶¶ 302, 305); FX futures prices were manipulated during the class period, (*id.* ¶¶ 4, 8, 96, 101-04); the alleged misconduct caused the artificial prices in the FX futures market (*id.*, ¶¶ 4, 81, 98, 101-04); and defendants had the power to control and did control prices in the FX futures market (*id.* ¶ 302).

[3] *I.e.*, U.S. Dollar and each of the Australian Dollar, the Canadian Dollar, the Euro, the Great Britain Pound and the Japanese Yen.

June 19, 2015
Page 4

their operative pleading.[4]   This expanded class would comprise a divergent mix of class members, including class members with fundamentally conflicting interests, namely those who traded only in spot and those who traded only in futures.  *See, e.g.*, *Literary Works*, 654 F.3d at 251 (Second Circuit explained rationale of Supreme Court decision in *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) as "[t]he conflict in *Amchem* could hardly have been more stark: class members fell into one of two mutually exclusive camps").  In addition, further conflicts would exist even among those class members who traded in both spot and futures, depending on trading practices.  For example, a consolidated class member with 50 spot transactions and 1 futures transaction will value – and advocate the allocation of compensation for – that single futures transaction far differently than a class member with a single spot transaction, and 50 futures transactions.  *See, e.g.*, *id.*, 654 F.3d at 251-52 (Second Circuit recognized that "all affected members of the plaintiff class are interested in maximizing their individual compensation" and would value certain claims – to the potential detriment of other class members – in order to do so).

Amending the Spot Action complaint to add a named plaintiff who traded in FX futures and to include a CEA futures claim would not cure this fundamental problem, especially, where, as here, spot counsel have already settled with multiple defendants.  Under facts more egregious than in *Literary Works*, these settlement negotiations were undertaken on behalf of a class that not only failed to include any futures claims, but also failed to include a single named representative who alleged transactions in futures.  *See, e.g.*, CC, ¶¶ 15-26.  As *Literary Works* requires, not only must there be separate futures class representatives, FX futures claims must also be independently prosecuted (either as a sub-class or separate class action), otherwise, the new futures named plaintiffs will have a fiduciary duty "to advance the collective interests of the class, rather than those of the subset of the class."  *Id.*, 654 F.3d at 252.  To further ensure the interests of this group are zealously advocated, they must be represented by independent counsel.

Moreover, *Literary Works* demands that fundamental intra-class conflicts must be dealt with at the inception of the action, and certainly prior to the negotiation of a compromise proposing to release or otherwise impair the differing claims, to protect against inadequate representation.  The Second Circuit made this clear when it vacated the proposed settlement and remanded the action back to the district court.  *Literary Works* requires that futures class members have their diverse claims zealously advocated through separate representation.[5]  The issue in *Literary Works* was *not* whether the settlement amount was large or the allocation was facially fair and equitable, rather it was that it was impossible to know what the total settlement

---

[4]  *Taylor* Action plaintiffs note that while the Court has invited them to state their position concerning Spot Action plaintiffs' proposed motion for leave to amend, *Taylor* Action plaintiffs are not parties to the Spot Action.  *Taylor* Action plaintiffs respectfully request that the Court treat this letter as a request for pre-motion conference with respect to a motion by *Taylor* Action plaintiffs to intervene in the Spot Action for the purpose of opposing any amendment implicating or potentially impairing *Taylor* Action plaintiffs' futures claims and those of similarly situated persons.  *See Bridgeport Guardians, Inc. v. Delmonte*, 602 F.3d 469, 474-475 (2d Cir. 2010) (reversing denial of intervention where movant's interest not adequately protected by existing parties); *Oneida Indian Nation of Wis. v. New York*, 732 F.2d 261, 263-64 (2d Cir. 1984) (reversing denial of intervention where motion was timely, movant had an interest in the subject of the action, disposition of the action might as a practical matter impair its interest, and representation by existing parties would not adequately protect that interest).

[5]  Spot counsel have made it clear they do not intend to create a futures subclass under separate counsel, as they are seeking to be named interim class counsel for these distinct claims as well.  *See* No. 13-cv-7789, ECF 317.

