**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | MDL No. 1720<br><br>Docket No. 05-md-01720-MKB-JO<br><br>*Document Electronically Filed* |
| BARRY'S CUT RATE STORES INC.; DDMB, INC. d/b/a EMPORIUM ARCADE BAR; DDMB 2, LLC d/b/a EMPORIUM LOGAN SQUARE; BOSS DENTAL CARE; RUNCENTRAL, LLC; CMP CONSULTING SERV., INC.; TOWN KITCHEN, LLC d/b/a TOWN KITCHEN & BAR; GENERIC DEPOT 3, INC. d/b/a PRESCRIPTION DEPOT; and PUREONE, LLC d/b/a SALON PURE,<br><br>          Plaintiffs,<br><br>  -v-<br><br>VISA, INC.; MASTERCARD INCORPORATED; MASTERCARD INTERNATIONAL INCORPORATED; BANK OF AMERICA, N.A.; BA MERCHANT SERVICES LLC (f/k/a DEFENDANT NATIONAL PROCESSING, INC.); BANK OF AMERICA CORPORATION; BARCLAYS BANK PLC; BARCLAYS BANK DELAWARE; BARCLAYS FINANCIAL CORP.; CAPITAL ONE BANK, (USA), N.A.; CAPITAL ONE F.S.B.; CAPITAL ONE FINANCIAL CORPORATION; CHASE BANK USA, N.A.; CHASE MANHATTAN BANK USA, N.A.; CHASE PAYMENTECH SOLUTIONS, LLC; JPMORGAN CHASE BANK, N.A.; JPMORGAN CHASE & CO.; CITIBANK (SOUTH DAKOTA), N.A.; CITIBANK N.A.; CITIGROUP, INC.; CITICORP; and WELLS FARGO & COMPANY,<br><br>          Defendants.<br><br>This Document Relates to:<br><br>ALL ACTIONS | **EQUITABLE RELIEF CLASS ACTION COMPLAINT** |

## I.   PREAMBLE

1.     For a half-century America's largest banks have fixed the fees imposed on Merchants (defined below) for transactions processed over the dominant Visa and MasterCard networks and have collectively imposed restrictions on Merchants that prevent them from protecting themselves against those fees. These practices continued despite the networks' and the banks' more recent attempts to avoid antitrust liability by restructuring the Visa and MasterCard corporate entities. Even after litigation, legislation, and regulation forced needed reforms on the Defendants and technology threatened to disrupt Visa and MasterCard's dominant position in the marketplace, the Defendants used their market power to continue to restrain competition, harming Merchants, cardholders, and consumers in general, all in further violation of the antitrust laws. Plaintiffs, on behalf of all similarly situated Merchants nationwide (the "Class") seek equitable relief to protect themselves from future harm caused by the anticompetitive acts described in detail below, and to rid the marketplace of the continuing anticompetitive effects of Defendants' past unlawful conduct.

2.     Barry's Cut Rate Stores Inc.; DDMB, Inc. d/b/a Emporium Arcade Bar; DDMB 2, LLC d/b/a Emporium Logan Square; Boss Dental Care; Runcentral, LLC; CMP Consulting Serv., Inc.; Town Kitchen, LLC d/b/a Town Kitchen & Bar; Generic Depot 3, Inc. d/b/a Prescription Depot; and PureOne, LLC d/b/a Salon Pure (collectively the "Equitable Relief Plaintiffs"), on behalf of themselves and a class of Merchants, by their undersigned attorneys herein, allege for their Complaint against Visa Inc., MasterCard Incorporated, MasterCard International Incorporate, and the other Defendants named in this Complaint ("Bank Defendants") (collectively referred to as "Defendants") as follows.

## II.   INTRODUCTION

3.     Plaintiffs operate businesses throughout the United States that accept Visa and MasterCard Credit Cards, Signature Debit Cards, and PIN-Debit Cards as forms of payment.

4.      Plaintiffs represent a class of millions of Merchants that accept Visa and MasterCard Credit and Signature Debit Cards and Interlink PIN-Debit Cards as forms of payment, and challenge the Defendants' collusive and anticompetitive practices under the antitrust laws of the United States and the State of California from January 1, 2004 to the present (the "Class Period"). Defendants' anticompetitive conduct harms competition and imposes upon Plaintiffs and Class Members supracompetitive, exorbitant, and collectively-fixed prices.

5.      The anticompetitive conduct alleged herein is illegal under the California Cartwright Act and Sections 1 and 2 of the Sherman Act.

## III.   JURISDICTION AND VENUE

6.      Plaintiffs file this Complaint under Section 16 of the Clayton Act, 15 U.S.C. Section 26, to prevent and restrain violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2, and § 16700 *et seq*. of the Cartwright Act (Bus. & Prof. Code, § 16700 *et seq*.). This Court has jurisdiction over Plaintiffs' federal antitrust claims under 28 U.S.C. §§ 1331, 1337, 2201, and 2202

7.      This Court has original jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1332. The aggregate amount in controversy for this class action exceeds $5,000,000 and less than one-third of all class members reside in New York. This Court has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367.

8.      Venue in the Eastern District of New York is proper under 28 U.S.C. §§ 1391, 1407 and 15 U.S.C. §§ 15, 22, and 26.   Plaintiff PureOne, LLC accepts payment by Visa and MasterCard Payment Cards through, for example, e-commerce or telephone orders from cardholders located in the Eastern District of New York. Defendants transact business and are found in the Eastern District of New York. Thousands of Merchants located in the Eastern District of New York accept Visa and MasterCard Credit Cards and Debit Cards issued by one or more Bank Defendants and, thus, are Class Members. Hundreds of Visa and/or MasterCard Member Banks, including most of the banks named as Defendants, issue Visa and MasterCard

Credit Cards and Debit Cards and/or acquire retail Merchant transactions for Visa and/or MasterCard in the Eastern District of New York. A substantial part of the interstate trade and commerce involved in and affected by Defendants' violations of the antitrust laws was and is carried on in part within the Eastern District of New York. The acts complained of have had, and unless enjoined will continue to have, substantial anticompetitive effects in the Eastern District of New York.

## IV.  DEFINITIONS

9.  As used in this Complaint, the following terms are defined as:

a.  "Access Device" means any device, including but not limited to a Payment Card or microchip, that may be used by a consumer to initiate a General Purpose Card or Debit Card transaction.

b.  "Acquiring Bank" or "Acquirer" means a member of Visa and/or MasterCard that acquires payment transactions from Merchants and acts as a liaison between the Merchant, the Issuing Bank, and the Payment-Card network to assist in processing the payment transaction. Visa and MasterCard rules require that an Acquiring Bank be a party to every Merchant contract. In a typical payment transaction, when a customer presents a Visa or MasterCard card for payment, the Merchant relays the transaction information to the Acquiring Bank. The Acquiring Bank then contacts the Issuing Bank via the network for authorization based on available credit or funds. Acquiring Banks compete with each other for the right to acquire payment transactions from Merchants but do not compete on the basis of the interchange fee, which is one of the subjects of this Complaint.

c.  "All-Outlets Rule" is a rule of the Visa and MasterCard networks that requires a Merchant with multiple outlets to accept Visa or MasterCard, respectively, in all of its outlets, even if those outlets are owned by a separate corporate entity, operated under a different brand name, or employ a different business model in order for the Merchant to receive the interchange rates for which the Merchant would ordinarily qualify.

d.  "Anti-Steering Restraints" are the rules of the Visa and MasterCard networks that forbid Merchants from incenting consumers to use less expensive payment forms, including: the No-Surcharge Rule; the No-Minimum-Purchase Rule; and Visa and MasterCard's "discrimination rules," which require Merchants to discriminate against other forms of payment by failing to treat them more favorably than Defendants' cards despite those competing forms' better pricing. The Defendants' standard-

4

form Merchant agreements implement these Anti-Steering Restraints.

e. "Assessment" refers to an amount computed and charged by Visa and MasterCard on each transaction amount to the Acquiring and Issuing Banks.

f. "Authorization" is the process by which a Merchant determines whether a cardholder is authorized by his or her Issuing Bank to make a particular transaction. The Merchant sends the cardholder's information to its Acquiring Bank or a Third-Party Processor, which sends it to Visa or MasterCard, which then sends it to the issuer or the issuer's processor, to obtain authorization. If authorization is given, the process is repeated in reverse.

g. "Charge Card" or "Travel & Entertainment Card" (T&E) is an access device, usually a Payment Card, enabling the holder to purchase goods and services on credit to be paid on behalf of the holder by the issuer of such device. Typically, the contractual terms of such cards require that payment from the holder to the issuer be made in full each month, for all payments made on behalf of the cardholder by the issuer during the preceding month. The issuer does not extend credit to the holder beyond the date of the monthly statement, nor does it impose interest charges on the balance due except as a penalty for late payment. Examples of Charge Cards are the American Express Green, Gold, Platinum, and Centurion cards as well as the Diners Club and Carte Blanche cards issued by Citibank.

h. "Credit Card" is an access device, usually a Payment Card, enabling the holder to (i) effect transactions on credit for goods and services purchased, which are paid on behalf of the holder by the issuer of such devices; or (ii) obtain cash with credit extended by the issuer. Credit Cards permit consumers to borrow the money for a retail purchase from the card issuer and to repay the debt over time, according to the provisions of a revolving-credit agreement between the cardholder and the issuer. Examples of Credit Cards are the Visa and MasterCard Credit Cards issued by members of the Defendant Bank card networks, as well as the Discover and Private Issue cards issued by Morgan Stanley, and the Optima and Blue-type cards issued by American Express. Proprietary cards of individual Merchants for use only at particular Merchants' outlets are not included in this definition.

i. "Debit Card" is an access device, usually a Payment Card, enabling the holder, among other things, to effect a cash withdrawal from the holder's depository bank account, either at an Automated Teller Machine ("ATM") or a point of sale ("POS").

j. "General Purpose Cards" collectively refers to Credit Cards and Charge

Cards.

k.  The "Honor All Cards" Rules are rules of the Visa and MasterCard networks that require any Merchant that accepts Visa or MasterCard Credit Cards to accept all Credit Cards that are issued on that network, and the rules of the Visa and MasterCard networks that require any Merchant that accepts Visa or MasterCard Debit Cards to accept all Debit Cards that are issued on that network.

l.  "Interchange Fee" in the United States General Purpose Card Network Services and Debit Card Network Services markets means a fee that Merchants pay to the Issuing Bank through the network and the Acquiring Bank for each transaction in which the Issuer's card is used as a payment device. The following example illustrates how the Visa and MasterCard Interchange Fees work. A customer presents a Visa or MasterCard card to a Merchant as a payment method. The Merchant contacts the Acquiring Bank, itself or through a Third-Party Processor, to authorize the transaction. The Acquiring Bank submits the transaction to the network. The network relays the transaction information to the Issuing Bank or the Issuing Bank's Third-Party Processor, which approves the transaction if the customer has a sufficient line of credit or available funds. If the transaction is authorized through the network, the Issuing Bank pays the Acquiring Bank the payment amount minus the "Interchange Fee," which is fixed by the Member Banks of Visa and MasterCard. The Acquiring Bank then pays the Merchant the payment amount minus the Interchange Fee and other charges for processing the transaction. The total fee charged the Merchant is often referred to as the "Merchant-Discount Fee." The Interchange Fee is the largest component of the Merchant-Discount Fee. "Merchant-Discount Fee" means the total amount that the Merchant, such as one of the Class members, pays to its Acquiring Bank for each transaction involving a Visa or MasterCard credit or Signature Debit Card.

m.  "Issuing Bank" or "Issuer" means a member of Visa and/or MasterCard that issues Visa and/or MasterCard branded Payment Cards to consumers for their use as payment systems and access devices. Issuing Banks compete with each other to issue Visa and MasterCard cards to consumers. Visa and MasterCard rules require that all Member Banks issue, respectively, Visa and MasterCard Payment Cards.

n.  "Merchant" means an individual, business, or other entity that accepts payments in exchange for goods or services rendered, as donations, or for any other reason.

o.  "Merchant-Discount Fee" is the total sum that is deducted from the amount of money a Merchant receives in the settlement of Visa and/or MasterCard transactions. The largest component of the Merchant-Discount Fee is the Interchange Fee.

6

p.  "Miscellaneous Exclusionary Restraints" refer collectively to the All-Outlets Rule, the No-Bypass Rule, and the No-Multi-Issuer Rule.

q.  "Network Services" means the services and infrastructure that Visa and MasterCard and their members provide to Merchants through which payment transactions are conducted, including authorization, clearance, and settlement of transactions, and those similar services offered by American Express and Discover. As they currently are offered by Visa and MasterCard and their Member Banks, Network Services include Network-Processing Services and the Visa and MasterCard Payment-Card Systems that facilitate acceptance of Visa and MasterCard Payment Cards by Merchants. "Network Services" are sometimes referred to as "Card Acceptance Services" as they relate to Merchants.

r.  "Network-Processing Services" are the services that are or may be used for authorizing, clearing, and settling Visa and MasterCard Credit and Debit Card transactions.

s.  "No-Minimum-Purchase Rule" is a rule of the Visa and MasterCard networks that prohibits Merchants from imposing minimum-purchase amounts for Visa and MasterCard Credit-Card purchases.

t.  "No-Bypass Rule" is a rule of the Visa and MasterCard networks that prohibits Merchants and Member Banks from bypassing the Visa or MasterCard system (thereby avoiding the supracompetitive Interchange Fees) in order to clear, authorize, or settle Credit Card transactions even if the Issuing and Acquiring Banks are the same, or even if a Third-Party Processor has agreements with both the Issuing and Acquiring Banks on any given transaction.

u.  "No-Multi-Issuer Rule" is a rule of the Visa and MasterCard networks respectively, that prohibits Visa and MasterCard transactions from also being able to be processed over other networks.

v.  "No-Surcharge Rule" is a rule of the Visa and MasterCard networks that forbids Merchants from charging cardholders a surcharge on their Payment-Card transactions to reflect cost differences among various payment methods. For example, Merchants are prohibited from surcharging cardholders who use a Visa Credit Card rather than a Discover-branded Credit Card, or use a Premium Credit Card rather than a standard Credit Card, or use a Credit Card rather than another form of payment.

w.  "Signature Debit Card" or "Offline Debit Card" is a Debit Card with which the cardholder authorizes a withdrawal from his or her bank account usually by presenting the card at the POS and signing a receipt. Signature Debit Card transactions are processed through signature

networks, like Credit Card transactions. Examples of Signature Debit Cards include Visa's "Visa Check" product and MasterCard's "Debit MasterCard" product.

x.  "Online PIN-Debit Card" or "PIN-Debit Card" is a Debit Card with which the cardholder authorizes a withdrawal from his or her bank account by swiping her card at the POS and entering a Personal Identification Number ("PIN"). PIN-Debit Card networks grew out of regional ATM networks and therefore process transactions differently than Offline transactions. Examples of Online PIN-Debit Card networks include Interlink, Maestro, NYCE, and Pulse.

y.  A "Premium Card" is a General Purpose Card that carries a higher Interchange Fee than a Standard Card and is required by a network to carry a certain level of rewards or incentives to the cardholder. Visa's "Visa Signature," "Visa Rewards," and "Visa Infinite" card products and MasterCard's "World" and "World Elite" card product are examples of Premium Cards.

z.  "On-Us Transactions" are transactions in which the Acquiring Bank and the Issuing Bank are the same. Even when the Issuing and Acquiring Banks are identical, Visa and MasterCard require that the Issuing Bank charge an Interchange Fee to the Merchant.

aa. "Payment Card" refers to a plastic card that enables consumers to make purchases from Merchants that accept the consumer's Payment Card. The term "Payment Card" refers to several different types of cards, including General-Purpose Cards, Debit Cards, Travel & Entertainment Cards, stored-value cards, and Merchant-proprietary cards.

bb. Although "Payment Cards" are a subset of "Access Devices," the two terms are used interchangeably herein, because despite evolving technology, Payment Cards continue to constitute the vast majority of Access Devices.

cc. "Settlement" is the process by which the Merchant is reimbursed for a Payment Card transaction. While Visa and MasterCard rules require that an Acquiring Bank be a party to all Merchant card-acceptance agreements, Merchants often use Third-Party Processors to process these transactions. The Acquiring Bank or its processor credits the Merchant's bank account with the amount paid by the cardholder less the Merchant-Discount fee, the largest component of which is the Interchange Fee, and then transmits the transaction data to Visa or MasterCard, which sends it to the Issuing Bank or its Third-Party Processor. The Issuing Bank then sends payment to the Acquiring Bank through Visa or MasterCard (and possibly the Acquirer's processor). In a Credit Card or Signature Debit Card transaction, settlement occurs two to four days after authorization and

8

clearing. In a PIN-Debit transaction, all three processes occur in the same electronic transaction virtually instantaneously.

dd. "Third-Party Processor" is a firm, other than Visa, MasterCard, a Member Bank, or an entity affiliated with a Member Bank, that performs the authorization, clearing, and settlement functions of a Visa or MasterCard Payment-Card transaction on behalf of a Merchant or a Member Bank. Examples of Third-Party Processors include First Data and Transfirst.

## V.   THE PLAINTIFFS

10.   Plaintiff Barry's Cut Rate Stores Inc. ("Barry's Cut Rate Stores") is a corporation doing business in and incorporated under the laws of the State of Illinois.  It is a discount pharmacy with its principal place of business at 1370 Milwaukee Ave., Chicago, IL  60622. Barry's Cut Rate Stores accepts payment by Visa and MasterCard Credit and Debit Cards. Defendants impose supracompetitive Interchange and associated with these Visa and MasterCard transactions on Barry's Cut Rate Stores and force it to abide by the Anti-Steering Restraints and other restraints that facilitate Defendants' anticompetitive practices. Barry's Cut Rate Stores has been injured in its business or property as a result of the unlawful conduct alleged herein, and will continue to be so injured unless that unlawful conduct is enjoined.

11.   Plaintiff DDMB, Inc. d/b/a Emporium Arcade Bar ("DDMB 1") is a corporation doing business in and incorporated under the laws of the State of Illinois.  It is a combination bar and videogame arcade with its principal place of business at 1366 N. Milwaukee Ave., Chicago, IL  60622.  DDMB 1 accepts payment by Visa and MasterCard Credit and Debit Cards. Defendants impose supracompetitive Interchange associated with these Visa and MasterCard transactions on DDMB 1 and force it to abide by the Anti-Steering Restraints and other restraints that facilitate Defendants' anticompetitive practices. DDMB 1 has been injured in its business or property as a result of the unlawful conduct alleged herein, and will continue to be so injured unless that unlawful conduct is enjoined.

12.   Plaintiff DDMB 2, LLC d/b/a Emporium Logan Square ("DDMB 2") is a corporation doing business in and incorporated under the laws of the State of Illinois.  It is a

combination bar and videogame arcade with its principal place of business at 1366 N. Milwaukee Ave., Chicago, IL 60622. DDMB 2 accepts payment by Visa and MasterCard Credit and Debit Cards. Defendants impose supracompetitive Interchange associated with these Visa and MasterCard transactions on DDMB 2 and force it to abide by the Anti-Steering Restraints and other restraints that facilitate Defendants' anticompetitive practices. DDMB 2 has been injured in its business or property as a result of the unlawful conduct alleged herein, and will continue to be so injured unless that unlawful conduct is enjoined.

13.   Plaintiff Boss Dental Care is a limited liability corporation doing business in and incorporated under the laws of the State of Texas.  It is a family dental practice that also engages in the retail selling of dental supplies, with its principal place of business at 801 Everhart Road, Corpus Christi, TX 78411.  Boss Dental Care accepts payment by Visa and MasterCard Credit and Debit Cards. Defendants impose supracompetitive Interchange associated with these Visa and MasterCard transactions on Boss Dental Care and force it to abide by the Anti-Steering Restraints and other restraints that facilitate Defendants' anticompetitive practices. Boss Dental Care has been injured in its business or property as a result of the unlawful conduct alleged herein, and will continue to be so injured unless that unlawful conduct is enjoined.

14.   Plaintiff Runcentral, LLC ("Runcentral") is a limited liability corporation doing business in and incorporated under the laws of the State of Florida.  It is a business internet service provider with its principal place of business at 1172 S. Dixie Highway, Coral Gables, FL 33146.   Runcentral accepts payment by Visa and MasterCard Credit and Debit Cards. Defendants impose supracompetitive Interchange associated with these Visa and MasterCard transactions on Runcentral and force it to abide by the Anti-Steering Restraints and other restraints that facilitate Defendants' anticompetitive practices. Runcentral has been injured in its business or property as a result of the unlawful conduct alleged herein, and will continue to be so injured unless that unlawful conduct is enjoined.

15.   Plaintiff CMP Consulting Serv., Inc. ("CMP") is a corporation doing business in and incorporated under the laws of the State of Florida.  It is a business information technology

support provider with its principal place of business at 7266 SW 48 Street, Miami, FL 33155. CMP accepts payment by Visa and MasterCard Credit and Debit Cards. Defendants impose supracompetitive Interchange associated with these Visa and MasterCard transactions on CMP and force it to abide by the Anti-Steering Restraints and other restraints that facilitate Defendants' anticompetitive practices. CMP has been injured in its business or property as a result of the unlawful conduct alleged herein, and will continue to be so injured unless that unlawful conduct is enjoined.

16.    Plaintiff Town Kitchen, LLC d/b/a Town Kitchen & Bar ("Town Kitchen") is a limited liability corporation doing business in and incorporated under the laws of the State of Florida.  It is a restaurant with its principal place of business at 7301 SW 57th Ct, South Miami, FL 33143.  Town Kitchen accepts payment by Visa and MasterCard Credit and Debit Cards. Defendants impose supracompetitive Interchange associated with these Visa and MasterCard transactions on Town Kitchen and force it to abide by the Anti-Steering Restraints and other restraints that facilitate Defendants' anticompetitive practices. Town Kitchen has been injured in its business or property as a result of the unlawful conduct alleged herein, and will continue to be so injured unless that unlawful conduct is enjoined.

17.    Plaintiff Generic Depot 3, Inc. d/b/a Prescription Depot ("Prescription Depot") is a corporation doing business in and incorporated under the laws of the State of Florida.  It is a pharmacy with its principal place of business at 8225 N. Pine Island Rd., Tamarac, FL 33321. Prescription Depot accepts payment by Visa and MasterCard Credit and Debit Cards. Defendants impose supracompetitive Interchange associated with these Visa and MasterCard transactions on Prescription Depot and force it to abide by the Anti-Steering Restraints and other restraints that facilitate Defendants' anticompetitive practices. Prescription Depot has been injured in its business or property as a result of the unlawful conduct alleged herein, and will continue to be so injured unless that unlawful conduct is enjoined.

18.    Plaintiff PureOne, LLC d/b/a Salon Pure ("PureOne") is a limited liability corporation doing business in and incorporated under the laws of the State of Georgia.  It is a

beauty salon with its principal place of business at 4690 Hog Mountain Rd, Flowery Branch, GA 30542.  PureOne accepts payments by Visa and MasterCard Credit and Debit Cards.  Defendants impose supracompetitive Interchange Fees associated with these Visa and MasterCard transactions on PureOne and force it to abide by the Anti-Steering Restraints and other restraints that facilitate Defendants' anticompetitive practices.  PureOne has been injured in its business or property as a result of the unlawful conduct alleged herein, and will continue to be so injured unless that unlawful conduct is enjoined.

