**REDACTED**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

IN RE:

PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION

This document relates to: All Class Actions

Master File No. 1:05-MD-1720-MB-JO

Jury Trial Demanded

**FILED UNDER SEAL**

# THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

ROBINS KAPLAN LLP
K. Craig Wildfang
Thomas J. Undlin
Ryan W. Marth

800 LaSalle Plaza
Suite 2800
Minneapolis, MN 55402

BERGER & MONTAGUE, P.C.
H. Laddie Montague
Merrill G. Davidoff
Michael J. Kane

1622 Locust Street
Philadelphia, PA 19103

ROBBINS GELLER RUDMAN & DOWD LLP
Patrick J. Coughlin
Joseph David Daley
Alexandra Senya Bernay

655 West Broad Way
Suite 1900
San Diego, CA 92101

*Counsel for Rule 23(b)(3) Class Plaintiffs*

## TABLE OF CONTENTS

Page

PREAMBLE .......... 1

I. INTRODUCTION .......... 1

II. JURISDICTION AND VENUE .......... 2

III. DEFINITIONS .......... 3

IV. THE PARTIES .......... 10

V. CO-CONSPIRATORS .......... 25

VI. TRADE AND INTERSTATE COMMERCE .......... 26

VII. CLASS-ACTION ALLEGATIONS .......... 26

VIII. FACTUAL ALLEGATIONS .......... 29

A. Evolution of the Visa and MasterCard Networks .......... 29

B. Interchange Fees in the context of a Payment-Card transaction. .......... 32

C. Visa and MasterCard leveraged their dominance in Credit Cards to become the dominant Debit-Card Networks .......... 43

D. Visa embarks on a successful strategy of Debit-Card "convergence" designed to increase Interchange Fees and stifle competition. .......... 45

E. Merchants directly pay Interchange Fees .......... 47

F. Visa and MasterCard require the payment of an Interchange Fee on every transaction. .......... 51

G. The Anti-Steering Restraints insulate Visa and MasterCard from competition in the Relevant Markets and maintain supracompetitive prices. .......... 53

H. MasterCard restructured itself to attempt to shield its anticompetitive business model from antitrust scrutiny. .......... 59

I. Visa Restructures itself to shield its anticompetitive business model from antitrust scrutiny. .......... 67

J. The effect of the Networks' Restructurings. .... 75

K. Legislative and regulatory reforms sought to inject needed competition into Payment-Card markets. .... 77

L. Defendants engaged in additional anticompetitive conduct to thwart industry reforms intended to benefit competition. .... 80

1. Defendants belatedly pushed the adoption of Chip-and-PIN technology. .... 80

2. The Defendants utilize the EMV shift to perpetuate their monopoly power. .... 82

3. Defendants begin to restrain competition in the mobile-payments sector. .... 85

M. Experiences from outside of the United States demonstrate that Defendants' practices are anticompetitive. .... 89

N. The practices above harm competition. .... 93

O. The Defendants' uniform schedules of Default Interchange Fees and Anti-Steering Restraints are not necessary to the functioning of a Payment-Card Network .... 95

IX. Relevant Markets .... 96

A. General-Purpose-Card Network Services .... 96

B. Debit-Card Network Services .... 102

C. General-Purpose-Card Network Services to Merchants and Cardholders. .... 107

D. Debit-Card Network Services to Merchants and Cardholders .... 110

CLAIMS FOR RELIEF .... 112

PRAYER FOR RELIEF .... 138

JURY DEMAND .... 139

**PREAMBLE**

1. For a half-century America's largest banks have fixed the fees imposed on Merchants for transactions processed over the dominant Visa and MasterCard Networks and have collectively imposed restrictions on Merchants that prevent them from protecting themselves against those fees. These practices continued despite—or perhaps because of—the Networks' and the banks' attempts to avoid antitrust liability by re-structuring the Visa and MasterCard corporate entities. Even after litigation, legislation, and regulation forced needed reforms on certain aspects of Defendants' conduct and technology threatened to disrupt Visa and MasterCard's dominant position in the market, the Defendants used their market power to continue to restrain competition, harming Merchants, Cardholders, and consumers in general, and in further violation of the antitrust laws. Defendants' anticompetitive conduct has caused a nationwide class of Merchants to pay, and continue to pay, significant overcharges on Visa and MasterCard branded Credit and Debit Card transactions.

2. Plaintiffs Photos Etc. Corporation; Traditions, Ltd.; Capital Audio Electronics, Inc.; CHS Inc.; Crystal Rock LLC; Discount Optics, Inc.; Leon's Transmission Service, Inc.; Parkway Corp.; and Payless Inc. (collectively the "Merchant Plaintiffs"), on behalf of themselves and a class of Merchants, by their undersigned attorneys herein, allege for their Complaint against Visa U.S.A., Inc., Visa International Service Association, and Visa, Inc. ("Visa"), MasterCard International Incorporated ("MasterCard"), and the other Defendants named in this Complaint ("Bank Defendants") (collectively referred to as "Defendants") as follows.

## I. INTRODUCTION

3. The Plaintiffs operate commercial businesses throughout the United States that have accepted Visa and MasterCard Credit Cards, Signature Debit Cards, and

Interlink PIN-Debit Cards as forms of payment, along with cash, checks, travelers checks, and other plastic or electronic Credit, Debit, and Charge Cards.

4. Plaintiffs represent a class of millions of Merchants that have accepted and currently accept Visa and MasterCard Credit and Signature Debit Cards and Interlink PIN-Debit Cards as forms of payment, and challenge the collusive and anticompetitive practices of the Defendants under the antitrust laws of the United States and the State of California. The contracts, combinations, conspiracies, and understandings entered into by the Defendants harm competition and impose upon Plaintiffs and Class Members supracompetitive, exorbitant, and collectively fixed prices in the Relevant Markets defined herein.

5. The contracts, combinations, and conspiracies in restraint of trade alleged herein are illegal under Section 1 of the Sherman Act and the California Cartwright Act. The acquisitions and combinations described herein violate Section 7 of the Clayton Act and Section 1 of the Sherman Act.

## II. JURISDICTION AND VENUE

6. This Complaint is filed under Section 16 of the Clayton Act, 15 U.S.C. Section 26, to prevent and restrain violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and for damages under § 4 of the Clayton Act, 15 U.S.C. § 15, and §§ 16700 and 17200 *et seq.* of the California Business and Professions Code. This Court has jurisdiction over Plaintiffs' federal antitrust claims under 28 U.S.C. §§ 1331, 1337, 2201, and 2202.

7. This Court has original jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1332. The aggregate amount in controversy for this class action exceeds $5,000,000 and less than one-third of all class members reside in New York. This Court has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367.

8. Venue in the Eastern District of New York is proper under 28 U.S.C. §§ 1391, 1407 and 15 U.S.C. §§ 15, 22, and 26. Plaintiff Payless operates retail outlets in this

District. It, Plaintiff Photos Etc. accept payment by Visa and MasterCard Payment Cards through, for example, e-commerce or telephone orders from Cardholders located in the Eastern District of New York. Plaintiff Capital Audio also accepts payment by Visa and MasterCard Payment Cards from Cardholders located in this district. Defendants transact business and are found in the Eastern District of New York. Thousands of Merchants located in the Eastern District of New York accept Visa and/or MasterCard Credit Cards and Debit Cards issued by one or more Defendants and, thus, are Class Members. Hundreds of Visa and/or MasterCard Member Banks, including many of the banks named as Defendants, issue Visa and MasterCard Credit Cards and Debit Cards and/or acquire retail Merchant transactions for Visa and/or MasterCard in the Eastern District of New York. A substantial part of the interstate trade and commerce involved and affected by the alleged violations of the antitrust laws was and is carried on in part within the Eastern District of New York. The acts complained of have had, and will have, substantial anticompetitive effects in the Eastern District of New York.

## III. DEFINITIONS

9. As used in this Complaint, the following terms are defined as:

   a. "Access Device" means any device, including but not limited to a Payment Card, mobile device or microchip, that may be used by a consumer to initiate a General-Purpose-Card or Debit-Card transaction.

   b. "Acquiring Bank" or "Acquirer" means a bank which is a member of Visa and/or MasterCard that acquires payment transactions from Merchants and acts as a liaison between the Merchant, the Issuing Bank, and the Payment-Card Network to assist in processing the payment transaction. Visa and MasterCard rules require that an Acquiring Bank be a party to every Merchant contract. In a typical payment transaction, when a customer presents a Visa or MasterCard card for payment, the Merchant relays the transaction information to the Acquiring Bank. The Acquiring Bank then contacts the Issuing Bank via the network for Authorization based on available credit or funds. Acquiring Banks

compete with each other for the right to acquire payment transactions from Merchants but do not compete on the basis of the interchange fee, which is the subject of this Complaint.

c. "All-Outlets Rule" is a rule of the Visa and MasterCard Networks that requires a Merchant with multiple outlets to accept Visa or MasterCard, respectively, in all of its outlets, even if those outlets are owned by a separate corporate entity, operated under a different brand name, or employ a different business model in order for the Merchant to receive the interchange rates for which the Merchant would ordinarily qualify.

d. "Anti-Steering Restraints" are the rules of the Visa and MasterCard Networks that forbid Merchants from incenting consumers to use less expensive payment forms, including: the No-Surcharge Rule; the No-Minimum-Purchase Rule; and the Networks' so-called "anti-discrimination rules," which prohibit Merchants from treating any other Payment Card or medium more advantageously than the Defendants' cards. The Defendants' standard-form-Merchant agreements proscribe steering by preventing Merchants from establishing procedures that favor, discourage, or discriminate against the use of any particular Card.

e. "Assessment" refers to an amount computed and charged by the Networks on each transaction amount to the Acquiring and Issuing Banks.

f. "Authorization" is the process by which a Merchant determines whether a Cardholder is authorized by his or her Issuing Bank to make a particular transaction. The Merchant sends the Cardholder's information to its Acquiring Bank or a Third-Party Processor, which sends it to Visa or MasterCard, which then sends it to the Issuer or the Issuer's processor, to obtain Authorization. If Authorization is given, the process is repeated in reverse.

g. "Bug" is a network's mark or logo on a Payment Card, which indicates that the Payment Card can initiate transactions over that network.

h. "Cardholder" means an individual who has a Payment Card that he or she uses from time to time to make purchases at Merchants.

i. "Charge Card" is an Access Device, usually a Payment Card, enabling the holder to purchase goods and services on credit to be

paid on behalf of the holder by the Issuer of such device. Typically, the contractual terms of such cards require that payment from the holder to the Issuer be made in full each month, for all payments made on behalf of the Cardholder by the Issuer during the preceding month. The Issuer does not extend credit to the holder beyond the date of the monthly statement, nor does it impose interest charges on the balance due except as a penalty for late payment. Examples of Charge Cards are the American Express Green, Gold, Platinum, and Centurion cards as well as the Diners Club and Carte Blanche cards issued by Citibank.

j. "Credit Card" is an Access Device, usually a Payment Card, enabling the holder to (i) effect transactions on credit for goods and services purchased, which are paid on behalf of the holder by the Issuer of such devices; or (ii) obtain cash with credit extended by the Issuer. Credit Cards permit consumers to borrow the money for a retail purchase from the card Issuer and to repay the debt over time, according to the provisions of a revolving-credit agreement between the Cardholder and the Issuer. Examples of Credit Cards are the Visa and MasterCard Credit Cards issued by Defendant Banks and processed through the Visa and MasterCard Networks, as well as the Discover and Private Issue cards issued by Morgan Stanley, Dean Witter & Co., and the Optima and Blue-type cards issued by American Express. Proprietary cards of individual Merchants for use only at particular Merchants' outlets are not included in this definition.

k. "Debit Card" is an Access Device, usually a Payment Card, enabling the holder, among other things, to effect a cash withdrawal from the holder's depository bank account, either at an Automated Teller Machine ("ATM") or a point of sale.

l. "General-Purpose Cards" collectively refers to Credit Cards and Charge Cards.

m. The "Honor-All-Cards Rules" are rules of the Visa and MasterCard Networks that require any Merchant that accepts Visa or MasterCard Credit Cards to accept all Credit Cards that are issued on that Network, and the Rules of the Visa and MasterCard Networks that require any Merchant that accepts Visa or MasterCard Debit Cards to accept all Debit Cards that are issued on that Network.

n. "Interchange Fee" means a fee that Merchants pay to the Issuing

Bank through the Network and the Acquiring Bank for each retail transaction in which the Issuer's card is used as a payment device at one of the Acquirer's Merchant accounts. The Interchange Fee is deducted by the Issuing Bank from amounts otherwise owed to Class Members on Payment-Card transactions, and constitutes a component of and a floor for the Merchant-Discount Fee. The following example illustrates how the Visa and MasterCard Interchange Fees work. A customer presents a Visa or MasterCard card to a Merchant as a payment method. The Merchant contacts the Acquiring Bank, itself or through a Third-Party Processor, to authorize the transaction. The Acquiring Bank submits the transaction to the Network. The Network relays the transaction information to the Issuing Bank or the Issuing Bank's Third-Party Processor, which approves the transaction if the customer has a sufficient line of credit or available funds. If the transaction is authorized through the Network, the Issuing Bank pays the Acquiring Bank the payment amount minus the "Interchange Fee," which is fixed by the Member Banks of Visa and MasterCard. The Acquiring Bank then pays the Merchant the payment amount minus the Interchange Fee and other charges for processing the transaction. The total fee charged to the Merchant is often referred to as the "Merchant-Discount Fee." The Interchange Fee is the largest component of the Merchant-Discount Fee. Visa Interchange Fees are fixed periodically by the Networks' "Merchant-Discount Fee" which means the total amount that the Merchant, such as one of the Class members, pays to its Acquiring Bank for each transaction involving a Visa or MasterCard credit or Signature Debit Card.

o. "Issuing Bank" or "Issuer" means a member of Visa and/or MasterCard that issues Visa and/or MasterCard branded Payment Cards to consumers for their use as payment systems and Access Devices. Issuing Banks compete with each other to issue Visa and MasterCard cards to consumers. Visa and MasterCard Rules require that all Member Banks issue, respectively, Visa and MasterCard Payment Cards.

p. "Merchant" means an individual, business, or other entity that accepts payments in exchange for goods or services rendered, as donations, or for any other reason.

q. "Member Bank" means a bank that issues Payment Cards or acquires transactions for Merchants on the Visa or MasterCard Networks.

r. "Merchant-Discount Fee" is the total sum that is deducted from the amount of money a Merchant receives in the Settlement of Visa and/or MasterCard transactions. The largest component of the Merchant-Discount Fee is the Interchange Fee.

s. "Mobile Payment" means a transaction that is initiated on a mobile device such as a mobile telephone, whether within a mobile app or through technology such as Near Field Communication (NFC) that can communicate with a Merchant's point-of-sale terminal.

t. "Mobile Wallet" is a solution available on a mobile device that enables payment through one or more forms of payment made available by the user of the mobile device to the Merchant. Examples of Mobile Wallets include Apple Pay, and Google Pay/Android Pay. Mobile Wallets are occasionally referred to as "Digital Wallets."

u. "Miscellaneous Exclusionary Restraints" refer collectively to the All-Outlets Rule, the No-Bypass Rule, the No-Multi-Bug Rule, and the Defendants' prohibition on cross-border acquiring (i.e., a U.S. Merchant processes transactions through a non-U.S. Acquirer).

v. "Network Services" means the services and infrastructure that Visa and MasterCard and their members provide to Merchants through which payment transactions are conducted, including Authorization, clearance, and Settlement of transactions, and those similar services offered by American Express and Discover. As they currently are offered by Visa and MasterCard and their Member Banks, Network Services include Network-Processing Services and the Visa and MasterCard Payment-Card Systems that facilitate acceptance of Visa and MasterCard Payment Cards by Merchants. "Network Services" are sometimes referred to as "Card Acceptance Services" as they relate to Merchants.

w. "Network-Processing Services" are the services that are or may be used for authorizing, clearing, and settling Visa and MasterCard Credit and Debit Card transactions.

x. "No-Minimum-Purchase Rule" is a rule of the Visa and MasterCard Networks that prohibits Merchants from imposing minimum-purchase amounts for Visa and MasterCard Credit-Card purchases.

y. "No-Bypass Rule" is a rule of the Visa and MasterCard Networks

that prohibits Merchants and Member Banks from bypassing the Visa or MasterCard system (thereby avoiding the supracompetitive Interchange Fees) in order to clear, authorize, or settle Credit Card transactions on an alternative network even if the Issuing and Acquiring Banks are the same, or even if a Third-Party Processor has agreements with both the Issuing and Acquiring Banks on any given transaction.

z. “No-Multi-Bug Rule” is a rule of the Visa and MasterCard Networks respectively, that prohibits cards carrying the Visa or MasterCard “Bug” from routing transactions over other networks.

aa. “No-Surcharge Rule” is a rule of the Visa and MasterCard Networks that forbids Merchants from charging Cardholders a surcharge on their Payment-Card transactions to reflect cost differences among various payment methods. For example, until the prior Settlement of this action, Merchants were prohibited from surcharging Cardholders who used a Visa Credit Card rather than a Discover-branded Credit Card, or used a Premium Credit Card rather than a standard Credit Card, or used a Credit Card rather than another form of payment.

bb. “Signature Debit Card” or “Offline Debit Card” is a Debit Card with which the Cardholder authorizes a withdrawal from his or her bank account usually by presenting the card at the POS and signing a receipt. Signature-Debit-Card transactions are processed as Credit Card transactions. Examples of Signature Debit Cards include Visa’s “Visa Check” product and MasterCard’s “Debit MasterCard” product.

cc. A “PIN-Debit Card” is a Debit Card with which the Cardholder authorizes a withdrawal from his or her bank account by swiping her card at the POS and entering a Personal Identification Number (“PIN”). PIN-Debit Card networks grew out of regional ATM networks and are therefore processed differently than Offline transactions. Examples of Online PIN-Debit Card networks include Interlink, Maestro, NYCE, and Pulse.

dd. A “Payment Facilitator” is a party other than a network, Issuer, or Acquirer that allows a Merchant to connect to a Payment-Card network. MasterCard’s Rules define a Payment Facilitator as a “service provider registered by an Acquirer to facilitate the acquiring of Transactions by the Acquirer from submerchants, and which in doing so, performs any one or more of the services

described in Rule 7.1 of the Mastercard Rules manual [Regarding non-bank service providers]…" Visa interprets the term similarly.

ee. A "Premium Card" is a General-Purpose Card that carries a higher Interchange Fee than a Standard Card and is required by a network to carry a certain level of rewards or incentives to the Cardholder. Visa's "Visa Signature," "Visa Rewards," and "Visa Infinite" card products and MasterCard's "World" and "World Elite" card product are examples of Premium Cards.

ff. "On-Us Transactions" are transactions in which the Acquiring Bank and the Issuing Bank are the same. Even when the Issuing and Acquiring Banks are identical, Visa and MasterCard require that the Issuing Bank charge an Interchange Fee to the Merchant.

gg. "Payment Card" refers to a plastic card that enables consumers to make purchases from Merchants that accept the consumer's Payment Card. The term "Payment Card" refers to several different types of cards, including, General-Purpose Cards, Debit Cards, Travel & Entertainment Cards, stored-value cards, and Merchant-proprietary cards.

hh. Although "Payment Cards" are a subset of "Access Devices," the two terms are used interchangeably herein, because despite evolving technology, Payment Cards continue to constitute the vast majority of Access Devices.

ii. "Relevant Markets" refers to the relevant product markets set forth in Section IX. below. The geographic component to each of these markets is the United States. "General-Purpose-Card Relevant Markets," refers to the markets described in Sections IX.A and IX.C. "Debit-Card Relevant Markets" refers to the markets described in Sections IX.B and IX.D.

jj. "Restructuring" means the series of agreements and transactions described below at ¶¶ 198-224 and 225-254 whereby MasterCard and Visa respectively restructured themselves from associations of banks to purportedly "single entity" corporations in an attempt to remove themselves from the prohibitions of Section 1 of the Sherman Act and similar laws across the globe.

kk. "Settlement" is the process by which the Merchant is reimbursed for a Payment-Card transaction. While Visa and MasterCard Rules require that an Acquiring Bank be a party to all Merchant card-

acceptance agreements, Merchants often use Third-Party Processors to process these transactions. The Acquiring Bank or its processor credits the Merchant's bank account with the amount paid by the Cardholder less the Merchant-Discount Fee, the largest component of which is the Interchange Fee, and then transmits the transaction data to Visa or MasterCard, which sends it to the Issuing Bank or its Third-Party Processor. The Issuing Bank then sends payment to the Acquiring Bank through Visa or MasterCard (and possibly the Acquirer's processor). In a Credit-Card or Signature-Debit-Card transaction, Settlement occurs two to four days after Authorization and clearing. In a PIN-Debit transaction, all three processes occur in the same electronic transaction virtually instantaneously.

ll. "Third-Party Processor" is a firm, other than Visa, MasterCard, a Member Bank, or an entity affiliated with a Member Bank, that performs the Authorization, clearing, and Settlement functions of a Visa or MasterCard Payment-Card transaction on behalf of a Merchant or a Member Bank. Examples of Third-Party Processors include First Data and Transfirst.

## IV. THE PARTIES

10. Plaintiff 30 Minute Photos Etc. Corporation ("Photos Etc.") is a California corporation doing business as "Scanmyphotos.com" with its principal place of business in Irvine, California. Photos Etc. is engaged in the business of photography finishing, which includes the operation of a national internet-based photography business. Photos Etc. accepts payment by Visa and MasterCard Credit and Debit Cards. Defendants impose supracompetitive Interchange and Merchant-Discount Fees associated with these Visa and MasterCard transactions on Photos Etc. and force it to abide by the Anti-Steering Restraints and other restraints that facilitate Defendants' anticompetitive practices. Photos Etc. has been injured in its business or property as a result of the unlawful conduct alleged herein.

11. Plaintiff Traditions Ltd. is a Minnesota corporation which owns and operates retail furniture stores in St. Paul and Minneapolis, Minnesota and Naples, Florida. Traditions Ltd. accepts payment by Visa and MasterCard Credit and Debit Cards.

Defendants impose supracompetitive Interchange and Merchant-Discount Fees associated with these Visa and MasterCard transactions on Traditions Ltd. and force it to abide by the Anti-Steering Restraints and other restraints that facilitate Defendants' anticompetitive practices. Traditions Ltd. has been injured in its business or property as a result of the unlawful conduct alleged herein.

12. Plaintiff Capital Audio Electronics Inc. ("Capital Audio") is a wholesale and retail consumer electronics company, with its principal place of business in New York, New York. Capital Audio accepts payment by Visa and MasterCard Credit and Debit Cards. Defendants impose supracompetitive Interchange and Merchant-Discount Fees associated with these Visa and MasterCard transactions on Capital Audio and force it to abide by the Anti-Steering Restraints and other restraints that facilitate Defendants' anticompetitive practices. Capital Audio has been injured in its business or property as a result of the unlawful conduct alleged herein.

13. Plaintiff CHS Inc. ("CHS") is a Minnesota cooperative corporation with its principal place of business in Inver Grove Heights, Minnesota. CHS is an agricultural cooperative that, among its many activities, does the following: (i) owns farm stores, gas stations and convenience stores (the "Owned Stores") and (ii) provides products, supplies and services to other persons and entities that own gas stations and convenience stores (the "Non-Owned Stores"). CHS accepts Visa and MasterCard Credit and Debit Cards on behalf of both the Owned Stores and the Non-Owned Stores. Defendants impose supracompetitive Interchange and Merchant-Discount Fees associated with Visa and MasterCard transactions on CHS and force it to abide by the Anti-Steering Restraints and other restraints that facilitate Defendants' anticompetitive practices. CHS has been injured in its business or property as a result of the unlawful conduct alleged herein.

14. Plaintiff Crystal Rock, LLC ("Crystal Rock") is a Delaware limited-liability company with its principal place of business in Watertown, Connecticut. Crystal Rock

markets and distributes natural spring water as well as coffee and other ancillary products to homes and offices throughout New England, New York, and New Jersey. Crystal Rock is the fourth-largest home and office water-distribution company in the United States. Crystal Rock accepts payment by Visa and MasterCard Credit and Debit Cards. Defendants impose supracompetitive Interchange and Merchant-Discount Fees associated with these Visa and MasterCard transactions on Crystal Rock and force it to abide by the Anti-Steering Restraints and other restraints that facilitate Defendants' anticompetitive practices. Crystal Rock has been injured in its business or property as a result of the unlawful conduct alleged herein.

15. Plaintiff Discount Optics, Inc. ("Discount Optics") is a Florida corporation with its principal place of business in Boca Raton, Florida. Discount Optics is in the business of wholesale optical supplies for the optical industry. Discount Optics accepts payment by Visa and MasterCard Credit and Debit Cards. Defendants impose supracompetitive Interchange and Merchant-Discount Fees associated with these Visa and MasterCard transactions on Discount Optics and force it to abide by the Anti-Steering Restraints and other restraints that facilitate Defendants' anticompetitive practices. Discount Optics has been injured in its business or property as a result of the unlawful conduct alleged herein.

16. Plaintiff Leon's Transmission Service, Inc. ("Leon's Transmission") is a California corporation with its principal place of business in Reseda, California. Leon's Transmission is an automotive transmission service serving Southern California. Leon's Transmission accepts payment by Visa and MasterCard Credit and Debit Cards. Defendants impose supracompetitive Interchange and Merchant-Discount Fees associated with these Visa and MasterCard transactions on Leon's Transmission and force it to abide by the Anti-Steering Restraints and other restraints that facilitate Defendants' anticompetitive practices. Leon's Transmission has been injured in its business or property as a result of the unlawful conduct alleged herein.

17. Plaintiff Parkway Corporation ("Parkway") is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania. Parkway is engaged in the automobile parking business. Parkway accepts payment by Visa and MasterCard Credit and Debit Cards. Defendants impose supracompetitive Interchange and Merchant-Discount Fees associated with these Visa and MasterCard transactions on Parkway and force it to abide by the Anti-Steering Restraints and other restraints that facilitate Defendants' anticompetitive practices. Parkway has been injured in its business or property as a result of the unlawful conduct alleged herein.

18. Plaintiff Payless Inc., ("Payless") is a Delaware Corporation with its principal place of business in Topeka, Kansas. Payless accepts payment by Visa and MasterCard Credit and Debit Cards. Defendants impose supracompetitive Interchange and Merchant-Discount Fees associated with these Visa and MasterCard transactions on Payless and force it to abide by the Anti-Steering Restraints and other restraints that facilitate Defendants' anticompetitive practices. Payless has been injured in its business or property as a result of the unlawful conduct alleged herein.

19. The anticompetitive behavior by the Visa and MasterCard Networks and their Member Banks has caused antitrust injury common to the Plaintiffs and Class Members.

20. Until the Visa corporate Restructuring described below at paragraphs 225-254, Defendant Visa International (f/k/a Visa International Service Association) was a non-stock, nonassessable Delaware membership corporation with its principal place of business in Foster City, California. Its members included approximately 21,000 banks.

21. Until the Visa corporate Restructuring described below at paragraphs 225-254, Defendant Visa U.S.A., Inc. was a group-member of Visa International Service Association and was also a non-stock, non-assessable Delaware membership corporation with its principal place of business in San Francisco, California. It was a national bank-card association whose members included approximately 14,000 banks.

Defendants Visa International Service Association, Visa U.S.A., Inc., and Visa, Inc. are collectively referred to herein as "Visa." During the relevant time period and until the Visa corporate Restructuring described below at paragraphs 225-254, Visa was governed by a board of directors comprised of bank executives selected from its Member Banks, including some of the Bank Defendants. "Old Visa" and "New Visa" refer to the Visa entities described herein as they existed, respectively, before and after the Visa IPO. Visa transacts business in this judicial district.

