

**ROBINS / KAPLAN**LLP

800 LASALLE AVENUE     612 349 8500 TEL
SUITE 2800     612 339 4181 FAX
MINNEAPOLIS MN 55402     ROBINSKAPLAN.COM

K. CRAIG WILDFANG
612 349 8554 TEL
KCWILDFANG@ROBINSKAPLAN.COM

April 27, 2017                *Via ECF*

The Honorable Magistrate Judge James Orenstein
United States District Court for the Eastern District of New York
225 Cadman Plaza East
Room 1227 South
Brooklyn, New York 11201

     Re:    *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*; Case No. 05-md-1720 (MKO)(JO)

Dear Magistrate Judge Orenstein:

In response to Your Honor's request, Rule 23(b)(3) Class Plaintiffs write to respectfully supplement their arguments, made during the status conference on April 20 and in the Motion to Amend, on whether the Court should grant leave to amend the operative Class Complaint. Specifically, we address the recent Southern District of New York decision in *US Airways, Inc. v. Sabre Holdings Corp. et al.*;[1] case law showing that a jury's rejection of a plaintiff's proffered market definition is not fatal to the plaintiff's case; and whether the *Salveson v. JP Morgan Chase & Co.*[2] decision is law of the case.

Market definition in antitrust cases is a fact determination for the jury that is not dispositive of the claims.[3] Thus, plaintiffs' allegations of an alternative market do not alter the "core facts" underlying plaintiffs' claims from the outset, such that the amendment relates back to the operative pleadings.

**I.**     ***US Airways, Inc. v. Sabre Holdings Corp. et al.***

Judge Schofield's recent decision in *Sabre Holdings* is instructive to show that (i) market definition is a factual question to be determined by a jury; (ii) a jury can simultaneously evaluate liability and damages in proposed "one-sided" and

---

[1] No. 11-cv-2725 (S.D.N.Y. Mar. 21, 2017).
[2] 166 F. Supp. 3d 242 (E.D.N.Y. 2016) (Brodie, J.).
[3] *See Dial Corp. v. News Corp.*, 165 F. Supp. 3d 25, 34 (S.D.N.Y. 2016) (recognizing that "Definition of the relevant market is generally considered a question for the trier of fact.... The jury may accept the market definition proposed by either party or may develop its own definition based upon the evidence." (quoting ABA Section on Antitrust Law, *Antitrust Law Developments* 620 (6th ed. 2007)).

"two-sided" relevant markets; and (iii) the Second Circuit's *AmEx* opinion does not mandate a two-sided market as a matter of law.

*Sabre Holdings* involved Sherman Act claims brought by US Airways against Sabre Holdings Corp., which operates a global distribution system ("GDS") – a platform that allows airlines to distribute schedule, fare and booking information to travel agents, and also provides a means for travel agents to search for, book and manage travel reservations. From an economic perspective each GDS is a two-sided platform. In that case, defendants argued that the relevant antitrust market included both sides of the platform (a two-sided market) and the plaintiffs argued that the relevant antitrust market included only the airline side of the platform, and not the travel-agent side of the platform.

The court submitted the question of relevant market to the jury, which found that the relevant market was one-sided, rejecting the relevance of travel agent incentives.[4] In denying defendants' post-trial motions following *AmEx*, Judge Schofield observed that economists consider a market as two-sided when the two sides of a platform were "interdependent" and held that "[w]hether the two sides of a platform are interdependent such that the relevant market is two-sided is a factual, not a legal, issue."[5] Significantly, Judge Schofield noted that "[a]lthough the jury found that the relevant market was one-sided, it also hypothetically found damages of approximately $5 million if the market were two-sided."[6]

