UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION<br><br>This document refers to: All Actions | MDL No. 1720<br>Case No. 1:05-md-1720-JG-JO |

# DECLARATION OF K. CRAIG WILDFANG, ESQ. IN SUPPORT OF RULE 23(b)(3) CLASS PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT

I.      Introduction and Overview. ................................................................................. 2

II.     Pre-filing Investigation by Robins Kaplan LLP. ............................................... 5

        A.      Expertise in payment-card markets.......................................................... 5

        B.      Meetings and information gathering with merchants. ........................... 8

III.    History of this Litigation – PHASE I.................................................................. 9

        A.      The first cases filed by Robins Kaplan LLP. ......................................... 9

        B.      Class Counsel organization, early status conferences, early discovery and
                the Court's case management role. ......................................................... 10

        C.      The First Consolidated Amended Complaint (April 2006) and motions to
                dismiss...................................................................................................... 12

        D.      The networks' restructurings and Class Plaintiffs' decision to challenge
                them........................................................................................................... 14

        E.      Defendants' motions to dismiss the FCACAC and supplemental
                complaint................................................................................................... 16

        F.      Class Counsel building the record. ......................................................... 18

                1.      Organizing the discovery effort. ................................................ 18

                2.      Early stages of discovery. .......................................................... 19

                3.      Depositions and document discovery of Defendants during Phase I....... 21

                4.      Discovery of Class Plaintiffs. .................................................... 23

                5.      Discovery of third parties........................................................... 24

                6.      Supplementation of the discovery record. ................................ 24

                7.      CaseMap cataloging of facts....................................................... 25

        G.      Class certification motion. ...................................................................... 25

        H.      Class Counsel's efforts to reform the payment-card industry. ............ 26

        I.      Department of Justice investigation....................................................... 29

        J.      Amended complaints and new motions to dismiss. .............................. 31

        K.      Merits experts reports and depositions. ................................................ 33

        L.      Summary judgment and *Daubert* motions............................................. 36

        M.      Communications with class representatives. ......................................... 40

        N.      Trial preparation...................................................................................... 40

IV.     Mediation and the 2012 Settlement. .................................................................. 41

V.      The 2012 Settlement. ........................................................................................... 44

VI.     Post-2012-Settlement Activities through June 30, 2016..................................... 45

        A.      Notice and administration of the 2012 Settlement............................... 45

|  | 1. | Co-Lead Counsel selected the class administrator following a lengthy process. | 45 |
|  | 2. | Co-Lead Counsel selected escrow and custodial banks to manage the class settlement cash and Interchange escrow account. | 45 |
|  | 3. | Notice to the Class. | 46 |
|  | 4. | Co-Lead Counsel took significant steps to obtain class member contact information to ensure the class received sufficient notice of the settlement. | 47 |
|  | 5. | Class member support via the toll-free number, dedicated website and through Co-Lead Counsel. | 49 |
|  | 6. | Class Counsel's efforts to combat misleading statements directed at the class by certain trade association and third-party filers. | 50 |
| VII. | Appellate Practice in Connection with the 2012 Settlement. | | 52 |
| VIII. | Litigation challenging state "no surcharge" statutes. | | 54 |
| IX. | Phase II Litigation. | | 55 |
| | A. | Drafting and motion practice relating to the Third Consolidated Amended Class Action Complaint. | 56 |
| | B. | Phase II discovery. | 57 |
| | | 1. Organizing the discovery effort for Phase II. | 57 |
| | | 2. Fact discovery taken of the Defendants and third parties. | 59 |
| | | 3. Defendants' fact discovery of Class Plaintiffs. | 60 |
| | | 4. Renewed expert discovery in Phase II of the litigation. | 62 |
| X. | Mediation and the 2018 Settlement. | | 64 |
| XI. | Conclusion. | | 68 |

## I.   Introduction and Overview.

1.   I, K. Craig Wildfang, am a partner in Robins Kaplan LLP, one of three Co-Lead Counsel appointed for the Rule 23(b)(3) damages class in the above-captioned litigation. I submit this declaration in support of the Class Plaintiffs' Motion for Preliminary Approval of the Superseding and Amended Definitive Class Settlement Agreement of the Rule 23(b)(3) Class Plaintiffs and the Defendants dated September 13, 2018 (the "2018 Settlement").

2.      This declaration summarizes the factual and procedural history of this litigation and the events leading up to this settlement. It also demonstrates that: (a) Class Plaintiffs and Class Counsel throughout have been fully engaged in this litigation and the related legislative and administrative procedures; (b) Class Plaintiffs and Class Counsel have a full understanding and appreciation of all the risks to the Class peculiar to this litigation; (c) Class Plaintiffs' and Class Counsel's prior pursuit of injunctive relief contributed to their thorough understanding of how Defendants' conduct caused injury to the class; (d) the settlement negotiations were at arms' length and involved only the interests of the Rule 23(b)(3) class; and (e) under all the circumstances, this settlement is well within the range of reasonableness to warrant notice being disseminated to the Class and ultimately final approval of the proposed settlement.

3.      As explained more fully below, under the leadership of the three Co-Lead Counsel[1] appointed by the Court - Robins Kaplan LLP, Berger Montague PC, and Robbins Geller Rudman & Dowd LLP - Class Counsel have achieved a monetary settlement for the Class of approximately $6.25 billion (before reduction for opt-outs), which we believe is the largest ever cash settlement in an antitrust class action.

4.      This settlement was achieved only after vigorous and determined opposition in litigation with the Defendants, which comprise many of the most powerful financial institutions in the world and are represented by some of the most formidable law firms in America. Only persistent and effective efforts by Class Counsel over the last thirteen years made this settlement possible – a result that provides significant cash recoveries to card-accepting merchants operating during the class period. '

---

[1] While the Superseding and Amended Definitive Class Settlement Agreement defines the three lead firms as "Rule 23(b)(3) Class Counsel," for readability and to avoid possible confusion, I refer to the three lead counsel firms appointed by this Court in the Order dated November 30, 2016 as "Co-Lead Counsel." ""The collective of all class firms who participated in this action will be referred to as "Class Counsel", unless otherwise explained in the text.

5.     Before the filing of this case in 2005, Visa and Mastercard, the dominant payment-card networks, were owned and controlled by a cartel of member banks that successfully avoided or defeated most of the prior challenges to their collusive structure, which had been maintained for over 30 years.

6.     The risks posed to Visa and Mastercard and their controlling banks by MDL 1720 and its challenge to the collective setting on interchange fees, stimulated the banks to more seriously consider what previously had been unthinkable, *i.e.* divesting their ownership and control of Visa and Mastercard. Three months after the filing of the first action in June 2005, Defendants set in motion their strategy to limit their litigation exposure by restructuring both Mastercard and Visa into publicly owned companies – a restructuring completed via an IPO by Mastercard in 2006, followed by Visa in 2008. Thus, one of the principal remedies initially sought by the Class Plaintiffs – bank divestiture of their ownership and control of Visa and Mastercard - was accomplished within three years of the commencement of the litigation, and ten years before this settlement.

7.     As described in more detail below, the relief obtained by the Department of Justice in its 2010 consent judgment with Visa and Mastercard, which eliminated many of the networks' anti-steering rules, complements the monetary relief obtained in this settlement, and was based substantially on the record and work product compiled by Class Counsel in MDL 1720.

8.     Moreover, our lobbying consultants in Washington, D.C. observed that the existence of this litigation, led by counsel who were willing to engage with Congress, and provide important strategic insights to merchants, were important factors that helped to convince Congress to enact legislation – the Durbin Amendment - capping interchange fees on debit-card transactions as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010.

4

9.    Now, in addition to the structural reforms accomplished via the Mastercard and Visa restructurings, the reform of the networks' anti-steering and other merchant-restraint rules accomplished by the DOJ consent decree and the 2012 Settlement, Class Plaintiffs have negotiated what we believe to be the largest ever cash settlement of an antitrust class action of $6.26 billion.[2] We respectfully submit that the relief we have obtained and the record we present to the Court will amply support preliminary and then final approval to the settlement, and the award of attorneys' fees and costs sought by Class Counsel.

## II.    Pre-filing Investigation by Robins Kaplan LLP.

### A.    Expertise in payment-card markets.

10.    The genesis of what became MDL 1720 began in 2003. I had become generally familiar with the economics and antitrust issues related to the payment-card industry during my service as Special Counsel to the Assistant Attorney General for Antitrust with the Department of Justice Antitrust Division in the mid-1990s. I added to my knowledge of the industry when I represented two large merchants, Best Buy Stores, Inc. and Darden Restaurants (Olive Garden, Red Lobster, Capital Grille) who had opted out of the class in the *In re Visa Check/MasterMoney Antitrust Litigation.*

11.    While representing Best Buy and Darden, I came into contact with several large merchants and merchant trade associations. I learned that merchants were dissatisfied with the continued domination of the payment-card industry by the country's largest banks. Although the Department of Justice had succeeded in its case challenging Visa's and Mastercard's exclusivity rules in 2002, *see United States v. Visa*

---

[2] This is the amount of the settlement as of September 7, 2018. However, approximation is necessary because the potential future opt-out reduction is unknown and the settlement funds, which have continued to be held in escrow accounts since the prior settlement, continue to earn interest and pay related taxes.

*U.S.A., Inc.*, 344 F.3d 229 (2d Cir. 2003), and although the class in *In re Visa Check/MasterMoney Antitrust Litigation* had obtained relief in the form of eliminating the tying agreement between credit- and debit-card acceptance for merchants, merchants believed that the competitive problems in the payment-card industry had not been substantially alleviated.

12.    Because the banks owned and controlled the networks, they were able to enforce a set of rules that inhibited the entry of new competitors by disabling merchants from conveying transparent price signals as to the costs of payment choices to their customers at the point-of-sale. Thus, unlike competitive markets where new entrants can succeed and build sales volume by offering products at a lower price, in the payment-card market that method of entry was impossible.

13.    Not only had the banks successfully enforced these rules, but they also were able routinely to increase the interchange rates paid by merchants on both credit-card and debit-card transactions. They did this not only by raising the pre-existing rates on standard "traditional" credit cards, but also by issuing new "premium" cards which carried much higher interchange rates allegedly to support the cost of providing rewards to cardholders and encouraging banks to migrate their customers from lower-interchange cards to "premium" cards. Finally, as consumer preferences shifted away from paying with cash and checks and towards credit and debit cards, the proportion of retail sales volume paid for with credit or debit cards, versus checks or cash, increased dramatically. By 2005, the total costs of acceptance for merchants had increased dramatically. Payment cards accounted for 38% of retail sales volume[3] and interchange-fee revenue paid by merchants to Visa and Mastercard card-issuing banks had risen to over $30 billion per year.

---

[3] Nilson Report No. 896 at 1, 7-9 (Dec. 2006).

14.    It became clear to me that the long-term solution for merchants was to wrest control of Visa and Mastercard from the banks that then owned and governed them, and to reform the rules such that transparent price signals could be provided at the point-of-sale so that the usual competitive market mechanisms would work to make the merchants' costs of acceptance more reflective of actual competitive conditions.

15.    I concluded that a new antitrust class action was the only option that offered any realistic chance of achieving a more competitive market for payment-card services in the foreseeable future. I also concluded that any such new action would have to be a broad-based attack on the structure of the industry and, in particular, must include an attack on the ownership and control of Visa and Mastercard by the nation's largest banks.

16.    During 2004 and 2005 my law firm and I conducted our pre-filing investigation. One of the conclusions we had reached was that in order to obtain the type of thorough relief that we thought necessary, the action would have to include as defendants banks that controlled Visa and Mastercard, as well as the networks themselves. It became apparent to us that some large merchants were unwilling to be the first to file a complaint that named the banks as defendants. Because many of these merchants had important banking relationships with many of the would-be defendants, they expressed that the business risk of retaliation outweighed whatever benefit they may obtain by being the lead plaintiff in a broad-based class-action lawsuit.[4] However, we found that this same fear of the banks did not necessarily extend to smaller merchants, who tended to have banking relationships with smaller banks who were not likely to be defendants.

---

[4] Because of a wave of mergers and acquisitions, in the banking industry in the decade from 1995 to 2005, 89% of MasterCard issuing volume was consolidated in the hands of five issuing banks. Five banks accounted for 75% of Visa issuing volume.

17.    In the spring of 2005 I was contacted by two small merchants who, after some discussion, decided that they were ready, willing, and able to become representative plaintiffs in the new class action. These two small merchants, who were prepared to undertake this litigation when it appeared that perhaps no other merchant would, were Photos Etc. Corp. and Traditions Ltd. Once these two merchants stepped forward, other merchants became more willing to lend their names to the cause, as well.

## B.    Meetings and information gathering with merchants.

18. I have represented plaintiffs and defendants in both class and non-class antitrust litigation since 1981. While we had confidence in the merits of the case we were planning to file, we understood that it represented a great risk to the law firm and its partners who would be risking millions of dollars to take on the largest members of the U.S. banking industry.

19.    Between November 2004 and June 2005, my Robins Kaplan colleagues and I continued to perform legal research and factual investigation as we drafted our first complaint. We met with a number of large and small merchants and several merchant trade associations, both to gather information from them regarding their experiences in the payment-card industry, and also to assess whether they were interested in being a part of this effort. We interviewed and engaged an economic-consulting firm, Lexecon, to advise us on the many complicated economic issues that we would face. And we engaged Professor Herbert Hovenkamp, the leading academic in the field of antitrust law, and the author of the most cited and most respected antitrust treatise.

20.    By June 2005 we had our complaint fully drafted, and had been retained by five merchants: Photos Etc. Corporation; CHS Inc.; Traditions Ltd.; A Dash of Salt, L.L.C.; and KSARRA, L.L.C. to file the case on their behalf. These merchants were willing to take on not only Visa and Mastercard, but also the banks that owned and

controlled both networks. On June 25, 2005 we filed the first complaint in the District of Connecticut, where two of the Class Plaintiffs did business.

## III.   History of this Litigation – PHASE I[5].

### A.   The first cases filed by Robins Kaplan LLP.

21.   Our initial complaint asserted claims under Sections 1 and 2 of the Sherman Act, and state law analogs, challenging the Defendants' collective setting of interchange fees and their imposition of rules that restricted merchant steering. The initial complaint named as Defendants Visa, Mastercard and the following banks: Bank of America Corporation; Bank of America, N.A.; National Processing, Inc.; Bank One Corporation; Bank One, Delaware, N.A.; Chase Manhattan Bank USA, N.A.; JPMorgan Chase & Co.; First Century Bank, N.A.,; First Century Bankshares, Inc.; Fleet Bank (RI), N.A.; Fleet National Bank; Capital One Bank; Capital One F.S.B.; Capital One Financial Corporation; Citicorp; Citigroup, Inc.; Citibank, N.A.; First National Bank of Nebraska; First National Bank of Omaha; HSBC Finance Corporation; HSBC Holdings, PLC; HSBC North America Holdings, Inc.; MBNA America Bank, N.A.; National City Corporation; National City Bank of Kentucky; Providian Financial Corporation; Providian National Bank; RBC Centura Banks, Inc.; RBC Royal Bank of Canada; People's Bank; RBS National Bank of Bridgeport; Royal Bank of Scotland Group, PLC; Suntrust Banks, Inc.; Texas Independent Bancshares, Inc.; USAA Federal Savings Bank; Wachovia Corporation; Wachovia Bank, N.A.; and Westpac Banking Corporation.

22.   That initial action sought damages and injunctive relief to make the market more competitive. Although we thought that obtaining the divestiture of the banks'

---

[5] "Phase I" refers to the history of these cases consolidated as MDL 1720 from the initiation of the pre-filing investigation in 2004 until the reversal of this Court's approval of the 2012 Settlement by the Second Circuit on June 30, 2016.

ownership interests in Visa and Mastercard would be difficult—because very few private antitrust actions in the history of the antitrust laws have ever succeeded in obtaining such structural relief—we were determined to make that effort. We believed that, because our goal was to get the banks out of their position as owners and controllers of Visa and Mastercard, a settlement was unlikely and a trial would be necessary.

23.   Within six days of the filing of our complaint, similar cases began to be filed in various district courts around the country. Most of these cases, like ours, were brought as class actions. A complete list of these actions is attached as Appendix A to the Superseding and Amended Definitive Class Settlement Agreement. Also among these cases were a number of non-class, individual actions brought on behalf of various large merchants. Ultimately, in the first phase of the litigation over 38 class actions, and seven individual actions on behalf of 19 large merchants, were filed in several different federal courts. The multiple filings led to proceedings before the Judicial Panel on Multidistrict Litigation. The JPML held a hearing on September 29, 2005 and, on October 19, 2005, ordered that all of these similar cases be consolidated and coordinated in the Eastern District of New York, before Judge Gleeson.

**B.   Class Counsel organization, early status conferences, early discovery and the Court's case management role.**

24.   By December 2005 a significant majority of counsel in the various cases that had been filed agreed upon an organizational and leadership structure to recommend to the Court. After reaching this agreement, we filed a motion with the Court recommending the entry of an order designating three firms as Interim Co-Lead

Counsel, Robins Kaplan LLP[6], Berger Montague PC,[7] and Robbins Geller Rudman & Dowd LLP.[8] By Order dated February 24, 2006 the Court appointed as Interim Co-Lead Counsel for the Class the three firms referred to above. [Dkt. No. 279]. Based upon their experience in managing large, multi-defendant antitrust class actions, Co-Lead Counsel knew that the success of their management of these consolidated actions required the Court to actively supervise and manage these actions. We requested that Magistrate Judge Orenstein require the parties to file a joint status report every other month, followed by regularly scheduled status conferences. [Dkt. No. 125, at 12]. We also knew that it was crucial to the efficient conduct of this case that the efforts of all of the law firms that had filed cases consolidated as MDL 1720 be carefully coordinated and directed so that there would be as little duplication of effort as possible. To that end, Co-Lead Counsel designated two other highly experienced law firms to serve as Co-Chairs of the Class Plaintiffs' Steering Committee: Freedman Boyd Hollander Goldberg Urias & Ward P.A., and Hulett Harper Stewart LLP. The talented lawyers at these two firms assisted the Co-Lead Counsel in managing the efforts of Class Counsel, and in developing the strategy that proved successful.

25.     Magistrate Judge Orenstein agreed to our suggestion and throughout the pretrial period, regularly scheduled status conferences were held. Class Plaintiffs pushed for an early start for discovery. As a result, at the status conference held on May 17, 2006, Magistrate Judge Orenstein ordered that the Defendants immediately produce the documents from prior cases, including documents produced in *In re Visa*

---

[6] When the Court issued its Order appointing Co-Lead Counsel this firm was named Robins, Kaplan, Miller & Ciresi L.L.P.
[7] When the Court issued its Order appointing Co-Lead Counsel this firm was named Berger & Montague, P.C.
[8] When the Court issued its Order appointing Co-Lead Counsel this firm was named Coughlin, Stoia, Geller, Rudman & Robbins L.L.P.

*Check/MasterMoney Antitrust Litigation* and *United States v. Visa U.S.A. and Mastercard International Co.* (hereinafter the "legacy productions").

26.   At the Court's direction the legacy productions were made by Defendants on a rolling basis over the next several months. This enabled Class Plaintiffs to begin preparing the background information for the more current discovery to come.

## C.   The First Consolidated Amended Complaint (April 2006) and motions to dismiss.

27.   Pursuant to the Scheduling Order of March 23, 2006 [Dkt. No. 303], Class Plaintiffs filed the First Consolidated Amended Class Action Complaint ("FCACAC") on April 24, 2006. The complaint contained 16 claims for relief under federal and state antitrust laws.

28.   The FCACAC sought relief on behalf of two classes—a monetary-relief class under Rule 23(b)(3) and an injunctive-relief class under Rule 23(b)(2). The complaint was set forth in three parts: the first setting out the factual background for all claims; the second alleging facts specific to claims relating to the fixing of credit-card interchange fees; and the third alleging facts specific to the fixing of signature-debit-card interchange fees.

