**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | **Case No. 05-MD-01720 (MKB) (JO)** |

**STATEMENT OF OBJECTION REGARDING THE PROPOSED CLASS
SETTLEMENT BY THE NATIONAL ASSOCIATION OF SHELL MARKETERS, THE
PETROLEUM MARKETERS ASSOCIATION OF AMERICA, AND THE SOCIETY OF
INDEPENDENT GASOLINE MARKETERS OF AMERICA**

116246829.2

The National Association of Shell Marketers ("NASM"), the Petroleum Marketers Association of America ("PMAA"), and the Society of Independent Gasoline Marketers of America ("SIGMA") (collectively, the "Associations") submit this statement objecting to preliminary approval of the proposed class settlement agreement that was filed on September 18, 2018. ECF 7257.

## INTRODUCTION

The Associations are members of the class set out in the preliminary settlement. Each of the Associations has accepted Visa and MasterCard payments during the time period from January 1, 2004 to the present. The Associations also speak on behalf of the industries they represent. These industries include the sellers of the vast majority of motor fuels in the United States. Many of these sellers of motor fuels contract with major oil refiners to obtain fuel and rights to the use of the refiners' brand names. They are referred to in this brief as "Branded Operators." These Branded Operators use the services of the major oil refiners to process the payment card transactions they accept. The Associations are concerned that their Branded Operator members face the risk of losing their legal claims without compensation (or with reduced compensation) through the preliminary settlement. Differing positions on the settlement between class counsel and the Defendants in the case also create problems for Branded Operators in that they cannot properly evaluate the relative benefits and risks of participating in the settlement or opting out of it. At issue is whether Branded Operators will be eligible to file a claim against the settlement fund on the basis of their acceptance of the cards and their payment of the fees. That is because the major oil refiners claim to be class members that are entitled to receive payment from the fund for transactions occurring at branded outlets operated by our members. Branded Operators are members of the Rule 23(b)(3) Settlement Class because they "accept" the transaction cards at their

branded outlets, but we fear that they will be treated as class members in name only; that is, as class members who may be ineligible to act as "Claimants" against the settlement proceeds but will nonetheless forfeit their rights to compensation for their legal claims.  For this reason, the Associations submit the following statement objecting to the proposed preliminary settlement.

## <u>ARGUMENT</u>

The Associations share the concerns discussed in the objections of the Fikes Wholesale, Inc. *et al.* marketer group (the "Marketers' Objection"). The Associations write separately to: (1) highlight the number of Rule 23(b)(3) Settlement Class members that would be prejudiced if preliminary approval of the settlement is granted without resolving the issues raised in the Marketers' Objection; (2) provide factual context about the harm these class members incurred from the interchange fees; (3) underscore how the settlement risks structural flaws that would fail to protect the rights of these class members; and (4) explain why these issues must be corrected <u>now</u> – before preliminary approval is granted – so that these class members can make an informed decision about whether to participate in the settlement or exclude themselves and pursue alternative avenues of recovery.

### (1)   <u>The Associations Represent a Large Portion of the Rule 23(b)(3) Settlement Class</u>

The Associations represent a large segment of the Rule 23(b)(3) Settlement Class. Association members are deeply concerned and confused about their rights under the proposed settlement. The Associations collectively represent the interests of the petroleum industry.

NASM is a national trade association representing approximately 130 wholesale distributors of Shell-branded petroleum products, together with 60 suppliers of goods and services to the petroleum industry. NASM provides various forums for the exchange and dissemination of information on industry developments affecting its members, and serves as a voice for them on

legislative, regulatory and judicial matters. NASM's members, and the service station dealers supplied by them, engage in the retail sale of convenience store items and Shell branded motor fuels to consumers.

PMAA is a federation of 47 State and Regional trade associations representing petroleum marketers.  Through its federated State and Regional associations, PMAA represents thousands of petroleum marketers nationwide.  The petroleum marketers represented by PMAA include branded wholesale distributors and chain retailers that are franchisees of all the major oil company suppliers, like ExxonMobil, Shell, BP, Valero, and Chevron, to name a few.

SIGMA represents a diverse membership of approximately 260 independent chain retailers and marketers of motor fuel who collectively command more than 50 percent of the retail petroleum market in the United States.

