UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

IN RE PAYMENT CARD INTERCHANGE FEE
AND MERCHANT DISCOUNT ANTITRUST
LITIGATION

**MEMORANDUM & ORDER**
05-MD-1720 (MKB) (JO)

This document refers to: ALL ACTIONS

-------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

A putative Rule 23(b)(3) class of over twelve million nationwide merchants brought an

antitrust action under the Sherman Act, 15 U.S.C. §§ 1 and 2, and state antitrust laws, against

Defendants Visa and Mastercard networks, as well as various issuing and acquiring banks.[1] *See*

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 986 F. Supp. 2d 207, 213,

223 (E.D.N.Y. 2013) ("*Interchange Fees I*"), *rev'd and vacated*, 827 F.3d 223 (2d Cir. 2016)

("*Interchange Fees II*"); (First Consolidated Am. Class Action Compl., Docket Entry No. 317.)

Plaintiffs are merchants that accept(ed) Visa- and Mastercard-branded cards, and have alleged

that Defendants harmed competition and charged the merchants supracompetitive fees by

---

[1] The putative Rule 23(b)(3) class sought relief in the form of monetary damages, and brought the action along with a separate class that sought equitable relief. (*See* First Consolidated Am. Class Action Compl. 1, Docket Entry No. 317.) At the earliest stages of this litigation, multiple class actions, as well as individual lawsuits by large retailers, were filed against the Defendants. All actions were consolidated together into a multi-district litigation in 2005 (the "MDL"). *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 986 F. Supp. 2d 207, 220 n.12 (E.D.N.Y. 2013) ("*Interchange Fees I*"). Since the initial consolidation, a number of matters have been continuously added to the MDL, which now involves over seventy associated cases.

creating unlawful contracts and rules and by engaging in various antitrust conspiracies.[2] *See id.* at 213; *Interchange Fees II*, 827 F.3d at 228–29.

Plaintiffs sought both injunctive and monetary relief, and after years of litigation, former District Judge John Gleeson approved a settlement for an injunctive relief class and a monetary damages relief class, *see Interchange Fees I*, 986 F. Supp. 2d at 216 n.7, 240, which was vacated by the Second Circuit on June 30, 2016, and remanded to this Court, *Interchange Fees II*, 827 F.3d at 227, 229.[3] After additional extensive discovery and renegotiations, the named

---

[2] In general, in a credit card transaction, a "merchant receives the purchase price minus two fees: the 'interchange fee' that the issuing bank charge[s] the acquiring bank and the 'merchant discount fee' that the acquiring bank charge[s] the merchant." *Interchange Fees II*, 827 F.3d at 228. As previously summarized by the Second Circuit, Plaintiffs challenged several credit card network rules as anticompetitive:

> The "default interchange" fee applies to every transaction on the network (unless the merchant and issuing bank have entered into a separate agreement). The "honor-all-cards" rule requires merchants to accept all Visa or MasterCard credit cards if they accept any of them, regardless of the differences in interchange fees. Multiple rules prohibit merchants from influencing customers to use one type of payment over another, such as cash rather than credit, or a credit card with a lower interchange fee. These "anti-steering" rules include the "no-surcharge" and "no-discount" rules, which prohibit merchants from charging different prices at the point of sale depending on the means of payment.

*Id.* at 228–29. "Plaintiffs allege[d] that these [anticompetitive] rules were adopted pursuant to unlawful agreements among the banks and Visa [and MasterCard]," and "that the banks owned and effectively operated Visa and MasterCard, such that Visa and MasterCard were unlawful 'structural conspiracies' or 'walking conspiracies' with respect to their network rules and practices." *Interchange Fees I*, 986 F. Supp. 2d at 220–21. For a further explanation of credit card transactions and interchange fees, *see id.* at 214–15. As discussed *infra*, some of these challenged rules have been altered as a result of changes in the credit card industry, and some have been altered as a result of a prior settlement in this action.

[3] Following remand, the two putative classes — the Rule 23(b)(2) injunctive class, and the Rule 23(b)(3) damages class — have been proceeding separately, and are each represented by separate counsel. (*See* Mem. and Order dated Nov. 30, 2016 ("Interim Class Counsel Order"), Docket Entry No. 6754.)

representatives of the damages class (the "Rule 23(b)(3) Class Plaintiffs") and Defendants reached a new and separate settlement agreement.

Currently before the Court is the Rule 23(b)(3) Class Plaintiffs' Motion for Class Settlement Preliminary Approval. The Rule 23(b)(3) Class Plaintiffs and Defendants move for preliminary approval of the settlement and preliminary certification of a settlement class under Rule 23(b)(3) of the Federal Rules of Civil Procedure. (Notice of Rule 23(b)(3) Class Pls. Mot. and Mot. for Class Settlement Prelim. Approval ("Mot. for Prelim. Approval"), Docket Entry No. 7257.) In support of the motion, interim class cousel for the Rule 23(b)(3) class ("Rule 23(b)(3) Class Counsel" or "Class Counsel") submitted a memorandum of law, a superseding Rule 23(b)(3) class settlement agreement ("Superseding Settlement Agreement") — with amended escrow agreements, a proposed Notice Plan, proposed Class Notices, and a proposed Plan of Administration and Distribution, among other items (the "Settlement Documents") — and the declarations of two mediators who facilitated settlement discussions.[4]

For the reasons discussed below, on January 24, 2019, the Court granted the Motion for Class Settlement Preliminary Approval (the "January 24, 2019 Order"). (Prelim. Approval Order, Docket Entry No. 7361.)

---

[4] (*See* Mem. in Supp. of Rule 23(b)(3) Class Pls. Mot. for Class Settlement Prelim. Approval ("Mem. in Supp. of Prelim. Approval"), Docket Entry No. 7257-1; Superseding and Am. Definitive Class Settlement Agreement of the Rule 23(b)(3) Class Pls. and the Defs. ("Superseding Settlement Agreement"), Docket Entry No. 7257-2; Amended and Restate Class Settlement Cash Escrow Agreement, annexed to Superseding Settlement Agreement as App. C; Amended and Restated Class Settlement Interchange Escrow Agreement, annexed to Superseding Settlement Agreement as App. D; Notice Plan, annexed to Superseding Settlement Agreement as App. F; Settlement Class Notices, annexed to Superseding Settlement Agreement as App. G; Plan of Administration and Distribution, annexed to Superseding Settlement Agreement as App. I; Decl. of Eric Green ("Green Decl."), Docket Entry No. 7257-4; Decl. of the Hon. Edward A. Infante (Ret.) ("Infante Decl."), Docket Entry No. 7257-5.)

**Table of Contents**

I.    Background ............................................................................................................ 5

   a.   Prior settlement approval and class certification .......................................... 6

   b.   The Second Circuit's reversal ....................................................................... 7

   c.   Relevant subsequent proceedings ................................................................. 9

   d.   Class Plaintiffs' allegations ......................................................................... 11

   e.   Rule 23(b)(3) Motion for Class Settlement Preliminary Approval .............. 12

   f.   Objections to preliminary approval and class certification .......................... 14

   g.   Hearing on the Superseding Settlement Agreement and subsequent filings ... 17

   h.   Preliminary approval of the Superseding Settlement Agreement ................. 18

II.   Discussion ........................................................................................................... 19

   a.   Preliminary approval of a proposed settlement ........................................... 19

      i.    Preliminary approval standards ............................................................... 20

      ii.   Preliminary approval factors ................................................................... 22

      iii.  The Court will likely approve the proposed settlement ........................... 24

         1.   Adequate representation by class representatives and class counsel ........ 25

            A.   Adequacy of class representatives .................................................... 27

               (1)   The named Rule 23(b)(3) Class Plaintiffs suffer the same injury as the putative class members and have an interest in vigorous pursuit of the claims .................... 27

               (2)   The Rule 23(b)(3) Class Plaintiffs' interests are not antagonistic to the putative class members ................................................................................................ 29

            B.   Adequacy of class counsel ............................................................... 31

         2.   Arms-length negotiations ........................................................................ 34

         3.   Adequate relief for the class ................................................................... 36

            A.   Costs, risks, and delay of trial and appeal ....................................... 37

               (1)   The complexity, expense, and likely duration of the litigation ...................... 37

               (2)   The risks of establishing liability .................................................... 39

               (3)   The risks of establishing damages ................................................... 44

               (4)   The risks of maintaining the class through the trial ........................ 45

            B.   Effectiveness of distributing relief to the class ............................... 46

            C.   The terms of any proposed award of attorneys' fees ....................... 48

            D.   Release from liability ...................................................................... 50

               (1)   The releases in the Original Settlement Agreement ....................... 52

               (2)   The release in the Superseding Settlement Agreement ................... 54

(3)    Analysis of the new release ........................................................... 57

    4.    Equitable treatment of class members relative to one another ................................ 60

    5.    The ability of Defendants to withstand a greater judgment ..................................... 60

    6.    The range of reasonableness of the settlement in light of the best possible recovery and all the attendant risks of litigation ............................................................ 61

b.    Certification of settlement class ................................................................ 66

    i.    Rule 23(a) requirements ................................................................ 69

    1.    Numerosity ................................................................................. 69

    2.    Commonality ............................................................................. 70

    3.    Typicality .................................................................................. 73

    4.    Adequate representation .............................................................. 74

    5.    Ascertainability ......................................................................... 74

    ii.    Rule 23(b)(3) requirements ........................................................... 75

    1.    Predominance ............................................................................ 76

    2.    Superiority ................................................................................. 82

c.    Appointment of Class Counsel ................................................................ 82

d.    Notice Plan and Plan of Allocation and Distribution ....................................... 83

e.    Final approval procedure ................................................................ 87

III.    Conclusion ................................................................................. 88

## I.    Background

The Court assumes familiarity with the facts and extensive procedural history as set forth in *Interchange Fees I*, 986 F. Supp. 2d 207; *Interchange Fees II*, 827 F.3d 223; *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2017 WL 4325812, (E.D.N.Y. Sept. 27, 2017), *order set aside*, No. 05-MD-1720, 2018 WL 4158290 (E.D.N.Y. Aug. 30, 2018); and *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2017 WL 4620988 (E.D.N.Y. Oct. 13, 2017). The Court therefore provides only a summary of the relevant facts and procedural history.

### a. Prior settlement approval and class certification

On November 27, 2012, Judge Gleeson granted preliminary approval of a jointly

submitted class settlement agreement (the "Original Settlement Agreement"). *In re Payment*

*Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2012 WL 12929536, at

*1 (E.D.N.Y. Nov. 27, 2012). Judge Gleeson also provisionally certified two separate classes for

settlement purposes only, (1) a mandatory Rule 23(b)(2) settlement class seeking injunctive

relief, from which class members could not opt out; and (2) a Rule 23(b)(3) class seeking

damages, from which class members could opt out.[5] *See id.* at *1–2. After issuance of notice to

the class and an allotted period for putative class members to object to or opt out of the

settlement, on April 11, 2013, the parties moved for final approval of the settlement. (Notice of

Mot. and Mot. for Class Pls. Final Approval of Settlement, Docket Entry No. 2111.)

After holding a fairness hearing on September 12, 2013, Judge Gleeson granted final

approval of the Original Settlement Agreement on December 13, 2013[6] ("final approval

decision" or "prior settlement approval"). *See Interchange Fees I*, 986 F. Supp. 2d at 213, 240.

Under the terms of the Original Settlement Agreement, the Defendants agreed to pay a cash

award of $7.25 billion, before reductions for opt outs and other expenses, to the Rule 23(b)(3)

---

[5] Under Rule 23, members of a class certified under Rule 23(b)(3) are afforded "opt-out" rights, or the right to exclude themselves from the class. Fed. R. Civ. P. 23(c)(2)(B)(v). No such rights are afforded under Rule 23 to classes certified under Rule 23(b)(2).

[6] To assist with his determination, Judge Gleeson appointed an economic and legal expert, Dr. Alan O. Sykes of New York University School of Law, to aid the court in weighing the settlement agreement and accompanying expert reports because "[t]he proponents of the settlement disagree[d] strongly with the objectors over the economic value of the proposed settlement to the class members, and specifically over the benefits of the proposed rules changes to the merchant class." *See Interchange Fees I*, 986 F. Supp. 2d at 218. Dr. Sykes filed his written analysis with the court on August 28, 2013. (Report from Court Appointed Expert Professor Alan O. Sykes ("Sykes Report"), Docket Entry No. 5965.)

class members, and to implement reforms of the Defendants' rules and practices to settle the

claims of the Rule 23(b)(2) class members.[7]  *Id.* at 213, 217.

### b. The Second Circuit's reversal

On June 30, 2016, the Second Circuit vacated the settlement, and remanded for further

proceedings.  *Interchange Fees II*, 827 F.3d at 240.  Objectors to the settlement and plaintiffs

that chose to opt out of the class prior to final approval argued on appeal that the "class action

was improperly certified and that the settlement was unreasonable and inadequate."  *Id.* at 227.

The Second Circuit agreed that the class was improperly certified — holding that the class

certification requirement of adequate representation under Rule 23(a)(4) had not been satisfied.[8]

---

[7]  The reforms included, among other things, "Visa and MasterCard rule modifications to permit merchants to surcharge on Visa- or MasterCard-branded credit card transactions at both the brand and product levels"; "[a]n obligation on the part of Visa and MasterCard to negotiate interchange fees in good faith with merchant buying groups"; "[a]uthorization for merchants that operate multiple businesses under different 'trade names' or 'banners' to accept Visa and/or MasterCard at fewer than all of its businesses"; and "[t]he locking-in of the reforms in the Durbin Amendment [of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010] and the DOJ [United States Department of Justice] consent decree with Visa and MasterCard, even if those reforms are repealed or otherwise undone."  *Interchange Fees I*, 986 F. Supp. 2d at 217.  The Durbin Amendment "limited the interchange fee that issuing banks could charge for debit card purchases, and allowed merchants to discount debit card purchases relative to credit card purchases."  *Interchange Fees II*, 827 F.3d at 229.  In the DOJ consent decree, "after an investigation assisted by the information developed by the [P]laintiffs," and following lawsuits that the Department of Justice initiated against Visa, Mastercard, and American Express in 2010, *Interchange Fees I*, 986 F. Supp. 2d at 215, "Visa and MasterCard agreed to remove their rules prohibiting merchants from product-level discounting of credit and debit cards," *id.*; *see also Interchange Fees II*, 827 F.3d at 229 ("pursuant to a consent decree with the Department of Justice in 2011, Visa and Mastercard agreed to permit merchants to discount transactions to steer consumers away from credit cards use. None of these developments affected the honor-all-cards or no-surcharging rules, or the existence of a default interchange fee.").

[8]  In particular, the Second Circuit found that unitary representation of the classes violated Rule 23(a)(4) — the class certification requirement that representative parties adequately protect the interests of the class — and the Due Process Clause, which requires that named plaintiffs in a class action adequately protect the interests of absent class members.  *Id.* at 228, 231 (citations omitted).

*Id.* The Court found that an inherent conflict of interest existed because a single set of counsel represented both the (b)(2) and (b)(3) class interests. *See id.* at 233–35.

Because of the conflict, the Court concluded that "members of the (b)(2) class were inadequately represented . . . ." *Id.* at 231. Relying on Supreme Court precedent, the Second Circuit held that settlement classes that consist of holders of present claims, such as the (b)(3) class seeking monetary relief for *past* harm, and holders of future claims, such as the (b)(2) class seeking injunctive relief to reform current and *future* rules and policies of the Defendants, must be divided "into homogenous subclasses . . . with separate representation." *Id.* at 234 (quoting *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999)).

The Second Circuit also found that the issues stemming from unitary representation were exacerbated by the inability of members of the (b)(2) class to opt out of the settlement or from their release of claims against the Defendants. *See id.* at 231, 234; *id.* at 241 (Leval, J., concurring). The Court expressed further concern that the injunctive relief secured for the (b)(2) class would not apply uniformly to benefit all (b)(2) class members. *See id.* at 238. For example, the Court noted that (b)(2) merchants that operated in certain states would be prohibited from surcharging costs to customers at the point of sale, as permitted under the Original Settlement Agreement, while merchants that operated in other states would not be prohibited from doing so. *See id.* at 230–31 (noting that "[t]he incremental value and utility of surcharging relief is limited, however, because many states, including New York, California, and Texas, prohibit surcharging as a matter of state law." (citations omitted)); *id.* at 238–39 ("A significant proportion of merchants in the (b)(2) class are either legally or commercially unable to obtain incremental benefit from the primary relief . . . and class counsel knew at the time the Settlement Agreement was entered into that this relief was virtually worthless to vast numbers of

class members.").[9]

Despite these significant concerns, the Second Circuit did not abrogate Judge Gleeson's analysis in its entirety, and the majority of its concerns were circumscribed to representation and relief afforded to the (b)(2) injunctive class. The Court acknowledged the due diligence and extensive time and labor that accompanied the final approval process, stating:

> Discovery included more than 400 depositions, 17 expert reports, 32 days of expert deposition testimony, and the production of over 80 million pages of documents. The parties fully briefed a motion for class certification, a motion to dismiss supplemental complaints, and cross-motions for summary judgment. Beginning in 2008, the parties participated in concurrent settlement negotiations assisted by well-respected mediators. At the end of 2011, the district judge and the magistrate judge participated in the parties' discussions with the mediators. In October 2012, after several more marathon negotiations with the mediators (including one more with the district court and magistrate judges), the parties executed the [Original] Settlement Agreement.

*Id.* at 229.

c. **Relevant subsequent proceedings**

After remand, on August 11, 2016, the Court held a case management conference to discuss, among other items, the Second Circuit's decision. (*See* Minute Entry dated Aug. 11, 2016, Docket Entry No. 6654.) In order to address the Second Circuit's concerns regarding unitary representation of the classes, on November 30, 2016, pursuant to Rule 23(g)(3), the Court

---

[9] The Court notes that the landscape of state no-surcharging laws is changing. For example, in 2017, the Supreme Court held that a New York state statute that prohibited merchants from imposing a surcharge on customers using credit cards regulated speech, and remanded the matter to the Second Circuit to determine whether such speech regulation violates the First Amendment. *See Expressions Hair Design v. Schneiderman*, --- U.S. ---, 137 S. Ct. 1144, 1146 (2017). In addressing a similar California statute, the Ninth Circuit recently held that the statute violated First Amendment commercial free speech rights. *Italian Colors Restaurant v. Becerra*, 878 F.3d 1165, 1179 (9th Cir. 2018).

appointed two separate groups of interim co-lead counsel to represent (1) merchants seeking certification under Rule 23(b)(2) for injunctive relief, and (2) merchants seeking certification under Rule 23(b)(3) for monetary damages.[10] *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2017 WL 4325812, at *4. The Court appointed the Nussbaum Law Group, P.C., Hilliard & Shadowen LLP, Freed Kanner London & Millen LLC, and Grant & Eisenhofer P.A. to serve as interim Rule 23(b)(2) Class Counsel for the merchants seeking injunctive relief, and appointed Robins Kaplan LLP, Berger & Montague P.C., and Robbins Geller Rudman & Dowd LLP (the "Robins Group") to serve as interim Rule 23(b)(3) Class Counsel for the merchants seeking damages relief — the same three firms that represented the entire consolidated class in the proceedings before Judge Gleeson. (*See* Mem. and Order dated Nov. 30, 2016 ("Interim Class Counsel Order") 1, Docket Entry No. 6754.)

