**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

IN RE PAYMENT CARD INTERCHANGE
FEE AND MERCHANT DISCOUNT
ANTITRUST LITIGATION

This document relates to: *Barry's Cut Rate Stores Inc., et al. v. Visa, Inc., et al.*

Case No. 1:05-MD-1720-MKB-JO

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>BANK DEFENDANTS' MOTION TO DISMISS</u>**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ..........................................................................................1

BACKGROUND ...........................................................................................................3

I.    VISA AND MASTERCARD CORPORATE STRUCTURES AND IPOS........................3

II.   THE CHALLENGED NETWORK RULES AND POST-IPO RULE CHANGES...........4

      A.    Overview of the Challenged Network Rules ........................................4

      B.    Rule Changes Under the Consent Decree Entered in *United States v. American Express* ................................................................................5

      C.    Rule Changes in Connection with the Earlier Settlement in this Case ..................6

III.   PLAINTIFFS' ALLEGATIONS OF A CONTINUING CONSPIRACY ..........................7

ARGUMENT ..............................................................................................................8

I.    PLAINTIFFS LACK STANDING TO PURSUE INJUNCTIVE RELIEF AGAINST THE BANK DEFENDANTS...............................................................8

      A.    Rule 12(b)(1) Standard ....................................................................8

      B.    Plaintiffs Lack Standing to Pursue Claims Against the Bank Defendants Because the Bank Defendants Cannot Amend or Rescind the Challenged Rules ........................................................................9

II.   PLAINTIFFS DO NOT PLAUSIBLY ALLEGE AN ONGOING CONSPIRACY ENTITLING THEM TO INJUNCTIVE RELIEF UNDER THE CLAYTON ACT ........16

      A.    The Clayton Act Allows Injunctive Relief Only If Plaintiffs Plausibly Allege an Impending or Contemporary Antitrust Violation ..................................16

      B.    Plaintiffs Do Not Plausibly Allege an Impending or Contemporary Antitrust Violation ................................................................................18

CONCLUSION...........................................................................................24

i

# **TABLE OF AUTHORITIES**

Page(s)

**CASES**

*Al George, Inc. v. Envirotech Corp.*,
  939 F.2d 1271 (5th Cir. 1991) ...........................................................................17

*B & R Supermarket, Inc. v. Visa, Inc.*,
  No. 16-cv-1150, 2016 WL 5725010 (N.D. Cal. Sept. 30, 2016)....................11, 14, 22, 24

*Bailey Lumber & Supply Co. v. Ga.-Pacific Corp.*,
  No. 08-cv-1394, 2010 WL 1141133 (S.D. Miss. Mar. 19, 2010).....................................22

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)..................................................................................3, 16, 18, 20

*B-S Steel of Kansas, Inc. v. Tex. Industries, Inc.*,
  439 F.3d 653 (10th Cir. 2006) ...........................................................................16

*Chang v. Fage USA Dairy Industry, Inc.*,
  No. 14-cv-3826, 2016 WL 5415678 (E.D.N.Y. Sept. 28, 2016) .......................................9

*In re Ciprofloxacin Hydrochloride Antitrust Litigation*,
  261 F. Supp. 2d 188 (E.D.N.Y. 2003) .................................................................17

*In re Citigroup Inc. Shareholder Derivative Litigation*,
  788 F. Supp. 2d 211 (S.D.N.Y. 2011)..................................................................4, 12

*Cortlandt Street Recovery Corp. v. Hellas Telecoms., S.A.R.L.*,
  790 F.3d 411 (2d Cir. 2015)...............................................................................8

*In re DDAVP Indirect Purchaser Antitrust Litig.*,
  903 F. Supp. 2d 198 (S.D.N.Y. 2012)..................................................................16

*Dickson v. Microsoft Corp.*,
  309 F.3d 193 (4th Cir. 2002) ...........................................................................21

*Fiswick v. United States*,
  329 U.S. 211 (1946).........................................................................................17

*In re G-fees Antitrust Litigation*,
  584 F. Supp. 2d 26 (D.D.C. 2008) .......................................................................17

*Graham v. City of N.Y.*,
  869 F. Supp. 2d 337 (E.D.N.Y. 2012) ..................................................................5

*Impro Products, Inc. v. Herrick*,
    715 F.2d 1267 (8th Cir. 1983) ...................................................................................21

*In re Insurance Brokerage Antitrust Litigation*,
    618 F.3d 300 (3d Cir. 2010) .......................................................................................21

*Justice v. Kuhnapfel*,
    985 F. Supp. 2d 334 (E.D.N.Y. 2013) .....................................................................9, 10

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) ...................................................................................20

*Korea Kumho Petrochemical v. Flexsys America LP*,
    No. 07-cv-1057, 2008 WL 686834 (N.D. Cal. Mar. 11, 2008) .................................23

*Lemelson v. Bendix Corp.*,
    104 F.R.D. 13 (D. Del. 1984) ....................................................................................14

*Mahon v. Ticor Title Insurance Co.*,
    683 F.3d 59 (2d Cir. 2012) ...........................................................................................9

*McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*,
    370 F.3d 275 (2d Cir. 2004) .......................................................................................24

*McDaniel v. Board of Education*,
    956 F. Supp. 2d 887 (N.D. Ill. 2013) .........................................................................10

*Morrison v. National Australia Bank Ltd.*,
    547 F.3d 167 (2d Cir. 2008) .........................................................................................9

*National Bankcard Corp. (NaBANCO) v. Visa U.S.A., Inc.*,
    779 F.2d 592 (11th Cir. 1986) ...................................................................................19

*In re New Motor Vehicles Canadian Export Antitrust Litigation*,
    522 F.3d 6 (1st Cir. 2008) ....................................................................................16, 22

*Okpaolobi v. Foster*,
    244 F.3d 405 (5th Cir. 2001) .......................................................................................9

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation*,
    986 F. Supp. 2d 207 (E.D.N.Y. 2013) ...............................................................6, 15, 19

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation*,
    No. 05-md-1720, 2008 WL 5082872 (E.D.N.Y. Nov. 25, 2008) ...............................15

*PepsiCo, Inc. v. Coca-Cola Co.*,
    315 F.3d 101 (2d Cir. 2002) .......................................................................................21

*In re Pre-Filled Propane Tank Antitrust Litigation,*
    860 F.3d 1059 (8th Cir. 2017) ........................................................22

*Reniger v. Hyundai Motor America,*
    122 F. Supp. 3d 888 (N.D. Cal. 2015) ...............................................9

*Schenker AG v. Societe Air Fr.,*
    102 F. Supp. 3d 418 (E.D.N.Y. 2015) ...............................................22

*Sitt v. Nature's Bounty, Inc.,*
    No. 15-cv-4199, 2016 WL 5372794 (E.D.N.Y. Sept. 26, 2016) ........................8

*Thomas-Ateba v. SAMHSA of the U.S. Government,*
    No. 13-cv-4662, 2014 WL 1414577 (E.D.N.Y. Apr. 10, 2014) ........................10

*In re Travel Agent Commission Antitrust Litigation,*
    583 F.3d 896 (6th Cir. 2009) ...................................................17, 22

