**UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | Case No. 05-md-01720-MKB-JO |

This Document Relates To:

*Barry's Cut Rate Stores Inc. et al. v. Visa, Inc., et al.*, 05-md-01720-MKB-JO


**EQUITABLE RELIEF CLASS PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
BANK DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................................................................ii

INTRODUCTION...........................................................................................................................1

SUMMARY OF RELEVANT ALLEGATIONS...........................................................................7

ARGUMENT...................................................................................................................................7

I.  THE COMPLAINT ALLEGES THAT THE BANKS ARE PARTICIPANTS IN, AND
COMMIT OVERT ACTS IN FURTHERANCE OF, ONGOING
CONSPIRACIES...........................................................................................................................8

     A. The Complaint Alleges that the Banks designed and implemented the Unlawful
Restraints and have never withdrawn from those conspiracies........................................................9

     B.  The Complaint alleges ongoing hub-and-spoke conspiracies in which the Networks
are the hubs and the Banks are the joined spokes.........................................................................11

II.  PLAINTIFFS HAVE ARTICLE III STANDING BECAUSE THE COMPLAINT
PROPERLY SEEKS INJUNCTIE RELIEF AGAINST THE
BANKS.........................................................................................................................................22

CONCLUSION.............................................................................................................................26

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Air Cargo Shipping Servs. Antitrust Litig.*,
No. 06-MDL-1775 JG VVP, 2010 WL 10947344 (E.D.N.Y. Sept. 22, 2010) ................21

*Am. Needle, Inc. v. Nat'l Football League*,
560 U.S. 183 (2010) .........................................................................................................17

*Anderson News, LLC v. American Media, Inc.*,
680 F.3d 162 (2d Cir. 2012) ...........................................................................................16

*Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC,*
843 F.3d 1225 (10th Cir. 2016) ......................................................................................19

*Ciprofloxacin Hydrochloride Antitrust Litig.*,
261 F. Supp. 2d 188 (E.D.N.Y. 2003) ............................................................................20

*Drug Mart Pharmacy Corp. v. Am. Home Prod. Corp.*,
288 F. Supp. 2d 325 (E.D.N.Y. 2003) ............................................................................10

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006) .........................................................................................................24

*In re G-Fees Antitrust Litig.*,
584 F. Supp. 2d 26 (D.D.C. 2008) ..................................................................................20

*Int'l Salt Co. v. U.S.*,
332 U.S. 392 (1947) .........................................................................................................24

*Interstate Circuit, Inc. v. U.S.*,
306 U.S. 208 (1939) ....................................................................................14, 15, 20, 22, 23

*Justice v. Kuhnapfel*,
985 F. Supp. 2d 334 (E.D.N.Y. 2013) ............................................................................23

*Klehr v. A.O. Smith Corp.*,
521 U.S. 179 (1997) .........................................................................................................21

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*,
359 U.S. 207 (1959) .........................................................................................................23

*Korea Kumho Petrochemical v. Flexsys Am. LP,*

No. C07-01057 MJJ, 2008 WL 686834 (N.D. Cal. Mar. 11, 2008) ...............................20

*Laumann v. Nat'l Hockey League*,
    907 F. Supp. 2d 465 (S.D.N.Y. 2012) ...............................................16, 20, 23

*Maricopa Cnty. v. Am. Pipe & Const. Co.*,
    303 F. Supp. 77 (D. Ariz. 1969), *aff'd*, 431 F.2d 1145 (9th Cir. 1970) ............................21

*Meyer v. Kalanick*,
    174 F. Supp. 3d 817 (S.D.N.Y. 2016) ...................................................16, 20

*Meredith Corp. v. SESAC LLC*,
    1 F. Supp. 3d 180 (S.D.N.Y. 2014) .......................................................20, 24

*Miller v. American Stock Exchange (In re Stock Exchs. Options Trading Antitrust Litig.)*,
    317 F.3d 134 (2d Cir. 2003) ...............................................................22

*Nat'l Soc. of Prof'l Eng'rs v. U.S.*,
    435 U.S. 679 (1978) ......................................................................24

*Nat'l Souvenir Ctr., Inc. v. Historic Figures, Inc.*,
    728 F.2d 503 (D.C. Cir. 1984) ...........................................................21

*PepsiCo, Inc. v. Coca-Cola Co.*,
    315 F.3d 101 (2d Cir. 2002) ..............................................................16

*Pa. Dental Ass'n v. Med. Serv. Ass'n of Pa.*,
    815 F.2d 270 (3d Cir. 1987) ..............................................................21

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*,
    No. 08-CV-42 (JG)(VVP), 2015 WL 13650032 (E.D.N.Y. June 24, 2015) ...................21

*Rite Aid Corp. v. Am. Exp. Travel Related Servs. Co.*,
    708 F. Supp. 2d 257 (E.D.N.Y. 2010) ...............................................18, 21

*Rosebrough Monument Co. v. Mem'l Park Cemetery Ass'n*,
    736 F.2d 441 (8th Cir. 1984) ........................................................20, 24

*SE Milk Antitrust Litig.*,
    555 F. Supp. 2d 934 (E.D. Tenn. 2008) ..................................................21

*Sitt v. Nature's Bounty, Inc.*,
    No. 15-CV-4199 (MKB), 2016 WL 5372794 (E.D.N.Y. Sept. 26, 2016) ......................23

*Teladoc, Inc. v. Texas Med. Bd.*,
    112 F. Supp. 3d 529 (W.D. Tex. 2015) ..............................................20, 24

*Toys 'R' Us v. FTC,*
    221 F.3d 928 (7th Cir. 2000) ................................................14, 16, 20, 23
*Trabert & Hoeffer, Inc. v. Piaget Watch Corp.,*
    633 F.2d 477 (7th Cir. 1980) ................................................................24

*U. S. v. Am. Exp. Co.,*
    2015 WL 1966362 (E.D.N.Y. Apr. 30, 2015) .....................................24

*U.S. v. Apple,*
    791 F.3d 290 (2d. Cir. 2015) ................................14, 15, 16, 19, 22, 24, 25

*U. S. v. Apple, Inc.,*
    889 F. Supp. 2d 623 (S.D.N.Y. 2012) ...............................................24

*U. S. v. Borden Co.,*
    308 U.S. 188 (1939) ...........................................................................21

*U.S. v. Diaz,*
    176 F.3d 52 (2d Cir.1999) .............................................................10, 11

*U.S. v. Flaharty,*
    295 F.3d 182 (2d Cir. 2002) ..............................................................10

*U.S. v. General Motors,*
    384 U.S. 127 (1966) ...........................................................................23

*U.S. v. Grimm,*
    738 F.3d 498 (2d Cir. 2013) .....................................................11, 18, 19, 20

*U.S. v. Leslie,*
    658 F.3d 140 (2d Cir. 2011) ..............................................................10

*U.S. v. Paramount Pictures,*
    334 U.S. 131 (1948) ...........................................................................24

*U. S. v. Rutigliano,*
    790 F.3d 389 (2d Cir. 2015) ..........................................................19, 20

*U.S. v. Socony-Vacuum Oil Co.,*
    310 U.S. 150 (1940) ...........................................................................11

*U.S. v. Salmonese,*
    352 F.3d 608 (2d Cir. 2003) ......................................................18, 19, 20

*U.S. v. Ward Baking Co.,*

376 U.S. 327 (1964) .................................................................................24

*U.S. Gypsum Co. v. Indiana Gas Co.*,
    350 F.3d 623 (7th Cir. 2003) .............................................................21

*U.S.S.E.C. v. Citigroup Glob. Markets, Inc.*,
    752 F.3d 285 (2d Cir. 2014) ..............................................................24

## SECONDARY SOURCES

Areeda & Hovenkamp, ANTITRUST LAW.......................................................24, 25

Herbert Hovenkamp & Christopher R. Leslie, *The Firm as Cartel Manager*,
    64 Van. L. Rev. 813 (2011) ...............................................................13, 14

## INTRODUCTION

The Court should deny the Defendant Banks' motion to dismiss the Equitable Relief Class Plaintiffs' Complaint.[1]  The Complaint alleges that the Banks have violated, and continue to violate, Sections 1 and 2 of the Sherman Act by developing, implementing, and continuing to agree to, and in fact adhering to, a series of unlawful restraints among themselves and with each of Visa and Mastercard (the "Networks"). Those unlawful agreements comprise, among others, the Default Interchange Rules, the Honor-All-Cards Rules, the No-Surcharge Rule, and the No-Discount Rule (the "Unlawful Restraints").

