UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION<br><br>This document refers to:<br>    All Actions | MDL No. 1720<br>Case No. 1:05-md-1720-MKB-JO |

**RULE 23(b)(3) CLASS PLAINTIFFS' MEMORANDUM OF LAW
IN SUPPORT OF FINAL APPROVAL OF CLASS-ACTION SETTLEMENT**

# TABLE OF CONTENTS

Table of Authorities ............................................................................................... iii

I.    Procedural History & Settlement Terms ........................................................... 1

      A.    The settlement resulted from more than thirteen years of hard-fought
            litigation, advocacy, and negotiation. ................................................... 1

      B.    The settlement yielded an historic result for the Class. ......................... 3

II.   The Settlement is Fair, Reasonable, and Adequate ........................................... 4

      A.    Judicial policy favors settlement ........................................................... 4

      B.    Courts approve class-action settlements when they are "fair, reasonable,
            and adequate." ....................................................................................... 5

      C.    The proposed settlement is procedurally fair .......................................... 6

            1.    Rule 23(e)(2)(A) - The class counsel has adequately represented
                  the class. ........................................................................................ 6

            2.    Rule 23(e)(2)(A) - Class representatives have adequately
                  represented the class. .................................................................... 9

            3.    Rule 23(e)(2)(B) - The proposed settlement was negotiated at
                  arm's length ................................................................................ 11

      D.    The proposed settlement is substantively fair. ...................................... 12

            1.    Rule 23(e)(2)(C)(i) - The relief provided to the class is far superior
                  to continued litigation. ............................................................... 13

                  a.    The Class faced significant risks in establishing liability. ........... 14

                  b.    Even if the Class proved liability, it risked not being able to
                        prove damages or maintain them on appeal. ............................... 17

                  c.    The Class faced significant hurdles in certifying a class and
                        maintaining it on appeal. ............................................................ 18

                  d.    The settlement fund is reasonable in light of the best
                        possible recovery and the attendant risks of litigation. ............... 19

                        i.    The Report of Michael Williams, Ph.D. .......................... 20

                        ii.   Other factors affecting the reasonableness of the
                              settlement amount .......................................................... 23

                  e.    While the Defendants may be able to sustain a larger
                        judgment, that factor alone does not undercut the
                        reasonableness of the settlement. ............................................... 24

            2.    Rule 23(e)(2)(C)(ii) - The claims process is fair and rational. ............... 26

            3.    Rule 23(e)(2)(C)(iii) - The proposed award of attorneys' fees
                  supports final approval ................................................................ 28

i

4.      Rule 23(e)(2)(C)(iv) & (e)(3) –No "side agreements" exist between Co-Lead Counsel and other individuals or entities. ................................. 29

5.      Rule 23(e)(2)(D) – The Proposed Settlement treats class members equitably to each other. .......................................................................... 29

III.    The Notice Campaign Adequately Apprised Class Members of their Rights. ............... 29

IV.     The Reaction of the Class to This Point Favors Approval. .............................................. 34

V.      The proposed Settlement Class should be finally certified. ............................................. 35

VI.     Conclusion. .................................................................................................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Needle, Inc. v. NFL*,
  560 U.S. 183 (2010)...................................................................................................8

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
  222 F.3d 52 (2d Cir. 2000)..........................................................................................9

*Charron v. Pinnacle Grp. N.Y. LLC*,
  874 F. Supp. 2d 179 (S.D.N.Y. 2012)..............................................................24, 30

*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974)....................................................................................13, 23

*Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*,
  502 F.3d 91 (2d Cir. 2007)...........................................................................................9

*D'Amato v. Deutsche Bank*,
  236 F.3d 78 (2d Cir. 2001)......................................................................................6, 12

*Dahl v. Bain Capital Partners, LLC*,
  No. 07-cv-12388, ECF No. 1095 (D. Mass. Feb 2, 2015) .......................................28

*Dial Corp. v. News Corp.*,
  317 F.R.D. 426 (S.D.N.Y. 2016) ..............................................................................27

*Elkind v. Revlon Consumer Prod. Corp.*,
  No. CV-14-2484, 2017 U.S. Dist. LEXIS (E.D.N.Y. Feb. 17, 2017).......................4

*Expressions Hair Design v. Schneiderman*,
  137 S. Ct. 1144 (2017)............................................................................................2, 7

*Garland v. Cohen & Krassner*,
  No. 08-CV-4626, 2011 WL 6010211 (E.D.N.Y. Nov. 29, 2011)...........................19

*Hicks v. Morgan Stanley & Co.*,
  2005 U.S. Dist. LEXIS 24890 (S.D.N.Y. Oct. 19, 2005) .......................................25

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
  No. 06-MD-1775 (JG)(VVP) (E.D.N.Y.) ................................................................28

*In re Am. Bank Note Holographics, Inc.*
  127 F. Supp. 2d 418 (S.D.N.Y. 2001)......................................................................26

iii

*In re ATM Fee Antitrust Litig.*,
 686 F.3d 741 (9th Cir. 2012) ...............................................................................15

*In re China Sunergy Sec. Litig.*,
 No. 07 Civ. 7895 (DAB), 2011 U.S. Dist. LEXIS 53007, 2011 WL 1899715
 (S.D.N.Y. May 13, 2011) .......................................................................................25

*In re Credit Default Swaps*,
 2016 WL 2731524 ..........................................................................................26, 28

*In re Currency Conversion Fee Antitrust Litig.*,
 263 F.R.D. 110 (S.D.N.Y. 2009) ...............................................................13, 23, 25

*In re Drexel Burnham Lambert Grp.*,
 995 F.2d 1138 (2d Cir. 1993) ................................................................................29

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
 No. 12-MD-2389, 2018 WL 6168013 (S.D.N.Y. Nov. 16, 2018) .........................20

*In re Flonase Antitrust Litig.*,
 951 F. Supp. 2d 739 (E.D. Pa. 2013) .....................................................................13

*In re Foreign Exchange Benchmark Rates Antitrust Litig.*,
 No. 13 Civ. 7789 (LGS), 2018 WL 5839691 (S.D.N.Y. 2018) ............................28

*In re Global Crossing Securities & ERISA Litig.*,
 225 F.R.D. 436 (S.D.N.Y. 2004) ......................................................................13, 14

*In re Initial Pub. Offering Sec. Litig.*,
 671 F. Supp. 2d 467 (S.D.N.Y. 2009) ....................................................................25

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
 No. 11-CV-5450, 2018 WL 3677875 (S.D.N.Y. Aug. 1, 2018) ............................20

*In re Lloyds' Am. Trust Fund Litig.*,
 2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002) .....................................................27

*In re NASDAQ Market-Makers Antitrust Litig.*,
 187 F.R.D. 465 (S.D.N.Y. 1998) ......................................................................17, 24

*In re PaineWebber Ltd. P'ships Litig.*,
 171 F.R.D. 104 (S.D.N.Y. 1997) .............................................................11, 26, 34

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
 827 F.3d 223 (2d Cir. 2016) ................................................................................2, 9

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
 986 F. Supp. 2d 207 (E.D.N.Y. 2013) ........................................................... *passim*

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
No. 05-MD-1720, 2019 WL 359981 (E.D.N.Y. Jan. 28, 2019) ..................................... *passim*

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*,
991 F. Supp. 2d 437 (E.D.N.Y. 2014) ...............................................................................7, 16

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
163 F.R.D. 200 (S.D.N.Y. 1995) .........................................................................................5

*In re Sumitomo Copper Litig.*,
189 F.R.D. 274 (S.D.N.Y. 1999) .......................................................................................17

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
MDL. No. 1827, 2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) .............................................28

*In re Visa Check/MasterMoney Antitrust Litig.*,
280 F.3d 124 (2d Cir. 2001).................................................................................................9

*In re Vitamins Antitrust Litig.*,
2000 WL 1737867 (D.D.C. Mar. 31, 2000)........................................................................27

*In re WorldCom, Inc. Sec. Litig.*,
388 F. Supp. 2d 319 (S.D.N.Y. 2005)................................................................................26

*Kendall v. Visa USA*,
518 F.3d 1042 (9th Cir. 2008) ...........................................................................................15

*Langford v. Devitt*,
127 F.R.D. 41 (S.D.N.Y. 1989) .........................................................................................34

*Maley v. Del Global Techs. Corp.*,
186 F. Supp. 2d 358 (S.D.N.Y. 2002)................................................................................26

*Morris v. Affinity Health Plan, Inc.*,
859 F. Supp. 2d 611 (S.D.N.Y. 2012)................................................................................23

*Motorola Credit Corp. v. Uzan*,
509 F.3d 74 (2d Cir. 2007)................................................................................................25

*Nat'l Bancard Corp. v. VISA U.S.A., Inc.*,
779 F.2d 592 (11th Cir. 1986) ...........................................................................................16

*Ohio v. Am. Express Co.*,
138 S. Ct. 2274 (2018)..................................................................................................8, 15

*Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*,
467 F.3d 283 (2d Cir. 2006)..............................................................................................15

*Shapiro v. JPMorgan Chase & Co.*,
  No. 11-cv-8331(CM)(MHD), 2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014) ........................12

*Sykes v. Harris*,
  No. 09-CV-8486, 2016 WL 3030156 (S.D.N.Y. May 24, 2016) ............................................14

*Teachers' Ret. Sys. of Louisiana v. A.C.L.N., Ltd.*,
  No. 01-CV-11814, 2004 WL 1087261 (S.D.N.Y. May 14, 2004) .........................................19

*Texaco Inc. v. Dagher*,
  547 U.S. 1 (2006) ....................................................................................................................8

*Torrisi v. Tucson Elec. Power Co.*,
  8 F.3d 1370 (9th Cir. 1993) ...................................................................................................34

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) .................................................................................................................9

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
  396 F.3d 96 (2d Cir. 2005) ............................................................................................ *passim*

*Weinberger v. Kendrick*,
  698 F.2d 61 (2d Cir. 1982) .....................................................................................................29

**Rules**

Fed. R. Civ. P. 23(e)(2)(C)(iv) .................................................................................................29

Fed. R. Civ. P. 23(e), 2018 Adv. Comm. Notes ............................................................... *passim*

**Other Authorities**

Alba Conte & Herbert Newberg, Newberg on Class Actions § 11.41 (4th ed. 2002) ..................35

J. Davis & R. Kohles, 2018 Antitrust Annual Report (May 2019) ...............................................13

**Introduction**

The Superseding and Amended Definitive Class Settlement Agreement of the

Rule 23(b)(3) Class Plaintiffs and the Defendants ("Superseding Settlement Agreement")

represents the largest known antitrust class-action settlement in the history of the antitrust laws.

