UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
In Re PAYMENT CARD INTERCHANGE    :      MASTER FILE NO.
FEE AND MERCHANT DISCOUNT      :      05-MD-1720 (MKB)(JO)
ANTITRUST LITIGATION             :
                                         :
This Document Relates To:            :
                                         :
Rule 23(b)(3) Class Action           :
------------------------------------------------------------X

MEMORANDUM OF LAW IN SUPPORT OF MOTION
OF GARY B. FRIEDMAN AND FRIEDMAN LAW GROUP LLP
<u>FOR LEAVE TO INTERVENE PURSUANT TO FED. R. CIV. P. 24</u>

Gary Friedman
Friedman Law Group LLP
154 Grand Street
New York, NY  10013
917-568-5024
gfriedman@flgllp.com

June 7, 2019

## TABLE OF CONTENTS

Table of Authorities…………………………………………………………………… iii

PRELIMINARY STATEMENT……………………………………………………… 1

FACTUAL BACKGROUND………………………………………………………… 6

    1.  *Friedman Develops the No-Surcharge Rule Claims*…………………………... 6

    2.  *The Interchange Cases Are Filed*……………………………………………… 7

    3.  *Counsel Reach an Agreement*…………………………………………………… 8

    4.  *The Parties Work Harmoniously Under the Agreement*………………………… 9

    5.  *The No-Surcharge Theory Is Borne Out*……………………………………… 10

    6.  *Friedman and Colleagues Invalidate the State Anti-Surcharging Statutes*……. 11

    7.  *The Parties Settle*……………………………………………………………… 13

    8.  *After The Settlement Is Overturned, The Case Settles Anew*…………………… 15

    9.  *Lead Counsel Disavows the Agreement*……………………………………… 16

ARGUMENT

I.  INTERVENTION IS WARRANTED……………………………………………… 19

    A.  Intervention Is Proper as a Matter of Right Under Rule 24(A)…............ 19

    B.  Alternatively, Intervention Under Rule 24(b) Is Warranted…………. 21

II.  THE DIRECTION BY LEAD COUNSEL TO FILE AN INDEPENDENT FEE PETITION IS MALICIOUS, AND WOULD CREATE TURMOIL…………. 22

CONCLUSION………………………………………………………………………… 24

TABLE OF AUTHORITIES

*Ballow Brasted O'Brien & Rusin P.C. v. Logan*,
      435 F.3d 235 (2d Cir. 2006)……………………………………………..      5, 19

*Carden v. Arkoma Assocs.*,
      494 U.S. 185 (1989) ………………………………………………….      21

*Dana's R.R. Supply v. Attorney General*,
      807 F.3d 1235 (11th Cir. 2015), cert. denied, 137 S. Ct. 1452 (2017)……….      12

*Dun & Bradstreet Corp. v. Harpercollins Publishers*,
      872 F. Supp. 103, 110 (S.D.N.Y. 1995) ………………………………………      19

*Expressions Hair Design v. Schneiderman*,
      975 F. Supp. 2d 430 (S.D.N.Y. 2013), *rev'd*, 808 F.3d 118 (2d Cir. 2015),
      *rev'd and remanded*, 137 S. Ct. 1144 (2017)…………………………………      12

*Grimes v. Chrysler Motors Corp.*,
      565 F.2d 841, 844 (2d Cir. 1977)……………………………………………..      20

*Italian Colors Rest. v. Harris*, 99 F.Supp.3d _
      (E.D. Cal. 201_), *aff'd*, _ F. 3d _ (9th Cir. 201_)……………………………..      12

*Jang v. Asset Campus Hous., Inc.*,
      2017 U.S. Dist. LEXIS 92376, at *1 (C.D. Cal. May 18, 2017),
      *aff'd*, 739 F. App'x 465, 465 (9th Cir. 2018)…………………………………      13

*Kaplan v. Reed Smith LLP*,
      919 F.3d 154 (2nd Cir. 2019)……………………………………………      20, 23

*Kaplan v. S.A.C. Capital Advisors, L.P.*,
      2017 U.S. Dist. LEXIS 202631 (S.D.N.Y. 2017),
      *aff'd*, 919 F.3d 154 (2nd Cir. 2019) ………………………………………..      20

*MasterCard Int'l, Inc. v. Visa Int'l Svc. Assn., Inc.*,
      471 F.3d 377, 389 (2d Cir. 2006)……………………………………………      19

*Rowell v. Pettijohn*, 2015 U.S. Dist. LEXIS 40739 (W.D. Tex. 2015),
      *aff'd*, 816 F.3d 73 (5th Cir. 2016), *vacated and remanded*,
      137 S. Ct. 1431 (2017), *remanded*, 865 F.3d 237 (5th Cir. 2018) ……………      12

*United States v. City of N.Y.*,
      198 F.3d 360, 367 (2d Cir. 1999)……………………………………………      21

*Windsor v. United States*,
      797 F. Supp. 2d 320, 323 (S.D.N.Y. 2011) …………………………………..      19, 20

Movants and proposed Intervenor-Plaintiffs Gary B. Friedman and Friedman Law Group LLP ("FLG") submit this memorandum of law in support of their motion to intervene into the above-captioned action under Fed. R. Civ. P. 24 and to pursue in this Court the annexed proposed complaint-in-intervention for breach of contract against co-lead counsel for the (b)(3) Class.

## PRELIMINARY STATEMENT

This Motion seeks to compel lead class counsel to comply with the terms of a 2005 written agreement (the "Agreement") under which Friedman and his partners and associates worked for more than a decade.[1]  The Agreement called for Friedman and his team to take responsibility for specific legal issues, and it provided an unambiguous formula for dividing attorneys' fees in proportion to the work performed.  Friedman and his team fully performed their obligations, making substantial contributions to the case, including the development of the very successful theory that the no-surcharge rules imposed by Visa and MasterCard violated the antitrust laws. FLG lawyers logged tens of thousands of hours on the case, all approved by lead counsel, and the firm invested millions of dollars.  And, working hand in glove with lead counsel, they achieved impressive and measurable results for the merchant class members.

