**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | : | |
| **IN RE PAYMENT CARD** | : | |
| **INTERCHANGE FEE AND** | : | **MDL Docket No. 1720** |
| **MERCHANT DISCOUNT** | : | |
| **ANTITRUST LITIGATION** | : | **MASTER FILE NO.** |
| | : | **1:05-md-1720-MKB-JO** |
| **This Document Relates To:** | : | |
| | : | |
| **ALL CASES** | : | |
| | : | |
| | : | |

**MEMORANDUM IN SUPPORT OF RULE 23(b)(3) CLASS PLAINTIFFS' MOTION**
**FOR ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**

# Table of Contents

Page(s)

I.        **INTRODUCTION** ........................................................................................................ 1

II.     **SUMMARY OF CLASS COUNSEL'S LITIGATION EFFORTS** ............................ 5

    A.  **Pre-Filing Preparation** ........................................................................................... 5

    B.  **Prosecution of the Case** ........................................................................................... 5

        1.  **Pre-Consolidation Proceedings** ...................................................................... 5

        2.  **Leadership, Pleadings, and Class Certification** .............................................. 6

        3.  **Phase One Discovery** ...................................................................................... 7

        4.  **Expert Discovery, Dispositive Motions and Trial Preparation** ....................... 9

        5.  **Co-Lead Counsel Petitioned All Three Branches of the Federal Government and Monitored Foreign Governments on Behalf of the Class.** ................................ 10

    C.  **Original Mediation and Settlement** ....................................................................... 12

    D.  **Original Settlement Administration and Efforts to Protect the Class** .................... 12

    E.  **Challenging State "No Surcharge" Statutes in the Courts and in State  Legislatures** ........ 13

    F.  **Phase Two Litigation** ............................................................................................. 14

    G.  **New Mediation and the Superseding Settlement** .................................................. 16

III.    **ARGUMENT** ............................................................................................................... 18

    A.  **Class Counsel Should Be Awarded Reasonable Attorneys' Fees** ......................... 18

        1.  **Counsel Seek a Reasonable Percentage of the Common Fund** ......................... 20

        a.  **Time and Labor Expended and Quality of Representation Support the Requested Fee** 21

        b.  **This Case Presents Complex Issues and Is Highly Risky** ................................. 23

        i.  **Risks Arising from Substantive Issues** .......................................................... 24

        ii.  **Lack of Government Action** ........................................................................... 27

    iii.  **Resources Committed to the Case** ......................................................................... 27

        c.  **The Fee Request Is Consistent with the Size and Scope of the Settlement.** ...................... 28

        d.  **The Requested Fee Is Reasonable in Light of Counsel's Lodestar** .................... 34

        i.  **The Review Process Resulted in a Conservative Figure as to Counsel's Hours** ........... 34

        ii.  **Counsel's Hourly Rates Are Reasonable** ........................................................ 35

        iii.  **The Resulting Multiplier Is Reasonable** ......................................................... 36

        e.  **Public Policy Considerations Support the Requested Fee** ............................... 37

i

**B. Counsel's Expenses Are Reasonable** ............................................................................... 37

**IV.    CONCLUSION** ........................................................................................................... 39

# Table of Authorities

Page(s)

Other Authorities

*Air Cargo Shipping Servs. Antitrust Litig.*, No.,
06-MD-1175 (JF) ......................................................................................... 29

*Alaska Electrical Pension Fund v. Bank of America Corp.*,
No. 14-CV-7126 (JMF), 2018 WL 6250657 (S.D.N.Y. Nov. 29, 2018) ................................. 38

*American Needle v. National Football League*,
538 F.3d 736 (7th Cir. 2008) ............................................................................. 11, 14

*ante* ................................................................................................................ 27

*Boeing v. Van Gemert*,
444 U.S. 472 (1980) ..................................................................................... 18

*City of Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974) .......................................................................... 27, 28

*Fleisherv. Phoenix Life Ins. Co.*,,
Nos. 11-cv2015 WL 10847814 ............................................................................. 2, 35

*Fresno Cty. Emps.' Retirement Assoc. v. Isaacson/Weaver Family Trust*,
No. 17-2662, 2019 WL 2219680 (2d Cir. May 23, 2019) ...................................... 18, 19, 20, 28

*Goldberger v. Integrated Res., Inc.*,
209 F.3d 43 (2d Cir. 2000) ..................................................................... 19, 21, 22, 23

*Hall v. ProSource Techs., LLC*,
No. 14-CV-2502, 2016 WL 1555128 (E.D.N.Y. Apr. 11, 2016) .............................................. 23

*In re Actos (Pioglitazone) Products Liability Litig.*,
274 F. Supp. 3d 485 (W.D. La. 2017) .............................................................. 31, 32, 33

*In Re American Express Anti-Steering Rules Antitrust Litig.*,
2015 WL 4645240 (E.D.N.Y. Aug. 4, 2015) ........................................................... 22

*In re ATM Fee Antitrust Litig.*,
686 F.3d 741 (9th Cir. 2012) ............................................................................. 24

*In re Boston Scientific Corp., Pelvic Repair System Products Liability Litig.*,
MDL No. 2326, 2019 WL 385420 (S.D. W.Va. Jan. 30, 2019) ............................................. 32

*In re Chocolate Confectionary Antitrust Litig.*,
801 F.3d 383 (3d Cir. 2015) .............................................................................. 28

*In re Credit Default Swaps Antitrust Litig.*,
2016 WL 2731524 (S.D.N.Y. April 26, 2016) ....................................................... 19, 29, 36, 37

*In re Currency Conversion Fee Antitrust Litig.*,
263 F.R.D. 110 (S.D.N.Y. 2009) .................................................................... 22

*In re Enron Corp. Sec., Derivative & "Eri*sa" Litig.*,
586 F. Supp. 2d 732 (S.D. Tex. 2008) ............................................................. 22, 36, 37

*In re Foreign Exchange Benchmark Rates Antitrust Litig.*,
2018 WL 5839691 (S.DN.Y. Nov. 8, 2018) ................................................................ passim

*In re Independent Energy*,
No. 00 Civ. 6689(SAS), 2003 WL 22244676 .......................................................... 36

*In re Libor-Based Financial Instruments Antitrust Litig.*,
   2018 WL 3863445 (S.D.N.Y. Aug. 14, 2018) ....................................................... 38

*In re Lloyd's Am. Trust Fund Litig.*,
   No. 96 Civ. 1262, 2002 WL 31663577 (S.D.N.Y. Nov. 26, 2001)........................................ 36

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
   246 F.R.D. 156 (S.D.N.Y. 2007)....................................................................... 23

*In re Nasdaq Market–Makers Antitrust Litig.*,
   187 F.R.D. 465 (S.D.N.Y. 1998)................................................................... 23, 30

*In re Nexium (Esomeprazole) Antitrust Litig.*,
   842 F.3d 34 (1st Cir. 2016) ......................................................................... 28

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*,
   2019 WL 359981 (E.D.N.Y. Jan. 28, 2019)..................................................... passim

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*,
   991 F. Supp. 2d 437 (E.D.N.Y. 2014)............................................................ passim

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   2013 WL 1365900 (N.D. Cal. April 3, 2013) ....................................................... 30

*In re Urethane Antitrust Litig.*,
   2016 WL 4060156 Case No. 04–1616–JWL(D. Kan. July 29, 2016)...........................................37

*In re Veeco Instruments Inc. Sec. Litig.*,
   2007 WL 4115808 (S.D.N.Y. Nov. 7, 2007) ......................................................... 2

*In re Visa Check/MasterMoney Antitrust Litig.*,
   297 F. Supp. 2d 503 (E.D.N.Y. 2003)............................................................ 30, 31

*In re Vitamin C Antitrust Litig.*,
   No. 06-MD-1738 (BMC)(JO), 2012 WL 5289514 (E.D.N.Y. Oct. 23, 2012) ................. 36, 38

*In re WorldCom, Inc. Sec. Litig.*,
   388 F. Supp. 2d 319 (S.D.N.Y. 2005)............................................................ 36, 37

*Kleen Products LLC v. Georgian Pacific LLC*,
   910 F.3d 927 (7th Cir. 2018)......................................................................... 28

*Masters v. Wilhelmina Model Agency, Inc.*,
   473 F.3d 423 (2d Cir. 2007)......................................................................... 20

*McDaniel v. Cty. of Schenectady*,
   595 F.3d 411 (2d Cir. 2010)...................................................................... 21, 36

*Missouri v. Jenkins by Agyei*,
   491 U.S. 274 (1989) ................................................................................. 2

*Nat'l Bancard Corp. (NaBanco) v. Visa U.S.A., Inc.*,
   779 F.2d 592 (11th Cir. 1986)....................................................................... 24

*Ohio v. American Express Co.*,
   __ U.S. __, 138 S. Ct. 2274 (2018) ............................................................. 26, 28

*Ross v. Citigroup, Inc.*,
   630 Fed. App'x 79 (2d Cir. 2015) ................................................................... 28

*Velez v. Novartis Pharms. Corp.*,
   2010 WL 4877852 (S.D.N.Y. Nov. 30, 2010) ....................................................... 2

*Vioxx Products Liability Litig.*,
   760 F. Supp. 2d 640 (E.D. La. 2010) ............................................................ 31, 32

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005)..................................................................... 21, 24, 27

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., U.S.A., Inc.*,
  369 F.3d 96 (2d Cir. 2005)................................................................................ 19
*Warman v. Law Off. of Daniel M. Slane*,
  No. 14-CV-700(LJV), 2017 WL 971196 (W.D.N.Y. Mar. 13, 2017) ..................................... 20

Rules

FED. R. CIV. P. 23(h) ........................................................................................ 19
Rule 23(b)(3)................................................................................................. 2, 4
Rule 23(e)(2)(C)(iii) of the Federal Rules of Civil Procedure....................................... 1

## I.     INTRODUCTION

The Rule 23(b)(3) Class Counsel ("Co-Lead Counsel")[1] respectfully submit this Memorandum in Support of Rule 23(b)(3) Class Plaintiffs' Joint Motion for Award of Attorneys' Fees and Expenses. The Court has recognized that Co-Lead Counsel "have expended enormous time and effort in litigating this action and should be rewarded for those efforts." *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 2019 WL 359981, at *26 (E.D.N.Y. Jan. 28, 2019) ("*Payment Card IV*").

The monetary settlement for the class, currently approximately $6.3 billion,[2] is the largest ever cash settlement in an antitrust class action. The settlement will provide immediate, meaningful monetary relief to Settlement Class members. Specifically, each of the millions of Settlement Class members who submit a valid claim will receive its *pro rata* share of the settlement fund after reduction for attorneys' fees, reimbursed expenses, service awards, administrative costs, and taxes. Defendants have no right of reversion. In addition, the rules reforms obtained by the original 2012 settlement have remained in place.

