# EXHIBIT 4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ———————————————— x | | |
| In re PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | : : : | MDL No. 1720(MKB)(JO) Civil No. 05-5075(MKB)(JO) |
| ———————————————— | : : | **ELECTRONICALLY FILED** |
| This Document Relates To: ALL ACTIONS. | : : : : : : : | SECOND DECLARATION OF PROFESSOR CHARLES SILVER CONCERNING THE REASONABLENESS OF CLASS COUNSEL'S REQUEST FOR AN AWARD OF ATTORNEYS' FEES |
| ———————————————— x | | |

I, Charles Silver, declare as follows:

1.      **SUMMARY OF OPINIONS**

In support of Class Plaintiffs' motion for fees in connection with the original settlement agreement in this case, I submitted the "Declaration of Professor Charles Silver Concerning the Reasonableness of Class Counsel's Request for an Award of Attorneys' Fees" (ECF No. 2113-5) ("First Silver Decl.") which is attached to this declaration as Ex. A. In my first declaration, I set out the reasons supporting my opinion that Class Counsel's request for a fee award equal to 10 percent of the recovery was reasonable.  My main point was that judges should take guidance from the market for legal services when setting fees.  Because sophisticated clients typically pay fees of at least 25 percent when hiring lawyers to handle commercial cases on straight contingency, even in enormous cases, the reasonableness of Class Counsel's request for a 10 percent fee was plain.

Now, six years later, the parties have submitted a second settlement for consideration.  If approved, the settlement provides for up to approximately $6.3 billion in relief for the members of the Rule 23(b)(3) merchant damages class, an amount "that Class Counsel believes is the largest

cash settlement in antitrust class action history." *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 2019 WL 359981 *7 (E.D. N.Y.).   In connection with the new settlement, Class Counsel requests a 9.56 percent fee award, which I again think is reasonable.

Events that occurred after 2013 strengthen my conviction.   In my first report I wrote:

> When this case started, no one could say with confidence when it would end.   Even now, the answer is not entirely clear.   Even assuming that the Court approves the proposed settlement and the requested fee award, there may be appeals that drag on for months or years.

First Silver Decl., p. 35.   I did not intend these words to be prophetic, although they turned out to be. Nor did I expect that this litigation would last another *six years*.

And that is precisely the point.   That it has taken far longer to reach this point than anyone likely expected in 2013 (or in 2005 when the case was commenced) is a potent reminder that commercial class actions are high-risk matters.   They require lawyers to bear enormous costs over lengthy periods with no guarantee of being paid. These costs must often be financed by loans that require interest to be paid even though the case's outcome is unknown.   Even when the first settlement was proposed, nothing was guaranteed.

When awarding fees from common funds, it is essential for judges to remember how risky class actions are.   Otherwise, they will set fees too low and lawyers will lack incentives to file cases. But when settlements are up for approval, especially large ones, it is easy to forget how great the risks of litigation were and to think that an enormous recovery was guaranteed.   This judgment error, known as the hindsight bias, must be avoided because of its strong potential to skew risk assessments downward.

The hindsight bias is avoided when judges base fee awards on market rates.   Because clients set fees up front when they hire lawyers directly, market rates reflect the real risks of litigation.   And

because sophisticated clients normally pay at least 25 percent of their recoveries as fees, the reasonableness of Class Counsel's request for a 9.56 percent fee is clear.

## 2.     CREDENTIALS

Because Judge Gleeson accepted my original report and discussed it in his opinion, I infer that my expertise has been established.  Therefore, in this section I will provide only an update to my first declaration.  I will also again attach my complete resume as Ex. B.

Since 2013, I have provided expert reports on fee awards in the following matters, among others: *Hale v. State Farm Mut. Auto. Ins. Co.*, Case 3:12-cv-00660-DRH-SCW, Dkt. 980 (S.D. Ill. Dec. 13, 2018) (fee award equal to one-third of a $250 million settlement); *Cook v. Rockwell Int'l Corp. and The Dow Chemical Co.*, 1:90-cv-00181-JLK (D. Colo. Apr. 28, 2017) ($375 million settlement with a 40 percent fee award);  *In re Urethane Antitrust Litig.*, 2016 WL 4060156 (D. Kan. July 29, 2016) (one-third fee on a $835 million settlement); *In re High-Tech Employee Antitrust Litig.*, 2015 WL 5158730 (N.D. Cal. Sept. 2, 2015) ($415 million settlement with lodestar-based fee award); and *In re U.S. Foodservice, Inc. Pricing Litig.*, No. 3:07-md-1894 (AWT) (D. Ct. Dec. 9, 2014) (fee award of one-third on a $297 million settlement).

Professionally, I continue to hold the Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure at the University of Texas School of Law.  In the fall of 2018, I was a Visiting Professor at the University of Michigan School of Law for the second time.

My post-2013 writings, which are too numerous to list here, include the following publications that are relevant to the subject of attorneys' fees.

- LAW OF CLASS ACTIONS AND OTHER AGGREGATE LITIGATION, (coedited with Richard Nagareda, Robert Bone, Elizabeth Burch and Patrick Woolley) (Foundation Press, 2nd Ed. 2012) (updated annually through 2018).

- "The Mimic-the-Market Method of Regulating Common Fund Fee Awards: A Status Report on Securities Fraud Class Actions," RESEARCH HANDBOOK ON

REPRESENTATIVE SHAREHOLDER LITIGATION, Sean Griffith, Jessica Erickson, David H. Webber, and Verity Winship, Eds. (2018).

- "Screening Plaintiffs and Selecting Defendants in Medical Malpractice Litigation: Evidence from Illinois and Indiana," 15 J. Empirical Legal Stud. 41-79 (2018) (with Mohammad Rahmati, David A. Hyman, Bernard S. Black, and Jing Liu)*

- "Medical Malpractice Litigation and the Market for Plaintiff-Side Representation: Evidence from Illinois," 13 J. Empirical Legal Stud. 603-636 (2016) (with David A. Hyman, Mohammad Rahmati, Bernard S. Black).*

- "Is the Price Right? An Empirical Study of Fee-Setting in Securities Class Actions," 115 Columbia L. Rev. 1371 (2015) (with Lynn A. Baker and Michael A. Perino).

- "The Economics of Plaintiff-Side Personal Injury Practice," U. Ill. L. Rev. 1563 (2015) (with Bernard S. Black and David A. Hyman).

- "Regulation of Fee Awards in the Fifth Circuit," 67 The Advocate (Texas) 36 (2014) (invited submission).

## 3.    DOCUMENTS REVIEWED

My first declaration contains a complete list of the materials I reviewed in 2013.  See First Silver Decl., pp. 5-6.  When preparing this declaration, I reviewed the items listed below which, unless noted otherwise, were generated in connection with this case.  I may also have reviewed other items including, without limitation, cases and published scholarly works.

- Memorandum in Support of Rule 23(b)(3) class Plaintiffs' Motion for Class Settlement Preliminary Approval

- Declaration of K. Craig Wildfang, Esq. in Support of Rule 23(b)(3) Class Plaintiffs' Motion for Preliminary Approval of Settlement

- Superseding and Amended Definitive Class Settlement Agreement of the Rule 23(b)(3) Class Plaintiffs and the Defendants

- Webpages, Payment Card Interchange Fee Settlement, https://www.paymentcardsettlement.com/en

- In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig., 986 F.Supp.2d 207 (E.D. N.Y. 2013)

- In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig., 991 F. Supp. 2d 437 (E.D. N.Y. 2014)

- In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig., 827 F.3d 223 (2nd Cir. 2016)

- *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 2019 WL 359981 (E.D. N.Y.)

**4.     COMMON FUND FEE AWARDS SHOULD BE BASED ON MARKET RATES**

I began my 2013 report by observing that the first proposed settlement was both the largest class-based antitrust recovery in history and one of the largest recoveries in any case of any type. Although several more cases settled for enormous amounts during the subsequent years, only two are larger than the approximately $6.3 billion proposal that is now before the Court.  The post-2013 settlements with recoveries in excess of $1 billion are:

- Volkswagen's settlement of claims relating to emissions from cars equipped with diesel engines ($10 billion)
- BP's settlement of economic loss claims arising out of the Deepwater Horizon disaster ($7.8 billion)
- The Petrobras securities litigation ($3 billion)
- The Bank of America/Merrill Lynch merger securities litigation ($2.425 billion)
- The Forex antitrust settlements to which multiple defendants contributed (collectively $2.3 billion)
- The Credit Default Swaps antitrust litigation ($1.86 billion)
- The Takata airbag settlements to which multiple automakers contributed (collectively $1.6 billion)
- The Household International securities litigation settlement ($1.57 billion)
- The Syngenta GMO corn litigation settlement ($1.5 billion)
- The TFT-LDC (Flat Panel) antitrust litigation ($1.08 billion)
- The NFL concussion litigation settlement (estimated at $1 billion over many decades)

Only the first two cases are larger than the settlement proposed in this case.  Like the first proposed settlement, this one is a landmark accomplishment.

In 2013, I also pointed out that credit for the settlement belongs to the private attorneys who investigated the price-fixing scheme, initiated the litigation, and shouldered the lawsuit's extraordinary costs.  Judge Gleeson agreed.  He observed that Class Counsel overcame a dearth of supporting legal authority, the absence of any prior governmental investigation, and difficult facts,

including procompetitive effects of the challenged arrangements, problems calculating damages, and obstacles to class certification.

My opinion today is the same. If anything, Class Counsel deserves more credit than before because, at enormous expense, they kept up their efforts for an additional six years. Their efforts now include reviewing more than 70 million pages of documents, participating in more than 550 depositions, and preparing and opposing a raft of experts. As the Court observed when approving the proposed settlement preliminarily, "Class Counsel's lodestar figure of attorneys' fees through November of 2012 approximated $160 million." *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 2019 WL 359981 at 21. When the first settlement was proposed, expenses also ran about $27 million. Today, the comparable figures are approximately $204.7 million for the lodestar at historical rates and approximately $38.2 million for expenses. The additional effort benefited the class members. The second proposed settlement is hundreds of millions of dollars larger than the first one.

In my first declaration I explained that, if we want lawyers to devote the resources that are needed to generate recoveries like the ones described, we must compensate them at market rates for the costs they bear and the effort they supply. In the private market for legal services, where clients hire lawyers directly, compensation is automatically set at the level needed to do this because lawyers reject requests from clients whose offers are too low. By taking guidance from the market when awarding fees in class actions, judges can reliably estimate the fees that are needed to persuade lawyers to accept the risks big class actions entail.

In 2013, support for the mimic-the-market approach was already widespread. It was the official doctrine of the Seventh Circuit and was also endorsed by the Second Circuit, which had written that "market rates, where available, are the ideal proxy for [class action lawyers']

6

compensation." *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 52 (2d Cir. 2000). Since then, more judges have adopted this approach. As I wrote in 2018, "judges seem to sense a need for an objective basis for fee awards and to recognize that the market for legal services provides one." Charles Silver, "The Mimic-the-Market Method of Regulating Common Fund Fee Awards: A Status Report on Securities Fraud Class Actions," RESEARCH HANDBOOK ON REPRESENTATIVE SHAREHOLDER LITIGATION, Sean Griffith, Jessica Erickson, David H. Webber, and Verity Winship, Eds. (2018), pp. 288-289. Judge Gleeson's opinion approving the prior request for fees is a good example. He used the percentage method because "it is essentially unheard of for sophisticated lawyers to take on a case of this magnitude and type on any basis other than a contingency fee, expressed as a percentage of the relief obtained." *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 991 F. Supp. 2d 437, 440 (E.D. N.Y. 2014). He also lamented the lack of concrete guideposts for the size of fee percentage. Id. at 442-443.

5.   **SOPHISTICATED CLIENTS TYPICALLY PAY FEES OF 25 PERCENT OR MORE WHEN HIRING LAWYERS TO HANDLE LARGE COMMERCIAL CASES ON STRAIGHT CONTINGENCY**

Judge Gleeson's concern arose in part because "there [was] little information about how sophisticated plaintiffs and lawyers behave in cases with recoveries this large." Id. at 443. Back in 2013, "there [were] very few cases of comparable size, and none include a fee arrived at through private bargaining." Id.

Since filing my first report, I have become aware of more information about lawyers' fees, and the vast majority of it supports my position that sophisticated clients normally pay fees of 25 percent or more when hiring lawyers to handle large commercial lawsuits on straight contingency. This is true when sophisticated clients sue only for themselves and when they sue as class representatives.

In 2012, the U.S. Court of Appeals for the Tenth Circuit decided a case involving a dispute over the fee a business client owed the law firm of Susman Godfrey ("SG").  SG had handled an oil and gas matter for the client on the following terms.  "Under the Fee Agreement, [the client] agreed to pay [SG] 30% 'of the sum recovered by settlement or judgment,'" subject to caps based on when the lawsuit was resolved. *Grynberg Production Corp. v. Susman Godfrey, L.L.P.*, No. 10-1248, (10th Cir. Feb. 16, 2012), available at http://law.justia.com/cases/federal/appellate-courts/ca10/10-1248/10-1248-2012-02-16.html.  "*[T]he Fee Agreement capped fees at $50 million if the case settled within one year after the action was filed*."  *Id.*  The fee agreement thus entitled SG to be paid $50 million for a year's worth of work—and that is what an arbitrator decided SG should receive, subject to an offset of less than $2 million that, for present purposes, is irrelevant.  The Tenth Circuit affirmed the attorneys' fee award.

The National Credit Union Administration's (NCUA) experience in litigation against securities underwriters provides another recent example.  After placing 5 corporate credit unions into liquidation in 2010, the NCUA filed 26 complaints in federal courts in New York, Kansas, and California against 32 Wall Street securities firms and banks.  To prosecute the complaints, which centered on sales of investments in faulty residential mortgage-backed securities, the NCUA retained two outside law firms, Korein Tillery and Kellogg, Hansen, Todd, Figel, & Frederick PLLC, on straight contingency.  The original contract entitled the firms to 25 percent of the recovery net of expenses.  As of June 30, 2017, the lawsuits had generated more than $5.1 billion in recoveries on which the NCUA had paid $1,214,634,208 in fees.[1]

---

[1] The following documents provide information about NCUA's fee arrangement and the recoveries obtained in the litigations:   Legal Services Agreement dated Sept. 1, 2009, https://www.ncua.gov/services/Pages/freedom-of-information-act/legal-services-agreement.pdf; National  Credit  Union  Administration,  Legal  Recoveries  from  the  Corporate  Crisis,

In *In re Merry-Go-Round Enterprises, Inc*., 244 B.R. 327 (D. Md. 2000), the bankruptcy trustee wanted to assert claims against Ernst & Young.  He looked for counsel willing to accept a declining scale of fee percentages, found no takers, and ultimately agreed to pay a law firm a straight 40 percent of the recovery.  Ernst & Young subsequently settled for $185 million, at which point the law firm applied for $71.2 million in fees, 21 times its lodestar.  The bankruptcy judge granted the request, writing: "Viewed at the outset of this representation, with special counsel advancing expenses on a contingency basis and facing the uncertainties and risks posed by this representation, the 40% contingent fee was reasonable, necessary, and within a market range."  *Id*. at 335.

Sophisticated business clients also agree to pay fees in the indicated range when serving as lead plaintiffs in class actions.  Here are a few examples.

- In *In re International Textile Group Merger Litigation*, C.A. No. 2009-CP-23-3346 (Court of Common Pleas, Greenville County, South Carolina), which settled in 2013 for relief valued at about $81 million, five sophisticated investors serving as named plaintiffs agreed to pay 35 percent of the gross class-wide recovery as fees, with expenses to be separately reimbursed.  (The 35 percent fee was bargained down after initially being set at over 40 percent.)

- In *San Allen, Inc. v. Buehrer*, Case No. CV-07-644950 (Ohio—Ct of Common Pleas), seven businesses serving as named plaintiffs signed retainer contracts in which they agreed to pay 33.3 percent of the gross recovery obtained by settlement

---

https://www.ncua.gov/regulation-supervision/Pages/corporate-system-resolution/legal-recoveries.aspx; Letter from the Office of the Inspector General, National Credit Union Administration to the Hon. Darrell E. Issa, Feb. 6, 2013, https://www.ncua.gov/About/leadership/CO/OIG/Documents/OIG20130206IssaResponse.pdf.

as fees, with a bump to 35 percent in the event of an appeal.  Expenses were to be reimbursed separately.

- In *In re U.S. Foodservice, Inc. Pricing Litigation*, Case No. 3:07-md-1894 (AWT) (D. Ct.), a RICO class action that produced a $297 million settlement, both of the businesses that served as named plaintiffs were represented by counsel in their fee negotiations and both agreed that the fee award might be as high as 40 percent.

A series of related pharmaceutical antitrust cases provides a particularly compelling example. The plaintiffs in these cases were 20 or so drug wholesalers who appeared as a class.  Many were large companies—several were of Fortune 500 size or bigger—and most or all had in-house or personal counsel monitoring the litigations.  The potential damages were enormous.  In one of the cases, *King Drug Company of Florence, Inc. v. Cephalon, Inc*., No. 2:06-cv-1797-MSG (E.D. Pa. Oct. 8, 2015), the plaintiffs recovered over $500 million.  In the series as a whole, they won more than $2 billion.  In all the cases that produced recoveries, the wholesalers actively supported fee awards in the normal range.  Many submitted declarations or letters urging judges to pay such amounts.  Seeing that these sophisticated clients believed that class counsel should receive market rates despite the number and size of the recoveries, the presiding judges gave their opinions great weight.

The table below identifies the cases in which recoveries were obtained and describes the amounts recovered and the fees awarded in each.  As is apparent, the plaintiffs supported fees equal to one-third of the recovery in most of the cases.  Even in the largest settlement, they supported a 27.5 percent fee.

| TABLE 1.  RECOVERIES AND FEE AWARDS IN PAY-FOR-DELAY PHARMACEUTICAL ANTITRUST CASES, SORTED BY SETTLEMENT DATE | | |
|---|---|---|
| **Case** | **Recovery (millions)** | **Fee Award** |
| *King Drug Company of Florence, Inc. v. Cephalon, Inc.*, No. 2:06-cv-1797-MSG (E.D. Pa. Oct. 8, 2015) | $512 | 27.5% plus expenses |
| *In re Doryx Antitrust Litig.*, No. 12-3824 (E.D. Pa. Sept. 15, 2014) | $15 | 33⅓% plus expenses |
| *In re Neurontin Antitrust Litig.*, No. 02-1830 (D.N.J. Aug. 6, 2014) | $191 | 33⅓% plus expenses |
| *In re Skelaxin (Metaxalone) Antitrust Litig.*, No. 12-cv-83 (E.D. Tenn. June 30, 2014) | $73 | 33⅓% plus expenses |
| *In re Flonase Antitrust Litig.*, No. 08-cv-3149 (E.D. Pa. June 14, 2013) | $150 | 33⅓% plus expenses |
| *In re Wellbutrin XL Antitrust Litig.*, No. 08-cv-2431 (E.D. Pa. Nov. 7, 2012) | $37.50 | 33⅓% plus expenses |
| *Rochester Drug Co-Operative, Inc. v. Braintree Labs., Inc.*, No. 07-142 (D. Del. May 31, 2012) | $17.25 | 33⅓% plus expenses |
| *In re DDAVP Antitrust Litig.*, No. 05-2237 (S.D.N.Y. Nov. 28, 2011) | $20.25 | 33⅓% plus expenses |
| *In re Wellbutrin SR Antitrust Litig.*, No. 04-5525 (E.D. Pa. Nov. 21, 2011) | $49 | 33⅓% plus expenses |
| *Meijer, Inc. v. Abbott Labs.*, No. C07-5985 CW (N.D. Cal. Aug. 11, 2011) | $52 | 33⅓% plus expenses |
| *In re Nifedipine Antitrust Litig.*, No. 03-mc-223-RJL (D.D.C. Jan. 31, 2011) | $35 | 33⅓% plus expenses |
| *In re Oxycontin Antitrust Litig.*, No. 04-md-1603-SHS (S.D.N.Y. Jan. 25, 2011) | $16 | 33⅓% plus expenses |
| *In re Tricor Direct Purchaser Antitrust Litig.*, No. 05-cv-340 (D. Del. April 23, 2009) | $250 | 33⅓% plus expenses |
| *In re Remeron Direct Purchaser Antitrust Litig.*, 2005 U.S. Dist. LEXIS 27013 (D.N.J. Nov. 9, 2005) | $75 | 33⅓% plus expenses |
| *In re Terazosin Hydrochloride Antitrust Litig.*, No. 99-MDL-1317, 2005 U.S. Dist. LEXIS 43082 (S.D. Fla. Apr. 19, 2005) | $74 | 33⅓% plus expenses |
| *In re Relafen Antitrust Litig.*, No. 01-12239, 2004 U.S. Dist. LEXIS 28801 (D. Mass. April 9, 2004) | $175 | 33⅓% plus expenses |
| *In re Buspirone Antitrust Litig.*, No. 01-CV-7951, 2003 U.S. Dist. LEXIS 26538 (S.D.N.Y. April 11, 2003) | $220 | 33⅓% plus expenses |
| *In re Cardizem CD Antitrust Litig.*, MDL No. 1278 (E.D. Mich. Nov. 26, 2002) | $110 | 30% plus expenses |

The examples discussed in this section, which I learned about after submitting my first report, support my contention that sophisticated business clients typically pay contingent fees of 25 percent or more. Business clients do so when and because the risks and costs of litigation warrant fees in this range. To be clear, I am not saying that sophisticated business clients always pay fees in this range; they will pay less when they can hire competent lawyers on more attractive terms. The point is just that they know how the market for legal services works: Large risks and high costs require comparable rewards.

**6.    IN MEGA-FUND CASES, JUDGES AWARD FEE PERCENTAGES THAT LAWYERS DESERVE**

There is a widely held but mistaken belief that in mega-fund cases with recoveries of $100 million or more judges award miniscule fee percentages. I documented this in my original report by including a table of 66 mega-fund cases in which judges awarded fees equal to or greater than 20 percent. The truth is that judges do not adhere to a simple-minded rule. Instead, they award the fees that, in their assessment, the lawyers deserve.

