UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTRUST LITIGATION**<br><br>This Document Relates To: All Cases | MDL Docket No. 1720<br><br>NO. 1:05-md-1720-MKB-JO |

## OBJECTION AND NOTICE OF INTENT TO APPEAR

Objector Kevan McLaughlin ("McLaughlin" or "Objector") hereby objects to the proposed settlement and plaintiffs' request for award of attorneys' fees and class plaintiffs' awards, and gives notice of his intent to appear at the fairness hearing through counsel and be heard. Pursuant to Rule 23(e)(5)(A), Objector indicates the following objections to apply to the entire class, including Objector.

### I. INTRODUCTION

Mr. McLaughlin objected to the original proposed settlement in this matter on May 25, 2013. DE2474. He objected to, among other things, the scope of the release, the disparate treatment of class members, and the form and manner of notice. The Second Circuit Court of Appeals agreed that the original settlement was unfair and, on June 30 2016, remanded to this Court for further proceedings. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 236 (2d Cir. 2016) ("Here, the bargain that was struck between relief and release on behalf of absent class members is so unreasonable that it evidences inadequate representation.").

1

Although many of the issues raised in McLaughlin's original objection have been addressed in the Superseding Settlement, the prospective five-year waiver of financial liability for future conduct in the release remains troubling. It may well be unenforceable but, even if it is not, there is no reason to extend the five-year bar by adding to it the duration of any appeals, as the release purports to do. Such a "floating release" could effectively add years to the class period, for no apparent justification, severely reducing the value of the settlement.

The uncertainty in the prospective duration of the release makes it far more difficult for this Court to determine what the Class will actually be giving up in exchange for the settlement fund, a core inquiry in valuation that is central not only to approving the settlement, but also to determining compensation for counsel. Even beyond that major infirmity, the fees sought by class counsel are excessive, particularly given the course of the case and its division into a Rule 23(b)(3) class and a Rule 23(b)(2) injunctive relief class. The requested 9.5% fee would result in a lodestar multiplier close to three, and a fee exceeding $600 million. That is well above the amounts typically awarded in cases with analogous recoveries and risk in this Circuit, which typically result in lodestar multipliers between one and two. Although counsel are surely entitled to a fully compensatory fee for obtaining a settlement, the Court should not grant the request in full.

Finally, McLaughlin objects that the incentive payments sought by the lead plaintiffs are prohibited by Supreme Court authority, despite the fact that some lower courts have made a practice of awarding them.

## II. OBJECTIONS AND ARGUMENT

A. **The Prospective Waiver of Claims for Future Conduct Remains Objectionable, and its Uncertain Duration Severely Impedes the Court's Ability to Analyze the Value of the Settlement and to Set Reasonable Attorneys' Fees**

The actual recovery in the case is obscured by the uncertain breadth of the release, by which the effective class period spans at least an additional five years beyond the resolution of any appeals in the case. Defendants are thus paying the class to compensate for past alleged misconduct, but are allowed to pursue the same or similar conduct for at least five more years without compensating the class or potentially being subject to later liability. Inexplicably, that uncompensated time period is extended for the duration of any appeals.

Objector is mindful that this Court has wrestled with this component of the Superseding Settlement, ultimately determining that such a waiver is permissible and imposing additional conditions upon its use here. *In re Payment Card Interchange Fee Litig.*, 330 F.R.D. 11, 42-47 (E.D.N.Y. 2019). Objector notes however that this provision goes beyond the release of claims that might arise later from pre-settlement conduct, and comprises a waiver of future liability for future *conduct* violative of the antitrust laws. The release language bars claims that:

> accrue no later than five years after the Settlement Final Date arising out of or relating to any conduct, acts, transactions, events, occurrences, statements, omissions, or failures to act of any Rule 23(b)(3) Settlement Class Released Party that are or have been alleged or otherwise raised in the Action, or that could have been alleged or raised in the Action relating to the subject matter thereof, or arising out of or relating to a continuation or continuing effect of any such conduct, acts, transactions, events, occurrences, statements, omissions, or failures to act.

3

DE 7257-2 at 34.[1] Thus, the release here appears to goes beyond releasing claims arising strictly from earlier alleged conduct, and purports to cover claims based on later conduct "relating to" the earlier conduct.

