THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | : : : : : : | MDL No. 1720(MKB)(JO) |
| This Document Relates To:  ALL ACTIONS. | : : : : : : : | |

**RETAILERS AND MERCHANTS' OBJECTIONS TO FINAL APPROVAL OF THE SUPERSEDING AND AMENDED SETTLEMENT AGREEMENT AND THE RULE 23(B)(3) CLASS PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

## I.   INTRODUCTION AND PRELIMINARY STATEMENT

The Retailer and Merchant Objectors (the "R&M Objectors") opposed the initial Class Settlement presented to this Court in 2012 (the "Original Settlement"), and the Second Circuit largely agreed with the R&M Objectors when overturning that grievously deficient agreement. Nonetheless, even though the R&M Objectors and their attorneys are a substantial cause of the new benefits made available to the Class via the much improved Superseding and Amended Definitive 23(b)(3) Class Settlement Agreement (the "Superseding Settlement"), neither that Superseding Settlement nor the Rule 23(b)(3) Class Plaintiffs' Motion for Attorneys' Fees and Reimbursement of Expenses ("Class Counsel's Fee Motion") recognizes in any way the contributions of the R&M Objectors and their counsel. The R&M Objectors object to the Superseding Settlement and Class Counsel's Fee Motion because of the failure of those instruments to provide for a reasonable service award to the R&M Objectors and a reasonable fee to their counsel.

## II. THE OBJECTING PARTIES

The objectors opposing the Superseding Settlement and Class Counsel's Fee Motion in this Objection are the following Class Members:

