UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | MDL No. 1720 |
| | Case No. 1:05-md-1720-JG-JO |
| This document refers to: All Actions | |

## MEMORANDUM OF LAW IN OPPOSITION TO
## MOTION OF GARY B. FRIEDMAN & FRIEDMAN LAW GROUP TO INTERVENE

# Table of Contents

I.     Introduction .............................................................................................. 1

II.     Factual Background ................................................................................... 1

    A.    Co-Lead Counsel and ASR Counsel reach agreement on a litigation structure for MDL 1720. .......................................................................... 1

    B.    Co-Lead Counsel learned of Friedman's misconduct. ............................ 4

       1.   Friedman's communications with Ravelo were extensive and improper. ...... 5

       2.   When Co-Lead Counsel learned of Friedman's conduct, they immediately terminated his role in MDL 1720. ........................................................ 6

       3.   Despite his misconduct, Freidman wants a guarantee that he will be compensated proportionally with Co-Lead Counsel. ....................................... 7

III.     This Court Should Deny Friedman's Motion to Intervene ..................................... 8

    A.    The standards for intervention under Rule 24. ........................................ 8

       1.   Fed. R. Civ. P. 24(a) - Intervention of right. ......................................... 8

       2.   Fed. R. Civ. P. 24(b) - Permissive intervention. ................................... 9

    B.    Denying Friedman's motion to intervene will not impair his ability to protect his interests. ............................................................................ 10

       1.   This Court already has broad equitable powers to resolve fee disputes among counsel. ................................................................................. 10

       2.   This Court can resolve Friedman's dispute without intervention. ................. 12

    C.    The lack of a ripe dispute is further reason to deny intervention. ................. 14

       1.   The 2005 Agreement, by its terms, does not apply to the situation before the Court because there is no "Court-approved lodestar," and this Court has not yet awarded an attorney fee. ........................................................ 14

       2.   Co-Lead Counsel's exclusion of Friedman Law Group's lodestar in its fee petition does not create a ripe dispute where none existed before. .............. 15

    D.    Intervention would inject needless complexity and delay into resolving fee disputes among counsel. ................................................................... 16

IV.     Conclusion ............................................................................................. 17

# Table of Authorities

**Page(s)**

## Cases

*Ark. Teacher Ret. Sys. v. State St. Bank & Trust Co.*,
2018 U.S. Dist. LEXIS 111409 (S.D.N.Y. May 14, 2018) ....................................10

*Canadian St. Regis Band of Mohawk Indians v. New York*,
Nos. 5:82-CV-1114, 5:89-CV-0829, 2005 U.S. Dist. LEXIS 44673
(N.D.N.Y. Oct. 11, 2005) .........................................................................9

*Curry v. Del Priore*,
941 F.2d 730 (9th Cir. 1991) ...................................................................10

*Del Col v. Rice*,
No. 11-CV-5138 (MKB), 2014 U.S. Dist. LEXIS 63371 (E.D.N.Y. May 7,
2014) .........................................................................................9, 17

*Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*,
261 F. Supp. 2d 293 (S.D.N.Y. 2003)..........................................................14

*FTC v. First Capital Consumer Mbrshp. Servs.*,
206 F.R.D. 358 (W.D.N.Y. 2001)................................................................8

*Goldberger v. Integrated Res., Inc.*,
209 F.3d 43 (2d Cir. 2000) .....................................................................14

*Gould v. United States*,
2012 U.S. Dist. LEXIS 3242 (S.D.N.Y. Jan. 3, 2012)....................................10, 17

*In re "Agent Orange" Prod. Liab. Litig.*,
818 F.2d 216 (2d Cir. 1987) ...................................................................11

*In re American Express Anti-Steering Rules Antitrust Litig.*,
No. 11-md-2221, 2015 WL 4645240 (Aug. 4, 2015)................................4, 5, 6, 16

*In re E. Sugar Antitrust Litig.*,
697 F.2d 524 (3d Cir. 1982) ...................................................................16

*In re Goldstein*,
430 F.3d 106 (2d Cir. 2005) ...................................................................16

*In re Holocaust Victim Assets Litig.*,
225 F.3d 191 (2d Cir. 2000) .....................................................................9

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.,*
986 F. Supp. 2d 207 (E.D.N.Y. 2013) ...................................................................3

*In re Payment Card Payment Card II,*
991 F. Supp. 2d 437 (E.D.N.Y. 2014) ...................................................................3

*In re Pub. Offering Secs. Litig.,*
No. 21 MC 92 (SAS), 2011 U.S. Dist LEXIS 76067 (SDNY Jul. 8, 2011) .........15

*In re Vitamins Antitrust Litig.,*
398 F. Supp. 2d 209 (D.D.C. 2005) .....................................................................15

