UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | Case No: 05-md-01720 (MKB) (JO) |
| This Document Applies to: | Case No. 14-cv-3529 (MKB) (JO) |
| MELVIN SALVESON, et al., v. JP MORGAN CHASE & CO., et al. | ORAL ARGUMENT REQUESTED |

### SALVESON PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR RELIEF FROM FINAL JUDGMENT

Pursuant to Federal Rule of Civil Procedure 60 and this Court's inherent authority,[1] Plaintiffs Melvin Salveson, Edward Lawrence, Dianna Lawrence, and Wendy M. Adams, on behalf of themselves and all others similarly situated ("Salveson Plaintiffs" or "Cardholder Plaintiffs") respectfully move this Court for relief from the final judgment entered in this case on December 4, 2014.  (Dkt. No. 86.)

I.   BACKGROUND

On December 16, 2013, Cardholder Plaintiffs filed a complaint on behalf of themselves and all other Visa and MasterCard credit cardholders in the United States, alleging a price-fixing agreement among banks to fix and increase credit-card interchange fees in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, as well as California's Cartwright Act, Bus & Prof. Code §

---

[1] The Court has inherent power to grant relief.  *Dictograph Products Company v. Sonotone Corporation,* 230 F.2d 131, 134-135 (2d Cir. 1956) per L. Hand, J.

16720.  In their complaint, Plaintiffs contended that – as cardholders – they suffered injury and damages when they paid high, supracompetitive interchange fees to issuing banks.

A separate group of plaintiffs – merchants who accept credit-card payments from their retail customers ("Merchant Plaintiffs") – had previously filed suit, alleging similar conspiratorial conduct.

Defendants moved to dismiss the Cardholder Plaintiffs' complaint, arguing they were indirect purchasers who lacked standing to sue under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).  On November 26, 2014, the Court granted the motion.  (Dkt. no. 83.)  Dismissing the complaint, the Court ruled, "[t]he plaintiffs claim that because [they] pay for each of their credit card transactions, they have sufficiently alleged they are direct purchasers – that is, they directly paid supracompetitive, fixed and inflated interchange fees to the defendants.  I disagree and hold that the plaintiffs' allegations require the dismissal of their federal claim pursuant to *Illinois Brick*." (Dkt. no. 83 at 6.)

The Court's ruling was premised on then-existing Second Circuit case law that "[t]he markets for general purpose payment cards and for payment card network services are separate and distinct.  'Whereas in the market for general purpose *cards*, the issuers are the sellers, and the cardholders are the buyers, in the market for general purpose card *network services*, the four networks themselves are the sellers, and the issuers of cards and merchants are the buyers.' " (Dkt. no. 83 at 6, *quoting United States v. Visa U.S.A, Inc.*, 344 F.3d 229, 239 (2d Cir. 2003) (emphasis in original).)  Based on *Visa*, the Court concluded that the Cardholder Plaintiffs did not *participate* in the market for credit card network services, and thus could not have been direct purchasers under *Illinois Brick*.  (Dkt. no. 83 at 7 ("[b]ecause the interchange fee runs between financial institutions within the card services market, consumers do not directly pay interchange fees and are not directly injured by their imposition").)  The Court dismissed as "facile" the Cardholders'

assertion that they were direct purchasers because the defendant issuing banks took the inflated interchange fees directly from the Cardholders' accounts. (*Id*. at 7.)

A judgment was entered against the Cardholder Plaintiffs on December 4, 2014. (Dkt. no. 86.) They filed a timely motion to reconsider pursuant to Local Civil Rule 6.3, and the defendants filed a cross-motion, seeking dismissal of Cardholder Plaintiffs' state law antitrust claims. (Dkt. no. 90.) On February 24, 2016, the Court denied the Cardholder Plaintiffs' motion, granted the defendants' cross-motion, and dismissed the Cardholders' state law claims. (Dkt. no. 112.) Plaintiffs appealed the order granting the motion to dismiss and the order denying the motion for reconsideration, but the Second Circuit affirmed on October 17, 2016. *Salveson v. J.P. Morgan Chase & Co.*, 662 Fed.Appx. 71 (2d Cir. 2016) (unpublished). On April 24, 2017, the Supreme Court denied Cardholder Plaintiffs' petition for certiorari. *Salveson v. J.P. Morgan Chase & Co.*, 137 S.Ct. 1826. From that point forward, only the Merchant Plaintiffs' suit has remained.

