UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------

BARRY'S CUT RATE STORES INC.; DDMB,
INC. d/b/a EMPORIUM ARCADE BAR; DDMB
2, LLC d/b/a EMPORIUM LOGAN SQUARE;
BOSS DENTAL CARE; RUNCENTRAL, LLC;
CMP CONSULTING SERV., INC.; TOWN
KITCHEN, LLC d/b/a TOWN KITCHEN &
BAR; GENERIC DEPOT 3, INC. d/b/a
PRESCRIPTION DEPOT; and PUREONE, LLC
d/b/a SALON PURE,

**MEMORANDUM & ORDER**
05-MD-1720 (MKB) (JO)

Plaintiffs,

v.

VISA, INC.; MASTERCARD
INCORPORATED; MASTERCARD
INTERNATIONAL INCORPORATED; BANK
OF AMERICA, N.A.; BA MERCHANT
SERVICES LLC (f/k/a DEFENDANT
NATIONAL PROCESSING, INC.); BANK OF
AMERICA CORPORATION; BARCLAYS
BANK PLC; BARCLAYS BANK DELAWARE;
BARCLAYS FINANCIAL CORP.; CAPITAL
ONE BANK, (USA), N.A.; CAPITAL ONE
F.S.B.; CAPITAL ONE FINANCIAL
CORPORATION; CHASE BANK USA, N.A.;
CHASE MANHATTAN BANK USA, N.A.;
CHASE PAYMENTECH SOLUTIONS, LLC;
JPMORGAN CHASE BANK, N.A.; JPMORGAN
CHASE & CO.; CITIBANK (SOUTH
DAKOTA), N.A.; CITIBANK N.A.;
CITIGROUP, INC.; CITICORP; and WELLS
FARGO & COMPANY,

Defendants.

-----------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

A putative Rule 23(b)(2) class of millions of merchants commenced this antitrust action

under the Clayton Act, 15 U.S.C. § 16, to prevent and restrain violations of the Sherman Act, 15

U.S.C. §§ 1 and 2, and the California Cartwright Act, Bus. & Prof. Code § 16700 *et seq.*,

seeking injunctive relief against Defendants Visa and Mastercard networks, as well as various

issuing and acquiring banks ("Bank Defendants").  (Compl., Docket Entry No. 6892.)  Plaintiffs

seek to represent a class of merchants that accept Visa- and Mastercard-branded cards as forms

of payment, and allege that Defendants engage in anticompetitive conduct that harms

competition and imposes supracompetitive and collectively-fixed fees on the merchants.  (*Id.* ¶

4.)

 Currently before the Court is Bank Defendants' joint motion to dismiss the claims

against them pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure for

lack of standing and for failure to state a claim upon which relief can be granted.  (Bank Defs.

Mot. to Dismiss ("Defs. Mot."), Docket Entry No. 7399; Bank Defs. Mem. of Law in Supp. of

Mot. to Dismiss ("Defs. Mem."), Docket Entry No. 7399-1.)  For the reasons set forth below,

the Court finds that Plaintiffs have standing to assert claims against Bank Defendants, and that

Plaintiffs have sufficiently alleged that Bank Defendants are participants in ongoing

conspiracies.  Accordingly, the Court denies Bank Defendants' motion to dismiss.

## I. Background

 The Court assumes the truth of the factual allegations in the Complaint for the purposes

of deciding Bank Defendants' motion to dismiss.

 A putative class of over twelve million nationwide merchants brought an antitrust action

under the Sherman Act, 15 U.S.C. §§ 1 and 2, and state antitrust laws, against Defendants Visa

and Mastercard networks, as well as various issuing and acquiring banks.[1]  *See In re Payment*

---

[1]  The putative class sought relief in the form of monetary damages, and brought the
action along with a separate class that sought equitable relief.  (*See* First Consolidated Am.
Class Action Compl. 1, Docket Entry No. 317.)  At the earliest stages of this litigation, multiple

*Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 986 F. Supp. 2d 207, 213, 223 (E.D.N.Y. 2013) ("*Interchange Fees I*"), *rev'd and vacated*, 827 F.3d 223 (2d Cir. 2016) ("*Interchange Fees II*"); (First Consolidated Am. Class Action Compl., Docket Entry No. 317).

The plaintiffs sought both injunctive and monetary relief, and after years of litigation, former District Judge John Gleeson approved a settlement for an injunctive relief class and a monetary damages relief class (the "2013 Settlement Agreement"), *see Interchange Fees I*, 986 F. Supp. 2d at 216 n.7, 240, which the Second Circuit vacated on June 30, 2016, and remanded to this Court,[2] *Interchange Fees II*, 827 F.3d at 227, 229.  Following remand, the two putative classes — a Rule 23(b)(2) injunctive relief class[3] and a Rule 23(b)(3) damages class — have been proceeding separately, each represented by separate counsel.  (*See* Mem. and Order dated Nov. 30, 2016, Docket Entry No. 6754.)  The Rule 23(b)(2) injunctive relief class filed its

---

class actions, as well as individual lawsuits by large retailers, were filed against Defendants. All actions were consolidated together into a multi-district litigation in 2005 (the "MDL").  *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 986 F. Supp. 2d 207, 220 n.12 (E.D.N.Y. 2013) ("*Interchange Fees I*").  Since the initial consolidation, a number of matters have been continuously added to the MDL, which now involves over seventy cases.

[2]  The Second Circuit vacated in part because it found that unitary representation of the two classes (damages and injunctive) violated Rule 23(a)(4) of the Federal Rules of Civil Procedure (the representative parties did not adequately protect the interests of the class), and the Due Process Clause (the named plaintiffs in the class action did not adequately protect the interests of all class members).  *Interchange Fees II*, 827 F.3d at 228, 231 (citations omitted). Relevant to the Rule 23(b)(2) class action — the relevant action for the present motion — the Second Circuit concluded that "members of the (b)(2) class were inadequately represented."  *Id.* at 231.

[3]  Documents and filings refer to the Rule 23(b)(2) action in a variety of ways.  In the MDL, the Rule 23(b)(2) action is proceeding as *Barry's Cut Rate Stores Inc. et al. v. Visa, Inc., et al.*, No. 05-MD-1720.  In addition, the action is sometimes referred to as "*Barry's*" and the class is sometimes referred to as the "equitable relief class."  For the purposes of consistency across opinions, the Court uses the terms "Rule 23(b)(2)" and "injunctive relief" to refer to the action, as opposed to "*Barry's*" and "equitable relief."

Complaint on March 31, 2017.[4]  (Compl.)  Bank Defendants now move to dismiss claims against them by the putative Rule 23(b)(2) injunctive relief class plaintiffs ("Plaintiffs" or "Rule 23(b)(2) Class Plaintiffs").  (Defs. Mot.)

The Court assumes familiarity with the facts and extensive procedural history of the MDL, as set forth in prior decisions.  *See Interchange Fees I*, 986 F. Supp. 2d 207; *Interchange Fees II*, 827 F.3d 223; *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2017 WL 4325812 (E.D.N.Y. Sept. 27, 2017), *order set aside*, No. 05-MD-1720, 2018 WL 4158290 (E.D.N.Y. Aug. 30, 2018); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2017 WL 4620988 (E.D.N.Y. Oct. 13, 2017), and *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2019 WL 359981.  The Court therefore provides only a summary of the relevant facts and procedural history.

### a.  Payment card transactions

The processing of card-based transactions and the actors involved have been described multiple times in this action and related cases, and the Court draws on the facts alleged in the Complaint and case law to describe the transactions.

"When a cardholder uses a credit card to buy something from a merchant, the transaction is facilitated by a credit-card network."  *Ohio v. Am. Express Co.* ("*Amex III*"), --- U.S. ---, ---, 138 S. Ct. 2274 (2018).  This also applies to certain debit card transactions.  The relevant

---

[4]  After additional extensive discovery and renegotiations, the named representatives of the Rule 23(b)(3) damages class and Defendants reached a new and separate settlement agreement, which this Court preliminarily approved on January 24, 2019.  (Prelim. Approval Order, Docket Entry No. 7361); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2019 WL 359981 (E.D.N.Y. Jan. 28, 2019).

networks in this action are Visa and Mastercard.[5]  Visa and Mastercard are "bank-card networks whose members include banks, regional-banking associations, and other financial institutions." (Compl. ¶ 56.)  Both networks "operate as standard-setting organizations" for certain credit and debit card services and "facilitate the exchange of transaction data and funds," typically among four main actors: merchants, acquiring banks, issuing banks, and consumers.  (*Id.* ¶ 84.) Acquiring banks are members of Visa and/or Mastercard that acquire payments from merchants when processing card payments.  (*Id.* ¶ 9(b).)  Generally, after a customer presents a card for payment, a merchant transfers the transaction information to an acquiring bank, and the acquiring bank contacts the issuing bank via the Visa or Mastercard network for the authorization of payment.  (*Id.*)  Issuing banks are members of Visa and/or Mastercard that issue Visa- and/or Mastercard-branded cards to consumers.  (*Id.* ¶ 9(m).)

When a customer (cardholder) makes a purchase with certain Visa- and/or Mastercard-branded cards, the merchant from whom the purchase is made "sends an electronic transmission to" the merchant's acquiring bank or a third-party processor.[6]  (*Id.* ¶ 85.)  The acquiring bank or third-party processor sends an electronic transmission to Visa or Mastercard.  (*Id.*)  Visa or Mastercard then informs the cardholder's issuing bank or a third-party processor of the transaction, and the issuing bank or third-party processor pays the acquiring bank via the Visa

---

[5]  The processing of payment transactions that occur over the Visa and Mastercard networks and the actors involved, differ from, for example, the business model that American Express uses.  *See generally United States v. Am. Express Co.* ("*Amex I*"), 88 F. Supp. 3d 143, 156–60 (E.D.N.Y. 2015), *rev'd on other grounds*, *United States v. Am. Express Co.* ("*Amex II*"), 838 F.3d 179 (2d Cir. 2016), *aff'd sub nom.*, *Amex III*, 138 S. Ct. 2274.

[6]  Third-party processors, as defined in the Complaint, are non-Visa, Mastercard, or member bank firms "that perform[] the authorization, clearing, and settlement functions of a Visa or Master[c]ard Payment-Card transaction on behalf of a Merchant or a Member Bank." (Compl. ¶ 9(dd).)

or Mastercard network.  (*Id.*)

During this process, two types of fees are deducted.  (*Id.*)  First, the "interchange fee" is deducted from the full price of the payment when the issuing bank pays the acquiring bank. (*Id.*)  Plaintiffs define the interchange fee as "a fee that Merchants pay to the Issuing Bank through the [Visa or Mastercard] network and the Acquiring Bank for each transaction."  (*Id.* ¶ 9(l).)  Second, the acquiring bank takes a "merchant-discount fee" when crediting the merchant's account for the payment.  (*Id.* ¶ 85.)  Plaintiffs define the merchant-discount fee as a total sum fee that is deducted from the amount of money paid to a merchant when a consumer makes a Visa- or Mastercard-branded purchase, the largest component of which is the interchange fee.  (*Id.* ¶¶ 9(o), 85.)  According to Plaintiffs, "[u]nder this system, the Issuing Bank earns revenue from annual fees and interest charged to cardholders, as well as the amount of the Interchange Fee, while the Acquiring Bank earns revenue from the difference between the Merchant-Discount Fee and the Interchange Fee."  (*Id.* ¶ 85.)

### b.   History of bank and network relationships

At the beginning of this litigation, and in prior related litigation in this Circuit, Visa and Mastercard were effectively owned by their member banks.  *See, e.g.*, *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 235 (2d Cir. 2003) (noting that at the time, in 2003, Visa and Mastercard were "organized as open joint ventures, owned by the numerous banking institutions that are members of the networks" — "MasterCard . . . by . . . approximately 20,000 member banks; Visa . . . by . . . approximately 14,000 member banks" — and that "[t]he networks' operations [were] conducted primarily by their member banks").  Given this ownership structure, the Second Circuit noted that it would be inaccurate to compare the structure of Visa or Mastercard to single entity structures such as Coca-Cola, because they "are not single

entities; they are consortiums of competitors.  They are owned and effectively operated by some 20,000 banks, which compete with one another in the issuance of payment cards and the acquiring of merchants' transactions.  These 20,000 banks set the policies of Visa U.S.A. and MasterCard."  *Id.* at 242.

During the course of this litigation, both networks underwent restructuring.  In 2006 and 2008, Mastercard and Visa, respectively, made initial public offerings ("IPOs"), becoming publicly traded individual companies.  *See Interchange Fees II*, 827 F.3d at 229 (noting that after the first consolidated complaint had been filed in this action in 2006, "[b]oth Visa and MasterCard conducted initial public offerings that converted each from a consortium of competitor banks into an independent, publicly traded company"); *Interchange Fees I*, 986 F. Supp. 2d at 215 ("While the case has been pending . . . . [t]he very structures of Visa and MasterCard themselves changed; in 2008 and 2006, respectively, initial public offerings . . . converted each from a consortium of competitor banks into single-entity, publicly traded companies with no bank governance.").

Pursuant to its IPO, Mastercard redeemed its member bank shares, "and then reissued them as Class B and Class M shares," i.e., non-voting shares.  (*See* Compl. ¶ 206.)  Class A shares, with voting rights, were offered to the public and "represented 41 percent of the voting control of MasterCard."  (*Id.* ¶¶ 206–07.)  Member banks, however, retained certain veto powers through their Class M shares.  (*Id.* ¶ 207.)  Visa similarly redeemed its member banks' shares and "reclassif[ied] them as publicly-held Class A shares," and in exchange, "Visa provided the banks with a large part of the proceeds of the IPO as well as Class B shares and C shares in Visa, Inc."  (*Id.* ¶ 236.)  Those holding Class B and C shares, i.e., the member banks, "were permitted to elect [six] or [seventeen] directors over the three years following the IPO."

(*Id.* ¶ 238.)

Plaintiffs allege that the anticompetitive practices they challenge have "continued despite the networks' and the banks' more recent attempt to avoid antitrust liability by restructuring the Visa and Mastercard corporate entities." (*Id.* ¶ 1.)  Bank Defendants remain member banks of both Visa's and Mastercard's networks. (*Id.* ¶ 37.)  In addition, Plaintiffs allege that Bank Defendants are, or were during the relevant period, represented on the Boards of Directors of Visa and/or Mastercard when the Boards collectively fixed and imposed anticompetitive fees and restraints, and that Bank Defendants participated in and committed the alleged conspiracies. (*Id.* ¶ 38.)

### c.   Challenged anticompetitive behavior and developments over the course of the MDL litigation

Throughout the course of the litigation, Plaintiffs have challenged several Visa and Mastercard network rules as being anticompetitive.  In addition to the IPOs, other significant changes in the credit and debit card industries have occurred during the litigation, as described below.

### i.   Challenged network rules

Plaintiffs argue that Bank Defendants violate antitrust laws "by developing, implementing, and continuing to agree to . . . a series of unlawful restraints among themselves and with each of Visa and Mastercard."  (Equitable Relief Class Pls. Mem. in Opp'n to Defs. Mot. ("Pls. Mem.") 1, Docket Entry No. 7402; *see generally* Compl.)  These "unlawful restraints" include default interchange rules, honor-all-cards rules, no-surcharge rules, and no-discount rules.  (Pls. Mem. 1.)  These network-developed rules have been described multiple times by courts in this Circuit.  As previously summarized by the Second Circuit,

> The "default interchange" fee applies to every transaction on the network (unless the merchant and issuing bank have entered into a separate agreement).[7]   The "honor-all-cards" rule requires merchants to accept all Visa or MasterCard credit cards if they accept any of them, regardless of the differences in interchange fees.   Multiple rules prohibit merchants from influencing customers to use one type of payment over another, such as cash rather than credit, or a credit card with a lower interchange fee.  These "anti-steering" rules include the "no-surcharge" and "no-discount" rules, which prohibit merchants from charging different prices at the point of sale depending on the means of payment.

*Interchange Fees II*, 827 F.3d at 228–29.  Judge Gleeson further described the challenges merchants faced as a result of the "anti-steering restraint" network rules:

> A linchpin to the problem, as far as the merchants are concerned, is the package of anti-steering restraints that prohibit merchants from using price signals at the point of sale to steer customers to less costly forms of payment.   The no-surcharge rules prohibit merchants from adding a surcharge to a transaction involving either of the networks' credit cards.   Thus, a merchant who must pay a 2% interchange fee upon accepting a Visa or MasterCard credit card is prohibited from adding a 2% surcharge (or any surcharge at all) to either discourage the use of that card or to recoup the cost of acceptance.   Similarly, until recently . . . no-discount rules prohibited merchants from offering price discounts at the point of sale.

*Interchange Fees I*, 986 F. Supp. 2d at 215 (E.D.N.Y. 2013).

