UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------

IN RE PAYMENT CARD INTERCHANGE FEE
AND MERCHANT DISCOUNT ANTITRUST
LITIGATION

**MEMORANDUM & ORDER**
05-MD-1720 (MKB) (JO)

This document refers to: ALL ACTIONS

--------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

A putative Rule 23(b)(3) class of over twelve million nationwide merchants brought an

antitrust action under the Sherman Act, 15 U.S.C. §§ 1 and 2, and state antitrust laws, against

Defendants Visa and Mastercard networks, as well as various issuing and acquiring banks.[1]  *See*

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 986 F. Supp. 2d 207, 213,

223 (E.D.N.Y. 2013) ("*Interchange Fees I*"), *rev'd and vacated*, 827 F.3d 223 (2d Cir. 2016)

("*Interchange Fees II*"); (First Consolidated Am. Class Action Compl., Docket Entry No. 317.)

Plaintiffs are merchants that accept or accepted Visa- and Mastercard-branded cards, and have

alleged that Defendants harmed competition and charged the merchants supracompetitive fees by

creating unlawful contracts and rules and by engaging in various antitrust conspiracies.  *See*

*Interchange Fees I*, F. Supp. 2d at 13; *Interchange Fees II*, 827 F.3d at 228–29.

---

[1]  The putative Rule 23(b)(3) class sought relief in the form of monetary damages, and
brought the action along with a separate class that sought equitable relief.  (*See* First
Consolidated Am. Class Action Compl. 1, Docket Entry No. 317.)  At the earliest stages of this
litigation, multiple class actions, as well as individual lawsuits by large retailers, were filed
against Defendants.  All actions were consolidated together into a multi-district litigation in 2005
(the "MDL").  *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 986 F.
Supp. 2d 207, 220 n.12 (E.D.N.Y. 2013) ("*Interchange Fees I*").  Since the initial consolidation,
a number of matters have been continuously added to the MDL, which now involves over
seventy associated cases.

Plaintiffs sought both injunctive and monetary relief, and after years of litigation, former

District Judge John Gleeson approved a settlement for an injunctive relief class and a monetary

damages relief class (the "2013 Settlement Agreement"), *see Interchange Fees I*, 986 F. Supp. 2d

at 216 n.7, 240, which was vacated by the Second Circuit on June 30, 2016 and remanded to this

Court, *Interchange Fees II*, 827 F.3d at 227, 229.[2]  After additional extensive discovery and

renegotiations, the named representatives of the damages class (the "Rule 23(b)(3) Class

Plaintiffs") and Defendants reached a new and separate settlement agreement (the "Superseding

Settlement Agreement"), which the Court preliminarily approved on January 24, 2019 (the

"January 2019 Order").  (Prelim. Approval Order, Docket Entry No. 7361); *see also In re*

*Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11 (E.D.N.Y. 2019)

("*Interchange Fees III*").

Currently before the Court is the Rule 23(b)(3) Class Plaintiffs' motion for attorneys'

fees and reimbursement of expenses.  (Rules 23(b)(3) Class Pls. Mot. for Attys' Fees and

Reimbursement of Expenses ("Pls. Mot."), Docket Entry No. 7471; Mem. in Supp. of Pls. Mot.

("Pls. Mem."), Docket Entry No. 7471-1.)  In support of the motion, Class Plaintiffs filed

attorney declarations from co-lead Class Counsel, and a declaration in support of the

reasonableness of the fee request from Professor Charles Silver, the Roy W. and Eugenia C.

McDonald Endowed Chair in Civil Procedure at the University of Texas School of Law.[3]

---

[2]  Following remand, the two putative classes — the Rule 23(b)(2) injunctive class and the Rule 23(b)(3) damages class — have been proceeding separately, and are each represented by separate counsel.  (*See* Mem. and Order dated Nov. 30, 2016 ("Interim Class Counsel Order"), Docket Entry No. 6754.)

[3]  (*See* Decl. of Thomas J. Undlin in Supp. of Pls. Mot. ("Undlin Decl."), Docket Entry No. 7471-2; Decl. of H. Laddie Montague, Jr. on Behalf of Berger & Montague PC ("Montague Decl."), Docket Entry No. 7471-3; Decl. of Alexandra S. Bernay in Supp. of Pls. Mot. ("Bernay Decl."), Docket Entry No. 7471-4; Second Decl. of Charles Silver Concerning the

For the reasons set forth below, the Court grants attorneys' fees in the percentage of 9.31% of the settlement fund amount as of October 25, 2019, amounting to $523,269,585.27, and grants expenses in the amount of $39,155,068.01.

## I.   Background

The Court assumes familiarity with the facts and extensive procedural history of the MDL, as set forth in prior decisions.  *See Interchange Fees I*, 986 F. Supp. 2d 207; *Interchange Fees II*, 827 F.3d 223; *Interchange Fees III*, 330 F.R.D. 11; *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d 437 (E.D.N.Y. Jan. 10, 2014).  The Court therefore provides only a summary of the relevant facts and procedural history.

### a.   The 2013 Settlement Agreement and attorneys' fees and expenses award

Judge Gleeson granted final approval of the 2013 Settlement Agreement on December 13, 2013.  *See Interchange Fees I*, 986 F. Supp. 2d at 213, 240.  Under the terms of the 2013 Settlement Agreement, Defendants agreed to pay a cash award of $7.25 billion, before reductions for opt-outs and other expenses, to the Rule 23(b)(3) class members, and to implement reforms of Defendants' rules and practices to settle the claims of the Rule 23(b)(2) class members.  *Id.* at 213, 217.

On January 10, 2014, Judge Gleeson granted attorneys' fees in the amount of $544.8 million — a slight reduction from the $570 million requested by Class Counsel — and approved a request for expenses in the amount of $27,037,716.97.  *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d at 439–40.  Class Counsel's requested $570

Reasonableness of Class Counsel's Req. for an Award of Attys' Fees ("Silver Decl."), Docket Entry No. 7471-5.)

million was approximately 10% of the settlement fund after opt-out reductions,[4] and Judge

Gleeson's award amounted to 9.56% of the settlement fund, which amounted to a lodestar

multiplier of 3.41. *Id.* at 437–39.

In awarding the fees, Judge Gleeson noted:

> Although every case is unique, this case stands out in size, duration,
> complexity, and in the nature of the relief afforded to both the
> injunctive relief and damages classes.   Class Counsel took on
> serious risks in prosecuting the case.   They now represent that,
> taking together all of the hours that they and other plaintiffs' counsel
> billed on this case, the lodestar figure for attorneys' fees is
> approximately $160 million, reflecting almost 500,000 hours of
> attorney and paralegal work conducted through November 30, 2012.

*Id.* at 439.

By vacating the settlement, and remanding for further proceedings, the Second Circuit

mooted Judge Gleeson's grant of attorneys' fees and expenses.  *Interchange Fees II*, 827 F.3d at

240.  As previously noted by this Court, while the Second Circuit found that an inherent conflict

existed because a single set of counsel represented both the Rule 23(b)(3) damages class and the

Rule 23(b)(2) injunctive relief class, *id.* at 233–35, "the Second Circuit did not abrogate Judge

Gleeson's analysis in its entirety, and the majority of its concerns were circumscribed to

representation and relief afforded to the (b)(2) injunctive class," *Interchange Fees III*, 330 F.R.D.

at 22.  The Court acknowledged Judge Gleeson's fee award in its decision, but noted that unitary

representation of the two classes was problematic where class counsel was compensated based

only on the relief secured for the Rule 23(b)(3) damages class, noting that while "counsel got

more money for each additional dollar they secured for the (b)(3) class . . .  the district court's

---

[4]  Although the initial settlement fund amount totaled $7.25 billion, after reductions for
opt-outs, the amount totaled $5.7 billion.  *In re Payment Card Interchange Fee & Merch. Disc.
Antitrust Litig.*, 991 F. Supp. 2d at 439.

calculation of fees explicitly did not rely on any benefit that would accrue to the (b)(2) class."
*Interchange Fees II*, 827 F.3d at 234.  In noting that the conflict of interest warranted remand, the Second Circuit did not otherwise criticize Judge Gleeson's fee award and noted that it "expressly d[id] not impugn the motives or acts of class counsel," but that "class counsel was [simply] charged with an inequitable task."  *Id.*

> **b.    The 2019 Rule 23(b)(3) class settlement**

On September 19, 2018, Rule 23(b)(3) Class Plaintiffs moved the Court for preliminary approval of the Superseding Settlement Agreement and preliminary certification of a Rule 23(b)(3) settlement class.  (*See* Rule 23(b)(3) Class Pls. Mot. for Class Settlement Prelim. Approval, Docket Entry No. 7257; Mem. in Supp. of Rule 23(b)(3) Class Pls. Mot. for Class Settlement Prelim. Approval, Docket Entry No. 7257-1.)

On January 24, 2019, after holding a hearing on December 6, 2018, the Court preliminarily approved the Rule 23(b)(3) Superseding Settlement Agreement, *Interchange Fees III*, 330 F.R.D. 11, and after holding a final fairness hearing on December 7, 2019, the Court granted final approval on December 13, 2019, (Order dated Dec. 13, 2019 ("Final Approval Order"), Docket Entry No. 7818).  In its preliminary approval order, the Court appointed the law firms of Robins Kaplan LLP, Berger & Montague P.C., and Robbins Geller Rudman & Dowd LLP to serve as Rule 23(b)(3) Class Counsel ("Class Counsel").  *Interchange Fees III*, 330 F.R.D. at 58.  At the time that Plaintiffs moved for final approval, the settlement fund size was approximately $6.3 billion, and the Superseding Settlement Agreement allowed for a maximum of $700 million in reductions for opt-out class members, (*see* Superseding Settlement Agreement ¶ 22); by October 25, 2019, the value of the settlement fund had been reduced by the maximum takedown amount of $700 million, and had a value of $5,620,511,120, (Notice re Pls. Mot. 2,

Docket Entry No. 7752 ("Based on the transaction volume that opted-out of the settlement, the takedown is $700 million.")).

### c.  Plaintiffs' renewed motion for attorneys' fees and expenses

On June 7, 2019, Rule 23(b)(3) Class Counsel moved for attorneys' fees and reimbursement of expenses.  (Pls. Mot.)  Class Counsel seeks 9.56% of $5,620,511,120, the settlement fund amount that remains after reduction of $700 million in takedown payments for opt-outs, and reserves the right to seek additional fees from those that have opted out of the Superseding Settlement Agreement.[5]  (Pls. Mot. 1; Reply in Supp. of Pls. Mot. and Mot. for Class Representative Service Awards ("Pls. Reply") 2 n.4, Docket Entry No. 7664.)

The percentage of the settlement fund requested is the same percentage previously approved by Judge Gleeson.  *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d at 445.  The request reflects over 630,000 hours of attorney and paralegal time through January 31, 2019, which Class Counsel calculated to amount to a lodestar of $204 million "based on historical rates," i.e., the hourly rates reflective of the rate at the time the work was performed as opposed to current hourly rates.  (Pls. Mem. 2.)  Class Counsel later submitted revised hours and lodestar calculations, including a fee request for Friedman Law Group LLP ("FLG") as part of the attorneys' fees request.  (*See* Notice re Pls. Mot.; Lodestar Multipliers Including FLG Time, annexed to Notice re Pls. Mot. as Ex. A, Docket Entry No. 7752-1.)  FLG requests fees for over 28,900 hours of time spent on the case, amounting to a lodestar of $11,047,661 for FLG through January 31, 2019, as calculated at historic hourly rates.  (Notice re

---

[5]  Class Counsel submitted the attorneys' fees and expenses motion on behalf of themselves and "Supporting Counsel," i.e., "the firms of Hulett Harper Stewart LLP and Freedman Boyd Hollander Goldberg Urias & Ward P.A., who assisted Co-Lead Counsel as to key decisions involving litigation strategy over the entire course of the case."  (Pls. Mot. 1 n.1.)

Pls. Mot. 1; Suppl. Decl. of Thomas J. Undlin ("Undlin Suppl. Decl.") tbls. 1 & 3, annexed to

Stip. re Pls. Mot. and Proposed Order as Ex. 1, Docket Entry No. 7692-1.)  The inclusion of

FLG's lodestar brings the total lodestar calculation to $214,801,410, which results in a multiplier

of approximately 2.5 when applying the 9.56% request to the settlement fund's October 25, 2019

amount of $5,620,511.120, and would result in a fee award of $537,320,863.  (*See* Lodestar

Multipliers Including FLG Time.)  Class Counsel notes that following remand from the Second

Circuit, "[Class] Counsel and Supporting Counsel analyzed more than five million additional

pages of documents selected from among Defendants' 100 million pages of supplemental

productions, participated in more than 175 depositions of defense and third-party witnesses, and

defended four Class Plaintiff depositions."  (Pls. Mem. 3 (citation omitted).)

        In addition to attorneys' fees, Class Counsel seeks reimbursement of expenses in the

amount of $39,192,962.41, which includes FLG's expense request.[6]  (*See* Pls. Mot. 2; Undlin

Suppl. Decl. tbls. 2 & 4.)

