**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | Case No. 05-MD-01720 (MKB) (JO) |
| This Document Applies to: *Melvin Salveson, et al. v. JP Morgan Chase & Co., et al.*, No. 14-cv-03529 (MKB) (JO) | |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO THE**
**SALVESON PLAINTIFFS' MOTION FOR RELIEF FROM FINAL JUDGMENT**

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ...........................................................................................................1

BACKGROUND ...........................................................................................................2

ARGUMENT .................................................................................................................5

     A.     The Salveson Plaintiffs Do Not Meet the High Standards of Rule 60(b). ...............5

          1.     The Second Circuit has already rejected the argument that the central finding in *Amex II*—that payment card networks are two-sided markets—is helpful to the Salveson plaintiffs' claims........................6

          2.     The Salveson plaintiffs do not demonstrate the existence of extraordinary circumstances based on inconsistent treatment of victims of the same tort because they are not themselves tort victims.........................................................................................................9

          3.     The Salveson plaintiffs' argument that there would be no other plaintiffs to sue lacks factual and legal support. ........................................10

     B.     The Supreme Court's *Amex II* Decision Did Not Make the Salveson Plaintiffs Direct Payors of Interchange Fees ........................................................11

CONCLUSION..............................................................................................................14

## <u>TABLE OF AUTHORITIES</u>

### CASES

*In re Aluminum Warehousing Antitrust Litig.*,
 833 F.3d 151 (2d Cir. 2016)..................................................................................11

*Apple Inc. v. Pepper*,
 139 S. Ct. 1514 (2019)...............................................................................13, 14

*De Curtis v. Ferrandina*,
 529 F. App'x 85 (2d Cir. 2013) ...........................................................................5

*Empresa Cubana del Tabaco v. General Cigar Co.*,
 385 F. App'x 29 (2d Cir. 2010) .......................................................................7, 8

*Federal Insurance Co. v. Kingdom of Saudi Arabia (In re Terrorist Attacks on September
 11, 2001 (Kingdom of Saudi Arabia)*,
 741 F.3d 353 (2d Cir. 2013)..................................................................5, 7, 9, 10

*Fjord v. AMR Corp. (In re AMR Corp.)*,
 527 B.R. 874 (Bankr. S.D.N.Y. 2015) ..............................................................12

*Gatt Communications, Inc. v. PMC Associates, L.L.C.*,
 711 F.3d 68 (2d Cir. 2013)..................................................................................12

*Gondeck v. Pan American World Airways, Inc.*,
 382 U.S. 25 (1965)..........................................................................7, 8, 9, 10

*Keepers, Inc. v. City of Milford*,
 776 F. App'x 734 (2d Cir. 2019) ..........................................................................5

*National Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*,
 596 F. Supp. 1231 (S.D. Fla. 1984), *aff'd*, 779 F.2d 592 (11th Cir. 1986)................10, 11

*Ohio v. American Express Co.*,
 138 S. Ct. 2274 (2018)...............................................................................1, 4, 9, 12

*Pan American World Airways, Inc. v. O'Hearne*,
 335 F.2d 70 (4th Cir. 1964) ...................................................................................8

*Ruotolo v. City of New York*,
 514 F.3d 184 (2d Cir. 2008).................................................................................5

*Salveson v. JP Morgan Chase & Co.*,
 137 S. Ct. 1826 (2017).........................................................................................4

*Salveson v. JP Morgan Chase & Co.*,
 166 F. Supp. 3d 242 (E.D.N.Y. 2016) ......................................................3, 13

*Salveson v. JP Morgan Chase & Co.*,
    663 F. App'x 71 (2d Cir. 2016) ......................................................................4, 7, 11, 13

*Stevens v. Miller*,
    676 F.3d 62 (2d Cir. 2012)...................................................................................9, 14

*Tapper v. Hearn*,
    833 F.3d 166 (2d Cir. 2016)......................................................................................5

*Tru-Art Sign Co. v. Local 137 Sheet Metal Workers International Ass'n*,
    852 F.3d 217 (2d Cir. 2017)......................................................................................5

*United States v. American Express Co.*,
    838 F.3d 179 (2d Cir. 2016)........................................................................3, 4, 7, 10

*US Airways, Inc. v. Sabre Holdings Corp.*,
    938 F.3d 43 (2d Cir. 2019)......................................................................................12

*Visa U.S.A., Inc. v. First Data Corp.*,
    No. C 02-01786 (JSW), 2006 WL 516662 (N.D. Cal. Mar. 2, 2006)...............................11

*Weitzner v. Cynosure, Inc.*, No. 12-CV-3668 (MKB),
    2014 U.S. Dist. LEXIS 14932 (E.D.N.Y. Feb. 6, 2014)....................................................8

*Zhang v. Wen Mei, Inc.*,
    No. 14-CV-1647 (JS)(SIL),
    2017 U.S. Dist. LEXIS 213389 (E.D.N.Y. Dec. 28, 2017) .................................................1

**RULES**

Fed. R. Civ. P. 25(a) .................................................................................................1

Fed. R. Civ. P. 60(b) ........................................................................................ *passim*

Fed. R. Civ. P. 60(c)(1)................................................................................................5

## INTRODUCTION

The Salveson plaintiffs[1] are misconstruing the Supreme Court's decision in *Ohio v. American Express Co.*, 138 S. Ct. 2274 (2018) ("*Amex II*"), in an effort to reopen a final judgment and relitigate arguments that have been squarely rejected both by this Court and the Second Circuit. Nothing in *Amex II* supports this gambit. This Court held (and the Second Circuit affirmed) that the Salveson plaintiffs' challenge to allegedly supracompetitive interchange fees fails because, as cardholders, the Salveson plaintiffs do not directly pay these fees. *Amex II* does not <u>in any way</u> alter or undermine this conclusion. If anything, the reasoning of *Amex II* illustrates the implausibility of the Salveson plaintiffs' claim: The Supreme Court's reasoning indicates that, to the extent the alleged inflation in interchange fees has indirect effects on cardholders, it <u>benefits</u> them by funding better rewards programs and other benefits. In any event, the two-sided market principles of *Amex II* were already controlling law of the Second Circuit at the time the Second Circuit affirmed the dismissal of the *Salveson* claims. The Salveson plaintiffs strained then to argue that these principles aided their case, and the Second Circuit declined to adopt those arguments.

Therefore, *Amex II* neither supported the Salveson plaintiffs nor changed controlling law. And even if it had done both of those things, a favorable change in the law would not meet the high burden for reopening a final judgment. The Salveson plaintiffs' motion should be denied.

---

[1] Plaintiffs' brief is filed on behalf of Melvin Salveson, who seeks to represent a putative class of cardholders. (*See* ECF No. 122 on 14-cv-03529-MKB-JO ("Br.") at 1.) But it appears that Mr. Salveson <u>died five years ago</u>. *See* https://www.informs.org/ORMS-Today/Public-Articles/December-Volume-41-Number-6/In-Memoriam-Melvin-Erwin-Salveson-1919-2014. Defendants respectfully reserve all rights in this regard, including as to any applicable sanctions. *See generally* Fed. R. Civ. Pr. 25(a) (requiring dismissal of action brought by decedent if party or decedent's counsel or representative makes no motion for substitution within ninety days of statement noting death); *see, e.g.*, *Zhang v. Wen Mei, Inc.*, No. 14-CV-1647 (JS)(SIL), 2017 U.S. Dist. LEXIS 213389, at *42 (E.D.N.Y. Dec. 28, 2017) (dismissing claims of deceased putative class representative for failure to file notice of substitution pursuant to Rule 25(a)).

## BACKGROUND

The flow of funds in Visa- and Mastercard-branded payment card transactions has often been described by federal courts, and the Salveson plaintiffs quote one such description in their complaint:

> When a consumer uses a Visa card or a MasterCard card to pay for goods or services, the accepting merchant relays the transaction information to the acquiring bank with which it has contracted. The acquirer processes and packages that information and transmits it to the network (Visa U.S.A. or MasterCard). The network then relays the transaction information to the cardholder's issuing bank, which approves the transaction if the cardholder has a sufficient credit line. Approval is sent by the issuer to the acquirer, which relays it to the merchant.
>
> Payment requests are sent by the merchant to the acquirer, which forwards the requests to the issuer. The issuer then pays the acquiring bank the amount requested, less what is called an "interchange fee"—typically 1.4%. The acquirer retains an additional fee—approximately .6%. Thus, the issuing bank and the acquirer withhold an aggregate of approximately 2% of the amount of the transaction from the merchant. This is known as the "merchant discount." For a $100 sale, the merchant typically will receive $98, the issuing bank retaining $1.40, while the acquiring bank retains 60 cents.

(ECF No. 1 on 14-cv-03529-MKB-JO at ¶ 49 (quoting *United States v. Visa U.S.A., Inc.*, 344 F.3d 229 (2d Cir. 2003)).) In this long-running multidistrict litigation, merchants have alleged that they were harmed by a conspiracy among payment card networks and card-issuing banks to set interchange fees—which the merchants claim they paid directly—at supracompetitive rates.

Nine years after the merchants' litigation commenced, the Salveson plaintiffs first filed their complaint. They argued that it is cardholders, not merchants, who directly pay interchange fees. (*See* ECF No. 1 on 14-cv-03529-MKB-JO at ¶ 1 (alleging agreement to "fix the Visa and Mastercard Interchange Fees paid directly by Cardholders"); *see also* ECF No. 93 on 15-15 at 9 ("The first and only 'payor' of this [interchange] fee is the cardholder.").) They therefore sought

2

to represent a putative class of Visa and Mastercard cardholders allegedly injured by the defendants' conduct.

On November 26, 2014, this Court dismissed the *Salveson* complaint because cardholder plaintiffs are not direct payors of interchange fees and therefore lack standing to bring federal antitrust law claims. *See Salveson v. JP Morgan Chase & Co.*, No. 14-cv-03529-MKB-JO (S.D.N.Y. Nov. 26, 2014) ("MTD Order") (citing *Illinois Brick Co. v. Ill.*, 431 U.S. 720 (1977)). This Court reasoned:

> Because the interchange fee runs between financial institutions within the card services market, consumers do not directly pay interchange fees and are not directly injured by their imposition. The plaintiffs' facile contention that cardholders pay interchange fees directly is refuted by their own allegations about how transactions over these two networks occur.

(MTD Order at 7.)  Judgment was entered on December 4, 2014.  (*See* ECF No. 112 on 14-cv-03529-MKB-JO.)  This Court subsequently denied the Salveson plaintiffs' motion for reconsideration in February 2016.  *See Salveson v. JP Morgan Chase & Co.*, 166 F. Supp. 3d 242 (E.D.N.Y. 2016).  In doing so, this Court reiterated that it "was not obligated to credit Plaintiffs' allegation that cardholders are the direct payors of interchange fees, as this allegation is directly contradicted by the specific allegations about the Payment Card and Card Services Markets and the transactions involving the interchange fee." *Id.* at 252.  The Salveson plaintiffs appealed both decisions to the Second Circuit.  (*See* ECF No. 113 on 14-cv-03529-MKB-JO.)

While the *Salveson* appeal was pending, the Second Circuit handed down its decision in *United States v. American Express Co.*, 838 F.3d 179 (2d Cir. 2016) ("*Amex I*"), holding that the market for payment card transactions includes both the merchants accepting the cards and the cardholders carrying them.  The Second Circuit did not, however, address—much less disturb—this Court's conclusion that cardholders do not directly pay interchange fees.  On the contrary,

the Second Circuit observed that "the interchange . . . is <u>paid by the acquirer [a bank] to the issuer [another bank]</u> as the price for handling its transactions with the cardholder"—again confirming that interchange fees run among financial institutions.  *Id.* at 188 (emphasis added).

The Salveson plaintiffs alerted the panel considering their appeal to the *Amex I* decision under Rule 28(j) of the Federal Rules of Appellate Procedure.  (*See* ECF No. 125 on No. 15-15.)  The parties also addressed *Amex I* at oral argument.

On October 27, 2016, in a summary order, the Second Circuit affirmed both of this Court's decisions dismissing the *Salveson* action.  *See Salveson v. JP Morgan Chase & Co.*, 663 F. App'x 71 (2d Cir. 2016).  Fundamental to the Second Circuit's decision was its conclusion that "the structure of [credit card] transactions demonstrates that cardholders do not directly pay interchange fees . . . .  The cardholder has not directly paid the interchange fee, but rather has only paid the full price for the item or service it has purchased."  *Id.* at 75 (citing *Amex I*, 838 F.3d at 188).  The Supreme Court denied the Salveson plaintiffs' petition for certiorari on April 24, 2017.  *See Salveson v. JP Morgan Chase & Co.*, 137 S. Ct. 1826 (2017).

Several months later, the Supreme Court granted certiorari to review *Amex I*, and on June 25, 2018, it affirmed the Second Circuit's *Amex I* judgment.  *See Amex II*, 138 S. Ct. 2274.

On August 30, 2018, this Court issued an order addressing *Amex II*'s effect on claims brought by merchant plaintiffs in this consolidated action and invited the Salveson plaintiffs to file a brief by October 1, 2018, addressing "whether they are entitled to any relief in light of the Supreme Court's decision in *Ohio v. American Express Co.*, 625 U.S. ___, 138 S. Ct. 2274 (2018) and this decision."  (ECF No. 7244 at 26 n.10.)  The Salveson plaintiffs did not do so.  Over a year later, counsel for the Salveson plaintiffs filed a letter attesting that they had not become aware of the Court's invitation until September 6, 2019, and requesting permission to

file briefing on the issue.  (*See* ECF No. 119 on No. 14-cv-03529-MKB-JO.)  Their motion for relief from final judgment under Rule 60(b)(6) followed.

## ARGUMENT

### A.    The Salveson Plaintiffs Do Not Meet the High Standards of Rule 60(b).

Vacatur of a judgment pursuant to Rule 60(b)(6) is "a mechanism for 'extraordinary judicial relief' invoked <u>only</u> if the moving party demonstrates 'exceptional circumstances.'" *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) (emphasis added) (citation omitted).  The remedy "is to be used sparingly," *De Curtis v. Ferrandina*, 529 F. App'x 85, 86 (2d Cir. 2013), and the grounds justifying relief under Rule 60(b)(6) may not be those "recognized in clauses (1)-(5) of the Rule," such as mistake, newly discovered evidence, or fraud.  *Tapper v. Hearn*, 833 F.3d 166, 172 (2d Cir. 2016) (citation omitted).[2]

The Salveson plaintiffs fail to demonstrate any extraordinary circumstances here.  They acknowledge, as they must, that "'as a general matter, a mere change in decisional law does not constitute an "extraordinary circumstance" for the purposes of Rule 60(b)(6).'"[3]  Their motion, however, is nothing but a thinly disguised assertion that *Amex II* represented a change in decisional law.  The only gloss the Salveson plaintiffs add is that *Amex II* has given rise to an

---

[2]    The Salveson plaintiffs purport to move for relief pursuant to "Federal Rule of Civil Procedure 60 and this Court's inherent authority" (Br. at 1) but present only arguments premised on relief under Rule 60(b)(6) and thus have waived any arguments that they are entitled to vacatur under Rule 60(b)(1)-(5).  *See Tru-Art Sign Co. v. Local 137 Sheet Metal Workers Int'l Ass'n*, 852 F.3d 217, 222 n.3 (2d Cir. 2017) (noting "[w]e ordinarily do not consider issues raised for the first time in a reply brief" with regard to newly-raised Rule 60(b) argument).  In any event, the Salveson plaintiffs cannot satisfy any of the other prongs of Rule 60(b) and, moreover, may not rely on the grounds described in Rule 60(b)(1)-(3) because more than one year has run since the entry of the judgment.  *See* Fed. R. Civ. P. 60(c)(1).

[3]    Br. at 8 (quoting *Fed. Ins. Co. v. Kingdom of Saudi Arabia (In re Terrorist Attacks on Sept. 11, 2001 (Kingdom of Saudi Arabia))*, 741 F.3d 353, 357 (2d Cir. 2013)); *see also, e.g., Keepers, Inc. v. City of Milford*, 776 F. App'x 734, 735 (2d Cir. 2019) (same), *petition for cert. filed*, No. 19-727 (U.S. Dec. 6, 2019).  The Salveson plaintiffs cite a Tenth Circuit decision for the proposition that, in some circuits, "a change in relevant case law by the Supreme Court alone warrants relief from judgment."  (Br. at 8 n.3.)  That is not the law in this Circuit, however, as the Salveson plaintiffs acknowledge.  *See, e.g, Keepers, Inc.*, 776 F. App'x at 735; (Br. at 8.)

5

"extraordinary circumstance" because "two different sets of victims of the same tort" are being treated differently—merchants, whose case has gone forward, and cardholders, whose case was dismissed. (Br. at 9.) This argument is without merit.

The Salveson plaintiffs fail to get over the Rule 60 hurdle for at least three independent reasons. First, because the Second Circuit issued *Amex I* (the opinion that was affirmed by the Supreme Court in *Amex II*) <u>before</u> it affirmed dismissal of the *Salveson* action, *Amex II* did not change the applicable decisional law—much less do so in a way that gives rise to extraordinary circumstances. Indeed, the Salveson plaintiffs' failure to raise *Amex II* with the Court on their own initiative suggests that even they did not believe the decision requires vacating this Court's judgment. Second, the Salveson plaintiffs' arguments that they and merchants are similarly situated "victims" of the same tort do not withstand scrutiny. If interchange fees were inflated, the effect would be to <u>benefit</u> cardholders (who would receive better rewards offers and other benefits), not injure them—as the Supreme Court made clear in *Amex II*. Third, the Salveson plaintiffs' arguments that they may be the only viable group of plaintiffs to prosecute a claim— an argument that on its face is inconsistent with their arguments that they are similarly situated to the merchant plaintiffs in the consolidated actions—is wrong as both a factual and legal matter.

1. **The Second Circuit has already rejected the argument that the central finding in *Amex II*—that payment card networks are two-sided markets—is helpful to the Salveson plaintiffs' claims.**

The premise underlying the Salveson plaintiffs' Rule 60 motion—that *Amex II* represented a change in the law—is simply false. The Salveson plaintiffs argue that *Amex II* changed the decisional law when it "held that card-payment platforms are single two-sided markets" (Br. at 3), but the Second Circuit had already reached this conclusion in *Amex I*— <u>before</u> it affirmed this Court's order dismissing the *Salveson* action. Accordingly, *Amex II* did

6

not change applicable decisional law at all, let alone do so in an "extraordinary circumstance" that would justify vacating the Court's previous judgment.

The Second Circuit's decision in *Amex I* held that the plaintiffs had not carried their burden of demonstrating that American Express's non-discrimination provisions constituted an unreasonable restraint on trade where they had not "prove[n] net harm to Amex consumers as a whole—that is, both cardholders and merchants." 838 F.3d at 206. The Second Circuit expressly relied upon *Amex I* when it affirmed this Court's dismissal of the *Salveson* action. *See Salveson*, 663 F. App'x at 75 (citing *Amex I*). Thus, any suggestion that *Amex II*—which affirmed *Amex I*—revived the Salveson plaintiffs' claims is foreclosed by the Second Circuit's *Salveson* decision. Simply put, there is no relevant change in the decisional law here because the holding of *Amex II* was <u>already</u> controlling in the Second Circuit when the Second Circuit last considered and rejected the claims of the Salveson plaintiffs. *See, e.g.*, *Empresa Cubana del Tabaco v. Gen. Cigar Co.*, 385 F. App'x 29, 32 (2d Cir. 2010) (no Rule 60(b)(6) relief based on change in decisional law where cited decision did "not represent an intervening development or change" in the law).

The procedural posture of this case stands in stark contrast to the authority upon which the Salveson plaintiffs rely. There, courts confronted changes in decisional law after the entry of judgment, <u>coupled with additional factors</u>, that created "extraordinary circumstances." For example, *In re Terrorist Attacks* involved the Second Circuit overruling the "reasoning behind [the] decision" after the entry of judgment. *See* 741 F.3d at 356.[4] Similarly, in *Gondeck v. Pan*

---

[4]   Notably, the Second Circuit did not rely solely on the change in the law but recognized that it was the "procedural history" of the case, which included the separate tracking of similar litigations before consolidation via the multidistrict litigation process, that had contributed to the circumstances justifying vacatur. *In re Terrorist Attacks*, 741 F.3d at 357. This Court has recognized that the Second Circuit's decision to vacate that

*(cont'd)*

*American World Airways, Inc.*, 382 U.S 25 (1965), judgment had been entered on the case under appeal before (i) another circuit court had expressly criticized the decision,[5] (ii) the circuit court that had affirmed the judgment had expressed doubt about the decision, and (iii) the Supreme Court had reversed the only case that had supported the original decision.  *See Gondeck*, 382 U.S. at 27.  Unlike the parties in those cases—whose claims had failed before the decisional law had changed—the Salveson plaintiffs already presented the central conclusion of *Amex II* (embodied in *Amex I*) to the Second Circuit.  The Second Circuit unanimously disagreed that this conclusion supported reversal of this Court's decision to dismiss the *Salveson* complaint.  The hurdle the Salveson plaintiffs must clear on a Rule 60 motion is even higher, and justice does not require that they be given yet another chance to make the same arguments.  *See Empresa Cuba del Tabaco*, 385 F. App'x at 33 ("In sum, *ITC* did not constitute an intervening development of law, much less evidence of extraordinary circumstances, sufficient to warrant reopening the 2004 judgment pursuant to Rule 60(b)(6).").

The Salveson plaintiffs' own conduct only buttresses this conclusion.  They waited more than a year to raise their *Amex II* argument, and did so only at the Court's invitation.  Although the Salveson plaintiffs seek to justify their delay by claiming that they "did not become aware of the Court's August 30, 2018, Order until Friday, September 6, 2019" (*see* ECF No. 119 on 14-cv-03529-MKB-JO), they certainly knew about the *Amex II* decision itself.  They do not explain why they did not raise the "extraordinary circumstances" supposedly created by the decision of their own volition.  Indeed, a decision on which Salveson plaintiffs rely (Br. at 3) indicates that a party's failure to raise the existence of "a supervening change in governing law that call[s] into

---

judgment turned on the "highly unusual procedural history of the case."  *See Weitzner v. Cynosure, Inc.*, No. 12-CV-3668 (MKB), 2014 U.S. Dist. LEXIS 14932, at *15 (E.D.N.Y. Feb. 6, 2014) (Brodie, J.).

[5]     *See Pan Am. World Airways, Inc. v. O'Hearne*, 335 F.2d 70, 71 (4th Cir. 1964).

question the correctness of the district court's judgment" weighs <u>against</u> a finding of extraordinary circumstances. *Stevens v. Miller*, 676 F.3d 62, 66 (2d Cir. 2012) (no extraordinary circumstances where moving party, due to its own negligence, failed to raise change in controlling caselaw before district court). If the Salveson plaintiffs truly believed that *Amex II* created extraordinary circumstances that justified vacating this Court's holding, and the Second Circuit's affirmation of that holding, then they would have made such an argument long ago.

> **2.    The Salveson plaintiffs do not demonstrate the existence of extraordinary circumstances based on inconsistent treatment of victims of the same tort because they are not themselves tort victims.**

Moreover, *Amex II* flatly contradicts the Salveson plaintiffs' contention that merchants and cardholders are "victims of the same tort." (Br. at 8.) While *In re Terrorist Attacks* and *Gondeck* involved conflicting decisions for similarly situated plaintiffs, merchants and cardholders are emphatically not similarly situated when it comes to interchange fees. Indeed, an important objective of fees imposed on the merchant side of the market is to fund benefits for cardholders. As the Supreme Court explained in *Amex II*: "To compete for the valuable cardholders that Amex attracts, both Visa and MasterCard have introduced premium cards that, like Amex, charge merchants higher fees and offer cardholders better rewards." 138 S. Ct. at 2282. Those "more robust" rewards programs are "necessary to maintain cardholder loyalty and encourage the level of spending that makes [credit card acceptance] valuable to merchants." *Id.* at 2288. Accordingly, the cardholders benefit—not suffer—when interchange fees rise, and *Amex II* confirms this conclusion.[6]

---

[6]    The Salveson plaintiffs have previously represented to the Court that their claims of injury are based solely on cardholders' supposed direct payment of interchange fees and <u>not</u> based on cardholders' payment of any inflated retail prices. (*See* ECF No. 52 on 14-cv-03529-MKB-JO at 11 ("Defendants contend 'Plaintiffs claim only derivative and remote injuries through their purchases from the merchants of a variety of retail goods *(cont'd)*

The difference between merchants and cardholders distinguishes this case from *In re Terrorist Attacks* and *Gondeck*.  In both of those cases, the party requesting post-judgment relief had been impacted by the tort at issue <u>in a manner identical to that of the second victim</u> whose case had been permitted to proceed.  *See In re Terrorist Attacks*, 741 F.3d at 355-56 (first set of plaintiffs includes family members of victims of September 11 attacks; second plaintiff was husband of victim of September 11 attacks); *Gondeck*, 382 U.S. at 26, 27 (first plaintiff was widow of employee killed in accident; second set of plaintiffs were survivors of employee killed in same accident).  The Salveson plaintiffs' situation is simply not comparable.

### 3.    The Salveson plaintiffs' argument that there would be no other plaintiffs to sue lacks factual and legal support.

Nor can the Salveson plaintiffs revive their case by asserting that *Amex II* "call[s] into question the Merchants' standing to sue, which would leave no plaintiffs available to prosecute the defendants' transgressions."  (Br. at 10.)  Their argument fails as both a factual and legal matter.  As a factual matter, there is no reason that the parties who actually pay the interchange fees alleged to be anticompetitive—the acquiring banks—cannot bring suit.  *See* MTD Order at 4, 7 (noting "[t]he issuing bank then sends the acquiring bank the amount of the purchase price minus an interchange fee" and "the interchange fees runs between financial institutions within the card services market"); *see also, e.g.*, *Amex I*, 838 F.3d  at 188 ("[T]he interchange fee . . . is paid by the acquirer to the issuer as the price for handling its transactions with the cardholder.")  In fact, acquiring institutions have done so in the past.  *See Nat'l Bancard Corp. (NaBanco) v.*

---

that Visa and MasterCard neither manufactured or sold. [] [T]his is a false characterization of the allegations of the Complaint. … By withdrawing the price-fixed 'interchange fee' from the cardholder's account, [] and keeping it, the Issuer bank inflicts direct injury and damage on the cardholder.")  Their rejection of this position is consistent with settled law; courts have repeatedly rejected the argument that cardholders can recover for indirect injuries—inflated prices—caused by payment card network rules.  (*See* ECF No. 38 on 14-cv-03529-MKB-JO at 6 n.5 (collecting cases).)

*Visa U.S.A., Inc.*, 596 F. Supp. 1231 (S.D. Fla. 1984), *aff'd*, 779 F.2d 592 (11th Cir. 1986); *Visa U.S.A., Inc. v. First Data Corp.*, No. C 02-01786 JSW, 2006 WL 516662 (N.D. Cal. Mar. 2, 2006).

Furthermore, the Salveson plaintiffs' argument that *Amex II* somehow deprives other plaintiffs of standing merely highlights the circularity of their argument:  If the merchant plaintiffs <u>have</u> standing to challenge inflated interchange fees, then the Salveson plaintiffs complain that merchants and cardholders are being treated differently.  If the merchant plaintiffs <u>don't have</u> standing to challenge inflated interchange fees, then the Salveson plaintiffs complain about the dearth of potential plaintiffs with standing.  Neither of these arguments comes close to constituting an "extraordinary circumstance" that would justify reopening a final judgment.[7] And, as the next section discusses, neither these arguments nor *Amex II* cast any doubt on the reason why the Salveson plaintiffs' claim was dismissed in the first place—they do not directly pay interchange fees.

## B.     The Supreme Court's *Amex II* Decision Did Not Make the Salveson Plaintiffs Direct Payors of Interchange Fees

The Salveson plaintiffs' motion also fails because *Amex II* did not address (much less change) the reason this Court and the Second Circuit dismissed their case—"that cardholders do not directly pay interchange fees."  *Salveson*, 663 F. App'x at 75.  The holding of *Amex II*—that antitrust analysis of credit card markets must encompass economic effects on both merchants and

---

[7]     Notably, *Illinois Brick* and its progeny expressly contemplate that different alleged "victims" of an antitrust violation may be treated differently.  *See, e.g.*, *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 157-63 (2d Cir. 2016) ("[a]ntitrust law has long recognized that defendants who may have violated a provision of the antitrust statutes are not liable to every person who can persuade a jury that he suffered a loss in some manner 'that might conceivably be traced' to the conduct of the defendants") (citation omitted).

cardholders—is logically and legally disconnected from the question of who is the direct payor of interchange fees.

The Salveson plaintiffs' characterization of the holding of *Amex II*—that "cardholders and merchants are <u>both</u> direct purchasers of the network's transactions" (Br. at 5)—is a naked fabrication unaccompanied by any citation to the decision.  And for good reason.  The Supreme Court's decision makes no reference at all to the direct-purchaser doctrine, nor does it include a single reference to the case that gave rise to the doctrine, *Illinois Brick*.  Instead, *Amex II* focuses on market definition.  *See* 138 S. Ct. at 2285-86 (defining relevant market to determine whether plaintiffs carried burden of demonstrating anticompetitive effects of challenged conduct); *see also US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 56 (2d Cir. 2019) (characterizing *Amex II*'s "central holding" as the principle that "in a case brought under the Sherman Act that involves a 'two-sided <u>transaction</u> platform,' the relevant market must <u>always</u> include both sides of the platform" (emphasis in original)).  Market definition and antitrust standing are separate questions.  *See, e.g., Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 75 (2d Cir. 2013) (describing demonstration of antitrust injury as "threshold" question and affirming dismissal for lack of antitrust standing rather than failure to identify relevant market underlying original dismissal); *Fjord v. AMR Corp.(In re AMR Corp.)*, 527 B.R. 874, 883 (Bankr. S.D.N.Y. 2015) (denying motion to amend antitrust complaint based on futility arising from both improperly defined relevant market and lack of standing).

Even if one credited the Salveson plaintiffs' imaginative construction of *Amex II*—that cardholders are "direct purchasers of the network's transactions"—they still did not directly pay the allegedly inflated interchange fees at issue in this case, and thus have no standing to sue.  The Salveson plaintiffs' shopworn contention that cardholders pay interchange fees because "the

banks take the overcharge directly from the Cardholders' accounts" (Br. at 6) remains as "facile" as it was before *Amex II*, when Judge Gleeson dismissed their complaint because "consumers do not directly pay interchange fees and are not directly injured by their imposition." (MTD Order at 7.) This assertion was, he noted, "refuted by their own allegations about how transactions over these two networks occur." *Id.* Nothing about *Amex II* has changed these facts.

This Court then reiterated Judge Gleeson's rationale in denying the Salveson plaintiffs' motion for reconsideration, declining "to credit Plaintiffs' allegation that cardholders are the direct payors of interchange fees, as this allegation is directly contradicted by the specific allegations about the Payment Card and Card Services Markets and the transactions involving the interchange fee." *Salveson*, 166 F. Supp. 3d at 252. Nothing about *Amex II* has changed these facts either.

Finally, the Second Circuit, in denying the Salveson plaintiffs' appeal, repeated that "the structure of these transactions demonstrates that cardholders do not directly pay interchange fees . . . . The cardholder has not directly paid the interchange fee, but rather has only paid the full price for the item or service it has purchased." *Salveson*, 663 F. App'x at 75. *Amex II* did not disturb this reasoning.

In short, nothing has changed about the Salveson plaintiffs' allegations (or the "transaction structure at the heart of this [fourteen]-year-case," MTD Order at 7) since this Court's judgment dismissing their case became final.

*Apple Inc. v. Pepper*, 139 S. Ct. 1514 (2019), does not alter this. *Apple* involved a challenge to the supposedly supracompetitive prices charged to Apple's App Store customers, which were set by the third-party developers who created the apps on the App Store but collected by Apple, who took a 30% commission on each sale before remitting the proceeds to the

developers.  *See id.* at 1519.  App Store customers were thus direct purchasers from Apple.  The Supreme Court affirmed that the *Illinois Brick* doctrine did not preclude standing for App Store customers because no intermediary stood between Apple and its App Store customers, who "pay the alleged overcharge directly to Apple."  *Id.* at 1521 (emphasis added).

By contrast, both this Court and the Second Circuit have squarely held that the Salveson plaintiffs do not pay interchange fees at all, much less pay them directly to the defendants.  *Apple* is therefore entirely inapposite.

Because their complaint still suffers from the same flaws that mandated its previous dismissal, this Court's denial of a motion for reconsideration, and the Second Circuit's affirmance of those decisions, the Salveson plaintiffs' motion for relief pursuant to Rule 60(b)(6) should be denied.  *See, e.g.*, *Stevens*, 676 F.3d at 69 (affirming denial of Rule 60(b)(6) motion where supposed change in decisional law was "of no help to [plaintiff's] position").  There are no cogent reasons—much less "extraordinary circumstances" necessary to displace a final judgment—that counsel otherwise.

## CONCLUSION

Defendants thus respectfully request that the Salveson plaintiffs' motion be denied in all respects.

14

Dated:    New York, New York
          December 16, 2019

                                        **SKADDEN, ARPS, SLATE, MEAGHER &
                                        FLOM LLP**

                                        By: /s/ *Boris Bershteyn*
                                             Boris Bershteyn
                                             Kamali P. Willett
                                             Michael M. Powell
                                             Skadden, Arps, Slate, Meagher & Flom
                                               LLP
                                             Four Times Square
                                             New York, NY 10036
                                             (212) 735-3000
                                             boris.bershteyn@skadden.com
                                             kamali.willett@skadden.com
                                             michael.powell@skadden.com

                                        *Attorneys for Defendants JPMorgan Chase &
                                        Co., Chase Bank USA, N.A., Chase
                                        Paymentech Solutions, LLC, and JPMorgan
                                        Chase Bank, N.A.*

                                        **WILMER CUTLER PICKERING HALE
                                          AND DORR LLP**

                                        By: /s/ *David Lesser*
                                             David Lesser
                                             Wilmer Cutler Pickering and Dorr LLP
                                             7 World Trade Center
                                             250 Greenwich Street
                                             New York, New York 10007
                                             Telephone:  (212) 230-8800
                                             Facsimile:  (212) 230-8888
                                             david.lesser@wilmerhale.com

                                        *Attorneys for Defendants HSBC Finance
                                        Corp., HSBC Bank USA N.A.,
                                        HSBC North American Holdings, Inc., and
                                        HSBC Holdings PLC*

15

O'MELVENY & MYERS LLP

By: /s/ *Abby F. Rudzin*
     Andrew J. Frackman
     Abby F. Rudzin
     O'Melveny & Myers LLP
     Times Square Tower
     7 Times Square
     New York, NY 10036
     (212) 326-2000
     afrackman@omm.com
     arudzin@omm.com

*Attorneys for Capital One Bank, (USA), N.A. and Capital One Financial Corporation*

MORRISON & FOERSTER LLP

By: /s/ *Mark P. Ladner*
     Mark P. Ladner
     Michael B. Miller
     Morrison & Foerster LLP
     1290 Avenue of the Americas
     New York, NY 10104
     (212) 468-8000
     mladner@mofo.com
     mbmiller@mofo.com

*Attorneys for Defendants Bank of America, N.A., BA Merchant Services LLC, and Bank of America Corporation*

16