UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------

MARVIN SALVESON, EDWARD LAWRENCE,
DIANNA LAWRENCE and WENDY M. ADAMS,
on behalf of themselves and all others similarly
situated,

                Plaintiffs,

        v.

JP MORGAN CHASE & CO., J.P. MORGAN
BANK, N.A., BANK OF AMERICA
CORPORATION, BANK OF AMERICA N.A.,
CAPITAL ONE F.S.B., CAPITAL ONE
FINANCIAL CORPORATION, CAPITAL ONE
BANK, HSBC FINANCE CORPORATION, HSBC
BANK USA, N.A., HSBC NORTH AMERICAN
HOLDINGS, INC. and HSBC HOLDINGS, PLC,

                Defendants.

--------------------------------------------------------------

**MEMORANDUM & ORDER**
14-CV-3529 (MKB)

MARGO K. BRODIE, United States District Judge:

      Plaintiffs Marvin Salveson, Edward Lawrence, Dianna Lawrence and Wendy M. Adams

commenced this putative antitrust class action on December 16, 2013, in the United States

District Court for the Northern District of California against Defendants, financial institutions

who issue general purpose payment cards that consumers use to purchase goods and services,

and the affiliates of such institutions.[1] (Compl., Docket Entry No. 1.) On behalf of a putative

nationwide class of consumers using payment cards issued by Defendants, Plaintiffs asserted

claims pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and pursuant to

---

[1] On June 4, 2014, the Clerk of Court for the Northern District of California entered a
Transfer Order from the United States Judicial Panel on Multidistrict Litigation, transferring this
case to the Eastern District of New York. (MDL Transfer Order, Docket Entry No. 61.)

the Cartwright Act, California Business and Professions Code § 16750(a). (*Id.*) Defendants moved to dismiss all of Plaintiffs' claims, and by Memorandum and Order filed on November 26, 2014 (the "November 26, 2014 Decision"), the Court dismissed Plaintiffs' federal claims and declined to exercise jurisdiction over Plaintiffs' state law claims.[2] (Nov. 26, 2014 Decision, Docket Entry No. 83.) The Clerk of Court entered judgment on December 4, 2014. (Dec. 4, 2014 J., Docket Entry No. 86.) By Memorandum and Order dated February 24, 2016 (the "February 24, 2016 Decision"), the Court denied Plaintiffs' motion for reconsideration of the dismissal of their federal claims, granted Defendants' cross-motion for reconsideration, and dismissed Plaintiffs' state law claims. (Feb. 24, 2016 Decision, Docket Entry No. 112.) On October 17, 2016, the Second Circuit affirmed both the November 26, 2014 Decision and the February 24, 2016 Decision. *See Salveson v. JP Morgan Chase & Co.*, 663 F. App'x 71 (2d Cir. 2016), *cert. denied*, --- U.S. ---, 137 S. Ct. 1826 (2017).

By Memorandum and Order dated August 29, 2018 and filed on the main MDL docket (the "August 29, 2018 Decision"), the Court "invited [Plaintiffs] to brief whether they are entitled to any relief in light of the Supreme Court's decision in *Ohio v. American Express Co.* [(*Amex II*)], 625 U.S. ---, 138 S. Ct. 2274 (2018)," as well as the Court's decision permitting various groups of plaintiffs in the MDL to amend their complaints to add an "alternative two-sided definition of the relevant market." *In Re Payment Interchange Fee & Merch. Disc. Antitrust Litig.* (*Interchange Fee Litig.*), No. 05-MD-1720, 2018 WL 4158290, at *14 n.10 (E.D.N.Y. Aug. 30, 2018). By letter dated September 12, 2019, counsel for Plaintiffs informed the Court that he "did not become aware of [the August 29, 2018 Decision] until Friday,

---

[2] On December 18, 2014, the United States Judicial Panel on Multidistrict Litigation, with the consent of the Court, ordered that the case be reassigned from Judge John Gleeson to the undersigned. (Order Reassigning Litigation, Docket Entry No. 88.)

September 6, 2019," and sought leave to brief the issues previously identified by the Court. (Letter dated Sept. 12, 2019, Docket Entry No. 119.) The Court granted Plaintiffs' request, (Order dated Oct. 3, 2019), and on November 1, 2019, Plaintiffs moved for relief from final judgment, pursuant to Rule 60 of the Federal Rules of Civil Procedure and "this Court's inherent authority," (Pls. Mot. for Relief from Final Judgment ("Pls. Mot."), Docket Entry No. 122; Pls. Mem. in Supp. of Pls. Mot. ("Pls. Mem."), Docket Entry No. 122-1). Defendants oppose the motion. (Defs. Opp'n to Pls. Mot. ("Defs. Opp'n"), Docket Entry No. 125.)

For the reasons set forth below, the Court denies Plaintiffs' motion.

## I. Background

### a. Factual background

The Court assumes the parties' familiarity with the facts as set forth in the Court's previous decisions and summarizes only the pertinent facts.

According to Plaintiffs, in the course of issuing payment cards to consumers, Defendants and their affiliates knowingly participated in an anticompetitive conspiracy to fix fees related to those payment cards. (Compl. ¶¶ 26–29.) These fees are known as interchange fees. (*See id.* ¶¶ 40, 48.) Plaintiffs contend that consumers like Plaintiffs and members of the putative class used the payment cards to purchase goods and services and "paid supracompetitive [i]nterchange [f]ees to Defendants and their co-conspirators." (*Id.* ¶¶ 19–20.)

Plaintiffs allege that each time a consumer uses a payment card, the following sequence of events occurs: the merchant accepts the payment card from the cardholder and relays the transaction information to the merchant's "acquiring bank"; the acquiring bank then transmits the transaction information to the payment card's network — either Visa or MasterCard; and the network then relays the transaction information to the cardholder's "issuing bank" for approval

of the transaction.  (*Id.* ¶ 49 (quoting *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 235 (2d Cir. 2003)).)  If the issuing bank determines the consumer has sufficient credit and approves the transaction, it conveys its approval to the acquiring bank and the acquiring bank then relays its approval to the merchant.  (*See id.*)  Finally, the issuing bank — in this case, one of the Defendants — pays the acquiring bank an amount representing the price of the goods or services purchased by the consumer in the underlying transaction, less an "interchange fee," the fee at issue in this case.  (*See id.*)

Plaintiffs allege that Defendants' participation in an anticompetitive conspiracy has injured cardholders by causing them to "pa[y] supracompetitive price-fixed [i]nterchange [f]ees to Defendants" that were higher "than [the fees] they would have paid in the absence of . . . antitrust violations" by Defendants.  (*Id.* ¶¶ 104–05.)  Plaintiffs contend that a cardholder "pays the gross amount of the transaction, including fees, directly to the [issuing bank], which keeps the [i]nterchange [f]ee and passes on a separate transaction fee to the [acquiring bank] and the net amount to the merchant via the Visa or MasterCard network."  (*Id.* ¶ 38.)  According to Plaintiffs, the interchange fee is paid "directly" by the cardholders.  (*Id.* ¶ 6.)  Plaintiffs specifically allege that the initial payment in the transaction is made by cardholders, that the issuing bank "keep[s]" the interchange fee from that payment, and that the payments made by cardholders are "comprise[d]" of the "balance" due to the merchant plus the interchange fee and other fees.  (*Id.* ¶¶ 47–48, 81.)

### b.  Procedural history

#### i.  The November 26, 2014 Decision

In the November 26, 2014 Decision, the Court found that Plaintiffs were indirect purchasers and therefore, under *Illinois Brick Company v. Illinois*, 431 U.S. 720 (1977), lacked

standing to sue under Section 4 of the Clayton Act.  (*See* Nov. 26, 2014 Decision 5–8.)

The Court summarized the structure of a "credit card transaction using the Visa or MasterCard network . . . as follows":

> When a cardholding consumer uses a Visa or MasterCard payment card, the merchant that accepts the card relays the transaction to its "acquiring bank," which in turn transmits it to the network, *i.e.* Visa or MasterCard, which sends the information to the cardholder's "issuing bank."  The issuing bank may approve the transaction and the approval is conveyed to the acquiring bank, which relays it to the merchant.  The issuing bank then sends the acquiring bank the amount of the purchase price minus an interchange fee.

(*Id.* at 4 (citing Compl. ¶ 49 (quoting *Visa U.S.A., Inc.*, 344 F.3d at 235)).)

In analyzing whether Plaintiffs had standing under *Illinois Brick*, the Court noted that "markets for general purpose payment cards and for payment card network services are separate and distinct, and payment-card consumers are considered to participate only in the former."  (*Id.* at 6.)  Thus, "[w]hereas in the market for general purpose *cards*, the issuers are the sellers, and cardholders are the buyers, in the market for general purpose card *network services*, the four networks themselves are the sellers, and the issuers of cards and merchants are the buyers."  (*Id.* (quoting *Visa U.S.A., Inc.*, 344 F.3d at 239).)  The Court concluded that "[b]ecause the interchange fee runs between financial institutions within the card services market, consumers do not directly pay interchange fees and are not directly injured by their imposition."  (*Id.* at 7.)

The Court rejected Plaintiffs' contention that "cardholders, as the first and only link in the credit card transaction chain to actually make a payment, pay the interchange fees charged for each transaction directly," (*id.* at 4), finding that it was "refuted by [Plaintiffs'] own allegations about how transactions over the[] two networks occur," and "[bore] no resemblance to the transaction structure at the heart of this nine-year-old case," (*id.* at 7).

### ii. The February 24, 2016 Decision

In the February 24, 2016 Decision, the Court denied Plaintiffs' motion for reconsideration of the dismissal of their federal claims, finding that Plaintiffs had failed to show that the Court had "overlooked critical facts . . . or any relevant controlling decision" and thus had not satisfied the standard for reconsideration. (Feb. 24, 2016 Decision 8.)

The Court rejected Plaintiffs' arguments that the Court had "ignored the obligation [on a motion to dismiss] to credit Plaintiffs' factual allegations," and had "overlooked Plaintiffs' allegations that the interchange fees are paid directly by cardholders." (*Id.*) The Court noted that, "in describing the structure of the transactions giving rise to the incursion and payment of the interchange fee," the Complaint "specifically quote[d] a portion of the Second Circuit decision [in *Visa U.S.A., Inc.*] stating '[w]hereas in the market for general purpose *cards*, the issuers are the sellers, and cardholders are the buyers, in the market for general purpose card *network services*, the four networks themselves are the sellers, and the issuers of cards and merchants are the buyers.'" (*Id.* (quoting Compl. ¶ 48).) The Court reasoned that:

> based on the allegations, Plaintiffs recognize that there is a distinction between two markets: one for payment cards (the "Payment Card Market"), in which consumers participate by purchasing cards from issuing banks, and another for network services (the "Card Network Services Market"), in which merchants purchase services to facilitate the use of those cards.

(*Id.* at 8–9.) The Court further noted that "Plaintiffs also allege[d] that the interchange fee is exchanged between financial institutions in the Card Network Services Market," and concluded that "the Court was not obligated to credit Plaintiffs' allegation that cardholders are the direct payors of interchange fees, as this allegation is directly contradicted by the specific allegations about the Payment Card and Card Services Markets and the transactions involving the interchange fee." (*Id.* at 9–10.) In addition, the Court rejected Plaintiffs' argument that "the

Court [had] specifically overlooked allegations that cardholders pay interchange fees directly by initiating the chain of events that occurs as part of each transaction," finding that "[t]he Court [had] considered and rejected this claim." (*Id.* at 10.) Because Plaintiffs had "failed to identify controlling law or allegations that the Court overlooked," the Court "decline[d] to reconsider its determination that Plaintiffs are barred from asserting claims under § 4 of the Clayton Act by the *Illinois Brick* doctrine." (*Id.* at 11.)

### iii.  The Second Circuit's decision affirming dismissal of Plaintiffs' federal claims

On October 17, 2016, the Second Circuit affirmed, *inter alia*, the November 26, 2014 Decision's dismissal of Plaintiffs' federal claims and the February 24, 2016 Decision's denial of Plaintiffs' motion for reconsideration of the dismissal of the federal claims. *Salveson*, 663 F. App'x at 75.

The Second Circuit agreed with the Court's ruling that Plaintiffs had "failed to plausibly allege that [they] directly pay interchange fees and are directly injured by their imposition," and thus lacked standing under *Illinois Brick. Id.* Quoting the November 26, 2014 Decision's summary of "the structure of the relevant credit card transactions," which had been "cited with approval by [P]laintiffs in their brief on appeal," the Second Circuit concluded that "[c]ontrary to [P]laintiffs' allegations, the structure of these transactions demonstrates that cardholders do not directly pay interchange fees." *Id.* at 74–75. To illustrate its point, the Second Circuit provided the following example:

> [W]hen a cardholder makes a $100 purchase, the merchant sends notice of the charge to its acquiring bank, and the acquiring bank in turn sends the information to the card issuer bank. If the charge is approved, the issuer bank pays the acquiring bank for the $100 purchase, retaining a portion as an interchange fee. The issuer bills the cardholder, who then is bound to pay the issuer according to the terms of the card.

*Id.* at 75.  Thus, the Second Circuit reasoned, "[t]he cardholder has not directly paid the interchange fee, but rather has only paid the full price for the item or service it has purchased." *Id.*  In addition, the Second Circuit cited its previous decisions noting that the interchange fee is paid by the acquiring bank to the issuing bank, *see id.* (first citing *United States v. Am. Express Co.* (*Amex I*), 838 F.3d 179, 188 (2d Cir. 2016); and then citing *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 102 (2d Cir. 2005)), "as the price for handling its transactions with the cardholder," *id.* (quoting *Amex I*, 838 F.3d at 188).

### iv.    The August 29, 2018 Decision

Following the Second Circuit's decision vacating the class action settlement in the *Interchange Fee Litigation*, the Court permitted various groups of MDL plaintiffs to amend their complaints to assert "an alternative, two-sided market definition."  *See Interchange Fee Litig.*, 2018 WL 4158290, at *1–3.  While, in their original complaints, plaintiffs had "defined the scope of the relevant market as a one-sided market based on then-existing case law and their understanding of two separate markets — the network services market and the general purpose payment cards market," they sought to amend their complaints in light of the Second Circuit's decision in *Amex I*, 838 F.3d 179, holding that the relevant market in a case involving similar claims was a single, two-sided market.  *See Interchange Fee Litig.*, 2018 WL 4158290, at *3.

In a footnote, the Court noted that it was "cognizant that this Memorandum and Order may be in tension with [the November 26, 2014] [D]ecision," and "invited [Plaintiffs] to brief whether they are entitled to any relief in light of the Supreme Court's decision in [*Amex II*] and this decision."  *Id.* at *14 n.10.  The Court directed Plaintiffs to file any submission on or before October 1, 2018.  *Id.*

By letter dated September 12, 2019, counsel for Plaintiffs informed the Court that he had

"not become aware of the [August 29, 2018 Decision] until . . . September 6, 2019." (Letter dated Sept. 12, 2019.) Counsel explained that because the August 29, 2018 Decision had been filed only on the main MDL docket, counsel had not received an electronic docket notification when it was filed. (*Id.*) Having just discovered the Court's invitation to provide briefing to the Court regarding any relief Plaintiffs might now be entitled to in light of the Supreme Court's decision in *Amex II* and the August 29, 2018 Decision, Plaintiffs requested leave to file briefing on the issues by October 14, 2019. (*Id.*) The Court granted Plaintiffs' request, (Order dated Oct. 3, 2019), and this motion followed.

## II. Discussion

### a. Standard of review

Rule 60(b) of the Federal Rules of Civil Procedure provides for relief from a final judgment, order, or proceeding in the following circumstances:

> (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud . . . , misrepresentation, or misconduct by an opposing party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b). "Properly applied, Rule 60(b) strikes a balance between serving the ends of justice and preserving the finality of judgments." *Reese v. Bahash*, 574 F. App'x 21, 23 (2d Cir. 2014) (quoting *Nemaizer v. Baker*, 793 F.2d 58, 61 (2d Cir. 1986)). Such a motion "must be made within a reasonable time," *Stevens v. Miller*, 676 F.3d 62, 67 (2d Cir. 2012) (citing Fed. R. Civ. P. 60(c)), and cannot be used "as a substitute for appeal," *Stevens v. Schneiderman*, No. 05-CV-10819, 2011 WL 6780583, at *5 (S.D.N.Y. Dec. 23, 2011) (quoting *United Airlines, Inc. v. Brien*, 588 F.3d 158, 176 (2d Cir. 2009)). "A Rule 60(b) motion is properly denied where it

seeks only to relitigate issues already decided." *Maldonado v. Local 803 I.B. of Tr. Health & Welfare Fund*, 490 F. App'x 405, 406 (2d Cir. 2013) (citing *Zerman v. Jacobs*, 751 F.2d 82, 85 (2d Cir. 1984). Each of the first five subsections of Rule 60(b) addresses a particular circumstance under which a party can obtain relief from a final judgment. *See Dugan v. United States*, No. 11-CV-3973, 2015 WL 5244341, at *3 (E.D.N.Y. Sept. 8, 2015).

In order to qualify for Rule 60(b)(6) relief, a plaintiff must also demonstrate either "extraordinary circumstances, or extreme hardship." *DeCurtis v. Ferrandina*, 529 F. App'x 85, 86 (2d Cir. 2013) (quoting *Harris v. United States*, 367 F.3d 74, 81 (2d Cir. 2004)); *see also Stevens*, 676 F.3d at 67 (noting that "courts require the party seeking to avail itself of [Rule 60(b)(6)] to demonstrate that 'extraordinary circumstances' warrant relief" (citing *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864 (1988))); *DePasquale v. DePasquale*, No. 12-CV-2564, 2013 WL 4010214, at * 2 (E.D.N.Y. Aug. 5, 2013) ("Granting a Rule 60(b)(6) motion requires a showing of extraordinary circumstances to justify the reopening of a final judgment." (citations and internal quotations marks omitted)); *Crawford v. Franklin Credit Mgmt. Corp.*, No. 08-CV-6293, 2013 WL 2951957, at * 1 (S.D.N.Y. June 14, 2013) ("Motions for relief under Rule 60(b) are disfavored, and are reserved for exceptional cases." (citations omitted)).

### b. Plaintiffs' motion to set aside the judgment

Plaintiffs argue that in light of the Supreme Court's decisions in *Amex II* and *Apple v. Pepper*, --- U.S. ---, 139 S. Ct. 1514 (2019), the Court must now find that, under newly developed and controlling law, Plaintiffs, as cardholders, are "consumers of the transactions product offered by the credit-card network[s]," and that "they *directly* purchase that product from the network participants and therefore have standing under *Illinois Brick*." (Pls. Mem. 5.)

10

Plaintiffs further argue that "[e]xtraordinary circumstances exist in this case" requiring that the Court vacate the judgment "in the interest of justice." (*Id.* at 7.) In support, Plaintiffs argue that "[i]n light of the changes in the law . . . there is now a risk that [c]ardholders and [m]erchants will be treated inconsistently, even though both groups suffered injuries from the same tort when [Defendants] illegally raised the price of transactions simultaneously sold to both groups." (*Id.*) In addition, Plaintiffs argue that the decisions in *Amex II* and *Apple* "might be used to call into question the [m]erchants' standing to sue, which would leave no plaintiff available to prosecute the [D]efendants' transgressions." (*Id.* at 10.)

In response, Defendants argue that Plaintiffs have "fail[ed] to demonstrate any extraordinary circumstances" warranting vacatur of the judgment pursuant to Rule 60(b)(6). (Defs. Opp'n 5.) In support, Defendants argue that (1) "there [has been] no relevant change in the decisional law here because the holding of *Amex II* was <u>already</u> controlling in the Second Circuit when the Second Circuit last considered and rejected [Plaintiffs' claims]," (*id.* at 7); (2) merchants and cardholders are not, as Plaintiffs contend, "victims of the same tort," (*id.* at 9 (quoting Pls. Mem. 8)), because "cardholders benefit — not suffer — when interchange fees rise, and *Amex II* confirms this conclusion," (*id.*); and (3) in addition to demonstrating "the circularity of their argument," Plaintiffs' contention that there may be no remaining viable plaintiff fails "[a]s a factual matter, [because] there is no reason that the parties who actually pay the interchange fees alleged to be anticompetitive — the acquiring banks — cannot bring suit," (*id.* at 10–11). Defendants further argue that "[t]he holding of *Amex II* . . . is logically and legally disconnected from the question of who is the direct payor of interchange fees," and "did not address (much less change) the reason this Court and the Second Circuit dismissed [Plaintiffs' federal claims]," and that *Apple* is "entirely inapposite." (*Id.* at 11–12, 13.)

#### i. *Amex II* represented a change in decisional law

Defendants argue that the holding in *Amex II* was already controlling law in this Circuit at the time the Second Circuit issued its decision affirming the dismissal of Plaintiffs' federal claims, and thus does not represent a change in decisional law. (Defs. Opp'n 6–7.) According to Defendants, *Amex II* merely affirmed the Second Circuit's decision in *Amex I*. (*See id.* at 7.) Thus, although the Supreme Court had not yet decided *Amex II* at the time the Second Circuit issued its decision in this case, because the Second Circuit *had* issued its decision in *Amex I*, and in fact cited to *Amex I* in affirming dismissal of Plaintiffs' claims, Defendants contend that *Amex II* did not constitute a change in decisional law. (*Id.* at 6–7.)

In response, Plaintiffs argue that while it is true that *Amex II* affirmed *Amex I*, "[m]ere affirmance doesn't mean the change in decisional law was effectuated by the Second Circuit in *Amex I* rather than the Supreme Court in *Amex II*." (Pls. Reply in Further Supp. of Pls. Mot. ("Pls. Reply") 5, Docket Entry No. 126.) Plaintiffs further argue that while *Amex I* "*reaffirmed the vitality of the Visa* [*U.S.A., Inc.*] decision," relied on by the Court in dismissing Plaintiffs' claims, and simply "distinguished it on the facts," (*id.*), *Amex II* "roundly repudiated *Visa* [*U.S.A., Inc.*], if not by name," (*id.* at 2).

The Court finds that *Amex II* represents a change in decisional law. As Plaintiffs point out, the Second Circuit has explicitly stated that "the central holding of *Amex II* . . . differs from the conclusion [it] had reached" in *Amex I*. (*Id.* (quoting *U.S. Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 56 (2d Cir. 2019)).) While in *Amex I*, the Second Circuit "concluded that the credit card market *at issue* was properly defined not as two separate markets, but as a single, two-sided market, which included both the merchants on one side and the cardholders on the other," the Supreme Court's holding in *Amex II* "was that in a case brought under the Sherman

Act that involves a 'two-sided *transaction* platform,' the relevant market must *always* include both sides of the platform.'" *U.S. Airways, Inc.*, 938 F.3d at 56 (first emphasis added) (quoting *Amex II*, 138 S. Ct. at 2283). Because, as the Second Circuit has made clear, *Amex II*'s holding was different from *Amex I*'s, the Court agrees with Plaintiffs that *Amex II* was not controlling law at the time the Second Circuit affirmed the November 26, 2014 Decision and the February 14, 2016 Decision. *See Salveson*, 663 F. App'x 71. While *Amex I* specifically distinguished the facts before it from the facts in *Visa U.S.A., Inc.*, that distinction, at least as it relates to relevant market definition in antitrust cases, is now meaningless as a matter of law. However, as explained further below, the Court finds that the change in the law effected by *Amex II* ultimately has no bearing on whether Plaintiffs have standing under *Illinois Brick* and does not disturb the prior reasoning of either this Court or the Second Circuit in finding they do not.

### ii. Standing under *Illinois Brick*

#### 1. The parties' arguments

Plaintiffs argue that in dismissing Plaintiffs' federal claims, the Court relied on the Second Circuit's decision in *Visa U.S.A., Inc.* to support its finding that the "markets for general purpose payment cards and for payment card network services are separate and distinct." (Pls. Mem. 2 (quoting Nov. 26, 2014 Decision 6).) Based on this framework, under which cardholders were buyers in the market for general purpose payment cards but not in the market for payment card network services, "the Court concluded that the Cardholder Plaintiffs did not *participate* in the market for credit card network services, and thus could not have been direct purchasers under *Illinois Brick*." (*Id.*)

Plaintiffs further argue that while it may be that *Amex II* concerned relevant market definition, and did not discuss direct purchaser standing, the same "is also true of *Visa* [*U.S.A.,*

*Inc.*]" — while "*Visa [U.S.A., Inc.*] makes no reference to the direct-purchaser doctrine," the decision "provided a template for this Court to decide whether the cardholders participated in the market as direct purchasers." (Pls. Reply 9.) Thus, Plaintiffs contend that the Court should apply "the framework . . . from [its] original decision," in a way that accounts for "updated legal principles." (*Id.*) Plaintiffs argue that *Amex II* articulated "a number of important principles governing 'two-sided' credit-card markets that directly apply to this case":

> First, "two-sided transaction platforms, like the credit-card market" do not consist of two separate markets, but rather are "better understood as supplying only one product — transactions." The network can sell that product "only if a merchant and a cardholder both simultaneously choose to use the network." Second, the credit-card platform sells a transaction to both the cardholder and merchant, every time a credit-card is used: "whenever a credit-card network sells one transaction's worth of card-acceptance services to a merchant it also must sell one transaction's worth of card-payment services to a cardholder." Therefore, cardholders and merchants are *both* direct purchasers of the network's transactions. Third, the cardholder and merchant both consume each transaction: "[i]n the credit-card market, these transactions are jointly consumed by a cardholder, who uses the payment card to make a transaction, and a merchant, who accepts the payment card as a method of payment."

(Pls. Mem. 5 (first quoting *Amex II*, 138 S. Ct. at 2286; and then citing *id.* at 2286 n.8).) According to Plaintiffs, *Amex II* "resets the manner in which courts must view *all* credit-card markets in antitrust cases," and is "not limited to judicial questions of defining the relevant market." (Pls. Reply 9.)

Plaintiffs argue that in addition to establishing that "cardholders consume[] the transaction product offered by the credit-card network," the Supreme Court's decision in *Apple* also "compel[s]" the "conclusion" that cardholders "*directly* purchase that product from the network participants and therefore have standing under *Illinois Brick*." (Pls. Mem. 5.) Plaintiffs assert that the Supreme Court's "conclusion" in *Apple* that Plaintiffs were direct purchasers

under *Illinois Brick* "was based on the fact that 'there is no intermediary in the distribution chain between Apple and the consumer,'" and that "[b]ecause the same is true of cardholders and issuing banks, the Cardholder Plaintiffs must be direct purchasers." (*See id.* at 6 (alteration omitted) (quoting *Apple*, 139 S. Ct. at 1522).) Plaintiffs argue that just as the iPhone users in *Apple* purchased apps directly from Apple, and paid the alleged supracompetitive fees directly to Apple, a cardholder purchases one transaction's worth of services from a credit-card network every time she uses her card, and "the banks take the overcharge directly from the [c]ardholders' accounts." (*Id.* (first citing *Amex II*, 138 S. Ct. at 2286; then citing *Apple*, 139 S. Ct. at 1522; and then citing Compl. 2:3–4, ¶¶ 104, 110, 120).)

In response, Defendants argue that "*Amex II* did not address (much less change) the reason this Court and the Second Circuit dismissed [Plaintiffs' claims] — 'that cardholders do not directly pay interchange fees.'" (Defs. Opp'n 11 (quoting *Salveson*, 663 F. App'x at 75).) Defendants contend that "[m]arket definition and antitrust standing are separate questions," and that the holding in *Amex II* dealt only with market definition, without reference to standing and the direct-purchaser doctrine. (*Id.* at 12.) Defendants further argue that "[e]ven if one credited [Plaintiffs'] imaginative construction of *Amex II* — that cardholders are 'direct purchasers of the network's transactions' — they still did not directly pay the allegedly inflated interchange fees at issue in this case, and thus have no standing to sue." (*Id.*) Defendants point to three previous decisions — the November 26, 2014 Decision, the February 24, 2016 Decision, and the Second Circuit's decision affirming dismissal of Plaintiffs' federal claims — all of which found that the Plaintiffs' claim that they directly paid the interchange fee was refuted by the structure of the transaction at issue, both as alleged by Plaintiffs and as described by courts in related cases, and argue that *Amex II* does nothing to "change[] these facts" or "disturb this reasoning." (*Id.* at 13.)

Finally, Defendants argue that *Apple* is "entirely inapposite," because while in that case, the plaintiffs, iPhone users, directly paid the alleged overcharge to the defendant, Apple, in this case, "both this Court and the Second Circuit have squarely held that [Plaintiffs] do not pay interchange fees <u>at all</u>, much less pay them directly to the defendants." (*Id.* at 13–14.)

### 2. *Amex II* does not disturb the prior reasoning of this Court or the Second Circuit

As discussed above, the Court's previous decisions finding that Plaintiffs lacked standing under *Illinois Brick* rested in part on the Court's understanding, consistent with then-controlling Second Circuit case law cited by Plaintiffs in the Complaint, that the "markets for general purpose payment cards and for payment card network services are separate and distinct," with cardholders participating only in the former. (*See* Nov. 24, 2016 Decision 6.) This framework had been endorsed by the Second Circuit in its decision in *Visa U.S.A., Inc.*, in regard to relevant market definition for purposes of the antitrust claims at issue in that case. *See Visa U.S.A., Inc.*, 344 F.3d at 238–39.

Following *Amex II*, that framework no longer reflects courts' understanding of the credit-card market in the context of relevant market analysis in antitrust cases. Instead, the Supreme Court has held that "the credit-card market" is a "two-sided transaction platform," in which "transactions are 'jointly consumed by a cardholder, who uses the payment card to make a transaction, and a merchant, who accepts the payment card as a method of payment.'" *Amex II*, 138 S. Ct. at 2286 (quoting Klein et al., Competition in Two–Sided Markets: The Antitrust Economics of Payment Card Interchange Fees, 73 Antitrust L.J. 571, 580 (2006)). "In cases

involving two-sided transaction platforms, the relevant market must, as a matter of law, include both sides of the platform." *U.S. Airways, Inc.*, 938 F.3d at 57 (emphasis omitted).

While antitrust standing was not at issue in *Visa U.S.A., Inc.* and the decision did not address the direct-purchaser doctrine, Plaintiffs are correct that the market framework it adopted nevertheless provided a basis, in part, for the Court's reasoning that Plaintiffs were not direct purchasers under *Illinois Brick*. However, it does not follow that any change to that framework in the context of relevant market definition will necessarily affect whether Plaintiffs have standing. In finding that Plaintiffs lacked standing under *Illinois Brick*, the Court also pointed to Plaintiffs' allegations that "the interchange fee is exchanged between financial institutions." (*See* Feb. 24, 2016 Decision 9.) The Court rejected Plaintiffs' contention that "cardholders, as the first and only link in the credit card transaction chain to actually make a payment, pay the interchange fees charged for each transaction directly," (Nov. 26, 2014 Decision 4), finding that it was "refuted by [Plaintiffs'] own allegations about how transactions over the[] two networks occur," and "[bore] no resemblance to the transaction structure at the heart of this nine-year-old case," (*id.* at 7). Similarly, the Second Circuit, in finding that "the structure of these transactions demonstrates that cardholders do not directly pay interchange fees," noted that "the issuer bank pays the acquiring bank for the . . . purchase, retaining a portion as an interchange fee," and cited to other Second Circuit decisions for the proposition that the interchange fee is paid by the acquirer to the issuer. *Salveson*, 663 F. App'x at 75 (first citing *Amex I*, 838 F.3d at 188; and then citing *Wal-Mart Stores, Inc.*, 396 F.3d at 102).

*Amex II* does not disturb this Court's or the Second Circuit's reasoning that Plaintiffs do not directly pay the interchange fee. If anything, the Supreme Court's decision clarifies that this Court's discussion of *Visa U.S.A., Inc.* in its prior decisions is best understood as supporting the

primary reasoning of those decisions, i.e., that the structure of the transaction at issue demonstrates that Plaintiffs are not direct purchasers under *Illinois Brick*. In *Amex II*, the Supreme Court held that, in the context of relevant market definition in antitrust cases, the credit-card market is a two-sided transaction platform that "facilitate[s] a single, simultaneous transaction between participants." 138 S. Ct. at 2286. A credit-card network "can sell its services only if a merchant and cardholder simultaneously choose to use the network," and "are thus better understood as 'supplying only one product' — transactions . . . [which] 'are jointly consumed by a cardholder . . . and a merchant.'" *Id.* (alteration omitted) (quoting Klein et al., *supra*, at 580). This forms the basis for the heart of Plaintiffs' argument — that following *Amex II*, "cardholder[s] and merchant[s] both consume each transaction," and "are both direct purchasers of the network's transaction." (Pls. Mem. 5.)

In taking this discussion of two-sided platforms in the context of relevant market definition and attempting to transpose it directly into a discussion about the direct-purchaser doctrine, Plaintiffs ignore that, in *Amex II*, the Supreme Court made clear that even as a cardholder and a merchant jointly consume a transaction, they each consume separate and distinct services from the network:

> The network provides separate but interrelated services to both cardholders and merchants. For cardholders, the network extends them credit, which allows them to make purchases without cash and to defer payment until later. . . . For merchants, the network allows them to avoid the cost of processing transactions and offers them quick, guaranteed payment.

*Amex II*, 138 S. Ct. at 2280. This distinction in services, in addition to being factually apparent in the context of credit-card network services, is inherent to the definition of a two-sided platform. *See id.* ("[A] two-sided platform offers different products or services to two different groups who both depend on the platform to intermediate between them."). Thus, when a

18

cardholder and merchant simultaneously engage in a transaction, they consume two distinct services at precisely the same time:

> These platforms facilitate a single, simultaneous transaction between participants. For credit cards, the network can sell its services only if a merchant and cardholder both simultaneously choose to use the network. Thus, whenever a credit-card network sells one transaction's worth of card-acceptance services to a merchant it also must sell one transaction's worth of card-payment services to a cardholder. It cannot sell transaction services to either cardholders or merchants individually.

*Id.* at 2286. In defining the relevant market in an antitrust case involving credit-card networks, "courts must include both sides of the platform — merchants and cardholders," because given the relationship between pricing on one side of the platform and demand on the other, "[p]rice increases on one side of the platform . . . do not suggest anticompetitive effects without some evidence that they have increased the overall cost of the platform's services." *Id.* at 2285.

Thus, in the context of relevant market definition, the distinction between the services provided on each side of the platform is not particularly important. What matters instead is that for every credit-card transaction, there is necessarily activity on both sides of the platform, and activity on one side is inextricably linked to activity on the other. However, for purposes of determining whether Plaintiffs are direct purchasers, this distinction between services is critical: the "card-payment services" the network supplies to the cardholder primarily include the extension of credit, "which allows [her] to . . . defer payment until later,"[3] *id.* at 2280, 2286, and thus do not implicate the interchange fee. In fact, the reasoning in the Court's prior decisions relied on a similar distinction, despite using different terminology to describe it, and ultimately

---

[3] In addition to the extension of credit, "[c]ardholders also can receive rewards based on the amount of money they spend, such as airline miles, points for travel, or cash back." *Ohio v. Am. Express Co.* (*Amex II*), 625 U.S. ---, ---, 138 S. Ct. 2274, 2280 (2018).

found that the distinction supported the conclusion that Plaintiffs did not pay the interchange fee.

In the November 26, 2014 Decision, the Court, relying on *Visa U.S.A., Inc.*, observed that "[t]he markets for general purpose payment cards and for payment card network services are separate and distinct, and payment-card consumers are considered to participate only in the former." (Nov. 26, 2014 Decision 6.) The Court went on to conclude that "[b]ecause the interchange fee runs between financial institutions within the card services market, consumers do not directly pay interchange fees and are not directly injured by their imposition." (*Id.* at 7.) In this context, the Court's reference to the "card services market" could just as well be a reference to the "card-acceptance services" supplied on one side of the two-sided platform but not the other. The Court further noted that Plaintiffs' "contention that cardholders pay interchange fees directly is refuted by their own allegations about how transactions over these two networks occur." (*Id.* at 7.)

Similarly, in the February 24, 2016 Decision, the Court found that "based on the allegations, Plaintiffs recognize that there is a distinction between two markets: one for payment cards . . . , in which consumers participate by purchasing cards from issuing banks, and another for network services . . . , *in which merchants purchase services to facilitate the use of those cards*." (Feb. 24, 2016 Decision 8–9 (emphasis added).) Again, the Court's reference to the market for network services is essentially a reference to the "card-acceptance services" that, as *Amex II* makes clear, Plaintiffs do not purchase. The Court found that these allegations, together with Plaintiffs' allegations that "the interchange fee is exchanged between financial institutions in the [network services market]," (*id.* at 9 (citing Compl. ¶ 48)), "directly contradicted" the allegation that "cardholders are the direct payors of interchange fees," (*id.* at 10).

The Court's discussion of two separate markets for cards and network services, drawn from then-current Second Circuit law defining relevant markets in antitrust cases involving credit-card networks, no longer reflects the precise way in which courts view credit-card markets in antitrust cases. Undoubtedly, these decisions would be written differently today. But the outcome would be the same, because nothing about the structure of the transaction at issue has changed. The Court previously cited *Visa U.S.A., Inc.*'s distinction between the market for general purpose payment cards and the market for payment card network services to support its finding that, based on the structure of the transaction at issue, Plaintiffs did not directly pay the interchange fee, and the Court now points to *Amex II*'s distinction between card-payment services and card-acceptance services to support that same proposition.

Significantly, in affirming this Court's decisions and finding that Plaintiffs lacked standing under *Illinois Brick*, the Second Circuit did not at all discuss the separate markets for cards and network services. Instead, the Second Circuit focused exclusively on the structure of the transaction, which, "[c]ontrary to [P]laintiffs' allegations, . . . demonstrates that cardholders do not directly pay interchange fees." *Salveson*, F. App'x at 75. To illustrate its point, the Second Circuit provided the following example:

> [W]hen a cardholder makes a $100 purchase, the merchant sends notice of the charge to its acquiring bank, and the acquiring bank in turn sends the information to the card issuer bank. If the charge is approved, the issuer bank pays the acquiring bank for the $100 purchase, retaining a portion as an interchange fee. The issuer bills the cardholder, who then is bound to pay the issuer according to the terms of the card.

*Id.* Thus, the Second Circuit reasoned, "[t]he cardholder has not directly paid the interchange fee, but rather has only paid the full price for the item or service it has purchased." *Id.* Thus, even if the market framework set forth in *Visa U.S.A., Inc.* and later displaced by *Amex II* had

been central to this Court's reasoning, it played no role in the Second Circuit's decision finding that Plaintiffs lacked standing under *Illinois Brick.*

Plaintiffs contend that the inflated interchange fees come directly from the cardholders' accounts, and that cardholders directly pay the interchange fee. As the Court has previously found, this claim is contradicted by the structure of the transaction at issue, and it was this reasoning that drove both this Court and the Second Circuit to find that Plaintiffs were not direct purchasers under *Illinois Brick.* Because *Amex II* does nothing to disturb this reasoning, Plaintiffs still lack standing.

### 3. *Apple* does not apply

Plaintiffs argue that the Supreme Court's decision in *Apple* compels the conclusion that Plaintiffs are direct purchasers under *Illinois Brick.* (Pls. Mem. 5.) In support, Plaintiffs argue that just as the iPhone user plaintiffs in *Apple* purchased apps directly from the alleged antitrust violator, Apple, a cardholder swiping her card purchases one transaction's worth of card-payment services from the credit-card network. (*Id.* at 6 (first citing *Apple*, 139 S. Ct. at 1522; and then citing *Amex II*, 138 S. Ct. at 2286).) Plaintiffs further argue that just as the plaintiffs in *Apple* paid "'the alleged overcharge directly to Apple,' . . . the banks take the overcharge directly from the Cardholders' accounts." (*Id.* (first quoting *Apple*, 139 S. Ct. at 1522; and then citing Compl. 2:3–4, ¶¶ 104, 110, 120).) Plaintiffs argue that "there is no party between the cardholder and the credit-card banks — either on the sale of the transaction or on the payment of the

overcharge," and thus under *Apple*, the Court must find that Plaintiffs are direct purchasers under *Illinois Brick*. (*Id.* at 6–7.)

As discussed at length above, Plaintiffs do not pay the interchange fee. Accordingly, Plaintiffs reliance on *Apple* is misplaced, and their attempt to analogize the facts in this case to the facts in *Apple* fails.

### iii. Extraordinary circumstances do not warrant vacatur of the judgment pursuant to Rule 60(b)

Plaintiffs argue that there are "[e]xtraordinary circumstances" in this case that warrant vacatur of the judgment. (Pls. Mem. 7.) In support, Plaintiffs argue that due only to "a fluke in timing," cardholders and merchants are now subject to inconsistent treatment despite being "equally injured" by Defendants' alleged conduct, and that under Second Circuit precedent, this inconsistency constitutes an extraordinary circumstance warranting vacatur of the judgment. (*Id.* at 10.) In addition, Plaintiffs argue that the Supreme Court's decision in *Apple* may also "be used to call into questions the [m]erchants' standing to sue, . . . leav[ing] no plaintiff available to prosecute" Defendants' alleged antitrust violations.[4] (*Id.*)

In response, Defendants argue that Plaintiffs have "fail[ed] to demonstrate any extraordinary circumstances here" because (1) "*Amex II* did not change the applicable decisional law," (Defs. Opp'n 6); (2) "[Plaintiffs] and merchants are [not] similarly situated 'victims' of the

_____

[4] Plaintiffs contend that just as the app developers in *Apple* "*received* a smaller percentage of the price than they would have absent the monopoly," but "*paid* nothing to Apple," in this case, "the credit card merchant does not *pay* anything to the banks as compensation for the sale of the transaction . . . even if, like the app developers, the merchants *received* a smaller percentage than they would have in a competitive environment." (Pls. Mem. 11.) Because the "overcharge . . . comes directly from [cardholders'] accounts," Plaintiffs argue, they, like the plaintiffs in *Apple*, are not only direct purchasers, but if successful on their claims, would be "'entitled to the *full amount* of the unlawful overcharge.'" (*Id.* (quoting *Apple v. Pepper*, --- U.S. ---, ---, 139 S. Ct. 1514, 1525 (2019)).)

same tort," because "[i]f interchange fees were inflated, the effect would be to <u>benefit</u> cardholders (who would receive better rewards offers and other benefits)," (*id.*); and (3) "there is no reason that the parties who actually pay the interchange fee alleged to be anticompetitive — cannot bring suit," as "acquiring institutions have . . . in the past," (*id.* at 10).

As discussed above, although the Court finds that *Amex II* represents a change in the law, the Court finds that its prior reasoning, as well as the Second Circuit's, in finding that Plaintiffs lack standing under *Illinois Brick* is undisturbed by *Amex II*. Because Plaintiffs still lack standing to sue under Section 4 of the Clayton Act, there is no basis for the Court to set aside its prior decisions. The Court therefore declines to address Plaintiffs' additional arguments as to why there are extraordinary circumstances present warranting vacatur of the judgment.

### III. Conclusion

For the foregoing reasons, the Court denies Plaintiffs' motion to set aside the judgment.

Dated: July 15, 2020
Brooklyn, New York

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge