UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | Case No. 05-MD-1720 (MKB)(JO) |
| | **ORAL ARGUMENT REQUESTED** |
| This Document Relates To: *7-Eleven, Inc. et al. v. Visa Inc. et al.*, No. 13-cv-5746 (MKB)(JO); *Target Corp., et al. v. Visa Inc., et al.*, No. 13-cv-5745 (MKB)(JO); and *The Home Depot, Inc. et al. v. Visa Inc., et al.*, No. 16-cv-5507 (MKB)(JO). | |

**MEMORANDUM OF LAW IN SUPPORT OF THE DIRECT ACTION PLAINTIFFS'
MOTION TO EXCLUDE THE REPORT AND OPINIONS
OF DEFENSE EXPERT GLENN HUBBARD**

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER
TO BE FILED UNDER SEAL

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

I.      PRELIMINARY STATEMENT ............................................................................1

II.     BACKGROUND ....................................................................................................3

III.    LEGAL STANDARD..............................................................................................3

IV.     ARGUMENT ...........................................................................................................5

        A.      Professor Hubbard is Not Qualified by Background or Experience to
                Testify Concerning the Opinions He Would Offer.................................5

        B.      Many of Professor Hubbard's Specific Opinions Both Confirm His
                Overall Lack of Banking Expertise and Are Independently Unreliable .................7

                1.      Professor Hubbard's opinions about how banks might respond to
                        the "but-for world" are unsupported by any relevant expertise or
                        analysis.................................................................................................7

                2.      Professor Hubbard's opinions on Basel III are unreliable because
                        they contradict binding federal regulations.................................10

                3.      Professor Hubbard withdrew his opinions on interchange serving
                        to "balance" payment card platforms so he cannot testify to them at
                        trial....................................................................................................12

                4.      Professor Hubbard's opinions on commercial cards are
                        unsupported by relevant expertise or any analysis ....................14

V.      CONCLUSION......................................................................................................16

# **TABLE OF AUTHORITIES**

**Page**

**Cases**

*Algarin v. N.Y.C. Dep't of Corr.*, 460 F. Supp. 2d 469 (S.D.N.Y. 2006) .................................... 12

*Amorgianos v. Amtrak*, 303 F.3d 256 (2d Cir. 2002) ......................................................... 9, 11, 13

*Atl. Specialty Ins. v. AE Outfitters Retail Co.*, 970 F. Supp. 2d 278 (S.D.N.Y. 2013) .................. 9

*Bank of Am., N.A. v. Bear Stearns Asset Mgmt.*, 969 F. Supp. 2d 339 (S.D.N.Y. 2013) ............ 12

*Barban v. Rheem Textile Sys., Inc.*, No. 01-CV-8475 (ILG), 2005 WL 387660 (E.D.N.Y. Feb. 11, 2005), *aff'd*, 147 F. App'x 222 (2d Cir. 2005) ............................................................ 6

*Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334 (S.D.N.Y. 2005) ......................... 14

*Cen-Oster v. Goldman, Sachs & Co.*, 325 F.R.D. 55 (S.D.N.Y. 2018) ........................................ 13

*Daubert v. Merrell Dow Pharmaceuticals*, *Inc.*, 509 U.S. 579 (1993) .................................. passim

*Davis v. Carroll*, 937 F. Supp. 2d 390 (S.D.N.Y. 2013) .......................................................... 9, 12

*Delehanty v. KLI, Inc.*, 663 F. Supp. 2d 127 (E.D.N.Y. 2009) ...................................................... 6

*Deutsch v. Novartis Pharm. Corp.*, 768 F. Supp. 2d 420 (E.D.N.Y. 2011) .................................... 4

*E.E.O.C. v. Freeman*, 778 F.3d 463 (4th Cir. 2015) ..................................................................... 8

*El Aguila Food Prods., Inc. v. Gruma Corp.*, 301 F. Supp. 2d 612 (S.D. Tex. 2003) ................ 16

*Elcock v. Kmart Corp.*, 233 F.3d 734 (3d Cir. 2000) .................................................................. 12

*General Elec. Co. v. Joiner*, 522 U.S. 136 (1997) .................................................................. 9, 15

*Highland Capital Mgmt., LP v. Schneider*, 379 F. Supp. 2d 461 (S.D.N.Y. 2005) ...................... 9

*In re Fresh Del Monte Pineapples Antitrust Litig.*, 2009 U.S. Dist. LEXIS 97829 (S.D.N.Y. Sept. 30, 2009) .......................................................................................................... 12

*In re Rezulin Prods. Liab. Litig.*, 309 F. Supp.2d 531 (S.D.N.Y. 2004) ....................................... 4

*In re Rezulin Prods. Liab. Litig.*, 369 F. Supp. 2d 398 (S.D.N.Y. 2005) ................................. 8, 15

*Kogut v. Cty. of Nassau*, 894 F. Supp. 2d 230 (E.D.N.Y. 2012) ................................................... 6

*Krause v. CSX Transp.*, 984 F. Supp. 2d 62 (N.D.N.Y. 2013) ................................................... 3, 4

ii

*Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316 (E.D.N.Y. 2013) .................................................. 6

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F.Supp.2d 558 (S.D.N.Y. 2007) ......... 7, 9

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612 (S.D.N.Y. 2016) ................................................................................................................................ 14

*Mid-State Fertilizer Co. v. Exch. Nat'l Bank of Chi.*, 877 F.2d 1333 (7th Cir. 1989) ................... 6

*Moody v. CSX Transp., Inc.*, 271 F. Supp. 3d 410 (W.D.N.Y. 2017) ......................................... 12

*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005) ............................................................ 4

*Restivo v. Hessemann*, 846 F.3d 547 (2d Cir. 2017)...................................................................... 6

*SEC v. Yorkville Advisors, LLC*, 305 F. Supp. 3d 486 (S.D.N.Y. 2018) ..................................... 12

*Securities & Exch. Comm'n. v. Tourre*, 950 F. Supp. 2d 666 (S.D.N.Y. 2013) ........................... 4

*Southern v. Eli Lilly & Co.*, 489 F. Supp. 2d 230 (E.D.N.Y. 2007) ............................................ 12

*Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76 (2d Cir. 1997) ............................................................ 4

*U.S. Info. Sys. v. IBEW Local Union No. 3*, 313 F. Supp. 2d 213 (S.D.N.Y. 2004).................... 13

*United States v. Duncan*, 42 F.3d 97 (2d Cir. 1994)...................................................................... 4

*United States v. Jakobetz*, 955 F.2d 786 (2d Cir. 1992) ................................................................ 4

*Zaremba v. Gen. Motors Corp.*, 360 F.3d 355 (2d Cir. 2004) ...................................................... 6

**Other Authorities**

"Best Practices for Maximizing Commercial Card Performance" (March 2007), https://cdn.ymaws.com/www.napcp.org/resource/resmgr/resource_center/visa_best_pr actices_for_maxi.pdf................................................................................................................ 15

*Basel Regulatory Framework*, available at https://www.federalreserve.gov/supervisionreg/basel/basel-default.htm ................................ 10

Federal Deposit Insurance Corporation, *Regulatory Capital Rules:  Standardized Approach for Risk-Weighted Assets; Market Discipline and Disclosure Requirements*, available at https://www.fdic.gov/news/news/financial/2012/fil12027.html ........................... 10

*Federal Reserve Board approves final rule to help ensure banks maintain strong capital positions*, available at https://www.federalreserve.gov/newsevents/pressreleases/bcreg20130702a.htm .................. 10

**Rules**

Fed. R. Evid. 403 ................................................................................................................ 4

Fed. R. Evid. 702 ........................................................................................................ passim

**Regulations**

78 Fed. Reg. 62,081 (Oct. 11, 2013) .................................................................................. 10

## I.      PRELIMINARY STATEMENT

The Target Plaintiffs, 7-11 Plaintiffs, and The Home Depot (the "Direct Action Plaintiffs")[1] respectfully move to exclude the report and opinions, or in the alternative portions thereof, of Professor Glenn Hubbard, one of Defendants' experts, under *Daubert v. Merrell Dow Pharmaceuticals*, *Inc*., 509 U.S. 579 (1993) and Fed. R. Evid. 702.

The Direct Action Plaintiffs contend that Visa's and Mastercard's "Honor-All-Cards" Rules ("HAC Rules") unlawfully restrain trade under Section 1 of the Sherman Act.  Under the HAC Rules, nearly all banks in the United States that issue payment cards have agreed not to compete for merchant acceptance.[2]  As a result, unless a merchant is willing to accept, for example, no Visa-branded credit cards at all—an unrealistic option for nearly all merchants— then the merchant must accept *every* Visa credit card issued by *every* Visa issuer, on *whatever terms* Visa sets.  The same applies for Mastercard credit cards and issuers over the Mastercard network.  Visa and Mastercard also maintain similar HAC Rules for debit cards.

Merchants therefore are prevented *by rule* from using competitive forces to negotiate for lower acceptance fees with the banks that issue Visa or Mastercard payment cards.  The Direct Action Plaintiffs' experts demonstrate that this restraint had adverse impacts on competition, including by artificially inflating the profits enjoyed by Visa and Mastercard issuing banks, which were funded by the supra-competitive acceptance fees imposed on merchants.

To support the point that Visa and Mastercard issuing banks enjoyed high profits during the relevant period, the Direct Action Plaintiffs submitted an expert report from a banking

---

[1]  The 7-Eleven Plaintiffs, Target Plaintiffs and The Home Depot are identified in the Declaration of James A. Wilson in support of this motion.

[2]  Nearly every payment card issuer in the United States is a member of both Visa and Mastercard.  The primary exceptions are American Express and Discover, which use their own banking arms to issue their payment cards.

industry expert, Dr. Reto Kohler.  Drawing on his significant experience performing financial modeling while working at and consulting for banks, Dr. Kohler applied accepted methodologies and modeling techniques to (i) assess the lifetime value of individual cardholders for issuing banks; (ii) examine the profitability of consumer credit and debit card accounts for issuing banks; and (iii) demonstrate that, at lower interchange rates, banks could continue to fund "rewards" on credit cards through the other lucrative revenue streams generated by credit cards, such as finance charge revenue.

Defendants retained Professor Hubbard to respond to Dr. Kohler.  Professor Hubbard is an academic economist who has virtually no practical banking experience.  He has never worked at a bank and has never consulted for a bank on any issues relevant to his opinions here, all of which require expertise in analyzing and modeling bank profitability.  The Direct Action Plaintiffs accordingly move this Court to exclude Professor Hubbard's opinions in their entirety because he simply is not qualified to testify as an expert regarding bank profitability.

Alternatively, the Direct Action Plaintiffs move to exclude portions of Professor Hubbard's opinions pursuant to *Daubert* and Fed. R. Evid. 702.  The Direct Action Plaintiffs submit that Professor Hubbard's speculation about how banks might respond to the "but-for world," his opinions about Dr. Kohler's lifetime value modeling, his opinions that Visa and Mastercard use interchange to "balance" demand and supply on both sides of a two-sided platform, and his opinions about commercial cards should be excluded as unreliable and not relevant to the facts and claims in these cases.

2

## II.    BACKGROUND

The Direct Action Plaintiffs' banking industry expert, Dr. Reto Kohler, worked at and consulted for banks for over two decades.  *See* Ex. 1, Kohler Rpt. ¶ 2.[3,4]  Dr. Kohler determined that banks' payment card issuing businesses have yielded profits in excess of investors' expected returns during the relevant period and that they could continue to generate profits under scenarios of reduced interchange.  Dr. Kohler prepared three profitability modeling analyses that demonstrate that, under scenarios of reduced interchange, issuing banks on average would be able to continue to issue credit cards profitably *without* reducing cardholder rewards.[5]  Ex. 1, Kohler Rpt. ¶¶ 16, 105.

Defendants proffer Professor Glenn Hubbard to respond to Dr. Kohler.  Professor Hubbard has no meaningful banking experience and no relevant modeling experience.  Ex. 3, Hubbard Dep. 22:10-24, 23:3-19, 24:16-25:15, 26:5-28:14, 79:18-24.  Professor Hubbard does not offer his own profitability models, but merely criticizes certain aspects of Dr. Kohler's models.

## III.    LEGAL STANDARD

A "proposed expert must be 'qualified' to give the proffered opinion."  *Krause v. CSX Transp.*, 984 F. Supp. 2d 62, 74 (N.D.N.Y. 2013) (quoting *Daubert*, 509 U.S. at 589-90).  "'A

---

[3]  The Direct Action Plaintiffs' initial banking industry expert, Maria Blanco, withdrew from the engagement after she took a position with a different employer and discovered a disabling conflict.  *See* Jt. Status Conf. Statement [Doc. 7506], at 2 (July 1, 2019).  Dr. Kohler was substituted as plaintiffs' banking industry expert, and deposed, well in advance of *Daubert* and summary judgment deadlines.  Joint Status Rpt. [Doc. 7920], at 5 (May 1, 2020).

[4]  Unless otherwise specified, "Ex." refers to exhibits attached to the Declaration of James A. Wilson.

[5]  Dr. Kohler's profitability models were the Visa and Mastercard Credit Card Issuing Industry Model (Appendix E), Lifetime Value Profitability Model (Appendix F) and Debit Linked Deposit Account Profitability Model (Appendix G).  Ex. 1, Kohler Rpt., Appendices E, F, G.

district court may properly conclude that witnesses are insufficiently qualified . . . [where] their expertise is too general or too deficient.'" *Id.* (quoting *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 81 (2d Cir. 1997)).  It is the burden of the party offering the testimony "to show that his expert is qualified to testify competently regarding the matters he intends to address." *Id*. at 79.

The central questions then become whether the expert's opinions are reliable and are helpful to the trier of fact.  *See Daubert*, 509 U.S. at 591-92; *Deutsch v. Novartis Pharm. Corp.*, 768 F. Supp. 2d 420, 425 (E.D.N.Y. 2011); Fed. R. Evid. 702.  Expert testimony is not admissible when it consists of a factual narrative, displaces the arguments of counsel, or usurps the jury's function of drawing inferences from the evidence.[6]

If it determines that the requirements of general helpfulness and specific "fit" are met, the court engages "in a balancing . . . to determine whether the probative value of the proffered evidence substantially outweighs its danger of unfair prejudice." *United States v. Jakobetz*, 955 F.2d 786, 794 (2d Cir. 1992); Fed. R. Evid. 403.  Because "expert evidence can be both powerful and quite misleading," the court "exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595 (internal quotation marks and citation omitted); *see also Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005) ("[T]he Supreme Court, echoed by members of our own court, has noted the uniquely important role that Rule 403 has to play in a district

---

[6]  *See Securities & Exch. Comm'n. v. Tourre*, 950 F. Supp. 2d 666, 675 (S.D.N.Y. 2013) ("It is also inappropriate for experts to become a vehicle for factual narrative") (citations omitted); *id.* (explaining that "narration of facts of the case may easily invade the province of the jury, providing a separate basis for exclusion");  *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp.2d 531, 541 (S.D.N.Y. 2004) (expert may not "supplant the role of counsel in making argument at trial, and the role of the jury in interpreting the evidence") (internal quotation marks and citation omitted); *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) (expert should not provide conclusory testimony that "undertakes to tell the jury what result to reach . . . [or] attempts to substitute the expert's judgment for the jury's").

court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberations.").

## IV.    ARGUMENT

Professor Hubbard lacks the background and experience to render the opinions he would purport to offer at trial.  Moreover, certain of his opinions do not satisfy *Daubert*'s reliability and relevance requirements and should be excluded.

### A.    Professor Hubbard is Not Qualified by Background or Experience to Testify Concerning the Opinions He Would Offer

Professor Hubbard has never been employed at a bank or performed any consulting work for a retail bank regarding its credit card business, debit card business, or depository account business.  Ex. 3, Hubbard Dep. 22:10-24.  He has never evaluated the performance of a bank's credit, debit, or depository account portfolios, including by modeling profitability.  *Id.* 26:5-28:14, 79:18-24.  His limited consulting work for banks involved "analyzing regulation and strategies in response to changes in regulation"—but that analysis did not involve any regulations that impact banks' credit and debit card businesses, such as the Durbin Amendment or the CARD Act.  *Id.* 23:3-19.  He has also never had any involvement with banks in setting any aspect of the pricing of their credit card, debit card, or deposit account offerings, including interchange rates, interest rates, or fees.  *Id.* 24:16-25:15.

Professor Hubbard's experience and knowledge does not encompass bank payment card profitability models, bank credit card portfolio management, lifetime value estimates, and the other issuing bank-specific topics that form the basis for Dr. Kohler's opinions.  And, as will be shown in the next section, his lack of knowledge about subjects like the requirements of Basel III regulations and bank management of the commercial cards confirms that he lacks the expertise to opine on the issuing bank topics addressed by Dr. Kohler.

In sum, when it comes to payment cards, bank valuations, or depository accounts, Professor Hubbard has *no expertise and no relevant experience*.  Because Professor Hubbard does not possess the experience or qualifications to address the banking issues that are the subject of Dr. Kohler's opinions, his opinions should be excluded.  *See Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316, 328-29 (E.D.N.Y. 2013) (finding that offered expert lacked qualifications to testify, where he "ha[d] written two books about Saudi Arabia, [but] he offer[ed] no basis for concluding that these books or his other professional experiences establish any background of expertise on the Saudi Committee. . . . [Moreover,] [he] identifie[d] no scholarly work or experience that he engaged in to develop expertise on the subject of his report after his assignment"); *Barban v. Rheem Textile Sys., Inc.*, No. 01-CV-8475 (ILG), 2005 WL 387660, at *4 (E.D.N.Y. Feb. 11, 2005), *aff'd*, 147 F. App'x 222 (2d Cir. 2005) (precluding expert who had "never designed a machine of any kind, and has never worked with laundry machines in any capacity that bears on the conclusions he reaches in this case," in spite of having a master's degree in mechanical engineering); *Delehanty v. KLI, Inc.*, 663 F. Supp. 2d 127, 132 (E.D.N.Y. 2009) (finding expert unqualified to testify about ladder safety, who "never designed any ladder, never worked for a manufacturer which designed a ladder[,] never participated in any Standards committee which addressed ladder safety[,] [and] never tested ladders under any standard," in spite of having a master's degree in mechanical engineering).[7]

---

[7]  *See also Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 359-60 (2d Cir. 2004) (excluding accident reconstructionist from design defect case because witness lacked expertise in the relevant issue—automobile design); *Mid-State Fertilizer Co. v. Exch. Nat'l Bank of Chi.*, 877 F.2d 1333, 1340 (7th Cir. 1989) (excluding economist who failed to "draw[] on the skills of an economist" but instead "examined materials produced in discovery and drew inferences from the record"); *Kogut v. Cty. of Nassau*, 894 F. Supp. 2d 230, 244–45 (E.D.N.Y. 2012), *aff'd in part sub nom. Restivo v. Hessemann*, 846 F.3d 547 (2d Cir. 2017) (finding an "accomplished statistician" unqualified to testify to "microscopy and forensic science"); *Louis Vuitton Malletier*

**B.**     **Many of Professor Hubbard's Specific Opinions Both Confirm His Overall Lack of Banking Expertise and Are Independently Unreliable**

Professor Hubbard also offers specific opinions that are independently subject to exclusion because they are unreliable.

**1.**     **Professor Hubbard's opinions about how banks might respond to the "but-for world" are unsupported by any relevant expertise or analysis**

Defendants claim that the interchange fees they impose on merchants are necessary for issuing banks to be able to offer "rewards" (like airline miles) to some of their cardholders. Dr. Kohler's profitability models demonstrate, however, that under scenarios of reduced interchange, banks would still be able to issue credit cards without reducing cardholder rewards.

In response, Professor Hubbard opines that "issuers would likely respond to reduced interchange" through so-called "competitive responses" that he criticizes Dr. Kohler for not considering.  Ex. 2, Hubbard Rpt. ¶¶ 44-45.  Professor Hubbard's purported "competitive responses" by issuers include: (1) "Reduce their issuance of credit and debit cards, or even exit the . . . business"; (2) "Shift their issuance away from Visa and/or Mastercard to other platforms or payment systems"; (3) "Reduce rewards and/or other services to cardholders"; (4) "Increase other fees"; (5) "Change their customer base"; and (6) "Change their product mix . . . to shift customers to alternative payment methods or transaction types such as . . . from card payments to checks."  *Id.* ¶ 44.

Professor Hubbard's suggestions about what issuing banks would "likely" do if interchange rates decline are wholly speculative and premised solely on "studies done by others." Ex. 3, Hubbard Dep. 65:3-68:3, 69:14-72:14.  Professor Hubbard did not conduct *any* empirical

---

*v. Dooney & Bourke, Inc.*, 525 F.Supp.2d 558, 642 (S.D.N.Y. 2007) ("An expert qualified in one subject matter does not thereby become an expert for all purposes.").

study or analysis to assess the likelihood of any of the "competitive responses" he offered or whether the "studies done by others" he relies on are even reliable. He admitted he *did not* undertake to model what would happen to credit card offerings if interchange revenues to issuers were reduced – in fact, he has *never* attempted to do that. He admitted he has *no* experience in advising banks as to whether to undertake any of his so-called "competitive responses." *Id.* 18:13-19:5, 21:1-22:1.

      Professor Hubbard also admitted ███████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████ *Id*. 80:13-82:4, 87:1-92:24. This alone merits exclusion. *See In re Rezulin Prods. Liab. Litig.*, 369 F. Supp. 2d 398, 425 (S.D.N.Y. 2005) (rejecting expert testimony where "the plaintiffs' experts have ignored a large amount of information that calls many aspects of the [expert's analysis] into question" and explaining that "any theory that fails to explain information that otherwise would tend to cast doubt on that theory is inherently suspect"); *see also E.E.O.C. v. Freeman*, 778 F.3d 463, 469-70 (4th Cir. 2015) ("Cherry-picking data is essentially the converse of omitting it: just as omitting data might distort the result by overlooking unfavorable data, cherry-picking data produces a misleadingly favorable result by looking only to good outcomes.") (internal quotation marks and citation omitted).

      Professor Hubbard did not even discuss the "competitive responses" that issuing banks might undertake, if any, with any issuing banks, even including the Defendant Banks that retained him in these cases. Ex. 3, Hubbard Dep. 46:16-24. In fact, he did so little to support his opinion that he *declined* to testify to a reasonable degree of professional certainty that issuers would actually undertake *any* of the six "competitive responses" described in his opinion, if interchange was reduced. *Id.* 74:4-23.

Professor Hubbard's opinions about potential "competitive responses" banks would "likely" undertake in the but-for worlds in response to reduced interchange are based on Professor Hubbard's own unsupported speculation.  "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  The situation in this instance is even worse than that in *Joiner*, where the challenged testimony at least involved epidemiological studies the court found insufficient to support the expert's opinion.  Here, Professor Hubbard conducted no studies *at all*.[8]  And his purported opinions do not even rise to the level of an *ipse dixit*, because Professor Hubbard was unwilling to testify to a reasonable degree of professional certainty about them.

For all of these reasons, Professor Hubbard's opinions about the purported "competitive responses" of issuing banks should be excluded as unreliable.  *See Amorgianos v. Amtrak*, 303 F.3d 256, 268 (2d Cir. 2002) (affirming exclusion of opinion of expert who declined to use available data because he "did not find it necessary," despite his stated opinion that a "proper exposure assessment" would take them into consideration) (citation omitted).[9]

---

[8]  *Daubert* does not permit Professor Hubbard to simply parrot the cited "studies done by others" that he admitted he did not evaluate himself.  *See Louis Vuitton Malletier*, 525 F. Supp. 2d at 678 (when the expert "is simply rehashing otherwise admissible evidence about which he has no personal knowledge, such evidence—taken on its own—is inadmissible" because "an expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence") (quoting *Highland Capital Mgmt., LP v. Schneider*, 379 F. Supp. 2d 461, 468-69 (S.D.N.Y. 2005)).

[9]  *See also Atl. Specialty Ins. v. AE Outfitters Retail Co*., 970 F. Supp. 2d 278, 289 (S.D.N.Y. 2013) ("Rule 702 requires that expert testimony rest on knowledge, a term that connotes more than subjective belief or unsupported speculation.") (internal quotation marks and citation omitted); *Davis v. Carroll*, 937 F. Supp. 2d 390, 417 (S.D.N.Y. 2013) (excluding opinion, where expert "failed to link his personal knowledge and experience to the issue in a non-speculative and non-conjectural manner").

### 2.    Professor Hubbard's opinions on Basel III are unreliable because they contradict binding federal regulations

Dr. Kohler performed a "lifetime value ('LTV') analysis," which is a methodology used by issuing banks to encompass revenue, cost, and risk into a single measure of value at the cardholder level.  *See* Ex. 1, Kohler Rep. ¶¶ 75-77 & nn. 86-88.  The LTV analysis determines the present value to an issuer of a single cardholder over the life of the credit card account, and quantifies and determines the drivers of value of subsets of cardholders based on the extent to which they spend on the card and make use of the revolving credit facility.  *Id.* ¶ 9, Section V.

Dr. Kohler's LTV model involves the "risk weighting" of credit card assets.  Risk weighting of assets is a standard feature in capital banking and a requirement of Basel III regulations.[10]  The relevant Basel III regulations adopted in the U.S. require a risk-weight of 100% for all credit card assets.[11]

In his report, Professor Hubbard criticizes the risk-weighting of Dr. Kohler's LTV analysis, suggesting it should have varied according to the behavioral characteristics of the cardholder.  He argues that Dr. Kohler's risk-weighting "does not properly account for the

---

[10]  Basel III is a "comprehensive set of reform measures" developed by the Basel Commission on Banking Supervision "to strengthen the regulation, supervision, and risk management of the banking sector."  *See* Ex. 4, *Basel Regulatory Framework*, available at https://www.federalreserve.gov/supervisionreg/basel/basel-default.htm.  In July 2013, the Federal Reserve Board finalized a rule to implement the Basel III capital regulations in the United States.  *Id.*  Basel III includes both liquidity and capital reforms, *id.*, that were designed to require banks to maintain "more and higher quality capital, which acts as a financial cushion to absorb losses, while reducing the incentive for firms to take excessive risks."  Ex. 5, *Federal Reserve Board approves final rule to help ensure banks maintain strong capital positions*, available at https://www.federalreserve.gov/newsevents/pressreleases/bcreg20130702a.htm.  The ensuing U.S. regulatory framework requires "risk-weighting" of assets and establishes minimum ratios of certain forms of capital to risk-weighted assets.  *See* 78 Fed. Reg. 62,081 (Oct. 11, 2013).

[11]  Ex. 6, Federal Deposit Insurance Corporation, *Regulatory Capital Rules:  Standardized Approach for Risk-Weighted Assets; Market Discipline and Disclosure Requirements,* https://www.fdic.gov/news/news/financial/2012/fil12027.html.

economic relevance of the underlying *credit risk* associated with revolving account balances" and that Dr. Kohler "calculates the risk-weighted assets of his various cardholders by weighting the assets of all his cardholder categories by the same risk weighting of 100 percent."  Ex. 2, Hubbard Rpt. ¶ 112.

Professor Hubbard apparently did not realize, however, that the U.S. Basel III regulations *require* the precise risk-weighting employed by Dr. Kohler.  When questioned at his deposition about the applicability of Basel III regulations, Professor Hubbard acknowledged the existence of the regulations and that they address risk weighting.  Ex. 3, Hubbard Dep. 188:21-189:4.  But, he did not know what the Basel III regulations specifically required, and said in any event that they would not affect his opinions.[12,13]

Professor Hubbard may believe that the regulators who adopted Basel III simply "got it wrong."  *Id*. 203:17-19.  But, an opinion that does not address material facts like binding regulatory requirements and airily contends that the requirements are "wrong" does not satisfy the *Daubert* reliability standards.  *See Amorgianos*, 303 F.3d at 266 ("[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions

___

[12]  Ex. 3, Hubbard Dep. 202:19-203:19 (emphasis added) ("Q. Do you know what the Basel III guidance would suggest be applied to the risk-weighted average? A. I don't recall. Q. So maybe you could explain, what is the basis for your critique of Dr. Kohler in this paragraph [paragraph 112 of the Hubbard Report]? A. Well, the critique is you have got categories that have very different risk exposure to an institution, and so an institution – whether or not regulation, regulation has all kinds of things that don't capture risk.  The question is whether a bank would do this, and I just find it curious that heavy revolvers are the same as other categories. Q. Do you know whether Basel III sets requirements as to how an issue when a bank needs to account for the risk-weighted average of these assets? A. I don't recall. Q. Would that make a difference to your criticism? A. *No.  It might mean that regulation got it wrong, but no, it wouldn't make a difference*.").

[13]  Professor Hubbard's lack of familiarity with the Basel III requirements is another indication that he is not qualified to respond to Dr. Kohler and offer opinions specific to the retail banking industry.

reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony.").[14]

An opinion that contradicts binding regulations "cannot be said to 'assist the trier of fact' as Rule

702 requires."  *Moody v. CSX Transp., Inc.*, 271 F. Supp. 3d 410, 418 (W.D.N.Y. 2017) (quoting

*Elcock v. Kmart Corp.*, 233 F.3d 734, 756, n.13 (3d Cir. 2000)).[15]

### 3. Professor Hubbard withdrew his opinions on interchange serving to "balance" payment card platforms so he cannot testify to them at trial

In his report, Professor Hubbard opines that interchange is used to "balance demand and

supply on both sides of the [payment card] platform."  Ex. 2, Hubbard Rpt. ¶ 42.  But, Professor

Hubbard did not conduct any analysis *himself* to evaluate the assertion that Visa and Mastercard

in fact use interchange to balance supply and demand.  Rather, he relies on a 2006 academic

paper by three experts that are currently, or have previously, worked for Visa and Mastercard

█████████████████████████████████████████████),[16] and a 2008 letter

written by the former Chief Executive Officer of Visa to members of the U.S. Senate.  Ex. 2,

---

[14]  *See also SEC v. Yorkville Advisors, LLC*, 305 F. Supp. 3d 486, 506 (S.D.N.Y. 2018) (declining to consider opinion that did not apply established methodologies for determining fair value); *In re Fresh Del Monte Pineapples Antitrust Litig.*, 2009 U.S. Dist. LEXIS 97829, at *28-30 (S.D.N.Y. Sept. 30, 2009) (holding that the "failure to discuss the import of, or even mention, material facts" amounted to "cherry picking" and "such selective use of facts fails to satisfy the scientific method and *Daubert*"); *Southern v. Eli Lilly & Co.*, 489 F. Supp. 2d 230, 284-85 (E.D.N.Y. 2007) (noting that subjective methodology, as well as testimony that is insufficiently connected to the facts of the case, have been relied upon by appellate courts as grounds for rejection of expert testimony.); *Algarin v. N.Y.C. Dep't of Corr.*, 460 F. Supp. 2d 469, 477 (S.D.N.Y. 2006) (excluding opinion that was based on expert's subjective views based on his personal experience rather than established methodology).

[15]  *See also Bank of Am., N.A. v. Bear Stearns Asset Mgmt.*, 969 F. Supp. 2d 339, 358 (S.D.N.Y. 2013) (holding that opinions that "were premised upon an unfounded assumption" would not be helpful to the finder of fact); *Davis v. Carroll*, 937 F. Supp. 2d 390, 415 (S.D.N.Y. 2013) (noting that art appraisal opinion failed to apply any established appraisal standards and noting that where expert testimony rests on inadequate factual foundations, problematic assumptions, or a misleadingly partial selection of relevant facts, it must be excluded under Fed. R. Evid. 702).

[16]  Ex. 7, Murphy Dep. Vol. I 64:20-67:23.

Hubbard Rpt. ¶ 42, n.50; Ex. 3, Hubbard Dep. 104:24-107:4.[17]  Professor Hubbard also did not review any documents or testimony from the record about whether Visa and Mastercard in fact evaluate supply and demand in setting interchange rates, nor did he ask the individuals at the consulting firm that was assisting him to do so.  Ex. 3, Hubbard Dep. 107:18-108:15.  This decision to ignore relevant facts is significant because the evidence adduced during discovery in these cases indicates that ███████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ██████████████████████[18]

Professor Hubbard also failed to consider, much less review, the documentary evidence and sworn testimony in this case about how Visa and Mastercard actually set interchange rates. These documents and deposition testimony make clear that ██████████████████████████ ████████████████████████████████████████████████████████████████████████████ █████████████  Ex. 8, Harris Rpt. ¶¶ 475-480 & n. 511-521.  Professor Hubbard's failure to consider actual evidence renders his statement on that point unreliable.  *See Amorgianos*, 303 F.3d at 270; *U.S. Info. Sys.*, 313 F. Supp. 2d at 227.  Furthermore, because Professor Hubbard's statement ignores the facts adduced during the discovery process, it fails to satisfy the *Daubert* "fit" and relevance requirements.  *See LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209

---

[17]  The fact that the only two sources cited by Professor Hubbard as support for his assertion were both authored by individuals who worked for Visa or Mastercard at the time, either directly or as experts, at a minimum raises a serious question of bias that further undercuts the reliability of any opinions based on the sources.  *See Cen-Oster v. Goldman, Sachs & Co*., 325 F.R.D. 55, 69 (S.D.N.Y. 2018); *U.S. Info. Sys. v. IBEW Local Union No. 3*, 313 F. Supp. 2d 213, 233 (S.D.N.Y. 2004).

[18]  *See, e.g.*, Ex. 8, Harris Rpt. ¶¶ 475-480 & nn. 511-521 █████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████).

13

F. Supp. 3d 612, 642-43 (S.D.N.Y. 2016); *Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 353 (S.D.N.Y. 2005).

When confronted at his deposition with the lack of work he had done to support this opinion, Professor Hubbard back-tracked, testifying that he is "*not* offering [the] affirmative opinion" that Visa and Mastercard actually use interchange to balance demand and supply on both sides of the platform.  Ex. 3, Hubbard Dep. 107:5-108:5, 108:16-21 (emphasis added). Given that concession, and the lack of any credible work to support this "opinion" in his report, Professor Hubbard should be prohibited from testifying at trial about interchange being used to "balance" supply and demand.

### 4.    Professor Hubbard's opinions on commercial cards are unsupported by relevant expertise or any analysis

Dr. Kohler's analysis of issuer profitability relates to *consumer* credit, debit, and demand deposit accounts, not commercial cards.  Ex. 1, Kohler Rpt. ¶ 16.  Dr. Kohler demonstrates that, unlike consumer credit cards, where performance is evaluated solely by their standalone profitability, "[c]ommercial cards are accounted for in the commercial or corporate banking segment and are part of a broader and more holistic client engagement strategy."  *Id.* ¶ 59.  For major issuers, "commercial cards are located in a completely separate division," and while "[b]anks do consider the standalone profitability of commercial cards," "they place a heavier emphasis on the overall profitability of the client relationship."  *Id.*

Professor Hubbard does not dispute Dr. Kohler's opinions about the significant differences between consumer cards and commercial cards and the fact that commercial card profitability does not bear on consumer card profitability.  Instead, Professor Hubbard opines on the general profitability of commercial cards without *any* regard to how they are placed within the bank's organization and accounted for.  Ex. 2, Hubbard Rpt. ¶¶ 64-67.

14

Professor Hubbard admitted he did *no* analysis to evaluate, and does not in fact dispute, Dr. Kohler's findings that "that issuing banks issue commercial cards as part of strategies to develop corporate cash management relationships with large and small businesses."  Ex. 3, Hubbard Dep. 235:21-236:5; *see also* Ex. 2, Hubbard Rpt. ¶ 89.   Professor Hubbard further admitted that, while he offered findings on commercial care profitability generally, he was not actually opining about whether commercial cards would be offered in the but-for worlds presented by the Direct Action Plaintiffs' experts, including what if any response there would be to commercial card issuance under reduced interchange.  Ex. 3, Hubbard Dep. 163:1-16.

Because Professor Hubbard has no experience with respect to commercial cards and did not conduct any relevant analysis, his *ipse dixit* about commercial card profitability should be excluded under *Joiner*.  522 U.S. at 147.

Professor Hubbard is not only unqualified to proffer his opinions, but his speculation about commercial-card profitability ignores critical client relationship and other commercial-product considerations.  Professor Hubbard concludes that "a reduction in interchange will have a substantial negative impact on the revenue and, likely, the profitability of commercial credit cards specifically, and on issuers, broadly," Ex. 2, Hubbard Rpt. ¶ 66, but he entirely ignores how a reduction in interchange would impact "banking relationships with commercial clients, which [Visa itself advises] is an important factor when focusing on client retention."[19]  As a result, Professor Hubbard's opinions on commercial card profitability would be misleading and unhelpful to the jury.  *See In re Rezulin Prods. Liab. Litig.*, 369 F. Supp. 2d at 425 (rejecting

---

[19]  Ex. 9, Kohler Reply Rpt. ¶ 86 (quoting Visa, "Best Practices for Maximizing Commercial Card Performance" (March 2007), at 8, https://cdn.ymaws.com/www.napcp.org/resource/resmgr/resource_center/visa_best_practices_for _maxi.pdf).

expert testimony where "the plaintiffs' experts have ignored a large amount of information that calls many aspects of the [expert's analysis] into question"); *El Aguila Food Prods., Inc. v. Gruma Corp.*, 301 F. Supp. 2d 612, 620-23 (S.D. Tex. 2003) (excluding expert testimony that failed to take into account "the facts of the case").

## V.   CONCLUSION

For all of the reasons described above, the Court should exclude the report and opinions of Professor Hubbard.

In the alternative, the Court should exclude the following portions of the report, opinions, and testimony:

- Professor Hubbard's speculation about how banks might respond to a reduction in interchange, *see* Ex. 2, Hubbard Rpt. ¶¶ 44-45;

- Professor Hubbard's opinions about Dr. Kohler's LTV analysis, as it pertains to Basel III regulations, *see* Ex. 2, Hubbard Rpt. ¶ 112;

- Professor Hubbard's assertion that Visa and Mastercard use interchange to "balance" demand and supply on both sides of a two-sided platform, *see* Ex. 2, Hubbard Rpt. ¶ 42; and

- Professor Hubbard's opinions about commercial cards and their profitability, *see* Ex. 2, Hubbard Rpt. ¶¶ 64-67.

Dated:  June 1, 2020

Respectfully submitted,

CONSTANTINE CANNON LLP

By:   /s/ Jeffrey I. Shinder
Jeffrey I. Shinder
A. Owen Glist
Ankur Kapoor
Taline Sahakian
David A. Scupp
335 Madison Avenue, 9th Floor
New York, New York 10017
Telephone: (212) 350-2700
Email: jshinder@constantinecannon.com

W. Stephen Cannon
David Golden
Allison F. Sheedy
1001 Pennsylvania Avenue, NW, Suite 1300N
Washington, DC 20004
Telephone: (202) 204-3500
Email: scannon@constantinecannon.com

*Attorneys for 7-Eleven Plaintiffs*

VORYS, SATER, SEYMOUR AND PEASE LLP

By:   /s/ James A. Wilson
James A. Wilson
Robert N. Webner
Douglas R. Matthews
Kimberly Weber Herlihy
Alycia N. Broz
Kenneth J. Rubin
52 East Gay Street
Columbus, Ohio 43215
Telephone: (614) 464-6400
Email: jawilson@vorys.com

GIBBS & BRUNS LLP
Kathy Patrick
Barrett Reasoner
Denise Drake
David Sheeren
Shannon Smith
Erica Krennerich
1100 Louisiana Street, Suite 5300
Houston, Texas 77002
Telephone: (713) 650-8805
Email: kpatrick@gibbsbruns.com

CLARICK GUERON REISBAUM LLP
Gregory A. Clarick
Nicole Gueron
Isaac Zaur
40 West 25th Street
New York, New York 10010
Telephone: (212) 633-4310
Email: gclarick@cgr-law.com

*Attorneys for Target Plaintiffs*

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By: ____/s/ Steig D. Olson____
Steig D. Olson
David LeRay
Andrew Sutton
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Email: steigolson@quinnemanuel.com

Alicia Cobb
600 University Street, Suite 2800
Seattle, WA 98101
Telephone: (206) 905-7000
Email: aliciacobb@quinnemanuel.com

Jonathan Eser
1300 I St NW #900
Washington, DC 20005
Telephone: (202) 538-8172
Email: jonathaneser@quinnemanuel.com

BONDURANT MIXSON & ELMORE, LLP
Frank M. Lowrey IV
Ronan P. Doherty
3900 One Atlantic Center
1201 West Peachtree Street, N.E.
Atlanta, Georgia 30309
Telephone: (404) 881-4100
Email: lowrey@bmelaw.com

*Attorneys for The Home Depot, Inc. and Home Depot U.S.A., Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on June 1, 2020, I caused a true and correct copy of the foregoing document to be served on a subset of counsel via File Transfer Protocol (FTP) per agreement of the relevant parties.  I caused service of a cover letter that provided notice of this service on counsel in the above-referenced actions via File&ServeXpress and ECF.

DATED this June 1, 2020.


*/s/ James A. Wilson*
James A. Wilson