# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| BARRY'S CUT RATE STORES INC.; DDMB, INC. d/b/a EMPORIUM ARCADE BAR; DDMB 2, LLC d/b/a EMPORIUM LOGAN SQUARE; BOSS DENTAL CARE; RUNCENTRAL, LLC; CMP CONSULTING SERV., INC.; TOWN KITCHEN, LLC d/b/a TOWN KITCHEN & BAR; GENERIC DEPOT 3, INC. d/b/a PRESCRIPTION DEPOT; and PUREONE, LLC d/b/a SALON PURE, | MDL No. 1720<br><br>Docket No. 05-md-01720-MKB-JO |
| Plaintiffs, | |
| v. | |
| VISA, INC.; MASTERCARD INCORPORATED; MASTERCARD INTERNATIONAL INCORPORATED; BANK OF AMERICA, N.A.; BA MERCHANT SERVICES LLC (f/k/a DEFENDANT NATIONAL PROCESSING, INC.); BANK OF AMERICA CORPORATION; BARCLAYS BANK PLC; BARCLAYS BANK DELAWARE; BARCLAYS FINANCIAL CORP.; CAPITAL ONE BANK, (USA), N.A.; CAPITAL ONE F.S.B.; CAPITAL ONE FINANCIAL CORPORATION; CHASE BANK USA, N.A.; CHASE MANHATTAN BANK USA, N.A.; CHASE PAYMENTECH SOLUTIONS, LLC; JPMORGAN CHASE BANK, N.A.; JPMORGAN CHASE & CO.; CITIBANK (SOUTH DAKOTA), N.A.; CITIBANK N.A.; CITIGROUP, INC.; CITICORP; and WELLS FARGO & COMPANY, | |
| Defendants. | |

## EQUITABLE RELIEF PLAINTIFFS' OPPOSITION TO VISA AND BANK DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' <u>MONOPOLIZATION CLAIMS</u>

**Table of Contents**

I.     INTRODUCTION ................................................................................................ 1

II.    LEGAL STANDARD.......................................................................................... 2

   A.  Standard Applicable to Summary Judgment.................................................. 2

   B.  Monopoly Power Is Substantial Market Power ............................................ 3

III.   ARGUMENT ..................................................................................................... 5

   A.  Visa's Monopolization of the Debit Market ................................................ 5

      1.  Ample Direct Evidence of Visa's Debit Market Monopolization
          Precludes Summary Judgment ............................................................... 5

        (a)   Visa's Pre-Durbin Monopolization of the Debit Market ....................... 5

        (b)   Visa's Post-Durbin Monopolization of the Debit Market....................... 6

        (c)   In Addition to Direct Evidence, ER Plaintiffs Have Indirect
              Evidence of Visa's Monopoly Power ..................................................... 9

      2.  ER Plaintiffs' Experts Demonstrated the Harmful Competitive Effects
          of the Merchant Restraints ................................................................... 10

   B.  Visa's Monopolization of the Credit Market ............................................. 11

      1.  The Direct Evidence of Visa's Monopoly Power is Substantial.................. 12

      2.  There is Substantial Evidence and Strong Legal Support for a  Relevant
          Market Limited to Visa Credit Card Network Services............................. 13

      3.  In the Alternative, Visa Has Monopoly Power in The Broader Credit
          Card Market ......................................................................................... 15

IV.   CONCLUSION................................................................................................. 16

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AD/SAT v. Associated Press,*
  181 F.3d 216 (2d Cir. 1999)...............................................................................................4, 9

*Anderson News, L.L.C. v. American Media, Inc.,*
  899 F.3d 87 (2d Cir. 2018)......................................................................................................3

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986)................................................................................................................2

*Coal Exps. Ass'n v. U.S.,*
  745 F.2d 76 (D.C. Cir. 1984).................................................................................................12

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.,*
  370 U.S. 690 (1962)................................................................................................................3

*Del. & Hudson Ry. Co. v. Consol. Rail Corp.,*
  902 F.2d 174 (2d Cir. 1990)..................................................................................................11

*Eastman Kodak Co v. Image Tech. Servs., Inc.,*
  504 U.S. 451 (1992).......................................................................................................*passim*

*Energex Lighting Corp. v. N. Am. Philips Lighting Corp.,*
  No 83 Civ. 2939 SWK, 1990 WL 83528 (S.D.N.Y. June 12, 1990)......................................15

*Geneva Pharms. Tech. Corp. v. Barr Lab. Inc.,*
  386 F.3d 485 (2d Cir. 2004).........................................................................................*passim*

*Intellective, Inc. v. Massachusetts Mut. Life Ins. Co.,*
  190 F. Supp. 2d 600, 612 (S.D.N.Y. 2002)...........................................................................14

*Jefferson Parish Hosp., Dist. No. 2 v. Hyde,*
  466 U.S. 2 (1984)..................................................................................................................12

*K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.,*
  61 F.3d 123 (2d Cir. 1995)..................................................................................................3, 4

*National Ass'n of Pharm. Mfgrs., Inc. v. Ayerst Lab.,*
  850 F.2d 904 (2d Cir. 1988)..................................................................................................14

*Newcal Indus. Inc. v. Ikon Office Sol.,*
  513 F.3d 1038 (9th Cir. 2008) ..............................................................................................14

*Ohio v. American Express Co.,*
  138 S. Ct. 2274 (2018)..........................................................................................................15

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
562 F. Supp. 2d 392 (E.D.N.Y. 2008) ...................................................3, 9, 10, 15

*In re Publ'n Paper Antitrust Litig.*,
690 F.3d 51 (2d Cir. 2012)............................................................................2

*Securities and Exchange Commission v. Yorkville Advisors, LLC*,
305 F. Supp. 3d 486 (S.D.N.Y. 2018).......................................................3

*Tops Mkts., v. Quality Mkts., Inc.*,
142 F.3d 90 (2d Cir. 1998)..................................................................4, 9, 10

*U.S. v. Microsoft Corp.*,
253 F.3d 34 (Fed. Cir. 2020)...........................................................13

*U.S. v. Visa, Inc.*,
344 F.3d 229 (2d Cir. 2003)...........................................................4, 9, 11, 12

*United States v. E.I. du Pont de Nemours & Co.*,
351 U.S. 377 (1956)........................................................................4, 15

*United States v. Grinnell*,
384 U.S. 563 (1966)........................................................................3, 9

*United States v. Visa*,
163 F. Supp. 2d 322 (S.D.N.Y. 2001).....................................................14

*US Airways, Inc. v. Sabre Holdings Corp.*,
938 F.3d 43 (2d Cir. 2019)...............................................................14

*In re Visa Check/Mastermoney Antitrust Litig.*,
297 F. Supp. 2d 503 (E.D.N.Y. 2003) ....................................................6

**Statutes**

Dodd-Frank Wall Street Reform & Consumer Protection Act, Section 1075, Pub.
L. No. 111-203, 124 Stat. 1376, 2068-74 (July 21, 2010), 15 U.S.C. § 1693o-2 .....................7

Sherman Act, 15 U.S.C.A. § 2 ..................................................................... *passim*

## I.  INTRODUCTION

Visa and Bank Defendants' (collectively, "Visa" or "Defendants" herein) Motion for Summary Judgment on Plaintiffs' Monopolization Claims ("Motion" or "Defs.' Br.") is primarily directed at Direct Action Plaintiffs The Home Depot and 7-Eleven Plaintiffs ("DAPs"), with only a few pages addressing the ER Plaintiffs' claims.  Visa argues that the ER Plaintiffs rely only on "boilerplate claims" without any evidence or expert opinions to support debit or credit monopolization claims, or any related exclusionary conduct.  Not so.  Discovery[1] has revealed key facts that would, if proven at trial, show that Visa violated Section 2 of the Sherman Act, 15 U.S.C.A. § 2, in both markets. And the ERP Plaintiffs' economic experts, Professors Dennis Carlton and Joseph Stiglitz, detail Visa's market power and how its conduct has enabled it to exclude competitors and charge supracompetitive prices that harm both Merchants and cardholders.

Specifically, the evidence advanced by the ER Plaintiffs shows that Visa unlawfully obtained, and continues to exercise, monopoly power in the debit transactions market (the "debit market") card and credit transactions market (the "credit market") by excluding competition that might undermine Visa's unchallenged dominance and reduce corresponding Interchange Fees and other costs to Merchants. Visa sidelines potential competition and preserves its market power through anticompetitive contractual provisions ("Merchant Restraints" or "Network Restrictions")

---

1 "SJDX" refers to exhibits attached to the Transmittal Declaration of Rosemary Szanyi submitted in connection with Defendants' summary judgment papers. "ERPX" refers to exhibits attached to the Transmittal Declaration of Robert G. Eisler in connection with ER Plaintiffs' opposition papers.  "CSUF" refers to the ER Plaintiffs' Counterstatement of Facts in Response to Defendants' Statement of Material Facts as to Which There is No Genuine Issue to Be Tried.

and other conduct detailed below.[2]  Over the past two decades, not a single competitor has successfully diluted Visa's debit market or credit market share.  Visa has maintained a market share of approximately 60% of every debit and 50% of every credit transaction in the United States. And contrary to Visa's assertion, Visa's documents and Prof. Carlton's and Prof. Stiglitz's analyses support the elements of the monopolization claims at issue.  For instance, Professors Carlton and Stiglitz conclude that both debit and credit card output would have been greater, and credit card prices lower, in the absence of the Merchant Restraints. Visa's liability arguments, as contested herein and by the DAPs, present issues for the trier of fact, not a basis for summary judgment.

## II.  LEGAL STANDARD

### A.  Standard Applicable to Summary Judgment

The law is well-settled that summary judgment is appropriate only when, "after construing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 61 (2d Cir. 2012) (internal quotations and citations omitted).  A fact is material when it might affect the outcome of the suit under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255 (citation omitted).  "Summary judgment is therefore "'improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-

---

[2] Prof. Carlton in his reports refers to the challenged Visa rules as "Network Restrictions," while Prof. Stiglitz refers to them as "Merchant Restraints." ER Plaintiffs use the terms here interchangeably.

moving party.'"  *Securities and Exchange Commission v. Yorkville Advisors, LLC*, 305 F. Supp. 3d 486, 509-10 (S.D.N.Y., 2018) (citation omitted).

In antitrust cases, summary judgment is not a substitute for a trial, and so "if the evidence admits of competing permissible inferences with regard to whether a plaintiff is entitled to relief," summary judgment should be denied.  *Anderson News, L.L.C. v. American Media, Inc.*, 899 F.3d 87, 98 (2d Cir. 2018) (citations omitted); *see also Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.").  An antitrust plaintiff need only adduce facts from which a reasonable inference of harm to competition, including economic inferences, can be drawn.  *See Eastman Kodak Co v. Image Tech. Servs., Inc.*, 504 U.S. 451, 468-69 (1992).  Harm to competition is satisfied by evidence of actual adverse effects, such as reason to believe the conduct raised prices, or by some evidence of the defendants' market power coupled with a credible reason for "believ[ing] that the defendant's behavior will  harm competition market-wide, such as the inherent anticompetitive nature of defendant's behavior . . ." *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 129 (2d Cir. 1995).

### B.    Monopoly Power Is Substantial Market Power

To state a claim for monopolization, a plaintiff must plausibly allege: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 562 F. Supp. 2d 392, 398 (E.D.N.Y. 2008) (citing *United States v. Grinnell*, 384 U.S. 563, 570–71 (1966)).  A company has monopoly power if it can sell a product or service for a supra-competitive price untroubled by market forces; in other words, if it is able to exert power

to insulate its prices from competition. *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 392 (1956) ("Monopoly power is the power to control prices or exclude competition."). When direct evidence is "unavailable or inconclusive ... monopoly power may be inferred from high market share." *Geneva Pharms. Tech. Corp. v. Barr Lab. Inc.*, 386 F.3d 485, 500 (2d Cir. 2004); *see Tops Mkts., v. Quality Mkts., Inc.*, 142 F.3d 90, 98 (2d Cir. 1998). In economic terms, market power is the power to raise price profitably above costs. *See K.M.B. Warehouse*, 61 F.3d at 129.

The Second Circuit has stated that market power is *synonymous* with monopoly power, and it has also stated that monopoly that monopoly power is *substantial* market power, *i.e.*, the ability to raise price substantially above the competitive level. *See Tops Mkts.*, 142 F.3d at 97-98; *AD/SAT v. Associated Press*, 181 F.3d 216, 226-27 (2d Cir. 1999). A plaintiff may plead and prove a defendant's substantial market power by either of two methods: (1) direct evidence of defendant's ability to control price or exclude competition; or (2) indirect evidence consisting of defendant's large share of the relevant market. *See, e.g., U.S. v. Visa, Inc.*, 344 F.3d 229, 239-40 (2d Cir. 2003); *Geneva*, 386 F.3d at 500. A properly defined antitrust market includes only those substitutes as to which there is significant cross-elasticity of demand. *See, e.g., Geneva*, 386 F.3d at 496 ("relevant market is determined by whether "the ability of consumers to switch to a substitute refrains a firm's ability to raise prices above the competitive level"). Sufficient cross-elasticity exists when the purchaser would respond to a slight increase in the price of one product by switching to another product. *AD/SAT*, 181 F.3d at 227. Evidence that shows directly that a defendant has priced its product above the competitive level supports a narrow market definition, i.e., potential substitutes are not in fact constraining defendant's price to the competitive level and therefore should not be included in the relevant market. *See, e.g., Eastman Kodak*, 504 U.S. at 469 n.15 (1992) ("whether considered in the conceptual category of 'market definition' or 'market power,' the ultimate inquiry is the same").

4

## III.    ARGUMENT

The ER Plaintiffs have proffered evidence that would allow a reasonable fact finder to determine that Visa violated Section 2 of the Sherman Act by engaging in a series of anticompetitive strategies to obtain and maintain monopoly power in the debit market and credit market.  That "willful acquisition or maintenance" of monopoly power violates Section 2. *Eastman Kodak*, 504 U.S. at 481. As shown below (and, as to debit, more completely in the DAPs' opposition brief), the record evidence is replete with factual details and expert opinion supporting substantial market power, exclusionary tactics, and anticompetitive effects in both the debit and credit markets.

### A.    Visa's Monopolization of the Debit Market

As a starting point, Visa concedes for purposes of these motions that the relevant market consists of all U.S. debit transactions from 2004 to the present. Defs.' Br. 5 n.3. ER Plaintiffs have the type of direct evidence that courts have endorsed as proving substantial market power, which is confirmed by Prof. Carlton's analysis, and indirectly by Visa's predominant share of the market.

### 1.    Ample Direct Evidence of Visa's Debit Market Monopolization Precludes Summary Judgment

Contrary to Visa's assertion that the ER Plaintiffs "have no evidence, including expert reports, to support debit . . . monopolization" (Defs.' Br. at 4), the direct evidence shows otherwise.

### (a)    Visa's Pre-Durbin Monopolization of the Debit Market

The Visa network originally carried only credit card transactions.  CSUF ¶ 1116.1. When Visa introduced a new category of "Signature" Debit transactions that were routed over its credit card network and that were subject to different rules and fees than PIN-Debit transactions, Visa induced Merchants to accept such transactions by "tying" acceptance of its Signature Debit cards to its credit cards through the Honor All Cards ("HAC") rules, *i.e.*, a Merchant that took Visa credit cards was required to also accept Visa Signature Debit cards. CSUF ¶1116.2. This aspect of the

HAC rules was challenged in *In Re Visa Check/MasterMoney*. CSUF ¶1116.3. Visa and Mastercard settled that case, removing the tying requirement and providing certain other injunctive relief as well as a $3.05 billion settlement fund. *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003).

Fearing that Merchants would abandon its more expensive Signature Debit cards, Visa then used its market power to cause a "convergence" of Interchange Fee rates for Signature and PIN cards. CSUF ¶ 1116.4. Visa did so to protect its supracompetitive Signature Debit fees. CSUF ¶ 1116.5. The American Banker ultimately confirmed that Visa's convergence strategy was effective when it concluded that: "Visa this month changed its debit interchange rates by raising PIN-based transaction costs and lowering Signature transactions; both are now 0.95% of each purchase plus 20 cents. The Signature Debit rate was previously 1.03% plus 15 cents, and PIN was 0.75% plus 17 cents." CSUF ¶ 1116.6.

The revised HAC rules, effective January 1, 2004, and in substantially the same form today, have maintained Visa's monopoly power. CSUF ¶ 1116.7. Visa endorsed the acceptance of debit cards by using the Signature Debit HAC rule to mandate that Merchants accept debit cards from all Visa Signature Debit issuers if the Merchant accepted any Visa Signature Debit cards. CSUF ¶ 1116.8. Issuing banks, therefore entered into exclusive contracts with Visa, for Signature and PIN-Debit because they knew their Signature Debit cards would be accepted and that they would not have to compete for such acceptance against other issuers. CSUF ¶ 1116.9. As a result, there is no competition between issuers for Merchant acceptance. CSUF ¶ 1116.10.

**(b)      Visa's Post-Durbin Monopolization of the Debit Market**

On July 21, 2010, the Durbin Amendment[3] was passed to limit the Interchange Fees that a non-exempt issuing bank (issuer with more than $10 billion in assets) may charge with respect to debit processing. Two provisions threatened Visa's monopoly power. First, the Federal Reserve Bank was given the power to regulate Interchange Fees charged to Merchants by debit card issuers. CSUF ¶ 1116.11. On June 29, 2011, the Federal Reserve Bank issued final rules setting the maximum Interchange Fee for nonexempt issuers at $0.21 plus .05 percent of the transaction value. CSUF ¶ 1116.12. Just as important, the Durbin Amendment required all debit cards offer a competing "unaffiliated" network option to create price competition on the Merchant side of the market. CSUF ¶ 1116.13.

**FANF**  After the Durbin Amendment went into effect, ███████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ One of the central components of its post-Durbin strategy was the new Fixed Acquirer Network Fee ("FANF") imposed on Merchants. CSUF ¶ 1116.16. The fee applies to all Merchant transaction volume with Visa, both credit and debit, and includes some volume discounts. CSUF ¶ 1116.17. The volume discounts incentivize Merchants to route transactions over Visa's networks rather than competing networks, and the linking of the volume discounts across credit and debit incentivizes acceptance of both. CSUF ¶ 1116.18. This new "per-location fee" was ███████████████ ████████████████████████████████. CSUF ¶ 1116.19. The FANF was carefully positioned as a reasonable, simple fixed-fee structure that would benefit Merchants via lower transaction costs, but in many ways, was variable, complicated, and primarily designed to incentivize processing through Visa's network, funneling Merchants toward higher margin card

---

[3] Dodd-Frank Wall Street Reform & Consumer Protection Act, Section 1075, Pub. L. No. 111-203, 124 Stat. 1376, 2068-74 (July 21, 2010), 15 U.S.C. § 1693o-2.

products, and dissuading use of lower cost PIN networks. CSUF ¶ 1116.20. ████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████████████████████████

**PAVD**   Meanwhile, most Merchants did not have the technical capacity to send a PIN transaction over the Visa Signature network, so Visa effectively created a bridge technology known as PIN-Authenticated Visa Debit ("PAVD"). CSUF ¶ 1116.23. As a Visa product, PAVD was priced more expensively to Issuers than existing Interlink transactions. CSUF ¶ 1116.24.  A Visa operating requirement was that Issuers needed to support PAVD transactions. CSUF ¶ 1116.25.  By promoting PAVD, Visa required that any Issuer using Visa's Signature Debit network also permit PIN functionality over the VisaNet network instead of Interlink. CSUF ¶ 1116.26. Notably, Visa only required that Issuing banks offer that service in response to the Durbin Amendment regulations.  In short, the PAVD mandate leveraged Visa's monopoly power to give Visa an unfair advantage over potential competitors and extended Visa's Signature Debit monopoly power into the PIN-Debit market. CSUF ¶ 1116.27.

**EMV**   Another example of Visa leveraging its post-Durbin market power was the delay in implementation of EMV, a technical standard for chip payment card technology, in the United States. CSUF ¶ 1116.28. Though ████████████████████████████████████████████ ████████████████████████████████—and all other developed countries implemented EMV more than decade before the Durbin Amendment—Visa chose to wait. CSUF ¶ 1116.29.  Yet despite the availability of EMV technology that would deter fraud by decreasing the value of the underlying data, thereby ██████████████████████████████████████████████

8

██████████████████████████████████████████████████████████████.

As a result, the United States payment ecosystem suffered unnecessary fraud. CSUF ¶ 1116.31.

> **(c)     In Addition to Direct Evidence, ER Plaintiffs Have Indirect Evidence of Visa's Monopoly Power**

Indirect evidence also establishes the existence of Visa's monopoly power which can be inferred from its predominant share of the market.  *Grinnell*, 384 U.S. at 571.  The Second Circuit previously affirmed a factual finding that Visa alone has market power. *Visa*, 344 F.3d at 239  ("we agree with the district court's finding that *Visa USA* and MasterCard, jointly and *separately*, have power within the market for network services") (emphasis added).  On different occasions, the Court of Appeals has stated both that (i) market power is *synonymous* with monopoly power and (ii) monopoly power is *substantial* market power. *Compare Tops Mkts.*, 142 F.3d at 97-98 with *AD/SAT*, 181 F.3d at 226-27.  If, as the Second Circuit has sometimes indicated, market power is *synonymous* with monopoly power, then the *Visa* Court's finding of market power makes it plausible to resolve this inquiry in ER Plaintiffs' favor.  If monopoly power means *substantial* market power, then ER Plaintiffs can show the necessary evidence to meet the enhanced degree requirement.

"Evidence of a defendant's high market share indirectly suggests that the defendant has the power to control prices if only because it demonstrates that there are few competitors and that customers' alternatives are limited in the event they decide the defendant's prices are too high. [] For example, a market with high entry barriers would to some extent suppress competition: whereas a seller in a market with low entry barriers could not raise its prices without the risk that a new seller would enter the market and offer the same product for a lower price, a competitor in a market with high entry barriers could raise its prices unfettered by the prospect of a new entrant into the market who would undercut prices." *In re Payment Card*, 562 F. Supp. 2d at 398 (citing

*Tops Mkts.,* 142 F.3d at 99). Here, it is undisputed that Visa has a dominant share of the overall debit market with a continual market share of approximately 60%.  CSUF ¶ 1116.32.

Additionally, significant barriers to entry exist in the debit card market entry. "Information about entry barriers, the strength of competition, the nature of the challenged conduct and the probable development of the industry, among other factors, can shed light on whether a defendant has acquired "the kind of competitive advantage about which the antitrust laws should be concerned."  *In re Payment Card*, 562 F. Supp. 2d at 398 (citing *Geneva,* 386 F.3d at 500–01).

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████

### 2.      ER Plaintiffs' Experts Demonstrated the Harmful Competitive Effects of the Merchant Restraints

The opinions of Professors Carlton and Stiglitz with respect to Visa's Merchant Restraints show how Visa exercised monopoly power with respect to debit card transactions. CSUF ¶ 1116.35.

By impeding price signals to cardholders, the Merchant Restraints have substantial impacts on the payment alternative that is the closest economic substitute for credit card transactions, debit cards. CSUF ¶ 1116.36.  With the Merchant Restraints in place, cardholders are induced by rewards to favor use of a credit cards over other payment means.  CSUF ¶ 1116.37. The Merchant Restraints prevent the Merchants from encouraging their customers to choose payment by debit card rather than by credit card. CSUF ¶ 1116.38.  This protected Visa's monopoly in credit cards and debit cards by, for example, excluding potential entry or expansion of competing payment networks—and it undoubtedly reduced output of debit transactions.  CSUF ¶ 1116.39.

Further, as Prof. Carlton noted, if pre-Durbin debit transaction pricing had been competitive, one would expect suppliers of debit card network services to exit the market in

response to capped Interchange Fees. CSUF ¶ 1116.40.  That did not happen, showing that competition from other payment methods did not constrain the price of debit card transactions to a competitive level. CSUF ¶ 1116.41.[4]  Prof. Carlton assessed other indicia, including Visa's price for debit card network services being above the competitive level, and concluded that Visa has substantial market power in the provision of such services. CSUF ¶ 1116.42.

### B.    Visa's Monopolization of the Credit Market

Visa devotes a single paragraph of its brief to contesting ER Plaintiffs' credit monopolization claim on the ground that it relies on a one-sided theory of monopoly power and a defective "single brand" product market. Visa is wrong. ER Plaintiffs have shown Visa's monopoly power directly, through evidence of Visa's supracompetitive prices and profits, and indirectly through its high share of the relevant markets for General Purpose Credit Card Network Services or the narrower market for Visa Credit Card Network Services.  CSUF ¶ 1116.43. *See, e.g., Visa*, 344 F.3d at 239-40 (a plaintiff may plead and prove a defendant's substantial market power by either of two methods: (1) direct evidence of defendant's ability to control price or exclude competition; or (2) indirect evidence consisting of defendant's large share of the relevant market). *See Geneva,* 386 F.3d at 500 (same). Further, Visa has maintained a market share of approximately 50% of every credit transaction in the United States. CSUF ¶ 1116.44.  *See also Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 179 (2d Cir. 1990) (evidence of 50% market share sufficient to sustain finding of Section 2 monopoly power).  Moreover, ER Plaintiffs' monopoly power theory is not one-sided. CSUF ¶ 1116.45.  As ample record evidence shows, Visa

---

[4] Defendants' separate motion to exclude Prof. Carlton's Report does not directly address (or seek to exclude) his opinion that debit card network services are a relevant market in which defendants have market power.  It only seeks exclusion of Prof. Carlton's opinion as to the import of the Durbin Amendment (showing that net fees for debit transactions have declined), but on narrow grounds that are separately discussed in the ER Plaintiffs' to that motion.

has monopoly power in its purest form, namely, the power to raise the two-sided prices for its credit cards substantially above the competitive level without losing sales to competitors, and to extract supracompetitive, artificially inflated Interchange Fees from Merchants.

### 1. The Direct Evidence of Visa's Monopoly Power is Substantial

For many of the same reasons as found in the debit market, direct evidence exists that Visa has monopoly power in the credit market. As a starting point, historical evidence proves this control. There has been no significant entry into card networks in over 30 years. Discover is the only successful general-purpose card market entrant, entering in 1985, and accounted for only four percent of the credit card purchase volume as of 2017. CSUF ¶ 1116.46. Further, the record is replete with evidence of Visa's market power:

- Merchants have continued to accept Visa credit transactions despite frequent and significant price increases. CSUF ¶ 1116.47. *See Visa*, 344 F.3d at 239 (this evidence supports finding of market power).

- Merchants have continued to accept Visa credit transactions despite Visa shifting card usage from standard cards to premium cards with growing Interchange Fees. CSUF ¶ 1116.48. *See Jefferson Parish Hosp., Dist. No. 2 v. Hyde*, 466 U.S. 2, 27 & n.46 (1984) ("as an economic matter, market power exists whenever prices can be raised above the levels that would be charged in a competitive market").

- Visa has engaged in sustained price discrimination among different classes of Merchants based in part on each class's ability to resist price increases. For example, Visa currently imposes substantially different fees on Merchants depending on the Merchant category's elasticity of demand for credit card network services (*e.g.*, Interchange Fees for the grocery store category are lower than Interchange Fees for restaurants). CSUF ¶ 1116.49. *See Coal Exps. Ass'n v. U.S.*, 745 F.2d 76, 91 (D.C. Cir. 1984) ("the ability of a firm to price discriminate is an indication of significant monopoly power").

- Credit card revenues generate the highest profit margins of all services offered by the co-conspirator banks. For example, the Federal Reserve Bank has found that earnings from credit cards are generally significantly higher than returns on other commercial banking activity. CSUF ¶ 1116.50. From 2010 through 2017, returns on assets for credit card banks averaged more than three times that of all commercial banks. CSUF ¶ 1116.51. Capital One's CEO, Robert Fairbank, stated that "The credit card business is the most resilient and most robust lending business by a large margin that I've ever personally experienced." CSUF ¶ 1116.52. *See*

*U.S. v. Microsoft Corp.*, 253 F.3d 34, 51 (Fed. Cir. 2020) (monopoly power established by ability to raise price above competitive level).

- Visa's market power is so substantial that the level of the Interchange Fees is essentially untethered to the cost of the services that the Merchants are purchasing. For example, in 2000, the cost per credit card transaction for all processing functions was about ▮▮▮▮▮▮. CSUF ¶ 1116.53. By 2008, the cost was about ▮▮▮▮▮▮, and it fell to ▮▮▮▮▮▮ by 2017. CSUF ¶ 1116.54. In spite of these substantial cost reductions, Visa's Merchant prices (and the two-sided price of credit transactions) have increased substantially. The average Interchange Fee in 1990 was about ▮▮▮▮▮. By 2014, this increased to ▮▮▮▮▮▮. CSUF ¶ 1116.55. *See Geneva*, 386 F.3d at 500 ("abnormally high price-cost margin" demonstrates monopoly power). *see also* Equitable Relief Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment under *Ohio v. American Express* (discussing evidence of Visa's supracompetitive two-sided price).

All of this evidence bolsters the conclusions of Professors Stiglitz and Carlton that Visa has monopoly power, which in turn, allows it to impose anticompetitive Merchant Restraints that preserve that power. CSUF ¶ 1116.56. "Where evidence indicates that a firm has in fact profitably [raised price above competitive level], the existence of monopoly power is clear." *Microsoft Corp.*, 253 F.3d at 51. Visa has succeeded in forcing Merchants nationwide to accept the Merchant Restraints, which prohibit Merchants from engaging in the normal, procompetitive activity of shifting demand in response to price increases. *See Eastman Kodak*, 504 U.S. at 464 ("Market power is the power to force a purchaser to do something that he would not do in a competitive market").

## 2.    There is Substantial Evidence and Strong Legal Support for a Relevant Market Limited to Visa Credit Card Network Services

The direct evidence of Visa's monopoly power shows that other potential substitutes—*i.e.*, other credit cards such as Mastercard, American Express, and Discovery—do not constrain Visa's price to a competitive level and therefore the relevant market is properly limited to sales of network services for Visa credit cards. Visa does not dispute that it has a 100% share of that market. Moreover, Visa's argument that "single-brand product markets" are highly disfavored lacks a

13

sound basis. Defs.' Br. at 45. In fact, the Second Circuit in Sabre reversed the district court's dismissal of a monopolization claim based on a single band market and re-iterated that a Section 2 claim can be limited to a defendant's product or service. *See US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 67 (2d Cir. 2019); *see also, Newcal Indus. Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1048 (9th Cir. 2008) ("the law permits an antitrust claimant to restrict the relevant market to a single brand of the product at issue."). And the Supreme Court has also concluded that a single brand can constitute the relevant market. *See Eastman Kodak*, 504 U.S. at 481 ("Kodak . . . contends that, as a matter of law, a single brand of a product or service can never be a relevant market under the Sherman Act. We disagree.").[5]  Visa's argument is precluded by controlling Supreme Court and Second Circuit precedent.

The record evidence shows that Visa, through the Merchant Restraints, foreclosed Merchants' incentive and ability to steer credit card usage in response to the price level of Interchange Fees.  CSUF ¶ 1116.57.  *See, e.g.*, *United States v. Visa*, 163 F. Supp. 2d 322, 340 (S.D.N.Y. 2001) ("In this regard, plaintiff has proven through the testimony of Merchants that they cannot refuse to accept Visa and Mastercard even in the face of significant price increases because the cards are such preferred payment methods that customers would choose not to shop at Merchants who do not accept them. . .  In addition, both Visa and Mastercard have recently raised interchange rates charged to Merchants a number of times, without losing a single Merchant customer as a result.").  The ER Plaintiffs' assertion of a narrow market limited to Visa credit card

---

[5] *See also Geneva*, 386 F.3d at 500 (finding a relevant market can consist of only generic copies of a single brand); *National Ass'n of Pharm. Mfgrs., Inc. v. Ayerst Lab.*, 850 F.2d 904, 915 (2d Cir. 1988) (limiting market to a single chemical entity); *Intellective, Inc. v. Massachusetts Mut. Life Ins. Co.*, 190 F. Supp. 2d 600, 612 (S.D.N.Y. 2002) (limiting market to particular category of investment analysis). The ER Plaintiffs incorporate by reference their Memorandum in Opposition to Defendants' Motion for Summary Judgment under *Ohio v. American Express*, which sets forth in detail the full scope of the anticompetitive effects of the Merchant Restraints.

14

transactions is therefore not only plausible, but compelling. *See du Pont*, 351 U.S. at 395 ("illegal monopolies under Section 2 may well exist over limited products and narrow fields where competition is eliminated").

    **3.**    **In the Alternative, Visa Has Monopoly Power in The Broader Credit Card Market**

At least for purposes of their summary judgment motion, Visa does not dispute that there is a relevant market for general purpose credit card network services.

Visa points to "increased competition" among American Express, Visa, and Mastercard. Defs.' Br. at 45 (citing *Ohio v. American Express Co.*, 138 S. Ct. 2274, 2282, 2288 (2018)). Even if competition has increased, however, it remains the case that Visa has generally maintained a market share of more than 50% in the credit card market. CSUF ¶ 1116.58. And courts in the Second Circuit, including this one, have found a 26% market share sufficient to support a finding of market power. *See In re Payment Card*, 562 F. Supp. 2d at 400 (adopting Magistrate Judge Orenstein's reasoning that "a finding that [a defendant's] market share is less than 30 percent would not, in any event, foreclose the possibility that [plaintiffs] may succeed on their Section 2 claims"); *Energex Lighting Corp. v. N. Am. Philips Lighting Corp.*, No 83 Civ. 2939 SWK, 1990 WL 83528, at *4 (S.D.N.Y. June 12, 1990) (refusing to "conclude at this time that there is no genuine issue on whether defendants had monopoly power" when "[d]efendants do not dispute that they had 25% of the purported GLM segment market when the alleged anti-competitive practice occurred").

Having adduced (1) a wealth of direct evidence showing Visa's market power and the ways that Visa's Merchant Restraints are used to preserve and enhance that power, and (2) indirect evidence of Visa's market power in the form of its high market share in the credit card market and monopoly share in the Visa credit card market, a reasonable fact finder could resolve in the ER

Plaintiffs' favor whether Visa is in "possession of monopoly power" in the credit market and violated Section 2.  *Eastman Kodak*, 504 U.S. at 481.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion for summary judgment on Plaintiffs' monopolization claims in its entirely.

Dated: September 22, 2020                    Respectfully submitted,

**GRANT & EISENHOFER P.A.**

By:   *s/ Robert G. Eisler*
Robert G. Eisler
Deborah A. Elman
Chad B. Holtzman
**GRANT & EISENHOFER P.A.**
485 Lexington Ave., 29th Floor
New York, NY 10017
(646) 722-8500
reisler@gelaw.com
delman@gelaw.com
choltzman@gelaw.com

Michael J. Freed
Robert J. Wozniak
Brian M. Hogan
**FREED KANNER LONDON & MILLEN LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
(224) 632-4500
mfreed@fklmlaw.com
rwozniak@fklmlaw.com
bhogan@fklmlaw.com

Linda P. Nussbaum
Bart D. Cohen
Marc E. Foto
**NUSSBAUM LAW GROUP, P.C.**
1211 Avenue of the Americas, 40th Fl.
New York, NY 10036
(917) 438-9189
lnussbaum@nussbaumpc.com
bcohen@nussbaumpc.com
mfoto@nussbaumpc.com

16

Steve D. Shadowen
Richard M. Brunell
Frazar W. Thomas
**HILLIARD & SHADOWEN LLP**
2407 S Congress Ste E 122
Austin, TX 78704
(855) 344-3298
steve@hilliardshadowenlaw.com
rbrunell@hilliardshadowenlaw.com
fraz@hilliardshadowenlaw.com

*Interim Co-Lead Counsel for the Equitable Relief
Class*

17