UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

IN RE PAYMENT CARD INTERCHANGE
FEE AND MERCHANT DISCOUNT
ANTITRUST LITIGATION

Case No. 05-md-01720 (MKB) (JO)

**ORAL ARGUMENT REQUESTED**

This Document Applies to:

*7-Eleven, Inc. et al. v. Visa Inc. et al.*, No. 13-cv-05746 (MKB) (JO);

*The Home Depot, Inc. et al. v. Visa Inc. et al.*, No. 16-cv-05507 (MKB) (JO);

*Visa U.S.A. Inc. et al. v. The Home Depot, Inc. et al.*, No. 14-cv-0261 (MKB) (JO);

*Visa U.S.A. Inc. et al. v. Nat'l Ass'n of Convenience Stores et al.*, No. 13-cv-03074 (MKB) (JO);

*Visa U.S.A. Inc. et al. v. Sears Holdings Corp.*, No. 14-cv-06450 (MKB) (JO).

**7-ELEVEN PLAINTIFFS, THE HOME DEPOT, AND ELGIN AVE. RECOVERY, LLC'S MEMORANDUM OF LAW IN OPPOSITION TO VISA AND BANK DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' MONOPOLIZATION CLAIMS**

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER
TO BE FILED UNDER SEAL

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT .......................................................................................... 1

II.   BACKGROUND ............................................................................................................... 3

  A.   Overview of Debit ........................................................................................................ 3

  B.   Visa Exploited the HAC Rule to Extend its Credit Market Power and to Monopolize
       Debit Prior to 2004 ...................................................................................................... 5

III.  LEGAL STANDARD ........................................................................................................ 6

IV.   ARGUMENT ..................................................................................................................... 7

  A.   Visa Unlawfully Maintained its Monopoly .................................................................. 7

    1.   Visa's HAC Rule ....................................................................................................... 8

    2.   Visa's pre-Durbin strategy to maintain its monopoly ............................................ 9

    3.   Visa's maintained its debit monopoly post-Durbin through exclusionary tactics ......... 14

      (i)    FANF ................................................................................................................16

      (ii)   PAVD ...............................................................................................................17

      (iii)  Bundled agreements with merchants and acquirers .................................18

      (iv)   Suppression of PINless .............................................................................20

      (v)    Exploitation of power over industry developments .................................21

    4.   Anticompetitive effects ......................................................................................... 23

    5.   Indirect evidence of Visa's monopoly power throughout the relevant period .............. 25

  B.   Visa Has Not Demonstrated Entitlement to Summary Judgment .................................... 26

    1.   Visa's flawed monopoly power arguments ............................................................. 26

    2.   Visa's flawed arguments concerning its anticompetitive conduct ............................ 31

  C.   Plaintiffs Have Demonstrated Antitrust Injury ................................................................ 43

  D.   Visa and the Bank Defendants Conspired to Monopolize Debit ...................................... 46

V.    CONCLUSION ...............................................................................................................48

## TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*Aerotec Int'l, Inc. v. Honeywell Int'l Inc.*,
    836 F.3d 1171 (9th Cir. 2016) .................................................................................. 35

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
    4 F. Supp. 3d 1123 (D. Ariz. 2014)........................................................................... 35

*Am. Express Travel Related Servs. Co. v. Visa U.S.A.*,
    No. 04 Civ. 8967, 2005 WL 1515399 (S.D.N.Y. June 23, 2005) ............................. 32

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) .................................................................................................... 7

*Apex Oil Co. v. DiMauro*,
    822 F.2d 246 (2d Cir. 1987)........................................................................................ 7

*Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*,
    738 F.2d 1509 (10th Cir. 1984).................................................................................. 38

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
    472 U.S. 585 (1985) ............................................................................................ 19, 38

*Atl. Richfield Co. v. USA Petroleum Co.*,
    495 U.S. 328 (1990) .................................................................................................. 46

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
    603 F.2d 263 (2d Cir. 1979)...................................................................................... 25

*Blue Shield of Va. v. McCready*,
    457 U.S. 465 (1982) .................................................................................................. 44

*Bradburn Parent/Teacher Store, Inc. v. 3M*,
    No. 02 Civ. 7676, 2000 WL 34003597 (E.D. Pa. July 25, 2003) ............................ 46

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977) ............................................................................................ 43, 46

*Cascade Health Solutions v. PeaceHealth*,
    515 F.3d 883 (9th Cir. 2008)................................................................... 11, 12, 35, 36

*Collins Inkjet Corp. v. Eastman Kodak Co.*,
    781 F.3d 264 (6th Cir. 2015)..................................................................................... 19

*Concord Boat Corp. v. Brunswick Corp.*,
    207 F.3d 1039 (8th Cir. 2000)................................................................................... 32

ii

*Cofnt'l Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962) ........................................................................ 38

*Cordes & Co. Fin. Servs., Inc v. A.G. Edwards & Sons, Inc.*,
    502 F.3d 91 (2d Cir. 2007) ............................................................. 43

*Dell & Hudson Ry. Co. v. Consol. Rail Corp.*,
    902 F.2d 174 (2d Cir. 1990) ........................................................... 25

*Discover Fin. Servs. v. Visa U.S.A. Inc.*,
    598 F. Supp. 2d 394 (S.D.N.Y. 2008) ................................... 9, 10, 32

*Eastman Kodak Co. v. Image Technical Servs., Inc.*,
    504 U.S. 451 (1992) ........................................................................ 17

*FTC v. Ind. Fed'n of Dentists*,
    476 U.S. 447 (1986) ........................................................................ 10

*Full Circle United, LLC v. Skee-Ball, Inc.*,
    No. 11 Civ. 5476 (LB), 2014 WL 12829195 (E.D.N.Y. May 12, 2014) ................................. 20

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*,
    386 F.3d 485 (2d Cir. 2004) .......................................................... 6, 7

*Giant Eagle, Inc. v. E. Mushroom Marketing Coop.*,
    No. 06 Civ. 3523, 2020 WL 1903640 n.1 (E.D. Pa. Feb. 14, 2020) ........................................ 30

*Hudson Ry. Co. v. Consol. Rail Corp.*,
    902 F.2d 174 (2d Cir. 1990) ........................................................... 25

*In re DDAVP Direct Purchaser Antitrust Litig.*,
    585 F.3d 677 (2d Cir. 2009) ....................................................... 43, 44

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
    383 F. Supp. 3d 187 (S.D.N.Y. 2019) .............................................. 44

*In re Publication Paper Antitrust Litig.*,
    690 F.3d 51 (2d Cir. 2012) ............................................................... 7

*In re Remicade Antitrust Litig.*,
    345 F. Supp. 3d 566 (E.D. Pa. 2018) .............................................. 46

*In re Visa Check/Mastermoney Antitrust Litig.*,
    297 F. Supp. 2d 503 (E.D.N.Y. 2003) ............................................... 5

*In re Visa Check/Mastermoney Antitrust Litig.*,
    No. 96 Civ. 5238, 2003 WL 1712568 (E.D.N.Y. Apr. 1, 2003) ...................................... 6, 46

iii

*Indeck Energy Servs., Inc. v. Consumers Energy Co.*,
   is misplaced. 250 F.3d 972 (6th Cir. 2000) ........................................................... 46

*Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co.*,
   812 F.2d 786 (2d Cir. 1987) ..................................................................................... 47

*Lenox McLaren Surgical Corp. v. Medtronic, Inc.*,
   762 F.3d 1114 (10th Cir. 2014) ................................................................................ 25

*LePage's Inc. v. 3M*,
   324 F.3d 141 (3d Cir. 2003) ............................................................................ *passim*

*Lifewatch Servs. Inc. v. Highmark Inc.*,
   902 F.3d 323 (3d Cir. 2018) ..................................................................................... 20

*Litton Sys., Inc. v. Am. Tel. & Tel. Co.*,
   700 F.2d 785 (2d Cir. 1983) ..................................................................................... 38

*Lorain Journal Co. v. United States*,
   342 U.S. 143 (1951) ................................................................................................. 25

*Maxon Hyundai Mazda v. Carfax, Inc.*,
   726 F. App'x 66 (2018) ........................................................................................ 32,

*Maxon Hyundai Mazda v. Carfax, Inc.*,
   13-cv-2680, 2016 WL 7231941 (S.D.N.Y. Dec. 9, 2016) ...................................... 33

*McWane, Inc. v. FTC*,
   783 F.3d 814 (11th Cir. 2015) ................................................................... 7, 11, 17, 33

*N. Am. Soccer League, LLC v. U.S. Soccer Federation, Inc.*,
   883 F.3d 32 (2d Cir. 2018) .................................................................................. 20, 23

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of, Okla.*,
   468 U.S. 85 (1984) ................................................................................................... 30

*New York ex rel. Schneiderman v. Actavis PLC*,
   787 F.3d 638 (2d Cir. 2015) ............................................................................... 15, 32

*Northeastern Tel. Co. v. Am. Tel. & Tel. Co.*,
   651 F.2d 76 (2d Cir. 1981) ................................................................................. 46, 47

*Ohio v. Am. Express Co.*,
   138 S. Ct. 2274 (2018) ........................................................................................... 3, 23

*Otter Tail Power Co. v. United States*,
   410 U.S. 366 (1973) ................................................................................................. 23

*Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*,
   507 F.3d 117 (2d Cir. 2007) ..................................................................... 43, 44

*Rambus Inc. v. FTC*,
   522 F.3d 456 (D.C. Cir. 2008) ........................................................................ 22

*Re/Max Int'l, Inc. v. Realty One, Inc.*,
   173 F.3d 995 (6th Cir. 1999) ............................................................................ 9

*Reazin v. Blue Cross & Blue Shield of Kan., Inc.*,
   899 F.2d 951 (10th Cir. 1990) ........................................................................ 11

*Ross v. Bank of Am., N.A. (USA)*,
   524 F.3d 217 (2d Cir. 2008) ........................................................................... 43

*Servicetrends v. Siemens Med. Sys.*,
   870 F. Supp. 1042 (N.D. Ga. 1994) ............................................................... 38

*Suture Express, Inc. v. Owens & Minor Dist., Inc.*,
   851 F.3d 1029 (10th Cir. 2017) ................................................................ 29, 36

*Tampa Elec. Co. v. Nashville Coal Co.*,
   365 U.S. 320 (1961) ........................................................................................ 32

*Todd v. Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001) ............................................................................. 6

*Tops Market, Inc. v. Quality Markets, Inc.*,
   142 F.3d 90 (2d Cir. 1998) ............................................................................. 47

*Trans Sport, Inc. v. Starter Sportswear, Inc.*,
   964 F.2d 186 (2d Cir. 1992) ........................................................................... 32

*U.S. Football League v. Nat'l Football League*,
   842 F.2d 1335 (2d Cir. 1988) ......................................................................... 25

*United States v. Dentsply Int'l, Inc.*,
   399 F.3d 181 (3d Cir. 2005) ............................................................................. 7

*United States v. Grinnell Corp.*,
   384 U.S. 563 (1966) .............................................................................. 6, 24, 25

*United States v. Microsoft*,
   253 F.3d 34 (D.C. Cir. 2001) .................................................................. *passim*

*United States v. Visa U.S.A., Inc.*,
   163 F. Supp. 2d 322 (S.D.N.Y.) ................................................................ 25, 26

*US Airways, Inc. v. Sabre Holdings Corp*,
   938 F.3d 43 (2d Cir. 2019) ................................................................. 24, 29

*Valassis Commc'ns, Inc. v. News Am. Inc.*,
   No. 06 Civ. 10240, 2011 WL 2420048 (E.D. Mich. Jan. 24, 2011) ......................................... 36

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko LLP*,
   540 U.S. 398 (2004) ................................................................. 15, 23

*Virgin Atl. Airways Ltd. v. British Airways PLC*,
   257 F.3d 256 (2d Cir. 2001) ................................................................. 46

*Wilk v. Am. Medical Ass'n*,
   895 F.2d 352 (7th Cir. 1990) ................................................................. 20, 23

*ZF Meritor, LLC v. Eaton Corps.*,
   696 F.3d 254 (2012) ................................................................. 33

**Statutes**

15 U.S.C. § 2 ................................................................. 1

Dodd-Frank Wall Street Reform & Consumer Protection Act, Section 1075, Pub. L. No. 111-203, 124 Stat. 1376, 2068-74 (July 21, 2010), 15 U.S.C. § 1693o-2 ................................. 1, 14

**Rules**

Fed. R. Civ. P. 56(a) ................................................................. 7

**Regulations**

12 C.F.R. §§ 235.3, 235.7 (2011) ................................................................. 14

**Other Authorities**

156 Cong. Rec. S5802 ................................................................. 14

3 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 651c (4th ed. Supp. 2020) ................................................................. 7

5 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 503 (4th ed. Supp. 2020) ................................................................. 10

7 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 749a (4th ed. Supp. 2020) ................................................................. 36

18 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1821c.1 (4th ed. Supp. 2020) ................................................................. 32

Herbert Hovenkamp & Erik Hovenkamp, *Complex Bundled Discounts and Antitrust Policy*, 57 Buff. L. Rev. 1227 (2009) ................................................................................................ 36

Herbert Hovenkamp, *The Rule of Reason*, 70 Fla. L. Rev. 81 (2018) ........................................................................................................ 30

Einer Elhauge, *Tying, Bundled Discounts, and the Death of the Single Monopoly Profit Theory*, 123 Harv. L. Rev. 399 (2009) .............................................................................................. 45

I.      **PRELIMINARY STATEMENT**

The 7-Eleven Plaintiffs, The Home Depot, and Elgin Ave. Recovery, LLC, successor-in-interest to Sears Holdings Corporation (collectively, "Plaintiffs"), respectfully oppose Visa's motion for summary judgment with respect to Plaintiffs' claims under Section 2 of the Sherman Act, 15 U.S.C. § 2.[1]  Visa's motion mischaracterizes the applicable law and disregards Plaintiffs' substantial evidence of the anticompetitive effects caused by Visa's conduct in the debit transactions market (the "debit market"), a market it has dominated for over two decades. Indeed, Visa's monopoly power is so durable that even an Act of Congress—the Durbin Amendment (or "Durbin")[2]—was unable to reign in Visa's dominance, as Visa has maintained a market share of roughly *60%* of the debit market in the United States throughout the relevant period and to the present day.

Visa's central argument is that Plaintiffs' theories "arise" from what Visa mischaracterizes as "[d]iscounts to [c]ustomers" on debit transaction prices, which Visa argues do not harm competition.  Defs.' Br. 12, 13.  By this, Visa refers both to the exclusive contracts that Visa secured with many large issuers and the bundling agreements it imposed upon merchants.  Substantial evidence supports a finding that both sets of agreements were anticompetitive.

The issuers that Visa locked up through exclusive contracts were not "customers"—they were (and still are) co-conspirators, who benefited from the absence of competition.  Visa's

---

[1]   Plaintiffs assert, in addition to a monopoly maintenance claim against Visa, a claim for conspiracy to monopolize against Visa and the Bank Defendants.  For ease of reference, this Memorandum (excluding the section addressing conspiracy to monopolize) refers to Visa and the Bank Defendants as "Visa."

[2]   Dodd-Frank Wall Street Reform & Consumer Protection Act, Section 1075, Pub. L. No. 111-203, 124 Stat. 1376, 2068-74 (July 21, 2010), 15 U.S.C. § 1693o-2.

signature debit "Honor All Cards" ("HAC") Rule, a horizontal agreement among competing banks, allowed Visa issuers to enter into these exclusive deals knowing that they would not have to compete by reducing interchange to maintain acceptance.  A portion of these exclusive contracts, ███████████████████████████████████ were priced in a way that ensured equally efficient PIN debit rivals could not match them without losing money. Through these agreements, Visa ensured merchants only had a choice of Visa Signature Debit or Interlink (Visa PIN)—*i.e.*, Visa or Visa.

When the Durbin Amendment banned Visa's anticompetitive exclusive agreements with issuers, Visa changed tactics.  Visa entered into bundling agreements with merchants that did not provide true economic discounts, but instead ████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████.  Merchants had to agree to these terms to obtain any relief from Visa's supracompetitive prices, even as the agreements helped cement Visa's dominance in the market.  And because Visa's debit rivals lacked Visa's scale and market power in signature debit, they could not match this strategy.  Visa was able to use these agreements to maintain roughly 60% share of the market, while continuing to charge supracompetitive prices for signature debit transactions.

Plaintiffs have further evidence of Visa's unlawful conduct in debit beyond its anticompetitive agreements with issuers and merchants.  As detailed below, Visa has acted as a cartel manager for thousands of banks issuing debit cards, imposed massive fixed fees to support its anticompetitive bundling strategy, tied signature and PIN debit together on the issuer side of the market to thwart competition, and suppressed innovative and superior products.  Visa's anticompetitive exercise of its monopoly power has resulted in the inferior and fraud-prone

"signature" debit product becoming the leading form of debit in the U.S. and led to the delay of EMV technology in the U.S.—a delay that needlessly exposed U.S. cardholders and merchants to fraud attacks from criminals around the globe for a decade.  This outcome contrasts with virtually every other developed country, where EMV was implemented much earlier and the more secure, faster, and cheaper PIN debit is the predominant form of debit transaction.[3]  Visa's motion largely ignores Plaintiffs' evidence of this anticompetitive conduct and the harm it inflicted on overall competition in the debit market.

At bottom, Visa's debit conduct has caused all of the anticompetitive effects recognized by the Supreme Court in *Amex*: Visa's monopolization has "[1] increased the cost of [debit] transactions above a competitive level, [2] reduced the number of [debit] transactions, [and] [3] otherwise stifled competition in the [debit]-card market," including through "decreased quality." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284, 2287 (2018) (hereinafter "*Amex*").[4] Accordingly, Visa's motion must be denied.

## II.    BACKGROUND

### A.    Overview of Debit

A debit card is a "pay now" instrument that allows consumers to make purchases using funds in their asset accounts—typically checking accounts, also known as "demand deposit accounts" ("DDAs").  COF ¶ 1092.  Visa's domination of the debit market[5] originated with its

---

[3] Plaintiffs' Counterstatement of Additional Material Facts ("COF") ¶¶ 1109, 1151, 1289 1331.

[4]  The lack of merit in Visa's motion is highlighted by the defects in Defendants' Statement of Material Fact as to Which There is No Genuine Issue to be Tried.  Defendants' Statement is filled with improper legal arguments, inaccuracies, and citations to inadmissible evidence—that is, not undisputed facts.  *See generally* Pls.' Resp. 56.1.

[5]  Visa concedes, for the purposes of these motions, that the relevant market consists of all debit transactions in the United States from 2004 to the present.  Defs.' Br. 5 n.3; *see also* COF ¶¶ 1086-91.

"Integrated Debit Strategy" in the 1990s.  COF ¶¶ 1120-21.  By 1990, PIN debit had emerged as

the leading form of debit payment in the United States.[6]  COF ¶ 1115-19.  PIN debit transactions

have numerous advantages for consumers, merchants, and issuing banks.  They are secure

because the transactions are authenticated by the cardholder providing a four-digit Personal

Identification Number ("PIN").  This lowers fraud, benefiting all stakeholders.  COF ¶¶ 1094,

1107-08.  And PIN debit transactions are also more efficient and cheaper for debit card issuers to

process, because the transactions are authorized, cleared, and settled in a single message, which

eliminates float and credit risk, and has lower processing costs.  COF ¶¶ 1101, 1106-07.

Historically, most U.S. debit cards were linked to more than one PIN network, allowing

cardholders to use their cards at more merchants.  When a cardholder selected "Debit" at the

POS, the merchant could select from a variety of routing options from networks, and this routing

competition yielded lower prices.  COF ¶¶ 1099-1100.

The "signature" debit product promoted by Visa, in contrast, is a fraud-prone payment

method offering none of these advantages.  COF ¶¶ 1102-07.  With signature debit, the

cardholder's signature is used (in theory) as means of authentication.  COF ¶ 1096.  But it is

widely recognized, including by Visa, that a signature is a virtually worthless authentication

device.[7]  In practice, store cashiers rarely if ever tried to authenticate signatures by inspecting

them.  COF ¶ 1104.  And because Visa's and Mastercard's rules mandated only one signature

---

[6]  Competitors in the debit market include Visa, Mastercard, and the PIN debit networks (such as STAR, NYCE, PULSE), the networks that emerged from the ATM infrastructure to provide both point-of-sale debit and ATM services to cardholders.  COF ¶¶ 1093, 1095, 1097.  While those networks expanded their product suite during the relevant period to offer PINless debit—single-message transactions without a PIN—and signature debit, Visa's conduct has prevented those products from attaining any meaningful success.  *See infra* Section IV.A.3.iv.  For convenience, they are referred to as the PIN debit networks.

[7]  In 2018, Visa stopped requiring the pretense of a signature for most transactions altogether. COF ¶ 1105.

debit network per card, these transactions did not offer the same competitive routing options to merchants as PIN debit—for Visa-branded debit cards, a signature debit transaction could be routed *only* to Visa.  COF ¶ 1098.

██████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████  Visa prioritized signature debit to benefit issuers, as such transactions allowed Visa issuers to earn more revenue.  *Id.*  Visa and its issuers thereafter embarked on a strategy that succeeded in making the fraud-prone, more expensive, and less efficient "signature" debit the dominant form of debit in the U.S.  COF ¶¶ 1121-31, 1151.

### B.    Visa Exploited the HAC Rule to Extend its Credit Market Power and to Monopolize Debit Prior to 2004

Beginning in the early 1990s, Visa used its HAC rule to force merchants that accepted Visa credit card transactions *also to accept Visa signature debit transactions* at credit-card-level interchange rates far higher than PIN debit rates.  COF ¶¶ 1123, 1132.  Visa used the supracompetitive interchange fees to induce debit card-issuing banks to issue Visa-branded "signature" debit cards and favor this fraud-prone and less efficient product over PIN debit.  COF ¶¶ 1124-28, 1132.  This strategy resulted in Visa's signature debit product becoming the dominant product in the U.S.  COF ¶¶ 1129-31.

A class of merchants led by Walmart challenged Visa's (and Mastercard's) tie between credit and debit acceptance, resulting in a landmark $3 billion settlement, which also required Visa (and Mastercard) to untie signature debit acceptance from credit acceptance.  COF ¶¶ 1133-

34; *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003)

(approving settlements); *In re Visa Check/Mastermoney Antitrust Litig.*, No. 96 Civ. 5238, 2003

WL 1712568 (E.D.N.Y. Apr. 1, 2003) (denying defendants' motion for summary judgment,

including debit Section 2 claims, and granting in part plaintiffs' motion for summary judgment).

Starting on January 1, 2004, Visa implemented a revised HAC Rule, which bifurcated

acceptance of Visa credit and Visa (signature) debit, but otherwise maintained its requirement

that merchants honor all cards within each category, credit or debit.  COF ¶¶ 1134-36.

It is Visa's HAC Rule revised effective January 1, 2004, and Visa's post-January 1, 2004

conduct to maintain its monopoly power that is at issue in these cases.  As discussed below, Visa

leveraged its HAC Rule requiring merchants to accept all Visa-branded signature debit

transactions from all Visa Debit issuers, combined with a series of interlocking anticompetitive

strategies, to maintain its monopoly power in the debit transactions market to this day.

## III.   LEGAL STANDARD

"The offense of monopolization has two elements: '(1) the possession of monopoly

power in the relevant market and (2) the willful acquisition or maintenance of that power as

distinguished from growth or development as a consequence of a superior product, business

acumen, or historic accident.'"  *United States v. Microsoft*, 253 F.3d 34, 50 (D.C. Cir. 2001)

(quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)).  Monopoly power under

Section 2 is defined as "the power to control prices or exclude competition."  *Grinnell*, 384 U.S.

at 571 (internal quotation marks omitted).[8]

_____

[8]  The existence of monopoly power can be established through direct evidence of power over
price or power to exclude competition, or through indirect, circumstantial proof such as high
market share and barriers to competitive entry.  *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*,
386 F.3d 485, 500 (2d Cir. 2004); *Microsoft*, 253 F.3d at 51; *see also Todd v. Exxon Corp.*, 275
F.3d 191, 206 (2d Cir. 2001).

"Unlawful maintenance of a monopoly is demonstrated by proof that a defendant has engaged in anti-competitive conduct that reasonably appears to be a significant contribution to maintaining monopoly power."  *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005) (citing *Microsoft*, 253 F.3d at 79; 3 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 651c (4th ed. Supp. 2020) (hereinafter "Areeda"); *see also McWane, Inc. v. FTC*, 783 F.3d 814, 832-33 (11th Cir. 2015) (condemning conduct that "allows a monopolist to maintain its monopoly power by raising its rivals' costs sufficiently to prevent them from growing into effective competitors").

Summary judgment is appropriate only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Upon reviewing the record, we draw all inferences and resolve all ambiguities in favor of the non-moving party, here plaintiffs."  *Geneva Pharm.*, 386 F.3d at 495 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  "[S]ummary judgment is not a substitute for trial. . . . Thus, when the evidence admits of competing permissible inferences with regard to whether a plaintiff is entitled to relief, 'the question of what weight should be assigned to those inferences remains within the province of the fact-finder at trial.'"  *In re Publication Paper Antitrust Litig.*, 690 F.3d 51, 61 (2d Cir. 2012) (quoting *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252-53 (2d Cir. 1987)).

# IV.   ARGUMENT

## A.   Visa Unlawfully Maintained its Monopoly

Ample evidence supports a jury finding that Visa unlawfully maintained its monopoly power.  After its HAC tying rule was removed in 2004, threatening Visa's monopoly power in debit, Visa engaged in a series of anticompetitive strategies to maintain its debit monopoly. These strategies caused substantial anticompetitive effects in the debit market, including

7

supracompetitive prices, reduced output, and harm to product quality.  Despite Congress enacting the Durbin Amendment to increase competition in debit, Visa successfully maintained its monopoly and sustained a durable market share of approximately 60% since 2004.  COF ¶¶ 1193, 1287-88.

### 1.     Visa's HAC Rule

Undergirding all of Visa's anticompetitive conduct was its debit HAC Rule, which prevented issuer competition for merchant acceptance, caused higher prices and lower output, and enabled Visa to block competition from other networks.  COF ¶¶ 1137, 1146-49, 1222. Visa's HAC Rule provides that "a Merchant that wishes to accept Visa Cards must accept any valid Visa Card in its category of acceptance that a Cardholder properly presents for payment." COF ¶ 1135.  Thus, *by rule*, Visa's issuing banks need not compete for merchant acceptance. COF ¶¶ 1136-37.  As Plaintiffs detail in their *Amex* opposition brief, Visa's HAC Rules prevent merchants from using competition among issuers to negotiate for better economic terms (lower prices) or more innovative acceptance arrangements.[9]  COF ¶¶ 1137-45.

Absent the HAC Rules, issuers would compete for cardholders by offering innovations through merchant partnerships, including enhanced rewards and other benefits.  COF ¶¶ 1138-41.  This competition would have driven debit transaction pricing to competitive levels, benefiting both cardholders and merchants.  COF ¶¶ 1142-43, 1148-49.  Merchants could also have used such agreements to favor PIN debit, which many preferred over Visa's fraud-prone Signature product.  COF ¶ 1106.

By propelling supracompetitive debit interchange, Visa's debit HAC Rule motivated issuing banks to enter into exclusive agreements with Visa to reinforce those interchange

---

[9]  *See* Pls.' Br. in Opp'n to Summ. J. under *Ohio v. Am. Express* at Section II.A.1.

revenues.  COF ¶¶ 1146-47.  Visa's debit HAC Rule—by inviting any qualifying bank to join its network, obtain supracompetitive prices, and avoid having to build its own network—also has deterred entry, and is evidence of Visa's monopoly power.  *See Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1020 (6th Cir. 1999) (ability to impose a policy disincentivizing entry sufficient to show monopoly power and withstand summary judgment).  No Visa issuers have broken ranks and competed for merchant acceptance at any time since January 1, 2004.  COF ¶ 1137.

### 2.  Visa's pre-Durbin strategy to maintain its monopoly

In addition to employing its HAC Rule, Visa maintained its monopoly power pre-Durbin through an interrelated two-pronged strategy.  *First*, Visa entered into long-term deals with debit issuing banks ████████████████████████████████████████ ████████████████████████████████████.  The resulting exclusion of rival networks suppressed network price competition because merchants could not route transactions to lower cost PIN competitors.  COF ¶¶ 1152-57, 1160.

By 2005, Visa had entered into long-term agreements that "essentially lock[ed] up 89% of the volume of its top 100 debit Issuers," preventing them from switching to MasterCard, which, at the time, was the only other signature debit network.  COF ¶¶ 1155-56.  Based on Visa's estimates, ████████ of Visa-branded debit cards in the U.S. were either Interlink-exclusive or did not have a PIN network option at all, meaning Visa faced no competition for those cards' transactions.  COF ¶¶ 1157, 1177-80.  Visa secured exclusive (or near exclusive) deals with the largest issuers by offering bundled pricing on credit and signature debit transactions that competing PIN networks could not match without losing money.  COF ¶¶ 1155,

1158, 1161-65.[10]

*Second*, using the pricing power from its exclusive deals, Visa █████████████

████████████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████. Visa did this to protect

signature debit and its supracompetitive fees.[11] COF ¶¶ 1153, 1159-60, 1181-84, 1188, 1190.

Between 2004 and 2010, Interlink's PIN debit interchange increased from ███ basis points to ███

basis points, and Visa's strategy drove the rest of the market to follow. COF ¶¶ 1160, 1183,

1185-87, 1189, 1191-92. Substantial evidence demonstrates that, but for Visa's strategy, debit

interchange rates would have fallen, further reducing prices. COF ¶¶ 1152-54, 1160, 1181-92,

1200, 1202-03. Visa's price increases on merchants were not offset by benefits provided on the

other side of the platform—debit rewards remained low, or non-existent.[12] COF ¶¶ 1197-99.

█████████████████████████████ thus allowed Visa to raise industry wide prices well above

---

[10] Visa claims its anticompetitive bundling agreements with issuers have "been upheld in prior litigation." Defs.' Br. 8. This is false. The fact discovery record in the *Discover* litigation closed on May 31, 2007. *See* COFEX 60130, Order, *Discover Fin. Servs. v. Visa U.S.A. Inc.*, No. 04-cv-7844 (BSJ)(DFE) (S.D.N.Y. filed Apr. 30, 2007), ECF No. 143. As a result, the critical bundled agreements at issue here were not presented as part of the *Discover* summary judgment record. SJDX 401 (Hausman Reply), ¶¶ 530-31 ("none of these facts were before Judge Jones"). *Discover*'s competitor antitrust claim also "rel[ied] largely on the exclusive nature of the agreements." *Discover Fin. Servs. v. Visa U.S.A. Inc.*, 598 F. Supp. 2d 394, 406 (S.D.N.Y. 2008). Here, Plaintiffs challenge the agreements as anticompetitive bundling arrangements that caused anticompetitive effects in the market, not exclusive deals.

[11] Visa acquired Interlink in 1991, then the largest PIN debit network. COF ¶¶ 1121-22. Visa's exclusive arrangements with issuers resulted both in Interlink's increased share of PIN debit and the suppression of the overall growth of PIN debit. COF ¶¶ 1195-96, 1200.

[12] ████████████████████████████████████████████████████████████████████████████████ That was in 2010, and "[f]or many years prior to that, the pass-through was even lower and close to zero." *Id*. As for PIN debit interchange, there was no evidence that increases in PIN debit interchange were passed through in the form of rewards. And the record shows little or no pass through in terms of debit transaction fees. COF ¶¶ 1197-98.

competitive levels.  COF ¶¶ 1160, 1183-86, 1197-1200.  *See* Areeda ¶ 503 (market power is "the ability profitably to raise price above marginal cost"); *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 459 (1986) (social welfare maximized when services are provided "at a price approximating the marginal cost of providing them").  Because pass through on the cardholder side was low or non-existent in debit, COF ¶¶ 1197-99, Visa's price increases raised the two-sided debit transaction price charged by Visa and its issuers above competitive levels, COF ¶ 1200.  That Visa was able to control PIN debit pricing and thus suppress PIN debit is direct evidence of its monopoly power.  *See Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 899 F.2d 951, 970-71 (10th Cir. 1990) (finding monopoly power where defendant "was in a position to use its leverage . . . to exclude or slow down the development of alternative" products in the relevant market); *McWane*, 783 F.3d at 830 (finding monopoly power from lack of disciplining effect on prices from competitors).

In addition to this direct evidence of Visa's ability to wield its monopoly power to harm competition, the anticompetitive nature of Visa's strategy also is confirmed by the economic analysis performed by Plaintiffs' economic expert, Professor Jerry Hausman.  Professor Hausman's analysis of Visa's exclusive issuer deals demonstrates that many with the largest issuing banks fail the applicable test for anticompetitive bundled pricing.  "A bundled discount occurs when a firm sells a bundle of goods or services for a lower price than the seller charges for the goods or services purchased individually."  *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008).  Courts condemn bundled pricing where it "pose[s] the threat of anticompetitive impact by excluding less diversified but more efficient producers."  *Id.* at 897; *accord LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003).

Bundled pricing is evaluated under the standards outlined in *PeaceHealth*.  The

11

*PeaceHealth* court imposed a "cost-based rule," termed the "'discount attribution' standard," to assess bundled pricing, to "ensure[] that the only bundled discounts condemned as exclusionary are those that would exclude an equally efficient producer of the competitive product." *PeaceHealth*, 515 F.3d at 906-09.

> Under this standard, the full amount of the discounts given by the defendant on the bundle are allocated to the competitive product or products. If the resulting price of the competitive product or products is below the defendant's incremental cost to produce them, the trier of fact may find that the bundled discount is exclusionary for the purpose of § 2. This standard makes the defendant's bundled discounts legal unless the discounts have the potential to exclude a *hypothetical* equally efficient producer of the competitive product.

*Id.* (emphasis in original).[13]

Consistent with these standards, Professor Hausman applies the Discount Attribution Test ("DAT") to Visa's exclusive deals with issuers. Under these contracts, ███████████ ███████████████████████████████████████████ ██ ███ ███████████████████████████████████████████████████████████ ███████████████. Professor Hausman's DAT evaluates whether an equally (or more) efficient debit rival would have to *lose money* on the PIN debit volumes to match Visa's

---

[13] Stated with more specificity, "[t]o prove that a bundled discount was exclusionary or predatory for the purposes of a monopolization or attempted monopolization claim under § 2 of the Sherman Act, the plaintiff must establish that, after allocating the incentives given by the defendant on the entire bundle of products to the competitive product or products, the defendant sold the competitive product or products below its average variable cost of producing them." *Id.* at 910. The Ninth Circuit considered but specifically rejected additional elements, including that a plaintiff show (1) recoupment and (2) "an adverse effect on competition." *Id.* at 910 n.21.

[14] Defendants have not challenged Visa's market power in credit on summary judgment. The evidence demonstrates that Visa possessed monopoly power in signature debit, with approximately ████ market share. COF ¶ 1194. Visa's only competitor in signature debit, Mastercard, demonstrated an inability to compete with Visa for signature volume, ██████ ███████████████████████████████████. COF ¶¶ 1172-74. This evidence, combined with substantial barriers to entry, *see infra* Section IV.A.5., demonstrates Visa's monopoly power in the signature debit segment.

bundle.  COF ¶¶ 1161-62.

Professor Hausman concludes that Visa's deals with ███████████████████ ████████████████████████████████████████████████████ failed the DAT.  These deals failed because an equally efficient debit network rival would have to lose money on the PIN debit volume to prevail against Visa's bundled pricing.  COF ¶ 1163.  Visa's deal with ████████████████████████ failed the Durbin Amendment's net compensation test, which is an economic proxy for the DAT (because it captures scenarios where an equally efficient rival would have to lose money to compete).  COF ¶ 1165 (citing SJDX 401, (Hausman Reply), ¶¶ 529-30).  ████████████████████████████████████

████████████████████████████████████████



During this same time period, Visa also exercised its monopoly power to delay the U.S. market's migration to EMV and to suppress the PINless products offered by its debit network rivals.[16]  COF ¶¶ 1262, 1323-32.  Visa's efforts to delay EMV and to suppress PINless were designed to protect the supracompetitive signature debit fees enjoyed by its issuers from competition from other networks.  COF ¶¶ 1150, 1259, 1262, 1264, 1406.  And, of course,

---

[15] ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████

[16]  PINless debit refers to single-message transactions, like PIN debit, that are authenticated without a PIN.  COF ¶ 1260.  ████████████████████████████
During the relevant timeframe, PINless transactions were typically offered on lower-ticket transactions or low-risk merchant categories, like recurring bill payments by customers with known identities (e.g., utilities, telecom, and insurance) and QSRs, and therefore, they gave the PIN debit networks the ability to win transactions away from Visa's signature debit volumes in those merchant categories (which traditionally did not accept PIN debit).  COF ¶ 1265.  Like PIN debit, PINless debit has proliferated in markets outside the United States, where Visa has not distorted competition.  COF ¶ 1266.

Visa's issuers were already free from having to compete because of Visa's HAC Rule.

### 3.   Visa's maintained its debit monopoly post-Durbin through exclusionary tactics

Congress enacted the Durbin Amendment in 2010 to stimulate competition in the debit market in a deliberate effort to erode Visa's dominance.[17]   The Durbin Amendment (1) prohibited the exclusive deals Visa had entered into with large debit issuers by requiring that all debit cards offer a competing "unaffiliated" network option to create price competition on the merchant side of the market and (2) imposed a cap on supra-competitive debit interchange rates paid to larger banks, eliminating the price difference between signature and PIN that motivated issuers to favor Visa's fraud-prone signature product.[18]   COF ¶¶ 1204-10.   Both provisions threatened Visa's monopoly power.   COF ¶¶ 1211-16.

The goal of the Durbin Amendment was to open up the debit market to competition.

---

[17]   *See, e.g.*, 156 Cong. Rec. S5802 (daily ed. July 14, 2010) (statement of Sen. Durbin) ("The two giant card networks control 80 percent of the debit card market—that is Visa and MasterCard.   And it is no surprise that debit interchange fees have risen, even as the price of processing the transaction has fallen.   They can impose these prices and say to the local businessperson:   Take it or leave it. . . .").

[18]   15 U.S.C. §1693o-2(a)(2), (b)(1)(A); 12 C.F.R. §§ 235.3, 235.7 (2011).   The Durbin Amendment resulted in a 37% reduction in the interchange fees merchants paid to issuers for debit transactions, signature or PIN.   COF ¶ 1209.   It also gave merchants control over routing, prohibiting any conduct by Visa, Mastercard, or the issuing banks that restricted merchants' ability to direct the routing of debit transactions.   *See* 15 U.S.C. § 1693o-2(b)(1)(B).

[19]

████████████████████████████████████████████████

████████████████████████████████████

But Visa wielded its dominant position in credit and signature debit to prevent PIN debit rivals from reaching the scale necessary to compete effectively.[20]   Visa's multi-faceted strategy to maintain its monopoly post-Durbin included:  (i) the FANF; (ii) the PAVD mandate; (iii) bundled-pricing agreements with merchants and acquirers; (iv) the suppression of PINless; and (v) abuses of its power over technological developments to exclude competition, including EMV and tokenization.  COF ¶ 1220.   Visa also benefited from the continuing anticompetitive effects of its pre-Durbin strategy—including the suppression of PINless and the foreclosure of competition in signature debit—which limited the PIN debit networks' ability to compete during the critical early post-Durbin period.  COF ¶ 1221.

Visa's interlocking strategies preserved Visa's monopoly and perpetuated signature debit's dominance, along with its higher prices and higher fraud rates.  COF ¶¶ 1287-92, 1296. Visa's signature debit remains the dominant form of debit in the U.S.—its share having *increased*—reflecting Visa's suppression of PINless and competition in fast growing digital formats.  COF ¶ 1289.  By protecting the inferior signature debit product, reducing choice, and raising two-sided prices, Visa's post-Durbin strategy harmed competition.  *See infra* Section IV.A.4.

---

[20]  Visa's ability to subvert the intended competitive benefits of the Durbin Amendment must be taken into account.  "The Supreme Court has made clear that '[a]ntitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue,'" including the interplay between regulatory legislation and a defendant's efforts to subvert those regulations. *See New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 658 (2d Cir. 2015) (quoting *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko LLP*, 540 U.S. 398, 411 (2004)) (rejecting defendants' argument "that antitrust law is not a vehicle for enforcing the 'spirit' of drug laws," specifically the Hatch-Waxman Act).  Visa's post-Durbin conduct sustaining its monopoly must be assessed against the backdrop of Congress's efforts to increase competition.

      *(i)*    *FANF*

Visa's anticompetitive scheme included imposing several two-sided price increases, which Visa deployed to harm competition. The largest of these price hikes is known as the Fixed Acquirer Network Fee, or FANF, a new monthly fixed network fee Visa imposed after Durbin on merchants for simply accepting Visa credit or debit—*on top of* the per-transaction network fees that merchants already paid.[21]  Visa introduced the FANF in April 2012, the same month that Durbin's prohibition against Visa's exclusives took effect.  COF ¶¶ 1223, 1225-27.

Visa used the FANF as a crucial component of Visa's integrated scheme to shut out rivals in the post-Durbin era. 



[23]  That ▇▇▇ deal fails Professor Hausman's DAT calculation.  COF ¶ 1242.

The FANF was an exercise in Visa's market power and it helped Visa maintain its

---

[21]  Visa's messaging to merchants in 2011 in the lead-up to the FANF initially indicated that the fee applied whether a merchant accepted credit *or* debit, thus threatening to reinstate the preexisting tie of credit and debit acceptance.  In February 2012, Visa stated, in a non-public bulletin *to acquirers*—▇▇▇▇—that the FANF could be reduced if a merchant accepted only Visa credit or debit. COF ¶ 1230.  Visa also introduced a new Transaction Integrity Fee and eliminated interchange refunds to merchants on debit transactions where the cardholder received a refund.  COF ¶ 1223.

[22]  Visa refers to these "concessions" as FANF "discounts."  In reality, these were reductions to supracompetitive fees.  COF ¶¶ 1233, 1235-38.

[23]  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

monopoly.[24]  At the stroke of a pen, Visa imposed this large new fee (for no new services provided) that generated ████████████████ revenues for Visa.  COF ¶¶ 1228, 1231. Merchants could only get any relief from that fee if they agreed to route to Visa instead of its competitors.  Visa was able to impose the FANF without losing acceptance.  COF ¶¶ 1224-25, 1229.  Visa does not provide any evidence that it passed through any of its FANF revenues to cardholders.  COF ¶¶ 1236, 1241.  The FANF thus exhibits Visa's power to raise two-sided, overall transaction prices and to exclude competition, *i.e.*, monopoly power.  *See McWane*, 783 F.3d at 830.

(ii)     PAVD

Visa also required Visa Debit issuers to enable additional PIN functionality on all Visa-branded debit cards (*i.e.*, PIN-authenticated Visa Debit, or PAVD), to protect signature debit and reduce competitors' transactions and scale.  Through its rulemaking power, Visa forced any issuer of Visa-branded signature debit cards to simultaneously offer PIN functionality over the Visa Debit network (*i.e.*, Visa's signature rails).  As a result, unlike its debit rivals, Visa did not have to compete for PIN placement on those cards.  COF ¶¶ 1273-74. ████████████████

████████████████████████████████████████████

████████████████████████████████

Rather than compete on the merits, Visa used PAVD to protect its signature debit product and its PIN debit network, Interlink, ████████████████████████████

████████████████████ .  COF ¶¶ 1277-78.  Visa achieved this not by competing for

---

[24]  ████████████████████████████ The FANF reflected Visa's market power in both the credit and debit transactions markets.  Because signature debit was predominantly the only form of debit for e-commerce transactions, and certain debit cards were signature-only post-Durbin, Visa could exploit its monopoly power in the debit market to implement the FANF.  COF ¶¶ 1218-19.

17

placement on the issuers card but instead by flexing its monopoly power to require such placement ████████████████████████. COF ¶¶ 1273-76.[25]  This further weakened rivals by making it more difficult for them to gain the volume necessary to meaningfully compete.

(iii)    *Bundled agreements with merchants and acquirers*

Leveraging its power in credit and signature debit, Visa also used anticompetitive bundled deals to ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████. In many cases, Visa structured these deals to make it virtually impossible for other networks to compete, either by bundling pricing across different products or otherwise pricing at levels that no other network could match without losing money. ████████████████████████████████████████████████████████████████ ████████████████████████████████████████ Visa did it anyway.

Visa's dominant share gave it an unassailable advantage over its competitors, even Mastercard.  COF ¶ 1255. ████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████ Professor Hausman's DAT analysis confirm the anticompetitive

---

[25] *See Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 464 (1992) ("Market power is the power to force a purchaser to do something that he would not do in a competitive market.") (internal quotation marks omitted); *Microsoft*, 253 F.3d at 62 (condemning practice as anticompetitive that had "a substantial effect in protecting [the defendant's] market power, and does so through a means other than competition on the merits").

nature of this strategy.[26]  ███████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████

 Visa's integrated scheme targeted important channels for Visa's rivals, including many of the leading debit-intensive merchants.  Visa also targeted many of the merchants that were leading prospects for PINless products offered by Visa's debit rivals, such as QSRs and bill-pay merchants, which otherwise could have competed against signature debit.  COF ¶ 1247.  And it targeted many of the leading acquirers (█████████████████████), which resulted in transactions being routed away from lower cost networks to Visa, costing merchants and

---

[26] ███████████████████████████████████████████████



[27]  Visa's only response to this evidence is that Professor Hausman did not calculate a DAT for these acquirer deals.  ████████████████

                 *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 610-11 (1985) (willingness to lose money "supports an inference that [a defendant] was not motivated by efficiency concerns and that it was willing to sacrifice short-run benefits and consumer goodwill in exchange for a perceived long-run impact on its" rivals).  And Visa offers no authority for the proposition that its *own analysis* of its pricing and costs is insufficient to create a material issue of fact regarding its conduct.  Defs.' Br. 18 n.11 ("We do not address those discounts further.").  There is no such requirement under the law; courts have accepted other evidence that demonstrates a defendant's pricing fails the discount attribution standard.  *See Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 275-76 (6th Cir. 2015) (accepting defendant's admission that it sold the contested product below its incremental cost as evidence supporting bundling claim and granting preliminary injunction application).  Because ███████████████████████████████████████ ███████, these deals were anticompetitive.

foreclosing competition.  COF ¶¶ 1242, 1253-54, 1256.

(iv)     <em>Suppression of PINless</em>

A core purpose of Visa's bundling scheme was to suppress the proliferation of PINless

debit, ███████████████████████████████████.[28]  COF ¶ 1259.  ███████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████

Visa's anticompetitive conduct protected signature debit in all of the merchant segments

that PINless threatened (bill-pay, QSRs and e-commerce) and thereby reduced choice and

innovation in the market.  COF ¶¶ 1263, 1265, 1272.  *See Lifewatch Servs. Inc. v. Highmark Inc.*,

902 F.3d 323, 340 (3d Cir. 2018) (reduction in innovation is anticompetitive); *Full Circle

United, LLC v. Skee-Ball, Inc.*, No. 11 Civ. 5476 (LB), 2014 WL 12829195, at *9 (E.D.N.Y.

May 12, 2014) (same); *Wilk v. Am. Medical Ass'n*, 895 F.2d 352, 360 (7th Cir. 1990) (reduction

or interference in consumer choice of product is anticompetitive); *N. Am. Soccer League, LLC v.

U.S. Soccer Federation, Inc.*, 883 F.3d 32, 42 (2d Cir. 2018) (same).  Visa's motion barely

addresses this anticompetitive conduct and, on that basis, should be denied.[29]

---

[28]  PINless debit offers the same efficiency and processing cost benefits as PIN debit, but without
PIN authentication.  COF ¶ 1260.  Because PINless debit in a card-present transaction is
typically limited to transactions under $50, the associated fraud risk is low.  PINless transactions
are also faster and more convenient for both merchants and cardholders than transactions
involving a signature.  COF ¶ 1261.

[29]  Visa's brief discussion of PINless highlights its willingness to distort Professor Hausman's
opinions.  Visa twists Professor Hausman's opinion that PINless "was a viable threat to signature
debit" before "Visa went to great lengths" to suppress it, into an opinion that PINless "*is* a
'viable' and growing 'threat.'"  *Compare* Defs.' Br. 38 (emphasis added), *with* Hausman Reply
¶ 690.  Similarly, Visa distorts Professor Hausman's testimony that ███████████ was behaving

(v)     *Exploitation of power over industry developments*

Visa played a prominent role in delaying the implementation of EMV technology in the United States, in large part to protect signature debit revenues.  COF ¶¶ 1405-20.  As discussed in detail in Plaintiffs' *Amex* opposition brief, such conduct needlessly exposed both cardholders and merchants to fraud attacks from around the world for a decade, making the U.S. the main target of payment card fraud worldwide, and lowering the quality of the payment system for merchants and cardholders alike.  Pls.' Mem. in Opp'n to Summ. J. re *Amex* at Section IV.B.C.

When Visa finally announced a roadmap for EMV in the U.S., more than a decade behind the rest of the world, Visa used its rulemaking power to require (and secure issuers' agreement) to prioritize Visa and bar routing to other networks.  COF ¶ 1399.  This caused debit transactions to be routed to Visa's signature network not because of competition on the merits, but because of Visa's rulemaking power and ability to cartelize the banks.  COF ¶¶ 1400-04.

Visa exploited EMV in other ways to protect its debit monopoly.  For example, Visa maintained a "Selection of Payment System" rule that required merchants to give cardholders a choice at the POS, including one that could only be routed to Visa.  COF ¶¶ 1372-84.  During the EMV rollout, Visa enforced this selection rule and provided similar guidance to terminal manufacturers, causing cardholders to be prompted with a deceptive choice between "Visa Debit," which, by rule, routed the transaction to Visa, and a non-existent and nonsensical brand "US Debit."  The latter, which consumers did not recognize and therefore typically did not choose, enabled routing to other debit networks (as well as Visa).  COF ¶¶ 1382-84. ███

████████████████████████████████████████████████████████████████████████████

---

competitively, converting that into an opinion that Visa was engaging in "price competition."  *Compare* Defs.' Br. 38, *with* Pls.' 56.1 Response ¶¶ 1059-1061.

███████████████████████████████████████████████████████████

██████████████████████████████  After federal agencies, including the FTC and Federal

Reserve, investigated this conduct, Visa rescinded the selection rule and manufacturer guidance

underpinning the deceptive screens.  COF ¶¶ 1393-97.

Visa's deceptive "cardholder selection" program caused transactions to route to Visa

rather than competing networks,[30] conduct that harmed competition by supporting the

maintenance of Visa's monopoly power.  *See Rambus Inc. v. FTC*, 522 F.3d 456, 464 (D.C. Cir.

2008) (deceptive conduct is exclusionary if "the conduct impaired rivals in a manner tending to

bring about or protect a defendant's monopoly power"); *Microsoft*, 253 F.3d at 76 (finding

defendant's conduct deceiving developers to prevent development of rival-compatible software

anticompetitive).

Visa similarly exploited tokenization—the industry effort pioneered by others to protect

cardholder information—to undermine the routing competition promoted by the Durbin

Amendment.  To enable merchant routing of tokenized transactions, which is required under

Durbin, the transaction needs to be detokenized—where the proxy token is matched with the

cardholder account number—so it can be sent to the unaffiliated network on the card.  COF

¶¶ 493-502, 1280.  This process impacted fast growing digital transactions, such as card-on-file

or in-app transactions (*e.g.*, ████).  COF ¶ 1282.  For years, Visa refused to comply with this

requirement, but only with respect to its traditional PIN debit rivals, while agreeing to share

---

[30] ████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████  While Visa claims that it is "necessary" for Plaintiffs to have alleged
they "unintentionally implemented or could not remove these choice screens," Defs.' Br. 30,
Visa cites no authority for that proposition.  That these screens contributed to Visa's overall
monopoly maintenance is sufficient to support Plaintiffs' claims against them.

tokens with Mastercard.  COF ¶ 1281.  As a result, Visa faced no routing competition in fast growing digital transactions, insulating its signature debit product from competition.[31]

Visa's conduct eliminated digital merchants' ability to choose lower cost networks (and likely violated Durbin), and had no justification other than to protect and maintain Visa's monopoly power.[32]  Therefore, this conduct was anticompetitive.  *Wilk*, 895 F.2d at 360; *N. Am. Soccer League*, 883 F.3d at 42; *cf. Trinko*, 540 U.S. at 410-11 (distinguishing case *sub judice* from exclusionary conduct where "the defendant was already in the business of providing a service to certain customers . . . and refused to provide the same service to certain other customers" and thus lacked business justification) (citing *Otter Tail Power Co. v. United States*, 410 U.S. 366, 370-71 (1973).

### 4.    Anticompetitive effects

A plaintiff can carry its burden of showing anticompetitive effects in a two-sided transaction market by demonstrating the challenged conduct "increased the cost of [debit] transactions above a competitive level, reduced the number of [debit] transactions, or otherwise stifled competition in the [debit]-card market," including through "decreased quality."  *Amex*, 138 S. Ct. at 2284, 2287; *see also LePage's*, 324 F.3d at 162 ("The relevant inquiry is the anticompetitive effect of 3M's exclusionary practices considered together.").  That Visa was able

---

[31] ███████████████████████████████████████████████████████

████████████████████████████████████  Visa changed its policy in 2018 to permit routing but only if the issuer requested the change, which it knew was unlikely with its larger issuers since ████████████████████████████████████.  COF ¶¶ 1283-84.

[32] ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

to cause these anticompetitive effects, through its control over pricing and exclusion of competition, also supports a finding of monopoly power. *See Microsoft*, 253 F.3d at 51.

Visa's conduct enabled Visa and its issuers to charge supracompetitive prices for debit transactions that harm both cardholders and merchants. COF ¶¶ 1142-45, 1148-49, 1160, 1181-83, 1186, 1197-1201, 1223, 1236, 1238-39, 1241, 1289-90, 1293-95. Because Visa's two-sided debit pricing was supracompetitive,[33] Visa reduced output compared to what would have occurred absent its conduct. Visa's higher fees were passed through to consumers in higher retail prices, reducing consumption and debit transactions.[34] These anticompetitive effects preclude summary judgment. *See Microsoft*, 253 F.3d at 58.

Visa's conduct also reduced quality in the debit market. By suppressing PIN and PINless in favor of Visa's fraud-prone and less efficient signature debit product, and through its decision to delay implementing EMV to protect its dominant signature debit product, Visa's conduct subjected cardholders and merchants to increased debit-card fraud and poorer quality debit transactions. COF ¶¶ 1194, 1200, 1262, 1272, 1289, 1332, 1406. *See US Airways, Inc. v. Sabre Holdings Corp*, 938 F.3d 43, 62 (2d Cir. 2019) (finding "abundant evidence of reduced quality" where defendant attempted to block competitors' products and "technologies [that] were far more efficient and convenient for the[] [same] purposes than the antiquated technology still used by" the defendant).

---

[33] Visa wrongly characterizes Plaintiffs' evidence as showing "higher costs to customers on only one side of a two-sided transaction platform." Defs.' Br. 16. But Professor Hausman demonstrates that Visa's *two-sided* debit prices are supracompetitive. Pls.' Br. in Opp'n to Summ. J. under *Ohio v. Am. Express* at Section IV.B.1.

[34] SJDX 400 (Hausman Rpt.), ¶¶ 371-85, 526, 529-532, 534-535; SJDX 401 (Hausman Reply), ¶ 555. Plaintiffs detail the link between higher prices and reduced output in their *Amex* opposition brief. Pls.' Br. in Opp'n to Summ. J. under *Ohio v. Am. Express* at Section IV.B.2.

### 5.    Indirect evidence of Visa's monopoly power throughout the relevant period

In addition to the direct evidence described above, Visa's entrenched dominance as measured by market share and other market characteristics further demonstrates Visa's monopoly power.  *Grinnell*, 384 U.S. at 571 ("The existence of [monopoly] power ordinarily may be inferred from the predominant share of the market.").[35]  Visa sustained a dominant share of the overall debit transactions market throughout the relevant period.  In 2004, Visa's market share (by purchase volume) was 60%, and as noted, its share post-Durbin is *still* approximately 60%.  COF ¶¶ 1193, 1287.

High barriers to competitive entry exist in the debit market.  Potential entrants to the signature debit segment must compete against an entrenched bank cartel that issues the vast majority of debit cards.  COF ¶¶ 1110-11.  Potential entrants cannot command Visa's supracompetitive interchange and therefore cannot dislodge the Visa bank cartel.  COF ¶ 1111.  Without cardholders, potential entrants cannot attract merchant acceptance; without merchant acceptance, potential entrants cannot attract cardholders, evidencing the "chicken-and-egg" problem of developing an acceptance network and network of cardholders.  COF ¶ 1112.  *See United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 342 (S.D.N.Y.), *modified*, 183 F. Supp. 2d 613 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003).  Those network effects form high barriers to entry that characterize two-sided platforms, as do the high costs of building a network.

---

[35] *See also Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 179 (2d Cir. 1990) (evidence of 50% market share sufficient to sustain finding of Section 2 monopoly power); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 273 & n.11 (2d Cir. 1979) (finding evidence of "two-thirds" market share sufficient to support a finding of monopoly power and despite evidence of declining market share across particular years); *Lenox McLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114, 1123-26 (10th Cir. 2014) (evidence of 62% share and high barriers to entry sufficient to create triable issue).

COF ¶ 1113; *see Microsoft*, 253 F.3d at 55 (discussing barriers to entry from network effects and "chicken-and-egg" problem).

Visa's prior antitrust violations further support a finding of monopoly power.[36]  In 2001, in *United States v. Visa*, the court determined that Visa's "By-law 2.10(e)", a horizontal agreement among the network's issuing banks not to compete by issuing debit (or credit) cards over the American Express or Discover networks, harmed competition and violated the Sherman Act § 1 by, among other things, blocking those networks' ability to compete in debit.  163 F. Supp. 2d 322, 408 (S.D.N.Y. 2001).  Tellingly, even though that rule was enjoined as unlawful, Discover and American Express failed to successfully enter signature debit because banks still would not break from the Visa debit cartel—demonstrating the cartel's continued barrier to competitive entry.[37]

### B.    Visa Has Not Demonstrated Entitlement to Summary Judgment

Visa engages in a series of flawed arguments that purport to show either that Visa lacks monopoly power in debit or that Visa's conduct did not harm competition.  These arguments fail.

### 1.    Visa's flawed monopoly power arguments

Based on the direct evidence of Visa's power over price and ability to exclude competition, and the indirect evidence of Visa's durable market share, there can be no serious dispute that Plaintiffs present sufficient evidence to raise a fact question as to Visa's monopoly power.  Visa nevertheless offers a series of misleading arguments—which fall apart when

---

[36] "Prior antitrust violations and the history of competition in a market may, in appropriate cases, be admissible to establish market power . . . ."  *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1371 (2d Cir. 1988) (citing *Grinnell*, 384 U.S. at 576; *Lorain Journal Co. v. United States*, 342 U.S. 143, 152-53 (1951)).

[37] American Express has not entered signature debit at all.  Discover did enter signature debit but its success has been marginal at best.  COF ¶ 1114.

considered in the context of this evidence and Visa's anticompetitive strategy.

To show it lacked power to exclude competition, Visa claims it did not "foreclose" competition because "PIN debit volume" became "less concentrated" in the pre-Durbin period. Defs.' Br. 36. But the relevant market is overall debit, where Visa held a durable, dominant share at around 60% throughout the relevant period.[38] COF ¶¶ 1193, 1287-88.[39] ███████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████[40] Signature debit, by comparison, grew faster than PIN debit and maintained its dominant position due to Visa's anticompetitive strategy. COF ¶¶ 1194, 1289-90.

Visa also contends that "debit-intensive" merchants' practice of "installing PIN pads" and success "steering over ██ percent of debit transactions to PIN debit" shows Visa lacked the ability to control price or exclude competition. Defs.' Br. 37. But that data shows only how PIN was a superior product that many merchants and consumers preferred. That Visa was able to perpetuate its fraud-prone signature product with inflated fees *notwithstanding those preferences* underscores the extent of Visa's monopoly power. And in any event, the record shows Visa's strategy *undermined* that procompetitive trend. COF ¶¶ 1154, 1188, 1194, 1289-90.

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

---

[38] Visa's (irrelevant) arguments regarding PIN volumes elides the fact that Visa possessed the largest share of PIN debit volumes starting in 2005 and for most, if not all, of the rest of the relevant period. COF ¶ 1292.

[39] Visa misleadingly asserts that "[i]n the 2000s" PIN debit grew faster signature debit. Defs.' Br. 6. Visa's support for this proposition considers only the early part of the decade, prior to Visa's anticompetitive strategy taking effect, *see* Pls.' Resp. 56.1 ¶ 699. Looking at the relevant period starting in 2004, signature debit grew faster than PIN. COF ¶ 1290.

[40] This evidence belies Visa's assertion that it was responsible for the "growth of PIN debit." Defs. Br. 40-41. Visa was trying to suppress PIN debit, not grow it.



Visa also tries to characterize Mastercard as a serious debit competitor in the *post-Durbin* environment, Defs.' Br. 37-38,



Visa also argues it has "no power to control price" because other networks "led the increase in PIN debit interchange rates from 2004 to 2011." Defs.' Br. 38. This argument is

---

41

42

easily dismissed.  Record evidence shows otherwise, including the very documents Visa cites.

For example, 

That is precisely what happened.  Visa's pre-Durbin strategy to raise PIN debit rates *did*

cause PIN rates to go up, and in the few instances where other PIN debit networks happened to

raise interchange rates before Visa, those increases were in response to Visa's ongoing strategy,

COF ¶¶ 1183-86.[43]

Visa next argues that the stability of its market share during the relevant period, even

after the Durbin Amendment prohibited Visa's exclusive arrangements, demonstrates those

arrangements could not have been anticompetitive.  Defs.' Br. 41.[44]  Visa's argument would only

make sense if it stopped engaging in anticompetitive conduct after Durbin was implemented, but

the opposite is true.  *Supra* Section IV.A.3.

Visa claims that

.  Defs.' Br. 40.  But Visa's argument is based solely on inadmissible testimony from

an expert from *another case*, whose report is unavailable and cannot be scrutinized—and for that

reason alone should be disregarded.[45]  The record in *this* case shows that Visa's profit margins

---

[43] Even when Visa's rivals attempted this strategy, they did not gain any material share because Visa's issuer deals had already locked up a substantial portion of the market.  COF ¶ 1187.

[44] The case Visa relies upon is inapposite.  *See Suture Express, Inc. v. Owens & Minor Dist., Inc.*, 851 F.3d 1029, 1044-45 (10th Cir. 2017) (competitor failed to demonstrate antitrust injury because buyers would not have purchased from plaintiff absent defendant's conduct).

[45] Contrary to Visa's misrepresentation, the Second Circuit in *Sabre* offered no opinion on whether the "comparable companies" considered by US Airways' expert were competitive.  938 F.3d at 61 (reviewing evidence that Sabre's profits were "very high").  What can be gleaned from the public materials concerning US Airways' expert's testimony is that the opinion was



██████████████████████████████████████████. COF ¶¶ 266, 268, 271-72.[46] ██████████████████████████████████████

███████████████████████████████████████ Visa has earned an average of $9.69 billion in profit per year between fiscal years 2017-2019. COF ¶ 271. ████ one of the most prominent debit rivals to Visa, earned a profit of only $195 million in 2011 and forecast significant losses thereafter. COF ¶ 1299. And to the extent ████████ achieved per-transaction margins at all close to Visa's, both ████████ documents show that those networks used pricing that emulated Visa's, reflecting Visa's pricing umbrella in the marketplace. *Id. See Giant Eagle, Inc. v. E. Mushroom Marketing Coop.*, No. 06 Civ. 3523, 2020 WL 1903640, at *1 n.1 (E.D. Pa. Feb. 14, 2020) ("'Every cartel . . . creat[es] a price umbrella . . . .'" (quoting Herbert Hovenkamp, *The Rule of Reason*, 70 Fla. L. Rev. 81, 110 (2018)).

Visa argues that increases in actual world output show that it does not have monopoly power. But the correct test, as acknowledged by Visa's experts, is whether output would have been greater in a but-for world without the anticompetitive conduct.[47] *See Nat'l Collegiate*

---

based on an average of all of the comparable companies considered, relied on (undisclosed) adjustments for each companies' size depending on the value of its assets, and used data from a report prepared by a third party. Trial Tr. 2325:20-2327:1, 2330:16-2331:8, 2439:23-2440:9, 2496:2-2497:8, *US Airways, Inc. v. Sabre Holdings Corp.*, No. 11-cv-2725 (S.D.N.Y. Jan. 9, 2017), ECF No. 763. And where the expert looked specifically at Visa, he looked at its profits in 2009, during "a downturn in the economy." *Id.* at 2481:12-2482:2.

[46] Visa's profits materially reflect its monopoly power in debit, in tandem with its substantial market power in credit, because █████████████████████████████████████████████████████████. COF ¶ 1298.

[47] Elzinga Tr. 47:15-48:11 (testifying that as a "general proposition" economists should examine output "compared to what output would have been absent the anticompetitive action"); Elzinga Tr. 50:12-24 (agreeing that a comparison between actual output and but-for world output would be "the ideal test of output").

*Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 106-07 (1984) (examining whether output was lower than it "would otherwise be" but-for challenged conduct).  As discussed above, Visa's conduct has reduced output in the debit market relative to what output would otherwise be.  *Supra* Section IV.A.4.  Visa's arguments do not address this test.[48]

## 2. Visa's flawed arguments concerning its anticompetitive conduct

Visa also makes a number of arguments about how its conduct could not have had anticompetitive effects in the marketplace.  These arguments also fail.

*First*, Visa mischaracterizes Plaintiffs' debit claims as "a single theory of exclusion" related to "Visa's Discounts" that are limited to "a small subset of issuers and merchants at specific points in time."  Defs.' Br. 11.  But there is no "single theory of exclusion": Plaintiffs' debit claims relate not only to its anticompetitive bundling agreements with merchants and issuers, but also Visa's signature debit HAC Rule, *supra* Section IV.A.1., Visa's imposition of high fixed fees, *supra* Section IV.A.3.i., Visa's anticompetitive forcing of the PAVD mandate on issuers, *supra* Section IV.A.3.ii., and Visa's harm to quality and choice relating to EMV, tokenization, and the suppression of PIN and PINless, *supra* Section IV.A.3.iv-v.  All of this conduct, in an integrated fashion, harmed competition in the debit market, in the form of supracompetitive pricing, reduced output, and reduced quality.  *Supra* Section IV.A.4.

Visa's assertion that Plaintiffs have identified anticompetitive conduct with only "a small subset of issuers and merchants at specific points in time" is false.  Visa's HAC Rule eliminated competition for merchant acceptance among all Visa debit issuing banks, harming merchants and cardholders, and Visa's pre-Durbin exclusive agreements gave it industry-wide power over price.

---

[48]  For example, Visa points to debit's growth relevant to other payment methods.  Defs.' Br. 40-41.

COF ¶¶ 1137, 1159-60.  Moreover, Professor Hausman's empirical analysis of the pre-Durbin issuer agreements shows that the "small subset of issuers" Visa refers to *represented over* ▓▓▓ *of the market*.  COF ¶ 1168.[49]

*Second*, Visa wrongly implies Plaintiffs must demonstrate a certain percentage of foreclosure, and then accuses Plaintiffs of failing to meet that legal requirement.  Defs.' Br. 18-20.[50]  But Section 2's conduct prong only requires proof of exclusionary conduct or anticompetitive effects, not specific foreclosure percentages.[51]  Plaintiffs have put forth direct evidence of *both* exclusionary conduct (*e.g.*, anticompetitive bundling, deception, and the exploitation of Visa's rules to exclude competitors) *and* anticompetitive effects (supracompetitive pricing, reduced output, and harm to quality, discussed *supra* Section IV.A.4.).  In any case, Plaintiffs *have* demonstrated a substantial foreclosure percentage: Visa's long-term deals with issuers that failed the DAT foreclosed over ▓▓▓ of the relevant market.[52]

---

[49]  Visa falsely claims Professor Hausman "put forward no economic test" in his opening report. Professor Hausman, in his first report, analyzed direct anticompetitive effects, by showing Visa's conduct raised debit prices to supracompetitive levels and reduced output.  SJDX 400 (Hausman Rpt.), ¶¶ 526-44.

[50]  Visa relies on inapposite exclusive dealing or predatory pricing authorities to support its argument.  Defs.' Br. 17-18 & n.10, 21 (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961); *Maxon Hyundai Mazda, et al. v. Carfax, Inc.*, 726 F. App'x 66, 68 (2018); *Discover*, 598 F. Supp. 2d at 406; *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1061-62 (8th Cir. 2000); Areeda ¶ 1821c.1 (discussing foreclosure requirements for § 1 exclusive dealing and predatory pricing theories)).  The issuer agreements are challenged as anticompetitive bundled pricing agreements and because of their substantial anticompetitive effects.

[51]  *Microsoft*, 253 F.3d at 58; *Actavis*, 787 F.3d at 652 ("courts look for evidence of 'exclusionary or anticompetitive effects'" (quoting *Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186, 188-89 (2d Cir. 1992))).

[52]  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *See Microsoft*, 253 F.3d at 70 ("a monopolist's use of exclusive contracts, in certain circumstances,

COF ¶ 1168.  *See LePage's*, 324 F.3d at 157-59; *Microsoft*, 253 F.3d at 70-71; *ZF Meritor, LLC v. Eaton Corps.*, 696 F.3d 254, 283-84 (2012).  This foreclosure carried over into the post-Durbin period.  COF ¶¶ 1221-22.

Visa describes Professor Hausman's foreclosure percentage of issuer agreements pre-Durbin as "overstate[d]" because it represents "each bank's share of the overall debit market" and because some of the deals allowed for less than 100% Visa exclusivity.  Defs.' Br. 19, 23.  But even in exclusive-dealing cases, courts look at the *effects* of near-exclusive arrangements.  *See McWane*, 783 F.3d at 837-38 (substantial foreclosure from non-exclusive agreements where plaintiff "did not quantify a percentage" foreclosure but provided evidence of deals with "the two largest distributors," the effects of the arrangement, and the distributors' market shares).  Here, the correct foreclosure metric (assuming one is even necessary) is the entire bank's debit volume: Visa's agreements with these banks gave it power over debit transaction pricing, power that essentially dictated pricing to Visa's rivals, including those that had a small share of the volume with respect to the deals in question.  COF ¶ 1159.  Indeed, even if the calculation were limited to volume over the Visa network, the share foreclosed would be ▆▆▆▆▆▆▆▆▆▆▆▆  COF ¶ 1170.

Visa also argues that "whatever happened in 2008 and 2009 does not show foreclosure of competition in any other year."  Defs.' Br. 19-20.  But Visa's argument ignores that ▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

---

may give rise to a § 2 violation even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a § 1 violation"); *see also Am. Express Travel Related Servs. Co. v. Visa U.S.A.*, No. 04 Civ. 8967, 2005 WL 1515399, at *3 (S.D.N.Y. June 23, 2005) ("an agreement must foreclose at least 30 percent to 40 percent of the market to support a § 1 violation").

███████████████████████████████████████████████████████████ [53] It

is highly likely that a deal that failed the DAT in one year would fail the DAT for every other

year of the agreement.[54]  That conclusion is corroborated by the direct effects of Visa's

monopoly power—its power over industry pricing throughout the pre-Durbin period—that

stemmed from these exclusive agreements.  COF ¶ 1159.

Visa also contends that Plaintiffs base their claim on issuer "discounts" that "were not

actually bundled across products" because Professor Hausman includes incentives in the DAT

"whether or not they would be lost by using another network for PIN debit."  Defs.' Br. 22-23.

This contention is *false*.  *See* Pls.' 56.1 Resp. ¶¶ 873-80.  ████████████████████████



Visa does not identify a *single* instance among the five issuer deals that failed the

discount attribution standard where, as a factual matter, the issuer would not have lost its credit

or signature debit incentives if the issuer failed to fulfill its PIN debit obligation across the entire

---

[53]  *Carfax*, on which Visa relies, is inapposite.  Defs.' Br. 20.  There, the agreements in question were mostly short term and terminable in under one year.  *Maxon Hyundai Mazda v. Carfax, Inc.*, 13-cv-2680, 2016 WL 7231941, at *7 (S.D.N.Y. Dec. 9, 2016).

[54]  Visa wrongly suggests that Professor Hausman "narrowed" his examination of issuer agreements to certain issuers.  Defs. Br. 7.  To the contrary, the data Visa produced precluded a DAT analysis involving a larger set of agreements and prevented consideration of the analyzed agreements in other years.  COF ¶ 1248; SJDX 380, Hausman Dep. 612:14-16 (explaining there was not sufficient data produced by Visa to do other analyses of its pre-Durbin conduct).

term of the contract. Visa's examples are contracts that were not 100% exclusive, but nonetheless condition discounts on routing PIN transactions to Visa. COF ¶ 1166. The exclusionary effect from bundled pricing comes from the below-cost nature of the defendant's offer once the incentives are attributed to the competitive product and thus *exclusivity is not required*.[55] ██████████████████████████████████████████████████

████████████████████████████████████—what matters is the economic effect of Visa's conduct towards maintaining its monopoly power.

    *Third*, Visa attempts to graft another requirement onto the law of bundled pricing: that there be no competitors in the market capable of offering the same array of products as a defendant's below-cost bundle. Visa cites *PeaceHealth* and *Aerotec* for the proposition that bundled discounts cannot cause anticompetitive foreclosure when at least one other seller has "as diverse a set of products as the defendant." Defs.' Br. 21. Those cases say the opposite—if even one rival cannot compete on the bundle the discount attribution test is appropriate. "As *Cascade Health* made clear, the discount attribution test only applies where *one of the competitors* produces fewer goods or services than the other competitor." *Aerotec Int'l, Inc. v. Honeywell Int'l Inc.*, 836 F.3d 1171, 1186-87 (9th Cir. 2016) (citing *PeaceHealth*, 515 F.3d at 909) (emphasis added).[56]

---

[55] *See LePage's*, 324 F.3d at 157 (condemning bundled pricing despite lack of contractual exclusivity requirement); *see also PeaceHealth*, 515 F.3d at 892 n.2, 909, 914-15 (setting forth discount attribution standard without reference to exclusivity where customers were "not explicitly forced to deal exclusively with" defendant).

[56] Visa's reliance on *Aerotec* is misplaced. There, the court rejected a bundled-discount theory because, in the relevant market of "repair services" for auxiliary aircraft engines produced by the defendant, the goods that the defendant bundled, parts and service, were provided together as a matter of course (including by the plaintiff itself), making a bundled-discount theory, which is concerned with the exclusion of sellers of less-diverse product lines, inapposite. *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 4 F. Supp. 3d 1123, 1141 (D. Ariz. 2014) (finding that "[t]he competitive product here is not just the labor, but the entire bundle of parts and labor"), *aff'd* 836

*PeaceHealth* says nothing about an "as-diverse rival" rendering the discount attribution test inapplicable.  For the test to apply, the *only* requirement is that there be at least *some* rivals in the market incapable of offering the bundle.  *See PeaceHealth*, 515 F.3d at 909 ("[T]he primary anticompetitive danger posed by a multi-product bundled discount is that such a discount can exclude a rival is who is equally efficient at producing the competitive product simply because the rival does not sell as many products as the bundled discounter."); *LePage's*, 324 F.3d at 159 ("[E]ven the foreclosure of one significant competitor from the market may lead to higher prices and reduced output." (internal quotation marks omitted)).  Visa's other authorities do not suggest otherwise.[57]

---

F.3d at 1176 ("Participants in this market typically bundle parts and repairs in an effort to woo the airlines into long-term repair and maintenance agreements.").  That the plaintiff provided the same bundle—and at times outbid the defendant on that bundle—made the theory all the more "absurd."  836 F.3d at 1187.

[57] Visa also relies on *Suture Express*, but there the Court of Appeals expressly *declined* to accept the defendants' "theoretical position that bundle-to-bundle competition necessarily creates a competitive market."  851 F.3d at 1043; *accord Valassis Commc'ns, Inc. v. News Am. Inc.*, No. 06 Civ. 10240, 2011 WL 2420048, at *5 (E.D. Mich. Jan. 24, 2011) (bundle-to-bundle competition does not reduce anticompetitive risk "if the defending firm retains a product that customers 'must have' from the defendant").  Defendants also rely on a law review article from 2009 for this proposition.  Defs.' Br. 21 n.15 (quoting Herbert Hovenkamp & Erik Hovenkamp, *Complex Bundled Discounts and Antitrust Policy*, 57 Buff. L. Rev. 1227, 1231 (2009)).  Other antitrust scholars and economists have roundly criticized this law review article's conclusions regarding bundle-to-bundle competition.  Br. for Law Professors and Scholars as Amici Curiae in Supp. of Pet'r, *Suture Express, Inc. v. Owens & Minor Dist., Inc.*, No. 16-1487, 2017 WL 2992309, at *2-3 (July 12, 2017) ("There is abounding literature on the potential consequences of tying and/or bundling that was not considered in Hovenkamp & Hovenkamp (2009) . . . . In particular, the dynamic effects of the tying and bundling arrangements do not appear to have been fully considered. . . . [T]he conduct at issue could eliminate rivalry from present and future disruptive and innovative competitors who could yield very substantial consumer benefits.").  Moreover, Professor Hovenkamp, in the current version of his treatise, has adopted a view requiring an examination of actual market realities in each case, rather than relying on theoretical presumptions concerning bundle-to-bundle competition.  *See* Areeda ¶ 749a (stating that a precondition to the discount attribution standard is that "no other *significant* firm in the market produces" the bundle (emphasis added)).  Here, the evidence shows that where Mastercard sought to compete with Visa on the bundle, it consistently failed and had no ability to discipline or erode Visa's monopoly power.  COF ¶¶ 1173-75, 1257.

Even if the law required the absence of a significant "as-diverse rival" (it does not), Visa's argument would still fail because Mastercard would not qualify.  Mastercard too was foreclosed by Visa's strategy pre-Durbin. ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████

Further demonstrating the weakness of its position, Visa offers an implausible hypothetical to support its case for imposing this new requirement.  According to Visa, merchants could somehow push "two or more" of Visa's rivals to "coordinate" and offer a competitive bundle.  Defs.' Br. 22.  Visa even goes so far as to suggest that merchants could coordinate a competitive bundle ranging from American Express and Discover, both of whom compete in the distinct credit market, to the PIN debit networks.[58]  Visa fails to offer even *one* example of this strategy occurring, let alone working, in the marketplace.  In fact, evidence demonstrates that such coordination across up to six networks competing in different markets was not remotely realistic.  COF ¶ 1258.  That Visa offers this baseless counterfactual argument as an *undisputed fact* reflects a cavalier approach to the evidence, emblematic of Visa's entire

---

[58]  In addition to its baseless coordination, Visa implies that Professor Hausman's analysis was one-sided for failing to take into account American Express and Discover.  This makes no sense because the DAT analyzed the impact Visa's bundling had on PIN debit competition and American Express and Discover did not compete for those transactions on either side of the market at any point during the relevant period.

approach to this motion.[59]

*Fourth,* Visa argues that Professor Hausman's opinions in the *Pulse* litigation are inconsistent with his opinion that Visa's exclusive issuer deals were anticompetitive.  Defs.' Br. 9.  But Visa ignores the crucial distinction between Visa and Pulse.  Visa's exclusive deals, which covered the front *and* back of the card (*i.e.*, signature and PIN), gave it pricing power to suppress PIN and protect its monopoly.  COF ¶ 1159.  By contrast, Pulse lacks market power, COF ¶ 1176, was seeking exclusivity on only one-side of the card, and thus, its strategy did not pose any threat to competition.  *See Servicetrends v. Siemens Med. Sys.*, 870 F. Supp. 1042, 1054 (N.D. Ga. 1994) ("Competitive behavior by a small firm with little market share may become anticompetitive conduct when committed by a company with dominant market power").

*Fifth,* Visa attempts to compartmentalize each aspect of its conduct as if it were a separate claim.  Defs.' Br. 24-34.  With integrated claims such as this one, courts reject a defendant's "seriatim attacks" on conduct that "'tightly compartmentaliz[e] the various factual components and wip[e] the slate clean after scrutiny of each.'"  *See, e.g., Litton Sys., Inc. v. Am. Tel. & Tel. Co.*, 700 F.2d 785, 816 (2d Cir. 1983) (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)).  Rather, the appropriate inquiry involves examining "the anticompetitive effect of [a defendant]'s exclusionary practices considered together. . . . [C]ourts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation," *LePage's*, 324 F.3d at 162, because the "synergistic nature" of a monopolist's practices can further support a finding of competitive injury.  *Litton Sys.*, 700 F.2d at 816; *see also Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1522 n.18 (10th Cir. 1984) ("Plaintiff's evidence should be viewed as a whole.  Each of the [instances of

---

[59] *See generally* Introduction to Pls.' 56.1 Statements.

exclusionary conduct] viewed in isolation need not be supported by sufficient evidence to amount to a § 2 violation.  It is enough that taken together they are sufficient to prove the monopolization claim."), *aff'd* 472 U.S 585 (1985).

Because many facets of Visa's conduct had interlocking anticompetitive effects—*e.g.*, FANF and PAVD were intertwined with Visa's bundling strategy—it would be impossible to measure the anticompetitive effects caused by each facet in isolation.  The proper analysis is to analyze the direct anticompetitive effects of Visa's conduct as a whole.  *LePage's*, 324 F.3d at 162 ("The relevant inquiry is the anticompetitive effect of 3M's exclusionary practices considered together.").  The anticompetitive effects of Visa's pre-Durbin strategy carried over to the post-Durbin period.  COF ¶ 1221.  In addition, an examination of Visa's conduct post-Durbin highlights both the interrelated nature of the strategy and the extent to which it blocked the competition the Durbin Amendment was designed to stimulate.  *See, e.g.*, COF ¶¶ 1224, 1247.

*FANF*:  Visa claims "Plaintiffs also cannot show that the FANF pricing structure constitutes Section 2 exclusionary conduct."  Defs.' Br. 27.[60]  This ignores the FANF's role in Visa's anticompetitive strategy to foreclose competition from equally efficient rivals, COF ¶¶ 1224, 1229, as evidenced by the FANF's inclusion in the ▮▮▮ deal, for example, COF ¶ 1242.  The FANF's integration into bundled routing deals is exactly why it is inappropriate to compartmentalize Visa's conduct and treat the various prongs of its strategy in isolation.[61]

---

[60]  Visa's argument that Plaintiffs have dropped their tying theory regarding the FANF is a red herring.  Visa initially presented its new fixed fee as being applicable whether the merchant accepts any Visa transactions, suggesting that it would, in fact, re-tie Visa credit and Visa Debit.  While Visa eventually created a separate FANF for selective acceptance merchants, that fact was not announced to merchants.  COF ¶ 1230.  Whether characterized as a tying arrangement or not, the FANF was an exercise in monopoly power by Visa that was used to distort competition in the debit market.  COF ¶¶ 1224, 1229.

[61]  Visa's argument that "no plaintiff can show injury-in-fact from the FANF structure" is wrong as a matter of law.  *See supra* Section IV.C. (injury results from paying supracompetitive prices

*Bundled Pricing to Merchants/Acquirers*:  Visa resurrects the same factually and legally incorrect arguments regarding bundling, and for the same reasons those arguments were incorrect with respect to Visa's exclusive issuer deals, they fail in the context of Visa's anticompetitive merchant bundles.  *See supra* pp. 35-37.  Visa further argues that "the undisputed facts" show that Visa's anticompetitive bundled pricing agreements with merchants and acquirers "covered only a sliver of debit volume at any time."  Defs.' Br. 20-21.  But this argument understates the strategic importance of the anticompetitive deals Visa struck.

Visa's anticompetitive agreements covered (i) leading debit-intensive merchants, including ████████████████████████████████████████████ ████ (among others); (ii) merchants in the pivotal e-commerce "bill-pay" and QSR segments, key prospects for the PINless products offered by Visa's debit rivals; and (iii) leading acquirers and payment facilitators such as ████████████████.  COF ¶¶ 1242, 1251, 1254.  Visa's anticompetitive conduct included █████ and digital merchants such as █████.  These agreements were pivotal to Visa's ability to maintain its monopoly power post-Durbin.  COF ¶¶ 1245, 1282.

Visa also contends (again) that some "discounts" in its anticompetitive merchant routing deals were not actually bundled across different products.  Visa claims several agreements with bill-pay merchants and QSRs should have been excluded from Professor Hausman's DAT

---

overall).  The argument is also based on a distortion of Plaintiffs' experts' opinions.  Plaintiffs' experts *did* account for both the variable fee reductions that were implemented concurrent with the FANF and the limited "concessions" Visa offered to some merchants to rebate part of the FANF, COF ¶¶ 1232-34, 1240, in calculating Plaintiffs' damages.  *See also* Pls.' Opp'n to FANF Daubert Mot. Sections III.A.1-2 (explaining that Plaintiffs' expert Stephen Rowe and Robert Hutchins did not calculate the variable fee reductions that went into effect concurrent with the FANF because Professor Hausman accounted for them in his network fee damages).  Those combined analyses show that all Plaintiffs suffered damages as a result of the FANF and Visa's supracompetitive network fees.  COF ¶ 1240.

analysis because "Visa provided discounts only on [signature debit]," making them unbundled. Defs.' Br. 23.  But Visa ignores that these merchants were candidates for PINless acceptance, which meant *some of their signature debit volume was contestable based on issuer enablement*, so that PINless volume was treated as if it were PIN debit volume.  COF ¶ 1248.  ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████  For that reason, Professor Hausman analyzes the debit incentives in the agreement on their own, independent of the credit discount, and concludes that the debit portion of the ████ agreement (in isolation) failed the DAT.  Pls.' 56.1 Resp. ¶ 882.

*PINless*:  Visa disregards Professor Hausman's analysis showing that Visa engaged in anticompetitive conduct to suppress PINless in all of the merchant categories where the product presents a serious threat to signature debit.  Defs.' Br. 38.  Rather than address this (and other undisputed evidence such as ████████████████████████████████

████████████████)), Visa relies on distortions of Professor Hausman's deposition testimony, including that Professor Hausman attributed the suppression of PINless to Mastercard and the incentives created by Durbin as opposed to Visa's conduct.  In fact, Professor Hausman attributes the suppression of PINless—including Mastercard's conduct—to Visa, since Mastercard's conduct contributing to the suppression of PINless followed, and was enabled by, Visa's strategy.  SJDX 401 (Hausman Reply), ¶¶ 699, 705.

*PAVD Mandate*: Visa similarly claims Plaintiffs have not shown an injury to competition from its "PAVD" mandate.  Defs.' Br. 33.  This ignores the evidence showing that PAVD was an exercise of monopoly power by Visa to require all of its issuers to offer PIN over the Visa network.  And it ignores evidence that PAVD saved Interlink from post-Durbin competition,

while insulating Visa's network fees for signature debit product from competition.  *See supra* Section IV.A.3.ii.

*EMV & Tokenization:*  Visa falsely claims that its issuer priority rule, which renders Visa as the default network unless the merchant undertakes the burden and expense to change the configuration, "has no impact on routing."  Defs.' Br. 29.  Visa does not dispute that all debit issuers in the United States have complied with this rule.  COF ¶ 1399.  Nor does it dispute that there are terminals in the marketplace that comply with this default.  COF ¶ 1400.  Moreover, it offers no justification or explanation for a rule, uniquely in place only in the United States, to require issuers to put a default preference for Visa in their EMV chips, which supposedly has no impact on the marketplace.  COF ¶¶ 1399, 1401 (███████████████████████████████ ███████████████████████████████).  Visa's contention that Plaintiffs' expert suggested otherwise is false.  Pls.' 56.1 Response ¶ 947.  As for the "choice screens," the undisputed facts show that merchants unwittingly deployed the deceptive screens, and consumers were tricked into directing transactions to Visa.  COF ¶¶ 1387-90.[62]

Visa, tellingly, does not dispute that its refusal to detokenize certain digital transactions effectively blocked the PIN debit networks from competing for years for transactions in fast growing segments that include merchants such as ███████.  Instead Visa offers a free rider justification, citing how Visa "invested heavily" in tokenization.  Defs.' Br. 31.  That justification is belied, however, by Visa's willingness to detokenize transactions for Mastercard but not for the PIN debit networks.  COF ¶ 1281.  It also ignores that other industry alternatives

---

[62] Visa also ignores both the record evidence showing the extent to which consumers were deceived by them, and the fact that it was forced by the FTC/Federal Reserve to rescind the "Cardholder Selection" rule that underpinned the screens.  COF ¶¶ 1393-97.

existed before Visa "heavily invested" in its own solution.  COF ¶¶ 494-97.[63]

### C.   Plaintiffs Have Demonstrated Antitrust Injury

Visa contends that Plaintiffs lack antitrust standing because they cannot prove they suffered injury in fact or antitrust injury.  Defs.' Br. 12.  This argument is meritless.

Plaintiffs are merchants that directly purchase debit transaction services from Visa.[64] Visa's anticompetitive conduct excluded competition from rival providers of debit transaction services, increased the prices paid by Plaintiffs and other merchants for those services to supracompetitive levels, suppressed output, and reduced quality in the form of higher payment fraud and less efficient debit transactions.  There is no serious question that merchants have been directly injured by that conduct, satisfying the injury-in-fact requirement.[65]

Plaintiffs' injuries also are antitrust injuries because they arise from Visa's exercise of monopoly power and the resulting suppression of competition.  *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)) (antitrust injury "plainly" satisfied where "the plaintiffs are purchasers of the defendants' product who allege being forced to pay supra-competitive prices as a result of the defendants' anticompetitive conduct" in furtherance of a monopoly scheme, even though "the defendants' conduct at issue targeted their competitors"); *see also Port Dock &*

---

[63]  For the reasons discussed *infra* in Section IV.C., Visa's arguments regarding injury from Visa's EMV and tokenization conduct fail.  However, regarding EMV, the undisputed facts show ▮▮▮▮▮▮ deployed the harmful screens in its stores and was injured by the boost to Visa's routing those screens enabled.  COF ¶ 1391.

[64]  *See generally* Pls.' Br. in Opp'n to Defs.' Mot. for Summ. J. re: *Ill. Brick*.

[65]  *See Cordes & Co. Fin. Servs., Inc v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 107-08 (2d Cir. 2007) (question of injury-in-fact in an overcharge case is "whether a particular plaintiff would have paid more in the but-for world"); *Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 222-23 (2d Cir. 2008) ("Injury in fact is a low threshold" and includes "reduced choice and diminished quality in credit services").

*Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 123-24 (2d Cir. 2007) ("Those who would suffer from the defendant's exercise of monopoly power would be the dealers or consumers who were forced to buy at higher prices (or inferior quality) because the defendant had acquired the market power to charge monopoly prices.").[66]

Visa claims that Plaintiffs have not been injured by *some* of the components of Visa's monopoly maintenance scheme, *e.g.*, bundled pricing, viewed in isolation. Defs.' Br. 2-4, 12-16, 24-26, 29-30, 33, 35. The implication of Visa's argument is that Plaintiffs must demonstrate standing separately for each component of Visa's unlawful conduct. That is not the law. Where a plaintiff is injured by paying supracompetitive prices as a result of multiple forms of anticompetitive conduct in a scheme to monopolize, the "injury of higher prices [is] 'inextricably intertwined' with the conduct's anti-competitive effects and thus 'flow[s] from that which makes defendants' acts unlawful." *DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d at 688 (quoting *Blue Shield of Va. v. McCready*, 457 U.S. 465, 484 (1982)) (purchaser's injuries are "derivative of the direct harm experienced by the defendants' competitors," because "harming competitors was simply a means for the defendants to charge the plaintiffs higher prices"); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 213, 221-22 (S.D.N.Y. 2019) (antitrust injury requirement satisfied in Section 2 case involving multiple theories of exclusionary conduct based on plaintiff-purchasers' payment of supracompetitive prices). Because Visa's intertwined monopolization schemes had anticompetitive effects in the overall market, Plaintiffs have standing.

Visa also argues that its anticompetitive bundled pricing deals to both merchants and

---

[66] Visa's reliance on *Port Dock*, is misplaced. There, the court held that the plaintiff-dealer, Port Dock, primarily a competitor, lacked standing to challenge price increases imposed after its termination as a dealer. 507 F.3d at 123 ("Port Dock is a *former* customer.").

issuers were "discounts" that reduced prices and therefore cannot support injury.  Defs.' Br. 12-16.  But those deals excluded Visa's rivals and thus reduced competition from other networks that would have driven down supracompetitive prices in the market.  COF ¶¶ 1159, 1200, 1243.  These "discounts," moreover, are properly analyzed as penalties for not taking Visa's bundle.[67]  While Visa provided small reductions to supracompetitive prices, Visa's pricing was still above what would have prevailed in a competitive market.  COF ¶¶ 1142, 1200, 1289.  The proof is in the pudding, as there is direct evidence of anticompetitive effects flowing from Visa's conduct: supracompetitive pricing, reduced output, and reduced quality.[68]

Next, Visa argues there is "no link" between its exclusive issuer deals and the supracompetitive prices paid by Plaintiffs.  Defs.' Br. 14.  But *the whole point* of Visa's strategy was ███████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████.  COF ¶ 1153.  Visa implemented its pre-Durbin strategy to raise revenues for Visa issuers and itself, and it did so, very successfully, at the expense of merchants, while debit cardholders received *de minimis* rewards.  COF ¶¶ 1152-53, 1197-99.  As Professor Hausman observes, ████ ████████████████████████████████████████████████████████████████████ ████████████████████████████—but in the real world, debit interchange actually hit

---

[67] "[T]he price difference we call a 'discount' is really a penalty imposed on buyers who refuse the bundle."  Einer Elhauge, *Tying, Bundled Discounts, and the Death of the Single Monopoly Profit Theory*, 123 Harv. L. Rev. 399, 402-03 (2009) ("Calling such pricing a bundled 'discount' is actually misleading in these situations because it wrongly implies there is a true discount from the but-for price (that is, the price that would have been charged 'but for' the bundling).").

[68] Visa asserts that it is Professor Hausman's opinion that increased merchant costs pre-Durbin resulted from "PIN debit networks compet[ing]."  Defs.' Br. 15.  Nothing could be further from the truth: Professor Hausman opined that those costs resulted from Visa's intentional strategy to raise PIN debit rates, which forced Visa's rivals to follow Visa's strategy, and protect its signature product.  SJDX 400 (Hausman Rpt.), ¶ 514.

45

███ .  SJDX 400 (Hausman Rpt.), ¶ 517.

Visa claims that it is "aware of no case" supporting antitrust injury to customers from a defendant's bundled discounts.  Defs.' Br. 13.  In fact, a number of courts have held that the exclusion of a competitor resulting from bundled pricing can support antitrust injury to a customer.  *See, e.g.*, *In re Remicade Antitrust Litig.*, 345 F. Supp. 3d 566 (E.D. Pa. 2018) (holding *purchasers* sufficiently alleged antitrust injury allegations in the context of a bundled-discount claim); *Bradburn Parent/Teacher Store, Inc. v. 3M*, No. 02 Civ. 7676, 2000 WL 34003597, at *4 (E.D. Pa. July 25, 2003).  Indeed, in *Bradburn* the court rejected the same flawed argument Visa presents here.  *Id.* at *3.

At bottom, eliminating Visa's anticompetitive conduct would have meant lower debit transaction prices to merchants and better product quality.[69]  Plaintiffs have therefore suffered an "injury of the type that the antitrust laws were intended to prevent."  *See Brunswick*, 429 U.S. at 489.[70]

### D.      Visa and the Bank Defendants Conspired to Monopolize Debit

"The essence of [a conspiracy to monopolize] is an agreement entered into with the specific intent of achieving monopoly or unreasonably restraining trade."  *Northeastern Tel. Co.*

---

[69]  Visa implies Plaintiffs are suing "to prevent discounts to other customers."  Defs.' Br. 13. Plaintiffs are suing to enjoin and recover for all of Visa's anticompetitive conduct, including bundled pricing, so that *all* merchants (and consumers) will get lower prices—including those merchants that currently receive "discounts."  Visa's emphasis on ███ exposes the flaw in its standing argument.  Despite its deal with Visa, ███ suffered damages from Visa's overall conduct.  Tellingly, Visa has not challenged the methodological basis for ███ debit damages.

[70]  Visa's reliance on *Indeck Energy Servs., Inc. v. Consumers Energy Co.*, is misplaced. 250 F.3d 972 (6th Cir. 2000).  In *Indeck*, which did not involve bundling, the plaintiff "failed to allege how [the defendants'] acts have injured competition," and therefore there was no antitrust injury.  *Id.* at 977-78. Visa's other authorities are inapposite.  *See Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 339 (1990) (involving competitor injury from predatory pricing); *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 272 (2d Cir. 2001) (same).

*v. Am. Tel. & Tel. Co.*, 651 F.2d 76, 85 (2d Cir. 1981); *In re Visa Check*, 2003 WL 1712568, at *6 ("To win on a conspiracy to monopolize claim, a plaintiff must show: '(1) proof of a concerted action deliberately entered into with the specific intent to achieve an unlawful monopoly, and (2) the commission of an overt act in furtherance of the conspiracy.'" (quoting *Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 795 (2d Cir. 1987))).  Specific intent can be established by direct evidence, or "the finder of fact . . . [may] infer defendants' intent from their anticompetitive practices." *Northeastern Tel.*, 651 F.2d at 85; *Tops Market, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 101 (2d Cir. 1998) (same).

At the beginning of the relevant period and prior to Visa's IPO, Visa was owned and controlled by competing banks, including the Bank Defendants.  COF ¶¶ 5, 14.



There is thus proof of concerted action among Visa and the Bank Defendants to engage in anticompetitive conduct and of overt anticompetitive acts taken in furtherance of that conduct. There is also both direct proof of specific intent to maintain Visa's power over price, *i.e.*, to monopolize the debit market, and proof of anticompetitive conduct from which Visa's and the Bank Defendants' specific intent may be inferred by a jury.

V.      **CONCLUSION**

For the foregoing reasons, Plaintiffs can establish each of the required elements of their Section 2 claims, and Visa has not sustained its burden of demonstrating the lack of a disputed issue of fact on any of those elements.  Visa's motion should be denied.

Dated:  September 22, 2020

CONSTANTINE CANNON LLP

By: ___/s/ Jeffrey I. Shinder___
Jeffrey I. Shinder
A. Owen Glist
Ankur Kapoor
Taline Sahakian
David A. Scupp
Harrison J. McAvoy
Kristian Soltes
335 Madison Avenue, 9th Floor
New York, New York 10017
Telephone: (212) 350-2700
Email: jshinder@constantinecannon.com

W. Stephen Cannon
David D. Golden
Allison Sheedy
1001 Pennsylvania Avenue, NW, Suite 1300N
Washington, DC 20004
Telephone: (202) 204-3500
Email: scannon@constantinecannon.com

*Attorneys for 7-Eleven Plaintiffs and Defendants in Visa U.S.A. Inc. v. National Association of Convenience Stores*

MCKOOL SMITH PC

By: ___/s/ Gayle R. Klein___
Gayle R. Klein
John C. Briody
James J. Smith
One Manhattan West, 50th Floor
New York, New York 10001
Telephone: (212) 402-9400
Facsimile: (212) 402-9444
gklein@mckoolsmith.com

*Attorneys for Elgin Ave. Recovery, LLC, successor-in-interest to Sears Holdings Corporation*

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By: ___/s/ Steig D. Olson___
Steig D. Olson
David LeRay
Andrew T. Sutton
Sophia Qasir
Matthew Fox
51 Madison Avenue, 22nd Floor
New York, New York 10010
Tel: (212) 849-7000
Email: steigolson@quinnemanuel.com

Alicia Cobb
600 University Street, Suite 2800
Seattle, WA 98101
Tel: (206) 905-7000
Email: aliciacobb@quinnemanuel.com

Jonathan Eser
1300 I St. NW #900
Washington, DC 20005
Telephone: (202) 538-8172
Email: jonathaneser@quinnemanuel.com

BONDURANT MIXSON & ELMORE, LLP
Frank M. Lowrey IV (admitted *pro hac vice*)
Ronan P. Doherty (admitted *pro hac vice*)
3900 One Atlantic Center
1201 West Peachtree Street, N.E.
Atlanta, Georgia 30309
Tel: (404) 881-4100
Email: lowrey@bmelaw.com

*Attorneys for The Home Depot, Inc. and Home Depot U.S.A., Inc.*

**CERTIFICATE OF SERVICE**

I certify that on September 22, 2020, I caused a true and correct copy of the foregoing document to be served on a subset of counsel via File Transfer Protocol (FTP) per agreement of the relevant parties.  I caused service of a cover letter that provided notice of this service on counsel in the above-referenced actions via File&ServeXpress and ECF.

DATED this September 22, 2020.

*/s/ Jeffrey I. Shinder*
Jeffrey I. Shinder