**UNITED STATES DISTRICT COURT FOR**
**THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BARRY'S CUT RATE STORES INC.; DDMB, INC. d/b/a EMPORIUM ARCADE BAR; DDMB 2, LLC d/b/a EMPORIUM LOGAN SQUARE; BOSS DENTAL CARE; RUNCENTRAL, LLC; CMP CONSULTING SERV., INC.; TOWN KITCHEN, LLC d/b/a TOWN KITCHEN & BAR; GENERIC DEPOT 3, INC. d/b/a PRESCRIPTION DEPOT; and PUREONE, LLC d/b/a SALON PURE, <br><br>     Plaintiffs, <br><br>     v. <br><br> VISA, INC.; MASTERCARD INCORPORATED; MASTERCARD INTERNATIONAL INCORPORATED; BANK OF AMERICA, N.A.; BA MERCHANT SERVICES LLC (f/k/a DEFENDANT NATIONAL PROCESSING, INC.); BANK OF AMERICA CORPORATION; BARCLAYS BANK PLC; BARCLAYS BANK DELAWARE; BARCLAYS FINANCIAL CORP.; CAPITAL ONE BANK, (USA), N.A.; CAPITAL ONE F.S.B.; CAPITAL ONE FINANCIAL CORPORATION; CHASE BANK USA, N.A.; CHASE MANHATTAN BANK USA, N.A.; CHASE PAYMENTECH SOLUTIONS, LLC; JPMORGAN CHASE BANK, N.A.; JPMORGAN CHASE & CO.; CITIBANK (SOUTH DAKOTA), N.A.; CITIBANK N.A.; CITIGROUP, INC.; CITICORP; and WELLS FARGO & COMPANY, <br><br>                              Defendants. | MDL No. 1720 <br><br> Docket No. 05-md-01720-MKB-VMS |

**MEMORANDUM OF LAW IN SUPPORT OF EQUITABLE**
**RELIEF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

*HIGHLY CONFIDENTIAL*
*SUBJECT TO PROTECTIVE ORDER*
*TO BE FILED UNDER SEAL*

## <u>TABLE OF CONTENTS</u>

<u>Page No.</u>

TABLE OF AUTHORITIES ................................................................................................. iii

I.      INTRODUCTION ............................................................................................... 1

II.     STATEMENT OF FACTS ................................................................................. 6

      A.    THE VISA AND MASTERCARD NETWORKS .................................................. 6

      B.    THE "DEFAULT" INTERCHANGE FEES ......................................................... 8

      C.    DEFENDANTS' UNLAWFUL RESTRAINTS INSULATE DEFENDANTS FROM COMPETITION AND PERMIT THEM TO MAINTAIN SUPRACOMPETITIVE PRICES ......... 9

            **1.**    The Honor All Cards Rule ...................................................... 11

            **2.**    The No-Surcharge Rule ......................................................... 12

            **3.**    The No-Discount Rule ........................................................... 14

      D.    THE RESTRAINTS CAUSE MASSIVE ANTICOMPETITIVE EFFECTS .......................... 15

            1.    Supracompetitive Total Prices ................................................ 15

            2.    Inefficient Price Pair ............................................................. 16

            3.    Reduced Output .................................................................... 16

            4.    Strengthened Entry Barriers ................................................... 17

            5.    Inefficient Cross-Subsidization .............................................. 18

      E.    THE NETWORK DEFENDANTS' SCHEME TO STIFLE COMPETITION IN THE DEBIT MARKET .................................................................. 18

            1.    The Debit Surcharging Rules Undermine the Credit Surcharging Rules .......................................................... 18

            2.    The Defendants Debit Card Rules Have Anticompetitive Effects Despite the Durbin Amendment .............................. 19

            3.    The Defendants Have Repeatedly Sought to Undermine the Durbin Amendment .................................................... 21

      F.    THE IMPORTANCE OF THE RULE 23(B)(2) CLASS IN THIS CASE ............................ 22

III.    CLASS CERTIFICATION IS APPROPRIATE IN THIS CASE ................................... 23

      A.    PLAINTIFFS SATISFY THE PREREQUISITES OF RULE 23(a) ................................... 25

            **1.**    The Proposed Class is Sufficiently Numerous .......................... 25

            **2.**    Numerous Legal and Factual Issues Are Common to All Class Members .................................................................. 25

            **3.**    Named Plaintiffs' Claims are Typical of Class Members' Claims .......... 27

**4.**     Plaintiffs and Proposed Interim Co-Lead Counsel Will Fairly and Adequately Represent the Class......................................................... 29

      (a)     Plaintiffs' Interests and Injuries Are the Same as Those of the Class ......................................................................... 29

      (b)     Plaintiffs' Counsel are Qualified and Experienced...................... 31

**5.**     The Class is Readily Ascertainable.................................................. 32

B.     PLAINTIFFS SATISFY THE REQUIREMENTS OF RULE 23(b)(2) ................................. 32

    **1.**     Defendants' Imposition and Enforcement of the Interchange Fee Applies to Each Member of the Class........................................... 34

    **2.**     Defendants' Imposition and Enforcement of the Honor-All-Cards Rule Applies to Each Member of the Class ...................................... 36

    **3.**     Defendants' Imposition and Enforcement of the No-Surcharge Rule Applies to Each Member of the Class ...................................... 38

    **4.**     Market Definitions Can Be Evaluated On A Class-Wide Basis and Would Apply to All Members of the Class ...................................... 42

    **5.**     Market Power Can Be Evaluated On a Class-Wide Basis And Would Apply to All Members of the Class ...................................... 43

    **6.**     The Plaintiffs Seek Classwide Relief........................................... 45

C.     MANDATORY NON-OPT OUT CLASSES ARE THE DEFAULT IN 23(B)(2) CLASSES ............................................................................... 46

IV.     CONCLUSION................................................................................ 50

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ackerman v. Coca-Cola Co.*,
    No. 09 CV 395 (DLI)(RML), 2013 U.S. Dist. LEXIS 184232 (E.D.N.Y. July
    17, 2013) ................................................................................................................27

*Allen v. Dairy Farmers of Am., Inc.*,
    No. 5:09-cv-230, 2011, 2011 U.S. Dist. LEXIS 48479 (D. Vt. May 4, 2011) .......................29

*Amara v. CIGNA Corp.*,
    775 F.3d 510 (2d Cir. 2014)..................................................................................32

*Ohio v. Am. Express Co.*,
    138 S.Ct 2274 (2018)....................................................................................16, 17

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013) ..............................................................................................24

*B & R Supermarket, Inc. v. Mastercard Int'l, Inc.*,
    No. 17-2738, 2018 U.S. Dist. LEXIS 42547 (E.D.N.Y. Mar. 14, 2018)................................25

*Barry's Cut Rate Stores Inc. et al. v. Visa, Inc., et al.*,
    05-md-01720 (MKB) (JO) 2019 U.S. Dist. LEXIS 205335 (E.D.N.Y. Nov.
    20, 2019) ................................................................................................................2

*Berni v. Barilla SpA*,
    964 F.3d 141 (2d Cir. 2020)..........................................................................23, 33

*Californians for Disability Rights, Inc. v. California Dep't of Transp.*,
    249 F.R.D. 334 (N.D. Cal. 2008) ........................................................................30

*Carrizosa v. Stassinos*,
    669 F.Supp.2d 1081 (N.D. Cal. 2009) ................................................................46

*Charron v. Wiener*,
    731 F.3d 241 (2d Cir. 2013)..................................................................................48

*Consolidated Rail Corp. v. Town of Hyde Park*,
    47 F.3d 473 (2d Cir. 1995)....................................................................................25

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*,
    502 F.3d 91 (2d Cir. 2007)....................................................................................28

*In re Currency Conversion Fee Antitrust Litig.*,
    224 F.R.D. 555 (S.D.N.Y. 2004) ..........................................................................25

*Denney v. Deutsche Bank AG*,
443 F.3d 253 (2d Cir. 2006)............................................................................................29

*Deshawn E. by Charlotte E. v. Safir*,
156 F.3d 340 (2d Cir. 1998)..............................................................................................5

*Dewey v. Volkswagen Aktiengesellschaft*,
681 F.3d 170 (3d Cir. 2012)............................................................................................44

*Dial Corp. v. News Corp.*,
314 F.R.D. 108 (S.D.N.Y. 2015) ....................................................................................41

*In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Products Litig.*,
MDL No. 1203 1999 U.S. Dist. LEXIS 13228 (E.D. Pa. Aug. 26, 1999)......................47

*Elkind v. Revlon Consumer Prods. Corp.*,
No. 14-2484 (JS) (AKT), 2017 U.S. Dist. LEXIS 24512 (E.D.N.Y. Feb. 17,
2017) ..........................................................................................................................24, 25

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
574 F.3d 29 (2d Cir. 2009)..............................................................................................27

*Fortner Enters., Inc. v. United States Steel Corp.*,
394 U.S. 495 (1969).........................................................................................................17

*Gooch v. Life Inv'rs Ins. Co. of Am.*,
672 F.3d 402 (6th Cir. 2012) ..........................................................................................44

*Hoover v. HSBC Mortg. Corp. (USA)*,
9 F. Supp. 3d 223 (N.D.N.Y. 2014).................................................................................20

*In re J.P. Morgan Chase Cash Balance Litig.*,
242 F.R.D. 265 (S.D.N.Y. 2007) ....................................................................................30

*Madden v. Midland Funding, LLC*,
237 F.Supp.3d 130 (S.D.N.Y. 2017)...............................................................................46

*Maywalt v. Parker & Parsley Petroleum Co.*,
67 F.3d 1072 (2d Cir. 1995).............................................................................................48

*Mazzei v. Money Store*,
288 F.R.D. 45 (S.D.N.Y. 2012) ......................................................................................25

*NCAA v. Board of Regents*,
468 U.S. 85 (1984)...........................................................................................................42

*Nicosia v. Amazon.com, Inc.*,
834 F.3d 220 (2d Cir. 2016)............................................................................................24

*O'Shea v. Littleton,*
   414 U.S. 488 (1974) .................................................................................23

*Otter Tail Power Co. v. United States,*
   410 U.S. 366 (1973) .................................................................................20

*Palmer v. Stassinos,*
   Nos. C-04-03026 RMW; C-05-02280 RMW 2009 U.S. Dist. LEXIS 4265
   (N.D. Cal. Jan. 9, 2009) ...........................................................................46

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.,*
   No. 05-MD-1720 (MKB) (JO), 2019 U.S. Dist. LEXIS 217583 (E.D.N.Y.
   Dec. 16, 2019) ..........................................................................................32

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.,*
   330 F.R.D. 11 (E.D.N.Y. 2019) ..........................................................26, 28

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.,*
   827 F.3d 223 (2d Cir. 2016) .................................................................46, 47

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.,*
   986 F. Supp. 2d 207 (E.D.N.Y. 2013), *rev'd on other grounds,* 827 F.3d 223
   (2d Cir. 2016) ........................................................................................5, 46

*In re Petrobras Sec. Litig.,*
   862 F.3d 250 (2d Cir. 2017) .....................................................................32

*Richards v. FleetBoston Fin. Corp.,*
   235 F.R.D. 165 (D. Conn. 2006) ..............................................................30

*Robinson v. Metro-N. Commuter R.R. Co.,*
   267 F.3d 147 (2d Cir. 2001) .....................................................................29

*Ross v. Am. Express Co. (In re Currency Conversion Fee Antitrust Litig.),*
   264 F.R.D. 100 (S.D.N.Y. 2010) ..............................................................27

*Shahriar v. Smith & Wollensky Rest. Grp., Inc.,*
   659 F.3d 234 (2d Cir. 2011) .....................................................................27

*Square D Co. v. Niagara Frontier Tariff Bureau, Inc.,*
   476 U.S. 409 (1986) .................................................................................20

*Stephenson v. Bell Atl. Corp.,*
   177 F.R.D. 279 (S.D.N.Y. 1997) ..............................................................41

*Sykes v. Mel S. Harris & Assocs. LLC,*
   780 F.3d 70 (2d Cir. 2015) .............................................................25, 27, 33, 46

*United States v. Visa U.S.A. Inc.*,
  163 F. Supp. 2d 322 (S.D.N.Y. 2001) ................................................................................4

*United States v. Visa U.S.A., Inc.*,
  344 F.3d 229 (2d Cir. 2003) ................................................................................4, 41, 42, 43

*Van Gemert v. Boeing Co.*,
  590 F. 2d 433 (2d Cir. 1978) (en banc), *aff'd*, 444 U.S. 472 (1980) ...................................45

*In re Visa Check/MasterMoney Antitrust Litig.*,
  280 F.3d at124 (2d Cir. 2001) ...........................................................................................29

*In Re Visa Check/MasterMoney Antitrust Litig.*,
  297 F. Supp. 2d 503 (E.D.N.Y.2003) ............................................................................11, 30

*In re VisaCheck/Master Money Antitrust Litig.*,
  192 F.R.D. 68 (E.D.N.Y. 2000) ..................................................................................1, 25, 41

*In re VisaCheck/Master Money Antitrust Litig.*,
  280 F.3d 124 (2d Cir. 2001) .......................................................................................1, 29, 30

*In re Vitamin C Antitrust Litig.*,
  279 F.R.D. 90 (E.D.N.Y. 2012) .........................................................................................27

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S. Ct. 2541 (2011) ............................................................................................ *passim*

**Statutes**

California Cartwright Act ...........................................................................................................41

Cartwright Act .............................................................................................................................5

Clayton Act, Cartwright Act ....................................................................................................29

Dodd-Frank Act .........................................................................................................................14

Dodd-Frank Act Amendment ..................................................................................................40

Nussbaum Law............................................................................................................................31

Sherman Act.................................................................................................................... *passim*

**Other Authorities**

Fed. R. Civ. P. 23 ............................................................................................................ *passim*

## I.      INTRODUCTION

Plaintiffs DDMB, Inc. d/b/a Emporium Arcade Bar; DDMB 2, LLC d/b/a Emporium Logan Square; Boss Dental Care; Runcentral, LLC; CMP Consulting Serv., Inc.; Town Kitchen, LLC d/b/a Town Kitchen & Bar; Generic Depot 3, Inc. d/b/a Prescription Depot; and PureOne, LLC d/b/a Salon Pure (collectively, "Plaintiffs" or "Equitable Relief Plaintiffs"), assert claims that are not only ideally suited for class certification pursuant to Rule 23(b)(2), but virtually require it. Defendants' relevant conduct has been substantially identical as to millions of members of the proposed class. To the extent that Defendants are required to reform that conduct as a result of any judgment or settlement of this action, their conduct must, as both a practical matter and a legal matter, remain substantially identical as to all members of the proposed class. Faced with allegations regarding similar conduct by the same payment card networks, the court in *In re VisaCheck/Master Money Antitrust Litig.*, 192 F.R.D. 68 (E.D.N.Y. 2000), certified a Rule 23(b)(2) class, as well as a Rule 23(b)(3) class that raised far more individual issues. The Second Circuit affirmed that certification. *In re VisaCheck/Master Money Antitrust Litig.*, 280 F.3d 124 (2d Cir. 2001).

Beginning no later than 2004, and continuing to this day, Defendants Visa,[1] Mastercard[2] (collectively, the "Network Defendants"), and the Bank Defendants,[3] undertook a uniform course

---

[1] Defendants Visa Inc., Visa U.S.A. Inc., and Visa International Service Association are collectively referred to as "Visa.".

[2] Defendants Mastercard Incorporated and Mastercard International Incorporated are collectively referred to as "Mastercard.".

[3] Defendants Bank of America, N.A., BA Merchant Services LLC (f/k/a Defendant National Processing, Inc.), Bank of America Corporation, Barclays Bank plc, Barclays Bank Delaware, Barclays Financial Corp., Capital One Bank, (USA), N.A., Capital One F.S.B., Capital One Financial Corporation, Chase Bank USA, N.A., Chase Manhattan Bank USA, N.A., Chase Paymentech Solutions, LLC, JPMorgan Chase Bank, N.A., JPMorgan Chase & Co., Citibank (South Dakota), N.A., Citibank N.A., Citigroup, Inc., Citicorp, Wells Fargo & Company are collectively referred to as the "Bank Defendants."

of unlawful conduct by requiring Merchants[4] who accept their payment cards to comply with the "Restraints,"[5] which are incorporated (along with other network operating rules) into the contracts between banks and their Merchant customers, and facilitate Defendants' imposition and collection of supracompetitive Total Prices[6] on Visa and Mastercard transactions. As the Court has recognized, at the beginning of the relevant period, both Visa and Mastercard were owned and controlled by their member banks. *Barry's Cut Rate Stores Inc. v. Visa, Inc.*, 2019 U.S. Dist. LEXIS 205335, at *101 (E.D.N.Y. Nov. 20, 2019) (citing *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 235 (2d Cir. 2003)). As the Court further recognized, Plaintiffs make detailed allegations to the effect that the networks' respective IPOs were structured so as to effectively maintain the status quo with respect to the conduct that serves as the basis for Plaintiffs' claims. *Id.*, 2019 WL 7584728, at *172.

The expert reports of Dennis Carlton[7] and Joseph Stiglitz[8] as to liability, and Keith Leffler as to class certification[9] further detail how, throughout the relevant period, the Restraints have prevented Merchants from, among other things, (1) setting retail prices that reflect the costs of

---

[4] All capitalized terms that are not defined in this Memorandum have the same meaning ascribed to them in the Equitable Relief Class Action Complaint (ECF 6892). *See id.* ¶ 9.

[5] The "Restraints" or "Anti-Steering Restraints" or "Merchant Restraints" are the rules of the Visa and Mastercard networks that forbid Merchants from incenting consumers to use less expensive payment forms, including:  the Default Interchange Rules, No-Surcharge Rule, Honor-all-Cards Rule, No-Discount Rule, No-Bypass Rule; and Visa and Mastercard's "discrimination rules," which require Merchants to discriminate against other forms of payment by failing to treat them more favorably than Defendants' cards despite those competing forms' better pricing.

[6] We use the term "Total Price" here to comprise, roughly, Interchange Fees minus cardholder rewards. The Total Price can be calculated in a variety of ways, by including (or not) various other fees such as network fees paid by Merchants to the Acquiring Banks (and from those banks to the Networks), cardholder annual fees, interest charges paid by cardholders, etc., all of which increase the amount of the Total Price. The Equitable Relief Plaintiffs seek only injunctive relief and are not required to establish supracompetitive prices with a degree of accuracy necessary to support a damages award.

[7] *See* Ex. 1 to the Declaration of Robert G. Eisler in Support of Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Class Certification, (Expert Report of Dr. Dennis Carlton dated October 4, 2018 ("Carlton Rpt.")).  All other exhibits appended to the Eisler Declaration will be referred to as "Ex.__").

[8] *See* Ex. 2 (Expert Report of Dr. Joseph Stiglitz dated October 5, 2018 ("Stiglitz Rpt.")).

[9] *See* Ex. 3 (Expert Report of by Dr. Keith Leffler dated December 18, 2020 ("Leffler Rpt.")).

their payment card acceptance, or (2) steering consumers to use lower-cost forms of payment. Defendants have been able to maintain their conspiracy for such an extended period of time because both networks and their member banks have at all times maintained the market power necessary to profitably raise and maintain Total Prices above competitive levels.

Defendants' misconduct includes the long-standing imposition of at least three separate rules, the Honor All Cards Rule, the No-Surcharge Rule, and the No-Discount Rule. The Honor All Cards Rule requires each of Visa's and Mastercard's member banks to agree that any Merchant that accepts payment cards issued by any bank must accept all other banks' payment cards that carry the brand of the same network, without regard to the costs associated with the card. The No-Surcharge Rule effectively prohibits Merchants from adding charges to transactions involving either of the Network Defendants' credit cards. Absent the No-Surcharge Rule, Defendants would be forced to reduce Interchange Fees and Total Prices to encourage Merchants to forgo surcharging. The No-Discount Rule precludes Merchants from offering their customers issuer-specific discounts that would in turn enable Merchants to secure favorable treatment from issuing banks. In addition, Visa's No-Bypass Rule prohibits Merchants from bypassing Visa's proprietary system for clearing, authorizing, and settling credit card transactions, even where the issuing and acquiring banks are the same, or even if the Merchant's processor has agreements with both the issuing and acquiring banks.[10]

Moreover, Visa and Mastercard each maintain substantial market power, which is reflected in, among other things, their ability to: (1) profitably maintain Total Prices far above the competitive level; (2) impose inefficient price pairs; (3) reduce output below what it would be

---

[10] ████████████████████████████████████████████████████████████████

under competitive conditions; (4) create and enhance barriers to entry; and (5) force inefficient cross-subsidization among those shoppers who do, and those who do not, use the Defendants' payment cards. As a result, accepting Visa and Mastercard Payment Cards is a competitive necessity for the vast majority of Merchants. The fact that the Network Defendants can successfully enforce the Restraints and other policies that harm Merchants and cardholders without sacrificing acceptance or transaction volume demonstrates the substantial market power that Visa and Mastercard have in the payment cards markets.

Other courts have found that Visa and Mastercard maintained market power, under relevant circumstances that differed only marginally, if at all, from the circumstances during the period relevant to this case. The court in *United States v. Visa U.S.A. Inc.,* 163 F. Supp. 2d 322 (S.D.N.Y. 2001), determined that "[b]ecause Visa and MasterCard[11] have large shares in a highly concentrated market with significant barriers to entry, both defendants have market power in the general purpose card network services market, whether measured jointly or separately; furthermore plaintiff has demonstrated that both Visa and MasterCard have raised prices and restricted output without losing merchant customers." *Id.* at 342. The United States "prove[d] through the testimony of merchants that they cannot refuse to accept Visa and MasterCard even in the face of significant price increases because the cards are such preferred payment methods that customers would choose not to shop at merchants who do not accept them." *Id.* at 340. The Second Circuit affirmed that determination of market power, holding that "Visa U.S.A. and MasterCard, jointly and separately, have power within the market for network services." *United States v. Visa U.S.A. Inc.,* 344 F.3d at 239. Although the courts in that case addressed a market comprised of only Merchants, the Defendants' market power in the relevant market here is confirmed by

---

[11] Mastercard changed its name from "MasterCard" in 2016.

4

supracompetitive Total Prices, inefficient price pairs, restrictions on output, creation of entry barriers, and inefficient cross-subsidization.

The legal implications of Defendants' conduct are likewise identical with respect to the Equitable Relief Plaintiffs and all class members. Defendants' collusion with respect to the Restraints violates Sections 1 and 2 of the Sherman Act and the Cartwright Act, by virtue of separate (but interrelated) conspiracies between and among: (1) the Visa network and its member banks; and (2) the Mastercard network and its member banks.

For these reasons and others, Plaintiffs seek the certification of a Rule 23(b)(2) Class defined as:

> All persons, businesses, and other entities (referred to herein as "Merchants") that accept Visa and/or Mastercard Credit and/or Debit cards in the United States at any time during the period between December 18, 2020 and 8 years after the date of entry of Final Judgment in this case.

Defendants acted on grounds generally applicable to the class, and their collusive conduct is market-wide rather than specific to individual Merchants. Plaintiffs move for class certification pursuant to Rule 23(b)(2) to provide all class members uniform equitable relief from future harm resulting from Defendants' ongoing anticompetitive conduct. *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998) (a plaintiff "must show a likelihood that he or she will be injured in the future").

"The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted – the notion that the conduct is such that it can be enjoined or declared unlawful *only as to all of the class members or as to none of them*.'" *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2557 (2011) (emphasis added). As Judge Gleeson held earlier in this MDL proceeding, "[t]hat is precisely the case with respect to the claims in this case that seek injunctive relief from the bundle of network rules that result in—according to the plaintiffs' allegations—

5

supracompetitive Interchange Fees in violation of the antitrust laws." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 986 F. Supp. 2d 207, 236 (E.D.N.Y. 2013), *rev'd on other grounds*, 827 F.3d 223 (2d Cir. 2016). For that reason as well as others, Plaintiffs further request the Court's certification of the class without permitting any opt-out rights.

## II.     STATEMENT OF FACTS

### A.     THE VISA AND MASTERCARD NETWORKS

The Visa and Mastercard networks facilitate credit and debit card transactions by operating a payment system consisting of: (i) cardholders; (ii) banks that issue cards to cardholders (the "Issuing Banks"); (iii) the Merchants' banks (the "Acquiring Banks"); and (iv) the Merchants.[12] Neither Visa nor Mastercard issues payment cards.[13] Instead, the Network, Visa or Mastercard, connects the Issuing Banks with the Acquiring Banks. The Networks require both the Issuing and Acquiring Banks to be members of the network.[14] In addition, they require their member banks to require Merchants to abide by the Restraints, and process the transfer of funds between issuers and acquirers.[15] The following illustration depicts a typical transaction:[16]

---

[12] ████████████████████████████████████████████████
████████████████████████████████.

[13] *Id*.

[14] ████████████████████████████████████████████████
████████████.

[15] *See* Ex. 4 (VISA00109997, at VISA00110000).

[16] Ex. 6 (Alan Frankel and Allan Shampine, "The Economic Effects of Interchange Fees," 73 Antitrust Law Journal No. 3, 2006, p. 630).



In a typical payment transaction, when a cardholder presents a Visa or Mastercard branded Card as a form of payment, the Merchant contacts its Acquiring Bank electronically to request authorization for the purchase.[17] That request, including the transaction amount and identity of the cardholder, is then sent to either Visa or Mastercard, which in turn relays it to the cardholder's Issuing Bank for approval.[18] The Issuing Bank either approves or rejects the request based on the cardholder's available credit limit or bank account balance. That decision is then transmitted electronically through the system to the Merchant. If the transaction is approved, it is then completed.

Once the transaction is authorized, the Issuing Bank sends payment on behalf of its cardholder, less its interchange fee, to the acquirer through the Visa or Mastercard network. The acquirer in turn credits the Merchant, less the "Merchant Discount Fee," which is comprised of the interchange fee, and any additional amount imposed by the Acquiring Bank. The Network sets default interchange fees for all transactions and acquirers, although the amount varies across different Merchant industry categories. Both Issuing and Acquiring Banks pay membership and

---

[17] ██████████████████████████████████████████████████████████.

[18] *See* Ex. 4 (VISA00109997, at VISA00110001); ████████████████, § 5.7 & 5.8, "Mastercard Rules 2016").

other fees to Visa and Mastercard for every transaction that is processed over the networks.[19] The Issuing Banks often provide "rewards" to their cardholders for using their cards.

### B.   THE "DEFAULT" INTERCHANGE FEES

Visa's rules provide that Interchange Fees "are determined by Visa and provided on Visa's published fee schedule," and that these fees "apply on every transaction, except where they have been 'customized where Member [Banks] have set their own financial terms'" for the interchange fee or entered into a separate business agreement to promote card acceptance and usage.[20] Mastercard's rules provide that Mastercard "has the right to establish default interchange fees . . . it being understood that all such fees set by [Mastercard] apply only if there is no applicable bilateral interchange fee agreement between two [Member Banks]." While both networks permit bilateral interchange arrangements in theory, in practice such agreements affect a small minority of large Merchants and, because of the Restraints, do not result in Total Prices anywhere near the competitive level.[21]

The Defendants established mandatory Interchange Fees when Visa and Mastercard were owned by their member banks, and effectively controlled by the largest of those banks, including the Bank Defendants, their predecessors, and a handful of others. Visa's and Mastercard's Boards of Directors authorized the establishment of uniform Default Interchange Fee schedules for all

---

[19] Ex. 1 (Carlton Rpt. ¶ 24).

[20] *Id.* (quoting Visa Product and Service Rule 9.1.1.3).

[21] Ex. 9 (VUSAMDL1-06180107 at 110); Ex. 10



); Ex. 11

*see also* Ex. 12

Ex. 13 (

.

transactions, and colluded to impose those price-fixed fees on Merchants. After the Networks' respective IPOs, Visa and Mastercard continue to operate substantially for the benefit of the Bank Defendants.

The Interchange Fees reflect that the Network Defendants are "█████████████████ ███████████████████████████████████████"[22] The Fees were implemented and are maintained collusively, and as a result almost all Merchants have no negotiating power as to Interchange Fees. The collectively fixed Interchange Fees are illegal. They are not necessary to accomplish any procompetitive benefits of the Visa or Mastercard networks. Professor Stiglitz concluded that the Restraints prevent Merchants from attempting to influence cardholders' payment card choices; therefore, Visa and Mastercard's supracompetitive Default Interchange Fees became the de facto prices charged by all issuing banks.[23] This makes default interchange rates an explicit price-fixing agreement among the issuing banks. The supra-competitive levels of Interchange Fees persist to this day.[24]

### C.   DEFENDANTS' UNLAWFUL RESTRAINTS INSULATE DEFENDANTS FROM COMPETITION AND PERMIT THEM TO MAINTAIN SUPRACOMPETITIVE PRICES

The Defendants collusively enacted the Restraints to maintain and enhance the Networks' dominant market power. The Restraints prevent Merchants from applying even minimal competitive pressure on Defendants with respect to Interchange and other fees. In addition, the Restraints function to eliminate any transparency on fees to consumers because they guarantee that consumers will choose which payment cards to use without regard to the cost of acceptance (*i.e.*,

---

[22] ████████████████████████████████████████████████████████████████ ███████████████████████████████████.

[23] Notwithstanding some limited exceptions. Ex. 2 (Stiglitz Rpt. ¶136).

[24] *Id.*

Merchants bear the costs of the transaction without the cardholder's knowledge). Thus there is no competitive pressure from consumers to reduce Interchange Fees. Consequently, the Network Defendants are able to maintain an anticompetitive scheme where **no** party adversely affected by Interchange and other fees is able to impose competitive pressure on Defendants to lower those fees.

In a continuing violation of Sections 1 and 2 of the Sherman Act, Defendants have maintained these Restraints to the present day for the purpose and with the effect of continuing to inflate Total Prices, and otherwise impair competition.[25] The Network Defendants have fully insulated themselves from any competitive threat on the Merchant side of the platform because they require the Restraints to be incorporated into every contract between Acquiring Banks and their Merchant customers, and every Merchant card-acceptance agreement requires the Merchant to abide by the Restraints.[26]

Defendants' Restraints disable the most fundamental market mechanism—a price signal. Without the Restraints, Merchants could give appropriate price signals to the customers at the point of sale, informing customers of the Total Price. Consumers would then migrate toward less-expensive payment products which, in turn, would induce Defendants to reduce their Interchange and other fees, and their Total Prices.[27] In sum, absent the Restraints, Defendants' Interchange Fees and Total Prices would be lower.

---

[25] ███████████████████████████████████████████████████████.

[26] Ex. 17 ("Visa Core Rules", Rule 1.5.2.1, dated October 2020); Ex. 18("Mastercard Rules", Rule 5.1. dated, December 2020).

[27] Ex. 1 (Carlton Rpt. ¶¶ 51-59, 67).

1.     **The Honor All Cards Rule**

The "Honor All Cards Rule" promulgated by the Visa and Mastercard networks requires any Merchant that accepts Visa or Mastercard Credit Cards to accept all Credit Cards that are issued on that network, and requires any Merchant that accepts Visa or Mastercard Debit Cards to accept all Debit Cards that are issued on that network.[28] Effectively, the Honor All Cards Rule mandates that any Merchant that accepts Visa or Mastercard credit or signature-debit cards accepts all credit or signature-debit cards bearing that brand,[29] regardless of the issuer, rewards, type of card (standard credit, premium credit, or commercial, for example), and importantly, regardless of the interchange rate or Total Price associated with that card.[30] The consequence of the Honor All Cards Rule is that a Merchant may not refuse to accept a high-cost Visa or Mastercard Card in favor of a lower cost card. Defendants have created a situation in which payment of a supracompetitive Interchange Fee is required on all payment card transactions.

The anticompetitive effects of the Honor All Cards Rule extend to abuse of Defendants' monopoly position in the emerging mobile payments space. Both Visa and Mastercard have construed and applied their Honor All Cards rules as essentially "Honor All Devices" rules. Specifically, Visa and Mastercard require Merchants to accept *all* devices (i.e., smartphones) that are configured to transact through the Visa or Mastercard networks to the extent the Merchant

---

[28] Ex. 17 (Visa Core Rules, Rule 1.5.4.4, dated October 2020); Ex. 18 (Mastercard Rules, Rule 5.11.1, dated December 2020).

[29] Merchants previously brought an antitrust class action against Visa and Mastercard alleging that defendants created a tying arrangement in violation of § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, by means of their "honor all cards" policy, which required stores that accept defendants' credit cards to accept their debit cards as well. As a result of the settlement reached in that matter, Visa and Mastercard removed the Honor All Cards requirement tying debit and credit. *See In Re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y.2003). Settlement Agreement, June 4, 2003, https://www.sec.gov/Archives/edgar/data/1403161/000119312507140569/dex101.htm, pp. 7-8.

[30] ████████████████████ Visa updated its rule to permit merchants to accept only Visa debit cards or only Visa credit cards. However, a merchant that accepts Visa credit cards cannot accept, for example, only Visa Classic cards, or decline to accept Visa cards issued by a particular bank. Ex. 16 (Dittrich 30(b)(6) Dep. at 78:9-80:3, 84:21-85:10 (March 15, 2017)).

11

accepts payments through such devices.[31] Thus, any Merchant who accepts digital wallets has limited ability to refuse or condition acceptance of any particular type of payments from digital wallets. If a Merchant accepts payment through one kind of digital wallet affiliated with Visa or Mastercard, it must accept payments through *all* digital wallets associated with Visa or Mastercard. This scheme in the mobile payments space thwarts competition and Merchants' ability to choose low-fee options. Extension of the Honor All Cards Rule to mobile devices inhibits future market competition by removing the decision-making ability from the Merchant, the party actually paying the fee on the transaction.

### 2.    The No-Surcharge Rule

The Visa and Mastercard networks each promulgate a "No Surcharge Rule" that severely limits Merchants' ability to surcharge cardholders' Payment Card transactions to reflect cost differences among various payment methods.[32] In practical terms, this means Merchants are substantially prohibited from surcharging cardholders who use a Visa Credit Card rather than a Discover-branded Credit Card, or use a Premium Credit Card rather than a Standard Credit Card, or even use a Credit Card rather than another form of payment.[33] The Visa and Mastercard rules continue to flatly prohibit any surcharging of debit cards.[34]

As a result of the now-vacated 2012 settlement in this matter, the Network Defendants at least nominally permit surcharging for credit card transactions, but only in very limited circumstances, such that the overwhelming majority of Merchants have been unable to take

---

[31] Ex. 16 ██████████████████████████████████████████

[32] Ex. 17 ("Visa Core Rules", Rule 5.5.1.7, dated October 2020); Ex. 18 ("Mastercard Rules", Rule 5.11.2 dated December 2020).

[33] Ex. 16 █████████████████████████████████████.

[34] Ex. 1 (Carlton Rpt. ¶ 120); Ex. 17 ("Visa Core Rules", Rule 5.5.1.7, dated October 2020); Ex. 18 ("Mastercard Rules", Rule 5.11.2 dated December 2020).

advantage of those settlement provisions. Any Merchant that wishes to surcharge Visa cards must, under the "Level Playing Field Rule," also surcharge competitive credit card brands that have a cost of acceptance to the Merchant that is equal to or greater than Visa's cost of acceptance to the Merchant, or surcharge Visa and Mastercard in line with that competing card's stricter rules.[35] Importantly, the No-Surcharge Rule requires that if the Merchant accepts a competitive credit card brand that does not allow surcharging (*i.e.*, American Express), it similarly may not surcharge Visa.[36]

Moreover, even if a Merchant is able to surcharge, the No-Surcharge Rule requires that the Merchant may surcharge only at the "brand level" or the "product level."[37] This means that a Merchant must either surcharge all Visa credit cards equally, or differentially surcharge by product level (such as Visa Signature, Visa Classic, etc.).[38] A Merchant cannot differentially surcharge by issuer, regardless of the cost of acceptance for that issuer.[39] That restriction restrains the benefit any Merchant might recognize by negotiating a reduced Interchange Fee with an Issuing Bank.

---

[35] Ex. 17 (October 2020 Visa Rule 5.6.1.2); *See also,* Ex.16 ███████████████████████████████) (███████████████████████████████████████████████████████████████ ███████████████████████████████████) .

[36] *Id.* American Express does not explicitly prohibit surcharging. It does, however, require that merchants that surcharge its card impose an equivalent surcharge on all other forms of card payment, including debit cards. Because the Visa and Mastercard rules preclude surcharging debit, it is impossible for a merchant to surcharge American Express while fully complying with the Visa and Mastercard Rules.

[37] Ex. 17 (Visa Core Rules, Rule 5.5.1.5, dated October 2020)); Ex. 16 ███████████████████ █████████████ .

[38] *Id.*

[39] Visa also caps the amount of surcharge a merchant can impose. If a merchant imposes a product level surcharge, the surcharge is further capped at the Visa surcharge cap less the debit card cost of acceptance. *Id.*

###     3.     The No-Discount Rule

Until the 2011 settlement between the Department of Justice, seventeen states, and Visa and Mastercard,[40] the Network Defendants' Restraints prevented Merchants from offering a discount to a customer who paid with another brand of Payment Card or a competing brand of credit card if that discount was not available to a consumer who used a Visa Credit Card.[41] After enactment of the Dodd-Frank Act, the Network Defendants changed their rules to allow Merchants to offer discounts to cardholders for using a particular brand.[42]

These rule changes permitted a Merchant to discount to favor "a means of payment other than a Visa card or a Visa Card of a different product type (e.g., Visa Classic Card, Visa Traditional Rewards Card, Visa Signature Card)."[43] While Visa did recently change its rules to allow discounting by issuer, Mastercard still maintains a No-Discount Rule to prohibit discounting by issuer.[44] But for the No-Discount Rule, Merchants across the board could use Issuer-specific

---

[40] As part of the consent order, Visa and MasterCard (and "all other Persons in active concert or participation with any of them") agreed not to adopt or enforce any Rule or other agreement that would prohibit a merchant from: (1) offering a discount or rebate to a customer for using a particular brand or type of credit card or a particular form of payment (each, a Payment Type); (2) offering a free or discounted product for use of a particular Payment Type; (3) offering a free, discounted, or enhanced service for use of a particular Payment Type; (4) offering an incentive or other benefit for use of a particular Payment Type; (5) expressing a preference of Payment Type; (6) promoting a particular Payment Type (such as a sign expressing a preference using varied size or prominence for different Payment Types); (7) communicating the costs of a Payment Type or cost relative to other Payment Types; or (8) doing the substantial equivalent of any of the above (collectively, the Payment Type Preferences). Final Judgment as to Defendants MasterCard International Incorporated and Visa Inc. (No. CV-10-4496 E.D.N.Y. Jul. 20, 2011), available at http://www.justice.gov/atr/whatsnew.html.

[41] 

[42] Ex. 16 ████████████████████████████████████████████.

[43] Ex. 17 (Visa Core Rules, Rule 1.5.4.12, dated October 2020).

[44] Ex. 19 (████████████████████████████████████).

discounts to secure more favorable acceptance costs and terms than are currently available. All Merchants would benefit from the Issuing Banks' incentive to compete for Merchants' business.[45]

### D.    THE RESTRAINTS CAUSE MASSIVE ANTICOMPETITIVE EFFECTS.

Plaintiffs' experts demonstrate that the unlawful Restraints have caused massive anticompetitive effects market-wide.

### 1.    Supracompetitive Total Prices

The Restraints result in supracompetitive Total Prices. As Dr. Stiglitz explains, the networks have never substantially restrained competition on the issuing side of the market. The result was that Issuing Banks eventually competed in part by offering rewards to cardholders.[46]

Dr. Carlton calculated 

The European Commission reached a similar conclusion, finding an average pass-through rate of 25 percent.[48]

[49]

Dr. Stiglitz proves the same point via other means,

[50] For example, in the early 1990s, Visa and Mastercard charged high Interchange Fees to Merchants, charged high annual fees to cardholders, and offered few rewards.

---

[45] Ex. 22

[46] Ex. 2 (Stiglitz Rpt. ¶ 14).

[47] Ex. 1 (Carlton Rpt. ¶¶ 86-87 & Fig. 6).

[48] *Id.* ¶ 89.

[49] *Id.* ¶ 85.

[50] Ex. 2 (Stiglitz Rpt. ¶ 99).

In contrast, Discover offered low Interchange Fees to Merchants, one percent cash back to cardholders, and did so profitably.[51]



### 2.    Inefficient Price Pair

A given Total Price is the result of combining a Merchant price with a cardholder price. Only one price pair, however, is the efficient one. Defendants' Restraints result in the wrong price pair and are therefore anticompetitive because Defendants did not *design* the Restraints to efficiently balance the two prices; they designed them to extract supracompetitive profits from the Merchants.[54]

### 3.    Reduced Output

The anticompetitive effects of the Restraints are not limited to their direct effect on Total Prices. As Dr. Stiglitz explains, the Restraints also reduce output below what it would be under competitive conditions. Certain Merchants, due to the Restraints, have at all times refused to accept cards.[55] A consumer choosing to shop with that Merchant must use an alternative form of payment,

---

[51] *Id.* ¶ 95.

[52] Ex. 2 (Stiglitz Rpt. ¶ 7).

[53] *Id.*, *see also,* Equitable Relief Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment Under *Ohio v. American Express*, p. 18 (describing the mountain of evidence that Professors Stiglitz and Carlton amassed to establish that the competitive Total Price is far lower).

[54] "Striking the optimal balance of the prices charged on each side of the platform is essential for two-sided platforms to maximize the value of their services and to compete with their rivals." *Ohio v. Am Express Co.*, 138 S.Ct. 2274, 2277 (2018). S *ee also,* Equitable Relief Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment Under *Ohio v. American Express*, pgs. 24-25 (describing how the Restraints Cause Inefficient Price Pairs).

[55] Ex. 2 (Stiglitz Rpt. ¶ 108).

even if the consumer prefers to pay with a card. The Restraints also limit competition to induce cardholder usage by limiting Merchants' ability to steer their customers via loyalty programs at the point of sale.[56] This "impede[s] the development of cards" and "reduces the usage of credit cards."[57]

More fundamentally, the Restraints reduce the output of low-cost payment mechanisms because they prohibit Merchants from using price signals to drive credit-card usage to relatively close substitutes that cost less.[58] Here, output includes all products affected by the Restraints, which includes debit cards and all other forms of payment.[59] Because other payment methods are less costly than the Defendants' credit cards, the Restraints waste resources in transaction costs.[60] As a result, the consumers lose resources that otherwise would have been available for them to buy the goods and services they seek and reduces the output of the payment mechanisms that shoppers use to buy those goods and services.[61]

### 4.       Strengthened Entry Barriers

Dr. Stiglitz further explains how the Restraints stifle competition by erecting barriers to entry into the relevant market. The Restraints have effectively precluded the entry of any low-cost card for over thirty years—despite the vast profitability of existing cards—by preventing Merchants from steering customers to low-cost alternatives.[62] ███████████████████

---

[56] *Id.* ¶ 110.

[57] *Id.*

[58] *See Fortner Enters., Inc. v. United States Steel Corp.*, 394 U.S. 495, 503 (1969) ("reduced output is the almost inevitable result of higher prices.").

[59] Ex. 2 (Stiglitz Rpt. ¶ 116); Ex. 23 (Stiglitz Reply Rep. ¶105, 109).   *See also,* Equitable Relief Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment Under *Ohio v. American Express*, pgs. 25-31 (describing how the Restraints reduce output.).

[60] *Id.*

[61] *Id.*

[62] Ex. 2 (Stiglitz Rpt. ¶ 119).

17



██████████████████████████████.[63] ██████████████████████████████████████████████████████████ ████████████████████████████████"[64] The result is that no platform can compete with Visa and Mastercard other than by mimicking that strategy themselves.[65]

### 5. Inefficient Cross-Subsidization

Defendants' Restraints force consumers who do not qualify for high-reward cards to subsidize those cards for others by preventing Merchants from imposing the high costs of high-reward cards on solely their users.[66] Defendants' Restraints require any Merchant to pass the costs of high-reward credit cards onto all shoppers equally, regardless of the payment means that they use. The Restraints, therefore, not only exacerbate inequality, but also economic inefficiency.[67]

### E. THE NETWORK DEFENDANTS' SCHEME TO STIFLE COMPETITION IN THE DEBIT MARKET

Debit cards are distinct from credit cards in that payment is taken directly from an account of the cardholder (i.e., the funds are debited rather than credit being extended by the issuing bank to the cardholder). Debit card transactions fall into two categories based on the type of network that carries the transaction from the Merchant to the issuing bank: (1) PIN-debit transactions ("off-line transactions"), and (2) signature debit transactions.

### 1. The Debit Surcharging Rules Undermine the Credit Surcharging Rules

The debit surcharging rules also effectively prohibit Merchants from surcharging American Express cards. American Express allows surcharging, but only if Merchants impose the same

---

[63] *Id.* ¶ 120.

[64] *Id.* ¶ 122.

[65] *Id. See also id.* ¶¶ 126-29 (detailing additional anticompetitive effects).

[66] *See* Ex. 2 (Stiglitz Rpt. ¶ 42 n.74); *see also* Ex. 1 (Carlton Rpt. ¶¶ 51, 57).

[67] *Id.*

18

surcharge on all electronic forms of payment, including debit cards. Because the Visa and Mastercard rules prohibit surcharging debit, a Merchant that accepts Visa or Mastercard and wishes to surcharge American Express is trapped in a logical dead-end: it can either comply with the American Express rules and surcharge Visa and Mastercard debit cards, breaking the Visa and Mastercard Rules, or comply with the Visa and Mastercard Rules and refrain from surcharging debit cards, breaking the American Express Rules. There is no way for a Merchant that accepts Visa or Mastercard to surcharge American Express while fully complying with all of the Networks' rules.

This has the additional effect of limiting the ability of the Merchant to surcharge Visa and Mastercard *credit cards* as well.  The Visa and Mastercard Level Playing Field Rules provide that a Merchant that accepts a competing card that has an equal or greater cost of acceptance, and that imposes additional restrictions on surcharging, may surcharge Visa and Mastercard credit cards only under those stricter rules, or actually surcharge the competing card. Again, however, if the Merchant accepts American Express (and the cost of accepting American Express is higher than the cost of accepting Visa or Mastercard), the Merchant is caught in a trap: it cannot surcharge American Express (because doing so would require it to surcharge Visa and Mastercard debit cards), and it cannot surcharge Visa and Mastercard credit cards due to the stricter American Express Rules (as application of the rules would be logically incompatible).

### 2. The Defendants Debit Card Rules Have Anticompetitive Effects Despite the Durbin Amendment

The Restraints surrounding the Defendants' debit cards are largely the same as the Restraints surrounding credit, but stricter. Merchants cannot selectively decline acceptance of the Defendants' debit cards, and they cannot surcharge debit cards under any circumstances—even in the limited circumstances in which they can surcharge credit cards.

The lower debit card cost of acceptance is entirely a function of direct regulation through the Durbin Amendment, which, among other things, imposes an explicit price ceiling on debit interchange and requires issuers to enable cards to route transactions to a minimum of two other networks, ensuring some degree of competition. Absent these regulations, the Visa and Mastercard Restraints would enable the same kind of anticompetitive price spirals to develop in the debit card market as in the credit card market.

This is, in fact, what happened in the decade before the Durbin Amendment was passed, as issuers began to offer debit card rewards, and increase debit card interchange rates to match.[68] While Defendants may try to invoke the filed-rate doctrine, the fact that aggressive regulation mitigates the anticompetitive effects of these rules does not mean that antitrust enforcement is unnecessary or inappropriate. *See, e.g., Otter Tail Power Co. v. United States*, 410 U.S. 366, 372 (1973) (district court enjoined antitrust violation notwithstanding similar relief provided by regulatory agency; "[a]ctivities that come under the jurisdiction of a regulatory agency nevertheless may be subject to scrutiny under the antitrust laws"). Antitrust claims are entirely consistent with price regulation. *See Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 421-422 (1986) (filed rate doctrine bars damages suits but does not create antitrust immunity).

The debit rules also have anticompetitive effects beyond their direct impact on Interchange Fees. The ability to recoup the costs of acceptance and to steer cardholders to using lower cost forms of payment is not only beneficial to the extent that it results in lower Interchange Fees, but also directly empowers Merchants to lower costs on transactions even if fees remain the same. That the Plaintiffs are seeking injunctive relief unrelated to the setting of rates likewise militates

---

[68] Ex. 2 (Stiglitz Rpt. ¶ 14).

against application of the filed rate doctrine. *Hoover v. HSBC Mortg. Corp. (USA)*, 9 F. Supp. 3d 223, 238 (N.D.N.Y. 2014).

### 3. The Defendants Have Repeatedly Sought to Undermine the Durbin Amendment

On July 21, 2010, the Durbin Amendment was passed as part of the Dodd-Frank financial reform legislation. The Durbin Amendment limits Interchange Fees that a non-exempt issuing bank[69] may charge with respect to debit processing, and also requires that banks issue debit cards with at least two competing network marks, which allows Merchants to route transactions along the network offering the lowest price.[70] Defendants, however, arranged for issuing banks to issue debit cards compatible with multiple unaffiliated PIN networks, but which still routed all signature transactions through the Visa or Mastercard signature network. In April 2012, Visa added a new fee called the Fixed Acquirer Network Fee ("FANF") that was not subject to the Durbin Amendment.[71] This flat fee had the effect of undermining the procompetitive reforms of the Durbin Amendment: even though Merchants were newly empowered to route debit transactions over competing interlink networks,[72] the flat FANF undermined the cost savings that Merchants would have experienced due to this reform, by migrating revenue from newly competitive, per-transaction fees to flat fees that Merchants had to pay for accepting Visa cards at all.[73] The Network Defendants also used their market power to force Merchants to route debit transactions over the Visa and Mastercard signature debit networks, thereby providing a mechanism to recoup fees on

---

[69] Ex. 1 (Carlton Rpt. ¶ 28) (defining as Issuers with more than $10 billion in assets).

[70] Ex. 3 (Leffler Report ¶ 13).

[71] Ex. 24 ███████████████████████████████████████████████.

[72] Ex. 1 (Carlton Rpt. ¶¶ 2, 6, 32).

[73] ████████████████████████████████████████████████████
██████████████████████████████████████████

debit transactions lost as a result of the Durbin Amendment.[74] Imposition of the FANF represents a significant, unilateral price increase by Visa without any commensurate benefit to Merchants. Through the FANF, Visa unlawfully abused its monopoly power via anticompetitive conduct that had the purpose and effect of excluding competition. Furthermore, while Mastercard had an opportunity to distinguish itself from Visa with Merchants and seek greater market share, it instead immediately followed Visa and instituted its own parallel fee.

The FANF, then, demonstrates both that Visa has market power in the debit card market, and that the Durbin reforms by themselves do not prevent anticompetitive conduct in that market. A finding of liability and appropriate injunctive relief are entirely proper with respect to the Defendants' Restraints on debit cards.

F.     THE IMPORTANCE OF THE RULE 23(B)(2) CLASS IN THIS CASE

On December 13, 2019, this Court granted final approval to the Rule 23(b)(3) damages Class settlement filed on September 18, 2018, and certified a Rule 23(b)(3) Settlement Class defined as: "All persons, businesses, and other entities that have accepted any Visa-Branded Cards and/or Mastercard-Branded Cards in the United States at any time from January 1, 2004 to January 25, 2019," with certain exceptions.[75] The Equitable Relief Plaintiffs now request certification of a similar class pursuant to Rule 23(b)(2) to secure additional and final equitable relief in this litigation.

If the Court does not certify an equitable relief class, Defendants will have paid off the damages class to end protracted and costly litigation, but most of the members of that class will continue to suffer the same harm from Defendants' continued course of action. The Equitable

---

[74] Ex. 1 (Carlton Rpt. ¶ 29).

[75] The Settlement is currently on appeal.

Relief Plaintiffs' claims are not only ideally suited for class certification pursuant to Rule 23(b)(2), but the certification of an Equitable Relief Class is necessary to ensure proper resolution of this MDL proceeding for all Merchants.

## III. CLASS CERTIFICATION IS APPROPRIATE IN THIS CASE

Certification of an equitable relief class is proper where defendants' anticompetitive conduct "'appl[ies] generally to the class,'" and the final relief sought is "'appropriate respecting the class as a whole.'" *Dukes,* 564 U.S. at 360 (*citing* Fed. R. Civ. P. 23(b)(2)). The Equitable Relief Plaintiffs' claims here satisfy both factors. First, Plaintiffs seek redress from Defendants' supracompetitive Total Prices and Restraints that generally act to harm the Merchant class. These Restraints directly interfere with competition, result in supracompetitive Total Prices, and limit entry and competition between payment card networks and among the Defendant Banks.[76] Second, equitable relief is appropriate as to the class as a whole, as the indivisible remedies are necessary to protect the entire Merchant class from future harm. *Id.* at 2545. Network Defendants have protected their price-fixing activities by adopting virtually identical policies that discourage competition at the point of sale.[77] By implementing and enforcing the Restraints discussed *infra,* sections III(C)(1-3), Visa and Mastercard have effectively insulated themselves from any competitive threat.

Defendants' entrenched market power in the market for credit card and debit card transactions means that Plaintiffs have no viable alternative to continuing to do business with Defendants.[78] Instances in which parties "have an ongoing relationship [] are the 'prime examples of what (b)(2) is meant to capture.'" *Berni v. Barilla SpA*, 964 F.3d 141, 147 n.29 (2d Cir. 2020)

---

[76] Ex. 3 (Leffler Rpt. ¶ 4).

[77] *Id.* at ¶¶ 72-73.

[78] *Id. at* ¶ 40.

(*citing Dukes*, 564 U.S. at 361). Where, as here, there is an established course of conduct and a continuing relationship, "past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury." *O'Shea v. Littleton,* 414 U.S. 488, 496 (1974). Thus, there exists a "real or immediate threat" that Defendants' conduct will repeat past harms and continue to cause injury. *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016) (past harms confer standing for injunctive relief when the plaintiff will "likely be harmed again in the future in a similar way") (*citing DeShawn E.*, 156 F.3d at 344-45). Absent redress from this Court, plaintiffs will continue to suffer harm by being forced to pay supracompetitive prices for credit card and debit card transactions. *Ohio v. Am. Exp. Co.*, 138 S. Ct. 2274, 2284 (2018) (increased price is a harm to competition) (internal citations omitted).

Class certification is appropriate here because Plaintiffs satisfy all the requirements of Rule 23(a) and Rule 23(b)(2). The prerequisites of Rule 23(a) are numerosity, commonality, typicality, and adequacy. Fed R. Civ. P. 23(a)(1)-(4). Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds that apply **generally** to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." (emphasis added).

The only issue before the Court at this stage is whether Rule 23 is satisfied, not whether plaintiffs will prevail on the merits. *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). As a result, the Court should assess the merits only to the extent necessary to apply Rule 23. "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* "Rule 23 is given liberal rather than restrictive construction, and courts are to adopt

a standard of flexibility[.]" *Elkind v. Revlon Consumer Prods. Corp.*, 2017 U.S. Dist. LEXIS 24512, at *17 (E.D.N.Y. Feb. 17, 2017) (quoting *Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997)). Cases involving uniform rules are "well suited for treatment as a class action." *Mazzei v. Money Store*, 288 F.R.D. 45, 67 (S.D.N.Y. 2012).

Other courts have certified nearly identical classes of Merchants that alleged antitrust claims against Visa and MasterCard with respect to their rules (*see In re Visa Check/MasterMoney Antitrust Litig.*, 192 F.R.D. 68 (E.D.N.Y. 2000), *aff'd*, 280 F.3d 124 (2d Cir. 2001), and against the networks and several of their largest member banks for similarly joint conduct. *In re Currency Conversion Fee Antitrust Litig.*, 224 F.R.D. 555 (S.D.N.Y. 2004). Plaintiffs' claims here are likewise well-suited for class certification.

## A.   PLAINTIFFS SATISFY THE PREREQUISITES OF RULE 23(a)

### 1.   The Proposed Class is Sufficiently Numerous

The numerosity requirement is met here because the Class "is so numerous that joinder of all members is impracticable." *See* Fed. R. Civ. P. 23(a)(1). The numerosity requirement generally is satisfied when a proposed class includes over 40 members. *See Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). Here, the proposed class is comprised of millions of Merchants throughout the United States who accept Defendants' Payment Cards. *See B & R Supermarket, Inc. v. Mastercard Int'l, Inc.*, No. 17-2738, 2018 U.S. Dist. LEXIS 42547, at *36 (E.D.N.Y. Mar. 14, 2018).

### 2.   Numerous Legal and Factual Issues Are Common to All Class Members

Commonality exists where "there is a common issue that 'drive[s] the resolution of the litigation' such that 'determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d

70, 84 (2d Cir. 2015) (quoting *Dukes*, 564 U.S. at 350); *see also Elkind v. Revlon Consumer Prods. Corp.*, No. 14-2484, 2017 U.S. Dist. LEXIS 24512, at *22 (E.D.N.Y. Feb. 17, 2017) ("Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question.") (*citing Johnson v. Nextel Comm's Inc.,* 780 F.3d 128, 137-38 (2d Cir. 2015)). A single significant issue of law or fact common to the Class suffices for commonality. *See Dukes*, 564 U.S. at 359 ("[F]or purposes of Rule 23(a)(2) even a single common question will do.") (quotation and alterations omitted).

In general, antitrust cases satisfy the commonality requirement, particularly where, as here, Plaintiffs allege a conspiracy that affects the entire class. *See, e.g., In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 52 (E.D.N.Y. 2019) ("'Numerous courts have held that allegations concerning the existence, scope, and efficacy of an alleged antitrust conspiracy present important common questions sufficient to satisfy the commonality requirement of Rule 23(a)(2).'") (citations omitted). Plaintiffs' claims raise multiple common issues, including but not limited to:

1. Whether (a) Visa and its Member Banks, and (b) MasterCard and its Member Banks conspired to impose the Restraints on Class Members;

2. Whether Visa, MasterCard and their Member Banks conspired to possess or exercise market power or monopoly power;

3. Whether the Restraints imposed by Defendants facilitated their respective price-fixing arrangements, by raising Interchange fees and Total Prices or otherwise;

4. Whether the conspiracies of the Visa and MasterCard networks continued after the networks' reorganizations and IPOs;

5. Whether the per se rule or the rule of reason should be applied to analyze the conspiracies of Visa, MasterCard, and their respective Member Banks;

6. Whether Visa, separately or together with its Member Banks, exercises market power or monopoly power that was willfully acquired and/or maintained;

7.      Whether MasterCard, separately or together with its Member Banks, exercises market power or monopoly power that was willfully acquired and/or maintained.

8.      Whether all or virtually all class members are injured and threatened with further injury by overcharges for Visa and MasterCard transactions as a result of the Restraints; and

9.      The appropriate relief to be granted to the Class to remedy the conduct alleged.

These types of questions—which necessarily focus on Defendants' conduct—satisfy the commonality requirement. *See, e.g., Sykes*, 780 F.3d at 84; *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 99 (E.D.N.Y. 2012) (commonality exists where the "most significant question posed . . . will generate common answers among all class members: did the defendants' price-fixing agreement cause an artificial increase in the market price of vitamin C? Because the answer to this question could not logically vary between class members, the answer will be applicable to all members of this proposed class").

### 3.      Named Plaintiffs' Claims are Typical of Class Members' Claims

The typicality requirement "is satisfied when each class member's claim arises from the same course of events[] and each class member makes similar legal arguments to prove the defendant's liability." *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 252 (2d Cir. 2011) (*quoting Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993)); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009). "Typicality refers to the nature of the claims of the representative, not the individual characteristics of the plaintiff." *Ross v. Am. Express Co. (In re Currency Conversion Fee Antitrust Litig.)*, 264 F.R.D. 100, 111 (S.D.N.Y. 2010). This requirement is "not demanding," *Ackerman v. Coca-Cola Co.*, 2013 U.S. Dist. LEXIS 184232, at *42 (E.D.N.Y. July 17, 2013), and "'tend[s] to merge'" with the commonality requirement. *Sykes*, 780 F.3d at 84 n.2.

"'[T]ypicality in the antitrust context will be established by plaintiffs and all class members alleging the same antitrust violations by the defendants.'" *In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 241 (E.D.N.Y. 1998) (citation omitted); *see also Ross*, 264 F.R.D. at 111 (collecting cases). Class certification in an antitrust case is generally warranted where plaintiffs allege "that they were harmed by the same course of events—Defendants' . . . restraints of trade." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 53 (E.D.N.Y. 2019) (citing *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2014 WL 7882100, at *31 (E.D.N.Y. Oct. 15, 2014) ("Here, the plaintiffs allege that the defendants engaged in a global conspiracy to fix prices, so it is nearly tautological that the class representatives will rely on the same factual and legal arguments to establish the defendants' liability.")).

Here, Plaintiffs' claims are typical of the claims of other Class Members because they stem from the same course of conduct (Defendants' conspiracy to impose the Restraints on all Merchants); they are based on the same legal theory (Defendants' violations of the Sherman, Clayton, and Cartwright Acts); and they will be proven by the same evidence (documents and testimony reflecting Defendants' agreement and its anticompetitive impact on the Class).[79] The proposed Class representatives will seek to prove that Defendants' conduct resulted in all Class members being injured or threatened with injury in violation of the antitrust laws and will seek equitable relief for that conduct. Plaintiffs' claims, therefore, are typical of the Class they seek to represent.

---

[79] Ex. 3 (Leffler Rpt. ¶¶ 25-34).

4.      **Plaintiffs and Proposed Interim Co-Lead Counsel Will Fairly and Adequately Represent the Class**

To establish adequacy, plaintiffs must have no interests antagonistic to the interests of other class members, and plaintiffs' counsel must be "qualified, experienced and able to conduct the litigation." *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007).

(a)      **Plaintiffs' Interests and Injuries Are the Same as Those of the Class**

"A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 170–71 (2d Cir. 2001) (internal citations and quotation marks omitted). Hypothetical conflicts are insufficient to defeat certification. Generally, "not every potential disagreement between a representative and the class members will stand in the way of a class suit." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d at124, 145 (2d Cir. 2001) (citation and quotation marks omitted). "A conflict or potential conflict alone will not . . . necessarily defeat class certification — the conflict must be 'fundamental.'" *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006) (citing *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d at 145).[80]

Plaintiffs have the same interests in prosecuting their claims as members of the proposed Class. All Plaintiffs, like all Merchants nationwide, are subject to the same Restraints. They are challenging the same underlying conduct, are asserting the same legal claims (Sherman Act, Clayton Act, Cartwright Act), and will seek to enjoin the same conduct.

---

[80] "To warrant denial of class certification, 'it must be shown that any asserted "conflict" is so palpable as to outweigh the substantial interest of every class member in proceeding with the litigation.'" *Allen v. Dairy Farmers of Am., Inc.*, 2011 U.S. Dist. LEXIS 48479, at *29-30 (D. Vt. May 4, 2011) (quoting *In re NASDAQ*, 169 F.R.D. at 514-15).

The prospect that Plaintiffs' preferences as to injunctive relief may differ from those of other class members' has no bearing at this stage. In *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124 (2d Cir. 2001), then-Judge Sotomayor rejected the premise that the existence of alternative theories for assessing plaintiffs' damages created irreconcilable conflicts within the class, observing that "[t]he conflict that will prevent a plaintiff from meeting the Rule 23(a)(4) [adequacy] prerequisite must be fundamental, and speculative conflict should be disregarded at the class certification stage." *Visa Check*, 280 F.3d at 145 (citations omitted). The Court further cited the "variety of devices available to resolve the problem" if and when it resulted in genuine conflict later in the case. *Id. See also supra*, at 3. Other courts have repeatedly held to similar effect. *See, e.g., In re J.P. Morgan Chase Cash Balance Litig.*, 242 F.R.D. 265, 275 (S.D.N.Y. 2007) (a "preference [by certain class members] for a different remedy does not preclude class certification"); *Californians for Disability Rights, Inc. v. California Dep't of Transp.*, 249 F.R.D. 334, 348 (N.D. Cal. 2008) ("A difference of opinion about the propriety of the specific relief sought in a class action among potential class members is not sufficient to defeat certification.").

The time at which a court must address conflicts as to remedies within a Rule 23(b)(2) class was explained by the court in *Richards v. FleetBoston Fin. Corp.*, 235 F.R.D. 165 (D. Conn. 2006):

> The question of remedies is not appropriate for resolution at this [class certification] stage in the litigation…. Moreover, as part of its continuing duty to assure adequacy of representation in a class action suit, the court may always decide to modify or decertify the class in the future. These possibilities help to assure that no subset of the class would be deprived of due process as this case goes forward, even though [Plaintiffs] asks the court to certify a class that would not permit members to opt out.

*Richards*, 235 F.R.D. at 172 (finding adequacy of representation) (citation omitted).

Finally, any equitable relief that Plaintiffs secure via either verdict or settlement will serve only as a baseline for all Merchants going forward. Every Merchant will remain free to seek to

negotiate additional relief specific to themselves and their own business needs. For example, Visa has at all relevant times granted "variances" to its rules for members and Merchants who sufficiently justified their requests to that end.[81] ████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████ More recently, Visa discussed with

████████████████ the possibility of "████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████[83] To the very limited extent that even marginal conflicts among Merchants might exist, the possibility of variances from the networks minimizes the import of those conflicts even further.

### (b)     Plaintiffs' Counsel are Qualified and Experienced

Plaintiffs are represented by counsel who are experienced in prosecuting antitrust cases and complex class actions to successful resolutions, including three attorneys who spent several years representing other plaintiffs in this proceeding prior to their appointment in this case. On November 30, 2016, after submissions setting forth the qualifications of each of several highly-qualified firms, the Court appointed Hilliard & Shadowen, LLP ("H&S"), Grant & Eisenhofer, P.A. ("G&E"), Freed Kanner London & Millen, LLC ("FKLM") and Nussbaum Law Group, P.C. ("NLG") as Plaintiffs' Interim Co-Lead Counsel for the proposed class ("Equitable Relief Class Counsel").[84] Plaintiffs now seek the appointment of these firms as Co-Lead Class Counsel. Counsel have vigorously pursued the litigation on behalf of the Class, engaged in extensive

---

[81] *See, e.g.,* Ex. 26, VDOJAMEX00367202, at 202.

[82] *Id.* at 7213, 7223.

[83] *See,* ██████████████████████████

[84] *See* ECF No. 6754.

investigation, fact discovery, motion practice, engagement with experts and complex settlement discussions. Counsel have devoted substantial time and money to prosecute this action on behalf of the proposed Class and will continue to do so.

### 5.     The Class is Readily Ascertainable

Rule 23(a) contains an implied requirement of ascertainability. *In re Petrobras Sec. Litig.*, 862 F.3d 250, 264 (2d Cir. 2017). That "requires only that a class be defined using objective criteria that establish a membership with definite boundaries." *Id.* "[A]scertainability presents only a 'modest threshold' that 'does not concern itself with the plaintiffs' ability to offer *proof of membership* under a given class definition.'" *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2019 U.S. Dist. LEXIS 217583, at *237 (E.D.N.Y. Dec. 16, 2019) (quoting *Petrobras*, 862 F.3d at 269) (emphasis in original). Plaintiffs meet that "modest threshold" for ascertainability because the proposed class is defined using the objective and readily verifiable criterion of whether Merchants have accepted Visa- and/or Mastercard-branded cards during a defined period of time.

### B.     PLAINTIFFS SATISFY THE REQUIREMENTS OF RULE 23(b)(2)

Plaintiffs' claims satisfy the straightforward requirements of Rule 23(b)(2): "the party opposing the class has acted or refused to act on grounds that apply generally to the class, or that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). A class may be certified under Rule 23(b)(2) "when a single injunction or declaratory judgment would provide relief to each member of the class." *Dukes*, 564 U.S. at 360. As the Second Circuit has explained, "the decision [in *Dukes*] simply emphasized that in a class action certified under Rule 23(b)(2), 'each individual class member' is not 'entitled to a *different* injunction.'" *Amara v. CIGNA Corp.*, 775 F.3d 510, 522 (2d Cir. 2014) (quoting *Dukes*,

32

564 U.S. at 360).[85] It is not required "that the relief to each member of the class be identical, only that it be beneficial." *Sykes v. Mel S. Harris and Assocs. LLC*, 780 F.3d at 70, 97 (2d Cir. 2015).

In his Class Certification Report, Dr. Leffler explains that Defendants' anticompetitive conduct affects all Plaintiffs and Class members, and that Defendants' conspiracy injured virtually all Merchants.[86] As Merchants have no viable business alternative to transacting with Defendants due to Defendants' market power,[87] the Class would thus generally benefit from equitable relief prohibiting Defendants' conduct.[88] The relief would protect all members of the class from the real, imminent threat of future harm, and cannot be divided or applied in differing forms among class members. *Barilla S.p.A.*, 964 F.3d at 146 (describing the analysis for whether a 23(b)(2) class should be certified as having a "prospective-orientation").

The Restraints apply to all Merchants and it is those market-wide Restraints that the Equitable Relief Plaintiffs challenge. For Instance, the 2011 Settlement with the DOJ bound Visa and Mastercard from restraining "any Merchant in the United States" offering discounts or expressing a preference for particular forms of payment. *U.S. v. American Express*, No. CV-10-4496, ECF 143 (Jul. 20, 2011), at § IV. A. It also required Visa and Mastercard to modify their rules in specific ways that applied to all Merchants. *Id.* at § V. B and C.

Similarly, in *In re Visa Check/Mastermoney Antitrust Litig.*, the district court, while ultimately certifying the class under (b)(3), noted that the class could be certified under Rule 23(b)(2) because it sought significant injunctive relief changing the Honor All Cards Rule to allow

---

[85] "When a class seeks an indivisible injunction benefiting all its members at once, there is no reason to undertake a case-specific inquiry into whether class issues predominate or whether class action is a superior method of adjudicating the dispute. Predominance and superiority are self-evident." *Dukes*, 564 U.S. at 362-363.

[86] Ex. 3 (Leffler Rpt. ¶¶ 25-41) (The Economic Analysis and Evidence of the Anticompetitive Effects of the Merchant Restraints Are Common To All Class Members).

[87] Ex. 3 (Leffler Rpt. ¶¶ 31, 45-63) (Defendants' Market Power and Supracompetitive Prices).

[88] Ex. 3 (Leffler Rpt. ¶ 26).

Merchants to decline acceptance of credit or debit, which the court described as "generally applicable to all members of the class."[89] *In re Visa Check/Mastermoney Antitrust Litig.*, 192 F.R.D. 68, 88 (E.D.N.Y. 2000), *aff'd* 280 F.3d 124 (2d Cir. 2001). While neither of these cases strictly certified a non-opt-out class, they both prescribed injunctive relief that changed Defendants' rules as to all Merchants. In these cases, certifying a non-opt-out class preserves classmember rights, because the prescribed relief applies to all Merchants similarly situated whether they are formally a member of the class or not. By remaining in the class, the Merchants retain the right to object. By opting out, the Merchants are not able to avoid the changes in the rules that impact them, and instead only lose the right to contest the ultimate outcome of the case. Similarly, the legislative relief in the United States from the Durbin Amendment (and in other jurisdictions, including Australia, New Zealand, the EU) required the Networks to modify their rules in ways that applied equally to all Merchants. With market-wide rules, eliminating or changing those rules is necessarily also market-wide.  Therefore, the class is ripe for certification under Rule 23(b)(2).

## 1. Defendants' Imposition and Enforcement of the Interchange Fee Applies to Each Member of the Class

The Equitable Relief Plaintiffs, and each member of the Class, are subject to supracompetitive, exorbitant, and collectively-fixed prices, largely via Interchange Fees, set by the Network Defendants.[90] Visa's rules provide that Interchange Fees "are determined by Visa and provided on Visa's published fee schedule," and that these fees "apply on every transaction, except where they have been 'customized where Member [Banks] have set their own financial terms'"

---

[89] While the later decision of *Wal Mart v. Dukes* would limit the ability of courts to certify "hybrid" class actions under Rule 23(b)(2) when plaintiffs seek money damages along with injunctive relief, this distinction is not applicable here, where Plaintiffs seek only injunctive relief.

[90] *See* Compl. ¶ 86, ECF No. 6910.

for the interchange fee or entered into a separate business agreement to promote card acceptance and usage.[91] Mastercard's rules provide that Mastercard "has the right to establish default interchange fees . . . it being understood that all such fees set by [Mastercard] apply only if there is no applicable bilateral interchange fee agreement between two [Member Banks]."[92] The overwhelming majority of Merchants pay Default Interchange Fees for every transaction.

As Dr. Leffler explains, in a competitive market, card-issuing banks would compete by offering favorable pricing to Merchants to increase transaction volume.[93]



By imposing the default Interchange Fee, therefore, Defendants have acted on grounds that apply generally to the class. Default Interchange

---

[91] *Id.* (quoting Visa Product and Service Rule 9.1.1.3)).

[92] *Id*. ¶ 87 (alterations in original) (quoting Mastercard Rule 8.3)).

[93] Ex. 3 (Leffler Rpt. ¶¶ 28).

[94] Ex. 9 (VUSAMDL1-06180107, at 110); Ex. 28 (MCI_MDL02_11423231 at MCI_MDL02_11423244); Ex. 29 (MCW_MDL_02739111 at MCW_MDL_02739113-114, ███████████████); Ex. 30 (VISA14MDL1-01748158).

[95] ███████████████████████████.

[96] Ex. 3 (Leffler Rpt. ¶ 29).

applies to every member of the class, and eliminating those default rates will provide relief to all members.[97]

### 2. Defendants' Imposition and Enforcement of the Honor-All-Cards Rule Applies to Each Member of the Class

All Merchants are subject to the Restraints, which operate to ensure that they pay the default interchange rate, with few exceptions. The Honor-All-Cards Rule mandates that any Merchant that accepts Visa or Mastercard credit or signature-debit cards must accept all credit or signature-debit cards bearing that brand,[98] regardless of the issuer, rewards, type of card (standard credit, premium credit, or commercial, for example), and importantly, regardless of the interchange rate associated with that card.[99] The consequence of the Honor All Cards Rule is that a Merchant may not refuse to accept a high-cost Visa or Mastercard Card in favor of a lower cost card.[100] The Honor-All-Cards Rule disincentivizes the Issuing Banks from negotiating Interchange Fees lower than the default interchange rate. Therefore, the default Interchange Fee becomes a fixed rate that applies to almost every transaction.[101]

The Network Defendants admit that the Honor-All-Cards Rule thwarts bilateral agreements. ███████████████████████████████████████████████████████████

---

[97] Ex. 3 (Leffler Rpt. ¶ 36).

[98] Merchants previously brought an antitrust class action against Visa and Mastercard alleging that defendants created a tying arrangement in violation of § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, by means of their "honor all cards" policy, which required stores that accept defendants' credit cards to accept their debit cards as well. As a result of the settlement reached in that matter, Visa and Mastercard removed the Honor All Cards requirement tying debit and credit. *See In Re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y.2003). Settlement Agreement, June 4, 2003.

https://www.sec.gov/Archives/edgar/data/1403161/000119312507140569/dex101.htm, pp. 7-8.

[99] In response to prior litigation, Visa updated its rule to permit merchants to accept only Visa debit cards or only Visa credit cards. However, a merchant that accepts Visa credit cards cannot accept, for example, only Visa Classic cards, or decline to accept Visa cards issued by a particular bank. Ex. 16 ████████████████████████
████████

[100] Ex. 3 (Leffler Rpt. ¶¶ 20, 28-29).

[101] *Id.* With the narrow exception of transactions by very large merchants who have sufficient volume that they can negotiate their own private Interchange Fees.



By imposing and enforcing the Honor-All-Cards Rule, therefore, Defendants have acted on grounds that apply generally to the class.[106] The Restraint applies to every Merchant that accepts Visa and Mastercard.[107] The Defendants' conduct is either anticompetitive to the class as a whole, or it is not. Corresponding relief to enjoin the Honor All Cards Rule is thus indivisible by nature and necessary for the class as a whole.[108] The class seeks certification to enjoin the Honor-All-Cards Rule.[109]

### 3.   Defendants' Imposition and Enforcement of the No-Surcharge Rule Applies to Each Member of the Class

Similarly, the networks' No-Surcharge Rules apply to every Merchant that accepts the card.[110] The Defendants, by implementing and enforcing the No-Surcharge Rule, insulate themselves from any competitive threat because when cardholders select which card to use in making a purchase, the No-Surcharge Rule guarantees that the consumer makes this selection without regard to the card's Total Price.[111] The No-Surcharge Rule thus obscures price signals and ensures that pricing remains opaque.[112] Merchants will continue to bear the costs of the transaction, robbed of the ability to steer the cardholder to a lower cost of payment. Expansion of the right to surcharge would alleviate these problems and impose substantial downward pressure on the Total Price.[113]

---

[106] Ex. 3 (Leffler Rpt. ¶ 19).

[107] *Id.*

[108] Ex. 3 (Leffler Rpt. ¶¶ 64-77).

[109] Ex. 2 (Stiglitz Rpt. ¶¶ 116-119); Ex. 3 (Leffler Rpt. ¶¶ 40-42).

[110] Ex. 3 (Leffler Rpt. ¶ 19).

[111] Ex. 3 (Leffler Rpt. ¶¶ 32-33).

[112] *Id.*

[113] *Id.*

Defendants recognize this. 

The effect of removing the No-Surcharge Rule would be profound.

---

114

115 Ex. 40 (MCI_MDL02_10638645-681, at 668).

116 *Id.*; *See also*, Ex. 41 (MCI_MDL02_10138647-8827, at ¶ 516

117 Ex. 22 (

118

119

This effect of surcharging on Merchant fees would come to fruition because, absent the Restraints, the market would actually reflect consumer choice.[120] This is not lost on Defendants, as they recognize that surcharging is an effective means of steering customers to use alternative means of payment, including discouraging purchasers from paying with high fee cards.[121] In a report submitted in a prior litigation, ███████████████████████████████████████ ████████████████████████████████████████████[122] In another proceeding, ████████████████████████████████████████████████████████████ ██████████████████████████████████████████[123] ██████

_____

[120] Ex. 3 (Leffler Rpt. ¶¶ 32-33).

[121] Visa:



Mastercard:

[122] Ex. 47 (Expert Report of Prof. R. Glenn Hubbard, Oct. 8, 2007, *Discover Financial Services, et al. v. Visa USA, Inc., et al.*, S.D.N.Y., 04-CV-7844 (B.J.S.), at 30).

[123]





[124]

. [126] Thus, the steering that would be made possible by eliminating the No-Surcharge Rule would put strong competitive pressure on future Interchange Fees—exactly the relief sought by the Equitable Relief Plaintiffs in this case. [127] This benefit would accrue to the Class as a whole. [128]

Pursuant to the prior class settlement in this litigation, Visa and Mastercard facially amended their rules to permit brand-level or product-level—but not issuer-level—surcharging of credit card transactions. [129] In practice, however, Merchants seeking to surcharge credit have been unable to avail themselves of this benefit, [130] and will continue to be foreclosed in the future.

---

[124] Ex. 48 (MCI_MDL03_00022242, at 247-248); *see also*, Ex. 49 (AmerExpMDL1720_0030683-708, at 695)

[125] Ex. 40 (MCI_MDL02_10638645-681, at 679).

[126]

[127] Ex. 3 (Leffler Rpt. ¶¶ 32-33).

[128] *Id.* at 26.

[129] Debit Card transactions cannot be surcharged unless the Interchange-Fee caps contained in the Durbin Amendment to the Dodd-Frank Act are repealed; Ex. 17 (Visa Rules, October 17, 2020, Section 1.5.5.2, Surcharges ("A Merchant must not add any amount over the advertised or normal price to a Transaction, unless applicable laws or regulations expressly require that a Merchant be permitted to impose a surcharge.")); Ex. 18 (Mastercard Rules, dated December 2020, Chapter 5, Acquiring, Section 5.11.2, Charges to Cardholders ("A Merchant must not directly or indirectly require any Cardholder to pay a surcharge or any part of any Merchant discount or any contemporaneous finance charge in connection with a Transaction.")).

[130] Ex. 2 (Stiglitz Rpt. ¶¶ 33-36).

Critically, now that the Second Circuit vacated the 2012 Settlement Agreement, the Network Defendants may re-impose the No-Surcharge Rule in its entirety at any time.[131]

### 4.   Market Definitions Can Be Evaluated On A Class-Wide Basis and Would Apply to All Members of the Class

In his report, Dr. Carlton concluded that direct evidence, consistent with the implications of economic theory, proves the harmful effect on competition of the Restraints and default interchange fee.[132] There is, therefore, no need to separately analyze market definition and market power. "The usual reason to analyze market definition and market power is to determine whether a firm has the ability to harm competition by engaging in the challenge conduct. But here the evidence shows that there is such a harmful effect."[133]

Nonetheless, Dr. Leffler opines that the definitions of the relevant markets for purposes of the Equitable Relief Plaintiffs' claims under Sections 1 and 2 of the Sherman Act and California Cartwright Act are subject to class-wide determination and would apply to all members of the Class.[134] Market definition cannot, by its very nature, be an individualized issue. *In re Visa Check/MasterMoney*, 192 F.R.D. at 87 (market definition is class-wide issue); *See also Dial Corp. v. News Corp.*, 314 F.R.D. 108, 114 (S.D.N.Y. 2015) (market definition "can be proven through



[131] [redacted] Ex. 52 [redacted] In addition, [redacted]

[132] Ex. 1 (Carlton Rpt. ¶ 125).

[133] *Id.*

[134] Ex. 3 (Leffler Rpt. ¶¶ 38-44).

class-wide, common evidence because … [the inquiry] focuses on [defendant's] conduct, not on the actions of putative class members"); *Stephenson v. Bell Atl. Corp.*, 177 F.R.D. 279, 287 (S.D.N.Y. 1997) (market definition is a class wide issue). "A distinct product market comprises products that are considered by consumers to be ''reasonab[ly] interchangeab[le] with what the defendant sells." *United States v. Visa U.S.A.*, Inc. 344 F.3d 229, 239 (2d Cir. 2003) (citation omitted).

As Dr. Leffler explains, in this case, the relevant markets can be determined on a class-wide basis using a methodology common to the class.[135] Dr. Carlton concludes that credit card network services and debit card network services are separate markets. To make this finding, Dr. Carlton uses two tests: (1) if Visa, Mastercard, American Express and Discovery attempted to merge their credit card operations, would that raise antitrust concerns; and (2) If Visa and Mastercard attempted to merge their debit card operations, would that raise antitrust concerns?[136] Dr. Carlton answers both questions in the affirmative; therefore, he concludes that credit card network services and debit card network services can both be considered a relevant market.[137] The relevant markets therefore are issues common to all class members, will be determined on a class-wide basis using a well-established methodology, and will apply to all members of the Class.

### 5.   Market Power Can Be Evaluated On a Class-Wide Basis And Would Apply to All Members of the Class

The determination of whether each of Visa and Mastercard have market power for purposes of Plaintiffs' claims is a question common to all class members and can be determined on a class-wide basis.[138] Market power is the ability to charge a price above that which would prevail under

---

[135] *Id.*

[136] Ex. 1 (Carlton Rpt. ¶ 133).

[137] *Id.*

[138] Ex. 3 (Leffler Rpt. ¶¶ 45-54).

43

competition. *NCAA v. Board of Regents*, 468 U.S. 85, 108 n.38 (1984). It may be established either directly through "evidence of specific conduct undertaken by the defendant that indicates [it] has the power to affect price or exclude competition" or indirectly through evidence establishing that defendant has a large share of the relevant market. *Visa U.S.A.*, 344 F.3d at 239.

According to Dr. Carlton, "a firm (or group of firms acting collectively) has market power "if it is profitably able to charge a price above that which would prevail under competition, which is usually taken to be marginal cost."[139] The Second Circuit in *United States v. Visa U.S.A.* used the same test and found that Visa and Mastercard each had market power because (1) Merchants could not refuse to accept Visa or Mastercard branded cards even when faced with significant price increases because of customers' preference to use particular cards and (2) no Merchant had discontinued accepting Visa or Mastercard branded cards despite significant increases in Interchange Fees. *Id.*, 344 F.3d at 240.

Here, based on his review of the record to date, including indirect measures such as market share and the difficulty of entry into a market, Dr. Carlton concludes that "Visa and Mastercard have market power in the provision of both credit and debit card network services." "[T]he available evidence shows that the (net) price for card network services, credit or debit, is above the competitive level, and thus that Visa and Mastercard each have market power in a market for card network services."[140]

The relevant evidence focuses on the Network Defendants, not individual Merchants. Evidence of Visa's and Mastercard's market power includes: (1) Visa has profitably increased the net price for transactions on numerous occasions, (2) Mastercard has profitably increased the net

---

[139] Ex. 1 (Carlton Rpt. ¶ 137).

[140] *Id.* at 138

price for transactions on numerous occasions; (3) a negligible number, if *any*, Merchants have stopped accepting Visa and/or Mastercard branded credit or debit cards; (4) Visa's net price for transactions varies significantly between categories of Merchant, but not within each category, despite no difference in the marginal cost of processing the transactions; (5) Mastercard's net price for transactions varies significantly between categories of Merchant, but not within each category despite no difference in the marginal cost of processing the transactions; (6) Visa and Mastercard have substantial shares of transactions and payment volume in both the credit and debit card market; (7) Visa and Mastercard are each highly profitable and have enjoyed recent increases in profitability; (8) each time the Interchange Fee is increased for a specific Merchant category every Merchant assigned to that category pays the increased Interchange Fee; (9) the differences in the net price for transactions between categories of Merchants are based on the Merchants' elasticity of demand, and not on costs; and (10) high barriers to entry.[141]

### 6.    The Plaintiffs Seek Classwide Relief

The equitable relief that Plaintiffs seek will be effective market-wide.[142] The fact that class members may differ in their willingness and/or ability to take full advantage of such relief does not negate the value of that relief. *See, e.g., Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 186 (3d Cir. 2012) ("[E]ach class member naturally derives different amounts of utility from any class-wide settlement."); *Gooch v. Life Inv'rs Ins. Co. of Am.*, 672 F.3d 402, 429 (6th Cir. 2012) ("[D]ifferently weighted interests are not detrimental" to class certification "[b]ecause few people are ever identically situated.").

---

[141] *Id.*

[142] Ex. 2 (Stiglitz Rpt. ¶¶ 120-125).

Notably, all prior reforms to the Defendants' Restraints have applied market-wide, without variation based on the identity of the Merchant or any other individual basis. The relief in the DOJ consent decree applied without variation by Merchant or otherwise.[143] So did the relief provided by the Durbin Amendment, by the first class settlement in this litigation, and by the reforms mandated in other jurisdictions, such as Australia, New Zealand, and the European Union.[144] Although expert reports on the precise relief requested here will await a liability verdict, it is clear that Plaintiffs will seek elimination of or reform to the Restraints, as well as additional ameliorative relief all of which is likewise classwide without variation by Merchant or otherwise.[145]

## C.   MANDATORY NON-OPT OUT CLASSES ARE THE DEFAULT IN 23(B)(2) CLASSES

The Supreme Court reaffirmed the default rule in *Dukes* that Rule 23(b)(2) classes are mandatory classes. The Court held:

> Classes certified under (b)(1) and (b)(2) share the most traditional justifications for class treatment--that individual adjudications would be impossible or unworkable, as in a (b)(1) class, or that the relief sought must perforce affect the entire class at once, as in a (b)(2) class. For that reason *these are also mandatory classes*: The Rule provides no opportunity for (b)(1) or (b)(2) class members to opt out, and does not even oblige the District Court to afford them notice of the action.

*Dukes*, 564 U.S. at 361-62 (emphasis added); *see also Van Gemert v. Boeing Co.*, 590 F. 2d 433, 439 n.14 (2d Cir. 1978) (en banc) (lack of opt out privilege "reflects the conclusion of those who drafted the Rules that individual choices should be subordinated to the interests of the class as a whole to avoid inconsistent judgments or prejudice to absent class members"), *aff'd*, 444 U.S. 472 (1980); 2 Newberg on Class Actions § 4:26 (5th ed. 2020) ("Given the innate cohesion of a class suit, 'voice' replaces 'exit' as the operable means of class member involvement").

---

[143] Ex. 3 (Leffler Rpt. ¶ 73).

[144] Ex. 3 (Leffler Rpt. ¶ 73).

[145] Ex. 2 (Stiglitz Rpt. ¶¶ 130-139).

Judge Gleeson properly applied *Dukes* earlier in this MDL proceeding when he rejected arguments to the effect that a Rule 23(b)(2) class should include opt-out rights:

> If merchants could opt out of the (b)(2) class, they would reap the benefits of that relief anyway, as the injunctive relief is generally applicable to all merchants. To allow them to opt out and pursue their own rules-based injunctive relief would eliminate the incentive to settle that Rule 23(b)(2) was designed in part to create. The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted – the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.' *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2557 (2011) (quoting Richard Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L.REV. 97, at 132 (2009)). That is precisely the case with respect to the claims in this case that seek injunctive relief from the bundle of network rules that result in – according to the plaintiffs' allegations – supracompetitive interchange fees in violation of the antitrust laws. Accordingly, the aspect of the settlement that resolves those claims by neutralizing that bundle of rules is the proper subject of a (b)(2) class from which no opt-outs are permitted.

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 986 F. Supp. 2d 207, 236 (E.D.N.Y. 2013), *rev'd on other grounds*, 827 F.3d 223 (2d Cir. 2016).[146]

Second Circuit courts deviate from the Supreme Court's proscription against opt-outs under Rule 23(b)(2) only when the class seeks "injunctive relief *and* significant monetary damages." *Madden v. Midland Funding, LLC*, 237 F.Supp.3d 130, 159 (S.D.N.Y. 2017) (emphasis added). In those cases, the court may, at its discretion, certify classes under both 23(b)(2) and 23(b)(3) or may certify one 23(b)(2) class allowing opt-outs for those class members to pursue damages. *Id.* (*citing Casale v. Kelly*, 257 F.R.D. 396, 408 (S.D.N.Y. 2009)); *Mel Harris*, 285 F.3d at 288-89 (same). That rule has no bearing here. Thus, out-of-circuit precedent that contemplates damages as part of a 23(b)(2) class is inapposite. *See, e.g., Carrizosa v. Stassinos*, 669 F.Supp.2d 1081, 1084 (N.D. Cal. 2009) (granting amended motion to certify a 23(b)(2) class allowing opt outs when plaintiffs sought declaratory relief and damages); *Palmer v. Stassinos*, Nos. C-04-03026

---

[146] The Second Circuit explicitly chose not to address the issue when it otherwise reversed Judge Gleeson's ruling. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d at 234.

RMW; C-05-02280 RMW 2009 U.S. Dist. LEXIS 4265, at *32 (N.D. Cal. Jan. 9, 2009) (explaining that plaintiffs in *Carrizosa* seek monetary damages in addition to injunction); *see also In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Products Litig.*, MDL No. 1203 1999 U.S. Dist. LEXIS 13228, at *12, *26 (E.D. Pa. Aug. 26, 1999) (excluding from the class those "who have not filed a claim for personal injuries" as to not disturb the "non-opt out nature of a Rule 23(b)(2) class. . . ").[147]

In his report on class certification, Dr. Leffler agrees and explains in detail the rationale for prohibiting opt-outs from this proposed Class.[148] In essence, disallowing opt-outs prevents free-riding by individual Merchants, thereby ensuring fairness and increasing the value of the injunctive-relief claim to *all* Merchants.[149]

As Dr. Leffler explains, if Merchants were permitted to opt out of the class, an individual Merchant would have an incentive to do so as part of a free-riding strategy.[150] However the class claim is resolved—by settlement or verdict—the opting-out Merchant could *threaten* to seek to obtain additional/different equitable relief from the Defendants.[151] That additional relief, *if actually effectuated*, would inure to the benefit of all Merchants and would be very costly to the Defendants.

---

[147] In other out-of-circuit cases in which the court allowed opt-outs in a 23(b)(2) action, the excluded parties were first to file, and thus, they preceded the class action. In *Harris v. Rainey*, the Western District of Virginia (with no objection by class plaintiffs) certified a 23(b)(2) class excluding four individuals challenging the constitutionality of Virginia's refusal to allow same sex marriages ("The Bostic Plaintiffs").[147] 299 F.R.D. 486 (W.D. Va. 2014). The Fourth Circuit follows a "first to file" rule. "When multiple suits are filed in different federal courts upon the same factual issues, the first or prior action is permitted to proceed to the exclusion of another subsequently filed." Bostic Pltfs.' Mot. to Request Amended Class Def. at 4 (*citing Elderberry of Weber City, LLC v. Living Centers-Southeast, Inc.*, 2013 WL 1164835 at *4 (W.D. Va. Mar. 20, 2013); *Volvo Const. Equip. North America, Inc. v. CLM Equip. Co., Inc.*, 386 F.3d 581, 594-95 (4th Cir. 2004) ("[T]he first suit should have priority, absent the showing of balance of convenience in favor of the second action.")(internal citations omitted)). Notably, the Commonwealth was not objecting to proceeding on the Bostic action. *Id.*

[148] Ex. 3 (Leffler Rpt. ¶¶ 64-80).

[149] *Id.*

[150] *Id.*

[151] *Id.*

So the individual Merchant's financial incentive would be to monetize the value of that claim *solely for itself* in a settlement (*e.g.*, "If you don't pay me an additional $50 million, I will continue to litigate for injunctive relief that will be effective nationwide").[152] The defendants would face significant financial pressure to accede to these hold-ups.[153] And knowing that these costly hold-ups will occur if opting-out is allowed, the Defendants will be willing to "pay" substantially less to the class in the form of effective injunctive relief.[154]

In short, allowing opt-outs would permit individual Merchants to monetize for themselves an asset—the claim for injunctive relief—that is valuable precisely because it would benefit all Merchants.[155] Allowing opt-outs would permit an individual Merchant to gain financially based on the benefit that a legal claim would provide to other Merchants. Moreover, that individual monetization of a collective asset significantly diminishes its overall value. The Court should not permit free-riding that would undermine the ability of the Equitable Relief Plaintiffs' duty to maximize the claim's value on behalf of *all* Merchants who have the claim.

The Court approval process short-circuits any counterargument that the relief to which the Equitable Relief Plaintiffs might agree would be somehow insufficient. Indeed, this is the purpose of the Rule 23 Court approval protection. As the Second Circuit held in *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1078 (2d Cir. 1995), "[t]he ultimate responsibility to ensure that the interests of class members are not subordinated to the interests of either the class representatives or class counsel rests with the district court." In *Charron v. Wiener*, 731 F.3d 241 (2d Cir. 2013), the court cited *Maywalt* to that end in affirming the approval of a settlement on

---

[152] Ex. 3 (Leffler Rpt. ¶¶ 64-77).

[153] *Id.*

[154] *Id.*

[155] *Id.*

behalf of a Rule 23(b)(2) class over objections to the lack of formal discovery in the case, citing the district court's extensive efforts to develop the record by other means before approving the settlement. *Id.* at 248.

Disallowing opt-outs would not prevent any individual Merchant from negotiating with the Defendants for better card-acceptance terms or rates. Disallowing opting out merely prevents a Merchant from using the threat of generally-applicable injunctive relief as a bargaining chip in those negotiations. The Merchant's bargaining leverage will be strictly its own, rather than that which would result from its free-riding on a claim that all Merchants have.

## IV.    CONCLUSION

Certification of an Equitable Relief Class is appropriate because Defendants' collusive conduct is market-wide and generally applicable to the class. An injunction that forces Defendants to cease all anticompetitive conduct as outlined in the Equitable Relief Plaintiffs' Complaint will ultimately result in lower fees to all Merchants in the future, a benefit to the *entire* Equitable Relief Class.

For the foregoing reasons, the Equitable Relief Plaintiffs respectfully request that the Court certify a Rule 23(b)(2) class on behalf of: All persons, businesses, and other entities (referred to herein as "Merchants") that accept Visa and/or Mastercard Credit and/or Debit cards in the United States at any time during the period between December 18, 2020 and 8 years after the date of entry of Final Judgment in this case.

Dated: December 18, 2020                    By:     */s/ Robert G. Eisler*
                                                    Robert G. Eisler
                                                    Deborah A. Elman
                                                    Chad B. Holtzman
                                                    **Grant & Eisenhofer P.A.**
                                                    485 Lexington Ave., 29th Floor
                                                    New York, NY 10017
                                                    Phone:  646-722-8500

reisler@gelaw.com
delman@gelaw.com

Linda P. Nussbaum
Bart D. Cohen
Marc E. Foto
**Nussbaum Law Group, P.C.**
1211 Avenue of the Americas, 40th Floor
New York, NY 10036
Phone: 917-438-9102
lnussbaum@nussbaumpc.com
bcohen@nussbaumpc.com
mfoto@nussbaumpc.com

Steve D. Shadowen
Richard M. Brunell
Frazar W. Thomas
**Hilliard & Shadowen LLP**
2407 S Congress Ste E 122
Austin, TX 78704
Phone: 855-344-3298
steve@hilliardshadowenlaw.com
rbrunell@hilliardshadowenlaw.com
fraz@hilliardshadowenlaw.com

Michael J. Freed
Robert J. Wozniak
Brian M. Hogan
**Freed Kanner London & Millen LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Phone: 224-632-4500
mfreed@fklmlaw.com
rwozniak@fklmlaw.com
bhogan@fklmlaw.com

*Interim Co-Lead Counsel for the
Equitable Relief Class*