UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------

DDMB, INC. d/b/a EMPORIUM ARCADE BAR;
DDMB 2, LLC d/b/a EMPORIUM LOGAN
SQUARE; BOSS DENTAL CARE;
RUNCENTRAL, LLC; CMP CONSULTING
SERV., INC.; GENERIC DEPOT 3, INC. d/b/a
PRESCRIPTION DEPOT; and PUREONE, LLC
d/b/a SALON PURE,

                Plaintiffs,

             v.

VISA, INC.; MASTERCARD
INCORPORATED; MASTERCARD
INTERNATIONAL INCORPORATED; BANK
OF AMERICA, N.A.; BA MERCHANT
SERVICES LLC (f/k/a DEFENDANT
NATIONAL PROCESSING, INC.); BANK OF
AMERICA CORPORATION; BARCLAYS
BANK PLC; BARCLAYS BANK DELAWARE;
BARCLAYS FINANCIAL CORP.; CAPITAL
ONE BANK, (USA), N.A.; CAPITAL ONE
F.S.B.; CAPITAL ONE FINANCIAL
CORPORATION; CHASE BANK USA, N.A.;
CHASE MANHATTAN BANK USA, N.A.;
CHASE PAYMENTECH SOLUTIONS, LLC;
JPMORGAN CHASE BANK, N.A.; JPMORGAN
CHASE & CO.; CITIBANK (SOUTH
DAKOTA), N.A.; CITIBANK N.A.;
CITIGROUP, INC.; CITICORP; and WELLS
FARGO & COMPANY,

                Defendants.

**MEMORANDUM & ORDER**
05-MD-1720 (MKB)

-----------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

I.     Background ........................................................................................................... 5

   a.   Prior settlement approval and class certification ................................................ 5

   b.   The Second Circuit's reversal ........................................................................... 7

c.   Relevant subsequent proceedings ......................................................... 9

d.   Class Plaintiffs' allegations.................................................................. 10

e.   Rule 23(b)(2) Plaintiffs' motion for class certification.......................... 12

f.   Opposition to Plaintiffs' motion for class certification.......................... 13

  i.   Direct Action Plaintiffs' opposition.......................................... 13

  ii.   Grubhub Plaintiffs' opposition.................................................. 14

  iii.   Intervenors' opposition.............................................................. 14

  iv.   Defendants' position ................................................................. 15

II.   Discussion ..................................................................................................... 16

a.   Standard of review............................................................................... 16

b.   Sequence of deciding the pending motions .......................................... 17

c.   Rule 23(a) requirements....................................................................... 25

  i.   Numerosity................................................................................ 25

  ii.   Commonality.............................................................................. 26

  iii.   Typicality................................................................................... 35

  iv.   Adequate representation............................................................ 38

    1.   Adequacy of class representatives ................................. 42

      A.   The named Rule 23(b)(2) Class Plaintiffs suffer the same injury as the putative class members and have an interest in vigorous pursuit of the claims ........................ 44

      B.   The type of relief sought by Plaintiffs is not antagonistic to the putative class members ...................................................................... 46

      C.   The risk of claim and issue preclusion does not create a fundamental conflict between class representatives and putative class members ........................................... 57

      D.   Class representatives do not improperly confiscate Opponents' injunctive relief claims or jeopardize any individual damages claims.................................................... 73

      E.   The Court declines to reach the issue of whether future merchants are adequately represented by the class representatives ...................................................... 79

      F.   Class representatives DDMB and DDMB2 are conflicted due to their relationship with class counsel................................................................................ 84

    2.   Adequacy of counsel.......................................................... 88

  v.   Ascertainability.......................................................................... 91

d.   Rule 23(b)(2) requirements.................................................................. 99

  i.   The Court declines to impose a cohesiveness requirement ....................... 103

  ii.   The class meets the requirements of Rule 23(b)(2) .................................. 107

e.   The Court declines to grant opt-out rights ...................................................... 113

f.    Appointment of class counsel ........................................................................ 121

III.   Conclusion ...................................................................................................... 122

A putative Rule 23(b)(2) class of millions of merchants commenced this antitrust action under the Clayton Act, 15 U.S.C. § 16, to prevent and restrain violations of the Sherman Act, 15 U.S.C. §§ 1 and 2, and the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, seeking equitable relief against Defendants Visa, Inc. ("Visa") and Mastercard[1] networks (together, the "Network Defendants"), as well as various issuing and acquiring banks ("Bank Defendants").[2] *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 986 F. Supp. 2d 207, 213, 223 (E.D.N.Y. 2013) (*Interchange Fees I*), *rev'd and vacated*, 827 F.3d 223 (2d Cir. 2016) (*Interchange Fees II*); (Equitable Relief Class Action Compl ("Compl."), Docket Entry No. 6892.)  Plaintiffs seek to represent a class of merchants that accept Visa- and Mastercard-branded cards as forms of payment, and they allege that Defendants engage in anticompetitive conduct that harms competition and imposes supracompetitive and collectively fixed fees on the merchants.  (Compl. ¶ 4.)

Currently before the Court is the putative Rule 23(b)(2) equitable relief class plaintiffs' ("Plaintiffs" or "Rule 23(b)(2) Class Plaintiffs")[3] motion for class certification, seeking to certify

---

[1]  Defendants Mastercard Incorporated and Mastercard International Incorporated are collectively referred to as "Mastercard."

[2]  Defendants Bank of America, N.A.; BA Merchant Services LLC (f/k/a Defendant National Processing, Inc.); Bank of America Corporation; Barclays Bank plc; Barclays Bank Delaware; Barclays Financial Corp.; Capital One Bank, (USA), N.A.; Capital One F.S.B.; Capital One Financial Corporation; Chase Bank USA, N.A.; Chase Manhattan Bank USA, N.A.; ChasePaymentech Solutions, LLC; JP Morgan Chase Bank, N.A.; JPMorgan Chase & Co.; Citibank (South Dakota), N.A.; Citibank N.A.; Citigroup, Inc.; Citicorp; and Wells Fargo & Company are collectively referred to as the "Bank Defendants."

[3]  Documents and filings refer to the Rule 23(b)(2) action in a variety of ways.  In the multidistrict litigation ("MDL"), the Rule 23(b)(2) action has proceeded as *Barry's Cut Rate*

a class under Rule 23(a) and Rule 23(b)(2) of the Federal Rules of Civil Procedure. (*See* Pls.'

Mot. for Class Certification ("Pls.' Mot."), Docket Entry No. 8444; Pls.' Mem. in Supp. of Pls.'

Mot. ("Pls.' Mem."), Docket Entry No. 8447.) Direct Action Plaintiffs,[4] Grubhub Plaintiffs,[5]

and Intervenors the Merchant Trade Groups and Walmart, Inc.[6] oppose certification of a

mandatory class.[7] Defendants do not oppose class certification but argue that the class should be

---

*Stores Inc. v. Visa, Inc.*, No. 05-MD-1720. In addition, the action has sometimes been referred to as "*Barry's*" and the class referred to as the "equitable relief class" or the "injunctive relief class." Because the Rule 23(b)(2) Plaintiffs seek both declaratory and injunctive relief, and because Barry's Cut Rate Stores Inc. is no longer a party to this action, the Court uses the terms "Rule 23(b)(2)" and "equitable relief" to refer to the action, as opposed to "*Barry's*" and "injunctive relief" action.

[4] For purposes of this Memorandum and Order, "Direct Action Plaintiffs" collectively refers to the Target Plaintiffs, the 7-Eleven Plaintiffs, and Home Depot. The Target Plaintiffs and 7-Eleven Plaintiffs in turn are comprised of many other merchants, as described in their respective complaints. (*See* Target Pls.' Second Am. Compl., Docket Entry No. 7117); Sixth Am. Compl., *7-Eleven, Inc. v. Visa Inc.*, No. 13-CV-5746 (E.D.N.Y. Apr. 30, 2020), Docket Entry No. 180; (*see also* Decl. of Jeffrey I. Shinder in Supp. of Direct Action Pls.' Class Certification Opp'n ("Shinder Decl.") ¶ 3, Docket Entry No. 8451 (listing the Direct Action Plaintiffs)).

[5] "Grubhub Plaintiffs" refers to the seven companies described in the Grubhub Plaintiffs' operative Complaint. (*See* Grubhub Pls.' Am. Compl. ¶ 1, Docket Entry No. 7906.)

[6] On June 28, 2021, the Court granted Intervenors' motion for permissive intervention pursuant to Rule 24 of the Federal Rules of Civil Procedure for the limited purpose of opposing the Rule 23(b)(2) Class Plaintiffs' motion for class certification. (*See* Mem. and Order dated June 28, 2021, Docket Entry No. 8605.) "Merchant Trade Groups" refers to the National Retail Federation (the "NRF") and the Retail Industry Leaders Association (the "RILA"). (*See id*. at 2.)

[7] (*See* Direct Action Pls.' Mem. in Opp'n to Pls.' Mot. ("Direct Action Pls.' Opp'n"), Docket Entry No. 8450; Grubhub Pls.' Mem. in Opp'n to Pls.' Mot. ("Grubhub Pls.' Opp'n"), Docket Entry No. 8454; Walmart's Mem. in Opp'n to Pls.' Mot. ("Walmart's Opp'n"), Docket Entry No. 8465; Merchant Trade Groups Mem. in Opp'n to Pls.' Mot. ("Merchant Trade Groups' Opp'n"), Docket Entry No. 8468-1.) The CenturyLink Plaintiffs, as described in their respective complaint, (*see* CenturyLink Pls.' Second Am. Compl., Docket Entry No. 7874), join in the Direct Action Plaintiffs' opposition to Plaintiffs' motion, (*see* CenturyLink Pls.' Notice of Joinder, Docket Entry No. 8475).

certified without opt-out rights.  (*See* Defs.' Reply to Class Certification Opp'n ("Defs.' Reply"), Docket Entry No. 8460.)

For the reasons set forth below, the Court grants Plaintiffs' motion for class certification in part and denies it in part.

## I.   Background

The Court assumes familiarity with the facts and extensive procedural history as set forth in prior decisions.  *See Interchange Fees II*, 827 F.3d at 223; *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.* (*Interchange Fees IV)*, No. 05-MD-1720, 2019 WL 6875472 (E.D.N.Y. Dec. 16, 2019); *Barry's Cut Rate Stores Inc. v. Visa, Inc.*, No. 05-MD-1720, 2019 WL 7584728 (E.D.N.Y. Nov. 20, 2019); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.* (*Interchange Fees III*), 330 F.R.D. 11 (E.D.N.Y. 2019); *Interchange Fees I*, 986 F. Supp. 2d at 213; (*see also* Compl.).  The Court therefore provides only a summary of the relevant facts and procedural history.

### a.   Prior settlement approval and class certification

On November 27, 2012, Judge John Gleeson granted preliminary approval of a jointly submitted class settlement agreement (the "2013 Settlement Agreement").  *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2012 WL 12929536, at *1 (E.D.N.Y. Nov. 27, 2012).  Judge Gleeson also provisionally certified two separate classes for settlement purposes only: (1) a mandatory Rule 23(b)(2) settlement class seeking equitable relief, from which class members could not opt out, and (2) a Rule 23(b)(3) class seeking damages, from which class members could opt out.[8]  *See id.* at *1–2.  After issuance of notice to the class

---

[8]  Under Rule 23, members of a class certified under Rule 23(b)(3) are afforded "opt-out" rights, or the right to exclude themselves from the class.  Fed. R. Civ. P. 23(c)(2)(B)(v).

and an allotted period for putative class members to object to or opt out of the settlement, on

April 11, 2013, the parties moved for final approval of the settlement.  (Notice of Mot. and Mot.

for Class Pls.' Final Approval of Settlement, Docket Entry No. 2111.)

　　After holding a fairness hearing on September 12, 2013, Judge Gleeson granted final

approval of the 2013 Settlement Agreement on December 13, 2013.[9]  *See Interchange Fees I*,

986 F. Supp. 2d at 213, 240.  Under the terms of the 2013 Settlement Agreement, the Defendants

agreed to pay a cash award of $7.25 billion, before reductions for opt-outs and other expenses, to

the Rule 23(b)(3) class members, and to implement reforms of the Defendants' rules and

practices to settle the claims of the Rule 23(b)(2) class members.[10]  *Id.* at 213, 217.

---

[9]  To assist with his determination, Judge Gleeson appointed an economic and legal expert, Dr. Alan O. Sykes of New York University School of Law, to aid the court in weighing the settlement agreement and accompanying expert reports because "[t]he proponents of the settlement disagree[d] strongly with the objectors over the economic value of the proposed settlement to the class members, and specifically over the benefits of the proposed rules changes to the merchant class."  *See Interchange Fees I*, 986 F. Supp. 2d at 218.  Dr. Sykes filed his written analysis with the court on August 28, 2013.  (Report from Ct. Appointed Expert Professor Alan O. Sykes, Docket Entry No. 5965.)

[10]  The reforms included, among other things, "Visa and MasterCard rule modifications to permit merchants to surcharge on Visa- or MasterCard-branded credit card transactions at both the brand and product levels"; "[a]n obligation on the part of Visa and MasterCard to negotiate interchange fees in good faith with merchant buying groups"; "[a]uthorization for merchants that operate multiple businesses under different 'trade names' or 'banners' to accept Visa and/or MasterCard at fewer than all of its businesses"; and "[t]he locking-in of the reforms in the Durbin Amendment [of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010] and the [United States Department of Justice ("DOJ")] consent decree with Visa and MasterCard, even if those reforms are repealed or otherwise undone."  *Interchange Fees I*, 986 F. Supp. 2d at 217.  The Durbin Amendment "limited the interchange fee that issuing banks could charge for debit card purchases, and allowed merchants to discount debit card purchases relative to credit card purchases."  *Interchange Fees II*, 827 F.3d at 229.  In the DOJ consent decree, "after an investigation assisted by the information developed by the [P]laintiffs," and following lawsuits that the DOJ initiated against Visa, Mastercard, and American Express in 2010, *Interchange Fees I*, 986 F. Supp. 2d at 215, "Visa and MasterCard agreed to remove their rules prohibiting merchants from product-level discounting of credit and debit cards," *id.*; *see also Interchange Fees II*, 827 F.3d at 229 ("[P]ursuant to a consent decree with the Department

### b.   The Second Circuit's reversal

On June 30, 2016, the Second Circuit vacated the settlement and remanded for further proceedings.  *Interchange Fees II*, 827 F.3d at 240.  Objectors to the settlement and plaintiffs that chose to opt out of the class prior to final approval argued on appeal that the "class action was improperly certified and that the settlement was unreasonable and inadequate."  *Id.* at 227. The Second Circuit agreed that the class was improperly certified and held that the class certification requirement of adequate representation under Rule 23(a)(4) had not been satisfied.[11] *Id.*  The Court found that an inherent conflict of interest existed because a single set of counsel represented both the (b)(2) and (b)(3) class interests.  *See id.* at 233–35.

Because of the conflict, the Court concluded that "members of the (b)(2) class were inadequately represented."  *Id.* at 231.  Relying on Supreme Court precedent, the Second Circuit held that settlement classes that consist of holders of present claims, such as the (b)(3) class seeking monetary relief for *past* harm, and holders of future claims, such as the (b)(2) class seeking injunctive relief to reform current and *future* rules and policies of the Defendants, must be divided "into homogenous subclasses . . . with separate representation."  *Id.* at 234 (quoting *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999)).

The Second Circuit also found that the issues stemming from unitary representation were exacerbated by the inability of members of the (b)(2) class to opt out of the settlement or from

---

of Justice in 2011, Visa and Mastercard agreed to permit merchants to discount transactions to steer consumers away from credit cards use. None of these developments affected the honor-all-cards or no-surcharging rules, or the existence of a default interchange fee.").

[11]  In particular, the Second Circuit found that unitary representation of the classes violated Rule 23(a)(4) — the class certification requirement that representative parties adequately protect the interests of the class — and the Due Process Clause, which requires that named plaintiffs in a class action adequately protect the interests of absent class members. *Interchange Fees II*, 827 F.3d at 228, 231.

their release of claims against Defendants.  *See id.* at 231, 234; *id.* at 241 (Leval, J., concurring).

The Court expressed further concern that the injunctive relief secured for the (b)(2) class would

not apply uniformly to benefit all (b)(2) class members.  *See id.* at 238.  For example, the Court

noted that (b)(2) merchants that operated in certain states would be prohibited from surcharging

costs to customers at the point of sale, as permitted under the 2013 Settlement Agreement, while

merchants that operated in other states would not be prohibited from doing so.  *See id.* at 230–31

(noting that "[t]he incremental value and utility of [surcharging] relief is limited, however,

because many states, including New York, California, and Texas, prohibit surcharging as a

matter of state law"); *id.* at 238–39 ("A significant proportion of merchants in the (b)(2) class are

either legally or commercially unable to obtain incremental benefit from the primary relief . . .

and class counsel knew at the time the Settlement Agreement was entered into that this relief was

virtually worthless to vast numbers of class members.").[12]  Despite these significant concerns,

the Second Circuit did not abrogate Judge Gleeson's analysis in its entirety, and the majority of

its concerns were circumscribed to representation and relief afforded to the (b)(2) injunctive

class.

---

[12]  The Court notes that the landscape of state no-surcharging laws is changing.  For example, in 2017, the Supreme Court held that a New York state statute that prohibited merchants from imposing a surcharge on customers using credit cards regulated speech, and the court remanded the matter to the Second Circuit to determine whether such speech regulation violates the First Amendment.  *See Expressions Hair Design v. Schneiderman*, 581 U.S. ---, 137 S. Ct. 1144, 1146 (Mar. 29, 2017).  In addressing a similar California statute, in 2018, the Ninth Circuit held that the statute violated First Amendment commercial free speech rights.  *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1179 (9th Cir. 2018).  Also in 2018, a federal district court in Texas relied on *Expressions Hair Design* to hold that the state's anti-surcharge statute was unconstitutional as applied to the merchants in the case.  *See Rowell v. Paxton*, 336 F. Supp. 3d 724, 732 (W.D. Tex. 2018).

### c.   Relevant subsequent proceedings

After remand, on August 11, 2016, the Court held a case management conference to discuss, among other items, the Second Circuit's decision.[13]   (*See* Min. Entry dated Aug. 11, 2016, Docket Entry No. 6654.)  In order to address the Second Circuit's concerns regarding unitary representation of the classes, on November 30, 2016, pursuant to Rule 23(g)(3), the Court appointed two separate groups of interim co-lead counsel to represent (1) merchants seeking certification under Rule 23(b)(2) for equitable relief, and (2) merchants seeking certification under Rule 23(b)(3) for monetary damages.[14]   Interim Class Counsel Order 1; *see also In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2017 WL 4325812, at *4 (E.D.N.Y. Sept. 27, 2017) (discussing Interim Class Counsel Order).  The Court appointed the Nussbaum Law Group, P.C., Hilliard & Shadowen LLP, Freed Kanner London & Millen LLC, and Grant & Eisenhofer P.A. ("Class Counsel") to serve as interim Rule 23(b)(2) Class Counsel for the merchants seeking equitable relief, and appointed Robins Kaplan LLP, Berger & Montague P.C., and Robbins Geller Rudman & Dowd LLP (the "Robins Group") to serve as interim Rule 23(b)(3) class counsel for the merchants seeking damages relief — the same three firms that represented the entire consolidated class in the proceedings before Judge Gleeson.[15]   (*See* Interim Class Counsel Order 1.)

---

[13]   On December 14, 2014, the litigation was reassigned from Judge Gleeson to the undersigned.  (Judicial Panel on Multidistrict Litigation Order Reassigning Case, Docket Entry No. 6359.)

[14]   Magistrate Judge James Orenstein, who managed discovery and other matters in this litigation for many years, decided the Class Counsel motions.  (Mem. and Order dated Nov. 30, 2016 ("Interim Class Counsel Order") 1, Docket Entry No. 6754.)

[15]   In September of 2018, the (b)(3) class jointly filed for preliminary approval of a proposed settlement, and in January of 2019, the Court preliminarily approved the proposed

### d.   Class Plaintiffs' allegations

On March 31, 2017, Rule 23(b)(2) Class Counsel filed a complaint on behalf of the Rule 23(b)(2) representative class plaintiffs and a putative Rule 23(b)(2) class.  (Compl.)  The Rule 23(b)(2) Plaintiffs challenge "Defendants' collusive and anticompetitive practices . . . [that] harm[] competition and impose[] upon Plaintiffs and Class Members supracompetitive, exorbitant, and collectively-fixed prices" in violation of Sections 1 and 2 of the Sherman Act, and the California Cartwright Act.  (*Id.* ¶¶ 4–5.)  Plaintiffs bring their claims under Section 16 of the Clayton Act, seeking equitable relief "to prevent and restrain violations" of the Sherman Act and California Cartwright Act.  (*Id.* ¶ 6.)

The seven named Plaintiffs are merchants that accept payment by Visa- and Mastercard-branded cards.[16]  (*See id.* ¶¶ 10–18.)  The named Plaintiffs are comprised of two "combination bar and videogame arcade[s]" with their principal places of business in Chicago, Illinois; "a family dental practice that also engages in the retail selling of dental supplies" with its principal place of business in Corpus Christi, Texas; a "business internet service provider" with its principal place of business in Coral Gables, Florida; a "business information technology support provider" with its principal place of business in Miami, Florida; a pharmacy with its principal place of business in Tamarac, Florida; and a beauty salon with its principal place of business in Flowery Branch, Georgia.  (*Id.* ¶¶ 11–15, 17–18.)

---

settlement.  *See Interchange Fees III*, 330 F.R.D. 11, 11 (E.D.N.Y. 2019).  In June of 2019, the (b)(3) class plaintiffs filed a motion for final approval of the settlement, and in December of 2019, the Court granted the motion for final approval.  *See Interchange Fees IV*, 2019 WL 6875472, at *36.  The final approval order is currently on appeal to the Second Circuit.

[16]  Barry's Cut Rate Stores, Inc. and Town Kitchen, LLC d/b/a Town Kitchen & Bar were initially part of the original nine proposed class representatives, (*see* Compl.), but they dismissed their claims in March of 2018, (*see* Stipulation and Order of Dismissal, Docket Entry No. 7171).

Plaintiffs allege that Defendants (1) impose supracompetitive interchange fees on Visa and Mastercard transactions and (2) facilitate these anticompetitive practices by forcing merchants to abide by anti-steering and other restraints.[17]  (*See id.*)  Plaintiffs also allege that this anticompetitive behavior causes antitrust injury common to Plaintiffs and putative class members and will continue to cause harm unless enjoined.  (*See id*. ¶ 19.)  Plaintiffs contend that "[e]ven after litigation, legislation, and regulation forced needed reforms on the Defendants and technology threatened to disrupt Visa and MasterCard's dominant position in the marketplace, the Defendants used their market power to continue to restrain competition."  (*Id.* ¶ 1.)  In addition, although the rule changes resulting from the Durbin Amendment, the DOJ consent decree, and the 2013 Settlement Agreement "were steps in the right direction for [m]erchants," Plaintiffs continue to suffer antitrust injury due to current anti-steering restraints, "and as a result of the continuing effects of decades of enforcement of the [n]o-[s]urcharge [r]ule and the prior versions of the restraints."  (*Id.* ¶ 165.)

Plaintiffs seek declaratory and injunctive relief against all Defendants.  They request a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. § 2201(a), declaring that Defendants' conduct is unlawful as alleged in the Complaint, (*id.* ¶ 426), and further request that the Court enjoin and restrain the wrongful conduct alleged in the Complaint, pursuant to Section 16 of the Clayton Act, (*id.* ¶ 428).

---

[17]  The challenged network rules and restraints include the default interchange fees, no-surcharge rules, honor-all-cards rules, no-discount rules, no-bypass rule, and Visa and Mastercard's discrimination rules, (*see* Pls.' Mem. 2 n.5), are sometimes referred to as the "Restraints" or "Anti-Steering Restraints" for purposes of this Memorandum and Order.  The Restraints have been described at length in previous decisions.  *See Barry's Cut Rate Stores Inc.*, 2019 WL 7584728, at *2–12; *Interchange Fees II*, 827 F.3d at 228–29; *Interchange Fees I*, 986 F. Supp. 2d at 213–15.

As to all Defendants, including Bank Defendants, Plaintiffs request, among other things, that the Court: "[d]eclare, adjudge, and decree that Defendants have committed the violations of the federal and state antitrust laws" alleged in the Complaint; "[o]rder that Defendants, their directors, officers, employees, agents, successors, members, and all persons in active concert and participation with them be enjoined and restrained from, in any manner, directly or indirectly, committing the violations of the Cartwright and Sherman Acts"; and "[g]rant further relief as is necessary to correct for the anticompetitive market effects caused by Defendants' unlawful conduct."  (*Id.* at 106–07.)

In April of 2019, the Bank Defendants moved to dismiss the Rule 23(b)(2) Plaintiffs' Complaint.  (*See* Bank Defs.' Mot. to Dismiss, Docket Entry No. 7399.)  In November of 2019, the Court denied the motion, finding that Plaintiffs had Article III standing and that they alleged an ongoing antitrust conspiracy.  *See Barry's Cut Rate Stores Inc.*, 2019 WL 7584728, at *34.

**e.  Rule 23(b)(2) Plaintiffs' motion for class certification**

On May 4, 2021, Plaintiffs filed their fully briefed motion for certification of a Rule 23(b)(2) class.[18]  (Pls.' Mot.)  In their motion for class certification, Plaintiffs seek to certify the following equitable relief class under Rule 23(a) and Rule 23(b)(2):

> All persons, businesses, and other entities (referred to herein as "Merchants") that accept Visa and/or Mastercard Credit and/or Debit cards in the United States at any time during the period between December 18, 2020 and 8 years after the date of entry of Final Judgment in this case.

---

[18]  In December of 2020, Rule 23(b)(2) Plaintiffs, Direct Action Plaintiffs, and Defendants filed several fully briefed motions for summary judgment, as well as several *Daubert* motions.  (*See* Defs.' Notice of Mot. for Summ. J., Docket Entry No. 8067; Target Pls.' Notice of Mot. for Partial Summ. J., Docket Entry No. 8097; Pls.' Notice of Mot. for Partial Summ. J., Docket Entry No. 8150; Elgin Pl.'s Notice of Mot. for Partial Summ. J., Docket Entry No. 8178; 7-Eleven Pls.' and Home Depot Pls.' Notice of Mot. for Partial Summ. J., Docket Entry No. 8184.)  The Court addresses the order in which the motions will be decided in Section II.b *infra*.

(Pls.' Mem. 5.)  Plaintiffs argue that they satisfy the requirements of Rule 23(a) because the proposed class is sufficiently numerous, legal and factual issues are common to all class members, the named Plaintiffs' claims are typical of class members' claims, and Plaintiffs and co-counsel will fairly and adequately represent the class.  (*See Id.* at 23–32.)  Plaintiffs also argue that they satisfy the requirements of Rule 23(b)(2) because Defendants' imposition and enforcement of the interchange fee, honor-all-cards rules, and no-surcharge rules apply to each member of the class, market definitions and market power can be evaluated on a classwide basis and would apply to all members of the class, and Plaintiffs seek classwide relief.  (*See id.* at 32–45.)  Finally, Plaintiffs argue that the class should be certified as a mandatory class because non-opt-out classes are the default in Rule 23(b)(2) classes.  (*See id.* at 46–50.)

### f.    Opposition to Plaintiffs' motion for class certification

#### i.    Direct Action Plaintiffs' opposition

Direct Action Plaintiffs oppose Plaintiffs' motion for class certification and argue that the class should not be certified as proposed.  (*See* Direct Action Pls.' Opp'n.)  Direct Action Plaintiffs argue that certification of a class without opt-out rights violates due process by risking the preclusion of individualized damages claims and violates due process and Rule 23 by extinguishing valuable injunctive relief claims.  (*See id.* at 6–16.)  They further argue that the proposed class lacks cohesion and is not adequately represented.  (*See id.* at 16–23.)  In addition, they contend that the constitutional and Rule 23 issues with the proposed class can be cured by allowing members of the putative Rule 23(b)(2) class to opt out or by redefining the proposed class to "exclude the Direct Action Plaintiffs and other entities who opted out of the Rule 23(b)(3) settlement."  (*See id.* at 23–25.)

### ii.   Grubhub Plaintiffs' opposition

Like Direct Action Plaintiffs, Grubhub Plaintiffs also oppose certification of a mandatory class.  (*See* Grubhub Pls.' Opp'n.)  Grubhub Plaintiffs argue that the (b)(2) class, as proposed, is not cohesive because the Grubub Plaintiffs are "distinct from the vast majority of putative class members" and that the putative class would not adequately represent them because there are "conflicts of interest between named parties and the class they seek to represent."  (*Id.* at 9–13.)  Grubhub Plaintiffs further argue that certification of the class as defined would violate due process and that "[t]he due process, cohesion, and adequacy of representation issues" can be solved by affording opt-out rights to the Grubhub Plaintiffs "and other entities that opted out of the Rule 23(b)(3) settlement."  (*Id.* at 13–18.)

### iii.   Intervenors' opposition

Intervenors Walmart and the Merchant Trade Groups also oppose Plaintiffs' class certification motion.  (*See* Walmart Opp'n; Merchant Trade Groups' Opp'n.)  Walmart argues that the proposed class lacks adequacy of representation because the Rule 23(b)(2) Plaintiffs will "undermine the interests of many absent class members" including Walmart and lacks cohesion because Plaintiffs "will not seek an injunction that benefits the entire class."  (Walmart Opp'n 9–20.)  Walmart further argues that the Court should either deny class certification, grant Walmart an opt-out right, or exclude Walmart from the class.  (*Id.* at 20–22.)

Merchant Trade Groups argue that the class certified should not include future class member merchants because their claims are too hypothetical and speculative, and because including future class members would raise due process concerns as well as invite litigation for years to come since future class members will need to ask a court whether they were adequately represented by this litigation.  (Merchant Trade Groups' Opp'n 18–26.)  In addition, Merchant

Trade Groups contend that Plaintiffs fail to satisfy the commonality and ascertainability requirements as to future merchants because the credit- and debit-card industry is rapidly changing and Plaintiffs have not justified an eight-year temporal limitation.  (*See id.* at 18–22, 24–26; Merchant Trade Groups' Resp. to Defs.' Reply and Pls.' Reply ("Merchant Trade Groups' Sur-Reply") 5–9, Docket Entry No. 8479.)  Like the other parties who oppose certification of a mandatory class, Merchant Trade Groups argue that the Court should allow merchants to opt out of the (b)(2) class because not all Plaintiffs seek the same injunctive relief, merchants encompassed by the broad proposed class are different from the named class representatives in size and structure, and opt-out rights are the traditional "escape valve" for intra-class disputes.  (Merchant Trade Groups' Opp'n 7–18.)

### iv.  Defendants' position

Defendants do not oppose class certification as Plaintiffs define it but argue that the Court "should not certify the Rule 23(b)(2) class and allow opt-outs or carve outs from the class, or exclude the future merchants from the class as the opponents of class certification . . . suggest." (Defs.' Reply 1.)  Defendants contend that opt-outs should not be permitted because Rule 23 does not provide for opt-outs from a Rule 23(b)(2) class, neither due process nor the potential for collateral estoppel require that opt-out rights be provided, and none of the cases cited by the class certification opponents support the exercise of the Court's discretion to provide opt-out rights. (*See id.* at 9–17.)  In addition, Defendants argue that the Court should not redefine the class to carve out any class members from the proposed class definition for the same reason.  (*See id.* at 17–18.)  Finally, Defendants argue that the Court should not exclude future class members from the proposed class because the challenged network rules and equitable relief sought would apply

15

generally to future merchants and because there is "no legitimate basis" to exclude them.  (*See id.* at 18–23.)

## II.   Discussion

### a.   Standard of review

Rule 23 of the Federal Rules of Civil Procedure sets forth a two-step process for certification as a class action.  First, the plaintiff must satisfy the four prerequisites set forth in Rule 23(a):

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); *Kurtz v. Costco Wholesale Corp.*, 818 F. App'x 57, 60 (2d Cir. 2020) ("To proceed with a class action, a plaintiff must satisfy four prerequisites under Rule 23: numerosity, commonality, typicality, and adequacy." (citing Fed. R. Civ. P. 23(a))).  The class must also satisfy the implied requirement of ascertainability under Rule 23(a).  *See In re Petrobras Sec.*, 862 F.3d 250, 266 (2d Cir. 2017); *de Lacour v. Colgate-Palmolive Co.*, 338 F.R.D. 324, 334 (S.D.N.Y. Apr. 23, 2021) ("[T]he Second Circuit has recognized that Rule 23 contains 'an implied requirement' that a class be "ascertainable." (quoting *In re Petrobras Sec.*, 862 F.3d at 260)).  In addition to satisfying the Rule 23(a) requirements, the proposed class must also qualify "under one of three subsection Rule 23(b) categories."  *Bruce E. Katz, M.D., P.C. v. Pro. Billing Collections, LLC*, No. 20-CV-3043, 2021 WL 2418387, at *2 (S.D.N.Y. June 14, 2021); *see also* Fed. R. Civ. P. 23(b); *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 80 (2d Cir. 2015) ("Beyond these prerequisites, Rule 23(b) provides additional considerations for a district court to consider prior to the certification of a class.").

"Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  "The party seeking class certification bears the burden of demonstrating compliance with Rule 23's prerequisites by a preponderance of the evidence." *Kurtz*, 818 F. App'x at 60 (citing *Miami Grp. v. Vivendi, S.A. (In re Vivendi, S.A. Sec. Litig.)*, 838 F.3d 223, 264 (2d Cir. 2016)); *Batalla Vidal v. Wolf*, 501 F. Supp. 3d 117, 134 (E.D.N.Y. 2020) (same).  "The Second Circuit has emphasized that Rule 23 should be given liberal rather than restrictive construction, and it seems beyond peradventure that the Second Circuit's general preference is for granting rather than denying class certification." *Espinoza v. 953 Assocs. LLC*, 280 F.R.D. 113, 124 (S.D.N.Y. 2011) (quoting *Gortat v. Capala Bros., Inc.*, 257 F.R.D. 353, 361 (E.D.N.Y. 2009), *aff'd*, 568 F. App'x 78 (2d Cir. 2014)); *see also Newkirk v. Pierre*, No. 19-CV-4283, 2020 WL 5035930, at *5 (E.D.N.Y. Aug. 26, 2020) ("[T]he Second Circuit has emphasized that Rule 23 should be given a 'liberal rather than restrictive construction.'" (quoting *Marisol A. v. Giuliani*, 126 F.3d 372, 375 (2d Cir. 1997))).  "The district court is afforded broad discretion in class certification questions because it is often in the best position to assess the propriety of the class action." *Zivkovic v. Laura Christy LLC*, 329 F.R.D. 61, 68 (S.D.N.Y. 2018) (citing *Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134, 139 (2d Cir. 2001)).

### b.   Sequence of deciding the pending motions

Because there are several pending motions in this MDL, the Court first addresses the sequence in which it intends to decide the instant motions.

Defendants argue that the Court should decide Plaintiffs' motion for class certification and the issue of whether opt-outs and exclusions will be permitted before it decides the pending motions for summary judgment and *Daubert* motions.  (*See* Defs.' Letter Mot. for Hearing on

Case Mgmt. ("Defs.' Case Mgmt. Letter"), Docket Entry No. 8425.)  In support, Defendants

argue that deciding the motions for summary judgment will raise an issue the Second Circuit has

referred to as the "one-way intervention" problem.  (*Id.* at 2 (citing *Brecher v. Republic of*

*Argentina*, 806 F.3d 22, 26 (2d Cir. 2015)).)  Defendants contend that if a decision on

certification of an opt-out class is deferred until after summary judgment, potential class

members could wait "for a merits determination, and then, depending on the Court's judgment,

choose to remain in or opt out of the class (once certified) in the way that benefits them."  (*Id.*)

To prevent this problem, Defendants argue that the "'ordinary' rule in this Circuit is that a

'court's decision on the merits' should 'not occur before or simultaneous with a decision on class

certification.'"  (*Id.* (quoting *Cuzco v. Orion Builders, Inc.*, 262 F.R.D. 325, 335–36 (S.D.N.Y.

2009)).)  Defendants assert that while the one-way intervention issue does not usually arise "in

the context of a typical mandatory Rule 23(b)(2) class from which exclusions are not permitted,"

the objectors' proposal to allow opt-outs from the class raises the risk of a one-way intervention

issue.  (*Id.*)  In addition, Defendants contend that resolving the class certification motions first

would "facilitate the efficient and fair resolution of the remaining actions in the MDL" because it

would "clarify for the parties in the remaining actions . . . the range of remedies available" and

because it would resolve the "relatively discrete legal issues" presented at the class certification

stage before addressing the complex summary judgment motions and motions in limine.  (*Id.* at

2–3.)

     Direct Action Plaintiffs argue that the Court should not delay resolving the summary

judgment motions until resolution of Plaintiffs' motion for class certification.  (*See* Pls.' Resp. to

Defs.' Case Mgmt. Letter, Docket Entry No. 8427.)  In support, Direct Action Plaintiffs argue

that (1) there is no risk of the one-way intervention problem and (2) in any event, Defendants

waived any one-way intervention argument.  (*See id.* at 2.)  Direct Action Plaintiffs argue that

there is no one-way intervention problem because they have done the opposite of sitting on the

sidelines to wait for a merits determination and instead have proactively litigated their cases by

opting out of the Rule 23(b)(3) settlement and fully briefing their own summary judgment and

*Daubert* motions.  (*Id.* at 1.)  As to the majority of other merchants, Direct Action Plaintiffs

contend that there is no meaningful risk of one-way intervention because all merchants that

remained in the (b)(3) settlement released "any and all manner of claims," including claims for

damages and for injunctive, declaratory, or other equitable relief except as sought through the

proposed (b)(2) class, except for the 675 merchants who opted out.  (*Id.* at 2 (quoting Final

Approval Order ¶ 16, Docket Entry No. 7818).)  Therefore, Direct Action Plaintiffs argue that

only the limited set of merchants who opted out and have not settled their claims could pursue

individual claims for equitable relief should an opt-out right in any certified (b)(2) class be

provided.  (*See id.*)  In addition, Direct Action Plaintiffs argue that Defendants waived their one-

way intervention argument because they (1) agreed that a summary judgment motion by the

Plaintiffs could be submitted in advance of their class certification motion, (2) moved for

summary judgment against all Plaintiffs including Direct Action Plaintiffs and the Rule 23(b)(2)

Plaintiffs before class certification was briefed, and (3) decided not to oppose the motion for

certification of the (b)(2) class.  (*See id.* at 2–3.)  Direct Action Plaintiffs argue that Defendants'

conduct reinforces waiver because they agreed to twelve extensions of the class certification

motions, and, as a result of these extensions, the class certification motion was served after the

parties moved for summary judgment.  (*See id.* at 3.)  Direct Action Plaintiffs state that with each

extension request, they repeatedly expressed concern that the Defendants would use repeated

delays of the (b)(2) class certification motion to delay the decision on summary judgment.  (*See id.* at 4.)

The Second Circuit has stated that "[t]he expansion of [a] class after a judgment on liability . . . raises the specter of one-way intervention." *Brecher*, 806 F.3d at 26.  The one-way intervention problem arises when a decision on certification of an opt-out class is deferred until after a decision on the merits, which enables potential class members to "wait[] on the sidelines" for a merits determination and then choose to remain in or opt out of the class once certified in a way that benefits them. *See id.* (quoting *Amati v. City of Woodstock*, 176 F.3d 952, 957 (7th Cir. 1999)).  As the Second Circuit has observed, "Rule 23 was substantially amended in 1966, in part to prevent prejudice to defendants that can arise when a determination of class certification is postponed until after trial." *Philip Morris Inc. v. Nat'l Asbestos Workers Med. Fund*, 214 F.3d 132, 134 (2d Cir. 2000) (per curiam).  The advisory committee note to Rule 23(c)(3) highlights this concern:

> Hitherto, in a few actions conducted as "spurious" class actions and thus nominally designed to extend only to parties and others intervening *before* the determination of liability, courts have held or intimated that class members might be permitted to intervene *after* a decision on the merits favorable to their interests, in order to secure the benefits of the decision for themselves, although they would presumably be unaffected by an unfavorable decision. . . . Under proposed subdivision (c)(3), one-way intervention is excluded; the action will have been early determined to be a class or nonclass action, and in the former case the judgment, whether or not favorable, will include the class, as above stated.

Fed. R. Civ. P. 23 advisory committee's note to 1966 amendment; *see also Weissman v. Collecto, Inc.*, No. 17-CV-4402, 2019 WL 254035, at *9 (E.D.N.Y. Jan. 17, 2019) ("The prejudice that Congress sought to address through the 1966 amendments arose from a practice called 'one-way intervention,' in which 'absent class members in a spurious action were permitted [to] intervene after a favorable judgment, while at the same time they were not bound

by an unfavorable decision.'" (alteration in original) (quoting *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 560 n.2 (2d Cir. 1968)).  Accordingly, courts within the Second Circuit and other circuit courts have held that "in general, issues relating to class certification should be decided before a decision on the merits is rendered." *Mendez v. Radec Corp.*, 260 F.R.D. 38, 44 (W.D.N.Y. 2009); *see also Bertrand v. Maram*, 495 F.3d 452, 455 (7th Cir. 2007) ("Class-action status must be [decided] . . . early to clarify who will be bound by the decision."); *Weissman*, 2019 WL 254035, at *9 ("Given concerns about one-way intervention, 'issues relating to class certification should' generally 'be decided before a decision on the merits is rendered.'" (quoting *Mendez*, 260 F.R.D. at 44)); *Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 507 (E.D.N.Y. 2017) (describing "deciding class certification prior to deciding summary judgment" as the "traditional route" and holding motion for summary judgment in abeyance because the parties had not conducted "sufficient discovery" to decide the summary judgment motions); *In re Cablevision Consumer Litig.*, No. 10-CV-4992, 2014 WL 1330546, at *16 (E.D.N.Y. Mar. 31, 2014) (deciding class certification before deciding the plaintiffs' motion for summary judgment and granting the plaintiffs "leave to re-file the motion after the class has received notice consistent with Rule 23 and has been provided with an opportunity to opt out of the suit"); *Cuzco*, 262 F.R.D. at 335 (declining to decide both the plaintiffs' and the defendants' cross-motions for summary judgment at the same time as certifying a Rule 23(b)(3) class and stating that "[a] court's decision on the merits, however, should ordinarily not occur before or simultaneous with a decision on class certification" (citing *Philip Morris Inc.*, 214 F.3d at 135)).

However, courts in the Second Circuit have recognized that there is "authority that a defendant can waive any objection to a decision on the merits prior to, or simultaneous with, a decision on class certification." *Mendez*, 260 F.R.D. at 45; *see also Curtin v. United Airlines,*

*Inc.*, 275 F.3d 88, 93 (D.C. Cir. 2001) ("[W]here the merits of the plaintiffs' claims can be readily resolved on summary judgment, where the defendant seeks an early disposition of those claims, and where the plaintiffs are not prejudiced thereby, a district court does not abuse its discretion by resolving the merits before considering the question of class certification."); *Schweizer v. Trans Union Corp.*, 136 F.3d 233, 239 (2d Cir. 1998) ("The decision to award summary judgment before acting on class certification [is] well within the discretion of the trial court."); *Cowen v. Bank United of Texas, FSB*, 70 F.3d 937, 941 (7th Cir. 1995) (finding that the defendant may elect to seek summary judgment prior to decision on class certification as a "way to try to knock . . . off [the action] at low cost," by disqualifying the named plaintiffs as proper class representatives, in order to moot the question whether to certify the suit as a class action); *Weissman*, 2019 WL 254035, at *9 (quoting *Mendez*, 260 F.R.D. at 45); *Bitzko v. Weltman, Weinberg & Reis Co., LPA*, No. 17-CV-458, 2019 WL 4602329, at *11 (N.D.N.Y. Sept. 23, 2019) ("Courts in the Second Circuit and elsewhere have recognized that 'a defendant can waive any objection to a decision on the merits prior to, or simultaneous with, a decision on class certification.'  This waiver can be express or implied through the defendant's motion for summary [judgment] before class certification." (citation omitted) (quoting *Mendez*, 260 F.R.D. at 45));[19] *Reynolds v. Barrett*, 741 F. Supp. 2d 416, 424–25 (W.D.N.Y. 2010), *aff'd*, 685 F.3d 193 (2d Cir. 2012) (quoting *Mendez*, 260 F.R.D. at 45); *Vega v. Credit Bureau Enters.*, No. 02-CV-1550, 2005 WL 711657, at *10 (E.D.N.Y. 2005) (granting simultaneous motions for class certification and summary judgment).  Courts that have decided summary judgment either before or simultaneously with class action motions have generally done so when the defendants moved

---

[19]  The defendants in *Bitzko v. Weltman, Weinberg & Reis Co., LPA*, requested that the court decide the class certification motion before deciding the pending summary judgment motions.  No. 17-CV-458, 2019 WL 4602329, at *11 (N.D.N.Y. Sept. 23, 2019).

for summary judgment as opposed to the plaintiffs.  *See, e.g.*, *Weissman*, 2019 WL 254035, at *9 (finding that when the defendant moved for summary judgment and "[i]n light of [the] [d]efendant's unambiguous decision to not oppose [the] [p]laintiff's motion for class certification, . . . [the] [d]efendant has waived any objection to the [c]ourt's disposition of its motion for summary judgment simultaneously with [the] [p]laintiff's motion for class certification"); *Mendez*, 260 F.R.D. at 48 ("[D]efendants have the right — should they choose to exercise it — to have class certification issues decided first, before any decision on the merits of the plaintiffs' claims.  Defendants here never invoked that right, however.  As stated, they thereby implicitly waived that right."); *Reynolds*, 741 F. Supp. 2d at 425 (finding that the defendants "implicitly waived any right they may have had to have class certification issues decided first" when the defendants moved for summary judgment).

Rule 23(b)(2) Plaintiffs, Direct Action Plaintiffs, and Defendants all moved for summary judgment before the class certification motion was fully briefed.  (*See* Pls.' Notice of Mot. for Partial Summ. J.; Target Pls.' Notice of Mot. for Partial Summ. J.; Elgin Pl.'s Notice of Mot. for Partial Summ. J.; 7-Eleven Pls.' and Home Depot Pls.' Notice of Mot. for Partial Summ. J.; Defs.' Notice of Mot. for Summ. J.)  However, a central issue briefed in the class certification papers concerns whether parties will be permitted to opt out from the Rule 23(b)(2) class.  While Plaintiffs seek certification of a mandatory class pursuant to Rule 23(b)(2), (*see* Pls.' Mem. 6), Direct Action Plaintiffs seek opt-out rights and argue that a mandatory class would threaten the individualized monetary claims of class members who are pursuing damages claims, (*see* Direct Action Pls.' Opp'n).  Defendants do not oppose certification of the Rule 23(b)(2) class but argue that the Court should not permit opt-outs from the proposed class.  (*See* Defs.' Reply.)  Both Intervenors oppose certification of a mandatory class and seek opt-out rights.  (*See* Merchant

23

Trade Groups' Sur-Reply,; Letter Joining Direct Action Pls.' and Merchant Trade Group's Sur-Replies, Docket Entry No. 8480.)  In view of the arguments concerning opt-out rights and the potential for an ensuing one-way intervention problem, the Court decides the class certification motion before considering the summary judgment motions.[20]

---

[20]  The Court acknowledges that there are also several pending *Daubert* motions filed by the parties.  "Although '[t]he Supreme Court has not definitively ruled on the extent to which a district court must undertake a *Daubert* analysis at the class certification stage,' it has 'offered limited dicta suggesting that a *Daubert* analysis may be required at least in some circumstances.'"  *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 407 F. Supp. 3d 422, 429 (S.D.N.Y. Sept. 3, 2019) (alteration in original) (quoting *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 129 (2d Cir. 2013)).  Similarly, "the Second Circuit has not resolved whether and to what extent *Daubert* applies at the class certification stage."  *Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*, 324 F. Supp. 3d 387, 393 (S.D.N.Y. 2018) (citing *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 470 (S.D.N.Y. 2018) (collecting cases)).  "Despite this lack of clarity, courts in the Second Circuit regularly 'subject expert testimony to *Daubert*'s rigorous standards insofar as that testimony is relevant to the Rule 23 class certification analysis.'"  *Bowling v. Johnson & Johnson*, No. 17-CV-3982, 2019 WL 1760162, at *7 (S.D.N.Y. Apr. 22, 2019) (quoting *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 55 (S.D.N.Y. 2016)); *see also In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, No. 18-MD-2819, 2020 WL 2280144, at *2 (E.D.N.Y. May 5, 2020) (same).  "In these instances, the 'scope of the *Daubert* analysis is cabined by its purpose at this stage: the inquiry is limited to whether or not the expert reports are admissible to establish the requirements of Rule 23.'"  *Bowling*, 2019 WL 1760162, at *7 (quoting *Chen-Oster v. Goldman, Sachs & Co.*, 114 F. Supp. 3d 110, 115 (S.D.N.Y. 2015)).  "In other words, '[t]he question is not . . . whether a jury at trial should be permitted to rely on [the expert's] report to find facts as to liability, but rather whether [the court] may utilize it in deciding whether the requisites of Rule 23 have been met.'"  *Ge Dandong v. Pinnacle Performance Ltd.*, No. 10-CV-8086, 2013 WL 5658790, at *13 (S.D.N.Y. Oct. 17, 2013) (alterations in original) (quoting *In re Visa Check/Mastermoney Antitrust Litig.*, 192 F.R.D. 68, 77 (E.D.N.Y. 2000), *aff'd sub nom. In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124 (2d Cir. 2001), *abrogated on other grounds by In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006)).

Defendants have filed *Daubert* motions to challenge the expert opinions of Professor Dennis W. Carlton and Dr. Joseph E. Stiglitz, the reports of whom Plaintiffs reference in support of their motion for class certification.  (*See* Defs.' Mot. to Exclude Pls.' Expert Dennis W. Carlton, Docket Entry No. 8086; Defs.' Mot. to Exclude Pls.' Expert Joseph E. Stiglitz, Docket Entry No. 8075.)  However, Defendants did not oppose Plaintiffs' motion for class certification, and the Court therefore infers that Defendants seek exclusion of Professor Carlton's and Dr. Stiglitz's opinions as to liability on summary judgment only and not for class certification purposes.  Accordingly, the Court declines to assess whether the opinions of Professor Carlton and Dr. Stiglitz are admissible to establish the requirements of Rule 23 before deciding the class

### c.   Rule 23(a) requirements

The Court first addresses the explicit Rule 23(a) requirements of numerosity, commonality, typicality, and adequacy, and then addresses the implied factor of ascertainability.

### i.   Numerosity

Plaintiffs argue that the numerosity requirement is met because the proposed class is "comprised of millions of [m]erchants throughout the United States who accept Defendants' [p]ayment [c]ards" and the numerosity requirement is "generally . . . satisfied when a proposed class includes over [forty] members."  (Pls.' Mem. 25 (first citing *Consol. Raid Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995); and then citing *B & R Supermarket, Inc. v. Mastercard Int'l, Inc. (B & R Supermarket I)*, No. 17-CV-2738, 2018 WL 1335355, at *36 (E.D.N.Y. 2018)).)

No party argues that Plaintiffs do not satisfy the numerosity requirement.

In order to proceed as a class action, the class must be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  "[N]umerosity is presumed at a level of [forty] members."  *Consol. Rail Corp.*, 47 F.3d at 483; *see also Jin v. Shanghai Original, Inc.*, 990 F.3d 251, 263 n.20 (2d Cir. 2021) (stating that "[a]lthough there is no magic number of class members needed to satisfy numerosity, . . . numerosity is generally 'presumed at a level of 40 [or more] members'" (second alteration in original) (quoting *Consol. Rail Corp.*, 47 F.3d at 483)).

Plaintiffs satisfy the numerosity requirement because the putative class consists of "millions of [m]erchants."  (Pls.' Mem. 25; Compl. ¶ 4.); *Interchange Fees III*, 330 F.R.D. at 51

---

certification motions.  *See In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 407 F. Supp. 3d at 429 (applying "a *Daubert* analysis *to the extent that [the] [d]efendant seeks to exclude* testimony relevant to class certification" (emphasis added)).

(finding that class met numerosity requirement when the proposed class consisted of "millions of merchants").

### ii. Commonality

Plaintiffs argue that they satisfy the commonality requirement because they "allege a conspiracy that affects the entire class." (Pls.' Mem. 26.) Plaintiffs identify several questions that they argue are common questions to the entire class: (1) whether Defendants conspired to impose the Restraints on class members, (2) whether Defendants conspired to possess or exercise market power or monopoly power, (3) whether the Restraints imposed by Defendants facilitated their alleged price-fixing arrangements, (4) whether the alleged conspiracies continued after the networks' reorganizations and IPOs, (5) whether Network Defendants exercise market power or monopoly power that was willfully acquired and/or maintained, (6) whether class members are threatened with further injury by overcharges as a result of the Restraints, and (7) what the appropriate relief should be to remedy the conduct alleged. (*Id.* at 26–27.)

Merchant Trade Groups argue that Plaintiffs do not satisfy the commonality prong because Plaintiffs seek to certify a class including merchants "that accept Visa and/or Mastercard [c]redit and/or [d]ebit cards . . . [eight] years after the date of entry of [f]inal [j]udgment in this case." (Merchant Trade Groups' Opp'n 18.) Merchant Trade Groups argue that future merchants do not have common questions of law or fact as current merchants because Plaintiffs are not challenging a specific policy or practice that will affect future class members in a predictable and identical manner; instead, Merchant Trade Groups contend that Plaintiffs challenge "a range of anti-competitive policies and practices" that affect merchants differently and future merchants are not a narrow, clearly defined, predictable group. (*Id.* at 20–21.) In addition, Merchant Trade Groups argue that future merchants "should have the right to decide

for themselves whether to challenge [Defendants'] rules as they are applied to new forms of payment and new technologies" amid an ever-changing payment industry that has seen the rise of new payment systems such as Venmo and its competitors.  (*Id.* at 21.)  Accordingly, Merchant Trade Groups argue that the commonality prong is not satisfied if future merchants are included in the class definition because "post-judgment changes in the governing law or factual circumstances surrounding the dispute may cause the interests of present and future class members to diverge."  (*Id.* at 22 (quoting Elizabeth R. Kaczynski, Note, *The Inclusion of Future Class Members in Rule 23(b)(2) Class Actions*, 85 Colum. L. Rev. 397, 412 (1985)).)

Defendants do not oppose certification but argue that Merchant Trade Groups' argument as to future merchants is unavailing because "the Visa and Mastercard network rules would apply generally to all merchants that accept Visa or Mastercard credit or debit cards, including future merchants, . . . regardless of changes in how consumers may make other types of payment in the future." (Defs.' Reply 22–23.)  Defendants contend that courts routinely certify classes including future merchants, including in antitrust actions, and including future merchants would allow for "definitive resolution of the [D]efendants' challenged conduct going forward."  (*Id.* at 20.)

Under Rule 23(a)(2), there must be "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2); *see also Brown v. Kelly*, 609 F.3d 467, 475 (2d Cir. 2010) ("The commonality requirement is met if there is a common question of law or fact shared by the class.").  A question is common if it is "capable of classwide resolution — which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350.  It is not enough to raise questions at such a high level of generality that they become common to the class.  *Id.*  Instead, plaintiffs must

demonstrate "the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution" of the case. *Id.* (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)); *Bruce E. Katz, M.D., P.C.*, 2021 WL 2418387, at *3 (same). "The claims for relief need not be identical for them to be common"; instead, "Rule 23(a)(2) simply requires that there be issues whose resolution will affect all or a significant number of the putative class members. 'Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question.'" *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015) (citations omitted) (quoting *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750 756 (7th Cir. 2014)). "[E]ven a single [common] question will" suffice to prove commonality. *Dukes*, 564 U.S. at 359 (second alteration in original); *de Lacour*, 338 F.R.D. at 336 (quoting *Dukes*, 564 U.S. at 359).

Plaintiffs satisfy the commonality requirement. Plaintiffs' overarching claims are that Defendants conspired to fix prices and impose supracompetitive interchange fees on merchants that accept Visa and Mastercard debit and credit cards, and that they facilitated these anticompetitive practices by forcing merchants to abide by the Restraints therefore preventing merchants from protecting themselves. (*See* Compl. ¶¶ 4–5, 364–428.) Unlike other cases in which the parties failed to demonstrate commonality because the challenged practices consisted of context-specific decisions rather than a uniform policy, *see, e.g.*, *Dukes*, 564 U.S. at 355 ("The only corporate policy that the plaintiffs' evidence convincingly establishes is Wal-Mart's 'policy' of *allowing discretion* by local supervisors over employment matters. On its face, of course, that is just the opposite of a uniform employment practice that would provide the commonality needed for a class action . . . ."); *Dobson v. Hartford Fin. Servs. Grp. Inc.*, 342 F. App'x 706, 709 (2d Cir. 2009) (denying class certification on commonality grounds when the

claims of each of the 24,000 putative class members would "invariably turn on whether [the benefits provider's] delay was 'reasonable' in each set of particular circumstances"); *Callari v. Blackman Plumbing Supply, Inc.*, 307 F.R.D. 67, 76 (E.D.N.Y. 2015) (finding no commonality when there was no evidence that the challenged employment policy applied to all class members), Class Plaintiffs point to specific policies and rules that they allege cause uniform harm to the putative class, such as the setting of default interchange fees, honor-all-card rules, and anti-steering restraints, (Compl. ¶¶ 320–322).

Although a single common question is sufficient, Plaintiffs identify several questions that are common to the putative class and that would generate common answers, such as whether Defendants conspired to impose the Restraints, whether Network Defendants exercise market power or monopoly power that was willfully acquired and/or maintained, and whether the Restraints imposed by Defendants facilitated their alleged price-fixing arrangements. (*See* Pls.' Mem. 26–27); *see also Dial Corp. v. News Corp.*, 314 F.R.D. 108, 113 (S.D.N.Y. 2015) ("[T]here are several questions common to the class and capable of resolution through common proof, including: (1) [the defendant's] liability under the Sherman Act and the Clayton Act; (2) the definitions of the relevant geographic and product markets; and (3) [the defendant's] market power in the relevant market. And the majority of [the defendant's] alleged predatory conduct involves its dealings with competitors and retailers, not the putative class members. This suggests that resolution is capable through common proof for the class."), *amended*, No. 13-CV-6802, 2016 WL 690895 (S.D.N.Y. Feb. 9, 2016); *Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 659 (S.D.N.Y. 2015) ("[T]here are a number of questions of fact and law in this case, relevant to either plaintiffs' [section] 1 or [section] 2 [Sherman Act] claims or both, that are common to the proposed class. These include: whether [the defendant] and its key affiliates

engaged in an unlawful agreement to fix prices; how the relevant product market is to be defined; whether [the defendant] has monopoly power in that market; whether [the defendant's] licensing practices constitute exclusionary conduct; whether [the defendant's] conduct, if found unlawful, caused cognizable injury to class members; whether plaintiffs and members of the class are entitled to injunctive relief; and the appropriate measures of damages sustained."); *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 110–11 (E.D.N.Y. 2012) ("The most significant question posed by the [i]njunction [c]lass is the same question posed by the [d]amages [c]lass: did the defendants' price-fixing agreement cause an artificial increase in the market price of vitamin C? The answer to this question will be generally applicable to all members of the [i]njunction [c]lass."); *Leider v. Ralfe*, No. 01-CV-3137, 2003 WL 24571746, at *9 (S.D.N.Y. Mar. 4, 2003) ("[W]hether there was a conspiracy between [the defendants] and its sightholders to harm [the defendants'] competitors plainly presents a question common to the class."), *report and recommendation adopted in part*, 2003 WL 22339305 (S.D.N.Y. Oct. 10, 2003).  These questions are the same as or similar to questions posed to the (b)(3) damages class, which this Court certified, are common to all members of the putative class, and, at trial, would require resolution on a classwide basis despite any differences in how each individual merchant was affected.  *See Interchange Fees III*, 330 F.R.D. at 52–53 (finding commonality as to the (b)(3) class in this MDL because questions of whether Defendants "collectively fixed and set interchange fees in violation of antitrust law, . . . collectively imposed anti-steering rules that disincentivized merchants from steering paying customers to other payment methods, thereby protecting Defendants from competitive pressure to lower interchange fees[,] and . . . continued the alleged behavior after becoming publicly[] owned corporations" needed to be determined on a classwide basis).

Merchant Trade Groups' argument that future merchants do not have common questions of law or fact with the current merchants is unavailing at the class certification stage of this litigation.  Courts both within and outside of this Circuit have routinely certified classes including future class members when "any equitable relief to which the class would be entitled would be of the sort that would affect present and future claimants in the same way."[21]  *Latino Officers Ass'n City of N.Y. v. City of New York*, 209 F.R.D. 79, 90 n.87 (S.D.N.Y. 2002); *Duprey v. Conn. Dep't of Motor Vehicles*, 191 F.R.D. 329, 338 (D. Conn. 2000) ("It is not at all uncommon for a class to include future members, who may generally avail themselves of the same relief available to class members who have already sustained damages."); *Sykes*, 780 F.3d at 75 (affirming certification of injunctive relief class pursuant to Rule 23(b)(2) comprised of "all persons who have been or will be sued by the . . . defendants . . . assert[ing] claims under [RICO]" (first alteration in original)); *Marisol A.*, 126 F.3d at 375 (affirming certification of "[a]ll children who are or will be in the custody of the New York City Administration for

---

[21]  The two cases cited by the Merchant Trade Groups to support excluding future merchants from the proposed class concern standing and numerosity, and do not defeat commonality.  In *In re Currency Conversion Fee Antitrust Litigation*, a case concerning an alleged price-fixing conspiracy of foreign currency conversion fees, the court declined to include "cardholders whose first foreign exchange transaction occurred after the addition of the arbitration clause to their cardholder agreement" because "there was no cognizable injury when this action commenced."  229 F.R.D. 57, 63 (S.D.N.Y. 2005), *appeal granted, order amended*, 2005 WL 1871012 (S.D.N.Y. Aug. 9, 2005).  In *Scott v. University of Delaware*, a class action discrimination suit, the Third Circuit held that the class should have been decertified because future faculty members could not satisfy the numerosity requirement.  601 F.2d 76, 89 (3d Cir. 1979), *abrogated on other grounds by EF Operating Corp. v. Am. Bldgs.*, 993 F.2d 1046 (3d Cir. 1993).  The Third Circuit held that the "class of future faculty members is simply ephemeral on the facts of this case" because it was "constructed on the hypothesis that the [u]niversity will hire black[] [faculty members] . . . and then discriminate against them by refusing to renew employment contracts or by denying promotion or tenure solely on the basis of race."  *Id.*  Unlike the class members in those cases, the putative class member merchants face "imminent threat of injury," *In re Currency Conversion Fee Antitrust Litig.*, 229 F.R.D. at 63, arising from the Defendants' alleged anticompetitive conduct as long as they accept Visa and Mastercard credit and debit cards should they not be included in the injunctive relief class.

Children's Services ('ACS'), and those children who, while not in the custody of ACS, are or will be at risk of neglect or abuse and whose status is or should be known to ACS"); *Robinson v. N.Y.C. Transit Auth.*, No. 19-CV-1404, 2020 WL 5884055, at *1 (S.D.N.Y. Aug. 31, 2020) (recommending certification of a Rule 23(b)(2) class including "all persons against whom [the defendant] has obtained or will obtain a default judgment in a New York State court"), *report and recommendation adopted*, 2020 WL 5814189 (S.D.N.Y. Sept. 30, 2020); *Butler v. Suffolk County*, 289 F.R.D. 80, 103 (E.D.N.Y. 2013) (certifying equitable relief class "comprised of all persons who, now or at any time in the future, are or will be detainees or prisoners in the custody of the Suffolk County Sheriff's Department"); *see also Roy v. County of Los Angeles*, No. 12-CV-9012, 2016 WL 5219468, at *14 (C.D. Cal. Sept. 9, 2016) (rejecting argument that there was no commonality or typicality because the proposed class included both "current and future individuals" who are or will be in the defendants' custody on the basis of an immigration hold and their claims were "too broad and not yet ripe" and stating that "including 'future class members in a class is not itself unusual or objectionable'" and that "[w]hen the future persons referenced become members of the class, their claims will necessarily be ripe" (quoting *Rodriguez v. Hayes*, 591 F.3d 1105, 1118 (9th Cir. 2010)), *aff'd sub nom. Gonzalez v. U.S. Immigr. & Customs Enf't*, 975 F.3d 788 (9th Cir. 2020); *Roshandel v. Chertoff*, 554 F. Supp. 2d 1194, 1203 (W.D. Wash. 2008), *amended in part*, 2008 WL 2275558 (W.D. Wash. June 3, 2008) ("Because all [the] [p]laintiffs, whether present or future members of the class, challenge the legality of the same government program, they inherently share common issues.").

As this Court has recognized, the commonality inquiry focuses on whether questions exist that "would need to be determined on a classwide basis, regardless of how each merchant was individually affected" and whether the answers to these questions would drive the resolution

of this litigation. *Interchange Fees III*, 330 F.R.D. at 53. Courts have found that commonality exists when the plaintiffs' "injuries derive from a unitary course of conduct by a single system," even when there are "differing 'individual circumstances of class members.'" *Kurtz*, 321 F.R.D. at 530 (quoting *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 571–72 (S.D.N.Y. 2014)). Courts in this Circuit have noted that "[n]umerous courts have held that allegations concerning the existence, scope, and efficacy of an alleged antitrust conspiracy present important common questions sufficient to satisfy the commonality requirement of Rule 23(a)(2)." *In re Platinum & Palladium Commodities Litig.*, No. 10-CV-3617, 2014 WL 3500655, at *9 (S.D.N.Y. July 15, 2014) (quoting *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 509 (S.D.N.Y. 1996) (collecting cases)); *see also Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 107 (2d Cir. 2007) (finding that the commonality prong was satisfied when the injury alleged in the complaint concerned "overcharges paid to a horizontal price-fixing conspiracy" and stating that "[b]ecause each class member allegedly suffered the same type of injury, the legal question of whether such an injury is 'of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful' is a common one" (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977))); *Meredith Corp.*, 87 F. Supp. 3d at 659–60 ("In general, 'monopolization claims are contingent upon a showing of monopoly power and an examination of the manner in which such power was acquired or maintained. These issues, along with others, are questions that are undoubtedly common to all the members of the putative class.'" (quoting *In re Buspirone Patent & Antitrust Litig.*, 210 F.R.D. 43, 57 (S.D.N.Y. 2002))).

Many of the questions identified by Plaintiffs focus on Defendants' conduct in implementing the Restraints which have caused or will cause the same general antitrust injury to

both present and future merchants — despite any differences in how future merchants are specifically impacted amid any changes in the credit or debit card industry. *See Batalla Vidal*, 501 F. Supp. 3d at 133 (certifying a Rule 23(b)(2) class challenging the Wolf Memorandum and consisting of individuals "who are or will be *prima facie* eligible for deferred action under the terms of the [Deferred Action] program" because "[a]s long as the Wolf Memorandum remains in effect, [c]lass members who are otherwise eligible for [Deferred Action] but have not yet applied share the same kind of 'distinct and palpable' injury with the named plaintiffs who happen to have already applied for [Deferred Action] and had their applications stalled or rejected"); *Newkirk*, 2020 WL 5035930, at *8, *12 (certifying a class of individuals with disabilities who "have applied for or will apply for" benefits through the Suffolk County Department of Social Services and stating that "'the disparate impact of a challenged policy or regulation does not defeat class certification,' particularly 'where . . . plaintiffs request declaratory and injunctive relief against a defendant engaging in a common course of conduct toward them, and there is therefore no need for individualized determinations of the propriety of injunctive relief'" (quoting *R. A-G ex rel. R.B. v. Buffalo City Sch. Dist. Bd. of Educ.*, No. 12-CV-960, 2013 WL 3354424, at *10 (W.D.N.Y. July 3, 2013), *aff'd*, 569 F. App'x 41 (2d Cir. 2014))); *see also Floyd v. City of New York*, 283 F.R.D. 153, 160, 173 (S.D.N.Y. 2012) (certifying class of individuals who "have been, or in the future will be" unlawfully stopped in violation of the Fourth and Fourteenth Amendment and stating that "even after *Wal–Mart*, Rule 23(b)(2) suits remain appropriate mechanisms for obtaining injunctive relief in cases where a centralized policy is alleged to impact a large class of plaintiffs, even when the magnitude (and existence) of the impact may vary by class member").

The questions that Plaintiffs raise are fundamental to both the outcome of the case, and would generate common answers that would assist in determining the resolution of Plaintiffs' claims.  Accordingly, Plaintiffs satisfy the Rule 23(a)(2) commonality requirement.

### iii.   Typicality

Plaintiffs argue that the typicality requirement is satisfied because their claims "stem from the same course of conduct (Defendants' conspiracy to impose the Restraints on all Merchants)," are based on the same legal theories of violations of the Sherman, Clayton, and Cartwright Acts, and "will be proven by the same evidence (documents and testimony reflecting Defendants' agreement and its anticompetitive impact on the Class)."  (Pls.' Mem. 28.) Plaintiffs contend that the proposed class representatives will "seek to prove that Defendants' conduct resulted in all Class members being injured or threatened with injury in violation of the antitrust laws and will seek equitable relief for that conduct."  (*See id.*)

Merchant Trade Groups argue that typicality is not satisfied as to future merchants because Plaintiffs fail to explain how the class representatives' claims are typical of future merchants' claims.  (Merchant Trade Groups' Opp'n 18–19.)  In support, Merchant Trade Groups contend that "market conditions and merchant relationships with Defendants will only continue to evolve in unknown ways," which will make determining typicality as to future merchants difficult.  (*Id.* at 19.)  Neither Merchant Trade Groups nor any other party object to typicality as to non-future-merchant class members.

The typicality prong of Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  The typicality requirement "is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the

defendant's liability." *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 252 (2d Cir. 2011) (quoting *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993)); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009). "The commonality and typicality requirements often 'tend to merge into one another, so that similar considerations animate analysis' of both." *Brown*, 609 F.3d at 475 (quoting *Marisol A.*, 126 F.3d at 376); *see also Sykes*, 780 F.3d at 84 n.2 ("[I]n certain 'context[s] . . . "[t]he commonality and typicality requirements of Rule 23(a) tend to merge.""" (second and third alterations in original) (quoting *Dukes*, 564 U.S. at 349 n.5)). "The purpose of typicality is to ensure that class representatives 'have the incentive to prove all the elements of the cause of action which would be presented by the individual members of the class were they initiating individualized actions.'" *Floyd*, 283 F.R.D. at175 (quoting *In re NASDAQ Mkt.–Makers Antitrust Litig.*, 169 F.R.D. at 510). "Since the claims only need to share the same essential characteristics, and need not be identical, the typicality requirement is not highly demanding." *In re Platinum & Palladium Commodities Litig.*, 2014 WL 3500655, at *9 (quoting *Bolanos v. Norwegian Cruise Lines Ltd.*, 212 F.R.D. 144, 155 (S.D.N.Y. 2002)).

Plaintiffs allege, on behalf of the putative class, that they were harmed by the same course of events — Defendants' unlawful price fixing of interchange fees and implementation of the Restraints which have restricted trade. *See In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1175, 2014 WL 7882100, at *31 (E.D.N.Y. Oct. 15, 2014) ("Here, the plaintiffs allege that the defendants engaged in a global conspiracy to fix prices, so it is nearly tautological that the class representatives will rely on the same factual and legal arguments to establish the defendants' liability."), *report and recommendation adopted*, 2015 WL 5093503 (E.D.N.Y. July 10, 2015); *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. at 511 ("In antitrust disputes,

[s]ince the representative parties need [to] prove a conspiracy, its effectuation, and damages therefrom — precisely what the absentees must prove to recover — the representative claims can hardly be considered atypical." (alteration in original) (quoting *In re Sugar Indus. Antitrust Litig.*, 73 F.R.D. 322, 336 (E.D. Pa. 1976))).  Plaintiffs all currently operate businesses that continue to accept payment by Visa and Mastercard credit and debit cards.  (*See* Compl. ¶¶ 10–18.)  Although the Class Plaintiffs represent an array of different interests, they seek redress for the same type of harms due to the same course of conduct.[22]

For the same reasons as those discussed regarding commonality, the Court finds that the inclusion of future merchants in the class does not destroy typicality.  *See Dukes*, 564 U.S. at 350 n.5 ("We have previously stated in this context that '[t]he commonality and typicality requirements of Rule 23(a) tend to merge.  Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the

---

[22]   To the extent that any party challenges typicality on the grounds that Plaintiffs, as mostly small, single-location retailers, differ in size and structure from other class members, (*see* Direct Action Pls.' Opp'n 20–21 (describing the factual differences between the class representatives and the class members); Merchant Trade Groups' Opp'n 5–6, 13–14 (same)), the Court notes that such an argument is not sufficient to defeat typicality, which focuses on the factual and legal arguments that would be made to prove liability.  *See Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 660 (S.D.N.Y. 2015) (finding typicality requirement satisfied although "conceivably not all class members may be similarly situated as to damages," because "as to liability, the claims of the named plaintiffs here are typical of those of the class" and "[t]o prevail, each would be required to show that [the defendant's] practices with respect to the blanket licenses violated § 1 or § 2 of the Sherman Act, and effectively forced class members to accept a . . . blanket license with an artificially high price"); *Dial Corp. v. News Corp.*, 314 F.R.D. 108, 114 (S.D.N.Y. 2015) (rejecting the defendant's argument that the class representatives' claims are not typical of the rest of the class because the class representatives differed in when they purchased in-store promotion services and their geographic range of marketing), *amended*, No. 13-CV-6802, 2016 WL 690895 (S.D.N.Y. Feb. 9, 2016); *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 111 (E.D.N.Y. 2012) ("A putative class representative need not be a heavy-weight in its industry to satisfy the typicality prong; the relevant inquiry is simply whether absent class members' interests are advanced by the prosecution of the representative's claim.").

named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157–58 n.13 (1982))); *Sykes*, 780 F.3d at 80 (same).  Future merchants would face the same harm from the same course of events as those challenged by Plaintiffs by virtue of accepting Visa and Mastercard credit and debit cards.  That there might be some differences surrounding the credit- and debit-card market does not defeat typicality.  *See Robidoux*, 987 F.2d at 936–37 ("When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims."); *Latino Officers Ass'n City of N.Y.*, 209 F.R.D. at 89 (finding typicality satisfied as to future claimants because typicality "does not require that the factual background of each named plaintiff's claim be identical to that of all class members; rather, it requires that the disputed issue of law or fact 'occupy essentially the same degree of centrality to the named plaintiff's claims as to that of other members of the proposed class'" (quoting *Caridad v. Metro-N. Commuter R.R.*, 191 F.3d 283, 293 (2d Cir. 1999))); *Messier v. Southbury Training Sch.*, 183 F.R.D. 350, 356 (D. Conn. 1998) ("[A] (b)(2) class may include future members who stand to benefit from a favorable outcome in the case.").

Accordingly, Plaintiffs satisfy the Rule 23(a)(3) typicality requirement.

### iv.   Adequate representation

Rule 23(a)(4) provides that a class action is only appropriate if "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  The purpose is to "uncover conflicts of interest between named parties and the class they seek to represent."  *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625 (1997); *In re Patriot Nat'l, Inc.*

*Sec. Litig.*, 828 F. App'x 760, 764 (2d Cir. 2020) (quoting *Amchem*, 521 U.S. at 625).

"Determination of adequacy typically 'entails inquiry as to whether: (1) plaintiff's interests are

antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are

qualified, experienced and able to conduct the litigation.'" *Cordes & Co. Fin. Servs., Inc.*, 502

F.3d at 99 (quoting *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir.

2000)); *see also Irvin v. Harris*, 944 F.3d 63, 70 (2d Cir. 2019) ("[A] class representative must

be part of the class and possess the same interest and suffer the same injury as the class

members." (quoting *Dukes*, 564 U.S. at 348–49)). "[C]onflicts which are merely 'speculative . . .

should be disregarded at the class certification stage.'" *In re Vitamin C Antitrust Litig.*, 279

F.R.D. at 102 (quoting *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 145 (2d

Cir. 2001), *abrogated on other grounds by In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24

(2d Cir. 2006)); *see also Kurtz*, 818 F. App'x at 60 ("While a conflict of interest between the

named plaintiff and absent class members can render the former an inadequate representative

under certain circumstances, the 'conflict must be "fundamental" to violate Rule 23(a)(4).'"

(quoting *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir.

2011))). The Court separately discusses the adequacy of the class representatives and class

counsel.

　　In its review of the prior unitary settlement approval, the Second Circuit concluded "that

class members of the (b)(2) class were inadequately represented in violation of both Rule

23(a)(4) and the Due Process Clause." *Interchange Fees II*, 827 F.3d at 231. The Second

Circuit held that the "class representatives had interests antagonistic to those of some of the class

members they were representing," because the (b)(3) damages class "would want to maximize

cash compensation for past harm," while the (b)(2) injunctive class "would want to maximize

restraints on network rules to prevent harm in the future," and thus, "[t]he class counsel and class representatives who negotiated and entered into the Settlement Agreement were in the position to trade diminution of (b)(2) relief for increase of (b)(3) relief." *Id.* at 233–34 (holding that the Supreme Court's decisions in *Amchem*, 521 U.S. at 591 and *Ortiz*, 527 U.S. 815, which manifested tension on essential allocation decisions between present and future claimants, require separate representation when a class can be divided between members that hold present claims, and members that hold future claims).  In addition, the Second Circuit noted that the issue of unitary representation was exacerbated "because the members of the worse-off (b)(2) class could not opt out." *Id.* at 234.  The Second Circuit declined to decide "whether providing these class members with opt out rights would be a sufficient 'structural assurance of fair and adequate representation,' to overcome the lack of separate class counsel and representative." *Id.* (quoting *Amchem*, 521 U.S. at 627).

The Second Circuit further held that the "bargain that was struck between relief and release on behalf of absent class members" did not comport with due process because the bargain was "so unreasonable that it evidence[d] inadequate representation." *Id.* at 236.  The Second Circuit held that the relief provided to the (b)(2) class in the unitary settlement was insufficient because "[t]he most consequential relief afforded the (b)(2) class was the ability to surcharge Visa- and MasterCard-branded credit cards at both the brand and product levels," which did not provide meaningful relief to merchants that "accept American Express or operate in states that prohibit surcharging . . . and merchants that begin business after July 20, 2021," the date that injunctive relief expired under the settlement, "gain no benefit at all." *Id.* at 230, 238.  The Second Circuit stated that more beneficial relief might consist of "remedies that affected the default interchange fee or honor-all-cards rule." *Id.*  In addition, the Second Circuit held that the

40

release was "exceptionally broad" when it "permanently immunize[d] the defendants from any claims that any plaintiff may have now, or will have in the future, that arise out of, *e.g.*, the honor-all-cards and default interchange rules." *Id.* at 239.

In his concurrence, Judge Leval raised the issue of "one class of [p]laintiffs accept[ing] substantial payments from the Defendants" and in return "compel[ling] Plaintiffs in another class . . . to give up forever their potentially valid claims, without ever having an opportunity to reject the settlement by opting out of the class." *Id.* at 240 (Leval, J., concurring).  Relying on the Supreme Court's decisions in *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) and *Dukes*, 564 U.S. at 338, Judge Leval stated that due process was violated because all future merchants' that will accept Defendants' cards are precluded from bringing claims "for relief from allegedly illegal conduct" while having no ability to opt out of the settlement. *Id.* at 241–42 (Leval, J., concurring).

The structural defect of unitary representation no longer exists — the (b)(2) and (b)(3) classes now have separate class counsel, with the Robins Group serving as Rule 23(b)(3) Class Counsel and Hilliard & Shadowen LLP, Grant & Eisenhofer, P.A., Freed Kanner London & Millen, LLP, and the Nussbaum Law Group, P.C. serving as interim Class Counsel for the putative Rule 23(b)(2) Class.  (*See* Interim Class Counsel Order.)  The (b)(2) and (b)(3) classes also now have separate class representatives.  (*See* Compl. ¶ 2; Rule 23(b)(3) Third Consolidated Am. Class Action Compl. ¶ 2, Docket Entry No. 7123.)

For these and the following reasons, the Court finds that the bifurcation of the (b)(2) and (b)(3) classes and their Class Counsel sufficiently addresses the Second Circuit's concerns.[23]

---

[23]  For the reasons stated in Section II.c.iv.1.E, the Court declines to reach the issue of whether future merchants are adequately represented in this class.

The Court finds that the class representatives — with the exception of DDMB and DDMB2 — and Class Counsel adequately represent the class.

### 1.   Adequacy of class representatives

Plaintiffs argue that the class representatives adequately represent the class because their interests and injuries are the same as those of the class.  (*See* Pls.' Mem. 29.)  In support, Plaintiffs argue that they have the same interests in prosecuting their claims because all Plaintiffs "are subject to the same Restraints," "are challenging the same underlying conduct," and "are asserting the same legal claims . . . and . . . seek to enjoin the same conduct."  (*Id.*)  Plaintiffs contend that "[t]he prospect that Plaintiffs' preferences as to injunctive relief may differ from those of other class members[] has no bearing" at the class certification stage of the litigation because it is speculative and premature.  (*Id.* at 30.)  Plaintiffs also argue that any equitable relief secured via verdict or settlement "will serve only as a baseline for all [m]erchants going forward" because "[e]very [m]erchant will remain free to seek to negotiate additional relief specific to themselves and their own business needs."  (*Id.* at 30–31.)

Direct Action Plaintiffs, Grubhub Plaintiffs, Merchant Trade Groups, and Walmart (collectively, "Opponents") oppose class certification on adequacy of representation grounds. They contend that Plaintiffs do not adequately represent the proposed class because (1) they want to prioritize different forms of injunctive relief than some of the merchants in the putative class, (2) a mandatory Rule 23(b)(2) class would impermissibly alter the rights of merchants seeking money damages via claim and issue preclusion, (3) class representatives are incentivized to trade away the claims of class members pursuing individual damages claims in exchange for relief that benefits the rest of the equitable relief class, and (4) future merchants may be differently situated in the future and would have no opportunity to be heard before being bound to a judgment.  (*See*

Direct Action Pls.' Opp'n; Grubhub Pls.' Opp'n; Merchant Trade Groups' Opp'n; Walmart Opp'n.)  Direct Action Plaintiffs also imply that there is an adequacy issue because of relationships between Class Counsel and class representatives.  (*See* Direct Action Pls.' Opp'n 20 n.15.)  The Court addresses each category of arguments in turn below.

The analysis of whether a class representative is adequate "is twofold: the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members."  *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006); *see also In re Patriot Nat'l, Inc. Sec. Litig.*, 828 F. App'x at 764 ("In considering Rule 23(a)(4)'s adequacy requirement, the primary factors are whether the class representatives have any 'interests antagonistic to the interests of other class members' and whether the representatives 'have an interest in vigorously pursuing the claims of the class.'" (quoting *Denney*, 443 F.3d at 268)).  "To assure vigorous prosecution, courts consider whether the class representative has adequate incentive to pursue the class's claim, and whether some difference between the class representative and some class members might undermine that incentive."  *Interchange Fees II*, 827 F.3d at 231 (citing *Robinson v. Metro-N. Commuter R.R.*, 267 F.3d 147, 170 (2d Cir. 2001), *abrogated on other grounds by Wal-Mart Stores, Inc.* v. *Duke*, 564 U.S. 338 (2011)).  In addition to the adequate representation requirement of Rule 23(a)(4), "[t]he Due Process Clause . . . requires that the named plaintiff at all times adequately represent the interests of the absent class members."[24]  *Id.* (quoting *Shutts*, 472 U.S. at 812); *see also Irvin*, 944 F.3d at 71 (quoting *Shutts*, 472 U.S. at 812).

---

[24]  The Court is not aware of any case discussing whether the adequacy of representation requirement under the Due Process Clause is coextensive with Rule 23(a)(4).  *See* 1 Newberg on Class Actions § 3:51 (5th ed.) ("[N]o court has ever considered the specific question of whether the constitutional requirement of adequate representation for preclusion purposes is less exacting

A.   **The named Rule 23(b)(2) Class Plaintiffs suffer the
same injury as the putative class members and have an
interest in vigorous pursuit of the claims**

Courts assessing the adequacy of class representatives generally find adequacy when the

class representatives allege restraint of trade and monopolization and when, despite factual

differences in how the class members are situated, the class representatives are similarly

incentivized to prove the defendants' liability under antitrust law.  *See In re Auction Houses*

*Antitrust Litig.*, 193 F.R.D. 162, 165 (S.D.N.Y. 2000) (rejecting argument that the class was

inadequately represented because it consisted of both buyers and sellers of auction items when

"[b]oth buyers and sellers who have used defendants' services allegedly have been impacted by

the artificial inflation of both buyers' and sellers' commissions pursuant to the conspiracy"); *In*

*re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 243 (E.D.N.Y. 1998) ("Where the plaintiffs

have alleged a single conspiracy to artificially inflate prices, a representative plaintiff may satisfy

the adequacy requirement without having purchased products from all of the defendants, having

---

than Rule 23's requirement of adequate representation for certification purposes."); William B.
Rubenstein, *Finality in Class Action Litigation: Lessons from Habeas*, 82 N.Y.U. L. Rev. 790,
810 & n.79 (2007) ("[A]re all of the aspects of Rule 23 — including (a)(4) and (g) and all of
their subparts, interpretations, and subsequent fairness hearing assessments — necessarily a part
of the Constitution's demand for adequacy?  Remarkably, the answer is that there is no answer.
No court or commentator has ever scrutinized the question; all just assume an equivalence.");
Samuel Issacharoff, *Governance and Legitimacy in the Law of Class Actions*, 1999 Sup. Ct. Rev.
337, 373 ("There is no reason to believe . . . the concept of adequate representation present in the
rules is anything other than the level of constitutional protection of absent class member interests
necessary to deem their virtual participation in litigation fundamentally fair.").  Because the
parties address adequacy of representation under Rule 23(a)(4) and under the Due Process
Clause interchangeably and there is no authority to the contrary, and because Second Circuit
jurisprudence does not appear to draw any distinction between adequacy under the Due Process
Clause and Rule 23, *see, e.g.*, *Interchange Fees II*, 827 F.3d at 236 ("Part of the due process
inquiry (and part of the Rule 23(a) class certification requirements) involves assessing adequacy
of representation and intra-class conflicts." (quoting *Stephenson v. Dow Chem. Co.*, 273 F.3d
249, 260 (2d Cir. 2001), *aff'd in part and vacated in part*, 539 U.S. 111 (2003))), the Court
assumes the two requirements are equivalent and addresses them together.

bought all of the affected products or having made purchases throughout the entire class period. The crucial inquiry is . . . whether each plaintiff has sufficient incentive to present evidence that will establish the existence of the alleged conspiracy and its effect on the prices of the products purchased by the putative class member." (quoting *In re Industrial Diamonds Antitrust Litig.*, 167 F.R.D. 374, 381 (S.D.N.Y. 1996))); *see also In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 262 (D.D.C. 2002) ("[A]s to the vitamin products class, plaintiffs have alleged that defendants have participated in a unitary overarching conspiracy which encompassed a number of identified vitamins. . . . It is irrelevant to this prerequisite that the representatives have not purchased all products because their incentive to produce evidence as to the entire conspiracy will be the same." (citing *In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, 208 n.8 (E.D. Pa. 2001))).

The proposed Rule 23(b)(2) putative class consists of a group of merchants that accept Visa- and/or Mastercard-branded cards from December 18, 2020, until eight years after the date of entry of final judgment.  (*See* Pls.' Mem. 5.)  The Rule 23(b)(2) Class Plaintiffs seek to challenge the same allegedly unlawful conduct that they claim has harmed them — Defendants' (1) imposition of supracompetitive interchange fees on Visa and Mastercard transactions, and (2) facilitation of these anticompetitive practices by forcing merchants to abide by the Restraints. (*Id.* ¶¶ 11–15, 17–18.)  This alleged harm applies to all members of the putative class, making Plaintiffs similarly incentivized as class members to vigorously litigate and prove Defendants' liability.  *See In re Patriot Nat'l, Inc. Sec. Litig.*, 828 F. App'x at 764 (finding that the lead plaintiffs had an interest in vigorously pursuing Exchange Act and Delaware state law claims when "[a]ll of the lead plaintiffs and every shareholder had an Exchange Act claim" and therefore were "sufficiently motivated to recover as much as possible for each class member"); *Lawrence v. NYC Med. Prac., P.C.*, No. 18-CV-8649, 2021 WL 2026229, at *10 (S.D.N.Y. May

20, 2021) (finding the adequacy requirement satisfied when the class representatives "have substantially the same claims against [the] [d]efendants" and stating that "[b]ecause they share their claims with absent class members, the [c]ourt concludes that these representatives are capable of vigorously pursuing the claims of the class"); *Rosenfeld v. Lenich*, No. 18-CV-6720, 2021 WL 508339, at *4 (E.D.N.Y. Feb. 11, 2021) (finding the adequacy requirement satisfied when "[e]ach class member . . . suffered the same type of alleged injury" and there were no conflicts that "conflict with those of the putative class members").

### B. The type of relief sought by Plaintiffs is not antagonistic to the putative class members

Direct Action Plaintiffs argue that Plaintiffs' interests in injunctive relief "differ in size and scope from those of the five remaining proposed class representatives, who are owned and operated by just a handful of individuals." (Direct Action Pls.' Opp'n 20.)  In support, Direct Action Plaintiffs contend that Plaintiffs are all "very small businesses . . . with limited payment capabilities" whereas Direct Action Plaintiffs "include some of the largest merchants in the United States" who operate "thousands of locations in multiple states, have substantial e-commerce operations, with sophisticated digital and contactless payment capabilities that include EMV chip terminals." (*Id.* at 20–21.)  Direct Action Plaintiffs argue that Plaintiffs' expert reports demonstrate that they are prioritizing surcharging relief as opposed to relief from rules like the honor-all-cards rules because Plaintiffs "did not retain experts in mobile payments or EMV technology," and Plaintiffs' class certification expert Dr. Keith Leffler conceded merchants "who are directly affected by restraints relating to PIN debit, EMV, and [h]onor [a]ll [w]allets have a greater interest in obtaining equitable relief with respect to those restraints than do merchants that are not affected by them at all." (*Id.* (citing Report of Keith Leffler ("Leffler Report"), Docket Entry No. 8474-3).)  In addition, Direct Action Plaintiffs contend that Plaintiffs

46

seek injunctive relief that would actively harm them by "prevent[ing] bilateral negotiations[] [and] placing them instead under ongoing Court control." (Direct Action Pls.' Sur-Reply 10.) In support, Direct Action Plaintiffs argue that the injunctive relief sought by Plaintiffs will reopen prior settlements entered into by other merchants and will place the Court "in the role of supplanting individual merchant competition with central control." (Direct Action Pls.' Opp'n 14.)

Grubhub Plaintiffs argue that the remedy proposed by Plaintiffs' expert Dr. Joseph E. Stiglitz creates a conflict of interest because Plaintiffs want to "restrain the ability of 'premium merchants' like the Grubhub Plaintiffs [from] us[ing] their negotiating leverage to reach agreements" with Defendants and would "invite other class members to challenge any contracts the Grubhub Plaintiffs might negotiate." (Grubhub Pls.' Opp'n 12.) Grubhub Plaintiffs also highlight the differences between themselves and Plaintiffs, stating that the class representatives are "differently situated than large merchants that have different business models[] and that the [Defendants'] rules and practices affect them differently as a result." (*Id.* at 5.) In support, Grubhub Plaintiffs rely on deposition testimony by class representatives stating that Visa's "all-outlets practice[25] . . . is not important to RunCentral[] which has no other brands or locations," and from the owner of two bars operated by DDMB Inc. and DDMB2 LLC who stated that "those businesses have no complaint about the Visa and Mastercard [h]onor [a]ll [c]ards rules." (*Id.*)

Walmart argues that Plaintiffs will "undermine merchants' interests in eliminating anticompetitive conduct, and in particular Defendants' [honor-all-cards] rules" because Plaintiffs

---

[25] Visa's all-outlets practice requires that "an entity that accepts Visa at one location to accept the cards at all locations in order to qualify for a better interchange tier." (Grubhub Pls.' Opp'n 5.)

"have little actual interest in rolling[] back these rules." (Walmart Opp'n 10–11.)  In support, Walmart cites to a 2016 filing in which class counsel "informed the Court that they only sought to eliminate [honor-all-cards] rules in just a few states (ones that prohibit surcharging)." (*Id.* at 11 (citing Resp. in Supp. of Appl. for Appointment as Co-Lead Counsel for Equitable Relief Class 6, Docket Entry No. 6695).)  Walmart contends that Plaintiffs will "put insufficient energy into challenging Defendants' [honor-all-cards] rules once their class is certified." (*Id.*)  Walmart contends that the submissions of Plaintiffs' experts confirm their view of Plaintiffs' relief priorities because (1) Plaintiffs' expert Professor Dennis W. Carlton "proposed leaving the [honor-all-cards] rules in place generally, so long as no-surcharge rules are struck down," (Walmart Suppl. Opp'n 3 (citing Dep. of Professor Dennis W. Carlton ("Carlton Dep.") 141:9–18, annexed to Decl. of Paul H. Schoeman in Supp. of Walmart's Suppl. Opp'n ("Schoeman Suppl. Opp'n Decl.") as Ex. B, Docket Entry No. 8621)), (2) Dr. Leffler acknowledged during his deposition that different merchants prioritize different relief, (*id.* at 3–4 (citing Dep. of Dr. Keith Leffler ("Leffler Dep.") 90:23–91:4, annexed to Schoeman Suppl. Opp'n Decl. as Ex. C, Docket Entry No. 8621-1)), and (3) several experts including Dr. Stiglitz "argue[d] that the Court should monitor commercial agreements reached by 'leading' or 'premium' merchants . . . [to] assess whether these 'special deals' would be detrimental to the interests of other class members," (*id.* 4 (first citing Stiglitz Report ¶¶ 166, 177, annexed to Schoeman Suppl. Opp'n Decl. as Ex. D, Docket Entry No. 8621-2; and then citing Leffler Dep. 74:7–13)).  Finally, Walmart contends that Plaintiffs will seek relief that will hamper large merchants' ability to negotiate their own deals directly with Defendants. (*Id.* at 6–7.)

Merchant Trade Groups argue that "[t]here is troubling indicia" that Plaintiffs' value injunctive relief focused on surcharging whereas many other merchants within the class "have

already made clear in their objection to the 2013 (b)(2) [s]ettlement and subsequent appeal" that "Defendants' antitrust violations cannot be remediated for Merchant Trade Groups or the merchant community more broadly unless the [h]onor-all-[c]ards and default interchange rules are eliminated." (Merchant Trade Groups' Opp'n 11.) In response to Plaintiffs' argument that Merchant Trade Groups' are speculating about relief priorities, Merchant Trade Groups argue that (1) Plaintiffs' class certification brief "cites no evidence about" the honor-all-cards and default interchange rules, (2) one class representative "revealed that it is not personally interested" in relief from the honor-all-cards rule at all, and (3) all three of Plaintiffs' expert reports "focus on Defendants' no-surcharging rules — both in their analyses of Defendants' liability and in their injunctive relief — and give short shrift to Defendants' [h]onor-all-[c]ards and default interchange rules." (Merchant Trade Groups' Suppl. Opp'n 5–6.)

In response, Plaintiffs argue that (1) there is no conflict as to the injunctive relief sought because Plaintiffs seek relief "as to all of the Restraints, including the [h]onor [a]ll [c]ards and [d]efault [i]nterchange rules, with the objective of creating a more competitive market for all merchants," (2) there is no authority suggesting that all class members must have suffered "the same exact injury in the exact same way," and (3) the potential need for court monitoring does not create a conflict within the class because "[i]t is common for courts to retain jurisdiction to ensure compliance with their decrees" and such monitoring is needed because Network Defendants' market power will not be immediately eliminated as a result of any injunctive relief obtained. (Pls.' Reply Mem. in Supp. Pls.' Mot. ("Pls.' Reply") 10–11, 15–18, Docket Entry No. 8457); *see also* Pls.' Reply to Merchant Trade Groups' and Walmart's Suppl. Opp'n ("Pls.' Suppl. Reply") 2–6, Docket Entry No. 8631 ("[T]he 'honor-all-wallets' rule . . . is an application of the [honor-all-cards] rule to mobile devices.").) First, Plaintiffs argue that there is no conflict

as to the type of relief sought because they are seeking relief as to all Restraints.  (*See* Pls.' Reply 15–16; Pls.' Suppl. Reply 3.)  Plaintiffs contend that while they did not retain a separate expert to "address the mobile-wallets issue, there was no need to" as Dr. Stiglitz had already "dissected the [h]onor [a]ll [c]ards rule in details, including its application to not only mobile wallets but also all new emerging technologies."  (Pls.' Reply 16 (citing Expert Report of Joseph E. Stiglitz ("Stiglitz Report") ¶ 121, annexed to Pls.' Notice of Service as Ex. 2, Docket Entry No. 8474-2).)  Next, Plaintiffs argue that "a disagreement about the proper scope of relief is not a basis for denying certification."  (*Id.* at 16.)  Finally, Plaintiffs contend that Direct Action Plaintiffs distort Dr. Leffler's deposition testimony who "innocuously testified that selective agreements *could* be inconsistent with relief ordered by the Court" and other parties will necessarily be impacted by the outcome of the (b)(2) class because of the nature of how injunctive relief operates.  (*Id.* at 12–13.)  In addition, Plaintiffs argue that any discussion of remedies is premature as "the Court will determine the scope of the equitable relief based on its liability findings and further remedy proceedings" and the class will have an opportunity to "object to relief that they deem adverse to their interests."  (*Id.* at 13.)

Opponents' arguments that Plaintiffs seek a different type of injunctive relief are not sufficient to establish a conflict between the class representatives and the class members that defeats adequacy of representation.  Despite Opponents' contentions that Plaintiffs are primarily focused on obtaining surcharging relief, Plaintiffs' complaint challenges several of the Restraints that Opponents claim they are not seeking to eliminate, including the honor-all-cards rules and the default interchange fees, as violations of antitrust law.  (*See* Pls.' Mem 2 n.5; Compl. ¶¶ 94, 113, 139–40, 144, 155–56, 216, 288–99, 364–428.)  Opponents point to quotes from Plaintiffs' expert reports to support their arguments, but in other parts of their reports the experts also opine

that the honor-all-cards and default interchange rules are anticompetitive and suggest eliminating

them to some extent.  For example, in his recommendations as to potential injunctive relief, Dr.

Stiglitz recommended "[e]liminating all restraints on non-price steering," "[e]liminating Visa

and Mastercard default interchange fees for large banks," and "[e]liminating the [h]onor-[a]ll-

[c]ards rule for large banks," and included the honor-all-cards rules and default interchange rates

in his list of "current significant Visa and Mastercard" restraints.  (*See* Stiglitz Report ¶¶ 7, 37.)

While Opponents correctly state that Dr. Stiglitz suggests in his report that the honor-all-cards

rule be eliminated in states where surcharging is not permitted, he also states that "[t]he [h]onor-

[a]ll-[c]ards [r]ule has anticompetitive impact beyond the states not allowing merchants to charge

for high-cost credit card use" and that eliminating the rule would result in driving down issuing

banks' profits.  (*Id.* ¶¶ 134–135.)  Professor Carlton's reports offer a less strict perspective

toward the honor-all-cards rules, though he also suggests eliminating the honor-all-cards rules in

certain states.  At one point in his report, he states that the honor-all-cards rules should be

eliminated "[i]n states that prohibit surcharging," (Report of Prof. Dennis W. Carlton ("Carlton

Report") ¶ 8, annexed to Pls.' Notice of Service as Ex. 1, Docket Entry No. 8474-1), and in the

remedies section of the report, he states that "[i]n states where surcharging is restricted by law,

competition would be improved if the [h]onor [a]ll [c]ards rules were relaxed," (*id.* ¶ 111).  In

addition, both experts suggest that applications of the honor-all-cards rules such as the honor-all-

wallets rule[26] should not be permitted in order to allow more competition.  (*See* Carlton Report

---

[26] The honor-all-wallets rules are an application of the honor-all-cards rules to payments made via mobile devices.  (*See* Pls.' Suppl. Reply 4 ("[T]he 'honor-all-wallets' rule . . . is an application of the [honor-all-cards] rule to mobile devices."); Compl. ¶ 295 ("Visa and MasterCard have also construed and applied their [h]onor [a]ll [c]ards rules to become '[h]onor [a]ll [d]evices' rules.  Specifically, Visa and MasterCard rules require Merchants to accept all devices set up to transact through a Visa or MasterCard network to the extent the Merchant

¶ 115 ("As an example of potential future behavior that the Court may wish to address, tying of credit and debit was disallowed as part of the *Visa/MasterMoney* litigation.  Competition would be protected if similar tying related to new payment methods or technologies were disallowed, lest Visa and Mastercard again use their market power in credit (and now debit) to gain market power over a new payment method." (footnote omitted)).)

While Plaintiffs' Complaint and expert reports thus far demonstrate a desire to eliminate the honor-all-cards and default interchange rules in some capacity, the Court declines to make any judgments at this stage of the litigation as to Plaintiffs' injunctive relief priorities based on the existing expert reports.  As Plaintiffs contend, on April 18, 2019, the Court directed that:

> The parties' expert reports are not required at this time, or until further order of the Court, to include expert recitations and opinions directed at the scope and form of any appropriate injunctive relief. In the event of a subsequent finding of liability, the parties shall confer regarding a schedule for the serving of expert reports directed at the scope and form of any proposed injunctive relief and report to the Court within twenty-eight days following any such liability determination.

(Order dated Apr. 18, 2019.)  Accordingly, expert reports at this stage of the litigation do not conclusively address "the scope and form of any appropriate injunctive relief" and any conflicts as to the form of injunctive relief are speculative.[27]  *See Denney*, 443 F.3d at 268 ("A conflict or

---

accepts payments using communications technology employed by the device.  This results in a Merchant having limited ability to refuse or condition acceptance of payments from digital wallets.").)

[27]  Direct Action Plaintiffs contend that Plaintiffs propose a plan to have the Court monitor agreements reached between a merchant and Defendants argue that this plan violates the Rules Enabling Act because it "seeks to abridge the Direct Action Plaintiffs' substantive rights and prohibit[s] them from continuing to litigate their own claims for past and future damages[] or reach[ing] individual settlements resolving those claims."  (Direct Action Pls.' Opp'n 14.)  Walmart contends that Plaintiffs will "likely seek an injunction that effectively prevent[] merchants from trying to use what bargaining power they have to secure lower interchange rates for themselves."  (Walmart's Opp'n 8; Walmart's Suppl. Opp'n 4–5.)  For the same reasons

potential conflict alone will not, however, necessarily defeat class certification — the conflict must be 'fundamental.'" (quoting *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d at 145)); *Zhang v. Ichiban Grp., LLC*, No. 17-CV-148, 2021 WL 3030052, at *5 (N.D.N.Y. May 21, 2021), *reconsideration denied*, 2021 WL 3030038 (N.D.N.Y. June 23, 2021) ("A conflict of interest between the parties and the class they seek to represent 'must be fundamental, and speculative conflict should be disregarded at the class certification stage.'" (quoting *Sykes*, 285 F.R.D. at 287)); *In re Vitamin C Antitrust Litig.,* 279 F.R.D. at 102 ("[C]onflicts which are merely speculative . . . should be disregarded at the class certification stage.").

Moreover, even if Plaintiffs' do have a different perspective on the specific form of injunctive relief, courts considering the issue routinely hold that different perspectives as to the appropriate form of injunctive relief or as to litigation strategy do not constitute a conflict sufficient to defeat adequacy of representation.  *See In re Yahoo Mail Litig.*, 308 F.R.D. 577, 596 (N.D. Cal. 2015) (finding that "the relief that [the] [p]laintiffs seek does not conflict with the interests of proposed class members" when the plaintiffs sought to shut down email scanning and the defendant contended that such actions would result in a less secure email experience, and holding that "[a] difference of opinion about the propriety of the specific relief sought in a class action among potential class members is not sufficient to defeat certification" (quoting *Californians for Disability Rts., Inc. v. California Dep't of Transp.*, 249 F.R.D. 334, 348 (N.D. Cal. 2008))); *Keepseagle v. Vilsack*, 102 F. Supp. 3d 205, 214 (D.D.C. 2015) (denying motion to modify class settlement and stating that "class representatives do not become inadequate merely because other class members disagree with their strategic decisions"); *Californians for Disability*

---

discussed above, the Court finds these arguments regarding the propriety of any proposed injunctive relief premature.

*Rts., Inc.*, 249 F.R.D. at 348 ("A difference of opinion about the propriety of the specific relief

sought in a class action among potential class members is not sufficient to defeat certification.");

*In re J.P. Morgan Chase Cash Balance Litig.*, 242 F.R.D. 265, 275 (S.D.N.Y. 2007) (finding that

the alleged ERISA violation "affects former and current employees equally" and stating that

"[w]hile current employees may prefer the cash balance formula for various reasons . . . [the]

preference for a different remedy does not preclude class certification"), *amended*, 255 F.R.D.

130 (S.D.N.Y. 2009); *Richards v. FleetBoston Fin. Corp.*, 235 F.R.D. 165, 172 (D. Conn. 2006)

("Even if the court could assume at this stage in the litigation that class members do prefer a

lump-sum distribution, a question it does not decide, this conclusion would go only toward the

question of which remedy class members would seek, which does not affect the viability of the

class at this stage in the litigation. . . . The question of remedies is not appropriate for resolution

at this stage in the litigation, and the court is not required to impose the particular remedy

requested by [the plaintiff] even if she prevails on the merits of her claims."); *see also In re*

*Motor Fuel Temperature Sales Pracs. Litig.*, 271 F.R.D. 221, 233 (D. Kan. 2010) (finding the

class representatives adequate in a Rule 23(b)(2) class action despite the fact that some class

members might oppose the requested injunctive relief because the injunction need only benefit

the class as a whole and because "[c]lass actions are not forbidden in every case in which class

members may disagree").  For example, in *In re Visa Check/MasterMoney Antitrust Litigation*,

the Second Circuit rejected the defendants' arguments that class representatives were inadequate

because they advanced an alternative theory for calculating the plaintiffs' damages.  280 F.3d at

144.[28]  The Second Circuit stated that the different theories did not create a fundamental conflict

---

[28]  The Second Circuit later abrogated *Visa Check/MasterMoney* on other grounds.  *See*
*In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 32, 42 (2d Cir. 2006), *decision clarified on*

because "[a]ll class members, regardless of their debt/credit proportion, wish to prove that the debit card fees would be significantly lower" without the challenged practice, and because "[e]very member also has an interest in establishing the hypothetical, 'untied' price as low as possible in order to maximize recovery of damages. *Id.* at 144. In addition, the *Visa Check/MasterMoney* court noted that speculative conflict "should be disregarded at the class certification stage." *Id.* at 146. Had the class representatives sought a different form of relief entirely — that is, monetary damages versus equitable relief, it may have raised an issue of inadequate representation. *See, e.g.*, *Dickens v. GC Servs. Ltd. P'ship*, 706 F. App'x 529, 535–36 (11th Cir. 2017) (noting that in a past Eleventh Circuit case the court found inadequate representation when a class sought primarily injunctive relief when damages were a more appropriate form of relief, stating that "there is a conflict between the named plaintiff and absent class members where the class representative seeks only a form of relief that might not be of the utmost importance to absent class members," and holding that there is no reason to deem the plaintiff an inadequate representative when the plaintiff sought injunctive relief and there was only a "remote possibility that some class members may have suffered actual damages"); *see also* 1 Newberg on Class Actions § 3:59 ("[W]hen a class includes members whose claims are for a different type of relief than the claims of the putative class representatives, it is possible that the differences create a conflict of interest disabling the representative from adequately representing the entire class."). Moreover, Rule 23 has procedural safeguards that will allow

---

*denial of reh'g sub nom. In re Initial Pub. Offering Sec. Litig.*, 483 F.3d 70 (2d Cir. 2007). The abrogation concerned the proper standard for demonstrating compliance with Rule 23's requirements on a motion for class certification and "disavowed the suggestion . . . that an expert's testimony may establish a component of a Rule 23 requirement simply by being not fatally flawed." *Id.*

class members to object to the injunctive relief provided in any settlement.  *See* Fed. R. Civ. P. 23(e)(5) ("Any class member may object to the [settlement] proposal . . . .").

The cases Opponents cite to the contrary are inapposite.  Several of the cases are cited in support of Opponents' speculative arguments regarding the form of the injunctive relief sought by Plaintiffs.  For example, Walmart cites *Wexler v. AT&T Corp.* for the proposition that "[a] proposed representative may be . . . inadequate if, for example, they . . . would otherwise permit a settlement on terms less favorable to absent class members."  (Walmart Opp'n 10 n.12 (citing *Wexler v. AT&T Corp.*, No. 15-CV-686, 2019 WL 4874746, at *2 (E.D.N.Y. Sept. 30, 2019)).)  However, for the reasons discussed above, the Court finds discussion of the specific type of injunctive relief Plaintiffs intend to seek premature at this stage of the litigation.  Walmart also suggests that the Court should broadly apply *Interchange Fees II* and hold that adequacy is lacking when groups within a class seek conflicting forms of relief, (*see* Walmart Opp'n 10 ("The Second Circuit has already warned, in this very MDL, that adequacy is lacking where different groups seek conflicting forms of relief, incentivizing class counsel to trade away one group's interests for the other's and settle on terms that disfavor certain class members.")), however, the Second Circuit did not reach such a conclusion in *Interchange Fees II*.  The Second Circuit found that adequacy was lacking due to the unitary representation of the damages and equitable relief class by the same class counsel.  *See Interchange Fees II*, 827 F.3d at 234 ("Unitary representation of separate classes that claim distinct, competing, and conflicting relief create unacceptable incentives for *counsel* to trade benefits to one class for benefits to the other in order somehow to reach a settlement." (emphasis added)).  While the Second Circuit emphasized the importance of obtaining greater injunctive relief than just primarily the ability to surcharge, the Court addressed this issue in the context of inadequate class counsel and an

56

"unreasonable tradeoff between relief and release that demonstrates their representation did not comply with due process." *Id.* at 238–40 ("This is not a matter of certain merchants (e.g., those based in New York and those that accept American Express) arguing that class counsel did not bargain for their preferred form of relief, did not press certain claims more forcefully, or did not seek certain changes to the network rule books more zealously. This is a matter of class counsel trading the claims of many merchants for relief they cannot use: they actually received nothing.").

Accordingly, the Court finds that Opponents' arguments regarding their preferred injunctive relief are premature and speculative and do not create a fundamental conflict that precludes a finding of adequacy of representation.

> **C. The risk of claim and issue preclusion does not create a fundamental conflict between class representatives and putative class members**

Direct Action Plaintiffs argue that the proposed class violates due process because their claims for damages are property interests protected by the Due Process Clause and certifying a mandatory class would "put class members at risk of having [their] individual damages claims precluded" because an "adverse judgment against a mandatory class could collaterally estop class members from pursuing their individual damages claims." (Direct Action Pls.' Opp'n 6–8 (first citing *Shutts*, 472 U.S. at 812; and then citing *Dukes*, 564 U.S. at 363).) Direct Action Plaintiffs contend that the Second Circuit's decision in *Interchange Fees II* prevents certification of a mandatory equitable relief class when doing so would "jeopardize the compensatory damages claims of individual class members, including because of the risk of collateral estoppel." (*Id.* at 7 (citing *Interchange Fees II*, 827 F.3d at 364).) In response to Plaintiffs' argument that due process only protects their property right in their claim "when a mandatory

(b)(2) class seeks both injunctive *and* monetary relief," Direct Action Plaintiffs contend that nothing in *Dukes* supports that argument, (Direct Action Pls.' Sur-Reply 2–3), and their individual damages claims are nevertheless at risk because Plaintiffs' claims for equitable relief raise the same issues and "require[] proof of Defendants' *liability* for engaging in anticompetitive restraints," (Direct Action Pls.' Opp'n 8–9).

Grubhub Plaintiffs raise a similar argument.  (*See* Grubhub Pls.' Opp'n 13.)  Grubhub Plaintiffs contend that their claims are protected by the Due Process Clause and will be precluded should they be collaterally estopped by an adverse judgment against the class.  (*Id.*)

In response, Plaintiffs argue that the collateral estoppel argument is meritless as it is speculative and premature.  (Pls.' Reply.)  In support, Plaintiffs argue that the "'potential preclusion' argument would prevent any court from certifying a mandatory (b)(2) class if any class member had a related claim for damages" and courts have "continued to certify and endorse the certification of (b)(2) classes including members that also maintain damages claims." (*Id.* at 7.)  Plaintiffs distinguish the cases cited by Opponents and argue that those cases were decided in other contexts that have no bearing on the instant motion.  (*See id.* at 8 (noting that the cases were decided in the context of class certification for a class predominantly for money damages or had damages claims compromised by the terms of a release).)

Defendants argue that due process is not implicated by certification of a mandatory class because Plaintiffs seek certification of a Rule 23(b)(2) class that seeks neither "monetary relief" nor even "'incidental' monetary relief" because the Rule 23(b)(3) settlement "separately addressed all other claims for relief, and notice and opt-out rights were provided to members of that class."  (Defs.' Reply 11.)  In response to Opponents' arguments regarding *Dukes*, Defendants contend that *Dukes* is inapposite because it concerned certification of a Rule 23(b)(2)

class that sought injunctive relief and backpay and "the monetary relief [was] not incidental to" the injunctive relief sought. (*Id.* (quoting *Dukes*, 564 U.S. at 360).)  In addition, Defendants argue that the potential for collateral estoppel does not violate due process because if that were the case, "courts typically would be required to provide opt-out rights to a Rule 23(b)(2) class." (*Id.* at 12.)

Opponents' claim preclusion argument is unpersuasive.  "The doctrine of res judicata, or claim preclusion, holds that 'a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.'"  *In re Motors Liquidation Co.*, 943 F.3d 125, 130 (2d Cir. 2019) (quoting *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 284 (2d Cir. 2000)); *In re Vitamin C Antitrust Litig.*, 279 F.R.D. at 114 ("[A] final judgment on the merits generally precludes a plaintiff from bringing a new lawsuit raising issues that could have been litigated in the first suit, but were not." (citing *Schwab v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 992, 1076 (E.D.N.Y. 2006))).  However, class action judgments are an exception to the general rule: "[P]articipation in a Rule 23(b)(2) class seeking injunctive relief does not ordinarily preclude absent class members from bringing their non-litigated claims in subsequent lawsuits." *In re Vitamin C Antitrust Litig.*, 279 F.R.D. at 114.  The United States Supreme Court's decision in *Cooper v. Federal Reserve Bank of Richmond* is widely cited as the source of this principle.  *See id.* at 114–15 ("This exception to the general claim-splitting rule has its origin in a puzzling Supreme Court decision from 1984." (citing *Cooper v. Fed. Reserve Bank*, 467 U.S. 867, 880 (1984))); *see also Hernandez v. J.P. Morgan Chase Bank N.A.*, No. 14-CV-24254, 2016 WL 3982496, at *13 (S.D. Fla. July 22, 2016) (quoting *Cooper*, 467 U.S. at 880); *Gonzalez v. City of New York*, 396 F. Supp. 2d 411, 420 (S.D.N.Y. 2005) (finding that the plaintiffs' failure to promote claim was not barred by a

previous class action judgment (quoting *Cooper*, 467 U.S. at 880)); *see also* 6 Newberg on Class Actions § 18:17 ("The Supreme Court's 1984 decision . . . is the leading case in which a court refused to bar individual claims that arose out of the same factual predicate as claims that had been resolved by a prior class suit, though the specific facts of that case are somewhat unique and beguiling.").  *Cooper* involved an individual suit which alleged racial discrimination following an earlier class action in which the court found no pattern and practice of discrimination.  *Cooper*, 467 U.S. at 867.  While the earlier class action resulted in a judgment for the defendant and the plaintiff had not opted out of the class, the Supreme Court held that the plaintiff's subsequent discrimination claim was not barred by the prior class action because there might be individual discrimination despite the lack of a "pattern and practice of discrimination" as concluded in the class action.  *Id.* at 880.  The *Cooper* court stated that the class action judgment:

> (1) bars the class members from bringing another class action against the [defendant] alleging a pattern or practice of discrimination for the relevant time period and (2) precludes the class members in any other litigation with the [defendant] from relitigating the question whether the [defendant] engaged in a pattern and practice of discrimination against black employees during the relevant time period.  The judgment is not, however, dispositive of the individual claims the . . . petitioners have alleged in their separate action. . . . The class-action device was intended to establish a procedure for the adjudication of common questions of law or fact.  If the [defendant's] theory were adopted, it would be tantamount to requiring that every member of the class be permitted to intervene to litigate the merits of his individual claim.

*Id.* at 880.

Courts have since relied on *Cooper* as an exception to the general rules of preclusion in the class-action context.  *See In re Vitamin C Antitrust Litig.*, 279 F.R.D. at 114 ("Although *Cooper* did not announce any bright-line rules, some courts have cited this case for the sweeping proposition that 'a class action judgment . . . binds the class members as to matters actually

litigated but does not resolve any claim based on individual circumstances that was not addressed in the class action.'" (quoting *Cameron v. Tomes*, 990 F.2d 14, 17 (1st Cir. 1993))); *see also In re AXA Equitable Life Ins. Co. COI Litig.*, No. 16-CV-740, 2020 WL 4694172, at *4 n.2 (S.D.N.Y. Aug. 13, 2020) ("[S]ome courts have held that inclusion in a mandatory class does not bar a class member from later asserting a claim for money damages arising out of the same transaction."); *Adkins v. Morgan Stanley*, 307 F.R.D. 119, 141 (S.D.N.Y. 2015) (citing *Cooper* and stating that "while absent class members risk losing on the merits and being precluded from separately asserting, for example, a claim that [the defendant] is culpable for their loans, if the class were to win on the merits they would be able to pursue separate claims for damages"), *aff'd*, 656 F. App'x 555 (2d Cir. 2016); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-MD-1827, 2012 WL 273883, at *1–2 (N.D. Cal. Jan. 30, 2012) ("'In the Ninth Circuit, 'the general rule is that a class action suit seeking only declaratory and injunctive relief does not bar subsequent individual damages claims by class members, even if based on the same events.' . . . The rationale for this rule — which has typically been applied in the Title VII context — is that claims for monetary damages typically rely upon different facts than claims for injunctive relief." (first quoting *Hiser v. Franklin*, 94 F.3d 1287, 1291 (9th Cir. 1996); and then citing *Cooper*, 467 U.S. at 891)); *see also Akootchook v. United States*, 271 F.3d 1160, 1165 (9th Cir. 2001) ("If all class members had to bring their own individual claims in addition to the common class claims, it would destroy the efficiency of having class actions and reduce the benefit of joining such a suit.").  In *Hiser v. Franklin*, for example, the Ninth Circuit rejected the argument that a state-court class-action judgment precluded a second suit seeking individual damages.  94 F.3d at 1291.  The Ninth Circuit stated that "the general rule is that a class action suit seeking only declaratory and injunctive relief does not bar subsequent individual damage claims by class

members, even if based on the same events" and noted that "every federal court of appeals that has considered the question" has reached the same conclusion. *Hiser*, 94 F.3d at 1291 (citing *Cooper*, 467 U.S. at 880 and collecting cases).  Circuit courts that have considered the issue have reached the same conclusion, although some of their holdings are arguably limited to the prisoners' conditions of confinement context. *See Frank v. United Airlines, Inc.*, 216 F.3d 845, 851–52 (2000) (limiting the preclusive effect of a Rule 23(b)(2) sex-discrimination class-action by holding that the absence of a right to opt out in the earlier case made preclusion unavailable); *Fortner v. Thomas*, 983 F.2d 1024, 1031 (11th Cir. 1993) ("It is clear that a prisoner's claim for monetary damages or other particularized relief is not barred if the class representative sought only declaratory and injunctive relief, even if the prisoner is a member of a pending class action."); *Norris v. Slothouber*, 718 F.2d 1116, 1117 (D.C. Cir. 1983) (per curiam) ("A suit for damages is not precluded by reason of the plaintiff's membership in a class for which no monetary relief is sought."); *Crowder v. Lash*, 687 F.2d 996, 1011 (7th Cir. 1982) ("Contrary to defendant's apprehensions, application of collateral estoppel to bar relitigation of issues determined in [the previous class action] will not automatically establish defendant's liability for damages here.  Even if the conditions under which [the plaintiff] was confined are held to constitute cruel and unusual punishment as a matter of law, issues of personal responsibility and good faith on the part of these defendants remain to be litigated.").

Although the Second Circuit has not addressed the issue, the Court agrees with the courts that have found that membership in an equitable relief class does not bar subsequent individual suits for damages and finds that Opponents are not inadequately represented on this basis.  The

class certification decision in *In re Vitamin C Antitrust Litigation* is instructive.[29]  279 F.R.D. at 90.  In that case, which involved alleged violations of antitrust law, the court certified a mandatory injunctive relief class of direct and indirect purchasers of vitamin C.  *Id.* at 116.  The defendants argued that the class was not adequately represented because the class only sought injunctive relief as to the indirect purchasers and failed to pursue damages, and "principles of res judicata [would] bar the indirect purchasers from bringing [their damages] claims in the future."  *Id.* at 114.  The court rejected the defendants' arguments, holding that "membership in th[e] Rule 23(b)(2) class does not bar the indirect purchasers' subsequent claims for damages."  *Id.* at 115.  The court disagreed with other courts that "refuse to certify a class which [seeks] injunctive relief but exclude[s] some class members' damages claims."  *Id.* at 115 (citing *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 209 F.R.D. 323, 340 (S.D.N.Y. 2002)).  The court noted that Rule 23(b)(3) requires notice and an opportunity to opt out whereas Rule 23(b)(2) does not require that a district court afford the same protections to class members because Rule 23(b)(2) class actions are only certified if "broad, class-wide injunctive or declaratory relief is necessary to redress a group-wide injury."  *Id.* at 115 (quoting *Robinson*, 267 F.3d at 162).  Damages claims, which "usually require individualized analyses of class members' circumstances," therefore "tend to destroy class certification under Rule 23(b)(2)."  *Id.*  While the court stated that only a subsequent court could determine the res judicata effect of the judgment, it also explicitly reserved "the right of the indirect purchasers to maintain their damages claims in subsequent proceedings notwithstanding their participation in the [i]njunction

---

[29]  The Court notes that while the antitrust claims in *In re Vitamin C Antitrust Litigation* were later dismissed by the Second Circuit on international comity grounds, the court's class certification decision was not before the Second Circuit on appeal.  *See In re Vitamin C Antitrust Litig.*, 8 F.4th 136, 143 (2d Cir. 2021) ("[W]e hold that principles of international comity required the district court to dismiss this action.").

[c]lass" and found this approach "sufficient to extinguish [the] defendants' claim-splitting concerns for the purpose of class certification." *Id.* at 116.

Similarly, the Court finds that the class representatives do not inadequately represent Opponents because Opponents' membership in the (b)(2) class will not preclude any individual damages claims. *See J.B. v. Onondaga County*, 401 F. Supp. 3d 320, 333 n.4 (N.D.N.Y. 2019) (following *In re Vitamin C Antitrust Litigation* and rejecting the argument that the class representative was inadequately representing the class because he sought only injunctive relief when other class members had potential claims for damages); *Ackerman v. Coca-Cola Co.*, No. 09-CV-395, 2013 WL 7044866, at *17 n.29 (E.D.N.Y. July 18, 2013) (certifying Rule 23(b)(2) class and stating that "participation in a Rule 23(b)(2) class seeking injunctive relief does not preclude absent class members from bringing their non-litigated damages claims in subsequent lawsuits" (citing *In re Vitamin C Antitrust Litig.*, 279 F.R.D. at 114)); *In re Paulsboro Derailment Cases*, No. 12-CV-7586, 2014 WL 4162790, at *15 (D.N.J. Aug. 20, 2014) ("It is clear that 'participation in a Rule 23(b)(2) class seeking injunctive relief does not ordinarily preclude absent class members from bringing their non-litigated claims in subsequent lawsuits.'" (quoting *In re Vitamin C Antitrust Litig.*, 279 F.R.D. at 114)). To find otherwise would essentially render Rule 23(b)(2) classes impossible to certify when there are also monetary damages at stake. *See In re Vitamin C Antitrust Litig.*, 279 F.R.D. at 116 ("[T]he *In re MTBE* court's approach has been criticized as saying, in effect, 'I know that you have proposed a class action that may be properly maintainable, but I won't allow you to proceed because I must protect the absentees from the possibility that a subsequent court might misapply my judgment.' This is an unacceptable result." (citation omitted) (quoting Tobias Barrington Wolff, *Preclusion in Class Action Litigation*, 105 Colum. L. Rev. 717, 745 (2005))); 6 Newberg on Class Actions

§ 18:18 ("Relying on the claim splitting concern alone would be an overbroad approach as it would tend to render the injunctive class action somewhat impossible to pursue.  In any case in which the class seeks only declaratory and injunctive relief, there may always be a possibility of monetary damages, but that possibility alone should not foreclose the injunctive class action.").

In addition to the claim preclusion argument, Opponents attempt to advance a slightly different but related theory — that they are inadequately represented because their rights as to their monetary claims will be impermissibly altered or circumscribed by their membership in a Rule 23(b)(2) mandatory class via issue preclusion.  While the exception developed in *Cooper* applies to claim preclusion, issues actually litigated in an earlier class action may still preclude litigation of the same issues in a subsequent individual action.  *See Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 565 (C.D. Cal. 2012) ("While *Cooper* indicates that under some circumstances individual damages claims remain available to class members even after an adverse judgment in a Rule 23(b)(2) class action, the [Supreme] Court clearly stated that a plaintiff could not relitigate the exact question that was adjudicated in the prior litigation."); *Van Gorder v. Lira*, No. 08-CV-281, 2010 WL 1235328, at *7–8 (N.D.N.Y. Mar. 15, 2010) (finding certain issues precluded by a previous 23(b)(3) class action when the requirements for issue preclusion were satisfied and the plaintiff received notice and an opportunity to opt out but failed to do so), *report and recommendation adopted*, 2010 WL 1235283 (N.D.N.Y. Mar. 30, 2010).  Although the Court acknowledges that issue preclusion may impact litigation of particular issues in their individual damages claims, the Court does not find that this effect would render Opponents inadequately represented by the Rule 23(b)(2) class.

Direct Action Plaintiffs and Grubhub Plaintiffs imply that the Court should read *Dukes* broadly for the proposition that certifying equitable relief classes could interfere with money

damages claims.  (*See* Direct Action Pls.' Opp'n 7–8; Grubhub Pls.' Opp'n 13–14.)  The Court

declines to do so.  In *Dukes*, the Supreme Court held that a Rule 23(b)(2) class could not be

certified for lack of commonality under Rule 23(a)(2) and the equitable relief test under Rule

23(b)(2).  *See Dukes*, 564 U.S. at 342.  The plaintiffs sought both individual monetary claims for

backpay and injunctive relief under Rule 23(b)(2).  *Id.* at 360–63.  The Supreme Court held that

Rule 23(b)(2) "does not authorize class certification when each class member would be entitled

to an individualized award of monetary damages" and noted that combining individualized and

classwide relief is inconsistent with Rule 23(b)(2).  *Id.* at 360–61.  In rejecting the respondents'

arguments that their backpay claims were properly certified under Rule 23(b)(2), the Supreme

Court found that those claims did "not 'predominate' over [the respondents'] requests for

injunctive and declaratory relief."  *Id.* at 363.  The *Dukes* court stated that adopting a

predominance test under Rule 23(b)(2) would incentivize class representatives to intentionally

not include monetary claims so that those claims do not predominate over the claims for

injunctive relief.  *Id.* at 364.  In *Dukes*, for example, the named plaintiffs "declined to include

employees' claims for compensatory damages in their complaint" in addition to the backpay

claims — a strategy that "made it more likely that monetary relief would not 'predominate.'"  *Id.*

In doing so, the Supreme Court noted that including the backpay claims created the possibility

"that individual class members' compensatory-damages claims would be *precluded* by litigation

they had no power to hold themselves apart from."  *Id.*  The Court went on to state that:

> If it were determined, for example, that a particular class member is
> not entitled to backpay because her denial of increased pay or a
> promotion was *not* the product of discrimination, that employee
> might be collaterally estopped from independently seeking
> compensatory damages based on that same denial.  That possibility
> underscores the need for plaintiffs with individual monetary claims
> to decide *for themselves* whether to tie their fates to the class

representatives' or go it alone — a choice Rule 23(b)(2) does not
ensure that they have.

*Id.*

Direct Action Plaintiffs and Grubhub Plaintiffs cite this language in their briefs to suggest
that the Supreme Court took issue with certification of a Rule 23(b)(2) class because of the
potential collateral estoppel effects generally.  (*See* Direct Action Pls.' Opp'n 7–8 (stating that
the Supreme Court "held that certifying a mandatory equitable relief class would violate due
process if doing so could jeopardize the compensatory damages claims of individual class
members, including because of the risk of collateral estoppel"); Grubhub Opp'n 13–14.)
However, the Supreme Court was concerned with the preclusive effects that could arise as a
result of splitting individual claims for monetary damages by including only some of the
individual claims *within* the Rule 23(b)(2) class.  *See Cholakyan*, 281 F.R.D. at 565 ("While
defendant would have the court read *Dukes* broadly, as another court recognized, there 'the
Supreme Court focused on the problems that would arise if individualized relief were allowed in
a (b)(2) class.  This focus confirms what common sense suggests: a Rule 23(b)(2) judgment, with
its one-size-fits-all approach and its limited procedural protections, will not preclude later claims
for individualized relief.'" (quoting *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2012 WL
273883, at *2)).  The Court therefore reads *Dukes* to hold that claims for monetary relief cannot
be certified *as part of* a mandatory Rule 23(b)(2) class because class members could be
precluded from asserting their compensatory damages claims without having had notice and an
opportunity to opt out — not that (b)(2) classes generally create a collateral estoppel risk as to
damages claims as Opponents suggest.

Direct Action Plaintiffs also attempt to find support for their argument in Judge Leval's
concurrence in *Interchange Fees II*.  (*See* Direct Action Pls.' Opp'n 7–8 (stating that Judge

Leval's concurrence in *Interchange Fees II* contended that "*Dukes* stands for the principle that 'a class may not even be certified because of the risk that adjudication of its rights might violate the due process rights of its members by forcibly depriving them of claims'" (quoting *Interchange Fees II*, 827 F.3d at 241 (Leval, J., concurring)).)  However, this argument reads Judge Leval's concurrence more broadly than the Court does.  In *Interchange Fees II*, Judge Leval found "the broad release of the Defendants" "particularly troublesome" because it "binds in perpetuity . . . all merchants who in the future will accept Visa and Mastercard, including those not yet in existence, who will never receive any part of the money."  *Id.*  Judge Leval found it impermissible that "[o]ne class of Plaintiffs receives money as compensation for the Defendants' arguable past violations, and in return gives up the future rights of *others*."  *Id.*  In support, Judge Leval stated that *Dukes* held that "claims for monetary relief cannot be certified under Rule 23(b)(2) . . . because of the possibility that 'individual class members' compensatory-damages claims would be *precluded* by litigation they had no power to hold themselves apart from.'"  *Id.* (quoting *Dukes*, 564 U.S. at 364).  Judge Leval went on to state:

> If a class may not even be certified because of the risk that adjudication of its rights might violate the due process rights of its members by forcibly depriving them of claims, then necessarily an adjudication of a class's rights that in fact forcibly deprives the members of their claims is also unacceptable.  Because the terms of this settlement preclude all future merchants that will accept the Defendants' cards (the (b)(2) class) from bringing claims without their having had an opportunity to opt out (or even object), the Supreme Court's rulings in *Shutts* and *Dukes* make clear that a court cannot accept it.

*Id.* at 241–42.  The Court understands Judge Leval's concurrence to find that a class or settlement class may not be certified if it confiscates money damages claims without notice and the opportunity to opt out.  The issue for Judge Leval was the broad *release* contained in the settlement, and he relied on *Shutts* and *Dukes*, both cases involving impermissible confiscation

of money damages claims without notice and an opportunity to opt out.  The Court does not understand Judge Leval to imply that mere membership in a mandatory (b)(2) class risks confiscating damages claims and violates due process.

While the cases cited by Direct Action Plaintiffs indicate that some courts have expressed hesitation in certifying an equitable relief class when individual damages claims are at stake for fear that issue preclusion may hinder or burden litigation of individual damages claims in a subsequent suit, the Court finds these cases distinguishable because they involved claims for money or money-adjacent claims within a (b)(2) class.  In *Cholakyan*, the court noted its concern as to "whether individual claims for money damages [would] be compromised if a mandatory Rule 23(b)(2) class is certified and plaintiffs lose on the merits" and concluded that "the state of the law on this subject is at best unsettled."  281 F.R.D. at 564–65.  However, the court ultimately "stop[ped] short of a finding that [plaintiff] and counsel are inadequate," stating that there were "other grounds . . . more than sufficient to support the denial of class certification" as the plaintiff failed to satisfy the Rule 23(a) requirements of commonality and typicality and the Rule 23(b)(2) requirement.  *Id.* at 565.  In addition, the *Cholakyan* court found that the plaintiff improperly sought injunctive relief to create a reimbursement program "to avoid the need to comply with Rule 23(b)(3) while preserving the possibility that some class members will be able to obtain monetary relief" and that none of the remedies sought by plaintiff would "result in classwide relief."  *Id.* at 559–60.  Similarly, in *Rouse v. Caruso*, the court noted that "while a class action would not preclude any member from pursuing an individual damages claim, it could have the effect of precluding him from establishing certain issues upon which the success of the claim depends" and therefore would "create[] the possibility . . . that individual class members' compensatory-damages claims would be *precluded* by litigation they had no power to

hold themselves apart from."  No. 06-CV-10961, 2013 WL 588916, at *6 n.3 (E.D. Mich. Jan. 7, 2013) (alteration in original) (quoting *Dukes*, 564 U.S. at 364), *report and recommendation adopted*, 2013 WL 569638 (E.D. Mich. Feb. 13, 2013).  The *Rouse* court found that the plaintiffs' claims "are the type that are ordinarily resolved through actions seeking damages, and rulings in the case contrary to plaintiffs' positions could have the effect of precluding a subsequent damages action by an individual plaintiff."  *Id.* at *6.  However, the court decided the case on other grounds, finding that a Rule 23(b)(2) class was not proper because the plaintiffs' claims challenged the adequacy of medical care and "include[d] individualized claims for monetary relief," which "belong in Rule 23(b)(3)."[30]  *Id.* (quoting *Dukes*, 564 U.S. at 362).

*In re Skelaxin (Metaxalone) Antitrust Litigation* presents a closer call.  299 F.R.D. 555 (E.D. Tenn. 2014).  In that case, the court denied certification of an injunctive relief class comprised of end payors for a type of drug on several grounds.  *Id.* at 577–79.  First, the court found that it was "unclear whether an injunction class of [e]nd [p]ayors [was] necessary or appropriate in this case" because the primary relief sought was monetary, and that the proposed class was unascertainable.  *Id.* at 577–78.  In addition to these concerns, the court was troubled by the possible "preclusive effect of an injunction-only class action on class members' ability to bring subsequent damages claims."  *Id.* at 578.  While the court noted that some courts, including

---

[30]  The other cases cited by Direct Action Plaintiffs are similarly distinguishable.  In *Slamon v. Carrizo (Marcellus) LLC*, while the court stated that "the individual lease holders must have the right to opt-out, and the absence of the ability to do so severely prejudice[d] their rights and also risk[ed] subjecting them, without their consent, to the doctrines of issue preclusion and collateral estoppel," the court also found that the injunctive relief sought "relate[d] predominantly to money damages" and failed the test set forth in Rule 23(b)(2).  No. 16-CV-2187, 2020 WL 2525961, at *16 (M.D. Pa. May 18, 2020).  *Richardson v. L'Oreal USA, Inc.* is inapposite because that case involved certification of a (b)(2) settlement class in which the settlement released "class-wide damages claims, but not individual damages claims," which the court found was improper under Rule 23(b)(2) under *Shutts* and *Dukes*.  991 F. Supp. 2d 181, 198–99 (D.D.C. 2013).

the Sixth Circuit, "have held that claim-splitting does not apply to class actions and that 'the general rule is that a class action suit seeking only declaratory and injunctive relief does not bar subsequent individual damage[s] claims by class members, even if based on the same events,'" *id.* (quoting *Hiser*, 94 F.3d at 1287), the court went on to note that "even if such a judgment did not have a claim preclusive effect, it might still prevent relitigation of a number of issues in subsequent actions," *id.* (first citing *In re MTBE Prods. Liab. Litig.*, 209 F.R.D. at 339–40 n.25; and then citing *Dukes*, 564 U.S. at 363). In articulating its "reservations about the possible preclusive effect" of an injunctive relief class such that "absent class members may be collaterally estopped from relitigating some [of the] issues in a damages action," the court relied on *Dukes* as demonstrating a "concern regarding the preclusive effect of a primarily injunction-based class." *Id.* at 579. However, for the reasons discussed above, the Court declines to adopt such a broad reading of *Dukes* and ultimately disagrees with the reasoning set forth in *Skelaxin*.

All of the cases cited by Direct Action Plaintiffs and Grubhub Plaintiffs involved class certification motions that failed for multiple reasons — no court relied solely on their concerns about issue preclusion to find the class representatives inadequate. *See Cholakyan*, 281 F.R.D. at 559–65; *In re Skelaxin (Metaxalone) Antitrust Litig.*, 299 F.R.D. at 577–79; *Rouse*, 2013 WL 588916, at *6; *Slamon*, 2020 WL 2525961, at *16–17; *see also* 6 Newberg on Class Actions § 18:18 ("Most of the courts denying class certification outright have coupled their claim splitting concerns with other concerns about the proposed class action."). In addition, the decisions suggesting inadequacy of representation involved class representatives who were attempting to shoehorn damages claims into Rule 23(b)(2) class actions — an approach clearly prohibited by *Shutts* and *Dukes*. *See Cholakyan*, 281 F.R.D. at 559–65 (noting that the plaintiff improperly sought injunctive relief to create a reimbursement program "to avoid the need to

comply with Rule 23(b)(3) while preserving the possibility that some class members will be able to obtain monetary relief"); *Rouse*, 2013 WL 588916, at *6 (finding that a Rule 23(b)(2) class was not proper because the plaintiffs' claims challenged the adequacy of medical care and "include[d] individualized claims for monetary relief," which "belong in Rule 23(b)(3)"); *Slamon*, 2020 WL 2525961, at *16–17 (finding that the injunctive relief sought predominantly involved damages claims). The Court does not find that any such improprieties exist in the context of the instant Rule 23(b)(2) class that would raise adequacy of representation concerns. To the contrary, the Court finds that class representatives' interests are aligned with absent class members' interests to maximize the equitable relief sought. *See Adkins*, 307 F.R.D. at 141 ("[W]hile absent class members risk losing on the merits and being precluded from separately asserting, for example, a claim that [the defendant] is culpable for their loans, if the class were to win on the merits they would be able to pursue separate claims for damages. Because the putative class representatives have not needlessly compromised the ability of the class to secure its relief, [the defendants'] argument that they are inadequate class representatives on that basis is unpersuasive."). Moreover, to find that a Rule 23(b)(2) class cannot be certified when it might collaterally estop litigation of issues in damages claims would essentially render Rule 23(b)(2) classes impossible to pursue. *See* 6 Newberg on Class Actions § 18:18 ("Relying on the claim splitting concern alone would be an overbroad approach as it would tend to render the injunctive class action somewhat impossible to pursue. In any case in which the class seeks only declaratory and injunctive relief, there may always be a possibility of monetary damages, but that possibility alone should not foreclose the injunctive class action."). As Plaintiffs accurately note, courts in the Second Circuit continue to certify equitable relief classes including members that are simultaneously pursuing damages claims. *See Sykes v. Mel Harris & Assocs., LLC*, 285

F.R.D. 279, 293 (S.D.N.Y. 2012) ("That plaintiffs are seeking substantial monetary damages is of no concern given the [c]ourt's certification of separate Rule 23(b)(2) and (b)(3) classes addressing equitable relief and damages, respectively."), *aff'd sub nom. Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70 (2d Cir. 2015).

Because the Court is not aware of a case mandating such a result and to imply such a requirement would render (b)(2) classes nearly impossible to pursue, the Court finds that the potential for issue preclusion against absent class members pursuing damages claims does not preclude class certification on adequate representation grounds.

### D. Class representatives do not improperly confiscate Opponents' injunctive relief claims or jeopardize any individual damages claims

Direct Action Plaintiffs' arguments fall into two groups: (1) that Rule 23(b)(2) Plaintiffs improperly confiscate their equitable relief claims and (2) that their damages claims are compromised because Rule 23(b)(2) Plaintiffs are members of the settlement class. (*See* Direct Action Pls.' Opp'n 11–18.) First, Direct Action Plaintiffs argue that the proposed class violates due process because a mandatory class would "confiscate [their] claims for injunctive *remedies*," "turn[] them over to putative class counsel who have adverse interests," and diminish their damages claims' value in order to "'monetize' injunctive claims that belong to the Direct Action Plaintiffs for the benefit of the remainder of the class." (*Id.* at 11 (citing Pls.' Mem. 48–49).) In support, Direct Action Plaintiffs argue that Plaintiffs intend to "exploit" their claims "for the benefit of other merchants," (Direct Action Pls.' Sur-Reply 8 & n.7), and could conceivably "allow class counsel to agree to a release that sacrifices some part of [their] claims to induce Defendants to settle with the class," which would create "perverse incentives for class representatives to place at risk potentially valid claims for monetary relief," (Direct Action Pls.'

73

Opp'n 18 (quoting *Dukes*, 564 U.S. at 364)).  Next, Direct Action Plaintiffs contend that there is

a conflict of representation because class representatives have "no incentive to protect [Direct

Action Plaintiffs'] damages and equitable relief claims."  (*Id.* at 18.)  In support of this argument,

Direct Action Plaintiffs contend that as members of the (b)(3) settlement class, the class

representatives have "no further interest in obtaining monetary relief" which creates a

"dichotomy in interests."  (*Id.*)  In further support, Direct Action Plaintiffs assert that equitable

relief class counsel has already justified "trading of claims in the name of a purported 'duty to

maximize the claim's value on behalf of *all* Merchants'" by stating in their brief that "[a]llowing

opt-outs would permit an individual Merchant to gain financially based on the benefit that a legal

claim would provide to other Merchants."  (*Id.* (quoting Pls.' Mem. 49).)

Similarly, Grubhub Plaintiffs argue that there is a conflict of interest because

(1) Plaintiffs are attempting to use Grubhub Plaintiffs' "*individual* injunctive claims that were

preserved when [they] opted out of the Rule 23(b)(3) class" as a "collective asset" and

(2) Plaintiffs are incentivized to trade benefits from one set of class members for benefits for the

other class members because Plaintiffs want to use Grubhub Plaintiffs' claims to "maximize the

claim's value on behalf of *all* Merchants who have the claim."  (Grubhub Pls.' Opp'n 12–13

(quoting Pls.' Mem. 49).)

Walmart argues that Plaintiffs may trade away other merchants' interests in exchange for

obtaining relief from the no-surcharging rule.  (Walmart Opp'n 11.)  In support, Walmart argues

that Prof. Carlton's and Dr. Leffler's testimonies "highlight[] the [Plaintiffs'] incentives to trade

away the injunctive relief many other merchants need."  (Walmart Suppl. Opp'n 4.)

In response, Plaintiffs argue that there is no conflict between (b)(3) class opt outs and the

(b)(2) class.  (*See* Pls.' Reply.)  Plaintiffs argue that there is no internal class conflict with

merchants that opted out of the damages settlement because Plaintiffs "have no ability to compromise or impair *any* merchants' damages claims." (*Id.* at 15.)

Opponents' arguments implicate adequacy of both the class representatives and class counsel, and the Court finds that there is no fundamental conflict as to either.[31] The gravamen of Opponents' trading-of-claims arguments are twofold: (1) that their claims for equitable relief are confiscated by virtue of their membership in a mandatory class, and (2) that their individual damages claims will be compromised because class counsel and class representatives will leverage those claims to receive their desired form of injunctive relief.

The Court does not find that mere membership in a mandatory class violates due process or improperly confiscates Opponents' claims. Direct Action Plaintiffs argue that "forcing an entity into a mandatory class action shatters the bundle of property rights represented by a legal claim [which] obliterate[es] an individual's constitutional 'right not to have someone else assert that claim without the claimholder's consent.'" (*See* Direct Action Pls.' Opp'n 11 n.6 (quoting Ryan C. Williams, *Due Process, Class Action Opt Outs & the Right Not to Sue*, 115 Colum. L. Rev. 599, 630 (2015)).) While the Supreme Court in *Shutts* stated that "a chose in action is a constitutionally recognized property interest possessed by each of the plaintiffs," and held that due process requires notice and an opportunity to opt out, the court explicitly stated that its holding does not apply to Rule 23(b)(1) and 23(b)(2) class actions. *See Shutts*, 472 U.S. at 807, 811 n.3 ("Our holding today is limited to those class actions which seek to bind known plaintiffs concerning claims wholly or predominately for money judgments. We intimate no view concerning other types of class actions, such as those seeking equitable relief."). In addition, in

---

[31] The parties' arguments regarding whether there is a risk that class representatives and counsel will trade claims also address whether the Court should permit opt-out rights. The Court addresses the opt-out arguments in Section II.e *infra*.

*Shutts*, the Supreme Court endorsed its view articulated in *Hansberry v. Lee* that "absent parties [are] bound by [a] decree so long as the named parties adequately represented the absent class and the prosecution of the litigation was within the common interest." *Id.* at 808 (citing *Hansberry v. Lee*, 311 U.S. 32, 41 (1940)).  The Supreme Court has since reiterated the limited nature of its holding in *Shutts*.  *See Dukes*, 564 U.S. at 362–63 ("The procedural protections attending the (b)(3) class — predominance, superiority, mandatory notice, and the right to opt out — are missing from (b)(2) not because the Rule considers them unnecessary, but because it considers them unnecessary *to a (b)(2) class*. . . . In the context of a class action predominantly for money damages we have held that absence of notice and opt out violates due process." (citing *Shutts*, 472 U.S. at 812)); *Ortiz*, 527 U.S. at 848 n.24 ("In *Shutts*, as an important caveat to our holding, we made clear that we were only examining the procedural protections attendant on binding out-of-state class members whose claims were 'wholly or predominately for money judgments.'" (quoting *Shutts*, 472 U.S. at 811 n.3)); 1 McLaughlin on Class Actions § 2:42 (17th ed.) ("While some litigants in the decade after *Shutts* sought to argue that its holding also extended to actions primarily seeking equitable relief, the Supreme Court's guidance has been limited and carefully worded.").  The Second Circuit has similarly stated that the lack of the ability to opt out in a Rule 23(b)(2) class does not violate due process as long as the other Rule 23 requirements including adequacy of representation are satisfied.  *See Robinson*, 267 F.3d at 165 ("Where class-wide injunctive or declaratory relief is sought in a (b)(2) class action for an alleged group harm, there is a presumption of cohesion and unity between absent class members and the class representatives such that adequate representation will generally safeguard absent class members' interests and thereby satisfy the strictures of due process.").  In view of the existing precedent which suggests that mandatory Rule 23(b)(2) classes do not violate due

process, and in the absence of compelling case law to the contrary, the Court declines to reach an

opposite conclusion.

The Court also finds that the inclusion of class members pursuing individual damages

claims does not create a fundamental conflict.  In support of their argument that class

representatives and Class Counsel will be incentivized to trade away their claims, Direct Action

Plaintiffs and Grubhub Plaintiffs cite to *Dukes* and *Interchange Fees II*, arguing that those cases

concerned similar circumstances.  (*See* Direct Action Pls.' Opp'n 18–19; Grubhub Pls.' Opp'n

13.)  However, *Dukes* and *Interchange Fees II* are inapposite.  Direct Action Plaintiffs cite to

*Dukes* for the proposition that "the vast majority of the putative Rule 23(b)(2) class . . . have no

further interest in obtaining monetary relief because they did not opt out of the Rule 23(b)(3)

class settlement of monetary claims" and "[t]his dichotomy in interests create the same 'perverse

incentives for class representatives to place at risk potentially valid claims for monetary relief'

that so troubled the Supreme Court in *Dukes*."  (*See* Direct Action Pls.' Opp'n 18 (quoting

*Dukes*, 564 U.S. at 364).)  However, as discussed above, the *Dukes* court was concerned that

adopting a predominance test under Rule 23(b)(2) would incentivize class representatives to not

include monetary claims in their complaint so that those claims do not predominate over the

claims for injunctive relief, not that class members separately pursuing damages claims outside

of the class would create a conflict to defeat adequacy of representation.  *See Dukes*, 564 U.S. at

364 ("Respondents' predominance test, moreover, creates perverse incentives for class

representatives to place at risk potentially valid claims for monetary relief.").  Similarly, in

*Interchange Fees II*, the Second Circuit was concerned with "[u]nitary representation of separate

classes that claim distinct, competing, and conflicting relief" which would "create unacceptable

incentives for counsel to trade benefits to one class for benefits to the other in order somehow to

reach a settlement." *Interchange Fees II*, 827 F.3d at 234.  However, the fundamental conflict identified by the Second Circuit no longer exists.  Each class — the Rule 23(b)(2) class and the Rule 23(b)(3) class — are represented by separate counsel and are no longer "in the position to trade diminution of (b)(2) relief for increase of (b)(3) relief." *Id.*  Moreover, the Rule 23(b)(2) representatives and class counsel are only seeking equitable relief and they have no authority to trade away Direct Action Plaintiffs' or Grubhub Plaintiffs' damages claims as they are represented by their own counsel.  Because the classes have been separated and there is no overlap between the named representative Class Plaintiffs in the (b)(2) classes and the plaintiffs seeking their own damages claims, the issue of unitary representation is not present here.[32]

Direct Action Plaintiffs, Grubhub Plaintiffs, and Walmart argue that Plaintiffs' desire to include them in the class is equal to Plaintiffs seeking to monetize Opponents' claims and gain "financially based on the benefit that a legal claim would provide to other Merchants."  (Direct Action Pls.' Opp'n 18; *see also* Grubhub Pls.' Opp'n 15 ("[T]he putative class wants to

---

[32] The other cases cited by Opponents are similarly inapposite.  For example, in *In re Literary Works in Electronic Databases Copyright Litigation*, the Second Circuit held that there was a fundamental conflict sufficient to preclude adequacy of representation when there were three subclasses and each subclass's "interests diverge[d] as to the distribution of that recovery because each category of claim [was] of different strength and therefore command[ed] a different settlement value.  Named plaintiffs who hold other combinations of claims had no incentive to maximize the recovery for Category C-only plaintiffs, whose claims were lowest in settlement value but eclipsed all others in quantity."  654 F.3d 242, 254 (2d Cir. 2011).  Like *Dukes* and *Interchange Fees II*, the court found that the "interests of Category C-only plaintiffs could be protected only by the formation of a subclass and the advocacy of independent counsel." *Id.*  Accordingly, *Literary Works* did not address whether class counsel might be incentivized or empowered to trade away claims that are not included within the class's suit.  Similarly, Opponents take the language in *Cholakyan* out of context.  (*See* Direct Action Plaintiffs' Opp'n 19; Grubhub Pls.' Opp'n 13.)  In that case, while the court spoke of concerns that the class representative and his counsel were "willing potentially to sacrifice individual class members' right to pursue the recovery of monetary damages," the court addressed such conflicts in the context of claim splitting and preclusion, not as to whether class representatives and counsel would make improper tradeoffs with claims pursued by parties outside of the class.  *See Cholakyan*, 281 F.R.D. at 565.

'monetize' the injunctive claims of the Grubhub Plaintiffs *for itself*."); Walmart Opp'n 11 ("The [Plaintiffs'] motion betrays how they see absent class members' claims as bargaining chips they can use to strengthen their negotiating leverage.").)  However, to the extent that Direct Action Plaintiffs, Grubhub Plaintiffs, and Walmart contend that Plaintiffs improperly seek to include their claims to maximize the equitable relief award, the Court does not find that a strategic attempt to certify the broadest equitable relief class possible to maximize the potential success of settlement negotiations constitutes a fundamental class conflict.  *See Bayshore Ford Truck Sales, Inc. v. Ford Motor Co.*, No. 99-CV-741, 2006 WL 3371690, at *4 (D.N.J. Nov. 17, 2006) ("[T]here [is] strength in numbers, and the [c]ourt can not [sic] find error with [the] [p]laintiffs' strategic attempt to maximize their bargaining power against [the defendant], by pursuing their claims as a unified group, so long as the requirements of Fed. R. Civ. P. 23(a)(1) are satisfied, which the [c]ourt finds that they are."), *aff'd*, 541 F. App'x 181 (3d Cir. 2013).

Accordingly, the Court finds that permitting a mandatory class under Rule 23(b)(2) does not violate due process and that Opponents' individual damages claims will not be compromised by class counsel and class representatives leveraging those claims to receive the most comprehensive equitable relief to the entire class's benefit.

### E.   The Court declines to reach the issue of whether future merchants are adequately represented by the class representatives

Direct Action Plaintiffs argue that the inclusion of future merchants also violates adequacy of representation because "it is impossible to conclude that future merchants, who may not exist for years to come, share those interests," and further argue that the proposed class "contains the same tension between current and future merchants as the prior settlement that was invalidated."  (Direct Action Pls.' Opp'n 22.)

Merchant Trade Groups argue that the inclusion of future merchants violates due process because future merchants would be unable to opt out and would have "no opportunity to be heard before entry of a final judgment that could bind them in perpetuity."  (Merchant Trade Groups' Opp'n 23–24; Merchant Trade Groups Sur-Reply 5–6.)  In addition, Merchant Trade Groups contend that including future merchants will create more litigation in years to come because future merchants will challenge whether they were adequately represented in this litigation such that they should be precluded from bringing future claims.  (Merchant Trade Groups' Opp'n 24–25.)  Merchant Trade Groups state that they "have no objection to future class members receiving whatever injunctive relief this case ultimately provides," but "including them in the certified class in order to preclude or release their post-judgment claims would be improper and raise due process concerns."  (*Id.* at 19.)

Plaintiffs argue that they adequately represent future merchants because "Defendants' Restraints *apply generally* to the class" and to exclude them from the class would mean they "face the risk of having to litigate their entitlement to relief ordered in this case."  (Pls.' Suppl. Reply 9.)  Plaintiffs contend that there is no conflict between present and future merchants because "[i]t is well settled that 'a (b)(2) class may include future members who stand to benefit from a favorable outcome in the case" and arguments concerning "release of claims by future merchants as part of any settlement in this litigation is premature."  (*See* Pls.' Reply 18–19; Pls.' Suppl. Reply 8–9.)

Defendants argue that the Court should not exclude future class members from the proposed class because there is "no legitimate basis" to exclude them.  (*See* Defs.' Reply 18–23.)  Defendants contend that the Second Circuit's concerns in *Interchange Fees II* are inapplicable because "the Second Circuit's decision did not take issue with the inclusion of future merchants

in the Rule 23(b)(2) settlement class, as long as the future merchants could avail themselves of the injunctive relief obtained in the settlement." (*Id.* at 21.)  Defendants also assert that Judge Leval's concerns in his concurrence regarding the ability of future merchants to opt out are inapplicable at this stage of the litigation because "[t]he Court can address whether any settlement with the proposed Rule 23(b)(2) class . . . raises a similar release concern if and when the parties settle and the Court decides whether to approve the settlement." (*Id.*)

Because the Court declines to include future merchants in the class on ascertainability grounds, *see infra* Section II.c.v, the Court need not decide whether such merchants are adequately represented.  However, the Court notes that the issue of whether future merchants should be included in the class is far from clear.

As discussed in Section II.c.ii *supra*, courts routinely certify equitable relief classes including future class members.  As Plaintiffs contend, the challenged Restraints have been in effect for the duration of this nearly two-decade litigation and there is no indication that voluntary changes are on the horizon.  Accordingly, future merchants suffer a threat of imminent injury if the Restraints are found to violate antitrust law.  *See R.F.M. v. Nielsen*, 365 F. Supp. 3d 350, 369 (S.D.N.Y. 2019) ("Courts regularly approve classes involving future members when those members face a threat of imminent injury." (first citing *Abdi v. Duke*, 323 F.R.D. 131, 137–38 (W.D.N.Y. 2017); and then citing *Butler*, 289 F.R.D. at 99)).  The class representatives are incentivized to prove Defendants' liability under antitrust law and should they prevail or reach a settlement, as Merchant Trade Groups concede, future merchants stand to benefit from any ensuing equitable relief.  (*See* Merchant Trade Groups' Opp'n 19 (clarifying that they do not object to future merchants receiving any injunctive relief obtained by the class).)

In addition, the Court does not believe the inclusion of future merchants in the Rule 23(b)(2) class suffers from the same deficiencies that plagued the classes in *Interchange Fees II* or *Amchem*.  In *Interchange Fees II*, the Second Circuit held that the substance of the bargain struck evidenced inadequate representation because the merchants who came into being after the equitable relief ended were "bound to an exceptionally broad [indefinite] release . . . but [were] guaranteed nothing."  827 F.3d at 238–39.  The Second Circuit did not express concern over future merchants' inclusion in the class generally.  *See id.* at 239 ("As in *Literary Works*, we conclude that such arbitrary harsher treatment of class members is indicative of inadequate representation.").  Similarly, Judge Leval in his concurrence expressed concern over the broad release which subjected members of the (b)(2) class, including future merchants, to "give up forever their potentially valid claims, without ever having an opportunity to reject the settlement by opting out of the class."  *Id.* at 240 (Leval, J., concurring).  However, for the reasons discussed above, the class is no longer subject to unitary representation and therefore future merchants are not at risk that their claims will be traded away for relief that does not serve their interests.  *See* Section II.c.iv.1.D *supra*.

In addition, the Supreme Court's decision in *Amchem* is factually inapposite to this case. In *Amchem*, the Supreme Court held that there was a conflict between class members presently suffering asbestos-related injuries and members who had not yet manifested an injury.  *Amchem*, 521 U.S. at 626.  The Supreme Court held that a single class representative could not adequately represent both groups of class members because presently injured members were incentivized to seek "generous immediate payments" and those who might suffer an injury in the future were incentivized to seek "an ample, inflation-protected fund for the future."  *Id.*  These allocation-related tensions are not present in the instant case — both present and future merchants will

benefit from injunctive relief curbing or eliminating the Restraints.  *See L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 616 n.9 (S.D.N.Y. 2018) ("Notwithstanding the limited size of the hypothetical class, the class action would be superior to joinder . . . because all plaintiffs challenge a policy that affects them uniformly; the putative class members do not have sufficient means to bring lawsuits; and the requested injunctive relief would impact all future class members.").

However, the court's decision in *Meacham v. Wing*, 227 F.R.D. 232 (S.D.N.Y. 2005) gives the Court pause.  In that case, the plaintiffs sought to certify a settlement class of current and future recipients of public assistance benefits.  *Id.* at 234.  The court relied on *Amchem* and refused to include class members who "may become benefit-eligible" in the future in the Rule 23(b)(2) class because "[f]uture eligible persons would be subject to the claim preclusive effects of the settlement but would not have received meaningful notice or the opportunity to be heard prior to the approval of th[e] settlement."  *Id.*  While the facts of *Meacham* are distinct because it involved a settlement that "'release[d]' and 'forever discharge[d]' equitable claims . . . that could have been asserted in this action," *id.* at 237, the Court is concerned about binding future merchants who cannot receive notice of any potential settlement.  Indeed, in mandatory Rule 23(b)(2) classes, class members are "entitled to voice their concerns with the court prior to final approval" and "'voice' replaces 'exit' as the operable means of class member involvement."  2 Newberg on Class Actions § 4:26.

In addition, the Court is not persuaded that the inclusion of future merchants is necessary to provide relief to those merchants.  If warranted, the Court could order prospective relief that benefits future class members regardless of whether they are included in the instant class.  *See* Kaczynski, 85 Colum. L. Rev., at 410 ("If the plaintiff class prevails, an award of injunctive or declaratory relief can be shaped so as to inure to the benefit of the future members whether or not

they are certified."). *But see* 2 Newberg on Class Actions § 4:26 ("[T]here is some relationship between the scope of the class and the scale of the remedy.").

Accordingly, while the Court need not reach the issue of whether future merchants are adequately represented by class representatives, the Court notes that should Plaintiffs move to modify the class definition to include future merchants, they should also address the issues raised in this Memorandum and Order regarding the adequacy of their representation.

### F.   Class representatives DDMB and DDMB2 are conflicted due to their relationship with class counsel

Although not explicitly raised as an adequacy of representation issue, Direct Action Plaintiffs allude to close relationships between class counsel and class representatives.  (*See* Direct Action Pls.' Opp'n 20 n.15.)  Accordingly, the Court addresses whether there is an adequacy of representation issue arising from these relationships.

Direct Action Plaintiffs state that "[a]ll five [representative businesses] have pre-existing personal, family, or business relationships with Class Counsel, who asked them to join this litigation."  (*Id.*)  In support, Direct Action Plaintiffs contend that Arthur Boss, Jr. of Boss Dental "plays tennis with class counsel Mr. Hilliard"; Douglas Marks of DDMB, Inc. d/b/a/ Emporium Arcade Bar and DDMB 2, LLC d/b/a Emporium Logan Square is a "co-investor in [a] cannabis dispensary with class counsel Mr. Kanner"; Pure One's manager "is related to class co-counsel Mr. Love"; RunCentral/CMP has a "long-term business relationship with Mr. Love's firm, which pays them $1500 [a] month"; and Generic Depot's owner "has a personal relationship with Mr. Love."  (*Id.*)

Plaintiffs do not address the relationships between class representatives and Class Counsel.  (*See* Pls.' Mem.; Pls.' Reply; Pls.' Suppl. Reply.)

"[W]hether a close relationship with class counsel renders a named plaintiff inadequate is a fact-intensive inquiry." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 565 (S.D.N.Y. 2018) (citing *Malchman v. Davis*, 761 F.2d 893, 900 n.2 (2d Cir. 1985)). "[C]ourts have long found that a familial (or any other) relationship creates a conflict if it gives the class representative an interest in the fees class counsel might recover." *Wexler v. AT & T Corp.*, 323 F.R.D. 128, 130 (E.D.N.Y. 2018).  To determine whether the relationship between the class representative and class counsel is inappropriate, courts consider (1) "the closeness and extent of the relationship," (2) "whether the related attorney's relationship and role in the litigation have been disclosed," (3) "whether attorneys' fees will greatly exceed the class representative's recovery," and (4) "the extent of the related attorney's involvement in the litigation." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d at 565; *see also Aliano v. CVS Pharmacy, Inc.*, No. 16-CV-2624, 2018 WL 3625336, at *5 (E.D.N.Y. May 21, 2018) ("Before disqualifying a representative plaintiff, though, courts consider factors such as the closeness of the relationship and the degree to which it has been disclosed. . . . Most significantly, a [c]ourt will consider whether the value a class member may recover is eclipsed by the benefit that plaintiff expects from an ongoing relationship with class counsel.").

First, the Court finds that Direct Action Plaintiffs overstate the role of counsel Kevin Love.  Love was not included in the Interim Class Counsel Order, (*see* Interim Class Counsel Order), and only later appeared in this litigation as counsel of record for RunCentral LLC — one of the putative (b)(2) class representatives, (*see* Kevin Love Notice of Appearance, Docket Entry No. 6870 ("Kevin B. Love of Criden & Love, P.A. hereby appears as counsel of record for Plaintiff RunCentral LLC.")).  Neither Love nor his firm is included as class counsel seeking appointment as co-lead class counsel in the instant class certification motion.  (*See* Pls.' Mem.

31–32.)  Accordingly, the Court need not assess the propriety of Love's contacts with the class representatives.

Next, the Court examines the relationships between class representatives and Hilliard and Kanner, who are seeking to be appointed as co-lead class counsel.  (*See id.*)  First, the Court finds that Hilliard's casual relationship with Arthur Boss, Jr. of Boss Dental, one of the class representatives, does not render class counsel inadequate.  In his deposition, Boss testified that he knows Hilliard "from tennis" and that he plays tennis approximately three times a week.  (*See* Dep. of Arthur Boss, Jr. 205:18–19, 206:2–5, annexed to Shinder Decl. as Ex. I, Docket Entry No. 8452.)  This relationship does not rise to the level of inadequate representation because the relationship is casual and does not indicate that Boss Dental will stand to benefit from any attorneys' fees awarded to Hilliard.  *Compare Langan v. Johnson & Johnson Cons. Cos.*, Nos. 13-CV-1470, 13-CV-1471, 2017 WL 985640, at *13 (D. Conn. Mar. 13, 2017) (finding that a pre-existing non-intimate, nonfinancial relationship between the named plaintiff and class counsel did not create a "fundamental conflict" with the other class members and stating that the "plaintiff and class counsel are not intimate friends and have no apparent financial relationship outside of this case"), *vacated and remanded on other grounds*, 897 F.3d 88 (2d Cir. 2018), *and In re Currency Conversion Fee Antitrust Litig.*, 230 F.R.D. 303, 309 (S.D.N.Y. 2004) (finding the adequacy requirement met even where class representative was "close personal friend of his attorney"), *with In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d at 566 (finding corporate class representative to be inadequate when its CEO's son was receiving fifteen percent of interim class counsel's fee award).  *See also Foley v. Student Assistance Corp.*, 336 F.R.D. 445, 449 & n.6 (E.D. Wis. 2020) ("Courts have found a conflict of interest that defeats adequate representation is present where familial ties exist between class counsel and the named

representative or long-standing, non-familial relationships are intermingled with financial, business, or professional interests.  District courts outside of this circuit have found that friendship alone is not enough to create a disqualifying conflict of interest." (collecting cases)); *Holt v. Noble House Hotels & Resort, LTD*, No. 17-CV-2246, 2018 WL 5004996, at *7 (S.D. Cal. Oct. 16, 2018) (finding that the plaintiff and class counsel's "friendship does not have the same potential for conflicts of interest" when no "financial, familial, or other potentially conflicting relationship beyond friendship" was identified).

However, Kanner's relationship with Douglas Marks of DDMB, Inc. d/b/a/ Emporium Arcade Bar and DDMB 2, LLC d/b/a Emporium Logan Square presents a conflict.  The court's decision in *In re Discovery Zone Securities Litigation*, 169 F.R.D. 104 (N.D. Ill. 1996), is instructive.  In that case, the court found that proposed class representatives who served as their counsel's stockbrokers inadequately represented the class because they constituted "sufficiently close business relationships . . . [and] create a possible conflict of interest."  *Id.* at 109.  The court found that because there was a "*possibility* of receiving more investment business from class counsel," the plaintiffs had "more incentive to maximize fees for the attorneys than to ensure adequate recovery for the class."  *Id.* (emphasis added).  The court noted that the "appearance of impropriety" was the "primary 'factor mandating judicial inquiry,'" *id.* (quoting *Susman v. Lincoln Am. Corp.*, 561 F.2d 86, 93 (2d Cir. 1977)), and that while it was not suggesting that "the representatives and class counsel would turn appearance into reality," the court deemed it "proper to eliminate any possible conflict of interest," *id.*  In his deposition, Marks stated that Kanner is "a small investor in one of [his] companies" called Modern Cannabis.  (*See* Dep. of Douglas Marks 271:18–272:4, annexed to Shinder Decl. as Ex. J, Docket Entry No. 8452.) Although Marks could not recall specifically when Kanner invested, he testified that he believes

"[t]he investment was made in . . . .2015," after he joined this litigation, and that the investment was "in no way related" to his participation in the instant suit.  (*See id.* 272:13–23.)  Because Kanner has invested in Mark's company, Mark stands to potentially benefit from any attorneys' fees secured by Kanner and could act in his own interest instead of the interest of the class as a whole.  *See In re IMAX Sec. Litig.*, 272 F.R.D. 138, 156–57 & n.86 (S.D.N.Y. 2010) (finding that "the close business and personal relationship between [the class representative] and [class counsel], and the incentives for [class counsel] to receive additional investments from [the class representative], as well as goodwill, are sufficient to warrant a finding of inadequacy under the circumstances of this case"); *see also* 6A Fed. Proc. § 12:145 ("[I]t is inappropriate for counsel to represent a class where there is a relationship between counsel and a potential class member who is heavily involved in the litigation and would directly benefit from any counsel fees as a result of the litigation.").

Because there is a wealth of other merchants who can serve as class representatives and five other class representatives in this litigation, the Court dismisses DDMB and DDMB2 as class representatives and allows Kanner to remain as Class Counsel.  *See In re Discovery Zone Sec. Litig.*, 169 F.R.D. at 109 ("Under these circumstances, the [c]ourt deems it proper to eliminate any possible conflict of interest between the named plaintiffs and the class by dismissing [the conflicted plaintiffs] as class representatives.").

## 2.  Adequacy of counsel

Plaintiffs argue that Hilliard & Shadowen LLP, Grant & Eisenhofer, P.A., Freed Kanner London & Millen LLP, and Nussbaum Law Group, P.C. are adequate to represent the Rule 23(b)(2) class because they are "experienced in prosecuting antitrust cases and complex class actions to successful resolutions," and have "vigorously pursued the litigation on behalf of the

Class [and] engaged in extensive investigation, fact discovery, motion practice, engagement with experts[,] and complex settlement discussions."  (Pls.' Mem. 31–32.)  Specifically, Plaintiffs argue that three of the attorneys who currently represent them "spent several years representing other plaintiffs in this proceeding prior to their appointment in this case" as interim class counsel. (*See id.* at 31.)

No party opposes appointment of these four firms as counsel for the Rule 23(b)(2) class.

To satisfy the adequacy of representation requirement as to class counsel, a court must "determin[e] whether they are 'qualified, experienced and generally able to conduct the litigation.'"  *Vargas v. Cap. One Fin. Advisors*, 559 F. App'x 22, 26 (2d Cir. 2014) (quoting *In re Joint E. & S. Dist. Asbestos Litig.*, 78 F.3d 764, 778 (2d Cir. 1996)); *Sharpe v. A.W. Concentrate Co. & Keurig Dr. Pepper, Inc.*, No. 19-CV-768, 2021 WL 3721392, at *5 (E.D.N.Y. July 23, 2021) (stating that "class counsel must be 'qualified, experienced, and generally able to conduct the litigation'" (quoting *In re Kind LLC "Healthy & All Nat." Litig.*, 337 F.R.D. 581, 596 (S.D.N.Y. 2021))); *Xiao Ling Chen v. XpresSpa at Terminal 4 JFK LLC*, No. 15-CV-1347, 2019 WL 5792315, at *7 (E.D.N.Y. Aug. 20, 2019) (same).

The Court finds class counsel adequate to represent the Rule (23)(b)(2) class.  Proposed class counsel are experienced and competent lawyers who will be able to conduct this litigation. Hilliard & Shadowen LLP, Grant & Eisenhofer, P.A., Freed Kanner London & Millen LLP, and Nussbaum Law Group, P.C. have extensive experience litigating antitrust actions and class actions in federal courts.  (*See* Appl. of Steve Shadowen, Michael Freed, and Robert Eisler for Appointment as Class Counsel, Docket Entry No. 6673 (detailing counsel's experience with previous antitrust class actions); Nussbaum's Mem. in Supp. of Nussbaum's Mot. to Appoint Counsel 7–14, Docket Entry No. 6669-1 (detailing Nussbaum's experience in antitrust litigation

and collecting cases in which Nussbaum has served as co-lead class counsel); Decl. of Linda P. Nussbaum in Supp. of Nussbaum's Mot. to Appoint Counsel, Docket Entry No. 6669-2); *see also In re Lidoderm Antitrust Litig.*, No. 14-MD-2521, 2017 WL 679367, at *9 n.4 (N.D. Cal. Feb. 21, 2017) (appointing Hilliard & Shadowen LLP as class counsel in antitrust suit and stating that Hilliard & Shadowen LLP and other firms "have ably and vigorously litigated this case, and nothing has occurred to undermine [the court's] initial determination of their experience and adequacy"); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-MD-2503, 2017 WL 4621777, at *12 n.13 (D. Mass. Oct. 16, 2017) (appointing Hilliard & Shadowen LLP as class counsel in antitrust suit and stating that they "have adequately prosecuted the interests of the class since the Court ordered them as interim co-lead counsel"); *In re Auto. Parts Antitrust Litig.*, No. 12-MD-02311, 2017 WL 469734, at *2 (E.D. Mich. Jan. 4, 2017) (appointing Freed Kanner London & Millen LLP as class counsel in antitrust class action); *Allan v. Realcomp II, Ltd.*, No. 10-CV-14046, 2013 WL 12333444, at *11 (E.D. Mich. Mar. 30, 2013) (same); *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 47 (S.D.N.Y. 2012) (appointing Grant & Eisenhofer, P.A. as class counsel and stating that it is "an experienced class action law firm").

As Judge Orenstein noted in the Interim Class Counsel Order, these firms "have been steeped in this litigation since its inception, and have demonstrated their ability to work cooperatively with each other, with the court, and with numerous non-lead counsel representing plaintiffs with very significant interests in this litigation."  (Interim Class Counsel Order 6.) Since the Court appointed them interim Class Counsel, they have filed the operative Rule 23(b)(2) class Complaint, successfully defended against the Bank Defendants' motion to dismiss, conducted extensive discovery, briefed opposition to Intervenors' motions to intervene, pursued the instant motion for class certification, and briefed summary judgment and *Daubert* motions in

addition to defending against Defendants' summary judgment and *Daubert* motions.  *See In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. at 47 (finding class counsel adequate when it "devoted considerable resources to this case since it was first filed, and has effectively protected the interests of [the] [p]laintiffs and the putative class" including successfully "oppos[ing] [the] [d]efendants' motion to dismiss . . . , prevail[ing] on a motion for leave to amend the complaint, appear[ing] before the [c]ourt in a five-day *Daubert* hearing, and conduct[ing] extensive discovery"); *In re Sadia, S.A. Sec. Litig.*, 269 F.R.D. 298, 310 (S.D.N.Y. 2010) (finding the adequacy prong satisfied when lead counsel had "been intimately involved in prosecuting [the] action from its beginning stages, including investigating the claims, filing an amended complaint, successfully defending a motion to dismiss [and] pursuing the current class action certification").

No other objections have been raised to the adequacy of the proposed class counsel aside from the arguments concerning whether counsel will trade away the claims of parties pursuing their individual damages claims.  These arguments were already addressed in Section II.c.iv.1.D *supra*.  Accordingly, the Court finds representation by Hilliard & Shadowen LLP, Grant & Eisenhofer, P.A., Freed Kanner London & Millen LLP, and Nussbaum Law Group, P.C. to be adequate under Rule 23(a)(4).

### v.    Ascertainability

Plaintiffs argue that they satisfy the ascertainability requirement because the proposed class "is defined using the objective and readily verifiable criterion of whether [m]erchants have accepted Visa- and/or Mastercard-branded cards during a definite period of time."  (Pls.' Mem. 32.)  In support of their request for an eight-year period to include future merchants, Plaintiffs argue that "the eight-year period is not random, but reflects the anticipated length of any decree

ordered in the case." (Pls.' Suppl. Reply 6–7.) Plaintiffs state that the injunctive relief obtained in the 2013 Settlement Agreement "was to last between eight and nine years" and that settlement was invalidated because it "released certain claims *in perpetuity* notwithstanding that the injunction terminated after eight to nine years." (*Id.* at 7 (citing *Interchange Fees II*, 827 F.3d at 239).) In addition, Plaintiffs argue that the "*same* Restraints *will continue* to generally apply *to every future* merchant unless they are enjoined as a result of this litigation." (*Id.* at 6–7.)

Merchant Trade Groups argue that Plaintiffs do not satisfy the ascertainability requirement as to the future merchants because they "fail to offer a single reason, much less any argument, for why future merchants should be included at all," (Merchant Trade Groups' Opp'n 21), and have not justified the eight-year temporal limitation on the class definition or "attempted to 'substantiate[]' the relationship between their proposed liability theory and their proposed class end date," (Merchant Trade Groups' Sur-Reply 8–9 (citing *B & R Supermarket, Inc. v. Mastercard Int'l, Inc. (B & R Supermarket II)*, No. 17-CV-2738, 2021 WL 234550, at *15 (E.D.N.Y. Jan. 19, 2021)).) In support, Merchant Trade Groups note that the Rule 23(b)(3) settlement in this MDL only released claims that accrued within five years of the settlement date and argue that Plaintiffs have not "explained why they now propose to bind merchants with a mandatory class period *longer* than the release period for the *non-mandatory* class approved in 2019." (*Id.* at 8 n.7.)

Rule 23(a) contains an implied requirement of ascertainability. *In re Petrobras Sec.*, 862 F.3d at 266 ("'Most . . . circuit courts of appeals have recognized that Rule 23 contains an implicit threshold requirement that the members of a proposed class be readily identifiable,' often characterized as 'an "ascertainability" requirement.'" (quoting *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 995 (8th Cir. 2016))). Unlike other circuits, the Second

Circuit does not have a "heightened" requirement of ascertainability — it requires only that a "class be defined using objective criteria that establish a membership with definite boundaries," and does not require "administrative feasibility" of identifying each class member based on that objective criteria. *Id.* (distinguishing the Second Circuit's approach to ascertainability from the circuits with a heightened ascertainability requirement); *see also Langan v. Johnson & Johnson Cons. Cos.*, 897 F.3d 88, 91 n.2 (2d Cir. 2018) (stating that *In re Petrobras Securities* rejected "the argument that proposed classes must be 'administratively feasible' and [held] that the class was 'clearly objective' and 'sufficiently definite'" where it identified the class by "'subject matter, timing, and location,' which made it 'objectively possible' to ascertain members" (quoting *In re Petrobras Sec.*, 862 F.3d at 267–70)); *Porter v. MooreGroup Corp.*, No. 17-CV-7405, 2021 WL 3524159, at *3 (E.D.N.Y Aug. 11, 2021) ("To be ascertainable, the class must be 'readily identifiable, such that the court can determine who is in the class and, thus, bound by the ruling.'" (quoting *Charron v. Pinnacle Grp. N.Y. LLC*, 269 F.R.D. 221, 229 (S.D.N.Y. 2010))); *Wang v. Tesla, Inc.*, 338 F.R.D. ---, ---, 2021 WL 3160795, at *7 (E.D.N.Y. July 26, 2021) ("A class is ascertainable when defined by objective criteria that are administratively feasible and when identifying its members would not require a mini-hearing on the merits of each case." (quoting *Brecher*, 806 F.3d at 24–25)); *Scott v. Quay*, 338 F.R.D. 178, 186 (E.D.N.Y. 2021) (stating that meeting the ascertainability requirement is "not a heavy burden because the requirement is 'designed only to prevent the certification of a class whose membership is truly indeterminable'" (quoting *Ebin*, 297 F.R.D. at 567)). "The ascertainability requirement, as defined in this Circuit, asks district courts to consider whether a proposed class is defined using objective criteria that establish a membership with definite boundaries." *In re Petrobras Sec.*, 862 F.3d at 269; *Wang*, 338 F.R.D. at ---, 2021 WL 3160795, at *7 ("[A] class must be 'defined

by objective criteria' so that it will not be necessary to hold 'a mini-hearing on the merits of each case.'" (quoting *Brecher*, 806 F.3d at 24)).

As a threshold matter, the Court notes that it is unclear whether the implied requirement of ascertainability applies to class actions under Rule 23(b)(2). *See Plaintiffs #1-21 v. County of Suffolk*, No. 15-CV-2431, 2021 WL 1255011, at *16 (E.D.N.Y. Mar. 12, 2021) (stating that "[i]t is not even clear 'that the implied requirement of definiteness should apply to Rule 23(b)(2) class actions at all'" (quoting *Davis v. City of New York*, 296 F.R.D. 158, 166 n.50 (S.D.N.Y. 2013))), *report and recommendation adopted*, 2021 WL 1254408 (E.D.N.Y. Apr. 5, 2021); *Westchester Indep. Living Ctr., Inc. v. State Univ. of N.Y., Purchase Coll.*, 331 F.R.D. 279, 299 (S.D.N.Y. 2019) ("As a threshold matter, '[i]t is not clear that the ascertainability requirement applies to Rule 23(b)(2) class actions . . . as notice is not obligatory and the relief sought is injunctive rather than compensatory.'" (quoting *Brooklyn Ctr. for Indep. of the Diasbled v. Bloomberg*, 290 F.R.D. 409, 418 (S.D.N.Y. 2012))); *see also* 1 Newberg on Class Actions § 3:7 (describing the ambiguity as to whether there is a definiteness requirement under Rule 23(b)(2) and stating that the First, Third, Sixth, and Tenth Circuits have declined to imply such a requirement as it pertains to equitable relief classes). Some courts applying the standard to Rule 23(b)(2) classes apply a relaxed version of the ascertainability test. *See, e.g.*, *Newkirk*, 2020 WL 5035930, at *11 ("In the context of a motion to certify a Rule 23(b)(2) class, the ascertainability requirement is less critical because 'a chief objective of this rule is to provide broad injunctive relief to "large and amorphous" classes not capable of certification under Rule 23(b)(3).'" (quoting *In re Vitamin C Antitrust Litig.*, 279 F.R.D. at 116)); 1 Newberg on Class Actions § 3:7 (stating that "[r]ather than strictly apply, or simply ignore, the definiteness requirement, some courts have taken a more flexible approach" and collecting cases).

However, Second Circuit decisions in the Rule 23(b)(3) context that address ascertainability do not make any distinctions on the applicability of the ascertainability requirement based on the type of class being certified.  *See In re Petrobras Sec.*, 862 F.3d at 264–65 (referring only to the "Rule 23" requirement of ascertainability); *Brecher*, 806 F.3d at 24 ("Like our sister Circuits, we have recognized an 'implied requirement of ascertainability' in Rule 23 of the Federal Rules of Civil Procedure." (quoting *In re Pub. Offerings Secs. Litig.*, 471 F.3d 24, 32 (2d Cir. 2006))).  In addition, district courts within the Second Circuit have applied the ascertainability requirement to Rule 23(b)(2) classes.  *See Wang*, 338 F.R.D. at ---, 2021 WL 3160795, at *7 (finding that putative Rule 23(b)(2) and 23(b)(3) classes were not ascertainable as "[d]etermining whether a particular individual fit within the class definition would require a hearing"); *Plaintiffs #1-21*, 2021 WL 1255011, at *10 (applying the ascertainability requirement to a Rule 23(b)(2) class and concluding that the class is ascertainable because the proposed class is "defined using objective criteria" and has "definite boundaries" (quoting *Petrobras*, 862 F.3d at 266)); *Newkirk*, 2020 WL 5035930, at *11 (concluding that the ascertainability requirement was satisfied as to a Rule 23(b)(2) class); *Batalla Vidal*, 501 F. Supp. 3d at 136 (same); *Westchester Indep. Living Ctr., Inc.*, 331 F.R.D. at 299 (finding that "[e]ven if ascertainability is required," the class met the requirement).  Accordingly, the Court assesses ascertainability as to the Rule 23(b)(2) class.

The Court finds that the proposed class is sufficiently defined as to current merchants but is insufficiently defined as to future merchants.  The Court's recent decisions in *B & R Supermarket v. Mastercard Int'l Inc.* are instructive.  *See B & R Supermarket I*, 2018 WL 1335355, at *13; *B & R Supermarket II*, 2021 WL 234550, at *4.  In *B & R Supermarket I*, the Court held that the class definition, including the class period, must be consistent with the

alleged liability theory.  *See B & R Supermarket I*, 2018 WL 1335355, at *12; *see also Comcast Corp. v. Behrend*, 569 U.S. 27, 38 (2013)[33] (requiring alignment of the proposed liability theory and the proposed methodology for damages); *In re Petrobras Sec.*, 862 F.3d at 259[34] (discussing temporal limitation and its relationship to the plaintiffs' reliance on the defendants' statements, in the context of a securities action, where reliance is one of the liability elements); *Pinnacle Grp. N.Y. LLC*, 269 F.R.D. at 228 (modifying class definition in Rule 23(b)(2) class to ensure sufficient relationship between the definition and the claims alleged).  The Court found that the plaintiffs' original class end date of "until the anticompetitive conduct ceases" and four proposed alternative end dates were unascertainable because the plaintiffs failed to "propose a class period that bears a relationship to [their] proposed liability theory" and "some of [the alternatives]

---

[33] In *Comcast*, the plaintiffs presented four theories of antitrust liability, with a damages model that calculated damages for the entire class based on all four theories.  *Comcast Corp. v. Behrend*, 569 U.S. 27, 32 (2013).  The district court accepted only one of the liability theories, rejecting the other three.  *Id.*  However, the plaintiffs' calculation method for damages did not isolate damages for each of the four theories, and the district court refused to review the inconsistency between the sole liability theory and the damages methodology, which was based on all four liability theories, on the grounds that doing so would require reaching the merits of the claims.  *Id.*  The Supreme Court held that because the court approved only one of the four antitrust liability theories, the plaintiffs could not rely on a model that included damages for all four antitrust theories.  *Id.* at 37.  Thus, the Court understands *Comcast* to require courts to ensure consistency between the liability theory and damages proposed by the putative class. Although *Comcast* did not focus on class definition, it is relevant to the question of class boundaries because the Supreme Court reasoned that only damages that can be attributed to the defendant's misconduct should be considered.  *Id.* at 38 ("Prices whose level above what an expert deems 'competitive' has been caused by factors unrelated to an accepted theory of antitrust harm are not 'anticompetitive' in any sense relevant here.").

[34] *In re Petrobras Securities* was a securities class action brought by Petrobras shareholders alleging that Petrobras made misleading statements that impacted the price of shares.  862 F.3d 250 (2d Cir. 2017).  The Second Circuit noted that the class definition was temporally limited to securities purchases made "before Petrobras made generally available to its security holders an earnings statement covering a period of at least twelve months beginning after the effective date of the offerings," and that such limitation was appropriate "given the absence of any allegation that Plaintiffs relied on any such earnings statement."  *Id.* at 259–60.

appear[ed] completely arbitrary." *B & R Supermarket I*, 2018 WL 1335355, at *11, *13.  In a later decision in the case deciding the plaintiffs' renewed motion for class certification, the Court found the plaintiffs' proposed class with an end date two years after the challenged policy went into effect ascertainable because the end date for the proposed class period "align[ed] with their theory of liability" of when merchants would have been able to avoid chargebacks for two years but for the defendants' conduct, and because the proposed class definition was sufficiently substantiated.  *See B & R Supermarket II*, 2021 WL 234550 at *16–17.

In this case, Plaintiffs use the objective criteria of merchants that have accepted Visa- and/or Mastercard-branded cards to identify class members.  (*See* Pls.' Mem. 5); *see also Interchange Fees III*, 330 F.R.D. at 54 (finding that the proposed class was ascertainable because it used objective criteria of merchants' acceptance of Visa- and/or Mastercard-branded cards).  However, Plaintiffs have failed to demonstrate why a class period running through eight years "after the date of entry of [f]inal [j]udgment in this case" is sufficiently objective or substantiated.  (*See* Pls.' Mem. 5.)  As Merchant Trade Groups correctly argue, (*see* Merchant Trade Groups' Sur-Reply 8–9), Plaintiffs offer no basis for including future merchants specifically for up to eight years after the entry of final judgment in the class other than that the period represents the length of time they expect the anticipated relief to last and that the Department of Justice's Antitrust Division generally limits "any behavioral relief stemming from consent decrees to ten years," (*see generally* Pls.' Mem.; Pls.' Suppl. Reply 6–9 & n.24).  In contrast to Plaintiffs' proposed definition as to the Rule 23(b)(2) class, the Court notes that the settlement class certified as to the Rule 23(b)(3) class in this MDL only releases claims that accrue "no later than five years after the [s]ettlement [f]inal [d]ate." *Interchange Fees IV*, 2019 WL 6875472, at *23.  While Plaintiffs need not align the dates for released claims as to both

classes, Plaintiffs must ensure that the date for inclusion of future class members is not arbitrary as "[t]he party seeking class certification bears the burden of demonstrating compliance with Rule 23's prerequisites by a preponderance of the evidence." *Kurtz*, 818 F. App'x at 60 (citing *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d at 264); *Batalla Vidal*, 501 F. Supp. 3d at 134; *see also B & R Supermarket I*, 2018 WL 1335355, at *13. Accordingly, the Court finds that the proposed class is ascertainable as to current merchants but not ascertainable as to future merchants.

The Court recognizes that it has authority to modify a proposed class definition or consider a renewed motion for certification pursuant to Rule 23(c)(1)(C), and exercises its discretion to carve out an appropriate class from the overbroad class proposed by Plaintiffs. *In re Initial Pub. Offering Sec. Litig.*, 483 F.3d 70, 73 (2d Cir. 2007) ("District courts have ample discretion to consider (or to decline to consider) a revised class certification motion after an initial denial. . . . Some district courts have explicitly reserved authority to revise a class certification ruling by denying certification 'without prejudice.'" (collecting cases)); *see Sicav v. James Jun Wang*, No. 12-CV-6682, 2015 WL 268855, at *7 (S.D.N.Y. Jan. 21, 2015) (inviting plaintiffs to renew their motion for certification for the second time after denial); *Charron*, 269 F.R.D. at 229 ("A 'district court "is not bound by the class definition proposed in the complaint,"' and is empowered to carve out an appropriate class." (quoting *Lundquist v. Sec. Pac. Auto. Fin. Servs. Corp.*, 993 F.2d 11, 14 (2d Cir. 1993))).

The Court redefines the Rule 23(b)(2) class to adopt the class definition set forth in Plaintiffs moving papers excluding merchants eight years after the date of entry of final judgment in this case. The Court therefore certifies a class consisting of "[a]ll persons, businesses, and other entities (referred to herein as 'Merchants') that accept Visa and/or Mastercard [c]redit and/or [d]ebit cards in the United States at any time during the period

98

between December 18, 2020" and "the date of entry of Final Judgment in this case."  (Pls.' Mem. 5.)  Plaintiffs may seek to modify the proposed definition of the class to include future merchants at any time, so long as they substantiate the time period that applies to future merchants.

### d.  Rule 23(b)(2) requirements

Plaintiffs argue that they satisfy the Rule 23(b)(2) requirements because the class would "generally benefit from equitable relief prohibiting Defendants' conduct."  (*See* Pls.' Mem. 32–46.)  Plaintiffs contend that (1) by imposing and enforcing the Restraints — including the default interchange fees, the honor-all-cards rules, and the no-surcharge rules — Defendants have acted on grounds that apply generally to the class, (2) market definitions and market power can be evaluated on a classwide basis and would apply to all members of the class, (3) the merchants have "no viable business alternative to transacting with Defendants due to Defendants' market power," and (4) they seek classwide relief that will benefit all class members.  (*Id.* at 33.)  In support, Plaintiffs rely on Dr. Leffler's class certification report, in which he explains that "Defendants' anticompetitive conduct affects all Plaintiffs and [c]lass members, and that Defendants' conspiracy injured virtually all [m]erchants."  (*Id.*)  As to the interchange fees, Plaintiffs argue that "individually negotiated [i]nterchange [f]ees are extremely rare due to the Restraints, and because there is little or no incentive for an issuing bank to implement a fee lower than the default for the overwhelming majority of [m]erchants," and even if a merchant does negotiate their own fees, "it could only marginally raise the usage of that issuer's cards, as it would still be precluded from refusing other issuers' cards or using other steering mechanisms precluded by the Restraints."  (*Id.* at 35.)  As to the honor-all-cards rules, Plaintiffs argue that these rules "disincentivize[] the [i]ssuing [b]anks from negotiating [i]nterchange [f]ees lower than the default interchange rate" which results in the default interchange fee "becom[ing] a

fixed rate that applies to almost every transaction." (*Id.* at 36.) As to the no-surcharge rules, Plaintiffs argue that Defendants "insulate themselves from any competitive threat because when cardholders select which card to use in making a purchase, the [n]o [s]urcharge rules guarantee[] that the consumer makes this selection without regard to the card's [t]otal [p]rice," which results in merchants "bear[ing] the costs of the transaction, robbed of the ability to steer the cardholder to a lower cost of payment." (*Id.* at 38.) Finally, Plaintiffs argue that they seek classwide relief that will be "effective market-wide," and the fact that "members may differ in their willingness and/or ability to take full advantage of such relief does not negate the value of that relief." (*Id.* at 45.) In addition, Plaintiffs contend that "all prior reforms to the Defendants' Restraints" including the Durbin Amendment and the Department of Justice consent decree "have applied market-wide, without variation based on the identity of the [m]erchant or any other individual basis." (*Id.* at 46.)

Opponents argue that "[c]ohesion is a prerequisite for a mandatory (b)(2) class," that Plaintiffs fail to meet the "required unity of interests, called 'cohesion,'" under Rule 23(b)(2), and that Rule 23(b)(2) requires "greater cohesiveness" than that required under Rule 23(b)(3). (*See* Direct Action Pls.' Opp'n 16 (citing *In re St. Jude Med.*, 425 F.3d 1116, 1121 (8th Cir. 2005)); Direct Action Pls.' Sur-Reply 8–10; *see also* Grubhub Pls.' Opp'n 9–10; Walmart's Opp'n 14–15.)

Opponents' arguments that Plaintiffs do not meet Rule 23(b)(2)'s requirements repeat their arguments in the adequacy of representation context that Plaintiffs seek a different type of injunctive relief and that this relief is not in their interests. (*See* Direct Action Pls.' Opp'n 16–17, 19–22; Direct Action Pls.' Sur-Reply 8–10; Grubhub Pls.' Opp'n 9–11; Walmart's Opp'n 14–20; Merchant Trade Groups' Opp'n 10–15.) They argue that "Plaintiffs seek injunctive relief

that is adverse" to their interests and that "these cases do not challenge one central practice or rule that harms all class members in the same way."  (Direct Action Pls.' Opp'n 19–20; *see also* Grubhub Pls.' Opp'n (stating that they opted out of the Rule 23(b)(3) class and are pursuing relief "shaped to their own, individual interests and business models").)  Direct Action Plaintiffs and Grubhub Plaintiffs contend that "these cases challenge a mix of complex rules and practices that affect merchants differently[] and are perceived and valued differently by different class members."  (Direct Action Pls.' Opp'n 20; Grubhub Pls.' Opp'n 9–10 (arguing that the Grubhub Plaintiffs are "larger merchants that have different interests, and different capabilities, than small merchants").)  In addition, Direct Action Plaintiffs argue that because they "seek to bar enforcement" of the honor-all-cards and default interchange fee rules, while Plaintiffs will prioritize surcharging relief, the Rule 23(b)(2) requirement is not satisfied.  (Direct Action Pls.' Opp'n 21; Direct Action Pls.' Sur-Reply 9–10.)

In addition to reiterating the same arguments as Direct Action Plaintiffs and Grubhub Plaintiffs regarding the form of relief, Walmart argues that (1) "not all of Visa and Mastercard's network rules apply to every merchant," (2) Plaintiffs failed to "articulate how a specific injunction will benefit every class member," and (3) Plaintiffs have not shown that "a single injunction can offer meaningful 'classwide relief' to every merchant that uses Visa and Mastercard payment cards" and the Court should "infer that there is no such uniform remedy and deny class certification accordingly."  (Walmart's Opp'n 16–18.)

Merchant Trade Groups contend that all merchants would not necessarily want the same injunctive relief.[35]  (*See* Merchant Trade Groups' Opp'n 9–10.)  In support, Merchant Trade

---

[35]  Although Merchant Trade Groups make their arguments in the context of requesting opt-out rights and not arguing that Plaintiffs do not satisfy Rule 23(b)(2), (*see* Merchant Trade Groups' Opp'n 9–10), the Court finds their arguments relevant for the Rule 23(b)(2) inquiry.

Groups argue that "Visa's and Mastercard's rulebooks span thousands of pages" and "[a] plaintiff could well resolve this case through other injunctive changes" because "there are multiple potential injunctive resolutions of this case." (*Id.* at 10.)

In response to Opponents' arguments that Rule 23(b)(2) imposes an additional requirement of cohesion, Plaintiffs argue that (1) cohesion, as formulated by Opponents, is not expressly required by the text of Rule 23(b)(2) and if it were, "it is shorthand for the need for generally applicable class-wide injunctive relief," and (2) any cohesiveness element "merely requires that plaintiffs' legal injuries be similar enough that they all can be remedied with a single 'indivisible' injunction." (Pls.' Reply 14–16 (quoting *Houser v. Pritzker*, 28 F. Supp. 3d 222, 250 (S.D.N.Y. 2014)).) Plaintiffs contend that because the "entire market is subject to substantially the same 'mix of complex rules'" a class under Rule 23(b)(2) is a "practical and legal necessity, regardless of each class member's individual circumstance." (*Id.* at 17–18.)

Rule 23(b)(2) provides for certification of a class seeking equitable relief "if 'the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief . . . is appropriate respecting the class as a whole.'" *Sykes*, 780 F.3d at 80 (quoting Fed. R. Civ. P. 23(b)(2)); *In re Kind LLC "Healthy & All Nat." Litig.*, 337 F.R.D. 581, 609 (S.D.N.Y. 2021) ("Rule 23(b)(2) provides for class certification when 'the party opposing the class has refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief.'" (quoting Fed R. Civ. P. 23(b)(2))). "The Supreme Court has clarified that certification of a class for injunctive relief is only appropriate where 'a single injunction . . . would provide relief to each member of the class.'" *Sykes*, 780 F.3d at 97 (quoting *Dukes*, 564 U.S. at 360); *see also Berni v. Barilla S.p.A.*, 964 F.3d 141, 146 (2d Cir. 2020) ("[T]he Supreme Court has counseled that 'Rule 23(b)(2) applies only when a single

injunction or declaratory judgment would provide relief to each member of the class.' Put another way, a class may not be certified under Rule 23(b)(2) if any class member's injury is not remediable by the injunctive or declaratory relief sought." (quoting *Dukes*, 564 U.S. at 360)). However, the Second Circuit has explained the Supreme Court's holding in *Dukes* as "simply emphasiz[ing] that in a class action certified under Rule 23(b)(2), 'each individual class member' is not 'entitled to a *different* injunction.'" *Amara v. CIGNA Corp.*, 775 F.3d 510, 522 (2d Cir. 2014) (quoting *Dukes*, 564 U.S. at 360–61); *see also Sykes*, 780 F.3d at 97 (quoting *Amara*, 775 F.3d at 522); *Plaintiffs #1-21*, 2021 WL 1255011, at *17 (same).

The Court first assesses whether there is a cohesiveness requirement under Rule 23(b)(2) and then addresses whether the class meets the requirements of Rule 23(b)(2).

### i.   The Court declines to impose a cohesiveness requirement

The Court declines to read an additional "cohesiveness" requirement into Rule 23(b)(2). The Court acknowledges that existing jurisprudence on this issue is mixed, with some courts imposing cohesiveness as an additional requirement and others declining to do so. *See Westchester Indep. Living Ctr., Inc.*, 331 F.R.D. at 301 ("Some courts require that plaintiffs seeking to certify a Rule 23(b)(2) class 'must demonstrate that the class is "cohesive,"' but it is not entirely clear how this differs from the commonality requirement found in Rule 23(a) . . . ." (quoting *Laumann v. Nat'l Hockey League*, 105 F. Supp. 3d 384, 395 (S.D.N.Y. 2015))). *Compare Brooks v. Roberts*, 251 F. Supp. 3d 401, 420 (N.D.N.Y. 2017) (stating that Rule 23(b)(2) class plaintiffs "must demonstrate the class is 'cohesive'"), *and Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 143 (3d Cir. 1998) ("While 23(b)(2) class actions have no predominance or superiority requirements, it is well established that the class claims must be cohesive. Discussing the requirements for 23(b)(2) classes in *Wetzel v. Liberty Mutual Insurance Company*, 508 F.2d

239 (3d Cir.1975), we noted, '[b]y its very nature, a (b)(2) class must be cohesive as to those claims tried in the class action. . . . Because of the cohesive nature of the class, Rule 23(c)(3) contemplates that all members of the class will be bound."), *with Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918, 938–39 (9th Cir. 2019) ("[T]he district court erred in imposing a 'cohesiveness' requirement for the proposed Rule 23(b)(2) class.  Although we have never explicitly addressed whether 'cohesiveness' is required under Rule 23(b)(2), courts that have imposed such a test treat it similarly to Rule 23(b)(3)'s predominance inquiry — something we have previously rejected in no uncertain terms." (citing Newberg on Class Actions)), *and Kurtz*, 321 F.R.D. at 540 (stating that the "additional case law interpretive requirements" of cohesion and necessity "are unjustified in light of the detailed legislative attention to Rule 23, which does not contain them," but finding that they were nevertheless satisfied "because the defendants, through their labeling practices, 'acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole'" (quoting Fed. R. Civ. P. 23(b)(2))).

The Second Circuit has not addressed whether there is a cohesiveness requirement under Rule 23(b)(2).  However, in the few decisions using the word "cohesion" when discussing a Rule 23(b)(2) class, the Second Circuit has suggested that "cohesion" is merely a descriptor for classes meeting Rule 23(b)(2)'s requirements.  For example, in *Handschu v. Special Services Division*, the Second Circuit stated that "[b]ecause of the common interests of all its members, a Rule 23(b)(2) class seeking declaratory and injunctive relief is cohesive by nature."  787 F.2d 828, 833 (2d Cir. 1986).  Similarly, in *Robinson v. Metro-North Commuter Railroad Co.*, the Second Circuit stated:

> Where class-wide injunctive or declaratory relief is sought in a (b)(2) class action for an alleged group harm, there is a presumption

> of cohesion and unity between absent class members and the class representatives such that adequate representation will generally safeguard absent class members' interests and thereby satisfy the strictures of due process.  This presumption of cohesion and unity continues where incidental damages are also sought because entitlement to such damages does not vary based on the subjective considerations of each class member's claim, but "flow[s] directly from a finding of liability on the . . . claims for class-wide injunctive and declaratory relief."

267 F.3d at 165 (alteration in original) (citation omitted) (quoting *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 415 (5th Cir. 1998)).  The language in *Robinson* suggests that cohesion is inherent in a properly certified Rule 23(b)(2) class action because class members' claims are inherently intertwined and relief to anyone in the group would be relief to the group as a whole.  *See Berry v. Schulman*, 807 F.3d 600, 608 (4th Cir. 2015) ("[B]ecause of the group nature of the harm alleged and the broad character of the relief sought, the (b)(2) class is, by its very nature, assumed to be a homogenous and cohesive group." (alteration in original) (quoting *Allison*, 151 F.3d at 413)); *see also* 2 Newberg on Class Actions § 4:33 ("Courts that adopt a cohesiveness requirement are essentially using it as a means of measuring whether the class's interests are in fact so intertwined.").  This view is consistent with the Supreme Court's holding in *Dukes* in which it reiterated that the additional procedural protections afforded to Rule 23(b)(3) classes do not apply to Rule 23(b)(2) classes because of the nature of equitable relief classes:

> The procedural protections attending the (b)(3) class — predominance, superiority, mandatory notice, and the right to opt out — are missing from (b)(2) not because the Rule considers them unnecessary, but because it considers them unnecessary *to a (b)(2) class*.  When a class seeks an indivisible injunction benefiting all its members at once, there is no reason to undertake a case-specific inquiry into whether class issues predominate or whether class action is a superior method of adjudicating the dispute.  Predominance and superiority are self-evident.

*Dukes*, 564 U.S. at 362–63.  The Supreme Court also stated that "[t]he key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted — the notion that the

conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Id.* at 360 (quoting Nagareda, 84 N.Y.U. L. Rev., at 132). In addition, courts imposing a cohesion requirement appear to undertake the same analysis as courts that look only to the text of Rule 23(b)(2). *See, e.g.*, *T.R. v. Sch. Dist. of Phila.*, No. 15-CV-4782, 2019 WL 1745737, at *21 (E.D. Pa. Apr. 18, 2019) ("For a court to find a class cohesive, it must find that the 'class's claims are common ones and that adjudication of the case will not devolve into consideration of myriad individual issues.' 'In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant.'" (citation omitted) (first quoting Newberg on Class Actions § 4:34; and then quoting *Dukes*, 564 U.S. at 360)), *aff'd*, 4 F.4th 179 (3d Cir. 2021); *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1122 (8th Cir. 2005) ("At base, the (b)(2) class is distinguished from the (b)(3) class by class cohesiveness . . . . Injuries remedied through (b)(2) actions are really group, as opposed to individual injuries.").

Accordingly, to the extent "cohesion" is required in Rule 23(b)(2) class actions, the Court understands it to refer to the requirements of Rule 23(b)(2) itself, rather than an additional requirement beyond the rule's text.[36] *See Houser*, 28 F. Supp. 3d at 250 ("The cohesiveness element merely requires that plaintiffs' legal injuries be similar enough that they all can be remedied with a single 'indivisible' injunction." (citing *Barnes*, 161 F.3d at 143 n.18)).

---

[36] The Court notes that in approving the 2013 Settlement Agreement, Judge Gleeson held that "the class is sufficiently cohesive to warrant Rule 23(b)(2) relief in this case." *See Interchange Fees I*, 986 F. Supp. 2d at 239. However, Judge Gleeson appeared to use the word "cohesive" in the same manner that this Court interprets it — to describe a class that meets the requirements of Rule 23(b)(2) because "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief . . . is appropriate respecting the class as a whole." *Id.* (quoting Fed. R. Civ. P. 23(b)(2)).

### ii.    The class meets the requirements of Rule 23(b)(2)

The Court finds that the class meets the requirements of Rule 23(b)(2).  Plaintiffs have

met their burden to demonstrate that the challenged Restraints apply to all merchants and

therefore relief would be effected on a classwide basis.

First, the Court finds that equitable relief under Rule 23(b)(2) is appropriate because

Defendants have acted on grounds generally applicable to the class.  Defendants' alleged

anticompetitive conduct via the Restraints affects all Plaintiffs and class members and the class

would generally benefit from equitable relief prohibiting Defendants' challenged conduct.  For

example, Plaintiffs allege that Visa has "established complex 'default' [i]nterchange [f]ee

schedules" which "apply on every transaction, except for where they have been 'customized

where Member [Banks] have set their own financial terms for the [i]nterchange of a Visa

[t]ransaction or Visa has entered into business agreements to promote acceptance and [c]ard

usage." (Compl. ¶¶ 86, 90 (third alteration in original).)  Plaintiffs allege that Mastercard's

interchange fees operate in a similar manner.  (*See id.* ¶ 87.)  In his report, Dr. Leffler notes that

the default interchange fees "become[] the de facto price charged by all issuing banks" (Leffler

Report ¶ 29 (quoting Stiglitz Report ¶ 136)), because "there is no benefit to an issuer setting a

merchant price lower than the maximum allowed price which is the default interchange." (*id.*;

Pls.' Mem. 35).  Dr. Leffler states that same is true of the honor-all-cards rule which impairs

merchant competition by preventing merchants from "selectively accept[ing] an issuer's payment

cards." (Leffler Report ¶ 28.)  Dr. Leffler stated that the Restraints "work together to reinforce

Visa and Mastercard's control over the pricing to merchants and make it virtually impossible for

merchants to exert any leverage to obtain substantially more favorable prices or terms." (*Id.*

¶ 38.)  These effects do not occur on an individual merchant basis — they apply generally to all

merchants in the class.

Second, the Court finds that equitable relief is appropriate because such relief would

apply to and benefit the class as a whole.  Courts contemplating equitable relief for similar

alleged anticompetitive rules have held that such relief is appropriate to be effected classwide.

The district court's decision in *In re Visa Check/Mastermoney Antitrust Litigation* is instructive.

192 F.R.D. 68, 78 (E.D.N.Y. 2000), *aff'd sub nom. In re Visa Check/MasterMoney Antitrust

Litig.*, 280 F.3d 124 (2d Cir. 2001).  In that case, the plaintiffs sought to challenge alleged tying

arrangement "rules issued by defendants Visa and MasterCard that require[d] stores accepting

[the] defendants' credit cards to also accept their debit cards."  *Id.* at 71.  Although the court

ultimately certified the class under Rule 23(b)(3), the court also concluded that "the action may

be maintained under Rule 23(b)(2)" because "[t]he 'honor all cards' rule is 'generally applicable'

to all members of the class, and the request for an injunction ending it is central to the plaintiffs

suit."  *Id.* at 88; *see also In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d at 146–47

(declining to discuss certification under Rule 23(b)(2) because the class was certified under Rule

23(b)(3)).

Similarly, in *Interchange Fees I*, Judge Gleeson held that certification of a Rule 23(b)(2)

settlement class was warranted because "[t]he network rules regimes that gave rise to this case

applied generally to every merchant accepting Visa or MasterCard credit cards, and the

injunctive relief in the proposed settlement" did as well.  986 F. Supp. 2d at 239.  Judge Gleeson

noted that "all merchants have the same interest in being able to inform cardholders at the point

of sale of the acceptance costs of their credit cards and to either steer them to lower-cost

alternatives or recoup the cost of acceptance."  *Id.*  While the Second Circuit vacated and

remanded that decision on other grounds regarding adequacy of representation and due process, it did not hold that meaningful equitable relief was not possible for the entire class.  *Interchange Fees II*, 827 F.3d at 238–40.  Instead, the Second Circuit identified two schisms in the 2013 Rule 23(b)(2) settlement class — merchants that accept American Express or operate in states that prohibit surcharging and merchants that began business after the expiration of the provided injunctive relief  — and found that the relief provided for in the settlement did not go far enough. *Id.*  The Second Circuit noted that "[a]lternative forms of relief might have conferred a real and palpable benefit, such as remedies that affected the default interchange fee or honor-all-cards rule."  *Id.* at 238.  Plaintiffs' example of the 2011 Department of Justice settlement as a form of classwide relief is similarly persuasive.  In that settlement, Visa and Mastercard were prevented from "offering discounts or expressing a preference for particular forms of payment" and required to "modify their rules in specific ways that applied to all [m]erchants."  (*See* Pls.' Mem. 33); Final Judgment, *United States v. Am. Express*, No. 10-CV-4496 (E.D.N.Y. July 20, 2011), Docket Entry No. 143.

Moreover, the advisory committee notes to Rule 23 contemplate the use of equitable relief classes in antitrust cases.  *See* Fed. R. Civ. P. 23 advisory committee notes to the 1966 Amendments ("Thus an action looking to specific or declaratory relief could be brought by a numerous class of purchasers, say retailers of a given description, against a seller alleged to have undertaken to sell to that class at prices higher than those set for other purchasers, say retailers of another description, when the applicable law forbids such a pricing differential.").  Courts certifying antitrust-focused putative equitable relief classes have found that they meet the Rule 23(b)(2) requirements.  *See In re Universal Serv. Fund Tel. Billing Pracs. Litig.*, 219 F.R.D. 661, 679–81 (D. Kan. 2004) (certifying a (b)(2) class in addition to a (b)(3) damages class in an

antitrust class action where defendants were allegedly engaged in horizontal price-fixing, and continued anti-competitive behavior, in the absence of an injunction, could possibly dwarf plaintiffs' damages claims); *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. at 516 (certifying a (b)(2) class despite the availability of treble damages under the antitrust statute because of the possibility that the defendants' alleged conspiracy would continue to inflate the spreads on securities in the absence of appropriate equitable relief).

The Court recognizes that merchants are likely impacted in a variety of ways by the Restraints.  As Opponents argue, the class consists of merchants large and small, with multiple locations or single locations, and with different business plans and perspectives.  However, Plaintiffs seek to challenge the total anticompetitive effect resulting from the Restraints, including how the Restraints interact with each other to create an overall anticompetitive environment, which Plaintiffs allege has the total effect of "limit[ing] merchants' ability to incentivize their customers to choose payment means that result in lower costs to the merchants and lower total prices for the transactions."  (Leffler Report ¶ 4.)  Differences in how each individual merchant is affected do not negate the fact that Defendants have acted on grounds generally applicable to the class and that each merchant in the class stands to benefit from equitable relief from the Restraints.  *See In re Vitamin C Antitrust Litig.*, 279 F.R.D. at 117 (stating that "[d]ifferences between the extent of harm suffered by each class member do not make Rule 23(b)(2) certification inappropriate" and finding that the defendants' "price-fixing conduct [was] alleged to have caused every class member to purchased vitamin C at an artificially increased price" which was "sufficient 'common impact' to warrant certification under Rule 23(b)(2)"); *Latino Officers Ass'n City of N.Y.*, 209 F.R.D. at 92 (certifying a 23(b)(2) class where "the actions complained of allegedly were taken on grounds generally applicable to

the proposed class, even if not every member actually felt the brunt of the actions"); *see also DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1201 (10th Cir. 2010) ("Rule 23(b)(2) does not require [n]amed [p]laintiffs to prove [the] controverted policies or practices actually harm or impose a risk of harm upon every class member at the class certification stage. . . . [C]ertification is appropriate even if the defendant's action or inaction 'has taken effect or is threatened only as to one or a few members of the class, provided it is based on *grounds* which have general application to the class.'  That a class possibly or even likely includes persons unharmed by a defendant's conduct should not preclude certification." (quoting Fed. R. Civ. P. 23(b)(2) advisory committee note to 1966 amendment)); *Lyon v. U.S. Immigr. & Customs Enf't*, 171 F. Supp. 3d 961, 983–85 (N.D. Cal. 2016) (holding that immigration detainees who claimed violation of procedural due process and sought class certification under Rule 23(b)(2) presented "substantial undisputed evidence of prejudice suffered by the class as a whole based on conduct which applies generally to the class," even if the plaintiffs did "not demonstrate every member of the class ha[d] suffered from an adverse effect on the outcome of their renewal hearing"); *In re J.P. Morgan Chase Cash Balance Litig.*, 242 F.R.D. at 276 (certifying a Rule 23(b)(2) class because "[i]f [p]laintiffs prevail on the merits and [the defendant's] [p]lan is found to violate ERISA[], any injunctive or declaratory relief ordered would be applicable to the entire class"), *amended*, 255 F.R.D. 130 (S.D.N.Y. 2009); *Richards*, 235 F.R.D. at 174 ("The defendants argue that some putative class members would not want the injunctive relief that [the plaintiff] seeks because it would disadvantage them financially to revert to coverage under the [t]raditional [p]lan terms.  However, the court may infer from the complaint and plan documents that all of the putative class members would benefit from at least some injunctive relief if the plaintiff prevails."); 2 Newberg on Class Actions § 4:28 ("While the Rule looks for grounds that 'apply

generally' to the class, it is well-settled that the defendant's conduct described in the complaint need not be directed or damaging to every member of the class.").  In addition, as Plaintiffs contend, merchants may continue to "negotiate additional relief specific to themselves and their own business needs" as the relief provided will serve as a baseline, but not a ceiling for relief to merchants.  (*See* Pls.' Mem. 30–31.)

The cases cited by Opponents do not persuade the Court that Rule 23(b)(2) is not satisfied.  For example, in *M.D. ex rel. Stukenberg v. Perry*, the Fifth Circuit held that the proposed class did not satisfy Rule 23(b)(2) because the class included "claims for individualized injunctive relief."  675 F.3d 832 (5th Cir. 2012).  However, the requested injunctive relief in that case was to formulate "'special expert panels to review the cases' of all individual class members in certain subgroups of the class to determine whether their 'services' or 'permanency' needs were 'being adequately addressed and, if not, to implement appropriate remedial steps to seek and secure permanency."  *Id.* at 846–47.  This relief was essentially crafting individualized injunctive-type relief, which is distinct from ordering changes, modifications, or the repeal altogether of the Restraints as to the entire merchant class.  *Id.*  Similarly, in *In re Managerial, Professional & Technical Employees*, a multidistrict antitrust action challenging the defendants' alleged exchange of detailed salary information, the plaintiffs sought to "stop [d]efendants from sharing compensation information concerning all members of the [p]roposed [c]lass."  No. 02-CV-2924, 2006 WL 38937, at *9 (D.N.J. Jan. 5, 2006).  The court held that "enjoining that conduct would not provide relief generally applicable to the class because it would have potentially conflicting effects on different members" and could potentially benefit employees in a job market where the defendants do not exercise market power.  *Id.* at *9.  The Court does not find that the relief proposed by Plaintiffs — eliminating the Restraints — has the potential to

harm the class.  Opponents cite no cases, and this Court is aware of none, that indicate that perpetuating the Restraints could be beneficial to any merchant.

Accordingly, the Court finds that the requirements of Rule 23(b)(2) are satisfied.

### e.   The Court declines to grant opt-out rights

Plaintiffs argue that the Court should certify a mandatory Rule 23(b)(2) class.  (Pls.' Mem. 46–50.)  They contend that the Supreme Court's decision in *Dukes* "reaffirmed the default rule" that Rule 23(b)(2) classes are mandatory classes because the rule "provides no opportunity for . . . (b)(2) class members to opt out."  (*Id.* at 46 (quoting *Dukes*, 564 U.S. at 361–62).) Plaintiffs argue that "Second Circuit courts deviate from the Supreme Court's proscription against opt-outs under Rule 23(b)(2) only when the class seeks 'injunctive relief *and* significant monetary damages."  (*Id.* at 47 (quoting *Madden v. Midland Funding, LLC*, 237 F. Supp. 3d 130, 159 (S.D.N.Y. 2017)).)  In support, Plaintiffs rely on Dr. Leffler's report, which states that "disallowing opt-outs prevents free-riding by individual [m]erchants, thereby ensuring fairness and increasing the value of the injunctive-relief claim to *all* [m]erchants."  (*Id.* at 48.)  Plaintiffs contend that if merchants are allowed to opt out, they may "*threaten* to seek to obtain additional/different equitable relief from the Defendants" and would "monetize the value of that claim *solely for [themselves]* in a settlement," which would result in Defendants paying "substantially less to the class in the form of effective injunctive relief."  (*Id.* at 48–49.)  Because "[a]llowing opt-outs would permit an individual [m]erchant to gain financially based on the benefit that a legal claim would provide to other [m]erchants," and "that individual monetization of a collective asset significantly diminishes its overall value," Plaintiffs contend that the Court should not grant opt-out rights to the class.  (*Id.* at 49.)  In addition, Plaintiffs argue that Rule 23's settlement approval process guarantees that class members will be heard as to whether any

relief is insufficient.  (*Id.*)  Finally, Plaintiffs contend that a mandatory class "is a practical and legal necessity to bring market-wide equitable relief to this litigation."  (Pls.' Reply 20.)

Direct Action Plaintiffs and Grubhub Plaintiffs argue that the Court should allow opt-out rights or redefine the class to exclude them because they are pursuing their own damages claims and excluding them from the class would cure inadequate representation and due process violations.  (Direct Action Pls.' Opp'n 23–25; Grubhub Pls.' Opp'n 16–18.)  First, Direct Action Plaintiffs and Grubhub Plaintiffs contend that the Court has the discretion under Rule 23(b)(2) to permit opt-outs from the Rule 23(b)(2) class when doing so would create a "just result."  (Direct Action Pls.' Opp'n 23–24; Grubhub Pls.' Opp'n 16–17.)  In support, Direct Action Plaintiffs point to *In re Visa Check/MasterMoney Antitrust Litigation*, in which the Second Circuit "avoided the question of whether certification was proper under Rule 23(b)(2) by affirming only under Rule 23(b)(3) to guarantee mandatory notice and opt-out rights."  (Direct Action Pls.' Opp'n 24.)  Direct Action Plaintiffs contend that "none of the dire predictions . . . about what would happen if opt-out rights are provided . . . [were] borne out in that case" because "there were a limited number of opt-outs, their claims were resolved individually, and the class achieved complete injunctive relief in a negotiated settlement."  (*Id.*)  Grubhub Plaintiffs similarly argue that granting opt-out rights "would provide them with that required right to decide" if they want to "'tie their fates to the class representatives' or go it alone."  (Grubhub Pls.' Opp'n 16.)  In the alternative, Direct Action Plaintiffs and Grubhub Plaintiffs argue that the Court should "exercise its authority to redefine the class to exclude" them from the class.  (Direct Action Pls.' Opp'n 24–25; Grubhub Pls.' 17–18.)

Merchant Trade Groups argue that the Court should not certify a mandatory class because (1) all class members do not seek the same injunctive relief, (2) the merchants encompassed by

114

the proposed class are different, will not be affected by injunctive relief in the same manner, and "should be permitted to make their own business decisions about what's best for them, their employees, and their customers without being bound by the judgments of *other* businesses about what is best for *them*," and (3) opt-out rights are the traditional escape valve for intra-class disputes. (Merchant Trade Groups' Opp'n 7–17.) Walmart argues that the Court should permit it to opt out of the class because "cohesion is lacking" and also argues that any such opt-out right should not be limited to merchants pursuing individual damages claims. (Walmart Opp'n 20–22.)

In response to Opponents' arguments, Defendants argue that the Court should certify a mandatory class. (*See* Defs' Reply 9–17.) Defendants argue that (1) Rule 23 does not provide for opt-outs from a Rule 23(b)(2) class, (2) Opponents do not provide a legitimate basis for the Court to permit opt outs because due process and adequacy of representation are satisfied, and (3) the Court should not permit opt-out rights as a matter of discretion because the Rule 23(b)(2) class seeks only equitable relief and diversity of opinion as to the proper injunctive relief does not warrant granting opt out rights. (*Id.*) In addition, Defendants contend that the Court should not permit opt-out rights because to do so would "undermine the Rule's purpose of providing 'final injunctive relief.'" (*Id.* at 17–18.)

Under Rule 23 of the Federal Rules of Civil Procedure, neither notice nor an opportunity to opt out is required for classes certified pursuant to Rule 23(b)(2).[37] *See* Fed. R. Civ. P. 23(c) ("For any class certified under Rule 23(b)(1) or (b)(2), the court may direct appropriate notice to the class."); *see also Dukes*, 564 U.S. at 361–62 (stating that Rule 23 "provides no opportunity

---

[37] The Court notes that Rule 23(e) requires that (b)(2) class members receive notice of any proposed settlement and Rule 23(h) requires that (b)(2) class members receive notice of any claim for an attorneys' fees award. *See* Fed. R. Civ. P. 23(e), (h).

for (b)(1) or (b)(2) class members to opt out, and does not even oblige the [d]istrict [c]ourt to afford them notice of the action."); *Batalla Vidal*, 501 F. Supp. 3d at 137 ("[T]he [g]overnment is correct that Rule 23(b)(2) does not require district courts to give notice or the opportunity for class members to opt out . . . ."). While "the right of a class member to opt-out in Rule 23(b)(1) and (b)(2) actions is not obvious on the face of the rule . . . , 'the language of Rule 23 is sufficiently flexible to afford district courts discretion to grant opt-out rights in (b)(1) and (b)(2) class actions.'" *McReynolds v. Richards-Cantave*, 588 F.3d 790, 800 (2d Cir. 2009) (quoting *Eubanks v. Billington*, 110 F.3d 87, 94 (D.C. Cir. 1997)); *Batalla Vidal*, 501 F. Supp. 3d at 137 (quoting *McReynolds*, 588 F.3d at 800); *Biediger v. Quinnipiac Univ.*, No. 09-CV-621, 2010 WL 2017773, at *7 (D. Conn. May 20, 2010) ("[A]ny members who do not want to be represented in the [Rule 23(b)(2)] class, or who believe they are erroneously included in the class, may opt out if they so choose." (citing *McReynolds*, 588 F.3d at 800)).

The Court declines to grant an opt-out right from the Rule 23(b)(2) class. For the reasons stated in Sections II.c.iv and II.d *supra*, the Court finds that the proposed class satisfies the adequacy of representation requirement of Rule 23(a)(4) and the Due Process Clause, as well as the equitable relief requirement of Rule 23(b)(2). As Defendants correctly argue, the "adequate representation that a court finds in certifying a Rule 23(b)(2) class obviates the need for permitting opt-outs from the class; in the absence of adequate representation, certification is simply denied." (Defs.' Reply 10.) Indeed, the Court is not aware of a case, and Opponents cite none, that suggest that a court can cure inadequate representation by providing opt-out rights. The Court is left with Opponents' arguments that it should use its discretion to permit opt-out rights.

The cases cited by Opponents in support of their arguments for an opt-out right demonstrate that many courts that have granted the ability to opt out in Rule 23(b)(2) classes have generally done so when monetary damages are being pursued in the same class.[38]  *See, e.g., Lemon v. Int'l Union of Operating Eng'rs, Loc. No. 139*, 216 F.3d 577, 580–81 (7th Cir. 2000) (remanding certification of Rule 23(b)(2) class for the court to consider its options, including providing opt-out rights, when the plaintiffs "sued for both equitable relief and monetary damages to remedy alleged violations of Title VII" and "each class member in actions for money damages is entitled as a matter of due process to personal notice and an opportunity to opt out of the class action"); *In re Monumental Life Ins. Co.*, 365 F.3d 408, 417 (5th Cir. 2004) ("[T]here is no absolute right of opt-out in a rule 23(b)(2) class, 'even where monetary relief is sought and made available.'  Under our precedent, should the class be certified on remand, class members must be provided adequate notice, and the district court should consider the possibility of opt-out rights." (first citing *Penson v. Terminal Transp. Co.*, 634 F.2d 989, 994 (5th Cir. 1979; and then citing *Kincade v. Gen. Tire & Rubber Co.*, 635 F.2d 501, 505–07 (5th Cir. 1981))); *Eubanks*, 110 F.3d at 96 ("[W]hen a (b)(2) class seeks monetary as well as injunctive or declaratory relief the district court may exercise discretion in at least two ways.  The court may conclude that the assumption of cohesiveness for purposes of injunctive relief that justifies certification as a (b)(2) class is unjustified as to claims that individual class members may have for monetary

---

[38]  Another case cited by Merchant Trade Groups is similarly unpersuasive.  In *Friedman v. California State Employees Association*, the court provided opt-out rights to a Rule 23(b)(2) class for members who "object[ed] to the portion of the action pertaining to the challenge to the constitutionality" of a statute because "some fair share fee payers [were] happy to pay their fair share of union dues to cover the benefits of collective bargaining and [did] not want the statute to be overturned."  No. CV-S000101, 2000 WL 288468, at *8 (E.D. Cal. Mar. 15, 2000).  The Court finds the facts of this case inapposite because in the instant litigation, no merchant is seeking opt-out rights to uphold the Restraints.

damages. . . .   Alternatively, the court may conclude that the claims of particular class members are unique or sufficiently distinct from the claims of the class as a whole, and that opt-outs should be permitted on a selective basis."); *In re Universal Serv. Fund Tel. Billing Pracs. Litig.*, 219 F.R.D. at 681 (certifying a Rule 23(b)(2) class but noting that the court will "exercise its discretionary authority pursuant to Rule 23(d)(2) and 23(d)(5) and provide the conspiracy class members with notice and opt-out rights equally insofar as that class is certified under Rule 23(b)(2) and Rule 23(b)(3)" when "the monetary damages aspect of the conspiracy claim [was] certainly significant, but the injunctive relief aspect [was] also potentially significant"); *see also Charron*, 269 F.R.D. at 237 ("Where, as here, a class seeks injunctive relief and significant monetary damages, due process concerns militate strongly against maintaining a mandatory (b)(2) class action without the procedural safeguards of notice and the opportunity to opt-out that are provided to members of a(b)(3) damages class.").

Due to the nature of the relief being sought, all merchants — regardless of whether they would choose to opt out of the class or not — would benefit from the equitable relief provided. *See J.D. v. Azar*, 925 F.3d 1291, 1319 (D.C. Cir. 2019) ("[I]n a (b)(2) case, an 'injunction prohibiting a defendant's action against "the class as a whole" would halt the action *regardless* [of] *whether some of those affected might have withdrawn from the suit if given the option*.'" (quoting *Richards v. Delta Air Lines, Inc.*, 453 F.3d 525, 530 (D.C. Cir. 2006))); *Messier*, 183 F.R.D. at 356 ("[O]pting out of a (b)(2) action for injunctive relief has little practical value or effect.  Even class members who opted out could not avoid the effects of the judgment." (collecting cases)).  In *Dukes*, the Supreme Court emphasized the "indivisible nature" of the relief provided in Rule 23(b)(2) actions, stating that "[t]he key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted — the notion that the

conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Dukes*, 564 U.S. at 360 (quoting Nagareda, 84 N.Y.U. L. Rev., at 132). In addition, although the court in *In re Visa Check/Mastermoney Litigation* ultimately only certified the class under Rule 23(b)(3), in holding that the class could also be certified under Rule 23(b)(2), the district court noted that it was inclined to "provide opt-out rights only as to the damages section." 192 F.R.D. at 89. The circumstances contemplated by the Supreme Court in *Dukes* are present in the case at hand — Plaintiffs seek equitable relief from the bundle of Restraints that together result in the supracompetitive interchange fees. Accordingly, equitable relief — should Plaintiffs prevail or reach a settlement — that tackles these Restraints is proper as to all merchants, not just those who are represented by class counsel.

Concerns about opt-outs resulting in contradictory equitable relief and disincentivizing settlement[39] weigh in favor of denying opt-out rights. *See Berry*, 807 F.3d at 613 ("What is being sought is a blanket right to opt out of a Rule 23(b)(2) settlement that provides purely injunctive relief . . . . That such a rule would discourage settlement seems undeniable; defendants . . . surely will not agree to settlements like this one if they cannot buy something approaching global peace."); *Van Gemert v. Boeing Co.*, 590 F.2d 433, 439 n.14 (2d Cir. 1978) ("[C]lass actions certified under Rule 23(b)(2) . . . do not contain an opt-out privilege. This reflects the conclusion of those who drafted the Rules that individual choice should be subordinated to the interests of the class as a whole to avoid inconsistent judgments or prejudice to absent class members. Because class certification represents a judicial determination that the absentees are

---

[39] While the Court is mindful of the Second Circuit's warning that litigation peace does not warrant certification of an unlawful class, *see Interchange Fees II*, 827 F.3d at 240 ("[T]he benefits of litigation peace do not outweigh class members' due process right to adequate representation."), the Court considers potential obstacles to settlement because it is satisfied that the representation is adequate under Rule 23(a)(4) and the Due Process Clause.

adequately represented, it would frustrate the Rule if we were to require an investigation into each plaintiff's willingness to accept the benefits of the litigation."), *aff'd*, 444 U.S. 472 (1980). In addition, as Dr. Leffler noted in his report, permitting opt-outs can decrease the efficiency of the class action:

> if the class wins, the opt-out wins; if the class loses, the opt-out does not lose. Therefore, because a merchant would get the benefit from a class win at trial but retain the right to re-address liability if the class loses, there is necessarily a positive expected net value from opting out. Hence, if the case is expected to go to trial, merchants will perceive a positive value of opting out as compared to remaining in the class. In effect, by opting out[,] a merchant can free ride on the benefits of a trial win but avoid the cost of a trial loss. Class action cases lower the costs of litigation reducing the dissipation of society's resources. If merchants are incented to opt out of the Class to free ride on the Class result and filing their own case, the benefits of a class action are undermined.

(Leffler Report ¶ 67.) The Court is persuaded by Dr. Leffler's warning and does not wish to incentivize free riding on the class action while detracting from the benefits of the class mechanism.

Accordingly, the Court declines to grant opt-out rights to members of the Rule 23(b)(2) class.[40]

---

[40] Direct Action Plaintiffs' remaining arguments that their inclusion in a mandatory class violates their constitutional rights are similarly meritless. Direct Action Plaintiffs argue that (1) "[c]ertification of mandatory classes implicates Seventh Amendment jury trial rights" because "[w]hen cases involve legal and equitable claims that share common factual issues, the Seventh Amendment requires a jury trial on the legal claims first," and (2) forcing them to participate in a mandatory class "would violate their due process right to choose their own counsel, and their First Amendment rights to free speech and freedom of association by requiring them to be represented by counsel they did not choose." (Direct Action Pls.' Opp'n 10.)

In response, Plaintiffs argue that "[i]t is black-letter law that the application of collateral estoppel does not implicate the Seventh Amendment" and the First Amendment arguments are "overblown at best" with Direct Action Plaintiffs citing "no case holding that such rights are impaired by certifying a mandatory (b)(2) class." (Pls.' Reply 9–10 & n.15.) Defendants similarly contend that any resulting collateral estoppel as a result of the Court's determination does not violate the Seventh Amendment because the Seventh Amendment only requires a jury

### f.   Appointment of class counsel

When a district court certifies a class, it must appoint class counsel.  In doing so, a court

must consider:

> (i) the work counsel has done in identifying or investigating
> potential claims in the action; (ii) counsel's experience in handling
> class actions, other complex litigation, and the types of claims
> asserted in the action; (iii) counsel's knowledge of the applicable
> law; and (iv) the resources that counsel will commit to representing
> the class.

Fed. R. Civ. P. 23(g)(1)(A)(i)–(iv).

For the reasons set forth in Section II.c.iv.2 *supra*, the Court finds that to date, Class

Counsel have fairly and adequately represented the putative class in accordance with Rule 23(g).

Accordingly, the Court appoints Hilliard & Shadowen LLP, Grant & Eisenhofer, P.A., Freed

Kanner London & Millen LLP, and Nussbaum Law Group, P.C. to serve as co-lead Rule

23(b)(2) Class Counsel.

---

trial when claims for damages and injunctive relief are tried in the same action.  (Defs.' Reply 13–14.)

The Court agrees with Rule 23(b)(2) Plaintiffs and Defendants that certification of a mandatory class does not violate the right to a jury trial for parties pursuing individual damages claims.  The Supreme Court has held that "an equitable determination can have collateral estoppel effect in a subsequent legal action and . . . this estoppel does not violate the Seventh Amendment."  *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 335 (1979); *Falbaum v. Pomerantz*, 19 F. App'x 10, 12-13 (2d Cir. 2001) (stating that in *Parklane Hoisery*, "the Supreme Court held that the Seventh Amendment did not prevent the application of collateral estoppel to a second action even though the first action was determined by a judge" when there were "two separate actions as is the case here").

Direct Action Plaintiffs' First Amendment argument is similarly unavailing.  Direct Action Plaintiffs cite no case, and this Court is aware of none, concluding that mandatory actions under Rule 23(b)(2) implicate free speech and freedom of association.  *See Ayers v. Thompson*, 358 F.3d 356, 376 (5th Cir. 2004) (rejecting the appellants' argument that denying them opt-out rights raises a First Amendment issue and stating that they "provide no authority for the proposition that denying them the right to opt out of a Rule 23(b)(2) class violates the First Amendment").  However, should Direct Action Plaintiffs wish to litigate this issue, they should address it in a more comprehensive manner than just providing a single sentence and footnote in their motion papers.

### III.   Conclusion

For the foregoing reasons, the Court grants Plaintiffs' motion for class certification in part and denies it in part.  The Court certifies a Rule 23(b)(2) class consisting of all persons, businesses, and other entities that accept Visa and/or Mastercard credit and/or debit cards in the United States at any time during the period between December 18, 2020 and the date of entry of Final Judgment in this case.  The Court dismisses DDMB and DDMB2 as class representatives. The Court appoints Hilliard & Shadowen LLP, Grant & Eisenhofer, P.A., Freed Kanner London & Millen LLP, and Nussbaum Law Group, P.C. to serve as co-lead Rule 23(b)(2) Class Counsel.

Dated:  September 27, 2021
　　　　Brooklyn, New York

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge