UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

IN RE PAYMENT CARD INTERCHANGE FEE
AND MERCHANT DISCOUNT ANTITRUST
LITIGATION

**MEMORANDUM & ORDER**
05-MD-1720 (MKB)

This document refers to: ALL ACTIONS

-------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

I.   Background .............................................................................. 6
  a.   Challenged network rules ....................................................... 6
  b.   Procedural history ................................................................. 9
II.  Discussion ............................................................................... 11
  a.   Standard of review ................................................................. 11
  b.   Motion to exclude opinions of Dr. Reto Kohler ..................... 14
    i.    Dr. Kohler's background and expert report ...................... 14
    ii.   Dr. Kohler's qualifications ............................................... 18
      1.   Dr. Kohler's qualifications generally ........................... 18
      2.   Dr. Kohler's qualifications to opine on the but-for world ..... 21
    iii.  Filters chosen for Dr. Kohler's bank sample ................... 24
      1.   Arbitrariness ............................................................... 24
        A.   Exclusion of banks with fewer than 100 branches ........... 25
        B.   Exclusion based on weighted equity ratio ..................... 25
        C.   Exclusion based on percentage of consumer loans ........... 26
      2.   Appropriateness for stated purpose .......................... 28
        A.   Exclusion of banks with fewer than $5 billion in assets ..... 28
        B.   Exclusion of banks without credit card assets ............... 29
      3.   Inconsistent application ........................................... 32
        A.   Addition of Southern Bancshares .............................. 32
        B.   Removal of E*Trade ................................................ 32
      4.   Failure to include large issuers .................................. 34
      5.   Argument that COE would be lower if filters were not applied ... 36

| iv. | Dr. Kohler's assumptions about bank responses in the "but-for" world | 37 |
| v. | Dr. Kohler's opinion on variable costs | 40 |
| vi. | Conclusion | 42 |
| c. | Motion to exclude in part the opinions of Professor Robert G. Harris | 42 |
| i. | Professor Harris's background and expert report | 42 |
| ii. | Market definition and damages benchmarks as one-sided | 50 |
| 1. | Market definition | 50 |
| 2. | Damages benchmarks | 56 |
| A. | Consistency with *US Airways* | 56 |
| B. | Calculating the two-sided transaction price | 58 |
| iii. | Supracompetitive pricing analysis | 60 |
| 1. | Network profitability | 61 |
| 2. | Issuer profitability | 66 |
| 3. | Total issuer pass-through | 67 |
| 4. | Co-branded transaction prices | 69 |
| iv. | Merchant pass-through | 71 |
| 1. | Unit of output | 73 |
| 2. | Empirical analysis | 74 |
| 3. | Testimony of Dr. McAfee | 76 |
| 4. | Reliability of Professor Harris's sources | 77 |
| v. | Conclusion | 79 |
| d. | Motion to exclude in part the Section 1 opinions of Professor Jerry Hausman | 79 |
| i. | Professor Hausman's background and expert report | 79 |
| ii. | Market definition, transaction price, and damages analysis as one-sided | 80 |
| 1. | Market definition | 81 |
| 2. | Supracompetitive prices | 82 |
| A. | Transaction price analysis | 82 |
| B. | Pass-through analysis | 86 |
| C. | Network profitability | 89 |
| D. | Issuer profitability | 91 |
| 3. | Damages calculations | 93 |
| iii. | Market-wide competition | 95 |
| iv. | "Mature market" theory | 98 |
| v. | Reduced retail output | 101 |

vi. "Tier 2" damages ........................................................................................ 102

vii. Conclusion ................................................................................................. 106

e. Motion to exclude in part the opinions of Joseph E. Stiglitz............................... 107

i. Professor Stiglitz's background and expert report........................................ 107

ii. Mature market theory and market definition .............................................. 114

1. Opinion that two-sided model is inappropriate........................................ 115

2. Opinion that market is mature................................................................. 117

3. Opinion that network Defendants are distinguishable from American Express..... 119

iii. Opinions on supracompetitive pricing ....................................................... 119

1. Benchmark analysis ................................................................................. 119

2. Issuer profitability................................................................................... 124

iv. Output analyses.......................................................................................... 126

v. Conclusion ................................................................................................. 130

III. Conclusion ...................................................................................................... 130

In December of 2020, several parties[1] in this multidistrict litigation filed a combined five

---

[1] The moving Plaintiffs consist of (1) the Equitable Relief Class, which was certified under Federal Rule of Civil Procedure 23(b)(2), *DDMB, Inc. v. Visa, Inc.*, No. 05-MD-1720, 2021 WL 6221326 (E.D.N.Y. Sept. 27, 2021); (2) the Target Plaintiffs, the 7-Eleven Plaintiffs, and The Home Depot (collectively, the "Direct Action Plaintiffs"), which are not members of a class, *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2017 WL 4325812, at *3 (E.D.N.Y. Sept. 27, 2017), *order set aside on other grounds*, No. 05-MD-1720, 2018 WL 4158290 (E.D.N.Y. Aug. 30, 2018); and (3) Elgin Ave. Recovery, LLC, which has filed its own separate complaint, (Elgin's Am. Compl., annexed to Mot. for Leave to File Under Seal as Ex. A, Docket Entry No. 8222-1), and has agreed to rely on the 7-Eleven Plaintiffs' experts at trial except in regards to damages, (Letter dated May 26, 2020, Docket Entry No. 7949).

The Defendants consist of the Visa and Mastercard networks as well as "various issuing and acquiring banks" (the "Bank Defendants"). *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 18 (E.D.N.Y. 2019). "At the beginning of this litigation . . . Visa and Mastercard were effectively owned by their member banks." *Barry's Cut Rate Stores Inc. v. Visa Inc.*, No. 05-MD-1720, 2019 WL 7584728, at *3 (E.D.N.Y. Nov. 20, 2019). In 2006 and 2008, "Mastercard and Visa, respectively, made initial public offerings ('IPOs'), becoming publicly traded individual companies." *Id.* However, Plaintiffs claim that the alleged anticompetitive practices have "continued despite the networks' and the banks' more recent attempt to avoid antitrust liability by restructuring the Visa and [Mastercard] corporate entities." *Id.*; (Equitable Relief Class Action Compl. ("Equitable Relief Class Compl.") ¶ 1, annexed to Szanyi Decl. as SJDX4, Docket Entry No. 8520-1; *see also* Sixth Amended 7-Eleven Compl.

motions for summary judgment and partial summary judgment,[2] and nineteen motions to exclude

expert testimony.[3] Plaintiff Elgin Ave. Recovery, LLC ("Elgin") also moved to join the

---

("7-Eleven Compl.") ¶¶ 78–79, annexed to Szanyi Decl. as SJDX1, Docket Entry No. 8520-1 (stating that "the IPOs did not change the essential character of" Visa and Mastercard's "combinations in restraint of trade"); Second Amended Target Compl. ("Target Compl.") ¶¶ 78–79, annexed to Szanyi Decl. as SJDX3, Docket Entry No. 8520-1 (same); First Amended The Home Depot. Compl. ("Home Depot Compl.") ¶¶ 120–34, annexed to Szanyi Decl. as SJDX2, Docket Entry No. 8520-1 (claiming that Visa's and Mastercard's "post-IPO structures . . . were designed to perpetuate, and not to disturb, the anticompetitive conduct detailed in this Complaint").)

[2] (Defs.' Notice of Mot. for Summ. J. ("Def.'s Mot."), Docket Entry No. 8067; Notice of Target Pls.' Mot. for Partial Summ. J. ("Target Pls.' Mot."), Docket Entry No. 8097; Equitable Relief Class Pls.' Notice of Mot. for Partial Summ. J. ("Equitable Relief Class Mot."), Docket Entry No. 8150; Notice of 7-Eleven Pls.' & The Home Depot's Motion for Partial Summ. J. ("7-Eleven & The Home Depot Mot."), Docket Entry No. 8184; Defs.' Notice of Mot. to Excl. Pls.' Expert Opinions on EMV Chargebacks & for Partial Summ. J. ("EMV Mot."), Docket Entry No. 8138).

[3] (Defs.' Notice of Mot. to Excl. Opinions of Dr. Reto Kohler ("Kohler Mot."), Docket Entry No. 8101; Defs.' Notice of Mot. to Excl. in Part Opinions of Prof. Robert G. Harris ("Harris Mot."), Docket Entry No. 8104; Defs.' Notice of Mot. to Excl. in Part Section 1 Opinions of Prof. Jerry Hausman ("Hausman Section 1 Mot."), Docket Entry No. 8081; Visa and Bank Defs.' Notice of Mot. to Excl. in Part Section 2 & Debit Opinions of Prof. Jerry Hausman ("Hausman Section 2 Mot."), Docket Entry No. 8084; Defs.' Notice of Mot. to Excl. in Part Opinions of Prof. Joseph E. Stiglitz ("Stiglitz Mot."), Docket Entry No. 8074; Defs.' Notice of Motion to Excl. Opinions of Mansour Karimzadeh ("Karimzadeh Mot."), Docket Entry No. 8077; Visa and Bank Defendants' Notice of Mot. to Excl. Expert Testimony Concerning Visa's Fixed Acquirer Network Fee ("FANF Mot."), Docket Entry No. 8070; Defs.' Notice of Mot. to Excl. Rep. & Testimony of the 23(b)(2) Pls.' Expert Dennis W. Carlton ("Carlton Mot."), Docket Entry No. 8086; Defs.' Notice of Mot. to Excl. Opinions of Stephen C. Mott ("Mott Mot."), Docket Entry No. 8080; Defs.' Notice of Mot. to Excl. Opinions of David P. Stowell ("Stowell Mot."), Docket Entry No. 8075; Notice of Direct Action Pls.' Mot. to Excl. Portions of Rep. & Opinions of Def. Expert R. Garrison Harvey ("Harvey Mot."), Docket Entry No. 8090; Notice of Direct Action Pls.' Mot. to Excl. Rep. & Opinions of Def. Expert Glenn Hubbard ("Hubbard Mot."), Docket Entry No. 8108; Notice of Direct Action Pls.' Mot. to Excl. Rep. & Opinions of Def. Expert Barbara E. Kahn ("Kahn Mot."), Docket Entry No. 8114; Notice of Direct Action Pls.' Mot. to Excl. Rep. & Opinions of Def. Expert David J. Teece ("Teece Mot."), Docket Entry No. 8135; Notice of Direct Action Pls.' Mot. to Excl. Portions of Rep. & Opinions of Def. Expert David P. Kaplan ("Kaplan Mot."), Docket Entry No. 8207; Notice of Mot. to Excl. the Rep. & Opinions of Def. Expert Andres V. Lerner ("Lerner Mot."), Docket Entry No. 8121;

memorandum supporting one of the motions for summary judgment and many of the memoranda supporting the motions to exclude Defendants' experts.[4] Because of the volume of motions, the Court decides the motions to exclude in six separate opinions based primarily on the parties who filed the motion.

Defendants filed eight motions to exclude expert testimony, seeking to exclude opinions from Dr. Reto Kohler, Professor Robert G. Harris, Professor Jerry Hausman, Professor Joseph E. Stiglitz, Mr. Mansour Karimzadeh, Professor Dennis W. Carlton, Mr. Stephen C. Mott, and Professor David P. Stowell. (*See* Kohler Mot., Harris Mot., Hausman Section 1 Mot., Stiglitz Mot., Karimzadeh Mot., Carlton Mot., Mott Mot, Stowell Mot.) In this decision, the Court decides four of Defendants' eight motions to exclude expert testimony, addressing the motions to exclude the opinions of Dr. Kohler on behalf of the Direct Action Plaintiffs, Professor Harris on behalf of the Target Plaintiffs, Professor Hausman on behalf of the 7-Eleven Plaintiffs and The Home Depot, and Professor Stiglitz on behalf of the Equitable Relief Class Plaintiffs.

For the following reasons, the Court grants in part and denies in part the motions to

---

Notice of Target Pls.' Mot. to Excl. Portions of Rep. & Opinions of Def. Expert Kevin M. Murphy ("Target Murphy Mot."), Docket Entry No. 8129; Notice of The Home Depot & 7-Eleven Pls.' Mot. to Excl. Portions of Rep. & Opinions of Def. Expert Kevin M. Murphy ("Home Depot & 7-Eleven Murphy Mot."), Docket Entry No. 8181; Notice of 7-Eleven Pls.' & The Home Depot's Mot. to Excl. Portions of Rep. & Opinions of Def. Experts Marc Cleven & Stuart J. Fiske ("Cleven & Fiske Mot."), Docket Entry No. 8200.)

[4] (Notice of Mot. for Partial Summ. J. & Joinder in the Mem. of Law in Support of 7-Eleven Pls.' and The Home Depot's Mot. for Partial Summ. J. & Supporting Evid. Regarding Same ("Elgin Joinder Mot."), Docket Entry No. 8178); (Notice of Mot. to Excl. Reports & Opinions of Def. Experts & Joinder in the Mem. of Law & Supporting Evid. Regarding Same ("Elgin Excl. Joinder Mot."), Docket Entry No. 8179.)

exclude filed by all Defendants.[5]

## I.   Background

The Court assumes familiarity with the facts and extensive procedural history as set forth in prior decisions. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 986 F. Supp. 2d 207 (E.D.N.Y. 2013) (*Interchange Fees I*), *rev'd and vacated*, 827 F.3d 223 (2d Cir. 2016) (*Interchange Fees II*); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11 (E.D.N.Y. 2019) (*Interchange Fees III*). The Court therefore provides only a summary of the relevant facts and procedural history.

### a.   Challenged network rules

When a customer uses a credit card to make a payment to a merchant, the merchant relays transaction information to the "acquiring bank" (or "acquirer"). *Interchange Fees II*, 827 F.3d at 228. The acquiring bank then relays the information to the network (in the case of this litigation, Visa or Mastercard), which in turn relays it to the "issuing bank" (or "issuer"), that is, the bank that issued the credit card to the customer. *Id.*; *Interchange Fees I*, 986 F. Supp. 2d at 214. If the issuing bank approves the transaction, the approval is relayed to the acquiring bank and then back to the merchant. *Interchange Fees II*, 827 F.3d at 228. The merchant receives the purchase price with certain fees deducted, including an "interchange fee" retained by the issuing

---

[5] The Court separately decides (1) the remaining four motions to exclude filed by all Defendants, (2) the two motions to exclude filed by Visa and the Bank Defendants, (3) the two motions to exclude filed by the Target Plaintiffs, (4) the two motions to exclude filed by the 7-Eleven Plaintiffs and The Home Depot, and (5) the five motions to exclude filed by the Direct Action Plaintiffs.

bank and a fee retained by the acquiring bank.[6] *Id.* The interchange fee varies by credit card network and by card type. *Id.*

Plaintiffs are merchants who are bound by Visa and Mastercard's network rules and who challenge those rules as anticompetitive. *Id.* They challenge the "honor all cards" ("HAC") or "honor all issuers" ("HAI") rule, which requires merchants to accept all Visa or Mastercard credit or debit cards if they accept any of them, (*see* 7-Eleven Compl. ¶ 3), as well as multiple forms of "anti-steering" rules, which "prohibit merchants from influencing customers to use one type of payment over another." *Interchange Fees II*, 827 F.3d at 228. Two types of anti-steering rules are "no-surcharge" and "no-discount" rules, "which prohibit merchants from charging different prices at the point of sale depending on the means of payment." *Id.* Plaintiffs claim that the challenged rules, in combination with the "default interchange fee" that "applies to every transaction on the network (unless the merchant and issuing bank have entered into a separate

---

[6] Although prior decisions in this case describe the "interchange fee" and "merchant discount fee" as two separate fees, the first going to the issuing bank and the second to the acquiring bank, *see Interchange Fees II*, 827 F.3d at 228, experts and papers in this litigation refer to the interchange fee as a *component* of the merchant discount fee. Professor Jerry Hausman, for example, describes a merchant discount fee made up of three component fees: the interchange fee to the issuing bank, the network fee to Visa or Mastercard, and the acquirer fee to the acquiring bank. (Expert Report of Professor Jerry Hausman ¶¶ 66–67, annexed to Carney Decl. as Ex. DDX5, Docket Entry No. 8544-1.) Professor Robert G. Harris describes the merchant discount fee similarly, (Expert Report of Dr. Robert G. Harris ¶ 25), and Defendants write that the merchant discount fee is comprised of "the acquirer fee . . . and may include the cost of some or all of the Visa and Mastercard interchange and network fees that the acquirer pays and passes on to the merchant," (Defendants' Stmt. of Material Facts ¶ 46, Docket Entry No. 8068). The parties also disagree about whether merchants pay interchange fees directly, (*see* Direct Action Pls.' Resp. to Defs.' Rule 56.1 Stmt. 37, Docket No. 8195 ("In fact, merchants pay interchange fees directly.")), or whether acquirers pay interchange fees and pass on some or all of the cost to merchants, (*see* Defs.' Reply in Supp. of Defs.' Stmt. of Material Facts 46, Docket Entry No. 8103 (stating that "acquirers, not merchants, pay interchange and network fees, and . . . acquirers pass on some or all of these costs to merchants"). The Court does not express an opinion on this disagreement at this time. Regardless of terminology, merchants pay (some or all of) an interchange fee to issuing banks as well as a fee to acquiring banks.

Case 1:05-md-01720-MKB-MS Document 1987 Filed 10/07/22 Page 8 of 130 PageID #: 24417
Case 1:05-md-01720-MKB-JO Document 8272 Filed 10/26/22 Page 8 of 130 PageID #:
496062

agreement),'" "allow the issuing banks to impose an artificially inflated interchange fee that merchants have little choice but to accept." *Id.*

Notably, Visa and Mastercard's rules have changed since the beginning of this litigation. "In 2010, the Dodd-Frank Wall Street Reform and Consumer Protection Act, which included the Durbin Amendment, was signed into law, and 'required the Federal Reserve to issue rules limiting the banks' practice of issuing debit cards that were compatible with only the issuer's networks.'" *Barry's Cut Rate Stores Inc.*, 2019 WL 7584728, at *5. The Durbin Amendment also "limited the interchange fee that issuing banks could charge for debit card purchases," "allowed merchants to discount debit card purchases relative to credit card purchases," and allowed merchants to place minimum-purchase limits on credit card transactions. *Id.* In 2011, Visa and Mastercard entered into a consent decree with the United States Department of Justice under which they "agreed to remove their rules prohibiting merchants from product-level discounting of credit and debit cards." *Id.* However, Plaintiffs claim that the current versions of the rules are still anticompetitive. (*See, e.g.*, 7-Eleven Compl. ¶ 120 (noting that Visa and Mastercard "maintain" the prohibition against surcharging by issuer "to this day"); ¶ 160 (stating that despite the 2011 consent decree, Visa and Mastercard "still prohibit merchants from offering discounts that encourage consumers to use cheaper forms of payment"); ¶ 191 (describing Visa and Mastercard's "now-current anti-surcharging rules").) In addition, they seek damages for the allegedly anticompetitive effects of the earlier versions of these rules. (*See* 7-Eleven Compl. ¶ 1 (defining the Damages Period as beginning on January 1, 2004).)

In addition to the claims described above, Plaintiffs also challenge a number of Defendants' other practices, including Visa's imposition of a Fixed Acquirer Network Fee, or "FANF," (*see, e.g.*, 7-Eleven Compl. ¶ 202; Home Depot Compl. ¶ 173; Target Compl. ¶ 154;

Equitable Relief Class Compl. ¶ 259); Visa and Mastercard's migration to Europay, Mastercard and Visa ("EMV") technology, (*see, e.g.*, 7-Eleven Compl. ¶¶ 208–30; Home Depot. Compl. ¶¶ 97–119; Equitable Relief Class Compl. ¶¶ 269–87); and allegedly exclusionary conduct in the debit market, (*see, e.g.*, 7-Eleven Compl. ¶¶ 194–99; Home Depot Compl. ¶¶ 166–70).

### b. Procedural history

In October of 2005, several complaints asserting similar antitrust claims were consolidated for pretrial purposes and transferred to the Eastern District of New York, where they were joined by other similar cases. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2008 WL 115104 (E.D.N.Y. Jan. 8, 2008) at *1. Some of the cases were pleaded as class actions, while other Plaintiffs sued on their own behalf. *Id.* In April of 2006, the Plaintiffs in the putative class actions ("Class Plaintiffs") filed a consolidated amended class complaint that defined two classes, one seeking damages and the other seeking equitable relief. *Id.* at *2. In November of 2012, the Court provisionally certified a Class Settlement Agreement between the Class Plaintiffs and Defendants. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2012 WL 12929536, at *1–2 (E.D.N.Y. Nov. 27, 2012). Following this preliminary approval, "three groups of merchants that had not previously appeared as named parties — the Target, 7-Eleven, and Home Depot groups or, collectively, the 'Direct Action Plaintiffs' — opted out of the settlement's damages class and filed their own complaints in other districts, all of which were ultimately transferred to this Court and consolidated in the instant multidistrict litigation." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2017 WL 4325812, at *3 (E.D.N.Y. Sept. 27, 2017), *order set aside on other grounds*, No. 05-MD-1720, 2018 WL 4158290 (E.D.N.Y. Aug. 30, 2018); (*see* Sixth Amended 7-Eleven Compl.; Home Depot Compl.; Second Amended Target

Compl.). The settlement was ultimately approved, *Interchange Fees I*, but in 2016 the Second

Circuit vacated the certification of the class action and reversed approval of the settlement,

*Interchange Fees II*.

In November of 2016, the Court appointed counsel to two putative classes under Rule

23(b)(2) (the "Equitable Relief Class") and (b)(3) (the "Damages Class"). *In re Payment Card*

*Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2016 WL 8138988

(E.D.N.Y. Nov. 30, 2016). The Court approved a settlement between the Damages Class and

Defendants in December of 2019. *In re Payment Card Interchange Fee & Merch. Disc.*

*Antitrust Litig.*, No. 05-MD-1720, 2019 WL 6875472 (E.D.N.Y. Dec. 16, 2019.) The settlement

is currently on appeal to the Second Circuit.[7] In September of 2021, the Court certified the

Equitable Relief Class. *DDMB, Inc. v. Visa, Inc.*, No. 05-MD-1720, 2021 WL 6221326

(E.D.N.Y. Sept. 27, 2021).

In December of 2020, Defendants, the 7-Eleven Plaintiffs, the Home Depot Plaintiffs, the

Target Plaintiffs, and the Equitable Relief Class Plaintiffs filed summary judgment and *Daubert*

motion papers.[8] Elgin, which is relying on the 7-Eleven Plaintiffs' experts, (*see* Letter dated

---

[7] (*See* Notice of Appeal, Docket Entry No. 7837; Notice of Appeal, Docket Entry No. 7839; Subsequent Notice of Appeal, Docket Entry No. 7840; Notice of Appeal, Docket Entry No. 7845; Subsequent Notice of Appeal, Docket Entry No. 7846; Notice of Appeal, Docket Entry No. 7848; Notice of Appeal, Docket Entry No. 7853; *see also* Mandate of U.S. Ct. of App., Docket Entry No. 7932 (stipulating to withdraw appeal); Mandate of U.S. Ct. of App., Docket Entry No. 8687 (stipulating to dismiss appeal).)

[8] (*See* Order dated Dec. 4, 2020 (adopting parties' proposal regarding filing and service of summary judgment and *Daubert* motions); Def.'s Mot.; Target Pls.' Mot.; Equitable Relief Class Mot.; 7-Eleven & The Home Depot Mot.; EMV Mot.; Kohler Mot.; Harris Mot.; Hausman Section 1 Mot.; Hausman Section 2 Mot.; Karimzadeh Mot.; FANF Mot.; Stiglitz Mot.; Stowell Mot.; Carlton Mot.; Mott Mot.; Harvey Mot.; Hubbard Mot.; Kahn Mot.; Teece Mot.; Kaplan Mot.; Lerner Mot.; Target Murphy Mot.; Home Depot & 7-Eleven Murphy Mot.; Cleven & Fiske Mot.)

May 26, 2020, Docket Entry No. 7949), has moved to join in some of these motions, (Elgin

Joinder Mot., Elgin Excl. Joinder Mot.).

## II. Discussion

### a. Standard of review

Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill,

experience, training, or education may testify in the form of an opinion or otherwise if: (a) the

expert's scientific, technical, or other specialized knowledge will help the trier of fact to

understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient

facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the

expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid.

702.[9] "While the proponent of expert testimony has the burden of establishing by a

---

[9] In June of 2022, the Judicial Conference Committee on Rules of Practice and Procedure voted to approve two amendments to Rule 702. *See* Colleen Cochran, *The Process, Progression, and Potential Ramifications of the Rule 702 Amendment*, BUSINESS LAW TODAY (Sept. 5, 2022), https://businesslawtoday.org/2022/09/rule-702-amendment-process-progression-potential-ramifications. One of the two proposed amendments changes the text of the rule to read: "A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if *the proponent demonstrates to the court that it is more likely than not that. . . .*" Committee on Rules of Practice and Procedure, Agenda Book, Tab 7A, at 891 (June 7, 2022), https://www.uscourts.gov/sites/ default/files/2022-06_standing_committee_agenda_book_final.pdf. The second proposed amendment changes subsection (d) from "the expert has reliably applied the principles and methods to the facts of the case" to "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." *Id.* at 891–92.

If approved by the Judicial Conference and the United States Supreme Court, and not rejected, modified, or deferred by Congress, the amendments will take effect in December of 2023. Cochran, *supra*. Because the amendments are not in force at the time this decision is published, the Court does not apply the amended version of Rule 702. However, in deciding these motions the Court is mindful of the proposed amendments' purpose of "emphasiz[ing] that the court must focus on the expert's opinion, and must find that the opinion actually proceeds from a reliable application of the methodology" and "explicitly weaving the Rule 104(a) standard into the text of Rule 702." Committee on Rules of Practice and Procedure at 871.

preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied, . . .

the district court is the ultimate gatekeeper." *United States v. Jones*, 965 F.3d 149, 161 (2d Cir.

2020) (alteration in original) (quoting *United States v. Williams*, 506 F.3d 151, 160 (2d Cir.

2007)); *see also United States v. Farhane*, 634 F.3d 127, 158 (2d Cir. 2011) ("The law assigns

district courts a 'gatekeeping' role in ensuring that expert testimony satisfies the requirements of

Rule 702." (citation omitted)), *cert. denied*, 565 U.S. 1088 (2011).

    Before permitting a person to testify as an expert under Rule 702, the court must make

the following findings: (1) the witness is qualified to be an expert; (2) the opinion is based upon

reliable data and methodology; and (3) the expert's testimony on a particular issue will "assist

the trier of fact." *Nimely v. City of New York*, 414 F.3d 381, 396–97 (2d Cir. 2005*); see also*

*United States v. Napout*, 963 F.3d 187–88 (2d Cir. 2020) (explaining that the court is tasked with

"ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task

at hand" (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993))); *United*

*States v. Cruz*, 363 F.3d 187, 192 (2d Cir. 2004) (same). In *Daubert v. Merrell Dow*

*Pharmaceuticals, Inc.*, the Supreme Court set forth a list of factors, in addition to the criteria set

forth in Rule 702, that bear on the determination of reliability: "(1) whether a theory or technique

has been or can be tested; (2) 'whether the theory or technique has been subjected to peer review

and publication;' (3) the technique's 'known or potential rate of error' and 'the existence and

maintenance of standards controlling the technique's operation;' and (4) whether a particular

technique or theory has gained general acceptance in the relevant scientific community." 

*Williams*, 506 F.3d at 160 (quoting *Daubert*, 509 U.S. at 593–94); *see also United States v.*

*Morgan*, 675 F. App'x 53, 55 (2d Cir. 2017) (same); *Zaremba v. Gen. Motors Corp.*, 360 F.3d

355, 358 (2d Cir. 2004) (same). The *Daubert* inquiry for reliability is a "flexible one" and does

not "constitute a definitive checklist or test," and thus, the *Daubert* factors "neither necessarily

nor exclusively appl[y] to all experts or in every case." *Kumho Tire Co., Ltd. v. Carmichael*, 526

U.S. 137, 141, 150 (1999) (citation omitted).

      The district court is afforded "the same broad latitude when it decides how to determine

reliability as it enjoys [with] respect to its ultimate reliability determination." *Id.* at 142.  Expert

testimony should be excluded if it is "speculative or conjectural." *Jones*, 965 F.3d at 162

(quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)); *Major League

Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (same). When an expert's

opinion is based on data or methodologies "that are simply inadequate to support the conclusions

reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony."

*Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 253 (2d Cir. 2005) (citation omitted); *see also

Nimely*, 414 F.3d at 396 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires

a district court to admit opinion evidence which is connected to existing data only by the *ipse

dixit* of the expert. A court may conclude that there is simply too great an analytical gap between

the data and the opinion proffered." (alteration in original) (quoting *Gen. Elec. Co. v. Joiner*, 522

U.S. 136, 146 (1997))).  Nevertheless, "in accordance with the liberal admissibility standards of

the Federal Rules of Evidence, only serious flaws in reasoning or methodology will warrant

exclusion." *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009) (*citing

Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002)); *see also Adams v.

Liberty Mar. Corp.*, 407 F. Supp. 3d 196, 202 (E.D.N.Y. 2019) (same).

### b. Motion to exclude opinions of Dr. Reto Kohler

Defendants move to exclude the opinions of Dr. Reto Kohler, an expert witness for the Direct Action Plaintiffs. (Kohler Mot.; *see* Expert Report of Reto Kohler ("Kohler Rep.") ¶ 6, annexed to Carney Decl. as Ex. DDX11, Docket Entry No. 8544-2.)

#### i. Dr. Kohler's background and expert report

Dr. Kohler has a degree in organic chemistry and a Ph.D. in biophysical protein chemistry. (Curriculum Vitae of Reto Jürg Kohler ("Kohler CV"), annexed to Carney Decl. as Ex. DDX77, Docket Entry No. 8544-7.) From 1998 to 2004, he worked at the Boston Consulting Group as a project leader "focused on Financial Services, Automotive and Industrials." (*Id.*) In 2004, he took a role as a director of the strategy and planning team at Barclays Capital, followed by roles at Barclays Group and Barclays Investment Bank. (*Id.*) In 2016, he served as founder, managing director, and sole employee of Rjkadvisors LLC, providing independent strategy advice and decision support. (*Id.*; Videotaped Deposition of Dr. Reto Kohler 52:21–53:21 ("Kohler Dep."), annexed to Carney Decl. as Ex. DDX26, Docket Entry No. 8544-4.) In 2017, Dr. Kohler moved to his current role as director at Marakon, "the Management Consulting business of Charles River Associates, New York." (Kohler CV.)

Dr. Kohler's expert report was submitted as a substitute for the expert report of Maria Blanco. (Letter from J. Wilson to M. Eisenstein & D. Ioffredo, at 1 (May 22, 2019), annexed to Carney Decl. as Ex. DDX80, Docket Entry No. 8544-7.) Ms. Blanco submitted an initial report on October 5, 2018 and a revised report on March 26, 2019, but was unable to continue as an expert witness after leaving Marakon and joining PricewaterhouseCoopers. (*Id.*) Dr. Kohler, who had "worked closely with Ms. Blanco on all aspects of her report," was asked to serve as the

14

expert witness after Ms. Blanco left the case. (*Id.* at 2.) He submitted an expert report (Kohler Rep.) on May 22, 2019. (*Id.*)

Dr. Kohler's report gives his "opinion regarding the profitability of credit and debit card accounts for banks historically and under scenarios of reduced interchange rates" and "compare[s] the financial structure of American Express, issuers, and Mastercard and Visa." (Kohler Rep. ¶ 6.) After an initial introductory section, Dr. Kohler outlines the profitability model of a retail bank. (*Id.* ¶¶ 17–38.) He explains that the report will use EP, or economic profit, as its measure of profitability. (*Id.* ¶¶ 35, 38.) He defines "cost of equity (COE)" as "the minimum threshold of return that investors expect to receive to be adequately compensated given the risk they are taking when they invest in a particular bank." (*Id.* ¶ 37.) "Returns on equity (ROE) greater than COE are additional returns over market expectations, which increase the market value of a bank." (*Id.*) Another measure of profitability is EP spread, "a percentage measure that shows the [ROE] minus the [COE] per dollar of capital." (*Id.* ¶ 38.)

Dr. Kohler goes on to discuss credit card income generation for banks, (*id.* ¶¶ 39–55), and historical credit card account profitability, (*id.* ¶¶ 56–74). He then discusses cardholder lifetime value ("LTV") as a measure of profitability. (*Id.* ¶¶ 75–92.) LTV is calculated as "the net present value of all expected revenue and costs, including capital costs, that a cardholder will generate over the lifetime of the account, discounted back to the current year" at the COE. (*Id.* ¶ 78.) It "provides a way of quantifying and ranking value between subsets of cardholders, as cardholders who exhibit certain behaviors will create more value for the issuing bank than others." (*Id.* ¶ 80.) In the next section of the report, Dr. Kohler models the benefits to issuing banks of offering credit card rewards, (*id.* ¶¶ 93–104), and then models the effects of reduced interchange on credit card account profitability, (*id.* ¶¶ 105–108). In the report he uses the

15

Case 1:05-cv-03817-NKB-VMS Document 1927 Filed 10/07/22 Page 16 of 130 PageID #:2425
Case 1:05-cv-03817-NKB-VMS Document 1927 Filed 10/26/22 Page 16 of 130 PageID #:425
496070

"competitive," "moderate," and "conservative" benchmarks derived from Professor Harris's expert report[10] and estimates the effect of these interchange rates on issuer bank profitability. (*Id.* ¶ 105.) Dr. Kohler finds that the competitive benchmark yields a weighted average ROE of ▊; the moderate benchmark yields a weighted average ROE of ▊; and the ceiling benchmark yields a weighted average ROE of ▊. (*Id.*; Fig. 18.) All of these values are higher than the weighted average COE of ▊. He notes in the report that "[t]hese scenarios assume that the cards would continue to provide the same rewards under the same terms as well as ~40% of the operating costs being fixed, meaning that they do not decrease as revenue decreases." (*Id.* ¶ 105.) He concludes that even at the lowest, "competitive" benchmark, "credit card issuing would still be profitable." (*Id.*) He then calculates the effect of changes in interchange on cardholders' LTV. (*Id.* ¶ 106.) He states that compared to revolve rate, account age, and transaction volume, "interchange rate has a far smaller impact on the LTV." (*Id.*; *see* Fig. 19.) For the average cardholder, "interchange rate can be lowered to as little as 0.68% (from the 2.0% interchange rate of Visa and Mastercard issued credit cards in 2016) and the LTV of the cardholder can still breakeven on an EP basis." (*Id.* ¶ 108.)

---

[10] The Target Plaintiffs' expert Professor Harris calculates debit and credit "benchmark" rates that represent "the likely interchange in the but-for world," that is, the world without the challenged network rules. (Expert Report of Professor Robert G. Harris ("Harris Rep.") ¶¶ 9, 1151, 1179, annexed to Carney Decl. as Ex. DDX3, Docket Entry No. 8544-1.) Notably, the 7-Eleven Plaintiffs and The Home Depot's expert Professor Hausman has also performed a similar analysis. (Expert Report of Professor Jerry Hausman (Hausman Rep.") ¶¶ 10, 26–39, annexed to Carney Decl. as Ex. DDX5, Docket Entry No. 8544-1.) Professor Hausman calculates a "Tier 1 benchmark" for "Tier 1 merchants," which "would have been positioned to achieve the most favorable rates" in the but-for world, and a higher "Tier 2 benchmark" for other merchants. (*Id.* at ¶¶ 28–30.) The Kohler Report explains that it uses Professor Harris's benchmarks because, "[s]ince Harris's competitive benchmark is lower than Hausman's Tier 1 benchmark, my conclusions are broadly applicable to the Hausman benchmarks as well." (Kohler Rep. n.127.)

16

In Appendix E to the report, Dr. Kohler explains the models that he used to calculate the profitability of the Visa and Mastercard credit card issuing industry under varying interchange scenarios. (Kohler Rep. App'x E.) To calculate COE, Dr. Kohler took "the weighted average COE of monoline US retail banks." (*Id.*) He arrived at "[t]he set of banks used for this calculation" by applying "a series of selection filters . . . to an initial set of 283 banks." (*Id.*) The filter criteria were as follows:

> (a) deposit-to-liability ratio < 70%; (b) weighted average equity ratio < 7.5% or > 13%; (c) weighted average consumer loans as a % of total loans < 30%; (d) lack of credit card assets; (e) not public or traded on a major exchange; (f) locations in fewer than two states; (g) fewer than 100 branches; (h) more than $50B in assets in 2016; and (i) significant international business. Banks at the operating company level were also removed to avoid duplicates with banks at the holding company level, and one bank was added back in for geographic diversity.

(*Id.*)

Dr. Kohler next compares American Express with Visa, Mastercard, and the issuing banks. (*Id.* ¶¶ 109–116.) Finally, in the last section of the report, Dr. Kohler discusses demand deposit accounts (DDAs). (*Id.* ¶¶ 117–142.) He explains that debit cards deduct money directly from bank accounts, (*id.* ¶ 117), and claims that banks consider the debit card combined with the deposit account as the relevant product, (*id.* ¶ 118.) He then models the effect of Professor Harris's competitive, moderate, and ceiling debit interchange benchmarks on DDA EP. (*Id.* ¶ 141, fig. 36.) He concludes that "[i]nterchange at competitive, moderate, and ceiling benchmarks reduce EP only slightly, demonstrating the low importance of interchange income to DDA profitability." (*Id.* ¶ 141.) Further, "DDA profitability in terms of EP per dollar of DDA deposit" would also be "only slightly reduced." (*Id.* ¶ 142, fig. 37.)

17

Dr. Kohler worked with Ms. Blanco and a "team of consultants" in developing the report.[11] (Kohler Dep. at 118:15–19, 153:1–9.) On October 11, 2019, he submitted a reply expert report, responding to rebuttal reports by David Kaplan and Professor Glenn Hubbard.[12] (Reply Expert Report of Dr. Reto Kohler ("Kohler Reply Rep.") ¶¶ 1, 6, annexed to Carney Decl. as Ex. DDX12, Docket Entry No. 8544-2.)

### ii. Dr. Kohler's qualifications

#### 1. Dr. Kohler's qualifications generally

Defendants claim that Dr. Kohler is not qualified to offer the opinions expressed in his expert report. (Mem. in Supp. of the Mot. to Excl. Opinions of Dr. Reto Kohler 10, "Kohler Excl. Mem.", Docket Entry No. 8115.) First, they argue that Dr. Kohler is not qualified to opine on payment card issuance because his educational background is in chemistry rather than economics or finance. (*Id.*) Second, they argue that Dr. Kohler cannot be qualified as an expert in financial modeling because financial modeling is "too generic to constitute a relevant field of putative expertise in this case," and that Dr. Kohler is not qualified to opine specifically on the payment card industry. (*Id.*; Reply Mem. in Further Supp. of the Mot. to Excl. Opinions of Dr. Reto Kohler ("Kohler Excl. Reply") 3, Docket Entry No. 8127.)

---

[11] For concision, the Court refers to "Dr. Kohler" regarding the authorship of the report even where "Dr. Kohler and his team" might be more accurate.

[12] Mr. David Kaplan, an expert for Defendants, submitted a report reviewing "the claims for individual plaintiff damages." (Expert Report of David P. Kaplan dated June 10, 2019 ("Kaplan Rep.") ¶ 7, annexed to Shinder Decl. as Ex. 1, Docket Entry No. 8489-1.) Professor Glenn Hubbard, an expert for Defendants, submitted a report "evaluat[ing] and respond[ing] to the analyses, opinions, and conclusions" of some of Plaintiffs' experts, including Dr. Kohler. (Rebuttal Expert Report of Glenn Hubbard ("Hubbard Rep.") ¶¶ 6, 8 annexed to Wilson Decl. as Ex. 2, Docket Entry No. 8495-1.)

In response, the Direct Action Plaintiffs point to Dr. Kohler's two decades of experience in the financial services industry, at least some of which involved analyzing the payment card industry. (Mem. in Opp'n to Defs.' Mot. to Excl. Opinions of Dr. Reto Kohler ("Kohler Excl. Opp'n") 2–3, Docket Entry No. 8360.) They further argue that "essentially every project" Dr. Kohler has worked on in his career has involved financial modeling. (*Id.* at 4.)

At his deposition, Dr. Kohler testified that he did not claim to be a statistician or an "expert in economics." (Kohler Dep. at 61:13–24.) Rather, he presented himself as an expert "[i]n financial modeling." (*Id.* at 62:4–6.) He described his assignment in the case as producing "three . . . financial models": one showing the effect of the three interchange rate benchmarks on the profitability of Visa and Mastercard's consumer credit card business; one showing the effect of the interchange rate benchmarks on the lifetime value model for Visa and Mastercard's consumer credit card business; and one showing the effect of the interchange rate benchmarks on the DDA market. (*Id.* at 20:19–21:9.) Dr. Kohler testified that "every project that [he] worked on" in his career "included financial modeling." (*Id.* at 63:14–19.)

Dr. Kohler's work at BCG did not include any work with payment cards. (*Id.* at 46:11–25.) His work at Barclays included two separate two-to-three-month projects involving payment cards. (*Id.* at 47:9–52:15.) Dr. Kohler testified that during his time at Barclays, his work in the investment banking business was also "continuously compared to the credit card business internally." (*Id.* at 51:19–52:4.) Dr. Kohler's work at Rjkadvisors included a project with a firm that was "looking at the potential acquisition of a professional services firm that exclusively focuses on credit cards and payments, DDAs." (*Id.* at 52:21–54:5.) He helped his client "with the strategic evaluation of" the professional services firm, "which involved understanding the business, how they generate value for credit card issues and DDAs. So it was a very

19

comprehensive look at that industry and how that business generates revenues." (*Id.* at 54:5–11.)
After Rjkadvisors, Dr. Kohler went to Marakon, where he did not work on any projects involving
credit cards until this case. (*Id.* at 55:13–19.) Around the same time, he also began working on a
project with a bank that focused on DDAs. (*Id.* at 55:19–56:14.) Dr. Kohler has never worked at
a payment card network (including Visa), a regional debit network, or on any projects relating to
private label card portfolios. (*Id.* at 57:14–58:4.) He has never been qualified as a testifying
expert. (*Id.* at 327:1–3.)

Dr. Kohler is not disqualified by virtue of holding degrees in science rather than
economics. It is not necessary that an expert be formally educated in the relevant subject matter
if they have gained specialized knowledge through experience or training. *McCullock v. H.B.
Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995) (holding that expert's testimony was properly
admitted where his background and personal experience qualified him as an expert despite his
lack of relevant formal education); *see also Pearlstein v. Blackberry Ltd.*, No. 13-CV-7060, 2021
WL 4131646, at *3 (S.D.N.Y. Sept. 10, 2021) ("[I]t is well-settled that, to be an expert, a person
need not hold a particular degree or license." (alteration in original) (quoting *Emig. v. Electrolux
Home Prods., Inc.*, No. 06-CV-4791, 2008 WL 4200988, at *5 (S.D.N.Y. Sept. 11, 2008)));
*Arista Records LLC v. Lime Group LLC*, No. 06-CV-5936, 2011 WL 1674796, at *2 (S.D.N.Y.
May 2, 2011) ("A witness may be qualified based on any one or more of the qualities listed in
Rule 702 — knowledge, skill, experience, training, or education." (citing *Tiffany (NJ) Inc. v.
eBay, Inc.*, 576 F. Supp. 2d 457, 458 (S.D.N.Y. 2007))).

Nor does the Court bar Dr. Kohler's qualification because he is an expert in financial
modeling rather than payment cards, as courts have found experts qualified based on their
general financial expertise even where they lacked more specific experience in the industry in

question. *See Alan L. Frank Law Assocs., P.C. v. OOO RM Inv.*, No. 17-CV-1338, 2021 WL
1906468, at *5 (E.D.N.Y. May 12, 2021) ("Given [the expert's] general qualification to perform
appraisals of businesses, the courts will not exclude his testimony merely because his experience
is not more closely 'tailored to the precise' type of business 'that is the subject matter of the
dispute.'" (quoting *Hilaire v. DeWalt Indus. Tool Co.*, 54 F. Supp. 3d 223, 236 (E.D.N.Y.
2014))); *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, No. 04-CV-7369, 2006 WL
2128785, at *6 (S.D.N.Y. July 28, 2006) ("It is not important that [the expert] does not have
specific training in the field of optometry or experience related to the eye care profession
because his opinions involve financial rather than industry specific analysis."); *TC Sys. Inc. v.
Town of Colonie*, 213 F. Supp. 2d 171, 174–75 (N.D.N.Y. 2002) (allowing testimony by an
economics expert despite lack of specific experience in telecommunications industry); *see also
Stagl v. Delta Air Lines, Inc.*, 117 F.3d 79, 80–82 (2d Cir. 1997) (allowing engineer to testify
about the safety of a baggage claim system despite his lack of experience in airline terminal or
baggage claim area design).

### 2. Dr. Kohler's qualifications to opine on the but-for world

The Court also rejects Defendants' argument that Dr. Kohler has admitted that he is not
qualified to opine on the but-for world. (Kohler Excl. Mem. 11.)

In his reply report and at his deposition, Dr. Kohler expressed that he was not qualified to
apply economic theory to the "but-for world" or to opine how banks would react in scenarios of
reduced interchange. In responding to criticism from Defendants' expert Professor Hubbard that
the report's analysis failed to incorporate issuer banks' "competitive response" to reduced
interchange revenue, (Kohler Reply Rep. ¶¶ 66–69), Dr. Kohler stated in his reply report:

> I am not an economist and not qualified to opine on what economic
> theory dictates the but-for world would look like. However,

> Professor Hubbard's statement is inaccurate insofar as my analysis
> does incorporate a response by banks to reduced interchange
> revenue, based on my banking experience: cutting costs, which
> Professor Hubbard agreed in his deposition would be what he
> deems a "competitive response." It is important to note again here
> that the only costs I reduce are noninterest costs, and rewards
> expenses remain unchanged.

(*Id.* ¶ 66.) At his deposition, Dr. Kohler repeatedly testified that he is not an economist, and that

applying economic theory to assess market-wide impacts of reduced interchange would be

beyond the scope of his expertise. (Kohler Dep. at 92:7–93:10.) When asked what qualifications

are necessary to analyze how banks would behave in a but-for world, (*id.* at 95:19–21), Dr.

Kohler responded: "Again, if you . . . apply economic theory for that definition, then you need an

economist to undertake that definition. If you say it's analyzing the impact of reduced

interchange on the financial profitability, then you need a practitioner like myself which would

be more beneficial than using an economist." (*Id.* at 95:24–96:8.) He acknowledged that his

analysis considered "scenarios of reduced interchange," but declined to say whether scenarios of

reduced interchange were examples of the but-for world. (*Id.* at 96:21–97:3.) Asked how he

could analyze how banks would act if he was not qualified to examine the but-for world, Dr.

Kohler replied that he is "not analyzing how banks would react." (*Id.* at 97:4–10.)

Defendants argue that these statements in the reply report and at his deposition show that

Dr. Kohler has conceded "that he 'is not qualified to opine on what economic theory dictates the

but-for world would look like,' or to 'analyz[e] how banks would react' to a reduction in their

interchange rates." (Kohler Excl. Mem. 11.)

Dr. Kohler's opinions closely relate to the but-for world. *See B&R Supermarket, Inc. v.*

*MasterCard Int'l Inc.*, 2018 WL 1335355, at *4 n.9 (E.D.N.Y. Mar. 14, 2018) ("This construct

of the world without Defendants' antitrust violation is known as the 'but-for world.'"). Unlike

Professor Harris, Dr. Kohler does not start with the specific "but-for world" assumption that the

22

challenged network rules are no longer in effect. (Expert Report of Dr. Robert G. Harris ("Harris Rep.") ¶ 1179, annexed to Carney Decl. as Ex. DDX3, Docket Entry No. 8544-1.)   Nor does he draw any conclusions about the but-for world specifically.   However, in his report he applies the interchange rates that Professor Harris claims would obtain in the but-for world, such that the resulting models are essentially models of the but-for world.   (*See* Kohler Dep. 95:2–5.)   Further, because it assumes that banks will reduce certain noninterest costs in response to reduced interchange revenue, (*see* Kohler Reply Rep. ¶ 66), the report also bears on "how banks will react" in the but-for world, (Kohler Dep. 97:4–10).

Even assuming that Dr. Kohler does opine about the but-for world, however, he is qualified to render the opinions in his report for the reasons discussed above.  While Dr. Kohler is not qualified to opine on "what *economic theory* dictates a but-for world would look like" given his lack of training in economic theory, (Kohler Dep. 95:14–17 (emphasis added)), his experience in financial modeling qualifies him to model the impact of reduced interchange on issuer profitability.  Dr. Kohler does make an apparently economic assumption that banks will respond to declining revenue by cutting costs, (Kohler Reply Rep. ¶¶ 66–69), despite claiming at his deposition that his report does not analyze "how banks would react" in the but-for world, (Kohler Dep. 97:4–10).  However, the Court concludes that Dr. Kohler may permissibly make this assumption, which he bases not on application of economic theory to the but-for world but on his banking experience, which he supports with citations to outside sources, (*see* Kohler Reply Rep. ¶¶ 21–25, 66–69), and which Defendants may challenge on cross-examination. *See Amorgianos v. Nat'l R.R. Passenger Corp.*, 137 F. Supp. 2d 147, 173 (E.D.N.Y. 2001) (noting that expert's "choice of a final estimate of 10% . . . appears to have been arbitrary," but that "any

23

inaccuracy introduced into the calculation thereby could presumably be challenged and quantified through testimony by the paint steward(s)").

Dr. Kohler could not accurately define "but-for world" at his deposition (*see* Kohler Dep. 94), and he inaccurately claimed that his report does not analyze "how banks would react" in that world, (*id.* at 97:4–10), but these facts do not render him unqualified as an expert. At the same deposition, Dr. Kohler testified that he believed he was qualified "to opine on the impact of reduced interchange on the profitability of the consumer credit card business." (*Id.* at 89:6–13). His reply report also makes clear that he understands that his model incorporates banks' response to declining revenue in the form of cutting costs. (Kohler Reply Rep. ¶¶ 66–69.) Dr. Kohler is qualified to opine on these topics despite unclear statements at his deposition and in his reply report.

### iii.   Filters chosen for Dr. Kohler's bank sample

Defendants make a series of arguments about the filters that Dr. Kohler used to select the banks in his COE sample. (Kohler Excl. Mem. 12.) They claim that some of Dr. Kohler's filters were chosen arbitrarily, (*id.* at 12–13); that some are unsuited to their putative purpose, (*id.* at 14–16); that Dr. Kohler applied his filters inconsistently by making exceptions, (*id.* at 16–17); and that the filters yielded an unrepresentative sample that does not include the largest issuers, (*id.* at 17–18).

#### 1.   Arbitrariness

Defendants argue that several of Dr. Kohler's filters are "nothing more than arbitrary numbers chosen without any discernable standards of methodology and with no basis in economic or business theory." (*Id.* at 12–13.)

24

### A. Exclusion of banks with fewer than 100 branches

First, Defendants challenge the filter that excludes banks with fewer than 100 branches, noting that at his deposition, "Dr. Kohler had no reasonable explanation for why other filters or filters of fewer or more than 100 branches would not have been equally appropriate." (*Id.* at 13.) In response, the Direct Action Plaintiffs argue that this filter was "drawn from Dr. Kohler's professional experience." (Kohler Excl. Opp'n at 19.)

The 100-branch filter "excludes banks with local idiosyncrasies due to a limited geographic reach." (Kohler Reply Rep. ¶ 16.) At his deposition, Dr. Kohler was asked how he chose 100 branches as a cutoff and replied that it was "[p]urely based on" the "combined experience" of himself, Ms. Blanco, and the other team members. (Kohler Dep. 217:19–24; 221:11–20.) He added that he agreed that it was "a good threshold based on my experience" and that "other people that came up with that obviously agreed with that as well." (*Id.* at 220:21–221:10.)

### B. Exclusion based on weighted equity ratio

Second, Defendants challenge the filter that excludes issuers with a weighted equity ratio below 7.5% or above 13%, claiming that Dr. Kohler was unable to explain "how his team determined that equity ratios below 7.5% were too low or above [13%] too high." (Kohler Excl. Mem. 13.) In response, the Direct Action Plaintiffs argue that the reply report establishes "that this filter was based on regulatory criteria." (Kohler Excl. Opp'n 18.)

The reply report states that the weighted equity ratio filter was used because "[b]anks with equity ratios that are too high or too low are outliers," are likely to change their lending practices or become subject to regulatory action, and may result in an artificially high or low ROE and COE. (Kohler Reply Rep. ¶ 16.) It cites to 12 C.F.R. § 208.45(a)(2), although notably

25

this section only describes the steps that must be taken by undercapitalized banks and does not

set a threshold for under- or overcapitalization. At his deposition, Dr. Kohler was asked how he

decided to apply this filter and replied that it was "[b]ecause we wanted to ensure that there were

no banks that were undercapitalized which . . . would be a big problem and that's not a bank that

is representative of what we're looking for[,] or any bank that is severely overcapitalized because

again . . . there are idiosyncrasies in those banks that are not relevant and we wanted to exclude."

(Kohler Dep. 137:10–21.) He also stated that "the capital ratio of 13 percent, for example, is as

determined by the regulators, so it is a threshold that is a regulatory threshold for globally

significant financial institutions." (*Id.* at 155:11–15.)

### C.    Exclusion based on percentage of consumer loans

Third, Defendants challenge the filter that excludes issuers with a weighted average of

less than 30% consumer loans. (Kohler Excl. Mem. 13.) They argue that Dr. Kohler had no

explanation at his deposition for why 30% is the appropriate filter threshold. (*Id.*) The Direct

Action Plaintiffs again argue that this threshold was "drawn from Dr. Kohler's professional

experience." (Kohler Excl. Opp'n 19.)

The reply report states that banks with less than 30% consumer loans "are not included in

the sample as their cost of equity will be weighted toward other types of assets" and that the

underlying risk profile of those assets "differs from those of credit cards, DDAs, and other

consumer products because the customer base is different." (Kohler Reply Rep. ¶ 16.) At his

deposition, Dr. Kohler stated that the filter was used "to identify banks that had a substantial

consumer lending business." (Kohler Dep. 137:22–138:3.)

Dr. Kohler's filters are not too arbitrary to be admissible. Although he does not explain

how he reached the specific figures "100," "7.5 to 13%," or "30%,", he explains why filtering

out banks based on their size, equity ratio, or percentage of consumer loans helps develop a sample that is representative of the consumer credit card business. The Court concludes that this is sufficient for admissibility; Defendants may challenge the exact figures on cross-examination. *See Amorgianos*, 137 F. Supp. 2d at 173 (noting that expert's "choice of a final estimate of 10% . . . appears to have been arbitrary," but that "any inaccuracy introduced into the calculation thereby could presumably be challenged and quantified through testimony by the paint steward(s)").[13]

Defendants' reliance on *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244 (S.D.N.Y. 2010) is misplaced as *R.F.M.A.S.* is distinguishable. The experts in *R.F.M.A.S.* analyzed "whether the acts underlying defendants' alleged legal violations caused plaintiff's decline in sales to Neiman Marcus," but did not identify the actual violations that supposedly caused the decline in sales. *R.F.M.A.S., Inc.*, 748 F. Supp. 2d at 269–70. By failing to identify the causes at issue in their causal analysis, the *R.F.M.A.S.* experts had not "explained their assumptions with the level of specificity necessary to allow defendants' counsel and the jury to test their conclusions," *id.* at 269. In comparison, Dr. Kohler has described the purpose of each of the filters he uses to generate the bank sample; his choice of specific variables for each of these filters can easily be tested by Defendants, who are free to attack Dr. Kohler's assumptions through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof."

---

[13] With regard to the equity ratio, the Court notes that Dr. Kohler testified that the weighted equity ratio maximum of 13% was set by "the regulators," (Kohler Dep. 155:11–15). However, his reply report cites to a portion of the Federal Register that addresses responses to *under*capitalization and does not mention overcapitalization, (Kohler Reply Rep. ¶ 16 n.25), and it is not clear what regulatory maximum Dr. Kohler could be referring to. Regardless, the Court determines that this may be sufficiently challenged on cross-examination.

*523 IP LLC v. CureMD.Com*, 48 F. Supp. 3d 600, 644 (S.D.N.Y. 2014) (quoting *Amorgianos*, 303 F.3d at 267).

The experts' evidence in *R.F.M.A.S.* was also excluded because the experts failed to consider alternate causes for the plaintiffs' decline in sales. *R.F.M.A.S., Inc.*, 748 F. Supp. 2d at 270. The court wrote that because the experts' "testimony that defendants' actions caused plaintiff's damages is based on little more than speculation," their analysis lacked the "intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 273 (quoting *Kumho Tire Co., Ltd.*, 526 U.S. at 152). The inadequacy of a causal analysis that fails to control for other possible causes is not comparable to the selection, based on experience, of individual variables in generating a sample of banks. An opinion must be excluded if it is "based on data, a methodology or studies that are simply inadequate to support the conclusions reached," but "[m]inor flaws in an expert's analysis . . . can be probed through cross-examination and generally go to the weight accorded to the expert's testimony rather than admissibility." *Id.* at 252.

## 2. Appropriateness for stated purpose

Defendants argue that several of the filters in Dr. Kohler's report are "unsuited for the purpose for which Dr. Kohler's colleagues allegedly adopted them." (Kohler Excl. Mem. 14.)

### A. Exclusion of banks with fewer than $5 billion in assets

First, Defendants challenge the filter that excludes any bank with fewer than $5 billion in assets, noting that the filter excludes only banks that had fewer than $5 billion in assets in the year 2016. (Kohler Excl. Mem. 15.) They argue that, "[t]hus, six of the twenty-seven issuers in Dr. Kohler's sample averaged fewer than $5 billion in assets for the period between 2004 and 2016." (*Id.*) Defendants also point to Dr. Kohler's inability at his deposition to explain why the

filter did not instead eliminate banks with average assets of less than $5 billion during the relevant period. (*Id.* at 15–16.) In response, the Direct Action Plaintiffs argue that Defendants "provide no basis for their claim that Dr. Kohler's methodology was inappropriate" and "disregard the fact that the banking industry grew substantially between 2004 and 2016; thus, a bank with $5 billion in assets in 2004 was much larger in relation to the overall banking market than a bank with $5 billion in 2016." (Kohler Excl. Opp'n 19–20.)

Dr. Kohler's reply report states that filtering out banks with fewer than $5 billion in assets "eliminates the effect that the idiosyncrasies of very small banks would have on the COE of the sample," noting that banks of that size "have limited access to resources and customers and lack economies of scale." (Kohler Reply Rep. ¶ 16.) At his deposition, Dr. Kohler stated that using a cutoff year that was earlier than 2016 would mean "excluding banks that might have grown in the meantime." (*Id.* at 158:24–9.) Asked about the value of excluding a bank with less than $5 billion in assets in 2015, Dr. Kohler replied that "you would have to put that in relation to the overall market and . . . [see] if that substantially is less than the 5 billion in 2016." (*Id.* at 185:6-12.) He described $5 billion as a "useful cutoff point" that is "widely used" in the world of "[c]onsulting with banks and other financial institutions on strategy." (*Id.* at 159:10–18.) When asked whether he considered using a filter based on a bank's average assets from 2004 to 2016, Dr. Kohler said that it did not seem like a relevant metric. (*Id.* at 160:13–20; 170:17–24.)

### B. Exclusion of banks without credit card assets

Second, Defendants challenge the filter that excludes banks without credit card assets. (Kohler Excl. Mem. 14.) They argue that the filter does not serve its purpose because it excludes only issuers that *never* issued credit cards at any point between 2004 and 2016, thus retaining any bank with even "de mininis credit card assets for even just one year of the 2004 to 2016

period." (*Id.*) Defendants point out that seven of the twenty-seven banks in the sample "averaged fewer than 0.01% credit card assets as a percentage of total assets throughout the relevant period, and six additional banks had no credit card assets for multiple years during the relevant period." (*Id.*) They argue that the filter thus fails to accomplish its stated purpose of eliminating banks whose business models do not focus on consumer credit and debit cards. (*Id.* at 15.) Elsewhere, Defendants' argue in their memorandum that for the banks in Dr. Kohler's sample, "credit card assets represent on average only 0.9% of the banks' total assets during the relevant period." (*Id.* at 18.)

In response, the Direct Action Plaintiffs argue that "[i]ncluding only banks capable of issuing credit cards (even if they did not actually engage in substantial issuing activity) ensured that the selected banks were appropriately representative of the risk profile Dr. Kohler intended to capture in the COE calculation." (Kohler Excl. Opp'n 19.)

In the reply report Dr. Kohler states that this filter "ensures that the sample banks provide a relevant and comprehensive portfolio of consumer banking products." (Kohler Reply Rep. ¶ 16.) Similarly, at his deposition Dr. Kohler stated that the team "felt it important that the banks had, you know, at least some experience of issuing credit cards at one stage in the period." (Kohler Dep. 139:13–16.) When asked if he thought it would be useful to include a bank for which only .01% of its assets were credit card assets, Dr. Kohler replied that the team decided to use a "binary filter." (*Id.* at 194:1–10.) Asked why they decided to use a binary filter, he replied that it was "[b]ecause our main concern was . . . to show that every one of the banks had at least one period of experience with issuing credit cards[,] be that one card, several cards . . . we also didn't measure how many credit cards." (*Id.* at 194:16–195:3.)

Both of Defendants' challenges are unavailing. The fact that Dr. Kohler could have chosen to exclude banks with fewer than $5 billion in average assets from 2004 to 2016 does not mean that the filter excluding banks with fewer than $5 billion assets in 2016 is inappropriate for its stated purpose. Dr. Kohler and the Direct Action Plaintiffs plausibly explain why the current version of the filter is arguably superior: because a bank's assets indicate its size only "in relation to the overall market," (Kohler Dep. 185:6–12), and because the banking market has grown between 2004 and 2016, (Kohler Excl. Opp'n 19–20), Defendants' proposed test risks disproportionately excluding banks with fewer than $5 billion assets early in the relevant period, when $5 billion represented a larger portion of the market. To the extent that Defendants wish to further challenge this filter as inferior to a filter that uses average assets, they are free to do so at trial. *See McCullock*, 61 F.3d at 1044 (affirming admission of testimony and concluding that "[d]isputes as to the strength of his credentials, faults in his use of differential etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony").

Second, Dr. Kohler's binary filter is not unsuited for its purpose. Dr. Kohler's binary filter eliminates banks with no experience issuing credit cards, which reasonably furthers his goal of producing a sample of banks the risk profile of whose customers is the same as the risk profile of credit card and DDA customers. Although Defendants may well have identified a more effective way of achieving this goal, the Court concludes that the fact that Dr. Kohler could have more effectively isolated the relevant banks does not render his binary filter "unsuited for the purpose for which Dr. Kohler's colleagues allegedly adopted them." (Kohler Excl. Mem. 14.) *See Amorgianos*, 303 F.3d at 267 ("The judge should only exclude the evidence if the flaw is

31

large enough that the expert lacks 'good grounds' for his or her conclusions." (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 746 (3d Cir. 1994))).

### 3. Inconsistent application

Defendants challenge Dr. Kohler's decision to make two exceptions to the bank filters, arguing that this constitutes "arbitrary and inconsistent applications of his stated methodology." (Kohler Excl. Mem. 16.)

#### A. Addition of Southern Bancshares

First, Dr. Kohler added Southern Bancshares to the sample even though it violates two of the filters: it only has locations in one state, and it operates fewer than 100 branches. (Kohler Excl. Mem. 16.) The purported justification for this manual override is that the sample does not otherwise include a bank based in Texas, a large and important state, but Defendants point out that the sample does not include a bank based in California. (*Id.* at 17.) In response, the Direct Action Plaintiffs note that "there were no California banks that also passed all other filters like Southside Bancshares did." (Kohler Excl. Opp'n 20.) They also point out that "the inclusion of Southside Bancshares did not materially affect the average COE Dr. Kohler calculated in his report. With Southside Bancshares, the COE was 8.95%; without it, the COE would be 8.97%." (*Id.*)

#### B. Removal of E*Trade

Second, Dr. Kohler removed E*Trade from the sample even though it is not eliminated by any of the filters. (Kohler Excl. Mem. 17.) Defendants point to Dr. Kohler's inability at his deposition to explain why E*Trade was removed from the sample. (*Id.*) In response, the Direct Action Plaintiffs argue that E*Trade was not manually removed from the sample at all; rather, "it was eliminated by the filters because it lacked data for several years of the period, specifically

for deposits." (Kohler Excl. Opp'n 20.) E\*Trade also "had only two branches and would have been excluded for failing the 100-branch filter even if it had sufficient data available for the entire period." (*Id.* at 21.) They claim that Dr. Kohler would have been able to explain this at his deposition had he been given access to his financial models during questioning. (*Id.*)

Neither the inclusion of Southside Bancshares nor the exclusion of E\*Trade renders Dr. Kohler's report unreliable. Although "an expert's own failure to consistently apply his methodology can form the basis for the exclusion of any resulting opinions," *In re Ephedra Prods. Liab. Litig.*, 494 F. Supp. 2d 256, 258 (S.D.N.Y. 2007), whether an expert's methodology has been consistently applied depends on the nature and goals of that methodology. In *Ephedra Prods.*, cited by Defendants, (Def. Mem. 16), the plaintiffs' expert lacked access to brain images of the plaintiff's stroke. *Id.* at 257. The expert, "by his own testimony, relie[d] on such brain images in order to reach a reasoned conclusion in these cases." *Id.* at 258. The expert's opinion was therefore inadmissible. *Id.* The relevant methodology used by Dr. Kohler involves the filters he developed "to isolate U.S. banks that have meaningful consumer lending and deposit businesses, yet do not have significant business activities in other lines of business and customer segments that would distort COE." (Kohler Reply Rep. ¶ 15.) Because the filters are only an intermediate tool in service of Dr. Kohler's larger goal of creating the bank sample, there is no reason that he cannot override the filters when necessary to create a sample that is more representative of the banking area he seeks to model. Such an override represents not a "failure to consistently apply his methodology" but the use of one analytical tool (reasoned application of discretion) alongside another (mechanical application of filters) in service of Dr. Kohler's ultimate methodology: creating a sample of banks whose COE is representative of the consumer lending and deposit businesses.

Dr. Kohler and the Direct Action Plaintiffs have explained how including Southside Bancshares furthers this goal: Southside Bancshares is based in Texas, and "to have no bank that is headquartered in Texas does not feel like an appropriate sample because it would leave out an important aspect of the industry." (Kohler Dep. 200:19–201:2.) No comparable bank from California was included because "no California-based bank would have passed all other filters, as Southside Bancshares did, meaning that no California-based bank was available to fill the need of geographic diversity." (Kohler Decl. ¶ 7, annexed to McGranor Decl. as Ex. 1, Docket Entry No. 8505-1.) Defendants are free to challenge the wisdom of this selection and its effects on COE, through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction of the burden of proof," but it does not represent a fatally inconsistent application of Dr. Kohler's methodology. *Amorgianos*, 303 F.3d at 267 (quoting *Daubert*, 509 U.S. at 596.)

Exclusion of E*Trade also does not represent an inconsistent application of Dr. Kohler's methodology. As the Direct Action Plaintiffs argue, there appears to be two reasons E*Trade was not included in the sample: first, it lacked data for several years of the period, and second, it failed the 100-branch filter. (Kohler Excl. Opp'n 20–21; *see also* Ex. C, Ex. D, Ex. E to Kohler Decl.) Because the only reason Defendants give for including E*Trade is that Dr. Kohler "inconsistently applied his own filter," and because this is not the case, the exclusion of E*Trade does not render Dr. Kohler's report unreliable.

### 4. Failure to include large issuers

Defendants argue that the sample is "unrepresentative of the payment card industry whose profitability the sample is intended to measure" because it does not include any of the Defendant banks "or, indeed, any of the large non-[D]efendant payment card issuers in the United States." (Kohler Excl. Mem. 17–18.) They point to the fact that the sample "consists of

banks that, collectively, represent on average a mere 0.5% of credit card assets in the United

States during the relevant period and for which credit card assets represent on average only 0.9%

of the banks' total assets during the relevant period." (*Id.* at 18.) In response, the Direct Action

Plaintiffs argue that including the largest banks in the sample "would skew the COE to represent

*not* the credit-card-issuing business but the banking business *as a whole*." (Kohler Excl. Opp'n

at 17.) They point to Defendants' rebuttal's expert's acknowledgement that it would be

necessary to exclude unrelated business lines in order to ensure that the COE for the credit-card-

issuing business "was actually reflective of that specific line of business." (*Id.*)

    The reply report indicates that banks with more than $50 billion in assets were excluded

because "[b]anks with a very large asset base participate in a wide array of business lines that are

not connected to consumer banking," and therefore their COEs "do not solely reflect the specific

risk associated with a consumer deposit and lending business that includes credit cards and

DDAs." (Kohler Reply Rep. ¶ 16.) Similarly, at his deposition Dr. Kohler explained that banks

with more than $50 billion in assets were excluded "[b]ecause we wanted to exclude banks that

are so large that they are engaged in business that is unrelated to the consumer business."

(Kohler Dep. 143:24–144:2.)

    The Court acknowledges that a sample must be representative. *S.E.C. v. Lek Secs. Corp.*,

370 F. Supp. 3d 384, 417–18 (S.D.N.Y. 2019) (collecting cases). However, Dr. Kohler explains

why it is necessary to exclude many of the largest issuers, including Defendants, in order to

obtain a sample that is representative of the consumer credit card business specifically:

> [F]or banks that are public, the available COE will represent the
> whole bank (i.e., all of its lines of business). As explained above,
> the ability to calculate COE . . . hinges on an available beta, which
> is dependent on a firm's stock price, and a firm's stock price reflects
> the price of the firm as a whole, not an individual line of business.
> Thus, to determine the COE applicable to the consumer credit card

> account and DDA businesses, I looked for a set of banks that have
> business models *focused on credit card and DDA consumers.*
> Arriving at the best sample of these banks for determining the COE
> of the consumer credit card account and DDA businesses requires
> applying filters to isolate U.S. banks that have meaningful consumer
> lending and deposit businesses, yet do not have significant business
> activities in other lines of business and customer segments that
> would distort COE.

(Kohler Reply Rep. ¶¶ 14–15.) Thus, a sample that is representative of the payment card

industry in that it includes the largest payment card issuers would not be representative for the

relevant purpose of generating a representative COE because the COE would be skewed by the

large payment card issuers' other lines of business. Defendants do not directly engage with this

rationale for excluding Bank Defendants and other large issuers, instead only claiming that

"Plaintiffs cannot demonstrate that a sample of payment card issuers that does not include any of

the defendant issuers . . . or any of their closest competitors is representative of the industry."

(Kohler Excl. Mem. 18.) However, this is not true for Dr. Kohler's purposes, as Dr. Kohler and

the Direct Action Plaintiffs explain. The fact that Dr. Kohler's sample does not include the

largest payment card issuers does not render it unacceptably unrepresentative.

### 5. Argument that COE would be lower if filters were not applied

In addition to responding to each of Defendants' specific arguments, the Direct Action

Plaintiffs also argue more generally that if the filters were not applied, COE would decrease,

"and thus economic profit would increase to levels *higher* than those calculated in Dr. Kohler's

model." (Kohler Excl. Opp'n 22.) They cite to Exhibit 2 of Dr. Kohler's reply, which shows a

COE of 10.6% when the only filter applied is "Publicly Traded on Major Exchange," as opposed

to 9% after all filters are applied. (Kohler Excl. Opp'n App. 2.)

The Court notes that this argument is not especially persuasive because, as Dr. Kohler

claims, "[a]rriving at the best sample of these banks for determining the COE of the consumer

credit card account and DDA businesses requires applying filters to isolate U.S. banks that have meaningful consumer lending and deposit businesses, yet do not have significant business activities in other lines of business and customer segments that would distort COE." (Kohler Reply Rep. ¶ 15.) Because there is no indication that the COE without filters is representative of credit card and DDA businesses, the fact that it is higher than the COE *with* the filters is not particularly probative. Regardless, Dr. Kohler's filters do not render his opinions inadmissible.

### iv. Dr. Kohler's assumptions about bank responses in the "but-for" world

Defendants claim that Dr. Kohler's model is inaccurate because it assumes that issuers would respond to a reduction in interchange fees only by reducing costs that do not directly affect cardholders. (Kohler Excl. Mem. 19.) They argue that this assumption is contradicted by undisputed facts that banks facing reduced interchange fees in the U.S. after the Durbin Amendment and in Australia after a 2003 reduction in interchange fees responded by, among other things, reducing cardholder rewards programs and increasing cardholder fees. (*Id.* at 19–23.) Dr. Kohler testified that this assumption was based on his view that banks would avoid actions that would negatively impact their customers, (*id.* at 22), but Defendants argue that this "simplistic view" is unsupported by the facts, (*id.* at 22–23), and that "Dr. Kohler's opinion that issuing banks would have limited their competitive response to cutting unspecified costs is mere *ipse dixit*," (Kohler Excl. Reply 5).

The Direct Action Plaintiffs argue that Dr. Kohler is not opining about what would happen in the but-for world, but rather about whether banks could still generate positive economic profit if interchange levels were reduced. (Kohler Excl. Opp'n at 23–24.) They challenge the existence of "undisputed facts" showing that banks would respond differently, arguing that the behavior of U.S. banks after the Durbin Amendment is "in fact[ ] disputed" and

37

that Defendants' statements about regulation in Australia "consist entirely of hearsay statements from articles, not record evidence admissible in this action." (*Id.* at 24.).

In his reply report, Dr. Kohler explains that he assumes that banks will specifically aim to cut "noninterest costs in a way that would not lead to significant customer attrition," which he states is "typical and rational" and what banks are "incentivized to do." (Kohler Reply Rep. ¶ 69.) He contends that banks' responses to the Durbin Amendment were more limited than Professor Hubbard claims, and that "[a]lthough most major banks announced new debit account fees in response to the Durbin Amendment, they largely rescinded those fees due to consumer backlash." (*Id.* ¶ 68.) Dr. Kohler also cites to several internal documents from credit card companies discussing cost reduction as a response to revenue pressure. (*Id.* ¶¶ 21–25.) When questioned about these documents at his deposition, Dr. Kohler testified that he believed the proposed cost-cutting measures mentioned in the documents support his position that banks aim to cut costs in ways that do not impact customer relationships. (*Id.* at 260:3–284:11.)

At his deposition, Dr. Kohler testified that when banks face revenue pressures, they will seek to reduce costs while trying not to affect existing customer relationships. (Kohler Dep. 253:21–256:5.) He based this claim not "on any specific examination or independent study of how issuer banks' expenses might change in the but-for world if interchange revenues declined," but rather "on a number of examples . . . in the report as well as experience through the years." (*Id.* at 257:4–23.) When asked why he did not consider the effect of reduced interchange on rewards in Australia, Dr. Kohler replied:

> So you're asking me why I didn't include a one particular country in the world and what may or may not have happened there and [draw] conclusions from that to my analysis of the U.S. banking system? Let's be very clear about what I know about the Australian banking system. It is totally and utterly different from the way the banking industry works in the US from a banking

38

concentration, et cetera, point of view. So I don't think it would be appropriate. So we never — would never even have occurred to me to do that.

(*Id.* at 313:9–314:4.) When opposing counsel asked why he had not considered "an experience with reduction in interchange fees as a result of Durbin on debit card rewards in [his] analysis," (*id.* at 314:5–8), Dr. Kohler replied that "that was not part of the assignment. Part of the assignment was to identify profitability, not the impact on certain aspects of fees." (*Id.* at 314:10–13.)

As an initial matter, contrary to the Direct Action Plaintiffs' claim, Dr. Kohler's claims about banks' responses to reduced interchange are in fact relevant to the but-for world. (Kohler Excl. Opp'n at 23-24). However, the Court does not exclude Dr. Kohler's model on the basis of his cost reduction assumption. First, Dr. Kohler's assumption is not necessarily contradicted by the record, as Defendants claim. Defendants argue that "undisputed facts in this case" contradict Dr. Kohler's assumption about how banks would react to a reduction in interchange revenue. (Kohler Excl. Mem. 20.) Even if banks' responses to reductions in interchange revenues in Australia and after the Durbin Amendment constitute undisputed facts in this case, it is not necessarily the case that banks in the United States would react in the same way to reductions in credit card interchange income today. Dr. Kohler's citations to sources reflecting that banks seek to cut costs without affecting customer relations and that banks' responses to the Durbin Amendment have relaxed over time indicate that his assumption is also supportable. (Kohler Reply Rep. ¶¶ 21–25.) While Defendants may believe that their arguments based on Australia and the Durbin Amendment are more persuasive than Dr. Kohler's arguments based on other sources — and may well be correct — this is not a basis for exclusion. *See Royal Ins. Co. of Am. v. Joseph Daniel Const., Inc.*, 208 F. Supp. 2d 423, 426 (S.D.N.Y. 2006) (stating that in assessing reliability, "[t]he district court is not charged with weighing the correctness of an

39

expert's testimony, nor must the court choose between the testimony of competing expert witnesses").

Second, Dr. Kohler's opinion is not "mere *ipse dixit*." (Kohler Excl. Reply 5.) Again, Dr. Kohler cites to supporting documents that are consistent with his own experience. (*See* Kohler Dep. at 257:4–23.) The Court concludes that Dr. Kohler's opinion is based on "sufficient facts or data." Fed. R. Evid. 702(b).

<strong>v.   Dr. Kohler's opinion on variable costs</strong>

Defendants claim that Dr. Kohler opines in his report that if interchange revenues decline, issuing banks' variable costs will also decline, but transaction volumes will stay the same. (Kohler Excl. Mem. 23–25.) They argue that this is impossible because variable costs in the credit card industry change in direct proportion to changes in credit card transaction volume. (*Id.*) Defendants claim that Dr. Kohler's "novel attempt to suggest that there is some proportional relationship between the level of variable costs and the level of interchange revenue . . . falls far outside the range of views on which experts may reasonably disagree," and is "a testament to the absence of his credentials as an economist." (Kohler Excl. Reply 9–10.)

The Direct Action Plaintiffs point to Dr. Kohler's reply report, in which Dr. Kohler states that he used the term "variable cost" to indicate costs that vary with revenue, not variable costs in relation to volume. (Kohler Excl. Opp'n 24–25.)

Dr. Kohler's report states that "variable costs are made up of ongoing operating costs . . . that increase in proportion to the number of transactions," and defines "variable cost" as "costs that move with the amount of goods or services provided." (Kohler Rep. Glossary ¶ 67.) It uses "variable" in this sense when it states that in the credit card market, "[o]f the operating expenses, approximately 60% are variable, meaning that the costs move with scale

40

(number of accounts, transactions, etc.)." (Kohler Rep. ¶ 65.) Defendants acknowledge that this is "consistent with the standard accounting and economic definition of variable costs." (Kohler Excl. Mem. 23–24.)

In assessing the credit card industry's ROE and COE under Professor Harris's benchmark scenarios, however, Dr. Kohler's report states: "These scenarios assume that the cards would continue to provide the same rewards under the same terms as well as ~40% of the operating costs being fixed, meaning that they do not decrease as revenue decreases." (Kohler Rep. ¶ 105.) Appendix E states that Figure 18, which shows credit card issuing profitability at hypothetical interchange levels, (*id.* fig. 18), applies "varying scenarios for interchange, all lower than current, assuming ~60% of operating/marketing costs are variable, to find ROE under different interchange conditions." (Kohler Rep. App'x E.) Appendix G states that in the DDA profitability model, "[f]ixed costs are held constant, variable cost change with revenue, and rewards are assumed at their current level." (Kohler Rep. App'x G.)

In his reply report, Dr. Kohler states:

> As further clarification, I used 'variable cost' in my opening report to indicate costs that vary with revenue, as my regression focuses on the relationship between revenue and costs over time. I did not mean variable costs in relation to volume since my regression does not include volume as a variable nor do any of my model scenarios assume a change in volume. Regardless, the assumption in my model that a certain percentage of a bank's noninterest costs vary with revenue is reasonable and allows me to model a noninterest cost reduction for the benchmark scenarios.

(Kohler Reply Rep. ¶ 27.)

Defendants argue that Dr. Kohler's report reflects a fundamentally unsound understanding of "variable cost." (Kohler Excl. Mem. 24.) In their reply memorandum, they claim that Dr. Kohler's explanation in his reply report is a "novel attempt to suggest that there is some proportional relationship between the level of variable costs and the level of interchange

41

revenue." (Kohler Excl. Reply 9–11.) However, Dr. Kohler did not use "variable costs,"

defined as costs that decrease with volume, in any novel or exceptional way; rather, in a limited

context he used "variable costs" to refer to costs that vary with revenue. Defendants do not cite

to an instance of Dr. Kohler implying something strange or exceptional about "variable costs"

defined as costs that vary with volume.

### vi. Conclusion

The Court denies Defendants' motion to exclude Dr. Kohler's report and opinions.

### c. Motion to exclude in part the opinions of Professor Robert G. Harris

Defendants move to exclude in part the opinions of Professor Robert G. Harris (Harris

Mot.), an expert witness for the Target Plaintiffs. (Harris Mot.; Harris Rep. ¶ 9.)

### i. Professor Harris's background and expert report

Professor Harris is a senior consultant at an economic consulting firm and a professor

emeritus at the Haas School of Business at the University of California, Berkeley. (Harris Rep.

¶¶ 1–3.) He has provided expert testimony to legislative bodies and regulatory agencies, in

regulatory proceedings, and in antitrust, mergers, intellectual property, and commercial

litigation. (Harris Rep. App. A 96–98.)

Professor Harris was asked "to evaluate the Target Plaintiffs' Complaint that Visa's and

Mastercard's Competitive Restraints and related conduct are anticompetitive." (Harris Rep. ¶ 9.)

He defines the "Competitive Restraints" as "consist[ing] principally of the Honor All Cards

42

rules, No Discount rules, No Surcharge rules, Anti-Discrimination rules, No Competing Marks rules, Visa's No Bypass rules, and Visa's All Outlets policy."[14]  (*Id.*)

After an initial introductory section, (*id.* ¶¶ 1–16), and an executive summary, (*id.* ¶¶ 17– 89), Professor Harris's report begins by describing the structure and background of the payment card industry.  (*Id.* ¶¶ 90–263.)  Next, he explains his theory that "Visa and Mastercard . . . each manage a cartel of issuing banks."  (*Id.* ¶¶ 264–444.)  Professor Harris then analyzes Visa and Mastercard's market power.  (*Id.* ¶¶ 445–602.)  He begins by explaining that market power "can be defined as the ability of a seller (or group of sellers) to raise the price(s) of its products above the competitive level without losing so many sales that the price increase is made unprofitable."  (*Id.* ¶ 445.)  Market power can be analyzed using an "indirect, or structural" approach, which defines the relevant market, "calculat[es] the market shares of the participants in that market, and infer[s] market power based on the Defendant's share of the relevant market, the degree of overall concentration of the market, and other factors such as barriers to entry."  (*Id.*)

Professor Harris therefore begins by defining the relevant market.  He finds that the relevant geographic market is the United States.  (*Id.* at ¶¶ 453–455.)  Professor Harris states that it is "[e]conomically [p]roper" in this case to consider only one side of the two-sided platform — namely, network services to merchants — as a relevant market.  (*Id.* ¶ 457.)  Because "the

---

[14]  In addition to the HAC rules, no-surcharge rules, and no-discount rules, described above, the Target Plaintiffs define the anti-discrimination rules as rules that "prohibit merchants from taking actions that might favor the use of one type or category of credit card or debit card, or one issuing bank's card, over another credit card or debit card," (Target Compl. ¶ 124); the no competing marks rule as prohibiting "the use of competitive marks on Visa-branded or Mastercard-branded cards," (*id.* ¶ 126); the no-bypass rule as prohibiting "issuing banks and acquirers from bypassing the VisaNet system when processing transactions on Visa-branded cards," (*id.* ¶ 128); and the all-outlet rules as "rules, policies or contractual provisions that require merchants who accept Visa-branded payment cards to accept those cards at all of their merchant locations," (*id.* ¶ 118.)

conduct at issue here concerns the exercise of market power against merchants that accept Visa-
and Mastercard-branded cards," the question of whether Visa and Mastercard have market power
"depends on the alternatives available to merchants, rather than the alternatives available to
cardholders." (*Id.*) The analysis should take into account "feedback effects that could
exacerbate or offset the merchants' first-order reduction in volume." (*Id.* ¶ 458.) However, even
accounting for these feedback effects, "[t]here is no economic reason why a firm could not have
market power with respect to customers on one side of a platform, but face a competitive market
with respect to customers on the other side." (*Id.* ¶ 461.) Professor Harris contrasts Visa and
Mastercard with American Express, which "directly sets all the prices to the cardholder for the
vast majority of its volume." (*Id.* ¶ 463.) He claims that because Visa and Mastercard "do not
set prices for their issuers' cardholders," they do not set a "single price" in the two-sided
platform, (*id.* ¶¶ 462–464), and cites to testimony by Visa and Mastercard executives to show
that the networks do not track the data they would need to "balance" the two sides of the
platform. (*Id.* ¶¶ 465–469, 465–480.) Professor Harris argues that other forms of payment,
"such as cash, checks, and store cards," "are not generally interchangeable substitutes for general
purpose credit card and debit card acceptance." (*Id.* ¶¶ 481–486.) Nor can merchants "use the
acceptance of debit cards to discipline the suppliers of credit card network services," or vice
versa. (*Id.* ¶¶ 487–514.)

Professor Harris then conducts the "hypothetical monopolist test" ("HMT"), "a
methodological construct used to evaluate whether sets of products belong in the same relevant
antitrust market." (*Id.* ¶ 515.) The test "begins with a candidate set of products that could define
a relevant market" and supposes that all the products were sold by the hypothetical monopolist.
(*Id.*.) It then postulates that the hypothetical monopolist "imposed a 'small but significant and

non-transitory increase in price' above the competitive price (SSNIP)." (*Id.*) If the SSNIP leads "a sufficient number of customers [to] substitute away to other products such that the price increase would be unprofitable for the hypothetical monopolist," then the candidate set of prices does not constitute the relevant market, and "the relevant market would be expanded to include at least some of the products to which customers substituted." (*Id.*) After conducting the test, Professor Harris concludes that the relevant credit card market is credit card network services for merchants and the relevant debit card market is debit card network services for merchants. (*Id.* ¶¶ 518–536.) He proceeds to analyze market power by calculating Visa's and Mastercard's market share in the relevant markets, (*id.* ¶¶ 547–552), analyzing barriers to entry and expansion in the market for network services, (*id.* ¶¶ 554–593), and discussing how the competitive restraints and cardholder reward programs reinforce that market power. (*Id.* ¶¶ 594–598.)

Professor Harris then invokes "two additional relevant product markets: (a) credit card transactions, and (b) debit card transactions." (*Id.* at ¶¶ 599–602.) He states that these markets "encompass both sides of the platform — merchants and cardholders." (*Id.* ¶ 600.) Professor Harris claims that an indirect analysis of these two-sided markets yields the same result as the analysis of the one-sided markets, as "it remains the case that the Competitive Restraints organize Visa and Mastercard and their issuers into cartels that replace competition for merchant acceptance." (*Id.* ¶ 601.) The participants in these markets "remain the same as before, and the shares of these two relevant markets are the same as the shares previously calculated for the single-sided market." (*Id.* ¶ 602.) The "market shares of Visa and Mastercard" and "the discussion . . . on barriers to entry" are also unchanged. (*Id.*) Therefore, "the inferences one can draw from the structural or indirect analysis of market power are the same." (*Id.*)

45

The next section of Professor Harris's report discusses direct evidence of Visa and Mastercard's market power, (*id.* ¶¶ 603–700), and the following section analyzes the competitive restraints. It begins by discussing each of the restraints. (*Id.* ¶¶ 704–784.) Professor Harris argues that interchange acts like a "[m]arket [p]ower '[t]ax'" on retail transactions, including transactions using other payment methods. (*Id.* ¶¶ 734–736.) Evidence "from economic studies, legal and regulatory investigations, and merchant testimony" indicates that when interchange fees increase, merchants pass a substantial share of the cost "on to their customers in the form of higher prices, reduced services, or lower product quality." (*Id.* ¶ 734.) He opines that this price increase is "similar to a tax on retail transactions, because it impacts all retail transactions and thus affects all consumers." (*Id.* ¶ 735.) Further, the tax is regressive because "low income consumers bear the cost of interchange fees through higher merchandise prices, without enjoying any of the benefits that credit cards may provide." (*Id.* ¶ 736.)

The next section of the report discusses the anticompetitive effects of the competitive restraints. (*Id.* ¶¶ 785–812.) Professor Harris claims that the competitive restraints have resulted in higher prices to merchants and consumers, (*id.* ¶¶ 813–902) and that these higher prices are not offset by higher rewards to cardholders. (*Id.* ¶¶ 903–944.) Professor Harris states that because "[t]he interchange revenue that rewards cards generate for issuers exceeds the cost of the reward programs," "only a portion of the interchange fees merchants pay for rewards cards are shared with rewards cardholders; the remainder goes to the issuer," (*id.* ¶ 903), citing examples that illustrate that interchange revenue is "decoupled" from rewards. (*Id.* ¶¶ 903–917.)

Professor Harris then addresses the "single price" approach to analyzing anticompetitive effects. (*Id.* ¶¶ 918–944.) Professor Harris argues that the competitive restraints are fundamentally different from the restraints imposed in *Ohio v. American Express Co.*, 138 S. Ct.

46

2274 (2018) ("*Amex*"). However, even if the *Amex* standard is applied to this case, "thereby requiring the calculation of a single 'price of credit-card transactions' that captures both sides of the two-sided platform," "reasonable approaches to determining the 'single price' — i.e., considering the costs and benefits to the participants on both sides of the transaction — confirm the anticompetitive effects of the competitive restraints consistent with the analysis above." (*Id.* ¶ 918.) Professor Harris then "define[s] a single price for transactions in two different ways." (*Id.* ¶ 920.) The first method "define[s] the price narrowly as the merchant discount fee . . . net of any economic effects on the cardholder directly resulting from making a transaction." (*Id.*) Because "acquirer/processor fees are determined in a generally competitive fashion by competition among acquirer/processors" and therefore "do not serve as an indicator of the anticompetitive effects of the competitive restraints," he omits these fees from his "single price" measure. (*Id.*) The second method of defining "single price" "define[s] it more broadly to include, as before, the total merchant discount fee paid by the merchant, omitting acquirer/processor fees, plus all fees charged by Visa or Mastercard and their issuing bank to the cardholder . . . minus any rewards paid out to cardholders." (*Id.* ¶ 921.) Professor Harris calculates a narrow "single price" for Visa and Mastercard over the relevant period. (*Id.* ¶¶ 923–997.) He concludes that the resulting price "exceeds the competitive price," as shown by two forms of evidence. (*Id.* ¶ 928.) First, the "single price" is higher than the price in "numerous, but isolated examples" of "limited competition" in the credit card industry, such as merchant co-brand agreements with card issuers. (*Id.*) Second, Professor Harris cites to Dr. Kohler's expert

report[15] to claim that the "economic profit rate" in the credit card business is "above zero," which implies that "banks are making profits in excess of the profits needed to earn a normal competitive rate of return." (*Id.* ¶ 929.) He then calculates the narrow single price for debit cards, concluding that the resulting price is above the competitive price both because "net benefit to cardholders is only 3% to 7% of the price to the merchant" and because "banks are making profits in excess of the profits needed to earn a normal competitive rate of return on debit accounts." (*Id.* ¶¶ 930–933.) Next, Professor Harris analyzes the single price under the broad definition, again concluding that the single price for both credit and debit accounts is "far above the competitive level" because Dr. Kohler's report shows that "credit accounts are highly profitable" and "the economic profit rate is above zero." (*Id.* ¶¶ 934–944.)

The report then discusses output. Professor Harris states that Defendants "will likely argue that because the number of payment card transactions continues to rise, there has been no anticompetitive reduction in output." (*Id.* ¶ 945.) He contends that this is "incorrect . . . for a number of reasons." (*Id.*) First, the competitive restraints cause "market distortion" that causes use of credit and debit cards to be "higher than it otherwise would be." (*Id.* ¶ 946.) Second, to determine if anticompetitive conduct has reduced output, "the proper comparison is between output in the actual world and output in the but-for world." (*Id.* ¶ 948.) Professor Harris argues that output would have been higher in the but-for world because more merchants would have been willing to accept Visa and Mastercard cards, leading to more transactions, and retail prices would have been lower, leading to higher sales numbers. (*Id.* ¶¶ 950–951.) In the remainder of

---

[15] Professor Harris refers to the "Expert Report of Maria Blanco," but that report is now credited to Dr. Reto Kohler. (*See* Kohler Rep.; Letter from J. Wilson to M. Eisenstein & D. Ioffredo, at 1 (May 22, 2019), annexed to Carney Decl. as Ex. DDX80, Docket Entry No. 8544-7.)

this section, he discusses network rules restricting entry and competition in the market for network services. (*Id.* ¶¶ 952–967.)

Next, Professor Harris argues that there are "no valid procompetitive justifications for" the competitive restraints. (*Id.* ¶¶ 968–1020.) Finally, in the last section of his report Dr. Harris claims that in the absence of the competitive restraints, "competition would have generated significantly lower interchange fees and network fees." (*Id.* ¶¶ 1021–1236.) Because the exact but-for world outcomes "are dependent upon a variety of factors," Professor Harris proposes "a range of possible benchmarks for assessing damages." (*Id.* ¶ 1022.) Specifically, he proposes three benchmarks: Competitive, reflecting "interchange levels that would have been achievable by the aggressive pursuit of competitive pricing initiatives by merchants in the absence of the Competitive Restraints"; Moderate, reflecting "enhanced debit competition and the absence of anticompetitive rules"; and Ceiling, reflecting "an upper limit on what debit interchange fees would have been in the but-for world."[16] (*Id.* ¶ 1154.) Professor Harris explains how he calculates each of these benchmarks for credit and debit. (*Id.* ¶¶ 1160–1203.) He then does the same for network fees. (*Id.* ¶¶ 1215–1232.)

Finally, Professor Harris argues that the benchmarks are conservative because some of the evidence "support[ing] and corroborat[ing] the reasonableness of the competitive benchmarks" also "indicates that interchange fees in the but-for world could have been even lower than reflected in the discussed benchmarks." (*Id.* ¶ 1235.) The damage estimates based on the benchmarks are also conservative because, in a world without the competitive restraints, "American Express and Discover likely would have found it necessary to lower their merchant

---

[16] The Expert Report of Dr. G William Kennedy uses these benchmarks to calculate Plaintiffs' damages. (*See* Expert Report of G. William Kennedy, Ph.D, CPA/ABV ("Kennedy Rep.") ¶ 14, annexed to Carney Decl. as Ex. DDX10, Docket Entry No. 8544-2.)

discount fees in order to continue to compete for volume with Visa and Mastercard," but the damage calculations "do not include any damages from lower American Express or Discover fees in the but-for world." (*Id.* ¶ 1236.) The damages estimates also "assume that Visa's and Mastercard's purchase volumes would have been the same in the but-for world as they were in the actual world," which "ignores ways that merchants may have had in the but-for world to reduce their payment acceptance costs even further." (*Id.*)

Professor Harris has also submitted a reply expert report, responding to criticisms in the Defendants' rebuttal expert reports. (Reply Expert Report of Dr. Robert G. Harris ("Harris Reply Rep.") ¶ 1, annexed to Carney Decl. as Ex. DDX4, Docket Entry No. 8544-1.)

### ii. Market definition and damages benchmarks as one-sided

Defendants argue that "the relevant market in this case is two-sided as a matter of law," and that Professor Harris's "opinions concerning market definition and his damages benchmarks — which analyze only one side of the two-sided market — are based on an erroneous legal premise and therefore inadmissible." (Defs.' Mem. in Supp. of Mot. to Excl. in Part Opinions of Professor Robert G. Harris ("Harris Excl. Mem.") 7–8, Docket Entry No. 8105.)

### 1. Market definition

Defendants claim that Professor Harris's market definition analysis considers only whether *merchants* substitute away from credit and debit cards, not whether cardholders also do so. (Harris Excl. Mem. at 8–11). They argue that this is improper because under *Amex*, "[m]erchants and cardholders jointly consume payment card transactions as a matter of law." (Harris Excl. Mem. at 8.) Defendants argue that *Amex* is not distinguishable just because Visa and Mastercard, unlike American Express, do not directly set prices to cardholders. (Reply Mem. in Further Supp. of the Mot. to Excl. Opinions of Dr. Robert G. Harris ("Harris Excl.

Reply") 4–5, Docket Entry No. 8107.) Further, they argue that although Visa and Mastercard do not set prices directly, they influence prices through other mechanisms like setting interchange fees and "'set[ting] minimum requirements for the level of rewards that must be offered [to cardholders] in order for an issuer to offer certain levels of interchange.'" (*Id.*)

In response, the Target Plaintiffs argue that Professor Harris properly "began by looking at a price change on the side of the platform that is directly affected by" the competitive restraints and "then examined the economic impact of that price on the *other* side of the platform . . . to analyze any feedback effects." (Target Pls.' Mem. in Opp'n to Defs.' Mot. to Excl. in Part Opinions of Prof. Robert G. Harris ("Harris Excl. Opp'n") 9, Docket Entry No. 8147.) They claim that Professor Harris's analysis "properly factored" the "material distinction" between American Express and the Defendant networks "into his market definition analysis." (*Id.* at 12.)

To the extent that Professor Harris's opinions are contrary to *Amex*, they are not helpful to the factfinder and should be excluded. *See Lamar Advertising Co. v. Zurich Am. Ins. Co.*, 533 F. Supp. 3d 332, 344 (M.D. La. 2021) ("[I]t is obvious that a legal expert will not be permitted to give legal opinions which are contrary to the law or base his conclusions on an incorrect understanding of the law."); *Pledger v. Reliance Trust Co.*, No. 15-CV-4444, 2019 WL 4439606, at \*8 (N.D. Ga. 2019) ("Expert opinions that conflict with controlling law are unreliable."); *Sprint Commc'ns Co. v. Cox Commc'ns Inc.*, 302 F. Supp. 3d 597, 619 (D. Del. 2017) ("[T]his statement is contrary to the law and is, therefore, unhelpful and likely to confuse a jury."); *United Food and Com. Workers Loc. 1776 & Participating Emps. Health and Welfare Fund v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1183 (N.D. Cal. 2017) ("[E]xclusion of opinions that are irrelevant as a matter of law or contrary to the law is appropriate through the *Daubert* process."); *Federal Hous. Finance Agency v. Nomura Holding Am., Inc.*, No. 11-CV-6201, 2015

WL 640875, at *3 (S.D.N.Y. Feb. 16, 2015) ("Defendants' interpretation of Section 12(a)(2) is

incorrect as a matter of law, and conclusions drawn therefrom cannot 'help the trier of fact . . . to

determine a fact in issue.'" (quoting Fed. R. Evid. 702)).

*Amex* states that two-sided platforms — including credit-card networks — exhibit

"indirect network effects," which "exist where the value of the two-sided platform to one group

of participants depends on how many members of a different group participate." *Amex*, 138 S.

Ct. at 2280. The two-sided platforms therefore "must take these indirect network effects into

account before making a change in price on either side." *Id.* at 2281. While it is not always

necessary to consider both sides of a two-sided platform, "two-sided transaction platforms, like

the credit-card market, are different":

> These platforms facilitate a single, simultaneous transaction between
> participants. For credit cards, the network can sell its services only
> if a merchant and cardholder both simultaneously choose to use the
> network. Thus, whenever a credit-card network sells one
> transaction's worth of card-acceptance services to a merchant it also
> must sell one transaction's worth of card-payment services to a
> cardholder . . . .
> Because they cannot make a sale unless both sides of the platform
> simultaneously agree to use their services, two-sided platforms
> exhibit more pronounced indirect network effects and interconnected
> pricing and demand. Transaction platforms are thus better
> understood as "suppl[ying] only one product"—transactions.

*Id.* at 2286.

Professor Harris's market definition is contrary to *Amex*. *Amex* holds that "in a case

brought under the Sherman Act that involves a 'two-sided *transaction* platform,' the relevant

market must *always* include both sides of the platform." *US Airways, Inc. v. Sabre Holdings

Corp.*, 938 F.3d 43, 56 (2d Cir. 2019). The Target Plaintiffs argue that Professor Harris's market

definition does include the cardholder side of the platform because in conducting the HMT, he

considers the feedback effects of an increase in the merchant price. (*See* Harris Excl. Opp'n 8–

10.) However, Dr. Harris does not consider feedback effects in response to a hypothetical increase on the *cardholder* side of the platform. (*See* Harris Excl. Reply 2.) Similarly, his analyses from functional interchangeability and natural experiments consider *merchant* substitution, not cardholder substitution. (*See* Harris Rep. ¶¶ 457–541). Dr. Harris's report seems to claim that considering the effect of a change in the cardholder price is unnecessary because unlike American Express, Visa and Mastercard do not set prices to cardholders and do not even "take account of the prices their issuers charge to cardholders." (*Id.* ¶ 439.) However, a credit card network is a two-sided platform and therefore must be analyzed as a single market as a matter of law. *See Amex*, 138 S. Ct. at 2285–86 (stating that courts should combine "different products or services into 'a single market' when 'that combination reflects commercial realities'" and that "courts must include both sides of the platform — merchants and cardholders — when defining the credit-card market.") In *US Airways*, the plaintiff's expert testified that, because of "the unique nature of the [global distribution system] services market," the market "lack[ed] interdependence" and therefore was "one-sided." *US Airways, Inc. v. Sabre Holdings Corp.*, No. 11-CV-2725, 2017 WL 1064709, at *9 (S.D.N.Y. Mar. 21, 2017), *vacated and remanded by US Airways, Inc.*, 938 F.3d at 59. On appeal, the Second Circuit held that the defendant was a transaction platform because it "(1) offer[ed] different products or services, (2) to different groups of customers, (3) whom the 'platform' connects, (4) in simultaneous transactions," and that the expert's theory was therefore "wrong as a matter of law." *US Airways, Inc.*, 938 F.3d at 58–59. Similarly, Professor Harris's theory is inconsistent with the law. The Court therefore excludes Professor Harris's two-sided market definition.

After conducting his indirect analysis under the theory that the relevant market is the provision of network services to merchants, Professor Harris considers "two additional relevant

product markets: (a) credit card transactions, and (b) debit card transactions." (Harris Rep. ¶

600.) Unlike the provision of network services to merchants, credit transactions and debit

transactions are two-sided markets because they include both sides of the platform identified by

*Amex*: cardholders and merchants. *Amex*, 138 S. Ct. at 2280. Professor Harris writes that in

these alternative product markets,

> it remains the case that the Competitive Restraints organize Visa and
> Mastercard and their issuers into cartels that replace competition for
> merchant acceptance. The market power of the cartels is exercised
> by extracting profits from merchants rather than from cardholders.
> In addition, the participants in the assumed "transactions" markets
> remain the same as before, and the shares of these two relevant
> markets are the same as the shares previously calculated for the
> single-sided market. In both cases, shares are based on the dollar
> volume of transactions. Therefore, the market shares of Visa and
> Mastercard, and the concentration of the markets as measured by
> HHIs,[17] are the same as those shown and discussed . . . above. In
> addition, the discussion . . . on barriers to entry appl[ies] equally if
> the markets are defined as single transactions markets. Therefore,
> the inferences one can draw from the structural or indirect analysis
> of market power are the same. Accordingly, Visa and Mastercard
> each have market power in the assumed relevant markets for credit
> transactions and debit transactions.

(Harris Rep. ¶¶ 601–602.)

Defendants argue that "the only support [Professor Harris] references for this conclusory

assertion is limited to one side of the market." (Harris Excl. Mem. 4.) Professor Harris supports

this conclusion with citations to his analyses of market shares and barriers to entry, both of

which are as applicable to transaction markets as to the markets for network services. (*See*

Harris Rep. ¶¶ 601–602, 547–576.) However, Defendants cite to additional portions of Professor

Harris's report in which he argues that "[o]ther forms of payment . . . are not generally

interchangeable substitutes for general purpose credit card and debit card acceptance," noting

---

[17] "HHI" is the "Herfindahl-Hirschman Index," "which is calculated by summing the
squares of the individual firms' market shares." (Harris Rep. ¶ 548.)

that accepting store cards, cash and checks "is not a substitute for accepting" credit and debit cards; that a store card program "is not a viable alternative for a merchant considering dropping acceptance of general credit or debit cards"; and that "[m]erchants are not able to use the acceptance of debit cards to discipline the suppliers of credit card network services, and vice versa." (Harris Excl. Mem. 3, 4 n.5 (citing to Harris Rep. ¶¶ 481–482, 485, 487).) To the extent Defendants' argument is that Professor Harris must prove that credit card transactions and debit card transactions are separate markets that do not include each other or other forms of payment, the Court finds that assuming the existence of separate credit card and debit card transaction markets is not "'so unrealistic and contradictory as to suggest bad faith' or to be in essence 'an apples and oranges comparison.'" *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009) (quoting *Boucher*, 73 F.3d at 21). Notably, Professor Harris cites to evidence that the networks do not behave as though credit and debit cards occupy the same market, (Harris Rep. ¶¶ 537–541), and claims in his reply report that of Defendants' experts, only Professor Elzinga[18] argues that credit and debit do not constitute separate relevant product markets, (Harris Reply Rep. ¶¶ 65–66). Further, *Amex* defines the relevant market as "the two-sided market for credit card transactions as a whole," *Amex*, 138 S. Ct. at 2287. The Court therefore treats the existence of a market for credit transactions and a market for debit transactions as assumptions that Defendants may challenge at trial. *R.F.M.A.S., Inc.*, 748 F. Supp. 2d at 269 ("[I]naccuracies in the underlying assumptions or facts do not generally render an expert's testimony inadmissible.").

---

[18] Professor Kenneth G. Elzinga, an expert for Defendants, "provide[s] an economic analysis of the competition issues raised by the Plaintiffs" and "evaluate[s] the analysis of the Plaintiffs' economic experts on these same topics." (Expert Report of Kenneth G. Elzinga, annexed to Szanyi Decl. as Ex. SJDX 388, Docket Entry No. 8526-12.)

## 2. Damages benchmarks

Defendants claim that Professor Harris's damages benchmarks "consist solely of allegedly competitive interchange rates and network fees" and that the damages calculations based on these benchmarks "calculate[ ] damages as the actual fees [the Target Plaintiffs] paid minus the fees they would have paid under [Professor Harris's] benchmark rates." (Harris Excl. Mem. 10–11.) They argue that this approach is improper because *US Airways* holds that "an overcharge theory of damages in a two-sided transaction market must calculate the difference between the actual transaction price and the competitive transaction price," and that Professor Harris's damages model "should be excluded as one-sided." (Harris Excl. Reply 5; Harris Section 1 Excl. Mem. 10.)

In response, the Target Plaintiffs argue, first, that "exact proof of the amount of damages is not required" and that "*Amex* requires only proof that the existing two-sided price *exceeds* the two-sided price in the but-for world." (Harris Excl. Opp'n 16 (quoting *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1378 (2d Cir. 1988)), 18.) Second, they point to evidence in Professor Harris's report that "issuers could afford to fund rewards and earn an economic profit at competitive, rather than supracompetitive, levels of interchange." (*Id.* at 17–18.) Thus, although issuers in the but-for world *could* decide to decrease rewards, "Professor Harris concluded that issuers could continue to provide robust rewards without high interchange rates." (*Id.* at 18 n.14.) In fact, he opined that they would "be incented to do so to retain their cardholder portfolios." (*Id.* (citing to Harris Reply Rep. ¶ 816.))

### A. Consistency with *US Airways*

In *US Airways*, the platform at issue was a "computerized network that travel agents . . . use to search for and book airline flights for their customers," with travel agents on one side of

the platform and airlines on the other side. 938 F.3d at 49–50. The platform, owned by a company called Sabre, collected booking fees from airlines, but paid the travel agents to use the platform. *Id.* at 50. After trial, the jury found that the market at issue was one-sided, defendant Sabre had unreasonably restrained trade, and plaintiff US Airways was owed a certain amount in damages. *Id.* at 57. However, it also found in the alternative that even if the market were two-sided, Sabre had unreasonably restrained trade and owed to US Airways the exact same amount in damages. *Id.* On appeal, the Second Circuit found, first, that the conclusion that the market was one-sided was erroneous under *Amex*. *Id.* at 58. It then found that it could not rely on the alternative verdict on appeal because, among other reasons, the jury had "returned identical damage amounts" whether it assumed that the market was one- or two-sided. *Id.* US Airways had argued at trial that it "was entitled to damages in an amount by which the supracompetitive fees paid by it exceeded the fees that it asserted would have been charged in a competitive market ($1.35 per booking)." *Id.* at 59. However, "[i]n a market that took into account both sides of the Sabre platform, the prices would be supracompetitive only to the extent that the net prices charged to travel agents . . . and airlines . . . *combined* exceeded the prices that would have been charged in a competitive market." *Id.* Because Sabre's payments to travel agents would reduce US Airways' damages, "[t]wo-sided damages must, in this case, be lower than one-sided damages would have been." *Id.* The court concluded that it was impossible for the jury to have "followed the district court's instructions" given its conclusion that "the compensable damages if the platform were one-sided . . . were identical in amount to the compensable damages if the platform were two-sided." *Id.*

To the extent that Professor Harris's damages benchmarks are contrary to *US Airways*, they are not admissible. *See Lamar Advertising Co.*, 533 F. Supp. 3d at 344 ("[I]t is obvious that

a legal expert will not be permitted to give legal opinions which are contrary to the law or base his conclusions on an incorrect understanding of the law."). However, Professor Harris's benchmarks are not contrary to *US Airways*. In *US Airways*, the plaintiff's "experts themselves testified that in a competitive market," the defendant's payments to travel agents "would not exist." *Id.* at 60. Professor Harris, on the other hand, concluded that issuers would be able and incentivized to continue to offer low prices to cardholders. (*See, e.g.,* Harris Rep. ¶¶ 843–846, 904–907 (pointing to evidence that interchange fees do not fund rewards); ¶ 1090 ("[T]he increased issuer competition in the but-for world would have tended to increase card issuer incentives to offer higher cardholder rewards and/or lower cardholder annual fees and APRs."); Harris Reply Rep. ¶ 559 "[I]n the but-for world, the single price for credit card transactions would have been lower than it was in the actual world . . . . With respect to rewards, . . . issuers would have had an incentive to offer rewards in the but-for world . . . . A similar assertion applies to cardholder fees."); ¶ 808 ("The claim that consumers in the but-for world would have received lower rewards . . . is unfounded."); ¶ 816 ("[B]anks would have continued to have incentives in the but-for world to offer rewards.")) Unlike in *US Airways*, it is not inconsistent that Professor Harris's damages benchmarks do not assume that the cost of rewards "would necessarily reduce" the Plaintiffs' damages. *US Airways*, 938 F.3d at 59.

### B. Calculating the two-sided transaction price

Defendants argue that it is insufficient to opine that reducing interchange fees "'need not' increase cardholder prices in the but-for world," and that Professor Harris must "do the math" of calculating the difference in the two-sided price. (Harris Excl. Reply 6.) They point to testimony at Professor Harris' deposition where he acknowledged that the cardholder price could be different in the but-for world: Professor Harris testified that he thought variations in the

interchange benchmarks would cause changes to the "other inputs" to the two-sided price, but that he "didn't go about trying to measure them," and that he did not "have an opinion as to whether rewards could have gone up or down in the but-for world." (*Id.*; Videotaped Dep. of Dr. Robert G. Harris ("Harris Dep.") 125:1–12, 577:7–25, annexed to Carney Decl. as DDX23, Docket Entry No. 8544-3).

As stated above, however, because Professor Harris concluded that cardholder prices would not meaningfully rise, he is not required to calculate both sides of the two-sided price in order to calculate overall two-sided damages. More accurate damages calculations may be possible, but the Second Circuit has held that proof of antitrust damages "need not conform to a particular theory or model, and exact proof of the amount of damages is not required. An antitrust plaintiff must thus provide only sufficient evidence to support a 'just and reasonable' estimate of damages." *U.S. Football League*, 842 F.2d at 1378; *see also Iowa Pub. Emps.' Ret. Sys. v. Bank of Am. Corp.*, No. 17-CV-6221, 2022 WL 2829880 (S.D.N.Y. June 30, 2022) (noting that where the "but-for world is entirely hypothetical," the plaintiffs' "burden of proving damages is, to an extent, lightened," and that the jury "will be permitted to 'make a just and reasonable estimate of the damage'"); *US Airways, Inc. v. Sabre Holdings Corp.*, No. 11-CV-2725, 2022 WL 1140291 (S.D.N.Y. Apr. 18, 2022) (noting that "courts have allowed antitrust plaintiffs considerable latitude in proving the amount of damages" (quoting *U.S. Football League*, 842 F.2d at 1378)); *AngioDynamics, Inc. v. C.R. Bard, Inc.*, 537 F. Supp. 3d 273, 335 (N.D.N.Y. 2021) ("'[T]he actual amount [of an antitrust plaintiff's damages] need not be proven to the same degree of certainty as proving some quantum of damages,' given the difficulty (and, at times, impossibility) of accurately constructing a hypothetical world untainted by the defendant's challenged conduct." (quoting *Drug Mart Pharm. Corp. v. Am. Home Prod. Corp.*,

472 F. Supp. 2d 385, 424 (S.D.N.Y. 2007))).  Given Professor Harris's opinion that issuers

would be able and motivated not to raise cardholder prices, his failure to incorporate changes in

the cardholder price into his damages calculation has an insufficient effect on the final

calculations to warrant exclusion.[19]

### iii.   Supracompetitive pricing analysis

Defendants argue that Professor Harris relies on a "hodge-podge" of evidence "to infer

that the actual two-sided price is higher than the competitive price" and that "[t]he gaps he

attempts to bridge with those inferences are too great."  (Harris Excl. Mem. 11–12.)  They argue

that Professor Harris's "network profitability," (*id.* at 12–13), "issuer profitability," (*id.* at 14),

"total issuer pass-through," (*id.* at 14–15), and "co-brand transaction price," (*id.* at 15–16)

analyses are unreliable.

In response, the Target Plaintiffs argue that Professor Harris provides "reliable opinions

addressing" all three ways that "a plaintiff could prove a defendant is charging a

---

[19]  Defendants also cite to the following exchange at Professor Harris's deposition: "Q.
Did you include the cost of rewards in your . . . but-for world credit benchmarks? . . . A. No.  Q:
Are you aware that if those costs had been included, the damages calculations for the Target
group would be substantially reduced?  A. Yes."  (Harris Dep. 342:9–18.)  This exchange
seemingly contradicts both the statements in Professor Harris's reports that issuers would be able
and motivated not to raise the cardholder price in the but-for world, (*see, e.g.*, Harris Rep. ¶
1090), and Professor Harris's testimony that he had no opinion as to whether rewards would go
up or down in the but-for world, (Harris Dep. 125:2–12).  While the statement is inconsistent, the
Court does not exclude Professor Harris's damages opinion on this sole basis.  Rather,
Defendants may question Professor Harris about this statement on cross-examination.  *See
Bargher v. White*, 541 F. Supp. 3d 682 (M.D. La. 2021) (declining to exclude expert's testimony
where expert mistakenly testified that his report relied on a deposition that hadn't occurred at the
time the expert submitted his report); *United States v. Torolopoulos*, No. 4:09-CV-316, 2010 WL
11566399 (N.D. Tex. Dec. 14, 2010) *1–2 (declining to exclude expert's testimony and report
despite "incorrect" misstatement in expert's report); *Frederick v. Swift Transportation Co., Inc.*,
No. 06-1332, 2009 WL 10689795, at *1–2 (D. Kan. Feb. 27, 2009) (declining to exclude expert
testimony where expert gave inconsistent testimony, holding that "defendant's arguments were
more appropriate for cross-examination").

supracompetitive price," as recognized in *Amex*. (Harris Excl. Opp'n at 20 (quoting *Amex*, 138
S. Ct. at 2288.))

### 1. Network profitability

Defendants challenge Professor Harris's finding that, because Visa and Mastercard's
profits were high, their prices were supercompetitive. (Harris Excl. Mem. at 12.) First, they
argue that Professor Harris "provides no reliable basis to support his opinion that, because Visa's
and Mastercard's *profits* were 'high,' their two-sided transaction *prices* were supracompetitive."
(*Id.*) Second, they argue that although Professor Harris defines the United States as the relevant
geographic market, his "profitability numbers are based on Visa's and Mastercard's *global
profits*." (*Id.* at 12–13.) They argue that the absence of better evidence "does not render reliable
[Professor Harris's] otherwise unreliable inference." (Harris Excl. Reply 9.) Third, Defendants
claim that Professor Harris "fails to show that the networks' levels of profitability were abnormal
for the payments industry or otherwise inconsistent with competitive conduct." (Harris Excl.
Mem. at 13.) In his reply report, Professor Harris provides a comparison between "the weighted
average EBITDA margin for Visa and Mastercard" and "the weighted average EBITDA margin
of their peers." (Harris Reply Rep. ¶ 558 & n. 995.) Defendants argue that the "peers" he cites
"includes companies . . . that do not even compete with Visa and Mastercard in the markets that
[Professor Harris] himself identified." (Harris Excl. Mem. at 13.)

In response, the Target Plaintiffs argue, first, that Professor Harris's opinions regarding
Visa's and Mastercard's high profits include high and rapidly increasing profit margins, large
increases in net network fees, declining network costs per transaction, and dramatic increase in
Visa and Mastercard stock prices, "all of which is proof permitted by *Amex*." (Harris Excl.
Opp'n 28.) Second, they claim that Professor Harris relies on global profits rather than U.S.

61

profits because Visa and Mastercard "do not produce sufficiently detailed and complete financial data by country or region, either in internal or public reports." (*Id.* at 29.) Further, there is "*no evidence* that Visa's and Mastercard's profits in the U.S. are *lower* than in other areas," and "the U.S. accounts for a larger share of Visa's and Mastercard's revenues than any other country." (*Id.* at 29–30.) Finally, the Target Plaintiffs argue that Defendants' criticism of Professor Harris's peer-group analysis "goes only to the weight, not the admissibility, of his profitability comparisons." (*Id.* at 31.)

Professor Harris's testimony that high network profits are evidence of a supracompetitive transaction price is reliable. (*See* Harris Reply Rep. ¶¶ 556–558.) Professor Harris testified that Visa's and Mastercard's profitability is consistent with the merchant network fee being above the competitive level, but Defendants argue that he "cannot reliably infer supracompetitive two-sided transaction prices from one-sided merchant network fees," citing to *Amex*. (Harris Excl. Mem. 12.) However, Professor Harris's opinions about network profits do not contradict the holding in *Amex* that "[p]rice increases on one side of the platform . . . do not suggest anticompetitive effects without some evidence that they have increased the overall cost of the platform's services." *Amex*, 138 S. Ct. at 2286; (*see* Harris Excl. Mem. 12). Professor Harris does not claim that evidence of high network profits *alone* establishes supracompetitive transaction prices; instead, he names high network profits as one "type[] of evidence" showing that "the single price for credit card transactions is above the competitive level." (Harris Reply Rep. ¶¶ 556, 558.) Evidence that the networks are highly profitable is relevant to a conclusion that the overall transaction price is supracompetitive, and "[e]xpert evidence is relevant if it tends to make any fact of consequence to the litigation more or less probable." *Kogut v. County of Nassau*, 894 F. Supp. 2d 230, 239 (E.D.N.Y. 2012). Whether this evidence is sufficient to show

a supracompetitive two-sided price under *Amex* is not determinative of whether it inadmissible. *See Ambrosini v. Labarraque*, 101 F.3d 129, 135 (D.C. Cir. 1996) (stating that the fact that expert's "testimony alone may be insufficient for the [plaintiffs] to survive summary judgment does not necessarily defeat its admissibility under the 'fitness' prong of *Daubert*").

Nor is Professor Harris's use of Visa and Mastercard's global data unreliable. Courts have held that "[a]n expert opinion is not *per se* unreliable because it relies upon some unverified or inaccurate information provided by the expert's client." *Lee Valley Tools, Ltd. v Indus. Blade Co.*, 288 F.R.D. 254, 267 (W.D.N.Y. 2013). Rather, "if a party provides its expert 'with a piece of false information or withheld relevant data, [the opposing party] can cross-examine the experts on this matter, calling into question the weight that the jury should accord their testimony.'" *Id.* (alteration in original); *see also In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 615 (8th Cir. 2011) (upholding district court's decision not to exclude expert's opinion where expert had assumed a certain figure because he lacked reliable data from opposing party); *Angiodynamics, Inc.*, 537 F. Supp. 3d at 337 (stating that "experts have wide latitude with respect to the data on which they rely, and challenges concerning the reliability of an expert's data often present questions of weight, rather than admissibility.").

Defendants' reliance on *In re Bard IVC Filters Products Liability Litigation* does not support exclusion. (Harris Excl. Reply 9.) In that case, the plaintiffs' expert opined that a certain product produced by the defendants was associated with a higher risk of adverse events than another product. *In re Bard IVC Filters Prods. Liab. Litig.*, No. 15-02641, 2018 WL 495607, at *1 (D. Ariz. Jan. 22, 2018). The defendants challenged the source of the expert's data as unreliable. *Id.* at *4. The court began by noting that the expert had used the only available evidence on the defendant's product's failure rates. It noted that "the fact that this is the only

admittable evidence does not mean that opinions based on it must be admitted." *Id.* However, it went on to note that the expert "readily concede[d] the limitations in the data she used" and "openly confirm[ed] that she ha[d] developed an estimate of failure rates, not completely accurate failure rates." *Id.* The court found that the expert was "eminently qualified to provide such opinions," did not "overstate her findings," and "clearly explain[ed] the basis for her assumptions and conclusions." *Id.* It concluded that "[u]nder *Daubert*,

> an expert need not base his or her opinion on the best possible evidence, regardless of availability, but upon 'good grounds based on what is known.'" And *Daubert* makes clear that "disputes about the facts underlying an expert's opinions are best addressed through the adversarial process and then by the jury as the ultimate fact-finder."

*Id.* (internal citations omitted). Defendants cite to the statement that "the fact that this is the only available evidence does not mean that opinions based on it must be admitted." (Harris Excl. Reply 9.) However, taken as a whole, *In re Bard* indicates that where a qualified expert bases his opinion on "good grounds based on what is known," imperfections in the data are properly attacked by the opposing party on cross-examination. *See Amorgianos*, 303 F.3d at 267 ("As the Supreme Court has explained, '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" (quoting *Daubert*, 509 U.S. at 596)).

Finally, Professor Harris's selection of companies for his network profitability comparison is not a basis to exclude his opinion. As the Target Plaintiffs identify, all of the companies Professor Harris selected "are in the payments space," two "own and operate rival PIN debit networks," several "are large payment card processors," one "is a large ATM network," and several are identified in Professor Elzinga's report as competitors to Visa and Mastercard. (Harris Excl. Opp'n 31–33.) While the comparison may not be perfect, Professor

64

Harris is not comparing "apples and oranges," and therefore arguments that his assumptions are unfounded "go to the weight, not the admissibility, of the testimony." *Zerega Ave.*, 571 F.3d at 214 (quoting *Boucher*, 73 F.3d at 21).

Defendants cite to *Bailley v. Allgas, Inc.* and *Church & Dwight Co. v. Mayer Labs, Inc.*, but these cases are distinguishable. (Harris Excl. Mem. 13.) In *Bailey*, an expert witness concluded that the defendant had extracted supracompetitive profits indicative of an oligopoly in 1993 and 1994 by comparing the defendant's "estimated rate of return on assets (ROA) for those two years with the average rate of return for Fortune 500 companies." *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1251 (11th Cir. 2002). The court held that the expert's testimony was insufficient to establish the existence of an oligopoly, noting that the Fortune 500 "contains a broad cross-section of industries and types of countries" and that the defendant's ROA should be compared to "the ROA of similar firms in the same or similar industries." *Id.* at 1253–54. While Professor Harris's selection of comparator companies may not be perfect, he does not simply compare Visa's and Mastercard's profit to a massive cross-section of industries, like the expert in *Bailley*, but rather targets companies in the payment space.

In *Church & Dwight Co.*, the plaintiff noted that defendant enjoyed a higher profit margin in the U.S. market than in the Canadian market, but "fail[ed] to provide any basis for comparison between the two markets or account for the variety of factors that may affect pricing and profit margins." *Church & Dwight Co. v. Mayer Labs., Inc.*, 868 F. Supp. 2d 876, 897 (N.D. Cal. 2012), *vacated in part on other grounds in Church & Dwight Co. v. Mayer Labs., Inc.*, No. 10-C-4429, 2012 WL 1745592 (N.D. Cal. 2012). The *Church & Dwight Co.* expert's comparison of the U.S. and Canadian markets, with no explanation as to why this comparison

was relevant, is distinguishable from Professor Harris's comparison of Visa and Mastercard's profits to those of other payments companies.

### 2. Issuer profitability

Defendants argue that neither Professor Harris's report nor Dr. Kohler's report supports the assertion that, because credit and debit card accounts are highly profitable for issuers, the single price of credit card transactions is above the competitive level. (*Id.* at 14.) They point out that "issuer profits derive from multiple sources of revenue that have no connection to the challenged rules," such as interest income. (*Id.*) Defendants also argue that Professor Harris fails to explain why issuing banks' margins are "comparable to, and often lower than, those of acquiring banks," which Professor Harris acknowledges are subject to competition. (*Id.*)

The Target Plaintiffs argue that whether issuer profits come from sources other than interchange is a "disputed issue[] that a jury must resolve," and that there is "abundant evidence" to the contrary. (Harris Excl. Opp'n 25.) The Target Plaintiffs also argue that whether acquiring banks' margins are higher than issuing banks is "irrelevant" and that "Defendants have not shown that acquiring banks earn a return above their cost of capital (indicating supracompetitive profits)." (*Id.* at 26–27.) Rather, "Defendants' argument misleadingly conflates the evidence of acquiring bank competition for large merchants with the price charged by acquiring banks to smaller merchants, who are differently situated." (*Id.* at 27.)

Professor Harris's opinion that issuer profitability indicates supracompetitive prices is admissible. Issuer profits on the merchant side of the platform cannot necessarily be isolated given evidence that issuers do not earmark income from certain sources to pay certain costs, but rather pay costs out of a general pool of income. (*See* Harris Rep. ¶¶ 843–846, 904–907.) Professor Harris's profitability analysis is not so clearly unsound as to be inadmissible, although

66

Defendants may challenge it by introducing evidence that issuers' profitability is due to income sources other than merchant fees. *See Dial Corp. v. News Corp.*, 165 F. Supp. 3d 25, 42 (S.D.N.Y. 2016) ("Where, as here, [the expert's] methodologies are not clearly unsound or unreasonable, the Court declines to exclude his testimony on a *Daubert* motion.") Nor does Professor Harris's failure to specifically compare issuing banks' and acquiring banks' margins render his opinion inadmissible. *See In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 466 (S.D.N.Y. 2016) (finding that while a certain fact "is fair game for cross-examination of [the expert], and seems to undermine his conclusion . . . , in these circumstances his failure to discuss it in his report is not so glaring as to render his opinion unreliable or admissible").

### 3. Total issuer pass-through

Defendants challenge Professor Harris's analysis that because the portion of the price that issuers pass through from merchants to cardholders is "low," transaction prices are supracompetitive. (Harris Excl. Mem. at 14.) They argue that the Second Circuit and the Supreme Court "rejected just this kind of total issuer pass-through calculation as evidence of supracompetitive prices in the *Amex* cases." (*Id.* at 14–15.) Further, they argue that total issuer pass-through cannot show supracompetitive prices in this case because Professor Harris has testified "that he has no idea what total issuer pass-through would be in the but-for world and admitted that it *could be exactly the same* as in the actual world." (*Id.* at 15.)

The Target Plaintiffs do not seem to respond to Defendants' arguments about issuer pass-through. (Harris Excl. Opp'n; *see also* Harris Excl. Reply (noting that the Target Plaintiffs "make no attempt to defend" Professor Harris's issuer pass-through theory.))

Both the Second Circuit and the Supreme Court have held that evidence of low issuer pass-through is insufficient evidence of supracompetitive pricing in the absence of "a reliable

measure of the two-sided price" (in the case of the Second Circuit) or "some evidence that tends to prove that output was restricted or prices were above a competitive level" (in the case of the Supreme Court). *United States v. Am. Express Co.*, 838 F.3d 179, 205 (2d Cir. 2016); *Amex*, 138 S. Ct. at 2288. As stated above, however, an expert's testimony need not be sufficient to defeat summary judgment in order to be admissible. *See Ambrosini*, 101 F.3d at 135. Because evidence of issuer pass-through is relevant to supracompetitive pricing, it is admissible.

Nor is Professor Harris's opinion about issuer pass-through inadmissible because he "testified that he has no idea what total issuer pass-through would be in the but-for world and admitted that it *could be exactly the same* as in the actual world." (Harris Excl. Mem. 15.) Defendants cite to a portion of Professor Harris's deposition in which he testified that he did not "have in mind" an issuer pass-through rate that "would be indicative of a competitive market." (Harris Dep. at 598:24–559:8.) Professor Harris does not opine, however, that a pass-through rate below a certain threshold signifies supracompetitive prices. Rather, he opines that "credit card fees paid by merchants are not offset by benefits to cardholders," and that this is consistent with a supracompetitive two-sided price. (*See* Harris Rep. ¶¶ 560–561.)

Defendants also cite to Professor Harris's statement at his deposition that "the issuer pass-through rate for debit is zero in both the actual and . . . the but-for world" because "[r]ewards for the vast majority of debit transactions" in the but-for world "would still be zero." (Harris Dep. 599:12–25.) Professor Harris went on to testify that the issuer pass-through rate for debit was "not a factor [he] weighed heavily" in determining "the competitiveness of the market"

and that in fact he didn't weigh it at all "that [he could] really think of."[20] (*Id.* at 600:1–9.) He also testified that he did weigh pass-through in the credit market and that the credit and debit markets are different in this respect "[m]ostly because of rewards on credit cards and the lack of rewards on debit cards." (*Id.* at 600:12–16.) The fact that Professor Harris testified that the debit pass-through rate in the but-for world "*could be exactly the same*" (i.e., zero) as in the actual world does not render his pass-through opinions unreliable. (Harris Excl. Mem. 15.)

### 4. Co-branded transaction prices

Defendants claim that Professor Harris opined that "the lower interchange rates applicable to some co-brand cards could be applied to Visa and Mastercard credit cards broadly accepted by all merchants without any change to the cardholder price." (*Id.* at 15.) They argue that Professor Harris "performs no analysis to support" this claim and that he "fails to acknowledge, let alone consider, record evidence that many co-brand cards were not profitable to the banks that issued those cards." (*Id.* at 15–16.)

The Target Plaintiffs argue that Professor Harris "*never* stated that any lower interchange applicable to co-brand cards accepted by that co-brand merchant would be applied to *all* transactions in the but-for world." (Harris Excl. Opp'n at 34.) Rather, "he examined co-brand cards, and the competition among banks to issue those cards, to show that banks will compete for

---

[20] The Court notes that this discussion is not wholly consistent with Professor Harris's report, in which he opines that "the price to the merchant for debit card transactions is not offset by the benefit . . . to cardholders" and that "[t]his very low pass through rate is evidence that the total price of Visa and Mastercard debit card transactions . . . exceeds the competitive price." (Harris Rep. ¶ 933.) While the Court does not exclude Professor Harris's opinions on pass-through for this reason, the Court notes that it may be a fertile ground for cross-examination. *See Bargher*, 541 F. Supp. at 682 (declining to exclude expert's testimony where expert mistakenly testified that his report relied on a deposition that hadn't occurred at the time the expert submitted his report); *Frederick*, 2009 WL 10689795, at *1–2 (declining to exclude expert testimony where expert gave inconsistent testimony, holding that "defendant's arguments were more appropriate for cross-examination.")

merchants *when the rules do not prevent such competition.*" (*Id.* at 34.) They claim that Defendants' argument that the co-brand cards were not profitable cites to only "three tiny co-brand programs for companies that are not among the Target Plaintiffs" and is "irrelevant as a matter of law." (*Id.*)

Professor Harris's opinions about the co-brand transaction price are admissible. As the Target Plaintiffs argue, Professor Harris does not claim that Visa and Mastercard could or should charge the co-brand merchant rate to *all* merchants. (*See* Harris Reply Rep. ¶ 556.) Rather, he notes that a form of competition exists with regard to co-brand deals that does not exist in Visa and Mastercard's business more generally: certain merchants "are able to generate some competition among issuers to drive a negotiated price for the use of the merchant's brand." (*Id.*) Under this scenario of limited merchant-side competition, the price to the co-merchant is significantly lower than the normal merchant price, the cardholder price does not rise, and "the total 'single price' on in-store co-branded card transaction is typically much lower than the single price for non-co-branded card transactions." (*Id.*) Defendants argue that "if the lower interchange that [Professor Harris] cites as a 'competitive' rate is not representative of what would apply market-wide in a but-for world, it is irrelevant." (Harris Excl. Reply 10.) Because the effect of merchant-side competition on the transaction price is a major issue in this case, however, a situation in which increased merchant-side competition is associated with a different total price is relevant evidence. *See Figueroa v. Bos. Sci. Corp.*, 254 F. Supp. 2d 361, 366 (S.D.N.Y. 2003) (stating that an expert will be permitted to testify if his testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue"). Defendants, in turn, may present evidence that increased merchant-side competition would *not* drive down the market-wide transaction price in the but-for world. This includes evidence that some co-brand

cards were not profitable for the issuers and that the co-brand prices could not be applied to all
merchants without driving up the cardholder price. (*See* Harris Excl. Reply 16.)

Defendants cite to *Maxon Hyundai Mazda v. Carfax, Inc.*, but that case is distinguishable.
(Harris Excl. Reply 10.) In *Carfax*, the plaintiffs alleged that the defendants, a provider of
Vehicle History Reports (VHRs), had violated the Sherman Act. 726 F. App'x 66, 67 (2d Cir.
2018). The Second Circuit affirmed summary judgment against the plaintiffs, holding that while
the plaintiffs could "show 'harm to competition by proving higher prices . . . *in the market as a
whole*,'" they had "adduce[d] evidence demonstrating only that prices increased for VHRs sold
by [the defendant] to franchise dealers in 2010–12." *Id.* at 69. The question here is not whether
the Target Plaintiffs have proved higher prices in the credit-card market as a whole sufficient to
defeat summary judgment. Rather, the inquiry is whether the transaction rate applicable to co-
brand cards is relevant expert evidence of supracompetitive transaction prices. The Court finds
that it is.

#### iv. Merchant pass-through

Defendants challenge Professor Harris's claim that "because merchants 'pass through'
interchange fees to their retail customers, lower interchange would have meant lower retail
prices, higher retail sales, and therefore higher 'output' in the but-for world." (Harris Excl.
Mem. at 16.) First, they argue that this analysis is improper "because credit and debit transaction
volume, not all retail sales, are the appropriate measures of output in the markets that Plaintiffs
allege." (*Id.* at 16.) Defendants argue that Professor Harris cannot assume that higher retail
sales would mean a greater number of credit and debit transactions, and that if the reduction in
retail prices were smaller than a reduction in credit card rewards, the resulting net price increase
to cardholders "could . . . result in *decreased* card transaction output." (Harris Excl. Reply at 12

71

(emphasis added).)  Second, they argue that Professor Harris fails to support this claim with empirical analysis.  (Harris Excl. Mem. at 16–18.)  Professor Harris claims that "analyzing merchant pass-through is not 'possible,'" but Defendants argue that "'[i]mpossibility' is not a reason to allow pure speculation to go to the jury."  (*Id.* at 18.)  Defendants also point to Target Plaintiffs' expert Dr. McAfee, who testified that it is "possible to empirically measure the relationship between interchange and prices."  (*Id.* at 18.)  Third, Defendants argue that the "economic studies" and "legal and regulatory interventions" cited by Professor Harris fail to support his conclusion.  (*Id.* at 18–20; Harris Excl. Reply 15 & n.15.)

In response to Defendants' argument that Professor Harris's analysis should be rejected because retail sales are the wrong measure of output, the Target Plaintiffs argue that Professor Harris "explains that in a world absent the competitive restraints, lower merchant payment acceptance fees would have been passed through in the form of lower retail prices, leading to higher retail sales and thus a greater number of credit and debit transactions."  (Harris Excl. Opp'n at 37.)  The Target Plaintiffs also respond to Defendants' argument that Professor Harris was required to support his claim with an empirical analysis, citing to case law holding that experts can rely on others' studies in lieu of conducting their own.  (*Id.* at 40–42.)  They also claim that Dr. McAfee never "opined that it is necessary to empirically test the degree to which merchants pass through changes in interchange fees to merchandise price," pointing to a recent declaration by Dr. McAfee.  (*Id.* at 42–43.)  Finally, the Target Plaintiffs argue that Professor Harris supported his conclusion with relevant sources and that Defendants' arguments to the contrary "go to weight, not admissibility."  (*Id.* at 40.)

## 1. Unit of output

Professor Harris's assumption that higher total retail sales will yield higher credit and debit transaction volume does not render his opinion unreliable. Defendants argue that "[i]n a but-for world with lower retail prices, higher retail sales could have been the result of greater cash purchases, or greater debit but not credit purchases." (Harris Excl. Reply 12.) However, Professor Harris's assumption that retail sales in the but-for world would maintain the same proportion of payment forms is an assumption that Defendants may challenge on cross-examination. *See Zerega Ave.*, 571 F.3d at 214 (unless expert testimony is based on assumptions that are "so unrealistic and contradictory as to suggest bad faith" or to be "an apples and oranges comparison," "contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony" (quoting *Boucher*, 73 F.3d at 21)). Defendants also point to Professor Harris's testimony that "[r]ewards could go down in the but-for world" and argue that if so, "the effective retail price to credit cardholders may well *increase*," resulting in "decreased card transaction output." (Harris Excl. Reply at 12.) Given Professor Harris's opinion that issuers would be able and incentivized not to raise cardholder prices, however, (*see, e.g.*, Harris Rep ¶ 1090; Harris Reply Rep. ¶¶ 559, 808, 816), his assumption that there would not be decreased transaction output caused by decreased card rewards in the but-for world is not so unreliable as to be inadmissible.

Defendants cite to *Spinelli v. National Football League*, but that case is distinguishable. (Harris Excl. Mem. 16.) In *Spinelli*, plaintiffs sports photographers alleged that defendants National Football League (NFL) and Associated Press "conspired to restrain trade in the market for commercial licenses of NFL event photographs." *Spinelli v. Nat'l Football League*, 903 F.3d 185, 192 (2d Cir. 2018). The plaintiffs alleged that the conspiracy had "substantially reduced the

73

output of stock photography for NFL events," but their claim was dismissed. *Id.* at 212. On appeal, the Second Circuit noted that "the relevant market, as [the p]laintiffs define it, is the market for *commercial licenses* of NFL photographs." *Id.* Even if the plaintiffs plausibly alleged that there were fewer photographs taken of NFL events, "those allegations say nothing about the market for licenses of such photographs because, among other reasons, the pool of photographers, no matter its size, still captures the entirety of each event, and multiple commercial licenses can attach to each photograph taken." *Id.* In *Spinelli*, the plaintiffs failed to allege decreased output in the relevant market, and there was no obvious relationship between the reduced output alleged by the plaintiffs and reduced output in the relevant market. Professor Harris claims that there is decreased output in the market for payment card transactions based on the reasonable assumption that decreased output of overall retail transactions will entail decreased output of one type of retail transactions. The Court finds that this opinion is sufficiently reliable for admission.

## 2. Empirical analysis

The Court does not exclude Professor Harris's opinion on the basis that he failed to perform the requisite empirical analysis. Professor Harris's discussion of merchant pass-through cites to depositions with Plaintiffs, a U.K. Office of Fair Trading study, studies analyzing merchant pass-through of tax increases, a review of card payments regulation by the Reserve Bank of Australia, a 2005 decision by the Office of Fair Trading, and testimony by Mastercard in a 2016 U.K. suit. (Harris Rep. ¶¶ 888–900.) "Experts need not conduct studies of their own in order to opine on a topic; a review of other studies and scientific literature can be enough to qualify experts to testify and to make that proposed testimony reliable." *In re Mirena*, 169 F.

74

Supp. 3d at 412. Professor Harris's opinion is based on "sufficient facts or data." Fed. R. Evid. 702(b).

Defendants claim that merchant pass-through is a matter on which Professor Harris must conduct an empirical analysis for his opinion to be admitted, but they do not cite to a case in which an expert's testimony was excluded because the expert failed to provide empirical pass-through analysis. (Harris Excl. Mem. 17). Rather, they cite to cases in which a lack of empirical analysis rendered an expert's opinion insufficient to preclude summary judgment or to certify a class. *See Major League Baseball Props., Inc*, 542 F.3d at 319 (on review of grant of summary judgment, holding that expert's vague declaration that lacked empirical support did not "create a genuine factual dispute"); *Procaps S.A. v. Patheon Inc.*, 141 F. Supp. 3d 1246, 1267–69 (S.D. Fla. 2015) (granting summary judgment where the plaintiff "did not quantify the actual competitive harm on *any* basis with any actual empirical evidence" and its expert "was unaware of any transactions where a customer was harmed, or any transaction where a customer could have been harmed"); *In re Fresh Del Monte Pineapples Antitrust Litig.*, No. 1:04-MD-1628, 2008 WL 5661873, \*9 (S.D.N.Y. Feb. 20, 2008) (declining to certify indirect purchaser class because the empirical analysis necessary to determine the pass-through rate to indirect purchasers "changes across time and location," such that "individual damages issues [would] predominate" and the case would be "unmanageable"); *In re Methionine Antitrust Litig.*, 204 F.R.D. 161, 1647–65 (N.D. Cal. 2001) (declining to certify indirect purchaser class where the plaintiff's expert could not show "that there is a reasonable method for determining on a class-wide basis whether and to what extent [the] overcharge was passed on to each of the . . . indirect purchasers at all levels of the distribution chain" and therefore the plaintiff had "not demonstrated that injury in fact—an element essential to prove liability—can reasonably be

proved on a class-wide basis"). Evaluated under the standard to exclude expert testimony, Professor Harris's testimony is admissible. *See Amorgianos*, 303 F.3d at 267 ("The judge should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions." (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 746)).

### 3. Testimony of Dr. McAfee

Defendants also make an argument based on the testimony of the Target Plaintiffs' expert Dr. McAfee. (*See* Expert Report of Dr. R. Preston McAfee ¶ 8 ("McAfee Rep."), annexed to Carney Decl. as DDX13, Docket Entry No. 8544-2.) In his deposition, Dr. McAfee stated that he "agree[d] that pass-through is an empirical matter." (Videotaped Dep. of Preston McAfee 124:1–5 ("McAfee Dep.") annexed to Wilson Declaration as Exhibit 23, Docket Entry No. 8511-2.) Dr. McAfee also indicated that according to an analysis he conducted of one of Professor Murphy's studies,[21] there is no "statistically significant relationship between interchange and retail prices." (*Id.* at 264:8–265:14.) Defendants argue that Dr. McAfee "says that an empirical analysis is necessary, performed such an analysis, and reached a conclusion contrary to Prof. Harris's unsupported opinion." (Harris Excl. Mem. 5.)

Dr. McAfee subsequently submitted a declaration responding to Defendants' argument. (Decl. of Dr. R. Preston McAfee ("McAfee Decl."), annexed to Wilson Decl. as Exhibit 22, Docket Entry No. 8511-2.) In his declaration, Dr. McAfee states:

> First, I did not opine that it is necessary to empirically test the degree to which merchants pass through changes in interchange fees to merchandise price. I only "agree[d] that pass-through is an empirical matter." In some situations, it is difficult to test an economic relationship directly, due, for example, to the nature of the

---

[21] Professor Kevin M. Murphy is an expert witness for Defendants. (Expert Report of Kevin M. Murphy ("Murphy Rep.") ¶ 2 n.1, annexed to Wilson Decl. as Ex. 1, Docket Entry No. 8501-1; *see also* Expert Report of Kevin M. Murphy, annexed to Olson Decl. as Ex. 1, Docket Entry No. 8488-1.)

available data or an inability to isolate the influence of a specific factor separately from others. In these situations, economists typically seek out other sources of relevant empirical information, such as real-world examples of empirical studies that assess analogous relationships. I understand this is the approach taken by [Professor] Harris. . . .

(*Id.* ¶ 8.) Dr. McAfee went on to state:

Third, I did not conclude that there is no positive, statistically significant relationship between interchange fees and retail price. I analyzed what could and could not be concluded from Prof. Murphy's empirical studies regarding the relationship between the price of merchandise and measures of credit card use and cost. In conducting this assessment, I adjusted one of Prof. Murphy's regression analyses so as to assess the impact of interchange fee cost on retail prices using a more reliable measure of stores' interchange fee costs than the one Prof. Murphy used. I found that issues inherent to Prof. Murphy's regression model mean that Prof. Murphy's regression model is statistically incapable of detecting an effect on grocery prices from interchange. . . .

Thus, contrary to Defendants' claim, the opinions I stated in my reply report and deposition do not contradict Professor Harris's opinions on this subject.

(*Id.* ¶¶ 10, 13.) The statements in Dr. McAfee's declaration are consistent with the transcript of his deposition. (McAfee Dep. 124:1–5, 263:15–265:14; *see also* McAfee Rep. ¶ 241.) Dr. McAfee's testimony does not provide a reason to exclude Professor Harris's testimony.

#### 4. Reliability of Professor Harris's sources

Professor Harris's sources are sufficiently reliable to support his merchant pass-through opinion. Defendants argue, first, that studies showing that retailers pass on the cost of taxes are insufficient to show that retailers pass on the cost of interchange, arguing that the connection between tax pass-through and interchange pass-through is speculative. (Harris Excl. Mem. 18–19.) They argue that "unlike the costs of accepting payment cards, taxes on cigarettes and alcohol do not provide merchants with incremental cigarette and alcohol sales," and further argue that "payment card acceptance — again, unlike taxes — can also make shoppers more elastic

consumers, which itself could result in merchants *lowering* their prices." (Harris Excl. Reply 13–14.) The Court concludes that Professor Harris's conclusion is based on sufficient facts and data. *See* Fed. R. Evid. 702(b); *Angiodynamics, Inc.*, 537 F. Supp. 3d at 337 (stating that "experts have wide latitude with respect to the data on which they rely, and challenges concerning the reliability of an expert's data often present questions of weight, rather than admissibility."). Defendants may attempt to distinguish the two on cross-examination.

Second, Defendants argue that the statements by the Reserve Bank of Australia and the U.K.'s Office of Fair Trading assume that interchange fees are passed through to retail customers "as a theoretical matter only," and perform "no empirical study to test that proposition." (Harris Excl. Mem. at 19–20.) As stated above, however, Defendants do not cite to a case holding that expert testimony regarding pass-through must rely on an empirical study to be admissible. In the absence of such a rule, the economic precepts employed by the Reserve Bank of Australia and the U.K.'s Office of Fair Trading are reliable bases for Professor Harris's opinion.

Finally, Defendants argue that testimony by Plaintiffs regarding pass-through is insufficient because "[c]ourts have specifically rejected this type of evidence as a replacement for an 'empirical demonstration' of actual anticompetitive effects," citing to *K.M.B. Warehouse Distributors, Inc. v. Walker Manufacturing Co.*, 61 F.3d 123 (2d Cir. 1995). (Harris Excl. Mem. at n.18.) *K.M.B.*, however, is distinguishable. In that case, the district court granted summary judgment to antitrust defendants, and the Second Circuit affirmed. *Id.* at 127. It agreed with the district court that the plaintiff had failed to show an adverse effect on competition:

> As Judge Sand noted, [the plaintiff] cannot show that "the impact on intrabrand competition was anything but *de minimis*." [The plaintiff's] proof on this point consists almost entirely of affidavits from twelve of its current customers stating that they prefer both [the defendant's] products and [the plaintiff's] superior service. Such isolated statements of preference are not a sufficient

> "empirical demonstration concerning the [adverse] effects of the
> [defendants'] arrangements on price or quality," to state a § 1
> claim.

*Id.* at 128 (citations omitted). The fact that testimony about customer preference was insufficient

to survive summary judgment says little about whether testimony from merchants about pass-

through, in combination with other forms of evidence, is a sufficiently reliable basis for expert

testimony. Defendants acknowledge that Professor Harris, unlike the plaintiffs in *K.M.B.*, "relies

on evidence other than" the statements of market participants, but argue that "that other evidence

does not include an empirical analysis of market pass-through of interchange." (Harris Excl.

Reply n.15.) However, as discussed above, Defendants cite to no rule that an expert opining as

to interchange pass-through must perform or cite to an empirical analysis of interchange pass-

through for his opinion to be admissible. In the absence of such a rule, the Court finds that the

testimony from Plaintiffs regarding pass-through is a reliable basis for Professor Harris's

opinion.

### v. Conclusion

The Court grants Defendants' motion as to Professor Harris's one-sided market definition

analysis and otherwise denies Defendants' motion to exclude his testimony.

### d. Motion to exclude in part the Section 1 opinions of Professor Jerry Hausman

Defendants move to exclude in part the Section 1 opinions of Professor Jerry Hausman,

an expert witness for the 7-Eleven Plaintiffs and The Home Depot. (Hausman Section 1 Mot.;

*see* Expert Report of Professor Jerry Hausman ("Hausman Rep.") ¶ 10, annexed to Carney Decl.

as Ex. DDX5, Docket Entry No. 8544-1.)

### i. Professor Hausman's background and expert report

Professor Hausman is a professor of economics at the Massachusetts Institute of

Technology. (Hausman Rep. ¶ 1.) He has previously published on antitrust issues and testified

in antitrust proceedings. (*Id.* ¶¶ 3–4.) Professor Hausman was asked "to assess the competitive

effects of certain Visa and MasterCard rules, policies, and practices." (*Id.* ¶ 10.) These "rules,

policies and practices" include the HAC rules as well as Visa and Mastercard's "practice of

establishing 'default' interchange schedules, 'no-bypass' rules and practices, and various other

restrictions on steering by merchants at the point of sale ('POS')." (*Id.*) His report discusses

background information about the payment card industry, (*id.* ¶¶ 40–128); market definition, (*id.*

¶¶ 129–72); market power, (*id.* ¶¶ 174–279); the competitive impact of the HAC rules, (*id.* ¶¶

280–470); Visa and Mastercard's other "anti-steering rules," (*id.* ¶¶ 471–89); and damages

calculations, (*id.* ¶¶ 608–89).[22] He concludes:

> that Visa and Mastercard each has substantial market power from
> their ability, through their respective HAC rules, to maintain and
> manage cartels involving virtually all the banks that issue credit and
> debit cards in the United States. That horizontal restraint on
> competition has eliminated issuer competition for merchant
> acceptance, resulting in supra-competitive fees to merchants and for
> the price of transactions overall. Visa's and Mastercard's market
> power also is evident from their ability to suppress innovative forms
> of payment, and from the manner in which they forced the payment
> card industry to migrate to chip-based transactions ("EMV").

(*Id.* ¶ 11.)

Professor Hausman also submitted a reply expert report responding to criticisms of his

initial report. (Reply Expert Report of Prof. Jerry Hausman ("Hausman Reply Rep."), annexed

to Carney Decl. as Ex. DDX6, Docket Entry No. 8544-1.))

### ii. Market definition, transaction price, and damages analysis as one-sided

Defendants argue that Professor Hausman's market definition, analysis of

supracompetitive prices, and damages calculation fail to "conduct the two-sided analysis"

---

[22] This summary only mentions those portions of Professor Hausman's report that are
relevant to the motion analyzed in this Memorandum and Order.

required under *Amex*.   (Defs.' Mem. in Supp. of Mot. to Excl. in Part Section 1 Opinions of

Prof. Jerry Hausman 5–11 ("Hausman Section 1 Excl. Mem."), Docket Entry No. 8083.)

### 1.   Market definition

The Court excludes Professor Hausman's one-sided product markets, but does not

exclude his "alternative" markets for credit card transactions and debit card transactions.

Defendants argue that Professor Hausman "misstates the law by asserting that using one-

sided market definitions in these cases would be 'appropriate.'"   (Hausman Section 1 Excl.

Mem. 6.) They claim that the opposition memorandum "concede[s]" that this opinion is

"contrary to law."   (Reply in Supp. of Mot. to Excl. in Part Section 1 Opinions of Prof. Jerry

Hausman 2 ("Hausman Section 1 Excl. Reply"), Docket Entry No. 8128.)

The 7-Eleven Plaintiffs, The Home Depot, and Elgin respond that Defendants "cite only

two introductory paragraphs" in support of their argument while "omitting references to over

[twenty] pages" in which Professor Hausman "sets forth the bases for his opinions that the

relevant markets are two-sided."   (Mem. in Opp'n to Mot. to Excl. in Part Section 1 Opinions of

Prof. Jerry Hausman 13 ("Hausman Section 1 Excl. Opp'n"), Docket Entry No. 8223.)  They

acknowledge that Professor Hausman "also defined alternative one-sided markets" in his report,

but explain that "the Second Circuit held that *Amex* requires transaction markets to be analyzed

as two-sided markets as a matter of law" *after* Professor Hausman submitted his report.  (*Id.* at

13 n.18.)  "None of Professor Hausman's opinions requires the use of those alternative one-sided

markets, and Plaintiffs now proceed only under a two-sided market definition."  (*Id.*)

Professor Hausman opines in his report that there are "four relevant product markets: (1)

general purpose credit and charge card issuing; (2) general purpose debit card issuing; (3)

general purpose credit/charge card network services to merchants; and (4) general purpose debit

network services to merchants." (Hausman Rep. ¶ 142.) In the alternative, "[t]he relevant product markets in this matter can . . . be analyzed as single transaction markets: (1) the market for general purpose credit and charge card transactions; and (2) the market for general purpose debit card transactions." (*Id.* ¶ 144.) Professor Hausman states that his conclusions about market power and competitive effects "are the same under both approaches." (*Id.*)

For the reasons described above with regard to Professor Harris's market definition, Professor Hausman's one-sided product markets — general purpose credit and charge card issuing, general purpose debit card issuing, general purpose credit/charge card network services to merchants, and general purpose debit network services to merchants — are contrary to *Amex*. The Court therefore excludes Professor Hausman's opinions about these one-sided markets. His "alternative" transaction markets for credit and charge card transactions and debit card transactions are properly two-sided and are not excluded.

## 2. Supracompetitive prices

Defendants argue that Professor Hausman fails to calculate competitive two-sided transaction prices for the credit and debit transaction markets and that his other arguments purporting to show that transaction prices are supracompetitive are flawed. (Hausman Section 1 Excl. Mem. 7.)

### A. Transaction price analysis

Professor Hausman's opinions about supracompetitive transaction prices are admissible.

Defendants argue that Professor Hausman fails to calculate competitive net transaction prices either for "his asserted credit or debit transaction markets" or for "the specific credit card products that he labels supra-competitively priced." (*Id.*) They argue that it is not enough for Professor Hausman to calculate a competitive merchant-side price and to conclude that, because

rewards would not change in the but-for world, the cardholder price would not change either. (Hausman Section 1 Excl. Reply 3.) Defendants also argue that because the price to the cardholder of either a credit or a debit card consists of more than just rewards, Professor Hausman's "cardholder-side analysis of transaction prices that looks only at rewards is inadequate." (*Id.*) They note that the cardholder price also includes "finance charges on revolving account balances," "the 'free float' benefit that cardholders receive," and "non-reward card benefits," arguing that Professor Hausman has done no analysis to show that finance charges would stay the same and even "acknowledges that issuers might respond in his but-for worlds by adjusting amounts other than rewards paid to cardholders." (*Id.* at 3–4.) Further, Defendants argue, Professor Hausman "has no reliable basis for asserting that the value of rewards in his but-for worlds 'likely would remain comparable to current levels'" because he failed to analyze whether, in his but-for worlds beginning in the late 1990s, "premium reward cards would have developed at all or to the extent they did in the real world." (*Id.* at 5.) At his deposition, Professor Hausman "conceded that he did not think Visa would have even been able to launch premium rewards cards in his but-for worlds without the Honor-All-Cards rules." (*Id.*)

The 7-Eleven Plaintiffs, The Home Depot, and Elgin argue, first, that "the law does not require the calculation of competitive but-for pricing to prove *liability*." (Hausman Section 1 Excl. Opp'n 16.) Second, they argue that Professor Hausman "calculates what merchant-side interchange and network-fee pricing would be under competition" and "also explains why the cardholder-side price will be the same," such that "[a]dding both sides' prices together yields a 'competitive net transaction price.'" (*Id.* at 17.)

The Court does not exclude Professor Hausman's opinions about supracompetitive transaction prices for failing to calculate a competitive two-sided transaction price. *Amex* holds

that "[e]vidence of a price increase on one side of a two-sided transaction platform cannot by itself demonstrate an anticompetitive exercise of market power," 138 S. Ct. at 2287, and *US Airways* holds that "prices [are] supracompetitive only to the extent that the net prices charged to [one side] and [the other side] *combined* exceed[] the prices that would have been charged in a competitive market," 938 F.3d at 59. Neither, however, states that in order for his opinions to be admissible an individual expert must specifically calculate a two-sided transaction price.

Nor does the Court exclude Professor Hausman's opinions as to supracompetitive transaction pricing for failure to more thoroughly analyze non-reward elements of the cardholder price. The assumption that these elements will stay constant is not "'so unrealistic and contradictory as to suggest bad faith' or to be in essence 'an apples and oranges comparison.'" *Zerega Ave.*, 571 F.3d at 214 (quoting *Boucher*, 73 F.3d at 21). In particular, Professor Hausman's reply report acknowledges that banks in the but-for world might decrease the "bounties" they offer on new cardholder sign-ups "while continuing to offer significant rewards." (Hausman Reply Rep. ¶ 68; Hausman Section 1 Excl. Reply 4; *see also* Videotaped Dep. of Jerry Hausman ("Hausman Dep.") 64:6–11, annexed to Carney Decl. as Ex. DDX25, Docket Entry No. 8544-4 (acknowledging that "the sign-up bonuses would be less" if the interchange rates on commercial cards were lower).) The Court accepts Professor Hausman's assumption that elimination of these "bounties" would not have a significant effect on the two-sided transaction price, although Defendants may of course challenge this assumption on cross-examination. *See Amorgianos*, 303 F.3d at 267 (stating that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence" (quoting *Daubert*, 509 U.S. at 596)). With regard to finance charge rates, Professor Hausman notes that an analysis

of the impact of lower interchange on finance charge rates must "take into account the effect of . . . competition" and that "the interest rate gap has gone up even though interchange has increased," although he also acknowledges that he has not analyzed the effect of reduced interchange rates on finance charge rates in the U.K. (Hausman Dep. 152:3–153:8.) While Professor Hausman's opinion might be more convincing if he had conducted a more thorough analysis of the effect of reduced interchange on finance charge rates, the Court finds that his analysis is not so insufficient as to be unreliable. *See Olin Corp. v. Certain Underwriters at Lloyd's London*, 468 F.3d 120, 134 (2d Cir. 2006) ("[Cross-examination] is an appropriate way of attacking weak expert testimony, rather than complete exclusion.").

Nor does the Court exclude Professor Hausman's opinions on supracompetitive transaction prices for failing to consider the absence of premium rewards cards in the but-for world. Professor Hausman testified that Visa likely would not have been able to launch its premium rewards cards in the but-for world, (Hausman Dep. 375:2–379:12), and that he did not know if reduced interchange would affect the rewards offered on commercial cards, (*id.* at 64:6–13). The Court agrees with Defendants that this is potentially inconsistent with Professor Hausman's opinion in his reply report that "the value of rewards in the [but-for world] likely would remain comparable to current levels." (Hausman Reply Rep. ¶ 68.) Notably, however, the fact that Visa may find it difficult in the but-for world to persuade merchants to accept the higher interchange rates on premium rewards cards does not mean that its *overall* rewards to cardholders would necessarily be lower in the but-for world, particularly given Professor Hausman's opinion that issuers in the but-for world would be able to offer the same level of rewards from their "substantial financing revenue." (*Id.*) The Court does not exclude Professor Hausman's opinions on supracompetitive transaction prices due to his failure to analyze the

absence of premium rewards cards, although Defendants may question Professor Hausman about premium rewards cards on cross-examination. *See Advanced Fiber Techs. Trust v. J & L Fiber Servs., Inc.*, No. 7-CV-1191, 2010 WL 1930569, at *6 (N.D.N.Y. May 11, 2010) ("Any perceived inconsistencies should be addressed through cross-examination, and it is for the jury to decide the relative weight his testimony should be given.")

### B. Pass-through analysis

Professor Hausman's issuer pass-through analysis is admissible.

Professor Hausman calculates the amount of interchange revenue that is passed through to cardholders, but Defendants argue that "the Supreme Court and Second Circuit rejected just this sort of total 'pass-through' calculation as evidence of supra-competitive prices" in *Amex.* (Hausman Section 1 Excl. Mem. at 8.) They contest the opposition memorandum's distinction between total and incremental pass-through by pointing, first, to testimony from *Amex*, in which an expert for the plaintiffs testified that "rewards payments are well less than half of the discount rates, significantly less." Joint Appendix at *231, *Ohio v. Am. Express Co.*, No. 16-1454, 2017 WL 6206252 (Dec. 7, 2017); (*see* Hausman Section 1 Excl. Reply 7 n.8.) Second, Defendants cite to the *Amex* plaintiffs' brief to the Second Circuit, which noted the trial court's holding that Amex's anti-steering provisions "were 'integral' to the success of its Value Recapture price increases, which 'were not wholly offset by additional rewards expenditures or otherwise passed through to cardholders, and resulted in a higher net price." Redacted Final Form Brief of Plaintiffs-Appellees, No. 15-1672, 2015 WL 6449244, *76–77. Third, they cite to the Second Circuit's holding that "[a] finding that not every dime of merchant fees is passed along to cardholders says nothing about other expenses that Amex faces, let alone whether its profit margin is abnormally high." *Am. Express Co.*, 838 F.3d at 205.

86

The 7-Eleven Plaintiffs, The Home Depot, and Elgin argue that Defendants "misstat[e]" *Amex* "as having rejected the 'sort of total "pass-through" calculation' presented by Professor Hausman." (Hausman Section 1 Excl. Opp'n 15.) They claim that "[i]n *Amex*, the Second Circuit rejected an economic analysis that focused only on whether certain *incremental increases* in merchant fees were passed along to cardholders," while Professor Hausman "analyzes *total* two-sided transaction prices in both credit and debit, finding them surpacompetitive." (*Id.*)

In the Second Circuit *Amex* decision, the Second Circuit noted that Amex's "price increases were not wholly offset by additional rewards expenditures or otherwise passed through to cardholders." *Am. Express Co.*, 838 F.3d at 205. Despite this, the Court found that

> "the evidentiary record does not include a reliable measure of the two-sided price charged by American Express that correctly or appropriately accounts for the network's expenses on the cardholder side of the platform." A finding that not every dime of merchant fees is passed along to cardholders says nothing about other expenses that Amex faces, let alone whether its profit margin is abnormally high.

*Id.* (citations omitted).

The Supreme Court *Amex* opinion, in turn, observed that the plaintiffs had offered "evidence that Amex increased the percentage of the purchase price that it charges merchants by an average of 0.09% between 2005 and 2010 and that this increase was not entirely spent on cardholder rewards." 138 S. Ct. at 2888. The Supreme Court noted that:

> [e]ven assuming the plaintiffs are correct, this evidence does not prove that Amex's antisteering provisions gave it the power to charge anticompetitive prices. "Market power is the ability to raise price profitably *by restricting output*." This Court will not "infer competitive injury from price and output data absent some evidence that tends to prove that output was restricted or prices were above a competitive level." There is no such evidence in this case.

*Id.* (citations omitted).

Professor Hausman's analysis does not contradict this caselaw. First, just as *Amex* does not impose an admissibility standard requiring experts to calculate two-sided transaction prices, it also does not impose an admissibility standard requiring experts to prove supracompetitive prices to the standard necessary to prevail at trial. The standard for admissibility does not require that the expert's evidence, without more, meet the burden of proof. *Compare Daubert*, 509 U.S. at 598 (explaining that the trial judge must "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand") *with Ross v. American Exp. Co.*, 35 F. Supp. 3d 407, 437 (S.D.N.Y. 2014) (stating that to succeed on a claim under Section 1 of the Sherman Act, the plaintiffs "must prove by a preponderance of the evidence '(1) a combination or some form of concerted action between at least two legally distinct economic entities that (2) unreasonably restrains trade" (quoting *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 506 (2d Cir. 2004))).

Second, the Second Circuit and Supreme Court *Amex* decisions hold that evidence of incomplete pass-through, *without more*, is insufficient to establish supracompetitive pricing. Professor Hausman does not claim that his pass-through analysis alone establishes that transaction prices are supracompetitive; rather, he opines that "this low average pass-through rate provides significant evidence that the Visa and Mastercard issuing banks exercise substantial market power when the market is examined through a two-sided lens." (Hausman Rep. ¶ 233.) Further, his report also cites to forms of evidence that the Second Circuit and Supreme Court noted were missing in *Amex* — evidence that the defendant's "profit margin is abnormally high," 838 F.3d at 205, (*see* Hausman Rep. ¶ 243; Hausman Reply Rep. ¶ 9) and "evidence that tends to prove that output was restricted," 138 S. Ct. at 2888, (*see* Hausman Rep. ¶¶ 429–436) — as well other evidence supporting an inference of supracompetitive pricing, (*id.* ¶¶ 187–193 (evidence

that the networks disregard cost when setting price), ¶¶ 184–222 (evidence of sustained

interchange and network fee increases to merchants without losing merchant acceptance), ¶¶

240–241 (opinion that American Express and Discover have not constrained Visa's and

Mastercard's pricing), ¶ 242 ("limited examples of merchant deals in the actual world that, to

some degree, reflect Visa and Mastercard competing for acceptance").)

### C. Network profitability

Professor Hausman's network profitability analysis is admissible.

Defendants argue that Professor Hausman "characterizes Visa's and Mastercard's 'profit

margins' as 'high,'" but "provides no analysis of why this would indicate supra-competitive net

transaction prices." (Hausman Section 1 Excl. Mem. 8.) In particular, they argue that Professor

Hausman fails to "account for the networks' fixed and sunk costs," which renders his opinion

insufficient to show market power under Second Circuit precedent. (*Id.*) Defendants further

argue that this failure to consider sunk costs also renders unreliable "Professor Hausman's

supposed 'analysis' showing that Visa's and Mastercard's 'two-sided network fees' have risen

'while their costs have been declining.'" (Hausman Section 1 Excl. Reply 8.)

The 7-Eleven Plaintiffs, The Home Depot, and Elgin argue in response that Professor

Hausman was correct to ignore sunk costs because "[i]t is wrong as a matter of economics to

consider sunk costs," and that "because Professor Hausman compares all networks' operating

margins, which exclude fixed costs for all networks, he compares like with like." (Hausman

Section 1 Excl. Opp'n 16 n.19.)

As Defendants argue, Plaintiffs fail to properly support their claim that "it is wrong as a

matter of economics to consider sunk costs." (Hausman Section 1 Excl. Reply 7.) Plaintiffs cite

to a section of Professor Hausman's deposition in which, in the context of comparing e-

commerce in China and the United States, he invokes "the sunk cost fallacy that because the costs are sunk, you don't want to improve things." (Hausman Dep. 486:1–487:13.) The sunk cost fallacy is unrelated to whether it is economically proper to consider sunk costs when analyzing network profitability.

However, the Court does not exclude Professor Hausman's opinion that high network profits indicate supracompetitive transaction prices. Defendants argue that Professor Hausman "provides no analysis of why [high network profits] would indicate supra-competitive net transaction prices," but the inference — that high profits indicate pricing substantially above costs — is obvious. (Hausman Section 1 Excl. Mem. 8.) Further, network profit margins were mentioned by the Second Circuit in *Amex* as relevant to supracompetitive transaction pricing. *See Am. Express Co.*, 838 F.3d at 205 ("A finding that not every dime of merchant fees is passed along to cardholders says nothing about other expenses that Amex faces, let alone whether its profit margin is abnormally high.").

Nor does the Court exclude Professor Hausman's opinions for failure to consider fixed and sunk costs. Professor Hausman assumes that Visa and Mastercard's fixed and sunk costs are not so high that supracompetitive profits cannot be inferred from their high profits. (*See* Hausman Reply Rep. ¶ 9.) Similarly, he assumes that Visa and Mastercard's fixed and sunk costs are not so high that supracompetitive profits cannot be inferred from their rising two-sided network fees and declining per-transaction costs. (*See* Hausman Rep. ¶ 216.) Defendants may challenge these assumptions on cross-examination, but they are not "so unrealistic and contradictory so as to suggest bad faith." *Zerega Ave.*, 571 F.3d at 214.

Defendants cite to *U.S. v. Eastman Kodak Co.* to argue that evidence of profits that does not include sunk costs does not support an inference of market power, but that case is

distinguishable. (Hausman Section 1 Excl. Mem. 8) *Eastman Kodak* concerned an appeal of the

district court's decision to terminate two antitrust consent decrees. 63 F.3d 95, 97 (2d Cir.

1995). The government argued that the defendant had market power in the United States

because its "short-run marginal costs equal one-half of the product's sales price." *Id.* at 108–09.

The Second Circuit held that even if this was true, it did not "necessarily follow[] that [the

defendant] is earning monopolistic profits" because "[c]ertain deviations between marginal cost

and price, such as those resulting from high fixed costs, are not evidence of market power." *Id.*

at 109. The court noted that "overwhelming evidence" showed that the defendant's business was

"subject to enormous expenses that [were] not reflected in its short-run marginal costs," and

concluded that "[e]ven if the government's evidence in this regard supported an inference of

market power . . . it certainly did not compel such an inference." *Id.* The discussion did not

concern admissibility of expert testimony, but rather was about whether the defendant possessed

market power in the United States, as part of a larger evaluation of whether the district court had

abused its discretion by terminating the consent decrees. *See id.* at 108–09. The admission of

Professor Hausman's opinions does not implicate the ruling in *Eastman Kodak.*

### D. Issuer profitability

Professor Hausman's issuer profitability analysis is admissible.

Defendants claim that Professor Hausman cannot rely on Dr. Kohler's calculations of

issuer profitability to show that prices are supracompetitive because he "does not have a

methodological basis for using evidence of issuer profitability from card programs overall to

conclude that interchange fees on Visa or Mastercard transactions are supra-competitive."

(Hausman Section 1 Excl. Mem. 9.) They also argue that Professor Hausman also offered

91

"several personal anecdotes" about issuer profitability at his deposition, which is "not a reliable expert methodology." (*Id.* at 9–10 & n.5.)

The 7-Eleven Plaintiffs, The Home Depot, and Elgin do not appear to respond to Defendants' argument about issuer profitability. (*See* Hausman Section 1 Excl. Opp'n; Hausman Section 1 Excl. Reply 8 ("Plaintiffs say nothing in defense of Professor Hausman's reliance on issuer profitability to claim that net transaction prices are supra-competitive."))

Defendants' argument to exclude Professor Hausman's opinion about issuer profitability is similar to their argument to exclude Professor Harris's opinion about issuer profitability, addressed above: Defendants claim that "issuer profits derive from multiple sources of revenue that have no connection to the challenged rules," (Harris Excl. Mem. 14), and that the experts fail "to isolate the impact of interchange on issuer profits, as distinct from other sources of issuer revenue like interest charges and late fees." (Hausman Section 1 Excl. Mem. 9.) Both experts' opinions that issuer profitability is evidence of supracompetitive prices are admissible, although Defendants may challenge these opinions by introducing evidence that issuers' profitability is due to income sources other than merchant fees. *See Dial Corp.*, 165 F. Supp. 3d at 42 ("Where, as here, [the expert's] methodologies are not clearly unsound or unreasonable, the Court declines to exclude his testimony on a *Daubert* motion."); *Ambrosini*, 101 F.3d at 133–35 (holding that "the fact that several possible causes might remain 'uneliminated' " goes to the weight rather than the admissibility of the expert's testimony) (citing *Mendes–Silva v. United States,* 980 F.2d 1482 (D.C. Cir. 1993)).

Defendants also point to Professor Hausman's comments at his deposition that it is possible to find evidence of issuer profitability by going online and seeing banks offering high sign-up bonuses, arguing that "personal anecdotes are not a reliable expert methodology."

(Hausman Section 1 Mem 9 n.5 (citing Hausman Dep. 59:13–62:23, 223:9–225:7)).  Defendants

correctly argue that personal anecdotes are not a reliable basis for an expert opinion.  *See Berk v.*

*St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 354 ("An anecdotal account of one

expert's experience, however extensive or impressive the numbers it encompasses, does not by

itself equate to a methodology."); *Playtex Prods., Inc. v. Procter & Gamble Co.*, No. 2-CV-8046,

2003 WL 21242769, at \*10 (S.D.N.Y. May 28, 2003) (stating that expert's conclusions "founded

solely on 'anecdotal evidence' are unreliable and are not based on scientific knowledge").  In

addition to the challenged testimony, Professor Hausman's reports refer to "[b]ounties to new

cardholders such as signing bonuses," (Hausman Rep. ¶ 342), and claim that these bounties are

"economic evidence that there are sufficient cartel profits to justify the bounties," (Hausman

Reply Rep. ¶ 68).  Defendants do not challenge the existence of these bounties, and in fact argue

that Professor Hausman fails to properly consider the effect of the elimination of said bounties

on the cardholder-side price.  (*See* Hausman Section 1 Excl. Reply 4.)  Professor Hausman is not

precluded from testifying that bounties to new cardholders are evidence of issuer profitability,

but he may not support this argument with personal anecdotes.

### 3.  Damages calculations

Professor Hausman's damages calculations are admissible.

Defendants argue that Professor Hausman's damages calculations are "deficient"

because, first, "he equates damages to what he believes were the inflated fees to merchant-

Plaintiffs without incorporating any reduction for increased cardholder costs or lower cardholder

benefits."  (Hausman Section 1 Excl. Mem. 1–2.)  Second, they cite to Professor Hausman's

testimony that "damages 'are the same using either [a one-sided or two-sided] market definition"

for both credit and debit transactions."  (*Id.* at 10.)  They argue that in *US Airways*, the Second

Circuit "held that it was error to conclude that damages were the same for a one-sided market and also a two-sided market when fees were charged and incentives paid on both sides of the market." (*Id.*)

In response, the 7-Eleven Plaintiffs, The Home Depot, and Elgin point to Professor Hausman's conclusion that in a competitive market Visa and Mastercard issuers would have continued to fund rewards, arguing that there is therefore "nothing to offset" in Professor Hausman's calculated damages. (Hausman Section 1 Excl. Opp'n 20–21.) They further argue that the Second Circuit's holding in *US Airways* relied on a "factual premise" — "that a reduction in payments on one side of the market would necessarily reduce incentives on the other" — that does not exist here. (*Id.* at 22.)

The Court does not exclude Professor Hausman's damages calculations. Like Professor Harris, Professor Hausman opines that rewards would not decrease in the but-for world. (Hausman Reply Rep. ¶¶ 68, 825; *see* Harris Rep. ¶¶ 843–846, 946–947.) Professor Hausman's damages calculations are therefore consistent with his other opinions. As described above in the discussion of the two-sided transaction price, Professor Hausman also assumes that other changes on the cardholder side of the price would not be sufficiently significant to affect damages; Defendants may challenge this assumption on cross-examination or with their own expert testimony. Finally, as is the case with Professor Harris, Professor Hausman's opinions do not contradict *US Airways*. Defendants argue that "the only factual distinction" between this situation and that in *US Airways* is that "by the time of trial, the plaintiffs' experts in [*US Airways*] had performed the two-sided analysis that, as discussed above, Professor Hausman failed to perform here." (Hausman Section 1 Excl. Reply 9.) In *US Airways*, however, the plaintiffs' experts themselves conceded that the payments to travel agents would be different in

Case 1:05-cv-03817-NKB-MS Document 1987-27 Filed 10/07/22 Page 95 of 130 PageID #: 2504
Case 1:05-cv-03817-NKB-MS Document 1987-27 Filed 10/26/22 Page 95 of 130 PageID #: 2504
496149

the real and but-for worlds, while Professor Hausman makes no such concession. *US Airways*, 938 F.3d at 59. Defendants argue that this is due to Professor Hausman's failure to properly calculate the two-sided transaction price, but, as described above, they may make these arguments at trial.

### iii. Market-wide competition

Professor Hausman's opinions about supracompetitive prices are admissible even though he does not definitively prove that transaction fees would be higher in the market as a whole.

Defendants argue that "[t]o demonstrate harm to competition based on supra-competitive prices, Plaintiffs must 'prov[e] higher prices . . . *in the market as a whole*.'" (Hausman Section 1 Excl. Mem. 11.) They argue that Professor Hausman, however, "presents an opinion on differences in transaction fees for approximately 65 merchants in his but-for worlds," all of them "category-influential" or at least "large or medium-sized," and "concedes that he has not 'proved an opinion as to the system-wide' merchant-side transaction fees." (*Id.*) Defendants argue that Professor Hausman's "methodology does not permit the required conclusion that transaction fees in his but-for worlds would be lower for merchants as a whole." (*Id.*) They claim that in the but-for world, issuers or merchants could "increase[ ] interchange rates or network fees applicable to the millions of merchants that lacked the leverage and capabilities to negotiate individual agreements," and claim that a similar pattern emerged in the real world with the ▮▮ debit network.[23] (Hausman Section 1 Excl. Reply 10.)

In response, the 7-Eleven Plaintiffs, The Home Depot, and Elgin argue that Professor Hausman's "extensive analysis of two-sided harm to competition . . . is applicable to all

---

[23] Defendants claim that "[w]ithout any alleged market power," ▮▮ raised interchange fees for small merchants and used the revenue to reduce interchange fees for larger merchants. (Hausman Section 1 Excl. Reply 10 n.10.)

merchants that purchase transactions in the relevant markets." (Hausman Section 1 Excl. Opp'n 17.) They claim that Defendants cite to a "non-precedential summary order" for "the proposition that, '[t]o demonstrate harm to competition based on supra-competitive prices, Plaintiffs must 'prov[e] higher prices . . . *in the market as a whole*.'" (*Id.*) However, they argue, the summary order quotes this language from a case that goes on to state that "[a]lternatively, a plaintiff may demonstrate an adverse effect indirectly by establishing that the alleged conspirators had sufficient 'market power' to cause an adverse effect, 'plus some other ground for believing that the challenged behavior' has harmed competition." (*Id.*)

The 7-Eleven Plaintiffs, The Home Depot, and Elgin are correct that *MacDermid Printing Solutions LLC v. Cortron Corp* identifies two ways that a plaintiff may show adverse effects on competition: a plaintiff may "offer *direct* evidence of harm to competition by proving higher prices, reduced output, or lower quality in the market as a whole," or "may demonstrate an adverse effect *indirectly* by establishing that the alleged conspirators had sufficient 'market power' to cause an adverse effect." 833 F.3d 172, 182 (2d Cir. 2016) (emphasis added). However, the fact that a plaintiff may show harm to competition indirectly does not necessarily change the burden required to show harm to competition directly. If Defendants are correct that Professor Hausman's opinions about supracompetitive prices must show "higher prices, reduced output, or lower quality *in the market as a whole*" to be admissible, then it is irrelevant that Professor Hausman also offers indirect evidence of competitive harm in the form of opinions about market power.

The Court does not exclude Professor Hausman's opinions about supracompetitive transaction prices for failure to consider the market as a whole. Even if Plaintiffs must prove "higher prices . . . in the market as a whole" in order to offer direct evidence of harm to

competition, this burden does not necessarily transfer to each expert at the admissibility stage. *Ambrosini*, 101 F.3d at 135 (stating that the fact that expert's "testimony alone may be insufficient for the [plaintiffs] to survive summary judgment does not necessarily defeat its admissibility under the 'fitness' prong of *Daubert*"). Further, much of Professor Hausman's analysis of supracompetitive transaction pricing is not specific to large merchants.  Professor Hausman's expert report opines that Visa and Mastercard set supracompetitive pricing across both sides of their platforms and points to evidence that Visa and Mastercard disregard cost when setting prices, (Hausman Rep. ¶¶ 187–193); opines that they have implemented sustained interchange fee increases to merchants without losing merchant acceptance, (*id.* at ¶¶ 194–211); opines that they have implemented sustained network fee increases to merchants without losing merchant acceptance, (*id.* ¶¶ 212–222); opines that relatively little of the interchange fee amount is "passed through" as rewards, (*id.* ¶ 223–240); opines that American Express and Discover "have not constrained Visa's and Mastercard's pricing," (*id.* ¶ 240–241); opines that real-world merchant deals under more competitive conditions have resulted in lower prices, (*id.* ¶ 242); and opines that issuers enjoy high profits, (*id.* ¶ 243).  In the paragraphs Defendants cite to, Professor Hausman also calculates damages benchmarks for "category-influential," (*id.* ¶¶ 618–644), and "large or medium-sized" merchants, (*id.* ¶¶ 645–648).  Defendants argue that Professor Hausman fails to consider "whether issuers or networks would have increased interchange rates or network fees applicable to the millions of merchants that lacked the leverage and capabilities to negotiate individual agreements in order to fund the but-for world discounts to merchant-plaintiffs that he posits." (Hausman Section 1 Excl. Reply 10.)  While Defendants may question Professor Hausman about this at trial, the Court does not exclude Professor Hausman's supracompetitive price analysis because he does not consider this specific possibility. *See In re Mirena*, 169 F.

Supp. 3d at 466 (finding that while a certain fact "is fair game for cross-examination of [the expert], and seems to undermine his conclusion . . . , in these circumstances his failure to discuss it in his report is not so glaring as to render his opinion unreliable or admissible").

### iv. "Mature market" theory

Professor Hausman's "mature market" opinions are admissible.

Defendants argue that Professor Hausman improperly invoked the "mature market" theory, citing to the statement in Professor Hausman's report that "by the late 1990s, payment card markets were 'mature, eliminating any continuing need for [honor-all-cards] rules to maintain acceptance,'" (Hausman Section 1 Excl. Mem. 12), and the testimony at Professor Hausman's deposition that "once a 'market matures,' the 'network interdependency becomes very weak or almost nonexistent,' so that increasing participation on one side of the platform is no longer needed to attract participation on the other side," (*id.*). Defendants argue that in *US Airways*, the Second Circuit rejected the mature market theory "as contrary to law." (*Id.*) Further, "[b]ecause his unreliable mature market theory is the first step in Professor Hausman's construction of his but-for worlds, those worlds are unreliable and his opinions based on those worlds are inadmissible." (*Id.* at 13.) Defendants also argue that in 2017, Professor Hausman testified in a separate ongoing litigation that debit card markets feature interdependent demand between the two sides of the market, and that "[t]his contradiction is a separate reason to find his current opinion on the subject unreliable." (*Id.*)

In response, the 7-Eleven Plaintiffs, the Home Depot, and Elgin argue, first, that Defendants mischaracterize Professor Hausman's opinion. (Hausman Section 1 Excl. Opp'n 22.) They claim that "Professor Hausman does not opine that these markets' 'maturity' renders them one-sided," and point to deposition testimony in which Professor Hausman opined that even a

98

mature market remains two-sided. (*Id.*) Second, they argue that "*US Airways* did not reject the notion that two-sided markets could mature." (*Id.*)

Professor Hausman stated in his deposition that when the credit card industry "start[ed] off," the interdependency between the cardholder and merchant sides of the market was high, causing a "chicken-and-egg problem." (Hausman Dep. 19:22–20:4.) As the "market matures," however, "the network interdependency becomes very weak or almost nonexistent." (*Id.* at 20:5–9.) In his report, Professor Hausman opines that because the market is mature, "rules that may have been necessary to support an emerging network [are] no longer necessary." (Hausman Rep. ¶ 44; *see also* ¶ 450 n.604 (stating that "in the early days of the Visa and Mastercard networks . . . an HAC rule arguably served a valuable role in solving the 'chicken-and-egg' problem," but that "that justification no longer exists once the brands are established and the market is mature").) In calculating his damages benchmarks, therefore, Professor Hausman assumes that "by the late 1990s, at the latest," "the relevant markets were mature and Visa and Mastercard had solved any 'chicken and egg' problem," noting that "the HAC rules and related practices arguably have value in solving that problem." (*Id.* ¶ 609.)

Professor Hausman's testimony does not contradict *US Airways*. In *US Airways*, the jury's deliberation occurred prior to the Supreme Court's decision in *Amex*. *US Airways*, 938 F.3d at 58. The Second Circuit wrote that:

> contrary to what the Supreme Court thereafter decided [in *Amex*], one of US Airways' expert witnesses, Professor Joseph Stiglitz, testified that the Sabre platform was one-sided because it lacked interdependence, . . . or what the [*Amex*] court later referred to as indirect network effects. . . . Professor Stiglitz based that opinion on the "market maturity" theory, which posits that "mature markets" — those in which virtually all potential customers are already participants — do not experience indirect network effects because changing prices on one side of a platform will not affect demand in the market as a whole.

99

*Id.* The district court "appeared to adopt US Airways' erroneous conception of transaction platform interdependency, instructing that '[t]he market in this case is considered two-sided if the two sides are interdependent *such that a change in price on one side of the market affects demand on the other side.*'" *Id.* at 59. The Second Circuit stated that "Stiglitz's theory, urged upon the jury by counsel for US Airways and buttressed by the district court's instructions, is wrong as a matter of law in light of" *Amex*. *Id.*

*US Airways* did not reject the possibility that the credit card market could be mature, but rather Professor Stiglitz's opinion that, because the market was mature, it "lacked interdependence" and was therefore "one-sided." *Id.* at 58. The fact that all transaction markets are two-sided, however, does not mean that all transaction markets must always exhibit the same degree of interdependence. Rather, it means that before a court may hold that a given practice in a two-sided transaction market is anticompetitive, it must first consider both sides of the market and the interaction of those sides through "indirect network effects." *See Amex*, 138 S. Ct. at 2286.

The Court agrees that it would be improper if Professor Hausman used market maturity to claim that the cardholder side of the market is irrelevant to the antitrust analysis. He does not. Notably, he applies two-sided economic theory, (Hausman Rep. ¶ 223; Hausman Reply Rep. ¶ 123), and considers the effect of lower interchange on cardholder rewards, (Hausman Reply Rep. ¶ 825). Instead, Professor Hausman uses market maturity in order to opine that the credit card market has changed in such a way that the HAC rules are no longer necessary to overcome the "chicken-and-egg problem." (*See* Hausman Rep. ¶ 44.) Neither *Amex* nor *US Airways* precludes a theory that, because the degree of interdependence between the two sides of a market has

changed over time, the extent to which certain practices are or are not competitive has also changed.

### v. Reduced retail output

Professor Hausman's opinions about reduced retail output are admissible.

Defendants argue that Professor Hausman's opinion that transaction fees are passed through to retail fees, leading to reduced output, is irrelevant because "the injury to competition that Professor Hausman purports to identify is not in any of the relevant product markets that he defines," namely credit and debit transactions. (Hausman Section 1 Excl. Mem. 14.) They argue that Professor Hausman's report fails to "account for the potential" that lower transaction fees would lead to increased cardholder fees, "thereby reducing credit and debit transactions even as usage of other payment forms might increase." (Hausman Section 1 Excl. Reply 12.) Defendants also claim that it is not enough that some customers that use payment cards also use cash because "Plaintiffs' alleged competitive effects must match their alleged market, not a separate market with an overlapping set of consumers." (*Id.* at 12–13.)

In response, the 7-Eleven Plaintiffs, The Home Depot, and Elgin claim that "[i]f cardholders and non-cardholders faced lower retail prices, there would be more cardholder *and* non-cardholder transactions." (Hausman Section 1 Excl. Opp'n 18.) Because cardholders would continue to receive rewards, "their card usage would increase as they used their cards to make more purchases at lower prices and thereby complete more transactions." (*Id.*) They argue that therefore, "contrary to Defendants' argument, supracompetitive acceptance costs and higher retail prices necessarily impact the relevant markets for credit and debit transactions." (*Id.*) They further argue that this analysis does not only relate to cash customers because, first, "the

higher prices caused by supracompetitive interchange (and network fees) are paid by *all*
consumers," and, second, payment card users also sometimes use cash. (*Id.* at 19.)

As with the discussion above regarding Professor Harris, Professor Hausman may
permissibly assume that retail sales in the but-for world would maintain the same proportion of
payment forms as the real world, such that reduced retail transactions would yield reduced credit
and debit transactions. Defendants argue that Professor Hausman fails to account for the
possibility that lower merchant-side fees would lead to higher cardholder fees, thus reducing
credit and debit transactions, (Hausman Section 1 Excl. Reply 12), but as stated above, Professor
Hausman permissibly assumes that lower merchant-side fees would not cause a significant
increase in cardholder fees. Defendants may challenge these assumptions on cross-examination
and with their own expert testimony.

### vi. "Tier 2" damages

The Court excludes Professor Hausman's implication that ▮▮▮▮▮▮▮▮ and other
intermediaries would have negotiated interchange on behalf of merchants, but does not exclude
Professor Hausman's other opinions about Tier 2 merchants.

Professor Hausman's report states that in or around 2001–02, ▮▮▮▮▮▮ "developed a
strategy to use its position in the marketplace, as both acquirer/processor for a substantial portion
of merchants and a processor for many issuers, to offer merchants and issuers an alternative
network connection, called ▮▮▮▮▮▮▮▮ to compete with Visa and Mastercard." (Hausman
Rep. ¶ 412.) However, Visa and Mastercard passed "no-bypass rules" that "blocked" ▮▮▮▮▮▮ 
▮▮▮ (*Id.* ¶¶ 412–413.) Professor Hausman's report also opines that in the absence of the HAC
rules, "[a]cquirers could aggregate the volume of smaller merchants and offer acceptance to
issuers or networks." (*Id.* ¶ 460.) As an example of "how this could work," he points to the

102



(*Id.* ¶ 461.)

Professor Hausman opines that in the absence of the HAC rules, "          could have negotiated such deals on a broader and more effective scale for        and others directly with issuers to reduce interchange." (*Id.*)

Professor Hausman calculates damages benchmarks for Tier 1, or "category-influential," merchants, and Tier 2 merchants, which are "other large or medium-sized merchants which do not meet the criteria for Tier 1 merchants, but nonetheless would have experienced lower acceptance costs in the [but-for world]."[24] (Hausman Rep. ¶¶ 618–622, 645). He bases his conclusion "that Tier 2 merchants would have reduced their acceptance costs in" the but-for world on "several factors," one of which is that          could have leveraged its unique position in the market in the [but-for world] to negotiate acceptance deals for these merchants with issuers or with networks":

> That approach was part of the strategy it wanted to execute with          and but-for the HAC rules, it would have been able to implement that strategy. Had          proceeded with that strategy, its competitors same in the acquiring market would have attempted to do the same. The result would have generated competition for acceptance at these merchants that would have reduced their costs of acceptance.

[24] Professor Hausman defines Tier 1, or "category-influential merchants," as "the merchants that would have had the greatest ability to take advantage of the removal of the HAC rules" in the but-for world. (Hausman Rep. ¶ 618.) Tier 1 merchants "tend to be the leading merchants in key verticals," but Tier 1 also includes "certain merchants that are not among the largest merchants in the United States . . . [but] nonetheless have attributes that would have rendered them well situated in the [but for world] to gain favorable rates from issuers or networks." (*Id.*) He defines Tier 2 merchants as "other large or medium-sized merchants which do not meet the criteria for Tier 1 merchants, but nevertheless would have experienced lower acceptance costs" in the but-for world. (*Id.* ¶ 645.)

(*Id.* ¶ 646.) Professor Hausman then estimates a benchmark for Tier 2 merchants that "includes the costs applicable to Tier 1 merchants, but raises the applicable benchmark to reflect the differentiated value of Tier 2 merchants." (*Id.* ¶ 647.)

Defendants challenge Professor Hausman's theory that ▮▮▮▮▮ would have negotiated acceptance deals for Tier 2 merchants that would have reduced their interchange rates, claiming that this opinion "is premised on unsupported assumptions." (Hausman Section 1 Excl. Mem. 14–18.) They argue, first, that Professor Hausman "cites no evidence that ▮▮▮▮▮ would choose to negotiate on a collective basis on behalf of Tier 2 merchants for lower interchange in his but-for worlds." (*Id.* at 16.) Second, Defendants point to Professor Hausman's testimony at his deposition acknowledging that ▮▮▮▮▮ did not "envision that it would be negotiating deals bilateral or multilaterally between the issuers and the merchants when it was coming up with ▮▮▮▮▮ (Hausman Dep. 171:1–8) and that "the ▮▮▮▮▮ example is not an interchange negotiation orchestrated by ▮▮▮▮▮" (*Id.* at 174:13–17.) Next, they cite to Professor Hausman's 2005 surrebuttal report from litigation between Visa and ▮▮▮▮▮ (Surrebuttal Report of Professor Jerry A. Hausman ▮▮▮▮▮ Surrebuttal"), annexed to Carney Decl. as Ex. DDX53, Docket Entry No. 8544-6.) In that report, Professor Hausman stated that ▮▮▮▮▮ "seeks to allow private arrangements that would facilitate alternative [interchange] in the form of bilateral arrangements. If issuers and merchants choose to, they can negotiate a lower alternative rate"; otherwise, "the default rate would apply." (*Id.* ¶ 21.) Defendants further argue that Professor Hausman fails to analyze "the fact that ▮▮▮▮▮ makes money on transactions" and that "lower interchange could reduce issuance, cardholder rewards, or other drivers of transaction volume." (Hausman Section 1 Excl. Mem. 17.) Nor does he "identify any other entity that

would have had the ability and the incentive to negotiate interchange rates for these merchants,"

but rather "describes ███████ position in the market . . . as 'unique.'" (*Id.*)

In response, the 7-Eleven Plaintiffs, The Home Depot, and Elgin claim that Defendants'

argument "is refuted by ███████ having built a business (███████) which would have

enabled [negotiation for lower interchange] in the early 2000s but which was precluded by

Visa's HAC Rule" and that ███████ maintains "the necessary infrastructure to facilitate direct

connections between merchants and issuers at lower rates."[25]  (Hausman Section 1 Excl. Opp'n

23.)  Further, they argue that Professor Hausman conceded that ███████ did not envision

negotiating deals between issuers and merchants "*because of Visa's HAC Rule*," and that ███████

███ sought "to allow private arrangements that would facilitate" alternative interchange.  (*Id.* at

24.)

The Court agrees with Defendants that Professor Hausman's claim that ███████ wanted

to negotiate interchange fees on behalf of merchants is not supported by the record.  Professor

Hausman's report states that "negotiating acceptance deals for . . . merchants with issuers or with

networks" was "part of the strategy ███████ wanted to execute with ███████"

(Hausman Rep. ¶ 646.)  Although this statement mentions "acceptance deals" generally, its use

---

[25] The 7-Eleven Plaintiffs, The Home Depot, and Elgin cite to a document from the ███████
███ litigation containing "████████████████████████████████████" arguing that it
"confirms Professor Hausman's analysis."  (Hausman Section 1 Excl. Opp'n 11 n.16.)  They cite
to language stating that ████████████████████████████████████████████

████████████████████████████████████████████████████

(*Id.*)  The Court agrees with Defendants that this document does not indicate that ███████
intended to negotiate on behalf of merchants, only that it sought to "facilitate[e]" agreements
between members and merchants that could lead to lower interchange.  (*See* Hausman Section 1
Excl. Reply 14.)

in the context of benchmark interchange rates clearly implies that ▮▮▮▮▮▮ would have

negotiated on behalf of merchants for reduced interchange fees. As Defendants argue, however,

Professor Hausman does not cite to any sources showing that ▮▮▮▮▮▮ intended to negotiate

interchange fees on behalf of merchants. (*See id.*) Further, this claim is contradicted by

Professor Hausman's surrebuttal report in the ▮▮▮▮▮▮ litigation, ▮▮▮▮▮▮ Surrebuttal ¶ 21),

and his testimony that ▮▮▮▮▮▮ did not "envision that it would be negotiating deals bilateral or

multilaterally between the issuers and the merchants when it was coming up with ▮▮▮▮▮▮

▮▮▮▮"[26] (Hausman Dep. 171:1–8). Because Professor Hausman's opinion that ▮▮▮▮▮▮

"competitors in the acquiring market" also would have negotiated on behalf of merchants

appears to rely on his claim that ▮▮▮▮▮▮ would have played this role first, this claim is

excluded as well. The Court therefore excludes paragraph 646 of Professor Hausman's report.

*See Buckley v. Deloitte & Touche USA LLP*, 888 F. Supp. 2d 404, 407, 413 (S.D.N.Y. 2012),

*aff'd*, 541 F. App'x 62 (2d Cir. 2013) (excluding expert evidence where the expert "surmise[d],

estimate[d], guess[ed] or conjecture[d]" what the board of a company "would have done" in a

certain situation, relying on "no foundation").

### vii. Conclusion

The Court grants Defendants' motion to exclude Professor Hausman's one-sided market

definitions and his claim in paragraph 646 that ▮▮▮▮▮▮ and other intermediaries would have

negotiated interchange on behalf of merchants. The Court otherwise denies Defendants' motion.

---

[26] The 7-Eleven Plaintiffs, The Home Depot, and Elgin are correct that Professor
Hausman testified that the HAC rules are the reason ▮▮▮▮▮▮
▮▮▮▮▮▮ (Hausman Dep. 174:21–175:6.) Regardless,
Professor Hausman's statement in his report that "negotiat[ing] acceptance deals for . . .
merchants with issuers or with networks" was "part of the strategy ▮▮▮▮▮▮ wanted to execute
with ▮▮▮▮▮▮ " is still misleading.

### e. Motion to exclude in part the opinions of Joseph E. Stiglitz

Defendants move to exclude the opinions of Professor Joseph E. Stiglitz, (Stiglitz Mot.), an expert witness for the Equitable Relief Class Plaintiffs. (*See* Expert Report of Joseph E. Stiglitz ("Stiglitz Rep.") ¶ 6, annexed to Carney Decl. as Ex. DDX18, Docket Entry No. 8544-3.)

### i. Professor Stiglitz's background and expert report

Professor Joseph Stiglitz is an economist who has taught, researched, and published extensively. (Stiglitz Rep. ¶¶ 1–3.) He is currently a University Professor at Columbia University holding joint appointments in the Faculty of Arts and Sciences, the Graduate School of Business, and the School of International and Public Affairs. (*Id.* ¶ 1.) Professor Stiglitz has held various national and international appointments and in 2001 received the Nobel Prize in Economics. (*Id.* ¶¶ 1–3.) He has previously served as an expert for Plaintiffs in this case and for the plaintiffs in *In re American Express Anti-Steering Rules Antitrust Litigation*, 11-MD-2221. (*Id.* ¶ 4); *see also In re American Express Anti-Steering Rules Antitrust Litigation*, No. 11-MD-2221, 2015 WL 4645240, at *6 n.19 (E.D.N.Y. Aug. 4, 2015).

Professor Stiglitz's assignment was "to explain the role that payment mechanisms play in the United States economy in reducing the costs of transacting, and Visa and Mastercard's roles in providing means of payment" and "to analyze the relevant economic market in which Visa and Mastercard credit card businesses participate and the extent of market power they may have within that relevant economic market." (Stiglitz Rep. ¶ 6.) His report refers to "Visa's and Mastercard's anti-steering rules" as "the 'Merchant Restraints.'" (*Id.*) It opines that "Visa and Mastercard's setting of default interchange fees . . . restrains competition among issuing banks and results in supracompetitive issuing bank prices to merchants"; that the Merchant Restraints "support and maintain the supracompetitive banks' prices to merchants"; that "[t]here is no direct

connection between the merchant fees charged and the rewards received by cardholders"; that "the Merchant Restraints directly interfere with the price mechanism and the efficiency incentives typically promoted by the price mechanism," and are "therefore anticompetitive"; and that the Merchant Restraints "result in a number of inefficiencies in the payments system." (*Id.* ¶ 7.)

Professor Stiglitz's report begins with sections discussing payment means and the Visa and Mastercard networks, (*id.* ¶¶ 8–16), and the Merchant Restraints, (*id.* ¶¶ 17–37). He then devotes a section of his report to credit card networks and two-sided markets. (*Id.* ¶¶ 38–58.) Professor Stiglitz states that establishing a credit card network requires both merchant and customer participation. (*Id.* ¶ 38.) He opines that with electronic transaction processing and card readers, "the only significant cost of a merchant participating in a network is the charge imposed by the network itself," and that therefore, contrary to the Second Circuit's opinion in *United States v. Am. Express Co.*, 838 F.3d 179 (2d Cir. 2016) a network would not struggle to convince merchants to join a network without many cardholders. (*Id.* ¶ 39.) Nor would the network struggle to convince cardholders to carry a card associated with a network accepted at few merchants, "since individuals can obtain many credit cards with no annual fees." (*Id.*) Professor Stiglitz states that "in some circumstances there *may be* demand interdependencies" in the credit card network context, such that "lowering the price to merchants might increase merchant acceptance, and increased merchant acceptance might increase the demand of cardholders," although he is "unaware of empirical evidence showing this." (*Id.* ¶ 42.) He states that if merchant demand for credit card network services were relatively inelastic and cardholder demand were relatively elastic, "the emerging networks might find it desirable to have high prices to merchants . . . and low prices to cardholders." (*Id.* ¶ 43.) However, he claims that

"even this purported balancing of the two-sides would not be observed in well-functioning markets" because "[i]n competitive retail markets, merchants would have to pass on whatever increased costs they faced to their customers" and "there is no possibility of shifting costs from consumers to merchants." (*Id.* at ¶ 44.)

Professor Stiglitz opines that for this and other reasons, "the standard two-sided market analysis is economically not the appropriate competitive analysis of the Visa/Mastercard Merchant Restraints." (*Id.* at ¶ 45.) Before addressing those reasons, he describes "the standard two-sided market model," under which, "if there were significant demand interdependency between merchants and cardholders," setting high fees for merchants and low prices to cardholders "could result in an indirect positive impact on merchant acceptance that theoretically *could* more than offset the direct negative impact form the high fees to merchants." (*Id.*) However, he states that in this situation, "merchants would still have the incentive to steer their customers to an alternative payment means with a lower merchant cost," which would "result in lower merchant costs" and would "benefit[] consumers in general." (*Id.* ¶ 46.) Visa and Mastercard could use the Merchant Restraints to support their "high-merchant-fee/low-card-holder-fee price pair," but Professor Stiglitz notes that even if the Merchant Restraints did "enhance the overall performance of the network," there still could have been "less distorting and more competitive mechanisms for achieving the desired goal"; the resulting pricing may have been inefficient or undesirable; or the anticompetitive effects may have outweighed any socially beneficial effects. (*Id.* ¶ 47.)

Professor Stiglitz then "emphasize[s] that the Visa and Mastercard platforms are significantly different from that of American Express." (*Id.* ¶ 48.) He lists these differences, claiming that Visa and Mastercard "do not directly set the prices on both sides of the platform,"

"are fully mature networks," and "are assemblies of what should be competing banks with
substantial overlap of the banks in both networks, collectively affecting a far larger volume of
commerce than does American Express"; that the Visa and Mastercard restraints "directly impair
horizontal competition among each network's issuers"; and that Visa and Mastercard issuers
"make substantial portions of their profits from credit card lending, which should lead them to
compete for access to merchants' customers." (*Id.* ¶ 49.) He states that these differences "make
it inappropriate, from an economic perspective, to apply the framework of the analysis in
*American Express* to the Visa and Mastercard Merchant Restraints." (*Id.* ¶ 50.) Nevertheless, he
contends that "even applying that two-sided analysis, it is clear that there are significant net
anticompetitive effects from the . . . Merchant Restraints." (*Id.*) Professor Stiglitz states that
given the "ample evidence of the presence of some market power" in this case, it is important to
consider the relationship between that market power and the "restraints imposed by the
platform." (*Id.* ¶ 51.) He opines that reducing Visa and Mastercard prices to merchants "will
increase merchant acceptance with minimal negative impact, if any, on cardholding," such that
"a lower price to merchants would increase the overall quality of the platform." (*Id.* ¶ 52.)
However, "both Visa and Mastercard have chosen an opposite price-pair, with higher prices to
merchants." (*Id.*) Professor Stiglitz opines that these price-pairs "cannot be justified on
efficiency grounds," but rather "are the result of the exercise of market power." (*Id.*) He also
claims that "the efficiency and competitiveness of the price-pairs cannot be evaluated solely
from the total of those prices" because "[w]hat matters are the levels of the individual prices and
the relationship between them and not simply the sum of those prices," which the Supreme Court
recognized "implicitly" in *Amex.* (*Id.* ¶ 53 & n.79.) Professor Stiglitz states that "the evidence
indicates that there are supracompetitive profits" and price discrimination, indicating the

presence of market power. (*Id.* ¶ 54.) He also opines that "even the absence of supracompetitive profits would not imply that the price-pair is competitive or efficient." (*Id.* ¶ 55.)

Professor Stiglitz next opines that today, the cost of credit card transactions is very low and "any 'chicken and egg' problem has been solved for many years." (*Id.* ¶ 56.) He opines that since the early 1990s, "to the extent that interdependencies of demand remained that might justify cross-subsidies from one side of the platform to the other, the cross-subsidies should have run from cardholders to merchants" because "marginal increases in cardholding or card use is not expected to increase merchant acceptance" but "increases in merchant acceptance may increase card use." (*Id.* ¶ 57.) Further, "merchant steering has the potential of substantially increasing card usage." (*Id.*) However, "[t]he actions of Visa and Mastercard at issue in this case are exactly the opposite," such that "the high Visa and Mastercard merchant prices for at least the last fifteen years are not 'explained' by demand interdependencies or efficient two-side prices, but rather by the exploitation of market power on the merchant side, enabled and maintained by the Merchant Restraints." (*Id.*)

Professor Stiglitz next discusses the relevant market and market power, (*id.* ¶¶ 59–84), before turning to the anticompetitive impacts of the merchant restraints, (*id.* ¶¶ 85–129). He states that he will demonstrate that the Merchant Restraints cause each of the three forms of anticompetitive impacts identified in *Amex*, "even though . . . there are sufficient differences between Amex and the Visa/Mastercard facts so as to make the *American Express* framework inapplicable here." (*Id.* ¶ 86.) First, he claims that "examples of the pricing of credit card services in circumstances of greater competition" demonstrate that "the average Visa and Mastercard total prices are at supracompetitive levels." (*Id.* ¶¶ 89–107.) He cites to private credit cards offered by 

111

████████, each of which charges zero or negative merchant fees. (*Id.* ¶¶ 90–91; Reply Expert Report of Joseph E. Stiglitz ("Stiglitz Reply Rep.") ¶ 26, annexed to Carney Decl. as Ex. DDX19, Docket Entry No. 8544-3.) Professor Stiglitz argues that "[i]f anything," the marginal cost of the private label cards "should be substantially higher than for Visa and Mastercard, because a substantial fraction of the costs of a credit card network are the fixed costs of creating the network." (Stiglitz Rep. ¶ 91.) Second, in the early 1990s, ████████ "offered merchants a merchant fee significantly below that of Visa and Mastercard," "charged no annual fee to cardholders," and "gave cardholders 1% cash back." (*Id.* ¶ 95.) From 2002 to 2004, ████████ offered "exclusive deals" with a number of merchants that included merchant prices "well below the best Visa or Mastercard prices at the time." (*Id.* ¶ 96. ████████ also offered higher "overall rewards levels" than Visa and Mastercard at this time. (*Id.*; *see also* Stiglitz Reply Rep. ¶ 20.) Third, Visa and Mastercard charge low or zero prices to "certain merchants," including ████████ ████████████████████████████ and "other merchants.████████████████ " (Stiglitz Rep. ¶ 97; *see also* Stiglitz Reply Rep. ¶¶ 16–19, 22–23, 25.) Fourth, Professor Stiglitz claims that the failure of total prices and merchant prices "to reflect the significant reductions in the costs of credit card transactions over the last few decades" is also an indicator of supracompetitive prices. (Stiglitz Rep. ¶ 98.) Fifth, "issuing banks hav[e] far higher profitability from credit cards than overall banking services," which Professor Stiglitz claims "verifies" "[t]he supracompetitive pricing by Visa and Mastercard." (*Id.* ¶ 99.) Sixth, Professor Stiglitz notes that "nearly all merchants pay substantially higher fees for credit card use than for debit card use," even though "[t]he cardholder side of Visa/Mastercard credit card transactions generates positive profits." (*Id.* ¶ 100; *see also* Stiglitz Reply Rep. ¶ 21.) Finally, after the Federal Reserve Bank of Australia regulated Visa and Mastercard credit card transactions in October

2003, "[t]he Visa and Mastercard networks in Australia remain viable and profitable with a total price lower than those of Visa and Mastercard in the United States." (Stiglitz Rep. ¶ 101.)

Professor Stiglitz again claims that "there is substantial evidence that the Visa and Mastercard networks are no longer subject to the two-sided externalities that might justify . . . identifying anticompetitive impact [by] consider[ing] both sides of the platform," and that unlike American Express, Visa and Mastercard do not directly set prices to both sides of the platform. (*Id.* ¶ 102.) In a footnote, he adds that "the Visa and Mastercard markets were mature and saturated by the early 1990s" and that by 2004, when the class period began, "the startup 'chicken and egg' issue was certainly solved, there were little if any externalities flowing from one side of the platform to the other, and there was not a balancing of the effects of each side in the setting of prices." (*Id.* ¶ 102 n.175.) Professor Stiglitz states that if the factfinder found a traditional one-sided analysis to be proper, "the high merchant fees themselves would satisfy the first step of a rule of reason analysis showing anticompetitive impact of the Merchant Restraints." (*Id.* ¶ 102.)

Next, Professor Stiglitz claims that the Merchant Restraints also caused the second anticompetitive impact identified in *Amex*: reduced output. (*Id.* ¶¶ 108–118.) In addition to his other opinions in this section, Professor Stiglitz claims that "the proper metric for output in this context, to measure the welfare effect, is total transaction volume." (*Id.* ¶¶ 115–118.) Finally, Professor Stiglitz argues that the Merchant Restraints have caused "[t]he final *American Express* criterion to establish the anticompetitive impact of the Merchant Restraints": "the general impact on competition in the credit card market." (*Id.* ¶¶ 119–29.) In the remainder of his report, Professor Stiglitz addresses the injunctive relief sought by Plaintiffs, (*id.* ¶¶ 130–80.)

Professor Stiglitz also submitted a reply expert report responding to criticisms of his initial report. (*See generally* Stiglitz Reply Rep.)

### ii.   Mature market theory and market definition

Defendants claim that Professor Stiglitz "offers core opinions in this case that rely upon the same market maturity theory" rejected in *US Airways* as contrary to *Amex*. (Mem. of Law in Supp. of Mot. to Excl. in Part Opinions of Prof. Joseph E. Stiglitz 8–9 ("Stiglitz Excl. Mem."), Docket Entry No. 8076.)  They argue that this "erroneous mature market theory" underpins Professor Stiglitz's "opinions on how credit card networks compete to maximize output" and should be excluded. (*Id.* at 8–9.)

In response, the Equitable Relief Class plaintiffs argue that *US Airways* "did not reject the 'market maturity theory' as an economic phenomenon." (Opp'n to Mot. to Excl. in Part Opinions of Prof. Joseph E. Stiglitz 7 ("Stiglitz Excl. Opp'n"), Docket Entry No. 8163.)  Rather, in that case "the Second Circuit rejected a mature market theory as a basis for concluding that the relevant market in that case . . . was one-sided," but "fully accepted" Professor Stiglitz's opinions that the two-sided market was highly noncompetitive. (*Id.* at 7–8.)  Nor, they argue, "is Professor Stiglitz's analysis contrary to *Amex*." (*Id.* at 8.)

Defendants challenge paragraphs 48 to 50 and 56 to 57 of Professor Stiglitz's report, (Stiglitz Excl. Mem. 8–9), as well as paragraph 7(G) in the summary section of his report, in which Professor Stiglitz writes:

> The Visa and Mastercard credit card payment networks are mature. Both networks have existed for over 50 years. Both networks include millions of merchants in the United States, and both have millions of cardholders, with virtually all individuals who are credit worthy (and many who are not) and who desire cards having one or more. In the current environment, the main impediment to more merchants honoring credit cards or consumers carrying them is not related to any feedback effects from one side of the network to the

114

> other.  Rather for merchants, it is the costs charged them for the use
> of the cards.  For some consumers, the main impediment to carrying
> a credit card is likely their own knowledge of their own lack of self-
> restraint, leading them to over indebtedness, combined with high
> and often not fully transparent charges.

(Stiglitz Rep. ¶ 7(G).)  Defendants also cite to a footnote in Professor Stiglitz's expert report that

states that "[b]y 2004," the beginning of the class period, "the startup 'chicken and egg' issue

was clearly solved, there were little if any externalities flowing from one side of the platform to

the other, and there was not a balancing of the effects on each side in the setting of prices."

(Stiglitz Rep. n.175; Stiglitz Excl. Mem. 8.)  In their reply memorandum, Defendants also call

attention to paragraphs 42, 44, 48, and 86, claiming that Professor Stiglitz "questions whether

payment card networks exhibit indirect network effects *at all*" and that his "attempts to

distinguish *Amex* based on purported differences between Mastercard and Visa . . . and American

Express . . . ignore the Supreme Court's conclusion that all three are two-sided transaction

platforms that compete in the same market."  (Defs.' Reply in Further Supp. of Mot. to Excl. in

Part Opinions of Joseph E. Stiglitz ("Stiglitz Excl. Reply") 3–4, Docket Entry No. 8158.)  At his

deposition, Professor Stiglitz acknowledged that he had opined that "taking the Visa and

Mastercard markets together, . . . they were mature and saturated by the early 1990s."

(Videotaped Dep. of Joseph E. Stiglitz 90:21–91:6 ("Stiglitz Dep."), annexed to Carney Decl. as

Ex. DDX29, Docket Entry No. 8544-4.)

### 1.  Opinion that two-sided model is inappropriate

The Court excludes Professor Stiglitz's opinions that the two-sided market model is

inappropriate.  *Amex* holds that "[e]valuating both sides of a two-sided transaction platform" — a

group that the Court defines to include credit card platforms — is "necessary to accurately assess

competition."  *Amex*, 138 S. Ct. at 2286–87; *see also id.* ("[C]ourts must include both sides of the

platform—merchants and cardholders—when defining the credit-card market.").  Professor

Stiglitz opines that "[i]n competitive product markets, there is no possibility of shifting costs from consumers to merchants, making the standard two-sided market analysis irrelevant," (Stiglitz Rep. ¶ 44), and that differences between the network Defendants and American Express "make it inappropriate, from an economic perspective, to apply the framework of the analysis in *American Express* to the Visa and Mastercard Merchant Restraints," (*id.* ¶ 50). Under *Amex*, Visa and Mastercard, as members of the credit-card market, must be analyzed using the two-sided platforms. Professor Stiglitz's opinion to the contrary is contrary to controlling law and will not assist the trier of fact. *See Lamar Advertising Co.*, 533 F. Supp. 3d at 344 ("[I]t is obvious that a legal expert will not be permitted to give legal opinions which are contrary to the law or base his conclusions on an incorrect understanding of the law."); *see also Hilaire*, 54 F. Supp. 3d at 234 (stating that "the trial court must determine that the expert's testimony will assist the trier of fact in understanding the evidence or determining an issue of fact"). The Court consequently excludes the last sentence of paragraph 44, the first sentence of paragraph 45, the first sentence of paragraph 50, and everything in paragraph 86 following "even though."

In paragraph 102, Professor Stiglitz states that although the preceding examples show that the total transaction price is supracompetitive, "[i]f the finder of fact were to determine that a traditional one-sided analysis was proper in this case, the high merchant fees themselves" would show anticompetitive effects. (Stiglitz Rep. ¶ 102.) In the footnote challenged by Defendants, (Stiglitz Excl. Mem. 8), Professor Stiglitz claims that the Visa and Mastercard markets were mature and saturated by the early 1990s and that therefore "the startup 'chicken and egg' issue was clearly solved, there were little if any externalities flowing from one side of the platform to the other, and there was not a balancing of the effects on each side in the setting of prices." (*Id.* at n.175.) While Professor Stiglitz's mature market theory is admissible in and

of itself, as described below, he may not use that theory to claim that "a traditional one-sided analysis [is] proper." (*Id.* ¶ 102.) The Court therefore also excludes paragraph 102.

As described below, the Court does not exclude the other paragraphs challenged by Defendants. Notably, despite opining that it is inappropriate to apply a two-sided analysis to Visa and Mastercard, (*Id.* ¶ 50), Professor Stiglitz does analyze the interdependencies between the two sides of the market, (*id.* at ¶¶ 51–57), concluding that that "[s]ince the early 1990s, to the extent that interdependencies of demand remained that might justify cross-subsidies from one side of the platform to the other, the cross-subsidies should have run from cardholders to merchants." (*Id.* ¶ 57.)

### 2.   Opinion that market is mature

The Court does not exclude Professor Stiglitz's opinion that the market is mature. Contrary to Defendants' arguments, (*see* Stiglitz Excl. Mem. 7–9), this opinion does not contradict *US Airways*. As described above, in *US Airways*, the Second Circuit found that the district court had improperly instructed the jury that "'[t]he market in this case is considered two-sided if the two sides are interdependent *such that a change in the market affects demand on the other side.*'" *Id.* at 59 (emphasis in original). The Second Circuit stated that "Stiglitz's theory, urged upon the jury by counsel for US Airways and buttressed by the district court's instructions, is wrong as a matter of law in light of" *Amex. Id.*

*US Airways* did not reject the "mature market" theory itself, but rather Professor Stiglitz's theory that, because the market was mature, it was one-sided. Professor Stiglitz's opinions in this case (other than those excluded above) assume that the market is two-sided and analyzes the resulting interdependencies of demand between the two sides of the market, concluding that "if demand interdependencies justify cross-subsidization from one side to the other, the subsidy

117

would be expected to be directed to merchants" but that "[t]he actions of Visa and Mastercard at issue in this case are exactly the opposite." (*See* Stiglitz Rep. ¶¶ 51–57.) *Amex* does not hold that an expert must reach a certain conclusion with regard to *how* the two sides of a credit card network interact, only that "[e]valuating both sides of a two-sided transaction platform is . . . necessary to accurately access competition." *Amex*, 138 S. Ct. at 2287.

Defendants also argue that Professor Stiglitz's mature market analysis is contrary to *Amex* because *Amex* "found that in a competitive credit card market, networks often charge merchants a higher fee than cardholders." (Stiglitz Excl. Mem. 9.) The fact that networks may competitively charge merchants a higher fee than cardholders does not mean that all situations in which networks charge a higher fee than cardholders are competitive, nor does Professor Stiglitz offer such an opinion. Rather, he opines that, given the market realities in this case, the price-pairs Visa and Mastercard have chosen "cannot be justified on efficiency grounds" and "are the result of the exercise of market power." (Stiglitz Rep. ¶ 52.)

Defendants further argue that Professor Stiglitz "seeks to overturn the Supreme Court's conclusions that Mastercard and Visa take into account indirect network effects when setting prices to balance their platforms," (Stiglitz Excl. Reply 3), pointing to Professor Stiglitz's statement that "the high Visa and Mastercard merchant prices for at least the last fifteen years are not 'explained' by demand interdependencies or efficient two-sided prices, but rather by the exploitation of market power on the merchant side." (Stiglitz Rep. ¶ 57.) This statement does not contradict *Amex*. The holding that two-sided platforms "must take . . . indirect network effects into account before making a change in price on either side [of the platform]" cannot mean that every platform's prices *are* explained solely by indirect network effects; such an

interpretation would be tantamount to a holding that two-sided platforms cannot act anticompetitively. *Amex*, 138 S. Ct. at 2281.

### 3. Opinion that network Defendants are distinguishable from American Express

The distinctions Professor Stiglitz draws between the network Defendants and American Express are also admissible. (*See* Stiglitz Excl. Reply 3–4.) The fact that *Amex* identified Visa and Mastercard as among the "four dominant participants in the credit-card market" does not mean that Professor Stiglitz may not draw attention to the differences between the networks; as the Equitable Relief Class Plaintiffs point out, *Amex* itself does the same. (Stiglitz Excl. Opp'n 9 n.7); *Amex*, 138 S. Ct. at 2282 (describing the four major networks' market share, the "significant structural advantages" Visa and Mastercard enjoy over Amex, and Amex's "different business model" from Visa and Mastercard). While opining that Visa and Mastercard are not two-sided platforms is contrary to *Amex*, Professor Stiglitz is not prevented from opining that the network Defendants are distinguishable from American Express in other ways.

### iii. Opinions on supracompetitive pricing

Professor Stiglitz claims that supracompetitive prices are shown by both "examples of the pricing of credit card services in circumstances of greater competition," also described as his "benchmark analysis," (Stiglitz Rep. ¶¶ 89–107) and high issuer profits, (*id.* ¶ 99; Stiglitz Reply Rep. ¶¶ 28–33). Defendants opine that both methods are unreliable. (Stiglitz Excl. Mem. 10–15.)

### 1. Benchmark analysis

The Court does not exclude Professor Stiglitz's benchmark analysis.

Defendants argue that Professor Stiglitz's benchmark analysis "hinges on a crucial, yet unsupported, assumption: that the lower interchange rates applicable to a single merchant or merchant group could be applied to Visa and Mastercard credit cards broadly accepted by all merchants without any change to the cardholder price." (Stiglitz Excl. Mem. 11.) They cite to "evidence showing that issuing banks could not profitably issue Visa or Mastercard credit cards at the low interchange rates applicable to the individual merchant or merchant groups that [Professor Stiglitz] cites," (*id.* at 12), and claim that Professor Stiglitz cannot meet his burden of showing a lower two-sided transaction price "without any analysis of how prices to cardholders would change if these lower interchange rates applied to all transactions," (Stiglitz Excl. Reply 6.) Defendants further argue that in pointing to merchant fees that Discover offered before the relevant time period, credit interchange fees regulated outside the United States, and acceptance costs for debit cards, Professor Stiglitz "does not adequately compare the cardholder-side prices of these benchmarks to the prices faced by cardholders for Visa and Mastercard credit card transactions . . . at any time at issue." (Stiglitz Excl. Mem. 13.) Finally, they argue that Professor Stiglitz fails to "offer any methodology for selecting these benchmarks" that is "rooted in the facts of this case." (*Id.*)

In response, the Equitable Relief Class Plaintiffs argue, first, that "there is at least a disputed issue of fact" as to whether issuing banks lost money on transactions at select large merchants at lower interchange rates. (Stiglitz Excl. Opp'n 11.) Second, they argue that "it is not necessary for Professor Stiglitz to show that the *lowest* interchange rates offered by Visa and Mastercard would be the rates in the but for world in order to establish that the competitive total price is far lower than the actual price." (*Id.*) Third, the Equitable Relief Class Plaintiffs argue that Professor Stiglitz's opinion does not depend "on the same level of rewards being offered in"

120

the but-for world, but rather that "Professor Stiglitz opines that the competitive price would be lower but with a different price pair (lower merchant fees and lower rewards)." (*Id.* at 11–12.) Defendants also defend the Discover benchmark, Australia benchmark, and debit card benchmark as "reasonable competitive benchmarks." (*Id.* at 12–13.)

As discussed in the Court's examination of the motion to exclude Professor Harris's opinions, lower fees in situations of greater competition are relevant evidence of the effect of merchant-side competition on the transaction price. Defendants argue that Professor Stiglitz's benchmark analysis fails to consider whether the lower interchange rates could be applied to all Visa and Mastercard transactions without raising the cardholder price. (Stiglitz Excl. Mem. 11.) The Court concludes, however, that Professor Stiglitz's comparisons are sufficiently relevant and reliable to support his conclusion that "services with costs comparable to Visa's and Mastercard's credit card services in the U.S." can be provided "profitabl[y] at lower rates, and that such lower rates do arise in situations of greater competition. (Stiglitz Excl. Opp'n 13.) Defendants' argument that the lower rates could not be universally applied can be explored on cross-examination. In particular, the Court does not assume that Defendants' " ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" is

dispositive. (Stiglitz Excl. Mem. 12.) Defendants claim that evidence shows that ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮," (*id.*), but as the

Equitable Relief Class Plaintiffs argue, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮e

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮' (Stiglitz Excl. Opp'n 11 & n.10.)

The evidence cited by Defendants is not a basis for exclusion. *See DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, No. 11-CV-564, 2019 WL 1515231, at \*9 (E.D.N.Y. Feb. 21, 2019)

121

(describing "falsities and inconsistencies" in expert's testimony as "perfect to elicit on cross-examination to attack [the expert's] credibility in front of the jury").

Defendants further argue that Professor Stiglitz does not adequately compare cardholder-side prices for the benchmarks to cardholder-side prices for Visa and Mastercard credit card transactions, and therefore "cannot compare the two-sided net price of these benchmarks to the actual two-sided net price of Visa and Mastercard credit [card] transactions." (Stiglitz Excl. Mem. 13.) In particular, Defendants point to paragraphs 95, 96, 100, and 102, in which Professor Stiglitz addresses Discover rates in the early 1990s and 2002–04, compares the credit market to the debit market, and compares the US credit market to the Australian credit market. (*Id.*)

The Court does not exclude Professor Stiglitz's benchmarks for failing to "adequately compare the cardholder-side prices . . . to the prices faced by cardholders for Visa and Mastercard credit card transactions." (Stiglitz Excl. Mem. 13.) As the Equitable Relief Plaintiffs note, Professor Stiglitz does not opine that the cardholder price would necessarily be the same in a competitive world; rather, he opines that "the competitive price would be lower but with a different price pair (lower merchant fees and lower rewards)." (Stiglitz Excl. Opp'n 11–12.) Professor Stiglitz therefore need not show specifically that the cardholder prices in the benchmark scenarios are the same or lower as Visa and Mastercard cardholder prices, but only that the *total* prices are lower. In each of the challenged examples, Professor Stiglitz states or clearly implies that the total price is lower than the Visa and Mastercard total price. (*See* Stiglitz Rep. ¶ 95 ("Therefore, Discover's total price was significantly below that of Visa and Mastercard[.]"); ¶ 96 (noting that the merchant price was "well below the best Visa or Mastercard prices" and that the Discover overall rewards level "exceeded those of Visa and

Mastercard"); ¶ 100 ("Assuming any difference on the cardholder side from rewards does not offset the difference on the merchant side, I qualitatively conclude that the total price of Visa and Mastercard credit card transactions is supracompetitive."); ¶ 101 ("The Visa and Mastercard networks in Australia remain viable and profitable with a total price lower than those of Visa and Mastercard in the United States.").)  While some of these examples could clearly be more rigorous, this is a matter for cross-examination, not exclusion.  In particular, the benchmarks are not "contrary to law."  (Stiglitz Excl. Mem. 13.)

Finally, the Court does not exclude Professor Stiglitz's benchmarks on the basis that he "'fail[s] to offer a satisfactory explanation rooted in the facts of this case' for his selection of them."  (*Id.*)  Defendants note that Professor Stiglitz's benchmarks are distinguishable from the facts of this case: Discover offered the reduced acceptance costs "in exchange for exclusivity," and debit cards in the United States and credit cards in Australia are "regulated by the government," unlike credit cards in the United States.  (*Id.*)  However, Professor Stiglitz *does* indicate what makes his examples relevant: they reflect "the pricing of credit card services in circumstances of greater competition."  (Stiglitz Rep. ¶ 89.)  Any such examples are bound to be in some way distinguishable from the facts of this case, since, as Professor Stiglitz also acknowledges, "direct observation of pricing absent the Merchant Restraints is elusive."  (*Id.*)  The Court finds the benchmarks sufficiently relevant and note that the ways in which they differ may be explored on cross-examination, but do not support exclusion.  *See Sullivan v. Saint-Gobain Performance Plastics Corp.*, No. 16-CV-125, 2019 WL 12323322, at *5 (D. Vt. July 15, 2019) (noting preference in *Daubert* for "resolving disputed issues through admission of contrary evidence and cross-examination, not through rigid exclusion").

### 2. Issuer profitability

Professor Stiglitz's issuer profitability analysis is admissible.

Defendants argue that Professor Stiglitz cannot conclude that because issuing banks have earned high profits, the two-sided competitive net prices of transactions is supracompetitive. (Stiglitz Excl. Mem. 14.) They point to Professor Stiglitz's own testimony that "issuer profit margins have been driven primarily by finance charges and other non-transaction revenue, and not interchange." (*Id.*) They further argue that Professor Stiglitz's opinion is not effectively supported by the sources he cites: "a paper in the Quarterly Journal of Economics," "a Federal Reserve Study," and "calculations of issuer profitability" by Drs. Roy Epstein and Reto Kohler.[27] (Stiglitz Excl. Mem. at 14–15.)

In response, the Equitable Relief Class Plaintiffs argue that under *Amex* and *US Airways*, "evidence of high economic profits is an additional and confirmatory indicator of two-sided supracompetitive pricing." (Stiglitz Excl. Opp'n 14–15.) They also defend the sources that Professor Stiglitz relies on, arguing that flaws in individual studies "would hardly justify excluding Professor's opinion on profitability which relies on *numerous* studies and admissions." (*Id.* at 15.)

The Court does not exclude Professor Stiglitz's issuer profitability analysis. As stated in the above discussion of the motion to exclude Professor Harris's opinions, evidence of supracompetitive net pricing in *US Airways* included evidence that the defendant's "economic profit" was much higher than "comparable companies' profits." *US Airways*, 938 F.3d at 61. Defendants attempt to distinguish Professor Stiglitz's opinions from *US Airways* by arguing that

---

[27] Dr. Roy Epstein is no longer an expert in this litigation. (Stiglitz Excl. Mem. 15, Stiglitz Excl. Opp'n 16 n.20.)

in *US Airways*, the Second Circuit noted that the defendant's "revenues (and thus profits) derived primarily from the relevant transactions," while Professor Stiglitz "concedes that issuer profits are driven by *non-transaction* revenue" (Stiglitz Excl. Reply 8.)  The Court finds that high issuer profits are nevertheless a reasonable basis for an opinion that transaction prices are supracompetitive, although Defendants may counter this opinion on cross-examination and with other evidence, including Professor Stiglitz's testimony that interest rates and late fees are highly profitable for issuers.  (*See* Stiglitz Excl. Mem. 14 & n.12.)  *See Ambrosini*, 101 F.3d at 133–35 (holding that "the fact that several possible causes might remain 'uneliminated'" goes to the weight rather than the admissibility of the expert's testimony").  Nor does the Court exclude Professor Stiglitz's opinion on the basis of the sources he cites.  Defendants argue that a study showing that banks have "far higher profitability from credit cards than overall banking services" is "an irrelevant apples-to-oranges exercise" because "overall banking services" "involves multiple activities, with different risk profiles and risk premiums."  (Stiglitz Excl. Mem. 14–15.)  The Court finds that data showing that credit cards are more profitable than other banking services is nevertheless relevant evidence of high issuer profits driven by credit card issuance, and that Defendants may critique the relevance of this data on cross-examination.  Nor does the Court exclude Professor Stiglitz's opinion on the basis that it relies on studies by Dr. Kohler and Dr. Epstein; as the Equitable Relief Class Plaintiffs argue, "[e]xperts may rely on other experts," and although Dr. Epstein is no longer an expert in the case, "Professor Stiglitz studied the underlying data . . . and will testify about it independently of Dr. Epstein."  (Stiglitz Excl. Opp'n 16 nn.20–21.)  Defendants do not appear to challenge the content of Dr. Epstein's study itself.  The Court concludes by a preponderance of the evidence that Professor Stiglitz's opinion is "based on sufficient facts or data."  Fed. R. Evid. 702(b).

### iv.    Output analyses

Professor Stiglitz's output opinions are admissible.

Defendants argue that Professor Stiglitz's opinion that "the 'proper measure for output' is total transaction volume, which would include transactions in payment forms beyond credit cards," is improper because "Prof. Stiglitz must show his alleged output restriction in the alleged credit card transaction market he defined." (Stiglitz Excl. Mem. 16–17.) They also claim that it is contrary to *Amex*. (*Id.* at 17.) Defendants argue that the cases cited by the Equitable Relief Class Plaintiffs "involve[] tying claims or monopolization claims that — by their nature — require analysis of multiple markets," but that no such claims were alleged here. (Stiglitz Excl. Reply 10.)

In response, the Equitable Relief Class Plaintiffs argue that when a competitive restraint takes the form of a ban on switching to a substitute, "the relevant 'output' must include that of the product to which switching is prohibited." (Stiglitz Excl. Opp'n 17.) They claim that absent the existence of the challenged restraints themselves, "the relevant market might be broader and include debit and other payment means." (*Id.* at 17–18.) They also argue that *Amex* does not hold that the relevant market for output must be the market for credit-card transactions. (*Id.* at 19.) Although an amicus brief filed in *Amex* explained why it would make sense to consider competitive effects outside the credit-card market, the Supreme Court did not address this argument, "and its silence on the point does not suggest that it would reject it in a case in which the issue is actually raised, fully developed, and legally supported." (*Id.*)

The Court does not exclude Professor Stiglitz's output opinions. Professor Stiglitz opines that because "the cross-subsidy from the Merchant Restraints results in consumers shifting to credit card transactions from the closest substitutes outside the relevant economic product market

126

of credit cards," "the proper metric for output in this context, to measure the welfare effect, is total transaction volume." (Stiglitz Rep. ¶ 118.) The Court is unpersuaded that this opinion is "wrong as a matter of law." (Stiglitz Excl. Mem. 17.)

The cases Defendants cite to are distinguishable. First, Defendants cite to *Spinelli*, in which the plaintiffs alleged that the defendants "conspired to restrain trade in the market for commercial licenses of NFL event photographs." *Spinelli*, 903 F.3d at 192; (Def.'s Mem. 17.) In support of this claim, the plaintiffs alleged that the conspiracy had "substantially reduced the output of stock photography for NFL events." *Spinelli*, 903 F.3d at 212. The Second Circuit noted that even if the plaintiffs plausibly alleged that fewer credentials were being given for NFL events and fewer photographs were being taken of those events, "those allegations say nothing about the market for licenses for such photographs." *Id*. That is, even if the plaintiffs proved their claim that the output of stock photography had been diminished, this would still fail to support their overall claim that the defendants had conspired to restrain trade in the market for commercial licenses. Professor Stiglitz, on the other hand, articulates a theory explaining why reduced outcome in total transaction volume supports Plaintiffs' claim that Defendants have restricted competition in the credit card market. Unlike in *Spinelli*, therefore, Professor Stiglitz explains why reduced output in the market he identifies supports Plaintiffs' antitrust claims.

Defendants also cite to *Major League Baseball Properties*. (Def.'s Mem. 17.) In that case, the defendant alleged that the plaintiff's licensing exclusivity agreements restricted output in the market for licenses for use of the plaintiff's intellectual property. *Major League Baseball Props., Inc.*, 542 F.3d at 295, 318. The Second Circuit found that the defendant had pointed to no evidence to support its characterizations and that the record did not show any reduction in the licensing of the plaintiff's intellectual property. *Id*. at 318–19, 322–23. *Major League Baseball*

finds that output is a relevant part of an antitrust analysis, but does not address how that output may be defined.

Nor is Defendants' argument supported by their citation to *E & L Consulting v. Doman Industries*, 472 F.3d 23 (2d Cir. 2006). In that case, the plaintiffs claimed that Doman and Sherwood's agreement for distribution of green hem-fir lumber violated federal antitrust laws. 472 F.3d at 27. The Second Circuit stated that this argument failed "because such a vertical arrangement provides no monopolistic benefit to Doman that it does not already enjoy and would not continue to enjoy if the exclusive distributorship were enjoined." *Id.* at 29. That is, "had Doman established its own in-house distribution system with the same monopoly that Sherwood is alleged to possess, there would have been no increase in the restriction of output of green hem-fir lumber." *Id.* Defendants point to this last quote, noting that green hem-fir lumber is "the product in the relevant product market." (Stiglitz Excl. Mem. 17.) While true, it does not rebut Professor Stiglitz's theory about why output in this case should be considered in a broader market than the market for credit card transactions.

Finally, Defendants cite to *Geneva Pharmaceuticals Technology Corp.* (Stiglitz Excl. Mem. 17.) In that case, the plaintiffs alleged that one of the defendants had a monopoly in the generic warfarin sodium market. 386 F.3d at 494. The Second Circuit began its analysis of the plaintiffs' Section 2 claims by "defin[ing] the relevant market for warfarin sodium," explaining that "[t]he goal in defining the relevant market is to identify the market participants and competitive pressures that restrain an individual firm's ability to raise prices or restrict output." *Id.* at 495–96. Defendants point to the fact that a product market is defined in part by the firm's ability to restrict output in that market. (*See* Stiglitz Excl. Mem. 17.) However, the Court does

not conclude from *Geneva Pharmaceuticals* that *all* analyses of output must be measured in the defined product market.

Defendants also claim that Professor Stiglitz's theory "is directly inconsistent with *Amex*" because in that case "the Supreme Court assessed the volume of credit card transactions to evaluate whether American Express's antisteering rules reduced output in the proffered credit card market." (Stiglitz Excl. Mem. 17.) Defendants are correct that in *Amex*, the Supreme Court held that there was no evidence of reduced output because "[t]he output of credit-card transactions grew dramatically from 2008 to 2013, increasing 30%." *Amex*, 138 S. Ct. at 2288. However, just because *Amex* measured output in credit card transactions does not mean that output may *only* be measured in credit card transactions. Defendants also point to an amicus brief in *Amex*, authored by Professor Stiglitz among others, which advanced the same theory that he advocates for here. (Stiglitz Excl. Mem. 18 n.17.) The amicus brief stated that "if the Amex restraints have effect beyond the Amex platform . . . then the Amex output alone is not a proper indicator of the welfare effect of the restraint," and that "[t]he proper measure of output" is in fact "the size of the market served by all competitors." Brief for John M. Connor *et al.* as Amicus Curiae Supporting Petitioners at *21–22, 2017 WL 2889690 (July 6, 2017). The *Amex* Court did not acknowledge this argument. *See Amex*, 138 S. Ct. 2274. In the context of a motion to exclude evidence, the Court declines to find that the *Amex* Court's failure to adopt Professor Stiglitz's theory indicates that the theory must be "contrary to controlling law." *Olin Corp.*, 2018 WL 1901634, at *21; *see also id.* (stating that an expert's testimony should be excluded as contrary to controlling law "only where an argument has already been rejected by the Court").

### v.   Conclusion

The Court grants Defendants' motion to exclude Professor Stiglitz's opinions that the two-sided analysis of the credit card market is inappropriate and otherwise denies the motion.

## III.   Conclusion

For the foregoing reasons, the Court grants Defendants' motions to exclude Professor Harris's one-sided market definition analysis, Professor Hausman's one-sided market definitions and paragraph 646 of his report, and Professor Stiglitz's opinion that the two-sided analysis of the credit card market is inappropriate, as expressed in paragraphs 44, 45, 50, 86, and 102 of his report.  The Court otherwise denies Defendants' motions to exclude the opinions of Dr. Kohler, Professor Harris, Professor Hausman, and Professor Stiglitz.

Dated: October 7, 2022
    Brooklyn, New York

SO ORDERED:

/s/ MKB
MARGO K. BRODIE
United States District Judge