UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

IN RE PAYMENT CARD INTERCHANGE FEE
AND MERCHANT DISCOUNT ANTITRUST
LITIGATION

    FILED UNDER SEAL

**MEMORANDUM & ORDER**
05-MD-1720 (MKB)

This document refers to: ALL ACTIONS

-------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

    In December 2020, the parties in this multidistrict litigation filed a combined five

motions for summary judgment and partial summary judgment,[1] and nineteen motions to exclude

expert testimony.[2]

---

[1] (Defs.' Notice of Mot. for Summ. J. ("Defs.' Mot."), Docket Entry No. 8067; Notice of Target Pls.' Mot. for Partial Summ. J. ("Target Pls.' Mot."), Docket Entry No. 8097; Equitable Relief Class Pls.' Notice of Mot. for Partial Summ. J. ("Equitable Relief Class Mot."), Docket Entry No. 8150; Notice of 7-Eleven Pls.' & The Home Depot's Motion for Partial Summ. J. ("7-Eleven & The Home Depot Mot."), Docket Entry No. 8184; Defs.' Notice of Mot. to Excl. Pls.' Expert Opinions on EMV Chargebacks & for Partial Summ. J. ("EMV Mot."), Docket Entry No. 8138.)

[2] (Defs.' Notice of Mot. to Excl. Opinions of Dr. Reto Kohler ("Kohler Mot."), Docket Entry No. 8101; Defs.' Notice of Mot. to Excl. in Part Opinions of Prof. Robert G. Harris ("Harris Mot."), Docket Entry No. 8104; Defs.' Notice of Mot. to Excl. in Part Section 1 Opinions of Prof. Jerry Hausman ("Hausman Section 1 Mot."), Docket Entry No. 8081; Visa and Bank Defs.' Notice of Mot. to Excl. in Part Section 2 & Debit Opinions of Prof. Jerry Hausman ("Hausman Section 2 Mot."), Docket Entry No. 8084; Defs.' Notice of Mot. to Excl. in Part Opinions of Prof. Joseph E. Stiglitz ("Stiglitz Mot."), Docket Entry No. 8074; Defs.' Notice of Mot. to Excl. Opinions of Mansour Karimzadeh ("Karimzadeh Mot."), Docket Entry No. 8077; Visa and Bank Defendants' Notice of Mot. to Excl. Expert Testimony Concerning Visa's Fixed Acquirer Network Fee ("FANF Mot."), Docket Entry No. 8070; Defs.' Notice of Mot. to Excl. Rep. & Testimony of the 23(b)(2) Pls.' Expert Dennis W. Carlton ("Carlton Mot."), Docket Entry No. 8086; Defs.' Notice of Mot. to Excl. Opinions of Stephen C. Mott ("Mott Mot."), Docket Entry No. 8080; Defs.' Notice of Mot. to Excl. Opinions of David P. Stowell ("Stowell Mot."), Docket Entry No. 8075; Notice of Direct Action Pls.' Mot. to Excl. Portions of Rep. & Opinions of Def. Expert R. Garrison Harvey ("Harvey Mot."), Docket Entry No. 8090; Notice of

Currently before the Court is Defendants' motion to exclude Plaintiffs' experts' opinions on Euripay, Mastercard, and Visa ("EMV") chargebacks and for partial summary judgment. (*See* EMV Mot.) For the reasons set forth below, the Court denies the motion.

## I. Background

The Court provides a brief background of the facts relevant to its disposition of this motion. For a complete factual background, the Court refers the reader to its order addressing the motions to wholly or partially exclude the opinions of Dr. Reto Kohler, Professor Robert G. Harris, and Professor Joseph E. Stiglitz, and the Section 1 opinions of Professor Jerry Hausman. (Mem. & Order, Docket Entry No. 8714.)

EMV technology is "a global standard for credit cards that uses computer chips and chip readers to authenticate (and secure) chip-card transactions." *B & R Supermarket, Inc. v. Mastercard Int'l Inc.*, No. 17-CV-2738, 2021 WL 234550, at *1 n.1 (E.D.N.Y. Jan. 19, 2021). On August 9, 2011, Visa announced that it would implement an EMV "liability shift" in October 2015. (Defs.' Stmt. of Material Facts ("Defs.' 56.1") ¶ 556, Docket Entry No. 8068; *see also* Direct Action Plaintiffs' Responses to Defs.' 56.1 Stmt. ("DAPs' 56.1 Response") ¶ 556, Docket

---

Direct Action Pls.' Mot. to Excl. Rep. & Opinions of Def. Expert Glenn Hubbard ("Hubbard Mot."), Docket Entry No. 8108; Notice of Direct Action Pls.' Mot. to Excl. Rep. & Opinions of Def. Expert Barbara E. Kahn ("Kahn Mot."), Docket Entry No. 8114; Notice of Direct Action Pls.' Mot. to Excl. Rep. & Opinions of Def. Expert David J. Teece ("Teece Mot."), Docket Entry No. 8135; Notice of Direct Action Pls.' Mot. to Excl. Portions of Rep. & Opinions of Def. Expert David P. Kaplan ("Kaplan Mot."), Docket Entry No. 8207; Notice of Mot. to Excl. the Rep. & Opinions of Def. Expert Andres V. Lerner ("Lerner Mot."), Docket Entry No. 8121; Notice of Target Pls.' Mot. to Excl. Portions of Rep. & Opinions of Def. Expert Kevin M. Murphy ("Target Murphy Mot."), Docket Entry No. 8129; Notice of The Home Depot & 7-Eleven Pls.' Mot. to Excl. Portions of Rep. & Opinions of Def. Expert Kevin M. Murphy ("Home Depot & 7-Eleven Murphy Mot."), Docket Entry No. 8181; Notice of 7-Eleven Pls.' & The Home Depot's Mot. to Excl. Portions of Rep. & Opinions of Def. Experts Marc Cleven & Stuart J. Fiske ("Cleven & Fiske Mot."), Docket Entry No. 8200.)

Entry No. 8195.) In 2012, Mastercard announced its own liability shift on the same date. (Defs.' 56.1 ¶ 557; *see also* DAPs' 56.1 Response ¶ 557 (disputing the supporting material and characterization of Mastercard's motivations, but not disputing Mastercard's imposition of liability shift deadline).) When the liability shift took effect, liability for fraudulent transactions at merchants that had not adopted EMV-compliant terminals shifted from "issuing banks" or "issuers" (banks that issue payment cards to consumers) to "acquiring banks" or "acquirers" (banks that accept consumers' payments for merchants) or the merchants themselves.[3] (Defs.' 56.1 ¶¶ 281–282; DAPs' 56.1 Response ¶¶ 281–282.) A "chargeback" occurs when an issuer seeks reimbursement for a transaction from the merchant or acquirer, including because the transaction was fraudulent. (Defs.' 56.1 ¶ 1118; DAPs' 56.1 Response ¶ 1118.)

Plaintiffs in this action are merchants who are bound by Visa and Mastercard's network rules and who challenge those rules as anticompetitive. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 228 (2d Cir. 2016).[4] The 7-Eleven Plaintiffs are a group of plaintiffs in this action who seek "the amount of EMV-related chargebacks" as damages. (Expert Report of Stephen Rowe ("Rowe Rep.") ¶ 10, annexed to Carney Decl. as Ex. DDX16, Docket Entry No. 8544-2 (expert for 7-Eleven Plaintiffs "quantify[ing] as damages the

---

[3] The parties dispute whether liability shifted to acquiring banks or to merchants. (Defs.' 56.1 ¶¶ 281–282; DAPs' 56.1 Response ¶¶ 281–282.) The Court does not resolve this disagreement for purposes of this motion.

Plaintiffs also contest any implication that before the liability shift, "issuers were always or 'generally' liable for fraud perpetrated on card-present transactions." (DAPs' 56.1 Response ¶ 1117.) They argue that Visa and Mastercard have "maintained network rules that substantially reduced issuer liability for fraud on their cards when used in person" even before the liability shift. (*Id.*) For purposes of this motion, the Court makes no findings about how often issuers were liable for fraud before the liability shift.

[4] The challenged network rules include the "honor all cards" ("HAC") rules, which require merchants to accept all Visa or Mastercard credit or debit cards if they accept any of them. *See id.*

3

amount of EMV-related chargebacks"); *see also* DAPs' 56.1 Response 2508 (noting that unlike the 7-Eleven Plaintiffs, "the Target Plaintiffs and The Home Depot are not seeking EMV chargeback damages in their case").)  Defendants move to exclude Plaintiffs' experts' opinions on EMV chargeback damages and for summary judgment on the issue of EMV chargeback damages; and the 7-Eleven Plaintiffs and Elgin Ave. Recovery, LLC ("Elgin") (collectively, "Plaintiffs") oppose the motions.[5]

## II.  Discussion

### a.  Standards of review

#### i.  Rule 702

Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid.

---

[5]  (Mem. in Supp. of Defs.' Mot. to Excl. Pls.' Experts' Opinions on EMV Chargebacks & Partial Summ. J. ("Defs.' Mem."), Docket Entry No. 8140; Defs.' Reply Mem. in Supp. of Mot. to Excl. Pls.' Experts' Opinions on EMV Chargebacks & Partial Summ. J. ("Defs.' Reply."), Docket Entry No. 8142; 7-Eleven Pls.' & Elgin Ave. Recovery, LLC's Mem. in Opp'n to Def.'s Mot. to Excl. Pls.' Experts' Opinions & Partial Summ. J. ("Pls.' Opp'n"), Docket Entry No. 8228.)
     The Court notes that Elgin and the 7-Eleven Plaintiffs have stipulated that Elgin will retain the 7-Eleven Plaintiffs' experts at summary judgment and trial.  (Letter Regarding Status Update dated May 26, 2020, Docket Entry No. 7949.)  In their supporting memorandum Defendants state that "[a]s usual, the '7-Eleven Plaintiffs' includes the Elgin Plaintiff" because Elgin's complaint is parallel to the 7-Eleven Plaintiffs' complaint and Elgin intends to rely on the 7-Eleven Plaintiffs' experts.  (Defs.' Mem. 1 n.1.)

702.[6] "While the proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied, . . . the district court is the ultimate gatekeeper." *United States v. Jones*, 965 F.3d 149, 161 (2d Cir. 2020) (alteration in original) (quoting *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007)); *see also United States v. Farhane*, 634 F.3d 127, 158 (2d Cir. 2011) ("The law assigns district courts a 'gatekeeping' role in ensuring that expert testimony satisfies the requirements of Rule 702." (citation omitted)), *cert. denied*, 565 U.S. 1088 (2011).

Before permitting a person to testify as an expert under Rule 702, the court must make the following findings: (1) the witness is qualified to be an expert; (2) the opinion is based upon reliable data and methodology; and (3) the expert's testimony on a particular issue will "assist the trier of fact." *Nimely v. City of New York*, 414 F.3d 381, 396–97 (2d Cir. 2005); *see also*

---

[6] In June of 2022, the Judicial Conference Committee on Rules of Practice and Procedure voted to approve two amendments to Rule 702. *See* Colleen Cochran, *The Process, Progression, and Potential Ramifications of the Rule 702 Amendment*, BUSINESS LAW TODAY (Sept. 5, 2022), https://businesslawtoday.org/2022/09/rule-702-amendment-process-progression-potential-ramifications/. One of the two proposed amendments changes the text of the rule to read: "A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if *the proponent demonstrates to the court that it is more likely than not that*. . . ." Committee on Rules of Practice and Procedure, Agenda Book, Tab 7A, at 891 (June 7, 2022), https://www.uscourts.gov/sites/default/files/2022-06_standing_committee_agenda_book_final.pdf. The second proposed amendment changes part (d) from "the expert has reliably applied the principles and methods to the facts of the case" to "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." *Id.* at 891–92.

If approved by the Judicial Conference and the United States Supreme Court, and not rejected, modified, or deferred by Congress, the amendments will take effect in December of 2023. Cochran, *supra*. Because the amendments are not in force at the time this decision is published, the Court does not apply the amended version of Rule 702. However, in deciding these motions, the Court is mindful of the proposed amendments' purpose of "emphasiz[ing] that the court must focus on the expert's opinion, and must find that the opinion actually proceeds from a reliable application of the methodology" and "explicitly weaving the Rule 104(a) standard into the text of Rule 702." Committee on Rules of Practice and Procedure, at 871.

*United States v. Napout*, 963 F.3d 163, 187–88 (2d Cir. 2020) (explaining that the court is tasked

with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the

task at hand" (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)));

*United States v. Cruz*, 363 F.3d 187, 192 (2d Cir. 2004) (same).  In *Daubert v. Merrell Dow*

*Pharmaceuticals, Inc.*, the Supreme Court set forth a list of factors, in addition to the criteria set

forth in Rule 702, that bear on the determination of reliability: "(1) whether a theory or technique

has been or can be tested; (2) 'whether the theory or technique has been subjected to peer review

and publication;' (3) the technique's 'known or potential rate of error' and 'the existence and

maintenance of standards controlling the technique's operation;' and (4) whether a particular

technique or theory has gained general acceptance in the relevant scientific community."

*Williams*, 506 F.3d at 160 (quoting *Daubert*, 509 U.S. at 593–94); *see also United States v.*

*Morgan*, 675 F. App'x 53, 55 (2d Cir. 2017) (same); *Zaremba v. Gen. Motors Corp.*, 360 F.3d

355, 358 (2d Cir. 2004) (same).  The *Daubert* inquiry for reliability is a "flexible one" and does

not "constitute a definitive checklist or test," and thus, the *Daubert* factors "neither necessarily

nor exclusively appl[y] to all experts or in every case." *Kumho Tire Co., Ltd. v. Carmichael*, 526

U.S. 137, 141, 150 (1999) (citation omitted).

The district court is afforded "the same broad latitude when it decides *how* to determine

reliability as it enjoys [with] respect to its ultimate reliability determination." *Id.* at 142.  Expert

testimony should be excluded if it is "speculative or conjectural." *Jones*, 965 F.3d at 162

(quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)); *Major League*

*Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (same). When an expert's

opinion is based on data or methodologies "that are simply inadequate to support the conclusions

reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony."

6

*Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 253 (2d Cir. 2005) (citation omitted); *see also Nimely*, 414 F.3d at 396 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." (alteration in original) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997))). Nevertheless, "in accordance with the liberal admissibility standards of the Federal Rules of Evidence, only serious flaws in reasoning or methodology will warrant exclusion." *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009) (citing *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002)); *see also Adams v. Liberty Mar. Corp.*, 407 F. Supp. 3d 196, 202 (E.D.N.Y. 2019) (same).

### ii. Summary judgment

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Jingrong v. Chinese Anti-Cult World All. Inc.*, 16 F.4th 47, 57 (2d Cir. 2021); *United States v. Bedi*, 15 F.4th 222, 225 (2d Cir. 2021). The court must "constru[e] the evidence in the light most favorable to the non-moving party" and "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019) (first quoting *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 118 (2d Cir. 2001); and then quoting *Johnson v. Goord*, 445 F.3d 532, 534 (2d Cir. 2006)). The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (first quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); and then citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)).

A genuine issue of fact exists when "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The "mere existence of a scintilla of evidence" is insufficient to defeat summary judgment. *Id.* at 252. The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

### b. Admissibility of expert testimony

#### i. Plaintiffs' challenged experts

Defendants challenge the opinions of Plaintiffs' experts' Professor Rowe, Professor Hausman, and Mr. Karimzadeh. (Defs.' Mem.)

##### 1. Professor Rowe

Professor Stephen Rowe is an expert for the 7-Eleven Plaintiffs. (Rowe Rep. ¶ 1.) He was asked "to calculate the total volume of chargebacks incurred by each merchant in the 7-Eleven Group related to the EMV liability shift that was imposed on merchants in October 2015." (*Id.*) Professor Rowe "was not asked to opine on any matters related to liability in this case." (*Id.* ¶ 4.)

Professor Rowe explains in his report that in August of 2011, Visa "set October 1, 2015 as the date for a liability shift, after which a party that has deployed EMV would be protected from financial liability for card-present fraud losses." (*Id.* ¶ 10.) He concluded that "[l]iability shift chargebacks on the Visa network, for all merchants in the 7-Eleven Plaintiffs' Group, totaled approximately ▮▮▮▮▮ for periods through December 2016." (*Id.* ¶ 26.) In a footnote, he explains that this figure "only covers liability shift chargebacks in 2015 and 2016"

8

because Visa "has not yet produced data covering 2017 liability shift chargebacks." (*Id.* ¶ 26 n.10)

For Mastercard, Professor Rowe explains that Mastercard set the liability shift date of October 1, 2015 in January of 2012. (*Id.* ¶ 10.) He concluded that "[l]iability shift chargebacks on the Mastercard network, for all merchants in the 7-Eleven Plaintiffs' Group, totaled approximately ▊▊▊▊ for periods through October 2017." (*Id.* ¶ 27.)

Professor Rowe also filed a reply report responding to criticisms of Defendants' experts. (Reply Report of Stephen Rowe ("Rowe Reply Rep.") ¶ 1, annexed to Carney Decl. as Ex. DDX17, Docket Entry No. 8544-3.) In his reply report, Professor Rowe states that he does not respond to Defendants' experts' claim that his EMV chargeback damages "do not account for chargebacks that would have occurred in the but-for world and that certain merchants are responsible for EMV liability shift chargebacks that they accrued."[7] (*Id.* ¶ 13.) He explains that "[w]hether or not merchants are entitled to EMV chargeback-related damages is beyond the scope of [his] report" because his assignment was "to calculate the chargebacks that were incurred as a result of the EMV liability shift." (*Id.*)

In the reply report, Professor Rowe provides updated liability shift chargeback calculations: ▊▊▊▊ in liability shift chargebacks on the Visa network through December of 2017, and $▊▊▊▊ on the Mastercard network. (*Id.* ¶¶ 14–15.) He states that "[b]ased on the expert opinions of Professor Hausman and Mr. Karimzadeh," he had been "instructed to calculate chargeback damages for the 7-Eleven Group merchants to cover all chargebacks classified as EMV chargebacks for the years 2015 to October 1, 2018." (*Id.* ¶ 16.)

---

[7] The "but-for world" or "BFW" is a "construct of the world without Defendants' antitrust violation." *B&R Supermarket, Inc. v. MasterCard Int'l Inc.*, 2018 WL 1335355, at *4 n.9 (E.D.N.Y. Mar. 14, 2018).

9

However, because he "only had access to data through December 2017" at the time of his report, he intends to supplement his report "when EMV chargeback data is produced for January 2018 to October 2018." (*Id.*)

### 2.  Mr. Karimzadeh

Mansour Karimzadeh is an expert witness for the 7-Eleven Plaintiffs and The Home Depot.  (Expert Report of Mansour Karimzadeh ("Karimzadeh Rep.") ¶ 6, annexed to Carney Decl. as Ex. DDX8, Docket Entry No. 8544-2.)  He claims that as a result of Visa and Mastercard's delayed migration to EMV, "the U.S. payment ecosystem . . . suffered disproportionately from fraud."  (*Id.* ¶ 89.)  Further, he claims that the delayed migration caused "U.S. travelers abroad and international travelers to the U.S. [to] suffer[] from poor customer experiences."  (*Id.* ¶ 95.)  Mr. Karimzadeh also opines that Visa's delay in bringing EMV to the United States protected its signature debit revenue,[8] (*id.* ¶ 99), and that despite EMV's "technical neutrality," Visa and Mastercard "implemented EMV technology" in the United States "in ways that substantially limit[ed] the ability of merchants to control transaction routing," (*id.* ¶ 117).

Mr. Karimzadeh also opines in his report that the four-year liability shift deadline was "far too short" and that "a period of 8–10 years for deployment would have been more appropriate in the U.S."  (*Id.* ¶ 185.)  He states that he reached this conclusion after reviewing factors including "(a) EMV adoption rates, including predicted rates, and rates before and after an EMV migration; (b) duration from roadmap announcement to liability shift; (c) complexity

---

[8]  In its Memorandum and Order deciding Defendants' motions to exclude the opinions of Mr. Karimzadeh, Professor Dennis W. Carlton, Mr. Stephen C. Mott, and Professor David P. Stowell, the Court explained that Mr. Karimzadeh may not opine as to parties' motivation or state of mind.  (Mem. & Order, Docket Entry No. 8718.)  Thus, Mr. Karimzadeh may not opine that Visa delayed bringing EMV to the United States in order to protect its signature debit revenue, although he may opine that the delay had the effect of protecting that revenue.

and size of the market; and (d) the use of merchant interchange incentives." (*Id.* ¶ 187.) Mr. Karimzadeh supports his conclusion with comparisons to migrations in other jurisdictions and "documents from the case," including "Visa's documents and its own analysis." (*Id.* ¶¶ 188–204.)

Mr. Karimzadeh also submitted a reply report responding to criticisms of his initial report. (Reply Expert Report of Mansour Karimzadeh ¶ 2 ("Karimzadeh Reply Rep."), annexed to Carney Decl. as Ex. DDX9, Docket Entry No. 8544-2.) In his reply report, Mr. Karimzadeh notes that Defendants' experts criticized his initial report "for not specifying exactly when the 8–10 year [migration period] . . . should have begun." (*Id.* ¶ 121.) He states that his initial report "demonstrated that Visa and Mastercard should have brought EMV to the U.S. at the same time as the rest of the world, beginning in approximately 1999," but that "[i]n all events, the U.S. migration should have begun at least by 2006." (*Id.* ¶¶ 121–122.) Mr. Karimzadeh states that this but-for 2006 transition "should have followed EMV migration best practices, including . . . a sufficient period for issuance and terminal certification before a liability shift deadline." (*Id.* ¶ 123.) He claims that in this but-for world, "most merchants would have been EMV-compliant by the time of the liability shift," and that this is "supported by experience in markets such as the U.K. and the Netherlands." (*Id.* ¶ 124.) Further, in this but-for world, "the massive chargeback exposure the 7-Eleven Group merchants experienced due to the premature liability shift . . . would not have happened." (*Id.* ¶ 125.)

Mr. Karimzadeh further claims that "[a]ctual world experience in the U.S. is consistent with this conception of the BFW" because "[i]f the liability shift had been correctly adjusted according to best practices — in keeping with what Visa decided and discussed with stakeholders before reversing course to align with Mastercard after the Target breach — the U.S.

liability shift would have taken effect October 1, 2018, providing a roughly 7-year period for merchant adoption." (*Id.* ¶ 126.) He supports this claim with citations to Visa sources. (*Id.* ¶ 126 n.234.) Mr. Karimzadeh opines that "all reasonably diligent merchants," including the 7-Eleven Plaintiffs, "could have been ready for EMV by this date" and that "any chargebacks imposed after" October 1, 2018 "could be fairly deemed to be imposed because of a merchant's decision not to upgrade." (*Id.* ¶ 127.) Mr. Karimzadeh claims that his opinion "is further supported by evidence that "as of December 2018, 99% of the top 200 merchants in the U.S. ha[d] implemented chip." (*Id.*)

At his deposition, Mr. Karimzadeh was asked whether his initial report included "any opinion that in some sort of but-for world there would be a fraud liability shift delayed until October 2018." (Videotaped Dep. of Mansour Karimzadeh ("Karimzadeh Dep.") 274:9–12, annexed to Carney Decl. as DDX27, Docket Entry No. 8544-4.) Mr. Karimzadeh replied, "Not in my first report." (*Id.* at 274:14.) When he was asked whether this opinion was "something [he] added to [his] reply report," he replied, "But-for world is in my reply report." (*Id.* at 274:15–17.) Mr. Karimzadeh was then asked whether it would change issuers' and merchants' incentives "as to when they would actually enable EMV "[i]f the fraud liability shift were delayed by three years as [he] put in [his] reply report." (*Id.* at 274:18–23.) He replied that he had said "that there should be a longer period of migration," but that "[t]hat does not mean that they have to extend it. It could . . . mean we start earlier." (*Id.* at 274:25–275:3.) Later during the deposition, asked again about what would happen "[i]f the liability shift was October 2018 instead of October 2015," Mr. Karimzadeh stated that he was "saying that we should have started earlier rather than extended it later by three years." (*Id.* at 279:17–280:11.) After a short break in the deposition, Mr. Karimzadeh was asked to clarify whether his opinion was "that Visa and

Mastercard should have started EMV migration earlier than they did and not that there should have been a three-year delay." (*Id.* at 294:7-12.) Mr. Karimzadeh agreed that this was both what he "said in the report" and was also his opinion on that day. (*Id.* at 294:13-17.) Opposing counsel asked: "So you're not saying that after the Target breach Visa and Mastercard, despite all the pressure to move forward on EMV, should have still delayed by three years?" (*Id.* at 294:18-21.) Mr. Karimzadeh responded: "I don't believe that's my opinion." (*Id.* at 294:24.)

### 3. Professor Hausman

Professor Jerry Hausman is an expert for the 7-Eleven Plaintiffs and The Home Depot. (Expert Rep. of Professor Jerry Hausman ("Hausman Rep.") ¶ 10, annexed to Carney Decl. as Ex. DDX5, Docket Entry No. 8544-1.) In his report, he opined that Visa and Mastercard's market power "is evident from . . . the manner in which they forced the payment card industry to migrate to chip-based transactions ('EMV')." (*Id.* at ¶ 11.) Professor Hausman stated that he understood "from the expert report of Mansour Karimzadeh" that "several aspects" of the EMV implementation "cannot be justified from a security or technical perspective." (*Id.* at ¶ 266.) These aspects "included the failure to require Chip & PIN . . . , the failure to offer merchants that were bearing the majority of the costs of EMV incentives to implement the technology, and the imposition of an unrealistic liability shift deadline that almost certainly guaranteed that the vast majority of merchants would face an effective price increase." (*Id.*)

Professor Hausman also submitted a reply expert report responding to criticisms of his initial report. (Reply Expert Rep. of Professor Jerry Hausman ("Hausman Reply Rep."), annexed to Carney Decl. as Ex. DDX6, Docket Entry No. 8544-1.) In his reply report, Professor Hausman refers to "Mastercard's ability . . . to force merchants to absorb a supra-competitive price increase through the fraud liability shift" as "direct evidence of Mastercard's substantial

market power." (*Id.* at ¶ 90.) He states that according to the record,



(*Id.* at ¶ 375.)

the October 2015 liability-shift deadline, which

effectively raised prices to merchants and the industry," which is "evidence confirming

Mastercard's substantial market power." (*Id.*; *see also id.* at ¶¶ 383, 389 (referring to

Mastercard's "maintenance of the EMV liability-shift date" as "direct evidence of Mastercard's

substantial market power").)

Later in his reply report, Professor Hausman states that "a liability shift can be an

effective way to spur EMV adoption," but that "[t]he relevant question . . . is whether the

liability shift has been configured to give both issuers and merchants adequate time to meet the

liability-shift timeline." (*Id.* at ¶ 733.) He claims that in the United States, "Visa and Mastercard

used the liability shift to shift fraud costs from issuers to merchants, imposing an effective price

increase on merchants" because the United States "saw an unprecedented disparity in the

readiness of merchants as compared to issuers, which caused a shift of fraud costs from issuers to

merchants." (*Id.* at ¶ 734.) Professor Hausman opines that Visa and Mastercard chose to

maintain the liability-shift deadline despite knowing it was unrealistic and that this decision

(*Id.* at ¶ 735.) He states that there is "no

evidence of this price increase (nor the eventual, industry-wide reduction in counterfeit fraud as

emphasized by Visa and Mastercard) being passed through by issuers," and that Defendants'

experts fail to "factor[] this substantial exercise in market power into their competitive-effects

analysis or their analyses of the two-sided price." (*Id.* at ¶ 736.) Professor Hausman also

14

responds to Dr. Andres V. Lerner's[9] argument that "Visa and Mastercard had a legitimate reason to maintain the liability-shift deadline," arguing that Dr. Lerner "misses the point" because "[c]ounterfeit fraud had been migrating to the U.S. for many years prior to Visa's (and Mastercard's) delayed decision to move the industry to EMV in 2011" but Visa and Mastercard "did nothing to move the industry to a less fraud-prone infrastructure until after the Durbin Amendment, in large part to protect signature debit." (*Id.* at ¶ 738.) He cites to sources that he claims "support the conclusion" that Visa and Mastercard did not migrate the U.S. to EMV earlier in order to "protect the higher revenues associated with fraud-prone signature products." (*Id.* at ¶¶ 739–740.) He concludes that he "attribute[s] Visa's and Mastercard's failure to migrate the U.S. payment system to EMV much earlier to the HAC rules and the supra-competitive interchange those rules enabled as significant economic factors." (*Id.* at ¶ 741.) Professor Hausman does "not contest that the Target breach put pressure on the industry to maintain the EMV deadlines," but claims that the pressure "was the result of years of inaction . . . driven by Visa['s] and Mastercard's protection of the revenue streams associated with fraud-prone signature products, revenues that were supported by the HAC rules." (*Id.* at ¶ 742.) He therefore views Visa's and Mastercard's "entire course of conduct with EMV, from their failure to implement it earlier to their imposition of a liability-shift deadline that they knew would impose significant chargeback exposure on merchants, as an exercise of substantial market power." (*Id.*) Later in his report, Professor Hausman again refers to the "unrealistic" liability shift as "an

---

[9] Dr. Lerner is an expert witness for Visa and the Bank Defendants. (Videotaped Dep. of Andres Lerner ("Lerner Dep.") 343:7–11, annexed to Wilson Decl. as Ex. 2, Docket Entry No. 8499-1; Defs.' Mem. in Opp'n to Target Pls.' Mot. to Exclude Rep. & Opinions of Def. Expert Andres Lerner ("Lerner Opp'n") 1, Docket Entry No. 8205.)

exercise of substantial market power by Visa and Mastercard" and claims that this market power was "underpinned by the HAC rules." (*Id.* at ¶¶ 878–879.)

At his deposition, Professor Hausman was asked whether he had "any opinions" on EMV chargeback damages. (Videotaped Dep. of Jerry Hausman ("Hausman Dep.") 745:25–746:1, annexed to Carney Decl. as Ex. DDX25, Docket Entry No. 8544-4.) He replied that his opinion was that "if it weren't for the market power that Visa and Mastercard were able to exercise," it "could well have been" that the EMV migration "would have been different and there would have been fewer amounts that merchants ended up paying." (*Id.* at 746:2–7.) Opposing counsel asked "[i]n what way" the EMV migration would have been different. (*Id.* at 746:14.) Professor Hausman replied that "[i]t might have been later and there would have been more time. ▮▮k

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮t ▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.* at 746:15–17.) Further, "if the liability shift had not been so rapid . . . there would have been lower costs to the merchants." (*Id.* at 746:18–22.) Professor Hausman testified that he had not "offer[ed] any opinion in [his] opening report about the EMV chargebacks as damages." (*Id.* at 746:23–25.) He also had not offered any opinion in his opening report about "the timing of the fraud liability shift in the United States," but testified that he thought he had included "an opinion saying [that] with respect to EMV, Visa[] and Mastercard exercised market power, because ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" (*Id.* at 747:1–9.)

### ii. Plaintiffs' experts' opinions are grounded in Plaintiffs' antitrust claims

Defendants argue that Plaintiffs' experts' opinions about chargeback damages should be excluded because there are no allegations in the 7-Eleven Plaintiffs' Sixth Amended Complaint ("SAC") "that Visa's or Mastercard's conduct with respect to their *EMV liability shifts* itself

16

violated the antitrust laws." (Defs.' Mem. 12; *see* SAC ¶ 129, annexed to Szanyi Decl. as Ex. SJDX1, Docket Entry No. 8520-1.) Regarding Section 1, they claim that the SAC "allege[s] no violation of Section 1 of the Sherman Act relating to the EMV fraud liability shifts being effective in October 2015 instead of three years later." (Defs.' Mem. 14.) They further claim that "Plaintiffs' experts agree that Visa's and Mastercard's decisions not to delay their liability shifts after the Target data breach were reasonable." (*Id.*) Regarding Section 2, Defendants argue that "because Plaintiffs' Section 2 claim is based on the same 'theory of anticompetitive conduct'" as their Section 1 claim, "Plaintiffs' inability to show anticompetitive conduct pertaining to the EMV liability shift on their Section 1 claims precludes Section 2 liability." (*Id.* at 15.) Further, they argue that even if the liability shift were "improperly" construed as a price increase to customers, "raising prices to customers is not unlawful under Section 2 in the absence of *exclusionary* conduct." (*Id.*) They claim that Plaintiffs neither allege nor put forth evidence "that Visa's decision not to delay its liability shift eliminated competition with other debit networks." (*Id.*) Defendants also argue that Plaintiffs' theory of liability "conflate[s] product quality harm with chargeback damages." (Defs.' Reply 8 n.29.)

Plaintiffs respond that "[e]ven if the [SAC] controlled at this stage," the SAC "does not focus on the *timing of liability shifts*" but rather "details a course of anticompetitive conduct allowing Defendants to foist inferior and insecure products on the U.S. market for years." (Pls.' Opp'n 22.) They also argue that the SAC "expressly connects these harms to the core anticompetitive conduct at issue in this case" by stating that "[t]o the extent that Plaintiffs and their customers were forced to absorb the costs of such fraud through chargebacks or fees or fines, such costs are damages that flow from the conspiracies." (*Id.*)

The allegations in the SAC provide a basis for considering EMV chargebacks as damages. With regard to Plaintiffs' Section 1 claims, they allege that Visa and Mastercard's price fixing allowed them to acquire substantial market power, (SAC ¶ 129), which they used to force merchants and consumers to accept products that used fraud-prone magnetic stripe technology while delaying introducing EMV technology in order to protect their signature debit revenues,[10] (*id.* at ¶¶ 130, 132, 273–274). Visa and Mastercard then used their market power to shift the cost of fraud losses to merchants through "compliance programs and liability rules." (*Id.* at ¶¶ 148, 150.) In listing the claims for relief against Visa and Mastercard for price fixing and agreements not to compete, Plaintiffs claim that the conspiracy "imposed . . . damages in the form of network fees, fines, and fraud losses," and that these price increases "were the products of the agreement among Visa and its owner/member banks that the banks will not compete for merchants' acceptance of Visa transactions." (*Id.* at ¶¶ 266, 274, 282, 290, 298, 304, 312, 319.)

With regard to Plaintiffs' Section 2 claims, they allege in the SAC that Visa "implement[ed] and exploit[ed] EMV to technology to subvert competition from PIN Debit Card networks" in order to preserve its monopoly power after the Durbin Amendment.[11] (*Id.* at ¶ 202.) They claim that "[a]s a result of its conduct, Visa has maintained its monopoly power throughout the Damages Period" and that "[a]s direct consequences of Visa's anticompetitive

---

[10] In the SAC, Plaintiffs also allege that Visa migrated to EMV without a PIN "notwithstanding the clear security risks of that approach." (SAC ¶¶ 147, 215.) However, Plaintiffs do not mention this claim in their opposition to Defendants' motion. (*See* Pls.' Opp'n.)

[11] In the SAC, Plaintiffs also describe the liability shift as an anticompetitive means for Visa to force issuers to accept its proprietary EMV technology. (*Id.* at ¶¶ 213, 223.) However, Plaintiffs do not appear to rely on this antitrust theory in their response to Defendants' motion, instead stating that the EMV chargeback damages are "the direct result of the core antitrust violation at issue in this case — the Honor All Cards Rules ('HAC Rules') and the fixed interchange they enable." (Pls.' Opp'n 1.)

18

conduct which has maintained its debit monopoly, merchants, including Plaintiffs, have incurred

damages throughout the Damages Period in the form of: . . . substantial and unnecessary

expenses in migrating their payment systems to EMV technology; and [] chargebacks imposed

for payment fraud, which would not have been imposed but for Visa's anticompetitive conduct."

(*Id.* at ¶¶ 232, 235.)  In listing its claims for relief against Visa for monopolizing and attempting

to monopolize the debit card market, Plaintiffs claim that "[a]s a direct and proximate result of

Visa's exclusionary conduct, Interchange Fees and network fees for General Purpose Debit Card

and Credit Card Network Services were set at artificial, supracompetitive levels and Plaintiffs

suffered injury to their business and property by . . . incurring chargebacks and unnecessary

hardware implementation costs."  (*Id.* at ¶ 326; *see also id.* at ¶¶ 333, 339.)

 The Court finds that EMV chargeback damages would be the result of "the alleged

violations of the antitrust laws set forth in" the SAC, and therefore does not exclude Plaintiffs'

experts' opinions on this basis.  *GAF Corp. v. Circle Floor Co.*, 463 F.2d 752, 757 (2d Cir.

1972).  Plaintiffs allege in the SAC that in a but-for world without anticompetitive practices,

Defendants would not have had the market power to force Plaintiffs to accept liability for fraud.

(*See* SAC ¶¶ 148, 150.)[12]  Thus, Plaintiffs would not have experienced EMV chargeback losses

in the but-for world and those losses are therefore properly pled as antitrust damages.  *See*

*Morris v. Tyson Chicken, Inc.*, No. 15-CV-77, 2022 WL 68963, at *3 (W.D. Ky. 2022)

("Damages calculations in antitrust cases seek to compare plaintiffs' actual experience in the real

world with what the plaintiffs' experience would have been, 'but for' the antitrust violation."

(quoting *In re Pool Prod. Distrib. Mkt. Antitrust Litig.*, 166 F. Supp. 3d 654, 678 (E.D. La.

---

 [12]  Plaintiffs also alleges that in the but-for world, Visa would not have imposed a short migration period in order to force issuers to accept its proprietary technology, although Plaintiffs do not rely upon that claim here.  (*Id.* at ¶¶ 213, 223.)

2016))); *see also Apotex, Inc. v. Cephalon, Inc.*, 321 F.R.D. 220, 236 (E.D. Pa. 2017) ("When recreating a but-for world to establish antitrust damages, a plaintiff must create a world 'characterized by the absence of the . . . challenged practices.'" (quoting *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp., L.P.*, 247 F.R.D. 156, 165 (C.D. Cal. 2007))).  The Court therefore disagrees with Defendants that Plaintiffs fail to allege that "Visa or Mastercard's conduct with respect to their *EMV liability shifts* itself violated the antitrust laws," (Defs.' Mem. 12), or that Plaintiff's theory of liability "conflate[s] product quality harm with chargeback damages," (Defs.' Reply 8 n.29).  Nor is it relevant whether "Plaintiffs' experts agree that Visa's and Mastercard's decisions not to delay their liability shifts after the Target data breach were reasonable." (Defs.' Mem. 14.)  Plaintiffs' argument is not that, given the state of fraud in 2013, a 2015 liability shift deadline was unreasonable.  Rather, it is that the late EMV shift and the short migration period were enabled by Visa's and Mastercard's anticompetitive practices.

### iii.  Professor Rowe's calculations are consistent with Plaintiffs' but-for world

Defendants seek to exclude Professor Rowe's EMV damages calculations, arguing that none of Plaintiffs' experts have "posited an antitrust but-for world — i.e., one that assumes away an antitrust violation and then asks what economically rational actors would have done in that but-for world — in which Visa and Mastercard would have delayed their liability shifts by three years until October 2018." (Defs.' Mem. 10–12.)  Defendants make several arguments in response to Plaintiffs' claim that its theory is that, in the but-for world, Visa and Mastercard would have implemented EMV earlier and with a longer migration period.  First, Defendants argue that Plaintiffs' liability experts do not provide "the requisite analysis to support this liability theory." (Defs.' Reply 3.)  They claim that neither Professor Hausman nor Mr. Karimzadeh "engaged in an actual analysis of HAC in the context of EMV chargebacks." (*Id.* at

3–4.)  Second, Defendants argue that Rowe's chargeback calculations do not correspond to Mr.

Karimzadeh's proposed but-for migration period because Professor Rowe calculated damages for

a 7-year period and Mr. Karimzadeh "proposed a migration period of 8–10 years, not 7 years."

(*Id.* at 7.)  Third, Defendants claim that if Professor Hausman and Mr. Karimzadeh had properly

analyzed "what economically rational issuers, merchants, and networks would have done in the

but-for world," they would have acknowledged the "substantial evidence that participants in the

U.S. payments industry made decisions on whether, and when, to implement EMV on an

individual basis considering their own commercial interests." (*Id.* at 4–5.)  Finally, Defendants

argue that evidence shows that "market participants did not support an earlier EMV migration,"

which contradicts Plaintiffs' theory that an earlier EMV migration would have occurred in the

but-for world.  (*Id.* at 6–7.)

      The Court finds that Professor Rowe's damages calculations are consistent with

Plaintiffs' but-for world.  As described above, Plaintiffs' claim in the SAC that Defendants used

market power — acquired through price-fixing and agreements not to compete in the form of the

HAC and other network rules — to shift fraud liability to Plaintiffs.[13]  (*See* SAC ¶¶ 106, 129,

148, 150.)  In the absence of anticompetitively acquired market power, Defendants would not

have been able to shift liability to Plaintiffs and Plaintiffs would not have been liable for EMV

chargebacks.  Therefore, Professor Rowe's treatment of EMV chargebacks as damages is

consistent with Plaintiffs' but-for world.

---

[13]  As noted above, Plaintiffs also appear to allege in the SAC that the short migration period was anticompetitive because Visa used it to pressure issuers to accept its proprietary and anticompetitive EMV technology.  (SAC at ¶¶ 213, 223.)  However, Plaintiffs do not rely on this theory in their opposition.  (*See* Pls.' Opp'n.)

Defendants claim that it is insufficient that Professor Rowe's EMV damages calculations are consistent with the but-for world implied by the SAC because Plaintiffs' liability experts failed to "engage[] in an actual analysis of HAC in the context of EMV chargebacks." (Defs.' Reply 3.) They acknowledge that Professor Hausman testified about the relationship between Visa's and Mastercard's market power and the EMV liability shift, but argue that he "said nothing about HAC." (Defs.' Reply 3–4; *see* Hausman Reply Rep. ¶¶ 90, 375, 383, 389, 878–79; Hausman Dep. 745–747 (opining that the liability shift was the product of market power).) However, Professor Hausman directly opines that Visa's and Mastercard's market power "is underpinned by the HAC rules." (Hausman Reply Rep. ¶ 879.) This is consistent with his analysis in his opening report that Defendants "have organized themselves as cartels composed of nearly every financial institution involved in the payment card industry in the U.S." and that Visa and Mastercard "manage their respective cartels . . . by insulating them from having to compete with each other for merchant acceptance," in part through "manag[ing] and enforce[ing] the HAC rules," which "constitute an explicit promise to issuing banks that Visa and Mastercard will protect them from having to compete with each other." (*Id.* at ¶¶ 174, 180.) Professor Hausman opines that through these cartels, which are maintained and managed through the HAC rules, Visa and Mastercard have acquired market power. (*Id.* at ¶ 181; *see also id.* at ¶ 174 (stating that the cartel structure "confers substantial market power on Visa and Mastercard and their issuing banks"); ¶ 208 (referring to Visa and Mastercard's "substantial market power as the manager of cartels involving virtually all credit card issuers"); ¶ 210 (referring to the "horizontal restraint on competition" posed by Visa and Mastercard's rules "and the substantial market power it creates").) The Court expresses no judgment as to whether these claims are correct, but

they constitute evidence that the liability shift would have been delayed in the absence of the HAC rules.

The Court also does not exclude Professor Rowe's calculations on the basis that the projected 7-year liability shift fails to correspond to Mr. Karimzadeh's proposed 8- to 10-year migration. (Defs.' Reply 7.) As an initial matter, Mr. Karimzadeh opined that in the but-for world Visa and Mastercard would have begun the U.S. EMV migration "at least by 2006," but the real-world migration did not begin until 2011. (Karimzadeh Reply Rep. ¶¶ 121–122.) It is inherently difficult to calculate what EMV chargeback damages would have been if the migration had not only lasted longer but also started at least five years earlier. (*See id.* ¶¶ 121–122.) While Mr. Karimzadeh did repeatedly opine in his reply report that the migration should have taken 8 to 10 years, (*see id.* ¶¶ 119 ("Visa and Mastercard delayed bringing EMV to the U.S., which in my opinion required 8–10 years to adopt chip."), 121 ("Defendants' experts fault my Opening Report for not specifying exactly when the 8–10 year period I described would be necessary for the migration should have begun."), ¶ 123 ("Consistent with other jurisdictions . . . the migration in the U.S. should have been in the range of 8–10 years.")), he also opined that if the real-world liability shift "had been correctly adjusted according to best practices" it would have taken effect on October 1, 2018, (*id.* ¶ 126). The Court agrees with Plaintiffs that to the extent this represents an inconsistency, Defendants may present this argument to the jury. (Pls.' Opp'n 21.) "Where the but-for price is uncertain, 'the plaintiff's burden of proving damages is, to an extent, lightened,' for 'the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.'" *In re Electronic Books Antitrust Litig.*, No. 11-MD-2293, 2014 WL 1282293, at *16 (S.D.N.Y. Mar. 28, 2014) (citation omitted) (quoting *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1077, 1078 (2d Cir. 1988)); *see also In re Restasis (Cyclosporine*

*Ophthalmic Emulsion) Antitrust Litig.*, 335 F.R.D. 1, 32 (E.D.N.Y. 2020) ("Courts recognize that, '[g]iven the inherent difficulty of identifying a "but-for world,"' antitrust damages need not 'be measured with certainty.'")  Defendants cite to *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013), in which the Supreme Court noted that at the class-certification stage, "any model supporting a 'plaintiff's damages case must be consistent with its liability case.'"  (Def.'s Reply 7.)  However, where the damages case and the liability case are consistent — as they are here — "courts have allowed antitrust plaintiffs considerable latitude in proving the amount of damage." *US Airways, Inc. v. Sabre Holdings Corp.*, No. 11-CV-2725, 2022 WL 1140291, at \*1 (S.D.N.Y. Apr. 18, 2022) (quoting *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1378 (2d Cir. 1988)).  This latitude is particularly appropriate here because assuming a 7-year migration, as Professor Rowe does, is *more* favorable to Defendants, and results in *lower* damages, than if Professor Rowe assumed an 8- to 10-year migration.

The Court also does not exclude Professor Rowe's calculations on the basis that they are insufficiently supported by the opinions of Plaintiffs' liability experts.  Defendants claim that Professor Hausman and Mr. Karimzadeh fail to analyze "what economically rational issuers, merchants, and networks would have done in the but-for world, with all other factors kept constant." (Defs.' Reply 4.)  Plaintiffs' experts may permissibly assume that, in a but-for world in which merchants were given more time to migrate to EMV before the liability shift, they would have done so.  Defendants argue that this assumption is contrary to the evidence, and in particular, that Professor Hausman and Mr. Karimzadeh fail to acknowledge "substantial evidence that participants in the U.S. payments industry made decisions on whether, and when, to implement EMV on an individual basis considering their own commercial interests." (*Id.* at 4–5.)  Defendants point to evidence that "many merchants . . . started work on EMV

implementation only after they started incurring chargebacks," and claim that even Mr. Karimzadeh acknowledged "that in a but-for world with a longer liability shift timetable, some Plaintiffs . . . would have experienced at least some EMV chargebacks." (*Id.* at 5.)  Defendants can explore these challenges on cross-examination, but they do not warrant excluding Professor Rowe's calculations. *See In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 465–66 (S.D.N.Y. 2016) (stating that while an expert's failure to analyze a certain piece of evidence was "fair game for cross-examination" and "seem[ed] to undermine [the expert's] conclusion," "in these circumstances his failure to discuss it in his report is not so glaring as to render his opinion unreliable or inadmissible"); *Pfizer Inc. v. Teva Pharms. USA, Inc.*, 461 F. Supp. 2d 271, 279 (D.N.J. 2006) (noting that although the plaintiffs pointed to evidence that the expert had "failed to consider some documents that might have affected his opinions," this was "an issue best addressed by cross-examination" that did not "render[] his entire testimony inadmissible").  This is particularly true given the latitude courts grant plaintiffs in calculating but-for-world antitrust damages. *US Airways, Inc.*, 2022 WL 1140291, at *1.  Evidence that some Plaintiffs would have incurred EMV chargebacks in the but-for world may limit the amount of chargebacks damages available, but it does not obviate the possibility of such damages entirely.[14]

Finally, the Court does not exclude Professor Rowe's damages calculations on the basis that they are "contradicted by evidence showing that *market participants did not support an earlier EMV migration.*" (Defs.' Reply 6.)  Mr. Karimzadeh's and Professor Hausman's failure

---

[14] Further Plaintiffs allege that the delay by Visa and Mastercard in migrating to EMV caused fraud rates in the United States to increase, (*see* SAC ¶¶ 149–150, 206–207), and point to evidence that by the mid-2000s, fraud migrated to the United States as the "weak link in the international payments system," (Pls.' Opp'n 5–6).  Thus, in a but-for world in which merchants began migrating to EMV by "at least" 2006, (Karimzadeh Reply Rep. ¶¶ 121–122), it is possible that some of the post-2015 fraud for which Plaintiffs became responsible never would have occurred.  (*See* DAPs' Counterstatement ¶ 1449, Docket Entry No. 8196.)

to consider the specific evidence enumerated by Defendants, (*see id.*), does not render their opinions inadmissible. As noted above, failure to consider every single relevant piece of evidence does not warrant exclusion. *See In re Mirena*, 169 F. Supp. 3d at 465–66 (stating that while an expert's failure to analyze a certain piece of evidence was "fair game for cross-examination" and "seem[ed] to undermine [the expert's] conclusion," "in these circumstances his failure to discuss it in his report is not so glaring as to render his opinion unreliable or inadmissible"). In his reply report, Mr. Karimzadeh claims that Defendants' experts are wrong to argue that there was no "business case" for EMV prior to 2011, pointing to data breaches, fraud, interoperability issues, Visa's and Mastercard's own internal studies, and statements from industry stakeholders, (Karimzadeh Reply Rep. ¶¶ 12–94). Defendants may cross-examine him with additional facts at trial, but Mr. Karimzadeh's conclusion that the EMV migration would have happened earlier in the but-for world is sufficiently reliable to warrant admission of Professor Rowe's EMV chargeback damage calculations.

### iv. Plaintiffs' experts' opinions are not contrary to law

Defendants argue that "the mere shifting of costs from one side of a payment platform to another [cannot] support an antitrust violation." (Defs.' Mem. 12.) They cite to Professor Hausman's description of the EMV chargebacks as "shift[ing] . . . fraud costs from issuers to merchants." (*Id.* at 12–13.) Defendants argue that in *Ohio v. American Express* ("*Amex*"), 138 S. Ct. 2274 (2018), the Supreme Court recognized that "shifting costs between the two sides of a transaction platform 'to bring both sides on board' . . . is of no concern to antitrust law." (*Id* at 13.) Further, in *US Airways, Inc. v. Sabre Holdings Corp.*, "the Second Circuit held that it is not proper to measure supposed damages to customers on one side of a two-sided transaction platform without accounting for a countervailing effect on the other side of the platform," which

Defendants argue is relevant here because "there is . . . an immediate dollar-for-dollar reduction in issuer-side costs equivalent to the increase in merchant-side costs from the shift in fraud liability." (*Id.* at 13.) Defendants argue that under *Amex*, it is Plaintiffs' experts' burden "to analyze whether any claimed price increases to merchants in the form of EMV chargebacks led to increased two-sided transaction prices." (Defs.' Reply 8.) They further claim that contrary to Plaintiffs' argument, any harm caused by a delay in the EMV migration is "irrelevant" because "Plaintiffs are not seeking damages based on an industry-wide increase in fraud or reduction in product quality during the pre-EMV period." (Defs.' Reply 8.)

In response, Plaintiffs argue, first, that "Defendants' isolated attack on one supposed aspect of Plaintiffs' claims" is contrary to the holding in *Continental Ore v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962), and its progeny that courts must "focus on the claims 'as a whole.'" (Pls.' Opp'n 22–23.) Second, they argue that in the but-for world without the HAC rules, "Visa and Mastercard would have implemented EMV earlier and given merchants time to upgrade," which would have benefited cardholders, merchants, and issuers. (*Id.* at 23.) Third, Plaintiffs argue that even in the absence of this systemwide reduction in fraud, "there is no evidence in the record that the price increase to merchants in the form of EMV chargebacks was passed through to cardholders by issuers." (*Id.* at 24.) They argue that without "evidence of pass-through," EMV chargebacks to merchants "amounted to a two-sided price increase." (*Id.* at 25.)

In *Amex*, the Supreme Court considered antitrust claims against American Express. 138 S. Ct. at 2280. It noted that credit-card companies operate a "two-sided platform," which is a platform that "offers different products or services to two different groups who both depend on the platform to intermediate between them." *Id.* Not only is a credit-card network a two-sided

platform, it is a "special type of a two-sided platform known as a 'transaction' platform," which "cannot make a sale to one side of the platform without simultaneously making a sale to the other." *Id.* Two-sided platforms often exhibit "indirect network effects," which "[s]ometimes . . . require two-sided platforms to charge one side much more than the other." *Id.* at 2281. In particular, platforms must design the "[r]elative price structure" in order to "bring both sides on board." *Id.* at 2281. The Court held that "[e]valuating both sides of a two-sided platform is . . . necessary to accurately assess competition," and that "[i]n two-sided transaction markets, only one market should be defined." *Id.* at 2287. It found that the *Amex* plaintiffs' "argument about merchant fees wrongly focuse[d] on only one side of the two-sided credit-card market." *Id.* Rather, "[t]o demonstrate anticompetitive effects on the two-sided credit-card market as a whole, the plaintiffs must prove that Amex's antisteering provisions increased the cost of credit-card transactions above a competitive level, reduced the number of credit-card transactions, or otherwise stifled competition in the credit-card market." *Id.*

*US Airways* concerned an antitrust suit against Sabre, which owned and operated a "global distribution system: an electronic network that travel agents use to search for and book airline flights for their customers." 938 F.3d 43, 49 (2d Cir. 2019). Right before trial in the case began, the Supreme Court issued its decision in *Amex*, which as described above addressed "when [a] relevant market is to be considered 'two-sided,' *i.e.*, when the effects of a challenged restraint on a market are to be judged by the net impact on customers on both sides, not either side, of a market." *Id.* at 52–53. At the end of trial, the jury returned its verdict, finding that the market at issue "was one-sided, that Sabre had unreasonably restrained trade and that [the plaintiff] had been injured as a result." *Id.* at 53. The jury also found that "even if the market were two-sided," Sabre still unreasonably restrained trade and US Airways suffered the same

amount in damages.  *Id.*  On appeal, the Second Circuit found, first, that the jury's conclusion

that the relevant market was one-sided was "erroneous" under *Amex* "because the Sabre [global

distribution system] is a transaction platform, and the relevant market for such a platform must as

a matter of law include both sides."  *Id.* at 58.  Second, the Second Circuit found that the jury

could not have been following the district court's instructions given its conclusion "that the

compensable damages if the platform were one-sided . . . were identical in amount to the

compensable damages if the platform were two-sided."  *Id.* at 59.  The court noted that in a two-

sided market, "the prices would be supracompetitive only to the extent that the net prices charged

to travel agents (here, -$0.85 per booking on average) and airlines (here, $3.49 per booking)

*combined* exceeded the prices that would have been charged in a competitive market."  *Id.*  In a

one-sided market, on the other hand, the jury would not take the prices charged to the travel

agents into account in its damages calculation.  *Id.*  "Two-sided damages must, in this case, then,

be lower than one-sided damages would have been."  *Id.*

      The Court does not exclude Plaintiffs' experts' opinions about EMV chargebacks as

contradictory to *Amex* or *US Airways*.  *Amex* defined a credit-card market as serving two groups:

merchants and cardholders.  138 S. Ct. at 2280.  As Plaintiffs argue, when fraud costs are shifted

from issuers to merchants, they are shifted from *cardholders* to merchants only if the issuers

were passing the costs through to cardholders.  Defendants claim that this argument is

insufficient because it is "*Plaintiffs' experts'* responsibility to analyze whether any claimed price

increases to merchants in the form of EMV chargebacks led to increased two-sided transaction

prices." (Defs.' Reply 8.)  First, however, Professor Hausman *does* discuss low issuer pass-

through in his report.  (*See* Hausman Rep. ¶¶ 223–243.)  He also opines that the liability shift

should have been factored into "the two-sided price," noting that there is no evidence that it was

passed through to cardholders. (Hausman Reply Rep. ¶¶ 735–736.) Second, and relatedly, "[t]he dispositive question [under Rule 702] is whether the testimony will assist the trier of fact . . . not whether the testimony satisfies the plaintiff's burden on the ultimate issue at trial." *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 661 (2d Cir. 2016). Defendants may ultimately demonstrate at trial that the liability shift did not cause an increase in the two-sided price and that the shift was necessary to "bring both sides on board." *Amex*, 138 S. Ct. at 2281. At the *Daubert* stage, however, the Court does not exclude any individual expert's opinion for failing to prove an increase in the two-sided price to the standard necessary to prevail at trial. Rather, it finds that Plaintiffs' experts' opinions about EMV chargebacks will help the jury "understand the evidence or determinate a fact in issue." Fed. R. Evid. 702(a).

> ### c. Summary judgment

Defendants argue that because "Plaintiffs have offered no proof that their alleged EMV chargeback damages were caused by Defendants' alleged violation of the antitrust laws," Defendants are "entitled to summary judgment on Plaintiffs' request for EMV chargeback damages." (Defs.' Mem. 17.) They claim that Plaintiffs "cannot connect" the EMV chargebacks and the HAC rules "without relying on a lengthy series of supposed intervening events and effects:

> (1) HAC caused supracompetitive profits on signature debit; (2)
> those profits caused Visa and Mastercard to "delay" EMV in the
> U.S.; (3) that "delay" caused a "fraud crisis"; (4) the "fraud crisis"
> caused Visa in October 2011 and Mastercard a few months later to
> introduce EMV with a liability shift timetable of 4 years; and (5)
> that timetable was too short for Plaintiffs, causing them to incur
> chargebacks.

(Defs.' Reply 9.) Defendants claim that this chain of causation "stretches the meaning of 'direct' beyond recognition." (*Id.*) Further, they argue that these damages "[a]t most" would be "akin to consequential or incidental damages" that are not available under antitrust law. (Defs.' Reply 9.)

Plaintiffs claim that Defendants fail to understand the theory supporting their EMV chargeback damages:

> These damages are . . . the direct result of the core antitrust violation at issue in this case — the Honor All Cards Rules ("HAC Rules") and the fixed interchange they enable. The record shows that the HAC Rules distorted incentives and caused Visa and Mastercard to sacrifice cardholder and merchant security for network and issuer profits. Specifically, the record shows that Visa and Mastercard delayed EMV in the United States for *over a decade* to protect supracompetitive interchange, leaving the U.S. as the target of the world's counterfeit fraud.

(Pls.' Opp'n 1.) Plaintiffs further claim that:

> In the but-for world without the HAC Rules and supracompetitive interchange, Visa and Mastercard would have implemented EMV much earlier, as they did around the world, and in accord with their own "best practice" would have given U.S. merchants an appropriate period to upgrade to EMV terminals before a liability shift, as they also did around the world. It is this theory that supports Plaintiffs' EMV chargeback damages. Plaintiffs will prove that *none of the EMV chargebacks they paid would have occurred in the but-for world.*

(Pls.' Opp'n 1.)

Antitrust plaintiffs must "prove in a reasonable manner the link between the injury suffered and the illegal practices of the defendant.'" *New York v. Julius Nasso Concrete Corp.*, 202 F.3d 82, 88 (2d Cir. 2000) (alteration in original) (quoting *MCI Comm'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1161 (7th Cir. 1983)). "An antitrust plaintiff must show that a defendant's anticompetitive act was a 'material' and 'but-for' cause of plaintiff's injury, although not necessarily the sole cause." *In re Actos End-Payor Antitrust Litig.*, 848 F.3d 89, 97 (2d Cir. 2017); *see also Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (1969) ("It is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury . . . ."); *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 66 (2d Cir. 2012)

("[T]o prevail on an antitrust claim, a plaintiff must establish that 'the injuries alleged would not have occurred *but for* [the defendant's] antitrust violation.'" (second alteration in original));

*AngioDynamics, Inc. v. C.R. Bard, Inc.*, 537 F. Supp. 3d 273, 321 (N.D.N.Y. 2021) ("To establish antitrust injury, '[t]here must be a causal connection between an antitrust violation and an injury sufficient for the trier of fact to establish that the violation was a 'material cause' of or a 'substantial factor' in the occurrence of damage.'" (quoting *Billy Baxter, Inc. v. Coca-Cola Co.*, 431 F.2d 183, 187 (2d Cir. 1970))).

"The lower courts have been virtually unanimous in concluding that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 263 n.14 (1972). Rather, for an antitrust plaintiff to prevail, "its alleged injury must be analyzed to determine whether it is of the type that the antitrust statute was intended to forestall." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 540 (1983) (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 487–88 (1977)); *see also Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 ("[I]njury, although causally related to an antitrust violation, nevertheless will not qualify as 'antitrust injury' unless it is attributable to an anti-competitive aspect of the practice under scrutiny, 'since "[i]t is inimical to [the antitrust] laws to award damages" for losses stemming from continued competition.'" (quoting *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 109–10 (1986))).[15]

---

[15] Whether Plaintiffs' alleged injury is of the type the antitrust statutes were designed to prevent is closely linked to whether Plaintiffs have standing. To establish antitrust standing, "a plaintiff must show (1) antitrust injury, which is 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful,' and (2) that he is a proper plaintiff in light of four 'efficient enforcer' factors[.]'" *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 115 (2d Cir. 2021) (alteration in

The Court denies Defendants' motion for summary judgment. Plaintiffs allege that Defendants used anticompetitively acquired market power to delay imposing EMV technology, which caused fraud to increase, and then used that same market power to shift the costs of the fraud to Plaintiffs. (SAC ¶¶ 129, 130, 132, 148, 150, 273–274.) This is not the "lengthy series of supposed intervening events and effects" described by Defendants, (Defs.' Reply 9), but rather two of the quintessential harms caused by anticompetitive practices: decreased quality and higher prices. *See Amex*, 138 S. Ct. at 2284 ("Direct evidence of anticompetitive effects would be "'proof of actual detrimental effects [on competition],'" such as reduced output, increased prices, or decreased quality in the relevant market." (alteration in original) (citation omitted) (quoting *FTC v. Indiana Fed. of Dentists*, 476 U.S. 447, 460 (1986))); *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 264 (2d Cir. 2001) ("[W]hether an actual adverse effect has occurred is determined by examining factors like reduced output, increased prices and decreased quality."); *New York Medscan LLC v. N.Y. Univ. Sch. of Med.*, 430 F. Supp. 2d 140, 146 (S.D.N.Y. 2006) ("A plaintiff asserts harm to competition by alleging adverse effects on the price, quality, or output of the relevant good or service."). Plaintiffs have therefore alleged that Defendants' anticompetitive practices were "a 'material' and 'but-for' cause of plaintiff's injury," *In re Actos End-Payor Antitrust Litig.*, 848 F.3d at 97, as well as "of the type that the antitrust statute was intended to forestall," *Associated Gen. Contractors of Cal., Inc.*, 459 U.S. at 540. Further, the Court finds that the Plaintiffs have presented sufficient "evidence on which the jury could reasonably find" that this is the case. *Anderson*, 477 U.S. at 252; (*see* Hausman Rep.,

---

original) (quoting *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 699 (2d Cir. 2009)). Since Defendants do not challenge Plaintiffs' standing in this motion, the Court does not conduct a standing analysis. Rather, it considers only whether EMV chargebacks are sufficiently related to Defendants' alleged antitrust violations to satisfy the causation prong of the antitrust inquiry.

Hausman Reply Rep. (discussing network rules as exclusionary)); Hausman Rep. ¶ 11 (opining

that the EMV migration was an exercise of market power); Hausman Reply Rep. ¶¶ 90, 383, 389

(same); Karimzadeh Rep. ¶¶ 185–204 (opining that the liability shift deadline was too short);

Karimzadeh Reply Rep. ¶¶ 121–127 (opining that in the but-for world, the EMV migration

would have started sooner and taken longer); Direct Action Pls.' Counterstatement of Material

Facts ("DAPs' Counterstatement") ¶¶ 1301–1449, Docket Entry No. 8196 (presenting evidence

that, among other things, payment fraud was a serious and increasing problem in the United

States, the EMV migration threatened signature debit, Visa and Mastercard eliminated EMV in

the United States only after the Durbin Amendment eliminated the interchange differential

between signature and PIN debit, and losses from fraud that could have been prevented by EMV

increased the two-sided price of Visa and Mastercard transactions).)

　　　　The Court is not persuaded by Defendants' arguments to the contrary. Defendants argue

that the liability shift should not be considered a price increase because this is "improper[] under

*Amex*." (Defs.' Mem. 15.) As described above, the *Amex* Court held that the plaintiffs'

argument "wrongly focuse[d] on only one side of the two-sided credit-card market" and that

"[t]o demonstrate anticompetitive effects on the two-sided credit-card market as a whole, the

plaintiffs must prove that Amex's antisteering provisions increased the cost of credit-card

transactions above a competitive level, reduced the number of credit-card transactions, or

otherwise stifled competition in the credit-card market." 138 S. Ct. at 2287. Notably, *Amex*

concerned a judgment after trial, not summary judgment. *See id.* at 2283.

　　　　The Court finds that Plaintiffs have met their summary judgment burden. Professor

Hausman opines that the liability shift was an increase in the two-sided price, (Hausman Reply

Rep. ¶¶ 735–736), and Plaintiffs state that there is "no evidence in the record that the price

increase to merchants in the form of EMV chargeback was passed through as a price decrease to cardholders by issuers[,] nor any evidence that cardholders received a benefit in more rewards," pointing to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ b

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (DAPs' Counterstatement ¶ 1449). Plaintiffs also provide evidence that the delay in EMV implementation increased the two-sided price by increasing fraud generally. (DAPs' Counterstatement ¶¶ 1323–1342, 1449). Drawing all inferences in Plaintiffs' favor, "a rational juror could find" that a liability shift from merchants to issuers does not represent a mere shifting of costs from one side of the platform to the other — given that cardholders, not issuers, represent the "other" side of the platform — but rather an overall increase in price, in combination with increased fraud caused by the delay in migrating to EMV. *Pinto*, 221 F.3d at 398.[16]

Defendants further argue that even if the liability shift does constitute a price increase, "raising prices to customers is not unlawful under Section 2 in the absence of *exclusionary* conduct," and note that the Plaintiffs "do not even allege . . . that Visa's decision not to delay its liability shift eliminated competition with other networks." (Defs.' Mem. 15.) However, Plaintiffs' theory is that the challenged network rules both constituted exclusionary conduct and enabled the liability shift. As described above, whether this is the case is a contested issue of material fact that a jury must decide.

---

[16] The *Amex* Court also found that evidence of an increase in the merchant price plus low pass-through was insufficient to establish market power without "some evidence that tends to prove that output was restricted or that prices were above a competitive level." 138 S. Ct. at 2288. However, Professor Hausman *does* opine that Defendants' actions decreased output, (Hausman Rep. ¶¶ 420–436; Hausman Reply Rep. ¶¶ 55–76, 209–231, 386–389, 555), and Plaintiffs elsewhere point to evidence of the same, (DAPs' Counterstatement ¶¶ 302–396).

## III. Conclusion

For the foregoing reasons, the Court denies Defendants' motion for summary judgment.

Dated: October 9, 2022
Brooklyn, New York

SO ORDERED:

/s/ MKB
_____
MARGO K. BRODIE
United States District Judge