**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION** | **No. 05-md-01720 (MKB) (VMS)** |
| **This Document Relates to:**<br><br>   **All Actions.** | |

## PARTIES' JOINT STATUS REPORT

The parties respectfully submit this joint status report for the status conference in MDL 1720 scheduled for 2:00 pm on May 11, 2023.  Pursuant to the Court's March 23, 2023, scheduling order, this joint status report sets forth the status of these actions and the parties' respective positions on proposed next steps following the Second Circuit's decision affirming the Rule 23(b)(3) class settlement.

Addressed below are the status and proposed next steps in:  (1) the Rule 23(b)(3) class action, (2) the Rule 23(b)(2) class action, (3) the actions of opt-outs from the Rule 23(b)(3) settlement class, and (4) the follow-on class actions.

## I.  THE RULE 23(b)(3) CLASS ACTION

### A.  Status

The Second Circuit affirmed in "all respects" this Court's orders constituting a final judgment approving the Rule 23(b)(3) class settlement agreement, with the minor exception of the service awards to class representatives.  *See In re Payment Card*, No. 20-339(L), Dkt. No. #503 at 52 (2d Cir. Mar. 15, 2023).  The Second Circuit also approved the Court's "plan to refer the dispute over class membership to a special master," concluding that "there is nothing unusual

about a special master identifying" what entities are in the class "after settlement approval."  *Id.* at 26-27.  It is only with respect to this question—the question of which of two or more entities is a member of the class entitled to settlement funds—that the Second Circuit concluded that there may be a conflict for the special master to resolve.  The Second Circuit, however, left untouched this Court's conclusion that any dispute among various entities as to which is in the class, is not an "intra-class conflict."  *Id*. at 24.

As part of the Court's final approval of the Rule 23(b)(3) class settlement, the Court approved a Plan of Administration and Distribution for the class settlement funds.  *See In re Payment Card*, No. 05-md-1720, Dkt. No. #7257-2, Superseding and Amended Definitive Class Settlement Agreement at Appendix I (Sept. 18, 2018).  The parties also submitted to the Court three proposed special master candidates and proposed procedures for resolving issues in the claims process, including issues relating to certain franchisor and franchisee claims to settlement funds.  *See In re Payment Card*, No. 05-md-01720, Dkt. No. #7791, Parties' Letter (E.D.N.Y. Nov. 21, 2019).

The Rule 23(b)(3) agreement provides that class settlement funds may be distributed after the exhaustion of all appeals from the Court's order finally approving the class settlement.  *See In re Payment Card*, No. 05-md-1720, Dkt. No. #7257-2, Superseding and Amended Definitive Class Settlement Agreement at ¶¶ 1(ww) and 25-26 (Sept. 18, 2018).  Two of the objectors to the Rule 23(b)(3) class settlement have filed petitions for rehearing and rehearing en banc, which in part challenge the Court's final approval of the release in the Rule 23(b)(3) class settlement.  *See In re Payment Card*, No. 20-339(L), Dkt. Nos. ##512 and 514 (2d Cir. Mar. 27 and 29, 2023).  If those petitions are denied, those objectors may still petition for review by the Supreme Court, as

US 173534142v16

may other objectors.  Given the Supreme Court's summer recess, it is likely that the Supreme Court would decide any such petitions in October 2023.

The parties to the Rule 23(b)(3) class action note that, while the motions for rehearing are pending before the Second Circuit, the Court lacks jurisdiction over the issues raised in the appeal.  At various points in this status report, those parties commit to taking certain actions on the assumption that the Second Circuit will have restored the mandate to this Court by the dates noted.

In March 2023, counsel for Jack Rabbit, LLC and 280 Station LLC filed a motion to intervene in the Rule 23(b)(3) class action, which Rule 23(b)(3) class counsel and counsel for the *Old Jericho* plaintiffs responded was premature and should be addressed at the May 11 status conference.  *See In re Payment Card*, No. 05-md-01720, Dkt. Nos. ##8801, 8803, and 8811 (E.D.N.Y. Mar. 22, Mar. 24, and Apr. 5, 2023).

### B.  Proposed Next Steps:  Settlement Administration and Claims Process

The Rule 23(b)(3) class plaintiffs and defendants (the "Settling Parties") respectfully submit that certain work in preparation for the claims process can proceed in short order.

### 1.  Appointment of a Special Master and Procedures Before the Special Master

Since the Settling Parties proposed their list of special-master candidates in 2019, Judge Howard A. Matz (Ret.) indicated that he is no longer able to serve, and Professor Francis McGovern passed away.  Judge Laporte remains interested in serving as the Special Master.

The Settling Parties are exploring additional candidates and will be prepared to address this issue and the procedures suggested in the Settling Parties' November 21, 2019 Letter at the upcoming status conference.  *See In re Payment Card*, No. 05-md-01720, Dkt. No. #7791, Parties' Letter (E.D.N.Y. Nov. 21, 2019).

3

### 2.      Rule 23(b)(3) Class Counsel's Update on Claims Process

Rule 23(b)(3) class counsel and the class administrator Epiq have been working to plan and prepare for the claims process.  To that end, Rule 23(b)(3) class counsel and Epiq have developed a multi-step action plan that balances the current uncertainties (petition for rehearing, potential petition for *certiorari*) with the need to ensure that the claims process can begin as soon as reasonably practicable and that when the claims process begins, it provides class members with a simple, intuitive method to file claims.  The current planning process is iterative and Rule 23(b)(3) class counsel expects to provide the Court with additional details at the May 11 Status Conference and beyond.

### a.      Class Counsel's Update on Data-related Matters

The proposed Plan of Allocation and Distribution, as approved by this Court (*In re Payment Card*, No. 05-md-1720, Dkt. No. #7257-2, Superseding and Amended Definitive Class Settlement Agreement at Appendix I (Sept. 18, 2018)), is based on Epiq calculating the total amount of interchange fees attributable to each class member based on the transactional data obtained from Visa, which contains the vast majority of Interchange Fees Paid attributable to Visa-Branded Card transactions by members of the Rule 23(b)(3) settlement class during the class period, for which there is interchange-fee-paid data from Visa or Mastercard.  Epiq may also use the transactional data produced by Mastercard in the litigation and additional available data to determine a "Claimant's Interchange Fees Paid."  Epiq will then use the Claimant's Interchange Fees Paid to calculate each Claimant's pro rata share of the settlement fund.  This is an enormous task, requiring Epiq to access, understand and integrate several extraordinarily large and different data sets and correctly match up transactions to identifiable class members.  As Rule 23(b)(3) class counsel submitted in connection with the motion for preliminary approval,

Epiq has extensive experience analyzing this type of data in connection with class-action administration and notice plans. *See In re Payment Card*, No. 05-md-1720, Dkt. No. #7257-2, Decl. of C. Azari, ECF No. #7257-2 (Sept. 18, 2018).

Since 2012 Epiq has received more than 300 billion lines of merchant- and transactional data from defendants and third parties. Epiq received updates from Visa and Mastercard of certain data sets in early 2019 to assist in the class settlement notice process that was conducted in the Spring of 2019. Rule 23(b)(3) class counsel, Visa and Mastercard are currently working on providing further updates of various data sets, which the parties expect to be produced shortly.

Following receipt and processing of these updated data sets, Epiq will undertake to integrate the new data sets with the legacy sets and continue the process of linking the transactions and interchange paid to merchant/class members. A first step in this process will be for Epiq to link transaction activity data to TINs (Tax Identification Numbers) through exact matching via Card Acceptor IDs. This approach is expected to provide the highest confidence linkages between the data sets. This work will be followed by other methods using various markers in the merchant records and transactional activity datasets to identify other potential linkages. Epiq is working on developing other so-called "fuzzy matching"—analytical methods that are expected to help surface additional linkages in the data, which may not be apparent by matching TINs and Card Acceptor IDs.

Once transactions are matched with merchant data, Epiq will then begin the rollup process to compile and report the data that will be displayed on claim forms. Rule 23(b)(3) class counsel anticipates that this data processing will take at least several months.

**b.      Rule 23(b)(3) Class Counsel's Update on Claim Forms and Claims Process**

In addition to taking steps described above to facilitate pre-populated claims forms based on the available data, Class Counsel and Epiq are considering using a secure web portal for claims filing.  Under the web-portal concept, class members identified in the mailing/notice database (currently more than 16 million records) would receive a mailed postcard with a unique claim number or QR code and directions to a secure web portal where the class member would be able to access pre-populated information regarding the class member's claim.  Paper claim forms would also be available to any class member requesting such a form.

Because of the large class size, Class Counsel and Epiq expect the claim process to be open to class members for a minimum of three months, but no more than five months. Following the close of the claims-filing period, Epiq would review and audit claims, following the procedures detailed in the Plan of Allocation and Distribution and procedures currently being developed to manage third party claims, disputed claims and other potential claims-filing issues, including matters such as those related to franchises and branded operators where a Special Master is expected to be instrumental in resolving issues related to those specialized matters.

**c.      Rule 23(b)(3) Class Counsel's Update on Outreach/Media**

Subject to the approval of the Court, and concurrent with the data work and claims form procedures discussed above, Epiq and Rule 23(b)(3) class counsel will update scripting for the website and phone lines.  Further, Epiq and Rule 23(b)(3) class counsel will prepare a paid and earned media campaign to ensure the best possible participation in the settlement's monetary recovery.  This campaign will run throughout the claims-filing period.  The size and scope of the paid media plan has not yet been determined.  In addition to paid media, Rule 23(b)(3) class

6

counsel expects to conduct a wide-ranging media outreach plan to reach class members through unpaid media stories.

B.   **Proposed Next Steps:  Rule 23(b)(3) Class Plaintiffs' Motion for Service Awards**

In its opinion affirming the settlement final approval, the Second Circuit remanded the order granting service awards to this Court, to the extent its service-award order reflected the Class Representatives' time spent lobbying.  *See In re Payment Card*, No. 20-339(L), Dkt. No. #503 at 39 (2d Cir. Mar. 15, 2023).  The Supreme Court on April 17, 2023 denied *certiorari* in two cases raising the permissibility of service awards in class actions.  *Carson v. Hyland*, Denial of Pet. for Writ of Certiorari, No. 22-634 (S. Ct. Apr. 17, 2023); *Johnson v. Dickenson*, Denial of Pet. for Writ of Certiorari, No. 22-389 (S. Ct. Apr. 17, 2023).

Now that the incentive-award petitions for *certiorari* have been denied, Rule 23(b)(3) class plaintiffs will be prepared to discuss at the status conference the nature and timing of supplemental submissions on the issue of service awards.

D.   **Proposed Next Steps:  Jack Rabbit Motion to Intervene**

1.   **Rule 23(b)(3) Class Plaintiffs' position**

As Rule 23(b)(3) class plaintiffs noted in their letter of March 24, 2023, this Court currently lacks jurisdiction to decide Jack Rabbit's most recent motion to intervene.  *See In re Payment Card*, No. 05-md-01720, Dkt. No. #8803 (E.D.N.Y. Mar. 24, 2023).  Rule 23(b)(3) class plaintiffs propose that, once the Second Circuit restores the mandate to this Court, the Settling Parties and the Jack Rabbit Objectors meet and confer on a briefing schedule regarding this motion.

### 2.      Jack Rabbit Objectors' Position

Because this Court issued a Memorandum & Order on July 18, 2022 (Docket entry 8704) certifying that the Final Approval Order (Docket Entry 7818) was a partial final judgment in accordance with Rule 54(b) of the Federal Rules of Civil Procedure, Rule 23(b)(3) class plaintiffs are incorrect in asserting that this Court currently lacks jurisdiction to decide Jack Rabbit's pending motion to intervene.

Although prior to this Courts July 18, 2022 Memorandum & Order clarifying that the Final Approval Order (Docket Entry 7818) was not a final judgment it appeared that the various appeals to the USCA for the Second Circuit had divested this Court of jurisdiction; it is now clear that the Court has jurisdiction to go forward with appointing both subclass counsel and a special master.  In multi-claim actions, regardless of whether they involve multiple claims against a single party, claims against multiple parties, or both, a final appealable decision normally does not come until all claims have been resolved.  However, if parties want to appeal from the resolution of only some claims, they can seek a partial judgment from the district court under Fed. R. Civ. P. 54(b).  If granted, that partial judgment then becomes final and appealable.

Thus, *ex post facto*, on July 18, 2022, this Court regained jurisdiction over the resolution of all of the legal and administrative issues that are not part of the December 13, 2019 Final (*sic*) Approval Order, as modified by the July 18, 2022 Memorandum & Order.  As a result, the Rule 23(b)(3) class counsel, and counsel for the *Old Jericho* plaintiffs are, as a matter of law, incorrect in asserting that Jack Rabbit LLC and 280 Station LLC motion to intervene (with regard to the pending legal and administrative issues) is premature.

Jack Rabbit's counsel only represent retail gas stations, and, as a result, have no conflict with the inchoate subclass of branded and unbranded retail gas station owners who are Illinois

Brick Cost-Plus Direct Purchasers.  Other objector counsel, who represent both oil distributors and retail gas stations, have an open and obvious conflict of interest. i.e., as noted by the Second Circuit, counsel are conflicted if they represent both franchisors and franchisees who are now adverse to each other for resolution of the questions regarding which of them should be deemed to have accepted the cards and therefore to come within the class and receive settlement funds, and how those funds should be allocated.

Because, as noted above, this Court has jurisdiction of all of the remaining legal and administrative issues, Jack Rabbit is prepared to go forward, should the Court so choose, with discussing appointing subclass counsel, and as Counsel for objectors proposed intervenors are well prepared to vigorously and zealously represent the interests of the subclass of retail, branded and unbranded, gas station owners, who are Illinois Brick Cost-Plus Direct Purchasers.

### E.   Branded Operators' Position on the Special Master Process

The "Branded Operators"[1] objected to approval of the Rule 23(b)(3) Settlement on the grounds that it created intra-class conflicts between franchisors and franchisees.[2]  The Branded Operators appealed that issue to the Second Circuit.

In its March 15, 2023 Opinion, the Second Circuit found "no reason why the settlement affecting all claimants ***other than*** the franchisors and franchisees of integrated oil companies should not be consummated." *In re Payment Card*, No. 20-339(L), Dkt. No. #503 at 25:9-11 (2d

---

[1] Counsel for the Branded Operator objectors represent more than 100 retail establishment franchisees (including objectors Fikes Wholesale, Inc., Midwest Petroleum Company and Slidell Oil Company, LLC, among others), and their related industry organizations, such as the National Association of Shell Marketers, Inc., the Petroleum Marketers Association of America, and the Society of Independent Gasoline Marketers of America.

[2] *See* ECF 7280; ECF 7559.

Cir. Mar. 15, 2023) (emphasis added).  But with respect to franchisor and franchisee claimants, the Court concluded that:

> Going forward, however, franchisors and franchisees will become adverse to each other for resolution of the questions regarding which should be deemed to have accepted the cards and therefore to come within the class and receive settlement funds, and how those funds should be allocated.  It appears that class counsel will be conflicted on those questions.  The district court should ensure that franchisors and franchisees will be represented by counsel, enabling each side to present arguments to the special master and the district court as to why they should be favored over the adversary, and enabling them to negotiate toward settlements of the disputes affecting each adverse pair.  Whether this will require designations of subclasses and appointment of further counsel to represent them or whether their existing privately retained counsel will adequately serve the needs, we leave to the good judgment of the district court.

*Id*. at 25:13 – 26:10.  While the Branded Operators have counsel, there are thousands more franchisees that do not currently have representation in this matter, and may not even know about their conflict with franchisors.  Because the Second Circuit concluded that there is indeed a conflict, and that each side must be represented separately before the Special Master, the Branded Operators urge the Court to appoint subclass counsel to ensure that the rights of *all* franchisees are protected.

The Branded Operators would appreciate the Court putting on its agenda for the status conference the issues of:  (1) appointing counsel for the subclass of franchisees, and (2) establishing a fair and transparent procedure for adjudication of the franchisees' claim submissions to the Special Master.  The Branded Operators will be prepared to discuss these issues at the status conference.

US 173534142v16

## II.      THE RULE 23(b)(2) CLASS ACTION

### A.      Status

The parties to the Rule 23(b)(2) action — *Barry's Cut Rate Stores*, now known as *DDMB* — completed fact and expert discovery in around February 2020.  Defendants and Rule 23(b)(2) class plaintiffs then served motions for summary judgment that were fully briefed and filed with the court in December 2020 (and in redacted form in February 2021).  Those summary judgment motions remain pending, and defendants welcome the opportunity for oral argument if it would be helpful to the Court.  The Rule 23(b)(2) class counsel do not believe that oral argument on the motions is necessary but of course welcome the opportunity to present argument if the Court would find it useful.

Rule 23(b)(2) class counsel served their motion for certification of a Rule 23(b)(2) class in December 2020 and that motion was fully briefed in August 2021.  In September 2021, the Court certified a Rule 23(b)(2) class from which opt-outs are not permitted.  That class consists of:  "all persons, businesses, and other entities that accept Visa and/or Mastercard credit and/or debit cards in the United States at any time during the period between December 18, 2020 and the date of entry of Final Judgment in this case."  *In re Payment Card*, No. 05-md-01720, Dkt. No. #8647, Memo. and Order (E.D.N.Y. Sept. 27, 2021).  On October 26, 2022, this Court issued orders granting in part and denying in part defendants' motions to exclude testimony of Rule 23(b)(2) class plaintiffs' experts.  *Id.*, Dkt. Nos. ##8727, 8730, Memos. and Orders (E.D.N.Y. Oct. 26, 2022).

Over the last year, Rule 23(b)(2) class plaintiffs and defendants have had numerous settlement discussions and exchanged settlement proposals.  Those discussions have employed

11

the assistance of a well-respected mediator and are active and ongoing.  Defendants are optimistic that the parties will be able to make further progress.

In the meantime, given the passage of time, Rule 23(b)(2) class plaintiffs and defendants have been negotiating the supplementation of their prior discovery productions in certain respects.  Those negotiations are now largely complete as to the networks, and Rule 23(b)(2) plaintiffs and the network defendants expect to commence their supplemental productions shortly without prejudice to pending summary judgment motions.

**B.      Proposed Next Steps**

**1.      Defendants' Position**

Because the Rule 23(b)(2) class complaint was filed in this Court, venue exists in this District for all purposes, including trial.  *See* 28 U.S.C. § 1391; *cf. Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 40-41 (1998).  Defendants propose that the Court enter a scheduling order that (i) provides Rule 23(b)(2) class plaintiffs and defendants with a 150-day period to negotiate a class settlement agreement and complete their production of supplemental discovery, and (ii) requires the parties to file a status report on those efforts no later than 10 days after the end of that 150-day period.  The status report should address proposed next steps in the case if (i) a settlement has not been reached and (ii) any summary judgment rulings by the Court do not result in the dismissal of the Rule 23(b)(2) class action.[3]  If warranted as part of that status

---

[3] Defendants note that, in certifying the Rule 23(b)(2) class, the Court recognized that a "one way intervention problem arises when a decision on certification of an opt-out class is deferred until after a decision on the merits, which enables potential class members to 'wait[] on the sidelines' for a merits determination and then choose to remain in or opt out of the class in a way that benefits them." *In re Payment Card*, No. 05-md-01720, Dkt. No. #8647, Memo. and Order (E.D.N.Y. Sept. 27, 2021) (quoting *Brecher v. Republic of Argentina*, 806 F.3d 22, 26 (2d Cir. 2015)).  Here, the pending motions for summary judgment in the Rule 23(b)(2) class action and the opt-out actions raise issues that also could warrant summary judgment in the Rule 23(b)(3) class action, and thus raise the possibility of one-way intervention.  While defendants are hopeful that final approval of the Rule 23(b)(3) class settlement will not be reversed on further appeals to the Second Circuit or Supreme Court, if there were a reversal, the former Rule 23(b)(3) class

report, the parties should include potential deadlines for the exchange and filing of joint pretrial order materials and the other trial-related filings required under Rule 4 of the Court's Individual Practices and Rules.

### 2.    Rule 23(b)(2) Class Plaintiffs' Position

The Rule 23(b)(2) class plaintiffs propose that the Court enter an order that (a) provides Rule 23(b)(2) class plaintiffs and defendants with a 150-day period to complete their production of supplemental discovery, and (b) requires the parties to meet and confer on the terms of a proposed scheduling order, including deadlines for the exchange and filing of joint pretrial order materials and the other trial-related filings required under Rule 4 of the Court's Individual Practices and Rules, that would lead to a trial of this litigation within the next 12 months. The parties should submit the proposed joint schedule to the Court within the next 30 days.

Rule 23(b)(2) class plaintiffs advise the Court that negotiations are ongoing with the bank defendants regarding supplemental discovery; class plaintiffs are hopeful that those negotiations will conclude promptly and the supplemental productions can be concluded on the same schedule as for the network defendants. One of the banks that are defendants in the Rule 23(b)(2) class case—Capital One—has declined to participate in the negotiations, and class plaintiffs may be required to file a motion to compel the supplementation.

---

members would be provided with an opportunity to "wait[] on the sidelines" and learn of the Court's summary judgment rulings in the Rule 23(b)(2) class action and opt-out actions, before choosing whether to opt-out of any Rule 23(b)(3) class that might later be certified by the Court.

US 173534142v16

### III.     ACTIONS OF OPT-OUTS FROM THE RULE 23(b)(3) SETTLEMENT CLASS

#### A.     Status

##### 1.     Defendants' Summary of Status

Following the Court's preliminary approval of the Rule 23(b)(3) class settlement, hundreds of merchants opted out of the settlement class and filed dozens of opt-out actions. The great majority of those actions have been settled and dismissed. While the Court's final approval of the Rule 23(b)(3) class settlement was on appeal, the opt-out claims in *Verizon*, *Roundy's Supermarkets*, *Hertz*, *Dollar General*, *Delta*, *Sunoco*, *Asbury Automotive*, *Equilon*, *Dell*, *Luby's*, *Fareway Stores*, *Boyd Gaming*, *Avon*, *Exxon Mobil*, *Accor Management*, *Westgate Resorts*, *Dunhill*, *MTA*, *Contrarian Funds*, *Pizzabov*, *Halcyon*, *Walt Disney*, *Elgin (Sears)*, *CenturyLink Communications*, and *Rum Point* all were settled and dismissed. Defendants also have settled with nine of the opt-out plaintiffs in *7-Eleven* and two plaintiffs formerly in *7-Eleven* (Roundy's Supermarkets and Elgin (Sears)).

Those settlements resolved the claims of many of the larger opt-out plaintiffs, including Costco, Lowe's, Comcast, Elgin (Sears), Verizon, Chevron, Sprint, United Airlines, DirectTV (AT&T), Hilton, and Marriott. Amazon and The Home Depot also settled their claims with Visa. Together, the settlements with opt-outs from the Rule 23(b)(3) settlement class account for approximately 70% of Visa's sales volume for all those opt-outs and for approximately 65% of Visa's and Mastercard's combined interchange for all those opt-outs. Including the settlements with the opt-outs from the original 2012 class settlement, Visa has settled more than 82% of its sales volumes for all opt-outs. All told, the settlements thus far—including members of the 2018 Rule 23(b)(3) class, and the settled opt-outs from the 2012 and 2018 class settlements—account for approximately 93% of sales volume during the class period.

US 173534142v16

Of the thirty opt-out actions from the Rule 23(b)(3) class settlement consolidated for pretrial proceedings in MDL 1720, only five opt-out actions remain pending before the Court: *7-Eleven* (where nine plaintiffs have settled); *The Home Depot* (where plaintiffs settled with Visa but continue to assert claims against Mastercard); *Target*; *Grubhub* (in which plaintiffs' counsel are the same as in *Target*); and *Intuit*.[4]  The opt-outs from the Rule 23(b)(3) class settlement seek monetary damages in their individual actions.  While they say that they "remain deeply committed to obtaining injunctive relief" in connection with their individual actions, those entities are members of the Rule 23(b)(2) class from which opt-outs are not permitted.  *In re Payment Card*, No. 05-md-01720, Dkt. No. #8647, Memo. and Order (E.D.N.Y. Sept. 27, 2021).  As such, those entities may only seek injunctive relief as members of the Rule 23(b)(2) class.

Most of the remaining opt-out plaintiffs and defendants have engaged in settlement discussions, including through mediations.  Those settlement discussions remain ongoing with respect to claims against both Visa and Mastercard.  Based on the settlements achieved thus far, defendants remain optimistic that further progress can be achieved.

Defendants and opt-out plaintiffs in the first three of those actions — *7-Eleven*, *Target*, and *The Home Depot* — have served and filed motions for summary judgment.  In addition, on October 26, 2022, this Court issued orders granting in part and denying in part the parties' motions to exclude expert testimony, and denying defendants' motion for partial summary judgment as to EMV chargebacks.  *In re Payment Card*, No. 05-md-01720, Dkt. Nos. ##8715, 8727-8732, Memos. and Orders (E.D.N.Y. Oct. 26, 2022).

---

[4] *E-Z Mart* also remains pending before the Court.  But the only non-settled plaintiff in that action is The Pantry, and *7-Eleven* opt-out plaintiff Alimentation Couche Tard acquired The Pantry, and so The Pantry's claims are now being pursued in *7-Eleven*.

US 173534142v16

Most of the document discovery in those actions concluded in 2016. Accordingly, while defendants continue to believe that the *7-Eleven*, *Target*, and *The Home Depot* actions should be dismissed pursuant to defendants' pending motions for summary judgment, defendants have engaged, over the last year or so, in discussions regarding supplemental discovery (without prejudice to pending summary judgment motions) so as to ensure that any such discovery can be conducted in an efficient and coordinated manner across the MDL, and to avoid the unnecessary costs or delays that would result from duplicative, overlapping discovery across multiple venues following the potential remand of the opt-out actions. In the *7-Eleven* and *The Home Depot* actions, the parties have engaged in good-faith negotiations over the scope of supplemental discovery and expect to commence productions shortly.

Unlike the *7-Eleven*, *The Home Depot*, and the Rule 23(b)(2) class plaintiffs, the *Target* plaintiffs have taken a far narrower position on the appropriate scope of supplemental discovery, and have insisted that only the court trying the case should resolve supplementation issues and only after this Court rules on the summary judgment motions. The *Target* plaintiffs have made clear they will not engage in any supplemental discovery in the MDL (unlike the other plaintiffs), and proposed an in-person meeting with defendants only to discuss an order broadly covering "all of the issues necessary" to bring the *Target* plaintiffs' to trial. Defendants disagreed that the parties needed to have those discussions now to make progress on supplemental discovery. In short, only the parties in *Target* have not been able to agree on the scope and timing of supplemental discovery.

The other two opt-out actions — *Gruhhub* and *Intuit* — were filed more recently, after the Rule 23(b)(3) class settlement. Fact and expert discovery in *Gruhhub* was recently completed in March 2023. As provided in the Court's order in the *Grubhub* action, No. 19-cv-

16

06555, Dkt. Order (E.D.N.Y. Dec. 27, 2022), the parties are filing, concurrently with this status report, letters stating their positions with respect to summary judgment motions in *Grubhub*.  In *Intuit*, the parties largely deferred discovery pending the resolution of the Second Circuit appeal. Dispositive motions have not yet been filed in *Intuit* given the status of discovery.

### 2.    Direct Action Plaintiffs' ("DAPs") Summary of Status

**7-Eleven, Home Depot, and Target Group:**  The DAPs comprise dozens of national and regional companies in nearly every merchant sector.  They include five former class representatives and trade associations comprised of thousands of small and large merchant members who first brought suit in 2005.  The DAPs continue to pay billions in interchange and network fees annually, and the rates that many of the DAPs pay to Visa, Mastercard and their issuing banks further increased in the past year.  The DAPs remain deeply committed to obtaining injunctive relief to remedy the persistent lack of competition in the relevant markets, along with damages to compensate them for the overcharges they have incurred since 2004. Defendants' contention that the DAPs may seek injunctive relief solely through the Rule 23(b)(2) class under all circumstances is incorrect.  While the Court's decision to certify a mandatory Rule 23(b)(2) class that included the DAPs gives Rule 23(b)(2) class counsel the right to represent the DAPs' injunctive claims, over their objections, that decision did not bar the DAPs from independently pressing injunctive claims.

The summary judgment motions were fully briefed in December 2020, and the DAPs understand that the Court has been working diligently to resolve them.  The DAPs do not believe oral argument on the motions is necessary at this juncture.  When decisions on the pending summary judgment motions are issued, the DAPs respectfully request that the Court set a status conference within 21 days.  At that conference, the parties and the Court can address the most

efficient way to schedule the trial(s) of their cases in light of the Court's summary judgment rulings.[5]

The *7-Eleven* plaintiffs and The Home Depot have largely reached agreement with the defendants concerning supplemental discovery.

The defendants misstate the *Target* plaintiffs' position with respect to supplemental discovery. The *Target* plaintiffs sought to meet with defendants to discuss supplementation and trial scheduling issues last November, but the defendants declined. The differences between the *Target* plaintiffs and defendants related to scope and timing of supplemental discovery, in the *Target* plaintiffs' view, can readily be resolved once the Court issues its summary judgment rulings—indeed, the *Target* plaintiffs believe that given defendants' highly unusual position that supplemental discovery should proceed immediately without resolution of the summary judgment motions, defendants recognize the lack of merit in their summary judgment arguments.

The DAPs respectfully submit that the defendants' suggestion that the Court order a 150-day functional stay of proceedings to give defendants even more time to resolve the DAPs' claims through settlement should be rejected. This is a thinly veiled attempt to suggest to the Court that the Court's decisions on the pending motions for summary judgment should be delayed during this period, or even until all appeals of the Rule 23(b)(3) class settlement approval are resolved.[6]

---

[5] In this set of cases, *The Home Depot* and *Amazon/Whole Foods* have settled their claims against Visa but not against Mastercard. Accordingly, they will present claims at trial only against Mastercard.

[6] This is apparent from defendants' suggestion, unsupported by any authority, of a continuing "one-way intervention" concern associated with those summary judgment decisions, even while only a small number of objectors pursue discretionary appeals of the Rule 23(b)(3) settlement approval, when those limited appeals will have no impact on the DAPs' continued decision to pursue their own claims.

No such delays are warranted or required.  Defendants have had *nearly a decade* to resolve the claims of these plaintiffs by settlement and have not done so.  The DAPs believe that clarity on the summary judgment rulings and prompt trial settings—rather than an additional 150-day delay—will crystallize issues for both sides and possibly facilitate settlement.  The 150-day timeline also has no relationship to the prospects for settling the DAPs' claims.  If this window is designed to suggest that the DAPs' cases should be delayed until defendants conclude or abandon their negotiations with Rule 23(b)(2) class counsel, that too should be rejected.  The DAPs damages claims cannot be resolved by a settlement with the Rule 23(b)(2) class, even if such a settlement is achieved.  Defendants have also been in mediation with Rule 23(b)(2) Class Counsel for years, without any resolution.  Defendants' "optimism" that "further progress can be made," whatever the basis for that statement might be, is not good cause for a five month *de facto* stay or for any delay in setting the DAPs cases for trial once the Court rules on summary judgment.

This is evident from another reality.  While the *7-Eleven* plaintiffs and the *Target* plaintiffs have continued to explore settlement with defendants—and a small number of the *7-Eleven* plaintiffs have settled their claims for their own business reasons—the parties' negotiating positions remain are far apart.  The Home Depot has recently reached settlement with Visa, but not as to Mastercard.  The DAPs do not anticipate that all DAPs will achieve settlement with defendants without a decision on the pending motions, and perhaps not before trial.  In the interim, the DAPs are prepared to continue to engage in settlement discussions with defendants in good faith, but no delay of progress toward trial is necessary for this to occur; to the contrary, progress toward trial and the imminence of a trial setting are well understood to be powerful motivators toward compromise and settlement.  As with any litigation, however, the existence

*vel non* of parallel settlement discussions should not delay decisions on summary judgment or the scheduling of trial.

**Grubhub.** The *Grubhub* plaintiffs (who are represented by one, but not both, of the firms representing the *Target* plaintiffs) and defendants have completed fact and expert discovery in the *Grubhub* case, with the exception of the deposition of experts related to damages, whom the parties agreed would be deposed after the remand of the *Grubhub* case and the production of supplemental discovery regarding damages in the court trying the case. No supplemental discovery will be necessary in the *Grubhub* case, other than with respect to damages, if a prompt resolution of summary judgment motions occurs.

In contrast to defendants' suggestion that they are engaged in widespread settlement discussions, defendants have not communicated any interest in discussing settlement with the *Grubhub* plaintiffs. The *Grubhub* plaintiffs are willing to engage in any discussions that do not delay the resolution of the pending motions (which is the most meaningful step the Court can take in moving the parties toward settlement) or remand and trial of their claims.

Like the other DAPs, the *Grubhub* plaintiffs disagree that they are prevented from gaining an injunction against any of Visa's or Mastercard's restraints a jury in its case finds violate the federal antitrust laws.

**Intuit.** After timely opting out of the Rule 23(b)(3) damages class settlement, the *Intuit* plaintiffs filed suit and subsequently agreed with defendants to largely stay their case pending the Second Circuit's decision on the class settlement—a voluntary stay that has been in place for approximately two years. As part of that agreement, the *Intuit* plaintiffs received access to all fact discovery and provided preliminary document and data productions of their own. They also responded to initial discovery requests from defendants and will shortly produce additional

20

materials in response to those requests.  The *Intuit* plaintiffs do not object to the 150-day

supplemental discovery period defendants propose below, but note that their case is differently-

situated than the other DAPs' cases due to its later-in-time nature and therefore do not intend for

their position to affect the Court's assessment of the proper course for the other DAP cases.

### B.     Proposed Next Steps

#### 1.     Defendants' Position

As in the Rule 23(b)(2) class action, defendants propose that the Court enter a scheduling

order that provides the opt-out plaintiffs and defendants in *7-Eleven*, *Target*, *The Home Depot*,

*Grubhub*, and *Intuit* with a 150-day period to seek to settle their claims and complete their

production of any supplemental or other discovery.  Because the *Target* plaintiffs have not been

willing to move forward with supplementation of prior discovery in the same way as the other

plaintiff groups, defendants may need to file a motion to compel supplemental discovery in

*Target*, so that supplemental discovery in that action also can be conducted efficiently within the

150-day period.  The parties would file a status report addressing proposed next steps in the opt-

out actions within 10 days after the end of that 150-day period.

As is explained in defendants' concurrent filing in *Grubhub* today, the *Grubhub* action

has comparable allegations to those in the *Target* action.  While defendants accordingly expect to

move for summary judgment in *Grubhub* on the same grounds as in *Target*, defendants believe

that the parties should continue to defer motion practice in *Grubhub* until after the Court's

decisions on summary judgment in *Target*, which likely will resolve or provide important

guidance on issues that the parties would raise in *Grubhub*.  After the Court renders those

decisions, defendants may choose not to file summary judgment motions, or they may wish to

file motions based on the factual record developed in the *Grubhub* action.  While *Grubhub*

plaintiffs propose that they simply "join" other plaintiffs' pending summary judgment motions, any such joinder should be without prejudice to defendants' rights to file their own separate motions in *Grubhub*, which defendants do not waive.

In *Intuit*, Intuit seeks to recover damages not only on its own behalf but also on behalf of merchants for which Intuit acted as a payment processor. Intuit claims to be the "direct payor" of those merchants' payments, but defendants believe that Intuit is asserting claims that have been resolved in the Rule 23(b)(3) damage class and that the merchants have not authorized Intuit either to opt them out of the Rule 23(b)(3) class settlement or to prosecute claims based on their transactions. Accordingly, depending on how discovery proceeds in the *Intuit* action and on how any similar issues may be addressed in the Rule 23(b)(3) class settlement claims process, defendants likely will seek to file a dispositive motion in *Intuit* on those grounds at or before the end of the 150-day period.

## 2.   Plaintiffs' Position

**7-Eleven, Home Depot, and Target Group:** The Rule 23(b)(2) class action and the *7-Eleven*, *Home Depot*, and *Target* actions are in similar procedural postures. Once the Court's summary judgment rulings are issued, these cases can proceed to trial. For the reasons explained above, the DAPs oppose defendants' request for a further, 150-day delay for the ostensible purpose of pursuing settlement. To the extent any meaningful discussions have or will take place, these may continue without unneeded delay in the progress of these cases toward trial.

As the Court is aware, the DAPs objected to the certification of a mandatory class that included them on various grounds, including concerns about issue preclusion that would deprive them of their due process rights. Once summary judgment has been decided, the DAPs are

prepared to work with all parties to propose an efficient mechanism the Court can use to address these issues when the cases are set for trial.

**Grubhub Plaintiffs**:  The *Grubhub* plaintiffs have submitted today a proposal regarding the joinder of the *Grubhub* plaintiffs in the pending summary judgment motions so as to avoid unnecessary delay or waste of the Court's resources.  (Pursuant to the Court's previous order, this proposal is being filed only in Case No. 1:19-cv-06555-MKB-VMS).  The *Grubhub* plaintiffs note that the defendants' position that summary judgment briefing should be delayed until after the pending motions for summary judgment are decided is inconsistent with the process agreed between the parties and the order by the Court that:

> [E]ach of the parties in the Grubhub case will file a letter with the Court stating its position with respect to summary judgment motions. The letters will indicate whether the parties intend to pursue a motion for summary judgment on the same grounds raised in the summary judgment motions that are pending in 05-MD-1720 (whether the Court has or has not yet ruled upon those motions by that date), or on new grounds, or will explain with specificity why they cannot determine whether they will file a summary judgment motion on the same grounds raised in the summary judgment motions that are pending in 05-MD1720, or on new grounds.

(Order of Dec. 27, 2022 regarding Dock. No. 64 in Case No. 1:19-cv-06555-MKB-VMS). Defendants' failure to comply with the Court's direction, notwithstanding their agreement, to "explain with specificity why they cannot determine whether they will file a summary judgment motion on the same grounds raised in the summary judgment motions that are pending in 05-MD1720, or on new grounds" is unfortunately consistent with their proposal to delay the other Direct Action Plaintiffs' claims in any way possible.  Given defendants' assertion that "the *Grubhub* action has comparable allegations to those in the *Target* action" (a revision of their assertion that "*Grubhub* is a copy-cat of the *Target* action" in their earlier drafts of the status report), it would be a waste of judicial resources to brief again the pending summary

motions.  To the extent defendants now claim different grounds for summary judgment on these "copy-cat" claims, they should show the Court now that they have good cause to file such a motion.  If the Court adopts the *Grubhub* plaintiffs' proposal regarding summary judgment briefing, it will shortly be in the same posture as the *7-Eleven* group, The Home Depot, and the *Target* group.

**Intuit Plaintiffs:**  The *Intuit* plaintiffs agree with the 150-day supplemental discovery period defendants propose because it will allow them to conduct supplemental discovery they deferred until after the Second Circuit's decision on the Rule 23(b)(3) damages class settlement. However, they wish to clarify the nature of their claims, so the Court is aware of certain nuances specific to their case.

Specifically, in addition to damages for interchange fees paid on transactions of Intuit products and transactions run through Intuit products (*e.g.*, TurboTax), the *Intuit* plaintiffs seek damages regarding transactions for which Intuit acted as either an ISO or payment facilitator ("PayFac") during the relevant time period, because it directly paid interchange fees on those transactions.  As the Second Circuit recently noted, any ambiguity in how defendants defined class membership for the Rule 23(b)(3) damages class settlement (*i.e.*, which entity "accepted" payment cards) is not the key to antitrust standing; what matters (as the Second Circuit approvingly noted this Court found) is which entities are the "direct payors of the challenged fees."  As defendants note, they and the *Intuit* plaintiffs have generally discussed a procedure whereby the parties will brief dispositive motions on the issue of the *Intuit* plaintiffs ISO/PayFac-based antitrust standing during or shortly after the proposed supplemental discovery period, given the implications that question has on the scope of the Intuit Plaintiffs' claims and damages.  At that time, the *Intuit* plaintiffs plan to explain why, contrary to defendants'

24

statements, the Rule 23(b)(3) damages class settlement from which the Intuit Plaintiffs properly and timely opted out did not resolve their claims. Further, the *Intuit* plaintiffs will explain in that briefing why they did not need to additionally opt out or obtain permission to sue from merchants further down the payment chain, because Intuit, not its sub-merchants, is the entity that directly paid interchange fee on those transactions.

## IV.    THE FOLLOW-ON CLASS ACTIONS

### A.    Status

Since the Court's final approval of the Rule 23(b)(3) class settlement, plaintiffs have filed four follow-on class actions pending in MDL 1720.

Plaintiffs in three of those actions — *Old Jericho*, *Lanning*, and *Camp Grounds Coffee* — are merchants that accepted payment cards through others, and that potentially might be outside the Rule 23(b)(3) damages class or barred from recovering damages under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). Each of those follow-on class actions seeks damages from Visa and Mastercard based on conduct also challenged in the Rule 23(b)(3) and Rule 23(b)(2) class actions and the opt-out actions.

In the *Old Jericho* action, the plaintiffs are gasoline retailers. They seek to represent a class of businesses that "have taken as payment a Visa or MasterCard branded credit card in a gasoline retail transaction and have received payment for that transaction from a Supplier, rather than directly from an Acquiring Bank," under state laws that do not follow *Illinois Brick*. *Old Jericho*, No. 20-cv-02394, First Am. Class Action Compl. ¶¶ 89-90 (E.D.N.Y. Dec. 21, 2020).

In *Lanning* and *Camp Grounds Coffee*, the plaintiffs are businesses that obtained credit-card acceptance services from Square. They seek to represent a class of persons that "have taken as payment a Visa or MasterCard branded credit card via the Square card acceptance service and

25

have received payment for that transaction from Square," under state laws that do not follow *Illinois Brick*. *Lanning*, No. 21-cv-02360, Dkt. No. #1, Class Action Compl. ¶ 78 (E.D.N.Y. Apr. 28, 2021); *Camp Grounds Coffee*, No. 21-cv-03401, Dkt. No. #1, Class Action Compl. ¶ 78 (E.D.N.Y. June 16, 2021).

The parties in *Old Jericho*, *Lanning*, and *Camp Grounds Coffee* have not yet engaged in any significant discovery pending the Second Circuit's decision on the Court's final approval of the Rule 23(b)(3) class settlement.  In *Old Jericho*, the Court ordered the plaintiffs and defendants to provide their positions on proposed next steps in this joint status report, which positions are described below.  *See Old Jericho*, No. 20-cv-02394, Dkt. Order (E.D.N.Y. March 30, 2023).

In addition, the Judicial Panel on Multidistrict Litigation recently transferred to MDL 1720 a fourth follow-on class action — *Palladino* — that was originally filed in California state court and removed to federal court.  The plaintiffs seek to represent a class of "[a]ll All Visa and Mastercard cardholders who are California citizens, each of whom has made retail purchases of goods and services in California using a Visa or Mastercard credit or debit card," under California laws that do not follow *Illinois Brick*.  *Palladino*, No. 23-cv-01215, Dkt. No. #1-1, Class Action Compl. ¶ 211 (E.D.N.Y. Jan. 30, 2023).  In March 2023, the *Palladino* plaintiffs filed a motion to remand that action back to California state court, which is now fully briefed and pending before the Court.

### B.     Next Steps

#### 1.     Defendants' Position

Defendants respectfully submit that *Old Jericho*, *Lanning*, and *Camp Grounds Coffee* all raise issues similar to those that this Court and the Second Circuit have suggested would need to

be resolved in the Rule 23(b)(3) class settlement claims process.  Plaintiffs in each of those actions may be found to be members of the Rule 23(b)(3) settlement class.  *See In re Payment Card*, No. 20-339(L), Dkt. No. #505 at 7 (2d Cir. Mar. 15, 2023) (Leval, J. concurring).  If those plaintiffs are members of the Rule 23(b)(3) settlement class, they will be entitled to file a claim for class settlement funds and will have released their claims against defendants under the class settlement agreement.  If not, determinations in the claims process may shed light on whether those merchants' claims are suitable for class treatment — for example, whether some of those merchants are members of the Rule 23(b)(3) settlement class while others are not, and for any that are not, how their franchisor relationships and contracts for payment card services, and the processing of their card payments, may impact the alleged causation of card payment injuries for which they seek damages.

Defendants therefore propose that the parties in *Old Jericho*, *Lanning*, and *Camp Grounds Coffee* proceed with discovery limited to the potential class membership of the plaintiffs and their proposed classes.  In a status report to be submitted within 150 days, the parties can then propose how best to address the threshold issue of class membership of the plaintiffs in the claims administration process.

### 2.    *Old Jericho* **Plaintiffs' Position**

Based on our review of the contracts between the gas brands and their retailers, counsel for the *Old Jericho* plaintiffs believe the gas retailers – our clients and putative class members – are indirect payors of interchange fees and not covered by the direct payor settlement or release.  The *Old Jericho* plaintiffs have two primary concerns with respect to how to address the question of franchisee gas retailer claim ownership: accuracy and efficiency.  Given (1) the lack of incentives of defendants and gas brands (which have largely settled already as opt-outs) to

resist this outcome, and (2) the concurring opinions of the Second Circuit floating the idea that gas retailer franchisees could on hypothetical facts be "joint direct" purchasers along with their franchisors, we are concerned about the possibility that the settlement claims administration process could reach incorrect determinations that gas retailers in *Illinois Brick* repealer states (the members of the putative *Old Jericho* class) are direct purchasers and could thereby prevent those retailers from pursuing their true, indirect purchaser claims. These retailers—many of whom are unlikely to be informed about their indirect purchaser status—should be able to exercise their right to pursue a potentially larger recovery through the *Old Jericho* action (including based on substantive state antitrust laws that may be more advantageous to plaintiffs here than federal antitrust law), free from this risk. The *Old Jericho* plaintiffs are also concerned about the delay that the claims administration process and resulting appeals could impose on the prosecution of indirect purchaser gas retailer claims. The prospect of a special master reviewing thousands of contracts or even potentially holding individual minitrials is a recipe for several years of delay and significant cost and burden to all the parties. The problems with this process will benefit only the defendants, who will either delay the prosecution of the *Old Jericho* indirect purchaser claims or potentially have indirect purchaser gas retailers waive their claims for amounts that are less than what their indirect purchaser claims could be worth (while diluting the recoveries of true direct purchaser class claimants).

We believe the issue of franchisee gas retailer claim ownership would be most efficiently and effectively resolved by a review of the relevant contracts by the Court, or failing that, by the special master. Because the gas brands used form contracts with their retailers, we believe this determination could be made based on the review of between 10 and 20 sample contracts. The *Old Jericho* plaintiffs have obtained form contracts of this type from several major gas brands as

part of their third-party document discovery efforts during the pendency of the appeal of the direct purchaser Rule 23(b)(3) class settlement.  We believe that if the contracts between the gas brands and their retailers had been in the record before the Second Circuit, the concurring opinions would likely not have included any speculation about "joint direct payors."

We think the most efficient course is to determine our clients' indirect/direct payor status by an examination of the gas brands' form contracts with their retailers prior to the claims process in the direct payor settlement.  If, as we believe to be the case, our clients are indirect payors of interchange fees, our case could then proceed to formal discovery.

Counsel for the *Old Jericho* plaintiffs also intend to renew their motion to be appointed interim class counsel on behalf of the class they seek to represent.  Through the efforts of their counsel and consistent with the Court's order permitting such third-party discovery, the *Old Jericho* plaintiffs have been pursuing relevant document discovery from numerous gas brands and several payment processors.  The *Old Jericho* plaintiffs have thereby obtained highly relevant documents and transaction data bearing on issues such as proving pass-on of damages by gas brands to their franchisees, in addition to the question of who is the direct payor. However, certain gas brands and processors have refused to even confirm preservation of relevant transaction data and documents responsive to our subpoenas, largely on the basis that *Old Jericho* counsel have not yet been appointed interim class counsel.  The *Old Jericho* plaintiffs respectfully submit that appointment would facilitate these important discovery efforts, as well as the prosecution of these claims more broadly should the issue of claim ownership be resolved soon.

In their submission, the Branded Operators propose that subclass counsel be appointed for all franchisee gas retailers.  The *Old Jericho* plaintiffs, however, seek to represent these same

retailers in all *Illinois Brick* repealer states.  At no point have the Branded Operators submitted any actual contracts supporting their direct purchaser theory, nor do they provide specifics about how to efficiently resolve the issue of gas retailer franchisee claim ownership.  Counsel for the *Old Jericho* plaintiffs, who already represent a putative class of gas retailers from *Illinois Brick* repealer states, respectfully submit that the Court should appoint *Old Jericho* counsel as interim lead counsel for the gas retailers in *Illinois Brick* repealer states, especially to pursue and preserve any indirect purchaser claims.

### 3. *Lanning* and *Camp Grounds Coffee* Plaintiffs' Position

Defendants' position runs contrary to the holdings of this Court and the Court of Appeals that the settlement class includes only direct purchasers and not indirect purchasers.

Plaintiffs in the *Lanning* and *Camp Grounds Coffee* cases are "Square Sellers," meaning that they purchase their credit-card acceptance service from Square, Inc., which obtains service from one or more acquiring banks (for Visa and Mastercard transactions) and from other networks (for Discover, Amex and other transactions).  Square Sellers pay Square, Inc. a bundled per-transaction fee for all card transactions, and Square, Inc. pays the acquiring banks fees that include the interchange fee for Visa and Mastercard transactions.

There is no basis for defendants' suggestion that the Square Sellers should be impeded from proceeding with merits discovery pending proceedings before a special master.  The only purpose for which this Court has ever considered that a special master might be appointed in this case is for determining which entity owns the direct-purchaser claim, in situations where claim ownership is disputed.  The defendants understand this well:  "the special master is tasked with determining only claim *ownership*."  *See* Brief of Defendants-Appellees, CA2 Case No. 20-339, Doc. No. 334 (Defs App. Br.) at 24 (emphasis in original).

US 173534142v16

In the case of the Square Sellers, there is quite literally no dispute regarding ownership of the direct-purchaser claim.  No one challenges Square, Inc.'s right to claim for the interchange fees that it paid to the acquiring banks as a direct purchaser—whether by submitting a claim to the claims facility or, as happened in this case, by opting out of the direct-purchaser class to pursue its own settlement.  *See* MDL 1720 Dkt. No. 7818-1 at 13:561 (12/13/19 list of opt-outs).

Defendants assert that special master proceedings might somehow provide "guidance" relevant to the Square Sellers claims.  This is baseless.  It is not for the special master to revisit the determination of this Court and the Court of Appeals that the direct-purchaser class settlement applies only to direct purchasers.  And where two merchants have claims related to a single transaction, it is settled—and not for the special master to revisit—that "only the merchant that is the more direct payor of the interchange fee can recover in the settlement. And it is that merchant—and no other—that is encompassed in the class definition."  Defs. App. Br. at 23.  Nor could the special master cast any doubt on the principle that, under the settlement as approved by this Court and now the Second Circuit as well, "an indirect payor with a claim under state law . . . will retain that claim, subject to any applicable defenses."  *Id.* at 41.

Accordingly, the Square Sellers should be permitted to proceed fully with discovery.  The Square Seller plaintiffs thus propose that the parties be directed to submit a proposed protective order within 30 days and that a scheduling conference be scheduled at the earliest convenience of the Court.

## **CONCLUSION**

The parties will be prepared to address any questions that the Court may have about the status of these actions and proposed next steps at the status conference scheduled for 2:00 pm on May 11, 2023.

US 173534142v16

Dated:  April 21, 2023

Respectfully submitted for the parties,

**ARNOLD & PORTER KAYE SCHOLER LLP**

By:   /s/ Robert Vizas

Robert J. Vizas
Three Embarcadero Center, 10th Floor
San Francisco, CA   94111-4024
(415) 471-3100
robert.vizas@arnoldporter.com

Anne P. Davis
Matthew A. Eisenstein
601 Massachusetts Avenue, NW
Washington, DC   20001-3743
(202) 942-5000
anne.davis@arnoldporter.com
matthew.eisenstein@arnoldporter.com

Robert C. Mason
250 West 55th Street
New York, NY   10019-9710
(212) 836-8000
robert.mason@arnoldporter.com

**HOLWELL SHUSTER & GOLDBERG LLP**

Michael S. Shuster
Demian A. Ordway
Blair E. Kaminsky
425 Lexington Avenue
New York, NY   10017
(646) 837-5151
mshuster@hsgllp.com
dordway@hsgllp.com
bkaminsky@hsgllp.com

*Attorneys for Defendants Visa Inc., Visa U.S.A. Inc., and Visa International Service Association,*

32