**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | Case No. 1:05-md-1720 (MKB) (VMS) |
| This Document Applies to: | |
| *Grubhub Holdings Inc., et al.* v. *Visa Inc., et al.*, No. 19-cv-06555 (E.D.N.Y.) (MKB) (VMS). | ORAL ARGUMENT REQUESTED |

**DEFENDANTS' REPLY MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**
<u>**UNDER *OHIO* v. *AMERICAN EXPRESS***</u>

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**
**TO BE FILED UNDER SEAL**

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER
TO BE FILED UNDER SEAL

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT .........................................................................................................................3

I.    *Amex* and *1-800 Contacts* Directly Govern Grubhub Plaintiffs' Burden of Proof. ............3

    A.    The Full Rule of Reason Analysis Is Required Under *Amex*. ................................. 3

    B.    Extensive Second Circuit Precedent Requires an Empirical Demonstration of the Challenged Rules' Anticompetitive Effects ........................................................... 5

II.    Plaintiffs Cannot Meet Their Burden of Establishing Anticompetitive Effects. .................8

    A.    Plaintiffs Have Failed to Show That the Challenged Rules Led to Supracompetitive Two-Sided Prices. .................................................................. 8

    B.    Plaintiffs Have Failed to Show That the Challenged Rules Led to Reduced Output. .............................................................................................................. 12

    C.    Plaintiffs Have Failed to Show That the Challenged Rules Led to Stifled Innovation. ........................................................................................................ 14

    D.    Plaintiffs Cannot Demonstrate Anticompetitive Effects Through Indirect Evidence. ......................................................................................................... 16

CONCLUSION .....................................................................................................................17

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER
TO BE FILED UNDER SEAL

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1-800 Contacts, Inc.* v. *Federal Trade Commission*,
　　1 F.4th 102 (2d Cir. 2021) ............................................................................................ *passim*

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
　　2014 U.S. Dist. LEXIS 180914 (E.D.N.Y. Oct. 15, 2014) ...................................................9

*Allegra* v. *Luxottica Retail N. Am.*,
　　341 F.R.D. 373 (E.D.N.Y. 2021) .........................................................................................8

*Ohio* v. *American Express Co.*,
　　138 S. Ct. 2274 (2018) ................................................................................................ *passim*

*United States* v. *American Express Co.*,
　　838 F.3d 179 (2d Cir. 2016) .................................................................................................4

*Comcast Corp.* v. *Behrend*,
　　569 U.S. 27 (2013) ...............................................................................................................8

*Epic Games, Inc.* v. *Apple, Inc.*,
　　67 F.4th 946 (9th Cir. 2023) ............................................................................................7, 8

*Giordano* v. *Saks Inc.*,
　　No. 20-CV-833 (MKB), 2023 WL 1451534 (E.D.N.Y. Feb. 1, 2023)...................................5

*New York* v. *Hendrickson Bros., Inc.*,
　　840 F.2d 1065 (2d Cir. 1988)................................................................................................8

*J. Truett Payne Co.* v. *Chrysler Motors Corp.*,
　　451 U.S. 557 (1981)...............................................................................................................8

*K.M.B. Warehouse Distribs., Inc.* v. *Walker Mfg. Co.*,
　　61 F.3d 123 (2d Cir. 1995).....................................................................................................6

*MacDermid Printing Sols. LLC* v. *Cortron Corp.*,
　　833 F.3d 172 (2d Cir. 2016)...................................................................................................6

*Maxon Hyundai Mazda* v. *Carfax, Inc.*,
　　726 F. App'x 66 (2d Cir. 2018) .............................................................................................6

*N. Am. Soccer League, LLC* v. *U.S. Soccer Fed'n, Inc.*,
　　296 F. Supp. 3d 442 (E.D.N.Y. 2017), *aff'd*, 883 F.3d 32 (2d Cir. 2018)...............................6

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER
TO BE FILED UNDER SEAL

*In re Namenda Indirect Purchaser Antitrust Litig.*,
  2022 U.S. Dist. LEXIS 170649 (S.D.N.Y. Sep. 19, 2022) ........................................................8

*Nat'l Collegiate Athletic Ass'n* v. *Alston*,
  141 S. Ct. 2141 (2021) ........................................................................................................5

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
  2022 U.S. Dist. LEXIS 195093 (E.D.N.Y. Oct. 9, 2022) ........................................................10

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
  638 F. Supp. 3d 227 (E.D.N.Y. 2022) ..............................................................................5

*In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig.*,
  986 F. Supp. 2d 207 (E.D.N.Y. 2013), *rev'd & vacated on other grounds*, 827
  F.3d 223 (2d Cir. 2016) ........................................................................................................4

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*,
  2022 WL 15053250 (E.D.N.Y. Oct. 26, 2022) ..............................................................10, 13

*Reiter* v. *Sonotone Corp.*,
  442 U.S. 330 (1979) ........................................................................................................8

*Tops Mkts., Inc.* v. *Quality Mkts., Inc.*,
  142 F.3d 90 (2d Cir. 1998) ..............................................................................................6, 11

*Valassis Commc'ns., Inc.* v. *News Corp.*,
  2019 U.S. Dist. LEXIS 27770 (S.D.N.Y. Feb. 21, 2019) ........................................................8

*Virgin Atl. Airways Ltd.* v. *British Airways PLC*,
  257 F.3d 256 (2d Cir. 2001) ..............................................................................................6

*United States* v. *Visa*,
  344 F.3d 229 (2d Cir. 2003) ..............................................................................................4

*US Airways, Inc.* v. *Sabre Holdings Corp.*,
  938 F.3d 43 (2d Cir. 2019) ..............................................................................................9, 10

## PRELIMINARY STATEMENT

In their opposition papers, Grubhub Plaintiffs offer little that was not already rebutted in Defendants' 2020 summary judgment papers and recent reply to the Direct Action Plaintiffs' ("DAPs") supplemental briefing in this MDL, all of which Defendants fully adopt and incorporate by reference here.[1]

Once again, Grubhub Plaintiffs strain to avoid the governing principles of *Ohio* v. *American Express Co.*, 138 S. Ct. 2274 (2018) ("*Amex*"), and *1-800 Contacts, Inc.* v. *Federal Trade Commission*, 1 F.4th 102 (2d Cir. 2021) ("*1-800 Contacts*"). But Grubhub Plaintiffs cannot sidestep *Amex* through an erroneous assertion that the rules at issue are horizontal instead of vertical. This is not a *per se* case, as Grubhub Plaintiffs themselves realize, Opp'n Br. at 1–2, and a "quick look" approach is not warranted in these circumstances. *Amex* Reply at 6–10. Grubhub Plaintiffs similarly fail to distinguish *1-800 Contacts*, and must grapple with the Second Circuit's instructions in that case and elsewhere that a plaintiff must support any purported showing of anticompetitive effects with "empirical," rather than "theoretical and anecdotal" evidence of impact "on the market as a whole." *1-800 Contacts*, 1 F.4th at 118 & n.11. Together, *Amex* and *1-800 Contacts* make clear that to establish a *prima facie* violation under Section 1 of the Sherman Act, Grubhub Plaintiffs must meet their initial burden by grounding any showing of anticompetitive effects from supracompetitive pricing, suppressed output, or stifled competition or innovation upon empirical evidence of actual market data. *See id.*; *Amex*, 138 S. Ct. at 2285. Plaintiffs have not come forward with evidence sufficient to create a triable question of fact.

---

[1] *See* Defs.' Mem. of Law & Reply Mem. of Law in Supp. of Mot. for Summ. J. Under *Ohio* v. *American Express* (respectively, "*Amex* Br." and "*Amex* Reply," filed at ECF Nos. 8071 and 8156); Defendants' Reply to DAPs' & Equitable Relief Class Pls.' Suppl. Mem. Regarding Proof of Anticompetitive Effects ("Suppl. *Amex* Br.," filed at ECF No. 8898).

Where, as here, the challenged rules have been operating in transaction markets characterized by declining prices, climbing output, and continual innovations that benefit all participants including consumers, Grubhub Plaintiffs' failure to offer legally sufficient evidence is even more stark.  As with the DAPs, Grubhub Plaintiffs fail to show empirically that Visa's or Mastercard's current pricing is higher than that of other competitors, or how low the pricing would be in a but-for world.  Grubhub Plaintiffs are left to rely upon pass-through theories rejected by the Second Circuit, excess profitability claims that are disconnected from the alleged conduct, and discrete co-brand examples that have no market-wide impact.  That is not enough to survive summary judgment.

Grubhub Plaintiffs' output arguments fare no better.  No party disputes the growth of credit and debit transactions; the Supreme Court in *Amex* found that market reality, standing alone, sufficient to conclude there was no competitive injury arising from purportedly suppressed output. *Amex*, 138 S. Ct. at 2288–89.  And even if this Court were to assess whether output would have been higher in a but-for world, Grubhub Plaintiffs offer only speculative economic hypotheses that output might have increased in a *different*, broader market, not the alleged markets for credit or debit transactions.  This is precisely the type of theoretical evidence that was rejected by the Second Circuit in *1-800-Contacts*.  1 F.4th at 118 & nn.10–11.

Finally, the Grubhub Plaintiffs do not—and cannot—identify any actual examples of stifled competition or innovation.  As the *Amex* Court found, this marketplace is characterized by robust inter-brand competition that leads to innumerable benefits for consumers and other participants in the payment ecosystem.  *Amex*, 138 S. Ct. at 2289–90.  No plaintiff in this action has justified the sought-after radical modifications to the payment systems that have worked so well for so many for so long.

This reply brief will not repeat the extensive arguments made by Defendants supporting summary judgment in the MDL actions; we will highlight only the key failures of Grubhub Plaintiffs' opposition to demonstrate why summary judgment should be granted in this specific action as well.

## ARGUMENT

I.  ***Amex* and *1-800 Contacts* Directly Govern Grubhub Plaintiffs' Burden of Proof.**

A.      **The Full Rule of Reason Analysis Is Required Under *Amex*.**

Like the DAPs, Grubhub Plaintiffs acknowledge that their case is governed by the rule of reason, under which they bear the initial burden of showing anticompetitive effects.  Opp'n Br. at 1–2.  They then follow the DAPs to attempt to bypass this burden by arguing that purported horizontal price-fixing agreements "by themselves, meet the initial burden placed upon plaintiffs under the rule of reason analysis." *Id.* at 2; *see also id.* at 8.  Again, this attempt fails.  First, Grubhub Plaintiffs  fail to demonstrate the existence of a horizontal agreement to fix prices. *See* Defs.' Mem. of Law in Supp. of Mot. for Summ. J. on Pls.' Post-IPO Conspiracy Claims.  Second, even if such an agreement existed, its mere existence would not meet or otherwise change Grubhub Plaintiffs' burden under the rule of reason. *See Amex* Reply at 6–10; Suppl. *Amex* Br. at 6–7.

As Defendants previously explained, the Visa and Mastercard rules are no different in nature than the American Express anti-steering rules addressed in *Amex* as "vertical" restraints subject to the full rule of reason analysis. *See Amex* Reply at 6–7.  Grubhub Plaintiffs do not set out any new facts demonstrating the existence of "horizontal" conspiracies among the networks and banks to refute Defendants' summary judgment arguments in their briefs on post-IPO

3

conspiracy claims.[2] Grubhub Plaintiffs also cannot circumvent their burden by invoking yet again the decades-old, pre-IPO findings of *United States* v. *Visa*, 344 F.3d 229 (2d Cir. 2003), regarding alleged restraints on *inter-network* conduct, which have no bearing on today's two-sided transaction markets, where the challenged rules operate *intra-network* among "different sides of the same network platform," as the Second Circuit more recently found in *United States* v. *American Express Co.*, 838 F.3d 179, 198 (2d Cir. 2016). *See also Amex* Reply at 7–8.

Nor does the *de facto* "quick look" approach for which Grubhub Plaintiffs advocate apply to the vertical rules of a payment card network. Opp'n Br. at 7–8; *see Amex* Reply at 7–10; Suppl. *Amex* Br. at 6–7. As the Second Circuit has explained, "[t]his approach is only permissible when 'an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets.'" *1-800 Contacts*, 1 F.4th at 115 (quoting *Cal. Dental Ass'n* v. *FTC*, 526 U.S. 756, 770 (1999)). "Further, if an arrangement might *plausibly be thought* to have a net procompetitive effect, or possibly no effect at all on competition, more than a 'quick look' is required." *Id.* (emphasis added) (internal quotation marks omitted) (quoting *Major League Baseball Props., Inc.* v. *Salvino, Inc.*, 542 F.3d 290, 318 (2d Cir. 2008)).

The record here contains ample evidence of "significant procompetitive benefits" of the challenged rules, recognized by both this Court in this litigation and the Supreme Court in *Amex*— including decreasing prices, increasing output, and continuous innovation. *See, e.g.*, *In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig.*, 986 F. Supp. 2d 207, 219 (E.D.N.Y.

---

[2]    *See generally* Defs.' Mem. of Law & Reply Mem. of Law in Supp. of Mot. for Summ. J. on Post-IPO Claims Against DAPs (ECF Nos. 8089 & 8094) and Against Grubhub Plaintiffs (dated, respectively, July 14, 2023 and Sept. 8, 2023).

2013), *rev'd & vacated on other grounds*, 827 F.3d 223 (2d Cir. 2016); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 638 F. Supp. 3d 227, 273 (E.D.N.Y. 2022) (summarizing and admitting expert opinions of Professor Kahn); *Amex*, 138 S. Ct. at 2288–90. Crucially, Grubhub Plaintiffs can point to no case that subjects any analogous conduct to the "quick look" approach, whereas this Court has explicitly cautioned that "quick look should not be applied in cases where courts have not 'amassed considerable experience with the type of restraint at issue and can predict with confidence that it would be invalidated in all or almost all instances.'" *Giordano* v. *Saks Inc.*, No. 20-CV-833 (MKB), 2023 WL 1451534, at *15 (E.D.N.Y. Feb. 1, 2023) (citing *Nat'l Collegiate Athletic Ass'n* v. *Alston*, 141 S. Ct. 2141, 2156 (2021)); *see also Amex* Reply at 8–10. Where, as here, no court has ever condemned comparable rules in two-sided transaction platforms as anticompetitive, the full rule of reason analysis must apply.

### B.   Extensive Second Circuit Precedent Requires an Empirical Demonstration of the Challenged Rules' Anticompetitive Effects.

Grubhub Plaintiffs try to circumvent *1-800 Contacts* by misleadingly contending that Defendants interpret it to announce "a new rule" that "ignores [] crucial 'market realities'" and "overrule[s] decades of precedent with no express acknowledgement it was doing so." Opp'n Br. at 4–6 & n.4. Defendants have argued no such thing. As Defendants made clear in their opening brief, *1-800 Contacts* reinforces the basic and long-standing proposition that, "in any antitrust case," a court "must determine whether the [challenged rules] are reasonable in light of their *actual effects on the market*." 1 F.4th at 113 (emphasis added) (citation and internal quotation marks omitted). As Plaintiffs' own authorities recognize, this is "no slight burden," leading courts to dismiss "nearly all rule of reason cases in the last 45 years" where "plaintiff [has] failed to show a substantial anticompetitive effect." *Nat'l Collegiate Athletic Ass'n*, 141 S. Ct. at 2160–61 (citing an *amicus* brief filed by law, business, economics, and sports management professors).

5

The Second Circuit requires "[e]mpirical evidence" to demonstrate anticompetitive effects where plaintiffs attempt to meet their burden with direct evidence. *1-800 Contacts*, 1 F.4th at 118 n.11. This requirement is consistent with a long line of Second Circuit cases that refuse to "substitute [] actual market data" with "hypothetical assumptions" and speculation. *Virgin Atl. Airways Ltd.* v. *British Airways PLC*, 257 F.3d 256, 264 (2d Cir. 2001); *MacDermid Printing Sols. LLC* v. *Cortron Corp.*, 833 F.3d 172, 184 (2d Cir. 2016); *see also Tops Mkts., Inc.* v. *Quality Mkts., Inc.*, 142 F.3d 90, 96 (2d Cir. 1998) (dismissing antitrust challenge where "[p]laintiff failed to demonstrate an actual detrimental effect on competition").

And courts in this jurisdiction have long required antitrust plaintiffs to come forward with "empirical" rather than "theoretical and anecdotal" evidence to make their initial showing of anticompetitive effects. *1-800 Contacts*, 1 F.4th at 118 & n.11; *K.M.B. Warehouse Distribs., Inc.* v. *Walker Mfg. Co.*, 61 F.3d 123, 128 (2d Cir. 1995) (requiring "a sufficient empirical demonstration concerning the adverse effect of [the challenged rules] on price or quality" (citation and internal quotation marks omitted)); *see also Maxon Hyundai Mazda* v. *Carfax, Inc.*, 726 F. App'x 66, 69 (2d Cir. 2018) (affirming grant of summary judgment where plaintiffs did not make "a sufficient empirical demonstration of adverse effects on competition" (citation and internal quotation marks omitted)); *N. Am. Soccer League, LLC* v. *U.S. Soccer Fed'n, Inc.*, 296 F. Supp. 3d 442, 472 n.41 (E.D.N.Y. 2017) (finding no direct evidence of anticompetitive effects where plaintiff failed to provide "empirical evidence" of consumer confusion or a reduction in output), *aff'd*, 883 F.3d 32 (2d Cir. 2018). Grubhub Plaintiffs cannot salvage their case at summary judgment by arguing that it must be governed by a different, more relaxed standard.

Grubhub Plaintiffs further contend that the "before-and-after" analysis in *1-800 Contacts* cannot apply here because some (but not all) of the challenged rules have been in place since the

networks' inception.  But this undisputed evidence only contradicts Plaintiffs' position, as neither Visa nor Mastercard is alleged to have had market power when the rules were first enacted, SMF ¶ 184, and thus those rules could not have caused anticompetitive effects.

In any event, Plaintiffs' theory makes plain that they had a full opportunity to demonstrate—as the case law requires—that there was "an actual anticompetitive change in prices" as a result of the challenged rules.  *1-800 Contacts*, 1 F.4th at 118.  Acknowledging that the challenged rules were not anticompetitive for decades after they were enacted, Grubhub Plaintiffs nonetheless allege that the rules became anticompetitive at some time "[b]y the late 1990s."  SMF ¶ 14.  Grubhub Plaintiffs accordingly could have tried to demonstrate the resulting anticompetitive impact by comparing prices or output "before and after" the supposed anticompetitive shift (however vague in time), yet they provide no empirical proof based on actual market data from those time periods to support their claim.  Plaintiffs' failure to provide any before-and-after analysis is of their own making, and their attempted distinction of *1-800 Contacts* cannot be used to bypass their burden at summary judgment.  Their failure to proffer the necessary empirical proof also underscores what the real-world evidence shows:  prices have steadily declined, output has dramatically expanded, and quality has improved through numerous innovations.

Grubhub Plaintiffs cite to *Epic Games, Inc.* v. *Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023), for the broad proposition that courts "have rejected" a "before and after" analysis as a requirement for direct evidence of supracompetitive price.  Opp'n Br. at 7.  That is wrong.  In *Epic*, the Ninth Circuit explicitly confirmed that a showing of supracompetitive pricing "ordinarily" involves "a price increase."  67 F.4th at 984.  Grubhub Plaintiffs have not provided any viable justification as to why they should be excused from that basic showing here, especially in light of governing

Second Circuit precedent.  Further, *Epic* in no way obviates Plaintiffs' burden to present empirical, market-based evidence.  The plaintiff in *Epic* presented, among other things, a data-based comparison of Apple's net effective prices as compared with those of its primary competitors.  *Id.* at 984–85.  Grubhub Plaintiffs did not do anything similar here.  *See* Grubhub *Amex* Br. at 6–7.

## II.   Plaintiffs Cannot Meet Their Burden of Establishing Anticompetitive Effects.

### A.   Plaintiffs Have Failed to Show That the Challenged Rules Led to Supracompetitive Two-Sided Prices.

As discussed above and in Defendants' prior briefing, "[w]hen an antitrust plaintiff advances an antitrust claim based on direct evidence in the form of increased prices, the question is whether it can show an actual anticompetitive change in prices after the restraint was implemented."  *1-800 Contacts*, 1 F.4th at 118.  Grubhub Plaintiffs do not and cannot dispute that they have made no such showing in the face of declining two-sided prices, a market reality they attempt to shrug off in a footnote.  Opp'n Br. at 10 n.6.  Even assuming that, notwithstanding the existence of "before and after" periods to test, they could meet their burden by comparing actual prices to but-for prices, Grubhub Plaintiffs also fail to make that showing.  The very cases cited by Grubhub Plaintiffs require the actual calculation of but-for world prices based on market data, *see, e.g.*, *Comcast Corp.* v. *Behrend*, 569 U.S. 27, 36 (2013) (examining how "[t]he 'but for' figure [for price] was calculated"),[3] and Grubhub Plaintiffs do not offer such a calculation, SMF ¶ 28.

---

[3]   *See also In re Namenda Indirect Purchaser Antitrust Litig.*, 2022 U.S. Dist. LEXIS 170649, at *28–29 (S.D.N.Y. Sep. 19, 2022) (discussing calculation of but-for world drug price in pay-for-delay case); *Allegra* v. *Luxottica Retail N. Am.*, 341 F.R.D. 373, 453 (E.D.N.Y. 2021) (discussing calculation of overcharges consumers paid for glasses based on "data on the retail market for eyeglasses"); *Valassis Commc'ns., Inc.* v. *News Corp.*, 2019 U.S. Dist. LEXIS 27770, at *38–39, *41–42 (S.D.N.Y. Feb. 21, 2019) (discussing damages model calculating plaintiff's but-for world profits based on market data); *J. Truett Payne Co.* v. *Chrysler Motors Corp.*, 451 U.S. 557, 564 (1981) (declining to award damages where plaintiffs proffered no "documentary evidence as to the effect of the [challenged conduct] on retail prices"); *New York* v. *Hendrickson Bros., Inc.*, 840 F.2d 1065, 1077 (2d Cir. 1988) (noting that "the jury is not allowed to base its damages assessment on speculation or guesswork" and must instead be able to rely "on relevant data"); *cf. Reiter* v. *Sonotone Corp.*, 442 U.S. 330, 340 (1979) (at the motion to dismiss stage, noting that plaintiffs must plead "defendants' antitrust violation caused it to pay a

8

Instead, Grubhub Plaintiffs point again to the series of "benchmarks" that were designed "specifically for assessing Grubhub Plaintiffs Group's damages," and "not meant to be estimates of industry-wide interchange or network fees in the but-for world." *Id.* ¶ 18; Opp'n Br. at 12. As Defendants explained in their opening brief, these merchant-specific "estimates" do not tend to prove "higher prices . . . in the market as a whole," and thus are insufficient as a matter of law. *See* Grubhub *Amex* Br. at 6.

Grubhub Plaintiffs try to sidestep this fatal flaw by cobbling together a list of substitute theories they claim "more than meet" their burden at summary judgment.  Namely, Grubhub Plaintiffs contend that because global network profits are purportedly high, pass-through rates for rewards are supposedly low, and some "isolated" merchants have above-average negotiating leverage to bargain for lower co-brand interchange rates, the overall two-sided pricing in the actual world must be supracompetitive.  Opp'n Br. at 10–13.  But these are just theoretical hypotheses unsupported by any quantitative comparisons or empirical analysis testing and proving these theories, and Defendants have already explained in detail why each theory is legally deficient.  *See* Grubhub *Amex* Br. at 7–8; *Amex* Br. at 26–27; *Amex* Reply at 11–20; *see also* Suppl. *Amex* Br. at 12–14, 17–20.  The few new points raised by Grubhub Plaintiffs are all inapposite.

First, *US Airways, Inc.* v. *Sabre Holdings Corp.*, 938 F.3d 43 (2d Cir. 2019) ("*Sabre*"), is no help to Grubhub Plaintiffs.  Contrary to Grubhub Plaintiffs' claim that Defendants ignored *Sabre*, Defendants fully addressed that case and Grubhub Plaintiffs' arguments in their prior summary judgment briefing.  *See Amex* Reply at 15–16 & n.22.  *Sabre* does not hold that there is antitrust liability merely where high profits exist.  Instead, the Second Circuit found that Sabre's

---

higher price for the [product] than it otherwise would have paid"); *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2014 U.S. Dist. LEXIS 180914, at *271–72 (E.D.N.Y. Oct. 15, 2014) (discussing calculation of antitrust damages at class certification stage).

profitability in that case indicated supracompetitive pricing because Sabre directly received the income from the fees it set.  *See Sabre*, 938 F.3d at 61.  That is indisputably not the case here, where neither Visa nor Mastercard receive any revenue from interchange.  *See* 2020 SOF ¶ 41. Moreover, Grubhub Plaintiffs concede that the Visa and Mastercard profitability figures that they rely upon are global, rather than U.S. specific, making the connection between profits and the challenged conduct here even more attenuated.  *See* Opp'n at 12 & n.7.  And to the extent that Grubhub Plaintiffs rely on bank profitability, they have failed to show that the challenged restraints are responsible for those allegedly high profits, which derive from multiple sources of revenue. *See Amex* Br. at 23, 25.[4]

Second, Grubhub Plaintiffs' invocation of this Court's partial summary judgment decision on the 7-Eleven Plaintiffs' EMV claim (a claim not brought by the Grubhub Plaintiffs) is unavailing, and only serves to underline the scarcity of their legal support.  *See* Opp'n Br. at 10, 22–23.  That decision centered on whether the networks' respective liability shifts for fraud costs associated with EMV (chip card) implementation could constitute a form of cognizable antitrust injury.  *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2022 U.S. Dist. LEXIS 195093, at *195–96 (E.D.N.Y. Oct. 9, 2022).  The decision did not examine whether the 7-Eleven Plaintiffs, or any other plaintiff, presented sufficient empirical evidence to demonstrate that two-sided credit or debit transaction prices are at a supracompetitive level.[5]

---

[4]   This Court's *Daubert* decision is in no way inconsistent with that analysis, because the fact that an expert opinion may be admissible does not mean that it is sufficient to carry the Plaintiffs' burden of proof.  *See In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 2022 WL 15053250, at *40 (E.D.N.Y. Oct. 26, 2022) ("The standard for admissibility does not require that the expert's evidence, without more, meet the burden of proof.").

[5]   Additionally, Grubhub Plaintiffs repeatedly highlight that Defendants have not moved to exclude their experts' opinions.  Opp'n Br. at 1, 12 n.7 & 13 n.8.  Plaintiffs neglect to mention that the parties have discussed seeking to enter stipulations regarding the applicability of the Court's prior *Daubert* decisions

Third, Grubhub Plaintiffs' reliance on the "lucrative" co-brand deals between Defendants and selected merchants to show supracompetitive prices does not withstand scrutiny.  By their economic expert's admission, "different merchants in the but-for world might [] reach[] different results in negotiating lower interchange rates."  SMF ¶ 19.  Put differently, there will always be some merchants who are able to offer networks or issuers greater value propositions than other merchants, and thus able to negotiate more favorable terms for payment card services than their peers.  If evidence of such discrete rates—standing alone without any market-wide empirical analysis showing their reasonable applicability across a fully scaled but-for world—is sufficient to indicate supracompetitive pricing, then there would be no actual "competitive" product markets. These are exactly the kind of "mistaken inferences" that "could 'chill the very conduct the antitrust laws are designed to protect,'" and should not be entertained on summary judgment.  *Amex*, 138 S. Ct. at 2287 (quoting *Brooke Grp. Ltd.* v. *Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 226 (1993)); *see also Tops Mkts.*, 142 F.3d at 95.

Lastly, Grubhub Plaintiffs attempt to distract the Court from the relevant evidence regarding Buy Now, Pay Later ("BNPL") payment services.  Despite vaguely asserting that Mastercard and Visa somehow forced these payment options upon merchants through "high cost virtual cards," they provide no quantification of the percentage of merchants (either among the Grubhub Plaintiffs or otherwise) actually incurring those virtual card rates, or how many BNPL transactions were conducted through virtual cards on a market-wide scale.[6]  More importantly, Grubhub Plaintiffs ignore merchants' prevalent use of ▉▉▉▉▉▉ independent BNPL options from entrants such as Affirm or Klarna that stand alongside traditional Visa, Mastercard, or Amex

on Grubhub Plaintiffs' experts—rather than briefing many of the same issues anew—and that there has been no deadline set for *Daubert* motions in this action.

[6]    SJDX 1319 (Romaine Dep. Tr. at 271:14–24).

options on merchant e-commerce check-out pages. *See* SMF ¶¶ 159–61. Indeed, Grubhub Plaintiffs studiously avoid grappling with the undisputed evidence that BNPL platforms ████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████. *See* SMF ¶¶ 24, 80, 154–64. This undisputed evidence further demonstrates that Visa's and Mastercard's pricing in the actual marketplace are competitive.

**B.    Plaintiffs Have Failed to Show That the Challenged Rules Led to Reduced Output.**

As Defendants explained in their opening brief, undisputed evidence shows that output of credit and debit card transactions has increased at rates even beyond those the *Amex* Court found to counter any suggestion that credit transactions were being suppressed. Grubhub *Amex* Br. at 9. Grubhub Plaintiffs make no real effort to rebut that evidence. Instead, they reprise their argument that output would have been greater in the but-for world, relying chiefly on the DAPs' prior opposition to Defendants' summary judgment motion. Opp'n Br. at 17–20. Defendants have already rebutted those arguments, and those counterpoints are equally applicable here. *See Amex* Reply 21–25.

Similar to other plaintiffs in this MDL, Grubhub Plaintiffs also rely on an attenuated theory that, if interchange fees were lower, output would be higher in a market *different* from the antitrust product markets alleged by Grubhub Plaintiffs here—namely, they point to theories about output expansion in a broader market for retail transactions of *all* goods and services, not a credit card transaction market or a debit card transaction market. Opp'n Br. at 18–19. As explained in Defendants' opening brief, this speculation fails at every step. Grubhub *Amex* Br. at 9–11. Because Grubhub Plaintiffs' one-sided theory merely speculates that there would be increased

12

output in the larger market for all retail transactions (as opposed to credit or debit transactions), Grubhub Plaintiffs have failed to meet their burden under *Amex*. *Id.* at 10.

In response to this criticism, Grubhub Plaintiffs point to this Court's *Daubert* opinion admitting the parallel opinions offered by Professor Harris. Opp'n Br. at 20 n.13. But again, as this Court made clear in its *Daubert* opinion, "[t]he standard for admissibility does not require that the expert's evidence, without more, meet the burden of proof." *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 2022 WL 15053250, at *40. Regardless of the admissibility of Harris's (or Romaine's) opinions on output, the absence of market-grounded empirical evidence in that opinion renders it insufficient on summary judgment. Moreover, to the extent Plaintiffs rely upon the notion that Defendants have not yet filed a *Daubert* motion as to Romaine in this case, that argument is unavailing—no deadline has yet been set for *Daubert* motions in this case. *See supra* 10 & n.5.

Aside from rehashing prior arguments, Grubhub Plaintiffs also rely on a handful of Mastercard documents regarding the growth of "small ticket" transactions as a result of lower transaction fees to suggest that the output of *all* credit and debit card transactions would increase in a but-for world. Opp'n Br. at 17–18. But that is far too great a logical leap. That Mastercard considered competing for acceptance in a certain merchant segment by *lowering transaction fees*, among other strategies (like eliminating credit card minimums for small purchases, *see* ████████ ████████████████████████████████████████████████████████████████████████ ████████ ), does nothing to demonstrate empirically that the network rules restricted output in the markets for debit and credit card transactions as a whole. Grubhub Plaintiffs fail to point to any evidence that bridges the gap between the small ticket transaction fees, the challenged rules, and the relevant antitrust markets of all credit and debit card transactions. If anything, this

evidence only reinforces the reality that the networks vigorously compete for transactions, including with price structures designed to grow output.

Grubhub Plaintiffs also concede the fact that the changes they seek to the marketplace could lead to decreased output. Romaine acknowledged that it was "certainly possible" that some issuers could stop issuing credit cards in the but-for world. SMF ¶ 53. Grubhub Plaintiffs handwave away the obvious possibility that fewer issuers could lead to reduced output by arguing that *Defendants* do not offer any "evidence" that cardholders would not shift to another payment card. Opp'n Br. at 19 n.12. But this critique misapprehends the burden—it is Grubhub Plaintiffs who must account for this admitted marketplace reality with actual evidence at summary judgment and demonstrate that output would actually increase in the but-for world.

Underscoring this point, Defendants explained in their opening brief that Grubhub itself has previously acknowledged in another litigation that capping fees on one side of a two-sided platform can shift costs to the other side and thereby reduce output. *See* Grubhub *Amex* Br. at 11 & n.5. Although Grubhub Plaintiffs attempt to distinguish the precise circumstances of that case, *see* Opp'n Br. at 21 n.14, the point is that Grubhub Plaintiffs ignore a fundamental deficiency in their theory driven by the nature of the two-sided platforms that both Grubhub and the card networks operate. And while Grubhub Plaintiffs attempt to argue that there would be sufficient revenue for rewards in the but-for world, *see id.*, their expert specifically acknowledged that rewards may decrease in the but-for world, which alone would tend to reduce output in the antitrust markets Grubhub Plaintiffs allege. *See* SMF ¶¶ 29–30.

### C.   Plaintiffs Have Failed to Show That the Challenged Rules Led to Stifled Innovation.

In *Amex*, the Supreme Court held that the credit card transaction market is characterized by "fierce competition between networks," and "robust interbrand competition." 138 S. Ct. at

14

2289–90.  The record is replete with evidence that this competition has only increased since *Amex* was decided and exists in both the credit card and debit card markets alleged by Grubhub Plaintiffs. As Defendants explained in their opening brief, there is not only evidence of robust competition between networks (as demonstrated, for example, by the lucrative co-brand deals secured by certain Grubhub Plaintiffs), but there is also evidence of significant innovation by Visa, Mastercard, and other players in the payment card space.  *See* Grubhub *Amex* Br. at 12–14. Grubhub Plaintiffs neither dispute that these innovations have taken place, nor bother to explain why this evidence does not show that the payment card industry is marked by thriving competition, innovation, and improvement in quality.

Instead, they largely fall back on the DAPs' prior speculation about how various forms of innovation might have unfolded differently than they actually did.  *See* Opp'n Br. at 21–22.  But as Defendants explained in their prior briefing, this speculation fails to address the broader competitive landscape, and is wholly untethered to the challenged conduct.  *See Amex* Reply at 25–29.

This Court's EMV summary judgment opinion does not change that analysis.  *See* Opp'n Br. at 21.  Even if the Court were to accept that EMV technology was somehow delayed in the United States, which is not even alleged in the Grubhub Plaintiffs' case, that would not negate the actual efforts the networks made to roll out such EMV technology in the U.S. and globally, or render irrelevant all of the other card network innovations in the marketplace apart from EMV. The question is not whether a particular form of innovation might have happened earlier, but whether Plaintiffs can "demonstrate anticompetitive effects" on the relevant markets "*as a whole*."

15

*Amex*, 138 S. Ct. at 2287 (emphasis added).  Grubhub Plaintiffs' anecdotal examples are dwarfed by industry developments over the decades and cannot satisfy their burden.[7]

### D.   Plaintiffs Cannot Demonstrate Anticompetitive Effects Through Indirect Evidence.

As Defendants explained in their opening brief, because Grubhub Plaintiffs fail to establish any harm to competition from the challenged rules, they have failed to demonstrate anticompetitive effects through indirect evidence.  *See* Grubhub *Amex* Br. at 14; *see also* Suppl. *Amex* Br. at 29–33.  A perfunctory attempt to marshal evidence of market power in a single sentence of their brief does not transform a deficient proffer of direct evidence into a sufficient proffer of indirect evidence.  *See* Opp. Br. at 22; Suppl. *Amex* Br. 29–33.  Further, Mastercard has separately shown that, because the undisputed facts demonstrate that Mastercard lacks market power in the relevant markets and could not have unilaterally implemented any anticompetitive rules or caused any anticompetitive effects, Grubhub Plaintiffs cannot prevail against it using the indirect method of proof.[8]

---

[7]   Grubhub Plaintiffs argue that Defendants' "focus on innovation" comes from a desire to somehow "co-opt" the innovations of others.  *See* Opp'n Br. at 22.  But a desire to compete with new market entrants is not anti-competitive—it is the hallmark of a competitive market.  Grubhub Plaintiffs fail to explain why, for example, ███████████████████████████████████ is an example of the stifling of innovation, as opposed to partnerships that provide consumers access to innovations that they would not have otherwise enjoyed.  In the absence of any evidence that these partnerships did anything to reduce innovation in the market, Grubhub Plaintiffs have failed to offer any evidence of anticompetitive effects.

[8]   *See* Mastercard's Mem. of Law in Supp. of Mot. for Summ. J. Based on Mastercard's Lack of Market Power, filed at ECF No. 8073; Mastercard's Reply Mem. of Law in Supp. of Mot. for Summ. J. Based on Mastercard's Lack of Market Power, filed at ECF No. 8157.

Grubhub Plaintiffs' citation to Mastercard's recent consent order with the Federal Trade Commission, which contained no admission of wrongdoing and resolved wholly unrelated allegations relating to whether Mastercard's tokenization technology complied with the Durbin Amendment's routing requirements, does nothing to advance Grubhub Plaintiffs' claims that the challenged rules had any anticompetitive effects.  Resp. to COF ¶ 498.

16

## **CONCLUSION**

Grubhub Plaintiffs have failed to raise a triable issue of fact as to whether the challenged rules unreasonably restrain competition.  Defendants' motion for summary judgment should be granted.

Dated:  September 8, 2023                    Respectfully submitted,

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

*Gary R. Carney*
Brette Tannenbaum
Gary R. Carney
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000
btannenbaum@paulweiss.com
gcarney@paulweiss.com

Kenneth A. Gallo
Donna M. Ioffredo
2001 K Street, N.W.
Washington, DC 20006-1047
(202) 223-7300
kgallo@paulweiss.com
dioffredo@paulweiss.com

*Attorneys for Defendants Mastercard Incorporated and Mastercard International Incorporated*

**ARNOLD & PORTER KAYE SCHOLER LLP**

Robert J. Vizas
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111-4024
(415) 471-3100
robert.vizas@arnoldporter.com

Anne P. Davis
Matthew A. Eisenstein
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
(202) 942-5000
anne.davis@arnoldporter.com
matthew.eisenstein@arnoldporter.com

**HOLWELL SHUSTER & GOLDBERG LLP**

Michael S. Shuster
Demian A. Ordway
Blair E. Kaminsky
Jayme Jonat
425 Lexington Avenue
New York, NY 10017
(646) 837-5151
mshuster@hsgllp.com
dordway@hsgllp.com
bkaminsky@hsgllp.com
jjonat@hsgllp.com

*Attorneys for Defendants Visa Inc., Visa U.S.A. Inc., and Visa International Service Association*

18

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 8, 2023, I caused a true and correct copy of the foregoing to be served on all counsel in the above-referenced action via FTP, in accordance with the parties' prior agreement.

Dated: September 8, 2023

*Gary R. Carney*
Gary R. Carney