UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

IN RE PAYMENT CARD INTERCHANGE FEE
AND MERCHANT DISCOUNT ANTITRUST
LITIGATION

**MEMORANDUM & ORDER**
05-MD-1720 (MKB)

This document refers to: ALL ACTIONS

-------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

I.    Background ........................................................................................................ 4
      a.   Procedural history ...................................................................................... 4
      b.   Factual background .................................................................................... 8
      c.   Challenged network rules ......................................................................... 11
II.   Discussion ......................................................................................................... 13
      a.   Standard of review .................................................................................... 13
      b.   Defendants' *Illinois Brick* motion ............................................................ 15
           i.   Legal background ............................................................................... 15
           ii.  The parties' arguments ...................................................................... 20
           iii. Disputed facts relevant to the Parties' arguments ............................ 23
           iv.  Plaintiffs have raised a triable question of fact as to their status as direct purchasers
                of card-acceptance services .............................................................. 25
           v.   Evidence creating a triable question of fact as to the identity of the direct purchaser
                of card-acceptance services .............................................................. 36
      c.   Defendants' motion for summary judgment as to post-IPO claims ............................... 42
           i.   Legal background ............................................................................... 43
           ii.  The parties' arguments ...................................................................... 45
           iii. Plaintiffs have demonstrated triable questions of fact as to the existence of a post-
                IPO conspiracy .................................................................................. 48
      d.   Direct Action Plaintiffs' motions for partial summary judgment ..................................... 57
III.  Conclusion ........................................................................................................ 64

Several Plaintiffs and several Defendants[1] in this multidistrict litigation moved for

summary judgment and partial summary judgment in December of 2020.[2]  Defendants also

---

[1]  Plaintiffs consist of (1) the Equitable Relief Class, which was certified under Federal Rule of Civil Procedure 23(b)(2), *DDMB, Inc. v. Visa, Inc.*, No. 05-MD-1720, 2021 WL 6221326, at *50 (E.D.N.Y. Sept. 27, 2021); (2) the Target Plaintiffs, the 7-Eleven Plaintiffs, and The Home Depot (collectively, the "Direct Action Plaintiffs"), who are not members of the class and filed briefing on the summary judgment issue together, *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2017 WL 4325812, at *3 (E.D.N.Y. Sept. 27, 2017), *order set aside on other grounds*, No. 05-MD-1720, 2018 WL 4158290 (E.D.N.Y. Aug. 30, 2018); and (3) the Grubhub Plaintiffs — another group of opt-out plaintiffs against whom Defendants sought summary judgment in September of 2023, *see infra* note 3.

Defendants consist of the Visa and Mastercard networks as well as "various issuing and acquiring banks" (the "Bank Defendants").  *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 18 (E.D.N.Y. 2019) (*Interchange Fees III*).  "At the beginning of this litigation . . . Visa and Mastercard were effectively owned by their member banks."  *Barry's Cut Rate Stores Inc. v. Visa Inc.*, No. 05-MD-1720, 2019 WL 7584728, at *3 (E.D.N.Y. Nov. 20, 2019).  "In 2006 and 2008, Mastercard and Visa, respectively, made initial public offerings ('IPOs'), becoming publicly traded individual companies."  *Id.*  However, Plaintiffs claim that the alleged anticompetitive practices have "continued despite the networks' and the banks' more recent attempt[s] to avoid antitrust liability by restructuring the Visa and Mastercard corporate entities."  *Id.*; (Equitable Relief Class Action Compl. ("Equitable Relief Class Compl.") ¶ 1, annexed to the Decl. of Rosemary Szanyi ("Szanyi Decl.") as SJDX4, Docket Entry No. 8520-1; *see also* Second Amended Target Compl. ("Target Compl.") ¶¶ 78–79, annexed to Szanyi Decl. as SJDX3, Docket Entry No. 8520-1 (stating that "the IPOs did not change the essential character of" Visa and Mastercard's "combinations in restraint of trade"); Sixth Am. 7-Eleven Compl. ("7-Eleven Compl.") ¶¶ 152–64, annexed to Szanyi Decl. as SJDX1, Docket Entry No. 8520-1 (claiming that Visa's and Mastercard's "post-IPO structures . . . were designed to perpetuate, and not to disturb, the anticompetitive conduct detailed in this Complaint"); First Am. The Home Depot Compl. ("THD Compl.") ¶¶ 120–34, annexed to Szanyi Decl. as SJDX2, Docket Entry No. 8520-1 (same).)

[2]  Defendants moved for summary judgment on several bases, two of which the Court addresses in this order.  (Defs.' Mot. for Summ. J. ("Defs.' Mot."), Docket Entry No. 8067; Defs.' Mem. in Supp. of Defs.' Mot. on Pls.' Post-IPO Conspiracy Claims ("Defs.' Post-IPO Mem."), Docket Entry No. 8089; Defs.' Mem. in Supp. of Defs.' Mot. Under *Illinois Brick Co. v. Illinois* ("Defs.' *Ill. Brick* Mem."), Docket Entry No. 8174; Defs.' Reply Mem. in Supp. of Defs.' Post-IPO Mem. ("Defs.' Post-IPO Reply"), Docket Entry No. 8094; Defs.' Reply Mem. in Supp. of Defs.' *Ill. Brick* Mem. ("Defs.' *Ill. Brick* Reply"), Docket Entry No. 8175; Equitable Relief Class Pls.' Mem. in Opp'n to Defs.' Mot. on Pls.' Post-IPO Conspiracy Claims ("ERCP's Post-IPO Opp'n"), Docket Entry No. 8167; Direct Action Pls.' Mem. in Opp'n to Defs.' Mot. on Pls.' Post-IPO Conspiracy Claims ("DAP's Post-IPO Opp'n"), Docket Entry No. 8193; Direct Action Pls.' Mem. in Opp'n to Defs.' Mot. Under *Illinois Brick v. Illinois* ("DAP's *Ill. Brick*

moved for summary judgment against the Grubhub Plaintiffs in September of 2023.[3]  This

Memorandum and Order addresses Defendants' motions for summary judgment (1) challenging

Plaintiffs' standing "under *Illinois Brick Co. v. Illinois*" and (2) on Plaintiffs' post-IPO

---

Opp'n"), Docket Entry No. 8192; Direct Action Pls.' Suppl. Mem. in Opp'n to Defs.' Mot. Under *Illinois Brick Co. v. Illinois* ("DAP's Suppl. *Ill. Brick* Opp'n"), Docket Entry No. 8860.)

The Court also addresses the Direct Action Plaintiffs' motions for partial summary judgment.  (Target Pls.' Mot. for Partial Summ. J. ("Target Mot."), Docket Entry No. 8097; Target Pls.' Mem. in Supp. of Target Mot. ("Target Mem."), Docket Entry No. 8098; 7-Eleven and The Home Depot Pls.' Mot. for Partial Summ. J. ("7-Eleven/THD Mot."), Docket Entry No. 8184; 7-Eleven and The Home Depot Pls.' Mem. in Supp. of 7-Eleven/THD Mot. ("7-Eleven/THD Mem."), Docket Entry No. 8185; Direct Action Pls.' Reply Mem. in Supp. of Mots. for Partial Summ. J. ("DAP Reply"), Docket Entry No. 8188; Defs.' Mem. in Opp'n to Mots. for Partial Summ. J. ("Defs.' Opp'n"), Docket Entry No. 8216.)

[3]  (Defs.' Mot. for Summ. J. against Grubhub Pls. ("Defs.' Grubhub Mot."), Docket Entry No. 8925; Defs.' Mem. in Supp. of Defs.' Grubhub Mot. on Grubhub's Post-IPO Conspiracy Claims ("Defs.' Grubhub Post-IPO Mem."), Docket Entry No. 8930; Defs.' Mem. in Supp. of Defs.' Grubhub Mot. Under *Illinois Brick Co. v. Illinois* ("Defs.' Grubhub *Ill. Brick* Mem."), Docket Entry No. 8931; Defs.' Reply Mem. in Supp. of Defs.' Grubhub Post-IPO Mem. ("Defs.' Grubhub Post-IPO Reply"), Docket Entry No. 8949; Defs.' Reply Mem. in Supp. of Defs.' Grubhub *Ill. Brick* Mem. ("Defs.' Grubhub *Ill. Brick* Reply"), Docket Entry No. 8950; Grubhub's Mem. in Opp'n to Defs.' Mot. for Summ. J. on Grubhub's Post-IPO Conspiracy Claims ("Grubhub's Post-IPO Opp'n"), Docket Entry No. 8934; Grubhub's Mem. in Opp'n to Defs.' Mot. for Summ. J. Under *Illinois Brick Co. v. Illinois* ("Grubhub's *Ill. Brick* Opp'n"), Docket Entry No. 8935.)

Defendants rely on arguments substantially identical to those raised in their memorandum of law in support of their motion against the Direct Action Plaintiffs and incorporate that memorandum by reference.  (Defs.' Grubhub *Ill. Brick* Mem. 3 ("Because the facts here are materially indistinguishable from those in the DAP cases, the legal arguments in support of summary judgment set forth in the DAP Actions *Illinois Brick* Motion apply here with equal force, and Defendants incorporate those arguments by reference.").)  Grubhub Plaintiffs also rely on the arguments set forth in the Direct Action Plaintiffs' opposition to Defendants' motion. (Grubhub's *Ill. Brick* Opp'n 1 ("The Grubhub Plaintiffs hereby join in full, adopt, and incorporate herein by reference the Direct Action Plaintiffs' . . . [Opposition] Based on *Illinois Brick Co. v. Illinois*.").)  The Court therefore refers to the Grubhub Plaintiffs' briefing only where necessary to distinguish it from the Direct Action Plaintiffs' briefing.

conspiracy claims.[4]  It also addresses Direct Action Plaintiffs' motions for partial summary judgment.

For the reasons discussed below, the Court denies Defendants' motions for summary judgment based on *Illinois Brick* standing and on the post-IPO conspiracy claims, and denies as moot Direct Action Plaintiffs' motions for partial summary judgment.

## I.   Background

The Court assumes familiarity with the facts and extensive procedural history as set forth in prior decisions.  *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 986 F. Supp. 2d 207 (E.D.N.Y. 2013) (*Interchange Fees I*), *rev'd and vacated*, 827 F.3d 223 (2d Cir. 2016) (*Interchange Fees II*); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11 (E.D.N.Y. 2019) (*Interchange Fees III*).  The Court therefore provides only a summary of the relevant facts and procedural history.

### a.   Procedural history

In October of 2005, several complaints asserting similar antitrust claims against Visa, Mastercard, and various issuing banks were consolidated for pretrial purposes and transferred to the Eastern District of New York, where they were joined by other similar cases.  *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2008 WL 115104, at *1 (E.D.N.Y. Jan. 8, 2008).  The consolidated cases included both class actions and individual actions.  *Id.*  In April of 2006, plaintiffs in the putative class actions ("Class Plaintiffs") filed a consolidated amended class complaint that defined two classes: one seeking damages and the

---

[4]  The Court partially resolved Defendants' motions for summary judgment in January of 2024, addressing Defendants' arguments under *Ohio v. American Express*, and Mastercard's and the Bank Defendants' arguments as to Mastercard's lack of market power.  *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2024 WL 278565 (E.D.N.Y. Jan. 8, 2024) (*Interchange Fees IV*).

other seeking equitable relief.  *Id.* at *2.  In November of 2012, the Court provisionally certified

a class settlement agreement between the Class Plaintiffs and Defendants.  *In re Payment Card*

*Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2012 WL 12929536, at *1–2

(E.D.N.Y. Nov. 27, 2012).  Following this preliminary settlement approval, "three groups of

merchants that had not previously appeared as named parties — the Target, 7-Eleven, and Home

Depot groups or, collectively, the 'Direct Action Plaintiffs' — opted out of the settlement's

damages class and filed their own complaints in other districts, all of which were ultimately

transferred to this court and consolidated in the instant multidistrict litigation."  *In re Payment*

*Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2017 WL 4325812, at

*3 (E.D.N.Y. Sept. 27, 2017), *order set aside on other grounds*, No. 05-MD-1720, 2018 WL

4158290 (E.D.N.Y. Aug. 30, 2018); (*see* 7-Eleven Compl.; THD Compl.; Target Compl.).  In

2013, the Court approved the settlement, *Interchange Fees I,* 986 F. Supp. 2d at 241, but in 2016,

the Second Circuit vacated the certification of the class and reversed approval of the settlement,

*Interchange Fees II,* 827 F.3d at 240.[5]

In November of 2016, the Court appointed counsel to two putative classes under Rule

23(b)(2) (the "Equitable Relief Class") and (b)(3) (the "Damages Class").  *In re Payment Card*

*Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2016 WL 8138988, at *1

(E.D.N.Y. Nov. 30, 2016).  The Court approved a settlement between the Damages Class and

Defendants in December of 2019.  *In re Payment Card Interchange Fee & Merch. Disc.*

*Antitrust Litig.*, No. 05-MD-1720, 2019 WL 6875472, at *36 (E.D.N.Y. Dec. 16, 2019).  In

March of 2023, the Second Circuit affirmed the settlement in all material respects, except for the

---

[5]  The case was reassigned from Judge John Gleeson to the undersigned on December 17, 2014.  (Order Reassigning Litigation, Docket Entry No. 6359.)

Court's approval of the amount of service awards to the named Plaintiffs. *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 727 (2d Cir. 2023). Separately, in September of 2021, the Court certified the Equitable Relief Class. *DDMB, Inc. v. Visa, Inc.*, No. 05-MD-1720, 2021 WL 6221326, at *50 (E.D.N.Y. Sept. 27, 2021).

Defendants, the 7-Eleven Plaintiffs,[6] the Home Depot Plaintiffs, the Target Plaintiffs, and the Equitable Relief Class Plaintiffs filed summary judgment and *Daubert* motion papers in December of 2020.[7] In October of 2022, the Court decided the *Daubert* motions, excluding

---

[6] On January 3, 2024, 7-Eleven, in its capacity as an individual member of the "7-Eleven Plaintiffs," settled its claims against all Defendants. (*See* Stip. & Order of Dismissal, Docket Entry No. 9038.) The Court nevertheless continues to refer to the remaining plaintiffs in *7-Eleven, Inc. v. Visa, Inc.*, No. 13-CV-5746 (E.D.N.Y.), as the "7-Eleven Plaintiffs" for consistency across the Court's decisions.

[7] (Defs.' Mot. to Exclude Opinions of Dr. Reto Kohler ("Kohler Mot."), Docket Entry No. 8101; Defs.' Mot. to Exclude in Part Opinions of Prof. Robert G. Harris ("Harris Mot."), Docket Entry No. 8104; Defs.' Mot. to Exclude in Part Section 1 Opinions of Prof. Jerry Hausman ("Hausman Section 1 Mot."), Docket Entry No. 8081; Visa & Bank Defs.' Mot. to Exclude in Part Section 2 & Debit Opinions of Prof. Jerry Hausman ("Hausman Section 2 Mot."), Docket Entry No. 8084; Defs.' Mot. to Exclude in Part Opinions of Prof. Joseph E. Stiglitz ("Stiglitz Mot."), Docket Entry No. 8074; Defs.' Mot. to Exclude Opinions of Mansour Karimzadeh ("Karimzadeh Mot."), Docket Entry No. 8077; Visa & Bank Defs.' Mot. to Exclude Expert Testimony Concerning Visa's Fixed Acquirer Network Fee ("FANF Mot."), Docket Entry No. 8070; Defs.' Mot. to Exclude Rep. & Testimony of the 23(b)(2) Pls.' Expert Dennis W. Carlton ("Carlton Mot."), Docket Entry No. 8086; Defs.' Mot. to Exclude Opinions of Stephen C. Mott ("Mott Mot."), Docket Entry No. 8080; Defs.' Mot. to Exclude Opinions of David P. Stowell ("Stowell Mot."), Docket Entry No. 8075; Direct Action Pls.' Mot. to Exclude Portions of Rep. & Opinions of Def. Expert R. Garrison Harvey ("Harvey Mot."), Docket Entry No. 8090; Direct Action Pls.' Mot. to Exclude Rep. & Opinions of Def. Expert Glenn Hubbard ("Hubbard Mot."), Docket Entry No. 8108; Direct Action Pls.' Mot. to Exclude Rep. & Opinions of Def. Expert Barbara E. Kahn ("Kahn Mot."), Docket Entry No. 8114; Direct Action Pls.' Mot. to Exclude Rep. & Opinions of Def. Expert David J. Teece ("Teece Mot."), Docket Entry No. 8135; Direct Action Pls.' Mot. to Exclude Portions of Rep. & Opinions of Def. Expert David P. Kaplan ("Kaplan Mot."), Docket Entry No. 8207; Target Pls.' Mot. to Exclude Rep. & Opinions of Def. Expert Andres V. Lerner ("Lerner Mot."), Docket Entry No. 8121; Target Pls.' Mot. to Exclude Portions of Rep. & Opinions of Def. Expert Kevin M. Murphy ("Target Murphy Mot."), Docket Entry No. 8129; The Home Depot & 7-Eleven Pls.' Mot. to Exclude Portions of Rep. & Opinions of Def. Expert Kevin M. Murphy ("Home Depot & 7-Eleven Murphy Mot."), Docket

certain expert opinions and otherwise denying the motions, and denied Defendants' Europay, Mastercard, and Visa ("EMV") motion for partial summary judgment.[8]  In September of 2023, Defendants moved for summary judgment against the Grubhub Plaintiffs, relying on arguments substantially similar to those raised in the motion for summary judgment against the Direct Action Plaintiffs and the Equitable Relief Class Plaintiffs.  In January of 2024, the Court decided Defendants' motions for summary judgment "under *Ohio v. American Express*" and Mastercard's and the Bank Defendants' motions for summary judgment as to Mastercard's lack of market power.  *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2024 WL 278565 (E.D.N.Y. Jan. 8, 2024) (*Interchange Fees IV*).

---

Entry No. 8181; The Home Depot & 7-Eleven Pls.' Mot. to Exclude Portions of Reps. & Opinions of Def. Experts Marc Cleven & Stuart J. Fiske ("Cleven & Fiske Mot."), Docket Entry No. 8200.)

[8]  *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2022 WL 15053250 (E.D.N.Y. Oct. 7, 2022) (Experts Dr. Reto Kohler and Profs. Robert Harris, Jerry Hausman, and Joseph Stiglitz); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2022 WL 14862098 (E.D.N.Y. Oct. 8, 2022) (Experts Prof. Kevin Murphy, Mr. Marc Cleven, and Dr. Stuart Fiske); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2022 WL 15044626 (E.D.N.Y. Oct. 8, 2022) (Experts Mr. Mansour Karimzadeh, Prof. Dennis Carlton, Mr. Stephen Mott, and Prof. David Stowell); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2022 WL 14863110 (E.D.N.Y. Oct. 8, 2022) (Experts Prof. Jerry Hausman, Prof. Stephen Rowe, and Mr. Robert Hutchins); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2022 WL 14865281 (E.D.N.Y. Oct. 9, 2022) (denying Defendants' EMV motion for partial summary judgment); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 638 F. Supp. 3d 227 (E.D.N.Y. 2022) (Experts Mr. Garrison Harvey, Prof. Glen Hubbard, Prof. Barbara Kahn, Dr. David Teece, and Mr. David Caplan).

### b.    Factual background

At the center of this litigation are two networks: Visa and Mastercard (the "Networks").[9]

Visa and Mastercard own and operate the systems that facilitate card transactions and set the

rules regarding those transactions.  On one side are the issuing banks ("Issuers").  Issuers

contract with Visa and Mastercard for the privilege of issuing Visa- and Mastercard-branded

payment cards that allow cardholders to transact on the Visa or Mastercard network,

respectively.  *Interchange Fees II*, 827 F.3d at 228; *Interchange Fees I*, 986 F. Supp. 2d at 214.

Issuers, such as Chase and Wells Fargo, in turn provide payment cards to consumers, typically as

credit cards and debit cards.  *Interchange Fees II*, 827 F.3d at 228.  On the other side are the

acquiring banks ("Acquirers").  Acquirers' customers are typically merchants who provide goods

or services to consumer-cardholders.  *Id.*  Acquirers receive and process payments from Issuers

on behalf of their merchant-customers.  *Id.*

When a customer uses a credit card to make a payment to a merchant, the merchant

initiates a transaction and relays information (*e.g.*, the amount of the purchase and the type of

card used) to the Acquirer.  *Id.*  The Acquirer then transmits this information to the Network

which in turn relays it to the Issuer.  *Id.*; *Interchange Fees I*, 986 F. Supp. 2d at 214.  If the Issuer

approves the transaction, the approval is relayed to the Acquirer and then back to the merchant.

*Interchange Fees II*, 827 F.3d at 228.

At several stages of the transaction, fees are assessed for the service of facilitating the

transaction.  Between the cardholder and the Issuer, the transaction fee might be negligible or

zero, as is often the case for debit cards, or may even be negative, in the case of rewards credit

---

[9]  The background provided in this section is for the benefit of the reader and is drawn from the parties' submissions, the Court's prior decisions, and the experts' reports.  It is not relied upon by the Court in deciding the motions.

cards that provide points, airline miles, or cash back to the cardholder.  *See id.*  Between the

Issuer and the Network, the Issuer pays the Network a network fee, some of which may be

returned to the Issuer in the form of "incentive payments."  Between the Issuer and the Acquirer,

the Issuer remits payment to the Acquirer minus an "interchange fee."  *Id.*  The interchange fee

varies by network and by card type (*i.e.*, the interchange fee for a debit-card transaction is

typically less than that of a credit-card transaction, and the interchange fee for a premium, high

rewards credit card is typically higher than that of a more basic credit card that offers little or no

rewards to the cardholder).  *Id.*  Between the Acquirer and the Network, the Acquirer pays a fee

to the Network, which may include a "Fixed Acquirer Network Fee" or "FANF."  Finally, the

Acquirer credits the merchant's account for the amount of the purchase minus what is known as

the "merchant discount fee."  *Id.*  Plaintiffs assert that the merchant discount fee includes the

interchange fee and the network fee in addition to any fees imposed on the merchant by the

Acquirer.[10]

---

[10]  Although prior decisions in this case describe the "interchange fee" and "merchant discount fee" as two separate fees, the first going to the issuing bank and the second to the acquiring bank, *see Interchange Fees II*, 827 F.3d at 228, experts and the parties in this litigation have referred to the interchange fee as a *component* of the merchant discount fee.  Professor Jerry Hausman, for example, describes a merchant discount fee made up of three component fees: the interchange fee to the issuing bank, the network fee to Visa or Mastercard, and the acquirer fee to the acquiring bank.  (Expert Rep. of Prof. Jerry Hausman ("Hausman Rep.") ¶¶ 66–67, annexed to Szanyi Decl. as SJDX400, Docket Entry No. 8526-17.)  Dr. Robert G. Harris describes the merchant discount fee similarly, (Expert Rep. of Dr. Robert G. Harris ("Harris Rep.") ¶ 25, annexed to Szanyi Decl. as SJDX391, Docket Entry No. 8526-12), and Defendants write that the merchant discount fee is "comprised of the acquirer fee . . . and may include the cost of some or all of the Visa and Mastercard interchange and network fees that the acquirer pays and passes on to the merchant," (Defs.' R. 56.1 Stmt. ("Defs.' 56.1") ¶ 46, Docket Entry No. 8068).  The parties disagree about whether merchants pay interchange fees directly, (*see* Direct Action Pls.' Resp. to Defs.' 56.1 ("DAP's 56.1 Resp.") 37, Docket No. 8195 ("In fact, merchants pay interchange fees directly.")), or whether acquirers pay interchange fees and pass on some or all of the cost to merchants, (*see* Defs.' Reply in Supp. of Defs.' 56.1, at 46, Docket Entry No. 8103 (stating that "acquirers, not merchants, pay interchange and network

Interchange fees, in theory, may be set by negotiation between Acquirers and Issuers; in the absence of an agreement, however, interchange fees are set by schedules established by the Networks.  In practice, the default interchange fee schedules almost always prevail.[11]  (Defs.' 56.1 ¶ 38; Direct Action Pls.' R. 56.1 Counter-stmt. ("DAP's Counter 56.1") ¶¶ 51–52, 58, 60–61, 63, Docket Entry No. 8196.)  In a few instances, however, merchants have entered directly into agreements with Visa or Mastercard related to interchange fees and network fees.  (Defs.' 56.1 ¶¶ 38 n.33, 510–12; DAP's Counter 56.1 ¶¶ 741–48, 779–82.)  Interchange fees charged by Issuers vary based on the type of merchant, the merchant's sales volume and number of transactions, how the merchant accepts the payment (whether the card is present at the merchant or whether the transaction occurs online), the size of the transaction, and the type of card used for payment.  (DAP's Counter 56.1 ¶¶ 724–31.)

The sum of all fees deducted from the purchase amount is referred to as the "merchant discount" or "merchant discount fee," and includes the interchange fee, network fees, chargebacks (or some portions of those fees) and acquirer fees.  (Defs.' 56.1 ¶¶ 35, 45–46, 283–88.)  According to Defendants, no network rule requires that the Acquirer pass on any fees (*e.g.*, network fees or interchange fees) to the merchant, leaving the Acquirer to negotiate with the

---

fees, and . . . acquirers pass on some or all of these costs to merchants")).  For the reasons discussed in section II.b., *infra*, the Court finds triable questions of fact exist as to whether merchants directly pay interchange fees and as to whether merchants are direct purchasers of card-acceptance services.

[11]  As Plaintiffs' experts credibly explain, Acquirers have no incentive to pay interchange fees above the default levels and Issuers have no incentive to accept interchange fees below the default levels.  (*See, e.g.*, Expert Rep. of Joseph Stiglitz ("Stiglitz Rep.") ¶ 19, annexed to Szanyi Decl. as SJDX416, Docket Entry No. 8526-19; Expert Rep. of Prof. Dennis W. Carlton ("Carlton Rep.") ¶ 22, annexed to Szanyi Decl. as SJDX386, Docket Entry No. 8526-11; Expert Rep. of Prof. Jerry Hausman ("Hausman Rep.") ¶ 96, annexed to Szanyi Decl. as SJDX400, Docket Entry No. 8526-17.)  Accordingly, the default interchange schedules become the *de facto* interchange schedules.

merchant regarding the merchant discount.  (Defs.' 56.1 ¶¶ 270, 281–85, 287–95, 1121; DAP's Counter 56.1 ¶¶ 20–21; Defs.' R. 56.1 Reply Stmt. ("Defs.' Reply 56.1") 50–51, Docket Entry No. 8103.)  According to agreements between merchants and their Acquirers, some merchants' "merchant discounts" are equal to the transaction-dependent[12] interchange fee plus additional fees imposed by the acquiring bank and/or processor (known as "interchange-plus" agreements), while others pay "blended" rates (known as "blended agreements"), meaning that the merchant discount is uniform across all transactions, even though the interchange fee and other costs for each transaction may vary.[13]  (Defs.' 56.1 ¶¶ 293–95.)

### c.   Challenged network rules

Plaintiffs are merchants who are bound by the Networks' rules and who challenge those rules as anticompetitive.  *Id.*  They challenge the "honor all cards" ("HAC") and "honor all issuers" ("HAI") rules, which, together, require merchants to accept all Visa or Mastercard credit or debit cards if they accept any of them, (*see* 7-Eleven Compl. ¶ 3), as well as multiple forms of "anti-steering" rules, which "prohibit merchants from influencing customers to use one type of payment over another."  *Interchange Fees II*, 827 F.3d at 228.  Two types of anti-steering rules are "no-surcharge" and "no-discount" rules, "which prohibit merchants from charging different prices at the point of sale depending on the means of payment."  *Id.*  Plaintiffs claim that the challenged rules, in combination with the "default interchange fee" that "applies to every

---

[12]  As discussed *supra*, the applicable interchange fee is transaction-dependent because it varies based on the type of merchant, the merchant's sales volume and number of transactions, how the merchant accepts the payment (whether the card is present at the merchant or whether the transaction occurs online), the size of the transaction, and the type of card used for payment. (DAP's Counter 56.1 ¶¶ 724–31.)

[13]  According to these "interchange-plus" agreements, merchants are responsible for interchange and network fees.  (DAP's Counter 56.1 ¶¶ 714–19, 758–62.)

transaction on the network (unless the merchant and issuing bank have entered into a separate agreement), . . . allow the issuing banks to impose an artificially inflated interchange fee that merchants have little choice but to accept." *Id.*

Notably, the Networks' rules have changed since the beginning of this litigation.  In 2010, the Dodd-Frank Wall Street Reform and Consumer Protection Act, which included the Durbin Amendment, was signed into law and "limited the interchange fee that issuing banks could charge for debit card purchases." *Barry's Cut Rate Stores Inc. v. Visa, Inc.*, No. 05-MD-1720, 2019 WL 7584728, at *5 (E.D.N.Y. Nov. 20, 2019).  The Durbin Amendment also "required the Federal Reserve to issue rules limiting the banks' practice of issuing debit cards that were compatible with only the issuer's networks," "allowed merchants to discount debit card purchases relative to credit card purchases," and allowed merchants to place minimum-purchase limits on credit card transactions.  *Id.*  In 2011, Visa and Mastercard entered into a consent decree with the Department of Justice under which they "agreed to remove their rules prohibiting merchants from product-level discounting of credit and debit cards." *Id.*  Plaintiffs claim, however, that the current versions of the rules are still anticompetitive.  (*See, e.g.*, 7-Eleven Compl. ¶ 120 (noting that Visa and Mastercard "maintain" the prohibition against surcharging by issuer "to this day"); *id.* ¶ 160 (stating that despite the 2011 consent decree, Visa and Mastercard "still prohibit merchants from offering discounts that encourage consumers to use cheaper forms of payment"); *id.* ¶ 191 (describing Visa and Mastercard's "now-current anti-surcharging rules").)  In addition, they seek damages for the allegedly anticompetitive effects of the earlier versions of these rules.  (*See id.* ¶ 1 (defining the Damages Period as beginning on January 1, 2004).)

In addition to the claims described above, Plaintiffs also challenge a number of Defendants' other practices, including Visa's imposition of a FANF, (*see, e.g.*, *id.* ¶ 202; THD Compl. ¶ 173; Target Compl. ¶ 154; Equitable Relief Class Compl. ¶ 259); Visa and Mastercard's migration to Europay, Mastercard and Visa ("EMV") technology, (*see, e.g.*, 7-Eleven Compl. ¶¶ 208–30; THD Compl. ¶¶ 97–119; Equitable Relief Class Compl. ¶¶ 269–87); and allegedly exclusionary conduct in the debit market, (*see, e.g.*, 7-Eleven Compl. ¶¶ 194–99; THD Compl. ¶¶ 166–70).

## II.   Discussion

### a.   Standard of review

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Radwan v. Manuel*, 55 F.4th 101, 113 (2d Cir. 2022) (quoting Fed. R. Civ. P. 56(a)). The court must "constru[e] the evidence in the light most favorable to the nonmoving party," *Radwan*, 55 F.4th at 113 (alteration in original) (quoting *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 358 (2d Cir. 2011)), and "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Koral v. Saunders*, 36 F.4th 400, 408 (2d Cir. 2022) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kee v. City of New York*, 12 F.4th 150, 167 (2d Cir. 2021) (quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment. *Id.* The

court's function is to decide whether, "after resolving all ambiguities and drawing all inferences in favor of the nonmovant, a reasonable jury could return a verdict for the nonmovant." *Miller v. N.Y. State Police*, No. 20-3976, 2022 WL 1133010, at *1 (2d Cir. Apr. 18, 2022) (first citing *Anderson*, 477 U.S. at 248; and then citing *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127, 129 (2d Cir. 2013)).  The moving party, however, need not *prove* a negative; rather, where "the burden of proof at trial would fall on the nonmoving party, the moving party 'can shift the initial burden by pointing to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.'"  *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022) (quoting *Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other materials *negating* the opponent's claim."); *El-Nahal v. Yassky*, 835 F.3d 248, 252 (2d Cir. 2016) ("[T]he movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." (quoting *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995))).

In the antitrust context, summary judgment serves a "vital function" by assisting courts in "avoiding wasteful trials and preventing lengthy litigation that may have a chilling effect on pro-competitive market forces."  *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 95 (2d Cir. 1998).  While courts on summary judgment must view the evidence in the light most favorable to the party opposing the motion, "in the context of antitrust litigation[,] the range of inferences that may be drawn from the ambiguous evidence is limited; the nonmoving party must set forth facts that tend to preclude an inference of permissible conduct."  *Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 542 (2d Cir. 1993) (citing *Matsushita Elec.*

14

*Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).  Evidence that is equally suggestive of competition as collusion, for example, is insufficient to survive summary judgment.  *See, e.g.*, *Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287, 1300 (11th Cir. 2003) ("Evidence that does not support the existence of a . . . conspiracy any more strongly than it supports conscious parallelism is insufficient to survive a defendant's summary judgment motion." (citing *Matsushita*, 475 U.S. at 594)).  "[B]roader inferences," however, "are permitted . . . when the conspiracy is economically sensible for the alleged conspirators to undertake."  *In re Publ'n Paper Antitrust Litig.,* 690 F.3d 51, 63 (2d Cir. 2012).  Conversely, summary judgment may be granted where the nonmovant's case relies on evidence that defies economic sense.  *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 468–69 (1992) ("If the plaintiff's theory is economically senseless, no reasonable jury could find in its favor, and summary judgment should be granted.").  Finally, "when the evidence admits of competing permissible inferences with regard to whether a plaintiff is entitled to relief, 'the question of what weight should be assigned to [those] inferences remains within the province of the fact-finder at a trial.'"  *In re Publ'n Paper Antitrust Litig.*, 690 F.3d at 61 (quoting *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987)).

### b.   Defendants' *Illinois Brick* motion

#### i.   Legal framework

Section 4 of the Clayton Act establishes a private right of action through which individuals may bring actions alleging, *inter alia*, violations of Section 1 and Section 2 of the Sherman Act, and provides for treble damages.  *See* 15 U.S.C. § 15(a).  Unlike the government, private plaintiffs must establish standing.  *See California v. Am. Stores Co.*, 495 U.S. 271, 296 (1990).  Although the Clayton Act provides that "any person who shall be injured in his business

15

or property by reason of anything forbidden in the antitrust laws may sue therefor," 15 U.S.C.

§ 15(a), the Supreme Court has delineated rules governing who among those "injured in [their]

business or property" may vindicate their rights pursuant to Section 4, *see, e.g.*, *Associated Gen.*

*Contractors of Calif., Inc. v. Calif. State Council of Carpenters*, 459 U.S. 519, 534 (1983)

("Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that

might conceivably be traced to an antitrust violation."). Accordingly, the private right to seek

treble damages for federal antitrust violations has "developed limiting contours," which are

"embodied in the concept of 'antitrust standing.'" *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*,

711 F.3d 68, 75 (2d Cir. 2013). As relevant here, in *Illinois Brick Co. v. Illinois*, the Supreme

Court limited standing to those who are the "direct purchasers" from antitrust violators.[14] 431

U.S. 720 (1977). Recently, in *Apple Inc. v. Pepper,* the Supreme Court reaffirmed the validity of

the *Illinois Brick* rule. 587 U.S. ---, 139 S. Ct. 1514, 1519–20 (2019).

    In *Illinois Brick*, the State of Illinois and a coalition of local government entities asserted

---

[14] Technically, the Court in *Illinois Brick* did not announce a standing rule. To the contrary, the Court explained, "Because we find *Hanover Shoe* dispositive here, we do not address the standing issue, except to note . . . that the question of which persons have been injured by an illegal overcharge for purposes of [section] 4 is analytically distinct from the question of which persons have sustained injuries too remote to give them standing to sue for damages under [section] 4." *Illinois Brick*, 431 U.S. at 728 n.7 (referencing *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968)). Because *Illinois Brick* and the direct-purchaser rule amount to a complete bar to recovery in damages for indirect purchasers, it has come to be treated by courts as a standing rule. *See e.g., Kansas v. UtiliCorp United, Inc.,* 497 U.S. 199 (1990) (treating *Illinois Brick* as a standing rule); *Simon v. KeySpan Corp*., 694 F.3d 196, 201 (2d Cir. 2012) ("Generally, only direct purchasers have standing to bring civil antitrust claims." (citing *Illinois Brick,* 420 U.S. 720)); *In re Vitamin C Antitrust Litig*., 279 F.R.D. 90, 102 (E.D.N.Y. 2012) ("Because [plaintiff] is an indirect purchaser and no exception to the *Illinois Brick* rule applies here, [plaintiff] lacks standing to sue for damages under federal law[.]"); *Laumann v. Nat'l Hockey League*, 907 F. Supp. 2d 465, 480 (S.D.N.Y. 2012) ("The Supreme Court's decision in [*Illinois Brick*] established that '[g]enerally only direct purchasers have standing to bring civil antitrust claims.'" (quoting *Simon*, 694 F.3d at 201–02)); *In re NASDAQ Mkt.-Makers Antitrust Litig.,* 169 F.R.D. 493, 505 (S.D.N.Y. 1996) (referring specifically to "*Illinois Brick* standing").

antitrust claims against Illinois Brick and other manufacturers alleging a price-fixing conspiracy that had artificially and unlawfully inflated the prices of concrete blocks used in projects funded by the state entities, such as schools and housing developments. 431 U.S. at 726–27. It was undisputed that Illinois and the local government entities were not the direct purchasers of concrete block. *Id.* Rather, the defendants "s[old] the block primarily to masonry contractors, who submit[ted] bids to general contractors for the masonry portions of construction projects. The general contractors in turn submit[ted] bids for these projects to customers such as . . . the State of Illinois and 700 local government entities in the Greater Chicago area." *Id.* at 726. Illinois and the local government entities were "thus indirect purchasers of concrete block," because it "passe[d] through two separate levels in the chain of distribution before reaching" the government entities. *Id.* The Court held that, as an indirect purchaser, Illinois was barred from recovering from Illinois Brick. *Id.* at 728–29.

The Court offered several rationales for this limiting rule. First, allowing indirect purchasers to recover "would create a serious risk of multiple liability for defendants." *Id.* at 730. Second, "trac[ing] the complex economic adjustments to a change in the cost of a particular factor of production would greatly complicate and reduce the effectiveness of already protracted treble-damages proceedings." *Id.* at 732. Third, the rule would "encourag[e] vigorous private enforcement of the antitrust laws," because "uncertainty of how [any] overcharge would be apportioned among the various plaintiffs . . . would further reduce the incentive to sue." *Id.* at 745.

As the Court subsequently explained, the bright-line rule of *Illinois Brick* means that courts should not ask whether the rationales of *Illinois Brick* "apply with equal force" in every individual case, and should not engage in "unwarranted and counterproductive exercise[s] to

17

litigate a series of exceptions." *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 216–17 (1990). As such, courts in this Circuit have recognized only two exceptions to the direct-purchaser rule, both of which were alluded to in *Illinois Brick*. First, an indirect purchaser may sue the antitrust violator when her purchases were made from the direct purchaser according to a pre-existing, fixed quantity cost-plus contract. *Simon v. KeySpan Corp.*, 694 F.3d 196, 201–02 (2d Cir. 2012) ("An indirect purchaser may have standing, however, if it had a pre-existing cost-plus contract with the direct purchaser, meaning that the indirect purchaser has agreed in advance to purchase a fixed quantity, paying the direct purchaser's costs plus a predetermined additional fee."). Second, an indirect purchaser may sue the antitrust violator when the direct purchaser is owned or controlled by the indirect purchaser (*e.g.*, a subsidiary of the plaintiff is the direct purchaser and re-sells to the corporate parent) and, conversely, when the direct purchaser is owned or controlled by the antitrust violator (*e.g.*, the antitrust violator sells to its subsidiary who in turn sells to the indirect purchaser). *See Laumann v. Nat'l Hockey League*, 907 F. Supp. 2d 465, 481 (S.D.N.Y. 2012). While the former was contemplated in *Illinois Brick*, the latter is a generally recognized exception and is far more common in practice. *Id.* ("The Supreme Court expressly recognized an exception to *Illinois Brick* 'where the direct purchaser is owned or controlled by its customer,' and courts have 'expanded [the exception] to include instances where the defendant owns or controls the intermediary that sold the goods to the indirect-purchaser plaintiff.'" (first citing *Illinois Brick*, 431 U.S. at 736 n.16; and then citing *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 101 (E.D.N.Y. 2012))). As the court explained in *Laumann*, "[t]he two exceptions share a common logic — where the relationship between the parties in a multi-tiered distribution chain is such that plaintiffs are the first or *only* victims of alleged anticompetitive agreements, the rationale for the *Illinois Brick* bar disappears." *Id.*

In *Apple*, the Supreme Court decided whether iPhone owners who purchased apps from Apple's "App Store" were direct purchasers of those apps from Apple. 139 S. Ct. at 1518–19. Apple argued that iPhone owners were not direct purchasers from Apple because the app developers set the consumers' purchase price. *Id.* at 1519. The Court's "straightforward conclusion" was that "under *Illinois Brick*, the iPhone owners were direct purchasers who may sue Apple" because it was "undisputed that the iPhone owners bought the apps directly from Apple." *Id.* at 1520. The Court reiterated that the "bright-line rule of *Illinois Brick* . . . means that indirect purchasers who are two or more steps removed from the antitrust violator in a distribution chain may not sue." *Id.* at 1521. As an example, "if manufacturer A sells to retailer B, and retailer B sells to consumer C, then C may not sue A. But B may sue A if A is an antitrust violator. And C may sue B if B is an antitrust violator." *Id.* According to the Court, this is "the straightforward rule of *Illinois Brick*." *Id.*

The *Illinois Brick* rule, however, is only a bar to recovery for damages. *Laumann*, 907 F. Supp. 2d at 480 n.80 ("*Illinois Brick* bars only damages under Clayton Act § 4, not injunctive relief under [Clayton Act § 5, 15 U.S.C.] § 16."). Accordingly, courts have consistently allowed indirect purchasers to advance claims for injunctive relief pursuant to Section 5 of the Clayton Act, 15 U.S.C. § 16.[15] *See, e.g., Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 111 n.6 (1986) (explaining how the *Illinois Brick* rationales are inapplicable to suits seeking injunctive relief under section 16); *Gordon v. Amadeus IT Grp., S.A.*, 194 F. Supp. 3d 236, 248 (S.D.N.Y. 2016) ("Neither of the concerns animating the *Illinois Brick* decision is implicated by claims brought under § 16. Unlike actions brought under § 4, antitrust claims seeking an injunction

---

[15] Thus, the claims advanced by the Equitable Relief Class Plaintiffs may proceed irrespective of their status as direct or indirect purchasers.

involve neither the need to quantify damages nor the need to avoid duplicative recovery.").

### ii.   The parties' arguments

Defendants argue that *Illinois Brick* requires dismissal of Direct Action Plaintiffs' and Grubhub Plaintiffs' damages claims because *Illinois Brick* bars suits by "indirect payors."[16] (Defs.' *Ill. Brick* Mem. 1 ("*Illinois Brick* established the bright-line rule that a plaintiff lacks antitrust standing to seek damages for allegedly supra-competitive prices that it did not pay directly."); *id.* at 8–9; Defs.' Grubhub *Ill. Brick* Mem. 1.)  They contend that merchants are "indirect payors" under *Illinois Brick* because Acquirers, rather than merchants, pay interchange fees, network fees, and chargebacks.  (Defs.' *Ill. Brick* Mem. at 11 (citing Defs.' 56.1 ¶¶ 39, 275–82, 286).)  Defendants argue that Merchants pay merchant discount fees to Acquirers and merchants negotiate those fees with Acquirers, not with the Networks.  (*Id.* at 11–12 (citing Defs.' 56.1 ¶¶ 45–46, 283–86, 296–424).)  Thus, "Plaintiffs, therefore, are not direct payors . . . and lack standing to recover damages under *Illinois Brick*."[17]  (*Id.* at 2.)  Defendants also contend that no exception to the *Illinois Brick* rule applies.[18]  (*Id.* at 12–15.)

---

[16]  This portion of Defendants' motion is directed only at Direct Action Plaintiffs' and Grubhub Plaintiffs' damages claims; Equitable Relief Class Plaintiffs do not seek damages.  (*See supra* note 15 and accompanying text.)  Accordingly, all references to "Plaintiffs" in section II.b. refer only to the Direct Action Plaintiffs and Grubhub Plaintiffs.

[17]  In referring to Plaintiffs throughout their submission, Defendants scrupulously avoid referring to them as "indirect purchasers," and instead refer to them as "indirect payors."  (*See generally* Defs.' *Ill. Brick* Mem.)  As discussed below, the Court is not persuaded by Defendants' attempt to transform the *Illinois Brick* direct *purchaser* rule into a direct *payor* rule.

[18]  Because the Court does not rely on an exception to the *Illinois Brick* rule in finding that Plaintiffs have raised a triable question of fact as to their status as direct purchasers, the Court only briefly summarizes Defendants' arguments regarding exceptions.
First, Defendants argue that neither the Supreme Court nor the Second Circuit has adopted a co-conspirator exception.  (Defs.' *Ill. Brick* Mem. at 13–14 (citing cases).)  Moreover, even if such an exception exists, there is no evidence that intermediaries (the acquiring banks and

Defendants also contend that in *Paycom*, the Second Circuit "applied *Illinois Brick* in the payment card industry to bar antitrust claims by merchants where the allegedly inflated amounts at issue were paid by intermediaries and then passed on through charges to merchants." (Defs.' *Ill. Brick* Mem. 9 (citing *Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283, 285, 288 (2d Cir. 2006)); Defs.' *Ill. Brick* Reply 3 (citing *Paycom*, 467 F.3d at 291–92).) Defendants argue that *Paycom* therefore bars the damages claims in this case. (Defs.' *Ill. Brick* Reply 3.) In addition, they argue that courts in other circuits have rejected similar claims by merchants for the same reason. (Defs.' *Ill. Brick* Mem. 10–11 (citing *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008)).)

Direct Action Plaintiffs argue that the evidence shows that Acquirers do not "directly purchase card-acceptance services and then re-sell those services to merchants," but instead "facilitate the *provision* of card-acceptance services to merchants." (DAP's *Ill. Brick* Opp'n 10 (citing Defs.' 56.1 ¶ 266).) Direct Action Plaintiffs rely on *Ohio v. American Express Co.*, 585 U.S. 529 (2018) (*Amex*), for the propositions that the relevant product markets are the markets for debit- and credit-card transactions and that merchants and cardholders simultaneously purchase transactions from the Networks — with merchants purchasing card-acceptance services and cardholders purchasing card-payment services. (DAP's *Ill. Brick* Opp'n 8–9); *see also* 585 U.S. at 544–45. Direct Action Plaintiffs contend that Acquirers do not purchase card-acceptance

---

processors) have fixed the price paid directly by the plaintiff and the plaintiffs have not named all intermediaries as Defendants, as required under the exception. (*Id.* at 14–15.) Second, Defendants contend that the 'owned or controlled' exception does not apply because that exception would require the direct purchaser — the Acquirer — be owned by its customer, the merchant. (Defs.' *Ill. Brick* Reply 16–17.) Defendants further contend that even if the Court was to extend the exception to circumstances in which intermediaries are owned or controlled by Defendants, Plaintiffs cannot establish that all the Acquirers and processors are owned or controlled by Defendants. (*Id.*)

services; rather, Acquirers merely facilitate *merchants'* purchases of card-acceptance services. (DAP's *Ill. Brick* Opp'n 10.)  Separate from the issue of who purchases card-acceptance services, Plaintiffs dispute Defendants' claims about who pays the fees.  They explain that Issuers deduct interchange fees and the Networks deduct network fees from the funds owed to merchants — that is, Acquirers do not pay interchange and network fees because they do not remit funds to Issuers and the Networks; instead, they receive funds from Issuers net of fees.  (*Id.* at 11.)  Plaintiffs further argue that Defendants' own documents and testimony recognize that merchants pay interchange and network fees.  (*Id.* at 12–15.)  Plaintiffs contend that these facts create at least a material dispute as to standing.  (*Id.* at 15.)  In addition, they argue that the cases cited by Defendants are inapposite because the plaintiffs in those cases conceded that they were indirect purchasers.  (*Id.* at 21–22 (first citing *Paycom*, 467 F.3d at 283; then citing *Kendall*, 518 F.3d 1042; and then citing *In re ATM Fee Antitrust Litig.*, 686 F.3d 741 (9th Cir. 2012)); DAP's Suppl. *Ill. Brick* Opp'n 5–6.)  Plaintiffs therefore argue that these cases cannot demonstrate that Plaintiffs are indirect purchasers.  (DAP's Suppl. *Ill. Brick* Opp'n 6.)  Finally, Plaintiffs argue that *Illinois Brick* is inapplicable to their claims for injunctive relief and state law claims brought in *Illinois Brick* repealer states.[19]  (DAP's *Ill. Brick* Opp'n at 25.)

---

[19]  As with Defendants' arguments concerning exceptions to the *Illinois Brick* rule, the Court only briefly summarizes Direct Action Plaintiffs' arguments regarding exceptions because the Court does not rely on an exception in finding that Plaintiffs have raised a triable question of fact as to their status as direct purchasers.

Direct Action Plaintiffs argue that, even if Plaintiffs are indirect purchasers, disputed issues of fact remain about exceptions to the direct purchaser rule.  (DAP's *Ill. Brick* Opp'n 22 (quoting *Illinois Brick*, 431 U.S. at 736 n.16).)  They argue that the co-conspirator exception applies where the "plaintiffs allege that the sellers conspired with intermediaries in the distribution chain to fix the price at which the plaintiffs purchased [the good or service]."  (*Id.* at 23 (quoting *Arizona v. Shamrock Foods Co.*, 729 F.2d 1208, 1212 (9th Cir. 1984)).)  In addition, they contend that *Illinois Brick* is inapplicable "where the direct purchaser is owned or controlled by its customer" and argue that the exception applies where "a seller interposes a middleman as a

### iii.   Disputed facts relevant to the Parties' arguments

Plaintiffs argue that merchants directly purchase card-acceptance services (*i.e.*, the merchant "half" of the two-sided transaction described in *Amex*) and pay interchange fees, network fees, and chargeback fees directly to Issuers and the Networks out of the funds due to merchants for each cardholder's purchase.  (DAP's *Ill. Brick* Opp'n 10–11.)  In support, they assert that interchange fees charged by Issuers never leave the issuing banks and that Acquirers do not send any funds to the Issuer for interchange fees — in other words, merchants directly pay interchange fees out of funds owed to them.  (*Id.* at 11–12 (citing DAP's Counter 56.1 ¶¶ 698–701).)  Plaintiffs also rely on Defendants' internal documents recognizing that merchants pay interchange fees and network fees, (*id.* at 13 (citing DAP's Counter 56.1 ¶¶ 732–40, 777–78)), and statements made by Defendants' own witnesses indicating the same, (DAP's Counter 56.1 ¶¶ 733, 749–56; *see also id.* ¶¶ 697–702).  Direct Action Plaintiffs also assert that merchants — and not Acquirers — treat interchange fees and network fees as business expenses.  (DAP's Counter 56.1 ¶¶ 702–12, 749–57, 777–78.)  Acquirers, instead, treat interchange fees and network fees as "contra-revenue."  (*Id.* ¶¶ 710–12.)  Some processors have testified they are unable to negotiate with merchants regarding interchange or network fees, but that they negotiate with merchants regarding their own processing fees.  (*Id.* ¶¶ 722, 763.)  Further, merchants almost always absorb any increases in interchange or network fees themselves.  (*Id.* ¶ 764.)

---

shield against antitrust liability."  (*Id.* at 23 (first quoting *Illinois Brick*, 431 U.S. at 736 n.16; and then quoting *Schwimmer v. Sony Corp. of Am.*, 637 F.2d 41, 48 (2d Cir. 1980)).)  They contend that those exceptions apply here because the acquiring banks are themselves card-issuing banks, which conspired with the networks and adopted the challenged restraints.  (*Id.* at 23–24.)  Further, they argue that Acquirers would not sue Issuers challenging the HAC rules because they would in effect be suing themselves.  (*Id.* at 24.)  In addition, Plaintiffs argue that the "owned or controlled" exception unambiguously applies to JCPenney because JCPenney had its own in-house acquirer between 1979 and 2012.  (*Id.* at 25.)

Direct Action Plaintiffs also argue that they directly pay chargebacks because the merchant processing agreements also provide that merchants are responsible for chargebacks.  (DAP's *Ill. Brick* Opp'n. 16 & n.6 (citing DAP's Counter 56.1 ¶¶ 783–84, 786).)  According to Plaintiffs, the evidence shows that Acquirers transfer chargeback amounts to Issuers directly from merchants' accounts.  (DAP's Counter 56.1 ¶¶ 786, 788.)  Finally, Direct Action Plaintiffs observe that, in some instances, the Issuer and the Acquirer are functionally the same entity, and argue that it does not make sense to say that the bank pays itself for these fees.  (DAP's *Ill. Brick* Opp'n 15–16 (citing DAP's Counter 56.1 ¶ 720); *see also* DAP's Counter 56.1 ¶ 720 (summarizing evidence that Bank of America refused to discuss reduced prices for transactions processed internally).)

Defendants rely on the network rules and certain testimony in support of their argument that Acquirers pay interchange fees for card transactions.  (Defs.' 56.1 ¶¶ 39, 268, 275.)  For example, the network rules describe interchange fees as payments by Acquirers to Issuers, rather than as fees paid by merchants.  (*Id.* ¶¶ 276–77, 290.)  Defendants also argue that Acquirers, subject to negotiations with merchants, decide whether to pass on those fees to merchants and that Acquirers do not always pass on those fees.  (*Id.* ¶¶ 270–71, 287–95.)  Further, Defendants rely on merchant-Acquirer contracts which indicate that Acquirers pay the network fees charged by the Networks in connection with transactions.  (*Id.* ¶¶ 279–80, 291.)  They argue that the same contracts also establish that Acquirers pay chargebacks to Issuers to compensate them for fraudulent transactions, before passing those charges and fees on to merchants.  (*Id.* ¶¶ 281–82, 1117–21.)

###### iv.   Plaintiffs have raised a triable question of fact as to their status as direct purchasers of card-acceptance services

The issue is whether Plaintiffs are indirect purchasers similar to the State of Illinois in *Illinois Brick*.  In *Illinois Brick*, the state and local government plaintiffs were indirect purchasers of concrete block.  431 U.S. at 723–27.  In *Apple*, the Court held that iPhone users bought the apps directly from Apple's App Store, making them direct purchasers.  139 S. Ct. at 1520.  However, because of the complexities of the arrangements between the parties before the Court and because the case involves a service, rather than a good, the issues are not as straightforward.

In both *Illinois Brick* and *Apple*, identifying the direct purchaser was relatively "straightforward" because tracing the good through the chain of distribution was relatively simple.  *See Illinois Brick*, 431 U.S. at 723–27; *Apple*, 139 S. Ct. at 1520 (finding it "straightforward" under *Illinois Brick* that "iPhone owners were direct purchasers" from Apple).  In *Illinois Brick*, it was undisputed that the masonry contractors were the direct purchasers because they bought concrete block from the defendants and it was undisputed that they resold it to general contractors.  431 U.S. at 726.  In *Apple*, the Court readily determined that iPhone users were direct purchasers of apps from Apple because Apple's digital storefront was the functional equivalent of a brick-and-mortar retail store.  *See* 139 S. Ct. at 1520.  If, hypothetically, instead of purely digital apps, iPhone owners had to go to a real-world Apple Store to purchase "physical" apps, the iPhone owners would likewise have standing to sue Apple.  *Cf. id.* at 1521.

To determine if Plaintiffs are direct purchasers, the Court must first determine what precisely is being purchased.[20]  "Even the strictest application of the *Illinois Brick* rule requires

---

[20]  Although *Illinois Brick* standing is a matter of law, a jury may find the facts necessary for the Court to establish standing or the lack thereof.  *Kreisler v. Second Ave. Diner Corp.*, 731 F.3d 184, 187 n.3 (2d Cir. 2013) ("[S]tanding presents a mixed question of law and fact.")

the court to identify which entity is the seller and which the direct purchaser." *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 838 (7th Cir. 2020).  Consistent with the Court's most recent decision, *see Interchange Fees IV*, 2024 WL 278565, at *12, the Court agrees with Plaintiffs' experts — and accepts Defendants' concession — that the relevant product markets are the markets for credit- and debit-card transactions.  As the Court in *Amex* explained, while cardholders and merchants jointly consume transactions, they each consume separate and distinct services from the network.  *See Amex*, 585 U.S. at 534.  Thus, "whenever a credit-card network sells one transaction's worth of card-acceptance services to a merchant it must also sell one transaction's worth of card-payment services to a cardholder." *Id.* at 545.  A service, unlike a tangible (*e.g.*, concrete block) or intangible good (*e.g.*, an app), is not generally susceptible to being resold, because a service like a transaction is "consume[d]" at the time of its purchase and, once consumed, cannot be re-used or re-sold.  *See id.* (explaining that "cardholders and merchants jointly consume . . . transactions" and do so "simultaneously").  Unlike in *Apple*, where "[t]he absence of an intermediary [was] dispositive," 139 S. Ct. at 1521, here, the existence of an intermediary (*i.e.*, the Acquirers) is *not* dispositive.  The presence of an intermediary does not necessarily mean that the party receiving the benefit of the service is an indirect purchaser of that service.  Therefore, while there may be direct and indirect *payors* of interchange and network fees, these fees are components of the price paid for the *purchase* of a service — namely, card-acceptance services.

The Court acknowledges that the distinction between payor and purchaser remains relevant to the *Illinois Brick* inquiry whether the product in question is a good or service.  For example, where a credit-card cardholder purchases a good on Amazon and then defaults on his credit-card obligations to Chase, it is the Issuer (Chase) who pays the merchant (Amazon).

26

Because Chase has paid Amazon the amount owed to it, Amazon is indifferent whether the cardholder ever satisfies his obligations to Chase for the amount of the purchase. There is no question, however, that the cardholder is the direct purchaser from Amazon, notwithstanding the fact that Chase paid for the product on the cardholder's behalf.

The Court is not persuaded by Defendants' attempt to transform the *Illinois Brick* direct purchaser rule into a direct payor or "who pays" rule, just as the Supreme Court did not accept Apple's attempt to transform the rule into a "who sets the price" rule. *See Apple*, 139 S. Ct. at 1522. Defendants' "who pays" rule "would require [the Court] to rewrite the rationale of *Illinois Brick* and to gut the longstanding bright-line rule." *Id.* Defendants' preferred rule would undermine the three animating rationales behind *Illinois Brick*. First, the rule would require courts to engage in complicated fact-finding exercises to identify who among the putative plaintiffs had actually made direct payments to the alleged antitrust violator. *Cf. Illinois Brick*, 431 U.S. at 732 (apportioning overcharge "would greatly complicate and reduce the effectiveness of already protracted treble-damages proceedings"). Presumably only putative direct payors who paid with cash would qualify. As discussed above, consumers who made purchases with credit or debit cards would lack standing because it was their issuing banks who made the payments on their behalf. Second, the "who pays" rule would discourage vigorous enforcement of the antitrust laws because "uncertainty [regarding the identities of the purchasers] would further reduce the incentive to sue" and because the issuing bank-payors who suffered little, if any, antitrust injury would have little incentive to sue on behalf of their cardholding customers. *Cf. id.* at 745. Finally, Defendants' rule "would draw an arbitrary and unprincipled line" among purchasers depending on the forms of payment used to make their purchases. *See Apple*, 139 S. Ct. at 1522. Accordingly, "[Defendants'] line-drawing does not make a lot of

sense, other than as a way to gerrymander [Defendants] out of this and similar lawsuits." *Id.* at 1522–23.

Other considerations support the Court's conclusion that a "direct payor" test is not an appropriate substitute for the direct purchaser rule. First, *Illinois Brick*, *UtiliCorp*, and *Apple* are clear that direct purchasers have standing. If the payor and purchaser are separate entities, the Court is bound by the Supreme Court's decision to confer standing on the purchasers.[21] Second, the facts of this case permit the reasonable interpretation that Issuers pay themselves interchange fees out of funds owed to merchants. (Defs.' 56.1 ¶ 46 (noting that Issuers deduct interchange fees (*i.e.*, pay themselves) before remitting funds to Acquirers); *id.* ("After the transaction is authorized by the issuer, the issuer pays the acquirer an amount equal to the value of the transaction minus the interchange fee.").) Thus, under Defendants' proposed rule, Issuers would be the only potential plaintiffs with standing — yet Issuers are among the defendants in this case. Although the *Illinois Brick* rule sometimes produces outcomes that appear unfair, *see UtiliCorp*, 497 U.S. at 208 (denying standing to utility consumer plaintiffs who paid "100 percent" of overcharges), *Illinois Brick* does not compel results that are manifestly unreasonable. Accordingly, the Court concludes that the identity of the direct payor may be probative of the identity of the direct purchaser, but it does not accept Defendants' contention that only direct payors have standing under *Illinois Brick*.

The Court also rejects Defendants' argument that *Paycom* compels a ruling in their favor. (Defs.' *Ill. Brick* Mem. 9–11; Defs.' *Ill. Brick* Reply 3–6.) In that case, Paycom challenged the

---

[21]  The terms 'payor' and 'purchaser,' moreover, are not so synonymous that the Court can treat them as interchangeable. *Compare* Payor, Black's Law Dictionary (11th ed. 2019) ("Someone who pays; esp., a person responsible for paying a negotiable instrument."), *with* Purchaser, Black's Law Dictionary (11th ed. 2019) ("Someone who obtains property for money or other valuable consideration; a buyer.").

chargeback fines and penalties imposed by issuing banks and Mastercard on its acquiring bank. 467 F.3d at 291–93.  The Second Circuit found that Paycom's situation was "similar to that of the plaintiffs in *Illinois Brick*" because Paycom's "acquiring bank . . . decide[d] on its own whether to assess the chargeback" against Paycom's account and because chargebacks were imposed by issuing banks "against the acquiring bank, not the merchant." *Id.* at 291.  Central to the court's decision was that Paycom had failed to adequately plead that it was a direct purchaser: "Paycom's complaint alleges that the chargebacks and chargeback fines and penalties are imposed by issuing banks and MasterCard on acquiring banks.  Paycom is, therefore, in a position analogous to the indirect purchasers in *Illinois Brick* . . . even if one hundred percent of the chargebacks, fines, and penalties were passed-on." *Id.* at 291–92 (citing *UtiliCorp*, 497 U.S. at 208).  *Paycom* is distinguishable by Paycom's failure to plead facts that would support a finding that Paycom was a direct purchaser.  Plaintiffs in this action have alleged that they directly purchase — and pay for — card-acceptance services; and Defendants' arguments to the contrary were rejected at the pleading stage.  (*See* Tr. of H'ng before Hon. John Gleeson on July 14, 2014 at 54:2–9 (ruling orally, the Court denied Defendants' motion to dismiss, stating: "I agree with the Target Plaintiffs that the factual allegations that the merchants actually paid the interchange fees . . . precludes my granting the motion at this point.  I accept those allegations as true.  They are sufficient to fend off the *Illinois Brick* claim, at least at this stage.").)

The Ninth Circuit has also held that merchants are indirect purchasers in other similar cases.  *See Kendall*, 518 F.3d at 1049 (finding that, with respect to interchange fees, merchants "run squarely into the *Illinois Brick* wall" because merchants did not directly pay interchange fees); *see also In re ATM Fee Antitrust Litig.*, 686 F.3d at 750 (agreeing with the district court

that cardholder plaintiffs were indirect purchasers of interchange services where the card-issuing

banks paid interchange fees and then passed on the costs in the form of inflated ATM fees).[22]

Plaintiffs argue that these cases are inapposite because the merchant-plaintiffs in *Paycom*

and *Kendall* conceded that they were indirect purchasers and that the acquiring banks passed on

the charges to the merchants in the form of merchant discount fees.[23]  (DAP's *Ill. Brick* Opp'n

21–22); *see also Paycom*, 467 F.3d at 291; *Kendall*, 518 F.3d at 1049–50; Complaint and Jury

Demand ¶¶ 21, 85, *Paycom Billing Servs., Inc. v. Mastercard Int'l*, No. 03-CV-6150 (E.D.N.Y.

Mar. 29, 2005), 2003 WL 23884731.  Similarly, in *In re ATM Fee*, the plaintiffs conceded that

---

[22]  In both *Kendall* and *In re ATM Fee Antitrust Litigation*, the plaintiffs failed to plead facts that would have supported finding that they were direct purchasers.  *See Kendall*, 518 F.3d at 1049 (noting that plaintiffs alleged only that the Networks set artificially high prices, which plaintiffs paid indirectly); *In re ATM Fee Antitrust Litig.*, 686 F.3d at 749–50 ("Plaintiffs concede that they have never directly paid interchange fees.").

In addition, the Ninth Circuit in *Kendall* did not probe the threshold question of what exactly was being purchased and, therefore, looked only at the identities of the payors.  Further, *Kendall*'s reasoning was rejected by the Supreme Court in *Apple*, to the extent that the Ninth Circuit held that plaintiffs' claims were barred because it was the acquiring banks, and not Visa and Mastercard, who set the price.  *Compare Kendall*, 518 F.3d at 1049 ("[Plaintiffs'] allegation is barred by *Illinois Brick* to the extent that the Consortiums [*i.e.*, Visa and Mastercard] do not directly set the merchant discount fee; the acquiring bank sets that fee."), *with Apple*, 139 S. Ct. at 1522 ("Apple's 'who sets the price' theory . . . would require us to rewrite the rationale of *Illinois Brick* and to gut the longstanding bright-line rule.").

Similarly, in *In re ATM Fee Antitrust Litigation*, the Ninth Circuit again looked at the identity of the payor without asking what was being purchased.  In affirming the lower court's dismissal, the Ninth Circuit agreed with the district court that plaintiffs were indirect purchasers "because they *do not directly pay the fixed interchange fee*."  686 F.3d at 750 (emphasis added).

[23]  Defendants also cite additional cases in this Circuit where courts have said that that acquiring banks pay interchange fees to issuing banks.  (Defs.' *Ill. Brick* Mem. 10.)  In none of these cases, however, was the question of whether merchants were direct purchasers squarely before the court.  *See United States v. Am. Express Co.*, 838 F.3d 179, 188 (2d Cir. 2016) (*Am. Express II*) ("[T]he interchange fee . . . is paid by the acquirer to the issuer as the price for handling its transactions with the cardholder."); *Wal–Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 102 (2d Cir. 2005) (defining "interchange fee" as a "fee the acquiring institution must pay to the card-issuing institution"); *see also Salveson v. JP Morgan Chase & Co.*, 663 F. App'x 71, 75 (2d Cir. 2016) (*Salveson III*) (first citing *Am. Express II*, 838 F.3d at 188; and then citing *Wal-Mart Stores*, 396 F.3d at 102).

they had not directly paid interchange fees, but that, instead, card-issuing banks paid the interchange fees and then passed on the costs in the form of inflated ATM fees.  686 F.3d at 749–50.  In contrast, Plaintiffs allege and offer evidence to demonstrate that they are the direct purchasers.  Therefore, unlike in *Paycom* and *Kendall*, the Court must determine whether the evidence demonstrates — or is sufficient to create a disputed issue as to whether — merchants are direct purchasers of card-acceptance services.  For the reasons explained below, the evidence is sufficient to establish at least a dispute of material fact as to whether merchants are direct purchasers of card-acceptance services.

### 1.  *Ohio v. American Express* is relevant to Plaintiffs' standing as direct purchasers

Defendants argue that the *Amex* decision relied upon by Plaintiffs did not address *Illinois Brick* standing and does not establish that merchants are direct purchasers.  (Defs.' *Ill. Brick* Reply 9 (first citing *Amex*, 585 U.S. 529; and then citing *Salveson v. JP Morgan Chase & Co.*, No. 14-CV-3529, 2020 WL 4810704 (E.D.N.Y. July 16, 2020) (*Salveson IV*)).)  In support, Defendants contend that *Salveson IV* explained *Amex*'s limited relevance to issues of antitrust standing.  (*Id.* at 10.)  Defendants also contend that *Salveson IV* requires dismissal of cardholders' claims because it found that interchange fees were exchanged between financial institutions and not paid by cardholders.  (*Id.* at 10–11.)  Defendants argue that *Salveson IV* shows that Acquirers, rather than merchants, directly pay interchange fees, and that cardholders are one step even further removed.  (*Id.* at 11.)

In contrast, Plaintiffs argue that the Supreme Court's decision in *Amex* and this Court's decision in *Salveson IV* make clear that merchants directly purchase card-acceptance services from the Networks.  (DAP's *Ill. Brick* Opp'n 8–9 (first citing *Amex*, 585 U.S. at 544–45; then citing *Salveson v. JP Morgan Chase & Co.*, No. 14–CV–3529, 2014 WL 12770235 (E.D.N.Y.

Nov. 26, 2014) (*Salveson I*); and then citing *Salveson IV*, 2020 WL 4810704).)  They argue that

the Court's conclusion in *Salveson IV* was that cardholders purchase a separate service altogether

(extensions of credit), while merchants purchase card-acceptance services, and it is only the

latter which implicates interchange fees.  (*Id.* at 9 (citing *Salveson IV*, 2020 WL 4810704, at

*10–11).)  Accordingly, Plaintiffs argue that the Court held cardholders could not recover

against Visa and Mastercard under *Illinois Brick* because cardholders did not purchase card-

acceptance services from Visa or Mastercard.  Plaintiffs also argue that other Second Circuit

decisions purporting to find that interchange fees run between financial institutions did not

require the Court to decide whether merchants or acquiring banks were the direct purchasers.

(*Id.* at 9–10 n.4 (first citing *Salveson v. JP Morgan Chase & Co.*, 663 F. App'x 71, 75 (2d Cir.

2016) (*Salveson III*)); then citing *United States v. Am. Express Co.*, 838 F.3d 179, 188 (2d Cir.

2016) (*Am. Express II*); and then citing *Wal-Mart Stores v. Visa U.S.A. Inc.*, 396 F.3d 96, 102

(2d Cir. 2005)).)

In *Amex*, the Supreme Court considered whether merchant plaintiffs had satisfied their

prima facie burden of demonstrating that American Express' network rules and challenged

restraints had an actual anticompetitive effect in the relevant market.  585 U.S. at 541–47.  The

Supreme Court explained that, to determine whether the plaintiffs had met this burden, it had to

first define the relevant market.  *Id.* at 542–43.  The Court held that "the credit-card market" is a

"two-sided transaction platform," in which "transactions 'are jointly consumed by a cardholder,

who uses the payment card to make a transaction, and a merchant, who accepts the payment card

as a method of payment.'"  *Id.* at 545 (quoting Klein *et al*., Competition in Two–Sided Markets:

The Antitrust Economics of Payment Card Interchange Fees, 73 Antitrust L.J. 571, 580 (2006)).

As a result of *Amex*, "[i]n cases involving two-sided transaction platforms, the relevant market

must, as a matter of law, include both sides of the platform." *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 57 (2d Cir. 2019) (emphasis omitted).

In the *Salveson* cases, this Court and the Second Circuit discussed the relevance of *Amex* to the issue of antitrust standing. *Salveson IV*, 2020 WL 4810704, at *9–12; *Salveson v. JPMorgan Chase & Co.*, 860 F. App'x 207, 209 (2d Cir. 2021) (*Salveson V*), *cert. denied*, 142 S. Ct. 773 (2022). There, the plaintiffs were cardholders and they argued that, in using their payment cards to purchase goods from merchants, they were direct payors of interchange fees. *Salveson III*, 663 F. App'x at 74. Prior to *Amex*, the Court held, and the Second Circuit affirmed, that cardholders were not direct purchasers because they did not participate the in the market for payment card network services and were "not directly injured by the[] imposition" of interchange fees. *Salveson I*, 2014 WL 12770235, at *3; *Salveson III*, 663 F. App'x at 75. In reaching that decision, the Court had relied in part on then-controlling law that cardholders only participated in the market for general purpose payments cards, not the distinct payment card network services market. *Salveson I*, 2014 WL 12770235, at *3 ("The markets for general purpose payment cards and for payment card network services are separate and distinct, and payment-card consumers are considered to participate only in the former."); *Salveson IV*, 2020 WL 4810704, at *9–12 (explaining the Court's rationale in its prior decision). After *Amex* was decided, the plaintiffs sought reconsideration on the basis that *Amex* showed that the cardholders and merchants jointly consume one product — transactions — and were therefore direct purchasers of transactions. *See Salveson V*, 860 F. App'x at 209; *Salveson IV*, 2020 WL 4810704, at *9–10.

In *Salveson IV*, the Court held that *Amex* had not undermined its decision that cardholders were not direct purchasers of (merchant) card-acceptance services — the only purchase that

implicates the interchange fees about which *Salveson* plaintiffs complained.  2020 WL 4810704,

at *9–12.  The Court explained that *Amex*'s change to the relevant market definition did not

impact whether the plaintiffs had standing.  *Id.*  First, the fact remained that the transaction

structure demonstrated that cardholders did not directly pay interchange fees.  *Id.* at *9, 12

(explaining that funds flow from Issuers to Acquirers net of interchange fees).  In addition, the

*Amex* decision demonstrated that cardholders were not direct purchasers of card-acceptance

services because cardholders and merchants consume separate services: "For cardholders, the

network extends them credit, which allows them to make purchases without cash and to defer

payment until later. . . . For merchants, the network allows them to avoid the cost of processing

transactions and offers them quick, guaranteed payment."  *Id.* at *10 (quoting *Amex*, 585 U.S. at

534).  The Court further explained that the distinction between the services provided on each side

of the platform is critical to determining whether the plaintiffs were direct purchasers of

interchange-implicating services.  *Id.*  The Court ultimately concluded that the service purchased

and consumed by cardholders did not directly implicate the challenged interchange fees.  *Id.*

("[F]or purposes of determining whether Plaintiffs are direct purchasers, this distinction between

services is critical: the 'card-payment services' the network supplies to the cardholder primarily

include the extension of credit, 'which allows [her] to . . . defer payment until later,' and thus do

not implicate the interchange fee." (quoting *Amex*, 585 U.S. at 534, 545)).

The Second Circuit affirmed the Court's decision and reiterated that the structure of the

transactions demonstrated that cardholders were not direct purchasers and that they "were not

directly injured by the supracompetitive interchange fees that they alleged defendants imposed."

*Salveson V*, 860 F. App'x at 209; *cf. Laumann,* 907 F. Supp. 2d at 481 ("[W]here . . . plaintiffs

are the first or *only* victims of alleged anticompetitive agreements, the rationale for the *Illinois*

*Brick* bar disappears."). The Second Circuit also explained that the plaintiffs overstated the significance of *Amex*, as the case did not address antitrust standing at all, and the fact that courts must use a two-sided market definition when analyzing market power and anticompetitive effects does not mean that courts cannot treat the participants in these markets as purchasers of separate goods or services for the purposes of antitrust standing. *Salveson V*, 860 F. App'x at 209.

The Court and the Second Circuit previously suggested in the *Salveson* cases that merchants (unlike cardholders) may be direct purchasers of card-acceptance services — and thereby harmed by inflated interchange fees — for purposes of antitrust standing. *See Salveson I*, 2014 WL 12770235, at *3 (remarking that "merchants . . . pay interchange fees" and suggesting that merchants are likely to have *Illinois Brick* standing); *Temple v. Circuit City Stores, Inc.*, No. 06-CV-5303, 2007 WL 2790154, at *3–7 (E.D.N.Y. Sept. 25, 2007) (Gleeson, J.) (suggesting that merchants had *Illinois Brick* standing when denying standing to cardholder-consumers who alleged injury stemming from supracompetitive interchange fees). Merchants use the Networks to facilitate transactions and to obtain quick and guaranteed payment, while cardholders use their credit cards to buy goods and services on credit. *See Salveson V*, 860 F. App'x at 209 (explaining that merchants and cardholders may be consumers of different services for purposes of standing); *Salveson IV*, 2020 WL 4810704, at *10 (explaining that merchants use card-acceptance services to process consumer purchases and to obtain quick and guaranteed payment). Although the Court and the Second Circuit said that interchange fees run between financial institutions, the issue before the courts in the *Salveson* cases was not whether it was Acquirers or merchants who directly purchase card-acceptance services. The question currently before the Court, and not resolved by *Amex* or the *Salveson* cases, is whether merchants are the direct purchasers of card-acceptance services. For the reasons discussed below, the Court finds

that there remains a disputed issue of material fact as to whether plaintiffs are direct purchasers of card-acceptance services that cannot be resolved on this motion for summary judgment.

### v. Evidence creating a triable question of fact as to the identity of the direct purchaser of card-acceptance services

Direct Action Plaintiffs and Defendants dispute whether merchants or Acquirers pay interchange fees, network fees, and chargebacks. The Court discusses the evidence regarding each of these fees in turn.

### 1. Interchange fees

The evidence shows that when a cardholder uses a payment card to purchase a good or service from a merchant, the merchant's Acquirer transmits the transaction over the network to the Issuer who deducts the interchange fee from the amount owed to the merchant. (Defs.' 56.1 ¶¶ 2, 9, 34–35, 38–39, 286; DAP's Counter 56.1 ¶¶ 698–701, 738.) As Plaintiffs argue, the Acquirer does not pay the interchange fee because the cost of the fee is taken directly from the amount owed to the merchant. (*See* DAP's Suppl. *Ill. Brick* Mem. 6.) Because the Issuer sends the Acquirer the amount of the purchase minus the interchange fee, and the Acquirer remits that amount to the merchant minus additional fees, (*see* Defs.' 56.1 ¶¶ 35, 45–46, 283–88), it is not necessarily the case that the Acquirer is paying the fee.[24] Instead, under one interpretation of the facts, Acquirers are simply facilitating the provision of card-acceptance services to merchants. *Cf. In re Cathode Ray Tube (CRT) Antitrust Litig*, No. 07-CV-5944, 2016 WL 7805628, at *14 (N.D. Cal. Aug. 4, 2016) ("[W]here a purchasing agent purchases goods on behalf of its principal, the principal — not the purchasing agent — is the direct purchaser."), *rev'd and*

---

[24] As discussed, *supra*, the party paying the fee is also not necessarily the same as the party *purchasing* the good or service.

Separately, Plaintiffs contend that none of the merchant plaintiffs in this case pay "blended" fees, contrary to Defendants' assertions. (*See* DAP's Suppl. *Illinois Brick* Mem. 11–12.)

*remanded by* 720 F. App'x 835 (9th Cir. 2017) (finding that district court improperly applied facts to the principal-agent determination); *see also In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 505–06 (S.D.N.Y. 1996) (finding plaintiff-investors were direct purchasers where their purchases were made through brokers who traded "for the account of others"); *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 25 (D.D.C. 2001) (same where the goods at issue were purchased through agents); *In re Toilet Seat Antitrust Litig.*, No. 75-CV-184, 1977 WL 1453, at *2 (E.D. Mich. Aug. 24, 1977) (interpreting *Illinois Brick*'s "owned or controlled" exception to encompass role of purchasing agent and relying on control aspect of exception); *but see McCarthy v. Recordex Srv., Inc.*, 80 F.3d 842, 852 (3d Cir. 1996) (finding plaintiffs were indirect purchasers because "none of the plaintiffs retained their lawyers to act as mere purchasing agents whose sole objective and function was to buy photocopies for the clients").

Although Defendants offer network rules and testimony indicating that Acquirers pay interchange fees before passing those fees on to merchants, (Defs.' 56.1 ¶¶ 268, 275–78, 290), Plaintiffs rely on other conflicting evidence tending to show that merchants directly pay interchange fees. As discussed above, the flow of funds demonstrates that the Acquirers do not remit any funds to Issuers for interchange fees or network fees. (DAP's Counter 56.1 ¶ 700.) Instead, Issuers retain the interchange fees and deduct the fees from the amounts owed to merchants. (*Id.*) In addition, many of Defendants' own documents indicate that merchants pay interchange fees. (*Id.* ¶¶ 732–40, 777–78.) For example, Mastercard's 2016 10-K states, "Interchange rates are a significant component of the costs that merchants pay in connection with the acceptance of cards," (*id.* ¶ 732), and Visa's internal documents state that interchange agreements "enable[] Visa to charge a specific rate to a specific merchant," (*id.* ¶ 734). Bank

Defendants have also made statements indicating that merchants pay interchange fees. (*Id.* ¶¶ 736–40.) Those statements include Defendants' witness testimony that merchants pay interchange fees — testimony which defense counsel later sought to amend. (*Id.* ¶¶ 733, 736.) The evidence also establishes that interchange fees are based on the characteristics of the merchant and the nature of that merchant's transactions, (*id.* ¶¶ 724–31), and that some merchants have entered directly into agreements with the Networks related to interchange fees, (*id.* ¶¶ 741–48.) In addition, Acquirers, as opposed to merchants, do not treat interchange fees as expenses. (*Id.* ¶¶ 710–12.) As Plaintiffs argue, the fact that some merchant-acquirer agreements and the network rules state that Acquirers pay interchange fees does not mean that Acquirers directly pay interchange fees "as an economic and factual matter." (DAP's Suppl. *Ill. Brick* Opp'n 10); *see also Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 373 (3d. Cir. 2005) (noting that courts look to the "economic substance of the transaction"); *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 89 (3d. Cir. 2011) (same); *Spinner Consulting LLC v. Stone Point Cap. LLC*, 623 B.R. 671, 676 (D. Conn. 2020) ("In assessing whether a plaintiff is a direct purchaser, courts examine the 'economic substance of the transaction.'" (citation omitted)), *aff'd*, 843 F. App'x 411 (2d Cir. 2021); *In re Vitamin C Antitrust Litig.*, 904 F. Supp. 2d 310, 322 & n.5 (E.D.N.Y. 2012) (looking to economic substance of the transactions and finding that plaintiffs' case was distinguishable from *Dentsply*). Thus, the Court finds that there is at least a disputed issue as to whether merchants are the direct payors of interchange fees.[25]

---

[25] In a recent decision affirming the settlement of the Damages Class, Judge Leval in a concurring opinion suggested that multiple entities (specifically, merchants) could be joint purchasers of a product or a service and directed the Court and the parties to consider the question in administrating the settlement. *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 730–33 (2d Cir. 2023) (Leval, J., concurring). Direct Action Plaintiffs and Defendants, however, agree that acquiring banks and merchants are not joint direct purchasers

*See In re Cathode Ray Tube (CRT) Antitrust Litig.*, 720 F. App'x 835, 837 (9th Cir. 2017) (reversing grant of summary judgment because "issues of material fact exist[ed] as to whether the direct purchaser rule bars [the plaintiff's] claims"); *In re Lantus Direct Purchaser Antitrust Litig.*, No. 16-CV-12652, 2022 WL 4239367, at *20 (D. Mass. Aug. 17, 2022) (recommending denial of summary judgment motion for the same reason), *report and recommendation adopted*, 2022 WL 4237276 (D. Mass. Sept. 14, 2022); *Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.*, No. 15-CV-6480, 2021 WL 1907501, at *13 (E.D. Pa. May 12, 2021) (same). Because interchange fees are a component of the price paid for card-acceptance services, this dispute over the identity of the payor contributes to the dispute of material fact of whether merchants are direct purchasers of card-acceptance services.

Separate from the dispute about which party pays the fees, the evidence more importantly tends to show that merchants directly purchase card-acceptance services. For example, Visa's internal documents state that interchange agreements "enable Visa to charge a specific rate to a specific merchant." (DAP's Counter 56.1 ¶ 734.) The evidence also establishes that the applicable interchange fee varies based on the characteristics of the merchant and the nature of that merchant's transaction. (*Id.* ¶¶ 724–31 (showing that the interchange fee varies based on the merchant's business category, transaction volume, and whether the card is present at the point of sale).) Interchange fees, however, are generally not dependent on the characteristics of the Acquirer. (*See generally id.*). Acquirers, moreover, do not accept credit cards and debit cards — merchants do. Therefore, the evidence tends to show that merchants, rather than Acquirers, are

---

because this is not a case where two entities jointly make a purchase; either Acquirers and merchants are successive purchasers, or merchants are the only direct purchasers. (DAP Supp. *Ill. Brick* Opp'n. 13–16; Defs.' Suppl. *Ill. Brick* Letter 3–4, Docket Entry No. 8857.)

the direct purchasers of card-acceptance services and raises a triable question of fact as to this issue.

### 2.   Network fees

The Court also finds that there is a disputed issue as to whether merchants directly pay network fees.  Although some agreements between merchants and Acquirers indicate that Acquirers pay network fees and then pass them on to merchants, (*see* Defs.' 56.1 ¶¶ 279–80, 296–98, 317–81; Defs.' Resp. to DAP's Counter 56.1 ¶¶ 749, 750, Docket Entry No. 8106), Plaintiffs offer other evidence — including testimony and Defendants' internal documents — tending to show that, after Issuers retain portions of the amounts owed to merchants, the Networks retain network fees and remit the remainder to Acquirers (who retain their own additional fees) and who then remit payments to merchants,  (*see* DAP's Counter 56.1 ¶¶ 749–56).  Accordingly, as with interchange fees, the evidence permits the reasonable interpretation that Acquirers do not pay network fees directly insofar as they do not send or remit any funds to the Networks as part of an obligation to pay network fees.  (*Id.*)  Instead, network fees are deducted from the amounts owed to merchants.  In further support, Plaintiffs cite testimony and Bank Defendants' documents indicating that Acquirers do not negotiate the portion of the network fees passed through to Plaintiffs and do not account for network fees as expenses.  (*Id.* ¶¶ 749, 757, 777.)  In contrast, some merchants — such as [redacted], [redacted], and [redacted] — have entered directly into agreements with the Networks regarding network fees and have received concessions on those network fees.  (*Id.* ¶¶ 779–82.)

Defendants argue that witnesses' understanding of payment mechanics cannot override the express language of merchant-Acquirer contracts and is untethered to the question of whether the fees are charged to an intermediary and then passed on to a merchant.  (*See* Defs.' Resp. to

DAP's Counter 56.1 ¶¶ 749–56.)  Even if true, the fact that certain merchant-Acquirer contracts indicate that Acquirers are direct payors of fees while other evidence indicates that merchants are direct purchasers of card-acceptance services demonstrates the disputed nature of the identity of the direct purchasers.  Similarly, Defendants argue that Acquirers decide whether to pass on interchange and network fees to merchants, subject to negotiations with merchants, and that they do not always pass on those fees.  (Defs.' 56.1 ¶¶ 270–71, 287–95.)  Thus, there is at least a disputed issue as to whether Acquirers or merchants directly pay network fees.  *See In re Cathode Ray Tube*, 720 F. App'x at 837 (denying summary judgment because "issues of material fact exist[ed] as to whether the direct purchaser rule bars [the plaintiff's] claims").  Because network fees are a component of the price paid for card-acceptance services, this dispute contributes to the dispute of material fact as to whether merchants are direct purchasers of card-acceptance services.

### 3.   Chargebacks

The Court also finds that there is a disputed issue as to whether chargebacks were imposed directly on the 7-Eleven Plaintiffs.[26]  (*See* DAP's Supp. *Ill. Brick* Opp'n. 5–6 n.3; DAP's *Ill. Brick* Opp'n 16 n.6.)  As a threshold matter, it is not clear to the Court that any party is a "direct purchaser" of chargebacks.  Instead, chargebacks — like interchange and network fees — appear to be a component of the price paid for card-acceptance services.  Defendants argue that both network rules and agreements between Plaintiffs and Acquirers establish that acquiring banks pay chargebacks and then pass those fees on to merchants.  (Defs.' 56.1 ¶¶ 281–82, 299–381.)  Other evidence — including testimony by Plaintiffs, Bank Defendants, and

---

[26]  According to the briefs, only 7-Eleven Plaintiffs make chargeback claims.  (*See* DAP's Supp. *Ill. Brick* Opp'n 5–6 n.3; DAP's *Ill. Brick* Opp'n 16 & n.6.)

Acquirers — indicates that once an Issuer initiates a chargeback, the Acquirer directly removes the amount of the chargeback from the merchant's account and remits those funds to the requesting Issuer. (*See* DAP's Counter 56.1 ¶¶ 783–95.) According to this evidence, merchants are direct payors of those chargebacks. Thus, the identity of the direct payor of chargebacks is disputed. While the identity of the payor may be probative of the identity of the purchaser, the threshold question of what is purchased needs to be resolved in the first instance. As discussed above, the two-sided transaction consumed by merchants and cardholders consists of separate services provided to each side. Chargebacks and associated fees appear to be a component of the price paid by merchants for card-acceptance services. In the merchant-side market for card-acceptance services, there are material disputes as to essential facts necessary to determine the identity of the direct purchasers of card-acceptance services. *See In re Cathode Ray Tube*, 720 F. App'x at 837 (denying summary judgment because "issues of material fact exist[ed] as to whether the direct purchaser rule bars [the plaintiff's] claims").

Accordingly, the Court denies Defendants' motion for summary judgment based on *Illinois Brick* because the Court cannot determine as a matter of law that Plaintiffs are indirect purchasers of card-acceptance services.[27]

###### c. Defendants' motion for summary judgment as to post-IPO claims

Defendants moved for summary judgment as to Plaintiffs' post-IPO conspiracy claims, contending that the IPOs terminated any pre-IPO conspiracies (assuming *arguendo* that such conspiracies existed) and arguing that Plaintiffs failed to adduce evidence of continuing conspiracies, either horizontally among the Bank Defendants or vertically between the Bank

---

[27] Given the Court's decision, the Court declines to decide whether an exception to *Illinois Brick* applies.

Defendants and the Networks.  (Defs.' Post-IPO Mem. 14–26.)

As further explained below, the Court denies Defendants' motion for summary judgment as to Plaintiffs' post-IPO conspiracy claims because Plaintiffs have raised a triable question of fact as to whether Defendants effectively withdrew from the pre-IPO conspiracies.

### i.   Legal framework

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce."  15 U.S.C. § 1.  The Sherman Act applies only to conduct that stems from "tacit or express agreement," not from independent decision making, *Relevent Sports, LLC v. U.S. Soccer Federation, Inc.*, 61 F.4th 299, 306 (2d Cir. 2023) (quoting *United States v. Apple, Inc.*, 791 F.3d 290, 314–15 (2d Cir. 2015) (*Apple E-Book Litig.*) — that is, even competitors who make the same decisions or set the same prices do not violate the antitrust laws where such parallel conduct "does not result from an agreement," *Apple E-Book Litig.*, 791 F.3d at 315.[28]  "Identifying the existence and nature of a conspiracy requires determining whether the evidence 'reasonably tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective.'"  *Id.* (alteration in original) (quoting *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)).  This evidence can consist of direct evidence that the defendants entered into an agreement or circumstantial evidence creating an inference that a conspiracy existed.  *Relevent Sports, LLC*, 61 F.4th at 306; *Apple E-Book Litig.*, 791 F.3d at 315.  Parallel action on the part of competitors is insufficient to

---

[28]  The Court refers to *United States v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015) as "*Apple E-Book Litig.*" to distinguish it from *Apple Inc. v. Pepper*, 139 S. Ct. 1514 (2019) discussed *supra* and because *United States v. Apple, Inc.* stems from the same conduct at issue in *In Re Electronic Books Antitrust Litigation*, 859 F. Supp. 2d 671 (S.D.N.Y. 2012) (denying dismissal and finding plausible allegations of hub-and-spoke conspiracy involving Apple and several of the largest publishing houses).

prove the existence of a conspiracy, and a plaintiff must offer additional evidence, often referred to as "plus factors," to prove the existence of a conspiracy.  *Apple E-Book Litig.,* 791 F.3d at 315. This additional evidence may include evidence of a common motive to conspire, of high-level communications between the co-conspirators, or that the parallel acts were against the individual self-interest of the co-conspirators.  *Id.* (quoting *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013)); *see also In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 62 (2d Cir. 2012) (same).

To survive a motion for summary judgment, a plaintiff needs to offer evidence that "tends to exclude the possibility" that the defendants were acting independently.  *Matsushita*, 475 U.S. at 588 (citation omitted); *Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 321 (2d Cir. 2010) ("[F]or purposes of a summary judgment motion, a Section 1 plaintiff must offer evidence that tends to rule out the possibility that the defendants were acting independently." (internal quotation omitted)).  "[T]he quality of the evidence required to satisfy *Matsushita*'s 'tends to exclude' standard varies with the economic 'plausibility' of the alleged agreement."  *Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 99 (2d Cir. 2018) (citing *Publ'n Paper Antitrust Litig.*, 690 F.3d at 63).  "[W]here a plaintiff's theory of recovery is implausible, it takes strong direct or circumstantial evidence to satisfy *Matsushita*'s tends to exclude standard."  *Id.* (quoting *Publ'n Paper Antitrust Litig.*, 690 F.3d at 63)*.*  In contrast, "broader inferences are permitted, and the tends to exclude standard is more easily satisfied, when the conspiracy is economically sensible for the alleged conspirators to undertake."  *Id.* (quoting *Publ'n Paper Antitrust Litig.*, 690 F.3d at 63).  "[W]hen the evidence admits of competing permissible inferences with regard to whether a plaintiff is entitled to relief, 'the question of what weight should be assigned to [those] inferences remains within the province of the fact-finder at a trial.'"  *In re Publ'n Paper*

*Antitrust Litig.*, 690 F.3d at 61 (quoting *Apex*, 822 F.2d at 253).

### ii.   The parties' arguments

Defendants argue that the Court should grant summary judgment as to Plaintiffs' post-IPO claims because Plaintiffs cannot point to any evidence that the banks conspired among themselves, or with Mastercard or Visa, to maintain the challenged restraints or to set supra-competitive interchange fees after each network's IPO.  (Defs.' Post-IPO Mem. 12.)  They concede for purposes of their motion that "the pre-IPO structures of Mastercard and Visa would enable Plaintiffs to establish that the networks' then-owner banks acted collectively regarding Mastercard's or Visa's interchange fees and rules before each network's IPO," but argue that the IPOs terminated bank ownership, governance, and voting control over the networks.  (*Id.* at 1–2.)  Further, they argue that the undisputed evidence shows that, post-IPO, "each network independently sets default interchange and determines its rules in accordance with its own independent self-interest and the interest of its public shareholders, and that banks participate in the networks and follow the network rules in accordance with their own independent self-interest."  (*Id.* at 12–13.)  Accordingly, Defendants contend that no evidence can support finding a post-IPO conspiracy because the unilateral decisions of banks and networks explain the continued existence of the challenged rules and default interchange fee schedules.  (*Id.* at 12.)  In addition, they argue that Plaintiffs cannot demonstrate the existence of a hub-and-spoke conspiracy because conscious parallelism is insufficient to satisfy Plaintiffs' burden and because Plaintiffs fail to offer adequate additional evidence ("plus factors") to demonstrate the existence of such a conspiracy.  (*Id.* at 20–24.)  Defendants argue that Plaintiffs cannot demonstrate the existence of a vertical conspiracy because they cannot show that Defendants "had a conscious commitment to a common scheme designed to achieve an unlawful objective."  (*Id.* at 24

45

(quoting *Monsanto*, 465 U.S. at 768).)  Finally, Defendants claim that the perverse result of

Plaintiffs' theory is that the only way for the Networks to avoid liability after the IPOs would be

to disband their networks and "abandoning" the network rules, and that the only way for the

banks to withdraw from the conspiracy would be to cease participating in the networks.  (*Id.* at

19.)

Direct Action Plaintiffs argue that Defendants cannot show that they affirmatively

withdrew from the horizontal agreements that they had established prior to the IPOs.  (DAP's

Post-IPO Opp'n 12–13.)  They contend that, as a matter of law, the anticompetitive agreements

are presumed to continue until Defendants establish that they withdrew from them.  (*Id.* at 13.)

Further, they argue that a finding of withdrawal is precluded if a member continues to benefit

from the agreement.  (*Id.*)  They argue that "[t]o obtain summary judgment, Defendants must

show that the evidence of withdrawal is so overwhelming that no reasonable jury could find that

they had *not* withdrawn."  (*Id.* (citing *Celotex*, 477 U.S. at 323).)  They argue, moreover, that the

Court's prior holding — that the complaints plausibly alleged that Defendants intended to

maintain the status quo post-IPOs, to the benefit of all involved — suggests that Defendants have

failed to make this showing.  (*Id.* at 14 (first citing *Barry's Cut Rate*, 2019 WL 7584728, at *25;

then citing *Celotex*, 447 U.S. at 323; and then citing Fed. R. Civ. P. 50(a)).)  Direct Action

Plaintiffs argue that where undisputed evidence now proves those allegations, the Court must

deny Defendants' summary judgment motion.  (*Id.*)  In addition, they argue that Defendants fail

to point to any evidence that Defendants took affirmative steps to withdraw from any horizontal

agreements, or that they stopped benefiting from the conspiracies.  (*Id.*)  Finally, they contend

that any changes to the structures of the conspiracies following the IPOs could not terminate the

ongoing conspiracies, particularly given that the Sherman Act is aimed at substance, rather than

form.  (*Id.* at 15.)

Equitable Relief Class Plaintiffs likewise argue that Defendants did not effectively withdraw from the pre-IPO conspiracies.  (ERCP's Post-IPO Opp'n 10.)  They argue that the burden is on Defendants to establish withdrawal and that Defendants do not even attempt to meet this burden.  (*Id.* at 10–11.)  Further, they contend that Defendants are presumed to maintain involvement in a conspiracy absent affirmative steps to withdraw.  (*Id.* at 11.)  In addition, Equitable Relief Class Plaintiffs argue that the Court may infer the existence of a hub-and-spoke conspiracy from a series of vertical agreements even if there is no direct evidence of horizontal agreements.  (*Id.* at 17.)  Equitable Relief Class Plaintiffs further contend that Defendants are unable to point to any affirmative steps taken to withdraw from the conspiracy, other than the IPOs themselves, which were in furtherance of the conspiracy, and also argue that Defendants continue to benefit from the conspiracy.  (*Id.* at 12–14.)  In addition, they argue that the banks' delegation of decision-making power to the networks does not insulate them from liability because courts have recognized that horizontal competitors cannot avoid liability by appointing a separate entity to sell their services.  (*Id.* at 14–15.)  Finally, they argue, "[f]rom an antitrust standpoint, there is no difference between agreeing to abide by the ringleader's decisions and agreeing to cede decision-making authority to a separate entity that runs the cartel," because, "[e]ither way, an independent firm has agreed to not compete on price."  (*Id.* at 15–16 (quoting Hovenkamp & Leslie, *The Firm as Cartel Manager*, 64 Vand. L. Rev. 813, 850, 867–72 (2011)).)

### iii.   Plaintiffs have demonstrated triable questions of fact as to the existence of a post-IPO conspiracy

For the reasons explained below, the Court concludes that there is a genuine dispute as to whether Defendants withdrew from any pre-IPO conspiracies and thus whether the post-IPO challenged rules are the products of ongoing conspiracies.  Although the Court finds that alternative bases exist to deny Defendants' motion — for example, a jury could reasonably find that Defendants' agreements constitute hub-and-spoke conspiracies — disputed facts regarding Defendants failure to withdraw from the conspiracies are independently sufficient to deny Defendants' motion.  As such, the Court declines to address Plaintiffs' alternative theories for liability.

In general, "[u]pon joining a . . . conspiracy, a defendant's membership in the ongoing unlawful scheme continues until he withdraws." *Smith v. United States*, 568 U.S. 106, 107 (2013) (discussing conspiracy in the criminal RICO context); *see also In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 07-CV-5944, 2016 WL 8669891, at *2 (N.D. Cal. Aug. 22, 2016) ("Once a corporation has joined a price-fixing conspiracy, it is jointly and severally liable for any actions taken in furtherance of the conspiracy until the objectives of the conspiracy are completed or the defendant withdraws.").[29]  "Passive nonparticipation in the continuing scheme

---

[29]   Courts routinely draw from case law regarding withdrawal from criminal conspiracies when assessing withdrawal from an antitrust conspiracy.  *See, e.g.*, *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 465 (1978) (finding error in district court's jury instructions regarding withdrawal and citing actions evincing withdrawal in criminal cases (first citing *Hyde v. United States*, 225 U.S. 347, 369 (1912); then citing *United States v. Borelli*, 336 F.2d 376, 385 (2d Cir 1964); and then citing Note, *Developments in the Law — Criminal Conspiracy*, 72 Harv. L. Rev. 920, 958 (1959))); *see also United States v. Consolidated Laundries Corp.*, 291 F.2d 563, 573 (2d Cir. 1961); *Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, No. 08-CV-42, 2015 WL 4987751, at *3 (E.D.N.Y. Aug. 19, 2015) (Gleeson, J.) ("A conspiracy is presumed to continue until the last overt act by any of the coconspirators, unless a defendant can prove that the conspiracy terminated or that he took affirmative steps to withdraw." (citing *United States v.*

is not enough to sever the meeting of minds that constitutes the conspiracy. '[T]o avert a continuing criminality' there must be 'affirmative action . . . to disavow or defeat the purpose' of the conspiracy." *Smith*, 568 U.S. at 112–13 (alteration in original) (quoting *Hyde v. United States*, 225 U.S. 347, 369 (1912)). "Unless a conspirator produces affirmative evidence of withdrawal, his participation in a conspiracy is presumed to continue until the last overt act by any of the conspirators." *United States v. Diaz*, 176 F.3d 52, 98 (2d Cir. 1999) (quoting *United States v. Greenfield*, 44 F.3d 1141, 1150 (2d Cir. 1995)). "To establish withdrawal, a defendant may show that it has taken '[a]ffirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators.'" *Osborn v. Visa Inc.*, 797 F.3d 1057, 1067 (D.C. Cir. 2015) (quoting *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 464 (1978)). As one court has observed:

> [C]ourts have been willing to grant summary judgment where the defendant: (1) severed all ties to the conspiracy; (2) severed all ties with the business through which it participated in the conspiracy; and (3) either communicated its withdrawal in a manner reasonably calculated to give notice [to] co-conspirators or took affirmative acts inconsistent with the object of the conspiracy.

*In re Cathode Ray Tube*, 2016 WL 8669891, at *3. Where a member of a conspiracy continues to benefit from or support the conspiracy, there is no withdrawal, even if it appears that the member has severed ties with other co-conspirators. *Osborn*, 797 F.3d at 1067 (citing *United States v. Eisen*, 974 F.2d 246, 269 (2d Cir. 1992)); *In re Cathode Ray Tube*, 2016 WL 8669891, at *3 (first citing *United States v. Lowell*, 649 F.2d 950, 958 (3d Cir. 1981); then citing *United States v. Bullis*, 77 F.3d 1553, 1561–63 (7th Cir. 1996); and then citing *Eisen*, 974 F.2d at 269).

---

*Flaharty*, 295 F.3d 182, 192 (2d Cir. 2002))); *Drug Mart Pharmacy Corp. v. Am. Home Prods. Corp.*, 288 F. Supp. 2d 325, 328–29 (E.D.N.Y. 2003) (discussing withdrawal and citing criminal cases); *In re GSE Bonds Antitrust Litig.*, No. 19-CV-1704, 2019 WL 5791793, at *5 (S.D.N.Y. Oct. 15, 2019) (finding "general principles of conspiracy law" applicable to antitrust conspiracy and collecting cases to same effect).

The defendant bears the burden of establishing withdrawal. *Smith*, 568 U.S. at 110; *United States v. Brown*, 332 F.3d 363, 374 (6th Cir. 2003).

Under essentially identical facts, the District of Columbia Circuit in *Osborn v. Visa* rejected the defendants' arguments that Visa's and Mastercard's IPOs terminated any pre-existing conspiracies. 797 F.3d at 1067. Defendants' arguments before that court mirrored those now before this Court:

> Defendants . . . seek refuge in the fact that the banks reorganized MasterCard and Visa as publicly held corporations in 2006 and 2008, respectively. The Defendants contend that even if there had been agreements or conspiracies, the public offerings terminated them. In their view, the offering constituted a withdrawal by the member banks — and with that withdrawal, the cessation of any concerted action. The Rules that remained intact no longer represented an agreement by the member banks, but rather unilateral impositions by the bankcard associations themselves, over which the banks no longer had control.

*Id.* (citation omitted). Rejecting this contention, the D.C. Circuit required defendants to establish their withdrawal from the conspiracy and noted that "effective withdrawal is typically a question of fact for the jury." *Id.* at 1068. The court found that "a jury could no doubt conclude that . . . the banks continue to protect Visa and MasterCard from price competition." *Id.* In addition, the court pointed to the fact that the banks have continued to issue Visa- and Mastercard-branded cards and have continued to benefit from the networks' challenged rules as supporting a conclusion that the banks did not effectively withdraw from the conspiracies. *Id.* Although *Osborn* was decided on a motion to dismiss, the Court agrees with the standard applied by the D.C. Circuit governing withdrawal from an antitrust conspiracy and declines to impose a different standard in this case. As discussed below, the Court finds that the question of "effective withdrawal" cannot be resolved in Defendants' favor on this motion for summary judgment and therefore remains "a question of fact for the jury" to resolve at trial.

50

Similarly, in *Barry's Cut Rate*, this Court found that Equitable Relief Class Plaintiffs had plausibly alleged that Bank Defendants are members of an ongoing conspiracy that they assisted in designing, and that the anticompetitive practices they challenged continued even after Defendants attempted to avoid antitrust liability by restructuring Visa and Mastercard.  2019 WL 7584728, at *23.  In reaching this conclusion, the Court relied upon the allegations in the Complaint that: (i) Bank Defendants were represented on the Boards of Directors of Visa and Mastercard when the boards collectively adopted the challenged rules, and all of the Bank Defendants participated in and furthered the alleged conspiracies; (ii) the Second Circuit recognized in *United States v. Visa*, 344 F.3d 229 (2d Cir. 2003), that Visa and Mastercard were not single entities, but instead were "consortiums of competitors" owned and operated by their member banks; (iii) after the Second Circuit's decision in *Visa*, Visa and Mastercard decided to restructure in order to avoid antitrust liability; (iv) the banks and networks expected the pre-IPO status quo to continue post-IPO; and (v) after the IPOs and through the relevant period, the challenged network rules were readopted and remained in effect.  *Id.*  The Court relied heavily on allegations that Defendants restructured specifically to address the threat of antitrust challenges, concluding that the "factual allegations plausibly suggest[ed] that the preference of all involved — Visa, Mastercard, and Bank Defendants — was that the benefits to everyone continue exactly as they did prior to the IPOs."[30]  *Id.* at 24–25.

---

[30]  The Court also noted that commentary by leading antitrust scholars Herbert Hovenkamp and Christopher R. Leslie lent support to Plaintiffs' theory that Bank Defendants have not withdrawn from an ongoing conspiracy.  *Barry's Cut Rate*, 2019 WL 7584728, at *25 n.15.  In one article, the authors note that "because Section One condemns only concerted action, [price-fixing] firms may attempt to structure their relationship to appear to be the action of a unified single entity that is beyond the reach of Section One."  Herbert Hovenkamp & Christopher R. Leslie, *The Firm as Cartel Manager*, 64 Vand. L. Rev. 813, 814 (2011).  In analyzing the Mastercard and Visa IPOs as a case study, the authors highlighted the uniqueness

The evidence offered by Plaintiffs supports the factual allegations the Court relied upon in *Barry's Cut Rate*.  For the purposes of their motion, Defendants do not dispute that the challenged rules were promulgated by horizontal agreement between the banks, which owned and controlled each network prior to the network's respective IPOs.  (Defs.' Post-IPO Mem. 3.)  Further, the undisputed facts show that after the Second Circuit's decision in *Visa*, 344 F.3d 229, which deemed the networks' exclusivity rules to be the products of horizontal agreements between competing banks, *id.* at 242–43, Mastercard and Visa began to review their governance structures to minimize the risk of litigation, (DAP's Counter 56.1 ¶¶ 550, 554, 556, 591–96; ERCP's R. 56.1 Counter-stmt. ("ERCP's Counter 56.1") ¶¶ 265.1–265.8, 265.13, 265.19– 265.23, Docket Entry No. 8172).  Mastercard's Chief Risk Officer indicated that "[i]nterchange is being threatened, and will inevitably go down."  (DAP's Counter 56.1 ¶ 547; ERCP's Counter 56.1 ¶ 265.1.)  Mastercard and Visa each ultimately decided that IPOs would be in the best interest of the networks and their current members.  (DAP's Counter 56.1 ¶¶ 556, 558–59, 592, 595–96.)  In the months leading up to the IPOs, the networks made clear that they would continue to protect the business interests of the banks and reassured potential investors and bank members that nothing would change in terms of how the networks did business with their bank customers.  (*Id.* ¶¶ 566, 568, 597–98, 602–04; ERCP's Counter 56.1 ¶¶ 265.9–265.12, 265.14– 265.18; 265.24–265.25.)  Similarly, there is evidence that the banks believed that the networks

---

of the fact that the banks relinquished their voting rights "while having only a minority stake," and surmise that "[t]he likely explanation for this strategy is that the participants were seeking to limit antitrust exposure by ceding 'control' to a single firm with diverse, inactive shareholders, as opposed to a joint venture in which decisions were made by active participants," and that "[t]he intended result would be that the IPOs would be treated as single entities for antitrust purposes rather than as collaborations involving agreements among rivals."  *Id.* at 869.  The authors suggest that "[e]ven though the banks are not voting decisionmakers in the firm, any rule that limits their individual behavior must be regarded as multilateral."  *Id.* at 871 (emphasis omitted).

would continue to act in the best interests of the banks.  (DAP's Counter 56.1 ¶¶ 568, 600; ERCP's Counter 56.1 ¶¶ 265.26–265.27.)  Visa's owner-banks, for example, specifically conditioned the IPO on the requirement that Visa maintain its by-laws and rules, including the HAC rules and default interchange rules.  (DAP's Counter 56.1 ¶ 601.)  In addition, it is undisputed that the challenged network rules were readopted after the IPOs and remain in effect. (Defs.' 56.1 ¶¶ 38, 44, 47, 206–07, 228–29, 234.)  Moreover, member banks knew that other members would be bound by the rules both before and after the IPOs — and they have continued to abide by the rules and benefit from those rules.  (DAP's Counter 56.1 ¶¶ 24–25, 78, 92, 612, 621, 667–68.)

Given the evidence that Defendants intended for the conspiracy to continue after the IPOs and that the banks have continued to benefit from the challenged rules and default interchange fee schedules — combined with a lack of evidence that Defendants effectively withdrew from the conspiracy — a jury could reasonably find by a preponderance of the evidence that the challenged rules are the product of continuing conspiracies between the Networks and the Bank Defendants.  *In re Cathode Ray Tube*, 2016 WL 8669891, at *7–8 (denying the defendant's motion for summary judgment because the defendant had not severed all ties with the conspiracy, continued to have an interest in the conspiracy, and continued to act in furtherance of the conspiracy).  Stated differently, the record before the Court compels denial of Defendants' motion for summary judgment.  The evidence demonstrates at least a triable issue as to whether the challenged rules are the product of ongoing, post-IPO conspiracies (from which the Bank Defendants have not withdrawn).  Moreover, the facts tend to exclude the possibility that the Networks and Bank Defendants were acting unilaterally by continuing to readopt the rules and

by continuing to adhere to them.[31]  *See id.* at *7 (finding there was a genuine dispute of material

fact as to whether the defendants withdrew from the conspiracy); *see also In re Optical Disk

Drive Antitrust Litig.*, No. 10-MD-2143, 2017 WL 6503743, at *8 (N.D. Cal. Dec. 18, 2017)

(finding the defendant was not entitled to summary judgment where it "failed to exit the industry

fully and to sever all ties").

Contrary to Defendants' arguments, it is not beyond dispute that the IPOs conclusively

terminated the conspiracies such that Defendants need not demonstrate withdrawal.  (*See* Defs.'

Post-IPO Reply 4–7.)  Defendants argue that once the structures of Visa and Mastercard

changed, the conspiracies no longer existed, (*id.*), but the Supreme Court and the Second Circuit

have explained that form should not be elevated over substance, *see American Needle, Inc. v.

Nat'l Football League*, 560 U.S. 183, 192–93 (2010) (explaining that the focus should be on

substance rather than form in determining whether a challenged rule is the product of concerted

---

[31]  To the contrary, participation in the conspiracy could be against the individual self-interests of the participants were it not for tacit agreement that all co-conspirators would abide by the cartel manager's rules and prices.  For example, JPMorgan Chase (and Chase Paymentech) could earn market share from both merchants and cardholders by offering competitive prices on "on-us" transactions and by offering additional rewards to cardholders shopping at merchants who used Chase Paymentech as their acquirer.  (*See, e.g.*, Expert Report of Dr. R. Craig Romaine ¶¶ 575–94, annexed to Decl. of Jayme Jonat as SJDX1320, Docket Entry No. 8927-28 (discussing Chase's myriad frustrations with Visa and its many incentives to defect from the cartel and implement its own "ChaseNet" system).)  Continued participation in a conspiracy where doing so would be contrary to independent (but not collective) self-interest is probative of the existence of tacit, horizontal agreement among the participants.  *See* Areeda & Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 1411 (Fourth and Fifth Editions 2018–2023) ("The presence of interdependence means that there would be a motive for conspiracy, that an agreement would benefit the alleged conspirators, and that an act could offend the actor's self-interest unless its rivals act similarly. . . .  Interdependence is consistent with the existence of a conspiracy but does not itself prove the traditional agreement.  It is a *necessary* condition for inferring any conspiracy from parallelism alone, but is not *sufficient* to infer a traditional conspiracy."); *id.* ¶ 1425a ("[A] conspiracy may be inferred if a defendant's action would have been contrary to its self-interest in the absence of advance agreement.").

action between competitors); *Relevent Sports*, 61 F.4th at 306 ("Competitors do not avoid antitrust liability by hiding behind or acting through third-party intermediaries."); Hovenkamp & Leslie, *The Firm as Cartel Manager*, 64 Vand. L. Rev. 813, 867–72 (2011) (explaining that Visa and Mastercard operate as cartels and that their network rules should be analyzed as horizontal agreements between competitors).  Further, as explained above and in *Barry's Cut Rate*, there is evidence that the conspiracies are ongoing — specifically that Defendants were invested in the continuation of the status quo following the IPOs and that Defendants continue to benefit from the challenged rules.  (*See, e.g.*, DAP's Counter 56.1 ¶ 566 (summarizing evidence that "leading up to the IPO, Mastercard repeatedly reassured prospective investors and its bank members that the IPOs would not cause any significant change"); *id.* ¶ 597–98 (same with respect to Visa); *id.* ¶ 602–04 (highlighting evidence that Visa assured bank members that the IPO would not upset "core business operations" and that "existing operating regulations and rules will remain in place"); ERCP's Counter 56.1 ¶¶ 265.9–265.12 ("MasterCard . . . provid[ed] assurances that it would continue to act in [the Bank's] best interests after the IPO."); *id.* ¶ 265.14–265.18 (elaborating on the same); *id.* ¶ 265.24–265.25 (same with respect to Visa and its member banks)); *see also Barry's Cut Rate*, 2019 WL 7584728, at *26 (citing *United States v. Grimm*, 738 F.3d 498 (2d Cir. 2013)).

Relatedly, and also contrary to Defendants' arguments, it is not clear and certainly not beyond dispute that Defendants withdrew from the conspiracies by agreeing to the restructurings. *See In re Cathode Ray Tube*, 2016 WL 8669891, at *7 ("[T]he sale of a conspiring business does not qualify as an affirmative act of withdrawal if the defendant fails to 'sever[] all ties' with the conspiracy." (quoting *Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 839 (11th Cir. 1999))).  Earlier in *In re Cathode Ray Tube (CRT) Antitrust Litigation*, the court denied the

defendants' motion to dismiss, noting:

> [T]he sale of an operating business does not automatically establish the defense [of withdrawal].  There must be factual inquiries — again, with the burden of proof on the defendants — into such subjects as the defendants' continued financial interest in the business that was sold, some continued participation, or some continued benefit from the alleged conspiracy.

No. 07-CV-5944, 2010 WL 9543295, at *12 (N.D. Cal. Feb. 5, 2010).  Instead, as explained

above, there is ample evidence that the Bank Defendants agreed to the restructurings to protect

their business interests and those of the networks, and to safeguard the network rules from

antitrust liability.  Further, Bank Defendants did not sever ties with the conspiracy because they

continued to have a financial interest in the networks and continued to act in furtherance of the

conspiracy.  (DAP's Counter 56.1 ¶ 568 ("Mastercard's issuing banks understood that

Mastercard would continue to operate in their best interests after the IPO."); *id.* ¶ 600 (discussing

Chase's interest in "retain[ing] control over structure and governance" post-IPO); *id.* ¶ 601

("Visa's owners conditioned Visa's IPO on the network maintaining its by-laws and rules.");

ERCP's Counter 56.1 ¶¶ 265.26–265.27 (describing a Chase executive's efforts to ensure that

Chase "retain[ed] control over" Visa's structure and governance after the IPO)); *see also In re*

*Cathode Ray Tube*, 2016 WL 8669891, at *7 (finding that the defendants failed to demonstrate

effective withdrawal even where the defendants sold the conspiring business).

Defendants argue that the "perverse result" of a ruling against Defendants would be that

Visa and Mastercard must eliminate procompetitive network rules or that issuing banks must

close all Visa and Mastercard accounts and stop issuing payment cards.  (*See* Defs.' Post-IPO

Reply 1.)  Defendants are mistaken.  Even if the challenged rules are the products of conspiracies

involving the networks and competing banks, the question remains whether the challenged rules

are *unreasonable* restraints, which depends on whether the challenged rules have anticompetitive

effects and whether any anticompetitive effect is outweighed by procompetitive effects.  *See NCAA v. Alston*, 594 U.S. 69, 86–87, 96–101 (2021) (assessing whether the horizontal restraints had actual anticompetitive effects and whether any procompetitive rationale could be achieved by less restrictive means to determine whether the restraints violated the Sherman Act); *Anderson News*, 899 F.3d at 97 (explaining that mere existence of agreement is insufficient because unreasonableness is the *sine qua non* of finding an antitrust violation).  That is, notwithstanding the existence of a conspiracy, a jury might either find that the challenged rules do not have anticompetitive effects or might agree with Defendants' procompetitive justifications for the challenged rules.

Thus, the Court finds that there is a material dispute as to whether the post-IPO rules are the products of conspiracies, and therefore denies Defendants' motion for partial summary judgment.[32]

### d.   Direct Action Plaintiffs' motions for partial summary judgment

Direct Action Plaintiffs moved for partial summary judgment on a limited issue on one element of their claims — that certain challenged agreements constitute "horizontal" agreements among competitors at the "same level of the market structure".[33]  (7-Eleven/THD Mem. 15–21 (quoting *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 182 (2d Cir. 2012)); Target

---

[32]  Because the Court finds that there is a disputed issue as to whether the IPOs conclusively terminated the conspiracies, the Court declines to decide whether Plaintiffs' alternative theories of liability are also viable.  *See Osborn*, 797 F.3d at 1068 & n.3 (finding that the plaintiffs had plausibly alleged that pre-IPO agreements between the networks and the member banks had continued after the IPOs and declining to decide whether the alternative hub-and-spoke theories or vertical conspiracy theories were also viable).

[33]  Direct Action Plaintiffs do not seek partial summary judgment as to whether the conspiracy unreasonably restrains trade.  (DAP's Reply 10–11.)

Mem. 12; DAP Reply 1 (quoting 15 U.S.C. § 1).)  7-Eleven Plaintiffs and The Home Depot Plaintiffs seek a ruling that the Honor All Cards rules "are horizontal agreements among competing card-issuing banks," because horizontal agreements "require 'harder looks' than vertical agreements," (7-Eleven/THD Mem. at 1–2), while Target Plaintiffs seek a ruling that the default interchange fee schedules and Honor All Cards rules constitute "horizontal agreements among competing card issuing banks that should be reviewed at trial *under the standards governing horizontal restraints*," (Target Mem. 1 (emphasis added)).  For the reasons discussed below, the Court denies Plaintiffs' motions as moot.

Direct Action Plaintiffs argue that the evidence is undisputed that the pre- and post-IPO rules are the products of horizonal agreements among the networks and the banks.  (Target Mem. 1; DAP's Reply 10.)  In support, they argue that Visa's and Mastercard's IPOs did not change anything about the substance of the horizontal agreements and that those horizontal agreements remain in place today.  (DAP's Reply 8–9.)  They contend that a ruling that the challenged rules are horizontal agreements will "help resolve how the Direct Action Plaintiffs may satisfy their burdens of proof under the Rule of Reason," because "horizontal agreements are antitrust's most suspect classification," will satisfy "plaintiffs' initial burden under the Rule of Reason," and will "shift[] the burden to defendants."[34]  (*Id.* at 11–12 (internal quotation marks and citations omitted).)

---

[34]  Plaintiffs raise for the first time in their reply brief that "a ruling that Defendants entered into horizonal agreements . . . [would] resolv[e] one key aspect of Plaintiffs' claims — that there was an *agreement*."  (DAP's Reply 11.)  The Court does not disagree; proving the existence of an agreement is a necessary element to making out a violation of Section 1 of the Sherman Act.  *See 1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 114 (2d Cir. 2021).  The Court, however, is not obligated to consider arguments raised for the first time in reply papers.  *Am. Hotel Int'l Grp., Inc. v. OneBeacon Ins. Co.*, 611 F. Supp. 2d 373, 375 (S.D.N.Y. 2009) ("[A] district court is free to disregard [an] argument raised for the first time in reply papers, especially

Defendants' argument in opposition is the same as set forth in their motion for summary judgment on this point: that the IPOs eliminated any ongoing conspiracies and that Bank Defendants withdrew from the conspiracies by voting to restructure the networks and by giving up their voting rights.  (Defs.' Opp'n 18–19.)  Defendants contend that the continued readoption of the rules is as consistent with the networks' independent business interests as with conspiracy, and that they are therefore entitled to summary judgment under the *Matsushita* standard.  (*Id.* at 17 (first citing *Matsushita*, 475 U.S. at 588; and then citing *Anderson News*, 899 F.3d at 113–14).)

As explained above in section II.c., the Court denies Defendants' cross-motion for summary judgment because Plaintiffs set forth sufficient evidence of Defendants' failure to withdraw from the pre-IPO conspiracies.  As noted in the discussion denying Defendants' motion, whether a defendant effectively withdrew from a conspiracy is typically a factual question reserved for the jury.  *See Osborn*, 797 F.3d at 1068 ("[E]ffective withdrawal is typically a question of fact for the jury.").  The Court did not find, however, that Defendants failed, as a matter of law, to effectively withdraw from the pre-IPO conspiracies.  Even if it had,

---

on a motion for summary judgment."), *aff'd*, 374 F. App'x 71 (2d Cir. 2010); *see also ABN Amro Verzekeringen BV v. Geologistics Americas, Inc.*, 485 F.3d 85, 97 n.12 (2d Cir. 2007) ("We decline to consider an argument raised for the first time in a reply brief.").  Plaintiffs' notices of motion and initial moving papers were limited to seeking "partial summary judgement adjudicating that the Challenged Rules . . . were and are *horizontal* agreements."  (Target Mot. 1 (emphasis added); *see also* DAP's Mot. 1 (seeking "partial summary judgment on the issue of whether Visa and Mastercard Honor All Cards Rules . . . are *horizontal* agreements") (emphasis added); DAP's Mem. 2 ("[T]his motion seeks a ruling only that . . . the HAC Rules constitute *horizontal* agreements.").)  Because the Court has already determined that the rule of reason applies to the challenged restraints, *Interchange Fees IV*, 2024 WL 278565, at *9–11, the issue of whether the restraints are horizontal is moot.

such a finding would not necessarily equate to a finding that the agreements are *horizontal* — as Plaintiffs seek.  For the reasons discussed below, the Court denies Plaintiffs' motions as moot.[35]

Plaintiffs seek a ruling that allows for a backdoor application of the *per se* standard reserved for horizontal price-fixing conspiracies or, alternatively, for application of the "quick look" standard.  (*See* 7-Eleven/THD Mem. 2 (explaining that horizontal agreements require "harder looks" than vertical agreements); Target Mem. 1 (explaining that horizontal agreements "provoke harder looks" than vertical agreements).)  However, the Court has already ruled that the challenged restraints would be evaluated under the rule of reason.  *Interchange Fees IV*, 2024 WL 278565, at *11; *see also NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 100–01 (1984) (acknowledging that horizontal restraints are ordinarily subject to heightened scrutiny, but may be subject to ordinary rule of reason analysis where "horizontal restraints on competition are essential if the product is to be available at all"); *Alston*, 594 U.S. at 88 ("Most restraints challenged under the Sherman Act — including most joint venture restrictions — are subject to the rule of reason.").[36]  Once a court has decided that the challenged restraints must be evaluated

---

[35]  Target Plaintiffs clarify that their summary judgment motion does not apply to Plaintiffs' hub-and-spoke and cartel manager theories of liability.  (Target Mem. 1 n.2.)  Instead, they argue only that the challenged rules are the product of horizontal agreements in light of Defendants' failure to withdraw from the pre-IPO conspiracies.  (*See generally id.*)  The 7-Eleven and Home Depot Plaintiffs' argument appears to be the same.  (*See* 7-Eleven/THD Mem; DAP Reply.)

[36]  *See also In re Mushroom Direct Purchaser Antitrust Litigation*, No. 06-620, 2015 WL 6322383, at *14 (E.D. Pa. May 26, 2015), explaining why the court chose to apply the rule of reason in a case involving mixed vertical/horizontal agreements and collecting similar cases:

> The presence of the integrated defendants prevents [the court] from simply bifurcating [its] consideration of the claimed agreement to fix mushroom distribution prices into horizontal and vertical components with the former being subject to per se liability and the latter subject to consideration under the rule of reason.  Because [the court is] unable to untangle the vertical and horizontal aspects of the

under the rule of reason — for example, because they may be necessary for the product to exist

at all — whether the challenged restraints are the product of horizontal or vertical restraints

becomes immaterial.  Rather, "the rule of reason requires the factfinder to decide whether under

all the circumstances of the case the restrictive practice imposes an unreasonable restraint on

competition."  *Arizona v. Maricopa Cnty. Med. Soc.*, 457 U.S. 332, 343 (1982).  Stated

differently, challenged restraints — whether horizontal or vertical — are assessed under the rule

of reason for their "actual adverse effect on competition as a whole in the relevant market."  *Tops*

*Mkts.*, 142 F.3d at 96 (emphasis omitted).  Only those restraints which have actual

anticompetitive effect (and for which the procompetitive justifications are found lacking) are

---

conduct of the integrated defendants in the alleged conspiracy to fix mushroom distribution prices, [the court] find[s] that it is appropriate to apply the rule of reason to the entirety of plaintiffs' claim that defendants violated Section 1 of the Sherman Act by "conspir[ing] among themselves and in conjunction with nonmember distributors to set artificially-inflated prices" for mushrooms.  *See In re Aluminum Warehousing Antitrust Litig.*, No. 13–2481, 2014 WL 4277510, at *25 (S.D.N.Y. Aug. 29, 2014) ("Most antitrust claims are evaluated under the rule of reason. . . . Most vertical agreements *and mixed agreements* (those with both horizontal and vertical aspects) are analyzed in this manner.") (emphasis added); *see also Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1481 (9th Cir. 1986) (finding that the rule of reason applied where the alleged conspirators were "in a 'hybrid' arrangement composed of both a dual distributorship and a horizontal relationship" because the Court did "not have enough experience with this type of arrangement to say with any confidence that a concerted refusal to deal in this context almost always will be anticompetitive"); *Black Box Corp. v. Avaya, Inc.*, No. 07–6161, 2008 WL 4117844, at *18 (D.N.J. Aug. 29, 2008) ("Here, there was a dual distributor arrangement in the market for PBX systems and a horizontal relationship in the service and maintenance aftermarket. . . . [T]his Court does not have enough experience with this type of arrangement to say that it will almost always be anticompetitive. Therefore, the Court concludes that a Rule of Reason analysis is appropriate.").

deemed unreasonable and in violation of Section 1 of the Sherman Act. *See Amex*, 585 U.S. at

540 (explaining that Section 1 "outlaw[s] only *unreasonable* restraints").  Contrary to Plaintiffs'

arguments, a ruling that the challenged restraints are horizontal would not "help resolve how the

Direct Action Plaintiffs may satisfy their burdens of proof under the Rule of Reason."  (DAP's

Reply 11.)  Under the rule of reason, Plaintiffs' burden at trial is the same whether the restraints

are horizontal or vertical:

> A plaintiff's initial burden . . . [is] to show that the "challenged
> action has had an actual adverse effect on competition." *Spinelli v.
> NFL*, 903 F.3d 185, 212 (2d Cir. 2018); *see also Amex*, 138 S. Ct. at
> 2284.  Second, the burden shifts to the defendant to offer a
> procompetitive justification for the challenged conduct. *Amex*, 138
> S. Ct. at 2284.  Third, if the defendant's justification is sufficient,
> the burden shifts back to the plaintiff to demonstrate that the
> procompetitive ends can be achieved through substantially less
> anticompetitive means. *Id.*

*Interchange Fees IV*, 2024 WL 278565, at *7 (citation omitted); *see also* Areeda & Hovenkamp,

Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 1914(c) (Fourth and

Fifth Editions 2018–2023) (same).

   In either case, Plaintiffs have the burden of proving (1) the existence of a contract,

combination, or conspiracy, that (2) unreasonably restrains trade. *See 1-800 Contacts*, 1 F.4th at

114 ("To prove a Sherman Act violation . . .  [a plaintiff] must establish (1) a contract,

combination, or conspiracy exists that (2) unreasonably restrains trade.")  Moreover, it is settled

law that, under the rule of reason, a plaintiff bears the burden of showing "an actual adverse

effect" on competition through increased prices, decreased output, or that the challenged conduct

"otherwise stifled competition." *See Amex*, 585 U.S. at 547; *see also Jefferson Par. Hosp. Dist.

No. 2 v. Hyde*, 466 U.S. 2, 31 (1984) (finding no antitrust violation where there was "no evidence

that the price, the quality, or the supply or demand . . .  ha[d] been adversely affected"); *Virgin

Atl. Airways Ltd. v. Brit. Airways PLC*, 257 F.3d 256, 264 (2d Cir. 2001) ("[W]hether an actual

adverse effect has occurred is determined by examining factors like reduced output, increased prices and decreased quality.").

Plaintiffs do not move for partial summary judgment as to the existence of a contract, combination, or conspiracy (and such a motion would not be moot).[37]  Instead, they merely ask the Court to find as a matter of law that the HAC rules and default interchange schedules constitute horizontal, rather than vertical, agreements.  (7-Eleven/THD Mem. 2 ("[T]his motion seeks a ruling only that there is no genuine material question that the HAC Rules constitute *horizontal agreements* by and among issuers of credit and debit cards."); Target Mem. 1 (seeking a ruling that "the Honor All Cards and default interchange rules . . . are horizontal agreements among competing card issuing banks that should be reviewed at trial under the standards governing horizontal restraints").)

Rule 56 of the Federal Rules of Civil Procedure requires a court to "grant summary judgment if the movant shows that there is no genuine dispute as to [a] *material* fact."  Fed. R. Civ. P. 56(a) (emphasis added).  A fact is "material" only if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (same).  Whether the HAC rules are horizontal or vertical is no longer material.  Under the governing law (*i.e.*, the rule of reason), whether the restraints are horizontal or vertical has no bearing on the outcome of the suit.  Accordingly, Plaintiffs' motion has been rendered moot by the Court's prior ruling that the challenged restraints must be evaluated under the rule of reason.

---

[37] *But see* note 34 *supra*.

63

### III.  Conclusion

For the foregoing reasons, the Court denies Defendants' motion for summary judgment

based on *Illinois Brick* standing and the post-IPO claims, and denies Direct Action Plaintiffs'

motions for partial summary judgment.

Dated: February 22, 2024
      Brooklyn, New York

                                     SO ORDERED:


                                     _____/s MKB_____
                                     MARGO K. BRODIE
                                     United States District Judge