UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

IN RE PAYMENT CARD INTERCHANGE FEE
AND MERCHANT DISCOUNT ANTITRUST
LITIGATION

          **MEMORANDUM & ORDER**
          05-MD-1720 (MKB)

This document refers to:
*Barry's Cut Rate Stores Inc., et al. v. Visa Inc., et
al.*, No. 05-MD-1720 (E.D.N.Y)

-------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

Several Plaintiffs and several Defendants in this multidistrict litigation moved for

summary judgment and partial summary judgment in December of 2020.[1]  This Memorandum

---

[1]  Plaintiffs consist of (1) the Equitable Relief Class, which was certified under Federal Rule of Civil Procedure 23(b)(2), *DDMB, Inc. v. Visa, Inc.*, No. 05-MD-1720, 2021 WL 6221326 (E.D.N.Y. Sept. 27, 2021); (2) the Target Plaintiffs, the 7-Eleven Plaintiffs, and The Home Depot (collectively, the "Direct Action Plaintiffs"), who are not members of the class and filed briefing on the summary judgment issue together, *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2017 WL 4325812, at *3 (E.D.N.Y. Sept. 27, 2017), *order set aside on other grounds*, No. 05-MD-1720, 2018 WL 4158290 (E.D.N.Y. Aug. 30, 2018); and, (3) the Grubhub Plaintiffs — another group of opt-out plaintiffs against whom Defendants sought summary judgment in September of 2023, (*see* Conditional Transfer Order dated Nov. 20, 2019, *Grubhub Holdings Inc. v. Visa Inc*, 19-CV-6555 (E.D.N.Y. Nov. 20, 2019), Docket Entry No. 23 (reflecting case's reassignment to this Court from the Northern District of Illinois); *see also* Defs.' Notice of Mot., *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 05-MD-1720 (E.D.N.Y. Sept. 12, 2023), Docket Entry No. 8925).

    Defendants consist of the Visa and Mastercard networks (the "Networks") as well as "various issuing and acquiring banks" (the "Bank Defendants").  *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 18 (E.D.N.Y. 2019).  "At the beginning of this litigation . . . Visa and Mastercard were effectively owned by their member banks."  *Barry's Cut Rate Stores Inc. v. Visa, Inc.*, No. 05-MD-1720, 2019 WL 7584728, at *3 (E.D.N.Y. Nov. 20, 2019).  In 2006 and 2008, "Mastercard and Visa, respectively, made initial public offerings ('IPOs'), becoming publicly traded individual companies."  *Id.* (citations omitted).  However, Plaintiffs claim that the alleged anticompetitive practices have "continued despite the networks' and the banks' more recent attempt[s] to avoid antitrust liability by restructuring the Visa and [Mastercard] corporate entities."  *Id.*; (Equitable Relief Class Pls.' Compl. ("Equitable Relief Class Pls.' Compl.") ¶ 1, annexed to the Decl. of Rosemary Szanyi

and Order addresses Equitable Relief Class Plaintiffs' motion for partial summary judgment seeking to preclude Defendants from offering a particular procompetitive justification raised in Defendants' expert reports.[2]  Specifically, Equitable Relief Class Plaintiffs ("Plaintiffs") seek a ruling that "Defendants' alleged buying-group discounts are not cognizable procompetitive benefits that can be set off against the Plaintiffs' showing of anticompetitive effects in the relevant antitrust markets for credit-card transactions."  (Pls. Mot 1.)

For the reasons discussed below, the Court denies Plaintiffs' motion for partial summary judgment.

---

("Szanyi Decl.") as SJDX4, Docket Entry No. 8520-1; *see also* Second Amended Target Compl. ("Target Compl.") ¶¶ 78–79, annexed to Szanyi Decl. as SJDX3, Docket Entry No. 8520-1 (stating that "the IPOs did not change the essential character of" Visa's and Mastercard's "combinations, the setting of interchange, or the [c]ompetitive [r]estraints"); Sixth Am. 7-Eleven Compl. ("7-Eleven Compl.") ¶¶ 152–164, annexed to Szanyi Decl. as SJDX1, Docket Entry No. 8520-1 (claiming that Visa's and Mastercard's "post-IPO structures . . . were designed to perpetuate, and not to disturb, the anticompetitive conduct detailed in this Complaint"); First Am. The Home Depot Compl. ("THD Compl.") ¶¶ 120–134, annexed to Szanyi Decl. as SJDX2, Docket Entry No. 8520-1 (same).)

The Court partially resolved Defendants' motions for summary judgment in January of 2024, addressing Defendants' arguments under *Ohio v. American Express*, and Mastercard's and the Bank Defendants' arguments as to Mastercard's lack of market power.  *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2024 WL 278565 (E.D.N.Y. Jan. 25, 2024) (*Interchange Fees IV*).  In February of 2024, the Court addressed Defendants' arguments that *Illinois Brick* bars Plaintiffs' damages claims and that Visa's and Mastercard's IPOs terminated, as a matter of law, any pre-existing conspiracies involving the Networks and the Bank Defendants.  *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No 05-MD-1720, 2024 WL 1014159 (E.D.N.Y. Feb. 22, 2024) (*Interchange Fees V*).

[2]  (Equitable Relief Class Pls.' Mot. for Partial Summ. J. ("Pls.' Mot."), Docket Entry No. 8150; Pls.' Mem. in Supp. of Pls.' Mot. ("Pls.' Mem."), Docket Entry No. 8152, Pls.' R. 56.1 Stmt. ("Pls.' 56.1"), Docket Entry No. 8153; Defs.' Mem. in Opp'n to Pls.' Mot. ("Defs.' Mem."), Docket Entry No. 8206; Defs.' Resp. to Pls.' 56.1 ("Defs.' 56.1 Resp."), Docket Entry No. 8208, Pls.' Reply in Supp. of Pls.' Mot. ("Pls.' Reply"); Docket Entry No. 8155.)

## I. Background

The Court assumes familiarity with the facts and extensive procedural history as set forth in prior decisions. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 986 F. Supp. 2d 207 (E.D.N.Y. 2013) (*Interchange Fees I*), *rev'd and vacated*, 827 F.3d 223 (2d Cir. 2016) (*Interchange Fees II*); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11 (E.D.N.Y. 2019) (*Interchange Fees III*); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2024 WL 278565 (E.D.N.Y. Jan. 8, 2024) (*Interchange Fees IV*); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2024 WL 1014159 (E.D.N.Y. Feb. 22, 2024) (*Interchange Fees V*).

## II. Discussion

### a. Standard of review

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Radwan v. Manuel*, 55 F.4th 101, 113 (2d Cir. 2022) (quoting Fed. R. Civ. P. 56(a)). The court must "constru[e] the evidence in the light most favorable to the nonmoving party," *Radwan*, 55 F.4th at 113 (alteration in original) (quoting *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 358 (2d Cir. 2011)), and "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Koral v. Saunders*, 36 F.4th 400, 408 (2d Cir. 2022) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kee v. City of New York*, 12 F.4th 150, 167 (2d Cir. 2021) (quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the

[nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment. *Id.* The court's function is to decide whether, "after resolving all ambiguities and drawing all inferences in favor of the nonmovant, a reasonable jury could return a verdict for the nonmovant." *Miller v. N.Y. State Police*, No. 20-3976, 2022 WL 1133010, at *1 (2d Cir. Apr. 18, 2022) (first citing *Anderson*, 477 U.S. at 248; and then citing *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127, 129 (2d Cir. 2013)). The moving party, however, need not *prove* a negative; rather, where "the burden of proof at trial would fall on the nonmoving party, the moving party 'can shift the initial burden by pointing to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.'" *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022) (quoting *Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other materials *negating* the opponent's claim."); *El-Nahal v. Yassky*, 835 F.3d 248, 252 (2d Cir. 2016) ("[T]he movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." (quoting *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995))).

In the antitrust context, summary judgment serves a "vital function" by assisting courts in "avoiding wasteful trials and preventing lengthy litigation that may have a chilling effect on pro-competitive market forces." *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 95 (2d Cir. 1998). While courts on summary judgment must view the evidence in the light most favorable to the party opposing the motion, "in the context of antitrust litigation[,] the range of inferences that may be drawn from the ambiguous evidence is limited; the non-moving party must set forth facts

that tend to preclude an inference of permissible conduct." *Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 542 (2d Cir. 1993) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).  Evidence that is equally suggestive of competition as collusion, for example, is insufficient to survive summary judgment.  *See, e.g.*, *Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287, 1300 (11th Cir. 2003) ("Evidence that does not support the existence of a . . . conspiracy any more strongly than it supports conscious parallelism is insufficient to survive a defendant's summary judgment motion." (citing *Matsushita*, 475 U.S. at 588)).  "[B]roader inferences," however, "are permitted . . . when the conspiracy is economically sensible for the alleged conspirators to undertake."  *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 63 (2d Cir. 2012).  Conversely, summary judgment may be granted where the nonmovant's case relies on evidence that defies economic sense.  *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 468–69 (1992) ("If the plaintiff's theory is economically senseless, no reasonable jury could find in its favor, and summary judgment should be granted.").  Finally, "when the evidence admits of competing permissible inferences with regard to whether a plaintiff is entitled to relief, 'the question of what weight should be assigned to [those] inferences remains within the province of the fact-finder at a trial.'"  *In re Publ'n Paper Antitrust Litig.*, 690 F.3d at 61 (quoting *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987)).

> **b. Plaintiffs have not shown that Defendants' potential procompetitive justification is either *per se* unlawful or that it must be precluded as a matter of law**

Under the three-step rule of reason burden-shifting framework — which the Court has already determined must apply to the challenged rules in this case, *see Interchange Fees IV*, 2024 WL 278565, at *11 — Plaintiffs have the initial burden of showing at trial "an *actual*

adverse effect on competition." *Spinelli v. NFL*, 903 F.3d 185, 212 (2d Cir. 2018) (citation omitted).  Assuming Plaintiffs meet this burden, Defendants may offer procompetitive justifications for the challenged conduct.  *See Interchange Fees IV*, 2024 WL 278565, at *7 (citing *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018) (*Amex*)).  Finally, assuming Defendants' justifications are valid and sufficient, Plaintiffs may demonstrate that Defendants could achieve the same procompetitive ends through less anticompetitive means.  *Id.* (citing *Amex*, 585 U.S. at 542).

Plaintiffs challenge as unlawful a particular procompetitive justification that Defendants *might* offer at trial at the second step of the burden-shifting framework.[3]  Plaintiffs point to analogies made by two of Defendants' experts in their respective expert reports, contending that

---

[3] Traditionally, procompetitive justifications are asserted by antitrust defendants in response to plaintiffs' interrogatories.  *See, e.g.*, *FTC v. Meta Platforms, Inc.*, No. 20-CV-3590, 2023 WL 3092651, at *1 (D.D.C. Apr. 26, 2023) (granting in part FTC's motion to compel Meta to answer interrogatories providing procompetitive justifications regarding its acquisitions of Instagram and WhatsApp because "the 'procompetitive benefits' argument is the centerpiece of Meta's affirmative defense to the FTC's claims"); *In re Impax Lab'ys, Inc.*, 2017 WL 5171124, at *4 (F.T.C. Oct. 27, 2017) ("Counsel served an interrogatory asking Impax to '[i]dentify all procompetitive justifications and benefits to consumers and the public interest referenced in the Eighth Defense in [its] Answer to the Complaint in this case.'" (citation omitted)).

Plaintiffs in this action have not supported their motion with evidence from any of Defendants' responses to interrogatories.  (*See generally* Pls.' 56.1.)  However, the Court recognizes that Defendants' experts may, at trial, offer the same analogies as presented in their expert reports and that these analogies would appear to be procompetitive justifications.  *See, e.g.*, *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 986 (9th Cir. 2023) ("A procompetitive rationale is 'a [1] nonpretextual claim that [the defendant's] conduct is [2] indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal.'" (quoting *FTC v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020)), *cert. denied*, No. 23-337, 2024 WL 156473 (U.S. Jan. 16, 2024).  In addition, Defendants do not disclaim or waive any ability to assert the challenged justifications at trial.  (*See generally* Defs.' Opp'n; *see also* Pls.' Reply 2 ("[Defendants'] assertion that the Plaintiffs' motion targets 'an argument Defendants and their experts do not make' is belied by their failure to stipulate to the relief that the motion seeks." (citing Defs.' Opp'n 2)).)  Accordingly, for purposes of this decision, the Court treats the challenged rationale as potential procompetitive justification and assesses whether this justification must be, as Plaintiffs argue, precluded as a matter of law.

Professors Kevin Murphy and Kenneth G. Elzinga[4] assert a "buying group" or "buying cartel" justification for the challenged rules.[5]  (Pls.' Mem. 6–7 (citing Pls.' 56.1 ¶¶ 4–8).)  Regarding this purported justification, Plaintiffs make two arguments.  First, Plaintiffs argue that "Defendants' proffered justification is not legally cognizable," because "[b]uyer cartels are *per se* unlawful," (*id.* at 8–11), and further argue that this justification is impermissibly one-sided in light of the Supreme Court's decision in *Amex,* (*id.* at 1, 13).  Second, Plaintiffs argue that Defendants' "buying group" rationale is "unlawfully tied . . . to the merchants' acceptance of . . . credit-card transactions."  (*Id.* at 13–16.)  They contend that Defendants have the burden to show

---

[4]  The Court denied The Home Depot and 7-Eleven's motion to exclude portions of Professor Kevin Murphy's report and opinions, *see In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation*, No. 05-MD-1720, 2022 WL 14862098, at *14 (E.D.N.Y. Oct. 8, 2022), and no plaintiffs moved to exclude the expert report or opinions of Professor Kenneth G. Elzinga.  In addition, the Equitable Relief Class Plaintiffs did not move to exclude the expert report or opinions of Prof. Murphy.

[5]  Plaintiffs point to a portion of Prof. Murphy's report in which he opines:
> [W]e may properly view the payment card platform as delivering additional customers and sales to the merchant in exchange for a discount, which is similar to a variety of other value-enhancing business practices in retail trade and elsewhere. . . . This exchange is similar to that which "buyers' clubs," or the designation as a "preferred provider," offers: an entity such as Costco or a group purchasing organization offering sellers a shift in demand in exchange for reduced prices for the buyers the entity represents. As I explain below, this is also the economic force behind retail intermediaries that deliver customers to major retailers in exchange for a discount or rebate provided to the customer, such as Mr. Rebate, Ebates and Hoopla Doopla.

(Expert Rep. of Kevin M. Murphy ("Murphy Rep.") ¶ 144 & n.216, annexed to the Decl. of James A. Wilson as Ex. 1, Docket Entry No. 8501-1; *see also* Pls.' 56.1 ¶¶ 5–7 (quoting Murphy Rep. ¶ 144 & n.216).)

Plaintiffs also point a portion of Prof. Elzinga's report in which he opines: "The Visa and Mastercard platforms in effect assemble 'buying groups' of consumers and offer them to merchants."  (Pls.' 56.1 ¶ 8 (quoting Expert Rep. of Kenneth G. Elzinga ("Elzinga Rep.") 152, annexed to Szanyi Decl. as SJDX 388, Docket Entry No. 8526-12).)

— and have failed, as a matter of law, to show — that their purported "buying group" is not unlawfully tied to merchants' acceptance of credit-card transactions. (*Id.* at 14.) Accordingly, they argue, Defendants' "proffered procompetitive justification is not cognizable." (*Id.* at 13.)

Defendants argue, as a threshold matter, that Plaintiffs' motion is improper or premature "because it asks the Court to assume away the first step of the rule of reason . . . and skip to the second step." (Defs.' Opp'n 2; *see also id.* 6–8.) Second, Defendants argue that the "buying group" analogy constitutes neither an unlawful buyer cartel nor an unlawful tying arrangement. (*Id.* at 11–16.) Finally, Defendants contend that "Professors Murphy and Elzinga describe legally cognizable two-sided procompetitive effects in the challenged buying group analogy." (*Id.* at 8–10.)

### i. Plaintiffs' motion is neither procedurally improper nor premature

Defendants argue that "assuming away Plaintiffs' burden" to show anticompetitive effect "would be procedurally improper, especially because the isolated analogy at issue does not form a discrete element or 'part of' a defense that could properly be addressed at summary judgment" (Defs.' Opp'n 6 (citing Fed. R. Civ. P. 56(a)).) They also contend that antitrust defendants need only "proffer a procompetitive justification . . . '*if* the plaintiff carries its burden' of demonstrating anticompetitive effects." (*Id.* (quoting *Amex*, 585 U.S. at 541) (alteration adopted and emphasis added)). In support, Defendants cite *In re Currency Conversion Fee Antitrust Litigation*, No. 01-MD-1409, 2012 WL 401113, at *9 (S.D.N.Y. Feb. 8, 2012) (*In re Currency Conversion*), in which the court held that the plaintiffs' summary judgment motion was "premature" because plaintiffs "ha[d] not [yet] proven their case by a preponderance of the evidence," and *Law v. NCAA*, 134 F.3d 1010, 1020–21 (10th Cir. 1998), in which Defendants contend the court addressed the plaintiffs' arguments regarding summary judgment on

procompetitive justifications only because plaintiffs had "demonstrated anticompetitive effect so conclusively that summary judgment on the issue was appropriate." (Defs.' Opp'n 7.)

Plaintiffs argue that their motion is procedurally proper. (Pls.' Reply 3–4.) Plaintiffs contend that Defendants are "wrong when they assert that their contention is not part of a defense," (*id.* at 3 (internal quotation marks omitted)), because "[t]he Supreme Court has repeatedly characterized as 'affirmative defenses' arguments made to offset the plaintiff's initial showing under the rule of reason," (*id.* (first citing *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 113 (1984) (*NCAA v. Oklahoma*); and then citing *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 693 (1978)).) In addition, Plaintiffs argue that courts consider defendants' affirmative defenses "on the assumption that the plaintiff will establish its case-in-chief at trial." (*Id.* (citing Pls.' Mem. 8).) In sum, Plaintiffs contend that "[s]ome asserted procompetitive justifications are not cognizable as a matter of law . . . and thus [are] ripe for partial summary judgment." (*Id.* at 4.)

Although Plaintiffs' motion is perhaps better construed as a motion *in limine* because it seeks to preclude the admission of certain testimony at trial, even as a motion for summary judgment it is neither procedurally improper nor premature. Courts routinely assess whether proffered procompetitive justifications are cognizable as a matter of law and regularly do so at the summary judgment stage. *See, e.g.*, *Eastman Kodak*, 504 U.S. at 483–86 (assessing Kodak's procompetitive justifications and finding them cognizable, but holding that they were insufficient to prove that Kodak was entitled to judgment as a matter of law); *1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 119–20 (2d Cir. 2021) (rejecting FTC's conclusion that "trademark protection was not a valid procompetitive benefit"); *Conn. Ironworkers Emps. Ass'n, Inc. v. New Eng. Reg'l Council of Carpenters*, 869 F.3d 92 (2d Cir. 2017) (reversing grant of summary judgement as to

9

the defendant's affirmative defense); *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 361 F. Supp. 3d 324, 334 (E.D.N.Y. 2019) ("A party may move pursuant to Rule 56(a) for summary judgment as to an entire claim or defense, as well as 'part of a claim or defense.'" (quoting *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 824 F. Supp. 2d 524, 533 (S.D.N.Y. 2011))); *see also O'Bannon v. NCAA*, 802 F.3d 1049, 1072 (9th Cir. 2015) (affirming district court's rejection of two procompetitive justifications on summary judgment motion); *In re Suboxone Antitrust Litig.*, 622 F. Supp. 3d 22, 50–51 (E.D. Pa. 2022) (considering, on motion for summary judgment, defendant's procompetitive justification and finding it cognizable); *Clarett v. NFL*, 306 F. Supp. 2d 379, 408–10 (S.D.N.Y. 2004) (rejecting the NFL's proffered procompetitive justifications and finding that the NFL "failed to offer *any* legitimate procompetitive justifications"), *rev'd on other grounds*, 369 F.3d 124 (2d Cir. 2004).

The Court agrees with Plaintiffs that the "buying group" justification constitutes "part of" a defense susceptible to resolution on a motion for summary judgment. *See* Fed. R. Civ. P. 56(a) ("A party may move for summary judgment . . . [on] part of each claim or defense."); *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 361 F. Supp. 3d at 334 ("A party may move pursuant to Rule 56(a) for summary judgment as to an entire claim or defense, as well as 'part of a claim or defense.'" (citation omitted)). In their answers to Plaintiffs' complaint, Defendants each asserted that their conduct was "pro-competitive."[6] (*See* Mastercard Answer 77 (Twenty-

---

[6] (Answer of Defs. Mastercard Inc. & Mastercard Int'l Inc. to Equitable Relief Class Pls.' Compl. ("Mastercard Answer"), Docket Entry No. 7293; Answer of Def. Visa Inc. to Equitable Relief Class Pls.' Compl. ("Visa Answer"), Docket Entry No. 7296; Answer of Def. Wells Fargo & Co. to Equitable Relief Class Pls.' Compl. ("Wells Fargo Answer"), Docket Entry No. 7934; Answer of Defs. Barclays Bank Plc, Barclays Fin. Corp., & Barclays Bank Del. to Equitable Relief Class Pls.' Compl. ("Barclays Answer"), Docket Entry No. 7935; Answer of Defs. Citigroup Inc., Citibank, N.A., Citibank S.D. & Citicorp (the "Citi Defendants") to Equitable Relief Class Pls.' Compl. ("Citi Answer"), Docket Entry No. 7936; Answer of Defs.

Second Defense) ("[Mastercard's conduct was] necessary, justified, pro-competitive, [and] constituted bona fide business competition."); Visa Answer 41 (Third Defense) ("Visa had legitimate business justifications for the conduct at issue, its conduct was pro-competitive, and its practices were and are reasonably justified."); Wells Fargo Answer 54 (Fourth Defense) ("Wells Fargo had legitimate business justifications for the conduct at issue [and] its conduct was pro-competitive."); Barclays Answer 49 (Thirteenth Defense) ("Barclays['] . . . conduct [was] . . . pro-competitive."); Chase Answer 63 (Third Defense) ("Chase['s] . . . conduct was pro-competitive."); BofA Answer 67 (Third Defense) ("Bank of America['s] . . . conduct was pro-competitive."); Capital One Answer 57 (Third Defense) ("Capital One had legitimate business justifications for the conduct at issue [and] its conduct was pro-competitive.").)

As Defendants' experts have proffered a rationale that is arguably procompetitive, may constitute a "legitimate business justification[]," (Visa Answer 41), and may have "constituted bona fide business competition," (Mastercard Answer 77), the Court finds that the buying group rationale constitutes "part of a . . . defense" that may be resolved on a motion for summary judgment, Fed. R. Civ. P. 56(a); *see also United States v. Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001) ("[A] procompetitive justification [is] a nonpretextual claim that [the defendant's] conduct is indeed a form of competition on the merits because it involves, for example, greater

---

Chase Bank USA, N.A., *et al.*, to Equitable Relief Class Pls.' Compl. ("Chase Answer"), Docket Entry No. 7937; Answer of Defs. Bank of Am. Corp., Bank of Am., N.A., & BA Merch. Servs. LLC ("BofA Answer"), Docket Entry No. 7938; Answer of Cap. One Bank (USA), N.A. & Cap. One Fin. Corp. to Equitable Relief Class Pls.' Compl. ("Capital One Answer"), Docket Entry No. 7958.)

The Court notes that the Citi Defendants appear not to have raised such a defense.  (*See generally* Citi Answer.)

efficiency or enhanced consumer appeal." (citing *Cap. Imaging Assocs.*, 996 F.2d at 543)).

Accordingly, Plaintiffs' motion is neither "procedurally improper" nor "premature."

> ### ii. Defendants' "buying group" rationale does not itself constitute a *per se* violation of the antitrust laws

Plaintiffs argue that "Defendants' proffered justification is not legally cognizable," because "[b]uying cartels such as those posited by the Defendants are anticompetitive, not procompetitive." (Pls.' Mem. 8–9.) Plaintiffs argue that "[b]uyer cartels are *per se* unlawful," and that the same conclusion must "apply when the lawfulness of buying cartels is litigated in the context of a proffered procompetitive justification." (*Id.* at 10–11.) In support, Plaintiffs point to cases holding that bidders at auctions "cannot lawfully agree among themselves on the price that they will offer the seller," (*id.* at 9 (first citing *United States v. Taubman*, 297 F.3d 161, 165–66 (2d Cir. 2002); and then citing *Harkins Amusement Enters., Inc. v. Gen. Cinema Corp.*, 850 F.2d 477, 487 (9th Cir. 1988))), and that "competing employers cannot lawfully agree on the prices they will pay employees," (*id.* (citing *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001))). Plaintiffs also cite *Law v. NCAA*, 134 F.3d at 1022, for the proposition that "[c]ost-cutting by itself is not a valid procompetitive justification." (*Id.* at 11.) Plaintiffs concede that "legitimate buying groups that provide distribution efficiencies, such as joint order-placing, warehousing, or reduced transactions costs" are not *per se* unlawful, but contend that Defendants "have not carried their burden of raising a genuine issue of fact that their posited 'buying groups' provide any such efficiency-enhancing characteristics." (*Id.* at 12.) Finally, Plaintiffs contend that such a justification is impermissibly one-sided in light of the Supreme Court's decision in *Amex.* (*Id.* at 1, 13.)

Defendants argue that "[b]uying groups are not necessarily — or even usually — *per se* unlawful." (Defs.' Opp'n 11 (citing *Castro v. Sanofi Pasteur, Inc.*, No. 11-CV-7178, 2012 WL

12516573, at *6 (D.N.J. Dec. 20, 2012)).)  Defendants argue that buying groups are not subject to *per se* condemnation "absent some illegitimate horizontal agreement" and further note that "vertical agreements . . . are subject to the rule of reason."  (*Id.* (quoting *Anderson News, L.L.C. v. Am. Media, Inc.*, 123 F. Supp. 3d 478, 497 (S.D.N.Y. 2015) (internal quotation marks omitted)).)  Defendants contend that "[n]one of the business models" referred to by Profs. Murphy and Elzinga (*e.g.*, Costco and Hoopla Doopla) "involve horizontal agreements among customers."  (*Id.* at 12.)  Rather, "Costco members have agreements with Costco, not with each other; members of group purchasing organizations have agreements with the group purchasing organization, not necessarily with each other; and users of Hoopla Doopla have agreements with the platform, not with each other."  (*Id.*)  Accordingly, they contend, "there is no suggestion from Professor Murphy or Professor Elzinga . . . that payment card networks are a product of a horizontal agreement *among cardholders*."  (*Id.*)  Finally, Defendants argue that the justification has an efficiency-enhancing rationale: in exchange for a discount, the networks deliver more customers to merchants, "similar to the effect of a buying group."  (*Id.*)

For the reasons discussed below, the Court concludes that Defendants' potential procompetitive justification does not constitute a *per se* unlawful buying cartel.

### 1.  Applicable standards

On a plaintiff's affirmative case, courts assess a challenged restraint under one of three standards to determine whether it is unreasonable and therefore in violation of the Sherman Act: the *per se* standard; the "quick look" standard; and, most often, the rule of reason.[7]  First, some

---

[7] As far as the Court is aware, whether a proffered procompetitive justification can itself make out a *per se* violation of the Sherman Act is a question of first impression.  As discussed above in section II.b.i, because courts routinely engage with procompetitive justifications at the summary judgment stage of litigation, the Court assesses the purported justification within the three-step, burden shifting framework for antitrust violations.  Because the parties refer to

restraints are so patently unreasonable as to be deemed unreasonable *per se*.  *NCAA v. Alston*, 594 U.S. 69, 89 (2021) ("[S]ome agreements among competitors so obviously threaten to reduce output and raise prices that they might be condemned as unlawful *per se* or rejected after only a quick look.").  The anticompetitive effects of these restraints are unambiguous, and courts need not carefully evaluate market realities to determine that such restraints are unreasonable.  *Id.* at 88–89.  These agreements "lack . . . any redeeming virtue" and may be condemned "without elaborate inquiry."  *1-800 Contacts*, 1 F.4th at 114–15 (citing *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958)).  This designation is used sparingly and typically applies only to agreements between competitors to fix prices or divide markets.  *Id.*; *N. Pac. Ry. Co.*, 356 U.S. at 5.  In the context of a proffered procompetitive justification, the Court agrees with Plaintiffs that a purportedly procompetitive justification that itself makes out a *per se* violation of the Sherman Act should be precluded as a matter of law.

Second, some restraints are plainly anticompetitive — such that "an observer with even a rudimentary understanding of economics" would see how the restraint harms competition, *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999) — but do not fit squarely within the proscribed *per se* categories of price fixing or market allocation.  In these cases, courts may determine unreasonableness in the "twinkling of an eye" with what is known as a "quick look."  *Alston*, 594 U.S. at 88 (quoting *NCAA v. Oklahoma*, 468 U.S. at 110).[8]  A "quick look," however, is only

Defendants' "buying group" justification with antitrust terms traditionally applied to a plaintiff's affirmative case, the Court briefly reviews the applicable standards of antitrust scrutiny and explains their relevance to Plaintiffs' motion.

[8]  The quick look approach is also described as "an abbreviated version of the rule of reason" analysis.  *United States v. Apple, Inc.*, 791 F.3d 290, 329–30 (2d Cir. 2015).  In conducting such an analysis, a court will still apply the three-step burden shifting framework, except that the plainly anticompetitive nature of the challenged conduct relieves the plaintiff of

appropriate where courts have gained enough experience with a particular type of restraint to conclude that its anticompetitive effects almost certainly outweigh any procompetitive justifications.  *Id.* at 89.  In the context of a proffered procompetitive justification, susceptibility to a "quick look" would suggest that that the justification is more likely to be anticompetitive than procompetitive — but this goes to its weight with the jury, not its preclusion as a matter of law.  *Cf. In re Publ'n Paper Antitrust Litig.*, 690 F.3d at 61 ("[W]hen the [rationale] admits of competing permissible inferences with regard to whether [it is procompetitive or anticompetitive], 'the question of what weight should be assigned to [those] inferences remains within the province of the fact-finder at a trial.'" (citation omitted)).

Third, courts most often assess challenged restraints under the "rule of reason." Determining whether a restraint is undue for purposes of the Sherman Act "presumptively" calls for a rule of reason analysis.  *Alston*, 594 U.S. at 81 (quoting *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006)).  The rule of reason requires a court to "conduct a fact-specific assessment of 'market power and market structure'" to assess a challenged restraint's "'actual effect' on competition." *Amex*, 585 U.S. at 541 (quoting *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984)).  The goal is for a court to "distinguis[h] between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest."  *Id.* (quoting *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007)).  In the context of a proffered procompetitive justification, application of the rule of reason means that the justification may likely be permissibly presented to the jury because its procompetitiveness or anticompetitiveness cannot be readily determined.  Accordingly, the

---

her burden to show an actual anticompetitive effect at the first step.  *Id.* at 330.  Unlike *per se* condemnation, however, the court will assess the defendant's procompetitive justifications for the challenged conduct.  *Id.*

weight to be afforded to such a justification "remains within the province of the fact-finder at a trial." *In re Publ'n Paper Antitrust Litig.*, 690 F.3d at 61.

Finally, not all rationales are legitimate. Some may be rejected as pretextual, *see, e.g.*, *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 658 (2d Cir. 2015), and others may be rejected because they have no relevance to economic competition, *see Alston*, 594 U.S. at 95 (discussing the Court's prior rejections of the procompetitive justifications asserted in *Professional Engineers*, 435 U.S. 679, that restraints on competitive bidding "protect[ed] public safety," and in *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411 (1990), that an agreement among defense lawyers to refuse court appointments until their compensation was increased "served some social good more important than competition").

### 2. Antitrust treatment of buying groups

Buying groups are not ordinarily subject to *per se* condemnation. As the Supreme Court has explained:

> Wholesale purchasing cooperatives . . . are not a form of concerted activity characteristically likely to result in predominantly anticompetitive effects. Rather, such cooperative arrangements would seem to be designed to increase economic efficiency and render markets more, rather than less, competitive. The arrangement permits the participating retailers to achieve economies of scale in both the purchase and warehousing of wholesale supplies, and also ensures ready access to a stock of goods that might otherwise be unavailable on short notice. The cost savings and order-filling guarantees enable smaller retailers to reduce prices and maintain their retail stock so as to compete more effectively with larger retailers.

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 295 (1985) (*Northwest Stationers*) (internal quotation marks and citation omitted) (rejecting plaintiff's claim that its expulsion from the cooperative was a *per se* violation of the Sherman Act). *Northwest Stationers* is also consistent with the line of cases holding that the activities of joint ventures are

subject to rule of reason analysis — even where the joint ventures are comprised of horizontal competitors. *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 23 (1979) ("Joint ventures and other cooperative arrangements are also not usually unlawful, at least not as price-fixing schemes, where the agreement on price is necessary to market the product at all.").

As Defendants argue, buying groups are only condemned *per se* where they involve horizontal agreements among competitors to "limit[] the price they will pay or the amount they will purchase." (Defs.' Opp'n 11 (quoting *Castro*, 2012 WL 12516573, at *5).) Even in cases involving horizontal competitors, courts do not always apply the *per se* rule. *See NCAA v. Oklahoma*, 468 U.S. at 101 ("[W]hat is critical is that this case involves an industry in which horizontal restraints on competition are essential if the product is to be available at all."); *Broad. Music*, 441 U.S. at 23; *see also Interchange Fees IV*, 2024 WL 278565, at *11 (explaining the same). Moreover, the *per se* rule is used sparingly and typically applies only to *agreements between competitors* to fix prices or divide markets. *See 1-800 Contacts*, 1 F.4th at 114–15. In addition, the Supreme Court's treatment of the purchasing collective at issue in *Northwest Stationers* undermines Plaintiffs' arguments. *See* 472 U.S. 284. There, the Supreme Court evaluated whether the expulsion of a member from the buying group constituted a *per se* violation of the Sherman Act — the lawfulness of the buying group itself was not questioned. *See, e.g., id.* at 295 ("[The plaintiff], of course, does not object to the existence of the cooperative arrangement, but rather raises an antitrust challenge to [the defendant]'s decision to bar [the plaintiff] from continued membership."). Further, Plaintiffs offer no evidence to suggest that cardholders have agreed among themselves, tacitly or otherwise, to appoint Visa or Mastercard as their agent to extract lower prices from merchants. In the absence of any evidence suggesting horizontal agreement or conspiracy among cardholders, the Court accepts for purposes of this

17

decision, that cardholders have entered into vertical agreements with the networks.  Vertical agreements are subject to the rule of reason because vertical restraints have "real potential to stimulate interbrand competition."  *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 724 (1988); *see also United States v. Aiyer*, 33 F.4th 97, 119 (2d Cir. 2022) ("[T]he rule of reason, rather than the *per se* rule, [is] "the appropriate standard to judge vertical price restraints." (quoting *Leegin*, 551 U.S. at 899)).

Because Defendants' procompetitive justification would be evaluated under the rule of reason, the Court concludes that Plaintiffs have not met their burden to show that the justification is "not cognizable" as a matter of law.  Accordingly, the Court will not preclude the justification on this basis.

### iii.   Plaintiffs have not demonstrated that the purported buying group is unlawfully tied to Defendants' transaction services

Plaintiffs argue that "Defendants have unlawfully tied their claimed buying-group services to the merchants' acceptance of the Defendants' credit-card transactions."  (Pls.' Mem. 13.)  They assert that "Defendants have failed as a matter of law to establish the lawfulness of the tie-in, so . . . their proffered procompetitive justification is not cognizable."  (*Id.*)  Plaintiffs argue that Defendants are required to show:

> (1) the tying arrangement does not affect a substantial amount of interstate commerce; (2) the two products are not distinct; (3) the Defendants did not actually tie the sale of the two products; (4) the Defendants did not have appreciable market power in the market for credit-card transactions; or (5) the tie had no anticompetitive effect.

(*Id.* at 14.)  Plaintiffs assert that the first element is satisfied as a matter of law by the court's ruling in *In re Visa Check/MasterMoney Antitrust Litig.*, No. 96-CV-5238, 2003 WL 1712568, at *2 (E.D.N.Y. Apr. 1, 2003), finding that "Visa and Mastercard's tying of their debit cards to the credit cards affected a substantial amount of commerce."  (*Id.*)  They also assert that "[t]he tying

arrangement undoubtedly affects a substantial amount of commerce" because "[i]n 2016, more than $1 trillion in U.S. sales were made with Visa credit cards," and "more than $600 billion in sales" were made with Mastercard credit cards.  (*Id.*)  Second, Plaintiffs argue that Defendants' "buying group" services are "plainly distinct from their credit-card transactions" because Defendants "offered credit-card transactions unconnected to any rewards" and did so "for many years."  (*Id.* at 15.)  Third, Plaintiffs argue that it is "similarly indisputable" that Defendants tied the "buying group" services to merchants' acceptance of credit-card transactions because "Professor Murphy candidly admit[ted] that the Defendants 'condition[] merchants' acceptance of cards on an agreement to offer cardholders discounts.'"  (*Id.* (quoting Pls.' 56.1 ¶ 4).)  Finally, Plaintiffs argue that the last two requirements "are established by the procedural posture of this motion," because procompetitive justifications "arise[] only if the Plaintiffs have first shown the Defendants' market power and an anticompetitive effect."  (*Id.* at 16.)

Defendants first argue that the burden is on Plaintiffs "to prove, among other things, that the tying and the tied product are 'separate product[s],' that the seller has market power in the tying product, and that 'the tie-in has anticompetitive effects in the tied market.'"  (Defs.' Opp'n 13 (quoting *Kaufman v. Time Warner*, 836 F.3d 137, 141 (2d Cir. 2016)).)  Second, Defendants argue that "Plaintiffs' tying argument fails on at least three distinct grounds: no tie between separate products; no evidence of anticompetitive effects in the tied product market; and no showing that Defendants have market power in the tying product market."  (*Id.*)  Third, Defendants contend that "Plaintiffs have made no attempt to demonstrate . . . that the purported buying group services constitute a separate or distinct 'product' from payment card transactions," and "[a]ny suggestion . . . that payment card transactions and rewards . . . are separate products in distinct markets is contrary to the Supreme Court's treatment of rewards as

19

one component of the price of transactions in the single, two-sided transactions market." (*Id.* at 13–14 (first citing *Eastman Kodak*, 504 U.S. at 462–63; and then citing *Amex*, 585 U.S. at 548).) They argue that this conclusion is reinforced by the fact that Visa and Mastercard do not "sell rewards . . . separately from transactions." (*Id.* at 14.)  Finally, Defendants argue that Plaintiffs have failed to show that "Defendants have market power in the purported tying market or that there are any anticompetitive effects in the purported tied market." (*Id.* at 16.)

For the reasons discussed below, the Court finds that Plaintiffs have not met their burden to show that Defendants' purported buying group justification is a *per se* unlawful tying arrangement.  Accordingly, the Court will permit Defendants to offer this justification.  Because the parties dispute the burden of production on Plaintiffs' motion, the Court first reviews the applicable procedural law before discussing the merits of Plaintiffs' arguments.

### 1. Plaintiffs bear the burden of demonstrating that, as a matter of law, Defendants' proffered rationale constitutes a *per se* unlawful tying arrangement

Plaintiffs' motion raises two competing principles regarding the burdens of proof and production.  First, the law is clear that Defendants bear the burden of proof as to any proffered procompetitive justification.  *Alston*, 594 U.S. at 96 ("'[T]he plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect.'  Should the plaintiff carry that burden, the burden then 'shifts to the defendant to show a procompetitive rationale for the restraint.'" (quoting *Amex*, 585 U.S. at 541)); *see also Cap. Imaging Assocs.*, 996 F.2d at 543 ("After the plaintiff satisfies its threshold burden of proof under the rule of reason, the burden shifts to the defendant to offer evidence of the pro-competitive 'redeeming virtues' of their combination." (citation omitted)).  The law is also clear that, on a motion for summary judgment, the burden of production necessary to survive a motion for summary judgment attaches to the party who would bear the burden of proof on that element at trial.  *Celotex*, 477 U.S. at 322

("Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").  Second, the Court is required to draw all reasonable inferences in favor of Defendants, as the nonmovants.  *See Radwan*, 55 F.4th at 113; *Koral*, 36 F.4th at 408.  Similarly, Defendants are not required to counter Plaintiffs' motion with affidavits or other affirmative evidence.  It is incumbent on Plaintiffs — as movants — to point to the absence of evidence in support of an element on which the Defendants would bear the burden at trial.  *McKinney*, 49 F.4th at 738; *El-Nahal*, 835 F.3d at 252.

Contrary to Plaintiffs' arguments, Defendants are not required to "establish the lawfulness of the tie-in."  (Pls.' Mem. 13.)  Rather, Plaintiffs must "point to an absence of evidence to support an essential element" of Defendants' proffered procompetitive justification.  *El-Nahal*, 835 F.3d at 252 (citation omitted).  Defendants only bear the burden of "establish[ing] the existence of an element essential to [their] case, and on which [they] will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  Because Defendants only seek to offer the buying group rationale as a procompetitive justification, they need not disprove the elements of an unlawful tying arrangement.  Plaintiffs seek to exclude Defendants' rationale as a *per se* unlawful tying arrangement; accordingly, they bear the burden of showing that "no reasonable jury" could find otherwise.  *Cruz v. 32BJ SEIU*, No. 22-2753, 2024 WL 676237, at *2 (2d Cir. Feb. 20, 2024).

> ### 2.   Plaintiffs have failed to show that, as a matter of law, Defendants' proffered rationale constitutes a *per se* unlawful tying arrangement

Tying involves the linking of two separate products from two separate product markets.  *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 21 (1984), *abrogated on other grounds*

by *Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006).[9]  "[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Id.* at 12. Tying arrangements may be evaluated under Section 1 of the Sherman Act under either *per se* or rule of reason analysis. *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1044 (N.D. Cal. 2021) (citing *Jefferson Parish*, 466 U.S. at 29).  A tying arrangement may be condemned *per se* "if the seller has 'appreciable economic power' [*i.e.*, market power] in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market." *Eastman Kodak*, 504 U.S. at 462 (quoting *Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 503 (1969)).[10]

> As the Second Circuit has stated:

> To state a valid tying claim under the Sherman Act, a plaintiff must allege facts plausibly showing that: (i) the sale of one product (the tying product) is conditioned on the purchase of a separate product (the tied product); (ii) the seller uses actual coercion to force buyers to purchase the tied product; (iii) the seller has sufficient economic power in the tying product market to coerce purchasers into buying the tied product; (iv) the tie-in has anticompetitive effects in the tied market; and (v) a not insubstantial amount of interstate commerce is involved in the tied market.

*Kaufman*, 836 F.3d at 141.

---

[9]  In *Illinois Tool Works*, the Supreme Court noted: "Over the years, . . . th[e] Court's strong disapproval of tying arrangements has substantially diminished.  Rather than relying on assumptions, in its more recent opinions the Court has required a showing of market power in the tying product."  547 U.S. at 35.

[10]  "In order to prevail in the absence of per se liability [*i.e.*, in the absence of a showing of market power], [a plaintiff] has the burden of proving that the . . . contract violated the Sherman Act because it unreasonably restrained competition.  That burden necessarily involves an inquiry into the actual effect of the exclusive contract on competition." *Jefferson Parish*, 466 U.S. at 29.

Plaintiffs' motion fails on the first element because Plaintiffs have failed to demonstrate as a matter of law that the challenged "buying group" discount is in fact a separate product. "[T]he tying product and tied product must be separate, *i.e.*, each must be in a separate and distinct product market." *Id.* As the Court recently explained in *Interchange Fees V*, interchange fees are not distinct products that are purchased; instead, they are a component of the price paid for card-acceptance services. 2024 WL 1014159, at *16 ("Because interchange fees are a component of the price paid for card-acceptance services, this dispute over the identity of the payor contributes to the dispute of material fact of whether merchants are direct purchasers of card-acceptance services."); *see also id.* at *17 ("As a threshold matter, it is not clear to the Court that any party is a 'direct purchaser' of chargebacks. Instead, chargebacks — like interchange and network fees — appear to be a component of the price paid for card-acceptance services.")

As Prof. Murphy explains, interchange fees fund rewards to cardholders. (*See* Defs.' 56.1 Resp. ¶ 5 (explaining that interchange fee "revenues [can be used] to reduce cardholder fees or to fund other cardholder benefits, such as rewards" (quoting Murphy Rep. ¶ 144)).) Further, the Court agrees with Defendants to the extent they argue that Plaintiffs' separation of transactions and rewards "is contrary to the Supreme Court's treatment of rewards as one component of the price of transactions in the single, two-sided transactions market." (Defs.' Opp'n 14 (citing *Amex,* 585 U.S. at 548).)

Drawing all reasonable inferences in favor of the nonmovants, the Court also concludes that a reasonable jury could find that Defendants' "buying group" is not a separate product in a separate market. According to Plaintiffs, what Defendants offer to merchants is a package deal: (1) card-acceptance services; and, (2) "additional customers and sales to the merchant in exchange for a discount." (Murphy Rep. ¶ 144.) The Court is not persuaded by Plaintiffs'

arguments regarding the analogies made by Defendants' experts.  Plaintiffs rely on Prof.

Murphy's claim that this rationale "is *similar* to a variety of other value-enhancing business

practices in retail trade and elsewhere."  (*Id.* (emphasis added).)  Prof. Murphy states:

> This exchange is *similar* to that which "buyers' clubs," or the designation as a "preferred provider," offers: an entity such as Costco or a group purchasing organization offering sellers a shift in demand in exchange for reduced prices for the buyers the entity represents. As I explain below, *this is also the economic force behind retail intermediaries* that deliver customers to major retailers in exchange for a discount or rebate provided to the customer, such as Mr. Rebate, Ebates and Hoopla Doopla.

(*Id.* ¶ 144 n.216 (emphases added).)  The fact that buying clubs and Defendants' networks have

similar effects and share certain characteristics does not mean they are the same.  Similarly, Prof.

Elzinga explains, "The Visa and Mastercard platforms *in effect* assemble 'buying groups' of

consumers and offer them to merchants."  (Elzinga Rep. 152 (emphasis added).)  Likewise, just

because Visa and Mastercard operate *in effect* like buying groups does not mean they are

*actually* buying groups.  Further supporting the inference that card-acceptance services and the

"buying group" discount are not separate products in distinct markets is the fact that merchants

cannot buy card-acceptance services without the expectation that accepting Defendants' cards

will bring them more customers and more revenue — and this is true with or without the

discount; what distinguishes the discount (and its concomitant rewards) is that it makes

Defendants' credit cards more attractive relative to their debit cards on the cardholder side.  As

*Amex* explains, the Court cannot consider the effects of some challenged activity on one side of

the market without assessing its corresponding effects on the other side.  585 U.S. at 546

("[C]ompetition cannot be accurately assessed by looking at only one side of the platform in

isolation.").  Defendants are therefore entitled to the reasonable inference that Plaintiffs'

purported "buying group" is not a separate product in a "separate and distinct product market,"

and is instead a component of a credit-card transaction that "is simply satisfying consumer demand." *Kaufman*, 836 F.3d at 141–42.  Accordingly, the Court finds that Plaintiffs have not met their burden to show that the "buying group" rationale constitutes an unlawful *per se* tying arrangement.

### iv.   Defendants' buying group rationale is not impermissibly one-sided

Plaintiffs argue that the "buying group" rationale should be rejected because "Defendants offer a *one-sided* procompetitive justification."  (Pls.' Mem. 1.)  In addition, they argue that "*AmEx* provides no basis for Defendants to defend against a finding of supracompetitive [t]otal [p]rices of credit-card transactions by proffering the rationale that the rewards are one-sided discounts to buying groups."  (Pls.' Reply 4 n.19.)

Defendants argue that "Professors Murphy and Elzinga analyzed two-sided procompetitive effects of the challenged network rules," opining that "Visa and Mastercard cardholders receive an effective discount . . . from which merchants also benefit in the form of increased sales."  (Defs.' Opp'n 8–9 (emphasis removed).)  Further, "Professors Murphy and Elzinga explained that these features make Visa and Mastercard transactions attractive to *both* merchants and cardholders, expand the number of transactions that occur over the Visa and Mastercard networks, and help them compete against other forms of payment."  (*Id.* at 9.)

The Court agrees with Defendants that Profs. Murphy and Elzinga properly describe the two-sided effects of their proffered rationale.  A purportedly procompetitive justification that might not pass muster in a one-sided market may in fact be procompetitive in a two-sided market because the networks stand in between merchants and cardholders.  If Defendants merely exercised their market power and bargaining power to extract rents from merchants, this one-sided conduct is likely anticompetitive and would likely be illegitimate as a procompetitive

justification.  *See Clarett*, 306 F. Supp. 2d at 409 ("[A defendant's] desire to keep its costs down is not a legitimate procompetitive justification.").  If, however, Defendants are able to extract discounts from merchants and offer them to cardholders, thus making credit cards more attractive to cardholders, this two-sided justification is likely valid.  *See Interchange Fees IV*, 2024 WL 278565, at *9 ("What may appear anticompetitive on one side of the market may in fact be procompetitive on the other side, and vice-versa."); *Amex*, 585 U.S. at 546 ("[C]ompetition cannot be accurately assessed by looking at only one side of the platform in isolation.").  Accordingly, the Court will not preclude the "buying group" rationale on the basis that it is impermissibly one-sided.

### III.  Conclusion

For the foregoing reasons, the Court denies Plaintiffs' motion for partial summary judgment as to Defendants' purported "buying group" justification.

Dated:  March 11, 2024
         Brooklyn, New York

SO ORDERED:

_____/MKB_____
MARGO K. BRODIE
United States District Judge

26