**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7140**

WRITER'S EMAIL ADDRESS
marcgreenwald@quinnemanuel.com

March 22, 2024

**VIA ECF**
The Honorable Margo K. Brodie
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:   *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 05-MD-1720-MKB-JAM (E.D.N.Y.); *Block, Inc. v. Visa Inc. et al.*, 23-cv-5377-MKB-JAM (E.D.N.Y.)

Dear Chief Judge Brodie:

On behalf of Block, Inc. (and its business Square), we respectfully submit this response to the March 19, 2024 letter from Class Counsel, which responds to the Court's invitation to share their position regarding the present dispute about Square's claims. ECF 9158.

Square agrees with Class Counsel that the question of direct purchaser status (and thus of Settlement Class membership) "is a factual matter that must be analyzed" in light of the record evidence. *Id.* at 2. While sharing what they "believe" about the status of PayFacs generally, as one potential view for this Court to consider in evaluating the motions, Class Counsel acknowledge that they "have not considered" the full factual record presented "in the motions referenced in this Court's order, that could impact this conclusion." *Id.* Helpfully, however, Class Counsel identify four "factors that may inform the decision" based on the record evidence. *Id.* Square agrees that those factors are relevant to the Court's consideration of this important issue, and writes to highlight how the evidentiary record on each factor strongly supports a finding that Square was the direct purchaser of card-acceptance services from Visa and Mastercard, and thus a member of the Settlement Class (until it validly opted out), and Square Sellers were not.

**1. Square's "contracts with the underlying merchants, the acquiring bank, and/or the networks"**: For the transactions at issue, ***Square*** is the entity that negotiated and entered into the relevant contracts with the networks that allowed Square to "accept" Visa and

quinn emanuel urquhart & sullivan, llp

LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | SEATTLE | BOSTON | SALT LAKE CITY
LONDON | TOKYO | MANNHEIM | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS | ZURICH | SHANGHAI | PERTH | STUTTGART

Mastercard cards as the "merchant of record."[1]  Square's contracts with its acquiring banks expressly required *Square*, as the merchant of record, to "▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌"[2]  Square also negotiated and entered into contracts with Visa and Mastercard that set the price of Square's card acceptance—*i.e.*, interchange fees owed by Square.[3]  In contrast, Square Sellers did *not* contract with the networks to purchase card-acceptance services.  Rather, they purchased services from Square by contracting with Square.  This first factor thus strongly supports a finding that Square was the direct purchaser of card-acceptance services from Visa and Mastercard.

       **2.  How the "networks set the price for card acceptance services"**:  The Court has held that "interchange fees are a component of the price paid for card-acceptance services" and that "the identity of the direct payor may be probative of the identity of the direct purchaser." ECF 9151 at 39, 28.  Here, the record demonstrates that the networks set the interchange fees for Square transactions pursuant to the contracts they negotiated with *Square*.  Square was obligated to pay those interchange fees, and Square paid ▌▌▌▌▌▌▌▌▌▌▌▌ fees over time, which Square recorded as expenses.[4]  Notably, some of Square's contracts with Visa and Mastercard set the interchange fee for Square transactions as part of an overall ▌▌▌▌▌▌▌▌▌▌▌ provided to Square.[5]  Such a structure applied because *Square* was in charge of card acceptance, and thus Square could be ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌.  In contrast, the networks did not set prices for individual Square Sellers, and Square Sellers did not pay interchange fees to the networks.  This second factor, therefore, also strongly supports a finding that Square was the direct purchaser.

---

    [1]  *See, e.g.*, Ex. S2 ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌; Ex. S6 ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌.

    [2]  Ex. S2 §3.3.

    [3]  *See, e.g.,* Ex. S8 ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌; Ex. S10 ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌; Ex. S11 ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌; Ex. S12 ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌; Ex. S13 ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌.

    [4]  Ex. S18 (Square, Inc. 10-K dated Mar. 10, 2016), 6 ("Square will ultimately pay the Issuing Bank an interchange fee as a percentage of the amount of the transaction plus a fixed fee per transaction, which together average between 1.5% to 2.0% of the transaction amount."); *id.*, 19 ("We are required to pay interchange fees and assessments to the payment card networks[.]"); Ex. S15 (Block, Inc. 10-K dated Feb. 23, 2023), 40 ("We are required to pay interchange and assessment fees, processing fees, and bank settlement fees to third-party payment processors, payment networks, and financial institutions.").

    [5]  *See e.g.*, Ex. S12 ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌; Ex. S13 ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌.

Class Counsel briefly speculate that a PayFac may have an agency relationship involving "either acquirers or merchants" but note that any such relationship presents "a factual matter that must be analyzed." ECF 9158 at 2. Defendants, however, did not argue that Square was an agent of acquirers or that it was merely a "purchasing agent" for its customers. Nor could Defendants credibly do so in light of the facts. Square entered into all of the relevant contracts on its own behalf, for its own economic benefit, and not as an agent for its Sellers. Most importantly, as it relates to the direct purchaser rule, Square is indisputably "a distinct economic entity" in the distribution chain that did much more than merely "securing an offer" from a seller for a purchaser. *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 7805628, at *14–15 (N.D. Cal. Aug. 4, 2016) (purchasing agent is an entity that "is merely an extension of the principal"), rev'd on other grounds, 720 F.App'x 835 (9th Cir. 2017). In fact, Square provides a suite of products and services to its Sellers, including proprietary software and hardware (like the Square Reader) that enable Sellers' customers to use payment cards. Square's point-of-sale software and other business services help Sellers manage inventory, locations, and employees; access financial services; engage buyers; build a website or online store; and grow sales.

**3. Whether Square is "responsible for compliance with the networks' rules"**: ***Square*** is directly responsible for compliance with the networks' rules,[6] including rules that require Square to pay the applicable interchange fee and the Honor All Cards Rules, which Square allege led to Square directly paying inflated interchange fees. That Square is the entity directly bound by the challenged rules clearly makes Square the proper plaintiff to challenge them under federal law. As the merchant of record, Square is also required to bear all financial responsibility for the transactions.[7] This factor, like the first two, strongly supports a finding that Square is the direct purchaser.

**4. "[T]he flow of funds among the various players" in the transactions**: Finally, the "flow of funds" also strongly supports Square's direct purchaser status as it is effectively identical to the "flow of funds" for the Direct Action Plaintiffs that were the subject of the Court's recent ruling. *See* ECF 9151 at 37. As with those entities, the issuer deducts the interchange fee applying to Square's transactions before the remaining funds are sent to ***Square's*** acquiring bank. Square Sellers are not part of this flow of funds. Rather, pursuant to their contracts with Square, Square Sellers separately pay ***to Square*** fees set ***by Square*** for the suite of services that Square provides to them, including, among other things, Square's "best-in-class point-of-sale software."[8]

As the direct payor of interchange fees, Square is best positioned to seek overcharge damages for those payments, consistent with the bright-line rule of *Illinois Brick*. In contrast, if only Square Sellers could seek overcharge damages under federal law for the interchange fees that they did not pay (and have little or no visibility into), they would have to "trace the complex

---

[6] *See, e.g.,* Ex. S2 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇; Ex. S6 ▇▇▇▇▇▇▇

[7] *See* note 2, *supra*.

[8] *See e.g.*, Ex. S7 (Squareup.com, *Learn About Square's Fees*).

economic adjustments to a change in the cost of a particular factor of production" through a distribution chain, a laborious and uncertain process the Supreme Court cautioned "would greatly complicate and reduce the effectiveness of already protracted treble-damages proceedings." *See Illinois Brick Co. v. Illinois*, 431 U.S. 720, 732 (1977).

*   *   *   *

In sum, in light of the undisputed evidentiary record, each of the four relevant factors identified by Class Counsel decidedly points in favor of holding that Square was the direct purchaser of card-acceptance services as compared to its customers. Square Sellers have expressly disclaimed having purchased such services from the networks or acquirers, and can only be considered to be ***indirect*** purchasers and payors. That is why Square Sellers have filed indirect purchaser claims, which should be allowed to move forward, just as Square's direct purchaser claims should be allowed to move forward. Finally, it bears emphasis that such an outcome is consistent with the notice program for the Rule 23(b)(3) Class Settlement, which (as Class Counsel do not dispute) was not designed to give Square Sellers direct notice, as would have been constitutionally required if they were actually in the Class (which they were not).

Respectfully submitted,

*/s/ Marc L. Greenwald*

Marc L. Greenwald


cc:     All Counsel of Record via ECF