**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | MDL No. 1720<br><br>Docket No. 05-md-01720 (MKB-JAM) |
| This Document Relates To:<br><br>BARRY'S CUT RATE STORES INC.; DDMB, INC. d/b/a EMPORIUM ARCADE BAR; DDMB 2, LLC d/b/a EMPORIUM LOGAN SQUARE; BOSS DENTAL CARE; RUNCENTRAL, LLC; CMP CONSULTING SERV., INC.; TOWN KITCHEN, LLC d/b/a TOWN KITCHEN & BAR; GENERIC DEPOT 3, INC. d/b/a PRESCRIPTION DEPOT; and PUREONE, LLC d/b/a SALON PURE,<br><br>    Plaintiffs,<br>  v.<br><br>VISA, INC.; MASTERCARD INCORPORATED; MASTERCARD INTERNATIONAL INCORPORATED; BANK OF AMERICA, N.A.; BA MERCHANT SERVICES LLC (f/k/a DEFENDANT NATIONAL PROCESSING, INC.); BANK OF AMERICA CORPORATION; BARCLAYS BANK PLC; BARCLAYS BANK DELAWARE; BARCLAYS FINANCIAL CORP.; CAPITAL ONE BANK, (USA), N.A.; CAPITAL ONE F.S.B.; CAPITAL ONE FINANCIAL CORPORATION; CHASE BANK USA, N.A.; CHASE MANHATTAN BANK USA, N.A.; CHASE PAYMENTECH SOLUTIONS, LLC; JPMORGAN CHASE BANK, N.A.; JPMORGAN CHASE & CO.; CITIBANK (SOUTH DAKOTA), N.A.; CITIBANK N.A.; CITIGROUP, INC.; CITICORP; and WELLS FARGO & COMPANY,<br>    Defendants. | **EQUITABLE RELIEF CLASS PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT** |

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................... iii

I.     INTRODUCTION ................................................................................ 1

II.    PROCEDURAL BACKGROUND ...................................................... 3

     A.     Second Circuit Opinion and Bifurcation of Damages and Equitable Relief Classes .................................................................. 3

     B.     Commencement of a Separate and Distinct Rule 23(b)(2) Action ........................ 4

     C.     Discovery .................................................................................... 5

     D.     Class Certification ....................................................................... 6

     E.     Summary Judgment and *Daubert* Motions .............................. 8

     F.     Settlement Negotiations ............................................................ 10

III.   TERMS AND BENEFITS OF THE SETTLEMENT ...................... 11

IV.   PRELIMINARY APPROVAL IS APPROPRIATE BECAUSE THE SETTLEMENT IS LIKELY TO GAIN FINAL APPROVAL ........ 23

     A.     The Governing Standards on Preliminary Approval ............... 23

     B.     The Settlement Has No Obvious Deficiencies and Directly Addresses and Resolves the Problems the Second Circuit Identified In Reversing the 2012 Agreement .............................. 26

     C.     The Proposed Settlement Provides Valuable Relief to the Equitable Relief Class ................................................................ 32

     D.     Consideration of the Final Approval Factors Supports Preliminary Approval of the Proposed Settlement .................. 32

     E.     The Class Representatives and Class Counsel Have Adequately Represented the Equitable Relief Class and the Settlement Resulted from Arm's-Length Negotiations by Experienced and Informed Counsel with the Assistance of a Nationally Renowned Mediator ......... 34

     F.     The Settlement Provides Adequate Relief to the Class ........... 37

           1.     The Costs, Risks, and Delay of Trial and Appeal ........ 38

                a.     The Complexity, Expense, and Likely Duration of the Litigation .............................................. 39

                b.     The Risks of Establishing Liability ................. 39

                c.     The Risk of Maintaining the Class Through Trial ......................... 42

i

2. The Effectiveness of any Proposed Method of Distributing Relief to the Class, Including the Method of Processing Class Member Claims, If Required ................................................................ 43

3. The Terms of any Proposed Award of Attorneys' Fees, Expenses and Plaintiffs' Service Awards, Including Timing of Payment ...................... 43

4. Agreements Required to be Identified under Rule 23(e)(3) .................... 45

G. The Settlement Treats Class Members Equitably Relative to Each Other .......... 45

1. The reaction of the Class to the Settlement ............................................. 46

2. The stage of the proceedings.................................................................... 46

3. The Ability of Settling Defendants to Withstand a Greater Judgment ..... 47

4. The Reasonableness of the Settlement Considering the Best Possible Recovery and the Attendant Risks of Litigation....................................... 48

V. THE COURT SHOULD AUTHORIZE DISSEMINATION OF NOTICE TO THE EQUITABLE RELIEF CLASS ............................................................................. 50

VI. PROPOSED TIMELINE FOR NOTICE AND FINAL APPROVAL ............................ 55

VII. CONCLUSION.................................................................................................... 56

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Advanced Battery Techs., Inc. Sec. Litig.*,
   298 F.R.D. 171 (S.D.N.Y. 2014) ........................................................................38

*In re Allstate Ins. Co*,
   400 F.3d 505 (7th Cir. 2008) .............................................................................53

*In re American Express Anti-Steering Rules Antitrust Litig.*, Mem. & Order, No. 11-MD-02221-
   NGG-RER, ECF No. 335 (E.D.N.Y. Feb. 11, 2014) ..........................................31

*In re AOL Time Warner, Inc. Sec. & ERISA Litig.*,
   No. 02 Civ. 5575, 2006 WL 903236 (S.D.N.Y. Apr. 6, 2006)........................46, 47

*In re Austrian & German Bank Holocaust Litig.*,
   80 F. Supp. 2d 164 (S.D.N.Y. 2000), *aff'd, D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d Cir.
   2001) ..................................................................................................................35

*Authors Guild v. Google, Inc.*,
   No. 05-8136, 2009 WL 4434586 (S.D.N.Y. Dec. l, 2009) ...................................32

*Babcock v. C. Tech Collections, Inc.*,
   2017 WL 1155767 (E.D.N.Y. Mar. 27, 2017) .....................................................44

*Barry's Cut Rate Stores Inc. v. Visa, Inc.*,
   No. 05-MD-1720 (MKB)(JO), 2019 WL 7584728 (E.D.N.Y. Nov. 20, 2019).....................25

*Baumgarten v. CleanWell LLC*,
   2017 WL 11648985 (E.D.N.Y. Aug. 21, 2017).....................................................49

*In re Bear Stearns Companies, Inc. Sec. Derivative & ERISA Litig.*,
   909 F. Supp. 2d 259 (S.D.N.Y. 2012)..................................................................43

*Bellifemine v. Sanofi-Aventis U.S. LLC*,
   No. 07 Civ. 2207 (JGK), 2010 WL 3119374 (S.D.N.Y. Aug. 6, 2010) .................42

*Benzio v. General Electric Co.*,
   655 F. Supp.2d 162 (N.D.N.Y. 2009)...................................................................44

*Blessing v. Sirius XM Radio Inc.*,
   2011 WL 3739024 (S.D.N.Y. Aug. 24, 2011), *aff'd*, 507 F. App'x 1
   (2d Cir. Dec. 20, 2012) .......................................................................................44

*Caballero by Tong v. Senior Health Partners, Inc.*,
2018 WL 4210136 (E.D.N.Y. Sept. 4, 2018) ..........................................................47, 48, 49

*Calibuso v. Bank of America Corp.*,
2013 WL 12370127 (E.D.N.Y. Dec. 27, 2013) ........................................................................49

*Carson v. Am. Brands, Inc.*,
450 U.S. 79 (1981) ...................................................................................................................38

*Charron v. Wiener*,
731 F.3d 241 (2d Cir. 2013)....................................................................................................49

*In re Checking Acct. Overdraft Litig.*,
694 F. Supp. 2d 1302 (S.D. Fla. 2010) ...................................................................................25

*Cholakan v. Mercedes-Benz, USA LLC*,
281 F.R.D. 534 (C.D. Cal. 2012) ............................................................................................53

*In the Matter of Ciba–Geigy Ltd.*,
123 F.T.C. 842, 1997 WL 33483248 (Mar. 24, 1997)............................................................30

*Cinelli v. MCS Claim Servs., Inc.*,
236 F.R.D. 118 (E.D.N.Y. 2006) ............................................................................................39

*In re CitiGroup Inc. Bond Litig.*,
296 F.R.D. 147 (S.D.N.Y. 2013) ............................................................................................35

*City of Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974)............................................................................................ *passim*

*Commonwealth v. Beth Israel Lahey Health, Inc.*,
C.A. No. 2018-3703 (Mass. Superior Ct. Nov. 29, 2018) .....................................................30

*County of Suffolk v. Long Island Lighting Co.*,
710 F. Supp. 1428 (E.D.N.Y. 1989), *aff'd in relevant part*, 907 F.2d 1295 (2d Cir. 1990)....29

*In re Currency Conversion Fee Antitrust Litig.*,
2006 WL 3253037 (S.D.N.Y. Nov. 8, 2006)..........................................................................49

*In re Currency Conversion Fee Antitrust Litig.*,
263 F.R.D. 110 (S.D.N.Y. 2009), *aff'd, Priceline.com, Inc. v. Silberman*, 405 F. App'x 532
(2d Cir. 2010).............................................................................................................36, 40, 44

*DDMB, Inc. v. Visa, Inc.*
No. 05-1720, 2021 WL 6221326 (E.D.N.Y. Sept. 27, 2021) .......................................... *passim*

*Dial Corp. v. News Corp.*,
317 F.R.D. 426 (S.D.N.Y. 2016) ......................................................................................33, 45

iv

*Doe #1 by Parent #1 v. New York City Dep't of Educ.*,
   2018 WL 3637962 (E.D.N.Y. July 31, 2018) ........................................................................47

*Dupler v. Costco Wholesale Corp.*,
   705 F. Supp.2d 231 (E.D.N.Y. 2010) ...................................................................................44

*EB v. New York City Dep't of Educ.*,
   2015 WL 13707092 (E.D.N.Y. July 24, 2015) ......................................................................48

*EB, LB1, HG, KSG, AJ, IP, SM, JW DR v. New York City Department of Education*,
   2015 WL 13707091 (E.D.N.Y. May 19, 2015) ......................................................................49

*Ebbert v. Nassau County*,
   2011 WL 6826121 (E.D.N.Y. Dec. 22, 2011) .......................................................................44

*Elkind v. Revlon Consumer Products Corp.*,
   2017 WL 9480894 (E.D.N.Y. Mar. 9, 2017) .........................................................................50

*In re Enron Corp. Sec. Derivative & ERISA Litig.*,
   2003 WL 22962792 (S.D. Tex. Nov. 5, 2003) ......................................................................37

*Fero v. Excellus Health Plan, Inc.*,
   2022 WL 1292133 (W.D.N.Y. Apr. 29, 2022) ......................................................................49

*Fleisher v. Phoenix Life Ins. Co.*,
   Nos. 11-cv-8405 (CM), 14-cv-8714 (CM), 2015 WL 10847814 (S.D.N.Y. Sept. 9, 2015)
   ......................................................................................................................................24, 37, 38

*FTC v. Butterworth Health Corp.*,
   946 F. Supp. 1285 (W.D. Mich. 1996), *aff'd*, 121 F.3d 708 (6th Cir. 1997).........................30

*In re Global Crossing Sec. and ERISA Litig.*,
   225 F.R.D. 436 (S.D.N.Y. 2004) ..........................................................................................49

*Grottano v. City of New York*,
   2022 WL 2763815 (S.D.N.Y. Jul. 15, 2022) ........................................................................44

*Gulbankian v. MW Mfs., Inc.*,
   2014 WL 7384075 (D. Mass. Dec. 29, 2014) .......................................................................37

*Hall v. ProSource Techs., LLC*,
   No. 14-cv-2502 (SIL), 2016 WL 1555128 (E.D.N.Y. Apr. 11, 2016) ...................................50

*Hart v. BHH, LLC*,
   2020 WL 5645984 (S.D.N.Y. Sept. 22, 2020)......................................................................44

*Hill v. City of New York*,
   2019 WL 1900503 (E.D.N.Y. Apr. 29, 2019) .......................................................................49

*Holmes v. Continental Can Co.*,
  706 F.2d 1444 (11th Cir. 1983) ........................................................................53

*Hyland v. Navient Corp.*,
  2020 WL 6554826 (S.D.N.Y. Oct. 9, 2020), *aff'd*, 48 F.4th 110 (2d Cir. 2022) ...................49

*In re IMAX Sec. Litig.*,
  283 F.R.D. 178 (S.D.N.Y. 2012) ..................................................................36, 46

*In re Initial Pub. Offering Sec. Litig.*,
  226 F.R.D. 186 (S.D.N.Y. 2005) ........................................................................24

*Jefferson v. Ingersoll Int'l Co.*,
  195 F.3d 894 (7th Cir. 1999) ..........................................................................54

*Jermyn v. Best Buy Stores, L.P.*,
  2012 WL 2505644 (S.D.N.Y. June 27, 2012) .............................................................44

*Johnson v. Kendall*,
  2023 WL 6227678 (D. Conn. Sept. 26, 2023) ............................................................49

*In re Joint E. & S. Districts Asbestos Litig.*,
  120 B.R. 648 (E.D.N.Y. & S.D.N.Y. 1990) ..............................................................30

*Kelen v. World Fin. Network Nat. Bank*,
  302 F.R.D. 56 (S.D.N.Y. 2014) ........................................................................36

*Kemp-Delisser v. Saint Francis Hospital & Medical Center*,
  2016 WL 6542707 (D. Conn. Nov. 3, 2006) .............................................................44

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
  2014 WL 6851096 (S.D.N.Y. Dec. 2, 2014) .............................................................24

*In re Literary Works in Electronic Databases Copyright Litig.*,
  654 F.3d 242 (2d Cir. 2011).........................................................................24

*M.G. v. New York City Department of Education*,
  2021 WL 3560764 (S.D.N.Y. Mar. 8, 2021) ............................................................49

*In re Marsh ERISA Litig.*,
  265 F.R.D. 128 (S.D.N.Y. 2010) ...................................................................50, 53

*Martin v. Weiner*,
  2007 WL 4232791 (W.D.N.Y. Nov. 28, 2007) ...........................................................50

*Mayhew v. KAS Direct LLC*,
  2018 WL 3122059 (S.D.N.Y. June 26, 2018) ...........................................................49

*McBean v. City of New York*,
   233 F.R.D. 377 (S.D.N.Y. 2006) ........................................................44

*McReynolds v. Richards-Cantave*,
   588 F.3d 790 (2d Cir. 2009)..................................................24, 49

*Meredith Corp. v. SESAC, LLC*,
   87 F. Supp. 3d 650 (S.D.N.Y. 2015).........................................35, 49

*In re MetLife Demutualization Litig.*,
   262 F.R.D. 205 (E.D.N.Y. 2009) ......................................................53

*Minnesota v. Health One Corp.*,
   1992 WL 313827 (D. Minn. Aug. 17, 1992) ......................................30

*Moses v. The New York Times Co.*,
   79 F.4th 235 (2d Cir. 2023) ....................................................43, 44

*Mycka v. Celotex Corp.*,
   1988 WL 80042 (D.D.C. July 18, 1988)..............................................31

*In re Nasdaq Market-Makers Antitrust Litig.*,
   176 F.R.D. 99 (S.D.N.Y. 1997) .........................................................24

*In re NASDAQ Market-Makers Antitrust Litig.*,
   187 F.R.D. 465 (S.D.N.Y. 1998) .......................................................39

*Nat'l Soc. of Prof'l Eng'rs. v. United States*,
   435 U.S. 679 (1978)...........................................................................25

*Ohio v. American Express*,
   585 U.S. 529 (2018)..........................................................9, 40, 41, 42

*In re PaineWebber Ltd. P'ships Litig.*,
   171 F.R.D. 104 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997)....................................24

*Parker v. Time Warner Entertainment Co., LP*,
   239 F.R.D. 318 (E.D.N.Y. 2007) .......................................................53

*Patellos v. Hello-Products, LLC*,
   2022 WL 2159566 (S.D.N.Y. June 15, 2022) .......................................49

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*,
   986 F. Supp. 2d 207 (E.D.N.Y. 2013), *rev'd on other grounds*, 827 F.3d 223 (2d Cir. 2016)
   .................................................................................................29

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*,
   827 F.3d 223 (2d Cir. 2016)...................................................... *passim*

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, No. 05-1720, 2016
   WL 8138988 (E.D.N.Y. Nov. 30, 2016)...................................................................30

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 330 F.R.D. 11
   (E.D.N.Y. 2019) ...........................................................................................24, 32, 51

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*,
   No. 05-1720, 2019 WL 13213700 (E.D.N.Y. Dec. 16, 2019) *aff'd in relevant part*, *Fikes
   Wholesale, Inc. v. Visa U.S.A., Inc.*, 62 F.4th 704 (2d Cir. 2023)
   ...........................................................................................................................44

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, No. 05-1720, 2022
   WL 14862098 (E.D.N.Y. Oct. 8, 2022)...................................................................9

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, No. 05-1720, 2022
   WL 15044626 (E.D.N.Y. Oct. 26, 2022) .................................................................8

*Pearlman v. Cablevision Systems Corp.*,
   2019 WL 3974358 (E.D.N.Y. Aug. 20, 2019).........................................................44

*Pennsylvania v. Geisinger Health Sys. Found.*,
   1:13-cv-02647-YK, Dkt. 7 (M.D. Pa. Nov. 1, 2013)...............................................30

*Reade-Alvarez v. Eltman, Eltman & Cooper, P.C.*,
   237 F.R.D. 26 (E.D.N.Y. 2006)...............................................................................46

*Reeb v. Ohio Dep't of Rehabilitation & Correction*,
   435 F.3d 639 (6th Cir. 2006) ..................................................................................54

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,
   527 F. Supp. 3d 269 (E.D.N.Y. 2021) .....................................................................53

*Robertson v. National Basketball Ass'n*,
   413 F. Supp. 88 (S.D.N.Y. 1976) ............................................................................31

*Sanders v. CJS Sols. Grp., LLC*,
   No. 17-cv-3809 (ER), 2018 WL 1116017 (S.D.N.Y. Feb. 28, 2018)......................36

*Schwartz v. Intimacy in New York, LLC*,
   2015 WL 13630777 (S.D.N.Y. Sept. 16, 2015)........................................................44

*Shapiro v. JPMorgan Chase*,
   2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014) .........................................................44

*Sierra v. City of New York*,
   2023 WL 7016348 (S.D.N.Y. Oct. 25, 2023) ..........................................................44

*Siler v. Landry's Seafood House—N.C., Inc.*,
  2014 WL 2945796 (S.D.N.Y. June 30, 2014) ..................................................42

*In re Sony SXRD Read Projection Television Class Action Litig.*,
  2008 WL 1956267 (S.D.N.Y. May 1, 2008) ....................................................44

*Sykes v. Harris*,
  2016 WL 3030156 (S.D.N.Y. May 24, 2016) ..................................................49

*In re Telectronics Pacing Sys. Inc.*,
  137 F. Supp. 2d 985 (S.D. Ohio 2001) ...........................................................38

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  2012 WL 13209696 (N.D. Cal. Nov. 9, 2012) .................................................37

*Thompson v. Metro. Life Ins. Co.*,
  216 F.R.D. 55 (S.D.N.Y. 2003) .......................................................................40

*UFCW v. Sutter Health*,
  Case No. CGC 14-5388451 (Cal. Sup. Ct. Aug. 27, 2021) ..............................30

*United States v. Am. Soc'y of Composers, Authors, Publishers*,
  No. 41-1395(WCC), 2001 WL 1589999 (S.D.N.Y. June 11, 2001) .................29

*United States v. American Express Co.*,
  838 F.3d 179 (2d Cir. 2017).............................................................................42

*United States v. American Express Co.*,
  88 F. Supp.3d 143 (E.D.N.Y. 2015) .................................................................41

*United States v. BMI*,
  No. 64-CIV-3787, 1994 WL 901652 (S.D.N.Y. Nov. 18, 1994) ......................29

*United States v. Carter Products, Inc.*,
  211 F. Supp. 144 (S.D.N.Y. 1962) ..................................................................29

*Vargas v. Capital One Fin. Advisors*,
  559 F. App'x. 22 (2d Cir. 2014) ......................................................................51

*Virgin Atl. Airways Ltd. v. British Airways PLC*,
  257 F.3d 256 (2d Cir. 2001)............................................................................39

*In re Visa Check/Master Money Antitrust Litig.*,
  297 F. Supp. 2d 503 (E.D.N.Y. 2003), *aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96 (2d Cir. 2005) ..............................................................29, 36

*In re Visa Check/Mastermoney Antitrust Litig.*,
  2005 WL 2100930 (E.D.N.Y. 2005).................................................................31

*Wal-Mart Stores Inc. v. Visa U.S.A. Inc.*,
   396 F.3d 96 (2d Cir. 2005)............................................................................ *passim*

*White v. NFL*,
   822 F. Supp. 1389 (D. Minn. 1993) ...................................................................30

*Williams v. Equitable Acceptance Corp.*,
   2021 WL 1625329 (S.D.N.Y. Apr. 27, 2021)......................................................49

*Wisconsin v. Kenosha Hosp. and Medical Center*,
   1997-1 Trade Cas. (CCH) ¶ 71669, 1996 WL 784584 (E.D. Wis. 1996)...............30

## OTHER AUTHORITIES

Federal Rule of Civil Procedure 23 ..................................................................... *passim*

2 MCLAUGHLIN ON CLASS ACTIONS § 6:7 (15th ed. 2018)...........................................24

3 NEWBERG AND RUBINSTEIN ON CLASS ACTIONS, § 8:14...........................................54

3 NEWBERG AND RUBINSTEIN ON CLASS ACTIONS, § 8:15...........................................54

4 NEWBERG AND RUBINSTEIN ON CLASS ACTIONS § 13.44 (6th ed.)

Press Release, *A.G. Schneiderman Announces Settlement with Utica Hospitals to Address Competitive Concerns* (December 11, 2013), https://ag.ny.gov/press-release/2013/ag-schneiderman-announces-settlement-utica-hospitals-address-competitive-concerns.............30

Press Release, *Alaska Dept. of Law, State Files Consent Decree to Provide Pricing Protection for Alaskans* (Nov. 7, 2012), https://law.alaska.gov/press/releases/2012/110712-PricingProtection.html ............................................................................30

# I.     INTRODUCTION

After more than seven years of hard-fought litigation, and more than two dozen mediation sessions spread over years, the Equitable Relief Class Plaintiffs ("ERCPs" or "Plaintiffs") have achieved a Settlement that will bring much needed competition to the payment card industry and economic relief to merchants nationwide. The proposed Settlement is worth tens of billions of dollars in both present and future benefits to the class.

As discussed below, the Settlement will produce a sea change in merchants' ability to surcharge high-priced credit cards. Currently less than 20% of Visa and Mastercard credit-card transactions are even eligible to be surcharged; the Settlement drives that number to more than 96%. The Settlement also makes surcharging more powerful by eliminating complex and confusing rules, requiring the rules to clarify and clearly state the circumstances in which surcharging is permitted, and incentivizing the networks to make available better data at the point of sale.

The Settlement pairs the surcharging-related relief with significant expansion of opportunities for merchants to offer discounts for using less-costly cards. The Settlement permits merchants to discount Visa and Mastercard credit cards by issuer, *i.e.*, based on the issuing bank. This instantaneously opens up interchange-fee price competition among large issuing banks. The Settlement also provides a $15 million merchant-education fund to, among other things, advise merchants how to permissibly differentiate among issuers in the gray area between surcharging and discounting (*e.g.*, providing free delivery for customers who use a favored issuer's card).

The Settlement eliminates the networks' "honor-all-wallets" rules. The networks have interpreted their honor-all-cards rules to require merchants that accept digital wallets to accept all such wallets that contain a Visa or Mastercard payment card. The Settlement prohibits that rule, instead allowing merchants to refuse acceptance of digital wallets regardless of whether they

include Visa or Mastercard payment cards.

To maximize merchants' use of these new competitive tools, the Settlement elevates merchant buying groups. It requires Visa and Mastercard to bargain in good faith with buying groups and provides a streamlined dispute-resolution process. The merchant-education fund will be used to promote and inform merchants, especially small merchants, about the benefits of banding together to activate the Settlement's new competitive tools.

In addition to reforming the merchant steering rules, the Settlement includes U.S. interchange rate caps and rollbacks. No merchant can have its posted credit-card interchange rate increased during the term of the Settlement. Moreover, every merchant's posted rate will be rolled back. In addition, each network must reduce its *average effective* credit-card interchange rate (accounting for posted rates as well as negotiated rates, and for the migration of transactions to higher-priced cards) by at least seven basis points for the duration of the Settlement.

Plaintiffs' experts Joseph Stiglitz and Keith Leffler value the caps and rollbacks alone at $29.79 billion. They conclude that, under reasonable assumptions, the surcharging/discounting relief will save merchants substantially more than that number.

This relief goes far beyond the overturned 2012 Agreement, and far beyond what the Second Circuit would have required to sustain that agreement. Nevertheless, the Settlement scrupulously responds to, and resolves, all the specific issues that troubled the Second Circuit. It eliminates the level-playing-field rule (most-favored nation clause), ensuring that the relief is ***not*** "virtually worthless to vast numbers of class members," *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 827 F.3d 223, 238 (2d Cir. 2016) ("*Payment Card Litig.*")— flipping the percentage of merchants that can surcharge from less than 20% to 96%. Even for the 4% of merchants in jurisdictions that statutorily prohibit surcharging, the Settlement provides other

relief such as permitting issuer-level discounting and eliminating the honor-all-wallets rules. Likewise, *all* merchants in *all* states will benefit directly from the rate caps and rollbacks. And unlike the 2012 Agreement, this Settlement's release of claims does not "bind [merchants] in perpetuity" (*id.* at 241); the release terminates exactly when the relief does, about five-plus years after this Court grants final approval.

The rules-related relief will go into effect 90 days after this Court has granted final approval of the Settlement. *See, e.g.*, Settlement Agreement ("S.A.") ¶¶ 19, 22-24, 26, 28-29, 51, 54, 46, 58, 60, 61. The cap on posted interchange rates will go into effect upon preliminary approval of the Settlement. *Id.* ¶¶ 2, 35, 67. The rollbacks on posted rates and on each network's average-effective interchange rate will go into effect on either April 15, 2025 or October 15, 2025,[1] depending on when the Court grants final approval (the networks need four months lead time to make the changes). *Id.* ¶¶ 33(a), 65(a). The Settlement terminates—and so does the release—five years after the rate rollbacks take effect. *Id.* ¶¶ 15, 33(b), 45, 65(b), 77, 86, 88.

For the reasons set forth below, the Settlement is a resounding win for merchants, both large and small, and merits preliminary approval under Federal Rule of Civil Procedure 23.

## II.     PROCEDURAL BACKGROUND

### A.     SECOND CIRCUIT OPINION AND BIFURCATION OF DAMAGES AND EQUITABLE RELIEF CLASSES

In June 2005, various merchants filed cases against Visa, Mastercard, and certain banks ("Defendants"),[2] which were consolidated into MDL 1720. The merchant plaintiffs alleged that

---

[1] These are the months when the networks customarily make rate changes, and when the industry is geared up to implement them.

[2] Defendants are Visa, Inc., including Visa U.S.A. Inc. and Visa International ("Visa"); Mastercard Incorporated and Mastercard International Incorporated ("Mastercard," and together with Visa, the "Network Defendants"); Bank of America, N.A.; BA Merchant Services LLC (f/k/a National Processing, Inc.); Bank of America Corporation; Barclays Bank plc; Barclays Bank Delaware

3

Defendants violated the antitrust laws by imposing supracompetitive interchange fees for acceptance of Visa and Mastercard branded payment cards. The cases were consolidated before Judge John Gleeson, and he appointed interim co-lead counsel to represent the class plaintiffs. *See* ECF No. 279.

In April 2006, a consolidated amended class complaint was filed on behalf of two classes: one seeking monetary damages under Rule 23(b)(3) and the other seeking equitable relief under Rule 23(b)(2). *See* ECF No. 317. In 2012, the parties reached a settlement of both the damages and equitable relief claims, which Judge Gleeson approved in 2013 (the "2012 Agreement"). *See* ECF Nos. 1745, 6124. The approval process was lengthy, with multiple objectors and appeals. In 2016, the Second Circuit reversed the District Court's approval of the 2012 Agreement and remanded, holding, *inter alia*, that the damages and equitable relief classes required separate counsel. *Payment Card Litig.*, 827 F.3d at 236.

### B.   COMMENCEMENT OF A SEPARATE AND DISTINCT RULE 23(B)(2) ACTION

Following remand, and in compliance with the Second Circuit's directive, the Court appointed the following firms as interim co-lead counsel (now "Class Counsel") for the equitable relief class: Hilliard & Shadowen LLP; Grant & Eisenhofer PA; Freed Kanner London & Millen LLC; and Nussbaum Law Group, P.C. Class Counsel served an Equitable Relief Class Action

---

(formerly known as Juniper Bank); Barclays Financial Corp. (formerly known as Juniper Financial Corporation); Capital One Bank (USA), N.A.; Capital One, N.A. (as successor to Capital One F.S.B.); Capital One Financial Corporation; JPMorgan Chase Bank, N.A. (as successor to Chase Bank USA, N.A. and as successor to Chase Manhattan Bank USA, N.A. and Washington Mutual Bank); Paymentech, LLC (as successor to Chase Paymentech Solutions, LLC); JPMorgan Chase & Co. (as successor to Bank One Corporation and Bank One Delaware, N.A.); Citibank (South Dakota), N.A.; Citibank, N.A.; Citigroup Inc. (as successor to Citicorp); and Wells Fargo & Company (as successor to Wachovia Bank N.A.) (the "Bank Defendants"). "Defendants" herein refers to both the Network Defendants and Bank Defendants, and together with the Equitable Relief Class Plaintiffs, the "Parties."

Complaint ("Complaint") on February 8, 2017, which was later filed under seal on March 31, 2017. *See* ECF Nos. 6858 and 6892. Mastercard and Visa answered the Complaint on November 15, 2018; the Bank Defendants filed a motion to dismiss on January 16, 2019. ECF Nos. 7293, 7296, and 7356.

On November 20, 2019, the Court denied the Bank Defendants' motion to dismiss, holding that Plaintiffs pled facts sufficient to suggest the likelihood that relief against the Bank Defendants could partially redress the alleged injury and, if Plaintiffs were successful on the merits, the Bank Defendants could be found liable and subject to injunctive remedies. ECF No. 7790 at 32, 34, 37. The Court further held that Plaintiffs sufficiently alleged that the restraints were ongoing. *Id.* at 42-44.

### C.   DISCOVERY

Class Counsel were appointed twelve years into the MDL, after significant discovery had already occurred. Upon their appointment, Class Counsel immediately reviewed and analyzed the existing, massive discovery record, worked cooperatively with counsel for the Rule 23(b)(3) Class and Direct-Action Plaintiffs ("DAPs") in connection with ongoing discovery, and engaged in separate discovery specific to the equitable relief claims, including depositions, interrogatories/responses, document requests/production, and extensive document review. *See* accompanying Declaration of Class Counsel in Support of Rule 23(b)(2) Motion for Preliminary Approval of Settlement ("Class Counsel Decl."), ¶¶ 28-49.

To keep the then-existing schedule, Class Counsel did not insist on taking leading roles in depositions, where doing so was unnecessary to prosecute the equitable-relief claims. Class Counsel examined witnesses in over 50 depositions, attended and monitored many more, and took key roles in the depositions concerning the relevant restraints. *Id.* ¶¶ 34-35. Class Counsel also prepared for and defended the depositions of ERCP experts Dennis W. Carlton ("Prof. Carlton"),

Joseph E. Stiglitz ("Dr. Stiglitz"), and Keith B. Leffler ("Dr. Leffler").

The discovery record developed between November 2016 and September 2018 supplemented the 60 million pages of documents produced and 400 depositions taken before Class Counsel's appointment. *Id*. ¶ 32. Most recently, in November 2023, the Network and Bank Defendants made supplemental productions of approximately 575,000 documents, which Class Counsel reviewed and analyzed to prepare for trial and to inform the terms of any potential settlement. *Id*. ¶¶ 48-49.

In sum, Class Counsel's participation in discovery was carefully considered, efficient, and focused on what was needed to prosecute this case on behalf of the ERCPs.

### D. CLASS CERTIFICATION

On December 18, 2020, ERCPs moved for certification of a Rule 23(b)(2) class. ECF No. 8444, 8447. Various DAPs and trade groups opposed class certification or sought leave to intervene for the purpose of doing so. *See*, *e.g.*, ECF Nos. 8411-8413. Class Counsel served ERCPs' replies in support of class certification addressing these objections on April 30, 2021, May 4, 2021, and August 27, 2021. ECF Nos. 8457, 8470, 8631. Defendants served their response on May 4, 2021. ECF No. 8460. Between May and August 2021, the DAPs and trade groups served additional papers opposing class certification.[3]

Among other things, ERCPs pointed out that only a non-opt-out class could optimize the merchants' collective interest in reforming the rules. Otherwise, opt-out plaintiffs could monetize for themselves the value of the class-wide injunctive relief. ECF No. 8477 at 2, 15.[4]

---

[3] ECF Nos. 8449-8456, 8463-8468, 8469-8472, 8476, 8479-8481, 8616-8623.

[4] Notably, there is no indication that any of the more than 21 opt-out cases that had previously settled with Defendants included any injunctive relief benefitting any other merchant. ECF Nos. 7203, 7646, 7750, 7857, 7884-88, 7917, 7921-23, 7965-67, 8001, 8004, 8006, 8421, 8478. The same is true of the additional 21 settlements that have occurred since class certification was

On September 27, 2021, the Court certified a class of more than 12 million U.S. merchants[5] and declined to permit opt-outs. *DDMB, Inc. v. Visa, Inc.* No. 05-1720, 2021 WL 6221326 at *47 (E.D.N.Y. Sept. 27, 2021). The Court held that "Opponents' arguments regarding their preferred injunctive relief are premature and speculative and do not create a fundamental conflict that precludes a finding of adequacy of representation[;]" "Opponents' membership in the (b)(2) class will not preclude any individual damages claims[;]" issue preclusion does not "render Opponents inadequately represented by the Rule 23(b)(2) class[;]" and "a Rule 23(b)(2) judgment, with its one-size-fits-all approach and its limited procedural protections, will not preclude later claims for individualized relief." *Id.* at *24, *26-27. The Court found no "improprieties," unlike the cases that the opponents cited: "To the contrary, the Court finds that class representatives' interests are aligned with absent class members' interests to maximize the equitable relief sought." *Id.* at *29. Certifying a class of all merchants, therefore, allows "leveraging those claims to receive the most comprehensive equitable relief to the entire class's benefit." *Id.* at *33.

The Court cited Dr. Leffler's conclusion that defendants' anticompetitive conduct affects *all* merchants. *Id.* at *40. And the Court relied on his opinion that disallowing opt-outs prevents free-riding by individual merchants, thereby ensuring fairness and increasing the value of injunctive relief to the benefit of the entire class. *Id.* at *46, *49.

In summary, the Court accepted the reasons advanced by ERCPs and rejected those of the opponents nearly in their entirety, finding the non-opt-out class did not violate due process; no

---

granted. ECF No. 8673, 8676, 8685, 8698, 8705, 8733, 8740, 8754, 8764, 8767-71, 8808, 8813, 8903, 8985, 9034, 9071, 9145.

[5] The Court certified an Equitable Relief Class comprising "all persons, businesses, and other entities that accept Visa and/or Mastercard credit and/or debit cards in the United States at any time during the period between December 18, 2020 and the date of entry of Final Judgment in this case." ECF No. 8647.

fundamental conflict exists between the class and the opponents; and the mandatory class does not threaten, compromise, jeopardize, or improperly confiscate individualized monetary claims. *Id.* at *47. The Court also appointed interim co-lead counsel as Class Counsel and Boss Dental Care, Runcentral, LLC, CMP Consulting Serv., Inc., Generic Depot 3, Inc. d/b/a Prescription Depot, and Pureone, LLC d/b/a Salon Pure as Class Representatives. *Id.* at *288.

### E.   SUMMARY JUDGMENT AND *DAUBERT* MOTIONS

In December 2020, ERCPs and Defendants filed motions for summary judgment. *See*, *e.g.*, ECF Nos. 8067-8071, 8073, 8088-8089, 8091, 8094, 8150, 8152-8158, 8167-8172, 8174-8175. Defendants also filed multiple *Daubert* motions seeking to exclude the testimony of, among others, Prof. Carlton and Dr. Stiglitz. *See*, *e.g.*, ECF Nos. 8074 (Stiglitz), 8086 (Carlton). *See* ECF No. 8899 (DAPs and ERCPs' Supp. Memorandum). After extensive briefing,[6] in October 2022, the Court issued its *Daubert* rulings, excluding certain expert opinions, but in large part denying the motions; the Court also denied Defendants' motion for partial summary judgment relating to EMV chip payment cards.[7]

In ruling on the *Daubert* motion filed against Prof. Carlton, the Court excluded only his opinion that the 2012 Agreement had caused "overall merchant fees and net fees to decline."[8] The Court allowed Prof. Carlton's numerous other opinions and later relied on them in denying Defendants' summary judgment motions. *Payment Card Litig.*, 2022 WL 15044626, at *28.

---

[6] *See*, *e.g.*, ECF Nos. 8020-8021, 8163-8165 and 8167-8172.

[7] "EMV" stands for Europay, Mastercard, and Visa and refers to chips embedded in payments cards that create unique codes for each transaction. *See Payment Card Litig.*, 2022 WL 15053250 (E.D.N.Y. Oct. 26, 2022) (including Joseph Stiglitz); 2022 WL 14862098 (E.D.N.Y. Oct. 8, 2022); 2022 WL 15044626 (E.D.N.Y. Oct. 8, 2022) (including Dennis Carlton); 2022 WL 14863110 (E.D.N.Y. Oct. 26, 2022); 2022 WL 14865281 (E.D.N.Y. Oct. 26, 2022) (denying Defendants' EMV motion for partial summary judgment).

[8] *See Payment Card Litig.*, 2022 WL 15044626, *28 (E.D.N.Y. Oct. 8, 2022).

Similarly, the Court excluded only Dr. Stiglitz's opinion about a mature, one-sided credit-card market but accepted and later relied on his numerous other opinions. *Id.* at \*60.

The parties completed additional summary judgment briefing in 2023 to address the Court's questions about "direct evidence." On January 8, 2024, the Court issued a Memorandum & Order granting in part and denying in part Defendants' motions for summary judgment under *Ohio v. American Express*, 585 U.S. 529 (2018).[9] The Court also denied Mastercard's motion for summary judgment as to lack of market power, holding that "Plaintiffs have adduced sufficient direct evidence of anticompetitive effect," *id.* at 37, and further noting that "Plaintiffs' evidence suffices to raise a triable issue of fact as to whether they have met their prima facie burden through direct evidence of anticompetitive effect." *Id.* at 38.[10] The Court recently denied ERCPs' motion for partial summary judgment. ECF No. 952.

---

[9] The Court granted summary judgment in favor of the Defendants only to the extent that Plaintiffs' claims did not account for the impact on the two different sides of a credit-card transaction. *See Payment Card Litig.*, 2022 WL 14862098, \*17 (E.D.N.Y. Oct. 8, 2022).

[10] The challenges for Plaintiffs on summary judgment were significant. Plaintiffs were required to define the relevant market and demonstrate the existence of a triable question of fact as to harm in a two-sided transaction market for payment-card transactions, consistent with the *American Express* Second Circuit decision affirmed by the Supreme Court. ECF No. 9042 at 17-20, 27. Plaintiffs' summary judgment motions were evaluated under the stringent rule of reason standard, long recognized as a far more challenging bar than a *per se* or "quick look" analysis. ECF No. 9042 at 20-24. Even though the Court accepted that the restraints were horizontal, this alone did not satisfy Plaintiffs' *prima facie* burden to show harm to competition. Plaintiffs were required to adduce direct evidence of reduced output, increased prices, or decreased quality in the two-sided market or, in the alternative, indirect evidence in the form of market power plus some evidence tending to show anticompetitive effect. *Id.* at 24-26.

Plaintiffs were ultimately successful in overcoming all these obstacles.

On the issue of market power, the Court held that a jury could reasonably conclude that Mastercard has market power, despite its self-described low and declining market share, where it had: (1) a consistent 25% share in a highly concentrated market defined by high barriers to entry and no successful entry for the past forty years; (2) the ability to price discriminate; (3) the ability to set prices without consideration of costs; (4) the ability to force merchants to accepts rates and rules without negotiation; and (5) consistently high, supracompetitive profit margins. *Id.* at 41-44.

F.    SETTLEMENT NEGOTIATIONS

While the parties were aggressively litigating this matter, they were also simultaneously exploring the possibility of resolving the ERCPs' claims, in many instances with the assistance of Professor Eric D. Green ("Prof. Green"), a nationally renowned mediator. Class Counsel and Defendants first mediated with Prof. Green in February 2017. Class Counsel Decl. ¶ 106. The parties ultimately participated in more than two dozen in-person or Zoom mediation sessions, many with Prof. Green's participation. *Id.* ¶ 107. The parties also had numerous telephone and video conferences to discuss outstanding terms, issues, and potential solutions to efficiently plan for the mediation sessions. *Id.* ¶ 108.

In December 2023 the parties had lengthy in-person mediation sessions attended by Prof. Green. *Id.* ¶ 109. ERCPs also interviewed and consulted with numerous class members of all types and sizes. *Id.* ¶ 118. Following a two-day session in December 2023 and yet more phone and video conferences with Defendants in December 2023 and January 2024, the parties reached a non-binding memorandum of understanding that they signed on January 17, 2024. *Id.* ¶ 109. After further intense and detailed negotiations, the parties executed the settlement agreement on March 25, 2024.

As discussed more fully below, the Settlement achieves significant relief on behalf of merchants, large and small. The measurable benefits are in the tens of billions of dollars. The injunctive relief is far superior, in every way, to that provided in the 2012 Agreement. As explained in the accompanying declarations of Dr. Leffler ("Leffler Decl."), ¶¶ 18, 27-29, and Dr. Stiglitz ("Stiglitz Decl."), ¶¶ 11, 45, the rate relief alone is $29.79 billion to merchants. Under reasonable assumptions, the rule changes for surcharging, discounting, and honor-all-cards will generate substantially more than that amount. Leffler Decl. ¶¶ 18, 29; Stiglitz Decl. ¶¶ 33, 44.

Plaintiffs and Class Counsel ask the Court to (1) preliminarily approve the Settlement, (2)

authorize dissemination of notice to the Equitable Relief Class, and (3) set a schedule for further proceedings including a Final Fairness Hearing.

## III.    TERMS AND BENEFITS OF THE SETTLEMENT

Unlike the original injunctive relief in the 2012 Agreement, the Settlement here provides for: (a) substantial changes to Visa's and Mastercard's rules[11] for the purpose of enhancing competition; (b) measures to enhance both the likelihood that rule changes will reduce interchange fees and how quickly those reductions will occur; and (c) limits on Visa's and Mastercard's credit-card interchange fees, including caps and rollbacks on credit-card interchange rates, while the market adjusts to greater competition. The principal provisions are:

**Enhanced Surcharging**.  The rule changes in the Settlement include substantial changes to rules that currently restrict merchants' ability to charge for the use of expensive Visa and Mastercard credit cards. The Settlement will allow merchants to place a price on the use of high-cost cards to a far greater degree than under the 2012 Agreement. As Dr. Stiglitz explains:

> Merchants' ability to steer customers to preferred payment means via price signals is the essential economic mechanism needed to create competition among credit-card networks. Merchants' significantly enhanced ability to impose surcharges (that is, use the price system) will help them to steer their customers to low-cost and preferred payment means by requiring shoppers who use high-cost cards to internalize the costs of their decisions. That enhanced ability will also increase merchants' ability to negotiate lower interchange fees from Visa and Mastercard.  The networks will be motivated to impose lower interchange rates in order to avoid these surcharges (or to lower the surcharges when merchants decide to impose them).

Stiglitz Decl. ¶ 7.

---

[11] Visa's rules are here: https://usa.visa.com/content/dam/VCOM/download/about-visa/visa-rules-public.pdf.

Mastercard's rules are here:

https://www.mastercard.us/content/dam/public/mastercardcom/na/global-site/documents/mastercard-rules.pdf.

The spiraling cost of interchange is no longer sustainable and is being regulated all over the world. This is the Settlement of an antitrust case, and it offers competition-based relief that is rational, practical, and achievable.

*First*, the Settlement eliminates the networks' level-playing-field rules. Visa's Rule 5.5.1.7 (14 October 2023) and Mastercard's Rules 5.12.2.1. and 5.12.2.2. (6 June 2023), provide that, if the merchant accepts American Express or another card that limits surcharging, the merchant must follow those rules in charging for Visa or Mastercard credit-card use. Stiglitz Decl. ¶ 13. American Express prohibits surcharging its cards unless the merchant also surcharges all other credit *and debit* transactions. Visa and Mastercard rules forbid surcharges on debit transactions, and merchants generally do not want to surcharge those low-cost transactions. *Id.* Merchants accounting for at least 83% of Visa and Mastercard credit-card transactions also accept American Express. The current Visa and Mastercard level-playing-field rules prevent merchants from surcharging those transactions. Stiglitz Decl. ¶¶ 13, 14; Leffler Decl. ¶ 6.

Eliminating the level-playing-field rules makes 100% of the Visa and Mastercard credit-card transactions available for surcharging, absent some other prohibition on surcharging. Most of those other prohibitions have gone away since 2012. Since then, eleven States that previously had no-surcharge statutes (California, Colorado, Georgia, Indiana, Iowa, Michigan, New York, Ohio, Oklahoma, Pennsylvania, and Texas) have repealed or stopped enforcing them. Today, only three U.S. jurisdictions (Connecticut, Massachusetts, and Puerto Rico) may continue to enforce no-surcharge statutes, accounting for just 4% of the Visa and Mastercard credit-card volume. Stiglitz Decl. ¶ 15; Leffler Decl. ¶ 6, n. 4. Eliminating the level-playing-field rules will instantly increase the surcharge-eligible Visa and Mastercard credit-card transactions from less than 20% to 96%. *Id.*

*Second*, consistent with eliminating the level-playing-field rules, the Settlement provides that a merchant that accepts American Express can charge Visa and/or Mastercard credit cards up to 1% regardless of whether: (a) its agreement with American Express prohibits surcharging American Express credit cards; or (b) the merchant actually surcharges American Express. S.A. ¶¶ 28(a), 60(a). Note that 1% is comparable to the differential between interchange fees for the highest cost credit cards and the lowest cost no-rewards credit cards, allowing merchants to offer efficient price signals to their customers. Stiglitz Decl. ¶ 16, n. 16.

*Third*, the Settlement provides that merchants can surcharge up to the lower of the cost of acceptance or 3%, if they also surcharge any comparative credit cards that they accept—including American Express or Discover—at the same rate. A merchant that does not accept such a comparative credit card could surcharge Visa and/or Mastercard at up to 3%. Stiglitz Decl. ¶ 17; S.A. ¶¶ 28(a), 60(a). Moreover, the proposed Settlement will encourage challenges to the American Express rules that tether the ability to surcharge its card to the merchant's also surcharging debit cards. Stiglitz Decl. ¶¶ 18, 35.[12]

*Fourth*, the Settlement requires that each network's rules make expressly clear the circumstances in which merchants can surcharge. For example, the Settlement eliminates confusion[13] by requiring that the rules expressly state that a merchant's ability to surcharge Visa's

---

[12] On March 21, 2024 a proposed class of merchants filed a complaint against American Express over its anti-steering rules. *See 5-Star General Store, et al. v. American Express Company, et al.*, No. 24-cv-00106-MSM-LDA (D.R.I.).

[13] The current rules subject merchants to the level-playing-field rule if the merchant accepts a "Competitive Credit Card Brand," and each of Visa and Mastercard defines the other as falling within that definition. *See* Visa Rule 5.5.1.7; Mastercard Rule 5.12.2.1. The 2012 Agreement noted "for the avoidance of doubt" that the level-playing-field rule should not be read to require merchants to apply the same surcharging to Visa and Mastercard. *See* Settlement Agreement ¶42(a)(v)(D). But the "avoidance of doubt" clarification was not included in the networks' *actual rules.*

credit cards does not depend on also surcharging Mastercard's credit cards, and vice-versa. Merchants can surcharge one, neither, or both, and can surcharge one at the brand level and the other at the product level, or any permutation. Stiglitz Decl. ¶ 19; S.A. ¶¶ 28, 60.

*Fifth*, the Settlement improves merchants' ability to surcharge only certain high-cost cards, such as Visa Signature Cards, or Mastercard World Elite. Currently, the networks do not make sufficient data available in real time at the point-of-sale to inform merchants of the product that the customer is using and the applicable interchange rate. The lack of such data reduces the efficacy of surcharging (or discounting) at the product level. The Settlement ameliorates the problem by providing that, if the networks do not make that information available in real time at the point-of-sale for a particular transaction, the merchant can presume that its cost of accepting the card is 3% and surcharge that amount if the merchant also surcharges comparable credit cards. Stiglitz Decl. ¶ 20; S.A. ¶¶ 28(b), 60(b).

*Sixth*, the Settlement improves the surcharging rules by greatly simplifying them. Currently, a merchant that accepts American Express and Visa or Mastercard must navigate a labyrinth involving the level-playing-field rule, applying the American Express rules to the Visa or Mastercard transaction, and comparing the cost of that transaction to a comparable American Express transaction. Visa Rule 5.5.1.7; Mastercard Rule 5.12.2.1. The Settlement provides clear, concise, and easy-to-understand rules. Fundamentally, the merchant need only determine whether it can surcharge up to 1% or up to 3%. Stiglitz Decl. ¶ 21; S.A. ¶¶ 28, 60.[14]

**Enhanced Discounting.** The Settlement also significantly expands merchants' ability to steer transactions by offering discounts for using lower-cost credit cards.

---

[14] The Settlement also expressly provides that a merchant can give the customer truthful information as to why the merchant is applying a charge for using the card. Stiglitz Decl. ¶ 22; S.A. ¶¶ 28(c), 60(c).

The Settlement extends the rule changes that were part of the 2011 Consent Decree between Visa, Mastercard, and the U.S. Department of Justice. Those provisions permitted merchants to offer discounts or enhanced services for a preferred payment card (credit card or debit card) by card brand and/or by card type. Stiglitz Decl. ¶ 24.[15] The Decree expired in July 2021; the Settlement extends these rule changes for more than five additional years. *Id.*; S.A. ¶¶ 18, 50.

In a major reform, the Settlement also requires the networks to modify their rules to permit issuer-level discounting, *i.e.*, discounting a network's credit cards based on the issuing bank (*e.g.*, a *Chase-issued* Visa credit card). Currently, Mastercard's rule prohibits merchants from discounting its credit cards based on the issuing bank. Mastercard Rule 5.11.1. Although not required by the 2012 Agreement, Visa has permitted issuer-level discounting since 2013, but the actual Visa rule itself has not been clear.[16] The Settlement requires each network to expressly state in its rules that merchants can discount by issuer—a new requirement for Mastercard and a clarification of the rule for Visa.

These reforms will make the large banks, as well as the networks, compete for merchants' business. S.A. ¶¶ 19, 51. Under the Settlement, merchants can discount at every level—the brand

---

[15] When this litigation began in 2005, debit interchange rates had not yet been regulated. Since then, the Durbin Amendment has regulated the debit-card rates charged by the large banks. *See* Stiglitz Merits Report ¶ 154. Nevertheless, the Settlement bolsters that regulatory regime by including debit cards in the relief (discussed further below) with respect to revival and temporal extension of the 2011 Consent Decree, the honor-all-wallets rule, selective acceptance at different store banners, selective-acceptance experiments, buying groups, and merchant education.

[16] Visa Rule 1.5.4.12 provides that a merchant may discount by product type (e.g., Visa Signature card), but is silent about discounting by issuer. The preceding rule—Visa Rule 1.5.4.11—is titled "Uniform Services – Merchant Requirement" and provides in whole that "A Merchant must process Transactions with all Cardholders in exactly the same manner. This does not apply to discounts, promotional offers, or in-kind incentives offered by the Merchant to a subset of Visa Cards." Visa apparently has interpreted the reference to "a subset of Visa Cards" to permit issuer-level discounting.

level (discount Visa but not Mastercard), the product level (discount Visa traditional cards), and/or the *issuer* (discount only Chase Visa cards).

The Settlement bolsters this issuer-level discounting by allocating merchant-education funds to show merchants how to permissibly differentiate between issuers in the gray area between discounting and surcharging. S.A. ¶¶ 42, 74. The Settlement identifies the relevant differentiation principles. S.A. Appendix G. The education materials will illustrate scenarios where issuer differentiation is permissible; for example, having signage that "We prefer Chase cards because their fees are lower," or having a special check-out lane for those who use a Chase card.

Taken together, the reforms to the surcharging and discounting rules will greatly enhance the merchants' freedom to steer customers to lower-cost payment forms using the linchpin of competition—prices. As customers come to understand the competitive rationale for imposing these prices, competition should lead to lower Visa and Mastercard credit-card interchange fees. Stiglitz Decl. ¶ 23. The merchant education program discussed below will assist merchants in choosing and implementing the most effective steering method for their business.

**Reforms to the Honor-All-Cards Rules**.  The Settlement also mandates several important reforms to the networks' honor-all-cards rules.

*First*, the Settlement modifies the honor-all-cards rules as they apply to digital wallets. Digital wallets such as Google Pay and Apple Pay are applications that allow users to make payments with various credit and debit cards or other sources of funds that are in the wallet. Digital wallets have rapidly grown in popularity, and that growth is expected to continue. Currently, Visa and Mastercard interpret their honor-all-cards rules to require that a merchant that enables digital wallets must accept all digital wallets that include a Visa or Mastercard payment card (credit card or debit card). Those rules eliminate the merchant's ability to negotiate with the digital wallet

vendor over whether, and on what terms, to accept the digital wallet. Stiglitz Decl. ¶ 26.

In their merits reports, ERCPs' experts Dr. Stiglitz and Prof. Carlton emphasized the importance of reforming the networks' "Honor All Wallets" rules. *See, e.g.,* Stiglitz Rpt. ¶ 121 & fn. 28; Carlton Rpt. ¶¶ 111, 122. In certifying this Class, the Court noted that "both experts suggest that applications of the honor-all-cards rules such as the honor-all-wallets rule should not be permitted in order to allow more competition" and that Dr. Stiglitz "dissected the [h]onor-[a]ll-[c]ards rule in detail, including its application to mobile wallets." *DDMB*, 2021 WL 6221326 at *21-22.

The Settlement achieves that goal. It requires the networks to permit a merchant to reject a digital wallet regardless of whether it contains a Visa or Mastercard payment card. S.A. ¶¶ 24-26, 56-58; Stiglitz Decl. ¶ 27. The digital-wallet vendor will no longer be able to gain acceptance at a merchant merely because it has a Visa or Mastercard payment card; the vendor will have to negotiate for that privilege.

Visa currently has the technology necessary for merchants to implement this reform; Mastercard does not. The Settlement requires Visa to maintain the technology and requires Mastercard to implement it by March 2025. S.A. ¶¶ 25, 57; Stiglitz Decl. ¶ 27. Further, the Settlement permits merchants to steer among the cards within a wallet under the same rules that govern steering among traditional Visa and Mastercard credit cards. S.A. ¶¶ 27, 59; Stiglitz Decl. ¶ 27.

*Second*, the Settlement clarifies and expands ways for merchants to selectively decline acceptance of traditional Visa and Mastercard payment cards (credit cards and debit cards). The Settlement requires Visa and Mastercard to clarify that their honor-all-cards rules apply only to

stores using the same "banner," *i.e.*, operating under the same brand name. S.A. ¶¶ 21-22, 53-54.[17] Retailers that have store brands geared toward different customer bases can make different card-acceptance decisions for those different brands. Stiglitz Decl. ¶ 29.

*Third*, the Settlement goes further by allowing merchants to conduct "experiments" to determine the circumstances in which non-acceptance, or selective non-acceptance, would be profitable. The Settlement requires the networks to permit each merchant to try non-acceptance in 120-day experiments for up to 20% of its stores every year. S.A. ¶¶ 22, 54. Merchants can use the data gathered during these experiments to decide not to accept the networks' payment cards at certain banners, or to threaten to do so, to negotiate lower interchange fees. These rule changes substantially reduce the risks to merchants of non-acceptance and will allow them to use the accumulated data to negotiate lower rates. Stiglitz Decl. ¶ 30.

**Merchant Education Program**.  The Settlement also boosts competition by providing substantial funds to educate merchants about the new competitive tools that the Settlement provides. In the current market environment, in which Visa and Mastercard have altered the competitive landscape through decades-long merchant restraints, it will be necessary to prod the market towards a more competitive outcome. The Settlement therefore provides a $15 million fund for a third party to provide merchant education. S.A. ¶ 9.

The education will include information on using the new competitive tools to steer customers to more preferred payments means; educating customers that using high-cost payment cards causes high retail prices; and using the expanded power to surcharge and discount to negotiate lower Visa and Mastercard (and issuer) interchange fees. Stiglitz Decl. ¶¶ 9, 31; S.A. ¶¶

---

[17] This was required by the 2012 Agreement but currently is not clearly permitted by the networks' rules.

40, 72. The merchant education program will assist merchants in choosing and implementing the most effective steering methods for their business. It will inform merchants of the importance and value of forming buying groups to negotiate interchange rates from Visa and Mastercard, and will assist merchants in forming buying groups. S.A. ¶¶ 40, 72.

As noted, the current surcharging rules are extremely complex and difficult to understand, and they require merchants to calculate their costs of acceptance of various competitive cards to determine whether and to what extent surcharging is permitted. *See, e.g.,* Visa Rule 5.5.1.6, 5.5.1.7, 5.5.1.8. As a result, small and mid-size merchants (those without large legal and payments departments) often require consultants to help interpret the rules. And the networks modify and renumber the rules as frequently as twice a year. The merchant education program ensures that *all* merchants will have ready access to the guidance they need to take advantage of the new competitive tools. S.A. ¶¶ 40, 72.

**Merchant Buying Groups**. Today only a handful of large merchants are able to negotiate credit-card interchange rates substantially lower than the posted rates. Those merchants have credibly threatened to steer transactions through discounting or surcharging, even under today's onerous rules. Stiglitz Decl. ¶ 32. Therefore, increased negotiations by more and smaller merchants can result in large savings in the interchange fees paid to Visa and Mastercard. Under reasonable assumptions about the growth in negotiated rates, the Settlement will result in very substantial merchant savings in interchange rates. Stiglitz Decl. ¶ 33. Competition among merchants results in these cost savings being passed on to customers in the form of lower prices. Stiglitz Decl. ¶ 33.

The Settlement encourages groups of smaller merchants to collectively "buy" payment card (credit card and debit card) services from Visa and Mastercard. The Settlement thereby extends real negotiating opportunities to *all* merchants of every category and size. The merchant education

program explicitly includes efforts to encourage and facilitate merchants' forming and joining collective buying groups. S.A. ¶¶ 40(d), 72(d). And the Settlement requires Visa and Mastercard to recognize and bargain with such groups in good faith. Stiglitz Decl. ¶ 32; S.A. ¶¶ 29-32; 61-64. The Settlement provides an improved ability for merchants of every size to band together in buying groups to demand lower interchange fees. Stiglitz Decl. ¶¶ 9, 32.

In the 2012 Agreement (paragraphs 43 and 56), the networks agreed to negotiate with such groups in good faith. However, in practice, merchants did not form or use any buying groups. In this Settlement, the merchant-education program (and the significant dollars devoted to it) explicitly includes efforts to encourage and facilitate merchants' forming collective buying groups. Stiglitz Decl. ¶ 32.

Moreover, this Settlement makes surcharging available for 96% of the Visa and Mastercard credit-card volume, and it vastly expands the ability to discount by issuer. Thus, small and mid-sized merchants now have a *reason* to band together in buying groups. The Settlement provides the competitive tools that will make it a commercial necessity for the networks and banks to negotiate with merchants representing significant volumes of business. The Settlement provides the tools, encouragement, procedures, and information necessary to get effective buying groups up and running.

**Rate Caps and Rollbacks**. In his 2018 merits expert report, Dr. Stiglitz opined that "the [competitive] adjustment will . . . require a significant period of time to reach the new more competitive equilibrium." Stiglitz Merits Report ¶ 170. While the market makes that adjustment, "the Court should set a maximum interchange rate during a transition period." *Id.*

The very long history of merchant restraints and the resulting lack of competition among credit cards has led customers to accept the distorted form of competition in which they do not

receive accurate price signals to guide their use of payment mechanisms. As a result, it is likely to take some time for customers to recognize that discounting for use of low-cost cards or charging for use of high-cost cards is fair, equitable, and competitive merchant behavior. The Settlement recognizes this inertia by including meaningful restrictions on Visa and Mastercard credit-card interchange fees. Stiglitz Decl. ¶ 10.

Visa and Mastercard's decades-long imposition of the merchant restraints has prevented merchants from providing price signals to customers regarding the relatively high cost of credit-card usage. This has resulted in norms of business behavior and customer habits and perceptions that merchants consider in deciding whether to impose an explicit price for credit-card payments. The long history of "free" use of premium credit cards (because of the merchant restraints), may cause some customers to view as "unfair" a merchant's imposing a price for such cards. Stiglitz Decl. ¶ 36. Given the uncertainty about customer responses, Dr. Stiglitz expects merchants to be concerned that charging for the use of a credit card may lead some customers to switch to competing merchants that do not impose a price on card use. In economic terms, the history, business norms, perceptions of fairness, and customer habits result in lower expected "elasticity" of switching payment mechanisms, and greater uncertainty about the consequences of providing price signals through surcharges or discounts. This could delay the onset of competitive interchange fees. Stiglitz Decl. ¶ 37. The Settlement accounts for this potential delay by halting the "interchange fee price spiral" while merchants use the new competitive tools to bring about a more competitive equilibrium. Stiglitz Decl. ¶ 39.

Given these commercial realities, the Settlement provides for guaranteed, immediate interchange rate reductions during the five-plus year term of the Settlement. This significant relief takes three forms which work together. *First*, the Settlement prohibits Visa and Mastercard from

raising any merchant's posted U.S. credit-card interchange rate above the rate that existed on December 31, 2023. That baseline cap applies for at least five years—closer to six years, depending on when the Court approves the Settlement. Dr. Leffler understands that each network's average rate of interchange increase over just the last 10 years has been about one basis point per year.[18] So these posted-rate caps will provide substantial relief to every merchant in the class, large and small. Stiglitz Decl. ¶ 40; S.A. ¶¶ 35, 67.

*Second*, the Settlement does not just cap the posted credit-card rates, it rolls them back. Visa and Mastercard are required to *reduce all* posted U.S. interchange rates by at least four basis points. They must do so for *every* merchant, and they must provide that relief in at least each of the first three years. Stiglitz Decl. ¶ 41; S.A. ¶¶ 34, 66.

*Third*, the Settlement also ensures that neither Visa nor Mastercard, despite the restrictions on the *posted* rates, can nevertheless increase credit-card interchange fees by switching consumers to higher-priced cards. The Settlement provides that an independent auditor will determine Visa and Mastercard's weighted average effective, system-wide interchange rate for the 12-month period ending March 31, 2024. Each network will then be required for five years (the Settlement term) to have a weighted average effective rate that is at least seven basis points below that auditor-determined baseline. Stiglitz Decl. ¶ 42; S.A. ¶¶ 33, 65.

The Settlement thus addresses both avenues for the networks to raise interchange fees on credit cards—by raising posted rates and by moving cardholders to higher-interchange cards. It stops the upward interchange-fee spiral. And it goes beyond halting that upward trajectory, providing impetus toward competitive fees by rolling back current rates. Stiglitz Decl. ¶ 43.

**The Savings to Merchants**.  Under reasonable assumptions, the more-competitive rates

---

[18] *See* Leffler Decl. ¶¶ 22, 24.

resulting from the rule changes—improved surcharging and discounting—will be very significant. Those savings by merchants and their customers are likely to be substantially more than the savings generated by the rate-caps and rollbacks. But the caps and rollbacks alone will provide very significant savings to the Class. Stiglitz Decl. ¶ 44.

The caps and rollbacks have powerful combined effects. They stop the historical rates of increase, roll back posted rates by at least four points, and roll back average effective rates by at least seven points. And they do all of that with respect to steadily increasing volumes of credit-card transactions.[19] In sum, the caps and rollbacks alone will generate savings of $29.79 billion Stiglitz Decl. ¶ 45; Leffler Decl. ¶¶ 18, 27-29.

Notably, the rate reductions and average-effective rates (minus 7 bps) are *minimums*; each network remains free to implement even lower published or effective rates, and merchants maintain their independent ability to negotiate rate reductions below the minimums.

## IV. PRELIMINARY APPROVAL IS APPROPRIATE BECAUSE THE SETTLEMENT IS LIKELY TO GAIN FINAL APPROVAL

### A. THE GOVERNING STANDARDS ON PRELIMINARY APPROVAL

As the Court noted in approving the Rule 23 (b)(3) class settlement, the amendments to Rule 23 (effective December 1, 2018) alter the standards that guide a court's preliminary approval analysis:

> Under the new Rule 23(e), in weighing a grant of preliminary approval, district courts must determine whether "giving notice is justified by the parties' showing that the court *will likely be able to*: (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B)(i–ii) (emphasis added). Because Rule 23(e)(2) sets forth the factors that a court must consider when weighing *final* approval, it appears that courts must assess at the preliminary approval stage whether the parties have shown that the court will likely find that the factors weigh in favor of final settlement approval. This standard appears to be more exacting than the prior

---

[19] *See* Leffler Decl. ¶¶ 22-25.

requirement.

*Payment Card Litig.*, 330 F.R.D. 11, 28 (E.D.N.Y. 2019).

The inquiry involves a determination of both procedural and substantive fairness. *McReynolds v. Richards-Cantave*, 588 F.3d 790, 803-04 (2d Cir. 2009). Factors include whether the settlement "appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class and falls within the range of possible approval," *In re Nasdaq Market-Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997) ("*NASDAQ II*"), provides "intangible benefits," *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2014 WL 6851096, at *2 (S.D.N.Y. Dec. 2, 2014), and grants the plaintiffs repose in the face of complex, uncertain litigation, *In re Initial Pub. Offering Sec. Litig.*, 226 F.R.D. 186, 198 (S.D.N.Y. 2005). "A 'presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery.'" *Wal-Mart Stores Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (quoting *Manual for Complex Litigation* (Third) § 30.42 (1995)). A mediator's involvement, such as that of Prof. Green's here, is a factor that helps to ensure that the proceedings were free of collusion. *In re Literary Works in Electronic Databases Copyright Litig.*, 654 F.3d 242, 252–53 (2d Cir. 2011); *see also* 2 MCLAUGHLIN ON CLASS ACTIONS § 6:7 (15th ed. 2018) ("A settlement reached after a supervised mediation receive[s] … a presumption of reasonableness and the absence of collusion.").

While "[t]he decision to grant or deny such approval lies squarely within the discretion of the trial court," *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 124 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997), courts in this District recognize that "there is an overriding public interest in settling and quieting litigation, and this is particularly true in class actions," *Fleisher v.*

24

*Phoenix Life Ins. Co.*, Nos. 11-cv-8405 (CM), 14-cv-8714 (CM), 2015 WL 10847814, at \*4 (S.D.N.Y. Sept. 9, 2015) (quoting *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 209 (S.D.N.Y. 1995)); *see also Wal-Mart Stores*, 396 F.3d at 116 ("We are mindful of the 'strong judicial policy in favor of settlements, particularly in the class action context.'" (quoting *In re PaineWebber Ltd. P'ships Litig.,* 147 F.3d 132, 138 (2d Cir. 1998))); *see also* 4 NEWBERG AND RUBINSTEIN ON CLASS ACTIONS § 13.44 (6th ed.) ("The law favors settlement, particularly in class actions and other complex cases where substantial resources can be conserved by avoiding lengthy trials and appeals").

In the antitrust context, district courts have broad discretion to fashion (and by extension, approve) appropriate equitable relief to eliminate the consequences of anticompetitive conduct. As this Court previously noted, "[w]here a court finds a violation of the Sherman Act, its ability to craft a remedy is broad, and it is 'empowered to fashion appropriate restraints on ... future activities both to avoid a recurrence of the violation and to eliminate its consequences.'" *Barry's Cut Rate Stores Inc. v. Visa, Inc.,* No. 05-MD-1720 (MKB)(JO), 2019 WL 7584728, at \*15 (E.D.N.Y. Nov. 20, 2019), *quoting*, *Nat'l Soc. of Prof'l Eng'rs. v. United States*, 435 U.S. 679, 697 (1978). Here, the rule changes and rate caps will work in concert to ameliorate the consequences of Defendants' years-long anticompetitive conduct. *See Nat'l Soc. of Pro. Engineers,* 435 U.S. at 697 ("the District Court was empowered to fashion appropriate restraints on the [defendant's] future activities both to avoid a recurrence of the violation and to eliminate its consequences"); *see also In re Checking Acct. Overdraft Litig.*, 694 F. Supp. 2d 1302, 1318 (S.D. Fla. 2010) ("If the overdraft fee provisions are found to be unconscionable, the Court retains the authority and discretion to fashion appropriate equitable relief.").

B.   **THE SETTLEMENT HAS NO OBVIOUS DEFICIENCIES AND DIRECTLY ADDRESSES AND RESOLVES THE PROBLEMS THE SECOND CIRCUIT IDENTIFIED IN REVERSING THE 2012 AGREEMENT**

The proposed Settlement has "no obvious deficiencies" and directly addresses and resolves the problems that the Second Circuit identified in reversing the 2012 Agreement. As demonstrated below, the terms and benefits of the Settlement cure those fatal defects and deliver unprecedented benefits to *all* merchants in the Rule 23(b)(2) class.

The Second Circuit found that class counsel, in representing separate classes for both damages and injunctive relief, had a conflict of interest. *Payment Card Litig.*, 827 F.3d at 233-35. This Court cured that deficiency by appointing separate counsel to represent only the Rule 23(b)(2) Class. Accordingly, there is no risk "that [ERCP Class Counsel] will trade the interests of one class for another." Cf. *Payment Card Litig.*, 827 F.3d at 236.  Moreover, this Court certified the Rule 23(b)(2) class for litigation, "and (importantly) … [not] certified as settlement-only." Cf. *id.* at 235.

In addition to being free of these structural defects, the Settlement here is clearly not "so unreasonable that it evidences inadequate representation." *Id.* at 236. The Settlement suffers from none of the specific deficiencies that prompted the Second Circuit's disapproval.

The Second Circuit noted that the settlement's "level-playing-field" rule (which the Court called a "most-favored nation clause") prevented merchants that accepted American Express cards from surcharging Visa or Mastercard credit cards. *Id.* at 238. The rule permitted merchants to surcharge Visa and Mastercard transactions only in circumstances in which the American Express rules would permit surcharging its card—and its rules generally prohibited surcharging its card. Moreover, anticompetitive statutes in certain States prevented merchants from surcharging there. *Id.*

The combination of the settlement's level-playing-field provision and the State No-

Surcharge statues made the settlement's surcharge-related relief "virtually worthless to vast numbers of class members." *Id.* at 238.[20] That combination also resulted in "unequal intra-class treatment" between those merchants that did, and those that did not, accept American Express cards or operate in No-Surcharge States. Today, less than 20% of Visa and Mastercard credit-card transactions are even eligible for surcharging. Leffler Decl. ¶ 6, n. 4; Stiglitz Decl. ¶ 14.

The Settlement flips that percentage on its head, resulting in 96% of the transactions being eligible for surcharging. Leffler Decl. ¶ 6; Stiglitz Decl. ¶ 15. The Settlement altogether eliminates the level-playing-field rule. Stiglitz Decl. ¶¶ 5, 15. Instead, merchants can surcharge Visa and/or Mastercard credit cards up to 1% regardless of whether they accept or surcharge American Express[21]; they can surcharge up to 3% if they either do not accept American Express (or other comparable cards) or also surcharge the other comparable cards in the same amount.[22] And today only three jurisdictions have No-Surcharge statutes, affecting only 4% of the Visa and Mastercard credit-card volume. Leffler Decl. ¶ 6, n. 4; Stiglitz Decl. ¶ 15.[23]

The Settlement does not leave even those 4% of merchants/transactions with "virtually

---

[20] The Court noted that, as of that time, "many states, including New York, California, and Texas, prohibit surcharging as a matter of law." *Payment Card Litig.*, 827 F.3d at 238.

[21] Notably, 1% is comparable to the differential between interchange fees for the highest cost cards and the lowest cost no-rewards cards. Stiglitz Decl. ¶ 16, n. 16. Amazon's imposing just a 0.5% surcharge on Visa in Australia and Singapore prompted Visa to reach a global agreement that reduced its interchange rates to Amazon. *See, e.g.*, https://www.cnbc.com/2022/02/17/amazon-and-visa-reach-global-truce-over-credit-card-fees.html. The threat of surcharging under even the current rules, with their dramatically limited scope, have prompted reduced interchange rates for some large merchants in exchange for, among other things, not surcharging.

[22] This surcharging structure incentivizes merchants to put pressure on American Express, commercially or through targeted litigation, to permit surcharging on an equal basis with Visa and Mastercard. Stiglitz Decl. ¶ 35.

[23] The Settlement also accommodates statutes such as those in New York, permitting dual-pricing in which the merchants disclose one purchase price for a credit-card transaction and a separate purchase price for a cash transaction. Stiglitz Decl. ¶ 22.

worthless" relief. *Cf. Payment Card Litig.,* 827 F.3d at 238. The Second Circuit noted that, where States have No-Surcharge statutes, a proper settlement could include other provisions that "might have conferred a real and palpable benefit[.]" *See id.*

The Settlement does exactly that. It provides that merchants may selectively discount a networks' credit cards by issuer. Stiglitz Decl. ¶¶ 8, 25. It also eliminates the requirement that a merchant that accepts a network's credit cards must also accept any third-party electronic wallets that store those cards; guarantees non-acceptance by store banner; and permits non-acceptance experiments. *Id.* ¶¶ 26-30. And it provides merchant-education funds that will be used to, among other things, advise merchants on permissible issuer-differentiation techniques that are arguably in the gray area between surcharging and discounting (*e.g.*, providing free delivery, special check-out lines, etc. for using a favored issuer's cards). Leffler Decl. ¶¶ 3, 5, 7. These "real and palpable benefits" are available to all merchants, including the 4% in States with No-Surcharge statutes.

Likewise, all merchants will benefit from the posted-rate caps and rollbacks, and from the average-effective-rate commitments. The reforms to the surcharging and discounting rules are expected to generate substantially more savings than the caps/rollbacks, but the latter alone are worth $29.79 billion. Stiglitz Decl. ¶¶ 11, 44-45; Leffler Decl. ¶¶ 10, 14, 16, 18, 27-29. This Settlement is a far cry from the prior deal, which "was virtually worthless to vast numbers of class members" *In re Payment Card*, 827 F.3d at 238.

Lastly, the Second Circuit was troubled because all the injunctive relief expired on July 20, 2021, while the release operated in perpetuity. *Id.* at 230, 239. The expiration of this Settlement's relief is exactly coterminous with that of the release. S.A. ¶¶ 15, 33(b), 45, 65(b), 77, 82(a), 86, 88. No Defendant is "permanently immunize[d]" from anything. *Cf. id.* at 239.

The mismatch between the end dates of the relief and the release in the 2012 Agreement

was especially unfair to merchants that came into existence after the relief terminated in July 20, 2021. Those merchants received no relief at all, yet were bound by the release in perpetuity. *See In re Payment Card*, 827 F.3d at 241 (Leval, J.) ("[t]his is not a settlement; it is a confiscation"). The Settlement here does not suffer from that deficiency; the relief and the release are coterminous. The only mismatch is that some future merchants—those that come into existence after final approval of the Settlement—will not be members of the class and therefore not bound by the release (S.A. ¶¶ 1(ee), 80), but will nevertheless benefit from the Settlement's relief. That is not unfair to them.

Beyond the issues that troubled the Second Circuit, no other elements of the Settlement have any "obvious deficiencies." The Settlement properly includes price caps and rollbacks. Such carefully crafted remedies are well accepted in antitrust law in general, and by this Court in particular. *See, e.g.*, *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 986 F. Supp. 2d 207, 240 (E.D.N.Y. 2013) (remedies included reduced credit-card interchange fees for eight months), *rev'd on other grounds*, 827 F.3d 223 (2d Cir. 2016); *In re Visa Check/Master Money Antitrust Litig.*, 297 F Supp. 2d 503, 508-09 (E.D.N.Y. 2003) (remedies included reduced debit interchange fees for five months), *aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A. Inc*., 396 F.3d 96 (2d Cir. 2005).

Courts routinely approve such remedies for periods comparable to, or greater than, the five-plus years at issue here. *See, e.g., United States v. Am. Soc'y of Composers, Authors, Publishers*, No. 41-1395(WCC), 2001 WL 1589999 (S.D.N.Y. June 11, 2001) (ongoing court-set royalty rates); *United States v. BMI,* No. 64-CIV-3787, 1994 WL 901652 (S.D.N.Y. Nov. 18, 1994) (same); *United States v. Carter Products, Inc.,* 211 F. Supp. 144, 147 (S.D.N.Y. 1962) (consent decree specifying maximum prices for duration of perpetual decree); *see also County of Suffolk v.*

*Long Island Lighting Co.*, 710 F. Supp. 1428, 1456-57 (E.D.N.Y. 1989) (approving civil RICO settlement including rate reductions for ten years), *aff'd in relevant part*, 907 F.2d 1295 (2d Cir. 1990).[24]

The Release here is carefully limited to claims for injunctive or declaratory relief.[25] The proposed Order temporarily stays all such claims, including those of the DAPs, pending this Court's ruling on a motion for final approval of the Settlement. Settlement Notice and Order, S.A., Appendix E ¶ 20. The propriety of such stays is implied in the very nature of non-opt-out classes. *See, e.g.*, *In re Joint E. & S. Districts Asbestos Litig.*, 120 B.R. 648, 655 (E.D.N.Y. & S.D.N.Y.

---

[24] So do courts in other jurisdictions. *See, e.g.*, Final Judgment ¶¶ V.D.3, D4, *UFCW v. Sutter Health*, Case No. CGC 14-5388451 (Cal. Sup. Ct. Aug. 27, 2021) (consent decree with limits on rates and charges for ten years); *Commonwealth v. Beth Israel Lahey Health, Inc.*, C.A. No. 2018-3703 (Mass. Superior Ct. Nov. 29, 2018) (settlement with a price cap for seven years); *Pennsylvania* v. *Geisinger Health Sys. Found.*, 1:13-cv-02647-YK, Dkt. 7 (M.D. Pa. Nov. 1, 2013) (consent decree with rate-limit process for eight years); *In the Matter of Ciba–Geigy Ltd.,* 123 F.T.C. 842, 898, 1997 WL 33483248 (Mar. 24, 1997) (FTC consent order with license royalty rate caps for ten years); *Wisconsin v. Kenosha Hosp. and Medical Center*, 1997-1 Trade Cas. (CCH) ¶ 71669, 1996 WL 784584 (E.D. Wis. 1996) (consent decree with revenue cap for five years); *FTC v. Butterworth Health Corp.*, 946 F. Supp. 1285, 1303-05 (W.D. Mich. 1996) (consent decree with freeze on hospital charges for three years and CPI limit on increases for four additional years), *aff'd*, 121 F.3d 708 (6th Cir. 1997); *White v. NFL*, 822 F. Supp. 1389 (D. Minn. 1993) (settlement with salary caps and minimum salary guarantees for five years); *Minnesota v. Health One Corp.*, 1992 WL 313827 (D. Minn. Aug. 17, 1992) (consent judgment with revenue cap anticipated for at least two years); Press Release, *A.G. Schneiderman Announces Settlement with Utica Hospitals to Address Competitive Concerns* (December 11, 2013), https://ag.ny.gov/press-release/2013/ag-schneiderman-announces-settlement-utica-hospitals-address-competitive-concerns (limit on price increases for five years); Press Release, *Alaska Dept. of Law, State Files Consent Decree to Provide Pricing Protection for Alaskans* (Nov. 7, 2012), https://law.alaska.gov/press/releases/2012/110712-PricingProtection.html (price caps for five years).

[25] *See, e.g.*, S.A. ¶ 82(a) (claims released "to the extent that they seek any form of declaratory, injunctive, or equitable relief, or attorneys' fees, costs, expenses, or interest, to the extent such fees, costs, expenses, or interest are related to those claims"); ¶ 82(c) (preserving "[a]ny claim of a Rule 23(b)(2) Class Releasing Party seeking monetary damages but not any form of declaratory, injunctive, or equitable relief with respect to the claims released herein"); ¶ 92(d) (ERCPs will seek a stay of "all further proceedings in MDL 1720, to the extent that they seek declaratory, injunctive, or equitable relief against the Defendants that is being released against the Rule 23(b)(2) Class Released Parties").

1990) (the effect of class certification is "for all pending state and federal cases to become part of the mandatory class and cease to exist as independent cases"); *Mycka* v. *Celotex Corp.*, 1988 WL 80042, at *4 (D.D.C. July 18, 1988) (same). A stay is necessary to protect "the jurisdiction of this court to determine this action, either by trial or by court-approved settlement," *Robertson v. National Basketball Ass'n,* 413 F. Supp. 88, 90 (S.D.N.Y. 1976), particularly "where a federal court is on the verge of settling a complex matter, and [other] court proceedings may undermine its ability to achieve that objective," *In re Visa Check/Mastermoney Antitrust Litig.*, 2005 WL 2100930, at *3-4 (E.D.N.Y. 2005). Accordingly, courts regularly stay potentially conflicting claims pending consideration of a proposed class settlement. *See, e.g.*, Class Settlement Preliminary Approval Order, ECF No. 1745 at 10 (staying conflicting claims pending final approval); *In re American Express Anti-Steering Rules Antitrust Litig.*, Mem. & Order, No. 11-MD-02221-NGG-RER, ECF No. 335 (E.D.N.Y. Feb. 11, 2014), at 2 (explaining that court had specifically enjoined individual plaintiffs from pursuing equitable relief pending final approval).[26] Indeed, the Court here certified a non-opt-out class for the very purpose of avoiding "inconsistent judgments or prejudice to absent class members," and making settlement possible, because "defendants … surely will not agree to settlements like this one if they cannot buy something approaching global peace." Mem. & Order, ECF No. 8647, at 119 (quoting *Berry* v. *Schulman*, 807 F.3d 600, 608 (4th Cir. 2015)).

The proposed Settlement has "no obvious deficiencies" and is an excellent result for the Equitable Relief Class, far exceeding the equitable relief provided by the 2012 Agreement. It is fair, reasonable, and adequate, and warrants preliminary approval under Rule 23(e).

---

[26] The Preliminary Approval Order is at No. 11-MD-02221-NGG-RER, ECF No. 333 at 2. The Court later denied final approval of the settlement on other grounds.

C.  **THE PROPOSED SETTLEMENT PROVIDES VALUABLE RELIEF TO THE EQUITABLE RELIEF CLASS**

The Settlement requires Mastercard and Visa to implement significant changes to their respective network rules that will benefit all merchants, large and small. The rule changes for surcharging, discounting, honor-all-cards, buying groups and merchant education will generate sufficient competition, under reasonable assumptions, to produce massive merchant savings. Leffler Decl. ¶¶ 10, 14, 16, 29; Stiglitz Decl. ¶¶ 11, 44-45. In addition, the rate caps and reductions guarantee *immediate* relief to *all* merchants, resulting in $29.79 billion in savings to merchants. *Id*.

D.  **CONSIDERATION OF THE FINAL APPROVAL FACTORS SUPPORTS PRELIMINARY APPROVAL OF THE PROPOSED SETTLEMENT**

Fed. R. Civ. P. 23(e)(2) provides that a court may approve a settlement that would bind class members only after a hearing and finding that the settlement is "fair, reasonable, and adequate." The Court is not required at the preliminary approval stage to determine whether it will grant final approval of the proposed settlements, only that it is likely to do so. *Payment Card Litig.*, 330 F.R.D. at 28; *Authors Guild v. Google, Inc.*, No. 05-8136, 2009 WL 4434586, at *1 (S.D.N.Y. Dec. l, 2009) ("a full fairness analysis" is unnecessary for preliminary approval).

As the Court noted in granting preliminary approval to the 23(b)(3) class settlement, amended Rule 23(e)(2) requires courts to consider whether:

(A)  the class representatives and class counsel have adequately represented the class;

(B)  the proposal was negotiated at arm's length;

(C)  the relief provided for the class is adequate, taking into account:

(i)  the costs, risks, and delay of trial and appeal;

(ii)  the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; if required;

(iii)  the terms of any proposed award of attorney's fees, including timing of payment; and

(iv)  any agreement required to be identified under Rule 23(e)(3);

and

(D)      the proposal treats class members equitably relative to each other.

*Payment Card Litig.*, 330 F.R.D. at 29; Fed. R. Civ. P. 23(e)(2).

Historically, courts in the Second Circuit have considered factors comparable to those in Rule 23(e)(2) that govern final approval. *See Payment Card Litig.*, 330 F.R.D. at 29 citing *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974) ("*Grinnell*"), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000) (identifying nine factors for courts to consider at preliminary approval stage (the "*Grinnell* factors")). The *Grinnell* factors are:

> (l) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Grinnell*, 495 F.2d at 463 (citations omitted). In applying these factors, "[n]ot every factor must weigh in favor of the settlement, rather, the court should consider the totality of these factors in light of the particular circumstances." *Dial Corp. v. News Corp.*, 317 F.R.D. 426, 431 (S.D.N.Y. 2016) (citing *In re Global Crossing Sec. and ERISA Litig.*, 225 F.R.D. 436, 456 (S.D.N.Y. 2004) (citation omitted)).[27]

As this Court explained, the new Rule 23(e) factors "add to, rather than displace the *Grinnell* factors." *Payment Card Litig.*, 330 F.R.D. at 29. Accordingly, both sets of factors should be reviewed in tandem. *Id.* (noting significant overlap between the *Grinnell* factors and the Rule

---

[27] The reaction of the Equitable Relief Class will follow notice and thus cannot be evaluated before the final approval briefing and a fairness hearing.

23(e)(2) factors). Consideration of the requirements of Rule 23(e)(2) and the *Grinnell* factors demonstrates not only that the proposed Settlement falls within the range of reasonableness, but also that the Court is likely to grant final approval. The Court should, therefore, grant preliminary approval of the Settlement and authorize notice to the Equitable Relief Class.

### E. THE CLASS REPRESENTATIVES AND CLASS COUNSEL HAVE ADEQUATELY REPRESENTED THE EQUITABLE RELIEF CLASS AND THE SETTLEMENT RESULTED FROM ARM'S-LENGTH NEGOTIATIONS BY EXPERIENCED AND INFORMED COUNSEL WITH THE ASSISTANCE OF A NATIONALLY RENOWNED MEDIATOR

The first two factors of Rule 23(e)(2)—adequate representation by the class representatives and class counsel and whether the settlement was reached at arm's length—focus on the conduct of the litigation and settlement negotiations. Relevant considerations may include the experience and expertise of plaintiffs' counsel, the quantum of information available to counsel negotiating the settlements, the stage of the litigation and magnitude of discovery taken, the pendency of other litigation concerning the subject matter, the length of the negotiations, whether a mediator or other neutral facilitator was used, the manner of negotiation, whether attorney's fees were negotiated with defendants and, if so, how they were negotiated and their amount, and other factors that may demonstrate the fairness of the negotiations. *See* Fed. R. Civ. P. 23 Advisory Committee Note.

Under any of the factors to be considered, Plaintiffs and Class Counsel have adequately represented the Equitable Relief Class throughout the litigation and in achieving the Settlement. In granting class certification, the Court has already found that the Plaintiffs and their counsel are adequate: "The Court finds that the class representatives – with the exception of DDMB and DDMB2 – and Class Counsel adequately represent the class." *DDMB, Inc. v. Visa, Inc.*, 2021 WL 6221326, at *18 (E.D.N.Y. Sept. 27, 2021). Additionally, the Court noted that Plaintiffs seek the same equitable relief for themselves and all other Class members, and Class Counsel are seasoned litigators with significant experience prosecuting and resolving complex, multi-defendant,

antitrust cases. *Id.*, at \*38.[28] The enormous value of the relief obtained in the Settlement further demonstrates the adequacy of Class Counsel.

Moreover, Class Counsel retained outstanding experts and defeated multiple motions for summary judgment, as well as a motion to dismiss and multiple *Daubert* motions, and successfully prosecuted a motion for class certification. In negotiating and evaluating the relief in the proposed Settlement, Class Counsel consulted at length with and received professional, expert advice from Nobel laureate economist Dr. Stiglitz and economic expert Dr. Leffler. Class Counsel also received input from payments experts employed by a number of merchants of various sizes and types, including national grocery chains, national restaurant chains, gaming, hospitality, airlines, and numerous small businesses. Class Counsel Decl. ¶ 118. At various points and to the extent possible, Class Counsel coordinated settlement efforts with certain of the DAPs. Class Counsel Decl. ¶ 118. The proposed Settlement is the product of a careful, deliberative process, and not of any sort of rush to settle or a mere "tweaking" of the relief in the 2012 Agreement.

The Settlement is entitled to a "presumption of fairness, adequacy, and reasonableness," *In re CitiGroup Inc. Bond Litig.*, 296 F.R.D. 147, 155 (S.D.N.Y. 2013), because negotiations between the parties were vigorous and were conducted at arm's length. Class Counsel Decl. ¶¶ 8, 114. *See, e.g., In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 173-74 (S.D.N.Y. 2000), *aff'd*, *D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d Cir. 2001).[29] "Further, 'great weight is accorded

---

[28] *See also* Memorandum and Order ECF No. 6754; *Payment Card Litig.*, 2016 WL 8138988, at \*4 (E.D.N.Y. Nov. 30, 2016) (concluding that Class Counsel were eminently qualified to represent the then-putative class of more than 12 million merchants).

[29] *See also CitiGroup Inc. Bond Litig.*, 296 F.R.D. at 155 ("This presumption arises because if the negotiation process is fair 'the forces of self-interest and vigorous advocacy will of their own accord produce the best possible result for all sides.'") (quoting *In re CitiGroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 381 (S.D.N.Y. 2013)); *Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 662 (S.D.N.Y. 2015) (finding settlement procedurally fair where due to experienced counsel and extensive discovery "counsel on both sides were well-situated to thoughtfully assess the potential

to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation.'" *In re IMAX Sec. Litig.*, 283 F.R.D. 178, 189 (S.D.N.Y. 2012) (Buchwald, J.) (quoting *PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. at 125). Class Counsel's recommendation in favor of the proposed Settlement is predicated on their extensive knowledge of the payment card industry, evaluation of a fully developed record, and analysis provided by economic experts. Leffler Decl. ¶¶ 30-32; Stiglitz Decl. ¶¶ 46-52.

The participation of Prof. Green as a mediator in the settlement process reinforces that negotiations were non-collusive and conducted at arm's length. *See Sanders v. CJS Sols. Grp., LLC*, No. 17-cv-3809 (ER), 2018 WL 1116017, at *2 (S.D.N.Y. Feb. 28, 2018) ("[T]he settlement was negotiated for at arm's length with the assistance of an independent mediator, which reinforces the non-collusive nature of the settlement."); *Kelen v. World Fin. Network Nat. Bank*, 302 F.R.D. 56, 68 (S.D.N.Y. 2014) ("[A] court-appointed mediator's involvement in pre-certification settlement negotiations helps to ensure that proceedings were free of collusion and undue pressure.").

In the preliminary approval of the Rule 23(b)(3) Class settlement in 2019, this Court noted that Prof. Green was one of two "highly qualified mediators" who assisted both sets of negotiations in this action, and that Prof. Green, "a retired Boston University School of Law professor and current full-time mediator, became involved in 2009 to mediate a first round of settlement negotiations for a subset of Plaintiffs in this action." *Payment Card Litig.*, 330 F.R.D. at 35. Prof. Green also served as a settlement mediator in *In re Visa Check/Mastermoney Antitrust Litig.*, 297

---

outcomes of the case and the likelihoods of each occurring"); *Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 122 (S.D.N.Y. 2009) ("Where a settlement is the 'product of arm's length negotiations conducted by experienced counsel knowledgeable in complex class litigation,' the negotiation enjoys a 'presumption of fairness.'") (quoting *In re Austrian & German Bank Holocaust Litig.,* 80 F.Supp.2d 164, 173–74 (S.D.N.Y. 2000)).

F. Supp. 2d 503, 510 and n. 7 (E.D.N.Y. 2003), a class action antitrust case brought by merchants against Visa and Mastercard, where the Second Circuit affirmed the district court's approval of the settlement and plan of allocation. *See also Wal-Mart Stores*, 396 F.3d at 117 (affirming district court's agreement with Professor Green's opinion that the proceedings operated with procedural integrity).[30]

In short, the Settlement was the product of extensive, hard-fought litigation occurring alongside equally extensive and hard-fought negotiations, with the assistance of a renowned and experienced mediator, in a framework that had resolved the conflict issues noted by the Second Circuit. The first two Rule 23(e)(2) factors weigh heavily in favor of the Court's preliminary approval of the proposed Settlement.

### F.    THE SETTLEMENT PROVIDES ADEQUATE RELIEF TO THE CLASS

The third factor to consider under Rule 23(e)(2) is the adequacy of the relief provided by the proposed Settlement. To determine whether the Settlement provides adequate relief for the Equitable Relief Class under Rule 23(e)(2)(C), the Court considers:

> (i)   the costs, risks, and delay of trial and appeal;
>
> (ii)  the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

---

[30] Numerous additional Courts throughout the country have recognized Professor Green's abilities and accomplishments. *See e.g., In re Enron Corp. Sec. Derivative & ERISA Litig.*, 2003 WL 22962792, at *10 (S.D. Tex. Nov. 5, 2003) (noting that, "the proposed settlement at issue arose during court-ordered mediation with an experienced and renowned court-appointed mediator, Professor Eric Green…"); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2012 WL 13209696, at *5 (N.D. Cal. Nov. 9, 2012) (noting that Professor Green is a nationally-known and acclaimed mediator); *Fleisher v. Phoenix Life Ins. Co.*, 2015 WL 10847814, at *13, *1, *3 (S.D.N.Y. Sept. 9, 2015) ("The parties reached the Settlement through arms'-length negotiations with the assistance of Professor Eric Green, an experienced and well-respected mediator."); *Gulbankian v. MW Mfs., Inc.*, 2014 WL 7384075, at *1 (D. Mass. Dec. 29, 2014) ("After the close of discovery, the parties engaged in several rounds of mediation with Professor Eric Green of Resolutions, LLC, an experienced and well-qualified mediator, which eventually resulted in the proposed Settlement Agreement.").

(iii)  the terms of any proposed award of attorney's fees, including timing of payment; and

(iv)  any agreement required to be identified under Rule 23(e)(3).

Fed. R. Civ. P. 23(e)(2)(C). Generally, in evaluating a proposed class settlement, the court does "not decide the merits of the case or resolve unsettled legal questions." *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981). There are two reasons for this. First, the object of settlement is to avoid the determination of contested issues, so the approval process should not convert into an abbreviated trial on the merits. Second, "[b]eing a preferred means of dispute resolution, there is a strong presumption by courts in favor of settlement." *In re Telectronics Pacing Sys. Inc.*, 137 F. Supp. 2d 985, 1008-09 (S.D. Ohio 2001) (citing *Manual for Complex Litig.* § 30.42 (3d ed. 1995)). *See also In re Advanced Battery Techs., Inc. Sec. Litig.*, 298 F.R.D. 171, 175 (S.D.N.Y. 2014) ("With respect to the settlement process, a class action settlement enjoys a strong 'presumption of fairness' where it is the product of arm's-length negotiations concluded by experienced, capable counsel after meaningful discovery.") (quoting *Wal-Mart Stores*, 396 F.3d. at 116). This is particularly true when considering the resolution of class action lawsuits. *Fleisher*, 2015 WL 10847814, at *4; *Wal-Mart Stores*, 396 F.3d at 116.

Here, the relief offered in the proposed Settlement easily surpasses the "adequacy" threshold.

### 1.    The Costs, Risks, and Delay of Trial and Appeal.

Pursuant to Rule 23(e)(2)(C)(i), the first factor to consider is the "costs, risks, and delay of trial and appeal." As this Court previously noted, this factor implicates many of the *Grinnell* factors, including the first (the complexity, expense, and likely duration of litigation), the fourth (risks of establishing liability), the fifth (risks of establishing damages), and the sixth (risks of maintaining class through trial), which are then useful guideposts for the Court's assessment.

*Payment Card Litig.*, 330 F.R.D. at 36.

### a.      The Complexity, Expense, and Likely Duration of the Litigation

The complexity, expense, and length of this litigation is indisputable. This case is an especially complex antitrust case involving a two-sided market and many other intricate issues addressed in the class certification, summary judgment and *Daubert* motions, as discussed above. Originally brought as part of the combined damages and equitable relief action filed against the Defendants in 2005, the ERCP Complaint was filed in 2017, a few months after the Court bifurcated the damages and equitable relief claims into separate cases. Class Counsel have been pursuing the equitable relief claims since then, having successfully obtained favorable rulings on class certification, *Daubert*, and summary judgment. Like most complex antitrust cases, absent a settlement, this case will proceed to a costly and lengthy trial and be the subject of many significant motions, appeals and expenses. *See Payment Card Litig.*, 330 F.R.D. at 36 ("Because of the complexity and difficulty of the issues in this case, it requires, and would continue to require, costly counsel and experts, and a wealth of time. This subfactor will likely weigh in favor of granting final approval."); *Wal-Mart Stores*, 396 F.3d at 118 ("Federal antitrust cases are complicated, lengthy, and bitterly fought."); *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 263 (2d Cir. 2001) (noting the "factual complexities of antitrust cases"); *In re NASDAQ Market-Makers Antitrust Litig.,* 187 F.R.D. 465, 477 (S.D.N.Y. 1998) ("*NASDAQ III*") (estimating that trial in a complex antitrust class action "could consume over a year").

The first *Grinnell* factor supports preliminary approval.

### b.      The Risks of Establishing Liability

The fourth *Grinnell* factor considers the risks of establishing liability. "In analyzing the parties' risks of establishing liability, the Court does not '[need to] decide the merits of the case or resolve unsettled legal questions.'" *Cinelli v. MCS Claim Servs., Inc.*, 236 F.R.D. 118, 121-22

(E.D.N.Y. 2006) (quoting *Marisol A. ex rel. Forbes v. Giuliani*, 185 F.R.D. 152, 164 (S.D.N.Y. 1999), *aff'd sub nom. Joel A. v. Giuliani*, 218 F.3d 132 (2d Cir. 2000)). Instead, "Courts approve settlements where plaintiffs would have faced significant legal and factual obstacles to proving their case." *Payment Card Litig.*, 330 F.R.D. at 37 (quoting *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. at 459); *see also Thompson v. Metro. Life Ins. Co.*, 216 F.R.D. 55, 64 (S.D.N.Y. 2003) (a settlement cannot be evaluated in a vacuum; it must be evaluated "in light of the attendant risks with litigation").

Antitrust claims are generally fact intensive, legally complex, and laden with substantial risk. Many of the risk factors identified by this Court in connection with the preliminary approval of the 23(b)(3) class settlement remain, including notably the Supreme Court's decision in *Ohio v. American Express Co.*, 585 U.S. 529 (2018).

That decision requires Plaintiffs to prove harm in a two-sided market, increasing the difficulty in proving that the restraints' anticompetitive harms outweigh their alleged procompetitive justifications. *See Payment Card Litig.*, 330 F.R.D. at 37-38; *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 123 (S.D.N.Y. 2009) (in assessing risks, courts recognize that "'[t]he complexity of Plaintiff's claims *ipso facto* creates uncertainty'") (citation omitted), *aff'd*, *Priceline.com, Inc. v. Silberman*, 405 F. App'x 532 (2d Cir. 2010).

Here, the ERCPs navigated four separate defense motions for summary judgment. Trial, however, will present a higher standard of proof. Defendants' motions for summary judgment raised potentially dispositive, complex legal and factual issues. For example, Defendants raised significant issues arising from the potential applicability and interpretation of the *American Express decision* and the complex task of establishing harm in a two-sided market. In another motion, Defendants argued that any structural conspiracies stemming from the old joint ventures

40

owned by the banks were fundamentally altered and eliminated by changes in ownership structures. In yet another motion, Mastercard and the Bank Defendants raised complex issues as to whether Mastercard has sufficient market power to restrict credit or debit transaction output to increase prices above competitive levels.[31]

Plaintiffs succeeded in raising triable issues of fact to defeat each of these motions, but there is no guarantee that the factfinder will ultimately resolve those issues in Plaintiffs' favor. A defense finding on any one of them would be fatal to the Class.

Even a victory at trial here would only be the first step. The Defendants are among the largest and wealthiest corporations in the world, with significant litigation resources including some of the most accomplished law firms in the United States. If they lost at trial, Defendants would undoubtedly appeal.

The *American Express* litigation illustrates the difficulties of prevailing at trial and through appeal. The plaintiffs there achieved a victory in the District Court after a seven-week bench trial, obtaining completely favorable findings of fact. *United States v. American Express Co.*, 88 F. Supp.3d 143 (E.D.N.Y. 2015). The District Court held that American Express had market power in the market for network services and that its anti-steering provisions, which prevented merchants from steering customers to alternative card brands, caused harm to competition by rendering low-price business models untenable, stunting innovation, and resulting in higher prices for merchants and their consumers. *Id.* at 213-18. The Court rejected all the proffered pro-competitive justifications, finding them "neither legally cognizable nor supported by the record." *Id.* at 225-26.

---

[31] A fourth defense motion for summary judgment remains pending, in which Defendants challenge Plaintiffs' monopolization claims, arguing that Plaintiffs cannot establish antitrust standing, injury-in-fact, or antitrust injury.

Despite all the District Court's favorable findings of fact, the Second Circuit reversed, holding that the market was defined improperly and should have included a "two-sided market" for both network services and cardholder services. *United States v. American Express Co.*, 838 F.3d 179 (2d Cir. 2017). The Supreme Court affirmed in a decision by Justice Thomas that sealed the victory for American Express. *Ohio v. American Express Co.*, 585 U.S. 529 (2018).

Nine years after the District Court opinion in *American Express*, the American Express-accepting merchants have received zero injunctive relief, and the credit-card purveyors have continued to rake in $60 billion annually over that span. The *American Express* decision looms over this litigation. To downplay that decision, or the treatment that the plaintiff-favorable findings received in the Court of Appeals and the Supreme Court, would be to deny reality.

When viewed against the substantial and certain benefits that the Settlement provides, the risks of continued litigation support approval. The Settlement provides substantial relief to all class members without subjecting them to the substantial risks, complexity, lengthy delays, and expense of continuing litigation. "Indeed, the primary purpose of settlement is to avoid the uncertainty of a trial on the merits." *Siler v. Landry's Seafood House—N.C., Inc.*, 2014 WL 2945796, at *6 (S.D.N.Y. June 30, 2014). Thus, the fourth *Grinnell* factor weighs in favor of the Settlement.[32]

### c.      The Risk of Maintaining the Class Through Trial

The Court previously certified the Equitable Relief Class, but the Court retains the ability to review and modify the grant of certification at any point prior to trial, such that the risk of maintaining the class through trial cannot be 100% certain. *See Bellifemine v. Sanofi-Aventis U.S. LLC*, No. 07 Civ. 2207 (JGK), 2010 WL 3119374, at *4 (S.D.N.Y. Aug. 6, 2010) ("There is no assurance of obtaining class certification through trial, because a court can re-evaluate the

---

[32] The fifth *Grinnell* factor—the risk related to establishing damages—is not relevant here.

appropriateness of certification at any time during proceedings."); *In re Bear Stearns Companies, Inc. Sec. Derivative & ERISA Litig.*, 909 F. Supp. 2d 259, 268–69 (S.D.N.Y. 2012) (risk of class being decertified "militates in favor of settlement approval").

> **2.     The Effectiveness of any Proposed Method of Distributing Relief to the Class, Including the Method of Processing Class Member Claims, If Required**

The second Rule 23(e)(2)(C) factor - there is no equivalent *Grinnell* factor - requires courts to look at the proposed method of processing class member claims. This case—and the proposed Settlement—involves equitable relief only, and Class members will not need to submit a claim or make any sort of proof or presentation to obtain the valuable relief that the Settlement provides. Rather, that relief will be effectuated by the settlement terms alone. Moreover, the Settlement calls for the creation of a Merchant Education Program, which will serve the important purpose of advising Class members and their processors, acquirers, and payments consultants on how to fully realize the Settlement's benefits. Class Counsel Decl. ¶¶ 132, 144-47.

> **3.     The Terms of any Proposed Award of Attorneys' Fees, Expenses and Plaintiffs' Service Awards, Including Timing of Payment**

Revised Rule 23(e) requires courts to consider the terms of any proposed award of attorney fees prior to approving a settlement. The Second Circuit requires the district court to review both the terms of the settlement and any fee award in tandem. *Moses v. The New York Times Co.*, 79 F.4th 235, 244 (2d Cir. 2023). Pursuant to the Settlement, all attorneys' fees and expenses approved by the Court shall be paid solely by the Defendants, who have agreed to pay Class Counsel attorneys' fees and expenses up to $170 million. S.A. ¶ 11.

Importantly, the parties never discussed Class Counsel's fees or expenses until after they had agreed to all other material Settlement terms. Class Counsel Decl. ¶ 117. Where fees are negotiated after the settlement terms have been agreed, and the fees are paid directly by the

defendant rather than taken out of the Class's recovery, the Court's fiduciary role in overseeing the award of attorney fees is greatly reduced, because there is no conflict of interest between the attorneys and the class members. *McBean v. City of New York*, 233 F.R.D. 377, 392 (S.D.N.Y. 2006).[33] Still, even when the defendant pays the attorney fees, a court must assess the reasonableness of the fee award. *In re Sony SXRD Read Projection Television Class Action Litig.*, 2008 WL 1956267, at *15 (S.D.N.Y. May 1, 2008).

The Settlement also contemplates that Class Counsel will seek service awards for the class representatives. As this Court and the Second Circuit recognized in approving the 23(b)(3) settlement, such awards are justified to recognize and reward the efforts that lead plaintiffs make on behalf of the class. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-1720, 2019 WL 13213700, *123 (E.D.N.Y. Dec. 16, 2019) (Brodie, J., awarding service fees), *aff'd in relevant part*, *Fikes Wholesale, Inc. v. Visa U.S.A., Inc.*, 62 F.4th 704, 721 (2d Cir. 2023). *See also Moses v. The New York Times Co.*, 79 F.4th 235, 254, 256 (2d Cir. 2023) (Second Circuit declining to "depart from Rule 23's mandate, which permits fair and appropriate incentive awards" and holding that "providing incentive payments to class representatives for their role in advancing litigation is, on its own, insufficient to create a conflict of interest"); *Currency Conversion Fee*

---

[33] *See, e.g.*, *Dupler v. Costco Wholesale Corp.*, 705 F. Supp.2d 231, 234 (E.D.N.Y. 2010); *Babcock v. C. Tech Collections, Inc.*, 2017 WL 1155767, *10 (E.D.N.Y. Mar. 27, 2017); *Shapiro v. JPMorgan Chase*, 2014 WL 1224666, at *25 (S.D.N.Y. Mar. 24, 2014); *Benzio v. General Electric Co.*, 655 F. Supp.2d 162, 168 (N.D.N.Y. 2009); *Blessing v. Sirius XM Radio Inc.*, 2011 WL 3739024, at *4 (S.D.N.Y. Aug. 24, 2011), *aff'd*, 507 F. App'x 1 (2d Cir. Dec. 20, 2012); *Ebbert v. Nassau County*, 2011 WL 6826121, at *13-14 (E.D.N.Y. Dec. 22, 2011); *Grottano v. City of New York*, 2022 WL 2763815, at *2, *4 (S.D.N.Y. Jul. 15, 2022); *Hart v. BHH, LLC*, 2020 WL 5645984, at *6 (S.D.N.Y. Sept. 22, 2020); *Jermyn v. Best Buy Stores, L.P.*, 2012 WL 2505644, at *9, *11 (S.D.N.Y. June 27, 2012); *Kemp-Delisser v. Saint Francis Hospital & Medical Center*, 2016 WL 6542707, at *14-15 (D. Conn. Nov. 3, 2006); *Pearlman v. Cablevision Systems Corp.*, 2019 WL 3974358, at *4-5 (E.D.N.Y. Aug. 20, 2019); *Schwartz v. Intimacy in New York, LLC*, 2015 WL 13630777, at *6 (S.D.N.Y. Sept. 16, 2015); *Sierra v. City of New York*, 2023 WL 7016348, at *6 (S.D.N.Y. Oct. 25, 2023).

*Antitrust Litig.*, 263 F.R.D. at 131-32 (awarding incentive awards to class representatives); *Dial Corp. v. News Corp.*, 317 F.R.D. 426, 439 (S.D.N.Y. 2016) (finding that "[c]lass representatives may receive an incentive award in addition to their allocable share of the ultimate recovery"). Further, the proposed notice discloses that Class Counsel may seek service awards for each Class Representative, and that the service awards to the Class Representatives will be paid by Defendants, not by the Class. S.A. ¶¶ 1(c), 11, Appendix D.

Class Counsel will file a separate motion for an award of fees, expenses, and service awards far enough in advance of the final fairness hearing so that Class members will have sufficient time to review the fee and expense motion and, if they so choose, object to those requests.

### 4. Agreements Required to be Identified under Rule 23(e)(3)

The Settlement is the only agreement between the Parties. There are no other agreements required to be identified under Rule 23(e)(3). Class Counsel Decl. ¶ 118.

### G. THE SETTLEMENT TREATS CLASS MEMBERS EQUITABLY RELATIVE TO EACH OTHER

If approved, the proposed Settlement will provide the same equitable relief to all Class members. It is indisputable, and this Court has already held, that the Visa and Mastercard network rules apply generally to all merchants that accept Visa or Mastercard credit or debit cards. *DDMB, Inc. v. Visa, Inc.,* 2021 WL 6221326 at *13. The challenged restraints "apply to all merchants and therefore relief would be effected on a classwide basis." *Id.* at *44. The injunctive relief will order changes, modifications, or the repeal altogether of the restraints as to the entire merchant class. *Id.* at 46. Due to the nature of the relief being sought, all merchants would benefit from the equitable relief provided. *Id.* at 48. "[E]quitable relief – should Plaintiffs prevail or reach a settlement – that tackles these Restraints [the bundle of Restraints that together result in the supracompetitive interchange fees] is proper as to all merchants …" *Id.* at 48. The vast majority (96%) of merchants

will be able to surcharge Visa and/or Mastercard credit-card transactions up to 1%; and *every* merchant will benefit from the extended ability to discount cards at the point of sale, decline acceptance of digital wallets, conduct acceptance experiments, use the merchant-education services, participate in viable buying groups, and partake in the $29.79 billion in rate relief.

The foregoing reflects consideration of all the amended Rule 23(e) factors and supports preliminary approval. As demonstrated below, consideration of the remaining *Grinnell* factors that do not overlap with Rule 23(e), to the extent they are relevant to an equitable relief class, further supports preliminary approval.

### 1. The reaction of the Class to the Settlement

Notice has yet to be provided to potential Class members, so courts generally do not consider this *Grinnell* factor at the preliminary approval stage. *See, e.g., Reade-Alvarez v. Eltman, Eltman & Cooper, P.C.*, 237 F.R.D. 26, 34 (E.D.N.Y. 2006) ("Clearly, some of the[] [*Grinnell*] factors, particularly the reaction of the class to the settlement, are impossible to weigh prior to notice and a hearing."). Although analysis of this factor is premature, each of the class representatives supports approval of the Settlement. Class Counsel Decl. ¶ 105.

### 2. The stage of the proceedings.

"The relevant inquiry for this [*Grinnell*] factor is whether the plaintiffs have obtained a sufficient understanding of the case to gauge the strengths and weaknesses of their claims and the adequacy of the settlement." *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, No. 02 Civ. 5575, 2006 WL 903236, at *10 (S.D.N.Y. Apr. 6, 2006). Discovery need not be fully complete or even under way before a settlement is approved. *See IMAX Sec. Litig.*, 283 F.R.D. at 190 ("The threshold necessary to render the decisions of counsel sufficiently well informed, however, is not an overly burdensome one to achieve—indeed, formal discovery need not have necessarily been undertaken yet by the parties."). It is enough for the Parties to "have engaged in sufficient investigation of the

facts to enable the Court to 'intelligently make … an appraisal of the Settlement." *In re AOL Time Warner, Inc.,* 2006 WL 903236, at *10 (quoting *In re Austrian & German Holocaust Litig.*, 80 F. Supp. 2d 164, 176 (S.D.N.Y. 2000)).

This *Grinnell* factor undoubtedly supports preliminary approval. As discussed above, extensive discovery has been completed. *See, supra,* section II(C); Class Counsel Decl. ¶¶ 28-49. Plaintiffs obtained several significant favorable rulings from the Court on summary judgment, *Daubert* motions, and class certification. *See, supra,* section II(D), (E). Class Counsel engaged in extensive legal analysis of Plaintiffs' claims. *See, supra,* section II(B). Class Counsel worked with economic experts to assess and value the benefits to Class members if the Settlement were to be approved. *See, supra*, section III. The settlement negotiations and mediation sessions included frank discussions about the relative strengths and weaknesses of the Parties' claims and defenses. Class Counsel Decl. ¶¶ 106-21. The understanding gained through these various endeavors provided Class Counsel with a comprehensive understanding of the relative strengths and weaknesses of their case that has enabled Class Counsel to negotiate a Settlement that will be extremely beneficial to the Equitable Relief Class. *Id.*

### 3.    The Ability of Settling Defendants to Withstand a Greater Judgment

Whether Defendants can withstand a greater "judgment" is not a relevant factor here because the Settlement involves only injunctive relief. *See Caballero by Tong v. Senior Health Partners, Inc.*, 2018 WL 4210136, at *12 (E.D.N.Y. Sept. 4, 2018) ("The remaining Grinnell factors—the risks of establishing damages, the ability of the defendants to withstand a greater judgment, the range of reasonableness of the settlement fund in light of the risks of litigation and the best possible recovery—are not particularly applicable here where the plaintiffs seek only injunctive relief and not damages."); *Doe #1 by Parent #1 v. New York City Dep't of Educ.*, 2018 WL 3637962, at *12 (E.D.N.Y. July 31, 2018) ("The seventh [Grinnell] factor, the ability of the

defendants to withstand a greater judgment, does not apply here because Plaintiffs seek only declaratory and injunctive relief.") (internal citation omitted); *EB v. New York City Dep't of Educ.*, 2015 WL 13707092, at *2 (E.D.N.Y. July 24, 2015) ("Clearly, since the case involves declaratory and injunctive relief, and does not have damages or a settlement fund, "there is no need to examine the last three Grinnell factors.") (internal citation omitted). In any event, the significant equitable relief achieved in the Settlement has been described as "very substantial merchant savings." Stiglitz Decl. ¶ 33. Put another way, the relief provided by the Settlement, including the rate reduction, rate cap, and rule changes, represent major changes by Defendants and wins for merchants, as described by Dr. Stiglitz. *Id.* ¶¶ 33-35, 44-52.

As discussed above, the potential risks, an assessment of the strength of the claims and defenses, the possible complications that may arise from future changed circumstances, and the vigorous arm's-length negotiations are all additional factors that place the value of the equitable relief recovery in its full context. When balancing these factors, especially the litigation risks of taking a case of this complexity through trial and further appeals, and the value of the relief provided by the Settlement, this factor favors preliminary approval.

### 4.   The Reasonableness of the Settlement Considering the Best Possible Recovery and the Attendant Risks of Litigation.

The last two *Grinnell* factors "recognize[] the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Wal-Mart Stores*, 396 F.3d at 119 (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)). The focus here is on the reasonableness of the equitable relief to Class members considering the risks of continued litigation. *See Caballero by Tong v. Senior Health Partners, Inc.*, 2018 WL 4210136, at *12 ("When the proposed settlement provides a meaningful benefit to the class when considered against the obstacles to proving plaintiffs' claims, the agreement is

reasonable."). Here, the meaningful benefits to the Class are very substantial. Indeed, the equitable relief provided by the Settlement far exceeds the value of other Rule 23(b)(2) only settlements that have routinely received preliminary and final approval over decades of antitrust and other class action litigation in this District and Circuit.[34] This relief also exceeds combined Rule 23(b)(2) and Rule 23(b)(3) settlements that are routinely approved in this District and Circuit.[35] Continuing this litigation against the Defendants would result in additional delays, perhaps measured in half-decades, during which the merchant class would continue to pay tens of billions annually in interchange fees. And there would be no guarantee that the Plaintiffs would establish liability or ever obtain better equitable relief than the Settlement provides. These risks are arguably dispositive for these *Grinnell* factors.

In sum, consideration of Rule 23(e) and the relevant *Grinnell* factors weigh in favor of this

---

[34] *See, e.g.*, *Hyland v. Navient Corp.*, 2020 WL 6554826 (S.D.N.Y. Oct. 9, 2020), *aff'd*, 48 F.4th 110 (2d Cir. 2022) (final approval of settlement and Rule 23(b)(2) only settlement class); *McReynolds v. Richards-Cantave*, 588 F.3d 790 (2d Cir. 2009) (same with modification to release provision); *Baumgarten v. CleanWell LLC*, 2017 WL 11648985 (E.D.N.Y. Aug. 21, 2017) (preliminary approval of settlement and Rule 23(b)(2) only settlement class); *Caballero v. Senior Health Partners, Inc.*, 2018 WL 4210136 (E.D.N.Y. Sept. 4, 2018) (same); *EB, LB1, HG, KSG, AJ, IP, SM, JW DR v. New York City Department of Education*, 2015 WL 13707091 (E.D.N.Y. May 19, 2015) (same); *Johnson v. Kendall*, 2023 WL 6227678 (D. Conn. Sept. 26, 2023) (same); *M.G. v. New York City Department of Education*, 2021 WL 3560764 (S.D.N.Y. Mar. 8, 2021) (same); *Fero v. Excellus Health Plan, Inc.*, 2022 WL 1292133 (W.D.N.Y. Apr. 29, 2022) (final approval of settlement and Rule 23(b)(2) only settlement class).

[35] *See, e.g.*, *Charron v. Wiener*, 731 F.3d 241 (2d Cir. 2013) (final approval of settlement with separate Rule 23(b)(2) and (b)(3) classes certified in the same litigation); *Calibuso v. Bank of America Corp.*, 2013 WL 12370127 (E.D.N.Y. Dec. 27, 2013) (same); *In re Global Crossing Securities Litig.*, 225 F.R.D. 436 (S.D.N.Y. Nov. 24, 2004) (same); *Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650 (S.D.N.Y. 2015) (same); *Sykes v. Harris*, 2016 WL 3030156 (S.D.N.Y. May 24, 2016) (same); *Hill v. City of New York*, 2019 WL 1900503 (E.D.N.Y. Apr. 29, 2019) (preliminary approval of settlement with separate Rule 23(b)(2) and (b)(3) classes certified in the same litigation); *In re Currency Conversion Fee Antitrust Litig.*, 2006 WL 3253037 (S.D.N.Y. Nov. 8, 2006) (same); *Mayhew v. KAS Direct LLC*, 2018 WL 3122059 (S.D.N.Y. June 26, 2018) (same); *Patellos v. Hello-Products, LLC*, 2022 WL 2159566 (S.D.N.Y. June 15, 2022) (same); *Williams v. Equitable Acceptance Corp.*, 2021 WL 1625329 (S.D.N.Y. Apr. 27, 2021) (same).

Court granting preliminary approval to the Settlement.

## V.    THE COURT SHOULD AUTHORIZE DISSEMINATION OF NOTICE TO THE EQUITABLE RELIEF CLASS

As part of the court's approval process, Rule 23(e) requires that notice of a proposed settlement be provided in a reasonable manner to all class members potentially bound by the settlement. Fed. R. Civ. P. 23(e)(1)(B). Notice regarding a proposed settlement is adequate under both Rule 23 and due process standards if it "fairly apprise[s] the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Hall v. ProSource Techs., LLC*, No. 14-cv-2502 (SIL), 2016 WL 1555128, at *4 (E.D.N.Y. Apr. 11, 2016).

Depending upon the type of relief sought, Rule 23 provides different requirements for notice. For Rule 23(b)(3) classes, which involve monetary relief and opt-out rights, Rule 23 requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort" Fed. R. Civ. P. 23(c)(2)(B). In a mandatory Rule 23(b)(2) class, in contrast, which solely seeks class-wide injunctive or declaratory relief, the court has wide discretion to "direct appropriate notice to the class." Fed R. Civ. P. 23(c)(2)(A); *Elkind v. Revlon Consumer Products Corp.*, 2017 WL 9480894 at *19 (E.D.N.Y. Mar. 9, 2017) (noting that the standards for notice to 23(b)(2) and 23(b)(3) classes differ, and that for a 23(b)(2) class, the Court has discretion to implement "appropriate notice"); *Martin v. Weiner*, 2007 WL 4232791, at *2 (W.D.N.Y. Nov. 28, 2007) (while Rule 23(e)(1) required the court to "direct notices in a reasonable manner to all class members who would be bound by a proposed settlement," in light of Rule 23(c)(2)(A), the court "has complete discretion as to how this notice is to be given").

As noted in *In re Marsh ERISA Litig.*, 265 F.R.D. at 144, "[t]o satisfy due process, notice

to class members must be reasonably calculated, under the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." (citation and internal quotation marks omitted). Moreover, "[t]he standard for the adequacy of a settlement notice in a class action under either the Due Process Clause or the Federal Rules is measured by reasonableness." *Wal-Mart Stores*, 396 F.3d at 113−14 (citations omitted).

With respect to substance, a notice must apprise class members of the settlement terms and "of the options that are open to them in connection with the proceedings." *Vargas v. Capital One Fin. Advisors*, 559 F. App'x. 22, 27 (2d Cir. 2014). As succinctly explained by this Court:

> [N]otice must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceeding." *Wal-Mart Stores*, 396 F.3d at 114 (citation and internal quotation marks omitted). In addition, notice "is adequate if it may be understood by the average class member." *Id.* (citation and internal quotation marks omitted)…
>
> Courts in this Circuit have explained that a Rule 23 Notice will satisfy due process when it 'describe[s] the terms of the settlement generally,'" "inform[s] the class about the allocation of attorneys' fees, and provide[s] specific information regarding the date, time, and place of the final approval hearing." *Id.* at 191 (alteration in original) (first citing *In re Michael Milken & Assocs. Sec. Litig.*, 150 F.R.D. 57, 60 (S.D.N.Y. 1993); and then citing *Clark v. Ecolab Inc.*, Nos. 07-CV-8623, 04-CV-4488, and 06-CV-5672, 2009 WL 6615729, at *6, 2009 U.S. Dist. LEXIS 108736, at *22 (S.D.N.Y. Nov. 17, 2009)).

*Payment Card Litig.*, 330 F.R.D. at 58–59.

The Notice Plan in this case, a non-opt-out Rule 23(b)(2) action for equitable relief only, provides both a reasonable manner of notice to the class and meets this Court's substantive requirements.

As set forth in the Declaration of Cameron R. Azari, Esq. On Proposed Class Notice Plan

("Azari Decl."), filed concurrently,[36] ¶¶ 27-53, the Notice Plan includes: (i) Publication Notices placed in National Business Publications, National Trade and Specialty Publications, Local Business Journals, Specialty Language and Targeted Newspapers, and U.S. Territory Newspapers; (ii) an all-encompassing Digital Notice Campaign using banner display notices, social media, podcast and streaming TV advertisements, and targeted website placements; (iii) audio advertisements over Streaming and Satellite Radio; (iv) a Case Website containing all pertinent information and documents related to the Settlement, including a long-form Website Notice, as well as a toll-free telephone number, email and postal address to contact for information regarding the Settlement; (v) Sponsored Search Listings on the three most highly visited search engines that will include links to the Case Website; and (vi) a nationwide Informational Release that will include the Case Website address and the toll-free telephone number to call for information about the Settlement.[37]

The proposed media notice effort is estimated to reach approximately 82.2% of all U.S. Business Owners with an average frequency of 4.5 times, and 84.8% of all U.S. Adults in Business and Finance Occupations with an average frequency of 4.1 times. Azari Decl. ¶ 27. Such extensive

---

[36] Mr. Azari is a Senior Vice President with Epiq Class Action & Claims Solutions, Inc. ("Epiq") and the Director of Legal Notice for Hilsoft Notifications ("Hilsoft"), a firm that specializes in designing, developing, analyzing, and implementing large-scale legal notification plans. Hilsoft is a business unit of Epiq. Class Counsel have retained Epiq to assist with providing notice of the Settlement to the Equitable Relief Class. In addition to describing the details of the Notice Plan, Mr. Azari's Declaration sets forth his expertise and experience with administering class action settlements and providing notices in a manner that satisfies Rule 23 and due process, and the methodology used in developing the Notice Plan.

[37] Copies of the Publication Notice and the Website Notice are annexed as Appendix D to the Settlement Agreement. The Notices are designed to be "noticed," reviewed, and understood by members of the Rule 23(b)(2) Class. The Notices contain substantial, easy-to-read summaries of all key information about the Rule 23(b)(2) Settlement and the rights of the members of the Rule 23(b)(2) Class, including the ability to object, and all relevant deadlines and hearing dates. Azari Decl. ¶ 54; S.A. Appendix D.

use of print publications and technological and digital means provides reasonable notice to the class. *See e.g., In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.,* 527 F. Supp. 3d 269, 275 (E.D.N.Y. 2021) ("Where plaintiffs' digital plan will reach 80 percent of the class, requiring them to supplement the plan with individual notice is unnecessarily burdensome."); *In re MetLife Demutualization Litig.*, 262 F.R.D. 205, 208 (E.D.N.Y. 2009) ("The best practicable notice under the circumstances is notice by publication in newspapers. In view of the millions of members of the class, notice to class members by individual postal mail, email, or radio or television advertisements, is neither necessary nor appropriate. The publication notice ordered is appropriate and sufficient in the circumstances").

Lesser notice is required for a mandatory, non-opt-out Rule 23(b)(2) settlement than for a Rule 23(b)(3) settlement. As this Court has found, the procedural protections attending the (b)(3) class, including mandatory notice, are unnecessary to a (b)(2) class. *DDMB, Inc., v. Visa, Inc*., 2021 WL 6221326 at *43, citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 362-63 (2011). To satisfy Rule 23 for non-opt-out cases, all that is required is "appropriate notice" as "the court may direct." *In re Marsh ERISA Litig.*, 265 F.R.D. at 144-45.

Although members of a class action certified under Rule 23(b)(2) are ordinarily not entitled to *individual* notice, or according to some courts any notice,[38] the procedure is different in the

---

[38] *See Parker v. Time Warner Entertainment Co., LP*, 239 F.R.D. 318, 330 (E.D.N.Y. 2007) (Rule 23(b)(2) "does not require that Plaintiffs' counsel give actual individual notice to each member of the class"); *Holmes v. Continental Can Co.*, 706 F.2d 1444, 1156 (11th Cir. 1983) ("Class members of action certified under (b)(2) are not entitled to individual notice"); *In re Allstate Ins. Co*, 400 F.3d 505, 506 (7th Cir. 2008) ("A Rule 23(b)(2) class action does not require giving class members notice of the suit and a chance to opt out of it and bring their own individual suits; a Rule 23(b)(3) class action does. The thinking behind this distinction is that declaratory or injunctive relief will usually have the same effect on all the members of the class as individual suits would."); *Cholakan v. Mercedes-Benz, USA LLC,* 281 F.R.D. 534, 562 (C.D. Cal. 2012) (noting that "unlike members of a class certified under Rule 23(b)(3), members of a Rule 23(b)(2) class do not have the right to receive notice or opt out"; however, the court may "exercise discretionary authority" to require

settlement context, which operates under Rule 23(e)(1) and requires notice in a reasonable manner, but not necessarily individual notice. "[S]ettlement notice is mandatory in all types of class actions – those certified under 23(b)(1), (b)(2), (b)(3) or any combination thereof – and hence is distinguished from certification notice, which is only mandatory in (b)(3) class actions." 3 NEWBERG AND RUBINSTEIN ON CLASS ACTIONS, § 8:14. "As part of the court's process in reviewing the proposed settlement, Rule 23(e) states that: '[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal." 3 NEWBERG AND RUBINSTEIN ON CLASS ACTIONS, § 8:15.

There is no need to incur the additional burden and expense of providing individual notice to millions of Rule 23(b)(2) Class members. Here: (i) the Rule 23(b)(2) Class has already been certified, (ii) there are no claim forms or opt-out forms to be disseminated to Rule 23(b)(2) Class members, who will instead automatically receive the benefits of the Settlement, and (iii) the Notice Plan provides extensive expected reach. The Notice Plan provides the best practicable and appropriate notice to the Class. Azari Decl. ¶12.

As to the substance of the Notice, the Publication Notice and Website Notice (annexed to the Settlement as Appendix D) inform class members of the nature of the action, the terms of the Settlement, the availability of information about the Settlement on the Settlement Case Website or from a toll-free telephone number and address for the Settlement Administrator, and an opportunity to be heard at the fairness hearing. The Notices describe basic information in plain, clear terms, including the Class claims, the Class definition, potential attorneys' fees and expense awards,

---

notice); *Reeb v. Ohio Dep't of Rehabilitation & Correction*, 435 F.3d 639, 464 (6th Cir. 2006) ("Potential class members do not have an automatic right to notice under Rule 23(b)(2)."); *Jefferson v. Ingersoll Int'l Co.*, 195 F.3d 894, 897 (7th Cir. 1999) ("Rule 23(b)(2) recognizes a no-notice and no-opt-out class for final injunctive relief or corresponding declaratory relief that operates with respect to the class as a whole.").

potential Class Representative service awards, the date and location of the final approval fairness hearing, and Class members' right to object to any aspect of the Settlement. For these reasons, the notice meets the standards of Rule 23(e)(1) and of due process.

## VI.   PROPOSED TIMELINE FOR NOTICE AND FINAL APPROVAL

Plaintiffs propose the following schedule for Notice and Final Approval:

1.       Within thirty (30) days after the Court's entry of the Rule 23(b)(2) Class Settlement Notice and Scheduling Order, in the form annexed to the Settlement as Appendix E (the "Settlement Notice and Order"), the Class Administrator shall substantially complete the notice to members of the Rule 23(b)(2) Class that is described in the Notice Plan, using the Publication Notice and Website Notice contained in Appendix D to the Settlement (the "Notices").

2.       Within thirty (30) days after the Court's entry of the Settlement Notice and Order, any motions seeking approval of attorneys' fees, expenses, and service awards for named Class Representatives shall be filed with the Court.

3.       Within forty-five (45) days after the Court's entry of the Settlement Notice and Order, the Class Administrator shall prepare and file with the Court a report that confirms that the Notice Plan was carried out and that the website notice, publication notice, and any other notice to members of the Rule 23(b)(2) Class was provided in the manner directed by the Court.

4.       Any objections by Class members to the Settlement or to Class Counsel's request for attorneys' fees, expenses, and service awards must (a) be submitted in writing, (b) be filed with the Clerk of Court, (c) be postmarked no later than ninety (90) days after the date of entry of the Settlement Notice and Order, and (d) otherwise comply with the requirements set forth in the Notices, including submitting a separate notice of intention to appear if any Objector, or counsel for an Objector, desires to appear at the final approval hearing.

5.       Within one hundred and twenty (120) days after the date of entry of the Settlement

Notice and Order, any replies and supporting papers that respond to any objections to the Rule 23(b)(2) Class Settlement and/or attorneys' fees, expenses, and service awards shall be filed with the Court.

6.     At least one hundred and fifty (150) days after the date of entry of the Settlement Notice and Order, the Court will schedule a final approval fairness hearing.

## VII.    CONCLUSION

For all the foregoing reasons, ERCPs respectfully request that the Court enter an order: (1) preliminarily approving the Settlement; (2) authorizing dissemination of notice to the Equitable Relief Class pursuant to the Notice Plan approved by the Court; (3) setting the dates for Class Counsel to file a motion for final approval of the Settlement and a motion for attorneys' fees, expenses, and service awards; (4) setting the date by which all Class member objections must be filed, or in the case of mail objections, the date that such objections must be post-marked; (5) setting the date that Class Counsel may file reply briefs in support of final approval of the Settlement and/or attorneys' fees, expenses, and service awards; (6) setting the date for Class Counsel to submit a Notice Report; and (7) setting a date for a final approval fairness hearing.

Dated:  March 26, 2024                          Respectfully submitted,

                                                **GRANT & EISENHOFER P.A.**

                                                By:___*s/ Robert G. Eisler*_____
                                                Robert G. Eisler
                                                Chad B. Holtzman
                                                **GRANT & EISENHOFER P.A.**
                                                485 Lexington Ave., 29th Floor
                                                New York, NY 10017
                                                (646) 722-8500
                                                reisler@gelaw.com
                                                choltzman@gelaw.com

Michael J. Freed
William H. London
Robert J. Wozniak
**FREED KANNER LONDON & MILLEN LLC**
100 Tri-State International, Suite 128
Lincolnshire, IL 60069
(224) 632-4500
mfreed@fklmlaw.com
wlondon@fklmlaw.com
rwozniak@fklmlaw.com

Linda P. Nussbaum
Susan R. Schwaiger
**NUSSBAUM LAW GROUP, P.C.**
1133 Avenue of the Americas, 31st Fl.
New York, NY 10036
(917) 438-9189
lnussbaum@nussbaumpc.com
sschwaiger@nussbaumpc.com

Steve D. Shadowen
Richard M. Brunell
Sherwin Faridifar
**Hilliard & Shadowen LLP**
1717 W. 6th Street, Suite 370
Austin, TX 78703
(855) 344-3298
steve@hilliardshadowenlaw.com
rbrunell@hilliardshadowenlaw.com
sfaridifar@hilliardshadowenlaw.com

*Equitable Relief Class Counsel*