**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | MDL No. 1720<br><br>Docket No. 05-md-01720 (MKB-JAM) |
| This Document Relates To:<br><br>BARRY'S CUT RATE STORES INC.; DDMB, INC. d/b/a EMPORIUM ARCADE BAR; DDMB 2, LLC d/b/a EMPORIUM LOGAN SQUARE; BOSS DENTAL CARE; RUNCENTRAL, LLC; CMP CONSULTING SERV., INC.; TOWN KITCHEN, LLC d/b/a TOWN KITCHEN & BAR; GENERIC DEPOT 3, INC. d/b/a PRESCRIPTION DEPOT; and PUREONE, LLC d/b/a SALON PURE,<br><br>         Plaintiffs,<br><br>   v.<br><br>VISA, INC.; MASTERCARD INCORPORATED; MASTERCARD INTERNATIONAL INCORPORATED; BANK OF AMERICA, N.A.; BA MERCHANT SERVICES LLC (f/k/a DEFENDANT NATIONAL PROCESSING, INC.); BANK OF AMERICA CORPORATION; BARCLAYS BANK PLC; BARCLAYS BANK DELAWARE; BARCLAYS FINANCIAL CORP.; CAPITAL ONE BANK, (USA), N.A.; CAPITAL ONE F.S.B.; CAPITAL ONE FINANCIAL CORPORATION; CHASE BANK USA, N.A.; CHASE MANHATTAN BANK USA, N.A.; CHASE PAYMENTECH SOLUTIONS, LLC; JPMORGAN CHASE BANK, N.A.; JPMORGAN CHASE & CO.; CITIBANK (SOUTH DAKOTA), N.A.; CITIBANK N.A.; CITIGROUP, INC.; CITICORP; and WELLS FARGO & COMPANY,<br><br>         Defendants. | **DECLARATION OF EQUITABLE RELIEF CLASS COUNSEL IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT** |

Linda P. Nussbaum, of Nussbaum Law Group, P.C.; Steve D. Shadowen, of Hilliard Shadowen LLP; Michael J. Freed, of Freed Kanner London & Millen; and Robert G. Eisler, of Grant & Eisenhofer, P.A. (together, "Equitable Relief Class Counsel"), pursuant to 28 U.S.C § 1746, hereby declare as follows:

## I.      INTRODUCTION AND OVERVIEW

1.      Equitable Relief Class Counsel ("ERCC") make this Declaration based on personal, firsthand knowledge, and if called upon and sworn as witnesses, could and would testify competently to the facts contained herein. ERCC are counsel for PureOne, LLC d/b/a Salon Pure ("PureOne"); RunCentral, LLC ("RunCentral"); CMP Consulting Serv., Inc. ("CMP"); Generic Depot 3, Inc. d/b/a Prescription Depot ("Generic Depot"); and Boss Dental Care PLLC ("Boss Dental") (collectively, "ERCPs") and the Rule 23(b)(2) equitable relief class certified by the Court on September 27, 2021 (the "Equitable Relief Class").

2.      ERCC submit this Declaration in support of ERCPs' Motion for Preliminary Approval of Proposed Settlement (the "Settlement") with Defendants Visa Inc., including Visa U.S.A. Inc. and Visa International; Mastercard Incorporated; Mastercard International Incorporated; Bank of America, N.A.; BA Merchant Services LLC (formerly known as National Processing, Inc.); Bank of America Corporation; Barclays Bank plc; Barclays Bank Delaware (formerly known as Juniper Bank); Barclays Financial Corp. (formerly known as Juniper Financial Corporation); Capital One Bank (USA), N.A.; Capital One, N.A. (as successor to Capital One F.S.B.); Capital One Financial Corporation; JPMorgan Chase Bank, N.A. (as successor to Chase Bank USA, N.A. and as successor to Chase Manhattan Bank USA, N.A. and Washington Mutual Bank); Paymentech, LLC (as successor to Chase Paymentech Solutions, LLC); JPMorgan Chase & Co. (as successor to Bank One Corporation and Bank One Delaware, N.A.); Citibank (South Dakota), N.A.; Citibank, N.A.; Citigroup Inc. (as successor to Citicorp); and Wells Fargo &

Company (as successor to Wachovia Bank N.A.) (collectively, "Defendants;" separately, by the Defendant groups, "Visa," "Mastercard," and "Bank Defendants;" and together with ERCPs, the "Parties").

3.       Attached to this Declaration are true and correct copies of the following:

Exhibit A:     Class Settlement Agreement of the Rule 23(b)(2) Class Plaintiffs and the Defendants (the "Settlement Agreement" or "S.A.").

Exhibit B:     Declaration of Cameron Azari, Sr. Vice President of Epiq Class Action & Claims Solutions, Inc. on Proposed Class Notice Plan ("Azari Decl.").

Exhibit C:     Declaration of Liz Lambert, Sr. Managing Director – National Settlement Team of Huntington National Bank in Support of Equitable Relief Plaintiffs' Motion for Appointment of Escrow Agent ("Lambert Decl.").

Exhibit D:     Declaration of Joseph E. Stiglitz, dated March 25, 2024 ("Stiglitz Decl.").

Exhibit E:     Declaration of Keith Leffler, dated March 24, 2024 ("Leffler Decl.").

Exhibit F:     Declaration of Eric D. Green in Support of the Motion for Preliminary Approval of the Equitable Relief Class Proposed Settlement ("Green Decl.").

4.       This Declaration summarizes the factual and procedural history of this litigation, starting with the appointment of ERCC and continuing through the events leading up to this Settlement.  ERCPs and ERCC have: (a) been fully engaged in this litigation; (b) gained a full understanding and appreciation of all the risks to the Equitable Relief Class if the case were to proceed to trial; (c) gained a full understanding of how Defendants' conduct caused injury to the Equitable Relief Class; and (d) conducted settlement negotiations at arm's length and in the best interests of the Equitable Relief Class.

5.       The Settlement was achieved following seven years of litigation and vigorous

opposition of Defendants, including the two dominant payment card networks in the United States and their counsel, some of the most formidable defense firms in the country.

6.     Under the leadership of ERCC, the Settlement achieves significant rule reforms, unprecedented interchange rate caps and rollbacks, and the removal of barriers to competition in the payment card industry.  A conservative estimate of the value to merchants of the rate relief alone is $29.79 billion,[1] making it one of the highest-valued settlements in the history of class actions.

7.     ERCPs and ERCC have adequately represented the Equitable Relief Class.  Among other things, ERCC prepared complex and sophisticated pleadings, retained renowned experts, and successfully opposed repeated efforts by the Direct Action Plaintiffs ("DAPs") and others to defeat the mandatory Rule 23(b)(2) litigation Class certified by this Court.  In addition to successfully litigating ERCPs' class certification motion, ERCC also successfully litigated a motion to dismiss, *Daubert* motions, and multiple summary judgment motions, prevailing at each step of this litigation in the face of formidable opposition from Defendants and their counsel.  ERCC also coordinated with other plaintiff groups in an efficient manner with respect to shared discovery efforts and other pretrial matters.

8.     The Settlement was negotiated at arm's length and with the assistance of a highly experienced, knowledgeable, and neutral mediator.

9.     The relief provided for the Equitable Relief Class in the Settlement is substantial. Among other things, the Settlement provides for important changes to Visa's and Mastercard's network rules that will significantly increase merchants' ability to surcharge, discount, and steer customers to lower-cost payment cards; an improved role for merchant buying groups; a fulsome

---

[1] *See* Stiglitz Decl. ¶ 43.

merchant education program run by an independent third party; interchange rate caps and rollbacks; and a critical anti-circumvention provision. The relief provided for the Equitable Relief Class is far beyond adequate, taking into account the costs, risks, and delay of trial and appeal and the terms of the proposed award of attorneys' fees, which will be paid by Defendants, subject to Court approval, under the terms of the Settlement.

10.     Finally, the Settlement treats all members of the Equitable Relief Class equitably relative to each other. The relief achieved by the Settlement—including substantial changes to the networks' surcharging, discounting, level-playing-field, honor-all-cards, honor-all-wallets, and all-outlets rules; provisions supporting the formation of merchant buying groups to negotiate reduced interchange fees; the establishment of a fund to educate merchants on newly available competitive tools provided by the Settlement; and the interchange rate caps and rollbacks— benefits all members of the Equitable Relief Class.[2]

11.     This Declaration describes the great effort, dedication, and expense put forth by ERCC and ERCPs to bring this challenging and highly complex case for equitable relief to a successful conclusion via the Settlement.

12.     Under all the circumstances discussed below, the Settlement is well within the range of reasonableness to warrant notice to the Equitable Relief Class and preliminary approval by the Court.

13.     Unless otherwise defined, all capitalized terms have the meanings prescribed to them in the Settlement.

---

[2] Merchants operating in Connecticut, Massachusetts, and Puerto Rico may be restricted in their ability to take advantage of the modified surcharging rules under current laws in those jurisdictions. Those jurisdictions may ultimately follow several other states who have, in recent years, repealed their no-surcharge laws.

## II.     HISTORY OF THE LITIGATION

### A.     THE COURT'S APPOINTMENT OF EXPERIENCED EQUITABLE RELIEF CLASS COUNSEL

14.     Since 2005, merchants in this multi-district litigation ("MDL") have alleged that they are forced to pay artificially inflated fees to accept Visa and Mastercard payment cards. Defendants are alleged to have undertaken a uniform course of unlawful conduct by requiring merchants to comply with anticompetitive restraints, which are incorporated (along with other network operating rules) into the contracts between banks and their merchant customers.  The merchants alleged that these restraints facilitated Defendants' imposition and collection of supracompetitive prices on Visa and Mastercard transactions in violation of the antitrust laws.  *See* ECF No. 6125; *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.* ("*In re Payment Card*"), 986 F. Supp. 2d 207 (E.D.N.Y. 2013), *rev'd and vacated*, 827 F.3d 223 (2d Cir. 2016); ECF No. 317 (First Consolidated Amended Class Action Complaint); *Photos Etc. Corp. v. Visa U.S.A. Inc.*, No. 3:05-cv-1007 (D. Conn. Jun. 22, 2005), ECF No. 1 ¶ 55 (initial complaint seeking certification of nationwide merchant class for purposes of both damages and equitable relief).

15.     The first stage of this litigation (the "First Stage Litigation") settled in 2012 (the "2012 Agreement").  Former District Judge John Gleeson approved the 2012 Agreement, which divided merchants into two classes: a Rule 23(b)(3) class, consisting of merchants that accepted Visa and Mastercard from January 1, 2004 to November 27, 2012; and a Rule 23(b)(2) class consisting of merchants that accepted Visa and Mastercard as of November 27, 2012 and into the future.  *See* ECF No. 1745 ¶¶ 5-6; ECF No. 6125 at 6 n.3; *In re Payment Card*, 2012 WL 12929536, at *1-2 (E.D.N.Y. Nov. 27, 2012); *In re Payment Card*, 986 F. Supp. 2d at 213 n.3.  Both classes were represented by a single set of counsel.  Under the 2012 Agreement, the Rule 23(b)(3) class

received monetary relief, while the Rule 23(b)(2) class received injunctive relief in the form of changes to various Visa and Mastercard rules. *See* ECF No. 1745; *In re Payment Card*, 2012 WL 12929536, at *1. Judge Gleeson certified the Rule 23(b)(2) injunctive relief merchants as a mandatory settlement class (i.e., no opt-out rights). *See* ECF No. 1745 ¶ 6; ECF No. 6125 at 52 n.20; *In re Payment Card*, 986 F. Supp. 2d at 239 n.20. Many large merchants, as well as several merchant associations, objected and opted out from the Rule 23(b)(3) class and objected to the Rule 23(b)(2) class as improperly certified. *See* ECF No. 6125 at 36-52; *In re Payment Card,* 986 F. Supp. 2d at 230-39.

16.     DAPs are merchants, including 7-Eleven, Home Depot, Target, and Amazon, that opted out and opposed the 2012 Agreement before filing individual actions in the MDL beginning in June 2013. *See, e.g.*, ECF No. 2442 (7-Eleven objection); ECF No. 2605 (Amazon objection); *The Home Depot, Inc. v. Visa Inc.*, No. 1:16-cv-05507 (E.D.N.Y.) (filed June 13, 2016); *7-Eleven, Inc. v. Visa Inc.*, No. 1:13-cv-4442 (S.D.N.Y.) (filed June 26, 2013) (7-Eleven and Amazon). Thus, DAPs did not participate in the First Stage Litigation. During most of the first three years of their participation in the MDL, initially as objectors to the 2012 Agreement, the DAP cases were essentially stayed, due to the pending appeal of the Court's approval of the 2012 Agreement.

17.     On June 30, 2016, the Second Circuit vacated the Court's approval of the 2012 Agreement, noting, *inter alia,* that there was an inherent conflict of interest in the appointment of a single set of counsel to represent two classes of plaintiffs separately seeking monetary and injunctive relief. *In re Payment Card*, 827 F.3d 223, 229, 234-35 (2d Cir. 2016).

18.     Following remand from the Second Circuit, this Court invited the Parties to submit proposals for representation of the proposed classes going forward. ECF No. 6654 (Aug. 11, 2016 Minute Entry). Multiple groups of attorneys moved for appointment as lead counsel for either the

Rule 23(b)(2) and Rule 23(b)(3) putative classes.

19.     DAPs objected to the formation of a mandatory Rule 23(b)(2) class, and by extension, to any representation of their interests by counsel for the Rule 23(b)(2) class.  *See, e.g.*, ECF No. 6662 (Target submission); ECF No. 6663 (Home Depot submission); ECF No. 6668 (7-Eleven submission); ECF No. 6686 (Target submission); ECF No. 6687 (Home Depot submission); ECF No. 6694 (7-Eleven submission).  DAPs argued that they were represented by their own counsel and thus did not want or need additional representation.  They sought to be excluded from any Rule 23(b)(2) putative class.  *See, e.g.*, ECF No. 6662 at 1; ECF No. 6694 at 4 n.2.  Former Magistrate Judge Orenstein rejected DAPs' arguments and, on November 30, 2016, appointed two sets of Interim Class Counsel—one for each putative class under Rules 23(b)(2) and 23(b)(3).  *See* ECF No. 6754 at 4-5.

20.     In appointing ERCC to represent the Rule 23(b)(2) class on an interim basis, Judge Orenstein concluded that ERCC were "in the best position to represent the interest of the Putative Injunctive Relief Class," in part, because certain of the firms had been "steeped in this litigation since its inception."  *See* ECF No. 6754 at 6; *In re Payment Card*, 2016 WL 8138988, at *3 (E.D.N.Y. Nov. 30, 2016).  Ms. Nussbaum and her co-counsel filed a complaint challenging the network rules and interchange fees under the antitrust laws of the United States on August 29, 2005 (No. 1:05-cv-04131), and Mr. Shadowen and his co-counsel filed a similar complaint on November 14, 2005 (No. 1:05-cv-05352).  Ms. Nussbaum and Mr. Shadowen successfully settled those cases, and, in doing so, gained valuable knowledge of the background and facts of this complex litigation, which the Court credited in its appointment.  *See* ECF No. 6754 at 6; *In re Payment Card*, 2016 WL 8138988, at *3.

21.     Judge Orenstein further found that the four ERCC firms had "demonstrated their

ability to work cooperatively with each other, with the court, and with numerous non-lead counsel representing plaintiffs with very significant interest in this litigation." *See* ECF No. 6754 at 6; *In re Payment Card*, 2016 WL 8138988, at *3. Moreover, Judge Orenstein concluded that "the participation in the leadership team of a firm that had extensive experience in the litigation but has no client relationship with any current member of the putative class heightens the likelihood that holders of future claims will have an effective voice in debates about how best to represent the putative class." *Id.*

22.     Four months after the interim appointment of ERCC, DAPs moved to amend Judge Orenstein's Order, requesting a declaration that ERCC do not represent DAPs and are not authorized to act or discuss or negotiate settlement with Defendants on behalf of DAPs. *See* ECF No. 6897 (DAPs motion); ECF No. 6908 (ERCC opposition); ECF No. 6909 (Walmart joining DAPs motion); ECF No. 6911 (Visa opposition). Judge Orenstein denied DAPs' motion and DAPs appealed to the District Court. *See* ECF No. 7068 (status conference transcript); *see also* ECF No. 6929; ECF No. 6947; ECF No. 6957; ECF No. 6958 (Visa Opp.); ECF No. 7076. DAPs argued that "if the motion is not granted, the Direct Action Plaintiffs' only recourse would be to oppose a potential settlement down the line." ECF No. 7100 at 7. Chief Judge Brodie rejected those arguments and affirmed Judge Orenstein's interim appointment of ERCC, finding that DAPs' motion was effectively an untimely request for reconsideration because DAPs had previously opposed the appointment of *any* counsel to represent a Rule 23(b)(2) class, which "would have rendered the same result that DAPs now seek." *Id.* at 9-10.

23.     By October 13, 2017, DAPs' attempts to oppose certification of a Rule 23(b)(2) class had been rejected three times.

24.     On September 21, 2021, after additional analysis, Judge Brodie officially appointed

the undersigned and their firms as ERCC and certified the Equitable Relief Class over similar objections.  The Court found that since their appointment, ERCC had "filed the operative Rule 23(b)(2) class Complaint, successfully defended against the Bank Defendants' motions to dismiss, conducted extensive discovery, briefed opposition to Intervenors' motions to intervene, pursued the instant motion for class certification, and briefed summary judgment and *Daubert* motions in addition to defending against Defendants' summary judgment and *Daubert* motions."  ECF No. 8647 at 90-91; *DDMB, Inc. v. Visa, Inc.*, 2021 WL 6221326, at *38 (E.D.N.Y. Sep. 27, 2021).

**B.  ERCPs' EQUITABLE RELIEF CLASS ACTION COMPLAINT AND SUCCESSFUL OPPOSITION TO BANK DEFENDANTS' MOTION TO DISMISS**

25.    On February 8, 2017, ERCPs' tendered a Proposed Equitable Relief Class Action Complaint (the "Complaint").  ECF No. 6858.  The Complaint challenged Defendants' collusive practices that harm competition and impose upon merchants supracompetitive, exorbitant, and collectively fixed prices in violation of Sections 1 and 2 of the Sherman Act and the California Cartwright Act.  *See* ECF No. 6858.  ERCPs brought their claims under Section 16 of the Clayton Act, seeking equitable relief to prevent and restrain violations of the Sherman Act and the California Cartwright Act.  *See id.*  Mastercard and Visa answered the Complaint on November 15, 2018.  *See* ECF No. 7293; ECF No. 7296.

26.    On April 18, 2019, Bank Defendants moved to dismiss the Complaint, which ERCPs opposed.  *See* ECF No. 7399; ECF No. 7402; ECF No. 7403; ECF No. 7408; ECF No. 7414.  On November 20, 2019, the Court denied Bank Defendants' motion to dismiss.  *See* ECF No. 7790; *Barry's Cut Rate Stores Inc. v. Visa, Inc.*, 2019 WL 7584728, at *34 (E.D.N.Y. Nov. 20, 2019).

27.    In denying Bank Defendants' motion to dismiss, the Court held that ERCPs "pled sufficient facts to suggest that it is likely, and not merely speculative, that relief from the Court

against Bank Defendants could partially redress [ERCPs'] alleged injury" and "if [ERCPs] were to succeed on the merits in this action, Bank Defendants could be found liable and subject to injunctive relief requiring them to stop adhering to particular restraints."  ECF No. 7790 at 32; *Barry's Cut Rate Stores Inc.*, 2019 WL 7584728, at *16.  The Court further held that "relief to [ERCPs] could theoretically take many forms, including placing obligations upon or otherwise enjoining the actions of Bank Defendants, and still be substantially likely to partially redress [ERCPs'] alleged injury, which stems from paying supracompetitive fees that Bank Defendants count as revenue."  ECF No. 7790 at 32; *Barry's Cut Rate Stores Inc.*, 2019 WL 7584728, at *16.

### C.   ERCPs' Efforts to Build and Update the Discovery Record

28.   Immediately after being appointed as interim counsel for the proposed Rule 23(b)(2) class, ERCC began working on behalf of ERCPs to supplement the factual record amassed in the First Stage Litigation, which had a fact-discovery-cutoff date in 2010.  The discovery record from the First Stage Litigation was outdated and required updating for trial.

### 1.   Discovery From Defendants and Third Parties

29.   In the period between the Second Circuit's decision in July 2016 and the appointment of ERCC in November 2016, Defendants and DAPs had negotiated various agreements and schedules to govern the next phase of discovery.  During this same period, over one million pages of documents (not including native files) were produced in the MDL, and counsel for DAPs, along with counsel for the Rule 23(b)(3) class who had been involved in the MDL since inception, were preparing to begin deposition discovery.

30.   On November 30, 2016—the day they were appointed by the Court—ERCC joined the discovery in progress—immediately coordinating scheduling and coverage of relevant depositions and gaining access to document depositories.  ERCC then prepared for and attended depositions within weeks of their appointment.

31.     In addition to cooperating and participating in these joint and unified discovery efforts with the other plaintiff groups, which Defendants requested, such as the negotiation of search terms, ERCC served Defendants with ERCPs' additional requests for production of documents tailored to ERCPs' equitable-relief claims.

32.     ERCC approached discovery strategically and with an eye toward efficiency.  Their work focused on mining the prior discovery record from the First Stage Litigation, which included 60 million pages of documents and over 400 deposition transcripts, for issues relevant to ERCPs' equitable-relief claims.   Going forward, ERCC participated in the depositions strategically, focusing on those witnesses that were likely to possess important information to prove the equitable relief class claims.   ERCC organized, coordinated, and completed their independent document review and analysis of the millions of pages of documents produced by Defendants to prepare for the relevant defendant and third-party fact depositions that were taken between December 1, 2016 and June 15, 2018.

33.     In addition, ERCC strategically organized their document discovery efforts to update and supplement the discovery record with respect to specific issues or network rules, and to prepare for several rule-focused depositions.  ERCC had independent economic experts Dennis W. Carlton with Lexecon and Joseph E. Stiglitz focused on the ERCP discovery efforts and the information they needed for their expert analysis.

34.     To keep the then-existing schedule, ERCC did not insist on taking leading roles in depositions, where doing so was unnecessary to prosecute ERCPs' equitable-relief claims.  They worked pursuant to a joint prosecution agreement with other plaintiff groups to select deponents, prepare for and take depositions, and took primary responsibility for certain depositions focused on Visa and Mastercard rules.  ERCC examined witnesses in over 50 depositions, attended and

monitored many more, and took key roles in the depositions concerning the relevant restraints. ERCC also prepared for and defended the depositions of ERCPs' economic experts.

35.     Furthermore, during the discovery phase, ERCC ensured that all key facts supporting ERCPs' claims were updated and developed.  For example, when it became apparent that important information regarding the 2012 Agreement's surcharging-related  terms was not in the record, ERCC established critical facts about the interplay of those terms with other Visa, Mastercard, and American Express rules at depositions of Visa executives.  Those facts confirmed that while the 2012 Agreement *appeared* to allow merchants to surcharge, the confluence of Visa's and Mastercard's level-playing-field rules, remaining Visa and Mastercard surcharging-related restraints, and American Express restraints in fact put more than 83% of credit card transaction dollar volume beyond the ability of merchants to surcharge.  At one deposition, the ERCC attorney requested and obtained a list of all waivers of surcharging rules that Visa granted to any merchant from 2009 to 2017, which information was then used in subsequent depositions.

### 2.     Discovery From ERCPs

36.     On June 15, 2017, Defendants served their first set of document requests on ERCPs.

37.     ERCPs served formal responses and objections to 87 individual document requests from Defendants and collected responsive documents.  ERCC also engaged in extensive discussions with defense counsel on behalf of ERCPs and oversaw substantial productions of documents responsive to Defendants' requests.  For example, CMP collected and produced over 1.3 million pages of documents by March 7, 2018.  Other ERCPs similarly collected and produced significant volumes of documents, including supplemental productions on November 9, 2023.

38.     ERCC worked with ERCPs to prepare responses and objections to 59 interrogatories and subparts served by the Defendants on June 15, 2017 and responses and objections to numerous contention interrogatories served by the Bank Defendants on February 7,

2020.

39.     In January 2018, Defendants served Rule 30(b)(6) deposition notices on each of the ERCPs.  ERCC objected to and negotiated the scope of the topics for those depositions on behalf of ERCPs.

40.     In January 2018, DAPs also served notices for individual third-party depositions of one witness from each ERCP, for a total of two seven-hour depositions.  This led to a dispute among ERCPs, Defendants, and DAPs, and Defendants filed a motion to compel on February 15, 2018.  *See* ECF No. 7149.  Following negotiations with DAPs, ERCPs agreed to be deposed for a total of eight hours on a single day, allowing one hour of additional questioning by DAPs.  *See* ECF No. 7151.  Defendants withdrew their motion to compel on February 22, 2018.  *See* ECF No. 7153.

41.     ERCC then prepared ERCPs' designated Rule 30(b)(6) witnesses and defended the depositions of Hal Goldman for Generic Depot on April 4, 2018; Carlos Perez for RunCentral on April 10, 2018 and CMP on April 12, 2018; Heather Boyd Smith for PureOne on April 30, 2018; and Arthus Boss, Jr. for Boss Dental on April 20, 2018.

### 3.     Expert Discovery

42.     ERCPs served expert reports from two renowned economists:  Professor Dennis W. Carlton ("Prof. Carlton"), the David McDaniel Keller Professor of Economics at the University of Chicago Booth School of Business and Senior Managing Director of Compass Lexecon; and Dr. Joseph E. Stiglitz ("Dr. Stiglitz"), recipient of the 2001 Nobel Prize in Economics and former Chairman of the Council of Economic Advisers to President Clinton, amongst his many honors and prestigious positions in economics over the past 45 years.

43.     In his expert report, Dr. Stiglitz explained the role payment mechanisms play in the U.S. economy in reducing transaction costs.  He analyzed the relevant economic market and the

extent to which Visa and Mastercard exert market power.  He focused on the significance of Visa and Mastercard in setting merchant prices for all banks that issue credit cards that are horizontal competitors in other aspects, and the role of network anti-steering rules or merchant restraints in protecting those prices from competition.  Finally, he analyzed how various merchant restraints impact economic efficiency and consumer welfare.  *See* ECF No. 8474-2 at 3.

44.     Dr. Stiglitz concluded, *inter alia*, that various alternative payments, such as credit cards, are central to the efficient functioning of a modern economy.  He observed that electronic funds transfers (EFTs) are an established and low-cost means of payment, with costs that continue to fall as technology advances.  An efficient modern system of EFT in the U.S. can connect every bank with every large merchant.  Visa and Mastercard can perform additional functions for merchants and customers, and those who value such services should be willing to pay for them. "This would incentivize cardholders to use the most cost-efficient system for their transactions, one in which added features are provided at the least cost and only if the costs exceed the benefits," thus promoting overall efficiency.  *Id*. at 4.  Dr. Stiglitz's other conclusions included the following:

- Sufficient competition among EFT networks would result in combined prices to merchants and consumers that would be expected to approach the average costs of providing the services.

- The observed pattern of prices to cardholders and merchants is distinctively different from that expected in a standard two-sided market.  There is no overall balancing of prices to the two sides.

- The networks' anti-steering rules support and maintain supracompetitive total prices by prohibiting merchants from steering customers to low-cost electronic means of payment and result in a number of inefficiencies, including total prices

and merchant prices above the competitive level, creating significant barriers to entry, impeding the introduction and growth of more efficient payments systems, preventing merchants from sharing cost savings with customers from the selection of low-cost payment means, preventing cardholders from having any incentive to choose an efficient low-cost payment means, and increasing the resource costs on accomplishing transactions relative to the benefits received, thereby reducing consumer welfare.

- The restraints result in higher prices of goods and services to all consumers who are forced to subsidize the high-cost cardholders, lower merchant acceptance, reduced output of credit card transactions, and reduced overall transactions for goods and services.

- Visa and Mastercard had sufficient market power to impose the anti-steering rules since the inception of the networks.

Dr. Stiglitz recommended the elimination of the restraints to the extent possible.  *See* ECF No. 8474-2 at 3-9.

45.     Prof. Carlton evaluated Visa and Mastercard restrictions that restrict the ability of merchants to provide accurate price signals to their own customers.  Prof. Carlton concluded that such restrictions harm competition, result in supra-competitive prices to merchants and an increase in the "net price," and reduce output.  Like Dr. Stiglitz, Prof. Carlton recommended eliminating the restrictions to the extent possible.  *See* ECF No 8474-1 at 5-7.

46.     Prof. Carlton and Dr. Stiglitz both submitted reply expert reports in October 2019. Each of those reports required substantial effort by ERCC in working with the experts and analyzing a massive discovery record.  ERCC defended Prof. Carlton and Dr. Stiglitz when they

were deposed in December 2019 and February 2020, respectively.

47.    ERCPs also retained Dr. Keith B. Leffler ("Dr. Leffler"), Emeritus Associate Professor of Economics at the University of Washington, to opine on issues related to certification of a mandatory Rule 23(b)(2) class.  Dr. Leffler prepared a report supporting class certification and relief for ERCPs' proposed Rule 23(b)(2) class.  Dr. Leffler analyzed the competitive impact of the Visa and Mastercard restraints, offered an opinion as to whether that analysis is based on class-wide evidence, and evaluated the economic impacts of allowing merchants to opt out of the class. Dr. Leffler concluded that economic analysis of the competitive effects of the restraints is based on evidence common to the proposed class.  *See* ECF No. 8474-3 at 2.   He also concluded that allowing merchants to opt out of the proposed Rule 23(b)(2) class would create perverse incentives for merchants and Visa/Mastercard, to the detriment of the Rule 23(b)(2) class as a whole.  *See id*.  ERCC also defended Dr. Leffler when he was deposed in February 2021.

### 4.    Supplemental Discovery from Defendants

48.    On November 12, 2021, ERCPs served requests for supplemental discovery from Defendants.  ERCPs' experts required updated data and documents on the network restraints and associated rules, including their impact, to continue analyzing the payment industry and prepare for trial on behalf of the Equitable Relief Class.  Defendants also requested supplemental discovery from ERCPs.  Over the next two years, ERCPs, Defendants, and DAPs negotiated the scope of supplemental productions and produced responsive documents on November 9, 2023.

49.    The Defendants produced more than 575,000 documents in response to ERCPs' requests for supplementation, which ERCC reviewed and analyzed.

### D.    THE COURT'S CERTIFICATION OF A RULE 23(b)(2) CLASS

50.    In December 2020, ERCPs moved to certify a mandatory Rule 23(b)(2) class. Among other things, ERCPs argued that their equitable-relief claims were ideally suited for class

certification because Defendants' conduct was market-wide, rather than specific to individual merchants, and was substantially identical as to the millions of merchants in the proposed class. ERCPs argued that to the extent Defendants are required to reform their conduct because of a judgment or settlement, those reforms will also be market-wide and substantially identical, as a practical and legal matter, as to all merchants. *See* ECF No. 8447 at 1, 5.

51.     In support of their motion, ERCPs asserted that beginning no later than 2004 and continuing to the present, the evidence shows that Defendants undertook a uniform course of unlawful conduct that requires merchants accepting their payment cards to comply with various "restraints" (e.g., Visa's and Mastercard's level-playing-field and honor-all-cards rules) intended to facilitate Defendants' imposition and collection of supracompetitive "total prices" on Visa and Mastercard transactions.  Visa's and Mastercard's member banks originally owned the networks, and the subsequent IPOs of both Visa and Mastercard were structured to effectively maintain that status quo. *See* ECF No. 8447 at 1-2.

52.     The liability expert reports of Prof. Carlton and Dr. Stiglitz attached to ERCPs' class-certification motion, along with the class-certification report of Dr. Leffler, further detailed how the restraints prevent merchants from, among other things, (1) setting retail prices that reflect the costs of their payment card acceptance, or (2) steering customers to lower-cost forms of payment. *See* ECF No. 8447 at 2-3.

53.     The ability of Defendants to maintain the market power necessary to profitably raise and maintain total prices above competitive levels, and successfully enforce the restraints, is critical to maintaining the conspiracy.  ERCPs and their experts described the evidence showing that market power was reflected in Defendants' ability to (1) profitably maintain total prices far above the competitive level, (2) impose inefficient price pairs, (3) reduce output below what it

would be under competitive conditions, (4) create and enhance barriers to entry, and (5) force inefficient cross-subsidization among other shoppers who do and do not use Defendants' payment cards. As a result, accepting Visa and Mastercard payment cards is a competitive necessity for merchants. *See* ECF No. 8447 at 3-4.

54. The key to a mandatory Rule 23(b)(2) class is the indivisible nature of the injunctive and declaratory remedy and the notion that the conduct is such that it can be enjoined or declared unlawful only as to all class members or none of them. For that reason, ERCPs requested certification of a Rule 23(b)(2) class with no opt-out rights. *See* ECF No. 8447 at 5-6.

55. Defendants did not oppose certification of a mandatory Rule 23(b)(2) class. Defendants agreed that the class should include all types of merchants that accept Visa and Mastercard credit or debit cards, including branded operators and franchisees and those that opted out of the Rule 23(b)(3) class. *See* ECF No. 8460 at 1-2.

56. Certain DAPs opposed certification of a mandatory Rule 23(b)(2) class, arguing that their damages claims for billions of dollars based on interchange fees were property interests protected by the Constitution's Due Process Clause. They argued that plaintiffs that prosecute individual claims in class actions are not required to be tied to the fate of the class representatives. DAPs further argued that if the mandatory Equitable Relief Class lost its case on liability, Defendants would contend "the loss precluded" and "*could* collaterally estop" DAPs from litigating the same issues and "*could* foreclose individual plaintiffs' ability to prove their damages claims." Thus, DAPs argued, a mandatory class would "confiscate" their equitable claims and "forcibly turn them over to parties with different interests." DAPs also claimed that ERCPs were seeking injunctive relief "adverse" to DAPs' interests because ERCPs sought to place commercial agreements between the networks and DAPs "under ongoing scrutiny by the Court and subject to

being nullified." DAPs also argued that the Second Circuit rejected the 2012 Agreement because it "tried to deny opt-out rights to merchants." ECF No. 8450 at 1-2, 8. The Court rejected all of DAPs' arguments.

57.     Another merchant group—comprised of Grubhub Holdings Inc., BJ's Wholesale Club, Inc., Bob Evans Restaurants, LLC, Belk Department Stores LP, and 43 other merchants ("GrubHub")—similarly argued that they had paid millions of dollars in interchange fees, whereas the named ERCPs are "small, single-location businesses that pay only a fraction" of that amount. GrubHub contended that a mandatory class would violate both the Constitution and Rule 23 by precluding them from pursuing their own injunctive relief. GrubHub purportedly disagreed with ERCPs as to which of Visa's and Mastercard's rules should be the target of a potential settlement. Like other DAPs, they argued that they would be exposed to "issue and claim preclusion risks" and that they have "distinct and divergent interests" from ERCPs. *See* ECF No. 8454 at 1-2. The Court rejected all of Grubhub's arguments.

58.     Merchant Trade Groups ("MTG")—comprised of the National Retail Federation and the Retail Industry Leaders Association—also sought to intervene to oppose certification of a mandatory Rule 23(b)(2) class. MTG complained about ERCC's refusal to continue meeting with their representatives beginning in May 2019. *See* ECF No. 8467 at 5-6, 13. Like Walmart and others, MTG disagreed with ERCPs "focusing on surcharging relief" instead of "removing the Honor-all-Cards and Default Interchange rule." MTG believed that "Defendants' core anticompetitive practices must be eliminated – not tinkered with on the margins." They further objected to the inclusion of future merchants in a mandatory class. *See* ECF No. 8467 at 12; ECF No. 8468-1 at 18-25; ECF No. 8479 at 5-9; ECF No. 8623 at 4-9.

59.     MTG essentially argued that because the merchant community is of unprecedented

breadth and size and has different opinions on what injunctive relief would be the best remedy, there can be no mandatory class certified. *See* ECF No. 8468-1 at 8-12; ECF No. 8479 at 1, 3; ECF No. 8623 at 3. MTG further alleged, without proof or citation, that Defendants and ERCPs were "apparently aligned with each other, unconcerned for the fate or opinion of absent class members." ECF No. 8479 at 1.

60. Walmart intervened in the MDL to oppose the mandatory class and, like the other large merchants that had filed individual actions, argued that ERCPs "will not adequately protect Walmart's interests," would "trade away" the interests of Walmart "to secure relief that narrowly benefits" ERCPs and secure attorneys' fees. ECF No. 8464 at 1-2; ECF No. 8465 at 1. Walmart claimed, without proof, that "ERPs and their counsel can be expected to pursue relief that is at best worthless, and more likely harmful, to Walmart, and to enter into a settlement that permits Defendants to continue their anticompetitive conduct . . ." ECF No. 8464 at 3; ECF No. 8465 at 3.

61. Walmart essentially made two arguments. Walmart argued that "even if *no* settlement materializes, Walmart's interests will still be undermined by (a) halfhearted and ineffective litigation of the claims related to [honor-all-cards] rules by the ERPs, and/or (b) the ERPs' seeking and obtaining an injunction that restrains Walmart and other merchants from negotiating for the best possible terms in their dealings with Defendants." ECF No. 8464 at 8-9.

62. Walmart also argued that "cohesion is lacking" because "the ERPs will not pursue injunctive relief that benefits the entire class." ECF No. 8465 at 1; *see also id*. at 14 ("[T]he ERPs have fundamental conflicts of interest with Walmart and other class members.").

63. Walmart asserted its "interest in being free to negotiate for the best possible terms in its dealings with Defendants." ECF No. 8464 at 3; ECF No. 8465 at 3. Walmart asserted ERCPs

"will likely seek an injunction that effectively prevents merchants from trying to use what bargaining power they have to secure lower rates for themselves . . ."  ECF No. 8465 at 8; ECF No. 8471 at 3.  Walmart objected to ERCPs seeking temporary rate caps on interchange fees that would benefit *all merchants*.  *See* ECF No. 8465 at 8 n.11; ECF No. 8471 at 3.  The Court rejected all of Walmart's arguments.

64.     Walmart repeatedly argued that Visa's and Mastercard's honor-all-cards rules must be entirely "eliminated," with the only factual support offered being a single individual's declaration and deposition testimony, which complained about Visa's and Mastercard's use of the honor-all-cards rules to "force merchants to accept new products."  ECF No. 8465 at 6-8; *see also* ECF No. 8471 at 3, 6-7.

65.     ERCPs served several response briefs addressing all of the issues raised by those opposing the certification of a mandatory Rule 23(b)(2) class.  Among other things, ERCPs noted that DAPs should not be free to monetize for themselves the value of other merchants' injunctive relief claims under Rule 23.  *See* ECF No. 8457 at 2-3, 15.  Moreover, DAPs' collateral estoppel arguments were based entirely on speculative (and contrary to case law) presumptions that (1) no settlement of DAPs' or ERCPs' claims would occur; (2) ERCPs' trial would occur before DAPs' trial; and (3) Defendants would prevail in ERCPs' trial.  *See id.* at 6-8.  No cases support the proposition that certifying a mandatory Rule 23(b)(2) class violates due process or the First Amendment.  *See id.* at 10.

66.     The potential need for court monitoring of an injunction is common, supported by case law, and does not create any conflict within a class or form any basis for denying class certification.  *See, e.g.*, *Laumann v. National Hockey League,* 105 F. Supp. 3d 384, 406-07 (S.D. N.Y. 2015).  The relief achieved in the Settlement and any injunctive relief for the Equitable Relief

22

Class is subject to Court approval, and any opponents will have the opportunity to object.  *See* ECF No. 8457 at 10-13; ECF No. 8631 at 5.  Nothing in the relief sought by ERCPs will prevent larger merchants from attempting to negotiate lower interchange rates, see ECF No. 8631 at 6, and in fact, the Settlement *enhances* that option.  Moreover, under Second Circuit law, classes seeking declaratory and injunctive relief are cohesive by nature.  *See* ECF No. 8457 at 14.

67.     Differing views among class members as to the best focus of rule changes does not create a conflict within the class.  Furthermore, the application of Visa's and Mastercard's honor-all-cards rules to mobile wallets and other new products is, in fact, of critical importance to ERCPs.  *See, e.g.*, ECF No. 8447 at 11-12; ECF No. 8457 at 16 ("Professor Stiglitz dissected the Honor All Cards rule in detail, including its application to not only mobile wallets but also all new and emerging technologies"); ECF No. 8631 at 4 ("ERPs' experts have opined that it is particularly important to remedy the "honor-all-wallets" rule, which is an application of the HAC rule to mobile devices.").

68.     As ERCPs argued, there is no requirement that all class members must have suffered the exact same injury in the exact same way.  The injuries must be similar enough that they can all be remedied with a single, indivisible injunction.  Where, as here, an entire market is subject to the same "mix of complex rules," a mandatory equitable class is a practical and legal necessity.  ECF No. 8457 at 15-18.

69.     Finally, ERCPs argued that nearly every issue in this case applies generally to the Equitable Relief Class, all the requirements under Rule 23 are met, and a litigation class should be certified.  ECF No. 8457 at 19-20.

70.     In total, ERCPs filed, analyzed, and/or responded to over 70 briefs and other filings relating to class certification.

71.     On September 27, 2021, the Court issued its Memorandum and Order certifying a Rule 23(b)(2) class consisting of "all persons, businesses and other entities that accept Visa and/or Mastercard credit and/or debit cards in the United States at any time during the period between December 18, 2020 and the date of entry of Final Judgment in this case." *See* ECF No. 8647; *DDMB, Inc. v. Visa, Inc.*, 2021 WL 6221326 (E.D.N.Y. Sep. 27, 2021).  The Court further approved certain ERCPs to proceed as class representatives for the Equitable Relief Class and appointed ERCC as co-lead counsel for the Equitable Relief Class.  *Id.*

72.     In granting certification, the Court relied heavily on reports submitted by ERCPs' economic experts, Prof. Carlton, Dr. Stiglitz, and Dr. Leffler.  *See, e.g.*, *DDMB Inc. v. Visa, Inc.* 2021 WL 6221326 at *21-22 (citing Stiglitz and Carlton opinions and noting that "both experts suggest that applications of the honor-all-cards rules such as the honor-all-wallets rule should not be permitted in order to allow more competition").  The Court recognized the critical testimony of Dr. Leffler and Dr. Stiglitz on the significance of the default interchange fees and how the rules work together to reinforce Visa and Mastercard's control over pricing.  *Id.* at 44.  The Court also recognized Dr. Leffler's report explaining the critical issue of how the anticompetitive conduct affects all merchants and class members and injures virtually all merchants.  *Id.* at 40.  Further, the Court quoted Dr. Leffler's report in explaining the critical total anticompetitive effect resulting from the restraints, including how they interact with each other and create the overall anticompetitive environment, and the impact on merchant steering and incentivizing their customers to use lower cost payment forms.  *Id.* at 45.  Finally, the Court relied on Dr. Leffler's analysis of the critical point that not allowing opt-out rights prevents free-riding by individual merchants, thereby ensuring the fairness and increasing the value of the injunctive relief to all merchants.  *Id.* at 46, 49.

73.     In its thorough 122-page opinion, the Court found that all the requirements of Rule 23(a) were met, including numerosity, commonality, typicality, adequate representation, adequate counsel, adequate class representatives, and ascertainability of the proposed class as to current merchants.  The Court also held that the proposed class met the requirements of Rule 23(b)(2) and established that the challenged restraints applied to all merchants and therefore the relief would be effectuated on a class-wide basis.  *Id.* at 44.  The Court concluded that differences in how individual merchants are affected do not negate the facts that Defendants acted on grounds generally applicable to the class and each merchant in the class stands to benefit from equitable relief related to the restraints.  *Id.* at 45; *see also id.* at 48 ("Due to the nature of the relief being sought, all merchants – regardless of whether they would choose to opt out of the class or not – would benefit from the equitable relief provided.").  Rejecting the arguments of those merchants that opposed certification, the Court held that the proposed mandatory Rule 23(b)(2) class would not violate merchants' due process rights; there was no fundamental conflict between the class and the opponents; and the mandatory class would not threaten, compromise, jeopardize, or improperly confiscate individualized monetary claims or injunctive relief claims.  *Id.* at 47.  Finally, the Court declined to impose an additional cohesiveness requirement into Rule 23(b)(2) sought by the opponents.  *Id.* at 42.

### E.     ERCPs' SUCCESSFUL OPPOSITION TO DEFENDANTS' *DAUBERT* MOTIONS

74.     Defendants filed multiple *Daubert* motions seeking to exclude certain expert opinions and testimony submitted by Prof. Carlton and Dr. Stiglitz.  *See* ECF Nos. 8074; ECF No. 8076 (Stiglitz); ECF No. 8086; ECF No. 8087 (Carlton).  Specifically, Defendants sought to exclude Prof. Carlton's opinion that "Visa and Mastercard's prices for network services are elevated as a result of the Network Restrictions" and related testimony.  ECF No. 8087 at 18.  Separately, Defendants moved to exclude Dr. Stiglitz's opinions on mature markets,

supracompetitive pricing, and certain measures of output beyond the alleged credit card market. *See* ECF No. 8076 at 7-18.

75.     ERCPs successfully opposed both motions.  *See* ECF No. 8727; ECF No. 8730; *In re Payment Card*, 2022 WL 15053250 (E.D.N.Y. Oct. 7, 2022); *In re Payment Card*, 2022 WL 15044626 (E.D.N.Y. Oct. 8, 2022).

76.     In deciding the *Daubert* motion filed with respect to Prof. Carlton, the Court excluded only Prof. Carlton's opinion that Mastercard's giving interchange reductions to merchants in exchange for not surcharging following the 2012 Agreement caused "overall merchant fees and net fees to decline."  ECF No. 8730 at 133; *In re Payment Card*, 2022 WL 15044626, at *28.  Prof. Carlton's numerous other opinions were relied on by the Court in its opinion denying Defendants' summary judgment motions.

77.     In deciding the *Daubert* motion filed against Dr. Stiglitz, the Court excluded the opinion that a two-sided analysis of the credit card market is inappropriate.  ECF No. 8727 at 130; *In re Payment Card*, 2022 WL 15053250, at *60.  Dr. Stiglitz's numerous other were relied on by the Court in its opinion denying Defendants' summary judgment motions.

## F.     PARTIES' AND DAPS' SUMMARY JUDGMENT MOTIONS

### 1.     ERCPs' and Defendants' Summary Judgment Motions

78.     In December 2020, ERCPs filed a motion for partial summary judgment against Defendants, and Defendants filed four motions for summary judgment and/or partial summary judgment against ERCPs.  Defendants' motions included the following: (i) Mastercard and Bank Defendants' Motion for Summary Judgment Based on Mastercard's Lack of Market Power; (ii) Visa and Bank Defendants' Motion for Summary Judgment on Plaintiffs' Monopolization Claims; (iii) Defendants' Motion for Summary Judgment under *Ohio v. American Express* ("*Amex*"), 138 S. Ct. 2278 (2018); and (iv) Defendants' Motion for Summary Judgment on Plaintiffs' Post-IPO

Conspiracy Claims.

79.     The motions were the subject of extensive briefing by the Parties.  *See, e.g.*, ECF No. 8067; ECF No. 8068; ECF No. 8069; ECF No. 8071; ECF No. 8073; ECF No. 8088; ECF No. 8089; ECF No. 8091; ECF No. 8067; ECF No. 8103; ECF No. 8106; ECF No. 8111; ECF No. 8150; ECF No. 8152; ECF No. 8153; ECF No. 8154; ECF No. 8155; ECF No. 8156; ECF No. 8157; ECF No. 8167; ECF No. 8168; ECF No. 8169; ECF No. 8170; ECF No. 8171; ECF No. 8172; ECF No. 8174; ECF No. 8175; ECF No. 8206; ECF No. 8208.

80.     In their motion related to Mastercard's market power, Mastercard and Bank Defendants argued that Mastercard was the third-largest credit card network and could not unilaterally restrict credit or debit transaction output to increase prices above competitive levels. They further argued that Mastercard did not control market output or prices because (a) the Supreme Court and Second Circuit previously held that American Express does not have market power under the same theories pursued in this case, (b) the credit and debit market share of around 20% was too low to create market power and was declining, (c) credit transactions (output) increased, (d) Mastercard's two-sided net price was not higher than its competitors, (e) merchants accept Mastercard because their customers want to use the cards and they find acceptance profitable, (f) innovation was not reduced because Mastercard provided new and improved products, and (g) cardholder insistence is not evidence of market power.  *See* ECF No. 8073 at 1-3.

81.     ERCPs responded that a showing of Mastercard's market power is not needed for their claims under Section 1 of the Sherman Act because ERCPs provided evidence of actual detrimental effects on competition in a two-sided market, including ERCPs' evidence of supracompetitive total prices, reduced output, and stifled competition.  ERCPs' evidence included

Mastercard's prices not being connected to its costs, stunted merchant acceptance and net reduced output, and the fact that there were no new entrants into the market for 30 years.  With respect to their Section 2 claims, ERCPs showed monopoly power and direct evidence of Mastercard's ability to profitably sustain supracompetitive total prices in the relevant markets for credit and debit card transactions.  ERCPs argued that the evidence showed the competitive dynamics and the market had remained the same for decades, including formidable barriers to entry, poor cross-elasticity of demand with other brand transactions, prices unconnected to costs, total price increases despite efficiency gains via technological advances, discriminatory pricing to merchants, significant profits; reduced output than otherwise would be the case in a competitive market, and foreclosure of the introduction of low-cost price pair payment cards.  *See* ECF No. 8170 at 1-6.

82.     On January 8, 2024, the Court denied Mastercard and Bank Defendants' motion for summary judgment as to Mastercard's lack of market power, holding that "Plaintiffs have adduced sufficient direct evidence of anticompetitive effect to defeat Defendants' summary judgment motion," ECF No. 9042 at 37, and noting that "Plaintiffs' evidence suffices to raise a triable issue of fact as to whether they have met their prima facie burden through direct evidence of anticompetitive effect," *id.* at 38.

83.     The Court further held that "[o]n the record before the Court . . . a jury could reasonably conclude that Mastercard has market power," agreeing with ERCPs and rejecting every argument advanced by Mastercard.  *Id.* at 41.  The Court concluded that Mastercard had mischaracterized *Amex* and other cases.  *See id.* at 41-42.  In *Amex*, the Supreme Court found that the *evidence was insufficient* to conclude that American Express wielded market power in a two-sided market but did not find as a matter of law that American Express affirmatively lacked market power.  Critically, "the different factual record before the Supreme Court had little bearing on the

findings of fact a jury is entitled to make in this case." *Id.* at 42.  The Court further held that controlling Second Circuit precedent clearly states that proof of market power is not required in Section 1 cases.  *See id.* at 43.  The Court went on to hold that triable issues of fact remain as to whether the challenged network rules support a finding that Mastercard exercised its market power to restrict output, raise prices, or reduce quality.  *See id.* at 43-44.  In denying the motion, the Court recognized evidence of the indicia of market power: Mastercard is able to price discriminate, does not consider costs when setting prices, forces merchants to accept the rates imposed and the challenged rules, and enjoys high profit margins.  *See id.* at 44.

84.    With respect to the *Amex* motion, Defendants argued that because American Express's anti-steering rules were held not to violate the antitrust law, ERCPs cannot show anticompetitive effects from the Visa and Mastercard challenged rules.   To assess the anticompetitive effects of a payment network rule, a court must evaluate both sides of the two-sized "transaction" market in which the network operates.   Yet, Defendants argued, ERCPs only offered evidence of price increases on the merchant side that were not wholly offset by additional rewards.   In Defendants' view, ERCPs had not shown that credit or debit transaction output decreased, arguing that it had, in fact, grown dramatically.   According to Defendants, the rules offered a, "predictable, favorable experience to cardholders and merchants" that promotes competition, and there has been inter-network competition and declining merchant-side fees since the late 1950s.  *See* ECF No. 8071 at 1-4.

85.    ERCPs responded that plaintiffs in *Amex* may not have carried their burden to prove anticompetitive effects in the two-sided market with vertical restraints, but the decision outlines how a plaintiff *can* prove anticompetitive effects in this market with horizontal restraints, which ERCPs did by showing evidence of (1) total price 2-3 times the competitive level; (2) the wrong

balance between merchant and cardholder fees, with the total price paid by merchants increasing from 135% in 2004 to 300% in 2016 unsupported by underlying industry economics; (3) reduced output; and (4) other anticompetitive effects, including supra-competitive profits, stiffened barriers to entry and expansion, prevention of inter-bank rivalry from competing via lower prices to merchants, spreading the costs of high priced credit cards to all shoppers, inefficient cross-subsidization, and other market distortions.  *See* ECF No. 8168 at 1-3.

86.     In its January 8, 2024 Memorandum and Order, the Court granted in part[3] and denied in part Defendants' motion for summary judgment under *Amex*, holding that "Plaintiffs have adduced sufficient direct evidence of anticompetitive effect to defeat Defendants' summary judgment motion."  ECF No. 9042 at 37.

87.     ERCPs faced significant challenges on the summary judgment motions.  First, ERCPs were required to define the relevant market and demonstrate a triable question of fact as to harm in a two-sided transaction market for credit card and debit card transactions.  *See* ECF No. 9042 at 17-20, 27.  Second, the motions were assessed under the rule of reason standard, long recognized as a far more challenging standard than *per se* or "quick look" analysis.  *See id.* at 20-24.  Third, while the Court accepted that the restraints at issue are horizontal, this alone did not satisfy ERCPs' prima facie burden to show harm to competition.  *See id.* at 24-26.  Fourth, ERCPs were required to establish such harm to competition where a "before and after" analysis was unavailable because the challenged restraints have been in place since the inception of the credit card networks and creation of the market.  *See id.* at 32-33.  Despite these challenges, ERCPs prevailed on summary judgment.

---

[3] The Court granted summary judgment in favor of Defendants only to the extent that ERCPs' claims were based on a one-sided market theory.  *See* ECF No. 9042 at 78.

88.     The Court agreed with ERCPs and their experts and rejected Defendants'
arguments related to the restraints causing supracompetitive prices, reduced output, entry barriers,
inefficient cross-subsidization, and other market distortions.  *See id.* at 45-52, 61-78.  The Court
further agreed with ERCPs that they were not required at the summary judgment stage to calculate
a but-for-world two-sided price to satisfy their prima facie burden; *Amex* only requires evidence
that prices would have been lower or output would have been higher without Defendants'
challenged conduct, and ERCPs satisfied their burden with the expert opinions of Prof. Carlton
and Dr. Stiglitz.  *See id.* at 48-49.  As evidence of supracompetitive two-sided pricing, Prof. Carlton
pointed to Visa's "Grand Bargain" strategy permitting certain merchants to surcharge; empirical
evidence from Australia as a comparative benchmark, where rates were reduced to 55 and then 50
basis points and Visa and Mastercard were still profitable and did not exit; the profitability of Visa
and Mastercard being above a normal rate of return; and a comparison of the interchange costs and
rewards costs on the different tiers of cards, where he found that a two-sided price above 59 basis
points on cards that offer no rewards to be supracompetitive.  *See id.* at 50-53.  As evidence of
supracompetitive two-sided pricing, Dr. Stiglitz pointed to competitive benchmarks of private
label credit cards where cardholders receive rewards and merchants pay no interchange fees; early
Discover card pricing with lower merchant fees; the debit card market with lower merchant fees;
and the Australian market with lower merchant fees.  *See id.* at 61-63.

89.     ERCPs' arguments prevailed on output, where the Court held that there was
sufficient evidence that the challenged restraints reduced output.  *See id.* at 72.  The Court held
that *Amex* suggests the relevant inquiry is whether output is lower *than it would otherwise be*, not
just whether output is lower, and "[o]utput increasing over time does not address whether output
would have increased at a greater rate in the absence of the network restraints."  *Id.* at 66, 72.  The

Court relied again on ERCPs' experts and noted evidence of Visa's and Mastercard's strategy of reducing interchange to gain acceptance into new merchant segments. *See id.* at 69. Evidence that the challenged restraints reduced output included certain merchants refusing to accept credit cards. *See id.* at 70. The Court further held that ERCPs offered direct, empirical evidence in support of their contention that card rewards would not decline in the but-for world. Decisions about interchange and rewards are bifurcated between the networks and issuing banks. *See id.* at 71-72.

90.     Finally, the Court held that ERCPs' experts adduced evidence that the challenged restraints have otherwise stifled competition, including creating barriers to new entry. *Id.* at 75, 78. The Court found that Plaintiffs' empirical evidence was bolstered by substantial theoretical support from Prof. Carlton's explanation of how surcharging would improve competition in the market. *See id.* at 77.

91.     With respect to Defendants' motion for summary judgment on the post-IPO conspiracy claims, Defendants argued that any structural conspiracies stemming from the old joint ventures owned by the banks were fundamentally altered and eliminated by changes in ownership structures. After the IPOs, Defendants argued, bank control over the boards was terminated, the networks unilaterally established default interchange fees, and the banks and networks "operated unilaterally and in their independent self-interest." Defendants asserted that after the IPOs, each bank agreed to abide by the rules as a customer of the network. *See* ECF No. 8089 at 1-2.

92.     ERCPs responded that the evidence shows that it was Defendants' intention for the anti-steering rules and default interchange fees to stay in place after the IPOs and, as a matter of law, Defendants never withdrew from the intra-network conspiracies that preceded the IPOs. Moreover, ERCPs argued that the IPOs added a "hub-and-spoke" conspiracy to the existing horizontal conspiracy and both continue today. ERCPs' response pointed to evidence showing

that (i) the restructurings were in response to court rulings that deemed Visa and Mastercard a "structural conspiracy" and threatened the networks with antitrust liability, and (ii) the member banks understood that Visa and Mastercard would continue to operate in their best interests after the IPOs and repeatedly received assurances to that end. ERCPs further argued that the evidence shows that the banks agreed to perpetuate the interchange fee business model in a form that would be less exposed to antitrust scrutiny. ERCPs further noted that the European Commission found that the banks orchestrated the restructuring simply to outsource the setting of default interchange fees to a new management body. Finally, ERCPs pointed out that the rules at issue in this action did not substantively change after the IPOs. *See* ECF No. 8170 at 1-9.

93.     On February 22, 2024, the Court rejected Defendants' arguments with respect to the post-IPO conspiracy claims. The Court found that there were triable questions of fact as to whether Defendants effectively withdrew from the pre-IPO conspiracies. *See* ECF No. 9140 at 42-43.

94.     The Court also held that ERCPs raised issues of triable fact as to the absence of evidence of affirmative steps to withdraw; the inference of a hub-and-spoke conspiracy from a series of vertical agreements; Defendants continuing to benefit from the conspiracy; and the inability to avoid liability by delegating decision making power to the networks and appointing the networks to sell their services. *See id.* at 47-50.

95.     The Court held that the evidence offered by ERCPs on summary judgment supports the factual allegations that the Court relied upon in the Complaint. Defendants could not dispute that the challenged rules were promulgated by a horizontal agreement between the banks, which owned and controlled the networks. The undisputed facts further showed that the IPOs were created to "minimize the risk of litigation" after the Second Circuit's decision in *Visa*, 344 F.3d

220.  In the months leading up to the IPOs, the networks made clear that they would continue to protect the business interests of the banks, and the banks believed the networks would continue to act in their best interests.  Critically, the challenged rules "were readopted" and "remained in effect" and every member bank knew that every other member would be bound by those rules— before and after the IPOs.  The evidence was unmistakable and overwhelming that Defendants intended for the conspiracy to continue; the banks continued to benefit from the rules and default interchange schedules; there was no evidence of withdrawal; Defendants were "invested in the continuation of the status quo;" and the banks "agreed to the restructurings to protect their business interests and those of the networks." *Id.* at 51-56.

96.     The Court concluded that whether the challenged rules were unreasonable restraints and whether any anticompetitive effects were outweighed by procompetitive effects, were material disputes to be decided by the factfinder.  *See id.* at 56-57.

97.     With respect to Visa's motion for summary judgment on ERCPs' monopolization claims, Defendants argued that Visa was "pursuing different debit strategies" than its rivals, such as a narrow set of bundled discounts, and was merely "being more successful" rather than monopolizing the debit card market.  Defendants argued that (a) ERCPs failed to show antitrust standing, injury-in-fact, or antitrust injury; (b) there was no injury to competition or competitors foreclosed from a substantial share of the relevant market; (c) bundled discounts were not exclusionary; (d) in some instances products were not actually bundled; (e) there was no actual exclusion of competition in the debit market; (f) there is no evidence of specific intent to monopolize; and (g) there was no exclusionary conduct in the debit or credit markets.  *See* ECF No. 8088 at 1-5.

98.     ERCPs responded that their economic experts, Prof. Carlton and Dr. Stiglitz,

detailed Visa's market power and how its conduct has enabled Visa to exclude competitors and charge supracompetitive prices to merchants and cardholders in both debit and credit transactions markets. Visa's debit and credit market shares have remained at 60% and 50%, respectively, and both debit and credit output would have been greater and credit card prices lower in the but-for world, supporting the elements of monopolization. *See* ECF No. 8169 at 1-2.

99.     To date, Visa and Bank Defendants' motion on the monopolization claims remains pending.

100.     ERCPs' motion for partial summary judgment argued that ERCPs will prove at trial that Defendants operate a cartel among banks that issue Visa and Mastercard credit cards and sell credit card transactions to merchants and cardholders at a supracompetitive total price under a two-sided market analysis. In response, Defendants offered a one-sided procompetitive justification that they are organizing "buying groups" of cardholders that obtain discounts from merchants (rewards), which are in turn procompetitive. ERCPs moved for partial summary judgment on the ground that this proffered procompetitive justification is precluded as a matter of law because "buying cartels are anticompetitive, not procompetitive" and *per se* unlawful. Accordingly, because "Defendants have unlawfully tied the alleged 'buying groups' to merchants' purchase of Defendants' credit-card transactions," ERCPs sought judgment as a matter of law on Defendants' contrived procompetitive justification. ECF No. 8152 at 1-4; *see also* ECF No. 8150, ECF No. 8153; ECF No. 8154; ECF No. 8155. The Court recently denied ERCPs' motion for partial summary judgment. *See* ECF No. 9152.

### 2.     DAPs' Summary Judgment Motions

101.     Several DAPs also moved for partial summary judgment. Home Depot and 7-Eleven moved for partial summary judgment seeking a ruling that Visa's and Mastercard's honor-all-cards rules are, as a matter of law, horizontal agreements among competing issuer banks. *See*

ECF No. 8184; ECF No. 8485; ECF No. 8188.  Target moved for a ruling that both default interchange fees and the honor-all-cards rules constitute, as a matter of law, horizontal agreements of competing issuers that should be reviewed at trial under standards governing horizontal agreements.  *See* ECF Nos. 8097; ECF No. 8098.  The Court denied DAPs' motions, holding that "[u]nder the governing law (*i.e.*, the rule of reason), whether the restraints are horizontal or vertical has no bearing on the outcome of the suit" and "[DAPs] motion has been rendered moot by the Court's prior ruling that the challenged restraints must be evaluated under the rule of reason."  ECF No. 9151.

### G.   ERCC'S EFFORTS TO MONITOR INDUSTRY DEVELOPMENTS, GOVERNMENT INVESTIGATIONS, AND LEGISLATIVE REFORMS RELATING TO PAYMENT CARDS

102.   ERCC researched, analyzed, and monitored industry developments, government investigations, and various legislative reforms relating to the payment card industry—not only in the U.S. but also in Australia, Canada, the European Union, and elsewhere—that might impact the equitable relief sought by ERCPs.  Such developments include, for example, the Credit Card Competition Act of 2023 and Congressional Hearings before the U.S. Senate Committee on the Judiciary held in May 2022.

103.   ERCC also researched, analyzed, and monitored developments in the payments industry and new alternative payments forms, including Buy Now Pay Later, eCommerce payment solutions, mobile payments, peer-to-peer digital payment applications, cryptocurrency, digital wallets, and mobile wallets.

104.   ERCC's work further included research, analysis, and monitoring of (i) developments in the payment processing and fintech industries that can enable and facilitate merchant surcharging; (ii) developments in state "no-surcharge" statutes; and (iii) legislation and litigation in non-U.S. markets, including Canada, the European Union, Australia, Singapore, and

the United Kingdon.

### H.    COMMUNICATIONS WITH ERCPs AS CLASS REPRESENTATIVES

105.    ERCC maintain regular written and telephonic communication with ERCPs as appointed class representatives for the Equitable Relief Class.  Subject to the limitations of the Protective Order, ERCC consistently updated ERCPs on discovery progress, orders of the Court, and the progress of mediation sessions and status of settlement negotiations with Defendants.  All of the ERCPs support this settlement.

## III.    SETTLEMENT

### A.    MEDIATION AND SETTLEMENT NEGOTIATIONS

106.    While aggressively and vigorously litigating this matter, ERCC were also simultaneously exploring the possibility of resolving the claims of the Equitable Relief Class, in many instances with the assistance of Professor Eric D. Green ("Professor Green"), a nationally renowned mediator who has been involved in the mediation of this litigation for many years.

107.    ERCC and Defendants first met with Professor Green on this matter in February 2017.  Since that initial mediation, the Parties participated in more than two dozen mediation and settlement negotiation sessions, most of which included the participation of Professor Green.

108.    Additionally, the Parties scheduled and participated in numerous phone and Zoom calls to discuss outstanding terms, issues, and potential solutions to efficiently make use of time during subsequent mediation sessions.

109.    As a result of the Parties' arm's-length negotiations, a mediation session with Professor Green in December 2023 resulted in a non-binding memorandum of understanding, which was signed on January 17, 2024.  After further negotiations, the Parties executed the Settlement on March 25, 2024.

110.    As discussed more fully below, the Settlement requires Defendants to implement

substantial changes to their respective network rules and offers rate reduction and protection for merchants for several years.

111.    Taken together, the relief provided under the Settlement is a significant victory for the Equitable Relief Class—with benefits measurably in the billions of dollars.  Dr. Stiglitz summarized the Settlement as follows:

> [I]n my view the Settlement Agreement represents a very favorable outcome for merchants. Under the Settlement Agreement, the changes to the Visa and Mastercard rules will allow merchants to steer their customers to lower-cost payment means by prices, both discounts and charges. The Settlement Agreement will offer significant immediate relief from the supracompetitive interchange fees, giving the new competitive tools time to take hold. The Settlement Agreement will put strong downward pressure on interchange fees and impede the fee spiral that has led to increasing distortions in this market.

Stiglitz Decl. ¶ 48.

112.    As described below, the relief provided by the Settlement is significantly superior, in every way, to the equitable relief provided by the 2012 Agreement.

### B.    THE SETTLEMENT PROCESS

113.    ERCC retained and consulted with economic and industry experts to assist ERCC in evaluating Defendants' offers and crafting the relief contained in the Settlement.

114.    Negotiations leading to the Settlement were entirely non-collusive and strictly at arm's length.  As discussed above, prior to reaching the Settlement, ERCPs and ERCC were well-informed regarding the strengths and weaknesses of the Equitable Relief Class's claims.

115.    Throughout the mediation process, the Parties engaged in adversarial negotiations over a multitude of issues.  These facilitated discussions were lengthy, principled, exhaustive, informed, and often contentious.  The negotiations, on both sides, were conducted by highly qualified attorneys with extensive experience and knowledge of the payments industry, as well as antitrust and class-action law.

116.    The Settlement represents the Parties' best professional efforts and judgments and is a fair, reasonable, and adequate result reached after a thorough investigation and assessment conducted over a period of many years.  The Settlement accounts for the risks, strengths, and weaknesses of the Parties' respective positions, the risks and costs of continued litigation, trial and appeals, and is in the best interest of the Equitable Relief Class.

117.    Attorneys' fees and expenses, and class representative service awards for ERCPs were not discussed until after the Parties had agreed to all material terms of the Settlement regarding the relief for the Equitable Relief Class.

118.    ERCC were fully aware of the significant litigation risks based on the extensive factual record; expert opinions and insights; and briefing and Court decisions on the motions challenging the appointment of counsel, motion to dismiss, motion for class certification, *Daubert* motions, and summary judgment motions described above.  ERCC also received input from payments experts employed by a number of merchants of various sizes and types, including national grocery chains, national restaurant chains, gaming, hospitality, airlines, and numerous small businesses.  At various points and to the extent possible, ERCC coordinated settlement efforts with certain of the DAPs.  The Settlement is the only agreement between the Parties.  There are no other agreements required to be identified under Rule 23(e)(3).

119.    Through the Settlement, the Equitable Relief Class receives the certainty of substantial relief via rule changes and interchange rate caps and rollbacks pending the merchants' adoption of those rule changes in the market, instead of enduring the risk of delay and the possibility of receiving no equitable relief if their claims are litigated through trial and post-trial proceedings.

120.    In the collective judgment of ERCC, the Settlement easily exceeds the applicable

legal standard of being fair, reasonable, and adequate for all merchants in the Equitable Relief Class.

121.    The Settlement complements other reforms achieved in the *Visa Check Card* litigation; the 2011 Consent Decree between Visa, Mastercard, and the U.S. Department of Justice; the Durbin Amendment regulating debit interchange rates; and the MDL Rule 23(b)(3) settlement approved by the Court.  The Settlement is far more preferable to continuing contentious litigation against Defendants for many more years with no guarantee of more favorable equitable relief.

C.    **THE VALUE OF THE SETTLEMENT RELIEF AND BENEFITS TO MERCHANTS**

122.    Unlike the original injunctive relief contained in the 2012 Agreement, the Settlement here provides for (a) substantial changes to Visa's and Mastercard's rules; (b) measures to enhance both the likelihood that rules changes will reduce interchange fees and how quickly those reductions will occur; and (c) limits on Visa's and Mastercard's interchange fees, including rate caps and rollbacks, while the market adjusts to greater competition resulting from the rules changes.

123.    **Enhanced Surcharging**.  The rule changes in the Settlement include substantial changes to rules that currently restrict merchants' ability to charge for the use of expensive Visa and Mastercard credit cards.  The Settlement will allow, to a far greater degree than under the 2012 Agreement, merchants to place a price on the use of high-cost cards.  As Dr. Stiglitz explains:

> Merchants' ability to steer customers to preferred payment via price signals is the essential economic mechanism to create competition among credit-card networks.  Merchants' significantly enhanced ability to impose surcharges (that it, use the price system) will help them to steer their customers to low-cost and preferred payment means by requiring shoppers who use high-cost cards to internalize the costs of their decisions.  That enhanced ability will also increase merchants' ability to negotiate lower interchange fees from Visa and Mastercard.  The networks will be motivated to impose lower interchange rates in order to avoid these surcharges (or to lower the surcharges when merchants decide to impose them).

Stiglitz Decl. ¶ 7.

124.   The spiraling cost of interchange is no longer sustainable and is being regulated all over the world.  This is the Settlement of an antitrust case, and it offers competition-based relief that is rational, practical, and achievable.

125.   The Settlement eliminates Visa's and Mastercard's level-playing-field rules. Visa's Rule 5.5.1.7 (14 October 2023) and Mastercard's Rules 5.12.2.1. and 5.12.2.2. (6 June 2023), provide that, if the merchant accepts American Express or another card that limits surcharging, the merchant must follow those rules in charging for Visa or Mastercard credit card use.  *See* Stiglitz Decl. ¶ 13.  American Express prohibits surcharging its cards unless the merchant also surcharges all other credit *and debit* transactions.  Visa's and Mastercard's rules forbid surcharges on debit transactions, and merchants generally do not want to surcharge those low-cost transactions.  *See id.*  Merchants accounting for at least 83% of Visa and Mastercard credit card transactions also accept American Express.  The current Visa and Mastercard level-playing-field rules prevent merchants from surcharging those transactions.  *See* Stiglitz Decl. ¶¶ 13-14; Leffler Decl. ¶ 6.

126.   Eliminating the level-playing-field rules makes 100% of Visa and Mastercard credit card transactions eligible for surcharging absent some other prohibition on surcharging.  Most of those other barriers to surcharging have been removed.  Since 2012, eleven states that had no-surcharge statutes (California, Colorado, Georgia, Indiana, Iowa, Michigan, New York, Ohio, Oklahoma, Pennsylvania and Texas) have repealed or stopped enforcing them.  Today, only three jurisdictions (Connecticut, Massachusetts, and Puerto Rico) may continue to enforce their no-surcharge statutes, accounting for about 4% of the Visa and Mastercard credit card transactions (based on population).  *See* Stiglitz Decl. ¶ 15; Leffler Decl. ¶ 6, fn. 4.  Eliminating the level-

playing-field rules will instantly increase the surcharge-eligible Visa and Mastercard credit card transactions from less than 20% to 96%.  *See* Stiglitz Decl. ¶ 15; Leffler Decl. ¶ 6, fn. 4.

127.    In addition to quadrupling the number of Visa and Mastercard credit card transactions that will be subject to surcharging, the Settlement also improves the specific surcharging tools available to merchants.  *First*, consistent with eliminating the level-playing-field rules, the Settlement provides that a merchant that accepts American Express can charge Visa and/or Mastercard credit cards up to 1% regardless of whether (a) its agreement with American Express prohibits surcharging its credit cards, or (b) the merchant actually surcharges American Express.  *See* S.A. ¶¶ 28(a), 60(a). Importantly, 1% is comparable to the differential between interchange fees for the highest-cost cards and the lowest-cost no-rewards cards, allowing merchants to offer efficient price signals to their customers.  *See* Stiglitz Decl. ¶ 16 & n.16.

128.    *Second*, the Settlement provides that merchants can surcharge up to the lower of the cost of acceptance or 3%, if they also surcharge any comparative credit cards that they accept—including American Express or Discover—at the same rate.  *See* S.A. ¶¶ 28(a), 60(a).  A merchant that does not accept such a comparative credit card could surcharge Visa and/or Mastercard up to 3% level.  *See* S.A. ¶¶ 28(a), 60(a).  Dr. Stiglitz explains that the Settlement will encourage challenges to the American Express rules that tether the ability to surcharge its card to the merchant's also surcharging debit cards.  *See* Stiglitz Decl. ¶¶ 18, 35.[4]

129.    *Third*, the Settlement requires that Visa and Mastercard make expressly clear the circumstances in which merchants can surcharge.  For example, the Settlement eliminates confusion by requiring that Visa's and Mastercard's rules expressly state that a merchant's ability

---

[4] On March 21, 2024, a proposed class of merchants filed a complaint against American Express over its anti-steering rules.  *See 5-Star General Store, et al. v. American Express Company, et al.,* No. 24-cv-00106-MSM-LDA (D.R.I.).

to surcharge Visa's credit cards does not depend on also surcharging Mastercard's credit cards, and vice-versa.[5]  *See* S.A. ¶¶ 28, 60.  Merchants can surcharge one, neither, or both, and can surcharge one at the brand level and the other at the product level, or any permutation.  *See* S.A. ¶¶ 28, 60; *see also* Stiglitz Decl. ¶ 19.

130.    *Fourth*, the Settlement improves merchants' ability to surcharge only certain high-cost cards, such as Visa Signature or World Elite Mastercard.  Currently the networks do not make sufficient data available in real time at the point-of-sale to inform merchants of the product that the customer is using and the applicable interchange rate.  The lack of such data effectively prevents some merchants from surcharging (or discounting) at the product level.  The Settlement addresses the problem by providing that, if the networks do not make that information available in real time at the point of sale for a particular transaction, the merchant can presume that its cost of accepting the card is 3% and surcharge that amount if the merchant also surcharges comparable credit cards.  *See* S.A. ¶¶ 28(b), 60(b); *see also* Stiglitz Decl. ¶ 20.

131.    *Fifth*, the Settlement improves the surcharging rules by greatly simplifying them.  Currently a merchant that accepts American Express and Visa or Mastercard must navigate a labyrinth involving the level-playing-field rule, applying the American Express rules to the Visa or Mastercard transaction, and comparing the cost of that transaction to a comparable American Express transaction. *See* Visa Rule 5.5.1.7; Mastercard Rule 5.12.2.1.  The Settlement provides clear, concise, and easy-to-understand rules.  Fundamentally, the merchant only has to determine

---

[5] The current rules subject merchants to the level-playing-field rule if the merchant accepts a "Competitive Credit Card Brand," and each of Visa and Mastercard defines the other as falling within that definition.  *See* Visa Rule 5.5.1.7; Mastercard Rule 5.12.2.1.  The 2012 Agreement noted "for the avoidance of doubt" that the level-playing-field rule should not be read to require merchants to apply the same surcharging to Visa and Mastercard.  *See* 2012 Agreement ¶ 42(a)(v)(D).  But the "avoidance of doubt" clarification was not included in the networks' *actual rules.*

whether it can surcharge 1% or 3%. *See S.A.* ¶¶ 28, 60; *see also* Stiglitz Decl. ¶ 21.[6]

132.    Taken together, these rule changes will greatly enhance the merchants' freedom to steer customers to lower-cost payment forms using price signals. As customers come to understand the competitive rationale for imposing these prices, competition should lead to lower Visa and Mastercard credit card interchange fees. *See* Stiglitz Decl. ¶ 23. The merchant education program discussed below will assist merchants in choosing and implementing the most effective steering methods for their business.

133.    **Enhanced Discounting**. The Settlement also significantly expands merchants' ability to steer transactions by offering discounts for using lower-cost credit cards. The Settlement extends the rule changes that were part of the 2011 Consent Decree between Visa, Mastercard, and the U.S. Department of Justice. Those provisions permitted merchants to offer discounts or enhanced services for a preferred credit card by card brand and/or by card type. *See* Stiglitz Decl. ¶ 24. The Decree expired in July 2021; the Settlement extends these rule changes for more than five additional years. *See* Stiglitz Decl. ¶ 24; S.A. ¶¶ 18, 50.

134.    In a major reform, the Settlement also requires Visa and Mastercard to modify their rules to permit issuer-level discounting, i.e., discounting a network's credit cards based on the issuing bank (e.g., a *Chase-issued* Visa credit card). Currently, Mastercard prohibits merchants from discounting its credit cards based on the issuing bank. *See* Mastercard Rule 5.11.1. Although not required by the 2012 Agreement, Visa has permitted issuer-level discounting since 2013, but Visa's rules have not been clear.[7] The Settlement requires each network to expressly state in its

---

[6] The Settlement also reduces the notice and disclosure requirements and expressly provides that the merchant can give the customer truthful information as to why the merchant is applying a charge for credit card use. *See* S.A. ¶¶ 28(c), 60(c); *see also* Stiglitz Decl. ¶ 22.

[7] Visa Rule 1.5.4.12 provides that a merchant may discount by product type (e.g., Visa Signature card), but is silent about discounting by issuer. The preceding rule—Visa Rule 1.5.4.11—is titled

rules that merchants can discount by issuer – a new requirement for Mastercard and a clarification of the rule for Visa.

135.     These reforms will make the large banks, as well as the networks, compete for merchants' business.  Under the Settlement, merchants will be permitted to discount at every level—the brand level (*e.g.*, discount Visa but not Mastercard), the product level (*e.g.*, discount Visa traditional cards), and/or the *issuer* (*e.g.*, discount only Chase Visa cards).  *See* Stiglitz Decl. ¶ 25.

136.     The Settlement will bolster issuer-level discounting by allocating merchant-education funds to show merchants how to permissibly differentiate between issuers in the gray area between discounting and surcharging.  *See* S.A. ¶¶ 42, 74.  The Settlement identifies the relevant differentiation principles.  *See* S.A., Appendix G.  The education materials will illustrate scenarios where issuer differentiation is permissible (e.g., having signage that "We prefer Chase cards because their fees are lower," or having a special check-out lane for those who use a Chase card).  Taken together, the reforms to the surcharging and discounting rules will greatly enhance merchants' freedom to steer customers to lower-cost payment forms using the linchpin of competition—prices.  As customers come to understand the competitive rationale for imposing these prices, competition should lead to lower Visa and Mastercard credit card interchange fees. *See* Stiglitz Decl. ¶ 23.

137.     **Reforms to the Honor-All-Cards Rules.**  The Settlement also mandates several important reforms to Visa's and Mastercard's honor-all-cards rules.

---

"Uniform Services – Merchant Requirement" and provides: "A Merchant must process Transactions with all Cardholders in exactly the same manner. This does not apply to discounts, promotional offers, or in-kind incentives offered by the Merchant to a subset of Visa Cards."  Visa apparently has interpreted the reference to "a subset of Visa Cards" to permit issuer-level discounting.

138. *First*, the Settlement modifies the honor-all-cards rules as they apply to digital wallets. Digital wallets such as Google Pay and Apple Pay are applications that allow users to make payments with various credit and debit cards or other sources of funds that are in the wallet. Digital wallets have rapidly grown in popularity, and that growth is expected to continue. Currently, Visa and Mastercard interpret their honor-all-cards rules to require that a merchant that enables digital wallets must accept all digital wallets that include a Visa or Mastercard payment card (credit card or debit card). Those rules eliminate the merchant's ability to negotiate with the digital wallet vendor over whether, and on what terms, to accept the digital wallet. *See* Stiglitz Decl. ¶ 26.

139. In their merits reports, ERCPs' experts, Dr. Stiglitz and Prof. Carlton, emphasized the importance of reforming the networks' honor-all-wallets rules. *See* Stiglitz Rpt. ¶ 121 & fn. 28; Carlton Rpt. ¶¶ 111, 122. In certifying the Equitable Relief Class, the Court noted that "both experts suggest that applications of the honor-all-cards rules such as the honor-all-wallets rule should not be permitted in order to allow more competition." ECF No. 8647 at 51; *DDMB*, 2021 WL 6221326 at *22.

140. The Settlement achieves that goal. It modifies the honor-all-cards rules to permit a merchant to reject a digital wallet regardless of whether it is provisioned with a Visa or Mastercard payment card. *See* S.A. ¶¶ 24-26, 56-58; *see also* Stiglitz Decl. ¶ 27. The digital-wallet vendor will no longer be able to gain acceptance at a merchant merely because it has a Visa or Mastercard payment card; the vendor will have to negotiate with the merchant for that privilege.

141. Visa currently has the technology necessary for merchants to implement this reform; Mastercard does not. The Settlement requires Visa to maintain the technology and requires Mastercard to implement it by March 2025. *See* S.A. ¶¶ 25, 57; *see also* Stiglitz Decl. ¶ 27.

Further, the Settlement permits merchants to steer among the cards within a wallet under the same rules that govern steering among traditional Visa and Mastercard credit cards.  *See* S.A. ¶¶ 27, 59; *see also* Stiglitz Decl. ¶ 27.

142.    *Second*, the Settlement clarifies and expands ways for merchants to selectively decline acceptance of traditional Visa and Mastercard payment cards (credit cards and debit cards).  The Settlement requires Visa and Mastercard to clarify that their honor-all-cards rules apply only to stores using the same "banner," *i.e.*, stores operating under the same brand name.  *See* S.A. ¶¶ 21-22, 53-54.[8]  Retailers that have store brands geared towards different customer bases can make different card-acceptance decisions for those different brands.  *See* Stiglitz Decl. ¶ 29.

143.    *Third*, the Settlement goes further by allowing merchants to conduct "experiments" to determine the circumstances in which non-acceptance, or selective non-acceptance, would be profitable.  The Settlement requires the networks to permit each merchant to conduct 120-day non-acceptance experiments at up to 20% of its stores every year.  *See* S.A. ¶¶ 22, 54.  Merchants can use the data gathered during these experiments to decide not to accept the networks' payment cards at certain banners or to threaten not to do so as a lever to negotiate lower interchange fees.  These rule changes substantially reduce the risks to merchants of non-acceptance and should increase their ability to use the data accumulated through such non-acceptance experiments to negotiate lower rates.  *See* Stiglitz Decl. ¶ 30.

144.    **Merchant Education Program**.  The Settlement also boosts competition by providing substantial funds to educate merchants about the new competitive tools that the Settlement provides.  In the current market environment, in which Visa and Mastercard have

---

[8] This was required by the 2012 Agreement but currently is not clearly permitted by the networks' rules.

altered the competitive landscape through decades-long merchant restraints, it will be necessary to prod the market towards a more competitive outcome. The Settlement provides a $15 million fund for an independent third-party to provide merchant education. S.A. ¶ 9.

145.    These funds can assist merchants in understanding the benefits of the changes in the Visa and Mastercard steering rules. The education will include information on using the new competitive tools to steer customers to more preferred payments means; educating customers with respect to using high-cost payment cards that causes high retail prices; and using the expanded power to surcharge and discount to negotiate lower Visa and Mastercard (and issuer) interchange fees. *See* Stiglitz Decl. ¶¶ 9, 31; *see also* S.A. ¶¶ 40, 72. The merchant education program will assist merchants in choosing and implementing the most effective steering methods for their business. Another critically important topic of merchant education program is understanding the importance and value to merchants of forming buying groups to negotiate interchange rates with Visa and Mastercard and assisting merchants in the formation of buying groups. *See* S.A. ¶¶ 40, 72.

146.    As discussed above, the current surcharging rules are extremely complex and difficult to understand. They require merchants to calculate their costs of acceptance of various competitive cards to determine whether and to what extent surcharging is permitted. *See, e.g.*, Visa Rule 5.5.1.7 Similar Treatment of Visa Transactions – US Region and US Territories; 5.5.1.6 Notification of Intent to Assess Surcharges – US Region and US Territories; 5.5.1.8 Credit Card Surcharge Requirements – Canada, US Region, and US Territories. As a result, small and mid-size merchants (those without large legal and payments departments) often require consultants to help them interpret the networks' rules. In fact, professional payments advisors are in the business of studying the rules and advising merchants who can afford those services. And the networks

modify and renumber the rules as frequently as twice a year.

147.    The Settlement will streamline and simplify the surcharging rules and requirements.  *See* S.A. ¶¶ 28, 60.  The merchant education program will provide to *all* merchants services similar to those provided by professional payments consultants.  *See* S.A. ¶¶ 40, 72.

148.    **Merchant Buying Groups**.  Some of Visa and Mastercard credit card transactions occur at interchange rates that are significantly below the posted rates.  *See* Stiglitz Decl. ¶ 32; Leffler Decl. ¶ 12.  Nearly all of these lower negotiated rates apply to large merchants that credibly threatened steering through discounting or surcharging under the current rules. *See* Stiglitz Decl. ¶ 32.  Therefore, increased negotiations by more and smaller merchants can result in large savings in merchants' interchange fees.  Under reasonable assumptions about the growth in negotiated rates, the Settlement will result in very substantial merchant savings in interchange rates.  *See* Stiglitz Decl. ¶ 33.  Competition among merchants results in these cost savings being passed on to customers in the form of lower prices.  *See* Stiglitz Decl. ¶ 33.

149.    The Settlement encourages groups of smaller merchants to collectively "buy" payment card (credit and debit card) services from Visa and Mastercard.  The Settlement thereby extends such negotiating opportunities that are currently (and practically) available to only the largest merchants, to *all* merchants of every category and size.  The merchant education program explicitly includes efforts to encourage and facilitate merchants' forming and joining collective buying groups.  *See* S.A. ¶¶ 40(d), 72(d).  And the Settlement requires Visa and Mastercard to recognize and bargain with such groups in good faith. *See* S.A. ¶¶ 29-32; 61-64; *see also* Stiglitz Decl. ¶ 32.  The Settlement provides an improved ability for merchants of every size to band together in buying groups to demand lower interchange fees.  Stiglitz Decl. ¶¶ 9, 32.

150.    In the 2012 Agreement, the networks agreed to negotiate with such groups in good

faith.  However, in practice, merchants did not form or use any buying groups.  The Settlement's provisions related to the merchant-education program (and the significant dollars devoted to it) explicitly includes efforts to encourage and facilitate merchants' forming collective buying groups. *See* Stiglitz Decl. ¶ 32.

151.    This Settlement makes surcharging available for 96% of the Visa and Mastercard credit card volume, and it vastly expands the ability to discount by issuer.  Small and mid-sized merchants now have a *reason* to band together in buying groups.  The Settlement provides competitive tools that will make it a commercial necessity for the networks and issuers to negotiate with merchants representing significant volumes of business.  The Settlement provides the tools, encouragement, procedures, and information necessary to get effective buying groups up and running.

152.    **Rate Caps and Rollbacks**.  In his 2018 merits expert report, Dr. Stiglitz opined that "the [competitive] adjustment will . . . require a significant period of time to reach the new more competitive equilibrium." Stiglitz Merits Report ¶ 170. While the market makes that adjustment, "the Court should set a maximum interchange rate during a transition period."  *Id*.

153.    The very long history of merchant restraints and the resulting lack of competition among credit cards has led customers to accept the distorted form of competition in which they do not receive accurate price signals to guide their use of payment mechanisms.  As a result, it is likely to take some time for customers to recognize that discounting for use of low-cost cards or charging for use of high-cost cards is fair, equitable, and competitive merchant behavior.  The Settlement recognizes this inertia by including meaningful restrictions on Visa and Mastercard credit card interchange fees.  Stiglitz Decl. ¶ 10.

154.    Visa and Mastercard's decades-long imposition of the merchant restraints has

prevented merchants from providing price signals to customers as to the relatively high cost of credit card usage.  This has resulted in norms of business behavior and customer habits and perceptions that merchants will consider in deciding whether to impose an explicit price for credit card use.  The long history of "free" use of premium credit cards (because of the merchant restraints), may cause some customers to view as "unfair" a merchant's imposing a price for using a premium card.  Stiglitz Decl. ¶ 36.  Given the uncertainty about customer responses, Dr. Stiglitz expects merchants to be concerned that charging for the use of a credit card may lead to some customers switching to competing merchants that do not impose a price on card use.  In economic terms, the history, business norms, perceptions of fairness, and customer habits result in lower expected "elasticity" of switching payment mechanisms, and greater uncertainty about the consequences of providing price signals through surcharges or discounts.  This could delay the onset of competitive interchange fees.  Stiglitz Decl. ¶ 37.  The Settlement accounts for this potential delay by halting the "interchange fee price spiral" while merchants use the new competitive tools to bring about a more competitive equilibrium.  Stiglitz Decl. ¶ 39.

155.    Given these commercial realities, the Settlement provides for guaranteed, immediate interchange rate reductions during the five-plus year term of the Settlement.  This significant relief takes three forms which work together.  *First*, the Settlement prohibits Visa and Mastercard from raising any merchant's posted interchange rate above the rate that existed on December 31, 2023.  *See* S.A. ¶¶ 35, 67.  That baseline cap applies for at least five years—closer to six years, depending on when the Court approves the Settlement.  Each network's average rate of interchange increase over just the last 10 years has been about one basis point per year.  *See* Leffler Decl. ¶ 24.  Accordingly, the Settlement's posted-rate caps will provide substantial relief to every merchant in the Equitable Relief Class, large and small.  *See* Stiglitz Decl. ¶ 40.

156.     *Second*, The Settlement does not just cap the posted rates. The Settlement also requires Visa and Mastercard to *reduce all* posted interchange rates by at least four basis points. They must do so for *every* merchant, and they must provide that relief in at least each of the first three years. *See* S.A. ¶¶ 34, 66; *see also* Stiglitz Decl. ¶ 41.

157.     *Third*, the Settlement also ensures that neither Visa nor Mastercard, despite the restrictions on the *posted* rates, can nevertheless increase interchange fees by switching consumers to higher-priced cards.  The Settlement provides that an independent auditor will determine Visa and Mastercard's weighted average effective, system-wide interchange rate for the 12-month period ending March 31, 2024.  Each network will then be required for five years (the term of the Settlement) to have a weighted average effective rate that is at least seven basis points below that auditor-determined baseline.  *See* S.A. ¶¶ 33, 65; *see also* Stiglitz Decl. ¶ 42.

158.     The Settlement thus addresses both avenues for the networks to raise interchange fees—raising posted rates and moving cardholders to higher-interchange cards.  In short, the Settlement stops the upward interchange-fee spiral.  And it goes beyond halting that upward trajectory, providing impetus toward competitive rates by reducing current rates.  Stiglitz Decl. ¶ 43.

159.     **The Savings to Merchants**.  Under reasonable assumptions, the more-competitive rates resulting from the rules changes—including improved surcharging and discounting—will be very significant.  Those savings by merchants and their customers are likely to be substantially more than the savings generated by the rate-caps and rollbacks.  But the rate caps and rollbacks alone will provide very large savings to the Equitable Relief Class.  *See* Stiglitz Decl. ¶ 44.

160.     The rate caps and rollbacks have powerful combined effects.  They stop the historical rates of increase, roll back posted rates by at least four points, and roll back average

effective rates by at least seven points.  And they do all of that with respect to steadily increasing volumes of credit card transactions.  *See* Leffler Decl. ¶ 22.  In sum, the caps and rollbacks alone will generate savings of $29.79 billion.  *See* Stiglitz Decl. ¶ 45; Leffler Decl. ¶¶ 26-29.

161.    Notably, the value of these savings from the rate reductions and average-effective rates (minus 7 bps) are *minimums*; each network remains free to implement even lower published or effective rates, and merchants maintain their independent ability to negotiate rate reductions below the minimums.

### D.    CURED DEFECTS OF THE 2012 AGREEMENT

162.    The Settlement cures the fatal defects of the 2012 Agreement and delivers unprecedented benefits to *all* merchants in the Equitable Relief class.  The Second Circuit found that the "incremental value and utility" of the surcharging relief was limited because "many states, including New York, California, and Texas, prohibit surcharging as a matter of law."  *In re Payment Card*, 827 F.3d at 229, 238.  The Second Circuit held that there was "unequal intra-class treatment" for merchants who operated in states that permit surcharging.  *Id*. at 238.  A "significant proportion" of the class was legally unable to benefit from the primary relief, making that the surcharging relief under the 2012 Agreement "virtually worthless." *Id.* at 238.

163.    The Settlement is substantially different.  As of 2024, all states and territories in the United States other than Connecticut, Massachusetts, and Puerto Rico have repealed or abandoned enforcement of statutes deemed unconstitutional or violative of the antitrust laws.  *See* Leffler Decl. ¶ 6, fn.4.  As a result, approximately 96% of credit card transactions in the U.S. will not be subject to any restrictions on surcharging by either state statutes or any network restraints if the Settlement is approved.  *See* Leffler Decl. ¶ 6.  By contrast, the combination of state no-surcharge laws and level-playing-field rules meant that 80% of such transactions could not be surcharged under the terms of the 2012 Agreement.  *See* Leffler Decl. ¶ 6; Stiglitz Decl. ¶ 14.  As discussed

above, the Settlement also includes other valuable relief for all members of the Equitable Relief Class, including but not limited to, rate reductions, merchant education, buying groups and discounting. No member of the Equitable Relief Class will receive relief that is "virtually worthless."

164. The Second Circuit also found that under the most-favored-nation clause of the 2012 Agreement, merchants who accepted American Express could not avail themselves of surcharging relief, because American Express effectively prohibits surcharging, and the agreement permits surcharging Visa and Mastercard only if the merchant also surcharges for use of American Express Cards. *In re Payment Card*, 827 F.3d at 230, 238. The Second Circuit held that there was "unequal intra-class treatment" for merchants who did not take American Express and, thus, were permitted to surcharge. *Id*. at 238. A "significant proportion" of the class was commercially unable to benefit from the primary relief, making that relief "virtually worthless." *Id.* at 238.

165. Under the Settlement here, merchants who accept American Express can surcharge Visa and/or Mastercard cards up to 1% without imposing any surcharge on the use of American Express. *See* S.A. ¶ 28. Accordingly, 96% of Visa and Mastercard transactions in the U.S. will potentially be subject to surcharging. *See* Leffler Decl. ¶ 6.

166. This is very powerful relief for merchants. Dozens of mega-merchants, such as Amazon, Costco, Target, Home Depot, Lowe's, TJ Maxx, Walmart, Walgreens, CVS, Best Buy, and the US Postal Service, have "partnerships" with Visa and have likely received interchange reductions with the threat of surcharging *any* amount.

167. When Amazon imposed a modest 0.5% surcharge on Visa in Australia and Singapore beginning on November 1, 2021, *half* the amount of the *minimum* permitted surcharge under the Settlement, Visa and Amazon were able to negotiate and reach a final global agreement

by February 17, 2022. *See, e.g.*, https://www.cnbc.com/2022/02/17/amazon-and-visa-reach-global-truce-over-credit-card-fees.html. Amazon will be free to take this same approach in the United States under the terms of the Settlement, which would have tremendous impact on U.S. consumers' and merchants' resistance to surcharging.

168.    In short, the Settlement is a vast improvement over the 2012 Agreement and greatly expands the ability of merchants to surcharge at the point-of-sale in addition to expanding discounting, eliminating the level-playing-field and honor-all-wallets rules, educating merchants on how to maximize their rights (including via buying groups), allowing for various non-acceptance experiments, and both rolling back and capping interchange rates. No merchant will receive relief that is "virtually worthless."

169.    Pointing to another fatal flaw in the 2012 Agreement, the Second Circuit noted that all injunctive relief expired on July 20, 2021, yet the release had no end date and operated in perpetuity, provided that Visa and Mastercard only kept in place several modified rules, including those permitting merchants to surcharge. However, "regardless of what Visa or Mastercard did with their network rules after July 20, 2021, no merchant will ever be permitted to bring claims arising out of the network rules that are unaffected by the Settlement, including most importantly, the honor-all-cards rule or existence of default of interchange fee." *In re Payment Card*, 827 F.3d at 230, 239. For all plaintiffs, defendants were "permanently immunized" from any "future antitrust litigation based on their honor-all-cards rules and their default interchange rules." *Id.* at 239; *see also Id.* at 241 (concurring opinion stating that temporarily abandoning challenged practices in return for a "release *forever*" of all future claims by existing or future merchants not yet in existence amounted to "confiscation.").

170.    Unlike the overly broad release in the 2012 Agreement, the release here is limited

to 5 years from the time the average-effective-rate commitment goes into effect, after which any merchant will have the ability to bring claims against Visa or Mastercard without limitation.  S.A. ¶ 82(a).  And in exchange for releasing claims during the five-plus-year period, *all* merchants in the United States, regardless of size, will receive the substantial and valuable relief described above.[9]  Notably, the cap on interchange rates is effective as of the date the district court grants final approval to the Agreement, so that benefit to class members will be in effect for more than 5 years.  Importantly, no Defendant is "permanently immunized" from anything related to any network rule.

171.    Another defect in the 2012 Agreement arose from class counsel representing both the (b)(3) and (b)(2) classes.  As the Second Circuit noted, where monetary damages and injunctive relief are combined into a single settlement, "[p]roblems arise when the (b)(3) and (b)(2) classes do not have independent counsel, seek distinct relief, have non-overlapping membership, and (importantly) are certified as settlement-only."  *In re Payment Card,* 827 F.3d at 235.  The Second Circuit held that there was a clear conflict between merchants of the (b)(3) class and merchants in the (b)(2) class, where the former would want to maximize cash compensation, and the latter would want to maximize restraints on the network rules.  This conflict required separate, independent representation of the classes.  *Id.* at 233.

172.    Here, a Rule 23(b)(3) settlement negotiated by separate counsel was previously approved by this Court.  Accordingly, there is no risk "that [ERCC] will trade the interests of one class for another."  *Id.* at 236.  Similarly, this Court previously certified the Equitable Relief Class

---

[9] The release does not bind any future merchants—the class includes (and the release binds) only merchants that accept Visa or Mastercard cards any time from December 2020 through the date the district court grants final approval of the Agreement. Merchants that come into existence after that date will benefit from the injunctive relief provided by the Settlement, but will not be bound by the release.

as a Rule 23(b)(2) litigation class.  Because the injunctive relief under the Settlement is distinct from the monetary relief obtained in the Rule 23(b)(3) settlement, there is no "allocation" among classes to be made.  *See id.* at 235-36.[10]  And ERCC will be compensated for work performed solely on behalf of the Equitable Relief Class subject to the Court's approval.

173.    The Second Circuit held that settlements approved simultaneously with class certification are especially vulnerable to conflicts of interest, where the pressures of the settlement process can influence the definition of the classes and allocation of relief, and where the parties may trade one claim for another or the interests of one class for another to reach the settlement. *See id.* at 235-36.  This is not an issue here.  First, after the Second Circuit vacated the 2012 Agreement, the Rule 23(b)(2) and Rule 23(b)(3) claims were bifurcated into separate cases.  Thus, there is no potential conflict of interest.  With separate representation of the classes, there was no possibility that damages would be traded for injunctive relief, that the (b)(3) class would be favored, or that any "structural defect" "sapped class counsel of the incentive to zealously represent" the Rule 23(b)(2) class.  *See id.* at 236.  Second, the Settlement was reached years after the Court certified the Equitable Relief Class.  There was no possibility of the settlement discussions influencing the class definition.

174.    In the 2012 Agreement, the Second Circuit found that the Rule 23(b)(2) class was targeted for worse treatment than the (b)(3) class.  *Id.* at 237.  Here, the injunctive relief rate cap and rollback alone is valued at $29.79 billion, considerably more than the $5.6 billion approved for the Rule 23(b)(3) settlement.  *See Fikes Wholesale, Inc. v. Visa U.S.A., Inc.*, 62 F.4th 704, 712 (2d Cir. 2023).

---

[10] Nor is there any "non-overlapping membership" concern given the unrelated Rule 23(b)(2) and Rule 23(b)(3) settlements negotiated independently by separate counsel on behalf of two distinct classes, one backward-looking and one forward-looking.

175.    The Settlement has "no obvious deficiencies" and is an excellent result for the Equitable Relief Class, far exceeding the equitable relief provided by the 2012 Agreement.  It is fair, reasonable, and adequate, and warrants preliminary approval under Rule 23(e).

**E.    ATTORNEY FEES, EXPENSES, AND SERVICE AWARDS**

176.    ERCC discussed attorney fees and expenses and service awards for ERCPs as named class representatives with Defendants only after reaching final agreement on all substantive terms of the Settlement.  Ultimately, Defendants agreed to pay attorneys' fees and expenses up to $170 million (including any service awards for ERCPs as class representatives).  ERCC intend to file a motion seeking Court approval of these amounts by no later than thirty (30) days after the Court's entry of the Settlement Notice and Order, annexed to the Settlement as Appendix E (the "Settlement Notice and Order").

**F.    NOTICE TO THE CLASS**

177.    Before filing for preliminary approval of the Settlement, ERCC and Defendants worked together with Cameron Azari, Senior Vice President of Epiq Class Action & Claims Solutions, Inc. ("Epiq"), to draft the proposed Notices and Notice Plan.  ERCC firms worked extensively with Epiq and Defendants to craft a Notice Plan that would exceed the due process requirements under the Constitution and Federal Rule of Civil Procedure 23.  *See* Azari Decl. at ¶¶ 55-61.

178.    The proposed Notice Plan, which is based on Epiq's extensive prior experience and research into the notice issues particular to this Settlement, includes (i) Notices placed in National Business Publications, National Trade and Specialty Publications, Local Business Journals, Specialty Language and Targeted Newspapers, and U.S. Territory Newspapers; (ii) an all-encompassing  Digital Notice Campaign utilizing banner display notices, social media, podcast and streaming TV advertisements, and targeted website placements; (iii) audio advertisements

over Streaming and Satellite Radio; (iv) a Case Website containing all pertinent information and documents related to the settlement, as well as a toll-free number, email and postal address to contact for information regarding the Settlement; (v) Sponsored Search Listings on the three most highly visited search engines that will include links to the Case Website; and (vi) a nationwide Informational Release that will include the Case Website address and the toll-free number to call for information about the Settlement.  Azari Decl. ¶¶ 9-10, 27-53.

179.    The proposed Notice Plan is designed to reach the greatest practicable number of the Rule 23(b)(2) Settlement Class Members.  Given its experience with similar notice efforts, Epiq expects the proposed Notice Plan media notice efforts will reach approximately 82.2% of all U.S. Business Owners with an average frequency of 4.5 times, and 84.8% of all U.S. Adults in Business and Finance Occupations with an average frequency of 4.1 times.  Azari Decl. ¶ 27.

180.    The Digital Notice Campaign alone will generate approximately 745 million impressions.  Clicking on the digital Notices will link the readers to the Case Website, where they can easily obtain detailed information about the Rule 23(b)(2) Settlement.  Azari Decl. ¶ 41.

181.    The Notices, a short-form Publication Notice for the print and digital publications, and a long-form, more-detailed, Website Notice for the Case Website (copies of which are annexed to the Settlement as Appendix D) provide reasonable and appropriate notice to members of the Class of the terms of the Settlement and of their rights to object and be heard.

182.    The Notices and the Notice Plan meet the procedural and substantive requirements of Rule 23 and constitutional due process, and are appropriate under the circumstances of this case.

We declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 25, 2024
New York, New York

_____
Linda. P. Nussbaum

Executed on March 25, 2024
Austin, Texas

_____
Steven D. Shadowen

Executed on March 25, 2024
Wilmington, Delaware

_____
Robert G. Eisler

Executed on March 25, 2024
Lincolnshire, Illinois

_____
Michael J. Freed