# UNITED STATES DISTRICT COURT FOR
# THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | MDL No. 1720<br><br>Docket No. 05-md-01720-MKB-JAM |
| BARRY'S CUT RATE STORES INC.; DDMB, INC. d/b/a EMPORIUM ARCADE BAR; DDMB 2, LLC d/b/a EMPORIUM LOGAN SQUARE; BOSS DENTAL CARE; RUNCENTRAL, LLC; CMP CONSULTING SERV., INC.; TOWN KITCHEN, LLC d/b/a TOWN KITCHEN & BAR; GENERIC DEPOT 3, INC. d/b/a PRESCRIPTION DEPOT; and PUREONE, LLC d/b/a SALON PURE,<br><br>Plaintiffs,<br>-v-<br><br>VISA, INC.; MASTERCARD INCORPORATED; MASTERCARD INTERNATIONAL INCORPORATED; BANK OF AMERICA, N.A.; BA MERCHANT SERVICES LLC (f/k/a DEFENDANT NATIONAL PROCESSING, INC.); BANK OF AMERICA CORPORATION; BARCLAYS BANK PLC; BARCLAYS BANK DELAWARE; BARCLAYS FINANCIAL CORP.; CAPITAL ONE BANK, (USA), N.A.; CAPITAL ONE F.S.B.; CAPITAL ONE FINANCIAL CORPORATION; CHASE BANK USA, N.A.; CHASE MANHATTAN BANK USA, N.A.; CHASE PAYMENTECH SOLUTIONS, LLC; JPMORGAN CHASE BANK, N.A.; JPMORGAN CHASE & CO.; CITIBANK (SOUTH DAKOTA), N.A.; CITIBANK N.A.; CITIGROUP, INC.; CITICORP; and WELLS FARGO & COMPANY,<br><br>Defendants. | |

**DECLARATION OF JOSEPH E. STIGLITZ**
**March 25, 2024**

I. **Introduction and Summary of Opinions**

1.      I have previously filed an initial report and a rebuttal report in this case. My qualifications and background are provided in the initial report. In summary, I received my Ph.D. degree in economics from MIT in 1967, and I currently am a University Professor at Columbia University, holding joint appointments in the Department of Economics in the Faculty of Arts and Sciences, the Department of Finance in the Graduate School of Business, and the School of International and Public Affairs. I have been elected to numerous academic and scientific societies in the United States and abroad, including the National Academy of Sciences, the Royal Society, the American Academy of Arts and Sciences, the American Philosophical Society, and the British Academy. In 1979, I was awarded the John Bates Clark Medal by the American Economic Association, and, in 2001, I was awarded the Nobel Memorial Prize in Economics.

2.      I have reviewed the Class Settlement Agreement of the Rule 23(b)(2) Class Plaintiffs and the Defendants, dated as of March 25, 2024 ("Settlement Agreement").

3.      I have been asked by counsel for the Rule 23(b)(2) Class Plaintiffs to give a preliminary assessment of the likely economic impact of the Settlement Agreement on competition and on merchants. I understand that if the Court preliminarily approves the Settlement Agreement, I will have an opportunity to provide a more complete economic assessment of the Settlement Agreement.

4.      In my Expert Report of October 5, 2018 ("Stiglitz Merits Report"), I described in detail the features of injunctive relief that would assist in rectifying the anticompetitive impact of decades of Visa and Mastercard merchant restraints ("rules") that have impeded competition in the General-Purpose Credit Card Network Services industry. As described below, the Settlement Agreement adopts many of the aspects of such desirable injunctive relief, and, most importantly, will allow merchants to impose a price on the use of high-cost cards. The Settlement Agreement also includes some additional measures not discussed in the Stiglitz Merits Report that should facilitate competition and competitive pricing. Thus, in my opinion, the Settlement Agreement has the potential to promote competition and benefit merchants by putting pressure on the supracompetitive Visa and Mastercard prices.

1

5.  The Settlement Agreement includes substantial changes to rules that currently restrict merchants' ability to charge for the use of expensive Visa and Mastercard credit cards.[1] As discussed in detail below, under the current restrictions, Visa's and Mastercard's so-called "level-playing-field" rules result in less than 20% of Visa and Mastercard credit-card transactions even being *eligible* to be surcharged.[2] The Settlement Agreement eliminates that rule, resulting in about *96%* of Visa and Mastercard credit-card transactions being eligible to be surcharged—more than a *quadrupling* of the potentially surcharged transactions.[3]

6.  In addition to significantly increasing the number of eligible transactions, the Settlement Agreement provides substantial improvements in the merchants' surcharging tools. It greatly simplifies the surcharging rules, making them comprehensible, practical, and effective. It makes clear that a merchant can surcharge Visa credit cards but not Mastercard credit cards, and vice-versa. And it ensures that merchants can selectively surcharge (or discount) only the highest-priced cards.

7.  Merchants' ability to steer customers to preferred payment means via price signals is the essential economic mechanism needed to create competition among credit-card networks. Merchants' significantly enhanced ability to impose surcharges (that is, use the price system) will help them to steer their customers to low-cost and preferred payment means by requiring shoppers who use high-cost cards to internalize the costs of their decisions. That enhanced ability will also increase merchants' ability to negotiate lower interchange fees from Visa and Mastercard. The networks will be motivated to impose lower interchange rates in order to avoid these surcharges (or to lower the surcharges when merchants decide to impose them).

---

[1] Such a price (or charge) is typically referred to as a "surcharge." However, when a customer elects to use a payment method that gives the customer added benefits (rewards or cash-back) while imposing costs on the merchant, having that customer pay a higher price than customers not imposing such costs is just "competitive charging," in which the price reflects the costs. The term "surcharge" should be used only in the case where the merchant charges the customer *more* than the cost imposed on the merchant by the payments system. Nonetheless, in the discussion below, for clarity I at times use the conventional language "surcharging."

[2] See Stiglitz Merits Report ¶ 35.

[3] See Declaration of Keith Leffler, March 24, 2024 ("Leffler Dec.") ¶ 6.

2

8. The Settlement Agreement will also significantly improve merchants' ability to discount preferred, lower-cost credit cards. The Settlement Agreement extends and improves upon the discounting relief agreed to by Visa and Mastercard as part of the 2011 Consent Decree with the Department of Justice (the "2011 Consent Decree"). Improving on that relief, the Settlement Agreement permits merchants to discount credit cards at the issuer level, i.e., provide discounts that vary by the issuing bank. This will allow merchants to more easily steer their customers to preferred payment means. And it increases the number of competitors that merchants can play off against each other in negotiating for lower fees—large and incentivized issuers in addition to the two networks.

9. The Settlement Agreement also includes many other provisions that will ensure that merchants can use surcharging and discounting as practical, effective competitive tools. These provisions include funds to educate merchants about the new competitive levers, an improved ability to band together in buying groups to demand lower interchange fees, an improved practical ability to surcharge or discount at the product level (i.e., for a specific type of Visa or Mastercard credit card, such as Visa Signature or World Elite Mastercard), the ability to conduct non-acceptance experiments, and more.

10. The very long history of the merchant restraints and the resulting entrenched distortion of competition among the networks and issuers has led customers to accept a warped form of competition in which they do not receive accurate price signals to guide their use of payment mechanisms. As a result, it is likely to take some time for customers to recognize that discounting for use of low-cost cards or charging for use of high-cost cards is fair, equitable, and competitive. The Settlement Agreement recognizes this inertia by including meaningful restrictions on Visa and Mastercard credit-card interchange fees. The Settlement Agreement prohibits Visa and Mastercard from raising any merchant's U.S. posted credit interchange rate during the five-plus-year term of the Settlement Agreement. And the networks must *lower* each of those posted rates by at least four basis points for the first three years. The Settlement Agreement also prevents each network from raising overall credit interchange fees by moving cardholders to higher-priced cards. For the full term of the Settlement Agreement, each network's average effective credit interchange rate—across the entire network—must be at least seven basis points lower than the system-wide rate as of March 31, 2024.

3

11. The rate caps and rollbacks alone will save merchants more than $29 billion over the term of the Settlement Agreement.[4] As I explain below, the savings from the rules reforms will likely be substantially greater.

## II. The Settlement Agreement's Competitive Tools

### A. Merchant Charging for Less-Preferred Cards

12. The 2011 Consent Decree[5] did not address the Visa and Mastercard rules that limit merchants' ability to impose the greater cost of high-cost credit cards on the customers who use them. The Settlement Agreement makes major changes to the Visa and Mastercard rules to allow merchants substantially greater latitude to steer customers to low-cost payment means via charges for using high-cost credit cards.

13. Under the current rules, Visa and Mastercard constrain merchants' ability to charge for use of high-cost payment means through their so-called level-playing-field rules.[6] A merchant that accepts another credit card brand that limits surcharging (e.g., American Express) must follow that brand's surcharging rules in surcharging Visa or Mastercard credit cards.[7] The American Express rules prohibit the merchant from surcharging American Express credit cards unless the merchant also surcharges all "Other Payment Products"—a term that American

---

[4] See Leffler Dec. ¶ 29.

[5] See Section IV of the final judgment that the court entered on July 20, 2011 in *United States v. American Express Co., et al.*, No. 10-CV-04496 (E.D.N.Y.) (NGG) (RER), the relevant text of which is attached as Appendix G to the Settlement Agreement.

[6] See Visa Rule 5.5.1.7 (Oct. 14, 2023), available at https://usa.visa.com/content/dam/VCOM/download/about-visa/visa-rules-public.pdf; Mastercard Rule 5.12.2 (Dec. 5, 2023), available at https://www.mastercard.us/content/dam/public/mastercardcom/na/global-site/documents/mastercard-rules.pdf. The Visa rule is formally titled "Similar Treatment of Visa Transactions." Like the misuse of the term "surcharging," Visa and Mastercard have also used other distracting language that impairs understanding of the workings of the credit-card markets. Visa and Mastercard's "level-playing-field" rules actually perpetuate a *tilted* playing field; American Express's "no-discrimination" rule requires that merchants *discriminate* – set prices unrelated to costs.

[7] See, for example, Visa Rule 5.5.1.7.

4

Express defines to include *debit cards*.[8]  The Visa and Mastercard rules forbid surcharging debit cards.[9]  Thus, for merchants that accept American Express, the Visa and Mastercard level-playing-field rules effectively prohibit merchants from surcharging Visa and Mastercard *credit cards*.[10]

14.     Discovery in this case revealed that the level-playing-field rules are a principal reason that surcharging did not take off after the 2012 settlement.  Merchants accounting for more than 80% of Visa's transaction volume accept both Visa and American Express.[11]  Consequently, the combined effect of state no-surcharge statues and the networks' level-playing-field rules "has been to place about 80% of Visa and Mastercard transactions beyond the ability of merchants to price."[12]  This helps explain why surcharging did not take hold in the U.S. after the 2012 settlement.

15.     The Settlement Agreement eliminates the level-playing-field rules—a significant reform.[13]  Moreover, since 2012, seven of the ten states that previously had no-surcharge statutes have repealed or stopped enforcing them.  Today, only three U.S. jurisdictions have such rules, accounting for only 4% of the Visa and Mastercard credit-card volume.[14]  So the Settlement

---

[8] See American Express Merchant Reference Guide (Oct. 2023), Rule 3.2 ("Treatment of the American Express Brand") and Glossary (definition of "Other Payment Products"), available at https://www.americanexpress.com/content/dam/amex/us/merchant/new-merchant-regulations/Reference-Guide_EN_US.pdf.

[9] See Visa Rule 1.5.5.2, 5.5.1.10; Mastercard Rule 5.12.2.

[10] In a nutshell: Visa and Mastercard's level-playing-field rules require the merchant to apply the American Express rule to the Visa or Mastercard transaction; that American Express rule prohibits surcharging the credit card unless the merchant also surcharges debit cards; and the Visa and Mastercard rules prohibit surcharging debit cards (and merchants generally do not want to surcharge debit cards).

[11] See Leffler Dec. fn 4.

[12] Stiglitz Merits Report ¶ 35.

[13] See Settlement Agreement ¶¶ 28, 60 (prior level-playing-field rule not included in new surcharging rules).

[14] See Leffler Dec. fn 4.

5

Agreement's elimination of the networks' level-playing-field rules will result in about 96% of Visa and Mastercard credit-card volume being subject to surcharging.[15]

16. With the scope for surcharging effectively quadrupled, the Settlement Agreement also improves merchants' specific surcharging tools. *First*, consistent with eliminating the level-playing-field rules, the Settlement Agreement provides that a merchant that accepts American Express can charge Visa and/or Mastercard credit cards up to 1% regardless of whether: (a) its agreement with American Express prohibits surcharging its credit cards; or (b) the merchant actually surcharges American Express. These changes should substantially increase the ability of merchants to steer customers.[16]

17. *Second*, the Settlement Agreement provides that merchants can surcharge up to the cost of acceptance (interchange fees plus other network fees) or 3%, provided that they also surcharge comparative cards like American Express and Discover (if the merchant accepts those cards) at the same rate.[17] A merchant that does not accept American Express or Discover can surcharge Visa and/or Mastercard at the 3% level.

18. Moreover, under the Settlement Agreement, a merchant that *does* accept American Express can surcharge Visa and/or Mastercard up to the 3% level, provided that the merchant also surcharges American Express (and other comparative cards) at the same rate. American Express would then have to decide whether to enforce its restriction that the merchant cannot surcharge its *credit cards* unless the merchant also surcharges its competitors' *debit cards*, i.e., discriminate against low-cost debit cards. If American Express does not enforce that restriction, then the merchants can surcharge all credit cards up to 3%—a major win for merchants and for competition. If American Express does enforce its restriction, then merchants might drop acceptance of American Express. Alternatively, merchants could (and should) sue American Express for enforcing a patently anticompetitive rule—a rule not addressed by the Second

---

[15] Ibid.

[16] Note that 1% is comparable to the differential between interchange fees for the highest cost cards and the lowest cost no-rewards cards.

[17] Merchants that do not accept American Express can charge Visa and Mastercard credit cards up to the cost of acceptance or 3%, whichever is lower.

6

Circuit or the Supreme Court in the *Amex* litigation[18]—that tethers the ability to surcharge American Express *credit cards* to its competitors' rules on *debit cards*.

19. *Third*, the current rules appear to bind together the merchants' ability to surcharge Visa and Mastercard, requiring a merchant that surcharges Visa credit cards to also surcharge Mastercard credit cards, and vice-versa.[19] The 2012 settlement agreement contained a caveat stating that the rules should not be read that way, but the caveat does not appear in the networks' actual rules. The Settlement Agreement requires[20] that the networks amend their rules to expressly state that, as between Visa and Mastercard credit cards, a merchant can surcharge one, neither, or both, and surcharge one at the brand level[21] and the other at the product level[22] or any permutation.[23]

20. *Fourth*, the Settlement Agreement improves merchants' ability to surcharge at the product level, i.e., to surcharge only certain high-cost cards, such as Visa Signature or World Elite Mastercard. Currently, the networks do not make available sufficient data in real time at the

---

[18] See, for example, *Ohio v. American Express Co.*, 585 U.S. 529, 539 (2018) (stating Court's understanding—a *mis*understanding—that American Express's "antisteering provisions do not . . . prevent merchants from steering customers toward *debit cards*, checks, or cash" (emphasis added)).

[19] See Visa Rule 5.5.1.7 (prohibiting merchant from surcharging Visa credit cards if merchant assesses a surcharge on conditions that are "not the same" as the conditions on which merchant surcharges a "Competitive Credit Card Brand"—a term defined in the rules' Glossary to include Mastercard); Mastercard Rule 5.12.2.1 (requiring merchant seeking to surcharge at the "brand level" to apply to Mastercard credit-card transactions "[t]he same terms under which the Competitive Credit Card Brand permits a Merchant to Surcharge" and defining "Competitive Credit Card Brand" to include Visa).

[20] See Settlement Agreement ¶¶ 28, 60.

[21] Surcharging at the "brand level" means surcharging all of one network's credit cards, e.g., all Visa credit cards.

[22] Surcharging at the "product level" means surcharging only certain of a particular network's credit cards, e.g., Visa Signature, but not Visa Traditional.

[23] See Settlement Agreement ¶¶ 28 & 28(a)(second bullet), 28(b)(second bullet), 60 & 60(a)(second bullet), 60(b)(second bullet). Standard price theory argues that if even two producers compete on price in an industry like this, where capacity constraints do not play an important role, price will be driven down to the competitive level. (This ignores, of course, tacit collusion and other market imperfections; still, the theory is strongly supportive that this reform alone could make a significant difference.)

7

point-of-sale to inform merchants of the product (the type of card) that the customer is using and the applicable interchange rate.[24] The lack of such data effectively prevents some merchants from surcharging (or discounting) at the product level. The Settlement Agreement provides incentives for Visa and Mastercard to develop the technology necessary to provide that information. It allows merchants to surcharge the card up to 3%, regardless of their actual cost of acceptance, unless and until the networks make that information instantly available to merchants at the point of sale.[25]

21.     *Fifth*, the Settlement Agreement simplifies the surcharging rules. As noted above, currently, a merchant that accepts American Express and Visa or Mastercard must apply American Express's rules to the Visa or Mastercard transaction to determine whether surcharging Visa or Mastercard credit cards is permissible. Even if American Express's rules would permit a surcharge, the Visa and Mastercard rules require the merchant to compare the cost of the Visa or Mastercard transaction to that of the competitor.[26] If the competitor brand's cost of acceptance to the merchant is equal to or greater than the cost of accepting Visa or Mastercard, the merchant can surcharge the Visa or Mastercard transaction only if the merchant surcharges them on conditions that are the same as (1) those under which the merchant would be allowed to surcharge the competitor's card, or (2) those under which the merchant actually surcharges the competitor's card.[27] Under the Settlement Agreement, the merchant only has to determine whether it can surcharge up to 1% or up to 3%.[28]

---

[24] Currently, each network provides only a "look up" service in which the customer swipes (or dips or taps) her card once in order to determine the applicable product or interchange fee, and then has to swipe again once the merchant decides how it wants to proceed. Under the Settlement Agreement, merchants can surcharge at the product level at 3%, regardless of their cost of acceptance, if the networks do not make sufficient product and interchange-fee information available at the point-of-sale with one swipe/dip/tap of the customer's card. Settlement Agreement ¶¶ 28(b)(fourth bullet), 60(b)(fourth bullet).

[25] Ibid. This provision gives immediate relief to merchants, who can surcharge up to 3%, and incentivizes the networks to develop the technology to make the requisite data available to merchants at the point-of-sale.

[26] See, for example, Visa Rule 5.5.1.7.

[27] Ibid.

[28] Fundamentally, if the merchant does not take American Express or Discover, or if American Express does not enforce (or is prohibited from enforcing) its debit-card-linked no-

8

22.     The Settlement Agreement also modifies the notice and disclosure requirements, to merchants' benefit.  The Settlement Agreement expressly provides that the merchant can give the customer truthful information as to why the merchant is applying a charge for credit-card use, i.e., that the merchant is surcharging because the customer's selected card costs the merchant more to accept.[29]  Merchants are also expressly permitted to use a dual pricing scheme in which they disclose one purchase price for a credit-card transaction and a separate purchase price for a cash transaction.[30]

23.     In short, the Settlement Agreement greatly enhances merchants' freedom to steer customers using the linchpin of competition—prices.  As customers come to understand the competitive rationale for imposing these prices, competition should lead to lower Visa and Mastercard credit-card interchange fees.

### B.  Merchant Discounting for More-Preferred Cards

24.     The Settlement Agreement requires Visa and Mastercard to keep in place the rule changes of the 2011 Consent Decree. The 2011 Consent Decree allowed merchants to discount (or offer enhanced services) by card brand and/or by product.  The 2011 Consent Decree expired in July 2021. Visa and Mastercard have voluntarily maintained the rule changes, but they are free to revert to the more onerous pre-2011-Consent-Decree terms.  The Settlement Agreement extends these rules changes for more than five additional years.[31]

---

surcharging restraint, the merchant can surcharge Visa and/or Mastercard credit cards up to 3%. Otherwise, the merchant can surcharge Visa and/or Mastercard 1%.

[29] Settlement Agreement ¶¶ 28(c)(ii), 60(c)(ii).  Specifically, the networks' rules prohibit merchants from "disparaging" their credit cards.  The Settlement Agreement expressly provides that "disparagement does not include a merchant's accurate statement in words or substance that the merchant prefers or requests that a cardholder pay with a Credit Card or Debit Card that has a lower cost of acceptance to the merchant than the payment card presented for payment by the cardholder."  For example, under the new rules the following notice will be permissible: "We impose a charge of 1% for the use of Visa and Mastercard credit cards, reflecting the increased costs those cards impose on us—those costs are more than 1%."

[30] Settlement Agreement ¶¶ 28(c)(iv), 60(c)(iv).  This is a benefit beyond those I discussed in the Stiglitz Merits Report.

[31] As noted in Professor Leffler's Declaration, some of the relevant provisions begin upon the Court's approval—presumably summer/fall 2024—while others begin upon implementation

9

25.     Moreover, the 2011 Consent Decree did not require Visa and Mastercard to allow a merchant to discount a *particular issuer's* cards (e.g., discount for use of a low-cost Chase Visa credit card).  Visa voluntarily permitted some issuer-level discounting, but Mastercard did not.  This limited merchants from unleashing what should be intense competition among the many banks that issue Visa and Mastercard credit cards.  The Settlement Agreement rectifies this problem, allowing merchant discounting at every level—brand, product, and/or *issuer*.  This reform to the networks' honor-all-cards rules increases the number of competitors that merchants can play off against each other in negotiating for lower fees—the many issuers in addition to the two networks.[32]

### C. Merchant Decisions on Digital Wallets

26.     Currently, Visa and Mastercard interpret their honor-all-cards rules to require that a merchant that accepts Visa or Mastercard accept all digital wallets (apps or platforms that effect a card payment via a smart phone) that are provisioned with a Visa or Mastercard credit or debit card.[33]  Those rules eliminate the merchant's ability to negotiate with the digital wallet vendor over whether, and on what terms, to accept the digital wallet.

27.     The Settlement Agreement solves that problem.  It permits the merchant to decide for itself whether to accept a digital wallet that contains a Visa or Mastercard credit card.[34]  Visa currently has the technology necessary for merchants to implement these decisions; Mastercard does not.  The Settlement Agreement requires Visa to maintain the technology and requires Mastercard to implement it by March 2025.[35]  The Settlement Agreement also provides that the

---

of the Average Effective Rate Commitment discussed in Paragraph 42 below—presumably April 15, 2025—and run until five years after that date.

[32] The credit card price-rewards spiral, in which issuing banks compete on the consumer side by offering increasing rewards paid for by increasing interchange fees, evidences the power of issuer competition.  The ability of merchants to discount at the issuer level has the potential to allow more effective competition.

[33] See, for example, Visa Rule 1.5.4.4.

[34] Settlement Agreement ¶¶ 24, 26, 56, 58. Thus, a merchant can selectively accept only digital wallets that specialize in low-cost payment means, saving interchange fees for merchants and putting additional competitive pressures on Visa and Mastercard.

[35] Settlement Agreement ¶¶ 25, 57.

10

merchant can steer among the cards within a digital wallet under the same rules that govern steering with respect to traditional Visa and Mastercard credit cards.[36]

### D. Provisions to Boost the Steering Tools

28. The Settlement Agreement also modifies other rules in order to improve merchants' ability to respond to supracompetitive credit-card interchange fees by steering or using the threat of steering to negotiate lower rates.

29. One way for merchants to affect card usage is to selectively decline acceptance of a network's credit cards altogether. The Settlement Agreement requires Visa and Mastercard to clarify that their honor-all-cards rules apply only to stores using the same "banner," i.e., operating under the same brand name.[37] This is important because some retailers have stores geared towards different customer bases, and while it might be profitable not to accept a network's credit cards at a store type that caters to customers who value low prices, accepting the cards may be profitable at higher-priced, service-oriented stores. The Settlement Agreement's mandate regarding the all-outlets rule ensures that merchants can differentiate acceptance by banner, thereby enhancing competition.

30. The Settlement Agreement goes further by allowing merchants to conduct "experiments" in order to determine whether selective non-acceptance would be profitable.[38] The Agreement requires the networks to permit each merchant to try non-acceptance in 120-day experiments for up to 20% of its stores every year. Merchants can use the data gathered during these experiments to decide not to accept the network's cards at certain banners or to threaten to do so in order to negotiate lower interchange fees. These rule changes substantially reduce the risks to merchants

---

[36] Settlement Agreement ¶¶ 27, 59. The improved ability of merchants to charge for the use of high-cost cards (surcharge at the product level), and the ability to discount by issuer, will alleviate much of the possible adverse effects on merchants of the requirement that they must accept all or none of Visa or Mastercard credit cards. Thus, the major remaining impact of the honor-all-cards rule will be in the three remaining states that, by statute, prevent surcharging. Only about 4% of Visa and Mastercard credit-card transactions occur in those states. Leffler Dec. fn 4. And, even there, the Settlement Agreement requires the networks to allow discounting by issuer and, as explained below, puts caps on interchange fees and rolls them back.

[37] Settlement Agreement ¶¶ 21-23, 53-55.

[38] Settlement Agreement ¶¶ 22, 54.

11

of non-acceptance and should increase their ability to use the accumulated data to negotiate lower rates.

31.     The Settlement Agreement also boosts steering by providing funds to educate merchants about the new competitive tools that the Settlement Agreement provides.  In the current market environment, in which Visa and Mastercard have altered the competitive landscape through decades-long imposition of the merchant restraints, it will be necessary to prod the market towards a more competitive outcome.  The Settlement Agreement therefore provides a $15 million fund for merchant education.  These funds can assist merchants in understanding the benefits of the changes to the Visa and Mastercard steering rules as a result of the Settlement Agreement.  The education can include information on using the new competitive tools to steer customers to more preferred payments means; on educating customers that using high-cost payment cards causes higher retail prices;[39] and on using the expanded power to surcharge and discount to negotiate lower Visa and Mastercard (and issuer) interchange fees.

32.     The Settlement Agreement provides the opportunity for merchants of all sizes to use the expanded competitive tools.  I understand that a modest percentage of Visa and Mastercard credit-card transactions occur at interchange fees that are significantly below the posted rates.[40]  Nearly all these lower negotiated rates apply to large merchants that credibly threaten some steering through discounting or surcharging even under the onerous current rules.  The Settlement Agreement extends such negotiating opportunities to smaller merchants by encouraging collective "buying" of Visa and Mastercard services by groups of smaller merchants.[41]  The merchant education program explicitly includes efforts to encourage and facilitate the forming of collective buying groups by merchants.[42]  And the Settlement

---

[39] In the Stiglitz Merits Report, I discussed the desirability of educating consumers about the inequities resulting from the price-rewards spiral resulting from the Visa and Mastercard rules.  Stiglitz Merits Report ¶¶ 157-159.  The Settlement Agreement's merchant education provisions allow the merchant to be the conduit of such consumer education.

[40] See Leffler Dec. ¶ 12.

[41] Settlement Agreement ¶¶ 29, 61.

[42] Settlement Agreement ¶¶ 40(d), 72(d).

Agreement requires Visa and Mastercard to recognize and negotiate with such groups in good faith.[43]

### E. Savings from the Competitive Tools

33. The Settlement Agreement's rule changes—including the enhanced ability to surcharge and discount—will unleash competitive forces that should become increasingly important in constraining credit-card interchange fees. I understand that, under reasonable assumptions, the Settlement Agreement may result in very substantial merchant savings. And, as I noted in the Stiglitz Merits Report, competition among merchants results in these cost savings being passed on to customers in the form of lower prices.[44]

34. Most fundamentally, merchants that elect to surcharge can potentially save the entirety of the Visa or Mastercard interchange fees. These savings can be compounded by the potential savings from enhanced competition. Surcharging and discounting can steer customers to use lower-cost payment means. And merchants can use the threat of surcharging and discounting to negotiate lower rates from Visa and Mastercard on *all* of the merchants' Visa and Mastercard transactions. As I noted earlier, I understand that the typical negotiated Visa and Mastercard rates are substantially lower than their posted rates. Thus, increased negotiations can result in large savings in the interchange fees that merchants pay to Visa and Mastercard.[45]

35. The outbreak of effective competition can also put downward pressure on American Express rates. One of the Settlement Agreement's virtues is that it creates incentives—the ability to surcharge up to 3%—for merchants to negotiate with American Express for the ability to surcharge its cards, to litigate for that ability, or to discontinue accepting its cards. All three

---

[43] Settlement Agreement ¶¶ 30-32, 62-64. The Agreement provides that the buying groups must adhere to the FTC's and DOJ's 2000 "Antitrust Guidelines for Collaborations Among Competitors." In addition, the Settlement Agreement provides a means for the Court to take action against any discriminatory exclusion of merchants from buying groups. Ibid.

[44] Stiglitz Merits Report ¶¶ 44, 115, 129.

[45] See Leffler Dec. ¶ 14. I understand that additional savings are likely to result from merchants steering their customers to use lower-cost credit cards. The relevant measure of savings is, of course, relative to what costs otherwise would have been. Merchants would benefit significantly if only the reward/fee spiral were stopped. The Settlement Agreement is designed to generate savings far beyond that.

avenues should increase the pressure on American Express to provide more competitive rates. The pressure on American Express can, in turn, ratchet up the competitive pressure on Visa and Mastercard, in a virtuous competitive spiral.

### III. The Settlement Agreement's Brakes on Interchange-Fee Increases

36. Visa and Mastercard's decades-long imposition of the merchant restraints has prevented merchants from providing price signals to customers as to the relatively high cost of credit-card usage. This has resulted in norms of business behavior and customer habits and perceptions, and merchants will take those customer expectations into account in deciding whether to impose an explicit price for credit-card use. The long history of "free" use of premium credit cards (because of the merchant restraints), may cause some customers to view as "unfair" a merchant imposing a price for using a premium card.

37. Given the uncertainty about the customer responses, I expect merchants to be concerned that charging for the use of a credit card may lead some customers to switch to competing merchants that do not impose a price on card use. In economic terms, the history, business norms, perceptions of fairness, and customer habits result in lower expected "elasticity" of switching payment mechanisms,[46] and greater uncertainty about the consequences to merchants of providing price signals through surcharges or discounts.[47] This could delay the onset of competitive interchange fees.[48]

---

[46] A merchant might worry that, given the embedded cultural norms, customers might change stores when confronted with even a modest surcharge.

[47] The provisions discussed above in paragraph 16 will go some way to reducing the uncertainty.

[48] The difficulty of changing the market equilibrium in a market with long-entrenched anticompetitive practices is well illustrated by the Australian experience. In 2003, Australia regulated the interchange fees of Visa and Mastercard to levels well below those existing previously, and at a level well below those of American Express. The Visa and Mastercard no-discount and no-price (no-surcharge) rules were also eliminated. The American Express rates were not regulated, but American Express agreed to eliminate its no-discount and no-price rules. Yet only after several years did pricing for high-cost American Express cards become common. See Stiglitz Merits Report ¶ 150. The expected adjustments to the fairness of charging for high-cost cards may be more rapid in the U.S. than it was in Australia. I observe an increasing number of merchants imposing minimum sales for use of credit cards, and some merchants imposing (seemingly against the rules) surcharges.

14

38.     Accordingly, I stated in 2018 in the Stiglitz Merits Report that "the [competitive] adjustment will . . . require a significant period of time to reach the new more competitive equilibrium."[49]  While the market makes that adjustment, "the Court should set a maximum interchange rate during a transition period."[50]

39.     The Settlement Agreement does exactly that, halting the "interchange fee price spiral" while merchants use the new competitive tools to bring about a more competitive equilibrium.[51]

40.     *First*, the Settlement Agreement prohibits Visa and Mastercard from raising any merchant's U.S. posted credit interchange rate above the rate that existed on December 31, 2023.[52]  That baseline cap applies for at least five years, depending on when the Court approves the Settlement Agreement.[53]  My understanding is that each network's average rate of credit interchange increase over the last 10 years has been about one basis point per year.[54]  And when a network has been required to provide discounted rates to one segment or set of merchants, the network has used its market power to maintain its overall effective rates by raising posted rates in another merchant segment.  The Settlement Agreement's baseline, five-plus-year cap will provide substantial relief to every merchant in the class, large and small.

41.     *Second*, the Settlement Agreement requires each network to *lower* all of its U.S. posted credit rates by at least four basis points.  It must do so for every merchant, and it must provide that relief in at least each of the first three years.[55]

42.     *Third,* the Settlement Agreement also prevents each network from raising its overall credit interchange fees by moving cardholders to higher-priced cards.  For the Settlement Agreement's full, five-plus-year term, each network must keep its average effective credit interchange rate—

---

[49] Stiglitz Merits Report ¶ 170.

[50] Ibid.

[51] See Stiglitz Merits Report ¶¶ 103-105.

[52] Settlement Agreement ¶¶ 35, 67.

[53] Ibid. ¶¶ 45, 79.

[54] See Leffler Dec. ¶ 24.

[55] Settlement Agreement ¶¶ 34, 66.

15

across the entire network—at least seven basis points lower than the system-wide rate as of March 31, 2024.[56]

43.     The Settlement Agreement thus closes off both avenues for the networks to raise interchange fees—by raising posted rates and by moving cardholders to higher-interchange cards. It stops the upward interchange-fee spiral. And it goes beyond halting that upward trajectory, providing a down payment toward more competitive fees via modest rate rollbacks.

44.     In this context, "modest" is a relative term. Under reasonable assumptions, the more-competitive rates resulting from the rules changes—improved surcharging and discounting—will be very substantial. Those savings by merchants and their customers are likely to be very substantially more than the savings generated by the rate caps and rollbacks. But even just the rate caps and rollbacks will provide very large savings.[57]

45.     The rate caps and rollbacks have powerful combined effects. They stop the historical rates of increase, roll back posted rates by at least four basis points, and roll back average effective rates by at least seven basis points. And they do all of that with respect to steadily increasing volumes of credit-card transactions.[58] My understanding is that, in sum, the rate caps and rollbacks alone will generate merchant savings of more than $29 billion over the term of the Settlement Agreement.[59]

**IV. Summary and Concluding Remarks**

46.     The Settlement Agreement has a variety of provisions designed to enhance competition in the marketplace for payment mechanisms, encouraging consumers to shift to lower cost/more efficient payments means, and allowing merchants to ameliorate the Visa and Mastercard supracompetitive interchange fees. Savings to merchants will occur in multiple ways: (a) lower interchange fees charged to merchants on each card; (b) induced switching to lower-cost cards, as a result of (i) the ability to use steering mechanisms; and (ii) increasing the competitive

---

[56] Settlement Agreement ¶¶ 33, 65. The benchmark is the combined weighted average of Visa and Mastercard credit card rates, minus seven points. Ibid.

[57] See Leffler Dec. ¶ 29.

[58] Ibid. ¶ 22.

[59] Ibid. ¶ 29.

16

pressure on other brands (e.g., American Express); and (c) recapture of some of the excess charges by surcharging. In addition, the backstop rate caps and rollbacks ensure that if competitive forces by themselves kick in only slowly, interchange fees will nonetheless come down, not only from where they are today but also from where they otherwise would be over the next five-plus years. Competitive pressures should end the upward spiral of interchange fees, and merchants will be able to (and will have an incentive to) recover some of the excess fees imposed upon them. The magnitude of the savings to merchants and customers is substantial even if there is not a competitive response from American Express (whether voluntary, through litigation, or regulation) but will be greater if there is a competitive response. As I pointed out in the Stiglitz Merits Report, much of the merchant savings are likely to be passed on to customers, who ultimately bear the cost of the inefficient and noncompetitive payments system we have today.

47. Visa and Mastercard have been in this litigation since 2006. In 2018, the Supreme Court ruled in another case, that, based on the record of that litigation, those plaintiffs failed to show that American Express's restraints were anticompetitive. In my opinion, multiple important features of the Visa/Mastercard case distinguish it from the American Express case. But it would deny reality to pretend that the American Express decision does not hover over this litigation.

48. Especially in this environment, in my view the Settlement Agreement represents a very favorable outcome for merchants. Under the Settlement Agreement, the changes to the Visa and Mastercard rules will allow merchants to steer their customers to lower-cost payment means by prices, both discounts and charges. The Settlement Agreement will offer significant immediate relief from the supracompetitive interchange fees, giving the new competitive tools time to take hold. The Settlement Agreement will put strong downward pressure on interchange fees and impede the fee spiral that has led to increasing distortions in this market.

49. Like nearly all settlements, this Settlement Agreement is not perfect. A rollback of the average effective rates *to the competitive level* would be desirable. Allowing issuer-level charging of high-cost cards might add to the competitive pressures on Visa and Mastercard interchange fees. Eliminating the honor-all-cards rule might, on net, be procompetitive.

50. Most developed countries address the competitive problems in credit-card markets by direct regulation of credit-card merchant fees. By contrast, the Settlement Agreement is the

17

settlement of private litigation under antitrust principles. It cannot be expected to achieve the results that a government can mandate through legislation or regulation.

51.     It is worth noting, however, that the Settlement Agreement here far surpasses the relief achieved in other similar litigation. Closest to home, the relief obtained by the U.S. Department of Justice in its litigation under the Sherman Act against Visa and Mastercard is just a small fraction of the relief offered by this Settlement Agreement. And I have outlined above the many and substantial ways that the Settlement Agreement improves on what the private plaintiffs originally achieved in 2012 in this litigation.

52.     The Settlement Agreement opens competitive doors that have been closed for decades, while providing rate relief to every merchant that accepts Visa or Mastercard credit cards. The Settlement Agreement offers the certainty of substantial benefits to merchants and enhancements to economic welfare while avoiding the risks of continuing litigation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

_____     March 25, 2024
Joseph Stiglitz, Ph.D.                                                Date

18