**UNITED STATES DISTRICT COURT FOR**
**THE EASTERN DISTRICT OF NEW YORK**

---

|
IN RE PAYMENT CARD INTERCHANGE FEE | MDL No. 1720
AND MERCHANT DISCOUNT ANTITRUST |
LITIGATION | Docket No. 05-md-01720-MKB-JAM
|

---

BARRY'S CUT RATE STORES INC.; DDMB, INC.
d/b/a EMPORIUM ARCADE BAR; DDMB 2, LLC
d/b/a EMPORIUM LOGAN SQUARE; BOSS
DENTAL CARE; RUNCENTRAL, LLC; CMP
CONSULTING SERV., INC.; TOWN KITCHEN,
LLC d/b/a TOWN KITCHEN & BAR; GENERIC
DEPOT 3, INC. d/b/a PRESCRIPTION DEPOT; and
PUREONE, LLC d/b/a SALON PURE,

Plaintiffs,
-v-

VISA, INC.; MASTERCARD INCORPORATED;
MASTERCARD INTERNATIONAL
INCORPORATED; BANK OF AMERICA, N.A.; BA
MERCHANT SERVICES LLC (f/k/a DEFENDANT       **[REDACTED VERSION]**
NATIONAL PROCESSING, INC.); BANK OF
AMERICA CORPORATION; BARCLAYS BANK
PLC; BARCLAYS BANK DELAWARE;
BARCLAYS FINANCIAL CORP.; CAPITAL ONE
BANK, (USA), N.A.; CAPITAL ONE F.S.B.;
CAPITAL ONE FINANCIAL CORPORATION;
CHASE BANK USA, N.A.; CHASE MANHATTAN
BANK USA, N.A.; CHASE PAYMENTECH
SOLUTIONS, LLC; JPMORGAN CHASE BANK,
N.A.; JPMORGAN CHASE & CO.; CITIBANK
(SOUTH DAKOTA), N.A.; CITIBANK N.A.;
CITIGROUP, INC.; CITICORP; and WELLS
FARGO & COMPANY,

Defendants.

---

**Declaration of Keith Leffler**
**March 25, 2024**

## I. Introduction

1.      I have previously issued a report in this case in November 2020 concerning Class Certification of the Equitable Relief Class.  My qualifications and background were provided in that report.  I have been asked by counsel for the Equitable Relief Class to assess the likely economic impact of the Settlement Agreement executed by that Class and the networks on March 25, 2024 (the "Settlement Agreement") on the interchange fees paid by merchants.  I have reviewed the terms of the Settlement Agreement, including those related to merchant steering and to rate caps and rate rollbacks.  To perform the analysis summarized in this Declaration, I have obtained and relied on data and documents produced by Visa, Mastercard, and Defendant banks in addition to materials referenced herein.[1]

2.      I understand that I may have an opportunity in connection with a motion for final approval of the Settlement Agreement to provide further details about the value to merchants of the rules changes.  I outline some of those benefits here, and I discuss the order of magnitude of their value to merchants.  I also address the value of the rate caps and rollbacks.

## II. Impact of the Settlement Agreement on the Interchange Fees Paid to Visa and Mastercard.

3.      Enhanced competition.  The Settlement Agreement includes provisions that will increase the likelihood of meaningful competition among payment card networks and issuing banks.[2] Most importantly, these include expanded opportunities for merchants to price the use of high-cost credit cards and/or to discount the use of low-cost credit cards.  In addition, the Settlement Agreement includes a merchant education program to assist merchants in

---

[1] Visa and Mastercard supplied monthly data on all their credit card transactions volume and interchange fees on those transactions.  This Visa data covered 2010 through November 2023; the Mastercard data began in 2011 and is also through November 2023.  The data was separated into consumer and business card types.  Visa and Mastercard also supplied monthly data for 2023 providing the transactions volumes and interchange fees for all transactions that would form the basis of the Average Effective Rate Limit as defined in the Settlement Agreement.  Defendant banks Barclays, Bank of America, Chase, Citibank, Wells Fargo, and Capital One also supplied financial data on their credit card operations.

[2] The Declaration of Joseph E. Stiglitz ("Stiglitz Declaration") discusses in greater detail the competition-enhancing provisions of the Settlement Agreement.

understanding and implementing steering opportunities and to encourage smaller merchant "buying groups" to negotiate reduced interchange rates from Visa and Mastercard.  The Settlement Agreement also allows merchants to engage in more selective non-acceptance of Visa and Mastercard and it lowers the cost of testing the value of not accepting Visa and Mastercard which will assist merchants in negotiating lower interchange fees.

4.      The Settlement Agreement provides several inter-related ways for merchants to drive down their cost of accepting Visa and Mastercard credit cards.  It significantly increases: (i) the scope for steering customers to lower-cost payment cards; (ii) merchants' leverage in negotiations with the networks and issuers; and (iii) the competitive dynamics among the credit-card purveyors, including issuers, and American Express and Discover.

5.      <u>Steering Customers to Low-Cost Payment Cards.</u>  Currently, the network rules impair the ability of merchants to discount lower-cost Visa and Mastercard credit cards.  Mastercard's rules prohibit discounting at the point-of-sale based on the identity of the issuing bank.  Although Visa permits some issuer-level discounting, its actual rules on the issue are not clear.  The Settlement Agreement requires that both networks modify their rules to expressly permit issuer-level discounting at the point-of-sale.  The Settlement Agreement will therefore guarantee merchants' ability to discount by issuer, by product, and by brand.  It will further promote issuer-level differentiation by educating merchants about permissible differentiation among issuers.

6.      Currently, the network rules impair the ability of merchants to surcharge Visa or Mastercard credit cards.  Those rules are complex and difficult to follow.  For merchants accepting American Express, the Visa and Mastercard "Level Playing Field" rules effectively preclude charging for high-cost credit cards.[3]  As a consequence of this rule and state laws precluding surcharging, today less than 20% of all Visa and Mastercard credit-card transactions can be surcharged.[4]  The Settlement Agreement greatly simplifies the surcharging rules,

---

[3] See Stiglitz Declaration for details of the economic impact of this rule.

[4] Today, two states, Connecticut and Massachusetts, and Puerto Rico have no-surcharging laws that they enforce.  See https://www.nationalmechants.com "Is it Legal to Surcharge on Credit Cards? You Guide to Surcharge Laws;" https://www.nadapayments.com.  These areas account for about 4% of Visa

reforms the disclosure and notice requirements, and eliminates the Level Playing Field rule. With the Settlement Agreement in place, surcharging will be possible for 96% of Visa and Mastercard credit-card transactions.

7.     The rules changes should lead to much greater merchant steering through discounting and surcharging.  I also expect the Merchant Education program to assist in more rapid adoption.  In addition, customers are increasingly aware of inequities and inefficiencies from the use of high-cost credit cards.[5]  That increased recognition also should help ease the transition to more frequent and effective merchant steering.

8.     The experience in Australia provides a benchmark for the likely impact from significantly expanding merchants' ability to surcharge.  According to the Reserve Bank of Australia, over 7% of merchants in Australia surcharge for credit-card transactions—principally on American Express transactions, given that the Visa and Mastercard rates are regulated—and these surcharging merchants are the larger merchants with higher volumes of transactions.[6]  Given the lower level of interchange fees in Australia compared to the United States, this experience

---

transactions (based on population).  Of the remaining 96% of transactions, at least 83% are from merchants that also accept American Express and are therefore subject to the Level Playing Field rule. Deposition of Billy Knupp, April 17, 2018.  Therefore, today less than 20% of all Visa credit-card transactions can be surcharged (=4% + [83% * 96%] cannot be surcharged).  More recent information indicates that more than 83% of the relevant transactions are from merchants that also accept American Express. See, for example, Nilson Report February 2020.  To the extent that is true, eliminating the Level Playing Field rule will have an even greater impact in making transactions subject to surcharging.

[5] See, e.g., NY Times opinion video "Your Rewards Card Is Actually Bad for You, and for Everyone Else, November 21, 2023 available at Opinion | Your Rewards Card Isn't as Rewarding as You Think - The New York Times (nytimes.com).  This is a publicly available video explaining how the current credit card rules system result in high merchant prices and redistribution of wealth to the higher income consumers who qualify for the high rewards cards and avoid interest charges by paying their balances each month.  See also, https://www.nytimes.com/2024/03/15/opinion/capital-one-discover-credit-cards-rewards-swipe-fees.html?smid=nytcore-ios-share&amp;referringSource=articleShare.

[6] See RDP 2023-08: The Evolution of Consumer Payments in Australia: Results from the 2022 Consumer Payments Survey | RBA.  This estimate is from consumer surveys rather than from actual receipts. Other estimates show a much greater prevalence of surcharging. For example, according to the payments processor Zeller, as many as 60% of its credit card transactions in Australia are surcharged. Surcharging in Australia: is it right for your business? | Zeller (myzeller.com).

provides a conservative estimate of the likely extent of surcharging after the Settlement Agreement takes effect.

9.      Data from Australia show that when faced with a surcharge, about 45% of customers pay it; the other 55% switch to lower-cost payment methods.  Interchange fees for merchants that steer their customers to lower-cost payment means through surcharging would be reduced by about 40%.[7]  Those savings will be in addition to the payback of the high fees that merchants will collect from the customers who elect to pay the surcharge.  Using the average surcharge in Australia as a guide, this would pay back about 70% of the merchants' interchange fees.[8]

10.      Assuming about 10% of Visa and Mastercard credit-card transactions are subject to surcharging within a year of the Settlement,[9] these savings would apply to nearly $400 billion in commerce.[10]  Therefore, I expect the merchants' enhanced ability to surcharge to save them tens of billions of dollars over the next five years.

11.      Negotiating Lower Rates.  The savings from actual surcharging are only a part of the reduced interchange fees that merchants will likely achieve under the Settlement.  When faced with the prospect of merchant steering, including by discounting or surcharging, the networks and issuing banks can avert, and have averted, the threat of losing transactions by negotiating reduced interchange rates in return for merchants' agreeing not to discount or surcharge.  By significantly improving the merchants' ability to discount and surcharge credit cards, the

---

[7] For the customers switching to lower-cost credit cards, the reduction in interchange fees would be about 19%.  For those switching to debit cards, the reduction would be about 62%.  The 40% figure above is the approximate average of these reductions.

[8] The average Visa and Mastercard interchange fee was about ███ basis points in 2023.

[9] The 10% estimate is based on the Australian experience.  I increase the 7% of merchants that are surcharging in Australia to 10% of the transactions volume to account for the differential in surcharging by merchant size.  Here in the U.S., it would take far fewer than 7% of merchants to affect 10% of transaction volume.  Data from Visa for 2020 show that if one of three of the larger merchants (excluding the top six merchants) surcharged, it would take only 78 merchants surcharging (0.48% of the 15821 listed merchants) to account for 10% of Visa transactions.  If one in four surcharged, 333 merchants (2.1%) would need to surcharge to account for 10% of Visa transactions.

[10] In 2023, there were over $4 trillion in Visa and Mastercard credit-card transactions in the U.S. that would be subject to the Settlement Agreement.

Settlement Agreement will therefore improve merchants' ability to negotiate lower interchange rates.

12.     Visa's data regarding negotiated rates illustrate the magnitude of potential savings. During a recent 12-month period, about ▮▮ of Visa's credit-card transactions were at lower negotiated rates rather than posted rates.

13.     Merchants achieved these reductions *under the current rules*, when only a portion of transactions are even potentially subject to surcharging.  Under the Settlement Agreement, about 96% of credit-card transactions will be available for surcharging.  And, as discussed in the Declaration of Professor Stiglitz, the Settlement Agreement will also make surcharging and discounting far more powerful by simplifying the surcharging rules, easing product-level surcharging, permitting issuer-level discounting, promoting buying groups, and assisting merchants in knowing how to use these improved competitive tools.

14.     The increased likelihood of surcharging is expected to result in more, and lower, negotiated interchange rates.  The order of magnitude of the merchants' savings from enhanced negotiating ability can easily be understood.  Assume that beginning in November 2024 the percentage of Visa and Mastercard transactions subject to negotiated rates increased by 15 percent points over the ensuing 12 months (a ▮▮▮▮▮ of the relevant transactions).  This would impact nearly $600 billion in annual Visa and Mastercard credit-card transactions.  If the average negotiated rate for these additional negotiated-rate transactions is a 25% reduction, the savings will be tens of billions of dollars over the next five years.  And the merchants that have already negotiated lower rates will gain increased bargaining power to negotiate even better rates, resulting in billions more in merchant savings.

15.   <u>Reductions from American Express.</u>  American Express is the third largest credit-card services provider.[11]  It also has the highest merchant fees,[12] and, as discussed by Professor Stiglitz, onerous restraints on merchant steering.[13]  With the Settlement Agreement in place, the increased ability of merchants to steer credit card users to low-cost payment methods will put competitive pressure on American Express as well as Visa and Mastercard.  Merchants will favor lower-cost payment methods, which is not American Express, and some merchants will likely decline American Express acceptance if it does not negotiate lower rates.

16.   The increased competition facing American Express because of the Settlement Agreement is therefore expected to result in lower profit-maximizing American Express merchant fees.  If, for example, American Express is constrained in the future to keep the same differential between its rates and those of Visa and Mastercard that exists today, it will need to substantially lower its average rates.[14]  If this occurred, merchants would save more than ten billion in fees to American Express.

17.   <u>The Substantial Potential Saving in Merchant Fees from the Settlement Agreement's Rules Reforms.</u>  I have illustrated above three types of ways in which the Settlement Agreement will increase competition: (i) making merchant discounting and surcharging—steering through prices—vastly more widely available and simpler and more powerful; (ii) prompting Visa and Mastercard to offer lower negotiated rates in return for no-discounting and no-surcharging

[11] American Express has a market share of credit card transactions of about 19.6% in 2022.  See, e.g., <u>Credit Card Market Share by Network (2024) (wallethub.com)</u>, <u>U.S. Credit Card Market Share - Facts & Statistics [2023] (upgradedpoints.com)</u>, <u>Credit and Debit Card Market Share by Network and Issuer | The Motley Fool</u>.

[12] See https://www.fool.com/the-ascent/research/average-credit-card-processing-fees-costs-america/. I have data on American Express's posted and overall rates by card type, by Opt Blue and regular AmEx processing.  Using the Visa proportions of card type transactions for the November 2022 – October 2023 period and assuming 25% of AmEx's transactions are processed using Opt Blue, the average American Express fee would be 264 bps compared to Visa's 214 bps and Mastercard's 218.

[13] See Stiglitz Declaration ¶¶ 14-15, 18, 21.

[14] To maintain the same differential with the Visa and Mastercard rate caps and rollbacks and the assumed impact of greater negotiating described above, American Express would have to lower its overall average rate by an amount equal to that of Visa and Mastercard.  Therefore, the estimated savings in American Express merchant fees is given by relative market share of American Express compared to Visa and Mastercard multiplied by the estimated saving for Visa and Mastercard.

agreements; and (iii) incentivizing American Express to lower its fees in order to avoid merchants' rejecting or steering away from its card.

18.     As noted, I understand that I may have an opportunity in connection with a motion for final approval of the Settlement Agreement to provide more details about the value of the rules relief.  Below I estimate the merchant savings from other provisions of the Settlement Agreement—rate caps and rate rollbacks.  Under reasonable assumptions about surcharging and discounting, the rules relief discussed above should deliver savings to merchants that is substantially more than the $29+ billion expected merchant savings from the rate caps and rate rollbacks estimated below.

19.     <u>The Rate Caps and Rate Rollbacks.</u>  The Settlement Agreement includes provisions that guarantee substantial benefits to merchants in reduced interchange fees, in addition to the rules reforms and consequent improved competition.  The Agreement puts caps on each network's posted U.S. credit interchange rates at the levels that were in effect as of December 31, 2023.  It also reduces all U.S. credit posted rates by at least four basis points for three years.  And, independently, it requires that both networks reduce their average effective U.S. credit interchange rates (encompassing posted as well as negotiated rates) by at least seven basis points for each of five years.[15]

20.     The Settlement Agreement's brakes on posted rates and average effective rates work in tandem.  Absent the caps on posted rates, the networks could meet the average-effective rate commitment by negotiating discounted rates to certain merchants or merchant segments while still raising rates on other merchants or segments.  Likewise, absent the brake on average effective rates, the networks could meet the posted-rate commitments but effectively raise rates by shifting card usage to higher-interchange cards.

---

[15] The average effective interchange rate must be at least 7 bps below the overall average of Visa and MasterCard rates for the year April 2023-March 2024.  The rate caps and rollbacks apply specifically to interchange fees, that is, the fees that are distributed to the issuing banks.  The Settlement Agreement also includes "Anti-Circumvention" language that prevents Visa and Mastercard from simply changing interchange fees to some other form of fees.  See Settlement Agreement ¶¶ 38, 70.

21.     The Posted-Rate Caps and Rollbacks.  The Settlement Agreement caps each merchant's posted credit interchange rate at the level that existed as of December 31, 2023.  The caps go into effect upon the district court's preliminary approval of the Agreement and extend for more than five years.  In addition, the Agreement provides for each of those posted rates to be rolled back by at least four basis points for each of the three years beginning (presumably) April 15, 2025.  I have estimated the value to the merchants from those caps and rollbacks to the merchant class as over $16.06 billion.

22.     In 2023, there were over $700 billion in Visa and Mastercard credit-card transactions that would be subject to the posted-rates rollback.  Over the period 2011 through 2023, Visa and Mastercard credit-card transactions volumes have increased at an annual rate of over 9.3%.[16]  That rate of growth is likely to continue.[17]

23.     Not only will the volume of transactions increase during the term of the Settlement Agreement, but without the Agreement the networks' interchange rates would also likely increase.  The Report of Professor Stiglitz filed in October 2018 describes the "rewards-price spiral" that the current Visa and Mastercard rules engender.[18]  This price spiral results from card-issuer competition on the cardholder side in offering "rewards" for card use.  Those rewards result in card user "loyalty" to the cards, with merchants facing a loss of customers if they do not accept the cards.  Greater rewards and greater loyalty allow the networks to charge higher fees without merchants rejecting the cards.  Thus, higher rewards lead to higher fees, which support higher rewards which lead to higher fees—rewards and interchange fees spiral upwards.

---

[16] This annual increase in expected transactions volume is estimated from regression analysis of the monthly volumes 2010/2011 as detailed in the Appendix to this Declaration, which is filed under seal.

[17] I estimate the growth by regression analysis of the Visa and Mastercard monthly transactions 2010/2011 – 2023.  For details see the Appendix.  As discussed above, the Agreement will unleash competition through merchants' enhanced ability to steer their customers to low-cost payment methods, which should increase merchant acceptance of Visa and Mastercard credit cards, leading to an acceleration of the growth of Visa and Mastercard transactions.

[18] Expert Report of Joseph E. Stiglitz, October 5, 2018, ¶¶ 103-105.

24.     That dynamic is seen empirically.  The networks' average credit interchange fees show a clear upward trend.   A regression analysis of Visa's and Mastercard's credit interchange rates confirms that upward trend in monthly average interchange rates over the period 2010-2023.[19] The results show an expected combined weighted average annual increase for the networks' credit interchange rates of .99 bps.[20]

25.     I have estimated the savings from the posted-rate caps and the minimum four basis points rate rollbacks over the relevant periods, taking into account the expected growth in Visa and Mastercard credit-card transactions volumes, and the expected increases in interchange rates absent the Settlement Agreement.  The Settlement Agreement will cap the posted rates at the levels that existed on December 31, 2023—beginning presumably by November 1, 2024 with court approval of the Settlement.  The posted-rate rollbacks will take effect (presumably) April 16, 2025 and remain in effect until April 15, 2028.  I find that the posted-rate rollbacks and caps will result in an expected reduction in interchange fees on Visa and Mastercard credit cards of about $16.06 billion.[21]

26.     <u>Rollback of Average Effective Rates.</u>  Independent of the posted-rate caps and rollbacks, the Settlement Agreement also rolls back each network's average effective credit interchange rate.  This provision encompasses negotiated rates as well as posted rates.

27.     Under the Settlement, for the period (presumably) April 16, 2025 through April 15, 2030 each network must reduce its average effective credit interchange rate at least seven basis points below the systemwide (Visa and Mastercard) average for the 12-month period ending March 31, 2024.  I estimate that this independent brake on interchange fees will generate $29.79 billion in savings in merchant Visa and Mastercard interchange fees.[22]

---

[19] As noted above, I have data on Visa's interchange rates beginning in 2010, and for Mastercard beginning 2011.

[20] The Appendix provides the regression results and the impact on expected interchange fees.

[21] The Appendix describes the details of the calculations.

[22] Appendix 1 also describes the details of the calculations.

28.     I have separately calculated the value of the posted-rate caps and rollbacks ($16.06 billion), and the average-effective interchange rate commitment ($29.79 billion).  The networks will likely take into account the posted-rate caps and rollbacks when aiming to meet their effective-rate commitments.  The value of the posted-rate caps and rollbacks is, therefore, likely to be subsumed in, rather than added to, the value of the average effective-rate commitment.

29.     Thus, the total guaranteed savings from the Settlement Agreement's posted rate caps and rollbacks, plus the effective-rate commitments, are expected to be about $29.79 billion. However, as noted above, under reasonable assumptions, the likely savings from the Agreement's reforms to the steering rules and related enhancements to competition will likely be substantially more than that amount.

**III. <u>Conclusion.</u>**

30.     The Settlement Agreement provides immediate and substantial benefits to merchants. The Agreement will roll back the average interchange fees and the posted rates that Visa and Mastercard can charge.  The posted rate caps go into effect immediately upon Court approval of the Agreement.  The other brakes and rollbacks follow shortly thereafter.

31.     More importantly, the relaxation and elimination of many of the Visa and Mastercard restrictions on merchants' steering customers to lower-cost payment methods will increase competition in the credit card services market.  As a result, an increasing number of merchants are expected to place appropriate prices on the use of high-cost credit cards.  This will introduce substantial efficiency into the distorted General Purpose Credit Card Network Services Market.

32.     Certainly, the Settlement Agreement does not result in perfectly competitive credit-card interchange fees.  But no viable settlement of an antitrust case could achieve that outcome. The Credit Card Network Services market is highly concentrated, and the networks' anticompetitive practices have been in place for decades.  By reducing the significant impediments to competition fostered by the Visa and Mastercard current rules, the Settlement Agreement will increase competition and provide merchants with substantial interchange-fee

10

reductions.  The Agreement is a large step in correcting the economic distortions that merchants and their customers have faced for decades.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

_____     __March 24, 2024_____

Keith Leffler, Ph.D.                                                      Date

11

Appendix







3





5

