UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------

IN RE PAYMENT CARD INTERCHANGE FEE
AND MERCHANT DISCOUNT ANTITRUST
LITIGATION

**<u>MEMORANDUM & ORDER</u>**

05-MD-1720 (MKB)


This document refers to: ALL ACTIONS

------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

I.    Background ............................................................................................................. 3

   a.   Procedural history ............................................................................................. 3

   b.   Factual overview of the debit-card market ....................................................... 4

   c.   Challenged network policies and practices ...................................................... 6
      i.   Pre-Durbin Amendment policies ................................................................ 6
      ii.  Post-Durbin Amendment policies .............................................................. 7

II.   Discussion ............................................................................................................... 9

   a.   Standard of review ............................................................................................ 9

   b.   Legal framework for claims under Section 2 of the Sherman Act .................. 12

   c.   Antitrust standing ........................................................................................... 13

   d.   Plaintiffs' debit monopolization claims .......................................................... 21
      i.   Whether Visa possessed monopoly power ............................................... 23
      ii.  Willful acquisition or maintenance of monopoly power .......................... 29

   e.   Plaintiffs' attempted monopolization claim .................................................... 44
      i.   Dangerous probability of achieving monopoly power .............................. 45
      ii.  Specific intent to monopolize ................................................................... 45

   f.   Plaintiffs' conspiracy to monopolize claim .................................................... 47

   g.   The Equitable Relief Plaintiffs' monopolization claims ................................. 51
      i.   Debit monopolization claim ..................................................................... 51
      ii.  Credit monopolization claim ..................................................................... 53

III.  Conclusion ............................................................................................................ 57

Several Plaintiffs and several Defendants[1] in this multidistrict litigation moved for summary judgment and partial summary judgment in December of 2020.[2]  This Memorandum and Order addresses Defendants' motion for summary judgment challenging the monopolization claims brought by the 7-Eleven Plaintiffs, the Home Depot Plaintiffs, and the Equitable Relief Class Plaintiffs against Visa and the Bank Defendants under Section 2 of the Sherman Act.[3]

---

[1]  Plaintiffs consist of (1) the Equitable Relief Class Plaintiffs (or "Equitable Relief Plaintiffs"), certified under Federal Rule of Civil Procedure 23(b)(2), *DDMB, Inc. v. Visa, Inc.*, No. 05-MD-1720, 2021 WL 6221326 (E.D.N.Y. Sept. 27, 2021); (2) the Target Plaintiffs, the 7-Eleven Plaintiffs, and The Home Depot, who are not members of the class and filed briefing on the summary judgment issue together and are referred to as the "Direct Action Plaintiffs," *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2017 WL 4325812, at *3 (E.D.N.Y. Sept. 27, 2017), *order set aside on other grounds*, No. 05-MD-1720, 2018 WL 4158290 (E.D.N.Y. Aug. 30, 2018); and (3) the Grubhub Plaintiffs — another group of opt-out plaintiffs against whom Defendants sought summary judgment in September of 2023. Target Plaintiffs and Grubhub Plaintiffs did not assert Section 2 claims against Defendants.

Defendants consist of the Visa and Mastercard networks as well as "various issuing and acquiring banks" (the "Bank Defendants").  *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 18 (E.D.N.Y. 2019).

[2]  Defendants moved for summary judgment on several bases, one of which the Court addresses in this order.  (Defs.' Mot. for Summ. J. ("Defs.' Mot."), Docket Entry No. 8067; Defs.' Mem. in Supp. of Defs.' Mot. on Pls.' Monopolization Claims ("Defs.' Mem."), Docket Entry No. 8088; Defs.' Reply Mem. in Supp. of Defs.' Mot. on Pls.' Monopolization Claims ("Defs.' Reply"), Docket Entry No. 8091; Equitable Relief Class Pls.' Mem. in Opp'n to Defs.' Mot. on Pls.' Monopolization Claims ("ERCP's Opp'n"), Docket Entry No. 8169; Direct Action Pls.' Mem. in Opp'n to Defs.' Mot. on Pls.' Monopolization Claims ("DAP's Opp'n"), Docket Entry No. 8229.)

[3]  The Court partially resolved Defendants' motions for summary judgment in January of 2024, addressing Defendants' arguments under *Ohio v. American Express*, and Mastercard's and the Bank Defendants' arguments as to Mastercard's lack of market power.  *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, --- F. Supp. 3d ---, 2024 WL 278565 (E.D.N.Y. Jan. 8, 2024) (*Interchange Fees IV*).  In February of 2024, the Court addressed Defendants' motions challenging Plaintiffs' *Illinois Brick* standing and Plaintiffs' post-IPO conspiracy claims.  *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2024 WL 1014159 (E.D.N.Y. Feb. 22, 2024) (*Interchange Fees V*).

For the reasons discussed below, the Court grants in part and denies in part Defendants' motion for summary judgment on the monopolization claims.[4]

## I.   Background

The Court assumes familiarity with the facts and extensive procedural history as set forth in prior decisions.  *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 986 F. Supp. 2d 207 (E.D.N.Y. 2013) (*Interchange Fees I*), *rev'd and vacated*, 827 F.3d 223 (2d Cir. 2016) (*Interchange Fees II*); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11 (E.D.N.Y. 2019) (*Interchange Fees III*); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, --- F. Supp. 3d ---, 2024 WL 278565 (E.D.N.Y. Jan. 8, 2024) (*Interchange Fees IV*); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2024 WL 1014159 (E.D.N.Y. Feb. 22, 2024) (*Interchange Fees V*).

### a.   Procedural history

In December of 2020, Defendants, the 7-Eleven Plaintiffs,[5] the Home Depot Plaintiffs, the Target Plaintiffs, and the Equitable Relief Class Plaintiffs filed summary judgment and

---

[4]  Because the 7-Eleven and Home Depot Plaintiffs — two of the three groups of plaintiffs referred to as the Direct Action Plaintiffs — rely on the same experts and oppose Defendants' motion in a single brief, the Court refers to these two plaintiff groups as "Plaintiffs" throughout this decision.  Defendants address the Equitable Relief Plaintiffs' monopolization claims separately from those brought by the other Plaintiffs, (*see* Defs.' Mem. 43–45), and Equitable Relief Plaintiffs respond in their own brief relying on their own experts, (*see* ERCP's Opp'n).  Accordingly, the Court addresses these arguments separately from those of the other Plaintiffs.  (*See infra* section II.g.)

Similarly, because only Visa and the Bank Defendants are implicated in the Section 2 claims, all references to "Defendants" throughout this decision refer only to Visa and the Bank Defendants.

[5]  On January 3, 2024, 7-Eleven, in its capacity as an individual member of the "7-Eleven Plaintiffs," settled its claims against all Defendants.  (*See* Stipulation and Order of Dismissal, Docket Entry No. 9038.)  The Court nevertheless continues to refer to the remaining plaintiffs in

*Daubert* motion papers.[6]  As relevant here, the Court decided the *Daubert* motions in October of 2022, excluding certain expert opinions but denying the Visa and Bank Defendants' motion to exclude portions of the report of Plaintiffs' expert, Professor Jerry Hausman.[7]  In January of 2024, the Court decided Defendants' motions for summary judgment "under *Ohio v. American Express*" and Mastercard's and the Bank Defendants' motions for summary judgment as to Mastercard's lack of market power.  *Interchange Fees IV*, 2024 WL 278565.  In February of 2024, the Court decided Defendants' motions for summary judgment based on *Illinois Brick* standing and on Plaintiffs' post-IPO conspiracy claims.  *Interchange Fees V*, 2024 WL 1014159.

### b.   Factual overview of the debit-card market

Debit cards, unlike credit cards, are "pay now" instruments that allow consumers to make purchases using funds in their checking or savings accounts — often called demand deposit accounts ("DDAs").[8]  Debit cards are often offered by banks to their customers, and are also issued for more specific purposes, such as to facilitate HSA- and FSA-eligible purchases or for pre-tax purchases of transit services.  Debit cards offer banks a relatively inexpensive way to give customers direct access to funds in their own accounts for payment purposes.  Debit card issuers earn revenue from DDAs and debit-card transactions through interest on account

---

*7-Eleven, Inc. v. Visa, Inc.*, No. 13-CV-5746 (E.D.N.Y.), as the "7-Eleven Plaintiffs" for consistency across the Court's decisions.

[6]  *See Interchange Fees V*, 2024 WL 1014159, at *3 & n.7.

[7]  *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2022 WL 14863110 (E.D.N.Y. Oct. 8, 2022); (*see also* Expert Rep. of Prof. Jerry Hausman ("Hausman Rep."), annexed to the Decl. of Rosemary Szanyi ("Szanyi Decl.") as SJDX400, Docket Entry No. 8526-1).

[8]  The facts in this section are undisputed unless otherwise noted.  For factual references, *see generally* Hausman Rep. ¶¶ 40–85.

balances, customer fees, and debit interchange.

Debit transactions have historically been authenticated in one of two ways: by PIN or cardholder signature.  PIN debit transactions generally require the cardholder to enter a four-digit PIN to authenticate the purchase, usually the same PIN that the cardholder uses to withdraw funds at an ATM.  These transactions are typically processed over Electronic Fund Transfer networks such as PULSE, STAR, and NYCE, and most cards are linked to more than one debit network.  PIN networks operate on a "single-message" infrastructure that authorizes, clears, and settles each transaction in a single electronic message.  Funds are deducted from the account immediately once the transaction is authorized, meaning these transactions are often seen as cheaper and more efficient to process.  Requiring PIN entry also meant that these transactions are seen as less prone to fraud.

Signature debit transactions, on the other hand, rely on the credit-card network infrastructures developed by Visa and Mastercard, and are typically authenticated by the cardholder signing a receipt at the point of sale.  Signature debit transactions are "dual-message" transactions because, much like credit card transactions, the authorization message occurs separately from the settlement message that often takes place some time later.  Unlike the single-message PIN, therefore, signature debit transactions carry a risk of float and chargebacks, as well as a greater risk of fraud.

Prior to the Durbin Amendment, which largely capped debit interchange fees, the interchange fees applicable to signature debit were similar to credit-card interchange fees.  PIN debit, however, was typically cheaper.  By capping interchange fees for transactions made with debit cards issued by banks with $10 billion or more in assets, the Durbin Amendment led to a widespread reduction in interchange fees for all debit transactions, reducing the differential

between signature and PIN debit interchange.

### c.   Challenged network policies and practices

At issue in Plaintiffs' monopolization claims are Visa's pre- and post-Durbin Amendment policies and practices that Plaintiffs contend excluded other PIN debit networks from competing in the debit transactions market.  Plaintiffs challenge a number of Defendants' practices, including Visa's imposition of a FANF; Visa and Mastercard's migration to Europay, Mastercard and Visa ("EMV") technology; and allegedly exclusionary conduct in the debit market.[9]  The following facts are undisputed unless otherwise noted and are drawn from Professor Jerry Hausman's expert report.  (*See* Hausman Rep. ¶¶ 490–607.)

### i.   Pre-Durbin Amendment policies

Plaintiffs challenge practices that they assert Defendants used to promote high interchange signature debit transactions over lower interchange PIN debit transactions.  Because merchants preferred to route transactions through the lower interchange PIN networks, Plaintiffs' theory is that Visa suppressed and contained PIN debit transactions in order to protect signature debit.  In support of this theory, Plaintiffs point to Visa's pre-Durbin Amendment arrangements with debit-card issuing banks ("Issuers") to issue "all-Visa" debit cards: cards that carried Visa's "VisaNet" mark for signature debit transactions "on the front" and Visa's "Interlink" PIN debit network "on the back."  These arrangements meant that any transactions using these "all-Visa" debit cards had to be routed either through Visa's signature debit network or Visa's Interlink PIN

---

[9]  (*See, e.g.*, Sixth Am. 7-Eleven Compl. ("7-Eleven Compl.") ¶¶ 194–99, 202, 208–31, annexed to Szanyi Decl. as SJDX1, Docket Entry No. 8520-1; First Am. The Home Depot Compl. ("THD Compl.") ¶¶ 97–119, 166–70, 173, annexed to Szanyi Decl. as SJDX2, Docket Entry No. 8520-1; Second Am. Target Compl. ("Target Compl.") ¶ 154, annexed to Szanyi Decl. as SJDX3, Docket Entry No. 8520-1; Equitable Relief Class Action Compl. ("Equitable Relief Class Compl.") ¶¶ 259, 269–87, annexed to Szanyi Decl. as SJDX4, Docket Entry No. 8520-1.)

debit network.  Visa's agreements with banks to issue these "all-Visa" debit cards required Issuers to enable Interlink as the exclusive PIN debit network on all Visa-branded debit cards, and in return, Visa offered reduced fees or volume-based rebates to these banks.  Visa entered into such arrangements with banks such as ████████████████████████████████. Any merchant that accepted Visa debit cards, therefore, was essentially required to maintain Interlink acceptance or would otherwise have to route Visa transactions through Visa's higher interchange signature debit network.  (*See generally* Hausman Rep. ¶¶ 507–44.)

### ii.   Post-Durbin Amendment policies

In 2010, the Durbin Amendment was signed into law, and one of its effects was to "limit[] the banks' practice of issuing debit cards that were compatible with only the issuer's networks." *Barry's Cut Rate Stores Inc. v. Visa, Inc.*, No. 05-MD-1720, 2019 WL 7584728, at *5 (E.D.N.Y. Nov. 20, 2019).  Visa- and Mastercard-branded debit cards now had to include a second PIN debit network in addition to their own, giving merchants the option to route PIN debit transactions to a competing network.  Plaintiffs highlight several of Visa's post-Durbin policies and argue that these policies were intended to maintain Visa's debit monopoly.  Each of the challenged policies is described briefly below.

### 1.   FANF

The Fixed Acquirer Network Fee ("FANF") requires merchants to pay a per-location fee to accept Visa transactions.  In addition to imposing the FANF, Visa lowered per-transaction fees, and Plaintiffs contend that this change was intended to make routing through Visa's debit networks more appealing to merchants who had already paid the FANF.  Plaintiffs characterize the FANF as an exercise of Visa's substantial market power, suggesting that merchants would not have accepted the price increase if not for the greater cost of dropping Visa acceptance.

A critical aspect of the FANF policy that Plaintiffs challenge is the use of FANF

concessions or discounts in exchange for routing commitments from "debit-intensive" merchants.  Some of these agreements set targets for merchants that would trigger certain rebates on FANF if those targets were met.  Other agreements used ███ incentives to gain merchant commitments.  For example, Visa entered into agreements with vendors such as ███████ ███████████████, pursuant to which the merchants would pay reduced ██████████ ████████ in exchange for debit routing commitments.  (*See* Hausman Rep. ¶¶ 555–73.)

## 2.   PAVD

Plaintiffs also challenge Visa's imposition of PIN-Authenticated Visa Debit ("PAVD"), a policy that required any Issuer of Visa-branded debit cards to enable PIN functionality over VisaNet.  The requirement would be waived, however, if the Issuer retained Interlink on the debit card.  This requirement meant that even if a Visa-branded debit card did not carry the Interlink mark on the back, any PIN transaction could still be routed through VisaNet, allowing Visa to compete for all PIN debit transactions on Visa-branded debit cards.  Plaintiffs assert that this policy allowed Visa to expand acceptance of its signature debit product as well as its PIN debit network without having to compete with other PIN debit networks.  (*See id.* ¶¶ 574–81.)

## 3.   Acquirer routing agreements

Plaintiffs also challenge agreements that Visa had with merchants' banks ("Acquirers") to route a greater volume of debit transactions through Visa's networks.  Like the merchant agreements discussed above, these agreements offered incentives to Acquirers if they reached certain transaction volume targets.  (*See id.* ¶¶ 582–84.)

## 4.   EMV and tokenization

The 7-Eleven Plaintiffs challenge how Visa implemented EMV (Europay, Mastercard, and Visa) chip card technology, arguing that Visa "exploited EMV . . . to protect its debit monopoly."  (DAP's Opp'n 21–23; *see also* Defs.' Stmt. of Material Facts ¶¶ 734–40, Docket

Entry No. 8068; Hausman Rep. ¶¶ 594–97.)  The first policy they challenge with respect to Visa's implementation of EMV is the recommendation that all EMV chip readers offer cardholders a choice between routing the transaction through "Visa Debit" and "US Debit."  The first option routed the transaction through Visa's network, while the latter allowed the merchant to route the transaction over any debit network enabled on that card, including Visa's.  The 7-Eleven Plaintiffs contend that "US Debit" was confusing to cardholders, and so most cardholders chose the recognizable "Visa Debit" option.

The second practice that the 7-Eleven Plaintiffs challenge is Visa's enforcement of rules and guidelines provided to EMV terminal manufacturers, through which Visa required all Issuers of Visa debit cards to code EMV chip cards to select Visa Debit by default at certain chip readers.  Plaintiffs contend that this "issuer priority rule" led to certain transactions automatically being routed to Visa's signature debit network.

Finally, the 7-Eleven Plaintiffs challenge Visa's use of tokenization for card-not-present transactions, such as those made in an "app" like Netflix or iTunes.  For some transactions in this category, Visa's "token" service offered merchants the option to store a "token" number rather than the customer's card number, minimizing the risk of a data breach.  Only Visa's network could be used for transactions that relied on these "tokens," and other networks therefore could not compete for these transactions unless the merchant opted not to use tokens in the first place.

## II. Discussion

### a. Standard of review

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Radwan v. Manuel*, 55 F.4th 101, 113 (2d Cir. 2022) (quoting Fed. R. Civ. P. 56(a)).  The court must

"constru[e] the evidence in the light most favorable to the nonmoving party," *Radwan*, 55 F.4th at 113 (alteration in original) (quoting *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 358 (2d Cir. 2011)), and "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Koral v. Saunders*, 36 F.4th 400, 408 (2d Cir. 2022) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).  The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists."  *Kee v. City of New York*, 12 F.4th 150, 166–67 (2d Cir. 2021) (quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010)).  A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the [nonmoving party]."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment.  *Id.*  The court's function is to decide whether, "after resolving all ambiguities and drawing all inferences in favor of the nonmovant, a reasonable jury could return a verdict for the nonmovant."  *Miller v. N.Y. State Police*, No. 20-3976, 2022 WL 1133010, at *1 (2d Cir. Apr. 18, 2022) (first citing *Anderson*, 477 U.S. at 248; and then citing *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127, 129 (2d Cir. 2013)).  The moving party, however, need not *prove* a negative; rather, where "the burden of proof at trial would fall on the nonmoving party, the moving party 'can shift the initial burden by pointing to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.'"  *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022) (quoting *Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."); *El-Nahal v. Yassky*, 835 F.3d 248, 252 (2d Cir. 2016) ("[T]he movant's burden will be

satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." (quoting *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995))).

In the antitrust context, summary judgment serves a "vital function" by assisting courts in "avoiding wasteful trials and preventing lengthy litigation that may have a chilling effect on pro-competitive market forces." *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 95 (2d Cir. 1998). While courts on summary judgment must view the evidence in the light most favorable to the party opposing the motion, "in the context of antitrust litigation[,] the range of inferences that may be drawn from the ambiguous evidence is limited; the non-moving party must set forth facts that tend to preclude an inference of permissible conduct." *Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 542 (2d Cir. 1993) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986)). Evidence that is equally suggestive of competition as collusion, for example, is insufficient to survive summary judgment. *See, e.g.*, *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1300 (11th Cir. 2003) ("Evidence that does not support the existence of a . . . conspiracy any more strongly than it supports conscious parallelism is insufficient to survive a defendant's summary judgment motion." (citing *Matsushita*, 475 U.S. at 588)). "[B]roader inferences," however, "are permitted . . . when the conspiracy is economically sensible for the alleged conspirators to undertake." *In re Publ'n Paper Antitrust Litig.,* 690 F.3d 51, 63 (2d Cir. 2012). Conversely, summary judgment may be granted where the nonmovant's case relies on evidence that defies economic sense. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 468–69 (1992) ("If the plaintiff's theory is economically senseless, no reasonable jury could find in its favor, and summary judgment should be granted."). Finally, "when the evidence admits of competing permissible

inferences with regard to whether a plaintiff is entitled to relief, 'the question of what weight should be assigned to [those] inferences remains within the province of the fact-finder at a trial.'" *In re Publ'n Paper Antitrust Litig.*, 690 F.3d at 61 (quoting *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987)).

### b.   Legal framework for claims under Section 2 of the Sherman Act

"Section 2 of the Sherman Act makes it an offense to 'monopolize, or attempt to monopolize[,] . . . any part of the trade or commerce among the several States.'" *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 651 (2d Cir. 2015) (quoting 15 U.S.C. § 2). Section 2 monopolization claims require a plaintiff to prove "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 67 (2d Cir. 2019) (*US Airways II*) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)); *see also Actavis*, 787 F.3d at 651 ("To establish monopolization in violation of § 2, a plaintiff must prove not only that the defendant possessed monopoly power in the relevant market, but that it willfully acquired or maintained that power 'as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" (quoting *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004))). "To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct." *Actavis*, 787 F.3d at 651 (emphasis omitted) (quoting *Trinko*, 540 U.S. at 407); *Mazda v. Carfax, Inc.*, No. 13-CV-2680, 2016 WL 7231941, at *15 (S.D.N.Y. Dec. 9, 2016) (*Carfax I*) (quoting the same).  Attempted monopolization, meanwhile, requires a plaintiff to prove: "(1) that the

defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) [has] a dangerous probability of achieving monopoly power." *Actavis*, 787 F.3d at 651 (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)). "Attempted monopolization, unlike monopolization, requires a finding of specific intent." *Id.* (citing *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 180 (2d Cir. 1990)). To succeed on a claim for conspiracy to monopolize, the plaintiff must show "(1) concerted action, (2) overt acts in furtherance of the conspiracy, and (3) specific intent to monopolize." *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 246 (2d Cir. 1997) (quoting *Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 74 (2d Cir. 1988)); *Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 795 (2d Cir. 1987) ("The elements of a conspiracy to monopolize are '(1) proof of a concerted action deliberately entered into with the specific intent to achieve an unlawful monopoly, and (2) the commission of an overt act in furtherance of the conspiracy.'" (citation omitted)); *see also In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 219–20 (S.D.N.Y. 2019) (listing the same elements).

### c.  Antitrust standing

Defendants challenge numerous aspects of Plaintiffs' Section 2 claims, but the Court first addresses Defendants' challenges to Plaintiffs' standing to raise these claims.

Defendants argue that Plaintiffs have not sufficiently shown that they have antitrust standing to challenge any of Defendants' policies under Section 2 of the Sherman Act, and that the Court should therefore grant summary judgment in Defendants' favor. (Defs.' Mem. 12–16, 24–34.) In support, Defendants argue that Plaintiffs fail to assert a theory of antitrust standing to

challenge "discounts" offered to merchants or issuing banks.[10]  With respect to Visa's pre-Durbin Amendment arrangements with Issuers to issue "all-Visa" debit cards, (*see supra* section I.d.i.), Defendants argue that Plaintiffs fail to present "evidence linking Visa's challenged issuer discounts to the increases in PIN debit interchange led by other networks and offered by those networks to other issuers," (Def.'s Mem. 15–16).  Accordingly, Defendants contend that the agreements that "Visa undisputedly offered as it competed with other networks for each issuer" cannot be linked "to any increased costs to Plaintiffs." (*Id.* at 14–15.)  As to the post-Durbin Amendment agreements that Visa entered into with merchants — offering credit incentives to merchants that routed PIN debit transactions through Visa's networks, (*supra* section I.d.ii.1) — Defendants assert that "[c]ustomers in a market are beneficiaries, not victims, of discounts," (Def.'s Mem. 13).  Defendants argue that "[e]liminating those discounts would necessarily mean increased costs to those customers," and that "Section 2 does not permit one set of customers to sue to prevent discounts to other customers."  (*Id.*)

Defendants also argue that Plaintiffs lack standing to challenge the remaining post-Durbin Amendment policies that Plaintiffs identify as violating Section 2.  First, Defendants argue that Plaintiffs "have not shown that any Plaintiff is worse off under the FANF pricing structure," described above, under which merchants can receive discounts to the FANF in exchange for routing commitments.  (*Id.* at 25–26.)  Defendants argue that Prof. Hausman failed "to do the calculations he said were required," *i.e.*, "deducting each Plaintiff's savings under the integrated price structure from the cost increase it faced from the FANF alone."  (*Id.*)

_____

[10]  Plaintiffs dispute whether the incentives offered to Issuers and merchants were "true economic discounts," (DAP's Opp'n 2, 16 n.22 (describing the "discounts" as "reductions to supracompetitive fees")), but the Court uses the term merely to describe the rebates that Defendants offered in exchange for Issuer and merchant commitments to route transactions through Visa's networks.

Defendants assert that "the only resulting competitive effect in the relevant debit market was . . . *lower* fees in the *debit* market against which PIN debit networks then compete." (*Id.* at 28.) Defendants argue that, without a claim of predatory pricing arising from the FANF pricing structure, Plaintiffs' claims must fail. (*Id.*)

Second, Defendants argue that Plaintiffs have failed to show injury to any plaintiff or to competition based on Defendants' implementation of PAVD. (*Id.* at 33–34.) Defendants contend that their requirement to support PIN as a verification method over its "historically signature-based Visa Debit network" only increased merchant routing options, "because Visa Debit cards would now be assured of including a second PIN routing option in addition to the unaffiliated network required by the Durbin Amendment." (*Id.*) The added option, Defendants argue, lowered interchange on both PIN and signature debit transactions, and Plaintiffs therefore cannot show injury-in-fact or harm to competition. (*Id.*)

Plaintiffs argue that Visa erroneously assesses each component of "Visa's monopoly maintenance scheme . . . in isolation" to argue that no single policy injures Plaintiffs. (DAP's Opp'n 44.) Plaintiffs argue that they are not required to "demonstrate standing separately for each component of Visa's unlawful conduct," and that "Visa's intertwined monopolization schemes had anticompetitive effects in the overall market," giving Plaintiffs standing. (*Id.*) Plaintiffs also dispute Defendants' characterization of "discounts" offered to issuers and merchants. (*Id.* at 44–45.) Although Defendants argue that these discounts categorically lowered prices across the market, Plaintiffs contend that "those deals excluded Visa's rivals and thus reduced competition from other networks that would have driven down supracompetitive prices in the market." (*Id.* at 45.)

"Section 4 of the Clayton Act provides for a private right of action and treble damages to

'[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws.'"[11]  *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 114 (2d Cir. 2021) (quoting 15 U.S.C. § 15(a)).  However, "the Supreme Court has recognized that 'Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation.'"  *Id.* at 114–15 (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 534 (1983) (*AGC*)).  The antitrust standing requirement arises from the Supreme Court's recognition of this principle.  *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 258 (2d Cir. 2023) ("The antitrust standing requirement 'originates in the Supreme Court's recognition that . . . Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation.'" (internal quotation marks omitted) (quoting *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 436–37 (2d Cir. 2005))).

The Supreme Court has identified several factors that courts should consider in assessing the availability of relief for an antitrust violation: "a causal connection between an antitrust violation and harm to the [plaintiffs]"; "improper motive"; whether the Sherman Act was enacted to protect the type of injury at issue; "the directness or indirectness of the asserted injury"; the

---

[11]  Private parties are granted the right to sue for violations of the Sherman Act by section 4 (damages) and section 16 (injunctive relief) of the Clayton Act.  15 U.S.C. §§ 15, 26; *see also Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 109–13 (1986) (stating that sections 4 and 16 of the Clayton Act "provide[] a vehicle for private enforcement of the antitrust laws"); *Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283, 290 (2d Cir. 2006) (noting that "the Clayton Act's Sections 4 (damages) and 16 (injunctive relief) permit private citizens to sue under the federal antitrust laws" (citations omitted)); *see also In re Google Digit. Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 405 (S.D.N.Y. 2022) (observing that while "the Sherman Act originally permitted only the United States to seek injunctive and equitable relief," the "Clayton Act was adopted to permit enforcement by broader categories of plaintiffs," including "states" and "private parties" (citing *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 39 (D.D.C. 2021))).

speculative nature of the damages; and "the potential for duplicative recovery or complex apportionment of damages." *AGC*, 459 U.S. at 537–46; *see also Gatt Commc'ns, Inc. v. PMC Assocs. L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013) (listing the same factors). The Second Circuit has applied these factors using a two-step inquiry: "To establish antitrust standing, a plaintiff must show (1) antitrust injury, which is injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful, and (2) that he is a proper plaintiff in light of four efficient enforcer factors." *Palladium Antitrust Litig.*, 61 F.4th at 258–59 (quoting *Schwab*, 22 F.4th at 115); *see also Gatt*, 711 F.3d at 76 (observing that the Second Circuit "has distilled [the *AGC*] factors into two imperatives: we require a private antitrust plaintiff plausibly to allege (a) that it suffered 'a special kind of "antitrust injury,"' and (b) that it is a suitable plaintiff to pursue the alleged antitrust violations and thus is an 'efficient enforcer' of the antitrust laws" (quoting *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.,* 507 F.3d 117, 121–22 (2d Cir. 2007))). "[A]ntitrust standing is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement[, the court] must dismiss it as a matter of law."[12] *Gatt*, 711 F.3d at 75–76 (first alteration in original) (quoting *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007)).

The antitrust injury requirement "ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place." *Gatt*,

---

[12] Although Defendants seek summary judgment based on a lack of antitrust standing — rather than dismissal at the pleading stage — the Court considers the undisputed facts in the record to determine whether Plaintiffs' theory of liability sufficiently establishes antitrust standing. *See, e.g.*, *US Airways, Inc. v. Sabre Holdings Corp.*, 105 F. Supp. 3d 265, 284 (S.D.N.Y. 2015) (*US Airways I*) (considering plaintiffs' theory of antitrust liability when addressing defendants' motion for summary judgment for lack of antitrust injury), *aff'd*, 938 F.3d 43 (2d Cir. 2019). In addition, Defendants challenge only the first element, whether Plaintiffs have shown antitrust injury, and do not challenge that Plaintiffs are "efficient enforcers" of the antitrust laws. The Court likewise addresses only the antitrust injury element.

711 F.3d at 76 (quoting *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342 (1990));

*see also US Airways, Inc. v. Sabre Holdings Corp.*, 105 F. Supp. 3d 265, 284 (S.D.N.Y. 2015)

(*US Airways I*) (quoting the same).  In order to establish antitrust injury, a plaintiff must

sufficiently allege facts showing "injury of the type the antitrust laws were intended to prevent

and that flows from that which makes defendants' acts unlawful."  *In re Keurig*, 383 F. Supp. 3d

at 220 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).  The

Second Circuit has laid out the following three-step process for determining whether a plaintiff

has adequately alleged antitrust injury:

> First, the party asserting that it has been injured by an illegal
> anticompetitive practice must "identify[] the practice complained of
> and the reasons such a practice is or might be anticompetitive." *Port
> Dock*, 507 F.3d at 122.  Next, we identify the "actual injury the
> plaintiff alleges." *Id.*  This requires us to look to the ways in which
> the plaintiff claims it is in a "worse position" as a consequence of
> the defendant's conduct. [*Brunswick*, 429 U.S. at 486].  Finally, we
> "compar[e]" the "anticompetitive effect of the specific practice at
> issue" to "the actual injury the plaintiff alleges." *Port Dock*, 507
> F.3d at 122.  It is not enough for the actual injury to be "causally
> linked" to the asserted violation. *Brunswick*, 429 U.S. at 489.
> Rather, in order to establish antitrust injury, the plaintiff must
> demonstrate that its injury is "of the type the antitrust laws were
> intended to prevent and that flows from that which makes [or might
> make] defendants' acts unlawful." *Daniel*, 428 F.3d at 438 (internal
> quotation marks omitted).

*Gatt*, 711 F.3d at 76 (second alteration added) (footnote omitted).  Given the need to "distinguish

the question of whether an antitrust violation occurred from whether plaintiffs have standing to

pursue" a claim, courts may "assum[e] the existence of a violation in addressing the issue of

standing.  *Daniel*, 428 F.3d at 437; *see also Gatt*, 711 F.3d at 76 n.9 (observing the difficulty a

court faces when assessing antitrust standing, because it must "posit[] a rationale for the antitrust

laws' prohibition of conduct that may, in fact, not be prohibited").

The Supreme Court's decision in *Atlantic Richfield*, 495 U.S. 328, highlights the

requirement that the anticompetitive effect of the unlawful practice be the source of the plaintiff's injury, and clarifies that a causal link between the asserted violation and the alleged injury, alone, is insufficient.  In *Atlantic Richfield*, competitor plaintiffs challenged a vertical agreement between an oil company and its retailers to set a maximum price for gasoline.  *Id.* at 332, 336–37.  Plaintiffs' alleged injury was that, as competitors not restrained by these regulations, they would have had to lose money by charging lower prices to compete with an artificially capped price.  *Id.* at 337–38.  The Supreme Court noted that the type of agreement challenged had already been found illegal in a prior case, *Albrecht v. Herald Co.*, 390 U.S. 145 (1968), but that the basis of its illegality under the antitrust laws was that the agreement would "limit[] the ability of small dealers to engage in nonprice competition," thus discouraging dealers from competing to "furnish services essential to the value which goods have for the consumer or to furnish services and conveniences which consumers desire and for which they are willing to pay."  *Atlantic Richfield*, 495 U.S. at 336 (quoting *Albrecht*, 390 U.S. at 152–53).  In essence, the arrangement discouraged capped retailers from competing to offer superior services, and this harm to competition hurt consumers — not fellow competitors — which is what made it a cognizable antitrust injury.  *See id.*; *see also Gatt*, 711 F.3d at 77 (noting that the challenged scheme would be unlawful "only because of the harm it may cause — increased prices — to purchasers" of the product).

Plaintiffs' allegations are sufficient at each step.  First, they identify each of the practices complained of, and specify the manner in which the conduct might exclude other PIN debit networks from the debit transactions market.  With respect to the pre-Durbin Amendment Issuer deals, for example, Prof. Hausman's report explains how Visa's exclusivity deals with issuing banks could have prevented regional PIN debit networks from participating in the market, and

how Visa could make these deals only because of its existing market power.  (Hausman Rep. ¶¶ 507–25.)  Without addressing the sufficiency of Plaintiffs' evidence, the injury alleged is of the type that the antitrust laws were meant to prohibit: that Plaintiffs — downstream merchants who utilize Defendants' debit transactions services, as opposed to Defendants' direct, horizontal competitors — were forced to pay supracompetitive prices for services because of unlawfully limited competition.  The same is true for the post-Durbin Amendment policies of which Plaintiffs complain.  Plaintiffs' theory of why the FANF pricing structure is illegal, as set forth in Prof. Hausman's report, is that Visa exercised its monopoly power to impose the FANF, and then excluded competitors by offering rebates or "discounts" to merchant consumers if they gave preferential treatment to Visa's debit network.  (*Id.* ¶¶ 555–73.)  Similarly, Plaintiffs' theory of liability with respect to the PAVD is that Visa used its monopoly power to require all Visa signature cards to carry PIN functionality over VisaNet, and that this requirement harmed merchants by insulating Visa from competition on its signature debit network pricing.  (*Id.* ¶ 574–81.)  This is precisely "injury of the type the antitrust laws were intended to prevent and that flows from that which makes [D]efendants' acts unlawful." *Palladium Antitrust Litig.*, 61 F.4th at 258–59 (quoting *Schwab*, 22 F.4th at 115).

Defendants' characterization of the challenged practices as merely reducing prices is insufficient to defeat Plaintiffs' antitrust standing.  Defendants rely, for example, on the Supreme Court's decision in *Atlantic Richfield*, 495 U.S. 328, discussed above, to argue that customers in a market can only benefit from discounts and therefore cannot establish standing to sue based on such discounts.  (Defs.' Mem. 13.)  Defendants also rely on the Second Circuit's decision in *Virgin Atlantic Airways Ltd. v. British Airways PLC*, 257 F.3d 256 (2d Cir. 2001), and the Ninth Circuit's decision in *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883 (9th Cir. 2008), for the

same proposition.  (Defs.' Mem. 13.)  In all three of these cases, however, the plaintiffs were *competitors* suing fellow competitors based on discounts to customers.  *Atlantic Richfield*, 495 U.S. at 331–32 (suit brought by entity that "compete[d] directly" with defendant company based on discounts that plaintiff could not match); *Virgin Atlantic*, 257 F.3d at 259 (describing Virgin Atlantic's allegations that competitor British Airways used "predatory business practices" to offer "below-cost pricing" that "impede[d] Virgin's efforts to expand service"); *Cascade Health*, 515 F.3d at 891 (dispute between "the only two providers of hospital care in Lane County, Oregon").  In none of these cases did a court hold that customers — such as merchants in this case — lacked standing to sue based on discounting practices that the *customers* allege drove out competition and resulted in supracompetitive prices.

Contrary to Defendants' argument that Plaintiffs' Section 2 claims fail for lack of antitrust injury, the Court finds that "the harm claimed by the [P]laintiff[s] corresponds to the rationale for finding a violation of the antitrust laws in the first place." *Gatt*, 711 F.3d at 76 (quoting *Atlantic Richfield*, 495 U.S. at 342).  The Court therefore addresses the merits of Plaintiffs' Section 2 claims.[13]

### d. Plaintiffs' debit monopolization claims

Defendants argue that Plaintiffs have failed to raise a triable question of fact regarding their Section 2 monopolization claims alleging that Visa monopolized the market for general purpose debit card transactions by possessing monopoly power and engaging in unlawful

---

[13] Defendants' summary judgment memoranda appear at times to assert challenges to Plaintiffs' Article III standing, in addition to Plaintiffs' antitrust standing.  (*See, e.g.*, Defs.' Mem. 12, 25 (stating in section headings that Plaintiffs cannot show "[i]njury-in-[f]act"); Defs.' Reply 4, 7, 13 (same).)  Defendants' arguments, however, focus exclusively on antitrust standing without reference to any Article III standing caselaw.  Accordingly, the Court construes Defendants' standing argument as being addressed only at a lack of antitrust standing.

exclusionary practices to maintain that monopoly power.  (*See generally* Defs.' Mem.)  In support, Defendants first argue that "Plaintiffs have not adduced a calculation of the share of the debit market allegedly foreclosed to competition," and that "a foreclosure calculation for the alleged debit market is an essential element of Plaintiffs' Section 2 claims."  (*Id.* at 17.)  Second, Defendants argue that Plaintiffs have failed to demonstrate evidence of exclusionary conduct.  (*Id.* at 21–34.)  In particular, Defendants argue that Plaintiffs' bundled discount claims fail because "other networks have always competed for Visa's credit and debit transactions," (*id.* at 21–22), that the bundled discount theory fails because "many discounts were not actually bundled across products," (*id.* at 22–24), and that Plaintiffs cannot show "harm to competition in the debit market . . . from the FANF pricing structure," (*id.* at 27–29).  Similarly, Defendants argue that EMV-related conduct did not injure competition.  (*Id.* at 29–32.)  Finally, Defendants contend that Plaintiffs have failed to adduce any evidence that Visa's conduct "actually foreclosed competition" or constituted the "exercise[ of] monopoly power."  (*Id.* at 34–42.)

Plaintiffs argue that the evidence reflects Visa's possession of monopoly power, both through its market share and its conduct.  (DAP's Opp'n 25–26.)  Plaintiffs also argue that Visa unlawfully maintained its monopoly through (1) the Honor All Cards ("HAC") Rule, (2) its pre-Durbin Amendment debit strategy, and (3) a number of post-Durbin Amendment exclusionary tactics, including the FANF, PAVD, bundled agreements, suppression of PINless debit, and Visa's exploitation of its power over industry developments.  (*Id.* at 7–23.)  Accordingly, Plaintiffs argue, "Visa has not sustained its burden of demonstrating the lack of a disputed issue of fact" on either of the elements of a Section 2 violation and that Visa's motion must be denied.  (*Id.* at 48.)

### i.   Whether Visa possessed monopoly power

The first element of a Sherman Act Section 2 violation is "the possession of monopoly power *in the relevant market*."  *US Airways II*, 938 F.3d at 67 (emphasis added) (quoting *Grinnell Corp.*, 384 U.S. at 570–71).  Under both Section 1 and Section 2, courts must start by defining the relevant market because, "[w]ithout a definition of [the] market there is no way to measure [a defendant's] ability to lessen or destroy competition."  *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018) (*Amex*) (quoting *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965)); *see also Concord Assocs., L.P. v. Ent. Properties Tr.*, 817 F.3d 46, 53 (2d Cir. 2016) ("[The market definition] analysis is equally applicable to claims made under Section Two of the Sherman Act, because 'without a definition of that market there is no way to measure the defendant's ability to lessen or destroy competition.'"); *FTC v. Shkreli*, 581 F. Supp. 3d 579, 630 (S.D.N.Y. 2022) ("The analysis under §§ 1 and 2 of the Sherman Act relies, as a threshold matter, on the definition of the relevant market.").  Accordingly, the Court begins with a discussion of the relevant market.

### 1.   Market definition

Plaintiffs contend that the relevant market is the market for debit-card transactions in the United States.  (*See* DAP's Opp'n 1; Hausman Rep. ¶ 18.)  Defendants do not dispute this definition.  (*See* Defs.' Mem. 5 n.3.)  The Court finds that debit-card transactions in the United States is the relevant market for two reasons.

First, the relevant market for antitrust purposes is defined in reference to reasonably available substitutes.  "The relevant market must be a market for particular products or services, the 'outer boundaries' of which 'are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.'"  *US Airways II*, 938 F.3d at 64 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)).  Plaintiffs'

expert Prof. Hausman contends that debit-card transactions should be viewed as the appropriate market because, among other reasons, (1) "[i]f credit cards and debit cards were substitutes, then merchants would have rejected credit cards in favor of debit cards," given the lower costs associated with accepting debit cards, (2) because "merchants . . . do not view other forms of payment as substitutes for debit cards," and (3) because "many consumers prefer debit cards for everyday purchases to credit cards, and many consumers prefer the convenience of debit cards to carrying cash or paying with checks." (Hausman Rep. ¶¶ 161, 163–64.)  The Court agrees with Prof. Hausman's assessment that credit-card transactions and other payment methods (*e.g.*, cash or checks) are not reasonable substitutes for debit-card transactions.

Second, the Supreme Court's decision in *Amex* makes clear that the relevant markets in antitrust cases involving two-sided transactions platforms must include both sides of the platform. *Amex*, 585 U.S. at 546 ("Evaluating both sides of a two-sided transaction platform is . . . necessary to accurately assess competition.").  As the Second Circuit explained, "[i]n cases involving two-sided *transaction* platforms, the relevant market must, as a matter of law, include both sides of the platform." *US Airways II*, 938 F.3d at 57.  Defining the relevant market as the two-sided market for debit-card transactions is therefore consistent with *Amex* and *US Airways II*.

## 2.  Monopoly power

Defendants argue that "Plaintiffs have no evidence that Visa has had the power to control price in the debit market," and contend, instead, that it is "undisputed" that "Visa's rivals led the increase in PIN debit interchange rates from 2004 to 2011." (Defs.' Mem. 38.)  Defendants also argue that Mastercard's higher signature debit interchange rates "caus[ed] about 1,000 smaller issuers to switch to Mastercard from Visa." (*Id.* at 38–39.)  They further argue that Prof. Hausman failed to show that "Visa's network fees were higher than its rivals for PIN debit or

signature debit," and that "the typically higher merchant cost of signature debit [is not] evidence

that Visa has . . . power over price."  (*Id.* at 39.)  Finally, Defendants argue that Prof. Hausman

only points at Visa's market share as evidence of its monopoly power.  (*Id.* at 41 ("In lieu of any

of the requisite evidence of power to foreclose competition, control price, and restrict output, Dr.

Hausman pointed repeatedly at Visa's 'market shares.'").)

Plaintiffs argue that they have shown Visa's monopoly power through its market share,

its power to control price, and its ability to exclude competition.  For example, Plaintiffs point to

Visa's "convergence strategy," where Visa "raised PIN interchange to levels comparable to

signature debit."  (DAP's Opp'n 10; see also *id.* at 11 ("That Visa was able to control PIN debit

pricing and thus suppress PIN debit is direct evidence of its monopoly power.").)  Plaintiffs also

argue, consistent with their opposition to Defendants' *Amex* motion, that they have shown that

Visa's HAC Rule "caused higher prices and lower output," (*id.* at 8), and "[b]ecause pass

through on the cardholder side was low or non-existent in debit, Visa's price increases raised the

two-sided debit transaction price . . . above competitive levels," (*id.* at 11 (citations omitted)).

Finally, Plaintiffs contend that "Visa's entrenched dominance as measured by market share and

other market characteristics further demonstrates Visa's monopoly power."  (*Id.* at 25.)  They

point to Visa's "dominant" market share of around 60% throughout the relevant period, the

market's high barriers to entry, and the lack of new entrants in the market as evidence that

precludes granting summary judgment.  (*Id.* at 25–26.)

Monopoly power is "the power to control prices or exclude competition." *Geneva

Pharms. Tech. Corp. v. Barr Lab'ys*, 386 F.3d 485, 500 (2d Cir. 2004) (quoting *United States v.

E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956)).  Defendants with monopoly power

have the ability "(1) to price substantially above the competitive level *and* (2) to persist in doing

so for a significant period without erosion by new entry or expansion." *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 227 (2d Cir. 1999) (citation omitted). A plaintiff can establish a defendant's monopoly power either "directly through evidence of control over prices or the exclusion of competition, or it may be inferred from a firm's large percentage share of the relevant market." *Geneva Pharms.*, 386 F.3d at 500.

"While market share is not the functional equivalent of monopoly power, it nevertheless is highly relevant to the determination of monopoly power." *Tops Mkts.*, 142 F.3d at 98. Market share, therefore, "can be used as a proxy for market power." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 108 (2d Cir. 2002). The Second Circuit has found that "a market share of over 70 percent is usually strong evidence of monopoly power" and "a share between 50% and 70% can occasionally show monopoly power." *Tops Mkts.*, 142 F.3d at 99. Regardless, market share alone cannot "conclusively establish . . . monopoly power." *Id.*; *see also PepsiCo*, 315 F.3d at 109 ("Absent additional evidence, such as an ability to control prices or exclude competition, a 64 percent market share is insufficient to infer monopoly power."); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 562 F. Supp. 2d 392, 401 (E.D.N.Y. 2008) ("Just as a defendant's large market share, without more, cannot support a finding of monopoly power, a low market share by itself cannot necessarily defeat such a finding.").

Although monopoly power under Section 2 requires "something greater" than market power under Section 1, *Eastman Kodak*, 504 U.S. at 481, the Court's recent discussion of the factors that support a finding of market power are relevant to a potential finding of monopoly power:

> (i) the ability to price discriminate (*i.e.*, to charge different prices to different consumers for the same product), *see, e.g.*, *United States v. Eastman Kodak Co.*, 63 F.3d 95, 106 & n.6 (2d Cir. 1995); *In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781, 783

(7th Cir. 1999) (Posner, J.) ("The reason price discrimination implies market power is that assuming the lower of the discriminatory prices covers cost, the higher must exceed cost."); [*United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 340–41 (S.D.N.Y. 2001)] (finding Visa's and Mastercard's "ability to price discriminate" by charging different interchange fees to different categories of merchants "illustrates their market power"); (ii) the ability to set prices without regard to costs, *Epic Games v. Apple*, 67 F.4th 946, 983 (9th Cir. 2023) ("[A] firm with market power is a price-*maker*, not the price-*taker[]* that economic theory expects in a competitive market."); (iii) excess or supracompetitive profits, *US Airways, Inc. v. Sabre Holdings Corp.*, No. 11-CV-2725, 2022 WL 1125956, at *9 (S.D.N.Y. Apr. 15, 2022) [(*US Airways III*)]; (iv) structural barriers to entry, *id.*; and, (v) the power to "force a purchaser to do something that he would not do in a competitive market," *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 14 (1984); *see also Epic Games*, 67 F.4th at 982 (describing market power as the "special ability . . . to force [a contracting partner] to do something he would not do in a competitive market" (alterations in original) (quoting *Jefferson Parish*, 466 U.S. at 13–14)).

*Interchange Fees IV*, 2024 WL 278565, at *17–18. Further, several of the cases discussed above involved "market power" in the context of Section 2 (and therefore actually involved "monopoly power"). *See, e.g.*, *Eastman Kodak*, 63 F.3d at 98 (terminating consent decree that had arisen from 1915 case in which "Kodak had monopolized the amateur camera, film, and photofinishing industries through acquisitions and a variety of exclusionary practices" and finding that Kodak no longer possessed monopoly power); *US Airways III*, 2022 WL 1125956, at *9 ("[A] reasonable jury could find that Sabre exercised monopoly power . . . [based on, *inter alia*, its] excessive profits."); *Visa*, 163 F. Supp. 2d at 393 (noting that Visa and Mastercard had a "virtual monopoly" in signature debit).

Defendants have not shown they are entitled to judgment as a matter of law as to the absence of Visa's monopoly power. Drawing all inferences in favor of Plaintiffs as the non-movants, a reasonable jury could conclude that Visa possesses monopoly power in the market for debit-card transactions. Prof. Hausman offers the following evidence supporting the conclusion

27

that Visa possesses monopoly power in the market for debit-card transactions.  First, Prof.

Hausman points to Visa's "longstanding high share of debit volume," including Visa's debit

share ranging from 56% to 63% between 2009 and 2015, and that, during this time, no

competitor processed more than 23% of debit volume.  (Hausman Rep. ¶ 275.)  Second, he

points to evidence showing that "[t]he debit market is highly concentrated," with a Herfindahl-

Hirschman Index ("HHI") score of at least 3778,[14] (*id.* ¶ 277), and that there are high barriers to

entry, including what he describes as a "chicken-and-egg problem and high sunk costs," (*id.*

¶ 278).  In addition, Prof. Hausman points to evidence tending to show Visa's ability to "control

prices or exclude competition."  (*See id.* ¶¶ 507–607.)  For example, Prof. Hausman describes

Visa's "supra-competitive signature debit network fees" on both the merchant and issuer sides of

the market.  (*See id.* ¶¶ 602–03.)  He also opines that Visa's exclusivity deals with issuers

"solidified Visa's dominance in both signature and PIN debit," and which "inhibited the ability

of Mastercard or any other network" from competing effectively for debit market share.  (*Id.*

¶¶ 508–09.)  Because this evidence overlaps with the evidence Plaintiffs have to show to

establish the second element of Section 2 violation, the Court discusses this evidence in more

detail below.[15]

---

[14]  Prof. Hausman does not explain what the Herfindahl-Hirschman Index ("HHI") is or its significance, but HHI is "a commonly accepted measure of market concentration" and is used by the Department of Justice and Federal Trade Commission when assessing market concentrations, especially in merger cases.  Dep't of Justice, Antitrust Division, *Herfindahl-Hirschman Index*, https://www.justice.gov/atr/herfindahl-hirschman-index (last updated Jan. 17, 2024).  A market in which the HHI is above 1,800 points is considered "highly concentrated."  *See id.*; *see also* Fed. Trade Comm'n, *Competitive Effects*, https://www.ftc.gov/advice-guidance/competition-guidance/guide-antitrust-laws/mergers/competitive-effects (last visited Mar. 22, 2024).

[15]  In the Section 1 context, evidence of harm to competition can relieve a plaintiff of having to show market power because "market power is but a surrogate for detrimental effects."

Plaintiffs have offered sufficient evidence to create a triable question of fact as to Visa's monopoly power. While market share alone is insufficient to *prove* monopoly power, the Second Circuit has established that market share is a helpful guidepost for assessing whether it is likely a defendant possesses market power. *See Tops Mkts.*, 142 F.3d at 98–99 ("While market share is not the functional equivalent of monopoly power, it nevertheless is highly relevant to the determination of monopoly power . . . [and] a share between 50% and 70% can occasionally show monopoly power."). The evidence of Visa's sustained market share around 60%, combined with evidence tending to show high barriers to entry, supracompetitive prices,[16] and exclusivity deals that could have the purpose or effect of excluding rivals, precludes granting summary judgment in favor of Defendants.

### ii. Willful acquisition or maintenance of monopoly power

The second element of a Section 2 violation is "the willful acquisition or maintenance of [monopoly] power." *US Airways II*, 938 F.3d at 67.

Defendants first argue that "the burden . . . remain[s] on Plaintiffs to present evidence that the conduct actually foreclosed competition." (Defs.' Mem. 34.) They assert that "a Section 2 claim requires proof that the defendant has the power to, and actually did, foreclose competition, so that the defendant could (and did) restrict output and raise prices without rivals

---

*Giordano v. Saks Inc.*, 654 F. Supp. 3d. 174, 205 (E.D.N.Y. 2023) (quoting *United States v. Am. Express Co.*, 838 F.3d 179, 194 (2d Cir. 2016)). In the Section 2 context, where monopoly power is an express element of the cause of action, no such exception applies, but evidence tending to show the second element (*i.e.*, "the willful acquisition or maintenance of [monopoly] power") can overlap with the evidence tending to show the existence of monopoly power, which includes the ability to "exclude competition." *Geneva Pharms.*, 386 F.3d at 495, 500 ("Monopoly power is the power to . . . exclude competition." (quotation omitted)).

[16] *See also Interchange Fees IV*, 2024 WL 278565, *20–29 (discussing evidence tending to show supracompetitive prices and denying Defendants' motion for summary judgment under *Amex*).

stepping in to replace the restricted output at a lower price." (*Id.* at 35.)  In support of their competitive foreclosure argument, Defendants cite *Maxon Hyundai Mazda v. Carfax, Inc.*, 726 F. App'x 66 (2d Cir. 2018) (*Carfax II*), *Suture Express, Inc. v. Owens & Minor Distribution, Inc.*, 851 F.3d 1029 (10th Cir. 2017), and *Aerotec International, Inc. v. Honeywell International, Inc.*, 836 F.3d 1171 (9th Cir. 2016).  (Defs.' Mem. 35.)  Defendants further contend that "Plaintiffs have no evidence that Visa foreclosed competition," and point to evidence tending to show that Visa lost market share in PIN debit and that Mastercard's share of signature debit volume grew faster than Visa's between 2004 and 2008.  (*Id.* at 36–37.)  In addition, Defendants point to evidence tending to show that, after the Durbin Amendment, 76% of PIN debit volume went to Visa's competitors and that PINless debit is a "growing threat to Visa's signature volume."  (*Id.* at 37–38.)  Second, Defendants argue that "Plaintiffs have no evidence that Visa has had the power to control price in the debit market," contending that "Visa's rivals led the increase in PIN debit interchange rates from 2004 to 2011," and that Mastercard set its rates above Visa's "causing about 1,000 smaller issuers to switch to Mastercard."  (*Id.* at 38–39.)  They argue that "the typically higher merchant cost of signature debit [is not] evidence that Visa has had power over price."  (*Id.* at 39.)  Third, Defendants argue that "Plaintiffs have no actual evidence that debit output was restricted by Visa's challenged conduct," and point to data regarding the relative growth rates of various debit products.  (*Id.* at 40–41.)  Finally, Defendants argue that Visa's "[s]uccess is not evidence of monopoly power or exclusionary conduct."  (*Id.* at 41 (citation omitted).)  They contend that "acting with an intent to win or protect business is what competitors of all sizes are supposed to do."  (*Id.* at 42 (citing *Endsley v. City of Chicago*, 230 F.3d 276, 283 (7th Cir. 2000)).)

Plaintiffs argue that "[a]mple evidence supports a jury finding that Visa unlawfully

maintained its monopoly power," and "caused substantial anticompetitive effects in the debit market, including supracompetitive prices, reduced output, and harm to product quality." (DAP's Opp'n 7–8.)  They first contend that "[u]ndergirding all of Visa's anticompetitive conduct was its debit HAC Rule, which prevented issuer competition for merchant acceptance, caused higher prices and lower output, and enabled Visa to block competition from other networks."  (*Id.* at 8.)  In further support, they argue that Visa's debit HAC Rule allowed issuers to obtain supracompetitive interchange fees and deterred them from building their own competing networks.  (*Id.* at 9 (citing *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1020 (6th Cir. 1999)).)  Second, Plaintiffs contend that "Visa maintained its monopoly power pre-Durbin through an interrelated two-pronged strategy," that involved (1) entering into exclusive deals with issuers to have "all-Visa" debit cards (*i.e.*, "cards branded with Visa signature on the front and Visa's PIN network, Interlink, on the back") and (2) using the pricing power from its exclusivity deals to implement a "convergence strategy" in which Visa raised PIN debit interchange fees to levels comparable to signature debit.  (*Id.* at 9–10.)  Third, Plaintiffs argue that Defendants' bundled discounts failed the Discount Attribution Test ("DAT"), which assesses whether a bundled discount is anticompetitive,[17] and contend that Prof. Hausman demonstrated that several of Visa's deals fail the DAT.  (*Id.* at 11–13.)  After the Durbin Amendment,

---

[17]  As the Court noted in deciding the *Daubert* motion on Prof. Hausman's report, "there is no binding law in this circuit that a plaintiff must apply the DAT to show that a bundled discount is anticompetitive."  *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2022 WL 14863110, at *13 (E.D.N.Y. Oct. 26, 2022).  However, "the parties agree that the DAT is the appropriate test to decide whether bundled pricing is exclusionary."  *Id.*  Accordingly, to the extent that Plaintiffs' Section 2 claims are predicated on anticompetitive bundled discounts, the Court will follow the Ninth Circuit's approach in *Cascade Health*, 515 F.3d at 909 ("[A] plaintiff who challenges a package discount as anticompetitive must prove that, when the full amount of the discounts given by the defendant is allocated to the competitive product or products, the resulting price of the competitive product or products is below the defendant's incremental cost to produce them.").

Plaintiffs contend that "Visa wielded its dominant position in credit and signature debit to prevent PIN debit rivals from reaching the scale necessary to compete effectively" through a "multi-faceted strategy" that included:

> (i) the FANF; (ii) the PAVD mandate; (iii) bundled-pricing agreements with merchants and acquirers; (iv) the suppression of PINless [debit]; and (v) abuses of its power over technological developments to exclude competition, including EMV and tokenization.

(*Id.* at 15; *see also id.* at 16–23.)  Finally, they argue that "Visa's conduct enabled Visa and its issuers to charge supracompetitive prices for debit transactions that harm[ed] both cardholders and merchants," and "[b]ecause Visa's two-sided debit pricing was supracompetitive, Visa reduced output compared to what would have occurred absent its conduct."  (*Id.* at 24.)

The conduct necessary to prove unlawful monopolization, *i.e.*, "the willful acquisition or maintenance of [monopoly] power," *US Airways II*, 938 F.3d at 67, has long been debated in the courts and among scholars.  *See, e.g.*, *Edwards Vacuum, LLC v. Hoffman Instrumentation Supply, Inc.*, 556 F. Supp. 3d 1156, 1169 (D. Or. 2021) ("Commentators have long described defining unlawful dominant firm conduct as one of the most uncertain areas of antitrust." (quoting ABA Antitrust Law Section, *Monopolization and Dominance Handbook* 75 (2d ed. 2021))).  In *Aspen Skiing*, which has been described as being "at or near the outer boundary of § 2 liability," *Trinko*, 540 U.S. at 409,[18] the Supreme Court affirmed a finding of Section 2 liability where "the evidence support[ed] an inference that [the defendant] was not motivated by

---

[18]  The Court in *Aspen Skiing* "found significance in the defendant's decision to cease participation in a cooperative venture.  The unilateral termination of a voluntary *(and thus presumably profitable)* course of dealing suggested a willingness to forsake short-term profits to achieve an anticompetitive end.  Similarly, the defendant's unwillingness to renew the ticket *even if compensated at retail price* revealed a distinctly anticompetitive bent." *Trinko*, 540 U.S. at 409 (citations omitted).

efficiency concerns and that it was willing to sacrifice short-run benefits and consumer goodwill in exchange for a perceived long-run impact on its smaller rival," *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 610–11 (1985).  Since then, "[the] Court and other courts have been careful to avoid constructions of § 2 which might chill competition, rather than foster it . . . [because it] is sometimes difficult to distinguish robust competition from conduct with long-term anticompetitive effects." *Spectrum Sports*, 506 U.S. at 458–59.  More recently, the D.C. Circuit's test for a violation of Section 2, as set forth in *United States v. Microsoft Corp.*, has become the leading standard for assessing a Section 2 claim.  253 F.3d 34, 58–59 (D.C. Cir. 2001) (en banc) (per curiam); *see also Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 998 (9th Cir. 2023) (noting that the Section 2 "anticompetitive-conduct requirement is 'essentially the same' as the Rule of Reason inquiry" and citing *Microsoft*, 253 F.3d at 59), *cert. denied*, 144 S. Ct. 682 (2024); *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 463–64 (7th Cir. 2020) (explaining and applying the *Microsoft* "burden-shifting framework"); *Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 438 (3d Cir. 2016) ("[T]he District Court properly applied the 'rule of reason' burden-shifting framework set forth by the D.C. Circuit in [*Microsoft*]."); *McWane, Inc. v. FTC*, 783 F.3d 814, 833 (11th Cir. 2015) (applying the D.C. Circuit's *Microsoft* "'rule of reason'-style" test).

In *Microsoft*, the D.C. Circuit explained:

> From a century of case law on monopolization under § 2 . . . several principles do emerge.  First, to be condemned as exclusionary, a monopolist's act must have an "anticompetitive effect."  That is, it must harm the competitive *process* and thereby harm consumers.  In contrast, harm to one or more *competitors* will not suffice.  The Sherman Act directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself.
>
> Second, the plaintiff, on whom the burden of proof of course rests . . . must demonstrate that the monopolist's conduct indeed has the

requisite anticompetitive effect. . . . Third, if a plaintiff successfully establishes a *prima facie* case under § 2 by demonstrating anticompetitive effect, then the monopolist may proffer a "procompetitive justification" for its conduct.  If the monopolist asserts a procompetitive justification — a nonpretextual claim that its conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal — then the burden shifts back to the plaintiff to rebut that claim.  Fourth, if the monopolist's procompetitive justification stands unrebutted, then the plaintiff must demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit. . . .  Finally, in considering whether the monopolist's conduct on balance harms competition and is therefore condemned as exclusionary for purposes of § 2, our focus is upon the effect of that conduct, not upon the intent behind it.

253 F.3d at 58–59 (citations and quotations omitted).

The Second Circuit has adopted the D.C. Circuit's burden-shifting framework to assess whether "a product change violate[d] § 2." *Actavis*, 787 F.3d at 652 (citing *Microsoft*, 253 F.3d at 58–60).  Under this framework, "once a plaintiff establishes that a monopolist's conduct is anticompetitive or exclusionary, the monopolist may proffer 'nonpretextual' procompetitive justifications for its conduct." *Id.* (citing *Microsoft*, 253 F.3d at 58–59).  If the defendant succeeds, the plaintiff may still prevail if they "either rebut those justifications" or "demonstrate that the anticompetitive harm outweighs the procompetitive benefit." *Id.*  As the Supreme Court explained in *Amex*, a plaintiff may show anticompetitive effect at the first step by offering evidence of "reduced output, increased prices, or decreased quality in the relevant market."  585 U.S. at 542.

For the reasons discussed below, the Court finds that Plaintiffs have offered sufficient evidence of anticompetitive effect such that material issues of fact preclude granting Defendants' motion for summary judgment.  The Court first discusses Defendants' market foreclosure arguments before addressing Defendants' arguments regarding bundled discounts and Plaintiffs' claims predicated on allegations of other anticompetitive conduct.

### 1. Plaintiffs' monopolization claims do not require a showing of "substantial foreclosure"

As a threshold matter, the Court does not agree with Defendants' contention that "a Section 2 claim requires proof that the defendant has the power to, and actually did, *foreclose competition*, so that the defendant could (and did) restrict output and raise prices without rivals stepping in to replace the restricted output at a lower price." (Defs.' Mem. 35 (emphasis added).) The cases cited by Defendants offer little support for Defendants' competitive foreclosure argument.[19]  In *Carfax II*, the parties stipulated to competitive foreclosure as the sole basis for the defendant's liability.  726 F. App'x at 67 ("The parties agreed . . . [that] the single question [was] whether its exclusive dealing agreements foreclosed competition . . . in violation of the Sherman Act.  The parties agreed that a ruling for Carfax on that issue would warrant a final judgment in its favor on the entire case.").  *Suture Express* is also inapposite because it was a Section 1 case and because "the crux of the antitrust harm inquiry" was "whether, in the but-for world without the challenged conduct, buyers would have paid less than they paid in the actual world with the conduct."  851 F.3d at 1044.  The *Suture Express* court's formulation of anticompetitive effect was thus correctly focused on price, as *Amex* subsequently affirmed — and not foreclosure.  Finally, the plaintiff's bundled discount claims in *Aerotec* turned on whether the defendant was offering its bundle of parts and service "below cost."  836 F.3d at 1186.  There, the court concluded that the defendant's discounts reflected the "'lower cost structure' of [its] vertical integration, and therefore reflect[ed] 'competition on the merits.'"  *Id.* (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 223 (1993)).  Rather than requiring proof of foreclosure, the crux of a Section 2 claim is a showing of

---

[19]  (*See* Defs.' Mem. 35 (first citing *Carfax II*, 726 F. App'x at 69–70; then citing *Suture Express*, 851 F.3d at 1041–45; and then citing *Aerotec*, 836 F.3d at 1175); *see also id.* at 35–39.)

anticompetitive conduct. *Actavis*, 787 F.3d at 651 ("To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*." (quoting *Trinko*, 540 U.S. at 407)). Foreclosure is instead just one way of showing anticompetitive conduct.[20] *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 263 (3d Cir. 2012) (finding sufficient evidence of foreclosure, which, "as a result, harmed competition"). Accordingly, the Court will not require Plaintiffs to show competitive foreclosure in order to avoid granting summary judgment against them.

### 2.   Plaintiffs have raised a triable question of fact regarding their claims predicated on discounts

Plaintiffs challenge the discounts offered by Visa to issuers and merchants, alleging that these discounts were part of Visa's "two-pronged strategy" to maintain its monopoly power in the debit market.

Defendants first argue that these discounts constituted "exclusive dealing agreements" that are "presumptively legal." (Defs.' Mem. 17 (quoting *CDC Techs., Inc. v. IDEXX Labs., Inc.*, 186 F.3d 74, 80 (2d Cir. 1999)).) As such, they argue, Plaintiffs are required to show competitive foreclosure and that "'the competition foreclosed' by actual or *de facto* exclusivity 'must . . . constitute a *substantial share* of the relevant market.'" (*Id.* (quoting *Tampa Elec. Co.*

---

[20]   The Court acknowledges that Defendants' argument is more tenable in the context of Plaintiffs' challenged exclusivity agreements. *See Mazda v. Carfax, Inc.*, No. 13-CV-2680, 2016 WL 7231941, at *4 (S.D.N.Y. Dec. 9, 2016) ("[T]he Supreme Court has long held that 'the competition foreclosed' by [an exclusive dealing] arrangement 'must be found to constitute a *substantial share* of the relevant market' in order to violate the antitrust laws." (quoting *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961))); *see also id.* ("Requiring plaintiffs who bring exclusive dealing claims to prove substantial foreclosure 'serves a useful screening function' because 'an exclusive deal affecting a small fraction of a market clearly cannot have the requisite harmful effect upon competition.'" (quoting *Microsoft*, 253 F.3d at 69)). *Microsoft*, however, makes clear that what is "requisite" is a "harmful effect upon competition," 253 F.3d at 365, and foreclosure — like market share in the market power or monopoly power context — "is but a surrogate for detrimental effects," *Giordano*, 654 F. Supp. 3d at 205 (citation omitted).

*v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961)).)  Defendants contend that "Plaintiffs have not put forward a calculation of the share of [the] . . . debit market that was foreclosed to competition."  (*Id.* at 18.)  As to the agreements that Prof. Hausman determined failed the DAT, they argue that "Dr. Hausman made no pretense of calculating a foreclosure share caused by merchant agreements that failed his DAT."  (*Id.* at 20.)  Second, Defendants argue that Plaintiffs' bundled discount claims also fail because "[t]he potential for foreclosure of competition from bunded discounts is eliminated when even one rival sells as diverse a set of products as the defendant."  (*Id.* at 21 (first citing *Aerotec*, 836 F.3d at 1186–87; and then citing *Cascade Health*, 515 F.3d at 896–97).)  Finally, Defendants argue that Plaintiffs' bundled discount theory fails because the discounts were not actually bundled across multiple products.  (*Id.* at 22–23.)  Specifically, Defendants contend that "the issuer agreements Dr. Hausman deemed anticompetitive did not require issuers to use Visa exclusively for PIN debit in order to receive discounts on credit and signature debit."  (*Id.* at 23.)

Plaintiffs first argue that Defendants' arguments are addressed only at Plaintiffs' allegations sequentially — "as if [they] were . . . separate claim[s]" — without considering the combined effect of the challenged rules and practices.  (DAP's Opp'n 38; *see also id.* at 31 ("[T]here is no 'single theory of exclusion': Plaintiffs' debit claims relate not only to its anticompetitive bundling agreements with merchants and issuers but also Visa's signature debit HAC Rule, Visa's imposition of high fixed fees, [and] Visa's anticompetitive forcing of the PAVD mandate on issuers.") (citations omitted); *id.* at 39 ("The proper analysis is to analyze the direct anticompetitive effects of Visa's conduct as a whole.") (citation omitted).)  Second, Plaintiffs argue that Defendants' reliance on "foreclosure" is misplaced; instead, "Section 2's conduct prong only requires proof of exclusionary conduct or anticompetitive effects, not

specific foreclosure percentages." (*Id.* at 32.)  Finally, Plaintiffs dispute Defendants' reading of *Aerotec* and *Cascade Health*, and assert that the cases stand for the opposite proposition: "if even one rival cannot compete on the bundle the discount attribution test is appropriate." (*Id.* at 35.)

As discussed above, the Court finds that Plaintiffs are not required to demonstrate foreclosure to make out a violation of Section 2 and the Court will not exclude Plaintiffs' bundled discount claims on this basis.  Moreover, several additional rationales reinforce this conclusion.  First, Defendants conflate the elements applicable to a bundled discount claim with the elements required to show unlawful exclusivity agreements.  The Court agrees with Defendants to the extent that a showing of "substantial foreclosure" is necessary where a monopolization claim is predicated solely on exclusivity agreements.[21]  *See, e.g.*, *ZF Meritor*, 696 F.3d at 271–72 (noting that a challenge to an exclusive dealing agreement "generally requires a showing of significant market power by the defendant, *substantial foreclosure*, contracts of sufficient duration to prevent meaningful competition by rivals, and an analysis of likely or actual anticompetitive effects considered in light of any procompetitive effects" (emphasis added) (citations omitted)); *accord Tampa Elec.,* 365 U.S. at 327–28; *Microsoft*, 253 F.3d at 69.  Section 2 claims predicated on bundled discounts appear to have no such requirement.  As the Ninth Circuit explained in *Cascade Health*:

> [T]he primary anticompetitive danger posed by a multi-product bundled discount is that such a discount can exclude a rival . . . who is equally efficient at producing the competitive product simply because the rival does not sell as many products as the bundled discounter.  Thus, a plaintiff who challenges a package discount as anticompetitive must prove that, when the full amount of the discounts given by the defendant is allocated to the competitive product or products, the resulting price of the competitive product or products *is below the defendant's incremental cost to produce them*.  This requirement ensures that the only bundled discounts

---

[21] *See supra* note 20 and accompanying text.

> condemned as exclusionary are those that would exclude an equally
> efficient producer of the competitive product or products.

515 F.3d at 909 (emphasis added).  Second, the reasons for the different elements to be shown in

bundled discount cases and exclusive dealing cases can also be explained by their closest

analogues.  Bundled discounts are much closer to predatory pricing cases, which turn on

defendants' own costs, *see Brooke Grp.*, 509 U.S. at 222–24, whereas exclusive dealing cases are

more akin to concerted refusals to deal.  Accordingly, a plaintiff asserting exclusive dealing has

to show many of the elements required when asserting a concerted refusal to deal.  *Compare,*

*e.g.*, *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 298 (1985)

(noting that plaintiff must show market power and foreclosure of "a business element necessary

for effective competition"), *with ZF Meritor*, 696 F.3d at 271–72 (requiring, *inter alia*, "a

showing of significant market power by the defendant [and] substantial foreclosure" (citations

omitted)).

Finally, the Court agrees with Plaintiffs to the extent that they argue that the Court should

assess the Defendants' conduct holistically.  There are many ways to show monopolization;

bundled discounts and exclusive dealing are just two of the ways.  *Cf. Microsoft*, 253 F.3d at 58

("[T]he means of illicit exclusion, like the means of legitimate competition, are myriad.").

Where a plaintiff challenges a number of rules and policies upon which a jury could find Section

2 liability, the plaintiff's case cannot rise or fall with the most restrictive element of one of the

asserted bases (*i.e.*, foreclosure).  Instead, it is incumbent upon the courts to "furnish 'an enquiry

meet for the case, looking to the circumstances, details, and logic of a restraint' to ensure that it

unduly harms competition before a court declares it unlawful." *Alston*, 594 U.S. at 97 (quoting

*Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 781 (1999)).  Stated differently, "[t]he emphasis always

is on the actual dynamics of the market rather than rote application of any formula." *N. Am.*

*Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 296 F. Supp. 3d 442, 471 (E.D.N.Y. 2017) (quoting *Geneva Pharms.*, 386 F.3d at 496), *aff'd*, 883 F.3d 32 (2d Cir. 2018); *see also Alston*, 594 U.S. at 97 ("The[] three steps [of the burden-shifting framework] do not represent a rote checklist, nor may they be employed as an inflexible substitute for careful analysis.").

Thus, regardless of the amount of competition foreclosed by Visa's discounts — a fact that itself is in dispute — a jury would be entitled to conclude that Visa's discounts contributed to the maintenance of its monopoly power, especially when viewed in conjunction with the other challenged activities and practices.  For example, Prof. Hausman opines that Issuers "agree[d] to enable Interlink as the exclusive PIN debit network on all (or most) of their Visa-branded signature debit cards in exchange for" discounts.  (Hausman Rep. ¶ 510.)  He further opines: "Visa achieved exclusives with certain large debit issuers through anticompetitive bundling that an equally (or more) efficient rival could not match without losing money."  (Reply Expert Rep. of Prof. Jerry Hausman ("Hausman Reply Rep.") ¶ 571, annexed to the Decl. of Rosemary Szanyi ("Szanyi Decl.") as SJDX401, Docket Entry No. 8526-17.)  Prof. Hausman evaluated deals with ███████████████████████████████████, and found that "for each of these issuers, a competing PIN debit network could not compete for the contestable volume because it would need to offer incentives and discounts in excess of the revenue it could earn from the contestable volume."  (*Id.* ¶¶ 528–30.)  A jury could reasonably find that Visa's strategy successfully excluded competition, because Visa maintained a market share in signature debit greater than 70%, (Hausman Rep. ¶ 523), and grew its PIN debit share from roughly 10% to 40% between 2001 and the enactment of the Durbin Amendment, (Hausman Reply Rep. ¶ 537).

### 3. Plaintiffs have raised a triable question of fact regarding their claims predicated on other conduct

As discussed in section II.c above, Defendants devote most of their arguments regarding Plaintiffs' challenges to Visa's other conduct to Defendants' contention that Plaintiffs lack standing to assert these challenges. For the reasons discussed above, the Court finds that Plaintiffs have established "antitrust standing" to bring their Section 2 claims and, in addition, a jury could reasonably find that Plaintiffs have, in fact, suffered the kind of injury the antitrust laws were designed to remedy. On the merits, Defendants argue that the various rules and policies challenged by Plaintiffs do not, standing alone, constitute violations of Section 2. For the following reasons, the Court denies Defendants' motion for summary judgment as to the other challenged conduct.

Regarding the FANF, Defendants argue, "[t]o the extent . . . the FANF in isolation increased fees to merchants overall or (perhaps) to a particular Plaintiff, that is not exclusionary even in a one-sided market." (Defs.' Mem. 27.) Plaintiffs argue that "[t]he FANF provided Visa with hundreds of millions of dollars in supracompetitive fees, which it could then strategically 'rebate' (in part) to select merchants if they promise to route debit volume to Visa instead of to Visa's rivals." (DAP's Opp'n 16.) A reasonable jury could conclude that the FANF, when viewed in conjunction with the discounts discussed above, for example, contributed to Visa's maintenance of its monopoly by preventing would-be competitors from competing effectively for debit volume.

Regarding PAVD, Defendants argue that PAVD "resulted in lower interchange on both PIN and signature debit transactions" and "gave merchants enhanced routing choice." (Defs.' Mem. 33–34.) Plaintiffs argue that "Visa used PAVD to protect its signature debit product and its PIN debit network" and "further weakened rivals by making it more difficult for them to gain

the volume necessary to meaningfully compete." (DAP's Opp'n 17–18.) The Court acknowledges that PAVD is a closer call than the FANF because a monopolist's conduct is not unlawful unless it is exclusionary,[22] but "a monopolist is [also] not free to take certain actions that a company in a competitive (or even oligopolistic) market may take." *LePage's Inc. v. 3M*, 324 F.3d 141, 151–52 (3d Cir. 2003). On balance, the determination of whether the imposition of PIN-authenticated Visa debit contributed to maintenance of Visa's monopoly power is best left to the jury because the Court cannot conclude as a matter of law that PAVD was incapable of harming competition.

Regarding EMV-related conduct, Defendants argue that no evidence shows that "Visa's preference for choice screens excluded competition." (Defs.' Mem. 30.) They argue that "[r]ivals each advocating for their preferred configuration is competition, not exclusionary conduct." (*Id.* at 31 (citing *Associated Radio Serv. Co. v. Page Airways, Inc.* 624 F.2d 1342, 1354 (5th Cir. 1980)).) Plaintiffs argue that "Visa maintained a 'Selection of Payment System' rule that required merchants to give cardholders a choice at the [point of sale], including one that could only be routed to Visa." (DAP's Opp'n 21.) Plaintiffs contend that the point-of-sale selection screens "caus[ed] cardholders to be prompted with a deceptive choice between 'Visa Debit' . . . and a non-existent and nonsensical brand 'US Debit.'" (*Id.*) According to Plaintiffs,

---

[22] *See, e.g.*, *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1359 (2d Cir. 1988) ("Distinguishing between efficient and predatory conduct is extremely difficult because it is frequently the case that '[c]ompetitive and exclusionary conduct look alike.'" (quoting Frank H. Easterbrook, *On Identifying Exclusionary Conduct,* 61 Notre Dame L. Rev. 972, 972 (1986))); *see also id.* at 1361 ("[T]here is nothing in the antitrust laws that requires a monopolist to act against its own self interest so long as the monopolist does not at the same time exercise its power to maintain that power."); *Microsoft*, 253 F.3d at 58 ("Whether any particular act of a monopolist is exclusionary, rather than merely a form of vigorous competition, can be difficult to discern: the means of illicit exclusion, like the means of legitimate competition, are myriad.").

"Visa's documents confirm that the deceptive screens caused a substantial shift from PIN to signature debit."  (*Id.* at 22.)  The Court acknowledges that misleading or deceptive conduct is not ordinarily proscribed by the Sherman Act,[23] but deceptive conduct can violate the Sherman Act if it has the requisite anticompetitive effect.  *See Rambus Inc. v. FTC*, 522 F.3d 456, 464 (D.C. Cir. 2008) ("Deceptive conduct . . . must have an anticompetitive effect in order to form the basis of a monopolization claim.").  A jury could reasonably conclude that Visa's implementation of the misleading point-of-sale selection screens had the effect of harming competition by deceptively steering debit volume to Visa and thus assisted Visa in maintaining its monopoly power.

In addition, the Court reiterates that Plaintiffs have already offered enough evidence of anticompetitive effect — in the form of increased prices, decreased output, and quality — to survive Defendants' motion for summary judgment under *Amex*.  *See Interchange Fees IV*, 2024 WL 278565.  Because anticompetitive effect is at the core of both Section 1 and Section 2 claims, the Court declines to further relitigate the issue of requiring Plaintiffs to show anticompetitive effect.[24]  As discussed above, a reasonable jury could find in favor of Plaintiffs

---

[23]  *See, e.g.*, *In re Google*, 627 F. Supp. 3d at 380.  As the court explained:
> Generally, misleading or deceptive statements to market participants standing alone do not amount to anticompetitive conduct for the purposes of section 2.  *See, e.g.*, *Interstate Properties v. Pyramid Co. of Utica*, 586 F. Supp. 1160, 1163 (S.D.N.Y. 1984) ("Not every business tort can be molded into an antitrust violation.").  "Deceptive conduct — like any other [conduct] — must have an anticompetitive effect in order to form the basis of a monopolization claim."  *Rambus Inc. v. FTC*, 522 F.3d 456, 464 (D.C. Cir. 2008).

*Id.*

[24]  *Compare Cap. Imaging Assocs.*, 996 F.2d at 542–43 ("[A] plaintiff claiming a § 1 violation must first establish a combination or some form of concerted action between at least two legally distinct economic entities . . . [and] that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market.") *with Microsoft*, 253 F.3d at 58

on their Section 2 claims for a number of reasons, and taken together with the evidence discussed in *Interchange Fees IV*, a jury could reasonably find that Defendants' conduct has had an anticompetitive effect.  Assuming a jury finds that Visa possesses monopoly power, those findings together would warrant returning a finding in favor of Plaintiffs at the first step of the *Microsoft* burden-shifting framework.  Accordingly, the Court denies Defendants' motion for summary judgment as to Plaintiffs' Section 2 monopolization claims.

> ### e.   **Plaintiffs' attempted monopolization claim**

Defendants argue that they are entitled to summary judgment on Plaintiffs' attempted monopolization claim against Visa, (*see* Defs.' Mem. 42–43), because Plaintiffs fail to show "a dangerous probability of achieving monopoly power" and "a specific intent to monopolize," *Actavis*, 787 F.3d at 651 (quoting *Spectrum Sports*, 506 U.S. at 456).  Defendants contend that Plaintiffs have not established "specific intent," and that "Plaintiffs have offered nothing beyond an intent by Visa to compete to win debit business."  (Defs.' Mem. 42–43.)  Further, Defendants argue that Plaintiffs have shown "no evidence that significant rivals have left or likely will leave the market," meaning that there is no "dangerous probability of success" of monopolization.  (*Id.* (quoting *Spectrum Sports*, 506 U.S. at 455).)  In support, Defendants point to evidence that "Visa's market share started at 60% in 2004, peaked at 65% in 2010, and then . . . declined modestly post-Durbin and has settled at roughly 60% as of 2017."  (*Id.* at 43 (internal quotation marks omitted).)

Plaintiffs do not explicitly respond to Defendants' arguments concerning their attempted monopolization claims.  Despite Plaintiffs' failure to respond to Defendants' arguments

---

("A firm violates § 2 only when it acquires or maintains, or attempts to acquire or maintain, a monopoly by engaging in exclusionary conduct . . . [and] to be condemned as exclusionary, a monopolist's act must have an 'anticompetitive effect.'").

regarding the attempted monopolization claims, the evidence before the Court precludes granting summary judgment in Defendants' favor.

### i. Dangerous probability of achieving monopoly power

As a threshold matter, the Court's holding above — that a triable question of fact remains as to whether Visa possessed or possesses monopoly power, (*supra* section II.d.i) — necessarily implies that a triable question remains as to whether Visa has "a dangerous probability of achieving monopoly power," *Actavis*, 787 F.3d at 651; *see also id.* at 652 (concluding that because the parties agreed that defendants possessed monopoly power, plaintiffs' attempted monopolization claim "turn[ed] on whether Defendants . . . attempted to maintain that monopoly in violation of § 2"); *Tops Mkts.*, 142 F.3d at 100 ( "[A] lesser degree of market power may establish an attempted monopolization claim than that necessary to establish a completed monopolization claim."); *H.L. Hayden Co. of N.Y. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1017 (2d Cir. 1989) ("A dangerous probability of success may exist where the defendant possesses a significant market share when it undertakes the challenged anticompetitive conduct.").

### ii. Specific intent to monopolize

Plaintiffs' attempted monopolization claim turns on whether a triable issue of fact remains as to Visa's "specific intent to monopolize." *See Actavis*, 787 F.3d at 651. "Although the completed offense of monopolization requires only a general intent, 'a specific intent to destroy competition or build monopoly is essential to guilt for the mere attempt.'" *Tops Mkts.*, 142 F.3d at 101 (quoting *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 626 (1953)). "The specific intent to monopolize is 'something more than an intent to compete vigorously,'" and "may be proven through the nature of the anticompetitive actions that have

been taken." *In re Google Digit. Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 380 (S.D.N.Y. 2022) (quoting *Spectrum Sports*, 506 U.S. at 459). Intent "'can be derived from [defendants'] words' or a 'stated goal.'" *Id.* (quoting *Tops Mkts.*, 142 F.3d at 101).

In *Tops Markets*, for example, the Second Circuit concluded that a factfinder could reasonably infer specific intent from evidence of defendants' "stated goal of preventing [plaintiff] from entering the . . . market." 142 F.3d at 101. The Court looked to evidence that defendants had "stated that one reason why the . . . defendants purchased [certain parcels of land] was to prevent [the plaintiff] from competing at that site." *Id.* The Court also explained that the conduct itself evinced the defendants' "specific intent to destroy competition," observing that "defendants purchased for above-market value two non-contiguous land parcels with no street frontage, which are, by themselves, essentially undevelopable," and that "[a] jury could find this conduct was not motivated by a valid business justification." *Id.* (citing *Aspen Skiing*, 472 U.S. at 605).

Evidence that Plaintiffs reference in opposing other aspects of Defendants' motion similarly permits the reasonable inference that Visa had the "specific intent to monopolize." Plaintiffs offer evidence, for example, that Visa executives were aware that they were "pushing the legal envelope" and taking "legal and business risks that may not be worth the trade" when they offered credit incentives to merchants after the passage of the Durbin Amendment. (*See* DAP's Opp'n 18; Direct Action Pls.' Counter-Stmt. of Material Facts ("DAP's Counter 56.1") ¶ 1246, Docket Entry No. 8196.) Similarly, with respect to the EMV choice screens, (*supra* section I.d.ii.4), Plaintiffs point to evidence that upon being informed by merchants that the choice screens were causing "customer confusion" because "most of the customers will not know the difference between US Debit and Visa Debit," Visa employees responded by offering

to "increase incentives" to these merchants and claiming that the screens were "a simple straightforward solution for cardholder choice," (DAP's Counter 56.1 ¶ 1387–89; *see also* DAP's Opp'n 21). These statements would allow a reasonable factfinder to conclude that Visa pushed these policies with the specific intent to prevent merchants from routing transactions through competitor PIN debit networks, and that "this conduct was not motivated by a valid business justification." *Tops Mkts.*, 142 F.3d at 101. Stated differently, the Court cannot conclude, based on this evidence, that the challenged policies were merely Visa's efforts to "compete vigorously" with rival PIN debit networks, *In re Google*, 627 F. Supp. 3d at 380 (quoting *Spectrum Sports*, 506 U.S. at 459), as opposed to efforts to "destroy competition or build monopoly," *Tops Mkts.*, 142 F.3d at 101 (quoting *Times-Picayune*, 345 U.S. at 626).

The Court concludes, therefore, that triable issues of fact remain as to whether Visa had the specific intent to monopolize, and as to whether the evidence shows a dangerous probability of achieving monopoly power. *See Actavis*, 787 F.3d at 651. Accordingly, these disputes preclude granting summary judgment in Defendants' favor with respect to Plaintiffs' attempted monopolization claims.

### f. Plaintiffs' conspiracy to monopolize claim

Defendants make the following argument against Plaintiffs' conspiracy to monopolize claim:



> Neither logic nor evidence shows why a Bank Defendant would conspire to offer rivals like ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ the issuer discounts on which Dr. Hausman relies to show exclusionary conduct. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ And it is undisputed that exclusivity is in the self-interest of many issuers and debit networks.

(Defs.' Mem. 43.)

Plaintiffs argue that Defendants' specific intent to monopolize "can be established by direct evidence" or the jury may "infer [D]efendants' intent from their anticompetitive practices." (DAP's Opp'n 47 (quoting *Ne. Tel. Co. v. Am. Tel. & Tel. Co.*, 651 F.2d 76, 85 (2d Cir. 1981)).) In support, Plaintiffs point to the following facts: (1) that Visa was owned and controlled by competing banks, including the Bank Defendants prior to Visa's IPO; (2) that the Bank Defendants, as members of Visa's board of directors, approved and agreed to abide by Visa's HAC Rule; and, (3) that "the banks on Visa's board approved of the 'Visa Partnership Program' through which Visa entered into the anticompetitive issuer agreements" challenged by Plaintiffs. (*Id.*) In further support, Plaintiffs contend that "[i]nternal Visa documents make clear that Visa's board was aware of and approved the network's anticompetitive strategies to maintain its dominance in debit and supracompetitive pricing," and that "[t]he record shows bank recognition that these agreements with Visa would give it the pricing power it wielded across the market."[25] (*Id.*)

For the following reasons, the Court grants Defendants' motion as to Plaintiffs' Section 2 conspiracy to monopolize claims. Although there is some evidence of Visa's specific intent to obtain or maintain a monopoly in debit transactions, (*see* section II.e *supra*), the evidence is insufficient to permit a reasonable jury to infer that the Bank Defendants had the specific intent to facilitate *Visa's* acquisition or maintenance of a monopoly over debit card transactions.

---

[25] As noted above, Section 2 of the Sherman Act makes it unlawful to "combine or conspire with any other person or persons, to monopolize . . . trade or commerce." 15 U.S.C. § 2. To succeed on a claim for conspiracy to monopolize, the plaintiff must show "(1) concerted action, (2) overt acts in furtherance of the conspiracy, and (3) specific intent to monopolize." *Elecs. Commc'ns*, 129 F.3d at 246. A plaintiff must show that all parties to the conspiracy had the specific intent to monopolize. *See Geneva Pharms.*, 386 F.3d at 507 ("[L]ack of intent by one party . . . precludes a conspiracy to monopolize."); *see also Belfiore v. N.Y. Times Co.*, 826 F.2d 177, 183 (2d Cir. 1987).

Plaintiffs' proffered evidence is insufficient to preclude an inference of permissible conduct.  As Defendants argue, the fact that the Bank Defendants sat on Visa's board when it approved the HAC Rule and the Visa Partnership Program is not evidence that the "directors did [so] with the specific intent of Visa achieving a monopoly."  (Defs.' Reply 37.)  Many of the Bank Defendants were also owner-members of the pre-IPO Mastercard joint venture and it is not clear that a Visa monopoly — at the expense of Mastercard — would have been in the Bank Defendants' best interests.  In addition, the evidence that "Visa's board was aware of and approved the network's anticompetitive strategies to maintain its dominance in debit and supracompetitive pricing," and that "[t]he record shows bank recognition that these agreements with Visa would give it the pricing power it wielded across the market," is similarly ambiguous and does not preclude the inference of permissible conduct.  (DAP's Opp'n 47.)  The evidence cited by Plaintiffs shows only that Wells Fargo and Wachovia[26] ███████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████  Recognition that Visa could raise Interlink interchange fees, which independently benefitted Wells Fargo and Wachovia, is not evidence that Wells Fargo and Wachovia had the specific intent to maintain Visa's monopoly.  As to the remaining Bank Defendants, Plaintiffs offer no evidence tending to show that they had the specific intent to maintain Visa's monopoly.

Regarding Visa's post-IPO challenged conduct, Plaintiffs similarly offer no evidence tending to show that the Bank Defendants had the specific intent to maintain Visa's monopoly.

---

[26]  After Wachovia's collapse during the 2008 Financial Crises, Wachovia was purchased by Wells Fargo.  *See* Wells Fargo, *Wachovia is Now Wells Fargo*, https://www.wellsfargo.com/about/corporate/wachovia (last visited Apr. 1, 2024).

The evidence cited by Plaintiffs only shows that Visa had a rule requiring issuer priority for Visa's chip-enabled debit cards.  (*See id.* ¶ 1399 ("With the implementation of EMV in the U.S., Visa also adopted an 'issuer priority rule' that required issuers to assign Visa's EMV application identifier to always have the highest priority.").)  This evidence offers no support for the proposition that the Bank Defendants adhered to Visa's issuer priority rule with the specific intent of maintaining Visa's monopoly.

Because Plaintiffs have failed to offer any evidence tending to show the Bank Defendants had the specific intent to maintain Visa's monopoly in debit, the Court grants Defendants' motion with respect to Plaintiffs' conspiracy to monopolize claims.[27]  *See El-Nahal*, 835 F.3d at 252 ("[T]he movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." (citation omitted)).

---

[27]  *See also Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 258 (3d Cir. 2010).  As the Third Circuit held:

> [W]e cannot infer the [defendants'] specific intent from their mere participation in the conspiracy, as the [p]laintiffs urge.  In fact, the only actual conduct the [p]laintiffs have alleged on the part of the [defendants] is that each one of them, acting on its own, signed a bilateral dealing agreement with Dentsply.  The only plausible inference from that conduct is that each [defendant] sought to acquire, retain and/or increase its own business.  Significantly, the antitrust laws do not prohibit such conduct.  *See, e.g., U.S. Steel Corp. v. Fortner Enters., Inc.,* 429 U.S. 610, 612 n.1 (1977).  At bottom, the [p]laintiffs' allegations of specific intent rest not on facts but on conclusory statements strung together with antitrust jargon.  It is an axiom of antitrust law, however, that merely saying so does not make it so for pleading-sufficiency purposes.

*Id.*

Plaintiffs essentially ask this Court to "infer [Bank Defendants'] specific intent from their mere participation in the conspiracy."  *Id.*  The Court declines to do so because the burden is on Plaintiffs to offer evidence that "tend[s] to preclude an inference of permissible conduct."  *Cap. Imaging*, 996 F.2d at 542.

### g.   The Equitable Relief Plaintiffs' monopolization claims

Equitable Relief Class Plaintiffs (or "Equitable Relief Plaintiffs") assert Section 2 monopolization claims against Visa in the debit and credit markets.  Defendants move for summary judgment as to both the debit and credit monopolization claims.

### i.   Debit monopolization claim

Defendants argue that Equitable Relief Class Plaintiffs "do not proffer any expert to opine that Visa has monopoly power in the debit market and have adduced no theory — let alone evidence — of exclusionary conduct."  (Defs.' Mem. 43.)  Accordingly, they argue, Equitable Relief Plaintiffs' "boilerplate debit monopolization claim fails for a lack of evidence."  (*Id.*) Defendants argue that Equitable Relief Plaintiffs have not offered evidence that Visa has monopoly power in debit nor have they demonstrated anticompetitive effect.  (*Id.* at 44–45.)

Plaintiffs argue that Visa's pre-Durbin Amendment monopolization of the debit market is evidenced by its HAC Rule and Visa's pricing convergence of signature and PIN debit.  (ERCP's Opp'n 5–6.)  As to post-Durbin Amendment conduct, Equitable Relief Plaintiffs point to much of the same evidence as the 7-Eleven and Home Depot Plaintiffs, including: the FANF, PAVD, and EMV.  (*Id.* at 7–9.)  Equitable Relief Plaintiffs also contend that "[i]ndirect evidence also establishes the existence of Visa's monopoly power which can be inferred from its predominant share of the market."  (*Id.* at 9.)  They argue "it is undisputed that Visa has a dominant share of the overall debit market with a continual market share of approximately 60%," and that "significant barriers to entry exist in the debit card market."  (*Id.* at 10.)  Finally, Equitable Relief Plaintiffs argue that "[t]he opinions of Professors Carlton and Stiglitz with respect to Visa's Merchant Restraints show how Visa exercised monopoly power with respect to debit card transactions."  (*Id.*)

The Court grants Defendants' motion as to Equitable Relief Plaintiffs' debit monopolization claim because they have failed to offer sufficient evidence to permit a reasonable jury to conclude that Defendants' conduct was exclusionary.  Moreover, Equitable Relief Plaintiffs do not sufficiently explain how the conduct they allege could lead to a monopoly in debit.  Their theory of exclusion appears to be that Visa's conduct in the credit-card market — offering high rewards cards and prohibiting steering — "induced" cardholders to "favor . . . credit cards over other payment means."  (ERCP's Opp'n 10.)  Equitable Relief Plaintiffs argue that "[t]he Merchant Restraints . . . protected Visa's monopoly in credit cards and debit cards by, for example, excluding potential entry or expansion of competing payment networks — and . . . undoubtedly reduced output of debit transactions."  (*Id.*)  They offer no explanation for why, or how, cardholders favoring credit cards, at the expense of debit cards, could maintain Visa's monopoly in debit.  Accordingly, Equitable Relief Plaintiffs' theory does not make economic sense.  *Eastman Kodak*, 504 U.S. at 468–69 ("If the plaintiff's theory is economically senseless, no reasonable jury could find in its favor, and summary judgment should be granted.").  Finally, to the extent that Equitable Relief Plaintiffs' argument relies on credit cards competing with debit cards for consumer usage, it undermines their contention that the relevant markets are the separate markets for credit- and debit-card transactions.  (*Contra* Expert Rep. of Prof. Dennis W. Carlton ¶ 132, annexed to Szanyi Decl. as SJDX386, Docket Entry No. 8526-11 ("I conclude that Visa and Mastercard participate in a market no broader than credit card network services."); *id.* ¶ 136 ("The economic evidence shows that the net price of debit card network services is not constrained to the competitive level by alternative forms of payment, and so Visa and Mastercard participate in a market no broader than debit card network services.").)  Equitable Relief Plaintiffs' theory of debit monopolization is thus incompatible with their expert, Prof. Carlton's,

market definition.  Accordingly, Equitable Relief Plaintiffs' claim is "economically senseless" and "no reasonable jury could find in [their] favor."  *Eastman Kodak*, 504 U.S. at 468–69.  The Court grants Defendants' motion for summary judgment as to Equitable Relief Plaintiffs' debit monopolization claim.

### ii.   Credit monopolization claim

Defendants argue that Equitable Relief Plaintiffs' credit monopolization claim fails as well, because they "allege a one-sided theory of monopoly power as to merchants only that is legally flawed."  (Defs.' Mem. 45 (internal quotation marks, alterations, and citations omitted).) Defendants further fault Equitable Relief Plaintiffs for relying on a "highly disfavored single-brand market theory" based on "Dr. Stiglitz's theory that cardholders do not substitute other networks for Visa credit cards."  (*Id.*)  In support, Defendants argue that this single-brand product market theory is unsupported by evidence and "inconsistent with the Supreme Court's observing 'increased competition' among American Express, Visa, and Mastercard."  (*Id.* (quoting *Amex*, 585 U.S. at 548–49).)

Equitable Relief Plaintiffs argue that they have presented sufficient direct evidence of Visa's monopoly power in both the market for "General Purpose Credit Card Network Services" and "the narrower market for Visa Credit Card Network Service."  (ERCP's Opp'n 11.)  First, they argue that "the record is replete with evidence of Visa's market power," pointing to evidence of Visa's high market share in the face of "significant price increases," growing interchange fees, and "sustained price discrimination among different classes of [m]erchants based in part on each class's ability to resist price increases."  (*Id.* at 12.)  They argue that "Visa's market power is so substantial that the level of the Interchange Fees is essentially untethered to the cost of the services that the Merchants are purchasing."  (*Id.* at 13.)  In support,

Equitable Relief Plaintiffs contrast the "substantial cost reductions" for processing credit card transactions from 2000 to 2017 to the increases in "Visa's Merchant prices (and the two-sided price of credit transactions)." (*Id.*) Second, the Equitable Relief Plaintiffs argue substantial evidence supports their view that "the relevant market is properly limited to sales of network services for Visa credit cards," as opposed to credit cards more generally. (*Id.* at 13–14.)

The Court first addresses the Equitable Relief Plaintiffs' argument concerning the relevant market, because "[w]ithout a definition of [the] market there is no way to measure [a defendant's] ability to lessen or destroy competition." *Amex*, 585 U.S. at 543 (quoting *Walker Process*, 382 U.S. at 177). As already noted in *Interchange Fees IV*, Equitable Relief Plaintiffs' expert, Prof. Carlton, contends that the relevant markets for the purposes of Plaintiffs' claims under Section 1 of the Sherman Act are the separate, two-sided transactions markets for credit- and debit-card transactions. 2024 WL 278565, at *12. The Court accepted this definition for the purposes of Defendants' summary judgment motion, *id.*, and sees no reason to depart from this definition for Equitable Relief Plaintiffs' Section 2 claims. *See Concord Assocs.*, 817 F.3d at 53 ("[The market definition] analysis is equally applicable to claims made under Section Two of the Sherman Act, because 'without a definition of that market there is no way to measure the defendant's ability to lessen or destroy competition.'"); *Shkreli*, 581 F. Supp. 3d at 630 (defining a single relevant market for the purposes of claims under both Sections 1 and 2 of the Sherman Act). Accordingly, the Court continues to consider the market for credit-card transactions as the relevant market for the purposes of Equitable Relief Plaintiffs' credit monopolization claims under Section 2 of the Sherman Act, as it did for all of Plaintiffs' Section 1 claims.[28]

---

[28] The Court has already defined the relevant markets as the markets for credit-card and debit-card transactions. (*Supra* section II.d.i.1); *Interchange Fees IV*, 2024 WL 278565, at *12.

With the relevant market established, the Court grants Defendants' motion with respect to the Equitable Relief Plaintiffs' credit monopolization claim because the evidence offered in support of Visa's monopoly power in the credit-card transactions market is entirely one-sided. As discussed above, (*supra* section II.d.i.1), "[i]n cases involving two-sided *transaction* platforms, the relevant market must, as a matter of law, include both sides of the platform." *US Airways II*, 938 F.3d at 57; *see also Amex*, 585 U.S. at 546 ("Evaluating both sides of a two-sided transaction platform is . . . necessary to accurately assess competition.").  Further, a plaintiff can establish a defendant's monopoly power either "directly through evidence of control over prices or the exclusion of competition, or it may be inferred from a firm's large percentage share of the relevant market." *Geneva Pharms.*, 386 F.3d at 500.  All the evidence that Equitable Relief Plaintiffs proffer in opposition to Defendants' motion concerns the continued practices of

_____

Equitable Relief Plaintiffs now ask the Court to redefine the market for the purposes of their Section 2 claims to include only *Visa's* credit-card transactions.  The Court declines to do so. Even on the merits, Equitable Relief Plaintiffs' argument finds little support.  "[T]ime and time again, courts in this circuit have rejected attempts by antitrust plaintiffs to limit the relevant market to a single brand or product."  *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 361 F. Supp. 3d 324, 343 (E.D.N.Y. 2019) (collecting cases).  Overcoming this presumption against single-brand markets requires an antitrust plaintiff to point to "exceptional market conditions" creating such a "market for a single brand that would otherwise be just 'one brand in a market of competing brands.'"  *Id.* (quoting *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 488 (5th Cir. 1984)).  The "one situation in which courts generally agree that single-brand markets can succeed" is for secondary markets consisting of "consumable goods or replacement components that must be used for the proper functioning of some primary good."  *Id.* (quoting IIA Phillip Areeda et al., *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 564b, at 421 (4th ed. 2014)).  For example, the Supreme Court in *Eastman Kodak* rejected the argument that "a single brand of a product or service can never be a relevant market under the Sherman Act" because in that case, "services and parts for Kodak equipment [were] not interchangeable with other manufacturers' services and parts."  504 U.S. at 481–82. Accordingly, the Court concluded that "the relevant market . . . [was] composed of only those companies that service Kodak machines."  *Id.* at 482.  The market in this case is unlike the secondary "aftermarket" in *Eastman Kodak*, and — as discussed in *Interchange Fees IV* — Visa's credit-card transaction services are "reasonably interchangeable" with those of brands like Mastercard.  2024 WL 278565, at *12.

*merchants* in the credit-card transactions market, without any meaningful reference to the cardholder side of the market.  (*See, e.g.*, ERCP's Opp'n 12 ("Merchants have continued to accept Visa credit transactions despite frequent and significant price increases."); *id.* ("Merchants have continued to accept Visa credit transactions despite Visa shifting card usage from standard cards to premium cards with growing Interchange Fees."); *id.* ("Visa currently imposes substantially different fees on Merchants depending on the Merchant category's elasticity of demand for credit card network services . . . .").)  Equitable Relief Plaintiffs' cursory and parenthetical reference to the increase in "the two-sided price of credit transactions," (*id.* at 13), neither constitutes a "direct" showing of "control over prices or the exclusion of competition" nor permits the Court to "infer[]" Visa's two-sided monopoly power "from [Visa's] large percentage share of the relevant market."  *Geneva Pharms.*, 386 F.3d at 500.

Equitable Relief Plaintiffs' evidence in support of their credit monopolization claim is therefore insufficient as a matter of law to support a finding of monopoly power in the two-sided credit-card transactions market.  Accordingly, the Court grants Defendants' motion for summary judgment as to Equitable Relief Plaintiffs' credit monopolization claims.

## III.   Conclusion

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion for summary judgment on the 7-Eleven and Home Depot Plaintiffs' Section 2 monopolization claims.  The Court denies Defendants' motion as to the 7-Eleven and Home Depot Plaintiffs' debit monopolization claim and attempted monopolization claim and grants Defendants' motion as to the 7-Eleven and Home Depot Plaintiffs' conspiracy to monopolize claim.  The Court grants Defendants' motion as to Equitable Relief Class Plaintiffs' debit and credit monopolization claims.

Dated:  April 2, 2024
        Brooklyn, New York


SO ORDERED:


_____s/ MKB_____
MARGO K. BRODIE
United States District Judge