# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | Case No. 05-md-1720 (MKB)(JAM) |
| This Document Applies to:<br><br>*Target Corp., et al. v. Visa Inc., et al.,*<br>No. 13-cv-05745 (MKB) (JAM) (E.D.N.Y.) | |

## THE TARGET PLAINTIFFS' STATEMENT OF OBJECTIONS TO EQUITABLE RELIEF CLASS PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT

## TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT ..................................................................................... 1

II.    ARGUMENT ............................................................................................................... 3

       A.     The Settlement Treats the Target Plaintiffs Inequitably ........................................ 4

              1.     Inequitable Delay of the Target Plaintiffs' Trial-Ready Claims................ 6

              2.     Release of the Target Plaintiffs' Individual Injunctive Claims ............... 10

              3.     Impact on the Target Plaintiffs' Monetary Claims ................................. 12

       B.     The Target Plaintiffs Have Not Been Adequately Represented .......................... 18

       C.     The Settlement Does Not Provide Fair, Reasonable, or Adequate Relief ........... 21

              1.     The Recycled Settlement Provisions ....................................................... 22

              2.     The "Pilot Program" And "Honor All Wallets" Provisions..................... 22

              3.     The "Surcharging" Relief ........................................................................ 23

              4.     The Interchange Rate Relief is Unlawful Price Fixing............................ 24

              5.     The Class Release .................................................................................... 29

       D.     The Class Should be Redefined, or Opt-Out Rights should be Afforded............. 30

III.   CONCLUSION........................................................................................................... 32

## **TABLE OF AUTHORITIES**

**Cases**

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ..................................................... 35

*Berni v. Barilla S.p.A.*, 964 F.3d 141 (2d Cir. 2020) ................................................... 23

*Cashon v. Encompass Health Rehab. Hosp. of Modesto, LLC*, No. 1:19-cv-00671, 2023 U.S. Dist. LEXIS 169355 (E.D. Cal. Sept. 21, 2023) .................................................. 32

*Cholokyan v. Mercedes-Benz USA, LLC*, 281 F.R.D. 534 (C.D. Cal. 2012) .......................... 15, 17

*City of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295 (2d Cir. 1990) .......................... 33, 34

*Costa v. FCA US* LLC, 2022 U.S. Dist. LEXIS 239194 (D. Mass. Sept. 30, 2022) ................... 17

*Creech v. Emerson Elec Co.*, 2019 U.S. Dist. LEXIS 66321 (S.D. Ohio Apr. 18, 2019) ........... 17

*Guy v. Convergent Outsourcing, Inc.*, No. C22-1558, 2023 U.S. Dist. LEXIS 226068 (W.D. Wash. Dec. 19, 2023) ..................................................................................... 32

*In re E.I. Dupont de Nemours & Co. C-8 Pers. Inj. Litig.*, No. 22-0305, 2022 U.S. App. LEXIS 25452 (6th Cir. Sept. 9, 2022) ...................................................................... 6

*In re Kia Hyundai Vehicle Theft Litig.*, No. 8:22-ml-03052, 2023 U.S. Dist. LEXIS 210622 (C.D. Cal. Aug. 16, 2023) ........................................................................... 32

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223 (2d Cir. 2016) .................................................................................................. passim

*In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003) ............. 13

*Int'l Salt Co. v. United* States, 332 U.S. 392 (1947) .................................................... 12

*Lemon v. Int'l Union of Operating Eng'rs*, 216 F.3d 577 (7th Cir. 2000) .................................. 33

*McManus v. Fleetwood Enter., Inc.*, 320 F.3d 545 (5th Cir. 2003) ......................................... 17

*McReynolds v. Richards-Cantave*, 588 F.3d 790 (2d Cir. 2009) ......................................... 33

*Moses v. N.Y. Times Co.*, 79 F.4th 235 (2d Cir. 2023) ................................................... 19

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) ........................................................ 16

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) ................................................. 16, 31

*Phillips v. Ford Motor Co.*, 2016 U.S. Dist. LEXIS 177672 (N.D. Cal. Dec. 22, 2016) ............. 17

*Slamon v. Carrizo (Marcellus) LLC*, 2020 U.S. Dist. LEXIS 87149 (M.D. Pa. May 18, 2020) .................................................................................................................... 17

*Strobl v. New York Mercantile Exch.*, 590 F. Supp. 875 (S.D.N.Y. 1984) .................................... 8

*Victorino v. FCA US LLC*, 326 F.R.D. 282 (S.D. Cal. 2018) ........................................ 17

*Vidal v. Wolf*, 501 F. Supp. 3d 117 (E.D.N.Y. Nov. 14, 2020) .................................... 34

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ........................................... passim

**Statutes**

15 U.S.C. § 26 ............................................................................................................... 11

**Rules**

Fed. R. Civ. P. 23(b)(2) ............................................................................................. passim

Fed. R. Civ. P. 23(b)(3) ...................................................................................... 1, 16, 31

Fed. R. Civ. P. 23(c) .................................................................................................... 21

Fed. R. Civ. P. 23(c)(1)(C) ................................................................................... 11, 31

Fed. R. Civ. P. 23(d)(2) ............................................................................................... 31

Fed. R. Civ. P. 23(d)(5) ............................................................................................... 31

Fed. R. Civ. P. 23(e) .................................................................................................. 2, 4

Fed. R. Civ. P. 23(e)(2)(D) ...................................................................................... 5, 17

Fed. R. Civ. P. 23, 2003 Adv. Comm. Notes .................................................... 11, 14

## I.      PRELIMINARY STATEMENT

This Court certified a mandatory Rule 23(b)(2) class on the promise that the Class would diligently pursue claims to enjoin core anticompetitive practices of Visa and Mastercard, like the Honor All Cards ("HAC") and "default" interchange rules (collectively, "the Rules").  That promise has not been kept.  The proposed Rule 23(b)(2) settlement does not eliminate the Rules; instead, it aims to give them a judicial imprimatur of legitimacy and—if approved—would provide cover for a naked price-fixing agreement between Visa and Mastercard.

Fatal flaws in the settlement preclude its approval *at all*.  But the settlement also threatens to inflict unique, impermissible harm upon the Target Plaintiffs,[1] who are differently situated from the Class Representatives and the vast majority of the Class.  The Target Plaintiffs opted out of the Rule 23(b)(3) settlement, preserving *both* their multi-billion dollar damages claims and their statutory right to seek injunctive relief against the unlawful practices that caused those damages.  The Rule 23(b)(2) Class Representatives and most of the Class did not.

The Target Plaintiffs have fought hard to preserve and pursue their own claims.  They successfully overturned a prior settlement that, like this one, was the product of profound conflicts of interest.  They then pursued their claims for years, surviving four summary judgment motions.  Now that the Target Plaintiffs' claims are ready to proceed to trial, Defendants have announced a "settlement" with the Rule 23(b)(2) Class that leaves in place *every* rule the Class promised to dismantle—a settlement Defendants now invoke to delay a jury's *decisive* decision in the Target case about whether the Rules are lawful at all.

---

[1] The Target Plaintiffs are: Target Corporation, Macy's, Inc., The TJX Companies, Inc., Kohl's Corporation, Staples, Inc., J.C. Penney Corporation, Inc., Office Depot, Inc., L Brands, Inc., OfficeMax Incorporated, Big Lots Stores, Inc., Abercrombie & Fitch Co., Ascena Retail Group, Inc., Saks, Incorporated, Lord & Taylor LLC, Chico's FAS, Inc., Luxottica U.S. Holdings Corp., American Signature, Inc., and their respective affiliates and subsidiaries.

1

The Rules are not lawful.  Nevertheless, the settlement would require the Target Plaintiffs to release their valuable, trial-ready injunctive claims that could overturn those Rules forever, without receiving *any* individual consideration in return.  To make matters worse, the settlement seeks to impose a discriminatory *stay* on the Target Plaintiffs' damages claims—prejudicing their right to proceed to trial on claims they alone possess and that have been pending *since 2013*.  Laying bare this intra-class conflict, Defendants are already invoking the settlement and proposed Class Settlement Notice and Scheduling Order ("Order") to try to thwart a prompt trial of the Target Plaintiffs' damages claims.  That result violates both the equitable treatment and adequate representation requirements of Rule 23(e) of the Federal Rules of Civil Procedure.

The settlement does not provide fair or adequate relief for the Target Plaintiffs or anyone else.  Defendants' ability to set "default" interchange rates, which the Second Circuit identified as a primary target for injunctive relief, is left undisturbed.  The Class that was supposed to dismantle the Rules now, incredibly, has *agreed* to an affirmative statement that Defendants have a "right" to set prices for thousands of member banks.  The "rate relief" the settlement would impose *by court order* and then insulate for five years is an overt price-fixing agreement between Visa and Mastercard, the primary erstwhile competitors in the highly concentrated payment card market.  The settlement also does not dismantle the unlawful horizontal agreement imposed by the HAC rules; instead, class members will be *forbidden* to challenge those rules for five years, destroying the Target Plaintiffs' statutory *right* to an injunction against these rules if they prevail at trial.  Finally, the settlement would limit the Target Plaintiffs' ability to surcharge to an amount far below their actual cost of acceptance, authorizing Defendants to punish surcharging merchants with even higher interchange rates.

Even if the troubling antitrust implications of the settlement could be set aside (they cannot), the "rate relief" touted in the settlement is illusory. The agreement to provide *average* "rate relief" is subject to manipulation: it allows Defendants to offer discounts to favored merchants that could consume the entirety of the "relief," leaving other class members with no consideration for their release at all. The *posted* "rate relief" does not roll back even the increases on the already supracompetitive rates that Defendants have implemented since the Target Plaintiffs filed their case. It bears emphasis: what the class touts as "rate relief" is a brazen price fixing agreement that the Defendants—and the Class—want the Court to immunize from antitrust consequences.

Judge Leval presciently wrote that the prior, rejected settlement was "not a settlement; it [was] a confiscation." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 241 (2d Cir. 2016) (Leval, J., concurring). This one is an abdication of the duties the Class Representatives and Class Counsel assumed to treat all class members equitably, to represent them fairly, and to obtain meaningful, class-wide relief for them all. This settlement threatens terrible consequences for the class members. For five years, if the settlement is approved, they will be subject to a mandatory price-fixing settlement that Defendants have used to reinforce their ongoing anticompetitive practices, expand them to the digital wallets, prevent any *real* rollback of their supracompetitive prices, and delay trial of claims that would—if permitted to proceed—in all likelihood dismantle the Rules entirely. No part of this settlement merits preliminary approval.

## II.   ARGUMENT

The proposed settlement does not satisfy the criteria of Rule 23(e) of the Federal Rules of Civil Procedure. It treats the Target Plaintiffs, who are differently situated from the rest of the Class, inequitably and discriminates against them, giving rise to the same breach of the duty of

adequate representation that prompted the Second Circuit to reject the prior, unified class settlement. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d at 234 (duty of adequate representation is violated when there are "unacceptable incentives for counsel to trade benefits to one class for benefits to the other in order to somehow reach a settlement."). Also contrary to the requirements of Rule 23(e), the settlement demonstrably fails to provide fair, reasonable, or adequate—and class-wide—relief. This Court should reject the settlement, afford the Target Plaintiffs the ability to opt out, or redefine the Class and modify the settlement terms to exclude the Target Plaintiffs in view of the important differences between them and other Class members.[2]

### A.    The Settlement Treats the Target Plaintiffs Inequitably.

The Target Plaintiffs opted out of the Rule 23(b)(3) settlement, are not subject to its release, and have preserved the right to try both their damages and injunctive relief claims. In the words of the Supreme Court in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 364 (2011), they "decide[d] for themselves whether to tie their fates to the class representatives' or go it alone" and chose the latter course. They have actively pursued their claims for years, have prevailed over Defendants' four summary judgment motions, and are ready to proceed to trial.

The Class Representatives and most of the Rule 23(b)(2) Class did *not* opt out of the Rule 23(b)(3) settlement. They voluntarily agreed to the terms of the Rule 23(b)(3) release—which covered all damages *and* any right to pursue individual injunctive relief claims other than the class injunctive claims asserted in the *Barry's* action. *See* ECF No. 7818, Final Approval Order ¶¶ 16(C)(a), (F)(a) & Ex. 1. They did not choose to "go it alone," specifically agreeing to "tie

---

[2] The Target Plaintiffs also adopt the arguments made by the 7-Eleven Plaintiffs and the Grubhub Plaintiffs in their objections to the proposed Rule 23(b)(2) settlement.

their fates" and their ability to obtain injunctive relief to this Rule 23(b)(2) class.[3]  *Dukes*, 564 U.S. at 364.

The Rule 23(b)(2) settlement treats unfairly every plaintiff—including the Target Plaintiffs and the Direct Action Plaintiffs ("DAPs")—that opted out of the prior settlement.  It destroys their chosen right to "go it alone," imposing in its place a mandatory release by the Target Plaintiffs of the *individual* injunctive claims they preserved.  *See* ECF No. 9179-2, Settlement Agreement ("SA") ¶¶ 80, 82 103.  Under the settlement, the Target Plaintiffs receive no special consideration for this mandatory release of their ability to control and obtain the statutory remedy of injunctive relief if they prevail at trial.  This distinguishes the Target Plaintiffs from the rest of the Rule 23(b)(2) Class, who will receive payments from the Rule 23(b)(3) settlement fund for release of individual injunctive claims in the Rule 23(b)(3) settlement.  By its express terms, the mandatory release impairs, after the fact, the opt-out decision the Target Plaintiffs made years ago, extinguishing—for no compensation—their due process-protected right to "go it alone."

Because of the factual differences between the Target Plaintiffs and the vast majority of the Class, the Target Plaintiffs and the Class are not "treat[ed] . . . equitably relative to each other," Fed. R. Civ. P. 23(e)(2)(D), in three key ways.[4]  In addition, the Class clearly has not provided adequate representation to the Target Plaintiffs within the meaning of Rule 23(e)(2)(A).

---

[3] There is substantial overlap in membership of the Rule 23(b)(3) and Rule 23(b)(2) classes because they are defined using the same basic elements.  *Compare* ECF No. 7818, Final Approval Order ¶ 1 *with* ECF No. 9179-8, Class Settlement Notice and Scheduling Order ¶ 5.  Sixteen million notices of the settlement were sent to Rule 23(b)(3) class members and only 675 opted out.  *See* ECF No. 7776, 2019 Suppl. Rpt. of Claims Administrator & Ex. A.  More than 99.99% of the Rule 23(b)(3) class members released their claims, so the vast majority of the Rule 23(b)(2) class also are subject to the Rule 23(b)(3) release.

[4] This Court previously held that there is no additional "cohesion" requirement in Rule 23(b)(2) beyond what is found in the requirements of the Rule itself.  *See* ECF No. 8647, Mem. & Order, at 103-06.  The different circumstances of the Target Plaintiffs, the DAPs, and the vast majority of Class members in this case demonstrate, concretely, why "cohesion" is a necessary element in any mandatory class that lacks

### 1.   Inequitable Delay of the Target Plaintiffs' Trial-Ready Claims

The stay and injunction terms of the settlement and proposed Order uniquely affect and harm the Target Plaintiffs, the DAPs, and their trial-ready claims.  The settlement states it shall not release:  "Any claim of a Rule 23(b)(2) Class Releasing Party seeking monetary damages *but not any form of declaratory, injunctive, or equitable relief with respect to the claims released herein*."  SA ¶ 85(c) (emphasis added); *id.* ¶ 86.  The proposed Order preemptively enforces the release *before* the settlement has received final approval:  if issued, it would stay "*all further proceedings* in MDL 1720 to the extent they seek declaratory, injunctive or equitable relief against the Defendants *that is being released*" and enjoin "all members of the Rule 23(b)(2) Class, pending the Court's determination of whether the Rule 23(b)(2) Class Settlement Agreement should finally be approved . . . from . . . maintaining, or participating in . . . *any claims being released* against the Rule 23(b)(2) Class Released Parties."  ECF No. 9179-8, Proposed Order ¶¶ 20, 21 (emphasis added).  Because most of the Class released their individual monetary and injunctive claims in the Rule 23(b)(3) settlement, *only* the Target Plaintiffs and DAPs are affected by those terms—especially now that their claims are ready for trial.

Defendants have already invoked these unfair, conflict-laden terms to try to delay any trial of the Target Plaintiffs' claims until after completion of the settlement final approval process and presumably any appeal.  *See* ECF No. 9201, Defs.' Letter of Apr. 10, 2024, at 1 (arguing that no trial or remand schedule for the Target Plaintiffs' claims should be set because "the proposed approval order would expressly enjoin pursuit of such equitable relief, which already has been subsumed by the mandatory class.").  Defendants argue the bald proposition that the Target Plaintiffs *must* prospectively give up their injunctive claims now if they want to

---

opt-out rights.  *See, e.g.*, *In re E.I. Dupont de Nemours & Co. C-8 Pers. Inj. Litig.*, No. 22-0305, 2022 U.S. App. LEXIS 25452, at *23 (6th Cir. Sept. 9, 2022).

try their damages claims timely—even though the settlement has not been approved and inclusion of the Target Plaintiffs in the Rule 23(b)(2) Class has not been tested on appeal.[5]

This is extraordinarily prejudicial and uniquely discriminatory to the Target Plaintiffs. The delay this imposes, as the price of preserving the Target Plaintiffs' settlement objection and appellate rights, is entirely uncompensated. Prejudgment interest does not apply to federal antitrust claims. *See*, *e.g., Strobl v. New York Mercantile Exch.*, 590 F. Supp. 875, 882-83 (S.D.N.Y. 1984) (collecting cases). Accordingly, to preserve their due process right to object to the settlement and appeal it (if necessary), the settlement condemns the Target Plaintiffs and other DAPs to suffer an automatic, indefinite, and uncompensated delay of the trial of their damage claims—claims the Class does not own and that it has no right, under *Dukes* or otherwise, to impair or compromise.

The settlement creates another, uniquely prejudicial issue for the Target Plaintiffs' treble damages claims. The Target Plaintiffs' claims will continue to accrue damages until they are resolved at trial. The settlement appears initially to recognize this when it carves out of the

---

[5] The settlement includes another provision that purports to preclude the Target Plaintiffs from obtaining appellate review of actions related to the Rule 23(b)(2) class. Paragraph 109 states:

> In the event that the provisions of the Rule 23(b)(2) Class Settlement Order and Final Judgment are asserted by any Defendant or Rule 23(b)(2) Class Released Party as a ground for a defense, in whole or in part, to any claim or cause of action, or are otherwise raised as an objection in any other suit, action, or proceeding by a Rule 23(b)(2) Class Plaintiff or member of the Rule 23(b)(2) Class, it is hereby agreed that ***the Rule 23(b)(2) Class Released Parties shall be entitled to an immediate stay of that suit, action, or proceeding until after the Court has entered an order or judgment determining any issues relating to the defense or objections based on such provision, and no further judicial review of such order or judgment is possible.***

(emphasis added). This provision, which prospectively bars any judicial review of the propriety of the "springing stay" it imposes affects *only* the Target Plaintiffs and the DAPs. No counsel fairly representing these uniquely affected class members would have agreed to deprive them of due process and appellate rights *ab initio* and regardless of the merit of the defense asserted. That Class Counsel agreed to this extraordinary provision is further proof of the inherent, incurable conflict in the settlement itself.

release, "[a]ny *claim* of a Rule 23(b)(2) Class Releasing Party seeking monetary damages but not any form of declaratory, injunctive, or equitable relief with respect to the claims released herein." SA ¶ 85(c). It does not say, however, that Defendants cannot invoke the illusory forward-looking relief provided in the settlement—relief the Target Plaintiffs may never even receive—to cap or bar the additional damages the Target Plaintiffs will certainly suffer between the time the settlement is approved and trial or until any trial judgment is resolved on appeal.

This is a multi-million dollar oversight on the part of the Class, but the consequences of it will be borne solely by the Target Plaintiffs. As the Court is aware from filings the Target Plaintiffs made under seal, Visa's and Mastercard's interchange rates are supracompetitive. *See* ECF No. 8526-12, Harris Rpt. ¶¶ 923-29 & Ex. 67 (narrow single price analysis) and ¶¶ 934-39 & Ex. 68 (broad single price analysis) (filed under seal), attached to Szanyi Decl. as SJDX 391. An illusory "rollback" of 4 basis points (if the Target Plaintiffs even receive that) will *not* compensate them for the supracompetitive rates they will continue to endure until trial, after and if the settlement is approved. No argument and no law supports any right of the Rule 23(b)(2) Class to compromise or cap the Target Plaintiffs' *damages* claims in this settlement. Accordingly, this Court should decline to approve the settlement unless it includes the following modification to paragraph 85, which we illustrate in bold-faced print below:

> 85.      Notwithstanding anything to the contrary in Paragraphs 80-84 above, the release in Paragraphs 80-84 above shall not release
>
> …
>
> (c) Any claim of a Rule 23(b)(2) Class Releasing party seeking monetary damages **(a "Direct Action Claim"). For the avoidance of doubt, the calculation of the damages for any Direct Action Claim shall not be affected or reduced in any way as a result of any provision of this Rule 23(b)(2) Class Settlement.**

8

Stated bluntly, the fact that Class Counsel agreed to a settlement that Defendants are now using to impose millions of dollars of uncompensated delay—and potentially billions of dollars of uncompensated damage caps on the Target Plaintiffs—is reprehensible.  No one disputes that the Target Plaintiffs have preserved and are entitled to try their damages claims and to receive 100% of the damages they prove at trial, trebled.  These discriminatory provisions must be excluded from the settlement now, because they cannot be reconciled with due process.

Defendants' claim that they would be prejudiced by that approach because they "would face an indeterminate set of potential consequences," ECF No. 9199, Defs.' Resp. to Grubhub Pls.' Mot. for a Suggestion of Remand, at 7, is false on its face.  Pretrial activities for those claims can certainly proceed while this Court evaluates the settlement.  And no stay can or should be imposed to *prevent* the Target Plaintiffs from trying their damages case while they challenge this settlement or appeal it.  In fact, in 2019, the Target Plaintiffs, Defendants, the Rule 23(b)(2) Class, and other DAPs agreed to a stipulation that "the issue of the scope and form of any injunctive remedy will not need to be adjudicated, if at all, until after liability is resolved." *See* ECF No. 7397, Stip. & Proposed Order, at 1.  Defendants have thus already *agreed* that the "scope and form" of injunctive relief would be reserved until after any liability finding, *id.*, and the stipulation was so ordered by this Court on April 18, 2019.

If the Court ultimately concludes the Class should be redefined to exclude the Target Plaintiffs or gives them opt-out rights, removing these provisions in the settlement and proposed Order ensures their case will not have been unnecessarily delayed.  If the Court approves the settlement and orders that the Target Plaintiffs may not seek injunctive relief, removing these provisions ensures they can proceed to trial on their damages claims, unfettered, while they challenge that ruling on appeal.

The Class's agreement to a one-sided stay and injunction imposed *only* on the Target Plaintiffs and DAPs is inequitable and a clear breach of their duty of adequate representation. There is also no basis for terms that could, like Paragraph 85(c), be argued *later* to operate as a cap on damages the Target Plaintiffs can eventually recover.  What the Target Plaintiffs seek is only what they are entitled to under *Dukes*: a prompt trial of their *entire* and unfettered damages claims with injunctive relief reserved until after liability is determined.  That outcome is fully consistent with Defendants' stipulation, the Court's prior orders, and due process.

    2.    *Release of the Target Plaintiffs' Individual Injunctive Claims*

The settlement seeks to release the Target Plaintiffs' ability to control their valuable individual injunctive claims in exchange for *nothing*.  The Target Plaintiffs *retained* their individual injunctive relief claims but will receive *no compensation of any kind* for them, even though those claims have survived summary judgment and are poised for trial.  Most of the Class, in contrast, released their individual injunctive relief claims and were compensated for that release through their participation in the Rule 23(b)(3) settlement fund—agreeing, in exchange for that compensation, only to pursue injunctive relief through the Rule 23(b)(2) class, which is by its nature is limited to class-wide injunctive relief, rather than the plaintiff-specific relief sought by the Target Plaintiffs.  *See* ECF No. 7117, Target Pls.' Second Am. & Supp. Compl. at 79-80 (seeking individual injunctive relief to remedy past anti-competitive conduct in ¶ C.3-7 of the Prayer for Relief).

Such a result is plainly inequitable.  In overturning the prior combined settlement, the Second Circuit found "unequal intra-class treatment" because some class members could benefit from surcharging relief while others could not.  *Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d at 238.  The Court observed:  "There is no basis for this unequal intra-

class treatment: the more valuable the right to surcharge (a point the parties vigorously dispute), the more unfair the treatment of merchants that cannot avail themselves of surcharging." *Id.* Anticipating what has now come to pass here, the Court added, "This is a matter of class counsel trading the claims of many merchants for relief they cannot use: they actually received nothing." *Id.*

The fact that the Target Plaintiffs will receive *nothing* for giving up valuable individual claims and potential remedies mandated by federal law,[6] and must instead suffer an indefinite stay of their damages claims if they protest, while the Class will receive *more* money for injunctive claims they were already paid to release in the prior Rule 23(b)(3) settlement, creates the same intra-class conflict and repeats the identical, obvious unfairness that caused the Second Circuit to reject the prior settlement. The Court should not accept it here.

That the Class has acquiesced in Defendants' position that the settlement can require the Target Plaintiffs to forsake their injunctive claims as the price of a prompt trial on their damages claims exacerbates the inequitable treatment and also violates *Dukes*. Defendants apparently believe—wrongly[7]—that the Target Plaintiffs can be forced through the settlement to either give

---

[6] Equitable and injunctive remedies to halt anticompetitive practices are afforded to successful antitrust plaintiffs by Section 16 of the Clayton Act, 15 U.S.C. § 26. If the Rule 23(b)(2) settlement precludes the Target Plaintiffs from obtaining such remedies, it would defeat the congressional purpose of encouraging private parties to enforce the antitrust laws through private litigation—a purpose that is well-served by injunctive relief, which can "effectively pry open to competition a market that has been closed by defendants' illegal restraints." *Int'l Salt Co. v. United* States, 332 U.S. 392, 401 (1947).

[7] Because this Court's class certification order "may be altered or amended before final judgment," Fed. R. Civ. P. 23(c)(1)(C), the Target Plaintiffs should not be required to forfeit their right to seek injunctive relief as a condition of moving forward with their damages claims. Indeed, settlement is a point at which a fresh look at certification is warranted because "[t]he terms of the settlement themselves, or objections, may reveal divergent interests of class members." 2003 Adv. Comm. Notes to Rule 23. Here, reevaluation is proper given the manifest conflicts that inhere in the settlement, the inequitable treatment it imposes upon the Target Plaintiffs, and the fact that it delivers none of the injunctive relief the Class sought. But even if this Court declines to decertify the class, the Target Plaintiffs are entitled to test that ruling on appeal—just as they did when they filed their claims in 2013, maintained and pursued them after Judge Gleeson approved the prior combined settlement, and then successfully obtained reversal of

up their injunctive claims forever, forgoing both their right to appeal their inclusion in the Rule 23(b)(2) Class and their injunctive claims, or endure further, indefinite delay of trial of their damages claims.  As explained above, the discriminatory and conflicted nature of this agreement is obvious:  *only* the Target Plaintiffs and DAPs would be required to give up judicial review rights in exchange for obtaining a prompt trial of damages claims that already have been pending for more than a decade.  *Dukes* forbids this.  The Target Plaintiffs cannot be compelled to wrestle their claims out of the hands of Class Counsel, nor can they be extorted by the threat that those claims will be extinguished or impaired in an unfair, unequal settlement engineered by Class Counsel they did not choose.

All of the following conflicted provisions must therefore be removed or made expressly inapplicable to the Target Plaintiffs and the other DAPs before any approval of the settlement can be considered:  ECF No. 9179-9, Proposed Order ¶¶ 20, 21; SA ¶¶ 85(c), and 86, and 109.

### 3.    *Impact on the Target Plaintiffs' Monetary Claims*

At the core of the Target Plaintiffs' Complaint are claims that, through use of the Rules and other anticompetitive practices, the Target Plaintiffs are forced unlawfully to pay fixed and supracompetitive fees to purchase transactions on the Visa and Mastercard networks.  These are classic *monetary* claims, in which the Target Plaintiffs seek to recover overpayments caused by the illegal practices.  These overpayments, which are all monetary relief, would normally be *remedied* by a damages award, to compensate for past overpayments, and an injunction, to eliminate the anticompetitive conduct and prevent future overpayments.  The claims are the same, whether the relief looks backward at damages, or forward at an injunction, and are *all* claims for *monetary damages* and compensatory relief.  *See In re Visa Check/Mastermoney*

---

that ruling on appeal.  *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d at 240.

*Antitrust Litig.*, 297 F. Supp. 2d 503, 508–09 (E.D.N.Y. 2003) (future savings caused by interchange rate reductions classified as "compensatory relief").

Through the settlement, Class Counsel have attempted to seize control of the Target Plaintiffs' monetary damages claims by converting them into "equitable" claims that will, ostensibly, be released and compensated by the settlement's creation of artificial interchange rate averages, posted rate reductions, and rate caps that provide purely monetary relief posing as ersatz "injunctive" relief.  By doing so, the Class offers Defendants the prospect of immunity from future challenges that might overturn such practices, through mandatory release provisions they seek to force upon the Target Plaintiffs and the DAPs in a no-opt-out class settlement.  This violates Rule 23(b)(2) in two ways.

First, under Rule 23(b)(2) the final injunctive relief must be "appropriate respecting the class as a whole," so that the remedy is "indivisible" rather than "individualized."  *Dukes*, 564 at 360-61 .  Here, the surcharging relief and the other rate "relief" is highly individualized.  It envisions different rates for surcharging and non-surcharging merchants, and rate tables where the interchange rates differ by categories of merchants.  The rate relief also is not class-wide.  Discounts given to large-volume merchants could account for and consume most or all of the average 7-basis point reduction promised in SA ¶ 33(a) (Visa) and ¶ 65(a) (Mastercard), without providing any benefit to the Target Plaintiffs.

This is not a figment of the Target Plaintiffs' imagination:  the Rule 23(b)(2) Class experts noted that Defendants often make special interchange rate deals with large merchants with volume-related bargaining power.  *See* ECF No. 8455, Decl. of James A. Wilson, Ex. 9, Carlton Rpt. ¶¶ 9, 12-14, 28-29, 41-47 & 59.  Here, the settlement incentivizes those individual special deals, authorizing Visa and Mastercard to reach them with favored merchants.  This

13

empowers *the Defendants* to do exactly what the Class experts attacked, transforming what is supposed to be class-wide relief into a mechanism that treats individual class members differently from everyone else.  This highly individualized treatment is forbidden by Rule 23(b)(2), which authorizes class-wide treatment only where it will provide indivisible, class-wide remedies.  As one court explained:

> Plaintiff cannot seek certification under Rule 23(b)(2) by combining an array of remedies, some of which will benefit only certain subsets of the class, and contending that each member of the class can avail himself or herself of one or more of the proposed remedies.  Rule 23(b)(2) demands that plaintiff seek 'an indivisible injunction benefitting all its members at once.'

*Cholokyan v. Mercedes-Benz USA, LLC*, 281 F.R.D. 534, 559 (C.D. Cal. 2012) (quoting *Dukes*, 564 U.S. at 362).  This settlement does not provide a single, class-wide remedy benefitting each member of the class at once, so it cannot be approved under Rule 23(b)(2).

Second, Rule 23(b)(2) does not "extend to cases in which the appropriate final relief relates exclusively or *predominantly* to money damages."  Advisory Comm. Note to Rule 23 (emphasis added).  Under the rule announced by a unanimous Supreme Court in *Dukes*, a mandatory Rule 23(b)(2) class cannot be used in cases with "claims for individualized relief," such as "individualized award[s] of monetary damages," and class members' individualized claims cannot be precluded without affording them opt-out rights.  564 U.S. at 360-61.  These procedural protections of Rule 23 and the Due Process Clause also apply to claims for monetary damages that will arise in the future.  *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 846 (1999) (discussing termination of monetary claims as a serious due process problem even though a large segment of the disputed claims were by "future claimants" who had no claim for damages at the time of settlement).

It bears emphasis that here, the vast majority of the Rule 23(b)(2) class members settled their damages and injunctive relief for *money* in the Rule 23(b)(3) settlement.  Now, the Class

seeks approval of a settlement that offers *no* rules relief—the premise for which the class was initially certified—but instead offers even more *money* to class members who have already been paid to release their individual damages and injunctive claims, doing so at the expense of the Target Plaintiffs and the other DAPs who have been paid nothing because they have released nothing.  Seen for what it is, the settlement's trumpet of $30 billion in "rate relief" is indisputably *monetary relief*, shoehorned into a quasi-injunctive form to allow Defendants to secure a mandatory class-wide release.  This Court recognized this as a concern that might come to pass in its decision to certify the Rule 23(b)(2) class.  *See* ECF No. 8647, Mem. & Order, at 71-72 (noting that "the decisions suggesting inadequacy of representation involved class representatives who were attempting to shoehorn damages claims into Rule 23(b)(2) class actions—an approach clearly prohibited by [*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985)] and *Dukes*.").  That concern is now a reality.

The true characterization of the settled claims as *monetary* is confirmed by the Rule 23(b)(2) memorandum in support of preliminary approval of the settlement.  In its very first paragraph, Class Counsel claim the settlement is worth "*tens of billions of dollars* in both present and future benefits to the class."  ECF No. 9179-1, Class Pls.' Mem. in Supp. of Mot for Prelim. App. of Settlement, at 1 ("ERCP Mot.").  Because the settlement has now converted the Class's ostensible injunctive claims for *rules relief*—which is nowhere provided—into claims for additional, individualized monetary *rate relief* that is illusory, monetary claims also now predominate.  Accordingly, the Rule 23(b)(2) class cannot proceed *without* the due process protection of the opt-out right that *Dukes* mandates.[8]

---

[8] At minimum, if the Class is to continue as a class action under Rule 23(b)(2), the class definition must be revised to exclude the Target Plaintiffs and the other DAPs from its ambit.  This is the only way to remove the incurable, intra-class conflict created by the proposed settlement—in which the Class obtained

Courts have been vigilant in reviewing Rule 23(b)(2) class actions to ensure class counsel do not manipulate the class action process to convert monetary claims into purported "injunctive" claims that lack the protections afforded to members of Rule 23(b)(3) classes. The Supreme Court condemned the manipulation of claims to try to fit within the very limited contours of Rule 23(b)(2) in *Dukes*, 564 U.S. at 364, and other courts have held to similar effect.[9] In *McManus v. Fleetwood Enter., Inc.*, 320 F.3d 545 (5th Cir. 2003), the court reversed certification of warranty claims under Rule 23(b)(2), because the "ordinary relief" for such claims "would be money damages, not injunctive relief" so class members should receive the protections of notice and a right to opt-out, as Rule 23(b)(3) provides. *Id.* at 553-54. It was, the Court held, an abuse of discretion for the district court to allow "the Rule 23(b) classification to inform the appropriate remedy, instead of vice versa." *Id.* at 554. Here, matters are made even worse by a clear, intra-class conflict: *only* the Target Plaintiffs and the DAPs are affected by the settlement's conversion of classic monetary claims into claims that can be released by a Rule 23(b)(2) action, because the vast majority of the Class has already released—and been paid for— their individual monetary claims, while the Target Plaintiffs and the DAPs have not.

Similarly, if the Target Plaintiffs prevail at trial and secure a jury verdict that Defendants' actions violate the antitrust laws, *res judicata* would dictate that Defendants could not engage in those anticompetitive practices with respect to the Target Plaintiffs. The broad release language in the settlement raises the possibility, however, that Defendants would argue that the judgment

---

more *money* for their already released individual claims in exchange for an agreement to *bar* the *unreleased* individual injunctive claims of the Target Plaintiffs and the other DAPs.

[9] *See, e.g.*, *Costa v. FCA US* LLC, 2022 U.S. Dist. LEXIS 239194 (D. Mass. Sept. 30, 2022); *Slamon v. Carrizo (Marcellus) LLC*, 2020 U.S. Dist. LEXIS 87149 (M.D. Pa. May 18, 2020); *Creech v. Emerson Elec Co.*, 2019 U.S. Dist. LEXIS 66321, at *30-34 (S.D. Ohio Apr. 18, 2019); *Victorino v. FCA US LLC*, 326 F.R.D. 282 (S.D. Cal. 2018); *Phillips v. Ford Motor Co.*, 2016 U.S. Dist. LEXIS 177672 (N.D. Cal. Dec. 22, 2016); *Cholakyan v. Mercedes-Benz USA, LLC*, 281 F.R.D. 534, 559-60 (C.D. Cal. 2012).

could not have that effect—or, alternatively, that Defendants could continue to engage in the anticompetitive practices with respect to *all other participants in the payment card system*, leaving the Target Plaintiffs unable to take advantage of the benefits of actual competition awarded to them in a final judgment.

The harmful treatment of the Target Plaintiffs and their claims precludes any finding that "the proposal treats class members equitably *relative to each other*."  Fed. R. Civ. P. 23(e)(2)(D) (emphasis added).  The Advisory Committee notes to Rule 23 explain:

> Paragraph (D) calls attention to a concern that may apply to some class action settlements—inequitable treatment of some class members vis-a-vis others. *Matters of concern could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief.*

(Emphasis added).  As the Second Circuit recently noted, when "inequity arises from treating different class members the same," the "matters of concern" identified by the Advisory Committee become "substantively momentous."  *Moses v. N.Y. Times Co.*, 79 F.4th 235, 245 (2d Cir. 2023).  Those "substantively momentous" concerns are all present here.  Alone among the class members, the Target Plaintiffs and DAPs are being forced to release highly valuable, trial-ready claims that have survived summary judgment—and will get *nothing* in return for them. Alone among the class members, the Target Plaintiffs and the DAPs are subject to stay and injunction provisions that seek to further delay their ability to try their claims.  And, alone among the class members, the Target Plaintiffs and the DAPs are subject to release provisions that could affect their ability to recover the full *amount* of the overpayment injuries they have sustained by the time of trial.  The Target Plaintiffs are not remotely treated "equitably" relative to other class members: they are, instead, subjected to special harm, so the settlement should not be approved.

B.    **The Target Plaintiffs Have Not Been Adequately Represented.**

The Class has not adequately represented the Target Plaintiffs.  The settlement reflects one of the most pernicious aspects of inadequate and conflicted representation: the trading of claims possessed by some class members for remedies that only benefit other class members. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d at 238-39. Class Counsel's refusal to recognize the obvious differences between the Target Plaintiffs and DAPs, on one hand, and the rest of the Class on the other is evident in the manifestly inequitable treatment of the Target Plaintiffs and their claims.  This dynamic is not new, as the Second Circuit pointed out in disapproving the earlier settlement:

> Unitary representation of separate classes that claim distinct, competing, and conflicting relief create unacceptable incentives for counsel to trade benefits to one class for benefits to the other in order to somehow reach a settlement.

*Id.* at 234.  By failing to recognize the massive fault lines between those who have *released* their damages claims and those who have not, Rule 23(b)(2) counsel have reenacted the conflicted dynamic that required rejection of the prior settlement:

> Structural defects in this class action created a fundamental conflict between the (b)(3) and (b)(2) classes and sapped class counsel of the incentive to zealously represent the latter.  Apparently, the only unified interests served by herding these competing claims into one class are the interests served by settlement:  (i) the interest of class counsel in fees, and (ii) the interest of defendants in a bundled group of all possible claimants who can be precluded by a single payment.

*Id.* at 236.

The record shows the pernicious effect of this lack of adequate representation.  Unwilling to *try* injunctive claims that would have *eliminated* the anticompetitive rules they promised to challenge, Class Counsel have instead grabbed for more monetary relief.  But—excepting the Target Plaintiffs and the other DAPs—the rest of the class *does not have* monetary relief claims. In every sense, Class Counsel have done exactly what the Second Circuit decision prohibits:

they traded a release of equitable claims that would have afforded *permanent relief* to *all* class members for additional monetary relief that will flow, overwhelmingly, to class members whose claims have already been released and compensated fully.  In exchange for this release (which costs most class members nothing), the Class has agreed to support a settlement that:  a) could *bar* the future monetary claims for damages the Target Plaintiffs accrue between the settlement and the time of trial, and b) will delay the trial of their existing claims, inevitably and without compensation in the form of prejudgment interest, *unless* they agree to give up their preserved injunctive claims.  The conflict inherent in the settlement puts the Target Plaintiffs and DAPs— but *not* the rest of the Class—to an intentional Hobson's Choice:  they must knuckle under to the uncompensated release of their injunction claims or suffer an indefinite and uncompensated stay of their damages claims while they litigate and appeal the settlement.  Because *only* the Target Plaintiffs and DAPs are pursuing individual injunctive and monetary relief claims in their cases, and *only they* are on the cusp of trial, these provisions inflict unique, immediate, and conflicting injury on the Target Plaintiffs and DAPs.

This discriminatory and targeted harm directed at the Target Plaintiffs and other DAPs violates due process and the Class's duty of adequate representation.  Both harms could easily have been avoided had Class Counsel simply done what they promised:  pursued and obtained class-wide Rules relief dismantling default interchange and the Honor All Cards rules.  Failing that, if the releasing class members wanted more money for their already released claims, Class Counsel could and should have insisted that the Class be redefined to exclude the Target Plaintiffs and the DAPs.  But neither of those happened, because Defendants had no reason *to pay the Class more money* on claims they had already been paid to release *unless* Defendants got something in return; here, that "something" was a promise to mandate an indefinite delay of trial

19

of the Target Plaintiffs' claims, delivery of a release of the Target Plaintiffs' individual injunctive claims, and agreement to settlement provisions that could be employed to lock the Target Plaintiffs' damages in place now, *regardless* of what Visa and Mastercard do to increase those damages between now and the time of trial.

The pernicious conflict the Second Circuit condemned in the prior settlement has again borne poisonous fruit here.  In no ethical or rational world would counsel providing *zealous* and *adequate* representation to the Target Plaintiffs and the DAPs agree that they *alone* should bear the burden of accepting a stay and being bound by a decree potentially capping their damages[10] because the Class's damages claims have already been released and compensated.  But by making exactly that prohibited trade, and by agreeing to a selective agreement that injures and hobbles *only* the Target Plaintiffs and other DAPs, Class Counsel obtained a settlement in which they seek up to *$170 million* in fees *paid by Defendants* whom the settlement benefits enormously.  *See* ERCP Mot. at 43.  Heedless of their disqualifying conflict of interest, Class Counsel now boast that their success in keeping the Target Plaintiffs in the class against their will "increased the value of the injunctive relief *to the class as a whole*."  *See* ERCP Mot. at 6-8 (emphasis added). This bragging says the conflicted, quiet part right out loud: the increased value Class Counsel trumpets was, *they admit*, created by a transfer of value *from* the Target Plaintiffs

---

[10] Class Counsel's assertion about a "baseline cap," ERCP Mot. at 22, obscures this issue. The settlement reflects an agreement by Visa and Mastercard to fix their current prices in place for five years, in violation of the antitrust laws.  If this price-fixing agreement is approved by the Court, the Target Plaintiffs will continue to *pay* supracompetitive rates because the "baseline cap" is "the rate that existed on December 31, 2023," *id.*, and the rates were supracompetitive at that time.  Class Counsel chooses not to address this, but neither their memorandum nor the settlement agreement prevents *Defendants* from arguing that the Target Plaintiffs' future damages claims are barred because, as members of the mandatory class, they are bound by the forward-looking relief.  At minimum, therefore, the settlement must be amended to state plainly that the preservation of the Target Plaintiffs' damages claims in ¶85(c) forecloses any such argument.  *See supra* pp. 8-12.

and DAPs alone, not from the class, because the latter's claims had already been released in the Rule 23(b)(3) settlement.

For all these reasons, the proposed settlement and the conflicted actions of Class Counsel fail to provide adequate representation under Rule 23(c), so the settlement cannot be approved.

### C.      The Settlement Does Not Provide Fair, Reasonable, or Adequate Relief.

This Court premised its certification of a mandatory Rule 23(b)(2) class on the fact that the Class Complaint challenged a series of restraints, including the HAC rules and "default" interchange rules, and sought injunctive remedies that would provide relief to all members of the class.  *See* ECF No. 8647, Mem. & Order, at 50-52.  While acknowledging the concerns expressed by the Target Plaintiffs and DAPs about adequate representation and the nature of the relief that might be sought, this Court at the time found them speculative and premature.  *Id.* at 52-53, 57 & n.27.  Now, with the filing of the motion for preliminary approval, the issues are concrete and immediate.  The settlement does not afford class-wide "relief."  It is riddled with exceptions and conditions that ensure class members will be treated differently from one another, including provisions that discriminate, specifically, against the Target Plaintiffs and DAPs, for whom the settlement affords no relief at all.

The Second Circuit is adamant: in a settlement under Rule 23(b)(2) "no matter what, [all class members] *must* stand to benefit (it cannot be the case that some members receive no benefit while others receive some)."  *Berni v. Barilla S.p.A.*, 964 F.3d 141, 147 & n.28 (2d Cir. 2020) (emphasis in original).  This settlement openly violates this threshold requirement.  It forces the Target Plaintiffs and DAPs to release valuable individual injunctive claims without compensation, it delays only *their* claims through court-ordered stays and injunctions, and it could be read to cap only *their* damages, because other class members' damages claims have

already been released.  Where, as shown below, the only purported "relief" on offer is without value to the Target Plaintiffs, the settlement cannot be approved.

### 1.    *The Recycled Settlement Provisions*

Three features of the settlement are largely recycled from prior settlements and consent decrees:  maintaining the "no discounting" and "non-discrimination" and "all outlets" rules, SA ¶¶ 18-22, 50-54, and modifying rules on merchant "buying groups," *id.* ¶¶ 29-32, 61-64.  The Second Circuit found there was no "meaningful value" in this claimed relief.  *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d at 238 ("To the extent that the injunctive relief has any meaningful value, it comes from surcharging, not from the buying-group provision, or the all-outlets provision or the locking-in of the Durbin Amendment and DOJ consent decrees.").

### 2.    *The "Pilot Program" And "Honor All Wallets" Provisions*

The Second Circuit noted that the prior Rule 23(b)(3)/Rule 23(b)(2) settlement failed to provide "[a]lternative forms of relief [that] might have conferred a real and palpable benefit, such as remedies that affected the default interchange fee or the honor-all-cards rule."  *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d at 238.  The proposed settlement again provides no relief for these unlawful practices.

The "pilot programs" feature gives merchants a limited ability to test non-acceptance, by either declining *all* debit devices or *all* other products.  It maintains the HAC rules firmly in place and does *not* permit any merchant to test the impact of non-acceptance of specific products, such as the most costly cards issued by a particular bank.  SA ¶¶ 22-23, 54-55.  Instead, merchants are saddled with another all-or-nothing choice of Defendants' devising—just like the

all-or-nothing choice imposed by the HAC rules.  *See* ECF No. 9042, Mem. & Order of Jan. 8, 2024, at 9-10.

The "Honor All Wallets" relief similarly allows only for non-acceptance of digital wallets themselves, as opposed to the particular cards within a wallet.  The settlement does not allow merchants to decline acceptance of Visa or Mastercard payment cards within digital wallets owned or operated by those Defendants, thereby handing Visa and Mastercard a significant competitive advantage over other digital wallet competitors through the mechanism of a mandatory class action settlement.  SA ¶¶ 24-27, 56-59.

These narrow features are the sum of the "relief" that the Class identifies as related to the HAC rules.  It is "relief" in name only.  It leaves the Rules utterly untouched and instead insulates them from challenge for five years, ensuring there will be *no competition at all* among issuing banks for merchant acceptance during that period.  Rather than dismantling the Rules, the settlement reinforces them by setting them in judicial concrete.  The settlement does not relax Defendants' stranglehold grip on merchant acceptance: rather, it imposes additional merchant acceptance restrictions by court order.  And what must the Class do to reach this mirage of relief?  They, including the Target Plaintiffs, must release all injunctive claims related to "any actual or alleged . . . 'honor all cards' rules, 'honor all issuers' rules, 'honor all devices' rules, [and] rules requiring the honoring of all credentials or accounts" for the next five years, SA ¶ 82(b)(iii), and for the benefit of the Class (but to their sole detriment) the Target Plaintiffs must also accept an *indefinite* stay of their damages claims if they seek to challenge the settlement *at all*.  ECF No. 9179-8, Proposed Order ¶¶ 20, 21.

### 3. *The "Surcharging" Relief*

The surcharging relief is similarly limited.  It permits surcharging only at a "brand level" or "product level"—but not both—and allows Defendants to prohibit surcharging at the issuer

level, thus preventing merchants from employing a tactic they could use to generate competition among issuing banks. SA ¶¶ 28(a), (b), (d), 60(a), (b), (d). If a merchant accepts American Express and is subject to rules that do not allow surcharging of those cards—a condition that applies to *all* of the Target Plaintiffs—the allowable surcharge of Defendants' cards is capped at 1 percent. That amount is far below the actual cost of acceptance of Defendants' credit cards, which *the settlement itself says should be deemed 3 percent. Id.* ¶¶ 28(a), (b), 60(a), (b).

The settlement also permits Defendants to establish "default interchange rate structures" in which merchants who surcharge will pay *higher* interchange rates than merchants who do not. SA ¶¶ 28(g), 60(g). This is outrageous and wrong. A class certified to seek an injunction *against* the Rules that enabled supracompetitive prices has now agreed to a settlement that allows Defendants to punish surcharging merchants with even *higher* fees. This term of the settlement, like the others, has the perverse effect of insulating and reinforcing Defendants' supracompetitive interchange rates from the pricing pressure that could otherwise be imposed by surcharging high cost cards. The settlement's intentional choice to allow *higher* rates for surcharging merchants will inevitably reduce the incentive to surcharge and, therefore, reduce the competitive pressure on Defendants' already supracompetitive rates. Tellingly, the surcharging rules also will not apply equally to all class members: Defendants reserve the ability to enter into agreements with certain merchants that provide special benefits if those merchants do not surcharge, *id.* ¶¶ 28(f), 60(f), and by extension, retain the right to selectively *punish* those merchants that do not knuckle under.

4.     *The Interchange Rate Relief is Unlawful Price Fixing*

The settlement includes several terms ostensibly related to interchange rates but none dismantle Defendants' central price-fixing scheme—"default" interchange. Taken together,

24

these terms are nothing more than an attempt to impose a *new* price fixing scheme—albeit one that is embedded in and shielded by a court order. These terms are particularly surprising given that the injunctive relief class has survived summary judgment on their claims.

The first provision requires *system-wide* volume-weighted average effective interchange rates that are 7 basis points lower than the *combined* volume-weighted effective interchange rates on both Visa- and Mastercard-branded credit card transactions. Another involves a 4-basis point reduction in posted December 2023 interchange rates, and a third states that Defendants will not increase their posted rates for applicable transactions for the duration of the release. SA ¶¶ 33-35, 65-67. If approved, these terms would fix Defendants' rates for a period of five years, amounting to a *judicially sanctioned price-fixing agreement* between the two main competitors in a highly concentrated market. *See* ECF No. 9042, Mem. & Order of Jan. 8, 2024, at 43. This price-fixing provision is directed at a key tool Defendants use to manage and avoid price competition: setting interchange rates. *See* Mastercard, Annual Report (Form 10-K), at 28 (Feb. 14, 2024). Rule 23(b)(2) counsel offers no explanation as to how such an agreement by each network to bind itself to a *combined* weighted average price, *see* SA ¶65(a) (Mastercard binding itself to provide a *combined* system-wide volume-weighted average Effective Interchange Rate on Applicable Domestic Credit Transactions *on both Visa-Branded Credit Cards and Mastercard-Branded Credit Cards* ('the Average Effective Rate Limit') (emphasis added)) and *id.* at ¶ 33(a) (same provision for Visa), could ever comply with the antitrust laws— even if embodied in a court-approved settlement.

But the settlement goes even farther. It includes a mandatory and express statement by every Class member that Defendants "have the right to continue setting default and custom interchange rates and network fees." SA ¶¶ 38, 70. The settlement thus not only does not

*eliminate* the "default" interchange rate-setting that the Second Circuit identified as a target for injunctive relief, *see In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d at 238, it asserts Defendants have the "*right" to do so*. That dubious statement is directly contrary to allegations of the Target Plaintiffs' Complaint, *see, e.g.*, ECF No. 7117, Target Plaintiffs' Second Am. and Supp. Complaint, at ¶¶ 188-91, 201-04, 216-19, 229-32, and to applicable law, which prohibits price fixing.

In the guise of a settlement, Class Counsel, Visa and Mastercard ask this Court to impose an overt price-fixing agreement between two networks that process 80% of the nation's credit transactions, one that allows them to make identical pricing and rules changes and to *maintain* their supracompetitive high prices at a specified "*combined system-wide* volume-weighted average Effective Interchange Rate." SA ¶¶ 33(a), 65(a). If this unlawful price-fixing agreement is approved, Visa and Mastercard will act *together* to impose coordinated supracompetitive prices that *all merchants* must pay for credit transactions, which prices will be imposed and policed by a court order.

Even to state the reality is to demonstrate why the Court should not approve this. But this is, without question, what is sought. Specifically, the Class asks this Court to give its imprimatur to the following agreements between the biggest payment networks in the United States:

- Identical "reductions" in the published interchange rates for the next three years. These "reductions" in many respects leave interchange rates higher than when the Target case began. SA ¶¶ 34-35 (Visa) and ¶¶ 66-67 (Mastercard).

- Identical percentage "reductions" in network-wide effective interchange. The effective interchange rates across each network are significantly higher than when this litigation began, or even what those rates were before the pandemic. *Id*. ¶ 33 (Visa) and ¶ 65 (Mastercard).

- Identical modifications of network rules regarding surcharging that limit surcharges to 1% under certain circumstances if applied only to either or both networks, allow the network to raise rates for surcharging merchants, and limit overall surcharging to 3% if other networks also are surcharged. *Id*. ¶ 28 (Visa) and ¶ 60 (Mastercard).

- Identical modifications to rules regarding digital payment wallets that prohibit merchants from declining acceptance of Visa and Mastercard cards in any payment wallet owned or operated by Visa or Mastercard. *Id*. ¶¶ 24-27 (Visa) and ¶¶ 56-59 (Mastercard).

- Identical modifications of rules regarding merchants' ability to test non-acceptance at stores within a particular banner. *Id*. ¶¶ 21-23 (Visa) and ¶¶ 53-55 (Mastercard).

The settlement does not afford *class-wide* rate relief, either. Instead, as noted above, it allows Defendants to enter into special deals with certain merchants and has other individualized features. *See* SA ¶¶ 33(c)(ii), (iii), 65(c)(ii)-(iii). These provisions represent an abrupt change from the prior views of Rule 23(b)(2) class expert Professor Stiglitz, who opined that the Court should mandate class treatment to *prevent* "special deals" between Defendants and "premium merchants" because they impair competition. ECF No. 8455, Decl. of James A. Wilson, Ex. 10, Stiglitz Rpt. ¶¶ 141, 166, 177. The Rule 23(b)(2) Class offers no explanation for this 180-degree about-face. In addition, because the 7-basis point reduction is based on a comparison to the average of the *combined* interchange rates of Visa and Mastercard—a contrived approach that has no parallel in the real world where Defendants maintain separate rates—the "average" has the effect of giving a Defendant whose rate in a particular category happens to be lower the benefit of an easier road to compliance, because it benefits from the higher rate of its competitor.[11]

Most important, the Class admits that the average *7-basis point* reduction would not even roll back the rate increases Defendants have implemented since the Target Plaintiffs' case was filed in 2013. According to Class Counsel, "each network's average rate of interchange increase over just the last 10 years has been about one basis point per year," ERCP Mot. at 22. That

---

[11] A hypothetical illustrates this point. Assume Mastercard has an interchange rate of 124 basis points, while Visa's rate is 100 basis points. Setting aside weighting, the raw *average* of those is 112 basis points. In that universe, Visa is *already* more than 7 basis points below the *average* effective interchange rate, so it would not have to roll back its rates at all to comply with the settlement.

means the average rate of increase since 2013 has been *11 basis points*—which is why Class Counsel speak of "halting the 'interchange fee price spiral,'" *id.* at 21, rather than making meaningful, affirmative *reductions* in the ever-increasing and already supracompetitive rates merchants pay.

The Visa rate table in the settlement reveals that individualized elements predominate in this "relief," too.  The interchange rates for "Visa Infinite Spend Qualified" range from a low of 1.15% and $0.25, for "fuel," to a high of 3.15% and $0.10, for "Non-Qualified Consumer Credit."  SA App'x I at 1-3.  Even though the interchange rates in the second category are more than double the rates in the first category, the merchants in both categories receive the same 4-basis point reduction in posted rates.  A "fuel" merchant might agree to a reduction in their rate to 1.11% in exchange for giving up their claims, whereas a "non-qualified consumer credit" merchant might conclude that reducing its rate to 3.11%—far higher than what other merchants pay—is not fair or adequate competition for a long-term release of antitrust claims.

There is yet another, fatal problem.  The Court certified this Class on the theory that the Class would pursue injunctive relief against Defendants' anticompetitive rules, but those rules are not dismantled by this settlement.  As a result, though this is an *equitable relief* class certified under Rule 23(b)(2), the relief the class has sought and that the settlement proffers is overwhelmingly monetary.  Where monetary relief claims are asserted or resolved on a class-wide basis, an opt-out right must be provided, *Dukes*, 564 U.S. at 363, because "the absence of notice and opt out violates due process."  *Id.*  (*citing Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985)).  Since this class action has unquestionably morphed into a monetary relief action, with money shoehorned into the language (but not the reality) of injunctive relief, due process and *Dukes* leave the Court no alternative: it must either provide an opt-out right or

entirely exclude those parties with money damages claims from the ambit of the class-wide release. Because only the Target Plaintiffs and DAPs have individual injunctive and damages claims affected by these provisions, the settlement cannot be approved without an opt-out right for the Target Plaintiffs and DAPs.

### 5. The Class Release

The settlement requires that the Target Plaintiffs release any "declaratory, injunctive, or equitable relief" claims relating to the setting of interchange rates and the HAC rules, SA ¶ 82(b)(i), (iii), even though the settlement does not meaningfully address the anticompetitive effects of those rules. The release does not stop there, however. It also releases claims related to "Merchant Fees"—"any amount that reduces from the face amount of a transaction the funds that a merchant receives in the settlement of a Credit Card or Debit Card transaction, or is otherwise charged to or paid by a merchant, or any interchange fee, network fee or assessment, or acquirer, issuer, or processor fee, including Visa's Fixed Acquirer Network Fee," *id.* ¶¶ 1(t), 82(b)(ii)—as well as *claims related to rules the settlement does not address*, like the "no bypass" rules, "no multi-issuer" rules, "no multi-bug" rules, "routing rules," "PAVD rules," and "rules or conduct relating to routing options regarding acceptance technology for mobile, e-commerce, or online payments," among others. *Id.* ¶ 82(b)(iii). The release is not fair or reasonable for that reason.[12]

---

[12] *See Guy v. Convergent Outsourcing, Inc.*, No. C22-1558, 2023 U.S. Dist. LEXIS 226068, at *15 (W.D. Wash. Dec. 19, 2023) (class settlement release that could "reasonably be read to expand the scope of the release to prevent any claims against [defendant] based on facts that do not relate to the claims at issue" was overly broad and prevented preliminary settlement approval); *Cashon v. Encompass Health Rehab. Hosp. of Modesto, LLC*, No. 1:19-cv-00671, 2023 U.S. Dist. LEXIS 169355, at *21-22 (E.D. Cal. Sept. 21, 2023) (class release that included claims that were not alleged on a class basis was overly broad and prevented settlement approval); *In re Kia Hyundai Vehicle Theft Litig.*, No. 8:22-ml-03052, 2023 U.S. Dist. LEXIS 210622, at *44-45 (C.D. Cal. Aug. 16, 2023) (release language that required class members to waive all claims against defendants that are "related to theft of a Class Vehicle" was ambiguous and overbroad).

Taken as individual provisions or as a whole, this settlement hits every negative touchstone noted by this Court in its summary of why the Second Circuit rejected the prior Rule 23(b)(2)/Rule 23(b)(3) settlement:

> The Second Circuit further held that the 'bargain that was struck between relief and release on behalf of absent class members' did not comport with due process because the bargain was 'so unreasonable that it evidence[d] inadequate representation.' [827 F.3d] at 236. The Second Circuit held that the relief provided to the (b)(2) class in the unitary settlement was insufficient because '[t]he most consequential relief afforded the (b)(2) class was the ability to surcharge Visa- and Mastercard-branded credit cards at both the brand and product levels,' which did not provide meaningful relief to merchants that 'accept American Express or operate in states that prohibit surcharging . . . and merchants that begin business after July 20, 2021,' the date that injunctive relief expired under the settlement, "gain no benefit at all.' *Id.* at 230, 238. The Second Circuit stated that more beneficial relief might consist of 'remedies that affected the default interchange fee or honor-all-cards rule.'

Mem. & Order [ECF No. 8647], at 40.

Judge Leval's conclusion in his concurrence remains apt: this is not a settlement, it is a confiscation. 827 F.3d at 241. It should be rejected by this Court.[13]

### D. **The Class Should be Redefined, or Opt-Out Rights should be Afforded.**

If not rejected outright for the many reasons described above, the Court should still take steps to cure the inadequate representation and intra-class conflict issues the settlement seeks to embed by modifying the proposed approval order.

First, the Second Circuit recognizes that "the language of Rule 23 is sufficiently flexible to afford district courts discretion to grant opt-out rights in (b)(1) and (b)(2) class actions."

---

[13] The settlement agreement contemplates that the terms of rules changes, the setting of interchange rates, and other material elements of the settlement will be determined after the Court grants preliminary approval. In addition, the experts for the Rule 23(b)(2) class indicate they may do additional work related to the settlement. To the extent that this Court grants preliminary approval to the settlement, the Target Plaintiffs therefore reserve their right to further address the lack of fairness, reasonableness, or adequacy in the settlement and to address the data and other information provided by the Rule 23(b)(2) class and its experts after those activities have occurred.

*McReynolds v. Richards-Cantave*, 588 F.3d 790, 800 (2d Cir. 2009) (internal quotations and citations omitted); *see also City of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1304-05 (2d Cir. 1990).  The Court has "plenary authority under Rule 23(d)(2) and 23(d)(5) to provide all class members with personal notice and opportunity to opt out, as though the class was certified under Rule 23(b)(3)."  *Lemon v. Int'l Union of Operating Eng'rs*, 216 F.3d 577, 582 (7th Cir. 2000).  *See also Dukes*, 564 U.S. at 363-64 ("The mere 'predominance' of a proper (b)(2) injunctive claim does nothing to justify elimination of Rule 23(b)(3)'s procedural protections: It neither establishes the superiority of *class* adjudication over *individual* adjudication nor cures the notice and opt-out problems.") (emphasis in original).

An opt-out right would cure *all* of the unequal treatment and class conflicts described above, because it would permit the Target Plaintiffs to "decide for themselves whether to tie their fates to the class representatives or go it alone," *Dukes*, 564 U.S. at 364, by choosing (as they have already done) to pursue *all* of their *unreleased* claims through counsel of their choosing, in a trial of their choosing, rather than having some of them pursued by counsel who represent, overwhelmingly, parties *without* damages claims that are *not* disposed to try the case at all.

Second, the Court could exercise its continuing authority under Rule 23(c)(1)(C) to redefine the Class to exclude the Target Plaintiffs, in view of the material factual differences between the Target Plaintiffs, who are currently pursuing individual injunctive and monetary claims, and the rest of the Class, who are not.  *See Vidal v. Wolf*, 501 F. Supp. 3d 117, 136 (E.D.N.Y. Nov. 14, 2020); *see also Long Island Lighting*, 907 F.2d at 1305.

Finally, as explained above, the Court should at minimum decline to approve the settlement without mandatory changes to its terms.  These changes should include the required elimination of discriminatory provisions in the settlement and the proposed approval order that

uniquely affect the Target Plaintiffs and the other DAPs, including ECF No. 9179-8, Proposed Order ¶¶ 20, 21; ECF No. 9179-2, SA ¶¶109, 85(c), and 86.  The Court should also mandate revisions to SA ¶¶85(c) and 86 to ensure those provisions foreclose any argument by Defendants that the "relief" provided in this settlement somehow caps or limits the Target Plaintiffs' rights to recover the *full* amount of the supracompetitive interchange and other damages they have incurred and will *continue to incur* until their claims are tried.

## III.    CONCLUSION

Every aspect of this settlement undermines the normal purpose of class certification—allowing small groups to band together to assert claims against a powerful defendant.  *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997).  This Class has instead allowed itself to be used as a *tool* by powerful Defendants to expand and insulate their supracompetitive price-fixing scheme, earning Class Counsel a potential $170 million fee in the process.  Now, the same Class urges the Court to lend its *imprimatur* to an unlawful price-fixing scheme, one it seeks to impose on unwilling merchants through a court order that insulates the Defendants from *any and all* attempts to enjoin their unlawful practices for a period of five years.  In the process, the settlement would force motivated parties who are on the verge of trial to release their claims and give up on their ability to finally halt anticompetitive practices that Defendants have employed for decades, in exchange for valueless "relief" they did not fashion and do not want.  No part of Rule 23 permits this, so the settlement should be rejected by this Court.

At a bare minimum, because the settlement as applied to the Target Plaintiffs is hopelessly conflicted and fails to meet the requirements of adequate representation and due process, the Court should either allow the Target Plaintiffs to opt out of the class or redefine the

Class to exclude the Target Plaintiffs and the other DAPs that are currently litigating their

claims.

 Dated:  April 26, 2024                        Respectfully submitted,


                                               VORYS, SATER, SEYMOUR AND PEASE LLP

                                               By:    /s/ James A. Wilson
                                               James A. Wilson
                                               Robert N. Webner
                                               Douglas R. Matthews
                                               Kimberly Weber Herlihy
                                               Alycia N. Broz
                                               Kenneth J. Rubin
                                               52 East Gay Street
                                               Columbus, Ohio 43215
                                               Telephone: (614) 464-6400
                                               Email: jawilson@vorys.com

                                               GIBBS & BRUNS LLP
                                               Kathy Patrick
                                               Barrett Reasoner
                                               1100 Louisiana Street, Suite 5300
                                               Houston, Texas 77002
                                               Telephone: (713) 650-8805
                                               Email: kpatrick@gibbsbruns.com

                                               *Attorneys for Target Plaintiffs*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on April 26, 2024, I caused a true and correct copy of the foregoing document to be served electronically on all counsel of record in the above-referenced action via the Court's CM/ECF system.

*/s/      James A. Wilson*

4/26/2024 48307947