UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| IN RE PAYMENT CARD INTERCHANGE | ) | |
| FEE AND MERCHANT DISCOUNT | ) | No. 05-md-01720 (MKB) (JAM) |
| ANTITRUST LITIGATION | ) | |
| | ) | |
| This Document Applies To: | ) | |
| _____ | ) | |
| | ) | |
| *Barry's Cut Rate Stores, Inc., et al. v. Visa,* | ) | |
| *Inc., et al.*, No. 05-md-01720 (E.D.N.Y.) | ) | |
| (MKB) (JAM), also now known as *DDMB,* | ) | |
| *Inc., et al. v. Visa, Inc., et al.*, No. 05-md- | ) | |
| 01720 (E.D.N.Y.) (MKB) (JAM). | ) | |
| _____ | ) | |

**WALMART'S OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY
APPROVAL OF PROPOSED MANDATORY SETTLEMENT**

## <u>TABLE OF CONTENTS</u>

**PAGE**

Preliminary Statement .................................................................................................... 1

Statement of Facts ......................................................................................................... 4

Argument ....................................................................................................................... 7

   I.   In the Proposed Settlement, the Named Plaintiffs and Class Counsel Have Sold Out the Large National Merchants' Interests, Violating the Adequacy of Representation and Cohesion Requirements ....................................................................................... 7

   A.  A Mandatory 23(b)(2) Class Requires a Unitary, Indivisible Interest .............................. 7

   B.  The Mandatory Class Defined in This Proposed Settlement Lacks Unity of Interests and Its Interests Are Not Indivisible ............................................................................ 9

   C.  The Proposed Settlement Demonstrates That the Class Representatives Failed to Adequately Represent the Interests of the Large National Merchants ........................... 11

   D.  The Terms of the Proposed Settlement Show That Class Counsel Sold Out the Interests of Absent Class Members Like Walmart ........................................................... 14

   II.  The Settlement's 5+ Year Release of the Class Members' Rights to Individually Enforce the Antitrust Statutes is Antithetical to Legislative Intent and Against Public Policy

   III.  If the Court Preliminarily Approves This Proposed Settlement, it Must Give the Class Members Who Would be Bound to it Notice and an Opportunity to Opt Out

Conclusion ..................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Express Co. v. Italian Colors Rest.*,
570 U.S. 228 (2013) ............................................................................................... 16

*AT&T Mobility LLC v. Fisher*,
2011 WL 5169349 (D. Md. Oct. 28, 2011) ............................................................ 17

*Batalla Vidal v. Wolf*,
501 F. Supp. 3d 117 (E.D.N.Y. 2020) .............................................................. 11, 17

*Biediger v. Quinnipiac Univ.*,
2010 WL 2017773 (D. Conn. May 20, 2010) .................................................... 17-18

*Brooklyn Sav. Bank v. O'Neil*,
324 U.S. 697 (1945) ............................................................................................... 16

*Broussard v. Meineke Discount Muffler Shops, Inc.*,
155 F.3d 331 (4th Cir. 1998)................................................................................... 10

*California v. Am. Stores Co.*,
495 U.S. 271 (1990) ............................................................................................... 15

*Coleman v. GMAC*,
296 F.3d 443 (6th Cir. 2002).................................................................................... 9

*County of Suffolk v. Long Island Lighting Co.*,
907 F.2d 1295 (2d Cir. 1990)............................................................................ 11, 17

*Demsheck v. Ginn Dev. Co., LLC*,
2009 WL 10663051 (M.D. Fla. Dec. 9, 2009) ....................................................... 17

*Eubanks v. Billington*,
110 F.3d 87 (D.C. Cir. 1997) ................................................................................. 17

*Flying J Inc. v. TA Operating Corp.*,
2008 WL 4923041 (D. Utah Nov. 14, 2008) .......................................................... 17

*Fowler v. Birmingham News Co.*,
608 F.2d 1055 (5th Cir. 1979)................................................................................. 18

*Fox Midwest Theatres v. Means*,
221 F.2d 173 (8th Cir. 1955)............................................................................. 16-17

ii

*FTC v. Actavis, Inc.*,
   570 U.S. 136 (2013) ............................................................................................. 16

*Fuller v. Fruehauf Trailer Corp.*,
   168 F.R.D. 588 (E.D. Mich. 1996) ...................................................................... 18

*Harris v. Union Pac. R.R. Co.*,
   953 F.3d 1030 (8th Cir. 2020) ............................................................................... 9

*Holmes v. Cont'l Can Co.*,
   706 F.2d 1144 (11th Cir. 1983) ............................................................................. 9

*Illinois Brick Co. v. Illinois*,
   431 U.S. 720 (1977) ............................................................................................. 15

*In re Literary Works in Elec. Databases Copyright Litig.*,
   654 F.3d 242 (2d Cir. 2011) .................................................................................. 9

*In re MTBE Prod. Liab. Litig.*,
   209 F.R.D. 323 (S.D.N.Y. 2002) .......................................................................... 9

*In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig.*,
   986 F. Supp. 2d 207 (E.D.N.Y. 2013) ............................................................ 3, 6
   *rev'd and vacated*, 827 F.3d 223 (2d Cir. 2016) ...................................... Passim

*In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig.*,
   2024 WL 278565 (E.D.N.Y. Jan. 25, 2024) ......................................................... 3

*In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig.*,
   2024 WL 1014159, at n.11 (E.D.N.Y. Feb. 22, 2024) .......................................... 1

*Innovation Data Processing, Inc. v. International Bus. Machs., Corp.*,
   585 F. Supp. 1470 (D.N.J. 1984) ........................................................................ 17

*Kartman v. State Farm Mut. Auto. Ins. Co.*,
   634 F.3d 883 (7th Cir. 2011) ................................................................................. 9

*Lawlor v. National Screen Serv. Corp.*,
   349 U.S. 322 (1955) ............................................................................................. 16

*McReynolds v. Richards-Cantave*,
   588 F.3d 790 (2d Cir. 2009) .......................................................................... 17, 18

*Minnesota Mining & Mfg. Co. v. Graham-Field, Inc.*,
   1997 WL 166497 (S.D.N.Y. Apr. 9, 1997) ........................................................ 17

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
   473 U.S. 614 (1985) .................................................................. 15, 16

*Ortiz v. Fibreboard Corp.*,
   527 U.S. 815 (1999) .................................................................. Passim

*Perry v. Amerada Hess Corp.*,
   1977 WL 1433 (N.D. Ga. July 7, 1977) ................................... 17

*Redel's Inc. v. General Elec. Co.*,
   498 F.2d 95 (5th Cir. 1974) ..................................................... 16

*Scholtisek v. Eldre Corp.*,
   229 F.R.D. 381 (W.D.N.Y. 2005) ........................................... 18

*Schwartz v. Dallas Cowboys Football Club, Ltd.*,
   157 F. Supp. 2d 561 (E.D. Pa. 2001) ..................................... 17

*Shook v. Board of Cnty. Comm'rs of Cnty. of El Paso*,
   543 F.3d 597 (10th Cir. 2008) ................................................. 9

*Valley Drug Co. v. Geneva Pharm., Inc.*,
   350 F.3d 1181 (11th Cir. 2003) .............................................. 9-10

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) .................................................................. 8, 9

*Weitzel v. Liberty Mut. Ins. Co.*,
   508 F.2d 239 (3d Cir. 1975) ..................................................... 9

**Statutes**

15 U.S.C. § 1 .................................................................................. 15

California Civil Code Section 1542 ............................................. 14

**Other Authorities**

Due Process, Class Action Opt Outs, and the Right Not To Sue,
   115 Colum. L. Rev. 599 (2015) ............................................... 18

*McLaughlin on Class Actions* § 5:15 (2012) ............................ 9

iv

Intervenor Wal-Mart Stores, Inc. ("Walmart") respectfully submits this Opposition to Plaintiff's Motion for Preliminary Approval of Settlement.

## PRELIMINARY STATEMENT

When Walmart intervened in this action to oppose certification of a Rule 23(b)(2) litigation class, it argued, *inter alia*, that Rule 23's requirements were not met and due process would be violated because the class representatives—who all are small local merchants ("Small Local Merchants")—had interests antagonistic to those of a separate group, large national merchants ("Large National Merchants") like Walmart.[1] Small Local Merchants were inadequate representatives of a class that includes Large National Merchants, Walmart explained, because Plaintiffs would trade off Walmart's interests to achieve their own: they would "abandon Walmart's interest in eliminating 'Honor All Cards' and other rules to get the right to surcharge consumers … [and] offer a settlement that prohibits opt-outs and grant[s] a broad, prospective release that Defendants no doubt would contend precludes Walmart from seeking different terms." ([Doc. 8471] at 6 (citing *In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig.*, 827 F.3d 223, 238-39 (2d Cir. 2016).) It is the Honor All Cards rules that inhibit competition, and any "equitable relief" settlement that leaves those rules in place offers only illusory relief, increases the likelihood that litigation over the central restraints at issue in this case will continue for decades, and fails to enforce the antitrust laws.[2]

---

[1] Walmart hereby incorporates by reference its submissions in support of its intervention [Docs. 8464, 8465, 8471], and in opposition to the certification of a 23(b)(2) litigation class [Doc. 8617].

[2] Although it is impractical for card issuers and networks to negotiate with Small Local Merchants because there are many thousands of them, it *would* be practical for them to negotiate with a Large National Merchant like Walmart. And Walmart, which already negotiates with thousands of vendors individually, is staffed and capable of conducting negotiations with the few thousand banks and card issuers, whereas an individual Small Local Merchant likely would not be. But so long as issuers are guaranteed that their cards must be accepted at Walmart stores because of the Honor All Cards rules, they have little incentive to negotiate directly with Walmart. *In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig.*, 2024 WL 1014159, at n.11 (E.D.N.Y. Feb. 22, 2024) ("Acquirors have no incentive to pay interchange fees above the default levels and Issuers have no incentive to accept interchange fees below the

1

In certifying the mandatory litigation class, this Court rejected Walmart's adequacy of representation, due process, and cohesion arguments principally because "Opponents' arguments regarding their preferred injunctive relief are premature and speculative." ([Doc. 8647] at 57; *id.* at 56 ("premature at this stage of the litigation"); *id.* at 52 ("the Court declines to make any judgments at this stage of the litigation").)

Now this Court is faced with concrete proof that Walmart and the other Objectors were right and the Small Local Merchants possess antagonistic interests that caused them to sell out the interests of the Large National Merchants in obtaining relief from the anticompetitive Honor All Cards rules. *Cf. In re Payment Card*, 827 F.3d at 236 ("Here, the bargain that was struck between relief and release on behalf of absent class members is so unreasonable that it evidences inadequate representation."). The Small Local Merchants are asking this Court to preliminarily approve a *mandatory* settlement—with *no* opt outs—that would:

- Leave intact the Honor All Cards rules that flagrantly violate the antitrust laws and are the single most important anticompetitive practice that Large National Merchants must obtain relief from;

- Provide "relief" that is meaningless to Large National Merchants, including: "group buying," which cannot meaningfully reduce rates because of the Honor All Cards rules and default interchange rates; "discounting" that might not be available to such merchants because of co-branding agreements; a surcharging procedure that does nothing to promote competition and would conflict with Walmart's "Everyday Low Prices" business model; and a small, time-restricted "rate cap" on interchange fees that is worthless to Large National Merchants, and the cap could in any event be circumvented simply by Defendants raising other rates (such as network assessments);[3] and

---

default levels."). If, however, Walmart could choose to accept or reject issuer's cards (*i.e.*, if the Honor All Cards rule were eliminated), then issuers would be incentivized to negotiate their rates with Walmart to ensure that Walmart would accept their cards. (*See also* [Doc. 8471] at 8 ("card-issuing banks … currently have little incentive to negotiate with Walmart because of the HAC rules."); [Doc. 8617] at 2-3 (Plaintiffs will "grant[] Defendants an extremely broad release of claims that lets them keep hampering competition through their HAC rules"), 4-6 ("ERPs will seek an injunction that disables large merchants' bargaining power").

[3] *See, e.g.*, Peter Lucas, *Mastercard Plans a Network Fee Hike for Later this Month. Merchants Aren't Happy* (Apr. 4, 2024) (describing Mastercard's plan to—after announcing the settlement's interchange fee rate cap—raise its Acquirer Brand Volume Fee by .01%, which is "expected to increase merchants' network fees by $259.1 million annually") (https://www.digitaltransactions.net/mastercard-plans-a-network-fee-hike-for-later-this-month-merchants-arent-

- Force Large Merchants to release *future* claims—both for *continuing* violations of the antitrust laws, and for as-yet-unknown *future* rules and conduct that violate the antitrust laws, for a period of *five years* after final approval of the settlement.

The class representatives and their counsel have utterly sold out the Large National Merchants in this Proposed Settlement. There can be little doubt that Defendants' Honor All Cards rules are subject to strong arguments that they are anticompetitive and an unlawful restraint on trade. *See, e.g., In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig.*, 2024 WL 278565, at *29 (E.D.N.Y. Jan. 25, 2024) ("a jury could reasonably conclude that the total two-sided prices of credit and debit transactions are supracompetitive," and "Plaintiffs have satisfied their burden [on summary judgment] by demonstrating direct evidence that Defendants controlled prices or excluded competition"). Indeed, this is the primary argument that has spawned nearly two decades of litigation in this MDL, and it is the one that Defendants most fear having a court actually rule on. *In re Payment Card*, 827 F.3d at 239 ("perhaps most important[]" of the released claims were the honor-all-cards and default interchange rules").

But the Small Local Merchants who represent this cram-down mandatory settlement class have traded away the interests of Large National Merchants for relief that is worthless to the members with the most at stake in this litigation—an easily-circumvented, time-limited rate cap that gives Large National Merchants nothing[4] and a surcharge process they cannot use consistent with their business models. Notably, none of the settlement's so-called "relief" would increase

---

happy/#:~:text=Merchants%20Aren't%20Happy,-Peter%20Lucas%20April&text=Mastercard%20merchants%20will%20see%20a,0.14%25%2C%20effective%20April%2015).

[4] As this Court has noted, some Large National Merchants have used their bargaining power to mitigate somewhat the damage caused by Defendants' anticompetitive conduct. *See In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig.*, 986 F. Supp. 2d 207, 239 (E.D.N.Y. 2013) ("[D]efault interchange operates only in the absence of bilateral agreement, and some of the very large merchants have sufficient transaction volume that they can actually negotiate for their own, lower interchange structures."), *rev'd and vacated*, 827 F.3d 223 (2d Cir. 2016).

competition, and incredibly, the settlement's Release would have this Court grant the Defendants free license to continue to overcharge all merchants for at least five more years into the future, precluding them from seeking equitable relief to enforce the antitrust laws and end Defendants' anticompetitive practices, thereby stopping their own hemorrhage of monetary losses.

The Proposed Settlement demonstrates that neither the named class representatives nor the lawyers who represent them considered the interests of the one group of class members who stand to gain the most from actual enforcement of the antitrust laws against Defendants' Honor All Cards rules. Large National Merchants are best situated to individually fund and prosecute lawsuits to attack those rules—even on an *individual*, rather than a classwide, basis. By agreeing to bar future individual private enforcement suits for a period of five years—without providing Large National Merchants any real relief—the Small Local Merchants and their lawyers have acted contrary to the interests of a significant, previously-identified segment of class members, making them inadequate representatives under Rule 23(a) and demonstrating the lack of cohesion in the class this Court previously certified. *Cf. In re Payment Card*, 827 F.3d at 240 ("an unreasonable tradeoff between relief and release … demonstrates their representation did not comply with due process").

## STATEMENT OF FACTS

The named Plaintiffs who purport to represent the class are all Small Local Merchants. They are a Corpus Christi dental practice, a Coral Gables business internet provider, a Miami IT support provider, a Florida pharmacy, and a Georgia beauty salon. ([Doc. 8647] at 10.)

Walmart is a Large National Merchant that accepts Defendants' payment cards at over 5,200 locations in the United States and runs a comprehensive ecommerce website that also accepts

Defendants' payment cards.[5] It operates over 4,600 retail stores under the Walmart brand in the United States, and another 599 stores under the Sam's Club brand in the United States. Unlike the named Plaintiffs, it is present in every US state and Puerto Rico. Due to its size, transaction volumes, and frequency of customer visits, Walmart is uniquely positioned to negotiate directly and individually with issuer banks—if it were not effectively prevented from doing so by the Honor All Cards rules, which is one of the most material inhibitors of Walmart's ability to negotiate what it believes are reasonable costs and otherwise rein in Defendants' anticompetitive practices.

Unlike the named Plaintiffs, Walmart opted out of the first proposed Rule 23(b)(3) settlement class in this case and also objected to the proposed mandatory Rule 23(b)(2) settlement. Visa then filed a declaratory judgment action against Walmart in this MDL, and Walmart brought its own antitrust action against Visa, which was transferred to this MDL. In that antitrust action, Walmart challenged anticompetitive practices that included, but were not limited to, Visa's use of its Honor All Cards rules to acquire and maintain the market power necessary to charge Walmart supracompetitive interchange fees. In 2017 Walmart dismissed its antitrust action against Visa and Visa dismissed its declaratory judgment action against Walmart.

This Court granted Walmart's intervention in this action in 2021, and Walmart filed an Opposition to Plaintiffs' motion to certify the Rule 23(b)(2) litigation class. This Court ultimately certified the litigation class on September 27, 2021. [Doc. 8647.]

Walmart has an intense interest in eliminating the Defendants' anticompetitive conduct, which causes it financial harm daily—and particularly has an interest in eliminating or rolling back Defendants' Honor All Cards rules, which require Walmart to accept for payment all manner of

---

[5] In fiscal year 2024, Walmart recorded $441.8 billion in U.S. net sales, the majority of which were transacted with Visa and Mastercard payment cards.  *See* Walmart Inc., 2024 Annual Report, at 7 https://stock.walmart.com/files/doc_financials/2024/ar/2024-annual-report-pdf-final-final.pdf.

Defendants' cards, including those that have interchange fees that are substantially higher than other cards. *See* [Doc. 2644]. Walmart has testified in this MDL how Defendants use Honor All Cards rules to harm competition and has explained why eliminating these rules is a priority for Walmart. (*See* Cook Decl. [Doc. 2644] ¶¶ 8, 48-50.)

Eliminating the Honor All Cards rules would allow Walmart freedom to negotiate individually with both Visa's and Mastercard's member banks over the terms of payment acceptance to secure terms that most benefit Walmart and its customers (*e.g.*, low interchange rates). *See In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig.*, 986 F. Supp. 2d 207, 239 (E.D.N.Y. 2013) ("some of the very large merchants have sufficient transaction volume that they can actually negotiate for their own, lower interchange structures"), *rev'd and vacated*, 827 F.3d 223 (2d Cir. 2016).

Walmart is in a unique position in this litigation. It has settled some of its past claims against Defendants and does not currently seek money damages. It does, however, have a critical interest in opting out of any class settlement that would further hamstring its ability to negotiate about or bring suit over Defendants' continued application of their Honor All Cards rules and the supracompetitive interchange rates that Walmart is paying. By giving Defendants carte blanche to maintain their Honor All Cards rules in force through at least the five-year period of the release, the Proposed Settlement removes the ability of all Large National Merchants to challenge Defendants' Honor All Cards rules—thereby negatively impacting the market as a whole.

Although the Small Local Merchants value relief that allows them to implement surcharges on their customers, Walmart and other Large National Merchants would not benefit from the ability to impose surcharges on their customers. (*See* Cook Decl. [Doc. 2644] ¶ 39; [Doc. 2644] at 4-14.) Surcharges are an ineffective cost-recovery tool that does nothing to increase competition.

Surcharging also conflicts with Walmart's Every Day Low Price strategy, where pricing is consistent across all forms of payment. Walmart competes with a vastly wider breadth of retailers than Small Local Merchants do, and if Walmart were to surcharge, then customers would switch to Walmart's competitors. Walmart also differs from Small Local Retailers in that it has more than 5,200 stores nationwide and, with its high-volume business, must have uniform processes that streamline the checkout process. Implementing surcharging would require changes to the process that would impact the uniformity across stores and increase wait times. Walmart also differs from Small Local Merchants in that it operates in all 50 states and Puerto Rico—including those that have laws which prohibit surcharging.

Walmart has a strong interest in negotiating its own acceptance and interchange rates with all Defendants, including individual issuer banks. And Walmart is uniquely positioned to drive interchange fees lower and pass those savings along to its customers—*if* it were unencumbered by the Defendants' Honor All Cards rules. But Small Local Merchants do not have the same incentives, and they have negotiated a deal that removes any reason for Defendants to negotiate terms during the five-year term of the release.

## **ARGUMENT**

### I.  IN THE PROPOSED SETTLEMENT, THE NAMED PLAINTIFFS AND CLASS COUNSEL HAVE SOLD OUT THE LARGE NATIONAL MERCHANTS' INTERESTS, VIOLATING THE ADEQUACY OF REPRESENTATION AND COHESION REQUIREMENTS

#### A.  A Mandatory 23(b)(2) Class Requires a Unitary, Indivisible Interest

As Justice Souter explained in *Ortiz*, the Supreme Court is particularly cautious to not allow adventurous interpretations of Rule 23's mandatory class provisions. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 842-43, 846 (1999) (where the legal rights of absentees are resolved without their consent, it is an exception to the general rule that one is not bound by a judgment in which he has

not been made a party by service of process); *see also In re Payment Card*, 827 F.3d at 231  ("Class actions are an exception to the rule that only named parties conduct and are bound by litigation" and the representative "'possess the same interest and suffer the same injury'" as the class). Unlike Rule 23(b)(3)—which in 1966 was a new innovation to allow class actions to try individual claims for monetary relief together for convenience—the mandatory class provisions (including 23(b)(2)) were drafted with a *retrospective* view to capture the pre-1966 practice, in which class actions were extremely limited. Thus, the *Ortiz* Court directed that one should presume with respect to mandatory classes that "historical antecedents identify requirements." *Ortiz*, 527 U.S. at 845; *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 361 (2011) ("Because Rule 23 "stems from equity practice" that predated its codification, in determining its meaning we have looked to the historical models on which the Rule was based.").

The class action for injunctive or declaratory relief—what is now 23(b)(2)—very clearly required in equity practice (and later, in practice under the 1938 rule) that the mandatory class have a *unitary* community of interest. *See, e.g.*, J. Story, Commentary on Equity Pleadings (3d ed. 1844) (courts require "a common interest or a common right," and that all class members "stand, or are supposed to stand, in the same situation"). In *Dukes*, the Court gave the example of civil rights cases involving class-based discrimination as the prime example of what Rule 23(b)(2) was meant to capture. 564 U.S. at 361 (observing that "[i]n none of the cases cited by the Advisory Committee as examples of (b)(2)'s antecedents did the plaintiffs combine any claim for individualized relief with their classwide injunction"). It described (b)(2) classes as ones where "the relief sought must perforce affect the entire class at once." *Id.* at 361-62. And it reasoned that such classes are mandatory *because of* the unitary interest of the class members; notice and the right to opt out are unnecessary precisely because the "class seeks an indivisible injunction benefitting all its

8

members." *Id.* at 362.[6] Indeed, the *Dukes* Court made it plain that in a proper (b)(2) mandatory class action, the class members' interests must be "indivisible":

> The key to the (b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful *only* as to all of the class members or as to none of them."

*Id.* at 360 (citation omitted).[7]

### B. The Mandatory Class Defined in This Proposed Settlement Lacks Unity of Interests and Its Interests Are Not Indivisible

The Second Circuit has held that an adequate class representative "must have <u>no</u> interests antagonistic to the interests of other class members." *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011) (emphasis added). Other courts also have considered the potentially divergent interests of class members when considering whether class certification under Rule 23(b)(2) is appropriate.  *See Shook v. Board of Cnty. Comm'rs of Cnty. of El Paso*, 543 F.3d 597, 604 (10th Cir. 2008) ("The latter half of Rule 23(b)(2) requires that final injunctive relief be appropriate for the class as a whole. The rule therefore authorizes an inquiry into the relationship between the class, its injuries, and the relief sought, and we have interpreted the rule to require that a class must be amenable to uniform group remedies.") (internal quotation marks omitted); *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1190 (11th Cir. 2003)

---

[6] *See also Coleman v. GMAC*, 296 F.3d 443, 447-48 (6th Cir. 2002) (opt outs are "unnecessary for a Rule 23(b)(2) class because its requirements are designed to permit only classes with homogenous interests"); *Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1155-56 (11th Cir. 1983) (homogeneity); *Weitzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 256 (3d Cir. 1975) (the "very nature of a (b)(2) class is that it is homogenous without any conflicting interests between the members of the class").

[7] *Accord Harris v. Union Pac. R.R. Co.*, 953 F.3d 1030, 1033 (8th Cir. 2020) ("The touchstone of a Rule 23(b)(2) class is that the claims must be cohesive."); *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 893 n.8 (7th Cir. 2011) ("Where a class is not cohesive such that a uniform remedy will *not* address the injuries of all the plaintiffs, class certification is typically not appropriate."); *In re MTBE Prod. Liab. Litig.*, 209 F.R.D. 323, 343 (S.D.N.Y. 2002) ("The hallmark of the (b)(2) action is homogeneity," and greater cohesiveness is required in a (b)(2) class because of its mandatory nature than in a (b)(3) class); 1 Jos. M. McLaughlin, *McLaughlin on Class Actions* § 5:15 (2012) ("Every Circuit to address the issue (other than the Ninth Circuit) has held that Rule 23(b)(2) requires a showing of cohesiveness among class members").

("This circuit is not alone in interpreting Rule 23(a)(4) to preclude class certification where the economic interests and objectives of the named representatives differ significantly from the economic interests and objectives of unnamed class members.").[8]

But both this Court *and* the Second Circuit have previously acknowledged in this litigation that Large National Merchants like Walmart are differently situated and have different interests than Small Local Merchants like Plaintiffs. In certifying the litigation class here, this Court noted:

> The Court recognizes that merchants are likely impacted in a variety of ways by the Restraints. As Opponents argue, the class consists of merchants large and small, with multiple locations or single locations, and with different business plans and perspectives.

([Doc. 8647] at 110.)

But one cannot say the same for the class representatives—they *all* are small, with very limited locations, and businesses in which they claim to value a right to surcharge their customers more than the hard-fought litigation it would take to have the Honor All Cards rules judicially declared an anticompetitive restraint. Plaintiffs would rather have an insignificant, temporary concession on fees than the permanent dismantling of the Honor All Cards rules that cause the supracompetitive interchange rates in the first place. The Second Circuit already has warned the parties here that adequacy is lacking where different groups seek conflicting forms of relief, incentivizing "class" counsel to trade away one group's interests for another's and settle on terms that disfavor certain class members. *See In re Payment Card*, 827 F.3d at 234.

Given that this Court previously has acknowledged the differences between Small Local Merchants and Large National Merchants, it should not approve a one-sided settlement that sells out the interests of the latter group entirely. Instead, this Court should: (*i*) refuse to preliminarily

---

[8] *Cf. Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 338-39 (4th Cir. 1998) ("the remedial interests of those within the single class [were] not aligned," and the named plaintiffs' election of remedies "may have benefitted [some class members], but at the expense of [other class members] who made up half of the class," which illustrated "the error in allowing them to sue on behalf of 'all' … franchisees.") (internal quotation marks omitted).

approve the Proposed Settlement in its entirety, or (*ii*) give the Large National Merchants (or just Walmart, as a merchant who has reached a prior settlement with the Defendants) the right to opt out, or (*iii*) define the Large National Merchants out of the class.[9]

### C.  The Proposed Settlement Demonstrates That The Class Representatives Failed To Adequately Represent the Interests of the Large National Merchants

In examining the prior settlement, the Second Circuit in *In re Payment Card* held that the members of the (b)(2) class were inadequately represented in violation of both Rule 23(a)(4) and the due process clause. The court looked to whether the class representatives had adequate incentive to represent the entire class's claim, and then "whether some difference between the class representative and some class members might undermine that incentive." 827 F.3d at 231.

Here, the differential between the Small Local Merchants and a Large National Merchant like Walmart could not be starker. In addition to limited surcharging relief versus an actual repeal or rollback of the Honor All Cards rules, the two groups have differently-valued claims as well. Giving the Defendants free license to continue their Honor All Cards rules for at least five years means that a Large National Merchant like Walmart will have to pay out millions of dollars and then sue to claw back its monetary losses. Such merchants have an enormous incentive to avoid such a release and target the repeal of the Honor All Cards rules instead.

Notably, in *Ortiz* (which was a *mandatory* class) the Supreme Court was very concerned about the differences among identifiable groups within the class when analyzing whether the adequacy of representation requirement was satisfied. These differences extended beyond the well-known conflict between those plaintiffs who were presently injured by asbestos (and valued a quick payout) and those who would be injured in the future (and valued preserving the fund for

---

[9] *See Batalla Vidal v. Wolf*, 501 F. Supp. 3d 117, 137 (E.D.N.Y. 2020) (approving (b)(2) class that excluded those who brought separate claims); *County of Suffolk v. Long Island Lighting Co.,* 907 F.2d 1295, 1305 (2d Cir. 1990).

future claims). The differences *also* extended to those whose monetary claims were worth much more than the others' claims because their claim arose within a period where there arguably was unlimited indemnification (insurance coverage). The Court recognized that treating everyone's claims the same in a mandatory settlement when one group had claims that were worth much more money than another group's claims was evidence of inadequate representation:

> It is no answer to say, as the Fifth Circuit said on remand, that these conflicts may be ignored because the settlement makes no disparate allocation of resources as between the conflicting classes. The settlement decides that the claims of the immediately injured deserve no provisions more favorable than the more speculative claims of those projected to have future injuries, and that liability subject to indemnification is no different from liability with no indemnification. *The very decision to treat them all the same is itself an allocation decision* with results almost certainly different from the results that those with immediate injuries or claims of indemnified liability would have chosen.

> Nor does it answer the settlement's *failures to provide structural protections in the service of equity* to argue that the certified class members' common interest in securing contested insurance funds for the payment of claims was so weighty as to diminish the deficiencies beneath recognition here. …

> … Rule 23 requires protections under subdivisions (a) and (b) against inequity and potential inequity at the precertification stage, quite independently of the required determination at postcertification fairness review under subdivision (e) that any settlement is fair in an overriding sense. A fairness hearing under subdivision (e) can no more swallow the preceding protective requirements of Rule 23 in a subdivision (b)(1)(B) action than in one under subdivision (b)(3).

*Ortiz*, 527 U.S. at 858-59 (emphasis added). It was precisely the trial court's failure to give structural protections—*i.e.* subclassing—to the group which had much more valuable claims that violated the adequacy of representation requirement and due process.

Here, the Large National Merchants suffer hundreds of millions of dollars of losses each year the Defendants' Honor All Cards rules escape judicial review. The Small Local Merchants' losses are understandably smaller. The first group's claims are worth substantially more than the second group's. Here, the class representatives (all of whom have smaller claims) have agreed to

a settlement that suits their interest in surcharging and gives nothing to the Large National Merchants—and worse, bars large merchants from suing to staunch the flow of their much larger financial losses for a period of at least five years. What *Ortiz* shows, and the Second Circuit recognized in *In re Payment Card*, is that one must look *past* the conduct that gave rise to the claim to identify "fault lines" between the interests of groups of plaintiffs that are "so fundamental that they require[] 'structural protection' in the form of subclasses with separate counsel." 827 F.3d at 232.

In this case, the proposed settlement negotiated by the Small Local Merchants is evidence that serious fault lines exist here between the two types of merchants identified:

- Plaintiffs agreed to let Defendants keep in place their Honor All Cards rules with five years of immunity from suits to enforce the antitrust laws against them, which is certain to cost the Large National Merchants billions of dollars in "prepaid damages."

- The Proposed Settlement provides "relief" that is of no value to Walmart or merchants like it.
    - "Group Buying" is of no utility for large merchants, Visa says group buying is already permissible, they are rarely—if ever—used, and without a repeal of Honor All Cards rules, Defendants have zero incentive to negotiate in good faith with merchants individually or in a group.
    - "Discounting" offers no benefit to Walmart because it conflicts with its Every Day Low Price strategy, could be complicated by co-branding agreements, and because Walmart has more than 140,000 SKUs at its typical supercenter, it is impractical for Walmart to display differentiated pricing based on payment types or issuers.
    - "Honor All Outlets" Pilot Testing is of no benefit to Walmart because it may be party to commercial arrangements that require acceptance across all of its locations, and such testing is inconsistent with Walmart's goal of providing customers with a uniform experience across its more than 5,000 locations.
    - The limited, time-restricted caps on average interchange fees do not increase competition and offer no real benefit because they can be offset by Defendants (*e.g.*, with network assessments).
    - The "surcharge" right does not promote competition and creates a cumbersome and ineffective cost recovery tool that conflicts with Walmart's business model.

- Importantly, the mandatory five-year waiver of antitrust law enforcement rights handicaps the one group of merchants, the Large National Merchants, that can actually prosecute individual enforcement actions that would benefit the market and the public.

As the Second Circuit instructed in *In re Payment Card*, "unitary representation of separate classes that claim distinct, competing, and conflicting relief create unacceptable incentives for counsel to trade benefits to one class for benefits in the other in order somehow to reach settlement." 827 F.3d at 234 (the problem is exacerbated because the members of the worse-off (b)(2) class could not opt out); *see also id.* at 237 ("When 'one category [of class members are] targeted for worse treatment without credible justification' it 'strongly suggests a lack of adequate representation for those class members who hold only claims in this category'").

### D. The Terms of the Proposed Settlement Show That Class Counsel Sold Out the Interests of Absent Class Members Like Walmart

The fault lines identified above also demonstrate the inadequacy of class counsel, who have a fiduciary duty to the entire class (including the Large National Merchants) to zealously pursue their interests. But counsel's failure to protect the class interests goes further. Incredibly, in a mandatory class action settlement in which class members are being forced—over their objection—to participate in the settlement, class counsel handed over to Defendants a "voluntary" release from unknown claims, hidden claims, and concealed claims, including claims covered by California Civil Code Section 1542. This is, of course, likely unenforceable in California as against public policy. But even more important, this overreach is evidence of class counsel's priority to obtain a "settlement" and their class counsel fee.[10]

The inadequacy of class counsel, as demonstrated by the Proposed Settlement itself—is an independent reason to deny preliminary approval.

---

[10] There are numerous other problems with the settlement that demonstrate counsel's inadequacy, which Walmart will more fully detail in its objection if this Court grants preliminary approval. For example, the broad release of claims that are not at the core of this lawsuit—such as claims relating to any corporate restructuring and IPOs of the Defendants, the Bank Defendants' employees' participation in boards or committees of the Visa and Mastercard Defendants, and sweeping into the definitions of "Released Parties" and "Releasing Parties" future entities that were not part of this litigation—further suggest class counsel utterly surrendered to Defendants' wishes and handed them the pen in drafting this settlement.

## II. THE SETTLEMENT'S 5+ YEAR RELEASE OF THE CLASS MEMBERS' RIGHTS TO INDIVIDUALLY ENFORCE THE ANTITRUST STATUTES IS ANTITHETICAL TO LEGISLATIVE INTENT AND AGAINST PUBLIC POLICY

The Proposed Settlement forces the mandatory class members not only to settle their past claims for equitable and declaratory relief against the Defendants, but it also forces them to release and covenant not to sue Defendants for *continuing* violations that occur within five years after the trigger date. It even goes so far as to preclude claims for *unknown* future changes Defendants may make to their "rules," as well as their future corporate restructuring and IPOs. ([Doc. 9179-2] at ¶¶ 80-85.) This Court should refuse to preliminarily approve the settlement because it is against public policy as expressed by Congress and recognized by the courts.

Prospective waivers of private antitrust claims are prohibited by the letter of the antitrust laws. Such waivers operate as an agreement in "restraint of trade" by insulating alleged anticompetitive conduct from private antitrust enforcement. 15 U.S.C. § 1. Private enforcement of the antitrust laws is the primary way such laws are enforced in America today, and the general public (and the market in general) benefits directly by virtue of antitrust suits brought by private individuals and companies. The private-enforcement mechanism is an "integral part of the congressional plan for protecting competition." *California v. Am. Stores Co.*, 495 U.S. 271, 284 (1990); *see also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 635 (1985) ("central role"); *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 755 (1977) ("paramount role").

The Supreme Court has expressed "little hesitation in condemning" an agreement that "operate[s] … as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations" as "against public policy" established in federal antitrust law. *Mitsubishi*, 473 U.S. at 637 n.19. Private agreements that confer even "a partial immunity from civil liability for future violations" of the antitrust laws violate the Sherman Act and the public policy underlying it. *Lawlor*

15

*v. National Screen Serv. Corp.*, 349 U.S. 322, 329 (1955); *see also Mitsubishi*, 473 U.S. at 629; *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 236 (2013); *cf. FTC v. Actavis, Inc.*, 570 U.S. 136, 158 (2013) (if parties structure a settlement with the "desire to maintain and to share patent-generated monopoly profits, then, in the absence of some other justification, the antitrust laws are likely to forbid the arrangement").

Notably, it did not matter to the Supreme Court in *Lawlor* that public (*i.e.,* government) enforcement of the antitrust laws remained an option, as it does in the Proposed Settlement here. Rather, the Court rejected the agreement because it would have violated "the antitrust laws" simply by extinguishing the claims of "a number of" *private* advertising businesses and thereby prevented them from enforcing the antitrust statutes. *See Lawlor*, 349 U.S. at 324, 329. "Where a private right is granted in the public interest to effectuate a legislative policy, waiver of a right so charged or colored with the public interest will not be allowed where it would thwart the legislative policy which it was designed to effectuate." *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 704 (1945).

This is not even a situation in which all parties to the agreement are voluntarily waiving their private enforcement rights. Rather, here the Proposed Settlement waives—*over the objections of a significant portion of the non-opt-out class*—the private right to challenge *continuing* violations of the antitrust laws for five years in the future, and mandatorily precludes retailers from bringing private actions for *new* violations of the antitrust laws based on "rules" the Defendants have not even written yet, as well as mergers/restructuring/IPOs that are as yet unexecuted. No such cram-down mandatory settlement could withstand appellate review. Indeed, courts have long understood that settlements which include a release or waiver of future antitrust claims are void as against public policy.[11]

---

[11] *See, e.g., Redel's Inc. v. General Elec. Co.*, 498 F.2d 95, 99 (5th Cir. 1974) ("The prospective application of a general release to bar private antitrust actions arising from subsequent violations is clearly against public policy."); *Fox*

This Court should refuse to preliminarily approve any proposed settlement that includes a provision releasing claims for future violations of the antitrust statutes.

### III.   IF THE COURT PRELIMINARILY APPROVES THIS PROPOSED SETTLEMENT, IT MUST GIVE THE CLASS MEMBERS WHO WOULD BE BOUND TO IT NOTICE AND AN OPPORTUNITY TO OPT OUT

Numerous courts have recognized that a district court has the discretion to grant class members the right to opt out in a Rule 23(b)(2) class action where fundamental fairness requires it. As the Second Circuit has explained, although the right to opt out is not obvious from the face of Rule 23(b)(2), "'the language of Rule 23 is sufficiently flexible to afford district courts discretion to grant opt-out rights in (b)(1) and (b)(2) class actions.'" *McReynolds v. Richards-Cantave*, 588 F.3d 790, 800 (2d Cir. 2009) (quoting *Eubanks v. Billington*, 110 F.3d 87, 94 (D.C. Cir. 1997)); *see also County of Suffolk,* 907 F.2d at 1304-05 ("a district court, in a proper case and in the exercise of sound discretion, may allow a class member to opt out of a limited fund class action … in order to facilitate the fair and efficient conduct of the action"); *Batalla Vidal*, 501 F. Supp. 3d at 137 (quoting the same passage of *McReynolds*); *Biediger v. Quinnipiac Univ.*, 2010

---

*Midwest Theatres v. Means*, 221 F.2d 173, 180 (8th Cir. 1955) ("Any contractual provision which could be argued to absolve one party from liability for future violations of the antitrust statutes against another would to that extent be void as against public policy."); *AT&T Mobility LLC v. Fisher*, 2011 WL 5169349, at *5 (D. Md. Oct. 28, 2011) (noting a waiver of "the right to a particular remedy under the antitrust acts (or even to bring an antitrust action at all) … might violate public policy and be unenforceable"); *Demsheck v. Ginn Dev. Co., LLC*, 2009 WL 10663051, at *3 (M.D. Fla. Dec. 9, 2009) (finding *prospective* releases of statutory remedies "invalid as contrary to public policy"); *Flying J Inc. v. TA Operating Corp.*, 2008 WL 4923041, at *4 (D. Utah Nov. 14, 2008) ("[A] prospective release of antitrust claims would be void as against public policy."); *Schwartz v. Dallas Cowboys Football Club, Ltd.*, 157 F. Supp. 2d 561, 578 (E.D. Pa. 2001) ("Because public policy prohibits a release from waiving claims for future violations of antitrust laws, and given that under the proposed release class members would be releasing unlitigated future claims, the releases are too broad."); *Innovation Data Processing, Inc. v. International Bus. Machs., Corp.*, 585 F. Supp. 1470, 1477 (D.N.J. 1984) (finding purported release agreement could not serve as an affirmative defense because "[t]he only way in which the [agreement] could here serve as an affirmative defense … would be if it had application as against antitrust violations occurring after the date of the release"); *Minnesota Mining & Mfg. Co. v. Graham-Field, Inc.*, 1997 WL 166497, at *3 (S.D.N.Y. Apr. 9, 1997) ("[A] prospective waiver of an antitrust claim violates public policy."); *Perry v. Amerada Hess Corp.*, No. 18384, 1977 WL 1433, at *1 (N.D. Ga. July 7, 1977) (noting "a release may not be executed to absolve a party from future violation of antitrust laws").

WL 2017773, at *7 (D. Conn. May 20, 2010) (citing *McReynolds*, 588 F.3d at 800) ("[A]ny members who do not want to be represented in the [Rule 23(b)(2)] class, or who believe they are erroneously included in the class, may opt out if they so choose."); *Scholtisek v. Eldre Corp.*, 229 F.R.D. 381, 393 n.10 (W.D.N.Y. 2005) ("A district court has discretion to permit opt-outs in a (b)(1) or (b)(2) action …."). [12]

Granting an opt-out right is particularly appropriate to remedy a conflict between competing interests among groups of class members. *See Fowler v. Birmingham News Co.*, 608 F.2d 1055, 1059 (5th Cir. 1979) (noting "[a]ny antagonistic interests involved [in the Rule 23(b)(2) class] were ameliorated by the provision for notice in the decree with an opportunity to opt out of the class"); *Fuller v. Fruehauf Trailer Corp.*, 168 F.R.D. 588, 604 (E.D. Mich. 1996) (granting an opt-out opportunity for members of a Rule 23(b)(2) class).

Of course, the Supreme Court in *Shutts* held that notice and opt-out rights are a due process right in claims involving monetary relief. But it bears repeating that even the injunctive relief at issue in this Proposed Settlement is clearly *monetary* in nature—dealing with rate caps, surcharges, and other things having to do with money. This "deal" effectively gives Defendants a license to continue their challenged anticompetitive practices for at least five years without *any* class member individually being able to obtain a judicial ruling on their legality or otherwise stop them. That, of course, results in ongoing *monetary* harm. [13] And that triggers the same sort of due process rights the Supreme Court recognized in *Shutts*.

---

[12] *Accord* Ryan C. Williams, Due Process, Class Action Opt Outs, and the Right Not To Sue, 115 Colum. L. Rev. 599, 605 (2015) ("Taking seriously the right of absent class members to control whether or not their claims will be asserted may require that opt-out rights be extended to all situations in which the inclusion [in the class] … has the potential to affect the scope of the defendant's remedial obligation—even where the action seeks only injunctive relief.")

[13] In fact, given that the provisions require a stay of even a claim for monetary damages where the Defendants raise this Proposed Settlement as a defense—coupled with the provision that this Court's determination somehow is *unreviewable* by an appellate court—it is highly questionable whether this "agreement" *really* preserves any absentee class member's monetary damages claim at all.

The Second Circuit already has held that it was improper under *Dukes* to approve a settlement that compromised an absent class member's interests in monetary relief without giving that absentee the basic notice and opt-out rights that *Shutts* required as a matter of fundamental due process. *In re Payment Card*, 827 F.3d at 238-39. From a constitutional perspective, there is no difference when the proposed settlement restrains the absentee for five years from suing to stop the overcharging and thereby prevent the loss of millions of dollars that will accrue in that time.

Because this Proposed 23(b)(2) Settlement necessarily implicates the Objectors' very real interest in stopping the forced "prepayment" of money into Defendants' coffers that they then must later sue to get back, due process and fundamental fairness require that this Court give the entire class notice and an opportunity to opt out of the Proposed Settlement if the Court decides to grant preliminary approval with the Release as written. In the alternative, Walmart requests that this Court use its "authority to modify a proposed class definition" and "exercise[] its discretion to carve out an appropriate class from the overbroad class proposed by Plaintiffs." ([Doc. 8647] at 98.) This Court could easily carve out of the class definition (and this settlement) the Large National Merchants like Walmart, who were not represented among the named class representatives and whose interests plainly were not addressed by class counsel in this Proposed Settlement.

## <u>CONCLUSION</u>

For the foregoing reasons, Walmart respectfully requests that this Court deny Plaintiffs' Motion for Preliminary Approval of the Proposed Settlement.

Dated: April 26, 2024

Respectfully submitted,

 */s/  Paul H. Schoeman*

Paul H. Schoeman
Jason M. Moff
KRAMER LEVIN
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100
pschoeman@kramerlevin.com
jmoff@kramerlevin.com

James F. Bennett MO 46826
DOWD BENNETT LLP
7676 Forsyth Blvd., Ste. 1900
Saint Louis, MO 63105
(314) 889-7300
jbennett@dowdbennett.com

*Attorneys for Walmart*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on April 26, 2024, a true and correct copy of the foregoing was filed electronically using the Court's electronic filing system. By operation of that system a notice of electronic filing will be served upon all counsel of record in the case.

*/s/ Paul H. Schoeman*