**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION** | **No. 05-md-1720 (MKB)(JAM)** |
| This Document Relates To:<br><br>*Barry's Cut Rate Stores Inc. et al. v. Visa, Inc. et al.*, **No. 05-md-1720 (MKB)(JAM)** | <u>**HIGHLY CONFIDENTIAL**</u><br><u>**TO BE FILED UNDER SEAL**</u> |

**7-ELEVEN PLAINTIFFS' OBJECTION TO EQUITABLE RELIEF CLASS PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT**

**CONSTANTINE CANNON LLP**
Jeffrey I. Shinder
A. Owen Glist
Ankur Kapoor
Taline Sahakian
David A. Scupp
335 Madison Avenue
New York, New York 10017
Telephone: (212) 350-2700
Email: jshinder@constantinecannon.com

*Counsel for the 7-Eleven Plaintiffs*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND ............................................................................................................... 3

I.      The Underlying Anticompetitive Conduct.......................................................... 3

II.     MDL 1720: Procedural History .......................................................................... 4

        A.     The First Class Settlement in MDL 1720 ................................................ 4

        B.     The Rule 23(b)(3) Opt-Out Damages Settlement and Release ............... 6

        C.     The 7-Eleven Plaintiffs ........................................................................... 6

III.    Certification of the Rule 23(b)(2) Class............................................................. 7

IV.   The Proposed Mandatory Settlement................................................................. 9

ARGUMENT ................................................................................................................... 14

I.      Legal Standard .................................................................................................. 14

II.     The 7-Eleven Plaintiffs Are Not Adequately Represented in the Proposed
       Mandatory Settlement ....................................................................................... 16

        A.     The Due Process Clause and Rule 23 Require the Right to Opt Out and
             Pursue Individualized Claims ................................................................ 16

             1.     As the Principal Relief is Monetary, the Settlement Violates Due
                  Process by Not Granting Opt-Out Rights ................................... 17

             2.     The "Relief" Is Divisible and Will Not Benefit All Merchants................ 18

                 a.     The Monetary Relief Is Divisible .................................. 18

                 b.     The Rules Relief Is Divisible........................................ 19

                 c.     The Settlement Release Fails to Account for the Divisible
                    Relief and Relinquishes Claims Against Network Fees ............... 23

        B.     The Court Should Amend Its Class Certification Order to Grant the
             7-Eleven Plaintiffs Opt-Out Rights........................................................ 26

III.    The Proposed Mandatory Settlement Includes a Naked Price-Fixing Arrangement........ 30

        A.     Visa and Mastercard Are Asking the Court to Endorse Supracompetitive
             Interchange Rates.................................................................................. 33

i

B.      The Cases Cited by ERCC Do Not Justify Defendants' Price-Fixing Agreement ................................................................................................... 37

C.      The "Relief" in the Settlement Does Not Justify Defendants' Price-Fixing Agreement ................................................................................................... 40

CONCLUSION ................................................................................................................. 46

# TABLE OF AUTHORITIES

## Cases

*Acosta v. Trans Union, LLC*,
  243 F.R.D. 377 (C.D. Cal. 2007) ......................................................... 30

*Amchem Products, Inc. v. Windsor*,
  521 U.S. 591 (1997) ........................................................................... 22

*Andrx Pharms., Inc. v. Biovail Corp. Int'l*,
  256 F.3d 799 (D.C. Cir. 2001) ............................................................ 37

*Arizona v. Maricopa Med. Soc'y*,
  457 U.S. 332 (1982) ........................................................................... 32

*Boucher v. Syracuse Univ.*,
  164 F.3d 113 (2d Cir. 1999) ............................................................... 16

*Cantor v. Detroit Edison Co.*,
  428 U.S. 579 (1976) ........................................................................... 37

*Catalano v. Target Sales*,
  446 U.S. 643 (1980) ............................................................... 32, 33, 40

*Cholakyan v. Mercedes-Benz, USA, LLC*,
  281 F.R.D. 534 (C.D. Cal. 2012) ....................................................... 18

*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974) ............................................................... 15

*County of Suffolk v. Long Island Lighting Co.*,
  710 F. Supp. 1428 (E.D.N.Y. 1989) ................................................... 38

*DDMB, Inc. v. Visa, Inc.*,
  No. 05-md-1720, 2021 WL 6221326 (E.D.N.Y. Sept. 27, 2021) .................... *passim*

*Epic Games, Inc. v. Apple, Inc.*,
  67 F.4th 946 (9th Cir. 2023) .............................................................. 28

*Expressions Hair Design v. Schneiderman*,
  581 U.S. 37 (2017) ............................................................................. 21

*Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*,
  62 F.4th 704 (2d Cir. 2023) ............................................................... 28

*FTC v. Butterworth Health Corp.*,
  946 F. Supp. 1285 (W.D. Mich. 1996) ............................................... 39

*Grunin v. Int'l House of Pancakes*,
  513 F.2d 114 (8th Cir. 1975) ........................................................................ 33

*Hansberry v. Lee*,
  321 U.S. 32 (1940)....................................................................................... 29

*In re Am. Int'l Grp. Sec. Litig.*,
  689 F.3d 229 (2d Cir. 2012)......................................................................... 22

*In re American Exp. Anti Steering Rules Antitrust Litig.*,
  Nos. 11-md-221, 13, 2015 WL 4645240 (E.D.N.Y. Aug. 4, 2015) ............... 29

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
  No. 07-cv-5944, 2016 WL 8669891 (N.D. Cal. Aug. 22, 2016) .................... 40

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*,
  261 F. Supp. 2d 188 (E.D.N.Y. 2003) ......................................................... 37

*In re GSE Bonds Antitrust Litig.*,
  414 F. Supp. 3d 686 (S.D.N.Y. 2019)........................................................... 15

*In re Nexium (Esomeprazole) Antitrust Litig.*,
  968 F. Supp. 2d 367 (D. Mass. 2013) ........................................................... 37

*In re Payment Card Interchange Fee & Merchant Disc. Antitrust Litig.*,
  330 F.R.D. 11 (E.D.N.Y. 2019) ......................................................... 4, 14, 15

*In re Payment Card Interchange Fee & Merchant Disc. Antitrust Litig.*,
  827 F.3d 223 (2d Cir. 2016)................................................................. *passim*

*In re Payment Card Interchange Fee & Merchant Disc. Antitrust Litig.*,
  986 F. Supp. 2d 207 (E.D.N.Y. 2013) ...................................................... 5, 17

*In re Payment Card Interchange Fee & Merchant Disc. Antitrust Litig.*,
  No. 05-md-1720, 2016 WL 8138988 (E.D.N.Y. Nov. 30, 2016) ..................... 6

*In re Payment Card Interchange Fee & Merchant Disc. Antitrust Litig.*,
  No. 05-md-1720, 2019 WL 6875472 (E.D.N.Y. Dec. 16, 2019) ..................... 6

*In re Payment Card Interchange Fee & Merchant Disc. Antitrust Litig.*,
  No. 05-md-1720, 2024 WL 1014159 (E.D.N.Y. Feb. 22, 2024)..................... 41

*In re Visa Check/MasterMoney Antitrust Litig.*,
  280 F.3d 124 (2d Cir. 2001).......................................................................... 19

*In re Visa Check/MasterMoney Antitrust Litig.*,
  297 F. Supp. 2d 503 (E.D.N.Y. 2003) .......................................................... 17

*Kiefer-Stewart Co. v. Joseph E. Seagram & Sons*,
    340 U.S. 211 (1951) ............................................................................ 32

*Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*,
    478 U.S. 501 (1986) ............................................................................ 30

*M.F. ex rel. Ferrer v. New York City Dep't of Educ.*,
    671 F. Supp. 3d 221 (E.D.N.Y. 2023) ............................................... 15

*Minnesota v. Health One Corp.*,
    1992 WL 313827 (D. Minn. Aug. 17, 1992) ...................................... 38

*Moses v. New York Times Co.*,
    79 F.4th 235 (2d Cir. 2023) ............................................................... 30

*Ortiz v. Fibreboard Corp.*,
    527 U.S. 815 (1999) ............................................................................ 20

*Robertson v. NBA*,
    556 F.2d 682 (2d Cir. 1977) ......................................................... 30, 33

*Robinson v. Metro-North Commuter Railroad Co.*,
    267 F.3d 147 (2d Cir. 2001) ............................................................... 20

*Sharp Farms v. Speaks*,
    917 F.3d 276 (4th Cir. 2019) ............................................................. 29

*Smith v. Sprint Commc'ns Co., L.P.*,
    387 F.3d 612 (7th Cir. 2004) ............................................................. 29

*Sykes v. Mel S. Harris & Assocs. LLC*,
    780 F.3d 70 (2d Cir. 2015) ................................................................ 27

*Toyo Tire & Rubber Co. v. Atturo Tire Corp.*,
    No. 14 C 0206, 2017 WL 1178224 (N.D. Ill. Mar. 30, 2017) ........... 37

*United States v. Am. Soc'y of Composers, Authors, Publishers*,
    No. 41-1395 (WCC), 2001 WL 1589999 (S.D.N.Y. June 11, 2001) ...... 38

*United States v. Apple, Inc.*,
    791 F.3d 290 (2d Cir. 2015) ............................................................... 32

*United States v. Bausch & Lomb Optical Co.*,
    321 U.S. 707 (1944) ............................................................................ 28

*United States v. Carter Products, Inc.*,
    211 F. Supp. 144 (S.D.N.Y. 1962) .................................................... 38

v

*United States v. Parke, Davis & Co.*,
  362 U.S. 29 (1960) ................................................................................................ 28

*United States v. Socony-Vacuum Oil Co.*,
  310 U.S. 150 (1940) ......................................................................................... 31, 33

*United States v. Trans-Missouri Freight Ass'n*,
  166 U.S. 290 (1897) ............................................................................................. 33

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ...................................................................................... *passim*

*White v. NFL*,
  836 F. Supp. 1458 (D. Minn. 1993) ................................................................. 39-40

*Wisconsin v. Kenosha Hosp. & Med. Ctr.*,
  1997-1 Trade Cas. (CCH) ¶ 71669, 1996 WL 784584 (E.D. Wis. 1996) .............................. 38

*Zink v. First Niagara Bank, N.A.*,
  155 F. Supp. 3d 297 (W.D.N.Y. 2016) ................................................................... 15

## Statutes

Me. Rev. Stat. Ann. tit. 9A, §8-509 (2021) ................................................................. 21

N.Y. General Business Law § 518.1, amended February 11, 2024 ............................................. 21

Truth in Lending Act, § 3(a), 90 Stat. 197 (1976) ....................................................... 21

Sherman Act, Sec. 4, 26 Stat. 209, 15 U.S.C.A. § 4 ...................................................... 28

## Rules

Fed. R. Civ. P. 23 ..................................................................................... *passim*

## Regulations

*Notice of Proposed Rulemaking*,
  88 Fed. Reg. 77420 (Nov. 9, 2023) ....................................................................... 21

## Other Authorities

ABA, Antitrust Law Developments (9th ed. 2022) ........................................................... 32

Phillip E. Areeda (late) & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust
  Principles and Their Application (4th & 5th eds. 2023 cum. supp.) .................................. 32, 33

The 7-Eleven Plaintiffs[1] submit the following objection to preliminary approval of the settlement proposed by Equitable Relief Class Counsel ("ERCC").[2]

**PRELIMINARY STATEMENT**

The Proposed Mandatory Settlement should be rejected at preliminary approval for two fundamental reasons.[3]  First, the Settlement demonstrates that ERCC are inadequate representatives for the 7-Eleven Plaintiffs (and the other Direct Action Plaintiffs, among others), and thus, due process requires that the 7-Eleven Plaintiffs be granted the right to opt out and pursue their own claims for injunctive relief.  Second, the Proposed Mandatory Settlement codifies a per se unlawful price-fixing agreement between horizontal competitors who have jointly used this Settlement, with the complicity of ERCC, to lock in supracompetitive interchange rates for the next five years or more.

---

[1] The "7-Eleven Plaintiffs" are Alimentation Couche-Tard Inc. (Circle K), Ashley Furniture Industries Inc., Barnes & Noble College Booksellers, LLC, Beall's, Inc., Boscov's, Inc., Brookshire Grocery Company, The Buckle, Inc., Coborn's, Incorporated, Cracker Barrel Old Country Store, Inc., Cumberland Farms, Inc., D'Agostino Supermarkets, Inc., Dick's Sporting Goods, Inc., Dillard's, Inc., Drury Hotels Company, LLC, Crate & Barrel, CB2 and Hudson Grace, Family Dollar Stores, Inc., Family Express Corporation, Fleet Farm and affiliates, Foot Locker, Inc., The Gap, Inc., Genesco Inc., HMSHost Corporation, IKEA North America Services, LLC, Jetro Cash & Carry Enterprises, LLC, Marathon Petroleum Company LP, Andeavor LLC, National Association of Convenience Stores, National Grocers Association, National Railroad Passenger Corporation (Amtrak), NIKE, Inc., P.C. Richard & Son, Inc., Panda Restaurant Group, Inc., Panera Bread Company, Booking Holdings Inc., priceline.com, LLC, Ralph Lauren Corporation, Recreational Equipment, Inc. (REI), Republic Services, Inc., Restoration Hardware, Inc. (RH), Starbucks Corporation, Swarovski U.S. Holding Limited, The Talbots, Inc., Thermo Fisher Scientific Inc., Thorntons LLC, and Yum! Brands, Inc.

[2] Mot. for Prelim. Approval of Settlement, ECF No. 9179 (filed Mar. 26, 2024); Class Settlement Agreement of the Rule 23(b)(2) Class Pls. and the Defs., ECF No. 9179-2 (filed Mar. 26, 2024) ("Proposed Mandatory Settlement" or "Sett.").

[3] For purposes of preliminary approval, the 7-Eleven Plaintiffs limit their objections to the most fundamental issues raised by the Proposed Mandatory Settlement.  Should this Settlement reach a final fairness hearing—which it should not—the 7-Eleven Plaintiffs will raise problems found with virtually every provision in this Settlement, which reinforce the conclusion that ERCC inadequately represented the class and that this Settlement is not fair, reasonable, or adequate.

The core restraints of trade at issue in this case are the Honor All Cards and default interchange rules, through which Visa and Mastercard issuing banks have agreed not to compete for merchant acceptance in violation of antitrust law.  That agreement perpetuates a price-fixing conspiracy that began when the banks owned and controlled Visa and Mastercard.  The Second Circuit, in its decision vacating the first attempt in this case to use a mandatory class to lock in Visa's and Mastercard's anticompetitive rules, criticized that settlement for focusing on surcharging while failing to address the Honor All Cards and default interchange rules.  Even though this Court just ruled that plaintiffs' challenge to the Honor All Cards and default interchange rules may proceed to trial, this Settlement does nothing to address those rules.  In fact, as if those decisions never happened, this Settlement actually *extends* the Honor All Cards rules to digital wallets (provided they are owned or operated by Visa and Mastercard) and new products (provided they are subject to the Settlement's rate "cap"), while using a mandatory class to immunize these rules from challenge for the next 5-7 years.

Contrary to ERCC's claims, the Proposed Mandatory Settlement is similar to the previous mandatory settlement in this case vacated by the Second Circuit.  Like that settlement, the Proposed Mandatory Settlement confiscates class members' claims concerning the Honor All Cards and default interchange rules by trading them for surcharging relief which is of no benefit to them.  But this Settlement goes a step further.  This Settlement asks this Court to put its imprimatur on supracompetitive credit card interchange rates that Visa and Mastercard, improperly, jointly agreed to with the complicity of ERCC.  This rate "cap" would lock in rates substantially above ███ basis points for credit card transactions in the United States, maintaining the United States' distinction as the highest-cost payments market in the world.  And it does so

even though plaintiffs' expert opinions have shown that, in a competitive but-for world, credit card interchange rates would be less than ███ basis points—at least 50% lower.

While this is a bad deal for merchants, it should be rejected at preliminary approval for different reasons. As the Supreme Court held in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011), an involuntary class is consistent with due process only when the class seeks an indivisible injunction that will benefit the class as a whole. The Proposed Mandatory Settlement fails that standard. The surcharging relief is not available to a portion of the class, and it will provide little or no benefit to many other class members, including the 7-Eleven Plaintiffs. The rate "cap" constitutes monetary relief akin to that provided in Rule 23(b)(3) settlements (which provide opt-out rights). And, in any event, this "cap" will not benefit the class as a whole and may not benefit many class members at all. ERCC's failure to deliver an indivisible injunction benefiting the class as a whole renders them inadequate representatives, particularly for those, like the 7-Eleven Plaintiffs, who continue to actively litigate their claims. For these reasons, this Settlement cannot pass muster under *Dukes*.

The Proposed Mandatory Settlement also should be rejected as a per se violation of the antitrust laws. Visa and Mastercard are indisputably horizontal competitors in the credit transactions market. Had they met in the ordinary course of business to fix credit card interchange rates for the next five years or more, such conduct would be condemned per se as horizontal price-fixing. The fact that they are attempting to fix prices through a settlement agreement does not change that conclusion.

## BACKGROUND

### I.    The Underlying Anticompetitive Conduct

Throughout the damages period (2004 to the present), Visa and Mastercard fixed the interchange fees that merchants pay to the banks that issue Visa and Mastercard credit and debit

cards.  Throughout that period, Visa and Mastercard maintained their Honor All Cards rules, which require merchants to accept all Visa and Mastercard credit (or debit) issuing banks' cards if they accept any bank's cards.  Through these rules, issuing banks have agreed not to compete for merchant acceptance, and thus, the "default" interchange fees fixed by Visa and Mastercard are the de facto rates applicable to virtually all Visa and Mastercard transactions.  As a result, Visa and Mastercard (and their co-conspirator member banks) exercise substantial market power over merchants, resulting in supracompetitive interchange and network fees.  As the Court has observed, "[b]y 2005, 'interchange fee revenue paid by merchants to Visa and Mastercard card-issuing banks had risen to over $ 30 billion per year.'" *In re Payment Card Interchange Fee & Merchant Disc. Antitrust Litig.*, 330 F.R.D. 11, 47 (E.D.N.Y. 2019) (quoting class counsel).  In 2023, U.S. merchants paid more than **$100 billion** in fees to accept Visa and Mastercard credit cards, and over **$30 billion** to accept Visa and Mastercard signature debit cards.[4]  The 7-Eleven Plaintiffs alone paid over ███ **billion** in interchange fees in 2023.

## II.     MDL 1720: Procedural History

### A.     The First Class Settlement in MDL 1720

In June 2005, the first of various individual merchant and class actions were filed and later consolidated for pretrial purposes and transferred to the Eastern District of New York under MDL 1720.  *See*, *e.g.*, Class Action Complaint, *Photos Etc. Corp. v. Visa U.S.A. Inc.*, No. 05-cv-1007, ECF No. 1 (D. Conn. filed June 22, 2005).  These complaints included Section 1 claims regarding the Honor All Cards and default interchange rules along with the so-called anti-steering rules.  According to then-lead class counsel, "While that initial action contained a damage claim, and we certainly expected damages to be enormous, the primary goals were to

---

[4] Nilson Report, Issue 1259 (Mar. 2024) at 9.

reform the market by eliminating the horizontal agreements among the banks to fix the levels of interchange fees and enforce the rules that we were challenging."  Declaration of K. Craig Wildfang ¶ 24, ECF No. 2113-6 (filed Apr. 11, 2013).

In July 2012, before the Court rendered any decisions on pending class certification, summary judgment or *Daubert* motions, class counsel at the time announced a settlement (the "2012 Settlement") that attempted to release all claims regarding Visa and Mastercard rules and practices in perpetuity, including damages claims accruing after preliminary approval.  *In re Payment Card Interchange Fee & Merchant Disc. Antitrust Litig.*, 986 F. Supp. 2d 207 (E.D.N.Y. 2013), *rev'd and vacated*, 827 F.3d 223 (2d Cir. 2016).  Upon approval, the court certified two settlement classes:  a mandatory Rule 23(b)(2) class seeking injunctive relief and a Rule 23(b)(3) damages class from which class members could opt out.  The 7-Eleven Plaintiffs and the other Direct Action Plaintiffs opted out of the Rule 23(b)(3) class and appealed the certification of the mandatory Rule 23(b)(2) settlement class.

The Second Circuit reversed, finding that the (b)(2) class had been inadequately represented because of the structural conflict inherent in the same counsel representing both a class seeking past damages and a class seeking future relief.  *In re Payment Card Interchange Fee & Merchant Disc. Antitrust Litig.*, 827 F.3d 223 (2d Cir. 2016) ("*Interchange Fee I*"), 827 F.3d at 227, 231, 233-35.  The Second Circuit emphasized, in its discussion of adequacy of representation, the settlement's failure to provide any relief on the Honor All Cards and default interchange rules, while requiring the release of all claims concerning those rules.  *Id.* at 230. The court of appeals also found that the due process and Rule 23(a)(4) problems with the settlement were "exacerbated" by the inability of Rule 23(b)(2) class members to opt out of the settlement and its mandatory release of claims.  *Id*. at 231, 234.  Judge Leval stressed in his

concurrence that it was improper to use a mandatory class to "confiscate" the claims of class members.  *Id*. at 241-42 ("This is not a settlement; it is a confiscation . . . .").

Upon remand in June 2016, the court appointed separate class counsel to assert damages claims under Rule 23(b)(3) and claims for equitable relief under Rule 23(b)(2).  *In re Payment Card Interchange Fee & Merchant Disc. Antitrust Litig.*, No. 05-md-1720, 2016 WL 8138988 (E.D.N.Y. Nov. 30, 2016).

### B.    The Rule 23(b)(3) Opt-Out Damages Settlement and Release

Rule 23(b)(3) counsel settled class damages claims in 2018.  *In re Payment Card Interchange Fee & Merchant Disc. Antitrust Litig.*, No. 05-md-1720, 2019 WL 6875472 (E.D.N.Y. Dec. 16, 2019).  Under the terms of that settlement, merchants that elected to stay in the Rule 23(b)(3) class released "any and all manner of claims," including their claims for "payment of money, or for injunctive, declaratory, or other equitable relief," other than equitable relief sought by the proposed Rule 23(b)(2) class in the (b)(2) action.[5]  The 7-Eleven Plaintiffs opted out of that settlement to preserve their claims.

### C.    The 7-Eleven Plaintiffs

The 7-Eleven Plaintiffs are a diverse group of 43 merchants and trade organizations.  The 7-Eleven Plaintiffs include some of the largest merchants in the country (*e.g.*, seven of the top 100 retailers and several of the largest quick-service-restaurant chains) across a variety of retail

---

[5] Final Approval Order ¶¶ 16(C)(a), 16(F)(a), ECF No. 7818 (filed Dec. 13, 2019).  According to the 2019 report, ECF No. 7641-1 (filed Aug. 7, 2019), and supplemental report of the Class Administrator for the Rule 23(b)(3) settlement, more than sixteen million notices of the settlement were sent to class members, and only 675 entities opted out of the Rule 23(b)(3) class. 2019 Supp. Rep. of the Class Administrator ¶ 6 & Ex. A, ECF No. 7772-1 (filed Nov. 6, 2019). The (b)(3) settlement agreement also excludes roughly 200 merchants as "dismissed plaintiffs" who settled their claims prior to the class settlement. *See* Superseding & Amended Definitive Class Sett. Agreement of the Rule 23(b)(3) Class Pls. and the Defs., Appendix B, ECF No. 7257-2 (filed Sept. 18, 2018).

sectors.  They also include regional merchants and trade associations with thousands of members, including many small merchants.

The 7-Eleven Plaintiffs (and the other Direct Action Plaintiffs) took the lead in this litigation after opting out and objecting to the first class settlement in 2013.  The 7-Eleven Plaintiffs produced dozens of their own witnesses and millions of their own documents, retained their own experts, and conducted years of discovery.  *See* Decl. of Jeffrey I. Shinder in Supp. of DAPs' Opp. to Equitable Relief Pls.' Mot. for Class Cert. ¶¶ 8-14, ECF No. 8451 (filed Mar. 26, 2021).  The Direct Action Plaintiffs also filed their own summary judgment and *Daubert* motions and separately opposed summary judgment motions, asserting different arguments and theories than the proposed 23(b)(2) class.[6]

### III.    Certification of the Rule 23(b)(2) Class

In 2020, ERCC moved to certify a mandatory class that included all merchants that accepted Visa and Mastercard credit and debit transactions, including the 7-Eleven Plaintiffs (and the other Direct Action Plaintiffs).  Defendants, remarkably, *supported* the certification of this class provided that it was mandatory and included all of the Direct Action Plaintiffs.[7]  The 7-Eleven Plaintiffs opposed their inclusion in this mandatory class, contending, among other

---

[6] *See, e.g.*, Defs.' *Ohio v. Amex* Br. at 12-13, 19-20, ECF No. 8071 (filed (Dec. 21, 2020) (noting opinion of Rule 23(b)(2) expert Prof. Stiglitz differed materially from opinions of Direct Action Plaintiffs' experts by claiming that the payment card market is "mature" and "does not experience indirect network effects"); Defs.' Post-IPO Reply Br. at 4 & n.3, ECF No. 8094 (filed Dec. 21, 2020), (Direct Action Plaintiffs disclaim making "structural conspiracy" claims while class does not); Mastercard Market Power Br. at 27, ECF No. 8073 (filed Dec. 21, 2020) (Rule 23(b)(2) class claims "single-brand" markets for Mastercard credit and debit cards); Mastercard Market Power Reply Br. at 10, ECF No. 8157 (filed Dec. 21, 2020) ("Direct Action Plaintiffs and the Rule 23(b)(2) Plaintiffs make two different arguments about how Mastercard's HAC rule purportedly supports their market power allegations"); *id.* at 27 (Direct Action Plaintiffs and class "contradict[] each other" in addressing innovations).

[7] *See generally* Defs.' Reply Mem. in Resp. to the Opp. to the Rule 23(b)(2) Class Pls. Mot. for Class Cert., ECF No. 8460 (filed Apr. 30, 2021).

things, that there was no precedent for the confiscation of ongoing claims that a putative class member had been litigating for years before the appointment of Rule 23(b)(2) counsel.

The Court certified the mandatory class over these objections.  The Court held that Rule 23(b)(2)'s indivisibility requirements were met because the core restraints of trade being litigated—which the Court characterized as Honor All Cards and default interchange—applied to all merchants.  *DDMB, Inc. v. Visa, Inc.*, No. 05-md-1720, 2021 WL 6221326, at *44 (E.D.N.Y. Sept. 27, 2021).  Based on this finding, the Court found certification appropriate because equitable relief "would apply to and benefit *the class as a whole*."  *Id.* (emphasis added). Consistent with this reasoning, the Court concluded that "cohesion is inherent in a properly certified Rule 23(b)(2) class action because class members' claims are inherently intertwined and *relief to anyone in the group would be relief to the group as a whole*."  *Id.* at *43 (emphasis added) (citations omitted).

The Court rejected the Direct Action Plaintiffs' due process objection, emphasizing that "[t]he Second Circuit has similarly stated that the lack of an ability to opt out in a Rule 23(b)(2) class does not violate due process *as long as the other Rule 23 requirements including adequacy of representation are satisfied*."  *DDMB*, 2021 WL 6221326, at *31 (emphasis added) (citation omitted).  With respect to adequacy of representation, the Court rejected the Direct Action Plaintiffs' concern that Rule 23(b)(2) counsel would exchange relief on the Honor All Cards and default interchange rules for surcharging relief on the basis that it was premature and unfounded.  The Court acknowledged that "[t]he Second Circuit stated that more beneficial relief might consist of 'remedies that affected the default interchange fee or honor-all-cards rule.'"  *Id.* at *18 (quoting *Interchange Fee I*, 827 F.3d at 238).  The Court emphasized, however, that ERCC were, in fact, pressing claims against the Honor All Cards and default interchange rules,

that price-fixing of interchange was their central theory of competitive harm, and that there was no basis to conclude that they would resolve those claims for surcharging relief.  *Id.* at *6, 13, 22, 44-45 ("While Plaintiffs' Complaint and expert reports thus far demonstrate a desire to eliminate the honor-all-cards and default interchange rules in some capacity, the Court declines to make any judgments at this stage of the litigation as to Plaintiffs' injunctive relief priorities based on the existing expert reports.").

Critically, the Court distinguished *Visa Check*, where the Second Circuit affirmed only a Rule 23(b)(3) opt-out class, finding that mere litigation choices about which claim or remedy to press should not defeat certification.  *DDMB*, 2021 WL 6221326, at *23.  But, in doing so, the Court emphasized that "[h]ad the class representatives sought a different form of relief entirely — *that is monetary versus equitable relief*, it may have raised an issue of inadequate representation."  *Id.* (emphasis added) (citations omitted).

## IV.    The Proposed Mandatory Settlement

On March 26, 2024, ERCC announced the Proposed Mandatory Settlement—Defendants' second attempt to preserve their anticompetitive practices via an improper mandatory (b)(2) settlement.  Mot. for Prelim. Approval of Settlement, ECF No. 9179 (filed Mar. 26, 2024); Class Settlement Agreement of the Rule 23(b)(2) Class Pls. and the Defs., ECF No. 9179-2 (filed Mar. 26, 2024) ("Proposed Mandatory Settlement" or "Sett.").  The Proposed Mandatory Settlement requires class members to release, without any right to opt out, all claims concerning Visa's and Mastercard's rules, practices, and pricing, including the Honor All Cards and default interchange rules—and any "substantially similar" future rules, conduct, or

practices—for five years following final approval.  Sett. ¶ 82; Appendix F ¶¶ 8(c)(i)–(iii) at F-7–F-8.

The Proposed Mandatory Settlement expressly targets the Direct Action Plaintiffs, attaching as **Appendix A** a list of the actions that will be stayed upon preliminary approval and **dismissed with prejudice** upon final approval.  Sett., Appendix A; proposed Class Settlement Notice & Scheduling Order, ECF No. 9179-8 (filed Mar. 26, 2024) at E-1 (referencing Appendix A in the very first Whereas clause).

In exchange for this mandatory release, Visa and Mastercard jointly agreed not to increase credit card interchange rates posted as of December 31, 2023, and to reduce credit card rates by a mere 4 basis points.  On its face, this is a meager reduction to supracompetitive U.S. interchange rates, which are among the highest in the world, as the accompanying declaration of economist Dr. Ketan Patel demonstrates.  *See* Decl. of Dr. Ketan Patel ("Patel Decl.") ¶ 9.  The Proposed Mandatory Settlement would effectively enshrine the rates that prevailed immediately prior to the pandemic when Visa and Mastercard, exploiting their substantial market power, implemented a highly controversial set of interchange increases at a perilous time for merchants across the country.  Patel Decl., Appendix 1 (showing blended Visa/Mastercard rate of ███ basis points in 2023 and ███ basis points in 2019).

Visa and Mastercard also agreed to invent a new rate—the volume-weighted average interchange rate for consumer and commercial credit card transactions across *both their networks*—contrived for purposes of this Settlement.  The Proposed Mandatory Settlement purports to set a five-year "ceiling" 7 basis points below this manufactured baseline.  However, the baseline mixes higher-rate commercial cards with comparatively lower-rate consumer credit cards.  Combining commercial cards with consumer cards brings the overall rate up by ███ basis

points.  The increase from this maneuver alone is substantially greater than the 7-basis-point

reduction set forth in the Settlement.  Patel Decl., Appendix 1 (showing 2023 Visa/Mastercard

overall commercial/credit combined rate is ██ basis points and consumer rate is ██ basis

points).  As a result of these agreements, with the complicity of ERCC, Visa and Mastercard

have jointly agreed to the interchange rates they will charge to the vast majority of merchants

and deliver to issuing banks for the next five years or more.

   This "relief" is both individualized and monetary.  Class members that do not pay posted

interchange rates but instead pay specified contractual rates (which are also supracompetitive)

will see no benefit from the minimal 4-basis-point rate "rollback."  Patel Decl. ¶ 4.  Moreover,

the extent to which a given class member who pays posted rates will see any of this "rollback"

will, among other things, depend on that merchant's mix of high interchange (rewards or card-

not-present) transactions.  *Id.* ¶¶ 10-17.  That stems from the fact that Visa's and Mastercard's

true system-wide volume-weighted consumer credit interchange rates are already likely below

the contrived "cap" set forth in the Proposed Mandatory Settlement, demonstrating that the "cap"

offers illusory relief for many merchants.  Patel Decl., Appendix 1 (showing 2023

Visa/Mastercard overall commercial/credit combined rate is ██ basis points and consumer rate

is ██ basis points); Decl. of Professor Keith Leffler, ECF No. 9179-6 (filed Mar. 26, 2024)

("Leffler Decl."), Appendix at 5 (showing a rate of ██ basis points).  As a result, Visa and

Mastercard and their member banks could shift cards to higher interchange categories, and

thereby raise consumer credit card interchange rates to merchants, under the "cap."  Patel Decl.

¶¶ 10-17.  That would differentially impact class members, particularly those that receive little or

no commercial card volume, with some seeing little or no benefit from the rate "rollback."  *Id.*

Merchants could be differentially impacted by the rate "cap" in numerous other ways, depending

on how Visa and Mastercard choose to manage their interchange tables to adhere to the "cap." For example, if the proportion of volume subject to custom interchange deals increases, Visa and Mastercard could raise rates to merchants not subject to those deals, typically smaller merchants, and stay under the "cap." If this happens, a small number of merchants will benefit, whereas a much larger universe of likely smaller merchants will experience rate increases. *Id*. ¶¶ 11-14.

The Proposed Mandatory Settlement also provides certain rules changes that ERCC claim justify a settlement that includes fixed rates jointly agreed to by Visa and Mastercard. None of those rules changes, however, include revisions to rules that eliminate issuer competition for merchants and enable the unlawful fixing of interchange—the Honor All Cards and default interchange rules. Instead, the Settlement offers further revisions to Visa's and Mastercard's surcharging rules.[8] These revisions would compel merchants that want to surcharge up to the cost of acceptance to engage in a form of parity surcharging. If the merchant accepts competing networks like American Express or Discover—which the vast majority of merchants, including the 7-Eleven Plaintiffs, do—and wants to surcharge Visa or Mastercard up to the cost of acceptance, it must surcharge competing networks at the same level.[9] That triggers the application of American Express's rules, which require that its cards are treated the same as other payment cards, including all credit and debit cards. Thus, if the merchant wants to surcharge Visa or Mastercard up to the cost of acceptance, the Proposed Mandatory Settlement maintains the level-playing-field restrictions of the 2012 Settlement, contrary to ERCC's claims.

---

[8] While the Proposed Mandatory Settlement permits surcharging at the network or product level, it expressly allows Visa and Mastercard to maintain their bans on differential surcharging at the issuer level. *See* Proposed Mandatory Settlement ¶¶ 28(a)(i), (b)(i), (d); 60(a)(i), (b)(i), (d).

[9] The Proposed Mandatory Settlement also permits surcharging of Visa or Mastercard credit cards up to 1% without requiring the merchant to surcharge American Express or Discover. Sett. ¶¶ 28(a), 60(a). Surcharging restricted to that amount—which is about one-third of the cost of acceptance—makes little economic sense for any merchant.

The Proposed Mandatory Settlement also purports to rescind the Honor All Wallets rule (*see* Sett. ¶¶ 24–27, 56–59), which requires merchants that switch on Near Field Communication technology to accept all third-party wallets such as Apple Pay.  But in doing so, the Settlement empowers Visa and Mastercard to tie a Visa or Mastercard owned or operated digital wallet to their Honor All Cards rules.  *Id.* ¶¶ 24(b), 56(b).  ERCC have thus not only failed to address the core competitive issue in this case—the Honor All Cards rule—they have empowered the extension of those rules to digital wallets.  ERCC also permit Visa and Mastercard to tie new products to their Honor All Cards rules, provided those products are subject to the over ■ basis points "cap," leaving the door open to further extensions of the Honor All Cards rules.[10]

The Proposed Mandatory Settlement shares many critical features with the 2012 Settlement.  Like that settlement, this Settlement fails to address the rules that bar issuer competition for merchants and enable the fixing of interchange fees (the Honor All Cards and

---

[10] The Proposed Mandatory Settlement also requires Mastercard to rescind its prohibition against discounting by issuer, and it further requires both Visa and Mastercard to clarify that their obligations under the DOJ consent decree shall extend to discounting by issuer.  Sett. ¶¶ 18-19.  Visa has permitted this form of steering since February 2013 with little impact on the marketplace.  As Professor Hausman explains in his report, discounting is ineffective standing alone without relief, such as against the Honor All Cards rules, which would cause issuers to compete for merchant acceptance or preference and thereby reduce interchange.  SDJX 400 (Hausman Report) ¶ 481 ("Since that rule change, there has been no evidence that change impacted interchange or resulted in meaningful competition between issuers for merchant preference.  I attribute this outcome to the continued anticompetitive effects of the HAC rules and the limitations of discounting as a standalone steering method discussed above.  With those rules in place and the supra-competitive interchange those rules enable, issuers have little incentive to compete by partnering with merchants to offer immediate discounts at the POS.  Merchants, for their part, have no incentive to enter into such partnerships unless issuers reduce their costs of acceptance, and with the HAC rules in place, issuers have no incentive to do so.  This outcome is supported by the record, including the lack of any strategy on the part of issuing banks to take advantage of Visa's rules changes.") (citation omitted).  Beyond this, the Proposed Mandatory Settlement provides that group buying shall be conducted in accordance with antitrust guidelines, and that Visa and Mastercard can disregard a buying group proposal that, in their view, does not benefit all of their stakeholders.  Sett. ¶¶ 30, 32, 62, 64.  And it allows merchants to conduct pilots of non-acceptance under certain stringent conditions.  Sett. ¶¶ 21-23, 53-55.

default interchange rules), while purporting to release all claims concerning those rules without any ability of class members to opt out.  Like the 2012 Settlement, the Proposed Mandatory Settlement confiscates individualized claims of class members who are involuntarily bound to this Settlement.  But in several critical respects, the Proposed Mandatory Settlement raises different, more egregious, problems than the 2012 Settlement.  Unlike the 2012 Settlement, it takes the claims of active litigants without their consent, litigants who were prosecuting their claims for years before ERCC were appointed.  Moreover, the Proposed Mandatory Settlement would enshrine, for five years or more, interchange rates that were jointly agreed to by Visa and Mastercard—dominant, horizontal competitors—with the complicity of ERCC.  And the Proposed Mandatory Settlement, unlike the 2012 Settlement, was agreed to against the backdrop of plaintiffs' claims being ready for trial after surviving numerous summary judgment and *Daubert* motions.

## ARGUMENT

### I.    Legal Standard

To grant preliminary approval, the Court must be satisfied "that it will likely be able" to approve the proposed settlement under Rule 23(e)(2).  Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment; *see In re Payment Card Interchange Fee & Merchant Disc. Antitrust Litig.*, 330 F.R.D. 11, 28 n.21 (E.D.N.Y. 2019).

Rule 23(e) permits approval of a settlement "only on finding that it is fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e).  The Rule enumerates four factors to guide the court in its analysis:

> (A) the class representatives and class counsel have adequately represented the class;
>
> (B) the proposal was negotiated at arm's length;
>
> (C) the relief provided for the class is adequate, taking into account:

(i) the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). "Factors (A) and (B) are 'procedural' factors that examine 'the conduct of the litigation and of the negotiations leading up to the proposed settlement,' while (C) and (D) are 'substantive,' addressing 'the terms of the proposed settlement.'" *M.F. ex rel. Ferrer v. New York City Dep't of Educ.*, 671 F. Supp. 3d 221, 225 (E.D.N.Y. 2023) (quoting Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment).  In addition to the factors prescribed by Rule 23, courts in the Second Circuit must consider the factors enumerated in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974); *see, e.g.*, *In re Payment Card Interchange Fee & Merchant Disc. Antitrust Litig.*, 330 F.R.D. at 29.

"Even at the preliminary approval stage, the Court's role in reviewing the proposed settlement 'is demanding because the adversariness of litigation is often lost after the agreement to settle.'"  *In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d 686, 692 (S.D.N.Y. 2019) (quoting *Zink v. First Niagara Bank, N.A.*, 155 F. Supp. 3d 297, 308 (W.D.N.Y. 2016)).  The Court's duty to closely review the Proposed Mandatory Settlement is especially important here:  the proponents of this Settlement are asking the Court to stay the 7-Eleven Plaintiffs' (and the other Direct Action Plaintiffs') declaratory judgment and injunctive claims, which have been actively litigated for over a decade, without their consent and without opt-out rights, upon preliminary approval, and enjoin further pursuit of these claims.  *See* Class Sett. Notice & Sched. Order at E-

15

1, E-6 ¶¶ 20-21, ECF No. 9179-8 (filed Mar. 26, 2024) (staying all proceedings and enjoining all class members to the extent they seek equitable relief).

## II.     The 7-Eleven Plaintiffs Are Not Adequately Represented in the Proposed Mandatory Settlement

Rule 23(e)(2)(A) requires the Court to consider whether "the class representatives and class counsel have adequately represented the class" with respect to the proposed settlement. This is required regardless of whether the class was previously certified as a litigation matter, because "in addition to evaluating the proposal itself, the court must determine whether it can certify the class under the standards of Rule 23(a) and (b) *for purposes of judgment based on the proposal*." 2018 Advisory Committee Notes (emphasis added). The "focus at this point is on the actual performance of counsel acting on behalf of the class." *Id.*; *see also* 4 Newberg & Rubenstein on Class Actions § 13:49 (6th ed.) (citing Advisory Committee Notes); *Boucher v. Syracuse Univ.*, 164 F.3d 113, 118 (2d Cir. 1999) ("[U]nder Rule 23(c)(1), courts are required to reassess their class rulings as the case develops.") (citation omitted).

### A.     The Due Process Clause and Rule 23 Require the Right to Opt Out and Pursue Individualized Claims

In accordance with principles of due process, Rule 23(b) authorizes a non-opt-out, (b)(2) class only in unique circumstances where "claims for *individualized* relief" are not at issue. *Dukes*, 564 U.S. at 360. In the Supreme Court's words, "[t]he key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Id.* (internal quotation omitted); *see DDMB*, 2021 WL 6221326, at *44 (concluding "class would generally benefit from equitable relief prohibiting Defendants' challenged conduct"); *id.* (concluding "equitable relief is appropriate because such relief would

16

apply to and benefit the class as a whole"); *id.* at *45 (concluding "Defendants have acted on grounds generally applicable to the class and that each merchant in the class stands to benefit from equitable relief from the Restraints").

The Proposed Mandatory Settlement cannot meet this standard. The relief includes a rate "cap" that plainly is monetary in nature, with entirely individualized effects.

### 1.    As the Principal Relief is Monetary, the Settlement Violates Due Process by Not Granting Opt-Out Rights

ERCC essentially admit that the rate "relief" is monetary by pointing to *Visa Check* and the 2012 Settlement as precedent for this type of rate cap. Equitable Relief Class Pls' Mem. Of Law in Support of Mot. For Prelim. Approval of Settlement, ECF No. 9179-1 (filed Mar. 26, 2024) ("ERCC Br.") at 29. In both examples, however, the court classified the temporary rate reduction as *compensatory relief.*[11] Lest there be any doubt about this conclusion, the ERCC press release trumpeted this Settlement as a $30 billion settlement for merchants.[12]

---

[11] *In re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d 503, 508–09 (E.D.N.Y. 2003) ("Most of the compensatory relief will take the form of cash payments . . . in annual installments over the next 10 years. The relief also includes approximately $846 million—the amount by which the interchange rates for defendants' debit products have been reduced for the period from August 1, 2003 through December 31, 2003. The discounted present value of the total compensatory relief . . . amounts to $3,383,400,000 (the 'Fund').") (internal citations omitted); *In re Payment Card Interchange Fee & Merchant Disc. Antitrust Litig.*, 986 F. Supp. 2d 207, 241 (E.D.N.Y. 2013) (describing the total $7 billion in cash as comprised of two funds, including an "estimated $1.2 billion Default Interchange Payments Fund . . . based on one-tenth of one percent of the claimant's Visa and MasterCard transactions during the eight-month period").

[12] Decl. of Jeffrey I. Shinder in Supp. of Obj. to ERCPs' Mot. for Prelim. Sett. Approval ("Shinder Decl.") Ex. A, Press Release, *U.S. Merchants Enter into Landmark Class Action Settlement with Visa and Mastercard to Eliminate Anti-Competitive Restraints and Reduce Swipe Fees* (Mar. 26, 2024) ("At least $29.79 billion in savings will be realized in the five years following approval of the settlement from agreed upon caps and rollbacks on credit card processing fees, or 'swipe fees.'").

### 2. The "Relief" Is Divisible and Will Not Benefit All Merchants

#### a. The Monetary Relief Is Divisible

In addition to being monetary in nature, the rate "relief" in the Proposed Mandatory Settlement is highly individualized. Merchants that do not pay posted rates will receive no benefit from the 4-basis-point reduction in posted rates set forth in the Settlement. A substantial percentage of network volume—according to Professor Leffler, more than ▮▮▮▮ involves deals where the merchant does not pay posted rates. Leffler Decl., Appendix at 3. For 2023, that is approximately ▮▮▮▮ in volume. Patel Decl. ¶ 12 n.16 & Appendix 2. As for class members who do pay posted rates, whether they will benefit is highly dependent on how Visa and Mastercard choose to manage their interchange tables and their deals with issuers to stay under the "cap," along with individualized factors such as the merchant's mix of consumer credit and commercial card transactions, and their mix of lower non-rewards card transactions versus higher-interchange rewards card transactions. *Id.* ¶¶ 10-17. A settlement with such individualized monetary relief should not be approved without giving class members the right to opt out.

Thus, because the Proposed Mandatory Settlement involves monetary or "money-adjacent claims within a (b)(2) class," it creates individualized issues that render a mandatory class inappropriate. *DDMB*, 2021 WL 6221326, at *28 (citing *Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 565 (C.D. Cal. 2012) (denying certification where plaintiffs improperly sought to include a reimbursement program to avoid the requirements of Rule 23(b)(3)).

There is no authority approving a release of present or future individualized claims without granting class members the right to opt out. The most analogous decision, *Visa Check*, approved the certification of a class of merchants under *only* Rule 23(b)(3), precisely to avoid

18

"the primary concern . . . about Rule 23(b)(2)," *i.e.*, "the absence of mandatory notice and opt-out rights." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 147 (2d Cir. 2001) (Sotomayor, J.). This Court's discussion of *Visa Check* in its decision certifying the mandatory Rule 23(b)(2) class is instructive. At the class certification juncture, this Court rejected the Direct Action Plaintiffs' argument that ERCC would trade Honor All Cards claims for surcharging relief as premature—a concern that has proven prescient—citing *Visa Check* for the proposition that differences over litigation strategy is insufficient to demonstrate inadequate representation. But this Court further noted that "[h]ad the class representatives sought a different form of relief entirely—*that is, monetary damages versus equitable relief*, it may have raised an issue of inadequate representation." *DDMB*, 2021 WL 6221326, at *23 (emphasis added) (citations omitted). That is precisely what ERCC have now done, seeking monetary relief versus equitable relief, rendering them inadequate as representatives for the class as well as the 7-Eleven Plaintiffs.

### b. The Rules Relief Is Divisible

The Proposed Mandatory Settlement should be rejected for an additional reason: it fails to offer indivisible relief to the class as whole. To the contrary, the Settlement improperly binds millions of diverse commercial entities together in a mandatory (b)(2) class, diverse merchants with conflicting interests, who therefore have not been adequately represented by ERCC.

In its certification decision, the Court concluded that there is not an independent cohesion requirement in the Second Circuit because that concept is built into the text and structure of Rule 23(b)(2). *DDMB*, 2021 WL 6221326, at *44 ("Accordingly, to the extent 'cohesion' is required in Rule 23(b)(2) class actions, the Court understands it to refer to the requirements of Rule 23(b)(2) itself, rather than an additional requirement beyond the rule's text."). In doing so, the

Court cited the Second Circuit's decision in *Robinson v. Metro-North Commuter Railroad Co.*, 267 F.3d 147, 165 (2d Cir. 2001), to suggest "that cohesion is inherent in a properly certified Rule 23(b)(2) class action because class members' claims are inherently intertwined and *relief to anyone in the group would be relief to the group as a whole*." *DDMB*, 2021 WL 6221326, at *43 (emphasis added) (citations omitted).  This holding is consistent with the Supreme Court's decision in *Dukes* that Rule 23(b)(2) "applies only when a single injunction . . . would provide relief to each member of the class;" it "does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant."  564 U.S. at 359.

The fact that defendants' practices *affect* all class members to some degree and that certain merchants have common complaints about them is insufficient to justify approval of a class settlement for injunctive relief.  If individual class members would want to litigate and redress their claims in different ways—particularly when a settlement purports to resolve multiple claims, and the class members' differing interests in those claims might be traded off against each other—then those claims are not suitable for (b)(2) treatment.  *See, e.g.*, *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 854-58 (1999) (noting the problem in a mandatory class action settlement aggregating different kinds of claims, including that "[t]he very decision to treat [all types of claims] the same is itself an allocation decision with results almost certainly different from the results that those with [different types of claims] would have chosen").

Here, the meager rules changes in the Proposed Mandatory Settlement will have very different value for different merchants.  Setting aside that surcharging is not an adequate remedy

20

for the substantial market power that supports supracompetitive interchange,[13] it is a remedy that intrinsically provides differentiated value to differently situated class members.  As ERCC acknowledge, ERCC Br. at 12, while many state restrictions have been repealed in recent years, some remain, and thus, some class members cannot surcharge because of state restrictions— including New York, where merchants cannot express surcharges as a percentage added to a customer's purchase.[14]  In total, merchants in states with more than 11% of U.S. consumer

---

[13] In 2007–2008, the Reserve Bank of Australia requested comment on, among other things, whether interchange rate regulation was necessary if merchant surcharging could restrain Visa's and Mastercard's interchange rates.  The RBA found that surcharging failed to restrain Visa's and Mastercard's market power, stating that "the Board is not persuaded that in the absence of some form of regulatory oversight the competitive forces would be strong enough to ensure that interchange fees will be set at levels that promote the overall efficiency of the system."  Shinder Decl. Ex. B, *Reform of Australian Payments System, Conclusions of the 2007/08 Review*, Reserve Bank of Australia (Sept. 2008), at 15; Shinder Decl. Ex. C, *Review of Card Payments Regulation, Issues Paper,* Reserve Bank of Australia (Mar. 2015), at 9.  Because surcharging is an inadequate market-wide solution for interchange, the RBA continues to maintain rate regulation, many years after surcharging was first permitted in Australia.

[14] The new law in New York effectively bars surcharging as it is defined in federal and state laws and Visa and Mastercard rules:  "any means of *increasing the regular price* to a cardholder which is not imposed upon customers paying by cash, check, or similar means."  *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 39 (2017) (discussing the history of surcharging and quoting the Truth in Lending Act, § 3(a), 90 Stat. 197 (1976) (emphasis added)); *see, e.g.*, Visa Operating Rules, "Credit Card Surcharge:  In the . . . US Region, and US Territories:  A fee assessed to a Cardholder by a Merchant that is added to a Credit Card Transaction for the acceptance of a Credit Card."); Mastercard Rule 5.12.2 ("A surcharge is any fee charged in connection with a Transaction that is not charged if another payment method is used.").  N.Y. General Business Law § 518.1, amended February 11, 2024, requires the 'regular price' to include any additional surcharge.  *See* Shinder Decl. Ex. D, *Governor Hochul Announces New Law to Clarify Disclosure of Credit Card Surcharges Goes Into Effect Sunday, February 11*, Governor of N.Y. (Feb. 6, 2024); Shinder Decl. Ex. E, *Credit Card Surcharge Guidance*, N.Y. Dep't of State (adding a surcharge at the point of sale is "illegal").  ERCC also omit that the FTC recently proposed a rule against "junk fees" that would operate just like the New York law, requiring that merchants display the total price, deeming a percentage surcharge at the point of sale an unfair and deceptive practice under federal law.  *See* Notice of Proposed Rulemaking, 88 Fed. Reg. 77420, 777472, 77483-84 (Nov. 9, 2023) (proposing regulation that would require merchants to disclose the "Total Price" including any credit card surcharges).  Finally, in addition to Connecticut and Massachusetts, Maine also prohibits surcharging.  Me. Rev. Stat. Ann. tit. 9A, §8-509 (2021).

spending are barred from surcharging.[15]  The clearest possible example of a class lacking

common interest in a claim is where—as here—relief on that claim will not apply to certain

members *as a matter of law*.  When "variations in state law might cause class members' interests

to diverge," a "district court should pay particular attention to . . . Rule 23's requirements

'designed to protect absentees by blocking unwarranted or overbroad class definitions.'"  *In re*

*Am. Int'l Grp. Sec. Litig.*, 689 F.3d 229, 243 (2d Cir. 2012) (citations omitted); *see also Amchem*

*Products, Inc. v. Windsor*, 521 U.S. 591, 624 (1997) (noting that "[d]ifferences in state law"

undermine class treatment).

Many other class members would not surcharge because of their business model or their

relationships with their customers.[16]  Those that might deploy surcharging might prefer the

ability to differentially surcharge by issuer, or by surcharging Visa and Mastercard up to the cost

---

[15] Shinder Decl. Ex. F, *State annual summary statistics: consumer spending,* Bureau of Econ.
Analysis (2022) (total consumer spending of Connecticut, Maine, Massachusetts, and New
York).

[16] *See, e.g.*, Shinder Decl. Ex. G, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Objections annexed to Decl. of Jeffrey I. Shinder in Supp. of
Opp. to Class Pls.' Mot. for Final Approval of the Proposed Class Sett., ECF No. 2670-1 (filed
May 28, 2013) ("Shinder 2013 Opp. Decl.") Exs. 1 (Coborn's (ECF No. 2670-2)) ¶ 15
("[S]urcharging is not a realistic option for Coborn's.  In the extremely competitive retail
marketplace, a retailer that surcharges its customers will quickly lose those customers to other
retailers that choose not to surcharge.  Coborn's made the unimportance of surcharging clear to
Class Counsel during the settlement mediation process, but the Class Counsel ignored Coborn's
statements."); 3 (Jetro (ECF No. 2670-2)) ¶ 9 ("Jetro has no plans to currently implement
surcharges, under any set of rules, due to competitive forces in the market.  Jetro competes for
customers on price, and the imposition of a surcharge could eviscerate that competitive
advantage."); 32 (GNC (ECF No. 2670-3)) ¶ 11 ("GNC has no current intention to impose
surcharges on customers.  We operate in a competitive, price sensitive market, and we believe
that imposing surcharges would result in an unacceptable loss of business."); 39 (Lowe's (ECF
No. 2670-3)) ¶ 14 ("Surcharging would pose a daunting challenge to Lowe's point of sale
operations, especially in the high-volume home improvement retail store environment.
Maintaining acceptable levels of customer service, customer loyalty, and the costs and
manpower required to comply with the complex surcharging rules would be impractical.").

of acceptance but not American Express or a lower-priced network such as Discover, neither of which are permitted under the Proposed Mandatory Settlement.  The Settlement also allows Defendants to charge two separate rates—one for merchants who surcharge, and one for those who do not.  Sett. ¶¶ 28(g)(i), 60(g)(i).

In other words, Defendants remain free to further balkanize the class after the fact and exploit bargaining leverage (which will surely be greater as to some merchants than others) to create a system in which the allegedly common practice that underlies (b)(2) certification becomes uncommon or utterly variable once again.

> ### c.   The Settlement Release Fails to Account for the Divisible Relief and Relinquishes Claims Against Network Fees

The Proposed Mandatory Settlement also releases claims against not just one of Defendants' practices, nor even several of their rules that relate to interchange fees identified in the Equitable Relief Class Plaintiffs' Complaint, but all of the policies in Defendants' massive rulebooks, their unwritten policies and practices, and any future rules, policies, or practices that are "substantially similar."  Sett. ¶ 82(c); *see also id.* ¶ 1(t) (definition of "Merchant Fee") and (y) (definition of "Rule" to include practice or course of conduct).

This materially expands the reasons why the Proposed Settlement cannot be reconciled with Rule 23(b)(2):  An already maximally diverse group of merchants will have even more conflicting interests in determining which rules and practices harm them the most and should be the subject of any negotiated relief.  For that reason, these class members would certainly not seek an "indivisible" bargain with respect to all those claims "at once."  *Dukes*, 564 U.S. at 361. ERCC has secured essentially monetary relief in the form of rate caps and modest relief on one claim (surcharging) while abandoning for the foreseeable future every claim concerning the rules

23

(Honor All Cards, default interchange) that would generate issuer competition for merchants, and thus, downward competitive pressure on interchange.[17]

This conclusion is reinforced by the Proposed Mandatory Settlement's failure to protect merchants against Visa and Mastercard raising network fees to merchants. Visa and Mastercard have already brazenly demonstrated their intention to raise network fees against the backdrop of the Settlement. Mastercard recently announced a 1-basis-point increase to a merchant-side fee,

---

[17] *See, e.g.*, DAP's Counterstmt. of Material Facts ¶ 167, ECF No. 8196 (filed Sept. 22, 2020) ("DAPs' Counterstmt.") ("Professor Hausman and Dr. Harris conclude that without the HAC Rules, issuers and networks would not have the market power to charge supracompetitive transaction prices."); *id.* ¶¶ 172 ("The HAC Rules prevent Plaintiffs from being able to negotiate with individual issuers for lower interchange fees."); 175 ("The HAC Rules prevent the economic response one would expect in a competitive market, which is for merchant-side competition to counteract high interchange fees.") (citing SJDX 400 (Hausman Report) ¶ 364 ("From an economic perspective, in a competitive market one would expect that competition on the other side of the platform—for merchant acceptance—would be a way of counteracting this tendency. But the HAC rules effectively prevent such competition, which means these competitive forces are unable to restrain the systematic distortion toward excessive interchange fees and overall costs toward which the Visa and Mastercard platforms are prone."); SJDX 391 (Harris Report) ¶ 721 ("In a competitive but-for world without the Honor All Cards rules, one would expect to see rigorous competition for merchant acceptance as card issuers attempt to distinguish themselves from rivals . . . . Instead of forcing merchant acceptance via collectively set rules, issuers would compete for it—a card that has limited acceptance by merchants has limited utility to a consumer (or an issuer) so issuers would need to compete for merchant acceptance in order to compete for consumers . . . . The end result of such competition would be lower merchant prices and true competitive balance between both sides of the two-sided platform, free of the distortive effects of the Honor All Cards rule and the other Competitive Restraints.")); 409 ("Merchants testified that the HAC Rules prevent issuing banks from competing for merchant acceptance."); 894 ("Because the HAC Rule and other Competitive Restraints eliminate issuer competition for merchant acceptance, merchants are forced to pay interchange and network fees that are significantly above the levels that would have existed in the absence of the rules . . . ."); 1142 ("Given the value of maintaining debit card acceptance and the potential value of partnering with merchants to originate new accounts, absent the HAC Rule it would have made economic sense for issuers to compete for debit card acceptance by reducing interchange to merchants.") (citing SJDX 400 (Hausman Report) ¶¶ 541-42 and other evidence); 1143 ("As explained by Professor Hausman, '[i]n the absence of the HAC rules, had large merchants entered into bilateral agreements with larger issuers, likely for both credit and debit acceptance, it is my view that smaller debit card issuers would have agreed to reduce interchange rates to preserve acceptance.'") (citing SJDX 400 (Hausman Report) ¶ 542).

on top of a recent 1-basis-point increase in a fee on all card-not-present volume, while Visa announced a 0.75-basis-point increase on card-not-present volume and a new fee on transactions involving commercial card products.[18]  Notably, in Europe, following the EU regulation of interchange, Visa and Mastercard increased network fees to merchants.  Patel Decl. ¶ 21.  The likelihood that Visa and Mastercard will continue to increase network fees will especially harm smaller merchants.  ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████.  *Id*. ¶ 22.

The Proposed Mandatory Settlement's anti-circumvention language will not restrict Visa's and Mastercard's ability to raise network fees.  The language, by focusing on the "systematic[] transfer" of network fees to replace interchange, is drafted to permit Visa and Mastercard to continue to do what they have been doing for over a decade—increase merchant fees ████████████████████████████████████████████████████████████████

███████████████████████  Patel Decl. ¶¶ 18-20.  And, of course, nothing in the Proposed Mandatory Settlement prevents Visa and Mastercard from continuing to raise network fees for

---

[18] Shinder Decl. Exs. H, Katie Arcieri, *Mastercard Still Raising Some Fees After Retailer Settlement*, Bloomberg Law (Apr. 3, 2024) ("The card company plans to raise its network 'assessment' fee to 0.14% from 0.13%, equating to an annual increase of $259.1 million . . . ."); I, Payment Network Pass-Through Fee Schedule, Wells Fargo Merchant Services (Apr. 2024), at 3, 6; Angel Au-Yeung, *Visa, Mastercard Prepare to Raise Credit-Card Fees*, Wall St. J. (Aug. 30, 2023); Shinder Decl. Ex. J, *The Top Upcoming Card Brand Changes All Merchants Should Know About*, W. Capra (Mar. 17, 2022) ("Effective April 1, 2022, Mastercard will double the Digital Enablement Fee (DEF) to 0.02% for Card Not Present (CNP) transactions in the US."); *see also* Patel Decl. ¶ 20 (referencing network fees imposed by Visa and Mastercard since October 2014).  In 2019, █████████████████████████████████████████████████████ ████████████████████████."  Shinder Decl. Ex. K, █████████████ ███████████████████████████████████████████████

25

the benefit of their own bottom lines, increasing the possibility that smaller merchants will be differentially impacted by this Settlement.

The members of the (b)(2) class are differently situated and ascribe very different value to the proposed rules changes for the purpose of negotiating a global settlement.  The Proposed Mandatory Settlement plainly violates *Dukes*' holding that "Rule 23(b)(2) applies only when a single injunction . . . would provide relief to each member of the class."  564 U.S. at 360.

### B.    The Court Should Amend Its Class Certification Order to Grant the 7-Eleven Plaintiffs Opt-Out Rights

The Court's class certification decision rejected as "speculative" the Direct Action Plaintiffs' concern that ERCC would exchange relief on the Honor All Cards or default interchange rules for surcharging relief.  *DDMB*, 2021 WL 6221326, at **18, 22.  That concern has now been realized.  If approved, the Proposed Mandatory Settlement would effectively eliminate the 7-Eleven Plaintiffs' ability to secure Honor All Cards relief—even for themselves in the form of individualized injunctive relief—providing in exchange only monetary relief in the form of rate "caps" and limited surcharging relief, which is essentially worthless to the 7-Eleven Plaintiffs.[19]  This raises a fundamental adequacy problem, just as the Second Circuit "expressed further concern that the injunctive relief secured for the (b)(2) class would not apply uniformly to benefit all (b)(2) members . . . ."  *Id.* at *4.  For example, the "Second Circuit stated that more beneficial relief might consist of remedies that affect[] the default interchange fee or honor-all-

---

[19] The rest of the "relief" in the Proposed Mandatory Settlement is worth little to the 7-Eleven Plaintiffs.  The Honor All Wallets relief is undermined by the fact that Visa and Mastercard can tie owned and operated digital wallets to the Honor All Cards rule.  Sett. ¶¶ 24–27, 56–59.  Discounting by issuer is, for the reasons discussed above, insufficient to jump start a competitive dynamic in the absence of broader relief such as Honor All Cards relief.  And the group buying relief merely parrots the antitrust laws, while giving Visa and Mastercard license to reject proposals that, in their view, do not benefit all stakeholders.  *Id.* ¶¶ 30, 62.

cards rule." *Id.* at *18 (citing *Interchange Fee I*, 827 F.3d at 230, 238).  By failing to address these issues in the Proposed Mandatory Settlement, ERCC have "trad[ed] the claims of many merchants for relief they cannot use: they actually receive[] nothing." *Id.* at *23 (quoting *Interchange Fee I*, 827 F.3d at 238-40); *see also id.* at *42 ("certification of a class for injunctive relief is only appropriate where 'a single injunction . . . would provide relief to each member of the class'") (quoting *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 97 (2d Cir. 2015)). Here, ERCC argued that certification was appropriate because the default interchange and Honor All Cards rules applied uniformly to the class—and yet neither are addressed in the Proposed Mandatory Settlement.  *Id.* at *44.

Further, while the Court held that opt-out rights were not necessary at the class certification stage, the Court noted that the "Second Circuit declined to decide 'whether providing these class members with opt out rights would be a sufficient structural assurance of fair and adequate representation . . . .'" *Id.* at *17 (quoting *Interchange Fee I*, 827 F.3d at 234); *see also id*. at *31.  Given the Proposed Mandatory Settlement's reliance on individualized relief, to preserve the due process rights of class members, opt-out rights should be provided to those, like the 7-Eleven Plaintiffs, who want to pursue injunctive relief.  *Id.* at *31 (finding no Due Process violation from the "lack of ability to opt out" because (b)(2) class did not seek money-adjacent relief).

Moreover, in certifying a mandatory litigation class, the Court noted ERCC's argument that "any equitable relief secured via verdict or settlement 'will serve only as a baseline for all [m]erchants going forward' because 'every [m]erchant will remain free to seek to negotiate additional relief specific to themselves and their own business needs.'" *DDMB*, 2021 WL 6221326, at *18 (citing ERCC Class Cert. Br. 30-31).  Yet, the Proposed Mandatory Settlement

reveals that assertion to have been false.  Instead of preserving the 7-Eleven Plaintiffs' freedom to negotiate individualized relief "specific to themselves," this Settlement would extinguish all of the 7-Eleven Plaintiffs' injunctive claims against the rules that matter to them; specifically, those that prevent issuer competition for merchants (Honor All Cards, default interchange).

Finally, the Proposed Mandatory Settlement also has been designed to confiscate the ongoing claims of the 7-Eleven Plaintiffs (and the other Direct Action Plaintiffs).  In this respect, the 7-Eleven Plaintiffs could not be more differentiated from the millions of absent class members.  The 7-Eleven Plaintiffs filed a complaint asserting claims for declaratory and injunctive relief in 2013, years before Rule 23(b)(2) class counsel were appointed.[20]  In over ten years of litigation, Defendants never brought a motion directed at the 7-Eleven Plaintiffs' right to seek such relief.[21]  Instead, rather than address the merits with those claims ripe for trial, Defendants and ERCC are seeking to eliminate them through another improper Rule 23(b)(2) settlement.

---

[20] Five of the 7-Eleven Plaintiffs were named class representatives in the initial class actions seeking monetary and equitable relief first filed in 2005:  Coborns, D'Agostino, Jetro, NACS, and the National Grocers Association.

[21] Defendants' concerns about conflicting injunctions are premature.  *See* Defs.' April 10, 2024, Letter Opposing the Request for a Status Conf., ECF No. 9201 (filed April 10, 2024); *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 720, 727 (2d Cir. 2023) (leaving the question of the legality of a release of future claims to the developed factual record of a future litigation).  The 7-Eleven Plaintiffs have the right to seek market-wide injunctive relief if they prove their claims and show that such relief is necessary to remedy the competitive harm to the market.  Injunctive relief is central to the Sherman Act, and "courts have an obligation, once a violation of the antitrust laws has been established, to protect the public from a continuation of the harmful and unlawful activities."  *United States v. Parke, Davis & Co.*, 362 U.S. 29, 48 (1960); *United States v. Bausch & Lomb Optical Co.*, 321 U.S. 707, 724 (1944) ("The scope of equity's power, Sherman Act, Sec. 4, 26 Stat. 209, 15 U.S.C.A. § 4 to obviate continued restraint on trade in accordance with the Congressional direction as to the use of the injunction against violators of the Sherman Act is no more restricted in its field than that of Congress."); *see, e.g.*, *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1003 (9th Cir. 2023) (affirming injunction under state unfair competition law against Apple with respect to all developers, not just the plaintiff, "because the scope is tied to [plaintiff's] injuries"), *cert. denied*, 144 S. Ct. 682 (2024).

There is no precedent for the confiscation of the claims of *present class members* who are actively litigating their claims.  *Cf. Hansberry v. Lee*, 321 U.S. 32, 41 (1940) ("*absent parties* are bound by the decree" so long as they are adequately represented) (emphasis added); *Sharp Farms v. Speaks*, 917 F.3d 276, 292-94 (4th Cir. 2019) (vacating settlement where parties "intentionally and deliberately negotiated a settlement that was intended" to affect the claims of other litigants); *Smith v. Sprint Commc'ns Co., L.P.*, 387 F.3d 612, 614 (7th Cir. 2004) (vacating settlement that interfered with parallel proceedings of absent class members).  Here, the Proposed Mandatory Settlement was specifically designed to bar the 7-Eleven Plaintiffs' (and other Direct Action Plaintiffs') ability to request an injunction against the core rules at issue in this case, the Honor All Cards and default interchange rules.  In fact, the Settlement provides the Defendants termination rights if the Court permits opt-outs.  Sett. ¶ 103 (allowing Defendants to "unilaterally terminate" if exclusions are permitted).

ERCC claim that "courts regularly stay potentially conflicting claims pending consideration of a proposed class settlement."  ERCC Br. at 31.  But the two cases they cite for this practice do not support their position—the Second Circuit vacated the 2012 Settlement and Judge Garaufis rejected the proposed settlement in *American Express* amid concerns about the conduct of class counsel.  *See Interchange Fee I*, 827 F.3d at 240; *In re American Exp. Anti Steering Rules Antitrust Litig.*, Nos. 11-md-221, 13, 2015 WL 4645240 (E.D.N.Y. Aug. 4. 2015).  In fact, contrary to ERCC's contention, there is nothing "regular[]" about a mandatory settlement aimed *directly* at compromising other plaintiffs' advanced litigation over their objection.[22]

---

[22] A recent settlement between the states suing Google over the Play Store, currently under review by the court, debunks the notion that a defendant should somehow be assured 'global peace' as part of a settlement providing injunctive relief.  During a recent hearing, when the court asked, "If I were to approve this, what would the impact be on the possibility of an

### III.     The Proposed Mandatory Settlement Includes a Naked Price-Fixing Arrangement

The Proposed Mandatory Settlement is both substantively and procedurally improper:  It enshrines a price-fixing arrangement that will affect the overwhelming majority of credit card transactions in the United States.[23]  That arrangement is per se illegal, and a court may not approve a settlement that allows "clearly illegal conduct . . . ."  *Robertson v. NBA*, 556 F.2d 682, 686 (2d Cir. 1977); *see also Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 395 (C.D. Cal. 2007) ("The Court is very concerned about the possibility that ratifying these provisions would effectively bless illegal conduct."); *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 526 (1986) (parties to settlement may not "agree to take action that conflicts with or violates the statute upon which the complaint was based").

Visa and Mastercard are horizontal competitors in the credit transactions market, a fact they have emphasized throughout this litigation.[24]  They compete for issuance, and while they

---

injunction in the *Epic v. Google* case?" which had recently been the subject of a jury verdict, the parties indicated that injunctive relief would still be available in that case.  Feb. 26, 2024 Hearing Tr. at 30-35, *In re Google Play Store Antitrust Litig.*, No. 21-md-2981-JD (filed Feb. 26, 2024), attached as Shinder Decl. Ex. L.

[23] Contrary to ERCC's claims, ERCC Br. at 24, the Second Circuit had held it is error to apply a presumption of procedural fairness in reviewing a class action settlement.  *Moses v. New York Times Co.*, 79 F.4th 235, 243 (2d Cir. 2023).

[24] *See*, *e.g.*, Defs.' Reply in Supp. of Defs' Stmt. of Material Facts at 27, ECF No. 8103 (filed Dec. 18, 2020) ("Defs.' 56.1 Stmt. Reply") ("*Visa and Mastercard compete with each other by setting interchange* and network fees on both sides of the platform at a level that maximizes the number of transactions that run on their networks . . . .") (emphasis added) (referring to Defs.' 56.1 Stmt. ¶¶ 47, 70–72); *see also* Mastercard & Bank Defs.' Mem. of Law in Supp. of Mot. for Summ. J. Based on Mastercard's Lack of Market Power at 8, ECF No. 8073 (filed June 1, 2020) ("Mastercard competes with the other networks, in particular Visa, for issuance, and default interchange rates are a key factor in the competitive landscape."); Defs.' Stmt. of Material Facts ¶ 70, ECF No. 8068 (filed June 1, 2020) ("Defs.' 56.1 Stmt.") ("Visa and Mastercard compete for payment card transactions."); *id.* ¶¶ 152 ("Visa, Mastercard, American Express, and Discover are the four primary general purpose credit card networks competing for credit transactions in the U.S."); 154 ("Visa and Mastercard compete for transactions with each other and other networks by, among other things, using interchange and network fees to incentivize card issuance and

should also compete on the merchant side of the market, they largely do not because of the restraints at issue in this case. Visa and Mastercard compete directly by, among other things, setting interchange rates that merchants pay to issuing banks. Through the Proposed Mandatory Settlement, however, Visa and Mastercard have collectively agreed to fix the interchange rates that merchants will pay to issuing banks. Visa and Mastercard have done so in two ways: first, by jointly agreeing to lower their published interchange rates by an identical 4 basis points, and second, by agreeing to the creation of a single wholly contrived benchmark—7 basis points below their *combined* volume-weighted system-wide interchange rates for consumer and commercial credit card transactions.

In proposing this "relief," the settling parties ask the Court to approve the resolution of antitrust violations through the mechanism of a different antitrust violation. Until now, the horizontal restraints at issue in this case were the agreements among the issuing bank members of the Visa or Mastercard networks not to compete for merchant acceptance and to fix interchange rates. The proponents attempt to resolve injunctive claims concerning those Section 1 violations by, among other things, sanctioning an express horizontal agreement between two network competitors, Visa and Mastercard, to fix interchange rates. These proposed restraints on price, entered into by two undisputed horizontal competitors, are per se unlawful. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 213 (1940). It is well-settled that any agreement "formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing

---

merchant acceptance."); *see also* Defs.' 56.1 Stmt. Reply at 13 ("Visa and Mastercard indisputably are robust competitors with each other and other card networks . . . ."); 25-26 ("Defendants set out undisputed evidence that Visa and Mastercard compete vigorously against each other for issuance, acceptance, and transaction volume, as well as against other card networks and payments systems.") (all citations in foregoing omitted).

the price . . . is illegal per se" and the precise "machinery employed . . . is immaterial." *United States v. Apple, Inc.*, 791 F.3d 290, 327 (2d Cir. 2015) (citation omitted).

That conclusion is inescapable, whether interchange is viewed as a component of the single two-sided price, or as the central price that Visa and Mastercard require merchants to pay to issuers.  The per se rule condemns not only conspiracies as to the ultimate 'single market price,' but also those that "fix some element of price or the process by which price is determined . . . ."  Phillip E. Areeda (late) & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 2020 (4th & 5th eds. 2023 cum. supp.); *id.* ¶ 2022a ("The per se rule generally governs not only explicit price fixing but also agreements to fix a 'price element,' which . . . is defined broadly to include any term of sale that can be regarded as affecting the price . . . or any mechanism such as a formula by which the price may be computed."); ABA, Antitrust Law Developments (9th ed. 2022) at 87 ("To constitute horizontal price fixing, the agreement among competitors need not directly concern the final or total prices charged to the consumers.").  It is "virtually self-evident" that any conspiracy regarding an "inseparable part of the price" falls "squarely within the traditional *per se* rule against price fixing."  *Catalano v. Target Sales*, 446 U.S. 643, 648 (1980) (citations omitted).

ERCC and Defendants cannot justify their price-fixing agreement on the basis that it sets a maximum, rather than a minimum, price:  "agreement[s] among competitors to fix maximum resale prices of their products . . . , no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment." *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons*, 340 U.S. 211, 213 (1951); *Arizona v. Maricopa Med. Soc'y*, 457 U.S. 332, 348 (1982) (maximum price-fixing subject to per se rule).

A price-fixing agreement also cannot be justified merely because it was effectuated as part of a settlement agreement. *Robertson*, 556 F.2d at 686 (A "settlement that authorizes the continuation of clearly illegal conduct cannot be approved."); *accord Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 123 (8th Cir. 1975). That flows from the bedrock legal principle that horizontal price-fixing is almost always harmful to competition, and as a result, the antitrust laws condemn such agreements per se without giving defendants an opportunity to offer any procompetitive "justification" for their conduct. *Socony-Vacuum*, 310 U.S. at 224 n.59; *Catalano*, 446 U.S. at 646-47 (price-fixing among "agreements or practices" that are so "plainly anticompetitive" that "they are conclusively presumed illegal without further examination").

In sum, Visa and Mastercard are network competitors that compete by, among other things, fixing interchange fees paid by merchants to issuing banks, and a 5-year agreement that locks both networks into a jointly negotiated set of common rates or common "caps" is per se unlawful price-fixing. Visa and Mastercard could not enter into these agreements in the ordinary course of business without running afoul of the per se rule. The Court should not allow itself to be made a party to this wrongdoing by enshrining it in a judicially approved settlement.

### A.   Visa and Mastercard Are Asking the Court to Endorse Supracompetitive Interchange Rates

The Sherman Act condemns horizontal price-fixing per se because (i) such conduct almost always harms competition, and (ii) courts are ill-equipped to determine what a reasonable or competitive price should be. *See United States v. Trans-Missouri Freight Ass'n*, 166 U.S. 290, 331 (1897) ("the subject of what is a reasonable rate is attended with great uncertainty"); Phillip E. Areeda & Herbert Hovenkamp *Antitrust Law: Analysis of Antitrust Principles and Their Application* ¶ 1509 (4th & 5th eds. 2023 cum. supp.) ("[T]olerance of price fixing implies continuous supervision, for which the courts are ill-suited."). Both evils are present here. Visa

33

and Mastercard (with the complicity of ERCC) have locked arms to fix prices to help justify a settlement that protects and insulates Visa's and Mastercard's Honor All Cards rules—the rules that would put downward competitive pressure on interchange—from challenge for the foreseeable future.  In doing so, they are asking this Court to step into the function of a rate regulator, and worse, a rate *protector*.  The Court should do neither—it should reject the Proposed Mandatory Settlement in its entirety.

To fix their prices at a supracompetitive level for five years, Visa and Mastercard (with the complicity of ERCC) ask the Court to approve what is essentially a shell game.  Their submission does not even attempt to explain why a 4-basis-point reduction in their already inflated and supracompetitive posted interchange rates—as opposed to 40 or 80 or 100 or more basis points—is a fair, reasonable, or adequate outcome for class members whose claims are ready to proceed to trial after nearly 20 years of litigation.  Nor do they explain why their newly created system-wide weighted average benchmark rate—which, in theory, is the only constraint against class members suffering credit or commercial interchange increases after this Proposed Mandatory Settlement goes into effect—is based on a wholly contrived number that does not exist in the real world:  the combined volume-weighted Visa/Mastercard system-wide credit and commercial card rates.[25]  This artificial "measurement" appears to have been designed to mask

---

[25] Visa and Mastercard classify commercial cards—which are issued to corporations for their employees to track business expenditures—as distinct from consumer credit cards given the different business models underpinning the two products.  Shinder Decl. Ex. M, Visa, ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████  Consistent with that, Visa and Mastercard have traditionally set higher interchange rates for commercial cards than consumer credit cards.  By aggregating commercial cards with consumer credit cards, Visa and Mastercard have increased the "benchmark" applicable to consumer credit card transactions. The materials filed in support of the Proposed Mandatory Settlement offer no explanation or justification for this decision.

Visa's and Mastercard's individual volume-weighted system-wide interchange rates for consumer credit transactions, which the Court will need to understand in order to determine whether the vast majority of merchants will see any benefits from the rate "cap."  This is indefensible.  As the accompanying declaration of Dr. Patel demonstrates, each of Visa's and Mastercard's system-wide consumer credit interchange rates are almost certainly below the gerrymandered benchmark set forth in the Proposed Mandatory Settlement.  This will give Visa and Mastercard (and the banks) the flexibility to shift more consumer credit cards and more transactions to high-interchange categories, negating in the process the meager 4-basis-point posted rate reductions for some merchants.  Patel Decl. ¶¶ 10-17.  This Settlement, as a result, exposes the substantial portion of the class that receives little commercial card volume to potential credit card interchange increases under the "cap."

But there is a more fundamental reason why this deal should be rejected now. Defendants (and ERCC) are asking this Court to bless and make unassailable for five years rates that the record in this case shows are supracompetitive and among the highest in the world.  In its denial of Defendants' motion based on *Ohio v. American Express*, this Court concluded that plaintiffs have "offered similar evidence" to the "mountain of evidence" of supracompetitive pricing that the Second Circuit deemed sufficient in *US Airways*.  *In re Payment Card Interchange Fee and Merchant Disc. Antitrust Litig.* ("*Interchange Fee II*"), No. 05-md-1720, 2024 WL 278565, at *29 (E.D.N.Y. Jan. 25, 2024).  The Court's opinion credited, for purposes of summary judgment, Plaintiffs' economic evidence concerning the supracompetitive nature of Visa's and Mastercard's interchange rates, supporting the conclusion that the jointly negotiated interchange rates in the Proposed Mandatory Settlement—even with the potentially illusory 4-basis-point "rollback"—would codify rates that are well above competitive levels.  *Id*. at *23 (as

35

one comparison cited by ERCC's expert, the "Reserve Bank of Australia fixed interchange fees charged by Visa and Mastercard to 55 basis points (later reduced to 50 basis points)" and "the networks did not exit the market."). That evidence also included Professor Hausman's "competitive benchmark rate of █ basis points" and Dr. Harris's alternative benchmarks that range from █ to █ basis points. And it included Dr. Kohler's issuer profitability analysis, which corroborated Dr. Harris's █-basis-point ceiling benchmark as "the point at which pass-through is [100%]," which according to both plaintiffs' and defendants' experts is a feature of "a competitive market." *Id.* at *27. At well over █ basis points, the joint Visa-Mastercard "cap" would be the highest "regulated" rate in the world. Patel Decl. ¶ 9.

The "mountain of evidence" in the summary judgment record shows that under competition, the market-wide credit card interchange rate likely would be less than 100 basis points, and quite possibly substantially below that threshold. ERCC and their experts avoid any mention or discussion of this evidence and instead offer fixed system-wide rates above █ basis points as an appropriate resolution of this long-pending case now ready for trial. *See* Leffler Decl., Appendix at 5 (showing a rate of █ basis points). Moreover, neither ERCC nor their experts who support this Proposed Mandatory Settlement offer any evidence or analysis to support the conclusion that benchmarks above █ basis points are a legitimate proxy for a competitive outcome—because no such evidence exists. It appears, therefore, that this Settlement has been negotiated as if the summary judgment record, and the Court's decisions on summary judgment, never happened. This is astounding given this Court's recent rulings regarding Visa's and Mastercard's pricing, and its holdings across numerous summary judgment motions that Plaintiffs' claims are ripe for trial. The profound disconnect between the "mountain" of record evidence and the pittance ERCC obtained in exchange for its agreement to

36

fix in place supracompetitive prices for five years exposes more than just the inadequacy of ERCC's representation.  It also highlights why it is inappropriate to ask this Court to endorse a rate "cap" in the context of a Rule 23 fairness proceeding.  Plaintiffs are on the precipice of a trial that would, among other things, determine whether Visa's and Mastercard's credit card interchange rates are supracompetitive.  That trial is the appropriate way to determine what a competitive benchmark for credit card interchange rates in this market would be.[26]

### B.    The Cases Cited by ERCC Do Not Justify Defendants' Price-Fixing Agreement

None of the cases cited by ERCC support making the Court a party to the unlawful price-fixing inherent in the Proposed Mandatory Settlement.  Nor is their argument helped by the disingenuous claim that the restraints on price they ask the Court to *impose* by its judgment will somehow protect merchants while they transition to a competitive marketplace.

To support the contention that the proposed price-fixing arrangement in this Settlement is a legitimate "carefully crafted remed[y]," ERCC cite this Court's decision in *Visa Check*.  ERCC Br. at 29.  In that case, however, Visa and Mastercard agreed to temporarily reduce their

---

[26] The Proposed Mandatory Settlement will not be protected under the *Noerr-Pennington* doctrine absent an extensive review by the Court.  The standard for determining whether *Noerr-Pennington* attaches in the litigation context is whether the anticompetitive harm is "caused by the decision of a court."  *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 818 (D.C. Cir. 2001).  It is well-established that "government action that 'amounts to little more than approval of a private proposal' is not protected."  *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 213 (E.D.N.Y. 2003) (quoting *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 602 (1976)).  Courts have rejected *Noerr* immunity for settling parties, even where the settlement was approved by a judge.  *See, e.g.*, *Ciprofloxacin*, 261 F. Supp. 2d at 213 (no immunity where court so-ordered consent judgment); *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 398 (D. Mass. 2013) (no immunity where "it is unclear how much of the content found within the consent judgments is properly attributable to the [court's] deliberation"); *Toyo Tire & Rubber Co. v. Atturo Tire Corp.*, No. 14 C 0206, 2017 WL 1178224, at *7 (N.D. Ill. Mar. 30, 2017) (no immunity where settlement provisions at issue in later action were outside the scope of prior court's review).

signature debit interchange rates for an eight-month period before the *permanent* rescission of the Honor All Cards tying rules—which tied debit card acceptance to credit card acceptance— could be implemented in the marketplace.  That was justified as a temporary measure that was needed solely because the rules changes at issue required technical modifications.  There is an important difference here:  In *Visa Check*, in stark contrast to this case, the plaintiff class won a complete and permanent rescission of the rules in question, and thus, the rate reduction was viewed by the Court as a temporary measure on the path towards a more competitive market.

Here the opposite is on the table.  Plaintiffs have not secured any relief on the Honor All Cards rules' restriction on issuer competition—nor any lasting meaningful relief of any kind to "transition" to a competitive market.  To paper over that deficiency, they instead offer more price-fixing:  rate "caps" that will keep supracompetitive rates in place for the next five years if not longer.  *Visa Check* is a basis to reject this Settlement, not a basis to approve it.

The remaining cases cited by ERCC illustrate just how unprecedented the proposed horizontal price-fixing arrangement is.  Three of the cited settlements did not involve a limit on pricing at all.  *See County of Suffolk v. Long Island Lighting Co.*, 710 F. Supp. 1428, 1456-57 (E.D.N.Y. 1989) (compensation to customers would be credited against electrical bill, with no ceiling as to what any given customer would pay); *Wisconsin v. Kenosha Hosp. & Med. Ctr.*, 1997-1 Trade Cas. (CCH) ¶ 71669, 1996 WL 784584 (E.D. Wis. 1996) (setting limit on defendant's total revenue, not individual prices); *Minnesota v. Health One Corp.*, 1992 WL 313827 (D. Minn. Aug. 17, 1992) (same).  Others that did limit pricing did not include horizontal competitors as parties to the settlement.  *See, e.g.*, *United States v. Am. Soc'y of Composers, Authors, Publishers*, No. 41-1395 (WCC), 2001 WL 1589999 (S.D.N.Y. June 11, 2001); *United States v. BMI*, No. 64-CIV-3787, 1994 WL 901652 (S.D.N.Y. Nov. 18, 1994); *United States v.*

38

*Carter Products, Inc.*, 211 F. Supp. 144, 147 (S.D.N.Y. 1962); Final Judgment, *UFCW v. Sutter Health*, Case No. CGC 14-5388451 (Cal. Sup. Ct. Aug. 27, 2021), *see* Shinder Decl. Ex. N.

Most of the cited settlements resolved legal challenges to mergers or acquisitions where a single entity agreed to limit its prices going forward, forestalling price increases resulting from potential monopolization. *See Commonwealth v. Beth Israel Lahey Health, Inc.*, C.A. No. 2018-3703 (Mass. Super. Ct. Nov. 29, 2018), *see* Shinder Decl. Ex. O; *Pennsylvania v. Geisinger Health Sys. Found.*, 1:13-cv-02647-YK, Dkt. 7 (M.D. Pa. Nov. 1, 2013), *see* Shinder Decl. Ex. P; *In the Matter of Ciba–Geigy Ltd.*, 123 F.T.C. 842, 898, 1997 WL 33483248 (Mar. 24, 1997); *FTC v. Butterworth Health Corp.*, 946 F. Supp. 1285, 1303-05 (W.D. Mich. 1996); Press Release, N.Y. Att'y Gen., *A.G. Schneiderman Announces Settlement with Utica Hospitals to Address Competitive Concerns* (Dec. 11, 2013), *see* Shinder Decl. Ex. Q; Press Release, Alaska Dept. of Law, *State Files Consent Decree to Provide Pricing Protection for Alaskans* (Nov. 7, 2012), *see* Shinder Decl. Ex. R.  A unilateral limit on prices does not trigger the per se rule against horizontal price-fixing like the agreement between horizontal competitors that is enshrined in the Proposed Mandatory Settlement.

These settlements are also distinguishable because they did not require the court to conduct a fairness analysis under Rule 23.  ERCC cite only one case that involved a Rule 23 court approving a price-fixing agreement among horizontal competitors, but that case also is distinguishable.  In *White v. NFL*, a group of professional football teams agreed with a group of players to set minimum salary guarantees and price caps.  822 F. Supp. 1389 (D. Minn. 1993). Crucially, the competitors on either side of the settlement were exempt from antitrust law's per se prohibition against horizontal price-fixes:  In granting final approval to the settlement, the court expressly found that the agreement between the parties was "protected by the nonstatutory

labor exemption to the antitrust laws," because salaries are mandatory subjects of collective bargaining.  *White v. NFL*, 836 F. Supp. 1458, 1501 (D. Minn. 1993).  Because *White* hinged on the application of the nonstatutory labor exemption to immunize otherwise anticompetitive conduct, it does not support ERCC's argument.

Moreover, the notion that naked price-fixing can be justified because it somehow will help transition the market to a competitive equilibrium cannot withstand serious scrutiny.  As an initial matter, as discussed above, naked price-fixing such as the horizontal price-fixing agreement between Visa and Mastercard set forth in the Proposed Mandatory Settlement is per se illegal.  Under the per se rule, it does not matter whether this agreement is tethered in some fashion to some transitional period.  *E.g.*, *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 07-cv-5944, 2016 WL 8669891 (N.D. Cal. Aug. 22, 2016) (per se liability extends during conspiracy period until "objectives of the conspiracy are completed or the defendant withdraws"); *Catalano*, 446 U.S. at 648-49 (joint elimination of interest-free credit during limited period of time subject to per se rule).

### C.   The "Relief" in the Settlement Does Not Justify Defendants' Price-Fixing Agreement

Even if it were appropriate to consider whether interchange "caps" will help transition the market while rules changes take hold, this price-fixing agreement still should be rejected.  As this Court and the Second Circuit have recognized, the core restraints of trade at issue in this case are the Honor All Cards and default interchange rules, which Plaintiffs have demonstrated—sufficient to take their claims to trial—restrain issuer competition and fix interchange

rates.[27]  There is no relief whatsoever regarding these rules in the Proposed Mandatory

Settlement.  To the contrary, the Settlement codifies and extends the Honor All Cards rules by

applying it to digital wallets and granting Visa and Mastercard the continued ability to require

merchants to accept new products under the Honor All Cards rules provided those products are

subject to the rate caps.[28]

Instead, the Proposed Mandatory Settlement trades Honor All Cards claims for

surcharging relief, which most merchants would not deploy for fear of customer backlash.[29]  For

---

[27] *See, e.g., In re Payment Card Interchange Fee & Merchant Disc. Antitrust Litig.,* No. 05-md-1720, 2024 WL 1014159, at n.11 (E.D.N.Y. Feb. 22, 2024) ("As Plaintiffs' experts credibly explain, Acquirers have no incentive to pay interchange fees above the default levels and Issuers have no incentive to accept interchange fees below the default levels."); DAPs' Counterstmt. ¶ 902 ("Mastercard recognized the threat of such bilateral deals occurring in the absence of the HAC Rule.  PX1211,

*Interchange Fee II*, 2024 WL 278565, at *19 ("Merchants would like to negotiate for lower interchange rates with Mastercard but are essentially 'forced' to accept the rates imposed by the network; and, as Dr. Harris writes in his reply report, 'Mastercard's ability to force merchants, through the Honor All Cards rules, to make an all-or-none acceptance decision . . . is also direct evidence of market power.'") (citation omitted).

[28] *See* Sett. ¶¶ 24(b) ("[A]ny such non-acceptance cannot include a Visa-Branded Card provisioned in a digital wallet that is owned or operated by the Visa Defendants . . . ."); 56(b) (same as to Mastercard); *see also id.* ¶ 1(b) (definition of "Applicable Domestic Credit Transactions").

[29] *See, e.g.,* Shinder 2013 Opp. Decl. Exs. 36 (IKEA (ECF No. 2670-3)) ¶¶ 16 ("Based on the experience of international affiliates of IKEA US operating outside the United States, the decision to surcharge is complicated and very sensitive, as it is an action that has very high (mostly negative) customer goodwill ramifications."), 32 ("In addition to the experience of the IKEA Group in the United Kingdom, the claim that surcharging will provide significant relief to merchants is also refuted by the reaction of the American consumer to the Bank of America decision in 2012 to institute monthly debit card fees, which were quickly reversed under enormous consumer outcry.  The customer backlash in the United States would be enormous, extremely negative and damaging to any merchant who introduced surcharging."); 1 (Coborn's (ECF No. 2670-2)) ¶ 15 ("In the extremely competitive retail marketplace, a retailer that surcharges its customers will quickly lose those customers to other retailers that choose not to

41

this reason, merchants have testified in this case that surcharging is an inadequate solution for fixed interchange.[30]  The central bank in Australia reached the same conclusion when it rejected the argument that surcharging would obviate the need to maintain the regulations that limit interchange fees in Australia.[31]

Beyond this, the contention that the proposed surcharging relief will jump start issuer or network competition over interchange is risible.  The Proposed Mandatory Settlement expressly continues the blanket prohibition against differential surcharging by issuer, and thus, the proposed surcharging relief plainly will not spur issuing bank competition to reduce interchange.[32]  As for network level surcharging, the Settlement offers a form of parity

---

surcharge."); 18 (Barnes & Noble College (ECF No. 2670-2)) ¶ 11 ("We believe that raising the cost of purchase based on the customer's chosen method of payment would create a terrible experience for the customer."); 32 (GNC (ECF No. 2670-3)) ¶ 11 ("We operate in a competitive, price sensitive market, and we believe that imposing surcharges would result in an unacceptable loss of business.").

[30] *See*, *e.g.*, Shinder 2013 Opp. Decl. Exs. 55 (Starbucks (ECF No. 2670-4)) ¶ 9 ("For Starbucks, the only reason to even contemplate implementing a surcharge would be as a measure to recover excessive interchange costs in the absence of a functioning, competitive market.  The Proposed Settlement introduces a series of hurdles that make any surcharge difficult, if not impossible, to accomplish."); 36 (IKEA (ECF No. 2670-3)) ¶ 33 ("[A]ny solution to the issue of interchange cannot rely solely on surcharging.  Even if surcharging were not illegal in many states and prohibited by American Express rules, the combination of the technical problems in identifying which cards should be subject to a surcharge, the additional significant extra operational costs that would have to be incurred to support POS functionality requiring two logical methods (if it could even be done), the control Visa and MasterCard will exert over the surcharging process and the negative customer service consequences make the primary relief in the Proposed Settlement of very little use to IKEA US.").

[31] *See supra* note 13.

[32] The Proposed Mandatory Settlement reaffirms Visa's and Mastercard's right to maintain their ban against differential surcharging by issuer.  Sett. ¶¶ 28(d); 60(d).  The record in this case shows that ████████████████████████████████████████████████████████████████

surcharging that is designed to reinstate the level-playing-field restrictions of the 2012 Settlement through backdoor means.  According to the Proposed Mandatory Settlement, if the merchant accepts competing networks such as American Express and Discover and wants to surcharge up to the cost of acceptance—which is the economically rational way to implement surcharging—the merchant must surcharge American Express and Discover at the same amount as Visa or Mastercard.  By forcing the merchant to also surcharge American Express, the Settlement invokes the application of that network's rules, which continue to require merchants to surcharge all cards, including all credit and debit cards, at the same rate as American Express.[33]  Since the Settlement allows Visa and Mastercard to maintain their prohibitions against surcharging debit cards, the interaction of these rules effectively reinstates the prohibition against surcharging.  *See Interchange Fee I*, 827 F.3d at 230.

ERCC may respond by arguing that merchants can drop American Express and surcharge without restriction, or surcharge Visa or Mastercard credit card transactions (but not American Express or Discover credit card transactions) up to 1%.  Both provisions are hollow.  Most

_____

[33] In his declaration in support of the Proposed Mandatory Settlement, Professor Stiglitz recognizes that parity surcharging may be blocked by American Express's rules.  Decl. of Joseph E. Stiglitz, ECF No. 9179-5 (filed Mar. 26, 2024) ("Stiglitz Decl.") ¶ 13, ¶ 18 ("If American Express does not enforce that restriction, then the merchants can surcharge all credit cards up to 3%").  That exposes a fundamental flaw in his opinion that parity surcharging will take hold over time and "should lead to lower" interchange.  *Id.* ¶ 23.  To paper over that flaw, Professor Stiglitz offers pure speculation—that American Express, which is known for its rigorous enforcement practices and has successfully defended challenges to its rules at the Supreme Court twice—will about-face and choose not to enforce its rules.  *Id.* ¶ 18.  He offers no support for such speculation, nor for the assertion that merchants would simply drop American Express.  Professor Stiglitz's opinion should be disregarded.

merchants cannot drop American Express, as many have testified, and even if they could do that, that would simply drive more transactions to Visa and Mastercard and increase their substantial market power.[34]

As for surcharging Visa or Mastercard credit card transactions up to 1%, that strategy makes no economic sense. For starters, that entirely arbitrary amount does not even recover half the cost of accepting a rewards credit card.[35] On top of that, virtually all Visa and Mastercard

---

[34] *See, e.g.*, Shinder 2013 Opp. Decl. Exs. 59 (Walmart (ECF No. 2670-4)) ¶ 17 ("Dropping American Express is not a practical business proposition for Walmart and would only further consolidate the market power of Visa and Mastercard."); 55 (Starbucks (ECF No. 2670-4)) ¶ 13 ("Dropping American Express would inconvenience our customers and would only decrease competition in the payments industry."); 43 (Amtrak (ECF No. 2670-3)) ¶ 16 ("The only theoretical alternative that would permit Amtrak to take advantage of the surcharging 'concession' would be to stop accepting American Express—something that Amtrak cannot realistically do. Since more passengers buy tickets using American Express credit cards than either Visa or MasterCard credit cards, dropping American Express is not a viable business option for Amtrak. In any event, dropping American Express would only further increase the market power of Visa and MasterCard. The adoption of mandatory rule changes that appear to encourage merchants to drop competitors of Visa and MasterCard – while allowing Visa and MasterCard to coordinate adopting identical surcharging rules – is an inappropriate outcome in this antitrust case and should not be sanctioned by this Court."); 39 (Lowe's (ECF No. 2670-3)) ¶ 20 ("American Express currently accounts for 9% of Lowe's bank card transactions. Dropping American Express is not a viable business proposition for Lowe's . . . and would only increase the market power of Visa and MasterCard.").

[35] ERCC's reference to Amazon's surcharges in Australia and Singapore is misleading. ERCC Br. at 27 n.21. As was publicly reported, Amazon *threatened to drop all Visa credit cards in the U.K.* and had already taken steps to inform its customers of the change, something no merchant in the U.S. (even Amazon) could credibly threaten. Shinder Decl. Ex. S, Jennifer Surane & Vlad Savov, *Amazon Strikes Agreement With Visa on Payment Fees*, Bloomberg (Feb. 17, 2022) ("While Amazon has been surcharging customers who use Visa cards on its site in Singapore and Australia for months, it sought to up the ante late last year with a threat to stop accepting the firm's credit cards by U.K. customers entirely. Last month, the two companies said they were working on an agreement, narrowly avoiding an outright ban on U.K. cards."). As for surcharging, a 50-basis-point surcharge in Australia **is the full cost of acceptance**. Shinder Decl. Ex. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

credit cards are rewards cards.[36]  Thus, it would be folly for merchants to risk incurring the wrath of their customers to impose a surcharge that does not cover their costs simply to drive consumers to the very few non-rewards cards that are left in the market.  And the imposition of a 1% surcharge on Visa and Mastercard could simply drive customers to pull out expensive American Express cards.  At the end of the day, no rational merchant would do this, and thus, the surcharging "relief" in this Settlement is illusory.  None of this will inject network competition and put downward pressure on interchange or network fees.

The absence of any meaningful relief that will cause price competition at the issuer or network level exposes the bankruptcy of this Proposed Mandatory Settlement.  There is nothing here but a price-fixing arrangement, and an improper attempt to ask a Rule 23 court to act as rate regulator.  To avoid sanctioning a per se unlawful arrangement, the Proposed Mandatory Settlement should be rejected in full.

---

[36] *See*, *e.g.*, Shinder Decl. Exs. U, Excel file titled ██████ ██████ *see also* Patel Decl., Appendix 2 (Table A2-2) (reflecting consumer volume on basic cards at only ████ (Visa) and ████ (Mastercard)); *id.* ¶ 14 n.17 ("I classify Visa Traditional, Visa Traditional Rewards, Mastercard Core, and Mastercard Enhanced as basic cards.  I classify Visa Signature, Visa Signature Preferred, Visa Infinite, Mastercard World, Mastercard World Elite, and Mastercard World High Value as premium cards."); *see also* Defs.' 56.1 Stnt. ¶ 177 ("Between 2004 and 2016, the share of Visa's consumer credit card purchase volume on rewards cards increased from ██% in 2004 to ██% in 2016, and the share of Mastercard's consumer credit card purchase volume on rewards cards increased from ██% in 2004 to ██% in 2016.") (citing SJDX 400 (Hausman Report) ¶ 200); Defs.' Consol. Resp. to Pls.' Stmts. of Add'l Material Facts ¶ 121, ECF No. 8106 (filed Dec. 18, 2020) ("Undisputed that transaction volume on rewards cards makes up a majority of credit card purchase volume.") (citations omitted).

**CONCLUSION**

For the reasons stated above, the Proposed Mandatory Settlement should be rejected, or, in the alternative, the 7-Eleven Plaintiffs should be permitted to opt out of the (b)(2) class.

Dated:  April 26, 2024

Respectfully submitted,

CONSTANTINE CANNON LLP

By: ___*/s/ Jeffrey I. Shinder*_____
Jeffrey I. Shinder
A. Owen Glist
Ankur Kapoor
Taline Sahakian
David A. Scupp
335 Madison Avenue
New York, New York 10017
Telephone: (212) 350-2700
Email: jshinder@constantinecannon.com

*Counsel for the 7-Eleven Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 26, 2024, I caused a true and correct copy of the foregoing

document and accompanying declarations and exhibits to be served on counsel of record via

File&ServeXpress and ECF.

DATED this April 26, 2024.

*/s/ Jeffrey I. Shinder*
Jeffrey I. Shinder
