UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------

IN RE PAYMENT CARD INTERCHANGE FEE
AND MERCHANT DISCOUNT ANTITRUST
LITIGATION

**MEMORANDUM & ORDER**
05-MD-1720 (MKB)

This document refers to:

ALL RULE 23(b)(3) CLASS ACTIONS;
*Block, Inc. v. Visa Inc.*, No. 23-CV-5377;
*Lanning v. Visa Inc.*, No. 21-CV-2360;
*Camp Grounds Coffee, LLC v. Visa, Inc.*, No. 21-CV-3401; *Intuit, Inc. v. Visa Inc.*, No. 21-CV-1175

------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

I.   Background ........................................................................................... 4
   a.   Procedural history ......................................................................... 4
      i.   Procedural history of the Rule 23(b)(3) Class ................................ 4
   b.   Factual overview of the payment facilitators ...................................... 8
II.  Discussion ............................................................................................ 9
   a.   Standard of review ......................................................................... 9
      i.   Motion to enforce a settlement agreement .................................... 9
      ii.  Summary judgment ................................................................... 10
   b.   Square and Intuit are not members of the Settlement Class ............................ 11
      i.   The term "accepted" as used in the Settlement Agreement is ambiguous .................. 16
      ii.  The term "accepted" is "guided by federal antitrust standards" ................................ 19
      iii. The Court finds that Sellers "accepted" payment cards ................................ 21
   c.   *Lanning* Plaintiffs are members of the Settlement Class ............................ 26
   d.   The Court denies Intuit's cross-motion for partial summary judgment .......................... 26
III. Conclusion .......................................................................................... 31

On January 31, 2024, Defendants[1] in this multidistrict litigation moved to enforce the Superseding and Amended Definitive Class Settlement Agreement of the Rule 23(b)(3) Class Plaintiffs and Defendants (the "Settlement Agreement"), or, in the alternative for summary judgment, seeking to dismiss claims brought by Plaintiffs Block, Inc., f/k/a Square, Inc. ("Square"), and Intuit Inc. and Intuit Payment Solutions, LLC (collectively, "Intuit"), that are based on transactions in which Square or Intuit served as a "payment facilitator" for their merchant customers.[2]   Square,[3] Intuit,[4] and *Lanning* and *Camp Grounds* Plaintiffs (collectively

---

[1]  Defendants consist of the Visa and Mastercard networks (the "Network Defendants") as well as "various issuing and acquiring banks" (the "Bank Defendants").  *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 18 (E.D.N.Y. 2019) (*Interchange Fees III*).

[2]  (Defs.' Mot. to Enforce Settlement Agreement or, in the Alternative, for Summ. J. ("Defs.' Mot."), Docket Entry No. 9056; Defs.' Mem. in Supp. of Defs.' Mot. ("Defs.' Mem."), Docket Entry No. 9057; Defs.' Reply in Supp. of Defs.' Mot. & Opp'n to Pls.' Cross-Mots. for Partial Summ. J. ("Defs.' Reply"), Docket Entry No. 9083; Defs.' R. 56.1 Stmt. ("Defs.' 56.1"), Docket Entry No. 9058; Defs.' R. 56.1 Counter-Stmt. in Opp'n to Pls.' Cross-Mots. for Partial Summ. J., Docket Entry No. 9084; Defs.' Resp. in Opp'n to Intuit's R. 56.1 Stmt., Docket Entry No. 9085; Defs.' Resp. in Opp'n to Square's R. 56.1 Counter-Stmt., Docket Entry No. 9086; Defs.' Resp. in Opp'n to *Lanning & Camp Grounds* R. 56.1 Stmt., Docket Entry No. 9087.)

[3]  (Pl. Square's Opp'n to Defs.' Mot. & Mem. in Supp. of Joinder in *Lanning & Camp Grounds* Pls.' Cross-Mot. for Partial Summ. J. ("Square Mem."), Docket Entry No. 9066; Pl. Square's Reply in Supp. of Joinder in *Lanning & Camp Grounds* Pls.' Cross-Mot. for Partial Summ. J. ("Square Reply"), Docket Entry No. 9091; Pl. Square's Resp. & Counter-Stmt. to Defs.' 56.1 ("Square Counter 56.1"), Docket Entry No. 9067; Pl. Square's Resp. to Defs.' Counter 56.1, Docket Entry No. 9092.)

[4]  (Pl. Intuit's Cross-Mot. for Partial Summ. J. Finding Intuit Has Standing on its Payment Facilitator Claims ("Intuit's Mot."), Docket Entry No. 9060; Pl. Intuit's Opp'n to Defs.' Mot. & Mem. in Supp. of Intuit's Mot. ("Intuit Mem."), Docket Entry No. 9061; Pl. Intuit's Reply in Supp. of Cross-Mot. for Partial Summ. J. Finding Intuit Has Standing on its Payment Facilitator Claims ("Intuit Reply"), Docket Entry No. 9089; Pl. Intuit's R. 56.1 Stmt., Docket Entry No. 9062; Pl. Intuit's Resp. to Defs.' 56.1 ("Intuit 56.1 Resp."), Docket Entry No. 9063; Pl. Intuit's Resp. to Defs.' Counter 56.1, Docket Entry No. 9090.)

"*Lanning* Plaintiffs"),[5] opposed the motion and cross-moved for partial summary judgment, seeking a ruling that Intuit has antitrust standing to bring claims based on the transactions at issue, and a ruling that *Lanning* Plaintiffs are not members of the Rule 23(b)(3) Class (the "Settlement Class").[6]  At the Court's direction, class counsel for the Rule 23(b)(3) Class ("Class Counsel") filed a letter on March 19, 2024, regarding Class Counsel's position on certain merchants' status as members of the Settlement Class.[7]  Square, Intuit, and *Lanning* Plaintiffs responded to Class Counsel's letter on March 22, 2024.[8]  Defendants responded to Square's, Intuit's and *Lanning* Plaintiffs' letters on March 26, 2024.[9]

For the reasons discussed below, the Court grants Defendants' motion to enforce the settlement agreement and denies Intuit's and the *Lanning* Plaintiffs' cross-motions for partial summary judgment.

---

[5]  (*Lanning* Pls.' Cross-Mot. for Summ. J. ("*Lanning* Mot."), Docket Entry No. 9070; *Lanning* Pls.' Mem. in Supp. of *Lanning* Mot. ("*Lanning* Mem."), Docket Entry No. 9072; *Lanning* Pls.' Reply in Supp. of Cross-Mot. for Partial Summ. J. ("*Lanning* Reply"), Docket Entry No. 9094; *Lanning* Pls.' R. 56.1 Stmt., Docket Entry No. 9073; *Lanning* Pls.' Resp. to Defs.' Counter 56.1, Docket Entry No. 9095.)

[6]  Square "joined" the *Lanning* Plaintiffs' motion and filed a memorandum in support of their motion.  (*See* Square Mem.)

[7]  (Letter from Class Counsel re: Order dated Mar. 13, 2024 ("Class Counsel Letter"), Docket Entry No. 9158.)

[8]  (Pl. Square's Resp. to Class Counsel Letter, Docket Entry No. 9176; Pl. Intuit's Resp. to Class Counsel Letter, Docket Entry No. 9163; *Lanning* Pls.' Resp. to Class Counsel Letter, Docket Entry No. 9164.)

[9]  (Defs.' Resp. to Mar. 22, 2024 Letters Filed by Intuit, Square & *Lanning* Pls., Docket Entry No. 9182.)

## I.  Background

The Court assumes familiarity with the facts and extensive procedural history as set forth in prior decisions.  *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 986 F. Supp. 2d 207 (E.D.N.Y. 2013) (*Interchange Fees I*), *rev'd and vacated*, 827 F.3d 223 (2d Cir. 2016) (*Interchange Fees II*); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11 (E.D.N.Y. 2019) (*Interchange Fees III*); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, --- F. Supp. 3d. ---, 2024 WL 278565 (E.D.N.Y. Jan. 8, 2024) (*Interchange Fees IV*); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2024 WL 1014159 (E.D.N.Y. Feb. 22, 2024) (*Interchange Fees V*).

### a.  Procedural history

#### i.  Procedural history of the Rule 23(b)(3) Class

In October of 2005, several complaints asserting similar antitrust claims against Visa, Mastercard, and various issuing banks were consolidated for pretrial purposes and transferred to the Eastern District of New York, where they were joined by other similar cases.  *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2008 WL 115104, at *1 (E.D.N.Y. Jan. 8, 2008).  The consolidated cases included both class actions and individual actions.  *Id.*  In April of 2006, plaintiffs in the putative class actions ("Class Plaintiffs") filed a consolidated amended class complaint that defined two classes: one seeking damages and the other seeking equitable relief.  *Id.* at *1–2.  In November of 2012, the Court provisionally certified a class and preliminarily approved a class settlement agreement between the Class Plaintiffs and Defendants.  *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2012 WL 12929536, at *1–2 (E.D.N.Y. Nov. 27, 2012).  In 2013, the Court approved the settlement, *Interchange Fees I*, 986 F. Supp. 2d at 241, but, in 2016, the Second

Circuit vacated certification of the class and reversed approval of the settlement, *Interchange Fees II*, 827 F.3d at 240.[10]

In November of 2016, the Court appointed counsel to two putative classes under Rule 23(b)(2) (the "Equitable Relief Class") and Rule 23(b)(3) (the "Damages Class"). *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2016 WL 8138988, at *1 (E.D.N.Y. Nov. 30, 2016). In December of 2019, the Court granted final approval to the Settlement Agreement between Defendants and the Damages Class. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2019 WL 6875472, at *36 (E.D.N.Y. Dec. 16, 2019). The Settlement Agreement defines the Damages Class as "all persons, businesses, and other entities that have accepted any Visa-Branded Cards and/or Mastercard-Branded Cards in the United States at any time from January 1, 2004 to the Settlement Preliminary Approval Date [of January 24, 2010]." (Settlement Agreement ¶ 4, annexed to Rule 23(b)(3) Class Pls.' Mot. for Class Settlement Preliminary Approval as Ex. 1, Docket Entry No. 7257-2.) The Settlement Agreement further provides that each class member who files a claim will receive a *pro rata* share of the settlement fund "in accordance with the relative economic interests of the [class member] as measured by the Interchange Fee amounts attributable to their Visa- and Mastercard-Branded Card transactions during the Class Period." (*Id.* § I-2.) In exchange, each class member would release claims "arising out of or relating to any conduct or acts that were or could have been alleged in the litigation. (*Id.* ¶ 31(a).)

Before final approval of the Settlement Agreement, the Court received objections from a group of entities that own or operate gas stations and convenience stores that sell petroleum

---

[10] The case was reassigned from Judge John Gleeson to the undersigned on December 17, 2014. (Order Reassigning Case, Docket Entry No. 6359.)

products produced and branded by major oil refiners such as Shell and ConocoPhillips (collectively, the "Branded Operators"). *In re Payment Card*, 2019 WL 6875472, at *5. The Branded Operators expressed concern that some portion of them would be excluded from the Settlement Class due to separately negotiated agreements entered into by the major oil suppliers and brands themselves. *Id.* Among the Branded Operators who objected were Fikes Wholesale, Inc., Midwest Petroleum Company, and Slidell Oil Company, LLC (collectively, the "Fikes Wholesale Objectors"), who "own and operate dozens of gas stations and convenience stores" and argued that "they are entities that accepted Visa- and MasterCard-branded cards at their stores and paid the alleged overcharges; therefore, they are quintessential settlement class members." (Obj. to Class Action Settlement filed by Fikes Wholesale Objectors ("Fikes Wholesale Obj.") 1, Docket Entry No. 7559.) In their view, "[t]he settlement and notice [could] be read to advise both Branded Operators and Oil Brands that they are proper claimants to the same portion of settlement funds corresponding to the same transactions." (*Id.* at 12.)

The Court interpreted the Branded Operators' challenge as one under Rule 23(a) for "ascertainability" of the class definition, and concluded that "[t]he term 'accepts' is objective enough by its plain English usage to satisfy the ascertainability requirement." *In re Payment Card*, 2019 WL 6875472, at *30–31; *see also* Fed. R. Civ. P. 23(a). The Court agreed that "disputes will inevitably arise," and that "proof of who holds a claim may ultimately need to be analyzed during a claims administration process," but held that this was "not a sufficient basis to reject class certification," especially where "the class definition is also objectively guided by federal antitrust standards." *In re Payment Card*, 2019 WL 6875472, at *31. Accordingly, the Court held that the class definition was objectively defined, and granted certification for the purposes of a settlement class. *Id.* at *32.

6

In March of 2023, the Second Circuit affirmed in all material respects this Court's decision certifying the Settlement Class and approving the Settlement Agreement.  *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 727 (2d Cir. 2023).  In relevant part, the court affirmed that the class was sufficiently ascertainable, because "[t]he only relevant inquiry is whether determinations as to class membership are 'objectively *possible*.'"  *Id.* at 717.  The Second Circuit further affirmed this Court's decision to refer any disputes over class membership to a special master, subject to *de novo* review by this Court.  *Id.* at 719.

In July of 2023, Square filed a complaint in this District against Visa and Mastercard asserting violations of the antitrust laws.  (*See* Compl., *Block, Inc. v. Visa, Inc.*, No. 23-CV-5377 (E.D.N.Y. July 14, 2023).)  Previously, in February of 2021, Intuit filed a complaint in the Northern District of California against Visa and Mastercard asserting violations of the antitrust laws.  (Compl., *Intuit, Inc. v. Visa Inc.*, No. 21-CV-1175 (E.D.N.Y. Feb. 19, 2021).)  Intuit's action was transferred to this Court in March of 2021, where it was consolidated with *In re Payment Card and Merchant Discount Antitrust Litigation*.  (*See* Order Transferring Case dated Mar. 5, 2021, *Intuit*, No. 21-CV-1175 (E.D.N.Y. Mar. 5, 2021).)  Both Square and Intuit timely opted out of the Rule 23(b)(3) Settlement Class.[11]  (*See* Intuit Opt-Out Letter dated July 23, 2019, annexed to Decl. of Adam B. Wolfson ("Wolfson Decl.") as IPX 14, Docket Entry No.

---

[11]  The deadline to opt out of the Rule 23(b)(3) Class was July 23, 2019.  *See In re Payment Card*, 2019 WL 6875472, at *5; (*see also* Order Approving Preliminary Settlement dated Jan. 24, 2019 ¶ 16, Docket Entry No. 7361 ("[A]ny member of the Rule 23(b)(3) Settlement Class that does not wish to participate in the Rule 23(b)(3) Settlement Class shall have until one hundred eighty days after the Court's entry of this Rule 23(b)(3) Settlement Preliminary Order — *i.e.*, [until July 23, 2019] — to submit a request to become an Opt Out and be excluded from the Rule 23(b)(3) Settlement Class.")).

9065-8; Square Opt-Out Letter dated July 19, 2019, annexed to Decl. of Marc L. Greenwald ("Greenwald Decl.") as Ex. S16, Docket Entry No. 9069-16.)

### b.   Factual overview of the payment facilitators

Typically, merchants who wish to accept payment cards enter into agreements with acquiring banks ("Acquirers").[12]  Acquirers facilitate merchants' acceptance of payment cards by, among other things, providing the hardware necessary to accept payment cards, transmitting payment information across the payment card network (*e.g.*, Visa, Mastercard, American Express, or Discover), and settling funds received on behalf of merchants from issuing banks ("Issuers").  For these services, merchants pay a fee known as the "merchant discount fee" or "merchant discount," which is typically a per-transaction fee that includes the full amount of any applicable interchange fees and network fees, in addition to the Acquirer's own fees.  *See generally Interchange Fees V*, 2024 WL 1014159, at *4–5.

Other merchants, typically small- and medium-sized businesses, may not want to contract directly with Acquirers to accept payment cards.  For these merchants ("Sellers"), entities such as Square and Intuit ("Payment Facilitators") provide another option.[13]  Square, for example, provides Sellers with its white, square card readers that enable cardholders to "insert, swipe, or tap" their payment cards when making purchases from Sellers.  Square maintains contracts with two Acquirers to acquire transactions on behalf of Sellers, and serves as an intermediary by

---

[12]  The background provided in this section is for the benefit of the reader and is drawn from the parties' briefs, Rule 56.1 statements, and expert reports, and from the Court's prior decisions.  It is not relied upon by the Court in deciding the motions.

[13]  The Court refers to merchants who utilize the services of Square or Intuit as "Sellers" to distinguish them from the merchants who contract directly with Acquirers for card-acceptance services.

sending transaction information to an Acquirer who, in turn, sends the transaction information across the payment card network.  Square also settles funds for Sellers that it receives from Issuers via its accounts at its Acquirers.  Visa's and Mastercard's rules describe Square and Intuit as "Payment Facilitators" or "PayFacs."  Intuit's payment facilitation services operate similarly, although primarily for Sellers who accept payment cards for online purchases.[14]

## II.   Discussion

### a.   Standards of review

#### i.   Motion to enforce a settlement agreement

"A settlement agreement is a contract that is interpreted according to general principles of contract law."  *Contant v. AMA Cap., LLC*, 66 F.4th 59, 66 (2d Cir. 2023) (quoting *Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 443 (2d Cir. 2005)); *see also In re World Trade Ctr. Disaster Site Litig.*, 754 F.3d 114, 121 (2d Cir. 2014) (*In re WTC*) (citing *Collins v. Harrison-Bode,* 303 F.3d 429, 433 (2d Cir. 2002)).  As a question of contract law, the court sits in diversity jurisdiction and "must apply the choice of law rules of the state in which it is located."[15] *Benicorp Ins. Co. v. Nat'l Med. Health Card Sys., Inc.*, 447 F. Supp. 2d 329, 335 (S.D.N.Y. 2006) (citing *Schwimmer v. Allstate Ins. Co.,* 176 F.3d 648, 650 (2d Cir. 1999)); *see also Omega Eng'g*, 432 F.3d at 443 (applying "the substantive law of the forum state" to interpretation of settlement agreement); *Waldman ex rel. Elliot Waldman Pension Tr. v. Riedinger*, 423 F.3d 145 (2d Cir. 2005) (applying New York law to dispute over interpretation of settlement agreement);.

---

[14]  Consistent with Intuit's description of the transactions it facilitates, the Court refers to such transactions as Intuit's "PayFac transactions."  (*See generally* Intuit Mem.)

[15]  The parties do not dispute that the Settlement Agreement provides that it "shall be governed, construed, enforced, and administered in accordance with the laws of the State of New York without reference to its conflict of laws principles."  (Settlement Agreement ¶ 79.)

In the context of enforcing settlement agreements, a court is empowered to find the facts necessary to determine the intent of the parties. *Serby v. First Alert, Inc.*, 664 F. App'x 105, 108–09 (2d Cir. 2016), *as amended* (Dec. 22, 2016) (finding term in settlement agreement ambiguous and remanding to district court "to consider and weigh the parties' extrinsic evidence as to the meaning of the" ambiguous term); *Collins*, 303 F.3d at 433 (finding term in settlement agreement ambiguous and remanding "for the trial court to consider and weigh extrinsic evidence to determine what the parties intended" (citing *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 430 (2d Cir. 1992))).

### ii.   Summary judgment

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Radwan v. Manuel*, 55 F.4th 101, 113 (2d Cir. 2022) (quoting Fed. R. Civ. P. 56(a)). The court must "constru[e] the evidence in the light most favorable to the nonmoving party," *Radwan*, 55 F.4th at 113 (alteration in original) (quoting *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 358 (2d Cir. 2011)), and "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Koral v. Saunders*, 36 F.4th 400, 408 (2d Cir. 2022) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kee v. City of New York*, 12 F.4th 150, 167 (2d Cir. 2021) (quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment. *Id.* The

court's function is to decide whether, "after resolving all ambiguities and drawing all inferences in favor of the nonmovant, a reasonable jury could return a verdict for the nonmovant." *Miller v. N.Y. State Police*, No. 20-3976, 2022 WL 1133010, at *1 (2d Cir. Apr. 18, 2022) (first citing *Anderson*, 477 U.S. at 248; and then citing *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127, 129 (2d Cir. 2013)).  The moving party, however, need not *prove* a negative; rather, where "the burden of proof at trial would fall on the nonmoving party, the moving party 'can shift the initial burden by pointing to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.'"  *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022) (quoting *Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other materials *negating* the opponent's claim."); *El-Nahal v. Yassky*, 835 F.3d 248, 252 (2d Cir. 2016) ("[T]he movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." (quoting *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995))).

### b.  Square and Intuit are not members of the Settlement Class

Defendants argue that Square and Intuit did not "accept" payment cards and are therefore not members of the Settlement Class.  (Def.'s Mem.)  Defendants offer evidence that Sellers, rather than Square or Intuit, "accepted" payment cards and are thus in the Settlement Class.[16]

---

[16]  Defendants also make various arguments relating to Square's and Intuit's statuses as indirect purchasers.  They contend that Acquirers are the only direct purchasers in the payment chain, but concede that they have waived this argument for purposes of reaching a settlement. (Defs.' Mem 3 ("[A]ll entities other than acquiring banks . . . are indirect purchasers that are barred from seeking damages under federal law.  Defendants compromised their indirect-purchaser defense solely to reach a settlement with the millions of class merchants . . . ." (emphasis omitted)); *see also id*. at 21 ("If Intuit and Square were to succeed in claiming the

(*Id.* at 4–6.)  In support, Defendants note that Square's and Intuit's merchant agreements specify that Sellers are the entities accepting payment cards.  (*Id.* at 2 n.2 ("You [*i.e.*, the Seller] agree to accept all valid credit and debit card types and brands properly presented by a payor or cardholder." (quoting Intuit Merchant Agreement § N, annexed to Decl. of Rosemary Szanyi ("Szanyi Decl.") as Ex. 1, Docket Entry No. 9059-1)); *see also id.* ("Square is a payment facilitator that allows you to accept [c]ards from customers for the payment for goods and services." (quoting Square Payment Terms § 1, annexed to Szanyi Decl. as Ex. 6, Docket Entry No. 9059-6)).)  Defendants also point to facts suggesting that Sellers are the parties accepting payment cards:

> When Square serves as a payment facilitator, the consumer "presents a payment card" to the merchant (not to Square).  The consumer then uses a point-of-sale device at the merchant (not Square) to "insert, swipe, or tap [the] payment card to make purchases from" the merchant.  And the merchant (not Square) may then provide the consumer with a receipt.  By contrast, Square describes itself a "*making the arrangements* to accept cards," "accepting payment cards for all card transactions *it facilitates*," and accept[ing] payment cards *on behalf of*" its merchant customers.

(Defs.' Reply 9–10 (citations omitted).)  Defendants note that how Sellers "accept" cards is no different from how a merchant who has contracted directly with an Acquirer, such as The Home Depot, accepts cards.  (*Id.* at 9.)

Second, Defendants point to Square's and Intuit's "own contracts with merchant customers specify[ing] that they act as the merchant[s'] 'payments *agent*,' or '*agent* for payment

---

'direct purchaser' mantle, the damages lawsuits brought by opt-out merchants that used payment facilitators and other intermediaries would necessarily be barred under *Illinois Brick*.").)  Defendants contend that their motion "does not turn on which entities are direct or indirect purchasers under federal antitrust standing law."  (*Id.* at 2.)  Instead, "[t]he relevant inquiry is whether merchants serviced by payment facilitators are members of the Rule 23(b)(3) class and subject to the release, which can be determined by looking at the language of the Settlement Agreement and the [Third Amended Complaint] alone."  (*Id.*)

processing.'"  (Defs.' Mem. 2 (citations omitted).)  Defendants contend that "payment

facilitators act as the agents of their merchant customers," and that "[t]he contracts under which

Intuit and Square operate expressly document this agency relationship."  (*Id.* at 8.)  In addition,

Intuit's contract with its Acquirer requires it to ███████████████████████████████

████████████████████████████████████████████████████████  (*Id.* at

9 (citation omitted).)  Defendants argue that, "[u]nder agency law principles, claims arising from

the payment transactions that are the subject of these agency relationships belong to the merchant

customers as principals, and they alone can decide whether to pursue or release the claims."

(Defs.' Reply 10.)  Defendants describe the flow of funds from Issuer, to Acquirer, to Payment

Facilitator, and, finally, to the Seller's bank account and assert that "[c]laims related to any

aspect of this flow of funds, including interchange, arise from Square's and Intuit's activities as

agents, and thus belong to their merchant customers as principals."[17]  (*Id.* at 11.)

　　　Square argues that the Settlement Agreement did not limit the settlement class to

"merchants," but rather was more broadly defined to include "'all persons, business, and entities'

that accepted payment cards."  (Square Mem. 3.)  Square argues that it "is the entity that *legally*

*and operationally* accept[ed]" payment cards.  (*Id.* at 16 (emphasis added).)  Square asserts that

---

[17]　Defendants also argue that Square and Intuit have inverted the principal–agent
relationship.  For example, Defendants contend that "Square has never been given the authority
to opt its merchant customers out of a class settlement," because "Square's authority as [an]
agent is contractually limited to 'payment processing.'"  (Defs.' Reply 13.)  They argue that
"[a]llowing Square to effectuate a group opt-out of its millions of small- and medium-sized
merchant customers would 'infringe on the due process rights of the individual class members,
who have the right to intelligently and individually choose whether to continue in a suit as class
members.'"  (*Id.* (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1024 (9th Cir. 1998)).)  The
Court does not address these arguments because, for the reasons discussed below, the Court finds
that Sellers "accepted" payment cards, and, thus, the Sellers' status as class members does not
turn on any agency relationship with Square or Intuit.

it "ma[de] the arrangements [with Acquirers] to accept cards itself for its customers," and argues

that every Visa or Mastercard transaction with a Square Seller is possible "only because *Square*

entered into agreements with Visa, Mastercard, and their member banks," and because Square is

the entity paying for card acceptance for those transactions.  (*Id.* at 2–3.)  Accordingly, Square

contends that "[t]he plain language of the Settlement Agreement . . . straightforwardly covers

Square which 'accepted' Visa/Mastercard branded cards."  (*Id.* at 14.)  Square's position is that

Square "accepted" payment cards because it "handles every aspect of card acceptance."  (*Id.* at

16.)  Second, Square argues that Sellers are not direct purchasers of card-acceptance services

because Square is listed as the "merchant of record" for all transactions at issue in which a Seller

used Square's platform to facilitate a transaction.  (*Id.* at 19.)  Square points to the contracts that

Square had with ██████████████████████████████████████████████

████████████████.[18]  (*Id.* at 19–20.)

---

[18]  In addition, Square argues that even if Square was excluded from the Settlement Agreement's class definition, as Defendants argue, the Sellers did not have the authority to release Square's antitrust damages claims.  In support, Square points to cases suggesting that assignment of direct purchaser antitrust claims must be "express" because of the "highly speculative inquiries" required to determine the extent of injury.  (Square Mem. 20–21 (citing *DNAML Pty, Ltd. v. Apple Inc.*, No. 13-CV-6516, 2015 WL 9077075, at *3 (S.D.N.Y. Dec. 16, 2015)).)  Intuit argues similarly, asserting that even if the "Intuit Submerchants" were settlement class members, they had no authority to release Intuit's direct purchaser claims because these claims were not assigned to these merchants.  (Intuit Mem. 20–23.)
   The Court finds these arguments to be circular: Square argues that the Sellers could not have released Square's claims because Square did not assign its direct purchaser claims to the Sellers, but this assumes that Square was, in fact, the direct purchaser for the purpose of these transactions.  The Court construes Square's argument as claiming that Square preserved its right to bring these direct purchaser claims by opting out of the Settlement Class, subject to a judicial determination that it is, in fact, a direct purchaser of card-acceptance services.  However, the Court declines to address these arguments, for the same reason discussed in note 17, *supra*, because the Court does not rely on any agency relationship to conclude that Sellers are the entities that "accepted" payment cards.

Intuit argues that it seeks to pursue claims for which it — not its customer "submerchants" — has direct purchaser standing. (Intuit Mem. 10–15.) Like Square, Intuit argues that it was the "direct and only payor" of interchange fees for all of its PayFac transactions. (*Id.* at 11–12.) It argues that, pursuant to its contracts with Acquirers, Intuit was the only entity with a "full merchant account" with the Acquirer, meaning it was the only entity legally responsible for paying interchange fees on those transactions. (*Id.*) Intuit contends that "the charge[s] Intuit debits from [its Sellers'] accounts is higher than interchange, to account for the other portions of the PayFac service Intuit provided, as well as all of its various costs." (*Id.* at 12.) Intuit also argues that the Second Circuit's decision in *Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283 (2d Cir. 2006), "strongly demonstrates why antitrust standing exists" in Intuit's case. (*Id.* at 15–18.) Although the Second Circuit in *Paycom* found that the plaintiff payment processor was an indirect purchaser of chargeback fees, Intuit argues that this conclusion was based on the specific conspiracy alleged — that Mastercard and issuing banks imposed chargeback fees on acquirers who were not alleged to be part of the conspiracy. (*Id.* at 17.) In contrast, Intuit argues its agreements with its Acquirers were "explicit" that Intuit is required to pay the interchange fees set by Defendants, showing why this case is different from *Paycom*. (*Id.*)

For the following reasons, the Court grants Defendants' motion to enforce the Settlement Agreement and finds that the Sellers (*i.e.*, Square's and Intuit's merchant-customers) "accepted" payment cards and are therefore members of the Rule 23(b)(3) Class.

i. **The term "accepted" as used in the Settlement Agreement is ambiguous**

The role of the Court is to construe the Settlement Agreement, as a contract, "in accordance with the parties' intent."[19] *In re WTC*, 754 F.3d at 122 (quoting *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002)); *Williams v. Buffalo Pub. Schs.*, No. 22-2810, 2024 WL 1460134, at *1 (2d Cir. Apr. 4, 2024) ([I]t is well-settled that a court's role 'is to ascertain the intention of the parties at the time they entered into the contract.'" (quoting *Evans v. Famous Music Corp.*, 1 N.Y.3d 452, 458 (2004)). "The best evidence of what the parties intended 'is what they say in their writing.'" *In re WTC*, 754 F.3d at 122 (quoting *Greenfield*, 98 N.Y.2d at 569). "'[T]he key inquiry at the initial stage of interpreting a contract' is therefore 'whether it is ambiguous with respect to the issue disputed by the parties.'" *Glob. Reins. Corp. of Am. v. Century Indem. Co.*, 22 F.4th 83, 94 (2d Cir. 2021) (alteration in original) (quoting *Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 914 (2d Cir. 2010)); *Gary Friedrich Enters. v. Marvel Characters, Inc.*, 716 F.3d 302, 313 (2d Cir. 2013) ("At the outset, the court must determine whether the language the parties have chosen is ambiguous, after giving all 'words and phrases . . . their plain meaning.'" (alteration in original and citations omitted)).

"A contract is unambiguous if its language has 'a definite and precise meaning,' providing 'no reasonable basis for a difference of opinion.'" *Revitalizing Auto Communities Env't Response Tr. v. Nat'l Grid USA*, 92 F.4th 415, 441 (2d Cir. 2024) (quoting *Greenfield*, 98

---

[19] The Court has jurisdiction to decide Defendants' motion to enforce the Settlement Agreement because it retained jurisdiction pursuant to the Clerk's entry of Judgment on December 20, 2019. (*See* Clerk's J. ¶¶ 18–20, Docket Entry No. 7832); *see also Cameron Int'l Trading Co. v. Hawk Imps., Inc.*, 501 F. App'x 36, 37–38 (2d Cir. 2012) (concluding that the district court retained jurisdiction to enforce the settlement agreement because it "so-ordered" the settlement agreement "which expressly provided for continued exclusive federal jurisdiction" (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 380 (1994))).

N.Y.2d at 569); *Lockheed Martin Corp. v. Retail Holdings, N.V*., 639 F.3d 63, 69 (2d Cir. 2011) (recognizing that a contract provision is unambiguous "if the language it uses has a definite and precise meaning, as to which there is no reasonable basis for a difference of opinion" (citing *White v. Cont'l Cas. Co*., 9 N.Y.3d 264, 267 (2007))).  "The language of a contract is not made ambiguous simply because the parties urge different interpretations."  *Glob. Reins.*, 22 F.4th at 94 (quoting *Seiden Assocs.*, 959 F.2d at 428).  Rather, a contract term is ambiguous if it "suggest[s] more than one meaning when viewed objectively by a reasonably intelligent person." *In re WTC*, 754 F.3d at 122 (quoting *L. Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010)); *see also Glob. Reins.*, 22 F.4th at 94 ("[A]n ambiguity exists where the . . . contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." (second alteration in original and internal quotation marks omitted) (quoting *Morgan Stanley Grp. Inc. v. New Eng. Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000))); *Lockheed Martin*, 639 F.3d at 69 ("[T]he language of a contract is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." (citing *Krumme v. WestPoint Stevens Inc*., 238 F.3d 133, 138–39 (2d Cir. 2000))).  In determining whether a contract provision is unambiguous, a court must consider the contract as a whole.  *See Glob. Reins.*, 22 F.4th at 95 ("When ascertaining the meaning of contractual language, 'it is important for the court to read the integrated agreement as a whole.'" (internal quotation marks omitted) (quoting *Lockheed Martin*, 639 F.3d at 69)).  "If the document as a whole 'makes clear the parties' over-all intention, courts examining isolated provisions should then choose that construction which

will carry out the plain purpose and object of the agreement.'" *Id.* (quoting *Lockheed Martin*, 639 F.3d at 69); *see also Westmoreland Coal Co. v. Entech, Inc*., 100 N.Y.2d 352, 358 (2003) (stating contracts should be read "as a harmonious and integrated whole" and each part should be "interpreted with reference to the whole . . . to give effect to its general purpose" (quoting *Empire Props. Corp. v. Mfrs. Tr. Co.*, 288 N.Y. 242, 248 (1942))).

The Settlement Agreement provides that the parties intended the Settlement Class to consist of "all persons, businesses, and other entities that have *accepted* any Visa-Branded Cards and/or Mastercard-Branded Cards in the United States at any time from January 1, 2004 to the Settlement Preliminary Approval Date [of January 24, 2010]." (Settlement Agreement ¶ 4 (emphasis added).)  The parties' only dispute is as to the meaning of the term "accepted," and the term is not defined in the Settlement Agreement, nor can its meaning be ascertained by looking within the "four corners" of the agreement.  *See Ezrasons, Inc. v. Travelers Indem. Co.*, 89 F.4th 388, 395 (2d Cir. 2023) ("[I]n assessing whether a contract is ambiguous, a court looks within only the four corners of the document.").  The Court finds that the term "accepted" is ambiguous because Sellers, Square, and Intuit can all credibly claim to have "accepted" payment cards.[20] The term is therefore susceptible to more than one reasonable interpretation.  *Id.* ("Ambiguity exists 'where [a contract's] terms are subject to more than one reasonable interpretation.'" (alteration in original) (quoting *Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 25 N.Y.3d 675, 680 (2015))); *accord Fikes*, 62 F.4th at 715 ("The word 'accepted' creates

---

[20]  Square, Intuit, and the *Lanning* Plaintiffs all claim to have accepted payment cards. Square argues, for example, that "Square is the entity that *legally and operationally* accepts the payment card." (Square Mem. 16 (emphasis added).)  Hayley Lanning similarly declares that she "operate[s] a cosmetology business and accept[s] all major credit and debit cards."  (Decl. of Hayley Lanning ("Lanning Decl.") ¶ 2, Docket Entry No. 9076.)

ambiguity.").[21]  Accordingly, the Court considers extrinsic evidence to determine the intent of

the parties. *Revitalizing Auto Communities*, 92 F.4th at 442 ("If a contract is ambiguous,

extrinsic evidence of the parties' intent may be considered." (citing *Greenfield*, 98 N.Y.2d at

569)); *Ezrasons*, 89 F.4th at 396 ("[I]f the contract is ambiguous, then relevant extrinsic evidence

should be admitted and considered by the factfinder to resolve the ambiguity." (citations

omitted)).  Finally, in the context of enforcing settlement agreements, the Court is empowered to

find the facts necessary to determine the intent of the parties.  *Serby*, 664 F. App'x at 108–09

(finding term in settlement agreement ambiguous and remanding to district court "to consider

and weigh the parties' extrinsic evidence as to the meaning of the" ambiguous term); *Collins*,

303 F.3d at 433 (finding term in settlement agreement ambiguous and remanding "for the trial

court to consider and weigh extrinsic evidence to determine what the parties intended" (citing

*Seiden Assocs.,* 959 F.2d at 430)).

### ii.   The term "accepted" is "guided by federal antitrust standards"

The parties appear to agree that as between any particular Seller and Square or Intuit,

only one entity may be in the Settlement Class for a given transaction, and the Second Circuit

has confirmed that this is a dispute about class membership.  *See Fikes*, 62 F.4th at 717 ("The

dispute is not over which group of class members will get the recovery; the dispute is over which

claimants are within the class.  Whoever 'accepted' the payment cards is by definition in the

class, gets compensation, and is bound by the release; an entity that did not accept the payment is

by definition excluded from the class and is not bound by the settlement."); *see also* Br. of

---

[21]  *See Fikes*, 62 F.4th at 715–16 ("Both the franchisors and the franchisees claim to have
'accepted' the payment card from the customers at the service stations.  The franchisees claim to
have 'accepted' Visa and/or MasterCard from consumers paying for the gasoline dispensed at
their stations, while the franchisors claim to have 'accepted' the payment cards by, inter alia,
providing operating and processing services on the same set of transactions.").

Defendants-Appellees 24, *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 20-339 (2d Cir. Oct. 15, 2020), Docket Entry No. 209 ("[T]here has never been a dispute that, consistent with federal law, only one entity can recover in the settlement for any given transaction.").  This understanding was confirmed by Class Counsel at the final approval hearing.  *See In re Payment Card*, 2019 WL 6875472, at *31 ("Class Counsel has stated that in line with federal antitrust law, they represent 'only . . . the direct purchaser,' and not every entity in the payment chain." (citation omitted)).  The Second Circuit has also cited with approval this Court's determination that the meaning of the term "accepted" is "guided by federal antitrust standards."  *Fikes*, 62 F.4th at 716 (citation omitted).  The parties do not appear to dispute this understanding.  Accordingly, in ascertaining the parties' intent and the meaning of the term "accepted," the Court is guided by the Supreme Court's decision in *Illinois Brick* and its progeny, which make clear that only one entity in a chain of transactions can have antitrust standing — the direct purchaser.[22]  Thus, the Court is guided by *Illinois Brick* to conclude that only one entity in the

---

[22] In *Illinois Brick Co. v. Illinois*, the Supreme Court limited standing to those who are the "direct purchasers" from antitrust violators.  431 U.S. 720 (1977).  Recently, in *Apple Inc. v. Pepper*, the Supreme Court reaffirmed the validity of the *Illinois Brick* rule.  587 U.S. ---, ---, 139 S. Ct. 1514, 1519–21 (2019).

In *Illinois Brick*, the State of Illinois and a coalition of local government entities asserted antitrust claims against Illinois Brick and other manufacturers alleging a price-fixing conspiracy that had artificially and unlawfully inflated the prices of concrete blocks in projects funded by the state entities, such as schools and housing developments.  431 U.S. at 726–27.  It was undisputed that Illinois and the local governmental entities were not the direct purchasers of concrete block.  *Id.* at 726.  Rather, the defendants "s[old] the block primarily to masonry contractors, who submit[ted] bids to general contractors for the masonry portions of construction projects.  The general contractors in turn submit[ted] bids for these projects to customers such as . . . the State of Illinois and 700 local governmental entities in the Greater Chicago area."  *Id.* Illinois and the local governmental entities were "thus indirect purchasers of concrete block," because the block "passe[d] through two separate levels in the chain of distribution before reaching" the governmental entities.  *Id.*  The Court held that, as an indirect purchaser, Illinois was barred from recovering from Illinois Brick.  *Id.* at 728–29.

payment chain can be deemed to have "accepted" a payment card.  This understanding effectuates the intent of the parties in ensuring that, as between competing claimants, only one entity is entitled to make a claim of the settlement fund, which prevents duplicative recovery and further ensures that the Settlement Class is sufficiently ascertainable for purposes of Rule 23 of the Federal Rules of Civil Procedure.

### iii.   The Court finds that Sellers "accepted" payment cards

In finding that Sellers "accepted" payment cards, the Court relies on the undisputed record drawn from the parties' Rule 56.1 statements and other extrinsic evidence in the record, including Square's and Intuit's merchant agreements, Visa's and Mastercard's rules, and declarations of the *Lanning* Plaintiffs.

### 1.   Square's and Intuit's merchant agreements

Square's and Intuit's agreements with their customers reinforce that Sellers "accept" payment cards.  Square's Payment Terms provide: "Square is a payment facilitator that allows you to *accept* Cards from customers for the payment for goods and services."  (Square Payment Terms § 1 (emphasis added).)  Similarly, Intuit's Merchant Agreement provides: "You [Seller] agree to *accept* all valid credit and debit card types and brands properly presented by a payor or

---

In *Apple*, the Supreme Court decided whether iPhone owners who purchased apps from Apple's "App Store" were direct purchasers of those apps from Apple.  139 S. Ct. at 1518–19.  Apple argued that iPhone owners were not direct purchasers from Apple because the app developers set the consumers' purchase price.  *Id.* at 1519.  The Supreme Court's "straightforward conclusion" was that "under *Illinois Brick*, the iPhone owners were direct purchasers who may sue Apple" because it was "undisputed that the iPhone owners bought the apps directly from Apple."  *Id.* at 1520.  The Court reiterated that the "bright-line rule of *Illinois Brick* . . . means that indirect purchasers who are two or more steps removed from the antitrust violator in a distribution chain may not sue."  *Id.* at 1521.  As an example, "if manufacturer A sells to retailer B, and retailer B sells to consumer C, then C may not sue A.  But B may sue A if A is an antitrust violator.  And C may sue B if B is an antitrust violator."  *Id.*  According to the Supreme Court, this is "the straightforward rule of *Illinois Brick*."  *Id.*

cardholder for payment for goods or services without discrimination."  (Intuit Merchant Agreement § N (emphasis added).)

In addition, the way real-world transactions are conducted supports the conclusion that Sellers "accept" payment cards.  In the prototypical transaction, the cardholder hands her card to a Seller, who "accepts" it for payment at the point of sale, just as the Seller could have instead accepted cash from a customer.[23]  This interpretation of "accept" comports with its plain-English meaning to "take or receive (something offered) willingly."  *See Accept*, Oxford English Dictionary, https://www.oed.com/dictionary/accept_v (last modified Mar. 2024).  Square and Intuit hold themselves out as enabling Sellers to "accept" payment cards, and admit as much in their own complaints.  *See* Compl. ¶ 1, *Block*, No. 23-CV-5377  ("Square is a cohesive commerce ecosystem that helps Sellers (merchants who utilize Square to *accept* payment cards, hereafter 'Sellers') start, run, and grow their businesses, including by enabling Sellers to *accept* card payments, providing reporting and analytics, and facilitating next-day settlement.") (emphasis added); Compl. ¶ 24(q), *Intuit*, No. 21-CV-1175 ("[Intuit] provides merchant customers the capability to access an electronic payment system and therefore *accept* cards that can transact over the payment system . . . .") (emphasis added).)  Square and Intuit cannot now disclaim the plain meaning of a term they have used to induce Sellers to utilize their services.

---

[23]  Square effectively concedes as much in its briefing:

> To accept payment cards, Square provides to its customers point-of-sale services and hardware that facilitate a consumer's ability to insert, swipe, or tap a payment card to make purchases from a Seller. . . . When a consumer inserts, swipes, or taps a card (or other payment instrument) at a Square Reader, a request for authorization to conduct the transaction is submitted to Square.

(Square Mem. 7.)

Thus, contrary to Square's and Intuit's arguments,[24] it would strain the meaning of the word "accepted" to interpret it to mean that Square or Intuit "accepts" a payment card, but the Seller "accepts" cash, for two otherwise identical transactions.

### 2. Visa's rules

Visa's rules classify an entity as either "a Payment Facilitator" or "a Merchant." (Defs.' 56.1 ¶ 10.) Visa's rules provide that:

> An entity that deposits a Transaction, receives settlement from, or contracts with an Acquirer on behalf of a Merchant is classified as a Merchant if all of the following apply: (1) The entity represents itself as selling the goods or services to the Cardholder; (2) [t]he entity uses its name primarily to identify its Merchant Outlet to the Cardholder; and (3) [t]he entity provides recourse to the Cardholder in the event of a dispute. Otherwise, the entity is classified as a Payment Facilitator.

(*Id.* (internal quotation marks omitted).) Square does not dispute this definition, but contends that "an entity can act as both a payment facilitator *and* a merchant." (Square Counter 56.1 ¶ 10.) Square's contention, however, is undermined by Visa's rule providing that an entity cannot *simultaneously* act as both a payment facilitator and a merchant.[25] (*See id.* ("An entity

---

[24] Square argues, for example, that "Square is the entity that *legally and operationally* accepts the payment card." (Square Mem. 16 (emphasis added).) The question, however, is who accepts payment cards as a factual matter. Intuit argues that ███████████████ ███████ citing its agreement with ████████████. (Intuit Mem. 6 (citing Intuit 56.1 ¶¶ 45–46).) Intuit's agreement with ████████████, however, offers little support for Intuit's claim because the agreement states in various forms that ████████████████████████ ████████████████████. (*See, e.g.*, PayFac Agreement ¶ 1.2, annexed to Decl. of Jennifer Maddux as IPX 1, Docket Entry No. 9064-1 ████████████████████ ████████████████████████████████████.

[25] It is undisputed that Square properly opted out of the Settlement Class for transactions in which it operated as a merchant (*e.g.*, selling terminals and other hardware to its customers); the only disputed transactions are the ones for which Square operated as a Payment Facilitator. Defendants concede that the Settlement Agreement does not cover claims brought by Square and Intuit in their capacities as merchants because they properly opted-out of the Settlement Class for such transactions. (Defs.' Mem. 3 ("To be clear, claims brought by Intuit and Square in their

that acts as both a Payment Facilitator and a Merchant must comply with the Payment Facilitator rules when acting as a Payment Facilitator and with Merchant rules when acting as a Merchant.").)

Visa's rules further provide that "a 'Merchant' serviced by a Payment Facilitator is referred to as a 'Sponsored Merchant' and is 'treated as a Merchant of its Payment Facilitator's Acquirer,'" and that a "Sponsored Merchant" is "[a]n entity for which Visa payment services are provided by a Payment Facilitator."  (Defs.' 56.1 ¶ 11.)  Square does not dispute these facts and agrees that Sellers (*i.e.*, "Sponsored Merchants") are entities for whom Visa payment services are provided by Square.  (Square Counter 56.1¶ 11.)  This rule thus provides that Sellers are regarded as "Merchants" for purposes of other applicable Visa rules.  Viewed in conjunction with the rule above describing a "Merchant," the evidence suggests that Sellers accept payment cards because (1) Sellers, not Square, represent themselves as selling the goods or services to cardholders; (2) Sellers use their names to identify themselves to cardholders; and (3) Sellers provide recourse to cardholders in the event of a dispute.  (*See* Defs.' 56.1 ¶ 10.)

### 3.   Mastercard's rules

Mastercard's rules operate similarly.  For example, Mastercard's rules "define a 'Submerchant' as a 'merchant that, pursuant to an agreement with a Payment Facilitator, is authorized to accept Cards.'"  (Defs.' 56.1 ¶ 13.)  Square does not dispute this definition, but notes that Mastercard's rules "define [a] 'Merchant' as 'any . . . corporation that, pursuant to a Merchant Agreement, agrees to accept Cards."  (Square Counter 56.1 ¶ 13.)  Mastercard's rules

---

capacities as merchants, *i.e.*, those based on their acceptance of payment cards for products and services that Intuit and Square themselves sell to consumers (such as Turbo Tax products sold by Intuit or payment terminals sold by Square), are not at issue in this motion.").)

further "define a 'Payment Facilitator' as a 'Service Provider' that 'facilitate[s] the acquiring of Transactions by the Acquirer from Submerchants.'"  (Defs.' 56.1 ¶ 14.)  Taken together, the Mastercard rules provide that Sellers (*i.e.*, "Submerchants") "accept" payment cards pursuant to their agreements with Square and Intuit (*i.e.*, the "Payment Facilitators").

### 4.  *Lanning* Plaintiffs' declarations

Finally, *Lanning* Plaintiffs admit in their declarations that they "accept" payment cards. Hayley Lanning declares, for example, that she "operate[s] a cosmetology business and accept[s] all major credit and debit cards."  (Lanning Decl. ¶ 2.)  The declarations of the other plaintiffs assert similarly.  (*See, e.g.*, Decl. of Dell Fox ¶ 2, Docket Entry No. 9074 ("Dell Fox Jewelry accepts all major credit and debit cards."); Decl. of Glenn Sieverson ¶ 2, Docket Entry No. 9075 ("I operate Andersonville Cryotherapy and Athletic Recovery Center and accept all major credit and debit cards."); *see also* Decl. of John Saric ¶ 2, Docket Entry No. 9077; Decl. of Maureen Roxberry ¶ 2, Docket Entry No. 9079; Decl. of Norva J. Bennett ¶ 2, Docket Entry No. 9080; Decl. of Pamela Murphy ¶ 2, Docket Entry No. 9081; Decl. of Sara Beth Goldfine Baratz ¶ 2, Docket Entry No. 9082.)

On this record, the Court finds that the Sellers "accepted" payment cards within the meaning intended by the parties at the time they reached the Settlement Agreement.  *Williams*, 2024 WL 1460134, at *1 ("[I]t is well-settled that a court's role is 'to ascertain the intention of the parties at the time they entered into the contract.'" (quoting *Evans*, 1 N.Y.3d at 458)). Accordingly, the Court grants Defendants' motion to enforce the settlement agreement.[26]

---

[26]  The Court declines to address Defendants' motion in the alternative for summary judgment because the Court grants their motion to enforce the settlement.  (*See* Defs.' Mot. 1.)

### c.   *Lanning* **Plaintiffs are members of the Settlement Class**

*Lanning* Plaintiffs cross-move for partial summary judgment, seeking a ruling that they "are not members of the Settlement Class." (*See Lanning* Mot. 2.)  The *Lanning* Plaintiffs are a group of merchants who use Square's services to accept payment cards. (*Lanning* Mem. 7.)  For the reasons discussed above, the Court finds that the merchants serviced by Square and Intuit (*i.e.*, Sellers), including the *Lanning* Plaintiffs, are members of the Settlement Class. Accordingly, the Court denies the *Lanning* Plaintiffs' cross-motion for partial summary judgment.

### d.   **The Court denies Intuit's cross-motion for partial summary judgment**

Intuit cross-moves for partial summary judgment as to its antitrust standing to bring claims against Visa and Mastercard based on PayFac transactions, "so that this issue does not crop up unnecessarily later in the case." (Intuit Mem. 2.)  In support, Intuit argues that "[t]he factual record is clear that Intuit was the direct and only payor of interchange to the 'antitrust violators' for all of its PayFac transactions." (*Id.* at 11–12 (citation omitted).)  Intuit contends that it was "the only entity in PayFac transactions with a full merchant account with the acquirer," that it was "legally responsible to pay interchange," and that it "assumed all risk associated with interchange." (*Id.* at 12.)  Intuit argues that Sellers, by contrast, "had no involvement in interchange payments" and that the higher fees they paid to Intuit "account[ed] for the other portions of the PayFac service Intuit provided." (*Id.*)

Intuit also argues that, contrary to Defendants' arguments in "other opt-out cases and the original class cases," Acquirers are neither the direct purchasers nor direct payors of interchange fees. (*Id.* at 12–15.)  In support, Intuit argues that "the *Illinois Brick* rule does not apply 'where the direct purchaser is owned or controlled by its customer,'" (*id.* at 13 (quoting *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 736 n.16 (1977)); Intuit Reply 8), nor does it apply "where

26

'plaintiffs allege that the sellers conspired with intermediates in the distribution chain to fix the price at which the plaintiffs purchased,'" (Intuit Mem. 13 (quoting *Arizona v. Shamrock Foods Co.*, 729 F.2d 1208, 1212 (9th Cir. 1984)); Intuit Reply 6–8.)  Intuit argues that Acquirers are "the very same banks that unquestionably adopted and promulgated" the rules being challenged "when Visa and Mastercard were associations owned and controlled by their bank members," and, therefore, that at least one of the exceptions to the *Illinois Brick* rule applies.  (Intuit Mem. 14–15.)

Defendants argue that Square and Intuit are not the entities that directly pay interchange, network fees, or chargebacks, and that Acquirers are direct purchasers of card-acceptance services.  (Defs.' Reply 16–19.)  In support, Defendants contend that for each PayFac transaction, "Square's or Intuit's acquirer pays the issuer of the card the interchange applicable to the transaction," and that the Acquirer likewise "pays network fees to Visa and Mastercard in connection with transactions processed over each network."  (*Id.* at 17–18.)  Defendants argue that Square and Intuit pay their Acquirers "a fee in connection with the processing services" they provide, and that Square and Intuit are free to "switch [A]cquirers to get better economic terms."[27]  (*Id.* at 18–19.)

---

[27]  Defendants also argue that "if the Court grants Defendants' motion to enforce [the Settlement Agreement], there is no need to reach Intuit's cross-motion for partial summary judgment."  (Defs.' Reply 16.)  The Court's conclusion regarding Defendants' motion to enforce the Settlement Agreement, however, relies on an interpretation of who "accepted" payment cards under the Settlement Agreement.  Even where such a finding is "guided by federal antitrust standards," *In re Payment Card*, 2019 WL 6875472, at *31, that finding as to the meaning of a disputed contract term is not equivalent to the conclusion that no genuine dispute of fact remains as to the identity of the direct purchaser of card-acceptance services under *Illinois Brick*.  The Court therefore addresses Intuit's cross-motion on the merits.

In *Illinois Brick*, the Supreme Court limited standing to bring claims under the Sherman Act to those who are "direct purchasers" from antitrust violators.[28]  431 U.S. at 720.  Recently, in *Apple Inc. v. Pepper*, the Supreme Court reaffirmed the validity of *Illinois Brick*'s direct purchaser rule.  587 U.S. ---, ---, 139 S. Ct. 1514, 1519–21 (2019).  In setting forth this limiting rule, the Court offered three primary rationales.  First, allowing indirect purchasers to recover "would create a serious risk of multiple liability for defendants."  *Illinois Brick*, 431 U.S. at 730.  Second, "trac[ing] the complex economic adjustments to a change in the cost of a particular factor of production would greatly complicate and reduce the effectiveness of already protracted treble-damages proceedings."  *Id.* at 732.  Third, the rule would "encourag[e] vigorous private enforcement of the antitrust laws," because "uncertainty of how [any] overcharge would be apportioned among the various plaintiffs . . . would further reduce the incentive to sue."  *Id.* at 745.  In ruling on Defendants' motion for summary judgment as to the direct-purchaser status of a group of opt-out Plaintiffs, this Court observed that "while there may be direct and indirect *payors* of interchange and network fees, these fees are components of the price paid for the *purchase* of a service — namely, card-acceptance services."[29]  *Interchange Fees V*, 2024 WL 1014159, at *7–18.  Thus, "[t]he presence of an intermediary does not necessarily mean that the party receiving the benefit of the service is an indirect purchaser of that service."  *Id.* at *11.

To determine whether Intuit is a direct purchaser, the Court begins with the question of what precisely is being purchased.  Consistent with the Court's prior decisions, the relevant

---

[28]  *See supra* note 22; *see also Interchange Fees V*, 2024 WL 1014159, at *7 & n.14 (collecting cases showing that the *Illinois Brick* direct-purchaser rule has come to be treated by courts as a standing rule).

[29]  *See Interchange Fees V*, 2024 WL 1014159, at *12–13 (explaining why a "direct payor" test "is not an appropriate substitute for the direct purchaser rule").

product markets are the markets for credit- and debit-card transactions.  *See id.*; *Interchange Fees IV*, 2024 WL 278565, at *12.

As detailed above, (*supra* section II.b.iii), the facts before the Court preclude the Court from granting summary judgment in Intuit's favor on the issue of whether it is the direct purchaser of card-acceptance services.  Intuit's Merchant Agreement, for example, suggests that Sellers, rather than the Payment Facilitators, are the entities purchasing card-acceptance services.  (*See, e.g.*, Intuit Merchant Agreement § N ("You [Seller] agree to *accept* all valid credit and debit card types and brands properly presented by a payor or cardholder for payment for goods or services without discrimination.").)  Such language suggests that Sellers are the entities purchasing card-acceptance services, while Intuit merely facilitates the provision of those services.  The agreement also suggests that when Intuit helps its merchant-customers, *i.e.*, Sellers, "receive payments from [their] customers," Intuit acts as the Sellers' "limited payments agent for the purpose of receiving, holding, and settling payments to you pursuant to this Agreement."  (*Id.*)  This relationship between Intuit and the Sellers is not dissimilar from that between Acquirers and those merchants that do not use Payment Facilitators, as described in the Court's prior decision addressing a similar issue.  *See Interchange Fees V*, 2024 WL 1014159, at *16 (observing, before denying summary judgment to Defendants on similar question, that "under one interpretation of the facts, Acquirers are simply facilitating the provision of card-acceptance services to merchants"); *id.* at *17 ("Acquirers, moreover, do not accept credit cards and debit cards — merchants do.  Therefore, the evidence tends to show that merchants, rather than Acquirers, are the direct purchasers of card-acceptance services and raises a triable question of fact as to this issue.").  Where Intuit's own agreements define such an agency relationship, there remains a triable question of fact as to the identity of the direct purchaser of the card-

29

acceptance services. *Cf. In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 07-CV-5944, 2016 WL 7805628, at *14 (N.D. Cal. Aug. 4, 2016) ("[W]here a purchasing agent purchases goods on behalf of its principal, the principal — not the purchasing agent — is the direct purchaser . . . ."), *rev'd and remanded by* 720 F. App'x 835 (9th Cir. 2017) (finding that district court improperly applied facts to the principal–agent determination); *see also In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 505–06 (S.D.N.Y. 1996) (finding plaintiff-investors were direct purchasers where their purchases were made through brokers who traded "for the account of others"); *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 25 (D.D.C. 2001) (same where the goods at issue were purchased through agents); *In re Toilet Seat Antitrust Litig.*, No. 75-CV-184, 1977 WL 1453, at *2 (E.D. Mich. Aug. 24, 1977) (interpreting *Illinois Brick*'s "owned or controlled" exception to encompass role of purchasing agent and relying on control aspect of exception). *But see McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 852 (3d Cir. 1996) (finding plaintiffs were indirect purchasers because "none of the plaintiffs retained their lawyers to act as mere purchasing agents whose sole objective and function was to buy photocopies for the clients").

Visa's and Mastercard's rules similarly create a triable issue of fact as to whether Intuit is the direct purchaser of those transactions, suggesting instead that the Sellers are direct purchasers. Visa's rules provide that entities can be classified as either "a Payment Facilitator" or "a Merchant," (Defs.' 56.1 ¶ 10), and that "[a]n entity that acts as both . . . must comply with the Payment Facilitator rules when acting as a Payment Facilitator and with Merchant rules when acting as a Merchant," (Square Counter 56.1 ¶ 10). The rules further provide that merchants who utilize a Payment Facilitator's services are to be "treated as a Merchant of its Payment Facilitator's Acquirer," likening their position to those of merchants that do not use Payment

Facilitators.  (*See* Defs.' 56.1 ¶ 11.)  Mastercard similarly defines a Payment Facilitator as "a 'Service Provider' that 'facilitate[s] the acquiring of Transactions by the Acquirer from Submerchants.'"  (*Id.* ¶ 14.)

Accordingly, the Court denies Intuit's motion for partial summary judgment as to whether it has antitrust standing based on PayFac transactions because the Court cannot determine as a matter of law that Intuit is the direct purchaser of card-acceptance services.

## III.  Conclusion

For the foregoing reasons, the Court grants Defendants' motion to enforce the Settlement Agreement and finds that Square's merchant-customers and Intuit's merchant-customers "accepted" payment cards and are therefore members of the Rule 23(b)(3) Class, denies the *Lanning* Plaintiffs' cross-motion for summary judgment, and denies Intuit's cross-motion for summary judgment.

Dated: May 28, 2024
       Brooklyn, New York

                                        SO ORDERED:


                                        _____s/ MKB_____
                                        MARGO K. BRODIE
                                        United States District Judge