UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

—————————————————————— x

In re PAYMENT CARD INTERCHANGE : MDL No. 1720(MKB)(JAM)
FEE AND MERCHANT DISCOUNT :
ANTITRUST LITIGATION : Civil No. 05-5075(MKB)(JAM)
 :
—————————————————————— :
 : RULE 23(b)(3) CLASS COUNSEL'S
 : RESPONSE TO THE COURT'S MAY 26,
This Document Relates To: : 2024 ORDER
 :
    ALL ACTIONS. :
 :
 :
—————————————————————— x

4884-5505-5557.v1

## I.    INTRODUCTION

Rule 23(b)(3) Class Counsel ("Class Counsel") here provides a response to the Court's May 26, 2024 Order.  This report is broken into two sections.  The first section responds to the Court's Order regarding issues related to claims-filing services by the law firm Milberg Coleman Bryson Phillips Grossman, LLC ("Milberg").  This section also contains, as ordered, a response from Milberg.  The second section responds to the Court's Order seeking additional details as to the development of processes to efficiently handle an increase in third-party claims.  To respond to this part of the Court's Order, Class Counsel has worked with personnel at Epiq, the Claims Administrator, to provide information to the Court.

### A.    Class Counsel's Report Regarding Milberg

Following the Court's May 26, 2024 Order, on Tuesday, May 28, 2024, Class Counsel wrote to Milberg with a number of questions, noting that answers would greatly aid in responding to the Court's Order.  Class Counsel asked for certain documents that Milberg referenced in its Status Report section, including: (1) a document "outlining Milberg's referral partner compliance standards," which it "supplie[s] during the onboarding of any referral partner," (2) the service agreement between Milberg and the referral partner at issue, and (3) the "list of leads" the referral partner had compiled.  ECF 9306 at 5-6.[1]  On June 3, 2024, after Class Counsel sent two follow-up emails, Milberg provided the requested documents.[2]  Class Counsel believes these documents will be helpful in determining certain underlying issues regarding the ultimate responsibility for the fraudulent submissions to Epiq.

Another focus of Class Counsel's questions to Milberg related to the timing of actions by Milberg to halt the problematic conduct.  Milberg reported to the Court that it first found out about

---

[1]   A routine background check of the referral partner has revealed she has been involved in multiple lawsuits and has numerous liens and judgments against her.

[2]   Milberg provided the service agreement, but stated it was confidential and that they did not agree for it to be "filed in Court or shared with anyone else.  The contents of the document are also confidential and may not be shared with anyone else."  Class Counsel stated that if the Court requested the document, it would be provided *in camera*.

the pattern of improper submissions on or around May 5, 2024, but did not sever the relationship with the referral partner for nearly three additional weeks – and not until after Class Counsel contacted the law firm on May 22, 2024.  Class Counsel also questioned why Milberg did not notify Epiq of a problem, despite learning of the pattern of improper submissions on or around May 5, 2024.  As of June 3, 2024, Milberg reported that "in hindsight" it should have severed the relationship earlier, but claimed that because it had not received new referrals since March 25, 2024 from the referral partner and because it "closed its book and ceased all campaigning and retaining of any new clients as of April 1, 2024. . . .  From Milberg's point of view, there was no ongoing threat." It further stated that as "a courtesy to class counsel and as an expression of our willingness to comply, Milberg formally severed the referral relationship on May 23, 2024."  Class Counsel finds this answer unpersuasive.  At least by May 5, 2024, there were significant signs – even according to Milberg – that there was a systemic problem, yet Milberg never alerted Class Counsel nor Epiq to any issue with the submitted materials.  Moreover, leaving false submissions with Epiq did constitute an "ongoing threat."

As to why it did not notify Epiq regarding problems with its submissions, Milberg noted only that "in hindsight" it should have notified Epiq earlier.  It further stated that it was "compliant and responsive to all written protocols set forth by Epiq, regarding the resolution of conflicts and withdrawals."  This too is unpersuasive, as Milberg certainly knew that the submission of fake documents would not be compliant with Epiq's protocols.  Instead of alerting Epiq to the problem, Milberg simply withdrew – without proper explanation – submissions it "found to be on the bad list (which was still developing) that were also on our conflicts list."  Many fake submissions remained with Epiq until after Class Counsel contacted Milberg.

Class Counsel also sought answers to questions related to Milberg's plans to try to audit its submissions and ensure that fake submissions are rooted out and removed from Epiq's databases. To that end, Class Counsel sought details regarding Milberg's plans to contact all merchants for whom it submitted materials to Epiq (questioning also whether it intended to contact any of the fake claim companies).  Class Counsel further sought information regarding whether Milberg had yet

- 2 -

4884-5505-5557.v1

determined how many referrals in total came from the referral partner and sought confirmation that Epiq had been told that all of those submissions were to be withdrawn.  As of June 3, 2024, Milberg reported that it has withdrawn all merchants that it believes were related to the referral partner and that it has sent a notice of cancellation to Epiq.

Additionally, Class Counsel sought assurances that marketing and advertising efforts regarding Milberg's claims-filing services in this case had ceased, and that all referral partners had received the message that additional claims would not be filed in this action by Milberg or any of its referral partners.  As of June 4, 2024, Milberg reported that it retained its last client on April 1, 2024, and that it had notified all partners that there will be no additional claims.

Finally, Class Counsel sought insight into how these fake submissions came to be and how they failed to be caught by Milberg before being submitted to Epiq, and additionally sought information regarding communications with the referral partner who submitted the false information to Milberg.  On June 3, 2024, Milberg stated, in response to a question regarding information about communications with the referral partner, that it would be "happy to answer any specific questions."  On June 4, 2024, Class Counsel sent six questions.  Milberg's responses are mostly adequate, but it claimed answering how the partner came to be hired as "beyond the scope of what's at issue."  It did confirm that nothing had been paid to the referral partner.

Under standard agency principles, Milberg is likely responsible for the actions of the referral partner as well as its own failure to vet the materials it submitted to Epiq.[3]  *See, e.g.*, ECF 6349 at 51, holding agency relationship existed where an entity by "routinely accepting the contracts which were the fruits of [agent's] solicitation activity, ratified [agent's] campaign."  *See also id*. at 46-53 (analyzing agency law in the context of referral partners and third-party claims filing company).  Epiq and Class Counsel have spent significant time reviewing and working on this issue.  To the

---

[3]    As noted, the fake agreements are easily taken apart.  These entities for whom false materials were submitted are in most cases household names.  The way the documents were "signed" by a person who has no relationship to the company being listed as "owner" with an email address that is plainly fake, revealed these to be fraudulent.  The Taxpayer Identification Numbers ("TINs") appear to be accurate, but for large, publicly traded companies, this information is readily available.

4884-5505-5557.v1

extent the Court determines a penalty should be imposed, one option would be to reimburse Epiq for the time spent related to these fake submissions, which has come at the expense of the class. Further, "Class Counsel . . . may wish to file a complaint with the Department of Justice or the United States Attorney's Office for the Eastern District of New York" related to the actions of the referral partner. *See* ECF 9009 at 11.

Class Counsel responds to certain of Milberg's statements in its section of the report. First, Class Counsel agreed to share drafts of its position, but asked that Milberg first provide its statement to Class Counsel. Class Counsel then provided to Milberg – in less than an hour – its draft section which was not changed following receipt of Milberg's statement.  Then, Milberg supplied an updated statement.  There was no attempt to "conceal" anything from Milberg. Second, Milberg claims it is aware of other fraudulent conduct related to claims filing.  Class Counsel asked Milberg on June 5, 2024 to let Class Counsel know of any fraudulent claims it is aware of as Class Counsel is under instructions from the Court to report on issues related to third parties.  If Milberg knows of fraud, it should alert Class Counsel or the Court.  Third, Milberg claims it is somehow being singled out for its conduct.  This is false.  Class Counsel has brought multiple issues to the Court over the past 10 years regarding false and misleading statements and other wrongful conduct by more than a dozen third parties.  Milberg bizarrely states it "could speculate as to why Class Counsel has chosen to focus exclusively on Milberg, it will not do so because that is not what is before the Court."  As noted above, this is not true.  Finally, after receiving Milberg's updated statement, Class Counsel three times suggested a conference call to discuss it.  An email was received stating that "other responses were coming" but all requests for a call were ignored.  Class Counsel stated that it would send a responsive draft to Milberg and provided a deadline so that this report could be timely filed.

### B. Milberg's Response

Milberg Coleman Bryson Phillips Grossman, LLC ("Milberg") submits this response to the Court's Status Report Order, dated May 26, 2024.  As stated in Class Counsel's monthly report regarding third-party entities, dated May 24, 2024, Milberg has: (1) withdrawn all potentially fraudulent claims, all of which came from a single referral source, (2) withdrawn from representing

4884-5505-5557.v1

the entities associated with the potentially fraudulent claims, (3) audited every submitted claim, regardless of source, in order to verify the accuracy of each claim, (4) contacted each merchant client to verify that they still want Milberg to handle their claim, and (5) withdrawn from representing each merchant client who confirmed that they do not want Milberg to continue handling their claim.

As previously represented, Milberg has terminated its relationship with the referral source that submitted fraudulent claims to Milberg. Since May 24, 2024, Milberg has withdrawn its registration of authorities to represent 116 entities that were submitted to Epiq. Each of these 116 entities was submitted to Milberg by the same problematic third-party referral source. To be clear, Milberg did not submit claims on behalf of any of these 116 entities. Rather, Milberg registered its representation of these entities via the platform and protocols implemented by Class Counsel and the Court so that Epiq could review and vet them as intended. Following the registration of these 116 entities is when the fraud was first detected. Milberg provided a detailed list of the merchants at issue and their submitted tax identification numbers to Class Counsel.

Additionally, Milberg has audited each claim submitted to Epiq, regardless of source, to verify the accuracy of the same. This process included visually inspecting all remaining claims and their submitted data for problematic submissions, segmenting the claims by category, and issuing an array of communications to the corresponding clients relative to each's current claim status. In connection with this process, merchant clients who are not compliant or fail to engage with Milberg after numerous communication attempts are having their claims withdrawn and Milberg is withdrawing from representing the non-compliant/responsive entities. To date, 82 merchant clients have confirmed that they do not want Milberg to continue handling their claims. In response, Milberg has withdrawn from representing these 82 merchant clients and communicated the same to the clients and Epiq. To date, every merchant client, with the exception of those whose claims Milberg has already withdrawn, has been sent an email giving them the opportunity to cancel Milberg's representation.

In connection with its ongoing due diligence, Milberg has contacted 3,600 approved merchant clients, inviting them to review their reported interchange fees and transaction data and to

- 5 -

4884-5505-5557.v1

provide any updated information or documentation in the event they dispute the reported figures.  Of these, 1,988 clients did not respond or submit any new information, resulting in Milberg withdrawing its representation of these merchants and withdrawing their respective registrations.  While Milberg does not have reason to believe that any of these merchant clients are fraudulent, out of an abundance of caution, Milberg opted to terminate its representation of these 1,988 merchants.  Milberg also withdrew 223 additional registrations and withdrew from the corresponding representations after receiving notification from Epiq that these 233 merchant clients' registered business names do not match their provided tax identification numbers.  Milberg attempted to contact these merchant clients in order to cure the inaccuracies, but because they were not responsive, Milberg withdrew their registrations and ceased representing these 223 merchant clients.  Again, Milberg does not believe these merchants are fraudulent, but due to their non-responsiveness and out of an abundance of caution, Milberg chose to end their representations.  Presently, Milberg is working to secure signatures that are missing from the retainer agreements of 59 additional merchant clients.  In the event that Milberg is unable to secure these signatures within a reasonable time frame, it will withdraw its representation of these merchant clients.

Additionally, there are 782 merchant clients with conflicted claims (i.e., dual representation issues) involving third parties that are still in the process of being resolved.  Because the clearing of these conflicts requires corresponding with and obtaining information from both the merchant clients and the conflicted parties, this is an ongoing process and the timing of the resolution of these conflicts is outside Milberg's control.  Milberg has successfully cleared hundreds of Owner/Employee conflicts by way of ongoing communications with the clients.

Following the issuance of the Court's Status Report Order, Milberg has responded to numerous follow-up questions from Class Counsel in an effort to be fully transparent.  Milberg ceased advertising for clients in connection with this matter as of April 1, 2024, and has not retained any new clients since that date from any source.  Milberg has no intention of doing any further

4884-5505-5557.v1

advertising and will not agree to represent any additional merchant clients in connection with this action.

Class Counsel's request that Milberg be penalized or referred to law enforcement is absurd. Milberg has been nothing but cooperative and transparent with Class Counsel throughout this process. Milberg is disappointed that Class Counsel tried to conceal the fact that it was going to make such a proposal to the Court by initially refusing to share its section of the joint report prior to its filing. Only after Milberg insisted on seeing a draft of Class Counsel's section of the report did all of this come to light. Further, Class Counsel refused to provide a draft of its section of the report until *after* it received Milberg's draft response. Milberg is aware that other fraudulent claims have been submitted by other companies and/or law firms. It is a very unfortunate part of the settlement process, particularly in a settlement as large as this one. Indeed, this phenomenon was recently discussed in a Reuters article, Scammers flood US class action settlements with fraudulent claims. *See* https://www.reuters.com/legal/us-class-action-settlements-flooded-with-fraudulent-claims-by-scammers-2024-05-02/. Nevertheless, Class Counsel has decided to make an example of Milberg. While Milberg could speculate as to why Class Counsel has chosen to focus exclusively on Milberg, it will not do so because that is not what is before the Court. Milberg will continue to be cooperative and do everything it can to rectify this unfortunate situation.

## II. RESPONSE TO THE COURT'S ORDER RELATED TO HANDLING OF THIRD-PARTY CLAIMS

As the Court is aware, matters related to third-party claims filing have been prevalent going back as far as the fall of 2013. For more than 10 years Class Counsel has closely monitored third-party claim filing companies and law firms offering such services, and the Court has taken an active role in ensuring that merchants are protected from companies providing misleading information or overreaching. *See, e.g.*, ECF 6349. There have been numerous evidentiary hearings, orders to show cause, and monthly reports to the Court regarding issues related to third parties.

Apart from the various docket entries related to these entities, Class Counsel and Epiq manage issues related to third parties on a daily basis. Now that the claims process is underway,

4884-5505-5557.v1

matters relating to third parties have increased.  Not only have more class members contacted Epiq and Class Counsel regarding issues related to third parties since the claims process opened, but Epiq and Class Counsel have seen a dramatic increase (not unexpectedly) in contacts with third parties as they navigate the claims process.  These contacts include requests for assistance, conflict resolution, detailed questions regarding claims filing, managing complaints between class members and third parties, hosting conference calls to discuss matters affecting claims-filing entities, correcting misleading marketing and other communications, data retrieval issues, and more.  Below Epiq and Class Counsel detail the various processes that have been implemented to efficiently manage this large volume of work related to third parties.

Prior to the December 1, 2023 noticing efforts, Epiq established a dedicated email inbox, bulkfiler@paymentcardsettlement.com, and a dedicated phone line, 1-888-823-3190, for third-party filer communications.  All inquiries received via these methods are handled by a dedicated team trained to handle third-party activity.

Further, in an effort to keep third-party filers apprised of settlement updates, Epiq and Class Counsel have implemented various methods of communications throughout the claims phase.  Class Counsel has held virtual town halls for third-party filers to attend where they have been able to hear updates from Class Counsel and receive answers to questions asked during the town hall.  The first town hall, held in November 2023, apprised third-party filers of the claim form mailing plans and claim filing timelines.  The second town hall, held in February 2024, was more specifically geared towards the conflicts process and notices that would be going out to filers.  Class Counsel intends to hold additional town halls with third-party filers over the coming months.

In addition to the town halls, Epiq has regularly sent email communications to known third-party filers with updates.  Separate communications have been sent each time a new process was implemented related to claim filing.  For example, notices were emailed to known third-party filers informing them of upcoming conflict notices and resolutions steps.  Most recently, Epiq sent email notices informing third-party filers of the claims-filing deadline extension shortly after the Court's May 14, 2024 Order.

4884-5505-5557.v1

With regard to claim filing on the Merchant Portal, Epiq has implemented bulk filing capabilities for third-party filers to use in order to make the process more streamlined and efficient. Third-party filers are able to utilize templates on the settlement website to submit claimant information in bulk, or claimant details which can be used to locate additional transactions, to the Class Administrator so that they do not have to fill out submissions one by one for each of their clients. In addition, because third-party filers are required to utilize the settlement website for all types of submissions in bulk, and because the bulk submission features require use of a template for all submissions, with automated validations of all submissions, uniformity of third-party filer submissions is enforced. This ensures that the Class Administrator does not expend unnecessary resources cleaning up or manipulating class member data from third-party filers, and instead shifts the time and cost of correctly submitting data to the third-party filers.

The Merchant Portal also affords third-party filers, as well as individual merchants, with various self-service functionalities to assist them with managing their clients' filings. Once a user logs into their account on the Merchant Portal, they are taken to their Account Summary page which provides an overview of all merchants the filer has associated with their account. The Merchant Portal displays information for each merchant, including: (1) their TIN, (2) Epiq's assigned Claimant ID number, (3) the current authorization status, (4) the status on whether a claim has been filed to date and where the proof of authorization requirement has been met, and (5) the interchange fees available in the data for each merchant. This information can all be downloaded at any time via the Account Summary page. In addition, third-party filers and any other registrants are able to see, via the Merchant Portal's Correspondence grid, a list of all communications sent with respect to any merchants registered to the account, and respond to those communications when necessary. This self-service functionality ensures third-party filers can answer most any questions about the status of a claim on their own and prevents multiple time-consuming requests to the Class Administrator for status updates and ad hoc reports related to their claims. Again, this shifts the cost of managing the high volume of clients the third-party filers have signed up to the third-party filers themselves, rather than making this a cost the class must bear.

- 9 -

4884-5505-5557.v1

As the presence of third-party filers in this case is the primary driver of conflicts, any processes that relate to conflict resolution directly impact management of third-party filers. The Merchant Portal allows filers the ability to extract multiple reports to easily view all the data associated with their clients in a single report. To help facilitate management of conflicts created by third-party filers, a conflicts report is available on their Account Summary page which provides information on the other party(ies) in conflict, including contact information for the other party(ies) and the 30-day response deadline for resolution. As new conflicts arise, Epiq sends email notifications to the affected parties which direct them to return to the Merchant Portal and extract a current version of the conflicts report to obtain the necessary information to resolve the conflicts by the deadline.

Similarly, as third-party filers are required to provide adequate proof of authority documentation for each merchant they link to their account, third-party filers hold a majority of the open deficiencies among all filers. The Merchant Portal also provides extract functionality via which third-party filers and other registrants can obtain information about pending deficiencies. The user can download a deficiency report and be provided with a quick view of the merchants with pending deficiencies, information on what the deficiencies are and what is needed to cure them, and the deadline to respond. Deficiency notices are sent via email, similar to conflict notices, as new deficiencies are identified, instructing users to download an updated version of the report and to visit the Merchant Portal to upload the required documentation by the deadline.

Internally, Epiq has created fields in its settlement-specific database to track third-party filer activity, including conflict and deficiency statuses and bulk claim submissions. In doing so, the Class Administrator can aggregate the data received in a uniform manner for tracking and reporting purposes, and easily monitor the responsiveness and progress of each third-party filer.

4884-5505-5557.v1

## III.    CONCLUSION

Epiq and Counsel believe this settlement is unprecedented in the number of third-party claim filing entities that are involved in the claims process.  Class Counsel and Epiq remain committed to working through these various issues and ensuring all are treated fairly.  Class Counsel and Epiq are available to answer any of the Court's questions should the Court require.

DATED:  June 6, 2024

ROBBINS GELLER RUDMAN
 & DOWD LLP
PATRICK J. COUGHLIN
ALEXANDRA S. BERNAY


                s/ Alexandra S. Bernay
ALEXANDRA S. BERNAY

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

ROBINS KAPLAN LLP
K. CRAIG WILDFANG
THOMAS J. UNDLIN
2800 LaSalle Plaza
800 LaSalle Avenue South
Minneapolis, MN  55402-2015
Telephone:  612/349-8500
612/339-4181 (fax)

BERGER MONTAGUE PC
H. LADDIE MONTAGUE, JR.
MERRILL G. DAVIDOFF
MICHAEL J. KANE
1818 Market Street, Suite 3600
Philadelphia, PA  19103
Telephone:  215/875-3000
215/875-4604 (fax)

Co-Lead Counsel for Plaintiffs

4884-5505-5557.v1