# EXHIBIT A

## MILBERG RESPONSE TO JUNE 7, 2024 ORDER

The Court's June 7, 2024 Order requested that Milberg provide (1) a more detailed overview of its claims review process, including updates on all claims submitted to Epiq, (2) its position on whether, as Class Counsel suggests, Milberg should be ordered to reimburse Epiq for the time spent related to fraudulent submissions, and (3) its position on whether a referral should be made to the Department of Justice regarding Ms. Laverne Hallak. Milberg addresses each of these items as follows:

1. **Claims Review Process and Status of Claims**

Milberg's process for claimant onboarding and review for the Payment Card Interchange Fee settlement claim involved several steps and a variety of marketing efforts were used to drive potential applicants to Milberg's digital webform. Here, Milberg received claimant information from third-party referral sources. *See* Declaration of Austin Camp ("Camp Decl."), attached hereto as Ex. 1, at 6. It is the firm's practice to exclusively work with trusted sources. *Id*.

The webform used for onboarding potential claimants included a series of qualifying questions, which were designed to filter out those who are less likely to qualify. *Id*. at 7. Those applicants who did pass the initial qualification were then required to produce their corporate details, including business name, address, and Tax Identification Numbers. *Id*. Applicants who did not provide this information were filtered out and deemed disqualified by Milberg's standards. *Id*. Those who did initially qualify were invited to retain Milberg for representation in connection with the Payment Card Interchange Fee settlement and asked to sign an Authority to Represent document, pursuant to the requirements set forth by the claims administrator, Epiq. *Id*.

The next layer of review and verification entailed a third-party solution provided by Cobalt Intelligence, a data driven solution that was integrated into Milberg's case management system. *Id*. Cobalt Intelligence specializes in programmatically querying the various Secretary of State

1

websites to match and/or lookup publicly available corporate details. *Id*. Milberg would send via API a data payload including the corporate details it captured from the claimant during the initial signup process to Cobalt. *Id*. Cobalt's system would then utilize Milberg's data in an effort to match and verify that a business does or had existed and would return to Milberg a data payload indicating the status of the corporation, as well as other data points, which enabled Milberg to further verify that the business was real and would potentially have a viable claim. *Id*. In addition to the aforementioned verification methods, Milberg regularly performed spot audits, as well as broadly reviewing large data sets, during which claimant data was reviewed for completeness and quality scoring. *Id*.

Milberg also sent a wide array or correspondence to its merchant clients via bulk email, canceling or disqualifying claimants along the way who were discovered to no longer be eligible or viable claimants, or who chose to cancel Milberg's services. *Id*. at 8. This included sending a welcome letter email, which was sent to each merchant client instantly after a merchant client signed up with Milberg, and additional correspondence, varying in topics, which were sent on the following dates:

- December 6, 2023 – Welcome letter follow up with case update;
- March 22, 2024 – Case update;
- April 24, 2024 – Merchant conflicts, call for resolution;
- April 26, 2024 - Discontinuance letters;
- May 15, 2024 – Interchange fee, call for updated merchant details or documentation;
- May 30, 2024 (x3) – Discontinuance letters, Merchant conflicts for resolution, NAM deficiencies;

2

- June 3, 2024 – Verify and affirm; and

- June 4, 2024 (x2) – Verify and affirm, discontinuance letters.

*Id*. at 8.

Throughout this process, Milberg started registering those claimants who it believed were viable with the claims administrator through the portal found at www.paymentcardsettlement.com. *Id*. at 9. The portal was represented by Epiq as a tool to be utilized for the initial review and verification of potential claimants. *Id*. Based on the instruction provided by Epiq to all third-party filers and in accord with the registration process outlined by Epiq, Milberg submitted via the portal the Authority to Represent documents executed by each of its merchant clients for review by Epiq. *Id*. Milberg relied on this portal as a means of providing final claimant verification before determining whether to actually "file" and/or "submit" a claim via the portal. *Id*. To this day, Milberg has not formally filed or submitted a single claim on behalf of any merchant client it represents. *Id*. The portal was portrayed as a means to support the overall claim submission process and as a mechanism for both Epiq and third-party filers alike to verify the following:

- Authority to Represent "Approvals;"

- Dual Representation ("Conflicts");

- "Deficiencies," such as business names not matching the Tax Identification Numbers, missing legible signatures, or missing proper authorization documents; and/or

- "Excluded Parties" for any merchants who previously opted out or had resolved their claims separately.

*Id*. The information provided by Epiq during this process was critical to Milberg's further review of its merchant clients and was used to correspond with its merchant clients and/or conflicted

3

parties in an effort to resolve, cure, move potential claims forward, or to withdraw and cancel claimants who were found to be ineligible. *Id*. at 10.

It was during this initial application and review process that Milberg began to realize a pattern of high-profile corporations coming back as "Conflicts" or "Excluded Parties." *Id*. at 11. Specifically, Milberg was receiving feedback and questions from the conflicted parties, which led Milberg to investigate further, only to learn that the names of the representatives of said corporations that signed our Authority to Represent documents were not real and/or were not individuals with actual authority to act on behalf of said corporations. *Id*. Milberg did not contest these findings and immediately moved to withdraw these merchants as it became aware of these facts. *Id*.

It is Milberg's understanding that Epiq and class counsel fully anticipated a variety of claim filing issues, given the size of the settlement and the volume of eligible merchant claimants. *Id*. at 12. Because of this, Epiq, along with class counsel, devised a platform, the portal at www.paymentcardsettlement.com, to assist in the claimant verification process, including multiple "bulk filing" options. *Id*. Milberg acknowledges that it could have done a better job identifying high profile claimants and holding those particular submissions to a higher standard internally before registering their Authority to Represent documents for review via the portal. *Id*. at 13. However, Milberg did rely on the tools provided by Epiq and Class Counsel. *Id*. Again, Milberg did not "file" or "submit" any fraudulent claims. *Id*. Rather, Milberg registered bulk spreadsheets and Authority to Represent documents for claimants in an effort to further validate them before formally filing or submitting any claims through the portal at www.paymentcardsettlement.com. *Id*. It was during this process that Milberg began to identify the problem and immediately began an internal investigation. *Id*.

Milberg still has not formally filed a single claim for compensation for any of its merchant clients. *Id*. at 14. To date, it has only registered merchant clients and their Authority to Represent documents for initial review and approval via the procedure set forth by the claims administrator. *Id*. To this day, Epiq has a record of 5,064 claimants for whom Milberg submitted an Authority to Represent document for review. *Id*. at 15. 2,527 of those claimants have since been withdrawn for conflict resolutions, false applications, deficient or uncured claims, little or no interchange fee data found and with no response from the claimants to cure or resolve. *Id*. 26 claimants were found to be excluded parties. *Id*. There are 27 remaining claimants with the status of "Deficient" due to the provision of illegible signatures from the merchant clients. *Id*. Milberg is in the process of attempting to cure these deficiencies by engaging with these 27 clients via email and phone calls. *Id*. Those who do not respond will also be withdrawn. *Id*. In the status of "Conflict," Milberg has 935 claimants that it is still attempting to resolve. *Id*. Finally, there are 1,549 "Approved" claims. *Id*. Milberg will soon be withdrawing an additional 430 of these approved claims due to unresponsive clients failing to reaffirm their intent to have Milberg continue representing them. *Id*.

2. **Reimbursement of Epiq**

At present, Milberg does not know whether significant time was expended by Epiq addressing Milberg's submissions or whether that time differs in comparison to that spent by Epiq dealing with the submissions of any other third-party filers in this action. While it is unfortunate that fraudulent claimants were submitted to Epiq in connection with the initial verification process, Milberg does not believe that reimbursement of Epiq's time is warranted here. Such sanctions, as proposed by Class Counsel, are similar to those at issue in a Rule 11 analysis in connection with the filing of a complaint. Aside from the fact that nothing was actually filed here, Milberg did not

5

submit any merchant clients to Epiq for verification in bad faith, reasonably relied on the veracity of the information provided by its referral source about the claimants and had not determined at the time of submission that the claimants were fraudulent. Because Milberg acted in good faith, no sanctions are warranted.

"To impose sanctions under the Court's inherent authority," "there must exist clear and convincing evidence that an individual's conduct was not merely negligent but was undertaken with subjective bad faith." *S.E.C. v. Smith*, 798 F. Supp. 2d 412, 422 (N.D.N.Y. 2011), *aff'd in part*, *dismissed in part*, 710 F.3d 87 (2d Cir. 2013) (citing *Schlaifer Nance & Co., Inc. v. Estate of Warhol*, 194 F.3d 323, 338 (2d Cir.1999)). A similar standard governs court-initiated Rule 11 sanctions proceedings. Because such proceedings afford no safe harbor to withdraw an offending paper, "the appropriate standard is subjective bad faith." *In re Pennie & Edmonds LLP*, 323 F.3d 86, 87 (2d Cir. 2003).

The record here does not support a finding of bad faith. On the contrary, Milberg relied on its referral source's information about the claimants and, upon discovering that data was unreliable, took corrective action. While Milberg could have done a better job of screening the would-be clients' information—and will do so in the future—such mistakes do not amount to bad faith. *See Schlaifer*, 194 F.3d at 340-41 (reversing sanctions order against law firm because "the record cannot support an inference of bad faith," concluding that, while the firm "should have known that the [client's] representations were flawed," the client's "conceded misrepresentations had the effect of assuaging" concerns and there was no "other evidence indicating [the firm's] absence of a genuine belief" in the claim).

To be sure, some misconduct may be punished by the Court's inherent power even without a finding of subjective bad faith. This exception, however, does not apply here. The Second

6

Circuit has held that a finding of bad faith is not required to punish "conduct not inherent to client representation, such as, violations of court orders or other conduct which interferes with the court's power to manage its calendar and the courtroom[.]" *United States v. Seltzer*, 227 F.3d 36, 42 (2d Cir. 2000). But in this case, the requested sanctions pertain to Milberg's diligence in reviewing the claims of potential clients. Because this activity is representational, under *Seltzer*, Milberg's good faith precludes an award of sanctions. *See Rossbach v. Montefiore Med. Ctr.*, 81 F.4th 124, 143 (2d Cir. 2023) (reversing sanctions order due to lack of finding that attorney acted in bad faith, concluding "[t]he cited misconduct pertained to" actions "integrally related to [attorney's] role as an advocate," such as "the investigation and prosecution of [client's] claims" and "submission of evidence").

A careful review of the record reveals that Milberg did not act in bad faith. Milberg has acknowledged that additional due diligence could have been undertaken internally prior to its submission of Authority to Represent documents to Epiq via the portal at www.paymentcardsettlement.com. However, the verification process put in place by Epiq was followed and performed exactly as was intended – documents identifying potentially viable merchant claimants were submitted for verification and were flagged as problematic. Accordingly, the retainer agreements for these merchant clients were subsequently terminated by Milberg, no claims were submitted to Epiq on their behalf, and Milberg terminated its relationship with the referral source.

3. **Referral to Department of Justice**

Given the severity of Ms. Hallak's actions in connection with the submission of fraudulent claimant information to Milberg and the toll it has taken on Class Counsel, the claims administrator, the Court, and the reputation of Milberg in the eyes of all of the above, Milberg

7

supports any action the Court wishes to take in connection with the referral of Ms. Hallak to the Department of Justice.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------ x
In re PAYMENT CARD INTERCHANGE : MDL No. 1720(MKB)(JAM)
FEE AND MERCHANT DISCOUNT :
ANTITRUST LITIGATION : Civil No. 05-5075(MKB)(JAM)
 :
------------------------------------------------------: DECLARATION OF AUSTIN CAMP
This Document Relates To: :
 :
 ALL ACTIONS. :
------------------------------------------------------ x

I, AUSTIN CAMP, declare as follows:

1. I am over 18 years of age, and I have personal knowledge of the facts stated herein.

2. I am the Vice President of Global Operations for Milberg Coleman Bryson Phillips Grossman LLC ("Milberg").

3. My role at Milberg entails the development, management, and oversight of a wide variety of technical solutions applied across multiple sectors of the law firm. This includes websites, case management systems, webforms, communication platforms, and all related integrations. The role also requires large data management and coordination of workflow and data transfer across the various platforms.

4. My team interfaces directly with Milberg's legal teams in support of their day-to-day data or document-processing needs, especially at large scale. This can include document generation, bulk data processing or transmittal, bulk filings, or API development and integration work. My team and I also interface with external third parties, whether that be integrated software solutions, co-counsel or referral law firms, or a variety of advertising agencies and resources, all to support the development and deployment of technology driven workflow solutions.

1

5. From the inception of this project at Milberg, my work and that of my team was overseen by attorneys, including founding partner Glenn Phillips, to whom I report. Meetings were consistently held on a weekly basis when the project first began and regular calls and meetings were held thereafter to address the assessment and status of our merchant clients, communications with clients, submission of their respective Authority to Represent documents to Epiq, and Epiq's responses to the same.

6. In connection with this action, Milberg received claimant information from third-party referral sources. It is the firm's practice to exclusively work with trusted sources.

7. Milberg's process for claimant onboarding and review for the Payment Card Interchange Fee settlement claim was as follows:

   a. A variety of marketing efforts were used to drive potential applicants to Milberg's digital webform.

   b. The webform used for onboarding potential claimants included a series of qualifying questions. These questions were designed to filter out those who are less likely to qualify.

   c. Those applicants who did pass the initial qualification were then required to produce their corporate details, including business name, address, and Tax Identification Numbers. Applicants who did not provide this information were filtered out and deemed disqualified by Milberg's standards.

   d. Those who did initially qualify were invited to retain Milberg for representation in connection with the Payment Card Interchange Fee settlement and asked to sign an Authority to Represent document, pursuant to the requirements set forth by the claims administrator, Epiq.

    e. The next layer of review and verification entailed a third-party solution provided by Cobalt Intelligence, a data driven solution that was integrated into Milberg's case management system. Cobalt Intelligence specializes in programmatically querying the various Secretary of State websites to match and/or lookup publicly available corporate details. Milberg would send via API a data payload including the corporate details it captured from the claimant during the initial signup process to Cobalt. Cobalt's system would then utilize Milberg's data in an effort to match and verify that a business does or had existed and would return to Milberg a data payload which indicated the status of the corporation, as well as other data points allowing Milberg to further verify that the business was real and would potentially have a viable claim.

    f. In addition to the aforementioned verification methods, Milberg regularly performed spot audits, as well as broadly reviewing large data sets, during which claimant data was reviewed for completeness and quality scoring.

8. Milberg also sent a wide array or correspondence to its merchant clients via bulk email, canceling or disqualifying claimants along the way who were discovered to no longer be eligible or viable claimants, or who chose to cancel Milberg's services. This included sending a welcome letter email, which was sent to each merchant client instantly after a merchant client signed up with Milberg, and additional correspondence, varying in topics, which were sent on the following dates:

- December 6, 2023 – Welcome letter follow up with case update
- March 22, 2024 – Case Update
- April 24, 2024 – Merchant Conflicts, call for resolution

3

- April 26, 2024 - Discontinuance letters

- May 15, 2024 – Interchange fee, call for updated merchant details or documentation

- May 30, 2024 (x3) – Discontinuance letters, Merchant Conflicts for resolution, NAM Deficiencies

- June 3, 2024 – Verify and Affirm

- June 4, 2024 (x2) – Verify and Affirm, Discontinuance letters

9. Throughout this process, Milberg started registering those claimants who it believed were viable with the claims administrator through the portal found at www.paymentcardsettlement.com. The portal was represented by Epiq as a tool to be utilized for the initial review and verification of potential claimants. Based on the instruction provided by Epiq to all third-party filers and in accord with the registration process outlined by Epiq, Milberg submitted via the portal the Authority to Represent documents executed by each of its merchant clients for review by Epiq. Milberg relied on this portal as a means of providing final claimant verification before determining whether to actually "file" and/or "submit" a claim via the portal. **To this day, Milberg has not formally filed or submitted a single claim on behalf of any merchant client it represents**. The portal was portrayed as a means to support the overall claim submission process and as a mechanism for both Epiq and third-party filers alike to verify the following:

- Authority to Represent "Approvals"

- Dual Representation ("Conflicts")

- "Deficiencies," such as business names not matching the tax identification numbers, missing legible signatures, or missing proper authorization documents

4

- "Excluded Parties" for any merchants who previously opted out or had resolved their claims separately

10. The information provided by Epiq during this process was critical to Milberg's further review of its merchant clients and was used to correspond with its merchant clients and/or conflicted parties in an effort to resolve, cure, move potential claims forward, or to withdraw and cancel claimants who were found to be ineligible.

11. It was during this initial application and review process that Milberg began to realize a pattern of high-profile corporations coming back as "Conflicts" or "Excluded Parties." Specifically, Milberg was receiving feedback and questions from the conflicted parties, which lead Milberg to investigate further, only to learn that the names of the representatives of said corporations that signed our Authority to Represent documents were not real and/or were not individuals with actual authority to act on behalf of said corporations. Milberg did not contest these findings and immediately moved to withdraw these merchants as it became aware of these facts.

12. It is Milberg's understanding that Epiq and class counsel fully anticipated a variety of claim filing issues, given the size of the settlement and the volume of eligible merchant claimants. Because of this, Epiq, along with class counsel, devised a platform, the portal at www.paymentcardsettlement.com, to assist in the claimant verification process, including multiple "bulk filing" options.

13. Milberg acknowledges that it could have done a better job identifying high profile claimants and holding those particular submissions to a higher standard internally before registering their Authority to Represent documents for review via the portal. However, Milberg did rely on the tools provided by Epiq and class counsel. Again, Milberg did not

5

"file" or "submit" any fraudulent claims. Rather, Milberg registered bulk spreadsheets and Authority to Represent documents for claimants in an effort to further validate them before formally filing or submitting any claims through the portal at www.paymentcardsettlement.com. It was during this process that Milberg began to identify the problem and immediately began an internal investigation.

14. Milberg still has not formally filed a single claim for compensation for any of its merchant clients. To date, it has only registered merchant clients and their Authority to Represent documents for initial review and approval as set forth by the claims administrator.

15. To this day, Epiq has a record of 5,064 claimants for whom Milberg submitted an Authority to Represent document for review. 2,527 of those claimants have since been withdrawn for conflict resolutions, false applications, deficient or uncured claims, little or no interchange fee data found and with no response from the claimants to cure or resolve. 26 claimants were found to be excluded parties. There are 27 remaining claimants with the status of "Deficient" due to the provision of illegible signatures from the merchant clients. Milberg is in the process of attempting to cure these deficiencies by engaging with these 27 clients via email and phone calls. Those who do not respond will also be withdrawn. In the status of "Conflict," Milberg has 935 claimants that it is still attempting to resolve. Finally, there are 1,549 "Approved" claims. Milberg will soon be withdrawing an additional 430 of these approved claims due to unresponsive clients failing to reaffirm their intent to have Milberg continue representing them.

\* \* \* \* \*

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, I certify that the statements set forth in this instrument are true and correct, except as

to matters therein stated to be on information and belief and as to such matters I certify as aforesaid that I verily believes the same to be true.  Executed in Woodinville, Washington on this 14th day of June, 2024.

>*/s/  Austin Camp*
>Austin Camp