UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

|  |  |  |
|---|---|---|
| | x | |
| In re PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | : : : : | MDL No. 1720(MKB)(JAM)<br><br>Civil No. 05-5075(MKB)(JAM) |
| | : | |
| This Document Relates To: | : : | RULE 23(b)(3) CLASS COUNSEL'S RESPONSE TO MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, LLC'S RESPONSE TO JUNE 7, 2024 ORDER |
| ALL ACTIONS. | : : : | |
| | x | |

## I.      INTRODUCTION

Milberg's Response to the Court's June 7, 2024 Order (ECF 9328-1) ("Milberg Response") fails to provide certain necessary information and fails to explain how more than 115 fraudulent submissions were made to Epiq (ECF 9318 at 5), completely glossing over details regarding actions of its referral partner and its failure to timely act – for weeks – after it learned that it had submitted fraudulent proofs of authority.[1]  In addition, Milberg appears to blame, in part, Epiq's processes and systems for Milberg's fraudulent submissions.

Milberg's authorities regarding a potential monetary payment, do not apply here.  Milberg's actions imposed costs on the Class by causing Epiq to spend time inputting, reviewing, and seeking to untangle the fake submissions.  Epiq has provided Rule 23(b)(3) Class Counsel ("Class Counsel") with an estimate of the time spent dealing with this issue, and Milberg should have to bear these costs, not the Class.  *See* §III., *infra*.  Class Counsel believes the estimate is reasonable and that the Court possesses the ability through its inherent authority to order Milberg to pay the costs associated with the time wasted dealing with this situation.  Unless Milberg is required to cover the costs of its wrongdoing, Epiq's expenses related to this issue will come out of the Class settlement fund. Finally, Class Counsel agrees with Milberg that because of the severity of the actions of its partner, Ms. Laverne Hallak, a referral to the United States Department of Justice ("DOJ") is warranted.

## II.     MILBERG'S RESPONSE REGARDING ITS SYSTEMS AND PROCESSES

Still missing from Milberg's explanation is how more than 115 plainly fraudulent submissions from a single referral partner slipped through all the alleged vetting processes Milberg claims it employed.  ECF 9318 at 5.  Milberg seems to claim that the fraudulent proof of authority documents submitted by the referral partner, some of which are from Fortune 500 companies, went through layers of "review and verification" at the firm.  Milberg Response at 1.  However, the submitted documents are so obviously fake that even a cursory review process should have

---

[1]      "Milberg" or the "firm" refers to Milberg Coleman Bryson Phillips Grossman, LLC.  Unless otherwise noted, all emphasis is added and citations are omitted.

uncovered them.[2] It may be that the process described by Milberg is not the same as that which may have been employed in relation to submissions by the referral partner.[3] If that is the case, Milberg still has not answered the fundamental questions the Court has posed: Nothing in Milberg's submission explains how this referral partner came to work with the firm, how the materials she submitted were or were not vetted and why it took weeks for Milberg to take action (other than withdrawing a few proofs of authority when actually confronted by the representatives of the claimants it purported to represent). Simply put, the submission does not explain how Milberg's system allowed these proofs of authorities, with fake signatures, purportedly on behalf of some of the best-known companies in the nation, to be submitted to Epiq.

Having failed to spot the fraudulent documents itself, Milberg incredibly blames, in part, Epiq and Class Counsel for Milberg's fraudulent submissions. In its response, while it acknowledges it "could have done a better job identifying high profile claimants and holding those particular submissions to a higher standard internally" it then states that it "did rely on the tools provided by Epiq and Class Counsel." *Id.* at 4. It also states that it relied on the "portal as a means of providing final claimant verification before determining whether to actually 'file' and/or 'submit' a claim via the portal." *Id.* at 3. Its position is that Epiq should have stopped Milberg from

---

[2]  The fraudulent proof of authority documents reviewed by Class Counsel are styled as "Authority to Represent." The documents authorize Milberg to act as attorneys, representatives, and agents in connection with settlement payments and provide specific instruction to send claim forms directly to Milberg. They authorize Milberg to communicate on behalf of the client and be paid 30% of the gross amount due from the settlement, while the client gets 70%. The form also instructs Epiq to send funds to the firm and to the client in those amounts. The fraudulent forms have a client signature (most of which appear to be written by the same hand), the title of "owner" appears on the faked forms, with an email address that is generally the name or initials of the person listed as "owner" then @the name of the company.

[3]  For example, Milberg states that it used a webform to onboard potential claimants. Milberg Response at 1. It then claims that those "applicants who did pass the initial qualification" were required to produce certain corporate details. *Id.* "Applicants who did not provide this information were filtered out and deemed disqualified by Milberg's standards." *Id.* It is not believable that this process was used for the 115 + submissions (ECF 9318 at 5) from the referral partner as the purported "applicants" from that source were "not real and/or were not individuals with actual authority to act on behalf of said corporations." Milberg Response at 4.

committing fraud.  However, the problem here was committed upon submission of the fake proofs of authority.   Systems and procedures Epiq has in place would have caught these fraudulent submissions had claims been filed.[4]

Milberg's Response further muddies the waters by eliding over its supposed "investigation." *Id.* at 4, 6-7.  It states that it noticed a "pattern of high-profile corporations coming back as 'Conflicts' or 'Excluded Parties.'" *Id.* at 4. It then states that it received "feedback" from conflicted parties that caused Milberg to look further and then learned "that the names of the representatives of said corporations that signed our Authority to Represent documents were not real and/or were not individuals with actual authority to act on behalf of said corporations." *Id.*  It states that it moved to withdraw these merchants, but the facts show that it did not do any sort of wholesale withdrawal until after Class Counsel confronted the firm.  Instead, it withdrew only where it was specifically told by those on the other side of a conflict that Milberg lacked the authority to act on behalf of the Class members.  For weeks, it knew there were fake submissions sent to Epiq, but did nothing until after Class Counsel contacted the firm and raised the issue.

Class Counsel also note that Epiq's records for Milberg's submissions differ somewhat from what Milberg has submitted to the Court.  As of June 20, 2024, Epiq reported a total of 5,064 proofs of authority.  Milberg's total is the same.  The breakdown of those proofs of authority is detailed in the chart below.  It is anticipated that the numbers will not exactly match Milberg's filing as the

---

[4]   Milberg claims the "portal was represented by Epiq as a tool to be utilized for the initial review and verification of potential claimants." *Id.* at 3.  This is inaccurate.  The bulk filing portal and the proof of authorization process are set up to ensure that those claiming to represent third parties actually have the right to do so – that is what Epiq is doing at this step in the process.  While Epiq has and continues to do extensive work with third parties, Milberg's claim that it is Epiq's responsibility to verify claimants in the first instance is a misstatement.  Mr. Camp states in his declaration:  "Milberg relied on this portal as a means of providing final claimant verification before determining whether to actually 'file' and/or 'submit' a claim via the portal."  Declaration of Austin Camp (ECF 9328-1), ¶9.  This, too, is a highly problematic statement.  Epiq does reach out to third parties noting whether they have provided sufficient proof of authority under which they can then file a claim for a Class member, but it is not Epiq that determines whether to file a claim for that third party.  Milberg's efforts to put the onus of ferreting out its fraud on Epiq is a distraction.

numbers are constantly changing as deficiency and conflict responses are received and processed, but these are the most current numbers available.[5]

| Authorization Status | Count |
|---|---|
| Approved | 1,547 |
| N/A | 1 |
| Conflicts | 932 |
| Deficient | 27 |
| Withdrawn | 2,528 |
| Excluded | 29 |
| **Total** | **5,064** |

## III.   REIMBURSEMENT OF EPIQ

Class Counsel requested that Epiq provide an estimate regarding the time spent dealing with this issue. In total, Epiq estimates that about $25,000 in costs have been incurred. If needed, a more detailed accounting can be provided. Epiq reports that there has been substantial time spent working to resolve these issues. This time includes several meetings with Class Counsel to discuss status and steps towards resolution. Further, it includes the time Epiq has spent compiling statistics for responses to filings, additional document review, and updates to the records that have since been withdrawn. Additionally, it includes time that senior members of Epiq's team spent working with the individual merchants themselves that raised concerns. The costs incurred currently would be part

---

[5]   Milberg refers to approved claims in its submission. This is confusing as it also states repeatedly that no claims have been filed. Class Counsel believes this "approved" comment relates to whether Epiq approved a submission of a given proof of authority. Milberg Response at 5. Approval in this context means that the submission contained all nine points of proof that Epiq has required. Those nine items are: (1) Full Legal Name of Merchant/Client/Business Entity; (2) Tax Identification Number(s) for Merchant/Client/Business Entity; (3) Signature (with date) by Authorized Client Representative of Merchant; (4) Title of Client Contact; (5) An indication that the Authorized Client Representative had signatory authority for that Business Entity (for example, title or statement); (6) An indication that the authorization applies to the instant case; (7) Language authorizing the third-party filer to file claims on behalf of the Merchant/Client/Business Entity; (8) Language authorizing the third-party filer to receive payment on behalf of the Merchant/Client/Business Entity (if receiving payment on behalf of the Merchant/Client/Business Entity); and (9) Court-ordered Disclosures.

- 4 -

4885-3027-5018.v1

of an invoice charged to the Class settlement fund.  Milberg questions whether the time estimate "differs in comparison to that spent by Epiq dealing with the submissions of any other third-party filers in this action." *Id.* at 5.  But Milberg does not say why any amount spent on others is relevant to the amount of time spent remediating the problems it has caused.  Epiq was asked to estimate its time and expenses related to Milberg's fraudulent submissions and that is what it provided.  To the extent there are other third parties submitting fraudulent materials, Class Counsel again requests that if Milberg knows of such frauds, Milberg provide information regarding these supposed instances so that Class Counsel can investigate those entities.

Milberg objects to reimbursing Epiq, claiming it is not warranted here, but Milberg is incorrect.  The Court has inherent authority to impose sanctions, as recognized by the very case law Milberg cites.  As the Second Circuit has recognized:

> Today, we hold that the inherent power of the district court also includes the power to police the conduct of attorneys as officers of the court, and to sanction attorneys for conduct not inherent to client representation, such as, violations of court orders or other conduct which interferes with the court's power to manage its calendar and the courtroom without a finding of bad faith.

*United States v. Seltzer*, 227 F.3d 36, 42 (2d Cir. 2000).  Milberg's conduct, which entailed accepting and then submitting fraudulent proofs of legal authority to represent more than 115 supposed clients is not "inherent to client representation" but instead is conduct that "interferes with the court's power to manage its calendar and the courtroom." *Id.*[6]  The Court has had to spend significant time handling this matter, ordering additional information to be submitted by Class Counsel and Milberg "to assure the integrity of the claims process." June 7, 2024 text-only Order;[7]

---

[6]  Milberg argues that the requested reimbursement relates to the firm's "diligence in reviewing the claims of potential clients."  Milberg Response at 7.  This is a stretch, at best.  Further, Milberg's efforts to view this matter as being akin to Rule 11 of the Federal Rules of Civil Procedure is unavailing.  Rule 11 plainly does not apply here.

[7]  Milberg again seeks to shift blame for its conduct onto Epiq, claiming: "[T]he verification process put in place by Epiq was followed and performed exactly as was intended – documents identifying potentially viable merchant claimants were submitted for verification and were flagged

- 5 -

*see also Chen v. Thai Greenleaf Rest. Corp.*, 2023 WL 2731712, at *4 (E.D.N.Y. Mar. 31, 2023) (Brodie J.) (alterations in original) (Imposing sanctions and holding: "A court need not make a finding of bad faith when an attorney "'violat[es] . . . a court order or [engages] in other misconduct that is not undertaken for the client's benefit.'""); *George v. Pro. Disposables Int'l, Inc*., 2018 WL 2148762, at *2 (S.D.N.Y. May 1, 2018) (sanctions appropriate even where no showing of bad faith was made to "impress upon [lawyer] the unacceptable nature of his behavior"); *Palmer v. Simon's Agency, Inc.*, 2020 WL 2129264, at *3 (N.D.N.Y. May 5, 2020), *aff'd*, 833 F. App'x 838 (2d Cir. 2020) (upholding sanction).

Moreover, the facts as currently understood, support a finding of bad faith here. In the June 6, 2024 submission, Milberg states that it became aware of a problem with materials it submitted to Epiq on or around May 5, 2024. ECF 9318 at 1-2. Yet, it withdrew only its proofs of authority for those entities for which Milberg was specifically confronted with a conflict from the actual representative of the class member. Other than this handful of conflicts, Milberg acted only after being contacted by Class Counsel on May 22, 2024. *Id.* Prior to that, Milberg neither withdrew, nor alerted anyone about the problematic, fake documents it submitted to Epiq. *Id.* That conduct meets the criteria for bad faith. Federal courts have the inherent authority to sanction bad-faith conduct, as well as conduct that is "'tantamount to bad faith.'" *Metz v. Unizan Bank*, 655 F.3d 485, 489 (6th Cir. 2011) (citing *Chambers v. NASCO, Inc*., 501 U.S. 32, 45-46 (1991)). Bad faith, in turn, is associated with conduct that is intentional or reckless. *See Schafer v. City of Defiance Police Dep't*, 529 F.3d 731, 737 (6th Cir. 2008); *United States v. Wheeler*, 154 F. Supp. 2d 1075, 1078-79 (E.D. Mich. 2001) (sanctions under court's inherent authority warranted for reckless or bad-faith conduct, and

---

as problematic." Milberg Response at 7. Milberg certainly did not properly follow Epiq's guidance – it submitted fake proofs of legal authority, not documents identifying "potential viable merchant claimants." *Id.* In effect, Milberg is stating that it is a good thing Epiq stopped them from committing the fraud they were committing. A driver stopped for speeding was still speeding prior to being pulled over.

4885-3027-5018.v1

defining "'recklessness'" as "'highly unreasonable conduct which is an extreme departure from the standards of ordinary care,'" such that it is "'more than mere negligence but less than intent'").

Class Counsel recognizes: "Because of the potency of the court's inherent power, courts must take pains to exercise restraint and discretion when wielding it." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 136 (2d Cir. 1998). The conduct here, however, is such that reimbursement of costs is an appropriate sanction.

## IV.    LAW ENFORCEMENT REFERRAL

Milberg now supports "any action the Court wishes to take" in connection with the referral of Ms. Hallak to the DOJ. Milberg Response at 8. A referral appears appropriate here given the conduct.

DATED:  June 24, 2024                     ROBBINS GELLER RUDMAN
                                                   & DOWD LLP
                                           PATRICK J. COUGHLIN
                                           ALEXANDRA S. BERNAY

s/ Alexandra S. Bernay
ALEXANDRA S. BERNAY

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

ROBINS KAPLAN LLP
K. CRAIG WILDFANG
THOMAS J. UNDLIN
2800 LaSalle Plaza
800 LaSalle Avenue South
Minneapolis, MN  55402-2015
Telephone:  612/349-8500
612/339-4181 (fax)

- 7 -

BERGER MONTAGUE PC
H. LADDIE MONTAGUE, JR.
MERRILL G. DAVIDOFF
MICHAEL J. KANE
1818 Market Street, Suite 3600
Philadelphia, PA  19103
Telephone:  215/875-3000
215/875-4604 (fax)

Co-Lead Counsel for Plaintiffs

- 8 -