UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------

IN RE PAYMENT CARD INTERCHANGE FEE
AND MERCHANT DISCOUNT ANTITRUST
LITIGATION

**FILED UNDER SEAL**

**MEMORANDUM & ORDER**
05-MD-1720 (MKB)

This document refers to:
*Barry's Cut Rate Stores Inc. v. Visa Inc.*,
No. 05-MD-1720 (E.D.N.Y.)

-----------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

I.   Background .................................................................................................................. 4
  a.   Procedural background ........................................................................................... 5
    i.   2013 Settlement .............................................................................................. 6
    ii.  2019 Settlement .............................................................................................. 8
    iii. Certification of the Equitable Relief Class ................................................... 8
    iv.  *Daubert* and summary judgment motions ..................................................... 9
  b.   Relevant facts ...................................................................................................... 11
    i.   Challenged network rules .............................................................................. 11
    ii.  The proposed settlement agreement .............................................................. 12
      1.   No discounting and non-discrimination rules ......................................... 13
      2.   All-outlets rule and non-acceptance pilot programs ............................... 13
      3.   Honor-All-Wallets rules .......................................................................... 15
      4.   Surcharging rules ..................................................................................... 16
      5.   Merchant buying groups .......................................................................... 17
      6.   Rate caps and rollbacks ........................................................................... 18
      7.   Merchant education program .................................................................... 19
      8.   Release ..................................................................................................... 19
      9.   Stay of opt-out actions ............................................................................. 20
  c.   Objections to preliminary approval ..................................................................... 20
  d.   Hearing on preliminary settlement approval ........................................................ 22
II.  Discussion .................................................................................................................. 23
  a.   Preliminary approval of a proposed settlement ................................................... 23

     i.    Preliminary approval standards...............................................................26

     ii.    Preliminary approval factors..................................................................27

   b.   The Court is not likely to approve the proposed settlement ............................27

     i.    Adequate representation by class representatives and class counsel ......................28

      1.   Adequacy of class representatives .........................................................34

      2.   Adequacy of class counsel ....................................................................40

     ii.   Arm's-length negotiations ......................................................................41

     iii.   Adequate relief for the class ...................................................................43

      1.   Costs, risks, and delay of trial and appeal...............................................44

        A.   The complexity, expense, and likely duration of the litigation...........................45

        B.   The risks of establishing liability .....................................................46

        C.   The risks of maintaining the class through the trial ...........................................49

        D.   The range of reasonableness of the settlement in light of the best possible recovery and all the attendant risks of litigation...........................................................50

      2.   Effectiveness of distributing relief to the class .........................................62

      3.   The terms of any proposed award of attorneys' fees ................................62

      4.   Release from liability............................................................................64

        A.   The releases in the 2013 Settlement..................................................69

        B.   The release in the 2019 Settlement ..................................................71

        C.   Analysis of the Settlement's release provisions ................................73

     iv.   Equitable treatment of class members relative to one another ................................76

     v.   The ability of Defendants to withstand a greater judgment......................84

III.  Conclusion .........................................................................................88

A class of over twelve million merchants, certified pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure,[1] moves for preliminary approval of a proposed settlement

---

[1] In September of 2021, the Court certified the Equitable Relief Class. *DDMB, Inc. v. Visa, Inc.*, No. 05-MD-1720, 2021 WL 6221326, at *50 (E.D.N.Y. Sept. 27, 2021). Since certification, the class action has been proceeding as *Barry's Cut Rate Stores Inc. v. Visa, Inc.*, No. 05-MD-1720 (E.D.N.Y.).

("Settlement") reached with Defendants[2] in this action — the Visa and Mastercard payment networks and a number of banks that issue Visa- and Mastercard-branded credit and debit cards.[3] The Settlement, if approved, would be the culmination of nearly twenty years of litigation between Plaintiffs[4] — merchants who accept Visa- and Mastercard-branded credit and debit cards — and Defendants. Although Plaintiffs challenge a number of Defendants' rules and policies, such as the "Honor All Cards" rules and Visa's and Mastercard's default interchange fee schedules, the Settlement primarily provides relief from Visa's and Mastercard's rules that prohibit merchants from imposing surcharges on Defendants' cards at the point of sale.[5] In addition, the Settlement provides for a modest reduction in interchange fees, which Plaintiffs'

---

[2] Defendants consist of the Visa and Mastercard networks (the "Networks") and "various issuing and acquiring banks" (the "Bank Defendants"). *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 18 (E.D.N.Y. 2019). "At the beginning of this litigation . . . Visa and Mastercard were effectively owned by their member banks." *Barry's Cut Rate Stores Inc. v. Visa Inc.*, No. 05-MD-1720, 2019 WL 7584728, at *3 (E.D.N.Y. Nov. 20, 2019). "In 2006 and 2008, Mastercard and Visa, respectively, made initial public offerings ('IPOs'), becoming publicly traded individual companies." *Id.* However, Plaintiffs claim that the alleged anticompetitive practices have "continued despite the networks' and the banks' more recent attempt[s] to avoid antitrust liability by restructuring the Visa and Mastercard corporate entities." *Id.* (quoting Equitable Relief Class Action Compl. ("Class Compl.") ¶ 1, Docket Entry No. 6892).

[3] (Equitable Relief Class Pls.' Mot. for Preliminary Approval of Settlement ("Pls.' Mot."), Docket Entry No. 9179; Equitable Relief Class Pls.' Mem. in Supp. of Pls.' Mot. ("Pls.' Mem."), Docket Entry No. 9179-1; Equitable Relief Class Pls.' Reply in Supp. of Pls.' Mot. ("Pls.' Reply"), Docket Entry No. 9295.)

[4] The Equitable Relief Class ("Plaintiffs") consists of "all persons, businesses, and other entities that accept Visa and/or Mastercard credit and/or debit cards in the United States at any time during the period between December 18, 2020, and the date of entry of Final Judgment in this case." *DDMB*, 2021 WL 6221326, at *50.

[5] (*See infra* sections I.b.i (summary of the challenged network rules) and I.b.ii (summary of the Settlement Agreement).)

experts value as being worth nearly $30 billion during the five-year settlement period.[6]

On March 26, 2024, Plaintiffs moved for preliminary approval of the Settlement. (Pls.' Mot.) Between April 17, 2024, and May 22, 2024, small, local merchants and large, national merchants filed objections with the Court.[7] On May 13, 2024, Visa and Mastercard Defendants filed a memorandum in support of preliminary approval.[8] On May 14, 2024, Plaintiffs filed a reply in support of preliminary approval. (Pls.' Reply.) On June 13, 2024, the Court held a hearing on preliminary approval of the Settlement and heard from Plaintiffs, Defendants, and the Direct Action Plaintiffs. (Min. Entry dated June 13, 2024.)

For the following reasons, the Court denies Plaintiffs' motion for preliminary approval of the Settlement.

### I. Background

The Court assumes familiarity with the facts and extensive procedural history as set forth in prior decisions. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 986 F. Supp. 2d 207 (E.D.N.Y. 2013) (*Interchange Fees I*), *rev'd and vacated*, 827 F.3d 223 (2d Cir. 2016) (*Interchange Fees II*); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11 (E.D.N.Y. 2019) (*Interchange Fees III*); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, --- F. Supp. 3d ---, 2024 WL 278565 (E.D.N.Y. Jan. 8, 2024) (*Interchange Fees IV*); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust*

---

[6] (*See* Decl. of Class Counsel ¶ 160, Docket Entry No. 9179-3 (estimating that the Settlement's changes to interchange rates would "generate savings of $29.79 billion").)

[7] (*See infra* section I.c & notes 23–28.)

[8] (Defs.' Mem. in Supp. of Pls.' Mot. ("Defs.' Mem."), Docket Entry No. 9292.)

4

*Litig.*, No. 05-MD-1720, 2024 WL 1014159 (E.D.N.Y. Feb. 22, 2024) (*Interchange Fees V*).

The Court therefore provides only a summary of the relevant facts and procedural background.

### a. Procedural background

In October of 2005, several complaints asserting similar antitrust claims against Visa, Mastercard, and various issuing banks were consolidated for pretrial purposes and transferred to the Eastern District of New York, where they were joined by other similar cases. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2008 WL 115104, at *1 (E.D.N.Y. Jan. 8, 2008). The consolidated cases included both class actions and individual actions. *Id.* In April of 2006, plaintiffs in the putative class actions filed a consolidated amended class complaint that defined two classes: one seeking damages and the other seeking equitable relief. *Id.* at *1–2. In November of 2012, the Court provisionally certified a class and preliminarily approved a class settlement agreement between class plaintiffs and Defendants. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2012 WL 12929536, at *1–2 (E.D.N.Y. Nov. 27, 2012). Following preliminary settlement approval, "three groups of merchants that had not previously appeared as named parties — the Target, 7-Eleven,[9] and Home Depot groups or, collectively, the 'Direct Action Plaintiffs' — opted out of the settlement's damages class and filed their own complaints in other districts, all of which were ultimately transferred to this court and consolidated in the instant multidistrict litigation." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2017 WL

---

[9] On January 3, 2024, 7-Eleven, in its capacity as an individual member of the "7-Eleven Plaintiffs," settled its claims against all Defendants. (*See* Stipulation & Order of Dismissal, Docket Entry No. 9038.) The Court nevertheless continues to refer to the remaining plaintiffs in *7-Eleven, Inc., et al. v. Visa, Inc., et al.*, No. 13-CV-5746 (E.D.N.Y.), as the "7-Eleven Plaintiffs" for consistency across the Court's decisions.

4325812, at *3 (E.D.N.Y. Sept. 27, 2017), *order set aside on other grounds*, 2018 WL 4158290 (E.D.N.Y. Aug. 30, 2018).

### i. 2013 Settlement

In 2013, the Court approved a settlement between class plaintiffs and Defendants (the "2013 Settlement"), *Interchange Fees I*, 986 F. Supp. 2d at 241, but, in 2016, the Second Circuit vacated certification of the class and reversed approval of the 2013 Settlement, *Interchange Fees II,* 827 F.3d at 240.[10]

Objectors to the 2013 Settlement and plaintiffs that had chosen to opt out of the (b)(3) class prior to final approval argued on appeal that the "class action was improperly certified and that the settlement was unreasonable and inadequate." *Id.* at 227. The Second Circuit agreed that the class was improperly certified — holding that the class certification requirement of adequate representation under Rule 23(a)(4) had not been satisfied.[11] *Id.* The court found that an inherent conflict of interest existed because a single set of counsel represented both the (b)(2) and (b)(3) class interests. *See id.* at 231–36. Specifically, the Second Circuit concluded that "members of the (b)(2) class were inadequately represented," because of a conflict between the interests of the (b)(2) class and the (b)(3) class. *Id.*. Relying on Supreme Court precedent, the Second Circuit held that settlement classes that consist of holders of present claims, such as the (b)(3) class seeking monetary relief for *past* harm, and holders of future claims, such as the

---

[10] The case was reassigned from Judge John Gleeson to the undersigned on December 17, 2014. (Order Reassigning Case, Docket Entry No. 6359.)

[11] The Second Circuit found that unitary representation of the classes violated Rule 23(a)(4) — the class certification requirement that representative parties adequately protect the interests of the class — and the Due Process Clause, which requires that named plaintiffs in a class action adequately protect the interests of absent class members. *Interchange Fees II*, 827 F.3d at 228, 231 (citations omitted).

(b)(2) class seeking injunctive relief to reform current and *future* rules and policies of the Defendants, must be divided "into homogeneous subclasses . . . with separate representation." *Id.* at 234 (alteration in original) (quoting *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999)).

The Second Circuit also found that the issues stemming from unitary representation were exacerbated by the inability of members of the (b)(2) class to opt out of the settlement or from the release of their equitable claims against the Defendants. *See id.* at 231, 234; *id.* at 241 (Leval, J., concurring). The Court expressed further concern that the injunctive relief secured for the (b)(2) class would not uniformly benefit all (b)(2) class members. *See id.* at 238. For example, the Court noted that (b)(2) merchants that operated in certain states would be prohibited from surcharging costs to customers at the point of sale, while merchants that operated in other states would not be prohibited from doing so. *See id.* at 229–30 (noting that "[t]he incremental value and utility of [surcharging] relief is limited, however, because many states, including New York, California, and Texas, prohibit surcharging as a matter of state law" (citations omitted)); *id.* at 238 ("A significant proportion of merchants in the (b)(2) class are either legally or commercially unable to obtain incremental benefit from the primary relief . . . and class counsel knew at the time the Settlement Agreement was entered into that this relief was virtually worthless to vast numbers of class members.").[12]

_____

[12] The Court notes that the landscape of state no-surcharging laws is rapidly evolving. For example, General Business Law § 518 went into effect in New York in February of 2024. Although the statute nominally permits surcharging, it is functionally impossible to comply with the statute because (1) it requires "clearly and conspicuously post[ing] the total price for using a credit card in such transaction," and (2) prohibits surcharging above the cost of acceptance. *See* N.Y. Gen. Bus. Law § 518(1). Because the cost of acceptance varies based on the brand and type of credit card used (*e.g.*, American Express Platinum or Visa Signature), the merchant cannot know prior to the point of sale what the total price will be to "clearly and conspicuously post the total price." *Id.* Accordingly, merchants in New York will likely be unable to avail themselves of the surcharging reforms in the Settlement. In addition, the Court observes that

In November of 2016, the Court appointed counsel to two putative classes under Rule 23(b)(2) (the "Equitable Relief Class") and (b)(3) (the "Damages Class").  *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2016 WL 8138988, at *1 (E.D.N.Y. Nov. 30, 2016).  On March 31, 2017, Rule 23(b)(2) Class Counsel filed a complaint on behalf of a putative Rule 23(b)(2) class.  (Class Compl.)

### ii.   2019 Settlement

In 2019, the Court approved a subsequent settlement between the Damages Class and the Defendants (the "2019 Settlement").  *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2019 WL 6875472, at *36 (E.D.N.Y. Dec. 16, 2019), *aff'd sub nom. Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704 (2d Cir. 2023).  In 2023, the Second Circuit affirmed in all material respects this Court's approval of the 2019 Settlement. *Fikes*, 62 F.4th at 712.

### iii.   Certification of the Equitable Relief Class

In September of 2021, the Court certified the Equitable Relief Class as a mandatory, non-opt-out class pursuant to Rule 23(b)(2) over the objections of the Direct Action Plaintiffs, Grubhub Plaintiffs, and other objectors.  *DDMB, Inc. v. Visa, Inc.*, No. 05-MD-1720, 2021 WL 6221326, at *46–50 (E.D.N.Y. Sept. 27, 2021).  The Court reasoned that "[d]ue to the nature of the relief being sought, all merchants — regardless of whether they would choose to opt out of the class or not — would benefit from the equitable relief provided," and, accordingly, "neither notice nor an opportunity to opt out is required for classes certified pursuant to Rule 23(b)(2)."

---

several other states impose various constraints on surcharging.  *See e.g.*, Conn. Gen. Stat. § 42-133ff; Kan. Stat. Ann. § 16a-2-403; Me. Rev. Stat. Ann. tit. 9-A, § 8-509; Mass. Gen. Laws Ann. ch. 140D, § 28A; N.J. Stat. Ann. § 56:8-156.1.

*Id.* at *47–48.  The Court noted that "Plaintiffs seek equitable relief from the bundle of Restraints that together result in the supracompetitive interchange fees," and concluded that "equitable relief — should Plaintiffs prevail or reach a settlement — that tackles these Restraints is proper as to all merchants, not just those who are represented by class counsel."  *Id.* at *48.  Finally, the Court observed that "[c]oncerns about opt-outs resulting in contradictory equitable relief and disincentivizing settlement weigh[ed] in favor of denying opt-out rights."  *Id.* at *49 (footnote and citation omitted).

### iv.   *Daubert* **and summary judgment motions**

Since certifying the Class, the Court decided Defendants' *Daubert* motions, seeking to exclude the testimony of Plaintiffs' experts, Professors Dennis W. Carlton and Joseph E. Stiglitz;[13] Defendants' summary judgment motions seeking dismissal of Plaintiffs' claims (1) for insufficient evidence supporting Plaintiffs' antitrust claims based on Defendants' Europay, Mastercard and Visa ("EMV") liability shift, *see In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2022 WL 14865281 (E.D.N.Y. Oct. 9, 2022); (2) based on the Supreme Court's decision in *Ohio v. American Express* (*Amex*), *see Interchange Fees IV*, 2024 WL 278565; (3) based on the Supreme Court's decision in *Illinois Brick*, *see Interchange Fees V*, 2024 WL 1014159; and (4) because Plaintiffs had purportedly failed to raise a triable question of fact regarding their monopolization claims brought pursuant to Section 2 of the Sherman Act, *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, --- F. Supp. 3d. ---, 2024 WL 1556931 (E.D.N.Y. Apr. 2, 2024) (*Interchange Fees VI*).  In addition, the Court

---

[13]   *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2022 WL 15044626, at *17–28 (E.D.N.Y. Oct. 8, 2022) (Prof. Carlton); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2022 WL 15053250, at *49–60 (E.D.N.Y. Oct. 7, 2022) (Prof. Stiglitz).

decided Plaintiffs' motion for partial summary judgment, seeking a determination that one of Defendants' proffered procompetitive justifications was invalid as a matter of law. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2024 WL 1142860 (E.D.N.Y. Mar. 11, 2024).

The Court denied Defendants' *Daubert* motions and admitted the expert reports of Profs. Carlton and Stiglitz, with two limited exceptions.[14] The Court also granted in part and denied in part Defendants' summary judgment motions. The Court granted Defendants' motions with respect to Plaintiffs' one-sided claims, which Plaintiffs conceded were no longer cognizable in light of *Amex*, *see Interchange Fees IV*, 2024 WL 278565, at *35; and granted Defendants' motion with respect to Plaintiffs' monopolization claims, *Interchange Fees VI*, 2024 WL 1556931, at *24–26. The Court otherwise denied Defendants' motions with respect to (1) Plaintiffs' claims based on Defendants' EMV liability shift, *In re Payment Card*, 2022 WL 14865281, at *13–16; (2) Plaintiffs' two-sided claims under *Amex*, *see generally Interchange Fees IV*, 2024 WL 278565; and (3) Plaintiffs' standing as direct purchasers under *Illinois Brick*, *see Interchange Fees V*, 2024 WL 1014159, at *18. Finally, the Court denied Plaintiffs' motion seeking a ruling that one of Defendants' proffered procompetitive justifications was not cognizable as a matter of law.[15] *In re Payment Card*, 2024 WL 1142860, at *12. Plaintiffs

---

[14] *See In re Payment Card*, 2022 WL 15044626, at *28 (denying Defendants' motion except as to Prof. Carlton's "opinions that Mastercard has given discounts to induce merchants not to surcharge since the 2012 settlement and that the 2012 elimination of the surcharging prohibition caused overall merchant fees and net fees to decline" but otherwise denying Defendants' motion); *In re Payment Card*, 2022 WL 15053250, at *60 ("The Court grants Defendants' motion to exclude Professor Stiglitz's opinions that the two-sided analysis of the credit card market is inappropriate and otherwise denies the motion.").

[15] As of April 2, 2024, all of the pending pre-trial motions were resolved, and Plaintiffs' case is essentially ready for trial.

moved for preliminary approval of their proposed Settlement Agreement on March 26, 2024. (Pls.' Mot.)

### b. Relevant facts

### i. Challenged network rules

Plaintiffs are merchants who are bound by Visa's and Mastercard's rules and who challenge those rules as anticompetitive. *Interchange Fees II*, 827 F.3d at 228. They challenge the "Honor All Cards" rule which requires merchants to accept all Visa or Mastercard credit or debit cards if they accept any of them, (*see, e.g.*, Class Compl. ¶¶ 139–140), as well as multiple forms of "anti-steering" rules, which "prohibit merchants from influencing customers to use one type of payment over another." *Interchange Fees II*, 827 F.3d at 228. Two types of anti-steering rules are "no-surcharge" and "no-discount" rules, "which prohibit merchants from charging different prices at the point of sale depending on the means of payment." *Id.* Plaintiffs claim that the challenged rules, in combination with the "default interchange fee" that "applies to every transaction on the network (unless the merchant and issuing bank have entered into a separate agreement)[,] . . . allow the issuing banks to impose an artificially inflated interchange fee that merchants have little choice but to accept." *Id.*

The Court notes that the Networks' rules have changed since the beginning of this litigation. In 2010, the Dodd-Frank Wall Street Reform and Consumer Protection Act, which included the Durbin Amendment, was signed into law and "limited the interchange fee that issuing banks could charge for debit card purchases." *Barry's Cut Rate Stores Inc. v. Visa, Inc.*, No. 05-MD-1720, 2019 WL 7584728, at *5 (E.D.N.Y. Nov. 20, 2019) (quoting *Interchange Fees II*, 827 F.3d at 229). The Durbin Amendment also "required the Federal Reserve to issue rules limiting the banks' practice of issuing debit cards that were compatible with only the

11

issuer's networks," "allowed merchants to discount debit card purchases relative to credit card purchases," and allowed merchants to place minimum-purchase limits on credit-card transactions. *Id.* (quoting Class Compl. ¶ 264). In 2011, Visa and Mastercard entered into a consent decree with the Department of Justice, in which they "agreed to remove their rules prohibiting merchants from product-level discounting of credit and debit cards." *Id.* (quoting *Interchange Fees I*, 986 F. Supp. 2d at 215). Plaintiffs claim, however, that the current versions of the rules are still anticompetitive. (*See, e.g.*, Class Compl. ¶ 147–148 (describing the "current forms" of Visa's and Mastercard's "No-Surcharge Rules"); *id.* ¶ 150 ("Merchants still are prohibited from offering discounts to cardholders for using the cards issued by particular Issuing Banks."); *id.* ¶ 165 (stating that "Plaintiffs continue to suffer injury as a result of the enforcement of the current Anti-Steering Restraints" despite the 2011 consent decree).)

In addition to the claims described above, Plaintiffs also challenge a number of Defendants' other practices, including Visa's imposition of a fixed acquirer network fee ("FANF"), (*see, e.g.*, *id.* ¶ 259); Visa and Mastercard's migration to EMV technology, (*id.* ¶¶ 269–287); and for allegedly exclusionary conduct (*i.e.*, monopolization) in the credit- and debit-card markets, (*see id.* ¶¶ 390–399).

### ii.   The proposed settlement agreement

After extensive motion practice and mediation efforts, the Rule 23(b)(2) Class Plaintiffs and Defendants reached an agreement in principle on January 17, 2024, and reached a final agreement on March 25, 2024. (*See* Decl. of Equitable Relief Class Counsel in Supp. of Pls.' Mot. ("Decl. of Class Counsel") ¶ 109, Docket Entry No. 9179-3.) On March 26, 2024, Rule 23(b)(2) Class Counsel, on behalf of Class Plaintiffs, moved the Court for preliminary approval of the Settlement. (*See* Pls.' Mot.; Pls.' Mem.)

The Settlement provides for a range of changes to Visa's and Mastercard's rules governing merchant practices, and also sets forth certain steps that Visa and Mastercard are to take in furtherance of the goals of the Settlement. Visa and Mastercard would abide by the terms of the Settlement for a period of five years, (Settlement ¶ 15, Docket Entry No. 9179-2), in exchange for release of related equitable claims arising in the same five-year period, (*id.* ¶¶ 82–83).

### 1. No discounting and non-discrimination rules

The Settlement first provides for clarifications to Visa's and Mastercard's "no discounting" and "non-discrimination" rules, requiring these rules to be revised "to clarify that discounting at the issuer level — *i.e.*, providing discounts that vary by the issuing financial institution of the [Visa- or Mastercard-branded payment card] — is permitted." (Settlement ¶¶ 19, 51.) This provision is intended to make clear that merchants can selectively offer discounts (or other benefits, such as dedicated checkout lines for Chase cardholders, for example) for payments made using cards issued by some banks but not others. (Pls.' Mem. 14–16.)

### 2. All-outlets rule and non-acceptance pilot programs

The Settlement would also clarify that Visa's and Mastercard's rules allow merchants to selectively decline acceptance of certain categories of Visa- or Mastercard-branded card products "at all outlets that operate under the same trade name or banner in the United States," even if that merchant accepts those cards at outlets operating under a different trade name or banner (the "All-Outlets" rule). (*See* Settlement ¶¶ 21–22, 53–54.) The provisions as to Visa, for example, specify that merchants can decline acceptance of all "Visa POS [(point-of-sale)] Debit Devices" or all "Other Visa Products" at all outlets of that merchant operating under the same trade name

13

or banner, even if outlets operating under a different trade name or banner accept all "Visa POS Debit Devices" or all "Other Visa Products."[16]  (*Id.* ¶¶ 21–22.)  The Settlement includes identically-worded provisions for Mastercard-branded card products.  (*Id.* ¶¶ 53–54.)  These provisions, which the Settlement states are currently in place, allow retailers to tailor card acceptance to some degree based on "different customer bases" they might have for stores under different trade names or banners.  (*See* Decl. of Joseph E. Stiglitz ("Stiglitz Decl.") ¶ 29, Docket Entry No. 9179-5 ("[W]hile it might be profitable not to accept a network's credit cards at a store type that caters to customers who value low prices, accepting the cards may be profitable at higher-priced, service-oriented stores.").)

   The Settlement would also allow merchants to run "pilot" programs for non-acceptance of certain cards at select outlets.  (*See* Settlement ¶¶ 22, 54.)  Through these pilot programs, merchants would be able to decline acceptance of all "Visa/Mastercard POS Debit Devices" or

---

[16]  The Settlement Agreement specifies that "Visa POS Debit Devices" and "Other Visa Products" are as defined pursuant to the settlement agreement in *In re Visa Check/MasterMoney Antitrust Litig.*, No. 96-CV-5238 (E.D.N.Y.).  (Settlement ¶ 21.)  In *Visa Check*, the settlement agreement defined "Visa POS Debit Devices" as follows:

>   "Visa POS Debit Device" means any consumer product, device, program, or service bearing or offered under the Visa blue, white and gold bands design, or under any other Visa brand Visa may choose pursuant to paragraph 5(d), issued within the United States by United States member financial institutions, that, when presented for payment in the United States, accesses, debits, holds or settles funds from the consumer's demand deposit or asset account.

Settlement Agreement ¶ 1(bb), *In re Visa Check*, No. 96-CV-5238 (E.D.N.Y. June 6, 2003), Docket Entry No. 812.  "Other Visa Product" is defined as follows:

>   "Other Visa Product" means any product, device, program, or service bearing or offered under the Visa blue, white and gold bands design, or under any other Visa brand Visa may choose as a replacement for the blue, white and gold bands design, issued within the United States by United States member financial institutions, that does not fall within the definition of Visa POS Debit Device.

*Id.* at ¶ 1(o).

14

all "Other Visa/Mastercard Products" "at some but not all outlets that operate under the same trade name or banner." (*Id.*) The pilot programs can be conducted as 120-day experiments in up to 20% of a merchant's outlets each year. (*Id.*)

### 3.   Honor-All-Wallets rules

The Settlement also provides for modifications to Visa's and Mastercard's "Honor All Wallets" rules, which currently "require that a merchant that enables digital wallets [such as Apple Pay or Google Pay] must accept all digital wallets that include a Visa or Mastercard payment card." (Pls.' Mem. 16.) As described by Dr. Stiglitz, the current rule "eliminate[s] the merchant's ability to negotiate with the digital wallet vendor over whether, and on what terms, to accept the digital wallet." (Stiglitz Decl. ¶ 26.) Under the Settlement, Visa and Mastercard would modify these rules to allow merchants to accept some digital wallets and decline others, subject to several restrictions. First, the merchant's non-acceptance of a digital wallet "must be of the digital wallet itself," regardless of which brands of payment cards are in the wallet. (Settlement ¶¶ 24(a), 56(a).) Second, the merchant cannot decline Visa- or Mastercard-branded cards that are "provisioned in a digital wallet that is owned or operated by" Visa or Mastercard, as long as the rules and fees applicable to the transaction are the same as those for standard (non-digital wallet) Visa- or Mastercard-branded card transactions. (*Id.* ¶¶ 24(b), 56(b).) Visa and Mastercard cannot, however, require acceptance of any non-Visa- or non-Mastercard-branded cards, even where such cards are included in a digital wallet owned or operated by the networks. (*Id.*) Finally, the Settlement also requires any merchant who wishes to decline any digital wallet to provide Visa and Mastercard with "no less than 30 days' advance written notice" of such non-acceptance. (*Id.* ¶¶ 24(c), 56(c).)

15

### 4. Surcharging rules

The Settlement also provides for changes to Visa's and Mastercard's restrictions on merchants' ability to surcharge for the use of cards that are more expensive for merchants to accept. (*See id.* ¶¶ 28, 60.) Currently, Visa's and Mastercard's rules function to prevent most merchants from surcharging any of their credit-card transactions. (Stiglitz Decl. ¶¶ 13–14.) These "level-playing-field" rules provide that if a merchant accepts any other credit-card brand that limits surcharging (*i.e.*, American Express or Discover), the merchant must also apply that other brand's surcharging rules to acceptance of Visa- or Mastercard-branded cards. (*Id.*) The interactions of these rules effectively prohibit surcharging.[17]  American Express, for example, prohibits surcharging unless the merchant also surcharges all other credit *and* debit transactions, regardless of card brand. (*Id.*) Visa and Mastercard, however, prohibit surcharging on debit transactions. (*Id.*) American Express' rules therefore effectively prohibit merchants from surcharging American Express credit-card transactions because merchants cannot surcharge Visa- and Mastercard-branded debit cards. Visa's and Mastercard's level-playing-field rules, in turn, require merchants to apply the effect of American Express' rule to Visa- and Mastercard-branded credit cards, as well, and merchants accordingly cannot surcharge Visa- and Mastercard-branded credit card transactions. (*Id.*)

Under the Settlement, these rules would be changed to permit merchants to surcharge all Visa- or Mastercard-branded credit card transactions up to 1%, regardless of whether the

---

[17]  *See e.g., In re Am. Express Anti-Steering Rules Antitrust Litig.*, No. 11-MD-2221, 2015 WL 4645240, at *3, *16–17 (E.D.N.Y. Aug. 4, 2015) (discussing the interactions of American Express' rules with Visa's and Mastercard's rules and noting that "most merchants will, as a practical matter, be precluded from surcharging Visa and [Mastercard] products" (quoting *Interchange Fees I*, 986 F. Supp. 2d. at 233)).

merchant accepts any "Comparator Credit Card Brands"[18] or actually surcharges transactions using those cards.[19]  (*See* Settlement ¶¶ 28(a)–(b), 60(a)–(b).)  Visa's and Mastercard's current surcharging rules are otherwise unaffected by the Settlement, so merchants would continue to be allowed to surcharge up to the "Cost of Acceptance" (but not more than 3%), provided that the merchant "actually surcharges" all Comparator Credit Card brands that it accepts "in at least the same amount."  (*Id.*)  The merchant can also surcharge up to 3% if it does not accept any other Comparator Credit Card brand.[20]  (*Id.*)

## 5. Merchant buying groups

Although already permitted, the Settlement would further require Visa and Mastercard to revise their rules to "remove any restrictions . . . on merchants' rights to organize Merchant Buying Groups" to collectively negotiate rates for Visa or Mastercard card services and to buy those services as a group.  (*Id.* ¶ 29–32, 61–64.)  The Settlement would require Visa and Mastercard to consider each proposal by a Merchant Buying Group and "determine whether the proposal sets forth commercially reasonable benefits to merchants, consumers, the network, and

---

[18]  The Settlement defines "Comparator Credit Card Brand" as "any brand of Credit Card or electronic credit payment form of a nationally accepted payment network other than Visa or Mastercard, specifically including without limitation American Express and Discover." (Settlement ¶¶ 28, 60.)

[19]  Merchants also have the option to apply the  surcharge at the "product level" rather than the "brand level," surcharging only specific Visa card products (*e.g.*, Visa Classic Card, Visa Signature Card, Visa Infinite Card, etc.) or specific Mastercard card products (*e.g.*, Mastercard Standard, Mastercard World, Mastercard World Elite, etc.), rather than all cards of one brand.  (Settlement ¶¶ 28(b), 60(b).)

[20]  Like the 1% surcharge option,  cost-of-acceptance surcharging can also be applied at the "product level" rather than the "brand level," as long as the merchant "actually surcharges all Comparator Credit Card Products of the same product type that it accepts in at least the same amount or . . . does not accept any Comparator Credit Card Brands."  (Settlement ¶¶ 28(b), 60(b).)

all other stakeholders," and if the network sees such benefits, it must "conduct reasonable, *bona fide* negotiations with the Merchant Buying Group concerning the proposal." (*Id.*)

### 6. Rate caps and rollbacks

The Settlement also provides several measures aimed at reducing the effective interchange rate applicable to domestic credit card transactions. First, the Settlement sets forth a procedure for establishing and maintaining an "Average Effective Rate Limit" for all domestic card transactions for the five-year period covered by the Settlement. (*Id.* ¶¶ 33, 65.) Pursuant to the Settlement, an independent auditor (the "Auditor") would calculate "the system-wide volume-weighted average Effective Interchange Rate . . . for the 12-month period ending March 31, 2024," for Visa- and Mastercard-branded credit cards. (*See id.*) The Auditor would then set an Average Effective Rate Limit that is at least seven basis points lower than the combined system-wide, volume-weighted average interchange rate for both Visa- and Mastercard-branded credit cards. (*Id.*) For the five years covered by the Settlement, Visa and Mastercard would be required to maintain an average interchange rate at or below the Average Effective Rate Limit. (*Id.*)

Second, aside from the reduction of the average system-wide rate, Visa and Mastercard would be required to reduce "all posted interchange rates for [domestic transactions] by a minimum of four basis points." (*Id.* ¶¶ 34, 66.) This reduction would apply to every merchant and must be provided for at least the first three years following establishment of the Average Effective Rate Limit. (*Id.*)

Third, the Settlement establishes a cap on posted interchange rates, requiring that Visa and Mastercard "will not increase any of their posted rates for [domestic transactions] above

Visa's [or Mastercard's] posted rates . . . effective as of December 31, 2023." (*Id.* ¶¶ 35, 67.) This cap would apply for the five years following the effective date of the Settlement. (*Id.*)

### 7. Merchant education program

Along with the changes detailed above, the Settlement provides for the commencement of a Merchant Education Program to advise merchants on "the proper interpretation and application of . . . all merchant Rules, including those modified by [the Settlement]," "the benefits of [the Settlement]," "the benefits of steering tools that merchants may use to reduce the costs of acceptance," and "the benefits of and the methods for forming and joining Merchant Buying Groups." (*Id.* ¶ 40.) The Settlement provides a $15 million fund for the establishment of the Merchant Education Program. (*See id.* ¶ 9.)

### 8. Release

The Settlement includes a release provision that requires all members of the class to "irrevocably waive, and fully, finally, and forever settle, discharge, and release" all Defendants "from any and all manner of claims, demands, actions, suits, and causes of action, . . . to the extent that they seek any form of declaratory, injunctive, or equitable relief" that relates to any conduct that was or could have been alleged or raised in this case. (*Id.* ¶ 82.) The release covers any potential causes of action that may have accrued as of the Settlement Approval Date and for the five years after the commencement of the Average Effective Rate Limit. (*Id.*) The class members accordingly would be barred from "tak[ing] any action or mak[ing] any claim until five years after the commencement of the Average Effective Rate Limit . . . relating to the claims released."[21] (*Id.* ¶ 86.) The release covers all members of the class "whether or not they object

---

[21] The Settlement provides that the Average Effective Rate Limit must be implemented "the first April or October that is no earlier than April 2025 and no earlier than four months

to the [S]ettlement . . . and whether or not they exercise any benefit provided under the" Settlement.  (*Id.* ¶ 80.)

### 9.   Stay of opt-out actions

The Settlement provides that the proposed Rule 23(b)(2) Class Settlement Notice and Scheduling Order ("Preliminary Approval Order") will "[s]tay . . . all further proceedings in MDL 1720, to the extent that they seek declaratory, injunctive, or equitable relief against the Defendants . . . pending the Court's determination of whether th[e Settlement] should be finally approved."  (*Id.* ¶ 92(d).)  Further, "[p]ending the Court's determination of whether th[e Settlement] should be approved," the Preliminary Approval Order will "enjoin the members of the Rule 23(b)(2) Class from . . . maintaining . . . any claims being released against [Defendants]."²²  (*Id.* ¶ 92(e).)

### c.   Objections to preliminary approval

On April 1, 2024, the Court ordered that "[a]ny objections to preliminary approval of the class settlement agreement [be filed] on or before April 26, 2024," in anticipation of the preliminary approval hearing scheduled for June 13, 2024.  (Order dated Apr. 1, 2024.)  Between April 22 and 24, 2024, the Court received objections from several owners or operators of small,

---

following the Settlement Approval Date, with the timing to coincide with the typical cycle for updates to the Visa [and Mastercard] Defendants' Rules and interchange rates" which occur in April and October of each year.  (Settlement ¶¶ 33(a), 65(a).)

   ²² (*See also* Proposed Class Settlement Notice & Sched. Order ¶ 20, Docket Entry No. 9179-8 ("The Court stays *Barry's* and all further proceedings in MDL 1720 to the extent they seek declaratory, injunctive, or equitable relief against the Defendants . . . ."); *id.* ¶ 21 ("The Court enjoins all members of the Rule 23(b)(2) Class, pending the Court's determination of whether the Rule 23(b)(2) Class Settlement Agreement should finally be approved . . . from . . . maintaining . . . any claims being released against the Rule 23(b)(2) Class Released Parties . . . .").)

independent grocery stores, independent gas stations, and convenience stores.[23]  On April 26,

2024, the Court received objections from the Target Plaintiffs, the Grubhub Plaintiffs, *Old

Jericho* Plaintiffs, 7-Eleven Plaintiffs, Walmart, and two merchant trade groups.[24]  Finally,

between April 29 and May 22, 2024, the Court received additional objections from (1) owners

and operators of small, independent grocery stores;[25] (2) owners and operators of independent

gas stations and convenience stores;[26] (3) trade organizations representing truck stop operators,

---

[23]  (Stmt. of Objs. by Alex Weatherall, Docket Entry No. 9210; Stmt. of Objs. by Clyde J. Boehm, Docket Entry No. 9278; Stmt. of Objs. by Scot Kinne, Docket Entry No. 9279; Stmt. of Objs. by Jarret W. Copheranham, Docket Entry No. 9280; Stmt. of Objs. by Beth Laborie, Docket Entry No. 9212; Stmt. of Objs. by Steven K. Dickerson, Docket Entry No. 9213; Stmt. of Objs. by Mike Wilson; Docket Entry No. 9214.)

[24]  (Target Pls.' Stmt. of Objs. to Pls.' Mot. ("Target Objs."), Docket Entry No. 9220; Grubhub Pls.' Stmt. of Objs. to Pls.' Mot. ("Grubhub Objs."), Docket Entry No. 9221; Nat'l Retail Fed'n Obj. to Pls.' Mot. ("Merch. Trade Grp. Objs."), Docket Entry No. 9222; *Old Jericho* Pls.' Obj. to Pls.' Mot. ("Old Jericho Objs."), Docket Entry No. 9223; 7-Eleven Pls.' Obj. to Pls.' Mot. ("7-Eleven Objs."), Docket Entry No. 9224-1; Walmart Opp'n to Pls.' Mot. ("Walmart Objs."), Docket Entry No. 9225.)

[25]  (Stmt. of Objs. by Sandra Garza, Docket Entry No. 9233; Stmt. of Objs. by Howard Kaminsky, Docket Entry No. 9276; Stmt. of Objs. by Jenny Osner, Docket Entry No. 9282.)

[26]  (Stmt. of Objs. by Jon Frank Clark, Docket Entry No. 9234; Stmt. of Objs. by Robert Razowsky, Docket Entry No. 9235; Stmt. of Objs. by John A. Milazzo, Docket Entry Nos. 9236–38, 9241–46, 9248–50, 9256; Stmt. of Objs. by Parker Lipscomb, Docket Entry No. 9251; Stmt. of Objs. by Monica Muns, Docket Entry No. 9252; Stmt. of Objs. by Perry Rackley, Docket Entry No. 9253; Stmt. of Objs. by Gilbert D. Moyle III, Docket Entry No. 9254; Stmt. of Objs. by Kevin Bailey, Docket Entry No. 9255; Stmt. of Objs. by Stephen P. Garrett, Docket Entry No. 9257; Stmt. of Objs. by Majida Rimawi, Docket Entry Nos. 9260–62; Stmt. of Objs. by Sarah McKinnon, Docket Entry No. 9263; Stmt. of Objs. by Anne Gauthier, Docket Entry No. 9265; Stmt. of Objs. by David Craddock, Docket Entry No. 9266; Stmt. of Objs. by Bob Burke, Docket Entry No. 9267; Stmt. of Objs. by Catherine R.J. Witterson *ex rel.* Robert S. Coleman & Ian M. Coleman, Docket Entry No. 9268; Stmt. of Objs. by Jim Emmart, Docket Entry No. 9269; Stmt. of Objs. by Raymond Huff, Docket Entry No. 9270; Stmt. of Objs. by Stephen F. White, Docket Entry No. 9271; Stmt. of Objs. by Thomas W. Foster, Docket Entry No. 9273; Stmt. of Objs. by John Foster, Docket Entry No. 9274; Stmt. of Objs. by Nancy K. Borgacz, Docket Entry No. 9275; Stmt. of Objs. by Matthew Bryson Bogue, Docket Entry No. 9277; Stmt. of Objs. by Rebecca S. Kresser, Docket Entry Nos. 9301–04.)

21

booksellers, and independent grocers;[27] and (4) a group of consumer advocates.[28]

The Court addresses the concerns raised by the objectors in the discussion below.[29]

### d. Hearing on preliminary settlement approval

On June 13, 2024, the Court held a hearing on preliminary approval of the Settlement. (*See* Min. Entry dated June 13, 2024; Tr. of Settlement Approval Hr'g ("Hr'g Tr."), Docket Entry No. 9330.)  The Court heard from Plaintiffs and Defendants in support of approval, and from the Direct Action Plaintiffs in opposition to approval.  In addition, the Target Plaintiffs urged the Court to clarify that the Settlement's stay provisions would not prohibit the opt-out plaintiffs' damages claims from proceeding, and *Old Jericho* Plaintiffs joined in this application. At the conclusion of the hearing, the Court indicated that it was not inclined to grant preliminary approval to the Settlement, and that it would issue a decision to explain the Court's reasons.

---

The Court also received objections from Wawa, a large, mid-Atlantic chain of gas stations and convenience stores with "over 1,000 fresh food and convenience stores . . . in a seven-state area including New Jersey, Pennsylvania, Delaware, Virginia, Florida, Alabama and Washington DC."  (Stmt. of Objs. by M. Preston Hawkins, Philip J. Drewes & Carolyn Maddaloni ("Wawa Objs.") 1, Docket Entry No. 9281.)

[27]  (Stmt. of Objs. by NATSO & SIGMA ("NATSO & SIGMA Objs."), Docket Entry No. 9258; Stmt. of Objs. by David Grogan ("Booksellers Objs."), Docket Entry No. 9259; Stmt. of Objs. by Stephanie Harris ("Food Industry Ass'n Objs."), Docket Entry No. 9272.)

[28]  (Stmt. of Objs. by Nidhi Hegde, Sumit Sharma, Chuck Bell & Ed Mierzwinski ("Consumer Advocate Objs."), Docket Entry No. 9240.)  In addition, the Court received objections from Dutch Medical Clinics, Inc., which "operate[s] four primary care medical clinics and a medical spa."  (Stmt. of Objs. by Amy Bogue 1, Docket Entry No. 9264.)

[29]  Where the objection is raised by multiple objectors or it is not necessary to identify a particular objector, the Court refers to the parties collectively as the "objectors."

## II.   Discussion

### a.   Preliminary approval of a proposed settlement

Rule 23(e) of the Federal Rules of Civil Procedure sets forth the standards and procedures that apply to class action settlements.  Under Rule 23(e), a court may grant final approval of a proposed settlement "only after a hearing and only on finding that it is fair, reasonable, and adequate after considering" the Rule 23(e)(2) factors.  Fed. R. Civ. P. 23(e)(2); *Moses v. N.Y. Times Co.*, 79 F.4th 235, 242 (2d Cir. 2023) (same); *see also In re Patriot Nat'l, Inc. Sec. Litig.*, 828 F. App'x 760, 762 (2d Cir. 2020) (*Patriot Securities*); *Charron v. Wiener*, 731 F.3d 241, 247 (2d Cir. 2013).  A class action settlement approval procedure typically occurs in two stages: (1) preliminary approval — where "prior to notice to the class, a court makes a preliminary evaluation of fairness," and (2) final approval — where "notice of a hearing is given to the class members, [and] class members and settling parties are provided the opportunity to be heard on the question of final court approval." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11-MD-2262, 2016 WL 7625708, at *2 (S.D.N.Y. Dec. 21, 2016) (citing *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997)).

Rule 23(e)(2) requires courts to consider whether:

> (A) the class representatives and class counsel have adequately represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
> > (i) the costs, risks, and delay of trial and appeal;
> > (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
> > (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
> > (iv) any agreement required to be identified under Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative to each other.

23

Fed. R. Civ. P. 23(e)(2). Paragraphs (A) and (B) constitute the "procedural" analysis factors, and require the Court to examine "the conduct of the litigation and of the negotiations leading up to the proposed settlement." Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment. Paragraphs (C) and (D) constitute the "substantive" analysis factors, and require the Court to examine "[t]he relief that the settlement is expected to provide to class members." *Id.*

In addition, courts in the Second Circuit have traditionally considered the nine factors listed in *City of Detroit v. Grinnell Corporation*, 495 F.2d 448 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000), known as the *Grinnell* factors, to assist in weighing final approval and determining whether a settlement is substantively "fair, reasonable, and adequate." *Moses*, 79 F.4th at 242 ("To evaluate the fairness, reasonableness, and adequacy of a class settlement, we have historically applied the nine factors set out in *Grinnell Corp.*, 495 F.2d at 463."); *see also Patriot Securities*, 822 F. App'x at 762–63 ("In assessing the adequacy of a class action settlement, district courts in this Circuit consider the *Grinnell* factors[.]"). Those factors are:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Hyland v. Navient Corp.*, 48 F.4th 110, 121 (2d Cir. 2022) (quoting *Grinnell*, 495 F.2d at 463); *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 117 (2d Cir. 2005) (quoting same). There is significant overlap between the Rule 23(e)(2) and *Grinnell* factors, which complement, rather than displace each other. *See* Fed. R. Civ. P. 23(e) advisory committee's note to 2018

24

amendment (observing that "[c]ourts have generated lists of factors to shed light on" concerns over whether a proposed class settlement is "fair, reasonable, and adequate," and explaining that "[t]he goal of this amendment is not to displace any factor, but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal"); *Moses*, 79 F.4th at 243 ("[T]he revised Rule 23(e)(2) does not displace our traditional *Grinnell* factors, which remain a useful framework for considering the substantive fairness of a settlement.").  In addition, the 2018 Amendments to Rule 23(e) "prohibit courts from applying a presumption of fairness to proposed settlements arising from an arms-length agreement."  *Moses*, 79 F.4th at 243.

During the preliminary approval stage, "a district court must consider whether the court '*will likely be able to*: (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal.'"  *In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d 686, 692 (S.D.N.Y. 2019) (quoting *Interchange Fees III*, 330 F.R.D. at 28).  "Even at the preliminary approval stage, the [c]ourt's role in reviewing the proposed settlement 'is demanding because the adversariness of litigation is often lost after the agreement to settle.'"  *Id.* (quoting *Zink v. First Niagara Bank, N.A.*, 155 F. Supp. 3d 297, 308 (W.D.N.Y. 2016)).

Even where parties have reached agreement in the class settlement context, courts need not grant preliminary approval, and have denied motions for class settlement preliminary approval.  *See, e.g.*, *Hernandez v. Between the Bread 55th Inc.*, 496 F. Supp. 3d 791 (S.D.N.Y. 2020); *Hart v. BHH, LLC*, 334 F.R.D. 74 (S.D.N.Y. 2020); *Douglas v. Allied Universal Sec. Servs.*, 371 F. Supp. 3d 78 (E.D.N.Y. 2019).  Courts should remain mindful, however, of the "strong judicial policy in favor of settlements, particularly in the class action context."  *Berni v.*

25

*Barilla S.p.A.*, 964 F.3d 141, 146 (2d Cir. 2020) (quoting *In re PaineWebber Ltd. P'ships Litig.*, 147 F.3d 132, 138 (2d Cir. 1998)).

### i.    Preliminary approval standards

As discussed above, amendments to Rule 23 took effect on December 1, 2018.[30]  Under the new Rule 23(e), in weighing a grant of preliminary approval, district courts must determine whether "giving notice is justified by the parties' showing that the court *will likely be able to*: (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal."  Fed. R. Civ. P. 23(e)(1)(B)(i)–(ii) (emphasis added).  Because Rule 23(e)(2) sets forth the factors that a court must consider when weighing *final* approval, it appears that courts must assess at the preliminary approval stage whether the parties have shown that the court is likely to find that the factors weigh in favor of final settlement approval.  This standard is more exacting than the prior requirement.  *See In re GSE Bonds*, 414 F. Supp. 3d at 692 (describing the 2018 amendments as imposing "new, more exacting standards").

---

[30]  Prior to the amendments, Rule 23 did not specify standards for courts to follow when deciding whether to grant preliminary approval.  Instead, courts in the Second Circuit interpreted Rule 23 to require a determination of whether the proposed settlement fell "within the range of possible final approval."  *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2012 WL 5989763, at *1 (E.D.N.Y. Oct. 24, 2012) ("Preliminary approval is appropriate where the proposal appears to be the product of serious negotiation and further appears to be within the range of possible final approval." (citing *In re NASDAQ Mkt.-Makers*, 176 F.R.D. at 102)); *see also In re Traffic Exec. Ass'n*, 627 F.2d 631, 634 (2d Cir. 1980) (suggesting that for preliminary approval, a court need only find "'probable cause' to submit the [settlement] to class members"); *Davis v. J.P. Morgan Chase & Co.*, 775 F. Supp. 2d 601, 607 (W.D.N.Y. 2011) ("A proposed settlement of a class action should . . . be preliminarily approved where it 'appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class and falls within the range of possible approval.'" (quoting *In re NASDAQ Mkt.-Makers*, 176 F.R.D. at 102)); *Menkes v. Stolt-Nielsen S.A.*, 270 F.R.D. 80, 101 (D. Conn. 2010) (quoting *Reade-Alvarez v. Eltman, Eltman & Cooper, P.C.*, 237 F.R.D. 26, 33 (E.D.N.Y. 2006)).

ii.    **Preliminary approval factors**

To guide the analysis during the preliminary approval stage in determining whether it is likely to approve a proposal under Rule 23(e)(2), the Court looks to the factors contained in the text of Rule 23(e)(2), which a court must consider when weighing final approval. *See* Fed. R. Civ. P. 23(e)(2) ("If the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering [the factors set forth in Rule 23(e)(2)]."). Accordingly, the Court considers both the Rule 23(e)(2) and *Grinnell* factors below in its analysis of whether the Court is likely to find that the proposed settlement is fair, reasonable, and adequate, and is likely to grant final approval.

b.    **The Court is not likely to approve the proposed settlement**

The Court first considers the Rule 23(e)(2) factors, and then considers additional *Grinnell* factors not otherwise addressed by the Rule 23(e)(2) factors.[31] The only factor that the Court does not fully address below is the second *Grinnell* factor — "the reaction of the class to the settlement." The Court has considered this factor, to the limited extent possible at the preliminary approval stage, through its consideration of the objections received prior to the preliminary approval hearing. After consideration of all relevant factors, the Court concludes that it is not likely to grant final approval to the proposed settlement.[32]

---

[31] The only *Grinnell* factor that does not appear to be addressed by the Rule 23(e)(2) factors is the ability of the defendants to withstand a greater judgment.

[32] Although both the Rule 23(e) and *Grinnell* factors are meant to guide a court's final approval analysis, as discussed *supra*, in consideration of the new Rule 23 likelihood standard applicable to the preliminary approval process, the Court looks to these final approval factors in determining whether the Court is likely to grant final approval. The Court nevertheless recognizes that it cannot engage in a complete analysis at the preliminary approval stage, and, as other courts in this Circuit have held, "it is not necessary to exhaustively consider the factors

27

i.    **Adequate representation by class representatives and class counsel**

Plaintiffs argue that the Class Representatives and Class Counsel "have adequately represented the Equitable Relief Class throughout the litigation and in achieving the Settlement." (Pls.' Mem. 34).  Plaintiffs observe that "the Court has already found that the [Class Representatives] and their counsel are adequate."  (*Id.*)  Plaintiffs further observe that "the Court noted that Plaintiffs seek the same equitable relief for themselves and all other Class [M]embers, and Class Counsel are seasoned litigators with significant experience prosecuting and resolving complex, multi-defendant, antitrust cases."  (*Id.* at 34–35 (citing *DDMB*, 2021 WL 6221326, at *38).)  Plaintiffs also argue that "[t]he rate caps and rollback are not impermissible 'monetary' relief," and that "[i]njunctions that alter future conduct — whether network rules or interchange rates — are not 'monetary' or 'damages' relief merely because they *prevent* or ameliorate *future* overcharges."  (Pls.' Reply 3.)  Rather, Plaintiffs contend that "[t]he Settlement reforms nationwide rules applicable to *all* merchants and provides caps and rollbacks of posted interchange rates for *all* merchants."  (*Id.*)

Target Plaintiffs first argue that "[t]he Class has not adequately represented the Target Plaintiffs," because the Settlement "reflects one of the most pernicious aspects of inadequate and conflicted representation: the trading of claims possessed by some class members for remedies that only benefit other class members."  (Target Objs. 18 (citing *Interchange Fees II*, 827 F.3d at 238–39).)  In support, Target Plaintiffs argue that the Class is conflicted between plaintiffs who released their damages claims in the (b)(3) settlement and those, like the Direct Action Plaintiffs, who did not.  (*Id.* ("By failing to recognize the massive fault lines between those who have

---

applicable to final approval" at this stage.  *In re Platinum & Palladium Commodities Litig.*, No. 10-CV-3617, 2014 WL 3500655, at *12 (S.D.N.Y. July 15, 2014).

*released* their damages claims and those who have not, Rule 23(b)(2) counsel have reenacted the conflicted dynamic that required rejection of the prior settlement . . . .").) Second, Target Plaintiffs argue that Class Counsel was "[u]nwilling to *try* injunctive claims that would have *eliminated* the anticompetitive rules they promised to challenge," and "have instead grabbed for more monetary relief." (*Id.*) In support, Target Plaintiffs contend that Plaintiffs "traded a release of equitable claims that would have afforded *permanent relief* to *all* class members for additional monetary relief that will flow, overwhelmingly to class members whose claims have already been released and compensated fully." (*Id.* at 19.) Finally, Target Plaintiffs argue that the Settlement "inflict[s] unique, immediate, and conflicting injury on the Target Plaintiffs and [Direct Action Plaintiffs]," because "*only* the Target Plaintiffs and [Direct Action Plaintiffs] are pursuing individual injunctive and monetary relief claims in their cases, and *only they* are on the cusp of trial."[33] (*Id.*)

7-Eleven Plaintiffs argue that "the Settlement demonstrates that [the Class Representatives] are inadequate representatives for the 7-Eleven Plaintiffs," because they "fail[ed] to deliver an indivisible injunction benefiting the class as a whole." (7-Eleven Objs. 1, 3.) 7-Eleven Plaintiffs reiterate the arguments they raised to the Court at the class certification stage, including their concern that "Rule 23(b)(2) counsel would exchange relief on the Honor All Cards and default interchange rules for surcharging relief." (*Id.* at 8.) Although the Court rejected these concerns at certification as "premature and unfounded," 7-Eleven Plaintiffs now contend that their concerns have materialized. (*Id.* at 8–9; *see also id.* at 19 ("At the class

---

[33] Grubhub Plaintiffs "adopt the arguments made by the Target Plaintiffs and the 7-Eleven Plaintiffs in their objections to the proposed Rule 23(b)(2) settlement." (Grubhub Objs. 2.)

certification juncture, this Court rejected the Direct Action Plaintiffs' argument that [Plaintiffs] would trade Honor All Cards claims for surcharging relief as premature — a concern that has proven prescient.").) 7-Eleven's contention is that the Settlement provides individualized, monetary relief — rather than equitable relief — and thereby "render[s the Class Representatives] inadequate as representatives for the class as well as the 7-Eleven Plaintiffs." (*Id.* at 19.) In support, 7-Eleven Plaintiffs assert:

> The fact that [D]efendants' practices *affect* all class members to some degree and that certain merchants have common complaints about them is insufficient to justify approval of a class settlement for injunctive relief. If individual class members would want to litigate and redress their claims in different ways — particularly when a settlement purports to resolve multiple claims, and the class members' differing interests in those claims might be traded off against each other — then those claims are not suitable for (b)(2) treatment. *See, e.g., Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 854–58 (1999) (noting the problem in a mandatory class action settlement aggregating different kinds of claims, including that "[t]he very decision to treat [all types of claims] the same is itself an allocation decision with results almost certainly different from the results that those with [different types of claims] would have chosen").

(*Id.* at 20.) Direct Action Plaintiffs reiterated these views at the preliminary approval hearing, and argued that there is intra-class conflict on three bases: (1) between merchants who want to preserve their Honor All Cards and default interchange claims and those who do not; (2) between merchants that operate in states that prohibit surcharging and those that do not; and (3) between merchants that will benefit from the rate relief and those that likely will not. (Hr'g Tr. 14:11–31:4.)

Walmart reiterates the arguments it raised in opposition to class certification: "Small Local Merchants were inadequate representatives of a class that includes Large National Merchants . . . because Plaintiffs would trade off Walmart's interests to achieve their own: they would abandon Walmart's interest in eliminating Honor All Cards and other rules to get the right

30

to surcharge consumers," and contends that this concern was realized in the Settlement. (Walmart Objs. 1 (internal quotation marks and citation omitted).)  Walmart first argues that the Class Representatives "possess antagonistic interests" to the Large National Merchants, which "caused them to sell out the interests of the Large National Merchants."  (*Id.* at 2.)  Walmart next contends that the Settlement "demonstrates that neither the named class representative nor the lawyers who represent them considered the interests of the one group of class members who stand to gain the most from actual enforcement of the antitrust laws against Defendants' Honor All Cards rules."  (*Id.* at 4.)  Third, Walmart argues that the Supreme Court has "described (b)(2) classes as ones where 'the relief sought must perforce affect the entire class at once,'" (*id.* at 8 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 361–62 (2011))), and asserts that the Settlement provides inequitable relief that does not benefit all Class Members.  Finally, Walmart contends that the Class lacks the requisite "*unitary* community of interest" and that the Class Members' interests are not "indivisible."  (*Id.* at 8–9; *see also id.* at 14 ("When 'one category of [class members are] targeted for worse treatment without credible justification' it 'strongly suggests a lack of adequate representation for those class members who hold only claims in this category.'" (quoting *Interchange Fees II*, 827 F.3d at 237)).)

Rule 23(e)(2)(A) requires the Court to consider whether "the class representatives and class counsel have adequately represented the class."  Fed. R. Civ. P. 23(e)(2)(A).  Courts in this Circuit routinely draw on case law regarding adequacy for purposes of class certification to assess adequacy under Rule 23(e).[34]  *See, e.g.*, *Kurtz v. Kimberly-Clark Corp.*, Nos. 14-CV-1142,

---

[34]  This adequate representation factor is nearly identical to the Rule 23(a)(4) prerequisite of adequate representation in the class certification context.  As a result, the Court looks to Rule 23(a)(4) case law to guide its assessment of this factor.  As a prerequisite to bringing a class action, Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect

15-CV-2910, 2024 WL 184375, at *7 n.4 (E.D.N.Y. Jan. 17, 2024); *see also Denney v. Deutsche Bank AG*, 443 F.3d 253, 270 (2d Cir. 2006) (explaining that the Supreme Court's decision in *Amchem* made clear that "the Rule 23(e) inquiry into the fairness of a settlement cannot supplant the inquiries under Rules 23(a) and (b) regarding whether the requirements for class certification have been met").  "Determination of adequacy typically 'entails inquiry as to whether: (1) plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation.'"  *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007) (quoting *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000)).  "Under Rule 23(a)(4) . . . adequacy is satisfied unless 'plaintiff's interests are antagonistic to the interest of other members of the class.'"  *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 90 (2d Cir. 2015) (quoting *Baffa*, 222 F.3d at 60).

In its review of this Court's approval of the 2013 Settlement, the Second Circuit concluded that "class members of the (b)(2) class were inadequately represented in violation of both Rule 23(a)(4) and the Due Process Clause."  *Interchange Fees II*, 827 F.3d at 231.  The

---

the interests of the class."  Fed. R. Civ. P. 23(a)(4); *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 592 (1997) ("To gain certification under Rule 23(b)(3), a class must satisfy the requirements of Rule 23(a), among them, that named class representatives will fairly and adequately protect class interests . . . .").  In addition, because this factor guides the Court's analysis of the procedural, as opposed to the substantive, fairness of the settlement, *see* Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment, the Court also looks to case law that assesses the procedural fairness of proposed settlements, *see, e.g., In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 160 (S.D.N.Y. 2011) (noting that when evaluating whether a proposed settlement is fair, reasonable, and adequate, "a [c]ourt must consider 'both the settlement's terms and the negotiating process leading to settlement,' that is, it must review the settlement for both procedural and substantive fairness," and noting that the *Grinnell* factors are used to guide a court's analysis of substantive fairness (quoting *Wal-Mart Stores*, 396 F.3d at 116)).

Second Circuit held that the "[c]lass representatives had interests antagonistic to those of some of the class members they were representing," because the (b)(3) damages class "would want to maximize cash compensation for past harm," while the (b)(2) injunctive class "would want to maximize restraints on network rules to prevent harm in the future," and thus, "[t]he class counsel and class representatives who negotiated and entered into the Settlement Agreement were in the position to trade diminution of (b)(2) relief for increase of (b)(3) relief." *Id.* at 233–34 (holding that the Supreme Court's decisions in *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997), and *Ortiz*, 527 U.S. 815, require separate representation when, *inter alia*, a class can be divided between members that hold present claims and those that hold future claims). In addition, the Second Circuit held that the issue of unitary representation was exacerbated "because the members of the worse-off (b)(2) class could not opt out." *Id.* at 234.

The structural defect of unitary representation no longer exists — the (b)(2) and (b)(3) classes have had separate Class Counsel since 2016. *See In re Payment Card*, 2016 WL 8138988. The (b)(2) and (b)(3) classes also have separate class representatives, *i.e.*, Class Plaintiffs. (*Compare* Class Compl. ¶ 2, *with* Third Consol. Am. Class Action Compl. [of the (b)(3) Class] ¶ 2, Docket Entry No. 6895.) The named Rule 23(b)(2) Class Plaintiffs represent a class that seeks changes to Visa's and Mastercard's rules that Plaintiffs allege cause supracompetitive interchange fees. (*See* Class Compl. ¶ 4.) Thus, all Rule 23(b)(2) Class Plaintiffs and members of the Rule 23(b)(2) class should have the same incentive to obtain relief from the challenged rules. *Interchange Fees II*, 827 F.3d at 233.

For the following reasons, the Court finds that the Class Representatives do not have interests "antagonistic to" other class members, *Sykes*, 780 F.3d at 90, nor do they have a "fundamental" conflict, such that the Class should not have been certified at all, *Interchange*

33

*Fees II*, 827 F.3d at 236.  Accordingly, this factor weighs in favor of granting final approval.

### 1. Adequacy of class representatives

The objectors argue that the Class Representatives — as small, local merchants — were incentivized to trade diminution of relief desirable to large, national merchants, such as elimination of the Honor All Cards rule, for increase of relief preferred by small merchants, such as the right to surcharge.  Thus, the objectors argue that the Class Representatives either do not adequately represent the Class or have interests antagonistic to other class members.

Target Plaintiffs argue that the Class is conflicted between plaintiffs who released their damages claims in the (b)(3) settlement and those, like the Direct Action Plaintiffs, who did not.  (Target Objs. 18 ("By failing to recognize the massive fault lines between those who have *released* their damages claims and those who have not, Rule 23(b)(2) counsel have reenacted the conflicted dynamic that required rejection of the prior settlement . . . .").)  Similarly, 7-Eleven Plaintiffs argue that the Settlement provides individualized, monetary relief — rather than equitable relief — and thereby "render[s the Class Representatives] inadequate as representatives for the class as well as the 7-Eleven Plaintiffs."  (7-Eleven Objs. 19.)  Relying on the Supreme Court's decision in *Ortiz*, the 7-Eleven Plaintiffs also argue that when different class members have "differing interests" that "might be traded off against each other," a mandatory class action is inappropriate.  (*Id.* at 20 (citing *Ortiz*, 527 U.S. at 854–58; *see also* Hr'g Tr. 31:6–11 (Direct Action Plaintiffs referencing Judge Leval's concurrence in *Interchange Fees II*, which described the 2013 Settlement as a "confiscation").)

One of the purposes of assessing adequate representation is to "uncover conflicts of interest between named parties and the class[es] they seek to represent."  *Amchem*, 521 U.S. at 625.  "[A] class representative must be part of the class and 'possess the same interest and suffer

the same injury' as the class members." *Dukes*, 564 U.S. at 348–49 (quoting *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)). The analysis of whether a class representative is adequate "is twofold: the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members." *Denney*, 443 F.3d at 268. In addition to the adequate representation requirements of Rule 23(a)(4) and Rule 23(e)(2)(A), "[t]he Due Process Clause . . . requires that the named plaintiff at all times adequately represent the interests of the absent class members." *Interchange Fees II*, 827 F.3d at 231 (quoting *Phillips Petrol. Co. v. Shutts*, 472 U.S. 797, 812 (1985)).

The Rule 23(b)(2) Class consists of "all persons, businesses, and other entities that accept [or accepted] Visa and/or Mastercard credit and/or debit cards in the United States at any time during the period between December 18, 2020 and the date of entry of Final Judgment in this case." *DDMB*, 2021 WL 6221326, at *50. The Rule 23(b)(2) Class Plaintiffs challenge the allegedly unlawful conduct that they claim has harmed them: "Defendants' anticompetitive conduct harms competition and imposes upon Plaintiffs and Class Members supracompetitive, exorbitant, and collectively-fixed prices." (Class Compl. ¶ 4.) These alleged harms apply to all members of the class.

In *Interchange Fees II*, the Second Circuit concluded that members of the Rule 23(b)(2) class were inadequately represented because the Rule 23(b)(3) Class Plaintiffs were incentivized to trade a diminution of future injunctive relief for greater monetary relief, at the expense of the interests of the (b)(2) class. *See* 827 F.3d at 233–34. As discussed above, however, this fundamental conflict between the (b)(2) and (b)(3) classes has been resolved. Although the objectors analogize the varying interests of individual class members (*i.e.*, between small, local

merchants and large, national merchants) to the fundamental conflict *between classes* in *Interchange Fees II*, the Court is not persuaded by the objectors' contentions that this alleged intra-class conflict renders the Class Representatives inadequate to represent the Class.

The named Rule 23(b)(2) Class Plaintiffs are comprised of "a family dental practice that also engages in the retail selling of dental supplies" with its principal place of business in Corpus Christi, Texas; a "business internet service provider" with its principal place of business in Coral Gables, Florida; a "business information technology support provider" with its principal place of business in Miami, Florida; a pharmacy with its principal place of business in Tamarac, Florida; and a beauty salon with its principal place of business in Flowery Branch, Georgia. (Class Compl. ¶¶ 13–15, 17–18.) The named Class Plaintiffs currently operate businesses that continue to accept payment by Visa and Mastercard credit and debit cards. (*Id.*); *see also DDMB*, 2021 WL 6221326, at *5.

The Rule 23(b)(2) Class Plaintiffs therefore represent a subset of the types of businesses that suffer alleged harms from Defendants' conduct. Notwithstanding the many differences between small, local merchants and large, national merchants, *all* Plaintiffs seek the same type of redress for the same type of harms: relief from the Honor All Cards rules, the default interchange rules, and a number of anti-steering rules, among others. (*See* Class Compl.) Accordingly, the Class Representatives are likely adequate representatives for the Class. Moreover, the Court does not agree with the objectors' contentions that the Class Representatives are inadequate to represent the Class. All class members have the same interests to eliminate the rules that permit Defendants to maintain supracompetitive interchange fees. *See Patriot Securities*, 828 F. App'x at 765 ("[W]here different claims within a class involve the identical factual predicate, adequate representation of a particular claim is determined by the *alignment of interests* of class members,

36

not proof of vigorous pursuit of that claim." (emphasis added) (quoting *Wal-Mart Stores*, 396 F.3d at 113)); *DDMB*, 2021 WL 6221326, at *45 ("Differences in how each individual merchant is affected [by the Defendants' conduct] do not negate the fact that Defendants have acted on grounds generally applicable to the class and that each merchant in the class stands to benefit from equitable relief from the Restraints."). Thus, the objectors' arguments are more appropriately directed at the adequacy of relief offered by the Settlement, rather than at the adequacy of the Class Representatives to represent the class.

In addition, the Court is unpersuaded by the Target and 7-Eleven Plaintiffs' adequacy arguments because the Court does not find that the Settlement provides "individualized monetary relief." (*See* 7-Eleven Objs. 18.) Although Class Counsel puts a dollar value on the four-basis-point rate reduction, (*see* Class Counsel Decl. ¶ 6 (estimating the rate reduction to be worth nearly $30 billion)), the Settlement also provides some surcharging relief, some relief from the Honor All Wallets rule, and the option for merchants to join or form "merchant buying groups," (*see supra* section I.b.ii). Class Counsel does not attempt to estimate the monetary value of the relief afforded by these changes to Visa's and Mastercard's rules. (*See generally* Pls.' Mem.) While it is possible to ascribe a dollar value to nearly any form of injunctive relief, the ability to do so does not transform it *ipso facto* into monetary relief. (*See* Pls.' Reply 21 ("[A]n injunction requiring prospective changes in conduct is not 'monetary' relief merely because its value is readily quantifiable.")); Fed. R. Civ. P. 23 advisory committee's note to 1966 amendment (noting that claims for unlawful supracompetitive pricing practices could properly be maintained as a Rule 23(b)(2) action); *DDMB*, 2021 WL 6221326, at *45 (observing the same); *see also In re NASDAQ Mkt.-Makers Antitrust Litig*., 169 F.R.D. 493, 516–17 (S.D.N.Y. 1996) (certifying a (b)(2) class despite the availability of treble damages under the antitrust statute because of the

37

possibility that the defendants' alleged conspiracy would continue to inflate the spreads on securities in the absence of appropriate equitable relief). Accordingly, the Court finds that there is not a conflict between Class Plaintiffs who have preserved their damages claims (*i.e.*, the Direct Action Plaintiffs) and those who have not.

In addition, 7-Eleven Plaintiffs' reliance on *Ortiz* to argue that the Class Members have conflicting interests is misplaced. *Ortiz* involved "a class action prompted by the elephantine mass of asbestos cases." 527 U.S. at 821. The Supreme Court reversed certification and settlement approval for a Rule 23(b)(1) class seeking damages from a purportedly "limited fund," in part because the requirements of Rule 23(b)(1) were not met — among other reasons, because the Supreme Court found that the defendant's assets did not constitute a "limited fund." *See, e.g.*, *id.* at 848 ("The defect of certification going to the most characteristic feature of a limited fund action was the uncritical adoption by both the [d]istrict [c]ourt and the [c]ourt of [a]ppeals of figures agreed upon by the parties in defining the limits of the fund and demonstrating its inadequacy." (footnote omitted)). This issue with respect to damages was compounded by the fact that the class was a mandatory, non-opt-out class:

> It is simply implausible that the Advisory Committee, so concerned about the potential difficulties posed by dealing with mass tort cases under Rule 23(b)(3), with its provisions for notice and the right to opt out, *see* Rule 23(c)(2), would have uncritically assumed that mandatory versions of such class actions, lacking such protections, could be certified under Rule 23(b)(1)(B).

*Id.* at 844. Finally, in conflict with the principles behind a "limited fund" case, the class excluded plaintiffs with valuable claims against the defendant. *Id.* at 848, 854. If the class distributed all of the available assets of the defendant, as is expected in a limited fund case, there would be no assets left for the excluded claimants. *Id.* at 834 (observing that a limited fund class action aggregates "claims . . . made by numerous persons against a fund *insufficient to satisfy all*

38

*claims*" (citation omitted, alteration in original, and emphasis added)).  Thus, the issues that motivated the Supreme Court's reversal in *Ortiz* are not present in this case: this settlement does not involve (1) monetary damages in (2) a Rule 23(b)(1) action where (3) the class will make claims against a "limited fund."  While the Supreme Court took issue with the mandatory nature of the class, those concerns are not applicable to this action seeking indivisible injunctive relief.  (*See also* Pls.' Reply 25 n.24 ("*Ortiz* involved a proposed settlement of thousands of personal injury claims, with several distinct subclasses treated differently in the context of a mandatory, limited-fund settlement.  Those facts bear no resemblance to the Settlement here, which provides *uniform* reforms to network rules that apply *equally* to *all* merchants.").)  Therefore, *Ortiz* does not demonstrate that the Class is conflicted between Class Members with differently-valued claims.

Plaintiffs' decision to reach a settlement on the proposed terms represents a difference in litigation strategy that does not amount to a fundamental conflict of interest and does not render Class Plaintiffs inadequate to represent the class.  *See DDMB*, 2021 WL 6221326, at *23 (noting that "even if Plaintiffs[] do have a different perspective on the specific form of injunctive relief, courts considering the issue routinely hold that different perspectives as to the appropriate form of injunctive relief or as to litigation strategy do not constitute a conflict sufficient to defeat adequacy of representation" and collecting cases to that effect).  "Ultimately, none of [the objectors'] critiques demonstrate that there exists 'some fatal dissimilarity among class members that would make use of the class-action device inefficient or unfair.'"  *Kurtz v. Costco Wholesale Corp.*, 818 F. App'x 57, 62 (2d Cir. 2020) (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 586 U.S. 455, 470 (2013)).  Accordingly, the Court is likely to find that Class Representatives adequately represent the class pursuant to Rule 23(e)(2)(A).

## 2.    Adequacy of class counsel

"Rule 23(a)(4) requires that plaintiffs demonstrate that class counsel is qualified,

experienced, and generally able to conduct the litigation." *Hyland*, 48 F.4th at 123 (quoting

*Marisol A. v. Giuliani*, 126 F.3d 372, 378 (2d Cir. 1997) (per curiam)); *In re Glob. Crossing Sec.*

*& ERISA Litig.*, 225 F.R.D. 436, 453 (S.D.N.Y. Nov. 24, 2004) ("[A district c]ourt must evaluate

adequacy of representation by considering . . . whether class counsel is qualified, experienced,

and generally able to conduct the litigation."); *see also* Fed. R. Civ. P. 23 advisory committee's

note to 2018 amendment ("[T]he nature and amount of discovery in this or other cases, or the

actual outcomes of other cases, may indicate whether counsel negotiating on behalf of the class

had an adequate information base.").  A court "may consider any matter 'pertinent to counsel's

ability to fairly and adequately represent the interests of the class.'"  *Hyland*, 48 F.4th at 123

(quoting Fed. R. Civ. P. 23(g)(1)(B)).  In *D'Amato*, for example, the Second Circuit upheld the

district court's determination of adequacy of class counsel where the district court noted

counsel's experience, involvement in other similar litigation, and knowledge in the area of

complex class actions.  *See D'Amato v. Deutsche Bank*, 236 F.3d 78, 85–86 (2d Cir. 2001).  In

*Hyland*, the Second Circuit upheld the district court's adequacy determination where there was

no evidence to contradict the district court's determination that class counsel's "commitment" to

the litigation was "nothing but admirable," and there was no evidence that class counsel had

"abandoned the litigation or otherwise acted in bad faith in pursuing th[e] case."  48 F.4th at 123.

When the Court certified the Class, the Court determined that Class Counsel would be

able to adequately represent the Class.[35]  *DDMB*, 2021 WL 6221326, at *37 (noting that Class

---

[35]  The Court also observed at class certification:
    As Judge Orenstein noted in the Interim Class Counsel Order, these

40

Counsel "are experienced and competent lawyers," who "have extensive experience litigating

antitrust actions and class actions in federal courts"); *see also id.* (collecting cases recognizing

the experience and competency of the firms comprising Class Counsel).  Since certification,

nothing has cast doubt on Class Counsel's ability to adequately represent the Class.  As

discussed above, Class Counsel ably briefed oppositions to several *Daubert* and summary

judgment motions, which were largely decided in favor of the Rule 23(b)(2) Class.  (*See supra*

section I.a.)  In addition, Class Counsel has actively worked on behalf of the Class in its

extensive negotiations to reach this Settlement.  (*See* Decl. of Class Counsel ¶¶ 106–121.)

Accordingly, the Court is likely to find that Class Counsel "have adequately represented the

class" pursuant to Rule 23(e)(2)(A).  Fed. R. Civ. P. 23(e)(2)(A).

### ii. Arm's-length negotiations

Plaintiffs argue that "the Settlement [is] the product of extensive, hard-fought litigation

occurring alongside equally extensive and hard-fought negotiations, with the assistance of a

renowned and experienced mediator."  (Pls.' Mem. 37.)  Plaintiffs detail extensive negotiations,

assisted by Professor Eric D. Green, "a nationally renowned mediator," beginning in February of

---

firms "have been steeped in this litigation since its inception, and have demonstrated their ability to work cooperatively with each other, with the court, and with numerous non-lead counsel representing plaintiffs with very significant interests in this litigation."  Since the Court appointed them interim Class Counsel, they have filed the operative Rule 23(b)(2) class Complaint, successfully defended against the Bank Defendants' motion to dismiss, conducted extensive discovery, briefed opposition to Intervenors' motions to intervene, pursued the instant motion for class certification, and briefed summary judgment and *Daubert* motions in addition to defending against Defendants' summary judgment and *Daubert* motions.

*DDMB*, 2021 WL 6221326, at *38 (citation omitted).

2017, and spanning more than two dozen mediation sessions through December of 2023. (*Id.* at

10.)  In December of 2023,

> the parties had lengthy in-person mediation sessions attended by
> Prof. Green.  [Plaintiffs] also interviewed and consulted with
> numerous class members of all types and sizes.  Following a two-
> day session in December 2023 and yet more phone and video
> conferences with Defendants in December 2023 and January 2024,
> the parties reached a non-binding memorandum of understanding
> that they signed on January 17, 2024.  After further intense and
> detailed negotiations, the parties executed the settlement agreement
> on March 25, 2024.

(*Id.* (citations omitted).)  Plaintiffs contend that "[t]he participation of Prof. Green as a mediator

in the settlement process reinforces that the negotiations were non-collusive and conducted at

arm's length."  (*Id.* at 36.)  In sum Plaintiffs argue that the Settlement "is the product of a

careful, deliberative process, and not any sort of rush to settle or a mere 'tweaking' of the relief

in the 2012 Agreement."  (*Id.* at 35.)

The 2018 amendment to Rule 23 "prohibits courts from applying a presumption of

fairness to a settlement based on its negotiation at arm's length."  *Moses*, 79 F.4th at 243.  Thus,

while the existence of "arms-length . . . negotiations remain[s] a factor in favor of approving [a]

settlement (one whose absence would count significantly against approval)," a court may not

"*presume*[] that the proposed settlement [is] fair, reasonable, and adequate because it was

reached in an arm's-length negotiation."  *Id.*  Prior to *Moses*, the Second Circuit had held that

"even 'an intense, [protracted], adversarial mediation, involving multiple parties,' including

'highly respected and capable' mediators and associational plaintiffs, does not 'compensate for

the absence of independent representation,'" but acknowledged that "a court-appointed

mediator's involvement in pre-certification settlement negotiations helps to ensure that the

proceedings were free of collusion and undue pressure."  *Interchange Fees II*, 827 F.3d at 235

(first quoting *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 252–53

42

(2d Cir. 2011); and then quoting *D'Amato*, 236 F.3d at 85). The Court finds that these cases are still instructive in evaluating settlement negotiations because they did not rely on a presumption of fairness when assessing whether the settlements were products of arm's-length negotiations.

As noted above, Class Counsel has been involved in this litigation for nearly two decades. The parties engaged in extensive discovery and Plaintiffs have been assisted by two highly qualified experts. At class certification, the Court credited Class Counsel's representation that they have "vigorously pursued the litigation on behalf of the Class [and] engaged in extensive investigation, fact discovery, motion practice, engagement with experts[,] and complex settlement discussions." *DDMB*, 2021 WL 6221326, at *37 (alterations in original). There is no reason to doubt Class Counsel's familiarity with the ins-and-outs of the case. Finally, Prof. Green, "a retired Boston University School of Law professor and current full-time mediator" — whose mediation efforts helped produce this Settlement — has been involved with this litigation since 2009. *See Interchange Fees III*, 330 F.R.D. at 35. Given this litigation's extensive procedural history and the lengthy record of negotiations with and without the assistance of mediators, there is no indication that the Settlement is anything other than the product of hard-fought, arm's-length negotiations between adversaries, and is not the "product of collusion." *May v. Telik, Inc.*, 381 F. App'x 83, 84 (2d Cir. 2010).

Accordingly, the Court finds that this factor is likely to weigh in favor of granting final approval.

### iii. Adequate relief for the class

In assessing whether a settlement provides adequate relief for the class under Rule 23(e)(2)(C), the Court is directed to consider:

> (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including

43

the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3).

Fed. R. Civ. P. 23(e)(2)(C). The first subfactor — costs, risks, and delay of trial and appeal — overlaps significantly with several *Grinnell* factors, which the Court considers below. The Court also considers the proposed release from liability as an additional factor under this section, as it affects the determination of the fairness, reasonableness, and adequacy of class relief.

For the following reasons, the Court finds that the adequacy of the relief for the Class is likely to weigh against granting final approval.

### 1. Costs, risks, and delay of trial and appeal

Under this Rule 23(e)(2) factor, "courts may need to forecast the likely range of possible classwide recoveries and the likelihood of success in obtaining such results." Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment. This assessment implicates several *Grinnell* factors, including: (i) the complexity, expense, and likely duration of the litigation; (ii) the risks of establishing liability;[36] (iii) the risks of maintaining the class through the trial; and (iv) the range of reasonableness of the settlement fund in light of the best possible recovery and in light of all the attendant risks of litigation. The Court uses these *Grinnell* factors to guide its assessment of whether the Court is likely to find that this Rule 23(e)(2) factor will weigh in favor of granting final approval.

---

[36] The inquiry under Rule 23(e)(2)(C)(i) also implicates the risks of establishing damages, but because the Class seeks only equitable relief, the Court need not address this factor. To the extent that this factor can be analogized to the context of an injunctive relief class, the Court acknowledges that, even if a (b)(2) class prevails on liability at trial, the injunctive relief provided by a court may be less substantial or extensive than the relief sought by the plaintiffs.

### A.   The complexity, expense, and likely duration of the litigation

Settlement is favored when litigation is likely to be "complex, expensive, or drawn out." *In re GSE Bonds*, 414 F. Supp. 3d at 693. "'[C]lass action suits' in general 'have a well-deserved reputation as being most complex.'" *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 281 (S.D.N.Y. 1999) (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977)). In particular, "[n]umerous federal courts have recognized that '[f]ederal antitrust cases are complicated, lengthy, and bitterly fought,' 'as well as costly.'" *In re GSE Bonds*, 414 F. Supp. 3d at 693 (second alteration in original) (first quoting *Wal-Mart Stores*, 396 F.3d at 118; and then quoting *In re Vitamin C Antitrust Litig.*, No. 06-MD-1738, 2012 WL 5289514, at *4 (E.D.N.Y. Oct. 23, 2012)).

This case is complex and costly, and has been ongoing for approximately two decades. The case has required numerous decisions from both district and appellate courts. The class is made up of millions of merchants throughout the country, seeking changes to policies that they allege have resulted in damages starting in 2004. *See DDMB*, 2021 WL 6221326, at *12. As the Court previously noted with respect to preliminary approval of the Damages Class settlement, the case has involved hundreds of depositions, many expert reports, and extensive work by class counsel leading to many millions of dollars' worth of attorneys' fees. *See Interchange Fees III*, 330 F.R.D. at 36. Prior to this motion for preliminary approval of the Settlement, the parties filed numerous *Daubert* motions and motions for summary judgment in 2020, which the Court decided in multiple, lengthy decisions. *See In re Payment Card*, 2022 WL 15053250; *In re Payment Card*, 2022 WL 15044626; *Interchange Fees IV*, 2024 WL 278565; *Interchange Fees V*, 2024 WL 1014159; *In re Payment Card*, 2024 WL 1142860; *Interchange Fees VI*, 2024 WL 1556931. These complex issues would need to be relitigated at trial, and would likely be raised

45

again on appeal.  *See Sykes v. Harris*, No. 09-CV-8486, 2016 WL 3030156, at *12 (S.D.N.Y. May 24, 2016) ("[E]ven if [Class] Plaintiffs were to prevail at trial, post-trial motions and the potential for appeal could prevent the class members from obtaining any recovery for several years, if at all.")

Because of the complexity and difficulty of the issues in this case, it requires — and would continue to require — costly counsel and experts, as well as a wealth of time from all parties.  This subfactor is likely to weigh in favor of granting final approval.

### B.   The risks of establishing liability

Plaintiffs argue that this *Grinnell* factor weighs in favor of approving the Settlement because "[m]any of the risk factors identified by this Court in connection with the preliminary approval of the 23(b)(3) class settlement remain."  (Pls.' Mem. 40.)  In support, Plaintiffs emphasize that the issues raised by the Supreme Court's decision in *Amex* — issues that the Court addressed at the summary judgment stage, *Interchange Fees IV*, 2024 WL 278565 — still present substantial obstacles to establishing liability at trial.  (Pls.' Mem. 40.)  Plaintiffs note that although they successfully defended against Defendants' summary judgment motion on the issue, a trial would require that Plaintiffs prove by a preponderance of the evidence that Defendants' conduct resulted in harm in a two-sided market.  (*Id.* at 40–41.)  Plaintiffs point to the trial in the *Amex* case, noting that plaintiffs in that case prevailed at trial only after a seven-week bench trial.  (*Id.* at 41 (citing *United States v. Am. Express Co.*, 88 F. Supp. 3d 143 (E.D.N.Y. 2015)).)

Similarly, Plaintiffs argue that the issues raised in Defendants' other summary judgment motions would present further issues if raised at trial.  Plaintiffs note that Defendants raised issues around whether "any structural conspiracies stemming from the old joint ventures owned

by the banks were fundamentally altered and eliminated by changes in ownership structures." [37] (*Id.* at 40–41.)  The Mastercard and Bank Defendants also "raised complex issues as to whether Mastercard has sufficient market power to restrict credit or debit transaction output to increase prices above competitive levels."  (*Id.* at 41.)  Although Plaintiffs successfully defended against summary judgment motions on these bases, they argue that they face a heightened risk of failure if forced to litigate these issues at trial.  (*Id.*)

Finally, Plaintiffs argue that even if they were to prevail at trial, the *Amex* litigation — as well as prior appeals in this case — demonstrate that "[i]f they lost at trial, Defendants would undoubtedly appeal."  (*Id.*)  In support, Plaintiffs again point to *Amex*, noting that although plaintiffs in that case prevailed at trial, the Second Circuit reversed based on the plaintiffs' failure to establish harm to competition in a two-sided market — a ruling that the Supreme Court affirmed.  (*Id.* at 41–42 (first citing *United States v. Am. Express Co.*, 838 F.3d 179 (2d Cir. 2017); and then citing *Ohio v. Am. Express Co.*, 585 U.S. 529 (2018) (*Amex*)).)  Highlighting that "[n]ine years after the [d]istrict [c]ourt opinion in [*Amex*], the American Express-accepting merchants have received zero injunctive relief," Plaintiffs argue that the Settlement "provides substantial relief to all class members without subjecting them to the substantial risks, complexity, lengthy delays, and expense of continuing litigation."  (*Id.* at 42.)  At the hearing, Plaintiffs also noted that, even if they prevailed at trial, the Court may not grant their requested relief, such as elimination of the Honor All Cards rule.  (Hr'g Tr. 7:18–8:4.)

---

[37] "[I]n 2008 and 2006, respectively, initial public offerings ('IPOs') converted [Visa and Mastercard] from a consortium of competitor banks into single-entity, publicly traded companies with no bank governance."  *Interchange Fees I*, 986 F. Supp. 2d at 215.

47

"This factor does not require the [c]ourt to adjudicate the disputed issues or decide unsettled questions; rather, the [c]ourt need only assess the risks of litigation against the certainty of recovery under the proposed settlement." *In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. at 459 (citing *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 177 (S.D.N.Y. 2000), *aff'd sub nom. D'Amato*, 236 F.3d 78). "Courts approve settlements where plaintiffs would have faced significant legal and factual obstacles to proving their case." *Id.*

In the Court's 2019 decision granting preliminary approval of the settlement between the 23(b)(3) class and Defendants, the Court focused on numerous evidentiary, procedural, and legal hurdles that the class had yet to overcome, all of which the Court noted "may increase the risk that Class Plaintiffs face in establishing liability." *See Interchange Fees III*, 330 F.R.D. at 38. Prior to the summary judgment motions, for example, plaintiffs (both the Equitable Relief Class and the Damages Class that settled in 2019) faced "legal uncertainty" because of the Supreme Court's decision in *Amex*; specifically, it was still unclear whether plaintiffs' theory of liability was supported by enough evidence of harm to competition in a two-sided market. *Id.* at 38–39; *Interchange Fees IV*, 2024 WL 278565, at *12–35.

Plaintiffs' claims have survived numerous *Daubert* and summary judgment motions, and while the issues addressed at summary judgment would likely be raised again at trial, what remains to be determined is only the sufficiency of the evidence, rather than the legal sufficiency of Plaintiffs' theories of liability. Stated differently, Plaintiffs' case is ready for trial — and this Settlement comes at a relatively late stage in this litigation.

For these reasons, the Court finds that this subfactor is likely to weigh against final approval of the Settlement.

48

### C.   The risks of maintaining the class through the trial

Although the "risk of maintaining a class through trial is present in [every] class action," *see Guippone v. BH S&B Holdings LLC*, No. 09-CV-1029, 2016 WL 5811888, at *7 (S.D.N.Y. Sept. 23, 2016), "this factor [nevertheless] weighs in favor of settlement" where "it is likely that defendants would oppose class certification" if the case were to be litigated, *Garland v. Cohen & Krassner*, No. 08-CV-4626, 2011 WL 6010211, at *8 (E.D.N.Y. Nov. 29, 2011); *see also In re Bear Stearns Cos., Inc. Sec., Derivative*, *& ERISA Litig.*, 909 F. Supp. 2d 259, 268–69 (S.D.N.Y. 2012) ("The risk that [the d]efendants could in fact succeed in their efforts to decertify the class militates in favor of settlement approval.").

Although the Court has already certified the Equitable Relief Class pursuant to Rule 23(b)(2), *see DDMB*, 2021 WL 6221326, at *50, the Court has the authority to review or modify the grant of certification at any point prior to trial, such that there is always a risk that the class may not be maintained through trial, *see* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment."); *In re NASDAQ Mkt.-Makers*, 187 F.R.D. 465, 476–77 (S.D.N.Y. 1998) (noting that "there is no guarantee that this class would not be decertified before or during trial" and stating that "if the [c]lass were to be decertified at trial, or if class certification were to be reversed on appeal, the class members (other than a few dozen plaintiffs) would recover nothing at all").  Nevertheless, none of the Defendants in this case have indicated an intention to move for decertification of the class. Although the Court has the authority to reconsider, the Court sees no basis to think that continued litigation would lead to disputes over class certification.

For these reasons, the Court finds that this subfactor is likely to be neutral in considering whether to grant final approval.

49

### D. The range of reasonableness of the settlement in light of the best possible recovery and all the attendant risks of litigation

Plaintiffs argue that the two "range of reasonableness" factors weigh in favor of preliminary approval because the Settlement provides "meaningful benefits to the Class [that] are very substantial." (Pls.' Mem. 49.) Plaintiffs contend that "the equitable relief provided by the Settlement far exceeds the value of other Rule 23(b)(2) only settlements that have routinely received preliminary and final approval over decades of antitrust and other class action litigation." (*Id.*) They further argue that continued litigation would mean that "the merchant class would continue to pay tens of billions annually in interchange fees," while the Settlement would offer them definite equitable relief. (*Id.*)

In support of the surcharging relief offered in the Settlement, Plaintiffs argue that "overwhelming primary evidence" shows that surcharging is an effective method of encouraging competition, pointing to expert evidence suggesting that "the Honor All Cards Rule would not be objectionable if surcharging were allowed." (Pls. Reply 9–10 (emphasis, citation, and alteration omitted).) Although some objectors raise the possibility of customer backlash at the point of sale if they impose surcharges on their customers, Plaintiffs argue that these same objectors "offer no explanation as to how merchants would encounter any less backlash or friction if the [Honor All Cards] rule were repealed and merchants therefore altogether declined the customer's proffered Visa card issued by a particular bank." (*Id.* at 12.) Next, in support of the changes to the level-playing-field rules, Plaintiffs argue that the Settlement would "permit[] merchants to surcharge Visa or Mastercard credit cards up to 1% regardless of whether the merchant surcharges any other cards." (*Id.* at 16.) With respect to the limits on surcharging that result from American Express' rules, Plaintiffs contend that the changes to Visa's and Mastercard's level-playing-field restrictions "make[] clear to merchants and to antitrust enforcers . . . that, going forward, the *only*

50

impediment to free and full surcharging of all credit cards in the United States is American Express and its rules." (*Id.*) Finally, in defense of the changes to the Honor All Wallets provision, Plaintiffs argue that the Settlement "expressly prohibits the networks from requiring merchants to accept third-party digital wallets that contain a Visa or Mastercard card," and permits networks to require acceptance of Visa or Mastercard cards "in a digital wallet that the network might hypothetically produce in the future" only if that merchant accepts traditional Visa or Mastercard cards. (*Id.* at 19–20.)

Target Plaintiffs argue that the Court's initial certification of the mandatory class under Rule 23(b)(2) was premised "on the fact that the Class Complaint challenged a series of restraints, including the [Honor All Cards] rules and 'default' interchange rules." (Target Objs. 21.) They note that the Second Circuit has previously described several features of the Settlement as lacking any "meaningful value," referring to the "no discounting," "non-discrimination," and "all outlets" rules. (*Id.* at 22 (quoting *Interchange Fees II*, 827 F.3d at 238).) Target Plaintiffs further argue that the changes to the "honor all wallets" rules and the non-acceptance pilot programs permitted under the Settlement are insufficient relief because they leave in place the Honor All Cards provisions that the Target Plaintiffs would continue to challenge if allowed to pursue their injunctive claims. (*Id.* at 22–23.) In addition, Target Plaintiffs argue that the surcharging relief offered in the Settlement is "limited" in that it "allows Defendants to prohibit surcharging at the issuer level, thus preventing merchants from employing a tactic they could use to generate competition among issuing banks." (*Id.* at 23–24.) Target Plaintiffs observe that any merchant that accepts American Express, and is therefore subject to its rules prohibiting surcharging without surcharging all debit cards, would have their ability to surcharge under the Settlement capped at 1%. (*Id.* at 24.) Target Plaintiffs contend that instead,

they should be allowed to continue seeking "an injunction *against* the Rules that enabled supracompetitive prices." (*Id.*) Finally, Target Plaintiffs argue that the rate caps and rollbacks proposed in the Settlement "are nothing more than an attempt to impose a *new* price fixing scheme" by Defendants. (*Id.* at 24–2829.) Pointing to the 7-basis point reduction in the average interchange, and the 4-basis point reduction in all posted interchange rates, Target Plaintiffs contend that the Settlement "allows Defendants to enter into special deals with certain merchants" that will ultimately "impair competition," all without reducing the interchange rate relative to that in place when the Target Plaintiffs filed their suit in 2013. (*Id.* at 27 (noting that each network's average rate has increased by one basis point per year over the last ten years).) Direct Action Plaintiffs reiterated these arguments at the hearing. (*See* Hr'g Tr. 22:23–25 ("[Plaintiffs are] being cute with you to say, well, we got rid of the level playing field, but AmEx still shackles the ability [of most merchants to surcharge up to the cost of acceptance.]"); *id.* at 26:9–11 ("[T]he merchants that don't pay posted rates, they get nothing from that portion of the rate relief."); *id.* at 31:21–23 ("[T]his agreement would be readily condemned, per se, if they did it in the ordinary course of business as a horizontal price-fixing agreement.").)

The 7-Eleven Plaintiffs argue that the Settlement Agreement "would effectively eliminate the 7-Eleven Plaintiffs' ability to secure Honor All Cards relief . . . providing in exchange only monetary relief in the form of rate 'caps' and limited surcharging relief, which is essentially worthless to the 7-Eleven Plaintiffs." (7-Eleven Objs. 26.) In support, they argue first, that the potential for changes to or elimination of the Honor All Cards, as well as for reductions to the default interchange rules, are being exchanged for surcharging relief that carries little value to them. (*Id.*) Second, they argue that the terms of the proposed Settlement Agreement amount to a court-sanctioned price-fixing arrangement that "protects and insulates Visa's and Mastercard's

Honor All Cards rules — the rules that would put downward competitive pressure on interchange — from challenge for the foreseeable future." (*Id.* at 33–34.) Third, they argue that neither Plaintiffs nor Defendants "attempt to explain why a 4-basis point reduction in their already inflated and supracompetitive posted interchange rates . . . is a fair, reasonable, or adequate outcome for class members whose claims are ready to proceed to trial after nearly 20 years of litigation." (*Id.* at 34.) Fourth, they argue that this 4-basis point reduction is "based on a wholly contrived number" that was "designed to mask Visa's and Mastercard's individual volume-weighted system-wide interchange rates for consumer credit transactions." (*Id.* at 34–35.) Fifth, they contend that this reduction is not reasonable relief in light of the Court's order denying Defendants' *Amex* summary judgment motion. (*Id.* at 35–36.) In support, they argue that the evidence considered at summary judgment shows that "under competition, the market-wide credit cards interchange likely would be less than 100 basis points," as opposed to the "fixed system-wide rates above ███ basis points" that the evidence reflects. (*Id.* (citing Decl. of Keith Leffler ("Leffler Decl.") App'x 5, Docket Entry No. 9180-1).) Where the evidence indicates that, absent the allegedly anticompetitive conduct, credit-card interchange rates could be more than 100 basis points lower than they currently are, the 7-Eleven Plaintiffs argue that the 4-basis point reduction offered in the Settlement Agreement is insufficient. (*Id.*)

Numerous other objectors similarly express their dissatisfaction with the Settlement's terms, arguing that the benefits offered have little value to them and that greater relief is achievable. (*See, e.g.*, Consumer Advocate Objs. 5 ("While the [S]ettlement would provide for temporary credit card interchange rate reductions of four basis points, this represents a tiny fraction of Visa and Mastercard's typical credit interchange rates which are generally set between 200 and 300 basis points."); Stmt. of Objs. by Amy Bogue 1 ("The proposed

53

[S]ettlement only reduces (temporarily) the fees that Visa and Mastercard fix on behalf of banks — not the network fees that go directly to Visa and Mastercard."); Stmt. of Objs. by Jon Frank Clark 1 ("The proposed reduction of the interchange rate is temporary and miniscule. When the current interchange rate is at a minimum of 200 basis points, a decrease of four points in three years and seven points in five years is of little consequence to the merchant and retailer."); Booksellers Objs. 2 (noting that the proposed rate decreases are "[n]ot only . . . meager and insignificant, they are also temporary"); Food Industry Ass'n Objs. 3 (opposing the Settlement because, *inter alia*, the basis point reductions "will not provide significant relief," the "honor-all-cards policy will continue without meaningful relief," and "[i]t restricts the legal rights of merchants and industry groups to challenge the anticompetitive credit card pricing model"); NATSO & SIGMA Objs. 2 ("Implementing surcharges merely positions the Associations' members as intermediaries collecting fees, rather than addressing the underlying issue of inflated fees mandated by payment processors."); Merch. Trade Grp. Objs. 2–3 ("The proposed [S]ettlement does not even approach the type of relief that is required here. The [S]ettlement agreement's minimal relief would always be inadequate without [elimination of Honor All Cards and default interchange rules], but it is particularly so *now* when the case is on the (relative) eve of trial after years of litigation."); Stmt. of Objs. by Thomas W. Foster 1 (objecting to the Settlement because its "changes are meager and temporary," it "does not stop cartel pricing and actually extends cartel pricing into the future," and it "pretends to deliver benefits that aren't real"); Wawa Objs. 1–3 (objecting to the Settlement because the rate reduction "represents a tiny fraction of the current rates," "Visa and Mastercard could potentially raise their own network fees to offset any potential savings to merchants and their customers," and "surcharging is not a quick fix because it has the potential implication of making merchants such as Wawa a toll

collector for the card companies").)  These objections represent only a sample of the issues raised, and the Court considers them all in assessing the reasonableness of the Settlement's proposed relief and comparing it to the relief sought by Class Members.

The range of reasonableness of the settlement in light of the best possible recovery, and the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation, are two *Grinnell* factors that are often combined for the purposes of analysis.  *See, e.g.*, *Interchange Fees I*, 986 F. Supp. 2d at 229–30; *Godson v. Eltman, Eltman, & Cooper, P.C.*, 328 F.R.D. 35, 58–59 (W.D.N.Y. 2018); *Ferrick v. Spotify USA Inc.*, No. 16-CV-8412, 2018 WL 2324076, at *5–6 (S.D.N.Y. May 22, 2018).  "In considering the reasonableness of the settlement fund, a court must compare 'the terms of the compromise with the likely rewards of litigation.'"  *Godson*, 328 F.R.D. at 58 (quoting *In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 384 (S.D.N.Y. 2013)).  "In order to calculate the 'best possible' recovery, the [c]ourt must assume complete victory on both liability and damages as to all class members on every claim asserted against each defendant in the [a]ction."  *Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*, No. 01-CV-11814, 2004 WL 1087261, at *5 (S.D.N.Y. May 14, 2004).  The range of reasonableness is "a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion."  *Wal-Mart Stores*, 396 F.3d at 119 (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)).

Some courts have decided that the range of reasonableness factors — along with several of the other *Grinnell* factors — do not apply where no monetary relief is sought.  *See, e.g.*, *Newkirk v. Pierre*, No. 19-CV-4283, 2022 WL 20358182, at *5 (E.D.N.Y. Oct. 25, 2022) ("The *Grinnell* factors relating to monetary damages (factor 5 [the risks of establishing damages]) and

55

the size of the judgment (*Grinnell* factors 7 [ability to withstand greater judgment], 8, and 9 [the range of reasonableness factors]) do not apply where, as here, [the p]laintiffs seek no monetary relief."); *Calibuso v. Bank of Am. Corp.*, 299 F.R.D. 359, 367 n.15 (E.D.N.Y. 2014) ("[W]here only non-monetary relief is being sought, more than one district court has suggested that 'the ability of the defendants to withstand a greater judgment' is not relevant to its determination."); *Ingles v. Toro*, 438 F. Supp. 2d, 203 211 (S.D.N.Y. 2006) ("In cases where the plaintiffs seek declaratory and injunctive relief rather than money damages, there is no need to examine the last three *Grinnell* factors.").  Other courts, however, have interpreted these factors more broadly to consider their weight even in cases where no monetary relief is sought.  *See, e.g.*, *Hyland*, 48 F.4th at 121 (affirming district court's consideration of "range of reasonableness" and "greater judgment" *Grinnell* factors when approving class settlement for equitable relief); *Wal-Mart Stores*, 396 F.3d at 119 (noting in considering this *Grinnell* factor that "the injunctive relief — valued at approximately $25 to $87 billion or more — adds great value to the [s]ettlement" (citation omitted)); *Campos v. Kijakazi*, No. 21-CV-5143, 2023 WL 8096923, at *7 (E.D.N.Y. Nov. 20, 2023) (observing, with respect to injunctive relief agreed to in a settlement agreement, that the defendant "would be well able to withstand a greater judgment").  The Court takes the latter approach and applies these *Grinnell* factors to the extent possible in assessing the Settlement.

The Court concludes that these two *Grinnell* factors weigh against preliminary approval of the Settlement.  As acknowledged above, (*supra* section II.b.iii.1.A–B), ongoing litigation inevitably carries risks, but whether those risks justify the proposed Settlement is a separate issue that requires comparing the relief offered by the Settlement's terms to the best possible recovery. *See Teachers' Ret. Sys.*, 2004 WL 1087261, at *5 ("In order to calculate the 'best possible'

recovery, the [c]ourt must assume complete victory on both liability and damages as to all class members on every claim asserted against each defendant in the [a]ction.").

In arguing for approval of the Settlement, Plaintiffs focus primarily on the surcharging relief, contending that "[t]he Settlement expands merchants' ability to surcharge Defendants' credit cards, from less than 20% of transactions to 96% of transactions." (Pls.' Reply 8.) Contrary to Plaintiffs' characterization of the surcharging provisions in the Settlement, the Court finds that the surcharging relief is too limited to justify approval of a settlement that does not provide most other forms of relief sought by other Class Members. As Target Plaintiffs point out, for example, the surcharging provisions would still prohibit surcharging at the issuer level, meaning that merchants still have no way to use surcharging (or credible threats thereof) to urge competition among issuing banks. (Settlement ¶¶ 28(a)–(d), 60(a)–(d); Target Objs. 23–24.) Moreover, in practice, any merchant that accepts American Express will be limited to surcharging a maximum of 1%, due to American Express' rules that prohibit surcharging unless debit cards are surcharged. (Settlement ¶ 28(a)–(b), 60(a)–(b).) While Visa and Mastercard cannot control American Express' surcharging rules, Visa's and Mastercard's rules that prohibit surcharging of debit cards, in tandem with American Express' rules that require surcharging of those cards, are what effectively limit a merchant's ability to surcharge to no more than 1%. Indeed, in concluding that the absent class members were inadequately represented in reaching the prior version of a settlement for the Class, the Second Circuit observed that "[m]erchants in the (b)(2) class that accept American Express or operate in states that prohibit surcharging gain no appreciable benefit from the settlement."[38] *Interchange Fees II*, 827 F.3d at 238.

---

[38] As discussed *supra*, note 12, numerous states have no-surcharging laws that may make it functionally impossible to comply with state laws while taking advantage of the Settlement's

Comparable limitations on surcharging exist in this Settlement and must be considered when objecting Class Members seek different forms of relief.

The Settlement also offers relief in the form of modifications to Visa's and Mastercard's Honor All Wallets rule, but such relief is a significantly limited form of the relief that several of the objecting Class Members seek: elimination of the Honor All Cards rules.[39]  As some objectors argue, the Settlement would require merchants to follow the Honor All Cards rules in accepting any digital wallet that is owned or operated by Visa or Mastercard.  (*See, e.g.*, 7-Eleven Objs. 13 ("[Class Counsel] have thus not only failed to address the core competitive issue in this case — the Honor All Cards rule — they have empowered the extension of those rules to digital wallets."); *see also* Settlement ¶ 24(b) (stating that any non-acceptance of digital wallets "cannot include a Visa-Branded Card provisioned in a digital wallet that is owned or operated by the Visa Defendants" if that transaction's terms are the same as those of non-digital wallet Visa transactions); *id.* ¶ 56(b) (same for Mastercard).)  The changes to the "All Outlets" rule and the "non-acceptance" pilot programs similarly give merchants the choice of accepting or declining all debit devices or all "Other" products from Visa or Mastercard.  (*See* Settlement ¶¶ 22–23, 54–

---

surcharging provisions.  The effects of these laws, therefore, cast doubt on Plaintiffs' representations that 96% of transactions will be eligible for surcharging.

[39]  In support of Plaintiffs' decision to prioritize surcharging relief over elimination of the Honor All Cards rule, Plaintiffs contend that elimination of the Honor All Cards rule would create significant "friction" for consumers at the point of sale:

> [T]hink about the friction that would occur if you eliminate[d] the Honor All Cards rule.  That is, Mrs. Jones is standing there with her groceries, there's a sign on the door that says ["W]e take Visa cards["], she gets to the check-out counter, and the counterperson says, ["W]ell, we don't take *that* Visa card because the Honor All Cards rule has been eliminated, we only take Chase-issued Visa cards and not any of the others.["]

(Hr'g Tr. 8:8–15 (emphasis added).)

55; *see also* Stiglitz Decl. ¶¶ 28–29.)  Although this change offers some merchants the option to test non-acceptance of some range of products at some of their outlets, merchants are still "saddled with another all-or-nothing choice" among card products.  (*See* Target Objs. 22.) Regardless of whether the objecting plaintiffs would successfully argue for the elimination of the Honor All Cards rule if allowed to proceed to trial, the fact that such relief has been continuously argued for, and would offer significantly more choice to all Class Members, suggests that the relief offered in the Settlement falls short of the "best possible" recovery.  *See Teachers' Ret. Sys.*, 2004 WL 1087261, at *5.

The reductions in posted and average interchange fees proposed in the Settlement similarly fall short of this bar.  As proposed, the Settlement would require Visa and Mastercard to lower all posted rates by at least four basis points, and to keep its average effective interchange rate at least seven basis points lower than the system-wide average as of March 31, 2024.  (Settlement ¶¶ 33–34, 66–666–7.)  However, as Plaintiffs' own experts acknowledge, "each network's average rate of credit interchange increase over the last [ten] years has been about one basis point per year."  (Stiglitz Decl. ¶ 40 (citing Leffler Decl. ¶ 24).)  This means that the proposed rollbacks, if strictly met, would maintain interchange rates above those in place while this litigation was ongoing, and above rates that many plaintiffs had already challenged as the result of anticompetitive restraints.  As reported by one of Plaintiffs' experts, the average Visa and Mastercard interchange rate in 2023 was about ███ basis points.  (Leffler Decl. ¶ 9 n.8.) Lowering this average rate by the amounts proposed in the Settlement would still keep interchange significantly above rates that experts in this litigation have previously described as an "upper limit" on what interchange fees might have been in the absence of the challenged competitive restraints.  (*See, e.g.*, Expert Rep. of Dr. Robert G. Harris ¶¶ 84, 86, 1197, 1201–

1203, annexed to Decl. of Rosemary Szanyi ("Szanyi Decl.") as SJDX391, Docket Entry No. 8526-12 (calculating a "ceiling" benchmark of █ basis points at which "issuers would remain profitable, . . . even with the lower interchange revenue"); *see also* Consumer Advocate Objs. 5 ("While the [S]ettlement would provide for temporary credit card interchange rate reductions of four basis points, this represents a tiny fraction of Visa and Mastercard's typical credit interchange rates which are generally set between 200 and 300 basis points.").) The rollbacks and rate caps offered in the Settlement, therefore, do not adequately compare to the "best possible" recovery such that these *Grinnell* factors weigh in favor of approving the Settlement to avoid the costs and risks of continued litigation.[40] *See In re GSE Bonds*, 414 F. Supp. 3d at 696 ("Whether these risks justify a settlement in the amount agreed to by [the] plaintiffs, however, requires analysis of the best possible recovery [the] plaintiffs could expect.").

　　Furthermore, many of the remaining terms of the Settlement are merely "clarifications" of rules that already exist or practices that the Settlement acknowledges are already permissible under Visa's and Mastercard's existing rules. For example, the "no discounting" and "non-discrimination" rules provision of the Settlement states that Defendants "shall continue to maintain their 'no discounting' and 'non-discrimination' Rules" already in place. (Settlement ¶¶ 18–19, 50–51.) Similarly, the "All Outlets" provisions states that "Defendants will continue

---

[40] Visa and Mastercard argue that "it is unreasonable to expect Visa and Mastercard to abandon the honor-all-cards and interchange rules that are central to the functioning of their networks." (Defs.' Mem. 8.) They argue that it is "a result so extreme that it is far from guaranteed even following a liability finding at trial," and that it therefore "cannot be the standard for approving this [S]ettlement." (*Id.*) The Court agrees that elimination of these rules cannot be the "standard" for approving the Settlement, but disagrees with Visa and Mastercard's contention that the Court must approve any Settlement to which Defendants agree, simply because they claim they would not agree to a more expansive settlement. The Court is obligated to compare the terms of the Settlement to the "best possible recovery" at trial — not to the best possible settlement to which Defendants would agree. *See In re GSE Bonds*, 414 F. Supp. 3d at 696.

to permit a merchant to decline acceptance" of specified categories of Visa and Mastercard card products.  (*Id.* ¶¶ 21, 53.)  The Merchant Buying Group provisions purport to "remove any restrictions" to the formation of such buying groups, but merchants are already allowed to form such buying groups, and the Settlement does not suggest otherwise.  (*See id.* ¶¶ 29–32, 61–64.)  Although the Settlement obligates Defendants to "conduct reasonable, *bona fide* negotiations" with any such Merchant Buying Groups that offer a proposal, (*id.* ¶¶ 30, 62), the provisions do not themselves offer merchants any more bargaining leverage than they previously had, (*see e.g.*, Consumer Advocate Objs. 7 ("[T]he option of forming buying groups is already available to merchants today, but they do not have the leverage to compel Visa and Mastercard to strike fair and reasonable agreements with them and the proposed [S]ettlement would not obligate Visa and Mastercard to do that."); NATSO & SIGMA Objs. 2 (noting that while retailers can already organize buying groups under existing laws, "[t]here are no provisions in the proposed [S]ettlement that provide any leverage to retailers or any incentives for payment processors to engage in negotiations")).  These clarification provisions, therefore, do not weigh in favor of concluding that the Settlement offers Class Members the "best possible" recovery.

Finally, in comparing the Settlement's relief to the "best possible" recovery at trial, the insufficiency of the provisions detailed above is underscored by the Court's denial of Defendants' motion for summary judgment on all of Plaintiffs' claims of anticompetitive conduct.  *See Interchange Fees IV*, 2024 WL 278565.  While the Court is free to simply "assume complete victory . . . as to all class members on every claim" when determining the "best possible" recovery, *Teachers' Ret. Sys.*, 2004 WL 1087261, at *5, the Court notes that substantial evidence has already been found to create at least a triable issue of fact as to whether the challenged restraints that are left unchanged by the Settlement (*i.e.*, Honor All Cards and

61

high interchange rates) are anticompetitive in violation of federal antitrust laws. *See Interchange Fees IV*, 2024 WL 278565, at *29 ("[T]he Court cannot conclude, on this evidence, that Plaintiffs have failed to meet their burden in raising a triable question of fact as to whether prices are higher than one would expect to find in a competitive market."). Accordingly, in comparing "the terms of the compromise with the likely rewards of litigation," the Court cannot conclude that these two *Grinnell* factors weigh in favor of approving the Settlement in order to avoid the risks of litigation. *See Godson*, 328 F.R.D. at 58 (quoting *In re Citigroup*, 965 F. Supp. 2d at 384).

### 2. Effectiveness of distributing relief to the class

This factor requires courts to look at "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." Fed. R. Civ. P. 23(e)(2)(C)(ii). The Court does not consider this factor where the only relief sought is equitable, and no method of distribution is required. *See, e.g.*, *Newkirk*, 2022 WL 20358182, at *4–7 (lacking any discussion of this factor when assessing settlement for equitable relief); (*see also* Pls.' Mem. 43 (observing that "the proposed Settlement[ ]involves equitable relief only," and that "relief will be effectuated by the settlement terms alone")).

### 3. The terms of any proposed award of attorneys' fees

This factor directs courts to examine "the terms of any proposed award of attorneys' fees, including timing of payment." Fed. R. Civ. P. 23(e)(2)(C)(iii). "This review provides a backstop that prevents unscrupulous counsel from quickly settling a class's claims to cut a check." *Moses*, 79 F.4th at 244 (quoting *Fresno Cnty. Emps.' Ret. Ass'n v. Isaacson/Weaver Fam. Tr.*, 925 F.3d 63, 72 (2d Cir. 2019)). "The symbiotic review of proposed relief and attorneys' fees aligns with '[t]he express goal of [the Second Circuit's] *Grinnell* opinions

[which] was to prevent unwarranted windfalls for attorneys.'"  *Id.* (first and third alterations in original) (quoting *Goldberger*, 209 F.3d at 49).

In cases where attorneys' fees and service awards come from a common fund to be awarded to a class, the Court must carefully review the award to protect the interests of absent class members.  *See, e.g.*, *Wal-Mart Stores*, 396 F.3d at 12–24 (observing that "settlement payments to approximately five million absent class members [were] at stake" in the course of assessing attorneys' fee award); *Goldberger*, 209 F.3d at 50 (setting forth factors that determine the reasonableness of a common fund fee).  Where attorneys' fees and costs are not paid from a common fund, and money paid to attorneys is "entirely independent" of any award to class members, "the [c]ourt's fiduciary role in overseeing the award is greatly reduced, because there is no conflict of interest between attorneys and class members."  *Sow v. City of New York*, No. 21-CV-533, 2024 WL 964595, at *6 (S.D.N.Y. Mar. 5, 2024) (quoting *McBean v. City of New York*, 233 F.R.D. 377, 392 (S.D.N.Y. 2006)).

The Settlement provides that within twenty days of the Court's approval of any attorneys' fees application, Defendants will pay the approved amounts "up to $170,000,000," with Visa Defendants paying up to two-thirds of the approved amount and Mastercard Defendants paying up to one-third.  (Settlement ¶ 11.)  Although not separately provided for, the Settlement defines "Attorneys' Fees and Expenses" to include "any incentive or service awards to be paid to a Rule 23(b)(2) Class Plaintiff."  (*Id.* ¶ 1(c).)  The terms of Defendants' payment of attorneys' fees and any approved service awards "were not discussed until after the Parties had agreed to all material terms of the Settlement regarding the relief for the Equitable Relief Class."  (Class Counsel Decl. ¶ 117.)

The Court concludes that the terms of any proposed attorneys' fees agreed to by the parties raise no issues with respect to whether the interests of the Class Members are adequately protected. *See, e.g.*, *Kurtz*, 2024 WL 184375, at *8 ("Because the attorneys' fee award will not affect the [c]lass's recovery, the [c]ourt finds this aspect of the [s]ettlement adequately protects the [c]lass's interests.").

### 4. Release from liability

Plaintiffs argue that the release "is carefully limited to claims for injunctive or declaratory relief," (Pls.' Mem. 30), and contend that the release "may properly 'release claims that were or could have been pled.'" (Pls.' Reply 37 (quoting *Wal-Mart Stores*, 396 F.3d at 106–107)). Plaintiffs argue that the release satisfies the "identical factual predicate" test because it "is expressly limited to claims that were or could have been brought in the litigation, and to rules that are in existence as of December 18, 2020," and is "further limited because it does not apply at all to damage[s] claims." (*Id.* at 37–38.) In addition, Plaintiffs argue that the release addresses the Second Circuit's concerns with the 2013 Settlement because "[t]he expiration of this Settlement's relief is exactly coterminous with that of the release." (Pls.' Mem. 28 ("[T]he Second Circuit was troubled [by the 2013 Settlement] because all of the injunctive relief expired on July 20, 2021, while the release operated in perpetuity.").) Plaintiffs argue that under this Settlement (unlike the 2013 Settlement, which would have bound future merchants), "some future merchants — those that come into existence after final approval of the Settlement — will not be members of the class and therefore not bound by the release, but will nevertheless benefit from the Settlement's relief." (*Id.* at 29 (citation omitted).) Finally, Plaintiffs argue that the release does not violate public policy because it does not "release[] all types of claims, including

'future' entirely unrelated antitrust claims not circumscribed to an identical factual predicate."
(Pls.' Reply 38 (quoting *In re Payment Card*, 2019 WL 6875472, at *4).)

Target Plaintiffs argue, first, that the release is "unfair" and "discriminatory," because it confiscates their equitable claims without compensation. (Target Objs. 6–7.) Second, Target Plaintiffs challenge the timing of the release, claiming that the Settlement "preemptively enforces the release *before* [it] has received final approval." (*Id.* at 6.) Third, Target Plaintiffs contend that the release could serve as a "cap or bar" on the damages they will be able to recover — which could cost them "potentially billions of dollars of uncompensated damage[s]." (*Id.* at 8–9.)

7-Eleven Plaintiffs argue that "[t]here is no authority approving a release of present or future *individualized* claims without granting class members the right to opt out." (7-Eleven Objs. 18 (emphasis added).) Regarding the scope of the release, 7-Eleven Plaintiffs contend that the Settlement "releases claims against . . . all of the policies in Defendants' massive rulebooks, their unwritten policies and practices, and any future rules, policies, or practices that are 'substantially similar.'" (*Id.* at 23.)

Walmart argues that the Settlement forces them and other large merchants "to release future claims — both for continuing violations of the antitrust laws, and for as-yet-unknown future rules and conduct that violate the antitrust laws for a period of five years after final approval of the [S]ettlement." (Walmart Objs. 3 (emphasis omitted).) In addition, Walmart contends that the release "would have this Court grant the Defendants free license to continue to overcharge all merchants for at least five more years into the future," and that it would eliminate the ability of large merchants "to challenge Defendants' Honor All Cards rules — thereby negatively impacting the market as a whole." (*Id.* at 4, 6.) Walmart argues that the Settlement

"hand[s] over to Defendants" a release from "unknown claims, hidden claims, and concealed claims, including claims covered by California Civil Code Section 1542," and objects to "the broad release of claims that are not at the core of this lawsuit — such as claims relating to any corporate restructuring and IPOs of the Defendants . . . and sweeping in to the definitions of 'Released Parties' and 'Releasing Parties' future entities that were not part of this litigation." (*Id.* at 14 & n.10.)  Finally, Walmart argues that "[p]rospective waivers of private antitrust claims are prohibited by the letter of the antitrust laws," and that the "Supreme Court has expressed 'little hesitation' in condemning' an agreement that 'operate[s] . . . as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations." (*Id.* at 15 (second and third alterations in original) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985)).)

The National Retail Federation and the Retail Industry Leaders Associations (collectively, the "Merchant Trade Groups") argue that the Settlement's "release forces all class members to waive all injunctive claims . . . irrespective of whether those claims relate to the misconduct at issue."  (Merch. Trade Grp. Objs. 2.)  They contend that the release "insulates Defendants from any future litigation that 'could have been alleged or raised' in this [litigation] no matter how distant from the allegations in the complaint," and that the release therefore "does not appear to have limits."  (*Id.* at 5.)  In addition, the Merchant Trade Groups object to the fact that the release will bind merchants that have not yet come into existence, which they assert is a violation of due process.  (*Id.* at 2, 5–6.)  In the context of a Rule 23(b)(2) mandatory class action, the Merchant Trade Groups observe that the Court recognized that "'voice' replaces 'exit' as the operable means of class member involvement."  (*Id.* at 5 (quoting *DDMB*, 2021 WL 6221326, at *35).)  The Merchant Trade Groups, however, assert that "many future businesses

that . . . come into existence between the deadline for lodging objections and final approval" will be deprived of "both voice *and* exit."[41] (*Id.* at 6; *see also id.* ("Future merchants that come into existence after the deadline for objections has expired but before [judgment] has been entered will have no notice of settlement, no voice to object, and no ability to exit.").) Finally, the Merchant Trade Groups argue that release of future claims "[m]ay [v]iolate the Sherman Act," and contend that the "Court should not decide whether to grant preliminary approval . . . until after the Supreme Court has had [the] opportunity to review" the pending petition for a writ of certiorari filed in *Home Depot U.S.A., Inc. v. Blue Cross Blue Shield Association*, No. 23-1063, 2024 WL 1343252 (Mar. 26, 2024).[42] (*Id.* at 6–7.)

"[T]he law is well established in this Circuit and others that class action releases may include claims not presented and even those which could not have been presented as long as the released conduct arises out of the 'identical factual predicate' as the settled conduct." *Melito v. Experian Mktg. Sols.*, 923 F.3d 85, 95 (2d Cir. 2019) (quoting *Wal-Mart Stores*, 396 F.3d at 107); *see also TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982) (setting forth the "identical factual predicate" standard and noting that the Second Circuit had "previously 'assume[d] that a settlement could properly be framed so as to prevent class members from subsequently asserting claims relying on a legal theory different from that relied upon in the class action complaint but depending upon the very same set of facts'" (alteration in

---

[41] The Merchant Trade Groups argue that "the cleanest end point for a Rule 23(b)(2) class here would be the preliminary approval date." (Merch. Trade Grp. Objs. 6 n.3.)

[42] Petitioners in *Home Depot* challenge the Eleventh Circuit's decision affirming an antitrust settlement in which the court concluded that "'no public policy prohibits prospective releases in antitrust cases,' including when the release 'perpetuate[s] conduct' challenged as anticompetitive." Petition for Writ of Certiorari, *Home Depot U.S.A., Inc. v. Blue Cross Blue Shield Ass'n*, No. 23-1063, 2024 WL 1343252, at *I (Mar. 26, 2024) (alteration in original).

original) (quoting *Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*, 660 F.2d 9, 18 n.7 (2d Cir. 1981))).

"[B]road class action settlements are common, since defendants and their cohorts would otherwise face nearly limitless liability from related lawsuits in jurisdictions throughout the country." *Interchange Fees II*, 827 F.3d at 240 (quoting *Wal-Mart Stores*, 396 F.3d at 106). However, releases cannot be boundless: "'[P]laintiffs in a class action may release claims that were or could have been pled in exchange for settlement relief'; but this authority 'is limited by the "identical factual predicate" and "adequacy of representation" doctrines.'" *Id.* at 236–37 (quoting *Wal-Mart Stores*, 396 F.3d at 106). Courts have denied preliminary approval where releases from liability are deemed to be overly broad. *See, e.g.*, *Sandoval v. Philippe N. Am. Rests. LLC*, No. 16-CV-615, 2017 WL 3841871, at *2 (S.D.N.Y. Aug. 31, 2017) (denying preliminary approval because the release was too broad and noting that "courts . . . routinely reject release provisions that 'waive practically any possible claim against the defendants, including unknown claims and claims that have no relationship whatsoever to [the statutory violation(s) asserted]'" (citation omitted)); *Oladapo v. Smart One Energy, LLC*, No. 14-CV-7117, 2017 WL 5956907, at *15 (S.D.N.Y. Nov. 9, 2017) (taking issue with the release for using the phrase "similar conduct" and finding it unacceptable that "the proposed release would extend to all claims that arise out of or relate to 'the conduct alleged in the [c]omplaints or similar conduct'" (quoting the release)), *report and recommendation adopted*, 2017 WL 5956770 (S.D.N.Y. Nov. 30, 2017); *Karvaly v. eBay, Inc.*, 245 F.R.D. 71, 88 (E.D.N.Y. 2007) (expressing concern that, "[a]s written, the release would constitute a waiver of claims completely unrelated to this action that could be brought under any of the statutes or common-law theories that [were] alleged" in the complaint).

In vacating the Court's approval of the 2013 Settlement, the Second Circuit expressed concern over that settlement's broad release provisions, noting that then-joint (b)(2) and (b)(3) class plaintiffs' authority to "'release claims that were or could have been pled in exchange for settlement relief' . . . '[was] limited by the "identical factual predicate" and "adequacy of representation" doctrines.'" *Interchange Fees II*, 827 F.3d at 236–37 (quoting *Wal-Mart Stores*, 396 F.3d at 106).

### A.    The releases in the 2013 Settlement

In the 2013 Settlement negotiated on behalf of both the (b)(2) and (b)(3) classes, the parties negotiated separate releases for each class.  (*See* 2013 Settlement ¶¶ 31–38, 66–74, Docket Entry No. 1656-1.)  Both releases required the classes to "expressly and irrevocably waive, and fully, finally, and forever settle, discharge and release [Defendants] from any and all manner of claims, demands, actions, suits and causes of action, whether individual, class, representative, *parens patriae*, or otherwise in nature . . . ."  (*Id.* ¶¶ 33, 68.)  The (b)(2) class released claims "relating to the period after the date of the Court's entry of the Class Settlement Preliminary Approval Order," (*id.* ¶ 68), while the (b)(3) class released claims "which could have been alleged from the beginning of time until the date of the Court's" preliminary approval, (*id.* ¶ 33).

The Rule 23(b)(3) class, as defined in the 2013 Settlement, consisted of "persons, businesses and other entities that had accepted Visa-Branded Cards and/or Mastercard-Branded Cards at any point between January 1, 2004 and the settlement preliminary approval date."  (*Id.* ¶ 2(a).)  Thus, the Rule 23(b)(3) class was comprised of a finite class of merchants already in existence.  In addition, pursuant to Fed. R. Civ. P. 23(c)(2)(b)(vi), members of the Rule 23(b)(3)

class had an opportunity to exclude themselves from the class, or opt out, while class members certified under Rule 23(b)(2) were offered no such relief.

The Second Circuit found the releases to be evidence of inadequate representation, determining that holders of present claims, such as the (b)(3) class, and holders of future claims, such as the (b)(2) class, could not be jointly represented. *See Interchange Fees II*, 827 F.3d at 231; *id.* at 236–37 ("[T]he bargain that was struck between relief and release on behalf of absent class members is so unreasonable that it evidences inadequate representation."). The Second Circuit was primarily concerned about the release with respect to the (b)(2) class — which heightens this Court's scrutiny of the release in this Settlement. As discussed above, the Second Circuit was concerned that the (b)(3) class benefitted from the 2013 Settlement at the expense of the (b)(2) class. *See, e.g.*, *id.* at 240 (Leval, J., concurring) (taking issue with the terms of the settlement because "one class of Plaintiffs accepts substantial payments . . . in return for which they compel Plaintiffs in another class, who receive no part of the Defendants' payments, to give up forever their potentially valid claims, without ever having an opportunity to reject the settlement by opting out of the class"). The Second Circuit was concerned that "[m]erchants in the (b)(2) class that accept American Express or operate in states that prohibit surcharging [would] gain no appreciable benefit from the settlement, and merchants that begin business after July 20, 2021 [would] gain no benefit at all."[43] *Id.* at 238. The (b)(2) class release effectively meant that merchants that came into existence after the preliminary settlement approval date would be barred by the release from ever bringing certain claims, without having been a part of the process, and the Second Circuit expressed concern that some of the (b)(2) merchants

---

[43] The 2013 Settlement provided "that all of the injunctive relief will terminate on July 20, 2021." *Interchange Fees II*, 827 F.3d at 230.

"actually received nothing" for the release of their claims.  *Id.*  The Court compared the release

before it to the *res judicata* issues presented in *Stephenson v. Dow Chemical Co.*, 273 F.3d 249

(2d Cir. 2001), *aff'd in part, vacated in part*, 539 U.S. 111 (2003), which involved a class action

settlement fund that provided compensation for persons injured by Agent Orange and who had

discovered their injuries prior to 1994.  The panel in *Stephenson* held that the two individual

plaintiffs had not been adequately represented because the settlement extinguished their claims

without affording them access to recovery simply because they discovered their injuries after

1994.  *Stephenson*, 273 F.3d at 260–61 ("Because the prior litigation purported to settle all future

claims, but only provided for recovery for those whose death or disability was discovered prior

to 1994, the conflict . . . [with] the class representatives becomes apparent.  No provision was

made for post-1994 claimants, and the settlement fund was permitted to terminate in 1994."

(footnote omitted)); *see also Interchange Fees II*, 827 F.3d at 237 (analyzing *Stephenson* and

noting that "[t]he two challengers could not have been adequately represented if their class

representative negotiated a settlement and release that extinguished their claims without

affording them any recovery").

### B.   The release in the 2019 Settlement

The Court discusses the release in the 2019 Settlement to the extent it helps inform the

Court's analysis of the release in the Settlement currently before the Court.

The 2019 Settlement broadly released claims arising out of certain rules challenged in the

litigation and other rules that are substantially similar.  It specified that the (b)(3) class members

agreed to release "any claims arising out of or relating to" the allegations of the (b)(3) class

including "any interchange fees, interchange rates, or any Rule of any Visa Defendant or

MasterCard Defendant relating to interchange fees," (2019 Settlement ¶ 31(b)(i), Docket Entry

No. 7257-2), "any . . . 'honor all cards' rules . . . [or] rules or conduct relating to routing options regarding acceptance technology for mobile, e-commerce, or online payments, or development and implementation of tokenization standards," (*id.* ¶ 31(b)(iii)).  It further specified that reference to these rules "mean[t] those rules as they are or were in place on or before the Settlement Preliminary Approval Date and rules in place thereafter that are *substantially similar*."  (*Id.* ¶ 31(c) (emphasis added).)

The Court approved the 2019 Settlement over objections that it impermissibly released "future violations of the antitrust laws."  *In re Payment Card*, 2019 WL 6875472, at *22.  The Court noted that "it does not appear that the law restricts how far into the future claims can be released, as long as the released claims are based on the 'identical factual predicate' of the action at issue."  *Id.* at *25; *see also id.* ("Such releases are acceptable where the future claims releases are those based on a continuation of conduct at issue and underlying the original claims." (citing *Melito*, 923 F.3d at 95)).  Finally, the Court was "not persuaded by the argument that the release [was] void due to public policy protection of antitrust cases."  *Id.*  Ultimately, the Court found that "the cases relied on by objectors [were] inapposite."  *Id.* at *26.

In affirming this Court's approval of the 2019 Settlement, the Second Circuit noted, with apparent approval, that the 2019 Settlement released claims that accrued up to five years after the settlement became final.  *Fikes*, 62 F.4th at 714.  The Second Circuit also noted that the release was intended to comport with the "identical factual predicate" test.  *Id.* at 714–15.  Although objectors had argued that the release treated class members inequitably,[44] the Second Circuit

---

[44]  The Second Circuit characterized the objections as follows:

> **Rule 23(a)(4).**  Newer merchants, who started accepting payment cards only toward the end of the class period, are said to be inadequately represented in violation of Rule 23(a)(4) because their

found it did not have to address these concerns because of a "de-facto severability clause" in the release, "providing that the release 'extend[s] to, but only to, the fullest extent permitted by federal law.'"  *Id.* at 720 (citation omitted and alteration in original).  Accordingly, "[a] holding as to the proper scope of the release — *i.e.*, whether the future release violates federal law — can await a case in which the issue would directly affect the proceedings."  *Id.*

### C.    Analysis of the Settlement's release provisions

The Settlement would release all Defendants "from any and all manner of claims, demands, actions, suits, and causes of action, . . . to the extent that they seek any form of declaratory, injunctive, or equitable relief" that relates to any conduct that was or could have been alleged or raised in this case.  (Settlement ¶ 82(a).)  The release also contains the "de-facto severability clause" described by the Second Circuit: "this release shall extend to, but only to, the fullest extent permitted by federal law."  (*Id.*)  Finally, the release covers any potential causes of action that may have accrued as of the Settlement Approval Date and for five years after the commencement of the Average Effective Rate Limit.  (*Id.*)

Contrary to the Target Plaintiffs' arguments, the Court finds that the release does not confiscate their equitable claims without compensation.  As discussed below, such an objection

---

interests diverged from those of the class representatives, all of which had accepted Visa and/or [Mastercard] for the full fifteen-year class period, and therefore had incentive to forgo five years (or more) of future claims in exchange for the cash that would afford newer merchants no more than a marginal recovery.

**Rule 23(e)(2)(D).**  Relatedly, it is contended that the future release results in inequitable treatment among the class members in violation of Rule 23(e)(2)(D) because it requires class members to forgo relief for the same length of time, regardless of whether the class member was in business for fifteen years of the class period, or for the final month only.

*Fikes*, 62 F.4th at 720.

is more properly directed at the release in the 2019 Settlement, which was already affirmed by the Second Circuit. (*See infra* section II.b.iv.) Moreover, as discussed above, the Court does not agree with Target Plaintiffs' and 7-Eleven Plaintiffs' contentions that the Settlement provides only "individualized" monetary relief, which is incompatible with a class action maintained pursuant to Rule 23(b)(2).[45] (*See supra* section II.b.i.1.)

Consistent with the Court's interpretation of the 2019 Settlement's release, the Court rejects the objectors' contentions that the release is overly broad, because it is constrained by the "identical factual predicate" test. (*See, e.g.*, 7-Eleven Objs. 23 (contending that the Settlement "releases claims against . . . all of the policies in Defendants' massive rulebooks, their unwritten policies and practices, and any future rules, policies, or practices that are 'substantially similar'"); Merch. Trade Grp. Objs. 5 (contending that the release "does not appear to have limits").) Similarly, the Court finds that the release does not impermissibly cover future violations of the antitrust laws. (*See, e.g.*, Walmart Objs. 3 (arguing that the Settlement forces merchants "to release future claims — both for continuing violations of the antitrust laws, and for as-yet-unknown future rules and conduct that violate the antitrust laws for a period of five years after final approval of the [S]ettlement" (emphasis omitted)).) As noted in approving the 2019 Settlement, "[s]uch releases are acceptable where the future claims releases are those based on a continuation of conduct at issue and underlying the original claims." *In re Payment Card*,

---

[45] For example, Target Plaintiffs assert that the Settlement provides "individualized monetary . . . relief," in part because the rate caps and rollbacks provisions of the Settlement will vary merchant-by-merchant in terms of how much benefit they provide based on, among other things, each individual merchant's transaction volume and whether it has negotiated interchange fees below the posted rates. (*See* Target Objs. 15 ("Because the [S]ettlement has now converted the Class's ostensible injunctive claims for *rules relief* — which is nowhere provided — into claims for additional, individualized monetary *rate relief* that is illusory, monetary claims also now predominate. Accordingly, the Rule 23(b)(2) class cannot proceed *without* the due process protection of the opt-out right that *Dukes* mandates.").)

2019 WL 6875472, at *25. The Second Circuit also recently explained that the issue of whether future releases violate federal law "can await a case in which the issue would directly affect the proceedings." *Fikes*, 62 F.4th at 720. This means that this question can properly be addressed at such time as a defendant seeks to enforce a release against a plaintiff in another action, because then "the issue would directly affect the proceedings." *Id.*

Finally, the Court agrees with the Merchant Trade Groups that the release is likely to violate the due process rights of future class members who come into existence and join the class between the deadline to raise objections and final settlement approval. (*See* Merch. Trade Grp. Objs. 2, 5–6.) These prospective class members will be deprived of both "voice" and "exit," which is incompatible with the strictures of Rule 23 and the Due Process Clause, because "class members are 'entitled to voice their concerns with the court prior to final approval.'" *DDMB*, 2021 WL 6221326, at *35 (quoting 2 Newberg on Class Actions § 4:26); *see also* Fed. R. Civ. P. 23(e)(5)(A) ("*Any* class member may object to the propose[d settlement] . . . ." (emphasis added)); *Richards v. Jefferson County*, 517 U.S. 793, 799 (1996) ("[T]he right to be heard ensured by the guarantee of due process 'has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest.'" (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950))). In addition, any class member that comes into existence after notice is sent to the class would be deprived of the right to be informed of a judgment to which she will be bound. Accordingly, the class period should end at the date of preliminary approval rather than the final approval date, and the Court amends the class definition as follows:

75

> [The] Rule 23(b)(2) class consist[s] of all persons, businesses, and
> other entities that accept Visa and/or Mastercard credit and/or debit
> cards in the United States at any time during the period between
> December 18, 2020 and the date of ~~entry of Final Judgment in this
> case~~ **preliminary settlement approval**.

*DDMB*, 2021 WL 6221326, at *50 (with alterations).

### iv.    Equitable treatment of class members relative to one another

Plaintiffs argue that the "Settlement will provide the same equitable relief to all Class

members," and, "therefore[,] relief would be effected on a classwide basis." (Pls. Mem. 45.)

Plaintiffs assert that "[d]ue to the nature of the relief being sought, all merchants w[ill] benefit

from the equitable relief provided." (*Id.*) In support, Plaintiffs note that "[t]he vast majority

(96%) of merchants will be able to surcharge Visa and/or Mastercard credit-card transactions up

to 1%," and, "*every* merchant will benefit from the extended ability to discount cards at the point

of sale, decline acceptance of digital wallets, conduct acceptance experiments, use the merchant-

education services, participate in viable buying groups, and partake in the $29.79 billion in rate

relief." (*Id.* at 45–46.) Plaintiffs further argue that "Rule 23(b)(2) does not require that the relief

to each member of the class be identical, only that it is beneficial." (Pls.' Reply 26 (internal

quotation marks omitted) (quoting *Barrows v. Becerra*, 24 F.4th 116, 132 (2d Cir. 2022)).)

Responding to the objectors' arguments, Plaintiffs assert that the benefits to Class Members "will

. . . vary only by degree," which they contend is "not a valid basis for objection." (*Id.* at 26–27.)

Target Plaintiffs argue that the Settlement "treats the Target Plaintiffs . . . inequitably and

discriminates against them." (Target Objs. 3.) First, Target Plaintiffs argue that "[t]he stay and

injunction terms of the [S]ettlement . . . uniquely affect and harm the Target Plaintiffs, the

[Direct Action Plaintiffs], and their trial-ready claims," because it "preemptively enforces the

release *before* the [S]ettlement has received final approval," and stays their litigation pending

final approval.[46]  (*Id.* at 6.)  They assert that "*only* the Target Plaintiffs and [Direct Action

Plaintiffs] are affected by those terms — especially now that their claims are ready for trial."

(*Id.*)  Second, Target Plaintiffs argue that the Settlement "seeks to release the Target Plaintiffs'

ability to control their valuable injunctive relief claims in exchange for *nothing*."[47]  (*Id.* at 10.)

Finally, Target Plaintiffs contend that "the surcharging relief and the other rate 'relief' is highly

individualized," because not all merchants will be able to surcharge and some merchants have

already negotiated lower rates.  (*Id.* at 12–17.)

      7-Eleven Plaintiffs argue that "an involuntary class is consistent with due process only

when the class seeks an indivisible injunction that will benefit the class as a whole."  (7-Eleven

Objs. 3 (citing *Dukes*, 564 U.S. at 360).)  They contend that "[t]he Proposed Mandatory

Settlement fails that standard," because "surcharging relief is not available to a portion of the

class, and it will provide little or no benefit to many other class members, including the 7-Eleven

Plaintiffs."  (*Id.*)  With respect to interchange fees, 7-Eleven Plaintiffs argue that "the rate 'relief'

---

[46]  Grubhub Plaintiffs argue similarly:
> The fact that the [Settlement] includes provisions staying and
> enjoining the Grubhub Plaintiffs for proceeding — contrary to the
> stipulation and to the Grubhub Plaintiffs' interest in a prompt trial
> of their damages claims — indicates that the true purpose of those
> provisions is to punish the Grubhub Plaintiffs for exercising their
> rights to opt out of the Rule 23(b)(3) class . . . .

(Grubhub Objs. 4.)

[47]  Target Plaintiffs contrast their position with that of most class members who "released
their individual injunctive relief claims and were compensated for that release through their
participation in the Rule 23(b)(3) settlement fund — agreeing, in exchange for that
compensation, only to pursue injunctive relief through the Rule 23(b)(2) class, which is by nature
limited to class-wide injunctive relief, rather than the plaintiff-specific relief sought by the Target
Plaintiffs."  (Target Objs. 10.)

in the . . . Settlement is highly individualized," because "[m]erchants that do not pay posted rates will receive no benefit from the 4-basis-point reduction in posted rates."[48] (*Id.* at 18.)

"Equitable treatment" pursuant to Rule 23(e)(2)(D) "include[s] whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief." Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment. According to the Second Circuit, "[i]t bears emphasis that Rule 23(e)(2)(D) requires that class members be treated *equitably*, not identically." *Moses*, 79 F.4th at 245. In addition, "the relief to each class member in a Rule 23(b)(2) action need not 'be identical, only . . . beneficial.'" *Berni*, 964 F.3d at 147 n.28 (alteration in original). "That means that different class members can benefit differently from an injunction — but no matter what, they *must* stand to benefit (it cannot be the case that some members receive no benefit while others receive some)." *Id.*

Where settlement funds are distributed *pro rata*, courts routinely find that this factor weighs in favor of approval. *See, e.g.*, *Zaslavskiy v. Weltman, Weinberg & Reis Co.*, No. 18-CV-4747, 2022 WL 1003589, at *8 (E.D.N.Y. Jan. 5, 2022), *report and recommendation adopted*, No. 18-CV-4747 (E.D.N.Y. Jan. 25, 2022); *Mikhlin v. Oasmia Pharm. AB*, No. 19-CV-4349, 2021 WL 1259559, at *8 (E.D.N.Y. Jan. 6, 2021); *In re Namenda Direct Purchaser Antitrust*

---

[48] Direct Action Plaintiffs also reiterated many of these arguments at the hearing. (*See, e.g.*, Hr'g Tr. 26:7–11 ("[T]he merchants that don't pay posted rates . . . get nothing from [the four-basis-point] rate relief."); *id.* at 30:1–10 ("[W]e see no value in this settlement and the claim that [matters] to us at the injunctive and declaratory relief level are being confiscated. . . . There's an easy fix to this. Let us opt out. Let us opt out and let us take our claims going forward.").)

*Litig.*, 462 F. Supp. 3d 307, 316 (S.D.N.Y. 2020) (noting that the settlement "allocate[d] funds among [c]lass members on a *pro rata* basis, which courts uniformly approve as equitable").

In related contexts, the Supreme Court and the Second Circuit have cautioned against class certification and settlement approval where differently situated class members were treated inequitably relative to one another. In *Ortiz,* for example, the Supreme Court rejected a settlement that treated all claimants equally, although some plaintiffs had claims that were more valuable. *See* 527 U.S. at 857; *see also Interchange Fees II*, 827 F.3d at 232 ("A second fatal deficiency in the *Ortiz* settlement was that all present claimants were treated equally, notwithstanding that some had claims that were more valuable."). In *Fikes*, at least one judge took issue with a future release provision in the 2019 Settlement, which "caused class members to be treated inequitably relative to each other." 62 F.4th at 730 (Jacobs, J., concurring) ("It is arguable that the future release: (A) resulted in newer merchants receiving inadequate representation from the class representatives; (B) caused class members to be treated inequitably relative to each other; and therefore (C) should be stricken from the settlement agreement. Ordinarily, [the Second Circuit] would reject a settlement which involved . . . inequitable treatment."). Inequitable treatment can arise where differently situated class members are treated equally by a settlement. For example, the Second Circuit rejected a settlement in which differently-situated class members (holders of liquidated and unliquidated futures contracts) received the same benefit from the settlement (*i.e.*, were treated identically to holders of only liquidated contracts). *Nat'l Super Spuds*, 660 F.2d at 19. The Court noted that:

> An advantage to the class, no matter how great, simply cannot be bought by the uncompensated sacrifice of claims of members, whether few or many, which were not within the description of claims assertable by the class. Under the settlement a class member holding one liquidated and one unliquidated contract receives no more than another class member holding only one liquidated

79

contract.  Mere statement suffices to show how far this departs from
principles of equity.

*Id.*  The Court is guided by these precedents in evaluating whether the Settlement treats Class

Members equitably relative to one another.

For the following reasons, the Court agrees with the objectors that the Settlement does

not treat Class Members equitably relative to one another.  The Settlement provides the least

benefit to the merchants with the most valuable claims.  In this respect, it is akin to the inversion

of *pro rata* distribution.  (*See, e.g.*, 7-Eleven Objs. 4 (noting that 7-Eleven Plaintiffs paid over $2

billion in interchange fees in 2023); Walmart Objs. 5 n.5 (noting that Walmart paid interchange

fees to Visa and Mastercard on "the majority" of "$441.8 billion in U.S. net sales").)  The largest

merchants who pay the most in interchange fees are also the most likely to have negotiated

individual rates with either their Acquirers or the Networks directly.[49]  Because these merchants

do not pay posted rates, they are unlikely to receive any benefit from the "rate caps and

rollbacks."[50]  Similarly, large national merchants are more likely to accept American Express

and operate in states that prohibit surcharging, (*see, e.g.*, Walmart Objs. 4–7), and therefore,

these merchants "gain no appreciable benefit from the [S]ettlement," while merchants "that do

not take American Express and operate in states that permit surcharging . . . derive a potentially

substantial benefit."  *Interchange Fees II*, 827 F.3d at 238.  Together, these facts limit the ability

---

[49]  *See Interchange Fees I*, 986 F. Supp. 2d at 239 ("[S]ome of the very large merchants
have sufficient transaction volume that they can actually negotiate for their own, lower
interchange structures.")

[50]  Plaintiffs argue in response that "negotiations over reduced rates start from the posted
rates, so merchants that negotiate rates below the posted rates will also benefit from the caps and
rollbacks on posted rates."  (Pls.' Reply 27.)

of large merchants to benefit from the changes to the surcharge provisions.[51]  In addition, large

national merchants are unlikely to benefit from the "merchant buying group" provisions and

merchant education fund.  (*See, e.g.*, Walmart Objs. 2.)  Although the Court does not agree with

objectors' contentions that the Settlement is "essentially worthless," (7-Eleven Objs. 26),

"meaningless," (Walmart Objs. 2), or provides "no benefit," (Target Objs. 21; 7-Eleven Objs.

18), the Court finds that the benefits of the Settlement are likely to flow disproportionately and

inequitably to small, local merchants like the Class Representatives.[52]

This Court's concerns with the adequacy of the Settlement are similar to the concerns the

Second Circuit expressed regarding the 2013 Settlement in *Interchange Fees II*.  First, the

Second Circuit took issue with the fact that not all class members would benefit equally from the

surcharging provisions:

---

[51]  The Court recognizes that Walmart's and 7-Eleven's decisions not to surcharge are their decisions; they still benefit from the Settlement in that it gives them the option to surcharge, should they so choose.  However, the Court also recognizes that surcharging could be contrary to these merchants' brand image.  (*See, e.g.*, Walmart Objs. 2 ("[S]urcharging . . . would conflict with Walmart's 'Everyday Low Prices' business model.").)

[52]  As discussed in section II.b.iii, *supra*, the Court also notes that many of the small, local merchants who have objected to the Settlement also claim that surcharging is an ineffective remedy and that they have no interest in imposing surcharges on their customers.  For example, Jenny Osner, the owner of a grocery store in Conway Springs, Kansas, submitted the following comments regarding surcharging relief:

> As a proposed solution, the [S]ettlement would slightly increase my ability to impose surcharges when customers wish to pay with certain credit cards.  However, not only does this violate contracts I have with other credit card companies, but I also do not want to charge my customers to use a certain credit card.  *It makes me look like I am collecting a fee for credit card companies* [or] that I am just inventing these fees[,] rather than being forced to do so by Visa and Mastercard.

(Stmt. of Objs. by Jenny Osner 2; *see also, e.g.*, Stmt. of Objs. by Howard Kaminsky 2 (same); Stmt. of Objs. by Scot Kinne 2 (same); Stmt. of Objs. by Beth Laborie 1–2 (same).)

No one disputes that the most valuable relief the Settlement Agreement secures for the (b)(2) class is the ability to surcharge at the point of sale. To the extent that the injunctive relief has any meaningful value, it comes from surcharging, not from the buying-group provision, or the all-outlets provision, or the locking-in of the Durbin Amendment and DOJ consent decree. For this reason, it is imperative that the (b)(2) class in fact benefit from the right to surcharge. But that relief is less valuable for any merchant that operates in New York, California, or Texas (among other states that ban surcharging), or accepts American Express (whose network rules prohibit surcharging and include a most-favored nation clause). Merchants in New York and merchants that accept American Express can get no advantage from the principal relief their counsel bargained for them.

It may be argued that the claims of the (b)(2) class are weak and can command no benefit in settlement. However, that argument would seem to be foreclosed because other members of the same class with the same claims — those that do not take American Express and operate in states that permit surcharging — derive a potentially substantial benefit. There is no basis for this unequal intra-class treatment: the more valuable the right to surcharge (a point the parties vigorously dispute), the more unfair the treatment of merchants that cannot avail themselves of surcharging.

*Interchange Fees II*, 827 F.3d at 238. As with the 2013 Settlement, there are many merchants that will not be able to fully avail themselves of the benefits of surcharging in this Settlement because (1) they either operate in states that expressly or functionally prohibit surcharging, (*see supra* note 12 & accompanying text), or (2) because they accept American Express cards, (*see supra* section II.b.iii.1.D).

Because the Second Circuit had already observed that "the buying-group provision, [and] the all-outlets provision, [and] the locking-in of the Durbin Amendment and DOJ consent decree . . . w[ere] virtually worthless," the Court noted that other forms of relief would likely have been more beneficial to merchants:

This is not a case of some plaintiffs forgoing settlement relief. A significant proportion of merchants in the (b)(2) class are either legally or commercially unable to obtain incremental benefit from the primary relief negotiated for them by their counsel, and class

82

counsel knew at the time the Settlement Agreement was entered into that this relief was virtually worthless to vast numbers of class members. Alternative forms of relief might have conferred a real and palpable benefit, such as remedies that affected the default interchange fee or honor-all-cards rule. This is not a matter of certain merchants (*e.g.*, those based in New York and those that accept American Express) arguing that class counsel did not bargain for their preferred form of relief, did not press certain claims more forcefully, or did not seek certain changes to the network rule books more zealously. This is a matter of class counsel trading the claims of many merchants for relief they cannot use: they actually received nothing.

*Interchange Fees II*, 827 F.3d at 238.

Finally, the Court does not agree with the Target Plaintiffs' objection that Direct Action Plaintiffs — who have preserved their damages claims — are treated inequitably relative to other Class Members who released their damages claims in the 2019 Settlement. Target Plaintiffs contend that members of the (b)(3) class were compensated in *that* settlement by releasing their injunctive relief claims, except for those pursued by the Rule 23(b)(2) Class Plaintiffs. (Target Objs. 10.) Target Plaintiffs now complain that their "valuable injunctive claims" will be released by *this* Settlement without having received the same compensation that (b)(3) class members received. (*Id.* at 11.) This argument misses the mark for at least two reasons. First, all (b)(2) Class Members would be entitled to the same benefits from this Settlement regardless of their status as (b)(3) class members or opt-outs. With respect to the relief provided by the Settlement, nothing treats the Direct Action Plaintiffs differently for having opted out of the (b)(3) class.[53]

---

[53] Although the Direct Action Plaintiffs do not value the relief afforded by the Settlement, it is incontrovertible that they benefit from the Settlement insofar as the changes to Visa's and Mastercard's rules apply with equal force to them. Stated differently, in the absence of the Settlement (*i.e.*, the *status quo*), Direct Action Plaintiffs are effectively prohibited from surcharging Defendants' credit cards; under the Settlement, Direct Action Plaintiffs would be permitted — like any other merchant — to surcharge at least 1%, and up to 3%, subject to the limitations as imposed by the Settlement. A Rule 23(b)(2) class member need not avail herself of the benefit of a settlement to be deemed to have benefit from it. *See, e.g., Amara v. CIGNA*

Instead, it was the (b)(3) settlement that compensated class members for releasing their rights to pursue injunctive relief claims separate from the (b)(2) class. *See In re Payment Card*, 2019 WL 6875472, at *4. Second, a (b)(2) settlement is definitionally not about *damages*, *see Dukes*, 564 U.S. at 360–61 (holding that "[Rule 23(b)(2)] does not authorize class certification when each class member would be entitled to an individualized award of monetary damages"), therefore complaints about releasing claims without compensation (*i.e.*, damages) are inapt in the context of a (b)(2) settlement, and reinforce the Court's conclusion that these objections were more properly directed at the (b)(3) settlement.

For the reasons discussed above, the Court finds that this factor weighs against final approval of the Settlement.[54]

### v. The ability of Defendants to withstand a greater judgment

The last *Grinnell* factor not covered by the discussion above is "the ability of the defendants to withstand a greater judgment." *Grinnell*, 495 F.2d at 463. Plaintiffs argue that this

---

*Corp.*, 775 F.3d 510, 522 (2d Cir. 2014) (observing that receiving notice of retirement plan reformation "provides . . . class members some benefit"); *cf. Berni*, 964 F.3d at 144–48 (finding proposed injunctive relief consisting of a "fill-line" on Barilla pasta boxes "would not provide a remedy for all members of the class," because once deceived, the consumers would not be harmed again).

[54] With respect to the parties' dispute over the scope of the stay provision (*i.e.*, whether it imposes a stay on Direct Action Plaintiffs' damages actions), and whether it treats Direct Action Plaintiffs and their damages claims inequitably, the Court notes that Plaintiffs and Defendants appeared to confirm at the hearing that their understanding of the proposed stay provision was that it would allow the damages claims to proceed. Specifically, when the Court stated its view that it understood the proposed stay provision to be "limited to declaratory, injunctive and . . . equitable relief," neither Plaintiffs nor Defendants disputed this interpretation. (*See* Hr'g Tr. 47:6–12; *see also id.* at 48:14–54:24 (responding to Direct Action Plaintiffs' arguments but making no mention of the stay); *id.* at 55:17–56:7 (Visa responding to Target Plaintiffs' suggested clarifications to the stay provision with, "I'm not sure at my first glance I think it's necessary")). The Court notes that the interpretation of the stay provision plays no role in the decision to deny preliminary approval, and its effect is immaterial in light of the Court's denial.

factor is not relevant where the Settlement involves only injunctive relief. (*See* Pls.' Mem. 47 ("Whether Defendants can withstand a greater 'judgment' is not a relevant factor here because the Settlement involves only injunctive relief." (citing *Caballero by Tong v. Senior Health Partners, Inc.*, Nos. 16-CV-326, 18-CV-2380, 2018 WL 4210136, at *12 (E.D.N.Y. Sept. 4, 2018)).) In support, Plaintiffs cite other courts in this district that did not consider this factor because the relief sought was only declaratory or injunctive. (*See id.* at 47–48 (first citing *Doe #1 by Parent #1 v. N.Y.C. Dep't of Educ.*, No. 16-CV-1684, 2018 WL 3637962 (E.D.N.Y. July 31, 2018); and then citing *EB v. N.Y.C. Dep't of Educ.*, No. 02-CV-5118, 2015 WL 13707092 (E.D.N.Y. July 24, 2015)).)

However, as discussed above, other courts have considered this factor even when no monetary relief was sought. (*See* section II.b.iii.1.D (collecting cases).) The Court therefore evaluates this *Grinnell* factor in assessing the Settlement.

At one end of the spectrum — as (b)(2) actions were originally conceived — the goal of the action was to have the defendant (or defendants) stop violating the plaintiffs' civil rights. *See Dukes*, 564 U.S. at 361 ("'[C]ivil rights cases against parties charged with unlawful, class-based discrimination are prime examples' of what (b)(2) is meant to capture." (quoting *Amchem*, 521 U.S. at 614)). In such cases, the ability of the defendant to withstand a greater judgment is essentially a non-issue because the defendant need only stop violating the law. At the other end of the spectrum, the resolutions of certain antitrust actions have required the dissolution of the defendant companies.[55] In 1911, for example, the Supreme Court ordered the dissolution of

---

[55] On May 23, 2024, for example, the Department of Justice filed a lawsuit in the Southern District of New York against Live Nation, seeking "the divestiture of . . . Ticketmaster, along with any additional relief as needed to cure any anticompetitive harm." *See* Compl.

85

Standard Oil for its violations of the Sherman Act. *See Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 77–82 (1911). More recently, in 1982, AT&T (then commonly known as "Ma Bell") entered into a consent decree with the Department of Justice that required it to divest its local operating companies (known as the "Baby Bells").[56] In between these extremes, the vast majority of injunctive relief will impose some costs on the defendant, short of requiring its dissolution. In *Doe #1*, for example, the proposed settlement agreement required the Department of Education to, *inter alia*, "introduce an electronic reporting system to allow parents to report bullying electronically and to learn when their complaints have been substantiated or resolved." 2018 WL 3637962, at *3. While implementing this reporting system was not costless, it also seems evident that doing so would not be so costly as to threaten the Department of Education with insolvency. The Court is guided by these principles in evaluating whether Defendants could withstand a greater judgment.

Based on the evidentiary record before the Court, the Court finds that Defendants could withstand a substantially greater judgment. The most easily quantifiable "cost" of the Settlement is the "rate caps and rollbacks," which Plaintiffs estimate as being worth nearly $30 billion over five years. As the Merchant Trade Groups point out, however, the estimated $6 billion in annual savings to merchants is paltry compared to the $100 billion that merchants paid in interchange fees on Visa and Mastercard transactions in 2023. (Merch. Trade Grp. Objs. 3.) Further, the

---

¶ 371(f), *United States v. Live Nation Ent., Inc.*, No. 24-CV-3973, 2024 WL 2346766 (S.D.N.Y. May 23, 2024).

[56] The case against AT&T had already gone to trial and the parties agreed to settle only after the government rested its case and the judge issued a decision denying AT&T's motion to dismiss. *See* Jake Kobrick, *The Breakup of "Ma Bell":* United States v. AT&T, Fed. Jud. Ctr., https://www.fjc.gov/history/spotlight-judicial-history/breakup-ma-bell (last visited June 24, 2024).

four- and seven-basis-point rollbacks and rate caps, respectively, are also relatively modest compared to the fact that "most of Visa's and Mastercard's current rates are *200 basis points* or more." (*Id.*) Without evidence of Visa's and Mastercard's profitability, the Court cannot say with certainty that Defendants *can* withstand a greater judgment; however, the evidence strongly suggests that they could withstand a substantially greater judgment.

In addition, evidence in the record regarding Visa's and Mastercard's fees in the United Kingdom, the European Union, and Australia reinforce the likelihood that Defendants could withstand a greater judgment. In the United Kingdom and the European Union, interchange fees are capped at 30 basis points, and in Australia, interchange fees are capped at 50 basis points. (*See* Expert Rep. of Prof. Dennis W. Carlton ¶ 97 & n.130, annexed to Szanyi Decl. as SJDX386, Docket Entry No. 8526-11; Expert Rep. of Joseph Stiglitz ¶ 101, annexed to Szanyi Decl. as SJDX415, Docket Entry No. 8526-19; Expert Rep. of Prof. Jerry Hausman ¶ 434, annexed to Szanyi Decl. as SJDX400, Docket Entry No. 8526-17.) Those rates are roughly ▮▮▮ and ▮▮▮, respectively, of the average prevailing rate in the United States. The continuing viability of Visa and Mastercard in those regulated jurisdictions thus strongly suggests that Defendants could agree to more substantial rate caps and rollbacks (*i.e.*, that they could withstand a greater judgment).

Accordingly, the Court finds that this factor weighs against final approval of the Settlement.

### III. Conclusion

For the foregoing reasons, the Court finds that it is not likely to grant final approval to the

Settlement and accordingly denies Plaintiffs' motion for preliminary settlement approval.

Dated: June 25, 2024
     Brooklyn, New York

                  SO ORDERED:


                  _____s/ MKB_____
                  MARGO K. BRODIE
                  United States District Judge