# EXHIBIT A

**ELECTRONICALLY FILED**
Superior Court of California
County of Marin
**08/13/2024**
James M. Kim, Clerk of the Court
By: D. Harrison, Deputy

Kassra P. Nassiri (215405)
(kass@njfirm.com)
Russell Taylor (320375)
russ@njfirm.com
NASSIRI & JUNG LLP
1700 Montgomery Street, Suite 207
San Francisco, California 94111
Telephone:  (415) 762-3100
Facsimile:   (415) 534-3200

Attorneys for Plaintiff
CASCADE SETTLEMENT SERVICES LLC

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

# FOR THE CITY AND COUNTY OF MARIN

| | |
|---|---|
| CASCADE SETTLEMENT SERVICES LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>OPTIUM CAPITAL LLC, a Wyoming limited liability company; NEIL KORNSWIET, an individual; TONY RALEIGH, an individual; DAVID SLOAN, an individual; HUGH ALEXANDER, an individual; and DOES 1-50, inclusive<br><br>Defendants. | Case No.  CV0003663<br><br>**COMPLAINT FOR:**<br><br>1.  **Breach of Contract**<br><br>2.  **Anticipatory Breach of Contract**<br><br>3.  **Declaratory Relief**<br><br>4.  **In the Alternative: Intentional Interference with Prospective Economic Relations**<br><br>5.  **Preliminary and Permanent Injunction**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Cascade Settlement Services LLC ("Plaintiff" or "Cascade") complains and alleges as follows:

**I.      PARTIES**

1.      Plaintiff Cascade Settlement Services LLC ("Cascade") is a Delaware limited liability company, with its principal places of business during the relevant period in the City of Mill Valley in the County of Marin. Cascade is in the business of providing financial services to members of class action settlements, specifically through claims filing and claims monetization in connection with these settlements. Cascade has acquired several interests and entities over the years, including Claimco LLC ("Claimco"), Spectrum Settlement Recovery, LLC ("Spectrum"), and Cascade continues to operate as Claimco or Spectrum. For purposes of this complaint, references to Cascade shall also refer to Spectrum, Claimco and other affiliates, subsidiaries and related entities, and vice versa.

2.      Defendant Optium Capital LLC ("Optium") is, upon information and belief, a Wyoming limited liability company with its principal place of business in Newport Beach, California. Optium purchases class action claims from class members.

3.      Defendant Neil Kornswiet ("Kornswiet") is an individual who, upon information and belief, resides in Orange County, California. At all relevant times, Kornswiet has served as Optium's Chief Executive Officer.

4.      Defendant Tony Raleigh is an individual who, upon information and belief, resides in Orange County, California. At all relevant times, Raleigh has served as Optium's Chief Investment Officer.

5.      Defendant David Sloan is an individual who, upon information and belief, resides in in the County of San Francisco. At all relevant times, Sloan has served as Optium's Chief Financial Officer.

6.      Defendant Hugh Alexander is, upon information and belief, an individual residing in Spain. At all relevant times, Alexander has served as Optium's General Counsel.

7.      The true names and capacities, whether individual, corporate, or otherwise of the Defendants named in this Complaint as Does 1 through 50, inclusive, are unknown to Plaintiff.

Plaintiff is informed and believes, and on that basis alleges, that each of said fictitiously named Defendants is liable to Plaintiff on the causes of action herein alleged and/or asserts some interest, legal or equitable, in the subject matter of this action, and therefore Plaintiff sues said Defendants by said fictitious names. Plaintiff will substitute named Defendants for fictitiously named Defendants as the true names and capacities of fictitiously named Defendants are determined.

8.      Plaintiff is informed and believes, and on that basis alleges, that at all times mentioned in this Complaint the Defendants, and each of them, were the agents, servants, employees, and/or alter egos of each of the other Defendants, and in doing the things alleged in this Complaint were acting within the scope of their authority as such agent, servant, employee, and/or alter ego, and with the permission and consent of the other Defendants.

## II.    JURISDICTION AND VENUE

9.      The Court has jurisdiction over this action pursuant to Cal. Civ. Proc. Code § 410.10, which provides that a court "may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States." Jurisdiction is constitutionally warranted because each Defendant has availed itself of this Court's jurisdiction by conducting business, owning property, maintaining bank accounts, residing, and/or entering into contracts in California.

10.     Venue is proper in this County pursuant to Cal. Civ. Proc. Code §§ 395(a) and 395.5 because the contract at issue in this Complaint was entered into in Marin County; and because Defendants' breaches of the contract occurred in large part in Marin County.

11.     As a direct and proximate result of Defendant's conduct described herein, Plaintiff has been damaged in an amount that exceeds $25,000, said amount to be proven at trial.

## III.    FACTUAL ALLEGATIONS

12.     This case arises out of a 2015 settlement arising from Optium's misappropriation of Plaintiff's trade secrets, unfair competition and interference with Plaintiff's contracts and other business interests. Rather than comply with the terms of the settlement, Optium has engaged in numerous surreptitious and fraudulent acts designed to conceal its breaches of the settlement agreement, to take control over the subject claims, and to avoid its financial obligations to Cascade.

1   Plaintiff was left with no choice but to file this Complaint to give effect to the terms of its settlement

2   agreement with Optium.

3           13.     Among other things, Plaintiff Cascade provides filing services to individuals and

4   entities entitled to recover funds from class action lawsuit settlements. Clients typically appoint

5   Cascade to act as their agent to file claims on their behalf in class action settlements, in exchange for

6   a contingent fee upon recovery. Cascade also purchases class action claims from class members in

7   pending class action litigation that may or may not result in a settlement.

8           14.     One such class action litigation is the 2005 case *In re: Payment Card Interchange*

9   *Fee and Merchant-Discount Antitrust Litigation* (Case No. 1:05-md-01720-JG-JO; E.D.N.Y.) (the

10  "Visa Antitrust Litigation"). Plaintiff—including the companies and businesses it has acquired over

11  the years, such as Claimco LLC and Spectrum Settlement Recovery, LLC—has been engaged in

12  analyzing and developing proprietary information in the Visa Antitrust Litigation since at least 2007,

13  and hundreds of class members have hired Plaintiff to serve as their agent in that litigation

14  ("Cascade Agency Contracts"). The case initially settled in 2012 but was vacated on appeal to the

15  Second Circuit. The case settled again in 2018 for approximately $5.5 billion and, after a subsequent

16  appeal, became final in 2023. The process for submitting claims began in December 2023 and is

17  underway. Because of the size and complexity of the class and claims process, Plaintiff expects the

18  claims filing and approval process to continue into 2025, with payments to class members no sooner

19  than 2025, if not later.

20          15.     The class action claim fulfillment process is quite technical and often spans years. It

21  begins long before the claims are filed and can continue for years after filing. To prepare for the

22  eventual claims filing in connection with the Visa Antitrust Litigation, Cascade has over the years

23  and at great expense continually gathered data and engaged economists to analyze and model the

24  claims recovery for its clients' claims and claims Cascade has purchased, and to evaluate and

25  scrutinize the claims administrator's data and calculations. Cascade's team has also engaged lawyers

26  to conduct legal analyses of the settlement agreement. Expertise in these steps is needed to recover

27  the full value of the claims.

28          16.     As is usual in class action settlements, a claims administrator is retained to provide

notice to class members, manage class member data and prepare preliminary claim values, provide and manage interactions with class members in the filing of claims, determine claim values for each class member, and resolve class member disputes. The claims administrator in the Visa Antitrust Litigation is Epiq Systems, Inc. ("Claims Administrator").

17.     In connection with its work on the Visa Antitrust Litigation and dozens of other class actions, Cascade has devoted substantial time and money to develop a deep portfolio of proprietary information ("Cascade Proprietary Information"). Cascade Proprietary Information includes the identities and other details for all of Cascade's clients over the years, such as which class action settlements they have participated in and how much they recovered in those class actions. It also includes economic models, legal analyses, a sales prospect list of entities for all class actions, relevant contact information within those entities, and notes from all conversations with those entities going back to 2002 concerning organizational hierarchies and approval processes, offers, claims, and data gathering efforts.

**A.     Optium's Misappropriation of Cascade Proprietary Information and Interference with Cascade Contracts, and the 2015 Settlement**

18.     Optium was founded in 2014 by Neil Kornswiet, its current CEO. Optium is in the business of purchasing class action claims from class members and has been purchasing class members claims in the Visa Antitrust Litigation since its founding. Because Cascade also purchases class member settlement claims, Optium competes directly with Cascade.

19.     Immediately prior to founding Optium, from approximately September 2013 through February 2014, Kornswiet was the CEO of Cascade. After being employed in that position for a mere five months, having added little value to Cascade, Kornswiet requested the immediate grant of 30% of Cascade's equity, in addition to salary and bonus compensation. When Cascade refused his demand, Kornswiet left Cascade on bad terms to start Optium. Within months, he also arranged the departure of two of Cascade's most knowledgeable employees—CFO David Sloan and Business Development Officer, Tony Raleigh, who each left Cascade for Optium in 2014. Eventually, Hugh Alexander, in-house counsel for Cascade for many years including 2015, would also join Optium. Alexander currently serves as Optium's general counsel.

20.     While at Cascade, Kornswiet, Sloan, Raleigh and Alexander had broad access to Cascade Proprietary Information. This included lists of all of Cascade's clients, many of whom had engaged Cascade as their agent to file claims in the Visa Antitrust Litigation ("Cascade Clients").

21.     Kornswiet, Sloan and Raleigh's departure to form Optium raised serious concerns over the potential misappropriation of Cascade Proprietary Information. It was widely understood at Cascade that Defendant Raleigh kept much of Cascade's Proprietary Information—including a comprehensive list of Cascade Clients and details about their contracts with Cascade—on a portable USB drive that he would regularly take home with him. When Raleigh joined Optium, he acknowledged that he had possession of the USB drive but claimed to have destroyed it. In ensuing discussions between the parties, Raleigh and Optium continued to deny having possession of any Cascade Proprietary Information. Cascade was forced to consider taking legal action against Raleigh and Optium to prevent them from undercutting the foundation of Cascade's business by using the Cascade Proprietary Information.

22.     The parties engaged in extensive pre-litigation settlement discussions. Cascade's primary concern was that Optium would use Cascade Proprietary Information to interfere with Cascade's agency contracts by, among other things, inducing Cascade Clients to terminate their agency agreements with Cascade, and by purchasing class action claims from Cascade Clients. Kornswiet, Sloan and Raleigh each had extensive knowledge of Cascade Proprietary Information, including which merchants had entered into Cascade Agency Contracts and on what terms. Cascade also had concerns that Optium was in possession of tangible copies of Cascade Proprietary Information, including details on the contacts and decision makers at Cascade Client companies and the specific terms of their engagements with Cascade.

23.     After weeks of negotiations (Kornswiet was the primary party negotiating for both Optium and Raleigh), the parties agreed to compromise and began working on written settlement agreements. The parties exchanged several redlines of the draft agreements, including redlines to what would become Section 2 of the settlement agreement with Optium. In exchange for not pursuing legal and equitable relief, Cascade sought two important concessions from Optium—first, that Optium would not interfere with any Cascade Agency Contracts by encouraging Cascade

1    Clients to cancel those contracts. Second, that should Optium purchase any class member claims

2    from a Cascade Client, Optium would assume Cascade's Agency Contract and allow Cascade to file

3    such claims, deposit receipts into a deposit account, retain its contractual fees, and distribute the

4    balance to Optium.

5          24.    During the negotiations, Cascade's concerns about Defendants plans were so acute

6    that it proposed the unusual step of attaching to the settlement a list of all Cascade Clients. Even

7    though Kornswiet, Sloan and Raleigh likely remembered many, if not all, of Cascade's largest

8    clients, Cascade believed that attaching its client list would serve as an acknowledgment by Optium

9    of the specific Cascade Clients, would clearly define the scope of Cascade Clients existing at the

10   time of the settlement, and would mitigate the risk that Optium would interfere with Cascade's

11   Agency contracts, whether inadvertently or intentionally. Kornswiet rejected Cascade's offer to

12   attach a list of Cascade Agency Contracts to the settlement.

13         25.    On or around May 28, 2015, Cascade and Optium entered into a written settlement

14   agreement (the "2015 Settlement"). The settlement required that Optium would assume Cascade

15   Agency Contracts whenever Optium purchased claims from a then-existing Cascade Client. It also

16   required that for each Cascade Client, Optium would allow Cascade to control the claims filing

17   process and receive settlement proceeds from the Claims Administrator.

18         26.    The 2015 Settlement defines "Company" as "Cascade Settlement Services, LLC and

19   all of its parents, subsidiaries, predecessors and affiliated entities, including Claimco LLC." The

20   2015 Settlement also refers to Spectrum as "Company."

21         27.    Section 2 of the 2015 Settlement, entitled "Cooperation and Non-interference,"

22   provides as follows:

23         **2. Cooperation and Non-interference**

24
25         Optium agrees that it will not use or disclose any Company Confidential
           Information in any future business activities.

26         Optium also agrees that existing Cascade / Spectrum agency contracts are
27         important assets of the Company and Optium will not knowingly solicit,
           induce interfere with or otherwise cause a client with an existing Company
28         agency filing contract ("Filing Contract") to cancel or in any way diminish
           the value of that contract to the Company. In order to comply with the

-6-

COMPLAINT
CASE NO.

terms of this provision, Optium agrees that it and its employees, agents, and anyone acting on its behalf, in any substantive contract negotiations with a potential client, will inquire whether that client has an existing filing contract with another company and, if so, if the company is Cascade/Spectrum. Failure to inquire and obtain the information on any existing filing contract shall constitute a "knowing'" violation of this clause.

In the event Optium purchases a Visa claim from a Company client, Optium will purchase the entire claim and assume the Filing Contract with the Company on the existing terms. Optium will not seek to purchase a "net claim" leaving the original claimant responsible for a service fee for an asset they no longer own, and therefore, are unlikely to pay. Per the terms of that Filing Contract, the Company will notify the Claims Administrator of its role in servicing the claim, will perform the filing services in a manner similar to the filing services performed for other Company clients according to the Filing Contract, and the Claims Administrator will distribute the settlement recovery check to the Company. The Company will deposit the settlement check in a deposit control account ("DCA"), deduct its contractual service fees, and make a net settlement payment to Optium on the same time schedule and basis as net settlement payments are made to other Company clients. These are the standard terms and procedures of the Company's agency filing contract and Optium will not subvert these terms by directing the Claims Administrator to distribute the settlement check to Optium.

28.    The second paragraph of Section 2 addresses Cascade's concern that Optium would encourage Cascade Clients to cancel their contracts with Cascade. This "non-interference" paragraph prohibits Optium from inducing any Cascade Client to "cancel or diminish" a Cascade Agency Contract (the "Non-Interference Provisions"). The paragraph imposes an affirmative obligation on Optium—intended to "comply with the terms of **_this provision_**"—to ask any potential Optium client whether it is also an existing Cascade client (emphasis added). The provisions of this paragraph apply to all _potential_ Optium clients, whether they ever became actual Optium clients. Importantly, nothing in the 2015 Settlement indicates that compliance with the Non-Interference Provisions provides Optium with a safe harbor to avoid its obligations to Cascade.

29.    During the exchange of written drafts, Kornswiet sought to weaken Optium's obligation not to interfere with Cascade Agency Contracts and inserted the word "knowingly" in the first sentence of the Non-Interference Provisions. Cascade responded by adding an additional

1   requirement to the Non-Interference Provisions—that Optium ask each potential Optium client

2   whether it had a contract with Cascade prior to buying any claims. Cascade's addition illustrates one

3   way, but not the only way, that Optium might "knowingly" interfere with Cascade Agency

4   Contracts.

5         30.     The third paragraph of Section 2 applies to all Cascade Clients who sold their claims

6   to Optium. It stands apart from the Non-Interference Provisions. It provides, without qualification or

7   limitations, that should Optium purchase a claim from a Cascade Client, Optium would have to pay

8   Cascade its agency fees as set forth in Cascade's Agency Contract with that client (the "Cooperation

9   Provisions"). The Cooperation Provisions also require Optium to notify the settlement Claims

10   Administrator that Cascade will control and manage the claims, receive the settlement monies from

11   the Claims Administrator, deduct its fee, and convey the balance of the settlement proceeds to

12   Optium ("Cascade Claim Control Rights").

13         31.     The financial compensation received by Cascade through its agency agreements

14   depends on the value of claim recovery. Cascade – through its management, employees, and agents

15   – brings experience and expertise going back more than 20 years as a leader in claim servicing,

16   filing, and prosecuting well-documented claims to increase the value of recoveries. Cascade

17   obtained the Cascade Claim Control Rights, which give Cascade the irrevocable right to take all

18   steps necessary to obtain any claim recovery, to ensure that the value of claims would not be

19   diminished by less experienced and less capable parties like Optium.

20         32.     Inadequate claim filing by Optium—who has little or no expertise in claim filing—

21   would prejudice the value of claims, risk claim filings being delayed or rejected, result in potential

22   lost compensation, and potentially cause substantial and irreparable harm to Cascade. Because of the

23   complexity of claim filing, and the need to prove the value of claims to the Claims Administrator

24   and ultimately the Visa Antitrust Litigation court, it is effectively impossible to determine on an ex

25   post facto basis the additional value that Cascade would have added to any claim had Optium not

26   interfered with the Cascade Claim Control Rights.

27       **B.**    **Optium's Breach of the 2015 Settlement**

28         33.     The Visa Antitrust Litigation finally moved into settlement claims processing in 2023

1    and all participating class members, or their agents or transferees, have registered with the

2    settlement Claims Administrator. Where more than one entity or claimant has registered a particular

3    claim, that claim goes into "conflict" status and all parties seeking to control the claim receive notice

4    of the conflict. It was through this process that Cascade learned, in 2024, that it was in conflict with

5    Optium on a number of claims, and, after some investigation, that Optium had breached the 2015

6    Settlement by claiming to have the authority to file the claims of certain Cascade Clients.

7    34.    Optium breached the 2015 Settlement in two ways. First, Optium interfered with

8    Cascade Agency Contracts (breach of the Non-Interference Provisions) by encouraging Cascade

9    clients to terminate their agreements with Cascade. Second, Optium has misconstrued the 2015

10   Settlement, claiming that it does not have to assume Cascade Agency Contracts for claims that

11   Optium purchased from existing Cascade clients. Optium also claims that it (and not Cascade) has

12   the right to control, file and collect on the claims at issue (breach and anticipatory breach of the

13   Cooperation Provisions and Cascade Claim Control Rights).

14   35.    Optium's construction of the intent and function of the 2015 Agreement is not only

15   legally incorrect, but also irrational. Optium has construed the Non-Interference Provisions as

16   imposing a ministerial obligation whose only function is to provides Optium a safe harbor from

17   which it can avoid its obligations under the Cooperation Provisions. Taken to its extreme, Optium's

18   position is that even if it had affirmative and actual knowledge of the existence of a Cascade Agency

19   Contract at the time it bought a claim from a Cascade Client, it would not have any obligation to

20   assume the agency contract if the seller did not disclose its existence to Optium. For example,

21   Cascade has referred several Cascade Clients to Optium who wished to sell their Visa claims. Under

22   Optium's contractual interpretation, even when a Cascade Client is referred to Optium by Cascade,

23   Optium could avoid assuming the Cascade Agency Contract if the Cascade Client failed to disclose

24   the existence of the Cascade Agency Contract.

25   **C.    Claims at Issue**

26   36.    What follows details the claims in dispute here. Every claim in dispute involves

27   Cascade Agency Contracts that existed before the departure of Kornswiet, Sloan and Raleigh from

28   Cascade. Thus, as of 2014, Kornswiet, Sloan and Raleigh (and later Alexander) had constructive, if

COMPLAINT
CASE NO.

1    not actual, knowledge of the existence of the Cascade Agency Contracts in dispute here.

2        37.    Not one conflict between Cascade and Optium concerns class members who signed

3    agreements with Cascade after Kornswiet's departure. This is curious, since Cascade continued to

4    enter into agency contracts with more than eighty Visa Antitrust Litigation class members after

5    Kornswiet's departure from Cascade, and yet, upon information and belief, Optium did not buy a

6    single claim from any of those Cascade clients. It is improbable that this occurred randomly. Based

7    on available evidence, it appears likely that Cascade's contact list was a primary source used by

8    Optium when soliciting Visa class members. Cascade does not yet know how many Visa claims, if

9    any, Optium purchased that it did not learn about from Cascade Proprietary Information.

10                   **1.    The Vail Corporation ("Vail")**

11       38.    Spectrum entered into agency agreement with Vail on May 10, 2012. Accordingly,

12   under the 2015 Settlement, Vail is a "Company client" and Optium is required to assume the

13   Cascade Agency Contract with Vail.

14       39.    Cascade preregistered Vail's claims in the Visa Antitrust Litigation in 2014. Between

15   2012 and 2024, Cascade contacted Vail more than fifty times and gathered data to use to maximize

16   Vail's claims.

17       40.    Once the claims process was underway, around April 2024, the Claims Administrator

18   informed Cascade that several other parties—including Optium—had also registered Vail's claims,

19   putting those claims in conflict. The conflict showed that Optium had purchased Vail's claims. Prior

20   to receiving the conflict report, Cascade did not know that Optium had purchased Vail's claims.

21       41.    Immediately upon receiving notice of conflict from the Claims Administrator,

22   Cascade contacted Vail to clear up the conflicts and forwarded to Vail a copy of the 2012 agency

23   contract. On April 26, 2024, Vail emailed Cascade denying any knowledge of its contract with

24   Cascade and stating that to the extent any such agreement existed, Vail was terminating it, effective

25   immediately.

26       42.    Shortly thereafter, Optium told Cascade, for the first time, that Optium had purchased

27   Vail's claims in 2020. When terminating its contract with Cascade, Vail never told Cascade that

28   Vail no longer owned the claims, or that those claims had been sold to a third party (Optium). And

1   Vail never explained why it was terminating a contract to file a claim it no longer owned.

2        43.     Upon information and belief, Optium knowingly and intentionally interfered with

3   Cascade's contract by encouraging Vail to deny knowledge of the existence of its agency contract

4   with Cascade, in breach of the Non-Interference Provisions of the 2015 Settlement. Upon further

5   information and belief, Optium did so to avoid its financial obligations to Cascade under the

6   Cooperation Provisions of the 2015 Settlement.

7        44.     In subsequent conversations with Cascade, Optium claimed that because Vail did not

8   disclose the existence of the Cascade contract to Optium when Optium purchased Vail's claim in

9   2020, the Cooperation Provisions of the 2015 Settlement do not apply. (Notably, although Cascade

10  has requested it, Optium has not provided Cascade with any evidence of its claim that Vail did not

11  disclose the existence of the Cascade contract.)

12       45.     Optium conflates the Non-Interference Provisions with the Cooperation Provisions to

13  arrive at this untenable position. The Cooperation Provision is not conditional on a class member's

14  disclosure to Optium of its agreement with Cascade. And in any event, Optium had actual or

15  constructive knowledge of Cascade's agreement with Vail because Kornswiet and other Optium

16  principals had access to that agreement when they were Cascade employees.

17       46.     On July 2, 2024, Optium's counsel sent a letter to Class Counsel in the Visa Antitrust

18  Litigation, seeking to resolve the Vail conflict in Optium's favor. In that letter, Optium's counsel

19  referenced the April 26, 2024, email from Vail terminating Cascade's agency. By failing to

20  relinquish control of Vail's claim to Cascade, Optium is in breach of the Cascade Claim Control

21  Rights provisions.

22       47.     Optium has also unequivocally told Cascade that it will not pay Cascade its agency

23  fee. This is an anticipatory breach of the Cooperation Provisions.

24            **2.     Peet's Coffee and Tea, Inc. ("Peet's")**

25       48.     Spectrum entered into agency agreement with Peet's Coffee and Tea, Inc. on June 2,

26  2005, as amended on August 2, 2011. Accordingly, under the 2015 Settlement, Peet's is a

27  "Company client" and Optium is required to assume the Cascade Agency Contract with Peet's.

28       49.     Cascade preregistered Peet's claims in the Visa Antitrust Litigation in 2014. Between

1   2011 and 2024, Cascade contacted Peet's more than seventy times about the Visa case (and at least

2   thirty times regarding other settlements) and gathered data to use to maximize Peet's claims.

3        50.     Once the claims process was underway, around April 2024, the Claims Administrator

4   informed Cascade that several other parties—including Crowell & Moring ("Crowell"), a law firm

5   that also serves as a third-party claim filer—had also registered Peet's claims, putting those claims

6   in conflict. Cascade would later learn that Optium purchased Peet's claims, and that Optium also

7   engaged Crowell to represent it in its present dispute with Cascade concerning the 2015 Settlement.

8        51.     On May 2, 2024, Peet's sent Cascade a letter terminating Cascade's agency contract.

9   When Cascade asked Peet's if Crowell advised Peet's on the language of the termination letter,

10  Peet's declined to answer, citing attorney-client privilege. On information and belief, Optium

11  encouraged Peet's to terminate its contract with Cascade and directed Crowell to advise Peet's on

12  the specific language for the termination letter. This constitutes a breach by Optium of the Non-

13  Interference Provisions.

14       52.     It was not until June 6, 2024, that Optium finally revealed to Cascade that it had

15  purchased Peet's claims in January 2017. This surprised Cascade, since neither Optium nor Peet's

16  had disclosed this fact previously. Optium further claims that when it bought Peet's claim, Peet's did

17  not disclose the existence of the agency contract with Cascade. Optium has rejected Cascade's

18  request for evidence that it asked if Peet's had an agency agreement with Cascade at the time

19  Optium tendered its offer to buy Peet's claim. And in any event, Optium had actual or constructive

20  knowledge of Cascade's agreement with Peet's because Kornswiet and other Optium principals had

21  access to that agreement when they were Cascade employees.

22       53.     As with the Vail claim, Optium has conflated the Non-Interference Provisions and

23  the Cooperation Provisions to argue that because Peet's did not disclose the existence of the Cascade

24  contract to Optium when Optium purchased Peet's claim in 2017, the Cooperation Provisions of the

25  2015 Settlement do not apply.

26       54.     Optium has also unequivocally told Cascade that it will not pay Cascade its agency

27  fee. This is an anticipatory breach of the Cooperation Provisions. Optium also refuses to relinquish

28  control of Peet's claim and is thus in breach of the Cascade Claim Control Rights provisions.

### 3.   Sleepy's and The Sleep Train

55.     Claimco LLC entered into agency agreement on September 1, 2011, with Sleepy's, LLC ("Sleepy's"). Accordingly, under the 2015 Settlement, Sleepy's is a "Company client" and Optium is required to assume the Cascade Agency Contract with Sleepy's.

56.     Claimco LLC entered into agency agreement on August 26, 2011, with The Sleep Train, Inc. ("The Sleep Train"). Accordingly, under the 2015 Settlement, The Sleep Train is a "Company client" and Optium is required to assume the Cascade Agency Contract with The Sleep Train.

57.     Cascade preregistered the Sleepy's and The Sleep Train claims with the Claims Administrator in 2014. Between 2011 and 2024, Cascade contacted Sleepy's more than eighty times and The Sleep Train at least fifty times and gathered data to use to maximize their respective claims.

58.     Upon information and belief, Mattress Firm Holding Corp. ("Mattress Firm") acquired The Sleep Train in 2014 and Sleepy's in 2016.

59.     Optium purportedly purchased Sleepy's and The Sleep Train's claims from Mattress Firm on April 17, 2020.

60.     On December 13, 2021, Mattress Firm sent a letter to Cascade purporting to terminate the Sleepy's and The Sleep Train agency agreements. On information and belief, Optium provoked Mattress Firm to terminate those contracts with Cascade, which constitutes a breach by Optium of the Non-Interference Provisions.

61.     Optium further asserts that when it bought the Sleepy's and The Sleep Train claims, Mattress Firm did not disclose the existence of the agency contract with Cascade. Although Cascade has requested it, Optium has provided no evidence of this. And in any event, Optium had actual or constructive knowledge of Cascade's agreements with Sleepy's and The Sleep Train because Kornswiet and other Optium principals had access to that agreement when they were Cascade employees.

62.     As with Vail and Peet's, Optium has argued that because Mattress Firm did not disclose its agency contracts with Cascade, Optium is not required to and will not pay Cascade its agency fee. This is an anticipatory breach of the Cooperation Provisions. Optium also refuses to

-13-

COMPLAINT
CASE NO.

1   relinquish control of the Sleepy's and The Sleep Train claims and thus in breach of the Cascade

2   Claim Control Rights provisions.

3              **4.     FullBeauty Brands, L.P. fka Redcats USA, Inc. ("FullBeauty Brands")**

4         63.    Spectrum entered into agency agreement with Redcats USA, Inc. ("Redcats") on

5   October 3, 2005. Redcats changed its name several times and in 2015 became FullBeauty Brands,

6   L.P. Accordingly, under the 2015 Settlement, FullBeauty Brands is a "Company client" and Optium

7   is required to assume the Cascade Agency Contract – and the financial and control benefits to

8   Cascade - with FullBeauty Brands fka Redcats USA, Inc.

9         64.    On information and belief, FullBeauty Brands filed for Chapter 11 bankruptcy in

10   2019. Within 24 hours of filing, FullBeauty Brands received court approval for a prepackaged

11   bankruptcy restructuring plan ("FullBeauty Restructuring Plan") that allowed the company to exit

12   bankruptcy and continue operating.

13        65.    The FullBeauty Restructuring Plan provides that all executory contracts were

14   assumed. For bankruptcy purposes, the Cascade Agency Contract with FullBeauty Brands was an

15   executory contract. Therefore, the Cascade Agency Contract with FullBeauty Brands survived the

16   bankruptcy and remains a valid and enforceable contract.

17        66.    Optium purportedly purchased FullBeauty Brands claims. As of the filing of this

18   complaint, Optium has refused to provide Cascade with any information about when and under what

19   circumstances Optium purchased the claims.

20        67.    Upon information and belief, Optium failed to ask FullBeauty Brands whether it had

21   an existing agency contract with Cascade. Optium thus breached the Non-Interference Provisions of

22   the 2015 Settlement. And in any event, Optium had actual or constructive knowledge of Cascade's

23   agreement with FullBeauty Brands because Kornswiet and other Optium principals had access to

24   that agreement when they were Cascade employees.

25        68.    Optium has told Cascade that it has no obligation to assume the Cascade Agency

26   Agreement Contract with FullBeauty Brands, and that it will not pay Cascade its agency fee. This is

27   an anticipatory breach of the Cooperation Provisions. Optium also refuses to relinquish control of

28   the FullBeauty Brands claims and thus in breach of the Cascade Claim Control Rights provisions.

**5.      Other Conflicts Not Yet Discovered**

69.      Cascade is currently not aware of any other Cascade Client claims purchased by Optium and will amend this complaint to add additional claims if and when they are discovered.

**<u>FIRST CAUSE OF ACTION</u>**

**Breach of Contract**

**(Against Optium)**

70.      Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

71.      On or about May 28, 2015, Plaintiff entered into a written contract with Optium Capital LLC.

72.      Plaintiff, on its own and through its agents, has at all times performed the terms of the contract in the manner specified by the contract and has remained ready and able to continue such performance.

73.      Optium has failed and refused, and continues to refuse, to tender performance as required by the contract. Optium has encouraged Cascade clients to cancel their agency contracts in violation of the Non-Interference Provisions of the contract. Optium has also prevented Plaintiff from managing certain claims as required by the Cascade Claim Control Rights of the contract.

74.      Defendant's failure to perform its obligations under the contract has caused direct damage to Plaintiff in an amount to be determined at trial.

**<u>SECOND CAUSE OF ACTION</u>**

**Anticipatory Breach of Contract**

**(Against Optium)**

75.      Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

76.      On or about May 28, 2015, Plaintiff entered into a written contract with Optium Capital LLC.

77.      Plaintiff, on its own and through its agents, has at all times performed the terms of the contract in the manner specified by the contract and has remained ready and able to continue

-15-

COMPLAINT
CASE NO.

1    such performance.

2        78.     Optium refuses to release its claims of control with the Claims Administrator, thus

3    keeping the subject claims in conflict status and preventing Cascade from using its expertise to

4    ensure full value is received, as is required by the Cascade Claim Control Rights in the 2015

5    Settlement.

6        79.     Optium has clearly and positively indicated that it will not pay Plaintiff's agency fees

7    as required by the Cooperation Provisions in Section 2 of the contract. Optium is thus in anticipatory

8    breach of the contract.

9        80.     Defendant's failure to perform its obligations under the contract will cause direct

10   damage to Plaintiff in an amount to be determined at trial.

11                            **THIRD CAUSE OF ACTION**

12                            **Declaratory Judgment**

13                            **(Against Optium)**

14       81.     Plaintiff re-alleges and incorporates herein by reference each and every allegation of

15   the preceding paragraphs as though fully set forth herein.

16       82.     An actual controversy has arisen between Plaintiff and Defendant Optium as to their

17   respective rights and duties under the Cooperation Provisions of the 2015 Settlement. Specifically,

18   Plaintiff asserts that the Cooperation Provisions apply in full to the Vail, Peet's, Sleepy's, The Sleep

19   Train, and FullBeauty Brands claims. Optium has clearly indicated that it has no obligations to

20   Plaintiff with respect to those claims because, according to Optium, those entities did not disclose

21   the existence of their contracts with Plaintiff to Optium when Optium purchased their claims.

22       83.     A present and actual controversy exists between Plaintiff and Defendant concerning

23   the legal rights and duties of the parties relating to the Cooperation Provisions of the 2015

24   Settlement.

25       84.     A judicial declaration regarding Cascade's and Optium's respective rights and

26   obligations is warranted and necessary because, as alleged above, Cascade has no adequate remedy

27   at law. Such a declaration is necessary and appropriate at this time because Defendant has refused to

28   relinquish to Plaintiff all control of the subject claims, as required by the Cascade Claim Control

Rights provisions, and Defendant has further declared that it will not pay Plaintiff its agency fee on those claims, as required by the Cooperation Provisions.

## FOURTH CAUSE OF ACTION

### In the Alternative: Intentional Interference with Prospective Economic Relations

### (Against All Defendants)

85.     Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

86.     Cascade and each of Vail, Peet's, Sleepy's, The Sleep Train, and FullBeauty Brands were in an economic relationship that probably would have resulted in an economic benefit to Cascade.

87.     Defendants Optium, Kornswiet, Raleigh, Sloan and Alexander each knew of each of those economic relationships.

88.     By engaging in the conduct set forth herein, Optium, Kornswiet, Raleigh, Sloan and Alexander each intended to or knew that disruption of those relationships was certain or substantially certain to occur.

89.     As a result of Defendants' actions, each of those relationships was disrupted, resulting in harm to Cascade. Defendants' conduct was a substantial factor in causing Cascade's harm.

## FIFTH CAUSE OF ACTION

### Preliminary and Permanent Injunction

### (Against All Defendants)

90.     Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

91.     On or about May 28, 2015, Cascade and Optium entered into the 2015 Settlement.

92.     Under the terms of the 2015 Settlement, and in particular, the Cascade Claim Control Rights provisions, for each Cascade Agency Client from whom Optium purchases a claim, Cascade is required to notify the Claims Administrator of its role in servicing the claims, perform filing services, and receive the monies paid on those claims.

COMPLAINT
CASE NO.

93.     Also under the Cascade Claim Control Rights provisions, "Optium will not subvert these claims by directing the Claims Administrator to distribute settlement checks to Optium."

94.     Defendants have breached the 2015 Settlement by registering the Vail, Peet's, Sleepy's, The Sleep Train, and FullBeauty Brands claims with the Claims Administrator, and by continuing to assert a purported right to control those claims over Cascade's objections.

95.     By putting the claims into conflict, Defendants have prevented Cascade from servicing and eventual monetizing the claims, which will result in the full value of those assets and others not being obtained to the detriment of Cascade.

96.     Unless and until enjoined and restrained by this Court, Defendants' conduct will continue to cause Cascade great and irreparable harm in that it undermines its lawful and contractual right to manage and file claims, and to receive the proceeds of those claims from the Claims Administrator.

97.     While Cascade has suffered, and is continuing to suffer, growing monetary damages as the result of Defendants' conduct, and while reserving the right to seek those damages in this or another action, the Cascade Claim Control Rights can only be secured if Defendants cease their efforts to obstruct Plaintiff's control. Plaintiff thus has no adequate remedy at law.

98.     Unless Defendant is restrained and enjoined from continuing to assert with the Claims Administrator control over the subject claims, in violation of the 2015 Settlement, the injury to Cascade will be irreversible.

99.     Although the monetary damage to Cascade (to the extent it can be calculated) can be remedied through damages, no adequate remedy at law will make Plaintiff whole from the difficult-to-quantify diminution in value of the claims resulting from Optium's lack of experience in the claim servicing industry. Nor does any adequate remedy at law exist by which the rights and duties of the parties may be determined.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays for judgment against Defendants as follows:

1.  That the Court issue a declaration that the Vail, Peet's, Sleepy's, The Sleep Train, and FullBeauty Brands claims are subject to the Cascade Claim Control Rights and

-18-
COMPLAINT
CASE NO.

Cooperation Provisions of the 2015 Settlement, and Defendant Optium must assume the Cascade Agency Agreement for each pursuant to the 2015 Settlement;

2. For a temporary, preliminary, and permanent injunction enjoining Defendants from continuing to assert control over the filing of the claims at issue;

3. For a judgement, in the alternative, that Defendants have intentionally interfered with the Cascade Agency Contracts at issue;

4. That Plaintiff be awarded general, special, and/or compensatory damages it has suffered in an amount to be proven at trial;

5. Disgorgement of profits and cost of modification for Defendants' breaches of contract;

6. That Plaintiff be awarded attorney's fees and costs of suit as permitted by law; and

7. Such other and further relief as the Court may deem proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for all causes of action so triable.

DATED: August 13, 2024

Respectfully submitted,
NASSIRI & JUNG LLP

By: _____

Kassra Nassiri
Attorneys for Plaintiff
CASCADE SETTLEMENT SERVICES LLC

COMPLAINT
CASE NO.