UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------

IN RE PAYMENT CARD INTERCHANGE FEE
AND MERCHANT DISCOUNT ANTITRUST
LITIGATION

**FILED UNDER SEAL**

**MEMORANDUM & ORDER**
05-MD-1720 (MKB)
20-CV-2394 (MKB)

This document refers to:

*Old Jericho Enterprise, Inc. v. Visa, Inc.*, No. 20-
CV-2394 (E.D.N.Y.)

----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

On March 15, 2024, Old Jericho Plaintiffs[1] in this multidistrict litigation moved for

partial summary judgment,[2] seeking a ruling that "as a matter of law, the Old Jericho Plaintiffs

are not bound by the [2019 Rule 23(b)(3) Class Settlement's] Release and are entitled to

summary judgment on Defendants' defenses invoking the Release."  (Pls.' Mem. 4.)  On April

11, 2024, Defendants in the *Old Jericho* action opposed the motion.[3]  On April 25, 2024, a group

---

[1]  Old Jericho Plaintiffs seek to represent a prospective class of gasoline retailers who
allegedly obtain card acceptance services indirectly via their gas suppliers and who operate in
states known as *Illinois Brick* repealer states.  (*See* Am. Compl. ("*Old Jericho* Am. Compl.")
¶¶ 4, 38–39, *Old Jericho Enter., Inc. v. Visa, Inc.*, No. 20-CV-2394 (E.D.N.Y. May 29, 2020),
Docket Entry No. 1.)  Old Jericho Plaintiffs allege that they are "indirect purchasers" of card-
acceptance services.  (*See id.*)

[2]  (Old Jericho Pls.' Mot. for Partial Summ. J. ("Pls.' Mot."), Docket Entry No. 9156; Old
Jericho Pls.' Mem. in Supp. of Pls.' Mot. ("Pls.' Mem."), Docket Entry No. 9156-1; Old Jericho
Pls.' Reply in Supp. of Pls.' Mot. ("Pls.' Reply"), Docket Entry No. 9298; Old Jericho Pls.' R.
56.1 Stmt. of Material Facts ("Pls.' 56.1"), Docket Entry No. 9156-2; Old Jericho Pls.' Resp. to
Defs.' Counter-Stmt. in Opp'n to Pls.' 56.1 ("Pls.' 56.1 Resp."), Docket Entry No. 9299.)

[3]  (Defs.' Mem. in Opp'n to Pls.' Mot. ("Defs.' Opp'n"), Docket Entry No. 9202-1;
Defs.' Counter-Stmt. in Opp'n to Pls.' 56.1 ("Defs.' 56.1"), Docket Entry No. 9202-41.)
Defendants in the *Old Jericho* action consist of Visa, Inc., and Mastercard, Inc.  (*See Old Jericho*
Am. Compl. ¶¶ 27–28.)

of plaintiffs known as the Fikes Plaintiffs, described below as the "Branded Operators," and a standalone plaintiff, Jack Rabbit LLC ("Jack Rabbit"), opposed Old Jericho Plaintiffs' motion with the permission of the Court.[4]  (Fikes Pls.' Mem. in Opp'n to Pls.' Mot. ("Fikes Opp'n"), Docket Entry No. 9217; Jack Rabbit's Opp'n to Pls.' Mot. ("Jack Rabbit Opp'n"), Docket Entry No. 9218.)  On May 20, 2024, Old Jericho Plaintiffs filed a reply in support of their motion. (Pls.' Reply.)

        For the reasons discussed below, the Court denies Old Jericho Plaintiffs' motion for partial summary judgment.

## I.  Background

        The Court assumes familiarity with the facts and extensive procedural history as set forth in prior decisions.  *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 986 F. Supp. 2d 207 (E.D.N.Y. 2013) (*Interchange Fees I*), *rev'd and vacated*, 827 F.3d 223 (2d Cir. 2016) (*Interchange Fees II*); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11 (E.D.N.Y. 2019) (*Interchange Fees III*); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, --- F. Supp. 3d ---, 2024 WL 278565 (E.D.N.Y. Jan. 8, 2024) (*Interchange Fees IV*); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust*

---

        [4]  Fikes Plaintiffs and Jack Rabbit are gas retailers similarly situated to the Old Jericho Plaintiffs, but who have taken legal positions adverse to Old Jericho Plaintiffs.  Specifically, Fikes Plaintiffs argue that they and Old Jericho Plaintiffs are class members because they "accept" payment cards.  (Fikes Opp'n 1 ("The Fikes Plaintiffs and other branded operators like them accept payment cards at their retail locations, pay interchange fees directly out of those transactions (where the fee is directly deducted from the transaction value), and thus incurred the economic harm arising from the Defendants' alleged anti-competitive conduct.").)  Jack Rabbit contends that it and Old Jericho Plaintiffs are class members because they are "cost-plus direct purchasers" under the limited exception to the *Illinois Brick* rule for those whose indirect purchases are made pursuant to a pre-existing cost-plus contract.  (*See* Jack Rabbit Mem. 2–4.) For this reason, the Court granted Fikes Plaintiffs and Jack Rabbit leave to respond to Old Jericho Plaintiffs' motion.  (*See* Order dated Dec. 11, 2023; *see also* Order dated Nov. 28, 2023.)

*Litig.*, No. 05-MD-1720, 2024 WL 1014159 (E.D.N.Y. Feb. 22, 2024) (*Interchange Fees V*). The Court therefore provides only a summary of the relevant facts and procedural background.

### a. Procedural history

#### i. Procedural history of the Rule 23(b)(3) Class

In October of 2005, several complaints asserting similar antitrust claims against Visa, Mastercard, and various issuing banks were consolidated for pretrial purposes and transferred to the Eastern District of New York, where they were joined by other similar cases. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2008 WL 115104, at *1 (E.D.N.Y. Jan. 8, 2008). The consolidated cases included both class actions and individual actions. *Id.* In April of 2006, plaintiffs in the putative class actions ("Class Plaintiffs") filed a consolidated amended class complaint that defined two classes: one seeking damages and the other seeking equitable relief. *Id.* at *1–2. In November of 2012, the Court provisionally certified a class and preliminarily approved a class settlement agreement between Class Plaintiffs and Defendants. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2012 WL 12929536, at *1–2 (E.D.N.Y. Nov. 27, 2012). In 2013, the Court approved the settlement, *Interchange Fees I*, 986 F. Supp. 2d at 241, but, in 2016, the Second Circuit vacated certification of the class and reversed approval of the settlement, *Interchange Fees II*, 827 F.3d at 240.[5]

In November of 2016, the Court appointed counsel to two putative classes under Rule 23(b)(2) (the "Equitable Relief Class") and Rule 23(b)(3) (the "Damages Class"). *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2016 WL 8138988, at

---

[5] The case was reassigned to the undersigned on December 17, 2014. (Order Reassigning Case, Docket Entry No. 6359.)

*1 (E.D.N.Y. Nov. 30, 2016). In December of 2019, the Court granted final approval to a settlement agreement between Defendants and the Damages Class (the "Settlement Agreement"). *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2019 WL 6875472, at *36 (E.D.N.Y. Dec. 16, 2019). The Settlement Agreement defines the Settlement Class as "all persons, businesses, and other entities that have accepted any Visa-Branded Cards and/or Mastercard-Branded Cards in the United States at any time from January 1, 2004 to the Settlement Preliminary Approval Date [of January 24, 2010]." (Settlement Agreement ¶ 4, annexed to Rule 23(b)(3) Class Pls.' Mot. for Class Settlement Preliminary Approval as Ex. 1, Docket Entry No. 7257-2.) The Settlement Agreement further provides that each class member who files a claim will receive a *pro rata* share of the settlement fund "in accordance with the relative economic interests of the [class member] as measured by the Interchange Fee amounts attributable to their Visa- and Mastercard-Branded Card transactions during the Class Period." (*Id.* § I-2.) In addition, each class member would release specified claims against the Defendants (the "Release"). (*Id.* ¶ 31(a).) The Release specified that members of the Settlement Class would release "any claims arising out of or relating to" the allegations of the Class, (*id.* ¶ 31(b)), including as to "any interchange fees, interchange rates, or any Rule of any Visa Defendant or Mastercard Defendant relating to interchange fees," (*id.* ¶ 31(b)(i)), "any . . . 'honor all cards' rules . . . [or] rules or conduct relating to routing options regarding acceptance technology for mobile, e-commerce, or online payments, or development and implementation of tokenization standards," (*id.* ¶ 31(b)(iii)). It further specified that reference to these rules "mean[t] those rules as they are or were in place on or before the Settlement Preliminary Approval Date and rules in place thereafter that are *substantially similar*." (*Id.* ¶ 31(c) (emphasis added).)

4

Before final approval of the Settlement Agreement, the Court received objections from a group of entities that own or operate gas stations and convenience stores that sell petroleum products produced and branded by major oil refiners such as Shell and ConocoPhillips (collectively, the "Branded Operators"). *In re Payment Card*, 2019 WL 6875472, at *5. The Branded Operators expressed concern that some portion of them would be excluded from the Settlement Class due to separately negotiated agreements entered into by the major oil suppliers and brands themselves. *Id.* Among the Branded Operators who objected were Fikes Wholesale, Inc., Midwest Petroleum Co., and Slidell Oil Company, LLC (collectively, the "Fikes Wholesale Objectors"), who "own and operate dozens of gas stations and convenience stores" and argued that "they are entities that accepted Visa- and MasterCard-branded cards at their stores and paid the alleged overcharges; therefore, they are quintessential settlement class members." (Obj. to Class Action Settlement filed by Fikes Wholesale Objectors 1, Docket Entry No. 7559.) In their view, "[t]he settlement and notice [could] be read to advise both Branded Operators and Oil Brands that they are proper claimants to the same portion of settlement funds corresponding to the same transactions." (*Id.* at 12.)

The Court interpreted the Branded Operators' challenge as one under Rule 23(a) for "ascertainability" of the class definition, and concluded that "[t]he term 'accepts' is objective enough by its plain English usage to satisfy the ascertainability requirement." *In re Payment Card*, 2019 WL 6875472, at *30–31; *see also* Fed. R. Civ. P. 23(a). The Court agreed that "disputes will inevitably arise," and that "proof of who holds a claim may ultimately need to be analyzed during a claims administration process," but held that this was "not a sufficient basis to reject class certification," especially where "the class definition is also objectively guided by federal antitrust standards." *In re Payment Card*, 2019 WL 6875472, at *31. Accordingly, the

5

Court held that the class definition was objectively defined, and granted certification for the purposes of a settlement class. *Id.* at *32.

In March of 2023, the Second Circuit affirmed in all material respects the Court's decision certifying the Settlement Class and approving the Settlement Agreement. *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 727 (2d Cir. 2023). In relevant part, the court affirmed that the class was sufficiently ascertainable, because "[t]he only relevant inquiry is whether determinations as to class membership are 'objectively *possible*.'" *Id.* at 717. The Second Circuit further affirmed the Court's decision to refer any disputes over class membership to a special master, subject to *de novo* review by this Court. *Id.* at 719.

  ii. **Procedural history of the *Old Jericho* action**

In May of 2020, Old Jericho Plaintiffs filed a complaint in this District against Visa and Mastercard, asserting violations of state antitrust laws pursuant to the Class Action Fairness Act. (*See* Compl. ¶¶ 4–6, *Old Jericho Enter., Inc. v. Visa, Inc.*, No. 20-CV-2394 (E.D.N.Y. May 29, 2020), Docket Entry No. 1.) Old Jericho Plaintiffs alleged that they were "indirect purchasers" without standing to sue under federal law, but that they "have standing to sue as indirect purchasers under the laws of certain states." (*Id.* ¶ 28.) In December of 2020, Old Jericho Plaintiffs filed an amended complaint, (*see Old Jericho* Am. Compl.), and Defendants filed an answer to the amended complaint, (*see* Visa's Answer to *Old Jericho* Am. Compl. ("Visa Answer"), *Old Jericho Enter., Inc. v. Visa, Inc.*, No. 20-CV-2394 (E.D.N.Y. Dec. 23, 2020), Docket Entry No. 23; Mastercard's Answer to *Old Jericho* Am. Compl. ("Mastercard Answer"), *Old Jericho Enter., Inc. v. Visa, Inc.*, No. 20-CV-2394 (E.D.N.Y. Dec. 23, 2020), Docket Entry No. 24). In their answers, Visa and Mastercard both raised affirmative defenses asserting that Old Jericho Plaintiffs' antitrust claims were released by the Settlement Agreement. (*See* Visa

Answer 28 (fifteenth affirmative defense); Mastercard Answer 47 (thirty-second affirmative defense).)

In July of 2023, Old Jericho Plaintiffs filed a motion to intervene in *In re Payment Card Interchange Fees and Merchant Discount Antitrust Litigation*.  (*See* Old Jericho Pls.' Mot. to Intervene, Docket Entry No. 8873.)  Although Old Jericho Plaintiffs contended that they were not members of the Settlement Class, they argued that intervention was necessary to protect their rights in the claims administration process.  (*See, e.g.*, Old Jericho Pls.' Mem. in Supp. of Old Jericho Pls.' Mot. to Intervene 1, Docket Entry No. 8873-1 ("The *Old Jericho* plaintiffs seek to intervene for the limited purpose of arguing before the Special Master (and, as applicable, the Court) that gas retailers in [*Illinois Brick*] Repealer States are indirect purchasers and therefore not bound by the release in the settlement between the Rule 23(b)(3) Class Plaintiffs and Defendants . . . , which includes only direct purchasers."); *see also id.* ("[T]he interests of indirect purchasers are not being adequately represented.").)  At a status conference on September 8, 2023, the Court "grant[ed] Old Jericho[] [Plaintiffs'] motion to intervene for the limited purpose of defending [their] interests in the special master proceeding[s] where the special master is deciding issues raised by gas retailers who claim an interest in the settlement funds."  (Min. Entry dated Sept. 8, 2023.)

On October 27, 2023, Old Jericho Plaintiffs requested permission to move the Court for a ruling that Old Jericho Plaintiffs are not members of the Settlement Class.  (Stip. & Proposed Scheduling Order, Docket Entry No. 8990.)  On October 30, 2023, the Court denied Old Jericho Plaintiffs' request and reiterated that, in the Court's view, "the best way to address the direct/indirect purchaser issue is through the claims administration process, with review by the Special Master."  (Order dated Oct. 30, 2023.)  However, the Court invited Old Jericho Plaintiffs

7

to file a letter brief "explaining why intervention in the claims administration process is insufficient to adequately protect their interests."  (*Id.*)

On November 13, 2023, Old Jericho Plaintiffs filed a letter brief explaining their view that the claims administration process "poses an unacceptable risk of wrongly releasing the claims of the proposed Old Jericho class."  (Letter Br. in Resp. to the Court's Oct. 23, 2024 Order, at 1, Docket Entry No. 9002.)  In addition, Old Jericho Plaintiffs contended that a motion for summary judgment would be the "best way" to resolve "the question of standing in their case" in order to "efficiently litigate" the action.  (*Id.* at 2.)  On November 16, 2023, the Court permitted Old Jericho Plaintiffs to file a renewed proposed scheduling order.  (Order dated Nov. 16, 2023.)

### b.   Factual overview of gas stations and their suppliers

Typically, merchants who wish to accept payment cards enter into agreements with acquiring banks ("Acquirers").[6]  Acquirers facilitate merchants' acceptance of payment cards by, among other things, providing the hardware necessary to accept payment cards, transmitting payment information across the payment card network (*e.g.*, Visa, Mastercard, American Express, or Discover), and settling funds received on behalf of merchants from issuing banks ("Issuers").  For these services, merchants pay a fee known as the "merchant discount fee" or "merchant discount," which is typically a per-transaction fee that includes the full amount of any applicable interchange fees and network fees, in addition to the Acquirer's own fees.  *See generally Interchange Fees V*, 2024 WL 1014159, at *4–5.

---

[6]  The background provided in this section is for the benefit of the reader and is drawn from the parties' briefs, Rule 56.1 statements, and expert reports, and from the Court's prior decisions.  It is not relied upon by the Court in deciding the motions.

According to Old Jericho Plaintiffs, however, the gas stations they represent contract with their suppliers (gas brands such as Shell or ExxonMobil) to receive card-acceptance services through their suppliers for sales of gasoline.[7]  Thus, instead of the gas stations contracting directly with Acquirers — as described above — it is the suppliers that contract with Acquirers to process credit- and debit-card transactions.  (*See* Pls.' 56.1 ¶¶ 11–23; Defs.' 56.1 ¶¶ 11–23.)  The suppliers subsequently remit funds owed to the gas stations after deducting fees that may include the wholesale price of the fuel, credit- or debit-card processing fees, and rent.  (*See* Pls.' 56.1 ¶¶ 4–9, 11–23; Defs.' 56.1 ¶¶ 4–9, 11–23.)  Similar to the circumstances for merchants who use the services of a payment facilitator such as Square or Intuit, the suppliers are intermediaries in the payment flow from Issuer to Acquirer to gas brand to gas station.  *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, --- F. Supp. 3d ---, ---, 2024 WL 2816049, at *4 (E.D.N.Y. May 28, 2024) (*Interchange Fees VII*) (explaining the arrangements for merchants who utilize the services of payment facilitators).

## II.  Discussion

### a.  Standard of review

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Radwan v. Manuel*, 55 F.4th 101, 113 (2d Cir. 2022) (quoting Fed. R. Civ. P. 56(a)).  The court must "constru[e] the evidence in the light most favorable to the nonmoving party," *Radwan*, 55 F.4th at 113 (alteration in original) (quoting *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 358 (2d Cir. 2011)), and "resolve all ambiguities and draw all permissible factual inferences in favor of the

---

[7]  Subject to certain exceptions not relevant to this overview, Defendants do not dispute the Old Jericho Plaintiffs' allegations.

party against whom summary judgment is sought," *Koral v. Saunders*, 36 F.4th 400, 408 (2d Cir. 2022) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).  The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists."  *Kee v. City of New York*, 12 F.4th 150, 166–167 (2d Cir. 2021) (quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010)).  A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the [nonmoving party]."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment.  *Id.*  The court's function is to decide whether, "after resolving all ambiguities and drawing all inferences in favor of the nonmovant, a reasonable jury could return a verdict for the nonmovant."  *Miller v. N.Y. State Police*, No. 20-3976, 2022 WL 1133010, at *1 (2d Cir. Apr. 18, 2022) (first citing *Anderson*, 477 U.S. at 248; and then citing *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127, 129 (2d Cir. 2013)).  The moving party, however, need not *prove* a negative; rather, where "the burden of proof at trial would fall on the nonmoving party, the moving party 'can shift the initial burden by pointing to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.'"  *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022) (quoting *Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other materials *negating* the opponent's claim."); *El-Nahal v. Yassky*, 835 F.3d 248, 252 (2d Cir. 2016) ("[T]he movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." (quoting *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995))).

### b. Old Jericho Plaintiffs are bound by the Release

In order to rule on Old Jericho Plaintiffs' motion for partial summary judgment as to whether Old Jericho Plaintiffs are bound by the Release, the Court must first determine whether Old Jericho Plaintiffs are members of the Settlement Class.[8]  The Court answers this question before turning to the applicability of the Release.

### i. Old Jericho Plaintiffs are members of the Settlement Class

Old Jericho Plaintiffs first argue that they are not members of the Settlement Class because they are "indirect purchasers," (Pls.' Mem. 12–18; Pls.' Reply 9–14), and contend that the Class consists only of direct purchasers, (Pls.' Mem. 12 ("[T]he only entities that could fall within the class definition were those deemed to be direct payors of the challenged fees." (quoting *Fikes*, 62 F.4th at 716))).  In support of their status as indirect purchasers, Old Jericho Plaintiffs assert that "they purchase credit card processing services from their [suppliers]," and explain how their contracts with their suppliers establish that their suppliers directly pay card processing fees, before passing those on to the Old Jericho Plaintiffs.  (*See id.* at 6–7, 16–17.)  In further support, Old Jericho Plaintiffs argue that their "agreements with their Suppliers[] uniformly reflect that the gas brands process credit card transactions for the retailers and that the retailers pay card processing fees to the brand, not to the acquiring bank or an agent thereof."

---

[8]  In arguing over class membership, the parties frame their arguments as whether a dispute of fact remains as to whether Old Jericho Plaintiffs "accepted" payment cards.  (*See, e.g.*, Defs.' Opp'n 12 ("At a minimum, there is a genuine issue of fact regarding 'acceptance' that precludes summary judgment on whether the Old Jericho Plaintiffs have released their claims . . . .").)  However, disputes over class membership are typically "determined after settlement approval" in the context of the settlement proceedings — rather than as a summary judgment question in separate proceedings — and the Second Circuit has affirmed that in this case, such disputes may properly be referred to the special master, subject to *de novo* review by this Court.  *See Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 718–19 (2d Cir. 2023) (citing *Rothstein v. Am. Int'l Grp.*, 837 F.3d 195, 204 (2d Cir. 2016)).  The Court accordingly has the authority to make an affirmative finding as to class membership, and does so in order to rule appropriately on Old Jericho Plaintiffs' motion for summary judgment.

(*Id.* at 16; Pls.' Reply 9 ("As demonstrated by every single contract between branded gas retailers and their Suppliers[,] . . . Suppliers process credit card transactions for, and receive card processing fees from, their branded retailers.").)  Second, Old Jericho Plaintiffs contend that Defendants are judicially estopped from arguing that the Settlement Class includes indirect purchasers.  (Pls.' Mem. 12–16).  Finally, Old Jericho Plaintiffs argue that "hybrid" claimants — gas retailers who used their suppliers for some of their transactions (typically, fuel sales) and had direct arrangements with Acquirers for other transactions (typically, convenience store sales) — are not subject to the Release with respect to their indirect purchaser claims.  (*See id.* at 19–22; *id.* at 19 ("The law of release confirms that the Settlement cannot release the indirect purchaser claims of branded gas retailers . . . includ[ing those of] branded retailers who also have ancillary businesses that purchase[d] network services more directly . . . .").)  They argue in support that their indirect purchaser claims do not share an "identical factual predicate" with the claims asserted by the Rule 23(b)(3) class, and that their claims were not adequately represented by Class Plaintiffs.  (Pls.' Reply 4–6.)

Defendants first argue that, contrary to Old Jericho Plaintiffs' arguments about direct purchaser status, "the relevant question is whether the Old Jericho Plaintiffs meet the (b)(3) settlement class definition," which turns on "whether they are merchants that 'accepted' Visa- and Mastercard-branded cards during the relevant period."  (Defs.' Opp'n 1.)  Defendants contend that, "[a]s a matter of common sense, there can be no dispute that Old Jericho Plaintiffs accept Visa- and Mastercard-branded payment cards."  (*Id.*)  In support, Defendants note that, "[w]hen consumers present the networks' cards for payment, the Old Jericho Plaintiffs . . . accept those cards in accordance with Visa's and Mastercard's respective rules."  (*Id.*)  Defendants also assert that "all Plaintiffs have agreements with their Suppliers indicating that Plaintiffs are the

entities that 'accept' cards under the class definition," and that "the majority of the Old Jericho Plaintiffs accepted cards both through their Suppliers and through direct contractual agreements with acquirers and independent payment processors." (*Id.* at 7 (emphasis omitted).) Second, Defendants argue that Old Jericho Plaintiffs "misapply the judicial estoppel standard," because "[j]udicial estoppel requires both an inconsistent position and having that prior position adopted by the tribunal in which it was advanced." (*Id.* at 10 (citing *Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138, 148 (2d Cir. 2005)).) Third, Defendants argue that the "hybrid" purchasers "necessarily released *all* of their claims," "as long as Plaintiffs accepted *some* transactions through their own contracts with acquirers and processors." (*Id.* at 19.) Finally, Defendants argue that "Plaintiffs' claim entitlement is a factual issue that can and should be resolved in the first instance through the approved claims administration procedures," (*id.* at 23), and that "[t]he propriety of these procedures is beyond debate," (*id.* at 25; *see also id.* ("[T]he Second Circuit observed that 'there is nothing unusual about a special master' resolving 'a dispute over class membership . . . after settlement approval.'" (quoting *Fikes*, 62 F.4th at 718))).

Fikes Plaintiffs argue that "Old Jericho Plaintiffs . . . do not address or rebut the most important factual issue: that they *accepted* payment cards at their retail locations." (Fikes Opp'n 2.) They argue that Old Jericho Plaintiffs' arguments about direct purchaser status "miss[] the point," because the "issue is not 'who had the relationship with the networks.'" (*Id.*) Rather, "the relevant question here is whether the Old Jericho Plaintiffs fall within the class definition by accepting payment cards." (*Id.* at 2–3.) In support, Fikes Plaintiffs note:

> The identity of the processor matters not for determining who is in the class, because it was the retailers (like the Old Jericho Plaintiffs and every other retailer, like Wal-Mart, Home Depot, Amazon, Macy's, and the Fikes Plaintiffs) that *accepted* the payment cards at their retail locations. There is functionally no difference between

13

the big payment card processors like First Data, on the one hand, and the oil refiners, on the other hand.

(*Id.* at 3–4.)  In addition, Fikes Plaintiffs argue that "if the Court finds that the Old Jericho Plaintiffs are outside the scope of the (b)(3) class because they used refiners to process their payment card transactions, then every other retailer in the country that used processors (which is nearly all of them) must also be excluded from the class settlement," and that "such a conclusion would gut nearly the entire class, which is a non-sensical result and should be summarily dismissed."  (*Id.* at 4.)  Finally, Fikes Plaintiffs argue that Old Jericho Plaintiffs have failed to demonstrate that their indirect purchaser claims apply to *all* gas retailer class members they purport to represent.  (*Id.* at 4–5.)  In support, they argue:

> Even if the Old Jericho Plaintiffs can demonstrate that there is no genuine dispute as to any material fact about their status as class members — which they cannot — they certainly have not made that showing as to every other gas retailer in every repealer state.  The Old Jericho Plaintiffs cite examples of certain (but not all) contracts with certain (but not all) oil refiners, but those contracts do not affirmatively take a position on which entity is a direct purchaser or not, they do not say anything about which entity "accepted" payment cards, and they do not dictate who is entitled to settlement proceeds in this case.

(*Id.* at 4.)

Jack Rabbit argues that Old Jericho Plaintiffs are cost-plus direct purchasers pursuant to the cost-plus exception to the *Illinois Brick* rule.  (Jack Rabbit Opp'n 2–4.)  In support, Jack Rabbit contends that Old Jericho Plaintiffs contracted with their suppliers to have their suppliers "provide[] a fixed quantity of goods and services," including the processing of Visa and Mastercard transactions on a cost-plus basis.  (*Id.* at 3.)  Jack Rabbit thus argues that Old Jericho Plaintiffs "are members of the Rule 23(b)(3) settlement class and the [suppliers] are not."  (*Id.* at 4.)

The Court first discusses the parties' judicial estoppel arguments as a threshold issue before considering whether Old Jericho Plaintiffs are members of the Settlement Class.

### 1. Defendants are not estopped from arguing that Old Jericho Plaintiffs accepted payment cards

Old Jericho Plaintiffs argue that Defendants are judicially estopped from arguing that Old Jericho Plaintiffs are members of the Settlement Class because "Defendants confirmed that the Settlement was limited to direct purchasers," "[a]t every point along the approval process." (Pls.' Mem. 12; Pls.' Reply 3 ("At every stage of the approval process, Defendants have confirmed that the Settlement is limited to direct purchasers.").)  In support, Old Jericho Plaintiffs collect the following examples of Defendants' arguments to the contrary:

> Quoting Mastercard at the final approval hearing stating that "whoever directly pays the fee to the acquirer" is in the class, (Pls.' Mem. 13 (quoting Final Approval Hr'g Tr. 90:25–91:20)), and quoting Defendants' brief to the Second Circuit,[9] stating that "it is only that merchant — and no other — that is encompassed in the class definition," (id. (quoting Defs.' 2d Cir. Br. 24));

> Quoting Defendants' brief to the Second Circuit, stating that "a franchisor or franchisee that is deemed not to be the appropriate claimant for any of its Visa or Mastercard transactions is not a class member and thus not bound by the release.  If that non-class member has a claim — for example, because it is an indirect payor with a claim under state law — it will retain that claim," (id. (quoting Defs.' 2d Cir. Br. 42)); and,

> Quoting Mastercard at oral argument before the Second Circuit[10] stating that "any branded gas retailer that purchased network services only indirectly through its Supplier 'is not going to be within the class and as a result is not going to be subject to the

---

[9]  *See* Br. of Mastercard Defendants-Appellees ("Defs.' 2d Cir. Br."), *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 20-339 (2d Cir. Oct. 15, 2020), Docket Entry No. 209.  Visa "join[ed] in and adopt[ed]" Mastercard's brief.  *See* Letter dated Oct. 15, 2020, *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 20-339 (2d Cir. Oct. 15, 2020), Docket Entry No. 218.

[10]  (*See* Tr. of Mar. 6, 2022 Oral Argument before 2d Cir. ("2d Cir. Tr."), annexed to Decl. of Christopher J. Bateman ("Bateman Decl.") as Ex. 7, Docket Entry No. 9156-4.)

releases,'" (*id.* (quoting 2d Cir. Tr. 82:18–19)), and further stating
that the *Old Jericho* action is, "[i]n our view, . . . a case involving
indirect purchaser claims," (*id.* (quoting 2d Cir. Tr. 82:24–25)).

Old Jericho Plaintiffs argue that Defendants' "bait-and-switch" is "squarely foreclosed by

Supreme Court and Second Circuit precedent," because "judicial estoppel[] generally prevents a

party from prevailing in one phase of a case on an argument and then relying on a contradictory

argument to prevail in another phase." (*Id.* at 14 (quoting *New Hampshire v. Maine*, 532 U.S.

742, 749 (2001)).)

Defendants argue that Old Jericho Plaintiffs' arguments "misrepresent Defendants' prior

statements and the courts' holdings, and misapply the judicial estoppel standard." (Defs.' Opp'n

10.) Defendants contend that judicial estoppel "requires both an inconsistent position and having

that prior position adopted by the tribunal in which it was advanced," but argue that "Plaintiffs

fail to satisfy either requirement." (*Id.*) In support, Defendants argue that "it is evident" that

Defendants' prior statements, quoted above, "do not assert that Branded Operators or any

indirect purchasers are categorically excluded from the settlement class." (*Id.*) Further,

Defendants contend that "they never said that *all* indirect payors with state law claims fall

outside the class." (*Id.* at 11.) Rather, they characterize their prior argument as an

acknowledgment that "if a 'franchisee . . . is *deemed not to be* the appropriate claimant for any of

its Visa or Mastercard transactions,' then that entity 'is not a class member and thus not bound

by the release.'" (*Id.* (quoting Defs.' 2d Cir. Br. 42).) Finally, Defendants dispute the

significance of the arguments they made in the *Speedy Stop* litigation in Texas state court,

because they have always maintained that "all merchants are indirect purchasers," but "waived

that position for the limited purpose of the (b)(3) settlement alone." (*Id.* at 11–12, 3 n.1.)

Judicial estoppel is a doctrine that may be invoked at a court's discretion. *See New*

*Hampshire*, 532 U.S. at 742 (noting that judicial estoppel is an equitable doctrine invoked in the

court's discretion).  The doctrine of judicial estoppel prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by her in a prior legal proceeding.  *Ashmore v. CGI Grp., Inc.*, 923 F.3d 260, 271–72 (2d Cir. 2019); *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 45 (2d Cir. 2015) ("Judicial estoppel 'prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by [that party] in a prior legal proceeding.'" (alteration in original) (quoting *Bates v. Long Island R.R. Co.*, 997 F.2d 1028, 1037 (2d Cir. 1993))).  "Judicial estoppel is properly invoked where (1) a party's later position is clearly inconsistent with its earlier position," "(2) the party's former position has been adopted in some way by the court in an earlier proceeding," *Ashmore*, 923 F.3d at 272 (quoting *New Hampshire*, 532 U.S. at 750–51), and (3) "the particular factual circumstances of a case 'tip the balance of equities in favor' of" judicially estopping a litigant, *Clark v. All Acquisition, LLC*, 886 F.3d 261, 266–67 (2d Cir. 2018) (quoting *New Hampshire*, 532 U.S. at 751).  The balance of equities may tip in favor of estoppel if the "prior inconsistent position" would "g[ive] the party to be estopped an 'unfair advantage' over the party seeking estoppel." *Id.* (quoting *BPP Ill., LLC v. Royal Bank of Scot. Grp. PLC*, 859 F.3d 188, 192 (2d Cir. 2017)).  Thus, there is a "general requirement that a party seeking estoppel have suffered prejudice." *Id.*; *see also Intellivision v. Microsoft Corp.*, 484 F. App'x 616, 619 (2d Cir. 2012) ("[I]n evaluating whether to apply the doctrine of judicial estoppel, courts generally look for the existence of three factors: (1) that a party's new position is 'clearly inconsistent' with its earlier position, (2) that the party seeking to assert this new position previously persuaded a court to accept its earlier position, and (3) that the party 'would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.'" (quoting *New Hampshire*, 532 U.S. at 750–51)).  Judicial estoppel typically only applies to

17

inconsistent factual positions, not to issues of law. *See Ashmore*, 923 F.3d at 271–72 ("The doctrine of judicial estoppel prevents a party from asserting a factual position in one legal proceeding that is contrary to a position that it successfully advanced in another proceeding." (quoting *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004))); *see also Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806–07 (1999) (noting that the majority of cases applying judicial estoppel involved purely factual contradictions); *cf. In re DeFlora Lake Dev. Assocs., Inc.*, 571 B.R. 587, 599–600 (Bankr. S.D.N.Y. 2017) ("Judicial estoppel applies to inconsistent factual positions, not alternative legal theories of the case.").

The Court declines to exercise its discretion to estop Defendants from arguing that Old Jericho Plaintiffs accepted payment cards. As a threshold matter, the Court cannot say with certainty that judicial estoppel could apply in this instance. First, Defendants are not asserting contrary *factual* positions. To the extent that Defendants' arguments can be construed as "clearly inconsistent," they have asserted incongruous *legal* positions because direct (or indirect) purchaser status, although a mixed question of law and fact, is ultimately a legal conclusion. *See, e.g.*, *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 760–61 (1977) (Brennan, J., dissenting) (explaining that "antitrust 'standing'" is akin to "the concept of proximate cause in tort law"); *Leider v. Ralfe*, No. 01-CV-3137, 2003 WL 22339305, at *3 (S.D.N.Y. Oct. 10, 2003) (observing that "a court may . . . determine that a plaintiff is an improper party to bring an antitrust claim," because they lack antitrust standing (citing *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983) (*AGC*))); *see also AGC*, 459 U.S. at 535 n.31 ("Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action."). Thus, Defendants' statements to

this Court and to the Second Circuit regarding their views on whether Old Jericho Plaintiffs are direct or indirect purchasers constitute legal arguments that do not speak to whether Old Jericho Plaintiffs accept payment cards as a *factual* matter. Second, and for the same reason, Defendants' arguments are not "clearly inconsistent." Defendants did not previously argue to this Court and the Second Circuit that Old Jericho Plaintiffs *do not* accept payment cards and are now trying to argue that they do. Rather, their prior arguments were about ascertainability and they now argue that Old Jericho Plaintiffs fall within the Settlement Class as a factual matter. *See Fikes*, 62 F.4th at 715–16 (describing appellants' objections to the settlement as an "ascertainability challenge"). Finally, to the extent that this Court and the Second Circuit were "persuaded . . . to accept [their] earlier position," the courts accepted only their ultimate position that there was no ascertainability issue with respect to the class definition because only one entity in the payment chain would be able to recover in the Settlement. *See* Defs.' 2d Cir. Br. 24 ("[T]here has never been a dispute that, consistent with federal law, only one entity can recover in the settlement for any given transaction."); *In re Payment Card*, 2019 WL 6875472, at *31 ("Class Counsel has stated that in line with federal antitrust law, they represent 'only . . . the direct purchaser,' and not every entity in the payment chain." (citation omitted)). This Court found that the term "accepted" was "guided by federal antitrust standards," *In re Payment Card*, 2019 WL 68754725, at *31, and the Second Circuit cited this Court's conclusion with approval, *see Fikes*, 62 F.4th at 716 ("[T]he district court properly concluded that 'the class definition is . . . objectively guided by federal antitrust standards.'" (citation omitted)). Accordingly, Old Jericho Plaintiffs cannot properly invoke judicial estoppel where Defendants' position is neither (1) "clearly inconsistent," nor (2) was it adopted by either this Court or the Second Circuit for the same purpose as Defendants now argue. *Cf. Ashmore*, 923 F.3d at 272 ("Judicial estoppel is

properly invoked where (1) a party's later position is clearly inconsistent with its earlier position, and (2) the party's former position has been adopted in some way by the court in an earlier proceeding." (quoting *New Hampshire*, 532 U.S. at 750–51)). Accordingly, the Court declines to estop Defendants from arguing that Old Jericho Plaintiffs "accepted" payment cards.

## 2. The term "accepted" as used in the Settlement Agreement is ambiguous

"A settlement agreement is a contract that is interpreted according to general principles of contract law." *Contant v. AMA Cap., LLC*, 66 F.4th 59, 66 (2d Cir. 2023) (quoting *Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 443 (2d Cir. 2005)); *see also In re World Trade Ctr. Disaster Site Litig.*, 754 F.3d 114, 121 (2d Cir. 2014) (*In re WTC*) (citing *Collins v. Harrison-Bode,* 303 F.3d 429, 433 (2d Cir. 2002)). As a question of contract law, the court sits in diversity jurisdiction and "must apply the choice of law rules of the state in which it is located."[11] *Benicorp Ins. Co. v. Nat'l Med. Health Card Sys., Inc.*, 447 F. Supp. 2d 329, 335 (S.D.N.Y. 2006) (citing *Schwimmer v. Allstate Ins. Co.*, 176 F.3d 648, 650 (2d Cir. 1999)); *see also Omega Eng'g*, 432 F.3d at 443 (applying "the substantive law of the forum state" to interpretation of settlement agreement); *Waldman ex rel. Elliot Waldman Pension Tr. v. Riedinger*, 423 F.3d 145, 149 & n.6 (2d Cir. 2005) (applying New York law to dispute over interpretation of settlement agreement). In the context of enforcing settlement agreements, a court is empowered to find the facts necessary to determine the intent of the parties. *Serby v. First Alert, Inc.*, 664 F. App'x 105, 108–09 (2d Cir. 2016), *as amended* (Dec. 22, 2016) (finding term in settlement agreement ambiguous and remanding to district court "to consider and weigh the parties' extrinsic evidence as to the meaning of the" ambiguous term (quoting *Collins*, 303 F.3d at 433)); *Collins*, 303 F.3d

---

[11] The parties do not dispute that the Settlement Agreement provides that it "shall be governed, construed, enforced, and administered in accordance with the laws of the State of New York without reference to its conflict of laws principles." (Settlement Agreement ¶ 79.)

at 433 (finding term in settlement agreement ambiguous and remanding "for the trial court to consider and weigh extrinsic evidence to determine what the parties intended" (citing *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 430 (2d Cir. 1992))).

The role of the court is to construe a settlement agreement, as a contract, "in accordance with the parties' intent." *In re WTC*, 754 F.3d at 122 (quoting *Greenfield v. Philles Recs., Inc.*, 98 N.Y.2d 562, 569 (2002)); *Williams v. Buffalo Pub. Schs.*, No. 22-2810, 2024 WL 1460134, at *1 (2d Cir. Apr. 4, 2024) ([I]t is well-settled that a court's role 'is to ascertain the intention of the parties at the time they entered into the contract.'" (quoting *Evans v. Famous Music Corp.*, 1 N.Y.3d 452, 458 (2004))). "The best evidence of what the parties intended 'is what they say in their writing.'" *In re WTC*, 754 F.3d at 122 (quoting *Greenfield*, 98 N.Y.2d at 569). "'[T]he key inquiry at the initial stage of interpreting a contract' is therefore 'whether it is ambiguous with respect to the issue disputed by the parties.'" *Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*, 22 F.4th 83, 94 (2d Cir. 2021) (alteration in original) (quoting *Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 914 (2d Cir. 2010)); *Gary Friedrich Enters. v. Marvel Characters, Inc.*, 716 F.3d 302, 313 (2d Cir. 2013) ("At the outset, the court must determine whether the language the parties have chosen is ambiguous, after giving all 'words and phrases . . . their plain meaning.'" (alteration in original) (citations omitted)).

"A contract is unambiguous if its language has 'a definite and precise meaning,' providing 'no reasonable basis for a difference of opinion.'" *Revitalizing Auto Cmtys. Env't Response Tr. v. Nat'l Grid USA*, 92 F.4th 415, 441 (2d Cir. 2024) (quoting *Greenfield*, 98 N.Y.2d at 569); *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (recognizing that a contract provision is unambiguous "if the language it uses has a definite and precise meaning, as to which there is no reasonable basis for a difference of opinion" (citing

*White v. Cont'l Cas. Co.*, 9 N.Y.3d 264, 267 (2007))).  "The language of a contract is not made ambiguous simply because the parties urge different interpretations."  *Glob. Reinsurance*, 22 F.4th at 94 (quoting *Seiden Assocs.*, 959 F.2d at 428).  Rather, a contract term is ambiguous if it "suggest[s] more than one meaning when viewed objectively by a reasonably intelligent person." *In re WTC*, 754 F.3d at 122 (quoting *L. Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010)); *see also Glob. Reinsurance*, 22 F.4th at 94 ("[A]n ambiguity exists where the . . . contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." (second alteration in original) (internal quotation marks omitted) (quoting *Morgan Stanley Grp. Inc. v. New Eng. Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000))); *Lockheed Martin*, 639 F.3d at 69 ("[T]he language of a contract is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." (citing *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138–39 (2d Cir. 2000))).  In determining whether a contract provision is unambiguous, a court must consider the contract as a whole.  *See Glob. Reins.*, 22 F.4th at 95 ("When ascertaining the meaning of contractual language, it is important for the court to read the integrated agreement as a whole." (internal quotation marks omitted) (quoting *Lockheed Martin*, 639 F.3d at 69)).  "If the document as a whole 'makes clear the parties' over-all intention, courts examining isolated provisions should then choose that construction which will carry out the plain purpose and object of the agreement.'"  *Id.* (quoting *Lockheed Martin*, 639 F.3d at 69); *see also Westmoreland Coal Co. v. Entech, Inc.*, 100 N.Y.2d 352, 358 (2003) (stating contracts should be read "as a harmonious and integrated whole" and each part should be

"interpreted with reference to the whole . . . to give effect to its general purpose" (quoting *Empire Props. Corp. v. Mfrs. Tr. Co.*, 288 N.Y. 242, 248 (1942))).

The Settlement Agreement provides that the parties intended the Settlement Class to consist of "all persons, businesses, and other entities that have *accepted* any Visa-Branded Cards and/or Mastercard-Branded Cards in the United States at any time from January 1, 2004 to the Settlement Preliminary Approval Date [of January 24, 2010]." (Settlement Agreement ¶ 4 (emphasis added).) The parties' only dispute is as to the meaning of the term "accepted," and the term is not defined in the Settlement Agreement, nor can its meaning be ascertained by looking within the "four corners" of the agreement. *See Ezrasons, Inc. v. Travelers Indem. Co.*, 89 F.4th 388, 395 (2d Cir. 2023) ("[I]n assessing whether a contract is ambiguous, a court looks within only the four corners of the document."). The Court has already found that the term "accepted" is ambiguous, *see Interchange Fees VII*, 2024 WL 2816049, at *7–8, and that conclusion applies with equal force to these facts because suppliers and gas stations can both credibly claim to have "accepted" payment cards. The term is therefore susceptible to more than one reasonable interpretation. *Id.* ("Ambiguity exists 'where [a contract's] terms are subject to more than one reasonable interpretation.'" (alteration in original) (quoting *Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 25 N.Y.3d 675, 680 (2015))); *accord Fikes*, 62 F.4th at 715 ("The word 'accepted' creates ambiguity.").[12] Accordingly, the Court considers extrinsic evidence to determine the intent of the parties. *Revitalizing Auto Cmtys.*, 92 F.4th at 442 ("If a contract is ambiguous, extrinsic evidence of the parties' intent may be considered." (citing *Greenfield*, 98

---

[12]  *See Fikes*, 62 F.4th at 715–16 ("Both the franchisors and the franchisees claim to have 'accepted' the payment card from the customers at the service stations. The franchisees claim to have 'accepted' Visa and/or MasterCard from consumers paying for the gasoline dispensed at their stations, while the franchisors claim to have 'accepted' the payment cards by, inter alia, providing operating and processing services on the same set of transactions.").

N.Y.2d at 569)); *Ezrasons*, 89 F.4th at 396 ("[I]f the contract is ambiguous, then relevant extrinsic evidence should be admitted and considered by the factfinder to resolve the ambiguity." (citations omitted)).

### 3. The term "accepted" is "guided by federal antitrust standards"

The parties appear to agree that as between any particular supplier and gas station retailer, only one entity may be in the Settlement Class for a given transaction, and the Second Circuit has confirmed that this is a dispute about class membership. *See Fikes*, 62 F.4th at 717 ("The dispute is not over which group of class members will get the recovery; the dispute is over which claimants are within the class. Whoever 'accepted' the payment cards is by definition in the class, gets compensation, and is bound by the release; an entity that did not accept the payment is by definition excluded from the class and is not bound by the settlement."); *see also* Defs.' 2d Cir. Br. 24 ("[T]here has never been a dispute that, consistent with federal law, only one entity can recover in the settlement for any given transaction."). This understanding was confirmed by Class Counsel at the final approval hearing. *See In re Payment Card*, 2019 WL 6875472, at *31 ("Class Counsel has stated that in line with federal antitrust law, they represent 'only . . . the direct purchaser,' and not every entity in the payment chain." (citation omitted)). The Second Circuit has also cited with approval this Court's determination that the meaning of the term "accepted" is "guided by federal antitrust standards." *Fikes*, 62 F.4th at 716 (citation omitted). The parties do not appear to dispute this understanding. Accordingly, in ascertaining the parties' intent and the meaning of the term "accepted," the Court is guided by the Supreme Court's decision in *Illinois Brick* and its progeny[13] to conclude that those who "accepted"

---

[13] In *Illinois Brick Co. v. Illinois*, the Supreme Court limited standing to those who are the "direct purchasers" from antitrust violators. 431 U.S. 720 (1977). Recently, in *Apple Inc. v.*

payment cards are deemed the "direct purchasers" of card-acceptance services for the limited purpose of the Settlement Agreement. This understanding effectuates the intent of the parties in ensuring that, as between competing claimants, only one entity is entitled to make a claim of the settlement fund, which prevents duplicative recovery and further ensures that the Settlement Class is sufficiently ascertainable for purposes of Rule 23 of the Federal Rules of Civil Procedure.

### 4. Old Jericho Plaintiffs "accepted" payment cards within the meaning of the Settlement Agreement

For the reasons discussed below, the Court finds that Old Jericho Plaintiffs "accepted" payment cards within the meaning of the Settlement Agreement. In making this determination,

---

*Pepper*, the Supreme Court reaffirmed the validity of the *Illinois Brick* rule. 587 U.S. 273, 277–281 (2019).

In *Illinois Brick*, the State of Illinois and a coalition of local government entities asserted antitrust claims against Illinois Brick and other manufacturers alleging a price-fixing conspiracy that had artificially and unlawfully inflated the prices of concrete blocks used in projects funded by the state entities, such as schools and housing developments. 431 U.S. at 726–27. It was undisputed that Illinois and the local governmental entities were not the direct purchasers of concrete block. *Id.* at 726. Rather, the defendants "s[old] the block primarily to masonry contractors, who submit[ted] bids to general contractors for the masonry portions of construction projects. The general contractors in turn submit[ted] bids for these projects to customers such as . . . the State of Illinois and 700 local governmental entities in the Greater Chicago area." *Id.* Illinois and the local governmental entities were "thus indirect purchasers of concrete block," because the block "passe[d] through two separate levels in the chain of distribution before reaching" the governmental entities. *Id.* The Court held that, as an indirect purchaser, Illinois was barred from recovering from Illinois Brick. *Id.* at 728–29.

In *Apple*, the Supreme Court decided whether iPhone owners who purchased apps from Apple's "App Store" were direct purchasers of those apps from Apple. 587 U.S. at 276–277. Apple argued that iPhone owners were not direct purchasers from Apple because the app developers set the consumers' purchase price. *Id.* at 277. The Supreme Court's "straightforward conclusion" was that "under *Illinois Brick*, the iPhone owners were direct purchasers who may sue Apple" because it was "undisputed that the iPhone owners bought the apps directly from Apple." *Id.* at 279. The Court reiterated that the "bright-line rule of *Illinois Brick* . . . means that indirect purchasers who are two or more steps removed from the antitrust violator in a distribution chain may not sue." *Id.* at 280. As an example, "if manufacturer A sells to retailer B, and retailer B sells to consumer C, then C may not sue A. But B may sue A if A is an antitrust violator. And C may sue B if B is an antitrust violator." *Id.* According to the Supreme Court, this is "the straightforward rule of *Illinois Brick*." *Id.*

the Court relies on the undisputed record drawn from the parties' Rule 56.1 statements and other evidence in the record, including Old Jericho Plaintiffs' agreements with their suppliers, as well as any agreements that Old Jericho Plaintiffs had directly with acquirers or other payment processors.

### A. Old Jericho Plaintiffs' agreements with suppliers

When Old Jericho Plaintiffs had agreements with suppliers concerning processing of card transactions, these agreements support the conclusion that Old Jericho Plaintiffs "accepted" payment cards within the meaning of the Settlement Agreement. For example, Phillips 66 Co., a gas brand and supplier, includes in its agreement with a branded gas station that the gas station shall "accept and honor for payment . . . [c]ards" approved by Phillips 66. (Phillips 66 Co. Branded Marketer Agreement '095, annexed to Decl. of Jayme Jonat ("Jonat Decl.") as Ex. 11, Docket Entry No. 9202-13.) A "Payment Card Authorization Agreement" that Chevron, another supplier, has with a Chevron-branded gas station similarly states that "Chevron hereby authorizes [the gas station] . . . to accept payment cards approved by Chevron for retail sales at the [p]remises." (Chevron Retailer Supply Contract '074, annexed to Jonat Decl. as Ex. 12, Docket Entry No. 9202-14.) Numerous other agreements that suppliers share with gas stations include similar provisions. ██████████████████████████████████ █████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ World Fuel Services, Inc. Wholesale Supply Agreement '001, annexed to Jonat Decl. as Ex. 17, Docket Entry No. 9202-19 (providing that the gas station "shall accept all credit cards" and other payment cards "that Major Supplier's Branded Program allows"); ████████████████████ ██████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████ Shell Retailer Product Sales Agreement '013, annexed to Jonat Decl. as Ex. 20, Docket Entry No. 9202-22 (providing that "[r]etailer shall accept all Transaction Cards identified in [Shell's] Transaction Card guide," and that Shell "shall accept from [r]etailer all transactions generated as a result of purchases made with authorized Transaction Cards").) Such examples are representative of the general understanding that the gas station or branded retailer is the entity that "accepts" payment cards at the point of sale.[14]

The contracts that Old Jericho Plaintiffs offer as evidence are not inconsistent with this assessment of who "accepts" payment cards. (*See* Pls.' Reply 14 n.11.) ████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ █████████████████████████████████████████████████████████ ████████████████████████████████████████████████████

████████ To the extent that suppliers are, in fact, transacting with customers and placed in positions to confirm details such as the payment card's validity and the cardholder's signature, they are operating the gas stations directly and are "accepting" payment cards for the purposes of class membership. However, these agreements do not preclude ████████████████ from

---

[14] Old Jericho Plaintiffs offer examples of contracts that suppliers have with acquiring banks and payment processors and argue that the suppliers "contract with acquiring banks and/or affiliated processors to process . . . card transactions . . . and pay interchange and other processing fees to the banks or processors." (Pls.' Mem. 16–17.) As discussed above, however, who pays the interchange fee is not the question before the Court in determining class membership; rather, whoever "accepts" payment cards is deemed the direct purchaser for purposes of the Settlement Agreement.

contracting with branded gas station operators and assigning to that branded operator the suppliers' own duties under its card-acceptance agreements.  Stated differently, ███ could maintain the referenced agreement, but assign the responsibility of verifying card validity to a ███ gas station operator, in which case the gas station would fill the role of "accepting" the card. The same can be said of other sample contracts that Old Jericho Plaintiffs present as evidence.

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████ Other examples of contracts that Old Jericho Plaintiffs offer, meanwhile, reference the acceptance of "transactions" rather than cards themselves, and the Court accordingly finds these contracts unpersuasive on the matter of which entity "accepts" *payment cards* for the purpose of class membership. ██████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

In addition — as the Court observed in finding that merchants using payment facilitators like Square and Intuit are members of the Settlement Class — the way real-world transactions are conducted supports the conclusion that Old Jericho Plaintiffs, and gas station operators generally, "accept" payment cards.  In the prototypical transaction, the cardholder swipes her card at a gas station, or hands it to the gas station operator, and the gas station "accepts" the card for payment at the point of sale, just as the gas station could have instead accepted cash from a

customer.  This interpretation of "accept" comports with its plain-English meaning to "take or receive (something offered) willingly."  *See Accept*, Oxford English Dictionary, https://www.oed.com/dictionary/accept_v (last modified Mar. 2024).  Thus, it would strain the meaning of the word "accepted" to interpret it to mean that the supplier "accepts" a payment card, but the gas station "accepts" cash, for two otherwise identical transactions.

Accordingly, the Court concludes that Old Jericho Plaintiffs "accepted" payment cards for transactions processed through their suppliers.

### B. Old Jericho Plaintiffs' agreements with Acquirers and payment processors

In some instances, Defendants observe that twelve of the nineteen named Old Jericho Plaintiffs "had contractual agreements directly with acquirers or processors.  (Defs.' Opp'n 17.)  Defendants contend that such agreements were necessary as a result of the "myriad ancillary businesses" that Old Jericho Plaintiffs operated at their gas stations, such as "convenience stores, repair shops, and restaurants."  (*Id.*)  Old Jericho Plaintiffs do not dispute this characterization of the agreements that some of them had with acquirers or processors directly, but argue simply that these agreements are "immaterial," and that the volume of transactions processed under these agreements is "dwarfed by the volume processed by their Suppliers." (Pls.' 56.1 Resp. ¶ 71.)

For the transactions processed pursuant to agreements that Old Jericho Plaintiffs had directly with acquirers or processors, the parties agree that suppliers did not serve as an intermediary, and therefore the Court finds that Old Jericho Plaintiffs "accepted" payment cards for these transactions.

On this record, the Court finds that Old Jericho Plaintiffs "accepted" payment cards within the meaning intended by the parties at the time they reached the Settlement Agreement.  *Williams*, 2024 WL 1460134, at *1 ("[I]t is well-settled that a court's role is 'to ascertain the

intention of the parties at the time they entered into the contract.'" (quoting *Evans*, 1 N.Y.3d at 458)).  Accordingly, the Court finds that Old Jericho Plaintiffs are members of the Settlement Class.

### ii.  Old Jericho Plaintiffs' claims are subject to the Release provisions

Old Jericho Plaintiffs argue that "[t]he law of release confirms that the Settlement does not — and cannot — release the indirect purchaser claims of branded gas retailers."  (Pls.' Reply 4.)  Old Jericho Plaintiffs argue that "class counsel's 'authority to release claims' is '*limited by* the "identical factual predicate" and "adequacy of representation" doctrines.'"  (*Id.* (quoting *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 106 (2d Cir. 2005)).)  In support, Old Jericho Plaintiffs also argue that the settlement "may release unpled claims only if (i) they 'share the same integral facts as settled claims' and (ii) 'the released claims are adequately represented prior to settlement.'"  (*Id.* at 5 (quoting *Wal-Mart Stores*, 396 F.3d at 106).)  Old Jericho Plaintiffs contend that neither of these requirements are met.  (*Id.*)  First, Old Jericho Plaintiffs argue that their claims do not share an identical factual predicate with the claims pled by Rule 23(b)(3) class counsel because Old Jericho Plaintiffs assert claims as indirect purchasers, while class counsel pled claims on behalf of a class of direct purchasers.  (*Id.* at 5–6.)  Second, Old Jericho Plaintiffs argue that their claims were not adequately represented for a similar reason: because Rule 23(b)(3) class counsel represented only a class of putative direct purchasers, they did not represent the claims of putative indirect purchasers.  (*Id.* at 5–6 & n.6.)

Defendants first argue that "[i]t is undisputed that a merchant has released its claims if it 'accepted any Visa-Branded Cards and/or Mastercard-Branded Cards in the United States at any time from January 1, 2004 to the Settlement Preliminary Approval Date' and did not opt out of the Rule 23(b)(3) class."  (Defs.' Opp'n 9 (quoting Settlement Agreement ¶ 4).)  Second, Defendants argue that "as long as Plaintiffs accepted *some* transactions through their own

30

contracts with acquirers and processors (outside the context of Supplier agreements), they necessarily released *all* of their claims, including those arising from transactions processed through Supplier agreements."  (*Id.* at 19.)  Stated differently, Defendants contend that if a Plaintiff made at least one transaction "directly" pursuant to a contract with an acquirer or processor, then they necessarily released all of their claims, including those purportedly made "indirectly."  (*Id.*)  In support, Defendants contend that "[c]ourts routinely approve settlement agreements that subject class members to broad releases, notwithstanding that the claimants will receive only a pro rata distribution on their more limited claims."  (*Id.* at 19–20 (first citing *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 371 (1996); then citing *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 327 F.R.D. 483, 496, 508 n.40 (S.D.N.Y. 2018); and then citing *Shapiro v. JPMorgan Chase & Co.*, No. 11-CV-8331, 2014 WL 1224666, at *13 (S.D.N.Y. Mar. 24, 2014)).)  Third, Defendants argue that "the identical factual predicate doctrine poses no bar to the release of the Old Jericho Plaintiffs' claims under the Settlement Agreement."  (*Id.* at 21.) Defendants argue that the identical factual predicate doctrine applies "only when a party seeks to enforce a settlement release to bar claims that were not and could not have been raised in the underlying action," but that Old Jericho Plaintiffs' claims "could have been raised in the (b)(3) action" because they are based on "the precise fees and rules" that the Settlement Agreement references in its release provision.  (*Id.*)

A settled class action may release claims "not presented directly in [the class action] complaint" if the subsequent claims are "based on the identical factual predicate as that underlying the claims in the settled class action."  *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 248 (2d Cir. 2011) (quoting *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982)); *In re WorldCom, Inc. Sec. Litig.*, No. 02-CV-3288,

2005 WL 2495554, at *3 (S.D.N.Y. Oct. 11, 2005) ("[A] class action settlement may 'prevent class members from subsequently asserting claims relying on a legal theory different from that relied on in the class action complaint, but depending upon the very same set of facts.'" (quoting *Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*, 660 F.2d 9, 18 n.7 (2d Cir. 1981))); *see also Bank v. ICOT Holdings, LLC*, No. 18-CV-2554, 2020 WL 10224833, at *2 (E.D.N.Y. Sept. 29, 2020) (quoting the same). The authority to release claims "is limited by the 'identical factual predicate' and 'adequacy of representation' doctrines." *Interchange Fees II*, 827 F.3d at 236–37 (quoting *Wal-Mart Stores*, 396 F.3d at 106). "This rule of law serves the important policy interest of judicial economy by permitting parties to enter into comprehensive settlements that prevent relitigation of settled questions at the core of a class action." *In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 119 (S.D.N.Y. 2010) (internal quotation marks omitted); *TBK Partners*, 675 F.2d at 460 ("[I]n order to achieve a comprehensive settlement that would prevent relitigation of settled questions at the core of a class action, a court may permit the release of a claim based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might not have been presentable in the class action."). Whether a class claim pleaded in a separate lawsuit "is predicated on sufficiently similar facts as the class action claim to be barred by a class action settlement release is inherently an individualized, fact-specific [inquiry]." *In re Credit Default Swaps Antitrust Litig.*, No. 13-MD-2476, 2016 WL 2731524, at *15 (S.D.N.Y. Apr. 26, 2016) (internal quotation marks and citation omitted). In addition, "[a]dequate representation of a particular claim is established mainly by showing an alignment of interests between class members, not by proving vigorous pursuit of that claim." *Wal-Mart Stores*, 396 F.3d at 106–07. Thus, "[c]laims arising

from a shared set of facts will not be precluded where class plaintiffs have not adequately represented the interests of class members."  *Id.* at 109.

The Court finds that Old Jericho Plaintiffs' claims were released by the Settlement Agreement because Old Jericho Plaintiffs' claims satisfy the "identical factual predicate" test, and they were adequately represented by Rule 23(b)(3) class counsel.  First, Old Jericho Plaintiffs' claims are covered by the "identical factual predicate" test because they allege the same facts as the Rule 23(b)(3) Class.  (*See Old Jericho* Am. Compl. ¶¶ 29–39 (describing the "Anatomy of a Credit-Card Transaction" and concluding that Old Jericho Plaintiffs are indirect purchasers); Third Consol. Am. Class Action Compl. of the Rule 23(b)(3) Class ("Class Compl.") ¶¶ 89–100, 152–168 (describing "Interchange Fees in the context of a Payment-Card transaction" and concluding that "Merchants directly pay Interchange Fees"), Docket Entry No. 7118.)  Although Old Jericho Plaintiffs allege that they "have standing to sue as indirect purchasers," (*Old Jericho* Am. Compl. ¶ 39), such allegations are merely legal conclusions that the Court is not required to accept, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[Courts] are not bound to accept as true a legal conclusion couched as a factual allegation." (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007))).  The facts alleged in support of their indirect purchaser status are not materially different from the facts alleged by the Rule 23(b)(3) Class — the only difference is that the two classes assert different legal conclusions based on those facts. For example, Old Jericho Plaintiffs describe a transaction as follows:

> Say a motorist pulls into a franchisee Shell station and, at the pump, she inserts a Visa-branded credit card that was issued to her by a credit-card-issuing bank such as Wells Fargo, Bank of America or another licensed Visa issuer (an "Issuing Bank").  And let's say she then pumps $40 worth of gas.  The payment interface at the pump immediately sends an electronic record of the $40 transaction to the franchisor, U.S. Shell, whose computers then send the transaction on to U.S. Shell's "Acquiring Bank."  Sometimes also called an

"acquirer," the Acquiring Bank is a bank or nonbank financial institution affiliated with the Visa network (including, e.g., Chase Paymentech, Bank of America Merchant Services and First Data, or one of their agents) with whom the merchant contracts to handle its payment card transactions.

Having received the transaction message from the franchisor, the Acquiring Bank then sends the message on to the Visa network, which in turn directs the message to the motorist's Issuing Bank. If there are sufficient funds or credit on hand and the account is in good standing, the Issuing Bank transmits an authorizing message back via the network, and the Acquiring Bank then commits to "acquire" the transaction from the merchant, for the face amount minus a discount, known as the "merchant discount fee," also referred to as the "swipe fee." This whole process unfolds in seconds, or less, with each swipe or insertion of a card.

(*Old Jericho* Am. Compl. ¶¶ 30–31.) Similarly, Rule 23(b)(3) Class Plaintiffs describe a transaction as follows:

When a consumer makes a payment with a Credit or Signature Debit Card, the Merchant sends an electronic transmission to its Acquiring Bank or Third-Party Processor. The Acquiring Bank or processor then sends an electronic transmission to the Networks. The Networks relay the transaction to the Cardholder's Issuing Bank or its Third-Party Processor, which makes a payment to the Acquiring Bank, through the Networks for the purchase amount minus the Interchange Fee. The Acquiring Bank then credits the Merchant's account for the transaction amount minus the Merchant-Discount Fee, the largest component of which is the Interchange Fee. Finally, the Issuing Bank charges the Cardholder's credit account for the full amount of the purchase. Under this system, the Issuing Bank earns revenue from annual fees and interest charged to Cardholders, as well as the amount of the Interchange Fee, while the Acquiring Bank earns revenue from the difference between the Merchant-Discount Fee and the Interchange Fee.

(Class Compl. ¶ 90.) In sum, both Old Jericho Plaintiffs and the Rule 23(b)(3) Class allege that they are harmed by Defendants' imposition of supracompetitive interchange fees[15] — the only

---

[15] (*See e.g.*, *Old Jericho* Am. Compl. ¶ 87 ("But for the illegal horizontal conspiracies that resulted in the establishment of elevated interchange rates before the IPO restructuring, Visa and MasterCard would not have been able to assess, and plaintiffs would not have incurred, the

difference is the legal label that each uses to characterize their status, which is no bar to release under the identical factual predicate test. *See In re WorldCom, Inc. Sec. Litig.*, 2005 WL 2495554, at *3 ("[A] class action settlement may 'prevent class members from subsequently asserting claims relying on a legal theory different from that relied on in the class action complaint, but depending upon the very same set of facts.'" (quoting *Nat'l Super Spuds*, 660 F.2d at 18 n.7)). Just like *WorldCom* plaintiffs, Rule 23(b)(3) class plaintiffs and Old Jericho Plaintiffs assert claims relying on different legal theories that depend on fundamentally the same facts.

Second, the Court adheres to its earlier conclusion — affirmed by the Second Circuit — that franchisees such as Old Jericho Plaintiffs were adequately represented throughout this action, and Old Jericho Plaintiffs therefore cannot avoid the Release on this basis. *See Fikes*, 62 F.4th at 717–18. Although Old Jericho Plaintiffs argue that adequate representation requires that "Class Counsel represented the interests of indirect purchasers," (Pls.' Reply 5), they misstate the relevant inquiry. Rather, the Court must consider whether the class representatives "'possess the same interest and suffer the same injury' as the class members," and whether Class Counsel advanced those interests, *see Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348–49 (2011) (quoting *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)), and if so, absent class members may properly be bound by the litigation, the resulting class settlement, and the accompanying release, *Interchange Fees II*, 827 F.3d at 231. Regardless of the legal theory that Old Jericho Plaintiffs advance, they seek redress for the same injury for which Class Counsel has continued to seek recovery: harm resulting from Defendants' anticompetitive

---

inflated and supra-competitive interchange fees that apply today."); Class Compl. ¶ 4 ("The contracts, combinations, conspiracies, and understandings entered into by the Defendants harm competition and impose upon Plaintiffs and Class Members supracompetitive . . . prices . . . .").)

conduct that led to supracompetitive interchange rates.  *See Fikes*, 62 F.4th at 718 (observing that

notwithstanding the dispute between franchisors and franchisees, "they have shared an interest in

maximizing the recovery for all class members"); *Bank*, 2020 WL 10224833, at *2 ("A class

action settlement may prevent class members from subsequently asserting claims relying on a

legal theory different from that relied on in the class action complaint, but depending upon the

very same set of facts." (internal quotation marks and citation omitted)).  These interests have

continued to remain at the heart of this litigation, and the only remaining question, as described

by the Second Circuit, is whether any given claimant seeking recovery for this harm is within the

Class:

> The dispute is not over which group of class members will get the
> recovery; the dispute is over which claimants are within the class.
> Whoever "accepted" the payment cards is by definition in the class,
> gets compensation, and is bound by the release; an entity that did
> not accept the payment is by definition excluded from the class and
> is not bound by the settlement.  The class representatives owe
> nothing to the losing entities; outsiders are irrelevant.

*Fikes*, 62 F.4th at 717 (citation omitted).  To the extent that Old Jericho Plaintiffs sought to avoid

the risk of being bound by the Settlement Agreement and the Release, the appropriate course of

action was to timely opt out of the Class.[16]  Having declined to do so, Old Jericho Plaintiffs

cannot now manufacture an intra-class conflict by claiming that Class Counsel would have had

---

[16]  In addition, if the Court were to accept Old Jericho Plaintiffs' position, any Class
Member bound by the release could file a new lawsuit asserting indirect purchaser claims under
state law.  Such a result would permit potentially duplicative recovery for class members and
would undermine the "ability of a defendant to achieve 'global peace' by obtaining releases from
all those who might wish to assert claims, meritorious or not."  *In re Am. Int'l Grp., Inc. Sec.
Litig.*, 689 F.3d 229, 244 (2d Cir. 2012) (quoting *Sullivan v. DB Invs., Inc.*, 667 F.3d 273 (3d Cir.
2011)); *see also Wal-Mart Stores*, 396 F.3d at 106 ("Broad class action settlements are common,
since defendants and their cohorts would otherwise face nearly limitless liability from related
lawsuits in jurisdictions throughout the country.  Practically speaking, '[c]lass action settlements
simply will not occur if the parties cannot set definitive limits on defendants' liability.'" (citation
omitted)).

to assert all possible legal claims arising out of the same set of facts in order for the Release to apply to those claims. Accordingly, the Court concludes that the Release applies to Old Jericho Plaintiffs' indirect purchaser claims.

## III. Conclusion

For the foregoing reasons, the Court finds that Old Jericho Plaintiffs "accepted" payment cards within the meaning of the Settlement Agreement, and that Old Jericho Plaintiffs are bound by the 2019 Rule 23(b)(3) Class Settlement's Release. Accordingly, the Court denies Old Jericho Plaintiffs' motion for partial summary judgment.

Dated: September 5, 2024
      Brooklyn, New York

                         SO ORDERED:


                         _____s/MKB_____
                         MARGO K. BRODIE
                         United States District Judge