# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | Case No. 1:05-md-01720-MKB-VMS |

# OPTIUM CAPITAL LLC'S REPLY IN
# SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION

## INTRODUCTION

Cascade's response gets one thing right—that this dispute hinges on a single critical question, albeit a different one than the one it presents in its opposition: "*If there are no valid filing agreements between the class members and Spectrum, does Cascade have a claim?*"[1] No matter how Cascade tries to spin it, the answer is a resounding no.

Cascade has repeatedly tried to reframe this dispute as a simple breach of contract dispute between two businesses in an attempt to distance it from the ongoing *Interchange Fee Litigation.*[2] Optium does not dispute that Cascade is alleging a contract dispute. Instead, Optium points out that, *even taking Cascade's breach of contract claims at face value*, the threshold question is whether Spectrum's purported *Interchange Fee* filing agreements with Vail, Peet's, Sleepy's, Sleep Train, and FullBeauty Brands (the "Merchants") remained valid at the time of claim purchases by Optium—a determination that lies squarely with this Court. Optium therefore reiterates the request that this Court enjoin Cascade from pursuing its claims outside of the *Interchange Fee Litigation* for the following reasons:

*First*, this Court has already weighed in on issues concerning third-party filing agreements—like those asserted by Cascade here— as part of its role in the settlement process. In October 2014, this Court ordered all third-party filing companies for claims arising in the *Interchange Fee Litigation* to send disclaimer notices with all solicitations and to amend all then-existing filing contracts to include the same disclaimers. Sasse Decl., Ex. A at 29-30, 33-34, 59-60. Cascade-affiliated Spectrum Settlement Recovery, LLC ("Spectrum")—whose own

---

[1] Cascade Settlement Services LLC acquired Spectrum Settlement Recovery, LLC and Claimco LLC (collectively, "Spectrum"). Cascade's alleged filing agreements were entered between Spectrum and the Merchants. *See* FAC ¶¶ 1, 38, 49, 57, 58, 66.
[2] This reply references two interrelated cases: this litigation, referred to in the opening brief as the "*Visa Antitrust Litigation*" and *In re Visa Check/MasterMoney Antitrust Litigation*, No. 96-CV-5238 (E.D.N.Y.). To avoid confusion, this reply and all supporting declarations refer to this litigation as the "*Interchange Fee Litigation*" and *In re Visa Check/MasterMoney Antitrust Litigation* as the "*Visa Check Litigation.*"

misconduct in securing filing agreements was specifically highlighted by this Court—was required to send notifications to and amend filing contracts with its clients. Spectrum's recognized history of misleading claimants to secure filing agreements is squarely relevant to this dispute.

*Second*, Cascade alleges that Spectrum entered into third-party filing agreements with these Merchants prior to this Court's October 2014 Order. Thus, Spectrum was required to send disclaimer notices and amended contracts to these Merchants; Spectrum has submitted no evidence to prove that it did so, or otherwise complied with the Order in any way with respect to these Merchants. Spectrum's failure to abide by the requirements set by this Court's October 2014 Order invalidates the asserted filing agreements with the Merchants. In any event, whether or not Spectrum has complied with the October 2014 Orders—and thus had valid and enforceable filing contracts with any of these Merchants at the time of claim purchases by Optium—is entirely within this Court's domain.

*Third*, and most fundamentally, whether there were then-valid filing contracts between the Merchants and Cascade is a fundamental prerequisite to even evaluating breach of the parties' 2015 settlement agreement. The settlement agreement only requires Optium to "inquire whether [a potential] client has an ***existing*** filing contract with another company and, if so, if the company is Cascade/Spectrum." FAC ¶ 28 (emphasis added). The parties clearly intended that an "existing" contract must be valid and enforceable in order to trigger Optium's obligations under the agreement; any alternative reading would be nonsensical.

*Finally*, Cascade's purported withdrawals have no bearing on the central nature of this dispute. Optium's obligations under the 2015 settlement agreement are triggered based on whether there is an "existing filing contract" between a class member and Cascade, not whether there is a conflicting claim dispute before the Special Master. The determination of filing contract validity,

2

including Cascade's compliance with this Court's October 2014 order regarding third-party filing agreements, lies squarely with this Court, irrespective of whether Cascade has now withdrawn registration for these Merchants' claims.

## ARGUMENT

**A.     This Court Has the Authority to Enjoin Cascade "In Aid of Federal Jurisdiction"**

This Court has the authority to enjoin Cascade from pursuing its claims outside of the *Interchange Fee Litigation* under the All Writs Act, which empowers federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a).[3] "An injunction, where necessary to protect the court's earlier orders . . . is authorized under the All Writs Act[.] That power extends to non-parties." *In re Synthroid Marketing Litig.*, 197 F.R.D. 607, 610 (N.D. Ill. 2000) (internal citation omitted); *United States v. Int'l Bhd. of Teamsters*, 907 F.2d 277, 281 (2d Cir. 1990) ("Injunctions may be issued against non-parties under the All Writs Act."); *Fed. Trade Comm'n v. 4 Star Resol., LLC*, No. 15-CV-112S, 2016 WL 4138229, at *4 (W.D.N.Y. Aug. 4, 2016) ("An important feature of the All-Writs Act is its grant of authority to enjoin and bind non-parties to an action when needed to preserve the court's ability to reach or enforce its decision in a case over which it has proper jurisdiction.").

The Supreme Court "has repeatedly recognized the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise

---

[3] Although Optium's opening brief inadvertently cites to the Anti-Injunction Act while referring to the All Writs Act, the quoted language and cited references make clear that Optium intended to cite the All Writs Act. *See Paulidor v. Hemphill's Horses, Feed & Saddlery, Inc.*, No. 3:20-CV-785 (OAW), 2023 WL 4931921, at *5 (D. Conn. Aug. 2, 2023) (referencing a case defendants cited to with an incorrect citation in the court's argument in favor of defendants' position); *Vernell v. Nuvell Credit Co. LLC*, No. 2:15-cv-674-FtM-38MRM, 2016 WL 931104, at *2 (M.D. Fla. Mar. 11, 2016) ("While the Counterclaim contains a typographical error-citing the wrong jurisdictional statute, this typographical error does not warrant dismissal of this claim").

obtained[.]" *United States v. New York Tel. Co.*, 434 U.S. 159, 172 (1977); *see also Oneida Indian Nat. v. Madison Cnty.*, 376 F. Supp. 2d 280, 282 (N.D.N.Y. 2005) (same). The Anti-Injunction Act, which may limit the court's power to enjoin state court actions, allows the court to grant such an injunction "where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. "The parallel 'necessary in aid of jurisdiction' language is construed similarly in both the All-Writs Act and the Anti-Injunction Act." *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 261 F.3d 355, 365 (3d Cir. 2001).

This Court has spent nearly two decades grappling with the complexities of the *Interchange Fee Litigation*, including the intricacies in administering the settlement. As a result, the Court appointed a Special Master "to resolve any disputes or matters arising out of or relating to the Plan of Administration and Distribution." Revised Order Appointing Special Master ¶ 1, ECF No. 9403. The Court's "heav[y] involve[ment]" in the settlement and claims administration processes makes it necessary for it to enjoin Cascade from pursuing related claims in a separate court, which would "seriously impair [this Court's] flexibility and authority to decide" issues intertwined with the *Interchange Fee Litigation*. *Hutton Const. Co. v. Cnty. of Rockland*, No. 87 CIV. 4027 (LAP), 1997 WL 291954, at *3-4 (S.D.N.Y. June 2, 1997); *United States v. Am. Soc'y of Composers, Authors, & Publishers*, 442 F.2d 601, 603 (2d Cir. 1971). *See also Diabo v. Delisle*, 500 F. Supp. 2d 159, 164, 166 (N.D.N.Y. 2007).

1. **This Court Has Already Determined It Has the Authority to Issue Injunctions Concerning Third-Party Filing Contracts Arising from the *Interchange Fee Litigation*.**

Cascade asserts that its lawsuit involves a simple contract dispute between two businesses, and thus this Court does not have the authority to enjoin it from pursuing its claims in California state or federal court. But this Court has already empowered itself to adjudicate issues concerning third-party filing contracts for claims arising from the *Interchange Fee Litigation*—the very same

filing contracts that lie at the heart of Cascade's contract claims. *See* Sasse Decl., Ex. A at 53-54 ("This Court also has the authority to enjoin a third party pursuant to the All Writs Act . . . An injunction, where necessary to protect the court's earlier orders . . . is authorized under the All Writs Act.") (cleaned up).

On October 3, 2014, this Court issued an injunction, ordering third-party filing companies to comply with certain requirements for all communications and contracts with merchant class members. *Id.* ¶ 8 & Ex. A. In the Order, Judge Gleeson acknowledged that "[s]everal actors"—including Spectrum—"ha[d] been singled out by Class Counsel as requiring further scrutiny" for making materially false and misleading statements to merchant class members in an effort to secure filing agreements. *Id.* ¶ 9 & Ex. A at 15. This Court addressed Spectrum's own history of misconduct with merchants' filing agreements, both in this Litigation and the related *Visa Check Litigation*. *Id.* ¶¶ 7, 9, 11. Specifically, this Court addressed Class Counsel's concern that Spectrum used false statements to induce United Airlines, Inc. into contracting with Spectrum for third-party claims filing services, falsely implying that it risked "los[ing] data critical to the claims process" if it did not. *Id.* ¶ 9 & Ex. A at 22. Judge Gleeson also honed in on Spectrum's conduct in the *Visa Check Litigation*, where it similarly spread false and misleading information to class members to induce them into entering into filing contracts with Spectrum. *Id.* ¶¶ 11-12 & Ex. A at 8-10. Finding that "Spectrum must now be held accountabl[e] for its carelessness," the *Visa Check Litigation* court ordered Spectrum to send a corrective notice to every class member that it solicited to pursue claims and to mail notices to every class member it had a contract with to indicate that the contract "may be voided by the merchant without legal ramification." *Id.*, Ex. A at 10 & Ex. C at 12, 16.

In order to "ensure the integrity of the proceedings and the protection of the class," this

5

Court chose to take "curative action," including by "requiring the distribution of corrective notices or entering injunctive relief." *Id.*, Ex. A at 53 (citation omitted). Spectrum and all other third-party filing companies were ordered in 2014 to send disclaimer notices with all solicitations to class members and to include these same disclaimers in "any contracts drafted by third-party claims-filing services to be signed by class members." *Id.* ¶ 10 & Ex. A at 33-34. This disclaimer—which was adopted from Class Counsel's February 2014 proposal, following multiple discussions with third-party claims filing company representatives involved in the *Interchange Fee Litigation*—states:

> Claim forms are not yet available from the Class Administrator. When claim forms do become available, class members are not required to sign up with any third-party service in order to participate in the monetary relief, but may instead file their claim directly with the Class Administrator. The claim form will inform most class members of their actual or estimated interchange fees on which it is proposed their claims will be paid. You may accept or dispute this estimate with the opportunity to submit additional information. No-cost assistance will be available from the Class Administrator and Class Counsel during the claims-filing period. For additional information, class members may visit www.paymentcardsettlement.com, the Court-approved website for this case.

*Id.* ¶ 10 & Ex. B at 3; *see also id.*, Ex. A at 33-34 (ordering "up front notice" previously submitted by Class Counsel to be included in all solicitations and third-party claims filing contracts). Spectrum did not object to using Class Counsel's proposed disclaimer. *Id.* Ex. B at n.2.

Because this Court's authority to issue injunctions to third-parties to protect class members is well established, this Court should enjoin Cascade from litigating these claims outside of the *Interchange Fee Litigation*.

    **2.    This Court Has the Authority to Determine Whether Spectrum's Filing Contracts Are Valid and In Compliance with All Applicable Court Orders.**

Because this Court has the authority to issue injunctions "to protect [its] earlier orders," *In re Synthroid Marketing Litig.*, 197 F.R.D. at 610, it has the authority to determine whether or not

6

Spectrum's purported filing contracts are compliant with the October 2014 Order. The validity of these filing contracts hinges, in part, on whether Spectrum has met the specific notice and contracting requirements set by this Court. Because the validity of these filing contracts goes to the heart of Cascade's claims, this Court should enjoin Cascade from litigating this issue in any other court.

Cascade alleges that Spectrum entered into third-party filing agreements with Vail, Peet's, Sleepy's, Sleep Train, and FullBeauty Brands prior to the October 2014 Order.[4] Because these purported filing agreements predate the Order, Spectrum was required to send notifications to its existing customers and to amend existing agreements to include the mandatory disclaimer language. Sasse Decl. ¶¶ 12, 15 & Ex. A at 33-34, 59-60. Spectrum has submitted no evidence that it sent such a notice or amended its asserted filing agreements with the Merchants. *Id.* ¶ 15. In fact, Spectrum has provided no evidence to prove it complied with this Court's October 2014 Order in any way with respect to these merchants. *Id.* Further, several of these merchants have submitted declarations asserting that they had no knowledge of these purported filing agreements, and Spectrum made no efforts to keep these merchants informed of any claims filing services. *See* Walker Decl. ¶¶ 4, 9, 12 (Vail); Chang Decl. ¶¶ 3, 8, 10 (Peet's); Nuno Decl. ¶¶ 4, 11, 17 (Sleepy's/Sleep Train).[5] Spectrum's failure to abide by the requirements set by this Court's October 2014 Order invalidates the asserted filing agreements with Vail's, Peet's, Sleepy's, Sleep Train, and FullBeauty Brands. Further, Spectrum's failure to engage with any of these Merchants for several years should constitute abandonment of these contracts or serve as grounds for

---

[4] *See* FAC ¶¶ 38 (Vail, entered on May 10, 2012), 49 (Peet's, entered on June 2, 2005 and amended August 2, 2011), 57-58 (Sleepy's, entered on September 1, 2011), 58 (Sleep Train, entered on August 26, 2011), 66 (FullBeauty Brands, entered on October 3, 2005).

[5] The FullBeauty Brands claim to the *Interchange Fee Litigation* settlement pertains to one tax identification number associated with Distinctive Apparel, which Optium purchased in March 2015. Because of changes in ownership and management since the 2015 purchase, Optium has been unable to connect with prior contacts at Distinctive Apparel. *See* Sasse Decl. ¶ 14.

7

termination by the Merchants. In any event, this Court is empowered to determine whether Spectrum has in fact complied with the October 2014 Order, or if these purported filing agreements are in any way invalidated. This issue properly belongs before this Court.

   3.   **Cascade's Breach of Contract Claims are Wholly Dependent on Whether the Underlying Filing Agreements with These Merchants Were Valid.**

At the core of its claims, Cascade alleges that Optium interfered with purportedly valid filing agreements, or breached the 2015 settlement agreement by not assuming these agreements. *See* FAC ¶ 34. Foundational to both of these claims is whether there is a valid filing agreement to begin with.

After "weeks of negotiations," Cascade and Optium entered into the settlement agreement on or around May 28, 2015. *Id.* ¶¶ 24, 26. Having been ordered by this Court just a few months prior to send disclaimers and amended contracts to its existing contracts, Spectrum was well aware of the requirements laid out by this Court in its October 2014 Order. At the time Cascade and Optium entered into the 2015 settlement agreement, Spectrum was aware and on notice that non-compliant filing contracts would not be honored.

Section 2 of the settlement agreement requires Optium to "inquire whether [a potential] client has an ___existing___ filing contract with another company and, if so, if the company is Cascade/Spectrum. . . . In the event Optium purchases a Visa claim from a [Cascade/Spectrum] client, Optium will purchase the entire claim and assume the Filing Contract with the Company on the ___existing___ terms." *Id.* ¶ 28 (emphasis added). In other words, Optium's obligations under the agreement are triggered if and only if the client discloses a valid, "existing" agreement between the merchant class member and Cascade/Spectrum. This requirement is clear on the face of the agreement, and any contrary interpretation requiring Optium to inquire about *in*valid, *no-longer-existing* contracts would be entirely nonsensical. Because determinations concerning the validity

8

of the Merchant filing agreements at issue here are squarely within this Court's domain, Cascade's claims belong before this Court.

4. **Cascade's Purported "Withdrawals" Have No Bearing on This Court's Authority to Enjoin Cascade.**

Finally, Cascade asserts that there is "no longer any dispute . . . suitable for resolution by the Special Master" because Cascade's purported withdrawals "sever[] any potential nexus between Cascade's dispute with Optium and this Court's administration of the *Visa Antitrust Litigation* settlement." Opp. at 7, 10. Put differently, Cascade flatly admits that disputes concerning third-party filing contracts with these merchants belong before this Court. It instead hopes that withdrawing its registration will be enough to avoid this Court's authority long enough to take this dispute across the country to a California state court. But withdrawing registration for these claims does not change the nature of its contract claims: regardless of whether these claims are "in conflict," Cascade's lawsuit rests on the validity of its purported filing contracts, which is clearly within this Court's authority.[6]

**B.  This Court Also Has the Authority to Enjoin Cascade Under the Traditional Injunction Requirements**

In addition, an injunction to prevent Cascade from pursuing these claims in another court is appropriate because Optium can demonstrate: "(1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits . . . (3) public interest weighing in favor of granting the injunction[, and (4)] the balance of equities tips in [its] favor." *Yang v. Kosinski*, 960 F.3d 119,

---

[6] Consistent with the dispute resolution process set forth by this Court, Spectrum and Optium have worked with the Claims Administrator since April 2024 concerning "conflict" claims for Vail, Sleepy's and Sleep Train. During the course of these discussions, Spectrum indicated that it was withdrawing the claims it filed on Vail's behalf. But only five days later, Spectrum notified Optium that it planned to revoke its withdrawals, thus putting these claims back in conflict. *See* Sasse Decl. ISO Mot., Ex. D at 1-2 (July 2, 2024 letter to Claims Administrator). There is no mechanism in place to prevent Cascade from re-registering these same claims prior to the claims filing deadline, thereby reviving this dispute for the Special Master after Cascade has solidified a forum of its choice. This Court would be the proper authority to prevent Cascade from doing so.

9

127 (2d Cir. 2020).

First, allowing Cascade to pursue these claims in another court creates "a risk of inconsistent judgments" because another court may arrive at a different conclusion concerning the validity of these filing contracts. *See State Farm Mut. Auto. Ins. Co. v. Metro Pain Specialists P.C.*, No. 21-CV-5523 (MKB), 2022 WL 1606523, at *19 (E.D.N.Y. May 20, 2022) (Brodie, J.) (explaining that "risk of inconsistent judgments" is sufficient to demonstrate irreparable harm). Second, as explained above, Optium has established a likelihood of success on the merits—both with respect to Cascade's lawsuit, and the question of this Court's jurisdiction. Cascade's claims rise and fall with this Court's determination of the validity of these filing contracts. Optium has presented "sufficiently serious questions" concerning whether Spectrum has met this Court's mandates concerning mandatory disclosures and contract amendments for its filing contracts, and whether there are other grounds for invalidating these merchants' contracts. *Id.* at *14-17 (at early stages of a case, "[district courts] look to whether there is a serious question going to the merits to make them a fair ground for trial.") (cleaned up). Finally, the public interest and the "balance of equities" weigh in favor of granting this injunction. Permitting Cascade to pursue these claims outside of this Court would be an inefficient use of judicial resources, would increase the risk of inconsistent rulings, and would deny this Court's authority to enforce its own orders.

## **CONCLUSION**

For these reasons, Optium respectfully requests the Court grant Optium's Motion for a Preliminary Injunction and enjoin Cascade from pursuing these claims outside of this Court's jurisdiction, including in California state or federal court.

Dated: September 23, 2024                    Respectfully submitted,


                                             <u>*/s/ Daniel A. Sasse*</u>
                                             Daniel A. Sasse (*pro hac vice*)
                                             **CROWELL & MORING LLP**
                                             3 Park Plaza, 20th Floor
                                             Irvine, California 92614
                                             Telephone: 949.263.8400
                                             Facsimile: 949.263.8414
                                             DSasse@crowell.com

                                             Kelly Currie
                                             **CROWELL & MORING LLP**
                                             Two Manhattan West
                                             375 Ninth Avenue
                                             New York, NY 10001
                                             KCurrie@crowell.com
                                             Tel: (212) 223-4000

                                             *Attorneys for Optium Capital LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on September 23, 2024, a copy of the foregoing document was electronically filed through the ECF system and will be sent electronically to all persons identified on the Notice of Electronic Filing.

*/s/ Daniel A. Sasse*
Daniel A. Sasse