

462 Fashion Ave Fl 6
New York, NY 10018
Phone: (212) 500-1891
Fax: (917) 591-0289
E-mail: james@thelawyerjames.com
Website: www.thelawyerjames.com

January 4, 2025

**VIA ECF**

Magistrate Judge Joseph A. Marutollo
United States District Court
  for the Eastern District of New York
225 Cadman Plaza East
Courtroom N324
Brooklyn, NY 11201

RE:     **IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION**
        **Case No. 05-MD-1720 (MKB) (JAM)**
        **CardSettlement.org Request to Resume Claims Activities, and, as necessary, Request to Conduct Bilateral Discovery**

Dear Judge Marutollo:

I represent CardSettlement.org, and CardSettlement.org hereby requests leave of Court to resume claims activities with respect to potential claimants who have signed up for third party claims filing services through CardSettlement.org, as of December 26, 2024, as more particularly described in the accompanying sworn Declaration of Greg Frierson, Managing Director of CardSettlement.org ("Frierson Decl.").

The overarching and predominant concern of the Court and Class Counsel is as follows, by the Court: "I think I remain concerned that there may be a massive fraud here particularly in light of class counsel's point that in two months there's now 13,000 proofs that have been submitted **which may be appropriate or may not be appropriate**." (December 11, 2024 Transcript, 19:7-11, submitted herewith) (emphasis added). There are other concerns as stated in the accompanying transcript of the December 11, 2024 conference, and the Frierson Decl. was carefully drafted to address all of them, and to give the Court and Class Counsel comfort as to the legitimacy of CardSettlement.org's operations, which include acquiring claimants and working the claims of those claimants through the claims administration process with Epiq.

To give the Court and Class Counsel additional comfort, CardSettlement.org, as set forth in great detail in the Frierson Decl., offers to send an email, at CardSettlement.org's expense, to all potential claimants who have signed up for CardSettlement.org's claims filing services and giving those potential claimants the option of cancelling their contracts with CardSettlement.org. The foregoing email is being proposed in the same spirit as the email approved in the stipulation with Betz & Baril (another third party claims filer) by Class Counsel and "so ordered" by the Court [Dkt. No. 9465]. While the emails are not identical, the option to cancel spirit is maintained and eliminates any indicia of fraud on the part of CardSettlement.org. The law of the case doctrine, while not directly on point, is instructive here in the sense that if it was sufficient

*strategic thinking ▪ practical solutions*

for Betz & Baril, it should similarly be sufficient for CardSettlement.org.

In addition to the foregoing, CardSettlement.org and the undersigned understand and appreciate that the protection of the Class is **paramount**. To that end, CardSettlement.org hereby offers to reimburse the Class for all expenses, i.e., Epiq and Class Counse associated first alleging, and then determining, the legitimacy of any of CardSettlement.org's withdrawn authorities to represent.

CardSettlement.org hereby respectfully requests leave of Court to resume claims activities as aforesaid and as set forth more particularly in the Frierson Decl.

In closing, if and to the extent that the Court and Class Counsel believe that the previously ordered discovery remains relevant, CardSettlement.org will be prepared to deliver its responses and objections by the January 6, 2025 deadline. Correspondingly, CardSettlement.org hereby also requests leave of Court to permit CardSettlement.org to engage in bilateral – instead of one-way – discovery, i.e., that CardSettlement.org be permitted to propound discovery upon others, including but not limited to the Claims Administrator, Epic. This discovery is necessary and relevant because, for instance, by way of example only and without limitation, Class Counsel claims that the following statement made by CardSettlement.org is false: "About 1/3 of the settlement claims have potential issues preventing them from receiving a settlement. We're here to help you get these problems solved. (this is definitely worth a few minutes!)" This statement is in fact true based on CardSettlement.org's internal claims data that, if and to the extent the Court does not moot discovery in the light of the foregoing proposal, CardSettlement.org will provide to Class Counsel. In addition, discovery is also necessary because Ms. Hong at Epiq, during the December 11, 2024 conference, "provided insight" into the claims process, and stated on the record, that Epic "cannot identify if they're fraudulent like the doctor who raised a concern with us. That, we would have no way because it was a legitimate class member." Again, if and to the extent CardSettlement.org's proposed solution above does not give the Court and Class Counsel adequate comfort, discovery of Epiq is necessary and appropriate in this regard to establish the contours of Epiq's fraud mitigation policies, if any, and to determine how, if at all, CardSettlement.org may or may not be expected to operate under a different standard, that Epiq itself is not expected to meet, nor held to meet.

As always, the undersigned and CardSettlement.org remain available to discuss the foregoing at the pleasure of the Court and Class Counsel.

Respectfully submitted,
/s/James J. DeCristofaro
James J. DeCristofaro

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

IN RE PAYMENT CARD INTERCHANGE FEE
AND MERCHANT DISCOUNT ANTITRUST
LITIGATION

This document refers to: ALL ACTIONS

05-MD-1720 (MKB) (JAM)

**DECLARATION OF GREG FRIERSON**

Greg Frierson, pursuant to 28 U.S.C. § 1746, hereby declares, under penalty of perjury, that:

1.      I am the Managing Partner of CardSettlement.org LLC.

2.      As of the morning of December 11, 2024 (up to the time that the Court enjoined CardSettlement.org from submitting new claims to Epiq),[1] **13,269** potential claimants signed up for third party claims filing services through CardSettlement.org and were registered with Epiq by CardSettlement.org.  Registrations were made with Epiq by CardSettlement.org on behalf of potential claimants.

3.      Consistent with the Court's December 11, 2024 order, CardSettlement.org has not submitted any new proofs or registered any new clients with Epiq after being so directed by the Court.  However, and also consistent with the Court's December 11, 2024 order, as of, and not after, the afternoon of December 26, 2024, **4,557** potential claimants signed up for third party claims filing services through CardSettlement.org but have not been registered or otherwise submitted to Epiq.  After December 26, 2024, no new potential claimants signed up for third

---

[1]      At the December 11, 2024 telephonic conference, the Court ordered as follows, relative to CardSettlement.org submitting new claims to Epiq:  "I am going to also order that at this point pending further order of the Court, cardsettlement.org should not be processing or retrieving any **new claims** or **new submissions** or proofs and certainly should not be sending anything to EPIC absent further order of the Court because, you know, the Court may ultimately decide here to cancel all these claim filing contracts and permanently bar cardsettlement.org from any settlement related services."  (Emphasis added.) December 11, 2024 Transcript, 2:12-2:20.

party claims filing services through CardSettlement.org and CardSettlement.org stopped accepting new clients; CardSettlement.org also agrees not to accept any new clients going forward.[2]

4.      The signup process through CardSettlement.org and then Epiq is as follows.

5.      Preliminarily, the potential claimant fills out a form at CardSettlement.org, enters their business information with CardSettlement.org (contact first name, contact last name, contact title, contact phone, legal name of company, doing business as (if any), taxpayer identification number or employer identification number, address with city, state, and zip code), and signs an engagement agreement and authority to represent document for CardSettlement.org to represent the claimant in the class settlement.  True and correct copies of the form engagement agreement and authority to represent are attached to this Declaration as Ex. A.[3]  Except for

---

[2]      However, if and to the extent there was missing or incomplete information in their December 26, 2024 or earlier submission, CardSettlement.org may have worked with those potential claimants to remedy their incomplete information after December 26, 2024; regardless, these potential claimants were not registered with Epiq.

[3]      The engagement agreement provides (§4):  Client acknowledges that, although there is no legal requirement that class members enter into an engagement similar to the engagement outlined herein to file claims on their behalf, Client nevertheless has selected and engaged Company to handle Client's Claim. Client understands the Settlement Administrator is available at no cost to Client to assist during the claims-filing period. Notwithstanding such availability, Client prefers to have Company coordinate communications with the Settlement Administrator.

The authority to represent provides, in the third paragraph:  Client acknowledges that, although there is no requirement that class members retain a Third Party Filer to file Claims on their behalf and that it may file the Claims itself, Client nevertheless has selected and engaged Company to file Client's Claim and to represent Client's interest in this Action.

adding one statement to the authority to represent as instructed by Epiq,[4] the engagement agreement and authority to represent have remained unchanged since September 24, 2024.

6.      After that, CardSettlement.org strictly follows its automation process and standard operating procedures, true and correct copies of which (together with dates of effectiveness, dates of any changes, and reasons for those changes) are attached to this Declaration as Ex. B.

7.      Through the implementation of, and following steps contained in, this automation process and these standard operating procedures, potential claimants are first vetted internally at CardSettlement.org.  After that, they are then registered with Epiq.  After registration with Epiq, the information submitted by a potential claimant is matched with the information in Epiq's database, and a claim is not submitted at Epiq for participation in the class settlement unless and until the dollar amount of the gross credit card processing volume of the claim provided by Epic is approved by the claimant or the claimant initiates a research request.  In other words, the claimant must interact with CardSettlement.org before final claims submission at Epiq.  For a detailed summary of the distinction between registration and submission at Epiq, please see the Merchant Portal for the Payment Card Interchange Fee Settlement here: https://paymentcardsettlement.com/en/Login.

8.      There have been no fraudulent claims or authorities to represent submitted by CardSettlement.org to Epiq on behalf of claimants for participation in the settlement.  Any unauthorized authorities to represent or claimants or claims were discovered through implementation of CardSettlement.org's automation process and standard operating procedures before final claim submission to Epiq.

---

[4]      The following language was added at the instruction of Rick A. at Epiq to CardSettlement.org's authority to represent document template:  "The person signing this document has the authority to sign on behalf of the merchant."

9.      With respect to the **13,269** claimants registered with Epiq before the December 11, 2024 Court conference, the then-existing policies and procedures in place at CardSettlement.org were and are designed to uncover (and have in the past uncovered) any unauthorized registrations, which prevented any unauthorized claims from being <u>submitted</u> to Epiq for participation in the class settlement; this is because, as stated above, claimants, before continuing in the claims <u>submission</u> process at Epiq after <u>registration</u> with Epiq, need to approve their numbers or reconcile any deficiencies, and therefore must be active participants in the process and final claims can only be <u>submitted</u> to Epiq with the claimant's knowledge and permission, except for the situation where the claimant itself – whether directly with Epiq or with the assistance of any third party claims filing servicer like CardSettlement.org – is itself trying to defraud the class by submitting a fraudulent claim, which is not an issue unique to CardSettlement.org or any other third party claims service provider, and, as Epiq admits below, could indeed happen with Epiq, in the absence of any third party claims service provider. Specifically, during the December 11, 2024 court conference, Epiq's Jennifer Hong, in her own words, admitted that there is no way of identifying unauthorized authorities to represent or fraudulent claims as a whole:  "we cannot identify if they're fraudulent like the doctor who raised a concern with us.  That, we would have no way because it was a legitimate class member."  December 11, 2024 Transcript, 16:23-17:1.

10.      As the Court may recall, the "doctor who raised a concern with" Epiq also contacted CardSettlement.org and stated that he did not sign up for claims filing services with CardSettlement.org.  Importantly, this issue was not initially discovered through Epiq's claims administration, but rather, it was discovered by CardSettlement.org implementing and executing CardSettlement.org's aforementioned automation process and standard operating procedures,

particularly the automation process where potential claimants are sent a welcome email that includes their signed engagement agreement and authority to represent, as detailed above and attached to this Declaration as Ex. B.  Upon receipt of CardSettlement.org's welcome email to the aforementioned doctor, the aforementioned doctor contacted CardSettlement.org, and CardSettlement.org immediately notified Epiq to withdraw the corresponding authority to represent.

11.    As of December 27, 2024, **1,866** of the **13,269** potential claimants that signed up for third party claims filing services through CardSettlement.org and are registered with Epiq via CardSettlement.org have submitted final claims for participation in the settlement (either by merchant approving the credit card volume, or by CardSettlement.org submitting a "research request" on behalf of the merchant).  Although there remain **11,403** of the **13,269** that are registered with Epic but not submitted to Epiq for participation in the settlement, as of December 27, 2024, CardSettlement.org, out of an abundance of caution, stopped submitting claims to Epiq because, at the December 11, 2024 conference, the Court and the parties did not discuss the distinction between registering with Epiq, and submitting a final claim with Epiq for participation in the settlement.  While CardSettlement.org believes that the Court order covered the former, CardSettlement.org stopped submitting claims to participate in the settlement already registered with Epiq even though they already had been registered with Epiq, until such time as CardSettlement.org receives, if at all, clarification from the Court, again, out of an abundance of caution.  Notably, the Court's order did not prohibit CardSettlement.org from servicing claims already registered with Epiq, i.e., the **13,269**.

12.    Subject to the permission of the Court, CardSettlement.org proposes to send, at CardSettlement.org's expense, the following email communication to all potential claimants

who, as of December 26, 2024, signed up for third party claims filing services through CardSettlement.org, which constitutes the **13,269** potential claimants already registered with Epiq, plus the **4,557** potential claimants new to CardSettlement.org (after December 11, 2024), but not underlined registered with Epiq for a total of **17,826**:

> **Subject:** Important Confirmation Regarding Your Claim with CardSettlement.org
>
> Dear Claimant,
>
> We hope this message finds you well. We are writing to confirm your engagement with us for claim-filing services in the Visa/Mastercard Merchant Processing Settlement. Your trust in us to assist with this process is truly appreciated.
>
> As part of our ongoing commitment to transparency and excellence, we want to ensure that you willingly signed up with CardSettlement.org and were not misled into doing so. If you signed up with us knowingly and would like us to proceed with registering your claim, no action is required on your part, and we will continue providing the services as agreed.
> That being said, it's important to remind you of your options. You have the right to file your claim independently at no cost through the official claims website: paymentcardsettlement.com. The claims administrator and class counsel can provide no-cost assistance throughout this process. If you would prefer to withdraw your engagement with us and file your own claim, we completely understand and are here to assist with that process. If you file your own claim, you will have no obligation to CardSettlement.org. Simply reply to this email or contact us directly to initiate the withdrawal of your agreement.
>
> If you wish to continue with our services, you don't need to take any action.
>
> We genuinely apologize for any confusion or inconvenience this communication may cause. Transparency and integrity are at the core of our operations, and your satisfaction remains our top priority.
>
> If you have any questions or concerns, please don't hesitate to reach out. We're here to help.
>
> Thank you again for choosing CardSettlement.org.
>
> Best regards,
> Greg Frierson
> Managing Partner CardSettlement.org
> Support Email: support@cardsettlement.org
> Support Phone: 601-389-7839

13.    Each day that passes that CardSettlement.org is prevented from "processing or retrieving any **new claims** or **new submissions**" (December 11, 2024 Transcript, 19:14-15; emphasis added), **15,960** (**17,826** less the **1,866** already submitted to Epiq) CardSettlement.org continues to be harmed, both reputationally and financially; however, more importantly, the protection of the Class Members' interests is paramount, and each day that CardSettlement.org is prohibited from "processing or retrieving any **new claims** or **new submissions**" (December 11, 2024 Transcript, 19:14-15; emphasis added), **15,960** individual business representatives and the businesses that they represent – who have chosen to engage our services through executed engagement agreements and authorities to represent – are left in uncertainty.    While CardSettlement.org has already submitted **1,866** claims to Epiq, the remaining **15,960** claimants – likely Class Members – are at risk of being denied the assistance they specifically sought to secure their rightful settlements.

14.    With approximately thirty (30) days remaining until the claims filing deadline, it is imperative that these claimants are allowed to proceed with CardSettlement.org, the partner they entrusted to navigate this settlement process on their behalf.  Our ability to fulfill their requests not only ensures that these potential Class Members obtain the compensation they deserve but also upholds the fundamental principle that their interests and decisions remain the guiding priority of this settlement process.

15.    CardSettlement.org remains available to discuss the foregoing or to address any additional concerns that the Court or Class Counsel may have.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

Dated:       January 4, 2025
                 Picayune, Mississippi

Pursuant to 28 U.S.C. § 1746, I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on January 4, 2025

_____
    Greg Frierson

**<u>Ex. A</u>**

# ENGAGEMENT AGREEMENT

THIS ENGAGEMENT AGREEMENT ("Agreement") dated _____, is entered into by and between the client identified in the signature block below ("Client") and CardSettlement.org ("Company").

      1.    <u>Scope of Engagement.</u> Client is engaging Company because Client believes it is entitled to a payment in a settled class action lawsuit known as In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation, MDL No. 1720 (MDK) (JO) (the "Action"). The Action relates to excessive fees charged to businesses for accepting Visa and Mastercard cards in violation of antitrust laws. To obtain a payment from the settlement, class members must submit a valid claim ("Claim") to the court-assigned settlement administrator, Epiq Class Action & Claims Solutions, Inc. (the "Settlement Administrator"). Client hereby engages Company to work with the Settlement Administrator to determine if Client is qualified, and if qualified, to submit Client's Claim on Client's behalf.

      2.    <u>Consulting Fees and Payment to Client.</u> In consideration for Company's services (as specified further below), Client agrees to pay Company a consulting fee of 25% of Client's gross dollar recovery from the settlement. If Client does not qualify for the settlement, or if there is otherwise no recovery, Client shall not be responsible for the payment of any fees, expenses, or any costs to Company.

      3.    <u>Investigation / Termination for Non-Eligibility.</u> Following Client's engagement of Company, Company will investigate and confirm whether Client is a class member eligible for Claim submission and payment from the settlement. If Company determines Client is not eligible, or if Company otherwise chooses not to submit a Claim for Client, Company may, at any time, terminate this Agreement. If Company terminates this Agreement, Client will not be responsible for the payment of attorneys' fees, any other fees, expenses, or any costs.

      4.    <u>Scope of Engagement / Claim Submission / Authority to Represent.</u> Client has engaged Company to work with the Settlement Administrator to determine if Client qualifies for the settlement, and if qualified, to handle the entirety of the Claim submission process on Client's behalf. Client acknowledges that, although there is no legal requirement that class members enter into an engagement similar to the engagement outlined herein to file claims on their behalf, Client nevertheless has selected and engaged Company to handle Client's Claim. Client understands the Settlement Administrator is available at no cost to Client to assist during the claims-filing period. Notwithstanding such availability, Client prefers to have Company coordinate communications with the Settlement Administrator. Client grants Company full, complete, and exclusive authority to communicate with the Settlement Administrator on Client's behalf. Client authorizes Company to instruct the Settlement Administrator to communicate exclusively and directly with Company on Client's behalf. Client authorizes Company to instruct the Settlement Administrator to send Client's Claim form to Company on Client's behalf (in lieu of the Claim form being sent to Client) to eliminate the possibility Client fails to receive or review the Claim form, and to ensure Client timely submits a completed Claim. Client authorizes Company to prepare, complete, and submit Client's Claim to the Settlement Administrator and to communicate as necessary with the Settlement Administrator about Client, Client's Claim, and the Claim process. Company may respond to any follow-up requests from the Settlement Administrator or others for additional information or documentation necessary to substantiate Client's Claim or to support the amount of the proposed Claim payment amount. Company shall

instruct the Settlement Administrator as to where and by what means (check or wire) to send Client's Claim payment proceeds. Company has the authority to sign Client's signature on any document needed to present or support the Claim to the Settlement Administrator, or on any check issued to Client for Client's Claim payment proceeds for purposes of distributing Client's share and Company's fees to each accordingly.

      5.    <u>Client's Payment.</u> Client acknowledges that Client's payment will be a pro rata share of the remaining money in the settlement fund after payment of Class Counsel's attorneys' fees and costs, Settlement Administration costs, service awards to the Action's class representatives, and payments allocated to those class members who opted-out of the settlement. It is not possible to know the amount of Client's payment until all valid claims for all class members are submitted. It is the intention of the parties to have the Settlement Administrator pay Client directly for its share of the settlement proceeds (after deduction for attorneys' fees) and to pay Company directly for its consulting fees. Client agrees this agreement shall serve as an instruction to the Settlement Administrator to make payments in that fashion. However, in the event the Settlement Administrator pays Company for the full amount of Client's settlement and the payment is in the form of a check in Client's name, Client gives Company power of attorney to endorse Client's name on the check and authorizes Company to deposit the check in Company's Account, for Company to retain its consulting fees, and to issue Client's payment to Client. In the event a check or electronic payment for the full amount of the settlement is sent directly to Client from the Settlement Administrator, Client agrees to, within 3 days, deliver Company its full consulting fees by check, ACH, or wire transfer.

      6.    <u>Obligation for Payment of Consulting Fees if Client Terminates.</u> Client shall have three days from the date this Agreement is signed to terminate the Agreement. Client will owe Company nothing if termination is timely made as long as the Claim has not yet been submitted and approved. If Client terminates this Agreement within the three days from the date this Agreement is signed and a claim is submitted and approved, then the Client shall be responsible for the consulting fee due to Company by Client once the settlement is paid. Cancellation must be made by email at the email address of Company identified in the signature block below. Following three days, Client shall be bound by the terms of the Agreement, including its commitment regarding payment of consulting fees.

      7.    <u>Limited Engagement & Legal and Tax Advice Excluded.</u> Company is only engaged for eligibility confirmation and Claim submission and for no other purpose. Company's engagement does not include any legal or tax advice, including, advice relating to the effect of submitting the Claim in the Action or the taxable consequences of receiving payment from the settlement.

      8.    <u>Association of Additional Counsel.</u> Company shall have the option to associate with lawyers, law firms, accountants, and/or consultants; provided that, Client will not have to pay any additional fees to such third parties. Company may retain the services of one or more vendors to provide services as needed to process Claim. The fees and expenses of the vendor(s) will be paid by Company at no additional charge to Client.

      9.    <u>Duties of Client.</u> Client agrees to cooperate fully with Company during the course of engagement, to advise Company fully of all pertinent matters, and to provide truthful and accurate information to the best of Client's knowledge. Client agrees to keep Company informed of Client's current mailing address, email address, and telephone number, and in the event of any changes, to email Company with the new contact information. Company and Client both

agree to be available, upon reasonable request of the other, for telephone calls or email conversations to discuss the settlement, Claim process, engagement, or other events as Company or the Settlement Administrator deems necessary. If required by the Settlement Administrator, Client agrees to provide a sworn statement under penalty of perjury to support the Claim.

10.    Client's Representations and Acknowledgments. Client acknowledges it has not submitted a Claim on its own behalf nor has Client retained any other party to submit a Claim on its behalf. Client represents that it will not submit its own Claim in the future unless this Agreement is terminated in writing by Company. Client acknowledges it will not sign an agreement with any other party in the future unless this Agreement is terminated in writing by Company. In the event Company learns Client has submitted its own Claim, or there is duplicative engagement by Client of another party, Client agrees this Agreement with Company shall supersede Client's own submission or any other agreement entered into with any other party, regardless of when the submission was made or the agreement entered. Client authorizes Company to use this Agreement as evidence that it intends for Company and Company only to handle its Claim. Client represents that its interest in the Action, including its right to the proceeds of the Claim, have not been sold, assigned, or conveyed to any other person or entity, and that the individual signing this Agreement for Client has the authority to execute and bind Client to the obligations hereunder. Likewise, in the event the Client is a dissolved entity, the individual signing this agreement for Client acknowledges the signor is the rightful and lawful successor in interest to the entity entitled to receive the payment under the settlement and that no other party has claimed or is claiming entitlement to some or all of the payment. Client also represents that is not a debtor in any current bankruptcy. Client acknowledges that Company is providing value in this matter by using their experience and knowledge to ensure Client's Claim is properly submitted and to ensure that Client's Claim is filed correctly and timely.

11.    Sworn Statement. To support the Claim, Client may be required to sign a sworn statement under penalty of perjury. Client authorizes Company to make that sworn statement and sign on its behalf. By signing this Agreement, the individual signing for Client is signing under the penalties of perjury that the information submitted to Company in connection with its eligibility for Claim submission is true and accurate, including that the signor has the full authority to sign for Client, the company took Visa and Mastercard as a form of payment between 2004 and 2019, that Client did not file for bankruptcy at any time, and that Client has not assigned its right to the proceeds from the settlement.

12.    Confidentiality. The Parties agree to keep the terms of this Agreement confidential between each other, with the exception that the Parties may share the Agreement with the Settlement Administrator, Class Counsel, or the Court. Client consents to the disclosure of limited, nonprivileged information by Company to third parties, including settlement information such as settlement offers, discussions, and negotiations.

13.    Other Services. Company is only representing Client to submit Client's Claim in the Action, and for no other purpose.

14.    Additional Information. More information about the Action and the settlement may be found at the settlement website: https://www.paymentcardsettlement.com/en.

15.    Total Agreement. This Agreement represents the total agreement between Client and Company regarding consulting fees and other terms involving Client's engagement of

Company. Any modifications, additions, or other changes to this Agreement shall be made only in writing and signed by Client and Company.

16.     <u>Governing Law.</u> This Agreement shall be governed by the laws of the State of Wyoming, without regard to its conflict of laws and principles. If any term of this Agreement is held invalid or unenforceable, the remainder of the Agreement shall remain in effect.

17.     <u>Dispute Resolution; Jury Trial Waiver.</u> THIS CONTRACT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES. If Client and Company are unable to amicably resolve in good faith any dispute between them arising out of, or in connection with, this Agreement, the dispute must be submitted to binding arbitration before a single arbitrator in Sheridan County, Wyoming. The arbitration hearing shall be held virtually and shall be administered by the American Arbitration Association pursuant to its Consumer Rules., under which Client and Company shall share equally in the costs of the arbitration. Judgment on any arbitral award may be entered in any court of competent jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction in Sheridan County, Wyoming. Client and Company agree that Wyoming law applies in the determination and adjudication of the parties' rights, responsibilities, and obligations in any such dispute. Client may consult an attorney to evaluate this arbitration requirement. By entering into an agreement that requires arbitration as the way to resolve certain disputes. CLIENT WAIVES THE RIGHT TO GO TO COURT TO RESOLVE THOSE DISPUTES BY A JUDGE OR JURY.

**[Signature Page Follows.]**

IN WITNESS WHEREOF, the Parties have executed this Agreement and agree to be bound to this Agreement as of the date first written above.


## "Company"

CardSettlement.org


Signature: _____

Date: _____

Name: _____

Title: _____

Email: _____

Address: _____

_____


## "Client"

_____
(Entity Name)


Signature: _____

Date: _____

Name: _____

Title: _____

Email: _____

Address: _____

_____

# AUTHORITY TO REPRESENT

Date: _____

On behalf of:_____, with Taxpayer Identification Number: _____, ("Client"), I, _____,_____, hereby authorize CardSettlement.org ("Company"), to act as my Third Party Filer, representative, and agent in connection with all my rights as a potential class member entitled to a payment in a settled class action lawsuit known as In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation, MDL No. 1720 (MDK) (JO), ("Action").

Client hereby instructs the Settlement Administrator, Epiq Class Action & Claims Solutions, Inc. ("Epiq"), to send Client's Claim form directly to Company as Company will submit the required Claim and/or information on Client's behalf. Company has Client's full authority and consent to file Client's Claim and to communicate with Epiq on Client's behalf, including the filing of additional information and documentation through the entire Claims process. Epiq shall share any information about Client's Claim with Company that Company requests. Company shall have the full authority of the Client to accept the sum to be paid by the settlement administrator based on the criteria used by the settlement administrator for claims.

Client acknowledges that, although there is no requirement that class members retain a Third Party Filer to file Claims on their behalf and that it may file the Claims itself, Client nevertheless has selected and engaged Company to file Client's Claim and to represent Client's interest in this Action.

Company shall be paid Twenty-Five percent (25%) of the gross amount due Client for Client's Claim. Company's Twenty-Five percent (25%) payment shall be sent by Epiq directly to Company, and Client's share of the payment (the remaining Seventy-Five percent (75%)) shall be sent by Epiq directly to Client. However, in the event the Settlement Administrator pays Company for the full amount of Client's settlement and the payment is in the form of a check in Client's name, Client gives Company power of attorney to endorse Client's name on the check and authorizes Company to deposit the check in Company's Account, for Company to retain its consulting fees, and to issue Client's payment to Client. In the event a check or electronic payment for the full amount of the settlement is sent directly to Client from the Settlement Administrator, Client agrees to, within 3 days, deliver Company its full consulting fees by check, ACH, or wire transfer. Client acknowledges that Company represents other clients in connection with the submission of Claims in this Action.

**\*\*\* The person signing this document has the authority to sign on behalf of the merchant. \*\*\***

All Communication regarding Client's Claim should be directed to Company.

CardSettlement.org

Greg Frierson, Managing Partner

1718 Capitol Avenue

Cheyenne, WY 82001

601-389-7839

claims@cardsettlement.org

**[Signature Page Follows.]**

IN WITNESS WHEREOF, the Client has executed this Agreement as of the date first written above.

**"Client"**

_____
(Entity Name)


Signature: _____

Date: _____

Name: _____

Title: _____

Email: _____

Address: _____

            _____

# The person signing this document has the authority to sign on behalf of the merchant.

**Ex. B**

# Automation Process List

---

**1. Client Welcome Email (Post-Engagement Letter Signing) (**Started  Sep 24, 2024  )

- **Trigger**: Client signs the engagement letter and the authority to represent forms.
- **Action**:
    - Send a welcome email to the client.
    - **Content of Email**:
        - Copies of the signed engagement letter and authority to represent forms.
        - Explanation of expected next steps in the process.
        - Contact details: support email and phone number..

---

**2. Conflict Notification Email**  (Started  Oct 29, 2024  )

- **Trigger**: Identification of a conflict in the client's file.
- **Action**:
    - Send an email notifying the client that their file is labeled as a conflict.
    - **Content of Email**:
        - Explanation of what a conflict entails.
        - Notify the client that they will receive another email with more details about the type of conflict.
- **Follow-up**: Ensure the second email detailing the conflict is sent.

---

**3. Deficiency Notification Email** (Started  Oct 29, 2024  , Revised  Nov 11, 2024  )

- **Trigger**: Identification of deficiencies in the client's documentation or information.
- **Action**:
    - Send an email to the client allowing them to upload supporting documents to clear the deficiencies.
    - **Content of Email**:
        - Clear instructions for submitting the required documents.
        - Link to upload their documents.
- **Follow-up**: Send reminders if the client does not submit the documents.

## Revision History

**Revision Date:** 11/11/2024

**Reason for Update:**

It was identified that there was a delay in communicating deficiency details during the initial entry process. While deficiencies were reported within a week of submission, the specific types of deficiencies were not communicated until approximately a week later. This gap in communication created potential inefficiencies and hindered timely corrective actions.

**What Was Updated:**

- An initial notification email is now sent promptly upon identifying a deficiency, informing relevant parties of the issue.
- A follow-up email is dispatched after the deficiency type report has been uploaded to the software, providing detailed information about the specific deficiencies and required corrective actions.
- This two-step notification process ensures clearer communication, faster response times, and improved workflow transparency.

---

## 4. Credit Card Volume Review Email (Started  Nov 11, 2024 )

- **Trigger**: Receipt of credit card volume data for the client.
- **Action**:
    - Send an email to the client to review and approve or reject the amounts.
    - **Content of Email**:
        - Details of the credit card volumes for review.
        - Instructions to approve or reject the amounts.
        - If rejected, automatically forward the client to complete a research request form.
- **Follow-up**: Send reminders if the client does not review or respond.

---

## 5. Approved $0 Notification Email (Started  Nov 11, 2024 )

- **Trigger**: A client is marked as "Approved" but with $0.00 amounts.
- **Action**:
    - Send an email explaining the "Approved $0.00" status.
    - **Content of Email**:
        - Clarify what "Approved $0.00" means.

- ■ Request the client to complete a research request form to address the issue.
- **Follow-up**: Send reminders if the client does not complete the research request.

---

**6. Unresponsive Client Process** (Started  Nov 25, 2024 )

- **Trigger**: Client does not complete the required steps after reminders.
- **Action**:
  - Mark the file as "Unresponsive."
  - Assign the case to the unresponsive team.
  - Unresponsive team initiates phone calls to resolve the issue.

---

## Additional Notes

- **Reminders**: For all automations, reminders are sent if the client does not take action within a specified timeframe.
- **Escalation**: If the client remains unresponsive after reminders, the case is escalated to the unresponsive team.

# Standard Operating Procedure (SOP): New Client Onboarding Process. (Started  Sep 24, 2024 , Revised  Nov 20, 2024 )

## Purpose

To ensure a thorough and standardized onboarding process for all new clients, validating client information, identifying discrepancies, and ensuring compliance with regulatory and organizational requirements before submission to the portal.

## Scope

This SOP applies to all personnel involved in the client onboarding process, including the Review Team and the Submission Team. It covers the validation of all client documents, communication protocols, and final submission steps.

## Process Overview

**1. File Review**

- Open the client file in the designated system.
- Ensure all necessary documents are present, including but not limited to:
    - Authority to Represent (ATR) form.
    - Supporting documents for EIN validation, if applicable.
    - Any additional forms or agreements required for submission.
- Confirm that the ATR form is the latest version approved by the organization. Any outdated forms must be flagged and replaced.

**2. EIN Validation**

- **Verification Process**:
    - Compare the provided Employer Identification Number (EIN) against the current whitelist of IRS-approved EIN numbers.
- **Actions Based on Validation Results**:
    - **Valid EIN**: Proceed to the next step.
    - **Invalid EIN**:
        - Mark the file as "Invalid EIN" in the system.
        - Notify the client via email and/or phone, providing clear instructions on how to correct or verify their EIN.
        - Pause further review until the issue is resolved.

### 3. Name and Address Verification

- **Name and Email Validation**:
  - Ensure the client name does not match known spam, fraudulent entries, or blacklisted names.
  - Use automated tools and manual review to verify the legitimacy of the name.
- **Address Validation**:
  - Confirm the address appears legitimate using:
    - Google Maps or similar tools.
    - Public records or official documentation, if required.
  - **Suspicious Addresses**:
    - If the address appears suspicious or invalid, mark the file as "Needs Review."
    - Contact the client to verify the address and request supporting documentation if deemed necessary.

---

### 4. Representative Title Check

- **Validation Process**:
  - Verify that the representative's title matches one of the approved titles in the software (e.g., Owner, CEO, Manager, etc.).
  - If the title is missing or not on the approved list:
    - Mark the file as "Title Needs Updating."
    - Notify the client via email with a request to update the title and re-sign the ATR form.
  - Provide templates or examples to assist clients in updating their information.

---

### 5. Submission Preparation

- Once all discrepancies are resolved:
  - Confirm that the file is complete and all validations have been logged.
  - Notify the Submission Team to begin the upload process.
- **Submission Team Actions**:
  - Upload the ATR and associated documents to the portal.
  - Verify successful upload and document the submission in the system.
  - Notify the client of successful submission and provide confirmation.

---

## Key Points of Compliance

- **Discrepancy Resolution**:
  - All discrepancies, including EIN issues, address mismatches, and title concerns, must be resolved before submission.
  - No files may be submitted with outstanding issues.
- **Timely Client Communication**:
  - Contact clients within 24 hours of identifying an issue.

- Provide clear and concise instructions for resolution, including examples where necessary.
- **File Marking and Tracking**:
  - Accurately mark all files in the system with appropriate statuses (e.g., "Invalid EIN," "Needs Review").
  - Ensure tracking logs are updated at every stage of the review process.

---

## Roles and Responsibilities

1. **Review Team**:
   - Conducts initial checks, including EIN, name, address, and title validation.
   - Flags discrepancies and notifies clients promptly.
   - Logs all interactions and updates in the system.
2. **Submission Team**:
   - Handles final preparation and uploads of client files to the portal.
   - Ensures all files are complete and meet compliance standards before submission.
   - Confirms submission and provides clients with necessary follow-up communications.

---

## Communication Guidelines

- **Templates**:
  - Use standardized approved email templates for notifying clients of discrepancies.
  - Include detailed instructions and examples where applicable.
- **Follow-Up**:
  - Ensure all client queries are addressed within 48 hours.
  - Assist clients with additional support when needed.

---

## Document Management

- **File Integrity**:
  - All client files must be securely stored and accessed only by authorized personnel.
  - Maintain version control for all documents to prevent outdated forms from being used.
- **Whitelist Updates**:
  - Regularly update the IRS-approved EIN whitelist in the software.
- **Audit Logs**:
  - Maintain a detailed log of all communications, and actions taken.

---

## Escalation Protocols

- **Unresolvable Issues**:
  - If a discrepancy cannot be resolved after three attempts to contact the client, escalate the file to a supervisor for review.

---

## Quality Assurance

- Conduct monthly audits of a random sample of files to ensure compliance with the SOP.
- Provide ongoing training to team members on updates to the SOP or submission requirements.

**Revision History**

1. **Revision Date:** 11/20/2024
   **Reason for Update:**
   Notification from class counsel via the claims administrator that spam files were erroneously entered as initial entries to Epiq.
   **What Was Updated:**
   - Enhanced verification protocols were introduced to safeguard against the inclusion of unauthorized or irrelevant files in future submissions.
   - A comprehensive review process was established, ensuring all Authority To Represent (ATRs) undergo rigorous checks before submission.
   - Specific verifications were implemented for each Authority To Represent document to confirm the validity of critical data points, including address, name, title, and EIN. These additional checks are designed to detect and filter out any anomalous or spam entries before they proceed through the workflow.
   - The updated process emphasizes accountability and compliance, aligning with best practices for data accuracy and administrative oversight.

# Standard Operating Procedure (SOP): Processing Files Through EPIQ. (Started  Sep 24, 2024 , Revised  Oct 29, 2024 ,Revised  Nov 11, 2024 , Revised  Nov 20, 2024 ,

---

## Purpose

To outline the procedure for processing files submitted to EPIQ, ensuring smooth handling and providing references for handling exceptions.

---

## Scope

This SOP applies to all files submitted to EPIQ that progress through the standard process and guides team members to additional SOPs for handling exceptions.

---

## Process Workflow

### Step 1: File Submission

1. Submit the client's file to the EPIQ system.
2. Monitor the file for its initial status update in the portal.

### Step 2: Monitoring File Status

Within two weeks, the file will typically update to one of the following statuses:

- **Auth Status: Approved**: Proceed with Step 3.
- **Auth Status: Deficient**: Refer to the SOP titled **"Handling Auth Status: Deficient"**.
- **Auth Status: Under Conflict**: Refer to the SOP titled **"Handling Auth Status: Conflict"**.

### Step 3: Handling "Auth Status: Approved"

1. Check the interchange amount:
   - If the interchange amount is **$0.00**, refer to the SOP titled **"Handling Auth Status: "Approved $0" and "Client Rejected" Dollar Amounts"**.
   - If the interchange amount displays dollar values, proceed with Step 4.

### Step 4: Sending an Approval Request Email

1. Send an Approval Request Email to the client, which includes:
    ○ The sales volume provided on their account.
    ○ Instructions for the client to either approve (thumbs up) or deny (thumbs down) the gross credit card processing dollar amounts provided by EPIQ for their claim.

**Step 5: Receiving Client Feedback**

1. If the client responds with:
    ○ **Rejected** (Thumbs Down): Refer to SOP titled **"Handling Auth Status: "Approved $0" and "Client Rejected" Dollar Amounts"**.
    ○ **Approved** (Thumbs Up): Proceed with Step 6.

**Step 6: Final Review**

1. The Final Review Team performs a thorough review of the client's file to ensure accuracy.
2. Once the review is complete, submit the file to EPIQ using their **Bulk Claim Submission** process.

**Step 7: Marking the File as Complete**

1. Update the system to mark the file as **Complete**.
2. Notify the client that their file has been successfully processed.

---

## Responsibilities

- **Processing Team**:
    ○ Monitor file statuses and direct files to the appropriate workflows.
    ○ Communicate with clients regarding approvals or exceptions.
- **Final Review Team**:
    ○ Ensure accuracy of files prior to submission.
    ○ Complete the bulk claim submission process.

---

## Linked SOPs

- **Handling "Auth Status: Deficient"**
- **Handling "Auth Status: Conflict"**
- **Handling "Auth Status: "Approved $0" and "Client Rejected" Dollar Amounts"**

# Revision History

**Revision Date:** 10/29/2024
**Reason for Update:**
Identified inefficiencies due to excessive emails sent to the conflict team (Claim Admin)  before the conflicting third party agreed to withdraw.

**What Was Updated:**

- ○ Adjusted the process to send an initial email to the third party in conflict, with the conflict team CC'd to monitor responses.
- ○ The conflict team is only engaged with the claims admin once the third party confirms their withdrawal, streamlining communication and reducing unnecessary email traffic.

**Revision Date:** 11/11/2024
**Reason for Update:**
After gaining a clearer understanding of the requirements to complete a Research Request, we identified the need for a more efficient process.

**What Was Updated:**

- ○ Developed a form for clients to provide the necessary information for Research Requests.
- ○ Created an email template that directs clients to complete the form on our website, streamlining and simplifying the Research Request process.

**Revision Date:** 11/20/2024
**Reason for Update:**
Notification from class counsel via the claims administrator that spam files were erroneously entered as initial entries to Epiq.

**What Was Updated:**

- ○ Enhanced verification protocols were introduced to safeguard against the inclusion of unauthorized or irrelevant files in future submissions.
- ○ A comprehensive review process was established, ensuring all Authority To Represent (ATRs) undergo rigorous checks before submission.
- ○ Specific verifications were implemented for each Authority To Represent document to confirm the validity of critical data points, including address, name, title, and EIN. These additional checks are designed to detect and filter out any anomalous or spam entries before they proceed through the workflow.
- ○ The updated process emphasizes accountability and compliance, aligning with best practices for data accuracy and administrative oversight.

# Standard Operating Procedure (SOP): Handling Auth Status: "Approved $0" and "Client Rejected" Dollar Amounts. (Started  Oct 14, 2024 , Revised  Nov 11, 2024 )

---

## Purpose

To outline the steps for processing files with "Auth Status: Approved" but showing $0 interchange dollar amounts or when clients reject the provided gross credit card processing and interchange fee dollar amounts.

---

## Scope

This SOP applies to all employees managing cases where clients' files show "Auth Status: Approved" with $0 interchange amounts or when clients issue a "Thumbs Down" (rejected) response to the gross credit card processing and interchange fee dollar amounts provided by the claims administrator.

---

## Process Workflow

### Step 1: Client Notification

1. Notify the client via email about their file status:
    - If the file shows "Approved" but with $0 interchange amounts, explain the situation.
    - If the client issued a "Thumbs Down" (rejected) response, acknowledge their feedback.
2. In both cases, request the client to complete a **Research Request** by providing the following details:
    - Merchant ID number(s).
    - Merchant Services Processor Name(s).
    - Uploaded Copy of Merchant statements (if any).
    - DBA Information.
    - Addresses with the business/used during the claims period.
    - An estimate of the **Average Yearly Total Payment Card Sales Volume** during the class period.

- ○ Any Additional Information (free type field and ability to upload any supporting documentation).

**Step 2: Marking Research Request as Completed**

1. Once the client submits the requested data:
   - ○ Update the status in the system to **"Research Request Completed."**

**Step 3: Upload Team Review**

1. The Upload Team:
   - ○ Review the data submitted by the client to ensure completeness and accuracy.
   - ○ Completes a Research Request in the EPIQ portal for the client based on the submitted information.

**Step 4: Follow-Up**

1. Ensure all updates are properly documented in the software.
2. Monitor the EPIQ portal for status changes or additional feedback required.

---

## Responsibilities

- **Processing Team**:
  - ○ Monitor files for "Auth Status: Approved $0" and Client Rejected Dollar Amounts, and ensure that correct actions are taken to resolve the status or rejection.
- **Client Services Team**:
  - ○ Communicate with the client and gather required research data.
  - ○ Mark research requests as completed in the system.
- **Upload Team**:
  - ○ Review and validate client-provided data.
  - ○ Submit the Research Request in the EPIQ portal.

---

## Key Notes

- Maintain clear and professional communication with the client throughout the process.
- Ensure that all required information is provided by the client before marking the research request as completed.
- Document all actions and communications in the software for tracking and audit purposes.

# Revision History

**Revision Date:** 11/11/2024
**Reason for Update:**
After gaining a clearer understanding of the requirements to complete a Research Request, we identified the need for a more efficient process.

**What Was Updated:**

- Developed a form for clients to provide the necessary information for Research Requests.
- Created an email template that directs clients to complete the form on our website, streamlining and simplifying the Research Request process.

# Standard Operating Procedure (SOP): Handling "Auth Status: Conflict". (Started  Oct 14, 2024 , Revised  Oct 29, 2024 )

---

## Purpose

To provide a detailed procedure for handling files marked with "Auth Status: Conflict," including client communication and resolution steps.

---

## Scope

This SOP applies to all employees handling files flagged with "Auth Status: Conflict" in the software.

---

## Process Workflow

**Step 1: Initial Notification to Client**

1. When a file is marked as "Auth Status: Conflict":
   - Send an email to the client notifying them of their file status.
   - Provide a brief explanation of what "Conflict" means.
   - Inform the client that the specific conflict type will be determined within the next 10 business days.

**Step 2: Determining Conflict Type**

1. Once the conflict type is identified, categorize it as either:
   - **Owner/Paper Conflict**
   - **Third Party Conflict**

**Step 3: Handling "Owner/Paper Conflict"**

1. Send the **Owner/Paper Conflict Email** to the client. Include:
   - An explanation of the conflict type.
   - A request for the client to confirm if they wish to continue using CardSettlement.org services.
2. Based on the client's response:
   - **If the client wishes to continue**:
     1. Notify EPIQ to review the file.

    2. Once reviewed, and portal data is updated, ensure the conflict is removed in the software.
- **If the client does not wish to continue**:
    1. Respond to the client's email, confirming their decision to withdraw.
    2. Mark the file as "Withdrawn" in the software.
    3. Add a note in the software detailing the client's decision and communication.

**Step 4: Handling "Third Party Conflict"**

1. Send a letter to the client requesting:
    - Confirmation if they wish to continue using CardSettlement.org services.
    - Their signature on the provided letter.
2. Based on the client's response:
    - **If the client wishes to continue**:
        1. Forward the signed letter to the conflicting third party.
        2. Await a response from the conflicting third party.
        3. Keep the client informed of any progress.
    - **If the client does not wish to continue**:
        1. Respond to the client's email copying the conflicting third party confirming the client's and our company's decision to withdraw from the claim.
        2. Mark the file as "Withdrawn" in the software.
        3. Add a note in the system documenting the client's decision and communication.

---

## Responsibilities

- **Processing Team**:
    - Monitor files for "Auth Status: Conflict" and ensure that correct actions are taken to begin the resolution process for resolving the conflict.
- **Client Services**:
    - Communicate with clients promptly and provide any necessary service and support.
    - Monitor file statuses and ensure accurate updates in the software.

---

## Key Notes

- Ensure all communications with the client are documented in the system.
- Follow up on client responses to ensure timely conflict resolution.

## Revision History

**Revision Date:** 10/29/2024
**Reason for Update:**
Identified inefficiencies due to excessive emails sent to the conflict team (Claim Admin) before the conflicting third party agreed to withdraw.


**What Was Updated:**

- ○ Adjusted the process to send an initial email to the third party in conflict, with the conflict team CC'd to monitor responses.
- ○ The conflict team is only engaged with the claims admin once the third party confirms their withdrawal, streamlining communication and reducing unnecessary email traffic.

# Standard Operating Procedure (SOP): Handling "Auth Status: Deficient". (Started  Oct 14, 2024 , Revised  Oct 29, 2024 , Revised  Nov 11, 2024 )

## Purpose

To outline the step-by-step process for managing files with the "Auth Status: Deficient" status after data is imported from the portal.

## Scope

This procedure applies to all personnel responsible for handling files with the status "Auth Status: Deficient" within the organization.

## Process Workflow

**Step 1: Initial Notification to Client**

1. Upon identifying a file with "Auth Status: Deficient":
   - Send an email to the client notifying them that their file has been marked as deficient.
   - Inform the client that the deficiency type will be determined and communicated within the next few days.

**Step 2: Weekly Spreadsheet Import**

1. Every **Tuesday**, the "Deficiency Code" spreadsheet is received from EPIQ.
2. Upload the spreadsheet into the software to identify the specific deficiency type for each deficient file.

**Step 3: Handling Deficiency Types**

- Based on the deficiency type, take the following actions:

**A. Deficiency Type: NAM (Name and EIN Verification)**

1. Send an email to the client requesting them to upload a document verifying the **Name of the Company** and the **EIN**.

2. Once the client uploads the requested document:
   ○ Notify the **Upload Team**.
   ○ The Upload Team will:
     ■ Review the uploaded document.
     ■ Upload the supporting document to Epic's portal.

**B. Deficiency Type: AUT (Authority to Represent) or SIG (Signature Verification)**

1. Verify the **Authority to Represent (ATR)**:
   ○ If the ATR is correct:
     ■ Resubmit the file to ensure proper upload (to account for any prior submission issues).
   ○ If the ATR is incorrect:
     ■ Reach out to the client via email to request an updated **Authority to Represent (ATR)** form.

---

## Responsibilities

- **Processing Team**:
  ○ Monitor files for "Auth Status: Deficient" and ensure that correct actions are taken to resolve the deficiency.
- **Upload Team**:
  ○ Review and upload supporting documents to EPIQ's portal.
- **Client Services**:
  ○ Communicate with clients to request necessary documents or updates.

---

## Key Notes

- Ensure timely communication with clients regarding deficiencies.
- Follow up on missing documents to avoid processing delays.
- Document all actions in the software for audit purposes.

# Revision History

Revision Date: 10/29/2024
**Reason for Update:**
We received an email listing all deficiency types and identified the need for clearer tracking and resolution methods.

**What Was Updated:**

- Added all deficiency types to the software as predefined categories.
- Included instructions for resolving each deficiency type to streamline the process and improve efficiency.

Revision Date: 11/11/2024
**Reason for Update**:
It was identified that there was a delay in communicating deficiency details during the initial entry process. While deficiencies were reported within a week of submission, the specific types of deficiencies were not communicated until approximately a week later. This gap in communication created potential inefficiencies and hindered timely corrective actions.

**What Was Updated:**

- An initial notification email is now sent promptly upon identifying a deficiency, informing relevant parties of the issue.
- A follow-up email is dispatched after the deficiency type report has been uploaded to the software, providing detailed information about the specific deficiencies and required corrective actions.
- This two-step notification process ensures clearer communication, faster response times, and improved workflow transparency.