# EXHIBIT A

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

_____
                               )
IN RE PAYMENT CARD             )
INTERCHANGE FEE AND MERCHANT   )
DISCOUNT ANTITRUST             )
LITIGATION,                    )
                               )No. 1:05-md001720(MKB)(JAM)
          Plaintiff,           )
                               )
     vs.                       )
                               )
_____)

REMOTE VIDEOTAPED DEPOSITION OF

LAWRENCE RAPOPORT

Thursday, January 9, 2025

Volume I

Reported by:
ALEXIS KAGAY
CSR No. 13795
Job No. 7102783
PAGES 1 - 171

Page 1

remove the language to accommodate you because I

learned a long time ago the importance and

strategic -- or the importance of strategic

compromise and acting in good faith to avoid

unnecessary conflict.                                    06:20:52

        So despite our confidence that the language

was appropriate and justified, we said, Okay,

Ms. Bernay, we're going to remove that, even though

we don't have to.

        The second thing was you said that the video    06:21:03

contains -- or, sorry, does not contain the

court-mandated disclaimer language, and I let you

know that we updated the language at the end of the

video, we wrote the disclaimer in easily readable

large text.  We didn't want something on there small    06:21:17

that people had to -- you know, couldn't really

read.  It's important they could see it clearly.

        Now, that being said, the court-mandated

disclosure applied specifically to solicitations.

The video in question was not a solicitation but        06:21:32

rather an explainer for an informational video.

Therefore, I 100 percent believe that the inclusion

of the disclosure was not originally required.

        Nevertheless, of course, we chose to

incorporate the disclosure into the video in good       06:21:45

Page 61

faith to mitigate potential contention, even though we were confident the language was not applicable in this context.

And then the third thing that you said happens to be that we have something on the site    06:21:57 where it says "Who can file a claim," and then it says, you know, "File a claim now to see if you qualify."

And you said that -- that that makes it appear that the merchants are filing the claim with    06:22:10 us as opposed to actually signing up for claims-filing services.

Now, let's be clear; right?  The phrase "file a claim now to see if you qualify" simply directed potential clients to take the initial step of    06:22:21 signing up for our claims-filing services.  It did not imply that they were filing the claim directly with us or any other entity.

However, just like the other two, in good faith, to address your concerns, we removed the    06:22:34 language from the FAQ section.  The change was unnecessary, as the wording was accurate and clear, but we acted to prevent further unwarranted contention.

So my testimony is that the three things that    06:22:46

Page 62

you brought up that you called misleading or misinformation or however you define them, you are incorrect, we were correct, but to appease you and to avoid contention and to avoid having any potential issues, out of wanting to have a good    06:23:02 relationship, we said no big deal to all of those, called up the developer and had them make those changes.

And you can quote -- you know, check for yourself, but I think, whether it was within a few    06:23:14 minutes or a few hours, it was that day, I e-mailed you multiple times with updates as they were happening, and then everything was done that you requested in less than 24 hours.

So that's my testimony.    06:23:28

BY MS. BERNAY:

Q    Okay.  You mentioned that there had been something that said "sign up today," I think is how you phrased it, that had been on the website?

A    I think it was --    06:23:44

Q    Or filing --

A    Something -- I think it was -- the FAQ was "Who can file a claim," and it said -- and I think it said "File a claim now to see if you qualify."

Q    Okay.  But earlier today, you testified that    06:23:55

Page 63

at no time was cardsettlement.org soliciting for merchants to file their claims, but you just said that they were -- it was so that they could sign up for claims-filing services.

So how do you reconcile those two statements,    06:24:12 sir?

A   So cardsettlement.org was not soliciting to merchants.  We've never solicited.  We haven't sent any marketing.  We haven't -- you know, whatever the things were that you listed, we have not solicited.    06:24:30 That was in the FAQ section.

Q   Was -- was there a button that allowed merchants to sign up for claims-filing services that you just testified moments ago on the cardsettlement.org?                                  06:24:48

A   On cardsettlement.org?

Q   That's what you were just talking about.

A   There is no button.  I never said there was a button.

(Simultaneous speaking.)                          06:24:56

A   There was a statement.  There's no button. You can never sign up for claims-filing services on cardsettlement.org.  It is physically not possible. There is --

Q   What can you do?                                06:25:05

Page 64

BY MS. BERNAY:

Q   So every single contract that cardsettlement.org has for claims-filing services came from a referral partner?

A   Correct.                                    06:42:21

Q   Okay.  We were talking about how we first came to meet each other in November, and do you recall, sir, that there was some videos posted online by a referral partner, Mr. Logan Shippy, I believe was his name?                          06:42:43

A   That's right.

Q   Okay.  And do you recall that there were inaccurate and potentially misleading statements made in that video or those videos?

A   I recall that that's what you said, and based   06:42:56 on that, we had them -- we contacted the referral partner and asked them to remove those immediately, which he did, and we confirmed with you that they were gone.  Or you replied to the e-mail, saying "That's a great first step."                        06:43:09

Q   Sir, I'm just asking for -- yes-or-no questions.  I don't need the extra commentary right now.  What -- you will get a chance to -- to make those statements.

Is it correct that there was a person who      06:43:18

Page 70

Q   Are you done?

A   Yes.

Q   Are you done with your answer?

A   Yes.

Q   Oh, sorry.  Okay.  So on occasion, based    07:33:45
on -- on your response here, there have been times
that you have provided guidance in terms of maybe
editing, I think you mentioned, certain materials
that your referral partners are using; right?

A   Yeah, in terms of -- there was a postcard,    07:34:05
but it didn't have the disclosure on the bottom of
it.  So we told them, "You have to add the
disclosure to the bottom."

Q   And do you monitor all of the outgoing
material that your referral partners use?    07:34:18

A   It's not humanly possible.

Q   Okay.  It's not humanly possible for you to
know what your referral partners are sending out in
total?

A   There is -- I -- I think that, you know,    07:34:39
there's over 2200, as you know, referral partners,
and we -- we provide this knowledge base,
guidelines.  We let them know that they have to
follow certain rules regarding solicitations and get
any solicitations approved by us.  And if someone --    07:35:00

Page 116

object, but you can answer.

THE WITNESS:  Okay.

Jorns & Associates, LLC.

BY MS. BERNAY:

Q   Okay.  Thank you.  Do you know whether any of   07:47:02
the, let's say, 13,000-plus contracts in the case,
do you know whether any of those are clients of the
accounting firm?

A   I do not know for a fact, no.

Q   Okay.  Do you have a belief as to whether   07:47:21
some of them are or -- because you said, "I do you
not know for a fact."  I just want to clarify.

Like, do you think some are?

A   It's not that I think some are.  Some may be.

Q   Fair enough.                                 07:47:33

A   Some -- some -- some may be.

Q   And just again, to be clear, your testimony
is that nobody at cardsettlement.org directly signed
up any clients; right?  It's all through referral
partners?                                            07:47:53

A   Correct.

Q   Okay.  So it would be correct that Mr. Hall
did not personally sign up any merchants for
claims-filing services?

A   That's correct.                              07:48:07

Page 126

does it not?

A    I would say that it is a solicita- -- well, it says (as read):

"Learn more here!"

Q    Okay.                                                    08:15:52

A    It doesn't say sign up.  So I think "learn more" implies that it's educational.

Q    Okay.  I guess we can agree --

A    It --

Q    -- to disagree?                                          08:15:59

A    It doesn't say get money by clicking here. It doesn't say sign up here.  It says (as read):

"Learn more here!"

Q    It says (as read):

"...contact me asap for an                               08:16:06

opportunity to get a big payout!"

Do you see that?

That doesn't read to you as if somebody is trying to sign up --

(Simultaneous speaking.)                                08:16:17

A    If they -- look, it's not for me to -- to -- to -- I can only go by what's written here.

Q    Uh-huh.

A    And what's written here says -- the -- the call to action is learned more here.                        08:16:30

Page 147

Q    Okay.

A    And he says --

Q    Okay.

A    -- "contact me," in the comments, "contact me

for more info" and provides a link.                              08:16:38

Q    Uh-huh.

A    And so two things.  One, when you click --

well, "learn more here" is not clickable on this

PDF, which is fine.

Q    It is on mine.  It is on mine.  I'm sorry,      08:16:47

not --

A    Okay.  Well, it should --

Q    -- "learn more here."

A    It should then take you to the link, which is

his -- his link.                                                08:16:54

Q    I apologize.  I'm sorry.  Let's just go back

for one second.

A    Okay.

Q    When I say it was clickable, I misspoke.

It's his -- his comment is clickable.  And I would    08:17:06

ask you, sir, if you could click on it, if -- if you

have that available to you.  I just was able to

click on it, in the comment.

A    Oh, yeah, that link?  Yeah, that link opens

up, yeah, absolutely.                                           08:17:19

Page 148