UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | MDL No. 1720(MKB)(JAM) <br><br> Civil No. 05-5075(MKB)(JAM) <br><br> MEMORANDUM OF LAW IN SUPPORT OF RULE 23(b)(3) CLASS COUNSEL'S MOTION FOR INITIAL, PARTIAL DISTRIBUTION OF SETTLEMENT FUNDS |
| This Document Relates To: <br><br> ALL ACTIONS. | |

96340159.4

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | CLAIMS ADMINISTRATION PROCESS | 2 |
| | A. The Plan of Administration and Distribution Calls for a Pro Rata Distribution of the Settlement Fund to Class Members | 2 |
| | B. Epiq and Class Counsel Conducted an Extensive Notice and Publicity Campaign | 2 |
| | C. A Large Number of Class Members, Representing a Large Portion of the Transaction Volume in the Class Period, Submitted Claims | 4 |
| | D. Pending Appeals Make a Complete Distribution at This Time Impractical | 5 |
| III. | THE PROPOSED DISTRIBUTION IS IN THE BEST INTEREST OF THE CLASS | 6 |
| | A. A Large Portion of the Class Will Benefit from the Proposed Distribution | 7 |
| IV. | CONCLUSION | 9 |

## I.   INTRODUCTION

On December 16, 2019, the Court granted final approval to this settlement which provides a pro rata distribution of an approximately $5.5 billion settlement funds to merchants that accepted Visa or Mastercard between 2004 and early 2019. ECF 7257-2 at Appendix I. Following the Second Circuit's affirmance of the settlement, the Court-Appointed Class Administrator ("Epiq" or "Administrator") mailed, over several mailings, nearly 38 million claim forms to likely class members.[1] The Court also approved an extensive education-and-outreach campaign, which Epiq and (W)rightOn Communications ("(W)rightOn"), a public-relations firm, conducted at the direction of Rule 23(b)(3) Class Counsel ("Class Counsel"). *See* ECF 8984; text-entry Order (Oct. 12, 2023) (granting funding request). These merchant-outreach efforts resulted in nearly 1.5 million claims filed, representing approximately 45% of the interchange fees identified in Epiq's records.

Because of certain outstanding legal disputes regarding payment facilitators ("PayFacs") and Branded Operators, and outstanding challenges to fee amounts or ownership of claims, full payment of claims cannot be accomplished at this time.[2] After considerable discussion and analysis with Epiq, Class Counsel respectfully request that this Court authorize an initial, partial distribution of the settlement fund to those claimants that are not likely to be impacted by the outstanding legal issues and whose claims are not otherwise in process or potentially subject to future audits.

Specifically, the requested initial, partial distribution (the "Proposed Distribution") provides partial payment to merchants that accepted Epiq's estimate of Interchange Fees paid, whose claims are not subject to appeals, ownership or valuation disputes, or future audits and whose partial payment would be at least $5.00 ("Proposed Distributees"). Kovach Decl., ¶¶16,

---

[1]   Declaration of Cameron R. Azari ("Azari Decl."), ¶4, filed concurrently herewith.

[2]   Declaration of Loree Kovach ("Kovach Decl."), ¶15, filed concurrently herewith.

18. The Proposed Distribution would disburse approximately $426 million to these merchants. *Id.* ¶28.

## II. CLAIMS ADMINISTRATION PROCESS

### A. The Plan of Administration and Distribution Calls for a Pro Rata Distribution of the Settlement Fund to Class Members

Under the approved Plan of Administration and Distribution, merchants that submitted timely claims would receive settlement payments equal to their pro rata share of the settlement fund, based on their Interchange Fees Paid relative to Interchange Fees Paid by all valid Claimants. ECF 7257-2 at I-2.[3] The plan contemplates that a merchant's Interchange Fees Paid are to be calculated primarily based on the interchange fees that the merchant paid on its Visa transactions. *Id.* at I-3. In the event that a merchant is dissatisfied with the data that the Administrator attributed to it, the Administrator may request additional information from the merchant, so as to assist the Administrator in locating the merchant's data in its database. Finally, the plan gives merchants the option to provide their own information to supplement the data that the Administrator was able to locate based on identifying information associated with the merchant. *Id.* at I-5. If the merchant is still dissatisfied with the fees attributed to it, it may appeal the Administrator's determination to the Special Master, and ultimately to this Court.

### B. Epiq and Class Counsel Conducted an Extensive Notice and Publicity Campaign

As previewed in the Court-approved Notice Plan (ECF 7257-2 at Appendix F & ECF 7361), Epiq and Class Counsel conducted an extensive notice and publicity campaign, both at the time of preliminary approval and continuing throughout the claims-administration process. Azari Decl., ¶¶7-14. The process began with Epiq working with the data it obtained from the Defendants and others to compile a database of merchants that were likely to have accepted Visa and

---

[3] For purposes of this motion, capitalized terms have the meanings given to them in the Definitive Amended and Superseding Class Settlement Agreement.

Mastercard during the fifteen-year class period.[4]  *Id.*, ¶8.  Through a months-long process, Epiq sorted through over 221 million merchant records to create a population of approximately 16 million likely class members.  *Id.*  Notice was provided to this population in 2019.  *Id.*

Starting in December of 2023, Epiq mailed more than 38 million Claim Forms, initially to the 16 million merchants identified above and later to additional merchants identified in data.  *Id.*, ¶¶8, 11 (referencing Aug. 8, 2024 text-entry Order regarding ECF 9380).  Many of the Claim Forms were prepopulated with merchant-identifying information and estimated Interchange Fees Paid and QR-code links to take the merchant to an online Merchant Portal that in many cases allowed the merchant to view its data and take various actions related to its claim.  *Id.*, ¶19.  The claim forms were designed in conjunction with (W)rightOn – an award-winning public-relations firm that Class Counsel engaged to assist in the claims process – to provide necessary information to merchants in an official yet accessible and concise manner.  *Id.*, ¶52.

Epiq also maintained a Settlement Website (PaymentCardSettlement.com), which it adapted to be consistent with the education-and-outreach campaign that Epiq, (W)rightOn, and Class Counsel were conducting.  In addition to containing the Merchant Portal, the Settlement Website was the main source of official settlement information to merchants, and as of August 11, 2025, had more than 24 million individual page visits.  *Id.*, ¶60.

While sending the Claims Forms via First Class Mail, Epiq simultaneously conducted an extensive paid-media campaign calculated to reach members of the Class.  The paid-media campaign included 171 separate print publication units, with a combined circulation of more than 11.2 million and more than 1.2 billion internet impressions by adults.  *Id.*, ¶13.  To reach potential merchants whose native language is not English, Epiq purchased media in seven additional languages.  *Id.*  The paid-media campaign included ads on streaming radio, internet banners, and leading social media platforms, such as Facebook, Instagram, and TikTok.  *Id.*, ¶¶10, 36-51, 64.

---

[4]  Epiq was also able to make use of the data work that it performed from the time of the 2012 settlement to the Second Circuit's reversal of that settlement.

- 3 -

96340159.4

In addition to assisting with the design of the claim forms, (W)rightOn provided outreach and educational support throughout the claims period. *Id.*, ¶¶52-56. This support included creating a "brand" for the settlement and ensuring that communications from Epiq and Class Counsel adhered to accurate messages that were designed to increase awareness of and participation in the settlement. (W)rightOn also arranged for media appearances for selected Class Representatives, other members of the class, and Class Counsel to raise awareness of the settlement in the merchant community. *Id.* (W)rightOn's campaign generated more than 70 million impressions from media mentions, social-media-influencer posts, and trade-association communications. *Id.*, ¶55.

Throughout the claims period, Class Counsel and Epiq fielded inquiries from large and small merchants regarding the claims process. Epiq staffed a call center to handle routine merchant questions, which could be escalated to more senior Epiq employees or Class Counsel as appropriate. *See id.*, ¶¶61-62. Class Counsel communicated repeatedly with merchants and their representatives by e-mail, telephone, and video conference, sometimes independently and other times together with Epiq, depending on the nature of the merchant's issue. Class Counsel believe that this extensive notice and publicity campaign is a significant cause of the positive claims results, reflecting claims representing approximately 45% of the interchange fees in Epiq's database.

### C. A Large Number of Class Members, Representing a Large Portion of the Transaction Volume in the Class Period, Submitted Claims

The settlement generated a high level of engagement among merchants. As of August 12, 2025, over 1.1 million registrants – corresponding to over 2 million Tax Identification Numbers ("TINs") – registered a merchant account. Kovach Decl., ¶8. The 2 million TINs linked to merchant accounts include only those who had verified their connection to those TINs, either through Epiq's own records or with supplemental information provided by the claimant. *Id.*, ¶7. As of August 12, claims were submitted for the majority – approximately 1.4 million – of these

- 4 -

96340159.4

TINs.[5] *Id.*, ¶8; *see also infra* §III.A. The TINs for which claims were submitted represented more than 45% of the interchange fee volume in Epiq's database. *Id.*

After class members verified that they had authority for their respective TINs, they had the ability to challenge Epiq's calculation of their respective Interchange Fees Paid total. They could do so through a multi-step process. *Id.*, ¶10. The first step was to submit a "research request," whereby they provided information to Epiq, which Epiq then used to attempt to find additional Interchange Fees Paid for that TIN in its database. *Id.* If this first step was unsuccessful or the merchant remained dissatisfied, the merchant was given an opportunity to provide its own data, for which Epiq retains the right to request verification. *Id.*, ¶11.

### D. Pending Appeals Make a Complete Distribution at This Time Impractical

Two legal disputes – currently pending before the Second Circuit – affect Epiq's ability to make complete payments to the class at this time. The first involves PayFacs and poses the question of whether PayFacs, such as Square or Intuit, or the merchant that takes payment through them "'accepted'" cards and thus is a member of the class. *See* ECF 9308. The second legal dispute poses a similar class-membership question as between upstream oil companies – such as Shell and Texaco – and the fuel retailers (so-called "Branded Operators") that interact with and sell fuel to the end consumer. ECF 9406.

Because of these appeals – and the associated uncertainty regarding certain merchants' class membership – the Court ordered Class Counsel to establish trust accounts with settlement funds attributable to, respectively Branded Operators and PayFacs merchants. ECF 9384; ECF 9450. Determining the precise interchange-fee volume of Branded Operators and PayFacs merchants is not a straightforward task. There is still uncertainty surrounding the precise volume

---

[5] Some of the TINs for which claims were not filed were "in conflict" (more than one filer claimed a connection to the TIN). Others had not yet provided sufficient proof of authority that they could act for the TIN. Still others were linked to a registered account but the registrant did not file the claim.

of Interchange Fees Paid that will be claimed by the parties to the PayFacs and Branded Operator disputes. Kovach Decl., ¶¶12-14.

With respect to the PayFacs, for example, the data provided by the Defendants does not contain a distinct identifier for "PayFac merchant." Kovach Decl., ¶12.d. As a result, Epiq must necessarily rely on proxy methods of identification, such as searching for TINs associated with the payment facilitators themselves, which are by their nature imprecise. *See id.*, ¶12.e. In addition, the resolution of the PayFacs dispute will affect the necessary holdback amount because the interchange-fee volume for filed claims is likely to be greater if the PayFacs are determined to be class members than if the PayFacs merchants are determined to be in the class. *Id.*, ¶¶12.g-h. Because the timing and result of the resolution of this dispute is unknown at this time, Epiq must hold back funds based on the more conservative assumption – *i.e.*, that the PayFacs will be determined to have "accepted" cards. *Id.*, ¶12.i.

Similarly, for the Branded Operators, the data in Epiq's possession do not clearly identify the population of merchants that contract with their fuel suppliers to receive card-acceptance services. *Id.*, ¶13. While Epiq can use various proxies for Branded Operators (such as the Merchant Category Codes ("MCCs") relating to fuel retailers), those too are imprecise. And like the PayFacs issue, the resolution of the Branded Operator question will impact the amount of funds which must be held back. *Id.*, ¶¶13.e.-f.

### III. THE PROPOSED DISTRIBUTION IS IN THE BEST INTEREST OF THE CLASS

While the ultimate resolution of the *Lanning* and *Old Jericho* appeals[6] is pending and funds are held back to account for any outcome, it would be in the best interests of the class to make a partial distribution to the subset of claimants whose payment eligibility is now certain.

---

[6] *Old Jericho Enters., Inc. v. Visa, Inc.*, No. 20-cv-2394 (E.D.N.Y.); *Lanning v. Visa, Inc.*, No. 21-cv-2360 (E.D.N.Y.); *Camp Grounds Coffee, LLC v. Visa, Inc.*, No. 21-cv-3401 (E.D.N.Y.). The Second Circuit has recently proposed both appeals be heard the week of October 13, 2025. Case Calendaring, *Old Jericho Enters., Inc. v. Visa, Inc.*, No. 24-2678 (2d Cir. July 9, 2025), ECF 90.

- 6 -

96340159.4

Specifically, Class Counsel propose to distribute approximately $426 million to more than 605,000 claimants, after conducting a quality-control audit.[7]  Kovach Decl., ¶28.  The population of claims included in the proposed partial distribution is limited to those that were timely, associated with a valid TIN, and in agreement with the fees calculated by Epiq and reflected on the pre-populated claim forms or the Merchant Portal.  *Id.*, ¶16.  The Proposed Distributees will receive a percentage of their pro rata share of the net settlement fund.  *Id.*, ¶¶23-24.  This will ensure that no merchant is overpaid now.  *Id.*  These claimants will receive the remaining portions of their pro rata shares in a subsequent distribution.

### A. A Large Portion of the Class Will Benefit from the Proposed Distribution

As of August 12, 2025, claims have been submitted on behalf of 1,424,566 unique TINs.  *Id.*, ¶8.  Most of these claimants (970,888) have agreed with the fee calculation reflected in Epiq's database.  *Id.*, ¶10.a.  The remainder are either in conflict, currently before the Special Master, have not submitted acceptable proof of authority, have requested that Epiq re-query its transaction data, or, in the absence of applicable transaction data, submitted their own data to inform Epiq's fee calculation.  *Id.*, ¶¶10.b.-c.  These requests are in process.

As detailed in the Kovach Declaration, a partial distribution is in the best interest of those class members and in the interest of the claimants as a whole.  A partial distribution now would accord with the salutary goal of Rule 23(b)(3) settlements "to get as much of the available damages remedy to class members as possible and in as simple and expedient a manner as possible." *Newberg on Class Actions*, §12:15.

Needless to say, any partial distribution should not jeopardize the eventual recovery of those claimants whose claims are still in process, or whose claims are implicated in the *Lanning*

---

[7] Class Counsel can provide the Court with a list of Claimant ID Numbers and corresponding partial-payment amounts, under seal, upon request.

- 7 -

and *Old Jericho* appeals. Accordingly, the proposed partial distribution is a conservative one, carefully calculated by Epiq to comport with the approved Plan of Allocation.

In addition to untimely or in-process claims, as well as claims likely to be in audit population, excluded from the proposed partial distribution are claims with MCC codes associated with gasoline (*i.e.*, implicated in the *Old Jericho* appeal) or claims from known Payment Facilitators or submerchants (*i.e.*, implicated in the *Lanning* appeal). Kovach Decl., ¶¶12-14. The current proposed partial distribution would also exclude otherwise eligible claims whose estimated partial pro rata payment would be less than $5.00; those claims would be paid out in a single tranche at a later date. *Id.*, ¶18. This accounts for nearly 100,000 claims in the initial population. *Id.*

After applying these criteria – and conducting rigorous quality checks on the resulting distribution universe (*see id.*, ¶19) – Epiq arrived at a population consisting of 605,472 merchant claims filed by 499,175 registrants ("Proposed Distributees"). *Id.*, ¶28. These claimants' total interchange fees is $36,151,062,607.90; the proposed partial distribution amount is $426,063,670.16. *Id.*

This sum of $426,063,670.16 reflects several conservative assumptions designed to eliminate any risk of this partial distribution harming future claimants. Notably, to estimate what percentage of total claimant fees the Proposed Distributees' $36,151,062,607.90 in interchange fees represents, Epiq used as the denominator not the sum total of interchange fees associated with submitted claims, but rather the interchange fees reflected in the complete universe of transaction data in Epiq's possession – a sum more than twice as large. *Id.*, ¶23. In addition, Epiq conservatively deducted from the net settlement amount available for distribution anticipated future costs, and did not include future accrued interest. *Id.*, ¶25.

The Court-approved Plan of Administration and Distribution proposed distributing the cash fund to eligible claimants pro rata through a process that is fair, equitable, simple, cost-effective, and minimally burdensome. ECF 7257-2 at I-2. The proposed partial distribution comports with these values. It will enable eligible claimants with the clearest, non-controversial claims to receive

- 8 -

a partial payment of their pro rata share of the net settlement fund now. And, because of the conservative holdback amount, it will ensure that the full measure of remedy damages remains available to claimants with more complex or controverted claims who require additional time for appeals and/or fee calculation.[8]

## IV. CONCLUSION

Because the proposed partial distribution is in the best interests of the claimants as a whole – benefitting a majority of claimants with an expeditious partial distribution, while protecting those claimants for whom a distribution is not yet ripe – Class Counsel respectfully request that the Court grant the motion.

DATED: August 20, 2025

Respectfully submitted,

ROBINS KAPLAN LLP
K. CRAIG WILDFANG
THOMAS J. UNDLIN
RYAN W. MARTH

*/s/ Ryan W. Marth*
RYAN W. MARTH

2800 LaSalle Plaza
800 LaSalle Avenue South
Minneapolis, MN 55402-2015
Telephone: 612/349-8500
612/339-4181 (fax)

---

[8] This Court has previously approved preliminary, partial distributions in large antitrust settlements, when doing so is in the best interests of the class. *See, e.g.*, *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-md-1775 (E.D.N.Y.) text-entry orders granting ECF 1526 (Aug. 25, 2011)) & ECF 1781 (Jan. 4, 2013); *Air Cargo*, ECF 2450; *Air Cargo*, ECF 2503; *Air Cargo*, ECF 2509; *Air Cargo*, ECF 2478.

ROBBINS GELLER RUDMAN
  & DOWD LLP
PATRICK J. COUGHLIN
ALEXANDRA S. BERNAY
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

BERGER MONTAGUE PC
H. LADDIE MONTAGUE, JR.
MERRILL G. DAVIDOFF
MICHAEL J. KANE
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: 215/875-3000
215/875-4604 (fax)

Co-Lead Counsel for Plaintiffs

- 10 -

96340159.4