**UNITED STATE DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION**<br><br>**This Document Applies to: All Cases.** | **No. 05-MD-1720 (MKB) (JO)** |

## DECLARATION OF LOREE KOVACH REGARDING ONGOING CLAIMS PROCESS AND INITIAL PARTIAL DISTRIBUTION

I, LOREE KOVACH, declare and state as follows:

1.      I am a Senior Vice President for Epiq Class Action & Claims Solutions, Inc. ("Epiq"), the Class Administrator in the above-captioned case.  In this capacity, I am authorized to make the following Declaration on behalf of Epiq.  The following statements are based upon my personal knowledge, information provided to me by associates and staff under common supervision, and upon a review of the business records maintained by Epiq.

2.      In conjunction with the *Declaration of Cameron R. Azari, Esq., on Implementation Claim Phase Notice* ("Second Supplemental Notice Declaration"), this Declaration is to update the Court further on completed and ongoing tasks related to the claims filing process and proposed initial partial distribution.

3.      The claim filing deadline established by the Court passed on February 4, 2025. Due to high volumes of engagement at the time of the deadline, Epiq and Class Counsel agreed to leave the Merchant Portal open until April 4, 2025. This meant that Class Members who had not previously filed claims or otherwise interacted with the Merchant Portal could register and link merchant records to their account, and that Class Members with existing registrant accounts could continue to link new merchant records through this later date. Following this date, and currently, previously registered individuals or third-party filers can only link new merchant Taxpayer

Identification Numbers ("TINs") to their records if exceptional circumstances are present, including where Epiq's analysis of a research request reveals additional TINs related to a given merchant or where a merchant mistakenly registered a TIN associated with a payment facilitator instead of their own.

## STATUS OF CLAIM SUBMISSIONS

4.      As of the date of this declaration, Class Members can only submit claims that are still considered timely in certain situations, as discussed further in Para. 11.a -e., *infra.* All other claims submitted after the deadline may be considered untimely.

5.      Throughout the claim submission period, Class Members were able to submit claims by mail, email, or via the Case Website.   At the outset of the claim submission process, to assist Class Members in filing claims and taking other actions via the website, Epiq created a Merchant Portal accessible via the website.  Any Class Member who received a claim form via mail could use the Claimant ID and Control Number on their claim form to log into the Merchant Portal, view their interchange fees, file a claim if in agreement with those fees, or take actions to challenge the fees if not.  A registration account was created for Class Members via this process. Class Members who did not have access to their Claimant ID and Control Number could register one or more TINs to create a registrant account in the Merchant Portal.  After providing proof they were authorized to act on behalf of the TINs they registered, the registrant would be able to review fee information associated with those TINs (if available in the Class Administrator's records), file a claim if they agreed with the fee amount, or engage in the challenge process if they did not or if fees were unavailable.  As of the date of this declaration, no new registration accounts can be created via the Merchant Portal.

6.      The Class Administrator also automatically created registration accounts for Class Members who filed claims via mail or email to allow them to more easily access information about their claim, respond to communications, and take any further actions with respect to their claim via the Merchant Portal.

7.      As of August 12, 2025, there are 1,113,638 registrant accounts in Epiq's records. These 1,113,638 registrants have linked 2,119,233 TINs to their accounts.

8.      As of August 12, 2025, claims have been submitted for 1,424,566 unique TINs. These claims currently represent over 45% of all interchange fees in the data available to Epiq.

9.      As of August 12, 2025, 692,872 unique TINs have been registered, but the registrant has not yet submitted a claim for the TIN. Below are additional details about these registered TINs without claims:

    a.  25,358 TINs are in conflict because they have been registered by two or more parties purporting to have authority to act on behalf of the TIN.[1]  Parties in conflict are first asked to resolve the conflict amongst themselves.  If they cannot do so, the conflict is referred to the Special Master for further determination as to which registrant is appropriately authorized to act on behalf of the TIN.  As conflicts are resolved, claims are typically filed, thus Epiq expects claims to be filed for the majority of these TINs after the conflicts are resolved.

    b.  134,686 TINs have been registered by an individual or entity which has not provided sufficient documentation proving the registrant's authority to act on

_____

[1] As of August 12, 2025, a total of 160,163 TINs have been registered by more than one registrant and have entered the conflict process. As of the date of this declaration, approximately 84% of all conflicts have been resolved.

DECLARATION OF LOREE KOVACH REGARDING ONGOING CLAIMS PROCESS AND INITIAL PARTIAL DISTRIBUTION - 3

behalf of the TIN. These registrants have been provided with notice of the deficiency and an opportunity to cure; they are also entitled to dispute any rejection of their documentation by the Class Administrator via an appeal to the Special Master.[2]

c.  160,900 TINs are not in conflict, nor are they engaged in the deficiency process regarding insufficient proof of authority, but the registrant has yet to file a claim. Of these, 157,751 were registered on or before the February 4, 2025, claim filing deadline. Epiq sent periodic reminders to these registrants, reminding them of the filing deadline and the need to take further action with respect to the TIN. Given the reminders and the fact that no action has been taken since the filing deadline, Epiq does not expect claims to be filed for most, if not all, of these TINs. The remaining 3,149 TINs were registered after the filing deadline; thus, it is more likely claims will be filed for TINs in this population.

d.  371,928 TINs are not in conflict, nor are they engaged in the deficiency process, but the registrant is a payment facilitator and the TIN(s) it registered belonged to a submerchant client of the payment facilitator. As discussed further in Para. 12, *infra*, payment facilitators are currently unable to file claims on behalf of their submerchant TINs because the merchants themselves, and not the payment facilitators, are Class Members. These registrants have been provided with notice of this determination and an opportunity to dispute via an appeal to the Special Master. Claims will only be allowed for these TINs if the Special Master so directs

---

[2] Where a registrant does not respond or provide appropriate proof of authority, no claim will be accepted for the associated TIN.

or if the *Lanning* appeal is resolved in a way that would make these payment facilitators Class Members.

10.    Class Members who filed claims could either agree with the interchange fee amounts in Epiq's records, if available, or could engage in a multi-step dispute process if they disagreed with the fees in Epiq's records.  Class Members for whom Epiq did not have fee data could likewise engage in a multi-step process to attempt to locate or calculate their estimated fees. The following numbers are as of August 12, 2025.

    a.    There are 970,888 TINs for which claims have been filed where the Class Member agreed with the fees in Epiq's records. As of the date of this declaration, the interchange fees associated with this population account for approximately 63% of all claimed fees.

    b.    There are 193,230 TINs for which claims have been filed where the Class Member disagreed with the fees provided by Epiq and submitted a research request. Research requests are submitted via the Merchant Portal by clicking the "Request Research" button and including various data points that Epiq could use to re-query the transaction data and attempt to find additional transaction records.  These research requests are either pending review and completion by Epiq or it has been less than 30 days since the results of the research request have been provided to the Class Member.  *See* Para. 11, *infra*, for further discussion regarding deadlines relevant to the dispute process.

    c.    There are 339,696 TINs for which claims have been filed where no transaction data is available in Epiq's records, and the Class Member provided an estimated interchange fee amount, stated that they did not know their estimated interchange

fees during the Class Period, or otherwise submitted annualized sales data volumes by clicking the "Provide Sales Data" button on the Merchant Portal. These submissions are either pending review and resolution by Epiq or it has been less than 30 days since the Class Member has been informed of the resolution of their submission.

11.    The above numbers are subject to change as Class Members take further action with respect to their claims. Specifically, the following activities are ongoing with respect to certain claims and may impact the above numbers:

a.    *Resolution of Conflicts*. As noted in Para. 9.a. above, when two or more registrants register the same TIN, the record is considered to be in conflict. The conflicted parties are asked to resolve the conflict amongst themselves. If they are not able to do so, the conflict is resolved by the Special Master.[3] Once a conflict is resolved, the registrant deemed to have authority to act on behalf of the relevant merchant has 30 days to take the next step relevant to the claim, whether that be filing a claim or challenging the interchange fee data in Epiq's records via submission of a research request or sales data.

b.    *Resolution of Research Requests*. For claimants who have submitted a research request, once they are notified of the results of that research by Epiq, they have 30

---

[3] The Plan of Distribution provides for an appeal process that goes beyond the Special Master, including for appeal to the District Court and beyond.

days to take any further action with respect to the claim.[4]  Claimants who are not satisfied with the results of a research request can submit sales data.

c.  *Resolution of Sales Data Submissions*.  Claimants who submit sales data to contest the interchange fees in Epiq's records may be asked to produce documentation to support some or all of their sales figures and are given 30 days to do so.[5]  Once a sales data submission is reviewed and resolved by Epiq, the claimant has 30 days to take any further action with respect to their claim.  Claimants who still disagree with their interchange fee amounts may submit a narrative dispute detailing what they think their interchange fee amounts should be, along with documentation supporting the narrative.

d.  *Resolution of Fee Disputes*.  Claimants who have submitted a narrative dispute regarding their interchange fees have 30 days to take further action with respect to their claim once Epiq resolves the dispute.  Claimants who still disagree with their interchange fees and with Epiq's resolution of their dispute can appeal to the Special Master.

e.  *Resolution of Appeals to the Special Master*.  The Special Master will review all appeals from determinations by Epiq and will request further documentation or

---

[4] As of August 12, 2025, Epiq has received research requests for 193,222 TINs. Over 180,000 of these requests have been completed. Over $5.35 billion in interchange fees has been located as a result of completed research requests to date.

[5] As of August 12, 2025, Epiq has received and is processing sales data submissions for 35,015 TINs.

DECLARATION OF LOREE KOVACH REGARDING ONGOING CLAIMS PROCESS AND INITIAL PARTIAL DISTRIBUTION - 7

briefing from the Class Member as needed, pursuant to the process outlined in the Court's Revised Order Appointing Special Master, Dkt 9403, ¶ 4.[6]

## **OUTSTANDING LEGAL ISSUES**

12.  Payment Facilitators

a.  On May 28, 2024, the Court issued its Order and Memorandum enforcing the Settlement Agreement with regard to payment facilitators and their merchant-customers. The Court found that merchant-customers, not the payment facilitators, accepted payment cards and are therefore members of the Rule 23(b)(3) Class.

b.  In its August 8, 2024, Memorandum & Order (the "Payfac Trust Order"), the Court directed Class Counsel to "establish and fund a trust account with settlement funds owed to merchants who used the services of payment facilitators such as Square and Intuit, pending the Second Circuit's resolution of the [*Lanning*] appeal."[7]

c.  The identification of "merchants who used the services of payment facilitators" (otherwise referred to as "submerchants") in the transaction data, and calculating "settlement funds owed to [them]" for purposes of funding the trust, is a particularly difficult task.

---

[6] Over the last 14 months, Epiq has worked with the Special Master on a variety of issues related to the administration. As of the date of this declaration, the largest concentration of time has been spent on the continued resolution of the large volume of registration conflicts between third-party filers, merchants, and claim purchasers. In consultation with the Special Master on process and content, Epiq has issued over 31,000 Special Master Conflict Determinations and resolved over 90,000 conflicts with more than 16,000 additional conflicts in process of final resolution. In addition, Epiq has worked with the Special Master on matters related to payment facilitator, conflict, claim purchaser, and proof of authority disputes and communications to resolve the same. Epiq expects certain Special Master standing orders related to this activity to begin issuing in the near future.

[7] ECF No. 9384.

d.  As an initial matter, there is no identifier in the data available to Epiq to denote which TINs used payment facilitators and which did not.  Epiq, using only the data provided by Visa or the acquirers, cannot identify with any certainty which claims may relate to merchants who used the services of a payment facilitator.

e.  Epiq can identify certain merchants who used payment facilitators via other methods.  It can refer to the opt-outs from payment facilitators Square and Intuit, which included the TINs of their clients.  Other payment facilitators have attempted to file claims on behalf of their submerchant clients by registering those TINs, and Epiq can refer to those registrations to identify TINs of merchants who presumably used those payment facilitators.  There is also limited ability to identify submerchants of PayPal in the data provided, and certain trends in the available transaction data typically indicate payment facilitator activity.  These proxy methods would not, however, identify all merchants who used payment facilitators nor would they identify all transactions intermediated by payment facilitators.  In addition, the above data sources do not indicate whether the identified merchant used a payment facilitator for a portion of the Class Period or for the entire Class Period.

f.  Even with respect to the merchants who used payment facilitators and who could be identified by the above proxy methods, calculating the interchange fees of each, and thus the settlement funds owed to them, is difficult at this juncture.  Many such claims are still engaged in the challenge process identified in Para. 9.d., *supra*.  The records available to Epiq to calculate submerchant interchange fee amounts are often insufficient, thus these Class Members are more likely to need to engage in

the challenge process to ensure their claim is based off the correct interchange fee amount. These transactions are harder to identify because transactions handled by a payment facilitator typically appear under the payment facilitator's merchant identifier rather than that of the underlying submerchant, and the other data related to those transactions is insufficient to determine the submerchant to which the transaction belongs.

g.  Even if Epiq were to estimate the fees owed to identifiable submerchants and extrapolate from those estimated fees the fees owed to unidentifiable submerchants, this amount would likely not be sufficient to address all possible outcomes of the *Lanning* appeal. Should the *Lanning* appeal result in a reversal of the Court's May 28, 2024, Order, such that payment facilitators can assert that they are the Class Members in the Settlement entitled to file claims, then the trust that is to be established should include any settlement funds that would be awarded under this outcome.

h.  For purposes of illustration, let us assume that Payment Facilitator X did not opt out, and has attempted to file a claim, and the total interchange fees attributed to their submerchants during the Class Period are $50 million. A subset of Payment Facilitator X's submerchants filed timely claims accounting for $10 million in interchange fees; the remainder of its submerchants did not register or file claims. If the *Lanning* appeal is resolved in favor of payment facilitators, $50 million of interchange fees would be claimed by Payment Facilitator X, rather than the only $10 million in fees associated with its submerchants who filed claims and are currently considered Class Members. Accordingly, the appropriate amount of

DECLARATION OF LOREE KOVACH REGARDING ONGOING CLAIMS PROCESS AND
INITIAL PARTIAL DISTRIBUTION - 10

funds to place into trust would be the settlement funds associated with the highest possible payment outcome related to resolution of the appeal.

i. To thus appropriately fund the trust, Class Counsel and Epiq propose a conservative approach (meaning one that accounts for all possible outcomes such that the risk is that the trust is overfunded rather than underfunded) whereby the following transactions are identified: 1) all transactions associated with card-acceptor IDs with a "PayFac" flag in the AMMF5 data produced by Visa; 2) all transactions with trends that typically identify payment facilitator activity, such as asterisks in the merchant name in the AMMF5 data; 3) any transactions associated with TINs identified on Square and Intuit's opt-out submissions; 4) all transactions associated with PayPal, and 5) all transactions associated with a TIN registered by a payment facilitator.[8]  The estimated pro rata payment amount that would result from all such fees, based on current data related to claims filed, is then calculated and used to fund the payment facilitator trust.[9] Using this methodology, Class Counsel and Epiq recommend that $2,900,000,000 be placed in the trust account referenced in the PayFac Trust Order.

---

[8] This methodology assumes that, regardless of the outcome of the *Lanning* appeal, no new registrations will be allowed.  For instance, if the appeal is resolved in such a way that payment facilitators are determined to be class members, any payment facilitators who have not already registered via the Merchant Portal or otherwise attempted to file a claim will not be given the opportunity to do so in the future.  Otherwise, money may not have been appropriately set aside for payment facilitators with a large volume of interchange fees but which could not be identified via the proxy methodology.

[9] A less conservative approach was also considered, whereby Epiq would identify the same set of interchange fees but then limit the calculation to only those fees associated with TINs that had been registered or filed a claim to date.  This methodology would have resulted in a trust fund of $2,075,080,000.  However, because many such TINs may still engage in the challenge process and their associated fees could thus increase, as discussed above, this approach was discarded as too risky.

13.    <u>Branded Operators</u>

a.    On October 1, 2024, the Court issued an order (the "Branded Operator Trust Order") based on Class Counsel's agreement with the *Old Jericho* plaintiffs and directed Class Counsel to "fund a trust account with settlement funds owed to branded gasoline retailers who contract with their suppliers to receive card-acceptance services."[10]

b.    Similar to the payment facilitator obstacles outlined above, the population of branded gasoline retailers who contract with their suppliers to receive card-acceptance services cannot be easily identified within the data available to Epiq.  In particular, the data available to Epiq does not reflect any contractual relationships regarding card acceptance services between gasoline retailers and their suppliers.

c.    Epiq can use Merchant Category Code ("MCC") information provided in the data to identify transactions that are likely to be related to gasoline retailers, with varying degrees of certainty.  MCC information is available at the transaction level, not the TIN level, so in order to identify MCCs applicable to a merchant, the transaction must be linked to a TIN in the Class Administrator's records.  In addition, not all transactions have any MCC information associated with them in the available data.

d.    There are MCCs that are strongly related to gasoline retailers, such as "service stations" and "automated fuel dispensers," while other MCCs are sometimes related, such as "Convenience Stores and Specialty Markets." Class Counsel and Epiq have determined that the appropriate proxy method for calculating the

---

[10] ECF No. 9450.

appropriate funding for the trust is to identify all transactions associated with any MCCs that are either strongly related or sometimes related to gasoline retailers and calculating the pro rata payment associated with those transactions based on claim data currently available.[11]

e. Use of MCCs in this way will result in a trust that is overfunded, as noted above, because including certain MCCs such as the ones related to convenience stores may include some merchants who do not sell gasoline. It will also be overbroad insomuch as *Old Jericho* Plaintiffs seek to represent merchants in *Illinois Brick* repealer states, and the population identified via MCC will not distinguish between merchants in repealer states and those which are in non-repealer states, nor can Epiq identify from the data available to it with certainty which Class Members or transactions are related to repealer states.

f. Based on the methodology discussed above, Class Counsel and Epiq have calculated $450,000,000 as the amount to be placed in the trust account referenced in the Branded Operator Trust Order.[12]

14. <u>General Information</u>

---

[11] Using MCCs to identify transactions related to gasoline retailers is a better proxy than attempts to identify relevant merchants by name because many branded gasoline retailers and suppliers use business names that have no apparent relation to "gasoline," such as ROUTE 66 IECA, FAST STOP 103, and ASC SF LLC, rather than the name of the gasoline brand they sell, like Chevron or BP.

[12] As with the PayFac Trust Order, a less conservative approach was considered whereby the population of transactions upon which the calculation was based was further limited to only instances where the identified transaction was linked to a TIN that was registered, but this approach was discarded for similar reasons, including that such claims may still be in the process of challenging their interchange fee amounts. This less conservative calculation would have resulted in a trust amount of $270,000,000.

a. Should the Court agree with these recommendations, each trust will be created as a sub-account of the existing Qualified Settlement Fund ("QSF") established for this settlement. The trust funds will be segregated from the remaining balance in the QSF but will earn interest for the benefit of the Class at the same rate as the remaining funds in the QSF.

b. The amounts of each trust can be revised at any time if the Court so recommends.

## IDENTIFICATION OF INITIAL PARTIAL DISTRIBUTION POPULATION

15.    Class Counsel asked Epiq to outline a process by which an initial partial distribution, to those claimants that are not potentially impacted by the outstanding legal issues and whose claims are not otherwise still in process, could be paid a portion of their total anticipated award before the end of this year. By excluding both claims still in process, those potentially subject to audit in the future, and those potentially impacted by any of the pending legal issues, Epiq identified a population of claims which could be issued initial partial payments now, with a conservative holdback that takes into account the legal issues discussed in Paras. 12 – 13, *supra*, and as discussed further below.

16.    The population of claims that could be included in an initial partial distribution was identified by including claims that met the below criteria:

a. The claim was submitted timely;

b. The TIN is not in conflict;

c. The claimant agreed with the fees provided by the Class Administrator on the pre-populated claim forms or on the Merchant Portal;

d.  No research request was submitted;[13]

e.  No annualized sales data was submitted; and

f.  The claimant has not otherwise engaged in any challenge or dispute process.

17.  The initial population excludes claims where any of the following is true:

a.  Claims submitted after the February 4, 2025, deadline;

b.  Claims missing the estimated interchange fees paid during the Class Period where the claimant either left the field blank or checked the "I don't know" box;

c.  The claimant did not agree with the fees provided by the Class Administrator (i.e., a research request and/or sales data was submitted);

d.  Claims with a pending response deadline associated with unresolved conflicts, deficiencies, disputes, research request results, sales data results, or fee disputes;

e.  Claims with any pending issue before the Special Master;

f.  Claims included in Epiq's Audit Plan population (discussed in further detail in Para. 21, *infra*);

g.  Claims associated with Excluded Party TINs;

h.  Claims with MCCs associated with gasoline, as discussed in Para. 13, *supra*; and

i.  Claims from payment facilitators or submerchants, as discussed in Para. 12, *supra*.

18.  In addition to the populations identified as excluded above, Epiq recommends also excluding from the initial partial distribution any otherwise eligible claims where the total estimated pro rata payment amount is less than $5.00. As of August 12, 2025, this accounts for

---

[13] Those claimants who disagreed with the interchange fee totals in the data and submitted research requests that have been resolved are not in the initial partial distribution population as those claims will be subject to the Audit Plan, discussed in Para. 21, *infra*.

99,877 claims. As discussed further in Para. 23 – 24, *infra*, any initial payment of eligible claims must be a partial payment of the total estimated pro rata award, resulting in multiple payments for any claims included in an initial partial distribution.  It will be more cost-effective to send those claimants with lower payment amounts only a single payment at a later date, rather than two or more low-value payments.

19.    After applying the criteria outlined in Paras. 16 – 18, *supra*, 605,472 claims were identified as potentially eligible for an initial partial distribution payment.  Epiq then conducted various quality assurance checks on this population. These checks included, but were not limited to:

a.    A manual review of all top 100 claims (by interchange fees) in the population, including authorization documentation, signatory authority, and address checks;

b.    A data analysis of the top 2,500 claims (by interchange fees) for data anomalies;

c.    A random sampling of proof of authority documentation across the entire population;

d.    A review of merchant name discrepancies, where the Class Member merchant name provided by the claimant differed from the merchant name in the transaction data;

e.    Fraud checks, including a review of claims submitted from the same IP address and those that contain duplicative name and address information; and

f.    A data analysis to ensure no invalid TINs were included in the population.

20.    Section IV.B. of the Plan of Distribution states that Epiq will be responsible for developing an appropriate plan to audit claim forms (an "Audit Plan") and will provide the Audit Plan to Class Counsel before beginning any audits.  A preliminary Audit Plan has been shared with Class Counsel and will be finalized once all claims processing activities have been concluded.  It

is customary to perform audits on finalized populations in order to ensure both statistical significance across the whole population as well as to ensure that, should the audit return abnormal results for the particular audit group, the entire group can be subject to further review.

21. At this time, the preliminary Audit Plan includes the following activities.

a. Random sampling (of a statistically significant size) of the entire claim population;

b. Random sampling of all claims submitted by third-party filers;

c. Random sampling of all claims that were:

  i. Updated via research request

  ii. Updated via sales data submission

  iii. Updated as a result of any other dispute step

d. Certain high-value claims with interchange fees above a designated threshold;

e. All claims that were updated by moving transactions from one TIN to another (i.e., instances where the merchant business was sold during the Class Period);

f. All claims where the TIN was associated with a potential payment facilitator (i.e., where a known payment facilitator attempted to register for the TIN);

g. All claims where the TIN was not in the original data set used for the claim form mailings, nor in any supplementary data sets for additional Class Members as discussed in the Second Supplemental Notice Declaration;

h. Other populations manually selected by Epiq.

22. Aside from the general random sampling referenced in Para. 21.a., *supra*, the claims included in the initial partial distribution population were unlikely to be included in any other audit populations and otherwise pose low risk of fraud or other fee calculation issues.

## CALCULATION OF THE PRO RATA DISTRIBUTION AMOUNT

23.    In order to ascertain the initial partial distribution amount for the population of claims discussed in Paras. 16 – 18, *supra*, and again summarized in Para. 28 below, Epiq undertook a conservative approach to calculating the potential pro rata value to be applied to a claimant's interchange fees.  To account for the uncertainty regarding the resolution of the *Lanning* and *Old Jericho* appeals, as well as the number of claims where claimants are still in the process of challenging their interchange fees, Epiq used the total amount of fees available in the data in its possession as the denominator, rather than the total fees claimed.  While it is extremely unlikely that any resolution of the pending appeals and pending challenges results in a scenario where all interchange fees in the data produced to Epiq are claimed, this conservative approach will allow for a reasonable calculation without requiring extensive efforts to project the final value of claims where challenges to the fee amount are still in progress, and will provide a buffer for the inherent lack of precision available in calculating the funds to place in trust regarding the pending appeals.

24.    The result of this approach is a pro rata value that is likely far lower than the ultimate and final pro rata value that will be calculated after all appeals are resolved and all claims have been fully processed.  Claimants eligible for the initial partial distribution will thus receive a payment that is only a portion of their total pro rata award, as is necessitated by the lack of certainty at present time. As outlined in Paras. 12 – 13, *supra*, once the outstanding legal issues are resolved and, once the challenge process has concluded and the full universe of claimed interchange fees is known, Epiq can complete the final pro rata calculation and ensure that supplemental payments are made to any merchant initially only paid a portion of their total settlement award.

25.    In calculating the net settlement amount available for distribution, Epiq has deducted amounts representing anticipated future costs. This includes Epiq's anticipated

administrative fees through the remainder of the administration and any possible future attorney fee awards. In addition, and again to be conservative, while the settlement funds will continue to earn interest throughout the life of the settlement administration, Epiq did not include projected future interest in the calculation of this initial partial distribution.

26.     It should also be noted that the pro rata value used to calculate the initial distribution amounts for claimants is not impacted because Class Counsel and Epiq recommend the more conservative calculations for funding the trusts related to the PayFac and Branded Operator Trust Orders. The overall holdback amount that results from the initial distribution calculation methodology would not change had the less conservative amounts referenced in footnotes 9 and 12 been used; only the amounts placed into trust would change.

27.     Should the Court provide its approval for an initial partial distribution, Epiq proposes updating functionality on the Merchant Portal to lock any claims that would be paid in the initial partial distribution to ensure that claimants do not unintentionally take actions that would result in their removal from the payment population. Once locked, these claimants would no longer be able to submit a research request or annualized sales data disagreeing with the interchange fee amounts that they previously agreed with when filing their claim without explicit permission from Epiq. The claims in this population have been finalized for a substantial amount of time, and these claimants are unlikely to make changes at this stage since they already accepted the interchange fees in the transaction data.

28.     As of August 12, 2025, after completion of all quality assurance checks, the proposed initial partial distribution population would include 605,472 merchant claims (approximately 42% of all claims filed), submitted by 499,175 registrants (approximately 44% of all registrants). The associated interchange fees for these claims amount to $36,151,062,607.90.

As discussed in Paras. 16 – 18 above, this population includes timely claims where registrants have authority to file on behalf of the provided merchant TIN, there is no conflicting registration or claim for the same TIN, the merchant agreed with the interchange fee amounts provided on the claim form or in the Merchant Portal, and the claimant has not otherwise engaged in any challenge or dispute process. Excluded from the population are claims that would have otherwise been included, but for the fact that the payment calculated for the claim in the initial partial distribution was less than $5.00, as discussed in Para. 18 above. The total funds to be distributed in the initial partial distribution is $426,063,670.16.

29.    As noted above in Para. 11.a. above, it is possible that claims in this population may be removed from the initial partial distribution if another registrant were to register the TIN, thus putting it into conflict, between now and when payments are distributed.  In addition, if any Class Member in the population requests and is granted permission to take additional steps with respect to their claim, despite having passed various deadlines by which they may do so, the Class Member may be removed from the population.

30.    Once an initial partial distribution is approved by the Court, Epiq will update the Merchant Portal to indicate for registrants whether their claims are included in the initial partial distribution and the initial distribution payment amount for those that are, and will contact each registrant with a claim or claims in the initial partial distribution and ask them to visit the Merchant Portal, review their claim(s) to be included for payment, and then elect how they would like to be paid.  Where a registrant has more than one eligible claim for payment, they will be able to elect a single payment as a lump sum or elect a different payment method for each merchant.  Epiq anticipates that available payment methods will include mailed physical check, direct deposit, and

certain digital payment options to be determined by Class Counsel.  Registrants who fail to make a payment election will be issued a paper check by mail for each claim.

31.     Making required updates to the Merchant Portal to accommodate the payment process, as described above, conducting outreach to registrants and providing them sufficient time to make a payment election, conducting any final fraud checks based on payment direction provided, and effectuating payments, is a multi-step process.  As such, Epiq recommends that the Court order a distribution no earlier than 90 days from the date of its Order approving said distribution.

## CONCLUSION

32.     The proposed plan described in this declaration for issuing initial payments is reasonable and will provide a measurable benefit for more than half of the claims received to date. In recognition of the fact that Class Members have been waiting many years to receive payments, the plan is calculated to pay as many claims as possible while maintaining a reasonable and conservative holdback of sufficient funds to account for any possible results of the outstanding legal issues and the resolution of all conflicts, research requests, sales data submissions, and any other pending disputes concerning the claims excluded from the initial partial distribution.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on August 19, 2025 at Seattle, Washington.


_____
Loree Kovach