UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------

IN RE PAYMENT CARD INTERCHANGE FEE
AND MERCHANT DISCOUNT ANTITRUST
LITIGATION

**MEMORANDUM & ORDER**

05-MD-1720 (MKB) (JAM)

This document refers to:

*Block, Inc. v. Visa Inc.*, No. 23-CV-5377;
*Intuit, Inc. v. Visa Inc.*, No. 21-CV-1175
-------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

On November 15, 2024, Visa, Inc., Visa U.S.A., Inc., Visa International Service

Association ("Visa"), and Mastercard Incorporated and Mastercard International Incorporated

("Mastercard") (collectively, "Defendants"), moved for an injunction compelling dismissal of the

released claims of Intuit Incorporated and Intuit Payment Solutions, LLC ("Intuit"), and Block,

Inc., formerly known as Square, Inc. ("Square") (collectively, "Plaintiffs") based on transactions

in which Plaintiffs acted as "payment facilitators" for their merchant customers, and a continued

stay of discovery of Plaintiffs' payment facilitator claims pending the resolution of this motion.[1]

Intuit and Square jointly opposed the motion.[2]  The Court referred the motion to Magistrate

Judge Joseph A. Marutollo for a report and recommendation.  (Order Referring Mot. dated Dec.

---

[1] (Defs.' Mot. for Injunction Compelling Dismissal of Released Claims and for an Interim Stay ("Defs.' Mot."), Docket Entry No. 9511; Defs.' Mem. in Supp. of Defs.' Mot. ("Defs.' Mem."), Docket Entry No. 9512; Defs.' Reply in Supp. of Defs.' Mot. ("Defs.' Reply"), Docket Entry No. 9517; Decl. of Rosemary Szanyi in Supp. of Defs.' Mot. ("Szanyi Decl."), Docket Entry No. 9513; Defs.' Ltr. in Resp. to Pls.' Suppl. Ltr. in Further Supp. of Pls.' Opp'n ("Defs.' Ltr. Resp."), Docket Entry No. 9523.)

[2] (Pls.' Opp'n to Defs.' Mot. ("Pls.' Opp'n"), Docket Entry No. 9514; Decl. of Adam B. Wolfson in Supp. of Pls.' Opp'n ("Wolfson Decl."), Docket Entry No. 9516; Pls.' Suppl. Ltr. in Further Supp. of Pls.' Opp'n ("Pls.' Suppl. Ltr."), Docket Entry No. 9522.)

30, 2024.)  By report and recommendation dated March 24, 2025, Judge Marutollo

recommended that the Court (1) construe Defendants' motion as a motion for reconsideration;

(2) deny Defendants' motion for reconsideration for procedural and substantive deficiencies; (3)

in the alternative, if the Court does not construe Defendants' motion as a motion for

reconsideration, deny Defendants' motion because outstanding factual issues compel denial of

Defendants' motion (the "R&R").  (R&R 2, 18, Docket Entry No. 9579.)  On April 7, 2025,

Defendants objected to the R&R, and on April 21, 2025, Plaintiffs filed their response to

Defendants' objections.[3]  For the reasons discussed below, the Court denies Defendants' motion

for injunction.

## I.    Background

The Court assumes familiarity with the facts and extensive procedural history as set forth

in prior decisions.  *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 986

F. Supp. 2d 207 (E.D.N.Y. 2013) (*Interchange Fees I*), *rev'd and vacated*, 827 F.3d 223 (2d Cir.

2016) (*Interchange Fees II*); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust*

*Litig.*, 330 F.R.D. 11 (E.D.N.Y. 2019) (*Interchange Fees III*); *In re Payment Card Interchange*

*Fee & Merch. Disc. Antitrust Litig.*, 714 F. Supp. 3d. 65 (E.D.N.Y. 2024) (*Interchange Fees IV*);

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2024

WL 1014159 (E.D.N.Y. Feb. 22, 2024) (*Interchange Fees V*); *In re Payment Card Interchange*

*Fee & Merch. Disc. Antitrust Litig.*, 729 F. Supp. 3d. 298 (E.D.N.Y. 2024) (*Interchange Fees*

*VI*); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 735 F. Supp. 3d 249

(E.D.N.Y. 2024) (*Interchange Fees VII*); *In re Payment Card Interchange Fee & Merch. Disc.*

---

[3]  (Defs.' Objs. to R&R ("Defs.' Objs."), Docket Entry No. 9593; Pls.' Resp. to Defs.' Objs. ("Pls.' Resp."), Docket Entry No. 9600.)

*Antitrust Litig.*, 2024 WL 3236614 (E.D.N.Y. June 28, 2024) (*Interchange Fees VIII*).  The

Court provides only a summary of the pertinent issues.

### a.    The multi-district litigation

In October of 2005, several complaints asserting similar antitrust claims against Visa,

Mastercard, and various issuing banks were consolidated for pretrial purposes and transferred to

the Eastern District of New York, where they were joined by other similar cases.  *In re Payment

Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2008 WL 115104, at

*1 (E.D.N.Y. Jan. 8, 2008).  The consolidated cases included both class actions and individual

actions.  *Id.*  In April of 2006, plaintiffs in the putative class actions ("Class Plaintiffs") filed a

consolidated amended class complaint that defined two classes: one seeking damages and the

other seeking equitable relief.  *Id.* at *1–2.[4]

In November of 2016, the Court appointed counsel to two putative classes under Rule

23(b)(2) (the "Equitable Relief Class") and Rule 23(b)(3) (the "Damages Class").  *In re Payment

Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2016 WL 8138988, at

*1 (E.D.N.Y. Nov. 30, 2016).  In December of 2019, the Court granted final approval to the

Settlement Agreement between Defendants and the Damages Class.  *In re Payment Card

Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2019 WL 6875472, at *36

(E.D.N.Y. Dec. 16, 2019).  The Settlement Agreement defines the Damages Class as "all

persons, businesses, and other entities that have accepted any Visa-Branded Cards and/or

Mastercard-Branded Cards in the United States at any time from January 1, 2004 to the

Settlement Preliminary Approval Date [of January 24, 2019]."  (Settlement Agreement ¶ 4,

annexed to Rule 23(b)(3) Class Pls.' Mot. for Class Settlement Preliminary Approval as Ex. 1,

---

[4]  The case was reassigned to the undersigned on December 17, 2014.  (Order Reassigning Case, Docket Entry No. 6359.)

Docket Entry No. 7257-2.)  The Settlement Agreement further provides that each class member who files a claim will receive a *pro rata* share of the settlement fund "in accordance with the relative economic interests of the [class member] as measured by the Interchange Fee amounts attributable to their Visa- and Mastercard-Branded Card transactions during the Class Period." (*Id.* § I-2.)  In exchange, each class member would release claims "arising out of or relating to" any conduct or acts that were or could have been alleged in the litigation.  (*Id.* ¶ 31(a).)

In March of 2023, the Second Circuit affirmed in all material respects this Court's decision certifying the Settlement Class and approving the Settlement Agreement.  *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 727 (2d Cir. 2023).  The Second Circuit further affirmed this Court's decision to refer any disputes over class membership to a special master, subject to *de novo* review by this Court.  *Id.* at 719.

In July of 2023, Square filed a complaint in this District against Visa and Mastercard asserting violations of the antitrust laws.  (*See* Compl., *Block, Inc. v. Visa, Inc.*, No. 23-CV-5377 (E.D.N.Y. July 14, 2023).)  Previously, in February of 2021, Intuit filed a complaint in the Northern District of California against Visa and Mastercard asserting violations of the antitrust laws.  (Compl., *Intuit, Inc. v. Visa Inc.*, No. 21-CV-1175 (E.D.N.Y. Feb. 19, 2021).)  Intuit's action was transferred to this Court in March of 2021, where it was consolidated with *In re Payment Card and Merchant Discount Antitrust Litigation*.  (*See* Order Transferring Case dated Mar. 5, 2021, *Intuit*, No. 21-CV-1175 (E.D.N.Y. Mar. 5, 2021).)  Both Square and Intuit timely opted out of the Rule 23(b)(3) Settlement Class.[5]  (*See* Intuit Opt-Out Letter dated July 23, 2019,

---

[5]  The deadline to opt out of the Rule 23(b)(3) Class was July 23, 2019.  *See In re Payment Card*, 2019 WL 6875472, at *5; (*see also* Order Approving Preliminary Settlement dated Jan. 24, 2019 ¶ 16, Docket Entry No. 7361 ("[A]ny member of the Rule 23(b)(3) Settlement Class that does not wish to participate in the Rule 23(b)(3) Settlement Class shall have until one hundred eighty days after the Court's entry of this Rule 23(b)(3) Settlement

annexed to Decl. of Adam B. Wolfson as IPX 14, Docket Entry No. 9065-8; Square Opt-Out Letter dated July 19, 2019, annexed to Decl. of Marc L. Greenwald ("Greenwald Decl.") as Ex. S16, Docket Entry No. 9069-16.)

### b. Factual background

Typically, merchants who wish to accept payment cards enter into agreements with acquiring banks ("Acquirers"). *Interchange Fees VII*, 735 F. Supp. 3d at 256. Acquirers facilitate merchants' acceptance of payment cards by, among other things, providing the hardware necessary to accept payment cards, transmitting payment information across the payment card network (*e.g.*, Visa, Mastercard, American Express, or Discover), and settling funds received on behalf of merchants from issuing banks ("Issuers"). *Id.* For these services, merchants pay a fee known as the "merchant discount fee" or "merchant discount," which is typically a per-transaction fee that includes the full amount of any applicable interchange fees and network fees, in addition to the Acquirer's own fees. *See generally Interchange Fees V*, 2024 WL 1014159, at *4–5.

Other merchants, typically small- and medium-sized businesses, may not want to contract directly with Acquirers to accept payment cards. *Interchange Fees VII*, 735 F. Supp. 3d at 256. For these merchants ("Sellers"), entities such as Square and Intuit ("Payment Facilitators" or "PayFacs") provide another option.[6] *Id.* Square, for example, provides Sellers with its white, square card readers that enable cardholders to "insert, swipe, or tap" their payment cards when

---

Preliminary Order — *i.e.*, [until July 23, 2019] — to submit a request to become an Opt Out and be excluded from the Rule 23(b)(3) Settlement Class.")).

[6] The Court refers to merchants who utilize the services of Intuit or Square as "Sellers" to distinguish them from the merchants who contract directly with Acquirers for card-acceptance services.

making purchases from Sellers. *Id.* Square maintains contracts with two Acquirers to acquire transactions on behalf of Sellers, and serves as an intermediary by sending transaction information to an Acquirer who, in turn, sends the transaction information across the payment card network. *Id.* Square also settles funds for Sellers that it receives from Issuers via its accounts at its Acquirers. *Id.* Visa's and Mastercard's rules describe Square and Intuit as "Payment Facilitators" or "PayFacs." *Id.* Intuit's payment facilitation services operate similarly, although primarily for Sellers who accept payment cards for online purchases.[7] *Id.*

### c.   Relevant procedural history

On January 31, 2024, Defendants moved to enforce the Settlement Agreement, or, in the alternative, for summary judgment, seeking to dismiss claims by Intuit and Square that are based on transactions in which Square or Intuit served as PayFacs for their merchant customers (the "Motion to Enforce"). Square and Intuit opposed the motion and cross-moved for summary judgment, seeking a ruling that they have antitrust standing to bring claims based on the transactions at issue.[8] Defendants argued that "Intuit's and Square's asserted claims based on

---

[7] Consistent with Intuit's description of the transactions it facilitates, the Court refers to such transactions as Intuit's "PayFac transactions." (*See generally* Pl. Intuit's Opp'n to Defs.' Mot. to Enforce & Mem. in Supp. of Intuit's Mot. ("Intuit Mem."), Docket Entry No. 9061.)

[8] (Defs.' Mot. to Enforce Settlement Agreement or, in the Alternative, for Summ. J. ("Defs.' Mot. to Enforce"), Docket Entry No. 9056; Defs.' Mem. in Supp. of Defs.' Mot. to Enforce ("Defs.' Mot. to Enforce Mem."), Docket Entry No. 9057; Defs.' Reply in Supp. of Defs.' Mot. to Enforce & Opp'n to Pls.' Cross-Mots. for Partial Summ. J. ("Defs.' Mot. to Enforce Reply"), Docket Entry No. 9083; Pl. Square's Opp'n to Defs.' Mot. to Enforce & Mem. in Supp. of Joinder in *Lanning* & *Camp Grounds* Pls.' Cross-Mot. for Partial Summ. J. ("Square Mem."), Docket Entry No. 9066; Pl. Square's Reply in Supp. of Joinder in *Lanning* & *Camp Grounds* Pls.' Cross-Mot. for Partial Summ. J. ("Square Reply"), Docket Entry No. 9091; Pl. Intuit's Cross-Mot. for Partial Summ. J. Finding Intuit Has Standing on its Payment Facilitator Claims ("Intuit Mot."), Docket Entry No. 9060; Intuit Mem.; Pl. Intuit's Reply in Supp. of Intuit Mot. ("Intuit Reply"), Docket Entry No. 9089.)

Defendants also moved to enforce the Settlement Agreement against the *Lanning* Plaintiffs, a group of merchants who use Square's services to accept payment cards. *Interchange*

transactions in which they served as [PayFacs] are barred by the . . . Settlement Agreement release and should be dismissed." (Defs.' Mot. to Enforce Mem. 2.) In support, Defendants argued that Intuit and Square (1) did not "accept" payment cards and are therefore not members of the Settlement Class, and (2) are "agents" of their Sellers and thus are not injured by Defendants' practices. (*Id.* at 2, 4–6, 8.) Intuit argued that it was the "direct and only payor of the interchange to the 'antitrust violators' for all of its PayFac transactions" and that Intuit was "legally responsible to pay interchange fees" on its PayFac transactions. (Intuit Mem. 2, 11–12.) Square similarly argued that it was the entity that "legally and operationally" accepted payment cards and made the arrangements with Acquirers "to accept cards itself for its customers." (Square Mem. 2–3, 16.)

On May 28, 2024, the Court granted Defendants' Motion to Enforce, finding that Intuit's and Square's Sellers "accepted" payment cards and are therefore members of the Settlement Class, but that Intuit and Square are not members of the Settlement Class (the "May 2024 Decision"). (May 2024 Decision, Docket Entry No. 9308); *Interchange Fees VII*, 735 F. Supp. 3d at 249. The Court explained that the record demonstrated Sellers "accepted" payment cards because (1) Intuit's and Square's "agreements with their customers reinforce that Sellers 'accept' payment cards"; (2) the "way real-world transactions are conducted supports the conclusion that Sellers 'accept' payment cards"; (3) "Sellers, not Square, represent themselves as selling the goods or services to cardholders"; (4) "Sellers use their names to identify themselves to

---

*Fees VII*, 735 F. Supp. 3d at 266. The *Lanning* Plaintiffs cross-moved for summary judgment and sought a ruling that they are not members of the Settlement Class. *Id.* at 253. The Court concluded that the *Lanning* Plaintiffs were members of the Settlement Class and denied the *Lanning* Plaintiffs' cross-motions for partial summary judgment. *Id.* The *Lanning* Plaintiffs subsequently appealed the Court's decision to the Second Circuit. (Notice of Appeal, Docket Entry No. 9327.) The *Lanning* Plaintiffs have not submitted briefing related to the current motion. The Court accordingly will only discuss the *Lanning* Plaintiffs to the extent the *Lanning* Plaintiffs' action is relevant to Plaintiffs' arguments.

cardholders"; and (5) "Sellers provide recourse to cardholders in the event of a dispute." *Interchange Fees VII*, 735 F. Supp. 3d at 264, 264–66.  The Court noted that "the Sellers' status as class members does not turn on any agency relationship with Square or Intuit" and thus the Court did not address Defendants' arguments regarding whether Intuit and Square had an agency relationship with their Sellers.  *Id.* at 259 n.17 & n.18.  The Court also denied Intuit's cross-motion for partial summary judgment, holding that there is a "triable question of fact as to the identity of the direct purchaser of the card-acceptance services."  *Id.* at 269.  The Court specifically noted that the Court's finding that the Sellers, rather than Intuit and Square, "accepted" payment cards "is not equivalent to the conclusion that no genuine dispute of fact remains as to the identity of the direct purchaser of card-acceptance services under *Illinois Brick* [*Co. v. Illinois*, 431 U.S. 720 (1977)]."  *Id.* at 267 n.27.

On June 11, 2024, Plaintiffs filed a letter with Defendants' consent informing the Court that the "parties have inconsistent readings of" the May 2024 Decision and that Plaintiffs intended to file a motion for clarification.  (Pls.' Ltr. re Mot. for Clarification, Docket Entry No. 9324; *see also* Pls.' Notice of Mot. for Clarification ("Pls.' Mot. for Clarification"), Docket Entry No. 9325.)  Specifically, Plaintiffs noted "Defendants have taken the position that the [May 2024 Decision] dismisses all of the antitrust claims arising out of Intuit's and Square's PayFac operations because the Court granted Defendants' motion to enforce the Rule 23(b)(3) . . . [S]ettlement [A]greement."  (Pls.' Mem. in Supp. of Pls.' Mot. for Clarification 2, Docket Entry No. 9325-1.)  The same day, the Court denied Plaintiffs' request to file a motion for clarification. The Court noted that the May 2024 Decision "speaks for itself" and that the Court "did not dismiss any claims or any portion of claims brought by Intuit or [Square], including any claims for damages based on transactions for which Intuit or [Square] served as a payment facilitator" ("June 2024 Order").  (Order dated June 11, 2024.)

On July 29, 2024, Defendants informed the Court that they served Plaintiffs with a Motion for Injunction Compelling Dismissal of Released Claims and for an Interim Stay ("Motion for Injunction"). (Defs.' Notice re Mot. for Injunction, Docket Entry No. 9367.) The next day, Plaintiffs wrote a letter to the Court arguing that "Defendants' renewed motion seeks the same relief as their previous Motion to Enforce Settlement Agreement or, in the Alternative, for Summary Judgment." (Pls.' Ltr. re Defs'. Mot. for Injunction, Docket Entry No. 9370.) In support, they argued that Defendants' motion (1) violated the Court's Individual Practices and Rules by failing to request a pre-motion conference prior to serving their motion on Plaintiffs; (2) attempted to re-litigate an issue the Court addressed in the May 2024 Decision and June 2024 Decision; and (3) failed to timely seek reconsideration of any portion of the Court's decisions. (*Id.* at 2.) On July 31, 2024, the Court ordered Defendants to comply with Rule 3.A of the Court's Individual Practices and Rules and file a letter setting forth the basis for their anticipated motion. (Order dated July 31, 2024.) On August 2, 2024, Defendants submitted a letter in anticipation of their Motion for Injunction, explaining that they planned to request that the Court (1) compel the *Lanning* Plaintiffs to dismiss their individual actions; (2) issue an injunction compelling Intuit and Square to dismiss their PayFac claims because they are barred by the Settlement Agreement[9]; and (3) issue an interim stay of the PayFac claims pending resolution of Defendants' request for "class-settlement-based relief." (Defs.' Pre-Mot. Conf. Ltr. re Mot. for Injunction and Stay 1–2, Docket Entry No. 9374.) On August 7, 2024, Plaintiffs responded to Defendants' letter, arguing (1) Defendants' "proposed [m]otion is an untimely and improper motion for reconsideration"; (2) Defendants identify "no case in which any court employed [the All Writs Act] to order a party before it to self-dismiss rather than to affirmatively order

---

[9] Defendants' Motion for Injunction as filed did not move to compel the *Lanning* Plaintiffs to dismiss their individual actions. (*See generally* Pls.' Mem.)

dismissal under Rule 12 or Rule 56"; and (3) Defendants' "anticipated [m]otion is an unsupported, futile Rule 56 motion for summary judgment that seeks to force Intuit and Square to self-dismiss their claims by way of an 'injunction' rather than have the Court grant dismissal." (Pls.' Opp'n Ltr. to Defs.' Pre-Mot. Conf. Ltr. re Mot. for Injunction and Stay, Docket Entry No. 9382.)  On October 11, 2024, Intuit filed a letter requesting that the Court order a discovery schedule.  (Intuit Ltr. re Discovery, Docket Entry No. 9459.)  The same day, Defendants responded that they opposed entry of a discovery schedule as to Plaintiffs' PayFac claims until the Court resolved Defendants' earlier request regarding their Motion for Injunction.  (Defs.' Ltr. re Discovery, Docket Entry No. 9460.)

On November 12, 2024, Judge Marutollo held a pre-motion conference to discuss Defendants' anticipated motion.  (Minute Entry dated Nov. 12, 2024.)  Defendants argued that Intuit and Square are "agent[s] of the [C]lass [M]embers that they service as payment facilitators," (Tr. of Nov. 12, 2024 Pre-Motion Conference ("Nov. 2024 Tr.") 9:13–15, Docket Entry No. 9543), and that because "all [C]lass [M]embers agreed to release damages claims based on the card transactions they accepted on behalf of themselves and any of their agents," (*id.* at 9:4–6), Defendants have no claims as PayFacs that are not already released by the Settlement Agreement, (*id.* at 9:12–25).  Plaintiffs argued that they have brought direct purchaser antitrust claims because they directly pay interchange fees to Acquirers, (*id.* at 14:8–18), that factual issues preclude granting dismissal of Plaintiffs' direct purchaser claims, (*id.* at 16:11–23), and that Defendants' motion is an untimely motion for reconsideration, (*id.* at 17:22–18:2).  Judge Marutollo granted leave for Defendants to file their Motion for Injunction and stayed discovery on Plaintiffs' PayFac claims.  (Min. Entry dated Nov. 12, 2024.)

### d.    Report and recommendation

Having reviewed the submissions, Judge Marutollo recommended that the Court deny Defendants' Motion for Injunction.  First, Judge Marutollo concluded that Defendants' motion should be construed as a motion for reconsideration because it is a "successive motion[] seeking the same relief" as Defendants' Motion to Enforce.  (R&R 11–14.)  Second, he concluded that the Court should deny Defendants' motion because it is untimely, (*id.* at 14–15), and does not meet the standard for a motion for reconsideration, (*id.* at 16).  In support, Judge Marutollo explained that Defendants effectively request the Court reconsider the May 2024 Decision's "lack of reliance on Defendants' agency arguments" and thus ask the Court to reexamine issues that Defendants believe the Court "overlooked."  (*Id.*)  He also noted that Defendants have not cited "to a change in controlling law, or the availability of new evidence," and that Defendants "have failed to show manifest injustice, or any other grounds for reconsideration" of the May 2024 Decision.  (*Id.* at 17–18.)  Third, Judge Marutollo recommended that even if the Court does not construe Defendants' motion as a motion for reconsideration, the Court should still deny Defendants' motion "given the outstanding factual questions regarding [Plaintiffs'] statuses as direct purchasers" under Supreme Court doctrine.  (*Id.* at 18–19.)  Judge Marutollo noted that Defendants "fail[ed] to even identify the legal standard applicable to a motion for a preliminary injunction," and explained that Defendants did not meet the standard for granting a motion for preliminary injunction.  (*Id.* at 18.)  Judge Marutollo also explained that courts "in this Circuit have identified several factors relevant to determining whether a principal and an agent constitute distinct entities for purposes of *Illinois Brick* standing," and that further discovery should resolve the remaining factual issues as to several of those factors.  (*Id.* at 19–20.)

11

## II.  Discussion

### a.  Standards of review

#### i.  R&R

A district court reviewing a magistrate judge's recommended ruling "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1)(C).  When a party submits a timely objection to a report and recommendation, the district court reviews *de novo* the parts of the report and recommendation to which the party objected.  *Id.*; *United States v. Romano*, No. 15-992, 2022 WL 402394, at *3 (2d Cir. Feb. 10, 2022) (citing *United States v. Romano*, 794 F.3d 317, 340 (2d Cir. 2015)); *see also Houghtaling v. Eaton*, No. 22-638, 2023 WL 113840, at *2 n.3 (2d Cir. Jan. 5, 2023) (noting that the district court conducted a *de novo* review of the magistrate judge's report and recommendation and addressed the plaintiff's objections).  The district court may adopt those portions of the recommended ruling to which no timely objections have been made, provided no clear error is apparent from the face of the record.  *See S.J. v. N.Y.C. Dep't of Educ.*, No. 21-240, 2022 WL 1409578, at *1 n.1 (2d Cir. May 4, 2022) (noting that the district court applied the correct legal standard in conducting *de novo* review of portions of the magistrate judge's report to which specific objections were made and reviewing portions not objected to for clear error).  The clear error standard also applies when a "party makes only conclusory or general objections, or simply reiterates his original arguments."  *Miller v. Brightstar Asia, Ltd.*, 43 F.4th 112, 120 (2d Cir. 2022) (quoting *Thomas v. Astrue*, 674 F. Supp. 2d 507, 511 (S.D.N.Y. 2009)); *Wu v. Good Samaritan Hosp. Med. Ctr.*, 815 F. App'x 575, 579 (2d Cir. 2020) ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection under . . . Fed. R. Civ. P. 72(b)." (quoting *Mario v. P & C Food Mkts., Inc.*, 313 F.3d 758, 766 (2d Cir. 2002))); Fed. R. Civ. P. 72(b)(2) ("[A] party may serve and file specific written objections to the

12

[magistrate judge's] proposed findings and recommendations.").  Where, however, a party takes "issue with a specific legal conclusion in the report and recommendation," a district court reviews the objected-to portions of the report and recommendation *de novo*.  *Miller*, 43 F.4th at 120–21 (concluding that the plaintiff's objection, although revisiting an issue already argued, should have been reviewed *de novo* where the plaintiff objected to a "specific legal conclusion in the report and recommendation," and noting that clear error is normally applied "when the objections are nonspecific or 'merely perfunctory responses . . . argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original petition'" (alteration in original) (citing *Edwards v. Fischer*, 414 F. Supp. 2d 342, 346–47 (S.D.N.Y. 2006))).

### ii.   Motion for reconsideration

The standard for granting a motion for reconsideration "is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked — matters, in other words, that might reasonably be expected to alter the conclusion reached by the court."  *Commerzbank AG v. U.S. Bank, N.A.*, 100 F.4th 362, 377 (2d Cir. 2024) (quoting *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995)), *cert. denied*, 145 S. Ct. 279 (2024); *Van Buskirk v. United Grp. of Cos., Inc.*, 935 F.3d 49, 54 (2d Cir. 2019) (same); *see also* S.D.N.Y. & E.D.N.Y. Local Civ. R. 6.3 (providing that the moving party must "set[] forth concisely the matters or controlling decisions which counsel believes the [c]ourt has overlooked").  "Controlling decisions include decisions from the United States Court of Appeals for the Second Circuit; they do not include decisions from other circuits or district courts . . . ."  *Pentacon BV v. Vanderhaegen*, No. 23-CV-2172, 2024 WL 3835334, at *12 (S.D.N.Y. Aug. 15, 2024) (quoting *Cobalt Multifamily Invs. I, LLC v. Shapiro*, No. 06-CV-6468, 2009 WL 4408207, at *2 (S.D.N.Y. Dec. 1, 2009)); *see also Tenemille v. Town of Ramapo*, No. 18-CV-724, 2022

WL 2047819, at *5 (S.D.N.Y. June 7, 2022) (quoting same).  In addition to considering any evidence or controlling cases the court overlooked, the court should also consider whether there has been "an intervening change of controlling law." *Commerzbank AG*, 100 F.4th at 377 (quoting *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)); *Ethridge v. Bell*, 49 F.4th 674, 688 (2d Cir. 2022) (quoting *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 729 F.3d 99, 104 (2d Cir. 2013)); *Network Apps, LLC v. AT&T Mobility LLC*, 778 F. Supp. 3d 610, 619 (S.D.N.Y. 2025) ("Reasons to 'depart from the law of the case and reconsider [an] issue' may include 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" (alteration in original) (quoting *Gulino v. Bd. of Educ. of N.Y.C. Sch. Dist. of the City of New York*, 555 F. App'x 37, 40 (2d Cir. 2014))); *Johnson v. Mount Sinai Hosp. Grp., Inc.*, No. 22-CV-2936, 2023 WL 3159233, at *1 (E.D.N.Y. Apr. 28, 2023) (quoting *Kolel Beth Yechiel Mechil of Tartikov, Inc.*, 729 F.3d at 104).

It is thus well-settled that a motion for reconsideration "is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking [another] bite at the apple." *U.S. for Use & Benefit of Five Star Elec. Corp. v. Liberty Mut. Ins. Co.*, 758 F. App'x 97, 101 (2d Cir. 2018) (alteration in original) (quoting *Analytical Survs., Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012), *as amended*, (July 13, 2012)).  "A motion for reconsideration is not an opportunity for a [party] to 'relitigate an issue already decided' or present arguments that could have been made before the judgment was entered." *Ethridge*, 49 F.4th at 688 (quoting *Shrader*, 70 F.3d at 257); *see also Doe v. Martucci*, No. 20-CV-2331, 2024 WL 5118505, at *2 (S.D.N.Y. Dec. 16, 2024) ("[A] motion for reconsideration is neither an occasion for repeating old arguments previously rejected nor an opportunity for making new arguments that could have been previously advanced." (quoting

14

*Assoc. Press v. U.S. Dep't of Def.*, 395 F. Supp. 2d 17, 19 (S.D.N.Y. 2005))); *Salveson v. JP
Morgan Chase & Co.*, 166 F. Supp. 3d 242, 248 (E.D.N.Y. 2016) ("A motion for reconsideration
is 'neither an occasion for repeating old arguments previously rejected nor an opportunity for
making new arguments that could have previously been made.'" (quoting *Simon v. Smith &
Nephew, Inc.*, 18 F. Supp. 3d 423, 425 (S.D.N.Y. 2014))), *aff'd*, 663 F. App'x 71 (2d Cir. 2016).

### iii.   All Writs Act

"The All Writs Act authorizes federal courts to 'issue all writs necessary or appropriate in
aid of their respective jurisdictions and agreeable to the usages and principles of law.'" *Wyly v.
Weiss*, 697 F.3d 131, 137 (2d Cir. 2012) (citation omitted) (quoting 28 U.S.C. § 1651(a));
*Higgins Ave., LLC v. Stathakis*, 711 F. App'x 54, 55 (2d Cir. 2017) (quoting *Wyly*, 697 F.3d at
137). "[W]hile the Act authorizes a federal court to issue commands that are 'necessary or
appropriate to effectuate or prevent the frustration of orders it has previously issued in its
exercise of jurisdiction otherwise obtained,' . . . the remedies permitted under the Act are
'extraordinary.'" *Citigroup, Inc. v. Abu Dhabi Inv. Auth.*, 776 F.3d 126, 130 (2d Cir. 2015)
(citation omitted) (first quoting *Sheet Metal Contractors Ass'n of N. N.J. v. Sheet Metal Workers'
Int'l Ass'n,* 157 F.3d 78, 82 (2d Cir.1998), and then quoting *United States v. Int'l Bhd. of
Teamsters, Chauffeurs, Warehousemen and Helpers of Am., AFL–CIO,* 907 F.2d 277, 280 (2d
Cir. 1990)); *see Eletson Holdings Inc. v. Levona Holdings Ltd.*, No. 23-CV-7331, 2025 WL
1617460, at *1 (S.D.N.Y. June 6, 2025) ("The All Writs Act, 28 U.S.C. § 1651, authorizes a
federal court 'to issue such commands . . . as may be necessary or appropriate to effectuate and
prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise
obtained.'" (alteration in original) (quoting *Pa. Bureau of Corr. v. U.S. Marshals Serv.*, 474 U.S.
34, 40 (1985))); *United States v. Kaplan*, No. 23-CR-293, 2023 WL 5718901, at *4 (E.D.N.Y.
Sept. 5, 2023) ("The All Writs Act is a source of extraordinary relief and is not ordinarily called

upon for routine matters." (citations omitted)); *see also Allen v. Koenigsmann*, No. 19-CV-8173, 2023 WL 6292648, at *2 (S.D.N.Y. Sept. 27, 2023) ("The All Writs Act invests a court with a power essentially equitable and, as such, not generally available to provide alternatives to other, adequate remedies at law." (quoting *Clinton v. Goldsmith*, 526 U.S. 529, 537 (1999))). Injunctions issued under the All Writs Act must "be specific and definite enough to apprise those within its scope of the conduct that is being proscribed." *Ronnie Van Zant, Inc. v. Cleopatra Records, Inc.*, 906 F.3d 253, 258 (2d Cir. 2018) (quoting *In re Baldwin-United Corp.*, 770 F.2d 328, 339 (2d Cir. 1985)).

> **b.    Defendants' objections to the R&R**

Defendants object to three portions of the R&R.  First, they argue that Judge Marutollo "incorrectly characterizes Defendants' motion as 'a motion for a preliminary injunction'" rather than a motion for an injunction under the All Writs Act, 28 U.S.C. § 1651.  (Defs.' Objs. 1.) Defendants argue that they do not have to satisfy the preliminary injunction standard for the Court to "enjoin non-parties Intuit and Square from thwarting this Court's Order and Final Judgment incorporating the . . . Settlement Agreement release." (*Id.* at 8–9.)  Second, they argue that Judge Marutollo incorrectly concluded that Defendants' motion is a motion for reconsideration because Defendants' motion raises an issue that the Court declined to reach in the May 2024 Decision rather than raising an issue that the Court previously rejected. (*Id.* at 9.) Third, Defendants argue that Judge Marutollo "erroneously concludes that further fact discovery is needed to resolve Defendants' motion" because whether Intuit and Square are "agents" of their Sellers can be resolved by the Court "based on the contracts . . . between Square and Intuit and their [C]lass [M]ember customers," and whether Intuit or Square are direct purchasers under federal antitrust law "has no bearing on the meaning or application of the word 'agent' in the . . . Settlement Agreement." (*Id.* at 2.)  Defendants "request that the Court reject the recommended

disposition in the [R&R] and grant Defendants' motion for injunction."  (*Id.*)

Plaintiffs argue that the Court should adopt the R&R in its entirety.  First, they argue that Judge Marutollo did not rely on Defendants' "failure to satisfy the preliminary injunction standard" in recommending that the Court deny Defendants' motion, but rather found that denial was "appropriate given the outstanding factual questions regarding Defendants' statuses as direct purchasers."  (Pls.' Opp'n 13–14.)  Plaintiffs contend that Judge Marutollo "properly relied on the Court's clear holdings in the May [2024 Decision] that genuine disputes exist as to direct purchaser and agency issues."  (*Id.* at 14.)  Second, they argue that Judge Marutollo "correctly concluded that Defendants' restyled motion is an untimely and deficient request for reconsideration."  (*Id.* at 8.)  Third, they argue that Judge Marutollo correctly concluded that there is a genuine dispute regarding "the agency relationship between Intuit and Square and their [Sellers]."  (*Id.* at 13.)

### c.  The Court construes Defendants' Motion for Injunction as a motion for reconsideration

Defendants argue that Judge Marutollo erred in concluding that Defendants' Motion for Injunction is "in sum and substance, one for reconsideration" of the May 2024 Decision.  (Defs.' Objs. 9 (quoting R&R 11).)  First, they argue that Judge Marutollo's recommendation is "legally incorrect because it fails to distinguish between re-raising an issue that a court has previously rejected, and re-raising an issue that a court has previously declined to reach."  (*Id.* (emphases omitted).)  In support, Defendants contend that the R&R cites no case law holding that a party may or must "move for reconsideration of an order granting its motion but expressly declining to reach one of the issues raised," and that such a requirement "would be unworkable, because a party in that situation . . . has no 'order or other decision' that they might ask 'be revised.'"  (*Id.* at 10 (emphases omitted) (quoting Fed. R. Civ. P. 54(b)).)  Second, they argue that the "cases on

17

successive motions on which the [R&R] relies all involve successive motions re-raising issues that the court had previously ruled on and rejected," rather than cases involving "an attempt to address an issue not reached in a prior order." (*Id.*)  Finally, they argue that subjecting their Motion for Injunction to the "strict reconsideration standard" would not "further the deterrence goals" of reconsideration. (*Id.* at 11 (internal quotations and citations omitted).)  They argue that "[a]n unreached issue on a successful motion, by definition, has not been 'considered fully by the Court,' nor has that motion been 'lost.'" (*Id.*)

Plaintiffs argue that Judge Marutollo correctly construed Defendants' motion as a motion for reconsideration.  First, they argue that Defendants' Motion for Injunction "seeks the same relief as their previous Motion to Enforce" and thus Judge Marutollo "correctly recognized that the Motion is nothing more than a motion for reconsideration." (Pls.' Resp. 8.)  They contend that Defendants' attempt to use the All Writs Act to seek the "same relief already requested and denied does not mean the Motion is not one for reconsideration." (*Id.* at 9.)  Second, they argue that Judge Marutollo correctly concluded that Defendants' motion does not "identify any possible basis to revisit" the May 2024 Decision. (*Id.* at 9–10.)  Finally, they argue that Defendants' distinction between arguments that the Court rejected and arguments that the Court did not reach "[d]oes [n]ot [e]xist." (*Id.* at 10.)  In support, they argue that Judge Marutollo correctly noted that "the agency issue and arguments contained in the Motion for Injunction were already presented to this Court, and to the extent anything was 'overlooked,' reconsideration was the only proper response." (*Id.* at 10–11.)  They also note that "successive attempt[s] to argue for the same relief under the same theory amounts to a motion for reconsideration," regardless of how the movant labels their motion. (*Id.* at 11.)

The Court finds that Defendants' Motion for Injunction is a motion for reconsideration. As Judge Marutollo correctly identified, Defendants seek the same relief based on the same legal

theory they submitted to the Court on the Motion to Enforce.  In the Motion to Enforce, Defendants argued that (1) Intuit's and Square's "asserted claims based on transactions in which they served as payment facilitators are barred by the . . . Settlement Agreement and should be dismissed," (Defs.' Mot. to Enforce Mem. 2); (2) "[t]he relevant inquiry is whether merchants serviced by payment facilitators are members of the Rule 23(b)(3) class and subject to the release, which can be determined by looking at the language of the Settlement Agreement and the TAC alone," (*id.*); (3) because Intuit's and Square's own agreements with Sellers establish that they are "agents" of the Sellers, and the Sellers released their own claims and "those of their agents" in the Settlement Agreement, the Court should dismiss the "claims based on transactions in which [Intuit and Square] served as payment facilitator agents," (*id.* at 2–4 (emphasis omitted)); and (4) whether Intuit and Square are direct purchasers for antitrust standing purposes is a distinct question from "determining which entities in the payment facilitator relationship are members of the [Settlement Class] and therefore entitled to release claims," (*id.* at 17).  In the present Motion for Injunction, Defendants make identical arguments and seek the same relief. They argue that (1) "[t]he payment-facilitator claims asserted by Intuit and Square are barred by the release in the . . . Settlement Agreement," (Defs.' Mem. 10); (2) "[b]ecause Intuit and Square acted as agents of [Settlement Class Members] in facilitating those class members' payment card transactions, their claims based on those transactions have been released under the plain language of the . . . Settlement Agreement," (*id.* at 2); and (3) "[b]y the express terms of their own contracts with merchant customers, Intuit and Square are the 'agent[s]' of their merchant customers when they serve as payment facilitators," (*id.* at 11 (citation omitted)), and the Court should dismiss Intuit's and Square's claims because the "Settlement Agreement release applies to claims by both class members themselves and their agents," (*id.* at 10).  Defendants also argue that "it does not matter whether payment facilitators or their merchant customers — or neither —

19

are found to be 'direct purchasers' under federal antitrust law. (*Id.* at 15.) Defendants' arguments and supporting authority in their Motion to Enforce also relies on substantially the same arguments and authority that Defendants include in their present Motion for Injunction. (*Compare* Defs.' Mot. to Enforce Mem. 10–11, 15–17 *with* Defs.' Mot. for Injunction 9, 11–14.) For example, both motions argue that the Court has the "power to enforce an ongoing order . . . to protect the integrity of a complex class settlement over which it retained jurisdiction." (Defs.' Mot. to Enforce Mem. 11 (quoting *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 134 (2d Cir. 2011); Defs.' Mot. for Injunction Mem. 9 (quoting same).) Defendants' Motion for Injunction thus presents "repetitive arguments on issues that have been considered fully by the [C]ourt," *see Cordaro v. Hegseth*, No. 22-CV-6027, 2025 WL 814830, at *2 (W.D.N.Y. Mar. 14, 2025) (quoting *Lettieri v. Dep't of Just.*, No. 23-CV-865, 2024 WL 2030113, at *2 (W.D.N.Y. Apr. 10, 2024)), which is properly construed as a motion for reconsideration. *See, e.g.*, *Shomo v. Eckert*, 755 F. Supp. 3d 344, 347 (W.D.N.Y. 2024) (explaining that "criteria [for reconsideration] are strictly construed against the moving party so as to avoid repetitive arguments on issues that have been considered fully by the court." (citations and internal quotation marks omitted)); *Hochfelder v. Pac. Indem. Co.*, No. 22-CV-2012, 2023 WL 4364228, at *1 (S.D.N.Y. July 5, 2023) (explaining that reconsideration should be "narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been considered fully by the [c]ourt" (citation and internal quotation marks omitted)). As Judge Marutollo correctly noted, in evaluating Defendants' motion, the Court "considers the substance of the motion, not the title." (R&R 12 (quoting *Al-Bukhari v. Dep't of Corr.*, No. 16-CV-53, 2019 WL 2288859, at *1 n.1 (D. Conn. May 29, 2019)).) Because Defendants' Motion for Injunction is "substantively identical" to their Motion to Enforce with regard to Plaintiffs' PayFac claims, the Court construes it as a motion for reconsideration. *See Funk v. Belneftekhim*, No. 14-CV-376, 2021

20

WL 3774196, at *1 (E.D.N.Y. Aug. 25, 2021) (deeming a "substantively identical" motion as a motion for reconsideration).

Defendants' argument to the contrary — that there is a legal distinction between issues "a court has previously rejected" and issues "a court has previously declined to reach" — is unavailing.  (Defs.' Objs. 9 (emphases omitted).)  First, Defendants cite no law, and the Court is aware of none, in support of their argument that there is a distinction in the reconsideration context between issues a court previously rejected and issues a court declined to reach. Defendants' argument that the R&R cites cases that "involve successive motions re-raising issues that the court had previously ruled on and rejected" rather than cases that "attempt to address an issue not reached in a prior order," (*id.* at 10), is not equivalent to citing case law that *supports* their argument that there is a meaningful legal distinction between issues the Court rejected and issues the Court declined to reach.  Second, Defendants argue that it would be "unworkable" for a party to have to file a motion for reconsideration of "an order granting [a] motion but expressly declining to reach one of the issues raised" because there is no "order or other decision" to "be revised."  (*Id.* (emphasis omitted).)  However, both cases Defendants cite in support of that argument are easily distinguishable from this case.  In *Au New Haven, LLC v. YKK Corp.*, No. 15-CV-3411, 2023 WL 3200102 (S.D.N.Y. May 2, 2023) and *Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am.*, 460 F. Supp. 3d 481 (S.D.N.Y. 2020), the district courts concluded that the reconsideration standard did not apply because the moving party raised issues that were not previously before the court at all.  *Au New York, LLC*, 2023 WL 3200102, at *2 (explaining that the motion presents arguments "distinct from those previously presented to" the court and therefore "does not represent a motion for reconsideration"); *Pilkington N. Am., Inc.*, 460 F. Supp. 3d at 500 (explaining that the motion is not a motion for reconsideration because the previous order dismissed a misrepresentation-based claim for failing to meet the

requirements of Rule 9(b) of the Federal Rules of Civil Procedure, and the defendants now argued that a separate claim of intent to defraud, which defendants had not previously challenged, did not satisfy Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure). In other words, the courts in *Au New Haven* and *Pilkington* rightly did not construe the motions before them as motions for reconsideration because the moving parties each raised new, distinct issues that were not previously raised by the parties before the courts. In this case, by contrast, Defendants make identical arguments and seek the same relief as in the earlier Motion to Enforce. Defendants' conclusory arguments that an "unreached issue in a successful motion, by definition, has not been 'considered fully by the [c]ourt,'" (*id.* at 11), is not supported by case law, particularly because a district court need not explicitly address every argument raised by a party in an order. *See United States v. Schulte*, No. 17-CR-548, 2022 WL 1284549, at *3 (S.D.N.Y. Apr. 29, 2022) (explaining that the defendant "previously moved for relief on this issue prior to his first trial, making many of the same arguments he advances here," and although the "prior opinion did not explicitly address [some of] [d]efendant's arguments," that "alone is not a sufficient basis for reconsideration"); *Ediagbonya v. United States*, No. 18-CV-3882, 2021 WL 4226400, at *3 (S.D.N.Y. Sept. 15, 2021) ("[T]here is no requirement for a court to specifically address each and every argument raised by a party" in papers filed with the court. (quoting *Miller v. Metro. Life Ins. Co.*, No. 17-CV-7284, 2018 WL 5993477, at *5 n.5 (S.D.N.Y. Nov. 15, 2018))); *see also Jackson v. Federal Exp.*, 766 F.3d 189, 199 (2d Cir. 2014) ("[A] district court is not required to 'write an opinion or lengthy order in every case.'" (quoting *Miranda v. Bennett*, 322 F.3d 171, 177 (2d Cir. 2003))). Accordingly, the Court construes Defendants' Motion for Injunction as a motion for reconsideration.

22

### d.    The Court denies Defendants' motion for reconsideration

Defendants have not presented any arguments to persuade the Court to reconsider the

May 2024 Decision.  As an initial matter, when construed as a motion for reconsideration,

Defendants' motion is untimely.  The Court filed the May 2024 Decision on May 28, 2024, and

issued an additional order on June 11, 2024, clarifying that the Court's May 2024 Decision did

not dismiss Plaintiffs' PayFac claims.  (May 2024 Decision; June 2024 Order.)  Defendants did

not seek reconsideration until they served Plaintiffs with their Motion for Injunction on July 29,

2024 — sixty-two days after the May 2024 Decision, and forty-eight days after the June 2024

Order.  Local Rule 6.3 provides that a "notice of motion for reconsideration must be served

within [fourteen] days after the entry of the court's order being challenged."  S.D.N.Y. &

E.D.N.Y. Loc. R. 6.3.  Thus, Defendants' motion is untimely.  *See, e.g.*, *Doyle v. Gentile*, No.

21-CV-8528, 2025 WL 1091345, at *3 n.2 (S.D.N.Y. Mar. 4, 2025) ("Courts in this Circuit

routinely deny untimely motions for reconsideration without considering their merits." (quoting

*McCaffrey v. Gatekeeper USA, Inc.*, No. 14-CV-493, 2022 WL 1321494, at *1 (S.D.N.Y. May 3,

2022))); *Scarsdale Cent. Serv. Inc. v. Cumberland Farms, Inc.*, No. 13-CV-8730, 2014 WL

2870283, at *3 (S.D.N.Y. June 24, 2014) (denying as untimely a motion for reconsideration filed

fifteen days after the initial order was docketed).

Moreover, Defendants have not met the high bar for reconsideration.  They argue that

they are not "asking the Court to change a prior ruling or contending that the Court 'overlooked'

anything" but merely ask that the Court "reach the agency issue that it did not reach before."

(Defs.' Reply 4.)  As discussed above, Defendants already raised this issue under the same legal

theory in their Motion to Enforce and also previously asked the Court to dismiss Plaintiffs'

PayFac claims.  The Court considered Defendants' arguments and declined to dismiss Plaintiffs'

PayFac claims.  (May 2024 Decision; June 2024 Order.)  In the May 2024 Decision, the Court

concluded that Intuit's own agreements with its Sellers define an agency relationship that raises "a triable question of fact as to the identity of the direct purchaser of the card-acceptance services." *Interchange Fees VII*, 735 F. Supp. 3d at 268. The Court clarified in its June 2024 Order that it did not dismiss "any claims for damages based on transactions for which Intuit or [Square] served as a payment facilitator." (June 2024 Order.) The Court will not permit Defendants to take "a second bite at the apple." *Macneal v. City of New York*, No. 23-CV-5890, 2025 WL 1906639, at *1 (S.D.N.Y. July 10, 2025) ("A motion for reconsideration 'is not a vehicle of relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple.'" (quoting *Analytical Surveys, Inc.*, 684 F.3d at 52)). Defendants do not identify "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice" to persuade the Court to reconsider its May 2024 Decision. *Commerzbank AG*, 100 F.4th at 377 (quoting *Virgin Atl. Airways, Ltd.*, 956 F.2d at 1255). The Court accordingly denies Defendants' motion for reconsideration. *Citibank, N.A. v. 88th Ave. Owner LLC*, No. 24-CV-3730, 2025 WL 1868049, at *1 (E.D.N.Y. July 7, 2025) (denying a motion for reconsideration where "[t]he [c]ourt has already considered the[] [moving party's] arguments" in deciding the underlying order); *Cordaro*, 2025 WL 814830, at *2–3 (denying reconsideration where plaintiff does not present new evidence, but uses the "same evidence that has supported his previous" motion and noting that "the [c]ourt will not continue to entertain repeated motions seeking the same relief that it has already decided more than one time"); *Carnegie Inst. of Wash. v. Fenix Diamonds, LLC*, 544 F. Supp. 3d 440, 451 (S.D.N.Y. 2021) (rejecting a "disguised motion for reconsideration" that "identifies no legal or factual basis for departing from the law of the case"); *see also PharmacyChecker.com LLC v. Nat'l Ass'n of Boards of Pharmacy*, No. 19-CV-7577, 2024 WL 1199500, at *9 (S.D.N.Y. Mar. 20, 2024) (denying a motion to for judgment on the

24

pleadings where the court previously denied the defendant's motion to dismiss on the same basis and the defendant did not "explain[] why the [c]ourt should revisit its prior opinion").

Although Defendants (1) failed to timely move for reconsideration and (2) failed to satisfy the standard for a motion for reconsideration, the Court nevertheless considers Defendants' arguments that the Court should grant their Motion for Injunction under the All Writs Act.

### e.    The Court denies Defendants' Motion for Injunction

Defendants argue that Judge Marutollo erred in evaluating their Motion for Injunction. First, they argue that the preliminary injunction standard does not apply to their request for an injunction under the All Writs Act.  (Defs.' Objs. 7–9, 12.)  They argue that "[b]ecause the characterization of the motion's requested relief and the applicable legal standard are wrong, [Judge Marutollo's] conclusion as to whether it would be 'appropriate' to grant or deny the mischaracterized motion is also wrong."  (*Id.* at 12.)  Second, Defendants argue that Judge Marutollo incorrectly concluded that the outstanding "factual questions regarding [Intuit and Square's] statuses as direct purchasers" are irrelevant to resolving Defendants' motion.  (*Id.*) Defendants argue that the "sole issue" they present is "whether, based on Intuit's and Square's contracts defining their agency relationships with merchant class members and the terms of the . . . Settlement Agreement, Intuit's and Square's [PayFac] claims have been released."  (*Id.*)  They contend that the "existence of the agency relationships in those contracts" and the "terms of the . . . Settlement Agreement release" are not genuinely in dispute.  (*Id.* at 13.)

Plaintiffs argue that Judge Marutollo correctly recommended that the Court deny Defendants' Motion for Injunction.  First, they argue that he "did not recommend denial for failing to meet the preliminary injunction standard."  (Pls.' Resp. 14.)  They note that Judge Marutollo recommended denying Defendants' Motion for Injunction based on failing to meet the

standard for a motion for reconsideration, (*id.*), and denied the Motion for Injunction on the merits after considering the "clear holdings in the May [2024 Decision] that genuine disputes exist as to direct purchaser and agency issues," (*id.*).  They also contend that the Court has "already rejected Defendants' effort to 'enforce' the class settlement against Intuit and Square as a basis to dismiss Plaintiffs' [PayFac] claims," so there "is no basis to 'enjoin' anything under the All Writs Act," and that Judge Marutollo was "correct to recommend rejecting this successive dismissal motion as an injunction under any standard."  (*Id.* at 15.)  Second, Plaintiffs argue that "Defendants contend, incorrectly, that factual questions regarding Intuit's and Square's status as direct purchasers 'are irrelevant to resolving Defendants' motion.'"  (*Id.* at 12 (quoting Defs.' Objs. 12).)  In support, they argue that Judge Marutollo explained that the Court's May 2024 Decision explicitly stated that the Court's decision was "not equivalent to the conclusion that no genuine dispute of fact remains as to the identity of the direct purchaser of card acceptance services under *Illinois Brick*."  (*Id.* at 6, 12–13 (internal quotation marks omitted) (quoting R&R 19).)  They also contend that "Defendants provide no basis for their incorrect assertion that the agency relationship between Intuit and Square and their [Sellers] are not 'genuinely in dispute.'"  (*Id.* at 13 (quoting Defs.' Objs. 13).)

> ### i. The Court declines to reverse the R&R based on Judge Marutollo's brief discussion of the preliminary injunction standard

As a preliminary matter, the Court concludes that although Judge Marutollo mentioned that Defendants failed to satisfy the preliminary injunction standard, (R&R 18), his recommendation for denying Defendants' Motion for Injunction was not based on that conclusion alone.[10]  Judge Marutollo recommended denying Defendants' motion because of their

---

[10]  Before discussing the outstanding questions about Defendants' direct purchaser status, Judge Marutollo noted that Defendants "fail[ed] to even identify the legal standard applicable to

26

failure to satisfy the procedural and substantive requirements of a motion for reconsideration, (*id.* at 14–18), as well as because there were "outstanding factual questions regarding Defendants' statuses as direct purchasers" under Supreme Court doctrine, (*id.* at 19), and the "existence and scope of an agency relationship" between Intuit and Square and their Sellers, (*id.* at 20).  Judge Marutollo's brief discussion of the preliminary injunction standard thus does not warrant reversal of the R&R because his legal analysis relied on alternative, independent bases.  *See Kohler Co. v. Bold Int'l FZCO*, 422 F. Supp. 3d 681, 709 (E.D.N.Y. 2018) (adopting a report and recommendation except with regard to two "harmless errors" that did not impact the disposition of the case); *Jones v. Smith*, No. 09-CV-1058, 2015 WL 5750136, at *3 (N.D.N.Y. Sept. 30, 2015) (adopting a report and recommendation where the magistrate judge applied the wrong standard but the "error [was] harmless because the court would have denied" the requested relief regardless of the standard (quoting *Bailey v. Christian Broad. Network,* 483 F. App'x 808, 810 (4th Cir. 2012) (holding that the magistrate's legal error was harmless because the proper standard would have rendered the same result))).

The Court next addresses Defendants' arguments that Intuit's and Square's PayFac claims should be dismissed because they are agents of their Sellers.

### ii.    The term "agents" is unambiguous as used in the Settlement Agreement

In construing the Settlement Agreement, as a contract, "the court's general objective should be to determine . . . the intention of the parties . . . from the language employed."  *Flynn v. McGraw Hill LLC*, 120 F.4th 1157, 1164 (2d Cir. 2024) (internal quotation marks omitted)

---

a motion for a preliminary injunction," and then noted that "Defendants make no cogent argument regarding irreparable harm in the absence of the injunction, or make any showing of manifest injustice," nor have they "proffered arguments demonstrating that they will be successful on the merits."  (R&R 18.)  Judge Marutollo accordingly concluded "Defendants have failed to demonstrate why a preliminary injunction is warranted here."  (*Id.*)

(quoting *Hartford Accident & Indem. Co. v. Wesolowski*, 33 N.Y.2d 169, 171–72 (1973)); *In re World Trade Ctr. Disaster Sit Litig. (In re WTC)*, 754 F.3d 114, 122 (2d Cir. 2014) (explaining that the role of the Court is to construe a contract "in accordance with the parties' intent") (quoting *Greenfield v. Philles Recs., Inc.*, 98 N.Y.2d 562, 569 (2002)); *Williams v. Buffalo Pub. Schs.*, No. 22-2810, 2024 WL 1460134, at *1 (2d Cir. Apr. 4, 2024) ("[I]t is well-settled that a court's role 'is to ascertain the intention of the parties at the time they entered into the contract.'" (quoting *Evans v. Famous Music Corp.*, 1 N.Y.3d 452, 458 (2004)). "The best evidence of what the parties intended 'is what they say in their writing.'" *In re WTC*, 754 F.3d at 122 (quoting *Greenfield*, 98 N.Y.2d at 569). "'[T]he key inquiry at the initial stage of interpreting a contract' is therefore 'whether it is ambiguous with respect to the issue disputed by the parties.'" *Glob. Reins. Corp. of Am. v. Century Indem. Co.*, 22 F.4th 83, 94 (2d Cir. 2021) (alteration in original) (quoting *Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 914 (2d Cir. 2010)); *Gary Friedrich Enters. v. Marvel Characters, Inc.*, 716 F.3d 302, 313 (2d Cir. 2013) ("At the outset, the court must determine whether the language the parties have chosen is ambiguous, after giving all 'words and phrases . . . their plain meaning.'" (alteration in original and citations omitted)).

"A contract is unambiguous if its language has 'a definite and precise meaning,' providing 'no reasonable basis for a difference of opinion.'" *Revitalizing Auto Communities Env't Response Tr. v. Nat'l Grid USA*, 92 F.4th 415, 441 (2d Cir. 2024) (quoting *Greenfield*, 98 N.Y.2d at 569); *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (recognizing that a contract provision is unambiguous "if the language it uses has a definite and precise meaning, as to which there is no reasonable basis for a difference of opinion" (citing *White v. Cont'l Cas. Co.*, 9 N.Y.3d 264, 267 (2007))). "The language of a contract is not made ambiguous simply because the parties urge different interpretations." *Glob. Reins.*, 22 F.4th at

28

94 (quoting *Seiden Assocs. Inc. v. ANC Holdings, Inc.*, 959 F.2d, 425, 428 (2d Cir. 1992)).

Rather, a contract term is ambiguous if it "suggest[s] more than one meaning when viewed

objectively by a reasonably intelligent person." *In re WTC*, 754 F.3d at 122 (quoting *L.

Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010)); *see also

Glob. Reins.*, 22 F.4th at 94 ("[A]n ambiguity exists where the . . . contract could suggest more

than one meaning when viewed objectively by a reasonably intelligent person who has examined

the context of the entire integrated agreement and who is cognizant of the customs, practices,

usages and terminology as generally understood in the particular trade or business." (second

alteration in original and internal quotation marks omitted) (quoting *Morgan Stanley Grp. Inc. v.

New Eng. Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000))); *Lockheed Martin*, 639 F.3d at 69 ("[T]he

language of a contract is ambiguous if it is capable of more than one meaning when viewed

objectively by a reasonably intelligent person who has examined the context of the entire

integrated agreement." (citing *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138–39 (2d Cir.

2000))).  In determining whether a contract provision is unambiguous, a court must consider the

contract as a whole.  *See Flynn*, 120 F.4th at 1166–67 ("The contract should be 'read as a whole,'

with every part 'interpreted with reference to the whole' in order, *inter alia*, 'to give effect to its

general purpose,' 'to safeguard against adopting an interpretation that would render any

individual provision superfluous,' and to ensure that particular words and phrases do not receive

'under emphasis'" (citations omitted)); *Glob. Reins.*, 22 F.4th at 95 ("When ascertaining the

meaning of contractual language, 'it is important for the court to read the integrated agreement as

a whole.'" (internal quotation marks omitted) (quoting *Lockheed Martin*, 639 F.3d at 69)).  "If

the document as a whole 'makes clear the parties' over-all intention, courts examining isolated

provisions should then choose that construction which will carry out the plain purpose and object

of the agreement.'"  *Id.* (quoting *Lockheed Martin*, 639 F.3d at 69); *see also Westmoreland Coal*

*Co. v. Entech, Inc.*, 100 N.Y.2d 352, 358 (2003) (stating contracts should be read "as a harmonious and integrated whole" and each part should be "interpreted with reference to the whole . . . to give effect to its general purpose" (quoting *Empire Props. Corp. v. Mfrs. Tr. Co.*, 288 N.Y. 242, 248 (1942))).

Paragraph 29 of the Settlement Agreement contains the "Release and Covenant Not to Sue Provided by the Rule 23(b)(3) Settlement Class" and provides:

> The "Rule 23(b)(3) Settlement Class Releasing Parties" are individually and collectively Rule 23(b)(3) Class Plaintiffs and each member of the Rule 23(b)(3) Settlement Class, on behalf of themselves and any of their respective past, present, or future officers, directors, stockholders, agents, employees, legal representatives, partners, associates, trustees, parents, subsidiaries, divisions, affiliates, heirs, executors, administrators, estates, purchasers, predecessors, successors, and assigns, whether or not they object to the settlement set forth in the Superseding and Amended Class Settlement Agreement, and whether or not they make a claim for payment from the Net Cash Settlement Fund.

(the "Settlement Class Release")).  In other words, a plain reading of the Settlement Class Release indicates that the "Settlement Class, on behalf of themselves and any of their respective past, present, or future . . . agents" released Settlement Class members' claims.  (*Id.*)  The parties do not dispute that in this context, "agents," which is listed as part of a long series of the various legal relationships Settlement Class members could have with other entities, refers to a legal principal-agent relationship.[11]  The parties disagree about the interpretation of the Settlement Class Release but "language of a contract is not made ambiguous simply because the parties urge

---

[11]  "Agency is the fiduciary relationship that arises when one person (a "principal") manifests assent to another person (an "agent") that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act."  Restatement (Third) of Agency § 1.01.

different interpretations." *Glob. Reins.*, 22 F.4th at 95.[12]  Accordingly, the Court concludes that

the Settlement Class members released Settlement Class members' claims on behalf of

themselves and their agents through the Settlement Class Release.  *See Barshay v. Naithani*, No.

20-CV-8579, 2023 WL 2051170, at *12 (S.D.N.Y. Feb. 16, 2023) (enforcing a release because

there was "nothing ambiguous" about the plaintiff's agreement to "release and discharge the

[defendants] from any claims"), *aff'd*, No. 23-382, 2023 WL 8708424 (2d Cir. Dec. 18, 2023);

*Shapiro v. NFGTV, Inc.*, No. 16-CV-9152, 2018 WL 2127806, at *8 (S.D.N.Y. Feb. 9, 2018)

(enforcing a "Release and Covenant Not to Sue" where the plaintiff agreed "on behalf of

[herself], and [her] heirs" to discharge "all claims").

---

[12]  Defendants argue that "merchant class members released any claims based on payments transactions in which Intuit and Square served as agents for those merchants" according to the "clear terms" of the Settlement Class Release.  (Defs.' Mem. 11.)  Plaintiffs argue that the Settlement Class Release was only "provided by the Rule 23(b)(3) Settlement Class," which "does not include Settlement Class members' agents."  (Pls.' Opp'n 19 (emphasis omitted).)  Plaintiffs argue that the "plain terms and context" of the Settlement Agreement "provided a release *only* from 'Settlement Class' members, and could not release claims held by non-Settlement Class members."  (*Id.*)  They argue that "[t]o the extent agency has any bearing on that release, it is of an agent's ability to bring the Settlement Class members' claims."  (*Id.* at 18.)  In other words, Plaintiffs argue that they are not subject to the Settlement Class Release because they are (1) not Settlement Class members, (*id.* at 28), and (2) bring their own independent claims rather than claims as Sellers' agents, (*id.* at 19).  Because the language of the contract is unambiguous, the parties' disagreement as to the interpretation of the Settlement Class Release does not create ambiguity.  *Walmart Inc. v. Capital On, Nat'l Assoc.*, 725 F. Supp. 3d 450, 463 (S.D.N.Y. 2024) ("Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation." (quoting *L. Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010)); *Thompson v. Gjivoje*, 896 F.2d 716, 721 (2d Cir. 1990) (explaining that "[t]he mere assertion of ambiguity" does not create ambiguity).

### iii. The Court cannot determine based on the current record that Plaintiffs were "agents" of the Sellers under the terms of the Settlement Agreement

Defendants argue that Intuit and Square, "[b]y the express terms of their own contracts with [Sellers]," are "agents" of the Sellers when they are serving as PacFacs.[13]  (Defs.' Mem. 11.)  They argue the released claims belong to the Sellers, not Intuit and Square, because the released claims "arise from Intuit's and Square's activities as agents."  (*Id.* at 12; Defs.' Reply 7–8.)  When a Seller uses a PayFac, the PayFac "receives the net transaction funds from the [A]cquirer before transferring the funds to the [Seller]," and thus the PayFac's "connection to the transaction funds is solely in its role as the [Seller's] 'payments agent'" or "agent for payment processing."  (Defs.' Mem. 12 (first quoting Intuit U.S. Terms of Service, annexed to Szanyi Decl. as Ex. 1, Docket Entry No. 9513-1; and then quoting Square Payment Terms, annexed to Szanyi Decl. as Ex. 6, Docket Entry No. 9513-6).)  They argue that "nothing in Intuit's or Square's contracts with [Settlement Class] members limits the [Settlement Class] members'

---

[13]  Defendants rely exclusively on Intuit's and Square's contracts with their Sellers in arguing that Intuit and Square are "agents" of their Sellers and that their claims were therefore released under the Settlement Class Release.  (*See* Defs.' Mem. 2 ("[T]he fact of the principal-agent relationship is clear from the face of the contracts between Intuit and Square and their merchant customers."); *id.* at 6 ("The contracts under which Intuit and Square operate expressly document th[e] agency relationship."); *id.* at 11 ("By the express terms of their own contracts with merchant customers, Intuit and Square are the 'agent[s]' of their merchant customers when they serve as payment facilitators." (alteration in original and citation omitted)); Defs.' R&R Objs. 2 ("The relevant issue thus can be resolved by the Court . . . based on the contracts . . . between [Intuit] and [Square] and their class member customers . . . .")))  Similarly, Plaintiffs' argument that Intuit and Square were agents for limited purposes relies solely on Intuit's and Square's contracts with their Sellers.  (*See* Pls.' Opp'n 25 ("Visa and Mastercard do nothing but invoke the word 'agent' in Intuit's and Square's respective agreements, ignoring its limited scope under the plain terms of the contracts."); *id.* at 26 ("Intuit's and Square's respective [Seller] contracts state that they act as an 'agent' of their [Sellers] for extremely limited purposes.")))  Accordingly, the Court's decision that Defendants have not shown that Intuit and Square are "agents" under the Settlement Agreement is based only on Intuit's and Square's contracts with their Sellers.

rights to resolve claims arising from [Settlement Class] members' payment transactions." (*Id.* at 13.)

Plaintiffs argue that Judge Marutollo confirmed "what the May [2024 Decision] already held: triable factual questions remain regarding 'the identity of the direct purchaser of the card-acceptance services,' where Intuit's and Square's 'service agreements define agency relationships with its [Sellers].'" (Pls.' Resp. 12 (quoting *Interchange Fees VII*, 735 F. Supp. 3d at 268).) They contend that "Defendants provide no basis for their incorrect assertion that the agency relationship between Intuit and Square and their [Sellers] are not 'genuinely in dispute.'" (*Id.* at 13 (quoting Defs.' Objs. 13).) They note that their opposition to Defendants' Motion for Injunction "make[s] clear" that there are disputes with regard to whether Intuit and Square were "agents" of the Sellers under the Settlement Agreement. (*Id.*) In support, they argue that Intuit's and Square's contracts with their Sellers state that they "act as an 'agent' of their [Sellers] for [the] extremely limited purposes" of "receiving, holding, and paying out funds belonging to the" Seller, while interchange fees "are paid to a cardholder's issuing bank." (Pls.' Opp'n 25–26 (emphasis omitted).)

"Under New York law, an agency relationship 'results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other to act.'"[14] *Steinbeck v. Steinbeck Heritage Found.*, 400 F. App'x 572, 575

---

[14] Defendants note that "Intuit and Square have argued that California agency law applies because their contracts with merchants are governed by California law." (Defs.' Mem. 13 n.12.) However, Plaintiffs cite to Second Circuit cases applying New York law in support of their argument that they had limited agency relationships with Sellers. (*See* Pls.' Opp'n 26–27.) Because the parties' briefs "assume that New York substantive law governs the issues," such "implied consent" is "sufficient to establish the applicable choice of law." *Arch Ins. Co. v. Precision Stone, Inc.* 584 F.3d 33, 39 (2d Cir. 2009); *Fed. Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 566 (2d Cir. 2011) ("[W]here the parties agree that New York law controls, this is sufficient to establish choice of law." (citation omitted)); *Northwell Health, Inc. v. Premera Blue Cross*, No. 23-CV-389, 2025 WL 959651, at *9 (E.D.N.Y. Mar. 15, 2025) (same).

(2d Cir. 2010) (quoting *N.Y. Marine & Gen. Ins. Co. v. Tradeline (L.L.C.)*, 266 F.3d 112, 122 (2d Cir. 2001)).  A principal's ability to exercise control over its agent is an essential element of agency.  *Id.*; *see also Zama Cap. Advisors LP v. Universal Ent. Corp.*, No. 24-CV-1577, 2025 WL 968783, at *32 (S.D.N.Y. Mar. 31, 2025) ("Under New York law, an express agency is created through (1) 'the principal's manifestation of intent to grant authority to the agent,' (2) 'agreement by the agent,' and (3) the principal's 'control over key aspects of the undertaking.'" (quoting *Com. Union Ins. Co. v. Alitalia Airlines, S.p.A.*, 347 F.3d 448, 462 (2d Cir. 2003))); *Zeus Constr. Servs., LLC v. Fame Constr., Inc.*, 78 N.Y.S.3d 864, 868 (N.Y. App. Term. 2018) ("A principal-agent relationship is established by evidence that one person — the principal — has allowed another to act on his or her behalf, subject to his or her control, and evidence of consent by the other person — the agent — to so act." (citing *Time Warner City Cable v. Adelphi Univ.*, 813 N.Y.S.2d 114, 116 (App. Div. 2006)); *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 290 (S.D.N.Y. 2005) ("The element of control often is deemed the essential characteristic of the principal-agent relationship."); *Mazart v. State*, 441 N.Y.S.2d 600, 605 (N.Y. Ct. Cl. 1981) (noting that "there can be no agency relationship where the alleged principal has no right of control over the alleged agent").  Where parties contend that an agency relationship is established by contract, a court will look to the language of that agreement to ascertain the relationship created between the parties.  *See Steinbeck*, 400 F. App'x at 575; *EBC I, Inc. v. Goldman, Sachs & Co.*, 5 N.Y.3d 11, 19–21 (2005).

Based on the current record, issues of fact prevent the Court from determining that Sellers, as principals, exercised the requisite degree of control over Intuit and Square to establish an agency relationship as set forth in the Settlement Agreement.  Defendants do not identify any language in any contract Intuit or Square had with a Seller indicating that Intuit or Square were "subject to [Seller's] control" in PayFac transactions.  *Bigio v. Coca-Cola Co.*, 675 F.3d 163,

175 (2d Cir. 2012).



(*id.*)  Similarly, while Square's Seller Agreement describes Square's role as "facilitat[ing] the processing of payments [Seller] receives from [their] [b]uyers," and notes that Square "collect[s], analyze[s], and relay[s] information generated in connection with these payments," it also "authorize[s] [Square] . . . to act as [Seller's] agent for the limited purposes of holding, receiving, and disbursing funds on [Seller's] behalf," and provides that Square "will remit funds actually received by [Square] from [customers] on [Seller's] behalf, less amounts owed to [Square], subject to any Chargeback or Reserve withheld . . . ."[15]  (Square Seller Agreement, annexed to Szanyi Decl. as Ex. 13, Docket Entry No. 9513-13.)  Although Intuit's and Square's contracts with their Sellers identify themselves as Sellers' "agents," using the word "agents" is insufficient to establish an agency

---

[15]  An older version of Square's General Payment Terms provides "[i]n connection with the Payment Services, [Seller] authorize[s] [Square] to act as [Seller's] agent for the purposes of holding, receiving, and disbursing funds on [Seller's] behalf," and to "recover funds from [Seller] when needed."  (Square Payment Terms.)

relationship.  *See Steinbeck*, 400 F. App'x at 575–76 ("Although agency is a consensual relationship, how the parties to any given relationship label it is not dispositive." (quoting Restatement (Third) of Agency § 1.02)); *In re Nigeria Charter Flights Cont. Litig.*, 520 F. Supp. 2d 447, 461 (E.D.N.Y. 2007) ("[T]alismanic language alone does not determine an agency relationship." (citation and internal quotation marks omitted)).  The contracts Defendants present in support of their argument only discuss a limited agency relationship between Intuit or Square and their Sellers for the purpose of issuing payments to the Sellers.  (*See* Intuit Payments Merchant Agreement; Square Seller Agreement.)  They do not establish "a self-evident" agency relationship between Intuit or Square and their Sellers as to the purchase of card acceptance services or the payment of interchange fees.  (Defs.' Reply 2.) ███████████

█████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████ Defendants correctly note that Intuit's and Square's "role as agents in 'receiving, holding, and paying out funds'" to Sellers and "interchange fees . . . paid to [I]ssuers" are "just two aspects of a single payment card transaction, which is the conduct that Intuit and Square facilitate as agents" for their Sellers. (Defs.' Reply 8 (quoting Pls.' Opp'n 26).)  However, Defendants fail to demonstrate that Sellers exercised the requisite control as principals over Intuit and Square as to every aspect of that transaction.  It is well-established that a party may be an agent for certain purposes but not for others.  *See Daimler AG v. Bauman*, 571 U.S. 117, 135 (2014) ("Agencies, we note, come in many sizes and shapes: 'One may be an agent for some business purposes and not others so that the fact that one may be an agent for one purpose does not make him or her an agent for every purpose.'" (quoting 2A C. J. S., Agency § 43, p. 367 (2013)); *In re Corp. Res. Servs., Inc.*, 849 F.

App'x 320, 322 (2d Cir. 2021) (explaining that even if an entity was an "agent when processing payments, that does not necessarily mean" the same entity was "also an 'agent' under the settlement agreement" (citation omitted)); *Found. Cap. Res., Inc. v. Prayer Tabernacle Church of Love, Inc.*, No. 17-CV-135, 2023 WL 4421715, at *4 (D. Conn. July 10, 2023) ("[O]ne may be an agent for some business purposes and not others." (quoting *Tirreno v. Mott*, 453 F. Supp. 2d 562, 565 (D. Conn. 2006))). The terms of Intuit's and Square's contracts with Sellers, which both parties exclusively rely on in their briefing, only establish that the PayFacs were Sellers' agents for the limited purpose of processing payments from Sellers' customers. Defendants have not shown that Sellers, through their PayFac contracts with Intuit and Square, *also* gained control over Intuit's or Square's separate contracts with Acquirers. As the Court noted in Defendants' prior motion to enforce the Settlement Agreement, Intuit and Square have separate relationships with Acquirers, which establish terms for Intuit and Square to "send[] transaction information to an Acquirer," and "settle[] funds for Sellers that [Intuit and Square] receive[] from Issuers via [their] accounts at [their] Acquirers." *Interchange Fees VII*, 735 F. Supp. 3d at 256. ███████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████ Defendants have not met their burden of showing that Sellers' control of Intuit and Square, as established in their "publicly available contract[s]," (Defs.' Mem. 7), extended to other aspects of the transactions Intuit and Square facilitated for Sellers. Thus, based on the record currently before the Court, the Court cannot determine that

Intuit and Square were Sellers' agents for purposes of the Settlement Agreement.[16]  *See*

*Northwell Health, Inc. v. Premera Blue Cross*, No. 23-CV-389, 2025 WL 959651, at *19

(E.D.N.Y. Mar. 15, 2025) (explaining there was no agency relationship without an "allegation

that [the d]efendant had any control over [the purported principal's] contract negotiations" with

the purported agent); *Russell v. Citigroup*, No. 22-CV-2057, 2023 WL 2969823, at *6 (E.D.N.Y.

Feb. 24, 2023) (concluding there was no agency relationship where the purported parent did not

"control" the purported agent); *Liu v. Rajacic*, No. 22-CV-379, 2023 WL 2118071, at *3

(S.D.N.Y. Feb. 17, 2023) (explaining there was no agency relationship because "[c]onclusory

statements that [the purported agent] acted as [the purported principal's] 'agent/employee or

tenant' [we]re unavailing" where the purported principal also "fail[ed] to suggest that [the

purported agent] acted on . . . behalf and subject to [the purported principal's] control").

---

[16]  The Court declines to address the parties' remaining arguments because they all
assume the existence of an agency relationship for purposes of the Settlement Agreement.
Defendants argue Sellers "did not need their agents' consent, or an assignment of rights, to
release" claims that "arise from Intuit's and Square's activities as agents," (Defs.' Mem. 12), and
that "[c]ourts routinely approve class settlement agreements in which class members release
claims on behalf of themselves and their 'agents,'" (*id.* at 13).  Plaintiffs argue they were not
Sellers' agents and the Settlement Agreement therefore could not have released Plaintiffs' third-
party claims, (Pls.' Opp'n 22–24), and also argue that Intuit and Square did not release or assign
any claims within a purported agency relationship with their sellers, (*id.* at 25–30).  Because the
Court cannot determine based on the current record that Intuit and Square are Sellers' agents
under the Settlement Agreement, the Court need not address arguments that rely on the agency
relationship.
     In addition, because the Court finds that Defendants have not shown that Intuit and
Square are Sellers' agents under the Settlement Agreement, the Court declines to address the
parties' arguments as to whether Intuit's and Square's disputed direct purchaser status bears on
the existence of an agency relationship between Intuit or Square and their Sellers.  (Defs.' Reply
10 ("Intuit's and Square's purported direct purchaser status is irrelevant to the determination of
whether, as agents of their merchant customers, their claims against Visa and Mastercard were
released under the . . . Settlement Agreement."); *see also id.* at 9–15; Defs.' Mem. 14–15; Defs.'
Objs. 12–13); (Pls.' Opp'n 27 (arguing that if Plaintiffs "prove to a jury they are direct
purchasers" then they are "principals with respect to the payment of any and all fees to
Defendants or their issuing and acquiring banks."); *see also id.* at 21–22; Pls.' Resp. 12–13.)

38

Accordingly, Defendants have not "demonstrated an adequate basis for an extraordinary injunction pursuant to the All Writs Act." *Citigroup, Inc.*, 776 F.3d at 127.

### III.  Conclusion

For the foregoing reasons, the Court denies Defendants' motion for an injunction pursuant to the All Writs Act.  The Court respectfully requests Judge Marutollo lift the stay of discovery on Plaintiffs' PayFac claims.

Dated:  August 22, 2025
            Brooklyn, New York

                                    SO ORDERED:


                                    _____s/ MKB_____
                                    MARGO K. BRODIE
                                    United States District Judge