**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | MDL No. 1720 |
| | Docket No. 05-md-01720 (BMC-JAM) |
| This Document Relates To: | |
| BARRY'S CUT RATE STORES INC.; DDMB, INC. d/b/a EMPORIUM ARCADE BAR; DDMB 2, LLC d/b/a EMPORIUM LOGAN SQUARE; BOSS DENTAL CARE; RUNCENTRAL, LLC; CMP CONSULTING SERV., INC.; TOWN KITCHEN, LLC d/b/a TOWN KITCHEN & BAR; GENERIC DEPOT 3, INC. d/b/a PRESCRIPTION DEPOT; and PUREONE, LLC d/b/a SALON PURE, | **EQUITABLE RELIEF CLASS PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF AMENDED SETTLEMENT AGREEMENT** |
| Plaintiffs, | |
| v. | |
| VISA, INC.; MASTERCARD INCORPORATED; MASTERCARD INTERNATIONAL INCORPORATED; BANK OF AMERICA, N.A.; BA MERCHANT SERVICES LLC (f/k/a DEFENDANT NATIONAL PROCESSING, INC.); BANK OF AMERICA CORPORATION; BARCLAYS BANK PLC; BARCLAYS BANK DELAWARE; BARCLAYS FINANCIAL CORP.; CAPITAL ONE BANK, (USA), N.A.; CAPITAL ONE F.S.B.; CAPITAL ONE FINANCIAL CORPORATION; CHASE BANK USA, N.A.; CHASE MANHATTAN BANK USA, N.A.; CHASE PAYMENTECH SOLUTIONS, LLC; JPMORGAN CHASE BANK, N.A.; JPMORGAN CHASE & CO.; CITIBANK (SOUTH DAKOTA), N.A.; CITIBANK N.A.; CITIGROUP, INC.; CITICORP; and WELLS FARGO & COMPANY, | |
| Defendants. | |

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................. 1

II.     SUMMARY OF THE AMENDED SETTLEMENT'S REFORMS .................................. 3

III.    PROCEDURAL BACKGROUND.................................................................................. 8

IV.     THE CHALLENGED RESTRAINTS........................................................................... 8

V.      THE AMENDED SETTLEMENT EFFECTIVELY RESPONDS TO THE
        COMPETITIVE PROBLEMS.................................................................................... 11

        A.  The Competitive Problems ..................................................................... 11

        B.  The Amended Settlement's Response ..................................................... 13

            1.  Honor-All-Cards Reforms ........................................................... 13

            2.  Surcharging Reforms ................................................................... 17

            3.  Discounting Reforms ................................................................... 20

            4.  Standard or "Value" Card ........................................................... 21

            5.  New Leverage for Merchants with Negotiated Rates ................. 23

            6.  Merchant Buying Groups ............................................................ 24

            7.  Merchant Education Program ...................................................... 24

            8.  Relief in States with Surcharging Restrictions .......................... 25

            9.  Immediate Rate Caps and Rollbacks .......................................... 27

VI.     THE AMENDED SETTLEMENT WARRANTS PRELIMINARY APPROVAL. ......... 28

        A.  The Governing Standard ......................................................................... 28

        B.  The Factors Previously Weighing in Favor of Approval Still Favor Approval............. 31

        C.  The Amended Settlement Resolves All Issues Previously Weighing Against
            Preliminary Approval............................................................................. 33

            1.  Recovery in light of the risks ...................................................... 33

            2.  Standards for Evaluating Litigation Risk ................................... 38

                a.  The fourth *Grinnell* factor............................................... 39

                b.  The eighth and ninth *Grinnell* factors ........................... 41

            3.  Equity Among Class Members .................................................... 42

            4.  Ability to Withstand a Greater Judgment ................................... 42

        D.  The Court Will Consider the Class's Reaction. ..................................... 46

VII.    THE COURT SHOULD AUTHORIZE CLASS NOTICE. ........................................ 46

VIII.   PROPOSED TIMELINE FOR NOTICE AND FINAL APPROVAL ........................... 49

i

IX.    CONCLUSION.............................................................................................................. 50

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                     **Page(s)**

*In re 3D Systems Sec. Litig.*,
    No. 21-cv-1920-NGG-TAM, 2024 WL 50909 (E.D.N.Y. Jan. 2, 2024)................................30

*Aramburu v. Healthcare Fin. Servs., Inc.*,
    No. 02-CV-6535MDG, 2009 WL 1086938 (E.D.N.Y. Apr. 22, 2009)..................................40

*In re Austrian &German Holocaust Litig.*,
    80 F.Supp.2d 164 (S.D.N.Y. 2000) ...............................................................................40, 46

*Ayzelman v. Statewide Credit Servs. Corp.*,
    242 F.R.D. 23 (E.D.N.Y. 2007)...................................................................................41

*Berni v. Barilla S.p.A.*,
    964 F.3d 141 (2d Cir. 2020).......................................................................................29

*Bodon v. Domino's Pizza, LLC*,
    No. 09–cv–2941, 2015 WL 588656 (E.D.N.Y. Jan. 16, 2015)..............................................41

*Calibuso v. Bank of America Corp.*,
    299 F.R.D. 359 (E.D.N.Y. 2014) .................................................................................30

*CardX, LLC v. Schmidt*,
    522 F.Supp.3d 929 (D. Kan. 2021)...............................................................................25

*In re Citigroup Inc. Sec. Litig.*,
    965 F.Supp.2d 369 (S.D.N.Y. 2013)..............................................................................40

*C.K. ex rel. P.K. v. McDonald*,
    No. 2:22-cv-1791 (NJC) (JMW), 2025 WL 2406399 (E.D.N.Y. Aug. 19,
    2025) ................................................................................................................30

*City of Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974)......................................................................... *passim*

*Clark v. Ecolab Inc.*,
    Nos. 07 Civ. 8623, 04 Civ. 4488, 06 Civ. 5672, 2010 WL 1948198 (S.D.N.Y.
    May 11, 2010)......................................................................................................30

*Copley v. Bactolac Pharm., Inc.*,
    No. 2:18-CV-00575-FB-PK, 2023 WL 2470683 (E.D.N.Y. Mar. 13, 2023).........................31

*Cruz Guerrero v. Montefiore Health Sys. Inc.*,
    No. 22-CV-9194 (KHP), 2025 WL 100889 (S.D.N.Y. Jan. 15, 2025)..................................31

*D'Amato v. Deutsche Bank*,
  236 F.3d 78 (2d Cir. 2001)................................................................................30, 46

*Dana's R.R. Supply v. Att'y Gen., Fla.*,
  807 F.3d 1235 (11th Cir. 2015) .................................................................................25

*Davis v. J.P. Morgan Chase & Co.*,
  827 F.Supp.2d 172 (W.D.N.Y. 2011) .......................................................................41

*DDMB, Inc. v. Visa, Inc.*,
  No. 05-1720, 2021 WL 6221326 (E.D.N.Y. Sept. 27, 2021) .............................1, 46

*Elkind v. Revlon Consumer Prods. Corp.*,
  No. CV 14-2484 (JS) (AKT), 2017 WL 9480894 (E.D.N.Y. Mar. 9, 2017).........................47

*In re EVCI Career Colls. Holding Corp. Sec. Litig.*,
  No. 05 Civ. 10240, 2007 WL 2230177 (S.D.N.Y. July 27, 2007) .........................30

*Gay v. Tri-Wire Eng'g Sols., Inc.*,
  No. 12-cv-2231 (KAM) (JO), 2014 WL 28640 (E.D.N.Y. Jan. 2, 2014)................................30

*In re Global Crossing Sec. & ERISA Litig.*,
  225 F.R.D. 436 (S.D.N.Y. 2004) .......................................................................31, 39

*In re GSE Bonds Antitrust Litig.*,
  414 F.Supp.3d 686 (S.D.N.Y. 2019).........................................................................42

*Hall v. ProSource Techs., LLC*,
  No. 14-cv-2502 (SIL), 2016 WL 1555128 (E.D.N.Y. Apr. 11, 2016) .......................39, 41, 47

*Hunter v. Blue Ridge Bankshares, Inc.*,
  No. 23-CV-8944, 2025 WL 1649323 (E.D.N.Y. June 11, 2025) .........................30

*Italian Colors Rest. v. Becerra*,
  878 F.3d 1165 (9th Cir. 2018) .................................................................................25

*Marroquin Alas v. Champlain Valley Specialty of New York, Inc.*,
  No. 5:15-cv-00441, 2016 WL 3406111 (N.D.N.Y. June 17, 2016) .........................31

*In re Marsh ERISA Litig.*,
  265 F.R.D. 128 (S.D.N.Y. 2010) ...............................................................................47

*Martin v. Weiner*,
  No. 06CV94, 2007 WL 4232791 (W.D.N.Y. Nov. 28, 2007)...................................47

*Massiah v. MetroPlus Health Plan, Inc.*,
  No. 11-cv-05669 (BMC), 2012 WL 5874655 (E.D.N.Y. Nov. 20, 2012).........................29, 30

*In re Med. X–Ray Film Antitrust Litig.,* No. 93–CV–5904, 1998 WL 661515
(E.D.N.Y. Aug. 7, 1998) ......................................................................................................39

*In re MetLife Demutualization Litig.,*
689 F.Supp.2d 297 (E.D.N.Y. 2010) ...............................................................................46, 48

*Mikhlin v. Oasmia Pharm. AB,*
No. 19-cv-4349-NGG-RER, 2021 WL 1259559 (E.D.N.Y. Jan. 6, 2021)............................29

*Moses v. New York Times Co.,*
79 F.4th 235 (2d Cir. 2023) ...................................................................................28, 29, 30

*In re NASDAQ Market-Makers Antitrust Litig.,*
187 F.R.D. 465 (S.D.N.Y. 1998) .......................................................................39, 42, 46

*Ohio v. American Express Co.,*
585 U.S. 529 (2018)............................................................................................11, 40, 43

*Paguirigan v. Prompt Nursing Emp. Agency LLC,*
No. 1:17-cv-01302-NG-CLP, 2022 WL 6564755 (E.D.N.Y. Apr. 7, 2022) .........................29

*In re PaineWebber Ltd. P'ships Litig.,*
147 F.3d 132 (2d Cir. 1998)............................................................................................29

*In re PaineWebber Ltd. P'ships Litig.,*
171 F.R.D. 104 (S.D.N.Y. Mar. 1997).............................................................................42

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.,*
05-md-01270 (MKB) (E.D.N.Y.) ................................................................................ *passim*

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.,*
827 F.3d 223 (2d Cir. 2016)........................................................................34, 36, 47

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.,*
527 F.Supp.3d 269 (E.D.N.Y. 2021) ...............................................................................48

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.,*
No. 18-md-2819-NG-LB, 2022 WL 3043103 (E.D.N.Y. Aug. 2, 2022) ...............................28

*Rosenfeld v. Lenich,*
No. 18-cv-6720-NGG-PK, 2021 WL 508339 (E.D.N.Y. Feb. 11, 2021).........................28, 29

*Rowell v. Paxton,*
336 F.Supp.3d 724 (W.D. Tex. 2018)..............................................................................25

*Schutter v. Tarena Int'l, Inc.,*
No. 21-cv-3502-PKC-RML, 2024 WL 4118465 (E.D.N.Y. Sep. 9, 2024) ...........................28

*In re Sinus Buster Prod. Consumer Litig.*,
   No.12-cv-2429-ADS-AKT, 2014 WL 5819921 (E.D.N.Y. Nov. 10, 2014) ..........................46

*Sow v. City of New York*,
   No. 21-CV-533, 2024 WL 964595 (S.D.N.Y. Mar. 5, 2024) ...................................................32

*State of West Virginia v. Chas. Pfizer & Co.*,
   314 F.Supp. 710 (S.D.N.Y. 1970), *aff'd*, 440 F.2d 1079 (2d Cir. 1971) ...............................39

*Stoetzner v. U.S. Steel Corp.*,
   897 F.2d 115 (3d Cir. 1990)....................................................................................................46

*Sykes v. Harris*,
   No. 09-CV-8486, 2016 WL 3030156 (S.D.N.Y. May 24, 2016) ......................................39, 40

*United States v. Am. Express Co.*,
   838 F.3d 179 (2d Cir. 2016).....................................................................................................40

*United States v. Visa U.S.A., Inc.*,
   344 F.3d 229 (2d Cir. 2003).......................................................................................................8

*Vargas v. Capital One Fin. Advisors*,
   559 F. App'x 22 (2d Cir. 2014) ...............................................................................................47

*In re Visa Check/MasterMoney Antitrust Litig.*,
   280 F.3d 124 (2d Cir. 2001).......................................................................................................8

*In re Visa Check/Mastermoney Antitrust Litig.*,
   297 F.Supp.2d 503 (E.D.N.Y. 2003) ..................................................................................29, 39

*In re Vitamin C Antitrust Litig.*,
   No. 06-md-1738 (BMC)(JO), 2012 WL 5289514 (E.D.N.Y. Oct. 23, 2012) ........................29

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005)...................................................................................8, 29, 39, 41

*Weinberger v. Kendrick*,
   698 F.2d 61 (2d Cir. 1982)........................................................................................................30

**Statutes**

N.Y. Gen. Bus. Law § 518 ...........................................................................................................26

Sherman Act Section 1, 15 U.S.C. § 1 ......................................................................................2, 39

Sherman Act Section 2, 15 U.S.C. § 2 ......................................................................................2, 39

**Federal Rules**

Fed. R. Civ. P. 23 ..................................................................................................... *passim*

**Other Authorities**

*Capital One Shopping Research*, DIGITAL WALLET STATISTICS (July 23, 2025),
https://capitaloneshopping.com/research/digital-wallet-statistics/ .........................................15

Final Judgment as to Defendants Mastercard Int'l Inc. and Visa Inc., No. CV-10-
4496 (E.D.N.Y. July 20, 2011), https://www.justice.gov/atr/case-
document/final-judgment-defendants-mastercard-international-incorporated-
and-visa-inc ...................................................................................................................11

Visa Rules (as of Oct. 18, 2025),
https://usa.visa.com/content/dam/VCOM/download/about-visa/visa-rules-
public.pdf ..........................................................................................9, 10, 11, 12, 17, 18, 19

Mastercard Rules (as of June 3, 2025),
https://www.mastercard.com/content/dam/mccom/shared/business/support/rul
es-pdfs/mastercard-rules.pdf....................................................................9, 10, 11, 12, 17, 18,

## I.    INTRODUCTION

Equitable Relief Class Plaintiffs (the "Class")[1] and the Network Defendants[2] have reached an amended settlement (the "Amended Settlement") that substantially reforms nearly all of the restraints that the Class has challenged, addresses all of the Court's concerns with the prior agreement, and will bring much-needed competition to this industry.[3]

---

[1]  On September 27, 2021, the Court certified an equitable relief class, comprising "all persons, businesses, and other entities that accept Visa and/or Mastercard credit and/or debit cards in the United States at any time during the period between December 18, 2020 and the date of entry of Final Judgment in this case." *DDMB, Inc. v. Visa, Inc.,* No. 1:05-md-01720-MKB-VMS, ECF No. 8647 at 98-99 (E.D.N.Y. Sep. 17, 2021); 2021 WL 6221326, at *40 (E.D.N.Y. Sep. 27, 2021). By Order dated June 28, 2024, the Court modified the class definition (the "Class") to:

> all persons, businesses, and other entities that accept Visa and/or Mastercard credit and/or debit cards in the United States at any time during the period between December 18, 2020 and the date of preliminary settlement approval.

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.,* 05-md-01270 (MKB) (E.D.N.Y. June 25, 2024), ECF Nos. 9333 and 9342 at 76; 2024 WL 3236614, at *35 (E.D.N.Y. June 28, 2024) ("Op.").

[2]  Defendants are Visa Inc., including Visa U.S.A. Inc. and Visa International ("Visa"), and Mastercard Incorporated and Mastercard International Incorporated ("Mastercard," and together with Visa, the "Defendants" or "Network Defendants"). The complaint also names Bank of America, N.A.; BA Merchant Services LLC (f/k/a National Processing, Inc.); Bank of America Corporation; Barclays Bank plc; Barclays Bank Delaware (formerly known as Juniper Bank); Barclays Financial Corp. (formerly known as Juniper Financial Corporation); Capital One Bank (USA), N.A.; Capital One, N.A. (as successor to Capital One F.S.B.); Capital One Financial Corporation; JPMorgan Chase Bank, N.A. (as successor to Chase Bank USA, N.A. and as successor to Chase Manhattan Bank USA, N.A. and Washington Mutual Bank); Paymentech, LLC (as successor to Chase Paymentech Solutions, LLC); JPMorgan Chase & Co. (as successor to Bank One Corporation and Bank One Delaware, N.A.); Citibank (South Dakota), N.A.; Citibank, N.A.; Citigroup Inc. (as successor to Citicorp); and Wells Fargo & Company (as successor to Wachovia Bank N.A.) as defendants (collectively, the "Bank Defendants"). The Bank Defendants are "Released Parties" but not signatories to the settlement. "Defendants" herein refers to both the Network Defendants and Bank Defendants.

[3]  A copy of the Superseding and Amended Class Settlement Agreement entered into by the Class and the Network Defendants as of November 10, 2025 (the "Amended Settlement") is annexed to the Declaration of Linda P. Nussbaum filed contemporaneously herewith ("Nussbaum Decl.") as Exhibit A.

The Class challenges under Section 1 of the Sherman Act[4] the Defendants' "merchant restraints," principally the Honor-All-Cards ("HAC") rules that require a merchant that accepts any of the network's credit cards to accept all of them, including the highest-priced ones; the No-Surcharge rules that severely restrict merchants from charging cardholders for using high-priced cards; and the No-Discount rules that prohibit merchants from giving discounts to cardholders who use low-priced cards. Collectively, these merchant restraints disable the price mechanism that makes competitive markets work. The restraints prohibit merchants from using prices to steer cardholders to payment cards that in fact have lower societal costs.

In June 2024, Chief Judge Brodie declined to approve the prior settlement agreement that the Class and Network Defendants proffered (the "prior agreement"). She was concerned that the prior agreement provided little HAC relief, granted only limited surcharging relief because it prohibited surcharges of more than 1% if the merchant did not also surcharge American Express (which the American Express rules do not permit), and treated Class members unequally by providing direct rate reductions to merchants that pay posted (list) rates but not to those that pay negotiated rates.

The Amended Settlement remedies each of those concerns and indeed provides reforms far beyond those the Court discussed. Among other relief, it will enact sweeping changes to the HAC rules, permitting merchants to, among other things, not accept the networks' high-cost Premium consumer credit cards and/or the even higher-cost Commercial credit cards; allow merchants to surcharge the networks' credit cards up to 3%, regardless of whether the merchant also accepts or

---

[4]  15 U.S.C. § 1. Plaintiffs also asserted claims against Visa and the Bank Defendants based on Section 2 of the Sherman Act, 15 U.S.C. § 2, but the Court granted summary judgment against Plaintiffs as to those Section 2 claims related to both debit and credit markets. *See In* re *Payment Card Interchange Fee & Merch. Disc. Antitrust Litig*., ECF No. 9187, 729 F.Supp.3d 298, 336-40 (E.D.N.Y. 2024).

surcharges American Express or other competing cards; and mandate rate reductions that will benefit all merchants, regardless of whether they pay posted or negotiated rates. The Amended Settlement's substantial additional reforms include permitting merchants to discount credit cards issued by a specific merchant-favored bank; creating many other ways for merchants to discount low-cost forms of payment; effectively creating a new "value card" to avoid incurring the highest fees; and permitting "dual pricing" that allows merchants to comply with state laws that purport to ban or restrict surcharging.

These reforms are the product of careful consideration and hard-fought negotiations over the past year,[5] and they provide very substantial relief—plainly more than adequate relief—to all Class members, particularly in light of the ample risks of continued litigation. Under reasonable assumptions, as discussed in the accompanying declaration of the Class's experts, Nobel Prize winning economist Joseph E. Stiglitz and Professor Keith B. Leffler, these reforms will drive the total price of Visa and Mastercard credit-card transactions (the interchange rates paid by merchants, minus the value of "rewards" that cardholders receive) far toward a competitive level.[6] The Amended Settlement will give merchants formidable competitive tools to push back against high interchange fees, substantially altering the portion of the total price that they pay. The result will be more competitive and efficient Visa and Mastercard networks, where market forces—not restraints—determine the prices for both cardholders and merchants.

## II.    SUMMARY OF THE AMENDED SETTLEMENT'S REFORMS

The Amended Settlement provides a complete toolbox of options that merchants can use

---

[5] *See* Declaration of Hon. James Orenstein (Ret.) dated November 7, 2025 ("Orenstein Decl."), annexed to the Nussbaum Decl. as Exhibit E.

[6] *See, e.g.,* Declaration of Joseph E. Stiglitz and Keith B. Leffler dated November 9, 2025 ("Stiglitz Decl."), annexed to the Nussbaum Decl. as Exhibit D, at ¶¶ 14, 59, 112, 116, 119.

to steer their customers to lower-cost methods of payment and to negotiate better rates from the networks and the issuing banks.[7] As discussed in detail in Section VI below, the Amended Settlement warrants preliminary approval, authorization of the requested Notice to the Class, and the scheduling of a Fairness Hearing. We provide first, for the Court's convenience, a summary of those reforms, with italics indicating the provisions that will bring substantially greater or entirely new relief compared to the prior agreement.

**Honor-All-Cards Relief**

- *For the first time, merchants will now be able choose to accept the lower cost Standard consumer credit cards, without having to accept higher-cost Premium consumer credit cards.*[8]

- *Merchants also will be permitted to choose to accept only consumer credit cards and decline Commercial credit cards, which typically have the networks' highest interchange rates.*

- *Visa and Mastercard will ensure that their Commercial and Premium cards are readily identifiable visually and electronically at the point-of-sale, so that merchants can, if they choose, selectively decline them from their customers.*

- Merchants will no longer be required to accept digital wallets just because they contain a Visa or Mastercard card. *The prior agreement provided an exception for digital wallets owned or operated by Visa or Mastercard; the Amended Settlement eliminates that exception.* The networks must modify their technologies to make this reform effective.

- Merchants will be permitted to conduct pilot programs to determine whether and in what circumstances non-acceptance of all of Defendants' credit cards—or the Premium or Commercial cards—is advantageous to them. The test period can

---

[7] *See id*. ¶¶ 8-9, 11-12, 90-91.

[8] "Premium" and "Standard" consumer credit cards are defined in the Amended Settlement. Amended Settlement ¶¶ 1(z), (nn). Premium consumer credit cards include Visa Signature, Visa Signature Preferred, Visa Infinite, Mastercard World, Mastercard World High Value, Mastercard World Legend, and Mastercard World Elite. These "premium" consumer credit cards have negative cardholder prices (high rewards) and high merchant prices (high interchange rates). Standard consumer credit cards include Visa Traditional, Visa Traditional Rewards, Mastercard Core, and Mastercard Enhanced Value. These "standard" consumer credit cards have zero or moderately negative cardholder prices (low or no cardholder rewards) and lower merchant prices (lower interchange rates).

4

extend *up to 180 days, at up to 20% of the merchant's outlets—more if the merchant operates in multiple states.*

- The Amended Settlement expressly identifies 19 circumstances, in certain gray areas, in which Defendants now agree that neither the HAC rules nor any other rules will prohibit merchants from differentially steering transactions among the networks' issuing banks (*e.g.*, steering transactions to only Chase-issued Visa cards).

- The Amended Settlement requires the networks to modify their rules to clarify that a merchant operating outlets under multiple banners can make different acceptance decisions for stores under the different banners.

**"Value" Card**

- *The Amended Settlement will cap the interchange rates on Standard consumer credit cards at 125 basis points ("bps")[9] for at least 8 years—a ▮▮-bps reduction from the current average posted rate on the Standard cards. This reduction will allow merchants to profitably offer customers a 1% discount for using the lower-cost cards.*

**Surcharging Relief**

- All merchants will be permitted to surcharge at the brand (*e.g.*, Visa or Mastercard) or product (*e.g.*, Visa Signature) level, up to the lesser of the full cost of acceptance or 3%, regardless of whether they accept or surcharge American Express or other competitive cards.

- *The prior agreement effectively limited the surcharge amount to 1% for merchants that accepted American Express or other competitive credit cards. The Amended Settlement eliminates that limitation.*

- The Amended Settlement will require each network to state in its rules that a merchant may surcharge either or both of Visa or Mastercard; surcharge both networks at the brand level, both at the product level, or one at the brand level and the other at the product level; or any permutation.

- The Amended Settlement will make surcharging more viable by eliminating the labyrinthine complexity of the present network rules. The new rules are simple and understandable and will be explained to merchants as part of the merchant education program provided for in the Amended Settlement and funded by

---

[9]  Basis points, otherwise known as "bps," are hundredths of one percent. One basis point is equivalent to 0.01% (1/100th of a percent) or 0.0001 in decimal form. One hundred basis points are equivalent to 1%.

Defendants.

- Visa and Mastercard will be prohibited from retaliating against a merchant that surcharges or uses the threat of surcharging in fee negotiations with Defendants.

**Discounting Relief**

- The Amended Settlement extends for at least another *eight years* the expired DOJ consent decree that required Visa and Mastercard to permit discounting at the brand and product levels.

- The Amended Settlement will require Visa and Mastercard to state in their rules that merchants may discount the networks' credit cards at the issuer level (*e.g.*, Chase-issued credit cards) as well as at the brand and product levels. Mastercard has not previously permitted issuer-level discounting. Visa permits issuer-level discounting, but that policy is not reflected in its rules.

- *The new 125-bps cap on the interchange rates applicable to Standard consumer credit cards provides a means for merchants to generate competition among issuers by, for example, promoting a particular issuer's Standard card in exchange for even lower rates.*

- The Amended Settlement requires the networks to modify their rules to clarify a merchant's ability to steer in its various outlets.

**Buying Group Reforms**

- The Amended Settlement will require the networks to negotiate in good faith with merchant buying groups[10] and will provide a streamlined process to resolve assertions of lack of good faith.

- *The buying groups will be eligible for negotiated rates that will count toward the mandated reductions in the networks' systemwide average effective interchange rates (see below).* Some of the merchant education funds (see below) will be used to promote buying groups.

- The Amended Settlement's HAC, surcharging, and discounting relief will, for the

---

[10]  A "buying group" is "two or more merchants, which conform to the Visa [or Mastercard] Defendants' requirements of 'Merchants' under their Rules and that accept Visa-[or Mastercard-] Branded Cards, that form a group and incorporate as a not-for-profit corporation in any state in the United States for the purpose of negotiating with the Visa [or Mastercard] Defendants in conformance with this Superseding and Amended Rule 23(b)(2) Class Settlement Agreement, and that comply with the requirements of the FTC's and DOJ's 'Antitrust Guidelines for Collaborations Among Competitors' dated April 2000, and any subsequent editions of that guidance; any other competition guidelines and policy statements of the FTC or DOJ; and any other applicable legal standards." Amended Settlement ¶¶ 44, 93.

first time, give merchants an incentive to form and join a buying group to take advantage of these new competitive tools.

**Merchant Education Program**

- A *$21 million* merchant education program, funded by Defendants, will provide merchants with information, education, and training to help them take advantage of the new competitive steering tools. *The program will also include technical and other support for merchants in states that restrict or ban surcharging.*

**Immediate Rate Relief**

- Each network must ensure a *10-bps reduction* in systemwide average effective interchange rates for five years.

- *Large merchants that currently pay negotiated rates will get a pro rata reduction in those rates (proportional to the 10-bps reduction in the systemwide average effective interchange rate), ensuring that all merchants will directly benefit from the rate reductions.*

- All posted Visa and Mastercard credit-card rates are capped at their March 2025 levels for five years.

- *As stated above, the 125-bps rate cap on Standard consumer credit cards will remain in effect for the full 8+ years of the Amended Settlement.*

**Term of the Agreement and Release**

- The Amended Settlement's substantive rules relief becomes effective 90 days after the district court grants final approval of the settlement (Amended Settlement ¶ 1(ll)) and *extends for at least 8 years*—specifically, until the later of 8 years after that date or 5 years after the conclusion of all appeals of the district court's final approval order (*id.* ¶ 116(a)).[11]

- The Release is effective for that same period. Amended Settlement ¶ 116(a).

- The mandated 10-bps reduction on the average effective interchange rate ("AER") goes into effect in the first April or October that is at least four months after the district court grants final approval (Amended Settlement ¶ 48(a)) and extends for 5 years thereafter (*id.* ¶ 48(a)).

- The caps on the posted interchange rates are effective during the same time as the AER. Amended Settlement ¶ 51.

---

[11] The provisions tying the substantive relief to this time frame are Paragraphs 19, 22, 26, 28, 32, 33, 34, 36, 39, 44, 67, 70, 74, 75, 79, 80, 81, 83, 86, and 91.

- The mandated pro-rata reductions on the interchange rates paid by merchants with negotiated rates are effective during the same time as the AER. Amended Settlement ¶ 49.

- The 125-bps cap on Standard consumer credit cards goes into effect when the AER does and extends until the termination of the Release. Amended Settlement ¶ 50.

## III.    PROCEDURAL BACKGROUND

Getting to the Amended Settlement has been a long road. As detailed in the accompanying Class Counsel Declaration,[12] the history of the litigation includes the initial complaints filed in June 2005, discovery, motion practice, the initial 2012 class settlement and reversal on appeal, subsequent class certification of a separate Rule 23(b)(2) class, summary judgment rulings, the denial of the motion for preliminary approval of the prior agreement in June 2024, trial preparation, and the renewed settlement negotiations that led to the Amended Settlement.

A brief description of the structure of the credit card industry is presented in the Class Counsel Declaration (see ¶¶ 23-25). Detailed information about how the credit card industry operates and its evolution is set out in the Court's 2013 opinion approving the first settlement in this case, *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 986 F.Supp.2d 207, 214-15 (E.D.N.Y. 2013), and in the Second Circuit's previous opinions dealing with past antitrust lawsuits against Visa and Mastercard, *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 101-02 (2d Cir. 2005); *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 234-37 (2d Cir. 2003); *In re Visa Check/MasterMoney Antitrust Litig.* ("Visa Check"), 280 F.3d 124, 129-31 (2d Cir. 2001).

## IV.    THE CHALLENGED RESTRAINTS

### *Default Interchange Rates*

Visa and Mastercard each sets what it terms "default" interchange rates, which the

---

[12] Declaration of Equitable Relief Class Counsel, filed contemporaneously herewith ("Class Counsel Decl."), at ¶¶ 26-123.

merchant must pay in the absence of an agreement between the merchant and the network or the issuing bank for a different rate.[13] While both networks *in theory* permit bilateral interchange arrangements, *in practice* such agreements exist with a small minority of merchants.

The merchant restraints prevent merchants from steering customers to lower-cost payment mechanisms and, thus, the high "default" interchange fees become the *de facto* prices charged on the vast majority of transactions. The combination of the default interchange rates and the merchant restraints results in supracompetitive total prices and an inefficient balance of prices on the merchant and cardholder sides of the network.[14]

### The Honor All Cards Rule

The networks' HAC rules require any merchant that accepts Visa or Mastercard credit cards to accept *all* credit cards that are issued on that network.[15] This means that the merchant must accept all of the network's credit cards, regardless of the issuer, rewards, type of card (Standard, Premium, or Commercial, for example), or interchange rate.[16] The HAC rules prohibit merchants from accepting only Visa's or Mastercard's lower-cost credit cards and refusing their

---

[13]    The current Visa rules (as of Oct. 18, 2025) can be found, in their entirety, at https://usa.visa.com/content/dam/VCOM/download/about-visa/visa-rules-public.pdf. The current Mastercard rules (as of June 3, 2025) are at https://www.mastercard.com/content/dam/mccom/shared/business/support/rules-pdfs/mastercard-rules.pdf. Extracts of the most relevant Visa and Mastercard rules are found, respectively, at Exhibits F and G to the Nussbaum Decl. Visa Rule 1.8.1.2 and Mastercard Rule 8.3 mandate the default interchange rates absent a superseding bilateral agreement. *See* Stiglitz Decl. ¶ 45.

[14]   Stiglitz Decl. ¶ 114.

[15]   Visa Rule 1.5.4.4; Mastercard Rule 5.11.1; *see* Stiglitz Decl. ¶ 38.

[16]    In response to prior litigation, Visa and Mastercard reformed their HAC rules to permit merchants to accept only the network's debit cards or only its credit cards. However, a merchant that accepts the network's credit cards cannot accept, for example, only the network's Standard credit cards, or only its consumer credit cards, or only its credit cards issued by a particular bank. Stiglitz Decl. ¶ 33 and n. 20.

higher-cost cards.

As customers have increasingly paid for goods and services using digital wallets on their smartphones, Visa and Mastercard have also construed and applied their HAC rules as essentially including an "Honor-All-Wallets" rule. Both networks require merchants that enable technology for accepting digital wallets (*i.e.*, smartphones) to accept *all* digital wallets that contain the network's credit cards.[17] Consequently, merchants have had limited ability to refuse or condition acceptance of payments made with digital wallets, again preventing them from steering customers to lower-cost options.

***The No-Surcharge Rule***

Visa and Mastercard both enforce a no-surcharge rule that severely limits merchants' ability to surcharge cardholders' credit-card transactions to reflect cost differences among various payment methods.[18] The networks nominally permit surcharging for credit-card transactions, but with an exception that swallows the rule.

Under Visa's "level-playing-field" rule, a merchant that wants to surcharge a Visa credit card must also surcharge competitive credit card brands that the merchant accepts, if they have a cost of acceptance that is equal to or greater than the merchant's cost of accepting Visa, or must surcharge Visa in line with that competing card's stricter surcharging rules.[19] Mastercard's rule is substantively the same. The upshot is that, if the merchant accepts a competitive credit card brand that does not allow surcharging (*e.g.*, American Express), it similarly may not surcharge Visa or

---

[17]  Visa Rule 1.5.4.4; Mastercard Rule 5.11.1; *see* Stiglitz Decl. ¶ 38.

[18]  Visa Rules 5.5.1.6, 5.5.1.7; Mastercard Rule 5.12.2; *see* Stiglitz Decl. ¶¶ 39-41.

[19]  Visa Rule 5.5.1.6; Mastercard Rule 5.12.2; *see* Stiglitz Decl. ¶¶ 39-41.

Mastercard credit cards.[20]

***The No-Discount Rule***

A 2011 consent decree with the DOJ[21] required Visa and Mastercard to allow merchants to offer discounts to customers for paying with a competing type of payment product (*e.g.*, a competing credit card or debit card, in addition to cash for which discounting was already allowed). But the networks' rules have continued to prohibit merchants from discounting by issuer (*e.g.*, giving discounts only to customers who use a Chase-issued Mastercard credit card).

Although Visa says that it has permitted this type of discounting, the policy is not reflected in its rules. Mastercard's rules expressly prohibit issuer-level discounting.[22] Those rules and practices prevent merchants from generating more competition among issuers for the merchants' business.

## V.    THE AMENDED SETTLEMENT EFFECTIVELY RESPONDS TO THE COMPETITIVE PROBLEMS.

### A.    THE COMPETITIVE PROBLEMS

The Supreme Court requires that the economic analysis of transactions platforms like Mastercard's and Visa's must focus on the transaction's "total price"—that is, the price paid by the merchant plus the price paid by the cardholder. *Ohio v. Am. Express Co.*, 585 U.S. 529, 545-46 (2018). Here, cardholders pay a negative price—they receive "rewards" for using their cards.

---

[20] Visa Rule 5.5.1.6; Mastercard Rule 5.12.2; Stiglitz Decl. ¶¶ 39-41. American Express does not explicitly prohibit surcharging. It does, however, require that merchants that surcharge its card impose an equivalent surcharge on all other forms of card payment, including debit cards. Because the Visa and Mastercard rules preclude surcharging debit (for which prices are, for the most part, set by regulation), it is impossible for a merchant to surcharge American Express while fully complying with the Visa and Mastercard rules. *Id.*

[21] Final Judgment as to Defendants Mastercard International Incorporated and Visa Inc., No. CV-10-4496 (E.D.N.Y. July 20, 2011), https://www.justice.gov/atr/case-document/final-judgment-defendants-mastercard-international-incorporated-and-visa-inc.

[22] Mastercard Rule 5.12.1; *see* Stiglitz Decl. ¶ 42.

So the Class economists define and calculate the total price as the interchange fee paid by the merchant minus the issuer's rewards expense.

The networks' HAC rules require merchants to either accept *all* Visa and/or Mastercard credit cards, or *none* of them. As Professor Stiglitz explains, these restraints prohibit merchants from using a fundamental market mechanism—a price signal—to steer customers towards less expensive payment methods, which results in supracompetitive total prices for Visa and Mastercard transactions:

> In a market economy, prices are the principal means by which buyers are informed of the social costs of their consumption decisions. When purchase or sales decisions are made absent knowledge of prices, an inefficient allocation of resources is expected. The market's "invisible hand" cannot function when buyers or sellers lack appropriate information and incentives to guide their decisions. The Visa and Mastercard Merchant Restraints result in merchants' customers having no knowledge of the total price of alternative payment means. As a result, the cardholders make their payment means decisions based solely on the portion of the total price that they are aware of — the price on the cardholder side. . . . This leads to cardholders favoring high-rewards cards regardless of whether the value of the rewards exceeds the costs, eliminating competition that would push credit card networks to set an efficient cardholder/merchant price-pair.[23]

Price signals would otherwise guide cardholders toward less-expensive payment products, which in turn would cause the networks to reduce their interchange fees and total prices.[24]

Instead, the HAC rules and other merchant restraints have allowed the networks to raise interchange rates to the point just below the levels at which merchants would decline acceptance of all cards. And the networks set a menu of "default" interchange rates tailored to the elasticities of demand within each network-defined merchant category (*e.g.*, large supermarket chains).[25] In

---

[23]  Stiglitz Decl. ¶ 18 n. 10. Professor Stiglitz provides a concrete example of how the restraints send false price signals to cardholders. Stiglitz Decl. ¶ 19 and n.11.

[24]  Stiglitz Decl. ¶ 19 and n.11.

[25]  *See* Visa Rule 1.8.1.2; Mastercard Rule 8.3; Stiglitz Decl. ¶¶ 24, 45.

short, the restraints allow the networks to turn the nominally "default" rates into *de facto* fixed rates, extracting supracompetitive interchange rates from each merchant segment.[26]

On the other side of the two-sided transaction platform, issuers compete to sign up cardholders and give them "rewards" to motivate them to increase their usage of credit cards with the highest, most supracompetitive interchange fees. In economic terms, under the protection of the Visa and Mastercard merchant restraints, the issuing banks compete on the cardholder side of the platform to garner a greater share of the supracompetitive profits that the restraints generate on the merchant side.[27] This leads to an upward "price spiral" on the merchant side of the platform, as the networks continually raise interchange rates to fund the rewards on the cardholder side, where the networks and issuers must compete. Professors Stiglitz and Leffler found that the average merchant fees were about ███% of the total price in 2004 and had increased to ███% by 2010, and to ███% by 2016.[28]

In short, the merchant restraints result in a supracompetitive total price and an inefficient "balance" between the two prices on opposite sides of the platform.

## B. THE AMENDED SETTLEMENT'S RESPONSE

The Amended Settlement's reforms and rule changes provide a powerful set of competitive tools for merchants to push back against too-high interchange fees.

### 1. Honor-All-Cards Reforms

***Commercial Cards.*** The Amended Settlement provides the first substantial changes to the HAC credit-card rules in the United States since the inception of Visa and Mastercard. Accepting

---

[26] Stiglitz Decl. ¶ 114.

[27] *Id.* ¶ 22.

[28] *Id.* ¶¶ 22 and nn.14, 52.

a network's credit cards will no longer be an all-or-nothing proposition. Merchants will be able to accept or decline subsets of each network's credit cards.

Under the Amended Settlement, merchants can choose to accept only consumer credit cards, declining the higher-cost Commercial credit cards. Commercial credit cards account for about ██% of the networks' credit-card transaction volume, with average interchange rates of ██ bps—about ██ bps higher than the Amended Settlement's new 125-bps cap on Standard consumer credit cards (see below).[29]

Currently, some merchants have negotiated rates applicable to Commercial credit cards that are ████████ bps lower than the posted rates for those cards.[30] Thus, substantial savings are available to merchants that leverage their new right to decline these cards if Visa and Mastercard do not reduce the rates on them.

***Premium Cards.*** Under the Amended Settlement, merchants can choose to accept only lower-cost Standard consumer credit cards, declining high-cost Premium consumer credit cards (or both Premium consumer credit cards and Commercial credit cards).[31] The Premium credit cards are about ██% of Visa's credit-card posted-rate transaction volume and ██% of Mastercard's.[32] The average posted rates on the Premium consumer credit cards are about ██ bps higher than for the Standard consumer credit cards.[33]

To make non-acceptance (or the threat of non-acceptance) of Premium consumer credit cards more viable, the Amended Settlement couples the HAC reforms with a cap on Standard

---

[29] *Id.* ¶ 62.

[30] *Id.* ¶ 107.

[31] Amended Settlement ¶¶ 22, 71.

[32] Stiglitz Decl. ¶ 48, Table 1.

[33] *Id.*

consumer credit cards of 125 bps (see below). Merchants can announce in advance that they will stop accepting Premium consumer credit cards and use that time to get their customers to sign up for lower-cost Standard consumer credit cards. Or they can start with surcharging Premium consumer credit cards, or discounting Standard consumer credit cards, and eventually build up to declining (or threatening to decline) Premium consumer credit cards.

*Digital Wallets.* The Amended Settlement gives merchants greater control over how they accept digital-wallet payments, which will give them important flexibility and leverage given the increasing use of digital payments. In 2023, 15% of point-of-sale payments and 37% of online payments in the United States were made with digital wallets. By 2027, 31% of point-of-sale payments and 51% of online payments in the United States are expected to be made with digital wallets.[34]

Currently, the networks interpret their HAC rules to require that merchants that accept their cards, and have the technology to accept digital payments, must accept all digital wallets that contain that network's credit card. This eliminates merchants' leverage to negotiate better economic terms with digital-wallet purveyors for agreeing to accept their wallets.

The Amended Settlement repeals this honor-all-wallets aspect of the HAC rules, including when Visa or Mastercard owns the digital wallet,[35] thus putting leverage back in merchants' hands.

*Clarification of Gray Areas.* The Amended Settlement synthesizes the general principles governing merchants' preferring a particular issuer's cards. It then identifies 19 specific circumstances in which the networks have agreed that their HAC rules (or other rules) will not prohibit merchants from preferring a particular issuer's credit cards over others. For example,

---

[34] *See Capital One Shopping Research*, DIGITAL WALLET STATISTICS (July 23, 2025), https://capitaloneshopping.com/research/digital-wallet-statistics/.

[35] Amended Settlement ¶¶ 34-38, 83-87.

merchants may:

- differentiate among issuers by having signage that states, "We prefer [Bank Name] cards because our fees are lower;"

- have a special check-out lane for those who use a particular issuer's cards; and/or

- highlight a particular issuer's card on a landing page for online sales.[36]

Whether merchants sell in brick-and-mortar stores or online, the relief provides another meaningful way to differentiate among issuing banks and spur competition.

***All-Outlets Reforms.*** The Amended Settlement will require the networks to modify their rules to clarify that (a) merchants operating outlets under multiple brands are permitted to decline acceptance of a network's credit cards, or subsets of them (*i.e.*, Premium consumer credit cards or Commercial credit cards) at outlets operating under some trade names or banners, but not at outlets operating under the merchant's other trade names or banners, and (b) merchants are not required to use the same steering tools in all of their outlets.[37]

Some retailers have outlets geared towards different customer bases. While it might be profitable not to accept a network's Commercial credit cards or Premium consumer credit cards at a store type that caters to customers who value low prices, accepting those cards may be profitable at higher-priced, service-oriented stores. The Amended Settlement's reforms to the all-outlets rules ensure that merchants can customize their card acceptance and steering based on local conditions and customer base.[38]

***Pilot Programs.*** If a merchant does not accept a customer's preferred card, that customer may take their business elsewhere. The current HAC rules force the merchant to make the

---

[36] Amended Settlement ¶¶ 19, 68, and Appendix H.

[37] Amended Settlement ¶¶ 31, 33, 80, 82.

[38] Stiglitz Decl. ¶ 72.

accept/reject decision without information regarding how its decision may impact its sales.

The Amended Settlement will modify the HAC rules to permit merchants to generate this information by conducting non-acceptance test programs. Once a year, for not more than 180 days, a merchant can refuse acceptance of Visa or Mastercard credit cards and/or debit cards at up to 20% of its outlets operating under the same banner, or, alternatively, if the merchant operates in at least five states, in all outlets operating under the same banner in no more than two states, where the outlets in those states account for no more than 50% of the merchant's outlets.[39]

The benefits from these pilot programs are even greater given the Amended Settlement's reforms to the HAC rules as they relate to Commercial credit cards and Premium consumer credit cards. A merchant can craft a narrow pilot program to a particular category of credit cards, experimenting with, for example, non-acceptance of just a network's Premium consumer credit cards in just a subset of the merchant's outlets. Merchants have previously testified as to the value of pilot-test programs.[40]

### 2.    Surcharging Reforms

***Level-Playing-Field Rules.*** As noted above (Section IV), the networks' so-called level-playing-field rules effectively prohibit merchants that accept American Express cards from surcharging Visa or Mastercard credit cards.[41] The Amended Settlement altogether repeals the

---

[39]  Amended Settlement ¶¶ 32, 81.

[40]  *See* Class Counsel Decl. ¶ 160, which cites exemplar deposition testimony from merchants, complaining about the limited ability to test under the networks' rules and verifying the importance of testing in the retail industry.

[41]  *See* Visa Rule 5.5.1.6; Mastercard Rule 5.12.2; Stiglitz Decl. ¶ 74. The Visa rule is formally titled "Similar Treatment of Visa Transactions." Like the misuse of the term "surcharging," Visa and Mastercard have also used other distracting language that impairs understanding of the workings of the credit-card markets. Visa's and Mastercard's "level-playing-field" rules actually perpetuate a *tilted* playing field; "no-discrimination" rules require that merchants *discriminate* – set prices unrelated to costs.

level-playing-field rules, eliminating restraints that prevented merchants from imposing surcharges on more than 80% of Visa and Mastercard credit-card transactions.[42]

**Surcharging Up to 3%.** The Amended Settlement provides that all merchants, including those that accept American Express, can surcharge Visa and/or Mastercard credit cards up to the lesser of the cost of acceptance (including fees beyond the interchange fee)[43] or 3%, regardless of whether: (a) their agreement with American Express prohibits surcharging its credit cards; or (b) the merchant actually surcharges American Express.[44]

Surcharging is a very effective way to steer cardholders to lower-cost payment mechanisms.[45] Merchants can also surcharge not in order to steer, but simply to recover the cost of acceptance up to 3%.

**Untethering Visa and Mastercard.** The current rules appear to bind together merchants' ability to surcharge Visa and Mastercard, requiring a merchant that surcharges Visa credit cards to also surcharge Mastercard credit cards, and vice-versa.[46] The Amended Settlement compels the networks to amend their rules to expressly state that, as between Visa and Mastercard credit cards,

---

[42] *See* Amended Settlement ¶¶ 39-41, 88-90 (prior level-playing-field rule not included in new surcharging rules).

[43] *See* Amended Settlement ¶¶ 40-41, 89-90.

[44] This is a significant improvement over the prior agreement, which limited the amount of the surcharge in these circumstances to 1%.

[45] *See* ECF Nos. 8067, 8307 at 8-10 (Class's summary judgment brief, with a section entitled "Surcharging Works").

[46] *See* Visa Rule 5.5.1.6 (prohibiting merchant from surcharging Visa credit cards if merchant assesses a surcharge on conditions that are "not the same" as the conditions on which merchant surcharges a "Competitive Credit Card Brand"—a term defined in the rules' Glossary to include Mastercard); Mastercard Rule 5.12.2 (requiring merchant seeking to surcharge at the "brand level" to apply to Mastercard credit-card transactions "[t]he same terms under which the Competitive Credit Card Brand permits a Merchant to Surcharge" and defining "Competitive Credit Card Brand" to include Visa).

a merchant can surcharge one, neither, or both, and surcharge one at the brand level and the other at the product level or any permutation.[47]

***Identifying Card Products.*** The Amended Settlement improves merchants' ability to surcharge at the product level—*i.e.*, to surcharge only certain high-cost cards, such as Visa Signature or Mastercard World Elite. Currently, the networks do not make sufficient data available to merchants in real time as to the specific credit card product that the customer is using and its applicable interchange rate.[48] This lack of information effectively prevents some merchants from surcharging (or discounting) at the product level. The Amended Settlement incentivizes Visa and Mastercard to develop the technology necessary to make that information available. It allows merchants to surcharge the card up to 3%, regardless of their actual cost of acceptance, unless and until the networks make that information instantly available to merchants at the point-of-sale.[49]

***Simplifying the Rules.*** The Amended Settlement greatly simplifies the surcharging rules. Currently, a merchant that accepts American Express and Visa or Mastercard must apply American Express's rules to the Visa or Mastercard transaction to determine whether surcharging is permissible, and even then must also compare the cost of the Visa or Mastercard transaction to that of the competitor.[50] Under the Amended Settlement, the merchant can surcharge Visa and/or

---

[47] *See* Amended Settlement ¶¶ 43(b) and (c), 92(b) and (c).

[48] Currently, each network provides only a "look up" service in which the customer swipes (or dips or taps) her card once in order to determine the applicable product or interchange fee, and then has to swipe again once the merchant decides how it wants to proceed. Under the Amended Settlement, merchants can surcharge at the product level at 3%, regardless of their cost of acceptance, if the networks do not make sufficient product and interchange-fee information available at the point-of-sale with one swipe/dip/tap of the customer's card. Amended Settlement ¶¶ 40(b)(ii), 41(b)(ii), 89(b)(ii), 90(b)(ii).

[49] *Id.* This provision gives immediate relief to merchants, who can surcharge up to 3%, and incentivizes the networks to develop the technology to make the requisite data available to merchants at the point-of-sale.

[50] *See, e.g.*, Visa Rule 5.5.1.6.

Mastercard credit cards up to the cost of acceptance or 3%, whichever is less, regardless of whether the merchant accepts American Express or other competing cards, or how much the merchant pays for them.

*Easing Notice and Disclosure.* The Amended Settlement will also ease the notice and disclosure requirements, permitting merchants to give their customers truthful information as to why the merchant is applying a charge for using credit cards, *i.e.*, because they cost merchants more to accept.[51]

*Prohibiting Retaliation.* The Amended Settlement will add provisions prohibiting the networks from retaliating against a merchant that surcharges, including by raising the posted rates to a merchant that is considering surcharging.[52]

### 3.    Discounting Reforms

Providing a discount for the customer's use of a particular credit card is an especially attractive competitive tool for merchants, because it can enhance the merchant/customer relationship. Unlike rewards for card use, which cardholders view as being given by the networks or the banks, cardholders will view these discounts as being given by the merchants. And, unlike most rewards, discounts on the purchases of the merchant's goods or services have a known, quantifiable value, and the customer receives them, immediately, at the point-of-sale.

*Extending DOJ Decree.* The Amended Settlement requires Visa and Mastercard to keep in place the rule changes required by their consent decree with the DOJ. The consent decree, which expired in July 2021, allowed merchants to discount (or offer enhanced services) by card brand and/or by card product. Although Visa and Mastercard have voluntarily maintained the rule

---

[51]  Amended Settlement ¶¶ 42(b), 91(b).

[52]  Amended Settlement ¶¶ 43(f), 92(f).

changes, they are free to revert to the more onerous pre-consent-decree terms. The Amended Settlement extends these rule changes for at least eight additional years.[53]

***Discounting by Issuer.*** Moreover, the consent decree did not require Visa and Mastercard to allow merchants to discount a particular *issuer's* cards (*e.g.*, Chase credit cards). Visa voluntarily permitted some issuer-level discounting, but Mastercard did not. This limited merchants from unleashing what should be intense competition among the many issuing banks. The Amended Settlement will rectify this problem, requiring the networks to modify their rules to permit merchants to discount at every level—brand, product, *issuer*, or any combination.[54]

This reform increases the number of competitors that merchants can pit against each other in negotiating for lower fees. Merchants will be able to negotiate with the major issuers in addition to the two networks. The top eight issuers account for about 78% of the Visa and Mastercard credit-card volume.[55] Large merchants and buying groups can use discounting or dual pricing (see Section V(B)(8) below) to negotiate reduced interchange rates from favored issuers.

These discounting reforms will be especially useful to merchants in encouraging customers to switch from Premium consumer credit cards to the 125-bps Standard consumer credit cards. As discussed below, merchants can partner with a particular issuing bank and negotiate an even lower interchange rate in exchange for encouraging customers to get and use one of that bank's Standard consumer credit cards.

### 4.    Standard or "Value" Card

Today the gap between the average posted interchange rates on Visa's Standard consumer

---

[53]  Amended Settlement ¶¶ 18, 67.

[54]  Amended Settlement ¶¶ 19, 68.

[55]  Nilson Report (February 2025).

credit cards (Traditional and Traditional Rewards) and its Premium consumer credit cards (Signature, Signature Preferred, and Infinite) is ███ bps. The same gap exists between Mastercard's Standard consumer credit cards (Core and Enhanced) and its Premium consumer credit cards (World, World High Value, World Legend, and World Elite).[56]

The prospect of saving that amount may be insufficient to motivate a merchant to decline acceptance of Premium cards or to offer discounts to customers who use Standard cards. The Amended Settlement will respond to that economic reality by requiring the networks to cap the posted interchange rates on Standard consumer credit cards at 125 bps for all merchant categories. This will ensure that almost all posted-rate consumer credit-card transactions will feature a gap of more than 100 bps between the posted Premium-card and Standard-card rates.[57]

The 100-bps gap will make the Standard consumer credit cards a versatile competitive tool. It will significantly increase merchants' economic incentive to decline acceptance of Premium consumer credit cards and could allow them, for example, to ease customers' concerns by simultaneously offering them a 1% discount on the merchant's goods or services at the point-of-sale for using a Standard consumer credit card. As noted above (Section V(B)(3)), those types of discounts can help solidify the merchant-customer relationship and change how customers view credit-card "rewards."

Other merchants may continue to accept Premium consumer credit cards but will use the new competitive tools to steer customers away from using them. Merchants can accept Premium credit cards but discount Standard credit cards; or surcharge Premium credit cards; or surcharge

---

[56]  Stiglitz Decl. ¶ 85.

[57]  Amended Settlement ¶¶ 50, 99; Stiglitz Decl. ¶ 86. The only exceptions result from the much-lower-than-average rates that very few categories of merchants already pay for Premium consumer credit cards.

Premium credit cards while also discounting Standard credit cards; or use the new technology (see Section V(B)(8) below), to post three prices—the "regular" price, the Premium-card price, and the Standard-card price. Merchant buying groups (see Section V(B)(6) below) can also use these strategies.

Moreover, the Standard consumer credit cards have, in recent years, accounted for over █% of the networks' outstanding consumer credit *cards* but only about █% of their posted-rate consumer credit-card *transaction volume*.[58] Thus, there is plenty of scope for banks to issue more Standard credit cards and for banks and merchants to promote their use. A merchant can partner with a particular issuer to help promote its Standard credit cards (*e.g.*, provide application forms at the checkout register) in exchange for even lower interchange rates. Some banks may embrace this opportunity to shift customers' focus away from nebulous, after-the-fact rewards to quantifiable, get-it-today discounts on the goods and services that they are actually buying.

### 5.     New Leverage for Merchants with Negotiated Rates

Currently, nearly all merchants pay posted rates. Fewer than █ merchants—of more than 12 million nationwide—have negotiated reduced credit-card interchange rates from one or both of Visa and Mastercard, accounting for less than █% of the networks' credit-card transaction volume.[59] Even with the existing merchant restraints in place, this small group of merchants achieve substantial interchange rate reductions—about █ bps on average.[60] The Amended Settlement's substantial relief will give these merchants even more leverage in their future rate negotiations.

---

[58] Stiglitz Decl. ¶ 88 n.86.

[59] *Id.* ¶¶ 49, 90.

[60] *Id.* ¶ 91.

More merchants, representing significantly more transaction volume, will be able to cut similar deals. If the networks or issuers refuse to lower rates, a disappointed merchant will be able to effectively reduce its card-acceptance costs by using the Amended Settlement's many tools to drive transactions to lower-cost cards (or by surcharging and recovering the full cost of acceptance).

### 6.    Merchant Buying Groups

To date, the merchant restraints have prevented most merchants from being able to credibly assert to the networks that they can deliver (or withhold) transaction volume in exchange for lower interchange rates. The Amended Settlement will fundamentally change that calculation. Smaller merchants will have the competitive tools necessary to negotiate reduced interchange rates. So they will have not only the *right* to join buying groups, but also *reasons* to join.[61]

The Amended Settlement will further encourage the formation of buying groups by requiring the networks to negotiate with them in good faith and providing a pathway to challenge any alleged failure of good faith.[62] It will also provide dedicated funds to educate merchants about the groups and facilitate their formation.[63] The reduced rates that the networks provide to buying groups will count toward the Amended Settlement's mandated rate reductions (see Section V(B)(9) below).

### 7.    Merchant Education Program

The Amended Settlement will boost steering by providing funds to educate merchants about these new competitive tools and help merchants decide which tools are best for them. Visa

---

[61]  Amended Settlement ¶¶ 44-47, 93-96.

[62]  Amended Settlement ¶¶ 45-46, 94-95.

[63]  Amended Settlement ¶¶ 56(d), 57, 105(d), 106.

and Mastercard have dominated the competitive landscape for decades, distorting merchants' views about what is fair, practical, and permitted. The Amended Settlement provides a $21 million fund for merchant education to help overcome any inertia in the market.

These funds may be used to inform and educate merchants on: (a) the benefits and use of merchant steering under the new rules, (b) how to best use the new tools to drive customers to lower-cost payment methods, (c) how to steer in states that restrict surcharging, (d) the benefits of joining merchant groups, (e) the value of negotiating lower interchange rates, and (f) how to educate customers about the effect of high-cost cards on merchants' prices.[64]

### 8.    Relief in States with Surcharging Restrictions

Notwithstanding the expanded surcharging relief in the Amended Settlement, state laws in Connecticut, Maine, Massachusetts, and Puerto Rico purport to prohibit merchants in those jurisdictions from surcharging credit-card transactions.[65] The Amended Settlement's expansion of merchants' ability to surcharge will motivate merchants there to challenge the constitutionality of those statutes,[66] which are materially indistinguishable from those in California, Florida, Texas, and Kansas that courts have already ruled unconstitutional.[67]

A New York statute requires that a merchant that wants to surcharge a credit-card transaction must post both the "regular" and the credit-card price for each individual item; posting

---

[64]  Amended Settlement ¶¶ 56, 105. More generally, these funds can be used for any purposes approved by the Court—with only lobbying, trade association activities, and disparagement of Visa and Mastercard, issuing banks, and card products explicitly precluded.

[65]  Stiglitz Decl. ¶ 97.

[66] Connecticut, Maine, Massachusetts, and Puerto Rico together comprise less than 4.5% of the U.S. population. Stiglitz Decl. ¶ 97 n. 94.

[67]  *See Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1179 (9th Cir. 2018); *Rowell v. Paxton*, 336 F.Supp.3d 724, 732 (W.D. Tex. 2018); *CardX, LLC v. Schmidt*, 522 F.Supp.3d 929, 946 (D. Kan. 2021); *Dana's R.R. Supply v. Att'y Gen., Fla.*, 807 F.3d 1235, 1251 (11th Cir. 2015).

the surcharge as a percent increase in price for all items is not sufficient.[68] The Amended Settlement will expressly permit merchants to surcharge (or discount, depending on one's perspective) by using such a dual-pricing system.[69] Moreover, recent technological advances—specifically, Electronic Shelf Labels—make complying with the statute feasible today.[70]

The Amended Settlement's extensive merchant-education program will include materials and programs developed specifically for merchants in restricted-surcharging states.[71] These programs will include education and assistance in how to use the new technology to comply with dual-pricing statutes like New York's.[72]

Moreover, much of the Amended Settlement's relief directly benefits merchants in restricted-surcharging states, regardless of whether or to what extent they surcharge or use dual pricing. These merchants will benefit from the extensive HAC relief and from the ability to steer in the gray areas between surcharging and discounting, to make different acceptance decisions for outlets operated under different banners, and to conduct pilot non-acceptance programs. These merchants will also benefit from the important discount-related relief, including the extension of the DOJ consent decree and the new ability to discount by issuer (as to Mastercard), and from the new 125-bps cap on interchange rates applicable to Standard consumer credit cards. These merchants will also directly benefit from the additional caps and mandated rate reductions

---

[68]  N.Y. Gen. Bus. Law § 518 ("Credit card surcharge notice requirement").

[69]  Amended Settlement ¶¶ 42(d), 91(d).

[70]  Amended Settlement ¶¶ 56(e), 105(e). *See* Stiglitz Decl. ¶ 99 and n.97 for details.

[71]  Class Counsel Decl. ¶ 174.

[72]  The Amended Settlement provides $21 million to be used for merchant education. Those resources can be used in part for educating merchants in these no-surcharge states about how to steer their customers to lower-cost payment methods in compliance with Visa's and Mastercard's rules, as modified by the Amended Settlement, and applicable state law. Amended Settlement ¶¶ 9, 56, 105.

discussed below.

### 9.     Immediate Rate Caps and Rollbacks

In addition to the substantial rules changes, the Amended Settlement provides immediate relief to merchants in the form of: (a) a rollback of 10 bps on the average effective systemwide rate, effective for five years beginning on a date tethered to the timing of the district court's final approval;[73] (b) a cap on every posted rate at its March 2025 level, effective until five years after the average-effective-rate rollback goes into effect;[74] (c) the substantial reduction and 125-bps cap on rates applicable to Standard consumer credit cards (which will count toward the 10-bps systemwide reduction);[75] and (d) a mandated *pro rata* reduction for merchants that already pay negotiated rates (which will also count toward the 10-bps systemwide reduction).[76]

As with the prior settlement, Professors Stiglitz and Leffler calculate a dollar value for these interchange rate reductions for the current settlement, which yield a substantial increase from the prior settlement.[77] However, by far the most substantial value that this settlement generates for the Class comes from the sweeping new changes to the HAC rules (permitting merchants not to accept the networks' high-cost Premium consumer credit cards or Commercial credit cards), the changes to the surcharging rules (which give merchants an unfettered ability to surcharge Visa and Mastercard credit cards up to 3%, regardless of whether the merchant also accepts American Express or other competing cards), and the other rules relief outlined above.  Given that these rule

---

[73] Amended Settlement ¶¶ 49, 98.

[74] Amended Settlement ¶¶ 51, 100.

[75] Amended Settlement ¶¶ 50, 99.

[76] Amended Settlement ¶¶ 49, 98.

[77] Professors Stiglitz and Leffler estimate the rate relief in the settlement alone will save merchants over $38 billion in interchange fees through 2031. Stiglitz Decl. ¶ 103.

changes are unprecedented and forward-looking, their value is difficult to quantify with any degree of precision. Conservatively, Professors Stiglitz and Leffler estimate that these reforms can save merchants well more than $200 billion over the course of the settlement.[78]

## VI.    THE AMENDED SETTLEMENT WARRANTS PRELIMINARY APPROVAL.

### A.    THE GOVERNING STANDARD

The Federal Rules, as amended on December 1, 2018, provide that the Court can authorize class notice of a proposed settlement if the Court determines that it likely will be able to grant final approval of the settlement. Fed. R. Civ. P. 23(e)(1)(B). Final approval shall be granted if the Court finds that the proposed settlement is "fair, reasonable and adequate," after considering the following four factors:

(A)    whether the class representatives and class counsel have adequately represented the class;

(B)    whether the proposal was negotiated at arm's length;

(C)    whether the relief provided for the class is adequate, taking into account:

    (i)    the costs, risks, and delay of trial and appeal;

    (ii)    the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims, if required;

    (iii)    the terms of any proposed award of attorneys' fees, including timing of payment; and

    (iv)    any agreement required to be identified under Rule 23(e)(3); and,

(D)    whether the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).[79]

---

[78]  Stiglitz Decl. ¶ 111.

[79]  *See Moses v. New York Times Co.*, 79 F.4th 235, 242-43 (2d Cir. 2023) (the four factors must be considered "holistically"); *Rosenfeld v. Lenich*, No. 18-cv-6720-NGG-PK, 2021 WL 508339, at *3 (E.D.N.Y. Feb. 11, 2021) (factors (A) and (B) are the procedural factors and factors (C) and (D) are the substantive factors); *Schutter v. Tarena Int'l, Inc.*, No. 21-cv-3502-PKC-RML, 2024 WL 4118465, at *6-7 (E.D.N.Y. Sep. 9, 2024) (same); *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, No. 18-md-2819-NG-LB, 2022 WL 3043103, at *4-5 (E.D.N.Y. Aug.

Additionally, courts in the Second Circuit have traditionally considered the nine factors addressed in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974) ("*Grinnell*"), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000), when considering the substantive fairness of a proposed class settlement (the "*Grinnell* factors"):[80]

> (l) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and, (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Grinnell*, 495 F.2d at 463 (citations omitted); *Massiah v. MetroPlus Health Plan, Inc.*, No. 11-cv-05669 (BMC), 2012 WL 5874655, at *2 (E.D.N.Y. Nov. 20, 2012).

A further important consideration is the "strong judicial policy in favor of settlements, particularly in the class action context."[81] And although it can no longer be "*presumed* that the

---

2, 2022) (same); *Paguirigan v. Prompt Nursing Emp. Agency LLC*, No. 1:17-cv-01302-NG-CLP, 2022 WL 6564755, at *5 (E.D.N.Y. Apr. 7, 2022) (same); *Mikhlin v. Oasmia Pharm. AB*, No. 19-cv-4349-NGG-RER, 2021 WL 1259559, at *2-3 (E.D.N.Y. Jan. 6, 2021) (same).

[80]  The *Grinnell* factors are not displaced and remain a useful framework in the Second Circuit, but the factors in the amended rule prevail over any prior inconsistent analysis. *Moses*, 79 F.4th at 242 ("The revision was 'not to displace any factor, but rather to focus the court and the lawyers on the core concerns of procedure and substance.'"). Judge Garaufis construed the Rule 23(e) factors as "clarifying and supplementing the *Grinnell* factors, rather than displacing them." *Lenich*, 2021 WL 508339, at *3. Further, the only previous holding that has been overruled by the Second Circuit as a result of the Rule 23(e) amendment is that the Second Circuit "prohibit[s] courts from applying a presumption of fairness to proposed settlements arising from an arms-length agreement." *Moses*, 79 F.4th at 243.

[81]  *Berni v. Barilla S.p.A.*, 964 F.3d 141, 146 (2d Cir. 2020) (quoting *In re PaineWebber Ltd. P'ships Litig.*, 147 F.3d 132, 138 (2d Cir. 1998)); *Massiah*, 2012 WL 5874655, at *2 ("Courts examine procedural and substantive fairness in light of the 'strong judicial policy favoring settlements' of class action suits." (quoting *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005))); *In re Vitamin C Antitrust Litig.*, No. 06-md-1738 (BMC)(JO), 2012 WL 5289514, at *3 (E.D.N.Y. Oct. 23, 2012) (citing *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F.Supp.2d 503, 509 (E.D.N.Y. 2003)); *Lenich*, 2021 WL 508339, at *3; *Mikhlin*, 2021 WL

settlement is fair, reasonable and adequate because it was reached in an arm's-length negotiation," arm's-length negotiation remains a significant "factor in favor of approving the settlement."[82] Likewise, a mediator's involvement in settlement negotiations weighs in favor of a finding of fairness because it "helps to ensure that the proceedings were free of collusion and undue pressure."[83]

The Court also gives weight to the parties' judgment that the settlement is fair and reasonable. "Absent fraud or collusion, [courts] should be hesitant to substitute [their] judgment for that of the parties who negotiated the settlement."[84] The Court should "keep in mind the unique ability of class and defense counsel to assess the potential risks and rewards of litigation."[85] That deference is especially justified where, as here, the settlement comes after the class has been certified.[86]

Finally, as many courts in this Circuit have held, "[n]ot every factor must weigh in favor of the settlement, 'rather the court should consider the totality of these factors in light of the

---

1259559, at *2; *In re 3D Systems Sec. Litig.*, No. 21-cv-1920-NGG-TAM, 2024 WL 50909, at *5 (E.D.N.Y. Jan. 2, 2024) (Judge Garaufis adopting report & recommendation in full).

[82] *Moses*, 79 F.4th at 243 (noting that arm's-length negotiation is considered one of the two procedural factors, and one of the four core factors courts must consider).

[83] *Hunter v. Blue Ridge Bankshares, Inc.*, No. 23-CV-8944, 2025 WL 1649323, at *15 (E.D.N.Y. June 11, 2025).

[84] *Massiah*, 2012 WL 5874655, at *2 (alterations in original) (quoting *In re EVCI Career Colls. Holding Corp. Sec. Litig.*, No. 05 Civ. 10240, 2007 WL 2230177, at *4 (S.D.N.Y. July 27, 2007)).

[85] *Massiah*, 2012 WL 5874655, at *2 (quoting *Clark v. Ecolab Inc.*, Nos. 07 Civ. 8623, 04 Civ. 4488, 06 Civ. 5672, 2010 WL 1948198, at *4 (S.D.N.Y. May 11, 2010)).

[86] *See, e.g., C.K. ex rel. P.K. v. McDonald*, No. 2:22-cv-1791 (NJC) (JMW), 2025 WL 2406399, at *7 (E.D.N.Y. Aug. 19, 2025) (citing *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982)); *Calibuso v. Bank of America Corp.*, 299 F.R.D. 359, 366 (E.D.N.Y. 2014) (citing *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001)); *Gay v. Tri-Wire Eng'g Sols., Inc.*, No. 12-cv-2231 (KAM) (JO), 2014 WL 28640, at *2 (E.D.N.Y. Jan. 2, 2014) (citing *D'Amato*, 236 F.3d at 85).

particular circumstances.'"[87]

### B. THE FACTORS PREVIOUSLY WEIGHING IN FAVOR OF APPROVAL STILL FAVOR APPROVAL.

In denying preliminary approval of the prior agreement in 2024, Chief Judge Brodie found that several factors weighed in favor of granting approval. The Court concluded that the class representatives have adequately represented the Class, and that remains the case. No conflicts exist among the Class members because "all Rule 23(b)(2) Class Plaintiffs and members of the Rule 23(b)(2) class should have the same incentive to obtain relief from the challenged rules." Op. at 33. Further, the "alleged harms apply to all members of the class." *Id*. at 35. And importantly, the intra-class conflict that troubled the Second Circuit with respect to the vacated 2012 agreement— the "fundamental conflict" between the (b)(2) injunctive-relief class and the (b)(3) damages class—"no longer exists" because "the (b)(2) and (b)(3) classes have had separate Class Counsel since 2016." *Id*. at 28-39. Nothing has changed since 2024 to alter these findings.

Likewise, Class Counsel have adequately represented the Class. *Id*. at 39. The Court found counsel "adequate" when certifying the class, and "[s]ince certification, nothing has cast doubt on Class Counsel's ability to adequately represent the Class. As discussed above, Class Counsel ably briefed oppositions to several *Daubert* and summary judgment motions, which were largely decided in favor of the Rule 23(b)(2) Class." *Id*. at 41. Class Counsel have continued, since June 2024, to ably represent the Class, prepare for trial, and successfully negotiate a detailed and sophisticated resolution of this litigation.

---

[87] *Copley v. Bactolac Pharm., Inc.*, No. 2:18-CV-00575-FB-PK, 2023 WL 2470683, at *10 (E.D.N.Y. Mar. 13, 2023) (quoting *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 456 (S.D.N.Y. 2004)); *Cruz Guerrero v. Montefiore Health Sys. Inc.*, No. 22-CV-9194 (KHP), 2025 WL 100889, at *6 (S.D.N.Y. Jan. 15, 2025) (same); *Marroquin Alas v. Champlain Valley Specialty of New York, Inc.*, No. 5:15-cv-00441 (MAD/TWD), 2016 WL 3406111, at *4 (N.D.N.Y. June 17, 2016) (same).

The Court found that the prior rounds of negotiations were conducted at arm's length. *Id*. at 41-43. The same is true of this round of negotiations.[88]

Ultimately, the Court denied preliminary approval of the prior agreement because it found that, on balance, the agreement provided inadequate relief for the Class when compared to the best possible recovery at trial and the attendant risks of continued litigation. Section VI(C) below demonstrates that the Amended Settlement's substantial additional relief addresses those concerns. However, the Court found that several sub-factors relating to the reasonableness of the settlement weighed in favor of approval, including "the complexity and difficulty of the issues in this case." Op. at 46. The Court found as "neutral" the likelihood of maintaining the Class through trial. *Id*. at 49. Those conclusions remain valid today.

With respect to Defendants' agreement to pay attorneys' fees and expenses (the amount, subject to a maximum, to be decided by the Court later pursuant to separate motion), the Court concluded that "[w]here attorneys' fees and costs are not paid from a common fund, and money paid to attorneys is 'entirely independent' of any award to class members, 'the [c]ourt's fiduciary role in overseeing the award is greatly reduced, because there is no conflict of interest between attorneys and class members.'" *Id*. at 63 (quoting *Sow v. City of New York*, No. 21-CV-533, 2024 WL 964595, at *6 (S.D.N.Y. Mar. 5, 2024)). The agreed amounts did not raise any issues with respect to whether the interests of the Class members were adequately protected. Op. at 62-64. Although the maximum agreed amount has been adjusted upward to account for another 17 months of advocacy and expenses (see Amended Settlement ¶ 11), the same conclusion holds true today.

With one exception, the Court comprehensively rejected all challenges to the scope of the prior agreement's release. Op. at 64-76. The one exception is that the Court adjusted the class

---

[88] Orenstein Decl. ¶ 19; Class Counsel Decl. ¶¶ 16, 100-121.

definition to account for merchants that come into existence between the deadline to raise objections and the date of final approval of the settlement. *Id*. at 75. To ensure that these merchants will not be bound by the release, the Court altered the class definition to include only merchants that are in existence as of the date of preliminary approval rather than final approval. *Id*. at 76. The Amended Settlement makes no changes to that class definition or to the release, so the scope of the release poses no barrier to approval.[89]

### C.  THE AMENDED SETTLEMENT RESOLVES ALL ISSUES PREVIOUSLY WEIGHING AGAINST PRELIMINARY APPROVAL.

#### 1.  Recovery in light of the risks

Chief Judge Brodie concluded that the prior agreement fell short on the two *Grinnell* factors that weigh the reasonableness of the settlement "in light of the best possible recovery" and "in light of all the attendant risks of litigation." The Court denied preliminary approval because the prior agreement principally provided relief from the networks' surcharging rules, *see* Op. at 3, and the surcharging relief was "too limited to justify approval of a settlement that does not provide most other forms of relief sought by other Class members." *Id.* at 57.

The Amended Settlement responds fully to both concerns. The surcharging relief no longer stands alone, and it is now much more powerful.

***Relief In Addition to Surcharging***

The Court concluded that the prior agreement "primarily provides relief from Visa's and Mastercard's rules that prohibit merchants from imposing surcharges on Defendants' cards at the point of sale" (Op. at 3), and provided only "a significantly limited form of" HAC relief (*id*. at 58). The Court found that the only substantive HAC relief in that agreement related to the honor-all-

---

[89]  The Court concluded that in determining the adequacy of injunctive relief, the Court does not consider the effectiveness of distributing relief to the class. Op. at 62.

wallets rule, and even there the Court observed that the proposed relief permitted the network to require merchants to accept a digital wallet that the network, rather than a third party, sponsored. *Id*. at 58.

Absent other changes to the HAC rules, the Court concluded, relaxing the All-Outlets rule and permitting merchants to experiment with non-acceptance were ineffectual because "merchants are still 'saddled with another all-or-nothing choice' among card products," and the buying-group provisions were fallow because, absent better steering mechanisms, the groups would not "have the leverage to compel Visa and Mastercard to strike fair and reasonable agreements with them." *Id*. at 59, 61.

The Amended Settlement now provides substantial HAC relief, repealing the rule entirely with respect to both Commercial credit cards and Premium consumer credit cards. Merchants can—for the first time—choose whether to accept a network's higher-cost Premium and Commercial cards, even if they already accept that network's lower-cost cards. This relief is responsive not only to the Court's concerns about the prior agreement, but also to merchants' desire to gain the "ability to differentiate between high cost interchange card[s] or low cost interchange card[s]."[90] These HAC reforms will "confer[] a real and palpable benefit" on merchants. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig*., 827 F.3d 223, 238 (2d Cir. 2016). The Amended Settlement also resolves the Court's concern about the limits on the prior agreement's honor-all-wallets relief. *See* Op. at 58. Now a merchant need not accept any digital wallet that contains a network's card, including a digital wallet sponsored by the network itself.[91]

---

[90] *See* Class Counsel Decl. ¶ 130 and n.106, which cites exemplar testimony from merchants on this issue.

[91] Amended Settlement ¶¶ 34-36, 83-85.

The changes to the HAC rules will provide substantial economic benefits to all Class members. Commercial credit cards, which account for about ██% of the networks' credit-card transaction volume, carry posted interchange rates of about ██ bps, which is ██ bps higher than the interchange rate for consumer credit cards and ██ bps higher than the Amended Settlement's new 125-bps cap for Standard consumer credit card transactions.[92] Now a merchant or a buying group need not accept high-cost Commercial credit cards or can negotiate a reduced interchange rate in exchange for continuing to accept them. The same is true for Premium consumer credit cards, which account for about ██% of the networks' credit-card transaction volume and have an average posted interchange rate of about ██ bps—██ bps higher than the new 125-bps cap for Standard consumer credit card transactions.[93]

In addition to creating the 125-bps Standard card, the Amended Settlement further bolsters the HAC relief by requiring the networks to make the Commercial cards and Premium cards immediately identifiable to merchants at the point-of-sale;[94] reform the All-Outlets rule; and permit non-acceptance pilot programs. These reforms complement the major HAC relief and will have substantial value, because the merchant will *not* "still be saddled with another all-or-nothing [acceptance] choice." *See* Op. at 59.

### Strengthened Surcharging Relief

Given the absence of "most other forms of relief," the Court viewed the prior agreement's surcharging relief as "too limited." *Id.* at 57. Among other things,[95] the Court pointed out that

---

[92] Stiglitz Decl. ¶ 62.

[93] *Id.* ¶ 24.

[94] Amended Settlement ¶¶ 26-27, 75-76.

[95] Regarding the Court's reference to issuer-level surcharging (Op. at 57), *see infra* nn.101-102 and accompanying text.

merchants that accept American Express could not surcharge more than 1% and some merchants operate in states that prohibit or restrict surcharging. *Id.*

The substantial HAC relief means that surcharging is no longer the principal focus of the settlement. The Amended Settlement nevertheless also substantially strengthens the surcharging relief provided to Class members. Most importantly, the Amended Settlement permits all merchants to surcharge Visa and Mastercard cards up to the cost of acceptance or 3%, whichever is lower, regardless of whether they accept or surcharge American Express or other payment cards.[96] This relief fully responds to the Court's prior concerns about surcharges being limited to 1% for merchants that accept American Express. *See* Op. at 57.

The substantial HAC and other non-surcharging relief also address the Court's concern that the prior agreement was "virtually worthless" to merchants in states that prohibit surcharging. *See* Op. at 7 (quoting *Interchange Fees*, 827 F.3d at 238). The Court analyzed the relief for merchants in these contested states *in the absence of "most other forms of relief."* Op. at 57. Under the Amended Settlement, merchants in states that restrict surcharging will nevertheless benefit by being able to decline Commercial credit cards and/or Premium consumer credit cards (or threaten to do so); use dual-price posting to effectively surcharge in compliance with state laws; discount to steer customers to the new Standard consumer credit cards; discount by issuer; selectively decline digital wallets; steer to a particular credit card (by brand, product, or issuer) in the gray area between surcharging and discounting; and get the benefit of the immediate rate caps and rollbacks.

Additionally, the Amended Settlement's surcharging relief will incentivize merchants in

---

[96] Amended Settlement ¶¶ 39-41, 88-90. The 3% maximum is appropriate because it is sufficient to recover the costs of acceptance in the vast majority of instances.

the few remaining jurisdictions that purport to prohibit surcharging—Connecticut, Maine, Massachusetts, and Puerto Rico—to challenge those statutes' constitutionality. Those statutes are materially indistinguishable from those that courts have unanimously struck down.[97] Nor is there any reason to think that surcharging is impracticable in New York.[98] The networks' level-playing-field rules eliminated the incentives of merchants in these states to clear the regulatory field for surcharging—merchants that accept American Express could not surcharge even absent the unconstitutional state statutes. The Amended Settlement will fundamentally alter those incentives. And the Amended Settlement provides dedicated funds and a specified program to help merchants in these states steer transactions in compliance with state law.[99]

### The Few Remaining Restraints

The only significant challenged restraints that the Amended Settlement leaves in place are the setting of default interchange rates, the HAC rule at the issuer level, and the prohibition on surcharging at the issuer level. The significance of those remaining restraints must be considered within the broader context of the Amended Settlement's reforms.

As the Court noted, Class Plaintiffs challenge the setting of default interchange rates "in combination with" the merchant restraints. Op. at 11. That combination is anticompetitive because the merchant restraints "ensure that, to a very large extent, the nominally 'default' interchange rates stick," such that the default rates become *de facto* fixed rates.[100] The Amended Settlement's

---

[97] Stiglitz Decl. ¶ 97.

[98] *See* Class Counsel Decl. ¶¶ 187-188 (responding to Op. at 7 n.12).

[99] Stiglitz Decl. ¶ 97.

[100] *See* ECF Nos. 8168 (under seal), 8307 (redacted) (Class's brief in opposition to summary judgment), at 5; *see also* ECF Nos. 8446 (redacted), 8447 (under seal), at 9 ("the Restraints discussed below prevent Merchants from attempting to influence a cardholders' choice of payment card; *therefore, Visa and Mastercard's supracompetitive Default Interchange Fees become the de facto prices* charged by all issuing banks").

elimination/reform of the merchant restraints resolves that problem.

Regarding issuer-level non-acceptance or surcharging, requiring merchants to accept credit cards issued by all banks in the network was essential to forming and growing the networks.[101] Given these and other concerns, Chief Judge Brodie concluded that "elimination of these rules cannot be the 'standard' for approving the Settlement." Op. at 60 n. 40.

Indeed, the Amended Settlement provides many other avenues for merchants to generate competition among the issuers: merchants can discount by issuer, steer by issuer in the gray area between surcharging and discounting, and get lower rates from an issuer by promoting issuance of its new Standard cards. And those are just a subset of a broader suite of relief that permits merchants to selectively decline Commercial credit cards; selectively decline Premium consumer credit cards; conduct pilot programs to test non-acceptance or other steering methods; use dual pricing; surcharge by brand or product regardless of whether they also surcharge American Express; discount by brand, product, or issuer; selectively non-accept, surcharge, or discount by product category to steer customers to Standard consumer credit cards over higher-cost cards; and decline digital wallets regardless of whether they contain any of the networks' cards.

Given this wide and varied set of competitive tools, Professors Stiglitz and Leffler conclude that any anticompetitive effect of the remaining restraints should be "minimal," a conclusion consistent with views expressed by economists for other plaintiffs' groups in this litigation.[102]

## 2.    Standards for Evaluating Litigation Risk

The Court considered the litigation risks in light of the shortcomings it found with the prior agreement. Again, those concerns have been addressed. The Amended Settlement resolves those

---

[101]  Stiglitz Decl. ¶¶ 30-32.

[102]  *Id*. ¶¶ 114-117.

deficiencies, and its substantial reforms satisfy the *Grinnell* factors under any reasonable standard. We discuss those litigation-risk standards only briefly.

### a.    The fourth *Grinnell* factor

The Court found that the "risks of establishing liability" (the fourth *Grinnell* factor) weighed against approval because the Class's claims under Section 1 of the Sherman Act survived summary judgment and the case is ready for trial. Op. at 46-48.[103] But defeating summary judgment did not establish Defendants' liability. And, as the Court recognized, "the[] complex issues [decided by the Court on summary judgment] would need to be relitigated at trial, and would likely be raised again on appeal." *Id*. 45-46.

Defendants' liability cannot be assumed when applying the fourth *Grinnell* factor.[104] Moreover, the fourth *Grinnell* factor "does not require the Court to adjudicate the disputed issues or decide unsettled questions; rather, the Court need *only assess the risks of litigation against the certainty of recovery under the proposed settlement*."[105] The Amended Settlement provides the

---

[103] Visa and the Bank Defendants won summary judgment on the Class's Section 2 claims as to credit cards and debit cards.

[104] *See, e.g.*, *Wal-Mart Stores*, 396 F.3d at 118 (applying fourth *Grinnell* factor: "Characterizing the defendants' 'Honor All Cards' policy as having at least some pro-competitive features, the district court concluded that establishing liability 'was no sure thing' for the plaintiffs." (quoting *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F.Supp.2d 503, 511 (E.D.N.Y. 2003))); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 475 (S.D.N.Y. 1998) (applying fourth *Grinnell* factor: "As held in another antitrust case in this District, '[i]t is known from past experience that no matter how confident one may be in the outcome of litigation, such confidence is often misplaced.'" (alteration in original) (quoting *State of West Virginia v. Chas. Pfizer & Co.*, 314 F.Supp. 710, 743-44 (S.D.N.Y. 1970), *aff'd*, 440 F.2d 1079 (2d Cir. 1971))).

[105] *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. at 459 (emphasis added); *see also, e.g.*, *Hall v. ProSource Techs., LLC*, No. 14-cv-2502 (SIL), 2016 WL 1555128, at *7 (E.D.N.Y. Apr. 11, 2016) ("The fourth . . . *Grinnell* factor[] requires that the court 'balance the benefits of a certain and immediate recovery against the inherent risks of litigation.'" (quoting *In re Med. X–Ray Film Antitrust Litig.*, No. 93–CV–5904, 1998 WL 661515, at *4 (E.D.N.Y. Aug. 7, 1998))); *Sykes v. Harris*, No. 09-CV-8486, 2016 WL 3030156, at *13 (S.D.N.Y. May 24, 2016) ("When the risk that Lead Plaintiffs would face in demonstrating Defendants' liability is balanced against the

Class with immediate and certain relief and avoids the inherent risks of litigation.

As the *American Express* litigation illustrates, surviving summary judgment did not make those risks go away. *See United States v. Am. Express Co.*, 838 F.3d 179 (2d Cir. 2016), *aff'd sub nom. Ohio v. Am. Express Co.*, 585 U.S. 529 (2018). Those plaintiffs had not only defeated summary judgment but had won at trial. But American Express appealed and the Second Circuit rejected the trial court's detailed, comprehensive findings of fact and reversed the judgment, 838 F.3d at 206-07, and the Supreme Court affirmed the Court of Appeals, 585 U.S. at 552.

The Court here discounted the Class's risk of losing on appeal, stating that "what remains to be determined is only the sufficiency of the evidence, rather than the legal sufficiency of Plaintiffs' theories of liability." Op. at 48. In cases of this complexity, however, the line between theories and evidence is rarely so clean, and mixed questions of law and fact abound.[106] Similarly, aspects of the relief that the Class would seek at trial, including temporary rate caps and reductions as the market adjusts to the new competitive regime, have not yet been litigated, even at the district-court level, and would surely be vigorously contested up through and including the Supreme Court. Each such issue raised at trial or on appeal would carry the risk that the Class would get less relief than the Amended Settlement delivers with certainty—or no relief at all.[107]

---

immediate and certain benefits of the Settlement, it weighs heavily in favor of approval." (citing *In re Austrian &German Holocaust Litig.*, 80 F.Supp.2d 164, 177 (S.D.N.Y. 2000))).

[106]  For example, *compare* ECF Nos. 8168 (under seal), 8307 (redacted), at 26 (Class asserting at summary judgment that metric for measuring "output" is all payment mechanisms) *with* ECF Nos. 8071 (under seal), 8277 (redacted), at 31-34 (Defendants asserting that metric for judging credit-card claims is output of only credit-card transactions). *See Ohio v. Am. Express Co.*, 585 U.S. at 549 (discussing "the output of credit-card transactions").

[107]  *See* Op. at 45-46 (citing *Sykes*, 2016 WL 3030156, at *12 ("[E]ven if [Class] Plaintiffs were to prevail at trial, post-trial motions and the potential for appeal could prevent the class members from obtaining any recovery for several years, if at all.") (alterations in original)). The long delay caused by continuing this litigation through trial and appeals also weighs in favor of approving the Amended Settlement and its immediate and certain relief. *See, e.g.*, *In re Citigroup Inc. Sec. Litig.*, 965 F.Supp.2d 369, 381-82 (S.D.N.Y. 2013); *Aramburu v. Healthcare Fin. Servs., Inc.*, No. 02-

### b. The eighth and ninth *Grinnell* factors

The Amended Settlement's substantial reforms similarly satisfy the eighth (comparison with the best possible recovery) and ninth (recovery in light of all litigation risks) *Grinnell* factors.

In evaluating these factors, courts recognize that "'there is a range of reasonableness with respect to a settlement–a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion.'"[108]

"[W]hile it is proper to assess the settlement . . . by comparing it with the 'best possible' recovery, that does not mean that the Court should rigidly measure the settlement . . . against some purely theoretical, best-case scenario . . . ."[109] Instead, "courts in this district have held that 'the question . . . is not whether the settlement represents the highest recovery possible . . . but whether it represents a reasonable one in light of the many uncertainties the class faces.'"[110] In short, the Court's consideration of the reasonableness of the Amended Settlement "in light of the best possible recovery" (the eighth *Grinnell* factor) cannot be completely divorced from the Court's consideration of the reasonableness of the Amended Settlement "in light of all the attendant risks of litigation" (the ninth *Grinnell* factor).[111] And the best possible litigation outcome is determined

---

CV-6535MDG, 2009 WL 1086938, at *3 (E.D.N.Y. Apr. 22, 2009); *Ayzelman v. Statewide Credit Servs. Corp.*, 242 F.R.D. 23, 27 (E.D.N.Y. 2007).

[108]  *Hall*, 2016 WL 1555128, at *8 (quoting *Wal-Mart Stores*, 396 F.3d at 119).

[109]  *Davis v. J.P. Morgan Chase & Co.*, 827 F.Supp.2d 172, 179 (W.D.N.Y. 2011).

[110]  *Hall*, 2016 WL 1555128, at *8 (alterations in original) (quoting *Bodon v. Domino's Pizza, LLC*, No. 09–cv–2941, 2015 WL 588656, at *6 (E.D.N.Y. Jan. 16, 2015)).

[111]  For this reason, the Second Circuit and its constituent courts have consistently considered the eighth and ninth *Grinnell* factors together when evaluating settlements. *See* Op. at 50, 55; *see also, e.g.*, *Wal-Mart Stores,* 396 F.3d at 119; *Hall*, 2016 WL 1555128, at *8 (E.D.N.Y. Apr. 11, 2016); *In re GSE Bonds Antitrust Litig.*, 414 F.Supp.3d 686, 697 (S.D.N.Y. 2019); *Davis*, 827 F.Supp.2d at 178.

by the relief that the plaintiff has actually sought.[112]

For all the reasons noted above, the Amended Settlement's relief readily clears that bar.

### 3.    Equity Among Class Members

The extent and nature of the Amended Settlement's relief also respond to the Court's concern that the prior agreement provided more relief to small merchants compared to large merchants. Op. at 81. The prior agreement did not expressly provide rate rollbacks to merchants that pay negotiated rates (large merchants) rather than posted rates. Op. at 80. The Amended Settlement solves that problem by expressly providing a pro rata reduction for merchants that pay negotiated rates.[113] The Court asserted that large merchants are more likely to accept American Express and therefore be limited to surcharging at the prior agreement's 1% cap in those circumstances. Op. at 80. The Amended Settlement eliminates that issue too.

The Court asserted that large merchants are more likely to operate in states that prohibit surcharging. Op. at 80. But state no-surcharge statutes purport to prohibit a multi-state merchant from surcharging only in that state, not nationwide. Regardless, the Amended Settlement comprehensively responds to the state-statute issue, as shown above.[114]

### 4.    Ability to Withstand a Greater Judgment

Finally, the Court concluded that Defendants' ability to withstand a greater judgment weighed against approval. Op. at 86. Other courts have concluded that this factor "do[es] not apply

---

[112] *See, e.g.*, *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. at 478 (evaluating the prospects of litigation in light of requested relief for uncertain damages); *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 129-32 (S.D.N.Y. Mar. 1997), *aff'd sub nom. In re PaineWebber Inc. Ltd. P'ships Litig.*, 117 F.3d 721 (2d Cir. 1997) (similar).

[113]  Amended Settlement ¶¶ 49, 98.

[114]  Moreover, the Court considered this issue in a context in which it had concluded that surcharging was essentially the only relief. Op. at 82. That is far from true now.

where no monetary relief is sought."[115] The Court here considered Defendants' ability to provide greater rate rollbacks (*id.* at 86-87), having previously concluded that the prior agreement's rules reforms had little value (*id.* at 57-59, 82-83).

Again, those are no longer the facts. Under any reasonable assumptions, the value of the Amended Settlement's rules relief far outpaces that of the rate caps and rollbacks.[116] The Amended Settlement's caps and rollbacks are *adjuncts to* the rules relief, not, as Chief Judge Brodie concluded as to the prior agreement, a *substitute for* rules relief. For example, the explicit purpose of the 125-bps cap on the Standard consumer credit cards, which will account for a substantial portion of the 10-bps systemwide rollback, is to make it more economically viable for merchants to steer cardholders away from the high-cost Premium and Commercial cards by surcharging or selectively declining those cards or by discounting the Standard cards.[117]

The Court compared the prior agreement's rate caps and rollbacks to the *regulated* rates in other nations, for example the 50-bps regulated rate in Australia. Op. at 87. Putting aside the relevance of that comparison to the U.S. market at issue here, in this antitrust case the focus is on the Amended Settlement's competitive tools—the discounting, surcharging, and selective non-acceptance—and specifically on their effect on the two-sided total price, not just the interchange rate charged on the merchant side. *See Ohio v. Am. Express*, 585 U.S. at 546-47 (affirming reversal of judgment that rested on plaintiffs' evidence of only merchant-side price rather than total price).

Today the networks' total prices (interchange rate minus the rewards expense) are about ▮▮▮▮▮ bps above the competitive benchmark.[118] As Professors Stiglitz and Leffler conclude, the

---

[115] *In re Payment Card*, 2024 WL 3236614, at *26.

[116] *See* Stiglitz Decl. ¶ 111.

[117] *Id.* ¶ 100.

[118] *Id.* ¶ 119.

variety, scope, and strength of the Amended Settlement's rules reforms represent "a frontal assault on the Merchant Restraints" that can "substantially reduce (or possibly altogether eliminate) the gap between the actual and competitive total price of Visa and Mastercard credit-card services."[119]

For example, if just 10% of the posted-rate transaction volume is surcharged at 3%, the average total price systemwide will be reduced by 30 bps; if just 10% of the transaction volume shifts from Premium cards to Standard cards the reduction is more than ███ bps; if those transactions are instead switched to debit cards, the reduction is ██ bps; if 10% of the posted-rate transactions are switched to negotiated rates, the reduction is ██ bps.[120] If the percentage of affected transactions is doubled to 20% rather than 10%, the reductions in total price are also doubled. The most likely outcome will be a combination of these events—surcharging, steering to the Standard cards, and more negotiated rates—with the accompanying *cumulative* reductions from each.

Of course, merchants care about not only the total price, but also the portion of it that they pay. The percentage of the total price paid by merchants increased from ███% in 2004 to ███% in 2016.[121] The new competitive tools will substantially drive down interchange rates as well as total prices.[122]

After the Amended Settlement's reforms eliminate or minimize the gap between the actual and competitive total price, "how much further the [interchange rate] should drop will be determined by competition in the market."[123] The prospects for substantial additional interchange-rate reductions are strong. For example, some merchants today are getting discounts of ███ bps

---

[119] *Id.* ¶¶ 8, 59.

[120] *Id.* ¶ 110.

[121] *Id.* ¶ 52.

[122] *Id.* ¶¶ 110-111.

[123] *Id.* ¶ 120.

off the posted rates for Commercial credit cards, and those cards account for ██% of the networks' transaction volume.[124] If merchants decline these cards, or get discounts in exchange for not declining them, "there are substantial savings available."[125] More broadly, today only ██% of the networks' credit-card transactions (by purchase volume) are at negotiated rates, but the negotiated discounts are large—████████ bps on average.[126] Under the Amended Settlement, more merchants will get negotiated rates, and merchants that already get them will have significantly more leverage to get even better deals.[127] Other new competitive tools will generate similarly outsized savings:

> The Amended Settlement substantially increases the scope for surcharging, permitting merchants to effectively reduce their interchange rates on those transactions up to 300 bps. Other merchants can choose to decline the premium and commercial credit cards, shifting those sales to the standard cards or to even lower-priced payments means, saving 100 bps or more on those transactions. Still other merchants will leverage of the ability to take one or both of those of those actions— alone or through a buying group— to join the ranks of merchants today whose average discount off the posted rates is ████ ████bps.[128]

What can Defendants afford? Merchants will be using these new competitive tools, and will be generating these significant interchange reductions on Visa and Mastercard transactions, in a context in which, for now at least, the courts have permitted American Express, these Defendants' formidable rival, to prohibit disadvantaging its cards. What is certain is that the Amended Settlement eliminates or substantially reforms nearly all the restraints about which the Class complains. The gains to the Class, and the costs to Defendants, are correspondingly very

---

[124] *Id*. ¶ 107.

[125] *Id*.

[126] *Id*. ¶ 108.

[127] *Id*. ¶ 109.

[128] *Id*.

significant. That reality makes this factor weigh decidedly in favor of preliminary approval.[129]

**D.    THE COURT WILL CONSIDER THE CLASS'S REACTION.**

The Court will consider the Class's reaction to the Amended Settlement. Objections are to

be expected in a class action with an extensive notice campaign and class members numbering in

the millions—here, more than 12 million—and a cadre of class members that opted out of the

corresponding Rule 23(b)(3) damages class and (unsuccessfully) protested their inclusion[130] in this

mandatory Rule 23(b)(2) action.[131] Objections from a relatively small percentage of class members

will confirm the settlement's adequacy.[132]

**VII.    THE COURT SHOULD AUTHORIZE CLASS NOTICE.**

Rule 23(e) requires that notice of a proposed settlement be provided in a reasonable manner

to all class members potentially bound by the settlement. Fed. R. Civ. P. 23(e)(1)(B). Notice

regarding a proposed settlement is adequate under both Rule 23 and due process standards if it

"fairly apprise[s] the prospective members of the class of the terms of the proposed settlement and

of the options that are open to them in connection with the proceedings."[133] In this mandatory Rule

23(b)(2) class action that seeks only class-wide injunctive relief, the Court has wide discretion to

---

[129]    Moreover, this factor has little if any significance where, as here, the other factors weigh in favor of approval. *See, e.g.*, *Grinnell*, 495 F.2d at 463; *D'Amato*, 236 F.3d at 86; *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 47 (E.D.N.Y. Jan. 28, 2019) (damages-class settlement); *In re Sinus Buster Prod. Consumer Litig.*, No.12-cv-2429-ADS-AKT, 2014 WL 5819921, at *11 (E.D.N.Y. Nov. 10, 2014); *In re MetLife Demutualization Litig.*, 689 F.Supp.2d 297, 339 (E.D.N.Y. 2010).

[130]    *See DDMB, Inc. v. Visa, Inc.,* No. 05-1720, 2021 WL 6221326, at *46-49 (E.D.N.Y. Sept. 27, 2021).

[131]    *See In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. at 478 ("In litigation involving a large class, it would be extremely unusual not to encounter objections.").

[132]    *See id.* at 478-79; *Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118-19 (3d Cir. 1990) (objections from only 10% of members "strongly favors settlement"); *In re Austrian & German Bank Holocaust Litig.*, 80 F.Supp.2d at 175 (objections from only 16% is "persuasive" of adequacy).

[133]    *Hall*, 2016 WL 1555128, at *4.

"direct appropriate notice to the class."[134] "To satisfy due process, notice to class members must be reasonably calculated, under the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."[135]

With respect to substance, a notice must fairly apprise class members of the settlement terms and "of the options that are open to them in connection with the proceedings."[136] The Notice should also "'describe the terms of the settlement generally,'" "inform the class about the allocation of attorneys' fees, and provide specific information regarding the date, time, and place of the final approval hearing." *Payment Card Litig.*, 330 F.R.D. at 58-59 (citations omitted).

The Notice Plan here satisfies these criteria. As set forth in the Declaration of Cameron R. Azari, Esq., On Proposed Class Notice Plan ("Azari Decl."),[137] the Notice Plan includes: (i) Publication Notices placed in National Business Publications, National Trade and Specialty Publications, Local Business Journals, Specialty Language and Targeted Newspapers, and U.S. Territory Newspapers; (ii) an all-encompassing Digital Notice Campaign using banner display notices, social media, podcast and streaming TV advertisements, and targeted website placements;

---

[134] Fed R. Civ. P. 23(c)(2)(A); *see Elkind v. Revlon Consumer Prods. Corp.*, No. CV 14-2484 (JS) (AKT), 2017 WL 9480894, at *19 (E.D.N.Y. Mar. 9, 2017) (for a 23(b)(2) class, the Court has discretion to implement "appropriate notice"); *Martin v. Weiner*, No. 06CV94, 2007 WL 4232791, at *2 (W.D.N.Y. Nov. 28, 2007) (in light of Rule 23(c)(2)(A), the Court "has complete discretion as to how this notice is to be given").

[135] *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 144 (S.D.N.Y. 2010), (citation and internal quotation marks omitted).

[136] *Vargas v. Capital One Fin. Advisors*, 559 F. App'x 22, 27 (2d Cir. 2014).

[137] *See* Nussbaum Decl., Ex. B. Mr. Azari is Senior Vice President with Epiq Class Action & Claim Solutions, Inc. ("Epiq") and the Director of Legal Notice for Hilsoft Notifications ("Hilsoft"), a firm that specializes in designing, developing, analyzing, and implementing large-scale legal notification plans. Hilsoft is a business unit of Epiq. Class Counsel have retained Epiq to assist with providing notice of the Amended Settlement to the Equitable Relief Class. In addition to describing the details of the Notice Plan, the Azari Declaration sets forth his expertise and experience with administering class action settlements and providing notice in a manner that satisfies Rule 23 and due process, and the methodology used in developing the Notice Plan.

(iii) audio advertisements over Streaming and Satellite Radio; (iv) a Case Website containing all pertinent information and documents related to the Settlement, including a long-form Website Notice, as well as a toll-free telephone number, email and postal address to contact for information regarding the Settlement; (v) Sponsored Search Listings on the three most highly visited search engines that will include links to the Case Website; and (vi) a nationwide Informational Release that will include the Case Website address and the toll-free telephone number to call for information about the Settlement.[138]

The proposed media notice is estimated to reach approximately 82.2% of all U.S. Business Owners with an average frequency of 4.5 times, and 84.8% of all U.S. Adults in Business and Finance Occupations with an average frequency of 4.1 times.[139] Such extensive use of print publications and technological and digital means provides reasonable notice to the class.[140] Individual notice to 12 million class members is unnecessary because: (i) the Class has already been certified, (ii) there are no claim forms or opt-out forms to be disseminated, and (iii) the Notice Plan provides extensive expected reach. The Notice Plan provides the best practicable and

---

[138] *Id*. ¶¶ 21-46. Copies of the Publication Notice and the Website Notice are annexed as Appendix D to the Amended Settlement. The Notices are designed to be "noticed," reviewed, and understood by members of the Rule 23(b)(2) Class. The Notices contain substantial, easy-to-read summaries of all key information about the Amended Settlement and the rights of the members of the Rule 23(b)(2) Class, including the ability to object, and all relevant deadlines and hearing dates. Azari Decl. ¶ 47; Amended Settlement, Appendix D.

[139] Azari Decl. ¶ 21.

[140] *See e.g., In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 527 F.Supp.3d 269, 275 (E.D.N.Y. 2021) ("Where plaintiffs' digital plan will reach 80 percent of the class, requiring them to supplement the plan with individual notice is unnecessarily burdensome."); *In re MetLife Demutualization Litig.*, 262 F.R.D. at 208 ("In view of the millions of members of the class, notice to class members by individual postal mail, email, or radio or television advertisements, is neither necessary nor appropriate. The publication notice ordered is appropriate and sufficient in the circumstances.").

appropriate notice to the Class.[141]

As to the substance of the Notices, the Publication Notice and Website Notice (annexed to the Amended Settlement as Appendix D) inform class members of the nature of the action, the terms of the Amended Settlement, the availability of information about the Amended Settlement on the Settlement Case Website or from a toll-free telephone number and address for the Settlement Administrator, and an opportunity to be heard at the fairness hearing. The Notices describe basic information in plain, clear terms, including the Class claims, the Class definition, potential attorneys' fees and expense awards, potential Class Representative service awards, the date and location of the final approval fairness hearing, and Class members' right to object to any aspect of the Amended Settlement. For these reasons, the Notices satisfy Rule 23(e)(1) and due process.

## VIII.    PROPOSED TIMELINE FOR NOTICE AND FINAL APPROVAL

Plaintiffs propose the following schedule for Notice and Final Approval:

1.    Within thirty (30) days after the Court's entry of the Rule 23(b)(2) Class Settlement Notice and Scheduling Order, in the form annexed to the Amended Settlement as Appendix E (the "Settlement Notice and Order"), the Class Administrator shall substantially complete the notice to members of the Rule 23(b)(2) Class that is described in the Notice Plan, using the Publication Notice and Website Notice contained in Appendix D to the Amended Settlement (the "Notices").

2.    Within thirty (30) days after the Court's entry of the Settlement Notice and Order, any motion or motions and supporting memoranda seeking final approval of the Amended Settlement and approval of attorneys' fees, expenses, and service awards for named Class Representatives shall be filed with the Court.

3.    Within forty-five (45) days after the Court's entry of the Settlement Notice and

---

[141]  Azari Decl. ¶ 12.

Order, the Class Administrator shall prepare and file with the Court a report that confirms that the Notice Plan was carried out and that the website notice, publication notice, and any other notice to members of the Rule 23(b)(2) Class was provided in the manner directed by the Court.

4.    Within 90 days after the Court's entry of the Rule 23(b)(2) Class Settlement Notice and Scheduling Order, *i.e.*, within 60 days after the deadline for substantial completion of notice under the Notice Plan (the "Class Objection Period"), any objections to the Amended Settlement or motions seeking approval of attorneys' fees, expenses, and service awards shall be filed with the Court by any Objector.

5.    Any objections by Class members to the Amended Settlement or to Class Counsel's request for attorneys' fees, expenses, and service awards must (a) be submitted in writing, (b) be filed with the Clerk of Court, (c) be postmarked no later than ninety (90) days after the date of entry of the Settlement Notice and Order, and (d) otherwise comply with the requirements set forth in the Notices, including submitting a separate notice of intention to appear if any Objector, or counsel for an Objector, desires to appear at the final approval hearing.

6.    Within one hundred and twenty (120) days after the date of entry of the Settlement Notice and Order, any replies and supporting papers that respond to any objections to the Amended Settlement or to the request for attorneys' fees, expenses, and service awards shall be filed with the Court.

7.    At least one hundred and fifty (150) days after the date of entry of the Settlement Notice and Order, the Court will schedule a final approval fairness hearing.

## IX.    CONCLUSION

The Class Plaintiffs respectfully request that the Court enter an order: (1) preliminarily approving the Amended Settlement; (2) authorizing dissemination of notice to the Class pursuant to the Notice Plan approved by the Court; (3) setting the dates for Class Counsel to file a motion

for final approval of the Amended Settlement and a motion for attorneys' fees, expenses, and service awards; (4) setting the date by which all Class member objections must be filed, or in the case of mail objections, the date that such objections must be post-marked; (5) setting the date that Class Counsel and Defendants may file reply briefs in support of final approval of the Amended Settlement and/or attorneys' fees, expenses, and service awards; (6) setting the date for Class Counsel to submit a Notice Report; and (7) setting a date for a final approval fairness hearing.

Dated: November 10, 2025

Respectfully submitted,

**NUSSBAUM LAW GROUP, P.C.**

By:   */s/ Linda P. Nussbaum*
Linda P. Nussbaum
Susan R. Schwaiger

**NUSSBAUM LAW GROUP, P.C.**
1133 Avenue of the Americas, 31st Fl.
New York, NY 10036
(917) 438-9189
lnussbaum@nussbaumpc.com
sschwaiger@nussbaumpc.com

Steve D. Shadowen
Richard M. Brunell
**HILLIARD & SHADOWEN LLP**
1717 W. 6th Street, Suite 290
Austin, TX 78703
(855) 344-3298
steve@hilliardshadowenlaw.com
rbrunell@hilliardshadowenlaw.com

Robert G. Eisler
Chad B. Holtzman
**GRANT & EISENHOFER P.A.**
485 Lexington Ave., 29th Floor
New York, NY 10017
(646) 722-8500
reisler@gelaw.com
choltzman@gelaw.com

Michael J. Freed
William H. London

Robert J. Wozniak
Michael E. Moskovitz
**FREED KANNER LONDON & MILLEN LLC**
100 Tri-State International, Suite 128
Lincolnshire, IL 60069
(224) 632-4500
mfreed@fklmlaw.com
wlondon@fklmlaw.com
rwozniak@fklmlaw.com
mmoskovitz@fklmlaw.com

*Equitable Relief Class Counsel*