

REDACTED

**UNITED STATES DISTRICT COURT FOR**
**THE EASTERN DISTRICT OF NEW YORK**

_____

| MDL No. 1720

IN RE PAYMENT CARD INTERCHANGE FEE |
AND MERCHANT DISCOUNT ANTITRUST | Docket No. 05-md-01720-BMC-JAM
LITIGATION |

_____ |

BARRY'S CUT RATE STORES INC.; DDMB, INC. |
d/b/a EMPORIUM ARCADE BAR; DDMB 2, LLC |
d/b/a EMPORIUM LOGAN SQUARE; BOSS |
DENTAL CARE; RUNCENTRAL, LLC; CMP |
CONSULTING SERV., INC.; TOWN KITCHEN, |
LLC d/b/a TOWN KITCHEN & BAR; GENERIC |
DEPOT 3, INC. d/b/a PRESCRIPTION DEPOT; and |
PUREONE, LLC d/b/a SALON PURE, |
 |
Plaintiffs, |
-v- |
 |
VISA, INC.; MASTERCARD INCORPORATED; |
MASTERCARD INTERNATIONAL |
INCORPORATED; BANK OF AMERICA, N.A.; BA |
MERCHANT SERVICES LLC (f/k/a DEFENDANT |
NATIONAL PROCESSING, INC.); BANK OF |
AMERICA CORPORATION; BARCLAYS BANK |
PLC; BARCLAYS BANK DELAWARE; |
BARCLAYS FINANCIAL CORP.; CAPITAL ONE |
BANK, (USA), N.A.; CAPITAL ONE F.S.B.; |
CAPITAL ONE FINANCIAL CORPORATION; |
CHASE BANK USA, N.A.; CHASE MANHATTAN |
BANK USA, N.A.; CHASE PAYMENTECH |
SOLUTIONS, LLC; JPMORGAN CHASE BANK, |
N.A.; JPMORGAN CHASE & CO.; CITIBANK |
(SOUTH DAKOTA), N.A.; CITIBANK N.A.; |
CITIGROUP, INC.; CITICORP; and WELLS |
FARGO & COMPANY, |
 |
Defendants. |

_____ |

**DECLARATION OF JOSEPH E. STIGLITZ, PH.D. AND KEITH B. LEFFLER, PH.D.**

## I) Qualifications

1) Professor Joseph Stiglitz is University Professor at the Columbia University School of International and Public Affairs.  Professor Stiglitz previously filed an initial report on October 5, 2018 ("Stiglitz Merits Report"),[1] a rebuttal report on October 11, 2019 ("Stiglitz Merits Rebuttal"),[2] and a report in support of the prior settlement agreement on March 25, 2024.  His qualifications and background are detailed in the Merits Report.  In brief, Professor Stiglitz has been elected to numerous academic and scientific societies in the United States and abroad, including the National Academy of Sciences, the Royal Society, the American Academy of Arts and Sciences, the American Philosophical Society, and the British Academy.  In 1979, he was awarded the John Bates Clark Medal by the American Economic Association, and, in 2001, he received a Nobel Memorial Prize in Economics.

2) Professor Keith Leffler is Professor Emeritus, Department of Economics, University of Washington.  Professor Leffler previously issued a report in this case on December 18, 2020 concerning class certification of the Equitable Relief Class, and a report and rebuttal reports, on March 25, 2024 and May 13, 2024 in support of the prior settlement agreement.  His qualifications and background are detailed in those reports.  Professor Leffler specializes in the economics of competition and antitrust.  He has studied the electronic payments industry for over twenty years.

3) We have been asked by counsel for the Equitable Relief Class to assess the likely economic impact of the Superseding and Amended Class Settlement Agreement of the Rule 23(b)(2) Class Plaintiffs and the Network Defendants (the "Amended Settlement" or "Settlement").  We have reviewed the terms of the Amended Settlement, including those related to Honor-All-Cards, merchant steering, rate caps, and rate rollbacks.  This joint declaration ("Declaration") details our preliminary assessment of how the Amended Settlement will likely impact competition in the credit card services market and the interchange fees paid by merchants.  To perform the analysis summarized in this Declaration, we have obtained and

---

[1] ECF 8474-2 (under seal).

[2] ECF 8474-23.

1

relied on data and documents produced by Visa, Mastercard, and defendant banks in addition to other materials referenced herein.[3]

4) We understand that if the Court preliminarily approves the Amended Settlement, we will have an opportunity to provide a more complete economic assessment of the Settlement.

**II) Summary**

5) Visa and Mastercard dominate the market for credit card services with a combined market share of about 76%.[4]  For decades, Visa and Mastercard have imposed rules on merchants that restrain them from steering their customers towards the merchant's preferred means of payment ("Merchant Restraints").  These Merchant Restraints include the Honor-All-Cards rule, which requires a merchant that wants to accept low-merchant-cost Visa and/or Mastercard credit cards to also accept their higher-cost cards.  The Merchant Restraints also include no-steering rules restricting merchants' ability to levy prices or discounts to their customers to reflect and signal the costs to the merchant of the customer's choice of payment method.

6) In well-functioning markets, the costs facing consumers (prices) are the guide to efficient consumer choices.  When prices reflect the costs of alternative choices, as they will in relatively competitive markets, consumers will make their product choices based on how they value the alternatives compared to the costs as reflected in the prices.  Such value-cost based choices lead to more efficient outcomes.  The Merchant Restraints interfere in the price mechanism and lead to inefficient consumer choices of the means of payment and consequently to a loss of consumer and social welfare.

---

[3] Visa and Mastercard supplied monthly data on all their credit card transaction volume and interchange fees on those transactions.  This Visa data covered 2010 through November 2023; the Mastercard data began in 2011 and is also through November 2023.  The data was separated into consumer and commercial card types.  Visa and Mastercard also supplied data for 2024 providing the transaction volumes and interchange fees for all transactions by card type that would form the basis of the Average Effective Rate Limit as defined in the Amended Settlement.

[4] *See* Daniel Vidal, *The state of credit cards in 2025: 50 stats you need to know*, Expensify (Apr. 4, 2025), https://use.expensify.com/blog/credit-card-statistics; Christy Rodriguez, *U.S. Credit Card Market Share by Network & Issuer – 2024 Facts & Statistics*, Upgraded Points (May 7, 2025), https://upgradedpoints.com/credit-cards/us-credit-card-market-share-by-network-issuer/; Peter Westberg, *Visa and Mastercard: The Global Payment Duopoly*, Quartr (Sept. 22, 2025), https://quartr.com/insights/edge/visa-and-mastercard-the-global-payment-duopoly.

7) The Merchant Restraints weaken, and in some cases sever, the connection between the actual cost of alternative payment means and the cost as perceived by cardholders making the payment-means choices.  Predictably, this results in substantial inefficiencies.  With merchants facing an all-or-none acceptance decision, and with merchants unable to effectively impose the costs of choosing high-cost credit cards for payment on their customers, Visa and Mastercard are able to set supracompetitive merchant fees and supracompetitive overall fees (the sum of the "prices" to cardholders and to the merchant – the "total price").[5]  In addition, because of greater competition on the cardholder side of the credit card services market than on the merchant side, the composition of the total price is distorted, with cardholders observing a negative price for use of high-cost premium cards while merchants face high prices when their customers, incentivized by their negative price, choose to use the high-cost premium credit cards.  Of course, merchants in competitive product markets (e.g., retail-goods markets) facing high costs from credit card use will attempt to pass on those costs in their product prices.  This results in further distortion whereby customers using low-cost payment means (such as low-cost credit cards, debit cards, or cash) subsidize customers using the high-cost premium Visa and Mastercard credit cards.

8) The Amended Settlement is a frontal assault on the Merchant Restraints.[6]  Under the Settlement, the Honor-All-Cards rule is substantially relaxed.  The Settlement allows merchants to accept only lower cost "standard" Visa and Mastercard consumer cards and reject high-cost premium cards.[7]  The Settlement also allows merchants to accept only

---

[5] In *Ohio v. American Express Co.,* 585 U.S. 529 (2018), the Supreme Court ruled that a proper analysis of the competitive level of pricing in the credit card services market must consider the prices on both sides of the market, the cardholder side and the merchant side.

[6] We provide additional details as to the Amended Settlement's reforms of the Merchant Restraints in ¶¶ 59-101 below.

[7] "Premium" and "standard" consumer credit cards are defined in the Amended Settlement at ¶¶ 1(z) and 1(nn). Premium consumer credit cards include Visa Signature, Visa Signature Preferred, Visa Infinite, Mastercard World, Mastercard World High Value, Mastercard World Legend, and Mastercard World Elite.  These "premium" consumer credit cards have negative cardholder prices (high rewards) and high merchant prices (high interchange rates). Standard consumer credit cards include Visa Traditional, Visa Traditional Rewards, Mastercard Core, and Mastercard Enhanced Value.  These "standard" consumer credit cards have zero or slightly negative cardholder prices (low or no cardholder rewards) and lower merchant prices (lower interchange rates).

3

consumer credit cards and reject high-cost commercial credit cards. The Settlement allows merchants to accept digital wallets of their choosing regardless of whether the wallets include Visa or Mastercard credit cards.

9) The Amended Settlement also eliminates nearly all restraints on merchant efforts to steer customers to low-cost payment methods via pricing. Under the Settlement, merchants can discount the use of a particular brand of card, favoring, for example, Mastercard over Visa in return for lower Mastercard fees. They can discount particular types of cards, for example, accepting both standard and premium credit cards but favoring standard credit cards via a discount. Merchants will also be able to favor a particular issuer's card, discounting, for example, only the standard cards of an issuer that cuts a special deal with the merchant. Merchants will also have increased opportunities to surcharge,[8] electing to, for example, surcharge only a brand's card type, such as Visa premium cards.[9]

10) The culture of the credit card services market has been warped by decades of anticompetitive Merchant Restraints. Customers have become accustomed to what they perceive to be "free rewards," which are not free but instead are paid for by merchants and by other customers who do not use high-cost rewards cards. The Amended Settlement addresses this market inertia by providing funds for merchant and customer education about the economic value of steering.

11) The Settlement provides merchants with the means to test and experiment with alternative ways of steering. With the reforms of the Settlement, merchants will be able to experiment

---

[8] We use the conventional language "surcharge" for charges imposed on customers for using a particular means of payment; but it is language that is not neutral. The merchant is only *charging* for the use of a card for which the merchant has to pay a fee; with a surcharge, the merchant is passing on (typically a part of) the cost associated with the payment mechanism. If a store provided a service for wrapping a present, one would not describe that as a surcharge, but as a charge for an extra service entailing an extra cost. The term surcharge should have been reserved for charges in *excess* of the costs incurred by the merchant.

[9] Under the Amended Settlement, merchants will not be able to surcharge a particular issuer's premium cards. However, if a merchant negotiates a reduced interchange rate for an issuer's premium cards, the merchant can steer its customers to use that card by offering a discount (or merchant rewards) for such card use. We expect there to be informational advantages to promoting a discount on a particular issuer's card (e.g., "receive a 1 percent discount (or double merchant rewards) for use of Chase Premium credit cards"), as compared to favoring the card by surcharging all others (e.g., "we impose a 1 percent charge for use of premium cards except for Chase Premium cards"). This will minimize any anticompetitive impact of maintaining the restraint on issuer-level surcharging.

4

with non-acceptance at a subset of their store locations, and experiment with discounting or surcharging at particular locations.

12) The Amended Settlement is intended to increase competition within and among the credit card networks. The elimination and relaxation of the Honor-All-Cards and anti-steering rules in the Amended Settlement will assist in fostering such competition. The Settlement includes a novel provision which will incentivize merchants to steer their customers to low-cost credit cards. Visa and Mastercard will be required to substantially reduce the merchant cost of standard credit cards. Currently the difference in the merchant price for the use of premium versus standard Visa and Mastercard consumer cards is ████████████████ ("bps"), while the cardholders perceive a benefit (a negative price) of ██████████ for use of their premium cards. This distortion in prices on the two sides of the credit card services market disincentivizes merchants from attempting to steer to standard cards.

13) The Amended Settlement requires Visa and Mastercard to reduce the interchange on standard cards to no greater than 125 bps. This is over 100 bps lower than the average interchange on premium cards. Increasing the savings to merchants that steer customers from premium to standard Visa and Mastercard credit cards will increase merchants' incentive to steer customers to the lower-cost cards. In addition, to overcome the inertia and rewards culture built up for decades, the Amended Settlement will assist merchants in muting the dissatisfaction of customers expecting free rewards by allowing merchants to offer significant merchant-designed rewards, tailored to their customers' preferences while still saving from steering.

14) As noted, the goal of the Settlement should be the enhancement of competition with the associated gains in efficiency and lowering of transaction costs. The reforms of the Amended Settlement are directed to such competition enhancement. We conclude that the relaxation of the Merchant Restraints in the Amended Settlement will significantly reduce transaction costs, is likely to significantly increase competition, and has the potential to drive the total price of Visa and Mastercard credit transactions towards a more competitive

level.[10]  It provides significant competitive tools for merchants to generate network and issuer competition that can drive down the average interchange rates and thereby produce a more reasonable and competitive balance between the prices paid by merchants and cardholders.

15) In addition to enhanced competition, the Amended Settlement offers substantial immediate rate relief to merchants.  The Settlement requires that Visa and Mastercard reduce the overall average effective interchange rate by 10 bps for five years.  In addition, the Amended Settlement ensures that all merchants receive some rate relief.  The Settlement caps all posted rates at their March 2025 level for five years.  Interchange fees paid under Visa and Mastercard posted rates, which apply to about ▮▮▮ of transactions, have increased by more than 1 bps per year over the last decade.  The cap on posted rates is expected to reduce the average interchange paid by those paying posted rates by 6 bps by 2031 (relative to the counterfactual of a 1 bps increase per year in the absence of the cap).  For merchants that pay negotiated rates, the Settlement requires the networks to reduce those negotiated rates by the same percentage as the overall mandated rate reduction.

16) The reforms proposed in the Amended Settlement will have substantial economic impact, with the potential to unlock significant competition on the merchant side of the credit card services market.  In the remainder of this Declaration, we explain in more detail the expected economic impact of these reforms.  We first describe the evolution of the Merchant Restraints and detail how the Amended Settlement eliminates or substantially relaxes those restraints.  We then explain the competitive problem in the market for payment means and describe the nature of economic tools that can alleviate that competitive problem.  We next evaluate the economic impact of the reforms of the

---

[10] By "competitive benchmark price," we do not mean the perfectly competitive result with price equal to marginal cost, but rather the price that would exist absent the alleged anticompetitive Merchant Restraints.  Visa and Mastercard have aggregated access to millions of card users.  The collection of millions of customers into groups with a single bargaining agent (Visa or Mastercard) creates buyer market power that is independent of the Merchant Restraints.  In addition, the credit card services market is one with a limited number of competitors, which likely would not achieve a zero-profit equilibrium (price equals marginal cost) even without any of the restraints at issue.  Although the Amended Settlement's reforms will not entirely eliminate Visa's and Mastercard's market power, they will significantly limit the magnitude of Visa's and Mastercard's market power and how they exercise and exploit it.

6

Amended Settlement in light of the economic tools needed to induce increased competition. We also provide a quantification of the likely impact of the rate rollbacks and caps, and the 10-bps overall mandated rate reduction. Those savings are substantial and benefit all merchants. However, we expect that under reasonable assumptions the savings from the rule reforms will be far greater.

17) We note that the Amended Settlement does not eliminate default interchange rates nor allow issuer level non-acceptance or surcharging. However, as we explain below, given the scope of the reforms from the Amended Settlement, there is a reasonable expectation that these few remaining restraints will have limited anticompetitive impacts.

18) We conclude this Declaration with a discussion of the balancing of the merchant and cardholder prices.

**III) The Competitive Problem**

19) The Amended Settlement addresses the Visa and Mastercard Merchant Restraints that impede the ability of merchants to influence their customers' choices of their means of payment. Visa and Mastercard offer credit cards with varying levels of interchange fees. Under the current rules, a merchant must either accept all of the network's credit cards, including high-cost, high-rewards credit cards and high-cost commercial credit cards, or accept none of its credit cards. While these cards may differ from the perspective of the customer, with some offering more rewards (with higher merchant fees) than others, from the perspective of the merchant, they are equivalent: the card for which the merchant must pay a higher fee doesn't deliver better transaction performance. Thus, the merchant might like to accept only the card with the low fee but not ones with high fees. The Honor-All-Cards rules prohibits that choice. Adding to the power of these Honor-All-Cards rules are "no steering rules" that limit merchants' ability to steer customers to lower-cost payments means.[11] The no-steering rules interfere with merchants' ability to impose costs on

---

[11] These no-steering rules are sometimes called "no-discrimination rules" because they prevent merchants from discriminating in price to shift customers to alternative payment means that impose lower costs on merchants. As explained in the Stiglitz Merits Report, ¶ 145 & n.218, these rules are actually "you must discriminate" rules, in that charging the same price for goods of different costs (implying differences in the ratio of price to marginal cost) is the definition of price discrimination. The "no-discrimination" rules result in the use of high-cost credit cards for

7

customers for their decisions about the means of payment.[12]  A market economy can produce efficient, competitive, and welfare-maximizing results only if customers consider the costs of their purchase decisions and are fully aware of the value and cost of alternatives.[13]  But merchants are not allowed to charge their customers for the extra cost that the choice of a high-cost payment mechanism imposes.

20) The Merchant Restraints severely impede competition among credit card networks and issuers on the merchant side of the credit card services market.  The merchants either pay the Visa and Mastercard fees or they do not accept Visa and Mastercard credit cards (with the attendant risk of losing customers).  With the Merchant Restraints in place, Visa and Mastercard can raise credit card merchant fees to supracompetitive levels just below those that would lead merchants to not accept the cards.

21) The supracompetitive fees paid by merchants increase the value of card usage to Visa, Mastercard, and the issuing banks.  Issuers and networks compete on the cardholder side to motivate increased usage of high-cost credit cards by offering "rewards" for the use of cards with the highest, most-supracompetitive merchant fees; that is, Visa and Mastercard lower

---

which the Merchant Restraints constrain merchants to charge their customers the same price (zero) as lower-cost credit cards.

[12] Defendants' anti-steering rules "prevent[] the merchants from indicating to buyers, via prices, information about the costs of alternative payment methods." Stiglitz Merits Report ¶ 21.  An example clarifies.  Assume that the merchant fee for a premium Visa credit card use is 250 basis points (2.5% of the transaction amount), and that the cardholder receives rewards worth 150 bps (implying a negative cardholder price of 1.5%).   In this example, the total price for the credit card services is 100 bps.  Assume an alternative payment means such as ACH with a price to the merchant of 50 bps, and no cost to the customer.  In a competitive market, if a customer wanted to use a premium Visa or Mastercard credit card, merchants would be expected to charge the customer the difference in the merchant's costs of that payment versus ACH, 200 bps.  The customer would then assess whether the value of the rewards was greater than the "cost" of those rewards, and an efficient choice would result.  The Merchant Restraints interfere with merchants imposing the cost of the customers' payment choices.  Instead, the customer perceives the *false* information that the cost of using the premium card rather than ACH is a *negative* 1.5%.

[13] As summarized by Professor Stiglitz: "In a market economy, prices are the principal means by which buyers are informed of the social costs of their consumption decisions. When purchase or sales decisions are made absent knowledge of prices, an inefficient allocation of resources is expected. The market's 'invisible hand' cannot function when buyers or sellers lack appropriate information and incentives to guide their decisions. The Visa and Mastercard Merchant Restraints result in merchants and cardholder-customers having no knowledge of the total price of alternative payment means. As a result, the cardholders make their payment means decisions based solely on the portion of the total price that they are aware of — the price on the cardholder side. . .. This leads to cardholders favoring high-rewards cards regardless of whether the value of the rewards exceeds the costs, eliminating competition that would push credit card networks to set an efficient cardholder/merchant price-pair." Stiglitz Merits Report ¶ 87.

the cost to cardholders of using premium cards to motivate additional usage with the accompanying supracompetitive merchant fees.[14]

22) Because of the Honor-All-Cards rules, if a merchant responds to the high cost of accepting "premium" consumer or commercial credit cards by not accepting them, it cannot accept any Visa or Mastercard credit cards, including lower-cost "standard" consumer credit cards. In addition, because cardholders with premium credit cards perceive significant benefits from using their high-rewards credit cards, some of the premium card users are expected to disfavor merchants that do not accept their preferred premium cards. This fear of losing business by not accepting (or charging for the use of) the premium cards leads to a "price spiral" in which higher merchant fees lead to higher cardholder rewards, which, in turn, leads to greater merchant expectations of lost customers from non-acceptance, which, in turn, leads to a higher merchant non-acceptance price,[15] which then spirals to higher merchant fees.[16]

23) *The economics of credit card pricing and steering.* Merchants' customers make their payment decisions based on the perceived costs and benefits of alternatives. Because the customers' price of using a premium Visa or Mastercard credit card is negative, absent merchant steering, customers will perceive substantial net benefits from using premium credit cards. If merchants could use steering tools, such as surcharging premium credit cards or discounting standard credit cards, customers preferring to use their premium credit cards would face the higher cost of shopping at the steering merchant. Some of these customers may respond by using other payment means but others may reduce their purchases at what they now perceive to be a relatively higher-cost merchant.

---

[14] The supracompetitive merchant prices imply high margins to the issuing banks from cardholder usage. This motivates issuers to attempt to increase card usage by lowering the cost to cardholders using high-merchant-cost, high-rewards "premium" credit cards.

[15] By "non-acceptance price," we mean the highest Visa and Mastercard merchant fees for which the merchant expects the lost profits from the high merchant fees to equal the profits the merchant expects to lose from customer purchase losses due to non-acceptance. At fees above this level, a profit maximizing merchant will not accept the cards.

[16] See Stiglitz Merits Report ¶ 103 for an extended discussion and explanation of the price spiral.

24) The potential for lost business from steering creates a dilemma for merchants that consider surcharging their customers' use of premium cards.  For a merchant paying posted interchange rates, premium cards have interchange rates of about ▮ bps, and standard cards have interchange rates of about ▮ bps.  Assume the merchant surcharges the difference and successfully steers some users to the lower-cost standard cards.  The merchant then increases its profits by ▮ bps per dollar of sales, whether the customer switches to a lower-cost card or not.[17]

25) There is, of course, some risk that the increase in the cardholder price (a less-negative cardholder price as a result of the surcharge) will be sufficient to cause some customers to shop elsewhere.  It is this risk of a loss in customers' purchases that allow the networks to impose supracompetitive prices on merchants.  A merchant that seeks to shift its customers from high-cost premium cards faces risks from such a strategy.  Customers faced with a charge (or non-acceptance) for use of their preferred premium credit cards may shift to standard credit cards, debit cards, or cash, but they may instead take their business elsewhere.  The compression in interchange rates between the premium credit cards and the standard credit cards (▮ bps and ▮ bps, respectively) means that the gains to the merchant from switching customers from premium cards are relatively small compared to the potential cost of lost business.

26) Visa's and Mastercard's Merchant Restraints also increase the cost and risks to merchants of not accepting the high-cost cards or of steering by imposing prices (surcharging).[18]  The current Visa and Mastercard rules require credit acceptance at the brand level and require the same steering policy at all the merchant's outlets.  The restraints do not allow issuer-level discounting, and they effectively prohibit surcharging if the merchant also accepts American Express.  Thus, the Merchant Restraints prevent merchants from "testing" on a

---

[17] This calculus of gains and losses will be different if the customer pays the surcharge.

[18] Visa and Mastercard credit card users account for about 32% of all retail purchases (about 20% for Visa and 12% for Mastercard).  *See* Capital One Shopping Research, Credit Card Industry Statistics (Dec. 19, 2024), https://capitaloneshopping.com/research/credit-card-industry-statistics/ (Visa accounts for 58% and Mastercard accounts for 34% of all U.S. credit card transaction volume); Adam McCann, Cash vs. Credit Card Spending Statistics, WalletHub (May 25, 2025), https://wallethub.com/edu/cc/cash-vs-credit-card-spending-statistics/133985 (credit cards account for 39% of all U.S. transaction volume).

limited basis the potential gains and losses from disfavoring premium Visa and Mastercard cards. The merchant either accepts or surcharges all Visa or Mastercard cards, or none of them. This disincentivizes merchant steering attempts.

27) For merchants to negotiate lower merchant fees using a credible steering threat, the possibility of increased profits from steering must be credible. There are two effective "levers" to make steering more profitable, more credible, and more likely. The first lever to promote profitable steering (or credible threats to steer) is to increase the potential gains from steering. The second lever is to reduce the risks and lower the cost to merchants of testing the gains and losses from disfavoring premium cards. Effective reform of the Merchant Restraints needs to work with one or both of these levers, and the Amended Settlement enables both.

28) A current disincentive to steering results from the interchange-rate price compression noted above. Credit cards can provide important benefits to cardholders beyond rewards. Swings in cash flow are mitigated by having free float and a guaranteed credit line.[19] Because steering cardholders from premium to standard credit cards retains those benefits, it could be the most effective steering option (as compared to steering to cash or debit) with the smallest expected loss of purchases. However, the current rate compression provides limited merchant benefit from such steering. The Amended Settlement responds to that problem by mandating a reduction in interchange rates to a maximum of 125 bps on all standard cards. This will increase the likelihood of steering or using the threat of steering to achieve more favorable negotiated Visa and Mastercard pricing.

29) Several Visa and Mastercard Merchant Restraints currently disincentivize merchant steering efforts by increasing the risks of steering attempts. These Merchant Restraints include:

   A) the Honor-All-Cards rules, including prohibiting merchants from electing to decline acceptance based on:

      i) card product category (e.g., commercial credit cards, standard consumer credit cards, premium consumer credit cards), or

      ii) digital wallets,

---

[19] Using a credit card also alleviates the need to carry cash and offers protection if the card is lost.

11

B) the all-outlets rules,

C) the level-playing-field rules, and

D) the prohibition on issuer-level discounting (for Mastercard).

As discussed in detail below, the Amended Settlement eliminates all these impediments to merchant steering, thereby increasing the net expected value of non-acceptance or steering away from high-cost cards. This makes steering more likely and makes the threat of steering far more credible.

**IV) Evolution of the Merchant Restraints**

30) *Historical Restraints.* Until the mid-2000s, Visa and Mastercard were, in effect, joint ventures of competing banks (i.e., the credit card issuers), with the networks setting the collective default prices. From inception, Visa and Mastercard imposed a number of restraints on merchants that wished to accept their credit cards. Most significant were the networks' respective Honor-All-Cards rules. If a merchant wanted to accept Visa or Mastercard, it was required to accept all that network's cards. This restraint was arguably helpful for the developing networks to solve the "what comes first" or "chicken and egg" problem. Becoming part of a payment system is of value to merchants only if many of its customers want to use the system, and the system is of value to customers only if many of their preferred merchants accept the card.

31) The economic problem is how to simultaneously achieve substantial customer use and substantial merchant acceptance when each depends on the other. Customers become knowledgeable of acceptance through experience and promotion. When customers had no or little knowledge of Visa and Mastercard, if card acceptance were by card type or by issuer customers would have had difficulty understanding the new card's value. The Honor-All-Cards rule simplified this informational problem – if the merchant accepted Visa, it would accept whichever Visa card the customer had. However, this chicken-egg problem was solved decades ago. Visa and Mastercard are mature networks with millions of card users and millions of accepting merchants.

32) Visa and Mastercard also prevented merchants from discounting or charging for using their cards. When these networks were just beginning and customers were uncertain of the

12

values of Visa or Mastercard credit card usage, having different prices at different merchants for different cards would create consumer uncertainty of the value of card acquisition and use.  Also, if merchants considering whether to accept the cards had to then negotiate with many issuing banks, the value of acceptance would be reduced.[20]  The default interchange rates addressed this.

33) *Challenging the Restraints.*  Approximately ten years after the Visa and Mastercard credit card networks were created, debit cards were introduced as a means of payment.[21]  To increase merchant acceptance of their debit cards, Visa and Mastercard interpreted their Honor-All-Cards rules as including debit cards issued on their respective networks.  In 1996, a class of plaintiffs challenged Visa's and Mastercard's Honor-All-Cards rules, alleging that requiring merchants that accepted Visa and Mastercard credit cards to accept also Visa and Mastercard debit cards was an illegal tying arrangement.[22]  The plaintiffs also alleged that Visa and Mastercard were using their market power in credit cards, along with the Honor-All-Cards rules, to monopolize the debit card market.  In a 2003 settlement, Visa and Mastercard agreed to amend their Honor-All-Cards rules such that merchants accepting Visa and Mastercard credit cards are not required to also accept Visa and Mastercard debit cards, and vice versa.

34) In 1998, the U.S. Department of Justice ("DOJ") brought a civil enforcement action against Visa and Mastercard, alleging that the networks conspired to restrain trade by, among other things,[23] enacting and enforcing "exclusionary rules" prohibiting their member banks from issuing American Express or Discover cards.  The district court held that these Visa and Mastercard exclusionary rules violated the Sherman Act, ordering that those rules be

---

[20] We discuss below at ¶ 114 possible procompetitive benefits of the default interchange rules related to issuer bank free-riding.

[21] Dan Miller, *When Were Debit Cards Invented?*, SoFi Learn (July 30, 2024), https://www.sofi.com/learn/content/when-were-debit-cards-invented/?msockid=2e0773bd74b368a92deb66dc757e6978.

[22] *In re Visa Check/MasterMoney Antitrust Litig.*, No. 96–cv–5238 (E.D.N.Y.).

[23]  The DOJ also challenged Visa's and Mastercard's rules permitting a member-owner of one network to function as a director of the other network (also known as "dual governance").  Although the district court held that the networks' dual governance arrangement did not violate the Sherman Act, Mastercard and Visa in 2006 and 2008, respectively, converted the networks from consortiums of competitor banks into single-entity, publicly traded companies.

13

repealed. In addition, Visa and Mastercard were enjoined from enacting any future rules prohibiting issuers from issuing credit or debit cards of other networks.[24]

35) In October 2005, this case was filed.[25] Several class actions and individual actions asserting similar antitrust claims against Visa, Mastercard, and several issuing banks were consolidated. In April 2006, class action plaintiffs filed a consolidated amended class complaint alleging that Visa, Mastercard, and the issuing banks conspired to fix interchange fees and to restrict merchants from charging for use of high-cost credit cards.

36) While this case was proceeding, in 2010 the DOJ and certain states filed lawsuits against Visa, Mastercard, and American Express, challenging the networks' rules that prohibit merchants from steering cardholders to lower-cost payment methods.[26] On the same day the DOJ case was filed, Visa and Mastercard settled the DOJ's claims against them by entering into a consent decree.[27] The consent decree required Visa and Mastercard to modify their rules to allow merchant discounts or other incentives for using a particular card network brand, using a lower-cost card product within a particular brand, or using another form of payment. The consent decree did not require the networks to modify their rules to allow merchants to offer discounts at the issuer level. The consent decree, which expired in July 2021, also did not address the networks' Honor-All-Cards rules or the rules prohibiting merchants from surcharging credit card transactions.

---

[24] *See United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001); *United States v. Visa U.S.A., Inc.*, 183 F. Supp. 2d 613 (S.D.N.Y. 2001).

[25] *In re Payment Card Interchange Fee &Merchant Discount Antitrust Litig.,* No. 1:05-md-01720; *Barry's Cut Rate Stores, Inc., et al. v. Visa, Inc., et al.*, No. 05-md-01720 (E.D.N.Y.) (MKB) (JAM), also now known as *DDMB, Inc., et al. v. Visa, Inc., et al.*, No. 05-md-01720 (E.D.N.Y.) (BMC) (JAM).

[26] The DOJ challenged rules prohibiting merchants from "encouraging consumers to use lower-cost payment methods when making purchases." *See* Press Release, U.S. Department of Justice, Office of Public Affairs, *Justice Department Sues American Express, Mastercard and Visa to Eliminate Rules Restricting Price Competition; Reaches Settlement with Visa and Mastercard* (Oct. 4, 2010), https://www.justice.gov/archives/opa/pr/justice-department-sues-american-express-mastercard-and-visa-eliminate-rules-restricting.

[27] *See* Andrew Martin, *U.S. Reaches Deal in Credit-Card Antitrust Suit*, N.Y. Times (Oct. 4, 2010), https://www.nytimes.com/2010/10/05/business/05card.html. American Express did not settle with the DOJ and the States, and the case was litigated in a bench trial with Judge Garaufis, who found that American Express's anti-steering rules were anticompetitive. *See United States v. Am. Express Co.*, 88 F. Supp. 3d 143 (E.D.N.Y. 2015). The Second Circuit reversed that ruling, concluding that the district court had improperly failed to conduct a two-sided-market analysis. *See United States v. Am. Express Co.*, 838 F.3d 179 (2d Cir. 2016). The Supreme Court affirmed the Second Circuit in 2018. *See Ohio v. American Express Co.*, 585 U.S. 529 (2018).

37) About two years after Visa and Mastercard settled with DOJ, the class in this case agreed to a settlement.  In addition to settling the class's damages claim, the settlement provided for certain reforms to Visa's and Mastercard's network rules.  Most importantly, under that settlement, the rules were to be modified to permit merchants to surcharge Visa or Mastercard credit card transactions at the brand or product levels, provided that the merchant also surcharge American Express.  The settlement did not include any relief from the Honor-All-Cards rules.  The settlement was approved by the district court, but, in 2016, the court of appeals overturned the settlement.[28]

**V) Some Details of the Current Merchant Restraints**

38) *The Honor-All-Cards Rules.*  Under Visa's and Mastercard's current rules, merchants that accept any Visa and/or Mastercard credit card must accept all Visa and/or Mastercard credit cards.  This includes all consumer and commercial credit cards, all premium and standard credit cards, and all digital wallets that include Visa and/or Mastercard credit cards (if the merchant enabled the technology to accept those wallets).  The rules also require the merchant to accept Visa and Mastercard at all of its stores.  Thus, the Honor-All-Cards rules prohibits merchants from testing the customer response to non-acceptance of credit cards or particular types of credit cards by running a pilot program in a single location or a subset of locations.

39) *The Level-Playing-Field Rules and Surcharging.*  Under the current Visa and Mastercard rules, if a merchant surcharges Visa or Mastercard, then it must surcharge all "competitive brands" that cost the same or more to accept than Visa and Mastercard.[29]  American Express and Discover are competitive brands, and Visa's and Mastercard's rules define each other as competitive brands.[30]  While Visa and Mastercard agreed after the vacated 2012 settlement to allow only one of the brands to be surcharged, the posted rules do not include

---

[28] The Rule 23(b)(3) damages class settled its claims in 2018.

[29] *See* Visa Rule 5.5.1.6; Mastercard Rule 5.12.2.  The networks' current rules nominally allow surcharging at the brand or the product level.  See Visa Rule 5.5.1.7 (Oct. 18, 2025), https://usa.visa.com/content/dam/VCOM/download/about-visa/visa-rules-public.pdf; Mastercard Rule 5.12.2 (June 3, 2025), https://www.mastercard.com/content/dam/mccom/shared/business/support/rules-pdfs/mastercard-rules.pdf.

[30] See Visa Glossary; Mastercard Rule 5.12.2.

15

such clarification.  In addition, the voluntary agreement to the vacated settlement concerns a settlement that expired in 2021.

40) The Visa and Mastercard level-playing-field rules further constrain charging for high-cost credit cards.  Under these rules, if a merchant accepts another credit card brand that limits surcharging (e.g., American Express), it must follow that brand's surcharging rules in surcharging Visa or Mastercard credit cards.  American Express's rules prohibit the merchant from surcharging American Express credit cards unless the merchant also surcharges all debit cards.  Because Visa's and Mastercard's rules prohibit surcharging of debit cards, merchants that also accept American Express credit cards are effectively barred from surcharging Visa and Mastercard credit cards.[31]

41) The current rules do not contain any provision that prohibits the networks from retaliating against a merchant that surcharges or threatens to surcharge the network's credit cards. The rules do not, for example, prohibit the networks from raising the interchange rates of merchants, or categories of merchants, that surcharge or threaten to surcharge.

42) *Discounting.*  As noted above, Visa's and Mastercard's consent decree with the DOJ allowed discounting by credit card brand (e.g., Visa or Mastercard) and/or by credit card product (e.g., Visa Infinite), but it did not require Visa and Mastercard to permit discounting by credit card issuer (e.g., Chase Visa).  That consent decree expired in 2021.  Mastercard's current rules prohibit issuer-level discounting, and Visa's rules do not address discounting by issuer.

43) *All-Outlets.*  Visa's and Mastercard's rules are silent on whether merchants that operate outlets under different banners are permitted to accept Visa and Mastercard at outlets operated under one banner but not at outlets operated under a different banner.  In addition, the rules do not address whether a merchant's steering policies must be the same at all outlets.

---

[31] Discovery in this case reveals that the level-playing-field rules may be a principal reason that surcharging did not take off after the 2012 settlement.  Merchants accounting for more than 80% of Visa's transaction volume accept both Visa and American Express.  Consequently, the effect of the networks' level-playing-field rules "has been to place about 80% of Visa and Mastercard transactions beyond the ability of merchants to price."  Stiglitz Merits Report ¶ 35.

16

44) *Buying Groups.*  The Visa and Mastercard rules do not require the networks to recognize or negotiate with groups of merchants with respect to the interchange rates imposed by Visa and Mastercard.

45) *Default Interchange Rates.* Each network sets the "default" posted interchange rates for categories of merchants.[32]  The networks' schedules of rates, which run to more than 10 pages for each network,[33] result in significant price discrimination by merchant size and type.  The complex default rates allow Visa and Mastercard to fine tune the merchant fees to attempt to set those fees to levels just below those at which merchants in that category would refuse to accept the network's credit cards.

## VI) The Competitive Effects of the Merchant Restraints

46) Visa and Mastercard are the dominant providers of credit card services.  In 2024, Visa credit cards accounted for about ▮▮▮▮▮▮ in transactions in the U.S.[34]  In 2024, Mastercard processed about ▮▮▮▮▮▮ in credit card transactions.[35]  Together Visa and Mastercard have about a 76% share of all U.S. credit card transactions.[36]  Visa's and Mastercard's credit card transaction volumes have been increasing at about 9% per year since 2011.[37]

47) *Supracompetitive Total Prices.*  Chart 1 (below) shows the Visa and Mastercard overall average interchange fees for 2011-2024.  Visa's average interchange rate was ▮▮bps in 2010, rising to ▮▮bps by 2024.  Mastercard's average interchange rate was ▮▮bps in 2011, increasing to ▮▮bps by 2024.  On average, over the 14 years, the effective interchange paid has increased by over 1 bps per year.  Given the increasing reliance on

---

[32] Stiglitz Merits Report ¶ 35.  As shown in Table 1, about ▮▮% of Visa and Mastercard credit card transactions by purchase volume are at negotiated rates.

[33] Amended Settlement, Appendix J and Appendix K.

[34] From data provided by Visa.  [file FRE 408 – visa B2 Data Questions May 2025 Responses.]

[35] From data provided by Mastercard.  [2025.05.19 – Mastercard Responses to B2 Data Questions, sheet Responses.]

[36] *See* Adam McCann, *Market Share by Credit Card Network*, WalletHub (Feb. 26, 2025), https://wallethub.com/edu/cc/market-share-by-credit-card-network/25531; Jack Caporal, *Credit and Debit Card Market Share by Network and Issuer*, Motley Fool Money (July 28, 2025), https://www.fool.com/money/research/credit-debit-card-market-share-network-issuer/.

[37] See Table 2, Impact of Rate Rollbacks.  Since the beginning of Covid, the growth in credit card transaction volume has been over 10% per year.

negotiated rates, the average effective rates for merchants paying posted rates have increased by significantly more than the overall increase.



2011  2012  2013  2014  2015  2016  2017  2018  2019  2020  2021  2022  2023  2024

48) Table 1 shows the Visa and Mastercard average interchange rates by card type for merchants paying posted rates and paying negotiated rates in 2024.[38]  The Table also shows the percentage of the network's transaction dollar volume, the estimated value of the rewards on those transactions, and the implied total prices.[39]

---

[38] The transactions percentages and interchange rates are from data supplied by Visa and Mastercard.

[39] We have only limited information on the overall rewards levels by card type.  The rewards data in Table 1 is from rewards expense information from Bank of America, Capital One, Chase, and Wells Fargo, and information from Visa and Mastercard on minimum rewards levels by card type.  The Total Prices in Table 1 are interchange minus rewards.

| Card Type | Posted Rates | | | |
|---|---|---|---|---|
| | %Transactions | Interchange | Rewards | TotalPrice |
| Visa Traditional | | | | |
| Visa Traditional Rewards | | | | |
| Visa Signature | | | | |
| Visa VSP/Infinite | | | | |
| Visa Commercial | | | | |
| Visa Standard | | | | |
| Visa Premium | | | | |
| Visa Consumer | | | | |
| Visa All Posted Rates | | | | |
| Mastercard Core | | | | |
| Mastercard Enhanced | | | | |
| Mastercard World | | | | |
| Mastercard World High/Elite | | | | |
| Mastercard Commercial | | | | |
| Mastercard Standard | | | | |
| Mastercard Premium | | | | |
| Mastercard Consumer | | | | |
| Mastercard All Posted Rates | | | | |
| | Negotiated Rates | | | |
| Visa All Negotiated Rates | | | | |
| Mastercard All Negotiated Rates | | | | |
| | All Rates | | | |
| Visa Consumer | | | | |
| Visa Commercial | | | | |
| Visa All Cards and Rates | | | | |
| Mastercard Consumer | | | | |
| Mastercard Commercial | | | | |
| Mastercard All Cards and Rates | | | | |

**TABLE 1 INTERCHANGE RATES 2024**



49) The overall average effective rates for merchants paying posted rates are ▮ bps and ▮ bps, respectively, for Visa and Mastercard. In contrast, the average effective negotiated rates are ▮ bps and ▮ bps. The volume of transactions at negotiated rates is ▮ ▮ of all Visa and Mastercard credit transactions. Nonetheless, the data demonstrate that merchants with sufficient bargaining power get significant interchange reductions from Visa and Mastercard.

19

50) As shown in Table 1, the overall average actual total price for Visa and Mastercard credit cards in 2024 was about ▮ bps.[40] Professor Stiglitz has discussed several comparative benchmarks demonstrating the supracompetitive levels of the Visa and Mastercard total prices. The benchmarks included, at the upper end, regulated debit-card rates with a net (total) price of about ▮ bps,[41] and, at the lower end, the costs of running the credit-card network of about ▮ bps in 2017.[42] We are here concerned with the impact of the Merchant Restraints on the credit card services total price. The cost of running the network provides an indication of the perfectly competitive benchmark total price, a total price lower than that expected from the elimination of the Merchant Restraints.[43] Conservatively, using this perfectly competitive benchmark as a lower bound of what might be accomplished by eliminating the Merchant Restraints suggests a supracompetitive premium in the networks' total price of about ▮ bps (actual total price of ▮ bps minus ▮ bps perfectly competitive benchmark total price). As we discuss below, the Amended Settlement has the potential to eliminate a substantial portion of the supracompetitive premium caused by the Merchant Restraints.

51) *The "Balance" Between Cardholder and Merchant Prices Is Inefficient.* As discussed above, there have been changes to Visa's and Mastercard's rules over the last two decades. Those rule changes have increased issuing banks' competition on the cardholder side of the market. As shown in Table 1, with unfettered issuer competition on the cardholder side and very constrained competition on the merchant side, cardholders pay, on average, ▮▮▮▮▮ ▮▮▮▮▮, while merchants pay, on average, ▮▮▮▮▮ bps.

---

[40] The overall average total price for All Cards and Rates in Table 1 is ▮ bps for Visa and ▮ bps for Mastercard.

[41] Stiglitz Merits Report ¶ 100; *see also* Federal Reserve Board, Average Debit Card Interchange Fee by Payment Card Network, https://www.federalreserve.gov/paymentsystems/regii-average-interchange-fee.htm.

[42] Stiglitz Merits Report 98. The costs of running the network include the costs of the infrastructure to "move electrons," the cost of administering the system (record keeping, billing, . . .), and the cost of fraud. With continual improvements in computer technology, the costs of running the network today are expected to be lower than they were in 2017.

[43] With the Merchant Restraints eliminated, the credit card services market will still be highly concentrated, the credit card networks will still have buyer market power, and the "rewards culture" engendered from decades of competitive restraints on the merchant side of the market will remain. All these factors are impediments to achieving the perfectly competitive total credit card services price.

20

52) This disparity in the prices paid on the two sides of the market is not the result of any efficient balancing by Visa and Mastercard of the cardholder and merchant prices.[44] As shown by Professor Stiglitz, the percentage of the total price paid by merchants increased from ▮▮▮▮ in 2004 to ▮▮▮▮ in 2016.[45] During that time, no underlying changes in economic conditions account for that increase in the percentage of the price paid by merchants.[46]

53) *Inefficient wealth transfers among customers.* The distorted Visa and Mastercard merchant and cardholder pricing leads to inefficient price discrimination and wealth transfers among customers. The restraints prevent merchants from imposing the costs of high-cost cards on the customers who choose to use them. Typically, customers pay merchants the same price for goods or services, regardless of whether they use a premium credit card, a standard consumer credit card, or a debit card. With the Merchant Restraints in place, merchants spread their costs of payments among all their customers in the prices of their goods and services.[47] But customers who use high-cost premium credit cards receive a significant "rebate" in the form of rewards, thereby paying lower net prices than other customers pay.

---

[44] The need for "balancing" of the prices on the two sides of the market results from possible externalities flowing in both directions. That is, cardholders benefit from greater merchant acceptance, which is enhanced by low merchant fees, while merchants benefit from greater customer usage, which is enhanced by low cardholder fees. The "correct" levels of the prices on the two sides of the market consider any such externalities. However, in the U.S., Visa and Mastercard are mature networks with near ubiquitous merchant acceptance and customer card-holding; any remaining externalities from one to the other side of the market are minimal. In particular, with over 80% of consumers having a credit card, changes in merchant acceptance should have little impact on credit card holding. See, e.g., Board of Governors of the Federal Reserve System, "Report on the Economic Well-Being of U.S. Households 2024-May 2025," May 2025 ("Eighty-one percent of adults had a credit card in 2024 . . ., at Figure 28.) Thus, any economic justification for subsidization of cardholders to increase card holding is minimal. Absent significant two-way externalities, there is no economic justification for merchant fees to subsidize cardholder rewards. Rather, in these mature markets, rewards introduce additional inefficiencies. *See* Stiglitz Merits Report ¶¶ 69, 122. The observed patterns of cardholder prices and merchant prices thus reflect not a desire by the networks to enhance platform efficiency but to exploit platform market power.

[45] Stiglitz Merits Rebuttal ¶ 12.

[46] *Id.*

[47] *See, e.g.*, Federal Reserve Bank of Boston, *Distributional Effects of Payment Card Pricing and Merchant Cost Pass-through in the United States and Canada,* December 2020 Working Paper, at 8-9 & n.13, https://www.bostonfed.org/publications/research-department-working-paper/2020/distributional-effects-payment-card-pricing-merchant-cost-pass-through-united-states-canada.aspx ("Boston Fed. Report") ("Theoretical and empirical literature suggests that various factors affect the merchant pass-through rate. We select 90 percent, as it is about the midpoint of long-run pass-through rates on retail prices due to industry-wide cost changes estimated by previous empirical studies on U.S. industries: 90 percent or 92 percent in the U.S. coffee industry, 81 percent or 100 percent in the U.S. gasoline industry, and 73 percent to 103 percent in the U.S. processed cheese industry." (references omitted)).

54) Therefore, in relatively competitive product markets, customers who use lower-cost payment methods are subsidizing the high-priced-card users' purchases. That is not only inefficient, but also inequitable.[48] As noted in a recent report from the Federal Reserve Bank of Boston, the users of high-cost, high-rewards credit cards tend to be among the more wealthy in the U.S.; users of lower-cost payment methods tend to be substantially less well off.[49] In plain terms, the Merchant Restraints cause the middle class and poor to subsidize the rich.[50]

55) *The Pricing of Different Card Types is Distorted.* As a result of the one-sided cardholder competition in this two-sided market, the pricing of different card types is also distorted. Premium consumer credit cards, which are the focus of issuer competition, have a total price of about ▮▮ basis points, while standard consumer credit cards with (currently) little issuer competition for cardholders have a total price ▮▮▮▮▮▮▮▮▮▮▮▮▮[51] And as noted, commercial cards are priced to merchants at fees even higher than the highest premium consumer cards.

56) The distorted pricing across card types results in significant "compression" between interchange rates on the networks' premium credit cards as compared to the rates on their standard credit cards. Table 1 shows that standard Visa consumer credit cards (Traditional and Traditional Rewards) have an average posted interchange rate of ▮▮ bps, and standard Mastercard consumer credit cards (Core and Enhanced) have an average posted interchange rate of ▮▮ bps. Visa's premium consumer credit cards (Signature, Signature Preferred, and Infinite) have an average posted interchange rate of ▮▮ bps; for Mastercard's premium consumer credit cards (World, World High Value, and World Elite) the average posted interchange rate is ▮▮ bps.

---

[48] Stiglitz Merits Report ¶¶ 46, 69; Stiglitz Merits Rebuttal ¶¶ 106, 107.

[49] Boston Fed. Report, at 1-4, 32. "Higher-income consumers use more payment methods that are more costly for merchants, and the cost that higher-income consumers incur via merchant pass-through is less than the cost they impose on merchants. Relative to how much it costs the merchants to process their payments, each consumer in the highest-income cohort pays $13 less on average per month through retail prices." *Id*. at 17.

[50] This is in addition to the well-known inefficiencies of customers facing different prices. *See, e.g.,* Carlton and Perloff, *Modern Industrial Organization*, 4th ed., pp 306-307.

[51] *See* Table 1.



57) Premium consumer credit cards have average posted interchange rates that are ███ bps more than the average rates for the standard cards.  The compression is even more stark given the significant difference in average total prices. The average rewards on standard consumer credit cards are about ██ bps and ██ bps for Visa and Mastercard, respectively,[52] but about ███ and ███ bps for premium consumer credit cards.  Thus, for posted-rate transactions the average total prices are about ███ bps for Visa's standard cards, versus ███ bps for its premium cards. The average total prices are about ███ bps for Mastercard's standard cards, versus ██ bps for its premium cards.

58) Table 1 also separately shows the interchange rates on consumer credit cards and commercial credit cards.  The average posted interchange rate on all commercial credit card transactions for both Visa and Mastercard exceeds that of the highest-cost premium consumer credit card.  The average interchange rate for posted-rate transactions on Visa consumer credit cards is ███ bps.  The average interchange rate for posted-rate transactions on commercial credit card transactions is ███ bps, ██ bps higher than for Visa consumer credit cards.  For Mastercard, the average interchange rate for posted rate transactions on consumer credit cards is ███ bps, while the average rate for commercial credit cards is ███ bps, ██ bps higher than for Mastercard consumer credit cards.

## VII)    Economic Evaluation of the Amended Settlement

59) Considered individually and cumulatively, the Amended Settlement's reforms provide a powerful set of competitive tools for merchants to push back against supracompetitive interchange fees, substantially reduce (or possibly altogether eliminate) the gap between the actual and competitive total price of Visa and Mastercard credit-card services, redress the "balance" between the merchant-side and cardholder-side transaction prices, and significantly ameliorate the unfair and inefficient subsidizing of wealthy cardholders' rewards.  As we show below, the Amended Settlement substantially reforms nearly every restraint that has bedeviled this market for decades.

---

[52] As noted, the rewards data is estimated.  The numbers in the text assume an average reward on Visa Traditional Rewards and Mastercard Enhanced cards of ██ bps.

60) *Honor-All-Cards*. The Amended Settlement provides the first substantial changes to the honor-all-credit-cards rules in the United States since the birth of Visa and Mastercard. Accepting a network's credit cards will no longer be an all-or-nothing proposition.

61) *Honor-All-Cards Rules: Premium and Standard Cards.* Under the Amended Settlement merchants can choose to accept only lower-merchant-cost standard consumer credit cards, declining high-cost premium consumer credit cards.[53] The Amended Settlement also significantly decreases interchange rates on standard cards to a maximum of 125 bps, motivating merchants' non-acceptance of premium cards.[54] The Amended Settlement will also allow merchants to mute the impact on customers of premium card non-acceptance, or of surcharging premium cards, by allowing merchants to offer significant merchant-provided "rewards" to customers who use the low-cost standard cards.

62) *Honor-All-Cards Rules: Commercial and Consumer Cards.* Under the Amended Settlement, merchants can choose to accept only consumer credit cards, declining the higher-cost commercial credit cards.[55] As shown in Table 1, commercial credit cards account for about ██% to ██% of Visa and Mastercard credit-card transaction volume, with interchange rates that are, on average, ██ bps,[56] which is ██ bps higher than consumer cards, and ██ bps higher than the reduced 125 bps on standard cards.

63) Merchants' ability to reject commercial credit cards provides a significant incentive and means for merchants to steer commercial card users to lower-cost standard consumer credit cards. In response to such merchant rejections (actual or threatened) or surcharging of commercial cards, Visa and Mastercard will be incentivized to negotiate lower rates for commercial credit card transactions in return for the merchant's continued acceptance of those cards. Currently, Visa negotiated commercial rates average ██ bps, which is ██ bps below the posted commercial rates while for Mastercard the posted-negotiated commercial

---

[53] Amended Settlement ¶¶ 22, 71.

[54] Issuers could negate the increased spread by lowering the interchange on premium cards. If this occurred, then the benefits of the lowered standard rate would include the lowered rates on the premium cards.

[55] Amended Settlement ¶¶ 22, 71. Under the Amended Settlement, merchants could choose to accept only commercial cards. However, this is unlikely given the high merchant price of commercial cards.

[56] This includes both posted and negotiated commercial interchange rates.

24

rate differential is ▮▮ bps.  Large potential savings should be available to merchants from their increased bargaining power from their ability to reject (or steer customers away from) commercial cards.

64) *Honor-All-Cards Rules: Digital Wallets.* The Amended Settlement gives merchants greater control over emerging digital-wallet payments. In 2023, about 15% of point-of-sale payments and 37% of online payments in the United States were made with digital wallets. By 2027, 31% of point-of-sale payments and 51% of online payments in the United States are expected to be made with digital wallets.[57]

65)  Under Visa's and Mastercard's interpretations of their current Honor-All-Cards rules, merchants that have enabled the technology for digital payments must accept any digital wallet that contains the network's credit card.  This eliminates the merchant's leverage to negotiate with digital wallet purveyors over whether and the terms on which the merchant will accept the wallet.  However, under the Amended Settlement, merchants can choose not to accept any particular digital wallet, regardless of whether it contains Visa or Mastercard credit cards or debit cards, or is owned or operated by Visa or Mastercard.[58]  This will put the merchant in position to negotiate with digital-wallet purveyors, who will no longer be guaranteed merchants' acceptance by inclusion of a single Visa and Mastercard issuer.

66) *Honor-All-Cards Rules: Preferring Issuers.* As part of the Amended Settlement, the networks have agreed not to construe their Honor-All-Cards rules to prohibit certain merchant conduct that prefers one (or more) particular issuer's credit cards over others.  The Amended Settlement states the general principles governing issuer preferencing, and then identifies 19 specific circumstances that, the networks agree, shall be deemed to not violate the Honor-All-Cards rule or any other network rule.  We understand that the permissible circumstances were selected based on consultations with groups of merchants.  The circumstances include, for example, a merchant preferring a particular issuer (e.g., Chase

---

[57] *See* Capital One Shopping Research, *Digital Wallet Statistics* (July 23, 2025),
https://capitaloneshopping.com/research/digital-wallet-statistics/.

[58] Amended Settlement ¶¶ 34-36, 83-85.

Visa card) on a website landing page or having a dedicated check-out lane in a brick-and-mortar store.[59]

67) *Honor-All-Cards Rules: Pilot Programs*. One of the difficulties that merchants face in deciding whether or not to accept a particular Visa or Mastercard card is the potential for lost purchases from customers who prefer to use the not-accepted card type.  A merchant considering non-acceptance faces uncertainty about profitability; that is, whether the savings from not accepting (or surcharging) a network's costly credit cards will be less than or greater than the cost of lost sales that might result from not accepting them.  The current Honor-All-Cards rules force the merchant to make the accept/reject decision in the absence of good information about how many sales might be lost or how the merchant might mitigate them.  A merchant with multiple stores that wants to accept the network's credit cards must accept all of them and everywhere.

68) The Amended Settlement modifies the Honor-All-Cards rules to permit merchants to generate valuable data on the impact of non-acceptance without rejecting all of a network's credit cards.  The Amended Settlement requires the networks to permit a merchant to conduct non-acceptance testing in which, no more than once a year for a period not to exceed 180 days, the merchant can refuse acceptance of Visa or Mastercard credit cards at up to 20% of its stores operating under the same name.  Alternatively, if the merchant operates in at least five states, the merchant can reject particular cards in all outlets operating under the same name in no more than two states, if the outlets in those states account for no more than 50% of the merchant's outlets.[60]

69) With the reformed Honor-All-Cards rules, a merchant can craft a narrow pilot program to a particular category of credit cards, experimenting with, for example, non-acceptance of just a network's commercial credit cards or its premium credit cards, and in just a subset of stores.  A failed experiment involving a subset of sales is simply another business expense; the prospect of a failed experiment involving all of the networks' credit cards in all of its stores might be a potential disaster such that the merchant would not risk giving it a try.

---

[59] Amended Settlement ¶¶ 19, 68 and Appendix H.
[60] Amended Settlement ¶¶ 32, 81.

70) The data generated by well-designed experiments can be valuable to the merchant, who can then use the data to make a well-informed decision about whether and which credit cards to accept.  Or the merchant can use the data in negotiating better interchange rates from the networks, allowing the merchant to continue to accept all the cards, but at more competitive rates.

71) *Honor-All-Cards Rules: All-Outlets Reforms*.  The Amended Settlement requires the networks to modify their rules to clarify that merchants are permitted selectively to decline acceptance of credit cards at outlets operating under the same trade name or banner, regardless of whether the merchant accepts those cards at outlets operating under a different trade name or banner.[61]  The Amended Settlement requires Visa and Mastercard to clarify that their Honor-All-Cards rules apply only to stores using the same "banner," i.e., operating under the same brand name.[62]

72) This all-outlets reform can be very valuable to merchants that have stores geared towards different customer bases.  For example, it might be profitable not to accept a network's premium credit cards at stores catering to customers who value low prices, while accepting those cards may be profitable at higher-priced, service-oriented stores. The Amended Settlement's changes regarding the all-outlets rule ensure that merchants can differentiate acceptance by banner, thereby enhancing competition.

73) *Surcharging Reforms.*  The 2011 DOJ Consent Decree did not address the Visa and Mastercard rules that limit merchants' ability to directly charge customers for using high-cost credit cards.  The Amended Settlement makes major changes to the Visa and Mastercard rules to allow merchants substantially greater latitude to steer customers to low-cost payment means via charges for using high-cost credit cards.

74) *Surcharging Reforms: Level-Playing-Field.*  Through their so-called level-playing-field rules, Visa and Mastercard constrain merchants' ability to charge customers who use high-cost payment means.[63]  A merchant that accepts another credit card brand that limits

---

[61] Amended Settlement ¶¶ 31, 80.

[62] Amended Settlement ¶¶ 33, 82.

[63] *See* Visa Rule 5.5.1.6; Mastercard Rule 5.12.2. The Visa rule is formally titled "Similar Treatment of Visa Transactions." Like the misuse of the terms "surcharging" and "no discrimination," Visa and Mastercard use other

surcharging (e.g., American Express) must follow that brand's surcharging rules in surcharging Visa or Mastercard credit cards.[64]  The American Express rules prohibit the merchant from surcharging American Express credit cards unless the merchant also surcharges all "Other Payment Products"—a term that American Express defines to include debit cards.[65]  The Visa and Mastercard rules forbid surcharging debit cards.[66]  Thus, for merchants that accept American Express, the Visa and Mastercard level-playing-field rules effectively prohibit merchants from surcharging Visa and Mastercard credit cards.[67]

75) The Amended Settlement eliminates the level-playing-field rules, allowing merchants to surcharge Visa and/or Mastercard credit cards, at the brand (e.g., Visa) and/or product (e.g., Visa Signature) level regardless of whether the merchant is subject to any other network's rules (American Express) or surcharges any other cards.[68]

76) *Surcharging Reforms: Up to 3%.*  With the scope for surcharging effectively quadrupled from the elimination of the level-playing-field rules,[69] the Amended Settlement also improves merchants' surcharging tools.  The Amended Settlement provides that a merchant that accepts American Express can charge Visa and/or Mastercard credit cards up to the lesser of

---

distracting language that impairs the understanding of the workings of the credit-card markets. Visa and Mastercard's "level-playing-field" rules actually perpetuate a *tilted* playing field, requiring that merchants *discriminate* by setting prices unrelated to costs.

[64] *Id.*

[65] *See* American Express Merchant Regulations (Oct. 2025), Rule 3.2 ("Treatment of the American Express Brand") and Glossary (definition of "Other Payment Products"), https://www.americanexpress.com/content/dam/amex/us/merchant/new-merchant-regulations/Regs_EN.pdf.

[66] *See* Visa Rule 1.5.5.2, 5.5.1.9; Mastercard Rule 5.12.2.

[67] In summary: Visa and Mastercard's level-playing-field rules require the merchant to apply the American Express rule to the Visa or Mastercard transaction; the American Express rule prohibits surcharging the credit card unless the merchant also surcharges debit cards; and the Visa and Mastercard rules prohibit surcharging debit cards (and merchants generally do not want to surcharge debit cards, for which relatively low interchange rates are mostly set by regulation).

[68] The Amended Settlement removes the Visa and Mastercard ratification and enforcement of the American Express rules, but the Settlement cannot eliminate American Express contractual rules that themselves impede competition.  However, with the expanded incentive to steer Visa and Mastercard users, to the extent that the American Express rules interfere with that incentive, merchants can a) drop American Express (its share is down to about 19%), b) ignore the American Express rule, forcing American Express to enforce it, and c) challenge the American Express rule as anticompetitive and beyond the constraints of the Supreme Court's American Express decision.

[69] As noted above, more than 80% of merchants accepting Visa also accept American Express, leaving fewer than 20% that can surcharge.

the cost of acceptance or 3% regardless of whether its agreement with American Express prohibits surcharging its cards or whether the merchant surcharges American Express.[70]

77) Merchants can use surcharging to steer customers to lower-priced payment means.  Or they can surcharge to recover the cost of acceptance.  Notably, the Amended Settlement defines the "cost of acceptance" to include not only the interchange fee but also the fees levied by the networks on merchants and their acquiring banks (the banks that process the transactions for the merchants).[71]

78) *Surcharging Reforms: Identifying Card Products.*  The Amended Settlement improves merchants' ability to surcharge at the product level, i.e., to surcharge only certain high-cost cards, such as Visa Infinite or World Elite Mastercard.  Currently, the networks do not make available sufficient data in real time at the point-of-sale that informs merchants of the product (the type of card) that the customer is using and the applicable interchange rate.[72] The lack of such data effectively prevents some merchants from surcharging (or discounting) at the product level.  The Amended Settlement provides incentives for Visa and Mastercard to develop the technology necessary to provide that information by allowing merchants to surcharge up to 3%, regardless of their actual cost of acceptance, unless and until the networks make the actual cost information instantly available to merchants at the point of sale.[73]

79) *Surcharging Reforms: Simplifying the Rules.*  The Amended Settlement simplifies the surcharging rules.  As noted above, currently a merchant that accepts American Express and Visa or Mastercard must apply American Express's rules to the Visa or Mastercard transaction to determine whether surcharging Visa or Mastercard credit cards is permissible.

---

[70] *See* Amended Settlement ¶¶ 43(c), 92(c).

[71] *See* Amended Settlement ¶¶ 40(b)(ii), 41(b)(ii), 89(b)(ii), 90(b)(ii).

[72] Currently, each network provides only a "look up" service in which the customer can swipe (or dip or tap) her card once in order to determine the applicable product or interchange fee and then swipe again once the merchant decides how it wants to proceed.  Under the Amended Settlement, merchants can surcharge at the product level at 3%, regardless of their cost of acceptance, if the networks do not make sufficient product and interchange-fee information available at the point-of-sale with one swipe/dip/tap of the customer's card.  Amended Settlement ¶¶ 41(b)(ii), 90(b)(ii).

[73] *Id*.  This provision gives immediate relief to merchants, who can surcharge up to 3%, and incentivizes the networks to develop the technology to make the requisite data available to merchants at the point-of-sale.

Even if American Express's rules would permit a surcharge, the Visa and Mastercard rules require the merchant to compare the cost of the Visa or Mastercard transaction to that of the competitor.[74]  If the competitor brand's cost of acceptance to the merchant is equal to or greater than the cost of accepting Visa or Mastercard, the merchant can surcharge the Visa or Mastercard transaction only if the merchant surcharges them on conditions that are the same as (1) those under which the merchant would be allowed to surcharge the competitor's card, or (2) those under which the merchant actually surcharges the competitor's card.[75]  Under the Amended Settlement, regardless of whether the merchant accepts American Express or other competing cards, or how much the merchant pays for a customer's use of those cards, the merchant can surcharge Visa and/or Mastercard credit cards up to the cost of acceptance or 3%, whichever is less.

80) *Surcharging Reforms: Easing Notice and Disclosure.*  The Amended Settlement also modifies the surcharge notice and disclosure requirements, making it easier for merchants to surcharge.  The Amended Settlement expressly provides that the merchant can give the customer truthful information as to why the merchant is applying a charge for credit-card use, including that the merchant is surcharging because the customer's selected card costs the merchant more to accept than other forms of payment.[76]  Merchants are also expressly permitted to use a dual pricing scheme in which they disclose a regular purchase price and a different purchase price for using credit cards or a particular type or brand of credit card.[77]

81) *Surcharging Reforms: Prohibiting Retaliation.*  The Amended Settlement also adds provisions prohibiting the networks from retaliating against a merchant that surcharges or threatens to surcharge.[78]

---

[74] *See*, for example, Visa Rule 5.5.1.6.

[75] *Id.*

[76] Amended Settlement ¶¶ 42(b)m 91(b).  The Amended Settlement expressly provides that merchants may make "accurate statement[s] in words or substance that the merchant prefers or requests that a cardholder pay with a Credit Card or Debit Card that has a lower cost of acceptance to the merchant than the payment card presented for payment by the cardholder."  For example, the following notice will be permissible: "We impose a charge of 3% for the use of Visa and Mastercard premium credit cards because of the high costs those cards impose on us."

[77] Amended Settlement ¶¶ 42(d), 91(d).

[78] Amended Settlement ¶¶ 43(f), 92(f), 103.

82) *Discounting Reforms.*  Providing a discount or merchant-specific rewards for the customer's use of a particular credit card can be an especially attractive competitive tool for merchants by enhancing the merchant's relationships with its customers.  Unlike issuer-supplied rewards for card use, which cardholders view as being given by the networks or the banks (but are actually paid for by the merchants and their customers), cardholders will associate the discounts or merchant-specific rewards with the merchants.  And unlike many rewards, "discounts" on the purchases of the merchant's goods or services can have an immediate, known, quantifiable value.

83) The Amended Settlement requires Visa and Mastercard to keep in place the rule changes of the 2011 Consent Decree.  The 2011 Consent Decree allowed merchants to discount (or offer enhanced services) by card brand and/or by product, but it expired in July 2021.  While Visa and Mastercard have voluntarily maintained the rule changes, they are free to revert to the more onerous pre-2011-Consent-Decree terms at any time.  The Amended Settlement extends these rules changes for at least eight additional years.[79]

84) Moreover, the 2011 Consent Decree did not require Visa and Mastercard to allow a merchant to discount a particular *issuer's* cards (e.g., discount for use of a Chase Traditional Visa credit card).  Visa voluntarily permitted some issuer-level discounting, but Mastercard did not.  This limited merchants from unleashing what could be intense competition among the many banks that issue Visa and Mastercard credit cards to become a merchant's favored credit card issuer.  The Amended Settlement rectifies this problem, allowing merchant discounting at every level—brand, product, and/or *issuer*.  The Amended Settlement requires that Visa and Mastercard explicitly clarify in their rules that merchants may discount by issuer, as well as by brand and/or product.[80]  With the ability to discount a particular issuer's cards, merchants will be able to negotiate for discounted interchange rates with the major issuers in addition to the two networks.

85) *New "Value" Card.*  A major distortion in the current market is the significant compression between interchange rates on the networks' premium credit cards as compared to the rates

---

[79] Amended Settlement ¶¶ 18, 67.

[80] Amended Settlement ¶¶ 19, 68.

on their standard credit cards.  Presently, the gap between the average posted interchange rates on Visa and Mastercard standard consumer credit cards and premium consumer credit cards is ▮▮▮▮ bps.[81]  That relatively modest gap provides limited incentive for merchants to take advantage of the Amended Settlement's steering tools by, for example, discounting standard cards.  Indeed, such steering is profitable only if the discount (or the costs of other merchant-supplied cardholder benefits) is less than ▮▮ basis points, a discount that is unlikely to motivate cardholders to give up as much as ▮▮ bps in rewards.

86) The Amended Settlement responds to this economic reality by mandating that the networks lower the posted rates on standard consumer credit cards to a maximum of 125 bps.  This will ensure that most posted-rate consumer Visa and Mastercard credit card transactions will have a gap (at current rates) of more than 100 bps between the premium and standard cards (or that the networks substantially lower the premium rates).[82]

87) Together with the Amended Settlement's other reforms, the increased gap in merchant costs between standard and premium cards makes steering to standard consumer credit cards a powerful competitive tool.  It increases the merchant's economic incentive to steer and allows merchants to mute any adverse customer response by passing on some of the cost savings to the customer.  For example, merchants considering declining premium cards can ease customers' concerns by simultaneously offering them a discount on the merchant's goods/services at the point-of-sale, for using a standard credit card.  Creative merchants can design their own rewards plans that cater to their customers' preferences as revealed in purchase patterns.  Unlike rewards programs designed by and associated with issuing banks, merchant-customer specific "rewards" programs will solidify the merchant-customer relationship and change the culture of "free" credit-card rewards.[83]

---

[81] Calculated from Table 1.

[82] The lowest level of premium cards, Visa Signature and Mastercard World, have 2024 interchange of ▮▮ and ▮▮ bps respectively.  These cards account for ▮▮% and ▮▮% of Visa and Mastercard credit card transactions.  Visa Signature Preferred and Infinite and Mastercard World High Value and World Elite have interchange rates of ▮▮ bps and ▮▮ bps and account for ▮▮% and ▮▮% of Visa and Mastercard transaction volumes, respectively.  *See* Table 1.

[83] With merchants' increased incentives to offer merchant-specific rewards, there is some danger that increased firm loyalty results which would reduce price elasticities and therefore increase mark-ups.  Regardless, by allowing

88) When merchants are motivated to steer their customers to standard cards, issuers will be incentivized to compete to become a merchant's preferred "value" card, and to partner with merchants to steer customers to the issuer's standard card.  Such steering is profitable to both the banks and the merchants.[84]  Some creative bank(s) could embrace this opportunity to shift customers' focus away from nebulous, after-the-fact rewards to quantifiable, get-it-today discounts on the goods and services that they buy.  A merchant could promote the standard cards of a partner bank in return for an interchange fee that is lower than the 125-bps industrywide standard card rate.  To encourage use of the partner card, merchants could profitably pass-on some of their cost savings in merchant-designed rewards (e.g., "we offer quadruple loyalty points or a 1% cash discount when you use a Chase Value credit card.  Pick up an application from your cashier!").

89) The new competitive card has the potential to disrupt the "rewards" paradigm. Even with the 125-bps cap on standard-card interchange rates, an issuing bank will still receive a significantly higher total price for standard consumer credit cards than for premium consumer credit cards, about ▮ bps for standard consumer credit cards compared to ▮ bps for premium consumer credit cards.  As rewards become merchant-centric and merchant-variable, cardholders' perceptions of their banks offering "free" rewards for particular card usage will be changed to a realization that network/bank issued rewards have a cost.

90) *Increased Leverage in Negotiating Rates.*  Currently, about ▮% of Visa and Mastercard transactions are at negotiated, reduced credit-card interchange rates.[85]  These negotiated rates were obtained under the current onerous no-steering Merchant Restraints.  The

---

competition among merchants by their catering to their customers' preferences, we expect a more efficient result than that generated by issuing banks' control of rewards.

[84] The ability of merchants to discount an individual issuer's standard card and encourage customers to acquire such a card will encourage competition among the issuing banks. Data provided by Visa and Mastercard show that the standard cards have represented about ▮% of Visa and Mastercard posted rate consumer card transaction volume.  But that data also shows that standard cards are over ▮% of the outstanding consumer cards.  The merchants' and the issuing banks incentives to push the standard cards will create demand for banks to issue more of those cards or to promote their use.  Merchants can reach deals with an issuing bank to provide standard card interchange fees below the 125-bps cap in exchange for the merchant's encouraging its customers to apply for and use that bank's standard card.

[85] *See* Table 1.

limited leverage used by merchants obtaining rate reductions includes, for example, agreeing not to surcharge, agreeing to route increased debit transactions over Visa's or Mastercard's networks, guaranteeing credit-card and debit-card volumes, agreeing to sell Visa and Mastercard pre-paid cards, agreeing to limit acceptance of competing PIN debit cards, or agreeing to steer customers to Visa or Mastercard as the merchant's preferred card brand.

91) Even with the existing Merchant Restraints constraining merchants' leverage in negotiations with Visa, Mastercard, and card issuers, some merchants have nonetheless achieved substantial interchange rate reductions of about ▇ bps on average.[86]  With the Amended Settlement's rules relief, including the ability to decline acceptance of commercial credit cards and premium consumer credit cards and to steer to standard consumer credit cards, merchants that were already able to negotiate lower interchange rates will have even more leverage in future negotiations.  In addition, we anticipate that significantly more merchants, representing significant additional transaction volume, will have increased negotiating power with the more credible threat to surcharge, to limit acceptance, to partner for standard card deals, or to engage in any of the various steering means explained above.

92) *Merchant Buying Groups*.  Included among the entities that can take advantage of the Amended Settlement's newly created negotiating leverage are smaller merchants that band together in buying groups.  To date, merchants have not joined buying groups to press the networks or banks for discounts off the posted interchange rates.  The Merchant Restraints have ensured that merchant collectives have had little to bargain with—most merchants have not been able to credibly claim to be able to deliver (or withhold) increased transaction volume in exchange for better rates and so have had no reason to join a buying group (whose purpose is to deliver lower rates).

93) The Amended Settlement fundamentally changes that calculation.  Smaller merchants in a buying group will now have competitive tools necessary to negotiate for, and get, reduced rates.  And the merchant groups will be able to develop rewards programs tailored to the

---

[86] *See* Table 1.

types of customers whose merchants are in the group.  In short, while merchants have previously had the right to join a buying group, the Amended Settlement provides economic reasons to do so.

94) The Amended Settlement encourages the formation of buying groups by expressly requiring Visa and Mastercard to negotiate with them in good faith and providing a pathway to challenge any alleged failure of good faith.[87]  The Settlement also provides dedicated funds to educate merchants about buying groups and to facilitate their formation.[88]

95) *Merchant Education Program.*  The Amended Settlement also boosts steering by providing funds to educate merchants about the new competitive tools that the Settlement provides. In the current market environment, in which Visa and Mastercard have altered the competitive landscape through decades-long imposition of the Merchant Restraints, it will be important to prod the market towards a more competitive outcome.  The Amended Settlement therefore provides a $21 million fund for merchant education.

96) These funds may be used to inform and educate merchants on:  i) the benefits and use of merchant steering under the new rules, ii) how merchants can best use the new steering tools to motivate customers to use lower-cost payment methods, iii) how merchants can steer in states that restrict surcharging, iv) the benefits to merchants of joining merchant groups for negotiations with Visa and Mastercard, v) the value of threats of steering in negotiating lower interchange, and vi) how merchants might mitigate the adverse effects of steering by educating customers about the impact of high-cost cards on the prices of goods and services.[89]

97) *Relief in States with Surcharging Restrictions.*  Notwithstanding the expanded surcharging relief in the Amended Settlement, we understand that state laws in Connecticut, Maine, Massachusetts, and Puerto Rico purport to prohibit merchants in those states from

---

[87] Amended Settlement ¶¶ 45, 94. The Settlement provides that the Court will retain jurisdiction over the Settlement and will resolve any disputes over whether the networks have acted in good faith with respect to the buying-group negotiations. *Id.* ¶¶ 46, 95.

[88] The negotiated rates these groups achieve will count toward the mandated 10 bps systemwide rate reduction.

[89] Amended Settlement ¶¶ 56, 105.  More generally, these funds can be used for any purposes approved by the Court—with only lobbying, trade association activities, and disparagement of Visa, Mastercard, issuing banks, and card products explicitly precluded. *Id.*

surcharging credit card transactions.[90]  We are informed, however, that the no-surcharge statutes in those places are materially indistinguishable from the California, Florida, Texas, and Kansas statutes that courts have declared unconstitutional in recent years.[91]  Given the Amended Settlement's expansion of merchants' ability to surcharge, its elimination of the level-playing-field rules, and the educational funds explaining merchants' rights, merchants in Connecticut, Maine, Massachusetts, and Puerto Rico will now have a significant incentive to challenge the no-surcharge statutes in those states as well.[92]

98) With respect to New York, we understand that the statute requires that a merchant that wants to surcharge a credit-card transaction must post both the "regular" and the credit-card price for each particular item; posting the surcharge percent increase in price for all items is not sufficient.[93]  That is, the merchant must display the regular price for, say, Crest toothpaste ($4.00) and its price when bought with a credit card ($4.12), and do that for all items in the store that are surcharged.  A merchant may not post a sign simply stating that there is a 3% surcharge on all credit card purchases.

---

[90] *See, e.g.*, Credit Card Surcharge Guidance: A State-by-State Overview of Surcharging Laws, https://staxpayments.com/blog/credit-card-surcharge-guidance/ (a small number of additional states regulate the disclosure and amount of the surcharge).  We understand that in denying approval of the 2024 proposed settlement, the Court noted that Kansas and New Jersey impose various constraints on surcharging.  However, as of January 1, 2025, merchants in Kansas can legally add a surcharge to a credit card transaction, as long as they post notice of the surcharge at the point of sale or point of entry.  Kan. Stat. Ann. § 16a-2-403.  New Jersey also permits merchants to impose credit card surcharges, as long as the amount of the surcharge is not greater than the merchant's actual cost.  N.J. Stat. Ann. §§ 56:8-156.1, 56:8-156.2.  California and Minnesota recently passed hidden-fee and price-transparency statutes, but the attorneys general in both states have issued guidance stating that the new statutes do not apply to credit card surcharges (because credit card surcharges are not mandatory fees and can be reasonably avoided by paying with a different payment method, e.g., cash).  *See* State of California Department of Justice, Office of the Attorney General, *SB 478 – Hidden Fees*, https://oag.ca.gov/hiddenfees; The Office of the Minnesota Attorney General, *Frequently Asked Questions About Minnesota's New Price Transparency Law*, https://www.ag.state.mn.us/Price-Transparency/PriceTransparencyLaw_FAQ.pdf.

[91]  *See Italian Colors Rest. v. Becerra*, 878 F.3d 1165 (9th Cir. 2018) (California); *Dana's R.R. Supply v. Att'y Gen., Fla.*, 807 F.3d 1235 (11th Cir. 2015) (Florida); *Rowell v. Paxton*, 336 F. Supp. 3d 724 (W.D. Tex. 2018) (Texas); *CardX, LLC v. Schmidt*, 522 F. Supp. 3d 929 (D. Kan. 2021) (Kansas).

[92] Connecticut, Maine, Massachusetts, and Puerto Rico together comprise less than 4.5% of the U.S. population. *See* Annual Estimates of the Resident Population for the United States, Regions, States, District of Columbia, and Puerto Rico: April 1, 2020 to July 1, 2024 (NST-EST2024-POP), https://www.census.gov/data/tables/time-series/demo/popest/2020s-state-total.html (U.S. Census Bureau estimate as of July 1, 2024).

[93] N.Y. General Business Law § 518 ("Credit card surcharge notice requirement").

99) The Amended Settlement expressly permits merchants to surcharge (or discount) by using a dual-pricing system, such as required in New York.[94]  Moreover, our understanding is that recent technological advances, such as Electronic Shelf Labels, may make such pricing feasible, indeed relatively simple.[95]

100) In addition, much of the Amended Settlement's relief directly benefits merchants in restricted-surcharging states regardless of whether or to what extent they surcharge or use dual pricing.  Surcharging restrictions have no impact on the Honor-All-Cards relief, the ability to steer in different ways at different stores, and to conduct pilot non-acceptance programs.  These merchants will also benefit from the important discount-related relief, including the extension of the DOJ Consent Decree, the new ability to discount by issuer, and the new 125-bps standard card, which will enhance merchants' incentive to decline premium credit cards, to steer customers away from those cards by offering discounts, and to generate competition among issuers.  And they will also directly benefit from the 125-bps cap on standard credit cards and from the additional caps and mandated rate reductions discussed below.[96]

101) *Immediate Rate Relief*.  The Amended Settlement prohibits the networks from raising their posted rates from the March 2025 levels for five years, and each network must reduce its systemwide average effective interchange rate by 10 bps for five years.[97]  The rate relief also applies to merchants paying negotiated rates who must receive a proportional reduction on their negotiated rates.[98]  We address the rate relief in more detail below.

## VIII) Impact of the Amended Settlement

---

[94] Amended Settlement ¶¶ 42(d), 91(d).

[95] See Jennifer Williams, *Welcome to the Grocery Store Where Prices Change 100 Times a Day*, The Wall Street Journal (July 31, 2025), at R4, https://www.wsj.com/business/retail/surge-grocery-prices-electronic-shelf-labels-a3d47701?gaa_at=eafs; Jenn McMillen, *Walmart, Kroger and Whole Foods Use Digital Pricing: What Customers Should Know*, Forbes (Sept. 9, 2024), https://www.forbes.com/sites/jennmcmillen/2024/09/09/walmart-kroger-and-whole-foods-use-digital-pricing-what-customers-should-know.

[96] *See* ¶¶ 102, 104.

[97] The 125-bps cap on standard cards remains in effect for at least eight years.  The impact of the 125-bps cap is included in meeting the 10-bps overall rate reduction.

[98] For example, if the 10-bps mandated effective rate reduction is a reduction of 5% off the average effective systemwide rate (auditors will determine the denominator), a merchant that pays a negotiated rate of 100 bps must get reduction of 5 bps (5% * 100).

102) The Merchant Restraints have substantially impaired competition in the credit card services market on the merchant side for decades.  The reforms enacted by the Amended Settlement will help restore competitive conditions.  Exactly how the market will respond to the enhanced competition on the merchant side cannot be known with certainty, but the estimations below make clear that the potential benefits to customers and merchants are very large.

103) *Savings from Amended Settlement's Rate Relief.*  As shown in Table 2 (appended), the expected reduction in merchant interchange fees from the overall rollback of 10 bps from the March 2025 level is expected to be about $38 billion.  This represents an average reduction in the interchange rate of ███ bps and a ███ % reduction in the expected merchant interchange fees.

104) *Savings from Amended Settlement's Rules Relief.*  The Amended Settlement's reforms to the rules are expected to produce even larger savings.  Under the Amended Settlement, merchants can decline acceptance of Visa's and Mastercard's high-priced commercial cards; decline acceptance of their high-priced premium cards; surcharge those cards; discount the lower-priced cards; surcharge or discount more finely (e.g., surcharge/discount only Visa Infinite cards but not Visa Signature cards); decline digital wallets regardless of whether they contain the network's credit cards or debit cards; use dual pricing to differentiate credit cards at the brand, type (commercial, premium, standard), product, or issuer level; discount a particular issuer's credit cards; steer customers to a particular issuer's cards in the grey area between surcharging and discounting,[99] negotiate a deal to promote a particular issuer's standard credit cards; conduct non-acceptance pilot programs; use different steering methods in different stores; band together in buying groups to negotiate better deals; and do all of this regardless of whether the merchant accepts or surcharges American Express or other competitive credit cards.

105) There is no directly comparable benchmark to assess the likely competitive impact of such competition.  In broad terms, the Amended Settlement increases competitive pressures on

---

[99] See ¶ 66 above regarding merchants' preferring particular issuer cards in circumstance where, absent the Amended Settlement's relief, the networks' rules might be unclear as to whether the preference would be an impermissible issuer-level surcharge or a permissible issuer-level discount.

Visa and Mastercard in four ways: (a) more credible merchants' threats to surcharge; (b) enhanced ability to impose a surcharge; (c) more credible threats not to accept Visa or Mastercard premium consumer credit cards or their commercial credit cards; and d) not accepting the high-cost credit cards.

106) We note, moreover, that surcharging has become far more accepted and common, and that trend seems likely to continue. For example, in 2004, when oil prices rose above $40 per barrel in the United States, airlines added fuel surcharges to ticket prices.  Beginning in 2009, a number of localities began requiring grocery stores to impose surcharges for grocery bags.[100]  During the pandemic, many restaurants added service charges to their bills.[101]  In the credit card environment, state and local municipalities now commonly include an added fee for using a credit card.  Many gas stations and restaurants impose surcharges for use of credit cards.  It has become more common knowledge that credit card fees impose substantial costs on merchants, which they pass on to their customers.[102]  Many U.S. customers already encounter credit card surcharges—whether they are permissible under the network rules or not.[103]  Thus, it is possible, and perhaps even likely, that U.S. customers will be less resistant than in the past to surcharging and other steering mechanisms.

107) Currently, some merchants have negotiated rates applicable to commercial credit cards that are ████████ bps lower than the posted rates for commercial credit cards.  Given that commercial credit cards account for about ██% of Visa and Mastercard credit transaction volumes,[104] there are substantial savings available if merchants leverage their

---

[100] *See, e.g.*, National Conference of State Legislatures, *State Plastic Bag Legislation* (updated Feb. 8, 2021), https://www.ncsl.org/environment-and-natural-resources/state-plastic-bag-legislation.

[101] *See, e.g.*, Amy Balmuth, *What is a Service Charge at a Restaurant?*, SpotOn (July 29, 2024), https://www.spoton.com/blog/what-is-a-service-charge-at-a-restaurant/.

[102] *See, e.g.,* Kellogg Insight, *Who Pays for All Those Generous Credit-Card Rewards?* (Jan. 1, 2024), https://insight.kellogg.northwestern.edu/article/who-pays-generous-credit-card-rewards; Danielle Kay, *As Cash Fades, Small Retailers Embrace Efforts to Rein in Swipe Fees*, N.Y. Times (Nov. 30, 2024), https://www.nytimes.com/2024/11/30/business/swipe-fees-merchants.html.

[103] *See* Press Release, J.D. Power, *Many Small Businesses Add Card Payment Surcharges to Customer Purchases as Point-of-Sale Payment Methods Proliferate, J.D. Power Finds* (Jan. 14, 2025), https://www.jdpower.com/business/press-releases/2025-us-merchant-services-satisfaction-study.

[104] *See* Table 1.

right to not accept these cards unless the networks reduce their commercial credit card rates to more competitive levels.

108) About ▉% of Visa and Mastercard credit card transactions by purchase volume currently occur at negotiated interchange rates that are below the posted rates.[105] Even with the existing Merchant Restraints in place, which constrain merchants' leverage in negotiations with Visa, Mastercard, and issuers, merchants with negotiated rates nonetheless have achieved substantial interchange rate reductions of about ▉ bps on average.[106]

109) With the Amended Settlement's rules relief, including the ability to decline acceptance of commercial credit cards and premium consumer credit cards and to steer to standard consumer credit cards, merchants that were already able to negotiate lower interchange rates will have even more leverage in future negotiations. The Amended Settlement substantially increases the scope for surcharging, permitting merchants to effectively reduce their interchange rates on those transactions up to 300 bps. Other merchants can choose to decline the premium and commercial credit cards, shifting those sales to the standard cards or to even lower-priced payments means, saving 100 bps or more on those transactions. Still other merchants will leverage the ability to take one or both of those actions—alone or through a buying group—to join the ranks of merchants today whose average discount off the posted rates is ▉ bps.

110) The potential for the reforms of the Amended Settlement to result in a significant reduction in the supracompetitive Visa and Mastercard total price is clear. For example, if 10% of the network's transactions are surcharged 3%, the effective systemwide total price and net interchange rate will be reduced by 30 bps,[107] ▉ reduction in the supracompetitive component of the Visa/Mastercard total price. In addition, if 10% of the transactions volume were switched from premium cards to standard cards, this would reduce the total and merchant prices by over ▉ bps. If those transactions were instead switched to debit cards, this alone would result in a total price reduction of about ▉

---

[105] *See* Table 1.

[106] *See* Table 1.

[107] This holds rewards constant. See ¶¶ 118-122 below for a discussion of the impact of the reforms on rewards.

bps.  Switching 10% of posted rate transactions to negotiated rates would result in a ▮-bps reduction in the total price and the merchant price.  Switching transactions from commercial cards to standard cards or debit would yield additional price reductions.

111) The reforms are expected to save merchants hundreds of billions of dollars in interchange fees.  For example, if an average of only a 20-bps reduction in the interchange fees results from the reforms, merchants would save about $112 billion in interchange fees over the 8-year period of the Settlement.[108]  If the reforms reduced the merchant fees by 40 bps, the merchant savings would double to $224 billion.

112) The Amended Settlement will help to reshape merchant and customer expectations and actions.  Each merchant will use the competitive strategy that best fits its business and its customers.  The expected outcome is the use of combinations of the new steering opportunities leading to a total price much closer to a competitive level.  It is reasonable to expect that some combination of shifts in customer and merchant behavior will significantly reduce the gap between actual and more competitive total prices.

## IX) The Remaining Merchant Restraints

113) The Amended Settlement eliminates or substantially reforms nearly all of the Merchant Restraints, but not all of them.  The default interchange rates will remain; merchants will not be permitted to decline acceptance based on the issuer; and merchants will not be allowed to surcharge at the issuer level.  These remaining restraints must be evaluated in the context of their purposes and of the numerous other restraints that the Amended Settlement does eliminate.

114) *Default Interchange.*  The Amended Settlement does not prohibit the networks from continuing to set "default" interchange rates, i.e., the rates that will prevail in the absence of a specific agreement between a merchant (or a buying group of merchants) and the network.  While the default rate is justified with standard arguments over "free riding," and while critics of the default rate worry that it is anticompetitive, for the reasons we have

---

[108] We assume that, absent the Settlement, credit card transactions volumes would continue to grow at the historical rate of 10.2% respectively per year.  This implies total transaction volume 2026-2033 of $55.95 trillion. 20 bps multiplied by $55.95 trillion is $112 billion.

41

discussed above, the Amended Settlement has the potential to unleash competitive forces, likely making any anticompetitive effects of the default rate limited, perhaps even minimal, a conclusion consistent with opinions put forward by economists for other plaintiffs' groups previously in this litigation.[109]

115) *Issuer Level Honor-All-Cards and No Issuer Level Surcharging.*  The Amended Settlement leaves in place the Honor-All-Cards rule at the issuer level (i.e., merchants may not selectively refuse acceptance of a particular issuer's credit cards) and the prohibition on surcharging at the issuer level (i.e., merchants may not selectively surcharge only a particular issuer's credit cards).  Having "universal acceptance" (if a merchant accepts Visa, it will accept my Visa) undoubtedly provided significant benefit to cardholders as the networks evolved, allowing cardholders to carry one preferred credit card and receive one monthly bill.

116) The Amended Settlement enacts significant Honor-All-Cards reforms, permitting merchants to decline acceptance of commercial credit cards; decline acceptance of premium credit cards; decline acceptance of digital wallets that contain the network's cards; conduct pilot non-acceptance programs; and accept the networks' cards, or the permitted subsets of them, in some store banners but not others.  The Amended Settlement also provides many mechanisms for merchants to generate competition among issuers.  It permits merchants to discount by issuer; use dual pricing to steer by issuer; steer by issuer in the grey area between surcharging and discounting; and cut deals with an issuer to promote the new competitive "value" credit card.  Merchants will also have an unrestrained ability to discount and enhanced ability to surcharge (or selectively not accept premium cards) to steer customers to a new competitive card, and surcharge at the brand, type, and/or product level.  These steering tools provide merchants with many varied and powerful competitive tools to drive prices toward competitive levels independent of the ability to not accept cards at the issuer level.

---

[109] *See, e.g.,* Expert Report of Roy J. Epstein (Oct. 5, 2018) ¶ 186 ("[t]he Honor All Cards Rule would not be objectionable if surcharging were allowed").

42

117) The Amended Settlement's sweeping changes to the Merchant Restraints should, by themselves, suffice to ensure an increase in competition, significantly lowering costs to merchants, even with the retention of the restraints on default interchange, issuer-level acceptance and issuer-level surcharging.

**X) The Balance Between Interchange Fees and Rewards**

118) As noted, the Merchant Restraints have four principal anticompetitive effects: (a) a supracompetitive total price, (b) an inefficient balance between the merchant-side price and the cardholder-side price, (c) distorted relative prices for different types of cards, and (d) an inefficient and unfair subsidizing of customers who use high-priced cards.

119) With respect to total price, we noted a variety of benchmarks indicating that today the gap between the Visa and Mastercard actual total price and a "competitive" total price is conservatively estimated to be something ▮▮▮▮▮▮ bps.[110]  Under reasonable assumptions, the Amended Settlement's reforms will significantly reduce that gap.

120) After the Amended Settlement's reforms narrow the gap between the actual and benchmark competitive total prices, how much further the merchant price should drop will be determined by competition in the market.  With the more competitive total prices, the networks and issuers may respond to merchants' continuing competitive pressure by reducing rewards, raising cardholders' annual fees, raising interest rates, or achieving lower issuer profits.  The proper role of antitrust law is to eliminate restraints impeding competition and to let the market work.  It is not to dictate the outcome.

121) Under the Amended Settlement, issuer rewards levels will result from a more competitive process.  The goal is that cardholders make their payment means decisions facing prices that *more accurately* reflect the cost of the decision.  The Amended Settlement certainly moves the credit card service market in this direction.  If card users value their rewards more than the costs, then even with surcharging they will pay the "price" and receive their rewards.

---

[110] We refer to the payment mechanism functions of credit cards and not the credit functions.  In addition, by competitive price we refer to the expected price absent the anticompetitive Merchant Restraints.  Given the economies of scale for payment networks and the entrenched positions of Visa and Mastercard, reforming the Merchant Restraints will not lead to a classic competitive market with many sellers offering homogeneous goods.

But cardholders can make efficient decisions only if they face prices that reflect the costs of the rewards.

122) Today, customers who qualify for premium cards like their rewards; they see it as getting something for nothing.  But rewards are not free.  With the Amended Settlement, prices will better signal the costs of rewards.  Just as prices guide what accessories car buyers elect to include on a new car or what quality of steak to serve for dinner, prices and competition better guide the characteristics of credit card transactions.  If issuer-provided rewards turn out not to be viable, that indicates that the cost of the rewards exceeds their value.

## XI) Conclusion

123) The Amended Settlement has a variety of provisions designed to enhance competition in the marketplace for credit card services, encouraging customers to shift to lower cost/more efficient payments means, and allowing merchants to ameliorate the Visa and Mastercard supracompetitive total prices and interchange fees.  Savings to merchants will occur in multiple ways: (a) lower interchange fees charged to merchants on each card; (b) induced switching to lower-cost cards resulting from more effective steering mechanisms; and (c) recapture of some of the supracompetitive merchant charges through pricing (surcharging).  In addition, with lower expected Visa and Mastercard interchange fees, American Express will be subject to increased competitive pressures.  The backstop rate rollback and posted-rate caps ensure that even if competitive forces evolve only slowly, interchange fees will immediately come down, not only from where they are today but also, even more, from where they otherwise would be over the next five-plus years.

124) Competitive pressures unleashed on the merchant-side of the credit card services market should end the upward spiral of interchange fees.  With lower merchant costs of credit card usage, much of the merchant savings from the Amended Settlement are expected to be passed on to customers, who ultimately bear the cost of the inefficient and noncompetitive payments system we have today.  Some are likely to benefit more than others; the less well-off who today subsidize the more affluent's high-cost card use are the most likely to gain.

125) The Amended Settlement is the settlement of private litigation under antitrust principles.  It cannot be expected to achieve the results that a government can mandate through

44

legislation or regulation. Most developed countries have addressed the competitive problems in credit card markets by direct regulation of credit card merchant fees. Such a regulatory approach can simply dictate that "competitive" fees be charged. Here, we are concerned with opening the doors to market competition. The unfettering of steering opportunities available under the Amended Settlement, boosted by other provisions such as the reduction in the interchange on standard cards, provides that opportunity. In addition, the Settlement guarantees significant rate relief to all merchants while the enhanced competitive opportunities begin to take hold in the market.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.


_____                    _11/9/2025_____

Joseph E. Stiglitz, Ph.D.                           Date



_____                    _11/9/2025_____

Keith B. Leffler, Ph.D.                             Date

45

**TABLE 2 - ESTIMATED MERCHANT SAVINGS FROM RATE ROLLBACKS AND CAPS**