June 19, 2015
Page 5

results and final allocations would have been had each divergent claim been zealously prosecuted and independently represented during the settlement process. Thus, spot counsel's contention that Mr. Feinberg's participation in "creating a fair allocation between OTC and exchange instruments" ameliorates this problem[6] runs afoul of *Literary Works*, where the Court held:

> The Supreme Court counseled in *Ortiz* that subclasses may be necessary when categories of claims have different settlement values. The rationale is simple: how can the value of any subgroup of claims be properly assessed without independent counsel pressing its most compelling case? It is for this reason that the participation of impartial mediators and institutional plaintiffs does not compensate for the absence of independent representation. Although the mediators safeguarded the negotiation process, and the institutional plaintiffs watched out for the interests of the class as a whole, no one advanced the strongest arguments in favor of Category C's recovery.

*Id.*, 654 F.3d at 253. *See also Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 857 (1999) ("The very decision to treat [conflicting groups with a class] all the same is itself an allocation decision with results almost certainly different from the results that those with immediate injuries or claims of indemnified liability would have chosen.").

These fundamental conflicts can only be avoided by the prosecution of a separate action or the creation of a sub-class to champion FX futures claimants, represented by independent counsel. Waiting until final settlement approval to resolve this issue is inappropriate, especially in the unique situation here confronting the court, where multiple spot action settlements have already been announced and/or settlement negotiations have already been completed or are substantially underway.[7] Any effort to sweep FX futures claims into already negotiated settlements would place the court in the situation *Literary Works* forbids. Allowing the Spot Action complaint to be amended to include claims that Spot Counsel contend are being released

---

[6] Further highlighting this conflict, the "economic analysis conducted by financials experts retained" by spot counsel that Mr. Feinberg states in his declaration in support of the JP Morgan settlement that he reviewed (*see* 13-7789, ECF 248, ¶ 14) reasonably had no relationship to on exchange products and no mechanisms for protecting the interest of on-exchange futures traders.

[7] As particularly relevant here, the LIBOR Court's concerns for intra-class conflicts were also directed to settlement. *See, e.g.*, *LIBOR* Order at *11-12 ("Similarly, separate representation is advisable because the two categories of plaintiffs may require different treatment in the event of settlement." (citing *Literary Works*)). Spot counsel's cases do not support their position (No. 13-cv-7789, ECF 296). In neither *London Silver* nor *Dairy Farmers*, was the issue of fundamental conflicts between OTC and exchange-based traders before the Court. *See In re London Silver Fixing, Ltd., Antitrust Litig.*, No. 14-MD-2573, ECF No. 17 (S.D.N.Y. Nov. 25, 2014); *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 767 F. Supp. 2d 880 (N.D. Ill. 2011). *Gold Fixing* actually *supports Taylor* Action plaintiffs' request that independent, zealous representation of the futures claims be maintained here; the Court saw no fundamental conflict because the case was in its incipience, with no discovery and no Rule 12(b)(6) practice addressing any claims, and expressly held that if conflicts later arose, they must be dealt with by the Court at that time. *In re Gold Fixing Antitrust and Commodity Exch. Act Litig.*, No. 14-cv-3111 (S.D.N.Y.), ECF 7. Nor was there any indication that any settlement addressing claims held by a subgroup of the proposed class had been announced or was imminent. Here, fundamental conflict is presently manifest.

June 19, 2015
Page 6

under already negotiated settlements[8] does not cure this defect.  The Second Circuit made clear that courts play a vital role in protecting absentee class members where, as here, class certification occurs in the settlement context.  *See, e.g.*, *In re Am. Int'l Grp. Secs. Litig.*, 689 F.3d 229, 240 (2d Cir. 2012) ("requirements of rule 23 'designed to protect absentees by blocking unwarranted or overbroad class definitions' such as the Rule 23(a)(4) requirement of adequate representation, will '*demand undiluted, even heightened attention*'") (citations omitted) (emphasis added)).

In sum, *Taylor* Action Counsel respectfully request that: (i) all futures complaints – the four currently filed futures complaints[9] and any others later filed – be consolidated into a single futures action; (ii) consolidated futures action be coordinated, but not consolidated, with the Spot Action for discovery and other pre-trial purposes; (iii) Spot Action counsels' request to amend their complaint to allege futures claims be denied; and (iv) interim class counsel, independent of the Spot Action, be appointed to prosecute FX futures claims.

Respectfully submitted,

 /s/ *David E. Kovel*
David E. Kovel (dkovel@kmllp.com)
KIRBY McINERNEY LLP
825 Third Avenue, 16th Floor
New York, NY 10022
Tel:  212-371-6600/ Fax: 212-751-2540

*Counsel for the FX Futures Plaintiffs*

cc:     All Counsel of Record (by ECF or Email)

---

[8]  By letter dated April 30, 2015, *Taylor* Action Counsel set forth grounds to support their request that spot counsel expressly exclude FX futures claims from the release of claims proposed under the JP Morgan settlement.  *See* copy of letter, attached hereto as Exhibit 1.  By letter dated May 8, 2015, spot counsel declined.  *See* copy of letter, attached hereto as Exhibit 2.  *Taylor* Action Counsel thus further request that the Court direct that the release in the JP Morgan and any other Spot Action settlements expressly exclude futures claims.  *Taylor* Action plaintiffs' request (at footnote 4 above) for a pre-motion conference to intervene also encompasses their request to expressly exclude futures claims from Spot Action settlement releases.

[9]  These futures complaints were filed in the Futures Action (*Taylor et al. v. Bank of America Corp. et al.*, No. 15-cv-1350), *Sterk v. Bank of America Corp., et al.* (No. 15-cv-2705), *Bakizada v. Bank of America Corp., et al.* (No. 15-cv-4230) and *Teel v. Bank of America Corp., et al.* (No. 15-cv-4436).

# EXHIBIT 3

KIRBY McINERNEY LLP

825 Third Avenue
New York, NY 10022
212.371.6600
Fax. 212.751.2540
WWW.KMLLP.COM
Of counsel
    Roger W. Kirby
    Alice McInerney

August 6, 2015

**BY ECF**

The Honorable Lorna G. Schofield
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York  10007

      Re:    *Taylor et al. v. Bank of America Corp. et al.*, No. 15-cv-1350 (LGS),
             related to case No. 13-cv-7789 (LGS)

Dear Judge Schofield:

Plaintiffs Neil Taylor, Steve Leaven and John Burnside (the "*Taylor* Plaintiffs") respectfully respond to the motion to consolidate and to appoint interim co-lead counsel (*In re Foreign Exchange Benchmark Rates Antitrust Litig.*, No. 13-cv-7789, ECF No. 347).  On February 23, 2015, *Taylor* Plaintiffs brought the first exchange-based ("Exchange") action under the Commodity Exchange Act and antitrust laws based on foreign exchange manipulation.  Since that time, several other Exchange cases have been filed and the MDL action plaintiffs (No. 13-cv-7789 (LGS)) have added Exchange Class claims in a second consolidated amended class action complaint (the "SAC").  *See* No. 13-cv-7789, ECF No. 368 ¶¶ 68, 413-50.

Counsel for the *Taylor* Plaintiffs, subject to the Court's approval, have met with and now agree with Co-Lead Counsel in the MDL ("Co-Lead Counsel") that it would be appropriate to consolidate all of the related actions asserting over-the-counter ("OTC") and Exchange Class claims, as those claims are defined in the SAC.  *See, generally, id.* ¶¶ 67-76, 400-50.  In addition, based on consultations with Co-Lead Counsel, we believe that both the Exchange and OTC claims can be efficiently and effectively prosecuted under a unitary structure focusing on the accountability of the Defendants with respect to the conduct in violation of the federal antitrust laws and the Commodity Exchange Act.

In consultation with Co-Lead Counsel we have agreed that this unified structure going forward would include active representation by firms in the litigation, like *Taylor* Plaintiffs' Counsel, who are focused on prosecuting and representing the Exchange Class claims.  Based on our conversations with Co-Lead Counsel, we understand that there would be cooperative responsibilities among all counsel to integrate the work necessary to successfully achieve maximum compensation for Defendants' misconduct.

NEW YORK            CALIFORNIA

Kirby **McInerney LLP**

Hon. Lorna G. Schofield
August 6, 2015
Page 2

In addition, the role of *Taylor* Plaintiffs' Counsel would include, among other things, under the leadership of the Co-Lead Counsel, participation in briefing, discovery, selection and work with experts, appeals, court conferences and appearances, as well as settlement negotiations and allocation. Co-Lead counsel have also agreed that participating counsel in this structure (including *Taylor* Plaintiffs' Counsel) will be provided full access to the Mediator and all settlement agreements executed to date. *Taylor* Plaintiffs' Counsel and other firms will participate in the allocation process of the settlement proceeds and a plan of distribution of the settlement funds as designated by Co-Lead Counsel.

Such a structure and delineation of roles, in our view, addresses the concerns raised in our previous submissions to the Court related to the effective representation of Exchange Class claims under Second Circuit and Supreme Court precedent.[1] Importantly, this structure going forward will also, in our judgment, advance an efficient pre-trial process.

As described in our earlier submissions, Kirby McInerney LLP and the other *Taylor* Plaintiffs' Counsel are extremely qualified and well-positioned to help steer the claims under the structure of Co-Lead Counsel.[2] *Taylor* Plaintiffs' Counsel have already devoted significant resources to identifying, investigating and prosecuting the claims in the litigation to date.

Counsel for the *Teel* Action (No. 15-cv-4436 (LGS)) and the *Robert Charles Class A, L.P.* Action (No. 15-cv-04926 (LGS)) also support this structure advanced by the *Taylor* Plaintiffs and Co-Lead Counsel.

---

[1] *See* No. 13-cv-7789, ECF No. 319 (citing *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999); *Literary Works in Elec. Databases Copyright Litig. v. Thomson Corp.*, 654 F.3d 242 (2d. Cir. 2011)).

[2] Kirby McInerney has served as lead counsel in numerous landmark cases of similar magnitude and complexity as this action, and is leading some of the most prominent private antitrust and Commodity Exchange Act ("CEA") cases currently being prosecuted, including *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11-md-2262, No. 11-cv-2613 (S.D.N.Y.) ("*LIBOR*") and *In re North Sea Brent Crude Oil Futures Litig.* No. 13-md-02475 (S.D.N.Y.) ("*Brent*").[2] The *LIBOR* and *Brent* cases both involve the alleged manipulation of global pricing benchmarks for interest rates and crude oil, respectively. Kirby McInerney and other *Taylor* Plaintiffs' counsel (Morris and Morris LLC Counselors at Law and Cafferty Clobes Meriwether & Sprengel LLP) have already and will continue to devote significant time and resources to litigating this case. The firm resumes can be found at Exhibits A-C to No. 13-cv-07789, ECF No. 312.

**Kirby McInerney LLP**

Hon. Lorna G. Schofield
August 6, 2015
Page 3

Respectfully submitted,

 /s/ *David E. Kovel*
David E. Kovel (dkovel@kmllp.com)
KIRBY McINERNEY LLP
825 Third Avenue, 16th Floor
New York, NY 10022
Tel:  212-371-6600
Fax: 212-751-2540

*Counsel for the Taylor Plaintiffs*

cc:      All Counsel of Record

# EXHIBIT 4

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: PLASMA-DERIVATIVE PROTEIN THERAPIES ANTITRUST LITIGATION | Case No. 09 C 7666 MDL No. 2109 Judge Joan B. Gottschall |
| This Document Relates To All Actions | |

## CONSOLIDATED AMENDED COMPLAINT

The University of Utah, Hospital Damas Inc., Mak Medical LLC, and Ravi Patel, M.D., Inc. d/b/a Comprehensive Blood and Cancer Center ("Plaintiffs"), individually and on behalf of a class of all others similarly situated, bring this action for treble damages under the antitrust laws of the United States against Defendants, and demand a jury trial.

## NATURE OF THE CASE

1.      Plaintiffs allege that Defendants, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, conspired, combined, or contracted to restrict output and to fix, raise, maintain, or stabilize the prices of Plasma-Derivative Protein Therapies that they sold to Plaintiffs and the other members of the Class from at least as early as July 1, 2003 through the present.  As a result of Defendants' unlawful conduct, Plaintiffs and other members of the Class paid supra-competitive prices for Plasma-Derivative Protein Therapies, and thus suffered injury of the type the federal antitrust laws are designed to prevent.

2.      Defendants CSL Limited, CSL Behring LLC, CSL Plasma (collectively "CSL"), and Baxter International Inc. ("Baxter") develop, manufacture, and sell Plasma-Derivative Protein Therapies, which are used primarily by hospitals and other healthcare

1

Dated: June 4, 2010

Respectfully submitted,

*/s/ Richard A. Koffman*

Daniel A. Small
Kit A. Pierson
Richard A. Koffman
Benjamin D. Brown
Christopher J. Cormier
Emmy L. Levens
COHEN MILSTEIN SELLERS &
     TOLL PLLC
1100 New York Avenue, NW
Suite 500 West
Washington, DC 20005
Telephone: 202-408-4600
Facsimle: 202-408-4699
E-mail:dsmall@cohenmilstein.com
     kpierson@cohenmilstein.com
     rkoffman@cohenmilstein.com
     bbrown@cohenmilstein.com
     ccormier@cohenmilstein.com
     elevens@cohenmilstein.com

Seth R. Gassman
COHEN MILSTEIN SELLERS &
     TOLL PLLC
88 Pine Street
14th Floor
New York, NY 10005
Telephone: 212-838-7797
Facsimle: 212-838-7745
E-mail:sgassman@cohenmilstein.com

***Plaintiffs' Steering Committee***

Charles E. Tompkins
Edward F. Haber
Todd S. Heyman
Ian J. McLoughlin
SHAPIRO, HABER & URMY LLP
53 State Street
Boston, MA 02109
Telephone: 617-439-3939
Facsimile: 617-439-0134
E-mail:ctompkins@shulaw.com
     ehaber@shulaw.com
     theyman@shulaw.com
     imcloughlin@shulaw.com

***Plaintiffs' Steering Committee***

78

William O. Crutchlow
Barry R. Eichen
Christian R. Mastondrea
EICHEN, CRUTCHLOW & McELROY
40 Ethel Road
Edison, NJ 08817
Telephone: 732-777-0100
Facsimile: 732-248-8273
E-mail:wcrutchlow@eichenlevinson.com
        beichen@eichenlevinson.com
        cmastondrea@eichenlevinson.com

Donald E. Haviland
Michael J. Lorusso
Michael P. Donohue
Robert G. Hughes
HAVILAND HUGHES LLC
111 S. Independence Mall East
Suite 1000
Philadelphia, PA 19106
Telephone: 215-609-4661
Facsimile: 215-392-4400
E-mail:Haviland@havilandhughes.com
        lorusso@havilandhughes.com
        donohue@havilandhughes.com
        Hughes@havilandhughes.com

Lori A. Fanning
Marvin A. Miller
Matthew E. Van Tine
MILLER LAW LLC
115 S. LaSalle Street
Suite 2910
Chicago, IL 60603
Telephone: 312-332-3400
Facsimile: 312-767-2676
E-mail:Lfanning@MillerLawLLC.com
        Mmiller@millerlawllc.com
        mvantine@millerlawllc.com

John Jernigan
JERNIGAN & McMILLIAN P.C.
P.O. Box 828
Brewerton, AL 36427
Telephone: 251-809-2981
Facsimile: 251-809-2980
E-mail: johnjernigan901@bellsouth.net

Daniel Hume
Kenneth G. Walsh
David E. Kovel
KIRBY McINERNEY LLP
825 Third Avenue
16th Floor
New York, NY 10022
Telephone: 212-317-2300
Facsimile: 212-751-2540
E-mail:dhume@kmllp.com
        kwalsh@kmllp.com
        dkovel@kmllp.com

A. Leroy Toliver
TOLIVER & GAINER, LLP
942 Green Street, SE
Suite A
Conyers, GA 30012
Telephone: 770-929-3100
Facsimile: 770-785-7879
E-mail: Toliver@ToliverandGainer.com

# EXHIBIT 5

Robert L. Begleiter (RB-7052)     Lloyd Constantine (LC-8465)     Amy N. Roth (AR-4534)
Stacey Anne Mahoney (SM-5425)     Mitchell C. Shapiro (MS-1019)
Jeffrey I. Shinder (JS-5719)      Gordon Schnell (GS-2567)
CONSTANTINE & PARTNERS, P.C.
477 Madison Avenue - 11th Floor
New York, NY  10022
(212) 350-2700
Attorneys for Plaintiffs Wal-Mart Stores, Inc., The Limited, Inc., Sears Roebuck and Company,
Inc., Safeway Inc., Circuit City Stores, Inc., and All Similarly Situated Persons, The International
Mass Retail Association, The National Retail Federation, and The Food Marketing Institute

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

IN RE                                        :

                                             :          MASTER FILE NO.
VISA CHECK/MASTERMONEY ANTITRUST             :          CV-96-5238
LITIGATION                                   :          (Gleeson, J.) (Mann, M.J.)

-------------------------------------------------------------------x

This Document Relates To:                    :

                                             :

WAL-MART STORES, INC., THE LIMITED, INC.,    :
SEARS ROEBUCK AND COMPANY, INC., SAFEWAY     :          **THIRD AMENDED**
INC. and CIRCUIT CITY STORES, INC., on Behalf :         **CLASS ACTION**
of Themselves and All Similarly Situated Persons, :     **COMPLAINT**
THE INTERNATIONAL MASS RETAIL               :          **AND JURY DEMAND**
ASSOCIATION, THE NATIONAL RETAIL            :
FEDERATION and THE FOOD MARKETING           :
INSTITUTE,                                   :

                                             :

                    Plaintiffs,              :

           v.                                :

                                             :

VISA U.S.A. INC. and                         :
MASTERCARD INTERNATIONAL, INC.,              :

                                             :

                    Defendants.              :

-------------------------------------------------------------------x


       Plaintiffs Wal-Mart Stores, Inc. ("Wal-Mart"), The Limited, Inc. ("The Limited"),

Sears Roebuck and Company, Inc. ("Sears"), Safeway Inc. ("Safeway"), Circuit City Stores, Inc.

("Circuit City"), The International Mass Retail Association ("IMRA"), The National Retail

Federation ("NRF") and The Food Marketing Institute ("FMI") by their attorneys, Constantine &

Partners, allege for their complaint against Visa U.S.A. Inc. ("Visa"), and MasterCard

International, Inc. ("MasterCard"), upon knowledge with respect to their own acts and upon information and belief with respect to all other matters, as follows:

## I.
## INTRODUCTION

1.        Plaintiffs Wal-Mart, The Limited, Sears, Safeway and Circuit City (the "Retailer Plaintiffs") own and operate thousands of retail stores throughout the United States.  Similar to more than three million United States retail establishments, the Retailer Plaintiffs accept Visa and MasterCard credit cards as a form of payment along with cash, checks, travelers checks and other plastic credit, debit and "travel and entertainment" cards.

2.        The Retailer Plaintiffs' acceptance of each of these forms of payment is voluntary, with the exception of two.  They are forced to accept two debit cards, the so-called "*Visa Check*" and "*MasterMoney*" cards, issued by members of the Visa and MasterCard bankcard associations.  The Retailer Plaintiffs are forced to accept these debit cards as a condition of being able to accept the ubiquitous and dominant Visa and MasterCard credit cards.  Without these credit cards, neither they nor virtually any retailer can operate successfully.

3.        Wal-Mart, The Limited, Sears, Safeway and Circuit City, on behalf of themselves and a national class of retailers, who accept Visa and MasterCard credit cards and are therefore forced to accept *Visa Check* and *MasterMoney*, and NRF, IMRA and FMI, three trade associations of retailers whose members and affiliates have annual sales of more than $2 trillion (the "Trade Association Plaintiffs"), challenge these tying arrangements under the antitrust laws. The tying arrangements force members of the class to accept *Visa Check* and *MasterMoney* cards.  These arrangements force retailers to pay supra-competitive, exorbitant and fixed prices for acceptance of these involuntary payment systems and raise the prices paid by all of their retail customers.  The arrangements also limit retailers' ability to accept and receive the forms of payment which they deem cost effective and efficient for themselves and their customers.

2

2567.2

4.     Visa and MasterCard's longstanding and coercive practice of tying *Visa Check* and *MasterMoney* to Visa and MasterCard credit cards has now become particularly costly as Visa and MasterCard have embarked upon aggressive national advertising campaigns for the *Visa Check* and *MasterMoney* cards.  The tying arrangements have resulted in the rapidly escalating use of the *Visa Check* and *MasterMoney* debit cards and have forced the Retailer Plaintiffs and class members to accept them and pay fees which are supra-competitive, exorbitant and fixed.  The tying arrangements are alleged to violate Sections 1 and 2 of the Sherman Act and the analogous provisions of the Donnelly Act, New York's antitrust law.

5.     All of the Plaintiffs seek declaratory and injunctive relief, and the Retailer Plaintiffs also seek damages to redress these violations of federal and state law.

## II.
## JURISDICTION AND VENUE

6.     This complaint is filed under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§1 and 2, and for damages under Section 4 of the Clayton Act, 15 U.S.C. § 15.  Claims arising under the Donnelly Act, New York General Business Law §§ 340-347 are also stated herein.  This Court has jurisdiction of the federal antitrust law claims alleged herein under 28 U.S.C. §§ 1331, 1337, 2201 and 2202.  Jurisdiction of the state antitrust claims is vested in this Court pursuant to the principles of pendent jurisdiction, in that they arise out of the same operative facts as the federal antitrust claims.

7.     Defendants transact business and are found in this District.  In particular, tens of thousands of retail establishments located in this District accept Visa and MasterCard credit cards and are forced to accept *Visa Check* and *MasterMoney* plastic debit cards.  Hundreds of bank members of Visa and/or MasterCard located in this District issue and/or "acquire" retail merchant transactions for Visa and/or MasterCard credit cards and *Visa Check* and *MasterMoney* debit cards.  The interstate trade and commerce involved and affected by the alleged violations of

2567.2

# EXHIBIT 6

## *Notice to Counsel Pursuant to FED. R. CIV. P. 23(G) Regarding Kay Et Al. V. Wells Fargo & Company, No. C07-01351 WHA (N.D. Ca)*

PR Newswire

December 21, 2007 Friday 2:00 PM GMT

Copyright 2007 PR Newswire Association LLC. All Rights Reserved.

**Length:** 786 words

**Dateline:** SAN FRANCISCO Dec. 21

# Body

SAN FRANCISCO, Dec. 21 /PRNewswire/ -- The following release was issued today by the United States District Court, Northern District of California, San Francisco/Oakland Division:

```
UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO/OAKLAND DIVISION

Civil Action No. C07-01351 WHA

CLASS ACTION
NOTICE TO COUNSEL PURSUANT TO FED. R. CIV. P. 23(G)

ANDREA KAY, individually and on behalf of all others similarly situated,

Plaintiff,

v.
```

WELLS FARGO & COMPANY(NYSE:WFC), WELLS FARGO BANK, N.A., NORTH STAR MORTGAGE GUARANTY REINSURANCE COMPANY,

```
Defendants.

TO THE ATTORNEYS AND LAW FIRMS RECEIVING THIS NOTICE:
```

The above-captioned case is a certified class action in which plaintiff Andrea Kay ("Plaintiff") alleges, both individually and on behalf of others similarly situated, that Defendants Wells Fargo & Company ("Wells Fargo"), Wells Fargo Bank, N.A. ("WFB") and North Star Mortgage Guaranty Reinsurance Company ("North Star") violated Section 8 of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. section 2607, by paying or receiving kickbacks, unearned fees or other prohibited payments in connection with captive reinsurance arrangements with certain residential private mortgage insurers.

Specifically, Plaintiff alleges, inter alia, that Wells Fargo and WFB referred residential loan customers who were required to purchase private mortgage insurance ("PMI") to PMI providers that had entered into reinsurance agreements for such referred PMI insurance with North Star, an affiliated business or "captive" of Wells Fargo and/or WFB. Plaintiff essentially alleges that these reinsurance agreements involved insufficient, if any, transfer of risk of loss and therefore violated the anti-kickback and prohibited payment/fee sharing provisions of Section 8 of RESPA.

The Defendants have denied all of the allegations and contend the agreements are appropriate and standard reinsurance involving meaningful risk transfer. The Defendants intend to continue vigorously defending the claims.

Notice to Counsel Pursuant to FED. R. CIV. P. 23(G) Regarding Kay Et Al. V. Wells Fargo & Company, No. C07-01351 WHA (N.D. Ca)

Plaintiff moved for certification of a class of all borrowers who obtained mortgage loans through WFB who paid for private mortgage insurance which was reinsured by WFB affiliate North Star from 1999 to the present. On November 30, 2007, the Court issued an Order:

(1) Granting Plaintiff's motion for certification for certification of a class defined as follows:

All homeowners who obtained residential mortgage loans through Wells Fargo Bank, N.A. that closed from March 7, 2006 through and including December 31, 2007, and who paid for private mortgage insurance subject to reinsurance through North Star Mortgage Guaranty Reinsurance Company, but not including those borrowers whose loans Wells Fargo Bank, N.A. acquired from third-party lenders ("Class Members").

```
-and-

(2) Directing Plaintiff's counsel to:
```

... publicize notice calculated to invite other counsel to compete for class representation in this case pursuant to [Fed.R.Civ.P.] Rule 23(g). Plaintiffs' counsel may also apply. All applicants must be prepared to meet the existing deadlines.

Copies of all filed documents, including the Court's November 30, 2007 Order and June 14, 2007 Case Management Order, are available through PACER. Any counsel wishing to compete for class representation in this case are invited to file an application with the Court, pursuant to Rule 23(g), on or before January 10, 2008.

In addition to explicit agreement to meeting all current Court deadlines, applications for Class Counsel should include:

```
-- Applicant's firm resume, including all relevant contact information;
-- A listing of any relevant experience including, but not limited to,

   class actions brought pursuant to RESPA where counsel was named (or

   effective) lead or co-lead counsel.  This list should be detailed,
   including case name and number, a short description of the action and
   case outcome and the attorney(s) who worked on those cases;
-- An express commitment regarding applicant's willingness and ability to
   commit the necessary expertise and resources to the full prosecution of

   the Class' claims, through trial if necessary, and
-- An express commitment to maintain current time records throughout the
   action as well as advance any reasonable expenses of Plaintiff and the

   Class.
```

Finally, the Court invites applicants to provide any other information they believe would be relevant and useful to the Court's Class Counsel evaluation process.

```
By Order of the Honorable William H. Alsup
United States District Judge

CONTACT:  Tiffany Melvin, Tel: +1-888-299-7706.
```

CONTACT: Tiffany Melvin, +1-888-299-7706

SOURCE United States District Court, Northern District of California, San
http://www.prnewswire.com

## Classification

**Language:** ENGLISH

Notice to Counsel Pursuant to FED. R. CIV. P. 23(G) Regarding Kay Et Al. V. Wells Fargo & Company, No. C07-01351 WHA (N.D. Ca)

**Publication-Type:** Newswire

**Subject:** US REAL ESTATE SETTLEMENT PROCEDURES ACT (90%); CLASS ACTIONS (90%); SUITS & CLAIMS (90%); AGREEMENTS (89%); LAWYERS (89%); LAW COURTS & TRIBUNALS (78%); CIVIL PROCEDURE (78%); LITIGATION (78%); REAL PROPERTY LAW (75%); HOMEOWNERS (75%); LEGAL SERVICES (70%); bc-CA-WellFargo-Lawsuit; LAW Legal Issues

**Company:** WELLS FARGO & CO (96%); United States District Court, Northern District of California, San

**Ticker:** WFC (NYSE) (96%); WFC NYSE

**Industry:** MORTGAGE LENDER GUARANTY INSURANCE (92%); US REAL ESTATE SETTLEMENT PROCEDURES ACT (90%); REINSURANCE (90%); INSURANCE (90%); MORTGAGE REINSURANCE (90%); MORTGAGE INSURANCE (90%); MORTGAGE LOANS (89%); LAWYERS (89%); REAL ESTATE (89%); LITIGATION (78%); CAPTIVE INSURANCE (75%); REAL PROPERTY LAW (75%); REAL ESTATE CONTRACTS (75%); LEGAL SERVICES (70%); FIN Banking; Financial Services

**Geographic:** SAN FRANCISCO, CA, USA (93%); SAN FRANCISCO BAY AREA, CA, USA (89%); OAKLAND, CA, USA (74%); CALIFORNIA, USA (92%); UNITED STATES (92%)

**Load-Date:** December 22, 2007

---