19.    The anticompetitive behavior by the Visa and MasterCard and their Member Banks has caused, and unless enjoined will continue to cause, antitrust injury common to the Plaintiffs and Class Members.

## VI.    THE DEFENDANTS

20.    Defendant Visa Inc. ("Visa") operates the Visa electronic payments network around the world.  It is a publicly-traded Delaware Corporation with its principal place of business in Foster City, California.    Until the Visa corporate restructuring described below, Visa International (f/k/a Visa International Service Association) was a non-stock, non-assessable Delaware membership corporation with its principal place of business in San Francisco, California.  Before the restructuring, Visa, U.S.A. Inc. was a group-member of Visa International Service Association and was also a non-stock, non-assessable Delaware membership corporation with its principal place of business in San Francisco, California.  Visa, Inc. is the successor in interest to Visa U.S.A. Inc. and Visa International (f/k/a/ Visa International Service Association).

21.    Defendant MasterCard Incorporated is a publicly-traded Delaware corporation with its principal place of business in Purchase, NY.  MasterCard Incorporated is the successor in interest to a private, SEC-registered share company, also called MasterCard Incorporated, organized under the laws of Delaware with its principal place of business in Purchase, New York.  Defendant MasterCard International Incorporated is a Delaware membership corporation

12

that is the principal operating subsidiary of MasterCard Incorporated.  MasterCard Incorporated and MasterCard International Incorporated are collectively referred to herein as "MasterCard."

22.    Defendant Bank of America, N.A. is a national banking association with its principal place of business in Charlotte, North Carolina. Defendant BA Merchant Services LLC (f/k/a Defendant National Processing, Inc.) is an Ohio corporation with its principal place of business in Louisville, Kentucky, and is a wholly owned subsidiary of Defendant Bank of America, N.A., which in turn is a wholly owned subsidiary of NB Holdings, which in turn is wholly owned by Defendant Bank of America Corporation, a Delaware corporation with its principal place of business in Charlotte, North Carolina. Defendant Bank of America, N.A., Defendant BA Merchant Services LLC (f/k/a Defendant National Processing, Inc.), and Defendant Bank of America Corporation are collectively referred to as "Bank of America."

23.    Bank of America is a member of both Visa and MasterCard. It engages in interstate commerce. Between 2000 and 2005 it was represented on the Visa U.S.A. Board of Directors. It is an Issuing Bank that, throughout this judicial district, issues Payment Cards to individuals and businesses. It is also an Acquiring Bank that, throughout this judicial district, provides card acceptance services to Class Members. It is currently and/or has been represented on the Visa Board of Directors. It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

24.    Defendant Barclays Bank plc is a bank operating under the laws of the United Kingdom with its principal place of business in London, England. Between at least 2000 and 2005, it was represented on the Visa International Board of Directors. During that period, the Visa International Board had authority to adopt, and did adopt, schedules of Interchange Fees. From time to time the Visa International Board would delegate to Visa Regional Boards, including the Visa U.S.A. Board, the actual adoption of schedules of Interchange Fees. Defendant Barclays Financial Corp., f/k/a Juniper Financial Corporation, a Delaware corporation with its principal place of business in Wilmington, Delaware, is a wholly-owned subsidiary of Defendant Barclays Bank plc. Defendant Barclays Bank Delaware, f/k/a Juniper Bank, is a

subsidiary of Defendant Barclays Financial Corp. Defendants Barclays Bank plc, Barclays Financial Corp., and Barclays Bank Delaware are collectively referred to herein as "Barclays."

25. Barclays is a member of both Visa and MasterCard through Barclays Financial Corporation and issues credit cards through its Barclaycard division. It engages in interstate commerce. It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

26. Defendants Capital One Bank, (USA), N.A., a Virginia bank with its principal place of business in Glen Allen, Virginia, and Capital One F.S.B., a national bank with its principal place of business in McLean, Virginia, are wholly-owned subsidiaries of Defendant Capital One Financial Corporation, a Delaware corporation with its principal place of business in McLean, Virginia. Defendants Capital One Bank, Capital One F.S.B., and Capital One Financial Corporation are collectively referred to as "Capital One."

27. Capital One is a member of both Visa and MasterCard. It engages in interstate commerce. Between 2000 and 2006, it was represented on the MasterCard Board of Directors. It is an Issuing Bank that, throughout this judicial district, issues Payment Cards to individuals and businesses. It is an Acquiring Bank that, throughout this judicial district, provides card-acceptance services to Class Members. It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

28. Defendant Chase Bank USA, N.A., a New York bank with its principal place of business in New York, New York, is the successor to Defendant Chase Manhattan Bank USA, N.A., and a wholly owned subsidiary of Defendant JPMorgan Chase & Co., a Delaware corporation with its principal place of business in New York, New York. Defendant Chase Paymentech Solutions, LLC is a limited liability company organized under the laws of Delaware, with its principal place of business in Dallas, Texas. Defendant JP Morgan Chase & Co. is the majority parent of Defendant Chase Paymentech Solutions, LLC. Defendants Chase Bank USA, N.A., Chase Manhattan Bank USA, N.A., Chase Paymentech Solutions, LLC, and JP Morgan Chase & Co. are collectively referred to herein as "Chase."

29.     Chase is a member of both Visa and MasterCard. It engages in interstate commerce. It is an Issuing Bank that issues Payment Cards to individuals and businesses throughout this judicial district. Between 2000 and 2003, Chase was represented on the MasterCard Board of Directors for the United States. Between 2003 and 2006, it was represented on the Visa U.S.A. Board of Directors. Chase is currently represented on the Board of Directors of Defendant Visa, Inc. Through Defendant Chase Paymentech Solutions, LLC, it is also an Acquiring Bank that, throughout this judicial district, provides card-acceptance services to Class Members.

30.     In July, 2004, Chase completed its acquisition of Bank One Corporation and Bank One Delaware, N.A., which also had acted as Issuing Bank and an Acquiring Bank. Before the acquisition, Bank One Corporation had actual knowledge of and knowingly participated in the conspiracies alleged in this Complaint. From at least 2000 until its acquisition by Chase, Bank One was represented on the Visa U.S.A. Board of Directors.

31.     Defendant JPMorgan Chase Bank, N.A., a nationally chartered bank operating under the laws of Ohio with its primary place of business in Columbus, Ohio, acquired the Credit-Card operations and receivables of Defendant Washington Mutual Bank from the FDIC on September 25, 2008. By acquiring these assets, JPMorgan Chase Bank, N.A. became the successor in interest to the liabilities that are associated with this litigation.

32.     Defendant Citibank (South Dakota), N.A. is a South Dakota bank with its principal place of business in Sioux Falls, South Dakota. It is identified in Citigroup's 2007 10-K filing as Citigroup's "primary banking entity responsible for U.S. credit card activities." Until 2006, Defendant Citibank (South Dakota), N.A. was a direct subsidiary of Defendant Citibank, N.A. In 2006 Defendant Citibank, N.A. transferred its investment in Defendant Citibank (South Dakota), N.A. to Defendant Citigroup, Inc.  Defendant Citibank N.A., a bank with its principal place of business in New York, New York, is a subsidiary of Defendant Citigroup, Inc., a Delaware corporation with its principal place of business in New York, New York. Defendant Citicorp merged into Defendant Citigroup, Inc., on August 1, 2005. Defendants Citibank (South Dakota),

N.A., Citibank N.A., Citicorp, and Citigroup, Inc. are collectively referred to herein as "Citigroup."

33. Citigroup is a member of both Visa and MasterCard. It engages in interstate commerce. It is an Issuing Bank that, throughout this judicial district, issues General Purpose Payment Cards to individuals and businesses. It is an Acquiring Bank that, throughout this judicial district, provides card-acceptance services to Class Members. It has been and remains represented on the MasterCard, Inc. Board of Directors. It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

34. Defendant Wells Fargo & Company ("Wells Fargo") is a Delaware corporation with its principal place of business in San Francisco, California.

35. Wells Fargo is a member of both Visa and MasterCard. It engages in interstate commerce. During parts of the relevant time period, it was represented on the Visa U.S.A. Board of Directors. It is an Issuing Bank that, throughout this judicial district, issues Payment Cards to individuals and businesses. Through its "Wells Fargo Merchant Services" division, it is an Acquiring Bank that, throughout this judicial district, provides card-acceptance services to Class Members. It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

36. In 2008, Wells Fargo acquired Wachovia Bank N.A., in what was reported as a transaction to help save Wachovia from receivership with the FDIC. Before the acquisition, Wachovia was a member of Visa and MasterCard that, between 2002 and 2006, was represented on the Visa U.S.A. Board of Directors. Wachovia acted as both an Issuing Bank and an Acquiring Bank during the relevant time period. Wachovia had actual knowledge of, and knowingly participated in, the conspiracies alleged in this Complaint.

37. Defendants Bank of America, N.A., BA Merchant Services LLC (f/k/a Defendant National Processing, Inc.), Bank of America Corporation, Barclays Bank plc, Barclays Bank Delaware, Barclays Financial Corp., Capital One Bank, (USA), N.A., Capital One F.S.B., Capital One Financial Corporation, Chase Bank USA, N.A., Chase Manhattan Bank USA, N.A.,

16

Chase Paymentech Solutions, LLC, JPMorgan Chase Bank, N.A., JPMorgan Chase & Co., Citibank (South Dakota), N.A., Citibank N.A., Citigroup, Inc., Citicorp, Wells Fargo & Company, (collectively "Bank Defendants"), are Member Banks of the Visa and MasterCard networks. The Bank Defendants are actual or potential competitors for the issuance of Credit Cards and acquisition of Merchants. All of the Bank Defendants belong to both networks and have conspired with each other and with the Visa and MasterCard Associations to fix the level of Interchange Fees that they charge to, and impose the unlawful Anti-Steering Rules on, Merchants.

38.     All of the Bank Defendants are, or were during the relevant period, represented on the Visa and/or MasterCard Boards of Directors at the times when those Boards collectively fixed uniform Interchange Fees and imposed the anticompetitive Anti-Steering Restraints and Miscellaneous Exclusionary Restraints. The Bank Defendants delegated to the Visa and MasterCard Boards of Directors the authority to take those actions. Each of the Bank Defendants had actual knowledge of, participated in, and consciously committed itself to the conspiracies alleged herein.

39.     Before Visa's IPO, Section 5.01(a) of the Bylaws of Visa U.S.A. (May 15, 2004) limited seats on its Board of Directors to (i) "officers of [Visa U.S.A.]," (ii) "officers of Charter Members [with some exceptions] . . . having at least the equivalent rank of Chief Executive Officer or Chief Administrative Officer, or [for larger Member Banks] a person who in their performance of his regular duties reports to such an officer." Individuals who "previously held the title of Chairman, Vice Chairman, or Chief Executive Officer of a Charter Member were allowed to hold the post of "Second Special Director At Large" or "Third Special Director At Large for Technology," provided that the latter is "well qualified in systems and technology issues of importance to [Visa U.S.A.'s] Payment Services." Even after the IPO, representatives of Member Banks maintain substantial representation on the Board of Visa, Inc.

40.     Similarly, prior to MasterCard's IPO, Article IV-1 of its Bylaws required that each Director "be an officer of a member institution of MasterCard International Incorporated or an individual otherwise uniquely qualified to provide guidance as to the Corporation's affairs."

41.     Bank Defendants are therefore directly responsible for collectively fixing Interchange Fees to be charged to Merchants on transactions within each network and between the two networks during the Class Period. Bank Defendants, acting by and through the Boards of Directors of Visa and MasterCard, were also directly responsible for the imposition of the Anti-Steering Restraints and engaging in the other anticompetitive conduct alleged herein. Collectively, the Bank Defendants, through their operation of Visa and MasterCard, adopted and approved the above-mentioned policies and have significantly profited from those policies and continue to do so to this day.

42.     Even after the corporate restructuring of Visa and MasterCard, the Bank Defendants continue to conspire to fix Interchange Fees and to impose the Anti-Steering Restraints and the other forms of anticompetitive conduct described herein. Each of the Bank Defendants belongs to Visa and MasterCard and has agreed that Visa and MasterCard may apply uniform schedules of default Interchange Fees to their Payment Card businesses and that they will adhere to the anticompetitive Visa and MasterCard rules.

43.     Acquiring banks enter into acceptance contracts with Merchants agreeing either implicitly or explicitly that Visa and MasterCard's uniform schedule of Interchange Fees will apply to all of the Merchant's transactions that are initiated by Visa or MasterCard Payment Cards. These Acquiring Banks understand that the same uniform schedule of Interchange Fees will be applied to transactions conducted by all other Acquiring Banks for those banks' Merchant customers. Issuing Banks enter into issuing contracts with Visa and MasterCard, agreeing and understanding that they will receive Interchange Fees from Merchants based on the Visa and MasterCard's uniform schedule of Interchange Fees.

18

## VII.  CO-CONSPIRATORS

44.     The Court of Appeals for the Second Circuit held that Visa and MasterCard "are not single entities; they are consortiums of competitors." *United States v. Visa U.S.A. Inc.*, 344 F.3d 229, 242 (2d Cir. 2003). Before the corporate restructuring described below, they were "owned and effectively operated by over 22,000 banks, which compete with one another in the issuance of Payment Cards and the acquiring of Merchants' transactions."  *Id.* Because of this judgment, among other things, the networks and their Member Banks recognized that the networks were "structural conspiracies" and "walking conspiracies."

45.     Various persons, firms, corporations, organizations, and other business entities, some unknown and others known, have participated as co-conspirators in the violations alleged and have performed acts in furtherance of the conspiracies. Co-conspirators include, but are not limited to, the following: (a) Issuing Banks that have issued Visa and/or MasterCard Credit and Debit Cards and have agreed to charge uniform, collectively fixed Visa and MasterCard Interchange Fees for various Merchants and transactions both before and after Visa and MasterCard's restructurings; (b) Acquiring Banks that acquire Visa and MasterCard transactions from Class Members, as described herein, and that have participated in the conspiracy to collectively fix Interchange Fees both before and after the Visa and MasterCard's restructurings; (c) certain banks that are or were members of the Boards of Directors of Visa or MasterCard and adopted and agreed to fix Interchange Fees for various Merchants and transactions, to impose the anticompetitive Anti-Steering Restraints and Miscellaneous Exclusionary Restraints alleged herein, and also designed and authorized the restructurings that themselves violate the antitrust laws.

## VIII. TRADE AND INTERSTATE COMMERCE

46.     The trade and interstate commerce relevant to this action consists of the Relevant Markets described herein.

19

47.     During all or part of the Class Period, each of the Defendants, directly or through their affiliates or subsidiaries, participated in the Relevant Markets described herein in a continuous and uninterrupted flow of interstate commerce.

48.     The activities of Defendants and their co-conspirators, as described herein, were within the flow of and had a substantial effect on interstate commerce.

## IX.   CLASS-ACTION ALLEGATIONS

49.     Plaintiffs seek to represent a class (the "Class") under Fed. R. Civ. P. 23(a) & (b), for violations of 15 U.S.C. §§ 1, 2, and Cal. Bus. & Prof. Code § 16700 et seq.  The class is defined as:

> The Class includes all persons, businesses, and other entities, that have accepted Visa and/or MasterCard Credit and/or Debit Cards in the United States at any time from and after January 1, 2004. This Class does not include the named Defendants, their directors, officers, or members of their families, or their co-conspirators or the United States Government.

The Class includes all persons, businesses, and other entities, that have accepted Visa and/or MasterCard Credit and/or Debit Cards in the United States at any time from and after January 1, 2004. This Class does not include the named Defendants, their directors, officers, or members of their families, or their co-conspirators or the United States Government.

50.     Plaintiffs are members of the Class, their claims are typical of the claims of the other Class members, and Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs are represented by competent counsel experienced in the prosecution of class-action antitrust litigation. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other member of the Class.

51.     Defendants' anticompetitive conduct has imposed, and unless enjoined will continue to impose, a common antitrust injury on the Class Members. The Class Members are so numerous that joinder of all members is impracticable.

52.   Defendants' relationships with the Class Members and Defendants' anticompetitive conduct have been substantially uniform. Common questions of law and fact will predominate over any individual questions of law and fact. Defendants have acted and refused to act on grounds that apply generally to the class, and final injunctive and other equitable relief is appropriate respecting the class as a whole.

53.   There will be no extraordinary difficulty in the management of this class action. Common questions of law and fact exist with respect to all lass Members and predominate over any questions solely affecting individual members. Among the questions of law and fact common to Class Members, many of which cannot be seriously disputed, are the following:

a.   **Conspiracy issues:**

i.   Whether (a) Visa and its Member Banks, and (b) MasterCard and its Member Banks illegally fixed uniform schedules of default Interchange Fees for Credit Card transactions, thereby extracting supracompetitive Interchange Fees and Merchant Discount Fees from Class Members;

ii.   Whether (a) Visa and its Member Banks, and (b) MasterCard and its Member Banks illegally fixed uniform schedules of default Interchange Fees for Debit Card transactions, thereby extracting supracompetitive Interchange Fees and Merchant Discount Fees from Class Members;

iii.   Whether Visa, MasterCard and their Member Banks possess or exercise market power or monopoly power;

iv.   Whether Visa and MasterCard and their dual Member Banks conspired with each other to fix the price of Interchange Fees imposed on Class Members;

v.   Whether the Anti-Steering Restraints imposed by Defendants facilitated their respective price-fixing arrangements;

vi.   Whether the conspiracies of the Visa and MasterCard networks continued after the networks' reorganizations and IPOs; and

vii.   Whether the per se rule or the rule of reason should be applied to analyze the price-fixing schemes of Visa, MasterCard, and their respective Member Banks.

21

b.   **Monopolization issues:**

    i.   Whether Visa, separately or together with its Member Banks, exercises market power or monopoly power that was willfully acquired and/or maintained; and

    ii.   Whether MasterCard, separately or together with its Member Banks, exercises market power or monopoly power that was willfully acquired and/or maintained.

c.   **Impact issues:**

    i.   Whether all or virtually all class members were overcharged for Visa and MasterCard transactions when higher Interchange Fees were extracted from them than would have occurred in a competitive market;

    ii.   Whether Defendants' Interchange Fees would exist at their current level – if at all – absent the above-referenced conduct; and

    iii.   The appropriate relief to be granted to the Class as to remedy the conduct alleged herein.

54.   These and other questions of law and fact are common to Class Members and predominate over any issues affecting only individual class members.

55.   This class action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all members is not only impracticable, but impossible. The expense and burden of individual litigation make it highly impractical for such Class Members to individually attempt to redress the wrongful conduct alleged herein.

## X.   FACTUAL ALLEGATIONS

### A.   Evolution of the Visa and MasterCard Networks.

56.   Visa and MasterCard are international bank-card networks whose members include banks, regional-banking associations, and other financial institutions. They were established by their members to develop, promote, and operate national Credit Card networks for the purpose of, among other things, enabling Issuing Banks to extract fees from Merchants with whom they have no business relationships.

57.     Visa and MasterCard evolved from regional and local Credit Card systems formed during the 1960s.

58.     Visa's predecessor, Bank Americard, was the local Credit Card program of Bank of America, then based in California. In 1970, the program was introduced throughout the United States under the name National Bank Americard, Inc. ("NBI"). In 1977, NBI changed its name to Visa.

59.     MasterCard is the successor to Mastercharge, which was created in 1967 when the Interbank Card Association of New York banks merged with the Western States Bankcard Association.

60.     During the early years of Visa and MasterCard, Merchants that accepted Credit Cards used paper forms called "drafts" to conduct transactions.

61.     In the mid-1980s, technology evolved such that many transactions were processed electronically and paper drafts were not needed for most Payment Card transactions. Since that time, the costs to Visa and MasterCard of the various components of Credit Card transaction processing (for example, computer hardware, telephone service, network service, and data-processing services) have decreased significantly. These changes led to significant reductions in the costs for Visa and MasterCard of processing Payment Card transactions.

62.     Since Visa and MasterCard began operating on a national scale, use of their cards has increased dramatically. In 1970, only 16% of households had a credit card. By 2006, 77% of U.S. adults had at least one credit card.

63.     Since 1970, the number of Visa Member Banks has increased from approximately 1,400 to nearly 14,000 in the United States and over 22,000 worldwide. U.S. consumers now carry more than 802 million Visa-branded Credit, Debit, commercial, and prepaid cards.

64.     MasterCard has experienced similar growth and now includes more than 23,000 Member Banks worldwide. As of today, there are more than 360 million MasterCard-branded cards in circulation in the United States.

65.     Visa and MasterCard have also experienced substantial consolidation among their Member Banks. For example, in 2006 Bank of America acquired MBNA and immediately became the second largest issuer of Credit Cards in the United States. Similarly, in 2004 when Chase – then already the nation's fourth largest card issuer – acquired Bank One, the combined entity became the largest issuer in the United States, accounting for 23.5% of all General Purpose Card transaction volume.

66.     In 2015, the top five Visa Credit Card-Issuing Banks accounted for 64.3% of all Visa Credit Cards in circulation in the United States.

67.     In 2015, the top five MasterCard Credit Card-Issuing Banks accounted for 67.3% of all MasterCard Credit Cards in circulation in the United States.

68.     In 2015, the top five Credit Card-Issuing Banks accounted for 65% of all Visa and MasterCard purchase volume in the United States.

69.     In 2015, 75.8% of Visa and MasterCard transaction volume was acquired by five Member Banks.

70.     The evolution of Visa and MasterCard through horizontal agreements stands in contrast to the development of American Express, Discover, and other "three-party" networks, which built Merchant- and cardholder bases independently of a cooperating partner on the other "side" of the platform. In a three-party network such as American Express or Discover, the network operator acts both as the Issuer and Acquirer for the vast majority of transactions involving its cards and is the only intermediary between the Merchant and the cardholder.

71.     When a three-party network sets Merchant and cardholder fees, it does so to maximize its own profit, rather than to increase the profits of the actors on one side (i.e., the Issuing Banks) of the platform.

24

**B.** **Visa and MasterCard Leveraged their Dominance in Credit Cards to Become the Dominant Debit-Card Networks.**

72.    Visa and MasterCard initiated their Visa Check and MasterMoney (the predecessor to MasterCard Debit) programs in 1979. Signature Debit Card transactions represented only a small portion of all Payment Card transactions.

73.    PIN-Debit networks were beginning to spring up from regional ATM networks. Before the early 1990s, PIN-Debit networks operated successfully either without Interchange Fees, or with "negative" Interchange Fees, whereby the Merchant received a small sum of money on each transaction to incent it to install PIN pads, the equipment necessary at the POS for a Merchant to accept a PIN-Debit transaction.

74.    The Interchange-Fee-free period of PIN-Debit networks came to a close, however, when Visa acquired the Interlink network and soon thereafter imposed an Interchange-Fee rate equivalent of 45 cents on a 100 dollar purchase.

75.    Signature Debit Cards carried higher Interchange Fees than PIN-Debit Cards, and therefore were slow to gain Merchant acceptance. Accordingly, in the early 1990s, PIN-Debit transactions accounted for over 60% of all Debit Card transactions. At that time, PIN-Debit transactions were growing at a rate of 40% annually and were poised to grow even faster.

76.    Because of the rapid growth in PIN-Debit transactions and the superiority of the PIN-Debit product, Visa's advisors predicted that PIN-Debit would wipe out Signature Debit.

77.    PIN-Debit also had the potential to eat into Credit-Card transaction volume, and thereby drive down Credit-Card Interchange Fees. Visa and MasterCard viewed the Regional PIN-Debit networks as potential threats to their dominance in the payments marketplace.

78.    To counteract the slow growth in Merchant acceptance of Offline-Debit Cards, Visa and MasterCard required Merchants that accepted their dominant Credit Cards to also accept their Signature Debit Cards.

79.    By tying their Signature Debit Cards to their dominant Credit Cards, Visa and MasterCard increased the number of Visa Check and MasterMoney cards to over 47 million by

25

1996. By 2004, the number of Visa and MasterCard Signature Debit Cards in circulation had grown to 228 million.

80.     The tying practices described above led to a lawsuit by a class of Merchants, in which this Court granted partial summary judgment for the class and denied summary judgment for the defendants. *In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568 (E.D.N.Y. Apr. 1, 2003).

81.     After the court's summary-judgment ruling in *Visa Check*, Visa and MasterCard entered into settlement agreements with the class, which required Visa and MasterCard to abandon the part of their "Honor All Cards" rules that required Merchants that accepted Visa and MasterCard Credit Cards to also accept Visa and MasterCard's Signature Debit Cards.

82.     Visa, fearing that Merchants would abandon its more expensive Signature Debit cards, used its market power to cause "convergence" of PIN-Debit and Signature Debit Interchange Fee rates. Through this "convergence" strategy, Visa sought to increase the Interchange Fee levels on its Interlink PIN-Debit transactions both to decrease the incentive of Merchants to steer consumers to PIN-Debit transactions away from Signature Debit transactions and to incent banks to issue Interlink cards. Visa's ultimate goal is to eliminate the competitive threat of PIN-debit networks that are not dominated by Visa Member Banks by making Merchants indifferent at the POS between PIN-Debit and Signature Debit.

83.     Visa has offered incentives to Issuing Banks to become exclusive issuers of Interlink PIN-Debit Cards. Although MasterCard has at times provided superior economic offers to these banks for issuance of Maestro PIN-Debit cards, banks have been migrating to Interlink, based on Visa's promise that once Interlink achieves a significant share of Debit Card transactions, Visa will gain greater pricing power. With this increased pricing power in hand, Visa plans to expedite the "convergence" in Interchange rates between PIN-Debit and Signature Debit transactions, which will permanently marginalize the competitive threat from the PIN-Debit networks.

26

C.    **Interchange Fees in the Context of a Payment-Card Transaction.**

84.    Visa and MasterCard operate as standard-setting organizations with respect to General Purpose Card Network services, Signature Debit Card Network Services and PIN-Debit Card Network Services that facilitate the exchange of transaction data and funds among Merchants, Acquiring Banks, Issuing Banks, and consumers.

85.    When a consumer makes a payment with a Credit or Signature Debit Card, the Merchant sends an electronic transmission to its Acquiring Bank or Third-Party Processor. The Acquiring Bank or processor then sends an electronic transmission to the Visa or MasterCard networks. The networks relay the transaction to the cardholder's Issuing Bank or its Third-Party Processor, which makes a payment to the Acquiring Bank, through the networks for the purchase amount minus the Interchange Fee. The Acquiring Bank then credits the Merchant's account for the transaction amount minus the Merchant-Discount Fee, the largest component of which is the Interchange Fee. Finally, the Issuing Bank charges the cardholder's credit account for the full amount of the purchase. Under this system, the Issuing Bank earns revenue from annual fees and interest charged to cardholders, as well as the amount of the Interchange Fee, while the Acquiring Bank earns revenue from the difference between the Merchant-Discount Fee and the Interchange Fee.

86.    Visa Product and Service Rule 9.1.1.3 provides that "Interchange Reimbursement Fees are determined by Visa and provided on Visa's published fee schedule." These Interchange Fees apply on every transaction, except for where they have been "customized where Member [Banks] have set their own financial terms for the Interchange of a Visa Transaction or Visa has entered into business agreements to promote acceptance and Card usage."

87.    Similarly, MasterCard Rule 8.3 provides that "[a] transaction settled between [Member Banks] gives rise to the payment of the appropriate interchange fee or service fee, as applicable. [MasterCard] has the right to establish default interchange fees and default service fees . . . ., it being understood that all such fees set by [MasterCard] apply only if there is no applicable bilateral interchange fee agreement between two [Member Banks] is in place, any

intraregional or interregional fees established by [MasterCard] are binding on all [Member Banks]."

88.   Despite the theoretical deviations from "default" Interchange Fees that MasterCard's rules permit, the Merchant Restraints ensure that the "default" rates set the prices that all Issuing Banks charge Merchants that accept their cards. Because of the Restraints, bilateral negotiations between a Merchant, or group of Merchants, and an Issuer simply do not occur. In fact, when questioned, MasterCard witnesses have admitted that there were only a few bilateral agreements in the United States, despite the existence of millions of Merchants and thousands of issuing banks and despite the technological capacity to facilitate millions of bilateral agreements.

89.   The Default Interchange Rules were adopted when Visa and MasterCard were owned and controlled by Defendants and other Member Banks and continually reaffirmed by votes of Visa and MasterCard's Boards of Directors that consisted of Member Banks. Defendants adopted those rules with the purpose and effect of inflating Merchants' costs of accepting Payment Cards and using the ill-gotten profits from those Interchange Fees to line the pockets of the Member Banks.

90.   Visa and MasterCard each have established complex "default" Interchange Fee schedules. Default Interchange includes the fee levels, the structure of the fees, such as the Interchange-Fee categories that are tiered by Merchant type, card type, and the Merchant's transaction volume, among other things. Interchange fees account for the largest portion of Merchant costs for accepting such cards.

91.   Until the restructurings described below, Visa and MasterCard's uniform schedules of Default Interchange Fees were adopted regularly—usually semiannually—by vote of the competing Bank Defendants and other Member Banks that occupied the seats on Visa and MasterCard's Boards.

92.   A typical transaction is depicted below:



93.    When a consumer makes a payment with a PIN-Debit card, the consumer swipes a Payment Card at a POS terminal and enters a personal identification number ("PIN") on a numeric keypad. After the PIN is entered, the POS terminal transmits the transaction and Payment-Card information to an Acquiring Bank or Third-Party Processor acting on the bank's behalf. The Acquiring Bank or processor then sends the information to the PIN-Debit network, which then switches the transaction to the Issuing Bank or a Third-Party Processor acting on its behalf. The Issuing Bank or its processor assesses the consumer's account to verify the PIN and ensure that the consumer has sufficient funds to pay for the purchase. Next, the Issuing Bank or its processor sends an electronic message to the PIN-Debit network, which indicates acceptance or rejection of the transaction for the purchase amount minus the Interchange Fee. The PIN-Debit network switches the Issuing Bank's reply back to the Merchant through the Acquiring Bank or its processor to complete the transaction. This entire "authorization" process takes place in just seconds. In the same transaction, the Merchant's acquirer "purchases" the transaction from the Merchant, guaranteeing payment and facilitating settlement of the transaction.

94.    This process changes somewhat in a Mobile-Payment transaction, for example a transaction initiated on a Mobile Device. For these transactions, the user sets the Mobile Device

to conduct Mobile-Payment transactions by enabling a setting on his device and providing the manufacturer of the mobile platform (such as Apple, Android, or Microsoft) with the account information for the Payment-Card accounts that he wants to use in Mobile-Payment transactions. The mobile platform communicates this request to the user's Issuing Bank, which communicates with the network to create a user-specific identifier, which is then embedded into the secure portion of the memory chip in the Mobile Device. At the POS, the user presents the Mobile Device and starts the transaction by using an alphanumeric password or a biometric identifier, such as a fingerprint. A request to authorize the transaction is then sent from the POS to the Acquirer, and to the network, as in a plastic-card-based transaction. Upon receiving the data, the network looks up the user's identifier, which it then inserts into the authorization request to the Issuer, which approves or denies the transaction. Notwithstanding the presence of a Mobile Device and the additional security features of a Mobile-Payment transaction, the Defendants' anticompetitive rules such as the Default Interchange Rules, the Honor-All-Cards Rules, and the Anti-Steering Restraints apply in full force, just as in plastic-card-based transactions.

95.    The below example demonstrates how a Mobile-Payment transaction functions on the popular Apple Pay platform.



Figure 1: How Apple Pay Works

Source: Mercator Advisory Group

30

96.     Visa and MasterCard monitor and enforce their Member Banks' compliance with the uniform schedule of default Interchange Fees. Visa and MasterCard's IT systems monitor each transaction to ensure that the "correct" default interchange rate is being applied. Thus, if the Acquiring Bank attempted to "cheat" on a particular transaction by applying an interchange rate lower than the default rate, Visa and MasterCard's systems would intervene and increase the interchange rate to the default rate. These same IT systems, however, have the capacity to facilitate literally millions of bilateral agreements between Issuers and Merchants.

97.     Visa and MasterCard rules also require that a Member Bank be a party to all or nearly all Merchant contracts for the acceptance of Visa and MasterCard Payment Cards. This rule applies even to Merchants and banks that use "Payment Facilitators" such as Third-Party Processors or Independent Sales Organizations. Payment Facilitators are obligated by Visa and MasterCard to include terms in their agreements with Merchants, including the obligation to abide by all Visa or MasterCard Rules. *See* Visa Core Rule 1.5.2.1; Visa Product and Service Rule 5.3.1; MasterCard Rules 7.2.1 & 7.6.

98.     Visa and MasterCard do not use the Interchange Fee to fund their operations. Rather, the Interchange Fee is retained by the Issuing Bank on every transaction. The majority of Visa and MasterCard revenues are derived from fees and Assessments that Visa and MasterCard charge Member Banks. These fees include fees for authorization and clearing of transactions, network-access fees, currency-conversion fees and various other service fees Visa and MasterCard assess Member Banks. In addition, based on the gross daily volume of these banks' transactions, Visa and MasterCard are increasingly relying on fees rather than assessments to fund their operations.

99.     Visa and MasterCard perform their functions of authorizing and clearing Credit-Card and Debit-Card transactions, acting as standard-setting entities for Credit and Debit Card transactions, promoting their respective networks, and paying other operating expenses through the operations fees and Assessments that their Member Banks pay. Interchange Fees are not necessary to perform these functions.

100.   Before their respective IPOs, Visa and MasterCard did not act as single entities when their Member Banks collectively fixed uniform schedules of Default Interchange Fees. The Visa and MasterCard Member Banks, which effectively controlled the decisions of the networks, competed against each other in acquiring and card issuing. These banks did not ever share a unity of interest. Rather, they were direct, horizontal competitors.

101.   The Member Banks did not pool all of their assets to form or operate the Visa and MasterCard networks.

102.   Before the Visa and MasterCard IPOs, the Member Banks did not owe a fiduciary duty to each other or the Visa and MasterCard networks with respect to the setting of Interchange Fees.

103.   The Member Banks of Visa and MasterCard impose Interchange Fees on Merchants even for On-Us Transactions, in which the Issuing and Acquiring Banks are the same bank. In such a situation, the network certainly does not need to "balance" the cardholder and Merchant "sides" of a transaction, because the Member Bank on both sides is the same. If that Member Bank believed that some "balancing" were needed, that bank could independently set a transfer price, rather than relying on price set by the Visa and/or MasterCard network.

104.   Before the Visa IPO, the Bank Defendants, acting as members of Visa by and through the Visa Board of Directors, fixed uniform Interchange Fees for various Merchants and transactions for all Visa General Purpose Card and Debit Card transactions, and agreed to impose those price-fixed fees on Merchants.

105.   The Bank Defendants, acting by and through the Board of Directors of MasterCard, then set similar uniform Interchange Fees for various Merchants and transactions for all MasterCard General Purpose Card and Debit Card transactions that they agreed to impose upon Merchants.

106.   Interchange Fees were devised in the early days of Visa and MasterCard. Interchange Fees purportedly helped pay for the costs of initial card issuance, marketing, transferring transactional paper (which at that time literally was paper) between Acquiring and Issuing

Banks, and purportedly balanced network costs between Issuers and Acquirers. These early Interchange Fees were cost-based, and in the case of Visa, set with the help of independent auditing firms.

107.   Credit-Card Interchange Fees were purportedly necessary in the early days of Visa and MasterCard to induce banks to issue Credit Cards to cardholders.

108.   Even if those initially proffered justifications for collectively set, uniform schedules of Default Credit-Card Interchange Fees once were valid, they no longer are valid. Interchange Fees are no longer cost-based, and Visa and MasterCard no longer need to incent card issuance to establish their networks.

109.   Beginning in the 1980s, even the Defendants realized that these early Interchange-Fee justifications had melted away. Therefore, Visa embarked on a campaign of subsidizing academic "scholarship" that would support its and its Member Banks' interest in receiving supracompetitive Interchange Fees. Some of this scholarship conceived the idea of the "two-sided" market—consisting of both Merchants and cardholders—in which uniform schedules of Default Interchange Fees (which bore little or no relationship to the underlying price) were purportedly necessary to set an efficient price.

110.   This "balancing" justification does not reflect how the Defendants actually set interchange fees or otherwise operate their businesses. Defendants set interchange fees based on Merchant elasticity irrespective of the "benefits" on the cardholder side. Likewise, Defendants design cardholder-facing Products are designed without regard to their effect on Merchants.

111.   Technology has greatly evolved since the early days Visa and MasterCard, such that they now have the technological capability to facilitate bilateral agreements among Issuing Banks, Acquiring Banks, and Merchants and to facilitate the settlement of funds pursuant to those bilateral agreements.

112.   Issuers, for their part, have the technological capability to process bilateral agreements with Merchants and to settle transactions pursuant to those bilateral agreements.

113.    The Defendants' capacity to facilitate bilateral agreements is demonstrated by a limited exception that Visa granted from its rules to Chase in 2013 in order to facilitate "ChaseNet," a proprietary Chase network. The ChaseNet agreement granted Chase the freedom to secure acceptance for ChaseNet at some Merchant locations that did not accept other Visa products—a practice that would otherwise violate the Honor-All-Cards Rule. Visa's granting such a high-profile exception to a rule that it refers to as part of its "Core" rules demonstrates that the Honor-All-Cards Rule and the Anti-Steering Restraints are not necessary for Visa and MasterCard to operate Payment-Card networks.

114.    During the same time period that Visa executed the ChaseNet agreement, it allowed discounting by Issuer. While this rule departure represented a slight loosening of Visa's unlawful restraints, it also demonstrated that its (and MasterCard's) continued insistence that treating all Issuers alike at the POS, with respect to Interchange Fees and steering practices, can no longer be justified as necessary for the operation of a Payment-Card network.

115.    Unlike in the early days of the networks, Visa and MasterCard now, jointly and separately, have market power with respect to both Credit Cards and Debit Cards. Even in the face of frequent and significant increases in Interchange Fees, Merchants have no choice but to continue to accept Visa's and MasterCard's dominant Credit Cards. *See United States v. Visa*, 163 F. Supp. 2d at 340, aff'd, 344 F.3d at 240; *In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568, (E.D.N.Y. Apr. 1, 2003). In recent years both Visa and MasterCard repeatedly and substantially increased the total Interchange Fees charged to and paid by Merchants, but did not experience any decline in Merchant acceptance.

116.    The collective setting of Interchange Fees neither performs the standard-setting function of Visa and MasterCard, nor enables them to perform that function.

117.    In 2010, the Department of Justice concluded that Visa and MasterCard possess market power. *See* Comp. Impact Stmt. at 6, *United States v. Am. Express Co.*, No. 1:10-cv-4496 (E.D.N.Y. Oct. 4, 2010). The DOJ found that the No-Discount Rule and other Anti-Steering Restraints reinforce this market power by creating an "all-or-nothing" choice for Merchants,

wherein they have no ability to scale back their card acceptance in response to the cost of those cards.

118. Therefore, given the ubiquity of Visa and MasterCard Payment Cards, banks now would find it in their best interest to issue Visa and MasterCard Payment Cards and acquire Merchants for the networks, even without the promise of supra-competitive Interchange Fee revenues.

119. The Visa and MasterCard networks could function efficiently without rules requiring the payment of Interchange Fees on every transaction. Even if the Member Banks of Visa and MasterCard did not fix and agree to abide by uniform schedules of default Interchange Fees, the Visa and MasterCard networks could continue in their roles as standard-setting organizations for Payment Card transactions. Many similar networks function efficiently without rules requiring the payment of Interchange Fees on every transaction. These include the Interac debit card network in Canada, and domestic Payment Card networks in Norway, The Netherlands, Denmark, Finland, Luxembourg and Iceland. There are even more examples of networks that operate efficiently with dramatically lower Interchange Fees, including payment card networks in all other industrialized countries. These include Australia, The United Kingdom, Mexico, and Spain.

120. The uniform schedules of Interchange Fees and rules requiring the payment thereof are not a core function of the Visa and MasterCard Credit and Signature Debit networks. They are not reasonably necessary to the operation of the Visa and MasterCard networks. Even if some Interchange Fees were reasonably necessary, Defendants' uniform schedules of Interchange Fees are more restrictive of competition than is necessary to effectuate the business of Visa and MasterCard.

121. Unlike the early days of Visa and MasterCard when Interchange Fees were purportedly based on certain issuer costs, Visa and MasterCard now set their Interchange Fees based on their perceptions of Merchants' elasticity of demand. This permits Visa and MasterCard and their Member Banks to identify and impose on each category of Merchants an Interchange

Fee that approximates the "reservation price" of Merchants in that category. This is the pricing strategy typically associated with firms that possess substantial market power.

**D.      Merchants directly pay Interchange Fees.**

122.   Visa U.S.A.'s Operating Regulation 1.15 specifies that "Visa has no liability of any nature to any Member arising from any cause or circumstance." Regulation 1.15A clarifies that the liability limitation "appl[ies] to all products, programs, services, specifications, standards or other matters or items provided by [Visa and its Member Banks]." Thus, if a Visa Member Bank determines that it was harmed by the uniform schedules of Interchange Fees, Regulation 1.15A prevents it from suing Visa.

123.  MasterCard's Bylaw 1.1 states that "[e]ach member shall…hold harmless [MasterCard . . . from any actual or threatened claim, demand, [or] obligation,…resulting from and/or arising in connection with . . . the compliance or non-compliance with the standards by the member." Thus, if a MasterCard Member Bank determined that it was harmed by the uniform schedules of Interchange Fees, Bylaw 1.1 prevents it from suing MasterCard.

124.   In a technical manual issued to its Member Banks, MasterCard states that "MasterCard shall have no liability to any member, member processor, or other person acting on behalf of the member for any loss, cost, or other damage arising out of or in connection with MasterCard's administration of or any member's participation in any interchange rate program." MasterCard Int'l, GCMS Reference Manual.

125.   Even if Visa and MasterCard Member Banks were not explicitly prevented from suing Visa and MasterCard over the uniform schedules of Interchange Fees, they have no practical incentive to do so.

126.   The Bylaws of Visa U.S.A. require that all "Principal Member [Banks]," which include the Bank-Defendant members of Visa U.S.A. and the vast majority of all Member Banks, "[s]hall issue Cards bearing the Visa service mark." Visa U.S.A., Bylaws § 2.04(a) (May 15, 2004).

36

127.   Similarly, MasterCard's Rule 3.1 requires that Member Banks "must have issued and outstanding a reasonable number of MasterCard Cards." If a Member Bank fails to issue the requisite number of cards, it will be assessed a penalty by MasterCard. The reason for these provisions is for all Member Banks to have a common economic interest in ever-rising Interchange Fees.

128.   Because all Member Banks are required to issue Visa or MasterCard Payment Cards, all Member Banks benefit from the supracompetitive Interchange Fees that they agree to abide by and, at least until Visa and MasterCard's reorganizations, collectively set. Moreover, because acquiring banks do not pay Interchange Fees, they have no economic incentive to sue over the Interchange Fees.

129.   Acquiring banks do not pay Interchange Fees. These banks do not view Interchange Fees as a "cost" but rather account for them as contra-revenue.

130.   Before the IPOs, the Member Banks appointed Visa and MasterCard's Boards of Directors and approved of and agreed to abide by Visa and MasterCard's rules and bylaws. Before the IPOs, the Member Banks conspired with each other and with Visa and MasterCard to collectively fix uniform schedules of default Interchange Fees. At all times relevant to these claims, the Member Banks have agreed to abide by the rules of Visa and MasterCard, including the rules that require the application of a default Interchange Fee on every Visa and MasterCard transaction. Third-Party Processors do not pay Interchange Fees and therefore have not been harmed by the imposition of those fees.

131.   As a result, Third-Party Processors do not have any practical incentive or ability to seek redress for Visa and MasterCard's supracompetitive Interchange Fees.

132.   Therefore, no realistic possibility exists that any Third-Party Processor will sue Visa or MasterCard over any of the practices described in this Complaint.

133.   Not surprisingly, Issuing Banks account for interchange fees as revenue, while Merchants account for them as an expense. In contrast, acquiring banks do not account for interchange fees as revenue nor an expense.

134. The following illustration shows how the acquiring bank accounts for the amounts due from the Issuing Bank:



Figure 19: Example of a Typical Credit Card Purchase Transaction Showing How Interchange Fees Paid by Merchants Are Allocated

United States Government Accountability Office Report, "Example of a Typical Credit Card Purchase Transaction Showing How Interchange Fees Paid by Merchants Are Allocated."

135. The fees detailed above are taken out of the total amount of the transaction between the cardholder and merchant. In both substance and form, the merchant pays all fees, including the interchange fee, which is collected by the issuer. As indicated in the diagram above, Merchants do not make payments for the services provided by the card system in a typical fashion – they do not receive a standard bill for services. Instead, each party deducts its fee as the funds flow through the system.

136. The Issuing Banks record Interchange Fees as revenue on their books and records. Typically, Issuing Banks report these fees as noninterest income as opposed to interest income

(revenue) generated through lending activities. With respect to interchange fees received, for example, Capital One in its 10-K for the fiscal year ended December 31, 2014 states that it "recognize[s] interchange income as earned at the time of purchase." *See also* BOA 10-K for the fiscal year ended December 31, 2015, at 147 ("Interchange…and other miscellaneous fees, which are recorded as revenue when earned.").

137.   A number of the largest acquirers are involved in multiple lines of business so the methods used to account for their interchange fees as acquirers are not always publicly available. Acquiring banks, however, account for revenue net of interchange. First Data, a joint partner of a division of defendant BOA, for example, states under components of revenue in its 10-K for the year ended December 31, 2015, "Global Business Solutions revenue is presented net of interchange fees and assessments but includes reimbursable PIN debit fees and other, which is also included as an expense." Id. at 35; see also id. at 64 ("In the case of client contracts that the Company owns and manages, revenue is comprised of fees charged to the client, net of interchange and assessments charged by the credit card associations, and is recognized at the time the client accepts a point of sale transaction."). Other publicly filing acquirers similarly account for revenue net of interchange (i.e., acquirers do not have interchange revenue). See, e.g., Global Payments Form 10-K (May 31, 2015) at 30, 54; Heartland Payment Services Form 10-K (Dec. 31, 2014) at 39-41; iPayment, Inc. Form 10-K (Dec. 31, 2013) at 4, 34-35, 62-63.

### E.   Visa and MasterCard Require the Payment of an Interchange Fee on Every Transaction.

138.   Before the IPOs, Bank Defendants, acting through the Visa and MasterCard Boards of Directors, collectively adopted and enforced rules that require the payment of an Interchange Fee, set at Visa and MasterCard's uniform levels, for all transactions on the respective networks. After the IPOs, the Bank Defendants agree to continue to abide by these rules. These unlawful agreements are enabled by other rules that were also collectively adopted and continue to be collectively enforced by the Bank Defendants and the other Member Banks.

139.   Both Visa and MasterCard enforce "Honor All Cards" Rules that require Merchants that accept any Visa or MasterCard-branded Payment Card to accept all Payment Cards bearing that brand, regardless of the identity of the Issuing Bank, the Card Product, or the cost of accepting that card. With respect to Visa, that rule is reflected in, for example, Visa Core Rules 1.5.4 and 5.4.1.1. With respect to MasterCard, the Honor All Cards Rule is embodied in, for example, Rule 5.10.1.

140.   By enacting and enforcing the "Honor All Cards" and Interchange Fee payment rules noted above, the Defendants have created a situation in which the payment of an Interchange Fee is required on all transactions, regardless of the Issuing Bank. Because of this problem – a problem entirely of Defendants' own creation – Defendants now claim that uniform schedules of "fall back" or "default" Interchange Fees actually benefit Merchants by preventing the Issuing Bank from "holding up" the Merchant by demanding an Interchange Fee that is as high as the Issuer would like, knowing that the Honor All Cards rule prevents the Merchant from refusing that transaction.

141.   This defense of Visa and MasterCard's anticompetitive practices does not stand up to scrutiny. In fact, those practices reinforce the networks' and banks' market power over Merchants by making it virtually impossible for Merchants or groups of Merchants to exert any leverage over Visa or MasterCard Member Banks in order to obtain more favorable prices or terms. But for the rules described in this section and the Anti-Steering Restraints, Merchants would have the option to reject a given Visa or MasterCard payment card for a given transaction if the benefit the Merchant receives from accepting the card or allowing the transaction is not commensurate with the associated Merchant fee or imposing a Surcharge or giving a discount, depending on the cardholder's choice of payment.

**F.     The Anti-Steering Restraints Insulate Visa and MasterCard from Competition and Maintain Supracompetitive Prices.**

142.   Because cardholders do not know the costs of the Interchange Fees and Merchant-Discount Fees paid by Merchants, Merchants are unable to assist them in choosing the most cost-effective payment methods.

143.   Beginning at their inception, Visa and MasterCard enforced "No Surcharge Rules" that prohibited Merchants from imposing a Surcharge on a transaction made with a Card that bore a particular Brand, Product, or Issuing Bank.

144.   The Honor-All-Cards Rule, the No-Surcharge Rule and the Anti-Steering Restraints were adopted when Visa and MasterCard were owned and controlled by the Bank Defendants and the other Member Banks and continually reaffirmed by votes of Visa and MasterCard's Boards of Directors that consisted of Member Banks. Defendants adopted these Rules with the purpose and effect of inflating Interchange Fees and impairing competition.

145.   By implementing and enforcing these rules, Visa and MasterCard fully insulated themselves from any competitive threat. Because it is the cardholder who selects which card to use in making a purchase, the No-Surcharge Rule and other Anti-Steering Restraints guaranteed that the consumer would make this selection without regard to the cost of accepting the card; the consumer could not know how expensive his or her chosen card was to the Merchant, because the Anti-Steering Restraints in their original forms ensured that Merchants would bear the costs of the transaction without the cardholder's knowledge.

146.   Before these rules were reformed by the prior settlement in this case, the DOJ Consent Decree, and the Durbin Amendment, they were embodied in, for example, Visa U.S.A. Op. Reg. 5.2F (2006) and MasterCard Op. R. 9.12 (2006).

147.   On January 27, 2013, Visa and MasterCard altered their rules as required by the preliminary approval of the 2012 settlement of this action, to permit surcharging of Credit-Card transactions under certain circumstances. Debit-Card transactions cannot be surcharged unless the Interchange-Fee caps contained in the Durbin Amendment to the Dodd-Frank Act are

41

repealed. Now that the settlement has been vacated by the Court of Appeals for the Second Circuit, the Defendants may impose their No-Surcharge Rules in their pre-settlement form at any time.

148.   In their current forms, the No-Surcharge Rules may be found at, for example, Visa Product and Service Rules 5.6.1 and MasterCard Rules 5.11.1 and 5.11.2 (U.S. Region).

149.   Defendants also imposed "No-Discount Rules" starting at their inception. Under the No Discount Rules in their original forms, Merchants were allowed only to offer discounts to customers who paid in cash, rather than using a Payment Card. Giving discounts for cash did not allow Merchants to counteract the Defendants' market power because cash was not a reasonable substitute for Payment Cards. Moreover, discounting for cash did not allow Merchants to play networks or Issuers against each other to secure the most favorable costs and acceptance terms.

150.   Pursuant to the DOJ Consent Decree, Visa and MasterCard changed their rules on July 20, 2011 to allow Merchants to offer discounts to cardholders for using a particular card brand or product. While the DOJ Consent Decree improved competition, Merchants still are prohibited from offering discounts to cardholders for using the cards issued by particular Issuing Banks or, where such ability exists, have been deterred from doing so by the Anti-Steering Restraints. The current versions of the No-Discount Rules may be found at Visa Core Rule 1.5.4.14 (US Region and Territories) and MasterCard Rule 5.11.1 (U.S. Region).

151.   But for the No-Discount Rules, Merchants could use Issuer-specific discounts to secure more favorable acceptance costs and terms than are currently available. Even those Merchants that could not offer discounts or chose not to do so would benefit by the additional competition of Issuers competing for Merchants' business.

152.   The Discrimination Rules prohibit Merchants from obtaining better pricing by taking actions that might favor the use of one type or category of credit card or debit card, or one Issuing Bank's card, over another Credit Card or Debit Card. The Discrimination Rules were modified as required by the DOJ Consent Decree in 2011. Although the DOJ Consent Decree improved competition, the remaining Visa and MasterCard Discrimination Rules harm

cardholders by precluding them from receiving the benefit of Merchant strategies that reward cardholders for using a lower-cost form of payment. Some of these strategies may include indicating a preference for certain Issuers' cards, in exchange for reduced Interchange Fees. The Discrimination Rules in their current form may be found at Visa Core Rule 1.5.4 and MasterCard Rule 5.11.1 (U.S. Region) and in Visa and MasterCard's and Member Banks' interpretation of those rules.

153.   The "No-Multi-Issuer Rules" prohibit the use of competitive marks on Visa-branded or MasterCard-branded Payment Cards. These rules prevent the issuance of Payment Cards through which a Merchant might reduce its cost of acceptance by routing a transaction to the network with the lowest cost of acceptance. Visa and MasterCard revised their rules to allow multiple PIN-Debit marks on cards to comply with the Durbin Amendment and its implementing regulations. The No-Multi-Issuer Rules deprive Merchants of a tool that they could use to route transactions over lower-cost networks or incent cardholders to choose lower-cost networks.

154. Visa's "No-Bypass Rule" prohibits Issuers and Acquirers from bypassing the VisaNet system when processing transactions on Visa-branded cards. This rule prevents an Issuing Bank and an Acquiring Bank from competing for Merchant acceptance by directly routing transactions between the two banks and bypassing the VisaNet system. In combination with other Anti-Steering Restraints, this rule prevents Merchants from seeking to lower their costs of acceptance by steering customers to use Payment Cards in which the Issuer and Acquirer are the same or have entered into an agreement to route transactions directly between the Banks, without using the VisaNet system.

155.   The Default Interchange Rules, the Honor-All-Cards Rules, and the Anti-Steering Restraints (including the No-Surcharge Rule, the No-Discount Rule, and the Miscellaneous Exclusionary Restraints described above) are reflected in the Rules and Merchant Agreements of Visa, MasterCard, and their Member Banks. Visa's Core Rule 1.5.2.1 and MasterCard Rule 5.1.2 ("Required Merchant Agreement Terms") mandate that Acquirers' Merchant Agreements require

43

Merchants to abide by the Visa and MasterCard's respective operating regulations, which include the Anti-Steering Restraints.

156.   The Acquiring Banks, including the Bank Defendants, in fact incorporate the Default Interchange Rules, the Anti-Steering Restraints, and the Honor-All-Cards rules into their agreements with Plaintiffs and other Merchants.

157.   Because of the Anti-Steering Restraints, a Credit or Debit Card network that charges Merchant-Discount Fees that are lower than the Defendants' fees will not be able to eliminate Visa and MasterCard's market power. While potential new entrants and competitors such as Discover stand ready, willing, and able to compete with the Defendants by offering lower fees charged to Merchants, the Defendants' rules prevent and restrain any such competition by ensuring that increased efficiency and lower prices will not lead to increased sales for competitors.

158.   Likewise, the Anti-Steering Restraints have a profound inflationary effect on retail goods and services. The Defendants' rules ensure that Merchants seeking to pass along these costs must raise prices to all consumers, including cash-payers (who are typically less affluent than reward-cardholders, and who subsidize cardholder rewards under the current system), PIN-Debit Card users, and those who would otherwise seek to avoid the high cost of Defendants' Interchange Fees. But for these rules, consumer prices would be lower. The prices of goods and services would fall because they would no longer be marked up to reflect the supracompetitive costs of Credit Card acceptance. Instead, those prices would be borne by the consumer choosing to use the Defendants' expensive payment products. Faced with transparent high prices for Defendants' Payment Cards, cardholders would seek to use lower-cost forms of payment.

159.   In fact, MasterCard admitted, in a submission to the Reserve Bank of Australia, that surcharging can place downward pressure on Merchant fees because "[networks] set interchange fees to avoid widespread surcharging and other forms of card usage discouragement behavior." Payment System Regulation, Response by MasterCard Worldwide to the Issues for the 2007/08 Review. Visa has made similar statements.

44

160.   Similarly, Robert Towne, Visa's former Senior Vice President of "acceptance economics," admitted that he believed that charges imposed by Merchants on cardholders would suppress consumers' demand to use Visa-branded Payment Cards. (Towne Dep. 373:24-375:8.)

161.   In addition to insulating Defendants from competition and raising prices for all consumers, the Anti-Steering Restraints compel inequitable and anticompetitive subsidies, running from the least-affluent U.S. consumers to the most-affluent. Because Merchants must mark up the prices of all goods to cover the costs of accepting Visa and MasterCard products, the Anti-Steering Restraints effectively compel cash payers and users of other low-cost payment forms to subsidize all of the costly perquisites given by Issuing Banks to consumers using more expensive payment forms such as Visa and MasterCard Payment Cards, including frequent-flier miles, rental-car insurance, free gifts, and even cash-back rewards.

162.   If given appropriate price signals at POS, consumers would migrate towards less-expensive payment products, causing Defendants to reduce their Interchange Fees. In the absence of the Anti-Steering Restraints, therefore, Defendants' Interchange Fees would be lower.

163.   No procompetitive justification existed for the Anti-Steering Restraints as they existed before they were reformed as a result of the settlement in this case, the DOJ Consent Decree, and the Durbin Amendment. These rules were naked restraints on trade, were not ancillary to the legitimate and competitive purposes of the Visa and MasterCard, and had had profound anticompetitive effects.

164.   The Anti-Steering Restraints are not necessary to "balance" the "two sides" of the alternative relevant markets for Credit-Card-Network Services to Merchants and cardholders or Debit-Card-Network Services to Merchants and cardholders. In fact, Visa admitted that its rules are actually counterproductive toward this end. On an investor call in May 2013 during which ChaseNet was discussed, Visa's then-CEO Charles Scharf admitted that Visa's rules had barred Issuers from competing for Merchant acceptance. When asked about Visa's arrangement with Chase, Mr. Scharf stated: "The reality is I think if you go around and talk to most issuers, they would probably say that there wasn't a lot of conversation that went on between the issuing and

acquiring [i.e., merchant] side, partially because of our rules that stood in the way of them working together to do something positive for the Merchant." Visa Inc. Q2 2013 Earnings Call Transcript, *FactSet CallStreet* (May 1, 2013), at 16. Those rules (with the exception of the rules now allowing discounting by Issuer at the POS, in the case of Visa) continue to stand in the way of banks "working together to do something positive" for Merchants.

165.   While the rules changes brought about as a result of the settlement, the DOJ Consent Decree, and the Durbin Amendment were steps in the right direction for Merchants, the Plaintiffs continue to suffer injury as a result of the enforcement of the current Anti-Steering Restraints and as a result of the continuing effects of decades of enforcement of the No-Surcharge Rule and the prior versions of the restraints.

### G.   MasterCard Restructured itself to attempt to shield its anticompetitive business model from antitrust scrutiny.

166.   Since the 1990s, Visa and MasterCard's collusive structure whereby their Member Banks established Network Rules and Interchange Fees for their own benefit was repeatedly determined to violate the competition laws of the United States and foreign jurisdictions.

167.   After the Visa Check settlement and the Second Circuit decision affirming the judgment in *United States v. Visa*, MasterCard executives and its legal department realized that MasterCard had been adjudicated a "structural conspiracy." (Murphy Dep. 72:4-8.)

168.   On July 13, 2003, approximately one month after the Visa Check settlement, MasterCard formed a task force to review its governance and business practices in order to, in the words of Christopher Thom, formerly its Chief Risk Officer, "mitigate existing and potential legal and regulatory risks and manage reputational concerns." (Hanft Exh. 28200.)

169.   In a September 12, 2003 "Business Update" to Standard & Poor's, CEO Robert Selander reviewed the legal and regulatory challenges faced by MasterCard and concluded that "they represent a threat to the business model." (Selander Exh. 28407.)

170.   Similarly, in a November 2003 presentation to the Board of Directors, COO Alan Heuer reported that "[r]ecent rulings question interchange legality," as MasterCard was under "increased regulatory scrutiny occurring in several markets, with litigation pending in [the United States]." Mr. Heuer concluded that interchange was under a "serious threat in several key geographic markets," including the U.S. (Heuer Exh. 27058.)

171.   MasterCard CEO Robert Selander articulated the fundamental challenges and significant antitrust liability facing MasterCard due to its ownership and governance structure in his remarks at a MasterCard marketing meeting in December 2003:

> When I look at our organization in the current legal/regulatory environment, the analogy I use is the python that ate the pig.
>
> We're the python, by the way. And we're slowly digesting the pig—and it will have a definite impact on our business.
>
> But we ARE in control. WE HAVE to be in control. In fact, I would argue that our current situation is in large part because we HAVEN'T been in control.
>
> For example, many of the ongoing legal and regulatory issues we're dealing with are legacies of things that generally were done by our customers [here, MasterCard's Member Banks].
>
> We were cited in the Wal-Mart litigation, even though we weren't an economic participant in the interchange.
>
> We've been cited by the Reserve Bank of Australia, even though we didn't determine or set the interchange rate. That was done by the local members.
>
> Same thing with OFT in the United Kingdom and the European commission on interchange. Again, we're cited because of our structure and who we are, not because of our having any particular economic involvement in these transactions.
>
> * * *
>
> I think we have to acknowledge that given our size and scope, the challenge is going to be with us from now on. We're talking about a fundamental repositioning of the company from a legal and regulatory standpoint—in effect, reversing the pendulum . . . so

47

that we're initiating more, and reacting less …and that CAN'T be done in a single step…or a single year.

It means more than building the walls a little higher, and boiling a little more oil, to keep the barbarians at bay. That's, at best, a short-term solution. Over time, we want the barbarians to go attack OTHER people's business, and leave ours alone. We want to reposition ourselves so some of the inherent things that we have aren't as interesting, or attractive, for regulators or others to come after.

By this time next year, I want to be able to look back and say, the pig may still be working its way through the python…but at least we know we're not going to have to swallow anything else like this, because we've done the necessary things from a structural or ownership or governance or whatever standpoint, so that we don't carry inherent exposures.

(Selander Exh. 28409) (capitals in original; italics added). In the above, "our customers" refers to MasterCard's Member Banks.

172.   Thus, MasterCard management recognized that interchange was threatened by legal and regulatory challenges and concluded that the "inevitable" result of these challenges was that Interchange Fees would decrease. CRO Chris Thom made comments to this effect at a December 8, 2003 meeting of MasterCard executives. (Thom Exh. 25135.)

173.   MasterCard's conclusion that antitrust enforcement would "inevitably" cause Interchange Fees to drop demonstrates the downward pressure that the prospect of antitrust enforcement has on Interchange Fees.

174.   At the direction of the Member Banks represented on MasterCard's then Board of Directors, Mr. Selander and his management team undertook a top-to-bottom strategy review to react to the antitrust and regulatory threat aimed at its governance and ownership structures. In the first half of 2004, MasterCard's Executive Management Group—a collection of high-level MasterCard executives—worked with consultant BCG to develop and analyze alternative business models. MasterCard phrased its investigation of alternative business models as a quest to "protect system value," which in plain English meant to protect the ability of MasterCard and

48

its Member Banks to transfer funds from Merchants to Issuing Banks, whether as Interchange Fees or fees under another name. The team of employees assigned to "protect system value" came up with what they described as the "New Business Model." (Selander Exh. 28410; Hanft Exh. 28201; McWilton Exh. 24616; Hanft Exh. 28204.)

175.   An early New Business Model document entitled "Getting in the Game . . ." contemplated eliminating interchange and ███████████████████████████████████ █████████████. In this document MasterCard described interchange as "wealth redistribution to issuers," "always in cash and uniform in amount and timing," and Merchants as "reluctant participants." (Selander Exh. 28410.)

176.   Under the New Business Model, fees imposed on Merchants would not necessarily decrease. ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████████

177.   MasterCard projected that its revenue under the New Business Model would ██████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ (Garabidien Dep. Exhs. 34022A, 34026A.)

178.  An example of how the New Business Model was intended to replace the Interchange Fee under a new name appears in a document entitled "Eliminate Interchange Exploration." ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ Not surprisingly, the document states that "success" would be attained by, among other things, "[a]chieving the interchange montra [sic] of maximizing card issuance and Merchant acceptance," and "[p]rotecting key issuer revenue…," while "reducing regulatory pressure." (Garabedian Exh. 34008A) (emphasis in original).

49

179.  In a Spring 2004 update to the Board of Directors, Mr. Selander noted that global regulatory actions and threats of further actions had significantly increased the legal and regulatory risks to four-party systems such as MasterCard, which meant that "[w]e should expect a reduction in interchange/Merchant fees, especially from large Merchants." Mr. Selander's paper also noted that "[t]here seems to be less regulatory pressure on interchange for 3 party system competitors such as American Express, despite higher Merchant discount rates than MasterCard or Visa." (Selander Exh. 20711.) Thus, in Mr. Selander's view, MasterCard and its Member Banks could decrease the pressure on it and thereby increase Merchant fees to be collected by Member Banks if it could convert itself into a three-party system such as American Express. Director Dato Tan, who kept in close communication with Mr. Selander throughout the restructuring process, questioned whether "in reinventing [MasterCard] in the solution contemplated, is the new [MasterCard] effectively a 3-party system?" (Murphy Exh. 21895.)

180.  In a June 7, 2004 update to the MasterCard Board of Directors, Mr. Selander summarized the Board's feedback concerning the strategy review, including that legal risks in the United States posed a significant threat to the overall business. (Selander Exh. 28413.) In this report, Mr. Selander summarized whether the New Business Model would enhance and maintain "system value" (i.e., interchange revenue) and decrease exposure to legal and regulatory risk. (Selander Exh. 28413.) MasterCard management concluded that:

- There are significant risks to the interchange model

- These risks stem from legal and regulatory threats, which in tandem with growing Merchant power, threaten interchange

- The risks are most acute in the U.S.

- The risks do not merely threaten MasterCard, but also directly threaten individual financial institutions. In the United States, Issuing Banks face the risk of lawsuits seeking treble damages which could result in payouts that are significant in relation to their overall earnings from payment services

- Awareness of the risk is growing and was published in a Morgan Stanley research report entitled, "Attacking the Death Star." (Selander Exh. 28413.)

181.   Given the threat, Mr. Selander wrote that "the case for a New Business Model was compelling." To drive home the seriousness of the situation, an appendix to the Board update warned that "the legal threat now presents significant and material risk to interchange system value." *Id.*

182.   On June 8, 2004, a document created in connection with a working session of MasterCard's Executive Management Group concluded that the New Business Model "would appear to be operationally feasible." (Hanft Exh. 28224.) Similarly, a document created by BCG in November 2004 concluded that the New Business Model was "feasible, executable, and potentially mitigates (though does not eliminate) the significant system value [antitrust] risk." (Garabedian Exh. 34015A.)

183.   The MasterCard Board took the information presented by MasterCard management seriously. In a June 15, 2004 email from Mr. Heuer to Mr. Selander, Mr. Heuer wrote that William Aldinger, a MasterCard Director and HSBC executive said, "the Morgan Stanley article really scared him." The article "Attacking the Death Star," which Mr. Selander caused to be distributed to the Board and MasterCard senior management, estimated a loss of interchange revenue in the several billions annually if rates were reduced to Australia's levels. (Selander Exh. 28414.)

184.   On July 8, 2004, Mr. Selander provided two presentations to the MasterCard Board of Directors that included estimates of the threat to interchange revenue. According to MasterCard and its consultant BCG, if as a result of litigation Interchange Fees were reduced in the United States to the same degree that they were reduced in Australia, the risk to MasterCard and its Member Banks in the United States was a loss of $16 billion annually, or a net present value of approximately $100 billion. These presentations also noted that the New Business Model could mitigate the antitrust risk that MasterCard and its Member Banks would face while preserving the revenue represented by Interchange Fees for its Member Banks. (Selander Exhs. 28415, 28417.)

185.  At the July 8, 2004 Board meeting, the Board formally instructed management to examine three alternative business strategies to mitigate and/or eliminate the antitrust risk to MasterCard and its Member Banks from allowing its bank-controlled Board to establish uniform schedules of default Interchange Fees: (i) the new business model; (ii) bilateral agreements between Issuing and Acquiring Banks or Issuing Banks and Merchants; and (iii) governance and ownership changes. (Selander Exhs. 28416, 28424.)

186.  In another strategy review update in September 2004, Mr. Selander wrote that the Morgan Stanley "Attacking the Death Star" report describing the threats to interchange confirmed MasterCard's approach to considering changes to its business model to address regulatory and legal risks. He reiterated that the risks threatened not only MasterCard but also the banks. (Selander Exh. 28422.)

187.  Mr. Selander, in a handwritten note to MasterCard's General Counsel, Noah Hanft, dated October 4, 2004, discussed the presentations that he, Mr. Heuer, Mr. Hanft, and CFO Christopher McWilton made to Board members. In the presentation, they acknowledge the risk to MasterCard, the replacement of interchange with the New Business Model, consideration of bilateral agreements, and a change in governance and ownership with an IPO. The key IPO consideration was addressing regulatory and legal concerns. Another key consideration was that the "IPO should protect broad business interests of current members." (Selander Exh. 28423.)

188.  Even though management and BCG had concluded that the New Business Model was operationally feasible and even though ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ on October 25, 2004, the Nominating and Corporate Governance Committee of the MasterCard Board of Directors—composed of representatives of MasterCard Member Banks—voted to pursue governance and ownership changes instead of the New Business Model. (Murphy Exh. 21863.)

189.  In the words of Mr. Heuer: "I did not make a sale" of the New Business Model to the Board of Directors. (Heuer Dep. 184:21-185:8.)

190. At the October 26, 2004, Nominating and Corporate Governance Committee meeting, Mr. Selander expressed management's view that bilateral agreements "among nearly 2,000 principal members" would not be feasible because it "would be technically challenging and would increase additional barriers to increased MasterCard participation in processing opportunities." *Id.* A bilateral-agreement solution to MasterCard's legal risk was formally rejected at a November 16, 2004 meeting of the Nominations and Corporate Governance Committee. (Murphy Exh. 21864.)

191. Mr. Selander's statement that bilateral agreements would be "technically challenging" is contradicted by MasterCard witnesses with far greater knowledge of MasterCard's technical capabilities. For example, T.J. Sharkey, the head of MasterCard's Global Merchant and Acquirers Group, testified that he is aware of no limit on the number of bilateral agreements that MasterCard's system can accommodate. (Skarkey Dep. at 93:2-101:5.) The real reason for MasterCard's rejection of bilateral agreements is that MasterCard's greatest value in the operation of the MasterCard network is its role in facilitating the transfer of money from Merchants to Issuing Banks by way of Interchange Fee deductions on every transaction. Bilateral agreements (which would take MasterCard out of the role of transferring money from Merchants to Issuing Banks) would facilitate "disintermediation" of MasterCard's role in the payments industry. (MCI_MDL02_11816533; MCI_MDL02_11832706.) In other words, MasterCard feared that, in a world of bilateral agreements, its function of guaranteeing a stream of supracompetitive revenues to Issuing Banks would vanish and its other functions could be replicated by others.

192. The Nominating and Corporate Governance Committee presented its analysis to the full Board of Directors on November 18, 2004, and the Board passed resolutions stating, "MasterCard in its current form may not be an acceptable alternative" and that a new governance and ownership structure needs to "significantly mitigate antitrust risks." (Selander Exh. 28426.)

193. The primary factor driving the decision to pursue governance and ownership changes instead of the New Business Model was the belief, based on the advice of counsel, that

governance and ownership changes had a greater likelihood of shielding MasterCard and its Member Banks from antitrust liability arising from the establishment of uniform schedules of default Interchange Fees. (Murphy Exh. 21863.) As reflected in the minutes of an October 26, 2004 meeting of MasterCard's Nominating and Corporate Governance Committee, MasterCard Director and Committee member, Dato Tan, expressed views that the New Business Model "presents many uncertainties, only partial protection against regulatory and legal challenges, and that a new strategy should address risk and opportunity concurrently not sequentially." *Id.* The committee members also "expressed a preference for a strategy that can rapidly reduce regulatory and legal risk and that is not itself a competitive risk to implement." *Id.* MasterCard agreed that one of the reasons for pursuing ownership and governance changes instead of the New Business Model was to "more clearly deliver against the objectives in terms of addressing those perceived…conflicts of interest or—or conspiracy issues…." (Murphy Dep. 268:10-14.)

194.   After the MasterCard Board decided neither to implement the New Business Model in the United States nor to pursue bilateral agreements, the MasterCard Board and top management focused their efforts on making changes to MasterCard's governance and ownership in hopes of removing its Interchange-Fee-setting conduct from scrutiny under Section 1 of the Sherman Act, while preserving the ability of the Member Banks to continue to control the business of MasterCard and the revenue stream provided by Interchange Fees.

195. On November 18, 2004, the full Board of Directors "determined that the continuation of MasterCard in its current form may not be an acceptable alternative and that a change in ownership and governance may be essential." (Heuer Exh. 27070.) This resolution confirmed the Nominating and Corporate Governance Committee's conclusion of two days earlier that "the company could not maintain the status quo ownership and governance model…" due to antitrust liability. (Murphy Exh. 21864.)

The Board further resolved:

. . . that management is authorized to work with the Nominating and Corporate Governance Committee towards the development of

54

a new governance and ownership structure for MasterCard, taking into account the following factors, (a) the need to significantly mitigate antitrust risks, and (b) the importance of recognizing the diversity of MasterCard, including a consideration of the feasibility of a holding company structure, and (c) *the significance of protecting the legitimate present and future interests and concerns of MasterCard's members to the extent that they do not adversely impact the risk profile of the enterprise*; . . .

(Murphy Exh. 21865) (emphasis added).

196.  By this time, MasterCard's management and its Board of Directors had developed a standard by which to judge its restructuring attempts. Under that standard, a new governance and ownership structure would be satisfactory if and only if a post-restructuring challenge to MasterCard's ownership or governance would stand a 90 percent chance of being dismissed without a trial on the merits. (See Murphy Dep. 258:15-20; 357:17-23.) This standard came to be known as the "90 percent standard." MasterCard hoped to meet the 90 percent standard by concocting a governance form that would be able to qualify MasterCard as a "single entity" under the antitrust laws and not a "structural conspiracy," while preserving the Member Banks' Interchange Fee revenue stream.

**1.  MasterCard management and its Directors agree on a structure intended to safeguard the Member Banks' revenues and control while supposedly protecting them from future liability for unlawful interchange fees.**

197.  On January 7 and January 14, 2005, MasterCard's Nominating and Corporate Governance Committee worked on a restructuring plan leading to an IPO in hopes of finding an antitrust safe haven for MasterCard and its Member Banks, while retaining enough control for the Member Banks to guarantee that MasterCard continued to transfer money from Merchants to Issuing Banks via Interchange Fees or other means. (Murphy Exh. 21872.)

198.  On January 10, 2005, Dato Tan, writing about the recent Nominating and Corporate Governance Committee meetings, noted that one problem facing the committee was "ring-fencing" U.S. assets. "We know the current difficulties also present the company with the best chance of escaping from its past. A lot of effort has been put in to devise solutions based on the

U.S.-centric tack & this is only natural as the epicenter of the litigation is the U.S. But the point was taken that it appears odd that it seems near impossible to shield the rest of the world from that tsunami save with the single company IPO or private placement under consideration." (Murphy Exh. 21866.)

199.   Writing again to Mr. Selander on January 25, 2005, Dato Tan stressed the importance of a solution to "the anti-trust and anti-competitive threats facing MCI, it is again that the proposed solution must pass the test of time. The damage would be unimaginable if, shortly after the IPO and a challenging re-birth MCI were to come under serious litigation and anti-competitive attack again." At the same time, Dato Tan warned against a solution that would enable a party or parties acting in concert to control a substantial interest in the MasterCard. Tan clearly understood the paramount goal of the IPO was to put "in place a governance structure devised chiefly to shield the business from future litigation and anti-competitive pressures." If successful and "with Visa mired in trouble, MCI may well end up Numero Uno with even greater market power." (MCI_MDL02_10133525.)

200.   The Nominating and Corporate Governance Committee met again on March 2, 2005 to discuss the IPO structure. Director and Chairman Baldo Falcones reported that the prospect of assuming antitrust risk stemming from the U.S. nettled the European Member Banks and that the European Members believed it to be necessary and appropriate to find a means to protect the corporation and its members, particularly U.S. members, from antitrust risk. In addition, CFO McWilton discussed the post-IPO elimination of special assessment rights and management's views on handling risk without assessment rights. During this time period, the Board had engaged special antitrust counsel, and each of the options the Board considered was evaluated according to the 90% test—i.e., whether the new structure would have a 90% chance of defeating an antitrust challenge on the merits before trial. (Murphy Exh. 21875.)

201.   On May 17, 2005, MasterCard management presented various IPO options to the European Regional Board. One of the solutions called for the creation of the MasterCard Foundation, a charitable institution that would hold a sizable percentage of shares, which it could

not sell for a number of years. The idea was that the Foundation would protect the interests of the Member Banks in a new MasterCard where the Member Banks held a minority stake and independent shareholders held a majority. (Murphy Exh. 21898.)

202.   Dato Tan again wrote Mr. Selander on May 17, 2005, expressing that an important issue in changing governance and ownership was accommodating European demands for continued autonomy in the European region. As the Europay integration had been completed in only 2002, certain of the European members resisted a change in governance and ownership that had them ceding additional control. Dato Tan told Mr. Selander that Director Baldo's dual role presented a conflict of interest: "A further complication as alluded to earlier is that the Chairman of the Board and the Chairman of the NCG is one and the same person. Wearing two hats, conflicts of interest are apparent and unavoidable." (MCI_MDL02_1108367.)

203.   During spring and summer of 2005, MasterCard's Nominating and Corporate Governance Committee, along with its Board of Directors and management, evaluated several proposed structures to determine which of them met its twin goals of (i) absolving it and its members of antitrust liability; and (ii) guaranteeing that the new entity did not act contrary to the Member Banks' interests.

204.   On June 22, 2005, the first complaint in what would become MDL No. 1720 was filed.

205.   On July 14, 2005, the MasterCard Board—composed of representatives of Member Banks—voted to approve the essential structure of the IPO and change in governance.

206.   To accomplish the IPO, MasterCard redeemed the shares owned by the Member Banks and then reissued them as Class B and Class M shares in the new MasterCard entity. MasterCard then offered to the public a series of Class A shares that represented 41 percent of the voting control of MasterCard. The capital raised by the public offering was used to pay the Member Banks for their shares, except that $1 billion ($650 million after taxes) owed to the U.S. Member Banks was retained by MasterCard.

207.   The MasterCard IPO created three classes of shares: Class A shares, Class B shares, and Class M shares. Voting rights were limited to Class A shares, although the Member Banks, through their Class M shares, had certain veto powers, and no shareholder is allowed to acquire more than 15 percent of outstanding Class A or B shares.

208.   The objectives that MasterCard and its Member Banks sought to achieve with the IPO and related agreements are also unambiguously depicted in another presentation that Mr. Selander made to MasterCard's regional Boards of Directors in the summer of 2005. Option 5F—the plan that eventually became the IPO and Agreements—was intended to provide MasterCard a high degree of protection from claims under U.S. antitrust law. This presentation also demonstrates that MasterCard and its Board viewed the bank-owned-and-controlled "status quo" to be of minimal to no protection from antitrust liability. (Murphy Exh. 21904.)



209.   The banks received assurances that they would continue to receive supracompetitive Interchange Fees, notwithstanding their loss of equity interest in MasterCard. After returning from a MasterCard Board meeting regarding restructuring, Citigroup executive Alan Silverman summarized the meeting to a colleague and noted that "we [Citigroup] need to safeguard who

owns/controls the company if not the Banks. What happens if Wal-Mart or Microsoft want to buy it?" (Massingale Exh. 26272.) Mr. Silverman also relayed his "informal discussions" with MasterCard COO Alan Heuer, in which Mr. Heuer "seemed very clear that **any new MasterCard needed to protect and even increase Interchange to keep and attract Banks.**" Mr. Silverman noted that he was nonetheless "uneasy" because of the "lack of any direct link between Interchange levels and the P/L of MasterCard in the future." *Id.* (emphasis added.)

210.   MasterCard addressed Bank unease by providing assurances that it would continue to act in their best interests after the IPO.  Board minutes reflect that MasterCard management "very strongly indicated its intent not to compete with its [Bank] customers" and made efforts "to find effective ways for management to strongly communicate this intent." (Murphy Exh. 21882.)

211.   Similarly, in an April 6, 2005 meeting of the Nominating and Corporate Governance Committee, the Committee noted that, "[a]lthough [banks] can not govern the new structure, either through voting or by economic control, a legitimate role must be found so they are supportive of the new enterprise and so MasterCard does not lose their wisdom and insight." (Murphy Exh. 21891.)

212.   MasterCard's assurances were effective. In response, Richard Fairbank, CEO of Defendant Capital One, stated in an email that the MasterCard IPO would result in "little-to-no change." (CO0003-00645342, at CO000-00645372.) Similarly, Citi's Steven Freiberg testified that he understood MasterCard would have "the same objective, pre and post" IPO. (Freiberg Dep. Tr. at 165:1-170:22.)

213.   The analysis of MasterCard and its Member Banks leading up to the IPOs makes clear that MasterCard and its Member Banks realized that the business structure they had collusively established—a structure that mandated the transfer of funds from Merchants to Issuing Banks—was anticompetitive and illegal under the antitrust laws of the United States and many foreign jurisdictions. But instead of changing their conduct, MasterCard and its Member Banks elected to restructure themselves into a new MasterCard that they hoped would allow

them to continue their anticompetitive behavior. They restructured Old MasterCard such that MasterCard would continue to facilitate the transfer of funds from Merchants to Issuing Banks.

214.   The restructuring created a new MasterCard which has market power in the Relevant Markets as described below.

215.   MasterCard remains under the effective control of its Member Banks. For example:

d.   The large banks' long-standing control of MasterCard and Visa have impaired and distorted competition through adoption and enforcement of the Honor-All-Cards Rule and the Anti-Steering Restraints, the Miscellaneous Exclusionary Restraints, and the rules requiring the deduction of Interchange Fees by Issuing Banks on every transaction. In order to capture a greater portion of the supracompetitive Interchange Fees, the Member Banks have focused their competition on issuing Payment Cards to cardholders (rather than, e.g., competing for Merchant acceptance). And the principal mode of competition among networks is through ever-increasing Interchange Fees paid to banks (and charged to Merchants) as an inducement to banks to issue MasterCard or Visa Payment Cards. Because both MasterCard and Visa have substantial market power, Merchants have no practical ability to decline to accept MasterCard and Visa Payment cards.

e.   The six largest Issuing Banks in the United States now account for almost 90 percent of the issuance of credit cards. Due to the anticompetitive conduct alleged herein, neither MasterCard nor Visa can pursue any business strategy that does not involve ever-higher Interchange Fees imposed on Merchants.

f.   Because the largest Member Banks have representatives on the Board of MasterCard, and neither Merchants nor cardholders have such representation, the largest Member Banks continue to exercise undue influence and effective control in the day-to-day business of MasterCard.

g.   Before the restructuring, MasterCard recognized that Merchant class action antitrust litigation (such as MDL No. 1720) threatened "ruinous liability" of as much as $200 billion. (Garabedian Exh. 34029A, Hanft Exh. 28216.) As a result, MasterCard's single most important business decision is how to resolve the pending Merchant antitrust class action in a way that will preserve MasterCard's business. However, the MasterCard Member Banks caused MasterCard to surrender the right to assess its Member Banks to cover its liabilities. This means that MasterCard's fate remains in the hands of the Member Banks who alone have the resources to resolve antitrust litigation in a way that would preserve MasterCard's business. Without the resources of its Member Banks, MasterCard would surely become insolvent in the event of a judgment in favor of the

damages Class Plaintiffs in MDL 1720.

h.   Even though MasterCard could, in theory, collect Interchange Fees from Merchants and keep that substantial revenue, it has not done so. Rather, the Board of Directors of MasterCard has continued to use Interchange Fees to transfer the supracompetitive Interchange Fees from Merchants to Issuing Banks.

i.   The current MasterCard Board of Directors understands that it lacks the resources to fund a significant adverse litigation judgment or settlement without the consent of the Member Banks. Post-IPO, the largest Member Banks have retained sufficient control over MasterCard to prevent it from settling this action on terms that involve lowering Interchange Fees. Thus, even if MasterCard is highly motivated to resolve the pending litigation, it cannot do so without the consent of its largest Member Banks.

j.   MasterCard, Visa, and the Bank Defendants have entered into a Joint Defense Agreement in MDL No. 1720. Under the terms of the agreement, each signatory is required to notify the other signatories each time that they have any communication with counsel for the Class Plaintiffs regarding any matter related to settlement of this litigation. The purpose and effect of this provision is to provide a mechanism, allegedly shielded by the attorney-client privilege and the joint-defense doctrine, for MasterCard and the Bank Defendants to coordinate their conduct with respect to the levels of Interchange Fees to be imposed on Merchants in the future.

## H.   Visa Restructures Itself to Try to Shield Its Anticompetitive Business Model from Antitrust Scrutiny.

### 1.   Visa Concedes That It Is a Structural Conspiracy and Explores Options to Continue Securing Interchange Fees for the Banks While Trying to Dodge Antitrust Liability.

216.   Even before Visa agreed to pay approximately $2 billion to settle the Visa Check class action in 2003, its management realized that its business model was leading it and its Member Banks down a path toward ruinous antitrust liability.

217.   Visa U.S.A. was the primary driver behind the global restructuring. Visa, Inc.'s former CEO, Joseph Saunders, admitted that Visa U.S.A.'s motivation resulted from the fact that it felt the open-association model was "untenable for the future." (Saunders Dep. Tr. 156:19-158:2.)

218.  Similarly, Bill Sheedy – then head of Visa's Interchange Strategy Group and currently a Global Executive for Corporate Strategy – testified that the current system "is fraught with risk (i.e., continued [interchange] escalation)." From Mr. Sheedy's perspective, "[t]he fact that all of the banks, and their two general purpose acceptance brands, are taking on this risk together should be of no consolation." (Sheedy Exh. 34812.) A March 2003 presentation authored by Mr. Sheedy also warned that "[c]ommoditized product utility requires risky [interchange] competition." (Sheedy Exh. 34812.)

219.  Soon after Mr. Sheedy's comments, the prospect of substantial antitrust liability for Visa and its Member Banks arising from their collaborative structure became more immediate. In June 2003, Visa had reached an agreement in principle to settle the Visa Check class action for $2 billion plus injunctive relief. In addition, when the court of appeals affirmed the district court's decision in *United States v. Visa*, Visa understood that it would be facing follow-on suits by American Express and Discover and that those suits would also impose multibillion-dollar liabilities. Finally, as some of the opt-out Plaintiffs in Visa Check had amended their complaints in March of 2004 to assert claims relating to Interchange-Fee price fixing, Visa was on notice that further class-action litigation was imminent.

220.  Two years later, in December 2005, after Visa had begun to give serious consideration to restructuring, it noted that its damages resulting from U.S. class-action lawsuits that challenge Interchange-Fee setting could be ██████████████ by 2006. (Partridge Exh. 32815.) This ████████ estimate is noteworthy because it represents only two years of damages, as Visa had assumed that the release in the Visa Check action would insulate it from monetary damages for the period before January 1, 2004. (Steele Exh. 31451.)

221.  By this time, Visa International and the other Visa regions realized the gravity of the potential liability that was facing Visa in the United States as a result of its anticompetitive conduct. Reflecting this realization, Christopher Rodrigues, the President and CEO of Visa International, wrote to Bill Campbell in January 2005, stating in part: "[C]ontext after the [Visa

International] Board meeting…the Regions now understand that:- Old Visa's days are numbered. No one can stay as they are…" (Partridge Exh. 32804 at VI_IC_02710990.)

222. Class Plaintiffs announced their intention to challenge the similar MasterCard restructuring shortly before the May 25, 2006 consummation of that transaction. Thus, Visa managers and directors who were involved in restructuring were more careful than their MasterCard counterparts to avoid stating that the restructuring was an attempt to preserve an anticompetitive structure while avoiding antitrust liability.

223. Realizing that its structure—wherein the Member Banks established Visa's Rules and Interchange Fees—was an inherent risk, Visa initially sought to partly mitigate that risk by delegating the setting of Interchange Fees to "independent" directors. But for the same reason that MasterCard's delegation of Interchange-Fee setting changed only the identity of the price fixer and thus did not affect its antitrust risk, Visa's initial "solution" did not remove its conduct from scrutiny under the antitrust laws.

224. The fact that Visa's delegation of Interchange-fee setting was mere window dressing is illustrated in the following exchange between Visa's former CEO, John Philip Coghlan, and its former Head of Global Interchange, Tolan Steele, in which Coghlan requested that Steele draft a response to a hypothetical inquiry from Citi's head of cards regarding Visa's Interchange Fees and its fee-setting process:

> "You know, I'm very concerned about your strategy on interchange. You're at parity with MCI in most areas, but I think I see you slipping behind in a few key areas. I also think that MCI's strategy after they go public will be to increase interchange to attrack [sic] big issuers like me. I'm concerned that with [Independent Directors] and the Merchant-friendly public pronouncements you've been making, that you won't be competitive. How can you assuage my concerns?"

(Morrissey Exh. 30533 at VUSA_MDL1_09023986.)

225. In cooperation with the Interchange Strategy team, Mr. Steele then drafted a response stating in part, "[a]nd though the Directors to whom we bring interchange decisions may have changed, the process that we go through to develop and deploy interchange

enhancements will remain largely the same." (*Id.*) Messrs. Steele and Morrissey agreed that in such a discussion with Citibank, Visa would need to discuss its "guts, as in our courage and willingness to drive rates one direction or another." (*Id.* at VUSA_MDL1_09023984.)

226.   The intention of Visa and its Member Banks was to create just enough autonomy for the new Visa entity to remove the appearance of bank control, while maintaining in place the business model that courts and antitrust agencies in the United States and abroad had ruled constituted a structural conspiracy.

> ### 2.   Visa Management and Its Bank Directors Devise a Structure that Preserves the Banks' Revenues and Control While Supposedly Absolving Them of Future Liability for the Setting of Interchange Fees.

227.   Defendant Chase – which occupied two seats on Visa's Board at the time of restructuring – confirmed the intention of Visa's Member Banks to give up just enough control to create the appearance of a "single entity," while guaranteeing that Visa continues to pursue its bank-focused strategy.

228.   For example, when Visa and its Member Banks were considering appointing "independent" directors to set Interchange Fees, Vincent D'Agostino, the head of Chase's payment strategy group detailed a conversation that he had with Visa, wherein Visa informed him that the reason that certain options were preferred by Visa was "because it will take a full vote of the membership (12-14M banks) to change anything about how Visa operates – so Visa believes it will always remain bank/issuer centric." Mr. D'Agostino further noted that "Visa believes that they will be sued in Oct[ober 2005] – so this will look like it is a reaction to that." (Webb Exh. 27628.)

229.   In another email, Susan Webb, then an Executive Vice President for Strategy and Corporate Development for Defendant Chase's retail banking and payment strategies, relayed her conversation with Bill Campbell, then a Chase representative on the Visa U.S.A. Board, about "how [Chase can] really retain control over structure and governance [and in today's call I thought it became, much more clear, the bank directors don't, the members do – entirely

different] versus the legal benefits – and how much those benefits are really enhanced by [a] majority [of "independent directors"] setting Interchange Fees." (Webb Exh. 27632) (second brackets in original).

230.   Ms. Webb admitted that when she wrote this email, she was "thinking about the extent to which [Chase] could retain control over [structure and governance of Visa]. And specifically it was how do we — or can we prevent Visa from becoming a competitor of ours." (Webb Dep. 210:2-6.)

231.   In February 2006, a project known as "Project Heights" was initiated by Visa's regional entities to perform the same function as the previous "Project George" – namely devise a global restructuring solution to the antitrust risk that Visa and its Member Banks faced. Unlike Project George, which was management driven, Project Heights was director driven (i.e., bank driven), which as Visa admitted in its deposition, was "probably one of the reasons why [Project George] didn't make much progress." (Partridge Dep. 40:23-41:5.)

232.   As part of Project Heights, Visa considered several restructuring options that provided varying degrees of autonomy for the various regional Visa entities.

233.   These options were described as: 1) a Global Float; 2) a Global Float with Regionality; 3) a Bilateral Global Solution; and 4) a Global Association. (Partridge Exh. 32836 at VI-IC-02792046.) Under the first option, the Global Float, the Visa would be a single worldwide majority publicly-owned publicly traded company. Under the second model (a variation of which became the final Visa structure) a Visa public company would maintain a regional structure with regional subsidiaries which could be bank-owned. The third option conceived of a bilateral solution very similar to the second option where regions could choose whether to retain the association structure or join a new for-profit public company. The fourth option of a global association essentially maintained Visa's former membership association structure with "improvements in key areas such as…antitrust exposure" stemming from regional incorporation and independent directors. (*Id.* at VI-IC-02792050-76.)

234.   Project Heights provided its Final Report and Recommendations to the Visa International Board on May 8, 2006. (Partridge Exh. 32849 at VI-IC-02755900.) After considering two specific implementations of Option 2 (the Global Float with Regionality discussed above), Heights settled upon and recommended what it referred to as Option 2A whereby "Visa Europe would be a Licensee Region, owned 5 percent by the Global Company [Visa Inc.] and 95 percent by local financial institutions." (*Id.* at VI-IC-02755901.)

### 3.   The Final Restructuring Plan.

235.   After the final restructuring plan was agreed upon, various Visa entities entered into a series of mergers that resulted in one entity known as Visa, Inc. and another separately-incorporated entity known as Visa Europe. Under these mergers, Visa U.S.A., Visa Canada, and Innovant, LLC became subsidiaries of Visa, Inc. Visa, Inc. then issued common stock to the financial-institution members of Visa U.S.A., the financial-institution members of Visa Canada, the financial-institution members of three unincorporated geographic regions of Visa International, Visa U.S.A., Visa Europe, and Visa Europe's subsidiary, VESI. The transactions that produced Visa, Inc. and Visa Europe were completed by October 3, 2007.

236.   After the merger phase of the restructuring was completed, Visa, Inc. conducted an Initial Public Offering of 406,000,000 shares of Class A common stock in Visa, Inc. on March 18, 2008. By redeeming those shares and reclassifying them as publicly-held Class A shares, the IPO had the effect of Visa, Inc. purchasing the Member Banks' shares in it. In exchange for redeeming the formerly-bank-held shares, Visa provided the banks with a large part of the proceeds of the IPO as well Class B shares and C shares in Visa, Inc.

237.   The types of shares that the banks could own post-restructuring were limited by geographic region. Class B shares could be held only by members of the former Visa U.S.A. Former members of Visa Canada, AP (Asia Pacific), LAC (Latin America/Caribbean), and CEMEA (Central Europe/Middle East/Africa) acquired Class C (series I) common stock. Member Banks in Visa Europe acquired Class C (series II, III, and IV) common stock. A portion

of these Class B and C shares were subject to a mandatory redemption following the IPO and a redemption of Class C (series II and III) stock occurred in October 2008.

238.   Similar to MasterCard's restructuring, the Visa restructuring placed several limitations on Visa that were intended to preserve the anticompetitive market structure that Visa and its Member Banks had created. For example, Visa's Board of Directors must provide advance approval before any person may own more than 15 % of the aggregate shares of Class A common stock. In addition, the holders of Class B and C shares (Visa's Member Banks) were permitted to elect 6 of 17 directors over the three years following the IPO.

239.   The Member Banks that hold Class B or C stock are entitled to voting rights governing certain extraordinary transactions that relate to the consolidation or merger of Visa, or its exit from the core payments business. In addition, approving a merger, consolidation, or exit of the core business requires an 80% approval of voting shares. This supermajority provision, in combination with the Member Banks' right to vote on these types of occurrences, gives the banks veto powers that allow them to prevent the sale of Visa or a change in the core business of Visa, just as the Member Banks of MasterCard retained certain veto rights through their Class M shares in the MasterCard restructuring. In addition, the holders of Visa, Inc. Class B and C stock must approve any changes to Visa's certificate of Incorporation that would take away this veto right.

240.   Class B stock – the stock that is held by the U.S. Member Banks – is non-transferable (with limited exceptions) until three years after the close of the IPO and the final resolution of this and other litigation. Class C stock is non-transferable until three years after the closing of the IPO.

241.   Another aspect of the restructuring involved a collective agreement among Visa and the U.S. Member Banks regarding this litigation.

242.   When asked whether Visa's Member Banks were concerned about losing control of Visa through restructuring, Visa testified that issuers voted to approve the restructuring only when they were convinced that their card-issuing businesses would continue to be successful.

(Partridge Dep. Tr. 183:7-187:7.) Furthermore, contemporaneous documents generated by Visa U.S.A. and Visa International clearly demonstrate that the banks held grave concerns about losing control and that these concerns drove Visa's restructuring process and the Member Banks' final approval of the restructuring plans.

243. For example, when Visa's restructuring options were presented to Visa International's Board of Directors, bank-control issues were discussed as part of the discussion on the Global Float option, which was similar to the final restructuring. This discussion noted that Visa would:

> "be a profit-seeking entity, with a need to maximize shareholder value while serving its chosen customers better than its competition. This means that it will behave differently from today's association. Over time, it can be expected to restructure and reorganize to reduce costs, change its mix of businesses and ensure commercial pricing for all customers. In the long term, we would expect the company to take these actions, although clearly its interests will not be served by alienating its customers."
>
> * * *
>
> In addition, constraints may be imposed on the actions of the new company to give comfort to members. For example, for a transitional period, the company might not be permitted to:
>
> •   Allow itself to be taken over
>
> •   Sell its major assets
>
> •   Merge with another company
>
> •   Exit its core payments business
>
> •   Remove the upper limit on ownership by a single entity
>
> These constraints may "sunset" after a period of time or if bank ownership falls below a specified percentage."

(Partridge Exh. 32846 at VI-IC-02792351 - 352.)

244.  This presentation also noted that some Member Banks may have concern with a "Global Float" or a "Global Float with Regionality" because they may lose "ownership and control over the future direction of the organization." (*Id.* at VI-IC-02792353, VI-IC-02792358.)

245. Again, while Mr. Partridge denied that Visa explicitly took actions to address the Member Banks' concern, he did state that, post-restructuring, if Visa did not address the needs of its customers (i.e., banks), it could not protect its value. (Partridge Dep. 335:1-17.) He also testified that post-restructuring, Visa's Member Banks "understood that, as a customer, you have certain control over any company that you do business with." (Partridge Dep. Tr. 185:5-7.)

246. Thus, Visa admitted that its Issuing Member Banks that controlled the restructuring, considered various restructuring options, and approved the final restructuring plan with the goal in mind of protecting their business interests as Visa Issuers (Partridge Dep. 186:18-187:7), rather than maximizing the value of Visa as an independent business. The primary way in which large Issuing Banks could protect their Issuing businesses was to guarantee the continued flow supracompetitive interchange fees from Merchants to Issuers in the post-restructuring world.

247. The Ownership and Control restrictions on Visa that were put in place have the effect of addressing the Member Banks' stated concerns of losing control of Visa through its transformation into a purported "single entity."

248. The restructuring limited the equity interest that any one shareholder can attain in Visa to 15 % of equity, save for a Member Bank that may have acquired a greater stake through the restructuring itself. This limitation prevents a single investor or group of investors from gaining a controlling stake in Visa. By preventing an outside entity – be it a Merchant, a group of Merchants, or another large buyer – from acquiring Visa and adopting a more Merchant-friendly business model, this ownership limitation serves to protect the bank-focused business model that Visa and its Member Banks constructed. It also protects the interests of Visa's Member Banks, which are virtually all members of MasterCard, by helping to ensure that competition for Merchants' business does not break out between the two networks.

249. Visa attempted to distinguish its limitation from MasterCard's by allowing the limitation to be overridden by a vote of its Board of Directors. This is not a persuasive distinction, however, because while the Member Banks surrendered a majority of their equity and governing stake in Visa, they retain substantial representation on the Board of Directors of

Visa and continue to have a large influence over any vote to approve an exception to the ownership limitation.

250.   Similarly, the veto right in the hands of the Member Banks, combined with the guarantee that the Member Banks will maintain that right for the duration of this litigation, perpetuates the situation in which Visa cannot take any business actions that are contrary to the Member Banks' interests of receiving supracompetitive Interchange Fees from Merchants on all Visa-branded Payment Card transactions. Moreover, it also handicaps Visa in this litigation by guaranteeing that any settlement that it attempts to enter into with Plaintiffs, including any settlement to eliminate the Anti-Steering Restraints, meets the approval of the Member Banks.

251.   On information and belief, the Member Banks' veto rights on attempts by Visa to exit the core payments business would allow the Member Banks to block an attempt by Visa to eliminate Interchange Fees.

## I.   The Effect of Visa and MasterCard's Restructurings.

252.   The restructurings adopted by MasterCard and Visa are akin to the members of a cartel who, having been caught fixing prices in violation of the Sherman Act, spin-off their competing businesses to a new "single entity," with the explicit understanding and with structural guarantees that the new "single entity" will continue to fix prices at the supracompetitive levels previously set by the cartel's members.

253. Because the "single entity" MasterCard and Visa have market power, they can unilaterally impose uniform schedules of default Interchange Fees on Merchants, maintain those Interchange Fees at supracompetitive levels, and impose Anti-Steering Restraints on the Merchants. This is demonstrated by the fact that MasterCard and Visa have increased Interchange Fees several times since their IPOs, and continue to enforce their restrictive rules, without losing significant Merchant acceptance.

254.   For example, on January 17, 2007, MasterCard announced interchange rate increases effective April 13, 2007 for World Elite Consumer and Business cards and World Business

cards. (Jonas Exhs. 23159, 23176.) MasterCard later increased its interchange rate on World Elite consumer credit cards. (Jonas Dep. 408:11-415:11.) With the January 17, 2007 announcement, MasterCard also increased interchange rates for enhanced consumer credit cards, effective June 15, 2007. (Jonas Exh. 23159.) In October 2007, MasterCard increased its overall effective interchange rate on commercial cards. (Jonas Dep. 460:10-462:17; 552:25-555:15.)

255.   Visa also increased its Interchange Fees after its IPO.

256.   Without the unlawful conduct alleged herein, Visa, MasterCard and their Member Banks could not impose uniform levels of default Interchange Fees on Merchants, raise and maintain those Interchange Fees at supracompetitive levels, or impose the Anti-Steering Restraints on the Merchants.

257.   Visa and MasterCard have argued that by reconstituting their Boards of Directors to include a majority of directors "independent" of the Member Banks, and changing the ownership and governance rights of the Member Banks, the "new" networks are single entities whose post-IPO setting of Interchange Fees and imposing of the Anti-Steering Restraints is outside the scope of Section 1 of the Sherman Act.

258.   As both MasterCard and Visa acknowledged before their IPOs, Interchange Fees were doomed to disappear or drastically decrease.  The IPOs harmed competition by allowing MasterCard and Visa to perpetuate their anticompetitive Interchange Fees.

259.   In April 2012, Visa implemented a fixed fee known as the Fixed Acquirer Network Fee ("FANF").  If a Merchant accepts any Visa Payment-Card transactions, Credit or Debit, the Merchant must pay a fixed fee to "access" Visa's networks, which increases with the number of locations that the Merchant operates.  The imposition of the FANF represents a significant, unilateral price increase by Visa without any commensurate benefit to Merchants or cardholders. The ability of Visa to impose such fees further demonstrates that its IPO significantly lessened competition.

260.   Since the restructurings, no Defendant or Member Bank has taken any affirmative steps to withdraw from any of the MasterCard or Visa conspiracies described in this complaint.

The Defendants and Member Banks continue to benefit—to the tune of tens of billions of dollars per year—from the supracompetitive Interchange Fees and other practices described in this complaint. Each Member Bank knows and understands that, even after the restructuring, it will continue to receive supracompetitive Interchange Fees at the default rates, absent a bilateral agreement (which are disincentivized nearly out of existence by the Anti-Steering Restraints).

**J.      Legislative and regulatory reforms sought to inject needed competition into the Payment-Card marketplace.**

261.   In 2009, the Antitrust Division of the Department of Justice opened an investigation into the anticompetitive practices of Visa, MasterCard, and American Express. Armed with the discovery from MDL 1720, and the DOJ concluded that

> Defendants' Merchant Restraints suppress price and nonprice competition by prohibiting a merchant from offering discounts or other benefits to customers for the use of a particular General Purpose Card. These prohibitions allow Defendants to maintain high prices for network services with confidence that no competitor will take away significant transaction volume through competition in the form of merchant discounts or benefits to customers to use lower cost payment options." Competitive Impact Stmt. at 9, *United States et al. v. Am. Express Co.*, No. 1:10-cv-04496-NGG-CLP (Oct. 4, 2010).

262.   DOJ then entered into a consent decree with Visa and MasterCard, in which Visa and MasterCard agreed to repeal their No-Discounting Rules, rules that prevented Merchants from promoting or expressing a preference for a particular brand of card, and rules that prevented Merchants from informing their customers of the cost of accepting various cards. *Id*. at 10-11.

263.   In response to the public comments submitted during the consent-decree-approval process, the DOJ clarified that the consent decree would require Visa and MasterCard to allow Merchants to post two (or more) separate prices for a bundle of goods at the POS, without specifying whether the separate prices were the result of a discount or a surcharge. Pl. Resp. to Public Cmts. at 26, *United States v. Am. Express Co.* (Jun. 14, 2011).

264.   In July, 2010, President Obama signed the Dodd-Frank act into law. Included in Dodd-Frank was the "Durbin Amendment", which required the Federal Reserve to issue rules limiting the banks' practice of issuing debit cards that were compatible with only the issuer's networks. Dodd-Frank Wall Street Reform and Consumer Protection Act, §1075, Pub. L. No. 111-203 (July 21, 2010). In response, the Federal Reserve issued Regulation II, which required issuers to enable their debit cards to route transactions through a minimum of two unaffiliated networks. 12 CFR 235.7(a). Regulation II also prohibited issuing banks from directly or indirectly inhibiting merchants from choosing to process card payments over any available network. *Id.* at (b) ("An issuer or payment card network shall not, directly . . . or otherwise, inhibit the ability of any person that accepts or honors debit cards for payments to direct the routing of electronic debit transactions for processing over any payment card network that may process such transactions.").

265.   The Durbin Amendment also allowed Merchants to place minimum-purchase amounts of up to $10 on Credit-Card transactions.

266.   Regulation II did not require that a card be compatible with both unaffiliated PIN and unaffiliated signature networks. An issuing bank could comply with the rules by enabling two unaffiliated PIN networks, and still routing all signature-authenticated transactions through a single, affiliated network. *See, e.g., Compliance Guide to Small Entities*, Board of Governors of the Federal Reserve System https://www.federalreserve.gov/bankinforeg/regiicg.htm. Visa and MasterCard arranged for issuing banks to issue debit cards compatible with multiple unaffiliated PIN networks, but which still routed all signature transactions through the Visa or MasterCard signature network.

267.   The Durbin Amendment was intended to lower Merchants' costs of accepting Payment Cards and also to provide some competition at the POS, such that Debit-Card networks would have an incentive to lower their Interchange Fees in order to incent Merchants to route Debit-Card transactions over their networks.

268. The threat to Visa's market power was exacerbated by competing PIN Debit Card networks' development of "PINless" Debit, which does not require entry of a PIN for transactions under a certain amount (today, typically $50). PINless Debit has the potential to expand significantly the number of transactions routed to Visa's PIN Debit Card network competitors, transactions for which PIN Debit has traditionally been unavailable. Visa's competitors also were developing Signature-Debit capability, and the combination of PINless Debit and Signature-Debit would have enabled them, for the first time, to compete for Merchant routing on all General Purpose Debit Card transactions. But to support its post-Durbin monopolization strategy, Visa entered into agreements with Issuers to incent or require them not to implement PINless Debit from PIN Debit Card networks, such as STAR and PULSE.

**K.    Defendants engaged in additional anticompetitive conduct to thwart industry reforms intended to benefit competition.**

**1.    Defendants belatedly pushed the adoption of Chip-and-PIN technology.**

269. Starting in the 1990s, technology was adopted outside of the United States that enabled the verification of a Payment-Card transaction through the use of a microchip embedded in the card that interacts with the POS terminal in place of the magnetic stripe. This "EMV chip" is named for the three companies that originally created it: EuroCard, MasterCard, and Visa. EMV chips must all meet certain technical standards established by EMVCo, LLC, an entity controlled by six members, which include Visa and MasterCard. EMVCo. establishes technical standards for EMV chips and the terminals that interact with them.

270. EMV was originally developed in the early 1990s to replace the 1970s-era magnetic stripe technology that made cards vulnerable to duplication through rudimentary and widely available methods. Unlike magnetic stripes, which contain a single unique identifier that remains constant throughout the life of the card, EMV chips transmit a new unique identifier every time a card is used. As a result, even if this identifier is intercepted at the POS, it cannot be used to process additional transactions.

271.   EMV chips connect to payment networks through an application identifier ("AID"), which is a piece of software that detects available payment networks and routes transactions through them. Unlike the static network data on a magnetic stripe, the data in an AID is dynamic. EMV chips can be programmed with multiple AIDs, which themselves can be linked to different networks. For instance, EMV chips can contain one AID linked only to a single network, and another AID linked to multiple networks. Which networks are available to route the transaction depends on the AID selected at the POS. In practice, most EMV chips contain a Global AID and a Common AID. Despite its name, the Global AID connects to only the payment networks owned by Visa or MasterCard. The Common AID connects to all payment networks that pay a licensing fee to EMVCo, including Visa and MasterCard, along with other smaller payment networks.

272.   While EMV technology was introduced in Europe and elsewhere shortly after its development in the 1990s, cards issued in the United States continued to use magnetic stripe technology. Defendants claimed this was because card payments had not been as widely adopted in Europe as in the United States. Because most Merchants in the United States had already invested in POS technology designed around the magnetic stripe, upgrading cards to EMV would require costly, cumbersome, and piecemeal upgrades. In Europe, by contrast, EMV technology could more easily be adopted whole-cloth. Visa purportedly resisted implementing EMV technology in the United States because of what it characterized as the "massive resource and requirements to force deployment of chip," and as e-commerce matured Visa added the criticism that EMV "does not address Card Not Present fraud, the largest type of fraud in the U.S."

273.   Visa and MasterCard were also reluctant to introduce EMV technology in the United States because doing so would risk steering debit transactions away from their proprietary signature networks. Outside of the United States, EMV is paired with PIN authentication, which offers additional protection against card fraud and theft. This "Chip-and-PIN" combination is widely considered to be the most secure form of authentication. The chip prevents duplication

and PIN authentication ensures that even if a card is physically stolen it cannot be used without its PIN.

274. A consequence of this arrangement, however, is that essentially all debit transactions are routed through PIN-Debit networks, instead of through Visa and MasterCard's proprietary, higher-fee Signature Debit networks. Visa and MasterCard delayed the U.S. rollout of EMV technology in order to preserve their dominance in signature networks in the United States.

275. After the Durbin Amendment prevented the issuing of Debit Cards linked to only proprietary networks, however, Visa and MasterCard both began a rollout of EMV technology in the United States even though, by this time, other technologies had developed that were more effective than the EMV chip in preventing fraud.

276. In 2011, Visa announced that it would begin implementing EMV technology in newly-issued cards, and that Merchants would need to update their POS terminals to accommodate the new technology by October 2015. MasterCard followed suit with a similar rule early in 2012. While new cards would continue to have magnetic stripes, and would therefore remain compatible with older POS terminals, Visa and MasterCard incentivized Merchants to upgrade their point of sale terminals by shifting liability for card theft: if a customer transacted a purchase using magnetic stripe with a card that was EMV-capable, and the magnetic stripe information was stolen and used fraudulently, the Merchant—not the bank—would be responsible for any resulting monetary loss.

277. Defendants rolled out the technology to allow for the choice mandated by Regulation II in a manner that thwarted competition.

278. First, even after the liability shift, Visa and MasterCard continued to promote signature authentication of debit transactions, in order to prioritize their signature networks. The liability shift applied to debit transactions authenticated by both PIN and signature, even though signature authentication accounts for the vast majority of debit card fraud.

279.   Outside of the United States, where Visa and MasterCard do not enjoy the benefits of their supracompetitive signature networks, each have praised mandatory PIN-authentication as "substantially, if not entirely" responsible for declines in debit card fraud. *See* Form A, Exclusionary Provisions and Associated Cartel Provisions: Application for Authorization, Public Version, Submission to the Australian Competition and Consumer Commission in support of the Application for Authorisation, Visa Worldwide Pte Limited and Visa AP (Australia) Pty Ltd (Collectively, Visa) and MasterCard Asia/Pacific Pte Ltd (MasterCard), at 6 (July 4, 2013).

280.   In the United States, both Visa and MasterCard continued to require merchants to allow customers to use either PIN or signature authentication. Despite widespread adoption of Chip-and-PIN abroad, Visa and MasterCard took the position that its use in the United States would be infeasible because PINs would be difficult to remember and slow down the authentication process.

281.   The purpose behind maintaining signature authentication was to allow Visa and MasterCard to continue to extract supracompetitive prices by routing transactions through their proprietary signature networks.

282.   Second, Visa's liability shift announcement initiated a scramble in the industry to deploy technology that simultaneously enabled EMV transactions, in compliance with Visa's dictate, and also complied with the Durbin Amendment's requirement that Merchants be able to route Debit-Card transactions.

283.   After Visa's announcement mandating that Merchants adopt EMV technology, technologies emerged that would have enabled Merchants to have competitive routing options on all Debit-Card transactions, regardless of whether those transactions were verified with a PIN, signature, or had no verification method at all. However, by imposing the liability shift on Merchants, Visa and MasterCard foreclosed any competing technology from emerging.

284.   Third, even Visa and MasterCard took steps to ensure that even debit transactions authenticated via PIN would continue to be routed over their networks. As an example, when a cardholder selects PIN authorization using a new EMV terminal, she was prompted to choose

whether to process the transaction over a "Visa Network" or a "US Debit Network." If the cardholder chose "Visa Network," the transaction would be routed over the Global AID, which links only to Visa's (higher fee) PIN network.  If the cardholder chose "US Debit Network," the transaction would be routed over the Common AID, which is linked to the two unaffiliated networks that charge a competitive fee.   The terminal did not further explain the difference between these two networks, or note the difference in each network's associated fees. Even if it did, this difference would be of little interest to the cardholder, since it is the Merchant that directly incurs the transaction fee. By delegating this choice to the cardholder, who is not impacted by the choice at all but is much more likely to pick the option labeled "Visa", the EMV terminals robbed the Merchants of the ability to route a PIN transaction over competitive networks, undermining the purpose of Regulation II.

285. While Visa claims that this change increased the freedom of choice of the cardholders, this change did no such thing. Rather, it shifted the choice away from a sophisticated stakeholder (the Merchant) and gave it to a party with no stake in or understanding of the choice at all. Delegating the choice to the cardholder served only to eliminate price competition, without providing any additional benefit to cardholders, and effectively raising prices for all consumers.

286. In November, 2016, the FTC launched an investigation into Visa's practice of requiring Merchants to allow customers to choose which AID to route PIN-debit transactions through.  The purpose of the investigation was to address concerns that these customer selection requirements inhibited the merchant routing choice guaranteed by the Durbin Amendment."  On November 22, 2016, the FTC announced that it closed its investigation in light of Visa revising its rules to allow Merchants to route PIN-debit transactions through the network of their choice.

287. The behavior described above demonstrates how, even after the EMV roll-out, Defendants continued to restrict competition in contravention of the Dodd-Frank Act.

## 2. Defendants begin to restrain competition in the mobile-payments sector through their expansion of Honor All Cards to Honor All Devices.

288.  Visa's anticompetitive actions have not been limited to plastic Payment Cards. To the contrary, Visa has extended the abuse of its monopoly position to the rapidly-emerging mobile-payments space.

289.  For example, Visa will not allow Merchants to route Debit-Card transactions to competing networks for "in-app" transactions (i.e., transactions that a consumer initiates from a mobile-payments application such as Amazon or eBay). "In-app" purchases account for the majority of mobile-payment transactions.

290.  Visa has also taken steps to cement its monopoly over Debit transactions conducted with a mobile device. As part of the EMV push, many Merchants now have the capability to accept mobile payments. If a Merchant has the proper terminal—as do most Merchants with EMV-capable terminals—it can accept a payment from a consumer who pays using a mobile device that interacts with the terminal's Near Field Communication ("NFC") technology. *See Visa Announces Plans to Accelerate Chip Migration and Adoption of Mobile Payments*, Visa (Aug. 9, 2011), *available at* https://usa.visa.com/about-visa/newsroom/press-releases.releaseId.1594598.html.

291.  Mobile payments are made through a "digital wallet" that runs on mobile devices such as smartphones and tablets. The most well-known early versions of digital wallets emerged in 2011 with the release of Google Wallet. Apple's digital wallet platform, Apple Pay, followed in 2014. In 2015, both Android Pay and Samsung Pay were released. Other versions, including Microsoft Wallet, have been released more recently, with more expected in 2017 and beyond. Multiple digital wallets can be downloaded onto a single device at minimal cost or inconvenience to the user, so mobile transactions have the potential to become highly dynamic and competitive.

292.  But competition that would inure to the benefit of Merchants and consumers is not favored by Defendants because it comes at the expense of their supracompetitive profits. Visa

and MasterCard adopted and implemented EMV—and with it, NFC—technology with an eye toward using their market power to ensure their continued dominance even as mobile payment overtook traditional card payment. By requiring Merchants to install new EMV terminals already equipped with NFC technology, Visa and MasterCard substantially increased the odds that their proprietary NFC technology would become entrenched as the dominant method of accepting mobile payments.

293.   As an example of inhibiting competition in mobile payments, Visa requires that, for all Debit Card transactions in which the consumer selects a Visa Debit Card, that transaction is routed over Visa's network, even though, according to the Durbin Amendment, it should provide the Merchant with the option of routing the transaction over a competitive network.

294.   Visa has admitted that it does not allow Merchant routing on payments made through Google Wallet, available on Android devices. In August 2012, Visa stated that it "understand[s] that merchants/acquirers are unable (and will continue to be with this proposal) to make routing choices on Debit cards which are required to support at least one non-affiliated network."

295.   Visa and MasterCard have also construed and applied their Honor All Cards rules to become "Honor All Devices" rules. Specifically, Visa and MasterCard rules require Merchants to accept all devices set up to transact through a Visa or MasterCard network to the extent the Merchant accepts payments using communications technology employed by the device. This results in a Merchant having limited ability to refuse or condition acceptance of payments from digital wallets.

296.   Merchants are thus restrained in their ability to refuse or condition payments from digital wallets because the Honor All Devices rules require Merchants to accept all network-branded payments from any device that uses a communications technology accepted by the Merchant. If a Merchant accepts payment through one kind of digital wallet affiliated with Visa or MasterCard, it must accept payments through all digital wallets associated with Visa or MasterCard.

297.  For example, Visa refuses to permit routing to competitive network for payments made with Apple's Apple Pay solution.  According to various public sources, Visa has secured Apple's adherence to this scheme by paying it fifteen basis points (i.e., 0.15%) on all Debit-Card transactions initiated with Apple Pay at the POS.  *See, e.g.*, Olga Kharif, Banks Are Ceding Ground to Apple Pay, Bloomberg Businessweek (Feb. 18, 2016, 2:08 pm), www.bloomberg.com/news/articles/2016-02-18/banks-are-ceding-ground-to-apple-pay.

298.  Visa's anticompetitive scheme in the mobile-payments space has prevented firms that offer digital wallets from leveraging ACH networks (which link to all U.S. bank accounts and clear without Interchange Fees) to give Merchants a cost-effective alternative to mobile payments.  For example, Visa and Apple agreed that Apple would not allow ███████████████ ████████ in Apple Pay nor would it allow ██████████████████████████ ██████████████████████ in Apple devices.

299.  Under the Honor All Devices rules, Merchants cannot choose to honor only digital wallets that route through low-fee networks, or that offer more security.  The rules inhibit market competition by removing the decision-making ability from the party that actually pays the fees on any transaction. Instead, the rules force the Merchant to accept any Visa or MasterCard product from any digital wallet that a customer presents for payment.

**L.    Events in other Countries Reflect that Defendants' Practices are Anticompetitive.**

300.  Competition and regulatory authorities in several jurisdictions around the globe have concluded that Visa and MasterCard's Interchange Fees and Rules are anticompetitive and illegal.

301.  As a result of these findings, Visa and MasterCard have been forced to change their practices to decrease their Interchange Fees allow greater competition for Merchant acceptance. Without exception when Visa, MasterCard, and other networks have lowered their fees or

relaxed their Rules, Merchants have benefitted while the networks have continued to thrive and even grow.

302. For example, in 2007 the European Commission ruled after an extensive investigation that MasterCard's uniform schedule of Default Interchange Fees violated Article 101 of the Treaty on European Union—the EU's equivalent to Section 1 of the Sherman Act.

303. The Commission's ruling was affirmed both by the EU's General Court and again by the Court of Justice of the European Union—the highest court in the European Union.

304. The court agreed with the Commission that MasterCard's Default Interchange fees harmed competition by "[limiting] the pressure which merchants can exert on acquiring banks when negotiating the [Merchant Discount] by reducing the possibility of prices dropping below a certain threshold, in contrast with 'an acquiring market operating without them." *MasterCard el al. v. Commission* (Case C-382/12 P) ¶ 193 (Sept. 11, 2014) (internal quotations omitted).

305. The court also concluded that MasterCard's IPO did not affect its status as an "association of undertakings"—EU's equivalent to the Sherman Act's "contract, combination, or conspiracy" element—because when Interchange Fees and Rules are set, the banks "intend or at least agree to coordinate their conduct by means of those decisions," and that the decisions on Interchange Fees and the Rules have "the same objective of joint regulation of the market within the framework of the same organisation, albeit under different forms." *Id*. ¶ 76.

306. After the Commission's decision against MasterCard, it opened a similar investigation into Visa's Default Interchange Fees and preliminarily concluded that Visa's Interchange Fees also harm competition. In response to the Commission's objections, Visa Europe committed in 2010 to reduce its Interchange Fees on Debit Cards to 0.2% and made a similar commitment in 2014 to reduce its Credit-Card Interchange Fees to 0.3%.

307. In 2015, the European Parliament capped Interchange Fees for bank-card networks (i.e., Visa and MasterCard) at 0.2% for Debit Cards and 0.3% for Credit Cards. Subsequent legislation outlawed Payment-Card surcharges on regulated networks, which previously had

been allowed. Merchants may continue to impose Surcharges on Payment-Card transactions on non-regulated networks (such as American Express).

308.   After the Defendants' Interchange Fees were capped, Merchants paid drastically less restrictive prices to accept Payment Cards, relative to before the various decisions and legislation. At the same time, Payment-Card Issuance continued to be profitable and only increased, demonstrating that Interchange Fees at today's levels are not necessary to operate a Payment-Card network.

309.   The Reserve Bank of Australia ("RBA") has also extensively investigated its domestic Payment Card industry. In 2002, as a result of that investigation, the RBA ordered Visa and MasterCard to reduce domestic Interchange Fees by nearly half, from an average of 95 basis points (.95%) before the reforms to approximately 50 basis points today. The RBA also required that Visa and MasterCard repeal their rules against Merchant surcharging and secured an agreement from American Express to voluntarily repeal its prohibition against surcharging.

310.   Before the RBA's reforms, the Visa and MasterCard predicted that any significant reduction in Interchange Fees would lead to disaster, with MasterCard going so far as to assert that the reforms would initiate a "death spiral" that would lead to the collapse of both Payment Card issuance and acceptance.

311.   Contrary to Visa and MasterCard's doomsday speculations, however, the Payment-Card market in Australia prospers after the reforms. The data since the reforms indicate that card issuance and transaction volumes are up, total costs to Merchants and cardholders have gone down, and banks remain profitable.

312.   Payment-Card markets in Australia have also benefitted from Merchants' ability to surcharge. As of 2014, when Merchants had the ability to surcharge for over a decade, the RBA reported that 43 percent of Merchants imposed surcharges on at least some Payment-Card transactions. While large Merchants were the most likely to surcharge, even small Merchants took advantage of their freedom to surcharge.

313.   The beneficial effect of surcharging is most apparent by examining American Express, which is not subject to the RBA's rate reductions. According to the RBA's 2016 review of its Payment-Card reforms, American Express decreased its Merchant Discount Rates from approximately 2.5% before the reforms to 1.6% today. This constitutes a larger drop than Visa or MasterCard's fees, which are subject to regulation.

314.   In addition to putting downward pressure on Payment-Card acceptance costs, the RBA concluded that its reforms—including the mandated liberalization of the networks' Rules—resulted in increased transparency, which in turn has improved Merchants' bargaining position vis-à-vis the networks and Acquirers, thereby resulting in lower card-acceptance costs.

315.   Experiences from other countries with Payment Card networks that function with zero or minimal Interchange Fees place the final nails in the coffin of the "death spiral" argument.

316.   In 2006, the New Zealand Commerce Commission—that country's antitrust enforcer—issued a Statement of Claim alleging that Visa and MasterCard's uniform schedules of Default Interchange Fees constituted unlawful price fixing.

317.   In 2009, the Commission settled with Visa and then MasterCard on terms that allowed Issuers to set their own Interchange Fees, subject to network-established maximum rates. The settlement also allowed Merchants to surcharge Credit-Card transactions by network (i.e., all Visa or MasterCard cards), by product (i.e., all "Premium" Credit Cards), or by Issuer. Visa and MasterCard also agreed to reimburse the Commission for its costs of bringing the action. This arrangement enabled Merchants to negotiate bilateral Interchange Fees with Issuers and accordingly gave Issuers some incentive to compete for Merchant acceptance.

318.   The New Zealand settlement demonstrates that the Visa and MasterCard are willing to permit Merchants to steer cardholders to cost-effective payment methods, including doing so by Issuer. Since the time of the settlement, Payment-Card networks and Issuers have continued to thrive, as card issuance and transaction volume have only increased since the settlement.

319.   In addition to the experiences after Payment-Card reforms in Europe, Australia, and New Zealand, more evidence that uniform schedules of Default Interchange Fees are unnecessary to the effective functioning of a Payment-Card network may be found in Canada, Norway, Finland, Germany, Denmark, The Netherlands, where national Debit-Card networks function effectively without Interchange Fees.

**M.   Defendants' unlawful conduct harms competition.**

320.   Defendants' unlawful conduct harms competition, with resulting adverse output effects, in myriad ways. Among other anticompetitive effects, Defendants' unlawful conduct:

a.   imposes supracompetitive Interchange Fees and other fees on Merchants;

b.   imposes a supracompetitive total price (considering prices to Merchants and cardholders) on the relevant transactions;

c.   significantly impairs the ability of low-price or differentiated-quality providers to enter or expand by charging lower Interchange Fees to Merchants;

d.   significantly impairs the ability of low-price or differentiated-quality providers to enter or expand by charging a lower total price for the transaction;

e.   significantly impairs the ability of cardholders to react to price signals and thereby internalize the costs of their choice of payment method and select the most efficient payment method;

f.   prevents competition from producing an efficient price-pair (an efficient price to both Merchants and cardholders);

g.   incentivizes inefficient spending by Issuing Banks on promoting card-holding and card-usage, as those banks chase a greater share of the supracompetitive profits and try to lock cardholders into non-monetary "rewards";

h.  substantially interferes with competition within and among networks by preventing the emergence and success of any pricing model or network that does not rely on an upward spiral of greater Interchange Fees imposed on Merchants and "rewards" to cardholders;

i.  substantially interferes with competition from less costly payment methods, by interfering with price signals at the POS and thereby shielding high-cost cardholders from the social costs of their choices;

j.  substantially impairs rival debit networks' ability to compete for Merchant acceptance; and

k.  transfers wealth from and creates a negative externality to customers who use efficient, lower-cost payment methods such as cash, debit, and non-premium credit cards.

321.  The unlawful conduct is not necessary—and is more restrictive than necessary—to attain any procompetitive benefit that Defendants may argue exists.

322.  The injury suffered by the Class Members accumulates and increases with each passing day that Defendants' anticompetitive practices are allowed to continue. These injuries will continue to increase during the pendency of this suit until halted by Court Order.

## XI.  Monopoly Power – Credit Cards

### 1.  Monopoly Power — Merchants.

323.  At all relevant times, each of Visa and its Member Banks and MasterCard and its Member Banks, respectively, had substantial market power (i.e., monopoly power) with respect to the sale of network services to Merchants. Direct evidence of that monopoly power includes:

a.  Defendants raised and maintained the Interchange Fees charged to Merchants at supracompetitive levels without losing enough sales to make the supracompetitive prices unprofitable;

86

b.  Defendants never lowered the Interchange Fees to a competitive level in response to the pricing of other means of payment;

c.  The Interchange Fees that Defendants charged to Merchants were at all times in excess of marginal costs and in excess of the competitive price;

d.  Defendants enjoyed unusually high profit margins as a result of the Interchange Fees that they charged to Merchants;

e.  Defendants' unlawful conduct, including the imposition of the Anti-Steering Restraints, prevented Merchants from reducing their card usage in response to changes in the level of Interchange Fees;

f.  Defendants have controlled pricing by setting "price tiers" for different groups of Merchants, increasing the level of their Interchange Fees and other Merchant fees, and establishing different Interchange Fees for general and premium credit cards, all without losing Merchant acceptance;

g.  Defendants have forced the Merchants to accept the anticompetitive Anti-Steering Restraints;

h.  Defendants steadily increased the level of the Interchange Fees despite steadily declining costs of providing the network services to Merchants; and

i.  Defendants set the level of the Interchange Fees charged to Merchants based on their perceived elasticity of demand.

324.  To the extent that Plaintiffs are required to prove monopoly power by defining a relevant product market, Plaintiffs allege that the relevant product market is the market for General Purpose Card Network Services to Merchants or narrower markets therein, such as (by way of example only) the market for Visa Credit Card Network Services to Merchants.

325.  A small but significant, non-transitory price increase in Defendants' Interchange Fees did not cause a significant loss of Merchant acceptance. At competitive prices, Defendants'

Network Services to Merchants do not exhibit significant, positive, cross-elasticity of demand with respect to the price of any other means of payment.

326.   For example, with the Anti-Steering Restraints in place, Merchants do not view Signature Debit Card Network Services and PIN-Debit Card Network Services as economic substitutes to Credit Card Network Services. This is demonstrated by the fact that Merchants continue to accept Visa and MasterCard Credit Cards even though the Interchange Fees associated with Credit Card transactions are significantly higher than the fees associated with Debit Card transactions.

327.   When the Durbin Amendment's caps on Debit-Card Interchange Fees went into force, Visa and MasterCard did not lower Credit Card Interchange Fees in response, indicating that Visa and MasterCard did not fear that Merchants would refuse to accept or steer customers away from Credit Cards in favor of Debit Cards.

328.   There are significant barriers to entry in the relevant market. Because of these barriers, the only successful market entrant since the 1960's has been Discover, which was introduced by Sears and benefited from its extensive network of stores, its extensive base of customers who carried Sears' store card, and relationship with Dean Witter.

329.   New entry into the relevant market would cost more than 1 billion dollars and would involve a "chicken-and-egg problem of developing a Merchant acceptance network without an initial network of cardholders who, in turn, are needed to induce Merchants to accept the system's cards in the first place." *United States v. Visa*, 163 F. Supp. 2d at 342.

330.   The relevant geographic market is the United States and its territories.

### 2.   Monopoly Power — Total Price.

331.   Defendants have asserted that monopoly power over Merchants must be assessed not with respect to the price that Defendants charge the Merchants, but with respect to that price minus the price that Defendants charge to their other customers, the cardholders.  Defendants assert that the Visa and MasterCard networks are "two-sided markets" and therefore the correct

price to analyze in terms of monopoly power is the "total price," i.e., the net of the price to Merchants minus the price to cardholders. The Visa and MasterCard networks, however, are not two-sided markets in the relevant economic or legal sense.

332.   Some positive externalities might exist for cardholders from greater Merchant acceptance. Cardholders might benefit if more Merchants accepted their cards. Such a positive externality could under some circumstances justify a fee imposed on cardholders and paid to Merchants in order to incentivize Merchant acceptance where it does not yet exist. Defendants have not imposed such a fee – they have done the opposite.

333.   No significant positive externalities exist for Merchants from greater use of cards by cardholders. Theoretically, Merchants might benefit from greater card usage *if they could price the usage of cards* at a level to reflect the difference between the cost to them of taking a card versus taking a possibly more expensive form of payment, say, a check. But the Anti-Steering Restraints prevent Merchants from appropriately pricing card usage. And the supracompetitive Interchange Fees make credit-card usage far more expensive for Merchants than other available means of payment.

334.   Even if the total price were the correct focus of the monopoly-power inquiry, each of Visa and its Member Banks and MasterCard and its Member Banks, respectively, had substantial market power (i.e., monopoly power) with respect to the sale of credit-card transactions to Merchants and cardholders. Direct evidence of that monopoly power includes:

       a.   Defendants have raised and maintained the total price at supracompetitive levels without losing sufficient transaction volume to make the supracompetitive prices unprofitable;

       b.   Defendants never lowered the total price to the competitive level in response to the pricing of other means of payment;

       c.   The total prices that Defendants charged were at all times in excess of marginal costs and in excess of the competitive price;

       d.   Defendants imposed inefficient price pairs on Merchants and cardholders;

e. Defendants enjoyed unusually high profit margins as a result of the total prices that they charged;

f. While Defendants have competed for cardholders and card usage, they have done so primarily in the form of non-cash "rewards" programs that are designed to prevent the outbreak of price competition and to lock cardholders into use of particular cards;

g. Defendants have imposed substantial new fees on Merchants, such as Visa's FANF, without any commensurate benefit to the Merchants or to cardholders; and

h. Defendants have succeeded in imposing a substantial portion of the cost of their supracompetitive total price on consumers other than their cardholders. Specifically, Defendants' Anti-Steering Restraints have the purpose and effect of shielding their high-cost card users from the full economic effect of their choice of card usage and instead imposing those costs on consumers who use less expensive means of payment.

335. To the extent that Plaintiffs are required to prove monopoly power with respect to the total price by defining a relevant product market, Plaintiffs allege in the alternative that the relevant product market is the market for General Purpose Card Services or narrower markets therein, such as (by way of example only) the market for MasterCard Credit Card Services.

336. The relevant geographic market is the United States and its territories.

## XII. Monopoly Power – Debit Cards

### 1. Debit-Card Network Services.

337. A relevant market exists, the product dimension of which is no broader than Debit Cards. *See In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568, at *2 (E.D.N.Y. Apr. 1, 2003). The geographic dimension of this market is the United States.

90

338.   A relevant market exists, the product dimension of which is no broader than Debit Card Network Services.  *See In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568, at *7 (E.D.N.Y. Apr. 1, 2003).   In addition, the evidence at trial may establish that "single-brand" markets exist for the processing of Visa Debit Card Network Services and MasterCard Debit Card Network Services. The geographic dimension of this market is the United States.

339.  Debit Cards and Debit Card Network Services are unique bundles of services. Consumers who use Debit Cards either want to or have to make contemporaneous payment for their purchases with funds in their depository accounts. These consumers either cannot borrow money for those purchases (because they may not be deemed credit-worthy by Credit Card Issuing Banks) or choose not to.

340.  With the Anti-Steering Restraints in place, other payment products are not reasonable substitutes for Debit Cards and Debit Card Network Services. Visa and MasterCard do not consider other products such as Credit Cards, checks, and cash when setting Debit-Card Interchange Fees. Cash cannot be used for online purchases and only a handful of online Merchants accept check payments.

341.  Before the Durbin Amendment capped Debit-Card Interchange Fees for most transactions, Debit-Card Interchange Fees were increasing, unconstrained by any other form of payment. If the Interchange-Fee caps under the Durbin Amendment were repealed, a hypothetical monopolist in the market for Debit-Card Network Services could impose a small but significant and non-transitory increase in price of at least five percent.

342.   As detailed above, Visa completed a decades-long strategy to "converge" PIN-Debit and Offline-Debit Interchange Fees in 2010. Until that time, submarkets within the markets for Debit Cards and Debit-Card-Network Services existed for respectively PIN-Debit cards and Signature Debit Cards, and for PIN-Debit-Card-Network Services and Offline-Debit-Card Network Services.

343.  From a consumer's perspective, Signature Debit Cards were not interchangeable with PIN-Debit Cards. Signature Debit Cards carried a Visa or MasterCard "Bug" and therefore

were accepted by virtually all Merchants that accepted Visa and MasterCard Payment Cards. On the other hand, PIN-Debit Cards were accepted at many fewer Merchant locations and therefore a consumer who preferred to pay for purchases with a PIN-Debit Card must necessarily have carried an alternate form of payment as well.

344.    Because Signature Debit Cards uniquely enable consumers to make certain types of purchases, the acceptance of Signature Debit Cards is also unique from a Merchant's perspective. Therefore no other services existed that were reasonably substitutable for Offline-Debit-Card-Network Services.

345.    PIN-Debit transactions require a PIN pad and are not processed by a paper receipt. This means that a greater upfront cost exists to the Merchant of accepting PIN transactions, and in some situations, the use of a PIN-Debit Card may require a change in business procedures. For example, in a restaurant, if customers did not pay at a central location, the server would have to bring a wireless PIN pad to the table. These practices are common in countries in which Zero-Interchange-Fee PIN-Debit Card networks are well-established, but, at least as of the time that Visa's "Convergence" strategy was completed, were not common in the United States.

346.    Visa and MasterCard have market power in the market for Debit-Card-Network Services. As of 2015, Visa had a 53.4% share of U.S. Debit-Card transaction volume, while MasterCard's share was 21.3%. These figures understate the Defendants' market power because the Anti-Steering Restraints shield them from meaningful competition.

347.    The experience after the settlement in *In re Visa Check and MasterMoney Antitrust Litigation* illustrates that Debit-Card-Network Services is a separate Relevant Market from General-Purpose Card Network Services and that Defendants have market power in that market. As a result of that settlement, Visa and MasterCard modified their Honor-All-Cards Rules to allow Merchants to accept only Debit Cards or only Credit Cards, if they so choose. Despite Merchants' somewhat greater freedom to make their own acceptance decisions, few Merchants chose to drop acceptance of Visa and MasterCard Debit Cards, even though those cards were significantly more expensive than those of other Debit-Card networks.

348.   Another natural experiment occurred after the passage of the Durbin Amendment that confirmed that Defendants have market power in the Debit-Card Network Services market. While the Durbin Amendment and subsequent Federal Reserve regulations capped Interchange Fee levels at a fraction of the previously existing levels, Defendants responded to the caps by raising all Interchange-Fee categories to the Federal Reserve cap.   For some small-ticket Merchants such as convenience stores, quick-service restaurants, and coffee shops, this represented a significant Interchange-Fee increase (these Merchants generally paid a low per-transaction amount and a small ad valorem percentage pre-Durbin, but paid the allowed maximum of $0.23 plus 5 basis points post-Durbin).   Despite the Debit-Card-Interchange-Fee increases, these Merchants did not discontinue accepting Visa and MasterCard Debit Cards.

349.   When they existed, Visa and MasterCard had market power in the submarkets for Signature Debit Cards and Offline-Debit-Card-Network Services and Visa had market power in the submarkets for PIN-Debit Cards and PIN-Debit-Card-Network Services. As of 2007, Visa's share of the Offline-Debit-Card transaction volume was 74% and MasterCard's was 26%. Visa's share of PIN-Debit-Card transaction volume was 39% in 2006 but, on information and belief, exceeded 50% by 2010.

350.   By adopting and enforcing the Anti-Steering Restraints, and thwarting the procompetitive reforms of the Durbin Amendment and the DOJ consent decree, Visa and MasterCard have successfully excluded competition in the Relevant Market.

351.   The Relevant Markets described in this section are characterized by high barriers to entry. Despite technological advances in data processing and mobile computing that have enabled entrants to "disrupt" established players in many industries, no meaningful entry has occurred in the Debit-Card or Debit-Card-Network Services Relevant Markets. Moreover, new entrance into these markets would be costly and would involve the "chicken-and-egg" problem of signing up both Card-Issuing banks and Merchants for the network. Visa has entered into exclusive business arrangements with many Member Banks which are designed to further raise entry barriers.

352.   In the alternative, there exists a Relevant Market, the product dimension of which is Debit-Card-Network Services to Merchants and cardholders. The geographic dimension of this market is the United States.

353.   This alternative Relevant Market for Debit-Card-Network Services to Merchants and cardholders consists of the authorization, clearing, and settlement services to Merchants, on one hand, and also to Issuing Banks and cardholders on the other.

354.   Other services to not compete with Debit-Card-Network Services to Merchants and cardholders.

355.   Defendants have market power in the market for Debit-Card-Network Services to Merchants and cardholders.

356.   Before the Durbin Amendment capped Debit-Card Interchange Fees for most transactions, Debit-Card Interchange Fees were increasing, unconstrained by any other form of payment, even if one considered the portion of those fees that were "refunded" to cardholders in the form of rewards and other benefits.

357.   If the Interchange-Fee caps under the Durbin Amendment were repealed, a hypothetical monopolist in the market for Debit-Card Network Services to Merchants and cardholders could impose a small but significant and non-transitory increase in price of at least five percent, even if one considers the portion of those fees that are "refunded" to cardholders in the form of rewards and other benefits.

358.   The Visa "Convergence" strategy (detailed above) illustrates the market power of it and its Member Banks, even if one considers the portion of Interchange Fees that were "refunded" to cardholders in the form of rewards and other benefits. Only a small portion of the supracompetitive fee increases that brought about the "convergence" of Interchange Fees for PIN-Debit Cards and Offline-Debit-Cards were refunded to cardholders.

359.   The Anti-Steering Restraints reinforce Defendants' market power in this market. Absent the Anti-Steering Restraints, a Merchant could send an efficient price signal to the cardholder in a given transaction, thereby enabling the combination of the two actors—the

Merchant and the cardholder—to choose the payment form that provides the optimal combination of price and benefits to the Merchant and the cardholder.

360.  Defendants' ability to thwart competition by preventing the competitive routing options that should have been available to Merchants as a result of the Durbin Amendment also illustrates their market power in this market, in that competitive routing options could have inured to the benefit of cardholders as well as Merchants, if, for example, Issuers offered cardholders benefits for using Debit Cards that enabled transactions over competitive PIN-Debit networks or if Merchants lowered their prices in response to lower Debit-Card Interchange Fees.

361.  Until Visa completed its "Convergence" strategy, submarkets within the markets for Debit Cards and Debit-Card-Network Services to Merchants and cardholders, existed for respectively PIN-Debit cards and Signature Debit Cards, and for PIN-Debit-Card-Network Services to Merchants and cardholders and Offline-Debit-Card Network Services to Merchants and cardholders.

362.  When they existed, Visa and MasterCard had market power in the submarkets for Offline-Debit-Card-Network Services to Merchants and cardholders while Visa had market power in the submarkets for PIN-Debit-Card-Network Services to Merchants and cardholders.

363.  As noted above, high barriers to entry exist in the Debit-Card Network Services Market, regardless of whether the market is defined to include cardholders as well as Merchants.

## XIII.  Claims for Relief

### FIRST CLAIM FOR RELIEF

### PLAINTIFFS VS. VISA AND BANK DEFENDANTS FOR UNLAWFUL PRICE FIXING OF CREDIT CARD INTERCHANGE FEES

364.  Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

365.  Visa and its Member Banks, including the Bank Defendants — direct, horizontal competitors of each other — engaged in unlawful contracts, combinations, and conspiracies in an

unreasonable restraint of interstate trade or commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and § 16700 *et seq.* of the Cartwright Act (Cal. Bus. & Prof. Code, § 16700 *et seq.*).

366.   The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings, and concerts of action between and among Visa's issuing and acquiring members including the Bank Defendants and Visa, the substantial terms of which were to illegally fix, raise, maintain, or stabilize the Credit Card Interchange Fees that Defendants impose on Merchants.

367.   The Visa Board of Directors, which included representatives from several Bank Defendants, act on behalf of the Member Banks to fix, raise, maintain, or stabilize the Interchange Fees.

368.   All of the Member Banks of Visa, including the Bank Defendants, have actual knowledge of, and have knowingly participated in, the conspiracy alleged herein.

369.   The collectively fixed Interchange Fees are illegal. They are not necessary to accomplish any procompetitive benefits of the Visa network. Even if some horizontal agreements were necessary to promote the efficiencies of the Visa network, the collectively-set Interchange Fee is significantly more restrictive than necessary to bring about those efficiencies. Visa and its Member Banks' price fixing achieves few — if any — procompetitive benefits to counterbalance the price-fixing's demonstrated anticompetitive effects.   The supracompetitive levels of Interchange continue to the present date.

370.   Plaintiffs have been injured and, unless Defendants' unlawful conduct is enjoined, will continue to be injured in their business and property as a result of Defendants' continuing price fixing of Credit Card Interchange Fees in violation of Section 1 of the Sherman Act and § 16700 *et seq.* of the Cartwright Act.

## SECOND CLAIM FOR RELIEF

**PLAINTIFFS VS. VISA AND BANK DEFENDANTS FOR UNREASONABLE RESTRAINT OF TRADE IN IMPOSING AND ENFORCING ANTI-STEERING RESTRAINTS**

371.   Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

372.   Visa has and exercises market power with respect to Interchange Fees imposed on Merchants and/or with respect to the total price imposed on Merchants and cardholders.

373.   Defendants' Anti-Steering Restraints and Miscellaneous Exclusionary Restraints are unlawful restraints of trade in violation of Section 1 of the Sherman Act and § 16700 *et seq.* of the Cartwright Act (Bus. & Prof. Code, § 16700 *et seq.*).

374.   In addition, the collective adoption and enforcement of the Anti-Steering Restraints and Miscellaneous Exclusionary Restraints by Visa and its Member Banks constitutes a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and § 16700 *et seq.* of the Cartwright Act (Bus. & Prof. Code, § 16700 *et seq.*).

375.   No procompetitive justifications exist for the Anti-Steering Restraints and Miscellaneous Exclusionary Restraints.   They are not necessary to accomplish any procompetitive benefits of the Visa network.   Even if some of the restraints were necessary to promote the efficiencies of the Visa network, the restraints are significantly more restrictive than necessary to bring about those efficiencies.

376.   Plaintiffs have been injured and, unless Defendants' unlawful conduct is enjoined, will continue to be injured in their business and property as a result of Defendants' continuing imposition of the Anti-Steering Restraints and Miscellaneous Exclusionary Restraints in violation of Section 1 of the Sherman Act and § 16700 *et seq.* of the Cartwright Act.

**THIRD CLAIM FOR RELIEF**

**PLAINTIFFS V. MASTERCARD AND BANK DEFENDANTS FOR UNLAWFUL PRICEFIXING OF CREDIT CARD INTERCHANGE FEES**

377.   Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

378.   MasterCard and its Member Banks, including the Bank Defendants — direct, horizontal competitors of each other — engaged in unlawful contracts, combinations, and conspiracies in an unreasonable restraint of interstate trade or commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

379.   The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings, and concerts of action between and among MasterCard's issuing and acquiring members including the Bank Defendants and MasterCard, the substantial terms of which were to illegally fix, raise, maintain, or stabilize the Credit Card Interchange Fees that Defendants impose on Merchants.

380.   The MasterCard Board of Directors, which included representatives from several Bank Defendants, act on behalf of the Member Banks to fix, raise, maintain, or stabilize the Interchange Fees.

381.   All of the Member Banks of MasterCard, including the Bank Defendants, have actual knowledge of, and have knowingly participated in, the conspiracy alleged herein.

382.   The collectively fixed Interchange Fees are illegal. They are not necessary to accomplish any procompetitive benefits of the MasterCard network. Even if some horizontal agreements were necessary to promote the efficiencies of the MasterCard network, the collectively-set Interchange Fee is significantly more restrictive than necessary to bring about those efficiencies. MasterCard and its Member Banks' price fixing achieve few — if any — procompetitive benefits to counterbalance the price-fixing's demonstrated anticompetitive effects. The supracompetitive levels of Interchange continue to the present date.

98

383.  Plaintiffs have been injured and, unless Defendants' unlawful conduct is enjoined, will continue to be injured in their business and property as a result of Defendants' continuing price fixing of Credit Card Interchange Fees in violation of Section 1 of the Sherman Act.

## FOURTH CLAIM FOR RELIEF

## PLAINTIFFS VS. MASTERCARD AND BANK DEFENDANTS FOR UNREASONABLE RESTRAINT OF TRADE IN IMPOSING AND ENFORCING ANTI-STEERING RESTRAINTS

384.  Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

385.  MasterCard has and exercises market power with respect to Interchange Fees imposed on Merchants and/or with respect to the total price imposed on Merchants and cardholders.

386.  Defendants' Anti-Steering Restraints and Miscellaneous Exclusionary Restraints are unlawful restraints of trade in violation of Sherman Act Section 1.

387.  In addition, the collective adoption and enforcement of the Anti-Steering Restraints and Miscellaneous Exclusionary Restraints by MasterCard and its Member Banks constitutes a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

388.  No procompetitive justifications exist for the Anti-Steering Restraints and Miscellaneous Exclusionary Restraints. They are not necessary to accomplish any procompetitive benefits of the MasterCard network. Even if some of the restraints were necessary to promote the efficiencies of the MasterCard network, the restraints are significantly more restrictive than necessary to bring about those efficiencies.

389.  Plaintiffs have been injured and, unless Defendants' unlawful conduct is enjoined, will continue to be injured in their business and property as a result of Defendants' continuing

imposition of the Anti-Steering Restraints and Miscellaneous Exclusionary Restraints in violation of Section 1 of the Sherman Act.

## FIFTH CLAIM FOR RELIEF

**PLAINTIFFS VS. VISA AND BANK DEFENDANTS FOR MONOPOLIZATION**

390.   Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

391.   Visa and its Member Banks have and have exercised monopoly power with respect to Credit Card Interchange Fees imposed on Merchants and/or with respect to the total price imposed on Merchants and cardholders.

392.   Visa and Bank Defendants' anticompetitive conduct identified above is exclusionary conduct the purpose and effect of which is to willfully maintain Defendants' monopoly power, which harms the competitive process and consumers, in violation of Section 2 of the Sherman Act.

393.   No procompetitive justification exists for Defendants' anticompetitive conduct. That conduct is not necessary to accomplish any procompetitive benefits of the Visa network. Even if some of that conduct were necessary to promote the efficiencies of the Visa network, the conduct is significantly more restrictive than necessary to bring about those efficiencies.

394.  Plaintiffs have been injured and, unless Defendants' unlawful conduct is enjoined, will continue to be injured in their business and property as a result of Defendants' continuing monopolization in violation of Section 2 of the Sherman Act.

## SIXTH CLAIM FOR RELIEF

**PLAINTIFFS VS. MASTERCARD AND BANK DEFENDANTS FOR MONOPOLIZATION**

395.   Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

396.   MasterCard and its Member Banks have and have exercised monopoly power with respect to Interchange Fees imposed on Merchants and/or with respect to the total price imposed on Merchants and cardholders.

397.   MasterCard and Bank Defendants' anticompetitive conduct identified above is exclusionary conduct the purpose and effect of which is to willfully maintain Defendants' monopoly power, which harms the competitive process and consumers, in violation of Section 2 of the Sherman Act.

398.   No procompetitive justification exists for Defendants' anticompetitive conduct. That conduct is not necessary to accomplish any procompetitive benefits of the MasterCard network. Even if some of that conduct were necessary to promote the efficiencies of the MasterCard network, the conduct is significantly more restrictive than necessary to bring about those efficiencies.

399.   Plaintiffs have been injured and, unless Defendants' unlawful conduct is enjoined, will continue to be injured in their business and property as a result of Defendants' continuing monopolization in violation of Section 2 of the Sherman Act.

## SEVENTH CLAIM FOR RELIEF

**PLAINTIFFS VS. VISA AND BANK DEFENDANTS FOR UNLAWFUL PRICE FIXING OF DEBIT CARD INTERCHANGE FEES**

400.   Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

401.   Throughout the relevant period, Visa and its Member Banks, including the Bank Defendants — direct horizontal competitors of each other — engaged in unlawful contracts, combinations, and conspiracies in an unreasonable restraint of interstate trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 and § 16700 *et seq.* of the Cartwright Act (Bus. & Prof. Code, § 16700 *et seq.*).

402.   The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings, and concerts of action between and among Visa's issuing and acquiring members, including the Bank Defendants and Visa, the substantial terms of which were to illegally fix, raise, maintain, or stabilize the Debit Card Interchange Fees imposed on Merchants.

403.   The Visa Board of Directors, which includes representatives from several Bank Defendants, acted on behalf of the Member Banks to fix, raise, maintain, or stabilize the Interchange Fees for Visa Debit Card transactions, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and § 16700 *et seq.* of the Cartwright Act (Bus. & Prof. Code, § 16700 *et seq.*).

404.   All of the Member Banks of Visa, including the Bank Defendants, have actual knowledge of, and have knowingly participated in, the conspiracy alleged herein.

405.   The collectively fixed Interchange Fee is illegal. It is not necessary to accomplish any procompetitive benefit of the Visa network. Even if some horizontal agreement were necessary to promote the efficiencies of the Visa network, the collectively-set Interchange Fee is significantly more restrictive than necessary to bring about those efficiencies. Visa and its Member Banks' price fixing achieves few — if any — procompetitive benefits to counterbalance the price-fixing's demonstrated anticompetitive effects. The supracompetitive levels of Interchange continue to the present date.

406.   Plaintiffs have been injured and, unless Defendants' unlawful conduct is enjoined, will continue to be injured in their business and property as a result of Defendants' continuing violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and § 16700 *et seq.* of the Cartwright Act (Bus. & Prof. Code, § 16700 *et seq.*).

## EIGHTH CLAIM FOR RELIEF

**PLAINTIFFS VS. MASTERCARD AND BANK DEFENDANTS FOR UNLAWFUL PRICE FIXING OF DEBIT CARD INTERCHANGE FEES**

407. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

408. Throughout the relevant period, MasterCard and its Member Banks, including the Bank Defendants — direct horizontal competitors of each other — engaged in unlawful contracts, combinations, and conspiracies in an unreasonable restraint of interstate trade or commerce in violation of Section 1 of the Sherman Act.

409. The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings, and concerts of action between and among MasterCard's issuing and acquiring members, including the Bank Defendants and MasterCard, the substantial terms of which were to illegally fix, raise, maintain, or stabilize the Offline Debit Card Interchange Fees imposed on Merchants.

410. The MasterCard Board of Directors, which includes representatives from several Bank Defendants, acted on behalf of the Member Banks to fix, raise, maintain, or stabilize the Interchange Fees for MasterCard Debit Card transactions, in violation of Section 1 of the Sherman Act.

411. All of the Member Banks of MasterCard, including the Bank Defendants, have actual knowledge of, and have knowingly participated in, the conspiracy alleged herein.

412. The collectively fixed Interchange Fee is illegal. It is not necessary to accomplish any procompetitive benefit of the MasterCard network. Even if some horizontal agreement were necessary to promote the efficiencies of the MasterCard network, the collectively-set Interchange Fee is significantly more restrictive than necessary to bring about those efficiencies. MasterCard and its Member Banks' price fixing achieves few — if any — procompetitive benefits to counterbalance the price-fixing's demonstrated anticompetitive effects. The supracompetitive levels of Interchange continue to the present date.

103

413.   Plaintiffs have been injured and, unless Defendants' unlawful conduct is enjoined, will continue to be injured in their business and property as a result of Defendants' continuing violation of Section 1 of the Sherman Act.

## NINTH CLAIM FOR RELIEF

## PLAINTIFFS VS. VISA AND BANK DEFENDANTS FOR MONOPOLIZATION

414.   Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

415.   Visa and its Member Banks have and have exercised monopoly power with respect to Debit Card Interchange Fees imposed on Merchants and/or with respect to the total price imposed on Merchants and cardholders.

416.   Visa and Bank Defendants' anticompetitive conduct identified above is exclusionary conduct the purpose and effect of which is to willfully maintain Defendants' monopoly power, which harms the competitive process and consumers, in violation of Section 2 of the Sherman Act.

417.   No procompetitive justification exists for Defendants' anticompetitive conduct. That conduct is not necessary to accomplish any procompetitive benefits of the Visa network. Even if some of that conduct were necessary to promote the efficiencies of the Visa network, the conduct is significantly more restrictive than necessary to bring about those efficiencies.

418.   Plaintiffs have been injured and, unless Defendants' unlawful conduct is enjoined, will continue to be injured in their business and property as a result of Defendants' continuing monopolization in violation of Section 2 of the Sherman Act.

## TENTH CLAIM FOR RELIEF

**PLAINTIFFS VS. MASTERCARD AND BANK DEFENDANTS FOR MONOPOLIZATION**

419.   Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

420.   MasterCard and its Member Banks have and have exercised monopoly power with respect to Debit Card Interchange Fees imposed on Merchants and/or with respect to the total price imposed on Merchants and cardholders.

421.   MasterCard and Bank Defendants' anticompetitive conduct identified above is exclusionary conduct the purpose and effect of which is to willfully maintain Defendants' monopoly power, which harms the competitive process and consumers, in violation of Section 2 of the Sherman Act.

422.   No procompetitive justification exists for Defendants' anticompetitive conduct. That conduct is not necessary to accomplish any procompetitive benefits of the MasterCard network. Even if some of that conduct were necessary to promote the efficiencies of the MasterCard network, the conduct is significantly more restrictive than necessary to bring about those efficiencies.

423.   Plaintiffs have been injured and, unless Defendants' unlawful conduct is enjoined, will continue to be injured in their business and property as a result of Defendants' continuing monopolization in violation of Section 2 of the Sherman Act.

## ELEVENTH CLAIM FOR RELIEF

**PLAINTIFFS VS. ALL DEFENDANTS FOR DECLARATORY AND INJUNCTIVE RELIEF**

424.   Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

425.   Plaintiffs have been injured and, unless Defendants' unlawful conduct is enjoined, will continue to be injured in their business and property as a result of Defendants' continuing unlawful conduct.

426.   Plaintiffs request a declaratory judgment, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a), that Defendants' aforementioned conduct is unlawful as alleged above.

427.   Defendants' unlawful conduct is likely to continue unless enjoined.

428.   Plaintiffs further request that the Court enjoin and restrain Defendants' wrongful conduct, alleged herein, pursuant to § 16 of the Clayton Act, 15 U.S.C. § 26.

## XIV. Prayer for Relief

WHEREFORE, Plaintiffs respectfully pray that this Court:

A. Declare, adjudge, and decree that Defendants have committed the violations of the federal and state antitrust laws as alleged herein;

B. Order that Defendants, their directors, officers, employees, agents, successors, members, and all persons in active concert and participation with them be enjoined and restrained from, in any manner, directly or indirectly, committing the violations of the Cartwright and Sherman Acts, in which they and co-conspirators have been engaged;

C. Order that Defendants, their directors, officers, employees, agents, successors, members, and all persons in active concert and participation with them be enjoined and restrained from, in any manner, directly or indirectly, committing any other violations of statutes having a similar purpose or effect;

D. Enjoin Visa's FANF;

E. Enjoin Visa's exploitation of EMV to suppress competition from alternative debit networks, including enjoining its enforcement of its cardholder selection rules and its strategy to force the industry to implement a dual-AID construct;

F.  Grant further relief as is necessary to correct for the anticompetitive market effects caused by Defendants' unlawful conduct;

G.  Award Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees as provided by law; and

H.  Award all other and further relief as this Court may deem just and proper.


Dated: February 8, 2017

By: *s/ Robert G. Eisler*
Robert G. Eisler (# RE1398)
Daniel L. Berger (# DB7748)
Deborah A. Elman (# DE8458)
**Grant & Eisenhofer P.A.**
485 Lexington Ave., 29th Floor
New York, NY 10017
Phone:  646-722-8500
reisler@gelaw.com
dberger@gelaw.com
delman@gelaw.com

Steve D. Shadowen
D. Sean Nation
**Hilliard & Shadowen LLP**
2407 S Congress Ste E 122
Austin, TX 78704
Phone:  855-344-3298
steve@hilliardshadowenlaw.com
sean@hilliardshadowenlaw.com

Michael J. Freed
Robert J. Wozniak
**Freed Kanner London & Millen LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Phone:  224-632-4500
mfreed@fklmlaw.com
rwozniak@fklmlaw.com

Linda P. Nussbaum
Bart D. Cohen
**Nussbaum Law Group, P.C.**
1211 Avenue of the Americas, 40th floor
New York, NY 10036
Phone:  917-438-9102
lnussbaum@nussbaumpc.com
bcohen@nussbaumpc.com

*Interim Co-Lead Counsel for the*
*Equitable Relief Class*