22. Visa conducted a number of corporate-Restructuring maneuvers in 2007 and 2008 to combine several previously independent entities into Visa, Inc. On March 19, 2008, Visa, Inc. conducted an initial public offering, by which Visa attempted to turn itself from a joint venture subject to scrutiny under Section 1 of the Sherman Act, to a "single entity" supposedly incapable of "conspiring" within the meaning of Section 1 when it sets a uniform schedule of default Interchange Fees. The company that resulted ("New Visa") is a publicly-traded Delaware Corporation known as Visa, Inc. with its principal place of business in San Francisco, California. Visa, Inc. is hereby made a Defendant in this action.

23. Before the MasterCard corporate Restructuring described below at paragraphs 198-224, Defendant MasterCard Incorporated was a private, SEC-registered share company, organized under the laws of Delaware with its principal place of business in Purchase, New York. Defendant MasterCard International Incorporated is a Delaware membership corporation that consists of more than 23,000 Member Banks worldwide and is the principal operating subsidiary of MasterCard Incorporated. MasterCard Incorporated and MasterCard International Incorporated are collectively referred to herein as "MasterCard."

24. On May 25, 2006, MasterCard conducted an Initial Public Offering and entered into several related agreements, in an attempt to turn itself from a joint venture subject to scrutiny under Section 1 of the Sherman Act, into a "single entity" supposedly

incapable of "conspiring" within the meaning of Section 1 when establishing uniform schedules of default Interchange Fees. The resulting entity is a publicly-traded Delaware corporation with its principal place of business in Purchase, New York. "Old MasterCard" and "New MasterCard" refer to the MasterCard entities described herein as they existed, respectively, before and after the MasterCard IPO.

25. Defendant Bank of America, N.A. is a national banking association with its principal place of business in Charlotte, North Carolina. Defendant BA Merchant Services LLC (f/k/a Defendant National Processing, Inc.) is an Ohio corporation with its principal place of business in Louisville, Kentucky, and is a subsidiary of Defendant Bank of America, N.A., which in turn is a wholly-owned subsidiary of NB Holdings, which in turn is wholly owned by Defendant Bank of America Corporation, a Delaware corporation with its principal place of business in Charlotte, North Carolina. Defendant Bank of America, N.A., Defendant BA Merchant Services LLC (f/k/a Defendant National Processing, Inc.), and NB Holdings and Bank of America Corporation are collectively referred to as "Bank of America."

26. Bank of America is a member of both Visa and MasterCard. It engages in interstate commerce. Between 2000 and 2005 it was represented on the Visa U.S.A. Board of Directors. It is an Issuing Bank that, throughout this judicial district, issues Payment Cards to individuals and businesses. It is also an Acquiring Bank that, throughout this judicial district, provides card acceptance services to Class Members. It has been represented on the Visa Board of Directors. It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

27. Defendant Barclays Bank plc is a bank operating under the laws of the United Kingdom with its principal place of business in London, England. Between at least 2000 and 2005, it was represented on the Visa International Board of Directors. During that period, the Visa International Board had authority to adopt, and did adopt, schedules of Interchange Fees. From time to time the Visa International Board would

delegate to Visa Regional Boards, including the Visa U.S.A. Board, the actual adoption of schedules of Interchange Fees. Defendant Barclays Delaware Holdings, LLC, f/k/a Juniper Financial Corporation, a Delaware corporation with its principal place of business in Wilmington, Delaware, is a wholly-owned subsidiary of Defendant Barclays Bank plc. Defendant Barclays Bank Delaware, f/k/a Juniper Bank, is a subsidiary of Defendant Barclays Financial Corp. Defendants Barclays Bank plc, Barclays Financial Corp., and Barclays Bank Delaware are collectively referred to herein as "Barclays."

28. Barclays is a member of both Visa and MasterCard through Barclays Financial Corporation and issues Credit Cards through its Barclaycard division. It engages in interstate commerce. It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

29. Defendant Capital One Bank (USA), N.A., a Virginia bank with its principal place of business in Glen Allen, Virginia, and Capital One F.S.B., and Capital One, N.A., a national bank with its principal place of business in McLean, Virginia, are wholly-owned subsidiaries of Defendant Capital One Financial Corporation, a Delaware corporation with its principal place of business in McLean, Virginia. Defendants Capital One Bank, Capital One F.S.B., and Capital One Financial Corporation are collectively referred to as "Capital One." On July 1, 2007, named defendant Capital One F.S.B. merged into Defendant Capital One, N.A. and ceased to exist as a legal entity. In May 2012, Capital One acquired HSBC's Credit-Card business, which made it the second-largest Issuer of Credit Cards in the United States.

30. Capital One is a member of both Visa and MasterCard. It engages in interstate commerce. Between 2000 and 2006, it was represented on the MasterCard Board of Directors. It is an Issuing Bank that, throughout this judicial district, issues Payment Cards to individuals and businesses. It is an Acquiring Bank that, throughout this judicial district, provides card-acceptance services to Class Members. It has had

actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

31. Defendant Chase Bank USA, N.A., a Delaware bank with its principal place of business in Newark, Delaware, is the successor to Chase Manhattan Bank USA, N.A., and a wholly-owned subsidiary of Defendant JPMorgan Chase & Co., a Delaware corporation with its principal place of business in New York, New York. Defendant Paymentech LLC is a limited liability company organized under the laws of Delaware, with its principal place of business in Dallas, Texas. Defendant JP Morgan Chase & Co. is the majority parent of Defendant Chase Paymentech Solutions, LLC. Defendants Chase Bank USA, N.A., Chase Paymentech Solutions, LLC, and JP Morgan Chase & Co. are collectively referred to herein as "Chase." Chase is a member of both Visa and MasterCard. It engages in interstate commerce. It is an Issuing Bank that issues Payment Cards to individuals and businesses throughout this judicial district. Between 2000 and 2003, Chase was represented on the MasterCard Board of Directors for the United States. Between 2003 and 2006, it was represented on the Visa U.S.A. Board of Directors and was represented on the Visa Inc. Board of Directors from 2008 until 2010. Through Defendant Chase Paymentech Solutions, LLC, it is also an Acquiring Bank that, throughout this judicial district, provides card-acceptance services to Class Members.

32. In July, 2004, Chase completed its acquisition of Bank One Corporation and Bank One Delaware, N.A., which also had acted as Issuing Bank and an Acquiring Bank. Before the acquisition, Bank One Corporation had actual knowledge of and knowingly participated in the conspiracies alleged in this Complaint. From at least 2000 until its acquisition by Chase, Bank One was represented on the Visa U.S.A. Board of Directors.

33. As described in paragraph 87 below, Defendant JPMorgan Chase Bank, N.A., a nationally chartered bank operating under the laws of Ohio with its primary place of

business in Columbus, Ohio acquired the Credit-Card operations and receivables of Defendant Washington Mutual Bank from the FDIC on September 25, 2008. By acquiring these assets, JPMorgan Chase Bank, N.A. became the successor in interest to the liabilities that are associated with this litigation.

34. Defendant Citibank (South Dakota), N.A. is a South Dakota bank with its principal place of business in Sioux Falls, South Dakota. It is identified in Citigroup's 2007 10-K filing as Citigroup's "primary banking entity responsible for U.S. credit card activities." Until 2006, Defendant Citibank (South Dakota), N.A. was a direct subsidiary of Citibank, N.A. In 2006 Defendant Citibank, N.A. transferred its investment in Defendant Citibank (South Dakota), N.A. to Defendant Citigroup, Inc. In 2011, Citibank, N.A. and Citibank (South Dakota), N.A. merged with the surviving FDIC charter of Citibank, N.A.

35. Defendant Citibank N.A., is a bank with its principal place of business in New York, New York, is a subsidiary of Defendant Citigroup, Inc., a Delaware corporation with its principal place of business in New York, New York. Defendant Citicorp merged into Defendant Citigroup, Inc., on August 1, 2005. Defendants Citibank N.A., Citicorp, and Citigroup, Inc. are collectively referred to herein as "Citigroup."

36. Citigroup is a member of both Visa and MasterCard. It engages in interstate commerce. It is an Issuing Bank that, throughout this judicial district, issues General-Purpose Payment Cards to individuals and businesses. It is an Acquiring Bank that, throughout this judicial district, provides card-acceptance services to Class Members. It has been represented on the MasterCard, Inc. Board of Directors. It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

37. Defendant Fifth Third Bancorp ("Fifth Third") is an Ohio corporation with its principal place of business in Cincinnati, Ohio.

38. Fifth Third is a member of both Visa and MasterCard. It engages in interstate commerce. It is an Issuing Bank that, throughout this judicial district, issues Payment Cards to individuals and businesses. From at least 2005 to 2006, Fifth Third was represented on the MasterCard Board of Directors. It is an Acquiring Bank that, throughout this judicial district, provides card-acceptance services to Class Members. In September 2010, it acquired NPC, which made it the fourth largest Acquirer of Visa and MasterCard transactions in the United States. It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

39. Defendant First National Bank of Omaha is a subsidiary of First National of Nebraska which is a Nebraska corporation with its principal place of business in Omaha, Nebraska.

40. First National Bank of Omaha is a member of both Visa and MasterCard. It engages in interstate commerce. Between 2000 and 2006, First National Bank of Omaha or First National Bank of Nebraska was represented on the Visa Board of Directors. It is an Issuing Bank that, throughout this judicial district, issues Payment Cards to individuals and businesses. It is also an Acquiring Bank that, throughout this judicial district, provides card-acceptance services to Class Members. It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

41. Defendant HSBC Finance Corporation is a Delaware corporation with its principal place of business in Arlington Heights, Illinois. It is an indirectly-held, wholly-owned subsidiary of Defendant HSBC North America Holdings, Inc., which is an indirect wholly-owned subsidiary of Defendant HSBC Holdings, plc, a corporation organized under the laws of the United Kingdom with its principal place of business in London, England. Defendant HSBC Bank USA, N.A., is a national bank with its principal place of business in New York, NY. Defendant HSBC Bank USA, N.A., is a subsidiary of HSBC USA Inc., which is an indirectly-held, wholly–owned subsidiary of

Defendant HSBC North America Holdings, Inc. Defendant HSBC Bank plc is a United Kingdom corporation with its principal place of business in London, England and is a wholly-owned subsidiary of HSBC Holdings plc. Defendant HSBC Finance Corporation, HSBC Bank USA, N.A., HSBC North America Holdings, Inc., Defendant HSBC Bank plc, and HSBC Holdings, plc, are collectively referred to herein as "HSBC."

42. HSBC is a member of both Visa and MasterCard. HSBC engages in interstate commerce. HSBC is an Issuing Bank that, throughout this judicial district, issues Payment Cards to individuals and businesses. Through HSBC Bank USA, N.A., and HSBC Bank, plc, HSBC is an Acquiring Bank that, throughout this judicial district, provides card-acceptance services to Class Members. Through HSBC Bank plc, HSBC is the Third-Party Processor of all PayPal Inc. transactions acquired by HSBC Bank USA, N.A., in the United States. It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

43. HSBC and its constituent entities have been represented on MasterCard Boards of Directors during the relevant time period. For example, from 2005 to 2006, HSBC North America Holdings, Inc. was represented on the MasterCard Global Board of Directors. From 2000 to 2005 Household International was represented on the U.S. Board of Directors for MasterCard. Between 2000 and 2005, HSBC Bank, plc was represented on the MasterCard Global Board of Directors.

44. Defendant PNC Financial Services Group, Inc. ("PNC") is a Pennsylvania corporation with its principal place of business in Pittsburgh, Pennsylvania. PNC is a member of both Visa and MasterCard. It engages in interstate commerce. In 2008, PNC acquired National City Corporation ("National City"), with the support of the Troubled Asset Relief Program. Before the acquisition, National City had been represented on the Visa USA Board of Directors between 2003 and 2006 and in 2005 was represented on the Visa International Board of Directors.

45. PNC and previously National City has issued Visa and MasterCard Payment Cards throughout the relevant time period. National City was an Acquiring Bank through its former subsidiary, Defendant National Processing, Inc. (n/k/a BA Merchant Services LLC), until National Processing, Inc. (n/k/a BA Merchant Services LLC) was purchased by Bank of America in October 2004. Until then, National City was an Acquiring Bank that, throughout this judicial district, provided card-acceptance services to Class Members. PNC has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

46. Defendant SunTrust Banks, Inc. ("SunTrust") is a Georgia corporation with its principal place of business in Atlanta, Georgia. Defendant SunTrust Bank is a bank operating under the laws of Georgia with it principal place of business in Atlanta, Georgia.

47. SunTrust is a member of both Visa and MasterCard. It engages in interstate commerce. Between 2000 and 2006 it was represented on the Visa U.S.A. Board of Directors. Through its subsidiary, Defendant SunTrust Bank, is an Issuing Bank that, throughout this judicial district, issues Payment Cards to individuals and businesses. It is also an Acquiring Bank that, throughout this judicial district, provides card-acceptance services to Class Members. It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

48. Defendant Texas Independent Bancshares, Inc. is a Texas corporation with its principal place of business in Texas City, Texas.

49. Texas Independent Bancshares, Inc. is a member of Visa and MasterCard. It engages in interstate commerce. Between 2000 and 2006 it was represented on the Visa U.S.A. Board of Directors. Between at least 2000 and 2002, and 2004 and 2005, it was also represented on the Visa International Board of Directors. It was represented on the Visa, Inc. Board of Directors from the Visa IPO in March 2008 until 2010. It has had

actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

50. Defendant Wells Fargo & Company ("Wells Fargo") is a Delaware corporation with its principal place of business in San Francisco, California.

51. Wells Fargo is a member of both Visa and MasterCard. It engages in interstate commerce. During parts of the relevant time period, it was represented on the Visa U.S.A. Board of Directors. It is an Issuing Bank that, throughout this judicial district, issues General-Purpose Payment Cards to individuals and businesses. Through its "Wells Fargo Merchant Services" division, it is an Acquiring Bank that, throughout this judicial district, provides card-acceptance services to Class Members. It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

52. In 2008, Wells Fargo acquired Wachovia Bank N.A., in what was reported as a transaction to help save Wachovia from receivership with the FDIC. Before the acquisition, Wachovia was a member of Visa and MasterCard that, between 2002 and 2006, was represented on the Visa U.S.A. Board of Directors. Wachovia acted as both an Issuing Bank and an Acquiring Bank during the relevant time period. Wachovia had actual knowledge of, and knowingly participated in, the conspiracies alleged in this Complaint.

53. Defendants Bank of America, N.A., BA Merchant Services LLC (f/k/a Defendant National Processing, Inc.), Bank of America Corporation, Barclays Bank plc, Barclays Bank Delaware, Barclays Financial Corp., Capital One Bank, (USA), N.A., Capital One F.S.B., Capital One Financial Corporation, Chase Bank USA, N.A., Chase Manhattan Bank USA, N.A., Chase Paymentech Solutions, LLC, JPMorgan Chase Bank, N.A., JPMorgan Chase & Co., Citibank (South Dakota), N.A., Citibank N.A., Citigroup, Inc., Citicorp, Fifth Third Bancorp, First National Bank of Omaha, HSBC Finance Corporation, HSBC Bank USA, N.A., HSBC North American Holdings, Inc., HSBC

Holdings, plc, HSBC Bank, plc, National City Corporation, National City Bank of Kentucky, SunTrust Banks, Inc., SunTrust Bank, Texas Independent Bancshares, Inc., and Wells Fargo & Company, (collectively "Bank Defendants"), are Member Banks of the Visa and MasterCard Networks. The Bank Defendants are actual or potential competitors for the issuance of Credit Cards and acquisition of Merchants. All of the Bank Defendants belong to both Networks and have conspired with each other and with the Visa and MasterCard Associations to fix the level of Interchange Fees that they charge to Merchants.

54. Many of the Bank Defendants have been during the relevant period represented on the Visa and/or MasterCard Boards of Directors at the times when those Boards collectively fixed uniform schedules of Default Interchange Fees and imposed the anticompetitive Anti-Steering Restraints and Miscellaneous Exclusionary Restraints and adopted the IPOs. The Bank Defendants delegated to the Visa and MasterCard Boards of Directors the authority to take those actions. Each of the Bank Defendants had actual knowledge of, participated in, and consciously committed itself to the conspiracies alleged herein.

55. Before Visa's IPO, Section 5.01(a) of the Bylaws of Visa U.S.A. (May 15, 2004) limited seats on its Board of Directors to (i) "officers of [Visa U.S.A.]," (ii) "officers of Charter Members [with some exceptions]...having at least the equivalent rank of Chief Executive Officer or Chief Administrative Officer, or [for larger Member Banks] a person who in their performance of his regular duties reports to such an officer." Individuals who "previously held the title of Chairman, Vice Chairman, or Chief Executive Officer of a Charter Member were allowed to hold the post of "Second Special Director At Large" or "Third Special Director At Large for Technology," provided that the latter is "well qualified in systems and technology issues of importance to [Visa U.S.A.'s] Payment Services."

56. Similarly, prior to MasterCard's IPO, Article IV-1 of its Bylaws required that each Director "be an officer of a member institution of MasterCard International Incorporated or an individual otherwise uniquely qualified to provide guidance as to the Corporation's affairs."

57. Bank Defendants have been directly responsible for collectively fixing Interchange Fees to be charged to Merchants. Bank Defendants, acting by and through the Boards of Directors of Visa and MasterCard, were also directly responsible for the imposition of the Anti-Steering Restraints and engaging in the other anticompetitive conduct alleged herein. Collectively, the Bank Defendants, through their operation of Visa and MasterCard, adopted and approved the above-mentioned policies and have significantly profited from those policies and continue to do so to this day.

58. Even after the corporate Restructuring of the Visa and MasterCard Networks, the banks continue to conspire to fix Interchange Fees and to impose the Anti-Steering Restraints and the other forms of anticompetitive conduct described herein. Each of the Bank Defendants belongs to Visa and MasterCard and has agreed that Visa and MasterCard may apply uniform schedules of default Interchange Fees to their Payment-Card businesses and that they will adhere to the anticompetitive Visa and MasterCard Rules.

59. The Bank Defendants—which collectively account for nearly 70% of each Network's issuing volume—retain effective control over the Networks' activities because the Networks understand that, if they do not continue their Bank-centric business models, supplying Issuers with supracompetitive Interchange Fees, they risk those banks shifting their issuing business to other networks or creating their own networks.

60. Acquiring Banks enter into acceptance contracts with Merchants agreeing that the Networks' uniform schedule of Interchange Fees will apply to all of the Merchant's transactions that are initiated by Visa or MasterCard Payment Cards. These

Acquiring Banks understand that the same uniform schedule of Interchange Fees will be applied to transactions conducted by all other Acquiring Banks for those banks' Merchant customers. Issuing Banks enter into issuing contracts with the Networks, agreeing and understanding that they will receive Interchange Fees from Merchants based upon the Networks' uniform schedule of Interchange Fees.

## V. CO-CONSPIRATORS

61. The Second Circuit held that Visa and MasterCard "are not single entities; they are consortiums of competitors." Before the corporate Restructuring described below, they were "owned and effectively operated by over 22,000 banks, which compete with one another in the issuance of Payment Cards and the acquiring of Merchants' transactions." *United States v. Visa U.S.A. Inc.*, 344 F.3d 229, 242 (2d Cir. 2003). Because of this judgment, among other things, the Networks and their Member Banks recognized that the Networks were "structural conspiracies" and "walking conspiracies."

62. Various persons, firms, corporations, organizations, and other business entities, some unknown and others known, have participated as co-conspirators in the violations alleged and have performed acts in furtherance of the conspiracies. Co-conspirators include, but are not limited to, the following: (a) Issuing Banks that have issued Visa and/or MasterCard Credit and Debit Cards and have agreed to charge uniform, collectively fixed Visa and MasterCard Interchange Fees to various Merchants both before and after the Networks' Restructurings; (b) Acquiring Banks that acquire Visa and MasterCard transactions from Class Members, as described herein, and that have participated in the conspiracy to collectively fix Interchange Fees both before and after the Networks' Restructurings; (c) certain banks that were members of the Boards of Directors of Visa or MasterCard and adopted and agreed to fix Interchange Fees for various Merchants and transactions, to impose the anticompetitive Anti-Steering

Restraints and Miscellaneous Exclusionary Restraints alleged herein, and also designed and authorized the Restructurings that themselves violate the antitrust laws.

## VI. TRADE AND INTERSTATE COMMERCE

63. The trade and interstate commerce relevant to this action consists of the Relevant Markets described in Section IX. herein.

64. During all or part of the Class Period, each of the Defendants, directly or through their affiliates or subsidiaries, participated in the Relevant Markets described in Section IX. herein in a continuous and uninterrupted flow of interstate commerce.

65. The activities of Defendants and their co-conspirators, as described herein, were within the flow of and had a substantial effect on interstate commerce.

## VII. CLASS-ACTION ALLEGATIONS

66. Plaintiffs seek to represent a class (the "Class") under Fed. R. Civ. P. 23(a) & (b)(3), for violations of 15 U.S.C. §§ 1, 18 and Cal. Bus. & Prof. Code §§ 16700 and 17200 *et seq*. The Class includes all persons, businesses, and other entities, that have accepted Visa and/or MasterCard Credit and/or Debit Cards in the United States at any time from and after January 1, 2004. This Class does not include the named Defendants, their directors, officers, or members of their families, or their co-conspirators or the United States Government.

67. Plaintiffs Photos Etc., Traditions, Capital Audio, CHS, Crystal Rock, Discount Optics, Leon's Transmission, Parkway, and Payless bring this action under Federal Rules of Civil Procedure 23(a), and (b)(3), on behalf of themselves and the Class. These Plaintiffs are members of the Class, their claims are typical of the claims of the other Class members, and Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs are represented by counsel who are competent and experienced in

the prosecution of class-action antitrust litigation. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Class.

68. The anticompetitive conduct of Defendants alleged herein has imposed, and threatens to impose, a common antitrust injury on the Class Members. The Class Members are so numerous that joinder of all members is impracticable.

69. Defendants' relationships with the Class Members and Defendants' anticompetitive conduct have been substantially uniform. Common questions of law and fact will predominate over any individual questions of law and fact.

70. There will be no extraordinary difficulty in the management of this Class Action. Common questions of law and fact exist with respect to all Class Members and predominate over any questions solely affecting individual members. Among the questions of law and fact common to Class Members, many of which cannot be seriously disputed, are the following:

a. Conspiracy issues:

i. Whether (a) Visa and its Member Banks, and (b) MasterCard and its Member Banks illegally fixed uniform schedules of Default Interchange Fees for Credit Card transactions, which were imposed on Merchants in the markets for Network Services for such cards, thereby extracting supracompetitive Interchange Fees and Merchant Discount Fees from Class Members;

ii. Whether (a) Visa and its Member Banks, and (b) MasterCard and its Member Banks illegally fixed uniform schedules of default Interchange Fees for Debit-Card transactions, which were imposed on Merchants in the markets for Network Services for such cards, thereby extracting supracompetitive Interchange Fees and Merchant Discount Fees from Class Members;

iii. Whether Visa, MasterCard and their Member Banks possess or exercise market power or monopoly power in the Relevant Markets alleged in this Complaint;

iv. Whether the Merchant restraints imposed by Defendants artificially inflated the level of Interchange Fees imposed on Merchants or facilitated Defendants' respective price-fixing arrangements;

v. Whether the conspiracies of the Visa and MasterCard Networks and their Member Banks continued after the Networks' reorganizations and IPOs; and

vi. Whether the per se rule or the rule of reason should be applied to analyze the price-fixing schemes of Visa, MasterCard, and their respective Member Banks.

b. Restructuring issues.

i. Whether MasterCard's Restructuring constituted an "acquisition" of the "stock" or "assets of another" within the meaning of Section 7 of the Clayton Act;

ii. Whether Visa's Restructuring constituted an "acquisition" of the "stock" or "assets of another" within the meaning of Section 7 of the Clayton Act;

iii. Whether MasterCard's Restructuring created a likelihood of "substantially lessening competition," within the meaning of Section 7 of the Clayton Act;

iv. Whether Visa's Restructuring created a likelihood of "substantially lessening competition," within the meaning of Section 7 of the Clayton Act;

v. Whether MasterCard's Restructuring constituted a "contract," "combination," or "conspiracy," within the meaning of Section 1 of the Sherman Act;

vi. Whether Visa's Restructuring constituted a "contract," "combination," or "conspiracy," within the meaning of Section 1 of the Sherman Act;

vii. Whether MasterCard's Restructuring harmed competition within any of the Relevant Markets described in this complaint;

viii. Whether Visa's Restructuring harmed competition within any of the Relevant Markets described in this complaint;

ix. Whether any procompetitive efficiencies exist for MasterCard's Restructuring and whether those efficiencies outweigh any of the competitive harm described above;

x. Whether any procompetitive efficiencies exist for Visa's Restructuring and whether those efficiencies outweigh any of the competitive harm described above.

c. Impact and damages issues.

i. Whether all or virtually all class members were overcharged for Visa and MasterCard transactions when higher Interchange Fees were extracted from them than could have occurred in a competitive market;

ii. Whether Interchange Fees in the Relevant Markets would exist at their current level – if at all – absent the above-referenced conduct; and

iii. The proper measure of damages sustained by the Class as a result of the conduct alleged herein.

71. These and other questions of law and fact are common to Class Members and predominate over any issues affecting only individual class members.

72. This Class Action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all members is not only impracticable, but impossible. The damages suffered by many Class Members are small in relation to the expense and burden of individual litigation, and therefore, it is highly impractical for such Class Members to individually attempt to redress the wrongful anticompetitive conduct alleged herein.

## VIII. FACTUAL ALLEGATIONS

### A. Evolution of the Visa and MasterCard Networks.

73. Visa and MasterCard (collectively the "Networks") are international bank-card networks whose members include banks, regional-banking associations, and other financial institutions. The Networks were established by their members to develop,

promote, and operate national Credit-Card Networks for the purpose of, among other things, enabling Issuing Banks to extract fees from Merchants with whom they have no business relationships.

74. The Networks evolved from regional and local Credit-Card systems formed during the 1960s.

75. Visa's predecessor, Bank Americard, was the local Credit-Card program of Bank of America, then based in California. In 1970, the program was introduced throughout the United States under the name National Bank Americard, Inc. ("NBI"). In 1977, NBI changed its name to Visa.

76. MasterCard is the successor to Mastercharge, which was created in 1967 when the Interbank Card Association of New York banks merged with the Western States Bankcard Association.

77. During the early years of the Networks, Merchants that accepted Credit Cards used paper forms called "drafts" to conduct transactions.

78. In the mid 1980s, technology evolved such that many transactions were processed electronically and paper drafts were not needed for most Payment-Card transactions. Since that time, the costs to Visa and MasterCard of the various components of Credit Card transaction processing (for example, computer hardware, telephone service, network service, and data-processing services) have decreased significantly. These changes led to significant reductions in the costs for Visa and MasterCard of processing Payment-Card transactions.

79. Since Visa and MasterCard began operating on a national scale, use of their cards has increased dramatically. In 1970, only 16% of households had a Credit Card. By 2006, 77% of U.S. adults had at least one Credit Card.

80. Since 1970, the number of Visa Member Banks increased from approximately 1,400 to nearly 14,000 in the United States and over 22,000 worldwide. U.S. consumers

now carry more than 802 million Visa-branded Credit, Debit, commercial, and prepaid cards.

81. MasterCard has experienced similar growth and now includes more than 23,000 Member Banks worldwide. As of today, there are more than 360 million MasterCard-branded cards in circulation in the United States.

82. The Networks have also experienced substantial consolidation among their Member Banks. For example, in 2006 Bank of America acquired MBNA and immediately became the second largest Issuer of Credit Cards in the United States. Similarly, in 2004 when Chase – then already the nation's fourth largest card Issuer – acquired Bank One, the combined entity became the largest Issuer in the United States, accounting for 23.5% of all General-Purpose-Card transaction volume.

83. In 2015, the top five Visa Credit Card-Issuing Banks accounted for 64.3% of all Visa Credit Cards in circulation in the United States.

84. In 2015, the top five MasterCard Credit Card-Issuing Banks accounted for 67.3% of all MasterCard Credit Cards in circulation in the United States.

85. In 2015, the top five Credit Card-Issuing Banks accounted for 65.0% of all Visa and MasterCard purchase volume in the United States.

86. In 2015, 75.8% of Visa and MasterCard transaction volume was acquired by five Member Banks.

87. The evolution of Visa and MasterCard through horizontal agreements stands in contrast to the development of American Express, Discover, and other "three-party" networks, which built Merchant and Cardholder bases independently of a cooperating partner on the other "side" of the platform. In a three-party network such as American Express or Discover, the network operator acts both as the Issuer and Acquirer for the vast majority of transactions involving its cards and is the only intermediary between the Merchant and the Cardholder.

88. When a three-party network sets Merchant and Cardholder fees, it does so to maximize its own profit, rather than to increase the profits of the actors on one side (i.e., the Issuing Banks) of the platform, as is the case in five-party networks.

**B. Interchange Fees in the context of a Payment-Card transaction.**

89. The Networks operate as standard-setting organizations in the markets for General-Purpose-Card Network Services, Signature-Debit-Card Network Services and PIN-Debit-Card Network Services by facilitating the exchange of transaction data and funds among Merchants, Acquiring Banks, Issuing Banks, and Cardholders.

90. When a consumer makes a payment with a Credit or Signature Debit Card, the Merchant sends an electronic transmission to its Acquiring Bank or Third-Party Processor. The Acquiring Bank or processor then sends an electronic transmission to the Networks. The Networks relay the transaction to the Cardholder's Issuing Bank or its Third-Party Processor, which makes a payment to the Acquiring Bank, through the Networks for the purchase amount minus the Interchange Fee. The Acquiring Bank then credits the Merchant's account for the transaction amount minus the Merchant-Discount Fee, the largest component of which is the Interchange Fee. Finally, the Issuing Bank charges the Cardholder's credit account for the full amount of the purchase. Under this system, the Issuing Bank earns revenue from annual fees and interest charged to Cardholders, as well as the amount of the Interchange Fee, while the Acquiring Bank earns revenue from the difference between the Merchant-Discount Fee and the Interchange Fee.

91. Visa Product and Service Rule 9.1.1.3 provides that "Interchange Reimbursement Fees are determined by Visa and provided on Visa's published fee schedule." These Interchange Fees apply on every transaction, except for where they have been "customized where Member [Banks] have set their own financial terms for

the Interchange of a Visa Transaction or Visa has entered into business agreements to promote acceptance and Card usage."

92. Similarly, MasterCard Rule 8.3 provides that "[a] transaction settled between Customers gives rise to the payment of the appropriate interchange fee or service fee, as applicable. [MasterCard] has the right to establish default interchange fees and default service fees…, it being understood that all such fees set by [MasterCard] apply only if there is no applicable bilateral interchange fee agreement between two Customers is in place, any intraregional or interregional fees established by [MasterCard] are binding on all Customers." "Customer" in Rule 8.3 is MasterCard parlance for "Member Bank."

93. Despite the theoretical deviations from "Default" Interchange Fees that Visa and MasterCard's Rules permit, the Merchant Restraints ensure that the "Default" rates set the prices that all or nearly all Issuing Banks charge Merchants that accept their cards. Because of the Restraints, bilateral negotiations between a Merchant, or group of merchants, and an Issuer are rare. In fact, when questioned, MasterCard witnesses have admitted that there were only a few bilateral agreements in the United States, while Visa witnesses could identify only a single bilateral agreement in the United States, (Steele Dep. Tr. at 67:3-69:22.) despite the existence of millions of merchants and thousands of Issuing Banks and despite the technological capacity to facilitate millions of bilateral agreements.

94. The Default Interchange Rules were adopted when Visa and MasterCard were owned and controlled by Defendants and other Member Banks and continually reaffirmed by votes of the Networks' Boards of Directors that consisted of employees of Member Banks. They were adopted with the purpose and effect of inflating Merchants' costs of accepting Payment Cards and using the ill-begotten profits from those Interchange Fees to line the pockets of the Member Banks.

95. Individual Directors sitting on the Networks' Boards of Directors often circulated Board materials to other Member Bank employees to seek their input on how

certain decisions by the Boards could affect the Member Banks as Issuers. (Sheedy Dep. Tr. at 168:18-169:8; Allen Dep. Tr. at 86:21-87:14; Saunders Dep. Tr. at 65:02-66:07; Goldman Dep. Tr. at 74:08-75:19; CHASE003627088-7127; WFINT0000590603, at WFINT0000590603; WFINT000590342 (Mar. 14, 2006 email from Kevin Rhein to Wells Fargo CEO John Stumpf offering comments on the March Visa Board materials).; Srednicki Dep. Tr. at 194: 1-7 (referencing Exh. 24,116).; League Dep. Tr. at 87:19- 89:11, 90:18-92:3.)

96. Visa and MasterCard each have established complex "Default" Interchange Fee schedules. Default Interchange includes the fee levels and the structure of the fees, such as the Interchange-Fee categories that are tiered by Merchant type, card type, and the Merchant's transaction volume, among other things. Interchange Fees account for the largest portion of Merchant costs for accepting such cards.

97. Until the Restructurings described below, the Networks' uniform schedules of Default Interchange Fees were adopted regularly—usually semiannually—by vote of the competing Bank Defendants and other Member Banks that occupied the seats on the Networks' Boards. After the Restructurings, the New Networks have continued the practice of adopting uniform schedules of Default Interchange Fees on the same semiannual schedule.

98. A typical transaction is depicted below:




99. When a consumer makes a payment with a PIN-Debit Card, the consumer swipes a Payment Card at a POS terminal and enters a (usually four-digit) personal identification number ("PIN") on a numeric keypad. After the PIN is entered, the POS terminal transmits the transaction and Payment-Card information to an Acquiring Bank or Third-Party Processor acting on the bank's behalf. The Acquiring Bank or processor then sends the information to the PIN-Debit network, which then switches the transaction to the Issuing Bank or a Third-Party Processor acting on its behalf. The Issuing Bank or its processor assesses the consumer's account to verify the PIN and ensure that the consumer has sufficient funds to pay for the purchase. Next, the Issuing Bank or its processor sends an electronic message to the PIN-Debit network, which indicates acceptance or rejection of the transaction for the purchase amount minus the Interchange Fee. The PIN-Debit network switches the Issuing Bank's reply back to the Merchant through the Acquiring Bank or its processor to complete the transaction. This entire "Authorization" process takes place in just seconds. In the same transaction, the Merchant's Acquirer "purchases" the transaction from the Merchant, guaranteeing payment and facilitating Settlement of the transaction.

100. This process changes somewhat in a Mobile-Payment transaction initiated on a Mobile Device. For these transactions, the user sets the Mobile Device to allow Mobile-Payment transactions by enabling a setting on his or her device and providing the mobile platform (such as Apple, Google/Android, or Microsoft) with the account information for the Payment-Card accounts that he or she desires to utilize in Mobile-Payment transactions. The mobile platform communicates this request to the user's Issuing Bank, which communicates with the Network to create a user-specific identifier, which is then embedded into the secure portion of the memory chip in the Mobile Device. At the point of sale, the user presents the Mobile Device and initiates the transaction by using an alphanumeric password or a biometric identifier, such as a fingerprint. A request to authorize the transaction is then sent from the POS to the Acquirer, and then to the Network, as in a plastic-card-based transaction. Upon receiving the data, the Network looks up the user's identifier, which it then inserts into the Authorization request to the Issuer, which approves or denies the transaction. Notwithstanding the presence of a Mobile Device and the additional security features of a Mobile-Payment transaction, the Defendants' anticompetitive rules such as the Default Interchange Rules, the Honor-All-Cards Rules, and the Anti-Steering Restraints apply in full force, just as in plastic-card-based transactions.

101. The Defendants have extended their Payment-Card dominance into Mobile Devices by interpreting their Honor-All-Cards Rules to mean that if a Merchant accepts one Digital Wallet that enables Visa or MasterCard transactions, it must accept all such Digital Wallets and all Visa or MasterCard products that are linked to that Digital Wallet.

102. Even if the Honor-All-Cards Rule is necessary in the context of a plastic-card-based transaction because of practical limitations on the number of Issuers or networks that can appear on a single card, these justifications are absent in Mobile-

Payment transactions initiated on Mobile Devices which can carry a virtually unlimited number of Issuers' and networks' cards.

103. The below example demonstrates how a Mobile-Payment transaction functions on the popular Apple Pay platform.




104. The Networks monitor and enforce their Member Banks' compliance with their uniform schedule of default Interchange Fees. The networks' IT-systems monitor each transaction to ensure that the "correct" default interchange rate is being applied. Thus, if the Acquiring Bank attempted to "cheat" on a particular transaction by applying an interchange rate lower than the default rate, the networks' systems would intervene and increase the interchange rate to the default rate. These same IT systems also have the capacity to facilitate millions of bilateral agreements between Issuers and Merchants.

105. Visa and MasterCard Rules also require that a Member Bank be a party to all or nearly all Merchant contracts for the acceptance of Visa and MasterCard Payment Cards. This rule applies even to Merchants and banks that use "Payment Facilitators" such as Third-Party Processors or Independent Sales Organizations (also known as

"ISOs"). Payment Facilitators are obligated to include the Network-mandated terms in their agreements with Merchants, including the obligation to abide by all Visa or MasterCard Rules. *See* Visa Core Rule 1.5.2.1; Visa Product and Service Rule 5.3.1; MasterCard Rules 7.2.1 & 7.6.

106. Visa and MasterCard do not use the Interchange Fee to fund their operations. Rather, the Interchange Fee is retained by the Issuing Bank on every transaction. The majority of Visa and MasterCard revenues are derived from fees and Assessments that the Networks charge Member Banks. These fees include fees for Authorization and clearing of transactions, network-access fees, currency-conversion fees and various other service fees Visa and MasterCard assess Member Banks.

107. The networks can and do perform their functions of authorizing and clearing Credit-Card and Debit-Card transactions, acting as standard-setting entities for Credit and Debit-Card transactions, promoting their respective networks, and paying other operating expenses through the operations fees and Assessments that their Member Banks pay. Interchange Fees are not necessary to perform these functions.

108. Before their respective IPOs, Visa and MasterCard did not act as single entities when their Member Banks collectively fixed uniform schedules of Default Interchange Fees. The Visa and MasterCard Member Banks, which effectively controlled the decisions of the networks, competed against each other in the Relevant Markets. These banks did not ever share a unity of interest. Rather, they were direct, horizontal competitors in the Relevant Markets.

109. The Member Banks did not pool all of their assets to form or operate the Visa and MasterCard networks.

110. Before the networks' IPOs, the Member Banks did not owe a fiduciary duty to each other or the Visa and MasterCard Networks with respect to the setting of Interchange Fees.

111. The Member Banks of Visa and MasterCard impose Interchange Fees on Merchants even for On-Us Transactions, in which the Issuing and Acquiring Banks are the same bank. In such a situation, the Network certainly does not need to "balance" the Cardholder and Merchant "sides" of a transaction, because the Member Bank on both sides is the same. If that Member Bank felt that some "balancing" were needed, that bank could independently set a transfer price, rather than relying on price set by the Visa and/or MasterCard Network.

112. Before the Visa and MasterCard IPOs, the Bank Defendants, acting as members of Visa by and through the Visa Board of Directors, fixed uniform Interchange Fees for various Merchants and transactions for all Visa General-Purpose-Card and Debit-Card transactions that they agreed to impose upon Merchants.

113. Before the MasterCard IPO, the Bank Defendants, acting by and through the Board of Directors of MasterCard, then set similar uniform Interchange Fees for various Merchants and transactions for all MasterCard General-Purpose-Card and Debit-Card transactions that they agreed to impose upon Merchants.

114. Interchange Fees were devised in the early days of the Networks. Interchange Fees purportedly helped pay for the costs of initial card issuance, marketing, transferring transactional paper (which at that time literally was paper) between Acquiring and Issuing Banks, and purportedly balanced Network costs between Issuers and Acquirers. These early Interchange Fees were cost-based, and in the case of Visa, set with the help of independent auditing firms.

115. Credit-Card Interchange Fees were purportedly necessary in the early days of the Networks to induce banks to issue Credit Cards to Cardholders.

116. Even if those initially proffered justifications for collectively set, uniform schedules of Default Credit-Card Interchange Fees once were valid, they no longer are valid. Interchange Fees are no longer cost-based, and the Networks no longer need to incent card issuance to establish their Networks.

117. Beginning in the 1980s, even the Defendants realized that these early Interchange-Fee justifications had melted away. Therefore, Visa embarked on a campaign of subsidizing academic "scholarship" that would support its and its Member Banks' interest in receiving supracompetitive Interchange Fees. Some of this scholarship conceived the idea that Payment-Card Networks represent a "two-sided" market—consisting of both Merchants and Cardholders—in which uniform schedules of Default Interchange Fees were purportedly necessary to set an efficient price by "balancing" the demands of the two "sides" of the market.

118. To the extent that the Relevant Markets are "two-sided," the Markets' two-sidedness is a result of the Defendants' own Anti-Steering Restraints and other anticompetitive practices, which distort competition and cause Cardholders' payment decisions to be independent of the costs of various forms of payment.

119. "Two-sided" markets or "platforms" are not a phenomenon that first happened with the development of Payment-Card Networks. Such markets include stock and commodity exchanges (the first such exchange was established in Amsterdam in 1602), newspapers (which connect readers and advertisers), railroad terminals (connecting sellers of goods wanting to get their goods to far off markets, and sellers of railroad transportation services), singles bars and dating websites (matching the lovelorn), and, in the last decade, social-media services such as Facebook, Instagram, and Twitter (matching persons who want to connect over the Internet).

120. Moreover, while the "balancing" justification described above may have gained traction in certain ivory towers, it does not reflect how the Defendants actually set interchange fees or otherwise operate their businesses. Visa witnesses have testified that Visa does not know or attempt to determine the optimal balance between the two sides of the claimed two-sided market when setting Interchange Fees. (Sheedy 30(b)(6) Dep. Tr. at 284:10-285:25, 286:23-287:20.) Rather, Interchange Fees are set based on

Merchant elasticity without respect for the "benefits" on the Cardholder side. Likewise, Cardholder-facing Products are designed without regard to their effect on Merchants.

121. Historically, government agencies charged with enforcing the antitrust laws have been concerned with the exercise of market power on either side of the two-sided market, since the exercise of market power inevitably leads to harm to competition. In the United States, the Department of Justice throughout the latter half of the twentieth century was concerned about the possibility of harm to competition in mergers of newspapers, typically by investigating whether newspaper mergers resulted in higher prices to advertisers, just one side of the two-sided market.

122. The economics of Payment-Card Networks are no different than these examples of two-sided markets. The exercise of market power is cause for antitrust concern, whether that power is exercised to harm competition on either "side", or both "sides", of the market.

123. Technology has greatly evolved since the early days of the Networks, such that the Networks now have the technological capability to facilitate bilateral agreements among Issuing Banks, Acquiring Banks, and Merchants and to facilitate the Settlement of funds pursuant to those bilateral agreements.

124. Issuers, for their part, have the technological capability to enter into bilateral agreements with Merchants and to settle transactions pursuant to those bilateral agreements.

125. T.J. Sharkey—the head of MasterCard's Global Merchant and Acquirers Group—testified that he is aware of no limit on the number of bilateral agreements that MasterCard's system can accommodate. (Sharkey Dep. 93:2-101:5).

126. The Defendants' capacity to facilitate bilateral agreements is demonstrated by Visa's facilitation of the "ChaseNet" solution. The fact that Visa granted such a high-profile exception to a rule that it refers to as part of its "Core" rules demonstrates that

the Honor-All-Cards Rule and the Anti-Steering Restraints are not necessary for Visa and MasterCard to operate Payment-Card Networks.

127. During the same time period that Visa executed the ChaseNet agreement, it allowed discounting by Issuer. While this rule departure represented a slight loosening of Visa's regulation of Merchant conduct, it also demonstrated that its (and MasterCard's) continued insistence that treating all Issuers alike at the Point of Sale, with respect to Interchange Fees and steering practices, cannot be justified as necessary for the operation of a Payment-Card Network.

128. Unlike in the early days of the Networks, Visa and MasterCard now, jointly and separately, have market power in the Relevant Markets. Even in the face of frequent and significant increases in Interchange Fees, Merchants have no choice but to continue to accept Visa's and MasterCard's dominant Credit Cards. *United States v. Visa,* 163 F. Supp. 2d at 340, *aff'd*, 344 F.3d at 240; *In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568 (E.D.N.Y. Apr. 1, 2003). Both Visa and MasterCard repeatedly and substantially increased the total Interchange Fees charged to and paid by Merchants, but did not experience any decline in Merchant acceptance.

129. The collective setting of Interchange Fees neither performs the standard-setting function of Visa and MasterCard, nor enables the Networks to perform that function.

130. In 2010, the Department of Justice concluded—based on the documentary-discovery record compiled by Class Counsel in this action—that Visa and MasterCard possessed market power in the General-Purpose-Card-Network Services Market. Comp. Impact Stmt. at 6, *United States v. Am. Express Co.*, No. 1:10-cv-4496 (E.D.N.Y. Oct. 4, 2010). The DOJ found that this market power is reinforced by the No-Discount Rule and other Anti-Steering Restraints by creating an "all-or-nothing" choice for Merchants wherein they have no ability to scale back their card acceptance in response to the cost of those cards.

### C. Visa and MasterCard leveraged their dominance in Credit Cards to become the dominant Debit-Card Networks.

131. Visa and MasterCard initiated their Visa Check and MasterMoney (the predecessor to MasterCard Debit) programs in 1979. At that time, Signature-Debit-Card transactions represented only a small portion of all Payment-Card transactions.

132. At that time, PIN-Debit networks were beginning to spring up from regional ATM networks. Before the early 1990s, PIN-Debit networks operated successfully either without Interchange Fees, or with "negative" Interchange Fees, whereby the Merchant received a small sum of money on each transaction to incent it to install PIN pads, the equipment necessary at the point-of-sale for a Merchant to accept a PIN-Debit transaction.

133. The Interchange-Fee-free period of PIN-Debit networks came to a close, however, when Visa acquired the Interlink network and soon thereafter imposed an Interchange-Fee rate equivalent of 45 cents on a 100-dollar purchase.

134. Signature Debit Cards carried higher Interchange Fees than PIN-Debit Cards, and therefore were slow to gain Merchant acceptance. Accordingly, in the early 1990s, PIN-Debit transactions accounted for over 60% of all Debit Card transactions. At that time, PIN-Debit transactions were growing at a rate of 40% annually and were poised to grow even faster.

135. Because of the rapid growth in PIN-Debit transactions and the superiority of the PIN-Debit product, Visa's advisors predicted that PIN-Debit would wipe out Signature Debit.

136. PIN-Debit also had the potential to eat into Credit-Card transaction volume, and thereby drive down Credit-Card Interchange Fees. The Regional PIN-Debit networks were viewed by the Networks as potential threats to their dominance in the market for General-Purpose-Payment-Card Network Services.

137. To counteract the slow growth in Merchant acceptance of Offline-Debit Cards, the Networks required Merchants that accepted their dominant Credit Cards to also accept their Signature Debit Cards.

138. At the same time, to shield themselves from competition, Visa and MasterCard paid leading Issuers tens of millions of dollars to issue Debit Cards that contained only the Visa or MasterCard Bug without the Bugs of competing networks.

139. By tying their Signature Debit Cards to their dominant Credit Cards and bribing Issuing Banks to remove PIN-Debit Bugs from the back of Visa and MasterCard Signature-Debit Cards, Visa and MasterCard increased the number of Visa Check and MasterMoney cards in circulation to over 47 million by 1996. By 2004, the number of Visa and MasterCard Signature Debit Cards had grown to 228 million.

140. Had it not been for the tying practices described above, PIN-Debit Cards were poised to challenge the dominance of Credit Cards as the electronic-payment form of choice for Merchants and Cardholders.

141. The tying practices described above led to a lawsuit by a class of Merchants, in which this Court granted partial summary judgment for the class and denied summary judgment for the defendants. *In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568 (E.D.N.Y. Apr. 1, 2003).

142. After this court's summary-judgment ruling in *Visa Check*, Visa and MasterCard entered into settlement agreements with the class, which required Visa and MasterCard to abandon the part of their Honor-All-Cards Rules that required Merchants that accepted Visa and MasterCard Credit Cards to also accept the Networks' Signature Debit Cards.

143. Visa, fearing that Merchants would abandon its more expensive Signature Debit Cards, utilized its market power to cause "convergence" of PIN-Debit and Signature-Debit-Interchange-Fee rates. Through this "convergence" strategy, Visa sought to increase the Interchange-Fee levels on its Interlink PIN-Debit transactions

both to decrease the incentive of Merchants to steer consumers to PIN-Debit transactions away from Signature-Debit transactions and to incent banks to issue Interlink cards. Visa's ultimate goal was to eliminate the competitive threat of PIN-debit networks that are not dominated by Visa Member Banks by making Merchants indifferent at the point of sale between PIN-Debit and Signature Debit.

144. Visa has offered incentives to Issuing Banks to become exclusive Issuers of Interlink PIN-Debit Cards. Although MasterCard has at times provided superior economic offers to these banks for issuance of Maestro PIN-Debit Cards, banks have been migrating to Interlink, based on Visa's promise that once Interlink achieves a significant share of Debit Card transactions, Visa will gain greater pricing power. With this increased pricing power in hand, Visa plans to expedite the "convergence" in Interchange rates between PIN-Debit and Signature-Debit transactions, which will permanently marginalize the competitive threat from the PIN-Debit networks.

### D. Visa embarks on a successful strategy of Debit-Card "convergence" designed to increase Interchange Fees and stifle competition.

145. When Visa acquired Interlink in 1991, its primary goal was to kill PIN-Debit which it and its Member Banks viewed as a threat to the supracompetitive Interchange Fees on credit-card transactions.

146. Handwritten notes by a Visa employee indicated that Visa "would like to see [PIN-debit] disappear. Much bigger than Amex." *Wal-Mart* Plfs' Summary Judgment Ex. 456 at '450. (SUFEX501).

147. Visa's intention when acquiring Interlink was to neutralize the competitive threat from PIN-debit by either killing the product or moving PIN-Debit interchange rates to the level of Signature-Debit interchange. Since the time it acquired Interlink in 1991, the "foundation" of Visa's debit strategy was to "ensure that Visa Debit is Visa's

premier debit product having far greater market value, utility, and acceptance than Interlink." Pinkerd 30(b)(6) Dep. Ex. 25851, at WALSJ0411.0003. (SUFEX510).

148. Visa 30(b)(6) designee for Convergence, Stacey Pinkerd, testified that Visa's convergence strategy was adopted in response to "continued deployment of PIN pads among merchants." Pinkerd 30(b)(6) Dep. 72:13-73:7, Aug. 20, 2008. (SUFEX508).

149. Visa's June 5, 2001 board presentation projected the ultimate goal of a converged debit rate of 115-120 basis points by 2010, which was between the then-current rates for PIN and signature, as shown by this graph. This document shows that Visa estimated that its convergence strategy would avert a projected decrease in cumulative Interchange revenue to Visa Issuers of $2.4 billion in 2005 and $6.4 billion in 2010. Pinkerd 30(b)(6) Dep. Ex. 25854, at VUSAMDL2-00007710. (SUFEX509).




150. Visa's convergence strategy was ultimately successful. On April 30, 2010, the American Banker reported, "Visa this month changed its debit interchange rates by raising PIN-based transaction costs and lowering signature transactions; both are now 0.95% of each purchase plus 20 cents. The Signature-Debit rate was previously 1.03%

plus 15 cents, and PIN was 0.75% plus 17 cents." "Visa Overhauls Its Debit Fees Amid Strong Results," American Banker, April 30, 2010 Frankel Rebuttal Rpt. ¶ 60 n.145. (SUFEX514).

151. That Visa could announce a nine-year pricing goal in 2001 and meet that goal precisely on target demonstrates that Visa has power over price and therefore market power in the market for in Debit-Card Network Services and the alternative Relevant Markets thereto.

### E. Merchants directly pay Interchange Fees.

152. Visa Inc.'s Core Rule 1.1.9.1 states that Member Banks are solely responsible for their "issuance of Visa products and acquiring of Merchants to accept Visa products, including for settlement of transactions, compliance with the Visa Charter Documents and the Visa International Operating Regulations…" Core Rule 1.1.9.1 further specifies that Member Banks "indemnify Visa for claims or liabilities that arise out of their issuance of Visa products and acquiring of Merchants, and broadly disclaim liability against Visa for such activities." Thus, if a Visa Member Bank determined that it was harmed by the uniform schedules of Default Interchange Fees, Core Rule 1.1.9.1 prevents it from suing Visa.

153. MasterCard's Rule 2.3 states that "IN NO EVENT WILL THE CORPORATION BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES, FOR LOSS OF PROFITS, OR ANY OTHER COST OR EXPENSE INCURRED BY A CUSTOMER OR ANY THIRD PARTY ARISING FROM OR RELATED TO USE OR RECEIPT OF THE SYSTEMS, WHETHER IN AN ACTION IN CONTRACT OR IN TORT…" (capitalization in original). Thus, if a MasterCard Member Bank determined that it was harmed by the uniform schedules of Default Interchange Fees, Rule 2.3 prevents it from suing MasterCard.

154. In a technical manual issued to its Member Banks, MasterCard states that "MasterCard shall have no liability to any member, member processor, or other person acting on behalf of the member for any loss, cost, or other damage arising out of or in connection with MasterCard's administration of or any member's participation in any interchange rate program." MasterCard Int'l, GCMS Reference Manual.

155. Even if Visa and MasterCard Member Banks were not explicitly prevented from suing Visa and MasterCard over the uniform schedules of Interchange Fees, they have no practical incentive to do so.

156. The Bylaws of Defendant Visa U.S.A. required that all "Principal Member [Banks]," which included the Bank-Defendant members of Visa U.S.A. and the vast majority of all Member Banks, "[s]hall issue Cards bearing the Visa service mark." Visa U.S.A., Bylaws § 2.04(a) (May 15, 2004). On information and belief, Visa continues to interpret its rules to require Member Banks to issue Payment Cards.

157. Similarly, MasterCard's Rule 3.1 requires that Member Banks "must have issued and outstanding a reasonable number of Mastercard Cards." If a Member Bank fails to issue the requisite number of cards, it will be assessed a penalty by MasterCard. The reason for these provisions is for all Member Banks to have a common economic interest in ever-rising Interchange Fees.

158. Because all Member Banks are required to issue Visa or MasterCard Payment Cards, all Member Banks benefit from the supracompetitive Interchange Fees that they agree to abide by and, at least until the Networks' reorganizations, collectively set. Moreover, because Acquiring Banks do not pay Interchange Fees, they have no economic incentive to sue over the Networks' Interchange Fees.

159. Acquiring Banks do not pay Interchange Fees. These banks do not view Interchange Fees as a "cost" but rather account for them as contra-revenue.

160. Before the IPOs, the Member Banks appointed the Networks' Boards of Directors and approved of and agreed to abide by the Networks' Rules and bylaws.

Before the IPOs, the Member Banks conspired with each other and with Visa and MasterCard to collectively fix uniform schedules of default Interchange Fees. At all times relevant to these claims, the Member Banks have agreed to abide by the Rules of Visa and MasterCard, including the rules that require the application of a Default Interchange Fee on every Visa and MasterCard transaction.

161. Payment Facilitators do not have any practical incentive or ability to seek redress for the Networks' supracompetitive Interchange Fees.

162. Payment Facilitators do not pay Interchange Fees and therefore have not been harmed by the imposition of those fees.

163. Thus no realistic possibility exists that any Third-Party Processor will sue Visa or MasterCard over any of the practices described in this Complaint.

164. Issuing Banks account for Interchange Fees as revenue, while Merchants account for them as an expense. In contrast, Acquiring Banks do not account for Interchange Fees as revenue nor an expense.

165. The following illustration shows how the Acquiring Bank accounts for the amounts due from the Issuing Bank:

**Figure 19: Example of a Typical Credit Card Purchase Transaction Showing How Interchange Fees Paid by Merchants Are Allocated**




Sources: GAO (analysis); Art Explosion (images).

United States Government Accountability Office Report, "Example of a Typical Credit Card Purchase Transaction Showing How Interchange Fees Paid by Merchants Are Allocated."

166. The fees detailed above are taken out of the total amount of the transaction between the Cardholder and Merchant. In both substance and form, the Merchant pays all fees, including the Interchange Fee, which is collected by the Issuer. As indicated in the diagram above, Merchants do not make payments for the services provided by the card system in a typical fashion - they do not receive a standard bill for services. Instead, each party except the Merchant deducts its fee from the Merchant sale price as the funds flow through the system.

167. The Issuing Banks record Interchange Fees as revenue on their books and records. Typically, Issuing Banks report these fees as noninterest income as opposed to interest income (revenue) generated through lending activities. With respect to

Interchange Fees received, for example, Capital One in its 10-K for the fiscal year ended December 31, 2014 states that it "recognize[s] interchange income as earned at the time of purchase." *See also* BOA 10-K for the fiscal year ended December 31, 2015, at 147 ("Interchange . . . and other miscellaneous fees, which are recorded as revenue when earned.").

168. A number of the largest Acquirers are involved in multiple lines of business so the methods used to account for their Interchange Fees as Acquirers are not always publicly available. Acquiring Banks, however, account for revenue net of interchange. First Data, a joint partner of a division of defendant BOA, for example, states under components of revenue in its 10-K for the year ended December 31, 2015, "Global Business Solutions revenue is presented net of Interchange Fees and Assessments but includes reimbursable PIN debit fees and other, which is also included as an expense." *Id*. at 35; *see also id*. at 64 ("In the case of client contracts that the Company owns and manages, revenue is comprised of fees charged to the client, net of interchange and Assessments charged by the credit card associations, and is recognized at the time the client accepts a point of sale transaction."). Other publicly traded Acquirers similarly account for revenue net of interchange (i.e., Acquirers do not have interchange revenue). See, e.g., Global Payments Form 10-K (May 31, 2015) at 30, 54; Heartland Payment Services Form 10-K (Dec. 31, 2014) at 39-41; iPayment, Inc. Form 10-K (Dec. 31, 2013) at 4, 34-35, 62-63.

### F. Visa and MasterCard require the payment of an Interchange Fee on every transaction.

169. Before the IPOs, Bank Defendants, acting through the Visa and MasterCard Boards of Directors, collectively adopted and enforced rules that require the payment of an Interchange Fee, set at Visa and MasterCard's uniform levels, for all transactions on the respective Networks. Even after the IPOs, the Bank Defendants agree to abide by

these rules, knowing and understanding that all member banks of Visa and MasterCard will do the same. These unlawful agreements are enabled by other rules that were also collectively adopted and continue to be collectively enforced by the Bank Defendants and the other Member Banks.

170. Both Visa and MasterCard enforce Honor-All-Cards Rules that require Merchants that accept any Visa or MasterCard-branded Payment Card to accept all Payment Cards bearing that brand, regardless of the identity of the Issuing Bank, the Card Product, or the cost of accepting that card. With respect to Visa, that rule is reflected in, for example, Visa Core Rules 1.5.4 and 5.4.1.1. With respect to MasterCard, the Honor-All-Cards Rule is embodied in, for example, Rule 5.10.1.

171. By enacting and enforcing the Honor-All-Cards and Interchange Fee payment rules noted above, the Defendants have created a situation in which the payment of an Interchange Fee is required on all transactions, regardless of the Issuing Bank. Because of this problem – a problem entirely of Defendants' own creation – Defendants now claim that uniform schedules of "fall back" or "default" Interchange Fees actually benefit Merchants by preventing the Issuing Bank from "holding up" the Merchant by demanding an Interchange Fee that is as high as the Issuer would like, knowing that the Honor-All-Cards Rule prevents the Merchant from refusing that transaction.

172. This defense of the Networks' anticompetitive practices does not stand up to scrutiny. In fact, they reinforce the Networks' and banks' market power over Merchants by making it virtually impossible for Merchants or groups of Merchants to exert any leverage over Visa or MasterCard Member Banks in order to obtain more favorable prices or terms. But for the rules described in this section and the Anti-Steering Restraints, Merchants would have the option to reject a given Visa or MasterCard Payment Card for a given transaction if the benefit the Merchant receives from accepting the card or allowing the transaction is not commensurate with the associated

Merchant fee or imposing a Surcharge or giving a discount, depending on the Cardholder's choice of payment.

### G. The Anti-Steering Restraints insulate Visa and MasterCard from competition in the Relevant Markets and maintain supracompetitive prices.

173. Because consumers do not know the actual costs of the Interchange Fees and Merchant-Discount Fees paid by Merchants, Merchants are unable to assist them in choosing the most cost-effective payment methods.

174. Beginning at their inception, Visa and MasterCard enforced "No Surcharge Rules" that prohibited Merchants from imposing a Surcharge on a transaction made with a card that bore a particular brand, product, or Issuing Bank.

175. The Honor-All-Cards Rule, the No-Surcharge Rule and the Anti-Steering Restraints were adopted when Visa and MasterCard were owned and controlled by the Bank Defendants and the other Member Banks and continually reaffirmed by votes of the Networks' Boards of Directors that consisted of Member Banks. These Rules were adopted for the purpose and effect of inflating Interchange Fees and excluding competition in the Relevant Markets described in this complaint.

176. By implementing and enforcing these rules, Visa and MasterCard fully insulated themselves from any competitive threat. Because it is the Cardholder who selects which card to use in making a purchase, the No-Surcharge Rule and other Anti-Steering Restraints guarantee that the consumer will make this selection without regard to the cost of accepting the card; the consumer could not know how expensive his or her chosen card was to the Merchant, because the Anti-Steering Restraints in their original forms ensured that the costs of the transaction would be borne, but without his or her knowledge.

177. Before these rules were reformed by the settlement in this case, the DOJ Consent Decree, and the Durbin Amendment, they were embodied in, for example, Visa U.S.A. Op. Reg. 5.2F (2006) and MasterCard Op. R. 9.12 (2006).

178. On January 27, 2013, the Networks altered their rules as required by the preliminary approval of the 2012 settlement of this action, to permit surcharging of Credit-Card transactions under certain circumstances. Debit-Card transactions cannot be surcharged unless the Interchange-Fee caps contained in the Durbin Amendment to the Dodd-Frank Act are repealed.

179. In their current forms, the No Surcharge Rules may be found at, for example, Visa Product and Service Rules 5.6.1 and MasterCard Rules 5.11.1 and 5.11.2 (U.S. Region).

180. Defendants also imposed "No-Discount Rules" starting at their inception. Under the No-Discount Rules in their original forms, Merchants were allowed to offer discounts only to customers who paid in cash, rather than those who had competitive Payment Cards. Giving discounts for cash did not allow Merchants to counteract the Defendants' market power because cash was not a reasonable substitute for Payment Cards. Moreover, discounting for cash did not allow Merchants to play Networks or Issuers against each other to secure the most favorable acceptance costs and terms.

181. Pursuant to the DOJ Consent Decree, Visa and MasterCard changed their rules on July 20, 2011 to allow Merchants to offer discounts to Cardholders for using a particular card brand or product. While the DOJ Consent Decree improved competition in the Relevant Markets, Merchants still are prohibited from offering discounts to Cardholders for using the cards issued by particular Issuing Banks or, where such ability exists, have been deterred from doing so by the Anti-Steering Restraints. The current versions of the No Discount Rules may be found at Visa Core Rule 1.5.4.14 (US Region and Territories) and MasterCard Rule 5.11.1 (U.S. Region).

182. But for the No-Discount Rules, Merchants could utilize Issuer-specific discounts to secure more favorable acceptance costs and terms than are currently available. Even those Merchants that could not offer discounts or chose not to do so would benefit by the additional competition of Issuers competing for Merchants' business.

183. The Anti-Discrimination Rules prohibit Merchants from taking actions that might favor the use of one type or category of Credit Card or Debit Card, or one Issuing Bank's card, over another Credit Card or Debit Card. The Anti-Discrimination Rules were modified as required by the DOJ Consent Decree in 2011. Although the DOJ Consent Decree improved competition in the Relevant Markets, the remaining Visa and MasterCard Anti-Discrimination Rules harm Cardholders by precluding them from receiving the benefit of Merchant strategies that reward Cardholders for using a lower cost form of payment. Some of these strategies may include indicting a preference for certain Issuers' cards, in exchange for reduced Interchange Fees. The Anti-Discrimination Rules in their current form may be found at Visa Core Rule 1.5.4 and MasterCard Rule 5.11.1 (U.S. Region) and in the Networks' and Member Banks' interpretation of those rules.

184. The "No-Multi-Bug Rules" prohibit the use of competitive marks on Visa-branded or MasterCard-branded Payment Cards. These rules prevent the issuance of Payment Cards on which a Merchant might reduce its cost of acceptance by routing a transaction to the Network with the lowest cost of acceptance. Visa and MasterCard revised their rules to allow multiple PIN-Debit marks on cards to comply with the Durbin Amendment and its implementing regulations. The No-Multi-Bug Rules deprive Merchants of a tool which they could use to route transactions over lower-cost networks or incent Cardholders to choose lower-cost networks. Visa and MasterCard's No-Multi-Bug Rules harm Cardholders by precluding them from receiving the benefit

of Merchant strategies that incentivize Cardholders to use a lower cost form of payment.

185. Visa's "No-Bypass Rule" prohibits Issuers and Acquirers from bypassing the VisaNet system when processing transactions on Visa-branded cards. This rule prevents an Issuing Bank and an Acquiring Bank from competing for Merchant acceptance by directly routing transactions between the two banks and bypassing the VisaNet system. In combination with other Anti-Steering Restraints, this rule prevents Merchants from seeking to lower their costs of acceptance by steering customers to use Payment Cards in which the Issuer and Acquirer are the same or have entered into an agreement to route transactions directly between the Banks, without using the VisaNet system.

186. The Default-Interchange Rules, the Honor-All-Cards Rules, and the Anti-Steering Restraints (including the No-Surcharge Rule, the No-Discount Rule, and the Miscellaneous Exclusionary Restraints described above) are reflected in the Rules and Merchant Agreements of Visa, MasterCard, and their Member Banks. Visa's Core Rule 1.5.2.1 and MasterCard Rule 5.1.2 ("Required Merchant Agreement Terms") mandate that Acquirers' Merchant Agreements require Merchants to abide by the Networks' respective operating regulations, which include the Anti-Steering restraints.

187. The Acquiring Banks, including the Bank Defendants, in fact incorporate the Default-Interchange Rules, the Anti-Steering Restraints, and the Honor-All-Cards Rules into their agreements with Plaintiffs and other Merchants.

188. Because of the Anti-Steering Restraints, a Credit or Debit-Card Network that charges Merchant-Discount Fees that are lower than the Defendants' fees will not be able to make inroads on the monopoly positions of Visa and MasterCard. While potential new market entrants and competitors such as Discover stand ready, willing, and able to compete with the Defendants by offering lower fees to Merchants, the Defendants' rules prevent and restrain any such competition by ensuring that increased

efficiency and lower prices will not lead to increased market share for competitors in the Network-Services Markets.

189. Likewise, the Anti-Steering Restraints have a profound inflationary effect on retail goods and services. The Defendants' rules ensure that Merchants seeking to recover these costs must raise prices to all consumers, including cash-payers, PIN-Debit Card users, and those who would otherwise seek to avoid the high cost of Defendants' Interchange Fees. But for these rules, consumer prices would be lower. The prices of goods and services would fall because those prices would no longer be marked up to reflect the supracompetitive costs of Credit Card acceptance. Instead, those supracompetitive prices would be borne by the consumer choosing to use the Defendants' expensive payment products. Faced with transparent high prices for Defendants' Payment Cards, consumers would seek to use lower cost forms of payment.

190. In fact, MasterCard admitted, in a submission to the Reserve Bank of Australia, that surcharging can place downward pressure on Merchant fees because "[Networks] set interchange fees to avoid widespread surcharging and other forms of card usage discouragement behavior." Payment System Regulation, Response by MasterCard Worldwide to the Issues for the 2007/08 Review. Visa has made similar statements.

191. Similarly, Robert Towne, Visa's former Senior Vice President of "acceptance economics," admitted that he believed that charges imposed by Merchants on Cardholders would suppress consumers' demand to use Visa-branded Payment Cards. (Towne Dep. 373:24-375:8.)

192. In addition to insulating Defendants from competition and raising prices for all consumers, the No-Surcharge Rule compels inequitable and anticompetitive subsidies, running from the least-affluent U.S. consumers to the most-affluent. Because Merchants must mark up the prices of all goods to cover the costs of accepting Visa and

MasterCard products, rather than impose a discrete surcharge on users of those products, the No-Surcharge Rule effectively compels cash payers and users of other low-cost payment forms to subsidize all of the costly perquisites given by Issuing Banks to consumers using more expensive payment forms such as premium Visa and MasterCard Payment Cards, including frequent-flier miles, rental-car insurance, free gifts, and even cash-back rewards.

193. The other Anti-Steering Restraints also serve to protect the Defendants' elevated Interchange Fees. In the face of Merchant prompting — and particularly faced with the prospect of incurring surcharges — consumers would migrate towards less-expensive payment products, causing Defendants to drop their Interchange Fees in order to maintain market share. In the absence of the Anti-Steering Restraints, therefore, Defendants' Interchange Fees, would be lower.

194. But for Defendants' conduct, the emergence of mobile payments would threaten to inject competition into the market to the benefit of Merchants. In contrast to in decades past when a consumer needed to carry a separate, plastic Payment Card for each Payment Form she possessed, multiple Payment Forms may be accessible on one device such as a mobile phone, which—absent interference from Defendants—would greatly ease Merchants' ability to steer transactions to the most cost-effective Payment Form.

195. No procompetitive justification existed for the Anti-Steering Restraints as they existed before they were reformed as a result of the settlement in this case, the DOJ Consent Decree, and the Durbin Amendment. These rules taken together were naked restraints on trade, are not ancillary to the legitimate and competitive purposes of the Defendant Networks, and have had profound anticompetitive effects.

196. The Anti-Steering Restraints are not necessary to "balance" the "two sides" of the alternative Relevant Markets for Credit-Card-Network Services to Merchants and Cardholders or Debit-Card-Network Services to Merchants and Cardholders. In fact,

Visa admitted that its rules are actually counterproductive toward this end. On an investor call in May 2013 during which ChaseNet was discussed, Visa's then-CEO Charles Scharf admitted that Visa's rules had barred Issuers from competing for Merchant acceptance. When asked about Visa's arrangement with Chase, Mr. Scharf stated: "The reality is I think if you go around and talk to most Issuers, they would probably say that there wasn't a lot of conversation that went on between the issuing and acquiring [i.e., merchant] side, partially because of our rules that stood in the way of them working together to do something positive for the merchant." Visa Inc. Q2 2013 Earnings Call Transcript, *FactSet CallStreet* (May 1, 2013), at 16. Those rules (with the exception of the rules now allowing discounting by Issuer at the point of sale, in the case of Visa) continue to stand in the way of banks "working together to do something positive" for Merchants.

197. Moreover, while the rules changes brought about as a result of the settlement, the DOJ Consent Decree, and the Durbin Amendment were significant, procompetitive steps, the Plaintiffs continue to suffer cumulative damages as a result continuing effects of decades of enforcement of the No-Surcharge Rule and the other Anti-Steering Restraints.

### H. MasterCard restructured itself to attempt to shield its anticompetitive business model from antitrust scrutiny.

198. On July 13, 2003, approximately one month after the *Visa Check* settlement, MasterCard formed a task force to review its governance and business practices in order to, in the words of Christopher Thom, formerly its Chief Risk Officer, "mitigate existing and potential legal and regulatory risks and manage reputational concerns." (Hanft Exh. 28200.)

199. Similarly, in a November 2003 presentation to the Board of Directors, COO Alan Heuer reported that "[r]ecent rulings question interchange legality," as

MasterCard was under "increased regulatory scrutiny occurring in several markets, with litigation pending in [the United States]." Mr. Heuer concluded that interchange was under a "serious threat in several key geographic markets," including the United States. (Heuer Exh. 27058.)

200. Thus, MasterCard management recognized that interchange was threatened by legal and regulatory challenges and concluded that the "inevitable" result of these challenges was that Interchange Fees would decrease. CRO Chris Thom made comments to this effect at a December 8, 2003 meeting of MasterCard executives. (Thom Exh. 25135.)

201. MasterCard's conclusion that antitrust enforcement would "inevitably" cause Interchange Fees to drop demonstrates the downward pressure that the prospect of antitrust enforcement has on Interchange Fees.

202. In a Spring 2004 update to the Board of Directors, Mr. Selander noted that global regulatory actions and threats of further actions had significantly increased the legal and regulatory risks to four-party systems such as MasterCard, which meant that "[w]e should expect a reduction in interchange/Merchant fees, especially from large Merchants." Mr. Selander's paper also noted that "[t]here seems to be less regulatory pressure on interchange for 3 party system competitors such as American Express, despite higher Merchant discount rates than MasterCard or Visa." (Selander Exh. 20711.) Thus, in Mr. Selander's view, MasterCard and its Member Banks could decrease the pressure on it and thereby increase Merchant fees to be collected by Member Banks if it could convert itself into a three-party system such as American Express. Director Dato Tan, who kept in close communication with Mr. Selander throughout the Restructuring process, questioned whether "in reinventing [MasterCard] in the solution contemplated, is the new [MasterCard] effectively a 3-party system?" (Murphy Exh. 21895.)

203. Although MasterCard claimed that it rejected bilaterals because of the technical difficulties that it would entail, the real reason for MasterCard's rejection of bilaterals is that MasterCard's greatest value in the operation of the MasterCard Network is its role in facilitating the transfer of money from Merchants to Issuing Banks by way of Interchange Fee deductions on every transaction. Bilateral agreements (which would take MasterCard out of the role of transferring money from Merchants to Issuing Banks) would facilitate "disintermediation" of MasterCard's role in the payments industry and turn the services offered by MasterCard into a commodity. (MCI_MDL02_11816533; MCI_MDL02_11832706.) In other words, MasterCard feared that, in a world of bilateral agreements, its function of guaranteeing a stream of supracompetitive revenues to Issuing Banks would vanish and its other functions could be replicated by others.

204. The primary factor driving the decision to pursue governance and ownership changes instead of the alternative business models was the belief, based on the advice of counsel, that governance and ownership changes had a greater likelihood of shielding MasterCard and its Member Banks from antirust liability arising from the establishment of uniform schedules of default Interchange Fees. (Murphy Exh. 21863.) By this time, MasterCard's management and its Board of Directors had developed a standard by which to judge its Restructuring attempts. Under that standard, a new governance and ownership structure would be satisfactory if and only if a post-Restructuring challenge to MasterCard's ownership or governance would stand a 90 percent chance of being dismissed without a trial on the merits. (See Murphy Dep. 258:15-20; 357:17-23.) This standard came to be known as the "90 percent standard." MasterCard hoped to meet the 90 percent standard by concocting a governance form that would be able to qualify MasterCard as a "single entity" under the antitrust laws and not a "structural conspiracy," while preserving the Member Banks' Interchange Fee revenue stream.

205. During spring and summer of 2005, MasterCard's Nominating and Corporate Governance Committee, along with its Board of Directors and management, evaluated several proposed structures to determine which of those structures met its twin goals of (i) absolving it and its members of antitrust liability; and (ii) guaranteeing that the new entity did not act contrary to the interests of the banks.

206. On June 22, 2005, the first complaint in what would become MDL No. 1720 was filed.

207. On July 14, 2005, the MasterCard Board—composed of representatives of Member Banks—voted to approve the essential structure of the IPO and change in governance.

208. To accomplish the IPO, MasterCard redeemed the shares owned by the Member Banks and then reissued them as Class B and Class M shares in "New MasterCard." MasterCard then offered to the public a series of Class A shares that represented 41 percent of the voting control of MasterCard. The capital raised by the public offering was used to pay the Member Banks for their shares, except that $1 billion ($650 million after taxes) owed to the U.S. Member Banks was retained by MasterCard.

209. The MasterCard IPO created three classes of shares: Class A shares, Class B shares, and Class M shares. Voting rights were limited to Class A shares, although the Member Banks, through their Class M shares, had certain veto powers, and no shareholder is allowed to acquire more than 15 percent of outstanding Class A or B shares.

210. The objectives that MasterCard and its Member Banks sought to achieve with the IPO and related agreements are also unambiguously depicted in another presentation that Mr. Selander made to MasterCard's regional Boards of Directors in the summer of 2005. Option 5F—the plan that eventually became the IPO and Agreements—was intended to provide MasterCard a high degree of protection from

claims under U.S. antitrust law. This presentation also demonstrates that MasterCard and its Board viewed the bank-owned-and-controlled "status quo" to be of minimal to no protection from antitrust liability. (Murphy Exh. 21904.)




211. The banks received assurances that they would continue to receive supracompetitive Interchange Fees, notwithstanding their loss of equity interest in MasterCard. After returning from a MasterCard Board meeting regarding Restructuring, Citigroup executive Alan Silverman summarized the meeting to a colleague and noted that "we [Citigroup] need to safeguard who owns/controls the company if not the Banks. What happens if Wal-Mart or Microsoft want to buy it?" (Massingale Exh. 26272.) Mr. Silverman also relayed his "informal discussions" with MasterCard COO Alan Heuer, in which Mr. Heuer "seemed very clear that **any new MasterCard needed to protect and even increase Interchange to keep and attract Banks.**" Mr. Silverman noted that he was nonetheless "uneasy" because of the "lack of any direct link between Interchange levels and the P/L of MasterCard in the future." *Id.* (emphasis added.)

212. MasterCard addressed Bank unease by providing assurances that it would continue to act in their best interests after the IPO. Board minutes reflect that MasterCard management "very strongly indicated its intent not to compete with its [Bank] customers" and made efforts "to find effective ways for management to strongly communicate this intent." (Murphy Exh. 21882.)

213. Similarly, in an April 6, 2005 meeting of the Nominating and Corporate Governance Committee, the Committee noted that, "[a]lthough [banks] can not govern the new structure, either through voting or by economic control, a legitimate role must be found so they are supportive of the new enterprise and so MasterCard does not lose their wisdom and insight." (Murphy Exh. 21891.)

214. MasterCard's assurances were effective. In response, Richard Fairbank, CEO of Defendants Capital One, stated in an email that the MasterCard IPO would result in "little-to-no change." (CO0003-00645342, at CO000-00645372.) Similarly, Citi's Steven Freiberg testified that he understood MasterCard would have "the same objective, pre and post" IPO. (Freiberg Dep. Tr. at 165:1-170:22.)

215. The analysis of MasterCard and its Member Banks leading up to the IPOs, makes clear that Old MasterCard and its Member Banks realized that the business structure they had collusively established—a structure that mandated the transfer of funds from Merchants to Issuing Banks—was anticompetitive and illegal under the antitrust laws of the United States and many foreign jurisdictions. But instead of changing their conduct, Old MasterCard and its Member Banks elected to restructure themselves into a New MasterCard that they hoped would allow them to continue their anticompetitive behavior. They restructured Old MasterCard such that MasterCard would continue to facilitate the transfer of funds from Merchants to Issuing Banks.

216. The Restructuring created New MasterCard which has market power in the Relevant Markets described in Section IX. below. The prevention of the acquisition or

maintenance of market power by merger or acquisition is the central goal of Section 7 of the Clayton Act.

217. That New MasterCard remains under the effective control of its Member Banks is shown by the following:

a. Due to the long-standing control of MasterCard and Visa by the largest banks in the United States, the Relevant Markets have been structured by the banks through the adoption and enforcement of the Honor-All-Cards Rule and the Anti-Steering Restraints, the Miscellaneous Exclusionary Restraints, and the rules requiring the deduction of Interchange Fees by Issuing Banks on every transaction such that the only form of competition that can exist is competition by the Networks for the issuance of their Payment Cards by banks (rather than, e.g., competing for Merchant acceptance), and the principal mode of competition is through ever-increasing Interchange Fees charged to Merchants and paid to banks as an inducement to issue MasterCard or Visa Payment Cards. Because both MasterCard and Visa have substantial market power in the Relevant Markets, Merchants have no practical ability to decline to accept MasterCard and Visa Payment Cards.

b. The five largest Issuing Banks in the United States now account for over 65 percent of the issuance of Credit Cards. Neither MasterCard nor Visa can pursue any business strategy that that does not involve ever-higher Interchange Fees imposed on Merchants.

c. Even though New MasterCard could, in theory, collect Interchange Fees from Merchants and keep that substantial revenue, it has not done so. Rather, the Board of Directors of New MasterCard, has continued to use Interchange Fees to redistribute wealth from Merchants to Issuing Banks.

218. The Restructuring adopted by MasterCard is akin to the members of a cartel who, having been caught fixing prices in violation of the Sherman Act, have spun-off their competing businesses to a new “single entity,” with the explicit understanding that the new “single entity” would continue to fix prices at the supra-competitive levels

previously set by the members of the cartel. However, Section 7 of the Clayton and Section 1 of the Sherman Act makes this evasive conduct unlawful.

219. Because the "single entity" New MasterCard has market power in the Relevant Markets, it can unilaterally impose uniform schedules of default Interchange Fees on Merchants and to set the fees at supra-competitive levels. This is demonstrated by the fact that MasterCard has increased Interchange Fees several times since its IPO, and continues to enforce its restrictive rules, without losing significant Merchant acceptance.

220. But for the illegal agreements challenged in this complaint, MasterCard and its Member Banks could not impose uniform levels of default Interchange Fees on Merchants, and they certainly could not increase those fees to the supracompetitive levels that exist today.

221. MasterCard contends that by reconstituting its Board of Directors to include a majority of directors "independent" of the Member Banks, and changing the ownership and governance rights of the Member Banks, New MasterCard is a single entity whose post-IPO setting of Interchange Fees is outside the scope of Section 1 of the Sherman Act. After the IPO, the New MasterCard Board of Directors voted, as the Old MasterCard Board of Directors had voted, to delegate Interchange-Fee setting authority to MasterCard management. Because it is the Restructuring, agreed to by the Member Banks, that reconstituted MasterCard's Board nominally "independent" of the Member Banks, it is the Restructuring that allows MasterCard's Board to continue to direct management to establish uniform schedules of default Interchange Fees and to establish those fees at supra-competitive levels.

222. MasterCard employs the same methodology to set Interchange Fees after its IPO as it used prior to the IPO. As MasterCard's Associate General Counsel, Carl Munson, testified, "essentially the process is unchanged. Except that today we wouldn't take that final step and go to a board." (Munson Dep. Tr. at 167:12-14.)

223. As MasterCard acknowledged before its IPO, Interchange Fees were doomed to disappear or drastically decrease. (Thom Exh. 25135.) The IPO harmed competition by allowing MasterCard to perpetuate the anticompetitive Interchange Fees described herein.

224. Since the Restructuring, no Defendant or Member Bank has taken any affirmative steps to withdraw from any of the MasterCard conspiracies described in this complaint. The Defendants and Member Banks continue to benefit—to the tune of tens of billions of dollars per year—from the supracompetitive Interchange Fees and other practices described in this complaint. Each Member Bank knows and understands that, even after the Restructuring, it will continue to receive supracompetitive Interchange Fees at the default rates, absent a bilateral agreement, which are disincentivized nearly out of existence by the Anti-Steering Restraints.

### I. Visa Restructures itself to shield its anticompetitive business model from antitrust scrutiny.

225. Even before Old Visa agreed to pay approximately $2 billion to settle the *Visa Check* class action in 2003, its management realized that the Old Visa business model was leading it and its Member Banks down a path toward ruinous antitrust liability.

226. Visa U.S.A. was the primary driver behind the global Restructuring. Visa, Inc.'s former CEO, Joseph Saunders, admitted that Visa U.S.A.'s motivation resulted from the fact that it felt the open-association model was "untenable for the future." (Saunders Dep. Tr. 156:19-158:2.)

227. Similarly, Bill Sheedy—then-head of Visa's Interchange Strategy Group and currently a Global Executive for Corporate Strategy, M&A and Government Relations — testified that the current system "is fraught with risk (i.e., continued [interchange] escalation)." From Mr. Sheedy's perspective, "[t]he fact that all of the banks, and their two general purpose acceptance brands, are taking on this risk together should be of no

consolation." (Sheedy Exh. 34812.) A March 2003 presentation authored by Mr. Sheedy also warned that "[c]ommoditized product utility requires risky [interchange] competition." (Sheedy Exh. 34812.)

228. Soon after Mr. Sheedy's comments, the prospect of substantial antitrust liability for Old Visa and its Member Banks arising from their collaborative structure became more immediate. In June 2003, Visa had reached an agreement on principle to settle the *Visa Check* class action for $2 billion plus injunctive relief. In addition, when the court of appeals affirmed the district court's decision in *United States v. Visa*, Old Visa understood that it would be facing follow-on suits by American Express and Discover and that those suits would also impose multibillion dollar liabilities. Finally, as some of the opt-out Plaintiffs in *Visa Check* had amended their complaints in March of 2004 to assert claims relating to Interchange-Fee price fixing, Old Visa was on notice that this lawsuit was imminent.

229. Two years later, in December 2005, after Old Visa had begun to give serious consideration to Restructuring, it noted that its damages resulting from U.S. class-action lawsuits that challenge Interchange-Fee setting could be as high as $50 billion by 2006. (Partridge Exh. 32815.) This $50 billion estimate is noteworthy because it represents only two years of damages, as Visa had assumed that the release in the *Visa Check* action would insulate it from monetary damages for the period before January 1, 2004. (Steele Exh. 31451.)

230. By this time, Visa International and the other Visa regions realized the gravity of the potential liability that was facing the Networks in the United States as a result of its anticompetitive conduct. Reflecting this realization, Christopher Rodrigues, then President and CEO of Visa International, wrote to Bill Campbell in January 2005, stating in part: "[C]ontext after the [Visa International] Board meeting . . . the Regions now understand that:- Old Visa's days are numbered. No one can stay as they are. . ." (Partridge Exh. 32804 at VI_IC_02710990.)

231. Realizing that its structure—wherein the Member Banks established Visa's Rules and Interchange Fees—was an inherent risk, Visa initially sought to partly mitigate that risk by delegating the setting of Interchange Fees to "independent" directors. But for the same reason that MasterCard's delegation of Interchange-Fee setting only changed the identity of the price fixer and thus did not affect its antitrust risk, Visa's initial "solution" did not remove its conduct from scrutiny under the antitrust laws.

232. The fact that Visa's delegation of Interchange-Fee setting was mere window dressing is illustrated in the following exchange between Visa's former CEO, John Philip Coghlan, and its former Head of Global Interchange, Tolan Steele, in which Coghlan requested that Steele draft a response to a hypothetical inquiry from Citi's head of cards regarding Visa's Interchange Fees and its fee-setting process:

> "You know, I'm very concerned about your strategy on interchange. You're at parity with MCI in most areas, but I think I see you slipping behind in a few key areas. I also think that MCI's strategy after they go public will be to increase interchange to attrack [sic] big issuers like me. I'm concerned that with [Independent Directors] and the Merchant-friendly public pronouncements you've been making, that you won't be competitive. How can you assuage my concerns?"

(Morrissey Exh. 30533 at VUSA_MDL1_09023986.)

233. In cooperation with the Interchange Strategy team, Mr. Steele then drafted a response stating in part, "[a]nd though the Directors to whom we bring interchange decisions may have changed, the process that we go through to develop and deploy interchange enhancements will remain largely the same." (*Id.*) Messrs. Steele and Morrissey agreed that in such a discussion with Citibank, Visa would need to discuss its "guts, as in our courage and willingness to drive rates one direction or another." (*Id.* at VUSA_MDL1_09023984.)

234. Documents produced in discovery that relate to the period of Visa's Restructuring, leading up to its IPO, confirm that the intention of Visa and its Member Banks was to create just enough autonomy for New Visa to remove the appearance of bank control, while maintaining in place the business model that courts and antitrust agencies in the United States and abroad ruled to constitute a structural conspiracy.

235. Leading up to the creation of New Visa, Old Visa worked to assure its Member Banks that it would continue to operate in their best interests. Visa's notice to its members of the changes to be made to its governance structure, including the appointment of independent directors, advised that "the changes we're making will not disrupt Visa's ongoing operations or change the nature of our relationship." (WFINT0000029683.)

236. Visa's Member Banks understood that New Visa would continue to operate in their best interests even after the IPO. For example, A 2006 Citibank presentation noted that even after the IPO, "it is expected that Visa will not take any decisions that would impact Citi's business negatively." (CITIINT 002518678.)

237. Documents produced in the litigation by Defendant Chase – which occupied two seats on Old Visa's Board at the time of Restructuring – confirm the intention of Old Visa's Member Banks to give up just enough control to create the appearance of a "single entity," while guaranteeing that the New Visa continues to pursue its bank-focused strategy.

238. For example, when Old Visa and its Member Banks were considering appointing "independent" directors to set Interchange Fees, Vincent D'Agostino, the head of Chase's payment strategy group detailed a conversation that he had with Visa, wherein Visa informed him that the reason that certain options were preferred by Visa was "because it will take a full vote of the membership (12-14M banks) to change anything about how Visa operates – so Visa believes it will always remain bank/issuer

centric." Mr. D'Agostino further noted that "Visa believes that they will be sued in Oct[ober 2005] – so this will look like it is a reaction to that." (Webb Exh. 27628.)

239. In another email, Susan Webb, then an Executive Vice President for Strategy and Corporate Development for Defendant Chase's retail banking and payment strategies, relayed her conversation with Bill Campbell, then a Chase representative on the Visa U.S.A. Board, about "how [Chase can] really retain control over structure and governance [and in today's call I thought it became, much more clear, the bank directors don't, the members do – entirely different] versus the legal benefits – and how much those benefits are really enhanced by [a] majority [of "independent directors" setting Interchange Fees." (Webb Exh. 27632) (second brackets in original).

240. Ms. Webb admitted that when she wrote this email, she was "thinking about the extent to which [Chase] could retain control over [structure and governance of Visa]. And specifically it was how do we — or can we prevent Visa from becoming a competitor of ours." (Webb Dep. 210:2-6.)

241. After a handful of management-led initiatives failed to yield a Restructuring plan that satisfied Visa's bank owners, the banks agreed on a final Restructuring plan that emerged from a bank-led initiative. Pursuant to the Restructuring plan that the banks agreed upon, various Visa entities entered into a series of mergers that resulted in one entity known as Visa, Inc. and another separately-incorporated entity known as Visa Europe. Under these mergers, Visa U.S.A., Visa Canada, and Innovant, LLC became subsidiaries of Visa, Inc. Visa, Inc. then issued common stock to the financial-institution members of Visa U.S.A., the financial-institution members of Visa Canada, the financial-institution members of three unincorporated geographic regions of Visa International, Visa U.S.A., Visa Europe, and Visa Europe's subsidiary, VESI. The transactions that produced Visa, Inc. and Visa Europe were completed by October 3, 2007.

242. After the merger phase of the Restructuring was completed, Visa, Inc. conducted an Initial Public Offering of 406,000,000 shares of Class A common stock in Visa, Inc. on March 18, 2008. By redeeming those shares and reclassifying them as publicly-held Class A shares, the IPO had the effect of Visa, Inc. purchasing the Member Banks' shares in it. In exchange for redeeming the formerly-bank-held shares, Visa provided the banks with a large part of the proceeds of the IPO as well as Class B shares and C shares in Visa, Inc.

243. The types of shares that the banks could own post-Restructuring were limited by geographic region. Class B shares could be held only by members of the former Visa U.S.A. Former members of Visa Canada, AP (Asia Pacific), LAC (Latin America/Caribbean), and CEMEA (Central Europe/Middle East/Africa) acquired Class C (series I) common stock. Member Banks in Visa Europe acquired Class C (series II, III, and IV) common stock. A portion of these Class B and C shares were subject to a mandatory redemption following the IPO and a redemption of Class C (series II and III) stock occurred in October 2008.

244. Similar to MasterCard's Restructuring, the Visa Restructuring placed several limitations on New Visa that were intended to preserve the anticompetitive market structure that Visa and its Member Banks has created. For example, New Visa's Board of Directors must provide advance approval before any person may own more than 15% of the aggregate shares of Class A common stock. In addition, the holders of Class B and C shares (Visa's Member Banks) were able to elect 6 of 17 directors over the three years following the IPO.

245. Until 2015, the Member Banks that held Class B or C stock were entitled to voting rights governing certain extraordinary transactions that relate to the consolidation or merger of New Visa, or its exit from the core payments business. Approval of a merger, consolidation, or exit of the core business required an 80% approval of voting shares. This supermajority provision, in combination with the

Member Banks' right to vote on these types of occurrences, gave the banks veto powers that allowed them to prevent the sale of Visa or prevent a change in the core business of Visa. Until 2015, Visa's certificate of incorporation could not remove this veto right without the approval of the holders of Visa, Inc. Class B and C stock.

246. Class B stock – the stock that is held by the U.S. Member Banks – was non-transferable (with limited exceptions) until three years after the close of the IPO and the final resolution of this and other litigation. Class C stock was non-transferable until three years after the closing of the IPO.

247. When asked whether Visa's Member Banks were concerned about losing control of the New Visa through Restructuring, Visa's 30(b)(6) witness on Restructuring topics, John Partridge, testified that Issuers voted to approve the Restructuring only when they were convinced that their card issuing businesses would continue to be successful. (Partridge Dep. Tr. 183:7-187:7.) Furthermore, contemporaneous documents generated by Visa U.S.A. and Visa International clearly demonstrate that the banks held grave concerns about losing control and that these concerns drove Visa's Restructuring process and the Member Banks' final approval of the Restructuring plans.

248. For example, when Visa's Restructuring options were presented to Visa International's Board of Directors, bank-control issues were discussed as part of the discussion on the Global Float option, which was similar to the final Restructuring. This discussion noted that New Visa would:

> "be a profit-seeking entity, with a need to maximize shareholder value while serving its chosen customers better than its competition. This means that it will behave differently from today's association. Over time, it can be expected to restructure and reorganize to reduce costs, change its mix of businesses and ensure commercial pricing for all customers. In the long term, we would expect the company to take these actions, although clearly its interests will not be served by alienating its customers."

* * *

> In addition, constraints may be imposed on the actions of the new company to give comfort to members. For example, for a transitional period, the company might not be permitted to:
>
> - Allow itself to be taken over
> - Sell its major assets
> - Merge with another company
> - Exit its core payments business
> - Remove the upper limit on ownership by a single entity
>
> These constraints may "sunset" after a period of time or if bank ownership falls below a specified percentage."

(Partridge Exh. 32846 at VI-IC-02792351 - 352.) (emphasis added)

249. This presentation also noted that some Member Banks had concern with a "Global Float" or a "Global Float with Regionality" because they may lose "ownership and control over the future direction of the organization." (*Id.* at VI-IC-02792353, VI-IC-02792358.)

250. Again, while Mr. Partridge denied that Visa explicitly took actions to address the Member Banks' concern, he did state that, post-Restructuring, if New Visa did not address the needs of its customers (i.e., banks), it could not protect its value. (Partridge Dep. 335:1-17.) He also testified that post-Restructuring, New Visa's Member Banks "understood that, as a customer, you have certain control over any company that you do business with." Partridge Dep. Tr. 185:5-7.

251. Thus, Mr. Partridge, as Visa's 30(b)(6) witness, admitted that Visa's Issuing Member Banks that controlled the Restructuring, considered various Restructuring options, and approved the final Restructuring plan with the goal in mind of protecting their business interests as Visa Issuers (Partridge Dep. 186:18-187:7), rather than maximizing the value of Visa as an independent business. The primary way in which large Issuing Banks could protect their Issuing businesses is to guarantee the continued flow of funds from Merchants to Issuers in the post-Restructuring world.

252. Following the IPO, Visa has continued to employ the same methodology for setting the schedule of default Interchange Fees that it used before the IPO. Visa's CEO at the time of the IPO, Joseph Saunders, acknowledged that "you still had Sheedy's group doing their thing; it just went to a different subset of the board made up of independent directors [for final approval]." (Saunders Dep. Tr. at 147:13-148:18.)

253. The Restructuring limits the equity interest that any one shareholder can attain in the New Visa to 15 % of equity, save for a Member Bank that may have acquired a greater stake through the Restructuring itself. While this limitation was in place, it would have prevented a single investor or group of investors from gaining a controlling stake in New Visa. By preventing an outside entity – be it a Merchant, a group of Merchants, or another large buyer – from acquiring Visa and adopting a more Merchant-friendly business model, this ownership limitation served to protect the bank-focused business model that Visa and its Member Banks constructed. It also protected the interests of Visa's Member Banks, which are virtually all members of MasterCard, by helping to ensure that competition for Merchants' business does not break out between the two Networks.

254. On information and belief, the veto rights on attempts by new Visa to exit the core payments business that was retained by the Member Banks of New Visa would have allowed the Member Banks to block an attempt by New Visa to eliminate Interchange Fees.

## J. The effect of the Networks' Restructurings.

255. The Restructurings adopted by MasterCard and Visa are akin to the members of a cartel who, having been caught fixing prices in violation of the Sherman Act, have spun-off their competing businesses to a new "single entity," with the explicit understanding that the new "single entity" would continue to fix prices at the supra-

competitive levels previously set by the members of the cartel. However, Section 7 of the Clayton and Section 1 of the Sherman Act makes this evasive conduct unlawful.

256. Because the "single entity" New MasterCard and New Visa have market power in the Relevant Markets, they can unilaterally impose uniform schedules of default Interchange Fees on Merchants. The "New" Networks' market power also allows them to fix their Interchange Fees at supracompetitive levels. This is demonstrated by the fact that MasterCard and Visa continue to impose and, through their Member Banks, enforce supracompetitive Interchange Fees without losing significant Merchant acceptance.

257. New Visa Interchange Fees continued to increase after the Visa IPO.

258. But for the illegal horizontal agreements challenged in this complaint, Visa, MasterCard and their Member Banks could not impose uniform levels of default Interchange Fees on Merchants, and they certainly could not increase those fees to the exorbitant levels that exist today.

259. Visa and MasterCard have argued that by reconstituting their Boards of Directors to include a majority of directors "independent" of the Member Banks, and changing the ownership and governance rights of the Member Banks, the New Networks are single entities whose post-IPO setting of Interchange Fees is outside the scope of Section 1 of the Sherman Act.

260. As both MasterCard (Thom Exh. 25135) and Visa (Partridge Ex. 32815) acknowledged before their IPOs, Interchange Fees were doomed to disappear or drastically decrease. The IPOs harmed competition by allowing MasterCard and Visa to perpetuate their anticompetitive Interchange Fees.

261. The IPOs had the effect of creating a cartel manager that fixes the uniform schedules of Default Interchange Fees on behalf of the Member Banks, which then can continue their price-fixing conduct under the guise of adhering to supposedly vertical agreements with the cartel manager that they created. In other words, through the IPOs

the Member Banks have ceded to the supposedly "independent" Networks the power to control the business decisions of the Member Banks.

262. In April 2012, Visa implemented a fixed fee known as the Fixed Acquirer Network Fee or "FANF." If a Merchant accepts any Visa Payment-Card transactions, Credit or Debit, the Merchant must pay a fixed fee to "access" Visa's Networks, which increases with the number of locations that the Merchant operates. The imposition of FANF represents a significant, unilateral price increase by New Visa without any commensurate benefit to Merchants or Cardholders. The ability of New Visa to impose such fees further demonstrates that its IPO significantly lessened competition.

263. Since the Restructurings, no Defendant or Member Bank has taken any affirmative steps to withdraw from any of the MasterCard or Visa conspiracies described in this complaint. The Defendants and Member Banks continue to benefit—to the tune of tens of billions of dollars per year—from the supracompetitive Interchange Fees and other practices described in this complaint. Each Member Bank knows and understands that, even after the Restructuring, it will continue to receive supracompetitive Interchange Fees at the default rates, absent a bilateral agreement, which are disincentivized nearly out of existence by the Anti-Steering Restraints.

### K. Legislative and regulatory reforms sought to inject needed competition into Payment-Card markets.

264. In 2009, the Antitrust Division of the Department of Justice opened an investigation into the anticompetitive practices of Visa, MasterCard, and American Express. Armed with the discovery from MDL 1720 and with the assistance of Class Counsel, the DOJ concluded that:

> Defendants' Merchant Restraints suppress price and nonprice competition by prohibiting a merchant from offering discounts or other benefits to customers for the use of a particular General Purpose Card. These prohibitions allow Defendants to maintain high prices for network services with confidence that no

> competitor will take away significant transaction volume through competition in the form of merchant discounts or benefits to customers to use lower cost payment options." Competitive Impact Stmt. at 9, *United States et al. v. Am. Express Co.*, No. 1:10-cv-04496-NGG-CLP (Oct. 4, 2010).

265. The DOJ then entered into a consent decree with Visa and MasterCard, in which the Networks agreed to repeal their No-Discounting Rules, certain rules that prevented Merchants from promoting or expressing a preference for a particular brand of card, and certain rules that prevented Merchants from informing their customers of the cost of accepting various cards. *Id*. at 10-11.

266. In response to the public comments submitted by Class Counsel during the consent-decree-approval process, the DOJ clarified that the consent decree would require the Networks to allow Merchants to post two (or more) separate prices for a bundle of goods at the point of sale, without specifying whether the separate prices were the result of a discount or a surcharge. Pl. Resp. to Public Cmts. at 26, *United States v. Am. Express Co.* (Jun. 14, 2011).

267. In July 2010, the Dodd-Frank Wall Street Reform and Consumer Protection Act was signed into law. Included in Dodd-Frank was the "Durbin Amendment", which required the Federal Reserve to issue rules limiting the Issuing Banks' practice of issuing Debit Cards that were compatible only with the Visa or MasterCard Networks. Dodd-Frank Wall Street Reform and Consumer Protection Act, §1075, Pub. L. No. 111-203 (July 21, 2010). In response, the Federal Reserve issued Regulation II, which required Issuers to enable their Debit Cards to route transactions through a minimum of two unaffiliated networks. 12 CFR 235.7(a). Regulation II also prohibited Issuing Banks from "directly or indirectly" inhibiting Merchants from choosing to process card payments over any available network. *Id.*

268. The Durbin Amendment also allowed Merchants to place minimum-purchase amounts of up to $10 on Credit-Card transactions.

269. Regulation II did not, however, require that a card be compatible with both unaffiliated PIN and unaffiliated Signature networks. An Issuing Bank could comply with the rules by enabling two unaffiliated PIN networks, and still routing all signature-authenticated transactions through a single, affiliated network. *See, e.g., Compliance Guide to Small Entities*, Board of Governors of the Federal Reserve System https://www.federalreserve.gov/bankinforeg/regiicg.htm. This is exactly what Visa and MasterCard did: they authorized the issuance of debit cards compatible with unaffiliated PIN networks, but which still routed all signature transactions through the Visa or MasterCard Signature-Debit-Card Network.

270. The Durbin Amendment was intended to lower Merchants' costs of accepting Payment Cards and also to provide some competition at the point-of-sale, such that Debit-Card Networks would have an incentive to lower their Interchange Fees in order to incent Merchants to route Debit-Card transactions over their Networks.

271. After seven years of hard-fought litigation, a class-action settlement was entered into in this litigation, which for the first time allowed Merchants to place surcharges on Visa and MasterCard transactions, subject to certain limitations. The settlement also provided a settlement fund to the Class of over $7 billion, locked in the relief contained in the DOJ consent decree and the Durbin Amendment and gave Merchants other freedoms such as the ability to negotiate with Visa or MasterCard through Merchant buying groups. Although the reforms contained in the settlement are pro-Merchant and procompetitive, the supracompetitive levels of Interchange Fees established through decades of anticompetitive practices have continued beyond the settlement. On June 30, 2016 the United States Court of Appeals for the Second Circuit overturned the approval of the settlement.

272. The threat to Visa's monopoly was exacerbated by competing PIN Debit Card networks' development of "PINless" Debit, which does not require entry of a PIN for transactions under a certain amount (today, typically $50). PINless Debit has the

potential to expand significantly the number of transactions routed to Visa's PIN Debit Card network competitors, transactions for which PIN Debit has traditionally been unavailable. Visa's competitors also were developing Signature-Debit capability, and the combination of PINless Debit and Signature-Debit would have enabled them, for the first time, to compete for Merchant routing on all General-Purpose-Debit-Card transactions. But to support its post-Durbin monopolization strategy, Visa entered into agreements with Issuers to incent or require them not to implement PINless Debit from PIN Debit Card networks, such as STAR and PULSE.

### L. Defendants engaged in additional anticompetitive conduct to thwart industry reforms intended to benefit competition.

#### 1. Defendants belatedly pushed the adoption of Chip-and-PIN technology.

273. The Defendants took a number of steps using their market power to hinder competition, including delaying and coordinating the implementation of more secure and less expensive (to the Merchant) payment technology. This allowed them to perpetuate their market power and continue to reap outsized profits.

274. Starting in the 1990s, technology was adopted outside of the United States that enabled the verification of a Payment-Card transaction through the use of a microchip ("chip") embedded in the card. This is referred to as a "chip card" or "EMV card" (EMV stands for Europay-MasterCard-Visa, which is the standards-setting body that originally implemented the technology). The chip in the card replaces card data with unique "tokens" that are unusable by outsiders and have no value outside of a specific Merchant or acceptance channel. There are two main implementations of this technology: "Chip-and-PIN and "Chip-and Signature" where the chip card would be taken by a Merchant accompanied by a PIN code or, alternatively for Chip-and-Signature, a simple signature.

275. While EMV technology was introduced in Europe and elsewhere shortly after its development in the 1990s, cards issued in the United States continued to use magnetic-stripe technology alone.

276. In Europe, by contrast, EMV is paired with PIN authentication, because it offers additional protection against theft. This Chip-and-PIN combination is widely considered to be the most secure form of authentication, because the chip prevents duplication, while PIN authentication ensures that even if a card is physically stolen, it cannot be used without its PIN. A consequence of this arrangement, however, is that essentially all transactions—debit and credit—are routed through PIN networks. The Defendants delayed the U.S. rollout of EMV technology in the United States in order to preserve the dominance of their Signature networks in the United States.

277. Although Chip-and-PIN technology was lower-cost and superior to the magnetic-stripe technology that was prevalent in the United States, the Defendants stood in the way of implementing Chip-and-PIN in the United States, as doing so would endanger the magnetic-stripe "cash cow" that the Defendants enjoyed.

278. But after the Durbin Amendment prevented the issuing of Debit Cards linked to only proprietary networks, the Defendants began rolling out in the United States of the Visa-and-MasterCard proprietary EMV technology they owned and controlled even though, by this time, more effective technologies had developed that would have addressed fraud in e-commerce transactions.

279. After the Durbin Amendment went into effect, Visa and MasterCard announced they both would begin implementing the technology in newly-issued cards, and that Merchants would need to update their point of sale terminals to accommodate the new technology by October 2015 or be responsible for certain types of chargebacks previously paid for by issuing banks. New cards would continue to have magnetic strips, and would therefore remain compatible with older point of sale terminals.

280. But when EMV was rolled out in the United States, instead of requiring Chip-and-PIN authentication, the Defendants implemented the less secure signature authentication. Despite widespread adoption of Chip-and-PIN abroad, the Defendants took the position that adopting Chip-and-PIN in the United States would not be feasible because Cardholders would have difficulty remembering PINs and using them would slow down the authentication process. That rationale was false. Almost all Debit Card users are already accustomed to remembering a PIN, and while EMV transactions sometimes take longer (especially those early on in the adoption process) than magnetic stripe transactions, this is the case whether or not the Cardholder uses signature or PIN authentication.

281. Thus, although the Defendants were pushing the proprietary EMV technology on Merchants—despite the fact that the technology was past its prime and superior tech was readily available—they did not require the entry of a PIN, which is one of the main security features of EMV technology that is proven to reduce fraud. The Defendants' omission of the PIN requirement demonstrates that any claim that the implementation of EMV technology was to reduce fraud is purely pretextual.

282. During the time between Visa's announcement necessitating Merchants' adoption of EMV technology, technologies emerged that would have enabled Merchants to have competitive routing options available on all PIN-Debit transactions, regardless of whether those transactions were verified with a PIN, signature, or had no verification method at all.

### 2. The Defendants utilize the EMV shift to perpetuate their monopoly power.

283. As EMV cards were rolled out in the United States, the Defendants, through Visa and MasterCard demonstrated their continuing market power and willingness to

engage in collusive behavior, this time drawing the ire of the Federal Trade Commission.

284. The Durbin Amendment to the Dodd-Frank Wall Street Reform and Consumer Act required certain new practices with respect to the acceptance of debit cards in the United States. One regulation promulgated from that Act by the Board of Governors of the Federal Reserve System, known as "Regulation II," regulated the routing of debit card interchange fees. This regulation prohibited all issuers and networks from restricting the number of networks over which electronic debit transactions may be processed to less than two unaffiliated networks.

285. The manner in which the Defendants rolled out the technology to allow for the choice mandated by the law was done in a way to thwart competition and enhanced the Networks' market power. First, both Visa and MasterCard gave this choice to the consumer rather than the merchant, but did not provide the consumer with any information about the economic results of his choice. As an example, when a customer selects PIN authorization using a new EMV terminal, she is prompted to choose whether she wishes to process the transaction over a "Visa Network" or a "US Debit Network." If the customer chooses "Visa Network," the transaction will be routed over Visa's PIN network, and incur a higher fee (for the merchant). If the customer chooses "US Debit Network," the transaction will be routed over the unaffiliated PIN networks, and incur the competitive, lower fee. The terminal does not further explain the difference between these two networks, or note the difference in each network's associated fees. Even if it did, this difference would be of little interest to the customer, since it is the merchant that directly incurs the transaction fee. By delegating this choice to the cardholder, who is completely indifferent to the two options and has no reason to understand the difference between them, the EMV terminals rob the merchants of the ability to route a PIN transaction over competitive networks, undermining the purpose

of Regulation II and maintaining the Defendants' supracompetitive dominance of the market.

286. While ostensibly increasing the freedom of choice of the cardholder, this change does no such thing. Rather, it shifts the choice away from a sophisticated stakeholder and gives it to a party who has no stake in or understanding of the choice at all. Delegating the choice to the cardholder serves only to eliminate price competition, without providing any additional benefit to cardholders.

287. Following the rollout of the new technology, there was outrage in the merchant community because they were being deprived of a competitive market by Visa and MasterCard who had taken away their ability to choose from multiple, low cost debit networks.

288. Learning of the Defendants' conduct and in the face of a bill that would repeal the Durbin amendment, the sponsor of the amendment, Senator Durbin (D-Ill), released a statement that said:

> Repealing the Durbin Amendment would be a windfall for Visa, MasterCard and the nation's biggest banks, but it would diminish transparency and competition in the debit card system and harm millions of Main Street merchants and their customers. Make no mistake – Main Street will not give up its hard-won gains under the Durbin Amendment without a fight. And repeal of the Durbin Amendment will not happen on my watch.
>
> While the big banks and card networks may want to reopen a battle they lost six years ago, Congress's time would be better spent investigating and reining in the new anti-competitive fees that keep popping up in the credit and debit card industries. Just last week I pointed out that Visa and MasterCard had created blatantly anti-competitive fees to penalize small banks and credit unions and deter them from doing business with other card networks. Continued vigilance by Congress and regulators is necessary to help expose these

rigged schemes and ensure that the credit and debit card systems operate fairly for all Americans.

289. After several lawsuits were filed against by major merchants seeking to open up the debit industry to competition among debit networks, on November 15, 2016, the FTC launched an investigation into Visa's anticompetitive steering and choice-reducing actions, which "addressed concerns that these customer selection requirements inhibited the merchant routing choice guaranteed by the Durbin Amendment." On November 22, 2016, the FTC announced that Visa had taken remedial actions including revising Visa Core Rule 1.5.4.6. Those actions made clear that merchants can continue to route debit transactions to any payment card network enabled on the card for that transaction and that merchants are not required to display these application selection screens to their customers.

290. This action by the Defendants and Visa in particular demonstrates that even after the EMV roll-out Defendants still maintained the market position to exclude competitors and did continue to harm competition by restricting the number of competitors and ability of competitors to compete as intended by the Dodd-Frank Act.

### 3. Defendants begin to restrain competition in the mobile-payments sector.

291. Visa's anticompetitive actions have not been limited to plastic Payment Cards. To the contrary, it has extended the abuse of its monopoly position to the mobile-payments space.

292. For example, Visa and its Member Banks have agreed to not allow Merchants to route Debit-Card transactions to competing Networks for "in-app" transactions (i.e., transactions that a consumer initiates from a mobile-payments app such as Amazon or eBay). "In app" purchases account for the majority of mobile-payment transactions.

293. Visa and MasterCard have also continued to impose uniform schedules of Default Interchange Fees even after the Durbin Amendment sought to cabin those fees. For "non-regulated" transactions (i.e., those with Issuers with under $10 billion in assets) the fees continue at their pre-Durbin supracompetitive levels. For "regulated" transactions, Visa and MasterCard impose Default Interchange Fees at the regulated level for all Issuing Banks, regardless of whether it or any Issuer could those fees based on costs.

294. Visa has also taken steps to cement its monopoly over Debit transactions conducted with a Mobile Device. As part of the EMV push, many Merchants now have the capability to accept biometrically authorized Mobile Payments. If a Merchant has the proper terminal—as do most Merchants that have EMV-capable terminals—it can accept a payment from a Cardholder who provides a biometric verification (usually a fingerprint on a mobile-phone button) for a particular transaction using the terminal's Near Field Communication ("NFC") technology. *See Visa Announces Plans to Accelerate Chip Migration and Adoption of Mobile Payments*, Visa (Aug. 9, 2011), *available at* https://usa.visa.com/about-visa/newsroom/press-releases.releaseId.1594598.html. Mobile payments enabled through NFC have the capability to inject needed competition into the industry in that consumers could load multiple payment methods on a mobile device, such that the Merchant had the ability to route transactions over the most cost-effective network present on the device. The combination of Mobile devices and NFC technology is commonly known as a "Digital Wallet" or "Mobile Wallet."

295. The most well-known early versions of digital wallets emerged in 2011 with the release of Google Wallet. Apple's Digital-Wallet platform, Apple Pay, followed in 2014. In 2015, both Android Pay (the successor to Google Wallet) and Samsung Pay were released. Other versions, including Microsoft Wallet, have been released more recently, with more expected in 2017 and beyond.

296. Digital wallets enable payments to be made from credit and demand deposit accounts using devices other than plastic Credit and Debit Cards. In a mobile payment at a brick-and-mortar business, a customer uses an application on a mobile device—instead of cash or a card—to pay for specific goods or services at checkout.

297. But competition that would inure to the benefit of Merchants and Cardholders is not favored by Defendants because it comes at the expense of their supracompetitive profits. Visa and MasterCard adopted and implemented EMV—and with it, NFC—technology with an eye toward using their market power to ensure their continued dominance even as Mobile Payments overtakes card-based payments. By requiring Merchants to install new EMV terminals already equipped with NFC technology, Visa and MasterCard substantially increased the odds that their proprietary NFC technology would become entrenched as the dominant method of accepting mobile payments.

298. As an example of inhibiting competition in mobile payments, Visa requires that, in all Debit-Card transactions in which the consumer selects a Visa Debit Card, that transaction is routed over Visa's network, even though, according to the Durbin Amendment, it should provide the Merchant with the option of routing the transaction over a competitive network.

299. Visa has admitted that it does not allow Merchant routing on payments made through the Google Wallet/Android Pay, available on Android devices. In August 2012, it stated that it "understand[s] that merchants/acquirers are unable (and will continue to be with this proposal) to make routing choices on Debit Cards which are required to support at least one non-affiliated network."

300. Visa also refuses to permit routing to competitive network on Apple's Apple Pay solution. According to various public sources, Visa has secured Apple's adherence to this scheme by paying it fifteen basis points (i.e., 0.15%) on all Debit-Card transactions initiated with Apple Pay at the point of sale. *See, e.g.*, Olga Kharif, Banks are

Ceding Ground to Apple Pay, BloombergBusinessweek (Feb. 18, 2016), *available at* https://www.bloomberg.com/news/articles/2016-02-18/banks-are-ceding-ground-to-apple-pay.

301. Visa's anticompetitive scheme in the mobile-payments space also prevented firms that offer "digital wallets"—mobile apps that enable consumers to pay for purchases using multiple forms of payment—from leveraging ACH networks (which link to all U.S. bank accounts and clear without Interchange Fees) to give Merchants a cost-effective alternative to accept mobile payments. For example, Visa and Apple agreed that Apple would not allow [REDACTED] in Apple Pay nor would it allow [REDACTED] in Apple devices.

302. As the payment sector landscape has changed, Visa and MasterCard have construed and applied their Honor-All-Cards Rules to become "Honor-All-Devices" Rules. Specifically, Visa and MasterCard rules require Merchants to accept all devices set up to transact through a Visa or MasterCard Network to the extent the Merchant accepts payments using communications technology employed by the device. This results in a Merchant having limited ability to refuse or condition acceptance of payments from digital wallets.

303. Merchants are thus restrained in their ability to refuse or condition payments from digital wallets because the Honor All Devices Rules require Merchants to accept all network-branded payments from any device that uses a communications technology accepted by the Merchant. If a Merchant accepts one kind of Visa- or MasterCard-affiliated digital wallet payment through NFC, then, it must accept all forms of Visa- or MasterCard-affiliated digital wallets.

304. Under the Honor All Devices Rules, Merchants cannot choose to honor only digital wallets that route through low-fee networks, or that offer more security. The rules inhibit market competition by removing the decision-making ability from the party that actually pays the fees on any transaction. Instead, the rules force the

Merchant to accept any Visa or MasterCard product from any digital wallet that a customer presents for payment.

### M. Experiences from outside of the United States demonstrate that Defendants' practices are anticompetitive.

305. Competition and regulatory authorities in several jurisdictions around the globe have concluded that Visa and MasterCard's Interchange Fees and Rules are anticompetitive and illegal.

306. As a result of these findings, Visa and MasterCard have been forced to change their practices to decrease their Interchange Fees and allow greater competition for Merchant acceptance. Without exception when Visa, MasterCard, and other networks have lowered their fees or loosened their Rules, Merchants have benefitted while the Networks have continued to thrive and even grow.

307. For example, in 2007 the European Commission ruled after an extensive investigation that MasterCard's uniform schedule of Default Interchange Fees violated Article 101 of the Treaty on European Union—the EU's equivalent to Section 1 of the Sherman Act.

308. The Commission's ruling was affirmed both by the EU's General Court and again by the Court of Justice of the European Union—the highest court in the European Union.

309. The court agreed with the Commission that MasterCard's Default Interchange fees harmed competition by "[limiting] the pressure which merchants can exert on acquiring banks when negotiating the [Merchant Discount] by reducing the possibility of prices dropping below a certain threshold, in contrast with 'an acquiring market operating without them." *MasterCard el al. v. Commission* (Case C-382/12 P) ¶ 193 (Sept. 11, 2014). (internal quotations omitted).

310. The court also concluded that MasterCard's IPO did not affect its status as an "association of undertakings"—EU's equivalent to the Sherman Act's "contract, combination, or conspiracy" element—because when Interchange Fees and Rules are set, the banks "intend or at least agree to coordinate their conduct by means of those decisions," and that the decisions on Interchange Fees and the Rules have "the same objective of joint regulation of the market within the framework of the same organisation, albeit under different forms." *Id.* ¶ 76.

311. After the Commission's decision against MasterCard, it opened a similar investigation into Visa's Default Interchange Fees and preliminarily concluded that Visa's Interchange Fees also harm competition. In response to the Commission's objections, Visa Europe committed in 2010 to reduce its Interchange Fees on Debit Cards to 0.2% and made a similar commitment in 2014 to reduce its Credit-Card Interchange Fees to 0.3%.

312. In 2015, the European Parliament capped Interchange Fees for bank-card Networks (i.e., Visa and MasterCard) at 0.2% for Debit Cards and 0.3% for Credit Cards. Subsequent legislation outlawed Payment-Card surcharges on regulated networks, which previously had been allowed. Merchants may continue to impose Surcharges on Payment-Card transactions on non-regulated Networks (such as American Express).

313. After the Defendants' Interchange Fees were capped, Merchants paid drastically less restrictive prices to accept Payment Cards, relative to before the various decisions and legislation. At the same time, Payment-Card Issuance continued to be profitable and only increased, demonstrating that Interchange Fees at today's levels are not necessary to operate a Payment-Card Network.

314. The Reserve Bank of Australia ("RBA") has also extensively investigated its domestic Payment-Card industry. In 2003, as a result of that investigation, the RBA ordered Visa and MasterCard to reduce domestic Interchange Fees by nearly half, from an average of 95 basis points (.95%) before the reforms to approximately 50 basis points

today. The RBA also required that Visa and MasterCard repeal their rules against Merchant surcharging and secured an agreement from American Express to voluntarily repeal its prohibition against surcharging.

315. Before the RBA's reforms, the Networks predicted that any significant reduction in Interchange Fees would lead to disaster, with MasterCard going so far as to assert that the reforms would initiate a "death spiral" that would lead to the collapse of both Payment Card issuance and acceptance.

316. Contrary to the Networks' doomsday predictions, however, the Payment-Card market in Australia prospers after the reforms. The data since the reforms indicate that card issuance and transaction volumes are up, total costs to Merchants and Cardholders have gone down, and banks remain profitable.

317. Australian Merchants have benefitted substantially from reductions in the Interchange Fee when Interchange Fees were reduced in Australia, MasterCard CEO Robert Selander explained that "There was a transfer of wealth annualized at about […] $500 million a year into the merchant community out of the bank community[…]" ("MasterCard Chief Claims Edge, Looks Ahead," American Banker, Aug. 1, 2007.) This reduction in Merchant fees exceeded the sum on increases in Cardholder fees and decreases in Cardholder rewards.

318. Payment-Card markets in Australia have also benefitted from Merchants' ability to surcharge. As of 2014, when Merchants had the ability to surcharge for over a decade, the RBA reported that 43 percent of Merchants imposed surcharges on at least some Payment-Card transactions. While large Merchants were the most likely to surcharge, even small Merchants took advantage of their freedom to surcharge. And many large Australian Merchants that do not surcharge have used the threat of surcharging to negotiate lower Interchange Fees or Merchant Discount Fees.

319. The beneficial effect of surcharging is most apparent by examining American Express, which is not subject to the RBA's rate reductions. According to the RBA's 2016

review of its Payment-Card reforms, American Express decreased its Merchant Discount Rates from approximately 2.5% before the reforms to 1.6% today. This constitutes a larger drop than Visa or MasterCard experienced after their fees were regulated.

320. In addition to putting downward pressure on Payment-Card acceptance costs, the RBA concluded that its reforms—including the mandated liberalization of the Networks' Rules—resulted in increased transparency, which in turn has improved Merchants' bargaining position vis-à-vis the Networks and Acquirers, thereby resulting in lower card-acceptance costs.

321. Experiences from other countries with Payment-Card networks that function with zero or minimal Interchange Fees place the final nails in the coffin of the "death spiral" argument.

322. In 2006, the New Zealand Commerce Commission—that country's antitrust enforcer—issued a Statement of Claim alleging that Visa and MasterCard's uniform schedules of Default Interchange Fees constituted unlawful price fixing.

323. In 2009, the Commission settled with Visa and then MasterCard on terms that allowed Issuers to set their own Interchange Fees, subject to Network-established maximum rates. The settlement also allowed Merchants to surcharge Credit-Card transactions by Network (i.e., all Visa or MasterCard cards), by product (i.e., all "Premium" Credit Cards), or by Issuer. The Networks also agreed to reimburse the Commission for its costs of bringing the action. This arrangement enabled Merchants to negotiate bilateral Interchange Fees with Issuers and accordingly gave Issuers some incentive to compete for Merchant acceptance.

324. The New Zealand settlement demonstrates that the Networks are willing and able to permit Merchants to steer Cardholders to cost-effective payment methods, including doing so by Issuer without incurring any harm. Since the time of the

settlement, Payment-Card Networks and Issuers have continued to thrive, as card issuance and transaction volume have only increased since the settlement.

325. In addition to the experiences after Payment-Card reforms in Europe, Australia, and New Zealand, more evidence that uniform schedules of Default Interchange Fees are unnecessary to the effective functioning of a Payment-Card Network may be found in Canada, Norway, Finland, Germany, Denmark, The Netherlands, where national Debit-Card Networks function effectively without Interchange Fees. Until Visa acquired Interlink and imposed an Interchange Fee, regional PIN-Debit networks in the United States functioned efficiently without an Interchange Fee.

### N. The practices above harm competition.

326. The rules requiring the payment of Interchange Fees on every transaction, the collective setting of uniform schedules of Default Interchange Fees, and the continued imposition of these fees on all Merchants that accept Visa and MasterCard Payment Cards restrains competition between Visa and MasterCard Member Banks in the Relevant Markets. This harms competition by imposing large and ever-increasing Interchange Fees, which thereby elevates Merchant-Discount Fees to supracompetitive levels.

327. The Defendants' uniform schedules of Default Interchange Fees are not necessary—or more restrictive than necessary—to attain any procompetitive benefit that they may argue exists. The process by which "Default" Interchange Fees are determined by the Defendants is not intended to, and does not and cannot, maintain pricing equilibrium in a two-sided platform between Cardholders and Merchants. Instead, "default" interchange rates are set by the Defendants with the objective of maximizing profits among the Issuing Banks. The Defendants set "default" Interchange Fees at levels that seek to avoid the exit of Issuing Banks from the illegal combination

and competing with the Networks. Further, in setting "Default" Interchange Fees, Visa has sought to transfer costs to Merchants, such as the risk of Cardholder default, which in a competitive market would not be borne by Merchants.

328. Not only do Defendants' Default Interchange Fees elevate Merchants' card-acceptance prices above competitive levels but they also increase the prices in the alternative Relevant Markets for General-Purpose-Card Network Services to Merchants and Cardholders and Debit-Card Network Services to Merchants and Cardholders described in Section IX.C. and IX.D. below.

329. Specifically, Visa admits that it earns revenue only if Issuing Banks make a profit, and has framed its setting of "default" interchange based solely on creating financial incentives to increase issuing banks' revenues. Visa does not know or attempt to determine the optimal level of fees to maximize output over its purported "two-sided" market. (Sheedy 30(b)(6) Dep. Tr. at 284:10-285:25, 286:23-287:20.)

330. The Anti-Steering Restraints harm competition by allowing Defendants to insulate themselves from competition from lower-priced General-Purpose-Card and Debit-Card Network Service providers, by inflating prices for all consumers, by compelling inequitable subsidies that adversely affect the least-affluent U.S. consumers, and by allowing Defendants to continue their practices of collectively fixing supracompetitive, uniform Interchange Fees.

331. The Anti-Steering Restraints also harm competition in the alternative Relevant Markets for General-Purpose-Card Network Services to Merchants and Cardholders and Debit-Card-Network Services to Merchants and Cardholders, in that they prevent the price signals from Merchants to Cardholders that would allow the pair to arrive at an efficient price. With the Anti-Steering Restraints in place, Payment-Card transactions carry a higher "combined price" to the Merchant and Cardholder than they would have carried in the absence of the restraints.

332. The damages suffered by the Class Members accumulate and increase with each passing day that Defendants' anticompetitive practices are allowed to continue. These damages will continue to increase during the pendency of this suit until halted by Court Order.

333. Through their anticompetitive activities in the mobile-payments sector, Defendants have foreclosed rival Debit Networks from competing with Visa and MasterCard for Merchant acceptance and have frustrated one of the central purposes behind the Durbin Amendment and the DOJ's consent decree with Visa and MasterCard, to the detriment of Merchants and Cardholders.

### O. The Defendants' uniform schedules of Default Interchange Fees and Anti-Steering Restraints are not necessary to the functioning of a Payment-Card Network.

334. The Visa and MasterCard Networks could function efficiently without rules requiring the payment of Interchange Fees on every transaction. Even if the Member Banks of Visa and MasterCard did not fix and agree to abide by uniform schedules of default Interchange Fees, the Visa and MasterCard Networks could continue in their roles as standard-setting organizations for Payment-Card transactions. Many examples of similar networks exist that function efficiently without rules requiring the payment of Interchange Fees on every transaction. These include the Interac Debit Card network in Canada, and domestic Payment-Card networks in Norway, The Netherlands, Denmark, Finland, Luxembourg and Iceland. There are even more examples of networks that operate efficiently with dramatically lower Interchange Fees, including Payment-Card networks in all other industrialized countries. These include Australia and the European Economic Area (consisting of the European Union plus four nonmember states).

335. The uniform schedules of Interchange Fees and rules requiring the payment thereof are not a core function of the Visa and MasterCard Credit and Signature-Debit

networks. They are not reasonably necessary to the operation of the Visa and MasterCard Networks. Even if some Interchange Fees were reasonably necessary, Defendants' uniform schedules of Interchange Fees are more restrictive of competition than is necessary to effectuate the business of Visa and MasterCard.

336. Unlike the early days of Visa and MasterCard when Interchange Fees were purportedly based on certain Issuer costs, the Networks now set their Interchange Fees based upon their perceptions of the elasticity of demand of Merchants. This permits the Networks and their Member Banks to identify and impose on each category of Merchants an Interchange Fee that approximates the "reservation price" of Merchants in that category. This is the pricing strategy typically associated with firms that possess substantial market power.

## IX. Relevant Markets

### A. General-Purpose-Card Network Services

337. A relevant market exists, the product dimension of which is no broader than General-Purpose Cards. *In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568, at *3 (E.D.N.Y. Apr. 1, 2003); *United States v. Visa*, 163 F. Supp. 2d 322, 335 (S.D.N.Y. 2001). The geographic dimension of this market is the United States ("General-Purpose-Card Market"). *United States v. Visa*, 163 F. Supp. 2d at 339-40 (S.D.N.Y. 2001), aff'd, 344 F.3d at 239 (2d Cir. 2003).

338. A separate relevant market exists, the product dimension of which is no broader than General-Purpose-Card Network Services. *In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568, at *3 (E.D.N.Y. Apr. 1, 2003); *United States v. Visa*, 163 F. Supp. 2d at 338, aff'd, 344 F.3d at 239. General-Purpose-Card Network Services consists of the acceptance of General-Purpose Cards by Merchants as payment for

goods and services. The geographic dimension of this market is the United States ("General-Purpose-Card-Network-Services Market").

339. The evidence at trial may establish the existence of narrower Relevant Markets, such as a market for the acceptance of Visa-branded or MasterCard-branded Credit-Card transactions.

340. The relevant-market inquiry in this case "is not the same as" that in *United States v. Am. Express Co.*, ___ F.3d ___, No. 15-1672 (2d Cir. 2016) (Slip Op. at 40). Unlike American Express, which is a "three-party" network that the Second Circuit opined to be a "single firm operating within the broader 'network services' industry at issue in [*United States v.*] *Visa*," Visa and MasterCard's restraints were adopted by "20,000 competitors."

341. A hypothetical monopolist in the market for General-Purpose-Card Network Services could impose a small but significant and nontransitory increase in price of at least five percent without losing significant Merchant acceptance.

342. Both Visa and MasterCard, "together with their Member Banks," jointly and separately, have market power in the markets for General-Purpose Cards and General-Purpose-Card Network Services. *United States v. Visa*, 163 F. Supp. 2d at 340, *aff'd*, 344 F.3d at 239.

343. The market shares of Visa and MasterCard indicate that each has market power in the General-Purpose-Card-Network-Services market. In 1999, Visa had a 47% share of the General-Purpose-Card transactions by dollar volume in the United States, while MasterCard's share was 26%. Visa and MasterCard had a combined market share of 73%. *United States v. Visa*, 163 F. Supp. 2d at 341. At that time, Visa and MasterCard collectively issued 85% of the General-Purpose Cards in the United States. *Id*.

344. In 2015, Visa transactions accounted for 47.5% of U.S. General-Purpose-Card purchase volume, which included American Express, and Discover. Visa's market share is significantly higher if Charge Cards are excluded from the market.

345. In 2015, MasterCard transactions accounted for 23% of all General-Purpose-Card purchase volume in the United States. Again, this figure would be even higher if Charge Cards were excluded from the market.

346. The Defendants' market shares underestimate their market power because the Anti-Steering Restraints convert Merchants' acceptance decisions into an all-or-nothing proposition where Merchants that have decided to accept one of the Networks' Payment Cards must accept all of that Networks' cards without regard to the costs of that Payment Card. Thus, unlike in other markets, the consumers of Network Services (Merchants) cannot accept more or less of a particular Payment-Card product depending on the price of that product.

347. Concerted activity between Visa and MasterCard allows the Networks to collectively assert market power. *See In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568, at *3 (E.D.N.Y. Apr. 1, 2003) (noting evidence of collusion between Visa and MasterCard with respect to their Debit Card strategies).

348. Merchants do not view Debit-Card Network Services and General-Purpose-Card Network Services as interchangeable. This is demonstrated by the fact that Merchants continue to accept Visa and MasterCard Credit Cards even though the Interchange Fees associated with Credit Card transactions are significantly higher than the fees associated with Debit-Card transactions.

349. A natural experiment occurred after the passage of the Durbin Amendment, which confirms that General-Purpose-Card Network Services and Debit-Card Network Services are separate Relevant Markets. At that time, the Federal Reserve capped Debit-Card Interchange Fees at levels that, for most Merchants, were a fraction of the then-existing Credit-Card Interchange Fees. Despite the increased delta between Debit-Card and Credit-Card acceptance costs, no significant Merchant discontinued acceptance of Defendants' Credit Cards after Durbin. Defendants did not decrease their Credit-Card

Interchange Fees, as one would expect if General-Purpose-Card Network Services and Debit-Card Network Services were in the same relevant market.

350. Throughout the relevant time period, Visa and MasterCard have increased Interchange Fees by large amounts, and introduced new premium Credit Cards with much higher Interchange Fees, without losing significant Merchant acceptance as a result.

351. None of the increases in Visa and MasterCard's Credit-Card Interchange Fees during the relevant time period have been attributable to increases in the level of costs associated with the operations of the Networks.

352. The demand for General-Purpose-Card-Network Services is unresponsive to the prices of other, facially similar products. For example, when the Durbin Amendment's caps on Debit-Card Interchange Fees went into force, Visa and MasterCard did not lower General-Purpose-Card Interchange Fees in response, indicating that the Networks did not fear that Merchants would refuse to accept or steer customers away from General-Purpose Cards in favor of Debit Cards. In fact, total transaction volume for Visa and MasterCard Credit Cards did not decline after the Durbin debit interchange limits were adopted.

353. Visa and MasterCard have exercised their market power in the General-Purpose-Card-Network-Services market. As the court noted in the United States' action against the Networks, Visa and MasterCard raised Credit-Card Interchange Fees charged to Merchants a number of times without losing Merchants. *United States v. Visa*, 163 F. Supp. 2d at 340. Visa and MasterCard continue their practice of increasing Interchange Fees, again without losing significant Merchant acceptance.

354. Visa and MasterCard have also demonstrated their market power by "price discriminating" in the level of Interchange Fees imposed on various Merchants and for various types of transactions. *United States v. Visa*, 163 F. Supp. 2d at 340. Since the

United States' action, Visa and MasterCard have only increased their price-discrimination practices.

355. The Networks' price-discrimination among categories of Merchants is not based on cost but is based instead on the Networks' perception of the "elasticity of demand" (i.e., the Merchants' willingness to pay) of the various categories of Merchants. The Networks' practice is to impose the highest fees on those Merchants that have the fewest options to discontinue acceptance when fees increase.

356. The Networks' pricing policies are reflected in the comments of MasterCard's Associate General Counsel before the European Commission in 2007. The Associate General Counsel discussed that when MasterCard performs a cost study, it attempts to answer the following question: "How high could interchange fees go before we would start having serious acceptance problems, where Merchants would say: we don't want this product anymore, or by Merchants trying to discourage the use of the card either by surcharging or discounting for cash." European Commission, Commission Decision of December 19, 2007 Relating to a Proceeding Under Article 81 of the EC Treaty and Article 53 of the EEA Agreement (COMP/34.579; COMP 36.518; COMP 58.580) at 56.

357. Visa and MasterCard have also forced Premium Credit Cards upon Merchants that accept Visa and MasterCard Credit Cards. These Premium Cards carry higher Interchange Fees than non-premium cards and many Merchants would refuse to accept them or steer customers away if they had the power to do so. Visa and MasterCard rules require Merchants that accept Visa and MasterCard Credit Cards to also accept these "Premium Cards," and prevented or limited their ability to steer customers of less expensive forms of payment to less expensive forms of payment. The inability of Merchants to resist the imposition of higher Interchange Fee cards further demonstrates Visa and MasterCard's market power.

358. There are significant barriers to entry in the General-Purpose-Card-Network-Services Market. Because of these barriers, the only successful market entrant since the 1960's has been Discover, which was introduced by Sears and benefited from its then extensive network of stores, its extensive base of customers who carried Sears' store card, and its relationship with financial services from Dean Witter.

359. New entry into the General-Purpose-Card-Network-Services Market would cost more than $1 billion and would involve a "chicken-and-egg problem of simultaneously developing a large Merchant acceptance network as well as a network of millions of cardholders who, in turn, are needed to induce Merchants to accept the system's cards in the first place." *United States v. Visa*, 163 F. Supp. 2d at 342.

360. Barriers to entry are so great that would-be entrants, such as Apple or Android, find it in their interest to take a share of Defendants' supracompetitive profits rather than to launch a payment solution to compete with Defendants.

361. Visa and MasterCard's substantial (individual and collective) market power in the General-Purpose-Card and Debit-Card Network-Services Markets has been reinforced by their implementation and enforcement of the Anti-Steering Restraints and Miscellaneous Exclusionary Restraints, which insulate them from competition that would exist in a free market.

362. The evidence at trial may establish that the markets relevant for the provision of Network Services are narrower "single brand" markets, i.e. a market for the processing of Visa Payment-Card transactions, and a market for the processing of MasterCard Payment-Card transactions. Or, the evidence at trial may establish other Relevant Markets affected by Defendants' conduct.

363. Single-brand markets may exist because, from a Merchant's perspective, the acceptance of Visa Payment-Card transactions does not substitute for the acceptance of MasterCard Payment-Card transactions and vice versa. When a consumer presents a Visa Payment Card to a Merchant, for example, the Merchant cannot accept that

transaction unless it has an agreement with a Visa Member Bank to acquire Visa transactions. An agreement with a MasterCard Member Bank to process MasterCard transactions does not provide the Merchant with the services it needs to process this Visa transaction.

364. As former Federal Trade Commission Chairman (and at that time Visa's paid consultant) Tim Muris noted, "[m]ost Merchants cannot accept just one major card because they are likely to lose profitable incremental sales if they do not take the major Payment Cards. Because most consumers do not carry all of the major Payment Cards, refusing to accept a major card may cost the Merchant substantial sales." Timothy J. Muris, Payment Card Regulation and the (Mis)application of the Economics of Two-Sided Markets, 2005 Colum. Bus. L. Rev. 515, 522 (2005).

**B. Debit-Card Network Services**

365. A separate relevant market exists, the product dimension of which is no broader than Debit Cards. *See In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568, at *2 (E.D.N.Y. Apr. 1, 2003). The geographic dimension of this market is the United States.

366. A relevant market exists, the product dimension of which is no broader than Debit-Card Network Services. *See In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568, at *7 (E.D.N.Y. Apr. 1, 2003). Debit-Card Network Services consists of the acceptance of Debit Cards by Merchants as payment for goods and services.

367. The evidence at trial may also establish the existence of narrower markets for Signature-Debit-Card Network Services and PIN-Debit-Card Network Services and may also establish that "single-brand" markets exist for the processing of Visa Debit-Card Network Services and MasterCard Debit-Card Network Services. The geographic dimension of this market is the United States.

368. The relevant-market inquiry in this case "is not the same as" that in *United States v. Am. Express Co.*, ___ F.3d ___, No. 15-1672 (2d Cir. 2016) (Slip Op. at 40). Unlike American Express, which is a "three-party" network that the Second Circuit opined to be a "single firm operating within the broader 'network services' industry at issue in [*United States v.*] *Visa*," Visa and MasterCard's restraints were adopted by "20,000 competitors." *Id.*

369. Debit Cards and Debit-Card Network Services are unique bundles of services. Consumers who use Debit Cards either want to or have to make contemporaneous payment for their purchases with funds in their depository accounts. These consumers either cannot borrow money for those purchases (because they may not be deemed credit-worthy by Credit Card Issuing Banks) or choose not to.

370. Other payment products are not reasonable substitutes for Debit Cards and Debit-Card Network Services. Visa and MasterCard do not consider other products such as Credit Cards, checks, and cash when setting Debit-Card Interchange Fees. Cash cannot be used for online purchases and only a handful of online Merchants accept check payments.

371. Before the Durbin Amendment capped Debit-Card Interchange Fees for most transactions, Debit-Card Interchange Fees were increasing, unconstrained by any other form of payment. If the Interchange-Fee caps under the Durbin Amendment were repealed, a hypothetical monopolist in the market for Debit-Card Network Services could impose a small but significant and nontransitory increase in price of at least five percent.

372. As detailed above, Visa completed a decades-long strategy to "converge" PIN-Debit and Offline-Debit Interchange Fees in 2010. Until that time, submarkets within the markets for Debit Cards and Debit-Card-Network Services, existed for respectively PIN-Debit Cards and Signature Debit Cards, and for PIN-Debit-Card-

Network Services and Offline-Debit-Card Network Services. The evidence at trial may also establish that these submarkets continued beyond 2010 and even to this day.

373. From a consumer's perspective, Signature Debit Cards were not interchangeable with PIN-Debit Cards. Signature Debit Cards carried a Visa or MasterCard "Bug" and therefore were accepted by virtually all Merchants that accepted Visa and MasterCard Payment Cards. On the other hand, PIN-Debit Cards were accepted at many fewer Merchant locations and therefore a consumer who preferred to pay for purchases with a PIN-Debit Card must necessarily have carried an alternate form of payment as well.

374. Because Signature Debit Cards uniquely enabled consumers to make certain types of purchases, the acceptance of Signature Debit Cards was also unique from a Merchant's perspective. Therefore no other services existed that were reasonably substitutable for Offline-Debit-Card-Network Services.

375. PIN-Debit transactions require a PIN pad and are not processed by a paper receipt. This means that a greater upfront cost existed to the Merchant for accepting PIN transactions, and in some situations, the use of a PIN-Debit Card required a change in business procedures. For example, in a restaurant, if customers did not pay at a central location, the server would have to bring a wireless PIN pad to the table. These practices are common in Canada and other countries in which Zero-Interchange-Fee PIN-Debit Card networks are well-established, but, at least as of the time that Visa's "Convergence" strategy was completed, were not common in the United States.

376. Visa and MasterCard have market power in the market for Debit-Card-Network Services. As of 2015, Visa had a 53.4% share of U.S. Debit-Card transaction volume, while MasterCard's share was 21.3%. These figures understate the Defendants' market power because the Anti-Steering Restraints shield them from meaningful competition.

377. The Defendants' market shares underestimate their market power because the Anti-Steering Restraints convert Merchants' acceptance decisions into an all-or-nothing proposition where Merchants that have decided to accept one of the Networks' Payment Cards must accept all of that Networks' cards without regard to the costs of that Payment Card. Thus, unlike in other markets, the consumers of Network Services (Merchants) cannot accept more or less of a particular Payment-Card product depending on the price of that product.

378. Concerted activity between Visa and MasterCard allows the Networks to collectively assert market power. *See In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568, at *3 (E.D.N.Y. Apr. 1, 2003) (noting evidence of collusion between Visa and MasterCard with respect to their Debit Card strategies).

379. The experience after the settlement in *In re Visa Check and MasterMoney Antitrust Litigation* illustrates that Debit-Card-Network Services is a separate Relevant Market from General-Purpose Card Network Services and that Defendants have market power in that market. As a result of that settlement, Visa and MasterCard modified their Honor-All-Cards Rules to allow Merchants to accept only Debit Cards or only Credit Cards, if they so choose. Despite Merchants' somewhat greater freedom to make their own acceptance decisions, few Merchants chose to drop acceptance of Visa and MasterCard Debit Cards, despite the fact that those cards were significantly more expensive than those of other Debit-Card Networks. Also, few Merchants that had not accepted Visa or MasterCard Payment Cards chose to begin accepting Visa or MasterCard Debit Cards without also accepting Visa or MasterCard Credit Cards.

380. Another natural experiment occurred after the passage of the Durbin Amendment that confirmed that Defendants have market power in the Debit-Card Network-Services market. While the Durbin Amendment and subsequent Federal Reserve regulations capped Interchange Fee levels at a fraction of the previously existing levels, Defendants responded to the caps by raising all Interchange-Fee

categories to the Federal Reserve cap. For some small-ticket Merchants such as convenience stores, quick-service restaurants, and coffee shops, this represented a significant Interchange-Fee increase (these Merchants generally paid a low per-transaction amount and a small ad valorem percentage pre-Durbin, but paid the allowed maximum of $0.23 plus 5 basis points post-Durbin). Despite the Debit-Card-Interchange-Fee increases, these Merchants did not discontinue accepting Visa and MasterCard Debit Cards.

381. When they existed, Visa and MasterCard had market power in the submarkets for Signature Debit Cards and Offline-Debit-Card-Network Services and Visa had market power in the submarkets for PIN-Debit Cards and PIN-Debit-Card-Network Services. As of 2007, Visa's share of the Offline-Debit-Card transaction volume was 74% and MasterCard's was 26%. Visa's share of PIN-Debit-Card transaction volume was 39% in 2006 but, on information and belief, exceeded 50% by 2010.

382. By adopting and enforcing the Anti-Steering Restraints, and thwarting the procompetitive reforms of the Durbin Amendment and the DOJ consent decree, Visa and MasterCard have successfully excluded competition in the Relevant Market.

383. The Relevant Markets described in this section are characterized by high barriers to entry. Despite technological advances in data processing and mobile computing that have enabled entrants to "disrupt" established players in many industries, no meaningful entry has occurred in the Debit-Card or Debit-Card-Network Services Relevant Markets. Moreover, new entrance into these markets would be costly and would involve the "chicken-and-egg" problem of signing up both Card-Issuing banks and Merchants for the network. Visa has entered into exclusive business arrangements with many Member Banks which are designed to further raise entry barriers.

### C. General-Purpose-Card Network Services to Merchants and Cardholders.

384. In the alternative, the evidence may establish that there exists a Relevant Market, the product dimension of which is General-Purpose-Card-Network Services to Merchants and Cardholders. The geographic dimension of this market is the United States.

385. If proven, alternative Relevant Market for General-Purpose-Card-Network Services to Merchants and Cardholders consists of the Authorization, clearing, and Settlement services to Merchants, on one hand, and also to Issuing Banks and Cardholders on the other.

386. Other services do not compete with General-Purpose-Card-Network Services to Merchants and Cardholders. Some consumers prefer Credit Cards because they do not have the funds available in their demand deposit accounts to purchase particular items and thus rely on the credit facility that Credit Cards supply. Likewise, Merchants understand that they will lose sales from these credit-dependent Cardholders if they do not accept Credit Cards.

387. As a result of Defendants' practices, the price of General-Purpose-Card Network Services to Merchants and Consumers is higher than it would be in a competitive market. Credit-Card Issuers do not completely pass through the cost of supracompetitive Interchange Fees to Cardholders. Thus, a significant portion of the Interchange Fees that Defendants impose on Merchants are transferred to Issuers in the form of supracompetitive profits.

388. Throughout the relevant time period, the price of General-Purpose-Card Network Services to Merchants and Cardholders has increased significantly, without the Defendants losing significant transaction volume.

389. More recently, when the Durbin Amendment's caps on Debit-Card Interchange Fees entered into force, Visa and MasterCard did not respond by lowering

the price of General-Purpose-Card-Network Services to Merchants and Cardholders, indicating that they did not fear that Merchants and Cardholders would switch to Debit Cards over Credit Cards, even in the face of a significant price differential.

390. Both Visa and MasterCard have market power in the Relevant Market for General-Purpose-Card-Network Services to Merchants and Cardholders. The Networks' rules that require all General-Purpose Cards of a particular network to be accepted by participating Merchants, together with the requirement that an Interchange Fee be paid, and until recently, prohibitions on Merchant Steering, allowed Defendants to raise Interchange Fees to supracompetitive levels, without losing acceptance to other networks or forms of payment. Nor did Cardholders switch to competing networks or forms of payment in a degree sufficient to make these price increases unprofitable, even though Cardholders received only a fraction of the supracompetitive Interchange Fees indirectly rebated to them.

391. The Anti-Steering Restraints reinforce Defendants' market power in this market. Absent the Anti-Steering Restraints, a Merchant could send an efficient price signal to the Cardholder in a given transaction, thereby enabling the combination of the two actors—the Merchant and the Cardholder—to choose the payment form that provides the optimal combination of price and benefits to the Merchant and the Cardholder.

392. History illustrates the extent of Defendants' market power in the market for General-Purpose-Card-Network Services to Merchants and Cardholders. Up to the mid-1980s, few if any Visa or MasterCard Issuing Banks provided Cardholders with the types of rewards that they now argue justify the existence of these fees. This changed when Discover—then a maverick entrant—offered Cardholders one-percent cashback on purchases. While Visa and MasterCard Issuing Banks responded by offering their own rewards, Issuers still refunded only a fraction of the Interchange Fees they received from issuing Visa and MasterCard Credit Cards.

393. Similarly, when the United States Court of Appeals for the Second Circuit affirmed that Visa and MasterCard's exclusionary rules violated Section 1 of the Sherman Act, American Express began approaching Issuing Banks to persuade them to issue American Express cards. Visa and MasterCard responded to this development by increasing their own Interchange Fees significantly to prevent Issuers from defecting to American Express, without regard to the effect on Acquiring Banks or Merchants. While some Issuers provided more lucrative rewards programs to Cardholders after Visa and MasterCard increased Interchange Fees, any increase in rewards provided to Cardholders was far surpassed by the Increase in Interchange Fees borne exclusively by Merchants. Accordingly, even if the rewards provided to Cardholders were considered part of the "price" of General-Purpose-Card Network Services, Defendants have been able to increase that price to supracompetitive levels without losing transaction volume to other networks or Forms of Payment.

394. The Defendants' Rules also reinforce Defendants' market power in this alternative Relevant Market for General-Purpose-Card-Network Services to Merchants and Cardholders. For example, the "Hold-Up Problem" created by the Honor-All-Cards Rule and reinforced by the Default Interchange Rule has eliminated any incentive for Issuers and Merchants to enter into bilateral acceptance agreements, whereby Issuers could incent Cardholders to patronize particular Merchants by offering the Cardholder unique rewards or benefits and a reduced cost of acceptance to the Merchant. The Hold-Up Problem and the ensuing disincentive to enter bilateral acceptance agreements, together with the restrictions of the Anti-Steering Restraints, agreements artificially inflates the cost of General-Purpose-Card Network Services to Merchants and Cardholders above what would exist in a competitive market.

395. Even Defendant Chase admits that the Visa and MasterCard Rules inhibit competition and reinforce the Defendants' market power. A Chase document produced in this litigation acknowledges the "weakness…of [the] existing network payment

model" in the "[i]nability for issuers to control key aspects of the product pricing (e.g. interchange rates…)" and the "[c]urrent network requirements on product design and branding [that] [l]imit[] issuer differentiation opportunities [and the] ability to directly compete with other issuers." Despite its dissatisfaction with the "existing network payment model," Chase continues to adhere to the Visa and MasterCard cartel for the same reason that other cartellists do – the supracompetitive profits of conspiracy exceed the profits of competition.

### D. Debit-Card Network Services to Merchants and Cardholders

396. In the alternative, the evidence may prove that there exists a Relevant Market, the product dimension of which is Debit-Card-Network Services to Merchants and Cardholders. The geographic dimension of this market is the United States.

397. If proven, alternative Relevant Market for Debit-Card-Network Services to Merchants and Cardholders consists of the Authorization, clearing, and Settlement services to Merchants, on one hand, and also to Issuing Banks and Cardholders on the other.

398. Other services to not compete with Debit-Card-Network Services to Merchants and Cardholders. Visa and MasterCard do not consider other products such as Credit Cards, checks, and cash when setting Debit-Card Interchange Fees. Cash cannot be used for online purchases and only a handful of online Merchants accept check payments. Likewise, consumers who are not creditworthy or who prefer not to incur debt on purchases do not view Credit Cards as adequate substitutes for Debit Cards.

399. Defendants have market power in the market for Debit-Card-Network Services to Merchants and Cardholders.

400. Before the Durbin Amendment capped Debit-Card Interchange Fees for most transactions, Debit-Card Interchange Fees were increasing, unconstrained by any other

form of payment, even if one considered the portion of those fees that were "refunded" to Cardholders in the form of rewards and other benefits.

401. If the Interchange-Fee caps under the Durbin Amendment were repealed, a hypothetical monopolist in the market for Debit-Card Network Services to Merchants and Cardholders could impose a small but significant and nontransitory increase in price of at least five percent, even if one considers the portion of those fees that are "refunded" to Cardholders in the form of rewards and other benefits.

402. The Visa "Convergence" story detailed above in Section VIII.D. illustrates the market power of it and its Member Banks, even if one considers the portion of Interchange Fees that were "refunded" to Cardholders in the form of rewards and other benefits. Only a small portion of the supracompetitive fee increases that brought about the "convergence" of Interchange Fees for PIN-Debit Cards and Offline-Debit-Cards were refunded to Cardholders.

403. The Anti-Steering Restraints reinforce Defendants' market power in this market. Absent the Anti-Steering Restraints, a Merchant could send an efficient price signal to the Cardholder in a given transaction, thereby enabling the combination of the two actors—the Merchant and the Cardholder—to choose the payment form that provides the optimal combination of price and benefits to the Merchant and the Cardholder.

404. Defendants' ability to thwart competition by preventing the competitive routing options that should have been available to Merchants as a result of the Durbin Amendment also illustrates their market power in this market, in that competitive routing options could have inured to the benefit of Cardholders as well as Merchants, if, for example, Issuers offered Cardholders benefits for using Debit Cards that enabled transactions over competitive PIN-Debit networks or if Merchants lowered their prices in response to lower Debit-Card Interchange Fees.

405. Until Visa completed its "Convergence" strategy, submarkets within the markets for Debit Cards and Debit-Card-Network Services to Merchants and Cardholders, existed for respectively PIN-Debit Cards and Signature Debit Cards, and for PIN-Debit-Card-Network Services to Merchants and Cardholders and Offline-Debit-Card Network Services to Merchants and Cardholders.

406. When submarkets existed, Visa and MasterCard had market power in the submarkets for Offline-Debit-Card-Network Services to Merchants and Cardholders while Visa had market power in the submarkets for PIN-Debit-Card-Network Services to Merchants and Cardholders.

407. As noted in ¶ 383 above, high barriers to entry exist in the Debit-Card-Network-Services Market, regardless of whether the market is defined to include Cardholders as well as Merchants.

## FIRST CLAIM FOR RELIEF

**Plaintiffs vs. Visa and Bank Defendants for damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, unlawful price fixing of Credit-Card Interchange Fees by Visa and its Member Banks**

408. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth herein.

409. The Member Banks of Visa, including the Bank Defendants — direct, horizontal competitors of each other — engaged in unlawful contracts, combinations, and conspiracies among themselves and with Visa in an unreasonable restraint of interstate trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

410. Visa and its Member Banks have and exercise market power in the General-Purpose-Card Relevant Markets.

411. The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings, and concerts of action between and among Visa's issuing and acquiring members including the Bank Defendants and Visa, the substantial terms of which were to illegally fix, raise, maintain, or stabilize the Credit-Card Interchange Fees that are imposed on Merchants in the General-Purpose-Card Relevant Markets.

412. The Visa Board of Directors, which for much of the relevant time period included representatives from several Bank Defendants, acted on behalf of the Member Banks to fix, raise, maintain, or stabilize the Interchange Fees for Visa transactions, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

413. All of the Member Banks of Visa, including the Bank Defendants, have actual knowledge of, and have knowingly participated in, the conspiracy alleged herein.

414. The contracts, combinations, and conspiracies alleged herein began before Visa's 2008 IPO and have continued after that date. Even after Visa's IPO the Bank Defendants'—and other banks'—membership in Visa is contingent upon those banks agreeing to adhere to the anticompetitive rules and uniform schedule of Default Interchange Fees described herein.

415. Even after Visa's IPO, each Member Bank agrees to adhere to Visa's uniform schedules of Default Interchange Fees and knows, understands, and expects that all other Member Banks will agree to abide by the same rules and uniform schedule of default Interchange Fees.

416. The contracts, combinations, conspiracies, and agreements alleged in this First Claim has had, and/or is likely to have, among others, the following anticompetitive effects which are common to Plaintiffs and Class Members:

a. Actual and potential competition in the General-Purpose-Card Relevant Markets was substantially excluded, suppressed, and

effectively foreclosed and thus competition has been unreasonably restrained;

b. Defendants acquired and maintained market power in the General-Purpose-Card Relevant Markets;

c. Defendants controlled, maintained, and elevated above competitive levels the Interchange Fees imposed on Class Members in the General-Purpose-Card Relevant Markets;

d. All Class members were required to pay supracompetitive Credit-Card Interchange Fees for Visa transactions in the General-Purpose-Card Relevant Markets;

e. Defendants derived direct and substantial economic benefits from the supracompetitive Credit-Card Interchange Fees for Visa transactions in the in the General-Purpose-Card Relevant Markets;

f. But for the anticompetitive conduct of Visa and its Member Banks, competition among banks would have eliminated or greatly reduced the Interchange Fees for Visa transactions in the General-Purpose-Card Relevant Markets; and

g. The specific amount of damages suffered by the Class has not yet been determined, as such determination will require additional discovery and expert analysis, but the Class estimates damages will range in the tens of billions of dollars.

417. The uniform schedules of Default Interchange Fees are illegal. They are not necessary to accomplish any procompetitive benefits of the Visa Network. Even if some horizontal agreement were necessary to promote the efficiencies of the Visa Network, the uniform schedules of Default Interchange Fees are significantly more restrictive than necessary to bring about those efficiencies. Visa and its Member Banks' price fixing achieves few — if any —procompetitive benefits to counterbalance the price-fixing's demonstrated anticompetitive effects in the General-Purpose-Card Relevant Markets. The supracompetitive levels of Interchange continue to the present date.

## SECOND CLAIM FOR RELIEF

**Plaintiffs vs. MasterCard and Bank Defendants for damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for violations of Sherman Act, § 1, 15 U.S.C. § 1, unlawful price fixing of Credit-Card Interchange Fees by MasterCard and its Member Banks**

418. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

419. The Member Banks of MasterCard, including Bank Defendants — direct, horizontal competitors of each other — engaged in unlawful contracts, combinations, and conspiracies among themselves and with MasterCard in an unreasonable restraint of interstate trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

420. MasterCard and its Member Banks have and exercise market power in the General-Purpose-Card Relevant Markets.

421. The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings, and concerts of action between and among MasterCard's issuing and acquiring members, including Bank Defendants and MasterCard, the substantial terms of which were to illegally fix, raise, maintain, or stabilize the Credit-Card Interchange Fees that are imposed on Merchants in the General-Purpose-Card Relevant Markets.

422. The MasterCard Board of Directors, which for much of the relevant time period included representatives from several Bank Defendants, acted on behalf of the Member Banks to fix, raise, maintain, or stabilize the Interchange Fees for MasterCard transactions, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

423. All of the Member Banks of MasterCard, including the Bank Defendants, have actual knowledge of, and have knowingly participated in, the conspiracy alleged herein.

424. The contracts, combinations, and conspiracies alleged herein began before MasterCard's 2006 IPO and have continued after that date. Even after MasterCard's IPO the Bank Defendants'—and other banks'—membership in MasterCard is contingent upon those banks agreeing to adhere to the anticompetitive Rules and uniform schedule of Default Interchange Fees described herein.

425. Even after MasterCard's IPO, each Member Bank agrees to adhere to MasterCard's the uniform schedules of Default Interchange Fees and knows, understands, and expects that all other Member Banks will agree to abide by the same rules and uniform schedule of default Interchange Fees.

426. The contracts, combinations, conspiracies, and agreements alleged in this Second Claim have had, and/or are likely to have, among others, the following anticompetitive effects which are common to Plaintiffs and Class Members:

a. Actual and potential competition in the General-Purpose-Card Relevant Markets was substantially excluded, suppressed, and effectively foreclosed and thus competition has been unreasonably restrained;

b. Defendants acquired and maintained market power in the in the General-Purpose-Card Relevant Markets;

c. Defendants controlled, maintained, and elevated above competitive levels the Interchange Fees imposed on Class Members in the in the General-Purpose-Card Relevant Markets;

d. All Class members were required to pay supracompetitive Credit-Card Interchange Fees for MasterCard transactions in the in the General-Purpose-Card Relevant Markets;

e. Defendants derived direct and substantial economic benefits from the supracompetitive Credit-Card Interchange Fees for MasterCard transactions in the General-Purpose-Card Relevant Markets;

f. But for the anticompetitive conduct of MasterCard and its Member Banks, competition among banks would have eliminated or greatly

reduced the Interchange Fees for MasterCard transactions in the General-Purpose-Card Relevant Markets; and

g. The specific amount of damages suffered by the Class have not yet been determined, as such determination will require additional discovery and expert analysis, but the Class estimates damages will range in the tens of billions of dollars.

427. The uniform schedules of Default Interchange Fees are illegal. They are not necessary to accomplish any procompetitive benefits of the MasterCard Network. Even if some horizontal agreement were necessary to promote the efficiencies of the MasterCard Network, the uniform schedules of Default Interchange Fees are significantly more restrictive than necessary to bring about those efficiencies. MasterCard and its Member Banks' price fixing achieves few — if any — procompetitive benefits to counterbalance the price-fixing's demonstrated anticompetitive effects in the General-Purpose-Card Relevant Markets. The supracompetitive levels of Interchange continue to the present date.

## THIRD CLAIM FOR RELIEF

**Plaintiffs vs. Visa and Bank Defendants for violation of the Cartwright Act, § 16700 *et seq.* of the California Business and Professions Code, unlawful price fixing of Credit-Card Interchange Fees**

428. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

429. The Member Banks of Visa, including the Bank Defendants — direct, horizontal competitors of each other — engaged in unlawful contracts, combinations, and conspiracies among themselves and with Visa in an unreasonable restraint of interstate trade or commerce in violation of § 16700 *et seq.* of the Cartwright Act (Cal. Bus. & Prof. Code, § 16700 et seq.). These unlawful contracts, combinations, and conspiracies were entered into and effectuated within the State of California.

430. Visa and its Member Banks have and exercise market power in the General-Purpose-Card Relevant Markets.

431. The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings, and concerts of action between and among Visa's issuing and acquiring members, including the Bank Defendants and Visa, the substantial terms of which were to illegally fix, raise, maintain, or stabilize the Credit-Card Interchange Fees charged to Merchants by Issuing Banks in the General-Purpose-Card Relevant Markets.

432. The Visa Board of Directors, which included representatives from several Bank Defendants, acted on behalf of the Member Banks to fix, raise, maintain, or stabilize the Interchange Fees for Visa transactions, in violation of § 16700 *et seq*. of the Cartwright Act..

433. All of the Member Banks of Visa, including the Bank Defendants, have had actual knowledge of, and have knowingly participated in, the conspiracies alleged herein.

434. The contracts, combinations, and conspiracies alleged herein began before Visa's 2008 IPO and have continued after that date. Even after Visa's IPO the Bank Defendants'—and other banks'—membership in Visa is contingent upon those banks agreeing to adhere to the anticompetitive Rules and uniform schedules of Default Interchange Fees described herein.

435. Even after Visa's IPO, each Member Bank agrees to adhere to Visa's the uniform schedules of Default Interchange Fees and understands that all other Member Banks will agree to abide by the same uniform schedule of default Interchange Fees.

436. The contracts, combinations, conspiracies, and agreements have had, and/or are likely to have, among other things, the following anticompetitive effects which are common to the Class of Plaintiffs:

a. Actual and potential competition in the General-Purpose-Card Relevant Markets was substantially excluded, suppressed, and effectively foreclosed and therefore has been unreasonably restrained;

b. Visa acquired and maintained market power in the General-Purpose-Card Relevant Markets;

c. Defendants controlled, maintained, and elevated above competitive levels the Credit-Card Interchange Fees imposed on Class members in the General-Purpose-Card Relevant Markets;

d. Class members were required to pay supracompetitive Interchange Fees;

e. Defendants derived direct and substantial economic benefits from the supracompetitive Credit-Card Interchange Fees in the General-Purpose-Card Relevant Markets;

f. But for the anticompetitive conduct of Visa and its Member Banks, competition among banks would have eliminated or greatly reduced the Credit-Card Interchange Fees in order to gain business from Merchants; and

g. The specific amount of damages suffered by the Class have not yet been determined, as such determination will require additional discovery and expert analysis, but the Class estimates damages will range in the tens of billions of dollars.

437. The Uniform Schedules of Default Interchange Fees are illegal. They are not necessary to accomplish any procompetitive benefit of the Visa Network. Even if some horizontal agreement were necessary to promote the efficiencies of the Visa Network, Uniform Schedules of Default Interchange Fees are significantly more restrictive than necessary to bring about those efficiencies. Visa and its Member Banks' price fixing achieved few procompetitive benefits to counterbalance its demonstrated anticompetitive effects in the General-Purpose-Card Relevant Markets.

## FOURTH CLAIM FOR RELIEF:

**Plaintiffs vs. Visa and Bank Defendants for damages under § 4 of the Clayton Act, 15 U.S.C. § 16, for violation of Sherman Act § 1 unreasonable restraint of trade by Visa and its Member Banks in imposing and enforcing Anti-Steering Restraints**

438. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

439. Visa has and exercises market power in the General-Purpose-Card Relevant Markets.

440. The No-Surcharge Rule and the other Anti-Steering Restraints, imposed upon Merchants by Visa and its Member Banks, represent unlawful contracts in restraint of trade violation of Sherman Act, Section 1.

441. In addition, the collective adoption and enforcement of the No-Surcharge Rule and the other Anti-Steering Restraints by Visa and its Member Banks constitute contracts, combinations, or conspiracies in unreasonable restraint of trade.

442. The Anti-Steering Restraints are anticompetitive restraints. Among their anticompetitive effects are the inflationary pressure they exert on consumer goods and services, the compulsion of subsidies running from users of low-cost payment media to users of Defendants' high-cost payment media, the entrenchment of Defendants' market positions, and the insulation of Defendants from any competitive threat from a rival offering cheaper or more efficient Payment-Card services.

443. No procompetitive justifications exist for the Anti-Steering Restraints.

444. The contracts, combinations, conspiracies, and agreements have had, and/or are likely to have, among other things, the following anticompetitive effects which are common to the Class of Plaintiffs:

a. Actual and potential competition in the General-Purpose-Card Relevant Markets was substantially excluded, suppressed, and effectively foreclosed;

b. Visa acquired and maintained market power in the General-Purpose-Card Relevant Markets;

c. Defendants controlled, maintained, and elevated above competitive levels the Credit-Card Interchange Fees imposed on Class members in the General-Purpose-Card Relevant Markets;

d. Class members were required to pay supracompetitive Interchange Fees;

e. Defendants derived direct and substantial economic benefits from the supracompetitive Credit-Card Interchange Fees in the General-Purpose-Card Relevant Markets;

f. But for the anticompetitive conduct of Visa and its Member Banks, competition among banks would have eliminated or greatly reduced the Credit-Card Interchange Fees in order to gain business from Merchants; and

g. But for the anticompetitive conduct of Defendants, Class Members would have saved tens of billions of dollars by avoiding or mitigating Defendants' uniform schedules of Default Interchange Fees.

## FIFTH CLAIM FOR RELIEF:

**Plaintiffs vs. MasterCard and Bank Defendants for damages under § 4 of the Clayton Act, 15 U.S.C. § 16, for violation of Sherman Act § 1 unreasonable restraint of trade by MasterCard and its Member Banks in imposing and enforcing Anti-Steering Restraints**

445. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

446. MasterCard has and exercises market power in the General-Purpose-Card Relevant Markets.

447. The No-Surcharge Rule and the other Anti-Steering Restraints, imposed upon Merchants by MasterCard and its Member Banks, represent unlawful contracts in restraint of trade violation of Sherman Act, Section 1.

448. In addition, the collective adoption and enforcement of the No-Surcharge Rule and the other Anti-Steering Restraints by MasterCard and its Member Banks constitute contracts, combinations, or conspiracies in unreasonable restraint of trade.

449. The Anti-Steering Restraints are anticompetitive restraints. Among their anticompetitive effects are the inflationary pressure they exert on consumer goods and services, the compulsion of subsidies running from users of low-cost payment media to users of Defendants' high-cost payment media, the entrenchment of Defendants' market positions, and the insulation of Defendants from any competitive threat from a rival offering cheaper or more efficient Payment-Card services.

450. No procompetitive justifications exist for the Anti-Steering Restraints.

451. The contracts, combinations, conspiracies, and agreements have had, and/or are likely to have, among other things, the following anticompetitive effects which are common to the Class of Plaintiffs:

a. Actual and potential competition in the General-Purpose-Card Relevant Markets was substantially excluded, suppressed, and effectively foreclosed and thus has been unreasonably restrained;

b. MasterCard acquired and maintained market power in the General-Purpose-Card Relevant Markets;

c. Defendants controlled, maintained, and elevated above competitive levels the Credit-Card Interchange Fees imposed on Class members in the General-Purpose-Card Relevant Markets;

d. Class members were required to pay supracompetitive Interchange Fees;

e. Defendants derived direct and substantial economic benefits from the supracompetitive Credit-Card Interchange Fees in the General-Purpose-Card Relevant Markets;

f. But for the anticompetitive conduct of MasterCard and its Member Banks, competition among banks would have eliminated or greatly reduced the Credit-Card Interchange Fees in order to gain business from Merchants; and

g. The anticompetitive conduct of Defendants has caused Class Members to be overcharged tens of billions of dollars as a result of paying collectively fixed Interchange Fees.

## SIXTH CLAIM FOR RELIEF

**Plaintiffs vs. Visa and Bank Defendants for damages under § 4 of the Clayton Act, 15 U.S.C. § 15, for violations of Sherman Act, § 1, 15 U.S.C. § 1, unlawful price fixing of Debit-Card Interchange Fees by Visa and its Member Banks**

452. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

453. Throughout the relevant period, the Member Banks of Visa, including the Bank Defendants — direct horizontal competitors of each other — engaged in unlawful contracts, combinations, and conspiracies among themselves and with Visa in an unreasonable restraint of interstate trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

454. The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings, and concerts of action between and among Visa's issuing and acquiring members, including the Bank Defendants and Visa, the substantial terms of which were to illegally fix, raise, maintain, or stabilize the Debit-Card Interchange Fees imposed on Merchants in the Debit-Card Relevant Markets.

455. Visa and its Member Banks have and exercise market power in the Debit-Card Relevant Markets.

456. The Visa Board of Directors, which, for much of the relevant time period, included representatives from several Bank Defendants, acted on behalf of the Member Banks to fix, raise, maintain, or stabilize the Interchange Fees for Visa Debit Card transactions, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

457. All of the Member Banks of Visa, including the Bank Defendants, have actual knowledge of, and have knowingly participated in, the conspiracy alleged herein.

458. The contracts, combinations, and conspiracies alleged herein began before Visa's 2008 IPO and have continued after that date. Even after Visa's IPO the Bank Defendants'—and other banks'—membership in Visa is contingent upon those banks agreeing to adhere to the anticompetitive Rules and uniform schedule of Default Interchange Fees described herein.

459. Even after Visa's IPO, each Member Bank agrees to adhere to Visa's uniform schedules of Default Interchange Fees and knows, understands, and expects that all other Member Banks will agree to abide by the same rules and uniform schedule of default Interchange Fees.

460. The contracts, combinations, conspiracies, and agreements alleged in this Claim have had, and/or are likely to have, among others, the following anticompetitive effects which are common to Plaintiffs and Class Members:

a. Actual and potential competition in the Debit-Card Relevant Markets was substantially excluded, suppressed, and effectively foreclosed and thus has been unreasonably restrained;

b. Defendants acquired and maintained market power in the Debit-Card Relevant Markets;

c. Defendants controlled, maintained, and elevated above competitive levels the Interchange Fees charged to Class Members in the Debit-Card Relevant Markets;

d. All Class members were required to pay supracompetitive Debit-Card Interchange Fees for Visa transactions in the Debit-Card Relevant Markets;

e. Defendants imposed supracompetitive Debit-Card Interchange Fees on all Class Members for Visa transactions in the Debit-Card Relevant Markets;

f. Defendants derived direct and substantial economic benefits from the supracompetitive Debit-Card Interchange Fees for Visa transactions in the Debit-Card Relevant Markets;

g. But for the anticompetitive conduct of Visa and its Member Banks, competition among banks would have eliminated or greatly reduced the Interchange Fees for Visa transactions in the Debit-Card Relevant Markets; and

h. The specific amount of damages suffered by the Class has not yet been determined, as such determination will require additional discovery and expert analysis, but the Class Members estimate damages will range in the tens of billions of dollars.

461. The collectively fixed Interchange Fee is illegal. It is not necessary to accomplish any procompetitive benefit of the Visa Network. Even if some horizontal agreement were necessary to promote the efficiencies of the Visa Network, the collectively-set Interchange Fee is significantly more restrictive than necessary to bring about those efficiencies. Visa and its Member Banks' price fixing achieves few — if any — procompetitive benefits to counterbalance the price-fixing's demonstrated anticompetitive effects in the Debit-Card Relevant Markets. The supracompetitive levels of Interchange continue to the present date.

## SEVENTH CLAIM FOR RELIEF:

**Plaintiffs vs. MasterCard and Bank Defendants for damages under § 4 of the Clayton Act, 15 U.S.C. § 15, for violations of Sherman Act, § 1, 15 U.S.C. § 1,**

**unlawful price fixing of Debit-Card Interchange Fees by MasterCard and its Member Banks**

462. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

463. Throughout the relevant period, the Member Banks of MasterCard, including the Bank Defendants — direct horizontal competitors of each other — engaged in unlawful contracts, combinations, and conspiracies among themselves and with MasterCard in an unreasonable restraint of interstate trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

464. The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings, and concerts of action between and among MasterCard's issuing and acquiring members, including the Bank Defendants and MasterCard, the substantial terms of which were to illegally fix, raise, maintain, or stabilize the Debit-Card Interchange Fees imposed on Merchants in the Debit-Card Relevant Markets.

465. MasterCard and its Member Banks have and exercise market power in the Debit-Card Relevant Markets.

466. The MasterCard Board of Directors, which, for much of the relevant time period, included representatives from several Bank Defendants, acted on behalf of the Member Banks to fix, raise, maintain, or stabilize the Interchange Fees for MasterCard Debit-Card transactions, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

467. All of the Member Banks of MasterCard, including the Bank Defendants, have actual knowledge of, and have knowingly participated in, the conspiracy alleged herein.

468. The contracts, combinations, and conspiracies alleged herein began before MasterCard's 2006 IPO and have continued after that date. Even after MasterCard's IPO the Bank Defendants'—and other banks'—membership in MasterCard is contingent

upon those banks agreeing to adhere to the anticompetitive Rules and uniform schedule of Default Interchange Fees described herein.

469. Even after MasterCard's IPO, each Member Bank agrees to adhere to MasterCard's uniform schedules of Default Interchange Fees and knows, understands, and expects that all other Member Banks will agree to abide by the same rules and uniform schedule of default Interchange Fees.

470. The contracts, combinations, conspiracies, and agreements alleged in this Claim have had, and/or are likely to have, among others, the following anticompetitive effects which are common to Plaintiffs and Class Members:

a. Actual and potential competition in the Debit-Card Relevant Markets was substantially excluded, suppressed, and effectively foreclosed and thus has been unreasonably restrained;

b. Defendants acquired and maintained market power in the Debit-Card Relevant Markets;

c. Defendants controlled, maintained, and elevated above competitive levels the Interchange Fees charged to Class Members in the Debit-Card Relevant Markets;

d. All Class members were required to pay supracompetitive Debit-Card Interchange Fees for MasterCard transactions in the Debit-Card Relevant Markets;

e. Defendants imposed supracompetitive Debit-Card Interchange Fees on all Class Members for MasterCard transactions in the Debit-Card Relevant Markets;

f. Defendants derived direct and substantial economic benefits from the supracompetitive Debit-Card Interchange Fees for MasterCard transactions in the Debit-Card Relevant Markets;

g. But for the anticompetitive conduct of MasterCard and its Member Banks, competition among banks would have eliminated or greatly reduced the Interchange Fees for MasterCard transactions in the Debit-Card Relevant Markets; and

h. The specific amount of damages suffered by the Class has not yet been determined, as such determination will require additional discovery and expert analysis, but the Class Members estimate damages will range in the tens of billions of dollars.

471. The collectively fixed Interchange Fee is illegal. It is not necessary to accomplish any procompetitive benefit of the MasterCard Network. Even if some horizontal agreement were necessary to promote the efficiencies of the MasterCard Network, the collectively-set Interchange Fee is significantly more restrictive than necessary to bring about those efficiencies. MasterCard and its Member Banks' price fixing achieves few — if any — procompetitive benefits to counterbalance the price-fixing's demonstrated anticompetitive effects in the Debit-Card Relevant Markets. The supracompetitive levels of Interchange Fees continue to the present date.

## EIGHTH CLAIM FOR RELIEF:

**Plaintiffs vs. Visa and its Member Banks for violation of The Cartwright Act, § 16700 *et seq*. of the California Business and Professions Code, unlawful price fixing of Debit-Card Interchange Fees by Visa and its Member Banks**

472. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

473. Throughout the relevant period, the Member Banks of Visa, including the Bank Defendants — direct, horizontal competitors of each other — engaged in unlawful contracts, combinations, and conspiracies in an unreasonable restraint of interstate trade or commerce in violation of § 16700 *et seq.* of the Cartwright Act (Bus. & Prof. Code, § 16700 *et seq.*). These unlawful contracts, combinations, and conspiracies among themselves and with Visa were entered into and effectuated within the State of California.

474. Visa and its Member Banks have and exercise market power in the Debit-Card Relevant Markets.

475. The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings, and concerts of action between and among Visa's issuing and acquiring members, including the Bank Defendants, and Visa, the substantial terms of which were to illegally fix, raise, maintain, or stabilize the Debit-Card Interchange Fees imposed on Merchants in the Debit-Card Relevant Markets.

476. The Visa Board of Directors, which for much of the relevant time period included representatives from several Bank Defendants, voted to fix, raise, maintain, or stabilize the Debit-Card Interchange Fees for Visa transactions, in violation of § 16700 *et seq*. of the Cartwright Act.

477. All of the Member Banks of Visa, including the Bank Defendants, have had actual knowledge of, and have knowingly participated in, the conspiracy alleged herein.

478. The contracts, combinations, and conspiracies alleged herein began before Visa's 2008 IPO and have continued after that date. Even after Visa's IPO the Bank Defendants'—and other banks'—membership in Visa is contingent upon those banks agreeing to adhere to the anticompetitive Rules and uniform schedules of Default Interchange Fees described herein.

479. Even after Visa's IPO, each Member Bank agrees to adhere to Visa's uniform schedules of Default Interchange Fees and knows, understands, and expects that all other Member Banks will agree to abide by the same rules and uniform schedule of default Interchange Fees.

480. The contracts, combinations, conspiracies, and agreements have had, and/or are likely to have, among other things, the following anticompetitive effects which are common to Plaintiffs and Class Members:

a. Actual and potential competition in the Debit-Card Relevant Markets was substantially excluded, suppressed, and effectively foreclosed and thus has been unreasonably restrained;

b. Defendants acquired and maintained market power in the Debit-Card Relevant Markets;

c. Defendants controlled, maintained, and elevated above competitive levels the Signature-Debit-Card Interchange Fees imposed on Class Members in the Debit-Card Relevant Markets;

d. Class Members were required to pay supracompetitive Interchange Fees;

e. Defendants derived direct and substantial economic benefits from the supracompetitive Debit-Card Interchange Fees in the Debit-Card Relevant Markets;

f. But for the anticompetitive conduct of Visa and its Member Banks, competition among banks would have eliminated or greatly reduced the Debit-Card Interchange Fees in order to gain business from Merchants; and

g. The specific amount of damages suffered by the Class have not yet been determined, as such determination will require additional discovery and expert analysis, but the Class estimates damages will range in the tens of billions of dollars.

481. The collectively fixed Interchange Fee is illegal. It is not necessary to accomplish any procompetitive benefit of the Visa Network. Even if some horizontal agreement were necessary to promote the efficiencies of the Visa Network, the collectively-set Interchange Fee is significantly more restrictive than necessary to bring about those efficiencies. Visa and its Member Banks' price fixing achieved few procompetitive benefits to counterbalance its demonstrated anticompetitive effects in the Debit-Card Relevant Markets.

482. As a consequence of the Defendants' illegal combinations and conspiracies, all Class Members suffered a common injury to their business and property, in part, because higher Debit-Card Interchange Fees were imposed on them in the Debit-Card Relevant Markets. The specific amount of damages suffered by Class Members has not yet been determined, as such determination will require additional discovery and

expert analysis. The supra-competitive levels of Interchange continue to the present date.

**NINTH CLAIM FOR RELIEF:**

**Plaintiffs v. Defendants MasterCard, Bank of America, Capital One, Chase, Citigroup, and HSBC for damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for violation of Section 7 of the Clayton Act, 15 U.S.C. § 18**

483. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

484. As part of the Restructuring, MasterCard acquired assets of its Member Banks including those banks' equity shares in the Old MasterCard, and attendant rights, such as the right to elect a Board of Directors that sets default schedules of Interchange Fees.

485. As part of the Restructuring, Defendants Capital One, Chase, Citigroup, and HSBC, as well as MasterCard's other Member Banks acquired Class M and B shares in New MasterCard.

486. The Restructuring was designed to, and has had the effect of substantially lessening competition in the Relevant Markets in violation of Section 7 of the Clayton Act as more fully described above in at least the following ways:

a. The Restructuring has created a single New MasterCard with sufficient market power in Relevant Markets to set Interchange Fees at supracompetitive levels;

b. It allows New MasterCard to establish uniform schedules of default Interchange Fees, which would not exist in a competitive market;

c. To the extent that it has reduced the likelihood of successful future antitrust enforcement against New MasterCard and its Member Banks, it has removed a significant downward pressure on Interchange Fees;

d. It has created New MasterCard that is perpetuating the anticompetitive market structure that Old MasterCard and its Member Banks established through collusive agreements, anticompetitive restraints on Merchants, and MasterCard's strategy focused on its largest Issuing Banks; and

e. By leaving much of the Member Banks' influence in New MasterCard intact, the Restructuring establishes a new forum for collusion among MasterCard's Member Banks.

487. The Plaintiffs, their members, and members of the Class have suffered common antitrust injury to their business or property by reason of the violation of Section 7 of the Clayton Act. This acquisition of assets by the New MasterCard and its Member Banks has injured and will continue to injure Plaintiffs and members of the Class by perpetuating an anticompetitive market structure, eliminating any competition that could place downward pressures on price, and by making antitrust enforcement more difficult or impossible for plaintiffs.

488. This harm that Plaintiffs, their members, and the Class will suffer outweighs any efficiencies that Defendants may argue arises from the Restructuring.

## TENTH CLAIM FOR RELIEF:

**Plaintiffs v. Defendants MasterCard, Bank of America, Capital One, Chase, Citigroup, and HSBC for damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for violation of Section 1 of the Sherman Act, 15 U.S.C. § 1**

489. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

490. The acquisition by MasterCard of the equity interest in MasterCard that, under Old MasterCard, had rested with the Member Banks constitutes a combination within the meaning of Section 1 of the Sherman Act.

491. The combination that occurred through the Agreements and the IPO are designed to, and has had the effect of harming competition in the Relevant Markets.

492. The harms to competition that result from the contracts, combinations, conspiracies, and agreements that are part of the Restructuring as more fully described above include at least the following:

a. The Restructuring has created a single New MasterCard with sufficient market power in the Relevant Markets to set Interchange Fees at supracompetitive levels;

b. It allows New MasterCard to establish uniform schedules of default Interchange Fees, which would not exist in a competitive market;

c. To the extent that it has reduced the likelihood of successful future antitrust enforcement against New MasterCard and its Member Banks, it has removed a significant downward pressure on Interchange Fees;

d. It has created New MasterCard that is perpetuating the anticompetitive market structure that Old MasterCard and its Member Banks established through collusive agreements, anticompetitive restraints on Merchants, and MasterCard's strategy focused on its largest Issuing Banks; and

e. By leaving much of the Member Banks' influence in New MasterCard intact, the Restructuring establishes a new forum for collusion among MasterCard's Member Banks.

493. The Plaintiffs and members of the Class have suffered common antitrust injury to their business or property by reason of the violations of Section 1 of the Sherman Act.

494. The harm that Plaintiffs, their members, and the Class will suffer outweighs any efficiencies that Defendants may argue arises from the Restructuring.

## ELEVENTH CLAIM FOR RELIEF:

**Plaintiffs v. Defendants Visa, Bank of America, Chase, National City, and Texas Independent Bancshares for damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for violation of Section 7 of the Clayton Act, 15 U.S.C. § 18**

495. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

496. As part of the Restructuring, Visa acquired assets of its Member Banks including those banks' equity shares in the Old Visa, and attendant rights, such as the right to elect a Board of Directors that sets default schedules of Interchange Fees.

497. As part of the Restructuring, Defendants Bank of America, Chase, National City Corporation, National City Bank of Kentucky, and Texas Independent Bancshares, Inc., as well as Visa's other Member Banks acquired Class B and C shares in New Visa.

498. The Restructuring was designed to, and has had the effect of substantially lessening competition in the Relevant Markets in violation of Section 7 of the Clayton Act in at least the following ways:

a. It has created a New Visa with sufficient market power in the Relevant Markets to set Interchange Fees at supra-competitive levels;

b. It allows New Visa to establish uniform schedules of default Interchange Fees, which would not exist in a competitive market;

c. To the extent that it has reduced the likelihood of successful future antitrust enforcement against New Visa and its Member Banks, it has removed a significant downward pressure on Interchange Fees;

d. It has created a New Visa that is perpetuating the anticompetitive market structure that Old Visa and its Member Banks established through collusive agreements, anticompetitive restraints on Merchants, and Visa's strategy focused on its largest Issuers; and

e. By leaving much of the Member Banks' influence in New Visa intact, the Restructuring establishes a new forum for collusion among Visa's Member Banks

499. The Plaintiffs, their members, and members of the Class will suffer common antitrust injury to their business or property by reason of the violation of Section 7 of the Clayton Act. This acquisition of assets by the New Visa and its Member Banks has injured and will continue to injure Plaintiffs, their members, and members of the Class

by eliminating any competition that could lead to a competitive price, and by making antitrust enforcement more difficult or impossible for plaintiffs.

500. This harm that Plaintiffs, their members, and the Class will suffer outweighs any efficiencies that Defendants may argue arises from the Restructuring.

## TWELFTH CLAIM FOR RELIEF:

**Plaintiffs v. Defendants Visa, Bank of America, Chase, National City, and Texas Independent Bancshares for damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for violation of Section 1 of the Clayton Act, 15 U.S.C. § 1**

501. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

502. The acquisition by Visa of the equity interest in Visa that, under Old Visa, had rested with the Member Banks constitutes a combination within the meaning of Section 1 of the Sherman Act.

503. As part of the IPO and Agreements, Defendant Visa agreed with Defendants Bank of America, Chase, National City Corporation, National City Bank of Kentucky, and Texas Independent Bancshares, Inc., and Visa's other Member Banks to impose the Ownership and Control Restrictions described herein.

504. The combination that occurred through the Agreements and the IPO was designed to, and has had the effect of harming competition in the Relevant Markets in violation of Section 1 of the Sherman Act.

505. The harms to competition that result from the contracts, combinations, conspiracies, and agreements that are part of the Restructuring include at least the following:

a. It has created a New Visa with sufficient market power in the Relevant Markets to set Interchange Fees at supra-competitive levels;

b. It allows New Visa to establish uniform schedules of default Interchange Fees, which would not exist in a competitive market;

c. To the extent that it has reduced the likelihood of successful future antitrust enforcement against New Visa and its Member Banks, it has removed a significant downward pressure on Interchange Fees;

d. It has created a New Visa that is perpetuating the anticompetitive market structure that Old Visa and its Member Banks established through collusive agreements, anticompetitive restraints on Merchants, and Visa's strategy focused on its largest Issuers; and

e. By leaving much of the Member Banks' influence in New Visa intact, the Restructuring establishes a new forum for collusion among Visa's Member Banks.

506. The Plaintiffs, their members, and members of the Class have suffered common antitrust injury to their business or property by reason of the violations of Section 1 of the Sherman Act.

507. The harm that Plaintiffs, their members, and the Class will suffer outweighs any efficiencies that Defendants may argue arises from the Restructuring.

## THIRTEENTH CLAIM FOR RELIEF

### Plaintiffs vs. Visa and Visa Member Banks for Restitution and Injunctive Relief for "Unlawful" Acts and Practices Under California Business & Professions Code Sections 17200, *et seq*.

508. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

509. The acts and practices by Visa alleged herein violate Sections 1 and 2 of the Sherman Act, Section 4 of the Clayton Act, and California Business & Professions Code Section 16720.

510. As a proximate result of these illegal business practices, Plaintiffs and members of the proposed class have been deprived of, and Visa and its member banks

have acquired, money by means of unfair competition in violation of Business and Professions Code Section 17200.

## FOURTEENTH CLAIM FOR RELIEF

### Plaintiffs vs. Visa and Visa Member Banks for Restitution and Injunctive Relief for "Unfair" Acts and Practices Under California Business & Professions Code Sections 17200, *et seq*.

511. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth here.

512. The acts and practices by Visa and its Member Banks alleged herein violate California's policy of fostering and encouraging competition by prohibiting unfair, dishonest, deceptive, destructive, fraudulent and discriminatory practices by which fair and honest competition is destroyed or prevented.

513. The acts and practices alleged herein violate the competitive policies underlying the Cartwright Act, California Business and Professions Code Sections 16720, *et. seq*. and have an actual and threatened adverse effect on competition.

514. The acts and practices alleged herein, threaten incipient violations of antitrust law and/or have effects which are comparable to, or the same as, a violation of antitrust law and significantly threaten or harm competition and thereby satisfy the standard for "unfair business practices" articulated by the California Supreme Court in *Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163 (1999).

515. As a result of the foregoing, the practices alleged herein constitute "unfair" business practices within the meaning of California Business and Professions Code Section 17200.

516. As a proximate result of these unfair business practices, Plaintiffs and members of the proposed class have been deprived of, and Visa and its member banks

have acquired, money by means of unfair competition in violation of Business and Professions Code Section 17200.

**FIFTEENTH CLAIM FOR RELIEF**

517. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth herein.

518. Plaintiffs have been injured and will continue to be injured in their business and property as a result of Defendants' continuing conduct in violation of the laws set forth herein.

519. Plaintiffs request a declaratory judgment, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a), that Defendants' aforementioned conduct violates the laws set forth herein.

520. Defendants' conduct described herein is likely to continue unless enjoined.

521. Damages are insufficient to remedy the violations of law described herein.

522. Plaintiffs further request that the Court enjoin and restrain Defendants' wrongful conduct, alleged herein, pursuant to § 16 of the Clayton Act, 15 U.S.C. § 26.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that this Court:

A. Declare, adjudge, and decree that Defendants have committed the violations of the federal and state antitrust laws as alleged herein;

B. Order that Defendants, their directors, officers, employees, agents, successors, members, and all persons in active concert and participation with them be enjoined and restrained from, in any manner, directly or indirectly, committing the violations of the Sherman, Clayton, and Cartwright Acts, in which they and co-conspirators have been engaged;

C. To the extent it may be appropriate and permissible under a Fed. R. Civ. P. 23 (b)(3) Class, Order that Defendants, their directors, officers, employees, agents, successors, members, and all persons in active

concert and participation with them be enjoined and restrained from, in any manner, directly or indirectly, committing any other violations of statutes having a similar purpose or effect; and

D. Pursuant to applicable law, award monetary damages sustained by the Plaintiffs and Class Members for the fullest time period permitted by the applicable statutes of limitations and the settlement and release in *In re Visa Check/MasterMoney Antitrust Litigation*, in an amount to be proved at trial, attorneys' fees, and costs of suit; and award all other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiffs hereby demand trial by jury of all issues properly triable thereby.

February 8, 2017

ROBINS KAPLAN LLP

*s/ K. Craig Wildfang*
K. Craig Wildfang
Thomas J. Undlin
Ryan W. Marth

800 LaSalle Plaza
Suite 2800
Minneapolis, MN 55402
KCWildfang@RobinsKaplan.com
TUndlin@RobinsKaplan.com
RMarth@RobinsKaplan.com
Tel: 612-349-8500
Fax: 612-339-4181

BERGER & MONTAGUE, P.C.

*s/ H. Laddie Montague*
H. Laddie Montague
Merrill G. Davidoff
Michael J. Kane

1622 Locust Street
Philadelphia, PA 19103
hlmontague@bm.net
mdavidoff@bm.net
mkane@bm.net
Tel: 215-875-3000
Fax: 215-875-4604

ROBBINS GELLER RUDMAN & DOWD LLP

*s/ Patrick J. Coughlin*
Patrick J. Coughlin
Joseph David Daley
Alexandra Senya Bernay

655 West Broad Way
Suite 1900
San Diego, CA 92101
patc@rgrdlaw.com
joed@rgrdlaw.com
xanb@rgrdlaw.com
Tel: 619-231-1058
Fax: 619-231-7423

*Counsel for Rule 23(b)(3) Class Plaintiffs*