Judge Schofield's special interrogatories to the jury did not anticipate or instruct that the defendants would prevail if they convinced the jury that the relevant market was two-sided. Rather, a two-sided market finding would require the jury to consider both sides of the platform in determining whether there was any wrongful exercise of market power (liability) and the extent of damages. Judge Schofield found there was sufficient evidence to support the jury's finding of liability and damages in a hypothetical "two-sided market," because "even in a two-sided market, taking into account incentives paid to the travel agents, Sabre's net prices were supracompetitive. US Airways' evidence regarding reduced quality and technological stagnation in the market is unaffected by a determination that the market is one-sided or two-sided. US Airways also

---

[4] *US Airways, Inc. v. Sabre Holdings Corp. et al.*, No. 11-cv-2725 at *15 & n.2 (S.D.N.Y. Mar. 21, 2017).
[5] *Id.* at *22; *see, e.g.*, *Meredith Corp. v. Sesac, LLC*, 1 F. Supp. 3d 180, 219 (S.D.N.Y. 2014) (market definition is "highly factual" and "best allocated to the trier of fact"); *Coastal Fuels Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 197 (1st Cir. 1996) ("the question of market definition is one of fact for the jury."); *Telecor Communs., Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124, 1131 (10th Cir. 2002) ("defining the relevant market is an issue of fact.").
[6] *Id.*

presented indirect evidence of harm in the two-sided market, by showing Sabre's market power plus lack of innovation and technological stagnation, which harmed both sides of the market."[7]

Judge Schofield also explained that the decision in *AmEx* did not require that the relevant market be defined as two-sided as a matter of law. The court began by noting that "the economic concept of two-sided platforms or markets is not the same as the legal concept of the *relevant market* in antitrust law."[8] The court then noted that "courts have long addressed claims and developed case law involving businesses now recognized as two-sided platforms by closely examining the competitive realities of the market."[9] Such an examination is "deeply fact intensive."[10]

Judge Schofield concluded that *AmEx* stands for the limited proposition that "where the two sides of a platform are interdependent, excluding one side from the relevant market would be improper."[11] But, in mature markets such as GDS, the court held (citing favorably an article authored by Class Plaintiffs' expert, Alan Frankel) that the interdependence of the two sides of a platform may no longer exist, and thus it was acceptable for the jury to look only at the one side of the platform in determining liability and damages.[12] The same market maturity analysis applies to payment-card markets, as Class Plaintiffs have argued from the inception of this case and is amply shown in Defendants' internal strategy documents, the broader discovery record, and readily available public information relating to the proliferation of payment cards and their widespread use in the United States.

## II. Antitrust decisions routinely allow for plaintiffs to plead market definition in the alternative, and plaintiffs can prevail even when their proffered market definition is rejected.

Judge Schofield's recognition in *Sabre* that the plaintiff could prevail even under an alternative market definition is consistent with settled law in this Circuit and more generally. Alternative market definitions are commonly accepted, especially when one market is a sub-market of another market.[13]

---

[7] *Id.* (internal citations omitted).
[8] *Id.* at *17.
[9] *Id.*
[10] *Id.* at *21.
[11] *Id.* at *22.
[12] *Id.* at *15.
[13] *See, e.g., New York v. Kraft Gen. Foods*, 926 F. Supp. 321, 325 (S.D.N.Y. 1995) (defendants' merger alleged to substantially lessen competition in the adult ready-to-eat cereal market, or, in the alternative, in the entire ready-to-eat cereal market); *W. Penn Allegheny Health Sys. v. UPMC*, 627

Even when Courts in this Circuit have found that a plaintiff "has failed to [properly] define the relevant market," they have nonetheless denied summary judgment.[14] A failure of the proposed market definition does not, in and of itself, preclude the plaintiff from proving market power.[15] Arguments otherwise "misapprehend[ ] the purpose in antitrust law of market definition, which is not an end unto itself but rather exists to illuminate a practice's effect on competition."[16]

*Sabre Holdings*, thus, confirms the settled law that antitrust plaintiffs may rely on alternative antitrust market definitions and demonstrates, in circumstances analogous to those here, that different relevant-market definitions do not alter the "core facts" of the case. The alternative market allegations in the proposed Third Amended Complaint ("TAC") do not alter the core of Defendants' conduct that forms the basis for Rule 23(b)(3) Class Plaintiffs' claims. Plaintiffs' proposed amendment therefore relates back, since it "asserts a claim . . . that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading . . ."[17] As the Second Circuit has held, "[i]f facts provable under the amended complaint arose out of the conduct alleged in the original complaint, relation back is mandatory."[18]

Indeed, "[t]he Second Circuit has repeatedly made clear that where a revised pleading contains alternative theories based on the same core facts as presented in a prior pleading, the alternative pleadings relate back to the original."[19] That is precisely what the TAC does here. Similarly, the Second Circuit has held that "[u]nder Fed. R. Civ. P. 15(c), the central inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations by the general fact situation

---

F.3d 85, 96 (3d Cir. 2010) (plaintiffs pleaded relevant market for Allegheny County acute-care inpatient services, or, in the alternative, Allegheny County high-end tertiary and quaternary acute-care inpatient services); *Hack v. President & Fellows of Yale Coll.*, 16 F. Supp. 2d 183. 197 (D. Conn. 1998) *aff'd*, 237 F.3d 81 (2d Cir. 2000) (permitting plaintiff to allege a relevant market for Yale student-only housing, as well as an alternative market for housing rental in New Haven); *Nabi Biopharm v. Roxane Labs, Inc.* No. 2:05-cv-889, 207 WL 894473 at *7 (S.D. Ohio Mar. 21, 2007) (approving a plaintiff's pleading, "in the alternative, several different putative markets, as permitted by Fed. R. Civ. P. 8(e)(2)").

[14] *Clarett v. NFL*, 306 F. Supp. 2d 379, 407 (S.D.N.Y. 2004).
[15] *Id* at 390.
[16] *Id.* at 407 (internal citations and quotation marks omitted).
[17] Fed. R. Civ. P. 15(c)(1)(B).
[18] *Slayton v. Am. Express Co.*, 460 F.3d 215, 227 (2d Cir. 2006); *see also id.* at 229 (claims related back when they merely "amplified, or stated in a slightly different way, [the] claim of the original complaint" and arose from the "same set of operative facts").
[19] *Wells v. Harris*, 185 F.R.D. 128, 131 (D. Conn. 1999).

alleged in the original pleading. . . . Where no new cause of action is alleged, as here, this Court liberally grants relation back under Rule 15(c)."[20] Here, the alternative market alleged in the proposed amendment concerns the same general fact situation alleged in the original pleading and does not allege any new causes of action.

*Precision Associates, Inc. v. Panalpina World Transport (Holding) Ltd.* provides further instruction regarding relation back.[21] In that case, the original class complaint asserted a violation of Sherman Act § 1 against multiple parties arising from the imposition of surcharges on freight forwarding services on air cargo shipments as "a single global conspiracy beginning in January 2001 to raise, fix, stabilize, and maintain at artificially high and non-competitive levels the prices at which they sold Freight Forwarding Services throughout the United States."[22] The amended complaint asserted 15 separate violations of Sherman Act § 1, including "three regional conspiracies and one global conspiracy, based on those individual local conspiracies."[23] As support for the conclusion that the amended complaint related back, this Court reasoned:

> The claims in the plaintiffs' Amended Complaint arose out of the conduct complained of in their original pleading: a pattern of anticompetitive conduct in the freight forwarding industry to increase the price of freight forwarding services through the imposition of fixed surcharges. While the plaintiffs' discovery of the more specific details of the defendants' anticompetitive conduct led them to alter their legal theories to assert individual conspiracies at different time periods and on specific routes, their claims are based on the same circumstances that gave rise to their original complaint. On this basis, the court can conclude that the fourteen defendants named in the Original Complaint were given adequate notice of the "general fact situation alleged in the original pleading."[24]

In the present case, the TAC and the original complaint center on the same alleged core facts and conduct. Because it focuses on the "same conduct, transaction, or occurrence" as set out in the original pleadings, the proposed amendment plainly relates back to the original complaint under Rule 15(c).

---

[20] *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 86-87 (2d Cir. 1999) (internal citation omitted).
[21] No. 08-cv- 42(JG)(VVP), 2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011).
[22] *Id.* at *3, *46 (internal quotation marks omitted).
[23] *Id.* at *46.
[24] *Id.* (quoting *In re Chaus Sec. Litig.*, 801 F. Supp. 1257, 1264 (S.D.N.Y. 1992)).

### III. It is doubtful that the *Salveson* decision is law of the case. Even if it were, amendment would not be futile.

At the status conference, Your Honor inquired as to whether this Court's decision in *Salveson v. JP Morgan Chase & Co. et al.* established a one-sided relevant market as law of the case. If *Salveson* did have that effect, Your Honor asked whether that would render the Rule 23(b)(3) Class Plaintiffs' proposed amendment futile. While Class Plaintiffs would welcome a holding that the only proper market is the merchant-facing market, upon review we believe that the answer to both of Your Honor's questions is likely "no."

First, *Salveson* is silent as to whether the relevant market in this case is one-sided or two-sided. We believe this silence was proper, since market definition is generally considered a question for the trier of fact and *Salveson* was resolved at the motion-to-dismiss stage.[25] That decision was affirmed on appeal.

The *Salveson* Court was not presented with, and did not decide, whether the relevant market was one-sided or two-sided. Both the Court and the *Salveson* plaintiffs referenced *United States v. Visa* and appear to have implicitly recognized that the payment card industry may be composed of multiple distinct markets: "one for payment cards (the 'Payment Card Market'), in which consumers participate by purchasing cards from issuing banks, and another for network services (the 'Card Network Services Market'), in which merchants purchase services to facilitate the use of those cards."[26] The Court did not dismiss the *Salveson* plaintiffs' complaint on the grounds that the proper relevant market was one-sided; rather, the Court dismissed the complaint because plaintiffs predicated their claim on the argument that interchange fees are paid directly by cardholders. Rejecting this "facile contention," the Court concluded that the plaintiffs failed to sufficiently allege that cardholders, as opposed to merchants, are direct purchasers in the Card Network Services Market and therefore dismissed their complaint under *Illinois Brick*.[27]

Accordingly, we read *Salveson* to stand for the proposition that, in the payment-card-network-services markets, merchants are direct purchasers and cardholders are indirect purchasers. We do not believe *Salveson* speaks to the interdependence, if any, between the Card Network Services Market and the

---

[25] *See, e.g., Meredith Corp. v. Sesac, LLC*, 1 F. Supp. 3d 180, 219 (S.D.N.Y. 2014) (explaining that "market definition 'is a highly factual one best allocated to the trier of fact.'") (citing *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171 (3d Cir. 1992)).

[26] *Salveson v. JP Morgan Chase & Co.*, 166 F. Supp. 3d 242, 251 (E.D.N.Y. 2016).

[27] *Id.*

Payment Card Market, nor to any other questions of market definition that may have been raised by the Second Circuit's intervening *AmEx* decision.

Finally, *Salveson* does not render Rule 23(b)(3) Class Plaintiffs' proposed amendment futile. In this Circuit, "[l]eave to amend will be denied as futile 'only if the proposed new claim cannot withstand a 12(b)(6) motion to dismiss for failure to state a claim, i.e., if it appears beyond doubt that the plaintiff can plead no set of facts that would entitle him to relief.'"[28] Because *Salveson* does not contain any conclusions of law or fact establishing beyond doubt that the proposed alternative relevant market pleadings would fail a 12(b)(6) motion, Plaintiffs' motion to amend is not futile.

Respectfully submitted,

*s/ K. Craig Wildfang*

K. Craig Wildfang

cc:   All Counsel of Record (*via ECF*)

---

[28] *Schweitzer v. Crofton*, 935 F.Supp.2d 527, 556 (E.D.N.Y. 2013) (Brodie, J.) (citing *Milanese v. Rust–Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001)).