29.    The chart below summarizes the various claims for relief in the FCACAC.

| Claim # | Class | Defendants | Cause of Action |
|---------|-------|------------|-----------------|
| 1 | I | Visa & Bank Defendants | Sherman Act § 1—Visa Intranetwork Conspiracy (Credit) |
| 2 | I | Mastercard & Bank Defendants | Sherman Act § 1—MC Intranetwork Conspiracy (Credit) |
| 3 | I | Visa, Mastercard & Bank Defendants | Sherman Act §1— Visa & MC Internetwork Conspiracy (Credit) |
| 4 | I | Visa & Bank Defendants | Sherman Act §1—Visa Anti-Steering Restraints. |
| 5 | I | Mastercard & Bank Defendants | Sherman Act §1—MC Anti-Steering Restraints |
| 6 | I | Visa & Bank Defendants | Sherman Act §2—Monopolization Through Anti-Steering Restraints. |
| 7 | I | Visa & Bank Defendants | Sherman Act §1—Tying/bundling of Various Services Within Network Services |
| 8 | I | Mastercard & Bank Defendants | Sherman Act §1— Tying/bundling of Various Services Within Network Services |
| 9 | I | Visa & Bank Defendants | Sherman Act §1—Exclusive dealing for Fraud Protection and Transaction Processing |
| 10 | I | Mastercard & Bank Defendants | Sherman Act §1—Exclusive dealing for Fraud Protection and Transaction Processing |
| 11 | I | Visa & Bank Defendants | Cal. Cartwright Act—Intranetwork Conspiracy (Credit) |
| 12 | II | All Defendants | Clayton Act §16—Declaratory and Injunctive Relief Relating to Conduct Alleged in Claims 1-10. |
| 13 | I | Visa & Bank Defendants | Sherman Act §1—Intranetwork Conspiracy (Debit) |
| 14 | I | Mastercard & Bank Defendants | Intranetwork Conspiracy (Debit) |
| 15 | I | Visa & Bank Defendants | Cartwright Act—Intranetwork Conspiracy (Debit) |
| 16 | II | All Defendants | Clayton Act §16—Declaratory and Injunctive Relief Relating to Conduct Alleged in Claims 13-15 |

13

30.    The complaint was the result of a comprehensive effort by Class Counsel, including several hundreds of hours of attorney time to marshal the facts in the public record.

**D.    The networks' restructurings and Class Plaintiffs' decision to challenge them.**

31.    Less than three months after we filed the first actions challenging the banks' use of Visa and Mastercard as price-fixing vehicles, Mastercard publicly announced that it was considering restructuring itself by having its bank owners divest their ownership interests in Mastercard and sell a majority their stock to the public via an initial public offering (IPO). Within weeks of Mastercard's announcement, Visa announced that it was considering a similar restructuring. We now know from the discovery taken with respect to the Mastercard and Visa restructurings that one of the primary motivations for the banks to give up their ownership and control of the two networks was the recognition of potentially ruinous damage exposure from the actions then being consolidated under MDL 1720. We also know from discovery that the banks desired alternatives that would permit them to remain effectively in control of the two networks, while minimizing their antitrust liability. The banks feared that, without ownership and control of Visa and Mastercard, the networks would abandon their "bank-centric" business model. Ultimately, the banks were advised by their counsel that no alternative short of complete divestiture of their ownership interests in both Mastercard and Visa would provide them the opportunity to limit their antitrust damage exposure that they sought, and accepted the risk that, freed of bank control, Visa and Mastercard would pursue their own economic interests, and not the banks.

32.    I believed that the restructuring could be challenged as antitrust violations themselves, under either Section 1 of the Sherman Act or Section 7 of the Clayton Act. Robins Kaplan researched the law on these issues and consulted with our antitrust

expert Professor Herbert Hovenkamp. Based on our research and analysis, we concluded that if we could prove that the transactions by which the restructurings were accomplished unreasonably restrained competition (Section 1 of the Sherman Act) and/or threatened to reduce competition in a relevant market (Section 7 of the Clayton Act), the claims might be viable. We recognized, however, that our ability to prevail on such claims would depend upon the facts obtained in discovery and proven at trial.

33.    On May 22, 2006, we informed the Court, Mastercard, and its banks that the Class intended to commence a new action challenging the Mastercard restructuring under Section 1 of the Sherman Act and Section 7 of the Clayton Act. While this claim had substantial risks for the Class Plaintiffs, it also created risks for Defendants by keeping the prospect of ruinous damage exposure on the bank Defendants.

34.    Class Counsel could not find another instance in which a court applied the antitrust laws to the reorganization of a joint venture into a publicly traded company. The precedent-setting nature of this issue was confirmed in the Defendants' briefing on the issue, in which they also did not point to a single instance in which this issue was addressed by a court or antitrust-enforcement agency.

35.    The First Supplemental Class Action Complaint ("FSCAC") alleged that the Mastercard restructuring was an attempt by the banks that then controlled Mastercard to continue their anticompetitive conduct, shielded from the proscriptions of Section 1 of the Sherman Act. It further alleged that, because the entity arising out of the IPO had been adjudicated by the Second Circuit in *United States v. Visa, et al.* to have market power, the IPO necessarily created a single entity with market power, which we challenged under Section 7 of the Clayton Act and Section 1 of the Sherman Act.

36.    Like the main consolidated amended complaint, the FSCAC was the result of hundreds of hours of attorney time. Class attorneys and advisors mined Mastercard's SEC filings to fill in factual allegations regarding the mechanics of and the stated

15

justifications for the Mastercard IPO. Class Counsel also consulted leading antitrust scholars who provided their input into the supplemental complaint.

37.   On May 25, 2006—a little more than a month after the FCACAC was filed—Mastercard completed and consummated its restructuring. Class Counsel later confirmed through discovery that a major motivation of the IPO was to escape or mitigate Defendants' damage liability in MDL 1720.

38.   The Mastercard restructuring posed significant risks for Class Plaintiffs. If Mastercard's planning was successful in establishing that its restructuring converted it from a "consortium of competitors," as found by the Second Circuit, into a "single entity," it would be increasingly difficult to show that it violated Section 1 of the Sherman Act when it established interchange fees and other rules. That would greatly limit Defendants' damages exposure and, more importantly, would greatly imperil Class Plaintiffs' prospects for injunctive relief.

39.   As discussed below, Class Counsel also challenged the Visa restructuring that was consummated on March 18, 2008 when we filed the Second Supplemental Class Action Complaint in January of 2009.

E.   **Defendants' motions to dismiss the FCACAC and supplemental complaint.**

40.   On June 9, 2006, the Defendants moved to dismiss the pre-2004 damages claims in the FCACAC or, in the alternative, to strike allegations relating to pre-2004 damages. Defendants argued that the release in *Visa Check* precluded all such damage claims.

41.   On July 21, 2006, we filed our opposition to Defendants' motion. Defendants filed their reply brief on August 18, 2006.

42.   Oral arguments on Defendants' motion to dismiss were conducted on November 21, 2006.

43.   On September 15, 2006, Defendants moved to dismiss the FSCAC in its entirety. We filed our response on October 30 and Defendants filed their reply on November 29, 2006.

44.   Class Plaintiffs' brief in opposition to Defendants' motions to dismiss was the product of hundreds of hours of attorney time, and was drafted in consultation with Class Plaintiffs' expert economists and leading antitrust scholars, including Professor Hovenkamp. The Court held oral argument on Defendants' motion to dismiss the FSCAC on February 2, 2007.

45.   On July 7, 2007, Magistrate Judge Orenstein issued a report and recommendation that the Defendants' motion to dismiss pre-2004 damages be granted. Class Plaintiffs appealed to Judge Gleeson and filed written objections to the report and recommendation on November 13, 2007. Judge Gleeson adopted the report and recommendation on January 8, 2008.

46.   On February 12, 2008, Judge Orenstein issued a report and recommendation that partially dismissed the FSCAC with leave to re-plead. Even though Judge Orenstein recommended partial dismissal, his report and recommendation accepted Class Plaintiffs' premise that the Mastercard restructuring could harm competition and thus could violate Section 7 of the Clayton Act. In an issue that was largely one of first impression, Judge Orenstein concluded that Section 7 of the Clayton Act applied both to Mastercard and the banks, as both had acquired "assets of another." He also concluded that the FSCAC alleged a substantial likelihood of harm to competition, as required by Section 7 of the Clayton Act. Judge Orenstein partially dismissed the antitrust claims of the FSCAC as to the banks, however, because Class Plaintiffs technically failed to allege that the banks acquired "assets of another." The Defendants filed objections to the

17

Report and Recommendation, arguing that the complaint should have been dismissed in its entirely for failure to state a claim.

47.  On November 25, 2008, Judge Gleeson upheld Defendants' objection and dismissed the FSCAC with leave to re-plead. On January 29, 2009, Class Plaintiffs filed the First Amended Supplemental Class Action Complaint.

## F.   Class Counsel building the record.

### 1.   Organizing the discovery effort.

48.  Building the record was a mammoth undertaking. The Class had sued 19 banks, including many of the world's largest banks, as well as Visa and Mastercard, the two largest payment-card networks in the world. These Defendants had enormous resources and were represented by many of the largest and most prestigious law firms in the world.

49.  In addition, we knew that the Defendants would retain experienced and well-regarded experts to help tell the Defendants' version of the story. The Defendants, and most particularly Visa, for years had funded "academic research" by prestigious economists all over the world, building Visa's argument that in "two-sided markets," standard economics and the antitrust rules do not apply.

50.  In discovery, many Defendants' documents, even routine correspondence, were withheld on the basis of privilege by reason of the document being copied to legal counsel. The result was that the privilege logs of each Defendant contained tens of thousands of entries. Visa's privilege log contained over 100,000 entries.

51.  Faced with such daunting obstacles, Co-Lead Counsel organized discovery efforts to efficiently obtain, review, analyze and summarize the evidence necessary to prove our case. This was accomplished by Co-Lead Counsel assigning tasks to Class

firms according to their capabilities and resources and established policies and practices to assure "quality control." So, for example, no firm (or lawyer) was assigned any work on the case until the firm/lawyer had attended a training session in order to gain a more complete understanding of the case. We also established procedures by which important evidence discovered by one firm was shared with other firms, so that the knowledge base was continually expanding.

52.   To organize pleadings and correspondence, Robins Kaplan established a case "Extranet," to which each of the Executive Committee firms had access. The Extranet contained, among other things, all correspondence, discovery requests, substantive pleadings from MDL 1720 and related cases, court orders, legal research, factual analysis, and news articles.

> 2.   Early stages of discovery.

53.   The discovery record in MDL 1720 became one of the largest ever in any private civil antitrust case. Including documents produced in other litigation between 2006 and 2011, the Defendants produced almost four million documents, totaling over 56 million pages. Class Plaintiffs produced nearly 200,000 documents, ultimately totaling over 2 million pages. Individual Plaintiffs' production added over 8.4 million pages to this count. In addition, third parties subpoenaed by Plaintiffs or Defendants produced nearly 300,000 documents totaling over four million pages. The Phase I record also included 370 depositions taken in MDL 1720 and over 570 taken in other matters. Exhibit 1 sets forth the number and pages of documents produced by each party to MDL 1720.

54.   Before discovery formally began on May 1, 2006, Class Counsel met with each of the Class Plaintiffs to discuss which individuals and categories of documents were

likely to have information responsive to Defendants' discovery requests and to organize each client's mandated, initial disclosures.

55.    Anticipating that reviewing and analyzing the documents produced in discovery would be an enormous undertaking, in February 2006, Class Counsel sent out requests for proposal ("RFPs") to leading e-discovery vendors seeking estimates for processing the production and making it accessible to Class Counsel via a web portal. We selected Encore Legal Solutions.

56.    As noted above, the first documents Class Plaintiffs requested were documents previously produced in earlier litigations. Obtaining these already-amassed documents required extensive negotiation and was accomplished only after Judge Orenstein ordered these "legacy productions" in early 2006.

57.    After culling the documents using search terms, we assigned dozens of Class Counsel who collectively spent thousands of hours reviewing, analyzing, and coding these documents.

58.    Also before the May 1, 2006 start of formal discovery, we worked in conjunction with Individual Plaintiffs' counsel to draft the initial sets of interrogatories and document requests to be served on Defendants. On May 1, Class and Individual Plaintiffs together served 417 document requests and 370 interrogatories. On May 3, 2006, Defendants collectively served 69 interrogatories and 122 document requests on Class Plaintiffs. Each of these figures includes subparts.

59.    The "meet and confer" sessions were lengthy and complicated. Altogether, there were dozens of meetings and telephone calls held to try to reach agreement on discovery disputes in order to avoid, to the extent possible, unnecessary burden on the Court.

3.    Depositions and document discovery of Defendants during Phase I.

60.    By the initial discovery cutoff in 2009, Class and Individual Plaintiffs collectively had served 718 document requests and 631 interrogatories, and five requests for admission.

61.    In addition to physical and electronic documents, the parties turned over massive amounts of data in discovery. Visa, for example produced thirteen years' worth of its transaction-level databases to Class Plaintiffs.

62.    A small team of Class Counsel was also tasked with gathering large quantities of data from each of the bank Defendants to support Class Plaintiffs' motion for class certification. Members from several Class Counsel firms were tasked with ensuring that that data needed by Class Plaintiffs' experts were produced. During a several-month period in 2008 and 2009—while the parties were in the throes of deposition discovery—Class Counsel held multiple meet-and-confer sessions with Defendants' counsel to secure this data.

63.    Class Counsel engaged in substantial motion practice and raised numerous issues I the regularly scheduled status conferences before Judge Orenstein relating to discovery issues. The scheduling of regular status conferences was an enormous help in resolving disputes, as many issues were resolved by the parties before, at, or immediately following status conferences, before those issues required formal motion practice.

64.    Class Counsel began receiving document productions from Defendants on a rolling basis in the fall of 2006. Defendants substantially completed their initial document productions in the spring of 2007.

65.    To assist in the review of documents, understanding the Defendants' businesses and the preparation for depositions, Class and Individual Plaintiffs' Counsel

21

conducted Rule 30(b)(6) depositions of each of the Defendants on issues related to their corporate structures and the identity of their employees with knowledge of the relevant facts in this litigation. These depositions occurred in the summer and fall of 2006.

66.   Like the legacy productions, the Defendants' main productions in MDL 1720 had to be reviewed and coded before Class Counsel could begin any substantive depositions. Each bank Defendant was assigned one or more Co-Lead Counsel or Executive Committee firms, which would take a leading role in reviewing their documents and deposing those Defendants' employees.

67.   Class Counsel who were charged with reviewing a particular custodian's documents were required to write a document-review memorandum that summarized that custodian's role in the Defendant's business, and identified salient documents in his or her files. Class Counsel reviewed the files of 880 custodians, and wrote custodial review memoranda for many of these.

68.   Class Counsel began taking depositions of Defendants' employees in the summer of 2007 and continued through the end of fact depositions in early 2009. Partners at Co-Lead Counsel and the co-chairs of the Executive Committee, supported by associates where appropriate, deposed the top-level executives at the Network and Bank Defendants. For all depositions, junior lawyers were responsible for identifying from among the hundreds-to-thousands of documents that were tagged as relevant for the deponent, those documents most likely to be helpful as deposition exhibits. Senior associates at Class Counsel firms deposed some of the lower-to-mid level employees of Defendants. For each deposition, paralegals worked with the associate taking or supporting the deposition to arrange for the copying and shipment of documents to the deposition location.

69.   A deposition-scheduling committee, made up of representatives from Class Counsel, Individual Plaintiffs, and Defendants met on a regular basis to propose

depositions, arrange schedules, and ensure the multi-tracked depositions were properly staffed with court reporters and videographers. Procedures were in place to limit the number of depositions in a given month by party and the members of the committee held calls sometimes weekly to organize the schedules.

70.     Exhibit 2 summarizes the Defendant depositions that were taken in Phase I.

### 4.     Discovery of Class Plaintiffs.

71.     While some attorneys at Class Counsel firms were reviewing Defendants' documents and taking depositions, other firms responded to Defendants' discovery requests and defended Class Plaintiff depositions. Defendants aggressively pursued discovery of all Class Plaintiffs.

72.     Over the course of the case, Defendants propounded 135 document requests and 295 interrogatories (including subparts) on Class Plaintiffs.

73.     Defendants were also aggressive in seeking depositions of Class Plaintiffs' employees. For example, Defendants demanded three full days of deposition testimony from Class Plaintiff Traditions Ltd.—a small furniture retailer with two outlets in Minneapolis-St. Paul and one in Naples, Florida.

74.     Generally, attorneys at the Co-Lead Counsel firms who were primarily responsible for the Class Plaintiffs' discovery responses took the lead in preparing for those Class Plaintiffs' depositions. Each deposition required at least several hours of document review plus a full day of preparation with the witness, in addition to defending the deposition. Most of these depositions required travel to the location of the deposition. Exhibit 3 summarizes the depositions that Class Counsel defended in Phase I.

75.   Defendants took numerous depositions of Individual Plaintiffs' employees as well. Even when Class Counsel did not directly participate in these depositions, Class Counsel monitored the depositions for their effect on the record.

### 5.   Discovery of third parties.

76.   Class Counsel, working together with Individual Plaintiffs' Counsel, also pursued extensive discovery of third parties. Some of these third parties included consulting firms that had performed work for the Defendants, rival payment-card networks, and member banks of Visa and Mastercard that were not named Defendants in this lawsuit.

77.   Disputes arose with these third parties over the discovery directed at them. Class Counsel therefore engaged in motion practice and extensive meet-and-confer sessions with the third parties' counsel.

78.   In addition to seeking and obtaining document discovery from third parties, Class Counsel took many depositions of third-party witnesses. Class Counsel also questioned witnesses in third-party depositions noticed by Defendants or Individual Plaintiffs. *See* Exhibit 4 which lists the third-party depositions in Phase I.

### 6.   Supplementation of the discovery record.

79.   Many major developments occurred in the payment-card industry between the time the initial discovery requests were served and the briefing on the dispositive motions in 2011. To name just a few, Mastercard and Visa completed their restructurings, each network was investigated by antitrust-enforcement agencies in the United States and abroad, and new payment technologies were being developed and implemented in the marketplace.

80.   These developments required multiple rounds of discovery supplementation from the Defendants. Each of these rounds was resisted by the Defendants, requiring

additional meet-and-confer sessions, additional correspondence between the parties, and, in some cases, further motion practice.

### 7.    CaseMap cataloging of facts.

81.    As fact discovery for Phase I was nearing a close, we prepared a master outline and a master evidentiary narrative that provided a roadmap for organizing the evidence that Class Counsel had obtained in discovery and would ultimately need for trial. This formed the starting point for building our CaseMap database. CaseMap is a tool that allows users to upload facts and exhibits into an organized structure of legal and factual issues. This effort was a necessary step in the preparation to try the case. The master case outline was supplemented with input from my colleagues, and the outline was then condensed into a format appropriate for CaseMap.

82.    Once the outline was created, junior attorneys at the Co-Lead firms reviewed each deposition summary, transcript, and exhibit. These attorneys marked where each piece of evidence should be placed in the outline and ensured that the information was inputted into the appropriate module in the CaseMap system.

83.    As we progressed into summary-judgment motion drafting, the CaseMap database was one of our primary sources of information. It would have also been the basis for our trial plan if the case would have proceeded to trial.

### G.    Class certification motion.

84.    Class certification was another major undertaking. It was only after much research during Phase I that we decided to pursue certification of both a Rule 23(b)(3) class for damages and a Rule 23(b)(2) class for equitable relief.[9] We sought discovery to support each class.

---

[9] For the reasons discussed below, in Phase II we sought certification of only a (b)(3) class.

85.    Class Plaintiffs retained Dr. Gustavo Bamberger of Lexecon as the expert economist supporting class certification. Co-Lead Counsel and the co-chairs of the steering committee worked with Dr. Bamberger to be sure he had all the information he needed to form his opinions for his expert report. This required marshaling materials from discovery (both documents and deposition testimony). These same attorneys worked with Dr. Bamberger in the preparation of his deposition and defended his two-day deposition by Defendants.

86.    Defendants retained Dr. Edward A. Snyder, as their expert opposing class certification. Co-Lead Counsel's preparation required an extensive review of his prior writings and opinions, as well as the discovery record upon which he relied. Co-Lead Counsel deposed Dr. Snyder for two days.

87.    Co-Lead Counsel and the co-chairs of the steering committee worked with Dr. Bamberger to prepare a rebuttal report, which was submitted along with Class Plaintiffs' Reply Memorandum in Support of Class Certification. Defendants then deposed Professor Bamberger again for one more day.

88.    The Court devoted a full day to class certification argument. That occurred on November 19, 2009 and was argued by Merrill G. Davidoff of Berger Montague PC, supported by other lawyers from the Co-Lead Counsel firms.

## H.    Class Counsel's efforts to reform the payment-card industry.

89.    Simultaneously with aggressively litigating their claims in court, Class Counsel were seeking to reform the payment-card industry outside of the courtroom, in particular before Congress and the Department of Justice. These efforts led to tangible benefits for the merchant class.

90.    In 2009, I was asked by several of my merchant clients in MDL 1720 to work with merchant groups to push a more effective, legislative strategy. Because Co-Lead

26

Counsel viewed developments in Washington, D.C., both in Congress and at the Department of Justice, as important adjuncts to the litigation, beginning in 2009 and continuing to the present I have been significantly involved in the development of strategic options for merchants with respect to legislative and regulatory remedies.

91.    After a series of meetings and other discussions with merchants and their trade associations, the merchants agreed in the spring of 2010 to adopt a unified strategy (for the first time) focused on drafting legislation, and urging its passage, which would impose a cap on interchange fees charged to merchants on debit-card transactions and direct the Federal Reserve Board to adopt regulations enforcing those limitations. Thus, in the spring of 2010, I became involved in the drafting and strategizing legislative proposals that ultimately came to be called the Durbin Amendment, after its author Sen. Dick Durbin of Illinois. The Durbin Amendment also contained other important relief, such as requiring issuing banks to enable debit cards to be processed over at least two competing networks, allowing merchants to provide discounts to consumers for payment by cash, check, or debit card, in lieu of credit cards, and allowing merchants to place a minimum purchase amount of up to $10.00 on credit-card transactions.

92.    I traveled to Washington, D.C. eight times in the first half of 2010 to meet with merchants and their counsel, and occasionally with senators and their staff, to assist with the efforts to convince the Senate to adopt the Durbin Amendment as an amendment to the bill that ultimately became known as the Dodd Frank Act. I also participated in dozens of conference calls to discuss these efforts, as well. On May 12, 2010, during the debate on the Dodd Frank Act on the floor of the Senate, Sen. Durbin offered his amendment, which passed with a bipartisan total of 64 votes.

93.    The Durbin Amendment to the Dodd-Frank Act and the ensuing Federal Reserve Board ("FRB") regulations limited interchange fees on debit-card transactions

to a maximum of about $0.24. This was highly significant to the MDL 1720 litigation because it gave merchants, for the first time, a substantially lower-priced form of payment other than cash to which they now could try to steer their customers. Debit-card transaction volume already was growing at a faster rate than credit-card transaction volume, and the Durbin Amendment seemed certain to accelerate that growth.

94.   After the enactment of the Durbin Amendment, permitting merchants to steer their customers to low-priced debit cards would be a valuable tool. Merchants in other countries had successfully employed steering strategies when they were permitted to surcharge, or threaten to surcharge.

95.   To assist the merchants after the enactment of Dodd-Frank in the summer of 2010, we prepared materials for submission to the FRB. To do so, we brought a motion before the Court to lift some of the restrictions on the Protective Order so that we could provide litigation materials to the FRB that we believed would assist it in carrying out its responsibilities under the Durbin Amendment, and personally met with and corresponded with the staff at the Federal Reserve Board that were responsible for the development of the rules. Our goal was to provide pertinent information about the economics of payment cards generally, and debit cards in particular.

96.   We also assisted the FRB in opposing a constitutional challenge to the Durbin Amendment. In October 2010, a large Minnesota-based bank, TCF National Bank, brought suit in the United States District Court for the District of South Dakota against the Board of Governors of the Federal Reserve Bank, charged with ratemaking for interchange fees on debit-card transactions under the Durbin Amendment. One feature of the Durbin Amendment was that the FRB rules would not apply to banks that had assets of less than $10 billion. TCF had assets above that level and claimed that the Durbin Amendment, and any FRB rules to be adopted pursuant to the new law, would

violate the Equal Protection Clause and amount to an unconstitutional confiscatory taking under the Due Process Clause. Thus, merchants came to me and asked me to provide assistance to the lawyers for the FRB in formulating their response to the TCF lawsuit. We did so. We prepared a long memorandum providing information to the FRB lawyers on the history of payment cards in United States, and describing many of the legal and economic issues that were relevant to TCF's claims. We also prepared and submitted an *amicus* brief, along with a declaration from our expert Dr. Alan Frankel, in opposition to TCF's motion for preliminary injunction to stop the FRB from conducting its ratemaking. Ultimately, the District Court in South Dakota denied TCF's preliminary injunction motion in April 2011. The Eighth Circuit Court of Appeals affirmed the denial in June 2011. Co-Lead Counsel submitted an *amicus* brief in support of the FRB on appeal as well.

## I.    Department of Justice investigation.

97.    I had discussions with the Department of Justice regarding the competitive problems in the payment-card markets since my representation of Best Buy and Darden Restaurants in the *In re Visa Check* litigation. After the commencement of MDL 1720, I continued those discussions with the goal of motivating the Department of Justice to open an investigation and to begin enforcement proceedings against Visa, Mastercard and the banks.

98.    In October 2008, the Department of Justice opened an investigation into the rules and conduct of Visa and Mastercard. This investigation led to a consent decree that provided another important benefit to merchants by reforming to Visa and MasterCard's point-of-sale rules. This relief is summarized in Judge Gleeson's opinion finally approving the 2012 settlement of this case. *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.,* 986 F. Supp. 2d 207, 265 (E.D.N.Y. 2013). By the spring of 2009, attorneys at the Department of Justice and at several state attorneys general's

offices began requesting information from Class Plaintiffs. Our ability to provide information to them was significantly constrained by the Protective Order the parties had negotiated and the Court had entered in MDL 1720. The Department of Justice eventually concluded that the most efficient way for them to gather information was to serve a Civil Investigative Demand ("CID") on the Class Plaintiffs in MDL 1720, which it did on April 21, 2009.

99.    Thus began a sixteen-month period of support by private plaintiffs of a Department of Justice antitrust investigation. Over that period, Class Counsel provided to the Department of Justice access to the document and deposition databases which Class Counsel had created, at great expense. The document database ultimately consisted of over 60 million pages of documents, which was completely searchable by custodian, key-word, or by any one of dozens of electronic "tags" that Class document reviewers had placed on documents to indicate their relevance to particular issues. The deposition database contained the transcripts and exhibits of over 400 depositions taken, or defended, by Class or Individual Plaintiffs' Counsel. We also provided to 15 state-attorney-general staff attorneys access to the same database. Class Counsel also shared their analyses of this record with the Department of Justice. Class Counsel's cooperation with the Department of Justice, including several in-person meetings and multiple telephone calls, consisted both of junior attorneys directing DOJ lawyers to salient portions of the record and senior attorneys having meetings and telephone calls with senior DOJ lawyers.

100.  We also made our expert, Dr. Frankel, available to the DOJ and the states. Dr. Frankel attended two of our meetings with DOJ officials in Washington, D.C. and participated in conference calls with state AG attorneys, at which he gave detailed presentations on the economic analysis of the record and discussed the issues surrounding the case.

101.  Our involvement with the DOJ and state attorney-general investigations culminated with a meeting with Assistant Attorney General Christine Varney and her senior staff at which we urged the Department of Justice to conclude its investigation by commencing an action against Visa and Mastercard challenging the Networks' anti-steering rules (ASRs). Shortly after that meeting the Department announced that it was going to file suit against Visa and Mastercard, and that both networks had agreed to eliminate many of the ASRs.

## J.   Amended complaints and new motions to dismiss.

102.  Class Counsel filed new amended and supplemental complaints in early 2009. By then, the fact-discovery record was nearly complete. Drafting amended complaints therefore became a fact-intensive exercise akin to summary-judgment briefing in a typical antitrust case.

103.  In December 2008 and January 2009, teams of Class attorneys worked on drafting the amended complaints and pulling evidence from the discovery record to support the amended claims. Like the original consolidated and supplemental complaints, Class Counsel invested hundreds of hours of attorney time on the Second Consolidated Amended Class Action Complaint, the First Amended Supplemental Class Action Complaint, and the Second Supplemental Class Action complaint.

104.  This significant time investment into the complaints—especially the supplemental complaints—was required in order to review and incorporate the discovery record in the tens of millions of pages in order to find the most persuasive documents and deposition excerpts to support the claims that Judge Gleeson had concluded were insufficient in their pre-discovery forms. We also supplemented the SCACAC with salient facts from the record, both to support our theory of post-IPO liability and to conform our allegations to the discovery record.

31

105.  In addition to adding factual detail to the allegations in the FCACAC, the SCACAC added new claims and revised previously asserted claims, primarily to address the now-accomplished Mastercard and Visa restructurings. It added claims that both Visa and Mastercard's default interchange fees constituted unreasonable restraints on trade, even after the IPOs. It also added claims that challenged the setting of default interchange fees on Visa's Interlink PIN-debit cards both before and after the restructurings.

106.  On March 31, 2009, Defendants moved to dismiss each of the amended complaints. The Defendants argued, as they had done with respect to the FSCAC, that the amended complaints challenging the restructurings failed to allege a substantial likelihood of harm to competition and—in the case of Mastercard—failed to allege a fraudulent conveyance.

107.  Unlike the original motion to dismiss the pre-2004 damages claims in the FCACAC, the Defendants raised a broad-based challenge to the SCACAC that sought to completely dismiss Class Plaintiffs' case. They moved to dismiss on the following bases: (i) that the release in the *In re Visa Check* case released *all* of Class Plaintiffs' damages and injunctive-relief claims; (ii) that the complaint failed to allege a "restraint on trade" sufficiently to state a claim under § 1 of the Sherman Act; (iii) that the complaint failed to allege a "plausible" inter-network conspiracy under *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007); (iv) that *Twombly* barred the complaint's allegations of post-IPO conspiracies within Visa and Mastercard; and (v) that Class Plaintiffs' claims were barred by the doctrine of *Illinois Brick.*

108.  In addition to the motions filed on behalf of all Defendants, Chase moved to strike its acquiring entity, Chase Paymentech, as a Defendant, arguing that Class Plaintiffs improperly added it as a Defendant without obtaining leave of court.

109.  Class Counsel again devoted substantial efforts to opposing Defendants' motions, which threatened to derail the entire case. The three Co-Lead firms divided the briefing up among themselves. Each firm assigned multiple attorneys to drafting opposition briefs. After nine weeks of briefing, Class Plaintiffs filed three separate opposition briefs: 42 pages in response to the motion to dismiss the SCACAC; 46 pages in response to the motions to dismiss the IPO complaints; and 9 pages in opposition to the motion to strike Chase Paymentech.

110.  Oral arguments on the motions to dismiss the amended complaints and on the class-certification motion were set for August 18 and 20, 2009 in front of Judge Orenstein.

111.  We prepared exhaustively for the oral arguments on the motions to dismiss and for Class certification. On August 12-13, 2009, Class Counsel held mock arguments on the motions to dismiss and the class-certification motion at Robins Kaplan's offices in Minneapolis. We retained the services of retired Minnesota Supreme Court Justice James H. Gilbert to preside over the mock arguments.

112.  Due to the sudden and unexpected unavailability of one of the Defendants' primary counsel, the Court rescheduled oral arguments from August to November 18-19, 2009.

113.  Because two-and-a-half months had passed since the originally scheduled arguments, Co-Lead Counsel had to duplicate many of our original preparation efforts before the November arguments.

**K.    Merits experts reports and depositions.**

114.  The selection of experts was crucial to the successful prosecution of the Class Plaintiffs' claims. Even before the first case was filed, Co-Lead Counsel conducted an exhaustive review of the economic literature related to payment-card networks and

interviewed several economists who had expertise in this field. In our review of the literature, we did not limit ourselves only to those articles which viewed the economics favorably from the merchants' point-of-view, but also tried to understand the economics from the point-of-view of the banks and networks.[10]

115.  The initial merits expert reports of both the Class Plaintiffs and the Individual Plaintiffs were filed on July 2, 2009. Class Plaintiffs filed a total of five initial expert reports, totaling over 377 pages of text. Individual Plaintiffs filed a total of four initial expert reports, totaling over 214 pages of text. The Class Plaintiffs' expert reports were founded upon the massive factual base assembled by Class Counsel, including the document database and the deposition database consisting of nearly 900 current and legacy depositions, with over 10,880 deposition exhibits. A list of all Plaintiffs' experts are set forth in Exhibit 5.

116.  The Class Plaintiffs' expert reports were also the product of the efforts of Co-Lead Counsel, and the co-chairs of the steering committee, to provide to the various experts information they requested from the factual record we had assembled, and to organize the efforts of the experts to address the various issues in the case that were within their respective areas of expertise. The lawyers who had been assigned to work with the various experts met frequently, and talked by telephone even more frequently over the many months during which the preparation of the expert reports took place, in order to keep the effort efficient and well organized, and to assure that all of the necessary issues were covered by at least one of our experts.

117.  Under the agreed-upon schedule, the Defendants served their initial expert reports on December 14, 2009. The Defendants served a total of 12 separate expert

---

[10] The expert issues related to class certification are discussed *Supra*. at III.I.

reports, totaling over 800 pages of text. As demonstrated in Exhibit 6, Defendants' experts included several economists with excellent reputations in their fields.

118.   Upon receiving these Defendants' expert reports, Co-Lead Counsel reviewed and analyzed each, and then organized the preparation of appropriate responses by Class Plaintiffs' experts. As with the initial expert reports, Co-Lead Counsel made assignments to various of the senior lawyers in the firms mentioned above to work with the experts in first understanding the reports we had received from the Defendants, doing the necessary analysis of the opinions reflected in those reports and the factual support (or lack thereof) for those opinions, then doing our own further analysis to determine whether any of the Class experts needed to expose errors in the analysis and/or factual support reflected in the Defendants' expert reports.

119.   Part of the exercise of responding to Defendants' expert reports included preparing for and taking depositions of Defendants' experts. Each of Defendants' 12 experts were deposed, for a total of 15 days of testimony. Senior Class lawyers took the lead on these depositions and were supported by more junior attorneys who scrutinized the experts' prior reports and publications and the documents that they relied upon. Class Counsel were also in frequent contact with Class experts and their support staff to help them analyze the economic arguments made by Defendants' experts.

120.   Under the agreed-upon schedule, the Class Plaintiffs' rebuttal expert reports were due on July 28, 2010. Class Counsel and our experts worked diligently to perform the necessary analysis of the opinions reflected in the Defendants' many expert report, understand the factual support (if any) for those opinions, identify facts that might contradict opinions proffered by any of the Defendants' experts, and then to do our own further analysis of the economics and the facts to determine what our experts would say in rebuttal.

121.  Defendants deposed Class and Individual Plaintiffs' experts in the late summer and early fall of 2010. In total, Defendants deposed Plaintiffs' experts for a total of 15 days of testimony. This included the three-day deposition of Dr. Frankel, Class Plaintiffs' principal economic expert. Defending depositions also required extensive preparation by Class Counsel, who reviewed prior publications and testimony of each expert and spent days preparing them for questioning.

122.  Almost immediately after the service of our rebuttal expert reports in July 2010, and knowing that the deadline for the filing of dispositive and *Daubert* motions was fast approaching, we began the preparation of drafts of motions to exclude the testimony of certain Defendants' experts.

## L.   Summary judgment and *Daubert* motions.

123.  On February 11, 2011, Class Plaintiffs, Individual Plaintiffs, and Defendants served motions for summary judgment. The parties also served several *Daubert* motions on the same day.

124.  Class Plaintiffs moved for summary judgment on liability on Claims 1, 2, 5, 10, 11, 13, 14, 17, 18, and 20 in the SCACAC. Generally speaking, these were the claims relating to the intra-network fixing of interchange fees before and after the networks' restructurings. Individual Plaintiffs moved for summary judgment with respect to their claims that the Defendants' anti-steering restraints constituted *per se* violations of the antitrust laws.

125.  The Defendants moved for summary judgment on the entirety of Class Plaintiffs' and Individual Plaintiffs' cases. They argued that summary judgment against Class Plaintiffs was appropriate on the following bases: that the *Visa Check* release barred Class Plaintiffs' claims; that the *Illinois Brick* doctrine precluded our claims; that the setting of interchange fees was not a "restraint on trade" within the meaning of

Section 1 of the Sherman Act; that Defendants' conduct did not reduce output; that no material issue of fact existed on our inter-network conspiracy claims; that Defendants were entitled to summary judgment on our claims challenging the networks' restructurings and our post-IPO Section 1 claims; and that Plaintiffs had not raised a material issue of fact with respect to the claims based on the anti-steering restraints.

126.  The Defendants moved to exclude each of the Plaintiffs' primary experts under *Daubert*. These include Alan Frankel, Kevin Henry, and Victor Fleischer for the Class Plaintiffs and Christopher Vellturo, Joseph Stiglitz, and Daniel Ariely for the Individual Plaintiffs. The Class and Individual Plaintiffs filed a joint motion to exclude the testimony of the Defendants' primary economic expert, Kevin Murphy, and accounting expert, J.T. Atkins.

127.  Moving for and opposing summary judgment with hundreds of depositions and tens of millions of pages in the record required nearly a year's worth of effort by the Co-Lead Counsel and other firms. Associate and partner-level attorneys at Co-Lead Counsel firms provided significant contributions, including drafting important sections of the memoranda of law and the Rule 56.1 fact statements. Attorneys at Executive Committee firms were also involved in this effort as necessary.

128.  Co-Lead Counsel began the process of drafting our affirmative summary-judgment briefs and Local Rule 56.1 Statements of Undisputed Facts (SUF) in the summer of 2010.

129.  Those who worked on this project reviewed the record for documents or deposition testimony that supported the various points in the SUF. They reviewed — among other sources — the CaseMap database in its entirety, the class-certification record in its entirety, the deposition summaries of all witnesses, as well as all documents tagged as "hot" or relevant to particular issues, all documents cited in class and merits expert reports, the *United States v. Visa* trial record and the *Visa Check*

summary-judgment record in their entirety, the expert reports in their entirety, the entire deposition transcripts of all important witnesses, the European Commission's decision ruling that Mastercard's interchange fees violated EU competition law, and other materials from foreign regulatory and judicial bodies that were available publicly or obtained in discovery.

130.  Two lead paralegals at Robins Kaplan cataloged all documents that were referenced as exhibits and cross-referenced them in the brief and statement of undisputed facts. This was a demanding and labor-intensive task as each of the 589 documents that were served as exhibits to our summary-judgment motion had to be cross-referenced to the brief and SUF in the appropriate places.

131.  Class Plaintiffs served a memorandum of law in opposition to Defendants' motion for summary judgment, along with a Rule 56.1 Counterstatement of Fact (CSF) on May 6, 2011. Summary-judgment briefing was completed on June 30, 2011, upon the service of Class Plaintiffs' reply brief and Rule 56.1 Reply Statement of Facts (RSF). That same day, summary-judgment and *Daubert* motion papers were filed with the Court under seal. The opposition papers to Defendants' motion and the reply papers in further support of Class Plaintiffs' motion demanded the same level of intensity and teamwork among Co-Lead Counsel.

132.  Briefing on *Daubert* motions followed the same schedule as the motions for summary judgment. It also required teamwork among lawyers at each of the Co-Lead firms and Individual Plaintiffs' counsel. We argued that Professor Murphy should be disqualified for two primary reasons: (i) his use of data from a study by Daniel Garcia-Swartz was plainly erroneous because he failed to take account for revisions to the data used in that study; and (ii) his analysis relating to the effect of credit availability on prices is plainly unreliable and therefore inadmissible.

133.  Executive Committee chair, Joseph Goldberg, along with attorneys from Berger Montague, and I were primarily responsible for drafting Class Plaintiffs' response to Defendants' motion to disqualify Alan Frankel. The response to Defendants' motion to disqualify Kevin Henry was primarily drafted by attorneys from Robbins Gellar Rudman & Dowd. These attorneys also provided invaluable assistance to our motion to disqualify Professor Murphy.

134.  After the sealed dispositive motions and *Daubert* motions were on file, the parties exchanged proposed public versions of the pleadings and supporting exhibits. Class Plaintiffs recommended no redactions. Some Defendants, on the other hand, proposed substantial redactions. After approximately two weeks of line-for-line, intense negotiations, the parties were able to reach agreement on a mutually acceptable set of redactions for the written pleadings.

135.  To assist the Court's review of the summary-judgment memoranda and supporting exhibits, we created "hyperlinked" versions of the non-public and public versions of the summary-judgment and *Daubert* motions. These are electronic copies of the pleadings that allow the user to see the documents supporting various propositions by clicking a mouse on electronic links within the documents. This task fell largely upon paralegals and litigation-and-case support staff at Co-Lead firms.

136.  Oral arguments on the summary-judgment and *Daubert* motions were set for November 3, 2011. Once again, we divided up responsibilities for arguing the motions. I argued the motion to disqualify Professor Murphy, as well as the portions of the summary-judgment motions relating to the networks' IPOs, Defendants' liability under Section 1, and their market power. My Co-Counsel, Bonny Sweeney of Robbins Gellar, took the defense of the Defendants' *Illinois Brick* and output arguments and also planned to argue the portion relating to the Defendants' argument that the Class Plaintiffs could not demonstrate a restraint on trade. Joseph Goldberg argued the

defense of the Defendants' motion to disqualify Alan Frankel. All of those assigned to argue portions of these motions received invaluable assistance from lawyers and staff at the Co-lead Counsel firms and at Mr. Goldberg's and Mr. Stewart's firms.

137.  Oral argument also involved an intensive preparation process. For example, I personally conducted three practice arguments with my colleagues. We conducted another mock argument in front of Justice Gilbert.

138.  The arguments took place as scheduled on November 3 and 4, 2011. The Court kindly complimented all counsel on the quality of the briefs and argument.

### M.   Communications with class representatives.

139.  Co-Lead Counsel has regularly communicated with all of the class representatives. Co-Lead Counsel met on dozens of occasions with groups of the class representatives, and met individually with them on many more occasions. In addition to the in-person meetings, we had frequent conference calls in which all class representatives were invited to participate. In addition to the meetings and phone calls, we maintained regular written communications with them as well. Subject to the limitations of the Protective Order, we provided to class representatives much detailed information about the evidence we were accumulating, and the progress of the litigation generally, as we could. In particular, I tried to communicate with class representatives before and after each formal mediation session.

### N.   Trial preparation.

140.  While most of the activities of Class Counsel to this point could be fairly characterized as preparing for trial, we began explicit trial planning in early 2011. At that time, Co-Lead Counsel and the co-chairs of the steering committee interviewed a handful of prominent trial-and-graphics consultants who might assist us in presenting our case to a jury. A firm was selected in early 2011.

141. At approximately the same time, Class Counsel, Individual Plaintiffs' Counsel, and Defendants each established small groups of lawyers who were tasked with meeting and conferring on issues relating to trial preparation, such as motion schedules and procedures, time limits, and designation of witness testimony.

142. Co-Lead Counsel and the co-chairs of the steering committee met with the trial consultants in May 2011 to discuss case themes and presentation strategies for trying the case to a jury. Based on this session, break-out groups prepared materials for a focus-group session in Brooklyn in the fall of 2011. The results of the focus-group session informed Class Counsel's future trial-planning activities.

143. In preparing the case for trial, Class Counsel also drafted comprehensive jury instructions and verdict forms which were to form the backbone of Class Plaintiffs' trial plan. The jury instructions were based on an analysis and assessment of jury instructions from more than 50 other antitrust cases, with significant work being done to account for the unique issues in this litigation. The verdict forms were designed to guide the jury through the complex and thorny issues raised in the case. Additionally, work began on various expected motions *in limine* and Class Counsel began the time-consuming process of culling the massive record down to trial exhibits, with consideration given to issues related to admissibility and other evidentiary concerns.

## IV.  Mediation and the 2012 Settlement.

144. Settlements between the Defendants and the Individual and Class Plaintiffs were reached in 2012, as the result of a prolonged and difficult mediation process spanning over five years. Ultimately, the parties agreed on using two of the most distinguished and most experienced mediators, at-the-time-retired Magistrate Judge Edward Infante and Professor Eric Green.

145.  By the time the settlement was reached and a Memorandum of Understanding was filed on July 13, 2012, counsel for the parties, either jointly or separately, had met with one or both of the mediators approximately 45 times. There were many hundreds of telephone calls and e-mails with the mediators. My co-counsel and I maintained regular communications with the Class Plaintiffs advising them of the status of the settlement discussions and mediation sessions.

146.  The first mediation session with Judge Infante occurred on April 14-15, 2008. Co-Lead Counsel prepared and submitted to Judge Infante a mediation statement, which described the factual and legal basis for the class's claims, and attached relevant materials that would assist the Judge in getting up to speed on the case. The first mediation session made it clear that the parties were far apart in their positions with respect to settlement, and that it was going to take a lot of time and effort to get the Defendants to the point where they would be willing to settle on terms that Class Counsel would be prepared to recommend to the class.

147.  Another mediation session took place on June 10, 2008 with both outside and inside counsel for Defendants present. During the litigation Co-Lead Counsel and co-chairs of the Executive Committee participated in hundreds of conference calls and dozens of in-person meetings with some or all of the class representatives. In addition, we frequently prepared memoranda to the class representatives summarizing the status of the litigation, including the status of settlement discussions.

148.  Between April of 2008 and December of 2011, the counsel for Class Plaintiffs and the Defendants, sometimes together with the Individual Plaintiffs, had dozens of face-to-face meetings, and hundreds of telephone calls, e-mails and other written communications trying to determine whether the parties could make progress toward a settlement.

149.  After the argument on the summary-judgment motions before Judge Gleeson on November 2, 2011, the Court had expressed interest in assisting the parties and the mediators in trying to resolve the litigation. To that end, on November 2, 2011 Judge Gleeson issued an order setting a two-day settlement conference with the Court, the mediators, counsel and all parties in the action. That settlement conference was scheduled for December 2-3, 2011. In the days leading up to that settlement conference, Co-Lead Counsel had several telephone conference calls and in-person discussions with many of the class representatives in preparation for them to attend the settlement conference. At the conference Judges Gleeson and Orenstein, as well as the mediators Judge Infante and Professor Green, all encouraged the parties to make every possible effort to try to reach agreement.

150.  After the two-day settlement conference, there was another flurry of communications between and among the mediators and the parties, and between and among Class Counsel and the class representatives.

151.  As is common in complex mediations, the mediators employed a mediators' proposal—which they presented to the parties on December 22, 2011, who in turn had to accept or reject the proposal in its entirety. Ultimately Class Counsel and the class representatives and Defendants accepted the mediators' proposal.

152.  Between February and June, 2012 Class Counsel and Defendants continued to negotiate over the many details of the settlement agreement. On June 20–22, 2012 the parties participated in another settlement conference with Judges Orenstein and Gleeson, and mediator Eric Green. After two days of great effort to reach agreement on language details the parties informed the court on the evening of June 22, 2012 that an agreement on all of the primary terms of a settlement had been reached. The parties agreed to finalize the Settlement Agreement and file a memorandum of understanding attaching the agreement with the Court by July 13, 2012.

43

## V.    The 2012 Settlement.

153.   The parties' negotiations resulted in a settlement that created two funds totaling over $5 billion (after accounting for opt outs) to compensate merchants for the overcharges they incurred as a result of the defendants' practices. The settlement also contained injunctive relief, primarily aimed at reforming the defendants' point-of-sale rules challenged in this litigation.

154.   This Court granted final approval on December 13, 2013. *See In re Payment Card Interchange Fee Antitrust Litig.*, 986 F. Supp. 2d 207 (E.D.N.Y. 2013).

155.   Shortly thereafter, this Court issued a 17-page decision approving a $544.8 million attorneys' fee—9.56% of the damages fund, after opt-out reductions—as "a reasonable overall fee" in light of the "unique … size, duration, complexity, and … relief" of this case. *In re Payment Card Interchange Fee & Merchant Disc. Antitrust Litig.*, 991 F. Supp. 2d 437, 439, 448 (E.D.N.Y. 2014). Applying the multi-factor standard of *Goldberger v. Integrated Resources*, 209 F.3d 43, 47-48 (2d Cir. 2000), Judge Gleason found the 2012 Settlement confirmed the court's judgment that class counsel "litigated the case with skill and tenacity" and that the settlement "would not exist" but for counsel's assumption of risk and extraordinary efforts. *Id*. at 441-42.[11]

156.   This Court's final approval of the 2012 settlement was appealed to the Second Circuit. After a protracted briefing schedule and oral argument on September 28, 2015, the Second Circuit reversed and vacated the final approval order finding there was a conflict arising from the same counsel representing both the Rule 23(b)(3) damages class and the Rule 23(b)(2) injunctive relief class.

---

[11] To calculate the fee, the court used a sliding scale that awarded counsel diminishing percentages of the settlement fund as the fund increased. *In re Payment Card Interchange Fee & Merchant Disc. Antitrust Litig.,* 991 F. Supp. 2d 437, 445 (E.D.N.Y. January 10, 2014). It further confirmed that the lodestar multiplier was "comparable to multipliers in other large, complex cases." *Id.* at 448.

## VI.   Post-2012-Settlement Activities through June 30, 2016.

### A.   Notice and administration of the 2012 Settlement.

      1.   Co-Lead Counsel selected the class administrator following a lengthy process.

157.  After reaching an agreement in principal for what became the 2012 Settlement, Co-Lead Counsel sought proposals from and interviewed a number of the top claims administration companies in the United States. It was apparent to counsel that effective notice and administration of a class settlement of this magnitude would require the services of a firm with an extensive data management expertise and resources.

158.  After a review and assessment of the proposals, Co-Lead Counsel recommended Epiq Class Action & Claims Solutions, Inc. ("Epiq") as the notice and claims administrator for the class.

159.  Hilsoft Notifications, a business unit of Epiq, served as the firm responsible for designing, developing, analyzing and implementing the notice plan. Hilsoft's services were included as part of Epiq's bid to serve as Class Administrator. Hilsoft has experience in more than 200 cases and notice plans developed by the company have been recognized and approved by courts throughout the United States.

160.  On November 27, 2012 the Court approved appointment of Epiq as the Class Administrator.

      2.   Co-Lead Counsel selected escrow and custodial banks to manage the class settlement cash and Interchange escrow account.

161.  Following the July 13, 2012 settlement announcement, Co-Lead Counsel was aware of their fiduciary duties to the class to consider and select escrow and custodial banks to manage Settlement Cash and Interchange Escrow Accounts. Co-Lead counsel

sought proposals from reliable and healthy banks that had experience in managing qualified settlement funds, particularly of the size and potential complexity presented by this settlement. After reviewing proposals, conducting interviews, and obtaining favorable fee quotes, Co-Lead counsel selected Huntington Bank as the primary escrow bank and US Bank as a secondary custodial bank. Currently each bank holds and manages approximately one-half of the Settlement Cash Escrow of $5.3 billion, originally funded by Defendants after preliminary approval of the 2012 Settlement, and following a reduction of the approximately $1.5 billion due to opt-outs per the terms of the agreement. Huntington Bank has been working with Co-Lead Counsel in connection with the escrowed funding to manage the accounts and disburse administrative expenses for class notice and administration with approval by the Court. Defendants, as per the 2012 Settlement Agreement, have participated in the process by approving Co-Lead Counsel's selection of the banks and in approving requested escrow functions.

### 3.   Notice to the Class.

162.  On October 19, 2012, the Notice Plan prepared by Hilsoft was submitted to the Court as Appendix E of the Definitive Class Settlement Agreement. [Dkt. No. 1656-1]. During the two months prior to the submission of the Settlement Agreement, Hilsoft, Co-Lead Counsel and Defendants worked together to draft the proposed notices. Senior attorneys from the Co-Lead Counsel firms worked extensively with Epiq and Defendants to craft a notice that would exceed the due process requirements under the Constitution and Federal Rule of Civil Procedure 23.

163.  Once the language of the notices was agreed upon, additional work regarding everything from type size to margins was considered and evaluated by senior lawyers from the Co-Lead Counsel firms. Proofs of the notices were approved by all parties on October 19, 2012 and revised on November 26, 2012. Following the agreement regarding

the content of the notices, further decisions regarding set up for mailing, paper thickness and other details were made by the attorneys and Epiq.

164.  Co-Lead Counsel also worked with Hilsoft on the paid media effort which included 475 separate print publication units with a combined circulation of over 80 million and 770 million adult internet banner impressions.

> 4.   Co-Lead Counsel took significant steps to obtain class member contact information to ensure the class received sufficient notice of the settlement.

165.  In July 2012, pursuant to Paragraph 81(d) of the Definitive Class Settlement Agreement, Co-Lead Counsel sent either a document request or subpoena to 25 entities. A document request and protective order was sent to following six settling Defendants: Bank of America Merchant Services, Chase Paymentech Solutions, Citi Merchant Services, SunTrust Merchant Services, Vantiv (f/k/a Fifth Third Bancorp), and Wells Fargo Merchant Services. Subpoenas were sent to the following 19 acquirers: BB&T Corporation, The Bancorp Bank, Elavon, Inc., EVO Merchant Services, LLC, Fidelity National Information Services, Inc., First Data Resources, Inc. ("First Data"), Global Payments Direct, Inc., Heartland Payment Systems, Inc., Intuit, Inc., iPayment, Inc., Merchant E-Solutions, Mercury Payment Systems, LLC, Merrick Bank Corporation, Moneris Solutions, Inc., PNC Financial Services Group, Inc., Santander Holdings USA, Inc., TransFirst, LLC, TSYS Merchant Solutions, LLC, and Worldpay US, Inc.

166.  Each document request and subpoena requested name, address and related information for each merchant for whom the entity had acquired or processed Visa or Mastercard transactions at any time between January 1, 2004 and August 1, 2012.

167.  Following the return date, several of the entities objected to the subpoenas via written objections. Several of the entities refused to produce the requested data without additional protective orders or agreements regarding confidentiality. Co-Lead Counsel

firms held numerous meet and confer negotiations with the subpoenaed entities. Dozens of telephone conferences and email negotiations with the various entities were conducted by Co-Lead Counsel attorneys.

168.  Special agreements regarding the confidentiality of produced data were created for several entities, including: First Data Heartland Payment Systems, Inc.; Global Payments Direct, Inc.; TransFirst LLC; and Wells Fargo Merchant Services, LLC. Getting to agreement on these confidentiality provisions entailed significant back and forth between the parties and included executives at Epiq (the entity that was to receive the data) as well as counsel for Visa and MasterCard.

169.  Co-Lead Counsel had difficulty getting any data from some of the subpoenaed parties and as to a few of the entities, motions to compel were threatened before the requested data was turned over. As to First Data, a letter motion to compel was filed after the parties reached impasse regarding the subpoena. That motion was filed on December 7, 2012. [Dkt. No. 1757]. It was later taken off calendar following First Data's agreement to produce requested data.

170.  Co-Lead Counsel also obtained data from Visa and Mastercard for use in the notice process. Visa provided extracts from two databases containing information about merchants who accepted Visa during the class period: the Visa Merchant Profile Database ("VMPD") and the Common Merchant Systems ("CMS") database. MasterCard provided two Aggregate Merchants List files that were imported on November 1, 2012 and December 21, 2012.

171.  Through this process, Co-Lead Counsel was able to provide Epiq with 115,045,756 rows of data containing merchant name, address and related information from the subpoenaed entities.

172.  Co-Lead Counsel worked with Epiq on all aspects of the development of the notice database, including de-duplication of records that shared key characteristics and the identification of excluded entities under the class definition. Once the notice database was finalized, Co-Lead Counsel worked with Epiq to monitor the mailing of the approximately 20 million notices. The initial notice mailing began January 29, 2013 and ended on February 22, 2013. Issues related to re-mailing of notices, undeliverable mail and other technical issues are monitored by lawyers at Co-Lead Counsel firms on a daily basis.

### 5.  Class member support via the toll-free number, dedicated website and through Co-Lead Counsel.

173.  Co-Lead Counsel worked with Epiq to develop a script for an automated Interactive Voice Response ("IVR") telephone system. By calling this number, potential class members can listen to the answer to frequently asked questions as well as request the Long-Form Notice and Settlement Agreement. Co-Lead Counsel also worked with Epiq to develop a script for live operators to respond to frequently asked questions. By January 28, 2013, the toll-free number was fully operational. Lawyers from Co-Lead Counsel assisted with in-person training of the live operators. As of March 31, 2013, the IVR system had received 93,478 calls, representing 426,157 minutes of use. Among these calls, 50,218 have been transferred to operators totaling 323,676 minutes of time. Through the end of the original claims period, May of 2013, and in the intervening years to present, the IVR system has handle many more inquiries.

174.  Attorneys from the Co-Lead Counsel firms regularly responded to class members who have called into the toll-free line, but requested more detailed information. Epiq provided Co-Lead Counsel with a list of Class Members who have either requested to speak to Class Counsel, or who had questions that required an answer from a lawyer. Co-Lead Counsel also have responded to hundreds of class

49

member calls made directly to Co-Lead Counsel. Responding to class member communications is a continuing process, with calls, emails and letters being received on a daily basis.

175.  Epiq and Co-Lead Counsel worked together to develop the content of the Settlement Website which became available on December 7, 2012. Attorneys from the Co-Lead Counsel firms worked on every aspect of the website, ensuring the content was neutral and informative.

176.  The settlement website allowed class members to preregister and provide information to help the Class Administrator in the preparation of the class member's Claim Form. Co-Lead Counsel worked with Epiq in the development and testing of the preregistration module, ensuring ease of use for class members.

> 6.     Class Counsel's efforts to combat misleading statements directed at the class by certain trade association and third-party filers.

177.  Numerous class members contacted the class administrator to express concern about various third party claims filers seeking to sign up class members for claims-filing services in exchange for up to 35% of the class members' expected recovery.

178.  In response to these concerns, Class Counsel engaged in extensive investigative, monitoring and litigation activities to ensure class members received only accurate information from third parties.

179.  In March 2013, Class Counsel became aware of a website launched by certain opponents of the 2012 Settlement, entitled www.merchantsobject.com. This website provided numerous links and information that purported to allow and encourage merchants to object, opt out, or otherwise voice opposition to the settlement.

180.  On March 29, 2013, Class Counsel wrote the Court seeking entry of an Order requiring modifications to the website and asking to receive advance notice of any planned future communications to class members. [Dkt. 1963]. The Court granted Class Counsel's motion on April 11, 2013, and, after the parties failed to reach agreement on a procedure to govern future communications to class members, the Court issued a new order that required corrective banners to be placed on the www.merchantsobject.com website.

181.  By the summer of 2013, Class Counsel learned that certain third-party claims filers had begun making misleading statements to class members, implying, or stating explicitly, that those class members could not recover under the settlement without enlisting the third party's assistance. Some communications implored class members to "act now" or contained similar language that implied that the class member receiving the notice was facing a deadline for recovery. Most of these third-party claims filers planned to take substantial portions of a merchant's recover in exchange for the "service" of filing their claims.

182.  One third party in particular, Managed Care Advisory Group, Inc. ("MCAG"), entered into contracts with various merchant processors which in turn told their merchant customers that unless they "opt[ed] out" MCAG would file a claim on their behalf, for which MCAG would retain a 25% share of the merchant's claim.

183.  After Class Counsel was unable to persuade MCAG to alter its practices, Class Counsel alerted the Court to MCAG's activities. [Dkt. 5964.] The Court in turn ordered MCAG and the processors with which it contracted to appear at a show cause hearing on September 12, 2013. [Dkt. 5975.] At this hearing, the Court ordered MCAG and the processors to stop their conduct immediately and negotiate with Class Counsel on proposed relief. Class Counsel and MCAG agreed on relief that, among other things, required MCAG to end its automatic claims-filing scheme and to inform merchants it

51

had contact that, should a settlement be finally approved, claims-filing assistance would be available to class members at no cost.

184.  In the summer and early fall of 2013, Class Counsel began noticing other third-party filers that were making misleading statements. When Class Counsel brought this to the Court's attention, the Court ordered Class Counsel to confer with "claims filing companies that Class Counsel alleges have knowingly made materially false or misleading solicitations to class members…to agree with them on dates for evidentiary hearings regarding any such statements." [Dkt. 6193 at 2.] Following the Court's order, Class Counsel directed discovery at several third parties regarding their activities, conducted six evidentiary hearings regarding misleading statements by those parties, and regularly updated the Court on third parties' conduct and Class Counsel's efforts to police it and protect class members.

185.  On October 3, 2014, the Court issued an omnibus order regarding third-party claims filers, which permanently enjoined one party, Premier, from activities relating to the settlement. The Court further concluded that various third-party filers' "statements deceived merchants in multiple ways." [Dkt. 6349 at 59.] The Court's order noted that "Class Counsel have been vigilant in policing the conduct of [third-party filers], contacting them directly when their statements are misleading and even working out corrective communications directly with them." The Court "commend[ed] Class Counsel for those actions, and for the professionalism and thoroughness that has characterized their conduct of the five evidentiary hearings on the subject." [*Id*. at 60.]

## VII.  Appellate Practice in Connection with the 2012 Settlement.

186.  Even though we believed that the 2012 settlement significantly benefitted the merchant class and was far superior to continued litigation, we knew the Court's final approval would be appealed. We therefore we retained Paul B. Clement, then with

Bancroft PLLC, as our appellate counsel. In addition to getting experienced appellate advocacy, another reason for retaining separate appellate counsel was to get a fresh look at issues that we had been living with for years. Mr. Clement was and is a highly experienced appellate lawyer. Between 2000 and 2008 Mr. Clement served for three year as Deputy Solicitor General in the U.S. Department of Justice followed by one year as Acting Solicitor General and three years as Solicitor General.

187.  After we selected Mr. Clement to lead our opposition to the appeals, we began the effort to get him up to speed on the relevant factual and legal issues.

188.  The briefing on the appeals to the Second Circuit was a group effort, led by the Bancroft team. Before we received the Appellants' briefs we researched the issues that were raised by the Appellants in the district court, and prepared memoranda summarizing that research. Then, after we received the Appellants' brief, we used those memoranda as the building blocks of our Brief of Appellees.

189.  The appellate work also included assisting Mr. Clement and his staff in preparing for the oral argument, set for the Fall of 2015. This preparation included both in-person and telephonic meetings and two mock arguments, including one before my partner, Eric Magnuson, a former Chief Justice of the Minnesota Supreme Court.

190.  On September 28, 2015, the United States Court of Appeals for the Second Circuit heard oral argument on the appeal.

191.  After the Second Circuit panel issued its opinion reversing the District Court's final approval order, Co-Lead Counsel and our appellate team considered our remaining options, and decided to file petitions for en banc review and for certiorari.

192.  On March 27, 2017, the Supreme Court denied our petition.

## VIII. Litigation challenging state "no surcharge" statutes.

193.  One feature of the legal landscape that emerged as directly relevant to our efforts was the existence of state laws in ten states—including California, Florida, New York, and Texas—governing credit-card surcharges. Enacted in the 1980s at the behest of the credit-card lobby, these laws made it illegal for merchants to "impose a surcharge on a cardholder who elects to use a credit card in lieu of payment by cash," while permitting them to offer discounts for cash. We knew early on that these laws could block hard-won relief. Even if Visa and Mastercard lifted their parallel contractual rules, the laws could still prevent merchants from surcharging. And given the integrated nature of the retail economy, they were likely to have national reach.

194.  To address this problem, we began coordinating in March 2013 with Deepak Gupta, a constitutional and appellate litigator at Gupta Wessler PLLC. With our support, and in collaboration with class counsel, Mr. Gupta devised and executed a nationwide strategy for challenging these statutes under the First Amendment. In June 2013, just after Visa and MasterCard lifted their no-surcharge rules, Mr. Gupta and this team initiated a series of constitutional challenges on behalf of small merchants that ultimately went to the U.S. Supreme Court and back. In the first case, Judge Jed Rakoff of the United States District Court for the Southern District of New York held that New York's surcharge law "plainly regulates speech" because it "draws the line between prohibited 'surcharges' and permissible 'discounts' based on words and labels, rather than economic realities" and fails First Amendment scrutiny because it "actually perpetuates consumer confusion," "by preventing sellers from using the most effective means at their disposal to educate consumers about the true costs of credit-card usage." *Expressions Hair Design v. Schneiderman*, 975 F. Supp. 2d 430, 444, 446 (S.D.N.Y. 2013).

195.  Following that initial victory, and with our continued support, Mr. Gupta and his team filed a second wave of First Amendment challenges in Florida, Texas, and

California in March 2014. After five years of litigation at all levels of the judiciary, those three challenges all proved successful, yielding decisions invalidating the Florida, Texas, and California laws and permanently enjoining those states' attorneys general from enforcing them against merchants who seek to impose fully disclosed credit-card surcharges. *See Rowell v. Paxton*, No. 14-190-LY (W.D. Tex. Aug. 16, 2018); *Italian Colors Restaurant v. Becerra*, 878 F.3d 1165 (9th Cir. 2018), *Dana's R.R. Supply v. Bondi*, 14-cv-134-RH (N.D. Fla. May 2, 2017); *Dana's R.R. Supply v. Attorney General*, 807 F.3d 1235 (11th Cir. 2015). The New York case, meanwhile, made its way up to the U.S. Supreme Court, which unanimously agreed with the merchants that these laws restrict speech rather than conduct and remanded for application of First Amendment scrutiny. *Expressions Hair Design v. Schneiderman*, 137 S. Ct. 1144 (2017). On remand, the Second Circuit certified the case to New York Court of Appeals to interpret the statute. The certified question was argued on Wednesday, September 12, 2018.

## IX.   Phase II Litigation.

196.  With the reversal of the 2012 Settlement approval, and upon remand to this Court, Class Counsel suggested to the Court that the best way to proceed, consistent with the Court of Appeals' opinion, would be for the Court to appoint separate counsel for any proposed Rule 23(b)(2) class for injunctive relief and for any proposed Rule 23(b)(3) class seeking damages only.

197.  Consistent with our recommendation, the Court invited applications by counsel, or groups of counsel, for appointment as Rule 23(b)(2) and Rule 23(b)(3) counsel. On November 30, 2016, after considering the applications of various counsel, the Court appointed Robins Kaplan, Berger Montague and Robbins Gellar Rudman & Dowd—the same counsel who had served as Phase I Class Counsel—as Rule 23(b)(3) damages counsel. The Court appointed The Nussbaum Law Group, P.C., Hilliard &

Shadowen LLP, Freed Kanner London & Millen LLC, and Grant & Eisenhofer P.A. to be
interim co-lead counsel for a proposed class of plaintiffs seeking class certification
pursuant to Federal Rule of Civil Procedure 23(b)(2). Those latter counsel prepared and
served a new complaint, and have been separately participating in the coordinated
discovery on behalf of the (b)(2) class in a case entitled *Barry's Cut Rate Stores, Inc., et al.
v. Visa, Inc., et al.*

A.   **Drafting and motion practice relating to the Third Consolidated
     Amended Class Action Complaint.**

198.   As soon as we were appointed as interim Co-Lead Counsel for the Rule
23(b)(3) Class, we began updating our operative class complaint to address legal and
factual developments and to address the Second Circuit's criticism of the 2012
Settlement and the previous structure of the classes and counsel.

199.   Because the operative class complaints were updated last in early 2009, the
process of bringing the complaint current was a significant undertaking, which, as
noted below, was occurring simultaneously with the renewed document and deposition
discovery of the Defendants. Class Counsel accordingly consolidated what had been
three standalone complaints (one consolidated complaint and one complaint
challenging each of the Visa and MasterCard IPOs) into one operative complaint. We
updated our factual allegations to conform to this new structure and to bring them in
line with market and legal developments over the past decade. The updates included
alleging alternative "two-sided" relevant markets that included both merchants and
cardholders, in order to address the argument that, in light of the Second Circuit's
*United States v. Am. Express* decision, the market included both "sides" of the Visa and
Mastercard platforms, and supporting those markets with concrete factual allegations.

200.   Defendants did not consent to Class Plaintiffs alleging alternative "two-
sided" relevant markets and argued that, even if amendment were permitted, the

56

amendments would not "relate back" to the beginning of the damages period in 2004. Class Plaintiffs accordingly engaged in motion practice to seek leave to amend and in support of the proposition that their amendments related back. [Dkt. 6880] Judge Orenstein held argument on these motions on April 20, 2017 and granted leave to amend on September 27, 2017, but concluded that Class Plaintiffs' amendments relating to an alternative "two-sided" relevant market did not relate back. [Dkt. 7076]. Class counsel worked with counsel for the other plaintiff groups to formulate objections to Judge Orenstein's Report and Recommendation. On August 30, 2018, Judge Brodie ruled that plaintiffs' amendments related back to their prior complaints. [Dkt. 7244.]

## B.   Phase II discovery.

201.   After the Second Circuit remanded the case to a renewed litigation footing, Class Counsel faced the prospect of additional discovery to prepare the case for trial. The factual record amassed in Phase I, discussed above, ended 6 years earlier, in 2010. The expert work, likewise, required updating in light of new case law, primarily the Second Circuit's decision in *United States v. Am. Express Co.,* 838 F.3d 179 (2d Cir. 2016), which held that, at least in the context of Amex's "three-party" network, the relevant market included both merchants and cardholders.

### 1.   Organizing the discovery effort for Phase II.

202.   The Rule 23 (b)(3) Class Counsel approached the organization of discovery efforts in Phase II of the litigation in generally the same way that we approached discovery during Phase I, including coordinating with the counsel for the Direct Action Plaintiffs and Rule 23(b)(2) Class Plaintiffs, so that discovery would be conducted efficiently and expeditiously.

203.   During the pendency of the appeal, and in the period after the decision of the Second Circuit and until the resolution of the issues of who would be appointed as class

counsel for the injunctive relief and damages classes were resolved, the Defendants and Direct Action Plaintiffs had negotiated various agreements and schedules that were to govern the next phase of discovery in their continuing litigation.

204.  In that period, the Defendants and Direct Action Plaintiffs had produced over one hundred million pages of documents (not including "native" files) and were preparing to begin deposition discovery.

205.  Indeed, deposition discovery in Phase II of the litigation began the day after the Court's order of November 30, 2016 appointing us as Class Counsel for the Rule 23(b)(3) Class.

206.  The combination of these developments—the progression of the Direct Actions, the reappointment of Class Counsel, and the immediate commencement of deposition discovery—challenged Class Counsel to analyze millions of pages of documents created after the conclusion of document discovery in Phase I while simultaneously preparing for dozens of depositions per month.

207.  While Class Counsel could take advantage of advancements in document-review and artificial-intelligence technology and their knowledge from Phase I of the case, this challenge necessarily had to be met by employing the human power of dozens of attorneys to review and summarize documents. Many of the reviewing attorneys were veterans of the Phase I review. These review attorneys reviewed over 5 million pages of documents (not including "native" files, which by Phase II of the litigation, constituted a significantly larger proportion of the total) produced by Defendants and third parties.

208.  Before reviewing documents, reviewers—including those with Phase I experience—were trained in-person or via webinar on the document-review software, the history of the case, and the points that needed to be addressed in Phase II. The Co-

Lead firms regularly held "check-in" meetings with document-review attorneys (which generally occurred weekly) to control the quality of the document-review work and direct reviewers' efforts going forward.

209.  Each Co-Lead firm and Executive-Committee-Co-Chair firms was again responsible for the participating in the depositions of one or more defendants. Senior associates and partners from these firms took the majority of depositions, with the assistance of more junior attorneys and paralegals to parse through the document record and organize lines of questioning.

## 2.  Fact discovery taken of the Defendants and third parties.

210.  Class Counsel took or participated in nearly 150 depositions over the next 18 months. As with the depositions taken during Phase I of the litigation, we had an organized effort to prepare summaries of the depositions contemporaneously and to circulate them to all of the Rule 23(b)(3) Class Counsel.

211.  Class Plaintiffs participated in another 32 depositions of third-party witnesses. These depositions involved similar levels of preparation to those of the Defendants, including review of the third parties' document productions, coordination with Direct Action Plaintiff counsel and Rule 23(b)(2) Class Counsel on allocation of time and topics to cover, and summary of the salient points from each deposition. Exhibit 7 to this declaration reflects a summary of the third-party and defendant depositions taken in Phase II.

212.  Document discovery also continued at an active pace after Class Counsel's appointment. Class Counsel, along with Direct Action Plaintiffs' counsel and counsel for the Rule 23(b)(2) Class, issued supplemental document requests to the network and bank defendants. Each of these requests was negotiated in extensive—and often contentious—sessions with the Defendants. Class Counsel, generally at the junior

59

partner level, actively participated in the drafting and negotiation over these requests with their peers among counsel for the Defendants and the other plaintiff groups.

213.   As in Phase I of the litigation, Defendants produced privilege logs that contained millions of entries. Class Counsel prioritized the review of Defendants' privilege logs, especially in connection with upcoming depositions. Accordingly, Class Counsel, in conjunction with counsel for the other plaintiff groups, sent dozens of letters challenging privilege designations, participated in meet-and-confer conversations with defense counsel regarding those documents.

214.   Working together with counsel for the other plaintiff groups, Class Counsel also engaged in motion practice relating to matters such as the scope of the Defendants' supplementation of prior discovery responses [Dkt. 6987], the allotted time and scope of defendant depositions [Dkt. 7048, 7060, 7070, 7083, 7170] and motions to de-designate certain Defendant documents as privileged [Dkt. 7049].

### 3.   Defendants' fact discovery of Class Plaintiffs.

215.   On September 11, 2017, Defendants served their Second Set of Requests for Production and Inspection of Documents to Each of the Putative Rule 23(b)(3) Class Plaintiffs. This set included 110 individual requests, each of which sought information going back to at least 2006, while a significant portion of the requests sought information extending back to 2000. Responding to these requests was made more challenging by the fact that a majority of the requests were lifted verbatim from the Defendants' requests to the Direct Action Plaintiffs, which generally were large, sophisticated entities with significantly more expansive operations.

216.   Class Counsel embarked upon a long and arduous meet-and-confer process over the document requests that spanned into 2018 and culminated in Defendants' motion to compel custodial searches in response to all of the requests and for certain

requests to extend back to 2000. [Dkt. 7139.] This was argued on January 23, 2018 [Dkt. 7142].

217.   The process of gathering documents responsive to Defendants' requests was labor intensive, Class Counsel was required to search for documents dating back nearly two decades. As would be expected in such a search, many of the custodians with knowledge of these documents had either moved jobs, retired, or in some cases passed away.

218.   Class Counsel generally employed associate-level attorneys to liaise with Class Plaintiffs to identify custodians and locations for responsive documents. Paralegals and litigation-support personnel collaborated to gather and process the data that was produced pursuant to the Defendants' requests. Teams of document-review attorneys reviewed the collected documents for responsiveness, privilege, and flagged particularly relevant documents. As with the review of the Defendants' documents, attorneys from the Co-Lead firms were in regular contact with the attorneys who reviewed Class Plaintiff documents to control quality and ensure consistency. Before documents were produced, paralegals and litigation-support staff inspected production for errors and technical deficiencies.

219.   These efforts resulted in Class Plaintiffs producing approximately half-a-million additional documents, and reviewing millions more.

220.   Defendants served their Second Set of Interrogatories to Each of the Putative (b)(3) Class Plaintiffs—totaling 59 interrogatories and subparts—on October 20, 2017. Class Counsel objected to and responded to these interrogatories on behalf of their clients on December 4, 2017. Class Counsel then began another lengthy and arduous meet-and-confer process relating to the interrogatories, simultaneously with negotiating the scope of their response to the document requests.

221.  Defendants served Class Plaintiffs with Rule 30(b)(6) deposition notices on January 25, 2018. Class Counsel thereafter negotiated the scope of the notices with defense counsel.

222.  Although the Defendants' deposition notices were not served until relatively late in the Phase II discovery period, Class Counsel anticipated that their clients would face additional depositions and therefore began preparing for deposition discovery of the Class Plaintiffs immediately after being appointed as (b)(3) counsel. Initially, this consisted of attending depositions of select Direct Action Plaintiff witnesses, in order to better understand the deposition strategies of defense counsel. As depositions approached, we worked with Class Plaintiffs to select designees, selected documents that were likely to be used as exhibits and outlining potential questions, and prepared the deponents in person for their depositions. After depositions were completed, Class Counsel summarized the depositions for the benefit of the other lawyers in the group.

223.  Class Counsel defended four Class Representative depositions in Phase II, most of which lasted nearly the entire seven hours allowed by the Federal Rules of Civil Procedure. By the time they reached agreement in principle on the terms of the 2018 settlement, Class Counsel had also begun preparing the defend depositions of the other Class Plaintiffs.

4.    Renewed expert discovery in Phase II of the litigation.

224.  Class Counsel also worked extensively to update the expert-discovery record to account for the passage of time since the 2010—when the last Phase I expert reports were served—as well as to address substantive developments during that time period, such as the Durbin Amendment, the loosening of the Defendants' steering rules, Defendants' new strategies to maintain high interchange rates, and the market reactions to those developments. Important developments had also occurred abroad, which could

affect the legal analysis of Class Plaintiffs' claims, and therefore needed to be addressed through expert testimony. Changes in the substantive law regarding class certification would also necessitate updated expert analysis from expert economists.

225.    Soon after the Second Circuit reversed the 2012 Settlement, Class Plaintiffs began working with Dr. Frankel and his firm, Coherent Economics, to update the expert work that had been done in Phase I. Class Counsel worked together with Dr. Frankel and other economists and staff at Coherent to agree upon expert tasks for Phase II, devise outlines for expert reports, and strategize as to areas of discovery to seek from the Defendants. Because of their familiarity with the antitrust and economic underpinnings of this case, the senior-most attorneys among the Co-Lead Counsel and the Co-Chairs of the Executive Committee firms had the most extensive substantive contacts with Dr. Frankel and Coherent.

226.    In addition to Coherent, Class Counsel engaged another nationally recognized consulting firm to assist in the expert analysis of the case and potentially submit an expert report. The same group of lawyers worked with this new firm and helped coordinate its work with that of Coherent.

227.    The experts retained by Class Counsel necessarily required updated data from the defendants in order to conduct their analyses. A subset of Co-Lead counsel therefore worked with counsel for the other plaintiff groups to receive updated data discovery from the Defendants. This included correspondence and meet-and-confer conversations spanning over a year with counsel for the networks, and inputs from economic consultants and to secure the data that our experts required.

228.    In an attempt to secure additional documents and data to be used in merits and class expert reports, Class Counsel served requests for production of documents on the bank defendants in 2017. In the following months, Class Counsel had several in-

person and telephonic meet-and-confer sessions with counsel for the bank defendants to resolve objections and secure responsive data.

## X.   Mediation and the 2018 Settlement.

229.  All antitrust litigation is risky, and big complex antitrust cases such as this one are exceptionally risky. There are two kinds of risks that should factor into the calculus of any contemplated settlement. The first is the risk of delay. Because of its difficulty and size, and the circuitous path of appeal following the 2012 Settlement, this case has now been pending over thirteen years. Further delay after litigation and a trial verdict, or even settlement, prolongs the period that merchants could possibly recover monetary compensation for past harm.

230.  The second risk is the ever-present prospect of losing in litigation, combined with the risk of the applicable law changing adversely to the interests of the class over time. As to risk of loss, nothing could more powerfully demonstrate this risk than the fact that one resolution to the case – the 2012 Settlement – was lost on appeal. A trial verdict and judgment would also be subject to the risk of reversal at the Second Circuit. Risks also exist for class certification. More recently adopted procedural hurdles also raise the stakes. For example, within a few weeks of the 2012 Settlement, the Supreme Court decided *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), which further elevated the hurdles one must overcome to successfully prosecute class actions. With these risks in mind, Co-Lead Counsel thought it most prudent to attempt to achieve a new settlement through renewed mediation while continuing to prepare for trial.

231.  Our mediation team had significant experience. Each of the three individuals who served on a day-to-day basis as Co-Lead Counsel as well as the chairs of the Executive Committee has tried to verdict antitrust cases with damages approaching or over a hundred million dollars. Other partners in the three Co-Lead Counsel firms have

tried to verdict many cases of a similar magnitude. Moreover, these firms have litigated massive cases in many industries involving antitrust, securities, and/or environmental claims, including in the payment industry, over the last three decades with exemplary results for their clients. In addition, almost all of the other Rule 23(b)(3) Class Counsel firms bring substantial trial, class-action, and antitrust expertise to their roles in the case. All Class Counsel and other counsel for the Rule 23(b)(3) Class Plaintiffs support this settlement as fair, reasonable, and adequate and certainly meeting the standard for preliminary approval

232.  After the Second Circuit's June 30, 2016 opinion, it was necessary that the class quickly make contact with the Defendants to discuss next steps. In part this was due to the fact that the 2012 Settlement had a termination provision that required a party who was entitled to terminate the agreement, such as after a reversal of the settlement approval on appeal, to give the required notice within 20 days. This would precipitate an unwinding of the agreement and all of the infrastructure that the parties had implemented for a settled resolution, such as the escrow agreements and accounts, claims administration and the like. This was of concern to both sides because if they wished to continue mediation, it was important to maintain the work completed in the event that any new settlement was achieved in a relatively short period of time. To that end, the parties agreed to a series of extensions as they resumed litigation and explored a resumption of new settlement negotiations concerning a single Rule 23(b)(3) class.

233.  The Defendants were willing to avoid outright termination of the 2012 Settlement through a series of extensions. This indicated to us there was hope for renewing settlement discussions for a new agreement on behalf of the Rule 23(b)(3) Class. Despite this indication, of course, we had no choice but to persist in the ongoing discovery between the DAPs and Defendants. This was particularly true since the discovery we conducted during the first phase of the litigation ended in 2010 – six years

earlier – and there had been many new developments in the payment card industry during the interim.

234.  Following several months devoted to our appointment as Co-Lead Counsel for the damages class, and reengagement in the pending litigation discovery, the parties resumed discussions about making a new effort to try to resolve the claims of the damages class. In addition to their own experiences and expertise, we again received the valuable assistance of two of the most experienced and respected mediators in the country, Professor Eric Green and Judge Edward Infante. At all times we insisted that our negotiations on behalf of the Rule 23(b)(3) Class be completely independent from the Rule 23(b)(2) injunctive relief class and that a settlement, if any, must not be contingent on a Rule 23(b)(2) class settlement or any other settlement.

235.  The parties approached Professor Green and Judge Infante in February of 2017. From then through the agreement in principle that the parties reached on June 7, 2018, Class Counsel engaged in twelve in-person mediation sessions, involving counsel for all, or nearly all, parties to the 23(b)(3) class case, and had countless telephone calls with counsel for defendants, the mediators, or both. Many of the mediation sessions were preceded by the exchange of draft settlement terms or proposed settlement language by one or both sides.

236.  Of course, the intensive mediation activities and the exchange of terms and language necessitated even more discussions and coordination among Co-Lead Counsel and the Co-Chairs of the Executive Committee regarding strategy for these mediation sessions.

237.  Class Counsel also made sure that the injunctive relief claims of the Rule 23(b)(2) Class Plaintiffs in *Barry's Cut Rate Stores, Inc., et. al. v. Visa, Inc., et al.*, MDL No. 1720, Docket No. 05-md-01720-MKB-JO ("*Barry's*") are explicitly excluded from, and unaffected by, the release and remain to be resolved in the *Barry's* case, that the

Settlement Class members retain their rights as prospective class members in *Barry's*, that the release of claims is of limited duration, and that only those claims arising out of or relating to conduct or acts that were alleged or raised or that could have been alleged or raised relating to the subject matter of the litigation are released.

238.  Despite the parties' diligent efforts to reach agreement on material terms, the mediators realized that the parties had reached impasse on certain key issues by late May of 2018, and received the parties' consent to resolve that impasse by issuing a mediators' proposal, which like the 2012 proposal, would have to be accepted or rejected in its totality.

239.  All parties accepted the mediators' proposal on June 5, 2018 and finalized their agreement on the principal terms of a settlement during an in-person meeting in New York two days later.

240.  The settlement greatly benefits the merchant class. The cash amount of the settlement– approximately $6.26 billion, before reduction for opt-outs, if any – is the largest antitrust class-action settlement in the history of U.S. courts. In addition, Class Counsel note that, even without an agreement to do so, the remaining anti-steering rules previously enforced by Visa and MasterCard that were eliminated or modified by the 2012 Settlement Agreement have not been re-instated. Class Counsel were and are unanimously in favor of settling the case on the terms embodied in the 2018 Settlement.

241.  Class Counsel were fully informed of the significant litigation risks based on an extensive factual record, expert opinions and insights, and the previously briefed and argued class, dispositive, and *Daubert* motions. Absent settlement, all of these motions would have had to be briefed and argued again to address the additional discovery and issues arising since then. Through this settlement, the Rule 23(b)(3) Settlement Class gets the certainty of a substantial monetary recovery instead of enduring the risk of delay, and the possibility of no recovery at all if their claims were

litigated through summary judgment, trial and post-trial proceedings. Thus, in our collective judgment, this resolution easily exceeds the applicable legal standard of being fair, adequate and reasonable to the Rule 23(b)(3) Damages Class.

## XI.   Conclusion.

242.   The preceding paragraphs in this declaration have described in some measure the great effort, dedication and expense that has been required to bring this complex and lengthy case to a successful conclusion. When we started this case, Visa and Mastercard were consortia of competing banks whose primary goal in their dual ownership of the payment-card networks was to drive card issuance and use through the promise of higher interchange rates, paid to the banks, and protected by anti-steering rules. This struggle has spanned over thirteen years to date. Class Counsel built a record based on millions of pages of documents testimony from hundreds of witnesses, critically analyzed that evidence, and and prepared for trial,. And the Class Plaintiffs have responded in kind to the reciprocal discovery demands of Defendants. The parties engaged in long, arduous, and often-stalled settlement negotiations that began before the Great Recession that eliminated some of the Bank Defendants originally named.

243.   But today, because of the efforts of Class Counsel, and their merchant clients, we have a much improved payment-card world. The banks have divested their ownership of the networks, Congress has provided through the Durbin Amendment a low-cost debit-card alternative to which merchants can migrate, and the Justice Department has imbedded the right of merchants to encourage lower-cost payment forms through discounts or other incentives. This proposed settlement complements these reforms by providing an unprecedented sum of monetary relief for past damages. Certainly, this settlement is preferable to continuing contentious litigation against Visa,

Mastercard, and the banks for years to come, with no guarantee of a more favorable outcome.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:     September 17, 2018
           Minneapolis, Minnesota.

K. Craig Wildfang

89273767.6

69

# EXHIBIT 1

EXHIBIT 1 to the Declaration of K. Craig Wildfang, Esq.
## DOCUMENT PRODUCTIONS – PHASE I

| DEFENDANT | DOCUMENTS | PAGES |
|---|---|---|
| MasterCard | 692,331 | 12,700,836 |
| Visa | 855,064 | 11,376,679 |
| Bank of America | 110,267 | 6,448,787 |
| Banks Citi | 129,790 | 2,595,857 |
| Banks FNBO | 124,792 | 1,184,764 |
| Banks SunTrust | 53,164 | 845,324 |
| Barclays | 22,994 | 877,604 |
| Capital One | 35,074 | 972,988 |
| Chase | 238,252 | 3,708,686 |
| Fifth Third | 217,059 | 2,549,733 |
| HSBC | 55,833 | 708,610 |
| MasterCard/DOJ | 89,525 | 496,758 |
| National City | 12,037 | 259,926 |
| Texas Independent | 7,220 | 51,300 |
| Visa/CID | 164,574 | 1,069,618 |
| Wachovia | 29,476 | 291,363 |
| Washington Mutual | 41,517 | 1,116,489 |
| Wells Fargo | 44,416 | 738,034 |
| Non MDL Deposition transcripts and exhibits | 15,169 | 330,065 |
| Legacy productions | 1,035,482 | 7,709,856 |
| TOTAL | 3,974,036 | 56,033,277 |
| CLASS PLAINTIFF | DOCUMENTS | PAGES |
| Affiliated Foods Midwest Cooperative | 6,820 | 36,453 |
| Capital Audio Electronics, Inc. | | 5,406 |
| CHS, Inc. | 98,385 | 497,085 |
| Coborn's Incorporated | 10,625 | 82,716 |
| Crystal Rock LLC | | 7,356 |
| D'Agostino Supermarkets | 15,556 | 220,929 |
| Discount Optics Inc | | 1,626 |
| Jetro Holdings, Inc. | 7,588 | 151,449 |
| Leon's Transmission Services, Inc. | | 27, 871 |
| National Association of Convenience Stores | 25,474 | 263,744 |
| National Community Pharmacists Association | 1,313 | 30,765 |
| National Cooperative Grocers Association | 2,543 | 7,473 |
| National Grocers Association | 10,116 | 183,657 |
| National Restaurant Association | 892 | 17,416 |
| NATSO | 14,521 | 99,808 |
| Parkway Corp. | | 20,886 |
| Payless ShoeSource Inc. | | 476,759 |
| Photos Etc. Corporation | 2,031 | 17,945 |
| Traditions Ltd. | 1,440 | 6,157 |
| TOTAL | 197,304 | 2,127,630 |
| INDIVIDUAL PLAINTIFF | DOCUMENTS | PAGES |
| Ahold USA, Inc. | 95,683 | 903,969 |
| Albertson's Inc. | 53,615 | 1,833,260 |

EXHIBIT 1 to the Declaration of K. Craig Wildfang, Esq.

## DOCUMENT PRODUCTIONS - PHASE I

| | | |
|---|---:|---:|
| Bi-Lo LLC | | 684,227 |
| Delhaize America, Inc. | | 958,900 |
| Hy-Vee, Inc. | 16,442 | 134,054 |
| Kroger Co. | 151,385 | 930,963 |
| Maxi Drug | | |
| Meijer, Inc. | | |
| Pathmark Stores, Inc. | 13,622 | 263,710 |
| Publix Supermarkets, Inc. | | |
| QVC, Inc. | | |
| Raley's | | |
| Rite Aid Corporation (includes Brooks, Eckerd) | | 2,208,752 |
| Safeway | 16,782 | 170,179 |
| Supervalue Inc. | | |
| Walgreen Co. | 48,293 | 355,025 |
| TOTAL | **395,822** | **8,443,039** |

| | | |
|---|---:|---:|
| **ALL PARTY TOTAL** | **4,567,162** | **66,603,946** |

# EXHIBIT 2

EXHIBIT 2 to the Declaration of K. Craig Wildfang, Esq.

## DEPOSITIONS OF DEFENDANTS - PHASE I

| Deponent | Date | Company | Location |
|---|---|---|---|
| Coscia, Albert 30(b)(6) on Organizational | 6/15/2006 | Visa USA | San Francisco, CA |
| Thoma, Joy 30(b)(6) on Organizational | 6/29/2006 | MasterCard | New York, NY |
| Hudson, Michael Sean 30(b)(6) on Organizational | 7/11/2006 | SunTrust | Atlanta, GA |
| McDonnell, Kristen 30(b)(6) on Organizational | 7/12/2006 | Washington Mutual | San Francisco, CA |
| Baxter, Nicholas 30(b)(6) on Organizational | 7/14/2006 | First National Bank of Omaha | Omaha, NE |
| Tabaczynski, Jeanine 30(b)(6) on Organizational | 7/18/2006 | Wachovia | Atlanta, GA |
| Madairy, David 30(b)(6) on Organizational | 7/19/2006 | Bank of America NA | New York, NY |
| Estabrook, Bard 30(b)(6) on Organizational | 7/20/2006 | Chase (Debit, issuing) | Columbus, OH |
| Wright, Michael 30(b)(6) on Organizational | 7/20/2006 | Bank of America NA | New York, NY |
| Counsellor, Melissa 30(b)(6) on Organizational | 7/21/2006 | Barclays | New York, NY |
| Potter, Catherine Owens 30(b)(6) on Organizational | 7/24/2006 | Texas Independent Bancshares | Galveston, TX |
| Goeden, David 30(b)(6) on Organizational | 7/25/2006 | HSBC | New York, NY |
| Rhein, Kevin 30(b)(6) on Organizational | 7/25/2006 | Wells Fargo | Minneapolis, MN |
| Likerman, Karyn 30(b)(6) on Organizational | 7/26/2006 | Citicorp Credit Services | New York, NY |
| Smith, Kathryn Jo 30(b)(6) on Organizational | 7/26/2006 | Chase Bank USA | Dallas, TX |
| Howe, Gaylon 30(b)(6) on Organizational | 7/27/2006 | Visa International | San Francisco, CA |
| Bostwick, William  30(b)(6) on Organizational | 7/28/2006 | National City | Kalamazoo, MI |
| Brashears, Kerry 30(b)(6) on Organizational | 7/31/2006 | SunTrust | Atlanta, GA |
| Banaugh, Michelle 30(b)(6) on Organizational | 8/4/2006 | Wells Fargo | San Francisco, CA |
| Pyke, Jacqueline 30(b)(6) on Organizational | 8/11/2006 | Capital One | Falls Church, VA |
| Dinehart, Shelley 30(b)(6) on Organizational | 10/17/2006 | Chase | Wilmington, DE |
| Bell, Chris 30(b)(6) on Organizational | 11/1/2006 | Fifth Third | Cincinnati, OH |

EXHIBIT 2 to the Declaration of K. Craig Wildfang, Esq.

## DEPOSITIONS OF DEFENDANTS - PHASE I

| Deponent | Date | Company | Location |
|----------|------|---------|----------|
| Doyle, Charles 30(b)(6) on Visa BOD | 11/29/2006 | Texas Independent Bancshares | Texas City, TX |
| Hsu, Peter 30(b)(6) on June 2003 interchange rate change | 6/14/2007 | Visa USA | San Francisco, CA |
| Haarma, Hannu | 8/2/2007 | Visa USA | San Francisco, CA |
| Towne, Robert 30(b)(6) on June 2003 interchange rate change | 8/30/2007 | Visa USA | Washington, DC |
| Lauritzen, Bruce | 9/14/2007 | First National Bank of Omaha | Omaha, NE |
| Jonas, Steven 30(b)(6) on June 2003 interchange rate change | 9/18/2007 | MasterCard | New York, NY |
| Kapteina, Elizabeth | 10/11/2007 | MasterCard International | New York, NY |
| Hawkins, Jay | 11/15/2007 | Visa USA | San Francisco, CA |
| Miller, Stephanie | 11/28/2007 | Chase | Columbus, OH |
| Batchelder, Elizabeth | 11/30/2007 | Bank of America NA | Charlotte, NC |
| Cullinane, Cathy | 12/4/2007 | Visa USA | San Francisco, CA |
| Williams, Elizabeth | 12/4/2007 | Visa USA | San Francisco, CA |
| Gelb, Valerie | 12/6/2007 | MasterCard International | New York, NY |
| Leoni, Giovanni | 12/14/2007 | Visa USA | San Francisco, CA |
| Bhamani, Riaz | 12/17/2007 | Bank of America NA | Charlotte, NC |
| Middleton, Dan | 12/20/2007 | Wells Fargo | San Francisco, CA |
| Quinlan, Greg | 12/20/2007 | Citigroup | Chicago, IL |
| Gore, Fred | 1/8/2008 | MasterCard International | Boston, MA |
| Kelleher, John | 1/8/2008 | Visa International (former), Washington Mutual (present) | San Francisco, CA |
| Fam, Hany | 1/9/2008 | MasterCard International | New York, NY |
| Marshak, Robert | 1/9/2008 | Visa USA | San Francisco, CA |
| Offenberg, Alex | 1/9/2008 | Visa USA | San Francisco, CA |
| Beck, Gary | 1/11/2008 | Visa USA | Denver, CO |
| Demanett, David | 1/11/2008 | Wells Fargo | Minneapolis, MN |
| Rossi, Debra | 1/15/2008 | Wells Fargo | San Francisco, CA |
| Morais, Diane | 1/16/2008 | Bank of America NA | Charlotte, NC |
| Eulie, Steven | 1/17/2008 | First National Bank of Omaha | Omaha, NE |
| Madairy, David | 1/17/2008 | Bank of America NA | Charlotte, NC |
| Moss, Kevin | 1/17/2008 | Wells Fargo | San Francisco, CA |
| Gauer, Matt | 1/18/2008 | First National Bank of Omaha | Omaha, NE |
| Thom, Christopher | 1/18/2008 | MasterCard International | New York, NY |
| Cramer, David | 1/22/2008 | Visa USA (former) | Cincinnati, OH |
| D'Agostino, Vincent | 1/24/2008 | Chase | New York, NY |
| Aafedt, John | 1/29/2008 | Visa USA | San Francisco, CA |
| Hunt, Donna | 1/30/2008 | Visa International | San Francisco, CA |
| Morrissey, Richard | 1/30-31/2008 | Visa USA | San Francisco, CA |
| Robinson, Chris | 1/30/2008 | Citicorp Credit Services | New York, NY |
| Fisher, Katherine | 1/31/2008 | Bank of America NA | Charlotte, NC |
| Leoni, Giovanni | 1/31/2008 | Visa USA | San Francisco, CA |

EXHIBIT 2 to the Declaration of K. Craig Wildfang, Esq.
## DEPOSITIONS OF DEFENDANTS - PHASE I

| Deponent | Date | Company | Location |
|---|---|---|---|
| DeVinney, Ericka | 2/5/2008 | Barclays | New York, NY |
| Best, Wayne | 2/6/2008 | Visa USA | San Francisco, CA |
| Forsey, Gareth | 2/8/2008 | MasterCard | New York, NY |
| Zuercher, Peter | 2/8/2008 | Visa USA | San Francisco, CA |
| Duffy, Michael | 2/11/2008 | Chase (Paymentech) | Dallas, TX |
| Lamba, Lakhbir | 2/19/2008 | National City | Cleveland, OH |
| Campbell, Radie Dickey | 2/20/2008 | Texas Independent Bancshares | Texas City, TX |
| DePhillipis, Ed | 2/20/2008 | MasterCard International | New York, NY |
| Huber, Marsha | 2/20/2008 | Chase (Chase debit) | Columbus, OH |
| Hughes, Kevin | 2/20/2008 | Citibank | New York, NY |
| Daly, Michael | 2/22/2008 | Bank of America NA | Wilmington, DE |
| Reid, Margaret | 2/22/2008 | Visa International | San Francisco, CA |
| Campbell, William | 2/26/2008 | Chase | New York, NY |
| Miller, Larry | 2/26/2008 | MasterCard International | New York, NY |
| Swales, Roger | 2/27/2008 | Visa International | San Francisco, CA |
| Kaiser, Caryn | 2/28/2008 | Chase (JP Morgan Corp) | Wilmington, DE |
| Landheer, Jamie | 2/28/2008 | Fifth Third | Cincinnati, OH |
| Murphy, Timothy 30(b)(6) on IPO | 2/28-29/2008 | MasterCard International | New York, NY |
| Robinson, Benjamin | 3/3/2008 | Bank of America NA | Charlotte, NC |
| Garofalo, Edward | 3/5/2008 | Citibank | New York, NY |
| Drury, Larry | 3/7/2008 | Visa International | San Francisco, CA |
| Pukas, Julie | 3/7/2008 | Citigroup | New York, NY |
| Abrams, Steve | 3/13/2008 | MasterCard | New York, NY |
| Lee, Bill | 3/13/2008 | Visa International | San Francisco, CA |
| Ehrlich, Susan | 3/14/2008 | Washington Mutual | Chicago, IL |
| Mattea, Karen | 3/18/2008 | Citigroup | Chicago, IL |
| Sommer, Kenneth | 3/20/2008 | Visa International | San Francisco, CA |
| Cullen, Lorinda | 3/25/2008 | Chase | New York, NY |
| Lampasona, Peter | 3/25/2008 | MasterCard | New York, NY |
| Pyke, Mark | 3/25/2008 | Bank of America NA | New York, NY |
| Rossi, Debra | 3/25/2008 | Wells Fargo | San Francisco, CA |
| Vaglio, Steven | 3/28/2008 | Bank of America NA | Charlotte, NC |
| Gustafson, Pete | 4/1/2008 | Visa USA (former) | San Francisco, CA |
| Fox, Eric | 4/2/2008 | Capital One | Richmond, VA |
| Steele, Tolan | 4/2-3/2008 | Visa USA | San Francisco, CA |
| Kresge, David | 4/3/2008 | Bank of America NA | Tampa, FL |
| League, Steven | 4/4/2008 | Bank of America NA | Wilmington, DE |
| Perry, Linda | 4/8/2008 | Visa USA | San Francisco, CA |
| Raymond, Douglas | 4/8/2008 | Mastercard | New York, NY |
| Buse, Elizabeth individual and 30(b)(6) on Premium Cards | 4/10-11/2008 | Visa USA | San Francisco, CA |
| Fischer, Raymond | 4/10/2008 | Chase | Wilmington, DE |

EXHIBIT 2 to the Declaration of K. Craig Wildfang, Esq.

**DEPOSITIONS OF DEFENDANTS - PHASE I**

| Deponent | Date | Company | Location |
|---|---|---|---|
| Doyle, Deborah individual and 30(b)(6) on Merchant Rules | 4/21-22/2008 | MasterCard | New York, NY |
| Jonas, Steven 30(b)(6) on Interchange Methodology | 4/23-24/2008 | MasterCard | New York, NY |
| Gallo, Paul | 4/24/2008 | Visa USA | Chicago, IL |
| Goldman, Ira | 4/24-25/2008 | Chase | New York, NY |
| Sabiston, Diana | 4/24/2008 | Citigroup | Jacksonville, FL |
| Morrison, Douglas | 4/30/2008 | Citigroup | Chicago, IL |
| Siraj, Mohamed | 4/30/2008 | SunTrust | Atlanta, GA |
| Baum, Elaine | 5/1/2008 | Visa USA | San Francisco, CA |
| Healy, Tim | 5/7/2008 | Wells Fargo | San Francisco, CA |
| Clay, Charmaine | 5/8/2008 | Wells Fargo | San Francisco, CA |
| Lehman, Luba | 5/8/2008 | Visa USA | San Francisco, CA |
| Banaugh, Michelle | 5/9/2008 | Wells Fargo | San Francisco, CA |
| Johnson, William | 5/14/2008 | Citicorp Credit Services | Atlanta, GA |
| Portelli, Jeffery | 5/14/2008 | MasterCard | New York, NY |
| Rethorn, Mike | 5/15/2008 | Mastercard | New York, NY |
| Knitzer, Peter | 5/21/2008 | Citicorp Credit Services | New York, NY |
| Sachs, Jeff | 5/21/2008 | Visa USA | San Francisco, CA |
| Christian, Frank Phillip | 5/22/2008 | Chase | Wilmington, DE |
| Baxter, Nicholas | 5/29/2008 | First National Bank of Omaha | Omaha, NE |
| Lyons, Richard | 5/29/2008 | Mastercard | New York, NY |
| Kadletz, Edward Michael | 5/30/2008 | Wells Fargo | Minneapolis, MN |
| Poorman Tschantz, Martha | 6/11/2008 | Bank of America NA | Wilmington, DE |
| Yankovich, Margaret | 6/13/2008 | HSBC | New York, NY |
| Sheedy, William 30(b)(6) on Interchange Methodology | 6/17-18/2008 | Visa USA | New York, NY |
| Birnbaum, Robert | 6/18/2008 | Chase | Wilmington, DE |
| Martinez, Adrian | 6/23/2008 | HSBC | New York, NY |
| James, Michael | 6/25/2008 | Wells Fargo | San Francisco, CA |
| Srednicki, Richard | 6/25/2008 | Chase | Wilmington, DE |
| Grathwohl, Sue | 6/26/2008 | Fifth Third | Cincinnati, OH |
| Poturalski, Joseph | 6/26/2008 | Visa USA | Denver, CO |
| Barth, Eric | 6/27/2008 | Bank of America NA | Louisville, KY |
| Beidler, Melissa | 6/27/2008 | Visa USA | San Francisco, CA |
| Mangan, Kara | 6/27/2008 | Fifth Third | Cincinnati, OH |
| Bruesewitz, Jean | 7/2/2008 | Visa USA | San Francisco, CA |
| Charron, Dan | 7/2/2008 | Chase | Dallas, TX |
| Friedman, Theodore | 7/2/2008 | MasterCard | New York, NY |
| Attinger, Tim | 7/8/2008 | Visa USA | San Francisco, CA |
| Jorgensen, Chris | 7/9/2008 | Visa USA | San Francisco, CA |
| Munto, Tim | 7/15/2008 | Bank of America NA | Louisville, KY |
| Stewart, James | 7/16/2008 | Barclays | Wilmington, DE |
| McWilton, Chris | 7/17/2008 | MasterCard | New York, NY |

EXHIBIT 2 to the Declaration of K. Craig Wildfang, Esq.

**DEPOSITIONS OF DEFENDANTS - PHASE I**

| Deponent | Date | Company | Location |
|---|---|---|---|
| Donnelly, Kathleen | 7/22/2008 | Citigroup | Hagerstown, MD |
| Peppas, Jamie | 7/23/2008 | HSBC | New York, NY |
| Schultz, Kevin | 7/24/2008 | Visa USA | Milwaukee, WI |
| Olebe, Edward 30(b)(6) on Premium Cards | 7/25/2008 | MasterCard | New York, NY |
| Vague, Richard | 7/25/2008 | Barclays | Philadelphia, PA |
| Malone, Wayne | 7/28/2008 | Citigroup | New York, NY |
| Groch, Jon | 7/29/2008 | Fifth Third | Cincinnati, OH |
| McElhinney, Bruce | 7/29/2008 | Visa USA | San Francisco, CA |
| Hambry, Doug | 7/30/2008 | Visa USA | San Francisco, CA |
| Marshall, Ruth Ann | 7/30/2008 | MasterCard | Santa Fe, NM |
| Fellman, Herbert | 7/31/2008 | Bank of America NA | Charlotte, NC |
| Ruwe, Steve | 8/5/2008 | Visa USA (former) | Chicago, IL |
| Kranzley, Art | 8/6/2008 | MasterCard | New York, NY |
| Murdock, Wendy | 8/7/2008 | MasterCard | New York, NY |
| Kilga, Ken | 8/8/2008 | HSBC | New York, NY |
| DiSimone, Harry | 8/14/2008 | Chase | New York, NY |
| Phillips, G. Patrick | 8/14/2008 | Bank of America NA | Charlotte, NC |
| Van Ryn, Carolyn | 8/14/2008 | MasterCard | New York, NY |
| Gardner, John | 8/15/2008 | Visa USA | Denver, CO |
| Hackett, Gail | 8/15/2008 | MasterCard | New York, NY |
| Pinkerd, Stacey individual and 30(b)(6) on Convergence Strategy | 8/19-20/2008 | Visa USA | San Francisco, CA |
| Taglione, Richard | 8/20/2008 | Chase | Wilmington, DE |
| Halle, Bruce | 8/27/2008 | Citigroup | New York, NY |
| Baker, David | 9/4/2008 | Fifth Third | Cincinnati, OH |
| Partridge, John 30(b)(6) on Reorganization | 9/4-5/2008 | Visa USA | San Francisco, CA |
| Towne, Robert | 9/4-5/2008 | Visa USA | Washington, DC |
| Peirez, Joshua | 9/5/2008 | MasterCard | New York, NY |
| Lorberg, Dana | 9/10/2008 | MasterCard | New York, NY |
| Weichert, Margaret | 9/10/2008 | Bank of America NA | Charlotte, NC |
| DiSimone, Harry | 9/11/2008 | Chase | New York, NY |
| Knupp, Billy | 9/11/2008 | Visa USA | San Francisco, CA |
| Massingale, Faith | 9/16/2008 | Citi (former) | New York, NY |
| Munson, Carl | 9/17/2008 | MasterCard | New York, NY |
| Nadeau, Robert 30(b)(6) on Merchant Rules | 9/17/2008 | Chase | Dallas, TX |
| Weaver, Lance | 9/17/2008 | Bank of America NA | Wilmington, DE |
| Hammonds, Bruce | 9/22/2008 | Bank of America NA | Wilmington, DE |
| Mehta, Siddharth | 10/1/2008 | HSBC (former) | Chicago, IL |
| Wechsler, Robert | 10/1/2008 | Chase | Dallas, TX |
| Flood, Gary | 10/2/2008 | MasterCard | New York, NY |

EXHIBIT 2 to the Declaration of K. Craig Wildfang, Esq.

## DEPOSITIONS OF DEFENDANTS - PHASE I

| Deponent | Date | Company | Location |
|---|---|---|---|
| Rhein, Kevin | 10/2/2008 | Wells Fargo | Minneapolis, MN |
| Saunders, Joseph | 10/2/2008 | Visa USA | San Francisco, CA |
| Hinderaker, James | 10/7/2008 | Bank of America NA | Charlotte, NC |
| Moran, Patrick | 10/7/2008 | Fifth Third | Cincinnati, OH |
| Naffah, Albert 30(b)(6) on Australia Related Topics | 10/7/2008 | MasterCard | New York, NY |
| Steel, Tim | 10/8/2008 | Visa Europe | London, England |
| Boeding, Donald | 10/9/2008 | Fifth Third | Cincinnati, OH |
| Stumpf, John | 10/9/2008 | Wells Fargo | San Francisco, CA |
| Davila, Kelly Ann 30(b)(6) on Merchant Rules | 10/15/2008 | Bank of America NA | Charlotte, NC |
| Heuer, Alan | 10/16/2008 | MasterCard | New York, NY |
| Macnee, Walter | 10/17/2008 | MasterCard | New York, NY |
| Humphrey, Thomas 30(b)(6) on Merchant Rules | 10/21/2008 | Fifth Third | Cincinnati, OH |
| Rajamannar, M.V. | 10/21/2008 | Citigroup | New York, NY |
| Reilly, Patricia | 10/21/2008 | Chase | New York, NY |
| Dahir, Victor | 10/22/2008 | Visa USA | San Francisco, CA |
| Goosse, Etienne 30(b)(6) on Europe and UK | 10/21-22/2008 | MasterCard | New York, NY |
| Rogers, Dan | 10/24/2008 | Wells Fargo (former), Presently at Fifth Third Bank | San Francisco, CA |
| Webb, Susan | 10/27/2008 | Chase | New York, NY |
| Wright, Michael | 10/29/2008 | Bank of America NA | Wilmington, DE |
| Holman, Jerrilyn | 10/30/2008 | SunTrust | Atlanta, GA |
| Bergman, Ginger | 11/4/2008 | Visa USA | San Francisco, CA |
| Kranzley, Art 30(b)(6) on Technology Issues | 11/4/2008 | MasterCard | New York, NY |
| Lorberg, Dana 30(b)(6) on Technology Issues | 11/4/2008 | MasterCard | New York, NY |
| McGee, Liam | 11/5/2008 | Bank of America NA | Charlotte, NC |
| Scharf, Charles | 11/5/2008 | Chase | New York, NY |
| Steele, Tolan 30(b)(6) on European/UK Topics and Australia | 11/5-6/2008 | Visa USA | San Francisco, CA |
| Atal, Vikram | 11/6/2008 | CitiGroup | New York, NY |
| Hanft, Noah | 11/7/2008 | MasterCard | New York, NY |
| Jenkins, Ben | 11/7/2008 | Wachovia | Charlotte, NC |
| Dimon, Jamie | 11/13/2008 | Chase | New York, NY |
| Boehm, Steve | 11/17/2008 | Wachovia | Charlotte, NC |
| Selander, Robert | 11/17/2008 | MasterCard | Purchase, NY |
| Alexander, Lou Anne | 11/19/2008 | Wachovia | Charlotte, NC |
| Freiberg, Steve | 11/20/2008 | CitiGroup | New York, NY |
| Sheedy, William | 11/20-21/2008 | Visa USA | Washington, DC |

EXHIBIT 2 to the Declaration of K. Craig Wildfang, Esq.

## DEPOSITIONS OF DEFENDANTS - PHASE I

| Deponent | Date | Company | Location |
|---|---|---|---|
| Stein, Alejandro | 11/21/2008 | Chase | New York, NY |
| Floum, Joshua | 12/2/2008 | Visa USA | San Francisco, CA |
| Flanagan, Veronica  30(b)(6) on Merchant Rules | 12/4/2008 | Wells Fargo | New York, NY |
| Grathwohl, Sue | 12/8/2008 | Fifth Third | Cincinnati, OH |
| Mangan, Kara | 12/8/2008 | Fifth Third | Cincinnati, OH |
| Gracia, Anthony 30(b)(6) on Merchant Relations | 12/9/2008 | MasterCard | New York, NY |
| Sharkey, Thomas 30(b)(6) on Merchant Relations | 12/9/2008 | MasterCard | New York, NY |
| Doyle, Charles | 12/12/2008 | Texas Independent Bancshares | Texas City, TX |
| Portelli, Jeffery 30(b)(6) on Premium Cards | 12/12/2008 | MasterCard | New York, NY |
| Allen, Paul | 12/16/2008 | Visa USA | San Francisco, CA |
| Coghlan, John | 12/16/2008 | Visa USA | San Francisco, CA |
| Attinger, Tim 30(b)(6) on Technology | 12/17/2008 | Visa USA | San Francisco, CA |
| Gonella, Michael 30(b)(6) on Technology | 12/17/2008 | Visa USA | San Francisco, CA |
| Gregory, Robert individual and 30(b)(6) on Card Business | 12/17-18/2008 | Capital One | Richmond, VA |
| Pascarella, Carl | 12/17-18/2008 | Visa USA | San Francisco, CA |
| Somerville, Una 30(b)(6) on Merchant Rules | 12/19/2008 | Visa USA | San Francisco, CA |
| Walker, Richard 30(b)(6) on Card Business | 12/19/2008 | Capital One | Richmond, VA |
| Selander, Robert | 1/26/2009 | MasterCard | Purchase, NY |
| Fulton, Henry | 2/12/2009 | Bank of America NA | Charlotte, NC |
| Fairbank, Richard | 4/7/2009 | Capital One | McLean, VA |
| Somerville, Una 30(b)(6) on Merchant Rules | 4/7/2009 | Visa USA | San Francisco, CA |

# EXHIBIT 3

EXHIBIT 3 to the Declaration of K. Craig Wildfang, Esq.
## DEPOSITIONS OF CLASS PLAINTIFFS - PHASE I

| Deponent | Date | Company | Location |
|---|---|---|---|
| Feeney, James 30(b)(6) on Organizational Structure | 8/10/2006 | Payless | Topeka, KS |
| Schumann, Michael | 11/15/2007 | Traditions | Minneapolis, MN |
| Schermerhorn, David | 12/4/2007 | NCGA | Minneapolis, MN |
| Agan, Colleen | 1/8/2008 | NCPA | Washington, DC |
| Ivancikova, Daniela | 1/8/2008 | Parkway (former) | Bala Cynwyd, PA |
| D'Agostino, Nicholas | 1/10/2008 | D'Agostino | New York, NY |
| Archer, Vincent | 1/17/2008 | Leon's | Los Angeles, CA |
| Emmert, Brian | 1/17/2008 | Jetro | New York, NY |
| Buckley, Neil | 1/18/2008 | D'Agostino | New York, NY |
| Schumacher, Jerome | 1/24/2008 | Coborns | Minneapolis, MN |
| Smith, Gary (Chuck) | 1/24/2008 | NCPA | Washington, DC |
| Vasco, Nunzi | 1/31/2008 | Capital Audio | New York, NY |
| Menard, Steve | 2/5/2008 | CHS | Minneapolis, MN |
| McPadden, Denise | 2/8/2008 | D'Agostino | New York, NY |
| Thueringer, Robert | 2/12/2008 | Coborns | Minneapolis, MN |
| Hall, Terry | 2/20/2008 | NCPA | Washington, DC |
| Gule, Roberta Avoletta | 2/21/2008 | Crystal Rock | Waterbury, CT |
| Smith, Kelly | 2/25/2008 | NCGA | Iowa City, IA |
| Hardman, John | 2/26/2008 | CHS | Minneapolis, MN |
| Schumann, Suzanne | 2/26/2008 | Traditions | Naples, FL |
| Shrader, Robynn | 2/26/2008 | NCGA | Iowa City, IA |
| Opper, Norman | 2/27/2008 | Discount Optics | Boca Raton, FL |
| Wolfe, Stephen | 2/28/2008 | NCGA | Madison, WI |
| Platkin, Susan | 3/13/2008 | Capital Audio | New York, NY |
| Ierubino, Paul | 3/20/2008 | Parkway | Bala Cynwyd, PA |
| Fiereck, Linda | 3/27/2008 | Coborns | Minneapolis, MN |
| Jurasek, David | 3/27/2008 | Crystal Rock | Waterbury, CT |
| Hayes, Pamela | 4/4/2008 | NATSO | Alexandria, VA |
| Berman, Carl | 4/10/2008 | Photos, Inc. | Los Angeles, CA |
| Severson, Duane | 4/10/2008 | Affiliated Foods | Omaha, NE |
| Beckwith, Lyle | 4/15/2008 | NACS | Washington, DC |
| Zlotnikoff, Stuart | 4/16/2008 | NGA | Washington, DC |
| Doughty, Peggy | 4/24/2008 | CHS (former) | Minneapolis, MN |
| Engelhaupt, David | 4/24/2008 | Affiliated Foods | Omaha, NE |
| Zuritzky, Robert | 4/30/2008 | Parkway | Bala Cynwyd, PA |
| Tucker, David | 5/2/2008 | NACS (Former) | Washington, DC |
| Hamilton, Kathy | 5/6/2008 | CHS | Minneapolis, MN |
| Wenning, Thomas | 5/23/2008 | NGA | Washington, DC |
| Lieberman, Erik | 6/4/2008 | NGA | Washington, DC |
| Sprague, Kristie | 6/10/2008 | CHS | Minneapolis, MN |
| Ching, Vic | 6/17/2008 | Affiliated Foods | Minneapolis, MN |
| DiPasquale, Frank | 6/18/2008 | NGA | Washington, DC |

EXHIBIT 3 to the Declaration of K. Craig Wildfang, Esq.

## DEPOSITIONS OF CLASS PLAINTIFFS - PHASE I

| Deponent | Date | Company | Location |
|---|---|---|---|
| Taylor, Gray | 6/26/2008 | NACS | Addison, TX |
| Ihry, Reed | 7/1/2008 | CHS | Minneapolis, MN |
| Lindberg, Michael | 7/2/2008 | CHS | Minneapolis, MN |
| Diehl, Carmen | 7/8/2008 | Affiliated Foods | Rapid City, SD |
| Shuman, Robert | 7/8/2008 | NATSO | Alexandria, VA |
| Kirschner, Richard | 7/17/2008 | Jetro | New York, NY |
| Zentner, Arlen | 7/23-24/2008 | Payless | Topeka, KS |
| Richman, Teri | 7/29/2008 | NACS | Washington, DC |
| Cooke, Brent | 7/31/2008 | Payless | Topeka, KS |
| Goldstone, Mitch | 8/6/2008 | Photos, Inc. | Los Angeles, CA |
| Riehle, Hudson | 8/6/2008 | NRA | Washington, DC |
| Leibman, Mark 30(b)(6) on Organizational structure, services, payment systems, studies & investigations | 8/7/2008 | NRA | Washington, DC |
| Mullings, Lisa | 8/13/2008 | NATSO | Alexandria, VA |
| Olson, Donald | 8/14/2008 | CHS | Minneapolis, MN |
| Chung, Anderson | 8/15/2008 | D'Agostino | New York, NY |
| Miller, James | 8/22/2008 | Affiliated Foods | Omaha, NE |
| Opper, Deborah | 8/27/2008 | Discount Optics | Boca Raton, FL |
| Culver, Paul individual and 30(b)(6) on Marketer/Merchant Agreements Rule | 8/28-29/2008 | CHS | Minneapolis, MN |
| Coborn, Chris | 9/4/2008 | Coborns | Minneapolis, MN |
| Munkittrick, Ron | 9/9/2008 | D'Agostino | New York, NY |
| Zaucha, Thomas | 9/19/2008 | NGA | Washington, DC |
| D'Agostino, Nicholas | 9/25/2008 | D'Agostino | New York, NY |
| Sinclair, Scott 30(b)(6) on Country Operations | 10/10/2008 | CHS | Minneapolis, MN |
| Cummings, Richard | 10/15/2008 | CHS | Minneapolis, MN |
| Armour, Henry | 10/22/2008 | NACS | Washington, DC |
| Culver, Paul 30(b)(6) on Proprietary Cards | 10/29/2008 | CHS | Minneapolis, MN |
| Harari, Abraham | 10/30/2008 | Capital Audio | New York, NY |
| Pearson, Harold | 10/30/2008 | Payless | Topeka, KS |
| D'Agostino, Nicholas 30(b)(6) on Payment Practices and Recordkeeping | 11/5/2008 | D'Agostino | New York, NY |
| Bendle, Bradley (Woody) | 11/14/2008 | Payless | Topeka, KS |
| Schumann, Michael 30(b)(6) on Cost of Payment Systems | 12/4/2008 | Traditions | Naples, FL |

# EXHIBIT 4

EXHIBIT 4 to the Declaration of K. Craig Wildfang, Esq.

## DEPOSITIONS OF THIRD PARTIES - PHASE I

| Deponent | Date | Company | Location |
|---|---|---|---|
| Dunn, Peter | 4/17-18/2008 | Edgar, Dunn & Co. | New York, NY |
| Campbell, Christopher | 10/17/2008 | Westpac | New York, NY |
| Garabedian, John | 11/6/2008 | Boston Consulting | Chicago, IL |
| Aviles, James | 11/11/2008 | Merchant e-Solutions | San Francisco, CA |
| Honor, Cathy | 12/4/2008 | Royal Bank of Canada | Toronto, ON |
| Pomerleau, Ricky | 12/9/2008 | Wright Express | Portland, ME |
| Randazza, Joseph | 1/7/2009 | National Payment Card LLC | Boca Raton, FL |
| Sourges, James | 1/13/2009 | MODASolutions | New York, NY |
| Grossman, Michael | 1/15/2009 | Tempo Payments | San Francisco, CA |
| Rathgaber, Steven | 2/17/2009 | NYCE Payments Network, LLC | New York, NY |
| Polikoff, Ira | 3/19/2009 | American Express | New York, NY |
| McCurdy, Stephen | 3/24/2009 | American Express | New York, NY |
| Smits, Suzanne | 4/14-15/2009 | DFS Services LLC (Discover) | Chicago, IL |
| Hatcher, Jennifer | 4/17/2009 | Food Marketing Institute | Washington, DC |
| McNeal, Glenda | 4/22/2009 | American Express | New York, NY |

# EXHIBIT 5

EXHIBIT 5 to the Declaration of K. Craig Wildfang, Esq.

**PLAINTIFFS' EXPERTS - PHASE I**

| Class Expert | Subject Matter | Company | Title | Education |
|---|---|---|---|---|
| Bamberger, Gustavo | Class certification | | Economist at Compass Lexecon | Ph.D., University of Chicago, 1987, Graduate School of Business; M.B.A., University of Chicago, 1984, Graduate School of Business; B.A., Southwestern at Memphis, 1981 |
| Fleischer, Victor | Motivations for networks' IPOs | University of Colorado | Assoc. Prof. of Law, University Colorado | J.D., Columbia University, 1996 |
| Frankel, Alan | Economic analysis of Class Plaintiffs' claims | Coherent Economics, LLC/Compass Lexecon/Antitrust Law Journal | Director of Coherent Economics, LLC; Senior Advisor to Compass Lexecon | Ph.D., Economics, University Chicago, 1986 |
| Henry, Kevin | Class Plaintiffs' fraudulent-conveyance claim | Freeman & Mills, Inc. | V.P., Freeman & Mills, Inc. | B.S. Business and Administrative Studies – Finance, Lewis & Clark College |
| Macey, Jonathan | Mastercard corporate governance | Yale Law School | Sam Harris Professor of Corporate Law, Finance, and Securities Regulation, Yale | J.D., Yale |
| McCormack, Michael | Industry background / *Illinois Brick* | Palma Advisors, LLC | President, Palma Advisors, LLC | B.A., Political Science, Cal. Poly., 1988 |
| McFarlane, Bruce | Defendants' accounting for interchange fees / *Illinois Brick* | LitNomics | Managing Director / CEO, LitiNomics | B.A., Bus. Admin., University Washington, 1984 |
| Wolter, Kirk* | Critique of Mr. Houston's survey of Australian merchants. | National Opinion Research Center/University of Chicago, Dept. of Statistics | E.V.P., National Opinion Research Center; University of Chicago, Dept. of Statistics | Ph.D., Statistics, Iowa State, 1974 |
| **Individual Plaintiffs' Expert** | **Subject Matter** | **Company** | **Title** | **Education** |
| Ariely, Dan | Behavioral economic analysis of anti-steering restraints | Duke University | James B. Duke Professor of Behavioral Economics at the Fuqua School of Business, The Center for Cognitive Neuroscience, and the Economics Department at Duke University | Ph.D. Cognitive Psychology, University of N.C. 1996; Ph.D. Business Administration, Duke University 1998 |
| Porter, Katherine | Effect of Defendants' business practices on consumer lending. | University of Iowa College of Law/ Robert Braucher Visiting Professor Harvard Law School | Prof. of Law, University Iowa | J.D., Harvard, 2001 |
| Stiglitz, Joseph | Economic analysis of ASR-claims | Columbia Business School/Sebago Associates, Inc. | Prof., Columbia, Recipient of 2001 Nobel Prize in Economics. | Ph.D., Economics, M.I.T., 1967 |
| Vellturo, Christopher | Economic analysis of Individual Plaintiffs' claims | QES | Pres., Quantitative Economic Solutions, LLC | Ph.D., Economics, M.I.T., 1989 |
| Warren, Elizabeth | Economic analysis of ASR-claims | | U.S. Senator, former Leo Gottlieb Professor of Law, Harvard | J.D., Rutgers, 1976 |

*Kirk Wolter was an expert for the Individual Plaintiffs as well

# EXHIBIT 6

EXHIBIT 6 to the Declaration of K. Craig Wildfang, Esq.

**DEFENDANTS' EXPERTS - PHASE I**

| Expert | Subject Matter | Company | Title | Education |
|---|---|---|---|---|
| Atkins, J.T. | Class Plaintiffs' fraudulent conveyance claim | Cypress Associates LLC | Managing Director, Cypress Assocs. LLC | J.D., Harvard, 1982 |
| Daines, Robert | Mastercard IPO | Stanford Law School | Pritzker Professor of Law and Business, Stanford | J.D., Yale |
| Elzinga, Kenneth | Economic analysis of Plaintiffs' claims | University of Virginia | Robert C. Taylor Professor of Economics, Univ. Va. | Ph.D., Michigan State University, 1967 |
| Houston, Gregory | Australian payment-card industry post RBA reforms | NERA Economic Consulting | Director, NERA Economic Consulting | B.S.c (First Class Honours), Economics, Univ. Canterbury, (NZ) 1982 |
| James, Christopher | Market definition and market power | University of Florida | William H. Dia/SunBank Eminent Scholar in Finance and Economics, University of Florida; Visiting Scholar for the San Francisco Federal Reserve Bank | Ph.D., Economics, Industrial Organization, Finance, Michigan, 1978 |
| Kahn, Barbara | Effect of anti-steering restraints on networks' brands | University of Miami School of Business Adm | Dean and Schein Family Professor of Marketing, School of Business Administration, University of Miami, Coral Gables, FL | Ph.D., Marketing, Columbia, 1984 |
| Klein, Benjamin | Economic analysis of anti-steering restraints | EA Associates/ Compass Lexecon | President, EA Associates, Inc. | PhD, Economics, Univ. Chicago, 1970 |
| Litan, Robert E. | Economic analysis of Individual Plaintiffs' claims | Brookings Institution | Senior Fellow, Economic Studies and Global Economy and Development Programs, The Brookings Institution | Ph.D., Economics, Yale, 1987; J.D., Yale, 1977. |
| Murphy, Kevin | Economic analysis of Plaintiffs' claims | University of Chicago | George J. Stigler Distinguished Service Professor of Economics, Booth School of Business & Dep't of Econ., Univ. Chicago | Ph.D., University of Chicago, 1986 |
| Snyder, Edward | Class Certification | | Dean and George Pratt Shultz Professor of Economics at the University of Chicago Graduate School of Business | B.A., Colby College, 1975 (Economics, Government); M.A., University of Chicago, 1978 (Public Policy); Ph.D., University of Chicago, 1984 (Economics) |
| Topel, Robert H. | Damages | University of Chicago | Isidore and Gladys J. Brown Professor, Booth School of Business, University of Chicago | Ph.D., Economics, UCLA, 1980 |
| Wecker, William E. | Damages | William E. Wecker Assoc. | President, William E. Wecker Associates, Inc. | Ph.D., Statistics and Management Science, Michigan, 1972 |
| Woodward, Suan E. | Profitability of credit-card lending | Sand Hill Econometrics | President, Sand Hill Econometrics | Ph.D., Financial Economics, UCLA, 1978 |

# EXHIBIT 7

EXHIBIT 7 to the Declaration of K. Craig Wildfang, Esq.

## DEPOSITIONS OF DEFENDANTS AND THIRD PARTIES - PHASE II

| Defendant Deponent | Date | Company | Location |
|---|---|---|---|
| Adrienne Chambers | 12/1/2016 | MasterCard | New York, NY |
| Chris Bond | 12/7/2016 | MasterCard | New York, NY |
| Jennifer Shulz | 1/6/2017 | Visa | Los Angeles, CA |
| Elizabeth Buse | 1/10/2017 | Visa | San Francisco, CA |
| Ivan Seele | 1/11/2017 | Bank of America | Wilmington, DE |
| Paul Gallo | 1/12/2017 | Visa | Chicago, IL |
| Michael Daly | 1/18/2017 | Bank of America | Wilmington, DE |
| Jay Adelsberg | 1/18/2017 | Chase | Wilmington, DE |
| Amy Bridge | 1/24/2017 | Visa | Sacramento, CA |
| Gary Korotzer | 2/1/2017 | Wells Fargo | San Francisco, CA |
| Beverly Anderson 30(b)(6) on Credit-Issuing | 2/3/2017 | Wells Fargo | San Francisco, CA |
| Robert Ryan | 2/8/2017 | Wells Fargo | Charlotte, NC |
| Frank Mautone | 2/14/2017 | MasterCard | New York, NY |
| Carolyn Balfany | 2/17/2017 | MasterCard | New York, NY |
| Chris Lambert | 2/17/2017 | Visa | Charlotte, NC |
| Caroline Dionisio | 2/23/2017 | MasterCard | New York, NY |
| Jonathan King 30(b)(6) on Credit-Issuing | 2/24/2017 | Chase | New York, NY |
| Rosemary Stack 30(b)(6) on Credit-Issuing | 2/28/2017 | Bank of America | Wilmington, DE |
| Richard Rozbicki 30(b)(6) on Rewards | 2/28/2017 | MasterCard | New York, NY |
| Trisha Asgeirsson 30(b)(6) on Rewards | 2/28/2017 | MasterCard | New York, NY |
| Bill Dobbins | 2/28/2017 | Visa | Wilmington, DE |
| Bill Sheedy 30(b)(6) on Interchange | 2/28/2017 | Visa | Washington, D.C. |
| Bill Sheedy 30(b)(6) on Interchange | 3/1/2017 | Visa | Washington, D.C. |
| Jennifer Roberts | 3/2/2017 | Chase | Wilmington, DE |
| Linda Kirkpatrick | 3/2/2017 | MasterCard | New York, NY |
| Michael Passilla | 3/9/2017 | Chase | Atlanta, GA |
| Andrew Dittrich 30(b)(6) on Rules | 3/15/2017 | Visa | San Francisco, CA |
| Terry O'Neil 30(b)(6) on Credit-Issuing | 3/16/2017 | Citi | New York, NY |
| Andrew Dittrich 30(b)(6) on Rules | 3/16/2017 | Visa | San Francisco, CA |
| Terry O'Neil 30(b)(6) on Credit-Issuing | 3/17/2017 | Citi | New York, NY |
| Mark Nelson | 3/21/2017 | Bank of America | Charlotte, NC |
| Brian Swain 30(b)(6) on Fees and profitability | 3/23/2017 | MasterCard | New York, NY |
| Tara Maguire 30(b)(6) on Fees and profitability | 3/23/2017 | MasterCard | New York, NY |
| Elizabeth Williams | 3/24/2017 | Visa | Washington, D.C. |
| Chris Reid 30(b)(6) on Issuer differentiation/ ChaseNet | 3/28/2017 | MasterCard | New York, NY |
| Doug Hambry | 3/28/2017 | Visa | Philadelphia, PA |
| Laura Mackenzie | 3/30/2017 | MasterCard | New York, NY |
| Herb Fellman | 4/4/2017 | Bank of America | Charlotte, NC |
| Jeffrey Manchester | 4/6/2017 | MasterCard | New York, NY |
| Brian Swain 30(b)(6) on Interchange | 4/19/2017 | MasterCard | New York, NY |
| Chris Reid | 4/25/2017 | MasterCard | New York, NY |

EXHIBIT 7 to the Declaration of K. Craig Wildfang, Esq.

## DEPOSITIONS OF DEFENDANTS AND THIRD PARTIES - PHASE II

| Defendant Deponent | Date | Company | Location |
|---|---|---|---|
| Mark Williams 30(b)(6) on Network Agreements | 5/9/2017 | Bank of America | Wilmington, DE |
| Douglas Bausch | 5/9/2017 | MasterCard | New York, NY |
| Elizabeth Hurvitz 30(b)(6) on ChaseNet | 5/10/2017 | Visa | New York, NY |
| Billy Knupp 30(b)(6) on Rewards | 5/11/2017 | Visa | San Francisco, CA |
| Elizabeth Hurvitz | 5/11/2017 | Visa | New York, NY |
| Jim Eitler | 5/12/2017 | Visa | San Francisco, CA |
| Brian Swain 30(b)(6) on Interchange and individual | 5/18/2017 | MasterCard | New York, NY |
| Ather Williams | 5/19/2017 | Bank of America | New York, NY |
| Elizabeth Hoople | 5/19/2017 | Wells Fargo | Walnut Creek, CA |
| Doug Raymond | 5/23/2017 | MasterCard | New York, NY |
| Jonette Sullivan 30(b)(6) on ChaseNet | 5/24/2017 | Chase | Wilmington, DE |
| Jim McCarthy | 5/24/2017 | Visa | San Francisco, CA |
| Pete Zuercher | 5/24/2017 | Visa | San Francisco, CA |
| Michael Simpson 30(b)(6) on Co-Brand/ Private Label | 5/25/2017 | Bank of America | Wilmington, DE |
| Jonette Sullivan | 5/25/2017 | Chase | Wilmington, DE |
| Pete Zuercher | 5/25/2017 | Visa | San Francisco, CA |
| Carolyn Van Ryn 30(b)(6) on Rules | 6/7/2017 | MasterCard | New York, NY |
| Carolyn Van Ryn 30(b)(6) on Rules | 6/8/2017 | MasterCard | New York, NY |
| Lillie Platko | 6/14/2017 | MasterCard | New York, NY |
| Denise Walker | 6/20/2017 | MasterCard | New York, NY |
| Tolan Steele | 6/21/2017 | Visa | San Francisco, CA |
| Stacey Pinkerd | 6/23/2017 | Visa | New York, NY |
| Billy Knupp 30(b)(6) on Profitability/ Fees | 6/27/2017 | Visa | San Francisco, CA |
| Carol Cosby | 6/28/2017 | MasterCard | New York, NY |
| Billy Knupp 30(b)(6) on Profitability/ Fees | 6/28/2017 | Visa | San Francisco, CA |
| Ralph Andretta 30(b)(6) on Credit-Issuing | 6/29/2017 | Citi | New York, NY |
| David Cramer | 6/29/2017 | Visa | Cincinnati, OH |
| Ralph Andretta | 6/30/2017 | Citi | New York, NY |
| Michael Milotich 30(b)(6) on Profitability/ Fees | 6/30/2017 | Visa | San Francisco, CA |
| Ed Kadletz 30(b)(6) on Network Issuing | 7/12/2017 | Wells Fargo | Minneapolis, MN |
| Ed Kadletz | 7/13/2017 | Wells Fargo | Minneapolis, MN |
| Max Krause | 7/20/2017 | MasterCard | New York, NY |
| Bruce McElhinney | 7/20/2017 | Visa | San Francisco, CA |
| Eileen Serra 30(b)(6) on Co-Brand / Private Label Agreements | 7/24/2017 | Chase | New York, NY |
| Eileen Serra | 7/25/2017 | Chase | New York, NY |
| Perry Beberman | 7/26/2017 | Bank of America | Wilmington, DE |
| Giovanni Leoni | 7/26/2017 | Visa | San Francisco, CA |
| David Hoyt | 7/27/2017 | Chase | Wilmington, DE |
| Joel Henckel | 8/3/2017 | MasterCard | New York, NY |

EXHIBIT 7 to the Declaration of K. Craig Wildfang, Esq.

**DEPOSITIONS OF DEFENDANTS AND THIRD PARTIES - PHASE II**

| Defendant Deponent | Date | Company | Location |
|---|---|---|---|
| Andrew Torre | 8/9/2017 | Visa | San Francisco, CA |
| Kevin Rhein | 8/9/2017 | Wells Fargo | Minneapolis, MN |
| Andrew Torre | 8/10/2017 | Visa | San Francisco, CA |
| Donald Boeding | 9/8/2017 | Visa | San Francisco, CA |
| Chris Como | 9/12/2017 | Visa | San Francisco, CA |
| Richard Morrissey | 9/13/2017 | Visa | San Francisco, CA |
| Phil Christian | 9/14/2017 | Chase | Wilmington, DE |
| Colin McGrath | 9/14/2017 | MasterCard | New York, NY |
| Tim Healy | 9/14/2017 | Wells Fargo | San Francisco, CA |
| Raymond Fischer | 9/18/2017 | Chase | Wilmington, DE |
| Ed Garofalo | 9/19/2017 | Citi | Wilmington, DE |
| Matthew Dill | 9/19/2017 | Visa | New York, NY |
| Sydney Ivey | 10/11/2017 | Bank of America | Charlotte, NC |
| Barry Rodrigues | 10/16/2017 | Citi | London, England |
| Kimberly Lawrence | 10/17/2017 | Visa | San Francisco, CA |
| Vincent D'Agostino | 10/19/2017 | Chase | New York, NY |
| Craig Vosburg | 10/25/2017 | MasterCard | New York, NY |
| Jonathan King 30(b)(6) on Network Agreements | 10/26/2017 | Chase | New York, NY |
| Pete Daly | 11/1/2017 | Visa | New York, NY |
| Chris McWilton | 11/2/2017 | MasterCard | New York, NY |
| Chris McWilton, B&R Supermarket matter | 11/3/2017 | MasterCard | New York, NY |
| Bob Nadeau | 11/8/2017 | Chase | Omaha, NE |
| Craig Vosburg, B&R Supermarket matter | 11/16/2017 | MasterCard | New York, NY |
| John Aafedt | 11/16/2017 | Visa | Palo Alto, CA |
| Charmaine Clay | 11/21/2017 | Wells Fargo | San Francisco, CA |
| Titi Cole | 12/1/2017 | Bank of America, | Charlotte, NC |
| Sameer Govil | 12/6/2017 | Visa | San Francisco, CA |
| Gary Flood | 12/11/2017 | MasterCard | New York, NY |
| Oliver Manahan | 12/13/2017 | MasterCard | New York, NY |
| Elizabeth Kapteina | 1/9/2018 | MasterCard | New York, NY |
| Robert Wilson | 1/19/2018 | Bank of America | Dallas, TX |
| Kevin Condon | 1/23/2018 | Bank of America | Chicago, IL |
| Paul Musser | 1/25/2018 | MasterCard | New York, NY |
| Michael Wright | 2/2/2018 | Bank of America | Wilmington, DE |
| Karen Mattea | 2/7/2018 | Citi | Chicago, IL |
| Lynn Kutruff | 2/9/2018 | Bank of America | New York, NY |
| Tim Murphy | 2/13/2018 | MasterCard | New York, NY |
| Craig Petersen | 2/16/2018 | Visa | New York, NY |
| Michael Cyr | 2/22/2018 | MasterCard | New York, NY |
| Ellen Richey, B&R Supermarket matter | 3/1/2018 | Visa | San Francisco, CA |
| Steve Jonas | 3/13/2018 | MasterCard | New York, NY |
| Ryan McInerney | 3/15/2018 | Visa | San Francisco, CA |
| Chiro Aikat | 3/20/2018 | MasterCard | New York, NY |

EXHIBIT 7 to the Declaration of K. Craig Wildfang, Esq.

## DEPOSITIONS OF DEFENDANTS AND THIRD PARTIES - PHASE II

| Defendant Deponent | Date | Company | Location |
|---|---|---|---|
| Chiro Aikat, B&R Supermarket matter | 3/22/2018 | MasterCard | New York, NY |
| Oliver Jenkyn | 3/28/2018 | Visa | San Francisco, CA |
| Oliver Jenkyn | 3/29/2018 | Visa | San Francisco, CA |
| Charles Scharf | 4/4/2018 | Visa | New York, NY |
| Marsha Huber | 4/11/2018 | Chase | Columbus, OH |
| Byron Pollitt | 4/11/2018 | Visa | San Francisco, CA |
| Caryn Kaiser | 4/13/2018 | Citi | New York, NY |
| Billy Knupp | 4/17/2018 | Visa | San Francisco, CA |
| Kevin Hughes 30(b)(6) on Network Agreements | 4/18/2018 | Citi | Greenville, SC |
| Kevin Hughes | 4/19/2018 | Citi | Greenville, SC |
| Ajay Banga | 4/20/2018 | MasterCard | New York, NY |
| Beverly Anderson | 4/24/2018 | Wells Fargo | San Francisco, CA |
| Ed McLaughlin | 4/25/2018 | MasterCard | New York, NY |
| Bill Sheedy | 4/25/2018 | Visa | San Francisco, CA |
| John Stumpf | 4/25/2018 | Wells Fargo | San Francisco, CA |
| Bill Sheedy | 4/26/2018 | Visa | San Francisco, CA |
| Bill Sheedy, B&R Supermarket matter | 4/26/2018 | Visa | San Francisco, CA |
| Gordon Smith | 4/27/2018 | Chase | New York, NY |
| Todd Wade 30(b)(6) on Checkout | 5/2/2018 | Visa | San Francisco, CA |
| Debra Rossi | 5/3/2018 | Wells Fargo | San Francisco, CA |
| Kevin Church | 5/8/2018 | Bank of America | Charlotte, NC |
| Jason Gaughan | 5/15/2018 | Bank of America | Wilmington, DE |
| Thomas O'Brien 30(b)(6) on Apple Pay, Chase Pay | 6/1/2018 | Chase | Wilmington, DE |
| Judson Linville | 6/19/2018 | Citi | New York, NY |

EXHIBIT 7 to the Declaration of K. Craig Wildfang, Esq.

## DEPOSITIONS OF DEFENDANTS AND THIRD PARTIES - PHASE II

| Third-Party Deponent | Date | Company | Location |
|---|---|---|---|
| Larry Earley | 12/1/2016 | nxtMOVE Corporation | Washington, D.C. |
| Larry Gorkin | 12/9/2016 | Stonebridge Consulting Cor | New York, NY |
| Steve Edgett | 4/7/2017 | Bayshore Consulting | Scottsdale, AZ |
| Peter Sidenius | 9/19/2017 | Edgar Dunn | San Francisco, CA |
| Russell Piparo | 2/26/2018 | Star Networks | Baltimore, MD |
| Thomas Layman | 2/27/2018 | Global Vision Group | San Francisco, CA |
| Russell Piparo | 2/27/2018 | Star Networks | Baltimore, MD |
| Patricia McQuade | 3/20/2018 | PNC | Pittsburgh, PA |
| Peter Dunn | 3/22/2018 | Peter T. Dunn LLC | New York, NY |
| Lee Manfred | 3/27/2018 | First Annapolis | Annapolis, MD |
| Marc Abbey | 3/27/2018 | First Annapolis | Annapolis, MD |
| Ashwin Adarkar | 4/2/2018 | Boston Consulting Group | New York, NY |
| Karen Liberto | 4/3/2018 | Global Payments | Atlanta, GA |
| Judith McGuire | 4/4/2018 | Pulse | Chicago, IL |
| Judith McGuire | 4/5/2018 | Pulse | Chicago, IL |
| Laurent Desmangles | 4/6/2018 | Boston Consulting Group | New York, NY |
| Steve Thogmartin | 4/6/2018 | Boston Consulting Group | New York, NY |
| Nathan Stephens | 4/19/2018 | Elavon | Atlanta, GA |
| Sandra Smith | 4/19/2018 | Elavon | Atlanta, GA |
| Anne Christenson | 4/13/2018 | U.S. Bank | Minneapolis, MN |
| Jason Tinurelli | 4/13/2018 | U.S. Bank | Minneapolis, MN |
| Asim Majeed | 4/13/2018 | U.S. Bank | Minneapolis, MN |
| Dekkers Davidson | 5/8/2018 | MCX | Boston, MA |
| Russell Piparo | 5/9/2018 | First Data | Baltimore, MD |
| Allen Friedman | 5/9/2018 | Ingenico | Atlanta, GA |
| Russell Piparo | 5/10/2018 | First Data | Baltimore, MD |
| Amy Parsons | 5/17/2018 | Discover | Chicago, IL |
| Kathryn Sebastian | 5/24/2018 | Navy Federal Credit Union | Washington, D.C. |
| Russell MacKaron | 5/24/2018 | USAA | San Antonio, TX |
| Vikram Parekh | 5/24/2018 | USAA | San Antonio, TX |
| Rob Orgel | 5/25/2018 | Apple, Inc. | Waltham, MA |
| Roger Hochschild | 6/15/2018 | Discover | Chicago, IL |