To put the retail petroleum industry that the Associations represent in perspective, petroleum retailers serve 160 million people per day—approximately half of the U.S. population— and the industry processes over 80 billion payment transactions per year. Collectively, we represent tens of thousands of fuel and convenience store retailers nationwide. Last year alone, the fuel wholesaling and convenience industry employed approximately 2.5 million workers and generated $601.1 billion in total sales. Because of the number of fuel and other transactions in which the industry engages, fuel retailers and marketers handle approximately one of every 30 dollars spent in the United States. The vast majority of those sales come by way of payment card. The majority of retail petroleum outlets across the United States are branded with the name of a major oil refiner, but far less than 5 percent of these outlets are actually owned and operated by a major refiner.  Notwithstanding its scope, the convenience store and fuel retail industry the Associations represent is truly an industry of small businesses.  Approximately 63 percent of the

industry operates a single store, and approximately 75 percent of the industry is composed of companies that operate ten stores or less.

**(2)     Branded Operators Pay the Interchange Fees**

Branded Operators – largely small business owners -- paid the interchange fees at issue in this case, and incurred the harm from the antitrust violations alleged in this class action in its entirety.   The oil brands and the defendants have taken the position in this and other related litigation that they own the legal claim for transactions that Branded Operators engage in with fuel purchasers.  That simply does not comport with the fact that Branded Operators pay the interchange fees at issue.

The Branded Operators here are the direct – and only – payors of the interchange fee.  A short summary of the way payment card transactions occur in this industry helps explain this.

When individual customers purchase gasoline or diesel fuel from Branded Operators using a Visa or MasterCard, the Branded Operators send the transactions through a series of businesses including a major oil refiner, acquiring bank and Visa or MasterCard until it reaches the bank that issued the applicable payment card to the customer who purchased the motor fuel. That issuing bank charges its customer's account for the full sale price of the purchase and remits back through the network the amount of the sale price less the interchange fee it charges.  Other entities that touch the transaction, including Visa/MasterCard, the acquiring banks, and the major refiners, each take their own separate fees out of the transaction amount.

The oil brands have agreements with the banks and with the marketers to process those transactions, but the interchange fee is taken out of the amount of the retail transaction – not from the oil brands' accounts.  The oil brands are simply "processors" of the transaction and do not pay the interchange fees any more than other payment processors that handle transactions for other

- 4 -

class members (including fuel sellers that are not branded by a major refiner).  Branded Operators, then, absorb the amount of the interchange fee (and overcharge).

The oil brands have no entitlement to fees paid on card transactions involving products sold at jobber and dealer-operated service stations and convenience stores.  The oil brands do not own the products sold in the transaction; the products are owned by the station or convenience store operator.  The brands are not entitled to payment for the products, irrespective of whether the customer pays in cash or by credit card.  Payment of the proceeds involved in the transaction belong to the operator, *i.e.*, the business that accepted the card.

### (3) Branded Operators Are the Only Class Members for Their Transactions

As explained above, Branded Operators are the businesses that accept Visa and MasterCard payment cards for purchases of fuel and other goods and services at their branded outlets.  In fact, standard contractual language in agreements that Branded Operators sign in order to purchase motor fuel and use the name of major refiners at their outlets requires that Branded Operators accept Visa and MasterCard payment cards, among others.  There should be no question, then, that Branded Operators are class members for the transactions they accept. Class counsel took this position in its submission to this Court.

The major branded refiners are class members in this case, but during the settlement period (2004 to the present), the acceptance of credit cards by the major branded refiners was rather limited.  The major branded refiners accepted transaction cards at the service stations and convenience stores operated by their company personnel and by independent operators called "commission agents," who never took title to or sold the products at the outlet.  But, these outlets collectively were a tiny percentage of the overall industry.

116246829.2

The overwhelming majority of branded transactions that occurred during the settlement period were sold through the "jobber" or "distributor" channel of trade, where the cards were accepted by the service station or convenience store operators – independently-owned businesses. The share of branded credit card transactions "accepted" by jobbers and independent dealers increased significantly after 2008-09 when most major oil companies divested their marketing assets to jobbers and no longer operated service stations/convenience stores through company employees or through commission agents.

Unfortunately, this clear question has been clouded by the position taken by the Defendants and some oil refiners that, in contrast to the plain language of the settlement and the facts of these transactions, the refiners own the legal claims for these transactions. If that was, in fact, the meaning of the settlement, it would be fundamentally flawed and create conflicts among the members of the settlement class, potentially confiscate the legal claims of Branded Operators without compensation, and do all of this without notice of these risks to class members that would at least allow them to weigh these risks in deciding whether to participate in the settlement. Unless the different positions of class counsel and the Defendants on the question of who are the class members with regard to the Branded Operators' claims is resolved in favor of the Branded Operators, the resulting class conflicts and confusion of rights simply cannot support preliminary approval of the settlement.

(A)     <u>Conflict with the Brands</u>

Despite the clear harm suffered by our branded members (and no one else in the chain, as explained above), the Defendants' position on the right of the refiners to these claims will mean that Branded Operators, despite being members of the Rule 23(b)(3) Settlement Class, may not have any compensation rights for their branded locations. While the class covers a broad set of

industries and merchants virtually every merchant retailer other than branded motor fuel outlets appears to face no question that the settlement ensures that some compensation will be available to them.

The Associations' branded members, however, may be deemed to lose their claims to the processors of their transactions. While other class member merchants process transactions through processors or acquiring banks, our members are different only in that their processors happen to be the oil brands. As discussed above, the oil brands and defendants have taken the position that the brands' aggregation of payment card processing at our members' retail locations entitles the brands to antitrust standing, class membership, and compensation through the class settlement.[1] This "processor" relationship between the marketers and the oil brands results in two separate sets of entities – our members, on the one hand, and the oil brands, on the other – claiming entitlement to compensation rights under the settlement on the *exact same* payment card transactions. Clearly the settlement is not intended for the defendants to pay twice on the same transaction.

These factual dynamics result in a tug-of-war between: (1) the class definition, which clearly includes our members because they, not the brands, were the merchants that "accepted" the payment cards for the transactions at their locations; and (2) the purported rights of the oil brands as processors. This tension has not been resolved in spite of class counsel's acknowledgment in its submission that the Branded Operators own these claims unless they have contractually transferred their rights. And, this is not an "allocation" or contract interpretation issue. Indeed, if

---

[1] For more than a decade, the major oil brands have been exiting the retail market, divesting their retail locations in droves. In 2003, industry watchers surmised that as many as one-third of the retail locations controlled by the oil brands were up for sale. As just one example, Shell went from having 378 company-operated stores in 2003 to just 23 in 2011. As a result, the oil brands' interest – as a retail establishment – in recouping any potential antitrust overcharges to which they may be entitled, is very small compared to their interest in recouping settlement dollars for all their divested retail locations that are now owned and operated by the Associations' branded members.

it were, then every class member would have an open interpretation issue because they too might have transferred their legal rights at some point. Rather, Branded Operators face unnecessary open questions about their claims due to Defendants' position on this issue and may be left out of the class compensation process in any meaningful sense. The settlement agreement does not, but must, solve this problem.

(B)     The Associations' Service to Members is Hindered by the Conflict

Class counsel referenced the potential for an allocation methodology in their letter of November 15, 2018 [ECF 7294], but without knowing how that methodology would actually work, the Associations cannot provide their members with clear information about the consequences of participation in this class settlement. Providing such information is a service that all of the Associations provide, particularly because most of the industry consists of small businesses. But, the confusion created unless class members are given certainty regarding the claims of Branded Operators will make it impossible to provide that service and impossible for Branded Operators to evaluate how to protect their rights.

This appears to be an "all or nothing" issue. The Branded Operators pay the interchange fees, but some refiners claim the legal rights for those transactions. One of these groups will be compensated for the transactions in question and one will not. The proposed settlement agreement faces the uncertainty of Defendants' flawed interpretation and, therefore, does not resolve that conflict.

Nor is any "allocation" of class settlement funds a matter of contract interpretation between the brands and marketers, as class counsel suggest. Every contract between the brands and the marketers requires the marketers to accept Visa and MasterCard branded payment cards at their retail locations. Those contracts do not transfer legal claims regarding interchange fees to refiners.

Class counsel are introducing questions that do not exist in these contracts any more than they exist in every contract that a merchant signs in order to have its payment card transactions processed. The declarations submitted by the Fikes Marketers make this clear.

Without Branded Operators knowing the answer to this dispute and the Associations having the ability to explain it, the uncertainty will not only create unfairness for Branded Operators but will likely lead to many unnecessary opt-outs. Branded Operators may justifiably see these unresolved questions and decide they must separately retain counsel in order to protect their rights. That is true even for many that might otherwise find it advantageous to participate in the settlement.

(B) <u>Valero Exclusion List</u>

We also echo the Fikes Marketers' concerns that businesses that have sold motor fuel under the Valero brand may be unfairly excluded from the settlement. Many of those businesses have informed the Associations that they were unaware that Valero included them on its opt-out list. A settlement that extinguishes the rights of these businesses, without even explaining that it is doing that in the notice to class members, cannot stand.

And, there is a risk that additional oil refiners may be emboldened if the Court grants preliminary approval to the settlement without resolving these issues. Refiners will take such an outcome as approval of what Valero has done and may try to strike their own settlements with Visa and MasterCard that take compensation for Branded Operators' claims. The Court should not provide an implicit stamp of approval on that foreseeable conduct.

Whether or how the Valero exclusion impacts the Association members' rights to relief in the class settlement is unclear and not addressed in the settlement. In fact, the settlement does not address whether the Valero release extinguishes Association members' right to compensation in

the class for their retail locations that are not branded with Valero, and does not provide notice about which entities and claims are excluded by virtue of the Valero release.

Since the Valero exclusion list was not publicly filed, many Association members do not know that they have been excluded from the settlement. The fact that the Fikes Marketers were able to discover the exclusion list because they are represented by *other* counsel (as class counsel assert in their submission to the Court) does not absolve the settlement from the requirements that it: (a) is transparent with the class, (b) provides clear notice about exactly what claims have been excluded; and (c) should not include an overly broad exclusion that may exclude even non-Valero related claims. The plain fact is that the class settlement papers and proposed class notice do not include the Valero exclusion list and the hundreds of Valero marketers that are not represented by other counsel do not know that they have – ostensibly and unilaterally – been excluded from this class settlement with respect to their Valero transactions, and possibly, their non-Valero transactions as well. Simply put, Association members with Valero affiliations are left to speculate about whether they will receive any compensation through the class structure.

The settlement requires class members to fully settle and release any antitrust claims they have against the defendants, but it gives Association members no ability to know whether they will be able to obtain any monetary recovery in exchange for that release. Association members will be prejudiced if they are forced to make a decision about participating in this settlement on mere speculation about their compensation rights.

**(4)** **The Flaws in the Settlement Must be Addressed *Now*, Before Class Members Are Obligated to Make a Decision About Whether to Participate**

The proposed class settlement was announced in mid-September 2018, and since then, the Associations have been inundated with questions and concerns from our members, expressing widespread confusion about whether they are going to recover anything through the settlement.

116246829.2

The Associations simply cannot provide their members guidance about their rights unless the Branded Operators are the only class members with respect to their transactions, and our members cannot make an educated decision about participating in the settlement given the current lack of clarity.

The uncertainties addressed above must be resolved now, on the front end, so that merchants in this industry will be able to make an informed decision by any opt-out deadline about whether to participate in the settlement. Without resolution of these uncertainties now – before the opt-out deadline – Association members will be left to speculate about whether they may get anything in exchange for releasing their claims. That is an unfair position in which to put any class members.

<u>**CONCLUSION**</u>

For the reasons discussed above, we ask the Court to deny preliminary approval of the class settlement until such time as the settlement makes clear that the Branded Operators are the class members for the transactions they accept.

Respectfully submitted,

*/s/ William L. Taylor*
William L. Taylor
TAYLOR & POWELL, PLLC
1455 Wisconsin Avenue, NW, Suite 400
Washington, DC 20004
Tel:  (202) 720-7880
Fax:  (202) 706-6080
Email:  williamltaylor@live.com

*Counsel for the National Association of Shell Marketers, Inc. and the Society of Independent Gasoline Marketers of America*

116246829.2

*/s/ Alphonse M. Alfano*
Alphonse M. Alfano
BASSMAN, MITCHELL, ALFANO & LEITER, CHARTERED
1707 L Street, NW, Suite 560
Washington, DC 20036
Tel:  (202) 466-6502
Fax:  (202) 331-7510
Email:  aalfano@bmalaw.net

*Counsel for the Petroleum Marketers Association of America*


## ATTESTATION

I, Steve W. Berman, am the ECF user whose credentials were utilized in the electronic filing of this document. I hereby attest that each of the signing attorneys concurred in the filing of this document.

s/ Steve W. Berman
STEVE W. BERMAN

- 12 -

116246829.2

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 20, 2018, I electronically filed the foregoing document using the CM/ECF system, which will send notification of such filing to the e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List.

s/ Steve W. Berman

STEVE W. BERMAN

116246829.2