On March 31, 2017, Rule 23(b)(2) Class Counsel filed a complaint on behalf of the Rule 23(b)(2) representative class plaintiffs, and a putative Rule 23(b)(2) class. (Equitable Relief Class Action Compl., Docket Entry No. 6910.) On October 30, 2017, Rule 23(b)(3) Class Counsel filed a Third Consolidated Amended Class Action Complaint ("TAC") on behalf of named Rule 23(b)(3) representative class plaintiffs ("Rule 23(b)(3) Class Plaintiffs" or "Class Plaintiffs"), and a putative Rule 23(b)(3) class.[11] (Third Consolidated Am. Class Action Compl.,

---

[10] Magistrate Judge James Orenstein, who has been ably managing the discovery and other matters in this litigation for many years, decided the Class Counsel motions.

[11] In 2017, Class Plaintiffs moved to amend their Complaint. (*See* Class Pls. Mot. for Leave to Amend Compl., Docket Entry No. 6880.) On August 30, 2018, after finding that the amended pleadings related back to earlier complaints under Rule 15(c), the Court affirmed Plaintiffs' ability "to amend the Complaints to assert an alternative, two-sided market theory following the Second Circuit's decision in *United States v. Am. Express Co.*, 838 F.3d 179 (2d Cir. 2016), *aff'd sub nom. Ohio v. Am. Express Co.*, --- U.S. ---, 138 S. Ct. 2274, 2285 (2018)." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2018 WL 4158290, at *3 (E.D.N.Y. Aug. 30, 2018). In *United States v. American Express Company*,

Docket Entry No. 7123 ("TAC").)  According to the TAC, the Rule 23(b)(3) Class Plaintiffs

include: Photos Etc. Corporation; Traditions, Ltd.; Capital Audio Electronics, Inc.; CHS, Inc.;

Crystal Rock, LLC;[12] Discount Optics, Inc.; Leon's Transmission Service, Inc.; Parkway Corp.;

and Payless, Inc.  (*See* TAC ¶ 2.)  All seek to represent a class certified under Rules 23(a) and

(b)(3).  (*Id.* ¶ 66.)

### d. Class Plaintiffs' allegations

The TAC alleges that Defendants[13] — in violation of Section 1 of the Sherman Act (15

U.S.C. § 1), Section 7 of the Clayton Act (15 U.S.C. § 18), the California Cartwright Act

(Section 16700 *et seq.* of the California Business and Professions Code), and the California

Unfair Competition Law (Section 17200 *et seq.* of the California Business and Professions Code)

— entered into "contracts, combinations, conspiracies, and understandings" that harmed

competition and the Rule 23(b)(3) Class Plaintiffs through supracompetitive fixed prices, unfair

acts and practices, and unreasonable restraints of trade.  (TAC ¶¶ 4–5, 408–516.)  Class Plaintiffs

allege that these practices have resulted in a common antitrust injury to an entire class of

merchants, and they seek damages under Section 4 of the Clayton Act, 15 U.S.C. § 15.  (*Id.* ¶¶

---

the Second Circuit held that "[t]he District Court erred in excluding the market for cardholders
from its relevant market definition."  838 F.3d at 197.

[12]  On April 27, 2018, the Court dismissed the claims and actions of Crystal Rock, LLC
without prejudice.  (Stipulation and Order of Dismissal dated Apr. 27, 2018, Docket Entry No.
7197 (stating, however, that "[a]ll discovery taken of Crystal Rock, LLC . . . will remain in the
factual record").)  As a result, Crystal Rock, LLC is not listed as a Class Plaintiff in the
Superseding Settlement Agreement, and the Court does not consider the facts as to Crystal Rock,
LLC in this Memorandum and Order.  (*See* Superseding Settlement Agreement ¶ 3(ii); TAC ¶
14.)

[13]  In the TAC, the Rule 23(b)(3) Class Plaintiffs list the Defendants as "Visa U.S.A.,
Inc., Visa International Service Association, and Visa, Inc. ('Visa'), MasterCard International
Incorporated ('MasterCard'), and the other Defendants named in th[e] Complaint ('Bank
Defendants') . . . ."  (*See* TAC ¶ 2.)

27, 112, 115.)

### e. Rule 23(b)(3) Motion for Class Settlement Preliminary Approval

After engaging in renewed discovery and mediation efforts, the Rule 23(b)(3) Class

Plaintiffs and Defendants reached an agreement in principle on June 7, 2018. (*See* Decl. of K.

Craig Wildfang ("Wildfang Decl.") ¶¶ 201–39, Docket Entry No. 7257-3.) On September 19,

2018, Rule 23(b)(3) Class Counsel, on behalf of Class Plaintiffs, moved the Court for

preliminary approval of the Superseding Settlement Agreement and preliminary certification of a

Rule 23(b)(3) settlement class. (*See* Mot. for Prelim. Approval; Mem. in Supp. of Prelim.

Approval.)

The Superseding Settlement Agreement defines the proposed Rule 23(b)(3) putative class

to include:

> [a]ll persons, businesses, and other entities that have accepted any
> Visa-Branded Cards and/or Mastercard-Branded Cards in the
> United States at any time from January 1, 2004 to the Settlement
> Preliminary Approval Date, except that the Rule 23(b)(3) Settlement
> Class shall not include (a) the Dismissed Plaintiffs, (b) the United
> States government, (c) the named Defendants in this Action or their
> directors, officers, or members of their families, or (d) financial
> institutions that have issued Visa-Branded Cards or Mastercard-
> Branded Cards or acquired Visa-Branded Card transactions or
> Mastercard-Branded Card transactions at any time from January 1,
> 2004 to the Settlement Preliminary Approval Date.

(Superseding Settlement Agreement ¶ 4.) All class members will have the right to "opt out" —

or exclude themselves — from participation in the class and from being bound by the terms of

the Superseding Settlement Agreement. (*See id.* ¶ 39(f); Mem. in Supp. of Prelim. Approval 2.)

The Superseding Settlement Agreement provides for an award of as much as

approximately $6.26 billion in relief before opt-out reductions and expense takedowns[14] — a figure that Class Counsel believes is the largest cash settlement in antitrust class action history. (Mem. in Supp. of Prelim. Approval 1; Wildfang Decl. ¶ 3.)  Putative class members that do not opt out of the settlement will "receive the same benefit — a *pro rata* share of the monetary fund based on the interchange fees attributable to their transactions during the class period . . . ." (Mem. in Supp. of Prelim. Approval 2; Plan of Administration and Distribution I-2, 3.)

In return, the class members will release the claims raised in the TAC.  Specifically, class members will release "claims arising out of or relating to conduct or acts that were alleged or raised or that could have been alleged or raised relating to the subject matter of this litigation," (*id.* at 2), that have accrued through the date of the Court's preliminary approval of the settlement, i.e., January 24, 2019, and that "accrue no later than five years after the Settlement Final Date . . . ," (Superseding Settlement Agreement ¶ 31(a) (stating that class members "fully, finally, and forever . . . release [Defendants] from . . . claims . . . that have accrued as of the Settlement Preliminary Approval Date or accrue no later than five years after the Settlement Final Date arising out of or relating to any conduct . . . alleged or otherwise raised . . . or that could have been alleged or raised . . .or arising out of or relating to a continuation or continuing effect of any such conduct . . . .")).[15]  The released claims also encompass claims that were or

---

[14]  Although reductions from the $6.25 billion figure will be made in accordance with the number of class members that choose to exclude themselves from the settlement, the award figure will not be reduced below approximately $5.56 billion.  (*See* Mem. in Supp. or Prelim. Approval 1.)

[15]  "Settlement Final Date" is defined as the business day after the affirmation by any appeals court of this Court's final approval of the proposed settlement.  (*See* Superseding Settlement Agreement ¶ (3)(ss).)  According to Class Counsel, this effectively means that "[t]he release will bar claims that have accrued within five years following . . . the exhaustion of all appeals."  (Mem. in Supp. of Prelim. Approval 23.)

could have been alleged in this action relating to, among other things, interchange fees, anti-steering rules, and honor-all-card rules. (*See id.* ¶ 31(b)(i–vi).)

The Superseding Settlement Agreement does not release the right of any Rule 23(b)(3) class member to participate in the Rule 23(b)(2) action, "solely as to injunctive relief claims . . . ."[16] (*See id.* ¶ 34(a); *see also* Mem. in Supp. of Prelim. Approval 23 ("the release does not bar the injunctive relief claims asserted in the pending proposed Rule 23(b)(2) class action . . . . Nothing in the release affects in any way the scope of injunctive relief which the [Rule 23(b)(2)] Plaintiffs and proposed class can seek.").)

### f. Objections to preliminary approval and class certification

After a November 1, 2018 status conference with the parties, on November 6, 2018, the Court ordered that "[a]ny objections to the proposed class settlement . . . be filed, in writing, on or before November 20, 2018."[17] (Order dated Nov. 6, 2018.) On November 20, 2018, the Court received three sets of objections from (1) Leathers Enterprises, Inc.; (2) Fikes Wholesale

---

[16] The Court notes that documents and filings refer to the Rule 23(b)(2) action in a variety of ways. The Rule 23(b)(2) action is proceeding in this MDL as *Barry's Cut Rate Stores Inc. et al. v. Visa, Inc., et al.*, No. 05-MD-01720. The action is sometimes referred to as "*Barry's*" and the class is sometimes referred to as the "equitable relief class." For the purposes of consistency across opinions, the Court uses the terms "Rule 23(b)(2)" and "injunctive relief" to refer to the action, as opposed to "*Barry's*" and "equitable relief."

[17] Prior to the November 1, 2018 status conference, on October 30, 2018, the Court received a letter, notifying the Court of an intention to object to preliminary approval of the Superseding Settlement Agreement. (Letter notice of intention to object to proposed settlement dated Oct. 30, 2018 ("Letter of Intention to Object"), Docket Entry No. 7280.) On November 15, 2018, Rule 23(b)(3) Class Counsel filed a response to the October 30, 2018 letter. (Rule 23(b)(3) Class Counsel's response to Branded Operators' letter of October 30 dated Nov. 15, 2018 ("Class Counsel's Nov. 15 Response"), Docket Entry No. 7294.) On November 23, 2018, Rule 23(b)(3) Class Counsel filed a response to the objections that were ultimately filed on November 20, 2018. (Rule 23(b)(3) Class Counsel's Response to Objections to Class Settlement Dkts. 7299, 7300, 7301 dated Nov. 23, 2018 ("Class Counsel's Nov. 23 Response"), Docket Entry No. 7303.)

Inc., Midwest Petroleum Company, and Slidell Oil Company, LLC; and (3) the National Association of Shell Marketers, the Petroleum Marketers Association of America, and the Society of Independent Gasoline Marketers of America (collectively, the "Branded Operators").[18]  The Branded Operators own and/or operate gas stations and convenience stores that sell petroleum products that are produced and branded by major oil refiners such as Shell and ConocoPhillips.  (Mem. in Opp'n to Prelim. Approval 1.)  They raised several concerns in their submissions to the Court.

First, the Branded Operators argue that preliminary settlement approval should not be granted because an intra-class conflict exists and class members will have competing claims over funds for the same merchant transactions.  The Branded Operators contend that the major oil companies will attempt to make claims for funds that the Branded Operators are allegedly owed.  (Mem. in Opp'n to Prelim. Approval 7–8.)  They argue that "[u]nless it is clear who will receive distributions from the settlement for the transaction accepted by Branded Operators, class members will not know whether they can or should participate in the settlement or opt out."  (*Id.* at 3.)

Second, the Branded Operators argue that Rule 23(b)(3) Class Counsel is not adequately representing them because of "dueling class members."  (*See id.* at 14–18 ("class counsel is inherently conflicted based on its representation of a class that contains dueling class members.").)

_____

[18]  (*See* Statement of Obj. Regarding the Proposed Class Settlement by Leathers Enterprises, Inc., Docket Entry No. 7299; Mem. in Opp'n to Prelim. Approval of Class Settlement ("Mem. in Opp'n to Prelim. Approval"), Docket Entry No. 7300; Statement of Obj. Regarding the Proposed Class Settlement by the National Association of Shell Marketers, the Petroleum Marketers Association of America, and the Society of Independent Gasoline Marketers of America, Docket Entry No. 7301.)

Third, the Branded Operators express concern that some portion of them have been excluded from the class. (*Id.* at 19 ("the Defendants have been allowing the Oil Brands to negotiate opt-out settlement agreements on behalf of all of their branded operators without the consent of the operators.").) For example, the Branded Operators refer to a list submitted by "Valero,"[19] which "identifies more than 400 branded operators that are now purportedly excluded from the [Superseding Settlement Agreement]." (*Id.* at 19–20.) The Branded Operators argue that there will be a "failure to notify" hundreds of class members as a result of these exclusion lists. (*Id.* at 5.)

In addition to the Branded Operator filings, on December 3, 2018, the Court received a letter from Rule 23(b)(2) Class Counsel on behalf of the injunctive relief Class Plaintiffs, expressing concern that the Superseding Settlement Agreement only preserves *injunctive* relief claims in the Rule 23(b)(2) injunctive relief action, instead of *injunctive, declaratory, or other equitable relief* claims. (*See* Letter from Equitable Relief Plaintiffs re Language in Settlement Agreement ("Letter re Language in Settlement Agreement"), Docket Entry No. 7313 (pointing out that the claims otherwise released in the Superseding Settlement Agreement include

---

[19] Valero Energy Corporation and Valero Marketing and Supply Company are listed as Dismissed Plaintiffs. (*See* Dismissed Plaintiffs, annexed to Superseding Settlement Agreement as App. B.) "Dismissed Plaintiffs," as defined in the Superseding Settlement Agreement, means:

> the individual plaintiffs and former opt-out plaintiffs that have dismissed with prejudice an action against any Defendant and that are listed in Appendix B [of the Superseding Settlement Agreement], and any additional persons, businesses, or other entities included in an exclusion request that those plaintiffs previously submitted to the Class Administrator in connection with the [Original] Settlement Agreement.

(Superseding Settlement Agreement ¶ 3(t).) The Branded Operators object to the fact that the content of the exclusion requests have not been disclosed to the Court or putative class members, and have not been included with the proposed class notice. (*See* Mem. in Opp'n to Prelim. Approval 20.)

"injunctive, declaratory, or other equitable relief," while the claims preserved for pursuit in the Rule 23(b)(2) action are "solely . . . injunctive relief claims[,]" and expressing the desire to "avoid a release that is broader than the . . . claims preserved" by the Superseding Settlement Agreement).)

The Court addresses the concerns of the Branded Operators and Rule 23(b)(2) Class Counsel *infra*.

> g. **Hearing on the Superseding Settlement Agreement and subsequent filings**

On December 6, 2018, the Court held a hearing on the Superseding Settlement Agreement. (*See* Hr'g Tr., Docket Entry No. 7331.) The Court discussed with the parties, among other things, the concerns of Rule 23(b)(2) Class Counsel regarding the preservation of injunctive, declaratory, and other equitable relief claims, (*id.* at 3:19–7:2), the Branded Operators' objections, (*id.* at 7:11–17:9), the Court's concerns regarding the terms of the Superseding Settlement Agreement, (*id.* at 17:14–28:23), and the factors of consideration for preliminary approval and class certification for the purposes of settlement, (*id.* at 32:7–38:20).

At the conclusion of the hearing, the Court informed the parties that it would approve the proposed settlement subject to the discussions had at the hearing, and requested that the parties submit a revised proposed preliminary approval order and Class Notices based on those discussions. (*See id.* at 38:18–38:22; *see also* Minute Entry dated Dec. 6, 2018, Docket Entry No. 7327 (instructing parties to incorporate clarifying language in the Class Notices to the putative class and instructing Class Counsel to "submit all relevant updated documents to the Court for review.").)

On January 15, 2019, in light of the discussions held at the hearing, Rule 23(b)(3) Class Counsel, Counsel for Visa, and Counsel for Mastercard, jointly submitted a letter to the Court,

with revised versions of a proposed preliminary approval order, and proposed Class Notices. (Letter dated Jan. 15, 2019 ("January 15, 2019 Letter"), Docket Entry No. 7354; Proposed Revised Rule 23(b)(3) Class Settlement Prelim. Approval Order ("Proposed Prelim. Approval Order"), Docket Entry No. 7354-1; Revised Class Notices, annexed to Proposed Prelim. Approval Order as Ex. 1.)  Pursuant to the Court's request, Class Counsel also drafted and submitted a Notice of Exclusion to be sent to Dismissed Plaintiffs — i.e., entities and their affiliates that have previously dismissed their lawsuits against the Defendants — in order to notify the Dismissed Plaintiffs that they will be ineligible to receive settlement funds.  (*See* Notice of Exclusion from Class Action Settlement ("Notice of Exclusion"), annexed to Proposed Prelim. Approval Order as Ex. 2.)  Shortly thereafter, on January 18, 2019, Rule 23(b)(2) Class Counsel submitted a letter to the Court, noting that, based on the "representations" in the January 15, 2019 Letter and the revised versions of the proposed preliminary approval order and Class Notices regarding the scope of the release in the Superseding Settlement Agreement, the Rule 23(b)(2) Class Plaintiffs "would not be filing an objection to the proposed [Superseding Settlement Agreement.]"  (Letter dated Jan. 18, 2019, Docket Entry No. 7359.)  The Court understands this to mean that the adjustments made to the proposed preliminary approval order and Class Notices have alleviated Rule 23(b)(2) Class Counsel's concern noted in Section I.f *supra*, surrounding the preservation of injunctive relief claims in the Rule 23(b)(2) action.

**h.  Preliminary approval of the Superseding Settlement Agreement**

On January 24, 2019, the Court preliminarily approved the Superseding Settlement Agreement and preliminarily granted class certification for the purposes of settlement, appointed Class Counsel and the Class Administrator, and approved the proposed Notice Plan, Class Notices, and Plan of Administration and Distribution.  (Prelim. Approval Order.)

## II. Discussion

### a. Preliminary approval of a proposed settlement

Rule 23(e) of the Federal Rules of Civil Procedure sets forth the standards and procedures that apply to class action settlements. Under Rule 23(e), a court may grant final approval of a proposed settlement "only after a hearing and only on finding that it is *fair, reasonable, and adequate*." Fed. R. Civ. P. 23(e)(2) (emphasis added); *see also Charron v. Wiener*, 731 F.3d 241, 247 (2d Cir. 2013). A class action settlement approval procedure typically occurs in two stages: (1) preliminary approval — where "prior to notice to the class, a court makes a preliminary evaluation of fairness," and (2) final approval — where "notice of a hearing is given to the class members, [and] class members and settling parties are provided the opportunity to be heard on the question of final court approval." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11-CV-5450, 2016 WL 7625708, at *2 (S.D.N.Y. Dec. 21, 2016) (citing *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997)); *see also In re Initial Pub. Offering Sec. Litig.*, 243 F.R.D. 79, 87 (S.D.N.Y. 2007) ("Review of a proposed class action settlement generally involves a two-step process: preliminary approval and a subsequent 'fairness hearing.' The court first must review the proposed terms of settlement and make a preliminary determination on the fairness, reasonableness and adequacy of the settlement terms.").

During the preliminary approval stage, a court "must review the proposed terms of settlement and make a preliminary determination on the fairness, reasonableness and adequacy of the settlement terms." *In re Initial Pub. Offering Sec. Litig.*, 243 F.R.D. at 87. The judicial role in reviewing a proposed settlement is demanding. *Zink v. First Niagara Bank, N.A.*, 155 F. Supp. 3d 297, 308 (W.D.N.Y. 2016) (noting that such review "is demanding because the

adversariness of litigation is often lost after the agreement to settle." (quoting *Martin v. Cargill, Inc.*, 295 F.R.D. 380, 383–84 (D. Minn. 2013)).

Even where parties have reached agreement in the class settlement context, courts need not grant preliminary approval, and have denied motions for class settlement preliminary approval. *See, e.g.*, *Patterson v. Premier Construction Co. Inc.*, No. 15-CV-00662, 2017 WL 122986, at *2 (E.D.N.Y. Jan. 12, 2007); *Oladapo v. Smart One Energy, LLC*, No. 14-CV-7117, 2017 WL 5956907, at *16 (S.D.N.Y. Nov. 9, 2017), *report and recommendation adopted*, No. 14-CV-7117, 2017 WL 5956770 (S.D.N.Y. Nov. 30, 2017). Courts should remain mindful, however, "of the 'strong judicial policy in favor of settlements, particularly in the class action context.'" *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.* ("*Wal-Mart Stores*"), 396 F.3d 96, 116 (2d Cir. 2005) (quoting *In re PaineWebber Ltd. P'ships Litig.*, 147 F.3d 132, 138 (2d Cir. 1998)).

### i. Preliminary approval standards

New amendments to Rule 23 took effect on December 1, 2018. These amendments alter the standards that guide a court's preliminary approval analysis.[20] Prior to the amendments, Rule 23 did not specify standards for courts to follow when deciding whether to grant preliminary approval. Instead, courts in the Second Circuit interpreted Rule 23 to require a determination of whether the proposed settlement fell "within the range of possible final approval." *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2012 WL 5989763, at *1 (E.D.N.Y. Oct. 24, 2012) ("Preliminary approval is appropriate where the proposal appears to be the product of serious negotiation and further appears to be within the

---

[20] Among other things, the new amendments set forth standards under Rule 23(e)(1)(B)(i–ii) that a district court must ensure are met prior to a grant of *preliminary approval* of a proposed settlement, and factors under Rule 23(e)(2) that a district court must now consider when evaluating whether to grant *final approval* of a proposed settlement. *See* Fed. R. Civ. P. 23(e).

range of possible final approval." (citing *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 176 F.R.D. at 102)); *see also In re Traffic Exec. Ass'n*, 627 F.2d 631, 634 (2d Cir. 1980) (suggesting that for preliminary approval, a court need only find "probable cause to submit the [settlement] to class members . . . ." (internal citation omitted)); *Davis v. J.P. Morgan Chase & Co.*, 775 F. Supp. 2d 601, 607 (W.D.N.Y. 2011) ("A proposed settlement of a class action should be . . . preliminarily approved where it 'appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class and falls within the range of possible approval.'" (quoting *In re NASDAQ MKT.-Makers Antitrust Litig.*, 176 F.R.D. at 102)); *Menkes v. Stolt-Nielsen S.A.*, 270 F.R.D. 80, 101 (D. Conn. 2010) (quoting *Reade-Alvarez v. Eltman, Eltman & Cooper, P.C.*, 237 F.R.D. 26, 33 (E.D.N.Y. 2006)) (same).

Under the new Rule 23(e), in weighing a grant of preliminary approval, district courts must determine whether "giving notice is justified by the parties' showing that the court *will likely be able to*: (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B)(i–ii) (emphasis added). Because Rule 23(e)(2) sets forth the factors that a court must consider when weighing *final* approval, it appears that courts must assess at the preliminary approval stage whether the parties have shown that the court will likely find that the factors weigh in favor of final settlement approval. This standard appears to be more exacting than the prior requirement.[21]

---

[21] It appears that a "likelihood standard" now guides a district court's analysis of whether to grant preliminary approval. That is, a district court must assess whether the parties have shown that the court will *likely* be able to grant final approval and certify the class. *See* Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment ("The decision to give notice of a proposed settlement to the class is an important event. It should be based on a solid record supporting the conclusion that the proposed settlement will likely earn final approval after notice and an opportunity to object.").

## ii. Preliminary approval factors

To guide its analysis during the preliminary approval stage in determining whether it will likely approve a proposal under Rule 23(e)(2), the Court looks to the factors contained in the text of Rule 23(e)(2), which a court must consider when weighing final approval. *See* Fed. R. Civ. P. 23(e)(2) ("If the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering" the factors set forth in Rule 23(e)(2).). Although the factors apply to final approval, the Court looks to them to determine whether it will likely grant final approval based on the information currently before the Court.

Prior to the December 1, 2018 amendments, Rule 23(e)(2) was silent on the factors that courts needed to assess when weighing final approval — the Rule only required that courts hold a final fairness hearing and find the proposed settlement to be "fair, reasonable, and adequate." District courts therefore looked to guidance from, and factors set forth in, circuit law and treatises in making the assessment. Courts in the Second Circuit have traditionally considered nine factors, known as the *Grinnell* factors, to assist in weighing final approval and determining whether a settlement is substantively "fair, reasonable, and adequate." These factors are:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*In re Initial Pub. Offering Sec. Litig.*, 260 F.R.D. 81, 88 (S.D.N.Y. 2009) (citing *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds by Goldberger*

*v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000); *D'Amato v. Deutsche Bank*, 236 F.3d 78, 86 (2d Cir. 2001)).

The amended Rule 23(e)(2) requires courts to consider whether:

> (A) the class representatives and class counsel have adequately represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
>> (i) the costs, risks, and delay of trial and appeal;
>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims, if required;
>> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>> (iv) any agreement required to be identified under Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). Paragraphs (A) and (B) constitute the "procedural" analysis factors, and examine "the conduct of the litigation and of the negotiations leading up to the proposed settlement." Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment. Paragraphs (C) and (D) constitute the "substantive" analysis factors, and examine "[t]he relief that the settlement is expected to provide to class members . . . ." *Id.*

The Court understands the new Rule 23(e) factors to add to, rather than displace, the *Grinnell* factors. *See id.* ("The goal of this amendment is not to displace any factor, but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal."). Indeed, there is significant overlap between the *Grinnell* factors and the Rule 23(e)(2)(C–D) factors, as they both guide a court's substantive, as opposed to procedural, analysis. Accordingly, the Court considers both sets of factors below in its analysis of whether the Court will likely find that the proposed settlement is fair, reasonable, and adequate, and grant final approval.

### iii. The Court will likely approve the proposed settlement

The Court first considers the Rules 23(e)(2) factors, and then considers additional *Grinnell* factors not otherwise addressed by the Rule 23(e)(2) factors.[22] The only factor that the Court does not fully address below is the second *Grinnell* factor — "the reaction of the class to the settlement." The Court has considered this factor to the limited extent possible at the preliminary approval stage, through its consideration of the objections received prior to the preliminary approval hearing.[23]

After consideration of all relevant factors in issuing the January 24, 2019 Order, the Court concluded for the following reasons that based on the record before it, it will likely grant final approval of the proposed settlement.[24]

---

[22] The Court finds that the following *Grinnell* factors do not appear to be addressed by the Rule 23(e)(2) factors: the ability of the defendants to withstand a greater judgment; the range of reasonableness of the settlement fund in light of the best possible recovery; and the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

[23] The Court notes that, based on the objections received during the preliminary approval process, as compared to the objections received during the prior preliminary approval process for the Original Settlement Agreement before Judge Gleeson, it appears that the class' reaction to the Superseding Settlement Agreement is more favorable, as the Court has received fewer objections both in volume and substance. (*See, e.g.*, Objecting Pls. Opp'n to Class Pls. Mot. for Prelim. Approval of Proposed Class Settlement, Docket Entry No. 1681 (objecting to preliminary approval on behalf of the majority of the named plaintiffs in the action); Amicus Br. From ATMIA Challenging Prelim. Approval of Class Settlement, Docket Entry No. 1683 (objecting to preliminary approval on behalf of the ATM Industry Association on the basis that the definition of the settlement class was overbroad, the scope of the injunctive relief, and the breadth of the release); Am. Retailers & Merchants' Obj. to Proposed Class Settlement Agreement, Docket Entry No. 1701 (objecting to preliminary approval on behalf of a wide range of businesses, including retailers, restaurants, oil companies, and pharmacies, and objecting on the basis that the size of the settlement fund was inadequate, that the release was excessive and overbroad, that the attorneys' fees were excessive, and that the injunctive relief was in adequate).)

[24] Although both the Rule 23(e) and *Grinnell* factors are meant to guide a court's final approval analysis, as alluded to *supra*, in consideration of the new Rule 23 likelihood standard

### 1. Adequate representation by class representatives and class counsel

"Determination of adequacy typically 'entails inquiry as to whether: (1) plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation.'" *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007) (quoting *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000)).[25]

In its review of the prior settlement approval, the Second Circuit concluded "that class members of the (b)(2) class were inadequately represented in violation of both Rule 23(a)(4) and

---

applicable to the preliminary approval process, the Court looked to these final approval factors in determining whether the Court will likely grant final approval. The Court nevertheless recognizes that it cannot engage in a complete analysis at the preliminary approval stage, and, as other courts in this Circuit have held, "it is not necessary to exhaustively consider the factors applicable to final approval" at this stage. *In re Platinum & Palladium Commodities Litig.*, No. 10-CV-3617, 2014 WL 3500655, at *12 (S.D.N.Y. July 15, 2014). Critical information as to whether a proposed settlement is fair, reasonable, and adequate, will be obtained through the notice and opt-out process, and the final fairness hearing.

[25] This adequate representation factor is nearly identical to the Rule 23(a)(4) prerequisite of adequate representation in the class certification context. As a result, the Court looks to Rule 23(a)(4) case law to guide its assessment of this factor. As a prerequisite to bringing a class action, Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4); *see also Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 592 (1997) ("To gain certification under Rule 23(b)(3), a class must satisfy the requirements of Rule 23(a), among them, that named class representatives will fairly and adequately protect class interests."). In addition, because this factor guides the Court's analysis of the procedural, as opposed to substantive fairness of the settlement, *see* Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment, the Court also looks to case law that assesses the procedural fairness of proposed settlements, *see, e.g.*, *In re Giant Interactive Group., Inc. Securities Litigation*, 279 F.R.D. 151, 160 (S.D.N.Y. 2011) (noting that when evaluating whether a proposed settlement is fair, reasonable, and adequate, "a Court must consider 'both the settlement's terms and the negotiating process leading to settlement,' that is, it must review the settlement for both procedural and substantive fairness," and noting that the *Grinnell* factors are used to guide a court's analysis of substantive fairness (quoting *Wal-Mart Stores*, 396 F.3d at 116)).

the Due Process Clause." *Interchange Fees II*, 827 F.3d at 231. The Second Circuit held that the "class representatives had interests antagonistic to those of some of the class members they were representing," because the (b)(3) damages class "would want to maximize cash compensation for past harm," while the (b)(2) injunctive class "would want to maximize restraints on network rules to prevent harm in the future," and thus, "[t]he class counsel and class representatives who negotiated and entered into the Settlement Agreement were in the position to trade diminution of (b)(2) relief for increase of (b)(3) relief." *Id.* at 233–34 (holding that the Supreme Court's decisions in *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591 (1997) and *Ortiz*, 527 U.S. 815, require separate representation when a class can be divided between members that hold present claims, and members that hold future claims). In addition, the Second Circuit held that the issue of unitary representation was exacerbated "because the members of the worse-off (b)(2) class could not opt out." *Id.* at 234.

The structural defect of unitary representation no longer exists — the (b)(2) and (b)(3) classes now have separate interim Class Counsel, with the Robins Group serving as interim Rule 23(b)(3) Class Counsel. (*See* Interim Class Counsel Order.) The (b)(2) and (b)(3) classes also now have separate class representatives, i.e., Class Plaintiffs. (*See* Equitable Relief Class Action Complaint ¶ 2; TAC ¶ 2.) The named Rule 23(b)(3) Class Plaintiffs seek to represent a finite class that desires and will receive the same type of relief — damages for past harm. (*See* Superseding Settlement Agreement ¶¶ 4, 27–28.) Thus, all Rule 23(b)(3) Class Plaintiffs and members of the Rule 23(b)(3) class will have the same incentive to "maximize cash compensation for past harm." *Interchange Fees II*, 827 F.3d at 233. Moreover, the Rule 23(b)(3) class will have "opt out" rights. *See* Fed. R. Civ. P. 23(c)(2)(B)(v).

For these and the following reasons, the Court finds that the bifurcation of the (b)(2) and

(b)(3) classes and their Class Counsel sufficiently addresses the Second Circuit's concern and that this factor will likely weigh in favor of a grant of final approval.

### A. Adequacy of class representatives

One of the purposes of assessing adequate representation is to "uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prod., Inc.*, 521 U.S. at 625. "[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Wal-Mart Stores, Inc. v. Dukes* ("*Dukes*"), 564 U.S. 338, 348–49 (2011) (citations and quotations omitted). The analysis of whether a class representative is adequate "is twofold: the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006). In addition to the adequate representation requirement of Rule 23(a)(4) and Rule 23(e)(2)(A), "[t]he Due Process Clause . . . requires that the named plaintiff at all times adequately represent the interests of the absent class members." *Interchange Fees II*, 827 F.3d at 231 (quoting *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985)).

> **(1) The named Rule 23(b)(3) Class Plaintiffs suffer the same injury as the putative class members and have an interest in vigorous pursuit of the claims**

The proposed Rule 23(b)(3) putative class consists of a group of merchants that accepted Visa- and/or Mastercard-branded cards at any point during a finite time period — from January 1, 2004 to the settlement preliminary approval date, i.e., January 24, 2019. (*See* Superseding Settlement Agreement ¶ 4.) The Rule 23(b)(3) Class Plaintiffs seek to challenge the same allegedly unlawful conduct that they claim has harmed them — Defendants' imposition of "supracompetitive interchange and merchant-discount fees on purchases using Visa- and/or

Mastercard-Branded cards, and anti-steering and other restraints that have injured them." (TAC ¶¶ 10–13, 15–18.)  This alleged harm would apply to all members of the putative class.

The Second Circuit did not conclude that members of the Rule 23(b)(3) class were inadequately represented.  Rather, the Second Circuit was concerned that the Rule 23(b)(3) Class Plaintiffs had *too much* incentive to maximize their own interests, at the expense of the interests of the (b)(2) class.  *See Interchange Fees II*, 827 F.3d at 233–34.  Because of the formal separation of the (b)(3) and (b)(2) classes and named Class Plaintiffs, the Court finds that it is unlikely that the Rule 23(b)(3) Class Plaintiffs are operating at the expense of the putative class members.

The named Rule 23(b)(3) Class Plaintiffs represent a wide-range of business interests and experience, including internet-based photography finishing services, retail furniture, wholesale and retail consumer electronics, agricultural cooperative ownership and product supply of farm stores, gas stations, and convenience stores, wholesale optical supplies, automotive transmission servicing, automobile parking, and shoe retail.  (TAC ¶¶ 10–13, 15–18.)  They have their principal places of business in California, Minnesota, New York, Florida, Pennsylvania, and Kansas.  (*Id.*)  All Class Plaintiffs currently operate businesses that continue to accept payment by Visa and Mastercard credit and debit cards.  (*Id.*)

The Rule 23(b)(3) Class Plaintiffs therefore represent a diverse array of business locations and interests, but seek the same type of redress for the same type of harms.  The Court will likely find at the final approval stage that the named Rule 23(b)(3) Class Plaintiffs adequately represent the putative class members.

### (2) The Rule 23(b)(3) Class Plaintiffs' interests are not antagonistic to the putative class members

Generally, "not every potential disagreement between a representative and the class members will stand in the way of a class suit." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 145 (2d Cir. 2001) (citation and quotation marks omitted). "A conflict or potential conflict alone will not . . . necessarily defeat class certification — the conflict must be 'fundamental.'" *Denney*, 443 F.3d at 268 (citing *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d at 145 and holding that no conflict existed where all members of the class could be identified and those members had the opportunity to opt out, even where the class representatives already knew the amount of IRS penalties leveled against them but members of the class did not).

The fundamental conflict identified by the Second Circuit no longer exists. The Rule 23(b)(3) Class Plaintiffs are no longer "in the position to trade diminution of (b)(2) relief for increase of (b)(3) relief," *Interchange Fees II*, 827 F. 3d at 234, because the classes have been separated, there is no overlap between the named representative Class Plaintiffs in the (b)(3) and (b)(2) classes, and the Superseding Settlement Agreement only provides for monetary, and not injunctive relief. In addition, all of the Class Plaintiffs are operating businesses that continue to be subject to the complained-of conduct by Defendants. They have every incentive to negotiate for the highest damages figure possible, especially as they will continue to incur the complained-of monetary injuries. *See In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 453 (S.D.N.Y. 2004) (finding class plaintiffs to be adequate representatives where "[a]ll share[d] the common goal of maximizing recovery.").

The Court further finds that the "conflict" raised by the Branded Operators — that certain putative class members may have competing claims — does not rise to the level of a

"fundamental" conflict sufficient for the Court to find that Rule 23(b)(3) Class Plaintiffs have not adequately represented the Branded Operators.[26] The Court agrees with Rule 23(b)(3) Class Counsel that the conflict does not amount to an "intra-class conflict," because the Superseding Settlement Agreement "does not treat groups of class members differently." (Class Counsel's Nov. 15 Response 2.)

Rather, as Class Counsel notes, the Branded Operators' concerns appear to stem from a contractual issue regarding the ownership of claims. (*Id.*; *see also* Class Counsel's Nov. 23 Response at 1.) Thus, because the conflict is not between class members, but between entities disputing who has the right to claim class status, there is no intra-class conflict or inadequate representation; Class Counsel and Class Plaintiffs are not responsible to, and do not represent, the entity that loses the dispute over the right to claim settlement funds.

The main case relied upon by the Branded Operators is inapposite. The Branded Operators cite to *Amchem* and argue that "[a] settlement class cannot be certified where it includes class members with competing claims." (Mem. in Opp'n to Prelim. Approval 3, 3 n.6.) However, the cited portion of *Amchem* discusses the need for separate representatives for subclasses, similar to the manner in which the Second Circuit discussed the need for separate representation in this case. (*Id.* at 3 n.6 (citing *Amchem Prod., Inc.*, 521 U.S. at 627 (citation

---

[26] The Court acknowledges that the issue of competing claims is a genuine issue that will need to be addressed in the future. At the hearing on the Superseding Settlement Agreement, the Court heard from the parties on the matter, and expressed the belief that the issue could be taken care of through a subsequent administrative process. (Hr'g Tr. 11:16–11:18.) The Court notes that a nearly identical issue arose in *In re Visa Check/Mastermoney Antitrust Litigation*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003). There, the court appointed a special master to resolve disputes over claims that did "not fit within the category of challenges contemplated by the Settlement Agreement and Plan of Allocation." *See In re Visa Check/Mastermoney Antitrust Litig.*, No. 96-CV-5238 (E.D.N.Y.), Order dated Jan. 19, 2006, Docket Entry No. 1244.

omitted)).) *Amchem* is not a case about *competing* claims. Rather, it is a case about different types, and risk, of injuries. Subclasses were deemed necessary in *Amchem* — a case about asbestos exposure where certification was sought for settlement purposes only — because of the disparity between the plaintiffs that were injured, and the plaintiffs that had been exposed to asbestos, but had not yet had any injury manifest. *See Amchem Prod., Inc.*, 521 U.S. at 609 ("class members in this case were exposed to different asbestos-containing products, in different ways, over different periods, and for different amounts of time; some suffered no physical injury, others suffered disabling or deadly diseases.").[27]

For these reasons, the Court will likely find at the final approval stage, that the named Rule 23(b)(3) Class Plaintiffs' interests are not antagonistic to members of the class.

### B. Adequacy of class counsel

"A court reviewing a proposed settlement must pay close attention to the negotiating process, to ensure that . . . plaintiffs' counsel have possessed the experience and ability, and have engaged in the discovery, necessary to effective representation of the class's interests." *D'Amato*, 236 F.3d at 85 (citation and internal quotations omitted); *see also* Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment ("the nature and amount of discovery in this or other cases, or the actual outcomes of other cases, may indicate whether counsel

---

[27] In addition to citing *Amchem*, the Branded Operators also reference the Second Circuit's decision to overturn the prior settlement approval, to support their argument that the Superseding Settlement Agreement should not be preliminarily approved "because it includes class member with competing claims for settlement proceeds for the same merchant transactions." (*See, e.g.*, Mem. in Opp'n to Prelim. Approval 7, 14.) As summarized in other Sections of this opinion, the conflict recognized in the Second Circuit's decision concerned the issue of unitary representation for two separate classes, and involved concern over an entire class potentially receiving "nothing." This does not provide support for the Branded Operator's concern regarding competing class members' contractual or other rights to receive settlement funds.

negotiating on behalf of the class had an adequate information base . . . .").  A district "[c]ourt must evaluate adequacy of representation by considering . . . whether class counsel is qualified, experienced, and generally able to conduct the litigation."  *In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. at 453 (citation omitted).  In *D'Amato*, the Second Circuit upheld a district court's determination of adequacy of class counsel where the district court noted counsels' experience, involvement in other similar litigation, and knowledge in the area of complex class actions.  *See id.* at 85–86.

The Robins Group represented the entire consolidated class in the proceedings before Judge Gleeson.  In holding that representation in the prior settlement was inadequate, the Second Circuit clarified that it "expressly d[id] not impugn the motives or acts of class counsel. Nonetheless, class counsel was charged with an inequitable task."  *Interchange Fees II*, 827 F.3d at 234.  As noted, the inadequacy resulted from unitary representation and the incentive to trade maximization of benefits for one class over benefits to the other class.  *Id.* at 236 ("Structural defects in this class action created a fundamental conflict between the (b)(3) and (b)(2) classes and sapped class counsel of the incentive to zealously represent *the latter*." (emphasis added)).

In acknowledging the concerns raised by objectors to the Original Settlement Agreement, Judge Gleeson noted that the record "demonstrates beyond any reasonable doubt that the negotiations were adversarial and conducted at arm's length by extremely capable counsel." *Interchange Fees I*, 986 F. Supp. 2d at 222.  When weighing competing applications to become interim class counsel for the (b)(3) class after the Second Circuit's remand, Judge Orenstein concluded that:

> in the circumstances of this litigation, the Robins Group is in the best position to continue to represent the interests of the Damages Class. They have already demonstrated their ability to work cooperatively with the court and with the other non-lead counsel,

> they have the support of a larger and more diverse group of clients, and those clients collectively advance a broader array of the legal theories at issue in this litigation.

(Interim Class Counsel Order 4.)

The Court agrees with this assessment. Although the Second Circuit held that Class Counsel's representation was inadequate, the structural barrier that created the conflict of interest has been removed. Since 2006, the Robins Group has arduously represented a variety of plaintiffs' groups in this action. (*See* Pretrial Order dated Feb. 24, 2006, Docket Entry No. 279.). All three law firms that comprise the Robins Group have extensive antitrust class action litigation experience. (*See* Mem. in Support re Co-Lead Counsel's Appl. for Continued Leadership of the Rule 23(b)(3) Class, Ex. A, Docket Entry No. 6665-1); *see also Godson v. Eltman, Eltman, & Cooper, P.C.*, No. 11-CV-764, 2018 WL 5263071, at *4 (W.D.N.Y. Oct. 23, 2018) (finding class counsel's representation to be adequate where class counsel had "significant experience litigating cases" the relevant field and had served as counsel in numerous class actions). Class Counsel has also negotiated what they believe is the largest antitrust settlement in history. *See Wal-Mart Stores*, 396 F.3d at 117 (noting that representation quality is determined best by looking at results and highlighting that plaintiffs' counsel had produced what was at the time the largest antitrust settlement in history (internal citations omitted)).

In the representation before Judge Gleeson, the Robins Group engaged in discovery that resulted in "more than 400 depositions, the production and review of more than 80 million pages of documents, the exchange of 17 expert reports, and a full 32 days of expert deposition testimony." *Interchange Fees I*, 986 F. Supp. 2d at 215. Since the Second Circuit's reversal, the Robins Group has engaged in new discovery efforts and has taken or participated in over 170 additional depositions, (*id.* ¶¶ 210–11), reviewed millions of additional documents, (*id.* ¶ 219),

and facilitated the production of updated expert reports, (*id.* ¶¶ 224–28). In addition, new negotiations between the Rule 23(b)(3) Class Plaintiffs and the Defendants lasted for over a year. (Wildfang Decl. ¶¶ 232–39.)

For these reasons, the Court will likely deem the Robins Group's representation to be adequate at the final approval stage.[28]

### 2. Arms-length negotiations

"A 'presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery.'" *Wal-Mart Stores*, 396 F.3d at 116 (quoting Manual for Complex Litigation (Third) § 30.42 (1995)); *cf.* Ann. Manual for Complex Litigation (Fourth) § 21.612 (2018) ("If, by contrast, the case is filed as a settlement class action . . . with little or no discovery, it may be more difficult to assess the strengths and weaknesses of the parties' claims and defenses.").

Although the Second Circuit held that "even 'an intense, [protracted], adversarial mediation, involving multiple parties,' including 'highly respected and capable' mediators and associational plaintiffs, does not 'compensate for the absence of independent representation,'"

---

[28] The Court finds the Branded Operators' argument that Class Counsel has not adequately represented the Branded Operators unconvincing. (*See generally* Mem. in Opp'n to Prelim. Approval 15–18.) The Branded Operators' argument rests on the assumption that "[C]lass [C]ounsel is inherently conflicted based on its representation of a class that contains dueling class members." (*Id.* at 15.) As elaborated upon elsewhere in this opinion, the Court finds that disagreement over the right to the funds does not amount to an intra-class conflict that would affect the Court's adequate representation analysis. The Branded Operators' argument assumes that they are class members deserving of Class Counsel's representation, which may not be the case, pending the outcome of any dispute over who has rights to settlement funds. Class Counsel does not have a duty to represent the Branded Operators in their dispute with other entities over which entities hold those rights.

the Court nevertheless acknowledged that "'a court-appointed mediator's involvement in pre-certification settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure.'" *Interchange Fees II*, 827 F.3d at 235 (first quoting *In re Literary Works in Electronic Databases Copyright Litigation*, 654 F.3d 242, 252–53 (2d Cir. 2011); and then quoting *D'Amato*, 236 F.3d at 85); *see also* 2 McLaughlin on Class Actions § 6:7 (15th ed. 2018) ("A settlement reached after a supervised mediation receives a presumption of reasonableness and the absence of collusion." (citing cases)).

As set forth above, the parties have engaged in protracted discovery for over a decade. In addition, two highly qualified mediators have assisted both sets of settlement negotiations in this action. The Honorable Edward A. Infante, a former Chief Magistrate Judge and current mediator, became involved in 2008 to mediate a first round of settlement negotiations in this action. (Infante Decl. ¶ 1–2.) Eric Green, a retired Boston University School of Law professor and current full-time mediator, became involved in 2009 to mediate a first round of settlement negotiations for a subset of Plaintiffs in this action.[29] (Green Decl. ¶ 1, 5–6.)

Since the separation of the (b)(2) and (b)(3) classes, both mediators have been involved "in the (b)(3) class action to restart mediation for the damage claims only." (Infante Decl. ¶ 12.) Over the course of more than a year, the parties have engaged in twelve "mediation sessions," including six day-long sessions. (*See id*. ¶¶ 13–25.) On June 2, 2018, the mediators issued a mediators' proposal to the parties, and on June 5, 2018, received "unanimous consent" from the

---

[29] Green also served as a settlement mediator in *In re Visa Check/Mastermoney Antitrust Litigation*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003), a class action antitrust case brought by merchants against Visa and Mastercard, where the Second Circuit affirmed the district court's approval of the settlement and plan of allocation. *See also Wal-Mart Stores*, 396 F.3d at 117 (affirming the district court's agreement with Green's opinion that the proceedings operated with procedural integrity).

parties to move forward.  (Infante Decl. ¶ 26; Green Decl. ¶ 11.)  "The settlement negotiations were extended, extraordinarily complicated, and contentious.  On several occasions the discussions were on the verge of collapsing."  (*See* Infante Decl. ¶ 31.)  "[C]ounsel involved in these mediation sessions are among the most knowledgeable, sophisticated and accomplished attorneys in the fields of antitrust, class actions, and complex litigation."  (Green Decl. ¶ 10.)  Both mediators state that Rule 23(b)(3) class counsel at all times emphasized the need to be independent from any Rule 23(b)(2) class claims resolution, and at no time were (b)(2) Class Counsel involved in the Rule 23(b)(3) class negotiations.  (Infante Decl. ¶ 30; Green Decl. ¶ 12.)

Accordingly, the Court finds that this factor will likely weigh in favor of granting final approval.

### 3.  Adequate relief for the class

In assessing whether the settlement provides adequate relief for the putative class under Rule 23(e)(2)(C), the Court is directed to consider:

> (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims, if required; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3).[30]

Fed. R. Civ. P. 23(e)(2)(C)(i–iv).  As one district court has noted, "[i]f the class settlement does not provide effectual relief to the class . . . then the class representatives have failed in their duty under Rule 23 to fairly and adequately protect the interests of the class."  *Scott v. Weig*, No. 15-CV-9691, 2018 WL 2254541, at *4 (S.D.N.Y. May 17, 2018) (quoting *In re Subway Footlong Sandwich Marketing and Sales Practice Litig.*, 869 F.3d 551, 556 (7th Cir. 2017) (citation

---

[30]  As to the fourth factor, the Court confirmed at the hearing that there are no agreements under Rule 23(e)(3) that the Court must review.  (Hr'g Tr. 33:9–33:17.)

omitted)).

The first factor — costs, risks, and delay of trial and appeal — subsumes several *Grinnell* factors, which the Court considers below. The Court also considers the proposed release from liability as an additional factor under this section, as it affects the determination of the fairness, reasonableness, and adequacy of class relief.

For the following reasons, the Court finds that this factor will likely weigh in favor of granting final approval.

## A. Costs, risks, and delay of trial and appeal

Under this Rule 23(e)(2) factor, "courts may need to forecast the likely range of possible classwide recoveries and the likelihood of success in obtaining such results." Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment. This assessment implicates several *Grinnell* factors, including: (i) the complexity, expense and likely duration of the litigation; (ii) the risks of establishing liability; (iii) the risks of establishing damages; and (iv) the risks of maintaining the class through the trial. The Court uses these *Grinnell* factors to guide its assessment of whether the Court will likely find that this Rule 23(e)(2) factor will weigh in favor of granting final approval.

### (1) The complexity, expense, and likely duration of the litigation

"Settlement is favored if settlement results in 'substantial and tangible present recovery, without the attendant risk and delay of trial.'" *Sykes v. Harris*, No. 09-CV-8486, 2016 WL 3030156, at *12 (S.D.N.Y. May 24, 2016) (quoting *In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 425 (S.D.N.Y. 2001)). "'[C]lass action suits' in general 'have a well-deserved reputation as being most complex.'" *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 281 (S.D.N.Y. 1999) (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977)). In particular,

"[f]ederal antitrust cases are complicated, lengthy, and bitterly fought." *Wal-Mart Stores*, 396 F.3d at 118 (quoting *Weseley v. Spear, Leeds & Kellogg*, 711 F. Supp. 713, 719 (E.D.N.Y. 1989)).

This case is complex and costly. The present litigation has been active for over a decade, and has involved litigation in both district and appellate courts. The proposed class include millions of putative members, and encompasses alleged injuries from 2004, approximately fourteen years ago. (*See* Superseding Settlement Agreement ¶ 4.) The first phase of MDL discovery alone involved 370 depositions, and multiple expert reports, and according to Class Counsel, "Class Plaintiffs have reviewed and analyzed more than 65 million pages of documents." (Wildfang Decl. ¶¶ 53, 115; Mem. in Supp. of Prelim. Approval 13.) Class Counsel's lodestar figure of attorneys' fees through November of 2012 approximated $160 million. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d 437, 439 (E.D.N.Y. 2014). In the litigation prior to the Original Settlement Agreement, the parties filed several motions, including *Daubert* motions, class certification motions, motions to dismiss, and motions for summary judgment, which the Court never decided. *See Interchange Fees I*, 986 F. Supp. 2d at 222. "[E]ven if [Class] Plaintiffs were to prevail at trial, post-trial motions and the potential for appeal could prevent the class members from obtaining any recovery for several years, if at all." *Sykes*, 2016 WL 3030156, at *12 (citations omitted).

Because of the complexity and difficulty of the issues in this case, it requires, and would continue to require, costly counsel and experts, and a wealth of time. This subfactor will likely weigh in favor of granting final approval.

## (2) The risks of establishing liability

"This factor does not require the Court to adjudicate the disputed issues or decide unsettled questions; rather, the Court need only assess the risks of litigation against the certainty of recovery under the proposed settlement." *In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. at 459 (citing *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 177 (S.D.N.Y. 2000), *aff'd sub nom. D'Amato*, 236 F.3d 78). "Courts approve settlements where plaintiffs would have faced significant legal and factual obstacles to proving their case." *Id.*

Based on the fact that the parties have briefed motions to dismiss, *Daubert* motions, class certification motions, and motions for summary judgment, Class Counsel has had to consider the requirements for and risks of establishing liability in this case. If the case were to proceed to trial, many of these motions would have to be relitigated, and they present challenges to recovery. Indeed, "[t]hese motions would have to be briefed and argued again, given the significant legal and factual developments, and additional discovery since their original briefing and argument over six years ago." (Mem. in Supp. of Prelim. Approval 14.)

Moreover, Defendants have previously raised affirmative defenses to liability (and have moved to dismiss the complaint), which also weighs in favor of settlement.[31] (*See generally*

---

[31] As summarized by Class Counsel, Defendants previously moved to dismiss on the following bases:

> (i) that the release in the *In re Visa Check* case released all of Class Plaintiffs' damages and injunctive-relief claims; (ii) that the complaint failed to allege a "restraint on trade" sufficiently to state a claim under § 1 of the Sherman Act; (iii) that the complaint failed to allege a "plausible" inter-network conspiracy under *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007); (iv) that *Twombly* barred the complaint's allegations of post-IPO conspiracies within Visa and Mastercard; and (v) that Class Plaintiffs' claims were barred by the doctrine of *Illinois Brick*.

(Wildfang Decl. ¶ 107.) Although raising affirmative defenses in and of itself weighs in favor of settlement, the Court does not take a position on whether Defendants would be successful on

Mem. in Support of Mot. to Dismiss Second Consolidated Am. Class Action Complaint, Docket

Entry No. 1171); *see also Ayzelman v. Statewide Credit Servs. Corp.*, 242 F.R.D. 23, 27

(E.D.N.Y. 2007) (finding that the risk of establishing liability weighed in favor of settlement

approval where "defendants . . . presented several affirmative defenses through which they may

avoid liability.").

      In assessing the risks of further litigation, Charles B. Renfrew[32] has highlighted

Defendants' intention to exclude as inadmissible one of Plaintiffs' economic experts, warning

that:

> [i]f this testimony is excluded there may be little, if any, evidence to
> establish plaintiffs['] theory that they suffered injury or measurable
> damages as a result of the establishment of the default interchange
> rates and merchant acceptance rules, or that the establishment of
> definitive interchange rates and merchant acceptance rates had an
> anti-competitive effect in any marked degree to Class Plaintiffs.

(Decl. of Charles B. Renfrew as to the Risks of Litigation ("Renfrew Decl.") ¶¶ 33–34, Docket

Entry No. 2111-4.)  Renfrew raises other hurdles that the Class Plaintiffs would likely face,

including the effect that the Visa and Mastercard initial public offerings would have on their

theories of anticompetitive behavior.  (*Id.* ¶¶ 49–55); *see also Interchange Fees I*, 986 F. Supp.

2d at 226 (noting that after the commencement of the initial action, "both Visa and MasterCard

came out from under the control of their member banks.  The IPOs that accomplished that result

strengthened the defendants' argument that they were no longer structural or 'walking'

---

such defenses.  Instead, the Court simply acknowledges that the existence of affirmative defenses
presents risk to Class Plaintiffs.

    [32]  In support of the Original Settlement Agreement, Class Plaintiffs submitted a
declaration from former District Judge Charles B. Renfrew, assessing the risks of further
litigation.  (*See* Decl. of Charles B. Renfrew as to the Risks of Litigation ("Renfrew Decl."),
Docket Entry No. 2111-4.)

conspiracies, and thus that the setting of interchange fees cannot constitute horizontal price-fixing.").[33] Renfrew further notes the issue of whether the release from a prior settlement agreement covers the scope of the Class Plaintiffs' claims. (Renfrew Decl. ¶¶ 56–64). Although Renfrew does not assess the merits of Class Plaintiffs' or Defendants' arguments, and equally emphasizes that litigation risks exist for Defendants, his submission highlights that there is substantial litigation risk for Class Plaintiffs'.

Similarly, Dr. Alan O. Sykes, the independent economic expert appointed by Judge Gleeson for the purposes of assessing the Original Settlement Agreement, highlighted the litigation risks that Plaintiffs will likely face, concluding that Class Plaintiffs "face a substantial probability of securing little or no relief at the conclusion of trial." (Sykes Report 3.) In particular, Dr. Sykes found that the Class Plaintiffs would "face considerable difficulty" in establishing that certain practices such as default interchange and honor-all-card rules cause anticompetitive harm that outweighs any procompetitive benefits, if the "rule of reason" rather than the "*per se* rule" were ultimately applied to determine liability, which is yet another hurdle that Class Plaintiffs would face in litigating their case.[34] (*Id.* at 3, 7–8.) Class Plaintiffs dispute

---

[33] "[I]n 2008 and 2006, respectively, initial public offerings ('IPOs') converted [Visa and Mastercard] from a consortium of competitor banks into single-entity, publicly traded companies with no bank governance." *Interchange Fees I*, 986 F. Supp. 2d at 215.

[34] In weighing antitrust liability, courts apply either the rule of reason, or the *per se* rule in determining whether restraints of trade violate Section 1 of the Sherman Act. Under a rule of reason analysis, courts weigh whether the alleged anticompetitive harm outweighs the procompetitive benefits of the behavior at issue. *See Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 877 (2007) ("The rule distinguishes between restraints with anticompetitive effect that are harmful to the consumer and those with procompetitive effect that are in the consumer's best interest."); *see also Interchange Fees I*, 986 F. Supp. 2d at 227 (noting that in this action, "the prospect that [the networks' rules] anticompetitive effects remain outweighed by [their] procompetitive ones is real."). In contrast, some antitrust restraints are deemed *per se* unlawful. *See United States v. Apple, Inc.*, 791 F.3d 290, 314 (2d Cir. 2015) (noting that in contrast to "vertical" agreements, "'horizontal' agreements . . . which involve

the findings of Dr. Sykes' report, and the Court draws no conclusions based on his findings. However, Dr. Sykes' report and his conclusion that the putative class would "face considerable difficulty" indicates the risk Class Plaintiffs face in litigating these claims.

Further, since the prior motions were briefed and argued, several important legal and factual developments may increase the risk that Class Plaintiffs face in establishing liability. Of particular concern to Class Counsel is the Supreme Court's recent decision in *Ohio v. American Express Company*, --- U.S. ---, 138 S. Ct. 2274 (2018) ("*American Express*"). Class Counsel states that the case "represents the first time the Supreme Court has analyzed the conduct of a credit card network towards both its cardholders and merchants as a single so-called two-sided market, not as two separate markets (cardholders and merchants). For the first time, the Court applied a market analysis where changes on one side of the platform, say merchant fees, were analyzed for their impact on the other side of the platform, cardholder products." (Mem. in Supp. of Prelim. Approval 14.) Thus, Class Plaintiffs would need to prove harm in this new, two-sided market, consisting of both merchants and cardholders, and would perhaps face greater

---

coordination 'between competitors at the same level of [a] market structure,' . . . with limited exceptions, [are deemed] *per se* unlawful." (first citing and quoting *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 182 (2d Cir. 2012); and then citing *Leegin Creative Leather Prod., Inc.*, 551 U.S. at 893)). Although for the purposes of this opinion the Court need not make a finding as to whether the rule of reason or *per se* rule would apply in determining antitrust liability, the Court notes that Judge Gleeson found that "the setting of default interchange fees would almost certainly be evaluated under the Rule of Reason." *Interchange Fees I*, 986 F. Supp. 2d at 227. Similarly, in *Ohio v. Am. Express Co.*, both parties acknowledged, and the Supreme Court affirmed, that American Express' antisteering provisions constituted vertical restraints "i.e., restraints imposed by agreement between firms at different levels of distribution," that should be assessed under the rule of reason test. *Ohio v. Am. Express Co.* ("*American Express*"), 138 S. Ct. at 2284 (internal quotation marks and citations omitted); *see also Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 501 (1988) (noting that given the potential for "significant procompetitive benefits," standard-setting by private associations is typically evaluated under the rule of reason).

difficultly in proving that the procompetitive justifications of interchange fees outweigh their harm.[35] (*See, e.g.*, Sykes Report 18 ("an important body of theoretical work on two-sided markets suggests that it may be socially desirable for prices to be higher on the side of the market that is less price sensitive."); *id.* at 24 ("a question arises as to how damages should be conceptualized in a two-sided market")).)

In addition to the Supreme Court's *American Express* decision, other developments in the payment card markets may increase Class Plaintiffs' legal uncertainty and affect whether Class Plaintiffs will be able to prove ongoing antitrust claims and injuries. For example and as noted *supra* n.7, the Durbin Amendment to the Dodd-Frank Act passed in 2010, which creates a cap on interchange fees for debit card transactions and "other important relief, such as requiring issuing banks to enable debit cards to be processed over at least two competing networks, allowing merchants to provide discounts to consumers for payment by cash, check, or debit card, in lieu of credit cards, and allowing merchants to place a minimum purchase amount of up to $10.00 on credit-card transactions." (Wildfang Decl. ¶ 91.) Further, a 2008 United States Department of Justice investigation into the rules and conduct of Visa and Mastercard "led to a consent decree that provided another important benefit to merchants by reforming . . . Visa and MasterCard's point-of-sale rules." (*Id.* ¶ 98.) While the Court makes no finding as to how these issues could ultimately affect Class Plaintiffs' case, it finds that these developments introduce additional risks to Class Plaintiffs.

For these reasons, the Court finds that this subfactor will likely weigh in favor of granting final approval.

---

[35] The Court expressly does not draw any conclusion regarding how the Supreme Court's decision in *American Express* might impact Class Plaintiffs' claims if the case were to proceed to trial, and only acknowledges that the case affects the overall assessment of risk.

### (3)    The risks of establishing damages

"[T]he history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal."  *Wal-Mart Stores*, 396 F.3d at 118; *see also In re Sumitomo Copper Litig.*, 189 F.R.D. at 283 ("Even outside of the particularly risky proof of damages in commodity price manipulation cases, the history of litigation is replete with cases in which plaintiffs succeeded at trial on liability, but recovered no damages, or only disappointing damages, at trial, or on appeal." (citing cases)).

As Judge Gleeson noted in his final approval decision, "[e]ven if liability is established, Class Plaintiffs would still face the problems and complexities inherent in proving damages to the jury . . . . These damages-related issues may not be insurmountable, but they are formidable." *Interchange Fees I*, 986 F. Supp. 2d at 229.  The parties previously submitted competing expert reports on damages, and at a trial, damages would likely be heavily contested.  Dr. Sykes concluded that "plaintiffs face considerable difficulty in proving their damages . . . ," (Sykes Report 3), and that the approaches they used would be "subject to substantial challenges," (*id.* at 23–25).  In assessing the risks of proving damages, former Judge Renfrew also predicted that "[i]t will be a battle of experts . . . ."  (Renfrew Decl. ¶ 33.)  He noted that "Defendants have moved to exclude as inadmissible, the opinion of plaintiffs' economic expert, Dr. Alan S. Frankel regarding . . . injury and damages attributed to the challenged conduct of defendants . . . . Dr. Frankel's testimony is highly supportive of Class Plaintiffs' theory and is some of the strongest evidence that they have as to essential elements of their antitrust claims." [36]  (*Id.*)

---

[36]  The Court notes that the Supreme Court's recent decision in *American Express*, 138 S. Ct. 2274, may increase the difficulty Class Plaintiffs face in proving damages.

Based on the opinions of multiple experts, there will be risks associated with establishing damages in this case. The Court finds that this subfactor will likely weigh in favor of granting final approval.

### (4) The risks of maintaining the class through the trial

Although the "risk of maintaining a class through trial is present in [every] class action," *see Guippone v. BH S&B Holdings LLC*, No. 09-CV-1029, 2016 WL 5811888, at *7 (S.D.N.Y. Sept. 23, 2016) (citation omitted), "this factor [nevertheless] weighs in favor of settlement" where "it is likely that defendants would oppose class certification" if the case were to be litigated, *Garland v. Cohen & Krassner*, No. 08-CV-4626, 2011 WL 6010211, at *8 (E.D.N.Y. Nov. 29, 2011) (citation omitted); *see also In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 909 F. Supp. 2d 259, 268–69 (S.D.N.Y. 2012) ("The risk that Defendants could in fact succeed in their efforts to decertify the class militates in favor of settlement approval.").

Class Plaintiffs previously moved for class certification over Defendants' objection, but the Court never ruled on the motion, instead approving the Original Settlement Agreement. If the case were to proceed to trial, Defendants could — and likely would — move for decertification of any class that the Court might ultimately certify. *See* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment."); (Superseding Settlement Agreement ¶ 4 ("Defendants will not oppose, the Court's certification of a settlement class, for settlement purposes *only*" (emphasis added)); Superseding Settlement Agreement ¶ 64(e) (noting that in the event of termination, "Defendants shall revert to their position before the execution of the . . . [Superseding Settlement Agreement], including with respect to the appropriateness of class certification.").) Although Class Counsel has provided enough information for the Court to determine that it will likely be able to certify

the class at the final approval stage for settlement purposes, there is no guarantee that the class could be certified if the parties proceeded with the litigation, and Defendants have indicated that they are only consenting to class certification for the purposes of settlement. *See, e.g.*, *Reade-Alvarez v. Eltman, Eltman, & Cooper, P.C.*, No. 04-CV-2195, 2006 WL 3681138, at *6 (E.D.N.Y. Dec. 11, 2006) ("The parties stipulated to class certification for settlement purposes only. If the class action were litigated, however, it is likely that defendants would oppose certification." (citation omitted)); *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 476–77 (S.D.N.Y. 1998) (noting that "there is no guarantee that this class would not be decertified before or during trial" and stating that "if the Class were to be decertified at trial, or if class certification were to be reversed on appeal, the class members (other than a few dozen plaintiffs) would recover nothing at all").

For these reasons, the Court finds that this subfactor will likely weigh in favor of granting final approval.

## B.    Effectiveness of distributing relief to the class

This factor requires courts to look at "the method of processing class-member claims." Fed. R. Civ. P. 23(e)(2)(C)(ii). "A claims processing method should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding." Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment. The method used in the present action is set forth primarily in the Plan of Administration and Distribution. (Plan of Administration and Distribution.)

"To warrant approval, the plan of allocation must also meet the standards by which the settlement was scrutinized — namely, it must be fair and adequate . . . . An allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and

competent class counsel." *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 344 (S.D.N.Y. 2005) (internal citations and quotation marks omitted). "[N]umerous courts have held . . . [that] a plan of allocation need not be perfect." *In re EVCI Career Colleges Holding Corp. Sec. Litig.*, No. 05-CV-10240, 2007 WL 2230177, at *11 (S.D.N.Y. July 27, 2007) (collecting cases).

Class Counsel, who are experienced and competent in complex class actions, prepared the Plan of Administration and Distribution. Under its terms, the Class Administrator will estimate the interchange fees paid by each claimant during the class period, and each claimant will receive a *pro rata* share of the settlement fund based on its interchange fees paid. (Plan of Administration and Distribution I-2.) Claimants will have the opportunity to "contest the accuracy of the statement or estimates" made by the Class Administrator. (*See id.* at I-7, 8, 13.) If the Court grants final approval, and once claims are estimated, the Class Administrator will disseminate a claim form. (*Id.* at I-10.) According to Class Counsel, the majority of the claim form can be "pre-populated" with data provided by Visa and potentially other Defendants. (Mem. in Supp. of Prelim. Approval 40.) Once a claim form is received, the Class Administrator will commence its audit, and "[c]laimants whose claims are denied, or who disagree with the final calculation of their claims, may challenge such denials or final calculations in writing, together with supporting documentation, mailed or emailed to the Class Administrator within thirty days after receipt of the notice of the denial or final calculation . . . ." (*See* Plan of Administration and Distribution I-13.) A website containing relevant documents and forms in multiple languages, and telephone support will be available to "obtain information and request documents related to the claims process." (*See id.* at I-13, 14.)

The Court finds that at this stage, the Plan of Administration and Distribution appears to be an effective form of relief distribution, and that this factor will likely weigh in favor of

granting final approval. *See In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 519 (E.D.N.Y. 2003) (approving allocation plan where "Class members will receive an award of money from the [settlement funds] directly proportional to their debit and credit purchase volume (as well as online debit transactions) during the Class period"); *Shapiro v. JPMorgan Chase & Co.*, No. 11-CV-7961, 2014 WL 1224666, at *13 (S.D.N.Y. Mar. 24, 2014) (approving an allocation plan where the settlement amount, less administration costs, would be distributed on a *pro rata* basis of net losses); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 475 (S.D.N.Y. 2009) (same).

### C.   The terms of any proposed award of attorneys' fees

Class Counsel "intend to apply for an Attorneys' Fee Award in a reasonable amount not to exceed ten percent (10%) of the Total Cash Consideration and for Expense Awards comprising all reasonable expenses and costs incurred not to exceed $40 million." (Superseding Settlement Agreement ¶ 57.)

"Courts may award attorneys' fees in common fund cases under either the 'lodestar' method or the 'percentage of the fund' method." *Wal-Mart Stores*, 396 F.3d at 121 (citing *Goldberger*, 209 F.3d 43). However, "[t]he trend in this Circuit is toward the percentage method, which 'directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation.'" *Id.* (internal citation omitted) (quoting *In re Lloyd's Am. Trust Fund Litig.*, No. 96-CV-1262, 2002 WL 31663577, at *25 (S.D.N.Y. Nov. 26, 2002). Although the percentage method is an appropriate method by which to award attorneys' fees, the lodestar method "remains useful as a baseline even if the percentage method is eventually chosen." *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000).

In cases with large settlement awards, courts have noted that smaller percentage awards of attorneys' fees are reasonable. *See, e.g.*, *Wal-Mart Stores*, 396 F.3d at 106, 123 (upholding a district court's award of $220,290,160.44, which amounted to 6.5 percent of a $3.05 billion settlement fund, or a 3.5 multiplier of the lodestar amount, and noting that "the sheer size of the instant fund makes a smaller percentage appropriate"); *see also Goldberger*, 209 F.3d at 52–53 (holding that a percentage fee award of roughly four percent did not constitute an abuse of discretion, reasoning that "empirical analyses demonstrate that in cases like this one, with recoveries of between $50 and $75 million, courts have traditionally accounted for these economies of scale by awarding fees in the lower range of about 11% to 19%" (citations omitted)); Ann. Manual for Complex Litigation (Fourth) § 14.121 (2018) (noting that in "mega-cases" such as this, where "large settlements or awards serve as the basis for calculating a percentage, courts have often found considerably lower percentages of recovery to be appropriate." (citing *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 339–40 (3d Cir. 1998)).

The proposal by Class Counsel to seek up to ten percent of any settlement is comparable to the percentage of attorneys' fees previously awarded by Judge Gleeson in this action.[37] *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d at 439–40

---

[37] Judge Gleeson based his award in part on the "enormous" risk that Class Counsel undertook in bringing the litigation. *In re Payment Card Interchange Fee*, 991 F. Supp. 2d at 441. He also found the injunctive relief that accompanied the monetary fund to weigh in favor of a larger attorney fee award because "the settlement constitutes a significant step toward remedying the merchants' complaints about interchange rates in Visa and MasterCard credit card transactions . . . . [and because] the merchants' newly acquitted ability to surcharge the use of credit cards at the product level has great value." *Id.*; *id.* at 442 ("When the rules changes are combined with the massive damages fund, the settlement must be labeled a significant success."). He determined that a lodestar multiplier of 3.41, for a lodestar amount of approximately $160 million, was reasonable. *Id.* at 447–48.

(granting a $544.8 award of attorneys' fees and a $27,037,716.97 request for expenses where the settlement fund after reductions for opt outs amounted to approximately $5.7 billion).[38]  The Court is aware that Rule 23(b)(3) Class Counsel have expended enormous time and effort in litigating this action and should be rewarded for those efforts.[39]

Accordingly, the Court finds that this subfactor does not weigh against preliminary approval.  The Court will engage in a full analysis at the final approval stage or thereafter, taking into consideration the "mega-case" nature of the suit, as well as the six *Goldberger* factors.[40]

### D. Release from liability

"The law is well established in this Circuit and others that class action releases may include claims not presented and even those which could not have been presented as long as the

---

[38]  While Class Counsel's representation that they will seek "up to ten percent" of the fund for attorneys' fees is not unreasonable, the Court notes that case law suggests that larger settlements warrant lower percentages of attorneys' fee awards.  Because "up to ten percent" suggests that the amount Class Counsels will seek could vary from one through ten percent, this factor does not weigh against granting preliminary approval of the settlement.

[39]  Although on appeal the Second Circuit noted that "Class [C]ounsel stood to gain enormously if they got the deal done," *Interchange Fees II*, 827 F.3d at 234, the Court was concerned with Class Counsel's lack of financial motivation to achieve greater gains for the (b)(2) class because "counsel got more money for each additional dollar they secured for the (b)(3) class." *Id.*  Such a conflict no longer exists, and Class Counsel's sole duty in negotiating the current settlement is to maximize recovery for the (b)(3) class.

[40]  Courts in the Second Circuit apply the six *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000) factors in determining whether a fee is reasonable in common fund cases: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation . . . ; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *Id.* at 50 (citation and quotation marks omitted).  The Court also notes that it will not necessarily adopt the graduated schedule that Judge Gleeson developed to calculate the previous attorney fee award. *See In re Payment Card Interchange Fee*, 991 F. Supp. 2d at 445.

released conduct arises out of the 'identical factual predicate' as the settled conduct."[41] *Wal-Mart Stores*, 396 F.3d at 107 (citing *TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982)); *see also TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d at 460 (setting forth the "identical factual predicate" standard and noting that the Court had "previously 'assume(d) that a settlement could properly be framed so as to prevent class members from subsequently asserting claims relying on a legal theory different from that relied upon in the class action complaint but depending upon the very same set of facts.'" (alteration in original) (quoting *National Super Spuds, Inc. v. New York Mercantile Exchange*, 660 F.2d 9, 18 n.7 (2d Cir. 1981)).

"Broad class action settlements are common, since defendants and their cohorts would otherwise face nearly limitless liability from related lawsuits in jurisdictions throughout the country." *Wal-Mart Stores*, 396 F.3d at 106. However, releases cannot be boundless; "'[p]laintiffs in a class action may release claims that were or could have been pled in exchange for settlement relief' . . . [but] this authority 'is limited by the "identical factual predicate" and "adequacy of representation" doctrines.'" *Interchange Fees II*, 827 F.3d at 236–37 (quoting *Wal-Mart Stores*, 396 F.3d at 106). Courts have denied preliminary approval where releases from liability are deemed to be overly broad. *See, e.g.*, *Oladapo*, 2017 WL 5956907, at *15 (taking issue with the release for using the phrase "similar conduct" and finding it unacceptable that "the proposed release would extend to all claims that arise out of or relate to 'the conduct alleged in the Complaints or similar conduct.'" (quoting the release)); *Karvaly v. eBay, Inc.*, 245 F.R.D. 71, 88 (E.D.N.Y. 2007) (expressing dismay that "[a]s written, the release would

---

[41] Although this is not an official Rule 23(e)(2) or *Grinnell* factor, analysis of the release provision of the Superseding Settlement Agreement will assist in determining whether relief is adequate for the class. The Court also separately discusses the release provision because of the concerns raised by the Second Circuit in its decision to vacate the prior settlement approval.

constitute a waiver of claims completely unrelated to this action that could be brought under any of the statutes or common-law theories that are alleged in the Second Amended Complaint.").

In vacating the prior settlement approval, the Second Circuit expressed concern over the Original Settlement Agreement's broad release provisions, noting that Class Plaintiffs' authority to "'release claims that were or could have been pled in exchange for settlement relief' . . . 'is limited by the "identical factual predicate" and "adequacy of representation" doctrines.'" *Interchange Fees II*, 827 F.3d at 236–37 (quoting *Wal-Mart Stores*, 396 F.3d at 106).

### (1) The releases in the Original Settlement Agreement

In the Original Settlement Agreement negotiated on behalf of both the (b)(2) and (b)(3) classes, the parties negotiated a separate release for each class. (*See* Original Settlement Agreement ¶¶ 31–38, 66–74.) Both releases required the classes to "expressly and irrevocably waive, and fully, finally, and forever settle, discharge and release [Defendants] from any and all manner of claims, demands, actions, suits and causes of action, whether individual, class, representative, parens patriae, or otherwise in nature . . . ." (*Id.* ¶¶ 33, 68.) The (b)(2) class released "relief relating to the period after the date of the Court's entry of the Class Settlement Preliminary Approval Order," (*id.* ¶ 68), while the (b)(3) class released relief "which could have been alleged from the beginning of time until the date of the Court's" preliminary approval, (*id.* ¶ 33).

The Rule 23(b)(3) class as defined in the Original Settlement Agreement consisted of persons, businesses and other entities that had accepted Visa- and/or Mastercard-branded Cards at any point between January 1, 2004 and the settlement preliminary approval date. (Original Settlement Agreement ¶ 2(a).) Thus, the Rule 23(b)(3) class was comprised of a finite class of merchants already in existence. In addition, pursuant to Fed. R. Civ. P. 23(c)(2)(b)(vi), members

of the Rule 23(b)(3) class had an opportunity to exclude themselves from the class, or opt out, while class members certified under Rule 23(b)(2) were offered no such relief.

The Second Circuit found the releases to be evidence of inadequate representation, determining that that holders of present claims such as the (b)(3) class, and holders of future claims such as the (b)(2) class, could not be jointly represented. *See Interchange Fees II*, 827 F.3d at 231; *id.* at 236–37 ("the bargain that was struck between relief and release on behalf of absent class members is so unreasonable that it evidences inadequate representation.").

Ultimately, the Second Circuit was primarily concerned about the release with respect to the (b)(2) class, and not the (b)(3) class. As discussed in Sections I.b and II.a.iii.3.D, *supra*, the Court was concerned that the (b)(3) class benefitted from the Original Settlement Agreement at the expense of the (b)(2) class. *See, e.g.*, *id.* at 240 (Leval, J., concurring) (taking issue with the terms of the settlement because "one class of Plaintiffs accepts substantial payments . . . in return for which they compel Plaintiffs in another class, who receive no part of the Defendants' payments, to give up forever their potentially valid claims, without ever having an opportunity to reject the settlement by opting out of the class"). The Second Circuit expressed concern that the "[m]erchants in the (b)(2) class that accept American Express or operate in states that prohibit surcharging gain no appreciable benefit from the settlement, and merchants that begin business after July 20, 2021 gain no benefit at all."[42] *Id.* at 238. The (b)(2) class release effectively meant that merchants that came into existence after the preliminary settlement approval date would be barred by the release from ever bringing certain claims, without having been a part of the process, and the Second Circuit expressed concern that some of the (b)(2) merchants "actually

---

[42] The Original Settlement Agreement provided "that all of the injunctive relief will terminate on July 20, 2021." *Interchange Fees II*, 827 F.3d at 230.

received nothing" for the release of their claims. *Id.* The Court compared the release before it to

the *res judicata* issues presented in *Stephenson v. Dow Chemical Company*, 273 F.3d 249 (2d

Cir. 2001), *aff'd in part, vacated in part*, 539 U.S. 111 (2003), which involved a class action

settlement fund that provided compensation for persons injured by Agent Orange, who

discovered their injury prior to 1994. The panel in *Stephenson* held that the two individual

plaintiffs had not been adequately represented because the settlement extinguished their claims

without affording them access to recovery, simply because they discovered their injury after

1994. *Id.* ("Because the prior litigation purported to settle all future claims, but only provided

for recovery for those whose death or disability was discovered prior to 1994, the conflict . . .

[with] the class representatives becomes apparent. No provision was made for post-1994

claimants, and the settlement fund was permitted to terminate in 1994."); *see also Interchange*

*Fees II*, 827 F.3d at 238 (analyzing *Stephenson* and noting that "[t]he two challengers could not

have been adequately represented if their class representative negotiated a settlement and release

that extinguished their claims without affording them any recovery.").

### (2) The release in the Superseding Settlement Agreement

The release from liability in the Superseding Settlement Agreement Release and

Covenant Not to Sue ("Release Provision") reads in pertinent part:

> The Rule 23(b)(3) Settlement Class Releasing Parties hereby
> expressly and irrevocably waive, and fully, finally, and forever
> settle, discharge, and release the Rule 23(b)(3) Settlement Class
> Released Parties from, any and all manner of claims, demands,
> actions, suits, and causes of action, whether individual, class,
> representative, parens patriae, or otherwise in nature, for damages,
> restitution, disgorgement, interest, costs, expenses, attorneys' fees,
> fines, civil or other penalties, or other payment of money, or for
> injunctive, declaratory, or other equitable relief, whenever incurred,
> whether directly, indirectly, derivatively, or otherwise, whether
> known or unknown, suspected or unsuspected, in law or in equity,

that any Rule 23(b)(3) Settlement Class Releasing Party ever had, now has, or hereafter can, shall, or may have and that have accrued as of the Settlement Preliminary Approval Date or accrue no later than five years after the Settlement Final Date arising out of or relating to any conduct, acts, transactions, events, occurrences, statements, omissions, or failures to act of any Rule 23(b)(3) Settlement Class Released Party that are or have been alleged or otherwise raised in the Action, or that could have been alleged or raised in the Action relating to the subject matter thereof, or arising out of or relating to a continuation or continuing effect of any such conduct, acts, transactions, events, occurrences, statements, omissions, or failures to act. For avoidance of doubt, this release shall extend to, but only to, the fullest extent permitted by federal law.

(Superseding Settlement Agreement ¶ 31(a).)

The Release Provision broadly releases claims arising out of certain rules challenged in the litigation and other rules that are substantially similar. It specifies that the (b)(3) class members agree to release "any claims arising out of or relating to" the allegations of the (b)(3) class including "any interchange fees, interchange rates, or any Rule of any Visa Defendant or MasterCard Defendant relating to interchange fees," (*id.* ¶ 31(b)(i)), "any . . . 'honor all cards' rules . . . [or] rules or conduct relating to routing options regarding acceptance technology for mobile, e-commerce, or online payments, or development and implementation of tokenization standards," (*id.* ¶ 31(b)(iii).) It further specifies that reference to these rules "mean those rules as they are or were in place on or before the Settlement Preliminary Approval Date and rules in place thereafter that are *substantially similar* . . . ." (*Id.* ¶ 31(c) (emphasis added).)

In addition, although the Release Provision releases class members' ability to seek injunctive relief generally, it does not release a Rule 23(b)(3) class member's participation in the (b)(2) injunctive action, "solely as to injunctive relief claims alleged" in that action. (*Id.*

¶ 34(a).) [43]  Specifically, the Release Provision does not release:

> A Rule 23(b)(3) [class member's] continued participation, as a named representative or non-representative class member, in *Barry's Cut Rate Stores, Inc., et al. v. Visa, Inc., et al.*, MDL No. 1720 Docket No. 05-md-01720-MKB-JO ("*Barry's*"), solely as to injunctive relief claims alleged in *Barry's*.  As to all such claims for injunctive relief in *Barry's*, the Rule 23(b)(3) [class members] retain all rights pursuant to Rule 23 of the Federal Rules of Civil Procedure which they have as a named representative plaintiff or absent class member in *Barry's* except the right to initiate a new separate action before five years after the Settlement Final Date. Nothing in this Paragraph shall be read to enlarge, restrict, conflict with, or affect the terms of any release or judgment to which any Rule 23(b)(3) Settlement Class Releasing Party may become bound in *Barry's*, and nothing in the release in Paragraphs 29–33 above shall be interpreted to enlarge, restrict, conflict with, or affect the request for injunctive relief that the plaintiffs in *Barry's* may seek or obtain in *Barry's*.

(*Id.*)

As in the release for the (b)(3) class under the Original Settlement Agreement, the

Superseding Settlement Agreement's Release Provision applies only to merchants who accepted

Visa-branded cards or Mastercard-branded cards between January 1, 2004 and the January 24,

---

[43]  Although (b)(2) Class Counsel originally expressed concern regarding the scope of "injunctive relief claims" that are preserved under the Superseding Settlement Agreement, (*see* Letter re Language in Settlement Agreement), following the parties' adjustments to the proposed preliminary approval order and the Class Notices, which further explain the extent to which such claims are preserved, (b)(2) Class Counsel subsequently informed the Court that it "would not be filing an objection to the proposed [Superseding Settlement Agreement.]"  (Letter dated Jan. 18, 2019.)  The Class Notices now expressly state that with respect to the (b)(2) injunctive relief action, the Release Provision in the Superseding Settlement Agreement does not release "injunctive relief claims," nor does it release "the declaratory relief claims that are a predicate for the injunctive relief claims."  (Revised Class Notices G1-4, G2-11; Prelim. Approval Order ¶ 31.)  Injunctive relief claims are claims that are understood "to prohibit or require certain conduct."  (*Id.* at G1-4, G1-5, G2-11; Prelim. Approval Order ¶ 31.)  The Class Notices further explain that claims for injunctive relief do "not include claims for payment of money, such as damages, restitution, or disgorgement."  (Revised Class Notices G1-4, G1-5, G2-11; *see also* Prelim. Approval Order ¶ 31.)  The Court approves and adopts this understanding of "injunctive relief claims."

2019 Settlement Preliminary Approval Date. (*See* Superseding Settlement Agreement ¶ 4.) It is consistent with the release deemed acceptable in *Wal-Mart Stores*, because the "injured parties may obtain remuneration from the settlement fund if they accepted Visa or MasterCard within a finite period . . . ." *Wal-Mart Stores*, 396 F.3d at 110.

However, unlike the (b)(3) release in the Original Settlement Agreement, which "fully, finally, and forever settle[d], discharge[d] and release[d]" the Defendants from claims, (Original Settlement Agreement ¶ 33), the Release Provision of the Superseding Settlement Agreement "is limited in duration" and only bars "claims that have accrued within five years following the Court's approval of the settlement and the exhaustion of all appeals." (Mem. in Supp. of Prelim. Approval 23; *see also* Superseding Settlement Agreement ¶ 31(a).)

### (3) Analysis of the new release

The Court understands the Release Provision to mean that, apart from any injunctive relief claims that are raised in the Rule 23(b)(2) injunctive relief action, and unless individual members choose to opt out, the Rule 23(b)(3) class members release certain rights that have already accrued or that will accrue up to five years after all appeals have been resolved in this action, that are based on rules that are the same or "substantially similar" to the rules in place on January 24, 2019, the date of preliminary approval. At the hearing, the Court clarified its understanding as to what was being released, and asked the parties to include such clarifying language in the Class Notices. (*See* Hr'g Tr. 18:7–19:6, 23:8–24:13.)

As agreed to at the hearing, on January 15, 2019, the parties submitted revised Class Notices to the Court, which clarify the terms of the Release Provision. (Revised Class Notices.) According to these revised Class Notices, the Release Provision bars:

> Claims based on conduct and rules that were alleged or raised in the litigation, or that could have been alleged or raised in the litigation

relating to its subject matter. This includes any claims based on interchange fees, network fees, merchant discount fees, no-surcharge rules, no-discounting rules, honor-all-cards rules, and certain other conduct and rules. These claims are released if they already have accrued or accrue in the future up to five years following the court's approval of the settlement and the resolution of all appeals.

(*Id.* at G1-3, G1-4, G2-10.) The Release Provision further bars:

Claims based on rules in the future that are substantially similar to – i.e., do not change substantively the nature of – the above-mentioned rules as they existed as of preliminary approval of the settlement. These claims based on future substantially similar rules are released if they accrue up to five years following the court's approval of the settlement and the resolution of all appeals.[44]

(*Id.* at G1-4, G2-10.)

At the hearing, the parties also clarified that the Release Provision as written is meant to comport with the Second Circuit's "identical factual predicate" test, despite using different language. (*See* Hr'g Tr. 20:19–24:6.) Paragraph 31(a) of the Release Provision states that the "release shall extend to, but only to, the fullest extent permitted by federal law." (Superseding Settlement Agreement ¶ 31(a).) In addition, paragraph 34(c) of the Release Provision states that "references to rules identified in [the Release Provision] mean those rules as they are or were in place on or before the Settlement Preliminary Approval Date and rules in place thereafter that are *substantially similar*."[45] (*Id.* ¶ 34(c).) The parties have expressed that while the language is

---

[44]   The parties also adjusted the Class Notices to clarify that the Release Provision does *not* extinguish, among other things: "[c]laims based on conduct or rules that could not have been alleged or raised in the litigation;" "[c]laims based on future rules that are not substantially similar to rules that were or could have been alleged or raised in the litigation;" and/or "claims that accrue more than five years after the court's approval of the settlement and the resolution of any appeals." (*See* Class Notices G1-4, G2-10.)

[45]   Some courts have expressed concern that the term "similar" when used in releases is broader than the Second Circuit's identical factual predicate test. *See Oladapo*, 2017 WL 5956907, at *6 (expressing concern that the settlement agreement "released not only claims

58

different, the Release Provision should not be read to release any rules or conduct not based on an identical factual predicate. (*See* Defs. Letter to the Court dated Dec. 4, 2018, 1, Docket Entry No. 7314; *see also* Class Counsel's Letter to the Court dated Dec. 5, 2018, 3, Docket Entry No. 7316 ("the reference to 'federal law' in Paragraph 31(a), incorporates the Identical Factual Predicate doctrine. The parties chose to refer to 'federal law' rather than the Identical Factual Predicate doctrine, however, because some courts use different language to describe the scope of the law."); Revised Class Notices G1-4, G2-10 (noting that the Superseding Settlement Agreement's "resolution and release of these claims is intended to be consistent with and no broader than federal law on the identical factual predicate doctrine.").)

As to the "substantially similar" language, Rule 23(b)(3) Class Counsel has clarified to the Court that the parties included this phrase to ensure that Defendants are protected from suit in the event of a minor change such as a "word" or "punctuation," but further clarified that a substantive change to a rule could perhaps be challenged under the identical factual predicate test to allows for claims to be brought that are based on the substantive change. (*See* Hr'g Tr. 26:24– 28:19.)

Having clarified the parties' intent with regard to the language in the Release Provision, the Court is satisfied that the terms of the release comport with the Second Circuit's standards. To ensure that putative class members understand what rights they are releasing, the parties have included language in the Class Notices to clarify the scope of the Release Provision and to clarify that it comports with the identical factual predicate test. (Revised Class Notices G1-3, G1-4, G2-

---

arising out of conduct alleged in the Complaint, but also claims arising out of any 'similar' conduct"). Dr. Sykes, the court-appointed expert, also expressed concern that the inclusion of the phrase "'substantially similar' conduct or rules raises a danger of adverse, unintended consequences in a technologically dynamic industry." (*See* Sykes Report 49–51.)

10; *see also* Hr'g Tr. 23:8–24:17, 26:13–26:16, 28:9–28:11.)

Because the terms of the Release Provision comport with the Second Circuit's identical factual predicate test, and does not implicate the issues that the Second Circuit raised in relation to the (b)(2) release in the Original Settlement Agreement, the Court will likely find that the Release Provision as written, in conjunction with the clarifying information in the Class Notices, permits a finding that the Superseding Settlement Agreement is fair, reasonable, and adequate at the final approval stage.

### 4. Equitable treatment of class members relative to one another

Consideration under this Rule 23(e)(2) factor "could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief." Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment.

For the reasons set forth in Section II.a.iii.3.B, *supra*, the Court finds that the *pro rata* distribution scheme is sufficiently equitable. *See also Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 667 (S.D.N.Y. 2015) (finding that a *pro rata* allocation plan "appear[ed] to treat the class members equitably . . . and has the benefit of simplicity"). Further, the scope of the release applies uniformly to putative class members, and does not appear to affect the apportionment of the relief to class members, apart from securing the opportunity to participate in the (b)(2) action. Accordingly, the Court finds that this factor will likely weigh in favor of granting final approval.

### 5. The ability of Defendants to withstand a greater judgment

Undoubtedly, Defendants can withstand a greater judgment. Defendants have agreed to pay a maximum settlement award of $6.26 billion. (Memo. in Support of Mot. for Prelim.

Approval 1.)  Although the agreed upon payment is objectively a large sum of money, it is less

so when viewed in perspective.  By 2005, "interchange fee revenue paid by merchants to Visa

and Mastercard card-issuing banks had risen to over $30 billion per year."  (Wildfang Decl.

¶ 13.)  In under one decade, one retailer alone — Wal-Mart Stores, Inc. — "paid approximately

$5.6 billion in interchange fees for payment card transactions on the Visa and MasterCard

networks."  (Wal-Mart's Obj. to the Proposed Settlement, Docket Entry No. 2644.)  Defendants

do not dispute that they could withstand a greater judgment.

Although the Court finds that this factor weighs against a grant of final approval, it does

not necessarily preclude a finding that the settlement is fair.  *See Charron v. Pinnacle Grp. N.Y.

LLC*, 874 F. Supp. 2d 179, 201 (S.D.N.Y. 2012) ("A defendant['s] ability to withstand a greater

judgment, standing alone, does not suggest that the settlement is unfair." (citation and internal

quotation marks omitted) (alteration in original)).

### 6. The range of reasonableness of the settlement in light of the best possible recovery and all the attendant risks of litigation

The range of reasonableness of the settlement in light of the best possible recovery, and

the range of reasonableness of the settlement fund to a possible recovery in light of all the

attendant risks of litigation, are two *Grinnell* factors that are often combined for the purposes of

analysis.  *See, e.g.*, *Interchange Fees I*, 986 F. Supp. 2d at 229–230; *Godson v. Eltman, Eltman,*

*& Cooper, P.C.*, 2018 WL 5263071, at *12–13; *Ferrick v. Spotify USA Inc.*, No. 16-CV-8412,

2018 WL 2324076, at *5–6 (S.D.N.Y. May 22, 2018).

"In considering the reasonableness of the settlement fund, a court must compare "'the

terms of the compromise with the likely rewards of litigation.'"  *Godson*, 2018 WL 5263071, at

*12 (quoting *In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 384 (S.D.N.Y. 2013) (citation

omitted)).  "In order to calculate the 'best possible' recovery, the Court must assume complete

victory on both liability and damages as to all class members on every claim asserted against each defendant in the Action." *Teachers' Ret. Sys. of Louisiana v. A.C.L.N., Ltd.*, No. 01-CV-11814, 2004 WL 1087261, at *5 (S.D.N.Y. May 14, 2004). The range of reasonableness is "a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Wal-Mart Stores*, 396 F.3d at 119 (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)).

The monetary settlement award could be as much as $6.26 billion, but will be no less than approximately $5.56 billion after the opt-out reductions, which the parties represent is "the largest ever class settlement fund in an antitrust action." (*See* Mem. in Supp. of Prelim. Approval at 1, 7; *id.* at 1 n.1.) A large settlement figure, however, does not mandate a finding that the award falls within a range of reasonableness. The Court notes that the entire amount of the settlement award will not be distributed to claimants, as attorneys' fee awards, taxes, class exclusion takedown payments, and administrative fees — rising to hundreds of millions of dollars — will be deducted from the maximum settlement fund figure. (*See* Superseding Settlement Agreement ¶¶ 19–25, 27.)

The Court looks to information in the record to estimate what the best possible recovery might be in this case.[46] Assuming Class Plaintiffs can establish liability and recover damages,

---

[46] Class Counsel should use their best efforts to provide the best possible recovery estimate when seeking final approval of the settlement. The Court recognizes, however, that it may be a difficult figure to generate, and, ultimately, this information, while helpful in assessing this factor, is not absolutely necessary. *See, e.g., In re Facebook, Inc., IPO Sec. and Derivative Litig.*, No. 12-MD-2389, 2018 WL 6168013, at *13 (S.D.N.Y. Nov. 26, 2018) (finding that although "particularized evidence ha[d] not been adduced to support a 'best possible' judgment, the agreed-upon figure [was] reasonable in light of the substantial risks to recovery."); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11-CV-5450, 2018 WL 3677875, at *8 (S.D.N.Y. Aug. 1, 2018) (finding in a complex antitrust conspiracy action that calculation of recoverable damages was "particularly complex" and therefore concluding "that an assessment of the 'best possible recovery' would be of little value in assessing the substantive fairness of the

based on the expert reports exchanged in 2009 and 2010, the parties presented competing figures for what the best possible recovery would be.  From 2004 to 2008 alone, for example, Class Plaintiffs' claim that they can attribute over $100 billion in damages to Defendants' unlawful conduct.  (*See* Mot. in Supp. of Prelim. Approval 18–19.)  For the same period, Defendants contend that they would be responsible for no more than $661 million in damages.  (*Id.* at 18.)  When analyzing the terms of the Original Settlement Agreement, Judge Gleeson found that the figure agreed to, $7.25 billion, "represent[ed] approximately 2.5% of total interchange fees paid by class members during the class period, and thus 2.5% of the largest possible estimate of actual damage to merchants."  *Interchange Fees I*, 986 F. Supp. 2d at 229.  Despite the $7.25 billion figure, objectors argued that the amount represented "only a few months of interchange fee collections" when divided among the millions of merchants that could claim damages.  (*See* Sykes Report 47 (noting that such a statement "appear[s] to be correct").)  The same is true of the settlement currently before the Court.

However, "the fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved."  *Grinnell,* 495 F.2d at 455.  "There is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery."  *Id.* at 455 n.2; *see also Morris v. Affinity Health Plan, Inc.*, 859 F. Supp. 2d 611, 621 (S.D.N.Y. 2012) ("It is well-settled that a case settlement amounting to only a fraction of the potential recovery will not *per se* render the

settlement."); *see also Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 186 (W.D.N.Y. 2005) ("'The determination whether a settlement is reasonable does not involve the use of a 'mathematical equation yielding a particularized sum.'" (quoting *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. at 178)).

settlement inadequate or unfair."); *Davis v. J.P. Morgan Chase & Co.*, 827 F. Supp. 2d 172, 178 (W.D.N.Y. 2011) ("[I]t is more important to assess the judgment in light of plaintiffs' claims and the other factors.").

Although the Superseding Settlement Agreement only provides for $6.5 billion, which may be only several months of interchange fees, the Court finds that this settlement figure falls within a range of reasonableness for the following reasons.

First, the Court finds it pertinent that the Second Circuit did not take issue with the monetary relief secured for the (b)(3) class in the Original Settlement Agreement. *See Interchange Fees II*, 827 F.3d at 240 (expressing concern that the (b)(2) class would be forced to give up claims forever with no opportunity to opt out, while "one class of Plaintiffs accepts substantial payments from the Defendants" (Leval, J., concurring)).

Second, the Court notes that while the members of the Rule 23(b)(3) class are required to release certain rights to claims in return for damages, putative members of the (b)(3) class can opt out at will and pursue their own actions. In addition, those members of the (b)(3) class that are also members of the Rule 23(b)(2) injunctive relief class action are not prohibited from participating in that action to secure injunctive relief. (*See* Superseding Settlement Agreement ¶ 34(a).) Thus, the Superseding Settlement Agreement does not prohibit recovery of additional structural relief in the future.

Third, since the commencement of this lawsuit in 2005, several forms of injunctive relief related to the Rule 23(b)(3) Class Plaintiffs' claims have been secured. Although this injunctive relief does not constitute consideration for the purposes of settling the Rule 23(b)(3) Class Plaintiffs' claims, the value of such injunctive relief cannot be ignored in assessing the range of reasonableness of this settlement. The Court notes that the Visa and Mastercard rule changes

secured in the Original Settlement Agreement remain in effect today. (Mem. in Supp. of Prelim. Approval 28.) These changes include, among others, permitting "merchants to surcharge on Visa- or Mastercard-branded credit card transactions at both the brand and product levels," and "[a]n obligation on the part of Visa and MasterCard to negotiate interchange fees in good faith with merchant buying groups." *Interchange Fees I*, 986 F. Supp. 2d at 217. The injunctive relief secured in the prior settlement approval was valued by Class Plaintiffs' expert to be worth at least $26 billion. (*See* Renfrew Decl. ¶ 17 ("[I]n addition to the monetary recovery, the Class Plaintiffs achieved significant modifications to the existing rules, which according to Plaintiffs' expert Frankel are estimated to be worth at a minimum $26+ billion.").) These forms of relief serve to partially address Plaintiffs' claims regarding supracompetitive interchange fees and anti-steering restraints.

Fourth, as one district Court has aptly stated, "the history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial or on appeal." *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. at 476 (collecting cases). As set forth in Section II.a.iii.3.A, *supra*, the Court believes that there is a significant risk of proceeding with the action in light of the attendant risks and complexities of proving liability and damages, and maintaining the class action. *See also In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. at 461 ("Due to the complexities inherent in this case, the certainty of this settlement amount has to be judged in this context of the legal and practical obstacles to obtaining a large recovery.").

Accordingly, the Court finds that these *Grinnell* factors will likely weigh in favor of granting final approval.

In sum, for the foregoing reasons, the Court finds that under the Rule 23(e)(2) and the

*Grinnell* factors, preliminary approval of the settlement is warranted because the Court will likely find the Superseding Settlement Agreement to be fair, reasonable, and adequate at the final approval stage.

### b. Certification of settlement class

In 2009, the parties submitted motions to the Court on the issue of class certification. On November 19, 2009, Judge Orenstein heard oral argument on the motions, but reserved making a recommendation at that time. (*See* Minute Entry dated Nov. 23, 2009, Docket Entry No. 1319.) After the parties informed the Court of their intent to settle the case, the Court deemed the class certification motions withdrawn without prejudice. (*See* Order dated July 17, 2012.)

The parties sought preliminary certification of the following class under subsection Rule 23(b)(3) for the purposes of settlement only:

> All persons, businesses, and other entities that have accepted any Visa-Branded Cards and/or Mastercard-Branded Cards in the United States at any time from January 1, 2004 to the Settlement Preliminary Approval Date, except that the Rule 23(b)(3) Settlement Class shall not include (a) the Dismissed Plaintiffs, (b) the United States government, (c) the named Defendants in this Action or their directors, officers, or members of their families, or (d) financial institutions that have issued Visa-Branded Cards or Mastercard-Branded Cards or acquired Visa-Branded Card transactions or Mastercard-Branded Card transactions at any time from January 1, 2004 to the Settlement Preliminary Approval Date.

(Superseding Settlement Agreement ¶ 4.)

"The ultimate decision to certify the class for purposes of settlement cannot be made until the hearing on final approval of the proposed settlement." Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment. When deciding whether to grant preliminary approval, district courts must determine whether "giving notice is justified by the parties' showing that the court *will likely be able to* . . . certify the class for purposes of judgment on the proposal." Fed.

R. Civ. P. 23(e)(1)(B)(ii) (emphasis added).  The Court therefore looks to the factors for class certification to make this determination.

"Before approving a class settlement agreement, a district court must first determine whether the requirements for class certification in Rule 23(a) and (b) have been satisfied."  *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 238 (2d Cir. 2012).  "This applies even to conditional certification for settlement purposes only."  *See Tart v. Lions Gate Entm't Corp.*, No. 14-CV-8004, 2015 WL 5945846, at *1 (S.D.N.Y. Oct. 13, 2015) (citing *Long v. HSBC USA Inc.*, No. 14-CV-6233, 2015 WL 5444651, at *5 (S.D.N.Y. Sept. 11, 2015)).

"To obtain certification of a class action for money damages, a plaintiff must satisfy prerequisites of numerosity, commonality, typicality, and adequacy of representation," pursuant to Rule 23(a), and "must also establish that questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy," pursuant to Rule 23(b)(3).  *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013); *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 80 (2d Cir. 2015).  In addition to the explicit requirements of Rule 23(a), the class must satisfy the implied requirement of ascertainability.  *In re Petrobras Sec.*, 862 F.3d 250, 266 (2d Cir. 2017).  "Rule 23 does not set forth a mere pleading standard."  *Dukes*, 564 U.S. at 350.  "The party seeking class certification must affirmatively demonstrate . . . compliance with the Rule, and a district court may only certify a class if it is satisfied, after a rigorous analysis, that the requirements of Rule 23 are met."  *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d at 237–38 (quotation marks and citations omitted); *see also Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010) ("The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each

of Rule 23's requirements has been met." (citations omitted)).

Assessment of class certification in the settlement context invokes a "responsibility imposed upon [the courts] to exercise independent judgment for the protection of class absentees." *In re Traffic Exec. Ass'n-E. Railroads*, 627 F.2d at 634 (citation omitted). Under Supreme Court guidance, consideration of problems that would occur in managing the class are relaxed in the settlement context, while the other requirements of Rule 23 must receive undiluted, if not heightened, scrutiny, even where a proposed settlement has been deemed fair, reasonable and adequate:

> Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial. But other specifications of the Rule — those designed to protect absentees by blocking unwarranted or overbroad class definitions — demand undiluted, even heightened, attention in the settlement context. Such attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold.

*Amchem Prod., Inc.*, 521 U.S. at 620 (citations omitted); *see also In re Literary Works*, 654 F.3d 242 ("When a court is asked to certify a class and approve its settlement in one proceeding, the class-certification rule requirements designed to protect absent class members demand undiluted, even heightened, attention."); *Denney*, 443 F.3d at 270 ("Before certification is proper for any purpose — settlement, litigation, or otherwise — a court must ensure that the requirements of Rule 23(a) and (b) have been met. These requirements should not be watered down by virtue of the fact that the settlement is fair or equitable." (citing *In re Ephedra Products Liab. Litig.*, 231 F.R.D. 167, 169–70 (S.D.N.Y. 2005))); *Amchem Prod., Inc.*, 521 U.S. at 620 n.16 (disapproving a settlement class in a multi-party asbestos litigation and noting that "[s]ettlement, though a relevant factor, does not inevitably signal that class-action certification should be granted more

readily than it would be were the case to be litigated."). Nevertheless, "[t]he Second Circuit has emphasized that Rule 23 should be given liberal rather than restrictive construction, and it seems beyond peradventure that the Second Circuit's general preference is for granting rather than denying class certification." *Espinoza v. 953 Assocs. LLC*, 280 F.R.D. 113, 124 (S.D.N.Y. 2011) (quoting *Gortat v. Capala Bros., Inc.*, 257 F.R.D. 353, 361 (E.D.N.Y. 2009), *aff'd*, 568 F. App'x 78 (2d Cir. 2014)).

In issuing the January 24, 2019 Order, the Court concluded for the following reasons, that based on the record before it, it will likely be able to certify the proposed class at the final approval stage.

### i. Rule 23(a) requirements

The Court first addresses whether Class Plaintiffs have presented sufficient information to suggest that the Court will likely be able to "certify the class for purposes of judgment on the proposal" under the explicit Rule 23(a) requirements of numerosity, commonality, typicality, and adequacy of representation, and the implied factor of ascertainability.

### 1. Numerosity

In order to proceed as a class action, the class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "[N]umerosity is presumed at a level of [forty] members." *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).

Class Plaintiffs have satisfied the numerosity requirement. At the time of the final approval hearing in 2013, "class counsel reported that the class was composed of about 12 million merchants." *Interchange Fees II*, 827 F.3d at 235. The proposed class still consists of "millions of [m]erchants." (TAC ¶ 4.)

69

## 2. Commonality

Under Rule 23(a)(2), there must be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2); *see also Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) ("The commonality requirement is met if plaintiffs' grievances share a common question of law or fact."). A question is common if it is "capable of classwide resolution — which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. "[I]t is not enough to raise questions at such a high level of generality that they become common to the class." *Tart v. Lions Gate Entm't Corp.*, 2015 WL 5945846, at *2 (citing *Dukes*, 564 U.S. at 350). Instead, plaintiffs must demonstrate "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution" of the case. *Dukes*, 564 U.S. at 350.

"Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *Id.* at 349–50. "The claims for relief need not be identical for them to be common," instead, "Rule 23(a)(2) simply requires that there be issues whose resolution will affect all or a significant number of the putative class members. Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015) (citations and quotation marks omitted). "Even a single common legal or factual question will suffice" to prove commonality. *Dukes*, 564 U.S. at 357; *Freeland v. AT&T Corp.*, 238 F.R.D. 130, 140 (S.D.N.Y. 2006) (citing *In re Agent Orange Prod. Liab.*, 818 F.2d 145, 166–67 (2d Cir. 1987)). "'Numerous courts have held that allegations concerning the existence, scope, and efficacy of an alleged antitrust conspiracy present important common questions sufficient to satisfy the commonality requirement of Rule 23(a)(2).'" *In re Platinum & Palladium*

*Commodities Litig.*, No. 10-CV-3617, 2014 WL 3500655, at *9 (S.D.N.Y. July 15, 2014)

(quoting *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 509 (S.D.N.Y. 1996)

(collecting cases)).

In their original class certification briefing, Defendants did not contest the issue of

commonality. (*See* Redacted Defs. Corrected. Mem. of Law in Opp'n to Pls. Mot. for Class

Certification Docket Entry No. 1166; Class Certification Hr'g Tr. 45:1, Docket Entry No. 1406

("the defendants do not contest commonality").) Class Plaintiffs' overarching claims are that the

Defendants conspired to fix prices and impose supracompetitive interchange fees on merchants

that accept Visa and Mastercard debit and credit cards, and through certain anticompetitive

restrictions, have prevented those merchants from protecting themselves. Thus, Class Plaintiffs

represent a putative class that has suffered an alleged common harm: payment of

supracompetitive interchange fees. Unlike in *Dukes*, where the class plaintiffs failed to show

that the defendant, Wal-Mart, had a uniform discrimination policy, Class Plaintiffs point to

specific policies and rules that they allege causes them uniform harm, such as the setting of

default interchange fees, honor-all-card rules, and anti-steering restraints.[47] (*See* TAC ¶ 170

(citing to Visa and Mastercard's honor-all-card rules that they enforce on merchants); *id.* ¶ 177

(citing to Visa and Mastercard's prior no-surcharge rules).)

Although even a single common question is sufficient, Class Plaintiffs identify several

questions that are common to the putative class, and that would generate common answers,

---

[47] In *Dukes*, the Supreme Court found that the class plaintiffs alleging discrimination on the basis of gender did not satisfy the commonality requirement of Rule 23(a)(2), because they had not offered evidence that Wal-Mart operated under a policy of discrimination. *Dukes*, 564 U.S. at 355 ("The only corporate policy that the plaintiffs' evidence convincingly establishes is Wal-Mart's 'policy' of *allowing discretion* by local supervisors over employment matters. On its face, of course, that is just the opposite of a uniform employment practice that would provide the commonality needed for a class action.").

including whether Visa and Mastercard, and their respective member banks, including the Bank Defendants, (1) collectively fixed and set interchange fees in violation of antitrust law; (2) collectively imposed anti-steering rules that disincentivized merchants from steering paying customers to other payment methods, thereby protecting Defendants from competitive pressure to lower interchange fees; and (3) continued the alleged behavior after becoming publicly-owned corporations. (*See* Mem. in Supp. of Mot. for Prelim. Approval 27–28.) If this case were to proceed to trial, these questions would need to be determined on a classwide basis, regardless of how each merchant was individually affected.

In addition, the putative class members' injuries raise common questions because they derive from a unitary course of alleged conduct, specifically, that Defendants collectively fixed supracompetitive interchange fees, and collectively imposed and enforced rules and restrictions on merchants. *See In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1175, 2014 WL 7882100, at *30 (E.D.N.Y. Oct. 15, 2014), *report and recommendation adopted*, No. 06-MD-1775, 2015 WL 5093503 (E.D.N.Y. July 10, 2015) (citation omitted) (noting that common questions "are often present where there are legal or factual disputes pertaining to the defendants' 'unitary course of conduct,' since such questions tend to give rise to answers that are broadly applicable to the entire class."); *see also Sykes*, 780 F.3d at 84 (upholding the district court's decision that the commonality requirement was satisfied where the district court found that "plaintiffs' injuries derive from defendants' alleged unitary course of conduct" of fraudulently procuring default judgments). Further, resolving the question of whether Defendants collectively set these fees would "resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350.

The questions that Class Plaintiffs raise are fundamental to both the outcome of the case, and would generate common answers that would assist in determining the resolution of Class Plaintiffs' claims. The Court will likely find that commonality is met at the final approval stage.

### 3. Typicality

The typicality prong of Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The typicality requirement "is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 252 (2d Cir. 2011) (quoting *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993)); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009). "The commonality and typicality requirements often 'tend to merge into one another, so that similar considerations animate analysis' of both." *Brown v. Kelly*, 609 F.3d 467, 475 (2d Cir. 2010) (quoting *Marisol A.*, 126 F.3d at 376). "The purpose of typicality is to ensure that class representatives have the incentive to prove all the elements of the cause of action which would be presented by the individual members of the class were they initiating individualized actions." *Floyd v. City of New York*, 283 F.R.D. 153, 175 (S.D.N.Y. 2012) (citation and internal quotation marks omitted). "'Since the claims only need to share the same essential characteristics, and need not be identical, the typicality requirement is not highly demanding.'" *In re Platinum & Palladium Commodities Litig.*, 2014 WL 3500655, at *9 (quoting *Bolanos v. Norwegian Cruise Lines Ltd.*, 212 F.R.D. 144, 155 (S.D.N.Y. 2002)).

The Court will likely find that the typicality requirement is met at the final approval stage. Class Plaintiffs allege, on behalf of the putative class, that they were harmed by the same

course of events — Defendants' unlawful price fixing of interchange fees and restraints of trade. *See In re Air Cargo Shipping Servs. Antitrust Litig.*, 2014 WL 7882100, at *31 ("Here, the plaintiffs allege that the defendants engaged in a global conspiracy to fix prices, so it is nearly tautological that the class representatives will rely on the same factual and legal arguments to establish the defendants' liability."). The Class Plaintiffs all currently operate businesses that continue to accept payment by Visa and Mastercard credit and debit cards, and represent a diverse array of merchant and business interests. (*See* TAC ¶¶ 10–13, 15–18.) Although the Class Plaintiffs represent a diverse array of interests, they seek redress for the same type of harms due to the same course of conduct.

### 4. Adequate representation

For the reasons set forth in Section II.a.iii.1, *supra*, the Court will likely find that the Class Plaintiffs and Class Counsel have provided adequate representation to the Rule 23(b)(3) putative class.

### 5. Ascertainability

Rule 23(a) contains an implied requirement of ascertainability. *In re Petrobras Sec.*, 862 F.3d at 266 ("Most circuit courts of appeals have recognized that Rule 23 contains an implicit threshold requirement that the members of a proposed class be readily identifiable, often characterized as an 'ascertainability' requirement."). Unlike other circuits, the Second Circuit does not have a "heightened" requirement of ascertainability — it only requires that a "class be defined using objective criteria that establish a membership with definite boundaries," and does not require "administrative feasibility" of identifying each class member based on that objective criteria. *Id.* (distinguishing the Second Circuit's approach to ascertainability from circuits with a heightened ascertainability requirement); *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 567

(S.D.N.Y. 2014) ("The standard for ascertainability is 'not demanding' and is 'designed only to prevent the certification of a class whose membership is truly indeterminable.'" (quoting *Gortat v. Capala Bros., Inc.*, 2010 WL 1423018, at *2 (E.D.N.Y. Apr. 9, 2010))); *Charron v. Pinnacle Grp. N.Y. LLC*, 269 F.R.D. 221, 229 (S.D.N.Y. 2010) ("To be ascertainable, the class must be 'readily identifiable, such that the court can determine who is in the class and, thus, bound by the ruling.'" (quoting *McBean v. City of N.Y.*, 260 F.R.D. 120, 132–33 (S.D.N.Y. 2009))); *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 209 F.R.D. 323, 337 (S.D.N.Y. 2002). "The ascertainability requirement, as defined in this Circuit, asks district courts to consider whether a proposed class is defined using objective criteria that establish a membership with definite boundaries." *In re Petrobras Sec.*, 862 F.3d at 269.

The proposed class is defined using the objective criteria of merchants that have accepted Visa- and/or Mastercard-branded cards. (Superseding Settlement Agreement ¶ 4.) The membership's boundaries are definite in that the proposed class only includes merchants that accepted such cards during a defined period of time — January 1, 2004 through January 24, 2019, the date that the proposed class settlement received preliminary approval. *Id.* As a result, the Court will likely find that the ascertainability requirement is met at the final approval stage.

### ii. Rule 23(b)(3) requirements

In addition to satisfying the Rule 23(a) requirements, certification must be appropriate under Rule 23(b). *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). Certification under Rule 23(b)(3) requires both that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and that (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *Amgen Inc.*, 568 U.S. at 460; *Sykes*, 780 F.3d at 80.

Under Rule 23(b)(3) generally, matters pertinent to both of these requirements — that

common questions predominate, and that a class action is superior — include:

> (A) the class members' interests in individually controlling the
> prosecution or defense of separate actions; (B) the extent and nature
> of any litigation concerning the controversy already begun by or
> against class members; (C) the desirability or undesirability of
> concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A–D). However, "'[s]ome inquiries essential to litigation class

certification are no longer problematic in the settlement context.'" *In re Am. Int'l Grp., Inc. Sec.*

*Litig.*, 689 F.3d at 239 (quoting *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 335 (3d Cir.

2011) (Scirica, J., concurring) (citing *Amchem Prod., Inc.*, 521 U.S. at 620)). As noted in

Section II.b, *supra*, in the class settlement context, a district court "need not inquire whether the

case, if tried, would present intractable management problems, for the proposal is that there be

no trial." *Amchem Prod., Inc.*, 521 U.S. at 620 (citing Fed. R. Civ. P. 23(b)(3)(D)).

## 1. Predominance

"The 'predominance inquiry tests whether proposed classes are sufficiently cohesive to

warrant adjudication by representation.'" *Tyson Foods, Inc. v. Bouaphakeo*, --- U.S. ---, 136 S.

Ct. 1036, 1045 (2016) (quoting *Amchem Prod., Inc.*, 521 U.S. at 623). According to the

Supreme Court:

> This calls upon courts to give careful scrutiny to the relation between
> common and individual questions in a case. An individual question
> is one where "members of a proposed class will need to present
> evidence that varies from member to member," while a common
> question is one where "the same evidence will suffice for each
> member to make a prima facie showing [or] the issue is susceptible
> to generalized, class-wide proof."

*Id.* (quoting 2 Newberg on Class Actions § 4:50 at 196–97 (5th ed. 2012)).

Predominance is satisfied "if resolution of some of the legal or factual questions that

qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) (internal quotation marks omitted) (quoting *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 131 (2d Cir. 2010)). Typically, common issues predominate when liability is determinable on a class-wide basis, even where class members have individualized damages. *See In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d at 139; *see also Tyson Foods, Inc.*, 136 S. Ct. at 1045 ("When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages . . . .'" (citing 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778 at 123–24 (3d ed. 2005) (footnotes omitted))).

While more demanding than commonality, Rule 23(b)(3) "does *not* require a plaintiff seeking class certification to prove that each elemen[t] of [her] claim [is] susceptible to classwide proof." *Amgen Inc.*, 568 U.S. at 468 (citations and internal quotation marks omitted) (emphasis and alterations in original). Instead, a class plaintiff is only required to show that "*questions* common to the class predominate, [and] not that those questions will be answered, on the merits, in favor of the class." *Id.* at 459. Thus, Rule 23(b)(3) contemplates the presence of individual questions as long as those questions do not predominate over the common questions which affect the class as a whole. *Sykes*, 780 F.3d at 81–82 (citing *Messner v. Northshore Uni. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012)). "If the most substantial issues in controversy will be resolved by reliance primarily upon common proof, class certification will generally

achieve the economies of litigation that Rule 23(b)(3) envisions." *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2014 WL 7882100, at *36.

"While predominance may be difficult to demonstrate in mass tort cases, such as *Amchem,* in which the 'individual stakes are high and disparities among class members great,' it is a 'test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws.'" *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d at 240 (quoting *Amchem Prod., Inc.*, 521 U.S. at 625). In the context of antitrust class actions, "allegations of the existence of a price-fixing conspiracy are susceptible to common proof . . . ." *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2014 WL 7882100 at *37 (quoting *Cordes*, 502 F.3d at 105).

In addition, "the predominance inquiry will sometimes be easier to satisfy in the settlement context." *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d at 241; *see also In re Petrobras Sec. Litig.*, 317 F. Supp. 3d 858, 870 (S.D.N.Y. 2018) ("[T]he predominance requirement differs between trial and settlement." (citation omitted)). Because predominance and manageability overlap, "the existence of a settlement that eliminates manageability problems can alter the outcome of the predominance analysis." *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d at 242 (citing *In re Initial Pub. Offering Sec. Litig.*, 226 F.R.D. 186, 195 n.51 (S.D.N.Y. 2005)); *In re Nat. Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 380 (E.D. Pa. 2015) ("[S]ettlement itself allows common issues to predominate. [C]ourts are more inclined to find the predominance test met in the settlement context." (second alteration in original) (citation and internal quotation marks omitted)); *see also* 2 Newberg on Class Actions § 4:63 (5th ed. 2018) ("in settlement class actions, because manageability need not be a concern, predominance — the main focus of manageability — recedes in importance as well . . . . Courts therefore regularly certify settlement classes that might not have been certifiable for trial

purposes because of manageability concerns.").

For example, in *In re Am. Int'l Grp., Inc. Sec. Litig.*, the Second Circuit vacated a district court's denial of class certification in a preliminary approval decision. 689 F.3d at 241. There, the district court had held that a settlement class of securities purchasers had to satisfy the fraud-on-the market presumption — which in the context of a litigation class would spare the plaintiffs from having to prove individual reliance on misrepresentations — in order to demonstrate predominance. *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d at 241. In reaching its holding, the district court had relied upon a class certification decision from a Second Circuit litigation case rather than a settlement case. *Id.* at 241–42. In reversing the decision, the Second Circuit concluded that in the settlement context, failure to satisfy the fraud-on-the-market presumption did "not necessarily preclude a finding of predominance." *Id.* at 242–43.

Class Plaintiffs raise numerous common questions that are essential to the claims of all putative class members, including whether Defendants conspired to engage in anticompetitive price fixing of interchange fees, and enforced rules and policies that hindered the introduction of competition that would reduce the interchange fees. (*See* Mem. in Supp. of Prelim. Approval 36 (citing Pls. Mem. of Law in Supp. of Class Pls. Mot. for Class Certification, Docket Entry No. 1165).) For many of the common questions that Class Plaintiffs raise, "the same evidence will suffice for each [class] member" in proving antitrust violation and injury.[48] *Tyson Foods, Inc.*,

---

[48] Class Counsel asserts that the following issues associated with Class Plaintiffs claims present common questions that would rely on class-wide evidence:

> (1) whether Defendants' conspired to fix and impose interchange fees, including whether Defendants require merchants to pay fixed interchange so as to fix the price of card acceptance services at supra-competitive levels; (2) whether Class Plaintiffs' price-fixing claims would be analyzed under the *per se* rule or the rule of reason; (3) whether the imposition of the anti-steering rules insulated fixed interchange fees from competitive pressure; (4) the anticompetitive

136 S. Ct. at 1045 (citation and internal quotation marks omitted). In particular, the question of whether Defendants conspired to collectively impose and fix interchange fees is a common question that requires generalized proof to answer — common evidence for all class members would be needed to prove a conspiracy to fix interchange fees. *See Cordes*, 502 F.3d at 107 (finding that "[b]ecause each class member allegedly suffered the same type of injury," i.e., overcharges paid in a price-fixing conspiracy, "the legal question of whether such an injury is 'of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful,' is a common one." (quoting *Brunswick Corp. v. Pueblo Bowl–O– Mat, Inc.*, 429 U.S. 477, 489 (1977)); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 590 (S.D.N.Y 2018) (concluding that "the existence of a conspiracy is a common question" and noting that Defendants did not dispute that the existence of a price-fixing conspiracy was susceptible to common proof).

Although individual class members would be impacted to different degrees by the alleged behavior, these individual issues, such as differences in individual damages assessments, are largely minimized in the settlement context. The common questions in this action appear to predominate over individual questions regarding the individual effect of such a conspiracy because the general proof needed to answer those questions — for example, the existence of the

---

effects and procompetitive effects, if any, of Defendants' conduct; (5) the relevant market; (6) whether Defendants had market power; (7) whether Defendants willfully maintained monopoly power; (8) whether the restructuring agreements that resulted in Mastercard's and Visa's initial public offerings, and the IPOs themselves, are antitrust violations; (9) whether the *NaBanco* decision applies to the claims in this case; and (10) whether the *Illinois Brick* indirect purchaser doctrine is a defense to Plaintiffs' claims.

(Mem. in Supp. of Prelim. Approval 36–37 (internal citations omitted) (citing Pls. Mem. of Law in Supp. of Class Pls. Mot. for Class Certification).)

alleged conspiracy — is far more essential than the individualized proof necessary to determine individual harm. *See generally In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. at 518 ("Courts repeatedly have held that the existence of a conspiracy is the predominant issue in price fixing cases, warranting certification of the class even where significant individual issues are present."). As noted *supra*, the Court need not consider aspects of manageability in the settlement context, which erases concerns that might otherwise be considered in a predominance analysis, and makes a finding of predominance more likely. *See, e.g.*, *Amgen Inc.*, 568 U.S. at 470 (upholding class certification in a securities action "[b]ecause the question of materiality is common to the class"); *In re Petrobras Sec. Litig.*, 317 F. Supp. 3d at 870 (preliminarily certifying a settlement class in a securities action where all plaintiffs "claim[ed] injury by reason of the same conduct, defendants' purported misrepresentations and omissions [were] common to all, plaintiffs' proof of intent would not differ between class members, and all class members . . . suffered an identical kind of injury"); *Mayhew v. KAS Direct, LLC*, No. 16-CV-698, 2018 WL 3122059, at *6 (S.D.N.Y. June 26, 2018) (preliminarily certifying a settlement class in a consumer products case and finding that "issues of proof regarding whether defendants' product labeling was false and misleading and would have deceived a reasonable consumer are common to all members of the class, and predominate over any issues any individual class member may have"); *In re Initial Pub. Offering Sec. Litig.*, 226 F.R.D. at 195 n.51 (noting that "[i]n this case, the removal of [the manageability] factor from consideration alleviates the predominance defect").

For these reasons, the Court will likely find that common questions predominate at the final approval stage.

## 2. Superiority

A class action may be maintained under Rule 23(b)(3) if a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). To satisfy the superiority requirement, the moving party must show that the class action presents economies of "time, effort and expense, and promote[s] uniformity of decision." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 130 (2d Cir. 2013). The superiority requirement is designed to avoid "repetitious litigation and possibility of inconsistent adjudications." *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2014 WL 7882100, at *64 (citing *D'Alauro v. GC Servs. Ltd. P'ship*, 168 F.R.D. 451, 458 (E.D.N.Y. 1996)).

Individual trials for a putative class of millions of members under any circumstance, but especially after thirteen years of litigation, would be far less efficient, and far more costly and repetitious than continuing to proceed as a class action. *See* Fed. R. Civ. P. 23(b)(3) (stating that "the extent and nature of any litigation concerning the controversy already begun by or against class members" is pertinent to the superiority determination). The Court finds that the superiority requirement will likely be met at the final approval stage.

In sum, for the foregoing reasons, the Court finds that under Rules 23(a) and 23(b)(3), that preliminary certification of the Rule 23(b)(3) settlement class, for the purposes of settlement only, is warranted because the Court will likely be able to certify the class at the final approval stage.

### c. Appointment of Class Counsel

When a district court certifies a class, it must appoint class counsel. In doing so, a court must consider:

> (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling

> class actions, other complex litigation, and the types of claims
> asserted in the action; (iii) counsel's knowledge of the applicable
> law; and (iv) the resources that counsel will commit to representing
> the class.

Fed. R. Civ. P. 23(g)(1)(A)(i–iv).

For the reasons set forth in Sections II.a.iii.1 and II.a.iii.2, *supra*, the Court finds that to date, the Robins Group has fairly and adequately represented the putative class in accordance with Rule 23(g). The Robins Group was first appointed as co-lead Interim Class Counsel over a decade ago, (Wildfang Decl. ¶ 24), and has been deemed competent by this Court numerous times. The Court, in the January 24, 2019 Order, therefore appointed Robins Kaplan LLP, Berger & Montague P.C., and Robbins Geller Rudman & Dowd LLP to serve as Rule 23(b)(3) Class Counsel.

### d.   Notice Plan and Plan of Allocation and Distribution

Class Counsel submitted for the Court's review a Notice Plan and two Notices — a short "Publication Notice," and a Long Form Notice. (Notice Plan; Revised Class Notices.)

Once a court has determined that "giving notice is justified by the parties' showing that the court will likely be able to" approve the proposed settlement and certify the class, the court "must direct notice in a reasonable manner to all class members who would be bound by the proposal . . . ." Fed. R. Civ. P. 23(e)(1)(B)(i–ii). "For any class certified under Rule 23(b)(3) — or upon ordering notice under Rule 23(e)(1) to a class proposed to be certified for purposes of settlement under Rule 23(b)(3) — the court must direct to class members the best notice that is practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B). This includes "individual notice to all members who can be identified through reasonable effort." *Id.* Notice may be made by "United States mail, electronic mean, or other appropriate means," and:

> must clearly and concisely state in plain, easily understood

language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B)(i–vii).

"The standard for the adequacy of a settlement notice in a class action under either the Due Process Clause or the Federal Rules is measured by reasonableness." *Wal-Mart Stores*, 396 F.3d at 113–14 (citations omitted). "[N]otice must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceeding." *Id.* at 114 (citation and internal quotation marks omitted). In addition, notice "is adequate if it may be understood by the average class member." *Id.* (citation and internal quotation marks omitted). "There are no rigid rules for determining whether a settlement notice to the class satisfies constitutional or Rule 23(e) requirements." *Charron v. Pinnacle Grp. N.Y. LLC*, 874 F. Supp. 2d 179, 191 (S.D.N.Y. 2012), *aff'd sub nom. Charron*, 731 F.3d 241.

"Courts in this Circuit have explained that a Rule 23 Notice will satisfy due process when it 'describe[s] the terms of the settlement generally,'" "inform[s] the class about the allocation of attorneys' fees, and provide[s] specific information regarding the date, time, and place of the final approval hearing." *Id.* at 191 (alteration in original) (first citing *In re Michael Milken & Assocs. Sec. Litig.*, 150 F.R.D. 57, 60 (S.D.N.Y.1993); and then citing *Clark v. Ecolab Inc.*, Nos. 07-CV-8623, 04-CV-4488, and 06-CV-5672, 2009 WL 6615729, at *6, 2009 U.S. Dist. LEXIS 108736, at *22 (S.D.N.Y. Nov. 17, 2009)).

Both the Publication Notice and the Long Form Notice satisfy each of the Rule

23(c)(2)(B) requirements and adequately notify class members of the proposed settlement. The Publication Notice describes basic information in plain, clear terms, including the class claims, the class definition, potential attorneys' fees and expense awards, the date and location of the final approval fairness hearing, and merchant rights including opt-out and objection rights. (*See* Revised Class Notices, G1-1 to G1-5.) The Long Form Notice includes frequently asked questions and the full text of the release. (*See* Revised Class Notices, G2-4 to G2-24.) The Court therefore finds the Class Notices to be sufficient and reasonable. *See Hall v. ProSource Techs., LLC*, No. 14-CV-2502, 2016 WL 1555128, at *5 (E.D.N.Y. Apr. 11, 2016) (finding notice sufficient where the notice and claim form "described essential and relevant information in plain terms, including . . . the terms of the Settlement Agreement . . . and the various rights of potential class members, such as the right to opt out of the Settlement Class or object to the instant Final Approval Motion.").

The Court also finds reasonable the manner in which the notices will be provided. The "Long Form Notice will be sent via First Class mail," and "an Email Notice will also be sent" to available email addresses. (Decl. of Cameron R. Azari, Esq. on Proposed Settlement Class Notice Program ("Azari Decl.") ¶ 13, annexed to Superseding Settlement Agreement as App. F.) To determine who will receive individualized notice, the Class Administrator "will work with the settling parties to develop a notice database using the extensive database developed for the proposed 2012 settlement, combined with additional data provided by Visa and MasterCard, and 2013–forward acquirer records." [49] (Azari Decl. ¶ 23.) During the first attempt to certify the

---

[49] In addition to individualized notice, notice will be published in targeted language publications, general media, newspaper, and business publications, including, among other locations, the *New York Times*, *Forbes*, the *Wall Street Journal*, *National Geographic*, *Sports Illustrated*, *People*, and *People en Español*. (Azari Decl. ¶¶ 29–35.) "The combined, measured media notice effort is estimated to reach 80.4% all U.S. Adults aged 18+ with an average

class, "[t]he Class Administrator notified class members of the terms of the proposed settlement through a mailed notice and publication campaign that included more than 20 million mailings and publication in more than 400 publications." *Interchange Fees I*, 986 F. Supp. 2d at 217.

The same website that was used in the prior settlement process — www.PaymentCardSettlement.com — will be maintained as the case website and contain relevant deadlines and documents, including the Superseding Settlement Agreement, the Long Form Notice, and "all papers filed in connection with the motions for approval of the class settlement and any motions for attorneys' fees, expenses, or service awards, and answers to frequently asked questions (FAQs)." (Azari Decl. ¶ 49.) The website will be available in English, Spanish, Chinese, Japanese, Korean, Russian, Thai, and Vietnamese, (*id.*), and is listed in both Notices as a resource. (*See, e.g.*, Revised Class Notices G1-2, G2-1.)

The only objections to the Notice Plan were filed by the Branded Operators. Because of the existence of exclusion lists, the Branded Operators warned that there would be a "failure to notify" hundreds of class members, and expressed concern that the Branded Operators' rights to participate in the class would be excluded "without even providing these class members with notice that identifies them as excluded." (Mem. in Opp'n to Prelim. Approval 5, 21; *see generally id.* at 19–21.) The Court has addressed these objections. First, at the hearing, Class Counsel assured the Court that the Branded Operators would in fact receive notice. (Hr'g Tr. 9:1–9:13; *id.* at 9:5–9:7 (clarifying that "[t]he exclusion list isn't to exclude [potential class members] from getting notice; it would be potentially down the road that [potential class

---

frequency of 2.8 times, 84.2% of all US Business Owners with an average frequency of 3.2 times; and 84.4% of all US Adults in Business and Finance Occupations, with an average frequency of 3.4 times." (*Id.* ¶ 22.) Banner advertisements will also be placed on websites. (*Id.* ¶¶ 36–42.)

members] may not be able to make a claim from the settlement fund.").)  Second, the Court further requested that Class Counsel send notice of exclusion to persons, businesses, or other entities found on any exclusion list.  (*Id.* at 13:9–13:18; *see also* Notice of Exclusion; Prelim. Approval Order ¶¶ 12, 15.)  Third, "a Long Form Notice will be mailed to all persons who request one via the toll-free phone number or by mail or email."  (Azari Decl. ¶ 26.)

For the foregoing reasons the Court found the Notice Plan and proposed Class Notices to be reasonable and constitute "the best notice that is practicable under the circumstances."  *See* Fed. R. Civ. P. 23(c)(2)(B).  In the January 24, 2019 Order, the Court therefore approved the method of notice to be provided to the Rule 23(b)(3) class members as set forth in the Notice Plan, and approved the Class Notices.  The Court also approved Epiq Systems, Inc. as the Settlement Administrator to perform duties in accordance with the Superseding Settlement Agreement.

### e.  Final approval procedure

The Court has set forth a schedule with deadlines for the mailing and publication of the Class Notices and the notice of exclusion, exclusion and opt out requests, submission of written statements of objection, submission of notices of intention to appear at the final approval hearing, submission of motions for class settlement final approval, filing of the Class Administrator report, submission of responses to objections, and the final approval hearing.  (*See* Prelim. Approval Order.)

The Court will hold the final approval hearing at 10:00 AM on Thursday, November 7, 2019.

### III. Conclusion

For the foregoing reasons, on January 24, 2019, the Court preliminarily approved the

Superseding Settlement Agreement and preliminarily granted class certification for the purposes

of settlement, appointed Class Counsel and the Class Administrator, and approved the proposed

Notice Plan, Class Notices, and Plan of Administration and Distribution.

Dated: January 28, 2019
      Brooklyn, New York

                    SO ORDERED:


                    _____s/ MKB_____
                    MARGO K. BRODIE
                    United States District Judge