*United States v. American Express Co.,*
    No. 10-cv-4496, 2011 WL 2974094 (E.D.N.Y. July 20, 2011)...................2, 5, 6

*United States v. Apple, Inc.,*
    791 F.3d 290 (2d Cir. 2015)........................................................21

*United States v. Borelli,*
    336 F.2d 376 (2d Cir. 1964).......................................................23

*United States v. Grimm,*
    738 F.3d 498 (2d Cir. 2013).............................................2, 17, 18, 21, 22

*United States v. Juodakis,*
    834 F.2d 1099 (1st Cir. 1987) .....................................................23

**STATUTES**

15 U.S.C. § 26.........................................................................16

Defendants Bank of America, N.A.; BA Merchant Services LLC; Bank of America Corporation; Barclays Bank plc; Barclays Bank Delaware; Barclays Financial Corp.; Capital One Bank, (USA), N.A.; Capital One Financial Corporation; Chase Bank USA, N.A.; Chase Manhattan Bank USA, N.A.; Chase Paymentech Solutions, LLC; JPMorgan Chase Bank, N.A.; JPMorgan Chase & Co.; Citibank (South Dakota), N.A.; Citibank, N.A.; Citigroup Inc.; Citicorp; and Wells Fargo & Company (collectively, the "bank defendants") respectfully submit this memorandum of law in support of their motion to dismiss the Equitable Relief Class Action Complaint, dated April 10, 2017.  (*See* ECF No. 6910 ("Compl." or "Complaint").)

## PRELIMINARY STATEMENT

Plaintiffs' Complaint for injunctive relief under the Clayton Act against the bank defendants is untenable.  In the Complaint, plaintiffs seek relief from the rules of Visa Inc. ("Visa") and Mastercard Inc. ("Mastercard"), which have been independent publicly owned companies since 2008 and 2006, respectively.  Even if this Court were to credit plaintiffs' allegation that the bank defendants effectively controlled decisions of Visa or Mastercard through representation on their boards of directors before the decade-old initial public offerings ("IPOs"), plaintiffs do not—indeed, they cannot—plausibly contend that such control survived the IPOs.  And because plaintiffs cannot show that the bank defendants today control Visa and Mastercard, the bank defendants are not proper targets of plaintiffs' request for injunctive and declaratory relief from the Visa and Mastercard rules.

The Complaint against the bank defendants stumbles at the gate, because plaintiffs lack standing to pursue their claims against the bank defendants.  Constitutional standing requires a plaintiff seeking injunctive relief to demonstrate that the defendant can redress the plaintiff's alleged injury.  Even assuming that plaintiffs could demonstrate that they are entitled to some

1

relief from the Visa and Mastercard rules, plaintiffs do not plausibly allege that any of the <u>bank defendants</u>, individually or collectively, has any authority to change the networks' rules. The bank defendants thus have no part to play in this injunctive relief case, just as they played no part in the government's injunctive relief lawsuit against Visa, Mastercard, and American Express that resulted in a consent decree requiring Visa and Mastercard to change their rules. *See United States v. Am. Express Co.*, No. 10-cv-4496, 2011 WL 2974094, at *4 (E.D.N.Y. July 20, 2011). The bank defendants are equally irrelevant here, and the injunctive claims against them should be dismissed for lack of standing.

Plaintiffs' suit against the bank defendants cannot survive for another reason: plaintiffs have failed to establish a significant threat of the bank defendants committing an impending antitrust violation, as required for injunctive relief under the Clayton Act. As the Second Circuit has held, a conspiracy continues <u>only so long as there is continuing "concerted action."</u> *United States v. Grimm*, 738 F.3d 498, 504 (2d Cir. 2013) (emphasis added). Plaintiffs plead no facts suggesting concerted activity among the bank defendants concerning the Visa or Mastercard rules in the decade since the IPOs, much less still ongoing today. The allegation that each of the banks continues to "adhere" to the default interchange fees and other rules set by Visa and Mastercard (and "understand[s]" that all other banks will do so) is insufficient to plead a plausible ongoing or new conspiracy among the banks; those allegations are consistent with independent, parallel conduct. Because plaintiffs have not plausibly alleged any relevant ongoing concerted action among the banks sufficient to state a claim of a continuing conspiracy,

*see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), plaintiffs' claims against the bank defendants should be dismissed.[1]

## BACKGROUND

### I.    VISA AND MASTERCARD CORPORATE STRUCTURES AND IPOS

Plaintiffs allege that Visa and Mastercard are "standard-setting" organizations that set rules for transactions occurring on their networks. (Compl. ¶¶ 84, 99.) Before 2006, Visa and Mastercard were each joint ventures among banks that issued payment cards. In 2006 and 2008, respectively, Mastercard and Visa became publicly traded companies. (*Id.* ¶¶ 206-07, 236-41.) Plaintiffs allege that before these IPOs, the bank defendants could adopt and enforce network rulemaking by "acting through the Visa and MasterCard Boards of Directors." (*Id.* ¶ 138; *see also id.* ¶¶ 104, 367, 380, 403, 410.)

Plaintiffs' own allegations demonstrate that this is not the case after the IPOs, however. As to Mastercard, plaintiffs acknowledge that banks "cannot govern" it anymore, "either through voting or by economic control." (*Id.* ¶ 211.) As to Visa, plaintiffs merely allege that only for three years after the IPO (*i.e.*, until 2011) banks were "permitted to elect 6 of 17 [*i.e.*, a minority of Visa] directors." (*Id.* ¶ 238.) The Visa and Mastercard boards are now independent of the banks (*see id.* ¶¶ 206-07, 236-40, 249, 257), and indeed no employee or officer of any bank defendant currently serves (or in the last several years has served) on the Visa or Mastercard boards of directors.[2]

---

[1] Whether plaintiffs have sufficiently alleged any act over the past ten years by any of the bank defendants in furtherance of the purported ongoing Visa and Mastercard conspiracies is distinct from the question of whether the IPOs constituted withdrawal from any pre-IPO conspiracies, which is the issue that Judge Gleeson addressed in his July 18, 2014, ruling from the bench. *See infra* pp. 23-24.

[2] Plaintiffs' allegations that Chase "is currently represented" on Visa's board (Compl. ¶ 29; *see also id.* ¶ 249) and Citigroup is "represented" on Mastercard's board (*id.* ¶ 33; *see also id.* ¶ 215(f)) are

*(cont'd)*

3

## II.    THE CHALLENGED NETWORK RULES AND POST-IPO RULE CHANGES

### A.    Overview of the Challenged Network Rules

Plaintiffs contend that certain network rules restrain trade and thereby violate the

Sherman Act.  As described below, plaintiffs allege that several of these rules were either

adopted or amended <u>after</u> the Visa and Mastercard IPOs.  For example, according to the

complaint:

- "Default Interchange Rules" set interchange rates for Visa and Mastercard transactions where the issuing and acquiring banks do not have bilateral agreements.  (*Id.* ¶¶ 86-90.)  Plaintiffs allege that since the IPOs the networks have each increased default interchange fees several times.  (*Id.* ¶¶ 253-55.)

- "'Honor All Cards' Rules . . . require Merchants that accept any Visa or MasterCard-branded Payment Card to accept all Payment Cards bearing that brand, regardless of the identity of the Issuing Bank, the Card Product, or the cost of accepting that card."  (*Id.* ¶ 139.)  Plaintiffs allege that since the IPOs, Visa and Mastercard have adopted "Honor All Devices Rules," which are extensions of the Honor All Cards Rules in that they require "a Merchant [that] accepts payment through one kind of digital wallet affiliated with Visa or MasterCard [to] accept payments through all digital wallets associated with Visa or MasterCard."  (*Id.* ¶¶ 295-99.)

- No Surcharge Rules "prohibited Merchants from imposing a Surcharge on a transaction made with a Card that bore a particular Brand, Product, or Issuing Bank."  (*Id.* ¶ 143.)  Plaintiffs allege that since the IPOs, the networks amended their No Surcharge Rules pursuant to the now vacated earlier class settlement of this litigation.  (*Id.* ¶ 147; *see also infra* p. 7.)

---

*(cont'd from previous page)*

demonstrably incorrect—a fact of which this Court may take judicial notice and which the bank defendants brought to plaintiffs' attention in correspondence dated July 18, 2017.  *See* Visa Inc., Annual Report (Form 10-K), at 117 (Nov. 16, 2018), https://www.sec.gov/Archives/edgar/data/1403161/ 000140316118000055/v093018.htm (listing directors) (*see* Willett Decl. Ex. A); Mastercard Inc., Annual Report (Form 10-K), at 107 (Feb. 14, 2018), https://www.sec.gov/Archives/edgar/data/1141391/ 000114139118000009/ma12312017-10xk.htm (listing directors) (*see* Willett Decl. Ex. B); *see also In re Citigroup Inc. S'holder Derivative Litig.*, 788 F. Supp. 2d 211, 214 & n.3 (S.D.N.Y. 2011) (taking "judicial notice of the specifics of this evolution in the membership of Citigroup's board as set forth in Citigroup's SEC filings" and using Form 8-K to identify Citigroup board members as of September 2009).

- No Discount Rules, "in their original forms, [allowed] Merchants . . . only to offer discounts to customers who paid in cash, rather than using a Payment Card." (Compl. ¶ 149.)  Plaintiffs allege that since the IPOs, pursuant to a consent decree with the Department of Justice, "Visa and MasterCard changed their rules . . . to allow Merchants to offer discounts to cardholders for using a particular card brand or product." (*Id.* ¶ 150; *see also infra* p. 6.)  Plaintiffs further allege that, unconnected with that settlement, Visa has "allowed discounting by Issuer." (Compl. ¶ 114.)

- The Fixed Acquirer Network Fee ("FANF"), which Visa promulgated in April 2012 (several years after its IPO), is a fixed fee per merchant location that accepts any Visa transaction.  (*Id.* ¶ 259.)

- In October 2015 (nearly a decade after their IPOs), Visa and Mastercard introduced rules related to the fraud-reducing chip technology known as "EMV" in a way that allegedly steered debit card traffic away from lower priced PIN debit networks, and towards Visa's and Mastercard's more expensive signature debit networks.  (*See id.* ¶¶ 269-85.)

Plaintiffs do not allege that any of the bank defendants played any role in any of these rate or rule changes.

**B.    Rule Changes Under the Consent Decree Entered in *United States v. American Express***

On October 4, 2010, the Department of Justice ("DOJ") brought an action against Visa, Mastercard, and American Express, alleging that each network's "anti-steering rules" violated the Sherman Act.  *See* Compl. at 1-2; *United States v. Am. Express Co.*, No. 10-cv-4496 (E.D.N.Y. Oct. 4, 2010), ECF No. 1 ("Amex Compl."); (*see also* Compl. ¶ 261).[3]  The DOJ did not name any bank (including any of the bank defendants) as a defendant in that action, nor did it allege that any bank played a role in any adoption or amendment to any Visa or Mastercard rules. *Cf.* Amex Compl. ¶ 34 ("Merchant acceptance of General Purpose Cards is defined and

---

[3] When considering a motion to dismiss "[r]ecords of prior litigation are facts of which judicial notice may be taken."  *Graham v. City of N.Y.*, 869 F. Supp. 2d 337, 343 (E.D.N.Y. 2012).  Moreover, because the DOJ Consent Decree and the settlement in that action were "referred to explicitly in the complaint, [were] in the plaintiff[s'] possession, and [were] relied on by [them] in pleading, [they are] incorporated by reference and may be considered at [the motion to dismiss] stage."  *Id.*

5

controlled at the network level, and prices to merchants are established directly or indirectly by the networks.").

On the same day it filed the complaint, the DOJ filed a notice of settlement and a Proposed Final Judgment as to Visa and Mastercard, with the express objective of "allow[ing] Merchants to attempt to influence the General Purpose Card or Form of Payment Customers select by providing choices and information in a competitive market." Proposed Final Judgment at 5, No. 10-cv-4496 (E.D.N.Y. Oct. 4, 2010), ECF No. 4-2. Among other provisions, the Proposed Final Judgment required Visa and Mastercard each to amend or alter its No Discount Rules so that merchants could offer consumers discounts for paying with other credit cards and inform consumers about Visa's and Mastercard's transaction fees. *Id.* at 5-8, 12; (*see also* Compl. ¶ 262). On July 20, 2011, the District Court approved a final judgment against Visa and Mastercard. *Am. Express*, 2011 WL 2974094, at *4. And, as plaintiffs acknowledge, "Visa and MasterCard changed their rules" as required by the DOJ Consent Decree. (Compl. ¶ 150; *see also id.* ¶ 152.) Plaintiffs do not allege that the bank defendants played any role in those rule changes. (*See id.*)

C.    **Rule Changes in Connection with the Earlier Settlement in this Case**

In October 2012, the parties executed a settlement agreement for claims brought on behalf of classes under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3). *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 986 F. Supp. 2d 207, 217 (E.D.N.Y. 2013), *rev'd*, 827 F.3d 223 (2d Cir. 2016). When this Court granted final approval of the settlement in December 2013, it observed that the IPOs "converted [Visa and Mastercard] from a consortium of competitor banks into single-entity, publicly traded companies with no

6

bank governance." *Id.* at 215; *see also id.* at 220 ("The IPOs wrested control of Visa and MasterCard from the banks.").

In the settlement agreement, defendants agreed to pay substantial monetary compensation to a Rule 23(b)(3) class, and as consideration for a Rule 23(b)(2) class, Visa and Mastercard each agreed, among other things, to modify its network rules to allow merchants to: (i) surcharge credit cards at both the brand and product levels, subject to certain conditions; (ii) engage in group negotiation of interchange fees; and (iii) accept Visa or Mastercard at fewer than all of their businesses if they operate multiple businesses under different "trade names" or "banners." *See id.* at 217. This Court granted preliminary approval of the settlement on November 27, 2012, and "[o]n January 27, 2013, Visa and MasterCard altered their rules as required by the preliminary approval of the 2012 settlement of this action, to permit surcharging of Credit-Card transactions under certain circumstances." (Compl. ¶ 147.) Plaintiffs do not allege that the bank defendants were required to do anything with respect to rules changes under the Rule 23(b)(2) portions of the settlement; instead, by their terms, those portions of the settlement required action only by the Visa defendants and Mastercard defendants. *See* Definitive Class Settlement Agreement, ECF No. 1656-1, at 40-66. Nor do plaintiffs allege that any bank defendant in fact played any role in the adoption of the revised rules by either network.

## III.   PLAINTIFFS' ALLEGATIONS OF A CONTINUING CONSPIRACY

Plaintiffs acknowledge, as they must, that the bank defendants "los[t]" or "surrendered" their equity and governing stake in Visa and Mastercard through the IPOs. (Compl. ¶¶ 209, 249; *see also id.* ¶ 211.) Plaintiffs nevertheless allege that the bank defendants maintain indeterminate "effective control" over Mastercard by (i) "hav[ing] representatives on the Board," (ii) having the resources to dictate whether and on what terms Mastercard could settle this lawsuit, and

7

(iii) entering a joint defense agreement that facilitates coordination of communications. (*Id.* ¶ 215.) As for Visa, plaintiffs allege that the bank defendants maintain control via "substantial representation on the Board of Directors" (*id.* ¶ 249) and "veto rights on attempts by Visa to exit the core payments business [which] would allow the Member Banks to block an attempt by Visa to eliminate Interchange Fees" (*id.* ¶ 251).

Plaintiffs alternatively allege that, after the IPOs, "[e]ach of the bank defendants . . . has agreed that Visa and MasterCard may apply uniform schedules of default Interchange Fees . . . and that they will adhere to the anticompetitive Visa and MasterCard rules" (*id.* ¶ 42) and "understand that the same uniform schedule of Interchange Fees will be applied to transactions" conducted by other banks (*id.* ¶ 43).

## ARGUMENT

The bank defendants must be dismissed from the Complaint for two independent reasons. <u>First</u>, plaintiffs lack standing to bring claims against the bank defendants because they cannot demonstrate that any of the bank defendants can redress their injuries allegedly arising from network rules that only Visa and Mastercard have the power to change. <u>Second</u>, even if they had standing, plaintiffs cannot obtain injunctive relief because they have not plausibly alleged that any of the bank defendants are participating in any purported ongoing conspiracy now—a decade after the IPOs.

## I.   PLAINTIFFS LACK STANDING TO PURSUE INJUNCTIVE RELIEF AGAINST THE BANK DEFENDANTS

### A.   Rule 12(b)(1) Standard

Motions to dismiss for lack of standing are properly brought under Rule 12(b)(1). *Cortlandt St. Recovery Corp. v. Hellas Telecoms., S.A.R.L.*, 790 F.3d 411, 416-17 (2d Cir. 2015). Plaintiffs have "the burden to prove that subject matter jurisdiction exists." *Sitt v. Nature's*

*Bounty, Inc.*, No. 15-cv-4199, 2016 WL 5372794, at *2 (E.D.N.Y. Sept. 26, 2016) (Brodie, J.).

"[J]urisdiction must be shown affirmatively, and that showing is not made by drawing from the

pleadings inferences favorable to the party asserting it." *Id.* (quoting *Morrison v. Nat'l Austl.*

*Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008), *aff'd*, 561 U.S. 247 (2010)).  Accordingly, this

Court "may consider matters outside of the pleadings when determining whether subject matter

jurisdiction exists." *Id.*

### B.    Plaintiffs Lack Standing to Pursue Claims Against the Bank Defendants Because the Bank Defendants Cannot Amend or Rescind the Challenged Rules

"In order to seek injunctive relief, a plaintiff must show that she has 'standing' to obtain

that relief." *Justice v. Kuhnapfel*, 985 F. Supp. 2d 334, 336 (E.D.N.Y. 2013) (Brodie, J.).  A

plaintiff must demonstrate standing as to each defendant for "each claim [she] seeks to

press." *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 64 (2d Cir. 2012) (alteration in original); *see*

*also id.* at 62 (rejecting argument that Article III standing "permits suits against non-injurious

defendants as long as one of the defendants in the suit injured the plaintiff"); *Reniger v. Hyundai*

*Motor Am.*, 122 F. Supp. 3d 888, 895 (N.D. Cal. 2015) (in cases "where there are multiple

defendants and multiple claims," the plaintiff must demonstrate Article III standing "as to each

defendant and each claim").  To have standing, a plaintiff must affirmatively "establish three

things: (1) that she has suffered an 'injury in fact,' (2) which was caused by the defendants'

actions, and (3) which the court can likely 'redress' or make right through a favorable decision."

*Justice*, 985 F. Supp. 2d at 336; *see also Chang v. Fage USA Dairy Indus.*, No. 14-cv-3826, 2016

WL 5415678, at *4 (E.D.N.Y. Sept. 28, 2016) (Brodie, J.).  A plaintiff seeking injunctive relief

against defendants who have no authority to provide the requested relief thus lacks standing

because those defendants cannot redress the alleged injury.  *See, e.g.*, *Okpaolobi v. Foster*, 244

9

F.3d 405, 427 (5th Cir. 2001) (en banc) (holding that plaintiffs lacked standing where defendants "have no power to redress the asserted injuries"); *Thomas-Ateba v. SAMHSA of the U.S. Gov't*, No. 13-cv-4662, 2014 WL 1414577, at *3 n.3 (E.D.N.Y. Apr. 10, 2014) (plaintiff lacked "standing to seek injunctive relief against HHS-SAMHSA, because the agency has no authority to grant plaintiff the injunctive relief that she seeks"); *McDaniel v. Bd. of Educ.*, 956 F. Supp. 2d 887, 893 (N.D. Ill. 2013) (similar); *Justice*, 985 F. Supp. 2d at 337, 341-42 (similar).

Under this settled rule, plaintiffs lack standing to seek injunctive relief from the bank defendants because none of the bank defendants can provide plaintiffs relief from the challenged Visa and Mastercard rules.  To satisfy their burden to establish standing, plaintiffs would, at a minimum, need to allege facts plausibly establishing that each of the bank defendants has the ability or authority to change Visa or Mastercard rules.  As explained below, plaintiffs have not met their burden here, and their claims for injunctive relief must be dismissed.

### Post-IPO Visa Allegations

Plaintiffs acknowledge, as they must, that the bank defendants "surrendered a majority of their equity and governing stake in Visa" when Visa conducted its IPO.  (Compl. ¶ 249.) Plaintiffs try to evade the fatal implications of that fact by asserting that the bank defendants nevertheless "retain substantial representation on the Board."  (*Id*.)  Plaintiffs are apparently referring to their allegation that Visa member banks "were permitted to elect 6 of 17 directors over the three years following the [Visa] IPO" (*id.* ¶ 238)—a period that ended in 2011, *i.e.*, more than seven years ago.  That allegation does not help plaintiffs because it does not suggest that the bank defendants control Visa's board now.  In fact, no employee or officer of any bank

10

defendant currently serves on the Visa board, a fact of which this Court may take judicial notice.
*See supra* p. 3 note 2.[4]

Unable to show control through board representation, plaintiffs contend that some of the
bank defendants have "veto rights" on "certain extraordinary transactions," including Visa
"exit[ing] from the core payments business."  (Compl. ¶ 239.)  Plaintiffs cannot explain,
however, how such "veto rights" translate into a bank defendant's ability to change, or block
changes to, the Visa rules plaintiffs challenge.  Instead, plaintiffs merely offer a conclusory
assertion "[o]n information and belief" that the veto rights "would allow the Member Banks to
block an attempt by Visa to eliminate Interchange Fees."  (*Id.* ¶ 251.)  Plaintiffs allege no factual
basis for that bald assertion—indeed, the alleged "veto rights" on which plaintiffs rely make no
reference to interchange or any other network fee.  *See* Visa Inc., Prospectus (Form 424(B)(4)),
at 219 (Mar. 18, 2008), https://www.sec.gov/Archives/edgar/data/1403161/00011931250
8060989/d424b4.htm (*see* Willett Decl. Ex. C) (permitting holders of class of stock held by bank
defendants to vote only on limited Visa actions following the IPO, including "any consolidation,
merger, combination or . . . any decision by us to exit our core payments business"); *see also id.*
at 38, F-42, F-96.[5]  Plaintiffs therefore have not met their burden of plausibly establishing that
any of the bank defendants, individually or collectively, have control over the challenged Visa
rules.  *See B & R Supermarket, Inc. v. Visa, Inc.*, No. 16-cv-1150, 2016 WL 5725010, at *10

---

[4] Because the Court can consider matters outside the pleadings on this Rule 12(b)(1) motion, the bank
defendants could also submit declarations attesting to these publicly available facts if plaintiffs attempt to
dispute them or the Court otherwise deems it necessary.

[5] The Court may take judicial notice of this document.  *See supra* note 2.  Moreover, because the filing
was referred to explicitly in the Complaint, was in plaintiffs' possession, and was relied on by them in
pleading, it is incorporated by reference and may be considered at the motion to dismiss stage.  *See supra*
note 3.

(N.D. Cal. Sept. 30, 2016) (allegations that issuing banks had "veto power" over some Mastercard decisions failed to plausibly suggest "control" of Mastercard's board and decisions related to network rules).

### Post-IPO Mastercard Allegations

Plaintiffs' allegations about the bank defendants' purported control of post-IPO Mastercard are equally deficient.  Plaintiffs assert in a conclusory fashion that "MasterCard remains under the effective control of its Member Banks."  (Compl. ¶ 215.)  But plaintiffs allege no facts to support this assertion.  Plaintiffs allege that "the largest Member Banks have representatives on the [Mastercard] Board," but they do not identify how many—as noted, this Court can take judicial notice that in fact none of the bank defendants has such a representative—nor do they explain how allegedly having some unspecified minority representation on the board would translate into "effective control" of Mastercard.  These allegations thus are not sufficient to plead that the bank defendants control Mastercard.  *See In re Citigroup Inc. S'holder Derivative Litig.*, 788 F. Supp. 2d 211, 215 (S.D.N.Y. 2011) (holding that plaintiffs had not plausibly alleged demand futility because complaint "cannot overcome a simple irrefutable arithmetic fact: the eight directors who plaintiffs claim are not impartial do not constitute a majority of the seventeen-person board").[6]

Plaintiffs likewise allege that "[t]he six largest Issuing Banks in the United States now account for almost 90 percent of the issuance of credit cards" (Compl. ¶ 215(e)), but they do not explain how that equates to control of Mastercard.  While some of the bank defendants may well

---

[6] It also goes without saying that a demonstrably inaccurate allegation that one or two of the bank defendants has a seat on a board does not provide standing to sue the numerous other bank defendants against whom no such allegation is made.

be among Mastercard's largest customers and members, and Mastercard may well take into

account how any rule change might affect them, that is hardly tantamount to the bank defendants

having the ability to amend or rescind a rule.

Next, plaintiffs attempt to construct a string of speculative scenarios, claiming that if

there were an adverse judgment in the action brought on behalf of a class under Rule 23(b)(3),

and if that judgment were to render Mastercard insolvent, the bank defendants would "alone

have the resources" to satisfy such an adverse judgment.  (*Id.* ¶ 215(g); *see also id.* ¶ 215(i).)

Whatever the relative resources of the defendants in these lawsuits, plaintiffs cannot explain how

this speculative (and counterfactual)[7] scenario translates into the bank defendants' control of

Mastercard.

Plaintiffs similarly suggest that "the Member Banks of MasterCard retained certain veto

rights through their Class M shares in the MasterCard restructuring."  (*Id.* ¶ 239.)  But, as with

Visa, none of these purported veto rights refer to interchange or any other network fee or any

rule.  *See* MasterCard Inc., Prospectus (Form 424(B)(4)), at 31 (May 24, 2006),

https://www.sec.gov/Archives/edgar/data/1141391/000119312506119247/d424b4.htm (*see*

Willett Decl. Ex. D) (permitting holders of class of stock held by bank defendants to vote only

on limited Mastercard actions following the IPO, including "the consummation of mergers or

consolidations of MasterCard or for us to cease to engage in the business of providing core

---

[7] As this Court is aware, the merchant damages class has reached a settlement with defendants in that action subject to Court approval.  Nothing in that settlement in any way affects Mastercard's ongoing ability to make its own unilateral decisions regarding its rules.  Moreover, the bank defendants are themselves named defendants in the merchant damages class action.  Accordingly, if, hypothetically, there were a "ruinous" adverse judgment, the bank defendants would be jointly and severally liable for that judgment.  In short, there would be no need for Mastercard to call on the bank defendants to satisfy a judgment as some sort of favor—plaintiffs would be entitled to do so themselves.

network authorization, clearing and settlement services for branded payment card transactions"); *see also id.* at 134-35.[8]

As a final purported indication of control over Mastercard, plaintiffs cite the bank defendants' entry into a joint defense agreement with Mastercard and Visa.  (Compl. ¶ 215(j).)  But plaintiffs do not explain how entering into a joint defense agreement—a commonplace litigation practice—establishes that the bank defendants control Mastercard's rules.  *See, e.g.*, *Lemelson v. Bendix Corp.*, 104 F.R.D. 13, 18 (D. Del. 1984) ("[J]oint defense, standing alone, cannot provide any basis for antitrust liability.").  That plaintiffs stretch this far is a measure of how implausible their post-IPO control allegations are.[9]

### Remaining Post-IPO Allegations

In sum—even assuming, <u>arguendo</u>, that plaintiffs plausibly suggested that the bank defendants had the ability before the IPOs to amend or rescind Visa's or Mastercard's rules through the networks' boards of directors—plaintiffs' allegations regarding post-IPO developments suggest nothing of the sort.  *See B & R Supermarket*, 2016 WL 5725010, at *10-11 (where plaintiffs pleaded issuing banks could elect up to 25% of Mastercard's post-IPO board and had "veto power" over some Mastercard decisions, and made similar allegations related to post-IPO Visa, plaintiffs failed to plausibly allege "control" of either network's board and decisions related to network rules); *see also In re Payment Card Interchange Fee & Merch.*

---

[8] *See supra* note 5.

[9] Plaintiffs note that the joint defense agreement requires a signatory to notify other signatories if and when it is engaging in settlement discussions.  (Compl. ¶ 215(j).)  (Plaintiffs do not and cannot allege that there is any requirement that the substance of any such settlement discussion be conveyed to co-signatories, as opposed to the fact of the discussions.)  From this unexceptional foundation, they then leap to the bald assertion that the "purpose and effect of this provision is to provide a mechanism . . . to coordinate their conduct with respect to the levels of Interchange Fees to be imposed on Merchants in the future."  (*Id.*)  There is no logical basis for this leap, and plaintiffs allege no such purported coordination.

14

*Disc. Antitrust Litig.*, No. 05-md-1720, 2008 WL 5082872, at *10 (E.D.N.Y. Nov. 25, 2008)

(similar allegations regarding Mastercard's post-IPO structure did not render it plausible that

Mastercard's board would "be controlled by the banks"). And injunctive relief can be sought

only against a defendant who can redress plaintiffs' injury today—not a decade ago. Plaintiffs

therefore fall far short of meeting their burden to establish standing to seek injunctive relief from

the bank defendants.[10]

Moreover, other developments, *see supra* pp. 5-7, further highlight these deficiencies in

the Complaint. For example, in the course of approving the 2012 settlement agreement, this

Court observed that "the IPOs wrested control of Visa and MasterCard from the banks," 986 F.

Supp. 2d at 220, leaving Visa and Mastercard "with no bank governance," *id.* at 215. Likewise,

the settlement between the DOJ and Visa and Mastercard belies plaintiffs' factually unsupported

theory that the bank defendants somehow retain control of Visa and Mastercard rules or need to

be parties to any actions involving changes to the networks' respective rules. The DOJ would

not have excluded the banks from its 2010 action challenging Visa's and Mastercard's rules had

it believed that the banks controlled those rules. Nor would it have agreed to a settlement of that

action on terms that required Visa and Mastercard to make changes to their rules if non-parties to

the settlement (and thus not bound by its terms) could undo or block those changes. The bank

defendants were irrelevant to the DOJ action and are equally so here, where plaintiffs likewise

seek to require changes to Visa's and Mastercard's rules that the bank defendants have no power

---

[10] Plaintiffs' decision to name as defendants Capital One F.S.B., Chase Manhattan Bank USA, N.A., and Chase Paymentech Solutions, LLC, which have not existed since well before plaintiffs filed their Complaint, only highlights this issue. While these defendants could easily be excised from the Complaint, the point remains: the Complaint does not plead why injunctive relief would be appropriate as to each bank defendant, as required.

to alter.  Plaintiffs' injunctive claims against the bank defendants should therefore be dismissed for lack of standing.

## II.     PLAINTIFFS DO NOT PLAUSIBLY ALLEGE AN ONGOING CONSPIRACY ENTITLING THEM TO INJUNCTIVE RELIEF UNDER THE CLAYTON ACT

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  To plausibly allege an antitrust conspiracy "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Id.* at 556.  Factual allegations couched as legal conclusions (*e.g.*, that defendants "conspired") should not be accepted as true, and conspiracy allegations that are equally consistent with independently-adopted business strategies do not plausibly allege a conspiracy. *See id.* at 553-57.

### A.     The Clayton Act Allows Injunctive Relief Only If Plaintiffs Plausibly Allege an Impending or Contemporary Antitrust Violation

Under Section 16 of the Clayton Act, injunctive relief is available only "against threatened loss or damage by a violation of the antitrust laws."  15 U.S.C. § 26 (emphasis added). "In other words, plaintiffs 'must demonstrate a significant threat of injury from an impending violation . . . or from a contemporary violation likely to continue or recur.'" *In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 209 (S.D.N.Y. 2012) (emphasis added) (quoting *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 13 (1st Cir. 2008)).  To determine whether a plaintiff may bring an injunctive relief claim under the Clayton Act, courts therefore focus on whether there is a significant threat of "defendants engag[ing] in future violations of the type alleged." *B-S Steel of Kan., Inc. v. Tex. Indus.*, 439 F.3d 653, 668 (10th Cir. 2006) (emphasis added).

16

Moreover, to threaten future harm, the conspiracy itself—not merely its effects—must be continuing. As the Second Circuit has explained, "[t]hough the result of a conspiracy may be continuing, the conspiracy does not thereby become a continuing one. Continuity of action to produce the unlawful result, or . . . continuous co-operation of the conspirators to keep it up is necessary." *Grimm*, 738 F.3d at 503-04 (quoting *Fiswick v. United States*, 329 U.S. 211, 216 (1946)); *see also In re G-fees Antitrust Litig.*, 584 F. Supp. 2d 26, 34-35 (D.D.C. 2008) (finding that injunctive relief is unavailable under the Clayton Act where allegations focused on continuing effects of a prior conspiracy, rather than "specific future conduct"). To demonstrate the requisite continuity of action, plaintiffs must "allege an overt act which (1) is a new and independent act that is not merely a reaffirmation of a previous act; and (2) inflict[s] new and accumulating injury on the plaintiff." *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 228 (E.D.N.Y. 2003) (internal quotation marks omitted); *see also id.* ("[C]ourts within the Second Circuit consistently have looked unfavorably on continuing violation arguments . . . ." (internal quotation marks omitted)). Acts that "are 'merely the abatable but unabat[ed] inertial consequences of'" the allegedly anticompetitive act do not constitute new predicates sufficient to continue a conspiracy. *Id.* at 229 (quoting *Al George, Inc. v. Envirotech Corp.*, 939 F.2d 1271, 1275 (5th Cir. 1991)). Thus, to plausibly establish that the conspiracy is in fact continuing, the complaint must contain allegations of conduct that suggests continuing "concerted action," *Grimm*, 738 F.3d at 504, not merely consequences that are "the *result* of a completed conspiracy," *id.* at 503.[11]

_____

[11] For example, in industries where high prices are not necessarily indicative of a conspiracy—due for example to structural characteristics of the industry—allegedly continued high prices several years after an alleged conspiratorial agreement do not adequately plead that the conspiracy is continuing. *See In re*

*(cont'd)*

17

**B.     Plaintiffs Do Not Plausibly Allege an Impending or Contemporary Antitrust Violation**

Plaintiffs do not allege ongoing conduct by the bank defendants in furtherance of the alleged conspiracy to continue to impose network rules during the decade since the Visa and Mastercard IPOs.  Instead, plaintiffs offer two theories to try to bridge that untraversable gap.  The first theory, that the bank defendants continue to control Visa's and Mastercard's rules after the IPOs, is factually unsupported and implausible on its face, as demonstrated above.  *See supra* Section I.B.  Hedging their bets, plaintiffs assert an alternative theory that, even if the alleged conspiracy based on the bank defendants' asserted control of Visa and Mastercard terminated with the IPOs, the conspiracy continued or was reconstituted in a different form.  According to plaintiffs, "[b]efore the IPOs, the Member Banks conspired with each other and with Visa and MasterCard to collectively fix uniform schedules of default Interchange Fees."  (Compl. ¶ 130.)  And after the IPOs, each of the bank defendants supposedly "has agreed that Visa and MasterCard may apply uniform schedules of default Interchange Fees" and "understand[s]" that the other banks will likewise adhere to the uniform schedules.  (*Id*. ¶¶ 42-43.)

This alternative theory fares no better because a bare allegation of parallel conduct without any indicia of continuing "concerted" action among the bank defendants fails the standards established in *Twombly* and *Grimm*.  In *Twombly*, the Supreme Court made clear that allegations of parallel conduct, without more, cannot survive a motion to dismiss a conspiracy complaint.  550 U.S. at 549.  There, local telephone companies known as "Incumbent Local Exchange Carriers" or "ILECs" lost their regional service monopolies with the enactment of the

_____
*(cont'd from previous page)*
*Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 909-10 (6th Cir. 2009); 2 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 320(c)(2) (3d ed. 2007).

Telecommunications Act in 1996, which required them to open their service areas to competition in exchange for giving the ILECs authority to enter the long-distance market. *Id.* The plaintiffs alleged that, despite the structural changes wrought by the Telecommunications Act, the ILECs suppressed competition by agreeing with one another (1) to prevent potential competitors, known as "Competitive Local Exchange Carriers" or "CLECs" from entering the ILECs' regional markets, and (2) to refrain from competing against each other by pursuing business opportunities in different regional markets. *Id.* at 550-51. The Second Circuit found these allegations sufficient to state a claim for conspiracy, but the Supreme Court reversed. *Id.* at 553. The Supreme Court reasoned that each of the ILECs had an incentive to "sit[] tight," maintaining the business advantages each had previously enjoyed as a structural monopoly. *Id.* at 568. This "obvious alternative explanation" for the ILECs' alleged continuing parallel conduct was fatal to the plaintiffs' complaint, because it meant that the allegations of an "agreement" among them did not cross "the line from conceivable to plausible." *Id.* at 570.

Here, too, there is an "obvious alternative explanation," at two different levels. As an initial matter, there is an "obvious alternative explanation" for Visa's and Mastercard's respective imposition of their rules other than alleged bank control of the networks—namely, that it is in each of their individual self-interest to do so. *See Nat'l Bankcard Corp. (NaBANCO) v. Visa U.S.A., Inc.*, 779 F.2d 592, 602 (11th Cir. 1986) ("[U]niversality of acceptance—the key element to a national payment system—could not be guaranteed absent prearranged [default] interchange rules."); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 986 F. Supp. 2d at 219 (default interchange and honor all cards rules "have significant procompetitive effects"). In fact, given the banks' lack of control over the networks, this explanation is not only an obvious alternative, but a far more plausible one.

Plaintiffs make no further headway with the conclusory assertion that the bank defendants—along with the thousands of other banks and credit unions that are network members—collusively agreed to follow the Visa and Mastercard rules that are a condition of network membership.  This also has an obvious alternative explanation: the bank defendants each independently determined to follow the network rules because it is in their individual self-interest to be a network member and issue payment cards under the Visa and Mastercard brands. That alternative explanation is rendered even more obvious given the stark absence of any factual allegations—after years of discovery covering the time period going back to 2000—suggesting ongoing collusion or even communication among the banks concerning the setting of network rules.

Dismissal here is accordingly warranted no less than in *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008), where the Ninth Circuit affirmed dismissal of a complaint alleging a similar conspiracy by Visa, Mastercard, and several banks that are members of the networks to fix interchange and other fees.  Relying on *Twombly* and citing the plaintiffs' "conclusory statement" that the defendant banks "knowingly, intentionally and actively participated" in a conspiracy to fix interchange or merchant discount fees, the Ninth Circuit held that the plaintiffs "failed to plead any evidentiary facts beyond parallel conduct to prove their allegation of a conspiracy." *Id.* at 1048.  The court elaborated that "merely charging, adopting or following the fees set by a Consortium is insufficient as a matter of law to constitute a violation of Section 1 of the Sherman Act." *Id.*  The same conclusion follows here.

If anything, plaintiffs' allegations here are structurally similar to cases where litigants have attempted to rely on "hub-and-spoke" conspiracies without showing any agreement between the alleged "spokes" of the conspiracy.  These "rimless wheel" conspiracies are

20

routinely rejected by courts across the country, including by the Second Circuit.  *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 110 (2d Cir. 2002) (holding that the district court properly rejected plaintiff's antitrust claims because plaintiff "offered no evidence of direct communications among [alleged spokes]"); *see also Dickson v. Microsoft Corp.*, 309 F.3d 193, 203-04 (4th Cir. 2002) (rejecting allegation of "rimless wheel" conspiracy); *Impro Prods., Inc. v. Herrick*, 715 F.2d 1267, 1279-80 (8th Cir. 1983) (rejecting "rimless" conspiracy where plaintiff failed to show agreement between spokes).  Such conspiracies are rejected because they "do not plausibly imply anything more than parallel conduct by the [spokes], [and] they cannot support the inference that the [spokes] associated together for a common purpose of engaging in a course of conduct."  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 374 (3d Cir. 2010) (internal quotation marks omitted); *see also United States v. Apple, Inc.*, 791 F.3d 290, 314 n.15 (2d Cir. 2015) (for a hub-and-spoke conspiracy, "the plaintiff must also prove the existence of a 'rim' to the wheel in the form of an agreement among the horizontal competitors").

There is no basis for a different result here.  As the Second Circuit has made clear, even assuming that a conspiracy previously existed, to demonstrate that a conspiracy has continued, there must be indicia of <u>ongoing</u> "concerted action."  *Grimm*, 738 F.3d at 504.  In *Grimm*, the defendants had agreed to pay kickbacks to brokers that enabled them to defraud municipalities in the bond market by paying below-market interest rates.  The five-year statute of limitations required the government to allege overt acts after July 2004.  While the indictment contained numerous allegations of overt joint action by the defendants before that date, the only allegation after July 2004 was the payment and receipt of interest under the purportedly fraudulent agreements entered years earlier.  On these facts, the Second Circuit rejected the indictment, ruling that the interest payments were the mere "*result* of a completed conspiracy, and [were] not

21

in furtherance of one that is ongoing." *Id*. at 503; *see also In re New Motor Vehicles,* 522 F.3d at

14 (holding that plaintiffs cannot pursue injunctive relief under Clayton Act where they "failed to

establish the continuing presence of the requisite threatened injury" because the "'perfect

storm' . . . ceased long ago").

     *Grimm* compels dismissal of plaintiffs' claims against the bank defendants here.  Because

plaintiffs do not allege any post-IPO overt acts—no meetings, communications, or other actions

purporting to reflect an agreement—by the bank defendants to collectively set, adjust, or even

agree to follow the challenged rules, they have not sufficiently alleged a continuing conspiracy.[12]

Thus, even had plaintiffs sufficiently pleaded a pre-IPO conspiracy and harm resulting from it,

no <u>continuing</u> conspiracy has been alleged, and the bank defendants do not threaten any

<u>impending</u> or <u>contemporary</u> antitrust violations—all prerequisites to injunctive relief.  The

injunctive antitrust claims against the bank defendants must accordingly be dismissed.  *Grimm*,

738 F.3d at 503-04; *see also In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 905 (6th

Cir. 2009) (affirming dismissal of Sherman Act allegations that, following bankruptcy, airline

continued to set travel agency sales commission at levels allegedly fixed by pre-bankruptcy

horizontal conspiracy because complaint contained nothing more "than bare assertions of

conspiracy and parallel conduct"); *B & R Supermarket*, 2016 WL 5725010, at *10-11

(dismissing Sherman Act complaint against bank defendants alleging conspiracy to shift liability

---

[12] The absence of any post-IPO overt acts distinguishes this case from others where courts have found allegations of a continuing conspiracy sufficient. *See, e.g.*, *In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1069-70 (8th Cir. 2017) (en banc) (continuing conspiratorial communications rendered plausible claims that horizontal conspiracy was ongoing); *Schenker AG v. Societe Air Fr.*, 102 F. Supp. 3d 418, 426-27 (E.D.N.Y. 2015) (allegations of meetings followed by subsequent price increases constituted additional overt acts); *Bailey Lumber & Supply Co. v. Ga.-Pac. Corp.*, No. 08-cv-1394, 2010 WL 1141133, at *4 (S.D. Miss. Mar. 19, 2010) (allegations of continued exchange of sensitive price information constituted additional overt acts).

to merchants for fraudulent charges where allegations that banks "continue to control Visa and MasterCard are vague and conclusory" and where allegations of agreement require "too much speculation").

Nothing in this analysis is precluded by Judge Gleeson's prior denial of the motion to dismiss the opt-out complaints for damages.  Judge Gleeson denied that motion because the opt-out plaintiffs had alleged "that the [bank] defendants didn't withdraw from the illegal concerted activity" by virtue of the networks' IPOs.  (Hr'g Tr. at 53:21-22, July 18, 2014, ECF No. 6342.) That ruling is inapposite here, where the question is not whether the bank defendants have satisfied the burden of demonstrating that the IPOs constituted withdrawal from the alleged pre-IPO conspiracies—for this motion is not based on withdrawal—but rather whether plaintiffs have met their burden of alleging post-IPO overt acts by the bank defendants suggesting active participation in a continuing conspiracy that would justify injunctive relief against them.  *See Kor. Kumho Petrochemical v. Flexsys Am. LP*, No. 07-cv-1057, 2008 WL 686834, at *8 n.8 (N.D. Cal. Mar. 11, 2008) ("Plaintiff's reliance on authorities concerning the alleged withdrawal by one defendant from a continuing conspiracy is misplaced [because] . . . Plaintiff's own allegations concerning the behavior of the other two alleged co-conspirators renders it implausible that any conspiracy continued into 2005."); *see also United States v. Borelli*, 336 F.2d 376, 385 (2d Cir. 1964) ("[W]e agree also that Tantillo did not make out the affirmative defense of withdrawal as a matter of law.  But before that issue is reached, the Government must present evidence justifying the jury in finding beyond a reasonable doubt that the particular agreement into which a defendant entered continued into the period not barred by limitation, and the scope of his agreement must be determined individually from what was proved as to him.") (citation omitted); *United States v. Juodakis*, 834 F.2d 1099, 1103 (1st Cir.

23

1987) (holding that the government's prosecution was barred because it had failed to prove an overt act in furtherance of the conspiracy during the limitations period, notwithstanding that "under the stringent standards for withdrawal . . . the district court was probably correct that defendant could not be said as a matter of law to have withdrawn from the conspiracy"). Accordingly, plaintiffs' injunctive claims against the bank defendants should be dismissed.

Plaintiffs' declaratory relief claims fail for the same reasons as the injunctive relief claims—namely, because plaintiffs fail to allege an ongoing conspiracy among the bank defendants and Visa and Mastercard that is likely to injure plaintiffs in the future. *See McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 284 (2d Cir. 2004) ("A plaintiff seeking . . . declaratory relief cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the future.").

The Cartwright Act claims are subject to dismissal for the same reasons. *See B & R Supermarket*, 2016 WL 5725010, at *12 ("The Cartwright Act was patterned after Section 1 of the Sherman Act, and the pleading requirements under the two statutes are similar.").

## CONCLUSION

For the foregoing reasons, this Court should dismiss plaintiffs' claims against the bank defendants.

24

Dated: January 16, 2019                    Respectfully submitted,


                                           **SKADDEN, ARPS, SLATE, MEAGHER &
                                           FLOM LLP**

                                           By: /s/ *Boris Bershteyn*
                                                  Boris Bershteyn
                                                  Kamali P. Willett
                                                  Skadden, Arps, Slate, Meagher & Flom
                                                     LLP
                                                  Four Times Square
                                                  New York, NY 10036
                                                  (212) 735-3000
                                                  boris.bershteyn@skadden.com
                                                  kamali.willett@skadden.com

                                           *Attorneys for Defendants Chase Bank USA,
                                           N.A., Chase Manhattan Bank USA, N.A.,
                                           Chase Paymentech Solutions, LLC, JPMorgan
                                           Chase Bank, N.A., and JPMorgan Chase &
                                           Co.*

                                           **PATTERSON BELKNAP WEBB &
                                           TYLER LLP**

                                           By: /s/ *Robert P. LoBue*
                                                  Robert P. LoBue
                                                  William F. Cavanaugh
                                                  Patterson Belknap Webb & Tyler LLP
                                                  1133 Avenue of the Americas
                                                  New York, NY 10036
                                                  (212) 336-2000
                                                  rplobue@pbwt.com
                                                  wfcavanaugh@pbwt.com

                                           *Attorneys for Wells Fargo & Co.*

**O'MELVENY & MYERS LLP**

By: */s/ Abby F. Rudzin*
    Andrew J. Frackman
    Abby F. Rudzin
    O'Melveny & Myers LLP
    Times Square Tower
    7 Times Square
    New York, NY 10036
    (212) 326-2000
    afrackman@omm.com
    arudzin@omm.com

*Attorneys for Capital One Bank, (USA), N.A.
and Capital One Financial Corporation*

**MORRISON & FOERSTER LLP**

By: */s/ Mark P. Ladner*
    Mark P. Ladner
    Michael B. Miller
    Morrison & Foerster LLP
    1290 Avenue of the Americas
    New York, NY 10104
    (212) 468-8000
    mladner@mofo.com
    mbmiller@mofo.com

*Attorneys for Defendants Bank of America,
N.A., BA Merchant Services LLC, and Bank of
America Corporation*

26

**SIDLEY AUSTIN LLP**

By: /s/ *David F. Graham*
     David F. Graham
     Sidley Austin LLP
     One South Dearborn Street
     Chicago, IL 60603
     (312) 853-7000
     dgraham@sidley.com

     Benjamin R. Nagin
     787 Seventh Avenue
     New York, NY 10019
     (212) 839-5300
     bnagin@sidley.com

*Attorneys for Defendants Citigroup Inc.,
Citibank, N.A., Citibank (South Dakota), N.A.,
and Citicorp*

**SHEARMAN & STERLING**

By: /s/ *Richard F. Schwed*
     Richard F. Schwed
     Grace J. Lee
     Shearman & Sterling
     599 Lexington Avenue
     New York, NY 10022
     (212) 848-4000
     rschwed@shearman.com
     grace.lee@shearman.com

*Attorneys for Barclays Bank plc, Barclays
Bank Delaware, and Barclays Financial Corp.*

27