The Banks argue that the Complaint fails to allege that they are participants in an ongoing antitrust violation. They assert that, as a result of Mastercard and Visa's IPOs (in 2006 and 2008, respectively) the Banks no longer control a majority of the Visa or Mastercard boards. The Banks contend that because they no longer *promulgate* the Unlawful Restraints—a task that now falls to the separately incorporated Networks—the Banks are not committing overt acts in furtherance of the conspiracy by continuing to *agree and adhere* to those Unlawful Restraints.

The Court previously rejected these same arguments in denying the Banks' motion to dismiss the Direct Action Plaintiffs' ("DAPs") complaints. Nothing warrants a different conclusion now.[2]

---

[1] The operative Complaint is ECF 6892, a copy of which is attached hereto as Exhibit A.

[2] The Banks recycle the same arguments they made against the DAPs' complaints. Compare Memorandum in Support of Bank Defendants' Motion to Dismiss, Jan. 16, 2019 ("[T]here is an 'obvious alternative explanation' for Visa's and Mastercard's respective imposition of their rules other than alleged bank control of the networks— namely, that it is in each of their individual self-interest to do so…. In fact, given the banks' lack of control over the networks, this explanation is not only an obvious alternative, but a far more plausible one."), with Defendants' Memorandum In Support of Their Motion to Dismiss the Opt-Out Complaints, in No. 14-MD-01720, ECF 21, at 32 ("An individual bank's decision to adhere to a broad set of network rules ... in order to obtain the economic advantages of participating in the network, is in the independent self-interest of the bank.").

The Court summarily denied the Banks' prior motion on two independent grounds. First, the DAPs' complaints alleged that the conspiracies began when the Banks directly controlled the Networks and devised and implemented the Unlawful Restraints.[3] The DAPs' complaints alleged that those conspiracies continued, and "alleg[ed] that the defendants didn't withdraw from the illegal concerted activity."[4] As set forth in detail below, the Complaint here makes the same allegations.

Second, setting aside the Banks' failure to withdraw from the conspiracies that they directly initiated, the DAPs' complaints alleged that the change in the Networks' corporate form did not eliminate the unlawful *ongoing agreements* among the Banks and between the Banks and each of the Networks. The complaints alleged that "the IPO's left intact [the] anticompetitive restraints."[5] Again, the Complaint here makes the same allegations, as set forth in detail below.

The Banks assert one new argument for dismissal of this Complaint, contending that Plaintiffs lack Article III standing to obtain injunctive relief from the Banks. The Complaint alleges, however, that the Banks have not withdrawn from the conspiracies that they initiated. So the Banks would be jointly and severally liable for the coconspirator Networks' ongoing overt acts in furtherance of the conspiracies even if, post-IPO, the Banks were not continuing to commit their own such acts. Regardless, the Complaint alleges that the Banks are in fact continuing to commit their own overt acts: they continue to agree and adhere to the Unlawful Restraints, and they collect ongoing and accumulating overcharges from the merchants. Plaintiffs are entitled to injunctive relief prohibiting the Banks from continuing to agree and

---

[3] Hearing Tr., 14-md-1720, at 53 (July 18, 2014) (Attached hereto as Exhibit B).

[4] *Id*. at 53:20-24 (July 18, 2014).

[5] *Id*.

adhere to the Unlawful Restraints and requiring the Banks to take affirmative steps to ameliorate the anticompetitive effects they continue to cause.

## SUMMARY OF RELEVANT ALLEGATIONS

"For a half-century America's largest banks have fixed the fees imposed on Merchants … for transactions processed over the dominant Visa and MasterCard networks and have collectively imposed restrictions on Merchants that prevent them from protecting themselves against those fees. These practices continued despite the networks' and the banks' more recent attempts to avoid antitrust liability by restructuring the Visa and MasterCard corporate entities. Even after litigation, legislation, and regulation forced needed reforms on the Defendants and technology threatened to disrupt Visa and MasterCard's dominant position in the marketplace, the Defendants used their market power to continue to restrain competition, harming Merchants, cardholders, and consumers in general, all in further violation of the antitrust laws."[6]

Before the IPOs, when the networks were associations of banks and the Banks were in control of the associations' boards of directors, the Banks directly developed and implemented the Unlawful Restraints.[7] "Collectively, the Bank Defendants, through their operation of Visa and MasterCard, adopted and approved the [Unlawful Restraints] and have significantly profited

---

[6] Complaint, at ¶ 1. The Complaint alleges that the interchange rates are supracompetitive, even after netting out the alleged "benefits" (e.g., rewards) to the cardholders. *Id*. at ¶ 110.

[7] *Id*. at ¶ 38; *id*. at 89 ("The Default Interchange Rules were adopted when Visa and MasterCard were owned and controlled by Defendants and other Member Banks and continually reaffirmed by votes of Visa and MasterCard's Boards of Directors that consisted of Member Banks."); *id*. at 104 ("Before the Visa IPO, the Bank Defendants, acting as members of Visa by and through the Visa Board of Directors, fixed uniform Interchange Fees for various Merchants and transactions for all Visa General Purpose Card and Debit Card transactions, and agreed to impose those price-fixed fees on Merchants.").

from those policies and continue to do so to this day."[8] The Banks specifically designed the Unlawful Restraints to enrich themselves at the expense of merchants: the Banks "adopted those rules with the purpose and effect of inflating Merchants' costs of accepting Payment Cards and using the ill-gotten profits from those Interchange Fees to line the pockets of the Member Banks."[9]

The Complaint alleges that before the IPOs "[t]he Court of Appeals for the Second Circuit held that Visa and MasterCard 'are not single entities; they are consortiums of competitors.' … [and] the networks and their Member Banks recognized that the networks were 'structural conspiracies' and 'walking conspiracies.'"[10]

The same conspiracies (one comprising the Banks and Visa, and another the Banks and Mastercard) continued seamlessly after the IPOs. "Before the IPOs, Bank Defendants, acting through the Visa and MasterCard Boards of Directors, collectively adopted and enforced rules that require the payment of an Interchange Fee, set at Visa and MasterCard's uniform levels, for all transactions on the respective networks. After the IPOs, the Bank Defendants agree to continue to abide by these rules. These unlawful agreements are enabled by other rules that were also collectively adopted and continue to be collectively enforced by the Bank Defendants and the other Member Banks."[11]

---

[8] *Id*. at ¶ 41.

[9] *Id.* at ¶ 88; *id*. 144 ("The Honor-All-Cards Rule, the No-Surcharge Rule and the Anti-Steering Restraints were adopted when Visa and MasterCard were owned and controlled by the Bank Defendants and the other Member Banks and continually reaffirmed by votes of Visa and MasterCard's Boards of Directors that consisted of Member Banks. Defendants adopted these Rules with the purpose and effect of inflating Interchange Fees and impairing competition.").

[10] *Id.* at ¶ 44.

[11] *Id.* at ¶ 138; *id*. at 42 ("Even after the corporate restructuring of Visa and MasterCard, the Bank Defendants continue to conspire to fix Interchange Fees and to impose the Anti-Steering Restraints and the other forms of anticompetitive conduct described herein. Each of the Bank Defendants belongs to Visa and MasterCard and has agreed that Visa and MasterCard may apply uniform schedules of default Interchange Fees to their Payment Card businesses and that they will adhere to the anticompetitive Visa and MasterCard rules.").

Specifically, Visa and Mastercard's so-called "default" interchange fees are the de facto fees because the other Unlawful Restraints eliminate the financial incentive for the Banks to compete on price for the merchants' business.[12] The Unlawful Restraints make the nominally "default" rates stick.

The IPOs cemented, rather than eliminated, the Networks' roles as cartel managers. The Banks designed the IPOs as fig leafs.[13] Their purpose was, in Mastercard's words, to "mitigate existing and potential legal and regulatory risks and manage reputational concerns."[14] Mastercard concluded, again in its own words, that "'the risk to MasterCard and its Member Banks in the United States was a loss of $16 billion annually, or a net present value of approximately $100 billion.'"[15] Mastercard searched for a new business model that would "mitigate the antitrust risk that MasterCard and its Member Banks would face *while preserving the revenue represented by Interchange Fees for its Member Banks*."[16]

Mastercard's solution was to "concoct[] a governance form that would be able to qualify MasterCard as a 'single entity' under the antitrust laws and not a 'structural conspiracy, while preserving the Member Banks' Interchange Fee revenue stream."[17] Mastercard expressly assured the Banks that, whatever its new structure, it would "protect and even increase Interchange [Fees] to keep and attract Banks."[18] The Banks were in fact reassured, with their executives

---

[12] *Id.* at ¶ 140.

[13] *Id*. at ¶¶ 193, 226.

[14] *Id.* at ¶ 168.

[15] *Id.*, at ¶ 184.

[16] *Id.* at ¶ 184 (emphasis added).

[17] *Id.* at ¶ 196 (emphasis added).

[18] *Id.* at ¶ 209; *see also id.* at 210 ("MasterCard addressed Bank unease by providing assurances that it would continue to act in their best interests after the IPO.").

concluding that the "IPO would result in 'little-to-no change'" and that "MasterCard would have 'the same objective, pre and post' IPO."[19]

The Complaint alleges that Visa donned the same fig leaf and made the same assurances to the Banks.[20] In summary, "[t]he intention of Visa and its Member Banks was to create just enough autonomy for the new Visa entity to remove the appearance of bank control, while maintaining in place the business model that courts and antitrust agencies in the United States and abroad had ruled constituted a structural conspiracy."[21]

Mastercard, Visa, and the Banks achieved their dual objectives—creating the appearance of reform while in fact continuing to deliver supracompetitive profits to the Banks—by, among other means, leaving the same Unlawful Restraints in place.[22] *"[I]nstead of changing their conduct*, MasterCard and its Member Banks elected to restructure themselves into a new MasterCard" with the goal of "continuing their anticompetitive behavior."[23] They "*restructured Old MasterCard such that MasterCard would continue to facilitate the transfer of funds from Merchants to Issuing Banks.*"[24]

The same is true of Visa and the Banks. "Thus, Visa admitted that its Issuing Member Banks that controlled the restructuring … approved the final restructuring plan with the goal in mind of protecting their business interests as Visa Issuers … rather than maximizing the value of

---

[19] *Id.* at ¶ 212.

[20] *Id.* at ¶ 216-259.

[21] *Id.* at ¶ 226.

[22] *Id.* at ¶ 42, 213, 215(a), (b).

[23] *Id.* at ¶ 213 (emphasis added).

[24] *Id.* (emphasis added).

Visa as an independent business."[25] Visa "guarantee[d] the continued flow [of] supracompetitive interchange fees from Merchants to Issuers in the post-restructuring world."[26]

Given the Banks' dominance of the Visa and Mastercard boards when the restructurings occurred, the result was essentially inevitable. The Banks' "long-standing control of MasterCard and Visa ha[d] impaired and distorted competition through adoption and enforcement of the Honor-All-Cards Rule and the Anti-Steering Restraints, … and the rules requiring the deduction of Interchange Fees by Issuing Banks on every transaction."[27] At the time of the IPOs, "[t]he six largest Issuing Banks in the United States … account[ed] for almost 90 percent of the issuance of credit cards," so "*neither MasterCard nor Visa [could] pursue any business strategy that does not involve ever-higher Interchange Fees imposed on Merchants.*"[28] The Defendants generated those supracompetitive fees by leaving in place the Unlawful Restraints that generated them.[29]

Thus, the same conspiracies that existed before the IPOs continued after them. Each of the Banks "has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint."[30] Moreover, "[s]ince the restructurings, no Defendant or Member Bank has taken any affirmative steps to withdraw from any of the MasterCard or Visa conspiracies described in this complaint. The Defendants and Member Banks continue to benefit—to the tune of tens of billions of dollars per year—from the supracompetitive Interchange Fees and other practices described in this complaint. Each Member Bank knows and understands that, even after the restructuring, it will continue to receive supracompetitive

---

[25] *Id.* at ¶ 246.

[26] *Id.*; *see also id.* at ¶ 252.

[27] *Id.* at ¶ 215(a).

[28] *Id.* at ¶ 215(b).

[29] *Id.* at ¶ 42, 155-158, 252, 260.

[30] *Id.* at ¶¶ 23, 25, 27, 30, 33, 35, 36.

Interchange Fees at the default rates, absent a bilateral agreement (which are disincentivized nearly out of existence by the Anti-Steering Restraints)."[31]

In short, "[e]ven after the corporate restructuring of Visa and MasterCard, the Bank Defendants continue to conspire to fix Interchange Fees and to impose the Anti-Steering Restraints and the other forms of anticompetitive conduct described herein. Each of the Bank Defendants belongs to Visa and MasterCard and has agreed that Visa and MasterCard may apply uniform schedules of default Interchange Fees to their Payment Card businesses and that they will adhere to the anticompetitive Visa and MasterCard rules."[32]

The Complaint requests injunctive relief against the Banks that, among other things: (1) prohibits them "from, in any manner, directly or indirectly, committing the violations of the Cartwright and Sherman Acts, in which they and co-conspirators have been engaged"[33]; and (2) "[g]rant[s] further relief as is necessary to correct for the anticompetitive market effects caused by Defendants' unlawful conduct."[34]

## ARGUMENT

### I.  THE COMPLAINT ALLEGES THAT THE BANKS ARE PARTICIPANTS IN, AND COMMIT OVERT ACTS IN FURTHERANCE OF, ONGOING CONSPIRACIES.

On each of two independently adequate grounds, the Court previously rejected the Banks' contention that they are not liable for the conspiracies' ongoing anticompetitive conduct. The Banks themselves directly designed and implemented the Unlawful Restraints and have never withdrawn from those conspiracies. And the Banks continue to actively participate in the

---

[31] *Id.* at ¶ 260.

[32] *Id.* at ¶ 42. Each Bank, as an acquirer, also agrees to impose the restraints on the merchants. *Id.* at ¶¶ 43, 155-156.

[33] *Id.* at ¶ XIV B.

[34] *Id.* at ¶ XIV F.

conspiracies because they continue today to agree and adhere to the Unlawful Restraints that the IPOs left in place.[35] The Court should reaffirm those conclusions.

### A. The Complaint alleges that the Banks designed and implemented the Unlawful Restraints and have never withdrawn from those conspiracies.

The Complaint alleges that the Banks originally controlled the networks and thereby directly established and set the interchange rates and adopted the Unlawful Restraints.[36] In acting jointly through the associations, the Banks operated as "walking conspiracies."[37]

Like the DAPs' complaints, the Plaintiffs' Complaint alleges that "[s]ince the restructurings, no Defendant or Member Bank has taken any affirmative steps to withdraw from any of the MasterCard or Visa conspiracies described in this complaint."[38] Instead, the "Member Banks continue to benefit—to the tune of tens of billions of dollars per year—from the supracompetitive Interchange Fees and other practices described in this complaint."[39]

The Court denied the Banks' motions to dismiss the DAPs' complaints because the Banks failed to establish that they had withdrawn from the conspiracies.[40] The Banks now *concede* that their defense of "withdrawal" is not cognizable on a motion to dismiss this

---

[35] The Banks try to countermand the Complaint's allegations with citations to numerous documents outside the Complaint. The Banks' citations are especially improper because, since the filing of the Complaint, discovery in this case has developed a fulsome record of the Banks' ongoing influence and control over the Network rules prohibiting competition among the Banks. Without relying on those new facts on this motion, attached hereto as Exhibit C is a list of some examples of the Banks' ongoing influence and control (in addition to their express agreement and adherence to the Unlawful Restraints).

[36] *See, e.g.*, Complaint, at ¶¶ 38, 41, 89.

[37] *Id*. at ¶ 44 (quoting "*United States v. Visa U.S.A. Inc.*, 344 F.3d 229, 242 (2d Cir. 2003)).

[38] Complaint, at ¶ 260.

[39] *Id*.

[40] Hearing Tr., 14-md-1720, at 53 (July 18, 2014) (Attached hereto as Exhibit B).

Complaint.[41] The Banks have not improved their motion by conceding the absence of withdrawal rather than losing it in a contested argument. Their concession requires denial of their motion.

The Banks try to avoid that obvious conclusion by asserting that the Court need not reach the issue of "withdrawal" because, they assert, the Complaint does not allege any "post-IPO overt acts *by the bank defendants* suggesting active participation in a continuing conspiracy."[42] The Banks seem to suggest that, despite the absence of withdrawal, the Complaint was required to, and fails to, allege that they committed some additional overt acts after the IPOs.

We demonstrate in detail below that the Complaint in fact alleges that the Banks continue to this day to commit new overt acts in furtherance of the conspiracies, including agreeing and adhering to the Unlawful Restraints and collecting supracompetitive interchange fees from the merchants. More fundamentally, however, Plaintiffs would be entitled to injunctive relief against the Banks even if, counterfactually, they had not continued to commit additional overt acts.

The Complaint makes clear that there was nothing magical about the IPOs. The Complaint alleges that each of Visa and the Banks, and Mastercard and the Banks, engaged in a single, uninterrupted conspiracy and set of Unlawful Restraints that began before the IPOs— when the Banks directly controlled the networks—and continues to this day.[43] It would therefore be irrelevant if the Banks had not committed additional overt acts after the IPOs. "Unless

---

[41] Def. Mem. in Support at 23. Any argument for withdrawal is inappropriate at the motion to dismiss stage. "[I]t is well-settled that withdrawal from a conspiracy is an affirmative defense for which the defendant bears the burden of proof at trial." *United States v. Leslie*, 658 F.3d 140, 143 (2d Cir. 2011). In order to meet its burden for a defense of withdrawal, a defendant must show that it performed acts that were (1) inconsistent with the object of the conspiracy and (2) communicated in a manner reasonably calculated to reach co-conspirators. *United States v. Flaharty*, 295 F.3d 182, 192 (2d Cir. 2002). Unless a defendant can produce this affirmative evidence of withdrawal, its participation in the conspiracy is presumed to continue until the last overt act by any of the conspirators. *United States v. Diaz*, 176 F.3d 52, 98 (2d Cir.1999). The question of withdrawal is a fact question for the trier of fact. *See, e.g., Drug Mart Pharmacy Corp. v. Am. Home Prod. Corp.*, 288 F. Supp. 2d 325, 329 (E.D.N.Y. 2003).

[42] Def. Mem. in Support at 23 (emphasis added).

[43] Complaint, at ¶ 252-260.

a conspirator produces affirmative evidence of withdrawal, his participation in a conspiracy is presumed to continue until the last overt act *by any of the conspirators*."[44]

Absent a withdrawal, "foreseeable overt acts by one coconspirator in furtherance of the conspiracy are attributable to all coconspirators."[45] The Networks continue to be parties to the Unlawful Restraints even if, counterfactually, the Banks had not also continued to be the other parties to them. The Supreme Court has held that "a conspiracy is a partnership in crime; and an overt act of one partner may be the act of all without any new agreement specifically directed to that act."[46]

The Banks do not, and cannot, deny that the Networks continue today to commit overt acts in furtherance of the conspiracies. Having conceded (for purposes of this motion) that they have not withdrawn from the conspiracies, the Banks are liable for that continuing wrongdoing. Being liable for the continuing violations, the Banks are subject to the injunctive relief that the Complaint seeks. As established further below, this includes affirmative injunctive relief specifically directed to the Banks, requiring them to take actions designed to ameliorate the Unlawful Restraints' ongoing anticompetitive effects.

### B. The Complaint alleges ongoing hub-and-spoke conspiracies in which the Networks are the hubs and the Banks are the joined spokes.

Like the DAPs' complaints, the Plaintiffs' Complaint also alleges that the Banks continue to commit overt acts in furtherance of the ongoing conspiracies. The Networks are not acting alone. The Banks are the other parties to the ongoing Unlawful Restraints.

---

[44] *United States v. Diaz,* 176 F.3d 52, 98 (2d Cir.1999) (quoting *United States v. Greenfield,* 44 F.3d 1141, 1150 (2d Cir.1995)).

[45] *United States v. Grimm*, 738 F.3d 498, 508 (2d Cir. 2013) (citing *Pinkerton v. United States,* 328 U.S. 640, 646–48 (1946)).

[46] *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 253–54, (1940) (quotations and citations omitted)..

"Even after the corporate restructuring of Visa and MasterCard, the Bank Defendants continue to conspire to fix Interchange Fees and to impose the Anti-Steering Restraints and the other forms of anticompetitive conduct described herein. Each of the Bank Defendants issues cards through Visa and MasterCard and *has agreed that it will adhere to the anticompetitive Visa and MasterCard rules and default interchange schedules.*"[47]

The Banks pretend that the Visa and Mastercard "rules" are exclusionary conduct *unilaterally* committed by the Networks. But that is not the economic reality, and that is not what the Complaint alleges. The Complaint repeatedly alleges that the rules—the Unlawful Restraints—are *ongoing agreements among the Banks, and between the Banks and the Networks, to which the Banks are culpable parties.*[48] The Banks continue today to commit overt acts in furtherance of the conspiracies by continually agreeing and adhering to the Unlawful Restraints.

The Banks are members of classic hub-and-spoke conspiracies. The Banks have, in effect, hired each of Visa and Mastercard to be the manager of a cartel whose essential agreement—the ongoing agreement that the Banks originally established when they directly controlled the networks—is that no member bank shall compete on price against another member for merchants' business.[49] As issuers, the Banks agree and adhere to the Unlawful Restraints; as acquirers, they agree to impose those restraints on the merchants.[50]

A leading antitrust scholar has seen through the Banks' arguments to the economic core of their arrangements. Professor Hovenkamp notes that independent business entities can restrain competition among themselves by hiring a cartel manager who might be a separately

---

[47] Complaint, at ¶ 42 (emphasis added).

[48] *See, e.g., id.* at ¶ 23, 25, 27, 30, 33, 35, 36, 42, 156, 212, 246, 252, 260.

[49] Complaint at ¶ 252.

[50] *Id.* at ¶¶ 3, 130, 156.

incorporated entity, and in fact might have become separately incorporated because "[p]rice-fixing firms may go to great lengths to make their schemes appear to be the product of a single entity's decisionmaking or of purely vertical agreements."[51] But "[t]he emphasis of substance over form is critical when analyzing cartels."[52] Would-be competitors are agreeing among themselves whether they do so directly or by agreeing to abide by the decisions of a third party to whom they have delegated decisionmaking authority: "From an antitrust standpoint, there is no difference between agreeing to abide by the ringleader's decisions and agreeing to cede decisionmaking authority to a separate entity that runs the cartel. Either way, an independent firm has agreed to not compete on price."[53]

Professor Hovenkamp uses the Visa and Mastercard IPOs as a "case study" in firms' continuing to agree among themselves by agreeing to abide by a third party's "rules."[54] Looking past the form to the substance, he concluded that "[e]ven though the banks are not voting decisionmakers in the [Networks], any rule that limits their individual behavior must be regarded as multilateral under [an antitrust] analysis."[55] In continuing the restraints that limit the Banks' ability to compete against each other, "the MasterCard and Visa IPOs have the characteristics of centrally managed cartels. In substance, the central organization has the power to control the independent business of the individual issuing [banks]."[56] The absence of express agreements among the Banks not to compete for merchants' business is irrelevant—that's the whole point of

---

[51] Herbert Hovenkamp & Christopher R. Leslie, *The Firm as Cartel Manager*, 64 Van. L. Rev. 813, 851 (April 2011).

[52] *Id*. at 850.

[53] *Id*.

[54] Hovenkamp did not analyze the lawfulness of the Banks' restraints, "but only whether they should be regarded as unilateral or conspiratorial," and concluded that they should be regarded as the latter. *Id*. at 868.

[55] *Id.* at 871.

[56] *Id*.

hiring Visa and Mastercard as cartel ringleaders: "it is unnecessary that the individual issuing banks coordinate their behavior with one another; the central organization solves that problem. Control runs from the organization to the individual members, limiting their independent business activity with respect to the issuance and management of bank cards."[57]

Hovenkamp's analysis comports with decades of antitrust jurisprudence.[58] The leading case is *Interstate Circuit*. There, one exhibitor asked eight motion picture distributors to refuse to provide films to exhibitor competitors that charged less than 25 cents for admission or showed double features.[59] Each of the distributors complied with the request.[60] The Supreme Court held that the plaintiffs proved the existence of a horizontal conspiracy where each distributor knew that the exhibitor (i.e., the hub) had made the same request of each of the other distributors (i.e., the spokes), even though no two distributors directly communicated with one another:

> Each [distributor] was aware that all were in active competition and that without substantially unanimous action with respect to the restrictions ... there was risk of a substantial loss of the business [from] independent exhibitors, but that with it there was the prospect of increased profits.[61]

In other words, if any one distributor had independently tried to impose these unattractive conditions on exhibitors, it would have lost business to the other seven distributors and the conduct would have been contrary to its self-interest. But if all the distributors acted together, each would know that it would not lose business to its rivals because all of them would be imposing the same unattractive conditions. From this evidence, the Supreme Court found a horizontal conspiracy among the eight distributors.

[57] *Id*. at 872.

[58] *See, e.g.*, *Interstate Circuit, Inc. v. U.S.*, 306 U.S. 208, 217-22 (1939); *U.S. v. Apple*, 791 F.3d 290, 299-302 (2d. Cir. 2015); *Toys 'R' Us. v. FTC*, 221 F.3d 928, 934-36 (7th Cir. 2000).

[59] 306 U.S. at 217.

[60] *Id*. at 216-17.

[61] *Id*. at 222.

The Court of Appeals concurs. In *U.S. v. Apple*[62] five of the six largest book publishers entered into separately negotiated but identical agreements with Apple that: (1) established an agency model of distribution for E-books through Apple's platform, in which the publishers— rather than Apple—would set the retail price; (2) set the Apple retail price higher than the Amazon retail price; and (3) required, through most favored nation ("MFN") clauses, that Apple's E-book retail price not be undercut by any competitor.[63]

The Court of Appeals upheld the district court's finding that Apple acted as the center of a hub-and-spoke conspiracy, using agreements between the hub and each of the spokes to establish the horizontal agreements among the spokes.[64] "[T]he Publisher Defendants' shifting to an agency model with Amazon was the result of express collusion among them and … Apple consciously played a key role in organizing that collusion."[65] The publishers' agreements not to undercut Apple's higher prices "created a set of economic incentives pursuant to which the Contracts were only attractive to the Publisher Defendants to the extent they acted collectively."[66]

---

[62] 791 F.3d 290 (2d. Cir. 2015).

[63] *Id.* at 303-305.

[64] *Id.* at 314.

[65] *Id.* at 316.

[66] *Id.* at 320. The decision in *Toys'R'Us. v. FTC*, 221 F.3d 928 (7th Cir. 2000), is to the same effect. There, Toys'R'Us asked the manufacturer competitors to refuse to sell to discounters, and all of them complied. The FTC characterized the case as the modern equivalent of *Interstate Circuit*. The Seventh Circuit agreed. *Id*. at 935. Judge Wood pointed out that each manufacturer was afraid it would lose sales to its rivals if it acted independently, but that each manufacturer would agree to the request "if it could be sure its competitors were doing the same thing." *Id*. at 935-36. The Court bluntly concluded, "[t]hat is a horizontal agreement." *Id*. at 936. The Banks cite *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 110 (2d Cir. 2002), where the Court distinguished *Toys'R'Us* on the ground that in response to a *motion for summary judgment* the *PepsiCo* plaintiffs had failed to *adduce evidence* that the asserted agreement was against the defendant's independent interest. The Complaint here pleads the relevant facts, and Plaintiffs will support those allegations in response to any motion for summary judgment and at trial.

Another example: In *Laumann v. Nat'l Hockey League*[67] plaintiffs alleged that regional sports broadcast networks engaged in a hub-and-spoke conspiracy with professional sports leagues to divide the media market for broadcasts. The complaint adequately alleged a hub-and-spoke conspiracy even without pleading that the regional sports networks entered into any express agreements among themselves to divide the market. The court held that in an *Interstate Circuit*-type conspiracy, it was "not necessary" that plaintiffs allege that the hubs "entered into actual agreements with one another."[68] Rather, plaintiffs adequately pleaded the rim by alleging that the spokes had "knowledge that other market participants are bound by identical agreements, and their participation is contingent upon that knowledge."[69]

The Complaint here easily satisfies the *Interstate Circuit/Apple* criteria. It would be plainly contrary to the economic self-interest of a member bank to *independently* agree to a supracompetitive price for its cards, or to restraints that prohibit merchants from *steering purchasers to its cards* (by surcharging its competitors' cards, declining to take its competitors' cards, or discounting its own cards). A member bank would be absolutely foolish to agree to

---

[67] 907 F. Supp. 2d 465, 486 (S.D.N.Y. 2012).

[68] *Id.* In essence, conduct against a defendant's independent interest acts as the rim to connect the spokes. *Anderson News, LLC v. American Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012). The Banks cite *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008), where the Court upheld dismissal of a complaint that alleged only parallel conduct in the Banks' adherence to the "default" interchange fees. Those plaintiffs did not allege, as the Complaint here meticulously does, that the other Unlawful Restraints made the "default" fee the de facto fee. It is precisely those Unlawful Restraints to which it is against each Bank's independent interest to agree. And the Complaint's allegations of the combined effect of the "default" fees and the Unlawful Restraints must be credited. *See, e.g., Cont'l Ore v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-99 (1962). The Banks' reliance on *B&R Supermarket, Inc. v. Visa, Inc.*, 2016 WL 5725010 (N.D. Cal. Sept. 30, 2016), is misplaced for the same reason. That court simply concluded that the complaint "lacks details" about "whether the issuing-bank defendants were in a position to control the adoption process [for chip-and-signature cards]." *Id.* at *11. The Complaint here contains pellucid allegations that the Banks use the Networks to manage horizontal cartels among the Banks to refrain from competing on price for the merchants' business.

[69] 907 F. Supp. 2d at 486; *see also Meyer v. Kalanick*, 174 F. Supp. 3d 817, 824 (S.D.N.Y. 2016) (denying motion to dismiss claim that Uber drivers were parties to a hub-and-spoke conspiracy to fix fares, because plaintiffs pleaded that "drivers sign up for Uber precisely on the understanding that the other drivers were agreeing to the same pricing algorithm, and in which drivers' agreements with Uber would be against their own interests were they acting independently.") (internal quotation marks and brackets omitted).

such restraints—unless, of course, it was sure that its competitors were simultaneously agreeing to the same supracompetitive prices and to the same restraints that prohibit merchants from *steering purchases to the competitors' cards.*

The Banks are not acting unilaterally post-IPO. When each Bank continues to agree to be bound by, and to impose, the Unlawful Restraints, it knows that its would-be competitors are simultaneously agreeing to the same set of horizontal restraints on inter-bank competition. This is exactly what *Interstate Circuit, U.S. v. Apple*, and similar cases make unlawful. And whether the ringmasters Visa and Mastercard are corporations rather than associations is entirely irrelevant.[70]

The Banks argue that it is in each member bank's unilateral interest *to issue payment cards as part of networks.* But Plaintiffs are not challenging the existence of card networks or the Banks' participation in them. Plaintiffs instead are challenging the Banks' *agreement to the Unlawful Restraints*, whose purpose and effect is to impair horizontal competition among the Banks. It is not in a Bank's independent interest to be a party to the Unlawful Restraints.[71]

The Complaint's allegations that the Banks are participants in ongoing hub-and-spoke conspiracies also disposes of their final argument. They apparently argue that they cannot be committing overt acts in furtherance of the conspiracies today because they originally devised

---

[70] *See, e.g.*, *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 191 (2010) ("We have long held that concerted action under § 1 does not turn simply on whether the parties involved are legally distinct entities. Instead, we have eschewed such formalistic distinctions in favor of a functional consideration of how the parties involved in the alleged anticompetitive conduct actually operate.").

[71] The Banks do not argue that they are somehow excused from liability on the ground that economic necessity requires them to issue Visa and Mastercard cards or that agreeing to the Unlawful Restraints is required as part of card issuance in those networks, and no such defense exists.  And this would be a particularly inappropriate case for the Banks to try to create such a defense. They themselves originally developed and imposed the Unlawful Restraints, so any argument that they are "required" to agree to them in order to issue cards would not only fail on the law, but would also immediately be rejected as an orphan-who-killed-his-parents plea for mercy.

and imposed the Unlawful Restraints long ago.[72] They rely on *United States v. Grimm*[73] where the Court of Appeals held that a defendant's entirely passive receipt of income resulting from a previously concluded agreement was not an overt act in furtherance of the conspiracy and thus no overt act fell within the statute of limitations. In *Grimm*, the defendants had originally colluded to keep their bids for a certain kind of derivative artificially low.[74] The Court held that, even though the defendants continued to receive interest income on the bonds, this passive receipt of income did not amount to an overt act in furtherance of the conspiracy, which otherwise fell outside of the limitations period.[75]

There is no statute of limitations on a claim for injunctive relief under Section 16 of the Clayton Act.[76] For that reason alone the Banks' reliance on *Grimm* is misplaced.

*Grimm* would provide no support for the Banks in any event. Unlike *Grimm*, this is not a case in which a single unlawful act long in the past continues to have, with no ongoing commitment and adherence to the scheme, anticompetitive effects today. Instead, the Banks actively generate anticompetitive effects today because they continue to participate in the conspiracy by adhering to and imposing the Unlawful Restraints.

That fact is determinative. In *U.S. v. Salmonese*[77] the defendants engaged in a pump-and-dump stock scheme outside of the limitations period, but sold the stock within the limitations period. The *Salmonese* Court affirmed that, "where a conspiracy's purpose is economic

---

[72] Def. Mem. in Support at 21.

[73] 738 F.3d 498, 503 (2d Cir. 2013); *see also U.S. v. Doherty*, 867 F.2d 47 (1st Cir.1989) (police officers' conspiracy to cheat on an entrance exam outside of the limitations period did not continue into the present merely because their present salaries were a function of their artificially high starting salaries).

[74] 738 F.3d at 504.

[75] *Id.* at 503.

[76] *See Rite Aid Corp. v. Am. Exp. Travel Related Servs. Co.*, 708 F. Supp. 2d 257, 272 (E.D.N.Y. 2010). A claim for injunctive relief is subject only to a defense of laches (*id.*), which the Banks do not assert on this motion.

[77] 352 F.3d 608, 613 (2d Cir. 2003).

enrichment, the jointly undertaken scheme continues through the conspirators' receipt of their anticipated economic benefits" and that "absent withdrawal, a conspirator's participation in a conspiracy is presumed to continue until the last overt act by any of the conspirators."[78] *Salmonse* illustrates the narrowness of the exception *Grimm* created: receiving a dividend is too passive to qualify as an overt act, but selling a security is not.

Since *Salmonese*, the Court of Appeals has treated *Grimm* as having created only a "narrow exception" based on entirely passive receipt of income from prior wrongdoing.[79] For example, in *U. S. v. Rutigliano*[80] defendants concocted a scheme to submit false disability claims, and after their initial agreement they continued submitting disability claims and receiving benefits from them into the limitations period, but without further direct communicate with each other.[81] The defendants argued that, like the *Grimm* defendants, they were merely collecting the ordinary anticipated profits of a conspiracy that had ended outside of the limitations period. The Court of Appeals disagreed, holding that "no exception to *Salmonese* [was] justified" where the conspirators had continued to further the conspiracy by submitting false re-certification forms to keep the payments flowing.[82] This continuous recertification meant that the continued receipt of the benefits could not be viewed "as merely the 'result' of a completed conspiracy."[83]

Like the defendants in *Salmonese* and *Rutiglano*, the Banks are not merely passively collecting returns from a competed conspiracy, but are continuing to commit overt acts in

---

[78] *Id.* at 614 (internal quotations and citations omitted).

[79] *United States v. Rutigliano*, 790 F.3d 389, 400 (2d Cir. 2015).

[80] *Id.* at 400

[81] *Id.*

[82] *Id.* at 400-401.

[83] *Id.*; *see also Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC*, 843 F.3d 1225, 1248 (10th Cir. 2016) (university's rule requiring all first-year students to live in campus apartments was a continuing antitrust violation even though the rule was first enacted long ago; the rule remained in place and was enforced each year).

furtherance of it. In *Grimm*, the conspirators had unlawfully purchased the bonds through a one-time unlawful act (submitting artificially low bids) and thereafter merely continued to collect passive income from them.[84] Here, in contrast, the Networks continue to participate in the conspiracy by promulgating the Unlawful Restraints, and the Banks continue to participate by continuing to adhere to and enforce them. This is not a case where conspirators cause future harm through some one-time, once-and-for-all anticompetitive act (e.g., acquiring a rival or driving it out of business). The Banks cause continuing and accumulating harm because they continuously agree to adhere to, and in fact adhere to, restraints that they could renounce and quit adhering to at any time. It has long been the law that "[a] conspiracy thus continued is in effect renewed during each day of its continuance."[85]

Every overcharge that the Banks collect from the merchants is another new overt act in furtherance of the conspiracy. Every day, new transactions take place under the Unlawful Restraints. Where, as here, "a price-fixing conspiracy … brings about a series of unlawfully high

---

[84] The other cases that the Banks cite are similarly inapposite. *See Korea Kumho Petrochemical v. Flexsys Am. LP*, No. C07-01057 MJJ, 2008 WL 686834 (N.D. Cal. Mar. 11, 2008) (plaintiffs did not allege a continuing injury, so even though no parties withdrew from the conspiracy, all of the relevant acts by all conspirators were outside of the limitations period); *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 188, 229 (E.D.N.Y. 2003) (payments from one party to another as part of the "fixed terms of the challenged agreement" did not extend or restart the limitations period "because the performance of an allegedly anticompetitive, pre-existing contract is …. 'merely the abatable but unabatable [sic] inertial consequences of some pre-limitations action,' which do not satisfy the requirements for a continuing violation."); *In re G-Fees Antitrust Litig.*, 584 F. Supp. 2d 26, 34 (D.D.C. 2008) (monthly mortgage payments not continuing injury because they are "baked into" the initial mortgage transaction, and so were merely "future damages," not "future injury"). Notably, *In re Ciprofloxacin* was decided before both *Salmonese* and *Rutigliano* and almost certainly would not have been decided the same way after them.

[85] *United States v. Borden Co.*, 308 U.S. 188, 202 (1939) (citation omitted); *see also United States Gypsum Co. v. Indiana Gas Co.*, 350 F.3d 623, 628 (7th Cir. 2003) ("The parties' decision to keep a joint venture in operation or manage the operations in ways that may violate antitrust rules is one that may be challenged when adverse effects are felt."); *Pa. Dental Ass'n v. Med. Serv. Ass'n of Pa.*, 815 F.2d 270, 278 (3d Cir. 1987) ("[T]he conspiracy charged by Blue Shield is a continuing one and … its effects continued well into the four-year period.... Most of the offending [agreements] have never been rescinded."); *Nat'l Souvenir Ctr., Inc. v. Historic Figures, Inc.*, 728 F.2d 503, 510 (D.C. Cir. 1984) ("the 'overt act' requirement may be satisfied merely by the parties continuing to maintain contractual relationships that directly affect competition"); *Maricopa Cnty. v. Am. Pipe & Const. Co.*, 303 F. Supp. 77, 82 (D. Ariz. 1969), *aff'd*, 431 F.2d 1145 (9th Cir. 1970) ("A conspiracy of the nature here alleged is a continuing one and is in effect renewed during each day of its continuance."); *In re SE Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 947 (E.D. Tenn. 2008) ("A conspiracy is presumed continuing where there is an agreement to eliminate competition with no 'affirmative showing of the termination of that agreement.'").

priced sales over a period of years," "each sale to the plaintiff" is an "overt act that is part of the violation."[86]

The Banks are not passively receiving income from a completed conspiracy. Instead, each day they continue to actively adhere to and enforce agreements that allow them to extract ongoing and accumulating supracompetitive interchange fees from the merchants.

## II.  PLAINTIFFS HAVE ARTICLE III STANDING BECAUSE THE COMPLAINT PROPERLY SEEKS INJUNCTIVE RELIEF AGAINST THE BANKS.

The Banks argue that Plaintiffs lack Article III standing because the Banks are purportedly unable to change the Unlawful Restraints and thus are not subject to effective injunctive relief. That argument fails because coconspirators that adhere to unlawful agreements are liable together with the organization that promulgates them. The Court of Appeals has so held specifically in the context of hub-and-spoke conspiracies such as this one.  Being liable under the Sherman Act, the Banks are subject to injunctive relief requiring that they stop adhering to and enforcing the Unlawful Restraints. Moreover, antitrust defendants must not only stop adhering to unlawful agreements, but also take affirmative action to try to undo their conduct's anticompetitive effects. Plaintiffs here seek such affirmative relief from the Banks.

---

[86] *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (quoting 2 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, ¶338b (rev. ed. 1995), at 145 (footnote omitted)); *see also Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, No. 08-CV-42 (JG)(VVP), 2015 WL 13650032, at *3 (E.D.N.Y. June 24, 2015) (collecting cases); *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MDL-1775 JG VVP, 2010 WL 10947344, at *14 (E.D.N.Y. Sept. 22, 2010). In *Rite Aid Corp. v. Am. Exp. Travel Related Servs. Co.*, 708 F. Supp. 2d 257, 271-72 (E.D.N.Y. 2010), Judge Garaufis held that where the unlawful agreement is solely vertical—the agreement between the merchant and American Express—and was entered into outside the limitations period, each extraction of an overcharge from the merchant was not a new overt act in furtherance of the conspiracy. However, American Express's *increases* to its merchant fees were new overt acts. *Id.* Plaintiffs' Complaint here alleges such increases. *See, e.g.*, Complaint, at ¶¶ 115, 254-256, 260, 324(h), 349. Moreover, Judge Garaufis noted that, in the case of *horizontal agreements* each overcharge *is* a new overt act in furtherance of the conspiracy. 708 F. Supp. 2d at n. 12 (noting that *Klehr* held that "in a 'price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years… each sale to the plaintiff, starts the statutory period running again.'" (quoting *Klehr*, 521U.S. at 189)). The Complaint here alleges horizontal agreements among the Banks, and the Banks have not denied, and cannot truthfully deny, that they renewed those agreements within the applicable laches period.

Initially, it is worth noting how lenient the standard is for establishing subject-matter jurisdiction under Article III. Subject-matter jurisdiction exists except where a plaintiff's claim under federal law is "insubstantial, implausible, [or] foreclosed by prior decisions of [the Supreme] Court."[87] The Court of Appeals has emphasized that "the district court has subject matter jurisdiction unless the federal claim 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous.'"[88] In order to establish standing to obtain injunctive relief, a plaintiff need show only "three things: (1) that she has suffered from an 'injury in fact,' (2) which was caused by the defendants' actions, and (3) which the court can likely 'redress' or make right through a favorable decision."[89]

Plaintiffs' allegations against the Banks far exceed what is necessary to satisfy Article III. The Court of Appeals held in *U.S. v. Apple* that the hub (Apple) had entered into a series of unlawful agreements with the spokes (the Publishers), the effect of which was to dampen horizontal competition among the Publishers.[90] This was not unlawful *unilateral* conduct by Apple, but a series of unlawful *agreements*. Both parties to the unlawful agreements—all parties

---

[87] *Miller v. American Stock Exchange (In re Stock Exchs. Options Trading Antitrust Litig.)*, 317 F.3d 134 (2d Cir. 2003) (quoting *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 89 (1998)).

[88] *Id.* (quoting *Bell v. Hood*, 327 U.S. 678, 682-83 (1946)).

[89] *Justice v. Kuhnapfel*, 985 F. Supp. 2d 334, 336 (E.D.N.Y. 2013) (citations omitted). The Banks cite *Sitt v. Nature's Bounty, Inc.*, No. 15-CV-4199 (MKB), 2016 WL 5372794 *6 (E.D.N.Y. Sept. 26, 2016), where the court found that the plaintiff lacked standing to seek injunctive relief because, although she had been harmed by false advertising in the past, she did *not* establish that she was likely to be harmed by it again *in the future*. Here, the merchants were harmed by the Banks' conduct in the past, are being harmed by it *in the present*, *and, unless this Court enjoins it, will continue to be harmed by it in the future.*

[90] *Apple*, 791 F.3d at 325.

to the unlawful hub-and-spoke conspiracy—were liable under the Sherman Act.[91] Courts in other *Interstate-Circuit*-type cases reached the same conclusion.[92]

Being liable for adhering to the Unlawful Restraints, the Banks are subject to an injunction prohibiting them from continuing that unlawful adherence. For example, the district court in *U.S. v. Apple* concluded, as to each of the spoke-Publishers, that "[t]he Complaint states a claim upon which relief may be granted against [the spoke-Publisher] under Section 1 of the Sherman Act…."[93] The court then entered a consent decree against all of the Publishers—finding that the decrees were in the public interest[94]—prohibiting them from continuing to adhere to the Apple-brokered agreements.[95] Courts routinely enjoin conspiracy defendants from adhering to or

---

[91] *Id.*

[92] *See, e.g.*, *Interstate Circuit*, 306 U.S. at 225 (the series of contracts between the distributors and the hub were enough to "justify the inference that the distributors acted in concert and in common agreement in imposing the restrictions upon their licensees"); *Toys"R"Us*, 221 F.3d at 936 ("[T]he only condition on which each toy manufacturer would agree to TRU's demands was if it could be sure its competitors were doing the same thing. That is a horizontal agreement."); *Laumann v. Nat'l Hockey League*, 907 F. Supp. 2d at 486–87 (plaintiffs adequately pleaded horizontal conspiracy because "where parties to vertical agreements have knowledge that other market participants are bound by identical agreements, and their participation is contingent upon that knowledge, they may be considered participants in a horizontal agreement in restraint of trade"). More generally, antitrust defendants are routinely held liable for their involvement in conspiracies enforced by coconspirators over which they had no direct control. In *United States v. General Motors*, 384 U.S. 127 (1966), the Court reversed a lower court's decision denying relief to a discounter whose competitors induced General Motors to discontinue its supply of new automobiles. In *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207 (1959), the Court likewise held that the plaintiff discounter's competitors were liable for inducing its suppliers to cut off its supply.

[93] *See* Final Judgment as to Defendants Hachette, HarperCollins, and Simon & Schuster, *U.S. v. Apple, Inc., et al.*, No. 1:12-cv-02826, ECF 119, at 8 (Sept. 6, 2012) ("Hachette Final Judgment") (Attached hereto as Exhibit D), p. 2; Final Judgment as to Defendants Verlagsgruppe Georg Von Hotzbrinck GMBH & Holtzbrinck Publishers, LLC D/B/A MacMillan, *U.S. v. Apple, Inc., et al.*, No. 1:12-cv-02826, ECF 354 (Aug. 12, 2013), p. 2; Final Judgment as to the Penguin Group, a Division of Pearson PLC, and Penguin Group (USA), Inc., *U.S. v. Apple, Inc., et al.*, No. 1:12-cv-02826, ECF 259 (May 17, 2013), p.2.

[94] *See* Antitrust Procedures and Penalties Act, 15 U.S.C. § 16 (requiring court in antitrust case to which the United States is a party to make a finding that a consent decree is in the public interest). Where a consent decree contains injunctive relief, the district court must find that plaintiff suffered an irreparable injury, the remedies of law are inadequate to compensate for that injury, the balance of the hardships warrants the equitable relief, and the public interest would not be disserved by a permanent injunction. *U.S.S.E.C. v. Citigroup Glob. Markets, Inc.*, 752 F.3d 285, 294 (2d Cir. 2014). These are the same standards for approving a fully litigated injunction. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

[95] *See, e.g.*, Hachette Final Judgment, at 8 ("Within seven days after entry of this Final Judgment, each Settling Defendant shall terminate any agreement with Apple relating to the Sale of E-books that was executed prior to the filing of this complaint").

enforcing unlawful rules formally promulgated by another entity.[96] While not all plaintiffs always choose to sue all of the spokes, no court, to our knowledge, has ever concluded that it lacked Article III jurisdiction to enter an injunction against a spoke defendant that has been found liable.

Moreover, Plaintiffs are entitled to injunctions that not only prohibit the Banks' ongoing unlawful conduct, but also require them to ameliorate that conduct's anticompetitive effects.[97] The Supreme Court has consistently affirmed that, having found a violation of the Sherman Act, a district court is "empowered to fashion appropriate restraints on the [defendant's] future activities both to avoid a recurrence of the violation *and to eliminate its consequences.*"[98] Plaintiffs are entitled to "relief [that] represents a reasonable method of eliminating the consequences of the illegal conduct."[99] The district court's "function includes undoing what the

---

[96] *See, e.g.*, *Rosebrough Monument Co. v. Mem'l Park Cemetery Ass'n*, 736 F.2d 441, 444 (8th Cir. 1984) (enjoining members of a trade association from agreeing and adhering to its anticompetitive rules); *Meredith Corp. v. SESAC LLC*, 1 F. Supp. 3d 180, 186 (S.D.N.Y. 2014) (allowing claim for damages and injunctive relief to proceed against a rulemaking entity and fifty affiliated artists); *Teladoc, Inc. v. Texas Med. Bd.*, 112 F. Supp. 3d 529, 533 (W.D. Tex. 2015) (issuing preliminary injunction against rulemaking authority and fourteen members forbidding them "from taking any action to implement, enact, and enforce" the rule at issue).

[97] *See, e.g.*, *Nat'l Soc. of Prof'l Eng'rs v. U.S.*, 435 U.S. 679, 697 (1978) (["Having found the Society guilty of a violation of the Sherman Act, the District Court was empowered to fashion appropriate restraints on the Society's future activities both to avoid a recurrence of the violation and to eliminate its consequences."); *U.S. v. Ward Baking Co.*, 376 U.S. 327, 330-31 (1964) ("After a District Court has concluded that a conspiracy in restraint of trade exists, it 'has the duty to compel action by the conspirators that will, so far as practicable, cure the ill effects of the illegal conduct, and assure the public freedom from its continuance.'") (quoting *U.S. v. United States Gypsum Co.*, 340 U.S. 76, 330 (1950)); *U. S. v. Apple, Inc.*, 889 F. Supp. 2d 623, 636–37 (S.D.N.Y. 2012) ("A court may not require that the [equitable] remedies perfectly match the alleged violations….[A] decree may nonetheless prohibit acts that are entirely proper when viewed alone. Relief may range broadly through practices connected with acts actually found to be illegal.") (internal citations omitted); *U. S.s v. Am. Exp. Co.*, 2015 WL 1966362, at *3 (E.D.N.Y. Apr. 30, 2015) ("It is entirely appropriate for an antitrust remedy to go [ ] beyond a simple proscription against the precise conduct previously pursued.") (internal citations omitted); *Trabert & Hoeffer, Inc. v. Piaget Watch Corp.*, 633 F.2d 477, 485 (7th Cir. 1980) (plaintiff is entitled to affirmative injunction that will "cure the ill effects of the illegal conduct"); 3 Areeda & Hovenkamp, ANTITRUST LAW ¶ 653f at 149 ("[E]quitable relief beyond a mere injunction against repetition is generally appropriate. We must also try to undo the various effects.").

[98] *Nat'l Soc. of Prof'l Eng'rs,* 435 U.S. at 697 (emphasis added).

[99] *Id.*; *see also Int'l Salt Co. v. U.S.*, 332 U.S. 392, 398 n.7 (1947) (affirming injunction that required defendant in all future contracts to offer the use of its patented technology "to any applicant on non-discriminatory terms and conditions.").

conspiracy achieved."[100]  Indeed, "the court's most important task is to devise a remedy that is reasonably well calculated to restore competitive conditions."[101]

Plaintiffs' Complaint requests ameliorative relief,[102] and Plaintiffs' experts have already specifically identified some of such relief that Plaintiffs may request *from the Banks* at trial. This relief includes an injunction: (1) Imposing a cap on the interchange fees that the Banks may charge to merchants (the Plaintiffs may seek an injunction prohibiting the Networks from setting "default" interchange fees), during an interim period after the Court has enjoined the Unlawful Restraints but before the market reaches equilibrium; (2) Enjoining the Banks from charging blended interchange rates in an effort to defeat merchants' ability to surcharge or selectively dishonor high-priced cards; (3) Requiring the Banks to include surcharging information on cardholders' monthly statements; and (4) Requiring the Banks, in their capacity as acquirers, to provide sufficient information at the point-of-sale to allow merchants to steer transactions to low-cost cards.

The Banks are jointly and severally liable with the Networks for the Unlawful Restraints that Plaintiffs challenge in this lawsuit.  Plaintiffs are entitled to injunctive relief against the Banks requiring that they stop agreeing and adhering to the Unlawful Restraints and that they take action to ameliorate those restraints' anticompetitive effects.

## CONCLUSION

The Court should deny the Banks' motion to dismiss the Complaint.

---

[100] *U.S. v. Paramount Pictures*, 334 U.S. 131, 171 (1948).

[101] 3 Areeda & Hovenkamp, ANTITRUST LAW ¶ 325a at 5.  For example, the court in *Apple* entered an injunction requiring that the spoke defendants stop adhering to the unlawful agreement *and also* take affirmative steps to prevent further injury. *See, e.g.*, Hachette Final Judgment, Sections IV(C); V(A), (C), (F), VII(A)-(G), VII(H), VIII(A), (B).

[102] Complaint, § XIV F.

Dated: March 18, 2019

By: */s/ Steve D. Shadowen*
Steve D. Shadowen
D. Sean Nation
Frazar W. Thomas
**Hilliard & Shadowen LLP**
1135 W. 6th Street Suite 125
Austin, TX 78703
Phone: 855-344-3298
steve@hilliardshadowenlaw.com
sean@hilliardshadowenlaw.com
fraz@hilliardshadowenlaw.com

Robert G. Eisler (# RE1398)
Deborah A. Elman (# DE8458)
**Grant & Eisenhofer P.A.**
485 Lexington Ave., 29th Floor
New York, NY 10017
Phone: 646-722-8500
reisler@gelaw.com
delman@gelaw.com

Michael J. Freed
Robert J. Wozniak
Brian M. Hogan
**Freed Kanner London & Millen LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Phone: 224-632-4500
mfreed@fklmlaw.com
rwozniak@fklmlaw.com
bhogan@fklmlaw.com

Linda P. Nussbaum
Bart D. Cohen
**Nussbaum Law Group, P.C.**
1211 Avenue of the Americas, 40th floor
New York, NY 10036
Phone: 917-438-9102
lnussbaum@nussbaumpc.com
bcohen@nussbaumpc.com

*Interim Co-Lead Counsel for*
*the Equitable Relief Class*