Yet, this settlement was never a foregone conclusion. Rather, it is the product of thirteen years of

hard-fought litigation, settlement negotiations, and related advocacy. And it was achieved in the

face of motion practice and intervening changes in the law that threatened to completely end the

case, and market developments that dramatically altered the factual basis for the case since the

first complaint that was filed in June 2005. In light of the settlement's accomplishments, the

knowledge that Class Counsel and Class Plaintiffs gained after more than a decade of litigation,

and the substantial challenges facing the plaintiffs' case should the case continue to be litigated,

Rule 23(b)(3) Class Plaintiffs respectfully request that this Court finally approve the Superseding

Settlement Agreement because it is fair, reasonable and adequate.

I.     **Procedural History & Settlement Terms**

A.     **The settlement resulted from more than thirteen years of hard-fought litigation, advocacy, and negotiation.**

The parties and this Court have detailed this case's procedural history in multiple

pleadings and orders, most recently in this Court's memorandum and order granting preliminary

approval. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-

1720, 2019 WL 359981 *15-17 (E.D.N.Y. Jan. 28, 2019) ("*Payment Card IV*") (citing prior

recitations of history); Mem. Sup. R. 23(b)(3) Cl. Pls.' Prelim. App. at 2-7, ECF No. 7257-1

(Sept. 18, 2018); Cl. Pls.' Mem. Supp. Fin. App. Sett. at 2-8, ECF No. 2111-1 (Apr. 11, 2013))

("2013 Final App. Mot."); Mem. Supp. Sett. Prelim. App. at 4, ECF No. 1656-2 (Oct. 19, 2012).

1

Since the first class-action complaint was filed in June 2005, Class Plaintiffs and Co-Lead Counsel aggressively litigated the case through motions for class certification and summary judgment, and engaged in three years of mediation and settlement negotiations to reach a settlement that yielded $5.3 billion in monetary compensation (after reduction for opt-outs) and changes to certain of the networks' point-of-sale rules. These activities are chronicled in detail in prior orders and pleadings in this matter. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 229 (2d Cir. 2016) ("*Payment Card III*") (acknowledging efforts of Co-Lead counsel); Decl. of K. Wildfang ¶¶ 21-153, ECF No.7257-3 (Sept. 18, 2018) ("Wildfang 2018 Decl."); Decl. of K. Wildfang ¶¶ 96-100, 151-75, ECF No. 2113-6 (April 11, 2013) ("Wildfang 2013 Decl."). And although the Second Circuit ultimately set aside the 2012 settlement, *Payment Card III*, 827 F.3d at 227, the rules reforms that the prior settlement and Co-Lead Counsel's related advocacy helped implement continue to this day.[1] *Payment Card IV*, 2019 WL 359981, at *16 n.7.

---

[1]    Some of the reforms that Co-Lead Counsel helped achieve outside of the four walls of this Court, include reforms to Visa and MasterCard's no-discount rules and other Anti-Steering restraints that were contained in a consent decree with the Department of Justice, which grew directly out of the evidence gathered by Co-Lead Counsel, *see In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 986 F. Supp. 2d 207 (E.D.N.Y. 2013) ("*Payment Card I*") (noting some of the reforms), Wildfang 2018 Decl. ¶¶ 97-101, increased competition in debit-card routing and capped debit-card interchange fees contained in the Durbin Amendment to the Dodd-Frank Wall Street Reform and Consumer Protection Act, *Payment Card I*, 986 F. Supp. 2d at 230-31; Wildfang 2018 Decl. ¶¶ 89-96, and a ruling by the United States Supreme Court, underminingstate laws that arguably banned merchant payment-card surcharges. *Expressions Hair Design v. Schneiderman,* 137 S. Ct. 1144, 1147 (2017); Wildfang 2018 Decl. ¶¶ 193-95. Co-Lead Counsel also helped lead a lobbying effort to defeat efforts within various state legislatures to ban surcharging. Wildfang Decl. ¶ 38.

"Phase Two"[2] of active litigation was also arduous. Co-Lead Counsel analyzed approximately five million pages of newly produced documents from the Defendants' files and produced 500,000 additional documents from their own clients' files, participated in over 180 defendant and third-party depositions while defending others, and spent collectively hundreds of hours working with experts as they prepared reports that would have to have been served absent this settlement. Wildfang 2018 Decl. ¶¶ 201-41. Negotiation and mediation in Phase Two were also intense, requiring nearly a dozen in-person meetings over eighteen months. Decl. of Infante, J. (Ret.) ¶¶ 10, ECF No. 7257-5 (Sept. 18, 2018) ("Infante 2018 Decl."); *see also* Decl. of E. Green ¶¶ 5-6, ECF No. 7257-4 (Sept. 18, 2018) ("Green 2018 Decl.").

### B.    The settlement yielded an historic result for the Class.

The proposed settlement constitutes the largest monetary antitrust class-action settlement in the history of the Sherman Act. Under the settlement, Defendants made additional cash payments of $900 million for the Class, in addition to the funds from the 2012 settlement funds, after reduction for opt-outs and administrative expenses. The approximately $6.3 billion[3] in funds is subject to a possible partial reduction, not to exceed $700 million, depending on the percentage of merchant volume that opts out from this settlement.[4]

---

[2]    For ease of reference, Class Plaintiffs refer to the period from the filing of the first complaint to the Second Circuit's 2016 decision setting aside the prior settlement as "Phase One" of this litigation, and the subsequent period as "Phase Two."

[3]    The value of the settlement fund as of June 6, 2019 is $6,322,607,198.34. The settlement funds, which have been held in escrow accounts since 2012, continue to earn interest and pay taxes.

[4]    If the "Total Opt Out Percentage," as defined under Paragraph 22 of the Superseding Settlement Agreement reaches twenty-five percent the Defendants have the option to terminate the settlement. Superseding & Am. Cl. Sett. Ag. ¶¶ 22, 62, ECF No. 7257-2 (Sept. 18, 2018).

As this Court found in its preliminary-approval order, *Payment Card IV*, 2019 WL 359981 at *31, the Superseding Settlement Agreement contains features that address the deficiencies that the Second Circuit found with the 2012 settlement. First, it is entered into solely on behalf of a unitary class under Rule 23(b)(3), with a right for all class members to opt out. Second, the settlement preserves the right to receive injunctive relief for class members through the Rule 23(b)(2) class that is currently litigating injunctive-relief claims. Third, the settlement class includes only merchants that accepted Visa or Mastercard-branded cards between 2004 and Preliminary Approval. Finally, the release is narrower than the 2012 release in important respects: (a) it is explicitly intended to be consistent with and no broader than federal law on the Identical Factual Predicate Doctrine, *see* Rev. R. 23(b)(3) Cl. Not. at G-1-3 to G-1-4, ECF No. 7354-2 (Jan. 15, 2019); (b) it carves out class claims for injunctive relief currently being litigated by separate counsel; and (c) it does not release claims that accrue more than five years after the settlement becomes final, after the resolution of any appeals. *See* Superseding Sett. Agr. ¶ 31(a), ECF No. 7257-2 (Sept. 18, 2018).

## II.     The Settlement is Fair, Reasonable, and Adequate.

### A.     Judicial policy favors settlement.

"The compromise of complex litigation is encouraged by the courts and favored by public policy." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116-17 (2d Cir. 2005) ("Wal-Mart"); *see also Elkind v. Revlon Consumer Prod. Corp.*, No. CV-14-2484, 2017 U.S. Dist. LEXIS, at *17 (E.D.N.Y. Feb. 17, 2017) (noting same). The Second Circuit therefore acknowledges "the strong judicial policy in favor of settlements, particularly in the class action context." *Wal-Mart*, 396 F.3d at 116-17.

**B.      Courts approve class-action settlements when they are "fair, reasonable, and adequate."**

Under the Federal Rules of Civil Procedure, class settlements must be "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e). Because the circuits implemented this standard through various formulations, the 2018 amendments to Rule 23 articulated a four-prong test that was intended to harmonize the circuits' varying articulations of the "fair, reasonable, and adequate" standard. Fed. R. Civ. P. 23(e), Adv. Comm. Notes to 2018 Amendments. The 2018 amendments explicitly focus the inquiry on the overall fairness of the settlement. *Id*.; *cf. Wal-Mart*, 396 F.3d at 116 (setting forth pre-amendment focus on procedural and substantive fairness). In making its fairness determination courts recognize the "unique ability of class and defense counsel to assess the potential risks and rewards of litigation …." *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 209 (S.D.N.Y. 1995) (internal quotation marks omitted). This is particularly true in a case as far advanced as this case, where all counsel are exceedingly well-versed in the relevant facts and applicable law. *See Wal-Mart*, 396 F.3d at 117 (citing class counsel's experience and advanced stage of litigation as favoring final approval).

According to the amended Rule 23(e)(2), a settlement is "fair, reasonable, and adequate" if:

> (A)    the class representatives and class counsel have adequately represented the class;
>
> (B)    the proposal was negotiated at arm's length;
>
> (C)    the relief provided to the class is adequate, taking into account:
>
> > (i)    the costs, risks, and delay of trial and appeal;
> >
> > (ii)    the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
> >
> > (iii)    the terms of any proposed award of attorney's fees, including the timing of payment; and

(iv)   any agreement required to be identified under Rule 23(e)(3); and

(D)   the proposal treats class members equally to each other.


The first two of these prongs address the "procedural fairness" of the settlement, while the last two address the "substantive fairness." Fed. R. Civ. P. 23(e), 2018 Adv. Comm. Notes to 2018 Amendments.


### C.    The proposed settlement is procedurally fair.

#### 1.    Rule 23(e)(2)(A) - The class counsel has adequately represented the class.

In appointing Co-Lead Counsel as interim representatives for the Rule 23(b)(3) Class, this Court has already made initial determinations of their adequacy. *See* Fed. R. Civ. P. 23(e)., Adv. Comm. Notes to 2018 Amendments (noting that appointment as interim representatives necessarily entails an evaluation of counsel's adequacy to represent the class); *Payment Card I*, 986 F. Supp. 2d at 239; *Payment Card IV*, 2019 WL 359981, at *24-27. At final approval, however, the focus is on the actual performance of counsel, as judged by the extensiveness of litigation required to reach settlement, counsel's conduct of settlement negotiations, and the result obtained relative to other cases on the same subject matter. *See* Fed. R. Civ. P. 23(e), Adv. Comm. Notes to 2018 Amendments; *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (directing courts to analyze the negotiating process and discovery taken by class counsel).

The results of this litigation demonstrate that Co-Lead Counsel adequately represented the Class. The settlement amount is approximately twice as large as the *Wal-Mart* settlement, which the Second Circuit called "staggering" in terms of its compensatory relief. *Wal-Mart*, 396 F.3d at 119. In addition to creating this cash fund, this litigation contributed to the Department of

Justice's consent decrees with Visa and Mastercard and the Durbin Amendment to the Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. § 1693o-2 (the "Durbin Amendment"), both of which secured additional, meaningful changes to Defendants' practices, including a cap on debit-card fees — itself worth billions of dollars—and relaxation of Visa and Mastercard's Anti-Steering restraints.[5] Co-Lead Counsel also worked with lawyers challenging certain state anti-surcharge laws, which led to decisions finding those laws unconstitutional in general or as applied. *See, e.g., Expressions Hair Design*, 137 S. Ct. at 1147; Wildfang 2018 Decl. ¶¶ 193-95.

Co-Lead Counsel's efforts were commensurate with the results obtained, both in the sheer volume of documents reviewed, depositions taken, and pleadings and memoranda created, Wildfang 2018 Decl. ¶¶ 21-88, 102-43, 196-228; Wildfang 2013 Decl. ¶¶ 55-95, and in the multi-faceted, ever-changing nature of the legal and factual landscape between 2005 and today. Since the first case in MDL 1720 was filed, Mastercard and Visa restructured from bank-owned joint ventures to publicly traded companies, the United States entered and emerged from the

---

[5]     Three years after the first case in MDL 1720 was filed, the Department of Justice Antitrust Division contacted Co-Lead Counsel to request their assistance in the DOJ's investigation of Visa, Mastercard, and American Express's Anti-Steering Restraints. Over the Defendants' objection, Co-Lead Counsel secured an amended Protective Order that allowed them to share their work product, including their analysis of Defendants' documents, with the DOJ. Or., ECF No. 1235 (Jun. 18, 2009); Wildfang 2013 Decl. ¶¶ 120-21, ECF No. 2113-6 (Apr. 11, 2013). Co-Lead Counsel then frequently met with and corresponded with the DOJ staff, as they investigated the networks and eventually entered into a consent decree that lessened the networks' Anti-Steering Restraints. *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 991 F. Supp. 2d 437, 442 (E.D.N.Y. 2014) ("*Payment Card II*"); Wildfang 2013 Decl. ¶¶ 7-9, 200-203; Wildfang 2018 Decl. ¶ 240, ECF No. 7257-3 (Sept. 18, 2018). Around the same time, Co-Lead Counsel retained lobbyists and devised a lobbying strategy to include payment-card reforms in the financial-reform bills that would eventually become the Dodd-Frank Act. As part of this effort, Co-Lead Counsel and a number of Class Representatives met with key legislators to explain the merchants' need for the reforms. Wildfang 2013 Decl. ¶¶ 107-17.

greatest financial crisis since the Great Depression, the networks rolled back many of the rules that the Class challenged, and technology opened up new ways for consumers to pay for goods and services. Each of these developments altered the factual landscape of the litigation, and required Co-Lead Counsel to continuously adapt the focus of their litigation efforts. Wildfang Decl. ¶¶ 17-22; Wildfang 2018 Decl. ¶¶ 14, 26, 29; Third Consol. Am. Cl. Action Compl. ¶¶ 62, 67, 77, 81, ECF No. 7123 (Nov. 6, 2017) ("TCACAC") (public version). Similarly, legal developments included three landmark Supreme Court decisions that impacted the antitrust analysis of joint ventures and the networks' point-of-sale rules. *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2287 (2018) (holding that challenge to Amex rules must establish harm to competition in "two-sided" relevant market); *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 200-01 (2010) (holding that Section 1 of the Sherman Act applied to NFL's restrictions on its teams' licensing activities); *Texaco Inc. v. Dagher*, 547 U.S. 1, 8 (2006) (holding that legitimate joint venture's setting common price for members' gasoline prices was not illegal per se).

Throughout this evolving landscape, Co-Lead Counsel negotiated a settlement of their claims as vigorously as they litigated them. Two experienced mediators presided over twelve in-person mediation sessions and many more telephonic sessions in Phase Two alone,[6] and declared, based on their experience, that Co-Lead Counsel possessed the skill and knowledge of

---

[6]    The mediation and negotiation process that culminated in the 2012 settlement was also "lengthy, exhaustive, difficult, and often contentious." Dec. of E. Green ¶ 35, ECF No. 2111-3 (Apr. 11, 2013) ("Green 2013 Decl."); *Accord* Decl. of Hon. E. Infante ¶ 12, ECF No. 2111-2 (Apr. 11, 2013) ("Infante 2013 Decl."). Co-Lead Counsel estimated that they had 45 separate meetings with one or both mediators. Wildfang 2013 Decl. ¶ 175. They and Mediator Eric Green estimated that they "had hundreds of telephone conversations with counsel for all Parties." *Id.*; Green 2013 Decl. ¶ 13.

the case necessary to evaluate the settlement in light of the risks of continued litigation. Infante 2018 Decl. ¶¶ 31-32, Green 2018 Decl. ¶¶ 9, 13.

## 2. Rule 23(e)(2)(A) - Class representatives have adequately represented the class.

The class representatives' adequacy is judged by whether their interests are antagonistic to the interests of other members of the class. *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007) (quoting *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000)); *Payment Card IV*, 2019 WL 359981, at *24-25. This includes an inquiry as to whether the class representative suffers the same injury as the other class members. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348–49 (2011) ("*Dukes*"). Adequacy must be assessed independently of the fairness of the settlement itself, and instead must look to whether the proposed settlement class is "sufficiently cohesive to warrant adjudication." *Payment Card III*, 827 F.3d at 232. When conducting this inquiry, courts note that "not every potential disagreement between a representative and the class members will stand in the way of" certification. *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 125 (2d Cir. 2001).

As this Court found at Preliminary Approval, the bifurcated class structure in Phase Two of this litigation resolved the "structural defect" that the Second Circuit found to plague the 2012 settlement. *Payment Card IV*, 2019 WL 355981, at *31. Thus, in the Superseding Settlement Agreement, the Class Representatives' sole incentive is to maximize monetary recovery for the class.

Specifically, the Class Representatives have the same interests as absent Class members since all claim to have suffered the same injury–overpaying to accept Visa and Mastercard payment cards as a result of allegedly collusively set interchange fees and anticompetitive

9

merchant restraints. TCACAC ¶¶ 10-13, 15-18. The rules that the Rule 23(b)(3) class is challenging are uniform throughout the Visa and Mastercard networks' respective systems, and thus apply uniformly to the class and the Class Representatives. TCACAC ¶¶ 186, 326. The default interchange fees that the merchant Class members paid were also set uniformly across each network's system. TCACAC, ¶¶ 54-58. In light of the uniform application of rules and fees, this Court concluded that "it is unlikely that the Rule 23(b)(3) Class Plaintiffs are operating at the expense of the putative class members." *Payment Card IV*, 2019 WL 359981, at *24. The mediators confirmed that Co-Lead Counsel negotiated independently from (b)(2) counsel in the Phase Two negotiations, maintaining the "firm position" that their negotiations—and any settlement resulting from those negotiations—had to be "independent of and not contingent in any way on" the settlement or outcome of the (b)(2) class action (Green Decl. ¶12).

The Class Representatives, while suffering the same legal injury, also represent a broad swath of the merchant community, which this Court found strengthened their adequacy. *Payment Card IV*, 2019 WL 359981, at *24. The Representatives include purely internet retailers to bricks-and-mortar stores, large companies to "mom-and-pop" stores, and operate on both coasts and in the Midwest. TCACAC, ¶¶ 10-18.

The only significant number and type of objections to the Superseding Settlement Agreement to date are the 37 boilerplate objections filed by the so-called "Branded Operators." Hamann Decl. ¶ 41(a). According to these objectors, the Class Representatives are inadequate because none of them are "Branded Operators"[7] and therefore cannot represent the interests of

---

[7]     As a factual matter, this is incorrect. Class Representative, CHS, Inc. is a regional cooperative that is owned by thousands of individual producers and local cooperatives, many of which own and operate fuel/convenience stores whose card-processing services are provided by

merchants whose claims may belong to another entity by virtue of contract, or were extinguished pursuant to another entity's settlement agreement. *See e.g.*, Obj. of Community Service Stations, Inc. at 1, ECF No. 7450 (May 20, 2019). As this Court found at Preliminary Approval, however, this purported "conflict," does not constitute a "fundamental" conflict within the meaning of Rule 23 because the settlement agreement does not treat different classes of merchants differently. *Payment Card IV*, 2019 WL 359981, at *16. This Court also correctly found that the grounds for the alleged "conflict," if any, stems from contractual relationships between the Branded Objectors and their oil-company suppliers/franchisors and not from any inequitable treatment within the Superseding Settlement Agreement. *Id*. at *17; Dec. 6, 2018 Hr'g Tr. at 10:15-11:18, ECF No. 7331. At bottom, the issues raised by the Branded Operators have nothing to do with the settlement as a whole, its adequacy, or the adequacy of the class representatives. At most, they constitute case-by-case distribution questions – e.g., whether the Branded Operator or some other entity is entitled to a settlement payment – that can be addressed and resolved through the allocation process. There is nothing atypical about this, and disputes of this sort (e.g., among divorced couples who each claim to "own" the right to a settlement payment) regularly arise and are handled in this fashion in connection with the distributions of class settlements.

### 3. Rule 23(e)(2)(B) - The proposed settlement was negotiated at arm's length

The 2018 revisions to Rule 23 reflect the long-standing Second Circuit rule that "a strong initial presumption of fairness attaches to [a] proposed settlement," when "the integrity of the arm's length negotiation process is preserved ...." *See* Fed. R. Civ. P. 23(e)(2)(B); *In re*

---

their fuel supplier. Thus, those CHS member cooperatives are in the same situation vis-à-vis card payments as are the "Branded Operators." McDonald Decl. ¶¶ 2-3.

*PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y. 1997), aff'd, 117 F.3d 721 (2d Cir. 1997). Regarding the conduct of the negotiations, the drafters of the 2018 amendments to Rule 23 made clear that "the involvement of a neutral or court-affiliated mediator or facilitator…may bear on whether [negotiations] were conducted in a manner that would protect and further the class interests." Fed. R. Civ. P. 23(e), Adv. Comm. Notes to 2018 Amendments; *see also D'Amato*, 236 F.3d at 85.

This Court found at Preliminary Approval that the history of this litigation and the negotiations that led to the Superseding Settlement Agreement would likely weigh in favor of granting final approval. *Payment Card IV*, 2019 WL 359981, at *27. Class Plaintiffs agree. Co-Lead Counsel engaged in intensive litigation activities for more than a year-and-a-half after being reappointed as Interim Co-Lead Counsel for the (b)(3) Class. This included participating in 179 defendant- and third-party depositions and defending four Class Representative depositions, reviewing and analyzing over 5 million pages of Defendant and third-party documents, and producing over a half million pages of documents from Class Representatives' files. Wildfang 2018 Decl. ¶¶ 207, 210-23. The conduct of negotiations also suggests an arm's-length agreement, as two nationally recognized mediators presided over twelve in-person mediation sessions and dozens of telephonic meetings over the course of sixteen months. *D'Amato*, 236 F.3d at 85; Infante 2018 Decl. ¶ 26; Green 2018 Decl. ¶ 11; Wildfang 2018 Decl. ¶ 238.

## D. The proposed settlement is substantively fair.

At final approval, the Court's role is not to "decide the merits of the case, resolve unsettled legal questions," or "foresee with absolute certainty the outcome of the case," *Shapiro v. JPMorgan Chase & Co.*, No. 11-cv-8331(CM)(MHD), 2014 WL 1224666, at *10 (S.D.N.Y. Mar. 24, 2014) (internal quotations omitted), but rather to "assess the risks of litigation against

the certainty of recovery under the proposed settlement." *In re Global Crossing Securities &*
*ERISA Litig.*, 225 F.R.D. 436, 459 (S.D.N.Y. 2004).

> 1.      **Rule 23(e)(2)(C)(i) - The relief provided to the class is far superior to
> continued litigation.**

The revised Rule 23(e)(2)(c)(i) essentially codifies many of the Second Circuit's *Grinnell*
factors, which for over four decades guided courts' assessments of the fairness of proposed
settlements. *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974). Six of the pre-
amendment factors are captured by Rule 23(e)(2)(c)(i): (iv) the risks of establishing liability; (v)
the risks of establishing damages; (vi) the risks of maintaining the class action through trial; (vii)
the ability of the defendants to withstand a greater judgment; (viii) the range of reasonableness of
the settlement fund in light of the best possible recovery; and (ix) the range of reasonableness of
the settlement fund to a possible recovery in light of all the attendant risks of litigation. *Id.*

To our knowledge, this is the largest class-action settlement fund in the history of the
Sherman Act. As noted above, the Second Circuit lauded the creation of a settlement fund half
the size of this one. *Wal-Mart*, 396 F.3d at 119. And significantly smaller settlements with
similarly large classes are also consistently praised by the courts that approve them. *See In re
Flonase Antitrust Litig.*, 951 F. Supp. 2d 739, 745 (E.D. Pa. 2013) (approving a settlement fund
of $150,000,000); *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 124
(S.D.N.Y. 2009) (noting with approval settlement fund amount of $336,000,000 for a class of
credit-card users who paid foreign-transaction fees); J. Davis & R. Kohles, 2018 Antitrust
Annual Report at 18-22 (May 2019) ("Antitrust Annual Report") (setting forth top fifty class-
action settlements by dollar value that were finally approved between 2013 and 2018, ranging
from $2.3 billion to $64 million) (Wildfang Decl. Ex. 4). Absent settlement, Class Plaintiffs

would have faced a series of significant hurdles to obtaining compensation for the Class. Each hurdle carried a significant risk that the Class would not recover. And continued litigation entailed a certainty of additional delay for millions of merchants that have already waited fourteen years to be compensated for the conduct challenged in this litigation. *See Sykes v. Harris*, No. 09-CV-8486, 2016 WL 3030156, at \*12 (S.D.N.Y. May 24, 2016) (noting the certainty of delay in continuing complex litigation). This settlement obviates the risk of no recovery by merchants or recovery in the distant future.

### a. The Class faced significant risks in establishing liability.

The district court's role in evaluating this factor is not to handicap the plaintiffs' chances of success or to resolve open factual or legal questions, but rather to "assess the risks of litigation against the certainty of recovery under the proposed settlement." *In re Global Crossings*, 225 F.R.D. at 459.

As this Court noted at Preliminary Approval, the parties briefed and argued motions to dismiss, *Daubert* motions (including of the Class's primary economic expert), and motions for summary judgment during Phase One of the litigation, which certainly would have been renewed in Phase Two of the litigation. Sarokin Decl. ¶¶ 19-22 (concluding that Class Plaintiffs faced a "significant risk" of Defendants reinstated *Daubert* motions); *see also Payment Card IV*, 2019 WL 359981, at \*21. The legal arguments that the Defendants raised in both phases of this litigation could have completely defeated or significantly narrowed the scope of the Class's claims. *See* Wildfang Decl. ¶¶ 24-32 (discussing risks from Co-Lead Counsel's perspective). They included an argument that the *Visa Check* settlement entirely extinguished the Class's claims, Sarokin Decl. ¶¶ 37-44, that the networks' restructurings cut off Defendants' Section 1 liability, *id.* ¶ 23, that the Defendants were incapable of "conspiring" even before the networks

14

restructured, that the plaintiffs failed to prove harm to competition in a properly defined relevant market, and that the plaintiffs were "indirect purchasers," barred by the *Illinois Brick* doctrine from recovering under federal law. *Id.* ¶¶ 31-39. On the *Illinois Brick* issue alone, the Defendants could point to a number of recent appellate decisions in payment-card antitrust cases that, while arguably distinguishable, held that *Illinois Brick* precluded merchants' or other actors' claims. *Id.*[8]

At Preliminary Approval, this Court cited the conclusion of Court-appointed expert, Alan Sykes, that the Class would face "substantial probability of securing little or no relief at the conclusion of trial." *Interchange Fees IV*, 2019 WL 359981, at *22 (quoting Mem. Alan O. Sykes to Hon. John Gleeson, at 3, ECF No. 5695 (Aug. 28, 2013) ("Sykes Rep.")).[9] Since the time of the Sykes Report, additional developments occurred that arguably increase the Class's challenges on liability. Sarokin Decl. ¶ 10. In addition to the defenses raised in Phase One, the Defendants would likely have argued—pointing to a recent Supreme Court opinion, *Ohio v. Am. Express*, 138 S. Ct. 2274 (2018)—that the proper "relevant market" in the case is a "two-sided" one consisting of merchants and consumers, in which the Class could not sufficiently prove harm. According to Judge Sarokin, the possibility of proving harm in a "two-sided market" could have "devastating consequences for plaintiffs" if this Court or the Second Circuit "strictly follow[ed] the language in the *Amex* case," which "could make a verdict for plaintiffs doubtful." Sarokin Decl. ¶ 26.

---

[8]    Judge Sarokin cited the following cases to highlight the *Illinois Brick* risk: *In re ATM Fee Antitrust Litig.*, 686 F.3d 741 (9th Cir. 2012); *Kendall v. Visa USA*, 518 F.3d 1042 (9th Cir. 2008); *Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc*., 467 F.3d 283, 291-92 (2d Cir. 2006). Sarokin Decl. ¶¶ 30-35.
[9]    While Co-Lead Counsel disagree with Dr. Sykes's assessment of Class Plaintiffs' claims, such an opinion from a court-appointed expert gives even the most confident counsel pause.

When Judge Gleeson approved the 2012 settlement, he noted the paradox that "[t]he more progress the merchants make – through private lawsuits, government cases, and legislation – the more difficult it becomes to establish an antitrust violation." *Payment Card I*, 991 F. Supp. 2d at 444. This statement is even truer today, as the reforms that Co-Lead Counsel and others achieved have now been in place for many years. The reform of these rules places additional pressure on the Class to prove that the Defendants' remaining rules—such as the default-interchange rule and the honor-all-cards rule—unreasonably harm competition. Sarokin Decl. ¶ 27; Wildfang Decl. ¶¶ 19-20. Proving that these rules harmed competition would run into the reality pointed out by Judge Gleeson in approving the 2012 settlement that no U.S. court has ever adjudged the default-interchange rule to be anticompetitive. *Payment Card I*, 986 F. Supp. 2d at 227 (citing *Nat'l Bancard Corp. v. VISA U.S.A., Inc.*, 779 F.2d 592, 605 (11th Cir. 1986) ("*Nabanco*")); Sarokin Decl. ¶ 14 (highlighting risk presented by *Nabanco*); *see also* Sykes Rep. at 15-16 (noting role that default-interchange, honor-all-cards and other rules played in the development and success of the Visa and Mastercard networks).

Based on these likely arguments that the Defendants would have raised, Judge Sarokin concluded that the parties "face[d] daunting challenges should litigation continue," such that "settlement is not only justified and appropriate, but is mandated in the best interests of the parties, the public and the court system." Sarokin Decl. ¶ 45; *see also* Wildfang Decl. ¶¶ 7. Class Plaintiffs agree and therefore respectfully suggest that this factor weighs in favor of final approval.

### b.   Even if the Class proved liability, it risked not being able to prove damages or maintain them on appeal.

"[T]he history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal." *Wal-Mart*, 396 F.3d at 118; *see also In re Sumitomo Copper Litig.,* 189 F.R.D. 274, 283 (S.D.N.Y. 1999). Complex cases, such as this one, often involve "battles of the experts" on the issues of damages, which prior courts have noted, makes it "difficult to predict with any certainty which testimony would be credited." *In re NASDAQ Market-Makers Antitrust Litig.,* 187 F.R.D. 465, 476 (S.D.N.Y. 1998).

This case is no exception. At trial both sides would have offered expert testimony on damages in addition to liability. But unlike the typical price-fixing antitrust case, there is no pre- or post-cartel benchmark period completely free of the challenged anticompetitive conduct to which the Class's experts could have referred to estimate a competitive price. *See* Sykes Rep. at 19, 23; Wildfang Decl. ¶¶ 24-31. While the Class's primary economic expert argued during Phase One of the litigation that in the but-for world there would not have been interchange fees[10] or, in the alternative, regulated markets in Australia and Europe provided useful benchmarks for damages estimates, the Defendants moved to disqualify his opinion, arguing the Class could not use a governmentally established fee level as a benchmark for proving damages. *See* Defs' Mem. Sup. Mot. Exclude Frankel at 1-5, ECF No. 1499-1 (Jul. 7, 2011); *see also* Sarokin Decl. ¶¶ 21-22 (highlighting risk of Daubert challenge); Sykes Rep., at 23 (concluding that Class Plaintiffs'

---

[10]   Dr. Frankel pointed to the interchange-fee-free evolution of the U.S. check and ACH systems, and several foreign debit-card networks to demonstrate that the Visa and MasterCard networks could have developed without interchange fees. Frankel Rep. ¶¶ 342-46 (Wildfang Decl. Ex. 4); Cl. Pls.' Mem. in Opp. to Mot. Exclude Frankel at 26-27, ECF No. 1499-2 (Jul. 7, 2011).

damages models were "subject to substantial challenges"). Citing Dr. Sykes and Judge Renfrew,[11] this Court concluded at Preliminary Approval that the challenge the Class faced in proving damages would likely weigh in favor of final approval. *Payment Card IV*, 2019 WL 359981, at *30.

In addition to the reasons contained in the Court's preliminary-approval order, the Defendants would likely argue that the *Amex* case requires that the Class prove damages, in addition to liability, in a "two-sided" market. Because the "two-sided market" concept was only recently endorsed by the Supreme Court, the Class's experts would have little guidance in estimating damages in a two-sided market. Some of the factors that they may have had to consider, however, include the value of payment-card "rewards" and the interest-free period on credit-card purchases, which are inherently difficult to value. *See* Sykes Rep. at 24-25 (addressing complexity of quantifying damages in a "two-sided" market). While Class Plaintiffs feel that they would have had strong arguments to prove damages, even if *Amex* were found to apply to this case, the risk that they would not be successful is real and weighs in favor of final approval. Wildfang Decl. ¶¶ 30-32.

Because the events which occurred throughout the course of this litigation increased the risks of an adverse outcome, the settlement is fair, adequate and reasonable.

### c.  The Class faced significant hurdles in certifying a class and maintaining it on appeal.

As this Court noted at Preliminary Approval, the risk of failing to certify a class or failing to maintain it through trial supports final approval when "it is likely that defendants would

---

[11]    Judge Renfrew passed away on December 14, 2017.

oppose class certification" if the case were to be litigated. *Payment Card IV*, 2019 WL 359981, at *31 (quoting *Garland v. Cohen & Krassner*, No. 08-CV-4626, 2011 WL 6010211, at *8 (E.D.N.Y. Nov. 29, 2011) (internal quotations omitted). Even if a class were certified, the Defendants could move to decertify it or appeal the grant of certification under Rule 23(f). Either move would threaten the viability of the Class's case and, even if unsuccessful, would have certainly added years to the pendency of this litigation, further delaying compensation to the merchant Class. Given the risks of maintaining a class through trial and appeal, this Court preliminarily concluded that this factor was likely to weigh in favor of final approval. *Payment Card IV*, 2019 WL 359981, at *24. Class Plaintiffs agree and respectfully request that this Court find that this factor supports final approval.

### d.  The settlement fund is reasonable in light of the best possible recovery and the attendant risks of litigation.

In its comments to the 2018 amendments to Rule 23, the Advisory Committee noted that courts considering proposed settlements often "forecast the likely range of possible classwide recoveries and the likelihood of success in obtaining such results." In making this calculation, courts often compare the terms of the settlement with a "complete victory" by the plaintiffs, *Teachers' Ret. Sys. of Louisiana v. A.C.L.N., Ltd.*, No. 01-CV-11814, 2004 WL 1087261, at *5 (S.D.N.Y. May 14, 2004), and discount that by the "uncertainties of law and fact" and "the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Wal-Mart*, 396 F.3d at 119. While such a forecast cannot be done with "arithmetic accuracy," it may be useful as "a benchmark for comparison with the settlement figure." Fed. R. Civ. P. 23(e)(2), Adv. Comm. Notes to 2018 Amendments.

In granting preliminary approval, this Court asked Co-Lead Counsel to "use their best efforts to provide the best possible recovery estimate when seeking final approval of the settlement." *Payment Card IV*, 2019 WL 359981, at *38 n.46. The Court acknowledged, however, that while such a benchmark may be "helpful," it was not a prerequisite to final approval. *See id.* (citing *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, No. 12-MD-2389, 2018 WL 6168013, at *13 (S.D.N.Y. Nov. 16, 2018) and *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11-CV-5450, 2018 WL 3677875, at *8 (S.D.N.Y. Aug. 1, 2018)).

### i.   The Report of Michael Williams, Ph.D.

To assist the Court in determining whether the fund created by the settlement amount in this case is reasonable in light of the best possible recovery, Class Plaintiffs engaged the services of Michael Williams, Ph.D., an experienced and well-respected economist.[12] Class Plaintiffs asked Williams to investigate whether the settlement amounts at issue were reasonable from an economic perspective, in light of the range of estimated damages associated with this case and the risks involved in this case. Williams Rep. ¶¶ 6, 30.

To draw an empirical comparison between this settlement and settlements in other large, complex antitrust cases, Williams reviewed a database of 71 past antitrust settlements, which he characterized as "the best data on settlements that is available." *Id.* ¶¶ 18-21 & n. 24. Williams

---

[12]   Dr. Williams is a Director in the consulting firm of Competition Economics LLC. Expert Report of Michael A. Williams, Ph.D. ¶ 1 ("Williams Rep."). He holds a doctorate in economics from the University of Chicago, with a specialty in antitrust, industrial organization and regulation. *Id.* ¶¶ 1,4. He has written articles in numerous peer-reviewed publications, and consulted or testified for both plaintiffs and defendants in numerous courts throughout the country, including the United States Department of Justice Antitrust Division and the United States Federal Trade Commission. *Id.* ¶¶ 1-3.

employed a standard regression analysis[13] to this data to investigate whether there was a systematic relationship between the size of damages estimated in the settled cases and the size the settlement amounts. *Id*. ¶¶ 21, 23. Williams found that "[a]s expected, settlement amounts increase as the claimed damages increase, but the settlement amount, as a percentage of the claimed damages, decreases." *Id*. ¶ 25.

To compare the current settlement with the best potential recovery, Williams then applied his regression equation to the damages estimations of Class Plaintiffs' expert, Dr. Alan Frankel and Defendants' expert, Dr. Robert Topel. *Id*. ¶¶ 8, 27–34 & Tables 2 & 3. In order to perform this calculation, Williams needed updated damages figures for Frankel, whose previous calculations covered only the period from 2004 through June 2009. Frankel updated his own damages estimates for the 2004-18 period and provided the results to Williams. *Id*. ¶ 11 & Table 1. Frankel's updated calculations yielded potential damages, ranging from $754 billion at the upper extreme to $463 billion, at the lower bound. *Id*. Table 1. Williams also extrapolated Topel's damages estimates resulting in damages estimate for the 2004-18 period of $1.21 billion to $3.66 billion. *Id*. ¶ 11.

Inserting Frankel's updated damages figures into his regression model, Williams concluded that the settlement amount in this case is "similar to, but higher than, the proposed

---

[13]    As Williams explained: "A regression is an equation which seeks to represent, in a statistically rigorous way, the relationship between one variable and one or more other variables. On the left-hand side of the equation is the dependent variable (in this case the settlement amounts). The observed settlement amounts vary from case to case. The goal of the regression analysis is to identify (on the right-hand side of the equation) independent variables that can explain or predict the variation in settlement amounts." *Id*. ¶ 23. Williams the explained that "[m]y primary regression uses as the independent variable the damages amounts claimed in the antitrust cases examined by Professors Connor and Lande to explain variation in settlement amounts in those cases." *Id*. ¶ 24.

settlement amounts predicted by [his] regression model for cases with damages similar to this case." *Id*. ¶ 30. The regression model therefore provided an empirical basis for Williams's opinion that "the settlement amounts in the proposed settlement are economically reasonable." *Id*. ¶ 30 & Table 2.

Williams also noted that "both the economic literature and the data on prior settlements suggest that an increase in risk of the litigation has a depressing effect on the size of the settlement amount, all else equal." *Id*. ¶ 16. After surveying various factors about the present case suggesting significant risk, *id*. ¶¶ 13-15, Williams concluded that this case presented "a high degree of risk," which "would imply and a lower settlement amount than that predicted by [his] regression . . . ." *Id*. ¶ 16.

Given his findings that there was a high degree of risk in this case and also that higher risk was a factor that likely depressed settlement amounts in relation to the estimated damages in the case, Williams specified an alternative regression equation that controlled not only for the size of the estimated damages but also for risk. Since the economic literature shows that civil damages cases that followed criminal proceedings "were placed on a 'surer footing'" (meaning had less risk), *id*. ¶ 19, and therefore were associated with settlement amounts that were a higher than would be predicted, Williams determined that the criminal fines were a good proxy for risk. He thus included variables in his alternative regression equation that controlled for risk, using data on the presence or not of fines and their magnitude. *Id*. ¶ 31. The results of this alternative specification showed that "the settlement amounts obtained in this case are similar to the proposed settlement amounts predicted by my regression model for cases with damages similar to this case." *Id*. These additional findings provide further support for Williams's opinion "that, from an economic perspective, considering the amounts of damages claimed in this case and the

risks involved, the amounts of monetary compensation in the settlement proposed for approval in

this case are economically reasonable when examined in comparison to the damages estimated

by the plaintiffs' and defendants' experts." *Id*. ¶ 38.

> ### ii.    Other factors affecting the reasonableness of the settlement amount

In addition to the factors that Williams discussed regarding the potential range of

damages, another factor that could influence damages is the Court's and the jury's treatment of

Mastercard's and Visa's restructurings in 2006 and 2008, respectively. Had this Court, or a jury,

concluded that the setting of default interchange fees ceased to violate Section 1 of the Sherman

Act after the restructurings, the vast majority of the Defendants' damages exposure would have

been eliminated, regardless of the damages model that applied. Wildfang Decl. ¶¶ 30-31. The

Supreme Court's decision in *Ohio v. Am. Express*, *supra*, could also reduce potential damages, if

this Court concluded that the Class had to offset its damages to account for the "benefits" that

Visa and Mastercard provided to the "consumer side" of their platforms. *Id*. ¶ 22.

Accordingly, the amount of potential damages in this case could range widely, even

without taking into account the challenges to succeeding in litigation that are described above.

Thus, the settlement is reasonable in light of the significant risks of further litigation. Prelim.

App. Mem., 2019 WL 359981, at *33-35 (citing *Grinnell*, 495 F.2d at 455 and *Morris v. Affinity

Health Plan, Inc*., 859 F. Supp. 2d 611, 621 (S.D.N.Y. 2012)); *In re Currency Conversion Fee*,

263 F.R.D. at 124 (approving settlement that returned a small portion of allegedly improper fees,

in part based on assessment of plaintiffs' risk).

In this case, the risks of further litigation, *see supra* at 13-19, underscore the

reasonableness of the settlement. As Dr. Sykes noted in his 2013 report, in order for the Class to

be successful, it must succeed on *each* of the challenges that the Defendants would raise, while

the Defendants have to succeed only once. Thus, to the extent that one could assign a probability to surviving any single defense, the Class's chances of prevailing would decrease exponentially with each defense that the Defendants presented.[14] The Class's chances of overall success would further decrease if the defendants raised these same defenses on appeal. *See In re NASDAQ Market Makers Antitrust Litig*., 187 F.R.D. at 476 (noting risks of class prevailing at trial but losing on appeal). In light of the substantial obstacles and many years that would stand in the way of litigation success and hence any distribution to the Class, the settlement amount should weigh in favor of final approval.

> **e. While the Defendants may be able to sustain a larger judgment, that factor alone does not undercut the reasonableness of the settlement.**

As this Court found at Preliminary Approval, there is no dispute that the Defendants in this case—Visa, Mastercard, and some of the world's largest financial institutions—could sustain a larger judgment. *Payment Card IV*, 2019 WL 359981, at *37-38. But this factor alone does not undercut the fairness of an otherwise exemplary settlement. *Charron v. Pinnacle Grp. N.Y. LLC*, 874 F. Supp. 2d 179, 201 (S.D.N.Y. 2012).

---

[14]     Dr. Sykes provided the following hypothetical illustration:

> [S]uppose that a plaintiff must prevail on five separate legal issues to establish liability and obtain significant damages. If we assume that the plaintiff's probability of success on each issue is 90%, and that these probabilities are independent of each other, then the plaintiff's overall probability of success is $(.9)^5$ or approximately 59%. If the probability of success on each issue is only 80%, then the overall probability of success falls to $(.8)^5$ or approximately 33%. And if the probability of success on each issue is just 50%, the overall probability of success falls to $(.5)^5$ or only a little above 3%. Sykes Rep. at 6.

The history of antitrust class actions is long on precedent for settlements that were approved because they delivered meaningful relief, even when the defendants were large corporations with sufficient coffers to "pay more" and even when the percentage of an alleged overcharge that is delivered to the class is quite small. *See Wal-Mart*, 396 F.3d at 119 (approving settlement over objection that additional contributions from card-issuing banks could have yielded an even larger settlement fund);[15] Williams Rep. ¶ 25 (concluding that, as potential damages in antitrust cases increase, the proportion of potential damages encompassed by settlements decreases). This case is no exception. The fact that the Defendants theoretically could have paid more in a fully litigated judgment, many years in the future, does not render this settlement—which creates the largest known class-settlement fund in the history of the Sherman Act—unreasonable.[16]

---

[15]   *See also In re Currency Conversion Fee*, 263 F.R.D. at 124 (finding $336,000,000 settlement amount that was approximately less than one percent of the potential damages was within the range of reasonableness even though defendant banks were "of substantial means"); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 484 (S.D.N.Y. 2009) (approving settlement that represented two percent of plaintiffs' damages expert's calculation); *Hicks v. Morgan Stanley & Co.*, 2005 U.S. Dist. LEXIS 24890, at *19 (S.D.N.Y. Oct. 19, 2005) (finding a settlement representing 3.8% of estimated damages to be within range of reasonableness); *see also In re China Sunergy Sec. Litig.*, No. 07 Civ. 7895 (DAB), 2011 U.S. Dist. LEXIS 53007, 2011 WL 1899715, at *5 (S.D.N.Y. May 13, 2011) (noting "average settlement amounts in securities fraud class actions where investors sustained losses over the past decade . . . have ranged from 3% to 7% of the class members' estimated losses") (internal quotation marks omitted).

[16]   This case is unique in that, if the Class actually did forego settlement to pursue their claims to trial and actually did obtain a verdict that corresponded to the plaintiffs' damages calculations, that verdict—potentially approaching a trillion dollars after trebling—would itself be vulnerable on post-trial motion and on appeal because of its sheer size. *Motorola Credit Corp. v. Uzan*, 509 F.3d 74, 87 (2d Cir. 2007) (affirming remittitur to $1 billion, which was half compensatory damages). Accordingly, theoretical projections of what a more aggressive litigation strategy *might have yielded* are not particularly helpful to assess the fairness of this settlement. Also, while the nation's largest banks might have assets sufficient to satisfy a trillion dollar judgment, it is far from certain that the nation's financial system could survive a shock of that magnitude, nor is it certain that the Congress or the Federal Reserve Board would permit that to happen.

## 2.      Rule 23(e)(2)(C)(ii) - The claims process is fair and rational.

A distribution plan is fair and reasonable as long as it has a "reasonable, rational basis." *Maley v. Del Global Techs. Corp*., 186 F. Supp. 2d 358, 367 (S.D.N.Y. 2002). This is particularly true when the formula is recommended by "experienced and competent class counsel." *In re WorldCom, Inc. Sec. Litig*., 388 F. Supp. 2d 319, 344 (S.D.N.Y. 2005). Because mathematical precision is often impossible, courts recognize that "the adequacy of an allocation plan turns on whether counsel has properly apprised itself of the merits of all claims, and whether the proposed apportionment is fair and reasonable in light of that information." *In re PaineWebber Ltd. P'ships Litig*., 171 F.R.D. 104, 133 (S.D.N.Y. 1997); *see also In re Am. Bank Note Holographics, Inc*. 127 F. Supp. 2d 418, 429-30 (S.D.N.Y. 2001) (according weight to counsel's belief in distribution plan's fairness). Courts also view the efficiency of the distribution process, emphasizing that distribution must be "equitable and timely…without burdening the process in a way that will unduly waste the fund." *In re Credit Default Swaps*, 2016 WL 2731524, at *9; *see also* Fed. R. Civ. P. 23(e)(2)(C), Adv. Comm. Notes to 2018 Amendments (advising courts to beware of claims processes that are "unduly demanding.").

The proposed plan of allocation in this case is fair, reasonable, and efficient. To prepare for notice and claims processing, Co-Lead Counsel provided the claims administrator with data—consisting of over 221 million merchant records—from Visa, Mastercard, most of the bank defendants, and many of the largest non-defendant acquirers. Azari Decl. ¶ 11. The administrator has already used this data to identify members of the Class, link transaction records to merchants, and reduce duplicative notice. *Id.* ¶ 11, 14.

If this Court grants final approval, the administrator will use data from a variety of sources to send claims forms to merchants that did not timely exclude themselves from the Class. Plan of Admin. & Distrib. at I-10-11, ECF No. 7257-2 (Sept. 18, 2018). Class members that

26

disagree with the administrator's interchange-fee estimate attributed to them will have the

opportunity to dispute the administrator's estimate. *Id.* The planned prepopulated claim form,

will likely reduce the burden of claims filing for the vast majority of merchants, while the right

to contest the amount on the claim preserves merchants' ability to contest their claim amount

based on their own records. Based on the information the claims administrator will use to

calculate its estimates, as well as supplemental information provided by merchant claimants who

contest those estimates, the administrator will make pro rata payments to Class members. Pro

rata distributions such as this one are regularly approved by courts as reasonable and equitable.

*See, e.g., Dial Corp. v. News Corp.,* 317 F.R.D. 426, 429, 439 (S.D.N.Y. 2016); *In re Vitamins*

*Antitrust Litig*., 2000 WL 1737867, at *6 (D.D.C. Mar. 31, 2000) ("Settlement distributions, such

as this one, that apportion funds according to the relative amount of damages suffered by class

members, have repeatedly been deemed fair and reasonable."); *In re Lloyds' Am. Trust Fund*

*Litig*., 2002 WL 31663577, at *19 (S.D.N.Y. Nov. 26, 2002) ("[P]ro rata allocations provided in

the Stipulation are not only reasonable and rational, but appear to the fairest method of allocating

the settlement benefits."). The pro rata distribution is based on interchange fees paid, which is

consistent with Class Plaintiffs' theory of harm that Defendants' practices inflated the uniform

schedule of default interchange fees applied to merchants. *See* TCACAC ¶¶ 54-58.

   Because the plan of distribution will both "take appropriate account of differences"

among claims, while also maximizing efficiency, the plan supports final approval. Fed. R. Civ.

P. 23(e), Adv. Comm. Notes to 2018 Amendments; *see also e.g., Dial*, 317 F.R.D. at 429, 439

(approving pro rata distribution).

### 3.   Rule 23(e)(2)(C)(iii) - The proposed award of attorneys' fees supports final approval.

This Court concluded that Co-Lead Counsel's request for attorneys' fees of up to ten percent of the settlement fund "d[id] not weigh against preliminary approval." *Payment Card IV*, 2019 WL 359981, at 32-3349-50. Co-Lead Counsel now seek a fee of 9.56 % (representing a lodestar multiplier of 2.94 based on historical rates) and expense reimbursement of $38,262,775.28, Mem. Sup. R. 23(b)(3) Cl. Pls' Mot. Atty. Fees. at 1-2 ("Fee & Exp. Mem.), the basis for which is set out in Co-Lead Counsel's Motion for Attorney Fees and Costs. For purposes of Final Approval, however, the requested fee is firmly within the range of fees granted recently in similar, complex, mega-fund cases and therefore weighs in favor of this Court granting final approval. *See* Fee & Exp. Mem. at 28-31;[17] Silver Decl. at 11, 13, 21 (comparing proposed fee to other fees, and lodestar "multipliers" in connection with the settlement of other large, complex cases).

The timing of the attorney-fee payment also supports final approval. Co-Lead Counsel is not seeking a "quick pay" and will receive fees under the agreement only when the settlement is finally approved and any appeals have been resolved in favor of the settlement. This timing is fair to the Class, as counsel have funded the action without compensation for the past fourteen,

---

[17]   *See also, e.g., In re Foreign Exchange Benchmark Rates Antitrust Litig.*, No. 13 Civ. 7789 (LGS), 2018 WL 5839691, at * 4 (S.D.N.Y. 2018) (13.0 %, 1.72 multiplier on a fund of $2,310,275,000.00); *In re Credit Default Swaps Antitrust Litig.*, No. 13-md-2476-DLC, 2016 WL 2731524, at *17 (S.D.N.Y. Apr. 26, 2016) (13.61%, 6.20 multiplier on a fund of $1,864,650,000.00); *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1775 (JG)(VVP) (E.D.N.Y.)[17] (23.34%, 1.99 multiplier on a fund of $1,181,618,239.55; *In re TFT-LCD (Flat Panel) Antitrust Litig.*, MDL. No. 1827, 2013 WL 1365900, at *7 (N.D. Cal. Apr. 3, 2013) (28.6%, 2.5 multiplier on a fund of $1,082,955,419.58); *Dahl v. Bain Capital Partners, LLC*, No. 07-cv-12388, ECF No. 1095 (D. Mass. Feb 2, 2015) (33.0%, 2.43 multiplier on a fund of $595,000,000); *see also* Antitrust Annual Report at 23 (table setting forth median attorney-fee range from 14% to 30% of settlement fund, dependent on size of fund).

and will continue to fund the case until its resolution. Silver Decl. at 2, 6; Undlin Decl. ¶¶ 3, 5, 19–20, and Exs. 5–7; *see also* Antitrust Annual Report at 8 (table demonstrating that only 3.7% of settled antitrust cases between 2013 and 2018 had lasted over twelve years since filing).

4.      **Rule 23(e)(2)(C)(iv) & (e)(3) –No "side agreements" exist between Co-Lead Counsel and other individuals or entities.**

The 2018 amendments to the Rules state that any "side agreement" involving class counsel or class representatives made in connection with the settlement may be considered when evaluating a motion for final approval. Fed. R. Civ. P. 23(e)(2)(C)(iv). No such agreements exist in this case.

5.      **Rule 23(e)(2)(D) – The Proposed Settlement treats class members equitably to each other.**

As detailed above in Section II.D.1.e.2, the Plan of Allocation and Distribution allocates funds among class members on a pro rata basis based on interchange fees paid, which courts uniformly approve as equitable. The Proposed Settlement therefore meets the requirements of Rule 23(e)(2)(D).

III.   **The Notice Campaign Adequately Apprised Class Members of their Rights.**

Due process requires that class members receive "the best notice practical under the circumstances." *In re Drexel Burnham Lambert Grp.*, 995 F.2d 1138, 1144 (2d Cir. 1993). "Best notice practical" does not impose any "rigid rules" on class notice, but instead imposes a "reasonableness" standard that is met when the notice campaign, "fairly apprise[s] the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Wal-Mart*, 396 F.3d at 114 (quoting *Weinberger v. Kendrick*, 698 F.2d 61, 70 (2d Cir. 1982)). Accordingly, courts in this circuit have

held that notice plans are adequate when they combine first-class mailed notice, reasonably calculated to reach nearly all class members with extensive publication-notice programs. *See Wal-Mart*, 396 F.3d at 105 (approving notice plan that required mailing 8 million notices via first-class mail and publication notice with a combined circulation of 151 million). The contents of a notice are adequate when they explain the general terms of the settlement and the proposed attorney fees, along with the date, time, and place of the fairness hearing, in a way that may be "understood by the average class member." *Id*. at 114; *Charron*, 874 F. Supp. 2d at 191.

At Preliminary Approval, this Court approved the substance of the publication and direct-mail notice communications to the Class as well as the manner in which they were to be disseminated. *Payment Card IV*, 2019 WL 359981, at *48-49. Co-Lead Counsel confirm that the notice plan was implemented as described to the Preliminary Approval motion. Azari Decl. ¶ 13.

The notice program was commensurate with the magnitude of this case, the Class size, and this settlement. Azari Decl. ¶¶ 10, 13–14, 16, 21, 23. As of June 3, 2019, the claims administrator has sent over 16 million individual notices by first class mail to likely Class members. Azari Decl. ¶¶ 14, 21, 23; Hamann Decl. ¶¶ 20–22. Completing the direct-mail notice plan was no easy task. Before the administrator could send out notices, it created a database based on 221 million merchant records that it assembled from the database it created in connection with the 2012 settlement, post-2012 Visa data, and data from select processors and acquiring banks. Azari Decl. ¶¶ 21–22. As detailed in the Azari and Hamann declarations, Epiq conducted extensive and complex data analysis to create a sufficiently reliable database of

merchants to whom it would mail notice. Azari Decl. ¶¶ 21–22; Hamann Decl. ¶¶ 8–20.[18] It supplemented the postal-mail campaign with e-mailed notice to the over 68,000 merchants whose e-mail addresses it had on file from the 2012 settlement. Azari Decl. ¶ 27; Hamann Decl. ¶ 24.

Hilsoft Notifications—a division of Epiq that specializes in creating and disseminating legal notices—executed an equally extensive media-notice campaign designed to reach small business owners and financial decision makers that published notices in publications with a collective circulation of approximately 40 million. Azari Decl. ¶¶ 16, 29–37. This included publications in the subcategories of National Consumer Publications, National Business and Trade Publications, U.S. Territory Newspapers, and Language/Ethnic Publications. *Id.* Hilsoft also placed digital-banner ads on websites targeted to reach settlement-class members, *id.* ¶¶ 16, 38–44, and purchased sponsored search listings on major internet-search platforms. *Id.* ¶¶ 45–47.

Epiq also established a case website—and translated it into seven languages. Azari Decl. ¶ 48; Hamann Decl. ¶¶ 36–37. The website contains case documents and other important information about the settlement. Azari Decl. ¶ 48; Hamann Decl. ¶¶ 36–38. Between September 1, 2018 and June 3, 2019, there have been 849,625 unique visitors to the website, who had over 1,536,030 page views. Hamann Decl. ¶ 39.

The administrator established a toll-free telephone-support line, which included Spanish-language support (and support in other languages through real-time interpreters), to answer questions about the settlement. Azari Decl. ¶ 49; Hamann Decl. ¶¶ 30–31. Co-Lead Counsel

---

[18]   The "Sankey diagram" included as Attachment A to the Hamann declaration graphically illustrates the complexity of the multi-level data analysis that the administrator conducted, at the direction of Co-Lead Counsel.

worked with Epiq to finalize an updated script for Epiq's automated Interactive Voice Response ("IVR") telephone system and for the live phone agents who field inquiries about the settlement. Hamann Decl. ¶¶ 30–32. Between September 1, 2018 and June 3, 2019, Epiq's IVR system received 81,372 calls, representing 369,643 minutes of use. Hamann Decl. ¶ 33. 28,800 callers requested to speak with live agents, who collectively logged 263,707 minutes with callers. *Id*. Epiq operators also made 2,830 outbound calls. *Id*.

At Preliminary Approval, a number of fuel retailers (the "Branded Operators"), which feared that they may be excluded from the Class by virtue of settlements and dismissals in previous lawsuits, including opt-out lawsuits after the now-vacated 2012 settlement, objected to the proposed notice because it did not inform them whether they would be entitled to claim funds relating to transactions at their locations. *See Payment Card IV*, 2019 WL 359981, at *9. To alleviate the Branded Objectors' concern, this Court requested that Co-Lead Counsel notify potentially excluded merchants that their claims may have been settled and dismissed. *Id*., 2019 WL 359981, at *10. In line with the Court's request, Epiq sent out approximately 6,600 supplemental "Notices of Exclusion" to such potentially excluded merchants and their affiliates. Hamann Decl. ¶ 28 & Attachment D. The Notice of Exclusion informed potentially excluded merchants that they had been identified as "Dismissed Plaintiffs" whose claims were potentially excluded from the Rule 23(b)(3) Settlement Class. Notice of Exclusion at G3-2, ECF No. 7354-1 (Jan. 15, 2019); Hamann Decl., Attachment D. The Notice directed merchants to contact Co-Lead Counsel or the settlement website with questions or to express their view that they were wrongly excluded from the class. *Id*.

In connection with Rule 23(b)(3) Class Plaintiffs' current motion for final approval, the some Branded Operators submitted boilerplate objections that uniformly contended that they

were "totally in the dark as to whether…[they are] part of the settlement class." *See, e.g.*, Obj. of TW Permits, LLC et al., ECF No. 7425 (May 3, 2019); Hamann Decl. ¶ 41 & Attachment G. The objections further state that "[n]othing in the Class Notice states whether Company or its branded supplier (whose fuel Company sells) have a right to recover for transactions at these locations." *Id*. In addition to adding little to the Court's assessment of the settlement's fairness, *Payment Card I*, 986 F. Supp. 2d at 223 ("it is…difficult to ascribe significant weight to [boilerplate objections]") these boilerplate objections are simply wrong. As demonstrated in Attachment G to Nicole Hamann's declaration, each of the merchants that submitted these boilerplate objections[19] received the long-form notice, which contains a section entitled, "Am I part of this Settlement?" Long-Form Notice at G2-7, ECF No. 7257-2 (Sep. 18, 2018). In this section, the notice explains that the Class includes "persons, businesses, and other entities" that accepted Visa or Mastercard cards from January 1, 2004 to January 2019, except for "(a) the Dismissed Plaintiffs," and three other categories of merchants. *Id*. Class membership is clear and unambiguous.[20] The notice defines Dismissed Plaintiffs as "plaintiffs that previously settled and dismissed their own lawsuit against a Defendant," and explains that "Dismissed Plaintiffs" include both the entities that are listed in Appendix B to the settlement agreement and those "entities related to these plaintiffs listed in Appendix B." *Id*. The notice also directs merchants that may be uncertain whether they are "Dismissed Plaintiffs," to call the toll-free settlement-information line or visit the settlement website. *Id*. By directing individuals where to go to determine whether they are members of the

---

[19]   Of these objectors, only five appear to have marketed fuel for a "Dismissed Plaintiff"—*i.e.,* an entity that opted out of the 2012 settlement and settled its claims with the Defendants.
[20]   To the extent that the Branded Operators claim that their gasoline suppliers might in the future file a claim seeking recovery for transactions that occurred at the Branded Operators' locations, that argument is speculative at this time.

Class, the notice plan fulfills the requirements under Rule 23. *See In re PaineWebber*, 171 F.R.D. at 124 (rejecting argument of objector who claimed that notice was inadequate because it did not "allow a [c]lass [m]ember to calculate his or her actual recovery" relative to other class members); *see also Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1374 (9th Cir. 1993) (same).

In addition, the Branded Operators' objections indicate on their face that they have actual notice that another entity may have settled claims relating to transactions conducted at their locations. *See, e.g.*, Obj. of TW Permits at 1 ("Nothing in the Class Notice states whether Company or its branded supplier…[has] a right to recover for transactions at these locations."). When a class member has actual notice of the pendency of a class action and how that action may affect it, that class member cannot attack the formal class notice as inadequate. *Langford v. Devitt*, 127 F.R.D. 41, 44-45 (S.D.N.Y. 1989). Moreover, who has the right to claim settlement funds for transactions at Branded Objectors' locations is a function of contracts that Branded Operators entered into with gasoline companies, and has nothing to do with notice or any inequitable featuer of the settlement. At Preliminary Approval, this Court correctly found the Branded Operators' objection to be meritless because it involves claims administration rather than a conflict of interest. *Payment Card IV*, 2019 WL 359981, at *19-20, 25, 27 n.28, 49.

In light of the extensive notice campaign (including the published notice) that Co-Lead Counsel and the administrator completed, the class notice efforts support final approval.

## IV. The Reaction of the Class to This Point Favors Approval.

Although the fairness period is ongoing, the initial reaction to the settlement favors final approval. As of June 3, 172 merchants have opted out and 62 have objected. Hamann Decl. ¶ 41. This represents infinitesimally small percentages of the approximately 16-million-member

Class.[21] *See* Azari Decl. ¶ 11 (noting size of merchant member class). Of the objections, 59.6% are boilerplate "Branded Operator" objections, many of which are factually inaccurate. *See supra* Section III; Hamann Decl. ¶ 41 & Attachment G; *see also Payment Card I*, 986 F. Supp. 2d at 223 (discounting value of boilerplate objections).[22] The small numbers of opt-outs and objectors to this point therefore firmly supports final approval. *See id.*; 4 Alba Conte & Herbert Newberg, Newberg on Class Actions § 11.41, at 108 (4th ed. 2002) ("[A] certain number of objections are to be expected in a class action with an extensive notice campaign and a potentially large number of class members. If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement.")

Class Plaintiffs and Co-Lead Counsel will respond to any timely objections in their reply memorandum in support of final approval.

## V.    The proposed Settlement Class should be finally certified.

At Preliminary Approval, Class Plaintiffs submitted substantial evidence to support the certification of the Settlement Class.[23] This Court concluded that certification of the Rule 23(b)(3) Settlement Class for settlement purposes was proper because it would likely be able to certify that class at final approval. The Court supported its conclusion with specific and detailed

---

[21]    It is expected that many of the "Direct Action Plaintiffs," who have been litigating this case alongside Rule 23(b)(3) Class Plaintiffs will opt out of the settlement. The DAPs who opt-out will largely account for the first 15% of eligible transaction volume opting-out, but under the terms of the settlement relating to a potential "take-down" that will not begin to impact the amount of settlement funds available to class claimants until the first 15% threshold is met and surpassed.

[22]    Some of these "objections" appear not to be objections at all, but rather class members asking questions about the settlement or alerting the Court to their membership in the class. *See e.g.,* Ltr. J. Lind to Court, ECF No. 7455 (May 20, 2019); Ltr. D. King to Court, ECF No. 7424 (May 1, 2019).

[23]    *See* Prelim. App. Mem., at 25-38, ECF No. 7257-1.

findings that each of the Rule 23(a) requirements of numerosity, commonality, typicality, representation, and the implicit requirement of ascertainability were met, *Payment Card IV*, 2019 WL 359981, at *42-44, and made similarly detailed findings that the requirements for certification of a Rule 23(b)(3) damages class were met. Prelim. App. Mem., 2019 WL 359981, at *44-49.

In light of the Court's extensive findings, Rule 23(b)(3) Class Plaintiffs respectfully request that this Court finally certify the Settlement Class described in Paragraph 4 of the Superseding Settlement Agreement for the reasons stated in the preliminary-approval memorandum.

## VI.   Conclusion.

After more than thirteen years of litigation, Class Plaintiffs and Co-Lead Counsel are acutely aware of the risks involved in pursuing this litigation further. The adversarial process has functioned as it should to produce an arms-length settlement agreement that delivers up to approximately $6.3 billion to the U.S. merchant community. By any measure, the Superseding Settlement Agreement is fair, reasonable, and adequate, such that Rule 23(b)(3) Class Plaintiffs respectfully request that this Court finally approve it and finally certify the Class for settlement purposes only.

June 7, 2019                              Respectfully submitted,

                                         ROBINS KAPLAN LLP
                                         K. Craig Wildfang
                                         Thomas J. Undlin
                                         Ryan W. Marth

                                          *s/ K. Craig Wildfang*
                                         K. CRAIG WILDFANG

2800 LaSalle Plaza
800 LaSalle Avenue South
Minneapolis, MN 55402-2015
Telephone: 612/349-8500
612/339-4181 (fax)

June 7, 2019                     ROBBINS GELLER RUDMAN
                                  & DOWD LLP
                                 Patrick J. Coughlin
                                 Alexandra S. Bernay
                                 Carmen A. Medici

                                  *s/ Alexandra S. Bernay*
                                 ALEXANDRA S. BERNAY

                                 655 West Broadway, Suite 1900
                                 San Diego, CA 92101
                                 Telephone: 619/231-1058
                                 612/339-4181 (fax)

June 7, 2019                     BERGER MONTAGUE PC
                                 H. Laddie Montague, Jr.
                                 Merrill G. Davidoff
                                 Michael J. Kane

                                  *s/ H. Laddie Montague, Jr.*
                                 H. LADDIE MONTAGUE, JR.
                                 1818 Market Street, Suite 3600
                                 Philadelphia, PA 19103
                                 Telephone: 215/875-3000
                                 215/875-4604 (fax)

                                 **Co-Lead Counsel for Rule 23(b)(3) Class Plaintiffs**

89764227.11

37