But now, only weeks before filing the petition for attorneys' fees in this class settlement, co-lead counsel have disavowed their obligations to Friedman and FLG under the Agreement.  A May 6, 2019 letter signed by all three co-lead counsel advised Friedman that lead counsel "will not include" in the joint fee petition "any portion of the lodestar time or expenses of the Friedman Law Group and any predecessor firms."  See May 6, 2019 letter, attached as Ex. 6 to the

---

[1]  A copy of the 2005 Agreement is annexed as Ex. 1 to the accompanying Declaration of Gary B. Friedman.  The Agreement consists of: (i) a November 29, 2005 letter from Craig Wildfang to Friedman and his colleague Mark Reinhardt; (ii) a December 29, 2005 letter from Friedman to Wildfang and other co-lead counsel; and (iii) signed acknowledgements from various law firms and lawyers agreeing to be bound by the terms of the Agreement.

accompanying Declaration of Gary Friedman ("Friedman Decl.").  Without elaboration, the co-leads simply wrote: "Under the circumstances, we do not believe that the 2005 letter requires us to include your firm's time and expenses. . ." *Id.*  The May 6 letter further advises that FLG "will need to file an independent fee petition" if it seeks compensation. *Id.*

The written 2005 contract, however, is unambiguous.  The Agreement provides that Friedman—who first conceived and developed the legal claim that the networks' no-surcharge rules ("NSRs") and related restraints violate antitrust law—would work together with co-lead counsel for the class and assume primary responsibility for litigating the action as it pertains to the NSRs (defined broadly, as used throughout this brief, to include the defendants' anti-steering rules or ASRs).  In return, Friedman, his co-counsel Mark Reinhardt, and a group of law firms working under them (defined in the Agreement as the "NSR Group") would collectively receive a share of the attorneys' fee award in proportion to their billings, or "lodestar."

Friedman and FLG did not merely perform under the Agreement; they delivered tangible results to the merchant class.  Since mid-2004, Friedman had been working on the NSR claims, researching the history and regulation of merchant surcharging, consulting leading economists, and initiating litigation – including the very first case filed in what would become MDL 1720. After entering the Agreement, Friedman took the lead role in drafting the NSR sections of the consolidated class action complaint, and then he and his team led all of the extensive discovery, expert work, and summary judgment briefing on NSR issues.  Their efforts caused Visa and MasterCard to rescind their long-held and fiercely-defended NSRs in 2013, and to leave those rules off the books in the years since.  And then, to prevent state laws from neutralizing that achievement, Friedman conceived of and launched (with his colleague, constitutional lawyer Deepak Gupta) successful constitutional challenges to state anti-surcharging statutes around the

country.  Friedman also took the lead in lobbying state legislators against enacting new anti-surcharging statutes after Visa and MasterCard dropped their NSRs.  Moreover, Friedman initiated a successful drive by the lead counsel group to scuttle a mediators' settlement proposal that would have effectively limited class damages to $4 billion, far below the ultimate settlement value of this class action.  See 2015 Friedman Decl., *infra* n. 3, at ¶¶ 34-39.

All of these efforts paved the way for the $6.24 billion settlement in this (b)(3) class action.  The 2017 damages-only complaint filed by the Rule 23(b)(3) class relies heavily on the NSR theory, even repeating much of the language that Friedman developed years earlier.  And the NSR damages claims were a driving force behind defendants' agreement to settle, as evidenced by the defendants' reported payment of $525 million to settle the *exclusively* NSR-based claims of the Kroger-Walgreens group of individual plaintiffs earlier in the litigation.  (See below at 10).

Nonetheless, despite the impactful efforts of Friedman and FLG on behalf of class members, lead counsel now disclaim their obligations under the Agreement.  The May 6 rescission letter cites no specific grounds for the disavowal, but clearly relates to Friedman's communications with former MasterCard outside counsel Keila Ravelo, a longtime friend of Friedman and a senior Willkie Farr partner, who was arrested in December 2014 for defrauding MasterCard out of roughly $7 million, and who subsequently pled guilty and was sentenced to prison.  But Friedman had no knowledge whatsoever of Ravelo's fraud.  And the communications at issue never even remotely went against the interests of the class.

In short, the Friedman-Ravelo communications do not support rescission of the Agreement.  Friedman has acknowledged that some of those communications violated a protective order issued

in separate litigation against American Express.[2]  But those violations, which were enumerated by the court in the *Amex* case, all took place **after** the parties in this case executed the 2012 settlement agreement.[3]  Even lead counsel has argued to this Court that the communications "demonstrate on their face that they were provided to Ms. Ravelo too late to impact anything in MDL 1720."  Class Opp. to Rule 60 Mo's (Merits), Dkt 6555 at 22-23.  It is simply not possible that protective order breaches occurring *after* a settlement agreement could have influenced that settlement agreement.

Moreover, the communications leading up to the 2012 settlement violated no orders or other strictures.  These settlement-stage communications were all directed toward achieving the best deal that the lead counsel group and Friedman could negotiate for the merchant class.  Lead counsel understands this.  During Rule 60 discovery in 2015, objectors received many thousands of pages of Friedman's emails and text messages.  When they cherry-picked a handful of individual emails, taking them out of context to argue that Friedman's agenda was somehow contrary to the interests of the class, lead counsel recognized the sheer absurdity of the objectors' arguments, dismissing them to this Court as "flatly and demonstrably false" and "pure fantasy."   Dkt 6555 at 27, 29.

And if lead counsel—as fiduciaries for the class—silently harbored doubts that Friedman at all times *was* acting in the best interests of the class, they would have taken steps to ascertain what the real story was.  They would have responded to Friedman's offers – repeated five times between February 2015 and May 2019—to meet with lead counsel and answer any questions they

---

[2]  For an explanation of the confidentiality breach, see Friedman's Open Letter To American Express Merchant Clients, dated Sept. 29, 2015 ("Open Letter"), available at: https://garyfriedman.typepad.com/openletter/.

[3]  See September 2, 2015 Declaration of Gary B. Friedman, submitted under seal (Dkt. 6576-2) along with the unsealed letter-motion contained at Dkt. 6582 ("2015 Friedman Decl.") at ¶ 70. *See also* Open Letter, *supra* n. 2, at §3.

4

may have, with nothing off-limits.  See Friedman Decl. ¶¶ 5-9 and Ex. 5.  But lead counsel never undertook any such inquiry.  *Id.*

Nor did lead counsel attempt to rescind the Agreement in response to the information it received in 2015—instead, they waited *four years* to do so, sending a rescission letter to FLG in May 2019.  By this last-minute maneuver—attempting to force FLG to seek its compensation *outside* of the joint petition—lead counsel stand to pocket millions of dollars in additional fees, regardless of how FLG fares.  See below at 17-18.  But their plan is flawed.  Not only is there no valid basis to rescind the Agreement, but any attempted rescission *four years after learning the underlying facts* is flatly foreclosed by binding Second Circuit authority.  See *Ballow Brasted O'Brien & Rusin P.C. v. Logan,* 435 F.3d 235, 243 (2d Cir. 2006) (rescission of fee-sharing agreement announced four years after alleged material breach and ethical violation is "manifestly untimely" under New York law).

Lastly, lead counsel's announcement that FLG "will need to file an independent fee petition" is contrary to the explicit instructions of the Court.  The class notice drafted by lead counsel and approved by the Court provides that "Rule 23(b)(3) Class Counsel will ask the Court… for a reasonable proportion of the settlement fund… to compensate all of the lawyers and their law firms that have worked on the class case."  The preliminary approval order is similar.  By suddenly declaring that FLG must file a separate petition for attorneys' fees from the merchant class, over and above the joint petition that was advertised as the *only* petition that would be made, lead counsel is violating the settled expectations of the class members, ignoring the Orders of the Court, and introducing chaos into the fee approval process.

<div style="text-align:center">*   *   *</div>

One final note: Friedman is mindful that lead counsel's purported rescission unfolds against the backdrop of Ravelo's criminal fraud conviction for sending fabricated invoices to multiple law firms. And one possible explanation for lead counsel's actions here is that they believe that Friedman somehow suspected, was aware of, or was even involved in Ravelo's actions. That could not be further from the truth; Friedman had absolutely no awareness of Ravelo's criminal activities.

## **FACTUAL BACKGROUND**

### *1.     Friedman Develops the No-Surcharge Rule Claims*

Friedman's contributions to this consolidated class action commenced well before the first constituent lawsuit was filed. In 2003, Friedman first began to represent merchant clients in payments industry litigation. By mid-2004, he had come to the view that the credit card networks' NSRs were undermining competition. See generally, 2015 Friedman Decl., *supra* n. 3, at ¶ 24.

Friedman began to investigate possible antitrust claims based upon the networks' NSRs. Throughout the fall of 2004, Friedman researched the history and economics of payment card surcharging and related regulation around the world. *Id.* Making trips to Chicago to consult with economics expert Dr. Alan Frankel, then of Lexecon, Friedman developed an original antitrust theory, generated white papers and draft complaints, and invited specific class action litigators to join him in representing merchants against Visa, MasterCard, and American Express. Ultimately, on May 5, 2005, Friedman and co-counsel filed a putative class action in federal court in Atlanta, *Animal Land Inc. v. Visa USA, Inc.,* No. 1:05-CV-1210 (N.D. Ga.), a direct challenge to the rules against credit card surcharging, and the first case filed in what would become MDL 1720. *See* 2015 Friedman Decl., *supra* n. 3, at ¶¶ 25, 26.

### 2.     *The Interchange Cases Are Filed*

Seven weeks after *Animal Land* was filed, the Robins Kaplan law firm, under the leadership of Craig Wildfang, filed a class action complaint against Visa, MasterCard, and leading banks in the District of Connecticut, *Photos Etc. Corp. et al. v. Visa U.S.A., Inc., et al.,* 05-CV-1007 (D. Conn.), Dkt. 1.  Arguing principally that the networks' interchange fees were collusively set by their then-member banks, Robins Kaplan's *Photos Etc.* complaint never challenged the no-surcharge rules. Indeed, the 176-paragraph complaint—a comprehensive and thought-through document—never even touches upon surcharging or steering. ***But see:*** Wildfang Decl., Dkt. 2113-6 at ¶¶ 21, 22 (falsely claiming that "on June 25, 2005 we filed the first complaint" in this MDL, and falsely claiming that it "challenged…rules of Visa and MasterCard which disabled merchants from providing discounts or employing surcharges… to steer customers"); Wildfang Decl., Dkt.7252-3 at ¶¶ 20, 21 (same);  Class Preliminary Approval Brief, Dkt. 7257-1 at 2 (falsely claiming that the Robins Kaplan complaint was "[t]the first of more than 40 complaints filed" in this MDL).

Beginning soon after the *Photos Etc.* filing, numerous copycat complaints were filed by law firms around the country.  Most mimicked the Robins Kaplan interchange theory, some parroted Friedman's NSR theory, and some included both sets of claims.  In proceedings before the Joint Panel on Multidistrict Litigation, Friedman's group argued for treating the NSR cases separately from the interchange cases—a proposal that was contested by the defendants and others. Ultimately, the JPML sent all cases to this District, to Judge Gleeson, but the panel explicitly left "to the discretion of the transferee court" the issue of the appropriate "extent and manner of coordination or consolidation" of "the no-surcharge rule actions [and] the interchange fee actions." 398 F. Supp. 2d 1356 (JPML October 20, 2005).

### 3.     *Counsel Reach an Agreement*

In the immediate wake of the transfer, Friedman and his colleagues held a series of meetings and phone conferences with Mr. Wildfang and the other members of the current lead counsel group regarding ways they could work together to benefit the merchant class.  2015 Friedman Decl., *supra* n. 3, at ¶¶ 29-31.  They soon reached agreement, the terms of which are set forth in a November 29, 2005 letter from Wildfang to Friedman and his colleague Mark Reinhardt, and a December 29, 2005 letter from Friedman to Wildfang and other co-lead counsel, enclosing signed acknowledgements from various law firms and lawyers agreeing to be bound by the terms of the Agreement.  See Agreement, Friedman Decl. ¶ 2 and Exs. 1-3.

The Agreement provided, among other things, that Friedman, Reinhardt, and the firms comprising the NSR Group would "support the organizational structure already agreed to by counsel in the broader Interchange cases," including the current lead counsel structure, and that Friedman and Reinhardt would "serve as heads of a 'working group' which will have primary responsibility, within the larger organizational structure, to litigate the issues raised by the 'no surcharge' rules of Visa and MasterCard."  (11/29/05 letter, first unnumbered paragraph).  As fleshed out by the December 29 letter, and in practice over the ensuing years, this included "primary responsibility for briefing and arguing motions relating to the NSR claims, taking and noticing depositions related to the NSR Claims, conducting all NSR-related discovery, working with experts on the NSR claims, staffing the NSR claims and other activities consistent with the foregoing."  Friedman Decl. Ex. 2.

As for attorneys' fees, the Agreement provided: "The NSR group will, as a group, receive a percentage of all attorneys' fees in this action that is equal to the percentage of the approved lodestar that the NSR Group accounts for.  So by way of example, if the NSR Group accounts for

10% of the approved lodestar (hours times hourly rate) of all plaintiffs' counsel, then the NSR Group shall receive 10% of all attorneys' fees awarded, irrespective of whether the NSR claim(s) result in any relief of any nature, and irrespective of whether the interchange claim(s) result in any relief of any nature.  The two of you [i.e., Friedman and Reinhardt] will be responsible for the allocation within the NSR group, and the members of that group agree not to seek additional fees from the other plaintiffs' counsel or from the Court."

In short order, Friedman's colleague Mr. Reinhardt wrote to the Court that the NSR Group lawyers, under the leadership of Friedman and himself, had reached an agreement with the proposed lead counsel group that would allow for the effective handling of the NSR claims, and he conveyed their support for the proposed leadership slate.  See Letters from Reinhardt to the Court dated January 3 and February 6, 2006, Dkt. 95 and 232.

### 4.     The Parties Work Harmoniously Under the Agreement: Pre-Settlement Years

Over the ensuing years, Friedman took the laboring oar on NSR-related issues, from drafting pertinent sections of the Consolidated Class Action Complaint to fashioning and negotiating discovery demands, organizing NSR discovery teams, taking and overseeing depositions, and working with economic experts, especially Dr. Frankel.  All the while, Friedman worked closely with co-lead counsel Bonny Sweeney and Craig Wildfang, talking regularly and keeping them apprised of his team's efforts.  He also served on the Executive Committee, and played a leading role alongside Mr. Wildfang in working with the Department of Justice as it launched proceedings against Visa and MasterCard based on their anti-steering rules—a legal theory that Friedman had championed from the beginning.

To support all these efforts, Friedman partnered with Tracey Kitzman to form Friedman Law Group LLP in 2006.  Over the following nine years, the firm generally employed between

three and five associates, operating principally out of FLG's offices on Lafayette Street in Manhattan.  The firm invested thousands of hours of legal work, met capital calls from the lead counsel group, and paid substantial expenses.  See 4/11/13 Undlin Decl. Ex. E, Dkt. 2113-2 at Exs. A and B.

### 5.   *The No-Surcharge Theory Is Borne Out*

From the inception of the litigation up through the first settlement, class plaintiffs worked alongside counsel for a group of twelve large retailers—including Kroger, Walgreens, and others—pursuing claims on a non-class basis (the "Individual Plaintiffs").   In their initial complaints, the Individual Plaintiffs challenged the banks' establishment of interchange fees as horizontal price fixing, just as the Robins Kaplan complaint had, and they secondarily challenged the NSRs and related rules. See e.g., 2/7/06 Complaint, *The Kroger Co., et al. v. MasterCard. Inc*., 06-cv-0039 (E.D.N.Y.), Dkt. 5.

As time went on, the Individual Plaintiffs became increasingly interested in the NSR claims, splitting time with Friedman, his partner Ms. Kitzman, and their colleagues at all of the dozens of depositions devoted to NSR issues, among other things.  By the time the parties served their expert reports, and later when the Individual Plaintiffs moved for summary judgment, the Individual Plaintiffs had fully jettisoned the interchange price-fixing theory and proceeded *solely* on the basis of NSR and other anti-steering restraints.  See, e.g., Indiv. Pltfs. Brief for S.J., Dkt. 1535.  And according to published reports, the Individual Plaintiffs were very successful in settling their NSR-only case, garnering a payout in July 2012 of $525 million.[4]

---

[4] See Jessica Dye, *Visa, MasterCard Banks in $7.25 Billion Retail Settlement*, REUTERS, July 13, 2012.

### 6.    *Friedman and Colleagues Invalidate the State Anti-Surcharging Statutes*

In attacking the NSRs on behalf of a class of merchants based in each of the fifty states, the class plaintiffs faced a huge obstacle: ten states, representing 40% of the U.S. population and 50% of transaction volume, banned credit card surcharges by statute.  Unsurprisingly, defendants harped on this fact in challenging the plaintiffs' damages experts.  After all, they argued, if state statutes ban merchant surcharging, how could the abolition of Visa and MasterCard's no-surcharge rules cause interchange rates to drop?  And how could the NSRs cause economic damage?  If surcharges are banned anyway, as a matter of state law, it becomes harder to justify substantial antitrust damages against defendants for maintaining rules against surcharging.

Plaintiffs' counsel and expert economists grappled with these seemingly insurmountable questions for years.  And then, in 2012, Friedman had the idea to challenge the constitutionality of the state statutes, and he began to develop a plan.  Some months later, with the approval of Mr. Wildfang and the lead counsel group, Friedman engaged noted constitutional lawyer Deepak Gupta.  Together, Gupta and Friedman developed First Amendment and void-for-vagueness challenges against the no-surcharge statutes of New York, Florida, Texas, and California. Representing merchants with an interest in credit-card surcharging from each of those states, they filed complaints—each listing Gupta and Friedman as co-counsel—in federal courts in Manhattan, Tallahassee, Austin, and Sacramento.[5]  (*But see* Wildfang Decl. 9/18/18, Dkt. 7257-3 at ¶¶ 193-195 (recounting history of the constitutional challenges while somehow omitting mention of Friedman)).

---

[5] *See Expressions Hair Design v. Schneiderman,* No. 13-CV-3775 (S.D.N.Y.) Dkt. 1; *Dana's R.R. Supply v. Bondi*, 14-cv-00025 (N.D.Fla.) Dkt. 1; *Rowell v. Abbott*, 14-CV-00190 (W.D. Tex.) Dkt. 1; *Italian Colors Rest. v. Harris*, 14-cv-00604 (E.D. Cal.) Dkt. 1.

FLG's expenditure of time and energy in the campaign against state anti-surcharging statutes was extensive by any measure— another massive investment under the Agreement. And the results were stellar. In the action challenging the New York statute, Gupta and Friedman won a groundbreaking injunction from Judge Rakoff. The ruling was subsequently reversed in the Second Circuit, but the plaintiffs successfully petitioned for certiorari. And then, with Gupta arguing, the merchants won a reversal at the U.S. Supreme Court in *Expressions Hair v. Schneiderman*. [6]

Meanwhile, after losing in the Northern District of Florida, Gupta and Friedman prevailed against the Florida law in the Eleventh Circuit.[7] In Texas, they lost at both the district court and Fifth Circuit levels but, following the Supreme Court's *Expressions* decision, the merchants won a final injunction against the Texas statute on remand.[8] In California, meanwhile, Gupta and Friedman won at the district court and Ninth Circuit, invalidating the California statute. [9] As a result of these extraordinary efforts, state statutes banning credit-card surcharges are all but dead.

Friedman also played *the* central role, on behalf of the class members, in defeating new legislative efforts to ban credit card surcharging. After Visa and MasterCard dropped their NSRs

---

[6] *Expressions Hair Design v. Schneiderman*, 975 F. Supp. 2d 430 (S.D.N.Y. 2013), *rev'd*, 808 F.3d 118 (2d Cir. 2015), *reversed and remanded*, 137 S. Ct. 1144 (2017).

[7] *Dana's R.R. Supply v. Attorney General*, 807 F.3d 1235 (11th Cir. 2015), cert. denied, 137 S. Ct. 1452 (2017). The Supreme Court held Florida's cert petition for more than a year, and then denied it once it upheld the plaintiffs' theory in *Expressions*.

[8] *Rowell v. Pettijohn*, 2015 U.S. Dist. LEXIS 40739 (W.D. Tex. 2015) (granting summary judgment for the State), *aff'd*, 816 F.3d 73 (5th Cir. 2016), *cert. granted, decision vacated and remanded sub nom. Rowell v. Pettijohn*, 137 S. Ct. 1431 (2017), *remanded,* 865 F.3d 237 (5th Cir. 2018), and on remand, 2018 U.S. Dist. LEXIS 157574 (W.D. Tex. Aug. 16, 2018) (granting summary judgment for the merchant plaintiffs).

[9] *Italian Colors Rest. v. Harris,* 99 F.Supp.3d 1199 (E.D. Cal. 2015), *aff'd sub nom. Italian Colors Rest. v. Becerra*, 878 F. 3d 165 (9th Cir. 2018)

as a result of the litigation, as discussed below, anti-surcharging bills were introduced in statehouses around the country.  Objectors to the prior settlement contended these bills were sweeping the nation and would doom merchant surcharging.  *See, e.g.*, 7-Eleven Group Obj. Br., Dkt 2670 at 11 ("An additional *20 states* have recently introduced legislation for similar prohibitions against surcharging credit card transactions.")  But class counsel lobbied effectively against those efforts.  And it was Friedman alone, not other class counsel, who went and met with state legislators around the country.  In the end, *not one* of these bills was signed into law.

As a result of these efforts, merchants are essentially unimpeded by state law from imposing credit card surcharges in the U.S. today.[10]  And the absence of state-law impediments greatly enhanced class plaintiffs' ability to prosecute damages claims based upon the networks' imposition of no-surcharge rules.

### 7. *The Parties Settle*

Following summary judgment arguments in November 2011, Judge Gleeson asked the parties to convene for a weekend of settlement talks at the courthouse, in an extraordinary effort to cut through years of fruitless mediations.  Friedman had not been part of negotiations up to that point and was not part of the small group that was invited to the courthouse on that Friday afternoon.  However, on his way home that Friday night, Friedman received a call from Individual

---

[10]  See, e.g., *Jang v. Asset Campus Hous., Inc.*, 2017 U.S. Dist. LEXIS 92376, at *1 (C.D. Cal. May 18, 2017), *aff'd*, 739 F. App'x 465, 465 (9th Cir. 2018).  In that case, following Visa and MasterCard's rescission of their NSRs, property management service providers imposed surcharges on payment card transactions, and plaintiff tenant brought a class action alleging the surcharges were illegal under California's anti-surcharging statute, Cal. Civil Code § 1748.1. Defended by Friedman and Gupta, the defendants argued that the California law was unconstitutional, and the district court and Ninth Circuit agreed.  Property managers now permit tenants to use credit cards by incurring a legal surcharge, compliant with Visa and MasterCard rules.

Plaintiff's counsel urging him to come down to the courthouse at once.  The lawyer, Linda Nussbaum, explained that the parties sought to negotiate seriously the terms of the networks' no-surcharge rules, and Mr. Wildfang had stated that the class was not prepared to engage in discussions on this subject without Friedman.  Friedman Decl. ¶ 4.  Friedman asked her to confirm that Mr. Wildfang indeed wanted him present.  So with Friedman on the line, she walked down to class counsel's conference room and confirmed that he should get down to court right away.  Friedman went to the courthouse, and remained centrally involved in the settlement process from that point forward.  *Id.*

The parties continued to talk about settlement options over the next eight months.  Given the large number of stakeholders, and the atmosphere of distrust among banks and networks, it was difficult to make progress through all-hands discussions.  That led to many one-on-one discussions, with lawyers floating trial balloons, taking the temperature of the other side, and trying to identify tradeoffs that all parties would find palatable.  Because Friedman had a longstanding relationship with Keila Ravelo, the senior-most partner at one of MasterCard's two law firms and the outside lawyer closest to MasterCard General Counsel Noah Hanft, he engaged in many casual conversations with her, attempting to gauge MasterCard's position with respect to various proposed deal points. As detailed in Friedman's September 2, 2015 declaration, these communications—and similar communications with senior Visa attorneys—were aimed at floating proposals, developing solutions to difficult problems, and improving Friedman's understanding of the other side's negotiating posture, so that he might bring valuable insights back to the negotiating team representing the merchant class.

After the parties reached agreement, lead counsel submitted a joint fee petition covering all the lawyers who had worked on the class action.  In a painstaking process, lead counsel directed

14

each firm to submit its billing records, which it then vetted with consulting accountants, making cuts to each firm's claimed lodestar.  4/11/13 Undlin Decl., Dkt 2113-2 at ¶¶ 6-11.  Many firms had their lodestars reduced by substantial amounts in this process.  But FLG's lodestar was reduced by less than one percent—the smallest reduction for any of the top-billing firms in the case.  *Id.* at Ex. A (Master Lodestar Report).  FLG's lodestar, as modified by lead counsel and submitted to the Court, was $9,596,329, and its cash contributions to the litigation fund totaled $805,000.  *Id.* at Ex. B (Master Expense Report).

### 8.      *After the Settlement is Overturned, the Case Settles Anew*

In June 2016, the Second Circuit overturned the first settlement in this case, reasoning that "unitary representation" of the equitable relief and damages classes by one set of lawyers created potential conflicts.  On remand, therefore, the Court appointed separate lead counsel for the (b)(3) and (b)(2) classes—effectively limiting the portfolio of the original lead counsel group to (b)(3) damages claims.  In February 2017, lead counsel then filed its new damages-only complaint.  See Third Amended Consolidated Class Action Complaint, Dkt. 6923.

The damages-only complaint that lead counsel filed in 2017, with a decade-plus of evidence and experience under their belts, is starkly different from the complaint they filed at the outset of the litigation.   Whereas Robins Kaplan's initial class action complaint contained ***no references at all*** to merchant surcharging or merchant steering, see above at 7, the, damages-only complaint made ***115 references*** to surcharging and steering.  Dkt. 6923.  Moreover, in addition to those 115 references, the complaint includes entire standalone claims for damages against each of Visa and MasterCard on the sole basis of the rules against steering and surcharging.

On the basis of the Third Amended Consolidated Complaint, class counsel settled the instant action for well over $6 billion.  Of course, it is impossible to say just how much of that

settlement is attributable to the NSR claims that figured so prominently in that damages-only pleading.  But we know that the NSR damages claims were 100% responsible for the settlements that the defendants paid to the Individual Plaintiffs.  *See* above at 10.  And it is reasonable to infer that the defendants here similarly perceived much of their damages exposure as emanating from the NSR claims for which Friedman and FLG were responsible.

### 9.    *Lead Counsel Disavows the Agreement*

In 2015, following Ravelo's arrest and termination from Willkie Farr, a court-supervised disclosure process was carried out under which Friedman, Willkie, and others produced more than eighteen thousand pages of e-mails and other documents, including all correspondence between Friedman and Ravelo going back years.

From the very inception of the disclosure process, Friedman volunteered to come meet with lead counsel and answer all their questions about his communications, with nothing off-limits. Friedman Decl. ¶¶ 5, 6.  But lead counsel never responded.  Then, when the present settlement was first announced in June 2018, Friedman reached out again to lead counsel Craig Wildfang, asking for "a chance to sit down with you, whether in MN or NY." *Id.* Ex. 5.  "There's a lot of potential for misunderstanding here," Friedman wrote, adding that he was "confident we can cut through all of it" with a meeting or conversation. *Id.*

Lead counsel never responded to Friedman's June 2018 email. *Id.,* ¶ 8.  On September 18, 2018, lead counsel submitted for the Court's approval a class notice, (Dkt. 7257-2 Appx. G) which informs class members that lead counsel will file a single unified fee application "to compensate all of the lawyers and their law firms that have worked on the case," and that the petition materials will be "posted on the settlement website the day they are filed."  The Settlement Agreement filed that same day makes the same points. (Dkt. 7257-2 ¶ 40).

In April 2019, Friedman wrote Mr. Wildfang again, noting that the time for filing a fee petition was drawing close and asking lead counsel to affirm its intention to abide by the 2005 Agreement.  And Friedman reiterated his offers to meet "anywhere, anytime, and to address any concerns you may have."   Friedman Decl. ¶ 8 and Ex. 5.  But lead counsel once again ignored Friedman's message.  Finally, after Friedman contacted Robins Kaplan on May 6, 2019 to confirm that Mr. Wildfang had received his emails, lead counsel responded that evening with its rescission letter, disavowing the 2005 Agreement.  *Id.,* ¶ 11.

The May 6 rescission letter provides that lead counsel are excluding FLG's lodestar and expenses from the joint fee petition, and it states that FLG should make a separate application for fees and costs.  *Id.* Ex. 6.  The May 6 letter is thus totally at odds with the orders and notices that these same lead counsel drafted and submitted for court approval eight months earlier, in September 2018. It is difficult to imagine that anything happened in those eight months that could justify lead counsel's 180-degree about-face.

Moreover, by suddenly pushing FLG to file a separate fee petition, lead counsel now stand to pocket many millions in fees that they would not otherwise have received. The math is clear. The petition will seek an award based on a percentage of the fund.  That percentage (most likely around 9% in this case) *will not change* depending upon whether FLG's lodestar of roughly $10 million is included or excluded—as lead counsel has previously explained to this Court.[11]

---

[11] See Class Br. Opp. R. 60 Mo., Dkt. 6533 at 3 ("an individual attorney's lodestar… does not impact the amount that is awarded under the percentage of the fund method," so long as a "lodestar cross-check [ ] confirm[s] the reasonableness of the attorneys' fee award," which it easily will "in a mega-fund case.")  And here, with or without FLG's lodestar included in the petition, the fee award here will certainly equate to a modest multiple of the case-wide lodestar that is well within the bounds that courts approve.

Accordingly, by now demanding that FLG pursue a separate fee petition, lead counsel stand to wrongfully gain many millions of dollars in incremental fees for themselves.

Shortly after lead counsel notified Friedman that they did not intend to comply with the terms of the Agreement, FLG partner Tracey Kitzman wrote to Craig Wildfang to propose that, rather than excluding all FLG time and expenses from the joint petition, lead counsel could exclude only the hours and dollars related to Friedman personally. Friedman Decl. Ex. 7.  Kitzman noted that she, former partner Noah Shube, and others clearly had "nothing to do with the interactions that appear to trouble" Mr. Wildfang, and Kitzman further offered that each of these parties would provide an affidavit to that effect. *Id.*  They would also affirm that no money flowing through the joint fee petition would benefit Friedman. *Id.*  In this way, lead counsel and Friedman could address their dispute without jeopardizing the economic interests of people like Kitzman, who worked tirelessly, and at tremendous personal sacrifice, to further the interests of the merchant class.

But lead counsel declined.  By email dated May 29, 2019, Mr. Wildfang informed Kitzman that the lead counsel group would not allow her, or other stakeholders, to be compensated out of the fee pool.  Friedman Decl. Ex. 7.  It made no difference how readily segregable Kitzman's economic entitlements are from Friedman's, and it made no difference that she indisputably had no connection to the Friedman-Ravelo communications.  Mr. Wildfang advised her simply that the lead counsel group refused to allow her to be compensated out of the joint petition.

Against this backdrop, movants bring the instant motion and the annexed complaint-in-intervention.  As shown below, the motion to intervene is warranted under Rule 24.  Moreover, the complaint-in-intervention is meritorious because, among other reasons, lead counsel's disavowal of the Agreement fails.  Under controlling New York law as interpreted by the Second

Circuit, any attempt to declare that the Agreement is void or unenforceable—any putative rescission of the Agreement—must be made *promptly* after the relevant factual predicate for the rescission becomes known.  *See Ballow supra; Dun & Bradstreet Corp. v. Harpercollins Publishers*, 872 F. Supp. 103, 110 (S.D.N.Y. 1995) ("rescission on the basis even of material breaches must be sought promptly"); 22A N.Y. Jur. Contracts § 488 (rescission must be sought "promptly after the injured party learns of the wrong justifying rescission.").  Therefore, in addition to having no merit, lead counsel's 2019 attempt at rescission based on evidence known in 2015 is foreclosed by controlling precedent.

## ARGUMENT

## I.   INTERVENTION IS WARRANTED

### A.   INTERVENTION IS PROPER AS A MATTER OF RIGHT UNDER RULE 24(A)

Rule 24(a) of the Federal Rules of Civil Procedure entitles a movant to intervene as of right where "(1) the motion is timely; (2) the movant asserts an interest relating to the property or transaction that is the subject of the action; (3) the movant is so situated that without intervention, disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest; and (4) the movant's interest is not adequately represented by the other parties." *Windsor v. United States*, 797 F. Supp. 2d 320, 323 (S.D.N.Y. 2011), quoting *MasterCard Int'l, Inc. v. Visa Int'l Svc. Assn., Inc.*, 471 F.3d 377, 389 (2d Cir. 2006).

As applied to this case, and the proposed complaint-in-intervention, Friedman and FLG satisfy each of the four requisites.

**1.   The Motion Is Timely.**  Lead counsel's letter disavowing the Agreement was dated May 6, 2019.  This motion follows only four weeks later.  Clearly, the motion is timely.

2.      **Interest in the Subject of the Action.**  The subject of the action, at this stage, is two-fold: (i) an application for final approval of a class action settlement under Fed. R. Civ. P. 23(e), and (ii) a petition for class action attorneys' fees under Fed. R. Civ. P. 23(h).  At a minimum, Friedman has a direct and concrete interest in the latter and the second element of Rule 24(a) intervention is satisfied for that reason.

And more generally, courts recognize that "a common nucleus of operative fact exists between [an] underlying [] class action[] and [a] motion" challenging the allocation of attorneys' fees.  *Kaplan v. S.A.C. Capital Advisors, L.P.,* 2017 U.S. Dist. LEXIS 202631, at *26 (S.D.N.Y. 2017), *aff'd,* 919 F.3d 154 (2nd Cir. 2019); *see Grimes v. Chrysler Motors Corp*., 565 F.2d 841, 844 (2d Cir. 1977) (a fee "dispute [that] involves two attorneys, neither of whom was a 'party' to the primary litigation" shares "a common nucleus of operative fact" with the underlying litigation).  Because the complaint-in-intervention shares a common nucleus of operative fact with the (b)(3) class proceedings, the movant's interest plainly "relat[es] to the property or transaction that is the subject of the action."  *Windsor,* 797 F. Supp. 2d at 323.

3.      **Impairment of Interest.**  Friedman is "so situated that, without intervention, disposition" of lead counsel's joint fee petition "may, as a practical matter, impair or impede [his] ability to protect [his] interest." *Id.*  Thus, in *Kaplan v. Reed Smith LLP*, 919 F.3d 154 (2nd Cir. 2019), where non-lead counsel never sought to intervene and press its claims against lead counsel in the federal class action court, that court's disposition of lead counsel's fee application was held to preclude non-lead counsel from proceeding on its claims in state court.  Absent intervention and the relief sought in the complaint-in-intervention, Friedman cannot receive what he bargained for in the 2005 Agreement.

**4.** **Inadequate Representation.**  Finally, the interests of FLG and lead counsel, as they relate to the subject matter of the proposed complaint-in-intervention, are adverse.  For this reason, it is clear that the movants' interests are not adequately represented in the action, and the fourth factor of the test under Rule 24(a) is satisfied as well.

For all the foregoing reasons, intervention under Rule 24(a) is appropriate.

**B.** **ALTERNATIVELY, INTERVENTION UNDER RULE 24(b) IS WARRANTED**

In the alternative, if the Court determines that intervention of right is unavailable, Friedman submits the Court should grant permissive intervention under Rule 24(b).  Permissive intervention is warranted "when an applicant's claim or defense and the main action have a question of law or fact in common. . . . In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties."  *United States v. City of N.Y.*, 198 F.3d 360, 367 (2d Cir. 1999).  In practice, applications under Rule 24(b) are almost completely discretionary.  *Id.*

In this case, the fee proceedings in the main action and the instant proposed complaint-in-intervention share questions of law and fact, to say the least.  Moreover, if intervention were disallowed, movants would be forced to file in state court,[12] creating inevitable inefficiencies and the potential for inconsistent rulings.  Under these circumstances, it is far better to allow the proposed complaint-in-intervention to proceed under the jurisdiction of this Court.

---

[12]  There is no diversity of citizenship because Friedman and FLG are citizens of New York, and Robins Kaplan LLP maintains a New York office and presumably has New York-resident partners and is thus a citizen of New York (among other places) for diversity purposes.  See *Carden v. Arkoma Assocs.*, 494 U.S. 185 (1989). The annexed complaint-in-intervention, at ¶ 12, thus relies solely upon supplemental jurisdiction principles, which apply only if intervention is granted.

## II.      THE DIRECTION BY LEAD COUNSEL TO FILE AN INDEPENDENT FEE PETITION IS MALICIOUS, AND WOULD CREATE TURMOIL

Lead counsel has a contractual obligation to pay FLG its proportional share of the fee award in this case.  By waiting four years to notify FLG of its purported rescission of the Agreement, it has missed any opportunity to rescind in accordance with New York law.  Moreover, even if lead counsel had given timely notice, there is no legal basis for rescission of the Agreement.  And yet, in plain violation of the Agreement, lead counsel has now directed FLG that it must file an independent fee petition if it seeks any compensation.  Lead counsel's direction is irresponsible and malicious.

Lead counsel has repeatedly represented to this Court and the class members that they would file an *integrated* fee petition covering "all of the lawyers and their law firms that have worked on the class case."  Long Form Notice, *supra*; *see also* Proposed Class Notice, Dkt. 7257-2 ¶ 40 and Appx. G (same); Preliminary Approval Order, Dkt. 7361 at ¶22, ("Class Counsel will file *all* motions and supporting papers seeking . . . the Court's approval of *any* Attorneys' Fee Awards") (emphasis added); Settlement Agreement, Dkt. 7257-2 ¶ 40 (same).  Time and again, they have represented that the integrated petition will seek a fixed percentage of the common fund, in consideration of the work of *all* lawyers and law firms on the case.  *See e.g*., Prelim. Approval Decision, Dkt 7361 at 48, citing Superseding Settlement Agreement ¶ 57.

None of these representations even hinted that lead counsel might instruct Friedman or anyone else to go file a separate fee petition.  Indeed, they exclude that possibility by their terms.  And critically, *all* of these representations—in the Long Form Notice, the Preliminary Approval Order, and the Superseding Settlement Agreement—were drafted and filed by lead counsel in September 2018, more than three years *after* receiving the Friedman-Ravelo communications in mid-2015.

22

But still, the lead counsel group is advising Friedman to file a separate fee petition with the Court.  A Friedman fee petition would run contrary to the direct instructions of this Court, and contrary to the representations that lead counsel has made to the class.  By definition, any such fee petition would be seeking legal fees straight out of the pockets of the class members, instead of coming out of class counsel's fee pool.  In other words, a standalone fee petition would *harm* the class.  *By design*, the recommendation of lead counsel is intended to create a firestorm of anger and animosity directed toward Friedman, since the class members will assume that Friedman is trying to collect fees outside of the agreed-upon limits (a fixed percentage of the common fund) and agreed-upon processes (a single fee petition).  *By design*, their recommendation is also intended to get Friedman to implicitly endorse the idea that there is no enforceable contract, when the contract is absolutely binding.[13]

---

[13]   Lead counsel may argue—mistakenly—that the recent Second Circuit decision in *Kaplan v. Reed Smith*, *supra,* supports the contention that FLG's failure to submit a fee petition by the deadline will defeat its right to seek fees under the Agreement.  This would be a misreading of *Reed Smith*, where the district court's preliminary approval order expressly "called for any counsel that believed it was entitled to fees or expenses from the litigation to make an application to the court."  919 F.3d at 160.  In this case, the preliminary approval order and class notice do the *exact opposite,* calling for *lead counsel* to file "all motions and supporting papers seeking . . . the Court's approval of any Attorneys' Fee Awards."  Indeed, on FLG's reading, the preliminary approval order and class notice *do not permit* the filing of an independent fee petition.

## <u>CONCLUSION</u>

For all the foregoing reasons, Friedman Law Group LLP and Gary Friedman respectfully submit the Court should grant the instant motion to intervene.

Dated:  New York, New York
        June 7, 2019

<div style="margin-left: 40%;">

FRIEDMAN LAW GROUP LLP
and GARY B. FRIEDMAN


<u>*s/ Gary B. Friedman*</u>
154 Grand Street
New York, NY  10013
gfriedman@flgllp.com
(917) 568-5024

</div>

24