This petition seeks fees totalling 9.56% of the value of the settlement fund. Co-Lead Counsel ask for the fee to be paid after final approval following all appeals.[3] It also seeks

---

[1] In the Order granting preliminary approval to the settlement, dated January 24, 2019 (ECF No. 7361), the Court appointed Robins Kaplan LLP, Berger Montague PC, and Robbins Geller Rudman & Dowd LLP as Rule 23(b)(3) Class Counsel. The Court appointed these same firms as interim Co-Lead Counsel earlier in the case by Orders dated November 30, 2016 (ECF No. 6754) and February 24, 2006 (ECF No. 279). For the purposes of this Motion, it should further include the firms of Hulett Harper Stewart LLP and Freedman Boyd Hollander Goldberg Urias & Ward P.A., who assisted Co-Lead Counsel as to key decisions involving litigation strategy over the entire course of the case.

[2] The value of the settlement fund as of June 6, 2019 is $6,322,607,198.34. The settlement funds, which have been held in escrow accounts since 2012, continue to earn interest and pay taxes.

[3] Rule 23(e)(2)(C)(iii) of the Federal Rules of Civil Procedure requires the Court to consider the timing of the payment of the requested fee award. Pursuant to paragraph 25 of the Superseding Settlement Agreement, attorneys' fees cannot be paid before the day after twenty business days after the Settlement Final Date.

1

reimbursement of expenses through January 31, 2019 in the amount of $38,263,023.81. Co-Lead

Counsel's conservative calculations reflect an investment of over 630,000 hours of attorney and

paralegal time through January 31, 2019, worth approximately $204 million based on historical

rates.[4] The multiplier is 2.96 of the historical lodestar[5] (based on a $6.3 billion settlement fund)

which is reasonable and well-within the range of multipliers approved by courts in megafund

cases. A simple investment of hours would not have sufficed to achieve what this litigation has

accomplished, as the task at hand—addressing myriad novel substantive, procedural and expert

issues—required the highest quality work. The settlement reflects the quality of that work. Only

a modest number of plaintiffs' firms have the expertise and resources to prosecute, supervise and

finance an effort of this magnitude. Co-Lead Counsel are among those few firms.[6] And all of the

non-lead firms (collectively, "Supporting Class Counsel") are sufficiently expert themselves that

they made meaningful contributions to the effort, under Co-Leads Counsel's guidance and

---

[4] *See* Declaration of Thomas J. Undlin in Support of Class Plaintiffs' Motion for Award of Attorneys' Fees and Reimbursement of Expenses ("Undlin 2019 Decl."), ¶¶ 3, 20, attached hereto as Ex. 1.

[5] At current rates, the multiplier would be lower at approximately 2.1. This multiplier is calculated based on the difference between the lodestar at current rates and historical rates for the five leadership firms whose time constitutes the majority of the lodestar. For the leadership firms the lodestar at current rates is approximately 28.7% greater than the lodestar at historical rates. Many courts in this Circuit use current rates to calculate the lodestar figure. *See, e.g.*, *Velez v. Novartis Pharms. Corp.*, 2010 WL 4877852, at *23 (S.D.N.Y. Nov. 30, 2010) (quoting *In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115808, at *9 (S.D.N.Y. Nov. 7, 2007); *Fleisher v. Phoenix Life Ins. Co.*, 2015 WL 10847814, at *18 (S.D.N.Y. Sept. 9, 2015) ("lodestar is calculated at current hourly rates, which has been endorsed repeatedly by the Supreme Court, the Second Circuit and district courts within the Second Circuit as a means of accounting for the delay in payment inherent in class actions and for inflation") (citations omitted). Using historical rates, as done here, obviously reduces the lodestar. This is particularly so for cases that last many years, as this case did. As the Supreme Court has noted: "compensation received several years after the services were rendered … is not equivalent to the same dollar amount received reasonably promptly as the legal services are performed, as would normally be the case with private billings." *Missouri v. Jenkins by Agyei*, 491 U.S. 274, 283 (1989).

[6] *See, e.g.,* Undlin 2019 Decl., ¶32; Declaration of H. Laddie Montague, Jr. on Behalf of Berger Montague PC ("Montague Decl."), ¶ 3, attached hereto as Ex. 2; Declaration of Alexandra S. Bernay in Support of Rule 23(b)(3) Class Plaintiffs' Motion for Award of Attorneys' Fees and Reimbursement of Expenses ("Bernay Decl."), ¶¶ 15-16, attached hereto as Ex. 3.

supervision.[7]

This historic settlement is the result of Co-Lead Counsel's skill, antitrust experience, and tenacity, with the assistance of Supporting Class Counsel, through fourteen years of fierce litigation. This case is undeniably complex, raising novel legal antitrust issues and difficult proof issues. *See Payment Card IV*, 2019 WL 359981, at *21-*23. At all times, Defendants—titans of the financial-services industry—presented a vigorous defense, represented by the best antitrust defense counsel in the nation.

Co-Lead Counsel litigated this case at both the district court and appellate level, and this case has encompassed two phases. The first phase involved developing an exhaustive factual record, including analyzing 65 million pages of documents and the taking of over 370 depositions, and the submission of numerous expert reports. *Id*. at *21. Co-Lead Counsel also briefed and argued motions to dismiss, class certification motions, summary judgment motions and *Daubert* motions. *Id*. This initial phase of the litigation culminated in a settlement agreement in June 2012 (the "Original Settlement Agreement").[8] After this Court granted preliminary approval of that settlement, Co-Lead Counsel focused on efforts relating to notice of the settlement, settlement administration, escrow work, and efforts to protect the class, in addition to seeking final approval of the settlement. This Court granted final approval of that settlement on December 13, 2013. (ECF No. 6124). The Second Circuit vacated that settlement on grounds that the damages class had to have separate counsel and representatives from the injunctive relief class and remanded the case in 2016, leading to phase two of this litigation. *Payment Card IV*,

---

[7] Co-Lead Counsel may also seek reimbursement, at their normal hourly rates and with no multiplier, for additional work to administer the settlement, distribute the settlement fund, and through any appeals.

[8] Co-Lead Counsel's first joint fee and expense petition was based on their efforts through November 30, 2012, days after the Court granted preliminary approval of the Original Settlement Agreement. (ECF No. 1745 Nov. 27, 2012).

2019 WL 359981, at *4-*6. In phase two, Co-Lead Counsel and Supporting Counsel analyzed more than five million additional pages of documents selected from among Defendants' 100 million pages of supplemental productions, participated in more than 175 depositions of defense and third-party witnesses, and defended four Class Plaintiff depositions. Declaration of K. Craig Wildfang Declaration in Support of Rule 23(b)(3) Class Plaintiffs Motion for Preliminary Approval of the Settlement ("Wildfang 2018 Decl.") ¶¶ 207, 210-23 (ECF No. 7257-3). Co-Lead Counsel also worked closely with economic experts to address the changing competitive conditions in the marketplace since class certification and summary judgment motions were submitted in phase one of this case.

This lengthy and expensive case has been prosecuted without the aid of any government investigation, much less indictments or guilty pleas. It was the government which later piggy-backed on Co-Lead Counsel's litigation efforts years after this case was filed. The Department of Justice's 2010 consent judgment with Visa and Mastercard, which reformed certain of the networks' anti-steering rules, was based almost entirely on the record and work product compiled by Co-Lead Counsel. *See* Section II.B.5 below. Co-Lead Counsel also provided important strategic insights to merchants and engaged with Congress to help enact legislation, which ultimately resulted in the Durbin Amendment, capping interchange fees on debit-card transactions as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010. *Id*.

Despite the significant risk that this case could have resulted in no recovery for the class, no fee for counsel, and no recovery of enormous out-of-pocket expenses, Co-Lead Counsel doggedly litigated this case throughout. Co-Lead Counsel's fee and expense request is well within the standards governing awards in this Circuit.

## II.      SUMMARY OF CLASS COUNSEL'S LITIGATION EFFORTS[9]

### A.      Pre-Filing Preparation

Robins Kaplan LLP ("Robins Kaplan") began its investigation of the claims alleged in this case in 2004, when it learned of merchants' widespread dissatisfaction over exorbitant interchange fees. *See* Wildfang 2018 Decl. ¶¶ 16, 19. That effort included consultation with economists, industry experts, antitrust experts from the academic community and merchants. *Id.* at ¶ 19. Eventually, two small merchants, Photos Etc. Corp. and Traditions Ltd., agreed to step forward to litigate on behalf of all merchants. *Id.* at ¶¶ 16-17. Prior to and concurrent with the Robins Kaplan investigation, long-time class action leaders Berger Montague PC ("Berger Montague") and Robbins Geller Rudman & Dowd LLP ("Robbins Geller") had developed and were continuing to develop their expertise in litigation involving payment cards, in particular, by pursuing a series of complex cases alleging various antitrust violations by several of the defendants in this case.[10]

### B.      Prosecution of the Case
#### 1.      Pre-Consolidation Proceedings

Robins Kaplan filed the initial complaint in this proceeding in June of 2005. Numerous similar complaints were then filed in courts around the nation, including both class actions and individual actions on behalf of major retailers. *See* Wildfang 2018 Decl. ¶¶ 21, 23. The Judicial Panel on Multidistrict Litigation consolidated the actions in this Court, based primarily on the fact that "Judge Gleeson [was] already familiar with the operation of the credit card networks."

---

[9] This section provides only a summary overview of the work performed by Co-Lead Counsel. Co-Lead Counsel's litigation efforts are described in detail in the Wildfang 2018 Declaration.

[10] *See, e.g., In re Currency Conversion Fee Antitrust Litig.*, MDL 1409 (S.D.N.Y) (settled for $386 million, including settlement with American Express); *Schwartz v. Visa Int'l, et al.*, No. 822404-4 (Cal Super. Ct. Alameda Cty.).

Panel Order at 2. After successfully coordinating their preliminary efforts, Robins Kaplan, Berger Montague and Robbins Geller sought appointment as Co-Lead Counsel, based on their expertise in antitrust class actions, their resources, and their respective records of having successfully managed complex litigation through trial. Wildfang 2018 Decl. ¶ 24.

### 2.    Leadership, Pleadings, and Class Certification

In 2006, the Court appointed Robins Kaplan, Berger Montague and Robbins Geller as Interim Co-Lead Counsel. *See* ECF No. 279 (Feb. 24, 2006); Wildfang 2018 Decl. ¶ 24. In April 2006, Co-Lead Counsel filed a consolidated amended complaint alleging 16 counts under federal and state antitrust laws. Wildfang 2018 Decl. ¶¶ 27-30. That complaint was followed within months by a supplemental complaint alleging antitrust violations arising from Mastercard's intervening corporate restructuring that culminated in its initial public offering. *Id*. at ¶¶ 31-36. This was a novel claim, as no other case ever challenged a transformation from a joint venture into a publicly traded corporation as an antitrust violation. *Id*. at ¶ 34. Defendants moved to dismiss both complaints, the earlier one in part, and the latter one in its entirety. *Id*. at ¶¶ 40-47.

Based on substantial discovery, in early May 2008, Co-Lead Counsel filed a motion for class certification supported by a 78-page memorandum, a comprehensive expert report and over a thousand pages of exhibits. Defendants' response was likewise comprehensive, raising myriad factual and legal defenses that they supported with expert reports and voluminous exhibits. Plaintiffs' reply papers, filed in January 2009, were even more extensive than the initial submission, touching on industry-specific factual and expert issues far afield from those raised in any previous antitrust class action, including: (1) Defendants' claim that their "co-branding" agreements with scores of merchants precluded the Court's finding predominance of common issues; (2) Defendants' novel characterization of payment card transactions as "factoring"; and

(3) Defendants' speculation as to what might have transpired in a "but-for" world without interchange fees. This process culminated in a day-long oral argument in November of 2009, followed by yet more letter briefing.

Concurrent with their class certification reply submission, Class Plaintiffs filed three complaints: a Second Consolidated Amended Class Action Complaint, which added claims; a First Amended Supplemental Class Action Complaint re-pleading the challenge to the Mastercard restructuring; and a Second Supplemental Class Action Complaint challenging the Visa restructuring from a joint venture to a publicly traded corporation the previous year. Defendants moved to dismiss each of those complaints in their entirety, and added a motion to strike allegations against defendant Chase Paymentech. Soon after that, Defendants added a motion to disqualify Class Plaintiffs' class expert. In early June of 2009, Plaintiffs responded to all three motions to dismiss and the motion to strike, and a month later, responded to the disqualification motion.

### 3.    Phase One Discovery

During phase one discovery, Class Plaintiffs worked collaboratively with Individual Plaintiffs[11] to serve 718 document requests and 631 interrogatories, and five requests for admissions. The Defendants were represented by able, experienced counsel from large, prestigious firms, who used their best efforts to limit the amount and use of any discovery they produced. *Id*. at ¶¶ 48, 63. A comprehensive protective order was negotiated early in the case, followed by extensive negotiations over the scope of the discovery requests, and motion practice

---

[11] In phase one of the litigation, a group of large chain merchants, including grocery chains such as Kroger and drug-store chains such as Walgreens, litigated the case alongside Class Plaintiffs. These merchants were known as the "Individual Plaintiffs."

over disputed discovery issues.[12] *See, e.g.*, *id*. at ¶¶ 48, 58-60.

During phase one discovery, Defendants produced 65 million pages that Class Plaintiffs culled and analyzed.[13] *Id*. at ¶¶ 53, 57. Such a massive undertaking required educating, coordinating and overseeing personnel from each of dozens of Supporting Class Counsel. Co-Lead Counsel also coordinated with Individual Plaintiffs' counsel. *Id*. at ¶¶ 57, 64-67. Co-Lead Counsel held a series of training seminars so that those Supporting Class Counsel involved in reviewing and analyzing the documents had a common understanding of the key issues and common goals for the review. That was followed by diligent and ongoing efforts to monitor both the quality and quantity of each firm's work, to ensure that it was being done properly and efficiently. Co-Lead Counsel continually reassessed the process to ensure that it could be completed in time to allow for the identification of key witnesses and for the preparation, scheduling and conduct of hundreds of depositions before the fact discovery deadline.[14] Co-Lead Counsel also analyzed and summarized the files of 880 custodian files to identify key documents for depositions. *Id*. at ¶ 67. These efforts provided the foundation for locating the key evidence to support plaintiffs' class certification motion and respond to Defendants' summary judgment motions. Because of subsequent developments in the marketplace, Co-Lead Counsel engaged in many negotiations with Defendants to produce multiple rounds of supplemental discovery. *Id*. at ¶ 80.

---

[12] Magistrate Judge Orenstein embraced Class Plaintiffs' suggestion that the Court hold regularly scheduled status conferences to keep matters current, with joint status reports to be filed shortly before each conference. That encouraged the parties to resolve routine discovery disputes, leaving only the most contentious ones for the Court to decide.

[13] In addition, Co-Lead Counsel obtained from Defendants the many terabytes of data necessary for their experts to analyze and determine impact and damages.

[14] The parties established a committee for the purpose of scheduling depositions, which in many instances were multi-tracked.

While they were consumed with discovery of Defendants, Co-Lead Counsel and the class representatives were faced with compiling and producing their own evidence in response to 135 document requests and 295 interrogatories, and preparing for and defending the depositions of the class representatives. *Id*. at ¶¶ 71-75. Co-Lead Counsel also issued subpoenas to numerous non-parties, met and conferred with their counsel, engaged in motion practice, compiled and reviewed their documents and took the depositions of third parties as well. *Id*. at ¶¶ 76-78. Overall, Class Counsel took or defended more than 370 depositions in Phase One. Wildfang 2018 Decl. Exhibits 2 & 3.

### 4.      Expert Discovery, Dispositive Motions and Trial Preparation

After phase one fact discovery closed, Co-Lead Counsel served the reports of five experts, including a comprehensive report by Dr. Alan Frankel that addressed the substantive aspects of the claims asserted by Class Plaintiffs. The Individual Plaintiffs served a similar number of reports. Defendants responded with 12 expert reports from some of the most esteemed testifying experts available. Plaintiffs took the depositions of each of Defendants' experts. That process was followed by six expert rebuttal reports, and the defense of Class Plaintiffs' experts' depositions. Finally, 17 months after the process began, Defendants served sur-rebuttal reports by two of their experts. *Id*. at ¶¶ 114-21.

Two months later, all parties filed summary judgment and *Daubert* motions. Class Plaintiffs sought partial summary judgment, and Defendants sought summary judgment as to the entirety of Class Plaintiffs' case. *Id*. at ¶¶ 123-27. The work on all of those motions required the investment of thousands of hours of attorney and paralegal time, spent in large part scouring the massive work product compiled over the course of the case for the best evidence supporting Class Plaintiffs' claims, and turning that evidence into briefs and appendices that collectively

told a complex story in as streamlined a way as possible. The preparation and defense of the multiple *Daubert* motions likewise required counsel to present exceptionally complex material in a concise and coherent manner. *Id*. at ¶¶ 128-33. Co-Lead Counsel spent a substantial amount of time and effort preparing for oral argument on all of the pending summary judgment and *Daubert* motions which the Court heard in November 2011. *Id*. at ¶¶ 136-38.

Trial was scheduled for September of 2012. To prepare for the scheduled trial, Co-Lead Counsel engaged and worked closely with jury consultants, drafted jury instructions, verdict forms and motions *in limine*, selected trial exhibits, and assessed their admissibility. *Id*. at ¶¶ 140-43.

### 5. Co-Lead Counsel Petitioned All Three Branches of the Federal Government and Monitored Foreign Governments on Behalf of the Class.

While this case was pending, Robins Kaplan retained a lobbying/consulting firm to assist the merchant community in securing federal legislation regulating interchange fees. All Co-Lead Counsel joined in this effort. Ultimately, in 2010, Congress passed the Durbin Amendment to the Dodd-Frank Act, which for the first time capped debit card interchange fees based on Defendants' costs in processing debit card transactions. *Id*. at ¶¶ 89-93. Co-Lead Counsel also drafted an *amicus* brief—which included an expert declaration drafted at Class Counsel's expense—defending the Durbin Amendment in *TCF National Bank v. Bernanke*, No. 4:10-cv-04149 (D.S.D.) (brief filed Mar. 11, 2011), in which a card-issuing bank attacked the Durbin Amendment on constitutional grounds. After the district court refused to grant a requested preliminary injunction, Co-Lead Counsel filed an additional *amicus* brief in the Court of Appeals for the Eighth Circuit, which subsequently affirmed the denial, and the case was later dismissed. *TCF National Bank v. Bernanke*, No. 11-1805 (8th Cir.) (filed June 29, 2011). *See generally*

Wildfang 2018 Decl. ¶¶ 95-96.

Also while this action was pending, the Department of Justice ("DOJ") and several states'
Attorneys General commenced an investigation into certain network rules at issue in this action.
That led the DOJ to ask Co-Lead Counsel to produce discovery materials from this action, first
informally, then via a civil investigative demand. Since the DOJ could not see, store, or use those
materials without substantial assistance from Co-Lead Counsel, Co-Lead Counsel secured an
amendment to the protective order allowing for their release, and a Court order (over
Defendants' objections) ensuring that such sharing of work product with the DOJ would not
waive work-product privilege protections. For three years the DOJ maintained unfettered access
to the document and deposition databases, and all of the associated work product, all at a
minimal cost to the DOJ. Subsequently, the DOJ filed antitrust claims challenging some of the
anti-steering rules of Visa, Mastercard and American Express and secured a consent judgment
against Visa and Mastercard. The consent judgment addressed several of Visa's and
Mastercard's rules targeted in this action, thus obtaining some of the relief sought in this case.
Significantly, neither the default interchange fee rules, honor-all-cards rules, nor the surcharge
rules were challenged by the DOJ. *Id*. at ¶¶ 97-10.

In 2009, the Supreme Court granted *certiorari* in *American Needle v. National Football
League*, 538 F.3d 736 (7th Cir. 2008), in which the Seventh Circuit held that the NFL and its 32
teams were a "single entity" for the purposes of that case. The Supreme Court's affirmance of
that decision could have undermined the conspiracy-based claims in this action, which arose
from events during the period in which the Defendant banks operated joint ventures under the
Visa and Mastercard umbrellas. Working with antitrust experts and other interested parties, Co-
Lead Counsel drafted and filed an *amicus* brief seeking the reversal of the Seventh Circuit

decision. The Supreme Court ultimately agreed with Co-Lead Counsel's position and reversed the Seventh Circuit.

### C.      Original Mediation and Settlement

For over five years Co-Lead Counsel and Defendants engaged in protracted and arms' length settlement negotiations with the assistance of two experienced mediators—Hon. Edward A. Infante and Prof. Eric D. Greene. Co-Lead Counsel participated in 45 meetings with one or both mediators, dozens of in-person meetings, and hundreds of calls with the mediators and Defendants attempting to settle this case. Wildfang 2018 Decl. ¶¶ 145-48. The parties attended a two-day settlement conference with the Court in early December 2011, which was followed by a mediators' proposal that the parties accepted. *Id.* at ¶ 149-51. This led to several more months of intense and contentious negotiations over the terms of the written settlement agreement, all of which culminated in the Original Settlement Agreement in July 2012. *Id.* at ¶¶ 151-52.

### D.      Original Settlement Administration and Efforts to Protect the Class

Co-Lead Counsel worked closely with the settlement administrator, Epiq, to provide the class notice of the settlement in a timely and efficient manner. This required obtaining contact information for more than ten million class members from over twenty of the largest acquirers. *Id.* at ¶ 165. Obtaining this information required dozens of negotiations and in some instances motion practice. *Id.* at ¶¶ 167-69. Visa and Mastercard also produced merchant identifying data. *Id.* at ¶ 170. Co-Lead Counsel provided Epiq with over 115 million rows of data containing merchant name, address and related information, which Epiq combined and prepared to create a mailing database. *Id.* at ¶ 171. Approximately 20 million notices were mailed. *Id.* at ¶ 172.

Co-Lead Counsel spent significant time protecting class members from misleading and confusing statements about the nature and terms of the proposed settlement. Certain third-party

claims filers communicated in various ways that their services were necessary for class members to recover under the settlement. Wildfang 2018 Decl., ¶¶ 182-84. Co-Lead Counsel informed the Court about those communications. The Court ordered evidentiary hearings concerning the alleged misconduct, which required Co-Lead Counsel to obtain discovery from a number of third-party claims filers. *Id.* at ¶ 184. After all of the evidentiary hearings were conducted, on October 3, 2014, the Court issued an order enjoining one third-party claims filer from providing services related to this settlement, while noting that others had also deceived merchants. ECF No. 6349 at 59 (Oct. 3, 2014). The Court acknowledged that Co-Lead Counsel were "vigilant in policing the conduct of [third-party filers], contacting them directly when their statements are misleading, and even working out corrective communications directly with them" and commended Co-Lead Counsel for "those actions, and for the professionalism and thoroughness that has characterized their conduct of the five evidentiary hearings on the subject." *Id*. at 60.

Co-Lead counsel also learned that opponents to the settlement launched a website containing misleading information about class members' rights and options under the settlement. This led to motion practice that resulted in the Court issuing an order that required the website to post banners that corrected the previously misleading information. Wildfang 2018 Decl. ¶¶ 179-80.

Co-Lead Counsel dedicated substantial effort to seeking approval of the Original Settlement Agreement, including on appeal, but is not including any of this time in its lodestar for this fee request. *See infra* n. 21.

## E.  Challenging State "No Surcharge" Statutes in the Courts and in State Legislatures

Ten States, including California, Florida, New York and Texas, had laws that potentially precluded merchants from surcharging credit cards. To allow merchants in those states to take

advantage of the reforms of the network Defendants' surcharging rules, Co-Lead Counsel coordinated with Deepak Gupta, a constitutional and appellate litigator, and other counsel for the class. Wildfang 2018 Decl., ¶¶ 193-94. Mr. Gupta developed a strategy to challenge the laws as an unconstitutional speech regulation, filing lawsuits in New York, Florida, Texas and California. *Id.* at ¶ 194. The laws in Florida, Texas and California were invalidated and those laws can no longer be enforced. *Id.* at ¶ 195. And the United States Supreme Court held that the New York law restricted speech rather than conduct and remanded that case to the Second Circuit to apply First Amendment standards. *Id.*

### F.    Phase Two Litigation

Phase two of this litigation commenced on November 30, 2016, after remand from the Court of Appeals, when this Court reappointed the same three firms as interim Co-Lead Counsel, but this time only for the proposed damages class seeking certification under Rule 23(b)(3). ECF No. 6754 at 1 (Nov. 30, 2016).

Co-Lead Counsel's immediate task was to revise the operative complaint to reflect the factual and legal developments in the market since the last complaints were filed in 2009. Co-Lead Counsel combined three standalone complaints into a single pleading. In addition, the new complaint pled a two-sided market that includes both merchants and cardholders, in light of the recent decision in the case brought by the DOJ and a number of states against American Express. Defendants objected to the filing of the amended complaint on grounds that the two-sided market allegations did not relate back. This led to motion practice. Wildfang 2018 Decl., ¶¶ 198-200.

Because the original discovery record closed in 2010, Co-Lead Counsel had to develop a factual record to show that Defendants' ongoing activities continued to restrain competition, despite a variety of changes in the payment card industry, including the continuation by Visa and

Mastercard of the rules changes negotiated by Class Plaintiffs in the Original Settlement Agreement. In the litigation brought by merchants who had opted out of the earlier settlement ("Direct Action Plaintiffs"), the Defendants had produced approximately 100 million pages of new documents which needed to be analyzed. It was impossible to review that volume of documents in a timely manner, so Co-Lead Counsel used technology-assisted review technology to find the most relevant documents, which resulted in 5 million pages of documents. This core set of documents were then reviewed and analyzed. Targeted searches were also conducted in connection with, among other things, deposition preparation and expert work. Co-Lead Counsel coordinated with Direct Action Plaintiffs to serve additional document requests and obtain supplemental productions from Defendants, including terabytes of data from Visa, Mastercard and the banks to supplement productions made in phase one of this litigation. Co-Lead Counsel sought and obtained supplemental document productions from banks that were defendants in the Rule 23(b)(3) class action, but not in the Direct Action Plaintiffs' cases. *Id*. at ¶¶ 202-08, 212.

Defendants also served wide-ranging discovery requests, requiring Class Plaintiffs to search archived client files for documents going back to 2002, to address Defendants' two-sided market arguments. Class Plaintiffs produced more than 500,000 pages of documents. *Id.* at ¶¶ 215-21.

Depositions commenced immediately upon Co-Lead Counsel's appointment as counsel for the damages class, as the Direct Action Plaintiffs had already negotiated numerous deposition dates. The deposition schedule was intense, requiring Co-Lead Counsel to devote significant time and resources. During an 18 month period, Class Plaintiffs participated in 147 depositions of defense witnesses, 32 depositions of third-party witnesses, and four Class Plaintiff depositions. *Id.* at ¶¶ 205, 209-11, 222-23.

Co-Lead Counsel also worked closely with economic experts to address the competitive conditions in the marketplace and damages as they had evolved since the filing of class and merits expert reports in phase one of this litigation. *Id.* at ¶¶ 224-28.

### G.    New Mediation and the Superseding Settlement

The Second Circuit's June 30, 2016 decision triggered the possibility of the Original Settlement Agreement being terminated. Termination of the Original Settlement Agreement would have initiated the unwinding of the settlement infrastructure, including escrow agreements and accounts. To avoid these consequences, the parties agreed to a series of extensions that maintained the status quo while litigation recommenced. At the same time, the Rule 23(b)(3) Class Plaintiffs explored the possibility of new settlement discussions with the Defendants. *Id.* at ¶ 232.

Starting in February 2017, Co-Lead Counsel initiated a new round of settlement discussions, solely on behalf of the (b)(3) damages class. With the renewed assistance of Hon. Edward Infante and Prof. Eric Greene, both of whom already had extensive knowledge of the litigation from their past mediation efforts, Co-Lead Counsel conducted twelve in-person mediation sessions with the Defendants over a period of 14 months, and held numerous telephonic meetings with the Defendants and with one or both of the mediators. *See* Declaration of Hon. Edward A. Infante in Support of Rule 23(b)(3) Class Plaintiffs' Motion for Preliminary Approval of Settlement ("Infante Decl.") ¶¶ 12-27 (ECF No. 7257-5); Declaration of Eric Green in Support of Rule 23(b)(3) Class Plaintiffs' Motion for Preliminary Approval of Settlement ("Green Decl.") ¶ 9 (ECF No. 7257-4); Wildfang 2018 Decl. ¶ 235. To facilitate meaningful discussions during the mediation sessions, the parties frequently exchanged draft settlement terms or proposed settlement language. Wildfang Decl. 2018 ¶ 235. Ultimately, in June 2018,

Class Plaintiffs and Defendants agreed to the mediators' proposal and reached an agreement in principle during an in-person meeting on June 7, 2018. Infante Decl. ¶¶ 26-27; Green Decl. ¶ 11-12; Wildfang 2018 Decl. ¶ 239. After further negotiation, this agreement in principle was documented in a written settlement agreement, dated September 17, 2018.

The settlement was negotiated solely on behalf of the Rule 23(b)(3) class for monetary compensation. And the structure of the prior cash settlement agreement provided the basis for negotiating the Superseding and Amended Definitive Class Settlement Agreement of the Rule 23(b)(3) Class Plaintiffs and the Defendants. Importantly, approximately $5.34 billion of funds from the previous settlement payments were still in escrow accounts.[15] That money was included in the new settlement along with the payment by Defendants of $900 million in additional money.[16] The original escrow accounts remain in place to hold the funds along with the original escrow agents.[17] In addition, the claims administrator, Epiq, and all the work it did with respect to notice and settlement administration, remain in place. Finally, the original written settlement agreement was modified and amended as necessary to reflect the negotiated and agreed upon terms of the superseding agreement instead of drafting and negotiating a new written agreement

---

[15] This was the total net settlement fund at the time of the current settlement after all deductions for opt outs from the prior settlement and settlement administration costs from the prior settlement, plus earned interest less tax payments.

[16] The settlement agreement provides for a "Total Class Exclusion Takedown Payment" to Defendants capped at $700 million. This means that the settlement fund can be reduced by no more than $700 million to account for transaction volume represented by those settlement class members who timely and validly opt out of the settlement. *See* Superseding and Amended Definitive Class Settlement Agreement of the Rule 23(b)(3) Class Plaintiffs and the Defendants ("Superseding Settlement Agreement"), ¶ 22. It is important to note that the first 15% of opt-out transaction volume is excluded from this takedown calculation to account for the volume associated with the Direct Action Plaintiffs or "DAPs" who are currently litigating individual actions against Visa, Mastercard and some of the bank defendants in MDL 1720. In addition, the "Dismissed Plaintiffs" are not class members and thus not part of this takedown calculation. "Dismissed Plaintiffs" means the individual plaintiffs and former opt-out plaintiffs that have dismissed with prejudice an action against any Defendant and that are listed in Appendix B to Superseding Settlement Agreement.

[17] Co-Lead Counsel managed these funds, subject to Defendants' approval.

from scratch.

On January 24, 2019, the Court preliminarily approved the settlement. ECF No. 7361 (Jan. 24, 2019). Since then, Co-Lead Counsel have worked closely with Epiq to provide the class notice of the settlement in a timely and efficient manner. This required updating the class member contact information database developed in 2012-13. To obtain this information, Co-Lead Counsel again served subpoenas on the largest acquirers, participated in dozens of negotiations and filed a motion to compel. The Defendant Banks, Visa and Mastercard also produced merchant identifying data. Co-Lead Counsel provided Epiq with nearly 107 rows of additional merchant identifying data. 2019 Declaration of Nicole Hamman on Class Administrator's Implementation of Settlement Notice Plan ¶ 16. More than 16 million notices were mailed. *Id*. at ¶ 22. Co-Lead Counsel also prepared a notice and mailed it to merchants, and their related entities, that opted out of the Original Settlement, filed lawsuits and settled those claims prior to this settlement ("Dismissed Plaintiffs"). *Id*. at ¶ 28.

## III.    ARGUMENT

### A.    Class Counsel Should Be Awarded Reasonable Attorneys' Fees

Under the "equitable fund" doctrine, attorneys for the plaintiffs in a class action may petition the court for compensation from the settlement fund that resulted from their efforts. *Boeing v. Van Gemert*, 444 U.S. 472, 478 (1980). The Second Circuit recently confirmed that "regardless of whether a case is brought pursuant to a statute with a fee-shifting provision, if the parties settle the case by creating a common fund, common-fund principles control class counsel's fee recovery." *Fresno Cty. Emps.' Retirement Assoc. v. Isaacson/Weaver Family Trust*, No. 17-2662, 2019 WL 2219680, at *2 (2d Cir. May 23, 2019). In common fund cases, to determine a fee, courts may use both the "percentage of the fund" or the "lodestar" methods. *See*

*Id*. at *3; *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., U.S.A., Inc.*, 369 F.3d 96, 121 (2d Cir. 2005); *Payment Card IV*, 2019 WL 359981, at *25. However, "[t]he trend in this Circuit is toward the percentage method," *Payment Card IV*, 2019 WL 359981, at *25, because "once the parties have agreed to settle, the percentage-of-the-fund methodology serves as an important motivation for counsel to maximize the class's recovery, and, a fortiori, counsel's fee." *Fresno Cty. Emps.*, 2019 WL 2219680, at *5. The percentage method also dispenses with the "cumbersome, enervating, and often surrealistic process of lodestar computation," but courts generally assess the hours submitted by counsel as a "cross-check" on the reasonableness of the requested percentage. *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000) (quotation marks omitted).

Guided by the following factors, the court has discretion to determine a reasonable fee: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation ...; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *Id.*; *Payment Card IV*, 2019 WL 359981, at *26 n.40; *In re Foreign Exchange Benchmark Rates Antitrust Litig.*, 2018 WL 5839691, at *1 (S.DN.Y. Nov. 8, 2018). At bottom, a fee award should be based on what is reasonable under the circumstances. *Goldberger*, 209 F.3d at 47. *See also* FED. R. CIV. P. 23(h) ("In a certified class action, the court may award reasonable attorney's fees…."); *In re Credit Default Swaps Antitrust Litig.*, 2016 WL 2731524, at *16 (S.D.N.Y. April 26, 2016). But, a reasonable fee is determined from the "plaintiff's perspective" and "can account for contingency risk where such risk exists." *Fresno Cty. Emps.*, 2019 WL 2219680, at *4. Where the contingency risk is significant, like here, a reasonable fee should include compensation for such risk. As the Second Circuit explained:

> The plaintiff class is therefore appropriately charged for contingency risk where such risk is appreciable because the class has benefited from class counsel's decision to devote resources to the class's cause at the expense of taking other cases. That is, because class counsel has decided to represent the plaintiff class, class counsel's ability to freely represent other clients is limited by the risk she has assumed that the class's cause will be unsuccessful. The class, having been enriched by counsel's acceptance of its cause at the expense of other clients' causes, may be charged for counsel's assumption of risk on its behalf.

*Id*. at *5. In *Fresno County Employees*, the Second Circuit affirmed a 25% fee of a $10.9 million settlement concluding that "Lead Counsel is entitled to compensation not only for skillfully negotiating that settlement fund but for bearing the risk that the suit would not generate any recovery." *Id*. at *6.

Here, Co-Lead Counsel's request for a 9.56% fee of the settlement fund[18] is reasonable following 14 years of difficult litigation, with many complex issues and is supported by the *Goldberger* factors and consistent with Second Circuit precedent.[19]

### 1. Counsel Seek a Reasonable Percentage of the Common Fund

"In using the percentage of the fund approach, the critical *Goldberger* factor is necessarily the size of the requested fee in relation to the settlement." *Foreign Exchange*, 2018 WL 5839691, at *2. The amount involved and the results obtained are unprecedented in this case. *See Warman v. Law Off. of Daniel M. Slane*, No. 14-CV-700(LJV), 2017 WL 971196, at *4 (W.D.N.Y. Mar. 13, 2017) (finding attorneys' fees to be reasonable in an FDCPA default judgment action "in light of such considerations as the level of skill required to perform the legal services in this case, the amount involved and the results obtained, and the experience and ability of the attorneys"). Moreover, "'market rates, where available, are the ideal proxy for [class

---

[18] In addition, the award should be based on "the total funds made available, whether claimed or not." *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 437 (2d Cir. 2007).

[19] Paragraph 57 of The Settlement Agreement provides that Co-Lead Counsel shall allocate any fees awarded among Class Plaintiffs' counsel. Subject to this Court's approval, the Court need not be burdened with that task.

counsel's] compensation.'" *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 123 (2d Cir. 2005) (quoting *Goldberger*, 209 F.3d at 52). *See also* Second Declaration of Professor Charles Silver Concerning the Reasonableness of Class Counsel's Request for an Award of Attorneys' Fee ("Silver Decl.") at pp. 1, 5-12, attached hereto as Ex. 4.  Counsel in this case seek a rate that is far below that which any single class member would have paid to prosecute this action alone, and far below what private plaintiffs typically pay. *Id*.

Finally, the requested "fee award should be based on scrutiny of the unique circumstances" of each particular case. *McDaniel v. Cty. of Schenectady*, 595 F.3d 411, 426 (2d Cir. 2010) (quoting *Goldberger*, 209 F.3d at 53). However, "reference to other common fund settlements of a similar size, complexity and subject matter" can assist in determining the reasonableness of the requested fee.[20] *Foreign Exchange*, 2018 WL 5839691, at *2. Here, the requested fee is lower than many fee awards in megafund settlements.

### a.   Time and Labor Expended and Quality of Representation Support the Requested Fee

The long and dedicated efforts undertaken by all counsel for the Settlement Class are detailed in the declarations of Craig Wildfang submitted in 2018 and in connection with the motion for final approval being filed concurrently, and as summarized in Section II above. Through January 31, 2019, Co-Lead Counsel and Support Class Counsel devoted approximately 630,000 hours, resulting in a lodestar of approximately $203,753,749.78 million (at historical rates), to amassing a massive discovery record in two phases of litigation, briefing and arguing class certification, motions to dismiss, motions for summary judgment, and motions to exclude

---

[20]  The Silver Declaration compiles and analyzes other cases involving large settlements. Thus, if comparisons are made, Professor Silver's compilation of cases reflects that Co-Lead Counsel's request is well within the established range for such cases. *See* Silver Decl. at pp. 5, 12 and Tables 1 and 2.

expert testimony, and negotiations to achieve this settlement, among other things.[21]

Co-Lead Counsel are among the most prominent and successful antitrust plaintiff attorneys in the country.[22] *See* Undlin 2019 Decl., ¶ 32; Montague Decl., ¶ 3; Bernay Decl., ¶¶ 15-16. The Second Circuit has noted that "the quality of representation is best measured by results." *Goldberger*, 209 F.3d at 55. In ruling on Co-Lead Counsel's request for fees following the Original Settlement Agreement, Judge Gleeson found that the settlement demonstrated the high quality of work, noting that "plaintiffs' counsel litigated the case with skill and tenacity" to

---

[21] Co-Lead Counsel have excluded from the lodestar submission the lodestar for the Friedman Law Group LLP and its predecessor firms because of Mr. Friedman's misconduct in this litigation relating to his covert communications with and the disclosure of confidential and privileged information and materials to Keila Ravelo, who was representing defendant Mastercard at the time. *See* Undlin 2019 Decl. ¶¶ 7-9. Mr. Friedman's inappropriate conduct is set forth in the Rule 60 Motions to Vacate Judgment and opposition to them (ECF Nos. 6542-6555, 6557-6574) and Judge Garaufis' opinion in *In Re American Express Anti-Steering Rules Antitrust Litig.*, 2015 WL 4645240 (E.D.N.Y. Aug. 4, 2015). Co-Lead Counsel are also excluding from the lodestar submission several categories of time, including: 1) time spent strategizing and preparing briefs, supporting papers and argument in support of the first settlement final approval from the date of preliminary approval through final approval (during the time period from December 1, 2012 to December 13, 2013); 2) time spent preparing the prior and current fee petition materials, including time and expense review of secondary and lead firms, working with experts in support, drafting related briefing and declarations; 3) time spent responding to the appeal of the 2013 final approval, including research, preparation for the oral argument with Paul Clement, review and redlining of draft briefs to be submitted to the Second Circuit, review and redlining the petition for certiorari to the Supreme Court and the like; and 4) time spent investigating, meeting, reviewing records and responding to the Friedman/Ravelo issue, including the Rule 60 motion work that resulted from the same. *See* Undlin 2019 Decl. ¶¶ 15-16.

[22] Co-Lead Counsel's records of success in representing plaintiffs in complex cases are exceptional. *See In re Currency Conversion Fee Antitrust Litig.*, MDL 1409 (S.D.N.Y.) (Robbins Geller and Berger Montague as co-lead counsel secured $336 million settlement followed by an additional $50 million settlement); *In re Exxon Valdez*, No. A89-095 Civ. (D. Alaska) (Berger Montague was co-chair of plaintiffs' discovery committee and one of four designated trial counsel and Robbins Geller was on plaintiff coordinating committee in multi-billion dollar verdict, later reduced to $507.5 million by the Supreme Court); *In re High Fructose Corn Syrup Antitrust Litig.*, MDL 1087 (C.D. Ill.) (Berger Montague was one of three co-lead counsel settling on the eve of trial for $531 million); *In re Domestic Drywall Antitrust Litig.*, No. 13-md-2437 (E.D. Pa.) (Berger Montague served as Co-Lead Counsel securing settlements totaling more than $190 million); *In re Enron Corp. Sec., Derivative & "Erisa" Litig.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008) ($7.227 billion recovery by Robbins Geller); *State of Minnesota ex rel. Humphrey v. Philip Morris*, No. A05-2540 (MN. State) ($6.8 billion recovery by Robins Kaplan mid-trial against tobacco companies); *Dahl v. Bain Capital Partners, LLC, et al.*, No. 07-cv-12388 (D. Mass.) ($590 million in settlements by Robins Kaplan and Robbins Geller as two of three co-lead counsel). The results in this case are consistent with those records. Supporting Class Counsel were a coalition of other firms with noteworthy records and substantial experience. *See also In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 129 (S.D.N.Y. 2009) ("The law firms of Berger & Montague and [the predecessor of Robbins Geller] were indefatigable. They represented the Class with a high degree of professionalism, and vigorously litigated every issue against some of the ablest lawyers in the antitrust defense bar.").

achieve that result. *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 991 F. Supp. 2d 437, 441-42 (E.D.N.Y. 2014) ("*Payment Card II*"). Since that time, Co-Lead Counsel have dedicated themselves to continuing to provide the highest quality work, which is reflected in this monetary settlement. *See Foreign Exchange*, 2018 WL 5839691, at *5 (finding the quality of the work was reflected in the $2.31 billion settlement). This settlement is the product of the hard work required to engage in complex and challenging litigation for fourteen years and protracted and difficult arms' length settlement negotiations.

The quality of defense counsel is also useful for assessing the quality of Co-Lead Counsel's work. *See In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 246 F.R.D. 156, 174 (S.D.N.Y. 2007) ("The quality of opposing counsel is also important in evaluating the quality of Class Counsels' work.") (citations omitted); *Hall v. ProSource Techs., LLC*, No. 14-CV-2502, 2016 WL 1555128, at *15 (E.D.N.Y. Apr. 11, 2016) (same); *In re Nasdaq Market–Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (awarding counsel 14 percent of $1 billion settlement where defendants' counsel included "the nation's biggest and best defense firms operating on a seemingly unlimited budget over a period of four years."). Defendants are collectively represented by over a dozen of the nation's foremost antitrust practitioners, many (if not most) of whom represented their clients in complex antitrust litigation before this case. Their knowledge of the relevant issues and their clients' respective interests is exhaustive. Defendants' incentives to draw on their vast resources were perhaps greater in this case than in any previous one.

**b.     This Case Presents Complex Issues and Is Highly Risky**

Litigation risk is measured as of when the case is filed. *Goldberger*, 209 F.3d at 55. "Federal antitrust cases are complicated, lengthy, and bitterly fought." *Payment Card IV*, 2019

WL 359981, at *20 (quoting *Wal-Mart*, 396 F.3d at 118). The Court has recognized that this case in particular has been complex, difficult and costly. *Id.* at *21. When they filed this case, Co-Lead Counsel had identified several difficult legal issues that could have ended the case, and recognized that proving liability and damages would be a difficult task. Numerous factual and legal developments during this litigation complicated this task even more, thereby enhancing the risk. Any of these substantial risks "could have meant the end of the litigation with no recovery for class members and no fee for counsel." *Payment Card II*, 991 F. Supp. 2d at 441.

### i.      Risks Arising from Substantive Issues

From the inception of this litigation in 2005, three central legal risks have loomed over this case, that have not yet been decided. First, the only time an American court has ruled on whether Defendants' setting of default interchange fees on payment cards violated the antitrust laws, Defendants prevailed.[23] *See Nat'l Bancard Corp. (NaBanco) v. Visa U.S.A., Inc.*, 779 F.2d 592 (11th Cir. 1986); *see also Payment Card II*, 991 F. Supp. 2d at 441; Declaration of the Honorable H. Lee Sarokin on the Risks of Litigation ("Sarokin Decl.") ¶¶ 12-14. Second, Defendants have asserted that Rule 23(b)(3) Class Plaintiffs do not have antitrust standing because they are not direct purchasers. Since then, the Ninth Circuit resolved the issue adversely to Class Plaintiffs' position under circumstances that the Defendants would have argued are similar. *See In re ATM Fee Antitrust Litig.*, 686 F.3d 741 (9th Cir. 2012); *see also Payment Card II*, 991 F. Supp. 2d at 441; Sarokin Decl. ¶¶ 28-36. Finally, Defendants have asserted that all the claims in this case were released by the release in the *Visa Check* settlement. *Payment Card IV*, 2019 WL 359981, at *22; Sarokin Decl. ¶¶ 37-44.

---

[23] Defendants also prevailed in an antitrust challenge to interchange fees in front of another American tribunal. *In re First Texas Savings Ass'n v. Fin. Interchange, Inc.*, 55 Antitrust & Trade Reg. Rep. (BNA) 340 (Aug. 19, 1988) (Kauper, Arb.).

In addition to those risks, Co-Lead Counsel understood from the beginning that establishing liability and damages would be difficult here as this case raises several unique issues, including whether the methodology for setting interchange fees constitutes price-fixing, and whether the networks' rules restrain price competition. As this Court noted, Rule 23(b)(3) Class Plaintiffs "'face considerable difficulty' in establishing that certain practices such as default interchange and honor-all-card rules cause anticompetitive harm that outweighs any procompetitive benefits, if the 'rule of reason' rather than the '*per se* rule' were ultimately applied to determine liability." *Payment Card IV*, 2019 WL 359981, at *22 (quoting Dr. Alan O. Sykes, the independent expert appointed by Judge Gleeson).

Another layer of complexity to establishing liability and damages was added when, while this case was pending, the Visa and Mastercard networks were converted from joint ventures of the banks to publicly traded corporate entities. Visa and Mastercard have argued that, after their respective IPOs, the unilateral setting of default interchange fees is lawful conduct, not illegal horizontal price fixing. *See Payment Card IV*, 2019 WL 359981, at *22; Sarokin Decl. ¶ 23. Rule 23(b)(3) Class Plaintiffs filed supplemental complaints alleging that the formation of the new network corporate entities were themselves antitrust violations, a claim that raised issues of first impression. The Court dismissed the claim asserted against Mastercard with leave to amend. ECF No. 1118 (Nov. 25, 2008). Although an amended complaint was filed, there would be no guarantee that the supplemental complaints would be sustained or that plaintiffs would ultimately prevail.

It was far from certain that Defendants' motions to dismiss and summary judgment would be denied in their entirety. In addition, Defendants moved to exclude the testimony of the Class Plaintiffs' primary economic expert. If that motion were to be granted, Class Plaintiffs

would be deprived of important evidence to establish antitrust injury or the anticompetitive effects of Defendants' conduct or damages. *Payment Card IV*, 2019 WL 359981, at *22-*23; Sarokin Decl. ¶¶ 21-22. And while Co-Lead Counsel believe their expert's testimony would be admissible, there was a substantial difference of opinion among the various economic experts, highlighting the risks to establishing damages at trial and the potential confusion to the jury. *Payment Card IV*, 2019 WL 359981, at *23-*24; Sarokin Decl. ¶ 20.

Since the prior motions to dismiss and summary judgment were briefed and argued, several developments have made proving liability and damages potentially more difficult. First, if the Court were to rule that the Supreme Court's recent decision in *Ohio v. American Express Co.*, __ U.S. __, 138 S. Ct. 2274 (2018) requires Class Plaintiffs to prove harm in a two-sided market, consisting of both merchants and cardholders, rather than a one-sided market consisting of just merchants, it would be more challenging to prove that the anticompetitive effects of default interchange fees outweigh any procompetitive justifications. *Payment Card IV*, 2019 WL 359981, at *23; Sarokin Decl. ¶¶ 24-26. Second, there have been changes to several of Visa's and Mastercard's point-of-sale rules challenged in this case, as a result of the DOJ consent decree, the Durbin Amendment to the Dodd-Frank Act and the Original Settlement Agreement. While these changes have benefitted merchants, they added a layer of complexity to demonstrating that Defendants' continuing conduct is anticompetitive. Consequently, the risks have only increased since this case was filed. *Payment Card IV*, 2019 WL 359981, at *23; Sarokin Decl. ¶ 27. "The more progress the merchants make—through private lawsuits, government cases, and legislation—the more difficult it becomes to establish an antitrust violation." *Payment Card II*, 991 F. Supp. 2d at 444.

The attorneys' fee award here should reflect that "the risk in this case was enormous" and

that "from an *ex ante* perspective, counsel no doubt had serious doubts about taking on such a risky and expensive litigation." *Payment Card II*, 991 F. Supp. 2d at 441.

### ii.    Lack of Government Action

By 2005, interchange fees had been attacked by government agencies in countries other than the United States, but not in any court of law. To this day, the United States government has conspicuously chosen not to challenge Visa's or Mastercard's default interchange fees, honor-all-cards rules or their respective no surcharge rules, even though it investigated and entered into a consent decree relaxing other of the networks' anti-steering rules. Co-Lead Counsel's decision to commit the resources to prosecute a case of this magnitude and complexity against that backdrop was fraught with risk. The lack of previous government action is a key factor in assessing risk in this context. *See, e.g.*, *Wal-Mart*, 396 F.3d at 122; *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 471 (2d Cir. 1974) (citations omitted), *abrogated on other grounds by Goldberger*, 209 F.3d 43; *Payment Card II*, 991 F. Supp. 2d at 441. Unlike many civil antitrust litigations, here, it was the government who followed the lead of this litigation, and relied primarily on the discovery record and work product developed in this case. Wildfang Decl. 2018 ¶¶ 97-101.

### iii.    Resources Committed to the Case

For more than a decade, counsel for the Settlement Class collectively committed over 630,000 hours of their time and approximately $38.2 million dollars in expenses, in support of substantially untested legal theories, without any assurance of any compensation at all. The historical record is replete with antitrust class actions—primarily actions far less novel than this one—in which a court granted summary judgment for defendants, as well as cases in which

27

defendants prevailed at trial or on appeal.[24]

The Second Circuit has long recognized that the risk associated with a case undertaken on

a contingent basis is an important factor in determining an appropriate fee award:

> No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success. Nor, particularly in complicated cases producing large recoveries, is it just to make a fee depend solely on the reasonable amount of time expended.

*Grinnell*, 495 F.2d at 470 (citation omitted). And recently, it reiterated that a reasonable fee

should reflect the risk borne by class counsel whose efforts have "enriched" the class. *Fresno*

*Cty. Emps.*, 2019 WL 2219680, at *5.

### c.    The Fee Request Is Consistent with the Size and Scope of the Settlement.

The 9.56% requested fee is consistent with the size and scope of the settlement. *See*

*Foreign Exchange*, 2018 WL 5839691, at *3 (recognizing that other antitrust class action cases

with settlements exceeding $1 billion provide a relevant comparison point); Silver Decl. at 5-7,

16-20; 2018 Antitrust Annual Report, Class Action Filings in Federal Court (May 2019) at 23

(attached as Ex. 4 to Declaration of K. Craig Wildfang in Support of Rule 23(b)(3) Class

Plaintiffs' Motion for Final Approval of Settlement and in Support of Motion for Award of

Attorneys' Fees, Expenses and Class Plaintiffs' Awards) (summarizing data on fee and expense

awards in settled cases from 2013 through 2018 and noting the mean fee percentage in

---

[24] *See, e.g., Ohio v. American Express Company*, __ U.S. __, 138 S. Ct. 2274 (2018) (government won at trial only to have decision reversed on appeal); *Kleen Products LLC v. Georgian Pacific LLC*, 910 F.3d 927 (7th Cir. 2018) (affirming summary judgment for non-settling defendants); *In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34 (1st Cir. 2016) (affirming jury verdict in favor defendants); *Ross v. Citigroup, Inc.*, 630 Fed. App'x 79 (2d Cir. 2015) (affirming trial verdict in favor of defendants); *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383 (3d Cir. 2015) (affirming summary judgment for defendants).

settlements exceeding $1 billion is approximately 14%). This settlement is the largest ever antitrust class action settlement and it followed from fourteen years of contentious litigation. The percentage of the fund requested here is lower than the percentages awarded in five other antitrust class action settlements exceeding a billion dollars, and is only greater than one.

In *Foreign Exchange*, the court awarded a fee of 13% ($300,335,750) of the $2,310,725,000 settlement fund, which equated to a multiplier of 1.72. In contrast to this case, the *Foreign Exchange* plaintiffs benefitted from government investigations and guilty pleas, and the case was litigated only for approximately four years. *Id*. at *4.

In *In re Credit Default Swaps Antitrust Litig.*, No. 13md2476 (DLC), 2016 WL 2731524, at *16-*18 (S.D.N.Y. April 26, 2016), the court awarded a fee of 13.61% ($253,758,000) of the settlement fund of $1.86 billion, which equated to a 6 multiplier. The *Credit Default Swaps* case settled after less than two years of litigation, and when the case was filed, the challenged conduct was being investigated by both the Department of Justice and the European Commission. *Id*. at *1-*3. In awarding the 13.61% fee, the court adopted a fee agreement between counsel and one of the named plaintiffs—a sophisticated benefits fund—as reasonable. The fee agreement employed a percentage calculation that scaled the marginal percentage down as the settlement amount increased.[25] *Id*. at *16-*17.

In *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1175 (JF)(VVP)

---

[25] Specifically, the fee was calculated based on the following schedule (*id.* at *17):

| Portion of Settlement | Percentage Applied to that Portion |
| --- | --- |
| $0-$200 million | 18% |
| >$200-$400 million | 17% |
| >$400-$600 million | 15% |
| >$600-$800 million | 13% |
| >$800 million | 12% |

Solely for comparison purposes, applying that formula here would amount to a fee of $778,800,000. This far exceeds the fee requested by Co-Lead Counsel.

(E.D.N.Y. Oct. 15, 2014), there were six settlements with various defendants over the years that cumulatively totaled $1.18 billion. Although the court awarded fees separately for each settlement, the total fees awarded (approximately $274,940,000) equaled approximately 23.3% of total settlement funds.

In *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 WL 1365900, at *7-*8 (N.D. Cal. April 3, 2013), the court awarded a 28.5% ($308,225,250) fee of a $1.08 billion settlement fund, which was approximately a 2.5 multiplier. The Court held that the fee "award [was] proper and fair in light of the amount and quality of the work done by the attorneys in th[at] case." *Id*. at *8.

In *NASDAQ*, 187 F.R.D. at 488-89, the court awarded a 14% fee ($143,780,000) of a $1.027 billion settlement fund, which equated to a 3.97 multiplier. The court found that the fee and multiplier were reasonable in light of several factors similar to those here: 1) at that time, the settlement was the largest ever in an antitrust class action; 2) the class action litigation was the foundation for the government's later investigation and consent decree; and 3) from inception, there was a substantial risk that there would be no recovery as many expressed skepticism about the merits of the claim. *Id*.

Lastly, in *In re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d 503, 509, 524 (E.D.N.Y. 2003), the court awarded a fee of 6.5% ($220.3 million) of the $3.38 billion settlement fund, which equated to a 3.5 multiplier. In awarding this fee, the court significantly reduced class counsel's requested 18% fee, a 9.68 multiplier of the lodestar. *Id*. at 524-25. In comparing the 6.5% fee awarded in *Visa Check* to the 9.56% fee awarded here following the Original Settlement Agreement, Judge Gleeson explained that the cases should not be treated equally because "[t]his case was more challenging. The impediments to the tying allegation in

the [*Visa Check*] case were not as ominous as the obstacles faced by the plaintiffs here."[26]
*Payment Card II*, 991 F. Supp. 2d at 444.

These cases provide further support that the 9.56% fee requested here is reasonable.

In contrast, MDL personal-injury megafund settlements are inappropriate comparators for the fee requested here. Those cases involve both different litigation procedures and a different attorney compensation structure. *See* Silver Decl. at 17-18. Unlike "class actions" in which "one attorney or firm represents all claimants and the class action is one case, in a [personal injury] MDL there are as many separate counsel as there are separate claims, and each claim retains its own independent procedural vehicle, and identity, as well as its own home venue for *resolution*." *In re Actos (Pioglitazone) Products Liability Litig.*, 274 F. Supp. 3d 485, 517 (W.D. La. 2017) (emphasis in original); *see also Vioxx Products Liability Litig.*, 760 F. Supp. 2d 640, 653 (E.D. La. 2010) (recognizing that in class actions "Class counsel perform all the work on behalf of the class and are the sole attorneys for the class members," in contrast to MDL personal injury actions, where certain counsel perform work for the common benefit of all personal injury plaintiffs while at the same time those same counsel (and other counsel) represent and litigate on behalf of their individual personal injury plaintiffs). For that reason, counsel who perform common benefit work in MDL personal injury cases are typically compensated twice from two different sources: 1) a fee from a common fund for work done to benefit all individual plaintiffs in the MDL; and 2) a percentage of their clients' recovery in individual cases under a contingent fee agreement. *See* Silver Decl. at 17-18.

For example, in *Actos*, the Court awarded an 8.6% common benefit fee out of a $2.4

---

[26] And in *Visa Check*, Judge Gleeson stated "application of the six *Goldberger* factors indeed compels the award of an extraordinary fee." 297 F.Supp.2d at 523.

billion total settlement value, that was funded through the withholding of a portion of the settlement recoveries from each claimant participating in the settlement, to compensate "common benefit" attorneys for expenses incurred and legal work performed for the common benefit of all claimants. *Actos*, 274 F. Supp. 3d at 487-88, 524-25, 533. In *Actos*, the individual plaintiffs paid additional attorneys' fees to their personal attorneys. Similarly, in *Vioxx*, the court awarded a 6.5% common benefit fee out of a $4.85 billion settlement to compensate the attorneys who did common legal work for the benefit of all claimants. The common benefit fee was funded from the fees payable to attorneys pursuant to their contingent fee agreements in the individual person injury cases, based on the benefit from the work product developed for the common benefit of all MDL plaintiffs. *Vioxx*, 760 F. Supp. 2d at 642-43, 646, 653-58. After the 6.5% reduction, the attorneys, including those who received a portion of the common benefit fee, in the individual cases still received a fee of 25.5% of the monetary recovery for each plaintiff they represented. *Id*. at 658. Recently, the court in *In re Boston Scientific Corp., Pelvic Repair System Products Liability Litig.*, MDL No. 2326, 2019 WL 385420 (S.D. W.Va. Jan. 30, 2019), awarded a 5% holdback from tens of thousands of individual personal injury recoveries, to compensate attorneys who performed common benefit work, where the overarching settlement resulted in a $7.25 billion common benefit fund. This common benefit fee was in addition to the fee those same common benefit attorneys received from their individual personal injury plaintiffs pursuant to contingent fee agreements.

However, in antitrust class actions like this one, Class Counsel's sole source for compensation is the percentage of the common fund settlement awarded by the court. There are no separate, individual representation agreements by which Class Counsel are paid. *Cf. Vioxx*, 760 F. Supp. 2d at 653. And the only attorneys' fee paid by class members in this case will be

the percentage of its recovery as awarded by this Court. Courts consider those distinctions when awarding fees from a settlement fund. *See Actos*, 274 F. Supp. 3d at 517.

Professor Charlies Silver[27] has submitted a declaration explaining that Co-Lead Counsel's requested fee is reasonable for a variety of reasons. His analysis focuses on how the market for legal services sets contingent fees when clients retain lawyers at the outset of cases facing the risk of no recovery, unlike class action settlements where fees are determined after settlement which "skews fees downward by giving judges the impression that success was inevitable." Silver Decl. at 14. In complex commercial litigation, sophisticated clients frequently pay lawyers contingent fees of 25 percent or more because these clients recognize "the risks and costs of litigation warrant fees in this range." *Id*. at 12; *see generally id*. at 7-12 (discussing many cases in which sophisticated businesses agreed to pay, or actively supported fees of, 25% or more). He also observes that in megafund cases courts have approved fees of 25 percent or more as reasonable. *Id*. at 12-13 and Table 2. Accordingly, Professor Silver explains that the requested fee here is reasonable in light of the risk assumed by Co-Lead Counsel when this case was filed and because the duration of this case exceeds by multiples the average length of a class action. *Id*. at 13-15. And the requested fee is lower than most antitrust class actions and directly within the range of the 68 antitrust class actions with the highest recoveries included in a recent study. *Id*. at 16-17. For these reasons, Professor Silver concludes "the reasonableness of Class Counsel's request for a 9.56 percent fee is clear." *Id*. at 3.

---

[27] Professor Silver is the Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure at the University of Texas School of Law and has been a visiting professor at the University of Michigan School of Law and has written extensively on the issue of attorneys' fees. Silver Decl. at 3-4.

> **d.      The Requested Fee Is Reasonable in Light of Counsel's Lodestar**
>
> > **i.      The Review Process Resulted in a Conservative Figure as to Counsel's Hours**

Co-Lead Counsel began this case understanding that absent wide-ranging case management efforts, the contributions of so many Supporting Class Counsel could lead to duplication of effort and unnecessary expense. To eliminate unnecessary expense and duplication of effort, Co-Lead Counsel established strict guidelines for billing, collected monthly time and expense reports, and reviewed those reports on a regular basis.

Prior to the submission of their fee request following the Original Settlement Agreement, Co-Lead Counsel undertook an additional, wide-ranging effort to review the lodestar figure to eliminate excessive, redundant and certain other time. Co-Lead Counsel developed a plan to standardize the mass of time records compiled over the course of the case, so as to ensure fairness to the class, present the most accurate figures to the Court as to the necessary scope of counsel's work, and to maximize fairness in the allocation of fees to dozens of firms with differing roles in the case, local markets and timekeeping practices. *See generally* Declaration of Thomas J. Undlin in Support of Class Plaintiffs' Joint Motion for Award of Attorneys' Fees, Expenses and Class Plaintiffs' Awards ¶¶ 4-8 (ECF No. 2113-2 April 11, 2013) ("Undlin 2013 Decl."); Undlin 2019 Decl. ¶¶ 11-12. Co-Lead Counsel sent a letter to Supporting Class Counsel detailing their initial responsibilities in auditing their own submissions. For example, all read and review time was eliminated, time billed solely for travelling (*e.g.* flying to a city without doing any work on the plane) was reduced by 50%, no attorney could bill more than 15 hours in a day, document review was limited to 10 hours per day, rates were capped for document review time, and time had to be reasonable for the task and described with sufficient particularity. Undlin 2013 Decl. ¶¶ 6-7; Undlin 2019 Decl. ¶¶ 11-12.

After reviewing the new revised submissions, Co-Lead Counsel sent another letter to Supporting Class Counsel, seeking additional details and adding objective criteria governing the reduction of all time and expense submissions. Undlin 2013 Decl. ¶ 7. Co-Lead Counsel reviewed those submissions, as well as their own time records, ultimately resulting in the initial total lodestar being reduced by approximately $13.9 million, or approximately 7.93%. *Id*. at ¶¶ 8-9, 12. Thereafter, Co-Lead Counsel engaged the outside accounting firm of Clifton Larson Allen ("CLA") to audit the submissions for consistency with the criteria. As a result of CLA's "forensic data analysis," the lodestar was further reduced by approximately $690,000. Supplemental Declaration of Thomas J. Undlin ¶¶ 2-6 (ECF No. 5940-1 Aug. 16, 2013); Undlin 2019 Decl. ¶ 5.

Co-Lead Counsel have applied the same billing guidelines and review process to the firms who have assisted in the litigation efforts from December 1, 2012 through January 31, 2019. Undlin 2019 Decl. ¶ 15.  After review, Co-Lead Counsel reduced the lodestar by $11,000,892.40. *Id*. at ¶ 17.

### ii.    Counsel's Hourly Rates Are Reasonable

This Memorandum sets forth the lodestar based on historical hourly rates charged by the attorneys involved at the time they did the work.[28] All of those rates are well within the range of what is normal for counsel with the expertise necessary to prosecute a case of this complexity and magnitude. *See Fleisher v. Phoenix Life Ins. Co.*, Nos. 11-cv-8405 (CM), 14-cv-8714 (CM), 2015 WL 10847814, at *18 and n.15 (S.D.N.Y. Sept. 9, 2015) (finding that counsel's rates are reasonable when they are "comparable to peer plaintiffs and defense-side law firms litigating

---

[28] The exceptions to that rule are the hourly rates of contract attorneys, whose time was necessary to review Defendants' massive document production. Those attorneys are billed at four times their hourly wages.

matters of similar magnitude" and noting that as of 2012 partners at New York firms were charging up to $1200 per hour); *In re Independent Energy*, No. 00 Civ. 6689(SAS), 2003 WL 22244676, at *9 (S.D.N.Y. Sept. 28, 2003) (approving plaintiff counsel rates that were "not extraordinary for a topflight New York City law firm").

### iii.    The Resulting Multiplier Is Reasonable

The Second Circuit recognizes that "[t]he level of risk associated with litigation . . . is 'perhaps the foremost factor' to be considered in assessing the propriety of a multiplier." *McDaniel*, 595 F.3d at 424. Unquestionably, Co-Lead Counsel undertook considerable risk, as reflected in counsel's extraordinary investments of time and money, as well as the novel and formidable issues unique to the case. The requested fee, which equates to a multiplier of approximately 2.96 times the lodestar based on historical rates (and a $6.3 billion settlement fund), is reasonable.[29] *See, e.g.*, *Credit Default Swaps*, 2016 WL 2731524, at *16-*18 (awarding a fee amounting to a 6 multiplier, that the court found reasonable in a case involving a $1.86 billion settlement); *Payment Card II*, 991 F. Supp. 2d at 447-48 (a 3.4 multiplier was reasonable under the circumstances and within the range of reasonableness found by other courts); *Enron*, 586 F. Supp. 2d , at 803 ("[A] multiplier of 5.2 is warranted, given the unmatched size of the [$7.2 billion] recovery, the obstacles and risks faced by [counsel] from the beginning, and the skill and commitment exhibited by counsel."); *Dahl v. Bain Capital Partners*, *LLC*, No. 07-cv-12388, ECF No. 1095 (D. Mass. Feb 2, 2015) (order granting motion for attorneys' fees) (2.43 multiplier on a fund of $595,000,000); Silver Decl. at 20-22.[30]

---

[29] Co-Lead Counsel rely here on relatively conservative historical rates, but application of current rates is instructive. As explained in n. 5, the multiplier using current rates is approximately 2.1.

[30] *See also In re Vitamin C Antitrust Litig.*, No. 06-MD-1738 (BMC)(JO), 2012 WL 5289514, at *10 (E.D.N.Y. Oct. 23, 2012) ("observing that lodestar multiples of between 3 and 4.5 had 'become common'") (quoting *In re Lloyd's Am. Trust Fund Litig.*, No. 96 Civ. 1262, 2002 WL 31663577, at *26-*27 (S.D.N.Y. Nov. 26, 2001)); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 353-59 (S.D.N.Y. 2005) (approving $194.6 million fee award, a

e.       **Public Policy Considerations Support the Requested Fee**

The number of firms that have the expertise, resources and willingness to lead the

prosecution of cases such as this one is small, as the overwhelming majority of firms with the

expertise and resources lack the inclination by virtue of a defense orientation. And the number of

those plaintiffs' firms who have proven their willingness and ability to carry such a case through

trial is even smaller yet.[31] *See  WorldCom*, 388 F. Supp. 2d at 359 ("In order to attract well-

qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand

are able and willing to do so, it is necessary to provide appropriate financial incentives."); *see*

*also Enron*, 586 F. Supp. 2d at 801 (quoting *WorldCom*). As one court recently recognized,

publicly policy favors attracting top tier firms to litigate complicated antitrust cases:

> It is important to encourage top-tier litigators to pursue challenging antitrust cases
> such as this one. Our antitrust laws address issues that go to the heart of our
> economy. Our economic health, and indeed our stability as a nation, depend upon
> adherence to the rule of law and our citizenry's trust in the fairness and transparency
> of our marketplace.

*Credit Default Swaps Antitrust Litig.*, 2016 WL 2731524, at *18.

B.       **Counsel's Expenses Are Reasonable**

Co-Lead Counsel faced substantial incentives to control out-of-pocket expenses in this

case, because of the risk they would not be reimbursed, and because of the virtual certainty that it

---

multiplier of 4.0, representing 5.5% of the fund, in a complex securities case with value of approximately $3.5 billion, and citing cases).

[31] *See Exxon Valdez Oil Spill Litig.* (D. Alaska) (H. Laddie Montague of Berger Montague PC was one of four designated trial counsel that achieved record punitive damages award of over $5 billion, later reduced to $507.5 million); *Merilyn Cook v. Rockwell International Corp., et al.*, No. 90-cv-00181-JLK (D. Col.) (Merrill G. Davidoff of Berger Montague lead trial counsel for plaintiffs that resulted in a $554 Million jury verdict and was settled, after numerous appeals, for $375 million); *Hall v. NCAA*, No. 94-2392-KHV (D. Kan.) (Robbins Geller was lead counsel in successful antitrust jury trial); *Jaffe v. Household Int'l, Inc.*, No. 02-cv-05893 (N.D. Ill.) (Robbins Geller brought securities class action to trial and received a verdict worth up to $2.5 billion); *In re Urethane Antitrust Litig.*, 2016 WL 4060156, Case No. 04–1616–JWL (D. Kan. July 29, 2016) (Joseph Goldberg was one of the lead trial counsel resulting in an approximately $1 billion jury verdict and after appeals settled for approximately $400 million).

would be years before they could be recouped regardless of the outcome of the case. Nevertheless, Co-Lead Counsel performed an extensive review on their expense reports based on criteria established by Co-Lead Counsel. *See* Undlin 2013 Decl. ¶¶ 6-7; Undlin 2019 Decl. ¶¶ 13-15, 17.

In general, counsel should be reimbursed for reasonable litigation expenses from the common settlement fund. *Alaska Electrical Pension Fund v. Bank of America Corp.*, No. 14-CV-7126 (JMF), 2018 WL 6250657, at *3 (S.D.N.Y. Nov. 29, 2018); *In re Libor-Based Financial Instruments Antitrust Litig.*, 2018 WL 3863445, at *1 (S.D.N.Y. Aug. 14, 2018). "Courts in the Second Circuit normally grant expense requests in common fund cases as a matter of course." *Libor*, 2018 WL 3863445, at *1 (citation omitted); *Vitamin C*, 2012 WL 5289514, at *11 (same). Judge Gleeson awarded the original expense request, finding the expenses were reasonable. *Payment Card II*, 991 F. Supp. 2d at 448. Since then, Co-Lead Counsel have incurred additional expenses of $12,907,750.84 for a total of $38,263,023.85. *Cf.* Undlin 2019 Decl. ¶¶ 17, 19-20 and Ex. 4. Here, the vast majority of expenses are for experts and consultants, depositions, electronic research, travel, and document copying. Because all of the expenses in this case are typical of those incurred in such a complex and lengthy case and reasonable, they should be reimbursed. *Alaska Electrical Pension Fund*, 2018 WL 6250657, at *3 (the amount of expenses requested "although sizeable, was reasonable and necessary given the nature and complexity of this case").

## IV.    CONCLUSION

For all of the reasons detailed in this Memorandum, Co-Lead Counsel respectfully request that the Court grant Rule 23(b)(3) Class Plaintiffs' Motion for Award of Attorneys' Fees and Expenses.

Dated: June 7, 2019                        Respectfully submitted,

                                           BERGER MONTAGUE PC


                          By:   s/ H. Laddie Montague, Jr.
                                H. Laddie Montague, Jr.
                                Merrill G. Davidoff
                                Michael J. Kane
                                1818 Market Street, Suite 3600
                                Philadelphia, PA 19103
                                (215) 875-3000
                                (215) 875-4604 Fax


                                ROBINS KAPLAN LLP


                          By:   s/ K. Craig Wildfang
                                K. Craig Wildfang
                                Thomas J. Undlin
                                Ryan J. Marth
                                2800 LaSalle Plaza
                                800 LaSalle Avenue
                                Minneapolis, MN  55402-2015
                                (612) 349-8500
                                (612) 339-4181 Fax

ROBBINS GELLER RUDMAN & DOWD LLP

By:   s/ Alexandra S. Bernay
Patrick J. Coughlin
Alexandra S. Bernay
Carmen Medici
655 West Broadway
Suite 1900
San Diego, CA 92101
(619) 231-1058
(619) 231-7423 Fax

*Attorneys for Rule 23(b)(3) Class Plaintiffs in In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*

40