There are many more mega-fund cases today with fee awards at or above the identified level than there were in 2013, including seven of the pharmaceutical antitrust cases identified in Table 1. Table 2 lists several additional examples, this time using 25 percent as the cutoff.

| | **TABLE 2. RECENT MEGA-FUND CASES WITH FEE AWARDS OF 25% OR MORE** | | |
|---|---|---|---|
| | **Case** | **Recovery (millions)** | **Fee Award** |
| 1 | *In re Syngenta AG MIR162 Corn Litigation,* MDL No. 2591 (D. Kan. Dec. 7, 2018) | $1,510 | 33.33% |
| 2 | *In re TFT-LCD (Flat Panel) Antitrust Litig..,* 2013 WL 1365900, at *7 (N.D. Cal. Apr. 3, 2013) | $1,080 | 28.60% |
| 3 | *In re: Urethane Antitrust Litig.,* No. 04-1616-JWL, 2016 WL 4060156, at *4 (D. Kan. July 29, 2016) | $974 | 33.33% |
| 4 | *Kirk Dahl et al. v. Bain Capital Partners LLC et al.,* No. 1:07-cv-12388 (D. Mass. Jan. , 2015) | $590 | 33.00% |
| 5 | *San Allen, Inc. v. Buehrer, Admin., Ohio Bureau of Workers' Compensation,* CV-07-644950 (Common Pleas, Cuyahoga Cty, OH Nov. 25, 2014) | $420 | 32.70% |
| 6 | *Cook v. Rockwell Int'l Corp. and The Dow Chemical Co., 1:90-cv-00181-JLK Document 2468 Filed 04/28/17* | $375 | 40.00% |
| 7 | *In re Neurontin Marketing and Sales Practices Litig.,* Civil Action No. 04-10981-PBS (Nov. 10, 2014) | $325 | 28.00% |
| 8 | *In re U.S. Foodservice, Inc. Pricing Litig.,* No. 3:07-md-1894 (AWT) (D. Ct. Dec. 9, 2014) | $297 | 33.33% |
| 9 | *Hale v. State Farm Mut. Auto. Ins. Co.,* Case 3:12-cv-00660-DRH-SCW, Dkt. 980 (S.D. IL Dec. 13, 2018) | $250 | 33.33% |
| 10 | *Standard Iron Works v. Arcelormittal et al.,* No. 08-C-5214 (N.D. Ill., Oct. 22, 2014) | $164 | 33.33% |
| 11 | *In re Titanium Dioxide Antitrust Litig.,* 10-CV-00318 (D. Maryland, Dec. 13, 2013) | $164 | 33.33% |

## 7.    RISK INCURRED

In my first declaration, I explained that case duration is a proxy for risk—cases with high stakes, close merits, and large settlements tend to last longer than others—and pointed out that this litigation had already lasted far longer than average.

Now, at 14 years and counting, this case is an outlier.  In 2015, two colleagues and I published an empirical study of 431 securities class actions that settled between the beginning of 2007 and the end of 2012.  The average (median) lifespan for cases in our dataset was 4 (3.5) years.  The oldest case tied this one.  It took about 13 years and 9 months to resolve.  Lynn A. Baker, Michael A. Perino, and Charles Silver, *Is the Price Right? An Empirical Study of Fee-Setting in Securities Class Actions*, 115 COLUMBIA L. REV. 1371, 1389, Table 1 (2015).  It is truly unusual for class actions to last this long.

When discussing this case's duration, I also explained how the hindsight bias works.  I began by observing that, when this case started, "no one could say with confidence when it would end."  First Silver Decl., p. 35. I then added the (unfortunately) prophetic remark that, even if the first settlement was approved, "there may be appeals that drag on for months or years."  Id.

My larger point was that the practice of setting fees when class actions settle, rather than when they begin, skews fees downward by giving judges the impression that success was inevitable.  "[W]hen people know how a risk actually turned out," I wrote, "they often grossly over-estimate the likelihood of the observed result."  Id.  Now that the case has dragged on 6 years after the first settlement was proposed, the risks inherent in class litigation should be clear to everyone.  Even when a multi-billion dollar settlement is on the table, success is not guaranteed.

The lesson is that, when setting fee percentages, judges should strive mightily to imagine the risks that existed when litigation began.  They should remember that

> The best time to determine [a contingent fee lawyer's] rate is the beginning of the case, not the end (when hindsight alters the perception of the suit's riskiness, and sunk costs make it impossible for the lawyers to walk away if the fee is too low). This is what happens in actual markets. Individual clients and their lawyers never wait until after recovery is secured to contract for fees. They strike their bargains before work begins.

*In re Synthroid Marketing Litigation*, 264 F.3d 712, 724 (7th Cir. 2001).

Obviously, it is impossible for any court to perform this thought experiment perfectly. Judges cannot blind themselves to what they know. But they can minimize the impact of the hindsight bias by taking guidance from the private market for legal services, as I have encouraged them to do.

## 8.  FEE-SETTING IS A POSITIVE-SUM GAME

An important point made in my first declaration is that fee-setting is not a zero-sum game. The impression that more dollars for attorneys means fewer dollars for class members is misleading. To see why, imagine what the consequences for class members would be if fee percentages were set at zero. Because no lawyer would take a case for a 0 percent fee, class members would recover nothing, no matter how valid their claims.

The point just made explains why, at the outset of litigation, claimants will rationally prefer a significant, positive fee percentage to zero. They understand that by paying their lawyers more, they can recover more for themselves. In other words, they understand that fee-setting is a positive-sum game. As the Third Circuit's task force on fees recognized, the object should be to set fees in a manner that maximizes claimants' net recoveries, "not to obtain the lowest attorney fee." *Third Circuit Task Force Report*, 208 F.R.D. 340 (January 15, 2002).

Again, the market for legal services can help a court determine the optimal fee. Because clients and lawyers normally set contingent fees at or near the time litigation commences, they should choose compensation arrangements that maximize the expected recovery, thereby creating the largest fund available to them to share. This is simply the application to the client-lawyer relationship of the standard economic analysis of contracting. See Steven Shavell, *Specific Performance Versus Damages for Breach of Contract: An Economic Analysis*, 84 TEX. L. REV. 832, 840 (2006) ("If parties are risk neutral, they will want to choose contractual terms that result in the highest joint expected value.").

15

9.      **FEE AWARDS IN OTHER CLASS ACTIONS**

Tables 1 and 2 of this report provide some evidence of fee award practices in class actions with mega-fund recoveries. As stated above, their contents show that judges do not adhere to the simple-minded rule that fee award percentages in mega-fund cases must be tiny. They award the fees that, in their judgment, plaintiffs' attorneys deserve.

In my 2013 report, I also discussed the results of empirical studies of fee awards. Before doing so, I explained that the studies "do *not* provide direct evidence of market rates. They show how judges regulate fees, and judges often deviate from market-based practices." First Silver Decl., p. 41. That point is worth remembering. I also cautioned against relying heavily on the studies, which tend to be dominated by securities class actions that bear little resemblance to this case. Because my 2015 study, mentioned above, included only securities cases, I will not discuss its findings here.

The two studies I summarized in my first report were Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 JOURNAL OF EMPIRICAL LEGAL STUDIES 811 (2010) ("*Fitzpatrick Study*"); and Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993–2008*, 7 JOURNAL OF EMPIRICAL LEGAL STUDIES 248 (2010) ("*E&M Study*"). The *Fitzpatrick Study*, which included 29 antitrust class actions, found that fee awards in these cases, which brought in $1.079 billion in 2006 and $660.5 million in 2007, averaged about 25 percent. The *E&M Study* contained 71 antitrust classes, with a mean fee award of 22 percent on an average gross recovery of $163.48 million.

Although Eisenberg and Miller found a strong inverse correlation between the percentage awarded and the size of the common fund, for the 68 cases in the highest recovery decile, the mean fee award was 12 percent with a standard deviation of 7.9 percent. The core of the distribution, including roughly two-thirds of the cases, thus extended from about 4.1 percent to about 19.9

16

percent.  As before, Class Counsel's fee request is lower than the mean and squarely within this size range.

In 2017, Professors Eisenberg and Miller published a new study of class actions that closed from 2009 to 2013.  Theodore Eisenberg, Geoffrey Miller, and Roy Germano, *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. L. REV. 937 (2017).  The dataset included 19 antitrust cases that collectively generated $9.52 billion in recoveries.  Across all 19 cases, the average fee award was 27 percent and the median award was 30 percent. Unfortunately, the authors did not report the fee percentages for the antitrust cases with the largest recoveries.  Across cases of all types in the highest recovery decile, the average fee was 22.3 percent, over twice the percentage requested here.

In my first report, I also discussed two studies of securities class actions.  The first found that fees averaged 30% of the recovery in cases led by individual investors and private institutions, and 25% in cases led by public institutions.  Stephen J. Choi, Jill E. Fisch, and A.C. Pritchard, *Do Institutions Matter? The Impact of the Lead Plaintiff Provision of the Private Securities Litigation Reform Act*, 83 WASHINGTON UNIVERSITY LAW QUARTERLY 869, 897, Table 6A (2005).  The second reported average fees of 26.6 percent, which dropped to 19.3 percent in cases where public pension funds served as lead plaintiffs.  Michael Perino, *Institutional Activism Through Litigation: An Empirical Analysis of Public Pension Fund Participation in Securities Class Actions,* 9 JOURNAL OF EMPIRICAL LEGAL STUDIES 368, 380, Table 1 (2012).  Again, Class Counsel's fee request is reasonable by comparison.

Before ending this discussion of judicial fee award practices, I will briefly explain why I have not mentioned fee awards in multi-district litigations (MDLs) comprised of many individual actions proceeding collectively before a single court, such as "mass tort" actions.  These MDLs typically involve large numbers of plaintiffs (sometimes hundreds or thousands) who retained

lawyers individually and who, when doing so, agreed to pay their lawyers fees.  As a result, these types of MDL settlements typically involve two payment sources: fees paid by individual claimants pursuant to their contracts; and fees awarded to lead attorneys from the common fund recovery for their work which conferred a "common benefit" on all plaintiffs.  Because fees come from two sources, common fund fee awards in these mass tort MDLs are not directly comparable to common fund awards in class actions, where only one payment source exists.  I discuss the many differences between these type of MDLs and class actions in Charles Silver and Geoffrey P. Miller, *The Quasi-Class Action Method of Managing Multi-District Litigations: Problems and a Proposal*, 63 VANDERBILT L. REV. 107 (2010).

**10.     ANALYSIS OF JUDGE GLEESON'S OPINION**

My first report contained a critical discussion of the opinion Judge Gleeson wrote in *In re Visa Check/Mastermoney Antitrust Litigation*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003)*, aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005).  In that opinion, Judge Gleeson did not take guidance from the market for legal services.  In my report, I urged him "to give the 'mimic the market' approach another look."  First Silver Decl., p. 39.

In *Visa Check*, Judge Gleeson awarded a 6.511 percent fee on a recovery of $3 billion.  This struck me as being too low because I had never seen a sophisticated client offer so small a percentage fee.  Even in the massive *Enron* securities litigation, the fee agreed to by the lead plaintiff was higher: 9.6 percent of the $7.25 billion recovery.

I do not know whether my argument persuaded Judge Gleeson, but I think it meaningful that he approved a 9.56 percent fee on the first proposed settlement, almost the exact percentage awarded in *Enron*.  I also find support in the fact that the declining scale of percentages he employed started at 33 percent, a percentage that clients frequently agree to pay.

18

Most importantly, I agree with Judge Gleeson's poignant observation of the need for clearer guidance:

> I have struggled to find a strong normative basis by which to evaluate the requested fee or to generate my own figure. The law sets only minimal constraints on fee awards. Within the boundaries of those constraints, it offers no concrete guideposts. And this case is so large and complex that it has few comparators to guide my judgment. More precise guidance would be useful, not so much for the district judges making the fee awards, who generally welcome broad discretion, but for the lawyers who do this kind of work. Bearing the risk of failure on the merits comes with the territory, but it seems anomalous that counsel must also bear the additional financial risk that inheres in such broad discretion even when they succeed.

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig*., 991 F. Supp. 2d 437, 442-443 (2014).

Other judges have also made this point.  In *Nilsen v. York County*, 400 F. Supp. 2d 266, 277–78 (D. Maine 2005), Judge D. Brock Hornby observed that the multifactor approach "offers little predictability," "would support equally a fee award of 16%, 20%, 25%, 30%, or 33-1/3%," "is not a rule of law or even a principle," "allows uncabined discretion to the fee-awarding judge," employs "factors [that] seem inconsistent with ... [the goal of] creat[ing] incentives for the lawyer to get the most recovery for the class by the most efficient manner," and "consume[s] significant lawyer and judicial resources."  More succinctly and, perhaps, more memorably, Judge Easterbrook wrote that "a list of factors without a rule of decision is just a chopped salad."  *In re Synthroid Mktg. Litig.*, 264 F.3d at 719.

The desire for objectivity and accuracy led Judges Hornby and Easterbrook to endorse the mimic-the-market method, which I have argued for here.  Judge Gleeson endorsed it too.  He cited *In re Nortel Networks Corp. Sec. Litig.,* 539 F.3d 129, 133 (2d Cir. 2008) for the proposition that "fee awards should, where possible, approximate market rates."  991 F. Supp. 2d at 443.

Looking to the market for guidance, one finds that, on the infrequent occasions when declining scales are employed, they typically generate fees above 10 percent, even in cases with enormous recoveries. For example, in *In re Credit Default Swaps Antitrust Litig*., 2016 WL 2731524, at *17 (S.D.N.Y. Apr. 26, 2016), where the recovery was just shy of $2 billion, the scale ran from 18 percent of the first $200 million to 12 percent of everything above $800 million. The court-awarded fee, which was based on the agreed scale, was 13.61 percent, higher than both the award that Judge Gleeson approved on the first go-round and considerably more than Class Counsel are requesting now.

## 11.    LODESTAR MULTIPLIERS

Over many decades, I have encouraged judges to employ the percentage method, not the lodestar method, when awarding fees from common funds. I have done so because, to my knowledge, sophisticated clients never use the lodestar method when hiring lawyers on straight contingency. I therefore see no reason for judges to use it either and am delighted that reliance on the lodestar has declined.

That said, I know that judges often use the lodestar method as a cross-check on the reasonableness of percentage-based fees, so I will briefly make a lodestar-based assessment of Class Counsel's requested fee. When doing so, I will assume that Class Counsel have reported their time and hourly rates accurately. I have not attempted to make anything that might be considered a fee audit.

When a case lasts as long as this one has, a question that must be answered before a lodestar assessment can be made is whether to apply timekeepers' historical hourly rates or their current hourly rates. The use of historical rates, which in a case of this duration are likely to be considerably lower than current rates, produces a smaller lodestar basis. Consequently, when historical rates are employed, a lodestar comparison will generate a higher multiplier than when current rates are

applied. One must keep this fact in mind when assessing the reasonableness of the requested multiplier.

Using historical hourly rates, Class Counsel reports a lodestar basis of approximately $204.7 million. If the requested fee of 9.56% is awarded, that would equate to a multiplier of approximately 2.96. Using current rates for the five leadership firms which I understand constitute the majority of the lodestar, the lodestar basis is approximately 28.7%, higher than at historical rates, and the multiplier is correspondingly smaller, approximately 2.1\. It is common for courts to use current rates to calculate the lodestar figure. *See, e.g.*, *Velez v. Novartis Pharms. Corp.*, 2010 WL 4877852, at *23 (S.D.N.Y. Nov. 30, 2010) (quoting *In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115808, at *9 (S.D.N.Y. Nov. 7, 2007); *Fleisher v. Phoenix Life Ins. Co.*, 2015 WL 10847814, at *18 (S.D.N.Y. Sept. 9, 2015).

Either way, the reasonableness of the requested multiplier is clear. When the first settlement was proposed, Judge Gleeson approved a multiplier of 3.41 on a lodestar basis of $160 million that was calculated using historical hourly rates. Now, the requested multiplier is lower—whether current or historical rates are employed. Given Judge Gleeson's prior opinion, the reasonableness of the requested multiplier is clear. It is well known that recoveries and multipliers increase together, so that the largest multipliers tend to be granted in the cases with the largest recoveries. In *Enron*, for example, Judge Melinda Harmon approved a 5.2 multiplier while noting that many courts had approved multipliers of 4 or more. *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 752 (S.D. Tex. 2008). In *Lawrence E. Jaffe Pension Plan v. Household International, Inc.*, No. 1:02-cv-05893 (N.D. Ill. Nov. 10, 2016), which took 14 years to resolve and produced a $1.575 billion settlement, the multiplier was 3.7. *In re Credit Default Swaps Antitrust Litig.*, 2016 WL 2731524, at *16-*18 (S.D.N.Y. April 26, 2016), produced a $1.86 billion settlement and a lodestar

multiplier of 6. *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 WL 1365900, at *7-*8 (N.D. Cal. April 3, 2013), produced a $1.08 billion settlement fund and a lodestar multiplier of 2.5. Finally, a survey of settlements and fee awards published by CLASS ACTION REPORTS found an average multiplier of 4.5 for the largest cases—those with settlements exceeding $100 million—and multipliers in individual mega-fund cases reaching as high as 21.8. *Attorney Fee Awards in Common Fund Class Actions*, 24 CLASS ACTION REPORTS 4 (April 2003).

In sum, when approving fee awards, judges have awarded a broad range of multipliers but have awarded higher multipliers in cases with larger recoveries. The multiplier requested here which is either 2.96 or 2.1, depending on whether historical or current hourly rates are employed, falls well within the range that judges have discretion to approve.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

DATED: June 6, 2019

_____
CHARLES SILVER

# EXHIBIT "A"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————— x

In re PAYMENT CARD INTERCHANGE    :    MDL No. 1720(JG)(JO)
FEE AND MERCHANT DISCOUNT    :
ANTITRUST LITIGATION    :    Civil No. 05-5075(JG)(JO)

————————————————————    :

   :    **ELECTRONICALLY FILED**

This Document Relates To:    :

   :    DECLARATION OF PROFESSOR
       ALL ACTIONS.    :    CHARLES SILVER CONCERNING THE
   :    REASONABLENESS OF CLASS
   :    COUNSEL'S REQUEST FOR AN AWARD
   :    OF ATTORNEYS' FEES

———————————————————— x

I, Charles Silver, declare as follows:

## 1.    SUMMARY OF OPINIONS

Two facts stand out in this case. First, considering only the monetary relief, the proposed

settlement is the largest class-based antitrust recovery in history and one of the largest recoveries

regardless of case type in the history of American civil litigation.[1] At $7.25 billion, it ranks

alongside the two landmark recoveries of the 21st Century: the $7.2 billion Enron settlement and the

proposed $7.8 billion BP settlement. In an interesting way, it even rivals the settlement of the states'

---

[1] The settlement also requires the Defendants to change their procedures going forward. Relying on a report submitted by Dr. Alan Frankel, Class Counsel contends that the injunctive reforms will save merchants between $26.2 and $62.2 billion over the next decade. Memorandum in Support of Class Counsel's Motion for Final Approval of Settlement (Draft of March 24, 2013). I took no account of the non-cash relief when formulating the opinions expressed herein. The cash fund alone is easily sufficient to justify the requested award of fees.

historic tobacco lawsuits.  From 2002 to 2012, only the three most populous states (California, New York, and Texas) received payments from the tobacco companies exceeding $7.25 billion.[2]

Second, the credit for this accomplishment belongs in large part to the private attorneys who investigated the price-fixing scheme, initiated the litigation, and shouldered its cost over nearly a decade.  Collectively, an army of plaintiffs' lawyers expended more than half a million hours and bore about $40 million in out of pocket expenses.  These are enormous amounts of resources to have invested in a single, risky lawsuit against well-funded defendants.  But, again, they are on par with the risks lawyers took in comparable cases.  In *Enron*, for example, class counsel expended about 300,000 hours and bore $45 million in costs.  Lawsuits that generate historic recoveries require exceptional dedication and impose enormous risks and costs on attonryes.

If lawyers working on contingency are to find cases like these financially attractive, the rewards must offset the costs and risks the lawyers have to bear.  In the private market for legal services, where clients hire lawyers directly, compensation is automatically set at the level needed to do this.  Otherwise, lawyers would decline to represent clients with large claims and find less risky work.  In class actions, of course, fees are set by courts, not by clients and lawyers bargaining at arms' length.  The possibility therefore arises that courts will set fees too low, in which event lawyers will be discouraged from handling big cases, or too high, in which event lawyers will receive more than the risks warrant.

Judges can avoid these bad outcomes by using the private market for legal services as a guide.  In the private market, sophisticated clients pay only what they have to, to get the legal services they desire.  Typically, they neither waste money by over-paying nor price themselves out

---

[2] Campaign for Tobacco-Free Kids, Actual Tobacco Settlement Payments Received by the States, 2002-2012, available at http://www.tobaccofreekids.org/research/factsheets/pdf/0365.pdf.

of the market for legal services by offering too little.  By studying the amounts sophisticated clients pay attorneys to handle big cases, judges can reliably estimate the fees that are needed to persuade lawyers to accept the risks big class actions entail.  The Second Circuit agrees that "market rates, where available, are the ideal proxy for [class action lawyers'] compensation." *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 52 (2d Cir. 2000).

In the private market for legal services where sophisticated clients shop for attorneys, contingent fees normally equal or exceed 25 percent of recoveries.  This is true even in cases where recoveries can be large.  Agreed fees are sometimes lower in securities fraud cases where sophisticated investors seeking to serve as lead plaintiffs hire attorneys, but even here they commonly fall near 20 percent.[3]  Taking the private market as a guide, then, one could justify a fee award of 20 percent or more in this case on the ground that the class as a whole, acting in the manner of a sophisticated client, would rationally have offered to pay that amount when litigation commenced.

In fact, several class members agreed to pay fees well in excess of 20 percent.  When the original named plaintiffs in this lawsuit hired the lawyers who became Class Counsel,[4] many signed contracts setting fees at 33.33 percent of the recovery.  Some even agreed to pay this amount out of their own recoveries, should the Court award less or should they settle individually rather than as part of a class.  The private market thus sent a clear signal as to what a reasonable fee in this litigation would be.

---

[3] See Lynn A. Baker, Michael A. Perino and Charles Silver, *Setting Attorneys' Fees In Securities Class Actions: An Empirical Assessment*, VANDERBILT LAW REVIEW (forthcoming 2013).

[4] Class Counsel are Robins, Kaplan, Miller & Ciresi L.L.P.; Berger & Montague, P.C.; and Robbins Geller Rudman & Dowd LLP

Yet, the lawyers are requesting far less. They have asked the Court to award approximately 10 percent in fees. This is a substantial amount of money, but it is on par with the $688 million Enron fee award and the $600 million in fees and expense reimbursements provided for in the BP settlement agreement. Taking market rates as a guide, the request is entirely reasonable and considerably below what the attorneys ought to receive.

## 2. CREDENTIALS

I have testified as an expert on attorneys' fees many times. Judges have cited or relied upon my opinions when awarding fees in the following enormous cases, as well as many smaller ones: *Allapattah Services, Inc. v. Exxon Corp.*[5] (30 percent fee award on recovery exceeding $1 billion); *In re Checking Account Overdraft Litigation*, No. 09-md-2036,( S.D. Fla. 2011) (fee award of 30 percent on recovery of $410 million);[6] *In re Enron Corp. Securities, Derivative & "ERISA" Litig.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008) ($688 million fee award on a $7.2 billion recovery); *Silverman v. Motorola, Inc.*, No. 07 C 4507 (N.D. Ill. May 7, 2012) (unpublished) (fee award of 27.5 percent on recovery of $200 million).

Professionally, I hold the Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure at the University of Texas School of Law, where I also serve as Co-Director of the Center on Lawyers, Civil Justice, and the Media. I joined the Texas faculty in 1987, after receiving an M.A. in political science at the University of Chicago and a J.D. at the Yale Law School. I received tenure

---

[5] See Order on Petitions for an Award of Attorneys' Fees, Costs, and Reimbursable Expenses and for Incentive Awards to Named Plaintiffs, *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006).

[6] See Order of Final Approval of Settlement, Authorizing Service Awards, Granting Application for Attorneys' Fees, and Overruling Objections to Settlement, available at http://www.bofaoverdraftsettlement.com/CourtDocuments.aspx.

in 1991. Since then I have been a Visiting Professor at University of Michigan School of Law, the Vanderbilt University Law School, and the Harvard Law School.

From 2003 through 2010, I served as an Associate Reporter on the American Law Institute's PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION (2010). Many courts have cited the PRINCIPLES with approval, including the U.S. Supreme Court.

I have taught, researched, written, consulted with lawyers, and testified about class actions, other large lawsuits, attorneys' fees, professional responsibility, and related subjects for over 15 years. I have published over 70 major writings, many of which appeared in peer-reviewed publications and many of which focus on subjects relevant to this Report. My writings are cited and discussed in leading treatises and other authorities, including the MANUAL FOR COMPLEX LITIGATION, THIRD (1996) and the MANUAL FOR COMPLEX LITIGATION, FOURTH (2004).

Finally, because awards of attorneys' fees may be thought to raise issues relating to the professional responsibilities of attorneys, I note that I have an extensive background, publication record, and experience as an expert witness testifying on matters relating to this field. I also served as the Invited Academic Member of the Task Force on the Contingent Fee created by the Tort Trial and Insurance Practice Section of the American Bar Association. In 2009, the Tort Trial and Insurance Practice Section of the American Bar Association gave me the Robert B. McKay Award in recognition of my scholarship in the areas of tort and insurance law.

I have attached a copy of my resume as Exhibit A to this declaration.

**3. DOCUMENTS REVIEWED**

When preparing this Report, I reviewed the items listed below which, unless noted otherwise, were generated in connection with this case. I also reviewed other items including, without limitation, cases and published scholarly works.

- Declaration of K. Craig Wildfang, Esq

- Declaration of Thomas J. Undlin

- Engagement Letter, CHS Inc., dated June 14, 2005

- Engagement Letter, 30 Minutes Photos, Etc., Inc., dated May 6, 2005

- Engagement Letter, Traditions Classic Home Furnishings, dated April 21, 2005

- Engagement Letter, National Association of Convenience Stores, dated September 23, 2005

- Definitive Class Settlement Agreement

- Publication Notice, available at https://www.paymentcardsettlement.com/Content/Documents/Settlement%20Publication%20Notice.pdf

- Init B & M Draft Payment Card Fee Petition - Legal Section (3.14.13)

- Memorandum in Support of Class Plaintiffs' Motion for Class Settlement Preliminary Approval

- Objecting Plaintiffs' Opposition to Class Plaintiffs' Motion for Preliminary Approval of Proposed Settlement

- Retailers & Merchants' Objection to Proposed Class Settlement Agreement

- Amended Retailers & Merchants' Objection to Proposed Class Settlement Agreement

- Other Objections to Request for Preliminary Approval of Proposed Settlement

- Engagement Letter, Affiliated Foods Midwest Cooperative, Inc., dated November 10, 2005

- Engagement Letter, National Restaurant Association, dated April 14, 2006

- Engagement Letter, Coburn's, Incorporated, dated November 9, 2005

- Engagement Letter, NATSO, February 24, 2006

- Engagement Letter, D'Agostino Supermarkets, October 31, 2005

- Engagement Letter, National Community Pharmacists Association, February 7, 2006

- Engagement Letter, Jetro Holdings, Inc., September 16, 2005

- Engagement Letter, National Grocers Association, dated October 31, 2005

- Memorandum in Support of Class Counsel's Motion for Final Approval of Settlement (Draft of March 24, 2013)

4.  **TO ENSURE THAT CLASS MEMBERS RECEIVE ZEALOUS REPRESENTATION, COURTS SHOULD PAY LAWYERS WHO WIN CLASS ACTIONS AT MARKET RATES**

Starting with the first article I published as a law professor, I have urged judges to base fee awards in successful class actions on market rates.[7]  Market rates comport with the law of restitution, the body of law upon which lawyers' rights to fee awards are based.[8]  Market rates also create desirable incentives while protecting class members against over-payments.  Many judges have accepted this argument.  Some agreed with me; others reached the same conclusion on their own.

The view that class action lawyers should be compensated at market rates has been the rule in the Seventh Circuit since 1992, when Judge Richard A. Posner wrote that "it is not the function of judges in fee litigation to determine the equivalent of the medieval just price.  It is to determine what the lawyer would receive if he were selling his services in the market rather than being paid by court order."  *In re Continental Illinois Securities Litigation*, 962 F.2d 566, 568 (7th Cir. 1992).  See also *Id.*, at 572 ("The object in awarding a reasonable attorney's fee ... is to give the lawyer what he would have gotten in the way of a fee in arm's length negotiation, had one been feasible.").[9]

Judge Frank Easterbrook elaborated on the rationale for the Seventh Circuit's rule in *In re Synthroid Marketing Litig.*, 264 F.3d 712 (7th Cir. 2001).  He pointed out that rates prevailing in

---

[7] See Charles Silver, *A Restitutionary Theory of Attorneys' Fees in Class Actions*, 76 CORNELL LAW REVIEW 656 (1991) ("Silver, *Restitutionary Theory*").

[8] *Id.*, at p. 700.  See also Douglas Laycock, MODERN AMERICAN REMEDIES 488 (1985) ("Quasi-contract proceeds on the fiction of an implied promise to pay....  If there were a real promise, it would probably be to pay the market value, and the implied promise is analogized to that.").

[9] Other Seventh Circuit cases establishing the rule are *Montgomery v. Aetna Plywood, Inc.*, 231 F.3d 399, 409 (7th Cir. 2000); *Gaskill v. Gordon*, 160 F.3d 361 (7th Cir. 1998); *Florin v. Nationsbank of Georgia, N.A.*, 60 F.3d 1245 (7th Cir. 1995) (Florin II); *Florin v. Nationsbank of Georgia, N.A.*, 34 F.3d 560 (7th Cir. 1994) (Florin I); and *In re Continental Illinois Securities Litigation*, 985 F.2d 867 (7th Cir. 1993) (Continental II).

private markets compensate lawyers for the costs and risks they incur.  *Id*. at p. 724 ("The greater the risk of loss, the greater the incentive compensation required."); *Id*. at p. 731 ("The market rate for legal fees depends in part on the risk of nonpayment a firm agrees to bear, in part on the quality of its performance, in part on the amount of work necessary to resolve the litigation, and in part on the stakes of the case.").  He also noted that, because claimants always prefer larger recoveries to smaller ones, "markets would not tolerate" the "mega-fund" approach the district court judge applied, which encouraged class counsel to settle for lesser amounts.  *Id*. at 723.  He completely rejected the "mega-fund" rule, according to which fees must fall in the 6 percent to 10 percent range when recoveries exceed $75 million, because the market would never punish success.  *Id*. at 722 ("We have never suggested that a 'megafund rule' trumps these market rates.").  To the contrary, "if counsel considering the representation in a hypothetical arms' length bargain at the outset of the case would decline the representation if offered only [the "mega-fund"] prospective return," the fee award had to be higher.  *Id*.  For these reasons, Judge Easterbrook urged "[district] courts [to] do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time."  *Id*. at 718.

It probably surprises no one that Judges Posner and Easterbrook endorse the use of market rates.  They usually prefer markets to other forms of regulation.  But in this instance, they are right, and they have the most defensible account of fee awards going.  To see this, one must initially recognize that fee award practices create the incentives to which lawyers are subject when acting on class members' behalf.  Good fee award practices foster good incentives; bad practices foster bad ones.  It remains to consider what makes particular incentives good or bad.

Due process law provides the relevant criterion, as I explained more than a decade ago. Charles Silver, *Due Process and the Lodestar Method: You Can't Get There From Here*, 74 TULANE

8

LAW REVIEW 1809 (2000). It permits judgments and settlements in class actions to bind absent class members only when they are zealously represented by lawyers whose interests align with their own. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 852 (1999) (rejecting a proposed settlement partly because "[c]lass counsel [] had great incentive to reach any agreement in the global settlement negotiations that they thought might survive a Rule 23(e) fairness hearing, rather than the best possible arrangement for the substantially unidentified global settlement class"). Fee award practices directly impact the extent to which the interests of class members and their lawyers harmonize. Good practices align their interests closely; bad practices cause their interests to conflict.

With this background in place, the relevance of fee-related practices prevailing in the market for legal services can quickly be explained. When sophisticated claimants, such as businesses seeking to enforce patent or antitrust claims, hire plaintiffs' attorneys in the private market, they use fee arrangements that align their interests and their lawyers' interests as closely as possible. By doing this, they position themselves to reach the goal they seek, which is to maximize their expected recoveries net of litigation costs. By studying the market for legal services, then, judges can learn how sophisticated clients with good incentives and information use fee arrangements to encourage plaintiffs' attorneys to provide zealous representation. By mimicking the market when awarding fees in class actions, judges can then give class members the greatest possible assurance of receiving the faithful representation that the law of due process requires.

When the Second Circuit took up the subject of class action lawyers' compensation in 2000, it "agree[d] that "that lawyers who successfully prosecute [class actions] deserve reasonable compensation, and that market rates, where available, are the ideal proxy for their compensation." *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 52 (2d Cir. 2000). However, the Second Circuit had two concerns. First, trial judges "cannot know precisely what fees common fund

plaintiffs in an efficient market for legal services would agree to, given an understanding of the particular case and the ability to engage in collective arm's-length negotiation with counsel." Id. Second "'hard data' on analogous situations-such as the fees sophisticated corporate plaintiffs typically agree to pay their attorneys-are "sketchy."

Id.

Neither concern should cause the Court to stray from market-based compensation in this case. For one thing, we know more about the fees sophisticated corporate clients pay when hiring lawyers on contingency than we did in 2000, and the evidence, which I survey below, shows that the fee Class Counsel requests is reasonable by comparison. For another, in this case, we have the fee agreements actually entered into by several trade associations that represent thousands of individual businesses.[10][11] When retaining Robbins, Miller, Kaplan and Ciresi LLP as Class Counsel and agreeing to pay a one-third of the class-wide recovery as fees, the trade associations "engage[d] in collective arm's-length negotiation with counsel", *Goldberger*, 209 F.3d at 52, as their members'

---

[10] The National Association of Convenience Stores is "an international trade association representing more than 2,200 retail and 1,600 supplier company members". About NACS, http://www.nacsonline.com/About_NACS/Pages/default.aspx. NATSO "represents more than 1,230 travel plazas and truckstops nationwide, owned by over 200 corporate entities"/ About NATSO, http://www.natso.com/about. The National Restaurant Association "is the largest foodservice trade association in the world*—supporting nearly 500,000 restaurant businesses". About Us, http://www.restaurant.org/About-Us. "The National Community Pharmacists Association … represents the pharmacist owners, managers, and employees of more than 23,000 independent community pharmacies across the United States." Introducing NCPA, http://www.ncpanet.org/index.php/home/introducing-ncpa. "The National Grocers Association (NGA) is the national trade association representing the retail and wholesale grocers that comprise the independent sector of the food distribution industry." Who We Are, http://www.nationalgrocers.org/who-we-are.

[11] Years after retaining Class Counsel, the trade associations withdrew as a named plaintiff and now oppose the proposed settlement. For present purpose, this is irrelevant. All that matters is that they thought one-third of the class-wide recovery was a reasonable contingent fee when hiring lawyers to advance the interests of their members at the start of litigation.

representatives. In this case, the Court has the information recognized in *Goldberger* as legitimating the use of market rates.

## 5.    BY BASING FEE AWARDS ON MARKET RATES, JUDGES CAN AVOID OVER-PAYING ATTORNEYS OR UNDER-PAYING THEM

The view that judges should base class action fee awards on market rates has many adherents. It also appeals to judges regardless of political affiliation. Judges Easterbrook and Posner were appointed the bench by a Republican President. So was Judge Melinda Harmon, who awarded $688 million in fees out of the $7.2 billion *Enron* recovery. In dollars, this is the largest fee award I know of, and it was based in important part on market-based practices.[12] See, e.g., *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 586 F.Supp.2d 732, 753 (S.D. Tex., 2008) (rejecting the mega-fund rule and citing *Synthroid,* 264 F.3d at 718).

*Enron* is far from the only mega-fund case in which a judge granted an enormous fee award. For example, in the three *Air Cargo* settlements, which collectively generated $422.2 million in settlement monies, this Court awarded 25 percent of the total recovery—over $100 million—as fees.[13] Nor were the awards in the *Air Cargo* cases unprecedented. To the contrary, many mega-

---

[12] *Enron* was a federal securities action governed by the Private Securities Litigation Reform Act, [cite] ("PSLRA"). Under the PSLRA, the lead plaintiff candidate with the largest financial stake in the outcome of litigation gains control of the case and retains counsel for the class. As a result, there was a real fee contract between the Regents of the University of California—the *Enron* lead plaintiff—and the law firm of Coughlin, Stoia, Geller Rudman & Robbins LLP. Following the Seventh Circuit's lead, Judge Harmon found that the contract was reasonable and based the fee award on its terms. Judge Harmon also invoked the private market when addressing objections to the fee request. When an objector contended that she should assess the riskiness of the litigation *ex post* (as of the date of the first settlement with a major defendant), Judge Harmon pointed out that the private market values risk *ex ante* (when litigation begins). See *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 586 F.Supp.2d at 824 (quoting *Florin v. Nationsbank, N.A.,* 34 F.3d 560, 565 (7th Cir.1994)).

[13] See *In re Air Cargo Shipping Servs. Antitrust Litig.* ("*Air Cargo I*"), No. 06–MD–1775, 2009 WL 3077396 (E.D.N.Y. Sept. 25, 2009) ($85 million recovery/$12.75 million in fees); *In re Air Cargo*

11

fund cases have yielded large percentage fee awards.  Table 1 lists 66 cases with recoveries of at

least $100 million and fee awards equal to or greater than 20 percent.

---

*Shipping Services Antitrust Litig.* ("*Air Cargo II*"), No. 06–MD–1775, MDL 1775, 2011 WL
2909162 (E.D.N.Y. July 15, 2011) ($153.8 million recovery/$38.5 million in fees); and *In re Air
Cargo Shipping Services Antitrust Litig.* ("*Air Cargo III*"), No. 06–MD–1775, MDL 1775, 2012 WL
3138596 (E.D.N.Y. Aug. 2, 2012) ($183.4 million recovery/$54.3 million in fees).

Table 1: Mega-Fund Class Actions with Fee Awards of At Least 20%

| | Case | Recovery (millions) | Fee Award |
|---|---|---|---|
| 1 | *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006) | $1,060 | 31.33% |
| 2 | *In re AT & T Mobility Wireless Data Services Sales Tax Litig.*, 792 F. Supp. 2d 1028 (N.D. Ill. 2011) | $956 | 20.00% |
| 3 | *In re Brand Name Prescription Drugs Antitrust Litig.*, No. 94 C 897, 2000 WL 204112 (N.D. Ill. Feb. 10, 2000) | $697 | 25.00% |
| 4 | *In re Fructose Antitrust Litig.*, MDL No. 1087, Master File No. 94-1577 (C.D. Ill. Oct. 4, 2004) | $531 | 25.00% |
| 5 | *In re Initial Pub. Offering Sec. Litig.*, 671 F.Supp.2d 467 (S.D.N.Y. 2009) | $510 | 33.30% |
| 6 | *Spartanburg Regional Health Services Dist., Inc., et al. v. Hillenbrand Industries, Inc. et al.*, No. 7:03-2141-HFF (D. S.C. Aug. 15, 2006) | $468 | 25.00% |
| 7 | *In re Adelphia Communs. Corp. Sec. and Derivative Litig.*, No. 03 MDL 1529(LMM), 2006 WL 3378705 (S.D.N.Y. Nov. 16, 2006) | $455 | 21.40% |
| 8 | *In re Air Cargo Shipping Servs. Antitrust Litig. ("Air Cargo I")*, No. 06–MD–1775, 2009 WL 3077396 (E.D.N.Y. Sept. 25, 2009) ($85 million); *In re Air Cargo Shipping Services Antitrust Litig. (Air Cargo II)*, No. 06–MD–1775, MDL 1775, 2011 WL 2909162 (E.D.N.Y. July 15, 2011) ($153.8 million); & *In re Air Cargo Shipping Services Antitrust Litig. (Air Cargo III)*, No. 06–MD–1775, MDL 1775, 2012 WL 3138596 (E.D.N.Y. Aug. 2, 2012) ($183.4 million) | $422.2 | 25.00% |
| 9 | *In Re (Bank of America) Checking Account Overdraft Litigation*, 830 F.Supp.2d 1330 (S.D. Fla. 2011) | $410 | 30.00% |
| 10 | *In re Freddie Mac Sec. Litig.*, No. 03-CV-4261 (JES), (S.D.N.Y. Oct. 27, 2006) | $410 | 20.00% |
| 11 | *In re Vitamins Antitrust Litig.*, No. 99-197, 2001 WL 34312839 (D.D.C. July 16, 2001) | $365 | 34.60% |
| 12 | *In Re Dynamic Random Access Memory (DRAM) Antitrust Litigation*, No. M:02-cv-01486-PJH, MDL-02-1486 (N.D. Cal. Nov. 1, 2006) | $326 | 25.00% |
| 13 | *In re Rite Aid Corp. Sec. Litig. (Rite Aid I)*, 146 F.Supp.2d 706 (E.D.Pa.2001)($193 million) & *In re Rite Aid Corp. Sec. Litig. (Rite Aid II)*, 362 F.Supp.2d 587 (E.D.Pa.2005) ($126 million) | $319 | 25.00% |
| 14 | *Cooper v. IBM Personal Pension Plan*, 2005 WL 1981501 (S.D. Ill. 2005)[1] | $314 | 28.30% |
| 15 | *In re Williams Sec. Litig.*, No. 02-cv-072-SPF-FHM (N.D. Okla. Feb. 12, 2007) | $311 | 25.00% |
| 16 | *In re Oxford Health Plans, Inc. Sec. Litig.*, MDL 1222 (S.D.N.Y. June 2003) | $300 | 28.00% |
| 17 | *In re DaimlerChrysler AG Sec. Litig.*, No. 00-0993 (KAJ) (D. Del. Feb. 5, 2004) | $300 | 22.50% |
| 18 | *In re Enron Corp. Sec. and ERISA Litig.*, MDL 1446, Case 4:01-cv-03913 (S.D. Tex. July 24, 2006) | $264 | 20.00% |

| | Case | Recovery (millions) | Fee Award |
|---|---|---|---|
| 19 | *In re Am. Continental Corp./Lincoln Sav. & Loan Sec. Litig.*, MDL No. 834 (D. Ariz. July 24, 1990)[2] | $250 | 26.60% |
| 20 | *In re Comverse Technology, Inc. Securities Litig.*, 2010 WL 2653354, 6 (E.D.N.Y., 2010) | $225 | 25.00% |
| 21 | *In re Buspirone Antitrust Litig.*, No. 01-MD-1410 (S.D.N.Y. Apr. 11, 2003)[3] | $220 | 33.30% |
| 22 | *In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295 (1st Cir. 1995) | $220 | 30.00% |
| 23 | *In re Waste Mgmt., Inc. Sec. Litig.*, No. 97-7709, 21 Class Action Rep. 263 (N.D. Ill. filed Sept. 17, 1999) | $220 | 20.80% |
| 24 | *In re Washington Mutual, Inc. Sec. Litig.*, No. 2:08-md-01919 MJP (W.D. Wash. Nov. 4, 2011) | $208.5 | 21.00% |
| 25 | *In re Linerboard Antitrust Litig.*, 2004 WL 1221350 (E.D. Pa. 2004) | $203 | 30.00% |
| 26 | *Silverman v. Motorola, Inc.*, No. 07 C 4507, 2012 WL 1597388 (N.D. Ill. May 7, 2012) | $200 | 27.50% |
| 27 | *Weatherford Roofing Co., et al. v. Employers National Ins. Co.*, No. 91-05637 (116th Dist. Ct, Dallas, TX) (Dec. 1, 1995) | $190 | 31.60% |
| 28 | *In re Lease Oil Antitrust Litig.*, 186 F.R.D. 403 (S.D.Tex.1999)[4] | $190 | 25.00% |
| 29 | *In re Home-Stake Prod. Co. Sec. Litig.*, MDL No. 153 (N.D.Okla. Jan. 2, 1990) | $185 | 30.00% |
| 30 | *In re Merry-Go-Round Enterprises, Inc.*, 244 B.R. 327 (Bankr. D. Md. 2000)[5] | $185 | 40.00% |
| 31 | *In re Relafen Antitrust Litig., No. 01-12239*, 2004 U.S. Dist. LEXIS 28801 (D. Mass. Apr. 9, 2004) | $175 | 33.30% |
| 32 | *Alaska Elec. Pension Fund v. Pharmacia Corp.*, No. 03-1519 (D.N.J. Jan. 30, 2013) | $164 | 27.50% |
| 33 | *In re: (Chase Bank) Checking Account Overdraft Litig.*, No. 1:09-MD-02036 (S.D. Fla. Dec., 19, 2012) | $162 | 30.00% |
| 34 | *In re Dollar Gen. Corp. Sec. Litig.*, No. 01-388 Order (M.D. Tenn. May 24, 2002) | $162 | 21.60% |
| 35 | *MBA Surety Agency, Inc. v. AT&T Mobility LLC*, No.1222-CC09746 (Mo. Cir. Ct. Mar. 7, 2013) | $152.6 | 25.00% |
| 36 | *In re: Managed Care Litig.*, No. 00-MD-1334, MDL1334, 2003 WL 22850070 (S.D. Fla. Oct. 24, 2003 | $150 | 29.00% |
| 37 | *Schwartz v. TXU Corp.*, No. 3:02–CV–2243–K, 2005 WL 3148350 (N.D.Tex. Nov.5, 2005) | $150 | 22.2% |
| 38 | *In re Coordinated Pretrial Proceedings In Petroleum Prods. Antitrust Litig.*, No. MDL 150, 1994 WL 675265 (C.D. Cal. Aug. 11, 1994) | $140 | 21.00% |
| 39 | *Carpenters Health v. Coco-Cola Co*., 587 F.Supp.2d 1266 (N.S. Ga. 2008) | $138 | 21.00% |
| 40 | *In re: (Citizens Bank) Checking Account Overdraft Litig*., No. 1:09-MD-02036 (S.D. Fla. Mar. 12, 2013) | $137.5 | 30.00% |
| 41 | *In re Computers assocs. Class Action Sec. Litig.*, CV-98-4839 (TCP) (E.D. NY 2003)[6] | $136 | 25.00% |
| 42 | *In re Informix Corp. Sec. Litig.*, Master File No. C-97-1289 CRB (N.D.Cal. Nov. 2, 1999) | $132 | 30.00% |

| | Case | Recovery (millions) | Fee Award |
|---|---|---|---|
| 43 | *In re Combustion, Inc.,* 968 F.Supp. 1116 (W.D.La.1997) | $127 | 36.00% |
| 44 | *In re Infant Formula Antitrut*., MDL No. 878, (N.D. Fla. Sept. 7, 1993) | $125 | 25.00% |
| 45 | *PaineWebber Ltd. P'ships Litig. v. Geodyne Res., Inc.,* 999 F. Supp. 719 (S.D.N.Y. 1998) | $125 | 20.80% |
| 46 | *Kurzweil v. Philip Morris Co., Inc.,* Nos. 94 Civ. 2373(MBM), 94 Civ. 2546(BMB), 1999 WL 1076105 (S.D.N.Y. Nov. 30, 1999) | $123 | 30.00% |
| 47 | *In re Deutsche Telekom AG Sec. Litig*., No. 00-CV-9475-NRB (S.D.N.Y.2005) | $120 | 28.00% |
| 48 | *Hershey, et al, v. Pac. Inv. Mgmt. Co. LLC,* No. 1:05-cv-04681 (N.D. Ill. May 2, 2011)[7] | $120 | 28.00% |
| 49 | *In re: Bank One Sec. Litig. First Chicago S'holder Claims*, No. 00-CV-0767 (N.D. Ill. Aug. 26, 2005) | $120 | 22.50% |
| 50 | *In re Sumitomo Copper Litig.,* 74 F.Supp.2d 393 (S.D.N.Y.1999) | $116 | 27.50% |
| 51 | *In re Ikon Office Solutions, Inc. Sec. Litig.,* 194 F.R.D. 166 (E.D.Pa.2000) | $111 | 30.00% |
| 52 | *Klein v. O'Neal, Inc*., 705 F.Supp.2d 632 (N.D.Tex. Apr. 9, 2010) | $110 | 30.00% |
| 53 | *In re Cardizem CD Antitrust Litig.,* No. 99-MD-1278, at 18-20 (E.D.Mich. Nov. 26, 2002) | $110 | 30.00% |
| 54 | *In re Prudential Sec. Inc. Ltd. P'ships Litig.,* 912 F.Supp. 97 (S.D.N.Y.1996) | $110 | 27.00% |
| 55 | *In re Sunbeam Sec. Litig*., 176 F.Supp.2d 1323 (S.D.Fla.2001) | $110 | 25.00% |
| 56 | *In re DPL Inc. Sec. Litig.*, 307 F.Supp.2d 947 (S.D. Ohio 2004) | $110 | 20.00% |
| 57 | *In re Methionine Antitrust Litig.*, No. C 99-3491, MDL No. 00-1311 (N.D. Cal. Oct. 3, 2002) | $107 | 23.30% |
| 58 | *In re Automotive Refinishing Paint Antitrust* Litigation, MDL No. 1426 (E.D. Pa. Jan. 3, 2008) | $106 | 32.70% |
| 59 | *City of Greenville v. Syngenta Crop Protection,* No. 3:10-cv-00188 (S.D. Ill. Oct. 23, 2012) | $105 | 33.33% |
| 60 | *Haynes v. Shoney's*, No. 89-30093-RV, 1993 WL 19915 (N.D. Fla. Jan. 25, 1993)[8] | $105 | 23.20% |
| 61 | *In re Prison Realty Sec. Litig.,* Civil Action No. 3:99-0458, 2001 U.S. Dist. LEXIS 21942 (M.D.Tenn. Feb. 9, 2001) | $104 | 30.00% |
| 62 | *Ingram v. Coca-Cola, Corp.*, 200 F.R.D. 685 (N.D. Ga. 2001)[9] | $104 | 20.00% |
| 63 | *In Re: Chase Bank USA, N.A. "Check Loan" Contract Litigation,* 3:09-md-02032-MMC (D. N.J. 2012) | $100 | 25.00% |
| 64 | *Baird v. Thomson Consumer Elecs.*, No. 00-761 (Ill. Cir. Court. Madison Co. June 15, 2001) | $100 | 22.00% |

| | Case | Recovery (millions) | Fee Award |
|---|---|---|---|
| 65 | *In re AT&T Corp. Sec. Litig*., 455 F.3d 160 (3d Cir. 2006) | $100 | 21.25% |
| 66 | *Stop N Shop Supermarket Company, et. al. v. SmithKline Beecham Corp*., Civil Action No. 03-CV-4578 (E.D. Pa. 2005) | $100 | 20.00% |

[1] The Court awarded a graduated amount ranging from 17–29% of the recovery. After an appeal reversed a portion of the award, this table reflects the actual settlement and fee realized.

[2] The Court awarded an increasing graduated amount (25% of the first $150 million and 29% of any larger amount). This table reflects the values realized.

[3] The global settlement exceeded $500 million, of which $220 million was reserved for the Direct Purchaser Class. The trial court approved a fee equal to 33 1/3% of the Direct Purchaser fund.

[4] The Court awarded 25% in five settlements and a 15% fee award in two others. This table lists $190 million, the total recovery from all settlements.

[5] While technically not a class action, this case is equivalent to a class-action in which the fee was negotiated *ex ante*.

[6] The settlement fund was paid in shares of stock. Class counsel received a percentage of the stock as fees.

[7] The attorneys' fee award was not part of the final judgment. The settlement notice stated that class counsel would request 20% of the recovery as fees and the final judgment

[8] This amount reflects only the cash relief. Additional non-cash relief was valued at $30 million.

[9] The fund amount excludes $10 million in a "Promotional Achievement Fund" and $43.5 million in "future pay equity adjustments."

A curious observer might reasonably ask whether in *Enron*, the *Air Cargo* cases, and the other cases listed in Table 1 the presiding judges were too generous. The fee awards were certainly large. Were they sized appropriately or excessive?

The mimic-the-market approach provides an objective basis for answering this question. A fee award is right-sized if it pays the amount that is reasonably thought to be needed to obtain legal services in the private market, given the best available evidence of prevailing rates. It is too large if it pays more than this amount and too small if it pays less. The basis for these conclusions is straightforward. By awarding a market-based fee, a judge transfers only the amount of resources that is needed to acquire legal services on contingency, as demonstrated by actual transactions between clients and lawyers. By picking a percentage above the market rate, a judge would require class members to pay more than the services are worth. In other words, the fee will exceed the amount class members could have offered plaintiffs' lawyers and found ready takers. By choosing a below-market rate, a judge would fail to cover the value of the legal services, as demonstrated by the amounts lawyers are willing to accept and real clients are willing to pay. Consequently, they would discourage lawyers from handling class actions.

The market-based approach also meshes well with the law of restitution, the law upon which lawyers' payment rights are based. A standard measure of recovery in restitution is the market value of the service supplied, often referred to as the providers usual and customary charge.[14] It makes sense to use the market for this purpose. Restitution provides for payments when, for various

---

[14] See Silver, *Restitutionary Theory*, *supra*, at p. 700 ("Quasi-contractual damages usually equal the reasonable or market value of the service provided."). Douglas Laycock, arguably the most prominent living writer on restitution, concurs. "Quasi-contract proceeds on the fiction of an implied promise to pay.... If there were a real promise, it would probably be to pay the market value, and the implied promise is analogized to that." Douglas Laycock, MODERN AMERICAN REMEDIES 488 (1985)).

reasons, service recipients and service providers cannot bargain directly. Had direct negotiations been possible, however, there is every reason to think that the parties would have settled on the going rate. The recipient would have had no reason to pay more than the market price, that being demonstrably sufficient to obtain the service. The provider would have had no reason to work for less, other opportunities being more profitable. The rate prevailing in the market is thus the most reliable measure of the payment that would have changed hands had a voluntary exchange been possible.

To evaluate the reasonableness of the fee awards in *Enron*, the *Air Cargo* cases, and the other mega-fund class actions listed in Table 1, one thus needs evidence of the amount clients willingly pay for legal services and lawyers willingly accept. The next two sections of this report survey the evidence I have been able to amass about fees agreed to in cases involving sophisticated clients. Section 6 shows that sophisticated clients use the percentage approach. Section 7 shows that they commonly pay 20 percent of recovered amounts or more.

If fees paid by *un*sophisticated clients were dispositive, the discussion would be very brief. There is broad agreement that contingent fees normally range from 25 percent to 40 percent in personal injury representations.[15] See, e.g., Deborah R. Hensler et al., COMPENSATION FOR ACCIDENTAL INJURIES IN THE UNITED STATES 135-36 & Table 5.11 (RAND 1991), available at http://www.rand.org/pubs/reports/2006/R3999.pdf (reporting that randomly selected accident victims who hired attorneys on contingency paid median fees of 33 percent and mean fees of 29 percent); Herbert M. Kritzer, *Investing in Contingency Fee Cases*, WISCONSIN LAWYER 11, 12 (August 1997)

---

[15] Somewhat lower rates prevail in commercial airplane crash cases, where liability is usually conceded. Higher rates are charged in medical malpractice cases and many mass tort representations, where costs are unusually high and the risk of losing can be great.

(reporting that in a sample of 989 plaintiff representations in Wisconsin, slightly more than half of the claimants agreed to pay a one-third contingent fee). Fees tend to be about the same, or perhaps slightly higher, in mass tort cases that involve large numbers of injured claimants. [16] Lower fees are said to prevail in cases arising out of commercial airplane crashes, where liability is often conceded.[17] Market forces account for this. When a defendant concedes liability and puts a

---

[16] See, e.g., *In re A.H. Robins Co., Inc.*, 182 B.R. 128, 131 (E.D.Va. 1995) (reporting that thousands of women injured by the Dalkon Shield signed contingent fee arrangements providing for fees between one-quarter and one-half of the recovery, with most charging one-third); Mireya Navarro, *Sept. 11 Workers Agree to Settle Health Lawsuits*, New York Times, November 19, 2010, available at http://www.nytimes.com/2010/11/20/nyregion/20zero.html (reporting that thousands of rescue and clean-up workers who were harmed as a result of the terrorist attacks on September 11, 2001, hired lawyers on terms requiring them to pay one-third of their recoveries); Martha Neil, *Frustration Over Uncontained Gulf Oil Spill—and Tort Claim Contingency Fees of Up to 50 Percent*, ABA JOURNAL (May 24, 2010), available at http://www.abajournal.com/news/article/frustration_over_uncontained_gulf_oil_spill-- and_tort_legal_fees_of_up_to_5/ (reporting that thousands of clients with claims against BP arising out of the Deepwater Horizon catastrophe promised to pay contingent fees in the range of 40 percent to 50 percent); James S. Kaklik, et al., COSTS OF ASBESTOS LITIGATION Table S.2 (RAND 1983) (finding that asbestos claimants whose cases closed before August, 1982, paid legal fees and other litigation equal to about 42 percent of their recoveries); James S. Kakalik et al., VARIATION IN ASBESTOS LITIGATION COMPENSATION AND EXPENSES xviii Figure S.1 (RAND 1984) (finding that asbestos claimants paid legal fees and expenses equal to 39 percent of their recoveries); Deborah R. Hensler et al., COMPENSATION FOR ACCIDENTAL INJURIES IN THE UNITED STATES 135-36 & tbl.5.11 (RAND 1991), available at http://www.rand.org/pubs/reports/2006/R3999.pdf (reporting that randomly selected accident victims who hired attorneys on contingency paid median fees of 33 percent and mean fees of 29 percent); Herbert M. Kritzer, *Investing in Contingency Fee Cases*, WISCONSIN LAWYER 11, 12 (August 1997) (reporting that in a sample of 989 plaintiff representations in Wisconsin, slightly more than half of the claimants agreed to pay a one-third contingent fee); Nora Freeman Engstrom, *Sunlight and Settlement Mills*, 86 NEW YORK UNIVERSITY LAW REVIEW 805, 846 (2011) (reporting that "every one of the twelve [high volume plaintiffs' firms she] studied charge[d] a tiered contingency fee," with most charging "at least 33%--and perhaps as high as 40%").

[17] See ABA Formal Opinion 94-389, n. 13 (1994) (reporting that "[i]n cases where airline insurers voluntarily sent out the 'Alpert letter' which makes an early settlement offer and concedes all legal liability, average contingent fee rates dropped to 17% and were often only charged on a portion of the recovery") (citing L. Kriendler, *The Letter: It Shouldn't be Sent*, 12 THE BRIEF 4, 38 (November 1982)).

settlement offer on the table from the get-go, risks fall and the market pays contingent fee lawyers less for handling cases.

Many judges know that market rates normally equal or exceed 33.3 percent of recoveries in personal injury cases. For example, in *Gaskill v. Gordon*, 160 F.3d 361, 362-63 (7th Cir.1998), where he affirmed a 38 percent fee, Judge Posner stated that the market range for contingent fee cases is 33 percent to 40 percent. Many cases contain similar observations. *See, e.g., Retsky Family Ltd. P'ship v. Price Waterhouse LLP*, 2001 WL 1568856, at *4 (N.D. Ill. Dec. 10, 2001) ("A customary contingency fee would range from 33% to 40% of the amount recovered.").

By comparison to the rates charged in any context where plaintiffs' lawyers represent unsophisticated clients on contingency, the fee Class Counsel requests is low. Thus, if fees paid by unsophisticated clients are considered, the reasonableness of Class Counsel's fee request is patent.

## 6.     THE FEE AWARD SHOULD BE A PERCENTAGE OF THE RECOVERY

When awarding fees in *Enron*, Judge Harmon understood that, to approximate the bargain class members and their attorneys would have struck in direct negotiations, she needed evidence of prevailing market rates. She cited *Taubenfeld v. AON Corp.*, 415 F.3d 597, 599 (7th Cir. 2005), for the following proposition:

> Although it is impossible to know *ex post* exactly what terms would have resulted
>
> from arm's length bargaining *ex ante*, courts must do their best to recreate the market
>
> by considering factors such as actual fee contracts that were privately negotiated for
>
> similar litigation, information from other cases, and data from class-counsel
>
> auctions."

*In re Enron Corp. Securities, Derivative & ERISA Litigation*, 586 F.Supp.2d 732, 824 (S.D.Tex., 2008). For reasons that need not be addressed here, class counsel auctions were discredited after *Taubenfield* was decided. Even so, the spirit of *Taubenfeld* is absolutely correct. To mimic the

private market for legal services, judges need to know how the market compensates plaintiffs' attorneys. This is a factual matter requiring evidence.

When searching for evidence, one must narrow the focus. Lawyers who handle class actions normally work on contingency. They get paid when they win and not otherwise. This is so because class members rarely agree to hire them on other terms. That was true here. Upon being asked to submit a report on attorneys' fees in this case, I asked Class Counsel whether the named plaintiffs signed retainer agreements. On learning that they had, I requested copies of the agreements and examined their terms. Without exception, the named plaintiffs hired the lawyers on contingency.[18]

There is nothing odd about this. To the contrary, it would be extremely unusual, although not entirely unprecedented,[19] for a named plaintiff to pay a lawyer a guaranteed hourly rate for waging a class suit.[20] Consider securities fraud class actions filed after the enactment of the Private Securities

---

[18] See Engagement Letter, CHS Inc., dated June 14, 2005; Engagement Letter, 30 Minutes Photos, Etc., Inc., dated May 6, 2005; Engagement Letter, Traditions Classic Home Furnishings, dated April 21, 2005; and Engagement Letter, National Association of Convenience Stores, dated September 23, 2005; Engagement Letter, Affiliated Foods Midwest Cooperative, Inc., dated November 10, 2005; Engagement Letter, National Restaurant Association, dated April 14, 2006; Engagement Letter, Coborn's, Incorporated, dated November 9, 2005; Engagement Letter, NATSO, February 24, 2006; Engagement Letter, D'Agostino Supermarkets, October 31, 2005; Engagement Letter, National Community Pharmacists Association, February 7, 2006; Engagement Letter, Jetro Holdings, Inc., September 16, 2005; and Engagement Letter, National Grocers Association, dated October 31, 2005.

[19] *Trustees v. Greenough*, 105 U.S. 527 (1881), is the most recent reported case I can think of in which a named plaintiff paid a lawyer to wage a class action out of his own pocket.

[20] It would be unusual for personal injury clients to do so as well. In 1998, Professor Herbert Kritzer, now of the University of Minnesota Law School, published the results of a survey of Wisconsin lawyers that produced 511 usable responses containing information on 989 cases, including 332 that were unfiled, 390 that were filed but not tried, and 267 that went to trial. Only 3% of the cases "involved a fee with a contingency element that did not conform to the standard percentage fee arrangement". Interestingly, none of the variations Professor Kritzer described resembled the lodestar method; that is, none combined a contingent hourly rate with a multiplier. Herbert M. Kritzer, *The Wages of Risk: The Returns of Contingency Fee Legal Practice*, 47 DEPAUL LAW REVIEW 267, 284-288 (1998).

Litigation Reform Act in 1995. In my academic study of these cases and my experience with them as a consultant, both of which are extensive, I have encountered not a single instance in which an investor serving as a lead plaintiff agreed to pay class counsel by the hour. This is true even though lead plaintiffs are often wealthy institutional investors that could afford to pay guaranteed rates if they thought that advisable. Lead plaintiff in securities fraud class actions offer contingent fees because they want to transfer litigation-related risks and costs to lawyers.

The relevant part of the market for legal services to scour for evidence is, then, the sector in which sophisticated clients agree to pay contingent fees. This is important for a simple reason: contingent fees are almost always set as percentages of clients' recoveries. Although judges sometimes base fee awards on hourly rates or use so-called "lodestar cross-checks", sophisticated clients who hire lawyers on contingency rarely do. No one has ever shown that sophisticated clients use the hourly-rate based lodestar method extensively, or even frequently, when hiring lawyers on contingency, and I represent to the Court that they do not. Percentage-of-the-recovery compensation predominates. See, e.g., David L. Schwartz, *The Rise of Contingent Fee Representation in Patent Litigation,* 64 ALABAMA LAW REVIEW 335 (2012) (reviewing contingent fee agreements used in patent cases and reporting on percentage compensation offered). This being so, the mimic-the-market approach establishes that judges should also use the percentage approach was awarding fees in class actions.

Abundant evidence supports my contention that sophisticated clients use percentage-based fee arrangements. In this case, for example, the named plaintiffs that hired Robbins Miller Kaplan & Ciresi LLP agreed to pay a percentage of the recovery. In *Enron* and other securities fraud class actions where compensation terms are set in *ex ante* agreements, lead plaintiffs also use percentage-based approaches. See, e.g., *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 586

F.Supp.2d 732, 766 (S.D. Tex., 2008) (finding that "[t]he *ex ante* fee agreement," according to which Class Counsel was hired on contingency pursuant to a rising scale of percentages, "weighs heavily in support of awarding Lead Counsel 9.52% of the net settlement fund"); Expert Report of Professor Charles Silver Concerning the Reasonableness of Class Counsel's Request for An Award of Attorneys' Fees, submitted in *In re Enron Corp. Securities, Derivative & ERISA Litigation*, Civil Action No. H-01-3624 (S.D. Texas—Houston) (reporting scales of percentages set in *ex ante* fee agreements in securities fraud class actions). The same is true in patent representations and other commercial lawsuits.

Presumably, the market favors percentage-based compensation in contingent fee representations because these arrangements motivate lawyers to prosecute claims aggressively by giving them sizeable stakes in the upside of litigation. Lodestar-based fee payments would not have this effect because they tie lawyers' rewards more heavily to time expended than to results obtained. Multipliers or bonuses linked to amounts recovered could improve matters somewhat. But the overwhelming use of percentage-based compensation in the private market suggests that anchoring fees primarily to hours expended creates interest conflicts that fee enhancements cannot readily ameliorate.

Second Circuit precedent allows the Court to use the percentage method. In *Goldberger v. Integrated Res., Inc.,* 209 F.3d 43 (2d Cir.2000), the Second Circuit freed district courts from having "to undertake the cumbersome, enervating, and often surrealistic process of lodestar computation." *Id.*, 209 F.3d at 49-50 (internal quotation marks omitted). See also *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) ("Courts may award attorneys' fees in common fund cases under either the "lodestar" method or the "percentage of the fund" method.") The reversal of precedent worked in *Goldberger* was based partly on the Supreme Court's pronouncement that

"under the 'common fund doctrine,' ... a reasonable fee is based on a percentage of the fund bestowed on the class." *Blum v. Stenson*, 465 U.S. 886, 900 n. 16 (1984) (quoted in *Goldberger*, 209 F.3d at 49). It makes overwhelming sense when one considers practices prevailing in the market as well.

*Goldberger* allows the Court to base a percentage fee award on prevailing market rates as well. After holding that percentage-based fee awards are permitted, the Second Circuit identified the "criteria" a district court just must consider "in determining a reasonable common fund fee", including: the magnitude and complexities of the litigation; the risk of the litigation, the requested fee in relation to the settlement; and public policy considerations. *Goldberger*, 209 F.3d at 50. The first three factors all matter in the private market transactions where contingent percentages are set. The last permits the Court to decide that, as a matter of public policy, it makes sense to take percentage fees paid by sophisticated clients as a guide.

Plainly, the magnitude and complexity of litigation and the risk involved determine the size of contingent percentages in the private sector. For example, percentages are higher in medical malpractice cases than in most other personal injury cases because the former are more expensive to wage and harder to win. Percentages are also high in patent infringement cases because they involve sizeable commitments of resources and, therefore, large risks. These matters are discussed further below.

The requested fee in relation to the settlement practically begs for a market-based comparison. What can it mean to say that the relation is appropriate except that it falls in the usual and customary range? And how can the usual and customary range be determined, except by studying the workings of the private market, where lawyers collect contingent fees every day.

Finally, as a policy matter, percentage-based awards are justified on the ground that they create superior incentives for attorneys to maximize class members' expected recoveries. This conclusion reflects the high frequency with which sophisticated clients pay lawyers contingent percentage fees when acting as plaintiffs in civil lawsuits. Given the due process imperative to ensure that class members are represented zealously, judges desirous of protecting class members' rights should learn from the market and use the contingent percentage approach.

## 7. SOPHISTICATED CLIENTS NORMALLY PAY CONTINGENT FEES OF 20 PERCENT OR MORE

Having established that judges should use the percentage method when awarding fees in class actions, it remains to consider how large fee percentages should be. In this section, I survey what is known about the fees sophisticated clients, normally businesses, usually pay. Because business clients can shop for lawyers and compare rates, are experienced negotiators, and have good information, the fees they pay should reflect the value of the services lawyers provide.

We know less about the fees businesses pay than we might.[21] No publicly available database collects this information, and businesses that sue as plaintiffs do not often make their fee agreements public. Consequently, most of what is known is drawn from anecdotal reports. Businesses also sometimes use hybrid arrangements that combine guaranteed payments with contingent bonuses.[22]

---

[21] I have studied the costs insurance companies incur when *defending* liability suits. See Bernard Black, David A. Hyman, Charles Silver and William M. Sage, *Defense Costs and Insurer Reserves in Medical Malpractice and Other Personal Injury Cases: Evidence from Texas, 1988-2004*, 10 AMERICAN LAW AND ECONOMICS REVIEW 185 (2008). Unfortunately, this information sheds no light on the amounts businesses play when acting as plaintiffs.

[22] In a recent case against Bank of American, a group of bankruptcy creditors with about $58 million at stake agreed to pay a law firm $1 million upfront and 5 percent of the net recovery. Petra Pasternak, *It's BIG, You're in Charge! Firm Picked for Pending Case Against BofA, Citi*, CORPORATE COUNSEL (Online) April 9, 2010. I note that the combination of a guaranteed payment with a contingent bonus differs from the lodestar method, which is a contingent hourly rate.

These arrangements hold few lessons for class actions because lawyers representing plaintiff classes must work on straight contingency. That said, the limited evidence available on the use of pure contingent fees by sophisticated clients shows that marginal percentages tend to be high.

Consider patent infringement representations. Reports of high percentages in this area abound. The most famous such instance may be the dispute between NTP Inc. and Research In Motion Ltd., the company that manufactures the Blackberry. NTP, the plaintiff, promised its law firm, Wiley Rein & Fielding ("WRF"), a one-third contingent fee. When the case settled for $612.5 million, WRF received more than $200 million in fees. Yuki Noguchi, *D.C. Law Firm's Big BlackBerry Payday: Case Fees of More Than $200 Million Are Said to Exceed Its 2004 Revenue*, WASHINGTON POST, March 18, 2006, D03. Another famous case involved the law firm of Dickstein Shapiro, which was reported to be entitled to a fee of $90 million under a *partial* contingent fee agreement,[23] after securing a $501 million jury award against Boston Scientific. Martha Neil, *Dickstein Contingent-Fee Payout Could Be $600K Per Partner*, ABA JOURNAL (May 20, 2008).[24] In yet another instance, the Texas law firm of McKool Smith won a $200 million jury verdict against Microsoft for Toronto-based i4i Inc. Penalties and interest added $90 million to the total. The firm's share, under another *partial* contingent fee agreement, was reported to be $60 million,

---

[23] In a partial contingent fee agreement, the contingent bonus, usually but not necessarily a percentage of the recovery, applies on top of other guaranteed compensation, such as a fixed payment upfront or a discounted hourly rate. Because guaranteed compensation is unavailable in class actions, partial contingent fee agreements provide no guidance for fee percentages in securities class actions.

[24] The parties later settled the case for $50 million. AMERICAN LAWYER, *Interest Award Brings Doctor's Judgment Against Johnson & Johnson to $593 Million In Patent Fight Over Stents*, April 01, 2011, http://www.dicksteinshapiro.com/files/News/264f90ee-6c20-49c9-a487-98a0b5487d82/Presentation/NewsAttachment/af4ec2e6-3255-4a0b-b3d8-996140459f30/American%20Lawyer_Saffran.pdf.

assuming the verdict held up. Cheryl Hall, *Patents and patience pay off for Dallas law firm McKool Smith*, THE DALLAS MORNING NEWS, March 27, 2010.

In a recent article, Assistant Professor David L. Schwartz reports findings based on interviews with 44 experienced lawyers who represent plaintiffs in patent cases and his review of 42 contingent fee agreements.[25] His conclusion: The percentages are high.

> On the whole, the contingent rates are similar to the "one-third" that a stereotypical contingent personal injury lawyer charges. There are two main ways of setting the fees for the contingent fee lawyer: a graduated rate and a flat rate. Of the agreements using a flat fee reviewed for this Article, the mean rate was 38.6% of the recovery. The graduated rates typically set milestones such as "through close of fact discovery," "through trial," and "through appeal," and tied rates to recovery dates. As the case continued, the lawyer's percentage increased. Of the agreements reviewed for this Article that used graduated rates, the average percentage upon filing was 28% and the average through appeal was 40.2%.

Schwartz, *The Rise of Contingent Fee Representation in Patent Litigation*, *supra*, at 360. In a case like this one that lasted almost a decade, the highest graduated rates would apply.[26]

---

[25] See David L. Schwartz, *The Rise of Contingent Fee Representation in Patent Litigation,* 64 ALABAMA LAW REVIEW 335 (2012).

[26] Professor Schwartz's findings are consistent with reports found in patent blogs. The following passage appeared in Matt Cutler, *Contingent Fee Patent Litigation, and Other Options*, PATENT LITIGATION, http://intellectualproperty-rights.com/?page_id=30 (reviewed March 13, 2012).
*Contingent Fee Arrangements*: In a contingent fee arrangement, the client does not pay any legal fees for the representation. Instead, the law firm only gets paid from damages obtained in a verdict or settlement. Typically, the law firm will receive between 33-50% of the recovered damages, depending on several factors—a strictly results-based system.
This item can now be found at http://patentlitigationstrategy.com/?page_id=30.

Another example of the use of scaled contingent percentages in patent litigation appears in *Tanox, Inc. v. Akin, Gump, Strauss, Hauer & Feld, LLP, et al.*, 105 S.W.3d 244 (Tex. Appls.—Houston, 2003), which involved a sophisticated client with an enormous intellectual property claim. The decision reports that the plaintiff agreed to pay his attorneys a scale of contingent percentages. "Under the fee agreement, Tanox agreed to pay the Lawyers a contingency fee pursuant to a sliding scale: 25% of the first $32 million recovered by Tanox, 33 1/3 % of recovery from $32 million to $60 million, 40% of recovery from $60 million to $200 million, and 25% of recovery over $200 million." *Id.* at 248-249. The agreement also contained other provisions favorable to the lawyers, including a promise of "$100 million if they obtained a permanent injunction." "The total fees Tanox agreed to pay the Lawyers were capped at $500 million and the total fees derived from royalties were capped at $300 million." *Id.* at 249. Like NTP in the *Blackberry* litigation, Tanox agreed to pay both a high percentage and a potentially enormous amount.

The payment of high contingent fees in patent cases is not a new phenomenon. In 1993, the AMERICAN LAWYER ran a cover story featuring patent litigator Gerald Hosier, who, by handling cases on contingency, reportedly made over $150 million in a single year, "more than the draws of all the equity partners at New York's Cravath, Swaine & Moore and Chicago's Winston & Strawn combined." Stewart Yerton, *The Sky's the Limit*, AMERICAN LAWYER (May 1993). An article published in 1997 reported that attorney Alfred Engelberg began handling patent cases on contingency in 1985. In an interview, Engelberg stated that he "ha[d] been involved in seven contingent patent challenges over the last 10 years … and ha[d] received remuneration in excess of $100 million. On an hourly basis, even if the cases had been fully staffed, the cases would have produced a total of no more than ten to fifteen million dollars in billing." P.L. Skip Singleton, Jr., *Justice For All: Innovative Techniques for Intellectual Property Litigation*, 37 IDEA 605, 610

28

(1997).  Clearly, in the segment of the market where sophisticated businesspeople hire lawyers to handle patent cases on contingency, successful lawyers earn enormous premiums over their normal hourly rates.  The reason is obvious.  When waging patent cases on contingency, lawyers must incur large risks and high costs, so clients must promise them hefty returns.

Turning from patent lawsuits to business representations more generally, many examples show that high percentage compensation is common.  A famous case from the 1980s involved the Texas law firm of Vinson & Elkins (V&E).  ETSI Pipeline Project (EPP) hired V&E to sue Burlington Northern Railroad and other defendants, alleging a conspiracy on their part to prevent EPP from constructing a $3 billion coal slurry pipeline.  In a sworn affidavit, Harry Reasoner, V&E's managing partner, described the financial relationship between EPP and V&E.

> The terms of our retention were that our client would pay all out-of-pocket expenses as they were incurred, but all legal fees were contingent upon a successful outcome.  We were paid 1/3 of all amounts received by way of settlement or judgment.  We litigated the matter for 5 years.  At the conclusion, we had settled with all defendants for a total of $634,900,000.00.  As a result, a total of $211,633,333.00 was paid as contingent legal fees.

*Declaration of Harry Reasoner*, filed in *In re Washington Public Power Supply System Securities Litigation,* MDL No. 551 (D. Arizona, Nov. 30, 1990).

Several things about this example are noteworthy.  First, the contingency fraction was one-third of the recovery in a massive case.  Second, V&E bore no liability for out-of-pocket expenses.  The percentage was high even though, by comparison to this case, where Class Counsel advanced costs and bore the risk associated with them until the end of litigation, the deal was favorable to the law firm.  Third, the case was enormous, ultimately generating a recovery greater than $600 million.

Fourth, the client was a sophisticated business with access to the best lawyers in the country. No claim of pressure or undue influence by V&E could possibly be made.

If lawyers who write about fee arrangements in business cases can be believed, high contingent percentages remain common today. In 2011, THE ADVOCATE, a journal produced by the Litigation Section of the State Bar of Texas, published a symposium entitled "Commercial Law Developments and Doctrine." It included an article on alternative fee arrangements, according to which:

> A pure contingency fee arrangement is the most traditional alternative fee arrangement. In this scenario, a firm receives a fixed or scaled percentage of any recoveries in a lawsuit brought on behalf of the client as a plaintiff. Typically, the contingency is approximately 33%, with the client covering litigation expenses; however, firms can also share part or all of the expense risk with clients. Pure contingency fees, which are usually negotiated at approximately 40%, can be useful structures in cases where the plaintiff is seeking monetary or monetizable damages. They are also often appropriate when the client is an individual, start up, or corporation with limited resources to finance its litigation. Even large clients, however, appreciate the budget certainty and risk-sharing inherent in a contingent fee arrangement.

Trey Cox, *Alternative Fee Arrangements: Partnering with Clients through Legal Risk Sharing*, 66 THE ADVOC. (TEXAS) 20 (2011).

A recent case shows, in monetary terms, that lawyers who handle business disputes on contingency can earn enormous premiums over their hourly rates. In 2012, the U.S. Court of Appeals for the Tenth Circuit decided a case involving a dispute over the fee a business client owed

30

to the law firm of Susman & Godfrey ("S&G"). S&G had handled an oil and gas matter for the client on the following terms. "Under the Fee Agreement, [the client] agreed to pay [S&G] 30% 'of the sum recovered by settlement or judgment,'" subject to caps based on when the lawsuit was resolved. *Grynberg Production Corp. v. Susman Godfrey, L.L.P.*, No. 10-1248, (10th Cir. February 16, 2012), available at http://law.justia.com/cases/federal/appellate-courts/ca10/10-1248/10-1248-2012-02-16.html. "*[T]he Fee Agreement capped fees at $50 million if the case settled within one year after the action was filed.*" *Id*. The fee agreement thus entitled S&G to be paid $50 million for a year of work—and that is what an arbitrator decided S&G should receive, before the case went to the Tenth Circuit, subject to an offset of less than $2 million that, for present purposes, is irrelevant.

Examples of high contingent fees can also be found in reported cases involving business clients who retained lawyers to participate on their behalf in class actions. Several appear in the *Synthroid* opinion written by Judge Easterbrook. He reports that, *after a settlement was already on the table*,

> a group of more than 100 [third party payers] … contracted with two law firms to
> represent them…. [T]he contracts provided for a 25% contingent fee at maximum.
> The "Porter Wright Group" (18 [third party payers] referred to collectively by their
> law firm's name) also negotiated with and hired counsel. Their setup allowed each
> insurance company to pick one of two fee options. Either the client paid Porter
> Wright's full costs and 70% of its normal hourly fees each month, with a 4% of
> recovery kicker at the end, or the client paid only costs each month but had to pony
> up 15% of the final settlement. Insurers are sophisticated purchasers of legal services,
> and these contracts define the market. Unfortunately, though, they identify a market

31

mid-way through the case, after defendants already had agreed to pay substantial sums.[27]

*In re Synthroid Marketing Litig.*, 264 F.3d at 727.  In *Synthroid*, the lawyers' job was merely to garner as large a portion of the settlement fund as possible for the third party payers.  They bore minimal risk of non-payment.  Even so, their sophisticated clients promised them large percentage fees than Class Counsel is seeking in this case, where the non-payment risk was enormous.

One can also consider the fees sophisticated business client serving as named plaintiffs or opt-out claimants agree to pay when they hire lawyers in connection with class actions.  In *In re: High Fructose Corn Syrup Antitrust Litigation*, the two named plaintiffs, Zarda Enterprises and Publix Supermarkets Inc., agreed to pay fees of 30% and "more than 25%", respectively, and an opt-out claimant, Gray & Co, agreed to pay its attorney 33%-40% of the recovery, depending on the time of settlement.  *Declaration of John C. Coffee, Jr.*, submitted in *In re High Fructose Corn Syrup Antitrust Litigation,* M.D.L. 1087 (C.D. Ill. Oct. 7, 2004), pp. 1-2.  In securities fraud class actions, where lead plaintiffs sometimes enter into *ex ante* fee agreements with their chosen counsel, substantial percentages are also promised.  For example, the State of Wisconsin Investment Board (SWIB), a sophisticated client, promised the fees set out in Table 2 when it served as lead plaintiff in three securities fraud cases.

---

[27]

| Table 2: Fees Promised by SWIB in Three Securities Fraud Class Actions | | |
|---|---|---|
| **Case** | **Fee** | **Recovery** |
| *In re Anicom Inc. Securities Litigation*, 00-CV-04391 (N.D. Ill.) | 23.5% | $40 Million |
| *In re Physician Computer Network, Inc. Securities Litigation*, Civil No. 98-981 (D.N.J.) | 15% | $21 Million |
| *Gluck v. CellStar Corp.*, 976 F. Supp. 542 (N.D. Tex. 1997) | 18% | $15 Million |

Source: Letter from Keith Johnson, Chief Legal Counsel, State of Wisconsin Investment Board (May 21, 2005), filed in *Schwartz v. TXU Corp.*, Civil Action No. 3:02-CV-2243-K (N.D. Texas—Dallas).

Having studied and consulted on securities class actions for years, I know of many other cases in which lead plaintiffs agreed to pay fees in this range. Rather than belabor the matter, though, I will represent to the Court that lead plaintiffs often agree to pay fees of 15 percent or more in securities class actions. This is so even in cases that generate larger recoveries than those listed in Table 2.

Really, though, the Court need not search through other cases to learn how much business clients serving as named plaintiffs are willing to pay. The Court need only consider the fee agreements signed by several of the named plaintiffs in this case. In all, I reviewed retainer agreements entered into by 12 class merchants. The agreements vary in important respects, indicating that they were negotiated agreements, but generally provide that Class Counsel will receive a fee equal to one-third of the class-wide recovery.[28] Some contain additional provisions

---

[28] Typical language reads as follows:

    (a) Fees As Class Counsel

        (1) Fees for the Firm's professional services in the Action as Class Counsel will be on a contingent basis and dependent upon the results obtained. In the event of a settlement or a favorable outcome at or after a trial, the Firm shall seek to recover legal fees equal to one-third of the Value of the Recovery attributable to our representation of the Class from one or more of the defendants. Any amount which is not recovered from the defendant(s) shall be payable on a contingent fee basis as described in paragraph (2) below. The Company agrees to support any

promising to make up any difference between one-third of the class-wide recovery and the actual fee from the client's share of the recovery or to pay a one-third fee from the client's recovery if the client recovers individually rather than as part of a class action. The market thus sent a strong signal that a fee well above the percentage Class Counsel requests would be reasonable in this case.

I hope the Court agrees that the cumulative weight of the examples presented in this section overwhelming. Sophisticated business clients routinely pay contingent fees of 15 percent or more (usually the latter) and rarely pay less. Class Counsel's request for about 10 percent of the recovery is thus at the far low end of the range and is therefore unquestionably reasonable.

## 8.    RISK INCURRED

The papers filed in support of the requested fee award describe the litigation risks Class Counsel incurred in detail. They make clear, for example, that this lawsuit has lasted about eight years, from the time (2005) the original complaint was filed through the fairness hearing on the proposed settlement (2013).

But the papers do not explain that, by class action standards, nine years is a very long time. A study of federal class actions resolved in 2006 and 2007 found that antitrust class actions lasted

---

request for attorney's fees, costs and disbursements to the court that is in an amount of one-third of the Value of the Recovery or less.

(2) In the event that the court does not approve the fee requested by the Firm, the Company and the other named plaintiffs agree to pay the difference between the fee awarded by the court and an amount equal to one-third of the Value of the Recovery made on behalf of the named plaintiffs.

(b) Fees Owed If Recovery Is Made Outside Of Class Action.

In the event that The Company makes a recovery outside of the class action (as, for example, if a class is not certified or the Company withdraws as a class representative) the Company agrees to pay a contingent fee equal to one-third of the Value of the Recovery to the Company.

1,140 days on average. Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 JOURNAL OF EMPIRICAL LEGAL STUDIES 820, Table 2 (2010). The longest antitrust class action in the dataset resolved in 2,480 days. At 8 years and counting, this case has already outlived the longest class action in Professor Fitzpatrick's dataset.[29]

When this case started, no one could say with confidence when it would end. Even now, the answer is not entirely clear. Even assuming that the Court approves the proposed settlement and the requested fee award, there may be appeals that drag on for months or years.

I mention case duration because the difficulty of predicting it provides a vivid reminder of the risks Class Counsel incurred when the investigation that preceded this litigation began nine years ago. Today, with $7.25 billion on the table, it is all too easy to think that a hugely successful result was inevitable. It may even be difficult for many people to credit the possibility that the suit might have been lost. As social scientists have shown repeatedly, when people know how a risk actually turned out, they often grossly over-estimate the likelihood of the observed result. "Hindsight vision is 20/20. People overstate their own ability to have predicted the past and believe that others should have been able to predict events better than was possible. Psychologists call this tendency for people to overestimate the predictability of past events the 'hindsight bias.'" Chris Guthrie, Jeffrey J.

---

[29] Studies also find that other types of class actions typically resolve much faster than this one has. See, e.g., Thomas E. Willging et al., AN EMPIRICAL STUDY OF CLASS ACTIONS IN FOUR FEDERAL DISTRICT COURTS: FINAL REPORT TO THE ADVISORY COMMITTEE ON CIVIL RULES 16 (Federal Judicial Center 1996) (reporting that, in the four federal district courts studied, median time periods from filing to closing for settled non-securities class actions ranged from "eleven and thirteen months" on the low end to "thirty-six and fifty months" on the high end); Michael Klausner and Jason Hegland, *When are Securities Class Actions Dismissed, When Do They Settle, and For How Much?—Part II*, XXIII PLUS JOURNAL 1, 4 (2010) (study of securities class actions filed from 2000 to 2003 reporting the cases that survived a motion to dismiss settlement in a mean length of time 24 months after the motion was decided).

Rachlinski and Andrew J. Wistrich, *Inside the Judicial Mind*, 86 CORNELL LAW REVIEW 777, 799 (2001) (citations omitted).

In the fee-setting context, the hindsight bias may cause a court to over-estimate the likelihood of a successful result. In other words, a court may inadvertently set the risk of non-recovery, and the related risk of non-payment, too low, simply because it knows that the case turned out well for the plaintiffs. As Judge Easterbrook wrote in the *Synthroid* case,

> The best time to determine [a contingent fee lawyer's] rate is the beginning of the case, not the end (when hindsight alters the perception of the suit's riskiness, and sunk costs make it impossible for the lawyers to walk away if the fee is too low). This is what happens in actual markets. Individual clients and their lawyers never wait until after recovery is secured to contract for fees. They strike their bargains before work begins.

*In re Synthroid Marketing Litigation*, 264 F.3d at 724.

In *Inside the Judicial Mind*, Professors Chris Guthrie, Jeffrey J. Rachlinski and Andrew J. Wistrich documented the tendency of the hindsight bias to influence judge's estimates of *ex ante* likelihoods. They gave more than 150 federal magistrate judges a statement describing a case in which a prisoner appealed after being sanctioned by a trial judge for filing a frivolous complaint. One-third of the statements indicated that the appellate court affirmed the sanction; another third indicated that the appellate court imposed a lesser sanction; and the last third indicated that the appellate court vacated the sanction entirely. All the judges were then asked to "go back in time" and identify the result that was most likely to occur. Demonstrating the influence of the hindsight bias, the judges' estimates of the *ex ante* likelihoods depended on the information they received about the actual outcome. "[T]he judges exhibited a predictable hindsight bias; when they learned

that a particular outcome had occurred, they were much more likely to identify that outcome as the most likely to have occurred." Guthrie et al., *Inside the Judicial Mind, supra*, at 803.

The Court possesses an enormous amount of information about the actual outcomes associated with probabilistic events in this litigation. For example, the Court is knowledgeable regarding all of the motions filed in the case and the risks they pose for all parties. Through their motions and oral arguments, the Court also knows what many documents obtained in discovery revealed and what many witnesses testified to in depositions. This knowledge could only have been guessed at when the lawsuit started, but today they are known outcomes which, because of the hindsight bias, may seem far more likely to have occurred than they actually were.

To accurately assess the risks Class Counsel incurred when litigation started in 2005, the Court would somehow have to blind itself to much of what it knows about the case. That is impossible, obviously. But there is a way out. The Court can take guidance from the private market for legal services, including the fees set in the retainer agreements signed by the named plaintiffs and information about prevailing market rates more generally. This is appropriate because in the contingent fee sector, compensation terms are set *ex ante*—when litigation begins—not *ex post*— when the results are known. *Ex ante* fees can provide valuable guidance concerning the fees that are needed to offset the litigation risks that are actually incurred.

9. **WHEN DONE CORRECTLY, FEE-SETTING IS A POSITIVE-SUM GAME**

Judges take seriously their role as absent plaintiffs' guardians when awarding fees from class action settlements. However, because they ordinarily set fees at the end of litigation rather than the beginning, they tend to believe that fee setting is a zero-sum game in which more for the lawyers means less for the class. This view exerts strong downward pressure on fees that may hurt class members in many ways, such as by discouraging lawyers from handling risky cases and from developing the cases they do take as fully and intensively as warranted.

The belief that class members always prefer lower fees to higher ones is incorrect. Taken to the limit, it implies that class members would be happiest with a fee of 0 percent. This is obviously wrong. At the outset of litigation, a 0 percent fee looks terrible to a class member (indeed, to any claimant) because no lawyer will take a case for that amount. When the fee is zero, a class member's expected recovery is also zero. Because any positive recovery is better than zero, any positive fee is also better than a zero fee.

The market for legal services, in which contingent fees are set *ex ante*, recognizes that fee setting is a positive-sum game, not a zero-sum competition. A higher attorney's fee can mean a larger expected net recovery for a claimant because a lawyer will take the case, expend effort on it, and increase the value of the client's claim by an amount that exceeds the lawyer's fee. Both the Third Circuit and the Seventh Circuit recognize this. The Third Circuit observed that "[t]he goal of appointment [of class counsel] should be to maximize the net recovery to the class and to provide fair compensation to the lawyer, *not to obtain the lowest attorney fee*. The lawyer who charges a higher fee may earn a proportionately higher recovery for the class than the lawyer who charges a lesser fee." *Third Circuit Task Force Report*, 208 F.R.D. 340 (January 15, 2002) (emphasis added). The Seventh Circuit agreed in *Synthroid I*. It rejected the so-called "mega-fund rule," according to which the fee percentage must be capped at a low percentage when the recovery is very large, noting that "[p]rivate parties would never contract for such an arrangement" because it would encourage cheap settlements. 264 F.3d at 718. Judge Harmon also rejected the "mega-fund rule" in *Enron*, as previously states.

When setting fees, then, a court should not ask 'What is the lowest possible fee?' but 'What fee would a group of claimants rationally have agreed to pay when this lawsuit began?' The best

answer is 'The market rate' because that is the fee shown by real engagements of attorneys to be most likely to maximize the expected value of claims net of litigation costs.

10.   **ANALYSIS OF THE COURT'S OPINION IN** *IN RE VISA CHECK/ MASTERMONEY ANTITRUST LITIGATION*

In the preceding sections, I have urged the Court to place great weight on fee percentages prevailing in the market for legal services when fixing the size of Class Counsel's fee award. I know that in *In re Visa Check/Mastermoney Antitrust Litigation*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003*), aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005), the Court considered and rejected several arguments like those I have made. I therefore take a moment to respectfully urge the Court to give the "mimic the market" approach another look.

In *Visa Check*, the Court's decision to award a low percentage fee seems to have been strongly influenced by the Second Circuit's observation in *Goldberger* that "in megafund cases [], courts have 'traditionally accounted for [] economies of scale by awarding fees in the lower range[s]'". *Visa Check*, 297 F. Supp. 2d at 521 (quoting *Goldberger,* 209 F.3d at 52). Importantly, the quoted language appears in a portion of the *Goldberger* opinion where the Second Circuit criticized the benchmark approach employed in the Ninth Circuit, which employs a presumption that 25 percent is a reasonable fee.

> Moreover, even a theoretical construct as flexible as a "benchmark" seems to offer an all too tempting substitute for the searching assessment that should properly be performed in each case. Starting an analysis with a benchmark could easily lead to routine windfalls where the recovered fund runs into the multi-millions. "Obviously, it is not ten times as difficult to prepare, and try or settle a 10 million dollar case as it is to try a 1 million dollar case." [citation omitted.]

*Goldberger*, 209 F.3d at 52.

I agree with this observation. A benchmark set at 25 percent could over-compensate lawyers for many reasons, one being the existence of economies of scale in litigation costs. That said, over-compensation cannot occur when judges set fees on the basis of rates prevailing in the market in cases where substantial economies of scale are present. Securities fraud class actions provide the best examples of cases fitting this description. Like antitrust class actions, they involve thousands or millions of claimants and, therefore, enormous scale economies. They also provide evidence of market-based fees because law firms compete for opportunities to represent institutional investors with large financial stakes. Many institutional investors routinely consider multiple proposals or hold 'beauty pageants' before choosing law firms and agreeing on fees. As Associate Professor David H. Webber observed recently, "institutions are ideally situated to force [law] firms to compete with one another, particularly on price." David H. Webber, *The Plight of the Individual Investor in Securities Class Actions*, 106 NORTHWESTERN UNIVERSITY LAW REVIEW 157, 167 (2012).

In securities fraud class actions, I have never seen or read about a fee agreement between an institutional investor and a law firm that entitled the firm to 6.511 percent of the recovery, the amount the Court awarded in *Visa Check*. Contracted-for fees are always higher. The fee agreement in *Enron*, arguably the most comparable case and surely one where the scale economies were enormous, never dipped that low. It started at 8 percent of the first billion dollars recovered and topped out at 10 percent of all dollars in excess of $2 billion. This signals the possibility that the 6.511 percent fee discounted for economies of scale too heavily. Were the Court to apply the *Enron* fee agreement to the cash portion of this settlement, the fee award would equal $695 million, 9.6 percent of the recovery.[30]

---

[30] (.08 * $1 billion) + (.09 * $1 billion) + (.10 * $5.25 billion) = $80 million + $90 million + $525 million = $695 million.

Mistakes are inevitable, I believe, when fee awards are based on "reasonableness factors" alone without the benefit of evidence of market rates. When acting as guardians charged with protecting class members from excessive fees, many judges are predisposed to cut fee requests, especially in cases that generate enormous settlements and seemingly breathtaking requests for fees. The benefit to class members seems obvious. But both the restitutionary impulse to compensate lawyers reasonably and class members' rational desire to maximize their expected recoveries will be frustrated if judges use the existence of scale economies as a reason for cutting fees too much. Too be clear, my point is not that judges are wrong in believing that class actions generate scale economies—I am confident that they are right about this. Rather, the weight scale economies should receive is an empirical matter requiring evidence, and market rates provide the only source of evidence that is both reliable and readily available. Judges can learn how much weight to give scale economies by studying the amounts real clients pay real lawyers in securities fraud class actions and other cases that involve large numbers of claimants.

## 11. FEE AWARDS IN OTHER CLASS ACTIONS

In my experience, courts often are interested in the results of empirical studies of fee awards in class actions. I am familiar with these studies and am in the process of conducting one of my own. This section presents the results.

Before addressing the studies, however, I think it is important to make two points. First, fee awards in other class actions do *not* provide direct evidence of market rates. They show how judges regulate fees, and judges often deviate from market-based practices. The findings reported in this section are therefore fallible guides. Second, it is perilous to use the studies as a basis for the fee award in this case because there are no other antitrust class actions as enormous as this one. A dataset that contains no comparable cases cannot provide much to go on.

Because empirical studies of class action fee awards document judicial practices, I begin by mentioning Table 1 of this report, which lists 66 mega-fund cases with recoveries of $100 million or more and fee awards of at least 20 percent.  These cases provide ample precedent in support of the requested fee award.  I also point to the $688 million award in Enron, arguably the most comparable case.  Finally, I note that in the Vioxx MDL, which settled for $4.85 billion, the court awarded the lead attorneys $315,250,000 in common benefit fees *on top of* the enormous sum the very same lawyers received from their clients pursuant to contingent fee agreements capped at 32 percent.  Order & Reasons, *In re Vioxx Products Liability Litigation*, MDL 1657 (E.D. LA, Oct. 19, 2010).  Although the total amount the lead *Vioxx* attorneys took home is unknown, it surely equals or exceeds the amount Class Counsel is requesting even though the recovery in this case is billions of dollars larger.

I now turn to empirical studies of fee awards in class actions.  There are many of these,[31] so I focus first on two of the most recent that examine class actions of diverse types: Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 JOURNAL OF EMPIRICAL LEGAL STUDIES 811 (2010) ("*Fitzpatrick Study*"); and Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993–2008*, 7 JOURNAL OF EMPIRICAL LEGAL STUDIES 248 (2010) ("*E&M Study*").  Both studies were peer-reviewed.

---

[31] See, e.g., Denise N. Martin, Vinita M. Juneja, Todd S. Foster, and Frederick C. Dunbar, RECENT TRENDS IV: WHAT EXPLAINS FILINGS AND SETTLEMENTS IN SHAREHOLDER CLASS ACTIONS?, Table 9 (1996); Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, EMPIRICAL STUDY OF CLASS ACTIONS IN FOUR FEDERAL DISTRICT COURTS: FINAL REPORT TO THE ADVISORY COMMITTEE ON CIVIL RULES 151 (1996); Mukesh Bajaj, et al., SECURITIES CLASS ACTION SETTLEMENTS: AN EMPIRICAL ANALYSIS (Nov. 16, 2000); Stuart J. Logan, Jack Moshman & Beverly C. Moore, Jr., Attorney Fee Awards in Common Fund Class Actions, 24 CLASS ACTION REPORTS 167 (2003); and Theodore Eisenberg and Geoffrey P. Miller, Attorney Fees in Class Action Settlements: An Empirical Study, 1 JOURNAL OF EMPIRICAL LEGAL STUDIES 27, 75 (2004).

Before discussing studies, it will be helpful to explain a statistics concept: the standard deviation. The standard deviation is a measure of the extent to which data points are spread about a reported estimate. A larger standard deviation means that the data points are spread farther from the point estimate than a smaller standard deviation, which indicates closer clustering.

The standard deviation also provides an easy way of identifying the core of a distribution. Assuming a normal distribution, about 68 percent of the data points will fall within one standard deviation above or below the reported point estimate. For example, suppose the average height of a U.S. adult male is 70" with a standard deviation of 3". It follows that the range running from 67" to 73" will capture about 68 percent of all adult U.S. males. If the standard deviation were 4", a wider spread running from 66" to 74" would be required to achieve the same result.

Turning to the studies, Fitzpatrick collected all class action settlements approved by federal judges in 2006 and 2007, a total of 668 reported and unreported decisions. The following figure describes the range of fee awards in cases where judges applied the percentage method with or without a lodestar cross-check. As is apparent, awards ranging from 30 percent to 35 percent of the recovery constitute the most common category. Over 30 percent of the cases in Fitzpatrick's dataset had fee awards this large.



*Figure 4:* The distribution of 2006–2007 federal class action fee awards using the percentage-of-the-settlement method with or without lodestar cross-check.

Source: *Fitzpatrick Study*, *supra*, at p. 834.

Fitzpatrick also reported aggregate settlement amounts and fee awards in antitrust class actions, which numbered 29 in all. In 2006, the antitrust settlements in his dataset collectively brought in $1.079 billion, 26 percent of which was awarded as fees. In 2007, settlements totaled $660.5 million, of which attorneys received 24 percent. *Fitzpatrick Study*, *supra*, at 825, Table 4 & p. 831, Figure 7.

Breaking down settlements by size, Fitzpatrick reported mean fee percentages for settlements in the largest decile, which contained 45 cases and spanned an incredible range from $72.5 million to $6.6 billion. The mean fee was 18.4 percent with a standard deviation of 7.9 percent, meaning that about two-thirds of the cases fell in the range extending from 10.5 percent to 26.3 percent. See *Fitzpatrick Study*, at p. 839, Table 10. The fee requested by Class Counsel falls at the low end of this range.

The *E&M Study* examined common fund class actions that closed from 1993 to 2008, a total of 689 cases. The authors drew their sample from Westlaw, Lexis and other reporters. For the entire dataset, the average fee-to-recovery ratio was 23 percent. *E&M Study*, *supra*, at pp. 258-259.

44

Focusing on antitrust cases, of which the dataset contained 71, the authors found a mean fee award of 22 percent on an average gross recovery of $163.48 million.  *Id.*, at p. 262, Table 5.

Eisenberg and Miller also found a strong inverse correlation between the percentage awarded and the size of the common fund.  Fee percentages tended to be larger in cases with smaller recoveries and smaller in the cases that produced the largest common funds.  Figure 7, shown below, makes this relationship clear.

Table 7:   Mean, Median, and Standard Deviation of Fee Percent, Controlling for Class Recovery Amount, 1993–2008

| Range of Class Recovery (Millions) Decile | Mean | Median | SD | N |
|---|---|---|---|---|
| Recovery <= 1.1 | 37.9 | 32.3 | 19.6 | 69 |
| Recovery > 1.1 <= 2.8 | 27.1 | 26.4 | 9.1 | 69 |
| Recovery > 2.8 <= 5.3 | 26.4 | 25.0 | 9.8 | 69 |
| Recovery > 5.3 <= 8.7 | 22.8 | 22.1 | 8.4 | 69 |
| Recovery > 8.7 <= 14.3 | 23.8 | 25.0 | 8.1 | 69 |
| Recovery > 14.3 <= 22.8 | 22.7 | 23.5 | 7.5 | 69 |
| Recovery > 22.8 <= 38.3 | 22.1 | 24.9 | 8.7 | 68 |
| Recovery > 38.3 <= 69.6 | 20.5 | 21.9 | 10.0 | 70 |
| Recovery > 69.6 <= 175.5 | 19.4 | 19.9 | 8.4 | 69 |
| Recovery > 175.5 | 12.0 | 10.2 | 7.9 | 68 |

SOURCES: Westlaw, LexisNexis, PACER.

Source:  *E&M Study*, *supra*, at p. 265.

Obviously, the recovery in this case, $7.25 billion (excluding the non-cash relief), falls at the extreme high end of this the table.  For the 68 cases in this decile, the mean (average) fee award was 12 percent with a standard deviation of 7.9 percent.  The core of the distribution thus extended from about 4.1 percent to about 19.9 percent.  The fee percentage requested by Class Counsel is lower than the mean and squarely within this size range.

The *E&M Study* also found a positive correlation between fee awards and risk.  In most of the case categories studied, "mean fee percentages were higher in high-risk cases than in other cases."  *E&M Study*, *supra*, at 265.  The measure of risk was exceedingly noisy, however.  The researchers could not assess the riskiness of any case directly, so they coded cases on the basis of the

comments about risk that appeared in judges' opinions.  Consequently, although the finding makes sense, it would be a mistake to place much weight on the numbers.  Having said that, the average fee in cases coded as high-risk was 26.1 percent, with no standard deviation reported. *E&M Study*, *supra*, at p. 265.  Because this case was exceptionally risky, the requested fee of about 10 percent can easily be justified on that basis.

I will now briefly discuss two recent studies of fee awards in securities class actions, which can also be large, high-risk cases.  Choi *et al*. found that fees averaged 30% of the recovery in cases led by individual investors and private institutions, and 25% in cases led by public institutions.  Stephen J. Choi, Jill E. Fisch, and A.C. Pritchard, *Do Institutions Matter? The Impact of the Lead Plaintiff Provision of the Private Securities Litigation Reform Act*, 83 WASHINGTON UNIVERSITY LAW QUARTERLY 869, 897, Table 6A (2005).  More recently, Professor Michael Perino, who also studied securities class actions, reported average fees of 26.6 percent, which dropped to 19.3 percent in cases where public pension funds served as lead plaintiffs.  Michael Perino, *Institutional Activism Through Litigation: An Empirical Analysis of Public Pension Fund Participation in Securities Class Actions,* 9 JOURNAL OF EMPIRICAL LEGAL STUDIES 368, 380, Table 1 (2012). Viewed as a percentage of the recovery, the fee requested in this case is well below average for cases led by public institutional investors.

In sum, empirical studies of fee awards in class actions suggest that a fee of about 10 percent in a case of this magnitude would be a normal result.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.


DATED:  April 10, 2013


_____

CHARLES SILVER

**EXHIBIT 1: RESUME OF PROFESSOR CHARLES SILVER**

# CHARLES SILVER

Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure
Co-Director, Center on Lawyers, Civil Justice and the Media
School of Law
University of Texas
727 East Dean Keeton Street
Austin, Texas 78705
(512) 232-1337 (voice)
csilver@mail.law.utexas.edu (preferred contact method)
Papers on SSRN at: http://ssrn.com/author=164490

Charles Silver holds the Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure at the School of Law at the University of Texas at Austin. He has published widely in law reviews and peer-reviewed journals. His articles use economic theory, philosophical and doctrinal reasoning, and empirical methodologies to shed light on issues arising in the areas of civil procedure, liability insurance, and the professional regulation of attorneys. He has written about group lawsuits (including class actions and other mass proceedings), attorneys' fees (including contractual compensation arrangements, common fund fee awards, and statutory fee awards), and professional responsibility (focusing on lawyers involved in civil litigation on behalf of plaintiffs and defendants). In recent years, as Co-Director of the Center on Lawyers, Civil Justice and the Media at the University of Texas, he has worked with a group of empirical researchers on a series of studies of medical malpractice litigation in Texas. The research group's findings are to appear in a book with the working title "To Sue is Human" on Yale University Press.

Professor Silver served as Associate Reporter on the Principles of the Law of Aggregate Litigation, published by the American Law Institute in 2010. He taught as a Visiting Professor at the Harvard Law School, the University of Michigan Law School, and the Vanderbilt University Law School.

Professor Silver has given many presentations at academic conferences, including programs sponsored by the American Law and Economics Association, the Conference on Empirical Legal Studies, the Law & Society Association, RAND, and the Searle Center on Law, Regulation and Economic Growth. He has also spoken at faculty colloquia at law schools across the U.S.

Professor Silver often consults with attorneys and serves as an expert witness. He has strong ties with all segments of the litigating bar. On the plaintiffs' side, he submitted an expert report on attorneys' fees in the massive Enron settlement and served as professional responsibility advisor to the private attorneys who handled the State of Texas' lawsuit against the tobacco industry. On the defense side, he advises on the responsibilities of lawyers retained by insurance carriers to defend liability suits against policyholders. Professor Silver has also testified to legislative committees and submitted amicus curiae briefs to courts on topics ranging from class certification to lawyers' fiduciary duties to medical malpractice litigation.

In 2009, the Tort Trial & Insurance Practice Section (TIPS) of the ABA awarded Professor Silver the Robert B. McKay Law Professor Award for outstanding scholarship on tort and insurance law.

## ACADEMIC EMPLOYMENTS

UNIVERSITY OF TEXAS SCHOOL OF LAW

| | |
|---|---|
| Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure | 2004-present |
| Co-Director, Center on Lawyers, Civil Justice, and the Media | 2001-present |
| Robert W. Calvert Faculty Fellow | 2000-2004 |
| Cecil D. Redford Professor | 1994-2004 |
| W. James Kronzer Chair in Trial & Appellate Advocacy | Summer 1994 |
| Graves, Dougherty, Hearon & Moody Centennial Faculty Fellow | 1991-1992 |
| Assistant Professor | 1987-1991 |

HARVARD LAW SCHOOL
Visiting Professor                                                    Fall 2011

VANDERBILT UNIVERSITY LAW SCHOOL
Visiting Professor                                                    2003

UNIVERSITY OF MICHIGAN LAW SCHOOL
Visiting Professor                                                    1994

UNIVERSITY OF CHICAGO
Managing Editor, Ethics: A Journal of Social, Political and          1983-1984
   Legal Philosophy

## EDUCATION

JD 1987, Yale Law School
MA 1981, University of Chicago (Political Science)
BA 1979, University of Florida (Political Science)

## SPECIAL PROJECTS

Associate Reporter, Principles of the Law of Aggregate Litigation, American Law Institute (2010) (with Samuel Issacharoff (Reporter), Robert Klonoff and Richard Nagareda (Associate Reporters)).

Co-Reporter, Practical Guide for Insurance Defense Lawyers, International Association of Defense Counsel (2002) (with Ellen S. Pryor and Kent D. Syverud) (published on the IADC website in 2003 and revised and distributed to all IADC members as a supplement to the Defense Counsel J. in January 2004).

## BOOKS UNDER CONTRACT

*To Sue is Human: Medical Malpractice Litigation in Texas 1988-2005* (coauthored with Bernard Black, David Hyman, William Sage and Kathryn Zeiler), Yale University Press (in progress).

*Professional Responsibilities of Insurance Defense Counsel* (coauthored with William T. Barker), Lexis Nexis Matthew Bender (in progress)

*Law of Class Actions and Other Aggregate Litigation* (1st Edition sole authored by Richard Nagareda; 2nd Edition coauthored with Richard Nagareda, Robert Bone, Elizabeth Burch and Patrick Woolley), Foundation Press (in progress)

*Health Law and Economics* (coedited with Ronen Avraham and David Hyman), Edward Elgar (in progress)

## PUBLICATIONS AND RECENTLY PRESENTED WORKS IN PROGRESS

1.   "Philosophers and Fiduciaries" (in progress) (presented at several law schools and conferences).

2.   "Does Tort Reform Affect Physician Supply? Evidence from Texas," (with David A. Hyman and Bernard Black) (in progress) (presented at Petrie Flom Center, Harvard Law School) (under submission).

3.   "ETHICAL OBLIGATIONS OF INDEPENDENT DEFENSE COUNSEL," COVERAGE (FORTHCOMING 2012) (WITH WILLIAM T. BARKER)

4.   "Health Care Quality, Patient Safety and the Culture of Medicine: 'Denial Ain't Just A River in Egypt,'" (coauthored with David A. Hyman), 46 New England Law Review 101 (2012) (invited symposium).

5.   "Medical Malpractice and Compensation in Global Perspective: How Does the U.S. Do It?", 87 Chicago-Kent L. Rev. 163 (2012) (coauthored with David A. Hyman) (invited paper prepared for Conference on Medical Malpractice and Compensation in Global Perspective, Institute for European Tort Law, Vienna, Austria, Dec. 2, 2010).

6.   "Justice Has (Almost) Nothing to Do With It: Medical Malpractice and Tort Reform," in Rosamond Rhodes, Margaret P. Battin, and Anita Silvers, eds., MEDICINE AND SOCIAL JUSTICE, Oxford University Press (forthcoming 2012) (with David A. Hyman).

7.   "Will Tort Reform Bend the Cost Curve? Evidence from Texas" (with Bernard Black, David A. Hyman, Myungho Paik), J. Empirical Legal Stud. (2012) (peer-reviewed).

8.   "How do the Elderly Fare in Medical Malpractice Litigation, Before and After Tort Reform? Evidence From Texas, 1988-2007" (with Bernard Black, David A. Hyman, Myungho Paik, and William Sage), available at http://ssrn.com/abstract=1605331.

9.   "The Responsibilities of Lead Lawyers and Judges in Multi-District Litigations," 79 Fordham L. Rev. (2011) (invited symposium on legal ethics).

10.  "Fiduciaries and Fees," 79 Fordham L. Rev. 1833 (2011) (with Lynn A. Baker) (invited symposium on legal ethics).

11.  "The Impact of the Duty to Settle on Settlement: Evidence From Texas," 8 J. Empirical Leg. Stud. 48-84 (2011) (with Bernard Black and David A. Hyman) (peer reviewed).

12.     "Ethics and Innovation," 79 <u>George Washington L. Rev.</u> 754 (2011) (invited symposium).

13.     "O'Connell Early Settlement Offers: Toward Realistic Numbers and Two-Sided Offers," 7 <u>J. Empirical Legal Stud</u>. 379 (2010) (with Bernard Black and David A. Hyman) (peer reviewed).

14.     "Access to Justice in a World without Lawyers: Evidence from Texas Bodily Injury Claims," 37 <u>Fordham Urb. L. J.</u> 357 (2010) (with David A. Hyman) (invited ABA symposium on access to justice).

15.     "The Quasi-Class Action Method of Managing Multi-District Litigations: Problems and a Proposal," 63 <u>Vanderbilt L. Rev</u>. 107 (2010) (with Geoffrey P. Miller).

16.     "The Effects of 'Early Offers' on Settlement: Evidence From Texas Medical Malpractice Cases, 6 <u>J. Empirical Legal Stud</u>. 723 (2009) (with David A. Hyman and Bernard S. Black) (peer-reviewed).

17.     "Estimating the Effect of Damage Caps in Medical Malpractice Cases: Evidence from Texas," 1 <u>J. Legal Analysis</u> 355 (2009) (with David A. Hyman, Bernard S. Black, and William M. Sage) (inaugural issue) (peer-reviewed).

18.     "The Impact of the 2003 Texas Medical Malpractice Damages Cap on Physician Supply and Insurer Payouts: Separating Facts from Rhetoric," 44 <u>The Advocate</u> 25 (2008) (with David A. Hyman and Bernard Black) (invited symposium).

19.     "Defense Costs and Insurer Reserves in Medical Malpractice and Other Personal Injury Cases: Evidence from Texas, 1988-2004," 10 <u>Amer. Law & Econ. Rev.</u> 185 (2008) (with Bernard Black, David A. Hyman, and William M. Sage) (peer-reviewed).

20.     "Incentivizing Institutional Investors to Serve as Lead Plaintiffs in Securities Fraud Class Actions," 57 <u>DePaul L. Rev.</u> 471 (2008) (with Sam Dinkin) (invited symposium), reprinted in L. Padmavathi, ed., SECURITIES FRAUD: REGULATORY DIMENSIONS (2009).

21.     "Malpractice Payouts and Malpractice Insurance: Evidence from Texas Closed Claims, 1990-2003," 33 <u>Geneva Papers on Risk and Insurance: Issues and Practice</u> 177-192 (2008) (with David A. Hyman, Bernard S. Black, William M. Sage and Kathryn Zeiler) (peer-reviewed).

22.     "Physicians' Insurance Limits and Malpractice Payments: Evidence from Texas Closed Claims 1990-2003," 36 <u>J. Legal Stud.</u> S9 (2007) (with Bernard Black, David A. Hyman, William Sage, and Kathryn Zeiler) (peer-reviewed).

23.     "Do Defendants Pay What Juries Award? Post-Verdict Haircuts in Texas Medical Malpractice Cases, 1988-2003," <u>J. Empirical Legal Stud.</u> 3-68 (2007) (with Bernard Black, David A. Hyman, William M. Sage, and Kathryn Zeiler) (peer-reviewed).

24.     "The Allocation Problem in Multiple-Claimant Representations," 14 <u>S. Ct. Econ. Rev.</u> 95 (2006) (with Paul Edelman and Richard Nagareda) (peer-reviewed).

25.     "Dissent from Recommendation to Set Fees Ex Post," 25 Rev. of Litig. 497 (2006) (accompanied Task Force on Contingent Fees, Tort Trial and Insurance Practice Section of the American Bar Association, "Report on Contingent Fees in Class Action Litigation," 25 Rev. of Litig. 459 (2006)).

26.     "In Texas, Life is Cheap," 59 Vanderbilt L. Rev. 1875 (2006) (with Frank Cross) (invited symposium).

27.     "Medical Malpractice Litigation and Tort Reform: It's the Incentives, Stupid," 59 Vanderbilt L. Rev. 1085 (2006) (with David A. Hyman) (invited symposium).

28.     "A Rejoinder to Lester Brickman: *On the Theory Class's Theories of Asbestos Litigation,*" 32 Pepperdine L. Rev. 765 (2005).

29.     "Medical Malpractice Reform Redux: Déjà Vu All Over Again?" XII Widener L. J. 121 (2005) (with David A. Hyman) (invited symposium).

30.     "Stability, Not Crisis: Medical Malpractice Claim Outcomes in Texas, 1988-2002," 2 J. Empirical Legal Stud. 207–259 (July 2005) (with Bernard Black, David A. Hyman, and William S. Sage) (peer-reviewed).

31.     "Speak Not of Error, Regulation (Spring 2005) (with David A. Hyman).

32.     "The Poor State of Health Care Quality in the U.S.: Is Malpractice Liability Part of the Problem or Part of the Solution?," 90 Cornell L. Rev. 893 (2005) (with David A. Hyman).

33.     "Merging Roles: Mass Tort Lawyers as Agents and Trustees," 31 Pepp. L. Rev. 301 (2004) (invited symposium).

34.     "Believing Six Improbable Things: Medical Malpractice and 'Legal Fear,'" 28 Harv. J. L. and Pub. Pol. 107 (2004) (with David A. Hyman) (invited symposium).

35.     "We're Scared To Death: Class Certification and Blackmail," 78 N.Y.U. L. Rev. 1357 (2003).

36.     "When Should Government Regulate Lawyer-Client Relationships? The Campaign to Prevent Insurers from Managing Defense Costs," 44 Ariz. L. Rev. 787 (2002) (invited symposium).

37.     "Introduction: Civil Justice Fact and Fiction," 80 Tex. L. Rev. 1537 (2002) (with Lynn A. Baker).

38.     "Does Civil Justice Cost Too Much?" 80 Tex. L. Rev. 2073 (2002).

39.     "Defense Lawyers' Professional Responsibilities: Part II—Contested Coverage Cases," 15 G'town J. Legal Ethics 29 (2001) (with Ellen S. Pryor).

40.  "A Critique of *Burrow v. Arce*," 26 <u>Wm. & Mary Envir. L. & Policy Rev.</u> 323 (2001) (invited symposium).

41.  "You Get What You Pay For: Result-Based Compensation for Health Care," 58 <u>Wash. & Lee L. Rev.</u> 1427 (2001) (with David A. Hyman).

42.  "The Case for Result-Based Compensation in Health Care," 29 <u>J. L. Med. & Ethics</u> 170 (2001) (with David A. Hyman).

43.  "Defense Lawyers' Professional Responsibilities: Part I—Excess Exposure Cases," 78 <u>Tex. L. Rev.</u> 599 (2000) (with Ellen S. Pryor).

44.  "What's Not To Like About Being A Lawyer?," 109 <u>Yale L. J.</u> 1443 (2000) (with Frank B. Cross) (review essay).

45.  "Due Process and the Lodestar Method: You Can't Get There From Here," 74 <u>Tul. L. Rev.</u> 1809 (2000) (invited symposium).

46.  "The Aggregate Settlement Rule and Ideals of Client Service," 41 <u>S. Tex. L. Rev.</u> 227 (1999) (with Lynn A. Baker) (invited symposium).

47.  "Representative Lawsuits & Class Actions," in <u>Int'l Ency. Of L. & Econ.</u>, B. Bouckaert & G. De Geest, eds., (1999) (peer-reviewed).

48.  "Preliminary Thoughts on the Economics of Witness Preparation," 30 <u>Tex. Tech L. Rev.</u> 1383 (1999) (invited symposium).

49.  "The Lost World: Of Politics and Getting the Law Right," 26 <u>Hofstra L. Rev.</u> 773 (1998) (invited symposium).

50.  "Flat Fees and Staff Attorneys: Unnecessary Casualties in the Battle over the Law Governing Insurance Defense Lawyers," 4 <u>Conn. Ins. L. J.</u> 205 (1998) (invited symposium).

51.  "I Cut, You Choose: The Role of Plaintiffs' Counsel in Allocating Settlement Proceeds," 84 <u>Va. L. Rev.</u> 1465 (1998) (with Lynn A. Baker) (invited symposium).

52.  "And Such Small Portions: Limited Performance Agreements and the Cost-Quality/Access Trade-Off," 11 <u>G'town J. Legal Ethics</u> 959 (1998) (with David A. Hyman) (invited symposium).

53.  "Mass Lawsuits and the Aggregate Settlement Rule," 32 <u>Wake Forest L. Rev.</u> 733 (1997) (with Lynn A. Baker) (invited symposium).

54.  "Professional Liability Insurance as Insurance and as Lawyer Regulation: A Comment on Davis, Institutional Choices in the Regulation of Lawyers," 65 <u>Fordham L. Rev.</u> 233 (1996) (invited symposium).

55. "All Clients are Equal, But Some are More Equal than Others: A Reply to Morgan and Wolfram," 6-3 <u>Coverage</u> 47 (May/June 1996) (with Michael Sean Quinn).

56. "Are Liability Carriers Second-Class Clients? No, But They May Be Soon-A Call to Arms against the Restatement of the Law Governing Lawyers," 6-2 <u>Coverage</u> 21 (Jan./Feb. 1996) (with Michael Sean Quinn).

57. "Bargaining Impediments and Settlement Behavior," in <u>Dispute Resolution: Bridging the Settlement Gap</u>, D.A. Anderson, ed. (1996) (with Samuel Issacharoff and Kent D. Syverud).

58. "The Legal Establishment Meets the Republican Revolution," 37 <u>S. Tex. L. Rev.</u> 1247 (1996) (invited symposium).

59. "Do We Know Enough About Legal Norms?" in <u>Social Rules: Origin; Character; Logic; Change</u>, D. Braybrooke, ed. (1996).

60. "The Professional Responsibilities of Insurance Defense Lawyers," 45 <u>Duke L. J.</u> 255 (1995) (with Kent D. Syverud), reprinted in <u>Ins. L. Anthol.</u> (1996) and 64 <u>Def. L. J.</u> 1 (Spring 1997).

61. "Wrong Turns on the Three Way Street: Dispelling Nonsense About Insurance Defense Lawyers," 5-6 <u>Coverage</u> 1 (Nov./Dec.1995) (with Michael Sean Quinn).

62. "Introduction to the Symposium on Bad Faith in the Law of Contract and Insurance," 72 <u>Tex. L. Rev.</u> 1203 (1994) (with Ellen Smith Pryor).

63. "Does Insurance Defense Counsel Represent the Company or the Insured?" 72 <u>Tex. L. Rev.</u> 1583 (1994), reprinted in Practising Law Institute, <u>Insurance Law: What Every Lawyer and Businessperson Needs To Know</u>, Litigation and Administrative Practice Course Handbook Series, PLI Order No. H0-000S (1998).

64. "Thoughts on Procedural Issues in Insurance Litigation," VII <u>Ins. L. Anthol.</u> (1994).

65. "A Model Retainer Agreement for Legal Services Programs: Mandatory Attorney's Fees Provisions," 28 <u>Clearinghouse Rev</u>. 114 (June 1994) (with Stephen Yelenosky).

66. "Incoherence and Irrationality in the Law of Attorneys' Fees," 12 <u>Tex. Rev. of Litig.</u> 301 (1993).

67. "A Missed Misalignment of Interests: A Comment on Syverud, The Duty to Settle," 77 <u>Va. L. Rev.</u> 1585 (1991), reprinted in VI <u>Ins. L. Anthol.</u> 857-870 (1992).

68. "Unloading the Lodestar: Toward a New Fee Award Procedure," 70 <u>Tex. L. Rev.</u> 865 (1992).

69. "Comparing Class Actions and Consolidations," 10 <u>Tex. Rev. of Litig.</u> 496 (1991).

70. "A Restitutionary Theory of Attorneys' Fees in Class Actions," 76 <u>Cornell L. Rev.</u> 656 (1991).

71. "Elmer's Case: A Legal Positivist Replies to Dworkin," 6 L. & Phil. 381 (1987) (peer-reviewed).

72. "Justice In Settlements," 4 Soc. Phil. & Pol. 102 (1986) (with Jules L. Coleman) (peer-reviewed).

73. "Negative Positivism and the Hard Facts of Life," 68 The Monist 347 (1985) (peer-reviewed).

74. "Utilitarian Participation," 23 Soc. Sci. Info. 701 (1984) (peer-reviewed).

75. "Public Opinion and the Federal Judiciary: Crime, Punishment, and Demographic Constraints," 3 Pop. Res. & Pol. Rev. 255 (1984) (with Robert Y. Shapiro) (peer-reviewed).

## NOTABLE SERVICE ACTIVITIES

Associate Reporter, American Law Institute Project on the Principles of Aggregate Litigation

Interested Party, Statistical Information Task Force, National Association of Insurance Commissioners, Model Medical Malpractice Closed Claim Reporting Law

Invited Academic Member, American Bar Association/Tort & Insurance Practice Section Task Force on the Contingent Fee

Chair, Dean Search Committee, School of Law, University of Texas at Austin

Chair, Budget Committee, School of Law, University of Texas at Austin

Coordinator, General Faculty Colloquium Series, School of Law, University of Texas at Austin

Sole Drafter, Assessment Report for the Juris Doctor Program at the School of Law, University of Texas at Austin, for the Commission on Colleges of the Southern Association of Colleges and Schools

## RECENT AWARDS

Robert B. McKay Law Professor Award, Tort Trial & Insurance Practice Section, American Bar Association (2009)

Faculty Research Grants, University of Texas at Austin (various years)

## MEMBERSHIPS

American Bar Foundation

Texas Bar Foundation (Life Fellow)

State Bar of Texas (admitted 1988)

Tort Trial and Insurance Practice Section, American Bar Association

Society for Empirical Legal Studies

American Law and Economics Association

American Association for Justice

# EXHIBIT "B"

# CHARLES SILVER

csilver@mail.law.utexas.edu (preferred contact method)
Papers on SSRN at: http://ssrn.com/author=164490

## CONTACT INFORMATION

Co-Director, Center on Lawyers, Civil Justice and the Media
School of Law
University of Texas
727 East Dean Keeton Street
Austin, Texas 78705

(512) 232-1337 (voice)

## ACADEMIC EMPLOYMENTS

School of Law, University of Texas at Austin, 1987-2015
Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure
W. James Kronzer Chair in Trial & Appellate Advocacy
Cecil D. Redford Professor
Robert W. Calvert Faculty Fellow
Graves, Dougherty, Hearon & Moody Centennial Faculty Fellow
Assistant Professor

University of Michigan Law School, Fall 2018
Visiting Professor

Harvard Law School, Fall 2011
Visiting Professor

Vanderbilt University Law School, Fall 2003
Visiting Professor

University of Michigan Law School, Fall 1994
Visiting Professor

University of Chicago, 1983-1984
Managing Editor, *Ethics: A Journal of Social, Political and Legal Philosophy*

## EDUCATION

Yale Law School, JD (1987)
University of Chicago, MA (Political Science) (1981)
University of Florida BA (Political Science) 1979

## PUBLICATIONS

### SPECIAL PROJECTS

PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION (with Samuel Issacharoff, Reporter, and Robert Klonoff and Richard Nagareda, Associate Reporters) (American Law Institute 2010).

## CHARLES SILVER

csilver@mail.law.utexas.edu (preferred contact method)
Papers on SSRN at: http://ssrn.com/author=164490

Invited Academic Member, ABA/Tort Trial & Insurance Practice Section, Task Force on Contingent Fees, "Report on Contingent Fees In Class Action Litigation," 25 Rev. Litig. 459 (2006).

Invited Academic Member, ABA/Tort Trial & Insurance Practice Section, Task Force on Contingent Fees, "Report on Contingent Fees In Mass Tort Litigation," 42 Tort Trial & Insurance Practice Law Journal 105 (2006).

Invited Academic Member, ABA/Tort Trial & Insurance Practice Section, Task Force on Contingent Fees, "Report on Contingent Fees In Medical Malpractice Litigation," 25 Rev. Litig. 459 (2006).

PRACTICAL GUIDE FOR INSURANCE DEFENSE LAWYERS (2002) (with Ellen S. Pryor and Kent D. Syverud, Co-Reporters); published on the IADC website (2003); revised and distributed to all IADC members as a supplement to the Defense Counsel J. (2004).

### BOOKS

MEDICAL MALPRACTICE LITIGATION: HOW IT WORKS, WHAT IT DOES, AND WHY TORT REFORM HASN'T HELPED (with Bernard S. Black, David A. Hyman, Myungho Paik, and William M. Sage) (in progress).

OVERCHARGED: WHY AMERICANS PAY TOO MUCH FOR HEALTH CARE (with David A. Hyman) (Cato Institute, 2018).

HEALTH LAW AND ECONOMICS, Vols. I and II (coedited with Ronen Avraham and David A. Hyman) (Edward Elgar 2016).

LAW OF CLASS ACTIONS AND OTHER AGGREGATE LITIGATION, (coedited with Richard Nagareda, Robert Bone, Elizabeth Burch and Patrick Woolley) (Foundation Press, 2nd Ed. 2012) (updated annually through 2018).

PROFESSIONAL RESPONSIBILITIES OF INSURANCE DEFENSE COUNSEL (with William T. Barker) (LexisNexis 2012) (updated annually through 2017).

### ARTICLES AND BOOK CHAPTERS BY SUBJECT AREA (* INDICATES PEER REVIEWED)

### Health Care Law & Policy

1.   "There is a Better Way: Give Medicaid Beneficiaries the Money," (with David A. Hyman) (under submission).

2.   "Medical Malpractice Litigation," (with David A. Hyman) OXFORD RESEARCH ENCYCLOPEDIA OF ECONOMICS AND FINANCE (2019), DOI: 10.1093/acrefore/9780190625979.013.365.*

## CHARLES SILVER

csilver@mail.law.utexas.edu (preferred contact method)
Papers on SSRN at: http://ssrn.com/author=164490

3.  "It Was on Fire When I Lay Down on It: Defensive Medicine, Tort Reform, and Healthcare Spending," (with David A. Hyman) OXFORD HANDBOOK OF AMERICAN HEALTH LAW, I. Glenn Cohen, Allison Hoffman, and William M. Sage, eds. (2017).*

4.  "Compensating Persons Injured by Medical Malpractice and Other Tortious Behavior for Future Medical Expenses Under the Affordable Care Act," (with Maxwell J. Mehlman, Jay Angoff, Patrick A. Malone, and Peter H. Weinberger)25 Annals of Health Law 35 (2016).

5.  "Double, Double, Toil and Trouble: Justice-Talk and the Future of Medical Malpractice Litigation," (with David A. Hyman) 63 DePaul L. Rev. 574 (2014) (invited symposium).

6.  "Five Myths of Medical Malpractice," (with David A. Hyman) 143:1 Chest 222-227 (2013).*

7.  "Health Care Quality, Patient Safety and the Culture of Medicine: 'Denial Ain't Just A River in Egypt,'" (with David A. Hyman), 46 New England L. Rev. 101 (2012) (invited symposium).

8.  "Medical Malpractice and Compensation in Global Perspective: How Does the U.S. Do It?" (coauthored with David A. Hyman) MEDICAL MALPRACTICE AND COMPENSATION IN GLOBAL PERSPECTIVE (Ken Oliphant & Richard W. Wright, eds. 2013)*; originally published in 87 Chicago-Kent L. Rev. 163 (2012).

9.  "Justice Has (Almost) Nothing to Do With It: Medical Malpractice and Tort Reform," in Rosamond Rhodes, Margaret P. Battin, and Anita Silvers, eds., MEDICINE AND SOCIAL JUSTICE, Oxford University Press 531-542 (2012) (with David A. Hyman).*

10. "Medical Malpractice Litigation and Tort Reform: It's the Incentives, Stupid," 59 Vanderbilt L. Rev. 1085 (2006) (with David A. Hyman) (invited symposium).

11. "Medical Malpractice Reform Redux: Déjà Vu All Over Again?" XII Widener L. J. 121 (2005) (with David A. Hyman) (invited symposium).

12. "Speak Not of Error, Regulation (Spring 2005) (with David A. Hyman).

13. "The Poor State of Health Care Quality in the U.S.: Is Malpractice Liability Part of the Problem or Part of the Solution?" 90 Cornell L. Rev. 893 (2005) (with David A. Hyman).

14. "Believing Six Improbable Things: Medical Malpractice and 'Legal Fear,'" 28 Harv. J. L. and Pub. Pol. 107 (2004) (with David A. Hyman) (invited symposium).

15. "You Get What You Pay For: Result-Based Compensation for Health Care," 58 Wash. & Lee L. Rev. 1427 (2001) (with David A. Hyman).

## CHARLES SILVER
csilver@mail.law.utexas.edu (preferred contact method)
Papers on SSRN at: http://ssrn.com/author=164490

16.  "The Case for Result-Based Compensation in Health Care," 29 J. L. Med. & Ethics 170 (2001) (with David A. Hyman).*

### Studies of Medical Malpractice Litigation

17.  "Fictions and Facts: Medical Malpractice Litigation, Physician Supply, and Health Care Spending in Texas Before and After HB 4," Texas Tech L. Rev. (forthcoming 2019) (with David A. Hyman and Bernard Black) (invited symposium on the 15th anniversary of the enactment of HB4).

18.  "Insurance Crisis or Liability Crisis? Medical Malpractice Claiming in Illinois, 1980-2010," 13 J. Empirical Legal Stud. 183 (2016) (with Bernard S. Black, David A. Hyman, and Mohammad H. Rahmati).

19.  "Policy Limits, Payouts, and Blood Money: Medical Malpractice Settlements in the Shadow of Insurance," 5 U.C. Irvine L. Rev. 559 (2015) (with Bernard S. Black, David A. Hyman, and Myungho Paik) (invited symposium).

20.  "Does Tort Reform Affect Physician Supply? Evidence from Texas," Int'l Rev. of L. & Econ. (2015) (with Bernard S. Black, David A. Hyman, and Myungho Paik), available at http://dx.doi.org/10.1016/j.irle.2015.02.002.*

21.  "How do the Elderly Fare in Medical Malpractice Litigation, Before and After Tort Reform? Evidence From Texas" (with Bernard S. Black, David A. Hyman, Myungho Paik, and William M. Sage), Amer. L. & Econ. Rev. (2012), doi: 10.1093/aler/ahs017.*

22.  "Will Tort Reform Bend the Cost Curve? Evidence from Texas" (with Bernard S. Black, David A. Hyman, Myungho Paik), 9 J. Empirical Legal Stud. 173-216 (2012).*

23.  "O'Connell Early Settlement Offers: Toward Realistic Numbers and Two-Sided Offers," 7 J. Empirical Legal Stud. 379 (2010) (with Bernard S. Black and David A. Hyman).*

24.  "The Effects of 'Early Offers' on Settlement: Evidence From Texas Medical Malpractice Cases, 6 J. Empirical Legal Stud. 723 (2009) (with David A. Hyman and Bernard S. Black).*

25.  "Estimating the Effect of Damage Caps in Medical Malpractice Cases: Evidence from Texas," 1 J. Legal Analysis 355 (2009) (with David A. Hyman, Bernard S. Black, and William M. Sage) (inaugural issue).*

26.  "The Impact of the 2003 Texas Medical Malpractice Damages Cap on Physician Supply and Insurer Payouts: Separating Facts from Rhetoric," 44 The Advocate (Texas) 25 (2008) (with Bernard S. Black and David A. Hyman) (invited symposium).

27.  "Malpractice Payouts and Malpractice Insurance: Evidence from Texas Closed Claims, 1990-2003," 3 Geneva Papers on Risk and Insurance: Issues and Practice 177-192 (2008) (with Bernard S. Black, David A. Hyman, William M. Sage and Kathryn Zeiler).*

## CHARLES SILVER

csilver@mail.law.utexas.edu (preferred contact method)
Papers on SSRN at: http://ssrn.com/author=164490

28. "Physicians' Insurance Limits and Malpractice Payments: Evidence from Texas Closed Claims 1990-2003," 36 J. Legal Stud. S9 (2007) (with Bernard S. Black, David A. Hyman, William M. Sage, and Kathryn Zeiler).*

29. "Do Defendants Pay What Juries Award? Post-Verdict Haircuts in Texas Medical Malpractice Cases, 1988-2003," J. Empirical Legal Stud. 3-68 (2007) (with Bernard S. Black, David A. Hyman, William M. Sage, and Kathryn Zeiler).*

30. "Stability, Not Crisis: Medical Malpractice Claim Outcomes in Texas, 1988-2002," 2 J. Empirical Legal Stud. 207–259 (July 2005) (with Bernard S. Black, David A. Hyman, and William S. Sage).*

### Empirical Studies of the Law Firms and Legal Services

31. "Screening Plaintiffs and Selecting Defendants in Medical Malpractice Litigation: Evidence from Illinois and Indiana," 15 J. Empirical Legal Stud. 41-79 (2018) (with Mohammad Rahmati, David A. Hyman, Bernard S. Black, and Jing Liu)*

32. "Medical Malpractice Litigation and the Market for Plaintiff-Side Representation: Evidence from Illinois," 13 J. Empirical Legal Stud. 603-636 (2016) (with David A. Hyman, Mohammad Rahmati, Bernard S. Black).*

33. "The Economics of Plaintiff-Side Personal Injury Practice," U. Ill. L. Rev. 1563 (2015) (with Bernard S. Black and David A. Hyman).

34. "Access to Justice in a World without Lawyers: Evidence from Texas Bodily Injury Claims," 37 Fordham Urb. L. J. 357 (2010) (with David A. Hyman) (invited symposium).

35. "Defense Costs and Insurer Reserves in Medical Malpractice and Other Personal Injury Cases: Evidence from Texas, 1988-2004," 10 Amer. Law & Econ. Rev. 185 (2008) (with Bernard S. Black, David A. Hyman, and William M. Sage).*

### Attorneys' Fees—Empirical Studies and Policy Analyses

36. "The Mimic-the-Market Method of Regulating Common Fund Fee Awards: A Status Report on Securities Fraud Class Actions," RESEARCH HANDBOOK ON REPRESENTATIVE SHAREHOLDER LITIGATION, Sean Griffith, Jessica Erickson, David H. Webber, and Verity Winship, Eds. (forthcoming 2018).

37. "Is the Price Right? An Empirical Study of Fee-Setting in Securities Class Actions," 115 Columbia L. Rev. 1371 (2015) (with Lynn A. Baker and Michael A. Perino).

38. "Regulation of Fee Awards in the Fifth Circuit," 67 The Advocate (Texas) 36 (2014) (invited submission).

39. "Setting Attorneys' Fees In Securities Class Actions: An Empirical Assessment," 66 Vanderbilt L. Rev. 1677 (2013) (with Lynn A. Baker and Michael A. Perino).

# CHARLES SILVER
csilver@mail.law.utexas.edu (preferred contact method)
Papers on SSRN at: http://ssrn.com/author=164490

40.   "The Quasi-Class Action Method of Managing Multi-District Litigations: Problems and a Proposal," 63 Vanderbilt L. Rev. 107 (2010) (with Geoffrey P. Miller).

41.   "Incentivizing Institutional Investors to Serve as Lead Plaintiffs in Securities Fraud Class Actions," 57 DePaul L. Rev. 471 (2008) (with Sam Dinkin) (invited symposium), reprinted in L. Padmavathi, Ed., SECURITIES FRAUD: REGULATORY DIMENSIONS (2009).

42.   "Reasonable Attorneys' Fees in Securities Class Actions: A Reply to Mr. Schneider," 20 The NAPPA Report 7 (Aug. 2006).

43.   "Dissent from Recommendation to Set Fees Ex Post," 25 Rev. of Litig. 497 (2006).

44.   "Due Process and the Lodestar Method: You Can't Get There From Here," 74 Tul. L. Rev. 1809 (2000) (invited symposium).

45.   "Incoherence and Irrationality in the Law of Attorneys' Fees," 12 Tex. Rev. of Litig. 301 (1993).

46.   "Unloading the Lodestar: Toward a New Fee Award Procedure," 70 Tex. L. Rev. 865 (1992).

47.   "A Restitutionary Theory of Attorneys' Fees in Class Actions," 76 Cornell L. Rev. 656 (1991).

## Liability Insurance and Insurance Defense Ethics

48.   "Liability Insurance and Patient Safety," 68 DePaul L. Rev. 209 (2019) (with Tom Baker) (symposium issue).

49.   "The Treatment of Insurers' Defense-Related Responsibilities in the Principles of the Law of Liability Insurance: A Critique," 68 Rutgers U. L. Rev. 83 (2015) (with William T. Barker) (symposium issue).

50.   "The Basic Economics of the Duty to Defend," in D. Schwarcz and P. Siegelman, eds., RESEARCH HANDBOOK IN THE LAW & ECONOMICS OF INSURANCE 438-460 (2015).*

51.   "Insurer Rights to Limit Costs of Independent Counsel," ABA/TIPS Insurance Coverage Litigation Section Newsletter 1 (Aug. 2014) (with William T. Barker).

52.   "Litigation Funding Versus Liability Insurance: What's the Difference?," 63 DePaul L. Rev. 617 (2014) (invited symposium).

53.   "Ethical Obligations of Independent Defense Counsel," 22:4 Insurance Coverage (July-August 2012) (with William T. Barker), available at http://apps.americanbar.org/litigation/committees/insurance/articles/julyaug2012-ethical-obligations-defense-counsel2.html.

# CHARLES SILVER

csilver@mail.law.utexas.edu (preferred contact method)
Papers on SSRN at: http://ssrn.com/author=164490

54.   "Settlement at Policy Limits and The Duty to Settle: Evidence from Texas," 8 J. Empirical Leg. Stud. 48-84 (2011) (with Bernard S. Black and David A. Hyman).*

55.   "When Should Government Regulate Lawyer-Client Relationships? The Campaign to Prevent Insurers from Managing Defense Costs," 44 Ariz. L. Rev. 787 (2002) (invited symposium).

56.   "Defense Lawyers' Professional Responsibilities: Part II—Contested Coverage Cases," 15 G'town J. Legal Ethics 29 (2001) (with Ellen S. Pryor).

57.   "Defense Lawyers' Professional Responsibilities: Part I—Excess Exposure Cases," 78 Tex. L. Rev. 599 (2000) (with Ellen S. Pryor).

58.   "Flat Fees and Staff Attorneys: Unnecessary Casualties in the Battle over the Law Governing Insurance Defense Lawyers," 4 Conn. Ins. L. J. 205 (1998) (invited symposium).

59.   "The Lost World: Of Politics and Getting the Law Right," 26 Hofstra L. Rev. 773 (1998) (invited symposium).

60.   "Professional Liability Insurance as Insurance and as Lawyer Regulation: A Comment on Davis, Institutional Choices in the Regulation of Lawyers," 65 Fordham L. Rev. 233 (1996) (invited symposium).

61.   "All Clients are Equal, But Some are More Equal than Others: A Reply to Morgan and Wolfram," 6 Coverage 47 (1996) (with Michael Sean Quinn).

62.   "Are Liability Carriers Second-Class Clients? No, But They May Be Soon-A Call to Arms against the Restatement of the Law Governing Lawyers," 6 Coverage 21 (1996) (with Michael Sean Quinn).

63.   "The Professional Responsibilities of Insurance Defense Lawyers," 45 Duke L. J. 255 (1995) (with Kent D. Syverud); reprinted in IX INS. L. ANTHOL. (1996) and 64 Def. L. J. 1 (Spring 1997).

64.   "Wrong Turns on the Three Way Street: Dispelling Nonsense about Insurance Defense Lawyers," 5-6 Coverage 1 (Nov./Dec.1995) (with Michael Sean Quinn).

65.   "Introduction to the Symposium on Bad Faith in the Law of Contract and Insurance," 72 Tex. L. Rev. 1203 (1994) (with Ellen Smith Pryor).

66.   "Does Insurance Defense Counsel Represent the Company or the Insured?" 72 Tex. L. Rev. 1583 (1994); reprinted in Practicing Law Institute, INSURANCE LAW: WHAT EVERY LAWYER AND BUSINESSPERSON NEEDS TO KNOW (1998).

## CHARLES SILVER
csilver@mail.law.utexas.edu (preferred contact method)
Papers on SSRN at: http://ssrn.com/author=164490

67.    "A Missed Misalignment of Interests: A Comment on *Syverud, The Duty to Settle*," 77 Va. L. Rev. 1585 (1991); reprinted in VI Ins. L. Anthol. 857 (1992).

### Class Actions, Mass Actions, and Multi-District Litigations

68.    "What Can We Learn by Studying Lawyers' Involvement in Multidistrict Litigation?  A Comment on *Williams, Lee, and Borden, Repeat Players in Federal Multidistrict Litigation*," 5 J. of Tort L. 181 (2014), DOI: 10.1515/jtl-2014-0010 (invited symposium).

69.    "The Responsibilities of Lead Lawyers and Judges in Multi-District Litigations," 79 Fordham L. Rev. 1985 (2011) (invited symposium).

70.    "The Allocation Problem in Multiple-Claimant Representations," 14 S. Ct. Econ. Rev. 95 (2006) (with Paul Edelman and Richard Nagareda).*

71.    "A Rejoinder to *Lester Brickman, On the Theory Class's Theories of Asbestos Litigation,"* 32 Pepperdine L. Rev. 765 (2005).

72.    "Merging Roles: Mass Tort Lawyers as Agents and Trustees," 31 Pepp. L. Rev. 301 (2004) (invited symposium).

73.    "We're Scared To Death: Class Certification and Blackmail," 78 N.Y.U. L. Rev. 1357 (2003).

74.    "The Aggregate Settlement Rule and Ideals of Client Service," 41 S. Tex. L. Rev. 227 (1999) (with Lynn A. Baker) (invited symposium).

75.    "Representative Lawsuits & Class Actions," in B. Bouckaert & G. De Geest, eds., Int'l Ency. Of L. & Econ. (1999).*

76.    "I Cut, You Choose: The Role of Plaintiffs' Counsel in Allocating Settlement Proceeds," 84 Va. L. Rev. 1465 (1998) (with Lynn A. Baker) (invited symposium).

77.    "Mass Lawsuits and the Aggregate Settlement Rule," 32 Wake Forest L. Rev. 733 (1997) (with Lynn A. Baker) (invited symposium).

78.    "Comparing Class Actions and Consolidations," 10 Tex. Rev. of Litig. 496 (1991).

79.    "Justice in Settlements," 4 Soc. Phil. & Pol. 102 (1986) (with Jules L. Coleman).*

### General Legal Ethics and Civil Litigation

80.    "A Private Law Defense of Zealous Representation" (in progress), available at http://ssrn.com/abstract=2728326.

81.    "The DOMA Sideshow" (in progress), available at http://ssrn.com/abstract=2584709.

## CHARLES SILVER
csilver@mail.law.utexas.edu (preferred contact method)
Papers on SSRN at: http://ssrn.com/author=164490

82.    "Fiduciaries and Fees," 79 <u>Fordham L. Rev.</u> 1833 (2011) (with Lynn A. Baker) (invited symposium).

83.    "Ethics and Innovation," 79 <u>George Washington L. Rev.</u> 754 (2011) (invited symposium).

84.    "In Texas, Life is Cheap," 59 <u>Vanderbilt L. Rev.</u> 1875 (2006) (with Frank Cross) (invited symposium).

85.    "Introduction: Civil Justice Fact and Fiction," 80 <u>Tex. L. Rev.</u> 1537 (2002) (with Lynn A. Baker).

86.    "Does Civil Justice Cost Too Much?" 80 <u>Tex. L. Rev.</u> 2073 (2002).

87.    "A Critique of *Burrow v. Arce*," 26 <u>Wm. & Mary Envir. L. & Policy Rev.</u> 323 (2001) (invited symposium).

88.    "What's Not To Like About Being A Lawyer?" 109 <u>Yale L. J.</u> 1443 (2000) (with Frank B. Cross) (review essay).

89.    "Preliminary Thoughts on the Economics of Witness Preparation," 30 <u>Tex. Tech L. Rev.</u> 1383 (1999) (invited symposium).

90.    "And Such Small Portions: Limited Performance Agreements and the Cost-Quality/Access Trade-Off," 11 <u>G'town J. Legal Ethics</u> 959 (1998) (with David A. Hyman) (invited symposium).

91.    "Bargaining Impediments and Settlement Behavior," in D.A. Anderson, ed., DISPUTE RESOLUTION: BRIDGING THE SETTLEMENT GAP (1996) (with Samuel Issacharoff and Kent D. Syverud).

92.    "The Legal Establishment Meets the Republican Revolution," 37 <u>S. Tex. L. Rev.</u> 1247 (1996) (invited symposium).

93.    "Do We Know Enough about Legal Norms?" in D. Braybrooke, ed., SOCIAL RULES: ORIGIN; CHARACTER; LOGIC: CHANGE (1996) (invited contribution).

94.    "Integrating Theory and Practice into the Professional Responsibility Curriculum at the University of Texas," 58 <u>Law and Contemporary Problems</u> 213 (1995) (with Amon Burton, John S. Dzienkowski, and Sanford Levinson,).

95.    "Thoughts on Procedural Issues in Insurance Litigation," VII INS. L. ANTHOL. (1994).

### Legal and Moral Philosophy

96.    "Elmer's Case: A Legal Positivist Replies to Dworkin," 6 <u>L. & Phil.</u> 381 (1987).*

## CHARLES SILVER
csilver@mail.law.utexas.edu (preferred contact method)
Papers on SSRN at: http://ssrn.com/author=164490

97.   "Negative Positivism and the Hard Facts of Life," 68 <u>The Monist</u> 347 (1985).*

98.   "Utilitarian Participation," 23 <u>Soc. Sci. Info.</u> 701 (1984).*

### Practice-Oriented Publications

99.   "Your Role in a Law Firm: Responsibilities of Senior, Junior, and Supervisory Attorneys," in F.W. Newton, ed., A GUIDE TO THE BASICS OF LAW PRACTICE (3D) (Texas Center for Legal Ethics and Professionalism 1996).

100.  "Getting and Keeping Clients," in F.W. Newton, ed., A GUIDE TO THE BASICS OF LAW PRACTICE (3D) (Texas Center for Legal Ethics and Professionalism 1996) (with James M. McCormack and Mitchel L. Winick).

101.  "Advertising and Marketing Legal Services," in F.W. Newton, ed., A GUIDE TO THE BASICS OF LAW PRACTICE (Texas Center for Legal Ethics and Professionalism 1994).

102.  "Responsibilities of Senior and Junior Attorneys," in F.W. Newton, ed., A GUIDE TO THE BASICS OF LAW PRACTICE (Texas Center for Legal Ethics and Professionalism 1994).

103.  "A Model Retainer Agreement for Legal Services Programs: Mandatory Attorney's Fees Provisions," 28 <u>Clearinghouse Rev</u>. 114 (June 1994) (with Stephen Yelenosky).

### Miscellaneous

104.  "Public Opinion and the Federal Judiciary: Crime, Punishment, and Demographic Constraints," 3 <u>Pop. Res. & Pol. Rev.</u> 255 (1984) (with Robert Y. Shapiro).*

## PERSONAL

Married to Cynthia Eppolito, PA; Daughter, Katherine; Step-son, Mabon.

Consults with attorneys and serves as an expert witness on subjects in his areas of expertise.

First generation of family to attend college.