First, there is a strong argument that the proposed waiver of future violations is void as against public policy in antitrust cases. The Supreme Court has warned that where settlement clauses operate "as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637, 105 S. Ct. 3346, 3359, 87 L. Ed. 2d 444 (1985).[2]

Second, it is not in any case clear that separate claims arising from later "related" conduct can be within the "identical" factual predicate for release purposes. In the *TBK Partners* case, for example, the subsequent barred demand for a state law appraisal was founded on the original conduct and incidents that gave rise to liability in the original case, and not subsequent conduct by the defendants after the resolution of the case. *TBK Partners, Ltd. v. W. Union Corp.*, 675

---

[1] Pinpoint citations herein are to the ECF-assigned page number unless otherwise noted.

[2] *See also, e.g.*, *Redel's Inc. v. Gen. Elec. Co.*, 498 F.2d 95, 99 (5th Cir. 1974)(" Releases may not be executed which absolve a party from liability for future violations of our antitrust laws."); *Gaines v. Carrollton Tobacco Board of Trade, Inc.*, 386 F.2d 757, 759 (6th Cir. 1967) (agreement "executed in a fashion calculated to waive damages arising from future violations of the antitrust laws, would be invalid on public policy grounds."); *Fox Midwest Theatres v. Means*, 221 F.2d 173, 180 (8th Cir. 1955)("Any contractual provision which could be argued to absolve one party from liability for future violations of the antitrust statutes against another would to that extent be void as against public policy."); *Westmoreland Asbestos Co. v. Johns-Manville Corp.*, 39 F.Supp. 117, 119 (S.D.N.Y. 1941)(even if agreement expressly intended "to cover defendants' subsequent misconduct….if the instrument purported to absolve defendants from liability for future violation of the anti-trust statutes, I should hold it void as against public policy.").

F.2d 456, 459–60 (2d Cir. 1982). Though courts are willing to enjoin later claims that arise from pre-settlement conduct, as in *TBK Partners*, they have been wary of endorsing waivers of future claims accruing from subsequent conduct. *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 110 (2d Cir. 2005) (release of future claims based on post-settlement conduct jeopardizes adequacy of representation); *Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 350 (6th Cir. 2009) (release valid where release of future claims was limited to those arising from "pre-settlement conduct."); *Faught v. Am. Home Shield Corp.*, No. 2:07-CV-1928-RDP, 2010 WL 10959223, at *16 (N.D. Ala. Apr. 27, 2010), aff'd., 668 F.3d 1233 (11th Cir. 2011) (release did not improperly bar "future" claims, but only "claims based upon conduct during the Class Period."); *but see Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 96 (2d Cir. 2019) (summarily concluding that impermissible text messages sent after settlement approval and class period arose from the "identical factual predicate as the settled conduct"), citing *Wal-Mart Stores,* 396 F.3d at 107.

Third, even assuming that the prospective release is permissible, Objector questions why the five-year immunity period should be effectively extended if any appeals are filed, for the duration of those appeals. There is nothing about the pendency of an appeal that justifies extending the release period to commence only after the appeal is resolved. If the approved settlement were struck down, the mooted release would fall with it regardless of when the period commenced. Conversely, an affirmance would leave the relative positions of the parties unchanged and so, too, any release they agreed upon. It is also unclear if "all appeals" includes appeals limited to the attorneys' fees or incentive awards only, and which do not challenge the settlement or release. As presently written, the settlement permits, but does not require, the Court to enter an order on attorneys' fees and service awards separate from the Rule 23(b)(3) Class Settlement Order and Final Judgment. DE7257-2, at 53, ¶58. An appeal from such a

5

separate order would not delay the Settlement Final Date. *Id*. But if the Court combines the two, an appeal of the Final Judgment relating to fees alone might be construed to delay the release term, because the "Settlement Final Date" definition does not except appeals taken only as to the award of attorneys' fees or incentive payments. See DE7257-2 at 18-19, ¶3(ss) ("Settlement Final Date" does not commence until Order and Final Judgment are "no longer subject to further court review by rehearing, appeal, petition for certiorari, or otherwise."). This complexity and ambiguity only highlights the lack of any logical connection between potential appeals and the duration of the future release of claims. There is no apparent rationale for extending a term certain during appeals except to penalize class members for taking appeals.

Meanwhile, the contingent potential to add years to the prospective release, and for no good reason, has a serious effect on the analysis of the settlement and attorneys' fees. Assuming arguendo that the prospective release is permissible, its uncertain temporal scope means that it is more difficult for this Court to evaluate what exactly the class will ultimately be giving up in exchange for the fund being offered. This Court has already observed that the settlement amount offered here is a tiny proportion of Defendants' ongoing earnings from the challenged practices. *In re Payment Card*, 330 F.R.D. at 47 ("Although the agreed upon payment is objectively a large sum of money, it is less so when viewed in perspective."); *see also id*. at 48-49 (observing evidence supported the assertion that the settlement represented "only a few months of interchange fee collections when divided among the millions of merchants that could claim damages."). The Superseding Settlement already adds six years to the original nine-year class period, while providing almost $1 billion less in cash relief. Adding the five-year prospective release, that means that defendants get a 20-year class period in exchange for the fund—and that is assuming no appeals are taken. If appeals are taken, how many additional years' worth of

6

class members' damage claims are to be exchanged for that same class fund recovery? The answer could vary considerably depending on the future existence and duration of any appeal, yet those circumstances are unconnected to any legitimate interest on the part of Defendants in extending their period of repose.

Objector therefore requests that this Court reconsider whether future conduct can or should be released in the manner the Superseding Settlement proposes, and whether it can comprise a "floating release" extended by appeals. If the Court should still uphold these features of the release, then Objector requests that the Court be cognizant of its unjustified and indefinite scope in determining the fees to be awarded to class counsel.

### B. Class Counsel's Requested Fee is Not Supported by Applicable Authority and would Result in a Substantial Windfall

The District Court, as a fiduciary for absent class members, must ensure this settlement treats the class members fairly. *Flanagan, Lieberman, Hoffman & Swaim v. Ohio Pub. Emps. Ret. Sys.*, 814 F.3d 652, 657 (2nd Cir. 2016). Here, every dollar that goes to class counsel is one less dollar available to compensate class members' valid claims. Accordingly, this Court should "approach fee awards 'with an eye to moderation' and should scrutinize the proposed settlement and attendant fee request with "a jealous regard to the rights of those who are interested in the fund." *Goldberger v. Integrated Resources*, 209 F.3d 43, 52-53 (2d Cir. 1999). The Second Circuit permits district courts substantial latitude in choosing the method of determining fees. *E.g.*, *id.* at 47 (use of either lodestar or percentage method is "reasonable.").

Whatever method is used, the criteria are the same: "No matter which method is chosen, district courts should continue to be guided by the traditional criteria in determining a reasonable common fund fee, including: '(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation ...; (4) the quality of representation; (5)

the requested fee in relation to the settlement; and (6) public policy considerations.'" *Id.* at 50. *See also id*. at 53 ("[A] fee award should be assessed based on scrutiny of the unique circumstances of each case….").

As already discussed above, analyzing factor number five—the crucial assessment of the requested fee in relation to the settlement—is hindered by the uncertain temporal scope of the release, which frustrates the attempt to determine the true value of the settlement fund versus the claims being released. In sum, the offered relief is a small fraction of the potential damages, and may be smaller still depending also on how many years of conduct end up being released. The settlement does not include injunctive relief, which has naturally been left to be pursued in the Rule 23(b)(2) case. These points do not necessary require rejection of the settlement, as this Court has already observed. But they also cut against the large fee Class Counsel request.

The fee sought here is 9.5 percent of the compensatory fund. By comparison, the *Goldberger* court affirmed an award of four percent of a $54 million settlement, over the objections of plaintiffs' counsel. *Goldberger, supra.* at 44. A few years later, in a seminal payment card case, the fee award was 6.5% of the $3,383,400,000 in compensatory relief, and the settlement included an estimated $25,076,000,000 in injunctive relief. *In re Visa Check/Mastermoney Antitrust Litig.,* 297 F. Supp. 2d 503, 525 (E.D.N.Y. 2003) (*Visa Check III*), aff'd sub nom. *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc*., 396 F.3d 96 (2d Cir. 2005). That injunctive relief was crucial to the generous award given by the district court in that case. *See id*. at 525 ("I agree that the substantial injunctive relief here should inform my decision on awarding fees, and it has."). The Second Circuit left undisturbed against cross-appeals the district court's fee award of over $220 million, noting particularly that the settlement provided injunctive relief producing "significant and lasting benefits for America's merchants and consumers." *Wal-Mart*

*Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 122 (2d Cir. 2005), quoting *Visa Check III*, 297 F.Supp.2d at 523–24. Here, unlike *Visa Check III*, there is no "lasting benefit" inherent in the settlement. On the contrary, there is a lingering and uncertain detriment because the settlement purports to waive new claims that accrue for five years after the resolution of any appeals.

The district court in *Visa Check III* also highlighted the novelty and complexity of bringing national class litigation against credit card issuers. 297 F.Supp.2d at 524. Since that time, of course, such litigation has become ubiquitous and far less novel, with some plaintiffs' lawyers going on two decades experience litigating payment card cases. Thus, although this litigation is inherently complex and large, handling that complex subject matter is a task class counsel should be managing with ever-greater efficiency.

Consideration of the time and labor expended by counsel, and the compensation of risk (factors one and three) are inquiries implicating the lodestar and multiplier. Class Counsel are seeking almost *three times* their already substantial hourly rates for settling this case. DE7471-1 at 8, 42. At the current lodestar class counsel submitted with their motion for fees, the requested multiplier would result in a fee of over $600 million.

A multiplier of nearly three cannot be supported in this case. The district court in *Visa Check III* relied on earlier non-binding authority to the effect that multipliers in the range of three were commonplace. *Visa Check III*, 297 F.Supp.2d at 524, citing *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 742 (3d Cir. 2001); *In re NASDAQ Market–Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998)). However, more recent Supreme Court and Second Circuit authority suggest that fee awards ought to be tethered much more closely to the basic lodestar.

Supreme Court discussions of lodestar awards reaffirm that the lodestar affords presumptively fair and adequate compensation for attorneys taking a matter on a contingent fee

basis. *See Perdue v. Kenny A.*, 130 S. Ct. 1662, 1669 (2010); *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992). The Supreme Court's precedents defining a "reasonable" fee in the context of contingent fee class actions uniformly hold that class counsel's flat lodestar is presumptively adequate compensation and thus a "reasonable" attorney's fee. *Perdue* unambiguously holds (1) that in contingent fee class action litigation, "a 'reasonable fee' is a fee that is sufficient to induce a capable attorney to undertake the representation of a meritorious … case," (2) that "the lodestar method yields a fee that is presumptively sufficient to achieve this objective," and (3) that enhancement of the lodestar is appropriate only in "'rare' and 'exceptional' circumstances." *Perdue*, 559 U.S. at 552. (emphasis added). Moreover, "there is a strong presumption that the lodestar is sufficient; factors subsumed in the lodestar calculation cannot be used as a ground for increasing an award above the lodestar; and a party seeking fees has the burden of identifying a factor that the lodestar does not adequately take into account and proving with specificity that an enhanced fee is justified." *Perdue*, 130 S. Ct. at 1669.

For the most part, the Second Circuit is in accord. *See In re Bolar Pharm. Co. Sec. Litig.*, 966 F.2d 731, 731 (2d Cir. 1992) ("in the context of attorneys' fee awards, we have demanded 'specific reasons' when a district court departs from the lodestar figure, which is 'strongly presumed to be reasonable'") (citations omitted); *Grant v. Martinez*, 973 F. 2d 96, 101 (2d Cir. 1992)(same); *compare Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany & Albany Cty. Bd. of Elections*, 522 F.3d 182, 192 (2d Cir. 2008) (honoring "the Supreme Court's emphasis on the need to use the approximate market rate for an attorney's services in calculating the presumptively reasonable fee.") citing *Missouri v. Jenkins by Agyei*, 491 U.S. 274, 109 S. Ct. 2463, 105 L. Ed. 2d 229 (1989).

Accordingly, although there are outlying examples of higher multipliers, courts in the Second Circuit tend to make fee awards embodying lodestar multipliers in the range of 1-2, particularly in megafund cases. *Dial Corp. v. News Corp.*, 317 F.R.D. 426, 437–38 (S.D.N.Y. 2016) (collecting recent cases finding multipliers of 1.33 to 1.9 appropriate in megafund class actions exceeding $300 million.); *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 129 (S.D.N.Y. 2009), aff'd *sub nom. Priceline.com, Inc. v. Silberman*, 405 F.App'x 532 (2d Cir. 2010) (awarding $51,250,000 fee award in megafund case equating to 1.6 multiplier on lodestar, commenting that "[A]s a rule, 'post-Goldberger courts ... have generally refused multipliers as high as 2.03.'") (quoting *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, No. 02 MDL 1484 (JFK), 2007 WL 4526593, at *21 (S.D.N.Y. Dec.20, 2007)) (quoting *In re Twinlab Corp. Sec. Litig.*, 187 F.Supp.2d 80, 87 (E.D.N.Y.2002)); *In re Currency Conversion Fee Antitrust Litig.*, No. 04 CIV. 5723 WHP, 2012 WL 3878825, at *2 (S.D.N.Y. Aug. 22, 2012) (multiplier of 1.35 in megafund case); *In re IPO Sec. Litig.*, 671 F.Supp.2d 467, 514–16 (S.D.N.Y.2009) (one-third award from net settlement fund represented multiplier of 0.7 on lodestar); *Carlson v. Xerox Corp.*, 596 F.Supp.2d 400, 413 (D. Conn.), aff'd, 355 F.App'x 523 (2d Cir. 2009) (16% award of $750 million fund was 1.25 multiplier on lodestar). [3]

On adjusting the multiplier for risk, the Second Circuit has recently held that when a litigation generates a common fund, there is more leeway for a lodestar enhancement than when

---

[3] *See also In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98 CV 4318 HB, 2001 WL 709262, at *6 (S.D.N.Y. June 22, 2001) (finding "red flags" were raised by a 30% fee request resulting in a multiplier above 2, and awarding a 15% fee representing no multiplier); *cf. Tiro v. Pub. House Investments, LLC*, No. 11 CIV. 7679 CM, 2013 WL 4830949, at *15 (S.D.N.Y. Sept. 10, 2013) ("[I]f the lodestar is significantly out of line with the percentage of recovery, it raises a red flag. Where, as here, lodestar is virtually identical to the percentage of recovery, no red flag waves.").

11

a fee is awarded under a fee-shifting statute. *Fresno Cnty. Emps.' Ret. Ass'n v. Isaacson/Weaver Family Tr.*, 925 F.3d 63 (2nd Cir. 2019). However, that will not counsel a higher fee in this case.

In *Fresno County*, the Second Circuit acknowledged that Supreme Court precedent mandated a relatively strict lodestar approach when fees are awarded pursuant to a fee-shifting statute, but held that courts could nevertheless award a common-fund fee exceeding lodestar, even if the fund is generated in litigation under an applicable fee-shifting statute. *Id*. at 68 ("[A]n attorney seeking a fee after establishing statutory liability will presumptively receive a fee equal to the unenhanced lodestar, and an attorney seeking a fee after establishing a common fund will receive a fee calculated using either the lodestar method or a percentage-of-the-fund method, which can yield a fee that is less than, equal to, or greater than the lodestar fee."). *But see McDaniel v. Cty. of Schenectady*, 595 F.3d 411, 422 (2d Cir. 2010) ("[I]n discussing the lodestar method, our common fund and statutory fee shifting cases have employed the same definition and referenced the same foundational cases.").

Although *Fresno County* concludes that counsel can invoke common-fund doctrines to supplant otherwise-applicable statutory fee provisions, it does not represent an expansion of the components that make up a lodestar multiplier, or counsel higher lodestar multipliers than had previously been awarded. There, for example, the fee award affirmed amounted to only a 1.39 multiplier of the lodestar. *Id*. at 66.

Moreover, *Fresno County* makes clear that it is primarily contingency risk that is being compensated by a lodestar multiplier in common fund cases, explaining

> The plaintiff class is therefore appropriately charged for contingency risk where such risk is appreciable because the class has benefited from class counsel's decision to devote resources to the class's cause at the expense of taking other cases. That is, because class counsel has decided to represent the plaintiff class, class counsel's ability to freely represent other clients is

12

> limited by the risk she has assumed that the class's cause will be unsuccessful.

*Fresno County*, 925 F.3d at 70. Applying that explanation of risk to this case, a request for a multiplier of two or three therefore embodies the notion that Plaintiffs' counsel stood to make two or three times as much money for the same time expended on other foregone cases or, alternatively, that they routinely end 33-66% of their cases with no fee recovery. There is no evidence to support that idea, in the record or in common knowledge, and the remainder of the factors such as the skill and experience of counsel are already subsumed in the substantial hourly rates charged by class counsel. Viewed against this backdrop, there is little support in this Circuit for awarding a fee of 9.5%, resulting in a multiplier of three on a gross lodestar of over $200 million in this case. That is particularly so in this case, in which the lodestar is unusually high to begin with, includes substantial time dealing with an original settlement that did not survive in the wild, and will probably not be subjected to detailed scrutiny for duplication of effort or other instances of overbilling.[4]

Thus the *Fresno County* case does not counsel a higher fee in this case, and Objector questions the ultimate viability of its approach under Supreme Court precedent if it results in common-fund fee awards that diverge greatly from lodestar in statutory fee-shifting cases. One undesirable result may be the overenforcement of cases potentially involving common funds at

---

[4] When courts use the lodestar only as a cross check, they need not make a painstaking review of the detailed time and hourly rates to determine if they are excessive. In the absence of that more searching inquiry, however, courts should be aware that the lodestar cross-check figure may be overstated. *See In re Dreyfus* 2001 WL 709262, at *7 (noting incidents of excess in lodestar and observing "Were I to use the lodestar methodology to award fees (rather than as a cross-check), I would set a lodestar considerably smaller than the…figure submitted by Counsel.").

the expense of cases involving primarily injunctive relief, regardless of their relative social or economic importance. There is also the prospect that plaintiffs' counsel will make strategic decisions in individual cases with an eye toward avoiding fee-shifting. In antitrust cases in particular, the financial value of an injunction can greatly exceed accrued damages, though attorneys may be incentivized to pursue the latter over the former. This Court has encountered an analogous problem in this very case, in the conflict that resulted in the division of the class into separate Rule 23(b)(3) and Rule 23(b)(2) classes. Indeed, the greater the divergence, the more likely it is that the Supreme Court will ultimately be required to take up the matter to reconcile the disparities among and between the various doctrines of fee entitlement and theories of fee calculation.

*Fresno County* seems to anticipate those criticisms, counselling that although common fund fees may sometimes practically exceed those available under a strict fee-shifting analysis based on lodestar, they should not exceed it by very much. *Fresno County*, 925 F.3d at 72 ("[T]he district court should use the lodestar as a "baseline" against which to crosscheck a percentage fee…."), citing *Goldberger*, 209 F.3d at 50. "Fee requests that deviate wildly from the unenhanced lodestar fee are unlikely to pass this crosscheck, and district courts are at liberty to reduce the requested fee within their discretion."). *See also id*. at 70, n.3 ("We note that it will not always be the case that an attorney representing a class assumes compensable contingency risk.").

### C. The "Incentive" Awards Requested by Lead Plaintiffs Are Precluded by Controlling Supreme Court Precedent

The named plaintiffs settled this case anticipating that class counsel would ask the Court to award them, collectively, incentive bonuses of $900,000.00. DE7472-1 at 22. The Supreme Court's seminal common-fund decisions flatly prohibit such awards. Special benefits for class

14

representatives impinge their fiduciary duties by presenting them an incentive to pursue their own interests rather than those of the class, and thus violate basic Rule 23 principles.

There is no question that district courts have made a practice of granting such awards, but as the Sixth Circuit observed in rejecting the argument that they are "common in class litigation," there is scant other authority for them:

> Our court has never approved the practice of incentive payments to class representatives, though in fairness we have not disapproved the practice either. [citation]. Thus, to the extent that incentive awards are common, they are like dandelions on an unmowed lawn—present more by inattention than by design.

*In re Dry Max Pampers Litig.*, 724 F.3d 713, 722 (6th Cir. 2013).

In fact, there is binding authority against them. The Supreme Court's decisions establishing the common-fund doctrine—under which lead plaintiffs and class counsel claim their "incentive awards" and attorneys' fees—are *Trustees v. Greenough*, 105 U.S. 527 (1882), and *Central Railroad & Banking Co. v. Pettus*,113 U.S.116 (1885). Both decisions clearly hold that a representative plaintiff who procures a common fund benefitting others is entitled to have attorneys' fees and litigation expenses assessed against the fund. But those decisions equally hold that the named plaintiff ***cannot*** recover compensation for his own service as class representative. *See Greenough*, 105 U.S. at 537-38; *Pettus,* 113 U.S. at 122.

*Greenough* specifically condemns as "decidedly objectionable" an incentive award to compensate the named plaintiff, Francis Vose, for services rendered to the class. *Greenough,* 105 U.S. at 537. "The reasons which apply to his expenditures incurred in carrying on the suit, and reclaiming the property subject to the trust, do not apply to his personal services and private expenses." *Id*. at 537. *Greenough* holds that "[s]uch an allowance has neither reason nor authority for its support," and thus is "illegally made." *Greenough,* 105 U.S. at 557-38. "'It would present,' said Mr. Justice Bradley, speaking for the court, 'too great a temptation to parties

15

to intermeddle in the management of valuable property or funds in which they have only the interests of creditors, and that, perhaps, only to a small amount, if they could calculate upon the allowance of a salary for their time and having all their private expenses paid.'" *Pettus,* 113 U.S. at 122 (quoting *Greenough*); *see also, e.g., Granada Investments, Inc. v. DWG Corp.,* 962 F.2d 1203, 1207-08 (6th Cir. 1992) (applying *Greenough's* distinction between litigation expenses on the one hand, and "personal services and private expenses," on the other); *Crutcher v. Logan,* 102 F.2d 612, 613 (5th Cir. 1939) (under *Greenough* and *Pettus* representative claimants interested in the fund itself can receive "no compensation for personal services"); *Gortat v. Capala Bros.*, 949 F.Supp.2d 374, 379 (E.D.N.Y. 2013) (quoting and discussing *Greenough* in denying incentive awards).

The Second Circuit has considered this argument on one prior occasion, but concluded without further explanation that the case before it was factually distinct, saying only "[n]either [*Pettus*] nor [*Greenough*] provide factual settings akin to those here." *Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 96 (2d Cir. 2019).

Objector submits *Greenough* and *Pettus* set forth a durable rule that federal courts are not equitably empowered to make incentive awards to plaintiffs in common fund cases, remain binding on that point, and may not be skirted lightly. Supreme Court decisions are binding authority until either overruled by the Supreme Court itself, or modified by Congress. Where, as here, a decision of the Supreme Court "has direct application," it properly controls. *Rodriguez de Quijas v. Shearson/Am. Express, Inc.,* 490 U.S. 477, 484 (1989). Even if the high-court precedent "appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Id.*; *accord, e.g., Bosse v. Oklahoma,* 137 S.Ct. 1, 2

(2016); *United States v. Hatter,* 532 U.S. 557, 567 (2001); *see generally* BRYAN A GARNER, ET AL., THE LAW OF JUDICIAL PRECEDENT 28-33 (Thomson West, 2016).  No Supreme Court precedent has undermined *Greenough* and *Pettus*.  Accordingly, this Court should reject lead plaintiffs' request for incentive award payments.

### III. CONCLUSION

First, the court should not permit the prospective release of claims predicated on future conduct, nor permit the release period to time-travel forward through appeals.  In the event that this Court otherwise finds the proposed settlement fair, adequate, and reasonable, Objector respectfully requests that the Court award a fee to class counsel that is substantially less than the requested fee.  Any fee award should provide a reasonable return on the hours devoted to the case, be commensurate with the rather modest pro-rata result, and take into consideration the substantial effort spent on the original settlement which the Second Circuit found was "so unreasonable that it evidences inadequate representation."

Date:  July 23, 2019          Respectfully submitted,


                                              s/ John W. Davis

John W. Davis (*pro hac vice*)
john@johnwdavis.com
Law Office of John W. Davis
3030 N. Rocky Point Drive W.
Tampa, FL  33607
Telephone:  (813) 533-1972

Attorney for Objector Kevan McLaughlin