1. Landers McLarty Bentonville, LLC d/b/a Landers McClarty Ford Chrysler Jeep – Bentonville, Arkansas;

2. Landers McLarty Bentonville Nissan, LLC d/b/a Landers McClarty Nissan – Bentonville, Arkansas;

3. Bessemer AL Automotive, LLC d/b/a Landers McClarty Dodge Chrysler Jeep – Bessemer, Alabama;

4. Shreveport Dodge, LLC d/b/a Landers Dodge Chrysler Jeep – Bossier City, Louisiana;

5. RML Branson MO, LLC d/b/a Tri-Lakes Motors – Branson, Missouri;

6. RML Burleson, TX, LLC d/b/a Burleson Nissan – Burleson, Texas;

7. RML Bel Air, LLC d/b/a Bel Air Honda – Falston, Maryland;

8. Landers McClarty Fayetteville TN, LLC d/b/a Landers McClarty Toyota Scion – Fayetteville, Tennessee;

9. RML Ft. Worth TX, LLC d/b/a Nissan of Fort Worth – Fort Worth, Texas;

10. RML Huntsville Chevrolet, LLC d/b/a Landers McClarty Chevrolet – Huntsville, Alabama;

11. RML Huntsville AL, LLC d/b/a Landers McClarty Huntsville Dodge Chrysler Jeep – Huntsville, Alabama;

12. RML Huntsville AL Automotive, LLC d/b/a Mercedes Benz of Huntsville – Huntsville, Alabama;

13. RML Huntsville Nissan, LLC d/b/a Landers McClarty Nissan of Huntsville – Huntsville, Alabama;

14. RML Huntsville, AL, LLC d/b/a Landers McClarty Subaru – Huntsville, Alabama;

15. Landers McClarty Lee's Summit MO, LLC d/b/a Lee's Summit Dodge Chrysler Jeep Ram – Lee's Summit, Missouri;

16. Landers McClarty Lee's Summit MO, LLC d/b/a Lee's Summit Nissan – Lee's Summit, Missouri;

17. RML Olathe II, LLC d/b/a Olathe Dodge Chrysler Jeep – Olathe, Kansas;

18. WML Waxahachie Dodge, LLC d/b/a Waxahachie Dodge Chrysler Jeep – Waxahachie, Texas;

19. RML Waxahachie Ford, LLC d/b/a Waxahachie Ford-Mercury – Waxahachie, Texas;

20. RML Little Rock, Inc. d/b/a Landers Harley Davidson – Little Rock, Arkansas;

21. RML Little Rock, Inc. d/b/a Landers Harley Davidson – Hot Springs, Arkansas;

22. RML Little Rock, Inc. d/b/a Landers Harley Davidson – Conway, Arkansas;

23. Landers Auto Group No. 1 d/b/a Landers Scion – Little Rock, Arkansas;

24. Landers Auto Group No. 1 d/b/a Landers Toyota – Little Rock, Arkansas;

25. Landers Auto Group No. 1 d/b/a The Boutique at Landers Toyota – Little Rock, Arkansas;

26. Landers Chrysler Jeep Dodge, LLC – Little Rock, Arkansas;

27. Landers CDJ, Inc. – Little Rock, Arkansas;

28. Landers CDJ, Inc. d/b/a Steve Landers Chrysler Dodge Jeep – Little Rock, Arkansas;

29. Landers of Hazelwood, Inc. – Hazelwood, Missouri;

30. Landers Chrysler Dodge Jeep d/b/a Landers Pre-Owned – Little Rock, Arkansas;

31. Landers Chrysler Dodge Jeep d/b/a Landers Suzuki – Little Rock, Arkansas;

32. Landers Brothers Auto No. 2, LLC f/d/b/a Landers Buick – Pine Bluff, Arkansas;

33. Landers Brothers Auto No. 3, LLC f/d/b/a Landers Hyundai – Pine Bluff, Arkansas;

34. Landers Brothers Auto No. 4, LLC f/d/b/a Landers Honda – Jonesboro, Arkansas;

35. Landers Brothers Auto No. 5, LLC f/d/b/a Landers Chrysler Dodge Jeep – Pine Bluff, Arkansas;

36. Landers Brothers Auto Group, Inc. f/d/b/a Landers Honda – Pine Bluff, Arkansas

37. Leisure Landing RV Park – Hot Springs, Arkansas;

38. The Tennis Shoppe, Inc. – Little Rock, Arkansas;

39. The Grady Corporation d/b/a Whole Hog Barbeque – Bentonville, Arkansas;

40. The Grady Corporation II d/b/a Whole Hog Barbeque – Fayetteville, Arkansas;

41. Storage World Limited Partnership, LLC – Little Rock, Arkansas;

42. A&D Wine Corp. – New York, New York;

43. A&Z Restaurant Corp. – New York, New York;

44. 105 Degrees, LLC – Oklahoma City, Oklahoma;

45. The Pantry Restaurant Group, LLC – Little Rock, Arkansas;

46. PPT, Inc. d/b/a Graffiti's Restaurant – Little Rock, Arkansas;

47. Sansole's Tanning Salon – Little Rock, Arkansas;

48. Greenhaw's, Inc. – Little Rock, Arkansas;

49. Roberson's Fine Jewelry, Inc. – Little Rock, Arkansas;

50. Don's Pharmacy, Inc. – Little Rock, Arkansas;

51. Gossett Motor Cars, Inc. – Memphis, Tennessee;

52. Gossett Motor Cars, Inc. – Atlanta, Georgia;

53. JB Cook, LLC d/b/a Downtown Oil & Lube – Hope, Arkansas;

54. Pinnacle Valley Liquor Store, Inc. – Little Rock, Arkansas;

55. Coulson Oil Company – North Little Rock, Arkansas;

56. Diamond State Oil LLC – North Little Rock, Arkansas;

57. Superstop Stores, LLC – North Little Rock, Arkansas;

58. PetroPlus, LLC – North Little Rock, Arkansas;

59. Port Cities Oil, LLC – North Little Rock, Arkansas;

60. New Mercury, LLC – North Little Rock, Arkansas;

61. New Vista, LLC – North Little Rock, Arkansas;

62. New Neptune, LLC – North Little Rock, Arkansas;

63. SVI Security Solutions – Olive Branch, Mississippi;

64. Shepherd's Flock – Townshend, Vermont;

65. AIMCO Equipment Company, LLC;

66. Park Hill Collections, LLC;

67. Riverbike of Tennessee, Inc.;

68. Par's Custom Cycle, Inc.;

69. RR #1 TX, LLC;

70. V.I.P. Motorcars, Ltd. – Palm Springs, California;

71. Desert European Motorcars, Ltd. – Rancho Mirage, California;

72. Newport European Motorcars, Ltd. – Newport Beach, California;

73. San Diego European Motorcars, Ltd. – San Diego, California.

The above R&M Objectors represented in this Objection to Final Approval of the Superseding Settlement and Class Counsel's Fee Motion are a broad-based, diverse group of businesses made up of restaurants, clothing stores, oil and gas companies, convenience stores, car dealerships, jewelry shops, beverage retailers, and other types of trades in numerous states, including New York, Vermont, Maryland, Arkansas, Tennessee, Mississippi, Alabama, Georgia, Kansas, Missouri, Oklahoma, Texas, and Louisiana. These objecting retailers and merchants sell goods to consumers in exchange for payment by credit cards, and each of them paid interchange, or swipe, fees during the Class Period.

### III.  THE ORIGINAL SETTLEMENT WAS SERIOUSLY FLAWED

Virtually from the day it was publicly announced, the R&M Objectors have spoken out against the terrible infirmities in the Original Settlement. (*See* ECF No. 1653.) Among those defects was the fact that the Original Settlement proposed to grant the Defendants immunity from liability stemming from the *future* application or interpretation of their rules governing merchants, meaning that even merchants *not yet in existence* would be prevented from challenging Defendants' conduct. To make matters worse, the release proposed by the Original Settlement purported to insulate Defendants from litigation of claims involving *any* provision in Defendants' rulebooks, which span hundreds of pages, even though very few of those rules were actually at issue in this case. Furthermore, a supposed "benefit" of the Original Settlement – the ability to pass along a "surcharge" to credit card customers – was actually worthless to many Class Members. Glaring shortcomings like these made the Original Settlement clearly improper, and the R&M Merchants made that point loud and clear. (*See, e.g.,* ECF No. 2281.)

### IV. THE R&M OBJECTORS AND THEIR COUNSEL PLAYED A MAJOR PART IN UNDOING THE ORIGINAL SETTLEMENT AND MAKING AVAILABLE THE ENHANCED BENEFITS IN THE SUPERSEDING SETTLEMENT

In 2012, as they began to develop a picture of the Original Settlement through news reports and other similar sources, the first R&M Objectors[1] approached the undersigned counsel with questions and concerns regarding various aspects of the Original Settlement. Those opening inquiries led to investigation, research, and further consultations, ultimately ending with the R&M Objectors' decision to challenge the Original Settlement on the general grounds set forth below. As demonstrated in the succeeding paragraphs, the R&M Objectors' unwillingness to accept unreasonable settlement terms, a position ultimately shared by the Second Circuit, has helped to create a Superseding Settlement that has, among other improvements, made available an additional $900 million to the Class.

#### A. As The First Non-Parties To Oppose The Original Settlement, The R&M Objectors Vigorously And Persistently Fought For Fairness Since The Earliest Disclosure Of That Initial Agreement

When they opposed the Original Settlement on October 18, 2012, the R&M Objectors distinguished themselves as the first non-parties to docket shortcomings in the terms of that compromise.[2] (ECF No. 1653.) Upon receiving word of the Original Settlement, the R&M Objectors retained an expert to help evaluate the terms of the settlement. After reviewing the expert's analysis, the R&M Objectors made themselves active participants in the effort to unravel

---

[1] As word spread of their determination to speak up for the smaller enterprises otherwise deprived of a voice in the proposed settlement of this action, additional entities joined the group of R&M Objectors. Numbering 38 when they first cautioned that the Original Settlement did not merit even preliminary approval (*see* ECF No. 1653), the membership of the R&M Objectors had swelled to over 60 just months later when they filed an objection to final approval (*see* ECF Nos. 2281, 2421).

[2] Certain Plaintiffs and Class Representatives, represented by the Constantine Cannon law firm, also objected to the Original Settlement (the "Plaintiff-Objectors") and had already voiced their disapproval by letter to the Court. (*See, e.g.,* ECF No. 1621.)

7

a deficient settlement. By way of example, only days after publicly voicing their disagreement with the settlement, counsel for the R&M Objectors wrote Judge Gleeson to recommend creation of a Proposed Objectors' Committee to be given access to the "400 depositions and 50 million pages of discovery which led to the [Original Settlement]," for the purpose of "pooling resources to examine, analyze and . . . report on the viability of any proposed objections." (ECF No. 1657.) Although this proposed committee never materialized, observations made by the R&M Objectors apparently made an impression. In an Order which soon followed, the Court specifically mentioned that it had "received a request from a large group of retailers and merchants" (ECF No. 1668, at 1) before announcing an intention to break with its "[o]rdinar[y]" custom of "not schedul[ing] oral argument of preliminary approval motions" (*id.* at 2). Significantly, the R&M Objectors had previously requested just such a hearing on preliminary approval, given the important issues at play in this massive litigation. (*See* ECF No. 1653 ¶ 20, at 14.) The Court followed through to schedule such an oral argument here, citing the "expectation among some interested parties that the preliminary approval process should be more involved in this case than in the usual class action." *Id.*

Counsel for the R&M Objectors attended the November 9, 2012 hearing addressing preliminary approval, but the Court at that early stage concluded that the Original Settlement bore no marks such as "indications of a collusive negotiation, unduly preferential treatment of class representatives or segments of the class, or excessive compensation of attorneys" necessary to justify denial of preliminary approval. (ECF No. 1732, at 61.) Nonetheless, the Court acknowledged the presence of "a number of issues that have been well-briefed by the objecting parties that are going to require significantly more careful scrutiny before there is any final approval of the proposed settlement." *Id.* at 62. In the following months, the R&M Objectors did

8

their best to sharpen their approach so that their arguments would carry the day as the Original Settlement was subject to the heightened scrutiny of final approval, to which the Court had alluded.

In furtherance of this mission, the R&M Objectors on May 15, 2013 filed a 31 page objection to final approval containing much more developed and refined versions of the arguments they had previously raised.  (ECF No. 2281; *see also* ECF No. 2421 (adding eight additional objectors on May 24, 2013).)  The substance of that objection is discussed more thoroughly in the next subsection of this current Objection, but it presently suffices to say that the R&M Objectors pointed out to the Court that the Original Settlement violated due process because it (i) purported to release future antitrust liability under the guise of a Rule 23(b)(2) mandatory class[3] (ECF No. 2281, at 8-11); (ii) inappropriately sought to release future antitrust liability on behalf of a (b)(3) class (*id.* at 11-20); and (iii) undertook to release conduct far more extensive than Defendants' actions at the center of the litigation (*id.* at 20-22).  In addition to these rather obvious incidents of impermissible overreach, the R&M Objectors raised more nuanced issues as well.  First, the Notice to the Class offered no real ability to opt-out, because the concomitance of a mandatory (b)(2) Class meant that, opt-out or not, future antitrust claims against Defendants were set to be released nonetheless.  *Id.* at 22-24.  Next, one supposed feature of the settlement – the ability to surcharge – was illusory to many because of numerous states' prohibitions on surcharging.  To that substantial portion of R&M Objectors (and the Class), the theoretical ability to surcharge was worthless.  *Id.* at 24-27.

---

[3] The Original Settlement was fatally flawed, from the outset, because it presumed to compromise claims on behalf of a (b)(3) class, with the mandatory prerogative to opt-out, and also a (b)(2) class, with no opt-out rights, at whose expense, it would be argued, the Original Settlement had been reached.  *Cf.* Fed. R. Civ. P. 23(b)(2)-(3).

The R&M Objectors' opposition to final approval again sought limited discovery to allow "a meaningful inquiry on cross-examination into the merits of the [Original] Settlement." (ECF No. 2281, at 31.) This was not forthcoming. Undeterred, however, counsel for the R&M Objectors spent thousands of dollars to retain an economic expert, upon whose analysis for the Class the R&M Objectors relied when recommending specific categories of discovery to aid the work of Professor Alan Sykes of the NYU School of Law, who had been appointed by the Court to review "economic issues related to the [Original Settlement]." (ECF No. 5873.) Moreover, at the same time they were presenting their objections to final approval, counsel for the R&M Objectors were simultaneously filing "conditional" opt-outs applicable to members of the group who wanted no part of the broad, perpetual release granted Defendants under the Original Settlement. (*See* ECF Nos. 2422, 2618.) The conditional Notice of Opt-Outs filed on behalf of some R&M Objectors described the impossible position into which those entities had been thrust by the Original Settlement:

> All of the businesses opting out by way of this notice of opt-out feel compelled to do so in an attempt to preserve future claims against Defendants . . . . Both of the settlement classes described in the Notice of Settlement waive these future claims, but it is presently unclear whether this Court will approve that waiver. These potential Class members do not believe a waiver of future claims is valid under either Rule 23(b)(2) or 23(b)(3). . . .
>
> Given the uncertainty surrounding this settlement, the unclear and confusing class notice, and with no way of knowing what this Court will ultimately approve, these businesses feel forced to opt-out of the Rule 23(b)(3) class at this time to preserve their substantive rights and not be bound by a judgment entered in this case.

(ECF Nos. 2422, 2618.)

As was so at the preliminary approval hearing, counsel for the R&M Objectors attended the final approval hearing. R&M counsel addressed the Court to reiterate what the group viewed as the most significant impediments to approval: The confounding notice, as an inevitable product

of the blend of (b)(2) and (b)(3) classes for the purposes of this settlement, and the worthless surcharge. (ECF No. 6094, at 173-77.) Still, when all was said and done, final approval was granted. (ECF No. 6124.)

The R&M Objectors remained vigilant and on the front lines of an issue that went to the very core of their businesses. As appeals followed, the R&M Objectors were intimately involved in the process by filing separate briefs – emphasizing their own arguments about the inadequacy of notice and the worthlessness of the surcharge "benefit" – and coordinating with counsel for Plaintiff-Objectors to ensure that the appellate arguments for the R&M Objectors and the Plaintiff-Objectors were consistent, cogent, and persuasive. Indeed, at the request of counsel for the Plaintiff-Objectors, the R&M Objectors contributed thousands of dollars toward expenses in the United States Supreme Court and joined with the Plaintiff-Objectors in certiorari briefing before the Supreme Court. In the end, the years of work put in by the R&M Objectors were successful when the Second Circuit ultimately adopted objectors' arguments to dismantle the Original Settlement.

The preceding summary shows that counsel for the R&M Objectors diligently worked, from the time the Original Settlement was first announced through the conclusion of the successful appeal, to ensure that the unfair and unreasonable Original Settlement would not be consummated. The following subsection establishes that the value of the points made by the R&M objections matched the intensity of those efforts.

> **B. Over The Years, The R&M Objectors Made Significant And Meaningful Arguments Against The Original Settlement, And These Were A Substantial Cause Of The Second Circuit's Rejection Of The Agreement**

Back in October of 2012, when they posited the first objection to the Original Settlement by an absent Class Member, the R&M Objectors generally alerted the Court to the most grievous

attributes of the agreement, such as its vastly overbroad release[4] and its woefully inadequate injunction (which would have prevented Defendants from engaging in similar anticompetitive activity for *only 8 months*). (*See* ECF No. 1653 ¶¶ 40, 49, 51, 54, at 8, 11-14.) These arguments would mature more fully months later when the R&M Objectors filed their formal opposition to final approval. At that time, after directing the Court to the established case law which questioned the efficacy of the Original Settlement on due process grounds (*see* ECF No. 2281, at 8-22), the R&M Objectors turned to the core of their objection. Specifically, the R&M Objectors sounded the alarm that the blending in this action of both (b)(2) and (b)(3) classes served to nullify class notice, and that the settlement's authorization of a surcharge was worthless to many Class Members.

With regard to the ineffective notice caused by the rush to settle clams on behalf of both (b)(2) and (b)(3) classes, the R&M Objectors highlighted the predicament of Class Members:

> This settlement is so fundamentally flawed, and the Notice is so intrinsically deficient, that even the most legally astute Class Member would be uncertain of what action to take upon receiving this Notice. As things stand now, all absent Class Members have been told that even if they opt-out of the Rule 23(b)(3) Class, they will lose the ability to sue Visa/Mastercard in the future [because of the mandatory (b)(2) release]. In this circumstance, even if a merchant disagrees with the relief afforded by the . . . "damages" settlement, it is likely to stay in the class so as to retain the ability to object to the more significant waiver of future rights. Should this Court agree that the relinquishment of future damage claims under a mandatory Rule 23(b)(2) class is improper, or conclude that such a release is inappropriate under Rule 23(b)(3), or both, the entire analysis surrounding a decision to opt out is altered. In that scenario, if a business could preserve future damage claims by opting out of the 23(b)(3) class – without being forced to accept the loss of future damage claims [under 23(b)(2)] – it may well decide to opt-out even though it is not doing so now. On the other hand, if this Court invalidates future damages releases under both 23(b)(2) and 23(b)(3), the same Class Member

---

[4] Throughout the settlement approval process, the R&M Objectors maintained that the proposed release was excessively overbroad because it purported to bind unknown parties not yet in existence, claimed to shield Defendants from future antitrust liability into perpetuity, and supposedly required Class Members to abandon claims related to *any* Visa or Mastercard rule then in existence. (*See* ECF No. 1653 ¶¶ 40(c), at 8; ECF No. 1703, at 6; ECF No. 2281, at 8-22.)

> might determine that it makes sense to remain a party [as] to the claim for current damages. Basically, the point is that a ***new notice, containing a new – and legitimate – opportunity to opt out,*** will be required should this Court revise the aspect of the [Original Settlement] releasing future damages claims.

(ECF No. 2281, at 23-24 (emphasis in original).) On the subject of the surcharge, the R&M Objectors advised that a significant and growing number of states prohibited these assessments. *Id.* at 25. Moreover, as a practical matter, many businesses in the Class would be unlikely to pass along to customers a credit card surcharge. *Id.* at 26-27. Most fundamentally, as a component of the (b)(2) settlement, it was imperative that the surcharge be part of "an individual injunction *benefitting all its members at once,*" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 362, 131 S. Ct. 2541, 2558 (2011) (emphasis added), and the surcharge relief fell far short of this. As argued by the R&M Objectors: "The surcharge, proposed as an element of class relief, is *not* nationwide relief and does *not* benefit the entire class. Class members are treated differently." (ECF No. 2281, at 25.) Summing it up, the surcharge featured as a "benefit" of the Original Settlement actually had no value for many Class Members and thus impaired the entirety of the deal. *See generally id.* at 24.

Counsel for the R&M Objectors stressed the notice and surcharge issues during his remarks at the final approval hearing. (*See* ECF No. 6094, at 173-77.) After this Court approved the Original Settlement over the objections, the R&M Objectors continued the fight before the Second Circuit. In close consultation with attorneys for the Plaintiff-Objectors, the R&M Objectors made the unique notice and surcharge arguments the centerpiece of their appellate briefs (*see* Opening Brief for Appellant Retailer & Merchant Objectors ("R&M Opening Brief"), No. 12-4671, at 13-30 (2d Cir.); Reply Brief for Appellant Retailer & Merchant Objectors ("R&M Reply Brief"), No. 12-4671 (2d Cir.)), specifically illustrating the real-world impact of the illusory surcharge relief on R&M members. The R&M Objectors used as examples the situations of 105 Degrees (an

13

Oklahoma business denied the ability to surcharge under that state's law) and Whole Hog (an Arkansas business unable to surcharge because of rules applicable to those who, like Whole Hog, also accept American Express cards). (*See* R&M Opening Brief, at 30-42; R&M Reply Brief, at 2-8.)

The Second Circuit took heed of these arguments. In reversing approval of the Original Settlement, the court explained that intractable conflict between the (b)(2) and (b)(3) classes made simultaneous representation of both impossible. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 231-36 (2d Cir. 2016). As the R&M Objectors had been arguing for years, it was this inherent tension between the classes that made the notice unworkable. (*See* ECF No. 2281, at 23-24; ECF No. 6094, at 173-77.) And when it came to surcharge, the Second Circuit echoed the arguments of the R&M Objectors:

> [I]t is imperative that the (b)(2) class in fact benefit from the right to surcharge. But that relief is less valuable for any merchant that operates in New York, California, or Texas (among other states that ban surcharging), or accepts American Express (whose network rules prohibit surcharging . . .). Merchants in New York and merchants that accept American Express can get no advantage from the principal relief their counsel bargained for them.

*In re Payment Card Interchange Fee*, 827 F.3d at 238. Continuing on, the court concluded that "[t]here is no basis for this unequal intra-class treatment: the more valuable the right to surcharge . . ., the more unfair the treatment of merchants that cannot avail themselves of surcharging." *Id.*

The Second Circuit reversed approval of the Original Settlement on largely the same grounds championed by the R&M Objectors since Day One. The R&M Objectors were a substantial cause of the eventual disapproval of the unfair and unreasonable Original Settlement.

14

**V. BECAUSE THE R&M INVESTORS AND THEIR COUNSEL ARE A SUBSTANTIAL CAUSE OF THE SUPERSEDING SETTLEMENT, THEY SHOULD RECEIVE REASONABLE SERVICE AWARDS AND ATTORNEYS' FEES**

The R&M Objectors commend Class Counsel for their efforts in converting the woefully inadequate Original Settlement into a Superseding Settlement that provides meaningful benefits, including an additional $900 million, to the Rule 23(b)(3) Class. As shown above, however, the R&M Objectors and their attorneys were also a substantial cause of the eventual rejection of the badly flawed Original Settlement, and they are a substantial cause of the enhanced benefits to the Class available via the Superseding Settlement. The law in the Second Circuit is that reasonable service awards and attorneys' fees are in order whenever an objector and its lawyers are a substantial cause of benefits available to the class. Nonetheless, neither the Superseding Settlement nor Class Counsel's Fee Motion provides for service awards or attorneys' fees for the R&M Objectors and their counsel. For that reason, the R&M Objectors object to Class Counsel's Fee Request and to final approval of the Superseding Settlement.

Dated: July 23, 2019

                                          Respectfully Submitted:

                                          /s/   Marcus Neil Bozeman
                                          Thomas P. Thrash
                                          Marcus Neil Bozeman
                                          **THRASH LAW FIRM, P.A.**
                                          1101 Garland Street
                                          Little Rock, Arkansas 72201
                                          (501) 374-1058 – Telephone
                                          (501) 374-2222 – Facsimile
                                          tomthrash@thrashlawfirmpa.com
                                          mbozeman@thrashlawfirmpa.com

                                          Phillip Duncan
                                          Richard Quintus
                                          **Duncan Firm, P.A.**
                                          900 S. Shackleford, Suite 725
                                          Little Rock, AR 72211
                                          Telephone:  (501) 228-7600
                                          phillip@duncanfirm.com
                                          richard@duncanfirm.com

                                          Jerrold S. Parker
                                          Jay L.T. Breakstone
                                          **Parker Waichman, LLP**
                                          6 Harbor Park Drive
                                          Port Washington, NY 11050
                                          Telephone:  (516)-723-4620
                                          jbreakstone@yourlawyer.com
                                          jerry@yourlawyer.com

                                          Counsel for the R&M Objectors