*In re Volkswagen & Audi Warranty Extension Litig.,*
89 F. Supp. 3d 155 (D. Mass. 2015) ....................................................................11

*Kalyawongsa v. Moffett,*
105 F.3d 283 (6th Cir. 1997) .........................................................................11, 13

*Kaplan v. Reed Smith LLP,*
919 F.3d 154 (2d Cir. 2019) .....................................................................11, 12, 13

*Kaplan v. S.A.C. Capital Advisors, L.P.,*
2017 U.S. Dist. LEXIS 202631 (S.D.N.Y. Nov. 16, 2017) ...............10, 11, 12, 13

*SEC v. Everest Mgmt. Corp.,*
475 F.2d 1236 (2d Cir. 1972) ................................................................................9

*Sierra Club v. United States Army Corps of Eng'rs,*
709 F.2d 175 (2d Cir. 1983) ..................................................................................9

*United States v. City of New York,*
198 F.3d 360 (2d Cir. 1999) ..................................................................................8

*United States v. Hooker Chems. & Plastics Corp.,*
749 F.2d 968 (2d Cir. 1984) .............................................................................9, 17

*United States v. Pitney Bowes, Inc.,*
25 F.3d 66 (2d Cir. 1994) ......................................................................................9

**Rules**

Fed. R. Civ. P. 23(h)............................................................................................13

Fed. R. Civ. P. 24(a)........................................................................................8, 13

Fed. R. Civ. P. 24(b)........................................................................................9, 13

## I. Introduction

This is a dispute between a dismissed attorney for the class and Co-Lead Counsel in this litigation, over the allocation of attorney fees that this Court has not yet awarded. Courts that oversee class actions routinely adjudicate these types of disputes through their authority under Rule 23 and via their inherent equitable authority to safeguard absent class members' funds. Thus, the Movants' request to initiate an entirely collateral proceeding over subject matter that is already entrusted to this Court's jurisdiction is misplaced. And their implicit request to have this dispute resolved now, before any fee has been awarded, is also premature. For these reasons, and for the reasons fully set forth below, intervention should be denied.

## II. Factual Background

### A. Co-Lead Counsel and ASR Counsel reach agreement on a litigation structure for MDL 1720.

Broadly speaking, two sets of class cases were consolidated into MDL 1720. The first set of cases (the "Interchange Cases") primarily challenged the setting of interchange fees within the Visa and Mastercard networks, which at that time was conducted by the banks that sat on the respective networks' boards. These cases were brought by the current Co-Lead Counsel and other firms. Another set of cases (the "ASR Cases") primarily challenged the networks' "no surcharge" rules and other rules (collectively known as the "Antisteering Restraints" or "ASRs") that prevented or restricted merchants from reducing payment-card-acceptance costs by steering consumers to pay with cheaper forms of payment. The ASR cases were brought by a separate set of counsel ("ASR Counsel"), which included the Friedman Law Group, Reinhardt Wendorff & Blanchfield, Markun Zusman & Compton LLP, Chitwood Harley & Harnes LLP, Gregory J. Hubachek LLC, Chestnut & Cambronne P.A., Murray Frank & Sailer, Bolognese & Associates,

and Starr Gern Davison & Rubin P.C. (Friedman Decl. Ex. 3.) Both sets of cases were brought on behalf of essentially identical classes of merchants.

After the Judicial Panel on Multidistrict Litigation consolidated the Interchange Cases, the ASR cases, and other non-class cases in this Court before Judge Gleeson, representatives of counsel for the Interchange Cases and the ASR Cases held a series of meetings, in an attempt to agree upon a collective leadership structure for the newly consolidated case that would best serve the class's interests. These meetings resulted in an agreement between them that was memorialized in a series of letters between the counsel groups (the "2005 Agreement"). The purpose of the 2006 Agreement was to allocate resources in a way that would most effectively address both ASR and Interchange Fee issues.

Under the 2005 Agreement, the ASR Counsel supported the case-leadership structure proposed by the current Co-Lead Counsel firms.[1] (Friedman Ex. 1 at 1.) The parties also agreed that the ASR Counsel would be designated as heads of a "'working group' which [would] have primary responsibility," within the larger organizational structure, to litigate the issues raised by" the networks' rules. (*Id*.; *see also* Friedman Ex. 2.) The two counsel groups agreed to collaborate on a common consolidated complaint that addressed the anticompetitive effects of the ASRs and to collaboratively determine how to treat ASR issues at crucial points in the litigation, such as at class certification, summary judgment, or trial. (Friedman Ex. 1 at 1-2.) The letter gave no authority to the ASR Counsel regarding settlement of ASR claims, except the right to object if they were dissatisfied with the settlement. (*Id*. at 2; *see also* Pretrial Or. 5 at 1-2, ECF No. 279, Feb. 24, 2006 (conferring on Co-Lead Counsel the exclusive authority to, among other things,

---

[1]     The ASR Counsel agreed to support the appointment of the current Co-Lead Counsel firm as "Interim Co-Lead Counsel." For ease of reference, these firms are referred to as Co-Lead Counsel throughout.

present Class Plaintiffs' positions during litigation and conduct settlement negotiations.) Regarding the allocation of any potential fee, the parties agreed that ASR Counsel would "as a group, receive a percentage of all attorneys' fees in this action that is equal to the percentage of Court-approved lodestar" attributable to ASR Counsel. (Friedman Ex. 3 at 1; *see* also Friedman Ex. 1 at 2.)

As the 2005 Agreement contemplated, Co-Lead Counsel and the ASR Counsel worked cooperatively to litigate the case through motions to dismiss, discovery, class certification, and summary judgment. When Co-Lead Counsel began discussing settlement with the defendants, the ASR Counsel, including Friedman, assisted by providing input and drafting assistance on rules-related issues. (Decl. of K.C. Wildfang (filed under seal) ¶¶5-6, ECF No. 6533, Aug. 18, 2015.) At all times, however, Friedman and the other ASR Counsel acted under the direction of Co-Lead Counsel, who had ultimate authority over the settlement discussions and the positions taken during negotiations. (*Id.*, Pretrial Order No. 5 at 1.) Co-Lead Counsel reached a settlement with all defendants in 2012.

Co-Lead Counsel moved for final approval of the 2012 settlement in April 2013. At the same time, Co-Lead Counsel submitted a fee petition that included all the time of the ASR firms, including Friedman's. Out of a total class lodestar of $ 161.1 million (after an audit by Co-Lead Counsel and an outside auditor), the ASR firms accounted for approximately $ 15 million, of which $ 9.6 million was attributable to the Friedman Law Group. (Decl. of T. Undlin, Ex. A, ECF No. 2113-2 (Apr. 11, 2013).) The district court approved the settlement, *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 986 F. Supp. 2d 207, 241 (E.D.N.Y. 2013) ("*Payment Card I*"), and, in a separate order, awarded a fee of $ 544.8 million. *In re Payment Card Payment Card II*, 991 F. Supp. 2d at 447-48.

Both orders were appealed.

## B. Co-Lead Counsel learned of Friedman's misconduct.

While the appeals of the final-approval and attorney-fee orders were pending before the Second Circuit, one of Mastercard's lead lawyers, Keila Ravelo, was implicated in a conspiracy to defraud her then-current and past law firms (and Mastercard) of millions of dollars by creating two supposed litigation-support firms that billed the law firms and Mastercard for services that were never performed. *In re American Express Anti-Steering Rules Antitrust Litig.*, No. 11-md-2221, 2015 WL 4645240, at *6-7 (Aug. 4, 2015) ("*In re Amex*"). Ravelo was alleged to have conducted her scheme alongside her co-conspirator-husband, Melvin Feliz. (*Id at *6.*)

Wilkie Farr, the law firm at which Ravelo worked at the time of her arrest, conducted an internal investigation into the matter. In the course of this investigation, Wilkie Farr informed Friedman and Co-Lead Counsel that Co-Lead Counsel's confidential attorney work product and attorney-client communications were discovered in Ravelo's files, much of which was sent to Ravelo by Friedman. *Id.* at *7. Wilkie Farr shared with Co-Lead Counsel these privileged and confidential communications and other communications between Friedman and Ravelo that violated the protective order in related class litigation[2] that challenged American Express's ASRs, in which Friedman was Lead Counsel. *Id.* For those communications that Co-Lead Counsel could not receive, either because they were subject to the protective order in *American Express*, or for other reasons, Co-Lead Counsel received a log of those communications. (*See, e.g.,* Decl. of M. Kane, Ex. 12, ECF No. 6555-1, Sep. 1, 2015.) Counsel to the leading objector groups received the same materials.

---

[2] The *In re Amex* class overlapped significantly with the class in MDL 1720.

### 1. Friedman's communications with Ravelo were extensive and improper.

Upon review of the Friedman-Ravelo communications, Co-Lead Counsel learned that, beginning early in the case, and continuing through the settlement-negotiation phase, and into the period when opposition to the 2012 settlement emerged, Friedman frequently, and often inappropriately, communicated with Ravelo. Their communications revealed that they had a close personal relationship and frequent business dealings, none of which Friedman ever disclosed to Co-Lead Counsel. *See In re Amex*, 2015 WL 4645240 at *18. Broadly speaking, the communications fell into four categories: (i) Friedman sharing Co-Lead Counsel's analysis of facts or legal issues in MDL 1720;[3] (ii) Friedman sharing Co-Lead Counsel's negotiation strategy with respect to the 2012 settlement; (iii) Friedman sharing Co-Lead Counsel's strategy for lobbying for the Durbin Amendment or against state-level surcharge bans; and (iv) Ravelo's sharing of Mastercard's highly confidential negotiating strategy and desired results in dealing with the Department of Justice, none of which was ever disclosed to Co-Lead Counsel. (*See generally* Obj. Mem. Law in Sup. Mot. Vac. J. at 18-19 & exhibits referenced therein, ECF No. 6566, Jul. 28, 2015.) The improper communications formed the basis for a Rule 60 motion by the objectors to the 2012 settlement, in which they requested that this Court set aside its judgment approving the 2012 settlement. (*See id.* at 40.) The objectors supported their motion with extensive briefing and a declaration from a leading ethics expert. (*See generally* Objs.' Not. Mot. Vac. J., ECF No. 6566, Jul. 28, 2015.) While Co-Lead Counsel opposed the objectors' motion because the 2012 settlement was not influenced by the Friedman-Ravelo communications, Co-

---

[3]     Judge Garaufis found that Friedman also disseminated the work product of plaintiffs' counsel in the *In re Amex* litigation.

Lead Counsel did not dispute the objectors' contention that Friedman's conduct was improper and unethical. (Cl. Pls.' Mem. Opp. R. 60 Mots. at 1, 2, 5, ECF No. 6533, Aug. 18, 2015.)

This motion was not decided at the time the Second Circuit set aside the 2012 settlement and thus became moot.

Many of the objectors to the MDL 1720 settlement also objected to a settlement that the class in *In re Amex*—with Friedman as Lead Counsel—entered into with American Express, arguing that the communications with Ravelo demonstrated Friedman's inadequacy. That settlement required Amex to modify its ASRs to permit surcharging of its cards, provided that all other credit cards (but not other debit cards, as its rules previously required) were surcharged at the same level. *In re Amex*, 2015 WL 4645240, at *4. Judge Garaufis found Friedman's conduct to be "improper and disappointing" and "disloyal[] to class members," and concluded that the "procedural unfairness and failure of adequate representation" that the Friedman/Ravelo communications revealed mandated disapproval of the settlement. *Id*. at *11, 14. Based on his findings, Judge Garaufis concluded that the *Amex* settlement was "fatally tainted." *Id*. at *11. He denied final approval for that settlement and removed Friedman as class counsel. *Id*. at *21.

### 2. When Co-Lead Counsel learned of Friedman's conduct, they immediately terminated his role in MDL 1720.

On March 5, 2015, immediately upon learning of the Friedman-Ravelo communications, Co-Lead Counsel sent Friedman a letter, which instructed that "neither [he] nor [his] firm, until further notice, [was] to participate in the representation of the Certified Settlement Class in MDL 1720." (Marth Decl., Ex. 1.) From that point until the beginning at the current dispute, Co-Lead Counsel's interactions with Friedman ceased. After the Second Circuit vacated the 2012 settlement, Friedman had no involvement in Phase Two of this litigation or in the negotiations

that led to the current settlement that is pending approval by this Court. (Decl. of T. Undlin ¶ 8, ECF. No. 7471-2, Jun. 7, 2019 ("2019 Undlin Decl.").)

### 3. Despite his misconduct, Freidman wants a guarantee that he will be compensated proportionally with Co-Lead Counsel.

Co-Lead Counsel's next interaction with Friedman came in June 2018, after Co-Lead Counsel and the defendants reached agreement on terms for a settlement on behalf of a Rule 23(b)(3) damages class. (Friedman Decl. Ex. 5 at 3.) At that time, Friedman proposed a meeting, "before any decisions [were] made that might affect [him] or [his] law firm." (*Id*.) Co-Lead Counsel did not meet with Friedman. In later emails dated April 9 and May 6, 2019, Friedman clarified that he sought assurances that the 2005 Agreement remained in force, as it related to the fee allocation between Co-Lead Counsel and the ASR Counsel.[4] (Friedman Ex. 5 at 1-2.) Co-Lead Counsel replied to these emails on May 6 that "Co-Lead Counsel for the (b)(3) Class will not include in any joint fee petition any portion of the lodestar time or expenses of the Friedman Law Group and any predecessor firms." Co-Lead Counsel also stated that, if Friedman wished to apply for a fee award on behalf of his firm, he would "need to file an independent fee petition with the Court." (Friedman Decl. Ex. 6.)

On June 7, Co-Lead Counsel moved for final approval of the settlement and petitioned for attorney fees, expense awards, and class-representative service awards. In its petition for fees, Co-Lead Counsel included the time of each of the ASR Counsel firms, with the exception of the Friedman Law Group. (2019 Undlin Decl. ¶ 9 & Ex. A attached to Ex. 1.) Each of these firms submitted a declaration to Co-Lead Counsel that they were not aware of Friedman's improper

---

[4]     Tracey Kitzman, one of Friedman's former partners, wrote an e-mail requesting that her time be included in Co-Lead Counsel's fee petition and that she be included in the allocation of any fee that is awarded. (Friedman Ex.7.) Co-Lead Counsel responded that she was free to put in her own petition for fees. (*Id*.)

conduct until it was publicly disclosed. (*Id.*) In addition to receiving ASR Counsel's declarations, Co-Lead Counsel have no reason to believe that any of these firms were involved in Friedman's improper conduct, or had any knowledge of it before it became public.

Instead of submitting his own fee petition, as Co-Lead Counsel suggested, Friedman filed this motion, seeking to initiate a collateral lawsuit within MDL 1720, in which he would sue Co-Lead Counsel for enforcement of the 2005 Agreement, essentially seeking a declaration that Co-Lead Counsel was obligated to pay his firm a certain portion of its attorney-fee award, before any such award was made.

### III.     This Court Should Deny Friedman's Motion to Intervene

#### A.     The standards for intervention under Rule 24.

##### 1.  Fed. R. Civ. P. 24(a) - Intervention of right.

Federal Rule of Civil Procedure 24 provides a method for non-parties to adjudicate their rights by inserting themselves into pending litigation. Rule 24(a) governs intervention of right. Absent an unconditional right to intervene granted by a federal statute, intervention under Rule 24(a) is available only when the proposed intervenor "claims an interest relating to the property or transaction that is the subject of the action," *and* "is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest." The application to intervene "will be denied" unless these requirements are met.

The Second Circuit consistently denies motions for intervention as of right by applicants that have other means available to adjudicate their rights. *United States v. City of New York*, 198 F.3d 360, 367 (2d Cir. 1999) ("Thus, the denial of intervention here does not amount to a foreclosure of opportunities for appellants to seek to vindicate their claims in more appropriate settings."); *see also FTC v. First Capital Consumer Mbrshp. Servs.*, 206 F.R.D. 358, 363

(W.D.N.Y. 2001). Intervention is inappropriate where other channels were available to the proposed intervenor, even where the proposed intervenors would have faced obstacles in exerting their rights through those alternative channels. *In re Holocaust Victim Assets Litig.*, 225 F.3d 191, 197-99 (2d Cir. 2000). This is especially the case where such obstacles arise only because of the proposed intervenor's failure to pursue available alternative channels for relief in a timely manner. *Canadian St. Regis Band of Mohawk Indians v. New York*, Nos. 5:82-CV-1114, 5:89-CV-0829, 2005 U.S. Dist. LEXIS 44673, at *33 (N.D.N.Y. Oct. 11, 2005).

## 2. Fed. R. Civ. P. 24(b) - Permissive intervention.

For non-governmental litigants without a statutory right to intervene, a court may grant intervention when the proposed intervener "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). A decision on whether or not to grant permissive intervention is committed to the sound discretion of the district court. *United States v. Pitney Bowes, Inc.*, 25 F.3d 66, 73 (2d Cir. 1994). Rule 24(b)(3) makes clear, however, that in exercising that discretion, the court *must* consider "whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." *Pitney Bowes, Inc.*, 25 F.3d at 73. Thus, permissive intervention will not be granted, even where there is a strong commonality of fact or law, where such intervention would cause undue delay, complexity or confusion in a case. *See Sierra Club v. United States Army Corps of Eng'rs*, 709 F.2d 175, 177 (2d Cir. 1983); *SEC v. Everest Mgmt. Corp.*, 475 F.2d 1236, 1239 (2d Cir. 1972).

Such prejudicial delays can include those required to accommodate "additional discovery, the prolongation of cross-examination of witnesses, and the necessity to engage in extensive investigation and cross-examination of the intervenors' witnesses." *United States v. Hooker Chems. & Plastics Corp.*, 749 F.2d 968, 990 (2d Cir. 1984); *see also Del Col v. Rice*,

No. 11-CV-5138 (MKB), 2014 U.S. Dist. LEXIS 63371, at *20, *29 (E.D.N.Y. May 7, 2014) (permissive intervention denied because it would force the parties to resume motion practice, delay discovery, and shift the focus of attention); *Gould v. United States*, 2012 U.S. Dist. LEXIS 3242, at *8 (S.D.N.Y. Jan. 3, 2012) (permissive intervention denied because doing so would have required the court to extend discovery).

### B. Denying Friedman's motion to intervene will not impair his ability to protect his interests.

#### 1. This Court already has broad equitable powers to resolve fee disputes among counsel.

This Court has broad authority to award attorney fees and resolve fee disputes among class counsel when they arise. "Courts have long recognized that fee disputes arising from litigation pending before a district court fall within that court's ancillary jurisdiction." *Curry v. Del Priore*, 941 F.2d 730, 731 (9th Cir. 1991). In the class-action context, Rule 23(h) vests the court with the authority to "award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." The Advisory Committee notes to Rule 23 make clear that the Court has an obligation to ensure that fees are fair and proper. Fed. R. Civ. P. 23(h), 2003 Adv. Comm. Notes.

A federal court's authority to award counsel fees gives it ancillary jurisdiction to adjudicate fee disputes among counsel, even when those disputes are pending before other federal or state courts. *See, e.g., Kaplan v. S.A.C. Capital Advisors, L.P.*, 2017 U.S. Dist. LEXIS 202631, at *26 (S.D.N.Y. Nov. 16, 2017). Courts' authority to resolve fee disputes to be paid out of class funds among class counsel arise pursuant to the court's "equitable authority to safeguard settlement funds as a fiduciary of the class." *Ark. Teacher Ret. Sys. v. State St. Bank & Trust Co.*, 2018 U.S. Dist. LEXIS 111409, at *187-89 (S.D.N.Y. May 14, 2018). This equitable authority

includes the power to apportion fee awards when fee disputes arise between current and former class counsel. *See, e.g., Kaplan*, 2017 U.S. Dist. LEXIS 202631, at *26. The court's equitable authority over counsel fees also allows it to resolve attorney-fee disputes that arise out of contractual agreements among counsel. *See, e.g., Kalyawongsa v. Moffett*, 105 F.3d 283, 287-88 (6th Cir. 1997) ("[W]e hold that although attorneys' fee arrangements are contracts under state law, the federal court's interest in fully and fairly resolving the controversies before it requires courts to exercise supplemental jurisdiction over fee disputes that are related to the main action."). And in appropriate cases, the court may disregard fee-sharing agreements among class counsel as part of its role as protector of absent class members' interests. *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 216, 223 (2d Cir. 1987); *see also In re Volkswagen & Audi Warranty Extension Litig.*, 89 F. Supp. 3d 155, 183 (D. Mass. 2015) (declining to "blindly follow" counsel's private arrangements among class counsel).

A recent Second Circuit decision provides ample guidance to the Court on this issue. *Kaplan v. Reed Smith LLP*, 919 F.3d 154 (2d Cir. 2019) ("*Reed Smith*"), involved a dispute between two law firms regarding the distribution of fees following the settlement of a securities class action. Following the settlement, the district court awarded fees to the firm of Wohl & Fruchter. Reed Smith, which had been engaged as trial counsel shortly before the case settled, did not petition for fees. *Id*. at 156. Instead, following the court's grant of Wohl's fee petition, Reed Smith filed a complaint in state court alleging that it was "entitled to its bargained-for contingent fee, based on the amount of the Settlement, under the terms of the . . . Agreement." *Id.* at 160.

The district court exercised ancillary jurisdiction over the dispute and permanently enjoined the state-court proceedings. On appeal, the Second Circuit approved of the district

court's actions. Although Reed Smith argued that the district court lacked jurisdiction to enjoin its state-court suit, the court of appeals disagreed. The court held that, "Where a district court has original jurisdiction over a civil action, it retains ancillary jurisdiction after dismissal to adjudicate collateral matters such as attorney's fees" because such matters constitute "the district court exercis[ing] its power to effectuate its decrees." *Id.* at 157-158 (internal quotation removed).

### 2. This Court can resolve Friedman's dispute without intervention.

Friedman's proposed lawsuit against Co-Lead Counsel is precisely analogous to Reed Smith's lawsuit. Like Reed Smith, Friedman attempts to style his action as "something other than a request for fees," but "the allegations . . . belie this sleight of hand." *Id*. at 160. Friedman's proposed suit in intervention is "seeking a fee award . . . based on a provision in [the] engagement letter that calls for the firm to be compensated." *Id.* Such allegations go directly to the heart of the court's equitable power to definitively determine the fees for class counsel. Because the district court retains ancillary jurisdiction to effectuate any fee order, Friedman's proposed suit in intervention is unnecessary.

In essence, Friedman is requesting a portion of the attorney fees awarded to class counsel or a declaration that he is entitled to a certain portion of class-counsel fees when they are awarded. As shown above, this is relief that the Court has the power to award by virtue of its equitable jurisdiction and its supervisory authority over class actions under Rule 23, without initiating a new action. *See Kaplan*, 2017 U.S. Dist. LEXIS 202631, at *26. Indeed the Court has set a schedule to receive applications for attorney fees and to adjudicate counsel's entitlement to those fees, which it has set forth in the Notice that was provided to class members. Under this schedule, petitions for attorney fees were to be made by June 7, objections to those petitions

raised by July 23, and replies to objections made by August 31, with a final fairness hearing on approval of the settlement and attorney fees to occur on November 7. To the extent that competing claims for attorney fees arise or to the extent class members object to any petition for attorney fees, those can and should be resolved by this Court, in this MDL, and through this Court's authority under Rule 23 and its equitable powers. To the extent that Friedman or other current or former class counsel objects to Co-Lead Counsel's allocation of any attorney award, this Court also has authority to resolve those disputes. *Kalyawongsa*, 105 F.3d at 287-88.

Despite this Court's well-established and pre-existing authority to adjudicate his rights, Friedman seeks to initiate an entirely new, collateral litigation, involving parties that are already subject to this Court's jurisdiction. If Friedman's wish for a lawsuit against the three Co-Lead Counsel firms were granted, this Court's ability to make final determinations on counsel's entitlement to fees and the apportionment of those fees, on the timeline set out in the class notice would be impaired. *See Reed Smith*, 919 F.3d at 160. Not only would this be inefficient for Friedman, Co-Lead Counsel, and this Court, but it would also prejudice the rights of absent class members who are entitled to a unitary and transparent process, in which to review and, if they choose, object to, the settlement and class counsel's fee petition. *See* Fed. R. Civ. P. 23(h)(1)-(2). In essence, by seeking to initiate a separate law suit, Friedman is attempting to elevate a private agreement among class counsel above the Court's inherent equitable authority to determine a reasonable fee and allocation. This is contrary to law and should not be allowed. *See, e.g.,* Fed. R. Civ. P. 24(a)&(b); *Kaplan*, 2017 U.S. Dist. LEXIS 202631, at *26, 40.

**C.**      **The lack of a ripe dispute is further reason to deny intervention.**

In addition to the considerations set forth above, Friedman's motion is improper because there is nothing for this Court to decide at this time, when no fee has been awarded or allocated.

**1.  The 2005 Agreement, by its terms, does not apply to the situation before the Court because there is no "Court-approved lodestar," and this Court has not yet awarded an attorney fee.**

The 2005 Agreement provides for ASR Counsel "as a group, [to] receive a percentage of all attorneys' fees in this action that is equal to the percentage of Court-approved lodestar" proportional to ASR Counsel's share of that lodestar. (Friedman Ex. 3 at 1.) At this time, however, there is no "Court-approved lodestar," and there are no "attorneys' fees." Thus, as far as allocation of attorney fees are concerned, the 2005 Agreement has yet to create any rights in any parties. When parties' rights under a contract have not yet arisen, those rights are not ripe for adjudication. *See Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 261 F. Supp. 2d 293, 295 (S.D.N.Y. 2003). While it is true that Co-Lead Counsel did not include Friedman Law Group's time in its attorney-fee petition, the exclusion of that time did not deprive Freidman of any particular "percentage of attorney fees." Rather it merely reduced Co-Lead Counsel's lodestar for purposes of the Court's cross-check. *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000); 2019 Undlin Decl. ¶¶ 2-3. Friedman's entire proposed lawsuit is therefore a theoretical dispute over a fee allocation that has not yet occurred.

**2. Co-Lead Counsel's exclusion of Friedman Law Group's lodestar in its fee petition does not create a ripe dispute where none existed before.**

Friedman argues that, despite the lack of an approved attorney fee or a Court-approved lodestar, this dispute is ripe because Co-Lead Counsel have "notified Friedman that they did not intend to comply with the terms of the Agreement,"[5] (Friedman Mem. of L. at 18), which he believes constitutes "harm of sufficient immediacy and reality to warrant[s] the issuance of a declaratory judgment." (Proposed Compl. ¶ 47.)

But Friedman's position misapprehends the roles of class counsel and the court in class-action litigation. It is the court, not class counsel, that awards a fee. When a fee is awarded, class counsel's allocation decisions are often afforded significant deference, but the ultimate authority to approve a distribution rests with the court. *In re Pub. Offering Secs. Litig.*, No. 21 MC 92 (SAS), 2011 U.S. Dist LEXIS 76067, at *23-24 (SDNY Jul. 8, 2011); *In re Vitamins Antitrust Litig.*, 398 F. Supp. 2d 209, 222 (D.D.C. 2005).

Far from "run[ning] contrary to the direct instructions of this Court," Friedman Mem. at 23, Co-Lead Counsel's proposal that Friedman submit his own fee petition for resolution on the same timeline as other petitions would protect the interests of absent class members while allowing Friedman to make any argument that he might make in his proposed collateral litigation. If Friedman had made an independent fee petition, he could have asked this Court for the same fee amount that he believed he was entitled to under the 2005 Agreement. And if he wished to avoid "seeking legal fees straight out of the pockets of the class members," Friedman Mem. at 23, he could have requested that his fee be paid out of any fee this Court may award

---

[5] This is an incorrect characterization. Co-Lead Counsel's May 6 letter to Friedman states, "[u]nder the circumstances, we do not believe that the 2005 letter requires us to include your time and expenses in a joint fee petition." Co-Lead Counsel suggested that he file his own petition independently. (Friedman Exh. 6.)

Class Counsel. Exercising its discretion, this Court would then determine (a) whether Friedman was entitled to a fee, in spite of his misconduct,[6] and (b) the amount of any fee that he was entitled to. But at the end of the day, Friedman would have been situated no worse submitting his own fee petition than he would have been if Co-Lead Counsel included Friedman's time for purposes of their lodestar cross-check, because under either scenario, his entitlement to a fee and the amount of that fee could be subject to the discretion of the Court.

Finally, Co-Lead Counsel were more than justified in requesting that Friedman submit an independent fee petition. In similar litigation in this district on behalf of a nearly identical class, Friedman was found to have acted "improper[ly]" and to have demonstrated "disloyalty to class members." *In re Amex*, 2015 WL 4645240, at *11, *14. If Co-Lead Counsel submitted Friedman's time for purposes of their lodestar cross-check, they would essentially be asking this Court to compensate them, in part, for work performed by someone who was found to be actively contradicting the interests of the class. *See id*. Doing so, in Class Counsel's view, would have fundamentally undermined the principle on which fees are award in class action litigation, *i.e.* for effort in the Class's interest which benefits the Class.

### D. Intervention would inject needless complexity and delay into resolving fee disputes among counsel.

Friedman was free to follow Co-Counsel's suggestion and pursue any fees he believes himself entitled to by petition to the Court by the deadline set forth in the Court's Preliminary Approval Order. ECF. No. 7361 (Jan. 24, 2019). Friedman's participation in the class fee-petition process would have allowed class members to respond to his petition and the Court to

---

[6]     *See In re Goldstein*, 430 F.3d 106, 111 (2d Cir. 2005) (upholding district court's attorney-fee reduction for attorney's neglect of client and disregard for court orders); *In re E. Sugar Antitrust Litig.*, 697 F.2d 524, 533 (3d Cir. 1982) (holding that district court, in its discretion, may decline to award fees to law firms that had engaged in unethical conduct); *In re Amex ASR*, 2015 WL 4645240, at *4, *11, *14, 21 (detailing Friedman's misconduct).

dispose of Friedman's arguments in a single hearing where all parties' rights could be adjudicated, which is the ultimate purpose of intervention. Instead, Friedman proposes to flip the intervention process on its head by asking the Court to splinter the determination of claims into separate processes. Under clear Second Circuit precedent, intervention as of right does not exist in such circumstances.

In addition Friedman's request to intervene should be denied because it would necessarily involve additional, undue delay. Permissive intervention is regularly denied by courts in the Second Circuit where it causes additional discovery, or renewed motions practice. *Hooker Chems.,* 749 F.2d at 990; *Del Col v. Rice,* 2014 U.S. Dist. LEXIS 63371, at *20, *29; *Gould,* 2012 U.S. Dist. LEXIS 3242, at *8. Friedman seeks far more than that – his proposed complaint-in-intervention requests that the conclusion of the present case be delayed until a *full jury trial* has taken place on Friedman's claim. (See Prop. Compl. at 16-17, ECF No. 7470-2, Jun. 7, 2019.). That request goes well beyond the types of delays regularly cited by courts in this Circuit as bases for denying permissive intervention, and thus undercuts Friedman's motion for intervention.

## IV.    Conclusion

This Court has broad powers to oversee this litigation, the class-counsel structure, and the allocation of fees among class counsel. There is therefore no reason to start an entirely new proceeding to decide what the Court can already decide, especially when the subject matter of that dispute (an attorney fee to class counsel) does not yet exist. Co-Lead Counsel therefore respectfully request that Friedman's motion be denied.

Dated: July 31, 2019                   Respectfully submitted,

/s/ *K. Craig Wildfang*
    Robins Kaplan LLP
    K. Craig Wildfang
    Thomas J. Undlin
    Ryan W. Marth
    2800 LaSalle Plaza
    800 LaSalle Avenue South
    Minneapolis, MN 55402-2015
    Telephone: 612-349-8500
    612-339-4181 (fax)

    BERGER & MONTAGUE, P.C.
    H. Laddie Montague, Jr.
    Merrill G. Davidoff
    Michael J. Kane
    1818 Market St., Ste. 3600
    Philadelphia, PA 19103
    Telephone: 215-875-3000
    215-875-4604 (fax)

    ROBBINS GELLER RUDMAN & DOWI
    LLP
    Patrick J. Coughlin
    Alexandra S. Bernay
    Carmen A. Medici
    655 West Broadway, Suite 1900
    San Diego, CA 92101
    Telephone: 619-231-1058
    619-231-7423 (fax)

    **Co-Lead Counsel for Rule 23(b)(2) Class Plaintiffs**

89859902.9