On June 25, 2018, the Supreme Court issued its opinion in *Ohio v. American Express Co.*, 138 S.Ct. 2274 (2018). Among other things, *American Express* invalidated the case law this Court relied on to dismiss the Cardholders' Complaint. Specifically, it held that card-payment platforms are single two-sided markets in which cardholders participate as consumers by purchasing transactions. Like this Court, the District Court in *American Express* had been "[g]uided by the Second Circuit's 2003 decision in *United States v. Visa*" which held that a credit card market consists of two separate and distinct markets. *United States v. American Express Co.*, 88 F.Supp.3d 143, 151 (EDNY 2015). The Second Circuit reversed, 838 F.3d at 196, and the Supreme Court affirmed, 138 S. Ct. at 2283. *Visa* is no longer good law.[2]

---

[2] In the Second Circuit's original *American Express* decision, the Court of Appeals distinguished *Visa* without overruling it, 838 F.3d at 197; however, the Second Circuit now recognizes that *Visa* is invalid, and all credit-card markets are two-sided with cardholders considered consumers. *See, US Airways, Inc. v. Sabre Holdings Corporation* (2d Cir. 2019) 938

3
*Salveson Plaintiffs' Memorandum in Support of Motion For Relief From Final Judgment*

On August 30, 2018, this Court issued an order that permitted the Merchant Plaintiffs to amend their complaints to include market allegations in line with the Supreme Court's decision in *American Express*. *In re: Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 05-MD-1720 (dkt. no. 7244). Specifically, the Court permitted the Merchants to amend by "add[ing] 'alternative relevant markets that consist of both merchants and cardholders.'" *Id*. at 3. By recognizing the participation of the cardholders in the market, the Court stated that it was "cognizant" that its order was "in tension with" its dismissal of Cardholder Plaintiffs' complaint. *Id*. at 26, n. 10. It therefore invited Cardholders "to brief whether they are entitled to any relief in light of the Supreme Court's decision in *Ohio v. American Express Co.*" *Id*. (citations omitted).

On May 13, 2019, the Supreme Court issued its opinion in *Apple, Inc. v. Pepper, et al.*, 139 S.Ct. 1514 (2019), another "two-sided" market case with important implications here.

On October 3, 2019, without objection from the defendants (dkt. no. 102), the Court "grant[ed] leave for Plaintiffs to brief whether they are entitled to any relief in this action in light of the Supreme Court's decision in *Ohio v. American Express Co.*, --- U.S. ---, 138 S.Ct. 2274 (2018), and the Court's August 30, 2018 Memorandum and Order in *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, No. 05-MD-1720." (Oct. 3, 2019 Minute Order, 14-cv-3529.)

## II.   DISCUSSION

Section 4 of the Clayton Act provides that any person "who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . and shall recover threefold the damages by him sustained." 15 U.S.C. § 15. To "make out a prima facie case of injury and damage under Section 4," an antitrust plaintiff purchaser need only show two things:

---

F.3d 43, 56 (in a credit-card case, "the relevant market must *always* include both sides of the platform") (emphasis in original).

(1) that "the price paid by him for materials purchased for use . . . is illegally high," and (2) "the amount of the overcharge." *Hanover Shoe, Inc. v. United Shoe Machinery Corp.* 392 U.S. 481, 489 (1968). In 1977, the Supreme Court decided *Illinois Brick* and held that, with some exceptions, only direct purchasers have standing to sue antitrust defendants. 431 U.S. at 728-29.

  A. **Cardholders are Direct Purchasers**

The Supreme Court in *American Express* established a number of important principles governing "two-sided" credit-card markets that directly apply to this case. First, "two-sided transaction platforms, like the credit-card market" do not consist of two separate markets, but rather are "better understood as supplying only one product – transactions." 138 S.Ct. at 2286. The network can sell that product "only if a merchant and a cardholder both simultaneously choose to use the network." *Id*. Second, the credit-card platform sells a transaction to both the cardholder and merchant, every time a credit-card is used: "whenever a credit-card network sells one transaction's worth of card-acceptance services to a merchant it also must sell one transaction's worth of card-payment services to a cardholder." *Id*. Therefore, cardholders and merchants are *both* direct purchasers of the network's transactions. Third, the cardholder and merchant both consume each transaction: "[i]n the credit-card market, these transactions are jointly consumed by a cardholder, who uses the payment card to make a transaction, and a merchant, who accepts the payment card as a method of payment." *Id*.; *id.* at n. 8.

Not only are cardholders consumers of the transaction product offered by the credit-card network, they *directly* purchase that product from the network participants and therefore have standing under *Illinois Brick*. This conclusion is compelled by the reasoning set forth in the Supreme Court's *Apple* decision.

*Apple* involved iPhone users who purchased apps created by third-party app developers. *Apple*, 139 S.Ct. at 1519. Apple acted as a kind of clearinghouse for the apps: it posted the

developers' apps in its App Store at prices set by the developers, and it accepted payment for the apps purchased by iPhone users. *Id*. Apple then sent the iPhone users' payments to the app developers, withholding 30% of the payment as a transaction fee. *Id*. The plaintiffs sued, alleging this transaction fee was a supracompetitive monopoly price. The district court dismissed the *Apple* complaint for the same reason this Court dismissed the Cardholders' complaint; namely, the *Apple* district court concluded, "the SAC is fairly read to complain about a fee created by agreement and borne *by the developers* to pay Apple 30% from their own proceeds—an amount which is passed-on to the consumers as part of the purchase price. . . . . Consequently, the Court finds the SAC does not allege facts from which Plaintiffs can be classified as direct purchasers." *In re Apple iPhone Antitrust Litigation* (NDCA, Dec. 2, 2013, No. 11-CV-06714-YGR) 2013 WL 6253147, at *6, *rev'd and remanded* (9th Cir. 2017) 846 F.3d 313, *aff'd sub nom. Apple Inc. v. Pepper* (2019) 139 S.Ct. 1514 (emphasis in original).

The Ninth Circuit reversed and the Supreme Court affirmed, holding that the "[iPhone users] purchased apps directly from Apple and therefore are direct purchasers under *Illinois Brick*." 139 S.Ct. at 1519. The Court's conclusion was based on the fact that "[t]here is no intermediary in the distribution chain between Apple and the consumer." *Apple*, 139 S.Ct. at 1522. Because the same is true of cardholders and issuing banks, the Cardholder Plaintiffs must be direct purchasers. "The iPhone owners purchase apps directly from the retailer Apple, who is the alleged antitrust violator." *Id*. Likewise, "a credit-card network . . . sell[s] one transaction's worth of card-payment services to a cardholder" every time the cardholder swipes its card. *American Express*, 138 S.Ct. at 2286. "The iPhone owners pay the alleged overcharge directly to Apple," 139 S.Ct. at 1522, just as the banks take the overcharge directly from the Cardholders' accounts. (Complaint, 1:3-4; ¶¶ 104, 110, 120.) In short, there is no party between the cardholder and the credit-card banks – either on the sale of the transaction or on the payment of the overcharge. "The absence

of an intermediary is dispositive." *Apple*, 139 S.Ct at 1522.  The Cardholders are direct purchasers with standing under *Illinois Brick*.

### B.        "Extraordinary Circumstances" Merit Vacating the Judgment

Rule 60(b)(6) provides that "[o]n motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding" for "any . . . reason that justifies relief."  Fed. R. Civ. P. 60(b)(6).  Rule 60 "confers broad discretion on the trial court to grant relief when appropriate to accomplish justice." *Marrero Pichardo v. Ashcroft*, 374 F.3d 46, 56 (2d Cir. 2004) *quoting Matarese v. LeFevre*, 801 F.2d 98, 106 (2d Cir. 1986), *cert. denied*, 480 U.S. 908.  A district court's decision to grant a Rule 60 motion is reviewed for abuse of discretion. *Johnson v. Univ. of Rochester Med. Ctr.*, 642 F.3d 121, 125 (2d Cir. 2011).

Notwithstanding the broad discretion bestowed on district courts, the boundaries are not limitless, and Rule 60(b)(6) motions are "disfavored."  *Weitzner v. Cynosure, Inc.* (EDNY Feb. 6, 2014, No. 12-cv-3668 MKB) 2014 WL 508237, at *3 *citing DeCurtis v. Ferrandina,* 529 F. App'x 85, 86 (2d Cir.2013) (quoting *Harris v. United States,* 367 F.3d 74, 81 (2d Cir.2004)).  But this means only that, "[r]ecognizing Rule 60(b)(6)'s potentially sweeping reach, courts require the party seeking to avail itself of the Rule to demonstrate that 'extraordinary circumstances' warrant relief."  *Stevens v. Miller*, 676 F.3d 62, 67 (2d Cir. 2012).

### 1.        Vacatur is Necessary To Ensure That Two Plaintiff Groups Harmed By The Same Tort Are Treated Consistently

Extraordinary circumstances exist in this case.  In light of the changes in law created by *American Express* and *Apple*, there is now a risk that Cardholders and Merchants will be treated inconsistently, even though both groups suffered injuries from the same tort when the defendants illegally raised the price of transactions simultaneously sold to both groups.  Under Second Circuit law, such a scenario requires vacating the judgment in the interest of justice.

The procedural history of the present case is strikingly similar to that in *In re Terrorist Attacks on September 11, 2001*, 741 F.3d 353, 357 (2d Cir. 2013), *cert. denied*, 134 S.Ct. 2875 (2014). There, the Second Circuit reversed the district court's denial of a Rule 60(b)(6) motion and held that a change in decisional law that impacted two different plaintiff groups of the same tort demonstrated the "extraordinary circumstances" necessary to support a Rule 60 grant. The plaintiffs in the *Terrorist Attacks* cases were made up of those who were injured or representatives of those who were killed during the September 11 attacks. They brought suit against the Kingdom of Saudi Arabia and others. *Terrorist Attacks*, 741 F.3d at 355. The district court dismissed the complaints because it found that the defendants were "foreign states" with immunity from U.S. jurisdiction, and that the so-called "tort exception" to immunity did not apply. *Id*. The Second Circuit affirmed. *Id*.

Later, in a different case called *Doe v. Bin Laden*, 663 F.3d 64 (2d Cir. 2011), a husband sued the country of Afghanistan for the death of his wife in the September 11 attacks. Like the plaintiffs in *Terrorist Attacks*, the *Bin Laden* plaintiff argued the defendant was not immune from suit because the tort exception to foreign state immunity applied. But, unlike the plaintiffs in *Terrorist Attacks*, the district court in *Bin Laden* ruled in the plaintiff's favor. On appeal, the Second Circuit affirmed *Bin Laden*. This resulted in an inconsistent result for two different sets of victims of the same tort. *Terrorist Attacks*, 741 F.3d at 356.

In the Second Circuit, "as a general matter, a mere change in decisional law does not constitute an 'extraordinary circumstance' for the purposes of Rule 60(b)(6)." *Terrorist Attacks*, 741 F.3d at 357. "That general rule, however, is not absolute." [3] *Id*.

---

[3] In some circuits, a change in relevant case law by the Supreme Court alone warrants relief from judgment. *See, e.g., Adams v. Merrill Lynch, Pierce, Fenner & Smith* (10th Cir. 1989) 888 F.2d 696, 702.)

Rule 60(b) aims to "strike[] a balance between serving the ends of justice and preserving the finality of judgments." *Terrorist Attacks*, 741 F.3d at 357 *quoting Nemaizer v. Baker*, 793 F.2d 58, 61 (2d Cir. 1986). But, "<u>the interest in finality is outweighed by the interest in treating victims of the same tort consistently</u>." *Terrorist Attacks*, 741 F.3d at 356, *citing Gondeck v Pan American World Airways, Inc.*, 382 U.S. 25, 26-27 (1965) (emphasis added). In *Terrorist Attacks*, "[t]he procedural history of th[e] case produced inconsistent results between two sets of plaintiffs suing for damages based on the same incident," which created an "extraordinary circumstance" warranting relief under Rule 60(b)(6). *Terrorist Attacks*, 741 F.3d at 357.

As the Court of Appeals described it, "[o]ur final word to the *Bin Laden* plaintiff was that the tort exception was available to him and that the parties should proceed with jurisdictional discovery. Our final word to the *Terrorist Attacks* plaintiffs was that the tort exception was unavailable and that their lawsuit against Saudi Arabia … could not go forward." *Id*. As with the Cardholders and the Merchants, "[t]he plaintiffs in *Terrorist Attacks* and *Bin Laden* are all suing based on a single underlying tort governed by the same statute." *Terrorist Attacks*, 741 F.3d at 358-59. Thus, the final word to Merchants has been that they may proceed, while the final word to Cardholders is that they may not, even though "cardholders and merchants jointly consume a single product, [so] their consumption of payment card transactions *must* be directly proportional." *American Express*, 138 S.Ct. at 2286 (emphasis added).

The principle underlying the *Terrorist Attacks* decision stems from the Supreme Court's opinion in *Gondeck v. Pan American World Airways, Inc.*, 382 U.S. 25, 26-27 (1965). In that case, two Longshoremen had been killed in an automobile accident near where they were employed. Gondeck's death benefits were asset aside by a district court and the Fifth Circuit affirmed. The Supreme Court denied certiorari. Later, the second man's death benefits were upheld, a decision that was affirmed by the Fourth Circuit. Gondeck's survivors petitioned the Supreme Court *three*

*years* after his petition for certiorari was originally denied, and this time the Court granted it, holding that the case "justified application of the established doctrine that the interest in finality of litigation must yield where the interests of justice would make unfair the strict application of [the Court's] rules." *Terrorist Attacks*, 741 F.3d at 358, *quoting Gondeck*, 382 U.S. at 26-27. As with *Terrorist Attacks*, the *Gondeck* case signifies that vacating a judgment is necessary when a change in decisional law threatens the unequal treatment of plaintiffs harmed by the same tort.

In this case, the alleged antitrust tort has directly injured both cardholders and merchants, yet by a fluke in timing in the Cardholders' procedural history relative to a change in Supreme Court law, only the Merchants have been permitted to sue. This inconsistency in treatment of two equally injured plaintiff groups creates an "extraordinary circumstance" that requires reviving the Cardholder's claims.

      **2.    Vacatur is Necessary To Ensure A Plaintiff Group Remains Viable To Prosecute The Defendants' Price-Fixing Conspiracy**

The legal developments from *American Express* and *Apple* have the potential to create an "extraordinary circumstance" in a second way; namely, these cases might be used to call into question the Merchants' standing to sue, which would leave no plaintiff available to prosecute the defendants' transgressions.

The distribution chains in *Apple* and the present case are similarly constructed in important ways, most significantly, neither the app developers nor the credit card merchants actually *paid* the overcharge, even though both *received* a smaller cut of the proceeds than they would have in a competitive market. Both this Court and the District Court in *Apple* incorrectly found that the iPhone Users/Cardholders would have to prove the overcharge was passed on to them to show injury and damages. *In re Apple iPhone Antitrust Litigation*, 2013 WL 6253147 at *6; Nov. 26, 2014 Order (dkt. no. 83) at 7 ("[h]ere . . . the harm to the consumers from the antitrust violation

they allege will depend on whether (and to what extent) the interchange fees charged to the merchants were passed along to the consumers").

But, the Supreme Court in *Apple* not only held the iPhone users were the direct purchasers, it also held that "[i]f iPhone owners prevail, they will be entitled to the *full amount* of the unlawful overcharge that they paid to Apple." *Apple*, 139 S.Ct. at 1525 (emphasis in original). That is because the iPhone users' *payment* of the overcharge established injury and damages. For each transaction, the app developers *paid* nothing to Apple, even though they *received* a smaller percentage of the price than they would have absent the monopoly.

Similarly, the credit card merchant does not *pay* anything to the banks as compensation for the sale of the transaction. That is true even if, like the app developers, the merchants *received* a smaller percentage then they would have in a competitive environment. It is the cardholders who pay the overcharge, since it comes directly from their accounts, and they would be entitled to the "full amount" of it. Under *Apple*, the merchants may not be entitled to the overcharge.

If this argument ever threatens the Merchants' ability to maintain their suit and the judgment against the Cardholders is not vacated, "those who violate the antitrust laws" will be permitted to "retain the fruits of their illegality because no one was available who would bring suit against them," *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 494 (1968), thwarting a central goal of antitrust. To prevent that possibility, the judgment should be vacated and the Cardholders' suit reinstated.

//

//

//

//

//

### III.  CONCLUSION

For the foregoing reasons, Cardholder Plaintiffs respectfully request the Court grant the motion, vacate the judgment, and reinstate both counts of their complaint.

Respectfully submitted,

Date: November 1, 2019  ALIOTO LAW FIRM

By: *s/ Joseph M. Alioto*

Joseph M. Alioto (SBN 42680)
Jamie L. Miller (SBN 271452)
ALIOTO LAW FIRM
One Sansome Street, Suite 3500
San Francisco, California 94104
Tel: (415) 434-8900
Fax: (415) 434-9200
Email: jmiller@aliotolaw.com

Lingel H. Winters, Esq. (SBN 37759)
LAW OFFICES OF LINGEL H. WINTERS
275 Battery Street, Suite 2600
San Francisco, California 94111
Tel: (415) 398-2941
Fax: (415) 393-9887
Email: sawmill2@aol.com

*Interim Co-Lead Counsel for the Salveson Plaintiffs and all others similarly situated*