---

[7]   According to Plaintiffs, Visa and Mastercard "have established complex 'default' Interchange Fee schedules, including the fee levels, the structure of the fees, such as the Interchange-Fee categories that are tiered by Merchant type, card type, and the Merchant's transaction volume, among other things." (Compl. ¶ 90.)  Plaintiffs also contend that "[i]nterchange fees account for the largest portion of Merchant costs for accepting such cards." (*Id.*)  Visa's rules "provide[] that 'Interchange Reimbursement Fees are determined by Visa and provided on Visa's published fee schedule.'"  (*Id.* ¶ 86 (citing Visa Product and Service Rule 9.1.1.3).)  Mastercard's rules "provide[] that . . . '[MasterCard] has the right to establish default interchange fees and default service fees.'"  (*Id.* ¶ 87 (quoting Mastercard Rule 8.3).)  Both networks' rules state that default interchange fees apply unless member banks of the networks set their own financial terms or created a bilateral interchange fee agreement between member banks, or, for example, "Visa has entered into business agreements to promote acceptance and Card usage."  (*Id.* ¶¶ 86–87.)

### ii.   Industry changes

The primary changes to network rules that have occurred over the course of this litigation, occurred pursuant to the Dodd-Frank legislative reform in 2010, a consent decree with the United States Department of Justice ("DOJ") in 2011, and the vacated 2013 Settlement Agreement in this action.

### 1.   Durbin Amendment to the Dodd-Frank Wall Street Reform and Consumer Protection Act

In 2010, the Dodd-Frank Wall Street Reform and Consumer Protection Act, which included the Durbin Amendment, was signed into law, and "required the Federal Reserve to issue rules limiting the banks' practice of issuing debit cards that were compatible with only the issuer's networks."  (Compl. ¶ 264 (citing 12 CFR § 235.7(a)).)  In addition, the Durbin Amendment "limited the interchange fee that issuing banks could charge for debit card purchases, and allowed merchants to discount debit card purchases relative to credit card purchases," *Interchange Fees II*, 827 F.3d at 229, and also permitted merchants "to place minimum-purchase amounts of up to [ten dollars] on [c]redit-[c]ard transactions," (Compl. ¶ 265).[8]

### 2.   DOJ consent decree

In 2010, the same year that the Durbin Amendment was signed into law, the DOJ and seventeen states filed an action against Visa, Mastercard, and American Express, challenging the networks' anti-steering rules as anticompetitive and in violation of the Sherman Act.  *See United States v. Am. Express Co.* ("*Amex II*"), 838 F.3d 179, 192 (2d Cir. 2016); *Interchange*

---

[8] "The Durbin Amendment did not change the networks' rules prohibiting surcharging," *Interchange Fees I*, 986 F. Supp. 2d at 215, nor did it "allow for product-level discounting, by which a merchant could choose to discount a particular card type," *id.* at 215 n.6.

*Fees I*, 986 F. Supp. 2d at 215; *United States v. Am. Express Co.* ("*Amex I*"), 88 F. Supp. 3d

143, 149 (E.D.N.Y. 2015), *rev'd and remanded sub nom.*, *Amex II*, 838 F.3d 179, *aff'd sub*

*nom.*, *Amex III*, 138 S. Ct. 2274.  While American Express decided to litigate the challenges,

Visa and Mastercard entered into a consent decree with the DOJ in 2011, agreeing to rescind

many of the challenged restraints.  *Amex II*, 838 F.3d at 192; *Amex I*, 88 F. Supp. 3d at 149.

Under the consent decree, "Visa and MasterCard agreed to remove their rules prohibiting

merchants from product-level discounting of credit and debit cards."[9]  *Interchange Fees I*, 986

F. Supp. 2d at 215; (*see also* Compl. ¶ 150 ("Pursuant to the DOJ Consent Decree, Visa and

MasterCard changed their rules . . . to allow Merchants to offer discounts to cardholders for

using a particular card brand or product."); Compl. ¶ 262 ("DOJ . . . entered into a consent

decree with Visa and MasterCard, in which Visa and MasterCard agreed to repeal their No-

Discounting Rules, rules that prevented Merchants from promoting or expressing a preference

for a particular brand of card, and rules that prevented Merchants from informing their

customers of the cost of accepting various cards." (citation omitted))).

### 3.    2013 Settlement Agreement terms

Under the terms of the 2013 Settlement Agreement approved by Judge Gleeson and

vacated by the Second Circuit, in addition to agreeing to pay a cash award of $7.25 billion

(before reductions for opt outs and other expenses) to the Rule 23(b)(3) class members,

Defendants agreed to implement reforms of their rules and practices to settle the claims of the

---

[9]  However, similar to the Durbin Amendment, the consent decrees did not affect the networks' no-surcharge rules.  *Interchange Fees II*, 827 F.3d at 229 ("[P]ursuant to a consent decree with the Department of Justice in 2011, Visa and Mastercard agreed to permit merchants to discount transactions to steer consumers away from credit cards use.  None of these developments affected the honor-all-cards or no-surcharging rules, or the existence of a default interchange fee.").

Rule 23(b)(2) class members.  *Interchange Fees I*, 986 F. Supp. 2d at 213, 217.  The relevant reforms included, among other things, "Visa and MasterCard rule modifications to permit merchants to surcharge on Visa- or MasterCard-branded credit card transactions at both the brand and product levels"; "[a]n obligation on the part of Visa and MasterCard to negotiate interchange fees in good faith with merchant buying groups"; "[a]uthorization for merchants that operate multiple businesses under different 'trade names' or 'banners' to accept Visa and/or MasterCard at fewer than all of its businesses"; and "[t]he locking-in of the reforms in the Durbin Amendment and the DOJ consent decree with Visa and MasterCard, even if those reforms are repealed or otherwise undone."  *Interchange Fees I*, 986 F. Supp. 2d at 217.

The Second Circuit and Judge Gleeson identified surcharging as one of the most significant benefits of the settlement.  *See Interchange Fees II*, 827 F.3d at 238 ("No one disputes that the most valuable relief the Settlement Agreement secures for the (b)(2) class is the ability to surcharge at the point of sale."); *Interchange Fee I*, 986 F. Supp. 2d at 219–20 (noting that in addition to prior payment card litigation, the Durbin Amendment, the DOJ Consent Decree, and the IPOs, "[t]his proposed settlement adds another crucial reform — the lifting of restrictions on network- and product-level surcharging").  However, the surcharging terms applied only to credit card transactions, and not to debit card transactions.  (*See* Compl. ¶ 147 ("Visa and MasterCard altered their rules as required by the preliminary approval of the 201[3] settlement of this action, to permit surcharging of Credit-Card transactions under certain circumstances.  Debit-Card transactions cannot be surcharged unless the Interchange-Fee caps contained in the Durbin Amendment to the Dodd-Frank Act are repealed.").)

The settlement benefits to the Rule 23(b)(2) injunctive relief class consisted of the rules modifications and agreements by Visa and Mastercard to maintain the terms of the DOJ consent

decree.  The 2013 Settlement Agreement did not contain obligations for Bank Defendants specifically, (*see* 2013 Settlement Agreement ¶¶ 39–65, Docket Entry No. 1656-1), but the release and covenant not to sue in the 2013 Settlement Agreement did release Bank Defendants from liability, (*see id.* ¶ 67(c)–(p)).

To date, the rule changes and certain reforms brought about as a result of the 2013 Settlement Agreement are still in effect, although Defendants now have the ability to alter those reforms.

### d.    Rule 23(b)(2) Plaintiffs' allegations and relief sought

Plaintiffs have consistently alleged that the anticompetitive restraints at issue "were adopted pursuant to unlawful agreements among the banks and Visa [and Mastercard]," and "that the banks owned and effectively operated Visa and MasterCard, such that Visa and MasterCard were unlawful 'structural conspiracies' or 'walking conspiracies' with respect to their network rules and practices."  *Interchange Fees I*, 986 F. Supp. 2d at 220–21.

The Rule 23(b)(2) Plaintiffs challenge "Defendants' collusive and anticompetitive practices . . . [that] harm[] competition and impose[] upon Plaintiffs and Class Members supracompetitive, exorbitant, and collectively-fixed prices" in violation of Sections 1 and 2 of the Sherman Act, and the California Cartwright Act.  (Compl. ¶¶ 4–5.)  Plaintiffs bring their claims under Section 16 of the Clayton Act, seeking injunctive relief "to prevent and restrain violations" of the Sherman Act and California Cartwright Act.  (*Id.* ¶ 6.)

The nine named Plaintiffs are merchants that accept payment by Visa- and Mastercard-branded cards.  (*See id.* ¶¶ 10–18.)  They allege that Defendants (1) impose supracompetitive interchange fees on Visa and Mastercard transactions, and (2) facilitate these anticompetitive practices by forcing merchants to abide by anti-steering and other restraints.  (*See id.*)  Plaintiffs

also allege that this anticompetitive behavior causes antitrust injury common to Plaintiffs and putative class members, and will continue to cause harm unless enjoined.  (*See id*. ¶¶ 10–19.)

Plaintiffs contend that "[e]ven after litigation, legislation, and regulation forced needed reforms on the Defendants and technology threatened to disrupt Visa and MasterCard's dominant position in the marketplace, the Defendants used their market power to continue to restrain competition." (*Id.* ¶ 1.)  In addition, although the rule changes resulting from the Durbin Amendment, DOJ consent decree, and the 2013 Settlement Agreement "were steps in the right direction for [m]erchants," Plaintiffs continue to suffer antitrust injury due to current anti-steering restraints, "and as a result of the continuing effects of decades of enforcement of the No-Surcharge Rule and the prior versions of the restraints." (*Id.* ¶ 165.)

### i.   Allegations regarding restraints

Plaintiffs assert that they are subject to supracompetitive, exorbitant, and collectively-fixed prices, (*id.* ¶ 4), largely via interchange fees, set by the networks, which operate as standard-setting organizations, (*see, e.g.*, *id.* ¶ 86).  Visa's rules provide that interchange fees "are determined by Visa and provided on Visa's published fee schedule," and that these fees "apply on every transaction, except where they have been 'customized where Member [Banks] have set their own financial terms'" for the interchange fee or entered into a separate business agreement to promote card acceptance and usage. (*Id.* (alteration in original) (quoting Visa Product and Service Rule 9.1.1.3).)  Mastercard's rules provide that Mastercard "has the right to establish default interchange fees . . . it being understood that all such fees set by [Mastercard] apply only if there is no applicable bilateral interchange fee agreement between two [Member Banks]." (*Id.* ¶ 87 (alterations in original) (quoting Mastercard Rule 8.3).)  Plaintiffs allege that although these rules theoretically provide for deviation — for example via entering into bilateral

14

agreements — other restraints, such as anti-steering rules, effectively operate to ensure that all issuing banks charge merchants the default rates.  (*Id.* ¶ 88.)  In addition, Plaintiffs contend that "[b]ecause of the [r]estraints, bilateral negotiations between a Merchant, or group of Merchants, and an Issuer simply do not occur."  (*Id.*)  Plaintiffs allege that these interchange fees, which were previously based on issuer costs, are now "based on [the networks'] perceptions of Merchants' elasticity of demand."  (*Id.* ¶ 121.)

Plaintiffs contend that the unlawful agreements regarding interchange fees "are enabled by other rules that were also collectively adopted and continue to be collectively enforced by the Bank Defendants."  (*Id.* ¶ 138.)  For example, honor-all-cards rules are enforced by Visa and Mastercard, which require merchants that accept Visa- or Mastercard-branded cards to accept all payment cards with the network brand, "regardless of the identity of the Issuing Bank, the Card Product, or the cost of accepting that card."  (*Id.* ¶ 139.)  Plaintiffs assert that this type of practice makes it "virtually impossible" for merchants to exert any leverage over Bank Defendants "in order to obtain more favorable prices or terms."  (*Id.* ¶ 140.)

Other restraints, including no-surcharge rules and other anti-steering restraints, have been changed by the 2013 Settlement Agreement, DOJ consent decree, and Durbin Amendment.  However, Plaintiffs allege that although pursuant to the 2013 Settlement Agreement, Visa and Mastercard changed their rules to permit surcharging of credit cards in certain circumstances, now that the 2013 Settlement Agreement has been vacated by the Second Circuit, the networks may reimpose the no-surcharge rules at any time.  (*See id.* ¶ 147.) Plaintiffs also assert that although the DOJ consent decree improved the ability of merchants to offer discounts to cardholders with a particular brand or products, merchants generally are still "prohibited from offering discounts to cardholders for using the cards issued by particular

Issuing Banks," and, but for the no-discount rule, "Merchants could use Issuer-specific discounts to secure more favorable acceptance costs and terms than are currently available." (*Id.* ¶¶ 150–51.)  Plaintiffs contend that if consumers were given price signals at a point of sale, "consumer[s] would migrate towards less-expensive payment products, causing Defendants to reduce their Interchange Fees" in the absence of the anti-steering restraints.  (*Id.* ¶ 162.)

Plaintiffs also allege that the default interchange rules, honor-all-card rules, and the anti-steering restraints (no-surcharge and other rules, including discrimination rules, no-multi-issuer rules, and no-bypass rules) can be found in merchant agreements with the networks, and acquiring banks also incorporate these rules into their agreements with Plaintiffs.  (*Id.* ¶¶ 155–56.)

### ii.   Allegations regarding Bank Defendants

Plaintiffs allege that "[f]or a half-century America's largest banks have fixed the fees imposed on Merchants" for payment transactions processed over Visa's and Mastercard's networks, "and have collectively imposed restrictions on Merchants that prevent them from protecting themselves against those fees."  (*Id.* ¶ 1.)  In addition, Plaintiffs contend that "[t]hese practices continued despite the networks' and the banks' more recent attempts to avoid antitrust liability by restructuring the Visa and MasterCard corporate entities," (*id.*), and that "[a]fter the IPOs, the Bank Defendants agree[ed] to continue to abide by these rules," (*id.* ¶ 138).

Plaintiffs name nineteen Bank Defendants in this action, some of which have parent-subsidiary relationships.  (*See, e.g.*, *id.* ¶ 22.)  The Complaint generally refers to these separate entities under an umbrella name, e.g., "Bank of America" for the three Bank of America-related Defendants, and notes that issuing and acquiring of network cards and payments is heavily consolidated among banks.  (*See id.*; *id.* ¶¶ 68–69 (noting that in 2015, the top five credit card

issuing banks accounted for nearly two-thirds of all Visa and Mastercard purchase volume in the United States and over three-quarters of Visa and Mastercard transaction volume was acquired by five acquiring banks).)

Plaintiffs also allege that Bank Defendants are all members of both the Visa and Mastercard networks, are issuing and/or acquiring banks, and are prevented by network rules from suing Visa or Mastercard from harm arising from the uniform schedule of interchange fees. (*See id.* ¶¶ 23–35, 122–23.) "Because all Member Banks are required to issue Visa or MasterCard Payment Cards, all Member Banks benefit from the supracompetitive Interchange Fees that they agree to abide by and, at least until Visa and MasterCard's reorganizations, collectively set." (*Id.* ¶ 128.) In addition, Plaintiffs contend that all Bank Defendants knowingly participated in the conspiracies alleged, (*id.*), "are actual or potential competitors" for credit card issuance and merchant acquisition, "and have conspired with each other and with [Visa and Mastercard] to fix the level of Interchange Fees that they charge to, and impose the unlawful Anti-Steering Rules on, Merchants," (*id.* ¶ 37). Plaintiffs further contend that Bank Defendants are or were represented on the Visa and/or Mastercard Boards of Directors at times when the Boards "collectively fixed" uniform interchange fees and imposed anti-steering and other restraints, that Bank Defendants delegated to the Boards the authority to take such actions, and that they "have significantly profited from those policies and continue to do so to this day." (*Id.* ¶¶ 38, 41; *see also id.* ¶¶ 89, 91.) In addition, Plaintiffs contend that Visa and Mastercard fund their operations and generate revenue from fees and assessments they charge their member banks. (*Id.* ¶ 98.) Plaintiffs also allege that interchange fees are exclusively retained by the issuing bank in a transaction and that interchange fees are not necessary to perform Visa and Mastercard's functions. (*Id.* ¶¶ 98–99.)

17

Plaintiffs allege that prior to the IPOs, both Visa's and Mastercard's bylaws reserved seats on the Boards of Directors for officers of member banks, and that, subsequent to the IPOs, Bank Defendants secured influence and representation on the Boards.  For example, as of the filing of the Complaint, "[e]ven after the IPO, representatives of Member Banks maintain[ed] substantial representation on the Board of Visa, Inc."  (*Id.* ¶¶ 39–40.)  Plaintiffs also allege that after the IPOs, Visa's member banks "were permitted to elect [six] of [seventeen] directors over the three years following the IPO."  (*Id.* ¶ 238.)

Plaintiffs equate the restructurings of Mastercard and Visa "to the members of a cartel who, having been caught fixing prices in violation of the Sherman Act, spin-off their competing businesses to a new 'single entity,' with the explicit understanding and with structural guarantees that the new 'single entity' will continue to fix prices at the supracompetitive levels previously set by the cartel's members," and note that both networks have increased interchange fees "several times" since the restructurings and IPOs.  (*Id.* ¶¶ 252–53.)  Plaintiffs highlight that the Court of Justice of the European Union ("EU") — the highest court in the EU —  affirmed the European Commission's ruling that Mastercard's default interchange fees harmed competition, and that the IPO did not alleviate its violation of the EU's equivalent of the Sherman Act's "contract, combination, or conspiracy" element, "because when Interchange Fees and Rules are set, the banks 'intend or at least agree to coordinate their conduct by means of those decisions,' and that the decisions on Interchange Fees and the Rules have 'the same objective of joint regulation of the market within the framework of the same organization, albeit under different forms.'"  (*Id.* ¶ 305 (citation omitted).)

Plaintiffs allege that after the IPOs, Bank Defendants "continue to conspire" to fix fees and impose restraints, agreeing as network members that Visa and Mastercard may apply

uniform default interchange fee schedules, and agreeing to adhere to Visa and Mastercard's anticompetitive network rules. (*Id.* ¶ 42.) They contend that the member banks understand that even after the IPOs, they "will continue to receive supracompetitive Interchange Fees at the default rates, absent a bilateral agreement (which are disincentivized nearly out of existence by the Anti-Steering Restraints)," and that no member bank "has taken any affirmative steps to withdraw from any of the MasterCard or Visa conspiracies described." (*Id.* ¶ 260.)

Plaintiffs further contend that "[a]cquiring banks enter into acceptance contracts with Merchants agreeing either implicitly or explicitly" that the networks' uniform schedule of interchange fees will apply to all merchant transactions made through the networks' payment cards, and with the understanding that the same uniform schedule of fees will be applied to transactions conducted by every other acquiring bank for the same merchants. (*Id.* ¶ 43.) Similarly, "[i]ssuing [b]anks enter into issuing contracts with Visa and MasterCard, agreeing and understanding that they will receive Interchange Fees from Merchants based on . . . Visa and MasterCard's uniform schedule of Interchange Fees." (*Id.*) Further, Plaintiffs allege that Bank Defendants operate as co-conspirators that have participated in these agreements and conspiracies both before and after the network restructurings and IPOs. (*Id.* ¶ 45.) This includes "certain banks that are or were members of the Boards of Directors" of the networks that agreed to fix and impose interchange fees and anticompetitive restraints, "and also designed and authorized the restructurings that themselves violate the antitrust laws." (*Id.*) The Court discusses in more detail below Plaintiffs' allegations relating to Bank Defendants and the IPOs.

### 1. Mastercard IPO allegations

Plaintiffs allege that following litigation in *Visa U.S.A.*, 344 F.3d 229, the networks restructured to shield themselves from antitrust liability. At a marketing meeting in December

of 2003, the Chief Executive Officer ("CEO") of Mastercard commented on the setting of

interchange fees and liability, stating:

> Many of the ongoing legal and regulatory issues we're dealing with
> are legacies of things that generally were done by our customers
> [here, MasterCard's Member Banks].
>
> We were cited in the Wal-Mart litigation, even though we weren't
> an economic participant in the interchange.
>
> We've been cited by the Reserve Bank of Australia, even though
> we didn't determine or set the interchange rate.  That was done by
> local members.
>
> . . . . Again, we're cited because of our structure and who we are,
> not because of having any particular economic involvement in
> these transactions.

(*Id.* ¶ 171 (alteration in original) (citation omitted).)  Similarly, Plaintiffs allege that in a June of

2004 update to the Board of Directors, Mastercard's CEO summarized the legal risks present,

and Mastercard management concluded in part that:

> The risks do not merely threaten MasterCard, but also directly
> threaten individual financial institutions.  In the United States,
> Issuing Banks face the risk of lawsuits seeking treble damages
> which could result in payouts that are significant in relation to their
> overall earnings from payment service.

(*Id.* ¶ 180.)  In considering how to respond and restructure, a "key consideration was that the

'IPO should protect broad business interests of current members.'"  (*Id.* ¶ 187 (citation

omitted).)  Plaintiffs allege that in rejecting a bilateral-agreement solution to Mastercard's legal

risk, and pursuing IPO restructuring, "MasterCard feared that, in a world of bilateral

agreements, its function of guaranteeing a stream of supracompetitive revenues to Issuing

Banks would vanish and its other functions could be replicated by others."  (*Id.* ¶ 191.)  After

rejecting other alternatives, Mastercard's Board of Directors and top management focused on

governance changes "in hopes of removing its Interchange-Fee setting conduct from scrutiny

under Section 1 of the Sherman Act, while preserving the ability of the Member Banks to continue to control the business of MasterCard and the revenue stream provided by Interchange Fees." (*Id.* ¶ 194.)  In November of 2004, the Board of Directors authorized Mastercard management to develop a new governance and ownership structure, taking into account, among other factors, "the significance of protecting the legitimate present and future interests and concerns of MasterCard's members to the extent that they do not adversely impact the risk profile of the enterprise." (*Id.* ¶ 195 (citation and emphasis omitted).)

Plaintiffs contend that the network member banks such as Bank Defendants "received assurances that they would continue to receive supracompetitive Interchange Fees, notwithstanding their loss of equity interest in MasterCard." (*Id.* ¶ 209.)  A Citigroup executive stated in reference to Board meetings regarding the restructuring, that "we [Citigroup] need to safeguard who owns/controls the company if not the Banks," and relayed his impression that the Chief Operating Officer ("COO") of Mastercard "seemed very clear that any new MasterCard needed to protect and even increase Interchange to keep and attract Banks." (*Id.* (alteration in original) (emphasis and citation omitted).)  Mastercard management "very strongly indicated its intent not to compete with its [Bank] customers." (*Id.* ¶ 210 (quoting Board meeting minutes) (citation omitted).)  In an email, the CEO of Capital One wrote that the Mastercard IPO would cause "little to no change," and a Citi executive testified to his understanding that Mastercard would have "'the same objective, pre and post' IPO." (*Id.* ¶ 212 (citation omitted).)

Plaintiffs contend that "MasterCard remains under the effective control of its Member Banks." (*Id.* ¶ 215.)  They allege, for example, that: the banks' "long-standing control" of the networks "ha[s] impaired and distorted competition through adoption and enforcement of" rules including interchange fees, honor-all-cards, and the anti-steering restraints, (*id.* ¶ 215(d)); the

21

largest member banks have representatives on the Board of Mastercard, and "continue to exercise undue influence and effective control," and Mastercard cannot resolve this pending litigation "without the consent of its largest Member Banks," (*id.* ¶ 215(f), (i)); the six largest issuing banks account for nearly ninety percent of credit card issuance, (*id.* ¶ 215(e)); and although Mastercard could collect interchange fees from merchants, "the Board of Directors . . . has continued to use Interchange Fees to transfer the supracompetitive Interchange Fees from Merchants to Issuing Banks," (*id.* ¶ 215(h)).

## 2.  Visa IPO allegations

Plaintiffs contend that the intention of Visa and its member banks in restructuring "was to create just enough autonomy . . . to remove the appearance of bank control, while maintaining in place the business model that courts and antitrust agencies in the United States and abroad had ruled constituted a structural conspiracy." (*Id.* ¶ 226.)  In support, Plaintiffs allege that around the time that Visa and its member banks considered whether to appoint independent directors to set interchange fees, an email from a Chase executive "relayed her conversation with" a Chase representative on the Visa U.S.A. Board "about 'how [Chase can] really retain control over structure and governance,'" which the executive later admitted "when she wrote this email, she was 'thinking about the extent to which [Chase] could retain control over [structure and governance of Visa].  And specifically, it was how do we — or can we prevent Visa from becoming a competitor of ours." (*Id.* ¶¶ 228–30 (alterations in original) (citation omitted).)

To further its goals, Visa considered several restructuring options, and under a "second model (a variation of which became the final Visa structure) a Visa public company would maintain a regional structure with regional subsidiaries which could be bank-owned." (*Id.*

¶ 233.)  Plaintiffs contend that the restructuring included limitations "that were intended to preserve the anticompetitive market structure that Visa and its Member Banks had created" — for example, that the member banks, "were permitted to elect [six] or [seventeen] directors over the three years following the IPO."  (*Id.* ¶ 238.)  Plaintiffs also allege that:

> The Member Banks that hold Class B or C stock are entitled to voting rights governing certain extraordinary transactions that relate to the consolidation or merger of Visa, or its exit from the core payments business.   In addition, approving a merger, consolidation, or exit of the core business requires an 80% approval of voting shares.  This supermajority provision, in combination with the Member Banks' right to vote on these types of occurrences, gives the banks veto powers that allow them to prevent the sale of Visa or a change in the core business of Visa, just as the Member Banks of MasterCard retained certain veto rights through their Class M shares in the MasterCard restructuring. In addition, the holders of Visa, Inc. Class B and C stock must approve any changes to Visa's certificate of Incorporation that would take away this veto right.

(*Id.* ¶ 239.)  Plaintiffs contend that the banks had "grave concerns" about losing control, and "Visa testified that issuers voted to approve the restructuring only when they were convinced that their card-issuing businesses would continue to be successful."  (*Id.* ¶ 242 (citation omitted).)  In addition, "Visa admitted that its Issuing Member Banks that controlled the restructuring, considered various restructuring options, and approved the final restructuring plan with the goal in mind of protecting their business interests as Visa Issuers . . . rather than maximizing the value of Visa as an independent business."  (*Id.* ¶ 246 (citation omitted).)

Thus, Plaintiffs contend that:

> [T]he veto right in the hands of the Member Banks, combined with the guarantee that the Member Banks will maintain that right for the duration of this litigation, perpetuates the situation in which Visa cannot take any business actions that are contrary to the Member Banks' interests of receiving supracompetitive Interchange Fees from Merchants on all Visa-branded Payment Card transactions.  Moreover, it also handicaps Visa in this

23

> litigation by guaranteeing that any settlement that it attempts to enter into with Plaintiffs, including any settlement to eliminate the Anti-Steering Restraints, meets the approval of the Member Banks.

(*Id.* ¶ 250.)

Plaintiffs further contend that:

> On information and belief, the Member Banks' veto rights on attempts by Visa to exit the core payments business would allow the Member Banks to block an attempt by Visa to eliminate Interchange Fees.

(*Id.* ¶ 251.)

### iii.   Relief sought

Plaintiffs seek declaratory and injunctive relief against all Defendants. They request a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. § 2201(a), declaring that Defendants' conduct is unlawful as alleged in the Complaint, (*id.* ¶ 426), and further request that the Court enjoin and restrain the wrongful conduct alleged in the Complaint, pursuant to Section 16 of the Clayton Act, (*id.* ¶ 428).

As to all Defendants, including Bank Defendants, Plaintiffs request, among other things, that the Court: "[d]eclare, adjudge, and decree that Defendants have committed the violations of the federal and state antitrust laws" alleged in the Complaint; "[o]rder that Defendants, their directors, officers, employees, agents, successors, members, and all persons in active concert and participation with them be enjoined and restrained from, in any manner, directly or indirectly, committing the violations of the Cartwright and Sherman Acts"; and "[g]rant further relief as is necessary to correct for the anticompetitive market effects caused by Defendants' unlawful conduct." (*Id.* ¶¶ 106–07.)

## II.  Discussion

### a.  Standards of review

#### i.  Rule 12(b)(1)

A district court may dismiss an action for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) when the court "lacks the statutory or constitutional power to adjudicate it." *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.À.R.L.*, 790 F.3d 411, 416–17 (2d Cir. 2015) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)); *Shabaj v. Holder*, 718 F.3d 48, 50 (2d Cir. 2013) (quoting *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005)); *see also Chau v. S.E.C.*, 665 F. App'x 67, 70 (2d Cir. 2016). "[T]he party asserting subject matter jurisdiction 'has the burden of proving by a preponderance of the evidence that it exists.'" *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (quoting *Makarova*, 201 F.3d at 113; *see also Suarez v. Mosaic Sales Sols. US Operating Co., LLC*, 720 F. App'x 52, 53 (2d Cir. 2018).  In evaluating whether a plaintiff has met that burden, "[t]he court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff,' but 'jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it.'" *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (citations omitted), *aff'd*, 561 U.S. 247 (2010).  As a result, courts may also "refer[] to evidence outside the pleadings" to evaluate whether subject matter jurisdiction exists.  *Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 223 (2d Cir. 2017) (quoting *Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000)); *see also M.E.S., Inc. v. Snell*, 712 F.3d 666, 671 (2d Cir. 2013) (same).

ii.   **Rule 12(b)(6)**

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil

Procedure, a court must construe the complaint liberally, "accepting all factual allegations in the

complaint as true and drawing all reasonable inferences in the plaintiff's favor." *Kim v. Kimm*,

884 F.3d 98, 103 (2d Cir. 2018) (quoting *Chambers v. Time Warner Inc.*, 282 F.3d 147, 152 (2d

Cir. 2002)); *see also Tsirelman v. Daines*, 794 F.3d 310, 313 (2d Cir. 2015) (quoting *Jaghory v.

N.Y. State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997)).   A complaint must plead "enough

facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570 (2007).   A claim is plausible "when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009)); *see also Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med.

Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717–18 (2d Cir.

2013).   Although all allegations contained in the complaint are assumed true, this principle is

"inapplicable to legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action,

supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678.

b.   **Plaintiffs have Article III standing**

Bank Defendants argue that Plaintiffs lack Article III standing to pursue the claims

against them because Plaintiffs have not plausibly alleged that Bank Defendants are capable of

redressing the alleged harm, i.e., Plaintiffs have not "plausibly allege[d] that any of the [B]ank

[D]efendants, individually or collectively, has any authority to change the networks' rules."

(Defs. Mem. 1–2, 8.)   The Court understands Bank Defendants to challenge redressability, the

26

third prong of Article III standing.[10]

Plaintiffs argue that the Complaint alleges that Bank Defendants have not withdrawn from the conspiracies alleged and are "continuing to commit their own overt acts" such that "Plaintiffs are entitled to injunctive relief prohibiting the Banks from continuing to agree and adhere" to specific restraints and requiring the Banks to "ameliorate the anticompetitive effects they continue to cause." (Pls. Mem. 2–3.)

In order to show Article III standing, a plaintiff must establish three things: (1) an "injury in fact — an invasion of a legally protected interest which is . . . concrete and particularized and actual or imminent, not conjectural or hypothetical," (2) "a causal connection between the injury and the conduct complained of," and (3) redressability of the injury "by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *see Pincus v. Nat'l R.R. Passenger Corp.*, 581 F. App'x 88, 89 (2d Cir. 2014) (describing three elements of Article III standing) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)); *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) ("[I]n order to seek injunctive relief, a plaintiff must show the three familiar elements of standing: injury in fact, causation, and redressability." (citing *Summers v. Earth Island Inst.*, 555 U.S. 488 (2009))).

Because the three elements of Article III standing "are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the

---

[10]  In antitrust cases, plaintiffs must demonstrate both Article III standing and antitrust standing. Antitrust standing is a separate two-part test which requires a plaintiff to show (1) antitrust injury of the type the antitrust laws were intended to prevent, and (2) that plaintiff is the proper plaintiff in light of a series of specific factors. *See, e.g.*, *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 62 (2d Cir. 2019); *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009). The Court understands Bank Defendants' motion to only challenge the redressability prong of Article III standing. The Court therefore does not address antitrust standing.

same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. "Thus, '[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [a court will] presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Osborn v. Visa Inc.*, 797 F.3d 1057, 1063–64 (D.C. Cir. 2015) (first and third alterations in original) (quoting *Lujan,* 504 U.S. at 561 (internal quotation marks omitted)); *see Hassan v. City of New York*, 804 F.3d 277, 289 (3d Cir. 2015), *as amended*, (Feb. 2, 2016) ("[T]o withstand a 'facial attack' at the motion-to-dismiss stage, a plaintiff need only plausibly allege facts establishing each constitutional requirement." (citing *Lewis v. Casey*, 518 U.S. 343, 358 (1996)); *Pub. Citizen Health Research Grp. v. Acosta*, 363 F. Supp. 3d 1, 11 (D.D.C. 2018) ("[T]o survive a motion to dismiss, [p]laintiffs 'must state a plausible claim that [they have] suffered an injury in fact fairly traceable to the actions of the defendant that is likely to be redressed by a favorable decision on the merits.'" (alteration omitted) (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (citation omitted)); *cf. Knight First Amendment Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541, 556 (S.D.N.Y. 2018) ("Conversely, in order to grant summary judgment in a plaintiff's favor, there must be no genuine issue of material fact as to that plaintiff's standing."); *see also Osborn*, 797 F.3d at 1063 ("A plaintiff's burden to demonstrate standing grows heavier at each stage of the litigation." (citing *Lujan,* 504 U.S. at 561)).

"In evaluating constitutional standing, courts 'must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.'" *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 650 (S.D.N.Y. 2016) (quoting *Warth v. Seldin*,

28

422 U.S. 490, 501 (1975)).  In addition, when evaluating standing, courts "must assume that the party asserting federal jurisdiction is correct on the legal merits of his claim, that a decision on the merits would be favorable and that the requested relief would be granted."  *Cutler v. U.S. Dep't of Health & Human Servs.*, 797 F.3d 1173, 1179 (D.C. Cir. 2015) (citation and internal quotation marks omitted); *Hassan*, 804 F.3d at 289 (same).  "[B]ecause Article III does not 'permit[ ] suits against non-injurious defendants as long as one of the defendants in the suit injured the plaintiff,' standing must also be assessed as against each defendant."  *Knight First Amendment Inst.*, 302 F. Supp. 3d at 556 (alteration in original) (quoting *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 62 (2d Cir. 2012)).

The nature of a redressability inquiry "focuses . . . on whether the *injury* that a plaintiff alleges is likely to be redressed through the litigation."  *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 286–87 (2008) (citation omitted).  To satisfy the redressability requirement, a plaintiff must establish that "it is likely and not merely speculative that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit[]."  *Id.* at 273–74 (internal quotation marks omitted) (citing *Lujan*, 504 U.S. at 560–61); *see also M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018) ("A plaintiff's burden to demonstrate redressability is relatively modest.  She need not demonstrate that there is a guarantee that her injuries will be redressed by a favorable decision; rather, a plaintiff need only show a substantial likelihood that the relief sought would redress the injury." (alteration, citations, and internal quotation marks omitted)); *Toll Bros. v. Twp. of Readington*, 555 F.3d 131, 143 (3d Cir. 2009) ("Redressability is not a demand for mathematical certainty.  It is sufficient for the plaintiff to establish a substantial likelihood that the requested relief will remedy the alleged injury in fact." (citation and internal quotation marks omitted)).  The redressability prong does not demand that court-

ordered relief completely redress all injury.  *Larson v. Valente*, 456 U.S. 228, 244 n.15 (1982) ("[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself.  He need not show that a favorable decision will relieve his *every* injury."); *see also Knight First Amendment Inst.*, 302 F. Supp. 3d at 561 (finding the redressability prong to be met and noting that "any relief provided need not be complete").

### i.     There is a substantial likelihood that a favorable decision on the merits and a grant of the requested relief would provide partial redress

Bank Defendants argue that under "settled rule," Plaintiffs lack standing to seek injunctive relief from Bank Defendants because Bank Defendants cannot "provide relief from the challenged Visa and Mastercard rules," and to meet their standing burden, "[P]laintiffs would, at a minimum, need to allege facts plausibly establishing that each of the bank defendants has the ability or authority to change Visa or Mastercard rules."  (Defs. Mem. 10.) In support, Bank Defendants contend that the "settled rule" is that "[a] plaintiff seeking injunctive relief against defendants who have no authority to provide the requested relief thus lacks standing because those defendants cannot redress the alleged injury."  (*Id.* at 9 (citations omitted).)

Plaintiffs contend that this "argument fails because co[-]conspirators that adhere to unlawful agreements are liable together with the organization that promulgates them."  (Pls. Opp'n 21.)  They further contend that "antitrust defendants must not only stop adhering to unlawful agreements, but also take affirmative action to try to undo their conduct's anticompetitive effects," that "Plaintiffs . . . seek such affirmative relief from the Banks," and that "[b]eing liable for adhering to the Unlawful Restraints, the Banks are subject to an injunction prohibiting them from continuing that unlawful adherence."  (*Id.* at 21, 23.)

The Clayton Act provides for "injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws" for private parties, 15 U.S.C. § 26, and in general, "where . . . a plaintiff asserts a cognizable competitive injury, it may be redressed by eliminating the allegedly unlawful barrier to competition." *Planned Parenthood of N.Y.C., Inc. v. U.S. Dep't of Health & Human Servs.*, 337 F. Supp. 3d 308, 323 (S.D.N.Y. 2018) (citations omitted).  Where a court finds a violation of the Sherman Act, its ability to craft a remedy is broad, and it is "empowered to fashion appropriate restraints on . . . future activities both to avoid a recurrence of the violation and to eliminate its consequences." *Nat'l Soc. of Prof'l Eng'rs. v. United States*, 435 U.S. 679, 697 (1978) (citations omitted); *see also id.* at 697–98 (indicating that this power is broad, and that while courts "may, of course, consider the fact that its injunction may impinge upon rights that would otherwise be constitutionally protected . . . , those protections do not prevent it from remedying the antitrust violations.  The standard against which the order must be judged is whether the relief represents a reasonable method of eliminating the consequences of the illegal conduct."); *New York v. Microsoft Corp.*, 224 F. Supp. 2d 76, 99 (D.D.C. 2002) ("It has long been established that it is the job of the district court to frame the remedy decree in an antitrust case, and the district court has broad discretion in doing so." (citing *Int'l Salt Co. v. United States*, 332 U.S. 392, 400–01 (1947)), *aff'd*, 373 F.3d 1199 (D.C. Cir. 2004).

When fashioning a remedy sufficient to alleviate a violation, courts may enjoin actions beyond those for which defendants have been found liable.  *Microsoft Corp.*, 224 F. Supp. 2d at 100 ("In crafting a remedy specific to the violations, this [c]ourt is empowered to enjoin not only the acts for which the defendant was found liable, but 'other related unlawful acts,' lest 'all of the untraveled roads to [restraint of trade] be left open and [ ] only the worn one be

closed.'" (second and third alteration in original) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 133 (1969) (citations and internal quotation marks omitted))); *see, e.g.*, *In re Elec. Books Antitrust Litig.*, 14 F. Supp. 3d 525, 533 (S.D.N.Y. 2014) ("An injunction against Apple runs for five years.  The injunction ended practices at Apple that were essential to the conspiracy, required Apple to reform its antitrust law training and compliance processes, and put in place a monitor to report periodically for at least two years on Apple's progress in making those reforms."); *see also Borough of Upper Saddle River, N.J. v. Rockland Cty. Sewer Dist. #1*, 16 F. Supp. 3d 294, 316 (S.D.N.Y. 2014) ("Redressability queries whether judicial action can abate or prevent the harm that the defendant allegedly caused or is causing." (citation omitted)); *MacIssac v. Town of Poughkeepsie*, 770 F. Supp. 2d 587, 598 (S.D.N.Y. 2011) ("A favorable decision on justiciability, however, ought not be read to necessitate any particular form of relief.  At the pleading stage, a showing of redressability is made where the alleged dispute is 'presented . . . in a form historically viewed as capable of judicial resolution.'" (quoting *Flast v. Cohen*, 392 U.S. 83, 101 (1968))).

Plaintiffs have pled sufficient facts to suggest that it is likely, and not merely speculative, that relief from the Court against Bank Defendants could partially redress their alleged injury.  If Plaintiffs were to succeed on the merits in this action, Bank Defendants could be found liable and subject to injunctive relief requiring them to stop adhering to particular restraints.  The relief to Plaintiffs could theoretically take many forms, including placing obligations upon or otherwise enjoining the actions of Bank Defendants, and still be substantially likely to partially redress the Plaintiffs' alleged injury, which stems from paying supracompetitive fees that Bank Defendants count as revenue.  *See, e.g.*, *Allco Fin. Ltd. v. Klee*, 861 F.3d 82, 96 (2d Cir. 2017) (finding redressability requirement met where requested relief

was a declaration that a state action was preempted by a federal act, and an "injunction halting

any further action relating to the [state action] and barring [d]efendants from issuing any future

similar [actions]"), *cert. denied*, 138 S. Ct. 926 (2018); *Ross v. Am. Express Co.*, 35 F. Supp. 3d

407, 435–36 (S.D.N.Y. 2014) (finding redressability requirement met where the plaintiffs

sought injunction invalidating American Express arbitration clauses that barred class actions

even where plaintiffs were not holders of American Express cards, because the harms were

"present market effects" and "the elimination of Amex's clause would redress the identified

injuries to the market even if it did not directly affect any individual cardholder" (citation

omitted)), *aff'd sub nom.*, *Ross v. Citigroup, Inc.*, 630 F. App'x 79 (2d Cir. 2015), *as

corrected*, (Nov. 24, 2015).

As Plaintiffs argue, courts have enjoined parties from adhering to agreements that have

been deemed unlawful.  Plaintiffs cite, for example, a final judgment issued against publishers

in *United States v. Apple, Inc.*, 791 F.3d 290, 315 (2d Cir. 2015), which ordered those

publishers to discontinue adherence to agreements and "terminate any agreement with Apple

relating to the Sale of E-books that was executed prior to the filing of this complaint."  (Final J.

as to Defs. Hachette, HarperCollins, and Simon & Schuster 8, annexed to Pls. Mem. as Ex. D,

Docket Entry No. 7402-4.)  The final judgment, among other things, also prohibited the settling

defendants from entering into certain types of agreements in the future.  (*See id.* at 11–12.)

Although Bank Defendants argue that Plaintiffs' reliance on *Apple* is misplaced because the

publishers in that case "had not merely agreed to follow rules set unilaterally by Apple," and

instead had "actively and collusively negotiated the terms of the challenged agreements," (Defs.

Mem. 4), as explained *supra*, Plaintiffs similarly allege Bank Defendants' involvement in the

alleged conspiracy despite the restructuring of Visa and Mastercard.  Thus, enjoining Bank

Defendants' behavior and their adherence to the agreements and other anticompetitive restraints detailed in the Complaint could likely redress Plaintiffs' alleged injury of paying supracompetitive fees by increasing competition between the actors that profit directly from those fees.

Bank Defendants appear to assume that Plaintiffs only seek changes to Visa's and Mastercard's rules. However, as set forth in detail *supra*, Plaintiffs broadly seek injunctive relief against all Defendants, including Bank Defendants, "from, in any manner . . . committing the violations of the Cartwright and Sherman Acts" alleged, and seek such "further relief as is necessary to correct for the anticompetitive market *effects* caused by Defendants' unlawful conduct." (Compl. ¶¶ 106–07 (emphasis added).) Although the injunctive relief secured in the 2013 Settlement Agreement only obligated the Visa and Mastercard Defendants to modify their rules and maintain the terms of the DOJ consent decree, (*see* 2013 Settlement Agreement ¶¶ 39–65), Plaintiffs seek similar relief against Bank Defendants and such relief could be enforced against Bank Defendants. Under the Durbin Amendment, for example, the Federal Reserve is required "to issue rules limiting *the banks' practice* of issuing debit cards that were compatible with only the issuer's networks." (Compl. ¶ 264 (emphasis added) (citation omitted).) Pursuant to the Durbin Amendment, a rule was promulgated that "required issuers to enable their debit cards to route transactions through a minimum of two unaffiliated networks" and "also prohibited issuing banks from directly or indirectly inhibiting merchants from choosing to process card payments over any available network." (*Id.* (citation omitted).) Thus, it is possible to fashion relief that would place obligations not only on the network Defendants, but also Bank Defendants, even if liability is proven as to the networks and specific relief is fashioned as to Visa and Mastercard. Such relief could come in the form of independent remedies against Bank

34

Defendants as a result of their liability, separate and apart from any liability on the part of the network Defendants.

Bank Defendants' reliance on several non-binding cases is misplaced, as these cases are distinguishable and do not support a contrary ruling. (*See* Defs. Mem. 9–10 (citing *Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001); *Thomas-Ateba v. SAMHSA of U.S. Gov't*, No. 13-CV-4662, 2014 WL 1414577 (E.D.N.Y. Apr. 10, 2014); *McDaniel v. Bd. of Educ.*, 956 F. Supp. 2d 887, 893 (N.D. Ill. 2013); *Justice v. Kuhnapfel*, 985 F. Supp. 2d 334, 336 (E.D.N.Y. 2013)).)

In *Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001), the plaintiffs sued the Governor and Attorney General of Louisiana, challenging abortion-related legislation. The Fifth Circuit found that the plaintiffs "ha[d] never suggested that any act of the defendants has caused, will cause, or could possibly cause any injury to them." *Id.* at 426. The court highlighted that the core issue was a "long-standing rule that a plaintiff may not sue a state official who is without any power to enforce the complained-of statute." *Id.* In further explaining why the plaintiffs could not meet the redressability prong of standing, the court found the injunction issued by the district court "meaningless" because it enjoined the statute rather than the defendants, and otherwise noted that "under [the challenged legislation], no state official has any duty or ability to do *anything*. The defendants ha[d] no authority to prevent a private plaintiff from invoking the statute in a civil suit." *Id.* at 427 & n.34.

In *Thomas-Ateba v. SAMHSA of U.S. Gov't*, No. 13-CV-4662, 2014 WL 1414577 (E.D.N.Y. Apr. 10, 2014), the *pro se* plaintiff sued, *inter alia*, the Substance Abuse and Mental Health Services Administration of the United States Department of Health and Human Services ("HHS–SAMHSA"), seeking to obtain a New York State Credentialed Alcoholism and Substance Abuse Counselor ("CASAC") certificate. *Id.* In a footnote, the court stated that the

35

plaintiff had "no standing to seek injunctive relief against HHS–SAMHSA, because the agency ha[d] no authority to grant plaintiff the injunctive relief that she [sought], namely, the awarding of a New York State CASAC certificate." *Id.* at *3 n.3. In finding that the plaintiff's claims were barred by sovereign immunity, the court noted that "HHS–SAMHSA has no oversight role over substance abuse counselor certification in New York State and played no role in any decision regarding plaintiff's CASAC certification status or waiver request." *Id.*

Unlike the plaintiffs in *Okpalobi*, Plaintiffs allege that Bank Defendants directly cause their harm by adhering to, enforcing, and profiting from interchange fees and the alleged restraints. In addition, unlike the relief requested in *Thomas-Ateba*, Plaintiffs' requested relief does not hinge on whether Bank Defendants have the *authority* to redress Plaintiffs' injuries. Rather, the issue is whether the Court can enjoin them from engaging in certain actions, and whether any such order is substantially likely to redress Plaintiffs' injury.[11]

The Court is persuaded by the D.C. Circuit's opinion in *Osborn v. Visa*, a case similarly brought against the card networks and affiliated banks, albeit by consumers and operators of non-bank-owned automated teller machines ("ATMs"), rather than merchants. In *Osborn*, the

---

[11] The other two cases cited by Bank Defendants, *McDaniel v. Board of Education*, 956 F. Supp. 2d 887, 893 (N.D. Ill. 2013) and *Justice v. Kuhnapfel*, 985 F. Supp. 2d 334, 336 (E.D.N.Y. 2013), are also distinguishable. *McDaniel* is similar to *Okpalobi* and *Thomas-Ateba* in that the suit was brought against a government agency, seeking to enjoin it from proceeding with school closings, and the court determined that plaintiffs lacked standing because "the Illinois legislature ha[d] empowered the Board, not the City, to administer [Chicago Public Schools]." 956 F. Supp at 894. Thus, the court in *McDaniel* found that "even if [p]laintiffs were to prevail in their claims against the City and this Court were to grant the injunctive relief they seek, the City would lack the power to carry out the injunction." *Id.* For the reasons stated in the Court's analysis of Bank Defendants' reliance on *Okpalobi* and *Thomas-Ateba*, the Court finds that *McDaniel* is distinguishable. Finally, in *Justice*, this Court found that defendants "lacked the power" to return plaintiff's son to her because her son's "custody status [was] the subject of a state court determination by a Michigan state court, and this Court lack[ed] the power to change that determination." 985 F. Supp 337. *Justice* is markedly different in terms of the relief sought and the jurisdiction and ability of the Court to order the requested relief.

D.C. Circuit vacated a district court decision granting a motion to dismiss, and held that the consumers and ATM operators had standing to sue, and that the plaintiffs had sufficiently alleged the existence of a horizontal agreement to restrain trade, including among the bank defendants in the case. *See generally Osborn*, 797 F.3d 1057. The district court had determined that the plaintiffs lacked standing due to a failure to show both injury and redressability, and that the plaintiffs' injuries would not be redressable even if the court provided the relief they sought. *Id.* at 1063; *Nat'l ATM Council, Inc. v. Visa Inc.*, 7 F. Supp. 3d 51, 58 (D.D.C. 2013), *vacated and remanded sub nom.*, *Osborn*, 797 F.3d 1057. In setting aside the district court's decision, the D.C. Circuit highlighted that in holding that the plaintiffs had failed to establish injury and redressability, the district court had relied on cases decided at the summary judgment stage, rather than at the motion to dismiss stage, and found that the plaintiffs did in fact have standing because they alleged facts that were specific, plausible, and susceptible to proof at trial. *Id.* at 1065–66.

The Court similarly finds that, at this stage of the litigation, Plaintiffs have sufficiently alleged that they have standing to pursue this action, that the Court has the power to redress the alleged harms, and that any relief fashioned could place obligations not only on the network Defendants, but also the Bank Defendants.[12] *Pub. Citizen Health Research Grp.*, 363 F. Supp.

---

[12]  This case is unlike cases in which courts could not redress the alleged injury.  S*ee, e.g.*, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998); *Coal. of Watershed Towns v. U.S. E.P.A.*, 552 F.3d 216, 218 (2d Cir. 2008).  In *Steel Co. v. Citizens for a Better Environment*, the Supreme Court found that the redressability prong was not met because the requested injunctive relief could not redress the plaintiff's injury, as "[n]one . . . would serve to reimburse respondent for losses caused by the late reporting, or to eliminate any effects of that late reporting upon respondent."  523 U.S. at 105–06; *see also Coal. of Watershed*, 552 F.3d at 218 (finding redressability not satisfied and that any relief would be speculative because there was no basis to conclude that the state would have taken any different action than the EPA did, meaning that the injury may very well have been the same).  In *Steel*, the Supreme Court noted that although the injunctive relief requested was "aimed at deterring petitioner from violation

3d at 14 ("It is not a question of whether an order granting [p]laintiffs' requested relief will instantly and unquestionably cure their alleged harm.  Indeed, [p]laintiffs, particularly at this stage of the litigation, are certainly not required to prove that granting the requested relief is *certain* to alleviate their injury." (citations and internal quotation marks omitted)).

### ii.   Plaintiffs can reasonably expect to encounter the same injury in the future

In their Reply, Bank Defendants appear to raise an argument about Plaintiffs' requested relief that may implicate the injury prong of Article III standing.[13]  (Reply Mem. of Law in Supp. of Defs. Mot. ("Defs. Reply") 2, Docket Entry No. 7400.)  Bank Defendants argue that Plaintiffs' requested forms of relief "hinge on hypothetical harms contingent upon uncertain future events," and that "these future injuries are, on their face, not 'concrete and particularized and . . . actual or imminent.'"  (*Id.* (citing *Davis v. N.Y. State Bd. of Elections*, 689 F. App'x 665, 668 (2d Cir. 2017)).)  They further state that "it is settled law that injunctive relief based 'on contingent future events' is insufficient for standing."  (*Id.* (quoting *Davis*, 689 F. App'x at 669; citing *Han v. Fin. Supervisory Serv.*, No. 17-CV-4383, 2018 WL 791353, at *3 (S.D.N.Y. Feb. 8, 2018)).)

Plaintiffs in their Opposition contend that "the merchants were harmed by the Banks'

---

[of an act] in the future," the plaintiffs had not alleged a threatened injury, and that if they "had alleged a continuing violation or the imminence of a future violation, the injunctive relief requested would remedy th[e] alleged harm."  *Steel*, 523 U.S. at 108–09.  The Court further noted that it could not envision appropriate relief under the plaintiffs' general request that the court provide "such further relief as the court deems appropriate" that "would serve to reimburse respondent for losses caused by the late reporting, or to eliminate any effects of that late reporting."  *Id.* at 105–06.  As noted elsewhere in this opinion, Plaintiffs have plausibly alleged a continuing violation and future threat of harm in the form of, *inter alia*, supracompetitive default interchange fees.

[13]   Although Bank Defendants failed to raise this argument in the standing section of their opening brief, the Court nevertheless addresses it.

conduct in the past, are being harmed by it *in the present, and, unless this Court enjoins it, will continue to be harmed by it in the future*."  (Pls. Opp'n 11 n.89.)

As noted *supra*, in order to show Article III standing, a plaintiff must establish three things, one of which is "injury in fact — an invasion of a legally protected interest which is . . . concrete and particularized and actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560.  "In seeking prospective relief like an injunction, 'a plaintiff must show that he can reasonably expect to encounter the same injury again in the future — otherwise there is no remedial benefit that he can derive from such judicial decree.'" *Leder v. Am. Traffic Sols., Inc.*, 81 F. Supp. 3d 211, 222 (E.D.N.Y. 2015), *aff'd*, 630 F. App'x 61 (2d Cir. 2015) (citing *Maxineau v. City of New York*, No. 11-CV-02657, 2013 WL 3093912, at \*11 (E.D.N.Y. June 18, 2013) (citing *Lyons*, 461 U.S. at 102–05)); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109 (1998) ("Because respondent alleges only past infractions . . . , and not a continuing violation or the likelihood of a future violation, injunctive relief will not redress its injury."); *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016) ("Plaintiffs lack standing to pursue injunctive relief where they are unable to establish a 'real or immediate threat' of injury." (first citing *Lyons*, 461 U.S. at 111–12; and then citing *Shain v. Ellison*, 356 F.3d 211, 215–16 (2d Cir. 2004))); *Pungitore v. Barbera*, 506 F. App'x 40, 41 (2d Cir. 2012) ("[W]hen seeking prospective injunctive relief, the plaintiff must prove the likelihood of *future* or *continuing* harm.").  The alleged injury "must be 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Knife Rights, Inc. v. Vance*, 802 F.3d 377, 383 (2d Cir. 2015) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)); *Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 800 (2d Cir. 2015) ("The Supreme Court has 'repeatedly reiterated that "threatened injury must be *certainly impending* to constitute injury in

fact," and "[a]llegations of *possible* future injury" are not sufficient.'" (alteration in original) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013))).

A plaintiff "cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he . . . will be injured in the future." *Shain*, 356 F.3d at 215; *see also Nicosia*, 834 F.3d at 239 (stating that past injuries do not confer standing to seek injunctive relief); *Pungitore*, 506 F. App'x. at 42 (stating that, while past wrongs may be "evidence bearing on 'whether there is a real and immediate threat of repeated injury,' such evidence 'does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects'" (quoting *Lyons*, 461 U.S. at 102)). "In establishing a certainly impending future injury, . . . the plaintiff must establish how he or she will be injured prospectively and that the injury would be prevented by the equitable relief sought." *Marcavage v. City of N.Y.*, 689 F.3d 98, 103 (2d Cir. 2012) (collecting cases). "[A]t the pleading stage, standing allegations need not be crafted with precise detail, nor must the plaintiff prove his allegations of injury." *Baur v. Veneman*, 352 F.3d 625, 631 (2d Cir. 2003) (citing *Lujan*, 504 U.S. at 561).

The Court finds that Plaintiffs sufficiently allege that they have been and will continue to be injured by Defendants' actions in the future, including Bank Defendants' actions. The main injury that Plaintiffs seek to alleviate is "fixed . . . fees imposed on Merchants," (Compl. ¶ 1) — fees that Bank Defendants are allegedly "directly responsible" for fixing, and that they continue to "significantly profit[] from," (*id.* ¶ 41). Plaintiffs contend that despite the IPOs, Bank Defendants continue to adhere to "rules that require the payment of an Interchange Fee, set at Visa and MasterCard's uniform levels," that they "collectively adopted and enforced" prior to the IPOs, "acting through the Visa and MasterCard Boards of Directors." (*Id.* ¶ 138.)

40

In particular, Plaintiffs contend that "[e]ach of the Bank Defendants . . . has agreed that Visa and MasterCard may apply uniform schedules of default Interchange Fees to their Payment Card businesses and that they will adhere to the anticompetitive Visa and MasterCard rules," (*id.* ¶ 42), and that "[t]hese unlawful agreement are enabled by other rules that were also collectively adopted and continue to be collectively enforced by the Bank Defendants," (*id.* ¶ 138). Further, acquiring banks enter into contracts with merchants, implicitly or explicitly agreeing that uniform schedules of interchange fees will apply, while issuing banks enter into contracts with the networks, agreeing to receive interchange fees based on the uniform schedule. (*Id.* ¶ 43.)

Plaintiffs allege that network rules, particularly anti-steering and other restraints, remain in place and allow the injury — supracompetitive fixed fees — to continue. This alleged harm is not "hypothetical" or "contingent" as Bank Defendants suggest, but ongoing and continually occurring. The network rules that Plaintiffs refer to include, for example, honor-all-cards rules, which require merchants that accept Visa- or Mastercard-branded cards to accept all payment cards with the network brand, "regardless of the identity of the Issuing Bank, the Card Product, or the cost of accepting that card." (*Id.* ¶ 139.) Plaintiffs assert that this type of practice makes it "virtually impossible" for merchants to exert any leverage over Bank Defendants "in order to obtain more favorable prices or terms." (*Id.* ¶ 140.)

Plaintiffs also assert that although pursuant to the 2013 Settlement Agreement, Visa and Mastercard changed their rules to permit surcharging in certain circumstances, because the 2013 Settlement Agreement has been vacated, the networks may reimpose the no-surcharge rules. (*Id.* ¶ 147.) In addition, although the DOJ consent decree improved the ability of merchants to offer discounts to cardholders with a particular brand or product, merchants generally are still

41

"prohibited from offering discounts to cardholders for using the cards issued by particular Issuing Banks," and, but for the no-discount rule, "Merchants could use Issuer-specific discounts to secure more favorable acceptance costs and terms than are currently available." (*Id.* ¶¶ 150–51.)  Plaintiffs contend that if instead consumers were given price signals at a point of sale, a "consumer would migrate towards less-expensive payment products, causing Defendants to reduce their Interchange Fees" in the absence of the anti-steering restraints.  (*Id.* ¶ 162.)

The injury alleged and the likelihood of continuing and future harm in this case are realistically a threat, in contrast to those cases where no standing was found due to the distant possibility of a future threat.  In *Lyons*, for example, the Supreme Court found that a plaintiff did not have proper standing to seek an injunction against police chokeholds because the plaintiff did not face a reasonable threat of reoccurrence.  *See Lyons*, 461 U.S. at 105 ("That [the plaintiff] may have been illegally choked by the police on October 6, 1976, . . . does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness."); *id.* at 107 n.7 (noting that the plaintiff "would have to credibly allege that he faced a realistic threat from the future application of the City's policy"); *see also Leder*, 81 F. Supp. 3d at 221–23 (finding that the plaintiff lacked standing regarding her equitable relief claims due to a "too speculative" chance of reoccurrence where she did "not allege any facts suggesting that she will be subject to additional tickets if the [c]ourt does not grant the injunctive relief she requests").

In contrast, Plaintiffs will face the same alleged injury in the future.  Plaintiffs are merchants that accept Visa and Mastercard payment cards, and are subject to interchange fees.

The ongoing nature of the allegedly supracompetitive interchange fees, the continued existence of anti-steering and other restraints, and the fact that the terms of the 2013 Settlement Agreement are not permanent, plausibly suggest that the same alleged injury will continue to occur. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 184 (2000) ("Here, in contrast [to *Lyons*], it is undisputed that [the] unlawful conduct — discharging pollutants in excess of permit limits — was occurring at the time the complaint was filed."); (*id.* at 190 ("[I]n [*Lyons*,] . . . we noted that a citywide moratorium on police chokeholds . . . would not have mooted an otherwise valid claim for injunctive relief, because the moratorium by its terms was not permanent.")).

The two cases cited by Bank Defendants are inapposite. (Defs. Reply 2 (citing *Davis*, 689 F. App'x at 670; *Han*, 2018 WL 791353).) In *Han v. Financial Supervisory Service*, the court held that "if the question to which the plaintiff seeks a declaration is abstract, hypothetical, or contingent, the district court must dismiss the claim for lack of subject matter jurisdiction." *Han*, 2018 WL 791353, at *3 (citations and internal quotation marks omitted). In *Han*, the court adopted a report and recommendation recommending that the court grant defendant's motion to dismiss because the plaintiff asked for a declaratory ruling on whether the defendant may invoke the doctrine of foreign sovereign immunity "to shield itself from her as-yet unissued and unserved subpoena," and the court agreed with the magistrate judge that the court lacked subject matter jurisdiction because "none of these things has occurred and none may ever occur." *Id.* at *2–3 (citations, internal quotation marks, and alteration omitted).

In *Davis* v. *New York Board of Elections*, the Second Circuit upheld a district court's decision that the plaintiff, an individual campaigning to be a delegate candidate for the New York Constitutional Convention, had not suffered an injury-in-fact and therefore lacked

standing. *Davis*, 689 F. App'x at 670.  The Second Circuit agreed with the district court's reasoning that one of the alleged injuries "was 'conjectural or hypothetical' and not 'actual or imminent' because the claim was based entirely on contingent future events." *Id.* at 669 (quoting *Davis v. Kosinsky*, 217 F. Supp. 3d 706, 712 (S.D.N.Y. 2016), *aff'd sub nom.*, *Davis*, 689 F. App'x 665).  The Plaintiffs alleged that the candidate laws of New York prevented the plaintiff from appearing as a non-partisan candidate on the ballot to serve as a delegate. *Id.*  In concluding that the plaintiff had not established injury-in-fact, the court noted that "the [d]istrict [c]ourt correctly observed that for [plaintiff] to reach the point of even appearing on the ballot a majority of New Yorkers would have to vote in favor of calling the Convention and 3,000 voters would have to sign a petition nominating [plaintiff].  While [plaintiff] provides reasons why, in his opinion, these events are likely to happen, they remain entirely hypothetical." *Id.*

The facts of both of these cases are in stark contrast to the facts before the Court.  In each case no injury had yet occurred, and intervening steps had to occur before an injury ever *could* occur, i.e., issuance of a subpoena and 3000 voters signing a nominating petition.  In contrast, Plaintiffs allege that they have been and will continue to be injured by supracompetitive interchange fees, and there is no real argument that such an injury will not continue.  Accordingly, the Court finds that Plaintiffs have sufficiently alleged an ongoing injury that will continue to injure them in the future, and finds unpersuasive Bank Defendants' arguments challenging injury-in-fact.

### c. Plaintiffs have alleged an ongoing antitrust conspiracy

Bank Defendants argue that Plaintiffs have not plausibly alleged an ongoing conspiracy sufficient to entitle them to injunctive relief under the Clayton Act.[14]  (*See* Defs. Mem. 16–24.) Bank Defendants contend that following the IPOs, Plaintiffs have not alleged ongoing conduct by Bank Defendants in furtherance of a conspiracy, (*see id.* at 18), and that simply operating as members of the card networks and following network rules is insufficient in and of itself to constitute a violation of Section 1 of the Sherman Act, (*id.* at 20–21).  Further, Bank Defendants argue that because there are no allegations of post-IPO overt acts by them, the Court must dismiss claims against them.  (*See id.* at 22.)

Plaintiffs contend that Bank Defendants' arguments have previously been rejected in this action, that Bank Defendants never withdrew from conspiracies they themselves designed, and that the Complaint sufficiently alleges that Bank Defendants are committing overt acts in furtherance of ongoing conspiracies, but that even if they did not, Plaintiffs are still entitled to injunctive relief, because Bank Defendants have "engaged in a single, uninterrupted conspiracy."  (*See* Pls. Mem. 8–10.)

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce."  15 U.S.C. § 1.  "Identifying the existence and nature of a conspiracy requires determining whether the evidence 'reasonably tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective.'"  *Apple*, 791 F.3d at 315 (alteration in original) (quoting *Monsanto Co.*

---

[14]  "To survive a motion to dismiss, a Sherman Act claim must (1) define the relevant geographic market, (2) allege an antitrust injury, and (3) allege conduct in violation of antitrust laws."  *Concord Assocs., L.P. v. Entm't Props. Tr.*, 817 F.3d 46, 52 (2d Cir. 2016) (citation and internal quotation marks omitted).  Here, Bank Defendants argue that the third prong is not met.

*v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)). "'[T]he crucial question' is whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express.'" *Twombly*, 550 U.S. at 553 (second alteration in original) (quoting *Theatre Enters. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)).

"[S]tating [a Section 1] claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Id.* at 544; *see also Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 54 (S.D.N.Y. 2016) ("Plaintiffs must allege that [d]efendants entered into an agreement or conspiracy — be it 'tacit or express' — to state a claim." (quoting *Twombly*, 550 U.S. at 553)). "[A] complaint must allege facts that show 'joint or concerted action' that 'reveal[s] a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.'" *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 591 (S.D.N.Y. 2015) (quoting *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012) (internal citation and quotation marks omitted)); *see also Anderson News*, 680 F.3d at 183 ("In order to establish a conspiracy in violation of § 1, whether horizontal, vertical, or both, proof of joint or concerted action is required; proof of unilateral action does not suffice.").

However, "to present a plausible claim at the pleading stage . . . the plaintiff need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action, as would be required at later litigation stages such as a defense motion for summary judgment." *Anderson News*, 680 F.3d at 184 (citations omitted); *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) ("While for purposes of a summary judgment motion, a Section 1 plaintiff must offer evidence that tends to rule out the possibility that the defendants were acting independently, to survive a motion to dismiss under

46

Rule 12(b)(6), a plaintiff need only allege enough factual matter (taken as true) to suggest that an agreement was made." (internal citations, alteration, and quotation marks omitted)).

> **i.   Plaintiffs have sufficiently alleged Bank Defendants' failure to withdraw from an ongoing conspiracy**

Plaintiffs argue that "America's largest banks [including Bank Defendants] have fixed the fees imposed on Merchants . . . for transactions processed over the dominant Visa and MasterCard networks and have collectively imposed restrictions on Merchants that prevent them from protecting themselves against those fees." (Compl. ¶ 1.)  In support, Plaintiffs contend that prior to the IPOs, Visa and Mastercard "were 'owned and effectively operated by over 22,000 banks, which compete with one another in the issuance of Payment Cards and the acquiring of Merchant transactions.'"  (*Id.* ¶ 44 (quoting *Visa U.S.A.*, 344 F.3d at 242).)  They allege that Bank Defendants were represented on the networks' Boards of Directors, "at the time when those Boards collectively fixed uniform Interchange Fees and imposed the anticompetitive [anti-steering and other restraints]."  (*Id.* ¶ 38.)  They further allege that issuing banks agreed to charge uniform collectively fixed interchange rates "both before and after" the IPOs, that acquiring banks "have participated in the conspiracy to collectively fix" the rates, and that certain banks operated on the Boards "and adopted and agreed to fix" the rates, impose anticompetitive restraints, "and also designed and authorized restructurings that themselves violate the antitrust laws."  (*Id.* ¶ 45.)  Plaintiffs further allege that Bank Defendants remain part of an ongoing conspiracy, and that "[s]ince the restructurings, no . . . Member Bank has taken any affirmative steps to withdraw from any of the MasterCard or Visa conspiracies described in th[e] [C]omplaint."  (*Id.* ¶ 260; Pls. Mem. 9.)

Bank Defendants argue that Plaintiffs do not plausibly allege an "impending or contemporary antitrust violation," and "do not allege ongoing conduct by the bank defendants in

furtherance of the alleged conspiracy . . . during the decade since the Visa and Mastercard IPOs." (Defs. Mem. 18.)  They argue that in order to allege a continuing conspiracy, and "[t]o demonstrate the requisite continuity of action, [P]laintiffs must 'allege an overt act which (1) is a new and independent act that is not merely a reaffirmation of a previous act; and (2) inflict[s] new and accumulating injury on the [P]laintiff.'"  (*Id.* at 17 (citing *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 228 (E.D.N.Y. 2003)).)  They further assert that "to plausibly establish that the conspiracy is in fact continuing, the complaint must contain allegations of conduct that suggests continuing 'concerted action,' not merely consequences that are 'the result of a completed conspiracy.'"  (*Id.* (citing *United States v. Grimm*, 738 F.3d 498, 503 (2d Cir. 2013)).)

In general, "[u]pon joining a . . . conspiracy, a defendant's membership in the ongoing unlawful scheme continues until he withdraws."  *Smith v. United States*, 568 U.S. 106, 107 (2013).  "Passive nonparticipation in the continuing scheme is not enough to sever the meeting of minds that constitutes the conspiracy.  '[T]o avert a continuing criminality' there must be 'affirmative action . . . to disavow or defeat the purpose' of the conspiracy."  *Id.* at 112–13 (alteration in original) (quoting *Hyde v. United States*, 225 U.S. 347, 369 (1912)).  "Unless a conspirator produces affirmative evidence of withdrawal, his participation in a conspiracy is presumed to continue until the last overt act by any of the conspirators."  *United States v. Diaz*, 176 F.3d 52, 98 (2d Cir. 1999) (quoting *United States v. Greenfield*, 44 F.3d 1141, 1150 (2d Cir. 1995)).  "To establish withdrawal, a defendant may show that it has taken '[a]ffirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators.'"  *Osborn*, 797 F.3d at 1067 (quoting *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 464 (1978)).

48

The Court finds that Plaintiffs plausibly allege that Bank Defendants are members of an ongoing conspiracy that they assisted in designing, and that the anticompetitive practices they challenge have "continued despite the networks' and the banks' more recent attempt to avoid antitrust liability by restructuring the Visa and Mastercard corporate entities."  (Compl. ¶ 1.) Plaintiffs' factual allegations state the following, which the Court accepts as true for the purpose of deciding this motion: Bank Defendants are or were during a relevant period represented on the Boards of Directors of Visa and/or Mastercard when the Boards collectively fixed and imposed anticompetitive fees and restraints, and that all of the Bank Defendants participated in and committed the conspiracies alleged, (*id.* ¶ 38); prior to the IPOs, the Second Circuit recognized in *Visa U.S.A.*, 344 F.3d 229, that Visa and Mastercard were not single entities, but "consortiums of competitors," owned and operated by their member banks, (*id.* ¶ 44); after the Second Circuit's decision in *Visa U.S.A.*, Mastercard's legal department "realized" they "had been adjudicated a 'structural conspiracy,'" and began to review their governance structure; Visa estimated damages from interchange fee lawsuits to run as high as $50 billion by 2006 and similarly began talks of restructuring, (*see id.* ¶¶ 167–68, 219–23 (citations omitted)); after the IPOs and to the date of the filing of the Complaint, the issuing and acquiring banks still agree to receive and/or apply uniform schedules of interchange fees to payment transactions, (*id.* ¶ 43); and, since the IPOs, interchange fees have increased several times, (*id.* ¶ 253).

Plaintiffs argue that the restructurings are similar "to members of a cartel who, having been caught fixing prices . . . spin-off their competing business to a new 'single entity,' with the explicit understanding and with structural guarantees that the new 'single entity' will continue to fix prices at the supracompetitive levels previously set by the cartel's members."  (*Id.* ¶ 252.)

In support of their allegations surrounding the relationship between Bank Defendants

and Visa and Mastercard, Plaintiffs rely on Defendants' actions and discussions surrounding the

IPOs.  Plaintiffs allege, for example, that due to the antitrust challenges being mounted,

Mastercard's Chief Risk Officer made comments at a meeting of Mastercard executives in 2003

"to th[e] effect" of saying that interchange fees would decline.  (*Id.* ¶ 172 (citation omitted).)

The member banks represented on Mastercard's Board of Directors then directed management

to conduct a strategy review regarding this threat, and Mastercard "phrased its investigation of

alternative business models as a quest to 'protect system value.'"  (*Id.* ¶ 174.)  Mastercard's

management noted that the legal risks of antitrust enforcement not only threatened the networks,

but that the "Issuing Banks [also] face the risk of lawsuits" as well.  (*Id.* ¶ 180.)  Moreover, in

2004, Mastercard's CEO made presentations to the Boards of Directors, and noted that, if due to

litigation interchange fees were reduced in the United States to be similar to the rates in

Australia, "the risk to MasterCard and its Member Banks in the United States w[ould be] a loss

of $16 billion annually, or a net present value of approximately $100 billion."  (*Id.* ¶ 184.)  The

presentations further noted that a new business model could mitigate the legal risk "while

preserving the revenue represented by Interchange Fees for its Member Banks."  (*Id.*)

Similarly, in a note to Mastercard's General Counsel, the Mastercard CEO discussed

presentations made to Board members and noted that "[t]he key IPO consideration was

addressing regulatory and legal concerns.  Another key consideration was that the 'IPO should

protect broad business interests of current members.'"  (*Id.* ¶ 187 (citation omitted).)  In

addition, when considering its new structure, the Board of Directors authorized management to

"work towards the development of a new governance and ownership structure . . . taking into

account . . . the significance of protecting the legitimate present and future interests and

concerns of MasterCard's members to the extent that they do not adversely impact the risk

50

profile of the enterprise." (*Id.* ¶ 195.)  On July 14, 2005, the Board of Directors, "composed of representatives of Member Banks," approved the IPO structure.  (*Id.* ¶ 205.)  Mastercard redeemed member banks' shares and reissued them as non-voting shares (Class B and M shares), and although voting rights were limited to Class A shares issued to the public, "the Member Banks, through their Class M shares, had certain veto powers."  (*Id.* ¶¶ 206–07.)

With respect to Visa, Plaintiffs allege that "Visa testified that issuers voted to approve the restructuring only when they were convinced that their card-issuing businesses would continue to be successful."  (*Id.* ¶ 242 (citation omitted).)  In addition, Plaintiffs allege that "documents . . . clearly demonstrate that the banks held grave concerns about losing control and that these concerns drove Visa's restructuring process and the Member Banks' final approval of the restructuring plan."  (*Id.*)  For example, Plaintiffs allege that during a discussion of restructuring options with Visa International's Board of Directors, it was noted that "constraints may be imposed on the actions of the new company to give comfort to its members."  (*Id.* ¶ 243.)

Plaintiffs further allege facts to suggest that Bank Defendants hoped and expected that the pre-IPO status quo would continue post-IPO.  For example, after returning from a Mastercard Board of Directors meeting, a Citigroup executive noted to a colleague that "we . . . need to safeguard who owns/controls the company if not the Banks.  What happens if Wal-Mart or Microsoft buys it?"  (*Id.* ¶ 209.)  The executive also explained to the colleague that pursuant to discussions with Mastercard's COO, the COO "seemed very clear that any new MasterCard needed to protect and even increase Interchange to keep and attract Banks."  (*Id.* (emphasis and citation omitted).)  Other allegations indicate that Mastercard's management "very strongly indicated its intent not to compete with its [Bank] customers."  (*Id.* ¶ 210 (alteration in original)

51

(quoting Board meeting minutes) (citation omitted).)  In addition, the Capital One CEO wrote in

an email that the IPO would create "little-to-no change," while a Citi executive testified to his

understanding that Mastercard would have "the same objective, pre and post" the IPO.  (*Id.* ¶

212 (citations omitted).)  Further, in a 2005 meeting of the Nominating and Corporate

Governance Committee, the Committee noted that "[a]lthough [banks] can not govern the new

structure . . . a legitimate role must be found so they are supportive of the new enterprise and so

MasterCard does not lose their wisdom and insight."  (*Id.* ¶ 211 (alterations in original) (citation

omitted).)  Plaintiffs also allege that veto rights exist in the hands of Visa's member banks, and

that "[o]n information and belief, the Member Banks' veto rights on attempts by Visa to exit the

core payments business would allow the Member Banks to block an attempt by Visa to

eliminate Interchange Fees."  (*Id.* ¶ 251.)

Construing these facts in the light most favorable to Plaintiffs, the Court finds that they

plausibly allege that Bank Defendants were members of a conspiracy to fix supracompetitive

interchange and other fees by imposing restrictions and restraints via network rules to reduce

competition, and that these actions continued after the IPOs.  As Plaintiffs argue, these factual

allegations do not suggest withdrawal from the conspiracy or that Bank Defendants wished to

disavow the purpose of any agreement.  Rather, these factual allegations plausibly suggest that

the preference of all involved — Visa, Mastercard, and Bank Defendants — was that the

benefits to everyone continue exactly as they did prior to the IPOs.[15]

---

[15]  Commentary by leading antitrust scholars Herbert Hovenkamp and Christopher R. Leslie lends support to Plaintiffs' theory that Bank Defendants have not withdrawn from an ongoing conspiracy.  In one article, the authors note that "because Section One condemns only concerted action, [price-fixing] firms may attempt to structure their relationship to appear to be the action of a unified single entity that is beyond the reach of Section One."  Herbert Hovenkamp & Christopher R. Leslie, *The Firm as Cartel Manager*, 64 Van. L. Rev. 813, 814 (Apr. 2011).  In analyzing the Mastercard and Visa IPOs as a case study, the authors highlight

The Court finds persuasive the D.C. Circuit's decision in *Osborn* rejecting a similar argument by certain defendants in an ATM access fees antitrust case, that Visa's and Mastercard's IPO terminated any prior agreements or conspiracies, if in fact any existed. *Osborn*, 797 F.3d at 1067.  In reaching its conclusion that a horizontal conspiracy was sufficiently alleged and that member banks had failed to establish withdrawal from the alleged conspiracy, the D.C. Circuit cited, among other cases, a Second Circuit case for the proposition that "[e]ven where a member of the conspiracy appears to sever ties with other co-conspirators, there is no withdrawal if that member continues to support or benefit from the agreement." *Id.* (citing *United States v. Eisen*, 974 F.2d 246, 269 (2d Cir. 1992)).  The D.C. Circuit noted that the plaintiffs had alleged that the member banks knew and understood that they and other members would agree to be bound by rules both before and after the IPOs, that the banks continued to work with Visa and Mastercard to route transactions over the networks, that several member banks continued to benefit indirectly from the rules, and that "[b]ecause the major banks still own shares in Visa and MasterCard, it can be inferred that the banks reap some ongoing financial benefit from increased profits at Visa and MasterCard." *Id.* at 1068 (internal citation omitted).  These facts are also present in the action before this Court and support a similar result.

---

the uniqueness of the fact that the banks relinquished their voting rights "while having only a minority stake," and surmise that "[t]he likely explanation for this strategy is that the participants were seeking to limit antitrust exposure by ceding 'control' to a single firm with diverse, inactive shareholders, as opposed to a joint venture in which decisions were made by active participants," and that "[t]he intended result would be that the IPOs would be treated as single entities for antitrust purposes rather than as collaborations involving agreements among rivals." *Id.* at 869.  The authors suggest that "[e]ven though the banks are not voting decisionmakers in the firm, any rule that limits their individual behavior must be regarded as multilateral." *Id.* at 871.

The Court also finds Judge Gleeson's denial of Defendants' prior motion to dismiss instructive.  On July 18, 2014, Judge Gleeson heard oral argument on a number of issues, including Defendants' motion to dismiss claims against all Defendants, including the Bank Defendants, by MDL plaintiffs that chose to opt-out of the 2013 Settlement Agreement.  (*See* July 18, 2014 Hr'g Tr., Docket Entry No. 6342.)  Defendants argued in part that "the opt-outs fail[ed] to plead facts that could show banks conspired with Visa or MasterCard to determine their respective network rules after the IPOs," and that "the opt-outs allege[d] no facts that could show those asserted 'structural' conspiracies existed after the Visa and MasterCard IPOs."  (Defs. Mem. in Supp. of Mot. to Dismiss Opt-Out Compls. 27, No. 14-MD-1720, Docket Entry No. 21.)   During oral argument, Defendants argued that "claims based on a structural conspiracy or a horizontal conspiracy to set interchange fees or pass the MasterCard or Visa rules fail as of the date" of the IPOs.  (July 18, 2014 Hr'g Tr. 8:22–9:3.)  At the time, Defendants relied on the district court decision in *Osborn* to support their argument, which decision was consistent with Defendants' arguments.[16]  (*Id.* at 9:14–17.)  Judge Gleeson was unpersuaded, and denied the motion to dismiss the opt-out complaint.  (*Id.* at 53:3–10.)  In rejecting Defendants' argument, he "agree[d] with the plaintiffs' argument that the allegations that the defendants didn't withdraw from the illegal concerted activity and that the IPOs intact anticompetitive restraints plausibly allege a violation of the antitrust laws," and expressed his opinion that the Defendants' arguments could not be resolved on a motion to dismiss.  (*Id.* at 53:15–54:1.)

The Court is also not persuaded by Bank Defendants' reliance on *United States v.*

---

[16]   However, as discussed *supra*, the D.C. Circuit subsequently overturned the district court's decision in *Osborn*, rejecting the argument that the IPOs effectively ended the conspiracies.

*Grimm*, 738 F.3d 498, to support their argument that Plaintiffs have not shown ongoing concerted action.  Bank Defendants argue that in *Grimm*, a "five-year statute of limitations required the government to allege overt acts after July 2004," but "[w]hile the indictment contained numerous allegations of overt joint actions by the defendants before that date, the only allegation after July 2004 was the payment and receipt of interest under the purportedly fraudulent agreements entered years earlier."  (Defs. Mem. 21.)  Bank Defendants contend that the Second Circuit "rejected the indictment, ruling that the interest payments were the mere '*result* of a completed conspiracy, and [were] not in furtherance of one that is ongoing.'"  (*Id.* at 21–22 (citing *Grimm*, 738 F.3d at 503).)  Thus, Bank Defendants argue that *Grimm* compels dismissal of the claims against them "[b]ecause [P]laintiffs do not allege any post-IPO overt acts — no meetings, communications, or other actions purporting to reflect an agreement — by the [B]ank [D]efendants to collectively set, adjust, or even agree to follow the challenged rules."  (*Id.* at 22.)  Bank Defendants' emphasis on *Grimm* is misplaced.  Unlike in *Grimm*, Plaintiffs allege far more than the passive receipt of interest payments.  Plaintiffs allege that Bank Defendants were invested in the continuation of the status quo and receipt of interchange fees, and that they continue to actively enter into agreements to adhere to and enforce anticompetitive restraints.

The Court finds that Plaintiffs have alleged facts to plausibly suggest that Bank Defendants have continued participating in a conspiracy.

### ii.  Plaintiffs have sufficiently alleged a hub-and-spoke conspiracy and unlawful agreement

In addition to having sufficiently alleged the continuation of a conspiracy after the IPOs, the Court finds that Plaintiffs have also sufficiently alleged that "Banks are members of classic hub-and-spoke conspiracies."  (Pls. Mem. 12.)  Plaintiffs argue in the alternative that following

the IPOs, Bank Defendants "have, in effect, hired each of Visa and Mastercard to be the manager of a cartel whose essential agreement . . . is that no member bank shall compete on price against another member for merchants' business."  (*Id.* (citing Compl. ¶ 252).)

Bank Defendants argue that Plaintiffs' argument and allegations "are structurally similar to cases where litigants have attempted to rely on 'hub-and-spoke' conspiracies without showing any agreement between the alleged 'spokes' of the conspiracy," (Defs. Mem. 20), and further argue that "[P]laintiffs ignore the holding of *Bell Atlantic Corp. v. Twombly* that parallel conduct, standing alone, does not plausibly allege a conspiracy," (Defs. Reply 7).

"[C]ourts have long recognized the existence of 'hub-and-spoke' conspiracies in which an entity at one level of the market structure, the 'hub,' coordinates an agreement among competitors at a different level, the 'spokes.'"  *Apple*, 791 F.3d at 314 (citation omitted); *see also In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 690–91 (S.D.N.Y. 2012) ("A hub-and-spoke conspiracy 'involves a hub, generally the dominant purchaser or supplier in the relevant market, and the spokes, made up of the distributors involved in the conspiracy.  The rim of the wheel is the connecting agreements among the horizontal competitors (distributors) that form the spokes.'" (quoting *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 255 (3d Cir. 2010))).

"To allege an unlawful agreement" under Section 1 of the Sherman Act, including in the context of hub-and-spoke conspiracies, "[p]laintiffs must assert either direct evidence (such as a recorded phone call or email in which competitors agreed to fix prices) or 'circumstantial facts supporting the *inference* that a conspiracy existed.'"  *See In re Commodity Exch.*, 213 F. Supp. 3d at 659 (quoting *Mayor & City Council of Baltimore (City of Baltimore) v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013)).  "Because unlawful conspiracies tend to form in secret,

56

such proof will rarely consist of explicit agreements." *In re Elec. Books Antitrust Litig.*, 859 F.
Supp. 2d at 681. Direct evidence of a conspiracy or agreement "is not required, as concrete,
'smoking gun' proof of an illegal conspiracy between sophisticated actors 'can be hard to come
by, especially at the pleadings stage.'" *Alaska Elec. Pension Fund*, 175 F. Supp. 3d at 54
(quoting *City of Baltimore*, 709 F.3d at 136). "Instead, circumstantial facts supporting
the *inference* that a conspiracy existed are sufficient." *Id.* (citation and internal quotation marks
omitted); *In re Commodity Exch.*, 213 F. Supp. 3d at 659 ("[C]onspiracies 'nearly always must
be proven through inferences that may fairly be drawn from the behavior of the alleged
conspirators,' [and] the [c]ourt cannot take [p]laintiffs' failure to present direct evidence as a
sign that no conspiracy existed." (quoting *In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
74 F. Supp. 3d at 591 (quoting *Anderson News*, 680 F.3d at 183))).

  In the context of horizontal conspiracies, while evidence of "parallel conduct can be
probative . . . [of] an antitrust conspiracy," such evidence "alone will not suffice." *Apex Oil Co.
v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987); *see also Twombly*, 550 U.S. at 557 ("[A]n
allegation of parallel conduct and a bare assertion of conspiracy will not suffice."); *In re Zinc
Antitrust Litig.*, 155 F. Supp. 3d 337, 366 (S.D.N.Y. 2016) ("In cases in which there is obvious
parallel conduct and the question is whether it is the product of coordinated or unilateral
decision making, a plaintiff must allege additional facts that point toward a meeting of the
minds." (citing *Twombly*, 550 U.S. at 557)); *City of Baltimore*, 709 F.3d at 136 ("[A] horizontal
agreement . . . 'may be inferred on the basis of conscious parallelism, when such interdependent
conduct is accompanied by circumstantial evidence and plus factors.'" (quoting *Todd v. Exxon
Corp.*, 275 F.3d 191, 198 (2d Cir. 2001)). "[A] showing of parallel 'business behavior is
admissible circumstantial evidence from which the fact finder may infer agreement,'" but

"[e]ven 'conscious parallelism,' a common reaction of 'firms in a concentrated market [that] recogniz[e] their shared economic interests and their interdependence with respect to price and output decisions' is 'not in itself unlawful.'" *Twombly*, 550 U.S. at 553–54 (first quoting *Theatre Enters.*, 346 U.S. at 540–41; and then quoting *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993)).

"Accordingly, [] a plaintiff must show the existence of additional circumstances, often referred to as plus factors, which, when viewed in conjunction with the parallel acts, can serve to allow a fact-finder to infer a conspiracy." *Apple*, 791 F.3d at 315 (citation and internal quotation marks omitted); *see also Alaska Elec. Pension Fund*, 175 F. Supp. 3d at 54 ("[A] horizontal agreement or conspiracy . . . 'may be inferred on the basis of conscious parallelism when such interdependent conduct is accompanied by circumstantial evidence and plus factors.'" (quoting *Todd*, 275 F.3d at 198)). "These 'plus factors' may include: a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *City of Baltimore*, 709 F.3d at 136 (citation omitted). "[T]hese plus factors are neither exhaustive nor exclusive, but rather illustrative of the type of circumstances which, when combined with parallel behavior, might permit a jury to infer the existence of an agreement." *Id.* at 136 n.6.

For the following reasons, the Court finds that Plaintiffs have sufficiently alleged facts to plausibly infer that Bank Defendants are members of a hub-and-spoke style conspiracy and agreement.

1.  **Plaintiffs have alleged agreement between the "spokes," i.e., Bank Defendants, and more than simple membership in a trade association**

Bank Defendants argue that "[P]laintiffs' allegations . . . are structurally similar to cases where litigants have attempted to rely on 'hub-and-spoke' conspiracies without showing any agreement between the alleged 'spokes' [i.e., the Bank Defendants] of the conspiracy.  These 'rimless wheel' conspiracies are routinely rejected by courts across the country, including by the Second Circuit."  (Defs. Mem. 20–21.)  Bank Defendants further argue that "[d]ismissal here is . . . warranted no less than in *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008), where the Ninth Circuit affirmed dismissal of a complaint alleging a similar conspiracy by Visa, Mastercard, and several banks that are members of the networks to fix interchange and other fees."  (*Id.* at 20.)

Plaintiffs argue that "[t]he Banks are members of classic hub-and-spoke conspiracies," and that "[t]he Complaint repeatedly alleges that the rules — the Unlawful Restraints — are *ongoing agreements among the Banks, and between the Banks and the Networks, to which the Banks are culpable parties*."  (Pls. Mem. 12 (citing Compl. ¶¶ 23, 25, 27, 30, 33, 35, 36, 42, 156, 212, 246, 252, 260).)  They argue that, "[a]s issuers, the Banks agree and adhere to the Unlawful Restraints; [and] as acquirers, they agree to impose those restraints on the merchants."  (*Id.*)

As noted *supra*, hub-and-spoke "arrangements consist of both vertical agreements between the hub and each spoke and a horizontal agreement among the spokes 'to adhere to the [hub's] terms,' often because the spokes 'would not have gone along with [the vertical agreements] except on the understanding that the other [spokes] were agreeing to the same

thing.'"[17]  *Apple*, 791 F.3d at 314 (alterations in original) (quoting VI Phillip E. Areeda &

Herbert Hovenkamp, Antitrust Law ¶ 1402c (3d ed. 2010) (citing *PepsiCo, Inc. v. Coca–Cola

Co.*, 315 F.3d 101 (2d Cir. 2002)); *see also In re Zinc Antitrust Litig.*, 155 F. Supp. 3d at 376

("Existing case law makes clear that a hub-and-spoke theory is cognizable under Section 1 only

if there are both vertical agreements between the hub and each spoke, and also a horizontal

agreement among the various spokes with each other.").  "Acceptance by competitors without

previous agreement, of an invitation to participate in a plan, the necessary consequence of

which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful

conspiracy under the Sherman Act."  *Interstate Circuit v. United States*, 306 U.S. 208, 227

(1939); *see also Dickson v. Microsoft Corp.*, 309 F.3d 193, 205 (4th Cir. 2002) ("The co-

conspirators need not share the same motive or goal; it is sufficient to allege that the co-

conspirators 'acquiesc[ed] in an illegal scheme.'" (quoting *United States v. Paramount Pictures,

Inc.*, 334 U.S. 131, 161 (1948))).

The Court finds that the Complaint states allegations akin to those found in other major

hub-and-spoke conspiracy cases.  *See, e.g.*, *Interstate Circuit*, 306 U.S. 208; *In re Elec. Books

Antitrust Litig.*, 859 F. Supp. 2d 671.  In *In re Electric Books Antitrust Litigation*, the court

found that the plaintiffs plausibly alleged that Apple and multiple publishers engaged in a hub-

and-spoke conspiracy to raise prices for eBooks.  The court found that the plaintiffs "plausibly

alleged that the publishers signing of agency agreements with Apple and demands that Amazon

accept the agency model would have contravened that defendant's self-interest in the absence of

---

[17]  "A horizontal agreement is an 'agreement between competitors at the same level of the market structure,' while a vertical agreement is a 'combination[ ] of persons at different levels of the market structure.'"  *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d at 376 (alteration in original) (quoting *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972)).

similar behavior by its rivals."  859 F. Supp. 2d at 683 (citation omitted).  In reaching its

conclusion, the court relied on a bedrock hub-and-spoke conspiracy case, *Interstate Circuit v.*

*United States*, 306 U.S. 208, which it described as follows:

> The defendants in *Interstate Circuit* consisted of a group of film distributors and a separate group of film exhibitors.  Interstate Circuit was one of the exhibitors, and it held a monopoly over the exhibition of movies in first-run theaters in a number of Texas cities.  Interstate's general manager sent identical letters to eight branch managers of the distributor companies, each of which included the names of all eight companies as addressees and proposed identical deal terms.  In exchange for allowing the distributors to continue showing their films in its cinemas, Interstate Circuit would require that the distributors refuse to sign a deal with *any* theater that charged below 25 cents for certain films or that showed double features under certain conditions.  These restrictions were designed to limit the ability of Interstate's competitors, principally subsequent-run theaters, to compete with Interstate.  All eight distributors agreed to the proposal.

*In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d at 684–85 (internal citations omitted).

In *Interstate Circuit*, the Supreme Court found that explicit agreement was not necessary

to constitute an unlawful conspiracy.  It instead found that:

> It was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it.  Each distributor was advised that the others were asked to participate; each knew that cooperation was essential to successful operation of the plan . . . . The evidence is persuasive that each distributor early became aware that the others had joined.  With that knowledge they renewed the arrangement and carried it into effect for the two successive years.

*Interstate Circuit*, 306 U.S. at 226–27.

The court in *In re Electronic Books Antitrust Litigation* compared the facts of *Interstate*

*Circuit* and another case, *Toys "R" Us, Inc. v. Federal Trade Commission*, 221 F.3d 928 (7th

Cir. 2000), to the complaint before it, and noted that "[j]ust like *Toys 'R' Us* and *Interstate*

*Circuit*, Apple coordinated a series of substantively-identical vertical agreements and made

61

clear to its vertical partners that it was offering each of them a similar deal." *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d at 685.

Plaintiffs have pled similar facts to suggest the hybrid existence of both vertical and horizontal conspiracies. Plaintiffs contend that "[e]ven after the corporate restructuring of Visa and MasterCard . . . . [e]ach of the Bank Defendants . . . has agreed that it will adhere to the anticompetitive Visa and MasterCard rules and default interchange schedules." (Compl. ¶ 42.) The facts allege that Bank Defendants, even after the IPOs, effectively knew when they signed these vertical agreements with Visa and Mastercard that the other Bank Defendants essentially would enter into identical deals, because Bank Defendants, via their representation on the Boards of Directors, helped approve and orchestrate the restructuring. Plaintiffs argue that "[i]t would be plainly contrary to the economic self-interest of a member bank to *independently* agree to a supracompetitive price for its cards, or to restraints that prohibit merchants from *steering purchasers to its cards* (by surcharging its competitors' cards, declining to take its competitors' cards, or discounting its own cards)." (Pls. Mem. 16.) Thus, Plaintiffs suggest that logically, it would be disadvantageous for Bank Defendants to adhere to the restraints unless they possessed knowledge that all others similarly situated would also adhere to those same restraints that allegedly prevent competition that might affect interchange fee rates. The Court finds that at the pleadings stage, these allegations of agreement and knowledge are sufficient to allege hub-and-spoke conspiracies and that the facts are similar to facts in cases where courts have found hub-and-spoke conspiracies to have been plausibly alleged. *See In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 244–45 (S.D.N.Y. 2019) (rejecting the defendant's argument at the pleadings stage that the plaintiff had "fail[ed] to allege any agreement among the 'spokes'" in part because the plaintiff had alleged

that the defendant created an exclusionary system of noncompetition agreements and that

"coffee and other beverage brands that enter into a license or manufacturing agreement with

[defendant] do so with the express knowledge of [defendant's] anticompetitive agreements with

other competitor roasters and brands"); *Meyer v. Kalanick*, 174 F. Supp. 3d 817, 824 (S.D.N.Y.

2016) (declining, at the pleadings stage, to dismiss plaintiff's allegations of horizontal

conspiracy where plaintiff "alleged a conspiracy in which drivers sign up for Uber precisely 'on

the understanding that the other [drivers] were agreeing to the same' pricing algorithm, and in

which drivers' agreements with Uber would 'be against their own interests were they acting

independently.'  Further, drivers' ability to benefit from reduced price competition with other

drivers by agreeing to Uber's Driver Terms plausibly constitutes 'a common motive to

conspire.'" (first quoting *Apple*, 791 F.3d at 314, 320; and then quoting *Apex Oil*, 822 F.2d at

254)); *Laumann v. Nat'l Hockey League*, 907 F. Supp. 2d 465, 486–87 (S.D.N.Y. 2012)

("[W]here parties to vertical agreements have knowledge that other market participants are

bound by identical agreements, and their participation is contingent upon that knowledge, they

may be considered participants in a horizontal agreement in restraint of trade."); *see also Meyer*,

174 F. Supp. 3d at 825 ("It is fundamental to the law of conspiracy that the agreements that

form the essence of the misconduct are not to be judged by technical niceties but by practical

realities.  Sophisticated conspirators often reach their agreements as much by the wink and the

nod as by explicit agreement, and the implicit agreement may be far more potent, and sinister,

just by virtue of being implicit.").

      In contrast, and for the reasons set forth *supra*, the Court finds that the "rimless wheel"

cases[18] that Bank Defendants cite are inapplicable and distinguishable, because Plaintiffs have sufficiently alleged the plausibility of knowledge on the part of Bank Defendants to constitute the rim to connect the spokes between Bank Defendants. *See, e.g.*, *PepsiCo*, 315 F.3d at 110 (finding, *at the summary judgment stage*, that plaintiffs had "failed to proffer sufficient *evidence* of a horizontal agreement"); *Impro Prod., Inc. v. Herrick*, 715 F.2d 1267, 1280 (8th Cir. 1983) (upholding a district court opinion, similarly to *PepsiCo*, *at the summary judgment stage*, dismissing in favor of defendants for failure to prove a hub-and-spoke conspiracy in part because the record showed "that none of the corporate defendants knew that [the hub] had consulting agreements with any of the other corporate defendants"); *Dickson*, 309 F.3d at 203 (finding at the motion to dismiss stage that plaintiff "d[id] not [even] argue that it is able to meet the test for establishing a 'rim' between [defendants]" and "[i]nstead . . . urge[d] [the Fourth Circuit] to follow [an out-of-Circuit approach], which [plaintiff] assert[ed] ha[d] adopted the proposition that a rimless wheel conspiracy constitutes a single, general conspiracy in the context of the Sherman Act").

In addition, the Court finds that Plaintiffs' allegations more plausibly allege a hub-and-spoke conspiracy than the allegations before the Ninth Circuit in *Kendall*, an admittedly similar case. Bank Defendants cite *Kendall*, 518 F.3d 1042, for the proposition that "merely charging, adopting or following the fees set by a Consortium is insufficient as a matter of law to constitute a violation of Section 1 of the Sherman Act." (Defs. Mem. at 20 (citing *Kendall*, 518 F.3d 1042).) In *Kendall*, merchants similarly brought antitrust claims against card companies and

---

[18] "A rimless wheel conspiracy is one in which various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other than the common defendant's involvement in each transaction." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203 (4th Cir. 2002) (citing *Kotteakos v. United States*, 328 U.S. 750, 755 (1946)).

banks regarding supracompetitive fees.  The Ninth Circuit affirmed the district court's determination that the plaintiffs had failed to state a Sherman Act claim against the banks, emphasizing that "membership in an association does not render an association's members automatically liable for antitrust violations committed by the association," *Kendall*, 518 F.3d at 1048 (citing *Kline v. Coldwell Banker & Co.*, 508 F.2d 226, 232 (9th Cir. 1974)), and holding that "merely charging, adopting or following the fees set by a Consortium is insufficient as a matter of law to constitute a violation of Section 1 of the Sherman Act."  *Id.*  Similarly, in *B & R Supermarket, Inc. v. Visa, Inc.*, No. 16-CV-01150, 2016 WL 5725010 (N.D. Cal. Sept. 30, 2016), a case that has since been transferred to this Court and which Bank Defendants also cite, District Judge William Alsup dismissed claims against Bank Defendants in an action brought by merchants against card companies and banks for conspiring to shift liability for fraudulent card charges, in an analysis that heavily relied on *Kendall*.  *See id.* at *10–11.

In *Kendall*, the Ninth Circuit emphasized the insufficiency of the allegations against the banks:

> Appellants do not allege any facts to support their theory that the Banks conspired or agreed with each other or with the Consortiums to restrain trade. Although appellants allege the Banks "knowingly, intentionally and actively participated in an individual capacity in the alleged scheme" to fix the interchange fee or the merchant discount fee, this allegation is nothing more than a conclusory statement.   There  are  no  facts  alleged  to  support  such  a conclusion.   Even after the depositions taken, the complaint does not answer the basic questions: who, did what, to whom (or with whom), where, and when?

*Kendall*, 518 F.3d at 1048 (citations omitted).

However, in *Osborn*, the D.C. Circuit found *Kendall* distinguishable, because the facts and allegations relied on by the plaintiffs in *Kendall* were vaguer than those relied on by the plaintiffs in *Osborn*.  Similarly, as discussed *supra*, Plaintiffs allege far more than Bank

65

Defendants' mere adoption of rules and membership in an association.  *See Osborn*, 797 F.3d at 1067 (citing *Kendall* and noting that while defendants were correct in noting that mere associational membership is insufficient to establish participation in a conspiracy, "the [p]laintiffs [did] much more than allege 'mere membership.'  They . . . alleged that the member banks *used* the bankcard associations to adopt and enforce a supracompetitive pricing regime for ATM access fees.").

Moreover, in contrast to the Ninth Circuit's pronouncement in *Kendall*, suggesting that a complaint should answer the basic questions of "who, did what, to whom (or with whom), where, and when," *Kendall*, 518 F.3d at 1048, the Second Circuit has held that in cases where parallel conduct is alleged, this Circuit does not require such specificity.  *See Starr*, 592 F.3d at 325 ("[T]he claim of agreement rests on the parallel conduct described in the complaint. Therefore, plaintiffs were not required to mention a specific time, place or person involved in each conspiracy allegation."); *see also Hinds Cty., Miss. v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 394 (S.D.N.Y. 2010) ("In *Starr* . . . the Second Circuit rejected the defendants' argument that *Twombly* requires a plaintiff to identify the specific time, place or person related to each antitrust conspiracy allegation.").

### 2.   Plaintiffs have alleged more than parallel conduct

Bank Defendants argue that "Plaintiffs' reliance on hub-and-spoke conspiracy cases is . . . misplaced, because all of them, unlike here, involved more than alleged parallel conduct." (Defs. Reply 8.)  Bank Defendants also argue that "[P]laintiffs ignore the holding of *Bell Atlantic Corp. v. Twombly* that parallel conduct, standing alone, does not plausibly allege a conspiracy."  (*Id.* at 7.)

Plaintiffs rely on several factual allegations to refute Bank Defendants' claims that Bank

Defendants are simply proceeding in parallel without more, including that Bank Defendants, without conspiring, would not have any independent economic incentive to agree to anti-steering and other restraints.  Plaintiffs argue that "[i]t would be plainly contrary to the economic self-interest of a member bank to *independently* agree to a supracompetitive price for its cards, or to restraints that prohibit merchants from *steering purchasers to its cards* (by surcharging its competitors' cards, declining to take its competitors' cards, or discounting its own cards)."  (Pls. Mem. 16.)

Further, Plaintiffs allege that after the IPOs, Bank Defendants "continue to conspire" to fix fees and impose restraints, agreeing, as network members, that Visa and Mastercard may apply uniform default interchange fee schedules, and agreeing to adhere to Visa and Mastercard's anticompetitive network rules.  (Compl. ¶ 42.)  The "[a]cquiring banks enter into acceptance contracts with Merchants agreeing either implicitly or explicitly" that the networks' uniform schedule of interchange fees will apply to all merchant transactions made through the networks' payment cards, and with the understanding that the same uniform schedule of fees will be applied to transactions conducted by every other acquiring bank for the same merchants. (*Id.* ¶ 43.)  Plaintiffs also allege that similarly, "[i]ssuing banks enter into issuing contracts with Visa and MasterCard, agreeing and understanding that they will receive Interchange Fees from Merchants based on the Visa and MasterCard's uniform schedule of Interchange Fees."  (*Id.*)

In addition to the reasoning set forth *supra* as to why Plaintiffs have sufficiently alleged a hub-and-spoke antitrust conspiracy, the Court finds that Plaintiffs have sufficiently alleged certain "plus factors" that when considered plausibly suggest that Bank Defendants' actions more than mere parallel conduct.  *See City of Baltimore*, 709 F.3d at 136 ("[P]lus factors may include: a common motive to conspire, evidence that shows that the parallel acts were against

the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." (citation and internal quotation marks omitted)).

First, Plaintiffs have alleged that Bank Defendants have a common motive to conspire. In support they allege that because the networks require member banks to issue cards bearing the Visa and Mastercard marks, "all Member Banks . . . have a common economic interest in ever-rising Interchange Fees," and "all Member Banks benefit from the supracompetitive Interchange Fees." (Compl. ¶¶ 127–28.) "A '[m]otive to conspire may be inferred where the parallel action taken [by defendants] had the effect of creating a likelihood of increased profits.'" *In re Commodity Exch.*, 213 F. Supp. 3d at 662 (quoting *Anderson News*, 123 F. Supp. 3d at 500). Issuing banks earn revenue from the interchange fees, and acquiring banks earn revenue from the difference between the merchant discount fee and interchange fee. (Compl. ¶ 85.) Thus, Plaintiffs' allegations plausibly suggest that it is the Bank Defendants more than other actors that would benefit from increasing interchange fees. *See Alaska Elec. Pension Fund*, 175 F. Supp. 3d at 55 ("Plaintiffs allege that [d]efendants had a common motive to conspire — namely that [d]efendants were major players in the market for interest rate derivatives who were jointly motivated by a desire to maximize profits by manipulating the ISDAfix benchmark rates."); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d at 594 (finding that the "[d]efendants' argument that the conspiracy does not make economic sense [was] unavailing at the pleading stage" and that the plaintiffs "proffered a plausible rationale that must await closer scrutiny at a later stage: sharing customer orders and net positions . . . allowed [d]efendants to take large proprietary positions and make trades that would have been too risky to undertake absent collusion").

Second, Plaintiffs have alleged that investigatory and regulatory actions have been taken

68

with respect to the alleged conspiracies.  As noted *supra* in the discussion of industry changes that have occurred throughout the course of litigation, the actions of all Defendants have been subject to investigations by DOJ and their conduct has been regulated through the Durbin Amendment.  In addition, Defendants' conduct has been investigated, litigated, and regulated in many jurisdictions around the world, with decisions that acknowledge the Bank Defendants' role in the conspiracy.  For example, the European Court of Justice has held that Mastercard's IPO did not affects its status under the European Union's Sherman Act "contract, combination, or conspiracy" element "because when Interchange Fees and Rules are set, the banks 'intend or at least agree to coordinate their conduct by means of those decisions,' and that the decisions on Interchange Fees and the Rules have 'the same objective of joint regulation of the market within the framework of the same organization, albeit under different forms.'"  (Compl. ¶ 305 (citation omitted).)  In addition, the European Parliament has capped interchange fees and the Reserve Bank of Australia ordered lowering interchange fees after investigations.  (*Id.* ¶¶ 307, 309.)  The Court finds that these domestic and global actions further support an inference of conspiracy. *See Starr*, 592 F.3d at 324 (taking into consideration as a plus factor that the defendants' price-fixing behavior was under investigation by DOJ and the New York State Attorney General); *Alaska Elec. Pension Fund*, 175 F. Supp. at 55 (noting that the complaint alleged ongoing government investigation and that "[t]he mere existence of such investigations," when combined with parallel behavior, might allow a jury to infer agreement (citation omitted)); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d at 592 (finding that "penalties and fines levied by regulators in three countries against six [d]efendants as a result of some of the investigations detailed in the U.S. [c]omplaint and for the very conduct alleged in the [c]omplaint," provided "non-speculative support for the inference of a conspiracy," and noting

that "while the fact of a single investigation may not be probative, the detailed allegations of investigations . . . by regulators in seemingly every significant financial market in the world lends some credence to the conspiracy allegation"); *Hinds Cty.*, 700 F. Supp. 2d at 394–95 (noting that "government investigations may be used to bolster the plausibility of § 1 claims," and taking under consideration a grand jury indictment, Securities and Exchange Commission order, and investigations by DOJ and state attorneys general).

The Court also finds that numerous other unique facets of the current action constitute additional support and plus factors from which Bank Defendants' involvement in an antitrust conspiracy can be inferred.  For example, the Court finds Defendants' corporate structures to be relevant.  The Bank Defendants were previously represented on the Boards of Directors of the networks, and were therefore active in approving the new corporate structures that resulted from the IPOs.  Comments made by bank representatives during the restructurings support an inference that Bank Defendants hoped, and presumed, that member banks of the networks would continue to operate in a uniform manner and receive interchange fees in the same manner as prior to the IPOs.  The CEO of Capital One wrote in an email that the Mastercard IPO would cause "little to no change," and a Citi executive testified to his understanding that Mastercard would have "'the same objective, pre and post' IPO."  (Compl. ¶ 212 (citations omitted).).  In addition, an email from a Chase executive "relayed her conversation with" a Chase representative on the Visa U.S.A. Board "about 'how [Chase can] really retain control over structure and governance,'" which the executive admitted later that "when she wrote this email, she was 'thinking about the extent to which [Chase] could retain control over [structure and governance of Visa].  And specifically it was how do we — or can we prevent Visa from becoming a competitor of ours."  (*Id.* ¶¶ 228–30 (alterations in original) (citation omitted).).

70

These allegations suggest more than mere parallel conduct occurred and support an inference that there was tacit agreement as to how to proceed, a unity of purpose, and that there remained "a conscious commitment to a common scheme," even after the IPOs.  *Apple*, 791 F.3d at 315 (quoting *Monsanto*, 465 U.S. at 764); *see also In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d at 591 ("[A] complaint must allege facts that show 'joint or concerted action' that 'reveal[s] "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement."'" (quoting *Anderson News, L.L.C.*, 680 F.3d at 183 (quoting *Monsanto*, 465 U.S. at 761))).

### iii.  *Twombly* does not compel a contrary result

Bank Defendants rely on *Twombly* to reiterate their argument that allegations of parallel conduct, without more, cannot survive a motion to dismiss a conspiracy complaint.  (Defs. Mem. 18 (citation omitted).)  However, the facts in *Twombly* are distinguishable.  In *Twombly*, the Supreme Court held that a putative class action's Section 1 of the Sherman Act antitrust complaint could not survive a motion to dismiss where it only alleged that companies engaged in parallel conduct, "absent some factual context suggesting agreement, as distinct from identical, independent action."  *Twombly*, 550 U.S. at 548–49.  The Supreme Court held that "when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."  *Id.* at 557; *see also City of Baltimore.*, 709 F.3d at 136 (noting that in *Twombly*, "all [plaintiffs] alleged as circumstantial facts were parallel actions by the competitors" (citation omitted)); *Alaska Elec. Pension Fund*, 175 F. Supp. 3d at 54 ("The ultimate question is whether allegations of parallel conduct are 'placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that

could just as well be independent action.'" (quoting *Twombly*, 550 U.S. at 557)).

Unlike the plaintiffs in *Twombly*, Plaintiffs allege facts supporting a conspiracy between Defendants prior to the IPOs, which directly places Plaintiffs' allegations of parallel conduct in the context of a preceding agreement, (which was absent from the allegations in *Twombly*), and support an inference of more than simple parallel conduct.  In addition, and in contrast to the fact that the "plaintiffs [in *Twombly*] . . . proceed[ed] *exclusively* via allegations of parallel conduct," *Twombly,* 550 U.S. at 565 n.11 (emphasis added), as noted *infra*, Plaintiffs have also sufficiently pled plus factors to plausibly allege a Section 1 violation.

Bank Defendants also rely on *Twombly* to argue that there is an "obvious alternative explanation" to the parallel conduct alleged because it is in their "individual self-interest to do so."  (Defs. Mem. 19.)

 The Supreme Court in *Twombly* rejected the plaintiffs' theory that the lack of competition between the horizontally situated companies at issue was indicative of conspiracy, because there instead existed "an obvious alternative explanation" — that monopoly was previously "the norm in telecommunications, not the exception," a norm that was "Government-sanctioned." *Twombly,* 550 U.S. at 567–68.  In *Twombly*, the companies being accused of conspiracy had effectively previously existed as state-sanctioned monopolies, comprising seven regional telephone service monopolies, until Congress withdrew its approval of the monopolies in the Telecommunications Act of 1966. *See Starr*, 592 F.3d at 322.  After the Telecommunications Act was passed, the plaintiffs in *Twombly* alleged that the failure of the former monopolies "to compete with one another . . . supported the allegation that the [former monopolies] entered into a conspiracy to prevent entry into their local markets and agreed to refrain from competing with one another." *Id.* (citation omitted).  The Supreme Court rejected

72

this argument, reasoning that "given that prior to the Telecommunications Act of 1996 monopoly was the norm, rather than the exception, 'a natural explanation for the noncompetition alleged is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same.'" *Id.* at 322–23 (quoting *Twombly*, 550 U.S. at 568).

Unlike in *Twombly*, where conduct was sanctioned by the government prior to being prohibited by Congress, Bank Defendants cannot rely on any such prior sanctioning of their allegedly unlawful conduct to provide an "obvious alternative explanation" in the way that Bank Defendants encourage. Instead, the networks and banks took action to alter their structures in response to the threat of antitrust liability, and as discussed *supra*, the present Complaint alleges specific facts, unlike in *Twombly*, that Bank Defendants' parallel conduct is the result of a conspiracy as opposed to independent behavior. In contrast, "nothing in the [*Twombly*] complaint intimate[d] that the resistance to the upstarts was anything more than the natural, unilateral reaction of each [former monopoly] intent on keeping its regional dominance." *Twombly*, 550 U.S. at 566. Bank Defendants previously engaged in coordinated action, and the structure that resulted cannot be said to be unilateral and natural in the way that monopolistic tendencies were in the *Twombly* case.

The Court is mindful of the plausibility of Bank Defendants' argument — that the Bank Defendants simply exist as members of the networks and adhere to agreements independently of one another because it is in their individual best interest to do so, and not, as Plaintiffs' suggest, because they know and rely on the fact that all other member banks will adhere to the same structure. However, at this stage of the proceedings, "plausibility is a standard lower than probability," and while "a given set of actions may well be subject to diverging interpretations,

73

each of which is plausible," "[t]he choice between or among plausible inferences or scenarios is one for the factfinder." *Anderson News*, 680 F.3d at 184 (citation omitted); *see also In re Commodity Exch.*, 213 F. Supp. 3d at 659 ("At the pleading stage, [p]laintiffs 'need not show that [their] allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action'" (quoting *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2016) (quoting *Anderson News*, 680 F.3d at 184))); *Alaska Elec. Pension Fund*, 175 F. Supp. 3d at 55–56 (noting that although defendants offered "plausible non-collusive explanations for many of the facts alleged," ultimately, "'[t]he choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion.'" (quoting *Anderson News*, 680 F.3d at 185)).  "The question at the pleading stage is not whether there is a plausible alternative to the plaintiff's theory; the question is whether there are sufficient factual allegations to make the complaint's claim plausible." *Anderson News*, 680 F.3d at 189.  Thus, regardless of whether Bank Defendants have presented their own plausible narrative to explain their conduct, the facts that Plaintiffs allege are sufficient to allow the case to proceed against Bank Defendants.

\* \* \*

Accordingly, because Plaintiffs have standing and have plausibly alleged that Bank Defendants are part of a conspiracy to unlawfully benefit from supracompetitive interchange fees, the Court denies Bank Defendants' motion to dismiss the claims against them.  *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)) ("The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.").

### III.   Conclusion

For the foregoing reasons, the Court denies Bank Defendants' motion to dismiss.

Dated:  November 20, 2019
       Brooklyn, New York

SO ORDERED:


_____s/ MKB_____
MARGO K. BRODIE
United States District Judge