        **d.   Objections**

        After the Court preliminarily approved the Superseding Settlement Agreement, Class

Counsel mailed over 16.3 million notices to potential class members to advise them of the

settlement terms, including Class Counsel's intent to seek attorneys' fees and expenses.  (Rule

23(b)(3) Class Pls. Reply Mem. in Further Supp. of Settlement Final Approval ("Pls. Final

Approval Reply") 1, Docket Entry No. 7667.)  Each notice stated in pertinent part:

> For work done through final approval of the settlement by the
> district court, Rule 23(b)(3) Class Counsel will ask the Court for
> attorneys' fees in an amount that is a reasonable proportion of the
> class settlement fund, not to exceed 10% of the class settlement
> fund, to compensate all of the lawyers and their law firms that have

---

[6]  Class Counsel requested $38,263,023.81 in their initial motion, which did not include
FLG expenses.  (Pls. Mot. 2.)

worked on the class case.  For additional work to administer the settlement, distribute the funds, and litigate any appeals, Rule 23(b)(3) Class Counsel may seek reimbursement at their normal hourly rates.  Rule 23(b)(3) Class Counsel will also request (i) an award of their litigation expenses (not including the administrative costs of settlement or notice), not to exceed $40 million.

(Class Notices G1-2, annexed to Proposed Prelim. Approval Order as Ex. 1, Docket Entry No. 7354-1.)  The notices also informed prospective class members that they could object to any part of the settlement, including if a class member "do[es] not agree with the requested award of attorneys' fees and expenses."  (*Id.* at G2-3; *see also id.* at G2-15, G2-16 (providing an answer to the FAQ: "How do I disagree with the requested attorneys' fees, expenses or service awards to Rules 23(b)(3) Class Plaintiffs?").)

Although July 23, 2019 was the deadline to file objections to the Superseding Settlement Agreement, (*see* Preliminary Approval Order ¶ 18, Docket Entry No. 7361), the Court considers several objections that were filed shortly after the deadline.  As of August 6, 2019, the Class Administrator had received 200 objections, (Suppl. Decl. of Cameron R. Azari, on Implementation and Adequacy of Settlement Notice Plan ¶ 22, Docket Entry No. 7641-2), approximately twenty-five of which relate to attorneys' fees, as summarized below.[7]

---

[7]  Magistrate Judge James Orenstein has ably managed several objections and matters related to attorneys' fees.  These include (1) a motion for leave to intervene to file a breach of contract claim for attorneys' fees filed by Gary B. Friedman and Friedman Law Group LLP, (Notice of Mot. to Intervene, Docket Entry No. 7470), (2) a motion for attorneys' fees, reimbursement of expenses, and service awards filed by retailer and merchant objectors ("R&M Objectors"), (Mot. for Attys' Fees, Reimbursement of Expenses, and Service Awards, Docket Entry No. 7474), and (3) objections for failure to allocate a portion of Class Counsel's fees to successful merchant objectors filed by the Goldstein Group, (Letter from Counsel for Merchant Objectors, Docket Entry No. 7478).  Two of these matters have been resolved: Class Counsel has updated their fee petition to include lodestar and expenses for Friedman Law Group and the motion to intervene has been withdrawn, (Stip. re Pls. Mot. and Proposed Order, Docket Entry No. 7692), and the Goldstein Group's request for fees has been folded into Class Counsel's fee request, (Letter from Class Counsel, Docket Entry No. 7569).  Judge Orenstein separately issued

###### i.   Short and form objections

The majority of the objections to the requested attorneys' fees are boilerplate objections with little or no reasoning for the objection, making it difficult to assign substantial weight to these objections.  Several of these objections track the language of the notice sent to class members, which provides a form template for objecting to the requested attorneys' fees, expenses, or service awards.  (*See* Class Notices G2-15–G2-16.)  Under a section of the notice titled, "What should my Statement of Objections say?", the form template instructs class members that wish to object to the attorneys' fees, expenses, or service awards to state their objection, and to provide the reasons for their objection.  (*Id.* at G2-16.)  The form instructs class members to write and fill in the following:

> I object to class counsel's request for attorneys' fees and expenses and/or to the request for service awards to the Rule 23(b)(3) Class Plaintiffs.
>
> My reasons for objecting are:
>
> The laws and evidence that support each of my objections are:

(*Id.*)

Several of the objections contain the sentence "I object to class counsel's request for attorneys' fees and expenses and/or to the request for service awards to the Rule 23(b)(3) Class Plaintiffs," but provide no reasoning for the objection.  (*See, e.g.*, Objs. at Docket Entry Nos. 7394, 7409, 7457, 7647; *see also* Objs. at Docket Entry Nos. 7490, 7491, 7492, 7493, and 7494 (using another form template to state that they "want to object to paying attorneys' fees, and [e]xpenses or service awards" but providing no reasoning); Objs. at Docket Entry Nos. 7585,

---

a report and recommendation (the "R&R") regarding the R&M Objectors' motion.  (R&R, Docket Entry No. 7734.)

7608.)   Several of these "objections" appear to have been mistakenly submitted, and instead indicate that the putative class member may have intended to file a claim rather than object to the Superseding Settlement Agreement.  (*See, e.g.*, Objs. at Docket Entry Nos. 7394, 7405 (failing to state any reasons for objecting but writing "[p]lease include me and my Partner in this class action suit"), 7457.)

Other form objections provide brief, non-substantive, or non-responsive reasoning.  For example, (1) "[m]y reasons for objecting are: [a]s a small business owner being overcharged for fees with interchange," (2) "[m]y reasons for objecting are the unfairness of the fees charged," (3) "[m]y reasons for objecting are I am not responsible for fees," (4) "[t]he reason[] for objecting is: I am a victim since the day the business was opened," and (5) "[m]y reasons for objection are: [e]xcessive."  (*See* Objs. at Docket Entry Nos. 7393, 7404, 7410, 7438, 7447.)

One putative class member objects to the "compensation [a]s excessive," but then states that "[a]verage contingency fees charged by lawyers in C.A. and N.Y. [i]s 33.33%," and "suggests that this amount (33.33%) would be a fair total compensation for lawyers' participation in this class action suit," which exceeds the 9.56% sought by Class Counsel.  (*See* Obj. at Docket Entry No. 7468.)  Another appears to believe that Class Counsel "could be awarded 1/3 of 6.2 [b]illion[,] receiving 2.5 billion."  (*See* Obj. at Docket Entry No. 7482.)  Another appears to object to attorneys' fees, expenses, and service awards but is generally incoherent.  (*See* Obj. at Docket Entry No. 7500.)

### ii.   Substantive objections

Approximately five of the attorneys' fees objections contain substantive reasoning, and are summarized below.

### 1.  Unlimited Vacations and Cruises, Inc. and USA Pets LLC's objections

Unlimited Vacations and Cruises. Inc. ("Unlimited Vacations") and USA Pets LLC argue that Class Counsel should not be entitled to fees for work done for the 2013 Settlement Agreement, and should only be compensated for work conducted after the Second Circuit's remand to this Court.  (Obj. to Class Action Settlement and Req. for Attys' Fees and Incentive Awards by Pets USA LLC, Unlimited Vacations and Cruises Inc. ("Unlimited Vacations and USA Pets Obj."), Docket Entry No. 7555.)  They argue that because the Second Circuit found that Class Counsel was "proceeding under an irreconcilable conflict of interest," the New York Rules of Professional Conduct "require[] forfeiture of all fees generated prior to the resumption of this case in this Court after the Court of Appeals reversed the prior settlement approval."  (*Id.* at 4 (citation omitted).)

Unlimited Vacations and USA Pets cite two Ninth Circuit decisions to argue that "[u]nder similar circumstances, the Ninth Circuit held that an ethics violation leads to a forfeiture of attorneys' fees under California professional conduct rules, which are similar to New York's." (*Id.* (citing *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 967–68 (9th Cir. 2009); *Radcliffe v. Experian Info. Sols., Inc.*, 715 F.3d 1157 (9th Cir. 2013)).)  They also cite two New York appellate division cases for the proposition that an attorney who violates the Rules of Professional Conduct is not entitled to fees.  (*Id.* at 5 (citing *Shelton v. Shelton*, 542 N.Y.S.2d 719 (App. Div. 1989); *Ulico Cas. Co. v. Wilson, Elser, Moskowitz, Edelman & Dicker*, 865 N.Y.S.2d 14 (App. Div. 2008)).)

Based on this reasoning, Unlimited Vacations and USA Pets conclude that:

> The only lodestar for which Class Counsel may seek compensation is the lodestar generated between their appointment as 23(b)(3) Class Counsel on November 30, 2016 and the preliminary approval

> of the proposed settlement on January 28, 2019. While this amount
> may be increased by a modest multiplier to reflect the short period
> of time during which Class Counsel faced risk, the fee should not
> exceed two and a half times the reasonable compensable lodestar, or
> $110 million.

(*Id.* at 5–6.)  They further argue that "[t]he nine class action settlements exceeding $1 billion

dollars post-*Goldberger* [*v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000)] in the Second

Circuit have an average fee of 7%.  Those megafund settlements exceeding $3 billion have an

average fee of 6%." (*Id.* at 7.)

### 2.    Kevan McLaughlin's objections

Objector Kevan McLaughlin argues that the Court should limit the attorneys' fees award

because "the fees sought by class counsel are excessive, particularly given the course of the case

and its division into a Rule 23(b)(3) class and a Rule 23(b)(2) injunctive relief class."  (Obj. to

Class Action Settlement and Notice of Intent to Appear by Kevan McLaughlin ("McLaughlin

Obj.") 2, Docket Entry No. 7571.)  He notes that because the release in the Superseding

Settlement Agreement releases claims that "will accrue up to five years after all appeals have

been resolved in this action," *Interchange Fees III*, 330 F.R.D. at 46, there is uncertainty as to

the length of time class members will be releasing claims, due to the "uncertain temporal scope"

given that the release lasts for five years after the end of all appeals, which time is difficult to

determine due to the lack of certainty over when the appeals process will end.  (McLaughlin Obj.

at 8.)  He writes:

> In sum, the offered relief is a small fraction of the potential damages,
> and may be smaller still depending also on how many years of
> conduct end up being released.  The settlement does not include
> injunctive relief, which has naturally been left to be pursued in the
> Rule 23(b)(2) case.  These points do not necessarily require rejection
> of the settlement, as this Court has already observed.  But they also
> cut against the large fee Class Counsel request.

(*Id.*)  McLaughlin argues that in contrast to the litigation *In re Visa Check/Mastermoney Antitrust Litigation*, 297 F. Supp. 2d 503, 525 (E.D.N.Y. 2003), *aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005), where injunctive relief was secured alongside the damages award and factored into the district court's decision regarding fees, "there is no 'lasting benefit' inherent in the settlement" because it is only for damages, while injunctive relief is being separately litigated.  (McLaughlin Obj. 8–9.)  He further argues that because class litigation has been previously brought against credit card issuers, and "although this litigation is inherently complex and large, handling that complex subject matter is a task class counsel should be managing with ever-greater efficiency."  (*Id.* at 9.)

Further, McLaughlin argues that "[a] multiplier of three cannot be supported in this case," because "more recent Supreme Court and Second Circuit authority suggest that fee awards ought to be tethered much more closely to the basic lodestar," and that the lodestar is a presumptively reasonable award.  (*Id.* at 9–10.)

### 3.  Nejat Kohan's objections

Objector Nejat Kohan "believes that a reasonable estimation for the overall class action should have so far taken 35,000 to 40,000 hours of litigation."  (Statement of Obj. of Class Member Nejat Kohan, Esq. ("Kohan Obj.") 4, Docket Entry No. 7550.)  He argues that "[i]n the event the Court is willing to approve 10% attorney fees, then with a simple calculation, any attorney may be awarded over $15,000 for each hour of their litigation on the case," and that these fees are unconscionable."  (*Id.* at 4–5.)  Instead of the requested amount, Kohan "believes that the attorney[s'] fees should not exceed one percent (1%) of the total settlement proceeds."  (*Id.* at 5.)

He writes that:

> It is undeniable that the acts of the Defendants had a profound impact on the economy. Kohan believes that any public or private institutions who protect the public interests deserve to receive a small portion of this award to promote the nation's economy & small businesses instead of paying unconscionable fees to each counsel. If there is no such organization [that] exists, then a small portion of this tremendous settlement fund should be allocated by the Court to create a new national institution to stop timely such unfair fee charges to the public in future.

(*Id.*)

As to expenses, Kohan writes that "expenses as part of attorney fees is unconvincing because there is a separate category of the Cost of Administration and Notices, and Taxes on the Settlement Fund." (*Id.*)

### 4. Jack Rabbit, LLC and Cahaba Heights Service Center, Inc.'s objections

Jack Rabbit, LLC and Cahaba Heights Service Center, Inc. ("Cahaba Heights") argue that the requested attorneys' fees are unreasonable in comparison to the size of the settlement fund. (Obj. to Class Action Settlement and Class Counsel's Req. for Attys' Fees by Jack Rabbit ("Jack Rabbit and Cahaba Heights Obj.") 3, Docket Entry No. 7574.) They note that "[i]n this Circuit, the average attorneys' fees percentage in settlements above $2.5 billion is 5.97%," and that "[e]ven adding in the additional class actions that settled for between $1 billion and $3 billion only increases the average attorneys' fees percentage from 5.97% to 7.05%." (*Id.* at 4–5.) Based on this argument, Jack Rabbit and Cahaba Heights request that the Court approve attorneys' fees of 5.97% of the settlement fund instead of the requested 9.56%. (*Id.* at 6.)

### 5. Gnarlywood LLC and Quincy Woodrights, LLC objections

Gnarlywood LLC and Quincy Woodrights, LLC argue that "Class Members have been provided insufficient and confusing information regarding the amount against which Class Counsel proposes to calculate its attorneys' fees in violation of Rule[s] 23(h) and

14

54(d)(2)(B)(iii)" of the Federal Rules of Civil Procedure.  (Obj. of Gnarlywood LLC, and

Quincy Woodrights, LLC to Class Pls. Mot. for Final Approval and Class Pls. Mot. for Attys'

Fees and Reimbursement of Expenses ("Gnarlywood and Quincy Woodrights Obj.") 15, Docket

Entry Nos. 7610, 7617.)  They argue that different statements regarding attorneys' fees that

appear in the class notice and the motion for attorneys' fees create confusion and "beg[] the

question" of whether "Class Counsel [is] seeking a percentage fee calculated on the gross Total

Cash Consideration as suggested by the Fee Memo and specifically described by the Superseding

Settlement Agreement," or whether "Class Counsel seek[s] a percentage fee calculated on the net

settlement fund (i.e. after reductions for opt-outs)."[8]  (*Id.* at 16.)

Gnarlywood and Quincy Woodrights also argue that the 9.56% fee sought is excessive.

(*Id.* at 17.)  They note that:

> [Although t]he Superseding Settlement Agreement incorporates the
> [2013 Settlement Agreement] fund monies and requires Defendants
> to contribute an additional $900 million, . . . the Rule 23(b)(2)[, i.e.,
> injunctive relief] is gone, the claims period is now 15 years [as
> opposed to 8], the number of claimants has substantially increased,
> and there is an extended release period of five years.  So rather than
> a $5.3 billion recovery being shared among fewer merchants for an
> eight-year damages period (i.e.[,] a recovery amounting to $662.5
> million per year), the now much larger Class will share $6.3 billion
> to compensate for a 15 year damages period (i.e.[,] $420 million per
> year), and Defendants' fees continue to increase.

(*Id.* at 17–18.)  Gnarlywood and Woodrights suggest that Judge Gleeson's prior decision to

---

[8]  Gnarlywood and Quincy Woodrights also argue that Class Counsel's statement that they are seeking "9.56% of the 'settlement fund deposited in the *Net Cash Settlement Escrow Account* and *Net Interchange Settlement Escrow Account*'" is confusing because "[n]either of these terms is defined anywhere," and therefore "the Fee Motion describes an unknown amount — referenced by undefined terms — against which the percentage fee is to be calculated, hence providing inadequate notice of, and opportunity to consider and object to, Class Counsel's fee motion."  (Gnarlywood and Quincy Woodrights Obj. 17.)

award attorneys' fees of 9.56% of the settlement fund should not be persuasive to the Court because the Second Circuit decided that members of the Rule 23(b)(2) class were inadequately represented, and therefore, "[t]he Second Circuit's opinion renders invalid both the [2013 Settlement Agreement] percentage fee award — intended to compensate for Class Counsel's time spent pursuing Rule 23(b)(3) damages and Rule 23(b)(2) relief — and the District Court's earlier lodestar cross-check." (*Id.* at 19.) They argue that because the Superseding Settlement Agreement does not include settlement terms for the Rule 23(b)(2) class, that the "portion of Class Counsel's $161,681,596.07 [2013 Settlement Agreement] lodestar attributable to Rule 23(b)(2) concerns ought not be included in the Court's analysis of the first *Goldberger* factor,[9] i.e.[,] time and labor expended by counsel in creating, enhancing, preserving, or protecting the Rule (b)(3) Class Settlement." (*Id.* at 20–21 (citing *Wal-Mart Stores*, 396 F.3d at 121).)

### iii. R&M objections

On June 7, 2019, a group of objectors previously identified in this action as Retailer and Merchant Objectors (the "R&M Objectors") filed a motion to be compensated for fees, expenses, and service awards for their role in objecting to the 2013 Settlement Agreement and their efforts to enhance the settlements. (Mot. for Attys' Fees, Expenses, and Service Awards by R&M Objectors ("R&M Mot."), Docket Entry No. 7474; Mem. in Supp. of R&M Mot. ("R&M Mem."), Docket Entry No. 7474-1.) The Court referred the motion to Judge Orenstein for a report and recommendation. (Order dated July 24, 2019.)

On July 23, 2019, the R&M Objectors filed objections to Class Plaintiffs' motion for attorneys' fees. (Obj. to Class Action Settlement filed by R&M Objectors ("R&M Obj."), Docket Entry No. 7575.) The R&M Objectors "object[ed] to the Superseding Settlement

---

[9] The *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000) factors are discussed *infra*.

[Agreement] and Class Counsel's Fee Motion because of the failure of those instruments to provide for a reasonable service award to the R&M Objectors and a reasonable fee to their counsel." (*Id.* at 1.)  They argue that they should receive reasonable service awards and attorneys' fees because they are a "substantial cause" of the rejection of the 2013 Settlement Agreement, and the "enhanced benefits" of the Superseding Settlement Agreement. (*Id.* at 15.)

On September 27, 2019, the R&M Objectors filed amended objections, including the arguments that "(1) Class Counsel improperly lays claim to all of the benefits made available to the class, including those only made available by the R&M Objections to the [2013 Settlement Agreement] and (2) Class Counsel's claim for their attorneys' fees is unsubstantiated for class members' and absent class members' review." (Obj. to Class Action Settlement Am. filed by R&M Objectors ("R&M Am. Obj.") 1, Docket Entry No. 7710.)  Class Counsel opposed the amendment as untimely. (Letter dated Oct. 4, 2019, Docket Entry No. 7723.)  Because R&M Objectors almost exclusively object to the proposed attorneys' fees award based on their request for fees, expenses, and service awards, the Court declines to consider those objections in this Memorandum and Order, and instead considers them in deciding R&M Objectors' motion for compensation.  To the extent that R&M Objectors also object to the proposed attorneys' fees award by arguing that "Class Counsel's claim for their attorneys' fees is unsubstantiated for class members' and absent class members' review," (R&M Am. Obj. 1), the Court declines to address this objection because it was submitted as part of an amended objection over two months after the July 23, 2019 settlement objection deadline.[10]

---

[10]  On October 11, 2019, Judge Orenstein issued an R&R, recommending that the Court deny the R&M Objectors' motion for fees, expenses, and service awards. (R&R.)  For the reasons to be set forth in a separate opinion, the Court adopts the R&R and denies the R&M Objectors' motion for fees, expenses, and service awards.

e.    **Final fairness hearing**

On December 7, 2019, the Court held a final fairness hearing and heard arguments from the parties and several objectors on Rule 23(b)(3) Class Plaintiffs motions for final approval of the Superseding Settlement Agreement, attorneys' fees and reimbursement of expenses, and class representative service awards.  (Minute Entry dated Nov. 11, 2019; Hr'g Tr.)

## II.    Discussion

### a.    Standards of review

#### i.    Attorneys' fees

Counsel are entitled to reasonable attorneys' fees in common fund class actions.  *See Goldberger*, 209 F.3d at 47; *see also* Fed. R. Civ. P. 23(h); *Fresno Cty. Emps.'s Ret. Ass'n v. Isaacson/Weaver Family Tr.*, 925 F.3d 63, 68 (2d Cir. 2019) ("The common-fund doctrine is . . . rooted in the courts' 'historic power of equity to permit' a person who secures a fund for the benefit of others to collect a fee directly from the fund." (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 257 (1975) (citation omitted))).  Courts in the Second Circuit consider "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation . . . ; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations" — often referred to as the *Goldberger* factors — in determining whether a fee award is reasonable.  *Goldberger*, 209 F.3d at 50 (citation and quotation marks omitted); *see McDaniel v. Cty. of Schenectady*, 595 F.3d 411, 423 (2d Cir. 2010).

"Courts may award attorneys' fees in common fund cases under either the 'lodestar' method or the 'percentage of the fund' method."  *Wal-Mart Stores*, 396 F.3d at 121 (citing *Goldberger*, 209 F.3d at 46); *see also Fresno Cty. Emps.'s Ret. Ass'n*, 925 F.3d at 68

(same); *McDaniel*, 595 F.3d at 417 (same).  However, "[t]he trend in this Circuit is toward the percentage method, which 'directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation.'"  *Wal-Mart Stores*, 396 F.3d at 121 (citation omitted) (quoting *In re Lloyd's Am. Trust Fund Litig.*, No. 96-CV-1262, 2002 WL 31663577, at *25 (S.D.N.Y. Nov. 26, 2002)).  While "[a] common-fund-percentage fee must still be evaluated for reasonableness," it "may exceed the lodestar — i.e., it may be less than, equal to, or greater than the lodestar."  *Fresno Cty. Emps.'s Ret. Ass'n*, 925 F.3d at 68 (citations omitted).  Although the percentage method is an appropriate method by which to award attorneys' fees, the lodestar method "remains useful as a baseline even if the percentage method is eventually chosen."  *Goldberger*, 209 F.3d at 50.

In assessing attorneys' fees, it remains a "district court's duty 'to act as a fiduciary who must serve as a guardian of the rights of absent class members.'"  *See McDaniel*, 595 F.3d at 419 (quoting *City of Detroit v. Grinnell Corp.* ("*Grinnell II*"), 560 F.2d 1093, 1099 (2d Cir. 1977), *abrogated on other grounds*, *Goldberger*, 209 F.3d at 43)).  The Second Circuit "has observed that the fee awarded must reflect 'the actual effort made by the attorney to benefit the class.'"  *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 249 (2d Cir. 2007) (quoting *Grinnell II*, 560 F.2d at 1099 (internal quotation marks omitted)).  In common fund settlements, courts "determine what a reasonable fee is from the *plaintiff's* perspective."  *Fresno Cty. Emps.'s  Ret. Ass'n*, 925 F.3d at 70.

### ii.   Expenses

"It is well established that counsel who obtain a common settlement fund for a class are entitled to the reimbursement of expenses that they advance to a class."  *Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 671 (S.D.N.Y. 2015) (citation omitted).  "Courts in the Second

Circuit normally grant expense requests in common fund cases as a matter of course." *In re EVCI Career Colls. Holding Corp. Sec. Litig.*, No. 05-CV-10240, 2007 WL 2230177, at *18 (S.D.N.Y. July 27, 2007) (citations omitted).

**b.   Application of the *Goldberger* factors**

The Court considers each of the *Goldberger* factors in determining the appropriate award of attorneys' fees.

**i.   Time and labor expended by counsel**

Class Counsel underscore their "long and dedicated efforts undertaken" in support of ultimately reaching settlement for a second time.  They summarize their efforts as follows:

> Through January 31, 2019, Co-Lead Counsel and Support Class Counsel devoted approximately 630,000 hours, resulting in a lodestar of approximately $203,753,749.78 million (at historical rates), to amassing a massive discovery record in two phases of litigation, briefing and arguing class certification, motions to dismiss, motions for summary judgment, and motions to exclude expert testimony, and negotiations to achieve this settlement, among other things.

(Pls. Mem. 20–21.)  In addition, they note that they spent "approximately $38.2 million dollars in expenses, in support of substantially untested legal theories, without any assurance of any compensation at all." (*Id.* at 27.)  As detailed *supra*, the late inclusion of FLG's hours increases the hours estimate by 28,900 hours, and the lodestar estimate by $11,047,661.  (Notice re Pls. Mot. 1; Undlin Suppl. Decl. tbls. 1 & 3; *see also* Hr'g Tr. 103:7–12.)

Objector Kohan argues that he "believes that a reasonable estimation for the overall class action should have so far taken 35,000 to 40,000 hours of litigation."[11]  (Kohan Obj. 4.)

---

[11]  Objectors Unlimited Vacations and USA Pets argue that Class Counsel's efforts prior to remand should not be considered by the Court.  (Unlimited Vacations and USA Pets Obj. 4–6.)  This argument is addressed *infra*.

20

Objectors Gnarlywood and Quincy Woodrights argue that because the Superseding Settlement Agreement does not include settlement terms for the Rule 23(b)(2) class, the "portion of Class Counsel's $161,681,596.07 [2013 Settlement Agreement] lodestar attributable to Rule 23(b)(2) concerns ought not be included in the Court's analysis of the first *Goldberger* factor — i.e.[,] time and labor expended by counsel in creating, enhancing, preserving, or protecting the Rule (b)(3) Class Settlement."  (Gnarlywood and Quincy Woodrights Obj. 20–21 (citing *Wal-Mart Stores*, 396 F.3d at 121).)

This factor weighs in favor of finding that the requested fee is reasonable.  As detailed by Class Counsel, they have devoted an enormous number of hours and many years to this case, through discovery, class certification, and summary judgment briefing, as well as additional briefing and discovery after the Second Circuit's remand.  Judge Gleeson and this Court have both acknowledged the extraordinary labor that this case involved on the part of the attorneys.[12] *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d at 442 ("The amount of time and energy that counsel spent on the case is clear."); *see also Interchange*

---

[12]  The Second Circuit has also acknowledged the enormous amount of labor expended, noting:

> Notwithstanding . . . pro-merchant industry developments, the plaintiffs pressed on.  Discovery included more than 400 depositions, 17 expert reports, 32 days of expert deposition testimony, and the production of over 80 million pages of documents.  The parties fully briefed a motion for class certification, a motion to dismiss supplemental complaints, and cross-motions for summary judgment.  Beginning in 2008, the parties participated in concurrent settlement negotiations assisted by well-respected mediators.  At the end of 2011, the district judge and the magistrate judge participated in the parties' discussions with the mediators.  In October 2012, after several more marathon negotiations with the mediators (including one more with the district court and magistrate judges), the parties executed the Settlement Agreement.

*Interchange Fees II*, 827 F.3d at 229.

*Fees III*, 330 F.R.D. at 36 ("The present litigation has been active for over a decade, and has involved litigation in both district and appellate courts . . . . The first phase of MDL discovery alone involved 370 depositions, and multiple expert reports, and according to Class Counsel, 'Class Plaintiffs have reviewed and analyzed more than 65 million pages of documents.'" (citations omitted)).  It is difficult to find cases that compare, but courts have found that this factor weighs in favor of significant fees in cases spanning shorter durations of hours and years. *See, e.g.*, *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, No. 14-CV-7126, 2018 WL 6250657, at *1 (S.D.N.Y. Nov. 29, 2018) (finding that this factor weighed in favor of approving requested fee of 28.5% of the gross settlement fund of a $504.5 million settlement where "counsel devoted almost four years and over 158,000 billable hours to the prosecution of this case"); *In re BioScrip, Inc. Sec. Litig.*, 273 F. Supp. 3d 474, 498 (S.D.N.Y. 2017) (noting that "there is no question" that counsel "expended significant time and labor" where "counsel expended almost 4,000 hours of time over a course of two years without receiving any compensation or guarantee of compensation," and also noting that "[t]his was not a case where, after the filing of the [c]onsolidated [c]lass [a]ction complaint, the parties immediately turned to settlement discussions" (citing *Cassese v. Williams*, 503 F. App'x. 55, 59 (2d Cir. 2012)); *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 129 (S.D.N.Y. 2009) (finding that the time and labor expended was "significant" and noting that counsel "engaged in lengthy and intensive discovery, producing and reviewing hundreds of thousands of documents, and deposing more than a hundred witnesses" and that counsel "briefed and argued motions to dismiss, compel arbitration, class certification and motions for reconsideration" as well as participated in settlement negotiations and "lengthy mediation"), *aff'd sub nom. Priceline.com, Inc. v. Silberman*, 405 F. App'x 532 (2d Cir. 2010); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp.

2d 467, 508 (S.D.N.Y. 2009) (noting that significant time and labor was spent where "the [c]ommittee has expended over 677,000 hours, producing an adjusted lodestar of more than $159 million . . . . th[e] litigation spanned eight years and has involved the review of over thirty million pages of documents and the taking of 145 depositions," and "[t]he parties briefed numerous procedural and substantive motions, after which th[e c]ourt issued twenty-nine opinions" (citations omitted)).

The objections as to the time and labor expended by Class Counsel and Supporting Counsel are unpersuasive. Kohan's personal belief that this case should only have involved "35,000 to 40,000 hours of litigation," (Kohan Obj. 4), is unsubstantiated and provides no basis to support this assertion other than that it is "[b]ased upon Kohan's experience as a licensed attorney in California," (*id.*).

As to the objections raised by Gnarlywood and Quincy Woodrights and several other objectors, that the lodestar calculation should not include the hours that Class Counsel spent working on matters for the Rule 23(b)(2) injunctive relief class because the Superseding Settlement Agreement no longer includes injunctive relief, the Court finds that under the circumstances of this case, reducing Class Counsel's lodestar calculation in such a manner is not warranted. (*See* Gnarlywood and Quincy Woodrights Obj. 20–21; *see also* Hr'g Tr. 116:15–18; 117:5–8 (counsel for Gnarlywood and Quincy Woodrights stating that "the problem is that we don't have in [Class Counsel's] lodestar any discrimination between that which was spent [on] (b)(2) and that which was spent [on] . . . (b)(3)" and that "the (b)(3) class, [is] simply not obligated to compensate counsel" for hours expended on behalf of the (b)(2) class); Hr'g Tr. 112:13–19, 113:7–8, 114:11–13 (counsel for Unlimited Vacations and USA Pets arguing that Class Counsel "shouldn't get paid for time that they spent on strictly (b)(2) issues," and stressing

23

that "[t]he fact that this is a smaller settlement than the one before is not reflected anywhere, either in class counsel's fee request, or lodestar," "even for time spent [working] on things that aren't being settled here," and further raising a hypothetical where "the lodestar were reduced to 100 million to account for all the time[] spent on the (b)(2) settlement"); Hr'g Tr. 121:9–10 (counsel for McLaughlin arguing that "there was a lot of time that was spent here that did not help the class").)

The Court rejects the notion that "there was a lot of time that was spent here that did not help the class." (Hr'g Tr. 121:9–10.) Although the Court does not formally consider the existence of injunctive measures in weighing final approval of a Rule 23(b)(3) settlement class, the Court nevertheless notes that the injunctive relief achieved under the 2013 Settlement Agreement remains in place, even though it can be altered. (*See* Pls. Reply 17.) In addition, as Class Counsel stated at the hearing, any work spent on appeals for both classes was not included in the lodestar calculation. (Hr'g Tr. 127:9–10 (Class Counsel stating that they "didn't include any of the appellate hours in our lodestar").) In addition, the majority of Class Counsel's work leading up to the 2013 Settlement Agreement would have been aimed generally at proving antitrust violation, regardless of the particular remedy sought or class represented. Moreover, the Second Circuit's concern was not that Class Counsel should not be compensated for their work, and the Court clearly stated that their decision should not be taken to criticize Class Counsel. *See Interchange Fees II*, 827 F.3d at 234 ("We expressly do not impugn the motives or acts of class counsel."). To the contrary, the Second Circuit appeared to express the concern that Class Counsel was compensated based only on the relief secured for the Rule 23(b)(3) damages class, noting that while "counsel got more money for each additional dollar they secured for the (b)(3) class . . . the district court's calculation of fees explicitly did not rely on any benefit that would

24

accrue to the (b)(2) class."  *Id.*; *see also id.* ("[C]lass [C]ounsel did not even ask to be

compensated based on the size or significance of the injunctive relief." (citation omitted)).

Despite the outcome, Class Counsel should not be punished for work that was reasonable

for them to do at the time for both classes; indeed, it is not uncommon for one set of counsel to

represent multiple classes, and the Second Circuit acknowledged as much.  *See id.* at 235 ("None

of this is to say that (b)(3) and (b)(2) classes cannot be combined in a single case, or that (b)(3)

and (b)(2) classes necessarily and always require separate representation.").  The Court is not

unsympathetic to objectors' arguments on this issue, and understands their concern that because

Class Counsel spent a certain amount of hours considering and pursuing injunctive relief, such

time should be discounted because it did not necessarily benefit the sole class that Class Counsel

is now charged with representing — the Rule 23(b)(3) damages class — especially in

consideration of the fact that the Rule 23(b)(2) injunctive relief class has yet to reach settlement.

However, as the Second Circuit previously recognized in its decision in the appeal of this case,

the fees awarded are sought and will be awarded as a percentage of the damages fund, and not as

a percentage of any value of injunctive relief, rendering any argument regarding Class Counsel's

efforts towards the Rule 23(b)(2) class unpersuasive.  Further, there is no convincing evidence to

support a conclusion that Class Counsel's effort in trying to prove its case prior to the 2013

Settlement Agreement did not benefit the Rule 23(b)(3) class.

### ii.   Magnitude and complexity of the litigation

Class Counsel argues that the "settlement is the product of the hard work required to

engage in complex and challenging litigation for fourteen years and protracted and difficult

arms' length settlement negotiations."  (Pls. Mem. 23.)

Objector McLaughlin argues that because class litigation has been previously brought

against credit card issuers, and "although this litigation is inherently complex and large, handling that complex subject matter is a task [C]lass [C]ounsel should be managing with ever-greater efficiency." (McLaughlin Obj. 9.)

The Court finds that the magnitude and complexity of this litigation weighs in favor of a substantial award. First, as noted in the Court's analysis of the first *Goldberger* factor, this litigation has been extremely protracted, occurring in multiple iterations, and has included extensive briefing at nearly every major stage of litigation. Every aspect of the case appears to be noteworthy, including the size of the class — over ten million — that Class Counsel is litigating on behalf of, the number of depositions taken, and the number of documents reviewed. Second, and as described further in the Court's analysis of the third *Goldberger* factor below, the case involved uncertainty as to success and complex legal antitrust questions that created a certain amount of risk. In addition, notable factual and legal developments took place during the course of the action that increased the complexity, some of which resulted in the filing of amended pleadings, including the restructurings and initial public offerings of Mastercard and Visa, the Supreme Court's decision in *Ohio v. American Express Co.*, 585 U.S. ---, 138 S. Ct. 2274 (2018), requiring that harm now be considered in a two-sided market, and changes to Mastercard's and Visa's network rules via a consent decree with the United States Department of Justice, and the Durbin Amendment to the Dodd-Frank Act. (*See* Pls. Mem. 24–26); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d at 441 ("[N]o one can reasonably dispute the fact that this case was enormously complex, both factually and legally."); *Interchange Fees III*, 330 F.R.D. at 36 ("This case is complex and costly."). Other courts have found this factor to weigh in favor of a substantial fee where the cases involved substantial legal questions, new Supreme Court decisions or other case law developments, and

26

antitrust claims. *See, e.g.*, *In re BioScrip, Inc. Sec. Litig.*, 273 F. Supp. 3d at 498 (noting that the "case was an unusually complex securities class action" where it involved "several complex legal and factual questions" that "divide[d] the parties throughout the settlement discussions," and "required briefing a shifting legal landscape" due to a new Supreme Court decision that affected standards governing the case); *Dial Corp. v. News Corp.*, 317 F.R.D. 426, 435 (S.D.N.Y. 2016) (finding that this *Goldberger* factor weighed in favor of the fee request and noting that "[f]ederal antitrust cases are complicated, lengthy, and bitterly fought," that plaintiffs claims were "nuanced," that the theories of liability "required both sides to work extensively with economists and . . . experts," and that the "case had far-reaching implications posing an existential threat to [d]efendants' business model" (internal quotation marks and citation omitted)); *Meredith Corp.*, 87 F. Supp. 3d at 669 (finding that this *Goldberger* factor supported the 20% fee request and noting that "[a]ntitrust class actions 'are notoriously complex, protracted, and bitterly fought'" (quoting *Visa Check*, 297 F. Supp. 2d at 510)); *In re Citigroup Inc. Bond Litig.*, 988 F. Supp. 2d 371, 379 (S.D.N.Y. 2013) (finding that magnitude and complexity of litigation weighed in favor of "a significant award" in a securities class action where "class period was relatively lengthy and encompassed a significant number of securities issuances," the alleged "misstatements involved an alphabet soup of complex financial instruments that have become synonymous with the financial meltdown of 2008," plaintiffs standing "was by no means assured," and "they had to contend with significant case law developments that occurred during the pendency of this action concerning the standard of proof required"); *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. at 129 (finding that this *Goldberger* factor weighed in counsel's favor and noting that "antitrust cases are typically complex, and this case has been no exception," that "[t]here was no Government investigation,"

27

and that many issues "were unique and issues of first impression"); *see also Jemine v. Dennis*, 901 F. Supp. 2d 365, 392 (E.D.N.Y. 2012) ("[I]n a class action suit, as here, the large number of plaintiffs increases the complexity of the litigation.").  The Court also notes that the fact that the 2013 Settlement Agreement was ultimately appealed and remanded for further consideration added a layer of complexity to this action.  *See Dial Corp.*, 317 F.R.D. at 435 (noting that this *Goldberger* factor weighed in favor of the fee request because "after deftly navigating the numerous pitfalls and traps set by [d]efendants' counsel, [p]laintiffs were also confronted with the risk that their victories could be overturned on appeal").

McLaughlin appears to suggest that the Court should find that this factor weighs against the requested fee because class litigation has been brought previously against credit card issuers, therefore "handling that complex subject matter is a task class counsel should be managing with ever-greater efficiency."  (McLaughlin Obj. 9.)  He argues that "[t]he district court in [*In re Visa Check/Mastermoney Antitrust Litigation*, 297 F. Supp. 2d 503] . . . highlighted the novelty and complexity of bringing national class litigation against credit card issuers," but that "[s]ince that time . . . such litigation has become ubiquitous and far less novel."  (*Id.*)  This argument is undermined by comments made by Judge Gleeson who presided over both *Visa Check* and this litigation.  In comparing this case to *Visa Check* when weighing attorneys' fees for the 2013 Settlement Agreement, Judge Gleeson noted that "[t]his case was more challenging."  *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d at 444.  The Court is not persuaded by McLaughlin's argument.

### iii.   Risk of the litigation

Class Counsel notes that "[w]hen they filed this case, Co-Lead Counsel had identified several difficult legal issues that could have ended the case, and recognized that proving liability

and damages would be a difficult task."[13]  (Pls. Mem. 24.)   At the outset of the litigation, Class

Plaintiffs faced three main legal risks: (1) the only U.S. court to rule on whether setting default

interchange fees violates antitrust laws sided with the defendants in that case; (2) Defendants

argued that Rule 23(b)(3) Class Plaintiffs are not "direct purchasers" and therefore do not have

antitrust standing; and (3) Defendants argued that the claims in this action were released in a

prior settlement in *Visa Check*.  (*See id.* (citations omitted).)   "In addition to those risks," Class

Counsel "understood from the beginning that establishing liability and damages would be

difficult here as this case raises several unique issues, including whether the methodology for

setting interchange fees constitutes price-fixing, and whether the networks' rules restrain price

competition." (*Id.* at 25.)   Class Counsel further notes that private plaintiffs led this litigation as

opposed to this litigation following a government investigation or challenge, which increased

their risk.  (*Id.* at 27 ("Unlike many civil antitrust litigations, here, it was the government who

followed the lead of this litigation, and relied primarily on the discovery record and work product

developed in this case." (citation omitted)).)  No objector appears to make a specific argument

under this *Goldberger* factor.

     The Second Circuit has historically labeled the risk of success as "'perhaps the foremost'

factor to be considered in determining whether to award an enhancement."  *Goldberger*, 209

F.3d at 54 (quoting *In re "Agent Orange" Prods. Liab. Litig.,* 818 F.2d 226, 236 (2d Cir. 1987)

(quoting *City of Detroit v. Grinnell Corp.* ("*Grinnell I*"), 495 F.2d 448, 471 (2d Cir. 1974))).  "In

particular, [courts] address three categories of risk: (1) risks inherent in the litigation itself (i.e.

---

[13]  Class Counsel also highlights that factual and legal developments that took place
during the *course* of the litigation enhanced the risk even further.  (Pls. Mem. 24–26.)  However,
because "[i]t is well-established that litigation risk must be measured as of when the case is
filed," *Goldberger*, 209 F.3d at 55, under this *Goldberger* factor, the Court only considers the
litigation risk faced by Class Counsel at the outset of the litigation.

hurdles to successfully establishing liability); (2) risks that the defendant may be unable to pay

any ultimate award (i.e. risks of recovery); and (3) contingency fee risks (i.e. the specific

risk that [l]ead [c]ounsel will not be compensated at all for its work)." *In re BioScrip, Inc. Sec.

Litig.*, 273 F. Supp. 3d at 498–99 (citation omitted); *see also Fresno Cty. Emps.'s Ret. Ass'n*,

925 F.3d at 68 ("Notably, an unenhanced lodestar fee does not account for the contingent risk

that a lawyer may assume in taking on a case."' (citations omitted)); *Goldberger*, 209 F.3d at 53

("[C]ontingency risk . . . must be considered in setting a reasonable fee."); *In re Foreign Exch.*

*Benchmark Rates Antitrust Litig.*, No. 13-CV-7789, 2018 WL 5839691, at *3 (S.D.N.Y. Nov. 8,

2018) ("Significant risks warrant a substantial fee because '[n]o one expects a lawyer whose

compensation is contingent upon his success to charge, when successful, as little as he would

charge a client who in advance had agreed to pay for his services, regardless of success.'"

(alteration in original) (quoting *Grinnell I*, 495 F.2d at 470)), *aff'd sub nom. Kornell v. Haverhill*

*Ret. Sys.*, No. 18-3673-CV, 2019 WL 5681336 (2d Cir. Nov. 1, 2019); *Johnson v. Brennan*, No.

10-CV-4712, 2011 WL 4357376, at *17 (S.D.N.Y. Sept. 16, 2011) ("Uncertainty that an ultimate

recovery will be obtained is highly relevant in determining the reasonableness of an award."

(citation omitted)). Essentially, "the risk analysis asks . . . whether certain claims and cases,

although potentially meritorious, might face factual and legal hurdles that create a material risk

that the case may fail." *In re BioScrip, Inc. Sec. Litig.*, 273 F. Supp. 3d at 500.

While courts must consider contingency risk, such risk "do[es] not always compel

enhanced fees." *Goldberger*, 209 F.3d at 53; *see also Fresno Cty. Emps.'s Ret. Ass'n*, 925 F.3d

at 70 ("[I]t will not always be the case that an attorney representing a class assumes compensable

contingency risk. A case may, for example, have such a high likelihood of being meritorious

that compensation for contingency risk is unnecessary." (citation omitted)). "The plaintiff class

is . . . appropriately charged for contingency risk where such risk is appreciable because the class

has benefited from class counsel's decision to devote resources to the class's cause at the

expense of taking other cases." *Fresno Cty. Emps.'s  Ret. Ass'n*, 925 F.3d at 70.

The Court finds that this *Goldberger* factor weighs in favor of a substantial fee award

because there were significant risks at the outset of the litigation and because Class Counsel and

Supporting Counsel took the case on contingency.[14]  In Judge Gleeson's original attorneys' fees

order, he wrote:

> [G]iven the existential threats to this litigation discussed in the
> Approval Order, I conclude that the risk in this case was enormous.
> My award of attorneys' fees must recognize that, from an *ex
> ante* perspective, counsel no doubt had serious doubts about taking
> on such a risky and expensive litigation.

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d at 441.

As previously acknowledged by Judge Gleeson and this Court, the litigation itself was

substantively risky from the outset.  "When the litigation began in 2005, only one court had ruled

on an antitrust challenge to the manner in which interchange rates are set, and it had found in

favor of the defendant." *Id.* (citing *Nat'l Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*, 779

F.2d 592 (11th Cir. 1986)); (*see also* Pls. Mem. 24).  In addition, at the time of filing, Plaintiffs

faced challenges under antitrust standing grounds pursuant to *Illinois Brick Co. v. Illinois*, 431

U.S. 720, 736 (1977), which held that indirect purchasers do not have antitrust standing, because

Defendants argued "that the merchants lack standing because they are indirect purchasers — the

acquiring banks being the direct purchasers — with respect to the interchange fees they allege

---

[14]  In addition, although case law does not indicate that the Court must consider this in deciding the weight of this factor, the Court nevertheless notes the extensive period of time for which Class Counsel has not received any compensation — nearly fifteen years — and acknowledges that it may still be several more years before Class Counsel is compensated for their efforts.

31

were fixed." *Interchange Fees I*, 986 F. Supp. 2d at 225.  Defendants also argued that "all the claims in this case were released by the release in the *Visa Check* settlement."  (Pls. Mem. 24 (citations omitted).)

In addition, Class Counsel initiated this case on their own, without the benefit of a prior government investigation.  Rather, the reverse occurred.  *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d at 441 ("[T]he plaintiffs did not piggyback on previous government action — indeed, the government piggybacked on their efforts.").  They did so even knowing that they would be litigating against some of the best defense counsel, largest banks, and largest household-known corporations without the benefit of a prior government inquiry, and for years on contingency and without pay.

These considerations weigh in favor of a substantial award.  *See, e.g.*, *Alaska Elec. Pension Fund*, 2018 WL 6250657, at *1 (noting that this factor weighed in favor of approving requested fee of 28.5% of the gross settlement fund of a $504.5 million antitrust settlement where the risk was "considerable," and "exacerbated" in part because of the number of defendants and size of their resources);  *In re BioScrip, Inc. Sec. Litig.*, 273 F. Supp. 3d at 501 (noting that the contingency risk analysis "weigh[ed] in favor of a large award" where lead counsel "worked for two years without compensation on a contingency fee basis, and in that time billed almost 4,000 hours without a guarantee of recovery," and "would reasonably have been aware, in accepting this representation, that it could be involved in protracted motion practice for years prior to receiving any fee"); *Dial Corp.*, 317 F.R.D. at 435 (finding that this *Goldberger* factor weighed in favor of the requested fee and noting that "counsel prosecuted this case largely on contingency and assumed the risk of recovering nothing" and "[b]oth [c]ounsel and their clients waged a battle against one of the largest corporations in the world"); *Sykes v. Harris*, No.

32

09-CV-8486, 2016 WL 3030156, at *16 (S.D.N.Y. May 24, 2016) ("Class Counsel's risk of no recovery was high.  Class Counsel did not benefit from a previous, similar suit or from any similar government action or investigation.  Nor was there a high likelihood of settlement at the outset of filing suit — as evidenced by the fact that settlement discussions lasted over two years."); *In re Citigroup Inc. Bond Litig.*, 988 F. Supp. 2d at 379 (noting that although in securities actions "the risk of achieving no recovery at all . . . has become quite small," this *Goldberger* factor weighed in favor of "a substantial fee" because the "suit did not involve certain factors that traditionally signal the virtual inevitability of a settlement — such as a successful government investigation — and did involve the risk of an unfavorable outcome brought on by changes in applicable case law" (citation omitted)); *see also Berni v. Barilla G. e R. Fratelli, S.p.A.*, No. 16-CV-4196, 2019 WL 2341991, at *19 (E.D.N.Y. June 3, 2019) ("Little about litigation is risk-free, and class actions confront even more substantial risks than other forms of litigation." (quoting *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 361 (E.D.N.Y. 2010))); *cf. In re World Trade Ctr. Disaster Site Litig.*, 754 F.3d 114, 127 (2d Cir. 2014) (noting that there was little risk of non-recovery in the case because "Congress appropriated $1 billion . . . to insure New York City for tort claims arising out of the attacks of September 11, 2001.  Thus, the attorneys who took on th[e] case did not face all the risks inherent in other mass tort litigations — such as the risk that plaintiffs would be denied any recovery or that defendants would be judgment-proof."); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2018 WL 5839691, at *4 (finding no unique amount of risk because "that [d]efendants would likely have denied the existence of an overarching conspiracy to fix prices did not constitute significant risk because it is hardly unique that an antitrust defendant would deny participation in an illicit price-fixing conspiracy" (citation and internal quotation marks

omitted)); *id.* (noting that litigation risk was *reduced* because "the numerous government investigations and criminal prosecutions relating to price fixing in the foreign exchange market" were helpful, and that "the investigations were strong indicia of wrongdoing at the outset, and litigation risks decreased as the government investigations progressed and defendants admitted guilt"); *In re IndyMac Mortg.-Backed Sec. Litig.*, 94 F. Supp. 3d 517, 525 (S.D.N.Y. 2015), *aff'd sub nom. DeValerio v. Olinski*, 673 F. App'x 87 (2d Cir. 2016) (finding that risk was lower than counsel suggested because "securities cases like this practically always settle, meaning that the risk of total non-recovery was almost nonexistent" and "plaintiffs had the benefit of pre-existing investigations by government authorities" (citations omitted)).

### iv.  Quality of representation

Class Counsel notes that they "are among the most prominent and successful antitrust plaintiffs attorneys in the country," and that "[t]his . . . is the largest antitrust class action settlement."  (Pls. Mem. 22, 29; *id.* 22 n.22 (collecting cases where Class Counsel's firms secured large antitrust settlements).)  They further note that "Defendants are collectively represented by over a dozen of the nation's foremost antitrust practitioners," and that "[t]heir knowledge of the relevant issues and their clients' respective interests is exhaustive."  (*Id.* at 23.)

Objectors Unlimited Vacations and USA Pets argue that Class Counsel should not be entitled to compensation for their work done in connection with the 2013 Settlement Agreement because the Second Circuit found that Class Counsel was "proceeding under an irreconcilable conflict of interest."  (Unlimited Vacations and USA Pets Obj. 4.)  In addition, Objector McLaughlin argues that the fact that the "relief is a small fraction of the potential damages" and that "[t]he settlement does not include injunctive relief" cuts against the "large" fee request. (McLaughlin Obj. 8.)  Further, Objectors Gnarlywood and Quincy Woodrights argue that a

9.56% fee award is not warranted because the Second Circuit decided that members of the Rule 23(b)(2) class were inadequately represented, and therefore, "[t]he Second Circuit's opinion renders invalid both the [2013 Settlement Agreement] percentage fee award — intended to compensate for Class Counsel's time spent pursuing Rule 23(b)(3) damages and Rule 23(b)(2) relief — and the District Court's earlier lodestar cross-check." (Gnarlywood and Quincy Woodrights Obj. 19.)

Like the third *Goldberger* factor, the fourth factor — quality of representation — "do[es] not always compel enhanced fees," *Goldberger*, 209 F.3d at 53, and "a big recovery does not necessarily justify a quality multiplier," *id.* at 56. "[T]he quality of representation is best measured by results, and such results may be calculated by comparing 'the extent of possible recovery with the amount of actual verdict or settlement.'" *Id.* at 55 (quoting *Lindy Bros. Builders of Phila. v. Am. Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 118 (3d Cir. 1976)). "[A] large settlement can as much reflect the number of potential class members or the scope of the defendant's past acts as it can indicate the prestige, skill, and vigor of the class's counsel." *Grinnell II*, 560 F.2d at 1099. "The quality of opposing counsel is also important in evaluating the quality of Class Counsels' work." *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 246 F.R.D. 156, 174 (S.D.N.Y. 2007) (citations omitted); *see also Cohan v. Columbia Sussex Mgmt., LLC*, No. 12-CV-3203, 2018 WL 4861391, at *4 (E.D.N.Y. Sept. 28, 2018) ("[C]ourts review, among other things, the backgrounds of the lawyers involved in the lawsuit and the recovery obtained.").

While this factor weighs in favor of a substantial award, it requires a more nuanced assessment than Class Counsel suggests. Class Counsel has without question done a tremendous job in litigating this case. They represent some of the best plaintiff-side antitrust groups in the

country, and the size and skill of the defense they litigated against cannot be overstated. They have also demonstrated the utmost professionalism despite the demands of the extreme perseverance that this case has required, litigating on behalf of a class of over 12 million for over fourteen years, across a changing legal landscape, significant motion practice, and appeal and remand. Class Counsel's pedigree and efforts alone speak to the quality of their representation. *See Dial Corp.*, 317 F.R.D. at 435 (finding that this *Goldberger* factor weighed in favor of the fee request where "[p]laintiffs were represented by some of the finest antitrust lawyers in the nation," and defendants' lawyers "were of equally high caliber"); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d at 511 ("That counsel continued to zealously represent class members in this litigation even after a devastating loss before the Court of Appeals is a testament to their commitment. Such tenacity should be rewarded."); *cf. McDaniel*, 595 F.3d at 419 ("[A]lthough the percentage method has the advantage of aligning the interests of plaintiffs and their attorneys more fully by allowing the latter to share in both the upside and downside risk of litigation, it can create perverse incentives of its own, potentially encouraging counsel to settle a case prematurely once their opportunity costs begin to rise.").

In addition, as noted above, Class Counsel did not commence this action after a government investigation, which courts have found to be relevant in weighing in favor of a substantial award and a finding that counsel engaged in quality representation. *See, e.g.*, *Dial Corp.*, 317 F.R.D. at 434 ("While many class actions are filed on the heels of a government investigation, the claims in this case were formulated entirely from the findings of a private investigation."); *Meredith Corp.*, 87 F. Supp. 3d at 670 ("[U]nlike in many class actions, the case against [defendant] was not built on following, or piggybacking on, regulatory investigation or settlement."); *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 142 F.R.D. 588, 597 (S.D.N.Y.

1992) ("[T]his is not a case where plaintiffs' counsel can be cast as jackals to the government's lion, arriving on the scene after some enforcement or administrative agency has made the kill. They did all the work on their own."); *cf. Goldberger*, 209 F.3d at 56 ("[T]wo of the defendants . . . were convicted of criminal conduct bearing directly on the claims advanced in this case. There can be no doubt that this was a proper basis for declining to award a formal quality multiplier. Indeed, a good portion of counsel's lodestar was based on hours spent scouring the records developed during the parallel criminal proceedings.").

Despite the fact that Class Counsel has done a tremendous job in litigating this case, the Court notes that the monetary recovery is quite small when compared to Plaintiffs' own damages estimate and the large number of class members. As noted in the January 2019 Order:

> Although the agreed upon payment is objectively a large sum of money, it is less so when viewed in perspective. By 2005, "interchange fee revenue paid by merchants to Visa and Mastercard card-issuing banks had risen to over $30 billion per year." (Wildfang Decl. ¶ 13.) In under one decade, one retailer alone — Wal-Mart Stores, Inc. — "paid approximately $ 5.6 billion in interchange fees for payment card transactions on the Visa and MasterCard networks." (Wal-Mart's Obj. to the Proposed Settlement, Docket Entry No. 2644.)

*Interchange Fees III*, 330 F.R.D. at 47.

When compared to the recovery obtained in cases where courts weighed this factor in favor of the requested amount, the recovery falls short. *See, e.g.*, *Alaska Elec. Pension Fund*, 2018 WL 6250657, at *1 ("[T]he quality of representation . . . was exceptional, as counsel obtained over half a billion dollars for the class — by counsel's calculation, between 35% and 73% of their expected trial demand." (citation omitted)); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2018 WL 5839691, at *5 ("Undoubtedly, the $2.31 billion settlement achieved in this case is an exceptional result . . . [t]he estimated participation rate by number of claimants is

30%, based on approximately 60,000 submitted claims . . . . [and] claimants are projected to recover 94% to 123% of estimated single damages."); *In re Citigroup Inc. Bond Litig.*, 988 F. Supp. 2d at 379 ("Though the recovery here — $730 million — represents only a fraction of the possible recovery estimated by plaintiffs' damages experts — $3 billion — that fraction is still an impressive result."); *In re Nigeria Charter Flights Litig.*, No. 04-CV-304, 2011 WL 7945548, at *8 (E.D.N.Y. Aug. 25, 2011) ("[I]mportantly, the amount of the settlement of up to $1,700 per passenger is a substantial recovery compared to the actual damages sustained and is significantly more than the amounts netted by non-class members who separately settled.  Utilizing . . . figures for the expenses incurred by [a] lead named plaintiff . . . , the $1,700 payment amounts to 48% of her losses, a percentage which is higher than a typical consumer class action."), *report and recommendation adopted*, 2012 WL 1886352 (E.D.N.Y. May 23, 2012).

Notwithstanding the size of the monetary recovery compared to the alleged damages, and acknowledging that the Court is tasked with analyzing settlement terms for a damages class only, the Court nevertheless notes Class Counsel's role in obtaining injunctive relief.  Prior to remand, Class Counsel engaged in quality representation that resulted in injunctive relief, despite the Second Circuit's conclusion that members of the Rule 23(b)(2) injunctive relief class were not adequately represented.  As described by Judge Gleeson:

> Class Plaintiffs' expert estimates that [one piece of the injunctive relief secured] could save merchants between $26.4 and $62.8 billion over the next decade.  Frankel Decl., ¶¶ 67–73, DE 2111–5.  Plaintiffs' counsel also worked toward the passage of the Durbin Amendment, which removed discounting restrictions at the network level.  And this case also helped precipitate the networks' consent decree with the Department of Justice after plaintiffs' counsel shared their work with government attorneys several years into the litigation.

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d at 442.

38

The Court also notes that the injunctive relief previously secured remains in place, (Pls. Reply 17), despite the separate proceeding of the Rule 23(b)(3) and Rule 23(b)(2) actions.  Thus, what Class Counsel has achieved, despite the litigation risks and the risks that remand presented, is still immensely commendable.  In general, counsel should not be automatically penalized for taking on riskier and more complex litigation that may result in a smaller percentage award for class members due to that inherent risk.  Nevertheless, the Court finds that because it is only considering the damages class action, and not the injunctive relief action, the low percentage of recovery in comparison to the total alleged damages figure weighs slightly against granting the full amount of Class Counsel's requested fee.  *See, e.g.*, *Grice v. Pepsi Beverages Co.*, 363 F. Supp. 3d 401, 409 (S.D.N.Y. 2019) ("[T]he class members are receiving only approximately 5% of their maximum potential recovery.  But considering the factual and legal hurdles that the class would have had to overcome before securing a favorable judgment, the current settlement represents a good result for the class members.  Such a good result, however, is not so exceptional as to merit an increase in the baseline percentage."); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d at 510 (noting that the court had "nothing but the highest respect for the professionalism" of the attorneys and that "[n]ot only did counsel successfully defend against numerous motions to dismiss, but they also exhibited extraordinary perseverance when they petitioned the Court of Appeals for rehearing of [a case that could affect their outcome] and obtained clarification [from the Second Circuit] that the action was not precluded from continuing," but ultimately finding that this factor weighed in favor of reducing the fee award because "plaintiffs' counsel has admittedly been able to secure only two percent of the estimated damages").

The Court is not persuaded by Objectors Unlimited Vacations and USA Pets' argument

that Class Counsel should not be entitled to compensation for their work done in connection with the 2013 Settlement Agreement because the Second Circuit found that Class Counsel was "proceeding under an irreconcilable conflict of interest." (Unlimited Vacations and USA Pets Obj. 4.) Unlimited Vacations and USA Pets argue that the New York Rules of Professional Conduct "require[] forfeiture of all fees generated prior to the resumption of this case in this Court after the Court of Appeals reversed the prior settlement approval," (*id.*), because under the Rules, an attorney may not recover fees for services rendered during the time they were violating those rules, (*id.* at 5). They cite two Ninth Circuit cases in support, and argue that California and New York have similar sets of ethical rules. (*Id.* at 4 (citing *Radcliffe*, 715 F.3d 1157; *Rodriguez*, 563 F.3d at 967–68).)

Unlimited Vacations and USA Pets have failed to establish that Class Counsel has committed any ethical violation of the New York Rules of Professional Conduct based on the Second Circuit's ruling that a conflict of interest existed in the unitary representation of the Rule 23(b)(3) and Rule 23(b)(2) classes. Conflicts that arise in complex class action contexts warrant consideration of the unique circumstances of the case, and the Second Circuit has "recognized that the traditional rules concerning conflict-free representation, applicable in non-class lawsuits, 'should not be mechanically applied to the problems that arise in the settlement of class action litigation.'" *In re Austrian & German Bank Holocaust Litig.*, 317 F.3d 91, 102 (2d Cir. 2003) (quoting *In re "Agent Orange" Prod. Liab. Litig.*, 800 F.2d 14, 19 (2d Cir. 1986)). Neither of the New York cases that Objectors cite are class action cases.

In the out-of-Circuit cases cited by Unlimited Vacations and USA Pets, class counsel affirmatively created conflicts of interest through assurances to class representatives regarding class representative service awards. In *Rodriguez*, the Ninth Circuit found that undisclosed

advanced agreements with class representatives, "tying their compensation — in advance — to a sliding scale based on the amount recovered . . . disjoined the contingency financial interests of the contracting representatives from the class," and implicated California's ethics rules prohibiting representation of clients with conflicting interests. *Rodriguez*, 563 F.3d at 959. The Ninth Circuit remanded for further consideration but stated that it "express[ed] no opinion on the impact of [ethical rules and] principles on the fees request in this case, but it is apparent that they are, at least, implicated." *Id.* at 968. In *Radcliffe*, explicit incentive award agreement conditions similarly created a conflict of interest and made class representatives inadequate representatives of the class. 715 F.3d at 1164 ("The settlement agreement explicitly conditions the incentive awards on the class representatives' support for the settlement.").

In contrast, not only did the Second Circuit not criticize Class Counsel's representation of the Rule 23(b)(3) class interests, as noted *supra*, it "expressly d[id] not impugn the motives or acts of class counsel." *Interchange Fees II*, 827 F.3d at 234. The conflict has been addressed through the assignment of separate counsel for each of the Rule 23(b)(3) and Rule 23(b)(2) classes. Moreover, as noted throughout this opinion, Class Counsel is seeking compensation based not on any relief previously secured for the Rule 23(b)(2) class, but instead as a percentage of the settlement fund secured for the Rule 23(b)(3) class. That fund exists for the Superseding Settlement Agreement, separate and apart from the previously secured relief, and to not acknowledge or compensate Class Counsel for any work completed up to and including 2016, when the Second Circuit remanded the settlement for further consideration, would be unjust, and would penalize counsel for not predicting exactly what turns the case would take.

v.    **Requested fee in relation to the settlement fund**

Class Counsel notes that "[t]his settlement is the largest ever antitrust class action settlement," and that they "seek a rate that is far below that which any single class member would have paid to prosecute this action alone, and far below what private plaintiffs typically pay." (Pls. Mem. 20–21, 29.) Class Counsel argues that market percentage rates should apply to a determination of what percentage of the settlement fund they are awarded. (*Id.* (first quoting *Wal-Mart Stores*, 396 F.3d at 123 (quoting *Goldberger*, 209 F.3d at 52); and then citing Silver Decl. 1, 5–12); *see also* Silver Decl. 2–3 ("Because clients set fees up front when they hire lawyers directly, market rates reflect the real risks of litigation. And because sophisticated clients normally pay at least 25 percent of their recoveries as fees, the reasonableness of Class Counsel's request for a 9.56 percent fee is clear.").) Further, Class Counsel argues that "Counsel's request is well within the established range for such cases," (*id.* at 21 n.20 (citing Silver Decl. at 5, 12, tbls. 1 & 2)), and states that "[t]he percentage of the fund requested here is lower than the percentages awarded in five other antitrust class action settlements exceeding a billion dollars, and is only greater than one," (*id.* at 29).

Objectors Unlimited Vacations and USA Pets argue that the percentage of the fund sought by Class Counsel is excessive because it exceeds the average percentage of common funds awarded in class actions exceeding $1 billion in the Second Circuit. (Unlimited Vacations and USA Pets Obj. 7.) Objectors Jack Rabbit and Cahaba Heights argue that the requested attorneys' fees are unreasonable, that "[i]n this Circuit, the average attorneys' fees percentage in settlements above $2.5 billion is 5.97%," and that the Court should therefore approve attorneys' fees of 5.97% of the fund. (Jack Rabbit and Cahaba Heights Obj. 4–5, 6.) Objector Kohan argues that "attorney[s'] fees should not exceed one percent (1%) of the total settlement

proceeds."  (Kohan Obj. 5.)

"In using the percentage of the fund approach, the critical *Goldberger* factor is

necessarily the size of the requested fee in relation to the settlement."  *In re Foreign Exch.*

*Benchmark Rates Antitrust Litig.*, 2018 WL 5839691, at *2 (citation omitted).  "Courts . . .

consider the size of the settlement to ensure that the percentage awarded does not constitute a

'windfall.'"  *Johnson*, 2011 WL 4357376, at *18 (citing *In re Gilat Satellite Networks, Ltd.*, No.

02-CV-1510, 2007 WL 2743675, at *16 n.41 (E.D.N.Y. Sept. 18, 2007)).  In order to weigh this

*Goldberger* factor, courts sometimes "determine a baseline reasonable fee by looking to other

common fund settlements of a similar size, complexity and subject matter."  *In re Foreign Exch.*

*Benchmark Rates Antitrust Litig.*, 2018 WL 5839691, at *2.

In cases with large settlement awards, courts have noted that correspondingly smaller

percentage awards of attorneys' fees are reasonable.  *See, e.g.*, *Wal-Mart Stores*, 396 F.3d at 106,

123 (upholding a district court's award of $220,290,160.44, which amounted to 6.5% of a $3.05

billion settlement fund, or a 3.5 multiplier of the lodestar amount, and noting that "the sheer size

of the instant fund makes a smaller percentage appropriate"); *Goldberger*, 209 F.3d at 52–53

(noting that "[s]tarting an analysis with a benchmark could easily lead to routine windfalls where

the recovered fund runs into the multi-millions," and holding that a percentage fee award of

roughly 4% did not constitute an abuse of discretion, reasoning that "empirical analyses

demonstrate that in cases like this one, with recoveries of between $50 and $75 million, courts

have traditionally accounted for these economies of scale by awarding fees in the lower range of

about 11% to 19%" (citations omitted)); *Dial Corp. v. News Corp.*, 317 F.R.D. at 435 ("In mega-

fund cases such as this, several courts in this Circuit have subscribed to the view that 'the

percentage used in calculating any given fee award must follow a sliding-scale and must bear an

inverse relationship to the amount of the settlement.'" (collecting cases) (quoting *In re Indep. Energy Holdings PLC*, No. 00-CV-6689, 2003 WL 22244676, at \*6 (S.D.N.Y. Sept. 29, 2003))); Ann. Manual for Complex Litigation (Fourth) § 14.121 (2018) (noting that in "mega-cases" where "large settlements or awards serve as the basis for calculating a percentage, courts have often found considerably lower percentages of recovery to be appropriate") (citing *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 148 F.3d 283, 339–40 (3d Cir. 1998)). "Nonetheless, this principle cannot be considered in isolation without also reviewing the amount of work and time spent by counsel in this litigation.  For those cases in which settlement is quick and the time and labor expended by counsel is low, a high percentage fee would be a windfall and therefore inappropriate." *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d at 514–15.

Due to the size of the settlement fund, there are relatively few cases that provide adequate comparisons for the percentage of the fund requested, but several large antitrust settlements are nevertheless useful points of comparison, despite the small sample size. *See, e.g.*, *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2018 WL 5839691, at \*3 (reducing requested percentage from 16.51% to 13% percent of a roughly $2.3 billion settlement after comparing to five other greater than $1 billion antitrust settlements and noting that "[a]lthough there are notable limitations — namely, the small sample size and high standard deviation (above 8%) — these data points still provide useful guidance, especially when situated within the sliding scale framework," i.e., awarding a smaller percentage for a bigger fund); *In re Credit Default Swaps Antitrust Litig.*, No. 13-MD-2476, 2016 WL 2731524, at \*17 (S.D.N.Y. Apr. 26, 2016) (finding the requested 13.61% of an approximately $1.9 billion settlement fund to be "generous," but "consistent with fees awarded in other large antitrust cases" (citing Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical Legal Stud.

44

811, 831 tbl. 7, 839 tbl. 11 (2010)); *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp.

2d at 509, 524 (awarding 6.5% of a $3.38 billion recovery); *In re NASDAQ Mkt.-Makers*

*Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (awarding 14% of a $1.027 billion

settlement fund); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-MD-1827, 2013 WL

1365900, at *7 (N.D. Cal. Apr. 3, 2013) (awarding 28.6% of a $1.08 billion settlement fund).

The Court recognizes that a simple comparison to cases of a similar type and settlement

size provides limited guidance, and is not a substitute for the unique circumstances of this case.

For example, Judge Gleeson presided over this action and the *Visa Check* case, both multi-

billion-dollar antitrust payment card actions, but awarded 9.56% in fees in this action compared

to 6.5% in fees in *Visa Check*, noting that "[t]his case was more challenging." *In re Payment*

*Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d at 444. Nevertheless, the

Court notes that, with the exception of the lower percentage awarded in *Visa Check*, Class

Counsel's 9.56% fee request falls within a similar range of fees awarded in other multi-billion-

dollar antitrust actions, and therefore, although from a small sample size, aligns with the Second

Circuit's sliding scale approach, and does not warrant a downward adjustment based on

percentage alone.

Objectors cite to the average percentages awarded for all settlement funds over $1 billion

in the Second Circuit as being lower than the fee sought in this case, but the Court finds that this

approach tends to be overinclusive. For example, Objectors Unlimited Vacations and USA Pets

encourage the court to consider a 1.7% fee award, similar to that awarded in *In re Tremont Sec.*

*Law, State Law & Insurance Litigation*, No. 08-CV-11117, 2019 WL 516148 (S.D.N.Y. Feb. 11,

2019), where the court determined that no lodestar multiplier was warranted. (Unlimited

Vacations and USA Pets Obj. 7.) But *Tremont* is not a good comparator. In addition to the fact

that *Tremont* was a securities action, which types of action are generally considered more straightforward and more likely to settle than antitrust actions, it is distinguishable because the money from which counsel sought fees had already been guaranteed, and "was generated without any risk by [l]ead [c]ounsel." *In re Tremont Sec. Law, State Law & Ins. Litig.*, 2019 WL 516148, at *11; *see also In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, No. 02-MD-1484, 2007 WL 313474, at *16 (S.D.N.Y. Feb. 1, 2007) ("There is generally only a very small risk of non-recovery in securities class litigation.").[15]

The Court finds that the best comparators are megafund antitrust class actions, declines to adopt the comparative approach that Objectors encourage, and finds that the requested percentage aligns with those percentages granted in other similar types of actions.

### vi. Public policy considerations

Class Counsel contends that "public policy favors attracting top tier firms to litigate complicated antitrust cases," and that "[t]he number of firms that have the expertise, resources and willingness to lead the prosecution of cases such as this one is small." (Pls. Mem. 37.) No one objected to the requested fee on public policy grounds.

"There is . . . commendable sentiment in favor of providing lawyers with sufficient incentive to bring common fund cases that serve the public interest." *Goldberger*, 209 F.3d at 51 (citation omitted). However, as the Second Circuit has acknowledged, "plaintiffs in common fund cases typically are not fully informed" and "rarely object" in part because "they have no

---

[15] In *Tremont*, the district court originally approved a 3% award of a specific fund, or a 2.5 multiplier of the lodestar, but "the Second Circuit explained that because [l]ead [c]ounsel was seeking fees for work completed only after the district court's approval of the [i]nvestor [s]ettlement, it did not make sense to multiply the fee award on this basis because the risk 'dissipated when the court approved that settlement.'" *In re Tremont Sec. Law, State Law & Ins. Litig.*, 2019 WL 516148, at *5 (citation omitted).

46

real incentive to mount a challenge that would result in only a 'miniscule' *pro rata* gain from a fee reduction." *Id.* at 52–53. "While public policy favors 'the award of reasonable attorney's fees,' courts must also 'guard against providing a monetary windfall to class counsel to the detriment of the plaintiff class.'" *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. at 130 (quoting *In re NTL Inc. Sec. Litig.*, No. 02-CV-3013, 2007 WL 1294377, at *8 (S.D.N.Y. May 2, 2007)).

Ultimately, "principles of moderation" should be applied to fee awards, and "award[s] should be assessed based on scrutiny of the unique circumstances of each case." *Goldberger*, 209 F.3d at 53. However, "[i]f attorneys' fees are routinely set too low, it may create poor incentives to bringing large class action cases." *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2018 WL 5839691, at *5 (citing *In re Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d 344, 352 (S.D.N.Y. 2014)). Public perception of fairness and overcompensation of attorneys should also factor into a court's consideration. *In re World Trade Ctr. Disaster Site Litig.*, 754 F.3d at 127 ("The district court was keenly aware that the funds available to these victims are limited. It recognized that overcompensation of attorneys would take away money from needy plaintiffs, and it was rightfully sensitive to the public perception of overall fairness.").

The Court finds that despite the apparent unfairness of the sheer size of the attorneys' fees award involved in this case, especially in comparison to the claims amount that an average class member will receive, public policy interests weigh in favor of a substantial award. There is a genuine public interest in bringing private antitrust class actions in order to protect consumers, competition, and businesses, and private antitrust suits often serve as a supplement to government antitrust investigations. *See Alaska Elec. Pension Fund*, 2018 WL 6250657, at *1 ("[P]ublic policy favors rewarding the successful prosecution of antitrust claims."); *In re Foreign*

47

*Exch. Benchmark Rates Antitrust Litig.*, 2018 WL 5839691, at \*5 ("Antitrust class actions serve the public interest by protecting consumers from exploitation . . . . Indeed, in some of the related criminal cases, the government has expressly declined to seek restitution in light of the availability of relief in the civil litigation." (citation omitted)); *In re Credit Default Swaps Antitrust Litig.*, 2016 WL 2731524, at \*18 (noting that public policy considerations weighed in approval of the fee request and that "[i]t is important to encourage top-tier litigators to pursue challenging antitrust cases" and that "[o]ur antitrust laws address issues that go to the heart of our economy.  Our economic health, and indeed our stability as a nation, depend upon adherence to the rule of law and our citizenry's trust in the fairness and transparency of our marketplace." (citing *F.T.C. v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216, 225 (2013))); *Meredith Corp.*, 87 F. Supp. 3d at 670 ("Private antitrust lawsuits 'provide a significant supplement to the limited resources available' to public antitrust regulators." (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979))); *In re Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d at 353 (noting that certain "types of common fund cases are based on laws reflecting important policy concerns — for example, the protection of consumers").

Class Counsel brought antitrust claims on behalf of millions of merchants, both large and small, challenging an economic structure that has become entirely ubiquitous in our society, but which the merchants believe unfairly harms them and is the result of illegal action on the part of Defendants.  There is an enormous public policy interest in bringing a lawsuit that has the potential to impact the way nearly all business is conducted in this country.  Thus, there is public policy interest in awarding fees in a manner that incentivizes and attracts capable counsel to bring such protracted and difficult lawsuits.  *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 359 (S.D.N.Y. 2005) ("In order to attract well-qualified plaintiffs' counsel who are able to

take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives.").

### c. Lodestar crosscheck

Class Counsel notes that their billing review process followed "strict guidelines" and resulted in a conservative estimate. (Pls. Mem. 34.) Prior to the 2013 Settlement Agreement, they "undertook a[] . . . wide-ranging effort to review the lodestar figure to eliminate excessive, redundant and certain other time." (*Id.*) For example, Class Counsel eliminated read and review time and capped document review time to ten hours per day, (*id.* at 34 (citation omitted)), and also reviewed time submissions from Supporting Class Counsel in addition to their own time, "ultimately resulting in the initial total lodestar being reduced by approximately $13.9 million, or approximately 7.93%," (*id.* at 35 (citation omitted)). They further hired an outside accounting firm to conduct an additional audit of the lodestar. (*Id.* (citation omitted).) Class Counsel argues that the hourly rates and the lodestar multiplier of 2.5 out of a $5.6 billion settlement fund is reasonable, and note that they "rely . . . on relatively conservative historical rates" as opposed to current rates to calculate the lodestar which has resulted in a larger multiplier than if current rates had been used, which would result in a multiplier of 1.94. (*Id.* at 35–36; Lodestar Multipliers Including FLG Time.)

Objector McLaughlin argues that the requested multiplier is inappropriate, that "more recent Supreme Court and Second Circuit authority suggest that fee awards ought to be tethered much more closely to the basic lodestar," and that the lodestar is a presumptively reasonable award. (McLaughlin Obj. 9–10.)

To ensure the reasonableness of a fee that constitutes a percentage of a common fund, courts are encouraged to check the fees that the percentage method would generate, against the

lodestar amount.  *See, e.g.*, *Fresno Cty. Emps.'s Ret. Ass'n*, 925 F.3d at 72 ("Further, if judicial

review of class-action settlements with a 'searching assessment' of counsel's fee award, were not

solace enough for the [o]bjector, we have also counseled that the district court should use the

lodestar as a 'baseline' against which to cross-check a percentage fee: 'we encourage the practice

of requiring documentation of hours as a "cross check" on the reasonableness of the requested

percentage.'" (first quoting *McDaniel*, 595 F.3d at 419 (internal quotation marks omitted); and

then quoting *Goldberger*, 209 F.3d at 50)).  "Under the lodestar method, the court multiplies the

reasonable hours billed by a reasonable hourly rate, then adjusts the award based on factors such

as the risk of the litigation and the performance of the attorneys."  *In re Foreign Exch.*

*Benchmark Rates Antitrust Litig.*, 2018 WL 5839691, at *1 (citing *Goldberger*, 209 F.3d at 50).

"A multiplier is typically applied to the lodestar figure to represent 'the risk of litigation, the

complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and

other factors.'"  *In re Citigroup Inc. Bond Litig.*, 988 F. Supp. 2d at 375 (quoting *In re Global*

*Crossing Sec. and ERISA Litig.*, 225 F.R.D. 436, 468 (S.D.N.Y. 2004)).  When using the lodestar

as a "cross check," the documented hours "need not be exhaustively scrutinized."  *Goldberger*,

209 F.3d at 50 (citation omitted).

While courts differ in opinion as to what constitutes an acceptable lodestar multiplier,

Class Counsel's proposed multiplier of 2.5 if the settlement fund remained at $5.6 billion, falls

well within a range of multipliers that have been deemed acceptable, especially in complex

actions.  *See Wal-Mart Stores*, 396 F.3d at 123 (noting, in a megafund antitrust action, that "the

lodestar yields a multiplier of 3.5, which has been deemed reasonable under analogous

circumstances" and that "multipliers of between 3 and 4.5 have become common" (collecting

cases)); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2018 WL 5839691, at *5

(approving a lodestar multiplier of 1.72 in an approximately $2.3 billion antitrust case but noting that "the lodestar multiplier in this case is lower than those in similarly sized antitrust cases . . . largely due to the exceptionally high number of hours billed (330,600)" and the fact that some of the hours billed related to ongoing litigation that had not yet settled); *In re BioScrip, Inc. Sec. Litig.*, 273 F. Supp. 3d at 497 ("There is no question that Lead Counsel's lodestar multiplier of 1.39 is at the lower range of comparable awards in common fund cases." (collecting cases)); *Sykes*, 2016 WL 3030156, at *16 ("The multiplier here is 3.3, which is consistent with other cases in the Second Circuit." (collecting cases)); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 WL 1365900, at *7–8 (approving a multiplier of 2.5 for a $1.08 billion settlement fund); *but see In re Platinum & Palladium Commodities Litig.*, No. 10-CV-3617, 2015 WL 4560206, at *4 (S.D.N.Y. July 7, 2015) (reducing multiplier from 2.6 to 1.9 for a $72.5 million fund); *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. at 130 (reducing multiplier from 2.69 to 1.6 for an $336 million fund); *In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d at 401 ("Courts in this Circuit have trended toward awarding lower percentages and lower multipliers for awards from extremely large common funds.").  Although the Second Circuit stated in *In re Tremont Securities Law, State Law & Insurance Litigation* that, "[a] lodestar multiplier of 2.5 would be considered high for a standard common fund case in this Circuit," as discussed *supra*, that case involved virtually no litigation risk, while this case involved significant litigation risk and is a far cry from a "standard" common fund case.  *In re Tremont Sec. Law, State Law & Ins. Litig.*, 699 F. App'x 8, 18 (2d Cir. 2017) ("Virtually all the cases that feature a multiplier are those in which, unlike here, the fund was collected by the efforts of counsel with an inherent risk that the litigation would yield less or none."), *cert. denied sub nom.*, *Haines v. Lange*, 138 S. Ct. 1264 (2018).

Although when used as a crosscheck the Court need not heavily scrutinize the lodestar, the Court finds that a slight downward adjustment of the lodestar is warranted based on its review of the post-2012 hourly rates submitted.  For example, the Court notes that Robins Kaplan's fee report indicates that paralegals were billing at rates of over $200 and 300 per hour, and from one year to another one partner's hourly rate jumped $290 per hour, from $500 to $790.  (*See* Undlin Suppl. Decl. Ex. 8.)  While the Court expects reasonable hourly rate increases for paralegals and attorneys working on the case, several of the rates, particularly the paralegal rates, that appear in the second as compared to the first reporting period, appear to slightly exceed what is considered a reasonable rate.  (*Compare* Undlin Supp. Decl. Ex. 8 *with* Undlin Decl. Ex. F); *see Hall v. ProSource Techs., LLC*, No. 14-CV-2502, 2016 WL 1555128, at *11–13 (E.D.N.Y. Apr. 11, 2016) (noting that the documented paralegal rate of "$150 is above the range typically awarded to paralegals in this district"); *see also In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d at 507 (capping paralegal rates at $100 per hour and noting that "[t]he requested rate of compensation for paralegals was both shocking and unconscionable," as "[t]he maximum requested fee for such service was $355 per hour").

The Court does not endorse Friedman Law Group's lodestar submitted for the second phase of litigation in this action — December of 2012 through January of 2019 — totaling $1,452,855.  (Undlin Suppl. Decl. tbl. 3.)  Class Counsel has not endorsed FLG's entire application for fees due to their perception that FLG "may have violated certain duties."  (Stip. re Pls. Mot. and Proposed Order 1; *see also* Undlin Suppl. Decl. 2.)  While FLG's lodestar submission of $9,594,806.15 for phase one of the litigation was previously submitted to the Court and audited by Class Counsel, Class Counsel did not audit FLG's phase two lodestar. Class Counsel contends that for phase two, FLG's work was "primarily devoted to countering

efforts to enact new anti-surcharge legislation in a variety of states following the approval of the [2013 Settlement Agreement] and also to challenge state legislative surcharge bans that were already in place in New York, Florida, Texas and California." (Undlin Suppl. Decl. 4.) Thus, Class Counsel suggests that FLG's proposed phase two lodestar should be reduced by fees it received pursuant to fee-shifting statutes in some of its successful state challenges, including $42,000 by the State of Florida, approximately $69,000 by the State of California, and approximately $35,000 by the State of Texas. (*Id.* at 6–7.) Because the majority of FLG's phase two hours were spent working on anti-surcharge legislation efforts, and because it appears that FLG has and/or will receive compensation for these efforts, in addition to the fact that there has been no audit of the phase two hours, the Court is unable to discern what percentage of FLG's phase two lodestar, if any, should be considered for the purposes of deciding the fee application. As a result, the Court only considers FLG's phase one lodestar submission in the amount of $9,594,806.15.[16]

However, even with a slight downward adjustment of post-2012 hourly rates and the exclusion of FLG's post-2012 lodestar, which would result in a slightly smaller lodestar, any resulting multiplier would likely still fall within a generally accepted range, and the Court finds that the lodestar cross check does not weigh against Class Counsel's fee request. *In re BioScrip, Inc. Sec. Litig.*, 273 F. Supp. 3d at 503–04 ("Even were the true multiplier higher . . . , it would still be well within the reasonable range of similar awards, and the Court would still approve the fee request."). For example, Judge Gleeson previously approved a lodestar multiplier of 3.41 in

---

[16] The Court notes however, that the resolution of whether FLG's phase two lodestar should be included has no impact on the Court's determination of the appropriate attorneys' fees as the Court is using the lodestar information as a cross-check and is instead awarding attorneys' fees based on a percentage of the funds only.

this case.  *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d at 448.

Some of the objectors argue that the lodestar amount itself is presumptively sufficient, but, as recently resolved by the Second Circuit, in common fund cases as opposed to where fees are awarded pursuant to a fee-shifting provision, courts retain greater discretion to award multipliers of the lodestar.  *See Fresno Cty. Emps.'s Ret. Ass'n*, 925 F.3d at 67 (noting that fees awarded pursuant to fee-shifting provisions, in contrast to common fund cases, face "greater restrictions," and that it is where "a statute's fee-shifting provision authorizes a reasonable attorneys' fee, [that] the Supreme Court has held that 'the lodestar method yields a fee that is presumptively sufficient.'" (quoting *Perdue*, 559 U.S. at 552)); *In re BioScrip, Inc. Sec. Litig.*, 273 F. Supp. 3d at 478–79 (rejecting the objector's argument that Supreme Court precedent requires a "strong presumption" that the lodestar is reasonable, noting that "[i]n the context of an award of fees from a *common fund* created after settlement, the Second Circuit has held that a court has a great deal of discretion in calculating a reasonable fee," and concluding "that the presumption against a lodestar enhancement articulated in [Supreme Court cases] when a court awards a reasonable attorney's fee from a defendant pursuant to a fee-shifting provision does not apply to the award of fees in this case from a common fund created after a settlement" (emphasis added)).

Other objectors make similar arguments to those set forth *supra* regarding the calculation of Class Counsel's total hours given the fact that some of those hours might have involved work on behalf of the Rule 23(b)(2) class.  (*See, e.g.*, Hr'g Tr. 118:17–20 ("[W]e can't do a lodestar crosscheck simply because we don't know what lodestar is attributable to the . . . (b)(3) class services.").)  In addition to the reasoning set forth *supra* under the Court's analysis as to the first

54

*Goldberger* factor, the Court notes that other courts have not necessarily discounted hours when those hours include hours billed for other related ongoing litigation.  *See, e.g.*, *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2018 WL 5839691, at \*5 (analyzing the lodestar multiplier and noting that the multiplier size was "largely due to the exceptionally high number of hours billed (330,600)" and that "some of these hours relate to work in the ongoing litigation against Credit Suisse, which has not settled").

The Court finds after conducting a lodestar cross check, that a slight reduction is warranted due to certain hourly rates, but that even with such a reduction, the resulting multiplier falls within an acceptable range.  The Court expressly declines to scrutinize each individual time entry, or to penalize individuals or specific firms, with the exception of excluding FLG's phase two hours as described above.  *See, e.g.*, *Hall*, 2016 WL 1555128, at \*13–14 ("Rather than scrutinizing the propriety of each individual time entry, the Court considers an across-the-board percentage cut of 2% to be reasonable in accounting for impermissible entries." (collecting cases)).  Instead, the Court considers this as a factor in its final percentage award.

\*   \*   \*

Balancing all of the above factors and considering the lodestar cross check, the Court finds that a slight reduction in fees is warranted, and awards Class Counsel 9.31% of the settlement fund in attorneys' fees.  This represents a .25% reduction of the 9.56% award sought by Class Counsel.  The Court commends Class Counsel's perseverance and overall excellent quality of representation, but finds that a slight reduction is warranted due largely to the fact that the settlement value, despite being impressive given the significant litigation risks Class Counsel faced, is nevertheless a small recovery when viewed in light of the size of the class, especially given that merchants are no longer guaranteed injunctive relief as they were in the 2013

55

Settlement Agreement.[17]  The Court understands this to amount to an award of $523,269,585.27 when using the settlement fund amount as of October 25, 2019.  (*See* Lodestar Multipliers Including FLG Time.)  The Court adjusts the lodestar amount to $213,348,555 after deducting FLG's phase two lodestar amount, and therefore calculates the lodestar multiplier to be approximately 2.45.

### d.   Reimbursement of expenses

Class Counsel argues that "[b]ecause all of the expenses in this case are typical of those incurred in such a complex and lengthy case and reasonable, they should be reimbursed."  (Pls. Mem. 38.)

Objector Kohan writes that "expenses as part of attorney fees is unconvincing because there is a separate category of the Cost of Administration and Notices, and Taxes on the Settlement Fund."  (Kohan Obj. 5.)

The Court has reviewed the affidavits in support of the request for reimbursements of expenses, and although large, the Court finds the requested fees to be reasonable, especially in light of the complexity and duration of this antitrust case.  *See In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2018 WL 5839691, at *1 (awarding $22,490,654.29 in litigation expenses for five years of work in a $2,310,275,000 settlement fund antitrust case); *Alaska Elec. Pension Fund*, 2018 WL 6250657, at *1 (awarding $18,429,687.63 in expenses for four years of work and roughly 160,000 billable hours); *see also Meredith Corp.*, 87 F. Supp. 3d at 671 (approving requested fees and noting "substantial expenses were necessary in this complex antitrust case"); *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. at 131 ("Given the magnitude of this

---

[17]  This acknowledgement is not a critique of the enormous representative efforts undertaken by Class Counsel.

case, its national scope, its long duration, and the extensive and expensive expert discovery conducted by the parties, this [c]ourt is satisfied that the expenses incurred were reasonable."). The Court accordingly grants Class Counsel's requested expenses in the amount of $38,263,023.81. In accordance with the reasoning set forth above, the Court grants FLG expenses for phase one of the litigation in the amount of $892,044.20 and declines to grant expenses in the amount of $37,894.40, associated with phase two of the litigation. (*See* Undlin Suppl. Decl. tbls. 2 & 4.)

### III. Conclusion

For the foregoing reasons, the Court grants attorneys' fees in the amount of 9.31% of the settlement fund, amounting to $523,269,585.27 and grants expenses in the amount of $39,155,068.01.

Dated: December 16, 2019
     Brooklyn, New York

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge